## Exhibit 26

**Borrower Trust Opposition to Silver Appeal**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------

| | |
|---|---|
| | ) |
| In re: | ) Case No. 12-12020 (MG) |
| Residential Capital, LLC, | ) Chapter 11 |
| Debtor | ) Jointly Administered |
| | ) |
| Francine Silver, | ) |
| | ) |
| Appellant, | ) 14cv3630 (GBD) |
| | ) |
| - against - | ) |
| | ) |
| ResCap Borrower Claims Trust, | ) |
| | ) |
| Appellee | ) |
| | ) |

------------------------------------------------------------


**THE RESCAP BORROWER CLAIMS TRUST'S MEMORANDUM OF LAW
IN OPPOSITION TO FRANCINE SILVER'S APPEAL PURSUANT TO
BANKRUPTCY RULES 8001 AND 8003 AND 28 U.S.C. § 158(a)**

Case 1:14-cv-03636-GBD   Document 2   Filed 01/08/14   Page 2 of 24

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF JURISDICTION .......................................................................3

ISSUES PRESENTED .............................................................................................3

STANDARD OF REVIEW .......................................................................................3

STATEMENT OF THE CASE ................................................................................4

    A.    The Chapter 11 Cases ...............................................................4

    B.    The Appeal ...................................................................................7

ARGUMENT ...........................................................................................................8

    A.    The Orders Should Be Affirmed ..........................................8

    B.    The Appeal Was Improper and Should Be Denied ...............12

        (i)    The Appellant's Appeal Was Filed in Improper Form...........12

        (ii)    The Orders Are Not Final Orders.............................13

        (iii)    The Appeal Should Not Be Granted by the District Court Under 28 U.S.C .........................................................14

    C.    Judge Glenn's Impartiality Is Without Question................17

    D.    The Appellant Received Due Process ..................................19

CONCLUSION ......................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACC Bondholder Grp. V. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.),*
    367 B.R. 84, 90-91 (S.D.N.Y. 2007) ...................................................................... 3

*Analect LLC v. Fifth Third Bancorp,*
    No. 06-cv-891 (JFB), 2009 WL 2568540 (E.D.N.Y. Aug. 19, 2009) .................................... 16

*Bankr. Servs., Inc. v. Ernst & Young LLP (In re CBI Holding Co.),*
    529 F.3d 432, 449 (2d Cir. 2008) ........................................................................ 3

*Cadles of Grassy Meadows II, LLC v. St. Clair (In re St. Clair),*
    No. 13-mc-1057 (SJF), 2014 U.S. Dist. LEXIS 8615 (E.D.N.Y. Jan. 21, 2014) .................... 15

*City of N.Y. v. Mickalis Pawn Shop, LLC,*
    624 F.3d 114 (2d Cir. 2001) ........................................................................... 11

*Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP (In re Coudert Bros. LLP
    Law Firm Adversary Proceedings),*
    447 B.R. 706 (S.D.N.Y. 2011) .......................................................................... 15

*In re Lyondell Chem. Co.,*
    No. 11-MC-387 (JPO), 2012 WL 163192 (S.D.N.Y. Jan. 18, 2012) .............................. 13, 15

*Law Debenture Trust Co. of N.Y. v. Calpine Corp. (In re Calpine Corp.),*
    356 B.R. 585 (S.D.N.Y. 2007) .......................................................................... 15

*Luke Oil Co. v. SemCrude, L.P. (In re SemCrude, L.P.),*
    407 B.R. 553 (D. Del. 2009) ............................................................................. 15

*MCI Worldcom Commc'ns v. Commc'ns Network Int'l, Ltd. (In re Worldcom, Inc.),*
    No. 02-13533 (AJG), 2006 WL 3592954 (S.D.N.Y. Dec. 7, 2006) .................................... 15

*McLaughlin Keough, et al. v. 217 Canner Assocs. (In re Greenwich Sentry, L.P.),*
    484 B.R. 567 (S.D.N.Y. 2012), *aff'd*, 534 Fed. App'x. 77 (2d Cir. 2013) .......................... 1

*Shimer v. Fugazy Express, Inc. (In re Fugazy Express, Inc.),*
    982 F.2d 769 (2d Cir. 1992) ............................................................................. 13

*Travelers Indem. Co. v. Baily,*
    557 U.S. 137 (2009) ..................................................................................... 19

*United States v. U.S. Gypsum Co.,*
    333 U.S. 364, 395 (1948) ................................................................................ 3

Case 1:14-cv-03635-GBD    Document 2    Filed 01/06/14    Page 8 of 24

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**STATUTES**

11 U.S.C. § 502(a) ........................................................................................................... 9

28 U.S.C. § 158(a) ............................................................................................ 12, 13, 14

28 U.S.C. § 1292(b) ........................................................................................... 2, 15, 16

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 3007(a) ................................................................................................ 9

Fed. R. Bankr. P. 8001(a) ......................................................................................... 2, 13

Fed. R. Bankr. P. 8003 .................................................................................................. 13

Fed. R. Bankr. P. 8013 .................................................................................................... 4

M.D.N.C.L.R. 15(k) ...................................................................................................... 10

N.D.N.Y.L.R. 56.2 ........................................................................................................ 10

N.Y.L.R. Civ. P. 55.2 .................................................................................................... 10

N.Y.L.R. Civ. P. 56.1 .................................................................................................... 10

Appellee, the ResCap Borrower Claims Trust (the "<u>Borrower Trust</u>"), established pursuant to the terms of the Confirmed Plan (defined below) in the above-captioned Chapter 11 cases (the "<u>Chapter 11 Cases</u>"), as successor in interest to the above-captioned debtors (collectively, the "<u>Debtors</u>") with respect to Borrower Claims,[1] by and through its undersigned counsel, hereby files the appellee's memorandum of law in opposition (the "<u>Objection</u>") to *Pro Se Appeal Brief by Francine Silver Regarding Allowed Claim # 61 Against GMAC Mortgage*, Case No. 14-cv-03630-GBD [Docket No. 6] (the "<u>Appeal Brief</u>"), interposed by Francine Silver (the "<u>Appellant</u>"), pursuant to Rules 8001 and 8003 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Section 158(a) of title 28 of the United States Code.  In support of the Objection, the Borrower Trust respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Appeal is centered on whether the Bankruptcy Court erred in denying the Appellant's request for immediate payment on her Claim.  Should the District Court deem the Appeal properly submitted, it must evaluate whether the Bankruptcy Court correctly interpreted the Confirmed Plan.  While issues concerning the interpretation of a Chapter 11 plan, such as the Confirmed Plan in the Chapter 11 Cases, are issues that, if appealed, are properly heard before

---

[1]    As defined in the Confirmed Plan filed in the Chapter 11 Cases, "<u>Borrower Claims</u>" means:

(i) Claims of a Borrower arising from or relating to any alleged act or omission or any other basis of liability of any Debtor (or any predecessor) in connection with the origination, sale, and/or servicing of a mortgage loan originated, sold, consolidated, purchased, and/or serviced by any Debtor, (ii) Claims filed for or on behalf of a Borrower by such Person's attorney or agent, including as part of a proof of claim filed on behalf of a putative class of Borrowers, and (iii) claims that have become Allowed as a result of settlement of Borrower litigation commenced against Ally and the Debtors. For the avoidance of doubt, Borrower Claims shall include Allowed Claims held by the Kessler Class Claimants (to the extent that the Kessler Class Claimants are certified as a class action for settlement or allowance purposes), and shall not include the: (a) Senior Unsecured Notes Claims; (b) Junior Secured Notes Claims; (c) RMBS Trust Claims; (d) Private Securities Claims; (e) General Unsecured Claims; (f) General Unsecured Convenience Claims; or (g) Intercompany Balances. For the further avoidance of doubt, no Claim described in subsection (ii) hereof shall be considered an Allowed Borrower Claim unless such Claim is either certified under Bankruptcy Rule 7023 or by Final Order for purposes of settlement or allowance.

*See* Confirmed Plan, Art. I.A.40.

the District Court (*see, e.g.*, *McLaughlin Keough, et al. v. 217 Canner Assocs. (In re Greenwich Sentry, L.P.)*, 484 B.R. 567 (S.D.N.Y. 2012), *aff'd*, 534 Fed. App'x. 77 (2d Cir. 2013) (where district court reviewed and upheld the bankruptcy court's interpretation of the plan of reorganization)), there are several deficiencies with the Appeal.[2]

2.       The first is the form in which the Appeal was taken: because the Orders at issue in the Appeal are interlocutory, the Appellant was first required to file a motion with the Bankruptcy Court seeking authority to file the Appeal pursuant to 28 U.S.C. § 158(a)(3) and Bankruptcy Rule 8001(b).  Instead, the Appellant simply filed the Notice of Appeal with both the Bankruptcy Court and the District Court, and failed to use the Official Bankruptcy Form to submit the Appeal.

3.       Second, in light of the interlocutory nature of the Orders, the reason for the Appeal – that the Bankruptcy Court's ruling was incorrect in denying the Appellant's request for immediate payment on her Claim in the Chapter 11 Cases – is insufficient to warrant the District Court's consideration of the Appeal.  The Appeal neither contends that the Orders involve a controlling question of law as to which there is a substantial ground for difference of opinion, or that an immediate appeal from the order may materially advance the ultimate termination of the litigation.  *See* 28 U.S.C. § 1292(b).

4.       Lastly, the Appellant makes unsubstantiated, meritless and conclusory allegations that call into question Judge Glenn's impartiality in entering the Orders, and further asserts that the Appellant was denied due process.  These allegations are not the proper subject of an appeal.

5.       For the reasons set forth herein, the decisions of the Bankruptcy Court should be affirmed, and the Appeal should be dismissed.

---

[2]       Capitalized terms that are undefined in the Preliminary Statement shall have the meanings ascribed to such terms in the Objection below.

ny-1162993

## STATEMENT OF JURISDICTION

6.      This Court is vested with jurisdiction over the Orders of the Bankruptcy Court under 28 U.S.C. §§ 158(a).

## ISSUES PRESENTED

7.      The statement of issues presented on appeal, as provided in the Appeal Brief, include:

  a.  whether the Bankruptcy Court made an error in not issuing a default judgment on Appellant's Motion for Payment;

  b.  whether Judge Glenn was impartial and should have disqualified himself;

  c.  whether Judge Glenn's arguments and bases for his decisions lack any merit and should be disregarded; and

  d.  whether Appellant was denied due process.

*See* Appeal Brief at 3.

## STANDARD OF REVIEW

8.      Bankruptcy Rule 8013 provides that a district court conducting appellate review may "affirm, modify, or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings."  Fed. R. Bank. P. 8013.  A district court reviews the bankruptcy court's findings of fact for clear error and applies *de novo* review to its conclusions of law.  *Bankr. Servs., Inc. v. Ernst & Young LLP (In re CBI Holding Co.)*, 529 F.3d 432, 449 (2d Cir. 2008); *ACC Bondholder Grp. V. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 367 B.R. 84, 90-91 (S.D.N.Y. 2007).  A factual finding is not clearly erroneous unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

ny-1162993

## STATEMENT OF THE CASE

### A.    The Chapter 11 Cases

9.    On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").   On the Petition Date, the Bankruptcy Court entered an order jointly administering the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

10.    On June 4, 2012, the Appellant filed a $3 million proof of claim as a general unsecured claim against Debtor Residential Capital, LLC, designated as Claim No. 61 (the "Claim"), citing "Mortgage litigation, fraud, [and] unjust enrichment" as grounds for the Claim. Through the *Order Granting Debtors' Thirty-Eighth Omnibus Objection to Claims (Wrong Debtor Borrower Claims)* (Case No. 12-12020 (MG), Docket No. 5898), the Bankruptcy Court redesignated the Claim as one against Debtor GMAC Mortgage, LLC.  The Debtors' right to object to the Claim on any and all bases was expressly preserved by this order.

11.    On December 11, 2013, the Bankruptcy Court entered an *Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* (the "Confirmation Order") approving the terms of the Chapter 11 plan, as amended (the "Confirmed Plan"), filed in these Chapter 11 Cases (Case No. 12-12020 (MG), Docket No. 6065).  Copies of the Confirmation Order and Confirmed Plan are annexed hereto as Exhibit A.

12.    On December 17, 2013, the Effective Date (as defined in the Confirmed Plan) of the Plan occurred, and, among other things, the Borrower Trust was established (Case No. 12-

4

12020 (MG), Docket No. 6137).  The Debtors did not object to the Appellant's Claim before the Bankruptcy Court issued the Confirmation Order.

13.     The Confirmed Plan provides for the creation and implementation of the Borrower Trust, which is established for the benefit of Borrowers[3] who filed Borrower Claims to the extent such claims are ultimately allowed either through settlement by the Trustee for the Borrower Trust or pursuant to an Order of the Bankruptcy Court.  *See* Confirmed Plan, Art. IV.F. The Borrower Trust was established to, among other things, "(i) direct the processing, liquidation and payment of the Allowed Borrower Claims in accordance with the Confirmed Plan, and the distribution procedures established under the Borrower Claims Trust Agreement, and (ii) preserve, hold, and manage the assets of the Borrower Claims Trust for use in satisfying Allowed Borrower Claims."[4]  *See id.*

14.     The Confirmed Plan provides a timeframe by which the Borrower Trust shall object to any proof of claim asserted by a Borrower filed in the Chapter 11 Cases.  The Confirmed Plan originally granted the Liquidating Trust and the Borrower Trust 270 days after the Effective Date to object to claims – which originally expired on September 15, 2014[5] – or

---

[33]   The term "Borrower" means an individual whose current or former mortgage loan was originated, serviced, sold, consolidated, or owned by any of the Debtors.  *See* Confirmed Plan, Art. I.A.38.

[4]   The Confirmed Plan also provides for the creation and implementation of the ResCap Liquidating Trust (the "Liquidating Trust"), which, among other things, is "authorized to make distributions and other payments in accordance with the Plan and the Liquidating Trust Agreement" and is responsible for the wind down of the affairs of the Debtors' estates.  *See* Confirmed Plan, Art. VI.A-D; *see also* Confirmation Order ¶ 22. Among other things, the Liquidating Trust is responsible for the reconciliation and payment of general unsecured claims filed by non-Borrowers.  Pursuant to the Confirmation Order and the Plan, the Liquidating Trust was vested with broad authority over the post-confirmation liquidation and distribution of the Debtors' assets.  *See generally*, Confirmation Order ¶¶ 26, 30, 48; Confirmed Plan, Art. VI.

[5]   Specifically, the Confirmed Plan provides that this "Claims Objection Deadline" is either "(i) two hundred seventy (270) days following the Effective Date or (ii) such other later date the Bankruptcy Court may establish upon a motion by the Liquidating Trust, which motion may be approved without a hearing and without notice to any party."  *See* Confirmed Plan, Art. I.A.54.

Pursuant to Article I, Section C. of the Confirmed Plan, this date accounted for the application of Bankruptcy Rule 9006(a) to compute any period of time prescribed or allowed in the Confirmed Plan.  Since 270 days

Case 1:14-cv-03636-GBD   Document 21   Filed 11/06/14   Page 20 of 24

alternatively, any later date set by the Court following a motion from the Liquidating Trust.  *See* Confirmed Plan, Art I.A.54.  On August 26, 2014, upon the Liquidating Trust's *Motion to Extend the Date by which Objections to Claims Must Be Filed* (Case No. 12-12020 (MG) Docket No. 7306), to which the Borrower Trust filed a reply in support thereof (*see* Case No. 12-12020 (MG) Docket No. 7406), the Bankruptcy Court entered an order extending the deadline by which claim objections must be filed by either the Liquidating Trust or the Borrower Trust to **June 15, 2015** (Case No. 12-12020 (MG) Docket No. 7445) (the "Claims Objection Order").  The Appellant did not object to the motion seeking an extension of the Claims Objection Deadline.

15.     Therefore, all unresolved proofs of claim are still subject to the claims reconciliation and objection process and may become the subject of an objection by either the Liquidating Trust or the Borrower Trust.  Borrowers are only entitled to receive payment on their claims from the Borrower Trust in the event that such claim is ultimately allowed by the Borrower Trust or by a final order of the Bankruptcy Court.  *See generally*, Confirmed Plan, Art. IV.F.

16.     On March 7, 2014, the Appellant filed the *Pro Se Motion by Francine Silver for Payment of Claim #61* (Case No. 12-12020 (MG), Docket Nos. 6639, 6690) (the "Motion for Payment") seeking immediate payment from the Borrower Trust on account of her Claim, which the Appellant asserted was allowed by virtue of the Debtors not objecting to it prior to the Effective Date.  On March 26, 2014, the Bankruptcy Court denied the Motion for Payment (Case No. 12-12020 (MG), Docket No. 6706).

17.     On April 9, 2014, the Appellant filed a motion for reconsideration of the order denying her request for immediate payment on her Claim (Case No. 12-12020 (MG), Docket No.

---

following the Effective Date fell on Saturday, September 13, 2014, the Claims Objection Period continued to run until the next day that was not a weekend day or holiday, *i.e.*, Monday, September 15, 2014.

6774) (the "Motion for Reconsideration"). In the Motion for Reconsideration, the Appellant relied primarily on arguments made in the Motion for Payment, arguments that had already been rejected by the Bankruptcy Court. On April 24, 2014, the Bankruptcy Court denied the Motion for Reconsideration (Case No. 12-12020 (MG), Docket No. 6818) (together with Docket No. 6706, the "Orders"). The Orders are annexed hereto as Exhibit B.

**B.    The Appeal**

18.    On April 24, 2014, the Appellant filed a notice of appeal (the "Notice of Appeal") of the Orders with the United States District Court for the Southern District of New York (the "District Court") (Case No. 14-cv-03630-GBD, Docket No. 1; Case No. 12-12020 (MG), Docket No. 6820) (the "Appeal"). The Notice of Appeal is annexed hereto as Exhibit C. On June 2, 2014, the Appellant filed the Appeal Brief in support of the Appeal (Case No. 14-cv-03630-GBD, Docket No. 6).

19.    On May 23, 2014, the District Court entered a scheduling order for the Appeal setting deadlines by which the Appellant and the Borrower Trust were required to submit their respective memorandum of law regarding the Appeal (Case No. 14-cv-03630-GBD, Docket No. 5). The Borrower Trust, as the appellee, has until November 6, 2014 to file its opposition to Appellant's memorandum of law in support of her appeal, and the Appellant has until February 5, 2015 to file a reply. *See id.*

20.    On June 5, 2014, the Appellant filed a motion with the District Court seeking to certify the Appeal to the Second Circuit (Case No. 14-cv-03630-GBD, Docket No. 8).

21.    On June 19, 2014, the Appellant filed a *Motion for Default Judgment* (Case No. 14-cv-03630-GBD, Docket No. 9) (the "Default Motion"), asserting that the Debtors failed to timely respond to Appellant's memorandum of law in support of the Appeal to the district court.

7

22.     On July 7, 2014, the Borrower Trust filed a letter to the District Court, dated July 3, 2014, in response to the Default Motion (Case No. 14-cv-03630-GBD, Docket No. 15).

23.     On July 9, 2014, the District Court entered an order denying both the Default Motion and the Appellant's motion seeking direct certification of the Appeal (Case No. 14-cv-03630-GBD, Docket No. 17) (the "District Court Order").

24.     On July 23, 2014, the Appellant filed a *Notice of Appeal in a Civil Case* and a *Memorandum of Law in Support of Appeal* (2d Cir. Case No. 14-2664, Docket No. 1; Case No. 14-cv-03630-GBD, Docket No. 18) the United States Court of Appeals for the Second Circuit (the "Second Circuit"), seeking to appeal the District Court Order.  The appeal in the Second Circuit remains pending.

## ARGUMENT

### A.     The Orders Should Be Affirmed

25.     The Confirmed Plan grants the Borrower Trust the right to object to the claim by the Claims Objection Deadline, as modified.  The Appellant's disagreement with the Borrower Trust and the Bankruptcy Court over the meaning of Confirmed Plan's provisions and contention that they are both inconsistent and incorrect reflects the Appellant's misunderstanding of the Confirmed Plan's terms and rights provided to the Borrower Trust (*see* Appeal Brief at 6, 22-24, asserting that the Claim met the Confirmed Plan's definition "of being an 'allowed' claim). Under the Confirmed Plan, the Borrower Trust retains the right to object to all or any part of the Borrower claims pending against the Debtors. *See* Confirmed Plan, Art. IV.F.  To date, the Borrower Trust has not yet made a final determination with respect to the Claim.  Although Bankruptcy Rule 3003(c)(3) provides that the court shall fix the time within which proofs of claim must be filed in a Chapter 11 case, there is no requirement in the Bankruptcy Code or Bankruptcy Rules that the Borrower Trust must object to claims by a date certain in their Chapter

11 Cases.  *See, e.g.*, 11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest … objects.") (no deadline specified for objection); Bankruptcy Rule 3007(a) ("An objection to the allowance of a claim shall be in writing and filed. A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant, the debtor or debtor in possession, and the trustee at least 30 days prior to the hearing.") (no deadline specified for objection).[6]  The Confirmed Plan set a deadline, as extended by the Claims Objection Order, by which the Liquidating Trust and the Borrower Trust shall file objections to claims.  That deadline, June 15, 2015, has not yet passed.

26.    The Borrower Trust continues to evaluate its potential exposure to the remaining population of individual Borrower Claims to which no objection has yet been filed, and the Appellant's Claim is a part of that population.  Collectively, the Borrower Trust and the Debtors have filed scores of claims objections since May of 2013 and following the Confirmed Plan's Effective Date, but there remains several hundred Borrower Claims, including the Claim filed by the Appellant, which the Borrower Trust needs to evaluate in order to determine whether such claims should be allowed (as filed), allowed in a reduced amount, or disallowed in their entirety. To the extent the Borrower Trust believes such claims shall be reduced or expunged, absent the consent of the claimant, it will need to prepare, file and prosecute appropriate objections.

27.    Pursuant to the Claims Objection Order and the Confirmed Plan, the Borrower Trust's Claims Objection Deadline has been extended from September 15, 2014 to June 15, 2015.  *See* Claims Objection Order at 5; *see also* Confirmed Plan at Art. I.A.54.  If and when the

---

[6]    On or about January 27, 2014, Appellant filed two separate requests for payment of administrative expense claims purportedly based on Appellant's assertions set forth in the Claims and subsequently the Motion (Case No. 12-12020 (MG), Docket Nos. 6401, 6402).  Although Appellant provides no support for such requests, the Liquidating Trust, the Debtors and Borrower Trust reserve all rights with respect to such requests and such requests will be addressed by an appropriate response before the Bankruptcy Court.

9

Borrower Trust ultimately seeks to object to the Claim, the Appellant will receive notice of any action the Borrower Trust intends to take with respect to the Claim and, like every other creditor, will be given an opportunity to respond. Accordingly, there was no reason or basis for the Bankruptcy Court to grant the relief requested in the Motion, particularly given that the Borrower Trust has ample time in which to conduct its analysis and make its determination as to the treatment of the Claim in the Chapter 11 Cases.

28. The Appellant contends that a default judgment is warranted because the Borrower Trust's non-responsiveness amounts to an admission of all statements contained in the aforementioned motions. However, the Appellant's arguments that a default judgment should have been entered against the Debtors "and was denied in error by the [Bankruptcy] Court" (*see* Appeal Brief at 6-10) are not supported by any factual or legal basis. While the Appellant cites to numerous rules and procedures,[7] these references generally are inapplicable[8] to the matter before the Bankruptcy Court, and now the District Court, and they do not support the Appellant's statements that a default judgment in her favor is the only reasonable and lawful outcome due to the Borrower Trust's lack of response to either the Motion for Payment or the Motion for Reconsideration. The Bankruptcy Court was not precluded from issuing, *sua sponte*, the Orders, particularly where the court has already ruled on the matter of whether immediate payment on a

---

[7]    The Appellant cites to the following authorities, among others (listed as referenced by the Appellant in the Appeal Brief): (i) Local Civil Rule 55.2, (ii) Rule 12 of the Federal Rules of Civil Procedure, (iii) Local Rule 15(k) Middle District of North Carolina, (iv) *Cabassa v. Smith, et al.*, Case No. 9:08cv480, (v) N.D.N.Y.L.R. 56.2, (vi) J.P.M.L. Rules of Procedure 6.1(c), (vii) Case 9:03-cv-01256-LES-GJD Document 69 Filed 12/09/2005; (viii) N.D.N.Y.L.R. 7.1(b)(3); and (ix) Local Rule 56.1, *et cetera*.

[8]    For instance, certain of the rules cited by the Appellant relate to motions for summary judgment (*see, e.g.*, N.D.N.Y.L.R. 56.2 provides, in pertinent part: "When moving for summary judgment against a pro se litigant, the moving party shall inform the pro se litigant of the consequences of failing to respond to the summary judgment motion." N.D.N.Y.L.R. 56.2; Local Civil Rules 55.2 and 56.1). Other rules are simply not relevant (*see, e.g.*, Local Rule 15(k) Middle District of North Carolina).

ny-1162993

Case 1:14-cv-03036-GBD   Document 21   Filed 11/06/14   Page 16 of 24

claim is warranted when the claim has not yet been deemed "allowed."[9] *See, e.g.*, *City of N.Y. v. Mickalis Pawn Shop, LLC*, 624 F.3d 114, 137 (2d Cir. 2001) (supporting the proposition that even if a defendant fails to answer allegations, "prior to entering default judgment, a district court is 'required to determine whether the [plaintiff's] allegations establish [the defendant's] liability as a matter of law.'") (citing *Finkel v. Romanowicz*, 577 F.3d 79, 84 n.6 (2d Cir. 2009)). In the context of the Chapter 11 Cases, these motions are not, themselves, of the nature of claims or allegations that typically comprise a plaintiff's complaint against a defendant, where a default in responding would serve as an admission of all well-pleaded allegations. The Appellant's motions were requests for immediate payment on the Claim, a claim that – as discussed above – remains subject to the ongoing claims reconciliation and objection process being administered, in part, by the Borrower Trust.

29.      Moreover, prior to the Appellant's filing of the Motion for Payment, a number of other claimants in the Chapter 11 Cases sought immediate payment on account of their filed claims, both prior and subsequent to the Effective Date. On each occasion, the Bankruptcy Court, without making a determination as to the merits of the filed claims, denied such request for immediate payment, finding that the Debtors or the Borrower Trust, as applicable, was not required to make such a payment unless and until the claim ultimately was deemed an "allowed" claim.[10] In fact, in response to these motions requesting payment, the Borrower Trust received permission from the Bankruptcy Court to file the *Notice to Holders of Borrower Claims Regarding Requests for Distributions on Account of Borrower Claims* (Case No. 12-12020 (MG), Docket No. 6852-1), dated May 2, 2014, in an effort to address any pending or future

---

[9]      *See infra* note 10.

[10]     *See, e.g.*, Order Sustaining Objection to Motions of Karen Michele Rozier for Payment on Claims, *In re Residential Capital, LLC, et al.*, No. 12-12020 [Docket No. 6519] (Bankr. S.D.N.Y. Feb. 26, 2014); Order Denying Joint Motion of Basic Life Resources and Pamela Z. Hill for Emergency Payment of Claims, *In re Residential Capital, LLC, et al.*, No. 12-12020 [Docket No. 2645] (Bankr. S.D.N.Y. Jan. 16, 2013).

ny-1162993

Case 1:14-cv-03636-GBD   Document 21   Filed 11/06/14   Page 18 of 24

Borrower request for distributions submitted on account of their claims asserted against the Debtors.

30.     Accordingly, based on these reasons, the Orders should be upheld, and the Appeal should be dismissed.

### B.    The Appeal Was Improper and Should Be Denied

#### (i)    *The Appellant's Appeal Was Filed in Improper Form*

31.     Official Bankruptcy Form B17, titled "Notice of Appeal under 28 U.S.C. § 158(a) or (b) from a Judgment, Order or Decree of a Bankruptcy Court" (the "Form"),[11] is the form a party may use to exercise their right to have an original bankruptcy decision reexamined.  As provided in the instructions to the Form, the *right* to appeal a judgment, order or decree only exists where that judgment, order or decree is "final," meaning that it finally disposes of a matter before the court.  28 U.S.C. § 158(a)(1).  All other orders and decrees, such as the Orders at issue here (as discussed below), are interlocutory, meaning that they are provisional decisions on a specific issue or matter but not a final decision in the entire controversy between the parties.

32.     As an initial matter, the Appellant used the wrong form for her Notice of Appeal, and should have completed and filed Official Form B17 provided by the Bankruptcy Court to file the Notice of Appeal pursuant to 28 U.S.C. § 158(a).  Furthermore, it is not clear who is the designated counterparty to the Appeal, as the Appellant does not specify which of the two successor entities of the post-effective date Debtors – the Liquidating Trust or the Borrower Trust – should be the responsive party.  Nonetheless, because the Appellant is a Borrower as such term is defined in the Confirmed Plan, the Borrower Trust has assumed the role of the responding party.

---

[11]    *See* Bankruptcy Forms, *available at* http://www.uscourts.gov/FormsAndFees/Forms/BankruptcyForms.aspx (last visited Nov. 5, 2014).

33.     The reference to appeals under subsection (a) of section 158, by its terms, encompasses appeals arising under section 158(a)(3).  Under section 158(a)(3) of title 28 of the U.S. Code, interlocutory appeals may be made only with "leave of the court," thus making the District Court a gate-keeper that ensures that appeals from the Bankruptcy Court's interlocutory orders are not granted where improperly sought.  While this does not speak to the merits of the appeal, the District Court may dismiss the appeal for its failure to comply with the proper procedures.  *See* Fed. R. Bankr. P. 8001(a).  As demonstrated herein, the Orders are interlocutory in nature, and therefore, the Appellant was obligated to file a motion for leave of the Bankruptcy Court prior to filing the Appeal.  Not only did the Appellant fail to submit the proper Form in filing the Appeal, she failed to file the required motion for leave to appeal with the Bankruptcy Court before filing the Appeal.  *See* 28 U.S.C. § 158(a)(3); *see also* Fed. R. Bankr. P. 8003.

(ii)     *The Orders Are Not Final Orders*

Appellant contends that each Order is a "final order" under 28 U.S.C. § 158(a)(1) (*see* Appeal Brief at 1-2); however, when viewed properly in the context of the Chapter 11 Cases, the Orders are interlocutory.  "With respect to a meritorious claim for damages, the dispute is not completely resolved until the bankruptcy court determines the amount of damages to be awarded."  *Shimer v. Fugazy Express, Inc. (In re Fugazy Express, Inc.)*, 982 F.2d 769, 776 (2d Cir. 1992); *see also In re Lyondell Chem. Co.*, No. 11-MC-387 (JPO), 2012 WL 163192, at *3 (S.D.N.Y. Jan. 18, 2012) (finding an appeal of a judgment that allowed an objection to be filed to the treatment of an administrative expense claim pursuant to the confirmation order was not an appeal of a final judgment because the judgment did not finally dispose of an entire claim or address the merits of the claim, only a procedural misstep, and expressly contemplated further proceedings on appellants' claims).

34.     Here, the Orders resolve only whether the Appellant is entitled to immediate payment on her Claim, and do not resolve <u>with any finality</u>, the merits or allowance of the Claim in the Chapter 11 Cases.  Accordingly, the Orders are properly regarded as interlocutory, rather than final.   The Orders provide specifically that the Claim has not yet been deemed an "Allowed"[12] claim because the Claim has not been settled or deemed "Allowed" by the Borrower Trust, and therefore remains subject to the Borrower Trust's determination as to whether it should become the subject of an objection or instead be entitled to a distribution from the Borrower Trust.  *See* Confirmed Plan, Art. IV.F.  The Claim, along with hundreds of other pending claims, will be evaluated as part of the Borrower Trust's claims reconciliation process, and the Borrower Trust has until the Claims Objection Deadline – June 15, 2015 – to file any objection to the Claim.  Contrary to the Appellant's assertions, neither the Confirmed Plan nor Confirmation Order provides that any claim not objected to before the Effective Date is automatically deemed "Allowed" and entitled to an immediate distribution on account of said claim.  Thus, the mere fact that the Appellant's Claim was neither objected to nor the subject of a pending claims objection as of the Effective Date does not render it an "Allowed" claim.  The Orders even contemplate future proceedings that may involve the Claim and its merits (or lack thereof).  <u>See</u> <u>Exhibit B</u>.

(iii)    *The Appeal Should Not Be Granted by the District Court Under 28 U.S.C. 158(a)(3)*

35.     In determining whether to grant an interlocutory appeal under Section 158(a)(3), district courts apply the analogous standard set forth in 28 U.S.C. § 1292(b) ("<u>Section 1292(b)</u>"),

---

[12]     An "<u>Allowed</u>" Claim means, with respect to a Claim against any Debtor, except as otherwise provided herein, (a) a Claim that is . . . (ii) evidenced by a valid Proof of Claim or request for payment of Administrative Claim, as applicable, Filed by the applicable Bar Date, **and as to which the Debtors or other parties-in-interest have not Filed an objection to the allowance thereof by the Claims Objection Deadline**, . . ."  Confirmed Plan, Art. I.11 (emphasis added).

ny-1162993

which governs interlocutory appeals from orders of the district court. *See, e.g.*, *Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP (In re Coudert Bros. LLP Law Firm Adversary Proceedings)*, 447 B.R. 706, 711 (S.D.N.Y. 2011); *Law Debenture Trust Co. of N.Y. v. Calpine Corp. (In re Calpine Corp.)*, 356 B.R. 585, 592-93 (S.D.N.Y. 2007); *MCI Worldcom Commc'ns v. Commc'ns Network Int'l, Ltd. (In re Worldcom, Inc.)*, No. 02-13533 (AJG), 2006 WL 3592954 (S.D.N.Y. Dec. 7, 2006). Section 1292(b) provides that leave should only be granted if the order being appealed (1) "involves a controlling question of law"; (2) "as to which there is substantial ground for difference of opinion"; and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation . . . ." 28 U.S.C. § 1292(b). All three elements set forth in Section 1292(b) must be met for a court to grant leave to appeal. *Id.*

36.     "[I]nterlocutory appeals from bankruptcy courts' decisions are disfavored in the Second Circuit." *In re Lyondell Chem. Co.*, No. 11-MC-387 (JPO), 2012 WL 163192, at *4 (S.D.N.Y. Jan. 18, 2012) (citations omitted); *Cadles of Grassy Meadows II, LLC v. St. Clair (In re St. Clair)*, No. 13-mc-1057 (SJF), 2014 U.S. Dist. LEXIS 8615, at *9-11 (E.D.N.Y. Jan. 21, 2014). "Because an interlocutory appeal represents a deviation from the basic judicial policy of deferring review until the entry of a final judgement [sic], the party seeking leave to appeal an interlocutory order must also demonstrate that exceptional circumstances exist." *Luke Oil Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 407 B.R. 553, 557 (D. Del. 2009) (citations omitted); *see also In re Calpine Corp.*, 356 B.R. at 593 ("Under section 1292(b), only exceptional circumstances will justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.") (quotations and citations omitted). Moreover, "[A] bare claim that a bankruptcy court's ruling was incorrect is not sufficient to satisfy the Section 1292(b) standard." *In re St. Clair*, 2014 U.S. Dist. LEXIS 8615, at *14 (citation omitted); *see*

15

*also Analect LLC v. Fifth Third Bancorp*, No. 06-cv-891 (JFB), 2009 WL 2568540, at *5
(E.D.N.Y. Aug. 19, 2009) ("Therefore, plaintiff's 'mere claim that [the] district court's decision
was incorrect' does not provide 'substantial ground for [a] difference of opinion,' as set forth in
28 U.S.C. § 1292.") (citation omitted).

37.     The Appellant has not met the applicable standard for granting an interlocutory
appeal under Section 1292(b).

38.     <u>First</u>, the Appellant does not assert that the Appeal "involves a controlling
question of law" and involves a question "as to which there is substantial ground for difference
of opinion"; therefore, the Appeal fails to satisfy these elements.  There is nothing before the
District Court to suggest that the issues raised by the Appellant are widespread or recurrent in
this district, and there is no assertion by the Appellant that the courts in this district are puzzled
over the particular reading of the Confirmed Plan's provisions in issue, which are indeed
common to Chapter 11 plans, or an issue raised by the Claim.  The issues may be of import to the
Appellant, but that is not the standard.

39.     <u>Second</u>, it appears that the Appellant erroneously believes that "an immediate
appeal from the [Bankruptcy Court's] order may materially advance the ultimate termination of
the litigation."  In determining when an appeal will materially advance a case, courts have
examined what other issues will remain once the issue to be appealed has been resolved.  The
Appellant's apparent motivation for the Appeal is simply a misunderstanding as to, among other
things, the applicable Claims Objection Deadline, its effect on the Claim and the validity of the
Claim itself.  *See, e.g.*, Appeal Brief at 23-24.  However, in light of the modified Claim
Objection Deadline, it is far from clear that the Appeal from the Orders will materially advance
the resolution of the Claim asserted against the Debtors.

16

40.    Accordingly, Appellant's argument that the Bankruptcy Court's ruling was incorrect is not sufficient to satisfy the Section 1292(b) standard; therefore, there is no basis for the District Court to even consider the Appeal.

### C.    Judge Glenn's Impartiality Is Without Question

41.    The Appellant questions the Honorable Martin Glenn's ("Judge Glenn") impartiality in the Chapter 11 Cases, and in particular, as related to his entry of the Orders.  *See* Notice of Appeal at 3; Appeal Brief at 10-22.  Specifically, the Appellant believes that Judge Glenn's relationship with former bankruptcy Judge James Peck and Mr. Peck's prior role as mediator in the Chapter 11 Cases, combined with former Judge Peck's subsequent employment at Morrison & Foerster LLP at or around the date on which the Appellant filed the Motion for Payment, is sufficient reason for Judge Glenn's impartiality to be reasonably questioned. The Appellant also claims that Judge Glenn ignored this purported concern and went on to act without impartiality in entering the Orders that denied the Appellant's Motion for Payment and Motion for Reconsideration.  Notice of Appeal at 3-4; Appeal Brief at 11, 22.  In the Appeal Brief, the Appellant cites to 28. U.S.C.A. § 455(a) and "NY Court Rules" that state when a judge is required to disqualify himself.  *See* Appeal Brief at 11 (highlighting that "impartiality might reasonably be questioned" . . . [when (ii)] "a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter . . . .").

42.    The Appellant also argues that Judge Glenn entered the Orders and improperly made arguments by "cherry pick[ing] terms and tak[ing] them out of context" on the Borrower Trust's behalf without the Borrower Trust having responded to the Motion for Payment or the Motion for Reconsideration (*see* Notice of Appeal at 4-5; Appeal Brief at 12-13).  Further, the Appellant contends that Judge Glenn not only failed to address all of the Appellant's arguments (*see id.*), but also "ignores" the applicable provisions in the Confirmed Plan that – according to

17

the Appellant – provides that the Claim is an "allowed claim" (*see* Notice of Appeal at 5-8; Appeal Brief at 12-13).

43.     Since the commencement of the Chapter 11 Cases, Judge Glenn has worked tirelessly on one of the most complex and demanding bankruptcy cases filed in the recent past. Throughout these proceedings, he has demonstrated, and continues to demonstrate, his devotion to supplying diligent and substantive rulings on all matters before him in the Chapter 11 Cases. Of course, parties have appellate rights and Appellant has exercised them.  However, there has never been cause in the Chapter 11 Cases to question Judge Glenn's impartiality, and the arguments offered by the Appellant are at best entirely misplaced conjecture and at worst entirely specious.  In any event, they are hardly worthy of a response.

44.     Nonetheless, the Appellant misunderstands the applicable law concerning the recusal of judges.  The "relationship" between Judge Glenn and former Judge Peck does not present a conflict of interest where a question as to Judge Glenn's impartiality would reasonably arise.  First, former Judge Peck acted as a mediator to help parties reach a consensual Confirmed Plan.[13]  The use of sitting bankruptcy judges as mediators has become a common practice to aid courts and parties in complex cases, and there is nothing improper about it.[14]  Not only does this activity promote effective case management, which is in the public interest, it reflects and is consistent with collegiality of the bench.  The substance of each mediation is confidential. Furthermore, nothing that takes place in a judicially sanctioned mediation can be used to influence the trial judge.  It is ludicrous and offensive to assert that former Judge Peck ever did

---

[13]   Former Judge Peck's involvement in the Chapter 11 Cases in a judicial capacity was solely limited to presiding over the two "First Day" hearings during Judge Glenn's absence.  As discussed herein, this is consistent with collegiality of the bench and effective case management practices, and gives no weight to Appellant's arguments.

[14]   In fact, during former Judge Peck's judicial career, he mediated cases for five bankruptcy judges (Judge Lane, Judge Chapman, Judge Gerber, Judge Glenn, and Judge Drain).

ny-1162993

anything that impacted the independent exercise of judicial discretion by Judge Glenn.  Since joining Morrison & Foerster, former Judge Peck has never discussed any pending matter with Judge Glenn.  His role with the firm is totally irrelevant to these matters.  Second, Judge Glenn and former Judge Peck have not practiced law together in private practice at any time.

45.     For the reasons set forth in this Objection, Judge Glenn's reasoned Orders are based on an impartial and correct reading of the Confirmed Plan,[15] and should be affirmed.

### D.     The Appellant Received Due Process

46.     Lastly, the Appellant attempts to argue that she has not received due process in the Chapter 11 Cases.  Specifically, the Appellant contends that the purported transfer of interest in her deed of trust from GMAC Mortgage, LLC to U.S. Bank for consideration[16] either occurred with Judge Glenn "turn[ing] a blind eye," or was an unreported sale that was not approved or acknowledged by the Bankruptcy Court – in either case, the Appellant finds this as a clear indication of "Bankruptcy Fraud or else there is fraud by fabrication of documents."  *See* Appeal Brief at 26.  The Appellant does not provide a scintilla of objective and specific evidence to substantiate this claim, it is entirely without merit and bears no relevance to the Appeal.

47.     For all these reasons, the Appeal should be dismissed and the Orders affirmed.

---

[15]   *See Travelers Indem. Co. v. Baily*, 557 U.S. 137, 151 n.4 (2009) ("Numerous Courts of Appeal have held that a bankruptcy court's interpretation of its own confirmation order is entitled to substantial deference.") (citing, *inter alia*, *In re Casse*, 198 F.3d 327, 333 (2d Cir. 1999)).

[16]   The Appellant claims that subsequent to the Debtors' sale of substantially all of their assets to Ocwen Loan Servicing, LLC on February 16, 2013, on March 25, 2013, GMAC Mortgage, LLC transferred its interest in the Appellant's deed of trust to U.S. Bank.  *See* Appeal Brief at 26.  This sale was purportedly recorded this transfer in the county records office for Los Angeles County.  *See id.*  The Appellant asserts that the Bankruptcy Court did not specifically approve or acknowledge this transfer of interest.  *See id.*

19

## <u>CONCLUSION</u>

For the foregoing reasons, the Borrower Trust respectfully requests that this Court

(a) affirm the Bankruptcy Court's Orders in all respects and (b) dismiss the Appeal.

Dated:   November 6, 2014
         New York, New York

By:  /s/ Norman S. Rosenbaum
     Norman S. Rosenbaum
     Jordan A. Wishnew
     MORRISON & FOERSTER LLP
     250 West 55th Street
     New York, NY  10019
     Telephone:  (212) 468-8000
     Facsimile:  (212) 468-7900

     *Counsel for Appellee The ResCap Borrower
     Claims Trust*

ny-1162993

**Exhibit A**

12-12020-mg   Doc 6019-45   Filed 01/22/15   Entered 01/22/15 18:14:28   Exhibit 26
12-12020-mg   Doc 6030   Filed 12/06/13   Entered 12/06/14   Page 27 of 228
Pg 27 of 398

Docket #6065   Date Filed: 12/11/2013

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) |
| | ) Chapter 11 |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |

## ORDER CONFIRMING SECOND AMENDED JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC, et al. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Residential Capital, LLC ("ResCap")[1] and its direct and indirect subsidiaries, each as a chapter 11 debtor and debtor-in-possession (collectively, the "Debtors") in the above-referenced chapter 11 cases (the "Chapter 11 Cases"), and the Official Committee of Unsecured Creditors (the "Creditors Committee" and, together with the Debtors, the "Plan Proponents") having proposed the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors (ECF Doc. # 6030), dated December 6, 2013 (the "Plan," a copy of which is attached hereto as Appendix 1); the Court having conducted a hearing to consider confirmation of the Plan on November 19, 2013 through November 25, 2013 (the "Confirmation Hearing"); the Court having considered: (1) each of the Confirmation Declarations,[2] all of which were admitted into evidence at the Confirmation Hearing, (2) the

---

[1]      All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[2]      The "Direct Testimony" consists of the: (a) Affidavit of P. Joseph Morrow IV Certifying the Tabulation of Votes on the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors (the "Voting Declaration") (ECF Doc. # 5699), (b) Declaration of Fernando Acebedo (ECF Doc. # 5674), (c) Direct Testimony of Lucy Allen (ECF Doc. # 5706); (d) Direct Testimony of Martin Blumentritt (ECF Doc. # 5698); (e) Direct Testimony of Michael Carpenter (ECF Doc. # 5695); (f) Direct Testimony of John Dubel (ECF Doc. # 5697), (g) Affidavit Regarding Dissemination of Notices and Information to RMBS Trust Certificateholders (ECF Doc. # 5687); (h) Direct Testimony of Ronald Friedman (ECF Doc. # 5710); (i) Direct Testimony of Gina Gutzeit (ECF Doc. # 5707); (j) Direct Testimony of Tammy Hamzehpour (ECF Doc. # 5708); (k) Declaration of Susheel Kirpalani (ECF Doc. # 5681); (l) Direct Testimony of Lewis Kruger (ECF Doc. # 5709); (m) Direct Testimony of Jeffrey A. Lipps (ECF Doc. # 5701); (n) Declaration of Ralph R. Mabey (ECF Doc. #

arguments of counsel presented at the Confirmation Hearing, (iii) the objections filed with
respect to confirmation of the Plan, (iv) the Plan Proponents Memorandum of Law in Support of
Confirmation of the Plan (the "<u>Confirmation Memorandum</u>") (ECF Doc. # 5720), (v) the Plan
Proponents' Omnibus Response to Certain Objections to Confirmation (the "<u>Reply</u>") (ECF Doc.
# 5718), (vi) the various responses and statements in support of confirmation filed by parties in
interest (ECF Doc. ## 5669, 5679, 5684, 5685, 5694, 5721); including the Objection of the Notes
Trustee and the Ad Hoc Committee of Junior Secured Noteholders to Confirmation of Plan
Proponents' Chapter 11 Plan (ECF Doc. # 5443), and (vii) the pleadings filed in the JSN
Adversary Proceeding, including, without limitation, the Joint Pretrial Order (ECF Doc. # 5716);
and the Court being familiar with the Plan and other relevant factors affecting these Chapter 11
Cases pending under the Bankruptcy Code; and the Court having taken judicial notice of the
entire docket of the Debtors' Chapter 11 Cases maintained by the Clerk of the Court and/or its
duly appointed agent, and evidence and arguments made, proffered, or adduced at the hearings
held before the Court during the pendency of the Chapter 11 Cases; and the Court having found
that due and proper notice has been given with respect to the Confirmation Hearing and the
deadlines and procedures for filing objections to the Plan; and the Court having heard the

---

5686); (o) Declaration of Robert Major (ECF Doc. # 5677); (p) Direct Testimony of Thomas Marano (ECF Doc.
# 5705); (q) Declaration of Brendan Meyer (ECF Doc. # 5690); (r) Direct Testimony of Nancy Mueller-Handal in
Support of Plan Confirmation (ECF Doc. # 5688); (s) Declaration of Thomas Musarra (ECF Doc. # 5675);
(t) Declaration of Alan M. Pfeiffer (ECF Doc. # 5682); (u) Direct Testimony of Mark Renzi (ECF Doc. # 5702);
(v) Direct Testimony of Mamta K. Scott, as Officer of U.S. Bank, as RMBS Trustee (ECF Doc. # 5683); (w) Direct
Examination of Frank Sillman (ECF Doc. # 5703); (x) Declaration of Mary Sohlberg (ECF Doc. # 5680); (y) Direct
Testimony of William R. Thompson (ECF Doc. # 5713); (z) Direct Testimony of Barbara Westman (ECF Doc.
# 5704); (aa) Declaration of Jim Young (ECF Doc. # 5696); (bb) Direct Testimony of John S. Dubel on behalf of
FGIC (ECF Doc. # 5692); (cc) Supplemental Declaration of Lorenzo Marinuzzi Regarding the Tabulation of Votes
on the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official
Committee of Unsecured Creditors (ECF Doc. # 6061) (the "<u>Marinuzzi Declaration</u>") (dd) Declaration of Gerard
Uzzi in Connection with Changed Votes of Members of Ad Hoc Group of Junior Secured Noteholders on Plan
Proponents' Second Amended Chapter 11 Plan (ECF Doc. # 6058) (together with the Marinuzzi Declaration, the
"<u>Supplemental Voting Declarations</u>"); and (ee) Supplemental Declaration of Lewis Kruger in Support of Plan
Confirmation (ECF Doc. # 6018).

statements, arguments and objections made in respect of Confirmation of the Plan, the Court having considered any and all objections to the Plan and to Confirmation and all such objections being consensually resolved, withdrawn, or overruled on the merits; and the appearance of all interested parties having been duly noted in the record of the Confirmation Hearing; and upon the record of the Confirmation Hearing, and after due deliberation thereon, and sufficient cause appearing therefor;

## I.  **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

IT IS HEREBY FOUND AND CONCLUDED, that:

### **JURISDICTION AND VENUE**

A.    **Jurisdiction and Venue**.  The Court has jurisdiction over this matter and these Chapter 11 Cases pursuant to 28 U.S.C. § 1334. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), this Court has jurisdiction to enter a final order with respect thereto, and this Court's exercise of such jurisdiction is constitutional in all respects.  The Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors are proper debtors under section 109 of the Bankruptcy Code, and the Debtors and the Creditors' Committee are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.

B.    **Proper Notice**.  As described below and as evidenced by the Affidavit of Service of P. Joseph Morrow IV re: Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan Proponents' Joint Chapter 11 Plan, (III) Approving the Form of Ballots, (IV) Scheduling a Hearing on Confirmation of the Plan, (V) Approving Procedures for Notice of the Confirmation Hearing and

for Filing Objections to Confirmation of Plan, and (VI) Granting Related Relief (ECF Doc. #
5196), dated September 25, 2013 (the "KCC Service Affidavit"), due, adequate and sufficient
notice of the Disclosure Statement, the Plan, including the Debtor Release and the Third Party
Release, the Plan Supplement, and the Confirmation Hearing, together with all deadlines for
voting on or objecting to the Plan and with respect to confirmation was given in compliance with
the Bankruptcy Rules, and no other or further notice is or shall be required.

   C.  **Transmission of Ballots**. Ballots were transmitted to holders of Claims and
Equity Interests in the Classes under the Plan that are treated as impaired ("Impaired") within the
meaning of section 1124 of the Bankruptcy Code (the "Voting Impaired Classes") and entitled to
vote on the Plan in accordance with the Plan and the Disclosure Statement Orders.  Subsequent
to the filing of the Second Amended Plan (as defined below), a Notice of Proposed Resolution of
Litigation Regarding Junior Secured Notes Claims and Opportunity to Change Voted with
Respect to Second Amended Plan (ECF Doc. # 5998) (the "JSN Change Vote Notice"), which
provided holders of Junior Secured Notes Claims that had previously rejected the Plan the
opportunity to change their vote to accept the Second Amended Plan, was filed and transmitted
to affected holders of Claims.

   D.  **Good Faith Solicitation (11 U.S.C. § 1125(e))**. The Plan Proponents solicited
votes for the Plan from the holders of Claims in the Voting Impaired Classes in good faith and in
a manner consistent with the Bankruptcy Code, including, but not limited to, section 1125(e) of
the Bankruptcy Code.

   E.  **Modification of the Plan (11 U.S.C. § 1127(a))**.  Pursuant to and in compliance
with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3018, the Plan Proponents
proposed certain modifications to the Plan as reflected in the modified or amended versions of

- 4 -

the Plan filed on November 12, 2013, November 18, 2013, December 3, 2013, and December 6, 2013 (collectively, the "Plan Modifications").  In accordance with Bankruptcy Rule 3019, the Plan Modifications do not (1) affect the classification of Claims or Equity Interests, (2) constitute material modifications of the Plan under section 1127 of the Bankruptcy Code, (3) cause the Plan to fail to meet the requirements of sections 1122 or 1123 of the Bankruptcy Code, (4) materially and adversely change the treatment of Claims or Equity Interests (other than any Claims and Equity Interests held by those who have accepted such Plan Modifications in writing or in open court), (5) require resolicitation of acceptances or rejections from any holders of Claims or Equity Interests, or (6) require that any such holders be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Under the circumstances, the form and manner of notice of the proposed Modifications are adequate, and no other or further notice of the proposed Modifications is necessary or required.

**STANDARDS FOR CONFIRMATION
UNDER SECTION 1129 OF THE BANKRUPTCY CODE**

F.      The Plan Proponents, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for confirmation of the Plan.  Further, the Plan Proponents have proven the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by clear and convincing evidence.  The evidentiary record of the Confirmation Hearing supports the findings of fact and conclusions of law set forth in the following paragraphs.

G.      **Section 1129(a)(1).**  The Plan complies with each applicable provision of the Bankruptcy Code.  Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the classification of Claims and Interests into separate Classes, based on differences in the legal nature or priority of such Claims and Interests (other

- 5 -

than Administrative Claims, Fee Claims, Priority Tax Claims, and Statutory Fees, which are addressed in Article II of the Plan and which are not required to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code). In particular, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code as follows:

1. In accordance with section 1122(a) of the Bankruptcy Code, Article III of the Plan classifies each Claim against and Equity Interest in the Debtors into a Class containing only substantially similar Claims or Equity Interests;

2. In accordance with section 1123(a)(1) of the Bankruptcy Code, Article III of the Plan properly classifies all Claims and Equity Interests that require classification. With respect to Claims and Equity Interests in all Classes, the Plan Proponents have provided proof of a legitimate reason for the separate classification of such Claims and Equity Interests, and such classification is justified. Separate classification was not done for any improper purpose and does not unfairly discriminate between or among holders of Claims or Equity Interests;

3. In accordance with section 1123(a)(2) of the Bankruptcy Code, Article III of the Plan properly identifies and describes each Class of Claims and Equity Interests that is Unimpaired under the Plan;

4. In accordance with section 1123(a)(3) of the Bankruptcy Code, Article III of the Plan properly identifies and describes the treatment of each Class of Claims or Equity Interests that is Impaired under the Plan;

5. In accordance with section 1123(a)(4) of the Bankruptcy Code, the Plan provides the same treatment for each Claim or Equity Interest within a particular Class unless the holder of such a Claim or Equity Interest has agreed to less favorable treatment;

6. In accordance with section 1123(a)(5) of the Bankruptcy Code, the Plan, including the Plan Supplement, provides in detail adequate and proper means for its implementation, including, pursuant to Section 1123(a)(5)(B), transfer and assignment of certain GM Insurance Rights to the Kessler Settlement Class, the Liquidating Trust, and others;

7. Pursuant to Article IV.P of the Plan, the Debtors will be dissolved on or after the Effective Date. Accordingly, section 1123(a)(6) of the Bankruptcy Code is not applicable in these cases;

8. Pursuant to Article IV.P of the Plan, the Debtors will be dissolved on or after the Effective Date and no individuals will serve as officers, directors or voting trustees of the Debtors after the Effective Date. Accordingly, section 1123(a)(7) of the Bankruptcy Code is inapplicable in these cases. Nevertheless, the initial

members of the Liquidating Trust Board and Liquidating Trust Management were set forth in Exhibits 6 and 7 to the Plan Supplement and, thus, were disclosed prior to the Hearing.  The Liquidating Trust Board and Liquidating Trust Management were selected by members of the Consenting Claimants in accordance with the terms of the Plan Support Agreement.  No party has objected to the identity of the members of the Liquidating Trust Board or Liquidating Trust Management.  In light of the foregoing, the manner of selection of the Liquidating Trust Board and Liquidating Trust Management is consistent with the interests of holders of Claims and Equity Interests and public policy;

H.    **Section 1129(a)(2).** The Plan Proponents have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1127 and 1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019, and all other applicable rules, laws and regulations with respect to the Plan and the solicitation of acceptances or rejections thereof.   In particular, acceptances or rejections of the Plan were solicited in good faith and in compliance with the requirements of sections 1125 and 1126 of the Bankruptcy Code as follows:

1.    In compliance with the *Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan Proponents Joint Chapter 11 Plan, (III) Approving the Form of Ballots, (IV) Scheduling a Hearing on Confirmation of the Plan, (V) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan, and (VI) Granting Related Relief* entered on August 23, 2013 (ECF Doc. # 4809) (the "Disclosure Statement Order"), on August 29, 2013, the Plan Proponents, through the Debtors' claims and noticing agent, Kurtzman Carson Consultants ("KCC"), caused copies of the following materials to be served on all holders of Claims in Classes that were entitled to vote to accept or reject the Plan (i.e., Claims in Classes R-3, RS-3, GS-3, R-4, GS-4A, GS-4B, RS-4, R-5, GS-5, RS-5, R-6, GS-6, RS-6, R-7, RS-7, R-8, GS-7, RS-8, R-11, RS-11, R-12, GS-10, and RS-12); *see* KCC Service Affidavit.

   - a written notice (the "Confirmation Hearing Notice") of (a) the Court's approval of the Disclosure Statement, (b) the deadline for voting on the Plan, (c) the date of the Confirmation Hearing, (d) the deadline for objections to the confirmation of the Plan, and (e) the Plan Releases (as defined herein);

   - the Disclosure Statement (together with the exhibits thereto, including the Plan and the Disclosure Statement Order) in a CD-ROM;

- the letter from the Creditors' Committee to holders of General Unsecured Claims (the "Committee Letter to GUCs") in Classes R-4, GS-4A, GS-4B, RS-4, R-6, GS-6, RS-6, R-7, RS-7, R-8, GS-7, RS-8, R-11, and RS-11 and the letter from the Creditors' Committee to holders of Borrower Claims (the "Committee Letter to Borrowers") in Classes R-5, GS-5, and RS-5;

- the appropriate form of Ballot with a postage prepaid return envelope.

2.  In compliance with the Disclosure Statement Order, on August 29, 2013, the Plan Proponents, through KCC, caused copies of the Disclosure Statement and the Confirmation Hearing Notice to be served on (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) the parties comprising the Monthly Service List (as defined in the *Order Under Bankruptcy Code Sections 102(1), 105(a) and 105(d), Bankruptcy Rules 1015(c), 2002(m) And 9007 And Local Bankruptcy Rule 2002-2 Establishing Certain Notice, Case Management And Administrative Procedures* (ECF Doc. # 141)). *See* KCC Service Affidavit (ECF Doc. # 5196).

3.  In compliance with the Disclosure Statement Order, on August 29, 2013, the Plan Proponents, through KCC, caused a copy of the notice of non-voting status to be served on all holders of Claims and Equity Interests in the non-voting classes (i.e., Classes R-1, GS-1, RS-1, R-2, GS-2, RS-2, R-9, R-10, GS-8, GS-9, RS-9, and RS-10). *See* KCC Service Affidavit (ECF Doc. # 5196).

4.  In compliance with the Disclosure Statement Order, on August 29, 2013, the Plan Proponents, through KCC, caused a copy of the Confirmation Hearing Notice to be served on all parties in the creditor database maintained by KCC not otherwise served pursuant to paragraphs 1 and 3 above, including, but not limited to, (a) all non-Debtor parties to Executory Contracts or Unexpired Leases, (b) all holders of Administrative Claims and Priority Tax Claims, (c), all parties to litigation with the Debtors, (d) all parties to litigation with Ally relating to the Debtors' businesses, regardless of whether such parties were entitled to vote on the Plan, (e) all known members of potential class action lawsuits, and (f) individual borrowers whose loans were serviced by the Debtors as of September 20, 2012. *See* KCC Service Affidavit (ECF Doc. # 5196).

5.  In compliance with the Disclosure Statement Order, on September 3, 2013, the Plan Proponents, through KCC, caused a copy of the Confirmation Hearing Notice to be published in the *Wall Street Journal* and *USA Today*. *See* KCC Affidavit of Publication (ECF Doc. # 5025), dated September 11, 2012.

6.  On October 11, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) the following exhibits to the Plan Supplement (together with the Plan and any and all documents executed in connection therewith including the FGIC Settlement, the "Plan Documents"), in substantially final forms (ECF Doc. # 5342):

- the Liquidating Trust Agreement (Exhibit 2 to the Plan Supplement)

- the RMBS Claims Trust Agreement (Exhibit 3 to the Plan Supplement);

- the Borrower Claims Trust Agreement (Exhibit 4 to the Plan Supplement);

- the Private Securities Claims Trust Agreement (Exhibit 5 to the Plan Supplement);

- the Initial Members of the Liquidating Trust Board (Exhibit 6 to the Plan Supplement);

- the Initial Members of Liquidating Trust Management (Exhibit 7 to the Plan Supplement);

- the Initial Members of the Borrower Claims Trust Committee and Identity of the Borrower Claims Trustee (Exhibit 8 to the Plan Supplement);

- the Identity of the Private Securities Claims Trustee (Exhibit 9 to the Plan Supplement);

- the Borrower Trust True-Up (Exhibit 10 to the Plan Supplement)

- the Cooperation Agreement between the Liquidating Trust and the Kessler Settlement Class (Exhibit 11 to the Plan Supplement);

- the Policy Numbers for the GM Policies (Exhibit 12 to the Plan Supplement);

- the Liquidating Trust Causes of Action (Exhibit 13 to the Plan Supplement);

- the Stipulated Allocation of the Allowed Fee Claim (Exhibit 14 to the Plan Supplement);

- the Borrower-Related Causes of Action (Exhibit 15 to the Plan Supplement);

- the Updated RMBS Trust Claims Schedules (Exhibit 16 to the Plan Supplement);

- the Ally Contract Claims Estimate (Exhibit 17 to the Plan Supplement);

- the identity of the RMBS Claims Trust Trustee (Exhibit 18 to the Plan Supplement);

- the Material Terms on which the Plan Proponents may Pay Post-Petition Interest Over Time (Exhibit 19 to the Plan Supplement);

- the Initial List of Claims to be Subordinated under the Plan (<u>Exhibit 20</u> to the Plan Supplement); and

- the Updated Disclosure Statement Exhibits 12 and 13 (<u>Exhibit 21</u> to the Plan Supplement).

7. On October 29, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) and served the Assumption Schedule setting forth Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan (ECF Doc. # 5547) as <u>Exhibit 1</u> to the Plan Supplement. *See* Affidavit of Service (ECF Doc. # 5561), dated October 30, 2013.

8. On November 12, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap), the *First Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* (the "<u>First Amended Plan</u>") (ECF Doc. # 5722) and the Confirmation Memorandum (ECF Doc. # 5720).

9. On November 12, 2013, the Plan Proponents, through KCC, caused copies of the First Amended Plan and the Confirmation Memorandum to be served on the parties comprising the Monthly Service List. *See* Affidavit of Service by KCC (ECF Doc. # 5770), dated November 14, 2013.

10. On November 12, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) the following amended Plan Supplement documents, in substantially final form (ECF Doc. # 5719):

- the Liquidating Trust Agreement (<u>Amended Exhibit 2</u> to the Plan Supplement);

- the Borrower Claims Trust Agreement (<u>Amended Exhibit 4</u> to the Plan Supplement);

- the Liquidating Trust Causes of Action (<u>Amended Exhibit 13</u> to the Plan Supplement); and

- the Borrower-Related Causes of Action (<u>Amended Exhibit 15</u> to the Plan Supplement).

11. On November 18, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap), certain modifications to the *First Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* (the "<u>Revised First Amended Plan</u>") (ECF Doc. # 5854).

12. On November 18, 2013, the Plan Proponents, through KCC, caused copies of the Revised First Amended Plan to be served on the parties comprising the Monthly Service List. *See* Affidavit of Service by KCC (ECF Doc. # 5922) dated November 21, 2013.

13. On December 3, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap), the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* (the "Second Amended Plan") (ECF Doc. # 5993).

14. On December 3, 2013, the Plan Proponents, through KCC, caused copies of (a) the Second Amended Plan and (b) the JSN Change Vote Notice to be served on the parties comprising the Monthly Service List. *See* Affidavit of Service by KCC (ECF Doc. # 6008), dated December 4, 2013.

15. On December 6, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap), certain modifications to the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* (the "Revised Second Amended Plan") (ECF Doc. # 6030).

16. On December 6, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) a revised Assumption Schedule (Amended Exhibit 1 to the Plan Supplement) (ECF Doc. # 6035):

17. On December 6, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) the following amended Plan Supplement documents, in substantially final form (ECF Doc. # 6036):

   • the Liquidating Trust Causes of Action (Second Amended Exhibit 13 to the Plan Supplement); and

   • the Borrower-Related Causes of Action (Second Amended Exhibit 15 to the Plan Supplement).

18. On December 6, 2013, the Plan Proponents, through KCC, caused copies of the Revised Second Amended Plan, Amended Exhibit 1, Second Amended Exhibit 13, and Second Amended Exhibit 15 to be served on the parties comprising the Monthly Service List. *See* Affidavit of Service by KCC (ECF Doc. # 6048) dated December 9, 2013.

19. On December 10, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) a revised Liquidating Trust Agreement (Second Amended Exhibit 2 to the Plan Supplement) (ECF Doc. # 6064):

20. The Confirmation Hearing Notice provided due and proper notice of the Confirmation Hearing and all relevant dates, deadlines, procedures and other information relating to the Plan and/or the solicitation of votes thereon, including, without limitation, the voting deadline, the objection deadline, the time, date and place of the Confirmation Hearing and the release provisions in the Plan, including the Debtor Release and the Third Party Release.

21. All persons entitled to receive notice of the Disclosure Statement, the Plan and the Confirmation Hearing have received proper, timely and adequate notice in accordance with the Disclosure Statement Order and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and have had an opportunity to appear and be heard with respect thereto.

22. The Plan Proponents solicited votes with respect to the Plan in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order.  Accordingly, the Plan Proponents are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article IX.H of the Plan.

23. Claims in Classes R-1, R-2, GS-1, GS-2, RS-1 and R-2 are Unimpaired, and such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

24. The Plan was voted on by 183 sub-Classes of Impaired Claims that were entitled to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order (i.e., each sub-Class entitled to vote within Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, R-12, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-3, RS-4, RS-5, RS-6, RS-7, RS-8, RS-11, and RS-12).

25. Prior to the filing of the Voting Declaration, KCC made a final determination of the validity of, and tabulation with respect to, all acceptances and rejections of the Plan by holders of Claims entitled to vote on the Plan, including the amount and number of accepting and rejecting Claims in each sub-Class entitled to vote within Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, R-12, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-3, RS-4, RS-5, RS-6, RS-7, RS-8, RS-11, and RS-12 under the Plan.  *See* Voting Declaration at Exhibit B.

26. As reflected in the Voting Declaration, each of the sub-Classes within Classes R-4, R-5, R-6, R-7, R-8, R-12, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-4, RS-5 (at all sub-Classes other than Residential Funding Real Estate Holdings, LLC), RS-6, RS-7, RS-8, and RS-12 voted to accept the Plan by at least two-thirds in amount and a majority in number of the Claims in such Classes actually voting. *See* Voting Declaration, at Exhibit B.

27. Subsequent to the filing of the Voting Declaration, and pursuant to the settlement with the FHFA, the FHFA changed their previous votes rejecting the Plan to votes to accept the Plan in Classes R-11 and RS-11.

28. Subsequent to the filing of the Voting Declaration, and pursuant to the JSN Settlement (as defined herein), certain holders of Claims in Classes R-3, GS-3, and RS-3 changed their previous votes rejecting the Plan to votes to accept the Plan such that, together with holders of Claims in Classes R-3, GS-3, and RS-3 that previously voted to accept the Plan, holders of at least two-thirds in amount and a majority in number of the Claims actually voting in Classes R-3, GS-3, and RS-3 have accepted the Plan. *See* Supplemental Voting Declarations.

I.    **Section 1129(a)(3).**  The Plan has been proposed in good faith and not by any means forbidden by law.  The Plan Proponents' good faith is evident from the facts and record of these Chapter 11 Cases, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in these Chapter 11 Cases.  The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' estates and effectuating an orderly liquidation of the Debtors.  The Plan is the result of extensive good faith, arm's-length negotiations between the Debtors, the Creditors' Committee, Ally, and certain of the Debtors' principal creditor constituencies, including each of the Consenting Claimants and their respective representatives, and reflects substantial input from the principal constituencies having an interest in the Chapter 11 Cases.  The Plan Proponents and each of their respective officers, directors, employees, advisors and professionals, as applicable: (i) acted in good faith in negotiating, formulating, and proposing, where applicable, the Plan and agreements, compromises, settlements, transactions, and transfers contemplated thereby, and (ii) will be acting in good faith in proceeding to (a) consummate the Plan and the agreements, compromises, settlements, transactions, transfers, and documentation contemplated by the Plan, including, but not limited to, the Plan Supplement documents, and (b) take any actions authorized and directed or contemplated by this Order.  Thus, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

J.    **Section 1129(a)(4).**  The Plan provides that Professional Fee Claims submitted by Professionals for services incurred prior to the Effective Date will receive payment only if and

to the extent they are approved by the Court. The Plan also provides for the payment of the reasonable pre- and postpetition fees and expenses of the RMBS Trustees pursuant to the provisions of, and subject to, the procedures set forth in the *Final Supplemental Order (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses* (ECF Doc. # 774), and the *Order under 11 U.S.C. §§ 105, 363, and 365, and Fed Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief* (ECF Doc. # 2246), which provisions and procedures will also apply to HSBC. The Plan further provides for the allowance of the Allowed Fee Claim, with Units and distributions on account of such claim made to counsel for the Institutional Investors. In accordance with the Plan, all other Administrative Claims will receive payment only to the extent they are Allowed Claims. Thus, the Plan satisfies the requirements of section 1129(a)(4) of the Bankruptcy Code.

K. **Section 1129(a)(5).** Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Plan discloses the identities and compensation structure for the members of the Liquidating Trust Board, Liquidating Trust Management, the Private Securities Claims Trustee, the RMBS Claims Trust Trustee, the Borrower Claims Trustee and the Borrower Claims Trust Committee.

In addition, members of the Liquidating Trust Board and Liquidating Trust Management set forth on Exhibits 6 and 7 to the Plan Supplement are qualified, and their selection is consistent with the interests of holders of Claims and Equity Interests and with public policy.

L.     **Section 1129(a)(6).** The Plan does not provide for any changes in rates that require regulatory approval of any governmental agency.  Accordingly section 1129(a)(6) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

M.     **Section 1129(a)(7).** The liquidation analysis set forth in Exhibit 8 to the Disclosure Statement, as well as other evidence proffered or adduced at or prior to, or in declarations in connection with, the Confirmation Hearing (a) are reasonable, persuasive, accurate and credible, (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence, and (d) establish that each holder of a Claim or Equity Interest in an Impaired Class either (i) has accepted the Plan or (ii) will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that it would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on such date.  Thus, the Plan Proponents have demonstrated that the Plan is in the best interests of creditors.

N.     **Section 1129(a)(8).** Claims in Classes R-1, R-2, GS-1, GS-2, RS-1, and RS-2, are Unimpaired and are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  As set forth in the Voting Declaration and the Supplemental Voting Declarations, each sub-Class entitled to vote within Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, R-12, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-3, RS-4, RS-5 (at all sub-Classes other than Residential Funding Real Estate Holdings, LLC), RS-6, RS-7, RS-8, RS-11, and RS-12 has voted to accept the Plan, and the Class RS-5 at the Residential Funding Real

Estate Holdings, LLC sub-Class voted to reject the Plan. In addition, holders of Intercompany Claims in Classes R-9, GS-8, and RS-9, and holders of Equity Interests in R-10, GS-9 and RS-10 are deemed to have rejected the Plan (collectively with Class RS-5 (at the Residential Funding Real Estate Holdings, LLC sub-Class), the "Rejecting Classes"). Nevertheless, the Plan is confirmable because it does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes and thus satisfies section 1129(b)(1) of the Bankruptcy Code (as set forth in paragraph U below).

O.    **Section 1129(a)(9).** The Plan provides treatment for Administrative Claims, Priority Tax Claims and Other Priority Claims that is consistent with the requirements of section 1129(a)(9) of the Bankruptcy Code.

P.    **Section 1129(a)(10).** The Plan has been accepted by at least one class of Impaired Claims at each Debtor that is entitled to vote on the Plan, determined without including any acceptance of the Plan by any "insider." *See* Voting Declaration, Exhibit B.

Q.    **Section 1129(a)(11).** The Plan is feasible, within the meaning of section 1129(a)(11) of the Bankruptcy Code. The Debtors' projections show that the Debtors expect to have sufficient funds to make the payments required under the Plan.

R.    **Section 1129(a)(12).** The Plan provides that fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors on or before the Effective Date. On and after the Effective Date, notwithstanding the grouping of the Debtors into the Debtor Groups under the Plan, each of the Debtors shall (i) pay the applicable U.S. Trustee fees when due in the ordinary course until such time as the Bankruptcy Court enters a final decree in such Debtors' Chapter 11 Case or until each Chapter 11 Case is converted or dismissed, and (ii) file consolidated post-confirmation quarterly status reports.

S.    **Section 1129(a)(13).**  The retirement plan covering the Debtors' employees is sponsored by AFI, the indirect parent of ResCap and a non-Debtor.  Article IX.E of the Plan provides that nothing in the Plan releases AFI or any other party from the obligations under the Employees Retirement Plan for GMAC Mortgage Group, LLC and ERISA.  The Debtors have no other retiree benefit obligations.  Therefore, to the extent applicable, section 1129(a)(13) of the Bankruptcy Code is satisfied.

T.    **Sections 1129(a)(14), (15) and (16).**  The Debtors do not owe any domestic support obligations and are not individuals.  Therefore, sections 1129(a)(14) and (15) of the Bankruptcy Code do not apply to the Debtors.  Further, the Debtors are moneyed, business, or commercial corporations or trusts, not nonprofit entities, and, therefore, section 1129(a)(16) of the Bankruptcy Code does not apply to the Debtors.  To the extent that any transfer of property under the Plan will be made by a nonprofit corporation or trust and section 1129(a)(16) of the Bankruptcy Code is thus applicable to the Debtors, such transfers shall be made in accordance with applicable non-bankruptcy law, thereby satisfying section 1129(a)(16) of the Bankruptcy Code.

U.    **Section 1129(b).**  The Plan satisfies section 1129(b) of the Bankruptcy Code with respect to the Rejecting Classes.  The evidence proffered or adduced at the Confirmation Hearing is persuasive and credible, has not been controverted by other evidence, and establishes that the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes.  As required by section 1129(b)(2)(B) and 1129(b)(2)(C) of the Bankruptcy Code, the Plan is fair and equitable with respect to the Intercompany Balances and Equity Interests because (a) no holder of a Claim or Equity Interest will receive more than it is legally entitled to receive on account of its Claim or Equity Interest, and (b) the Plan does not

provide a recovery on account of any Claim or Equity Interest that is junior to the Rejecting

Classes.  As a result, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy

Code. Thus, the Plan may be confirmed even though section 1129(a)(8) of the Bankruptcy

Code is not satisfied. After entry of the Confirmation Order and upon the occurrence of the

Effective Date, the Plan shall be binding upon the members of the Rejecting Classes.

V.     **Section 1129(c).** The Plan (including previous versions thereof) is the only plan

that has been filed in these Chapter 11 Cases that has been found to satisfy the requirements of

subsections (a) and (b) of section 1129 of the Bankruptcy Code.  Accordingly, confirmation of

the Plan complies with the requirements of section 1129(c) of the Bankruptcy Code.

W.     **Section 1129(d).** No party in interest has requested that the Court deny

Confirmation of the Plan on grounds that the principal purpose of the Plan is the avoidance of

taxes or the avoidance of the application of section 5 of the Securities Act, and the principal

purpose of the Plan is not such avoidance.  Accordingly, the Plan satisfies the requirements of

section 1129(d) of the Bankruptcy Code.

X.     **Section 1129(e).** None of these Chapter 11 Cases is a small business case within

the meaning of the Bankruptcy Code.

Y.     Based upon the foregoing and all other pleadings and evidence proffered or

adduced at or prior to the Confirmation Hearing, the Plan and the Debtors as proponents of the

Plan satisfy the requirements for confirmation set forth in section 1129 of the Bankruptcy

Code.

## IMPLEMENTATION OF THE PLAN

Z.     All documents and agreements necessary to implement the Plan, including, but

not limited to, the Plan Documents, are essential elements of the Plan and consummation of each

agreement is in the best interests of the Debtors, the Estates and holders of Claims. The Debtors have exercised reasonable business judgment in determining to enter into the Plan Documents, and each of the Plan Documents have been negotiated in good faith, at arm's length, are fair and reasonable, and shall, upon execution and upon the occurrence of the Effective Date, constitute legal, valid, binding, enforceable, and authorized obligations of the respective parties thereto and will be enforceable in accordance with their terms. Pursuant to section 1142(a) of the Bankruptcy Code, the Plan Supplement documents, and any other documents or agreements necessary to implement the Plan will apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

## CONDITIONS TO THE CONFIRMATION OF THE PLAN

AA.    Each of the conditions precedent to entry of this Order has been satisfied in accordance with Article X.A of the Plan or properly waived in accordance with Article X.C of the Plan.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

BB.    Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, upon the occurrence of the Effective Date, Article V of the Plan provides for the assumption, assumption and assignment, or rejection of certain Executory Contracts and Unexpired Leases. The Debtors' determinations regarding the assumption, assumption and assignment, or rejection of Executory Contracts and Unexpired Leases are based on and within the sound business judgment of the Debtors, are necessary to the implementation of the Plan and are in the best interests of the Debtors, their Estates, holders of Claims and other parties in interest in the Chapter 11 Cases. The Plan Proponents have filed the Assumption Schedule (as it may have been amended or supplemented) and have provided notice to counterparties of the Debtors' determinations

- 19 -

regarding the assumption, assumption and assignment, or rejection of Executory Contracts or
Unexpired Leases and any related Cure Claims.  *See* KCC Affidavit of Service (ECF Doc. #
5581).

### GLOBAL SETTLEMENT UNDER THE PLAN

CC.    The Plan settles numerous litigable issues in the Chapter 11 Cases pursuant to
Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code.  These settlements are in
consideration for the compromises, distributions and other benefits provided under the Plan.  The
Plan constitutes a compromise of all Claims, Equity Interests or Causes of Action relating to the
contractual, legal and subordination rights that a holder of a Claim or Equity Interest may have
with respect to any Allowed Claim or Equity Interest or any distribution to be made on account
of such an Allowed Claim or Equity Interest.

DD.    **The Global Settlement.**  The Plan includes an integrated and comprehensive
settlement that resolves various inter-Debtor, Debtor-Creditor and inter-Creditor issues through
(i) the Ally Settlement, including the funding of the Ally Contribution, (ii) the RMBS
Settlement, (iii) the settlement of the allowed amount and priority of Claims held by certain
monoline insurers, including the FGIC Settlement Agreement, (iv) the settlement of the Private
Securities Claims, (v) the settlement of the allowed amount and priority of the Claims of the
Kessler Class Claimants, (vi) the NJ Carpenters Claims Settlement, (vii) the settlement of the
claims held by the Senior Unsecured Notes Indenture Trustee, on behalf of the Senior Unsecured
Noteholders, (viii) the settlement with FHFA, (ix) the division of the Ally Contribution and
Administrative Expenses among Debtor Groups, (x) a settlement of issues regarding substantive
consolidation, (xi) a settlement of the treatment of the Intercompany Balances, and (xii) a
settlement with the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior
Secured Notes Collateral Agent, and the Ad Hoc Group.  Each component of the Global

- 20 -

Settlement is an integral and inextricable part thereof that cannot be severed from the whole without unraveling the entire Plan. The creditors supporting the Global Settlement include each of the Consenting Claimants, the NJ Carpenters Class, Ambac, Assured, Syncora, the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Collateral Agent, and the Ad Hoc Group, each of which is a sophisticated party and represented by counsel that is recognized as being knowledgeable and experienced in the field of complex chapter 11 cases. The Global Settlement, and each of the settlements embodied within the Global Settlement, is a result of good faith arm's-length negotiations, is in the best interests of the Debtors, the Estates, the RMBS Trusts, Investors, and other parties-in-interest, and is fair, equitable, and within the range of reasonableness.

EE.    In reaching its decision on the substantive fairness of the Global Settlement and the various settlement incorporated therein, the Court considered the following factors: (i) the balance between the litigation's possibility of success and the settlement's future benefits; (ii) the likelihood of complex and protracted litigation with attendant expense, inconvenience and delay; (iii) the paramount interests of creditors, including the relative benefits to each affected class and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (iv) whether other parties in interest support the settlement; (v) the competency and experience of counsel and the experience and knowledge of the bankruptcy judge; (vi) the nature and breadth of releases to be obtained by officers and directors; and (vii) the extent to which the settlement is the product of arm's length bargaining.

FF.    As set forth in Article IV.B. of the Plan, pursuant to the Global Settlement, Ally shall pay the Estates the Ally Contribution in accordance with the Plan. In addition, Ally has made numerous substantial contributions to the Estates during the chapter 11 cases that were

essential to the success of the Debtors' bankruptcy, e.g., serving as the stalking horse bidder for the Debtors' portfolio of HFS loans; enabling the Debtors to continue originating loans during the chapter 11 cases by funding the loans on market terms, which sustained and enhanced the value of the Debtors' servicing platform sold to Ocwen Loan Servicing, LLC for $3 billion; providing the Debtors with DIP financing of up to $220 million; permitting the Debtors to use Ally Bank's portfolio of loans to satisfy their obligations to various regulators so that the Debtors could continue operations and reduce liabilities; providing certain shared services to the Debtors; and supporting certain pension obligations of the Debtors.  In exchange for the Ally Contribution and the Ally Released Parties' other substantial contributions during the Chapter 11 Cases, Ally shall receive the following consideration:  (i) the Debtor Releases, (ii) the Third Party Releases, (iii) a settlement of the Debtors' rights to and under the Settlement Insurance Policies, (iv) the transfer by the Debtors of the funds held in the Ally Indemnity Escrow Account and the remission of the Misdirected Funds to Ally, and Ally's release of the approximately $1.787 million in Cash overfunded by the Debtors prior to the Petition Date and which is currently held by Ally, (v) the Debtors' performance of the obligations under the DOJ/AG Settlement, the Consent Order and the Order of Assessment on the terms set forth in Article IV.B(e) of the Plan, and (vi) the allowance and payment in full of the Ally Contract Claims as provided in the Plan.

GG.   The consideration provided to the Ally Released Parties as part of the Global Settlement, including the rights and obligations accorded elsewhere in the Plan to Ally is: (1) in exchange for the good, valuable and substantial consideration from the Ally Released Parties; (2) in the best interests of the Debtors, the Estates, the Plan Trusts and all holders of Claims and Equity Interests; (3) a good faith settlement and compromise of the claims released under the Plan; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for a

- 22 -

hearing; (6) justified by truly unusual circumstances; (7) an essential component and critical to the success of the Plan; (8) resulting in distributions to the creditors that would otherwise have been unavailable; (9) the result of an identity of interest between the Debtors and the Ally Released Parties regarding the Plan; and (10) a bar to the Debtors, the Plan Trusts, in the case of the Debtor Releases, and any party asserting a claim or cause of action released against any of the Ally Released Parties in connection with the Third Party Release.

HH.    As one component of the Global Settlement, the Plan implements the FGIC Settlement Agreement.  The Court approved the FGIC Settlement Agreement by order dated September 16, 2013.  The findings of fact and conclusions of law in support of the Court's approval of the FGIC Settlement are set forth in the Court's *Memorandum Decision and Order, and Findings of Fact and Conclusions of Law, Approving the FGIC Settlement Motion* (ECF Doc. # 5042) (the "FGIC Settlement Approval Decision"), dated September 13, 2013, and included, among other things, that the FGIC Settlement is an "essential, inextricable, and critical cornerstone of the Global Settlement" underlying the Plan. (FGIC Settlement Approval Decision, at *35; *see also id.* at *20 ("The Settlement Agreement that is the subject of this Motion, while a stand-alone agreement, represents a critical component of the Global Settlement.").  Among other things, the FGIC Settlement Approval Decision overruled an objection by the Ad Hoc Group of Junior Secured Noteholders (the "JSNs") that the FGIC Settlement Agreement did not subordinate the Monoline Claims pursuant to section 510(b) of the Bankruptcy Code.  The JSNs objected to confirmation on this same basis.  That objection has been resolved by the JSN Settlement.

II.    As one component of the Global Settlement, the Plan also implements the RMBS Settlement, and the Global Settlement reflects a good faith compromise and settlement of all

objections to the Original RMBS Settlement Agreements by the Creditors' Committee, certain of the Consenting Claimants, and certain other parties.

JJ. As one component of the Plan and Global Settlement, the Plan also implements a settlement with the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Collateral Agent, and the Ad Hoc Group (the "JSN Settlement"), and the JSN Settlement reflects a good faith compromise and settlement between the Plan Proponents and the Ad Hoc Group that resolves all issues raised in the JSN Adversary Proceeding, and the confirmation objections filed by the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Collateral Agent, and the Ad Hoc Group. Each of the "Managed Funds" and the "Direct Holders" listed on Exhibit A to the Declaration Of Gerard Uzzi In Connection With Changed Votes Of Certain Members Of Ad Hoc Group Of Junior Secured Noteholders On Plan Proponents' Second Amended Chapter 11 Plan, dated December 10, 2013 (ECF Doc. # 6058) has voted to accept the Second Amended Plan and, along with each Managed Fund's "Investment Manager" also listed on Exhibit A, is a Consenting JSN under the Plan and this Confirmation Order. Each of the entities listed on Schedule 1 to the Supplemental Declaration of Lorenzo Marinuzzi Regarding the Tabulation of Votes on the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors, dated December 10, 2013 (ECF Doc. # 6061) has voted to accept the Second Amended Plan and is a Consenting JSN under the Plan and this Confirmation Order.

KK. The Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement, the JSN Settlement, and all transactions contemplated by each of the foregoing, including the releases given therein, are in the best interests of the Debtors, their Estates, their creditors, the Investors in each RMBS Trust, each

such RMBS Trust, the RMBS Trustees and all other parties in interest.  The RMBS Trustees acted reasonably, in good faith and in the best interests of the Investors in each RMBS Trust and each such RMBS Trust in (i) entering into the Plan Support Agreement, (ii) performing their obligations under the Plan Support Agreement, including voting in favor of the Plan, where applicable, and (iii) agreeing to, and performing under, the Global Settlement and each of the settlements embodied therein, including the RMBS Settlement and the FGIC Settlement Agreement.  The RMBS Trustees' Notice of the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement, and all the transactions contemplated by each of the foregoing, including the releases given therein, was sufficient and effective in satisfaction of federal and state due process requirements and other applicable law to put the parties in interest in these Chapter 11 Cases and others, including the Institutional Investors and the Investors in each RMBS Trust, on notice of the Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement, and all the transactions contemplated by each of the foregoing, including the releases given therein.  The findings of fact and conclusions of law set forth in this paragraph shall be binding solely in connection with the RMBS Trustees, the RMBS Trusts (including the Investors in the RMBS of such RMBS Trusts) and the actions of the RMBS Trusts and the RMBS Trustees with respect to the Plan Support Agreement and Plan, including the RMBS Settlement and the FGIC Settlement Agreement.  In addition, the Allowed Fee Claim is reasonable and appropriate under the circumstances.

LL.    The Global Settlement, and each of the settlements embodied therein, gives due consideration to the strengths and weaknesses of potential arguments that have been made for and against substantive consolidation of the Debtors' estates.  As set forth in the Confirmation

- 25 -

Brief and the Direct Testimony, litigation regarding substantive consolidation of the Debtors would require vast amounts of discovery and investigation into the Debtors' operations prior to the Petition Date, would be extraordinarily complex and costly for all parties involved and would significantly delay distributions to creditors. The proposed partial consolidation under the Plan, as a key element of the Global Settlement, is reasonable and appropriate under the circumstances, and does not adversely affect any holders of Claims or Equity Interests.

MM.    Prior to the Petition Date, the Debtors entered into tens of thousands of transactions over a period of years which led to intercompany balances on the Debtors' books and records as of the Petition Date. The Debtors conducted an analysis of the Intercompany Balances and, based on the facts and analyses set forth in the Disclosure Statement, Confirmation Brief, and the Direct Testimony, believe, with the support of the Creditors' Committee, that such Intercompany Balances lack many of the indicia of true debt and enforceable claims. Litigation regarding the enforceability of the Intercompany Balances would be extremely time consuming and expensive, would delay distributions to all creditors, and would have a substantial detrimental impact on creditor recoveries. In light of the JSN Settlement, the waiver of Intercompany Balances as one part of the Global Settlement embodied in the Plan is therefore in the best interest of the Debtors' estates and all creditors.

NN.    **Releases, Exculpations, and Injunctions of Released Parties.**  Each Debtor Released Party that is not a Debtor will benefit from the releases, exculpations and related injunctions set forth in the Plan (collectively, the "Plan Releases"), and either shares an identity of interest with the Debtors (either by way of right to indemnity, contribution, or otherwise), was instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors, which value provided a

significant benefit to the Debtors' estates and general unsecured creditors, and which will allow for distributions that would not otherwise be available but for the contributions made by such non-Debtor parties. The Plan, including the Plan Releases, garnered overwhelming support from the Debtors' creditor constituencies. The Plan Releases are, individually and collectively, integral to, and necessary for the successful implementation of, the Plan, essential to the Debtors' orderly liquidation and supported by reasonable consideration.

OO. <u>Debtor Releases</u>. The releases and discharges of Claims and Causes of Action by the Debtors described in Article IX.C of the Plan (the "<u>Debtor Releases</u>") pursuant to section 1123(b)(3)(A) of the Bankruptcy Code represent a valid exercise of the Debtors' business judgment. Settling such claims against the Debtor Released Parties is in the best interest of the Debtors' estates as the benefits of settling such claims outweigh any potential benefit from pursuing such claims in light of, among other things, the cost and risk involved in litigation. Thus, the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Debtor Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtors' release; (3) in the best interests of the Debtors, the Estates, the Plan Trusts and all holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to the Debtors, the Plan Trusts and any holder of a Claim or Equity Interest or other Entity who would have been legally entitled to assert such Claim or Equity Interest on behalf of any of the Debtors or any of their Estates from asserting any Claim or Cause of Action released pursuant to the Debtors' release.

PP. <u>Third Party Releases</u>. The circumstances of these Chapter 11 Cases are unique and truly unusual and they render the releases of Claims and Causes of Action by Holders of Claims and Interests described in Article IX.D of the Plan (the "<u>Third Party Release</u>") critical to

the success of the Plan.  The Ally Contribution constitutes a substantial contribution to the estates by the Ally Released Parties and constitutes the vast majority of the $2.6 billion that is estimated to be available for distribution to unsecured creditors.  In addition, the Ally Released Parties made several non-economic contributions to the Estates during the Chapter 11 Cases, including cooperation with the Debtors to enable their operations to continue unabated following the Petition Date and to achieve the sale of their key assets as a going concern.  Ally also permitted the Debtors to continue to originate and subservice loans that were sold to Ally Bank, which helped maintain the value of the Debtors' origination and servicing platform.  Ally also provided a DIP loan to the Debtors and was willing to serve as the stalking horse bidder for the Debtors' legacy loan portfolio, each of which contributed significant incremental value to the Debtors' estates.

QQ.    The individual officers and directors of Ally and its subsidiaries (including the Debtors' directors, officers, and employees) covered by the Third Party Release have also made a substantial contribution to the Plan by giving up their rights to shared insurance that they would otherwise have access to defend themselves against such potential claims.  The amount of the coverage that Ally's individual officers and directors have sacrificed is directly related to $150 million of the Ally Contribution.  These parties will also forego their own claims for indemnity and contribution from the estates.  By giving up their insurance and contractual indemnity claims, the Debtors' officers and directors have provided substantial consideration to the Debtors' Estates.

RR.    In consideration for the Ally Contribution and as part of the Global Settlement, the Ally Released Parties required that the Third Party Release be included in the Plan.  The Ally Contribution is the lynchpin of the Plan, without which the cases would devolve into endless

- 28 -

litigation, the Plan would not be confirmable or feasible, and the recoveries currently contemplated by the Plan would not exist.  These facts are unprecedented and justify the approval of the Third Party Releases.

SS.    There is an identity of interest between the Debtors and the beneficiaries of the Third Party Releases. The Ally Released Parties have the right to seek indemnity, contribution or other reimbursement from the Debtors with respect to the Debtors' activities.  The Third Party Releases appropriately relieve the Debtors from these potential expenses.  Finally, Ally and the Debtors' officers, directors, and employees are co-insured parties on "wasting asset" errors and omissions and directors and officers insurance.  Any claim against Ally, or its subsidiaries or affiliates, or against any of its directors, officers, or employees, that is covered by any of these policies could reduce the amount of insurance available to the Debtors.

TT.    The Third Party Releases are overwhelmingly consensual as they are supported by all parties to the Global Settlement, are not opposed by any clearly affected creditors, and numerous additional creditors have expressed their consent as part of individual or group settlements entered into subsequent to Plan solicitation. The Third Party Release is also consensual as to those parties that affirmatively voted to approve the Plan.  The Third Party Release was extensively disclosed in the Disclosure Statement and the Ballots and consented to by all parties who either voted in favor of the Plan and/or failed to properly submit a ballot voting on the Plan.

UU.    The Third Party Releases satisfy the applicable standards contained in *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005), are otherwise appropriate under *In re Johns-Manville Corp.*, 600 F.3d 135 (2d Cir. 2010), and are: (1) in exchange for the good, valuable and substantial consideration provided by the Ally Released Parties; (2) in the best

interests of the Debtors, the Estates, the Plan Trusts and all holders of Claims and Equity Interests; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for a hearing; (5) justified by truly unusual circumstances; (6) an essential component and critical to the success of the Plan; (7) the primary source of distributions to the Creditors that would otherwise have been unavailable; (8) the result of an identity of interest between the Debtors and the Ally Released Parties regarding the Plan; and (9) a bar to any party asserting a claim or cause of action released pursuant to this Third Party Release against any of the Ally Released Parties.

VV.    Exculpation.  The exculpation provisions set forth in Article IX.H of the Plan are essential to the Plan. The record in the Chapter 11 Cases fully supports the Exculpation, and the Exculpation provisions set forth in Article IX.H of the Plan are appropriately tailored to protect the Exculpated Parties from inappropriate litigation. The Exculpation shall have no effect on the liability of any Entity that results from any act or omission that is determined in a final, non-appealable, order to have constituted gross negligence or willful misconduct; provided, however, that each Exculpated Party shall be entitled to rely upon the advice of counsel and financial advisors concerning his, her, or its duties pursuant to, or in connection with, any prepetition plan support agreement, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, and the RMBS Settlement.  There are no remaining objections to the Exculpation set forth in Article IX.H of the Plan.

WW.    Injunction.  The injunction provisions set forth in Article IX.I of the Plan are essential to the Plan and are necessary to preserve and enforce the Debtor Releases, the Third Party Releases, and the exculpation provisions in Article IX of the Plan, and are narrowly tailored to achieve that purpose.

XX.      Each of the Debtor Releases, the Third Party Releases, and the injunction and exculpation provisions set forth in the Plan: (a) is within the jurisdiction of the Bankruptcy Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated into the Plan; (d) confers material benefits on, and is in the best interests of, the Debtors, the Estates, and their Creditors; (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors; and (f) is consistent with sections 105, 1123, 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law. The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the Debtor Releases, the Third Party Releases, and the injunction and exculpation provisions contained in Article IX of the Plan.

## MISCELLANEOUS

YY.      **Objections**.  All parties have had a full and fair opportunity to litigate all issues raised in the objections (excluding any timely filed objections that relate solely to the assumption of any executory contract), or which might have been raised, and the objections (excluding any timely filed objections that relate solely to the assumption of any executory contract) have been fully and fairly litigated.

ZZ.      **Waiver of Stay**.  Given the facts and circumstances of these cases and the absence of any material objections to confirmation of the Plan, it is appropriate that the 14-day stay imposed by Bankruptcy Rules 3020(e) and 7062(a) be waived.

AAA.  **Retention of Jurisdiction**.  This Court is authorized to retain jurisdiction over the matters set forth in Article XII of the Plan and sections 105(a) and 1142 of the Bankruptcy Code.

## II.    ORDER

BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.    **Confirmation of the Plan.**    The Plan (including the Plan Supplement), is CONFIRMED in each and every respect, pursuant to section 1129 of the Bankruptcy Code, and the terms of the Plan (including the Plan Supplement) are incorporated by reference into, and are an integral part of, this Order.  The Effective Date of the Plan shall occur on the date determined by the Plan Proponents in accordance with Articles X.D and XI.A of the Plan, when the conditions set forth in Article X.B of the Plan have been satisfied or, if applicable, have been waived in accordance with Article X.C of the Plan.  The failure to specifically include or to refer to any particular article of the Plan, section or provision of the Plan, Plan Supplement or any related document in this Order shall not diminish or impair the effectiveness of such article, section or provision, it being the intent of the Court that this Order confirm the Plan and any related documents in their entirety.

2.    **Objections to the Plan are Overruled**.  All parties have had a full and fair opportunity to litigate all issues raised by objections to confirmation of the Plan.  Any objections or responses to confirmation of the Plan and the reservation of rights contained therein that (a) have not been withdrawn, waived or settled prior to the entry of this Order or (b) are not cured by the relief granted herein are hereby OVERRULED in their entirety and on their merits, and all withdrawn objections or responses are hereby deemed withdrawn with prejudice.

3.    **Notice**.  Notice of the Confirmation Hearing complied with the terms of the Disclosure Statement Order, was appropriate and satisfactory based on the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.  In addition, due, adequate and sufficient notice of the

Assumption Schedule was provided to all counterparties to Executory Contracts and Unexpired Leases with the Debtors, in substantial compliance with the Disclosure Statement Order and Bankruptcy Rules 2002(b), 3017 and 3020(b), and no other or further notice is or shall be required.

4.      **Plan Classification Controlling.**  The terms of the Plan shall solely govern the classification of Claims and Equity Interests for purposes of the distributions to be made thereunder.  The classifications set forth on the Ballots tendered to or returned by the holders of Claims or Equity Interests in connection with voting on the Plan pursuant to the Disclosure Statement Approval Order:  (a) were set forth on the Ballots solely for purposes of voting on the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims and Equity Interests under the Plan for distribution purposes; (c) may not be relied upon by any holder of a Claim or Equity Interest as representing the actual classification of such Claim or Equity Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtors or the Plan Trusts except for voting purposes.

5.      **Order Binding on All Parties.**   Subject to Article X.A of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and this Order shall be immediately effective and enforceable and deemed binding upon, and inure to the benefit of: (a) the Debtors; (b) the Plan Trusts; (c) any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan); (d) all Entities that are parties to or subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan; (e) each Entity acquiring property under the Plan; (f) any and all non-Debtor parties to Executory Contracts or Unexpired Leases with any of the Debtors; and (g) the respective heirs,

executors, administrators, trustees, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries (including the Investors), guardians, successors or assigns, if any, of any of the foregoing.  On the Effective Date, all settlements, compromises, releases (including, without limitation, the Plan Releases), waivers, discharges, exculpations, and injunctions set forth in the Plan shall be effective and binding on all Persons.

6.      **Other Essential Documents and Agreements.**      The form of documents comprising the Plan Supplement, any other agreements, instruments, certificates or documents related thereto, including any amendments permitted or contemplated by paragraph 60 of this Order, and the transactions and other matters contemplated by each of the foregoing are approved and, upon execution and delivery of the agreements and documents relating thereto by the applicable parties, shall be in full force and effect and valid, binding and enforceable in accordance with their terms without the need for any further notice to or action, order or approval of this Court, or other act or action under applicable law, regulation, order or rule.  The Debtors, and after the Effective Date, the Plan Trusts, are authorized, without further approval of this Court or any other party, to execute and deliver all agreements, documents, instruments, securities and certificates relating to such agreements and perform their obligations thereunder, including, without limitation, payment of all fees due thereunder or in connection therewith.

7.      **Global Settlement**.  The Global Settlement set forth in Article IV of the Plan, and each component of the Global Settlement, including the JSN Settlement, are hereby approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 as fair and reasonable and in the best interests of each of the Debtors, their estates and Creditors.  Each provision of the Global Settlement is non-severable from each other and the remaining terms of the Plan.  The compromises and settlements embodied in the Global Settlement are in the best

interests of the Debtors, their Estates, Creditors, the RMBS Trusts, Investors, and other parties-in-interest, and are fair, equitable, and within the range of reasonable results if the issues were litigated and therefore falls above the lowest point in the range of reasonableness. The Debtors or the Plan Trusts, as applicable, are duly authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents, and papers, including each of the Plan Documents, and to take any and all actions reasonably necessary or appropriate to consummate the Global Settlement and each of the settlements embodied therein, including waiving any conditions precedent to their effectiveness, and performing any and all obligations contemplated therein.

8.      <u>Ally Settlement</u>. The Ally Settlement set forth in Article IV.B of the Plan is hereby approved as part of the Global Settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

9.      <u>RMBS Settlement</u>. The RMBS Settlement, including the Allowed Fee Claim, set forth in Article IV.C of the Plan is hereby approved as part of the Global Settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. To the extent applicable, the Allowed Fee Claim is hereby approved as reasonable pursuant to section 1129(a)(4) of the Bankruptcy Code. Pursuant to section 502 of the Bankruptcy Code, the RMBS Trusts shall have Allowed Claims against the Debtor Groups in the amounts and allocations set forth in Article IV.C.2 of the Plan, with distributions on account of such Claims subject to the RMBS Trust Allocation Protocol, and the Allowed Fee Claim shall be payable to counsel to the Institutional Investors in the amount set forth in Article IV.C.6 of the Plan and the Plan Supplement. Upon entry of this Order, all objections to the Original RMBS Settlement Agreement by the Creditors' Committee and the Consenting Claimants, as applicable, shall be deemed settled.

10.     <u>Settlement of Monoline Claims</u>. The settlements of the Allowed amount and priority of the Claims held by certain monoline insurers set forth in Article IV.D of the Plan are hereby approved as part of the Global Settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.  Pursuant to section 502 of the Bankruptcy Code, MBIA, FGIC, Assured, and Ambac shall have Allowed General Unsecured Claims against the Debtor Groups in the amounts and allocations set forth in Article IV.D.1, IV.D.2, IV.D.3, and IV.D.4 of the Plan, respectively.

11.     <u>Settlement of Settling Private Securities Claimants' Claims</u>. The settlements of the Allowed amount and priority of the Claims held by the Settling Private Securities Claimants set forth in Article IV.E of the Plan are hereby approved as part of the Global Settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.  Pursuant to section 502 of the Bankruptcy Code, the Settling Private Securities Claimants shall have Allowed Claims for voting purposes in the amounts set forth in Article IV.E.6 of the Plan.

12.     <u>Settlement of Senior Unsecured Notes Claims</u>. The settlement of the Senior Unsecured Notes Claims set forth in Article IV.I of the Plan is hereby approved as part of the Global Settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. Pursuant to section 502 of the Bankruptcy Code, the Senior Unsecured Noteholders shall have Allowed Claims in the amounts set forth in Article IV.I of the Plan.

13.     <u>NJ Carpenters Settlement</u>. The NJ Carpenters Settlement, including but not limited to the payment of the NJ Carpenters Claims Distribution in settlement of the NJ Carpenters Claims, is hereby approved as part of the Global Settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.  The NJ Carpenters Class Members shall receive the NJ Carpenters Claims Distribution less the amounts advanced by the Debtors for

- 36 -

class notice and administration as provided for and in accordance with the Plan and New Jersey Carpenters Settlement.

14.    <u>Partial Consolidation of the Debtors</u>.  The partial consolidation of the Debtors into Debtor Groups solely for purposes of describing treatment under the Plan and making distributions under the Plan is fair and appropriate and approved as one component of the Global Settlement.  The partial consolidation of the Debtors, however, shall not (other than for purposes relating to making distributions under the Plan) affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets except as contemplated by the Plan; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities until dissolved in accordance with the Plan.

15.    <u>FHFA Settlement</u>. The FHFA assigned to Ally any and all distributions due to the FHFA and/or Freddie Mac under the Plan effective as of the Effective Date on account of the proofs of claim filed by the FHFA in the Chapter 11 Cases [Claim Nos. 6296, 6297, 6298, 6299, 6300, and 6301) (the "<u>FHFA Claim Proceeds</u>").[3] The FHFA has in writing directed the Debtors and the Liquidating Trustees to pay to Ally on the Effective Date the FHFA Claims Proceeds.

---

[3]    For the avoidance of doubt, the FHFA Claim Proceeds do not include any distributions to the Federal Home Loan Mortgage Corporation ("<u>Freddie Mac</u>") or to securitization trustees on account of claims set forth in proofs of claims other than claim numbers 6296, 6297, 6298, 6299, 6300, and 6301. Nothing herein or in the Plan prohibits, restricts, or limits FHFA or Freddie Mac from receiving any benefits deriving from, or exercising any rights appurtenant to, Freddie Mac's ownership of interests in RMBS at issue in the lawsuit entitled Federal Housing Finance Agency v. Ally Financial Inc., et al., No. 11 Civ. 7010 or these Chapter 11 Cases, including without limitation, the right to receive or assign payments from its investments in the RMBS or to sell or otherwise dispose of its interests in the RMBS. Other than the FHFA Claims Proceeds, Ally is not entitled to any other amounts relating to RMBS owned by Freddie Mac, including any amounts relating to claims set forth in Article IX.E.ii of the Plan.

The Debtors and the Liquidating Trust shall pay to Ally on the Effective Date the FHFA Claim
Proceeds.

16.    Strictly for purposes of voting on the Plan and distributions thereunder, (i) the
FHFA Claims against RFC shall be allowed in the amount of $1.2 billion in full and final
satisfaction of the FHFA Claims; (ii) such allowed claim shall be an "Allowed FHFA Claim" in
class RS-11 as provided in Art. III.D.3(k) of the Plan; (iii) the Allowed FHFA Claim shall not be
subject to subordination and shall receive a cash distribution of $24 million on the Effective Date
(equal to 2% of the Allowed amount of the FHFA Claim), as provided in Art. III.D.3(k) of the
Plan; and (iv) the FHFA Claims against any Debtors other than RFC shall be deemed satisfied in
full, without any further order or action.

17.    The Plan does not contain any determination regarding the validity or invalidity of
the application of Section 4617(b)(15) of the Housing and Economic Recovery Act of 2008
("HERA") in the Chapter 11 Cases. Nothing herein or in the Plan is, or shall be construed as, a
concession to the validity of any disputes or defenses interposed to claims asserted by FHFA and
Ally, including, without limitation, with respect to FHFA's assertions of rights, powers, and
priorities under 12 U.S.C. § 4617(b)(15) as such disputes have been compromised and settled
pursuant to FHFA and Ally's October 25, 2013 agreement, and any subsequently entered into
agreement between them. Nothing in the Plan or this Order shall affect, limit or otherwise
prejudice the FHFA's rights, titles, powers, and privileges under HERA; provided that nothing in
this paragraph 17 shall limit the releases as set forth in the Plan and any such agreement between
FHFA and Ally.

18.    JSN Settlement. The JSN Settlement, including but not limited to the payment of
the Junior Secured Notes Distribution in full and final settlement, satisfaction and release of any

and all Claims of (and obligations and duties between and among) the Junior Secured
Noteholders, the Ad Hoc Group, the Junior Secured Notes Indenture Trustee, the Junior Secured
Notes Predecessor Indenture Trustee, and the Junior Secured Notes Collateral Agent (including
Claims by the Junior Secured Noteholders against the Junior Secured Notes Collateral Agent, the
Junior Secured Notes Indenture Trustee, and the Junior Secured Notes Predecessor Indenture
Trustee), under, evidenced by, or related to any of the JSN Documents, including, but not limited
to, any claims for principal, interest, fees and expenses (including the Junior Secured Notes
Collateral Agent Fees and Expenses and the Junior Secured Notes Indenture Trustee Fees,
which, to the extent unpaid, shall be charged against and paid from the Junior Secured Notes
Distribution promptly following the distribution of the Junior Secured Notes Distribution),
indemnification claims, and other charges, is hereby approved pursuant to section 1123 of the
Bankruptcy Code and Bankruptcy Rule 9019. No person shall be entitled to seek to disgorge or
recharacterize any amounts previously paid or reimbursed under the Paydown Orders or the
AFI/JSN Cash Collateral Order, which amounts shall be deemed indefeasibly paid and finally
allowed.   On the Effective Date, all claims, counterclaims, and/or issues raised in the JSN
Adversary Proceeding and the FGIC Settlement Appeal shall be automatically deemed finally
and irrevocably settled by the Plan.  Within five (5) days of entry of this Confirmation Order, (i)
the parties to the JSN Adversary Proceeding shall execute, and within one (1) Business Day after
the funding of the Junior Secured Notes Distribution the plaintiffs in the JSN Adversary
Proceeding shall file, a stipulation of dismissal in the JSN Adversary Proceeding; and (ii) the
parties to the FGIC Settlement Appeal shall execute, and within one (1) Business Day after the
funding of the Junior Secured Notes Distribution the Ad Hoc Group shall file, a stipulation
voluntarily dismissing the FGIC Settlement Appeal in accordance with Bankruptcy Rule

8001(c), in each of (i) and (ii) above, with prejudice and without costs awarded to any party.  For

the avoidance of doubt, the Bankruptcy Court shall retain jurisdiction to enforce the terms of this

paragraph 18.

19.    **WFBNA Objections**.  The *Limited Objection of WFBNA to Confirmation of Joint*

*Chapter 11 Plan Proposed by Residential Capital, LLC and the Official Committee of Unsecured*

*Creditors* (ECF Doc. # 5411) and the *Post Confirmation Hearing Brief in Further Support of*

*Limited Objection to WFBNA to Confirmation of Joint Chapter 11 Plan Proposed by Residential*

*Capital, LLC and the Official Committee of Unsecured Creditors* (ECF Doc. # 6017) have been

withdrawn with prejudice. (ECF Doc. ## 6052, 6053). Wachovia Bank and Wachovia Bank of

Delaware, now succeeded by Wells Fargo Bank, N.A. ("<u>WFBNA</u>") shall be deemed to have

consented to confirmation of the Plan.   The Plan Proponents, Liquidating Trust and the

Liquidating Trustee, on the one hand, and WFBNA, on the other hand, reserve all of their

respective rights with respect to the claims filed by WFBNA in these Chapter 11 Cases.

20.    **Compromise and Settlement of Claims, Equity Interests, and Controversies.**

In accordance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in

consideration for the distributions and other benefits provided pursuant to the Plan, the

provisions of the Plan shall, upon consummation, constitute a good faith compromise of all

Claims, Equity Interests and controversies relating to the contractual, legal and subordination

rights that a holder of a Claim may have with respect to any Allowed Claim or Equity Interest, or

any distribution to be made on account of such Allowed Claim or Equity Interest.   All such

compromises or settlements of Claims, Equity Interests and controversies, are approved, in the

best interests of the Debtors, their Estates and holders of Claims and Equity Interests are entirely

fair and are fair, equitable and reasonable.   In accordance with the provisions of the Plan,

pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any

further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date,

the Liquidating Trust may compromise and settle Claims against the Debtors and Causes of

Action against other Entities.

21.     **Implementation of the Plan**.   This Confirmation Order authorizes (a) the

creation and implementation of the Liquidating Trust, the RMBS Claims Trust, the Private

Securities Claims Trust and the Borrower Claims Trust in accordance with the terms of the

Confirmation Order, the Plan, the Liquidating Trust Agreement, the RMBS Claims Trust

Agreement, the Private Securities Claims Trust Agreement and the Borrower Claims Trust

Agreement, and (b) the Liquidating Trust Board and Liquidating Trust Management, the RMBS

Claims Trust Trustee, the Private Securities Claims Trustee, and the Borrower Claims Trustee to

accomplish the purposes of the Liquidating Trust, the RMBS Claims Trust, the Private Securities

Claims Trust and the Borrower Claims Trust, respectively, as set forth in the Liquidating Trust

Agreement, the RMBS Claims Trust Agreement, the Private Securities Claims Trust Agreement

and the Borrower Claims Trust Agreement, respectively, notwithstanding any otherwise

applicable nonbankruptcy law.   The Liquidating Trust, the RMBS Claims Trust, the Private

Securities Claims Trust and the Borrower Claims Trust may be established prior to the Effective

Date to the extent necessary, desirable, or appropriate to effectuate the Plan.   The Liquidating

Trust, the RMBS Claims Trust, the Private Securities Claims Trust and the Borrower Claims

Trust, and each of their respective boards, trustees, and management, as applicable, shall have no

liability other than as set forth in the applicable trust agreement, and shall have no other

obligations other than to carry out the purpose and obligations of the respective Plan Trust in

accordance with their terms.

- 41 -

22.     The Debtors, the Liquidating Trust, the Liquidating Trust Manager, their respective members, directors, officers, representatives and agents are hereby authorized to enter into, execute, deliver, file and/or implement any documents and instruments substantially consistent with or incidental to the Plan, and any amendments, supplements or modifications thereto as may be appropriate, and to take such other steps and perform such other acts as may be necessary, useful or appropriate to implement and effectuate the Plan and all other related instruments and documents and this Confirmation Order, and to satisfy all other conditions precedent to the implementation and effectiveness of the Plan.  The Liquidating Trust is hereby authorized to make distributions and other payments in accordance with the Plan and the Liquidating Trust Agreement, regardless of whether any appeal of this Confirmation Order has been filed, except where a stay pending appeal has been granted. The signature of the Liquidating Trust Manager, or any other member of the Liquidating Trust Management duly authorized by the Liquidating Trust Board, on any check issued by the Debtors or the Liquidating Trust in payment of Distributions or other amounts contemplated by the Plan shall be sufficient authorization for the drawee bank to honor such check, and no other signature shall be required.

23.     On or prior to the Effective Date the Liquidating Trust shall be converted from a Delaware common law trust to a Delaware statutory trust, and if such conversion occurs prior to the Effective Date, John S. Dubel shall be appointed to serve as the sole member of the Liquidating Trust Board until the Effective Date.  Quest Turnaround Advisors, LLC shall be appointed as the Liquidating Trust Manager at such time as the Liquidating Trust is converted to a Delaware statutory trust as aforesaid.  The members of the Liquidating Trust Board from and after the Effective Date shall initially consist of John S. Dubel, Mitchell Sonkin, Matthew

- 42 -

Doheny, Paul J. Weber, Samuel L. Molinaro, Jr.   John S. Dubel, in his capacity as trustee of the common law trust, and the sole member of Liquidating Trust Board, the Liquidating Trust Manager and any other officers of the Liquidating Trust, insofar as they shall serve in such capacities prior to the Effective Date, shall be exculpated and indemnified to the same extent as the exculpation and indemnification of the Liquidating Trust Board, the Liquidating Trust Manager and the other officers of the Liquidating Trust from and after the Effective Date.  The appointment of the Liquidating Trust Manager and the Liquidating Trust Board is consistent with the interests of holders of Claims against and Equity Interests in the Debtors and with public policy.

24.     As provided in the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, the Debtors will transfer and assign to the Liquidating Trust the Available Assets in accordance with Article VI.C of the Plan, which shall be deemed vested in the Liquidating Trust.  On and after the Effective Date, the Liquidating Trust Board shall have discretion with respect to the timing of the transfers of Liquidating Trust Assets.   The Liquidating Trust will hold and administer Liquidating Trust Assets, including the Available Assets, including among other things, (i) Cash in bank account(s), (ii) the Liquidating Trust Expenses Set Aside, (iii) the Administrative, Priority, Secured and Convenience Distribution Reserve, (iv) the DOJ/AG Settlement Reserve, and (v) the Disputed Claims Reserve.

25.     All transfers of property by the Debtors to the Liquidating Trust (i) are or shall be legal, valid and effective transfers of property, (ii) vest or shall vest the Liquidating Trust with good title to such property free and clear of all liens, charges, claims, encumbrances or interests, except as expressly provided in the Plan or in this Confirmation Order, (iii) do not and shall not constitute voidable transfers under the Bankruptcy Code or under applicable non-bankruptcy

law, (iv) shall be exempt from any transfer, sales, stamp or other similar tax (which exemption shall also apply to the transfers by the Liquidating Trust) and (v) do not and shall not subject the Liquidating Trust Board, Liquidating Trust Management, or holders of Claims to any liability by reason of such transfer under the Bankruptcy Code or under applicable non-bankruptcy law, including, without limitation, any laws affecting successor or transferee liability.

26.     On and after the Effective Date, the Liquidating Trust Board shall be authorized, in its sole and absolute discretion, to take all actions reasonably necessary to manage or dissolve the Debtors and their subsidiaries, including the Non-Debtor Subsidiaries, under applicable laws, including the laws of the jurisdictions in which they may be organized or registered, notwithstanding any applicable consent requirements or other restrictions contained in any financing agreements or other debt or other documents to which any Debtor is a party, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation.  The Liquidating Trust Board shall have no liability for using its discretion to dissolve or not dissolve any of the Debtors or their subsidiaries.  Whether or not dissolved, the Debtors shall have no authorization to implement the provisions of the Plan from and after the Effective Date except as specifically provided otherwise in the Plan or as directed by the Liquidating Trust.  Notwithstanding the foregoing, the Liquidating Trust Board shall not dissolve any Debtor to the extent such Debtor is required to hold Available Assets after the Effective Date pursuant to Article VI.C of the Plan, and any such Debtors shall be authorized to take such actions at the direction of the Liquidating Trust Board as may be necessary to implement the provisions of the Plan with respect to such Available Assets or otherwise.  Notwithstanding anything in this Order, the Equity Interests in the Debtors are cancelled on the Effective Date as set forth in Article III.D of the Plan.

27.     <u>**Waiver of Rights to and Under Settlement Insurance Policies**</u>.  Article IV.B.c of the Plan provides that the Debtors shall: (a) permit Ally to recover under the Settlement Insurance Policies, and (b) relinquish in favor of Ally and its Representatives all coverage that might otherwise belong to, or inure to the benefit of, the Debtors under such Settlement Insurance Policies.   Subject to Article IV.B.c of the Plan, in exchange for the Third Party Releases under the Plan, the Debtors' former and current officers and former and current directors that would otherwise have indemnity rights against the Debtors or rights as an "insured" under applicable insurance policies, shall be deemed to have waived such rights against the Debtors.

28.     <u>**Exemption from Certain Taxes and Fees**</u>.  Pursuant to Bankruptcy Code section 1146(a), any transfers of property pursuant to the Plan shall not be subject to any stamp, real estate transfer, mortgage reporting, or other similar tax or governmental assessment in the United States, and this Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

29.     <u>**Governmental Approvals Not Required**</u>. Except as otherwise expressly provided in this Confirmation Order, this Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement, and any documents, instruments, or agreements, and any amendments or modifications thereto. Each

federal, state, commonwealth, local, foreign, or other governmental agency is directed and authorized to accept the validity of (a) any and all documents, trust agreements, mortgages, and instruments and (b) all actions of the Liquidating Trust and those acting on its behalf, that are necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan, this Confirmation Order, and the agreements created or contemplated by the Plan.

30.    **Vesting of Assets**. From and after the Effective Date, the Liquidating Trust may take any action, including, without limitation, the use, acquisition, sale, lease and disposition of property, and the entry into transactions, agreements, understandings or arrangements, subject to the Liquidating Trust Agreement, whether or not in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, free of any restrictions in the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as explicitly provided in the Plan.

31.    **Obligations Under Ocwen APA and Ocwen Sale Order**.    Notwithstanding anything to the contrary in the Plan, on the Effective Date, the Ocwen APA (as defined in the *Order Under 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief* (ECF Doc. # 2246) (the "Ocwen Sale Order")) and that certain AFI/ResCap/Ocwen/Walter Cooperation Agreement, dated as of January 31, 2013 (which for the purposes hereof shall be included in the definition of Ocwen APA) shall vest in the Liquidating

- 46 -

Trust in accordance with the Plan and the Ocwen Sale Order. The Liquidating Trust shall assume and perform any and all rights, benefits, duties and obligations of the Debtors under the Ocwen APA and the Ocwen Sale Order in accordance with their terms, and such rights, benefits, duties and obligations shall not be deemed to have been released or discharged by the occurrence of the Effective Date, by any provisions of the Plan (including, but not limited to, the provisions of Article IX of the Plan), or otherwise. Nothing in the Plan Documents or this Confirmation Order shall, or shall be deemed or construed to, alter, change, modify or amend the terms and provisions of the Ocwen APA and Ocwen's, the Debtors', and the Liquidating Trust's rights, as applicable, thereunder, which rights shall continue in full force and effect and be enforceable following the Effective Date in accordance with the terms thereof. For the avoidance of doubt, Ocwen shall not be required to file an Administrative Claim to preserve its rights or Claims arising after the Effective Date from or related to the Ocwen APA.

32. **Obligations Under Berkshire APA and Berkshire Sale Order**. Notwithstanding anything in this Article IX or in the Plan to the contrary, on the Effective Date, the Berkshire APA shall vest in the Liquidating Trust in accordance with the Plan and the Berkshire Sale Order. The Liquidating Trust shall assume and perform any and all rights, benefits, duties and obligations of the Debtors under the Berkshire APA and the Berkshire Sale Order in accordance with their terms, and such rights, benefits, duties and obligations shall not be deemed to have been released or discharged by the occurrence of the Effective Date, by any provisions of the Plan (including, but not limited to, the provisions of Article IX of the Plan), or otherwise. Nothing in the Plan Documents shall, or shall be deemed or construed to, alter, change, modify or amend the terms and provisions of the Berkshire APA or the rights of the Debtors, the Liquidating Trust, and Berkshire Hathaway Inc. and its Affiliates, subsidiaries, and

related entities, as applicable, thereunder, which rights shall continue in full force and effect and be enforceable following the Effective Date in accordance with the terms thereof. For the avoidance of doubt, Berkshire Hathaway Inc., its Affiliates, subsidiaries, and related entities shall not be required to file an Administrative Claim to preserve their rights or Claims arising after the Effective Date from or related to the Berkshire APA.

33.    **NJ Carpenters Settlement and District Court Approval**.  Notwithstanding anything to the contrary in the Plan, on the Effective Date, the Order and Final Judgment entered on October 7, 2013 in the NJ Carpenters Class Action (the "NJ Carpenters District Court Order") and the NJ Carpenters Settlement shall vest in the Liquidating Trust in accordance with the Plan. The Liquidating Trust shall assume and perform any and all rights, benefits, duties and obligations of the Debtors under the NJ Carpenters District Court Order and the NJ Carpenters Settlement in accordance with their terms, and such rights, benefits, duties and obligations shall not be deemed to have been released or discharged by the occurrence of the Effective Date, by any provisions of the Plan, or otherwise.  Nothing in the Plan Documents or this Confirmation Order shall, or shall be deemed or construed to, alter, change, modify or amend the terms and provisions of the NJ Carpenters Settlement and the applicable parties' rights thereunder, which rights shall continue in full force and effect and be enforceable following the Effective Date in accordance with the terms thereof.

34.    **Substitution in Pending Legal Actions**.  Except as otherwise provided in this Confirmation Order or in the Plan, on the Effective Date, the Liquidating Trust shall be deemed to be substituted as the party to any litigation in which the Debtors are a party, including, but not limited to: (i) pending and contested matters or adversary proceedings in the Court, (ii) any appeals of orders of the Court, and (iii) any state court or federal or state administrative

proceeding pending as of the Petition Date. The Liquidating Trust, and professionals for the Liquidating Trust are not required to, but may, take such steps as are appropriate to provide notice of such substitution.

35.    **Plan Distributions.**    On or as soon as practicable after the Effective Date, (i) Cash distributions to holders of Allowed Administrative, Priority, Secured, ETS Unsecured and General Unsecured Convenience Claims, the Borrower Claims Trust, the NJ Carpenters Settlement, (ii) the issuance of Units to the RMBS Claims Trust, the Private Securities Claims Trust, the Disputed Claims Reserve, and the holders of Allowed Unsecured Claims (other than the Allowed Unsecured Claims otherwise provided for under the Plan), and (iii) distributions of Distributable Cash paid by the Liquidating Trust, shall each be effectuated in accordance with Article VII of the Plan and the Liquidating Trust Agreement.  On or within one (1) Business Day of the Effective Date, the Junior Secured Notes Indenture Trustee shall receive the Junior Secured Notes Distribution, which shall thereafter be distributed in accordance with Article VII.G of the Plan.  The issuance of Units to the RMBS Claims Trust shall be subject to the rights of the RMBS Trustees under Article XI.A of the Plan.

36.    **No Reserve for Disallowed or Expunged Claims**.  None of the Debtors, the Liquidating Trust, the RMBS Claims Trust, the Private Securities Claims Trust or the Borrower Claims Trust shall be required to establish reserves for Claims that have been disallowed or expunged by order of the Bankruptcy Court in the absence of an order of the Bankruptcy Court expressly directing the Debtors to establish such a reserve.

37.    **Setoffs and Recoupment**.  Except as prohibited by the Plan, the Liquidating Trust may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that it may have against the claimant, including any Causes of Action transferred to

the Liquidating Trust by the Debtors, but neither the failure to do so nor the Allowance of any Claim shall constitute a waiver or release by the Debtors or the Liquidating Trust of any such Claim it may have against the holder of such Claim.

38.     Before the Liquidating Trust or the Borrower Claims Trust can set-off or recoup against the distribution to be made on account of an Allowed Claim, the holder of the Claim shall be served with written notice of the proposed setoff or recoupment at least thirty (30) days prior to exercising any asserted setoff or recoupment right, and, if such claimant serves a written objection to such asserted setoff or recoupment on or before thirty (30) days of receipt of such written notice, (i) the objection shall be deemed to initiate a contested matter governed by, inter alia, Bankruptcy Rule 9014 and Local Bankruptcy Rules 9014-1 and 9014-2, (ii) nothing in the Plan shall affect the respective burden of each party in connection with such contested matter, and (iii) the Liquidating Trust and the Borrower Claims Trust shall not proceed with the asserted setoff or recoupment absent the withdrawal of such objection or by order of the Bankruptcy Court overruling such objection.

39.     **Securities Laws Exemption**. The offering, issuance, or distribution of the Units by the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement is exempt from the provisions of Section 5 of the Securities Act of 1933, as amended, and any state or local law requiring registration for the offer, issuance, or distribution of a security by reason of section 1145(a) of the Bankruptcy Code. The Units shall be transferrable to the extent permitted by applicable securities laws.

40.     **Releases, Exculpations and Injunctions of Released Parties.**

(a)     The Plan Releases set forth in Article IX of the Plan are approved and authorized in their entirety, are so ordered and shall be immediately effective on the Effective

Date of the Plan without further order or action on the part of the Court, any of the parties to

such releases or any other party:

**A.  Releases by the Debtors**

> Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including with respect to the Ally Released Parties, the Ally Contribution provided to the Estates under the Plan and otherwise, on and as of the Effective Date of the Plan, the Debtor Released Parties are deemed released and discharged by the Debtors, the Estates and the Liquidating Trust from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors would have been legally entitled to assert against a Debtor Released Party in its own right (whether individually or collectively) or that any holder of a Claim or Equity Interest, the Liquidating Trust, or other Entity would have been legally entitled to assert on behalf of any of those Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law.

**B.  Third Party Release**

> On and as of the Effective Date of the Plan, except as provided by Article IX.E of the Plan, the holders of Claims and Equity Interests shall be deemed to provide a full and complete discharge and release to the Ally Released Parties and their respective property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan, the Consent Order, and the Order of Assessment.

**C.  Third Party Release Carve-Out**

> Notwithstanding anything to the contrary in the Plan, the Third Party Release shall not apply to any claims held by: (i) the FHFA, as conservator for Fannie Mae, and/or Fannie Mae against Ally Bank, including, without limitation, any claims of FHFA and/or Fannie Mae against Ally Bank for

continuing liabilities, obligations, and duties owed by Ally Bank to FHFA and/or Fannie Mae under the Fannie Mae Contract, including the obligations and duties to honor all selling and servicing representations and warranties related to the portfolio of loans sold and/or serviced, or that were previously serviced, by Ally Bank; (ii) the FHFA and/or Freddie Mac (a) against Ally Bank for any selling and servicing representation and warranty claims for loans sold to Freddie Mac directly by Ally Bank subsequent and pursuant to the May 1, 2012 and August 1, 2012 master selling and servicing agreements among Ally Bank and Freddie Mac, and (b) against Ally Financial Inc. as guarantor for the limited time that the Debtors subserviced the Ally Bank loans sold pursuant to the agreements set forth in clause (ii)(a) above, (iii) the United States and the DOJ/AG Settling States with regard to any monetary obligation the Ally Released Parties may have arising under the DOJ/AG Settlement or causes of action preserved under Article V and Exhibits F and G of the DOJ/AG Settlement; and shall not apply to (iv) any liability or obligation of AFI to the United States or the States arising under the Internal Revenue Code, environmental laws, civil fraud laws, or criminal laws, including, but not limited to, any such liability or obligation preserved under Article V and Exhibits F and G of the DOJ/AG Settlement.

Nothing herein is intended to expand any liabilities under any agreement set forth above or applicable law; the carve outs set forth above in clauses (ii) and (iii) are limited to liabilities under agreements referenced therein and Ally expressly reserves all rights, claims, and defenses against persons and entities carved out under Article IX.E of the Plan regarding any liability that is the subject of Article IX.E of the Plan.

Notwithstanding anything to the contrary in the Plan or this Confirmation Order, in the event of a "Cap Re Settlement Denial"• (as defined below), the claims pled by plaintiffs Donna Moore, Frenchola Holden, and Keith McMillon (the "Cap Re Plaintiffs") and the right to assert and prosecute those claims against Cap Re in the action commenced by the Cap Re Plaintiffs pending in the United States District Court for the Eastern District of Pennsylvania (the "Cap Re District Court"), captioned *Moore v. GMAC Mortgage, LLC*, No. 2:07-cv-04926-PD (the "Cap Re Action") are preserved as against Cap Re.  In the event of a Cap Re Settlement Denial, if there is a subsequent adjudication in the Cap Re Action against Cap Re or a settlement with Cap Re, the Cap Re Plaintiffs' rights to any recovery against Cap Re arising from that adjudication or settlement are preserved.  The preservation of rights in this paragraph is intended solely for the Cap Re Plaintiffs and the putative class they represent in the Cap Re Action and no other Person or Entity in any capacity.  For the avoidance of doubt, no Ally Released Party, other than Cap Re, shall have any liability or obligation under or in connection with this paragraph or, as of the Effective Date, the Cap Re Action, including that no Ally Released Party or Debtor shall have any liability or obligation to Cap Re.  As used herein, the term "Cap Re Settlement Denial" means the failure of the Cap Re District Court to grant final approval of the settlement of the Cap Re Action among the Cap Re

Plaintiffs, GMACM, and Cap Re of the Cap Re Action, or the subsequent reversal or set aside of the Cap Re District Court's final approval of such settlement.

For the avoidance of doubt, no party can assert claims, causes of actions or liabilities against the Debtors or Liquidating Trust arising from claims that are carved out under Article IX.E(i) of the Plan.

Nothing in the Plan or this Confirmation Order releases AFI or any other party from the obligations under the Employees Retirement Plan for GMAC Mortgage Group, LLC (the "Pension Plan") and ERISA. Notwithstanding the foregoing, upon the Effective Date, the Debtors and the Plan Trusts shall be released from all obligations under the Pension Plan and ERISA related thereto, except for any Claims for fiduciary breaches or prohibited transactions (as defined in ERISA) relating to the Pension Plan under applicable law.

### D. Ally Release

Except with respect to the Ally Contract Claims, on and as of the Effective Date of the Plan, the Ally Released Parties shall release the Creditors' Committee, the Debtors, and the Consenting Claimants and their respective successors and assigns, members, partners, advisors, and Representatives, in their capacities as such, from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise arising from or related to the Debtors' liquidation, including the negotiation, formulation, or preparation of the Plan Support Agreement, the Plan, the Disclosure Statement, and any other Plan Documents and related disclosures, as well as any counterclaims in commenced or tolled litigation with the Debtors or the Consenting Claimants.

### E. Junior Secured Notes Releases

As set forth in Article IX.G of the Plan, on and as of the Effective Date, (i) each of the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Ad Hoc Group, and the Junior Secured Notes Collateral Agent, and each of their predecessors, successors, and assigns, group members (except any such member of the Ad Hoc Group that voted to reject the Plan and has not changed its vote to accept the Plan by the Confirmation Date), general partners, advisors, and Representatives, each solely in their capacities as such, shall be deemed to release (a) each other, and (b) the Debtors, the Creditors' Committee, each of the Consenting Claimants, and the Ally Released Parties, and each of their predecessors, successors and assigns, group members, general partners, advisors, and Representatives, each solely in their capacities as such; and (ii) the Debtors, the Creditors' Committee, each of the Consenting Claimants, and the Ally Released Parties and each of their   successors   and   assigns,   members,   partners,   advisors,   and

- 53 -

Representatives, each solely in their capacities as such, shall be deemed to release the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Ad Hoc Group, and the Junior Secured Notes Collateral Agent and each of their predecessors, successors, and assigns, members (except any such member of the Ad Hoc Group that voted to reject the Plan and has not changed its vote to accept the Plan by the Confirmation Date), partners, advisors, and Representatives, each solely in their capacities as such, in the case of (i) and (ii) above from any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise arising from or related to the Debtors, including, without limitation, any right to seek sanctions, take discovery, or initiate any investigation or examination pursuant to Bankruptcy Rule 2004 or any other similar action, all of which shall be considered Released Claims under the Plan; it being understood and agreed that the Claims and Causes of Action being released pursuant to Article IX.G of the Plan are limited to those Claims and Causes of Action arising from or related to the JSN Documents and each Person's conduct and participation in the Chapter 11 Cases and shall not include any Claims or Causes of Action that a Person holds in any other capacity or arising under any other documents or facts and circumstances; provided, however, that nothing in this release shall limit the rights of the Junior Secured Notes Indenture Trustee to receive and make distributions as provided in the Junior Secured Notes Indenture and as provided and preserved in the Plan. Notwithstanding anything to the contrary contained in Article IX.G of the Plan, any Person (other than a Person that is itself a member of the Ad Hoc Group or a Junior Secured Noteholder, in each case that is also a Consenting JSN) that is a former, present or future parent, affiliate, member, member firm, associated entity, shareholder, principal, limited partner, equity investor, or managed entity (along with the respective attorneys, financial advisors, investment advisors, employees, officers, directors, managers, agents and other authorized representatives of each of the foregoing) of a Consenting Claimant or a Junior Secured Noteholder that is a Consenting JSN, in each case solely in their capacities as such, shall be the recipient of, but shall not itself grant to any other Person, the release provided for by Article IX.G of the Plan. Notwithstanding the above, nothing contained in Article IX.G of the Plan in any way limits Article IX.D of the Plan.

## F.  Exculpation

The Exculpated Parties shall neither have, nor incur, any liability to any entity for any pre-petition or post-petition act or omission taken in connection with, or related to, formulating, negotiating, preparing, disseminating, soliciting, implementing, administering, confirming, or effecting the consummation of any prepetition plan support agreements, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, the Kessler Settlement Agreement, the RMBS

Settlement, the settlement of the Junior Secured Notes Claims as provided in the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, **provided, however**, that the foregoing provisions of this Exculpation shall have no effect on the liability of any entity that results from any such act that is determined in a final, non-appealable order to have constituted gross negligence or willful misconduct; **provided, however**, that the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors concerning his, her, or its duties pursuant to, or in connection with, any prepetition plan support agreement, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, the Kessler Settlement Agreement, the RMBS Settlement, and the settlement of the Junior Secured Notes Claims as provided in the Plan. Notwithstanding the foregoing or any other provision in the Plan to the contrary, as to the DOJ-Represented Agencies, nothing in this paragraph shall release or exculpate any of the Exculpated Parties from any liability or obligation to the DOJ-Represented Agencies for any pre-petition act or omission, or from any liability or obligations arising under the tax laws, the environmental laws, civil fraud laws, criminal laws, or the police or regulatory powers of the United States, except (i) to the extent the applicable Bar Date or the discharge, release or injunction provisions of the Plan bar the United States from pursuing Claims against the Debtors or the Liquidating Trust and (ii) to the extent the United States released or settled any causes of action against any of the Exculpated Parties, including but not limited to under the DOJ/AG Settlement (including exhibits). For the avoidance of doubt, nothing in the foregoing provisions shall release or exculpate the Ally Released Parties from any claims or obligations to the United States and the DOJ/AG Settling States arising under the DOJ/AG Settlement or causes of action preserved under Article V and Exhibits F and G of the DOJ/AG Settlement.

## G. Injunction

Except as otherwise provided in the Plan or this Order and in accordance with Article IX.E of the Plan, all Entities, including Investors, who have held, hold or may hold Claims, Equity Interests, Causes of Action or liabilities that constitute Released Claims, are permanently enjoined and precluded, from and after the Effective Date of the Plan, from: (a) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party whether directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Released Party on account of or in connection with or with respect to any Released Claims; (c) creating, perfecting or enforcing any lien (other than any charging lien of a trustee under its respective indenture), claim or encumbrance of any kind against any Released Party on account of or in connection with or with respect to any Released Claims; (d) asserting any right to setoff, subrogation or recoupment

of any kind against any obligation due from any Released Party on account
of or in connection with or with respect to any Released Claims unless such
holder has filed a motion requesting the right to perform such setoff on or
before the Confirmation Date, and notwithstanding any indication in a Proof
of Claim or Equity Interest or otherwise that such holder asserts, has or
intends to preserve any right of setoff pursuant to section 553 of the
Bankruptcy Code or otherwise; (e) commencing or continuing in any manner
or action or other proceeding of any kind against any Released Party on
account of or in connection with or with respect to any Released Claims; and
(f) seeking relief or collecting judgments on an Investor-related securities
claim in a manner that fails to conform with the terms of the judgment
reduction provision set forth in the Plan and the Confirmation Order;
**provided**, that nothing contained in the Plan shall be construed to prevent
any entity from objecting to claims or defending against claims objections or
collection actions whether by asserting a right of setoff or otherwise to the
extent permitted by law.  Such injunction shall extend to the successors of the
Liquidating Trust, if any, and to their respective properties and interests in
property.  Any person injured by any willful violation of this injunction shall
be entitled to recover actual damages, including costs and attorneys' fees
and, in appropriate circumstances, may recover punitive damages from the
willful violator.

For the avoidance of doubt, nothing in Article IX.E of the Plan shall expand
or limit the application of Article IX.I of the Plan to Claims, Equity Interests,
Causes of Action or liabilities against the Debtors or the Liquidating Trust.

41.    **Release of Liens**. Except as otherwise provided in the Plan or in any contract,
instrument, release, or other agreement or document created pursuant to the Plan, on the
Effective Date and concurrently with the applicable distributions made pursuant to the Plan and,
in the case of any Secured Claim, satisfaction in full of the portion of the Secured Claim that is
Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security
interests against any property of the Estates shall be fully released and discharged, and all of the
right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other
security interests shall vest in the Liquidating Trust.

42.    **Discharge**. Except as expressly provided in the Plan or the Confirmation Order,
(a) each holder (as well as any trustees and agents on behalf of each holder) of a Claim against or
Equity Interest in a Debtor shall be deemed to have forever waived, released and discharged the

Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any

and all Claims, Equity Interests, rights and liabilities that arose prior to the Effective Date and (b)

all such holders shall be forever precluded and enjoined, pursuant to section 524 of the

Bankruptcy Code, from prosecuting or asserting any discharged Claim against or terminated

Equity Interest in the Debtors.

43. **Satisfaction and Release of Claims and Equity Interests**. The rights afforded in

the Plan and the treatment of all Claims and Equity Interests under the Plan shall be in exchange

for and in complete satisfaction and release of all Claims of any nature whatsoever, including

any interest accrued on such Claims from and after the Petition Date, against the Debtors, the

Plan Trusts, or any of their respective assets or properties arising prior to the Effective Date.

Except as otherwise expressly specified in the Plan, after the Effective Date, any holder of such

Claim or Equity Interest shall be precluded from asserting against the Debtors, the Plan Trusts,

or any of their respective assets or properties, any other or further Claim based on any document,

instrument, act, omission, transaction, or other activity of any kind or nature that occurred before

the entry of this Order.

44. **Judgment Reduction**. A defendant against whom a judgment of a court of

competent jurisdiction is obtained (whether in a proceeding now pending or hereafter

commenced) on an Investor-related securities claim where such defendant has a claim for

indemnity or contribution that is subject to the Third Party Releases shall be entitled to a

judgment credit in the underlying litigation in the amount and on the terms that would be

available if the Third Party Releases were treated as a bar order in the underlying litigation, in

accordance with, and to the extent permitted under, applicable statutory or common law, as

determined by a court of competent jurisdiction. (For the avoidance of doubt, a defendant

against whom a judgment of a court of competent jurisdiction is obtained (whether in a proceeding now pending or hereafter commenced) on an Investor-related securities claim where such defendant has or had a claim for indemnity or contribution against any Debtor is not precluded from asserting that it is entitled to a judgment credit in the underlying litigation in connection with such claim against the Debtors, and the plaintiff(s) in such action shall have the right to oppose any such request for a judgment credit on any basis, including but not limited to that no such right exists and with reference to Bankruptcy Code section 502(e).)   For the avoidance of doubt, judgment reduction in the NJ Carpenters Class Action shall be governed by the terms of the Order and Final Judgment entered by the District Court granting final approval to the NJ Carpenters Settlement.  *See* (ECF Doc. # 5354).  Notwithstanding the foregoing and without limitation (i) no Ally Released Party shall be deemed to have admitted to such fault by virtue of this provision; (ii) nothing in the Plan or Confirmation Order shall create any right for a defendant that it does not have under applicable statutory or common law, if any, to obtain discovery from any Ally Released Party, or create an obligation for any Ally Released Party to participate in any proceeding to determine fault that does not exist under applicable statutory or common law, if any, in connection with such claim; and (iii) no finding in any proceeding to determine fault shall create any claim against any Ally Released Party or obligation of any Ally Released Party to satisfy any claim.  For the avoidance of doubt, nothing in Article IX.L of the Plan affects the Third Party Releases, and all parties' rights under applicable law with respect to discovery and any Ally Released Party's participation in any proceeding to determine fault are preserved.

45.    **Special Provisions for the United States and the States.**

(a)    As to the United States, except where the Plan or Confirmation Order explicitly states otherwise as to the United States, nothing in the Plan or Confirmation Order shall limit or expand the scope of discharge, release or injunction to which the Debtors or Liquidating Trust are entitled to under the Bankruptcy Code, if any.  The discharge, release, exculpation and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States and the States from, subsequent to the Bankruptcy Court's entry of the Confirmation Order, pursuing any police or regulatory action against the Debtors or the Liquidating Trust, except (i) to the extent the applicable Bar Date or the discharge, release, exculpation or injunction provisions of the Plan bar a Governmental Unit from pursuing pre-petition Claims against the Debtors or the Liquidating Trust and (ii) to the extent a Governmental Unit released or settled any causes of action against the Debtors or the Liquidating Trust, including but not limited to under the DOJ/AG Settlement (including exhibits).  For the avoidance of doubt, Governmental Units are subject to the Administrative Claim Bar Date.

(b)    Notwithstanding anything contained in the Plan or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall discharge, release, impair or otherwise preclude: (1) any liability of the Debtors or the Liquidating Trust to the United States and the States that is not a Claim; (2) any Claim of the United States and the States against the Debtors or the Liquidating Trust arising on or after the Confirmation Date; (3) any valid right of setoff or recoupment of any Governmental Unit against any of the Debtors, regardless of whether (a) a right of setoff was reserved in a proof of claim filed with respect to the debt subject to setoff or (b) the setoff has been authorized or approved by the Bankruptcy Court; or (4) any liability of

the Debtors or the Liquidating Trust to any Governmental Unit under environmental law as the owner or operator of property that such entity owns or operates after the Confirmation Date. Nor shall anything in this Confirmation Order or the Plan: (i) enjoin or otherwise bar the United States or the States from seeking to assert or enforce outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by the United States or the States are discharged or otherwise barred by this Confirmation Order, the Plan, or the Bankruptcy Code. Notwithstanding the foregoing, (1) to the extent any Governmental Unit has (i) in connection with these Chapter 11 Cases, entered into any stipulation or settlement of claims, or been subject to a Bankruptcy Court order and (ii) there is any conflict between the terms of such stipulation or settlement of claims or Bankruptcy Court order and this paragraph, the terms of such stipulation, settlement or Bankruptcy Court order shall control; and (2) this paragraph shall not expand or limit the scope of any releases or settlement of causes of action granted to or for the benefit of the Debtors or the Liquidating Trust by any Governmental Unit, including but not limited to under the DOJ/AG Settlement (including exhibits).

(c)      Nothing in the Confirmation Order or the Plan shall bar the United States and the States from pursuing any police and regulatory action against any non-Debtor (including AFI). Further, nothing in the Confirmation Order or Plan shall release or exculpate any non-Debtor (other than AFI, which for purposes of this paragraph shall be governed by Article IX.D, IX.E and IX.I of the Plan) from any liability to any DOJ-Represented Agency including, but not limited to, any liabilities arising under the Internal Revenue Code, the environmental laws, the civil fraud laws, or the criminal laws, nor shall anything in this Confirmation Order or Plan enjoin any DOJ-Represented Agency from bringing any claim, suit, action, or other proceeding

against any non-Debtor in connection therewith, except as provided by sections 1125(e) and 1145 of the Bankruptcy Code; provided, however, that the foregoing sentence shall not expand or limit the scope of discharge granted to the Debtors and the Liquidating Trust under sections 524 and 1141 of the Bankruptcy Code; and provided further, however, that this paragraph shall not expand or limit the scope of any exculpations granted to the Exculpated Parties, which shall be governed by Article IX.H of the Plan; and provided further, however, that this paragraph shall not expand or limit the scope of any releases or settlement of causes of action granted to or for the benefit of any non-Debtor by the United States or the States, including but not limited to under the DOJ/AG Settlement (including exhibits).

(d)     Nothing contained in the Plan or Confirmation Order shall constitute a determination of the United States or the Bankruptcy Court regarding the federal tax liability of any person or entity, including but not limited to the Debtors or the Liquidating Trust, nor shall the Plan or Confirmation Order be deemed to have determined the federal tax treatment by the United States or the Bankruptcy Court of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in the Plan or Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.  For the avoidance of doubt, the foregoing paragraph does not modify the terms of any settlement under the Plan or Confirmation Order.

(e)     Nothing in the Plan or the Confirmation Order shall limit or expand the scope of the Debtors' or the Liquidating Trust's ability to estimate a Disputed Claim of the United States or the States pursuant to 11 U.S.C. § 502(c) of the Bankruptcy Code.

(f)     Notwithstanding any other provision in the Plan, the Liquidating Trust shall not retain and may not enforce any cause of action, whether based upon 11 U.S.C. §§ 547 and 548 or otherwise, against either the United States or any DOJ/AG Settling States under the DOJ/AG Settlement, for any transaction required by the DOJ/AG Settlement, whether arising before or after the Petition Date.

(g)     To the extent the Debtors or the Liquidating Trust are found liable for any obligations arising out of a Final Order or settlement in Commonwealth of Massachusetts v. Bank of America, N.A., et al. (Civ. A. No. 11-4363) currently pending in the Superior Court of Massachusetts, Suffolk County, all parties reserve their rights with regard to enforcement of such obligations against the Debtors or the Liquidating Trust.   The aforementioned civil action is referenced in proofs of claim numbers 6025, 6028 and 6033.

46.     **Limitation on Obligations to the Ally Released Parties.**  Except with respect to the Debtors' and the Liquidating Trust's obligations to Ally as specifically set forth in the Plan (including their obligations to perform under the Ally Contracts in accordance with their terms), on and after the Effective Date the Debtors and the Plan Trusts shall have no other obligations to the Ally Released Parties.

47.     **Executory Contracts and Unexpired Leases.**

(a)     The Executory Contract and Unexpired Lease provisions of Article V of the Plan are specifically approved in all respects, are incorporated herein in their entirety and are so ordered.  The Debtors are authorized to assume, assign and/or reject Executory Contracts or Unexpired Leases in accordance with Article V of the Plan.

(b)     Pursuant to Article V of the Plan, on the Effective Date each Executory Contract and Unexpired Lease not previously assumed shall be deemed automatically rejected

pursuant to sections 365 and 1123 of the Bankruptcy Code unless any such Executory Contract

or Unexpired Lease:   (i) is expressly identified on the Assumption Schedule; (ii) has been

previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order

of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the

Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; or (iv)

is otherwise assumed pursuant to the terms of the Plan.  This Order will constitute an order of the

Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of

the Effective Date or as otherwise set forth in the Plan Supplement.

(c)      Unless withdrawn from the Assumption Schedule by the Plan Proponents

prior to the Effective Date, each Executory Contract and Unexpired Lease identified on the

Assumption Schedule shall be deemed assumed pursuant to sections 365 and 1123 of the

Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

(d)      Any request for payment of a Cure Claim that is not timely filed and

served shall be disallowed automatically, forever barred and not be enforceable against any

Debtor or the Liquidating Trust, without the need for an objection by the Debtors or the

Liquidating Trust or order of the Court.  The Plan Proponents, prior to the Effective Date, or the

Liquidating Trust, following the Effective Date, may settle any dispute on the amount of a Cure

Claim without further notice to any party or action, approval, or order of the Bankruptcy Court.

If the Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the

Effective Date, object to any request for payment of a Cure Claim, the Bankruptcy Court shall

determine the Allowed amount of such Cure Claim and any related issues.  Unless the parties to

the Executory Contract or Unexpired Lease agree otherwise, all disputed defaults that are

required to be cured shall be cured by the later of (i) ten (10) days after entry of a Final Order

determining the amount, if any, of the Debtors' liability with respect thereto and (ii) the Effective

Date.  The Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the

Effective Date, reserve the right either to reject or nullify the assumption of any Executory

Contract or Unexpired Lease no later than thirty (30) days after a Final Order determining a Cure

Claim greater than that proposed by the Debtors.

(e)     Assumption of any Executory Contract or Unexpired Lease pursuant to the

Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults,

whether monetary or nonmonetary, including defaults of provisions restricting the change in

control or ownership interest composition or other bankruptcy-related defaults, arising under any

assumed Executory Contract or Unexpired Lease at any time before the date the Debtors or the

Liquidating Trust assume such Executory Contract or Unexpired Lease.  Any proofs of claim

filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be

deemed disallowed and expunged, without further notice to or action, order or approval of the

Bankruptcy Court.

(f)     Notwithstanding anything herein or in the Plan to the contrary, and subject

to approval by the Bankruptcy Court, the parties to the *Stipulation (I) Resolving the Objection to*

*Confirmation of Impac Funding Corporation, and Impac Mortgage Holdings, Inc., and (II)*

*Resolving Impac's Objection to and Providing for the Sale, Assumption and Assignment of*

*Certain Servicing Agreements to Ocwen Loan Servicing, LLC* (ECF Doc. # 6059) shall perform

their obligations thereunder in accordance with the terms thereof.

(g)     Notwithstanding anything to the contrary herein or in the Plan and based

upon the information available to the Debtors as of the date hereof, in order to resolve *Oracle's*

*Limited Objection and Reservation of Rights Regarding Joint Chapter 11 Plan Proposed by*

*Residential Capital, LLC, et al., and the Official Committee of Unsecured Creditors* (ECF Doc. #

5404), the Debtors have agreed as follows:  The Debtors have endeavored to list all agreements

between one or more of the Debtors and Oracle America, Inc. (including any of its predecessors-

in-interest) ("Oracle") that they seek to have transferred to the Liquidating Trust on the

Assumption Schedule, as amended, filed in connection with the Plan.  Any agreements presently

existing between any of the Debtors and Oracle that are not listed on the Assumption Schedule or

that are subsequently removed from the Assumption Schedule shall be deemed rejected (the

"Oracle Rejected Agreements") as of the Effective Date of the Plan ("Rejection Date").  For any

and all of the Oracle Rejected Agreements: (a) on the Rejection Date, the Debtors shall

immediately cease use of all Oracle software and services subject to the Oracle Rejected

Agreements; (b) as soon as practicable after the Rejection Date, to the extent required by the

Oracle Rejected Agreements, the Debtors shall use commercially reasonable efforts to cause

their agents to scrub, remove and expunge all Oracle software that is subject to the Oracle

Rejected Agreements and any portions thereof from all computers, hardware, servers,

mainframes and storage media and devices on which it is located (with no copies retained by the

Debtors); and (c) if requested by Oracle, the Debtors shall certify in writing that the Debtors or

their agents have complied with the obligations in (a) and (b) herein within sixty (60) days of the

Rejection Date.  The Debtors agree to execute customary assignments in connection with any

Oracle agreements assigned to the Liquidating Trust.

48.     **Preservation of Causes of Action.** Unless any Causes of Action against an Entity

are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan

(including pursuant to the Plan Support Agreement), or by a Final Order, in accordance with

section 1123(b) of the Bankruptcy Code, the Borrower Claims Trust with respect to Borrower-

Related Causes of Action, and the Liquidating Trust with respect to all other Causes of Action, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors or the Debtors' Estates, whether arising before or after the Petition Date, including, without limitation, any Causes of Action specifically enumerated in the Plan Supplement, and the Liquidating Trust's and Borrower Claims Trust's respective rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Liquidating Trust and the Borrower Claims Trust may pursue their respective Causes of Action, as appropriate, in accordance with the best interests of the respective Trust.  **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Liquidating Trust or Borrower Claims Trust, as the case may be, will not pursue any and all available Causes of Action against such Entity. The Liquidating Trust and the Borrower Claims Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Liquidating Trust expressly reserves all Causes of Action other than Borrower-Related Causes of Action, and the Borrower Claims Trust expressly reserves all Borrower-Related Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation, the Global Settlement, the Plan Settlements, or Consummation. For the avoidance of doubt, the Plan does not release any Causes of Action that the Plan Proponents or the Liquidating Trust or

Borrower Claims Trust have or may have now or in the future against any Entity other than the
Released Parties (and only in their capacity as Released Parties).  The Liquidating Trustees and
the Borrower Claims Trustee, as applicable, are deemed representatives of the Estates for the
purpose of prosecuting, as applicable, the Liquidating Trust Causes of Action, Borrower-Related
Causes of Action and any objections to Claims pursuant to section 1123(b)(3)(B) of the
Bankruptcy Code.

49.    Except as otherwise provided in the Plan or in a Final Order, the Liquidating
Trust reserves and shall retain Causes of Action notwithstanding the rejection of any Executory
Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance
with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors may hold
against any Entity that is not released under the Plan or a separate settlement approved by Final
Order shall vest in the Borrower Claims Trust with respect to Borrower-Related Causes of
Action and in the Liquidating Trust with respect to all other Causes of Action. The Liquidating
Trust and Borrower Claims Trust, as the case may be, through their respective authorized agents
or representatives, shall retain and may exclusively enforce any and all such Causes of Action.
The Liquidating Trust has the exclusive right, authority, and discretion to determine and to
initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to
judgment any Causes of Action other than Borrower-Related Causes of Action, or to decline to
do any of the foregoing, without the consent or approval of any third party or any further notice
to or action, order, or approval of the Bankruptcy Court.  The Borrower Claims Trust has the
exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce,
abandon, settle, compromise, release, withdraw, or litigate to judgment any Borrower-Related
Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any

third party or any further notice to or action, order, or approval of the Bankruptcy Court.  In

pursuing any claim, right, Cause of Action or objection, the Liquidating Trust or the Borrower

Claims Trust shall be entitled to the tolling provisions provided under section 108 of the

Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the time periods in

which a Cause of Action may be brought under section 546 of the Bankruptcy Code.

      50.    **Claims Bar Dates and Other Claims Matters.**

      (a)    **Bar Date.** Except as otherwise agreed by the Debtors, the Liquidating

Trust, or the Borrower Claims Trust, as applicable, or ordered by the Bankruptcy Court, any and

all Proofs of Claim filed after the applicable Bar Date shall be deemed disallowed, discharged,

released, and expunged as of the Effective Date without any further notice to or action, order, or

approval of the Bankruptcy Court, and holders of such claims may not receive any distributions

on account of such claims, unless such late Proof of Claim is deemed timely filed by a Final

Order of the Bankruptcy Court.

      (b)    **Professional Claims.** All requests for compensation or reimbursement of

Professional Claims (other than Professional Claims for the Examiner and the Professionals

retained by the Examiner) accrued through the Effective Date shall be Filed no later than

seventy-five (75) days after the Effective Date, and any final hearing on any request for

compensation or reimbursement of Professional Claims accrued through the Effective Date,

unless authorized by final order prior to the Effective Date, shall occur no sooner than sixty (60)

days after the filing of such final requests for compensation or reimbursement, and the deadline

to object to such requests shall be no sooner than ten (10) days before any hearing on such

request.

(c)     Other than as set forth herein or in the Plan, the procedures set forth in the

Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of

Professionals (the "Interim Compensation Order") (ECF Doc. # 797) shall remain in effect

through the Effective Date.

(d)     **Bar Date for Rejection Claims.** Claims arising from the rejection of

Executory Contracts or Unexpired Leases must be Filed with the Court no later than the

Rejection Damages Claims Bar Date, which is: (a) with respect to an Executory Contract or

Unexpired Lease that is rejected pursuant to the Plan, forty-five (45) days after the Effective

Date, or (b) with respect to an Executory Contract or Unexpired Lease that is otherwise rejected,

the applicable bar date established by the Bar Date Order or other order of the Bankruptcy Court.

For the avoidance of doubt, all Allowed Claims arising from the rejection of Executory Contracts

or Unexpired Leases shall be treated as General Unsecured Claims against the applicable Debtor

Groups.

(e)     Any Claims arising from the rejection of Executory Contracts or

Unexpired Leases that are not timely filed shall be disallowed automatically, forever barred from

assertion, and shall not be enforceable against the Debtors, the Liquidating Trust, or their assets

or properties without the need for any objection by the Liquidating Trust or further notice to, or

action, order, or approval of the Bankruptcy Court.

(f)     **Administrative Claim Bar Date.** Except as provided for in the Plan, this

Confirmation Order, or in any order of the Bankruptcy Court, and subject to section 503(b)(1)(D)

of the Bankruptcy Code, holders of Administrative Claims that arose prior to the Effective Date

(other than holders of Administrative Claims paid in the ordinary course of business, holders of

Professional Claims, holders of Claims for fees and expenses pursuant to section 1930 of chapter

123 of title 28 of the United States Code, and holders of Postpetition Intercompany Balances)
must File and serve on the Plan Proponents or the Liquidating Trust, as applicable, requests for
the payment of such Administrative Claims not already Allowed by Final Order in accordance
with the procedures specified in the Confirmation Order, on or before the first Business Day that
is thirty (30) days following the Effective Date, or be forever barred, estopped, and enjoined
from asserting such Claims against the Debtors, the Plan Trusts, or their assets or properties, and
such Claims shall be deemed discharged as of the Effective Date.

(g)    **Statutory Fees.**  Notwithstanding anything to the contrary contained in
the Plan, on the Effective Date or as soon as practicable thereafter, the Liquidating Trust shall
pay all U.S. Trustee Fees that are due and owing on the Effective Date.  For the avoidance of
doubt, nothing in the Plan shall release the Liquidating Trust from its obligation to pay all U.S.
Trustee Fees due and owing after the Effective Date before a Final Order is entered by the
Bankruptcy Court concluding or closing the Chapter 11 Cases.

51.    **No Change in Control.**  Pursuant to Article V.F. of the Plan, the consummation
of the Plan or the assumption of any Executory Contract or Unexpired Lease is not intended to,
and shall not, constitute a change in ownership or change in control under any employee benefit
plan or program, financial instrument, loan or financing agreement, Executory Contract or
Unexpired Lease or contract, lease or agreement in existence on the Effective Date to which a
Debtor is a party.

52.    **Cancellation of Existing Securities.**  Subject to Article IV.C.8 of the Plan and
the assumption of Executory Contracts and Unexpired Leases as set forth in the Plan, and except
for purposes of evidencing a right to distributions under the Plan or in order to prosecute
preserved Causes of Action, on the Effective Date, all notes, stock, instruments, certificates,

indentures, guarantees, and other documents or agreements evidencing a Claim against or Equity Interest in the Debtors will be deemed automatically cancelled with respect to the Debtors and shall be of no further force or effect as against the Debtors, whether such document is surrendered for cancellation or not, and the obligations of Ally, the Debtors, or the Liquidating Trust, thereunder or in any way related thereto will be discharged.

53.    Notwithstanding anything to the contrary in the Plan, (i) the Senior Unsecured Notes Indenture will continue in effect for the limited purposes of: (a) allowing the Senior Unsecured Noteholders to receive distributions on account of their Senior Unsecured Notes Claims, and (b) allowing the Senior Unsecured Notes Indenture Trustee to make distributions in accordance with the terms of the Plan, to fund the Senior Unsecured Notes Indenture Trustee Reserve, and to exercise its Senior Unsecured Notes Indenture Trustee Charging Lien against distributions under the Plan and against the Senior Unsecured Notes Indenture Trustee Reserve for payment of Senior Unsecured Notes Indenture Trustee Fees and Expenses; (ii) the First Priority Security Agreement will continue in effect for the limited purposes of allowing the First Priority Collateral Agent to exercise its First Priority Collateral Agent Lien for the payment of First Priority Collateral Agent Fees and Expenses; and (iii) all JSN Documents shall be deemed automatically canceled and discharged on the Effective Date, provided, however, that the JSN Documents shall continue in effect solely for the purposes of (x) allowing the holders of the Junior Secured Notes Claims to receive distributions on account of their Junior Secured Notes Claims as provided in the Plan, (y) allowing the Junior Secured Notes Indenture Trustee to make the distributions to be made on account of the Junior Secured Notes Claims in accordance with Article VII.G of the Plan; and (z) permitting the Junior Secured Notes Indenture Trustee to assert its Junior Secured Notes Indenture Trustee Charging Lien against such distributions for payment

of the Junior Secured Notes Indenture Trustee Fees and the Junior Secured Notes Collateral
Agent Fees and Expenses.

54.     **Treatment of Intercreditor Agreement**.  The Intercreditor Agreement shall be
deemed automatically cancelled and discharged upon the Effective Date.  Upon the occurrence
of the Effective Date, no Ally Party shall be entitled to receive any portion of the Junior Secured
Notes Distribution and no Person may directly or indirectly interfere in any manner with the
distribution of the Junior Secured Notes Distribution to the Junior Secured Noteholders in
accordance with Article VII.G of the Plan.

55.     **Escrow Agreement**. Subject to paragraph 16 of that certain Escrow Agreement
made and entered into as of January 3, 2013 by and among GMACM, AFI, and U.S. Bank
National Association, a national banking association (the "Escrow Agreement") and the
Compensation Order, GMACM, and its successors and assigns, shall comply with all applicable
regulatory and statutory requirements, including any requirements under the Troubled Asset
Relief Program, when distributing funds pursuant to the Compensation Order.

56.     **Binding Effect of Prior Orders.**  Pursuant to section 1141 of the Bankruptcy
Code, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date
and subject to the terms of the Plan and this Order, all prior orders entered in the Chapter 11
Cases, all documents and agreements executed by the Debtors as authorized and directed
thereunder and all motions or requests for relief by the Debtors pending before the Court as of
the Effective Date shall be binding upon and shall inure to the benefit of any parties thereto,
including the Debtors, the Plan Trusts, and any heir, executor, administrator, successor or assign,
Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of
each Entity.

57. **Reversal.** If any or all of the provisions of this Order are hereafter reversed, modified or vacated by subsequent order of this Court or any other court, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtors' receipt of written notice of such order. Notwithstanding any such reversal, modification or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan and all related documents or any amendments or modifications thereto.

58. **Notice of Confirmation of the Plan and Occurrence of the Effective Date.** Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c)(2), the Plan Proponents or the Liquidating Trust are directed to serve a notice of the entry of this Order and notice of the occurrence of the Effective Date, substantially in the form of Appendix 2 attached hereto and incorporated herein by reference (the "Confirmation Notice and Notice of Effective Date"), upon (a) all parties listed in the creditor matrix maintained by KCC and (b) such additional persons and entities as deemed appropriate by the Plan Proponents, no later than five (5) Business Days after the Effective Date. The Plan Proponents shall publish the Confirmation Notice and Notice of Effective Date in each of the national editions of the *Wall Street Journal* and *USA Today* within seven (7) Business Days after the Effective Date. As soon as practicable after the entry of this  Order, the Plan Proponents shall make copies of this Order available on the Debtors' restructuring website at www.kccllc.net/rescap. As soon as practicable after the Effective Date, the Plan Proponents shall make copies of the Confirmation Notice and Notice of Effective Date available on the Debtors' restructuring website at www.kccllc.net/rescap.

59.  **Notice of Administrative Claim Bar Date.**  The Plan Proponents or the
Liquidating Trust are directed to serve a notice of Administrative Claim Bar Date, substantially
in the form of Appendix 3 attached hereto an incorporated by reference (the "Administrative
Claim Bar Date Notice") upon (a) all parties listed in the creditor matrix maintained by KCC and
(b) such additional persons and entities as deemed appropriate by the Plan Proponents, no later
than five (5) Business Days after the Effective Date; provided, however, that with respect to (a)
above, those Entities whose Claims have been expunged from the Debtors' official claims
register as of the Confirmation Date, shall not be entitled to service of the Administrative Claim
Bar Date Notice and neither the Plan Proponents nor the Liquidating Trust shall be under any
obligation to serve such Entities with the Administrative Claim Bar Date Notice.  As soon as
practicable after the Effective Date, the Plan Proponents shall make copies of the Administrative
Claim Bar Date Notice available on the Debtors' restructuring website at www.kccllc.net/rescap.

60.  **Modification of the Plan.**  The Plan Proponents or the Liquidating Trust, as
applicable, are authorized to amend or modify the Plan in accordance with and subject to Article
XI of the Plan at any time prior to the substantial consummation of the Plan without further order
of the Court, or if requested by the Plan Proponents or the Liquidating Trust, pursuant to a
subsequent order of the Court.  In addition, without the need for a further order or authorization
of this Court, but subject to the express provisions of this Order and the Plan, the Plan
Proponents and the Liquidating Trust shall be authorized and empowered to make non-material
modifications to the documents filed with the Court, including the Plan Supplement, in their
reasonable business judgment as may be necessary.  At any time, at the request of the RMBS
Trustees, Art. IV.C.3 of the Plan may be amended as will be required to preserve the REMIC tax
status of the RMBS Trusts notwithstanding the distribution of Units to the RMBS Claims Trust

under the Plan to the RMBS Claims Trust on behalf of the RMBS Trusts, and such amendment

will be deemed non-material.

61.     **Dissolution of Creditors' Committee.**  On the Effective Date, the Creditors'

Committee shall dissolve; underline provided, however, that, following the Effective Date, the Creditors'

Committee shall continue in existence and have standing and a right to be heard for the following

limited purposes: (i) Claims and/or applications, and any relief related thereto, for compensation

by  Professionals  and  requests  for  allowance  of  Administrative  Claims  for  substantial

contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (ii) any appeals to which

the Creditors' Committee is a party; (iii) any adversary proceedings or contested matters as of

the Effective Date to which the Creditors' Committee is a party; and (iv) responding to creditor

inquiries for one-hundred-twenty (120) days following the Effective Date.  Upon the dissolution

of the Creditors' Committee, the current and former members of the Creditors' Committee and

their  respective  officers,  employees,  counsel,  advisors  and  agents,  shall  be  released  and

discharged of and from all further authority, duties, responsibilities and obligations related to and

arising from and in connection with the Chapter 11 Cases, and the retention or employment of

the Creditors' Committee's respective attorneys, accountants and other agents shall terminate,

except with respect to matters (i) through (iv) above.

62.     **Governing Law.**  Unless a rule of law or procedure is supplied by federal law

(including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated,

the laws of the State of New York, without giving effect to the principles of conflict of laws that

would require application of the law of another jurisdiction, shall govern the rights, obligations,

construction, and implementation of the Plan, and any agreements, securities, instruments, or

other documents executed or delivered in connection with the Plan (except as otherwise set forth

in those documents, in which case the governing law of such documents shall control); provided, however, that governance matters relating to the Debtors, the Liquidating Trust, the Borrower Claims Trust, the RMBS Claims Trust, or the Private Securities Claims Trust, as applicable, shall be governed by the laws of the State of organization or formation thereof.

       63.    **Miscellaneous Provisions.**

       (a)    Notwithstanding any other provision in the Plan or this Confirmation Order, to the extent Ally processes any employment tax refunds on behalf of the Debtors, Ally will remit such refunds that it receives that are attributable to the Debtors to the Debtors or the Liquidating Trust, as applicable.

       (b)    Except as otherwise provided in the Plan and this Order, following the Effective Date, notice of all subsequent pleadings in the Chapter 11 Cases shall be limited to counsel to the Debtors, counsel to the Liquidating Trust, the U.S. Trustee and any party known to be directly affected by the relief sought.

       (c)    On or before the Effective Date, the Plan Proponents may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Liquidating Trust, as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

       (d)    Any document related to the Plan that refers to a plan of liquidation or chapter 11 plan of the Debtors other than the Plan confirmed by this Order shall be, and it hereby

is, deemed to be modified such that the reference to a plan of liquidation or chapter 11 plan of the Debtors in such document shall mean the Plan confirmed by this Order, as appropriate.

(e)      Without intending to modify any prior Order of this Court (or any agreement, instrument or document addressed by any prior Order), in the event of an inconsistency between the Plan, on the one hand, and any other agreement, instrument, or document intended to implement the provisions of the Plan, on the other, the provisions of the Plan shall govern (unless otherwise expressly provided for in the Plan or such agreement, instrument, or document).  In the event of any inconsistency between the Plan or any agreement, instrument, or document intended to implement the Plan, on the one hand, and this Order, on the other, the provisions of this Order shall govern.

(f)      In accordance with Article X.D. of the Plan, if the Effective Date does not occur on or before December 24, 2013, then upon motion by the Plan Proponents or Ally made before the Effective Date, this Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, this Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion. If this Order is vacated, then, except as provided in any order of the Bankruptcy Court vacating this Order, the Plan, including the assumptions, assignments or rejections of Executory Contracts, will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Equity Interests or Causes of Action; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking of any sort by such Debtor or any other Entity.

(g)      Unless otherwise provided in the Plan or in this Order, all injunctions or

- 77 -

stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or

any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any

injunctions or stays contained in the Plan or this Order) shall remain in full force and effect until

the Effective Date. All injunctions or stays contained in the Plan and this Order shall remain in

full force and effect in accordance with their terms, provided, however, that any and all relief

from the automatic stay granted by the Court during these Chapter 11 Cases on an individual or

omnibus basis by order, including, without limitation, pursuant to the *Final Supplemental Order*

*Under Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a), and 1108 and Bankruptcy Rule*

*9019 (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II)*

*Approving Procedures For Compromise and Settlement of Certain Claims, Litigations and*

*Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction*

*Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing*

*and Directing the Debtors to Pay Securitization Trustee Fees and Expenses* (ECF Doc. # 774), to

the extent such relief remains applicable, shall not be subject to the injunction provisions of this

Order or the Plan, and such orders shall remain in full force and effect in accordance with their

terms.

(h)    Each term and provision of the Plan, as it may have been altered or

interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms

and (b) integral to the Plan and may not be deleted or modified without the consent of the Plan

Proponents.

64.    **Findings and Conclusions**. The determinations, findings, judgments, decrees,

and orders set forth and incorporated into this Order constitute the Court's findings of fact and

conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by

Bankruptcy Rule 9014.  Each finding of fact set forth or incorporated herein, to the extent it is or

may be deemed a conclusion of law, shall also constitute a conclusion of law.  Each conclusion

of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact,

shall also constitute a finding of fact.  The terms of the Plan, the Plan Supplement, and the

exhibits thereto are incorporated herein by reference to, and are an integral part of, this Order.

The terms of the Plan, the Plan Documents, all exhibits thereto, and all other relevant and

necessary documents shall be effective and binding as of the Effective Date.

65.  **Headings**.  The headings contained within this Confirmation Order are used for

the convenience of the parties and shall not alter or affect the meaning of the text of this

Confirmation Order.

66.  **Retention of Jurisdiction**.  The business and assets of the Debtors shall remain

subject to the jurisdiction of this Court until the Effective Date.  Notwithstanding the entry of

this Order, from and after the Effective Date, the Court shall retain such jurisdiction over the

Chapter 11 Cases as is legally permissible, including jurisdiction over those matters and issues

described in Article XII of the Plan, including with respect to (i) insurance settlements and

disputes involving insurance policies settled or otherwise addressed under or in connection with

the Plan, and (ii) the Claims filed by WFBNA in these Chapter 11 Cases and any Claims or

Causes of Action that may be asserted by WFBNA against any of the Ally Released Parties.

67.  **Order Effective Immediately**.  Notwithstanding Bankruptcy Rules 3020(e) or

7062 or otherwise, the stay provided for under Bankruptcy Rule 3020(e) or any other applicable

rule (e.g., Rules 6004(h) or 6006(d)) shall be waived and this Order shall be effective and

enforceable immediately upon entry.  The Debtors are authorized to consummate the Plan and

the transactions contemplated thereby immediately after entry of this Order and upon, or

concurrently with, satisfaction of the conditions set forth in the Plan.


Dated: December 11, 2013
      New York, New York



                              *Martin Glenn*
                                MARTIN GLENN
              United States Bankruptcy Judge

# <u>Appendix 1</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) |
| | ) Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) |
| | ) Chapter 11 |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |

---

### SECOND AMENDED JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC, et al. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

---

MORRISON & FOERSTER LLP
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
1290 Avenue of the Americas
New York, New York 10104
Telephone:   (212) 468-8000
Facsimile:   (212) 468-7900

*Counsel for Debtors and Debtors-in-Possession*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Rachael L. Ringer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee of Unsecured Creditors*

Dated:  December 6, 2013
        New York, New York

# **TABLE OF CONTENTS**

**Page**

ARTICLE I. DEFINED TERMS, RULES OF CONSTRUCTION, COMPUTATION OF
TIME, AND GOVERNING LAW ...................................................................... 1
    A.    Defined Terms ................................................................................ 1
    B.    Rules of Construction.................................................................... 34
    C.    Computation of Time .................................................................... 34
    D.    Governing Law .............................................................................. 34

ARTICLE II. ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, PRIORITY
TAX CLAIMS, AND U.S. TRUSTEE FEES ...................................................... 35
    A.    Administrative Claims ................................................................... 35
    B.    Professional Claims ....................................................................... 36
    C.    Priority Tax Claims ....................................................................... 36
    D.    U.S. Trustee Fees .......................................................................... 37

ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND
EQUITY INTERESTS....................................................................................... 37
    A.    Classification of Claims and Equity Interests ............................... 37
    B.    Record Date for Claims................................................................. 37
    C.    Summary of Classification and Class Identification...................... 37
    D.    Treatment of Claims and Equity Interests .................................... 40
    E.    Subordinated Claims ..................................................................... 53
    F.    Distributions on Account of Allowed Claims and Interests........... 53
    G.    Elimination of Vacant Classes ...................................................... 53
    H.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
Code............................................................................................. 54

ARTICLE IV. IMPLEMENTATION OF THE PLAN ............................................... 54
    A.    Global Settlement .......................................................................... 54
    B.    Ally Settlement .............................................................................. 56
    C.    RMBS Settlement .......................................................................... 58
    D.    Settlement of Monoline Claims...................................................... 64
    E.    Private Securities Claims Trust ..................................................... 65
    F.    Borrower Claims Trust .................................................................. 67
    G.    Settlement of Claims of Kessler Class Claimants........................... 70

| | | |
|---|---|---|
| H. | NJ Carpenters Claims Settlement | 70 |
| I. | Senior Unsecured Notes Settlement | 71 |
| J. | JSN Adversary Proceeding and FGIC Settlement Appeal | 71 |
| K. | Adjustment Mechanism | 71 |
| L. | Cancellation of Securities, Indentures, and Other Documents Evidencing Claims and Equity Interests | 72 |
| M. | Treatment of Intercreditor Agreement | 72 |
| N. | Compensation Order | 73 |
| O. | Corporate Action | 73 |
| P. | Dissolution of the Debtors | 73 |
| Q. | Effectuating Documents; Further Transactions | 74 |
| R. | Exemption from Certain Taxes and Fees | 74 |
| S. | Preservation of Causes of Action | 74 |
| ARTICLE V. | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 76 |
| A. | Rejection of Executory Contracts and Unexpired Leases | 76 |
| B. | Assumption of Executory Contracts and Unexpired Leases | 76 |
| C. | Contracts and Leases Entered Into After the Petition Date | 78 |
| D. | Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases | 78 |
| E. | Nonoccurrence of Effective Date | 78 |
| F. | No Change in Control | 79 |
| ARTICLE VI. | THE LIQUIDATING TRUST | 79 |
| A. | Generally; Creation and Conversion | 79 |
| B. | Purpose of the Liquidating Trust | 79 |
| C. | Transfer of Assets to the Liquidating Trust | 79 |
| D. | Liquidating Trust Expenses Set Aside and Administrative, Priority, Secured and Convenience Distribution Reserve | 80 |
| E. | Liquidating Trust Governance | 81 |
| F. | Financial Statements/Reporting | 81 |
| G. | Tax Treatment | 82 |
| H. | Duration | 83 |
| I. | Conflicting Terms | 83 |
| J. | Exculpation; Indemnification; Insurance | 83 |

ARTICLE VII. PROVISIONS GOVERNING ISSUANCE OF UNITS AND OTHER
      DISTRIBUTIONS ................................................................................. 84

  A.   Applicability ................................................................................. 84

  B.   Cash Distributions ........................................................................ 84

  C.   Initial Issuance of Units and Distributions in Respect of Units by the Liquidating
      Trust ........................................................................................... 85

  D.   Fractional Units ............................................................................ 86

  E.   Timing and Calculation of Amounts to be Distributed ..................... 86

  F.   Disbursing Agent .......................................................................... 87

  G.   Delivery of Distributions and Undeliverable or Unclaimed Distributions ..... 87

  H.   Compliance with Tax Requirements ................................................ 92

  I.    Allocations ................................................................................... 92

  J.   Setoffs and Recoupment ................................................................ 92

  K.   Claims Paid or Payable by Third Parties ......................................... 93

  L.   Allowed Unsecured Claims for Which More than One Debtor in a Debtor
      Group Is Jointly and/or Severally Liable ........................................ 94

  M.  Distributions Free and Clear .......................................................... 94

ARTICLE VIII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS .............................. 95

  A.   Resolution of Disputed Claims ....................................................... 95

  B.   Disallowance of Claims ................................................................. 96

  C.   Amendments to Claims .................................................................. 97

  D.   Disputed Claims Reserve ............................................................... 97

ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
      PROVISIONS ................................................................................. 98

  A.   Compromise and Settlement of Claims, Equity Interests, and Controversies 98

  B.   Release of Liens ............................................................................ 99

  C.   Releases by the Debtors ................................................................. 99

  D.   Third Party Release ..................................................................... 100

  E.   Third Party Release Carve-Out ..................................................... 100

  F.   Ally Release ............................................................................... 101

  G.   Junior Secured Notes Releases ..................................................... 101

  H.   Exculpation ................................................................................ 102

  I.    Injunction .................................................................................. 103

  J.   Waiver of Subrogation ................................................................. 104

K.      Satisfaction and Release of Claims and Equity Interests ............................... 104

L.      Judgment Reduction for Co-Defendants in Securities Litigation ................. 105

M.     Limitations ..................................................................................................... 105

ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN ................................................................. 106

A.      Conditions Precedent to Confirmation ........................................................... 106

B.      Conditions Precedent to the Effective Date .................................................... 107

C.      Waiver of Conditions ..................................................................................... 108

D.      Effect of Nonoccurrence of Conditions ......................................................... 108

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ..... 109

A.      Modification and Amendments ...................................................................... 109

B.      Effect of Confirmation on Modifications ....................................................... 110

C.      Revocation or Withdrawal of the Plan ........................................................... 110

ARTICLE XII. RETENTION OF JURISDICTION ................................................................. 110

ARTICLE XIII. MISCELLANEOUS PROVISIONS ............................................................. 112

A.      Immediate Binding Effect ............................................................................... 112

B.      Additional Documents .................................................................................... 113

C.      Payment of Statutory Fees .............................................................................. 113

D.      Dissolution of the Creditors' Committee ........................................................ 113

E.      Access to Debtors' Records after Effective Date. .......................................... 114

F.      Substantial Consummation .............................................................................. 114

G.      Reservation of Rights ...................................................................................... 114

H.      Successors and Assigns ................................................................................... 114

I.       Service of Documents ...................................................................................... 115

J.       Further Assurances .......................................................................................... 117

K.      Term of Injunctions or Stays .......................................................................... 117

L.      Entire Agreement ............................................................................................ 117

M.     Exhibits and Related Documents .................................................................... 117

N.      Severability of Plan Provisions ...................................................................... 118

O.      Waiver or Estoppel Conflicts ......................................................................... 118

P .      Conflicts .......................................................................................................... 118

# INTRODUCTION

The Debtors and the Creditors' Committee together propose this Joint Chapter 11 Plan[1] for resolution and satisfaction of all Claims against and Equity Interests in the Debtors. Each Debtor and the Creditors' Committee is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement accompanying the Plan, including the exhibits thereto, for a discussion of the Debtors' history, business, properties, and operations and risk factors, together with a summary and analysis of the Plan and a description of the settlements agreed to by the Debtors, the Creditors' Committee and certain other parties pursuant to the Global Settlement. All holders of Claims entitled to vote on the Plan are encouraged to consult the Disclosure Statement and to read the Plan carefully before voting to accept or reject the Plan.

NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH AS APPROVED BY THE BANKRUPTCY COURT, HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF CONSTRUCTION, COMPUTATION OF TIME, AND GOVERNING LAW

### A.    Defined Terms

**1.**    "Accrued Professional Compensation" means, at any date, and regardless of whether such amounts are billed or unbilled, all of a Professional's accrued and unpaid fees (including success fees) and reimbursable expenses for services rendered in the Chapter 11 Cases through and including such date, whether or not such Professional has filed a fee application for payment of such fees and expenses, (i) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount) and (ii) after applying any retainer that has been provided by the Debtors to such Professional and not previously applied. No amount of a Professional's fees and expenses denied under a Final Order shall constitute Accrued Professional Compensation.

**2.**    "Additional Settling RMBS Trusts" means all RMBS Trusts other than the Original RMBS Settling Trusts.

**3.**    "Ad Hoc Group" means that certain Ad Hoc Group of Junior Secured Noteholders represented by White & Case LLP and Milbank, Tweed, Hadley & McCloy LLP in connection

---

[1] All capitalized terms not defined in this introduction have the meanings ascribed to them in Article I of this Plan.

with the Chapter 11 Cases.  For purposes of this Plan, where the consent of the Ad Hoc Group is required, it will be satisfied by a majority (by amount of holdings) of the Ad Hoc Group.

4.       "Administrative Claim" means any Claim for costs and expenses of administration under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Claims; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; (d) any indebtedness or obligations assumed by the Debtors in connection with the conduct of their businesses; and (e) any Claim for goods delivered to the Debtors within twenty (20) days of the Petition Date and entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code.

5.       "Administrative Claim Bar Date" means the deadline for filing requests for payment of Administrative Claims, which shall be the first Business Day that is thirty (30) days following the Effective Date, unless otherwise ordered by the Bankruptcy Court, except with respect to Professional Claims which shall be subject to the provisions of Article II.

6.       "Administrative, Priority, Secured and Convenience Distribution Reserve" means the reserve of the Liquidating Trust established for maintaining Cash or other assets from time to time necessary to satisfy payments after the Effective Date to holders of certain Allowed Claims as provided in Article VI.D.

7.       "Affiliate" means an "affiliate" as such term is defined in section 101(2) of the Bankruptcy Code.

8.       "AFI" means Ally Financial Inc.

9.       "AFI/JSN Cash Collateral Order" means the *Final Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Adequate Protection Parties*, entered June 25, 2012 [Docket No. 491].

10.       "AIG" means AIG Asset Management (U.S.), LLC, on behalf of itself and its affiliates, as investment advisor for certain affiliated entities that have filed proofs of claim in the Chapter 11 Cases.

11.       "Allowed" means, with respect to a Claim against any Debtor, except as otherwise provided herein, (a) a Claim that is (i) listed in the Schedules as of the Effective Date as neither disputed, contingent nor unliquidated, and for which no Proof of Claim has been timely filed, or (ii) evidenced by a valid Proof of Claim or request for payment of Administrative Claim, as applicable, Filed by the applicable Bar Date, and as to which the Debtors or other parties-in-interest have not Filed an objection to the allowance thereof by the Claims Objection Deadline, or (b) a Claim that is Allowed under the Plan or any stipulation or settlement approved by, or Final Order of, the Bankruptcy Court; provided,

12-12020-mg   Doc 8019-45   Filed 01/23/15   Entered 01/23/15 18:14:20   Appendix 26
Pg 115 of 398

however, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed Claims" under the Plan, provided further, however, any Claims expunged or disallowed under the Plan or otherwise shall not be Allowed Claims. If a Claim is Allowed only in part, references to Allowed Claims include and are limited to the Allowed portion of such Claim. Notwithstanding anything to the contrary herein, no Claim that is disallowed in accordance with Bankruptcy Rule 3003 or section 502(d) of the Bankruptcy Code is Allowed and each such Claim shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

12.     "Allowed Fee Claim" means 5.7% of the Allowed RMBS Trust Claims, which shall be distributed to counsel to the Institutional Investors as fees via direct allocation to counsel for the Institutional Investors and without conveyance to the RMBS Claims Trust, the RMBS Trustees, or the RMBS Trusts.

13.     "Allowed Kessler Claim" means a non-subordinated Allowed Borrower Claim for voting and distribution purposes in an amount to be determined under the Kessler Settlement Agreement.

14.     "Allstate" means Allstate Insurance Company and its subsidiaries and affiliates.

15.     "Ally" means, collectively, AFI and its direct and indirect subsidiaries and affiliates, excluding the Debtors and their direct and indirect subsidiaries.

16.     "Ally Bank" means AFI's indirect banking subsidiary (f/k/a GMAC Bank), a commercial state chartered bank regulated by the FDIC and the State of Utah.

17.     "Ally Contract Claim" means any and all amounts owed to Ally as of the Effective Date by any of the Debtors pursuant to (i) orders of the Bankruptcy Court and (ii) the Debtors' performance of the Ally Contracts following the Petition Date, provided, no Revolving Credit Facility Claim is an Ally Contract Claim.

18.     "Ally Contracts" means the contracts listed in Annex IV to Exhibit B of the Plan Support Agreement.

19.     "Ally Contribution" means Ally's contribution to the Estates of (a) $1,950,000,000 in Cash on the Effective Date,  and (b) promptly after receipt on or after the Effective Date, the first $150,000,000 received by Ally for any directors and officers or errors and omissions insurance policy claims it pursues against its insurance carriers related to the Claims released in connection with this Plan, provided that Ally guarantees that the Liquidating Trust will receive such $150,000,000 on account of such contribution, which guarantee shall be payable without defense, setoff or objection on September 30, 2014.

20.     "Ally Indemnity Escrow Account" means the escrow account created pursuant to the *Stipulation and Order Reserving Rights with Respect to Debtors' Motion for Interim and Final Orders under Bankruptcy Code Section 105(a) and 363 Authorizing the Debtors to*

*Continue to Perform under the Ally Bank Servicing Agreement in the Ordinary Course of Business* [Docket No. 1420].

**21.** "Ally Released Parties" means (a) Ally, and each of Ally's and the Debtors' respective members, shareholders, partners, non-Debtor affiliates, and Representatives, including Cap Re of Vermont, LLC and its current and former members, officers, and directors and (b) each of Ally's successors and assigns, each Entity in clause (a) and (b) solely in its capacity as such. For the avoidance of doubt, and without limiting the foregoing, the Ally Released Parties shall not include (i) any purchaser of any assets relating to the Debtors' servicing business that is not Ally or a Debtor, (ii) any assignee of a Servicing Agreement that is not Ally or a Debtor, (iii) notwithstanding any status as a shareholder of any Ally Released Party, and solely in their capacity as such, any underwriter of RMBS that is unaffiliated with Ally, and the Representatives of such underwriter, against which an Investor has a pending or tolled Cause of Action, (iv) the FHFA, (v) the FDIC, (vi) any assignee of executory contracts that were assumed by the Debtors that is not Ally, (vii) any insurer that is not Ally that sold any directors & officers or errors & omissions insurance policies that cover Debtors, (viii) any party that is not Ally against whom RFC may have indemnity rights arising out of the Kessler Class Action, specifically, any successors in interest to CBNV and GNBT, (ix) the Plan Trustees, and (x) Fannie Mae.

**22.** "Ally Securities" means Ally Securities, LLC.

**23.** "Ambac" means, collectively, Ambac Assurance Corporation and the Segregated Account of Ambac Assurance Corporation.

**24.** "Ambac Cure Stipulation" means that certain stipulation and order currently being negotiated between the Plan Proponents and Ambac regarding (i) the resolution of Ambac's objection to sale of certain Ambac agreements to Ocwen pursuant to the Ocwen APA, (ii) the fixing of Ambac's cure claims in connection therewith, (iii) the amount of Ambac's General Unsecured Claims to be allowed pursuant to the Plan.

**25.** "Assumption Schedule" means the schedule in the Plan Supplement setting forth certain Executory Contracts and Unexpired Leases for assumption under section 365 of the Bankruptcy Code.

**26.** "Assured" means Assured Guaranty Municipal Corp., f/k/a Financial Security Assurance Inc., and its affiliates including AG Financial Products Inc. and Assured Guaranty Corp.

**27.** "Available Assets" means all the assets of the Estates, including all Equity Interests in the Non-Debtor Subsidiaries, the Ally Contribution, and the Liquidating Trust Causes of Action, which are not (a) Excluded Assets or (b) otherwise excluded pending the resolution of legal or logistical issues; provided, however, that any proceeds relating to the assets which are excluded pursuant to clause (b) will belong to the Liquidating Trust.

**28.** "Ballot" means each of the ballot forms distributed to each holder of a Claim that is entitled to vote to accept or reject this Plan and on which the holder is to indicate, among other things, acceptance or rejection of this Plan.

4

**29.** "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect as of the date hereof.

**30.** "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases.

**31.** "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, as the context may require.

**32.** "Bar Date" means, collectively, the Administrative Claim Bar Date, the Rejection Damages Claim Bar Date, and any deadline by which a Proof of Claim must be filed under the Bar Date Order, as applicable.

**33.** "Bar Date Order" means the *Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof*, entered by the Bankruptcy Court on August 29, 2012 [Docket No. 1309], as amended, supplemented, or modified.

**34.** "Berkshire" means Berkshire Hathaway Inc., solely in its capacity as a holder of certain Junior Secured Notes and a former holder of Senior Unsecured Notes, and its former, present, and future parents, Affiliates, member firms, associated entities, shareholders, principals, members, limited partners, general partners, equity investors, managed entities, and their respective attorneys, financial advisors, investment advisors, employees, officers, directors, managers, agents and other authorized personnel, in their capacity as such.

**35.** "Berkshire APA" means that certain Asset Purchase Agreement, dated as of November 2, 2012, as amended and supplemented, entered into by and among Berkshire, ResCap, RFC, GMACM, GMACM Borrower LLC, and RFC Borrower LLC [Docket No. 2247, Ex. 1].

**36.** "Berkshire Sale Order" means the Order under 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014, (I) Approving (A) Sale of Debtors Assets Pursuant to Asset Purchase Agreement With Berkshire Hathaway, Inc.; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; and (C) Related Agreements; and (II) Granting Related Relief [Docket No. 2247].

**37.** "BNY Mellon" means The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., each solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts.

**38.** "Borrower" means an individual whose current or former mortgage loan was originated, serviced, sold, consolidated, or owned by any of the Debtors.

**39.** "Borrower-Related Cause of Action" means a Cause of Action of any of the Debtors that has been or could be asserted, including by way of setoff, recoupment, defense, counterclaim or cross-claim with respect to any Borrower Claim, by any of the Debtors

5

against a Borrower as of the Effective Date; provided, however, that on the Effective Date the Debtors waive and release any Claim or Cause of Action to recover transfers to any Entity made by the Debtors to or for the benefit of a Borrower arising under chapter 5 of the Bankruptcy Code, except by way of setoff, recoupment, defense, counterclaim, or cross-claim.

40.    "Borrower Claims" means (i) Claims of a Borrower arising from or relating to any alleged act or omission or any other basis of liability of any Debtor (or any predecessor) in connection with the origination, sale, and/or servicing of a mortgage loan originated, sold, consolidated, purchased, and/or serviced by any Debtor, (ii) Claims filed for or on behalf of a Borrower by such Person's attorney or agent, including as part of a proof of claim filed on behalf of a putative class of Borrowers, and (iii) claims that have become Allowed as a result of settlement of Borrower litigation commenced against Ally and the Debtors.  For the avoidance of doubt, Borrower Claims shall include Allowed Claims held by the Kessler Class Claimants (to the extent that the Kessler Class Claimants are certified as a class action for settlement or allowance purposes), and shall not include the: (a) Senior Unsecured Notes Claims; (b) Junior Secured Notes Claims; (c) RMBS Trust Claims; (d) Private Securities Claims; (e) General Unsecured Claims; (f) General Unsecured Convenience Claims; or (g) Intercompany Balances.   For the further avoidance of doubt, no Claim described in subsection (ii) hereof shall be considered an Allowed Borrower Claim unless such Claim is either certified under Bankruptcy Rule 7023 or by Final Order for purposes of settlement or allowance.

41.    "Borrower Claims Trust" means the trust established for the benefit of the holders of Allowed Borrower Claims.

42.    "Borrower Claims Trust Agreement" means that certain trust agreement, the form of which shall be included in the Plan Supplement, that, among other things, sets forth the methodology and procedures for resolving Disputed Borrower Claims and making distributions to holders of Allowed Borrower Claims.

43.    "Borrower Claims Trust Assets" means (i) Cash transferred to the Borrower Claims Trust by the Liquidating Trust as of the Effective Date in the amount of $57,600,000 less any amounts paid by the Debtors to or on behalf of holders of Borrower Claims prior to the Effective Date pursuant to (a) *the Order Approving Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and (d), Bankruptcy Rules 1015(c), 2002(m), 7016, and 9007 and Local Bankruptcy Rule 2002-2 for Entry of an Order Approving (A) Supplement to Case Management Order Establishing Mandatory Procedures for Management of Adversary Proceedings Commenced by Borrowers and Former Borrowers and (B) Related Relief* [Docket No. 3304], as amended by the *Amended Order Approving Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and (d), Bankruptcy Rules 1015(c), 2002(m), 7016, and 9007 and Local Bankruptcy Rule 2002-2 for Entry of an Order Approving (A) Supplemental to Case Management Order Establishing Mandatory Procedures for Management of Adversary Proceedings Commenced by Borrowers and Former Borrowers and (B) Related Relief* [Docket No. 3490], or (b) any other order of the Bankruptcy Court plus the amount of the Borrower Trust True-Up, and (ii) all Borrower-Related Causes of Action.

44.     "Borrower Claims Trust Committee" means (i) counsel for the Kessler Settlement Class, and (ii) those Borrowers or the representatives of Borrowers appointed by the Kessler Settlement Class, with the consent of the Plan Proponents, which consent shall not be unreasonably withheld, to oversee the administration of the Borrower Claims Trust and the disposition of the Borrower Claims Trust Assets.  The identities of the initial Persons to serve on the Borrower Claims Trust Committee as of the Effective Date will be set forth in the Plan Supplement.

45.     "Borrower Claims Trustee" means the Person selected to serve as the trustee of the Borrower Claims Trust.  The identity of the Person to serve as the Borrower Claims Trustee as of the Effective Date will be set forth in the Plan Supplement.

46.     "Borrower Trust True-Up" means the additional Cash, if any, required to be added to the Borrower Claims Trust Assets such that distributions, estimated as of the Confirmation Date, made from the Borrower Claims Trust on account of an Allowed Borrower Claim will be comparable to the recovery that a holder of an Allowed Claim of the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim, based on the value of the assets in the Liquidating Trust available for distribution to holders of Units as of the Effective Date (without in each case giving effect to any insurance proceeds, including proceeds from the GM Policies, that may be received in respect of the Allowed Borrower Claims in accordance with the Plan or to the time delay in receipt of distributions in respect of the Units from the Liquidating Trust).  For the avoidance of doubt, to the extent necessary, there shall only be a single Borrower Trust True-Up.

47.     "Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are required or authorized by law or governmental action to close.

48.     "Cash" means legal tender of the United States of America or the equivalent thereof.

49.     "Cash Management Order" means the *Final Order Under Bankruptcy Code Sections 105(a), 345, 363, 364, and 503(b)(1) and Bankruptcy Rules 6003 and 6004 Authorizing (I) Continued Use of Cash Management Services and Practices, (II) Continued Use of Existing Bank Accounts, Checks, and Business Forms, (III) Implementation of Modified Cash Management Procedures and Use of Certain Bank Accounts Established in Connection with Use of Pre-And Post-Petition Lenders Financing Facilities and Cash Collateral, (IV) Waiver of the Investment and Deposit Requirements of Bankruptcy Code Section 345, (V) Debtors to Honor Specified Outstanding Prepetition Payment Obligations, and (VI) Continuation of Intercompany Transactions and Granting Administrative Expense Status to Intercompany Balances*, entered by the Bankruptcy Court on June 11, 2012 [Docket No. 309], as amended, supplemented, or modified.

50.     "Cause of Action" means any and all Claims, actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, debts, damages, dues, sums of money, accounts, reckonings, deficiencies,

bonds, bills, disbursements, expenses, losses, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross-claims (including those of the Debtors, and/or the bankruptcy estate of any Debtor created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases), including, without limitation, any claims, causes of action, objections, rights, remedies arising under Chapter 5 of the Bankruptcy Code pursuant to, among others, sections 502, 510, 542 through 545 and 547 through 553 or 558 thereof, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, whether held in a personal or representative capacity, that are or may be pending as of the date hereof or instituted hereafter against any entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date hereof.

51.     "Centerview" means Centerview Partners LLC.

52.     "Chapter 11 Cases" means the chapter 11 cases commenced by the Debtors, which are jointly administered, styled *In re Residential Capital, LLC, et al.*, Case No. 12-12020 (MG), and currently pending before the Bankruptcy Court, or any of such cases as applicable.

53.     "Claim" means a "claim" as such term is defined in section 101(5) of the Bankruptcy Code.

54.     "Claims Objection Deadline" means (i) two hundred seventy (270) days following the Effective Date or (ii) such other later date the Bankruptcy Court may establish upon a motion by the Liquidating Trust, which motion may be approved without a hearing and without notice to any party.

55.     "Claims Record Date" means the Voting Deadline, which is the date on which the transfer register for each Class of Claims or Equity Interests, as maintained by the Debtors or their agents, shall be deemed closed.

56.     "Claims Register" means the official register of Claims in these Chapter 11 Cases maintained by Kurtzman Carson Consultants LLC, in its capacity as the Debtors' notice and claims agent.

57.     "Class" means a group of holders of Claims or Equity Interests classified together under this Plan.

58.     "CBNV" means Community Bank of Northern Virginia.

59.     "Compensation Order" means the *Amended Order Under Bankruptcy Code Sections 105(a), 363, 503(b)(1), 507(a)(2), 1107(a) and 1108 and Bankruptcy Rule 9019 to the Final Wages Order (I) Authorizing and Directing the Debtors to Reimburse Ally Financial Inc. for Payments Made to the Debtors Employees on Account of Compensation Issued on or After the Petition Date; (II) Granting Ally Financial Inc. an Administrative Expense Claim on*

*Account of Such Payments; (III) Granting Ally Financial Inc. a Limited Release; and (IV) Authorizing the Debtors to Establish and Fund an Escrow Account for the Benefit of Ally Financial Inc. on Account of Such Administrative Expense Claims, including Additional Amounts to the Escrow Account as Necessary* [Docket No. 2548].

60. "Confirmation" means the entry on the docket of the Chapter 11 Cases of the Confirmation Order.

61. "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

62. "Confirmation Hearing" means the hearing before the Bankruptcy Court under section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as the same may be continued from time to time.

63. "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan, as amended, supplemented, or modified, under, among others, section 1129 of the Bankruptcy Code.

64. "Consent Order" means the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMACM, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, as amended.

65. "Consent Order Borrower Claims" means claims held by Borrowers arising from residential mortgage foreclosure actions (including judicial and non-judicial foreclosures and related bankruptcy proceedings, and other related litigation) or proceedings (including foreclosures that were in process or completed) for loans serviced by the Mortgage Servicing Companies (as defined in the Consent Order), whether brought in the name of Ally Bank, the Mortgage Servicing Companies, the investor, or any agent for the mortgage note holder (including Mortgage Electronic Registration Systems, Inc.), that have been pending at any time from January 1, 2009 to December 31, 2010, as well as claims arising from residential foreclosure sales that occurred during this time period.

66. "Consenting Claimants" means, collectively, AIG, Allstate, FGIC, the Kessler Class Claimants, MassMutual, MBIA, Prudential, the RMBS Trustees, the Steering Committee Consenting Claimants, the Talcott Franklin Consenting Claimants, the Supporting Senior Unsecured Noteholders, Wilmington Trust, Paulson, and any other parties (other than Ally) that agree to be bound by the terms of the Plan Support Agreement. Each of the foregoing parties is a Consenting Claimant.

67. "Consenting JSNs" means, collectively, the Junior Secured Noteholders that have voted in favor of the Plan, or have changed their vote or do change their vote to a vote in favor of this Plan by the Confirmation Date, in exchange for the treatment of the Junior Secured Notes Claims under the Plan, and each such Junior Secured Noteholder's respective former, present and future parents, affiliates, member firms, associated entities, shareholders, principals, members, limited partners, general partners, equity investors, management companies, investment managers, managed entities, and their respective attorneys, financial advisors,

investment advisors, employees, officers, directors, managers, agents and other authorized, each solely in their capacities as such.

68.    "<u>Consummation</u>" means the occurrence of the Effective Date.

69.    "<u>Creditor</u>" means a "creditor" as defined in section 101(10) of the Bankruptcy Code.

70.    "<u>Creditors' Committee</u>" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases.

71.    "<u>Cure Claim</u>" means a Claim based upon a monetary default, if any, by a Debtor under an Executory Contract or Unexpired Lease as of the time such contract or lease is assumed by such Debtor under sections 365 or 1123 of the Bankruptcy Code, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

72.    "<u>DB</u>" means Deutsche Bank Trust Company Americas and Deutsche Bank National Trust Company each solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian, and/or similar agency capacities in respect of certain of the RMBS Trusts.

73.    "<u>Debtor Group</u>" means, individually or collectively, the ResCap Debtors, the GMACM Debtors or the RFC Debtors.

74.    "<u>Debtor Group Unit Distribution</u>" means each of the GMACM Debtors Unit Distribution, the ResCap Debtors Unit Distribution and the RFC Debtors Unit Distribution.

75.    "<u>Debtor Released Parties</u>" means the Ally Released Parties, the Creditors' Committee, the Consenting Claimants, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Junior Secured Notes Collateral Agent, the Consenting JSNs, the Ad Hoc Group, and their respective successors and assigns, members (except any such member of the Ad Hoc Group that voted to reject the Plan and has not changed its vote to accept the Plan by the Confirmation Date), partners, non-Debtor affiliates, and Representatives, each in its capacity as such. For the avoidance of doubt, and without limiting the foregoing, the Debtor Released Parties shall not include (i) any purchaser of any assets relating to the Debtors' servicing business that is not Ally, Berkshire, or a Debtor, (ii) any assignee of a Servicing Agreement that is not Ally, Berkshire, or a Debtor, (iii) any underwriter of RMBS that is unaffiliated with the Debtors or Ally, and the Representatives of such underwriter, against which an Investor has a pending or tolled Cause of Action, (iv) any assignee of executory contracts that were assumed by the Debtors that is not Ally or Berkshire, (v) any insurer that is not Ally that sold any directors & officers or errors & omissions insurance policies that cover the Debtors in their capacity as insurers, or (vi) any party that is not Ally against whom RFC may have indemnity rights arising out of the Kessler Class Action, specifically, any successors in interest to CBNV and GNBT.

10

76.　"Debtors" means ditech, LLC; DOA Holding Properties, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; ETS; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC RH Settlement Services, LLC; GMACM; GMACM Borrower LLC; GMACM Holding; GMACM REO LLC; GMACR Mortgage Products, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecomings Financial Real Estate Holdings, LLC; Homecomings Financial, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; ResCap; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC Holding; RFC REO LLC; RFC SFJV-2002, LLC; and RFC–GSAP Servicer Advance, LLC.

77.　"Debtor Release" means the release set forth in Article IX.C.

78.　"Delaware Trustee" means the trustee, or its successor, appointed in accordance with the Liquidating Trust Agreement to comply with the requirement of Section 3807 of the Delaware Statutory Trust Act.

79.　"Disbursing Agent" means the Liquidating Trust, or any Person engaged by the Liquidating Trust, to perform the function of a disbursing agent.

80.　"Disclosure Statement" means the disclosure statement for this Plan, as amended, supplemented, or modified in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

81.　"Disputed Borrower Claim" means any Borrower Claim that is not Allowed, until it is disallowed or expunged by Final Order, written agreement, or under the Plan.

82.　"Disputed Claim" means any Claim that is not Allowed until it is disallowed or expunged by Final Order, written agreement, or under the Plan, other than Disputed Borrower Claims and Disputed Private Securities Claims.

83.　"Disputed Claims Reserve" means the reserve of Units, Cash distributed thereon and other assets, if any, maintained by the Liquidating Trust for distribution to the Liquidating Trust Unit Beneficiaries that are holders of Disputed Claims, if and when such Disputed Claims become Allowed.

84.　"Disputed Private Securities Claims" means any Private Securities Claim that is not Allowed until it is disallowed or expunged by Final Order or under the Plan.

85.　"Distributable Cash" means the Cash to be distributed to holders of Units, including the Disputed Claims Reserve, on any Distribution Date.

86.     "Distribution Date" means a date or dates, as determined by the Liquidating Trust Board in accordance with the Liquidating Trust Agreement, on which the Liquidating Trust makes a distribution, or causes a distribution to be made, of Distributable Cash to the Unitholders.

87.     "District Court" means the United States District Court for the Southern District of New York.

88.     "DOJ" means the United States Department of Justice and any component thereof, including but not limited to the United States Attorney's Office for any district.

89.     "DOJ/AG Settlement" means the Consent Judgment filed by the United States District Court for the District of Columbia (Case: 1:12-cv-00361-RMC) on April 4, 2012.

90.     "DOJ/AG Settling States" means the District of Columbia and the states that are parties to the DOJ/AG Settlement.

91.     "DOJ-Represented Agency" means the United States of America and any of its agencies, departments, offices or agents to the extent that they are represented by the DOJ, whether or not the DOJ has entered an appearance on behalf of that agency, department, office or agent in this proceeding.  For the avoidance of doubt, the term "DOJ-Represented Agency" shall not apply to any agency, department, office or agent of the United States that has appeared in these Chapter 11 Cases or filed a notice pursuant to Bankruptcy Rule 2002 in these Chapter 11 Cases, in each case through non-DOJ counsel.

92.     "DTC" means the Depository Trust Company.

93.     "Duff" means Duff & Phelps, LLC, financial advisor to certain of the RMBS Trustees.

94.     "Effective Date" means the first Business Day after the Confirmation Date on which no stay of the Confirmation Order is in effect and all of the conditions precedent to the Effective Date specified in Article X.B have been satisfied or waived pursuant to Article X.C.

95.     "Entity" means an "entity" as such term is defined in section 101(15) of the Bankruptcy Code.

96.     "Equity Interest" means any "equity security" as defined in section 101(16) of the Bankruptcy Code, of a Debtor existing immediately prior to the Effective Date, or any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire, sell, or subscribe for any such interest.

97.     "ERISA" means the Employee Retirement Income Security Act.

98.     "Estates" means the estates of the Debtors created under section 541 of the Bankruptcy Code.

99.    "ETS" means the Debtor entity, Executive Trustee Services, LLC.

100.    "ETS Unsecured Claims" means all General Unsecured Claims against ETS.

101.    "Excluded Assets" means (i) those noneconomic "residual" interests in various REMICs and an interest in a passive foreign investment company (collectively, "NERDS") held by a Debtor which are identified in Schedule 5, (ii) those interests in owner trusts, entities, or other financing or securitization entities held by a Debtor which are identified in Schedule 6, (iii) common land which is owned by a Debtor and which is identified in Schedule 7, and (iv) home equity lines of credit having no outstanding balances.

102.    "Exculpated Party" means each of the following in its capacity as such: (a) the Debtors; (b) the Consenting Claimants; (c) Ally; (d) the Creditors' Committee and the members thereof; (e) the Consenting JSNs, (f) the Junior Secured Notes Indenture Trustee and the Junior Secured Notes Predecessor Indenture Trustee, (g) the Junior Secured Notes Collateral Agent, (h) the Ad Hoc Group, and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entity's successors and assigns, members (except any such member of the Ad Hoc Group that voted to reject the Plan and has not changed its vote to accept the Plan by the Confirmation Date), affiliates, subsidiaries, officers, directors, partners, principals, employees, and Representatives; provided, however, without limiting the foregoing, the following shall not be an Exculpated Party: (i) any purchaser of any assets relating to the Debtors' servicing business that is not Ally, Berkshire, or a Debtor, (ii) any assignee of a Servicing Agreement that is not Ally, Berkshire, or a Debtor, (iii) any underwriter of RMBS that is unaffiliated with the Debtors or Ally, and the Representatives of such underwriter, against which an Investor has a pending or tolled Cause of Action, (iv) any assignee of executory contracts that were assumed by the Debtors that is not Ally or Berkshire, (v) any insurer that is not Ally that sold any directors & officers or errors & omissions insurance policies that cover the Debtors, in their capacity as insurers, or (vi) any party that is not Ally against whom RFC may have indemnity rights arising out of the Kessler Class Action, specifically, any successors in interest to CBNV and GNBT.

103.    "Exculpation" means the exculpation provision set forth in Article IX.H.

104.    "Executory Contract" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

105.    "Fannie Mae" means Fannie Mae (f/k/a The Federal National Mortgage Association).

106.    "Fannie Mae Contract" means that certain Mortgage Selling and Servicing Contract dated March 29, 2007, including the incorporated Fannie Mae Selling and Servicing Guides and various Master Agreements, including but not limited to the Master Agreement, dated August 3, 2012, between Fannie Mae and Ally Bank, each as may have been amended from time to time.

107.    "FDIC" means the Federal Deposit Insurance Corporation.

13

**108.** "FGIC" means Financial Guaranty Insurance Company and its subsidiaries and affiliates.

**109.** "FGIC Policies" means insurance policies issued by FGIC in connection with the RMBS Trusts insured by FGIC.

**110.** "FGIC Rehabilitation Court" means the New York State Supreme Court with jurisdiction over FGIC's rehabilitation proceeding.

**111.** "FGIC Settlement Agreement" means that certain settlement agreement dated, as of May 23, 2013, among the Debtors, FGIC, BNY Mellon, U.S. Bank and WFB, each in its capacity as RMBS Trustee, and the Institutional Investors.

**112.** "FGIC Settlement Appeal" means the appeal to the Southern District of New York of the *Memorandum Decision and Order, and Findings of Fact and Conclusions of Law, Approving the FGIC Settlement Motion* [Docket No. 5042] and the *Order Granting Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among FGIC, the Debtors, the Trustees and the Institutional Investors* [Docket No. 5125], filed by the Ad Hoc Group, Case No. 13-08024 (LAK).

**113.** "FHFA" means Federal Housing Finance Agency.

**114.** "FHFA Claims" means Claims held by FHFA in its capacity as Conservator for the Federal Home Loan Mortgage Corporation related solely to Proofs of Claim Nos. 6296, 6297, 6298, 6299, 6300, and 6301.

**115.** "File," "Filed," or "Filing" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or, in the case of a Proof of Claim, with the Debtors' notice and claims agent.

**116.** "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, which has not been modified, amended, reversed, vacated, or stayed, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order, shall not cause an order not to be a Final Order.

**117.** "First Priority Collateral Agent" means Wells Fargo Bank, N.A., as collateral agent and collateral control agent under the First Priority Security Agreement, together with its respective successors and assigns in such capacity.

**118.** "First Priority Collateral Agent Fees and Expenses" means the reasonable fees, costs, and expenses and indemnity claims of the First Priority Collateral Agent, including but not limited to, the fees, costs, and expenses of the First Priority Collateral Agent's counsel.

**119.** "First Priority Collateral Agent Lien" means the Liens and other priority in payment and rights of the First Priority Collateral Agent under the First Priority Security Agreement, the Intercreditor Agreement, and related documents, or otherwise available to the First Priority Collateral Agent under applicable law, for the payment of First Priority Collateral Agent Fees and Expenses.

**120.** "First Priority Security Agreement" means that certain security agreement, dated as of December 30, 2009, among RFC and GMACM and certain of their affiliates, GMAC Inc., and the First Priority Collateral Agent.

**121.** "FTI" means FTI Consulting, Inc.

**122.** "General Unsecured Claim" means any Claim against a Debtor that is not a/an: (a) Administrative Claim; (b) Priority Tax Claim; (c) Other Priority Claim; (d) Borrower Claim; (e) Revolving Credit Facility Claim; (f) Junior Secured Notes Claim; (g) Other Secured Claim; (h) Senior Unsecured Notes Claim; (i) RMBS Trust Claim; (j) Intercompany Balance; (k) Professional Claim; (l) General Unsecured Convenience Claim; (m) Private Securities Claim; (n) Postpetition Intercompany Balance; (o) NJ Carpenters Claim, except as otherwise provided herein; or (p) FHFA Claim.

**123.** "General Unsecured Convenience Claim" means Claims that would otherwise be classified as General Unsecured Claims but, with respect to each Claim either (i) the aggregate amount of such Claim is less than $30,000, or (ii) the aggregate amount of such Claim is reduced to $30,000 by agreement of the holder of such Claim.  For the avoidance of doubt, General Unsecured Convenience Claims do not include Borrower Claims.

**124.** "Global Settlement" means the settlements among the Debtors, the Creditors' Committee, Ally, the Consenting Claimants, and certain other parties-in-interest, as set forth in Article IV of the Plan.

**125.** "GM Insurance Rights" means any and all of the Debtors' rights, titles, privileges, interests, claims, demands, or entitlements to any proceeds, payments, causes of action, and choses in action under, for, or related to the GM Policies with respect to a particular item of loss under the GM Policies, including the rights (1) to recover insurance proceeds for an item of loss covered under the GM Policies and (2) to recover from the insurers that issued the GM Policies for breach of contract or breach of other duty or obligation owed by such insurer under the GM Policies, as applicable, including the duty to settle, together with any extra contractual or tort claim arising therefrom, including bad faith, breach of implied covenant of good faith and fair dealing, fraud, or violation of any

statutory or common law duty owed by the insurer under the GM Policies, as applicable, and all with respect to a particular item of loss under the GM Policies.

126. "<u>GM Policies</u>" means the General Motors Combined Specialty Insurance Program 12/15/00 – 12/15/03, with the policy numbers as set forth in the Plan Supplement.

127. "<u>GMACM</u>" means GMAC Mortgage, LLC.

128. "<u>GMACM Debtors</u>" means each of following Debtor subsidiaries of GMACM Holding: GMACM; ditech, LLC; ETS; ETS of Virginia, Inc.; ETS of Washington, Inc.; GMAC Mortgage USA Corporation; GMAC RH Settlement Services, LLC; GMACM Borrower LLC; GMACM REO LLC; GMACR Mortgage Products, LLC; Home Connects Lending Services, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; and Residential Mortgage Real Estate Holdings, LLC.

129. "<u>GMACM Debtors Unit Distribution</u>" means 27,045,339 Units, representing 27.05% of the Total Initial Units Outstanding, subject to the adjustment as provided in <u>Article IV.K.</u>

130. "<u>GMACM Holding</u>" means GMAC Residential Holding Company, LLC.

131. "<u>GMACM Pool</u>" has the meaning set forth in Article IV.C.2(a).

132. "<u>GMACM Unsecured Claims</u>" means the RMBS Trust Claims and General Unsecured Claims, in each case, against the GMACM Debtors.

133. "<u>GMACM Weighted Claim</u>" has the meaning set forth in Article IV.C.3(c).

134. "<u>GNBT</u>" means Guaranty National Bank of Tallahassee.

135. "<u>Governmental Unit</u>" means "governmental unit" as such term is defined in section 101(27) of the Bankruptcy Code.

136. "<u>HSBC</u>" means HSBC Bank USA, N.A. solely in its capacity as trustee in respect of certain of the RMBS Trusts.

137. "<u>Impaired</u>" means, with respect to any Class, a Class that is impaired as set forth in section 1124 of the Bankruptcy Code.

138. "<u>Indenture Trustees</u>" means the Junior Secured Notes Indenture Trustee and the Senior Unsecured Notes Indenture Trustee.

139. "<u>Indentures</u>" means the Junior Secured Notes Indenture and the Senior Unsecured Notes Indenture.

16

**140.** "Initial Unit Distribution Date" means the date on which the Liquidating Trust makes, or causes to be made, the initial distribution of Units.

**141.** "Initial Unit Distribution Record Date" means the date as of which the Disputed Claims are to be estimated pursuant to the motion for an order establishing the Disputed Claims Reserve with respect to unliquidated and/or Disputed Claims, which is the record date for determining the Liquidating Trust Unit Beneficiaries holding Allowed Claims that are entitled to receive a distribution of Units on the Initial Unit Distribution Date.

**142.** "Institutional Investors" means the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants.

**143.** "Insured Exception" has the meaning set forth in Article IV.C.

**144.** "Insured RMBS Trust" means any RMBS Trust that has an insurance policy with a Monoline.

**145.** "Intercompany Balance" means any prepetition Claim of a Debtor against another Debtor, or any prepetition Claim held by a Non-Debtor Subsidiary against a Debtor, including any subrogation claims and fraudulent conveyance claims related to the forgiveness of intercompany debt, and any other subrogation claims owed by any Debtor to any other Debtor. For the avoidance of doubt, Intercompany Balances do not include any Claim that Ally may assert against a Debtor.

**146.** "Intercreditor Agreement" means the intercreditor agreement, dated as of June 6, 2008, by and among WFB, GMAC LLC, USB, RFC, GMACM, ResCap, Homecomings Financial, LLC, GMAC-RFC Holding Company, LLC, GMAC Residential Holding Company, LLC, GMAC Model Home Finance, LLC, Developers of Hidden Springs, LLC, DOA Holding Properties, LLC, RFC Asset Holdings II, LLC, Passive Asset Transactions, LLC, Residential Mortgage Real Estate Holdings, LLC, Residential Funding, Real Estate Holdings, LLC, Homecomings Financial Real Estate Holdings, LLC and Equity Investment I, LLC [Docket No. 1866, Ex. A].

**147.** "Investor" means a current or former holder of RMBS, in such capacity.

**148.** "JSN Adversary Proceeding" means the adversary proceeding which consolidates the adversary proceeding commenced against the Junior Secured Noteholders by the Creditors' Committee in the proceeding *Official Committee of Unsecured Creditors v. UMB Bank, N.A. et al.*, Case No. 13-01277(MG) and the adversary proceeding commenced by the Debtors in the proceeding *Residential Capital, et al. v. UMB Bank, N.A.*, Case No. 13-01343(MG) seeking a determination of the Allowed amount and collateral of the Junior Secured Notes Claims.

**149.** "JSN Documents" means the Junior Secured Notes, the Junior Secured Notes Indenture, the Junior Secured Notes Security Agreement, and the Intercreditor Agreement, and any respective amendments, supplements or related documents in connection therewith.

**150.** "Junior Secured Noteholders" means the beneficial holders of Junior Secured Notes.

**151.** "Junior Secured Notes" means the 9.625% junior secured notes due 2015 issued by ResCap pursuant to the Junior Secured Notes Indenture.

**152.** "Junior Secured Notes Claims" means any and all Claims, including any Secured Claim or unsecured Claim, of the Junior Secured Noteholders, the Ad Hoc Group, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, and the Junior Secured Notes Collateral Agent, under, evidenced by, or related to any of the JSN Documents, including, but not limited to, any claims for principal, interest, fees and expenses (including the Junior Secured Notes Collateral Agent Fees and Expenses and the Junior Secured Notes Indenture Trustee Fees), indemnification claims, and other charges.

**153.** "Junior Secured Notes Collateral Agent" means Wells Fargo Bank, N.A., as collateral agent and collateral control agent under the Junior Secured Notes Security Agreement, together with its respective successors and assigns in such capacity.

**154.** "Junior Secured Notes Collateral Agent Fees and Expenses" means the reasonable compensation, fees, expenses, liabilities, disbursements and indemnity claims, including, without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by the Junior Secured Notes Collateral Agent, whether prior to or after the Petition Date and whether prior to or after the consummation of the Plan.

**155.** "Junior Secured Notes Distribution" means an indefeasible and irrevocable distribution without offset or recoupment of any kind in the amount of $1,247,506,575.83, in Cash, in full and final satisfaction and release of the Junior Secured Notes Claims, which amount represents $2,222,506,575.83 of principal, interest, and fees owing as of the Petition Date plus $125,000,000.00, in settlement of all Claims for postpetition interest and unpaid fees and other charges[2] under the JSN Documents less $1,100,000,000.00 previously paid under the Paydown Orders, which amounts previously paid under the Paydown Orders have been finally and indefeasibly paid. No Person shall be entitled to seek to disgorge or recharacterize any fees previously paid or reimbursed under the AFI/JSN Cash Collateral Order, which amounts shall be deemed indefeasibly paid and finally allowed.

**156.** "Junior Secured Notes Distribution Record Date" means the date on which the distributions under this Plan on account of the Junior Secured Notes Claim are made to the Junior Secured Notes Indenture Trustee.

**157.** "Junior Secured Notes Indenture" means that certain Indenture, dated as of June 6, 2008, among ResCap, as issuer, GMAC Holding, GMAC-RFC Holding Company, LLC, GMACM, RFC, and Homecoming Financial, LLC as guarantors, and the Junior Secured Notes Indenture Trustee.

---

[2]    The remaining unpaid fees and charges are estimated to be in a range between $54 million and $56 million.

**158.**    "Junior Secured Notes Indenture Trustee" means UMB Bank, N.A., as indenture trustee or successor indenture trustee under the Junior Secured Notes Indenture, together with its respective successors and assigns in such capacity.

**159.**    "Junior Secured Notes Indenture Trustee Charging Lien" means any Lien or other priority in payment to which the Junior Secured Notes Indenture Trustee is entitled, pursuant to the Junior Secured Notes Indenture, against distributions to be made to holders of Junior Secured Notes Claims for payment of any Junior Secured Notes Indenture Trustee Fees and Junior Secured Notes Collateral Agent Fees and Expenses.

**160.**    "Junior Secured Notes Indenture Trustee Fees" means the reasonable compensation, fees, expenses, liabilities, disbursements and indemnity claims, including, without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by the Junior Secured Notes Indenture Trustee, whether prior to or after the Petition Date and whether prior to or after the consummation of the Plan.

**161.**    "Junior Secured Notes Predecessor Indenture Trustee" means U.S. Bank National Association, in its capacity as predecessor indenture trustee under the Junior Secured Notes Indenture.

**162.**    "Junior Secured Notes Security Agreement" means that certain Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009, among ResCap and certain of its affiliates, the Junior Secured Notes Indenture Trustee and the Junior Secured Notes Collateral Agent.

**163.**    "Kessler Class Action" means the consolidated class action entitled *In re Community Bank of Northern Virginia Second Mortgage Lending Practice Litigation*, consolidated in the United States District Court for the Western District of Pennsylvania, MDL No. 1674, Case Nos. 03-0425, 02-01201, 05-0688, 05-1386.

**164.**    "Kessler Class Claimants" means the putative class of Persons represented in the Kessler Class Action, asserting claims against the Debtors.

**165.**    "Kessler Settlement Agreement" means that certain Settlement Agreement between the Debtors and the representatives of the Kessler Class Claimants, attached as Exhibit 5 to the *Joint Motion Pursuant to 11 U.S.C. 105 and Fed. R. Bankr. P. 7023 and 9019 for an Order (1) Granting Class Certification for Purposes of Settlement Only, (2) Appointment Class Representative and Class Counsel for Purposes of Settlement Only, (3) Preliminarily Approving the Settlement Agreement Between Plaintiffs, On Their Own Behalf and On Behalf of the Class of Similarly Situated Persons, and the Debtors, (4) Approving the Form and Manner of Notice to the Class, (5) Scheduling a Fairness Hearing to Consider Approval of the Settlement on a Final Basis and Related Relief and (6) Approving the Settlement Agreement on a Final Basis and Granting Related Relief* [Docket No. 4451].

**166.**    "Kessler Settlement Approval Orders" means the preliminary and final orders approving the certification of the Kessler Class Claimants as a settlement class under Bankruptcy Rule 7023 and approving the Kessler Settlement Agreement under section 105(a) of the Bankruptcy Code and Bankruptcy Rules 9019 and 7023.

167.    "Kessler Settlement Class" means the settlement class comprised of the Kessler Class Claimants certified pursuant to the Kessler Settlement Approval Orders.

168.    "LDTC" means Law Debenture Trust Company of New York solely in its capacity as separate trustee in respect of certain of the RMBS Trusts.

169.    "Lien" means a "lien" as such term is defined in section 101(37) of the Bankruptcy Code.

170.    "Liquidating Trust" means that certain Delaware statutory trust continued on or about the Effective Date as successor by conversion of a common law trust in accordance with the provisions of Article VI of the Plan and the Liquidating Trust Agreement.

171.    "Liquidating Trust Expenses Set Aside" means an amount of Cash or other assets set aside from time to time by or under the direction of the Liquidating Trust Board for paying costs, fees, and expenses, and reserving for liabilities, of the Liquidating Trust, including costs, fees, and expenses of the Estates payable after the Effective Date.

172.    "Liquidating Trust Agreement" means that certain trust agreement, the form of which shall be included in the Plan Supplement, that, among other things: (a) establishes and governs the Liquidating Trust; (b) describes the powers, duties and responsibilities of the Liquidating Trustees; and (c) provides for the liquidation and distribution of proceeds of the Liquidating Trust Assets.

173.    "Liquidating Trust Assets" means all property held from time to time by the Liquidating Trust, including the Available Assets transferred to the Liquidating Trust on the Effective Date.

174.    "Liquidating Trust Board" means the board of trustees appointed to oversee the administration of the Liquidating Trust and the disposition of the Liquidating Trust Assets.  The identities of the Persons to serve on the Liquidating Trust Board as of the Effective Date will be set forth in the Plan Supplement.

175.    "Liquidating Trust Budget" means the annual budget of expenses for administering the Liquidating Trust.

176.    "Liquidating Trust Causes of Action" means the Claims and Causes of Action transferred to the Liquidating Trust on the Effective Date, including those Claims and Causes of Action set forth in the Plan Supplement.

177.    "Liquidating Trust Management" means those Persons designated by the Liquidating Trust Board to manage the Liquidating Trust.  The identities of the Persons to serve as Liquidating Trust Management as of the Effective Date will be set forth in the Plan Supplement.

178.    "Liquidating Trust Unit Beneficiaries" means (i) the holders of ResCap Unsecured Claims, GMACM Unsecured Claims, and RFC Unsecured Claims (in each case, whether Allowed or Disputed), other than holders of RMBS Trust Claims and ETS

Unsecured Claims, (ii) the RMBS Claims Trust, and (iii) the Private Securities Claims Trust (and those Private Securities Claimants holding Units). For the avoidance of doubt, Liquidating Trust Unit Beneficiaries includes Wilmington Trust, on behalf of the Senior Unsecured Noteholders, until such time as Wilmington Trust causes the distribution of Units received by it to the Senior Unsecured Noteholders.

179. "Liquidating Trustee" means a member of the Liquidating Trust Board.

180. "Loan Group" means any group of loans established by the governing agreements for an RMBS Trust so that only a particular class or classes of securities issued by such RMBS Trust benefit from the proceeds of such loans.

181. "MassMutual" means Massachusetts Mutual Life Insurance Company and its subsidiaries and affiliates.

182. "MBIA" means MBIA Insurance Corporation and its subsidiaries and affiliates but excluding Cutwater Holdings, LLC and its subsidiaries Cutwater Investor Services Corp., Cutwater Asset Management Corp. and Trifinium Advisors (UK) Limited.

183. "Misdirected Funds" means the approximately $2.6 million of funds that were misdirected to the Debtors' tri-party account with Bank of New York Mellon prior to the Petition Date.

184. "Moelis" means Moelis & Company LLC.

185. "Monolines" means FGIC, MBIA, and the other insurers who provided financial guaranty insurance policies insuring amounts payable to RMBS in connection with certain of the RMBS Trusts, but does not include insurers of particular mortgage loans or groups of mortgage loans held by an RMBS Trust, for the purposes of the RMBS Trust Allocation Protocol.

186. "Monoline Claims Settlement" means the settlement of the Allowed amount and allocation among Debtor Groups of the Claims held by MBIA, and FGIC.

187. "Monoline Reservation" means the reservation of rights of each Insured RMBS Trustee (excluding the RMBS Trusts insured by FGIC) as set forth in Article IV herein.

188. "NJ Carpenters Approval" means the approvals of the NJ Carpenters Settlement from the Bankruptcy Court (which may be the Confirmation Order or a separate order of the Bankruptcy Court), and the District Court.

189. "NJ Carpenters Claims" means any and all claims, demands, rights, liabilities, and causes of action of every nature and description, known or Unknown, suspected or unsuspected, contingent or non-contingent, matured or unmatured, whether or not concealed or hidden, which now exist, or heretofore have existed, whether arising under federal, state, common, or foreign law, that any NJ Carpenters Class Member (a) asserted in the NJ Carpenters Class Action, or (b) could have asserted in any forum arising from or related in any way to the acts, failures to act, transactions, facts, events, matters, disclosures,

statements, occurrences, representations, or omissions asserted or that could have been asserted in the NJ Carpenters Class Action against the NJ Carpenters Released Parties. Notwithstanding the foregoing, "NJ Carpenters Claims" shall not include (a) any rights or claims against the Debtors that any NJ Carpenters Class Member may possess or be entitled to as a holder of RMBS pursuant to the RMBS Trust Settlement or any other distribution in the Plan in connection with the claims asserted in connection with the RMBS Trust Settlement, or (b) claims against any NJ Carpenters Non-Settling Defendant.

190.    "NJ Carpenters Claims Distribution" means a distribution in the amount of $100 million in Cash in full and final satisfaction of the NJ Carpenters Claims, on terms as set forth in the NJ Carpenters Settlement.

191.    "NJ Carpenters Class Action" means the class action entitled *New Jersey Carpenters Health Fund, et al. v. Residential Capital, LLC, et al.,* Civ. No. 08-8781(HB) pending in the District Court.

192.    "NJ Carpenters Class Members" means the named plaintiffs in the NJ Carpenters Class Action and all other persons or entities who purchased or otherwise acquired beneficial interests in any of the following pass-through certificates and who were allegedly damaged thereby: RALI Series 2007-QS1, RALI Series 2007-QO4, RALI Series 2007-QH4, RALI Series 2006-QO7, RALI Series 2007-QS5, RALI Series 2006-QS7, RALI Series 2007-QO2, RALI Series 2006-QS11, RALI Series 2007-QS4, RALI Series 2006-QA4, RALI Series 2006-QA6, RALI Series 2006-QA7, RALI Series 2006-QA8, RALI Series 2006-QA10, RALI Series 2006-QA11, RALI Series 2007-QA1, RALI Series 2007-QA2, RALI Series 2007-QO3, RALI Series 2007-QA3, RALI Series 2007-QA5, RALI Series 2007-QH8, RALI Series 2007-QH9, RALI Series 2007-QO5, RALI Series 2007-QS11, RALI Series 2007-QS6, RALI Series 2006-QS8, RALI Series 2006-QS9, RALI Series 2007-QS7, RALI Series 2007-QH2, RALI Series 2007-QH5, RALI Series 2007-QH6, RALI Series 2006-QS18, RALI Series 2006-QO10, RALI Series 2006-QO3, RALI Series 2006-QO6, RALI Series 2007-QH3, RALI Series 2007-QS2, RALI Series 2006-QO9, RALI Series 2006-QO8, RALI Series 2006-QO5, RALI Series 2006-QA5, RALI Series 2006-QA9, RALI Series 2006-QH1, RALI Series 2006-QO4, RALI Series 2006-QS5, RALI Series 2006-QS16, RALI Series 2006-QS17, RALI Series 2007-QH1,  RALI Series 2007-QO1, RALI Series 2007-QS3, RALI Series 2007-QA4, RALI Series 2007-QH7, RALI Series 2007-QS8, RALI Series 2007-QS10, RALI Series 2006-QS12, RALI Series 2006-QS13, RALI Series 2006-QS6, RALI Series 2007-QS9 and RALI Series 2006-QS15.  Notwithstanding the foregoing, "NJ Carpenters Class Members" shall not include (a) the NJ Carpenters Class Opt-Outs, (b) the Private Securities Claimants, or (c) the NJ Carpenters Defendants, and their respective officers, affiliates and directors at all relevant times, members of their immediate families and their legal representatives, executors, estates, administrators, successors and assigns, insurers, or any entity in which any defendants have or had a controlling interest, provided that any investment company or pooled investment fund (including, but not limited to, mutual fund families, exchange-traded funds, fund of funds, and hedge funds) in which any of the NJ Carpenters Defendants have or may have a direct or indirect interest, or as to which its affiliates may act as investment advisors, but in which any of the NJ Carpenters Defendants or any of their

respective affiliates is not a majority owner or does not hold a majority beneficial interest, shall not be deemed an excluded person or entity by definition.

193. "NJ Carpenters Class Opt-Outs" means any persons or entities who exclude themselves from the NJ Carpenters Class Action and the NJ Carpenters Settlement in the manner contemplated by the NJ Carpenters Notice.

194. "NJ Carpenters Defendants" means the NJ Carpenters Non-Settling Defendants and the NJ Carpenters Settling Defendants.

195. "NJ Carpenters Non-Settling Defendants" means Goldman, Sachs & Co., Deutsche Bank Securities Inc., Citigroup Global Markets Inc., and UBS Securities LLC, as well as any other defendant(s) later brought into the NJ Carpenters Class Action (not including the NJ Carpenters Released Parties).

196. "NJ Carpenters Notice" means the Notice of Pendency of Class Action and Proposed Settlement, Settlement Fairness Hearing and Motion for Reimbursement of Litigation Expenses, attached as Exhibit A-1 to the NJ Carpenters Settlement.

197. "NJ Carpenters Plan of Allocation" means the plan of allocation for the NJ Carpenters Claims Distribution to be approved by and under the jurisdiction of the District Court.

198. "NJ Carpenters Released Parties" means (a) the NJ Carpenters Settling Defendants, and (b) with respect to each of the foregoing, as applicable, their parents, subsidiaries, and affiliates and all of their respective past, current, and future respective directors, officers, employees, partners, insurers, co-insurers, reinsurers, agents, controlling shareholders, shareholders, attorneys, accountants, auditors, advisors, investment advisors, personal or legal representatives, predecessors, successors, divisions, joint ventures, assigns, spouses, heirs, related or affiliated entities, and any entity in which any NJ Carpenters Released Party has a controlling interest, and all of their respective property. For the avoidance of doubt, the insurers, co-insurers, and reinsurers listed above do not include the insurers that issued the GM Policies in their capacity as insurers under the GM Policies.

199. "NJ Carpenters Settlement" means the Stipulation and Agreement of Settlement with Certain Defendants, dated as of June 14, 2013, by and among the lead plaintiffs in the NJ Carpenters Class Action and the NJ Carpenters Released Parties, which is subject to the NJ Carpenters Approval.

200. "NJ Carpenters Settling Defendants" means Residential Capital, LLC, Residential Funding Company, LLC, Residential Accredit Loans, Inc., Bruce J. Paradis, Kenneth M. Duncan, Davee L. Olson, Ralph T. Flees, Lisa R. Lundsten, James G. Jones, David M. Bricker, James N. Young and Ally Securities.

201. "Non-Debtor Subsidiaries" means Canada Mortgage Acceptance Corporation; Cap Re of Vermont, LLC; Foreign Obligation Exchange, Inc. 2003-H11; Foreign Obligation Exchange, Inc. 2003-H12; Foreign Obligation Exchange, Inc. 2003-H14; Foreign Obligation Exchange, Inc. 2004-H11; Foreign Obligation Export, Inc.; Flume (No. 8) Limited; GMAC

Residential Funding of Canada Limited; GMAC-RFC Auritec, S.A.; GMAC-RFC Espana Hipoteacas SL; GMAC-RFC Europe Limited; GMAC-RFC Holdings Limited; GMAC-RFC Property Finance Limited; Investments B.V. GXI; Investments B.V. GXII; Phoenix Residential Securities, LLC; PreEmac 2 NL B.V.; and Viaduct (No. 7) Limited.

202.    "Ocwen" means Ocwen Loan Servicing, LLC.

203.    "Ocwen APA" means that certain Asset Purchase Agreement, dated as of November 2, 2012, as amended and supplemented, entered into by and among Ocwen, ResCap, RFC, GMACM, ETS, ETS of Washington, Inc., EPRE LLC, GMACM Borrower LLC and RFC Borrower LLC [Docket No. 2246, Ex. 1].

204.    "Order of Assessment" means the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012.

205.    "Original RMBS Settlement Agreements" means, collectively, the Third Amended and Restated RMBS Trust Settlement Agreement between the Debtors and the Steering Committee Consenting Claimants, and the Third Amended and Restated RMBS Trust Settlement Agreement between the Debtors and the Talcott Franklin Consenting Claimants, filed with the Bankruptcy Court on March 15, 2013, as Exhibits 1 and 2, respectively to the *Declaration of LaShann M. DeArcy in further support of Debtors Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Settlement Agreements* [Docket No. 3220].

206.    "Original Settling RMBS Trusts" means those 392 RMBS Trusts covered in the Original RMBS Settlement Agreements.

207.    "Other Priority Claim" means any Claim other than an Administrative Claim or Priority Tax Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

208.    "Other Secured Claim" means any Secured Claim other than a Junior Secured Notes Claim.

209.    "Paulson" means funds and accounts managed by Paulson & Co. Inc.

210.    "Paydown Orders" means the *Order Granting Debtors' Amended Motion for Entry Under 11 U.S.C. §§ 105 and 363 Authorizing the Debtors to Satisfy Certain Secured Claims* [Docket No. 3967] and the *Stipulation And Order Regarding The Satisfaction Of Certain Secured Claims* [Docket No. 4404].

211.    "Pension Plan" has the meaning set forth in Article IX.E.

212.    "Person" means a "person" as such term is defined in section 101(41) of the Bankruptcy Code.

213.    "Petition Date" means May 14, 2012.

214.    "Plan" means this Joint Chapter 11 Plan proposed by Residential Capital, LLC, *et al.* and the Official Committee of Unsecured Creditors, including all exhibits, addenda, schedules or other attachments hereto, and the Plan Supplement, each of which is incorporated herein by reference, as may be amended, modified, or supplemented from time to time in accordance with the Plan Support Agreement.

215.    "Plan Documents" means, collectively, the Plan, including all exhibits thereto and the Plan Supplement, the Disclosure Statement and the Confirmation Order.

216.    "Plan Proponents" means the Debtors and the Creditors' Committee.

217.    "Plan Supplement" means a compilation of documents and forms of documents, schedules, and exhibits to the Plan to be Filed on notice to parties-in-interest, and additional documents filed as supplements or amendments to the Plan Supplement including the following: (i) the Assumption Schedule, (ii) the Liquidating Trust Agreement, (iii) the RMBS Claims Trust Agreement, (iv) the Borrower Claims Trust Agreement, (v) the Private Securities Claims Trust Agreement, (vi) the identities of the initial Liquidating Trust Board, (vii) the identities of the initial Liquidating Trust Management, (viii) the identity of the Borrower Claims Trustee and the initial members of the Borrower Claims Trust Committee, (ix) the identity of the Private Securities Claims Trustee, (x) the amount of the Borrower Trust True-Up, (xi) a cooperation agreement by and between the Liquidating Trustees and the Kessler Settlement Class, (xii) the policy numbers for the GM Policies, (xiii) the Liquidating Trust Causes of Action, (xiv) the stipulated amounts of the Allowed Fee Claim, (xv) the Borrower-Related Causes of Action, (xvi) updated RMBS Trust Claims Schedules, (xvii) estimated Ally Contract Claims, (xviii) the identity of the RMBS Claims Trust Trustees, (xix) the material terms on which the Plan Proponents may pay over time any post-petition interest owed to the Junior Secured Noteholders to the extent ordered by the Bankruptcy Court, including the interest rate; and (xx) an initial list of Claims proposed to be subordinated under the Plan.  The Plan Proponents shall File the Assumption Schedule no later than twenty-one (21) days before the commencement of the Confirmation Hearing, and the remainder of the substantially complete versions of the materials comprising the Plan Supplement no later than ten (10) days prior to the deadline to object to the Plan or such later date as may be approved by the Bankruptcy Court, except as otherwise provided under the Plan.

218.    "Plan Support Agreement" means the agreement to support the Plan together with all exhibits attached thereto, including the term sheets, dated as of May 13, 2013, by and among the Debtors, Ally, the Creditors' Committee, and the Consenting Claimants, as the same may be amended or modified in accordance with its terms. [Docket No. 3814, Ex. 3].

219.    "Plan Trustees" means, collectively, the Liquidating Trustees, the RMBS Claims Trust Trustees, the Borrower Claims Trustee, and the Private Securities Claims Trustee.

220.    "Plan Trusts" means, collectively, the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and the Private Securities Claims Trust.

221.    "Postpetition Intercompany Balances" means any Claim against a Debtor held by another Debtor based on "Intercompany Transactions" arising pursuant to the Cash Management Order, which Claim is, pursuant to the Cash Management Order, accorded administrative expense status and priority of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

222.    "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code, and any secured tax claim arising under section 506(a) or 506(b) of the Bankruptcy Code.

223.    "Private Securities Claimants" means (i) AIG, (ii) Allstate, (iii) Asset Management Funds d/b/a AMF Funds, AMF Intermediate Mortgage Fund, AMF Ultra Short Mortgage Fund, (iv) Bank Hapoalim B.M., (v) Cambridge Place Investment Management, Inc., in two capacities based on separate actions, (vi) Deutsche Zentra-Genossenschaftsbank, New York Branch, d/b/a DZ Bank AG, New York, DH Holding Trust, (vii) Federal Home Loan Bank of Boston, (viii) Federal Home Loan Bank of Chicago, (ix) Federal Home Loan Bank of Indianapolis, (x) HSH Nordbank AG, HSH Nordbank AG Luxembourg Branch, HSH Nordbank AG New York Branch, HSH Nordbank Securities S.A., (xi) Huntington Bancshares Inc., (xii) IKB Deutsche Industriebank AG, IKB International S.A. in liquidation, (xiv) John Hancock Life Insurance Company (U.S.A.), (xiv) MassMutual, (xv) Principal Life Insurance Company, Principal Funds, Inc., Principal Variable Contracts Funds, Inc., (xvi) Prudential, (xvii) Sealink Funding Limited, (xviii) Stiching Pensioenfonds ABP, (xix) The Union Central Life Insurance Company/Ameritas Life Insurance Corp./Acacia Life Insurance Company, and (xx) the Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company, and Fort Washington Investment Advisors, Inc., all in their capacity as holders of Private Securities Claims.

224.    "Private Securities Claims" means those securities litigation claims against the Debtors, including claims against the Debtors and Ally, arising from the purchase or sale of RMBS, held by the Private Securities Claimants.

225.    "Private Securities Claims Trust" means the trust established for the benefit of the holders of the Private Securities Claims.

226.    "Private Securities Claims Trust Agreement" means that certain trust agreement, the form of which shall be included in the Plan Supplement, that, among other things, sets forth the criteria, methodology and procedures for making distributions to holders of Private Securities Claims.

227.    "Private Securities Claims Trust Unit Distribution" means the number of Units to be issued by the Liquidating Trust to the Private Securities Claims Trust on the Initial Unit Distribution Date, which shall equal 9,545,578 Units, representing 9.55% of the Total Initial Units Outstanding, subject to the adjustment as provided in Article IV.K.

**228.** "Private Securities Claims Trustee" means the Person selected to serve as trustee of the Private Securities Claims Trust. The identity of the Person to serve as the Private Securities Claims Trustee as of the Effective Date will be set forth in the Plan Supplement.

**229.** "Pro Rata Share" means, with respect to any Claim, at any time, the proportion that the amount of such Claim in a particular Class or group of Classes bears to the aggregate amount of all Claims (including Disputed Claims) in such Class or group of Classes, unless in each case the Plan provides otherwise. The amount of a Disputed Claim shall be the amount of such Claim as estimated in accordance with the provisions of Article VIII.D, and as such definition is used in Article III.D.1(d), Article III.D.2(d) and Article III.D.3(d), the Claim amounts shall be determined as of the Initial Unit Distribution Record Date.

**230.** "Pro Rata Unit Share" means, with respect to a Unitholder at any time, the fraction (which may be expressed as a percentage) equal to the number of Units held by such Unitholder divided by the Total Units Outstanding at that time.

**231.** "Professional" means any Person or Entity: (a) employed in the Chapter 11 Cases under a Final Order in accordance with sections 327, 328 or 1103 of the Bankruptcy Code and compensated for services rendered prior to or on the Effective Date under sections 327, 328, 329, 330, or 331 of the Bankruptcy Code or (b) for which the Bankruptcy Court has allowed compensation and reimbursement under section 503(b)(4) of the Bankruptcy Code.

**232.** "Professional Claim" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred from and after the Petition Date through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

**233.** "Proof of Claim" means a written proof of Claim Filed against any Debtor in the Chapter 11 Cases.

**234.** "Prudential" means Prudential Insurance Company of America and its subsidiaries and affiliates.

**235.** "Recognized Additional R+W Claims" has the meaning set forth in Article IV.C.3.a.ii.2.

**236.** "Recognized Cure Claims" has the meaning set forth in Article IV.C.3.a.i.

**237.** "Recognized Original R+W Claims" has the meaning set forth in Article IV.C.3.a.ii.1.

**238.** "Recognized RMBS Claims" means (i) Recognized Cure Claims, (ii) Recognized Original R+W Claims, (iii) Recognized Additional R+W Claims, and (iv) Recognized Unsecured Servicing Claims.

27

**239.** "Recognized Unsecured Servicing Claims" has the meaning set forth in Article IV.C.3.a.iii.

**240.** "Registered Holder" means the registered holders of the Junior Secured Notes and the Senior Unsecured Notes issued pursuant to the Indentures.

**241.** "Rejection Damages Claim Bar Date" means the date that is (a) with respect to an Executory Contract or Unexpired Lease that is rejected pursuant to the Plan, forty-five (45) days after the Effective Date, or (b) with respect to an Executory Contract or Unexpired Lease that is otherwise rejected, the applicable bar date established by the Bar Date Order or other order of the Bankruptcy Court.

**242.** "Released Claims" means Claims, Equity Interests, Causes of Action or liabilities that: (i) have been discharged, terminated, or satisfied pursuant to the terms of the Plan; (ii) have been released pursuant to the Plan; or (iii) are subject to exculpation pursuant to the Plan.

**243.** "Released Party" means the Liquidating Trust, and each Ally Released Party, Debtor Released Party, and Exculpated Party, or the property or Estate of any Entity so released, discharged or exculpated.

**244.** "REMIC" means a real estate mortgage investment conduit as defined in section 860D(a) of the Tax Code.

**245.** "Representatives" means a person's or entity's former and current officers, former and current directors, former and current principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals, each solely in its capacity as such; provided, that in the case of Ally and the Debtors, "Representatives" shall not include an underwriter that is unaffiliated with Ally and the Debtors against which an Investor has a pending or tolled Cause of Action.  For the avoidance of doubt, Lewis Kruger shall be deemed to be a Representative of the Debtors.

**246.** "ResCap" means Residential Capital LLC.

**247.** "ResCap Debtors" means ResCap, GMACM Holding, and RFC Holding.

**248.** "ResCap Debtors Unit Distribution" means 30,413,337 Units, representing 30.41% of the Total Initial Units Outstanding, subject to the adjustment as provided in Article IV.K.

**249.** "ResCap Unsecured Claims" means the Senior Unsecured Notes Claims and General Unsecured Claims, in each case against the ResCap Debtors.

**250.** "Revolving Credit Facility" means that certain Amended and Restated Credit Agreement, dated as of December 30, 2009 (as amended, supplemented or otherwise modified), by and among AFI as initial lender and agent, Wells Fargo, N.A. as first priority collateral agent, RFC and GMACM as borrowers, and ResCap and certain other affiliates of the borrowers as guarantors.

251.    "Revolving Credit Facility Claims" means any Claim held by Ally for default interest or fees under the Revolving Credit Facility.

252.    "RFC" means Residential Funding Company, LLC.

253.    "RFC Debtors" means each of the following Debtor subsidiaries of RFC Holding: RFC; DOA Holding Properties, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; GMAC Model Home Finance I, LLC; HFN REO SUB II, LLC; Homecomings Financial Real Estate Holdings, LLC; Homecomings Financial, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; RFC–GSAP Servicer Advance, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC REO LLC; and RFC SFJV-2002, LLC.

254.    "RFC Debtors Unit Distribution" means 32,995,746 Units, representing 33.00% of the Total Initial Units Outstanding, subject to the adjustment as provided in Article IV.K.

255.    "RFC Holding" means GMAC-RFC Holding Company, LLC.

256.    "RFC Pool" has the meaning set forth in Article IV.C.2(a).

257.    "RFC Unsecured Claims" means the RMBS Trust Claims and General Unsecured Claims, in each case against the RFC Debtors.

258.    "RFC Weighted Claim" has the meaning set forth in Article IV.C.3(d).

259.    "RMBS" means residential mortgage-backed securities, notes and certificates issued by the RMBS Trusts.

260.    "RMBS Claims Trust" means the trust established for the benefit of the RMBS Trusts that have Recognized RMBS Claims, which shall be treated by all parties, including, without limitation, the Debtors, the RMBS Claims Trust Trustees, and the RMBS Trustees as a "qualified settlement fund" within the meaning of 468B of the Tax Code and the Treasury Regulations thereunder.

261.    "RMBS Claims Trust Agreement" means that certain trust agreement, the form of which shall be included in the Plan Supplement, that, among other things, sets forth the criteria, methodology and procedures for making distributions to RMBS Trusts having Recognized RMBS Claims.

262.    "RMBS Claims Trust Trustees" means the Persons selected to serve as trustees of the RMBS Claims Trust, which may be one or more of the RMBS Trustees. The identity of the Persons to serve as the RMBS Claims Trustees as of the Effective Date will be set forth in the Plan Supplement.

29

263.    "RMBS Cure Claims" means all claims of RMBS Trusts against the Debtors other than RMBS R+W Claims, including, without limitation, all claims of RMBS Trusts against the Debtors based on servicing obligations and other obligations of the Debtors as servicers and otherwise that were outstanding as of the date of the closing of the sale of the Debtors' servicing platform to Ocwen, that became due and owing after such closing date, or that become due and owning, as a result of pre-closing actions of the Debtors as servicers and were required to be cured prior to the assumption and assignment to Ocwen pursuant to section 365(b)(1)(A) of the Bankruptcy Code.

264.    "RMBS R+W Claims" means claims of the RMBS Trusts against the Debtors arising from any obligations or liability in respect of the origination and sale of mortgage loans to the RMBS Trusts.

265.    "RMBS Settlement" means, as part of the Global Settlement, the settlement that provides for the allowance, priority, and allocation of the RMBS Trust Claims, through approval of the Original RMBS Settlement Agreements as expanded, modified and superseded as set forth in Article IV.C of the Plan.

266.    "RMBS Trust Allocation Protocol" means the provisions set forth in Article IV.C.3 of the Plan.

267.    "RMBS Trust Claims" means all the claims, including RMBS Cure Claims and RMBS R+W Claims, of the RMBS Trusts against the Debtors which shall be Allowed under Article IV.C.2(a) of the Plan as non-subordinated unsecured Claims.

268.    "RMBS Trust Claims Schedules" means Schedules 1-G, 1-R, 2-G, 2-R, 3-G, 3-R, 4-G and 4-R attached to the Plan, as amended and restated when filed as part of the Plan Supplement, and as updated as of the Effective Date as contemplated by Article IV.C.

269.    "RMBS Trusts" means all residential mortgage backed securitization trusts, net interest margin trusts and similar residential mortgage backed trusts for which the Debtors act as sponsor, depositor, servicer, master servicer or in similar capacities, or a Loan Group in such RMBS Trust, as applicable.

270.    "RMBS Trustees" means BNY Mellon, DB, USB, HSBC, LDTC, and WFB.

271.    "Schedules" means the Debtors' schedules of assets and liabilities and statements of financial affairs, Filed under section 521 of the Bankruptcy Code and the Bankruptcy Rules, as amended, supplemented, or modified.

272.    "Secured Claim" means any Claim that is (a) secured by a Lien on collateral, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or (b) subject to a valid right of setoff under section 553 of the Bankruptcy Code.

273.    "Senior Unsecured Noteholders" means the beneficial holders of Senior Unsecured Notes.

274. "Senior Unsecured Notes" means the United States dollar denominated notes maturing between June 2012 and June 2015, euro denominated notes that matured in May 2012, and U.K. sterling denominated notes maturing between May 2013 and July 2014, each issued by ResCap pursuant to the Senior Unsecured Notes Indenture.

275. "Senior Unsecured Notes Claim" means any Claim under or evidenced by the Senior Unsecured Notes, which shall be deemed Allowed against the ResCap Debtors in an amount of $1,003,327,213.90.

276. "Senior Unsecured Notes Indenture" means that certain Indenture, dated as of June 24, 2005, between ResCap, any guarantors party thereto, and the Senior Unsecured Notes Indenture Trustee, as supplemented from time to time.

277. "Senior Unsecured Notes Indenture Trustee" means Wilmington Trust, as successor indenture trustee with respect to the Senior Unsecured Notes, and as paying agent, calculation agent and registrar with respect to the United States Dollar Senior Unsecured Notes, under the Senior Unsecured Notes Indenture, together with its respective successors and assigns in such capacity.

278. "Senior Unsecured Notes Indenture Trustee Charging Lien" means the Liens and other priority in payment and rights available to the Senior Unsecured Notes Indenture Trustee under the Senior Unsecured Notes Indenture or otherwise available to the Senior Unsecured Notes Indenture Trustee under applicable law, for the payment of Senior Unsecured Notes Indenture Trustee Fees and Expenses.

279. "Senior Unsecured Notes Indenture Trustee Fees and Expenses" means the reasonable fees, costs, expenses and indemnity claims of the Senior Unsecured Notes Indenture Trustee, including, but not limited to, the fees, costs and expenses of the Senior Unsecured Notes Indenture Trustees' counsel and financial advisors.

280. "Senior Unsecured Notes Indenture Trustee Reserve" means the reserve of Cash to be funded from the initial Cash distribution issued on account of the Senior Unsecured Notes Claims, and held by the Senior Unsecured Notes Indenture Trustee for the payment of future projected accrued and unpaid, Senior Unsecured Notes Indenture Trustee Fees and Expenses.

281. "Servicing Agreement" means either a "Pooling and Servicing Agreement" or an integrated set of "Servicing Agreements," "Mortgage Loan Purchase Agreements," "Indentures," and/or "Trust Agreements," which, when combined, provide for, among other things, the servicing of the mortgage loans held by an RMBS Trust.

282. "Settlement Insurance Policies" means all directors & officers and errors & omissions insurance policies with policy periods between November 2006 and the Effective Date which provide coverage to Ally or its Representatives as well as to the Debtors and/or their Representatives.

283. "Settling Parties" means each of the following in its capacity as such: the Debtors, the Creditors' Committee, Ally, and the Consenting Claimants.

31

284.    "Settling Private Securities Claimants" means each of AIG, Allstate, MassMutual and Prudential.

285.    "States" means the District of Columbia and the fifty states of the United States.

286.    "Steering Committee Consenting Claimants" means certain Investors in RMBS backed by mortgage loans held by RMBS Trusts associated with securitizations sponsored by the Debtors between 2004 and 2007 and represented by Kathy D. Patrick of Gibbs & Bruns LLP and Keith H. Wofford of Ropes & Gray LLP.

287.    "Supporting Senior Unsecured Noteholders" means the holders of the Senior Unsecured Notes that have executed or joined the Plan Support Agreement.

288.    "Talcott Franklin Consenting Claimants" means certain Investors in RMBS backed by mortgage loans held by RMBS Trusts associated with securitizations sponsored by the Debtors between 2004 and 2007 represented by Talcott Franklin of Talcott Franklin, P.C., Carter Ledyard & Milburn LLP and Miller Johnson.

289.    "Tax Code" means the Internal Revenue Code of 1986, as amended.

290.    "Tax Lien" has the meaning set forth in Article II.C.

291.    "Third Party Release" means the release set forth in Article IX.D.

292.    "Total Units Outstanding" means 100 million Units, which is the total number of Units to be issued by the Liquidating Trust pursuant to the Plan.

293.    "Treasury Regulations" means the Treasury regulations promulgated under the Tax Code.

294.    "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

295.    "Unimpaired" means, with respect to any Class, a Class that is not Impaired.

296.    "Unit Distribution Date" means a date or dates established pursuant to the Liquidating Trust Agreement or otherwise determined by the Liquidating Trust Board, as of which a distribution of Units shall be made to Liquidating Trust Unit Beneficiaries that are holders of Disputed Claims that became Allowed, in whole or in part.

297.    "Unit Issuance Percentage" means, in the case of the GMACM  Debtors, 27.05%; in the case of the ResCap Debtors, 30.41%; in the case of the RFC Debtors, 33.00%; and in the case of the Private Securities Claims Trust, 9.55%.

298.    "United States" means the United States of America, its agencies, departments, and agents.

299.    "Unitholders" means holders of Units.

**300.**    "<u>Units</u>" means units of beneficial interest issued by the Liquidating Trust, which entitle the holders thereof to receive from the Liquidating Trust a Pro Rata Unit Share of Distributable Cash.

**301.**    "<u>Unknown</u>" as used in the definition of NJ Carpenters Claims, means any and all NJ Carpenter Claims that any NJ Carpenters Class Member does not know or suspect to exist in his, her or its favor at the time of the release, which if known by him, her or it might have affected his, her or its settlement with and release of the NJ Carpenters Released Parties, or might have affected his, her or its decision not to object to the NJ Carpenters Settlement or not exclude himself, herself or itself from the settlement class.  With respect to any and all NJ Carpenters Claims, the parties stipulated and agreed under the NJ Carpenters Settlement that, upon the Effective Date, the NJ Carpenters Class Members shall expressly waive, and shall be deemed to have waived, and by operation of the order approving the NJ Carpenters Settlement, shall have expressly waived, to the fullest extent permitted by law, any and all provisions, rights and benefits conferred by Cal. Civ. Code § 1542 (to the extent it applies to the Action), and any law of any state or territory of the United States, or principle of common law, or the law of any foreign jurisdiction, that is similar, comparable or equivalent to Cal. Civ. Code § 1542, which provides:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

**302.**    "<u>Unsecured Claims</u>" means, collectively, the GMACM Unsecured Claims, the ResCap Unsecured Claims and the RFC Unsecured Claims.

**303.**    "<u>USB</u>" means U.S. Bank National Association solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts.

**304.**    "<u>U.S. Trustee</u>" means the United States Trustee for the Southern District of New York.

**305.**    "<u>U.S. Trustee Fees</u>" means fees arising under 28 U.S.C. § 1930, and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**306.**    "<u>Voting Deadline</u>" means the date set forth in the order of the Bankruptcy Court approving the Disclosure Statement as the deadline for, among other things, voting to accept or reject the Plan.

**307.**    "<u>Walter</u>" means Walter Investment Management Corporation.

**308.**    "<u>WFB</u>" means Wells Fargo Bank, N.A. solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian, and/or similar agency capacities in respect of certain of the RMBS Trusts.

**309.** "<u>Wilmington Trust</u>" means Wilmington Trust, National Association, not individually, but solely in its capacity as Senior Unsecured Notes Indenture Trustee.

## B.     Rules of Construction

For the purposes of the Plan: (1) any term used in capitalized form that is not defined in the Plan, but that is defined in the Bankruptcy Code or the Bankruptcy Rules, has the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (2) in the appropriate context, each term, whether stated in the singular or the plural, includes both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender include the masculine, feminine, and the neutral gender; (3) unless otherwise stated herein, any reference in the Plan to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (4) except as otherwise provided in the Plan, all references in the Plan to "Articles" are references to Articles of the Plan; (5) except as otherwise provided in the Plan, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) the words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity, or specificity and do not in any respect qualify, characterize, or limit the generality of the class within which such things are included; (7) any reference to an Entity or a Person as a holder of a Claim or Equity Interest includes that Entity's or Person's successors, assigns, and affiliates; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (10) any immaterial effectuating provisions may be interpreted by the Plan Proponents or the Liquidating Trust, as applicable, in a manner that is consistent with the overall purpose and intent of the Plan, all without further order of the Bankruptcy Court.

## C.     Computation of Time

Except as otherwise provided in the Plan, Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan.

## D.     Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws that would require application of the law of another jurisdiction, shall govern the rights, obligations, construction, and implementation of the Plan, and any agreements, securities, instruments, or other documents executed or delivered in connection with the Plan (except as otherwise set forth in those documents, in which case the governing law of such documents shall control); provided, however, that governance matters relating to the Debtors, the Liquidating Trust, the Borrower Claims Trust, the RMBS Claims Trust, or the Private Securities Claims Trust, as applicable, shall be governed by the laws of the State of incorporation or formation thereof.

12-12020-mg   Doc 8019-15 Diffeb2010a6-1 Filed 01/22/15 18:14:28 Appendix 1
Pg 147 of 203

# ARTICLE II.

## ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, Priority Tax Claims and U.S. Trustee Fees have not been classified and, therefore, are excluded from the Classes of Claims and Equity Interests set forth in Article III and shall have the following treatment:

A.    **Administrative Claims**

1.    **Treatment of Administrative Claims Other than Professional Claims**.

Unless otherwise agreed to by the holder of an Allowed Administrative Claim, or set forth in an order of the Bankruptcy Court, the Liquidating Trust will pay each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) the full unpaid amount of such Claim in Cash: (1) if the Administrative Claim is Allowed before the Effective Date, on the Effective Date, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon as practicable thereafter); or (2) if the Administrative Claim is Allowed on or after the Effective Date, on the date such Administrative Claim is Allowed, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon as practicable thereafter); provided, however, that Allowed Administrative Claims other than Professional Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions; provided further, however, that accrued and unpaid Postpetition Intercompany Balances shall be satisfied pursuant to the Cash Management Order without further application or order of the Bankruptcy Court.  On or after the Effective Date, the Liquidating Trust may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

2.    **Administrative Claims Bar Date**

Except as provided for herein or in any order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, holders of Administrative Claims (other than holders of Administrative Claims paid in the ordinary course of business, holders of Professional Claims, holders of Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and holders of Postpetition Intercompany Balances) must File and serve on the Plan Proponents or the Liquidating Trust, as applicable, requests for the payment of such Administrative Claims not already Allowed by Final Order in accordance with the procedures specified in the Confirmation Order, on or before the Administrative Claim Bar Date or be forever barred, estopped, and enjoined from

asserting such Claims against the Debtors, the Plan Trusts, or their assets or properties, and such Claims shall be deemed discharged as of the Effective Date.

## B.  Professional Claims

### 1.  Final Fee Applications

All final requests for Professional Claims must be Filed no later than seventy-five (75) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims will be determined by the Bankruptcy Court.

### 2.  Professional Claims

The amount of Professional Claims owing to the Professionals will be paid in Cash to such Professionals by the Liquidating Trust, or at the Liquidating Trust's direction, without interest or other earnings therefrom, when such Claims are approved by the Bankruptcy Court; provided, that notwithstanding the foregoing, on the Effective Date, the Debtors shall pay (1) Centerview's full In-Court Transaction Fee (as defined in paragraph 3(b) of the engagement letter by and between Centerview and the Debtors), (2) Moelis' full Restructuring Fee (as defined in paragraph 2 of the engagement letter between Moelis and the Creditors' Committee), and (3) FTI's full Completion Fee (as defined in paragraph 3 of the addendum to the engagement letter between FTI and the Debtors, as amended); provided, further, that Centerview, Moelis, and FTI shall File final requests for Professional Claims in accordance with Section II.B.1 above.

### 3.  Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, the Liquidating Trust shall pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Professionals from and after the Effective Date, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Professionals may be employed and paid in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## C.  Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, the Liquidating Trust shall pay each holder of an Allowed Priority Tax Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim, in accordance with Bankruptcy Code section 1129(a)(9)(C), the full unpaid amount of such Allowed Priority Tax Claim in Cash on, or as soon as practicable after, the latest of: (1) the Effective Date; (2) the date such Allowed Priority Tax Claim becomes Allowed; or (3) in regular payments over a period of time not to exceed five (5) years after the Petition Date

with interest at a rate determined in accordance with section 511 of the Bankruptcy Code, provided, that such Allowed Priority Tax Claims shall not be treated in a manner less favorable than the most favored nonpriority Unsecured Claim provided for by the Plan (other than Cash payments made to a class of creditors under section 1122(b)), and provided, further, that such election shall be without prejudice to the Liquidating Trust's right to prepay such Allowed Priority Tax Claim in full or in part without penalty. To the extent a holder of an Allowed Priority Tax Claim holds a valid lien (a "Tax Lien") for outstanding and unpaid real property taxes against property of the Debtors or the Liquidating Trust, as applicable, any liens imposed on account of such Claim shall remain unimpaired until such Allowed Priority Tax Claim is paid in full.

**D.     U.S. Trustee Fees**

On the Effective Date or as soon as practicable thereafter, the Liquidating Trust shall pay all U.S. Trustee Fees that are due and owing on the Effective Date. For the avoidance of doubt, nothing in the Plan shall release the Liquidating Trust from its obligation to pay all U.S. Trustee Fees due and owing after the Effective Date before a Final Order is entered by the Bankruptcy Court concluding or closing the Chapter 11 Cases.

# ARTICLE III.

## CLASSIFICATION, TREATMENT, AND VOTING
## OF CLAIMS AND EQUITY INTERESTS

**A.     Classification of Claims and Equity Interests**

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Equity Interests. A Claim or Equity Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest has not been paid, withdrawn or otherwise settled before (i) the Claims Record Date for voting purposes, or (ii) the time at which distributions are made with respect to such Claims or Equity Interests pursuant to the Plan for distribution purposes.

**B.     Record Date for Claims**

As of the Claims Record Date, the transfer registers for each Class of Claims or Equity Interests (other than for publicly traded securities), as maintained by the Debtors or their agents, shall be deemed closed and there shall be no further changes made to reflect any new record holders of any such Claims or Equity Interests. The Debtors and the Liquidating Trust shall have no obligation to recognize any transfer of such Claims or Equity Interests occurring on or after the Claims Record Date.

**C.     Summary of Classification and Class Identification**

i.      Except for Claims addressed in Article II, all Claims and Equity Interests are classified in the Classes set forth in this Article III in accordance with section 1122 of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the

extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. In no event shall any holder of an Allowed Claim be entitled to receive payments under this Plan that, in the aggregate, exceed the Allowed amount of such holder's Claim.

ii.        Although the Plan applies to all of the Debtors, (a) the Plan constitutes fifty-one (51) distinct chapter 11 plans, one for each Debtor; and (b) for voting purposes, each class of the Debtor Groups will contain sub-classes for each of the Debtors within a particular Debtor Group.  The Plan groups the Debtors into three Debtor Groups (the ResCap Debtors, the GMACM Debtors and the RFC Debtors) solely for purposes of describing treatment under the Plan and making distributions under the Plan.  Such grouping shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities. For voting purposes, each Class of the Debtor Groups will contain sub-classes for each of the Debtors within a particular Debtor Group (*e.g.,* there will be three (3) sub-Classes for each Class of the ResCap Debtors, twenty-one (21) sub-Classes for each Class of the GMACM Debtors (<u>provided</u>, that, in lieu of Class GS-4A, the Plan for ETS contains a sub-Class, Class GS-4B, for ETS Unsecured Claims), and twenty-seven (27) sub-Classes for each Class of the RFC Debtors, and many of the sub-Classes may be vacant).   Notwithstanding the foregoing, the Plan Proponents reserve the right to seek approval of the Bankruptcy Court to consolidate any two or more Debtors for purposes of administrative convenience, provided that such consolidation does not materially and adversely impact the amount of distributions to any Person under the Plan and is in accordance with the terms of the Plan Support Agreement.

iii.        Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; <u>provided</u>, <u>however</u>, that in the event no holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot indicating acceptance or rejection of the Plan, such Class will be deemed to have accepted the Plan.  The Plan Proponents shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests.  The Plan Proponents reserve the right to modify the Plan in accordance with Article XI.A hereof, including the right to withdraw the Plan as to an individual Debtor at any time before the Effective Date.

iv.        The following are tables assigning each Class a letter and number designation for purposes of identifying each separate Class, a description of whether that Class is Impaired, and the Class' voting rights:

### 1.    ResCap Debtors

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| R-1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| R-2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| R-3 | Junior Secured Notes Claims | Impaired/ Unimpaired | Yes/No (presumed to accept) |
| R-4 | ResCap Unsecured Claims | Impaired | Yes |
| R-5 | Borrower Claims | Impaired | Yes |
| R-6 | Private Securities Claims | Impaired | Yes |
| R-7 | NJ Carpenters Claims | Impaired | Yes |
| R-8 | General Unsecured Convenience Claims | Impaired | Yes |
| R-9 | Intercompany Balances | Impaired | No (deemed to reject) |
| R-10 | Equity Interests | Impaired | No (deemed to reject) |
| R-11 | FHFA Claims | Impaired | Yes |
| R-12 | Revolving Credit Facility Claims | Impaired | Yes |

### 2.    GMACM Debtors

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| GS-1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| GS-2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| GS-3 | Junior Secured Notes Claims | Impaired/ Unimpaired | Yes/No (presumed to accept) |
| GS-4A | GMACM Unsecured Claims | Impaired | Yes |
| GS-4B | ETS Unsecured Claims | Impaired | Yes |
| GS-5 | Borrower Claims | Impaired | Yes |
| GS-6 | Private Securities Claims | Impaired | Yes |
| GS-7 | General Unsecured Convenience Claims | Impaired | Yes |
| GS-8 | Intercompany Balances | Impaired | No (deemed to reject) |
| GS-9 | Equity Interests | Impaired | No (deemed to reject) |
| GS-10 | Revolving Credit Facility Claims | Impaired | Yes |

### 3.    RFC Debtors

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| RS-1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| RS-2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| RS-3 | Junior Secured Notes Claims | Impaired/ Unimpaired | Yes/No (presumed to accept) |
| RS-4 | RFC Unsecured Claims | Impaired | Yes |

39

| RS-5 | Borrower Claims | Impaired | Yes |
| RS-6 | Private Securities Claims | Impaired | Yes |
| RS-7 | NJ Carpenters Claims | Impaired | Yes |
| RS-8 | General Unsecured Convenience Claims | Impaired | Yes |
| RS-9 | Intercompany Balances | Impaired | No (deemed to reject) |
| RS-10 | Equity Interests | Impaired | No (deemed to reject) |
| RS-11 | FHFA Claims | Impaired | Yes |
| RS-12 | Revolving Credit Facility Claims | Impaired | Yes |

**D.     Treatment of Claims and Equity Interests**

Except to the extent that a holder of an Allowed Claim or Equity Interest, as applicable, agrees to a less favorable treatment, such holder shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Equity Interest, receive the treatment described below under the Plan.

**1.     Claims Against and Equity Interests in the ResCap Debtors**

(a)     Class R-1 – Other Priority Claims

(i)     Classification: Class R-1 consists of all Allowed Other Priority Claims against the ResCap Debtors.

(ii)     Treatment: In full and final satisfaction of the Other Priority Claims in Class R-1, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Priority Claim in Class R-1 shall receive one of the following treatments on account of such Claim, as determined by the Plan Proponents prior to the Effective Date or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, or (b) treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; provided, that Other Priority Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date will be paid in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting: Class R-1 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class R-1 Claims are conclusively presumed to accept the Plan.

(b)     Class R-2 – Other Secured Claims

(i)     Classification: Class R-2 consists of all Allowed Other Secured Claims against the ResCap Debtors.

       (ii)      <u>Treatment:</u> In full and final satisfaction of the Other Secured Claims in Class R-2, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Secured Claim in Class R-2 shall receive one of the following treatments on account of such Claim as determined by the Plan Proponents prior to the Effective Date, or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, including any interest, at the non-default rate (or such other rate as may be ordered by the Court), required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (b) the collateral securing its Allowed Other Secured Claim.

       (iii)   <u>Voting:</u> Class R-2 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class R-2 Claims are conclusively presumed to accept the Plan.

(c)     Class R-3 – Junior Secured Notes Claims

       (i)      <u>Classification:</u> Class R-3 consists of all Allowed Junior Secured Notes Claims against the ResCap Debtors.

       (ii)      <u>Treatment:</u> In full and final satisfaction and release of the Junior Secured Notes Claims in Class R-3, on or within one (1) Business Day of the Effective Date, the Junior Secured Notes Indenture Trustee shall receive the Junior Secured Notes Distribution, which will thereafter be distributed pursuant to Article VII.G.1 hereof.

       (iii)   <u>Voting:</u> Class R-3 is Impaired. Holders of Allowed Class R-3 Claims are entitled to vote to accept or reject the Plan.

(d)     Class R-4 – ResCap Unsecured Claims

       (i)      <u>Classification:</u> Class R-4 consists of all Allowed ResCap Unsecured Claims.

       (ii)      <u>Treatment:</u> In full and final satisfaction of the ResCap Unsecured Claims in Class R-4, as soon as practicable after the Effective Date, each holder of an Allowed ResCap Unsecured Claim in Class R-4 shall receive its Pro Rata Share of the ResCap Debtors Unit Distribution.

       (iii)   <u>Voting:</u> Class R-4 is Impaired. Holders of Allowed Class R-4 Claims are entitled to vote to accept or reject the Plan.

(e)     Class R-5 – Borrower Claims

12-12020-mg   Doc 8019-13   Filed 02/04/15   Entered 01/06/15 17:31:29   Appendix 1
Pg 56 of 208

       (i)        <u>Classification:</u> Class R-5 consists of all Allowed Borrower Claims against the ResCap Debtors.

       (ii)     <u>Treatment:</u> In full and final satisfaction of the Borrower Claims in Class R-5, as soon as practicable after the Effective Date, holders of Allowed Borrower Claims in Class R-5 shall receive their allocated share of Cash available for distribution from the Borrower Claims Trust, in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.

       (iii)    <u>Voting:</u> Class R-5 is Impaired.  Holders of Allowed Class R-5 Claims are entitled to vote to accept or reject the Plan.

   (f)     Class R-6 – Private Securities Claims

       (i)        <u>Classification:</u> Class R-6 consists of all Allowed Private Securities Claims against the ResCap Debtors.

       (ii)     <u>Treatment:</u> In full and final satisfaction of the Private Securities Claims in Class R-6, as soon as practicable after the Effective Date, holders of Allowed Private Securities Claims in Class R-6 shall receive their allocated share of either (A) Cash distributions from the Private Securities Claims Trust, or (B) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution, in each case in accordance with the methodology and procedures set forth in the Private Securities Claims Trust Agreement.

       (iii)    <u>Voting:</u> Class R-6 is Impaired.  Holders of Allowed Class R-6 Claims are entitled to vote to accept or reject the Plan.

   (g)     Class R-7 – NJ Carpenters Claims

       (i)        <u>Classification:</u> Class R-7 consists of all Allowed NJ Carpenters Claims against the ResCap Debtors.

       (ii)     <u>Treatment:</u> Subject to the NJ Carpenters Approval, in full and final satisfaction of the NJ Carpenters Claims in Class R-7, within ten (10) Business Days of the Effective Date, the lead plaintiff, on behalf of holders of Allowed NJ Carpenters Claims in Class R-7 shall receive the NJ Carpenters Claims Distribution which will thereafter be distributed pursuant to the NJ Carpenters Plan of Allocation.  Absent the NJ Carpenters Approval, Claims held by NJ Carpenters Class Members, to the extent Allowed, shall be classified as

42

General Unsecured Claims, which claims may be subject to subordination.

    (iii)    <u>Voting:</u> Class R-7 is Impaired.  Holders of Allowed Class R-7 Claims are entitled to vote to accept or reject the Plan.

(h)    Class R-8 – General Unsecured Convenience Claims

    (i)    <u>Classification:</u> Class R-8 consists of all Allowed General Unsecured Convenience Claims against the ResCap Debtors.

    (ii)    <u>Treatment:</u> In full and final satisfaction of the General Unsecured Convenience Claims in Class R-8, as soon as practicable after the Effective Date, each holder of an Allowed General Unsecured Convenience Claim in Class R-8 shall receive a distribution in Cash equal to 36.3% of such holder's Allowed Class R-8 Claim.

    (iii)    <u>Voting:</u> Class R-8 is Impaired.  Holders of Allowed Class R-8 Claims are entitled to vote to accept or reject the Plan.

(i)    Class R-9 – Intercompany Balances

    (i)    <u>Classification:</u> Class R-9 consists of all Intercompany Balances against the ResCap Debtors.

    (ii)    <u>Treatment:</u> On the Effective Date, Intercompany Balances against the ResCap Debtors in Class R-9 shall be waived, cancelled, and discharged.  Holders of Intercompany Balances in Class R-9 shall receive no recovery on account of their Claims.

    (iii)    <u>Voting:</u> Class R-9 is Impaired.  Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class R-9 Claims are deemed to reject the Plan.

(j)    Class R-10 – Equity Interests

    (i)    <u>Classification:</u> Class R-10 consists of all Equity Interests in the ResCap Debtors.

    (ii)    <u>Treatment:</u> Holders of Equity Interests in Class R-10 shall receive no recovery on account of such Equity Interests and such Equity Interests shall be canceled on the Effective Date.

    (iii)    <u>Voting:</u> Class R-10 is Impaired.  Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class R-10 Equity Interests are deemed to reject the Plan.

(k)     Class R-11 – FHFA Claims

   (i)     <u>Classification:</u> Class R-11 Consists of all FHFA Claims against the ResCap Debtors.

   (ii)    <u>Treatment:</u> Holders of FHFA Claims in Class R-11 shall waive any recovery on account of such Claims.

   (iii)   <u>Voting:</u> Class R-11 is Impaired. Holders of Allowed Class R-11 Claims are entitled to vote to accept or reject the Plan.

(l)     Class R-12 – Revolving Credit Facility Claims

   (i)     <u>Classification:</u> Class R-12 consists of all Allowed Revolving Credit Facility Claims against the ResCap Debtors.

   (ii)    <u>Treatment:</u> In full and final satisfaction of the Revolving Credit Facility Claims in Class R-12, on the Effective Date, any amounts paid under the Paydown Orders shall be indefeasibly and finally approved and allowed; <u>provided</u>, that on the Effective Date holders of Allowed Revolving Credit Facility Claims in Class R-12 shall waive as against any Debtor or Plan Trust any right to payment on account of the Revolving Credit Facility Claims.

   (iii)   <u>Voting:</u> Class R-12 is Impaired.  Holders of Allowed Class R-12 Claims are entitled to vote to accept or reject the Plan.

**2.     Claims Against and Equity Interests in the GMACM Debtors**

(a)     Class GS-1 – Other Priority Claims

   (i)     <u>Classification:</u> Class GS-1 consists of all Allowed Other Priority Claims against the GMACM Debtors.

   (ii)    <u>Treatment:</u> In full and final satisfaction of the Other Priority Claims in Class GS-1, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Priority Claim in Class GS-1 shall receive one of the following treatments on account of such Claim, as determined by the Plan Proponents prior to the Effective Date, or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, or (b) treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; <u>provided</u>, that Other Priority Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date will be paid in the ordinary course of business in accordance with the terms thereof.

44

(iii)    <u>Voting:</u> Class GS-1 is Unimpaired.  Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class GS-1 Claims are conclusively presumed to accept the Plan.

(b)    Class GS-2 – Other Secured Claims

    (i)    <u>Classification:</u> Class GS-2 consists of all Allowed Other Secured Claims against the GMACM Debtors.

    (ii)    <u>Treatment:</u> In full and final satisfaction of the Other Secured Claims in Class GS-2, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Secured Claim in Class GS-2 shall receive one of the following treatments on account of such Claim as determined by the Plan Proponents prior to the Effective Date, or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, including any interest, at the non-default rate (or such other rate as may be ordered by the Court), required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (b) the collateral securing its Allowed Other Secured Claim.

    (iii)    <u>Voting:</u> Class GS-2 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class GS-2 Claims are conclusively presumed to accept the Plan.

(c)    Class GS-3 – Junior Secured Notes Claims

    (i)    <u>Classification:</u> Class GS-3 consists of all Allowed Junior Secured Notes Claims against the GMACM Debtors.

    (ii)    <u>Treatment:</u> In full and final satisfaction and release of the Junior Secured Notes Claims in Class GS-3, on or within one (1) Business Day of the Effective Date, the Junior Secured Notes Indenture Trustee shall receive the Junior Secured Notes Distribution, which will thereafter be distributed pursuant to Article VII.G.1 hereof.

    (iii)    <u>Voting:</u> Holders of Allowed Class GS-3 Claims are unimpaired and deemed to accept the Plan at the following GMACM Debtors:  Passive Asset Transactions, LLC; Residential Mortgage Real Estate Holdings, LLC; Home Connects Lending Services, LLC; GMACR Mortgage Products, LLC; ditech, LLC; Residential Consumer Services, LLC; and GMAC Mortgage USA Corporation.  Holders of Allowed Class GS-3 Claims are impaired and entitled to vote on the Plan at GMACM.

(d)    Class GS-4A – GMACM Unsecured Claims

(i)     <u>Classification:</u> Class GS-4A consists of all Allowed GMACM Unsecured Claims (other than Allowed ETS Unsecured Claims).

(ii)     <u>Treatment:</u> In full and final satisfaction of the GMACM Unsecured Claims in Class GS-4A, as soon as practicable after the Effective Date, each holder of an Allowed GMACM Unsecured Claim in Class GS-4A shall receive its Pro Rata Share of the GMACM Debtors Unsecured Unit Distribution, <u>provided, however,</u> that, with respect to the distributions on account of the Allowed RMBS Trust Claims, the holder shall be the RMBS Claims Trust, and subsequent distributions of, or on account of, such Units, shall be governed by Article IV.C of the Plan.

(iii)     <u>Voting:</u> Class GS-4A is Impaired. Holders of Allowed Class GS-4A Claims are entitled to vote to accept or reject the Plan.

(e)     Class GS-4B – ETS Unsecured Claims

(i)     <u>Classification:</u> Class GS-4B consists of all Allowed ETS Unsecured Claims.

(ii)     <u>Treatment:</u> In full and final satisfaction of the ETS Unsecured Claims in Class GS-4B, as soon as practicable after the Effective Date, each holder of an Allowed ETS Unsecured Claim in Class GS-4B shall receive its Pro Rata Share of Cash in an amount that is equal to the value, if any, of assets available at ETS that exceed the amount of Allowed Claims senior in right of payment to such Allowed ETS Unsecured Claim against ETS.

(iii)     <u>Voting:</u> Class GS-4B is Impaired. Holders of Allowed Class GS-4B Claims are entitled to vote to accept or reject the Plan.

(f)     Class GS-5 – Borrower Claims

(i)     <u>Classification:</u> Class GS-5 consists of all Allowed Borrower Claims against the GMACM Debtors.

(ii)     <u>Treatment:</u> In full and final satisfaction of the Borrower Claims in Class GS-5, as soon as practicable after the Effective Date, holders of Allowed Borrower Claims in Class GS-5 shall receive their allocated share of Cash available for distributions from the Borrower Claims Trust, in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.

(iii)    <u>Voting:</u> Class GS-5 is Impaired. Holders of Allowed Class GS-5 Claims are entitled to vote to accept or reject the Plan.

(g)    Class GS-6 – Private Securities Claims

(i)    <u>Classification:</u> Class GS-6 consists of all Allowed Private Securities Claims against the GMACM Debtors.

(ii)    <u>Treatment:</u> In full and final satisfaction of the Private Securities Claims in Class GS-6, as soon as practicable after the Effective Date, holders of Allowed Private Securities Claims in Class GS-6 shall receive their allocated share of either (A) Cash distributions from the Private Securities Claims Trust, or (B) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution, in each case in accordance with the methodology and procedures set forth in the Private Securities Claims Trust Agreement.

(iii)    <u>Voting:</u> Class GS-6 is Impaired. Holders of Allowed Class GS-6 Claims are entitled to vote to accept or reject the Plan.

(h)    Class GS-7 – General Unsecured Convenience Claims

(i)    <u>Classification:</u> Class GS-7 consists of all Allowed General Unsecured Convenience Claims against the GMACM Debtors.

(ii)    <u>Treatment:</u> In full and final satisfaction of the General Unsecured Convenience Claims in Class GS-7, as soon as practicable after the Effective Date, each holder of an Allowed General Unsecured Convenience Claim in Class GS-7 shall receive a distribution in Cash equal to 30.1% of such holder's Allowed Class GS-7 Claim.

(iii)    <u>Voting:</u> Class GS-7 is Impaired. Holders of Allowed Class GS-7 Claims are entitled to vote to accept or reject the Plan.

(i)    Class GS-8 – Intercompany Balances

(i)    <u>Classification:</u> Class GS-8 consists of all Intercompany Balances against the GMACM Debtors.

(ii)    <u>Treatment:</u> On the Effective Date, Intercompany Balances against the GMACM  Debtors in Class GS-8 shall be waived, cancelled, and discharged.  Holders of Intercompany Balances in Class GS-8 shall receive no recovery on account of their Claims.

47

        (iii)    <u>Voting:</u> Class GS-8 is Impaired. Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class GS-8 Claims are deemed to reject the Plan.

(j)     Class GS-9 – Equity Interests

        (i)    <u>Classification:</u> Class GS-9 consists of all Equity Interests in the GMACM Debtors.

        (ii)    <u>Treatment:</u> Holders of Equity Interests in Class GS-9 shall receive no recovery on account of such Equity Interests and such Equity Interests shall be canceled on the Effective Date.

        (iii)    <u>Voting:</u> Class GS-9 is Impaired. Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class GS-9 Equity Interests are deemed to reject the Plan.

(k)     Class GS-10 – Revolving Credit Facility Claims

        (i)    <u>Classification:</u> Class GS-10 consists of all Allowed Revolving Credit Facility Claims against the GMACM Debtors.

        (ii)    <u>Treatment:</u> In full and final satisfaction of the Revolving Credit Facility Claims in Class GS-10, on the Effective Date, any amounts paid under the Paydown Orders shall be indefeasibly and finally approved and allowed; <u>provided</u>, that on the Effective Date holders of Allowed Revolving Credit Facility Claims in Class GS-10 shall waive as against any Debtor or Plan Trust any right to payment on account of the Revolving Credit Facility Claims.

        (iii)    <u>Voting:</u> Class GS-10 is Impaired.  Holders of Allowed Class GS-10 Claims are entitled to vote to accept or reject the Plan.

**3.**     **Claims Against and Equity Interests in the RFC Debtors**

(a)     Class RS-1 – Other Priority Claims

        (i)    <u>Classification:</u> Class RS-1 consists of all Allowed Other Priority Claims against the RFC Debtors.

        (ii)    <u>Treatment:</u> In full and final satisfaction of the Other Priority Claims in Class RS-1, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Priority Claim in Class RS-1 shall receive one of the following treatments on account of such Claim, as determined by the Plan Proponents prior to the Effective Date, or the Liquidating Trust, following the Effective Date: (a) payment in full in

48

Cash, or (b) treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; provided, that Other Priority Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date will be paid in the ordinary course of business in accordance with the terms thereof.

(iii) <u>Voting:</u> Class RS-1 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class RS-1 Claims are conclusively presumed to accept the Plan.

(b) Class RS-2 – Other Secured Claims

(i) <u>Classification:</u> Class RS-2 consists of all Allowed Other Secured Claims against the RFC Debtors.

(ii) <u>Treatment:</u> In full and final satisfaction of the Other Secured Claims in Class RS-2, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Secured Claim in Class RS-2 shall receive one of the following treatments on account of such Claim as determined by the Plan Proponents prior to the Effective Date, or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, including any interest, at the non-default rate (or such other rate as may be ordered by the Court), required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (b) the collateral securing its Allowed Other Secured Claim.

(iii) <u>Voting:</u> Class RS-2 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class RS-2 Claims are conclusively presumed to accept the Plan.

(c) Class RS-3 – Junior Secured Notes Claims

(i) <u>Classification:</u> Class RS-3 consists of all Allowed Junior Secured Notes Claims against the RFC Debtors.

(ii) <u>Treatment:</u> In full and final satisfaction and release of the Junior Secured Notes Claims in Class RS-3, on or within one (1) Business Day of the Effective Date, the Junior Secured Notes Indenture Trustee shall receive the Junior Secured Notes Distribution, which will thereafter be distributed pursuant to Article VII.G.1 hereof.

(iii) <u>Voting:</u> Holders of Allowed RS-3 Claims are unimpaired and deemed to accept the Plan at the following RFC Debtors: GMAC Model Home Finance I, LLC; DOA Holding Properties, LLC; RFC Asset Holdings II, LLC; RFC Construction Funding,

LLC; Residential Funding Real Estate Holdings, LLC; Homecomings Financial Real Estate Holdings, LLC; Residential Funding Mortgage Securities I, Inc.; RFC Asset Management, LLC; RFC SFJV-2002, LLC; and RCSFJV2004, LLC.  Holders of Allowed RS-3 Claims are impaired and entitled to vote on the Plan at RFC and Homecomings Financial, LLC.

(d)    Class RS-4 – RFC Unsecured Claims

    (i)    <u>Classification:</u> Class RS-4 consists of all Allowed RFC Unsecured Claims.

    (ii)   <u>Treatment:</u> In full and final satisfaction of the RFC Unsecured Claims in Class RS-4, as soon as practicable after the Effective Date, each holder of an Allowed RFC Unsecured Claim in Class RS-4 shall receive its Pro Rata Share of the RFC Debtors Unit Distribution; <u>provided, however</u>, that, with respect to the distributions on account of the Allowed RMBS Trust Claims, the holder shall be the RMBS Claims Trust, and subsequent distributions of, or on account of, such Units, shall be governed by Article IV.C of the Plan.

    (iii)  <u>Voting:</u> Class RS-4 is Impaired. Holders of Allowed Class RS-4 Claims are entitled to vote to accept or reject the Plan.

(e)    Class RS-5 – Borrower Claims

    (i)    <u>Classification:</u> Class RS-5 consists of all Allowed Borrower Claims against the RFC Debtors.

    (ii)   <u>Treatment:</u> In full and final satisfaction of the Borrower Claims in Class RS-5, as soon as reasonably practicable after the Effective Date, holders of Allowed Borrower Claims in Class RS-5 shall receive their allocated share of Cash available for distributions from the Borrower Claims Trust, in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.

    (iii)  <u>Voting:</u> Class RS-5 is Impaired. Holders of Allowed Class RS-5 Claims are entitled to vote to accept or reject the Plan.

(f)    Class RS-6 – Private Securities Claims

    (i)    <u>Classification:</u> Class RS-6 consists of all Allowed Private Securities Claims against the RFC Debtors

    (ii)   <u>Treatment:</u> In full and final satisfaction of the Private Securities Claims in Class RS-6, as soon as practicable after

50

the Effective Date, holders of Allowed Private Securities
Claims in Class RS-6 shall receive their allocated share of
either (A) Cash distributions from the Private Securities
Claims Trust, or (B) the Units transferred to the Private
Securities Claims Trust that constitute the Private Securities
Claims Trust Unit Distribution, in each case in accordance
with the methodology and procedures set forth in the Private
Securities Claims Trust Agreement.

    (iii)    <u>Voting:</u> Class RS-6 is Impaired. Holders of Allowed Class
RS-6 Claims are entitled to vote to accept or reject the Plan.

(g)    Class RS-7 – NJ Carpenters Claims

    (i)    <u>Classification:</u> Class RS-7 consists of all Allowed NJ
Carpenters Claims against the RFC Debtors.

    (ii)    <u>Treatment:</u> Subject to the NJ Carpenters Approval, in full and
final satisfaction of the NJ Carpenters Claims in Class RS-7,
within ten (10) Business Days of the Effective Date, the lead
plaintiff, on behalf of holders of Allowed NJ Carpenters
Claims in Class RS-7 shall receive the NJ Carpenters Claims
Distribution which will thereafter be distributed pursuant to
the NJ Carpenters Plan of Allocation.  Absent the NJ
Carpenters Approval, Claims held by NJ Carpenters Class
Members, to the extent Allowed, shall be classified as
General Unsecured Claims, which claims may be subject to
subordination.

    (iii)    <u>Voting:</u> Class RS-7 is Impaired. Holders of Allowed Class
RS-7 Claims are entitled to vote to accept or reject the Plan.

(h)    Class RS-8 – General Unsecured Convenience Claims

    (i)    <u>Classification:</u> Class RS-8 consists of all Allowed General
Unsecured Convenience Claims against the RFC Debtors.

    (ii)    <u>Treatment:</u> In full and final satisfaction of the General
Unsecured Convenience Claims in Class RS-8, as soon as
practicable after the Effective Date, each holder of an
Allowed General Unsecured Convenience Claim in Class RS-
8 shall receive a distribution in Cash equal to 9.0% of such
holder's Allowed Class RS-8 Claim.

    (iii)    <u>Voting:</u> Class RS-8 is Impaired. Holders of Allowed Class
RS-8 Claims are entitled to vote to accept or reject the Plan.

(i)    Class RS-9 – Intercompany Balances

51

(i)     Classification: Class RS-9 consists of all Intercompany
        Balances against the RFC Debtors.

(ii)    Treatment: On the Effective Date, Intercompany Balances
        against the RFC Debtors in Class RS-9 shall be waived,
        cancelled, and discharged. Holders of Intercompany Balances
        against the RFC Debtors in Class RS-9 shall receive no
        recovery on account of their Claims.

(iii)   Voting: Class RS-9 is Impaired. Pursuant to Bankruptcy Code
        section 1126(g), holders of Allowed Class RS-9 Claims are
        conclusively deemed to reject the Plan.

(j)     Class RS-10 – Equity Interests

(i)     Classification: Class RS-10 consists of all Equity Interests in
        the RFC Debtors.

(ii)    Treatment: Holders of Equity Interests in Class RS-10 shall
        receive no recovery on account of such Equity Interests and
        such Equity Interests shall be canceled on the Effective Date.

(iii)   Voting: Class RS-10 is Impaired. Pursuant to Bankruptcy
        Code section 1126(g), holders of Allowed Class RS-10 Equity
        Interests are conclusively deemed to reject the Plan.

(k)     Class RS-11 – FHFA Claims

(i)     Classification: Class RS-11 consists of all FHFA Claims against
        the RFC Debtors.

(ii)    Treatment: Each holder of an Allowed FHFA Claim in Class
        RS-11 shall receive a distribution in Cash equal to 2.0% of
        such holder's Allowed FHFA Claim in Class RS-11 on the
        Effective Date.

(iii)   Voting: Class RS-11 is Impaired. Holders of Allowed Class
        RS-11 Claims are entitled to vote to accept or reject the Plan.

(l)     Class RS-12 – Revolving Credit Facility Claims

(i)     Classification: Class RS-12 consists of all Allowed Revolving
        Credit Facility Claims against the RFC Debtors.

(ii)    Treatment: In full and final satisfaction of the Revolving
        Credit Facility Claims in Class RS-12, on the Effective Date,
        any amounts paid under the Paydown Orders shall be
        indefeasibly and finally approved and allowed; provided, that

52

on the Effective Date holders of Allowed Revolving Credit Facility Claims in Class RS-12 shall waive as against any Debtor or Plan Trust any right to payment on account of the Revolving Credit Facility Claims.

(iii)    Voting: Class RS-12 is Impaired.  Holders of Allowed Class RS-12 Claims are entitled to vote to accept or reject the Plan.

## E.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. For purposes of Bankruptcy Rule 7001(8), the Plan provides for subordination.  The Plan Proponents, prior to the Effective Date, or the Liquidating Trust (and the Borrower Trust with respect to Borrower Claims), following the Effective Date, reserve the right to subordinate any Claim or Equity Interest, other than the Consenting Claimants' Allowed Claims, the NJ Carpenters Claims (assuming the NJ Carpenters Approval), the Allowed Private Securities Claims, and the Ally Contract Claims, in accordance with any contractual, legal, or equitable subordination relating thereto under the Bankruptcy Code as long as such treatment is consistent with the Plan Support Agreement. An initial list of Claims proposed to be subordinated under the Plan shall be set forth in the Plan Supplement, without prejudice to the right of the Plan Proponents or Liquidating Trust (and the Borrower Trust with respect to Borrower Claims), as the case may be, to seek to subordinate additional Claims.  Subordinated Claims shall not receive a distribution under the Plan until all senior Allowed Claims are paid in full.

## F.    Distributions on Account of Allowed Claims and Interests

Except as otherwise provided in this Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim against the Debtors shall receive the distributions that this Plan provides for Allowed Claims in the applicable Class from either the Liquidating Trust, RMBS Claims Trust, Borrower Claims Trust, or Private Securities Claims Trust, as applicable and as set forth below. Distributions on account of Disputed Claims of Liquidating Trust Unit Beneficiaries that become Allowed shall be made from the Disputed Claims Reserve pursuant to the Plan.  Except as otherwise provided herein, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions regardless of whether such distributions are delivered on or at any time after the Effective Date.

## G.    Elimination of Vacant Classes

Any Class of Claims or Equity Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

## H.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

`      Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Plan Proponents shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests.

## ARTICLE IV.

## IMPLEMENTATION OF THE PLAN

### A.    Global Settlement

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a compromise and settlement of numerous inter-Debtor, Debtor-Creditor and inter-Creditor issues designed to achieve an economic settlement of Claims against the Debtors and Ally and an efficient resolution of these Chapter 11 Cases. This Global Settlement constitutes a settlement of the potential litigation of issues including substantive consolidation, the validity and enforceability of Intercompany Balances, the allocation of the Available Assets, the amount and allocation of certain disputed Unsecured Claims, in addition to the resolution of extensive litigation, Claims, and potential Claims against Ally. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the following compromises or settlements and all other compromises and settlements provided for herein, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, Creditors, the RMBS Trusts, Investors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness. Each provision of the Global Settlement shall be deemed non-severable from each other and from the remaining terms of the Plan. As set forth in detail herein, the Global Settlement will be implemented as follows:

a)     The Ally Contribution will be paid to the Estates in accordance with the Plan and will be allocated by the Plan Proponents, consistent with the terms of Articles II and III herein, as follows:

| Entity | Allocation |
|---|---|
| ResCap Debtors | $782.74 million |
| GMACM Debtors | $462.32 million |
| RFC Debtors | $462.32 million |

| Private Securities Claims Trust | $235.00 million |
|---|---|
| Borrower Claims Trust | $57.62 million |
| NJ Carpenters Claims Distribution | $100.00 million |
| **TOTAL** | **$2.10 billion** |

b)        Administrative Claims shall be allocated among the ResCap Debtors, the GMACM Debtors and the RFC Debtors in accordance with the Plan Support Agreement. Of the projected Administrative Claims of $1,086.2 million, $836.3 million shall be allocated to the GMACM Debtors, and $249.8 million shall be allocated to the RFC Debtors.   Any variation in the amount of the Administrative Claims above or below $1,086.2 million shall be borne or realized by the Liquidating Trust.

c)        On the Effective Date, the Borrower Claims Trust will be funded with the Borrower Claims Trust Assets for the benefit of holders of Borrower Claims.  Holders of Borrower Claims shall receive their allocated share of the Borrower Claims Trust Assets in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.

d)        On or as soon as practicable after the Effective Date, the Private Securities Claims Trust shall be funded with the Private Securities Claims Trust Unit Distribution, for the benefit of Private Securities Claimants.  Private Securities Claimants shall receive their allocable share of Cash distributions received by the Private Securities Claims Trust from the Liquidating Trust in respect of the Private Securities Claims Trust Unit Distribution, and shall not be required to tender or surrender the RMBS underlying their Private Securities Claims.

e)        The RMBS Settlement is incorporated in the Plan and shall become effective on the Effective Date.

f)        The Monoline Claims Settlement is incorporated in the Plan and shall become effective on the Effective Date.

g)        A settlement of the Allowed amounts and treatment of the Claims held by the Settling Private Securities Claimants for voting purposes is incorporated in the Plan and shall become effective on the Effective Date.

h)        Subject to the NJ Carpenters Approval, the amount of the NJ Carpenters Claims Distribution is incorporated in the Plan and shall become effective on the Effective Date.

i)        Subject to approval of the Kessler Settlement Agreement by the Bankruptcy Court, a settlement of the Allowed amount and treatment of the Claims of the Kessler Class Claimants pursuant to the Kessler Settlement Agreement is incorporated in the Plan and shall become effective on the Effective Date.

j)      A settlement of potential Claims, whether liquidated or unliquidated, of the Senior Unsecured Noteholders and of the Senior Unsecured Notes Indenture Trustee shall become effective on the Effective Date.

k)      As agreed upon among the Consenting Claimants, the Junior Secured Notes Claims shall be allocated among the Debtors;

l)      Holders of the Junior Secured Notes Claims shall receive the Junior Secured Notes Distribution on account of the Junior Secured Notes Claims;

m)      The GMACM Debtors and the RFC Debtors shall waive and release all subrogation claims against the ResCap Debtors.

n)      Each Debtor agrees to compromise Intercompany Balances and such Claims shall not be entitled to receive any recovery under the Plan.

**B.      Ally Settlement**

Ally shall pay the Estates the Ally Contribution in accordance with the Plan. In exchange for Ally's contributions to the Chapter 11 Cases, including the Ally Contribution, Ally shall be entitled to the following consideration:

a)      Debtor Releases;

b)      Third Party Releases;

c)      _Settlement of Debtors' Rights to and Under Settlement Insurance Policies_:  The Debtors (i) agree to permit Ally exclusively to recover under the Settlement Insurance Policies; (ii) relinquish in favor of Ally and its Representatives all coverage that might otherwise belong to, or inure to the benefit of, the Debtors under such Settlement Insurance Policies; (iii) shall, at Ally's discretion, assign, and seek an Order of the Bankruptcy Court permitting the assignment, to Ally of any and all of the Debtors' rights under the Settlement Insurance Policies with respect to any claims made against the Debtors or their Representatives prior to or during the bankruptcy, including each of the claims set forth on a schedule to Exhibit B to the Plan Support Agreement; and (iv) shall cooperate fully with Ally, in order to help maximize Ally's recovery under the Settlement Insurance Policies with respect to claims against the Debtors or their Representatives.

The Debtors shall retain their rights as insureds under the existing Ally general liability and workers' compensation insurance policies for bodily injury and property damage claims to the extent covered by those insurance policies. By the Effective Date, the Debtors shall be required to have purchased their own insurance policies (including general liability and workers' compensation insurance) to cover all risks of loss, damage or injury (including bodily injury and property damage) occurring on or after the Effective Date.  For the avoidance of doubt, there is no obligation for Ally to provide insurance under the Plan, or otherwise.

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order shall release, enjoin, or preclude any Representative of the Debtors from pursuing any

rights a Representative of the Debtors may have (i) to indemnification or advancement from Ally solely for any claims that are not released by the Plan and the Confirmation Order; or (ii) as an "insured" under any insurance coverage purchased by Ally or covering Representatives of the Debtors, or against any party (other than the Debtors) arising out of such policies of insurance, solely for any claims that are not released herein and in the Confirmation Order.  For the avoidance of doubt, nothing in this Plan expands or reduces any existing indemnification rights or rights as an "insured" for any Representative of the Debtors for claims that are not released by the Plan.

For the avoidance of doubt, the releases in the Plan shall not extend to any rights, defenses, or counterclaims, under any directors & officers or errors & omissions insurance policies sold by any of the Consenting Claimants or their affiliates and covering either Debtors or any of the Ally Released Parties. Nor do the releases herein extend to any indemnity rights against non-Ally Released Parties arising out of the Kessler Class Action or to any other indemnity right against non-Ally Released Parties arising out of any other claims of Borrowers; specifically, the releases do not extend to any indemnity rights RFC may have against any non-Ally Released Party that is a successor in interest to CBNV and GNBT, including, but not limited to, those indemnity rights extending out of the Client Contracts between RFC, on the one hand, and either CBNV or GNBT, on the other hand, which incorporate by reference the indemnity provisions of RFC's AlterNet Seller Guide.

No rights of the Consenting Claimants are released under the Plan in their capacity as liability insurance or reinsurance carriers for Ally or the Debtors, to the extent applicable.  In addition, nothing herein or in the Confirmation Order shall impair any of the Debtors' or any Borrower or former Borrower's rights or remedies (including the GM Insurance Rights) under or with respect to insurance policies other than the Settlement Insurance Policies (as assigned in the Plan), including but not limited to the GM Policies.

With respect to the Settlement Insurance Policies, the Confirmation Order shall contain language regarding the settlement of insurance that is reasonably acceptable to Ally, the Plan Proponents, and the Consenting Claimants.

d)    _Release of Funds_:  On the Effective Date, the Debtors will (i) transfer the funds held in the Ally Indemnity Escrow Account to Ally, and (ii) remit the Misdirected Funds to Ally, and Ally shall release the approximately $1.787 million in Cash that was overfunded by the Debtors prior to the Petition Date and which is currently held by Ally.

e)    _Regulatory Obligations_: Through the Effective Date, the Debtors shall perform all respective obligations under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment, including, for the avoidance of doubt, satisfying the settlement of the foreclosure review obligations under the Consent Order, fulfilling all specific performance obligations, and satisfying all monetary obligations in full in Cash; provided, however, that the Debtors shall not be obligated to perform those obligations under the DOJ/AG Settlement and the Consent Order that Ocwen or Walter is obligated to perform under the Ocwen APA.  On and after the Effective Date, the Liquidating Trust shall assume all rights and perform all obligations of the Debtors under the Ocwen APA, the DOJ/AG Settlement, the Consent Order, and the Order of Assessment (including as set forth above) other than those obligations under the DOJ/AG

Settlement and the Consent Order that Ocwen or Walter is obligated to perform under the Ocwen APA. For the avoidance of doubt, as of the Effective Date, Ally shall have no obligations under the Consent Order and the Order of Assessment; any monetary obligations of Ally under the DOJ/AG Settlement are governed by Article IX.D, IX.E and IX.I of the Plan. Nothing set forth herein is intended to or shall be deemed to modify any right or obligation of Ocwen or Walter with respect to the DOJ/AG Settlement and the Consent Order, each of which shall be governed in all respects by the provisions of the Ocwen APA.

f) *Treatment of Ally Contract Claims*. On the Effective Date, the Ally Contract Claims shall be presumptively Allowed in full and the Debtors shall pay such Claims in full in Cash. The parties to the Ally Contracts shall perform under such contracts in accordance with the terms of such contracts and orders of the Bankruptcy Court. For the avoidance of doubt, the parties' performance under each Ally Contract shall terminate in accordance with the terms of such contract and orders of the Bankruptcy Court, subject to an agreement among the Debtors, the Creditors' Committee, and Ally to otherwise terminate such contract. Ally shall provide to the Plan Proponents a good-faith estimate of the Ally Contract Claims on or about August 15, 2013; and every month thereafter until the Effective Date, underlined provided, for the avoidance of doubt, such estimate shall be non-binding on Ally and subject to change. Except with respect to the Debtors' and the Liquidating Trust's obligations to Ally as specifically set forth in the Plan (including their obligations to perform under the Ally Contracts in accordance with their terms), on and after the Effective Date the Debtors and the Plan Trusts shall have no other obligations to the Ally Released Parties. In the event that before Confirmation of the Plan, Ally identifies claims that arose prior to the Petition Date under the Ally Contracts, the Plan Proponents and Ally agree to negotiate in good faith with respect to the treatment of such claims under the Plan. Nothing herein will be deemed an assumption of the Ally Contracts.

The consideration set forth above and the rights and obligations accorded elsewhere in this Plan to Ally shall constitute the compromise and settlement under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code in exchange for the consideration provided by Ally, and shall further constitute the Bankruptcy Court's finding that such consideration to Ally is: (1) in exchange for the good, valuable and substantial consideration from the Ally Released Parties; (2) in the best interests of the Debtors, the Estates, the Liquidating Trust and all holders of Claims and Equity Interests; (3) a good faith settlement and compromise of the claims released under the Plan; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for a hearing; (6) justified by truly unusual circumstances; (7) an essential component and critical to the success of the Plan; (8) resulting in distributions to the creditors that would otherwise have been unavailable; (9) the result of an identity of interest between the Debtors and the Ally Released Parties regarding the Plan; and (10) a bar to the Debtors, the Liquidating Trust, in the case of the Debtor Releases, and any party asserting a claim or cause of action released against any of the Ally Released Parties in connection with the Third Party Release.

## C.    RMBS Settlement

Entry of the Confirmation Order, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of the RMBS Settlement, on terms set forth herein. The Global Settlement constitutes a good faith compromise and settlement of all

objections to the Original RMBS Settlement Agreements by the Creditors' Committee and Consenting Claimants, as applicable, and all such objections shall be deemed withdrawn with prejudice upon entry of the Confirmation Order.

**1.**    _Modification of Original RMBS Settlement Agreements_.    The Original RMBS Settlement Agreements are hereby expanded to include all RMBS Trusts holding RMBS Trust Claims and are otherwise modified as set forth herein.

**2.**    _Allowance of RMBS Trust Claims and Distribution of Units to the RMBS Claims Trust for the benefit of the RMBS Trusts_.

(a)    Entry of the Confirmation Order shall constitute approval of the Allowed amount of the RMBS Trust Claims as non-subordinated Unsecured Claims, subject only to the Allowed Fee Claim, in the aggregate amounts of (i) $209.8 million against the GMACM Debtors; (ii) $7,091.2 million against the RFC Debtors; and (iii) $0 against the ResCap Debtors. On account of the Allowed RMBS Trust Claims, the RMBS Claims Trust shall receive (i) its Pro Rata Share of the GMACM Debtors Unit Distribution (the "GMACM Pool") and (ii) its Pro Rata Share of the RFC Debtors Unit Distribution (the "RFC Pool"), provided, however, 5.7% of the Allowed RMBS Trust Claims, including the Units to be distributed on account thereof (and any Distributable Cash thereon), shall be directly allocated to counsel for the Institutional Investors, without conveyance to the RMBS Claims Trust, the RMBS Trustees, or the RMBS Trusts, as the Allowed Fee Claim, in accordance with Article IV.C.6 of this Plan.

(b)    Notwithstanding anything to the contrary contained in the Plan, including but not limited to the approval of the Allowed amounts of the Claims held by RMBS Trust against the GMACM Debtors, the RFC Debtors and the ResCap Debtors described in the preceding paragraph,  the Units distributed to the RMBS Claims Trust shall be reallocated in accordance with Section 3 below.

**3.**    _RMBS Trust Allocation Protocol._ The Units distributed to the RMBS Claims Trust, pursuant to Article IV.C.2(a) shall be re-allocated between the GMACM Pool and the RFC Pool as provided in subparagraph (b) below, and subsequent distributions from the RMBS Claims Trust of such Units or Distributable Cash received from the Liquidating Trust as distributions on such Units, as so reallocated, shall be made to the RMBS Trusts pursuant to subparagraphs (c) and (d) below. In no event shall the provisions of this paragraph 3 entitle the RMBS Claims Trust to a distribution any more or any less than the Units described in Article IV.C.2(a), Article III or other applicable provisions of the Plan.

(a)    _Recognized RMBS Trust Claims._

(i)    **Recognized Cure Claims**. For each RMBS Trust whose Servicing Agreement was assumed by the applicable Debtor, the Recognized cure claims for servicing damages against any of the GMACM Debtors are listed on Schedule 1-G (the "GMACM Recognized Cure Claims") and the Recognized Cure Claims for Servicing Damages against any of the RFC Debtors are listed on Schedule 1-R (the "RFC Recognized Cure Claims", together with the GMACM Recognized

59

Cure Claims, the "<u>Recognized Cure Claims</u>"). The Recognized Cure Claims do not include servicing damage claims arising under any Servicing Agreement that was not assumed by the applicable Debtor by the Effective Date pursuant to a Final Order, for any reason, including the following: (a) prior to the Petition Date, the applicable Debtors transferred all of its servicing obligations for the RMBS Trust to a non-Debtor servicer; (b) prior to the Petition Date, the applicable Debtor ceased servicing all mortgage loans in the RMBS Trust, either because the RMBS Trust was wound up or otherwise; or (c) after the Petition Date, the applicable Debtor chose not to assume the Servicing Agreement.

(ii)     **Recognized R+W Claims**

(1)    *Recognized Original R+W Claims.* For each of the Original Settling RMBS Trusts, the Recognized R+W Claims against GMACM are listed on Schedule 2-G (the "<u>GMACM Recognized Original R+W Claims</u>") and the Recognized R+W claims against RFC are listed on Schedule 2-R (the "<u>RFC Recognized Original R+W Claims</u>," together with the GMACM Recognized Original R+W Claims, the "<u>Recognized Original R+W Claims</u>").

(2)    *Recognized Additional R+W Claims.* For each of the Additional Settling RMBS Trusts, the Recognized R+W Claims against GMACM are listed on Schedule 3-G (the "<u>GMACM Recognized Additional R+W Claims</u>") and the Recognized R+W Claims against RFC are listed on Schedule 3-R (the "<u>RFC Recognized Additional R+W Claims</u>," together with the GMACM Recognized Additional R+W Claims, the "<u>Recognized Additional R+W Claims</u>").

(iii)    **Recognized Unsecured Servicing Claims**. For each RMBS Trust whose Servicing Agreement was not assumed by the applicable Debtor by the Effective Date pursuant to a Final Order, the Recognized Unsecured Claims for servicing damages against GMACM are listed on Schedule 4-G (the "<u>GMACM Recognized Unsecured Servicing Claims</u>"), and the Recognized Unsecured Claims for servicing damages against RFC are listed on Schedule 4-R (the "<u>RFC Recognized Unsecured Servicing Claim</u>," together with the GMACM Recognized Unsecured Servicing Claim, the "<u>Recognized Unsecured Servicing Claims</u>").

(iv)    **Effect of Monoline Insurance on Recognized Claims.** If an RMBS Trust (i) is an Insured RMBS Trust and (ii) has made policy claims against its Monoline and as of the Effective Date has received full payment of such claims, the Recognized Claim of such RMBS Trust

60

will be set to zero, unless (a) such Insured RMBS Trust is one for which the sum of the net unreimbursed insurance payments, the accrued and unpaid losses, and projected future policy payments is zero or close to zero, (b) such Insured RMBS Trust contains one or more unwrapped tranches of securities that rank senior or equal in priority to tranches insured by a Monoline, in which case the portion of such Insured RMBS Trust's Claims allocable to such unwrapped tranches shall not be set to zero (or, when applicable to the following sentence, shall not be reduced) and any distribution on such unwrapped tranches shall be allocable only to such unwrapped tranches, or (c) the RMBS Trustees, with the advice of Duff, reasonably determine that, based on a particular RMBS Trust's structure, it would be unfair or inequitable to set the Recognized Claim to zero or, when applicable to the following sentence, it would be unfair to reduce the Recognized Claim (each of (a), (b) or (c), an "Insured Exception"), in each case as determined by Duff. If an RMBS Trust (i) is an Insured RMBS Trust and (ii) has made policy claims against its Monoline and, as of the Effective Date has not received full payment of such claims, the Recognized Claims of such RMBS Trusts will be reduced to take into account the value of partial payments made (or expected to be made) by such Monoline, if any, on such claims, unless an Insured Exception applies as determined by Duff as of the Effective Date.

(v)    **Necessity of a Timely Filed Proof of Claim**. An RMBS Trust will not have any Recognized Claim unless a Proof of Claims asserting an RMBS R+W Claim or an RMBS Cure Claim, as applicable, was timely filed for that RMBS Trust.

(b)    _Reallocation of Units from the RFC Pool to the GMACM Pool_. The number of Units distributed to the GMACM Pool and the RFC Pool is a function of the approval of the Allowed Amounts of the Unsecured Claims held by the RMBS Trusts against the Debtor Groups as provided in Article IV.C.3(a), but, as an integral part of the RMBS Settlement, the Units to be held in the GMACM Pool and the RFC Pool shall be determined based on the amount of the GMACM Recognized Cure Claims, the RFC Recognized Cure Claims, the GMACM Recognized Original R+W Claims, the RFC Recognized Original R+W Claims, the GMACM Recognized Additional R+W Claims, the RFC Recognized Additional R+W Claims, the GMACM Recognized Servicing Claims and the RFC Recognized Servicing Claims. Based on calculations prepared by Duff (taking into account the allocation of the Allowed Fee Claim), 2,949,494 Units[3] (together with any cash distributions, if any, on such Units made prior to the reallocation of Units contemplated by this paragraph) shall be moved from the RFC Pool to the GMACM Pool.

(c)    _Allocations of Units in the GMACM Pool to RMBS Trusts with Recognized Claims against GMACM_. For purposes of allocations of Units held in the GMACM Pool to

---

[3] Subject to adjustment after the Unit Issuance Percentages are adjusted as contemplated by Art. IV.K.

RMBS Trusts having Recognized Claims against GMACM, Duff shall calculate the aggregate value of each such RMBS Trust's Recognized Claims as of the Effective Date as follows: (i) GMACM Recognized Cure Claims shall be valued at 100% of the GMACM Recognized Cure Claims, if any, for such RMBS Trust shown on the applicable RMBS Trust Claims Schedules; (ii) GMACM Recognized Original R+W Claims, GMACM Recognized Additional R+W Claims and GMACM Recognized Unsecured Servicing Claims of such RMBS Trust, if any, will be valued at 16.7%[4] of the GMACM Recognized Original R+W Claims, GMACM Recognized Additional R+W Claims, and GMACM Recognized Unsecured Servicing Claims shown on the applicable RMBS Trust Claims Schedules; and (iii) the values so calculated will be summed for each such RMBS Trust (the "GMACM Weighted Claim"). All distributions from the RMBS Claims Trust from the GMACM Pool to RMBS Trusts with Recognized Claims against GMACM will be based on the percentage that such RMBS Trust's GMACM Weighted Claim has to the total of all of the GMACM Weighted Claims.

(d)    *Allocations of Units in the RFC Pool to RMBS Trusts with Recognized Claims against RFC.*  For purposes of allocations of Units held in the RFC Pool to RMBS Trusts having Recognized Claims against RFC, Duff shall calculate the aggregate value of each such RMBS Trust's Recognized Claims as of the Effective Date as follows: (i) RFC Recognized Cure Claims shall be valued at 100% of the RFC Recognized Cure Claims, if any, for such RMBS Trust shown on the applicable RMBS Trust Claims Schedules, (ii) RFC Recognized Original R+W Claims, RFC Recognized Additional R+W Claims and RFC Recognized Unsecured Servicing Claims of such RMBS Trust, if any, will be valued at 5.34%[5] of the RFC Recognized Original R+W Claims, RFC Recognized Additional R+W Claims, and RFC Recognized Unsecured Servicing Claims shown on the applicable RMBS Trust Claims Schedules, and (iii) the values so calculated will be summed for each such RMBS Trust (the "RFC Weighted Claim"). All distributions from the RMBS Claims Trust from the RFC Pool to RMBS Trusts with Recognized Claims against RFC will be based on the percentage that such RMBS Trust's RFC Weighted Claim has to the total of all of the RFC Weighted Claims.

(e)    *Distributions as Subsequent Recoveries*. All distributions from the GMACM Pool or the RFC Pool on account of any Recognized RMBS Claim shall be treated as "Subsequent Recoveries," as that term is defined in the applicable governing agreement for that RMBS Trust; provided that if the governing agreement for a particular RMBS Trust does not include the term "Subsequent Recovery," the distribution resulting from any Recognized Claim shall be distributed as though it was unscheduled principal available for distribution on that distribution date; provided, however, that should the Bankruptcy Court determine that a different treatment is required to conform the distributions to the requirements of the governing agreements, that determination shall govern and shall not constitute a material change to this Plan. Notwithstanding the forgoing or anything to the contrary in any governing agreement, no distributions from the GMACM Pool or the RFC Pool will be paid over to any Monoline.

**4.**    *Monoline Reservation*. Each Insured RMBS Trust shall retain the ability to enforce its rights, in the Bankruptcy Court or otherwise, against any Monoline (other than FGIC)

---

[4] Subject to adjustment after the Unit Issuance Percentages are adjusted as contemplated by Art. IV.K.

[5] Subject to adjustment after the Unit Issuance Percentages are adjusted as contemplated by Art. IV.K.

that does not, in the future, perform in accordance with an insurance policy for the benefit of that RMBS Trust.

5.    *RMBS Trustee Fees and Expenses*. In addition to distributions made on account of RMBS Trust Claims, the RMBS Trustees will be paid in full in Cash on the Effective Date for their reasonable pre- and post-petition fees and expenses, pursuant to the provisions of and subject to the procedures set forth in the *Final Supplemental Order (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses* [Docket No. 774], and the *Order under 11 U.S.C. §§ 105, 363, and 365, and Fed Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief* [Docket No. 2246] (the "Sale Order"), which provisions and procedures will also apply to HSBC.  The RMBS Trustees may be reimbursed for their reasonable fees and expenses associated with making distributions and taking other actions required under the Plan following the Effective Date in accordance with the provisions of the applicable pooling and servicing agreements, including but not limited to pooling and servicing agreements assumed by the Debtors and assigned to the purchaser/assignee of same.  For the avoidance of doubt, the foregoing shall not modify the terms of the Sale Order.

6.    *Allowed Fee Claim*. The Plan Supplement sets forth the stipulated amounts of the Allowed Fee Claim. On the Effective Date or as soon as practicable thereafter, the Liquidating Trust shall distribute Units on account of the Allowed Fee Claim to counsel for the Institutional Investors.  For the avoidance of doubt, the amount of the Allowed Fee Claim shall reduce the total Units (and Cash distributed thereon) by the Liquidating Trust on account of RMBS Trust Claims to the RMBS Claims Trust, and shall have no impact on any other party entitled to a distribution under this Plan. The Allowed Fee Claim payable to counsel for the Institutional Investors may be reduced to separate claim stipulations for the convenience of the parties subject to the terms of the Plan.

7.    *Affirmative Findings*. The Confirmation Order shall include affirmative findings that the Plan, including the RMBS Settlement and the FGIC Settlement Agreement, is in the best interests of Investors, that the RMBS Trustees acted in good faith and in the best interests of the Investors in entering into the Plan Support Agreement and performing their obligations thereunder, including voting for the Plan, provided, however, the Confirmation Order shall provide that such findings shall be binding solely in connection with the RMBS Trustees, the RMBS Trusts (including the Investors in the RMBS of such RMBS Trusts), and the actions of the RMBS Trusts and the RMBS Trustees with respect to the Plan Support Agreement and the Plan, including the RMBS Settlement, and the FGIC Settlement Agreement.

8.    *Continuation of Governing Agreements*.  Except with respect to the Debtors and the Liquidating Trust, all agreements, indentures, pooling and servicing agreements and other documents governing the RMBS Trusts shall remain in full force and effect in accordance with

their terms and conditions, except (i) to the extent modified by consent in connection with any assumption and assignment thereof or (ii) as specifically provided in Article IV.C.3.e above.

**D.  Settlement of Monoline Claims.**

**1.** *MBIA Settlement.* Entry of the Confirmation Order, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of Allowed non-subordinated General Unsecured Claims held by MBIA in the amount of $719 million against the ResCap Debtors, $1,450 million against the GMACM Debtors, and $1,450 million against the RFC Debtors. In full and final satisfaction of MBIA's General Unsecured Claims against the Debtors, MBIA shall receive on account of its Allowed General Unsecured Claims (i) its Pro Rata Share of the GMACM Debtors Unit Distribution, (ii) its Pro Rata Share of the RFC Debtors Unit Distribution, and (iii) its Pro Rata Share of the ResCap Debtors Unit Distribution, as applicable.

**2.** *FGIC Settlement.* As a condition precedent to Plan Consummation, the Bankruptcy Court and the FGIC Rehabilitation Court each shall have approved, by no later than September 16, 2013, the FGIC Settlement Agreement, which governs the amount and priority of the General Unsecured Claims held by FGIC. Entry of an order substantially in the form attached to the FGIC Settlement Agreement as Exhibit D (or such other form as agreed to by FGIC, the Debtors, the RMBS Trustees, and counsel for the Institutional Investors), pursuant to Bankruptcy Rule 9019, shall constitute approval, among other things, of the minimum Allowed non-subordinated General Unsecured Claim amounts as set forth therein. Entry of the Confirmation Order pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of Allowed non-subordinated General Unsecured Claims held by FGIC in the amount of $337.5 million against the ResCap Debtors, $181.5 million against the GMACM Debtors, and $415.0 million against the RFC Debtors, as implemented by the Plan. In full and final satisfaction of FGIC's General Unsecured Claims against the Debtors, FGIC shall receive on account of its Allowed General Unsecured Claims: (i) its Pro Rata Share of the GMACM Debtors Unit Distribution, (ii) its Pro Rata Share of the RFC Debtors Unit Distribution, and (iii) its Pro Rata Share of the ResCap Debtors Unit Distribution, as applicable.

**3.** *Assured Settlement.* Entry of the Confirmation Order, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of Allowed non-subordinated General Unsecured Claims held by Assured in the amount of $88,868,346 against the GMACM Debtors and $57,950,560 against the RFC Debtors. In full and final satisfaction of Assured's General Unsecured Claims against the Debtors, Assured shall receive on account of its Allowed General Unsecured Claims: (i) its Pro Rata Share of the GMACM Debtors Unit Distribution, and (ii) its Pro Rata Share of the RFC Debtors Unit Distribution, as applicable.

**4.** *Ambac Settlement.* Subject to Bankruptcy Court approval of the Ambac Cure Stipulation, entry of the Confirmation Order, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of Allowed non-subordinated General Unsecured Claims held by Ambac in the amount of $207,315,815 against the GMACM Debtors and $22,800,000 against the RFC Debtors. In full and final satisfaction of Ambac's General Unsecured Claims against the Debtors, Ambac shall receive on account of its Allowed General

Unsecured Claims: (i) its Pro Rata Share of the GMACM Debtors Unit Distribution, and (ii) its Pro Rata Share of the RFC Debtors Unit Distribution, as applicable.

**E.      Private Securities Claims Trust**

The Private Securities Claims Trust shall be established for the sole benefit of the holders of Allowed Private Securities Claims, and shall be funded on the Effective Date with the Private Securities Claims Trust Unit Distribution. The Private Securities Claims Trust shall be administered by the Private Securities Claims Trustee, who shall distribute to holders of Allowed Private Securities Claims in accordance with the Private Securities Claims Trust Agreement (a) the Cash distributed by the Liquidating Trust in respect of the Units allocated to the Private Securities Claims Trust to holders of Allowed Private Securities Claims, or (b) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution.

**1.**      _Private Securities Claims Trust Agreement_. On or before the Effective Date, the Private Securities Claims Trust Agreement, in a form reasonably acceptable to the Plan Proponents, Ally and the Settling Private Securities Claimants, each in their individual capacity, shall be executed, and all other necessary steps shall be taken to establish the Private Securities Claims Trust and the interests therein, which shall be for the benefit of the holders of Allowed Private Securities Claims. The Private Securities Claims Trust Agreement shall provide for the distribution of the Private Securities Trust Assets in accordance with the allocation agreement, executed by each of the Private Securities Claimants.

**2.**      _Purpose of the Private Securities Claims Trust._ The Private Securities Claims Trust shall be established to perform the following duties, to the extent necessary: (i) directing the processing, liquidation and payment of the Allowed Private Securities Claims in accordance with the Plan; and (ii) preserving, holding, and managing the assets of the Private Securities Claims Trust for use in paying and satisfying Allowed Private Securities Claims. The Private Securities Claims Trust Agreement shall include, among other things: (i) the terms, methodology, criteria, and procedures for distributing either (a) the Cash distributed by the Liquidating Trust in respect of the Units allocated to the Private Securities Claims Trust to holders of Allowed Private Securities Claims, or (b) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution; and (ii) to the extent necessary, the establishment of appropriate disputed claims reserves.

**3.**      _Private Securities Claimants to Forego Other Recoveries_. In consideration of the Private Securities Claims Trust Unit Distribution transferred to the Private Securities Claims Trust and in furtherance of the purposes of the Private Securities Claims Trust and the Plan, the Private Securities Claimants shall agree to forego any other recovery from the Debtors or the Liquidating Trust in respect of the Private Securities Claims, and neither the Debtors, Ally, nor the Liquidating Trust shall have any further financial or other responsibility or liability therefor. Private Securities Claimants instead shall be entitled to receive their allocated share of either (a) the Cash available for distribution from the Private Securities Claims Trust in respect of the Private Securities Claims Trust Unit Distribution, or (b) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution, in

each case in accordance with the Private Securities Claims Trust Agreement, as their sole source of recovery in respect of the Private Securities Claims.

        **4.**     *Administration of the Private Securities Claims Trust*.  The Private Securities Claims Trust shall be administered by the Private Securities Claims Trustee.  For the avoidance of doubt, upon the Effective Date, the Private Securities Claims Trust shall be completely independent of the Liquidating Trust and the Liquidating Trust shall have no authority over the Private Securities Claims Trust.  One or more candidates for the Private Securities Claims Trustee shall be recommended on or before the Effective Date by the Settling Private Securities Claimants, in each of their individual capacities, and the Private Securities Claims Trustee will be designated with the consent of the Plan Proponents, which consent shall not be unreasonably withheld.

        **5.**     *Distributions to the Private Securities Claimants*.  To the extent the Private Securities Claims Trust holds the Units distributed by the Liquidating Trust, the Cash distributions received by the Private Securities Claims Trust in respect of the Units that it holds shall be distributed to holders of Allowed Private Securities Claims in accordance with the methodology, criteria and procedures established in the Private Securities Claims Trust Agreement. To the extent the Private Securities Claims Trust has distributed the Units that constitute the Private Securities Claims Trust Unit Distribution to Private Securities Claimants, the Liquidating Trust shall make Cash distributions directly to the Private Securities Claimants.

        **6.**     *Settlement of Allowed Claims of Settling Private Securities Claimants*. Entry of the Confirmation Order, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of the settlement of the Allowed Claim amounts for voting purposes of each of the Settling Private Securities Claimants as follows: AIG shall have an allowed claim of $1.168 billion for voting purposes, Allstate shall have an allowed claim of $140 million for voting purposes, MassMutual shall have an allowed claim of $218 million for voting purposes, and Prudential shall have an allowed claim of $227 million for voting purposes.

        **7.**     *Costs and Expenses of Private Securities Claims Trust*.  The reasonable costs and expenses of administering the Private Securities Claims Trust, including the reasonable fees and expenses of the Private Securities Claims Trustee and its retained professionals, shall be funded on the Effective Date as agreed to by the Plan Proponents and Consenting Claimants.

        **8.**     *Retention of Professionals by Private Securities Claims Trustee*. The Private Securities Claims Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Private Securities Claims Trustee on such terms as the Private Securities Claims Trustee deems appropriate without Bankruptcy Court approval, but subject to the terms and conditions provided for in the Private Securities Claims Trust Agreement.  The Private Securities Claims Trustee may retain professionals who represented parties in the Chapter 11 Cases, provided such retention is otherwise permissible under applicable law.

        **9.**     *Indemnification of the Private Securities Claims Trustee*.  The Private Securities Claims Trustee and its agents or professionals shall not be liable for any actions taken or omitted in its capacity as, or on behalf of, the Private Securities Claims Trustee or the Private Securities Claims Trust, except those acts arising out of its own willful misconduct, gross negligence, or

bad faith, and each shall be entitled to indemnification or reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Private Securities Claims Trustee except for any and all actions or inactions involving willful misconduct, gross negligence, or bad faith.  Any indemnification claim of the Private Securities Claims Trustee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the assets of the Private Securities Claims Trust and no recourse may be had to the Liquidating Trust, Ally, or the Debtors' Estates.  The Private Securities Claims Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

**F.      Borrower Claims Trust**

The Borrower Claims Trust shall be established for the sole benefit of the holders of Allowed Borrower Claims, and shall consist of the Borrower Claims Trust Assets. The Borrower Claims Trust shall be administered by the Borrower Claims Trustee, subject to oversight and supervision by the Borrower Claims Trust Committee, who shall administer and distribute the Borrower Claims Trust Assets to holders of Allowed Borrower Claims in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.  The Borrower Claims Trust shall be completely independent of the Liquidating Trust and the Liquidating Trustees shall have no authority over the Borrower Claim Trust or the Borrower Claims Trustee.

**1.**      *Borrower Claims Trust Agreement.* On or before the Effective Date, the Borrower Claims Trust Agreement, in a form reasonably acceptable to the Plan Proponents, Ally and the Kessler Class Claimants, shall be executed, and all other necessary steps shall be taken to establish the Borrower Claims Trust and the interests therein, which shall be for the benefit of the holders of Allowed Borrower Claims.  In the event of any conflict between the terms of the Plan with respect to the Borrower Claims Trust and the terms of the Borrower Claims Trust Agreement, the Borrower Claims Trust Agreement shall govern.  The Borrower Claims Trust Agreement includes: (i) participation and qualification criteria for holders of Borrower Claims to receive a distribution from the Borrower Claims Trust Assets, (ii) procedures for the prosecution and settlement of objections to Borrower Claims, including those previously filed by the Debtors or any other party, (iii) the establishment of reserves for Disputed Borrower Claims; and (iv) the establishment of procedures to resolve Disputed Borrower Claims, inclusive of any counterclaims or offsets in favor of the Debtors.

**2.**      *Purpose of the Borrower Claims Trust.* The Borrower Claims Trust shall be established to, among other things, (i) direct the processing, liquidation and payment of the Allowed Borrower Claims in accordance with the Plan, and the distribution procedures established under the Borrower Claims Trust Agreement, and (ii) preserve, hold, and manage the assets of the Borrower Claims Trust for use in satisfying Allowed Borrower Claims.

**3.**      *Assumption of Certain Liabilities by the Borrower Claims Trust.*  In consideration of the Borrower Claims Trust Assets transferred to the Borrower Claims Trust and in furtherance of the purposes of the Borrower Claims Trust and the Plan, the Borrower Claims Trust shall assume all liability for all Borrower Claims, and neither the Debtors, the Released Parties, nor the Liquidating Trust shall have any further financial or other responsibility or liability therefor.

4.      *Borrower Claims Trust Assets*.  The Borrower Claims Trust shall consist of the Borrower Claims Trust Assets and any other assets held from time to time incidental to the administration of the Borrower Claims Trust.  On the Effective Date, the Liquidating Trust, in its capacity as Disbursing Agent, shall fund the Borrower Claims Trust with the Cash portion of the Borrower Claims Trust Assets free and clear of all Liens, Claims, and encumbrances, except to the extent otherwise provided herein.

5.      *Administration of the Borrower Claims Trust*.  The Borrower Claims Trust shall be administered by the Borrower Claims Trustee subject to the supervision and oversight of the Borrower Claims Trust Committee.  The Borrower Claims Trustee will be designated by counsel for the Kessler Class Claimants with the consent of the Plan Proponents, which consent shall not be unreasonably withheld.

6.      *Distributions from the Borrower Claims Trust*.  It is the intention that distributions made from the Borrower Claims Trust on account of an Allowed Borrower Claim will be comparable to the recovery that the holder of an Allowed Claim in the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim, based on the value of the assets in the Liquidating Trust available for distribution to holders of Units as of the Effective Date (without in each case giving effect to any insurance proceeds, including proceeds from the GM Policies, that may be received in respect of certain of the Allowed Borrower Claims or to the time delay in receipt of distributions in respect of the Units issued by the Liquidating Trust).  For the avoidance of doubt, the comparable recovery percentages that the holder of an Allowed Claim in the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim shall be established once and finally for all  purposes, including for all future distributions by the Borrower Claims Trust, at the time of and in connection with the Borrower Trust True-Up and confirmation of the Plan, and neither the amount to be transferred to the Borrower Claims Trust nor the percentage distributions from the Borrower Claims Trust shall be adjusted following the Effective Date based on actual experience with respect to recoveries from the Liquidating Trust following the Effective Date of the Plan.

Except as otherwise provided herein or in the Kessler Settlement Agreement, to the extent a Borrower recovers insurance proceeds on account of all or some of an Allowed Borrower Claim, (i) if distributions on account of such Allowed Borrower Claim have not been made, the amount of such Allowed Borrower Claim shall be reduced to the extent paid by insurance proceeds, or (ii) if distributions on account of such Allowed Borrower Claim have been made, the Borrower shall be required to return an amount equal to all distributions received by the Borrower from the Borrower Claims Trust on account of such Allowed Borrower Claim multiplied by a fraction, the numerator of which is the amount of the insurance proceeds received and the denominator of which is the amount of its Allowed Borrower Claim.  Such Borrower shall thereafter continue to be entitled to its proportionate share of any future distribution from the Borrower Claims Trust.  For the avoidance of doubt, the Kessler Settlement Class shall continue to be entitled to its proportionate share of any such future distribution.  Any Borrower who recovers insurance proceeds on account of all or some of an Allowed Borrower Claim shall be required to notify the Borrower Claims Trustee of such recovery within ten (10) Business Days of receipt.

68

If any Borrower Claim constitutes, in whole or in part, a Consent Order Borrower Claim, the Allowed amount of such Borrower Claim shall be reduced to the extent paid pursuant to the Consent Order or any settlement of the Debtors' obligations thereunder, without further order of the Bankruptcy Court.

7.      *U.S. Federal Income Tax Treatment of Borrower Claims Trust*. All parties (including, without limitation, the Debtors, the Borrower Claims Trustee, and the holders of Borrower Claims) shall treat the Borrower Claims Trust as a "qualified settlement fund" within the meaning of section 468B of the Tax Code and the Treasury Regulations thereunder.

8.      *Dissolution of the Borrower Claims Trust*.  The Borrower Claims Trustee and the Borrower Claims Trust shall be discharged or dissolved, as applicable, at such time as (i) all Borrower Claims have been resolved by Final Order, written agreement, or pursuant to the Plan, and (ii) all distributions to be made by the Borrower Claims Trustee under the Plan and the Borrower Claims Trust Agreement have been made.  Any Cash or other remaining assets in the Borrower Claims Trust shall be transferred to the Liquidating Trust upon dissolution of the Borrower Claims Trust.

9.      *Costs and Expenses of Borrower Claims Trust*.  The reasonable costs and expenses of administering the Borrower Claims Trust, including the reasonable fees and expenses of the Borrower Claims Trustee and its retained professionals, shall be funded on the Effective Date as agreed to by the Plan Proponents and Consenting Claimants. Such costs shall not include fees and expenses incurred by the Kessler Class Claimants pursuit of GM Insurance Rights.

10.     *Retention of Professionals by Borrower Claims Trustee*. The Borrower Claims Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Borrower Claims Trustee on such terms as the Borrower Claims Trustee deems appropriate without Bankruptcy Court approval, but subject to the terms and conditions provided for in the Borrower Claims Trust Agreement.  The Borrower Claims Trustee may retain professionals who represented parties in the Chapter 11 Cases, provided such retention is otherwise permissible under applicable law.

11.     *Indemnification of the Borrower Claims Trustee and the Borrower Claims Trust Committee*.  The Borrower Claims Trustee and members of the Borrower Claims Trust Committee and their agents or professionals shall not be liable for any actions taken or omitted in its capacity as, or on behalf of, the Borrower Claims Trustee or the Borrower Claims Trust, except those acts arising out of its or their own willful misconduct, gross negligence, or bad faith, and each shall be entitled to indemnification or reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Borrower Claims Trust except for an action or inaction involving willful misconduct, gross negligence, or bad faith.  Any indemnification claim of the Borrower Claims Trustee and the Borrower Claims Trust Committee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the Borrower Claims Trust Assets and no recourse may be had to the Liquidating Trust, the Released Parties or any creditor in these Chapter 11 Cases. The Borrower Claims Trustee and the members of the Borrower Claims Trust Committee shall be entitled to rely, in good faith, on the advice of its retained professionals.

12.     *Borrower Claims Trustee as Estate Representative under 1123(b)(3)(B).*   The Borrower Claims Trustee is hereby appointed as the representative of the Estates with respect to Borrower-Related Causes of Action pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

## G.     Settlement of Claims of Kessler Class Claimants

1.     *Settlement of Allowed Amount of Kessler Class Claims.*   As provided in the Kessler Settlement Agreement**,** as one element of, and in consideration for, an overall negotiated settlement of numerous disputed claims and issues embodied in the Plan and subject to the entry of the Kessler Settlement Approval Orders, the Kessler Settlement Class shall receive the Allowed Kessler Claim against the RFC Debtors.   The sole source of recovery of the Allowed Kessler Claim shall be distributions from the Borrower Claims Trust and the GM Insurance Rights, and not from any other assets or property of the Released Parties, the Liquidating Trust, or the Private Securities Claims Trust.

2.     *Transfer of GM Insurance Rights.* Subject to entry of the Kessler Settlement Approval Orders, on the Effective Date, the Debtors shall, pursuant to section 1123(a)(5) of the Bankruptcy Code, convey, transfer, and assign the GM Insurance Rights under the GM Policies in accordance with the Kessler Settlement Agreement and the Kessler Settlement Approval Orders, to (i) the Kessler Settlement Class with respect to indemnity for the Allowed Kessler Claim, and (ii) except to the extent that any such GM Insurance Rights have been transferred by the Debtors to other creditors on or before the Effective Date, the Liquidating Trust with respect to any other GM Insurance Rights.   For the avoidance of doubt, the (i) rights of the Kessler Settlement Class in and to the GM Insurance Rights and proceeds thereof, and (ii) the rights of any other creditor who has received from the Debtors an assignment of GM Insurance Rights prior to the Effective Date, shall not be transferred to the Liquidating Trust and shall not constitute Available Assets.

3.     *Discovery of Additional Insurance Policies.* Subject to the entry of the Kessler Settlement Approval Orders, if, after the Effective Date, the Liquidating Trust discovers any additional insurance policies under which any of the Debtors are an insured and that provide coverage for the Debtors' liability to the Kessler Settlement Class, then the Liquidating Trust will assign to the Kessler Settlement Class the insurance rights under such policies with respect to the liability of the Debtors to the Kessler Settlement Class.

## H.     NJ Carpenters Claims Settlement

The NJ Carpenters Settlement, which is subject to the NJ Carpenters Approval, contemplates the payment of the NJ Carpenters Claims Distribution in settlement of the NJ Carpenters Claims, which amount shall be the sole source of recovery available in respect of the NJ Carpenters Claims.   If the NJ Carpenters Approval occurs, the NJ Carpenters Class Members shall be entitled to the NJ Carpenters Claims Distribution.   The NJ Carpenters Class Opt-Outs shall not receive any portion of the NJ Carpenters Claims Distributions and shall receive no consideration under the Plan other than in respect of their Allowed Claims against the Estates, which Claims shall be classified as General Unsecured Claims and may be subject to subordination.   The reasonable costs of class notice and administration shall be advanced by the Debtors prior to the Effective Date in accordance with applicable orders of

the Bankruptcy Court and District Court, which costs will be deducted from the NJ Carpenters Claims Distribution. Absent the NJ Carpenters Approval, the NJ Carpenters Class Members will not receive any portion of the NJ Carpenters Claims Distribution, and, to the extent any NJ Carpenters Class Members hold Allowed Claims, such Claims shall be classified as General Unsecured Claims, which claims may be subject to subordination.

**I.      Senior Unsecured Notes Settlement**

The Plan shall constitute a good faith compromise and settlement of claims that the Senior Unsecured Notes Indenture Trustee, on behalf of the Senior Unsecured Noteholders, has against the Ally Released Parties and any Debtor, both as described in the Disclosure Statement. Distributions to the Senior Unsecured Noteholders shall be carried out consistent with Article VII.G.1 of the Plan.

**J.      JSN Adversary Proceeding and FGIC Settlement Appeal**

On the Effective Date, all claims, counterclaims, and/or issues raised in the JSN Adversary Proceeding and the FGIC Settlement Appeal shall be automatically deemed finally and irrevocably settled by the Plan. Within five (5) days of entry of the Confirmation Order, (i) the parties to the JSN Adversary Proceeding shall execute, and within one (1) Business Day after the funding of the Junior Secured Notes Claims Distribution the plaintiffs in the JSN Adversary Proceeding shall file, a stipulation of dismissal in the JSN Adversary Proceeding; and (ii) the parties to the FGIC Settlement Appeal shall execute, and within one (1) Business Day after the funding of the Junior Secured Notes Claims Distribution the Ad Hoc Group shall file, a stipulation voluntarily dismissing the FGIC Settlement Appeal in accordance with Bankruptcy Rule 8001(c), in each of (i) and (ii) above, with prejudice and without costs awarded to any party.

**K.      Adjustment Mechanism**

The allocation of Units issuable pursuant to the Plan shall be determined in accordance with the following adjustment mechanism. Prior to the Initial Unit Distribution Date, a determination shall be made of the estimated amount of the General Unsecured Claims against each of the Debtor Groups that are Disputed Claims, in accordance with the provisions of Article VIII.D. Thereupon, the Unit Issuance Percentages shall be adjusted such that all holders of Allowed Unsecured Claims and the Private Securities Claims Trust shall share proportionately in the accretion or dilution of recoveries as a result of variances in the Allowed amounts of Unsecured Claims from the amounts set forth in the Disclosure Statement; and shall be further adjusted through an iterative mathematical process such that all holders of Allowed Unsecured Claims against a Debtor Group receive Units in the same ratio of number of Units to Allowed amount of Claim. For the purposes of this paragraph, "proportionately" means in proportion to the recovery of the holders of Unsecured Claims in the amounts set forth in the Disclosure Statement.

The Debtor Group Unit Distributions shall be determined based on the respective Unit Issuance Percentages, after adjustment, and shall include, with respect to each Debtor Group, the Units to be issued to holders of Allowed Unsecured Claims against that Debtor

Group as of the Initial Unit Distribution Record Date and the Units to be issued to the
Disputed Claims Reserve with respect to that Debtor Group.

**L.  Cancellation of Securities, Indentures, and Other Documents Evidencing Claims
and Equity Interests**

Subject to the assumption of Executory Contracts and Unexpired Leases as set forth
in the Plan, and except for purposes of evidencing a right to distributions under the Plan, on
the Effective Date, all notes, stock, instruments, certificates, indentures, guarantees, and
other documents or agreements evidencing a Claim against or Equity Interest in the Debtors
will be deemed automatically cancelled with respect to the Debtors and shall be of no
further force or effect as against the Debtors, whether such document is surrendered for
cancellation or not, and the obligations of Ally, the Debtors, or the Liquidating Trust,
thereunder or in any way related thereto will be discharged.

Notwithstanding anything to the contrary herein, the Senior Unsecured Notes
Indenture will continue in effect for the limited purposes of: (i) allowing the Senior
Unsecured Noteholders to receive distributions on account of their Senior Unsecured Notes
Claims, and (ii) allowing the Senior Unsecured Notes Indenture Trustee to make
distributions in accordance with the terms of the Plan, to fund the Senior Unsecured Notes
Indenture Trustee Reserve, and to exercise its Senior Unsecured Notes Indenture Trustee
Charging Lien against distributions under the Plan and against the Senior Unsecured Notes
Indenture Trustee Reserve for payment of Senior Unsecured Notes Indenture Trustee Fees
and Expenses.

Notwithstanding anything to the contrary herein, the First Priority Security Agreement
will continue in effect for the limited purposes of allowing the First Priority Collateral Agent to
exercise its First Priority Collateral Agent Lien for the payment of First Priority Collateral
Agent Fees and Expenses.

Notwithstanding anything to the contrary herein, all JSN Documents shall be deemed
automatically canceled and discharged on the Effective Date, provided, however, that the JSN
Documents shall continue in effect solely for the purposes of (i) allowing the holders of Junior
Secured Notes Claims to receive distributions on account of their Junior Secured Notes Claims
as provided in the Plan, (ii) allowing the Junior Secured Notes Indenture Trustee to make the
distributions to be made on account of the Junior Secured Notes Claims; and (iii) permitting the
Junior Secured Notes Indenture Trustee to assert its Junior Secured Notes Indenture Trustee
Charging Lien against such distributions for payment of the Junior Secured Notes Indenture
Trustee Fees and the Junior Secured Notes Collateral Agent Fees and Expenses.

**M.  Treatment of Intercreditor Agreement**

The Intercreditor Agreement shall be deemed automatically cancelled and discharged
upon the Effective Date.  Upon the occurrence of the Effective Date, no Ally Party shall be
entitled to receive any portion of the Junior Secured Notes Distribution and no Person may
directly or indirectly interfere in any manner with the distribution of the Junior Secured

Notes Distribution to the Junior Secured Noteholders in accordance with Article VII.G.1 hereof.

## N.    Compensation Order

Notwithstanding anything herein to the contrary, following the Effective Date, Ally and the Liquidating Trust shall continue to comply with their respective obligations under the Compensation Order.

## O.    Corporate Action

Except as otherwise provided in the Plan, the corporate or related actions to be taken by or required of the Debtors in connection with each matter provided for by the Plan shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by holders of Claims or Equity Interests, directors of the Debtors, or any other Entity. On or prior to the Effective Date, the appropriate officers of the Debtors shall be authorized and directed to issue, execute, and deliver the agreements, securities, instruments, or other documents contemplated by the Plan, or necessary or desirable to effect the transactions contemplated by the Plan, in the name of and on behalf of the Debtors, prior to the Effective Date, or the Liquidating Trust, following the Effective Date. Notwithstanding any requirements under nonbankruptcy law, the authorizations and approvals contemplated by this provision shall be effective.

On the Effective Date, upon the appointment of the Liquidating Trust Board, the persons acting as directors, managers, and officers of the Debtors prior to the Effective Date as the case may be, will be released from all further authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors or the Chapter 11 Cases, including, for the avoidance of doubt, the continuing obligations related to the DOJ/AG Settlement.  Upon such release and discharge, the Liquidating Trust Board will be charged with the authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors and these Chapter 11 Cases, except to the extent such authority, duties, responsibilities, and obligations are to be undertaken by the Private Securities Claims Trustee, the RMBS Claims Trust Trustees, the Borrower Claims Trustee, or, with respect to the NJ Carpenters Claims Distribution, in each case as provided in the Plan.

## P.    Dissolution of the Debtors

On and after the Effective Date, the Liquidating Trust Board shall be authorized, in its sole and absolute discretion, to take all actions reasonably necessary to manage or dissolve the Debtors and their subsidiaries, including the Non-Debtor Subsidiaries, under applicable laws, including the laws of the jurisdictions in which they may be organized or registered, notwithstanding any applicable consent requirements or other restrictions contained in any financing agreements or other debt documents to which any Debtor is a party, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation.  The Liquidating Trust Board

shall have no liability for using its discretion to dissolve or not dissolve any of the Debtors or their subsidiaries. Whether or not dissolved, the Debtors shall have no authorization to implement the provisions of this Plan from and after the Effective Date except as specifically provided otherwise in the Plan. Notwithstanding the foregoing, the Liquidating Trust Board shall not dissolve any Debtor to the extent such Debtor is required to hold Available Assets after the Effective Date pursuant to Article VI.C of the Plan, and any such Debtors shall be authorized to take such actions at the direction of the Liquidating Trust Board as may be necessary to implement the provisions of the Plan with respect to such Available Assets.

## Q.    Effectuating Documents; Further Transactions

On the Effective Date, the Liquidating Trust Board will be authorized to take any actions or effect transactions, including conversions, dissolutions, transfers, liquidations, or other corporate transactions, as may be determined by the Liquidating Trust Board to be necessary or appropriate to implement to terms of the Plan. After the Effective Date, the Liquidating Trust Board may utilize the aforementioned authority without any further notice to or action, order or approval of the Bankruptcy Court.

On and after the Effective Date, the Liquidating Trust Board, directly or acting through the Liquidating Trust Management, is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Plan Proponents, without the need for any approvals, authorizations, or consents, except for those expressly required by the Plan.

## R.    Exemption from Certain Taxes and Fees

Pursuant to Bankruptcy Code section 1146(a), any transfers of property pursuant to the Plan shall not be subject to any stamp, real estate transfer, mortgage reporting, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

## S.    Preservation of Causes of Action

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan (including pursuant to the Plan Support Agreement), or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Borrower Claims Trust with respect to Borrower-Related Causes of Action, and the Liquidating Trust with respect to all other Causes of Action, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors or the Debtors' Estates, whether arising before or after the Petition Date, including, without limitation, any Causes of Action specifically enumerated in the Plan Supplement, and the Liquidating Trust's and Borrower Claims Trust's respective rights to

commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Liquidating Trust and the Borrower Claims Trust may pursue their respective Causes of Action, as appropriate, in accordance with the best interests of the respective Trust. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Liquidating Trust or Borrower Claims Trust, as the case may be, will not pursue any and all available Causes of Action against such Entity. The Liquidating Trust and the Borrower Claims Trust expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Liquidating Trust expressly reserves all Causes of Action other than Borrower-Related Causes of Action, and the Borrower Claims Trust expressly reserves all Borrower-Related Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, the Plan does not release any Causes of Action that the Plan Proponents or the Liquidating Trust or Borrower Claims Trust have or may have now or in the future against any Entity other than the Released Parties (and only in their capacity as Released Parties). The Liquidating Trustees and the Borrower Claims Trustee, as applicable, are deemed representatives of the Estates for the purpose of prosecuting, as applicable, the Liquidating Trust Causes of Action, Borrower-Related Causes of Action and any objections to Claims pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

Except as otherwise provided in the Plan or in a Final Order, the Liquidating Trust reserves and shall retain Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors may hold against any Entity that is not released under the Plan or a separate settlement approved by Final Order shall vest in the Borrower Claims Trust with respect to Borrower-Related Causes of Action and in the Liquidating Trust with respect to all other Causes of Action. The Liquidating Trust and Borrower Claims Trust, as the case may be, through their respective authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Liquidating Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action other than Borrower-Related Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court. The Borrower Claims Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Borrower-Related Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

75

# ARTICLE V.

## TREATMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES

**A.     Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously assumed shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (i) is expressly identified on the Assumption Schedule; (ii) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; or (iv) is otherwise assumed pursuant to the terms herein.  The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, including any Executory Contracts or Unexpired Leases rejected or deemed rejected under the Plan, must be Filed in accordance with the procedures set forth in the Bar Date Order by the Rejection Damages Claim Bar Date or such Claims will be automatically disallowed, forever barred from assertion, and shall be unenforceable against the Debtors, the Liquidating Trust, or their assets or properties without the need for any objection by the Liquidating Trust or further notice to, or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases will be classified as General Unsecured Claims against the applicable Debtor Groups and treated in accordance with the terms of Article III. The deadline to object to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, shall be the Claims Objection Deadline.

**B.     Assumption of Executory Contracts and Unexpired Leases**

The Debtors will file the Assumption Schedule with the Bankruptcy Court at least twenty-one (21) days before the commencement of the Confirmation Hearing.  The Assumption Schedule will include (a) the name of the non-Debtor counterparty, (b) the legal description of the Executory Contract or Unexpired Lease to be assumed, and (c) the proposed amount to be paid on account of an associated Cure Claim, if any.  On or as soon as practicable thereafter, the Debtors will serve a notice of filing of the Assumption Schedule upon each non-Debtor counterparty listed thereon that will describe the procedures by which such parties may object to the proposed assumption of their respective Executory Contract or Unexpired Lease or the proposed Cure Claim amount, and explain how such disputes will be resolved by the Bankruptcy Court if the parties are not able to resolve a dispute consensually.  Objections, if any, to the proposed assumption and/or Cure Claim must be filed with the Bankruptcy Court and served so as to be actually received by the Debtors no later than fourteen (14) days from the date of filing the Assumption Schedule.  Any non-Debtor counterparty to an Executory Contract or

Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim amount will be deemed to have assented to such assumption or Cure Claim amount.

If an objection to the proposed Cure Claim is sustained by the Bankruptcy Court, the Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it on proper notice to the non-Debtor counterparty thereto, which non-Debtor counterparties shall then be entitled to file Proofs of Claim asserting Claims arising from the rejection thereof, if applicable, in accordance with the terms of the Plan and the Bar Date Order.

The Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, may settle any dispute on the amount of a Cure Claim without further notice to any party or action, approval, or order of the Bankruptcy Court.  If the Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, object to any request for payment of a Cure Claim, the Bankruptcy Court shall determine the Allowed amount of such Cure Claim and any related issues.  Unless the parties to the Executory Contract or Unexpired Lease agree otherwise, all disputed defaults that are required to be cured shall be cured by the later of (i) ten (10) days after entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto and (ii) the Effective Date.  The Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease no later than thirty (30) days after a Final Order determining a Cure Claim greater than that proposed by the Debtors.

**ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE OF THE DEBTORS OR THE LIQUIDATING TRUST ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT**.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan or each Debtor's Schedules, shall constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease capable of assumption, that any Debtor has any liability thereunder or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement.  Further, the Plan Proponents expressly may (a) remove any Executory Contract or Unexpired Lease from the Assumption Schedule and reject an Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Effective Date and (b) contest

any Claim (or cure amount) asserted in connection with assumption of any Executory Contract or Unexpired Lease.

The assumption of Executory Contracts and Unexpired Leases under the Plan shall include the vesting of such contracts in the Liquidating Trust. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and vesting.

In the event a written objection is filed with the Bankruptcy Court as to whether a contract or lease is executory or unexpired, the right of the Plan Proponents to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired, in which case the deemed assumptions and rejections provided for in the Plan shall not apply to such contract or lease.

## C. Contracts and Leases Entered Into After the Petition Date

Counterparties to contracts and leases entered into after the Petition Date by a Debtor, including any Executory Contract or Unexpired Lease assumed by a Debtor, must File a proof of claim for an Administrative Claim against the appropriate Debtor by the Administrative Claims Bar Date or have their rights with respect to such Administrative Claims forever waived and released; provided that this provision shall not apply to any Ally Contract Claims. Executory Contracts and Unexpired Leases entered into after the Petition Date by any Debtor will vest in the Liquidating Trust. Accordingly, the Liquidating Trust shall be deemed a successor in interest to the Debtors under, and a beneficiary of, such contracts and unexpired leases, and any rights, obligations and benefits thereunder shall be transferred to the Liquidating Trust.

## D. Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such Executory Contract or Unexpired Lease. Notwithstanding any applicable non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a non-Debtor party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors from non-Debtor parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall vest in the Liquidating Trust as of the Effective Date.

## E. Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request, pursuant to Bankruptcy Code section 365(d)(4), to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases.

### F.    No Change in Control

The consummation of the Plan or the assumption of any Executory Contract or Unexpired Lease is not intended to, and shall not, constitute a change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing agreement, Executory Contract or Unexpired Lease or contract, lease or agreement in existence on the Effective Date to which a Debtor is a party.

## ARTICLE VI.

## THE LIQUIDATING TRUST

### A.    Generally; Creation and Conversion

The powers, authority, responsibilities, and duties of the Liquidating Trust are set forth in and will be governed by the Liquidating Trust Agreement, the form of which shall be included in the Plan Supplement.  The Liquidating Trust shall be a representative of the Estates pursuant to section 1123(b)(3)(B).

A predecessor to the Liquidating Trust was initially formed pursuant to a Declaration of Trust as a common law trust under the laws of the State of Delaware.  On or prior to the Effective Date, the Delaware Trustee will file a Certificate of Conversion and a Certificate of Trust in accordance with the Delaware Statutory Trust Act to convert the initial trust to a Delaware statutory trust that will constitute the Liquidating Trust under the Plan.

### B.    Purpose of the Liquidating Trust

The Liquidating Trust shall be established for the purpose of liquidating and distributing the Liquidating Trust Assets in accordance with Treasury Regulations Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose described in this Plan and set forth in the Liquidating Trust Agreement. The Liquidating Trust, acting through the Liquidating Trust Board, Liquidating Trust Management, and their agents, shall wind down the affairs of the Debtors and perform the assumed obligations under the DOJ/AG Settlement, Consent Order, and Order of Assessment in accordance with the terms of the Plan.

### C.    Transfer of Assets to the Liquidating Trust

On the Effective Date, the Debtors are authorized and directed to transfer, grant, assign, convey, set over, and deliver to the Liquidating Trustees, for the benefit of the Liquidating Trust, in the form thereof existing on such date, all of the Debtors' and Estates' right, title and interest in and to the Available Assets free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons and Entities to the maximum extent contemplated by and permissible under section 1141 of the Bankruptcy Code.

Notwithstanding the foregoing, (i) if on the Effective Date, any of the Available Assets cannot be transferred to the Liquidating Trust or it is deemed impractical or inadvisable to do so, as determined by the Liquidating Trust Manager, the Debtors shall continue to hold such

Available Assets, as bailee for the account of the Liquidating Trust, until such time as the Liquidating Trust may receive such Available Assets (and any proceeds of such assets retained by the Debtors shall constitute Available Assets) and (ii) subject to the entry of the Kessler Settlement Approval Order, the GM Insurance Rights to be assigned to the Kessler Settlement Class or any other GM Insurance Rights that are assigned to any other Creditor pursuant to order of the Bankruptcy Court prior to or at Confirmation, shall be excluded from the Available Assets assigned to the Liquidating Trust.

The Debtors and the Liquidating Trust, as successor in interest to the Estates, may (i) execute and deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed), and (ii) take, or cause to be taken, all such further action in order to evidence, vest, perfect or effectuate the transfer of the Available Assets to the Liquidating Trust and consummate transactions contemplated by and to otherwise carry out the intent of the Plan. Upon the transfer of the Available Assets, the Liquidating Trust shall succeed to all of the Debtors' right, title and interest in the Available Assets, and the Debtors will have no further rights or interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

**D.      Liquidating Trust Expenses Set Aside and Administrative, Priority, Secured and Convenience Distribution Reserve**

The Liquidating Trust Expenses Set Aside shall be established on the Effective Date for the purpose of maintaining Cash from time to time necessary, subject to the Liquidating Trust Budget, to satisfy reasonable costs and expenses of the Liquidating Trust and other obligations incurred or reasonably anticipated by the Liquidating Trust in accordance with the Plan Documents, including, without limitation, fees and costs incurred in connection with (i) the implementation of the Plan, including to the extent not paid on the Effective Date, funds for making the payments provided in Article VII.B, (ii) the liquidation of the Liquidating Trust Assets, (iii) the resolution of Disputed Claims, and other Causes of Action, (iv) the winding down of the Estate and affairs of the Debtors, (v) the costs of performing under the DOJ/AG Settlement, (vi) the reserves for potential liabilities and (vii) compensation for the Liquidating Trust Board, Liquidating Trust Management, and the employees, professionals, advisors and other agents of the Liquidating Trust. In its discretion, the Liquidating Trust Board may reserve non-Cash assets in satisfaction of the aforesaid set-aside requirements, which non-Cash assets may be monetized from time to time and the Cash so realized included in the Liquidating Trust Expenses Set Aside, provided, however, that in connection with any such reservation of non-Cash assets, the Liquidating Trust Board shall give due consideration to the timing and amount of scheduled and anticipated payments and both the fair market value and the timing of monetization of such non-Cash assets, so as to enable the Liquidating Trust to pay its obligations as they become due. Any Cash released from the Liquidating Trust Expenses Set Aside shall be available for distribution to the Unitholders, and any other assets released from the Liquidating Trust Expenses Set Aside shall become general, unrestricted assets of the Liquidating Trust.

The Administrative, Priority, Secured and Convenience Distribution Reserve shall be established on the Effective Date for the purpose of maintaining Cash from time to time necessary to satisfy (i) Administrative Claims, Priority Tax Claims, Other Priority Claims, Other

Secured Claims and Junior Secured Notes Claims that are (a) Allowed as of the Effective Date but that cannot be paid on or promptly following the Effective Date, or (b) Disputed Claims as of the Effective Date but that may become Allowed after the Effective Date, (ii) Professional Claims that are Allowed or that may become Allowed on or after the Effective Date, and (iii) General Unsecured Convenience Claims that are Allowed or that may become Allowed on or after the Effective Date. In its discretion, the Liquidating Trust Board may reserve non-Cash assets in satisfaction of the aforesaid reserve requirements, which non-Cash assets may be monetized from time to time by the Administrative, Priority, Secured and Convenience Distribution Reserve, provided, however, that in connection with any such reservation of non-Cash assets, the Liquidating Trust Board shall give due consideration to the timing and amount of scheduled and anticipated payments and both the fair market value and the timing of monetization of such non-Cash assets, so as to enable the Liquidating Trust to pay its obligations as they become due. Any Cash released from the Administrative, Priority, Secured and Convenience Distribution Reserve shall be available for distribution to the Unitholders, and any other assets released from the Administrative, Priority, Secured and Convenience Distribution Reserve shall become general, unrestricted assets of the Liquidating Trust.

## E.    Liquidating Trust Governance

The affairs of the Liquidating Trust shall be managed by, or under the direction of, the Liquidating Trust Board, which shall consist of five (5) Liquidating Trustees, one of whom shall be selected by each of (i) MBIA, (ii) FGIC, (iii) the RMBS Trustees that are members of the Creditors' Committee, the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants, jointly, (iv) Paulson, and (v) the holders of Private Securities Claims, and such other Liquidating Trustees as agreed to by the Plan Proponents and the Consenting Claimants. The Liquidating Trust Board shall be authorized and empowered to undertake, acting through the management and agents of the Liquidating Trust, actions on behalf of the Liquidating Trust, including without limitation (i) to hold, manage, dispose and convert to Cash, the Liquidating Trust Assets, (ii) to maintain the Liquidating Trust Expenses Set Aside, the Disputed Claims Reserve, and the Administrative, Priority, Secured and Convenience Distribution Reserve, (iii) to appoint and supervise management and agents of the Trust and (iv) to prepare and review periodic financial reports of the Liquidating Trust.

The Liquidating Trust Board shall elect a Liquidating Trustee to act as the Chairman of the Liquidating Trust Board and may designate one or more committees of the Liquidating Trust Board. The Liquidating Trust Board shall appoint officers or other representative agents of the Liquidating Trust, including a Liquidating Trust manager and a secretary, to serve as the Liquidating Trust Management and carry out the purpose of the Liquidating Trust. The Liquidating Trust Management shall be authorized to hire employees and engage advisors and other professionals, subject to any limitations imposed by the Liquidating Trust Board.

## F.    Financial Statements/Reporting

The Liquidating Trust will provide or make available certain financial and other information, including annual and quarterly financial statements, and will also provide other information to the extent required to make the Units freely tradable in accordance with applicable securities laws.

## G.    Tax Treatment

### 1.    *In General*

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trust Board and the Unitholders) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as:

(a)    a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Unitholders, other than Liquidating Trust Assets that will be distributed pursuant to Article VII.B of the Plan or that are allocable to Disputed Claims (based on such Claims' Pro Rata Share of such Liquidating Trust Assets), followed by

(b)    the transfer by such Unitholders to the Liquidating Trust of such Liquidating Trust Assets in exchange for the Units.

Accordingly, those holders of Allowed Unsecured Claims receiving Units shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets (other than such Liquidating Trust Assets that will be distributed pursuant to Article VII.B of the Plan or that are allocable to Disputed Claims). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

### 2.    *Tax Reporting.*

(a)    The Liquidating Trust shall file returns treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Article VI.G.  The Liquidating Trust also shall annually send or otherwise make available to each holder of Units a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their U.S. federal income tax returns or to forward the appropriate information to their respective beneficial holders with instructions to report such items on their U.S. federal income tax returns.  The Liquidating Trust Board also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit.

(b)    As soon as possible after the Effective Date, the Liquidating Trust shall make a good-faith valuation of the Liquidating Trust Assets, and such valuation shall be made available from time to time, to the extent relevant, and shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trust, the holders of Allowed Unsecured Claims, and the Unitholders) for all U.S. federal income tax purposes.

(c)    Allocation of Liquidating Trust taxable income and loss among the Unitholders (other than taxable income and loss allocable to the Disputed Claims Reserve) shall be made pro rata to the Unitholders.

(d)    The Liquidating Trust shall (A) treat the Disputed Claims Reserve and Liquidating Trust Assets allocable thereto as a "disputed ownership fund" governed by Treasury

Regulation section 1.468B-9 by timely making an election and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

(e)  The Liquidating Trust shall be responsible for payment, out of the Liquidating Trust Assets, of any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets, including the Disputed Claims Reserve.  In the event, and to the extent, that any Cash retained on account of Disputed Claims of Liquidating Trust Unit Beneficiaries in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, such Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of such Disputed Claims or (ii) to the extent such Disputed Claims subsequently have been resolved, deducted from any amounts otherwise distributable as a result of the resolution of such Disputed Claims.

(f)  The Liquidating Trust may request an expedited determination of taxes of the Liquidating Trust, including the Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

## H.  Duration

The Liquidating Trust shall be dissolved as soon as practicable after the date that is the earliest to occur of: (i) the distribution of all Liquidating Trust Assets available for distribution pursuant to the Plan, (ii) the determination of the Liquidating Trust Board that the administration of the Liquidating Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit, or (iii) all the distributions required to be made by the Liquidating Trust have been completed; provided, however, that in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date, unless the Bankruptcy Court, upon motion within the six (6) months prior to the third (3rd) anniversary of the Effective Date (or within six (6) months prior to the end of an extension period), determines that a fixed-period extension is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets (without the need for a favorable private letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the trust as a Liquidating Trust for United States federal income tax purposes).

## I.  Conflicting Terms

To the extent that the terms of the Plan with respect to the Liquidating Trust are inconsistent with the terms set forth in the Liquidating Trust Agreement, then the terms of the Liquidating Trust Agreement shall govern.

## J.  Exculpation; Indemnification; Insurance

The Liquidating Trust Agreement shall provide for the following with respect to exculpation, indemnification, and insurance:

**1.**  None of the Delaware Trustee, the Liquidating Trustees, the Liquidating Trust Management or Liquidating Trust Agents, or their respective advisors or professionals, shall be liable to the Liquidating Trust or any Unitholder for any damages arising out of the

creation, operation or termination of the Liquidating Trust, including actions taken or omitted in fulfillment of his or her duties with respect to the Liquidating Trust, except in the case of such party's gross negligence, bad faith or willful misconduct; provided, that in no event will any such party be liable for punitive, exemplary, consequential or special damages under any circumstances. Furthermore, no Liquidating Trustee shall be liable to the Liquidating Trust or any Unitholder for any action taken in good faith reliance upon the advice of Liquidating Trust Management.

**2.** None of the Delaware Trustee, the Liquidating Trustees, the Liquidating Trust Management or the Liquidating Trust Agents, when acting in such capacities, shall be subject to any personal liability whatsoever, whether in tort, contract or otherwise, to any person, other than the Liquidating Trust or the Liquidating Trust Unit Beneficiaries, in connection with the affairs of the Liquidating Trust to the fullest extent provided under section 3803 of the Delaware Statutory Trust Act, and all persons claiming against any of the Delaware Trustee, the Liquidating Trustees, the Liquidating Trust Management or Liquidating Trust Agent, or otherwise asserting claims of any nature in connection with affairs of the Liquidating Trust, shall look solely to the Liquidating Trust Assets for satisfaction of any such claims.

**3.** The Liquidating Trust Board, the Delaware Trustee, the Liquidating Trust Management and their respective affiliates, and their respective officers, directors, partners, members, managers and employees shall be indemnified to the fullest extent permitted by law by the Liquidating Trust against all liabilities arising out of the creation, operation or termination of the Liquidating Trust, including actions taken or omitted in fulfillment of their duties with respect to the Liquidating Trust, except for those acts that are determined by Final Order to have arisen out of their own willful misconduct, gross negligence, or bad faith.

**4.** The Liquidating Trust will maintain customary insurance coverage for the protection of the Liquidating Trustees, the Delaware Trustee and the Liquidating Trust Management from and after the Effective Date.

## ARTICLE VII.

## PROVISIONS GOVERNING ISSUANCE OF UNITS AND OTHER DISTRIBUTIONS

### A. Applicability

The provisions of this Article VII shall govern distributions to the extent not otherwise provided for in the Plan or in any indenture, trust agreement or plan of allocation recognized under the Plan. To the extent the provisions of any such indenture, trust agreement or plan of allocation address specific matters set forth in this Article VII, the provision of such indenture, trust agreement or plan of allocation shall govern.

### B. Cash Distributions

1.    *Administrative, Priority, Secured and General Unsecured Convenience Claims*.
On or as soon as practicable after the Effective Date, if the Debtors shall not otherwise have done

so, the Liquidating Trust, in its capacity as Disbursing Agent, shall make Cash distributions to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Junior Secured Notes Claims, Allowed ETS Unsecured Claims and Allowed General Unsecured Convenience Claims.

2.      *Borrower Claims Trust*.   On the Effective Date, the Debtors shall transfer the Borrower-Related Causes of Action to the Borrower Claims Trust. On or as soon as practicable after the Effective Date, if the Debtors shall not otherwise have done so, the Liquidating Trust, in its capacity as Disbursing Agent, shall fund the Borrower Claims Trust with $57.6 million in Cash, subject to the Borrower Trust True-Up, and shall also make a one-time cash payment to the Borrower Claims Trust on the Effective Date in the amount set forth in the Borrower Claims Trust Agreement, which amount represents the amount of the administrative fees and expenses of the Borrower Claims Trust to be funded by the Liquidating Trust.   Distributions to holders of Borrower Claims will be made in accordance with methodology, criteria and procedures established in the Borrower Claims Trust Agreement.

3.      *NJ Carpenters Claims Settlement*. Assuming the NJ Carpenters Approval, if the Debtors shall not otherwise have done so, the Liquidating Trust, in its capacity as Disbursing Agent, shall fund the NJ Carpenters Claims Distribution with Cash within ten (10) Business Days of the Effective Date. Distributions to holders of NJ Carpenters Claims will be made in accordance with the methodology, criteria and procedures established in the NJ Carpenters Plan of Allocation.

**C.      Initial Issuance of Units and Distributions in Respect of Units by the Liquidating Trust**

On the Initial Unit Distribution Date, the Liquidating Trust shall issue Units to the RMBS Claims Trust, the Private Securities Claims Trust, the Disputed Claims Reserve, and the holders of Allowed Unsecured Claims (other than RMBS Trust Claims and ETS Unsecured Claims), in each case, as of the Initial Unit Distribution Record Date, in accordance with the terms of the Plan, including the RMBS Trust Allocation Protocol.

Units shall entitle the holder thereof to receive a Pro Rata Unit Share of the distributions of Distributable Cash paid by the Liquidating Trust, when and as such distributions are made. Prior to making any distributions on the Units, the Liquidating Trust will (i) fund the Borrower Claims Trust with the Borrower Claims Trust Assets, and the NJ Carpenters Claims Distribution, and (ii) pay, or adequately reserve for the payment in full of, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Junior Secured Notes Claims, and General Unsecured Convenience Claims, including funding the Administrative, Priority, Secured and Convenience Distribution Reserve. Distributions on account of Disputed Claims shall be made in accordance with Article VIII.D. of the Plan.

Units will be issued in global certificate form only and registered to DTC, with interests in the certificate being held through DTC participants, for so long as the Units are eligible to be held through DTC.   Liquidating Trust Unit Beneficiaries must follow specified procedures to designate a direct or indirect DTC participant to receive their Units.   The Units shall be freely

negotiable and transferrable, subject to restrictions under applicable securities laws. The Units shall not be listed on any national security exchange or interdealer quotation system, and the Liquidating Trust shall not take any action to promote or facilitate a trading market in the Units.

On each Distribution Date, pursuant to the Liquidating Trust Agreement, the Liquidating Trust (i) shall distribute to each Unitholder, on account of its Units, an amount equal to its respective Pro Rata Unit Share of the Distributable Cash, and (ii) shall deposit into the Disputed Claims Reserve the Pro Rata Unit Share of the Distributable Cash allocable to the Units held in the Disputed Claims Reserve. The initial distribution of Distributable Cash to the Unitholders shall be made by the Liquidating Trust on an initial Distribution Date as soon as practicable after the Effective Date. Subsequent Distribution Dates shall be determined by the Liquidating Trust Board from time to time, but shall occur no less frequently than at intervals provided in the Liquidating Trust Agreement, provided that the Liquidating Trust shall not be required to make a distribution if the aggregate Distributable Cash at the time would make the distribution impracticable, as determined by the Liquidating Trust Board.

Holders of Units shall not be entitled to interest on Cash distributions made in respect of such Units, regardless of when such distributions are made.

## D.    Fractional Units

No fractional Units shall be issued or distributed under the Plan. The actual distribution of Units shall be rounded to the next higher or lower whole number as follows: (i) fractions less than one-half (½) shall be rounded to the next lower whole number and (ii) fractions equal to or greater than one-half (½) shall be rounded to the next higher whole number. The total amount of Units to be distributed hereunder shall be adjusted as necessary to account for such rounding. No consideration shall be provided in lieu of fractional Units that are rounded down.

## E.    Timing and Calculation of Amounts to be Distributed

### 1.    Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter, each holder of an Allowed Claim against the Debtors as of the Effective Date shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 2.    Distributions on Account of Claims Allowed After the Effective Date

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made to the extent such Claims are Allowed in accordance with the provisions set forth in Article VIII with respect to dispute resolution. Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the

Effective Date shall be made as soon as practicable after the Disputed Claim becomes an Allowed Claim.

Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

## F.    Disbursing Agent

### 1.    Generally

All distributions under the Plan shall be made by the Liquidating Trust, as Disbursing Agent, or by such other Person designated by the Liquidating Trust to act as a Disbursing Agent.  Except as otherwise ordered by the Bankruptcy Court, a Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

### 2.    Rights and Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, securities, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated by the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### 3.    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by a Person designated by the Liquidating Trust as Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Liquidating Trust from the Liquidating Trust Expenses Set Aside.

## G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

### 1.    Delivery of Distributions

If a Creditor holds more than one Allowed Claim in any one Class, all Allowed Claims of the Creditor in a single Class will be aggregated into one Allowed Claim and one distribution will be made with respect to the aggregated Allowed Claim.

Distributions under this Plan to holders of Junior Secured Notes Claims shall be made to the Junior Secured Notes Indenture Trustee, which, subject to the right of the Junior Secured Notes Indenture Trustee to assert its Junior Secured Notes Indenture Trustee Charging Lien against such distributions, shall transmit such distributions to the holders of such Junior Secured Notes Claims as provided in the Junior Secured Notes Indenture.

Notwithstanding any provision contained in this Plan to the contrary, the distribution provisions contained in the Junior Secured Notes Indenture shall continue in effect to the extent necessary to authorize the Junior Secured Notes Indenture Trustee to receive and make distributions to the holders of Junior Secured Notes Claims and shall terminate completely upon completion of all such distributions. Notwithstanding anything to the contrary in this Plan, the Junior Secured Notes may continue to trade until the Junior Secured Notes Distribution Record Date. As of the close of business on the Junior Secured Notes Distribution Record Date, (i) the transfer books and records of the Junior Secured Notes as maintained by the Junior Secured Notes Indenture Trustee or its agent shall be closed, and (ii) any transfer of any Junior Secured Notes, Junior Secured Notes Claims or any interest therein shall be prohibited. The Debtors, the Liquidating Trust and the Junior Secured Notes Indenture Trustee shall have no obligation to recognize any transfer of any Junior Secured Notes, Junior Secured Notes Claims or any interest therein occurring after the close of business on the Junior Secured Notes Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under this Plan with only those holders of record as of the close of business on the Junior Secured Notes Distribution Record Date. The Junior Secured Notes Indenture Trustee may assert its rights under the Junior Secured Notes Indenture Trustee Charging Lien, including for the payment of any and all accrued Junior Secured Notes Indenture Trustee Fees and Junior Secured Notes Collateral Agent Fees and Expenses. The Junior Secured Notes Indenture Trustee may withhold distribution of any Cash it receives on account of the Junior Secured Notes Claims until such time as it determines that it has received sufficient payments to satisfy all accrued and reasonably expected Junior Secured Notes Indenture Trustee Fees and Junior Secured Notes Collateral Agent Fees and Expenses, and such payments shall be made in accordance with the requirements of the Junior Secured Notes Indenture and the Junior Secured Notes Security Agreement, as applicable.

Distributions under the Plan to Senior Unsecured Noteholders shall be made to the Senior Unsecured Notes Indenture Trustee for the benefit of the Senior Unsecured Noteholders and shall be deemed completed when made to the Senior Unsecured Notes Indenture Trustee. On the Effective Date, and subject to the provisions in paragraph IV.L, the Senior Unsecured Notes, the Senior Unsecured Notes Indenture and all other related documents will be deemed cancelled except as set forth herein. Notwithstanding the foregoing, the Senior Unsecured Notes may continue to trade until the Senior Unsecured Notes Indenture Trustee makes distributions of Units it has received to the Senior Unsecured Noteholders. The Senior Unsecured Notes Indenture Trustee may (a) assert its rights under the Senior Unsecured Notes Indenture Trustee Charging Lien, including for the payment of any and all accrued Senior Unsecured Note Indenture Trustee Fees and Expenses and (b) establish the Senior Unsecured Notes Indenture Trustee Reserve on any distribution of Units or Cash. The Senior Unsecured Notes Indenture Trustee may withhold distribution of the Units and any Cash it receives on account of such Units, until such time as it determines that it has received sufficient payment to satisfy the accrued Senior Unsecured Note Indenture Trustee Fees and Expenses and to fund the Senior Unsecured Notes Indenture Trustee Reserve. At such time, the Senior Unsecured Notes Indenture Trustee shall distribute such Units and any remaining Cash it has received on account of such Units to the Registered Holders of the Senior Unsecured Notes, which distributions shall satisfy the Senior Unsecured Notes Indenture Trustee's obligations hereunder. The Senior Notes Indenture

Trustee shall be reimbursed by the Liquidating Trust as a Disbursing Agent in accordance with the Plan.  Notwithstanding the foregoing, in the event that the Units are not registered with DTC, the Senior Unsecured Notes Indenture Trustee shall not bear any responsibility for the distribution of the Units to the Senior Unsecured Noteholders and such distributions will be effected by the Disbursing Agent. Upon release by the Senior Unsecured Notes Indenture Trustee of any funds remaining in the Senior Unsecured Notes Indenture Trustee Reserve, such funds shall be delivered to the Senior Unsecured Noteholders.

Subject to the NJ Carpenters Approval, the distributions under the Plan to holders of NJ Carpenters Claims shall be made and deemed completed when made to the lead plaintiff in the NJ Carpenters Class Action or as the District Court may otherwise order.  The RMBS Claims Trust Trustee shall be empowered to make distributions to holders of Recognized RMBS Claims, and any distributions to holders of Recognized RMBS Claims, and any distributions to the RMBS Claims Trust for the benefit of holders of Recognized RMBS Claims by the Liquidating Trust, shall be deemed completed upon the funding of the RMBS Claims Trust.  The Borrower Claims Trustee shall be empowered to make distributions to holders of Allowed Borrower Claims, and any distributions to or for the benefit of holders of Allowed Borrower Claims by the Debtors or Liquidating Trust shall be deemed completed upon the funding of the Borrower Claims Trust.  The Private Securities Claims Trustee shall be empowered to make distributions to holders of Allowed Private Securities Claims, and distributions to holders of Allowed Private Securities Claims shall be deemed completed upon the issuance of the Private Securities Claims Trust Unit Distribution to the Private Securities Claims Trust.

### 2. Distributions to Holders of Disputed Claims

Except as otherwise provided in the Plan or agreed to by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged. Any distributions arising from property distributed to holders of Allowed Claims in a Class and made to such holders under the Plan shall be made also, in the applicable amounts, to any holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such distributions were earlier made to holders of Allowed Claims in such Class.

### 3. Surrender of Junior Secured Notes and Senior Unsecured Notes

a. <u>Junior Secured Notes</u>. On the Effective Date, or as soon as reasonably practicable thereafter, the Junior Secured Notes Indenture Trustee, with the cooperation of the Debtors or the Liquidating Trust, as applicable, shall direct DTC and any other applicable securities depository to surrender the Junior Secured Notes to the Junior Secured Notes Indenture Trustee.  All distributions by the Junior Secured Notes Indenture Trustee to Registered Holders of Junior Secured Notes Claims shall only be made to such holder after (i) the surrender by each such holder of the debt securities representing such Junior Secured Notes

Claim or appropriate instructions from the applicable securities depository have been received by the Junior Secured Notes Indenture Trustee; or (ii) the loss, theft, mutilation, or destruction of such debt securities has been established to the reasonable satisfaction of the Junior Secured Notes Indenture Trustee, which satisfaction may require such Registered Holder to submit a lost instrument affidavit and an indemnity bond holding the Debtors, the Liquidating Trust, and the Junior Secured Notes Indenture Trustee harmless in respect of such debt securities and distributions made in respect thereof. Each Registered Holder shall be deemed to have surrendered such debt securities as of the date it has complied with the foregoing conditions. Upon surrender of such debt securities, the Junior Secured Notes Indenture Trustee shall cancel and destroy such debt securities. As soon as practicable after the surrender date, the Junior Secured Notes Indenture Trustee shall distribute to the holder thereof such holder's pro rata share of the distribution, but subject to the rights of the Junior Secured Notes Indenture Trustee to assert its Junior Secured Notes Indenture Trustee Charging Lien against such distribution. Any Registered Holder that fails to surrender such debt securities or, if applicable, satisfactorily explain the loss, theft, or destruction of such debt securities to the Junior Secured Notes Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Liquidating Trust, or the Junior Secured Notes Indenture Trustee in respect of such Claim and shall not be entitled to receive any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall, subject to the Junior Secured Notes Indenture Trustee Charging Lien, be promptly returned to the Liquidating Trust by the Junior Secured Notes Indenture Trustee and any such debt securities shall be cancelled.

b. Senior Unsecured Notes. On the Effective Date, or as soon as reasonably practicable thereafter, the Senior Unsecured Notes Indenture Trustee, with the cooperation of the Debtors or the Liquidating Trust, as applicable, shall advise DTC and any other applicable securities depository of the occurrence of such Effective Date and the cancellation of the Debtors obligations with respect to the Senior Unsecured Notes, but not to terminate the CUSIP or ISIN numbers of the Senior Unsecured Notes. At such time as the Senior Unsecured Notes Indenture Trustee is prepared to release the Units it received on account of the Senior Unsecured Notes Claims, it may request that such depositories surrender the Senior Unsecured Notes, if deemed appropriate, or with the cooperation of the Debtors or the Liquidating Trust, issue such other instructions to DTC and any other securities depository, as appropriate to effectuate the distributions contemplated under the Plan; provided, however, that nothing herein shall contravene the effectiveness of the Senior Unsecured Notes as set out in Article IV.K. No distributions under the Plan shall be made for or on behalf of a Registered Holder unless and until (i) such debt securities have been received by the applicable Indenture Trustee or other appropriate instructions have been issued or received by the applicable Indenture Trustee; or (ii) the loss, theft, or destruction of such debt securities has been established to the reasonable satisfaction of the Senior Unsecured Notes Indenture Trustee, which satisfaction may require such Registered Holder to submit a lost instrument affidavit and an indemnity bond holding the Debtors, the Liquidating Trust, and the Senior Unsecured Notes Indenture Trustee harmless in respect of such debt securities and any distributions to be made in respect thereof. Each Registered Holder shall be deemed to have surrendered such debt securities as of the date it has complied with the foregoing conditions. On such surrender or deemed surrender date, the Senior Unsecured Noteholders shall be entitled to receive distributions pursuant to the Plan.

If required by the Senior Unsecured Notes Indenture Trustee, any Registered Holder that fails to surrender such debt securities or, if applicable, satisfactorily explain the loss, theft, or destruction of such debt securities to the Senior Unsecured Notes Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Liquidating Trust, or the Senior Unsecured Notes Indenture Trustee in respect of such Claim and shall not be entitled to receive any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Liquidating Trust by such Indenture Trustee and any such debt securities shall be cancelled.

### 4. Minimum Distributions; Foreign Exchange Rate; and Other Distribution Limitations

Other than with respect to Allowed General Unsecured Convenience Claims and Allowed ETS Unsecured Claims, no Cash payment of less than $50 shall be made to a holder of an Allowed Claim on account of such Allowed Claim. If a holder of an Allowed Claim would be entitled to receive less than $50 as of the time of a particular distribution, but would be entitled to receive more than $50 in combination with later distributions, the Disbursing Agent will combine such distributions with later distributions to such holder of an Allowed Claim so that such holder may eventually be entitled to a distribution of at least $50 in value.

Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

Except as otherwise provided in the Plan or a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than United States dollars shall be automatically deemed converted to the equivalent United States dollar value using the exchange rate as of the Petition Date as quoted at 4:00 p.m. (EDT), mid-range spot rate of exchange for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

### 5. Undeliverable Distributions and Unclaimed Property

In the event that any distribution to a holder of an Allowed Claim is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) at the expiration of six (6) months from the applicable date of distribution. After such date, all unclaimed property or interests in property shall revert to the Liquidating Trust (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property or interest in property shall be released, settled, compromised, and forever barred.

## H.    Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed upon it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution. The Disbursing Agent has the right, but not the obligation, not to make a distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such withholding tax obligations and, if the Disbursing Agent fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse the Disbursing Agent. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within six months, such distribution shall be deemed an unclaimed distribution. Finally, the Disbursing Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

## I.    Allocations

Distributions in respect of Allowed Claims shall be allocated first to the principal amount (as determined for federal income tax purposes) of such Claims, and then, to the extent the consideration exceeds the principal amount of such Claims, to any portion of such Claims for accrued but unpaid interest, provided, however, that distributions on the RMBS Trust Claims shall be allocated pursuant to the RMBS Trust Allocation Protocol described in Article IV herein.

## J.    Setoffs and Recoupment

The Liquidating Trust may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that it may have against the claimant, including any Causes of Action transferred to the Liquidating Trust by the Debtors, but neither the failure to do so nor the Allowance of any Claim shall constitute a waiver or release by the Debtors or the Liquidating Trust of any such Claim it may have against the holder of such Claim.

Before the Liquidating Trust can set-off or recoup against the distribution to be made on account of an Allowed Claim, the holder of the Claim shall be served with written notice of the proposed setoff or recoupment at least thirty (30) days prior to the Liquidating Trust exercising

any asserted setoff or recoupment right, and, if such claimant serves a written objection to such asserted setoff or recoupment on or before thirty (30) days of receipt of such written notice, (i) the objection shall be deemed to initiate a contested matter governed by, inter alia, Bankruptcy Rule 9014 and Local Bankruptcy Rules 9014-1 and 9014-2, (ii) nothing herein shall affect the respective burden of each party in connection with such contested matter, and (iii) the Liquidating Trust shall not proceed with the asserted setoff or recoupment absent the withdrawal of such objection or the entry of a Final Order overruling such objection.

### K.    Claims Paid or Payable by Third Parties

#### 1.    Claims Paid by Third Parties

Except as otherwise provided herein, including with respect to the Ally Contract Claims, the Debtors, on or prior to the Effective Date, or the Liquidating Trust, after the Effective Date, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice, action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment on account of such Claim from a party that is not a Debtor, the Liquidating Trust, or other party making distributions on account of the Claim pursuant to the Plan.

#### 2.    Claims Payable by Insurers

(a)    *Distributions*.  Except as otherwise provided herein, including with respect to the rights of (i) the Kessler Settlement Class and (ii) other creditors who have entered into a settlement agreement with the Debtors prior to the Effective Date, in and to the GM Insurance Rights as provided herein and in the Kessler Settlement Agreement, and the Ally Contract Claims:

(i)    No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, excluding the GM Policies, until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; and

(ii)    to the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' payment, such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court,

provided, that if a Debtor or the Liquidating Trust believes a holder of an Allowed Claim has recourse to an insurance policy and intends to withhold a distribution pursuant to this Article VII.K, the Debtor, prior to the Effective Date, or Liquidating Trust, following the Effective Date, shall provide written notice to such holder as to what the Debtor or Liquidating Trust believes to be the nature and scope of applicable insurance coverage.

(b)     _Insurance Neutrality_.  Except as set forth below in VII.K.2.(e), nothing contained in this Plan, in the Disclosure Statement, in the Liquidating Trust Agreement, or in the Borrower Claims Trust Agreement (including addendums, exhibits, schedules, or supplements to the Plan, Disclosure Statement, Liquidating Trust Agreement, or Borrower Claims Trust Agreement, and including any provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights under the GM Policies of any of those insurers that issued the GM Policies (the "GM Insurers").  Except as set forth below in VII.K.2.(e), for all issues of insurance coverage or otherwise, the provisions, terms, and conditions of the GM Policies, as construed under applicable  non-bankruptcy law, shall control.

(c)     _Preservation of Insurance-Related Causes of Action_.     Nothing contained in this Plan, in the Disclosure Statement, in the Liquidating Trust Agreement, or in the Borrower Claims Trust Agreement (including addendums, exhibits, schedules, or supplements to the Plan, Disclosure Statement, Liquidating Trust Agreement, or Borrower Claims Trust Agreement, and including any provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing, reducing, decreasing, or impeding any Cause of Action that the Debtors, the Liquidating Trust, or any Entity may hold against any insurers under any policies of insurance.

(d)     _Settlement Insurance Policies_.  Nothing contained in this Article VII of the Plan shall impair, reduce, decrease, or impede Ally's rights under the Plan to recover from the Settlement Insurance Policies or any of its other insurance policies.

(e)     _Defenses to Assignment of Rights_.  The GM Insurers shall be deemed to have waived any defense to coverage that is based on the assertion that the transfer of the insurance rights in this Plan are invalid, unenforceable or otherwise breach the terms of the GM Policies.  For the avoidance of doubt, as set forth in VII.K.2.(b), all other rights and defenses shall remain unaffected by the Plan, the Disclosure Statement, and the Liquidating Trust Agreement, and the Borrower Claims Trust Agreement.

## L.    Allowed Unsecured Claims for Which More than One Debtor in a Debtor Group Is Jointly and/or Severally Liable

Where a Creditor holds Allowed Unsecured Claims for which more than one Debtor in a Debtor Group is jointly and/or severally liable, such creditor shall only receive one recovery from the Debtor Group on account of such Claim.  This provision shall not affect distributions on account of such Creditor's Allowed Claims, if any, against the Debtors in another Debtor Group.

## M.    Distributions Free and Clear

Except as otherwise provided herein, any distributions under this Plan shall be free and clear of any Liens, Claims, and encumbrances, and no other Entity, including the Debtors, the Liquidating Trust, or the Disbursing Agent shall have any interest (legal, beneficial or otherwise) in property of the Estate distributed pursuant to this Plan, except that (i) distributions on account

94

of Senior Unsecured Note Claims shall remain subject to the Senior Unsecured Notes Indenture Trustee Charging Lien, and (ii) distributions on account of Junior Secured Notes Claims shall remain subject to the Junior Secured Notes Indenture Trustee Charging Lien.

# ARTICLE VIII.

# PROCEDURES FOR RESOLVING DISPUTED CLAIMS

## A.    Resolution of Disputed Claims

### 1.    Applicability

The provisions of this Article VIII shall govern the resolution of Disputed Claims to the extent not otherwise provided for in this Plan or in any other trust agreement (such as the RMBS Claims Trust Agreement, the Private Securities Claims Trust Agreement or the Borrower Claims Trust Agreement) or plan of allocation (such as the RMBS Trust Allocation Protocol) approved under this Plan.  To the extent the provisions of any such trust agreement or plan of allocation address specifically matters set forth in this Article VIII, the provision of such trust agreement or plan of allocation shall govern.

### 2.    Allowance of Claims

On or after the Effective Date, the Liquidating Trust shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim (i) deemed Allowed as of the Effective Date or (ii) waived, relinquished, exculpated, released, compromised, settled, or Allowed in the Plan or in a Final Order. Except as otherwise provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed (a) under the Plan or the Bankruptcy Code or (b) by Final Order of the Bankruptcy Court, including the Confirmation Order.

### 3.    Prosecution of Objections to Claims

On the Effective Date, the Liquidating Trust will have the exclusive authority to: (a) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests (other than Borrower Claims, Private Securities Claims, and the NJ Carpenters Claims); (b) settle or compromise (or decline to do any of the foregoing) any Disputed Claim (other than Borrower Claims, Private Securities Claims, and NJ Carpenters Claims) or Cause of Action (other than the Borrower-Related Causes of Action) without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### 4.    Claims Estimation

The Plan Proponents, prior to the Effective Date, or the Liquidating Trust or Borrower Claims Trust (to the extent provided for in the Borrower Claims Trust

Agreement), as applicable, following the Effective Date, may request that the Bankruptcy Court estimate any disputed, contingent, or unliquidated Claim to the extent permitted by Bankruptcy Code section 502(c) regardless of whether the Plan Proponents (prior to the Effective Date) or the Liquidating Trust or Borrower Claims Trust (following the Effective Date) has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. Among other things, the Plan Proponents may request that the Bankruptcy Court estimate the Recognized RMBS Claims in the amounts set out in the RMBS Trust Claims Schedules for the purpose of implementing the RMBS Trust Allocation Protocol. The Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. Except as set forth below with respect to reconsideration under section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under this Plan, including for purposes of distributions. If the estimated amount constitutes a maximum limitation on such Claim, the Liquidating Trust or Borrower Claims Trust (to the extent provided for in the Borrower Claims Trust Agreement) may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 5.    Expungement or Adjustment of Claims Without Objection

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Debtors' notice and claims agent, and any Claim that has been amended may be adjusted thereon by the Debtors' notice and claims agent, in both cases without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### 6.    Deadline to File Claims Objections

Any objections to Claims shall be Filed by no later than the applicable Claims Objection Deadline.

### B.    Disallowance of Claims

Any Claims held by an Entity from which property is recoverable under Bankruptcy Code sections 542, 543, or 550, or that is a transferee of a transfer avoidable under Bankruptcy Code sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a), shall be deemed disallowed pursuant to Bankruptcy Code section 502(d), and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes

of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, by that Entity have been turned over or paid by such Entity to the Debtors or the Liquidating Trust.

EXCEPT AS OTHERWISE AGREED BY THE DEBTORS, THE LIQUIDATING TRUST, OR THE BORROWER CLAIMS TRUST, AS APPLICABLE, OR ORDERED BY THE BANKRUPTCY COURT, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED, DISCHARGED, RELEASED, AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

**C.    Amendments to Claims**

On or after the Effective Date, a Claim may not be Filed or amended without prior authorization of the Bankruptcy Court, the Liquidating Trustees, or the Borrower Claims Trustee, as applicable, and any such new or amended Claim Filed without such prior authorization shall be deemed disallowed in full and expunged without any further action.

**D.    Disputed Claims Reserve**

The provisions of this Article VIII.D shall apply to Disputed Claims held by Liquidating Trust Unit Beneficiaries.

To effect distributions to holders of Allowed Unsecured Claims in a timely manner, prior to the Effective Date, the Plan Proponents shall file a motion for an order establishing the Disputed Claims Reserve with respect to unliquidated and/or Disputed Claims. The Disputed Claims Reserve shall be issued a number of Units equal to the amount sufficient to provide the distributions to which holders of Disputed Claims would be entitled under the Plan as of such date as if the Disputed Claims were Allowed Claims either in the amounts of the Claims as filed or in such amounts as estimated in accordance with Article VIII.A.4. The Disputed Claims Reserve shall also hold the Cash distributed with respect to such Units, provided that in its discretion, the Liquidating Trust Board may substitute non-Cash assets for Cash distributed in respect of Units held in the Disputed Claims Reserve, which non-Cash assets may be monetized from time to time by the Disputed Claims Reserve; provided, however, that distributions from the Disputed Claims Reserve shall only be made in Units and Cash; and provided further that in connection with any such substitution of non-Cash assets, the Liquidating Trust Board shall give due consideration to the timing and amount of scheduled and anticipated payments and both the fair market value and the timing of monetization of such non-Cash assets, so as to enable the Liquidating Trust to distribute Cash in respect of Units that are released from the Disputed Claims Reserve as such Cash distributions are due.

Disputed Claims that become Allowed, in whole or in part, shall be satisfied exclusively out of the Disputed Claims Reserve. The holder of a Disputed Claim that becomes Allowed, in

whole or in part, shall receive a number of Units and amount of Cash equal to the number of
Units and amount of Cash such holder would have received in accordance with the provisions of
the Plan had such Claim been Allowed as of the Initial Unit Distribution Record Date.  In the
event the Units, and the Cash distributed with respect thereto, remaining in the Disputed Claims
Reserve shall be insufficient to satisfy all the Disputed Claims that have become Allowed and
are due to be satisfied with distributions from the Disputed Claims Reserve on any Unit
Distribution Date, such Disputed Claims shall be satisfied Pro Rata from the Disputed Claims
Reserve.  After all Units, and the Cash distributed with respect thereto, have been distributed
from the Disputed Claims Reserve, no further distributions shall be made in respect of Disputed
Claims.

If a Disputed Claim is disallowed, in whole or in part, then on the Unit Distribution Date
next following the date of determination of such disallowance, unless the Liquidating Trust
Board determines otherwise, there shall be released from the Disputed Claims Reserve, (i) a
number of Units equal to the Units that would have been released from the Disputed Claims
Reserve to the holder thereof had such Claim been Allowed in the as-filed or estimated amount,
as applicable, of such Claim, or disallowed portion thereof if such Claim is disallowed in part,
which Units shall be cancelled and retired and (ii) Cash, in the amount of such distribution made
to the Disputed Claims Reserve in respect of such Units since the Effective Date, which shall
then be unreserved and unrestricted, and which shall be added to the Liquidating Trust Expenses
Set Aside or available for distribution to the Unitholders, as determined by the Liquidating Trust
Board.

If the Liquidating Trust Board at any time determines that it is not necessary to hold in
the Disputed Claims Reserve all of the Units and Cash and other assets, if any, contained therein
in order to satisfy all Disputed Claims of Liquidating Trust Unit Beneficiaries, the Liquidating
Trust Board may, but shall not be required to, cancel such number of Units in the Disputed
Claims Reserve as it determines is not required for the satisfaction of Disputed Claims and
release from the Disputed Claims Reserve for distribution to Unitholders, or for deposit to the
Liquidating Trust's Administrative Reserve, some or all of the Cash previously deposited to the
Disputed Claims Reserve in respect of such Units.  Any non-Cash assets released from the
Disputed Claims Reserve shall become general, unrestricted assets of the Liquidating Trust.  At
such time as all Disputed Claims of the Liquidating Trust Unit Beneficiaries have been resolved,
any remaining Units in the Disputed Claims Reserve shall be cancelled and any remaining Cash
in the Disputed Claims Reserve shall be released from the Disputed Claims Reserve for
application as aforesaid.

## ARTICLE IX.

## SETTLEMENT, RELEASE, INJUNCTION,
## AND RELATED PROVISIONS

### A.     Compromise and Settlement of Claims, Equity Interests, and Controversies

In accordance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019,
and in consideration for the distributions and other benefits provided pursuant to the Plan,
the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests

and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Equity Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trust may compromise and settle Claims against the Debtors and Causes of Action against other Entities.

## B.    Release of Liens

**Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of any Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall vest in the Liquidating Trust.**

## C.    Releases by the Debtors

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including with respect to the Ally Released Parties, the Ally Contribution provided to the Estates under the Plan and otherwise, on and as of the Effective Date of the Plan, the Debtor Released Parties are deemed released and discharged by the Debtors, the Estates and the Liquidating Trust from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors would have been legally entitled to assert against a Debtor Released Party in its own right (whether individually or collectively) or that any holder of a Claim or Equity Interest, the Liquidating Trust, or other Entity would have been legally entitled to assert on behalf of any of those Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the**

Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Debtor Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtors' release; (3) in the best interests of the Debtors, the Estates, the Liquidating Trust and all holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to the Debtors, the Liquidating Trust and any holder of a Claim or Equity Interest or other Entity who would have been legally entitled to assert such Claim or Equity Interest on behalf of any of the Debtors or any of their Estates from asserting any Claim or Cause of Action released pursuant to the Debtors' release.

**D.     Third Party Release**

On and as of the Effective Date of the Plan, except as provided by Article IX.E, the holders of Claims and Equity Interests shall be deemed to provide a full and complete discharge and release to the Ally Released Parties and their respective property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan, the Consent Order, and the Order of Assessment.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute the Bankruptcy Court's finding that this Third Party Release is:   (1) in exchange for the good, valuable and substantial consideration provided by the Ally Released Parties; (2) in the best interests of the Debtors, the Estates, the Liquidating Trust and all holders of Claims and Equity Interests; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for a hearing; (5) justified by truly unusual circumstances; (6) an essential component and critical to the success of the Plan; (7) resulted in distributions to the Creditors that would otherwise have been unavailable; (8) the result of an identity of interest between the Debtors and the Ally Released Parties regarding the Plan; and (9) a bar to any party asserting a claim or cause of action released pursuant to this Third Party Release against any of the Ally Released Parties.

**E.     Third Party Release Carve-Out**

Notwithstanding anything to the contrary herein, the Third Party Release shall not apply to any claims held by: (i) the FHFA, as conservator for Fannie Mae, and/or Fannie Mae against Ally Bank, including, without limitation, any claims of FHFA and/or Fannie Mae against Ally Bank for continuing liabilities, obligations, and duties owed by Ally Bank to FHFA and/or Fannie Mae under the Fannie Mae Contract, including the obligations and duties to honor all selling and servicing representations and warranties related to the portfolio of loans sold and/or serviced, or that were previously serviced, by Ally Bank; (ii) the FHFA and/or Freddie Mac (a) against Ally Bank for any selling and servicing representation and warranty claims for loans sold

100

to Freddie Mac directly by Ally Bank subsequent and pursuant to the May 1, 2012 and August 1, 2012 master selling and servicing agreements among Ally Bank and Freddie Mac, and (b) against Ally Financial Inc. as guarantor for the limited time that the Debtors subserviced the Ally Bank loans sold pursuant to the agreements set forth in clause (a) above, (iii) the United States and the DOJ/AG Settling States with regard to any monetary obligation the Ally Released Parties may have arising under the DOJ/AG Settlement or causes of action preserved under Article V and Exhibits F and G of the DOJ/AG Settlement; and shall not apply to (iv) any liability or obligation of AFI to the United States or the States arising under the Internal Revenue Code, environmental laws, civil fraud laws, or criminal laws, including, but not limited to, any such liability or obligation preserved under Article V and Exhibits F and G of the DOJ/AG Settlement.

Nothing herein is intended to expand any liabilities under any agreement set forth above or applicable law; the carve outs set forth above in clauses (ii) and (iii) are limited to liabilities under agreements referenced therein and Ally expressly reserves all rights, claims, and defenses against persons and entities carved out under this Article IX.E. regarding any liability that is the subject of this Article IX.E.

For the avoidance of doubt, no party can assert claims, causes of actions or liabilities against the Debtors or Liquidating Trust arising from claims that are carved out under Article IX.E(i).

Nothing in the Plan releases AFI or any other party from the obligations under the Employees Retirement Plan for GMAC Mortgage Group, LLC (the "Pension Plan") and ERISA. Notwithstanding the foregoing, upon the Effective Date, the Debtors and the Plan Trusts shall be released from all obligations under the Pension Plan and ERISA related thereto, except for any Claims for fiduciary breaches or prohibited transactions (as defined in ERISA) relating to the Pension Plan under applicable law.

## F.    Ally Release

**Except with respect to the Ally Contract Claims, on and as of the Effective Date of the Plan, the Ally Released Parties shall release the Creditors' Committee, the Debtors, and the Consenting Claimants and their respective successors and assigns, members, partners, advisors, and Representatives, in their capacities as such, from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise arising from or related to the Debtors' liquidation, including the negotiation, formulation, or preparation of the Plan Support Agreement, the Plan, the Disclosure Statement, and any other Plan Documents and related disclosures, as well as any counterclaims in commenced or tolled litigation with the Debtors or the Consenting Claimants.**

## G.    Junior Secured Notes Releases

**On and as of the Effective Date, (i) each of the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Ad Hoc Group, and the Junior Secured Notes Collateral Agent, and each of their predecessors,**

successors, and assigns, group members (except any such member of the Ad Hoc Group that voted to reject the Plan and has not changed its vote to accept the Plan by the Confirmation Date), general partners, advisors, and Representatives, each solely in their capacities as such, shall release (a) each other, and (b) the Debtors, the Creditors' Committee, each of the Consenting Claimants, and the Ally Released Parties, and each of their predecessors, successors and assigns, members, partners, advisors, and Representatives, each solely in their capacities as such; and (ii) the Debtors, the Creditors' Committee, each of the Consenting Claimants, and the Ally Released Parties and each of their successors and assigns, group members, general partners, advisors, and Representatives, each solely in their capacities as such, shall release the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Ad Hoc Group, and the Junior Secured Notes Collateral Agent and each of their predecessors, successors, and assigns, members (except any such member of the Ad Hoc Group that voted to reject the Plan and has not changed its vote to accept the Plan by the Confirmation Date), partners, advisors, and Representatives, each solely in their capacities as such, in the case of (i) and (ii) above from any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise arising from or related to the Debtors, including, without limitation, any right to seek sanctions, take discovery, or initiate any investigation or examination pursuant to Bankruptcy Rule 2004 or any other similar action, all of which shall be considered Released Claims under the Plan; it being understood and agreed that the Claims and Causes of Action being released pursuant to this Article IX.G are limited to those Claims and Causes of Action arising from or related to the JSN Documents and each Person's conduct and participation in the Chapter 11 Cases and shall not include any Claims or Causes of Action that a Person holds in any other capacity or arising under any other documents or facts and circumstances; **provided, however,** that nothing in this release shall limit the rights of the Junior Secured Notes Indenture Trustee to receive and make distributions as provided in the Junior Secured Notes Indenture and as provided and preserved in the Plan. Notwithstanding anything to the contrary contained in this Article IX.G., any Person (other than a Person that is itself a member of the Ad Hoc Group or a Junior Secured Noteholder, in each case that is also a Consenting JSN) that is a former, present or future parent, affiliate, member, member firm, associated entity, shareholder, principal, limited partner, equity investor, or managed entity (along with the respective attorneys, financial advisors, investment advisors, employees, officers, directors, managers, agents and other authorized representatives of each of the foregoing) of a Consenting Claimant or a Junior Secured Noteholder that is a Consenting JSN, in each case solely in their capacities as such, shall be the recipient of, but shall not itself grant to any other Person, the release provided for by this Article IX.G. Notwithstanding the above, nothing contained in this Article IX.G in any way limits Article IX.D.

## H.    Exculpation

The Exculpated Parties shall neither have, nor incur, any liability to any entity for any pre-petition or post-petition act or omission taken in connection with, or related to, formulating, negotiating, preparing, disseminating, soliciting, implementing, administering, confirming, or effecting the consummation of any prepetition plan support agreements, the

Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, the Kessler Settlement Agreement, the RMBS Settlement, the settlement of the Junior Secured Notes Claims as provided in this Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, provided, however, that the foregoing provisions of this Exculpation shall have no effect on the liability of any entity that results from any such act that is determined in a final, non-appealable order to have constituted gross negligence or willful misconduct; provided, however, that the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors concerning his, her, or its duties pursuant to, or in connection with, any prepetition plan support agreement, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, the Kessler Settlement Agreement, the RMBS Settlement, and the settlement of the Junior Secured Notes Claims as provided in this Plan.  Notwithstanding the foregoing or any other provision in this Plan to the contrary, as to the DOJ-Represented Agencies, nothing in this paragraph shall release or exculpate any of the Exculpated Parties from any liability or obligation to the DOJ-Represented Agencies for any pre-petition act or omission, or from any liability or obligations arising under the tax laws, the environmental laws, civil fraud laws, criminal laws, or the police or regulatory powers of the United States, except (i) to the extent the applicable Bar Date or the discharge, release or injunction provisions of the Plan bar the United States from pursuing Claims against the Debtors or the Liquidating Trust and (ii) to the extent the United States released or settled any causes of action against any of the Exculpated Parties, including but not limited to under the DOJ/AG Settlement (including exhibits). For the avoidance of doubt, nothing in the foregoing provisions shall release or exculpate the Ally Released Parties from any claims or obligations to the United States and the DOJ/AG Settling States arising under the DOJ/AG Settlement or causes of action preserved under Article V and Exhibits F and G of the DOJ/AG Settlement.

I.    **Injunction**

Except as otherwise provided in the Confirmation Order or herein and in accordance with Article IX.E hereof, all Entities, including Investors, who have held, hold or may hold Claims, Equity Interests, Causes of Action or liabilities that constitute Released Claims, are permanently enjoined and precluded, from and after the effective date of the Plan, from: (a) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party whether directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Released Party on account of or in connection with or with respect to any Released Claims; (c) creating, perfecting or enforcing any lien (other than any charging lien of a trustee under its respective indenture), claim or encumbrance of any kind against any Released Party on account of or in connection with or with respect to any Released Claims; (d) asserting any right to setoff, subrogation or recoupment of any kind against any obligation due from any Released Party on account of or in connection with or with respect to any Released Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in a Proof of Claim or Equity Interest or otherwise that such holder asserts, has or intends to preserve any right of setoff pursuant to section 553 of

the Bankruptcy Code or otherwise; (e) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party on account of or in connection with or with respect to any Released Claims; and (f) seeking relief or collecting judgments on an Investor-related securities claim in a manner that fails to conform with the terms of the judgment reduction provision set forth in the Plan and the Confirmation Order; <u>provided</u>, that nothing contained herein shall be construed to prevent any entity from objecting to claims or defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law. Such injunction shall extend to the successors of the Liquidating Trust, if any, and to their respective properties and interests in property. Any person injured by any willful violation of this injunction shall be entitled to recover actual damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages from the willful violator.

For the avoidance of doubt, nothing in Article IX.E shall expand or limit the application of this Article IX.I to Claims, Equity Interests, Causes of Action or liabilities against the Debtors or the Liquidating Trust.

## J.    Waiver of Subrogation

The GMACM Debtors and the RFC Debtors hereby release the ResCap Debtors from any and all liability or responsibility to the GMACM Debtors and the RFC Debtors or any entity claiming through or under the GMACM Debtors and the RFC Debtors by way of subrogation or otherwise, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those subrogated Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors would have been legally entitled to assert against a Released Party in its own right (whether individually or collectively) or that any holder of a Claim or Equity Interest, the Liquidating Trust, or other entity would have been legally entitled to assert on behalf of any of those Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law.

## K.    Satisfaction and Release of Claims and Equity Interests

The rights afforded herein and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Liquidating Trust, or any of their respective assets or properties arising prior to the Effective Date. Except as otherwise expressly specified in the Plan, after the Effective Date, any holder of such Claim or Equity Interest shall be precluded from asserting against the Debtors, the Liquidating Trust, or any of their respective assets or properties, any other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the entry of the Confirmation Order.

## L.    Judgment Reduction for Co-Defendants in Securities Litigation

A defendant against whom a judgment of a court of competent jurisdiction is obtained (whether in a proceeding now pending or hereafter commenced) on an Investor-related securities claim where such defendant has a claim for indemnity or contribution that is subject to the Third Party Releases shall be entitled to a judgment credit in the underlying litigation in the amount and on the terms that would be available if the Third Party Releases were treated as a bar order in the underlying litigation, in accordance with, and to the extent permitted under, applicable statutory or common law, as determined by a court of competent jurisdiction.  (For the avoidance of doubt, a defendant against whom a judgment of a court of competent jurisdiction is obtained (whether in a proceeding now pending or hereafter commenced) on an Investor-related securities claim where such defendant has or had a claim for indemnity or contribution against any Debtor is not precluded from asserting that it is entitled to a judgment credit in the underlying litigation in connection with such claim against the Debtors, and the plaintiff(s) in such action shall have the right to oppose any such request for a judgment credit on any basis, including but not limited to that no such right exists and with reference to Bankruptcy Code section 502(e)).  For the avoidance of doubt, judgment reduction in the NJ Carpenters Class Action shall be governed by the terms of the Order and Final Judgment entered by the District Court granting final approval to the NJ Carpenters Settlement.  *See* Docket No. 5354.  Notwithstanding the foregoing and without limitation (i) no Ally Released Party shall be deemed to have admitted to such fault by virtue of this provision; (ii) nothing herein shall create any right for a defendant that it does not have under applicable statutory or common law, if any, to obtain discovery from any Ally Released Party, or create an obligation for any Ally Released Party to participate in any proceeding to determine fault that does not exist under applicable statutory or common law, if any, in connection with such claim; and (iii) no finding in any proceeding to determine fault shall create any claim against any Ally Released Party or obligation of any Ally Released Party to satisfy any claim.  For the avoidance of doubt, nothing in this Article IX.L affects the Third Party Releases, and all parties' rights under applicable law with respect to discovery and any Ally Released Party's participation in any proceeding to determine fault are preserved.

## M.    Limitations

For the avoidance of doubt, the releases set forth in this Article IX shall not extend to: (i) any rights, defenses, or counterclaims under any directors & officers or errors & omissions insurance policies sold by any of the Consenting Claimants, the Consenting JSNs, or their affiliates and covering either the Debtors or any of the Ally Released Parties; (ii) any indemnity rights against non-Ally Released Parties arising out of the Kessler Class Action or to any other indemnity right against non-Ally Released Parties arising out of any other claims of Borrowers; specifically, these releases do not extend to any indemnity rights RFC may have against any non-Ally Released Party that is a successor in interest to CBNV and GNBT, including, but not limited to, those indemnity rights extending out of the client contracts between RFC, on the one hand, and either CBNV or GNBT, on the other hand, which incorporate by reference the indemnity provisions of RFC's AlterNet Seller Guide, and (iii) any indemnity rights held by the Debtors' Representatives against Ally arising from Claims not released by this Article IX.

Notwithstanding anything in this Article IX or in the Plan to the contrary, on the Effective Date, the Berkshire APA shall vest in the Liquidating Trust in accordance with the Plan

and the Berkshire Sale Order.  The Liquidating Trust shall assume and perform any and all rights, benefits, duties and obligations of the Debtors under the Berkshire APA and the Berkshire Sale Order in accordance with their terms, and such rights, benefits, duties and obligations shall not be deemed to have been released or discharged by the occurrence of the Effective Date, by any provisions of the Plan (including, but not limited to, the provisions of Article IX of the Plan), or otherwise.  Nothing in the Plan Documents shall, or shall be deemed or construed to, alter, change, modify or amend the terms and provisions of the Berkshire APA or the rights of the Debtors, the Liquidating Trust, and Berkshire Hathaway Inc. and its Affiliates, subsidiaries, and related entities, as applicable, thereunder, which rights shall continue in full force and effect and be enforceable following the Effective Date in accordance with the terms thereof.  For the avoidance of doubt, Berkshire Hathaway Inc., its Affiliates, subsidiaries, and related entities shall not be required to file an Administrative Claim to preserve their rights or Claims arising after the Effective Date from or related to the Berkshire APA.

## ARTICLE X.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

**A.    Conditions Precedent to Confirmation**

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived in accordance with the terms of the Plan:

(a)    Court approval of the Disclosure Statement in a form and substance reasonably acceptable to the Plan Proponents, Ally, and each of the Consenting Claimants, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code;

(b)    The Plan shall be reasonably acceptable to the Plan Proponents, Ally, and each of the Consenting Claimants, in accordance with the terms of the Plan Support Agreement;

(c)    The Confirmation Order shall be reasonably acceptable to the Plan Proponents, Ally, each of the Consenting Claimants, the Junior Secured Notes Indenture Trustee, a majority (by amount of holdings) of the Consenting JSNs, and the Ad Hoc Group;

(d)    The Plan Supplement and any related documentation shall be reasonably satisfactory to the Plan Proponents, Ally, and each of the Consenting Claimants;

(e)    Court approval of the RMBS Settlement as part of the Plan pursuant to Bankruptcy Rule 9019;

(f)    No Plan modifications that have altered distributions to be made under the Plan shall have occurred without the consent of the Plan Proponents, Ally, each of the Consenting Claimants, the Junior Secured Notes Indenture Trustee, a majority (by amount of holdings) of the Consenting JSNs, and the Ad Hoc Group;

(g)     Court approval of the Third Party Releases and Debtor Releases in the Plan, without any modification thereto; and

(h)     Court approval of the Exculpation, in a form reasonably satisfactory to the Plan Proponents, Ally, each of the Consenting Claimants, the Junior Secured Notes Indenture Trustee, a majority (by amount of holdings) of the Consenting JSNs, and the Ad Hoc Group.

## B.     Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article X.C:

(a)     the Bankruptcy Court shall have entered the Confirmation Order, which shall grant final approval of the Plan, including all settlements therein, the Debtor Releases, the Third Party Releases, the injunctions, and Exculpation;

(b)     the Confirmation Order shall not have been stayed, modified, or vacated on appeal;

(c)     on or before September 16, 2013, the FGIC Rehabilitation Court shall have entered an order substantially in the form attached to the FGIC Settlement Agreement as Exhibit E (or such other form as agreed to by FGIC, the Debtors, and the RMBS Trustees) approving the Plan Support Agreement (as it related to FGIC) and the FGIC Settlement Agreement, including the settlement and release of all present and future claims against FGIC under or relating to the FGIC Policies;

(d)     the Bankruptcy Court shall have entered an order substantially in the form attached to the FGIC Settlement Agreement as Exhibit D (or such other form as agreed to by FGIC, the Debtors, and the RMBS Trustees and counsel for the Institutional Investors) approving the FGIC Settlement Agreement, including the settlement and release of all present and future claims against FGIC under or relating to the FGIC Policies and the allowance of FGIC's General Unsecured Claims against the Debtors, pursuant to a Bankruptcy Rule 9019 motion, which order shall include a finding that the transactions contemplated by the FGIC Settlement Agreement are in the best interests of the RMBS Trusts;

(e)     Ally will have funded at least $1,950,000,000 of the Ally Contribution;

(f)     the Liquidating Trust Agreement, the RMBS Claims Trust Agreement, the Private Securities Claims Trust Agreement and the Borrower Claims Trust Agreement shall have been executed;

(g)     the Ally Contract Claims and any other claims held by Ally Allowed under the Plan, will have been Allowed, deemed indefeasible, and approved by the Bankruptcy Court without subordination of any kind, and satisfied as set forth herein;

(h)     subject to Article VI.C, the Available Assets shall have been transferred to the Liquidating Trust;

(i)      all material governmental and third party approvals and consents, including Bankruptcy Court approval, and approvals Ally may be required to obtain, necessary in connection with the transactions contemplated by this Plan, shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; and

(j)      all other actions, documents, and agreements necessary to implement the Plan as of the Effective Date will have been delivered and all conditions precedent thereto will have been satisfied or waived.

## C.    Waiver of Conditions

The Plan Proponents shall have the right to waive one or more of the conditions to Confirmation and Consummation of the Plan set forth in Articles X.A and X.B(b), and (e) through (j), with the consent of Ally and the Consenting Claimants, and, solely with respect to such waivers of the conditions set forth in Article X.B(c) and (d) with the consent of FGIC and the RMBS Trustees, and, solely with respect to such waivers of the conditions set forth in Article X.A(c), (f), (h) and Article X.B(a) and (b) with the consent of the Junior Secured Notes Indenture Trustee, a majority (by amount of holdings) of the Consenting JSNs, and the Ad Hoc Group, at any time without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

## D.    Effect of Nonoccurrence of Conditions

Each of the conditions to the Effective Date must be satisfied or duly waived, and the Effective Date must occur on or before December 24, 2013.  The Plan Proponents will use best efforts for the Plan to become effective by December 19, 2013.  If the Effective Date has not occurred on or before December 24, 2013, then upon motion by the Plan Proponents or Ally made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; underline, provided, however, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion.   If the Confirmation Order is vacated, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments or rejections of Executory Contracts, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Equity Interests or Causes of Action; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking of any sort by such Debtor or any other Entity.

# ARTICLE XI.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A.    Modification and Amendments

Subject to the terms of the Plan Support Agreement, the Plan Proponents may amend, modify, or supplement the Plan pursuant to Bankruptcy Code section 1127(a) at any time prior to the Confirmation Date; provided that the Plan Proponents obtain the consent, which shall not be unreasonably withheld, of (a) the Settling Parties, in accordance with the terms of the Plan Support Agreement; and (b) the Junior Secured Notes Indenture Trustee and a majority (by amount of holdings) of the Consenting JSNs; provided, further, that no Plan modifications may adversely affect the treatment of the Junior Secured Notes Claims or the releases of, or distributions to, the holders of Junior Secured Notes Claims absent the consent of the Junior Secured Notes Indenture Trustee, a majority (by amount of holdings) of the Consenting JSNs, and the Ad Hoc Group; provided, further, that, if the Confirmation Order has not been entered or if the Confirmation Order has been entered and a stay of such order is in effect, the Plan Proponents and Ally may agree to extend the deadline for the Effective Date of the Plan beyond December 24, 2013, with the consent of each of the Consenting Claimants in accordance with the terms of the Plan Support Agreement, with such consent to not be unreasonably withheld; provided, however, that the Plan Proponents and Ally may not extend the deadline for the Effective Date of the Plan beyond December 24, 2013 absent the consent of the Junior Secured Notes Indenture Trustee, a majority (by amount of holdings) of the Consenting JSNs, and Ad Hoc Group.  After the Confirmation Date, but prior to Consummation of the Plan, the Plan Proponents may, with the consent, which shall not be unreasonably withheld, of (a)  the other Settling Parties, in accordance with the terms of the Plan Support Agreement and (b) the Junior Secured Notes Indenture Trustee, and a majority (by amount of holdings) of the Consenting JSNs, amend, modify, or supplement the Plan without further order of the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order; provided that no Plan modifications may adversely affect the treatment of the Junior Secured Notes Claims or the releases of, or distributions to, the holders of Junior Secured Notes Claims absent the consent of the Junior Secured Notes Indenture Trustee, a majority (by amount of holdings) of the Consenting JSNs, and the Ad Hoc Group.  At all times, the Plan Proponents may amend, modify, or supplement the Plan without the consent of any other Entity to the extent that such amendments, modifications, or supplements are non-material; provided that no Plan modifications may adversely affect the treatment of the Junior Secured Notes Claims or the releases of, or distributions to, the holders of Junior Secured Notes Claims absent the consent of the Junior Secured Notes Indenture Trustee, a majority (by amount of holdings) of the Consenting JSNs, and the Ad Hoc Group.  For the avoidance of doubt, no modifications to the Exculpation will discriminate unfairly against any individual Exculpated Party.  At any time, at the request of the RMBS Trustees, Art. IV.C.3 of the Plan may be amended as will be required to preserve the REMIC tax status of the RMBS Trusts notwithstanding the distribution of Units to the RMBS Claims Trust under the Plan to the RMBS Claims Trust on behalf of the RMBS Trusts, and such amendment will be deemed non-material.

### B.      Effect of Confirmation on Modifications

Pursuant to Bankruptcy Code section 1127(a), entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### C.      Revocation or Withdrawal of the Plan

Subject to the terms of the Plan Support Agreement and conditions to the Effective Date, the Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in the Plan shall constitute a waiver or release of any Claims or Equity Interests or prejudice in any manner the rights of the Plan Proponents, the Settling Parties, or any other Entity, or constitute an admission, acknowledgement, offer, or undertaking of any sort by the Plan Proponents or any other Entity.

## ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction:[6]

(a)      to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

(b)      to determine, adjudicate, or decide any other applications, adversary proceedings, contested matters, and any other matters pending on the Effective Date;

(c)      to hear and determine any matter, case, controversy, suit, dispute, or Causes of Action: (i) regarding the existence, nature, and scope of the releases, injunctions, and

---

[6] For the avoidance of doubt, the effectiveness of the NJ Carpenters Settlement and the related NJ Carpenters Claims Distribution is subject to District Court approval.

110

12-12020-mg    Doc 8019-45    Filed 01/28/15    Entered 01/22/15 18:14:28    Appendix 1
Pg 113 of 398

exculpation provided under the Plan, and (ii) enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(d)    to ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e)    Reserved;

(f)    other than with respect to the GM Policies and the GM Insurers, to hear and determine matters relating to insurance claims and settlements regarding insurance;

(g)    to resolve disputes as to the ownership of any Claim or Equity Interest;

(h)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, reversed, modified, or vacated;

(i)    to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(j)    to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(k)    to hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan including, without limitation, the allocation of RMBS Trust Claims, the RMBS Trust Allocation Protocol, the Monoline Reservation, and the Kessler Settlement Agreement;

(l)    to hear and determine any matters relating to the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and/or the Private Securities Claims Trust, including to hear and determine any actions brought against the Liquidating Trust Board, Borrower Claims Trustee and/or the Private Securities Claims Trustee, as applicable, in connection with the Plan, including any action or other dispute relating to distributions under the Plan, provided, that if the Plan does not become effective, nothing herein shall be deemed to transfer the venue or jurisdiction over any underlying litigation against Ally to the Bankruptcy Court;

(m)    to hear and determine any issue for which the Plan requires a Final Order of the Bankruptcy Court;

(n)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)    to hear and determine all matters related to applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(p)    to resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) a potential contractual obligation under any executory contract or unexpired lease that is assumed by the Debtors or the Liquidating Trust amending, modifying, or supplementing, after the Effective Date, any Executory Contracts or Unexpired Leases to the Assumption Schedule or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(q)    to hear and determine any Causes of Action preserved under the Plan;

(r)    to enter a final decree closing any of the Chapter 11 Cases;

(s)    to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(t)    to enforce the affirmative findings governing the RMBS Trustees that are contemplated in Article IV herein;

(u)    to enforce all orders previously entered by the Bankruptcy Court; and

(v)    to hear any other matter not inconsistent with the Bankruptcy Code.

Notwithstanding anything else contained herein, on and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction to the extent permissible under applicable law to hear and determine matters relating to the GM Policies and the GM Insurers, including rights under the GM Policies.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

## A.    Immediate Binding Effect

Subject to Article X.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Liquidating Trust, and any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with any Debtor.

Notwithstanding anything in Bankruptcy Rule 3020(e) to the contrary, (i) the entry of the Confirmation Order shall constitute a Final Order and the period in which an appeal must be

filed shall commence upon the entry thereof, and (ii) the Confirmation Order shall take effect immediately upon its entry and the Plan Proponents are authorized to consummate the Plan immediately after entry of the Confirmation Order and the satisfaction or waiver of all other conditions to the Effective Date of the Plan, in accordance with the terms of the Plan.

## B.    Additional Documents

On or before the Effective Date, the Plan Proponents may File with the Bankruptcy Court any and all agreements and other documents that may be necessary or appropriate in order to effectuate and further evidence the terms and conditions of the Plan.

## C.    Payment of Statutory Fees

Notwithstanding the grouping of the Debtors described herein, on the Effective Date, and thereafter as may be required, each of the Debtors shall (i) pay all the respective fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code, until the earliest to occur of the entry of (a) a final decree closing such Debtor's Chapter 11 Case, (b) a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (c) a Final Order dismissing such Debtor's Chapter 11 Case, and (ii) be responsible for the filing of consolidated post-confirmation quarterly status reports with the Bankruptcy Court in accordance with Rule 3021-1 of the Southern District of New York Local Bankruptcy Rules, which status reports shall include reports on the disbursements made by each of the Debtors.

## D.    Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve; provided, however, that, following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (i) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (ii) any appeals to which the Creditors' Committee is a party; (iii) any adversary proceedings or contested matters as of the Effective Date to which the Creditors' Committee is a party; and (iv) responding to creditor inquiries for one-hundred-twenty (120) days following the Effective Date.  Upon the dissolution of the Creditors' Committee, the current and former members of the Creditors' Committee and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's respective attorneys, accountants and other agents shall terminate, except that the Creditors' Committee and their respective Professionals shall have the right to pursue, review and object to any applications for compensation or reimbursement of expenses filed in accordance with Article II hereof.

### E.      Access to Debtors' Records after Effective Date.

On the Effective Date, Debtors shall be deemed to have transferred, assigned and conveyed to the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and the Private Securities Claims Trust, as their interests may appear with respect to the Claims of their respective beneficiaries, and the Liquidating Trust shall be authorized to take possession of, all of the books and records of the Debtors, including, except as set forth in any Ally Contract, all information and data on computers owned or leased by the Debtors or otherwise on premises occupied by the Debtors, and all rights of access to data of the Debtors and their affiliates, that were not otherwise transferred to a third party on or prior to the Effective Date. The Liquidating Trust shall have the responsibility of storing and maintaining such books and records to and for the benefit of each of the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and the Private Securities Claims Trust as their interests may appear, and the respective Plan Trusts shall enter into an agreement or protocol with respect to access to such books and records. The Debtors shall cooperate with the Plan Trustees of the Plan Trusts to facilitate the delivery and storage of such books and records in accordance herewith. For the purpose of this Section, books and records include computer generated or computer maintained books and records and computerized data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtors maintained by or in possession of third parties, except as set forth in any Ally Contract, and all of the claims and rights of the Debtors in and to books and records, wherever located. The Debtors or the Liquidating Trust, as applicable, shall make available current and historic tax returns with supporting files to Ally as necessary for Ally to address Ally's audit requirements and to facilitate Ally filing its 2013 tax returns.

### F.      Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### G.      Reservation of Rights

Except as otherwise provided in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Plan Proponents or Ally with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the Plan Proponents or Ally with respect to the holders of Claims or Equity Interests prior to the Effective Date.

### H.      Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## I.    Service of Documents

All notices, requests and demands hereunder to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    if to the Debtors, (i) if by mail or courier to: Residential Capital LLC, Lewis Kruger, CRO, c/o Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104; with copies to: (a) Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York, 10104, Attn:  Gary Lee, Lorenzo Marinuzzi, and Todd Goren; and (b) Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, New York 10178, Attn: Steven J. Reisman, Theresa A. Foudy, and Maryann Gallagher; and (ii) if by e-mail, to: Lewis.Kruger@gmacrescap.com, glee@mofo.com, lmarinuzzi@mofo.com, tgoren@mofo.com, sreisman@curtis.com, tfoudy@curtis.com, and mgallagher@curtis.com.

(b)    if to the Liquidating Trust: as provided in the Liquidating Trust Agreement for notices to the Liquidating Trust.

(c)    if to the Borrower Claims Trust: as provided in the Borrower Claims Trust Agreement for notices to the Borrower Claims Trust.

(d)    if to the Private Securities Claims Trust: as provided in the Private Securities Claims Trust Agreement for notices to the Private Securities Claims Trust.

(e)    if to the RMBS Claims Trust: as provided in the RMBS Claims Trust Agreement for notices to the RMBS Claims Trust.

(f)    if to Ally to: Ally Financial, Inc., 1177 Avenue of the Americas, New York, NY 10036; Attn:  William B. Solomon and Timothy Devine; with copies to: Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Richard M. Cieri, and Ray C. Schrock.

(g)    if to the Creditors' Committee, (i) if by mail or courier to: Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036; Attn: Kenneth H. Eckstein, Douglas H. Mannal and Stephen D. Zide; and (ii) if by email to keckstein@kramerlevin.com, dmannal@kramerlevin.com and szide@kramerlevin.com.

(h)    if to AIG, Allstate, MassMutual and/or Prudential, (i) if by mail or courier to: Quinn Emanuel Urquhart & Sullivan LLP, 51 Madison Avenue, 22nd Floor, New York, New York 10010; Attn: Susheel Kirpalani and Scott Shelley; and (ii) if by email to susheelkirpalani@quinnemanuel.com and scottshelley@quinnemanuel.com.

(i)      if to FGIC, (i) if by mail or courier to: Jones Day, 222 East 41st Street, New York, New York 10017; Attn: Richard L. Wynne and Howard F. Sidman; and the Superintendent of Financial Services of the State of New York, as Rehabilitator of FGIC, c/o Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153; Attn: Gary T. Holtzer; and (ii) if by e-mail to: rlwynne@jonesday.com, hfsidman@jonesday.com, and gary.holtzer@weil.com.

(j)      if to the Steering Committee Consenting Claimants, (i) if by mail or courier to: Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002; Attn: Kathy D. Patrick and Robert J. Madden; and Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036; Attn: Keith H. Wofford and Ross Martin, and (ii) if by e-mail to: kpatrick@gibbsbruns.com, rmadden@gibbsbruns.com, keith.wofford@ropesgray.com, and ross.martin@ropesgray.com.

(k)      if to the Talcott Franklin Consenting Claimants, (i) if by mail or courier to: (a) Talcott Franklin, P.C., 208 N. Market Street, Suite 200, Dallas, Texas 75202; Attn: Talcott J. Franklin, (b) Carter Ledyard & Milburn LLP, 2 Wall Street, New York, New York 10005, Attn: James Gadsden, and (c) Miller Johnson, 250 Monroe Avenue, NW, Suite 800, P.O. Box 306, Grand Rapids, Michigan, Attn: Thomas Sarb; and (ii) if by e-mail to: tal@talcottfranklin.com, gadsden@clm.com and sarbt@millerjohnson.com.

(l)      if to Wilmington Trust, (i) if by mail or courier to: Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Attn: Thomas J. Moloney and Sean A. O'Neal and Loeb & Loeb, 345 Park Avenue, New York, New York 10154, Attn: Walter H. Curchack; and (ii) if by e-mail to: tmoloney@cgsh.com, soneal@cgsh.com, and wcurchack@loeb.com.

(m)      if to MBIA, (i) if by mail or courier to: Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281, Attn: Gregory M. Petrick and Mark Ellenberg; (ii) if by e-mail to: Gregory.Petrick@cwt.com and Mark.Ellenberg@cwt.com.

(n)      if to the Kessler Class Claimants, (i) if by mail or courier to: Polsinelli, 900 Third Avenue, 21st Floor, New York, New York 10022, Attn: Daniel J. Flanigan; Carlson Lynch, Ltd., PNC Park, 115 Federal Street Suite 210, Pittsburgh, PA 15212, Attn: R. Bruce Carlson, Walters Bender Strohbehn & Vaughan, P.C., 2500 City Center Square, 12th & Baltimore, P.O. Box 26188, Kansas City, MO 64196, Attn: R. Frederick Walters; and (ii) if by e-mail to: dflanigan@polsinelli.com, bcarlson@carlsonlynch.com, and fwalters@wbsvlaw.com.

(o)      if to the RMBS Trustees (i) if by mail or courier to: BNY Mellon, c/o Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036, Attn: Glenn E. Siegel; DB, c/o Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178, Attn: James L. Garrity, Jr.; USB, c/o Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004, Attn: Arlene R. Alves; WFB,

c/o Alston & Bird LLP, 1 Atlantic Center, 1201 W. Peachtree Street, NW, Atlanta, Georgia 30309-3424, Attn: John C. Weitnauer; LDTC, Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004, Attn: Dale C. Christensen, Jr., HSBC, c/o John Kibler, Allen & Overy, 1221 Avenue of the Americas, New York, NY 10020; and (ii) if by e-mail to: glenn.siegel@dechert.com, jgarrity@morganlewis.com, alves@sewkis.com, kit.weitnauer@alston.com, christensen@sewkis.com, and John.Kibler@AllenOvery.com.

(p)     if to Paulson, (i) if by mail or courier to: Paulson & Co., Inc., 1251 Avenue of the Americas, New York, New York 10020, Attn: Daniel J. Kamensky; and (ii) if by e-mail to: Daniel.Kamensky@paulsonco.com.

After the Effective Date, the Liquidating Trust has authority to send a notice to any Entity that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, it must File a renewed request to receive documents with the Bankruptcy Court. After the Effective Date, the Liquidating Trust is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

## J.     Further Assurances

The Debtors or the Liquidating Trust, all holders of Claims receiving distributions pursuant to the Plan, and all other Entities, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

## K.     Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan and the Confirmation Order shall remain in full force and effect in accordance with their terms.

## L.     Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## M.     Exhibits and Related Documents

All exhibits and documents Filed in relation to the Plan are incorporated into and are a part of the Plan as if set forth in full in the Plan. After any exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the

Liquidating Trust's counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website, http://www.kccllc.net/rescap, or the Bankruptcy Court's website, http://www.nys.uscourts.gov (a PACER login and password are required to access documents on the Bankruptcy Court's website).

## N.      Severability of Plan Provisions

Except as otherwise provided herein, if, before Confirmation of the Plan, subject to the terms of the Plan Support Agreement, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan, including the Third Party Releases, Debtor Releases, Exculpation, including Article X.A, B and C, shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Plan Proponents' consent; and (c) nonseverable and mutually dependent.

## O.      Waiver or Estoppel Conflicts

Each holder of a Claim or Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated, by virtue of an agreement made with the Plan Proponents, or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

## P.      Conflicts

Except as set forth in the Plan or unless otherwise ordered by the Bankruptcy Court, to the extent that the Disclosure Statement, any order of the Bankruptcy Court (other than the Confirmation Order), or any exhibit to the Plan or document executed or delivered in connection with the Plan is inconsistent with the terms of the Plan, the terms of the Plan shall control.

Dated: December 6, 2013
     New York, New York

Respectfully Submitted,

RESIDENTIAL CAPITAL, LLC for itself
and its Debtor subsidiaries

By: /s/ Lewis Kruger
Name: Lewis Kruger
Title: Chief Restructuring Officer

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS

By: /s/ John S. Dubel
Name: John S. Dubel
Title: Co-Chair

By: /s/ Peter F. Finkel
Name: Peter F. Finkel
Title: Co-Chair

## Schedule 1G

Schedule 1 – Advance Recognized Cure Claims
Subject to Further Review and Due Diligence

| Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|------|--------|------------------|-------------|---------|------------------------|
| ACE 1999-A [Total] | Subprime 1999 | 9.00% | $8 | MBIA | $0 |
| ACE 2005-SL1 [Total] | CES 2005 | 53.10% | $5,649 | | $5,649 |
| ACE 2006-SL1 [Total] | CES 2006 | 29.54% | $4,645 | | $4,645 |
| ACE 2006-SL4 [Total] | CES 2006 | 100.00% | $5,044 | | $5,044 |
| ACE 2007-HE4 [1A] | Subprime 2007 | 11.23% | $33,042 | | $33,042 |
| ACE 2007-HE4 [1F] | Subprime 2007 | 11.23% | $6,862 | | $6,862 |
| ACE 2007-HE4 [2A] | Subprime 2007 | 11.23% | $46,537 | | $46,537 |
| ACE 2007-HE4 [2F] | Subprime 2007 | 11.23% | $7,563 | | $7,563 |
| ACE 2007-SL1 [1] | CES 2007 | 76.47% | $236 | | $236 |
| ACE 2007-SL1 [2] | CES 2007 | 76.47% | $1,084 | | $1,084 |
| AHM 2004-4 [1] | ALT-A 2004 | 14.48% | $5,141 | | $5,141 |
| AHM 2004-4 [2] | ALT-A 2004 | 14.48% | $11,797 | | $11,797 |
| AHM 2004-4 [3] | ALT-A 2004 | 14.48% | $11,131 | | $11,131 |
| AHM 2004-4 [4] | ALT-A 2004 | 14.48% | $17,976 | | $17,976 |
| AHM 2004-4 [5] | ALT-A 2004 | 14.48% | $11,743 | | $11,743 |
| AHM 2004-4 [6] | ALT-A 2004 | 14.48% | $7,796 | | $7,796 |
| AHM 2004-4 [7] | ALT-A 2004 | 14.48% | $4,404 | MBIA | $0 |
| AHM 2006-2 [2_1] | CES 2006 | 3.64% | $942 | | $942 |
| AHM 2006-2 [2_2] | CES 2006 | 3.64% | $1,029 | | $1,029 |
| AHM 2006-2 [3] | CES 2006 | 3.64% | $2,687 | | $2,687 |
| AHM 2006-2 [4] | CES 2006 | 3.64% | $3,544 | | $3,544 |
| AHM 2006-2 [5] | CES 2006 | 3.64% | $847 | CIFG | $0 |
| AHM 2007-A [11] | CES 2007 | 8.24% | $2,338 | | $2,338 |
| AHM 2007-A [12] | CES 2007 | 8.24% | $1,286 | | $1,286 |
| AHM 2007-A [13] | CES 2007 | 8.24% | $5,731 | | $5,731 |
| AHM 2007-A [2] | CES 2007 | 8.24% | $1,999 | | $1,999 |
| AHM 2007-A [3] | CES 2007 | 8.24% | $2,227 | Assured Guaranty | $0 |
| AHM 2007-A [4WP] | CES 2007 | 8.24% | $3,527 | | $3,527 |
| AHM 2007-A [4SD] | CES 2007 | 8.24% | $5,639 | | $5,639 |
| AHM 2007-SD2 [NP] | Subprime 2007 | 5.00% | $8,512 | | $8,512 |
| AHM 2007-SD2 [P] | Subprime 2007 | 5.00% | $2,450 | | $2,450 |
| AHM 2007-SD2 [REO] | Subprime 2007 | 5.00% | $4,028 | | $4,028 |
| AHM 2007-SD2 [RP] | Subprime 2007 | 5.00% | $564 | | $564 |
| AHM 2007-SD2 [SP] | Subprime 2007 | 5.00% | $1,704 | | $1,704 |
| ALBT 2007-S1 [Total] | CES 2007 | 5.00% | $17 | | $17 |
| ARMT 2004-5 [1] | ALT-A 2004 | 13.09% | $1,127 | | $1,127 |
| ARMT 2004-5 [2] | ALT-A 2004 | 13.09% | $2,199 | | $2,199 |
| ARMT 2004-5 [3] | ALT-A 2004 | 13.09% | $1,662 | | $1,662 |
| ARMT 2004-5 [4] | ALT-A 2004 | 13.09% | $1,400 | | $1,400 |
| ARMT 2004-5 [5] | ALT-A 2004 | 13.09% | $1,077 | | $1,077 |
| ARMT 2004-5 [6] | ALT-A 2004 | 13.09% | $1,350 | | $1,350 |
| ARMT 2004-5 [7A] | ALT-A 2004 | 13.09% | $1,471 | | $1,471 |
| ARMT 2004-5 [7B] | ALT-A 2004 | 13.09% | $3,265 | | $3,265 |
| ARMT 2005-1 [1] | ALT-A 2005 | 2.92% | $556 | | $556 |
| ARMT 2005-1 [2] | ALT-A 2005 | 2.92% | $937 | | $937 |
| ARMT 2005-1 [3] | ALT-A 2005 | 2.92% | $496 | | $496 |
| ARMT 2005-1 [4] | ALT-A 2005 | 2.92% | $586 | | $586 |
| ARMT 2005-1 [51] | ALT-A 2005 | 2.92% | $496 | | $496 |
| ARMT 2005-1 [52] | ALT-A 2005 | 2.92% | $1,403 | | $1,403 |
| ARMT 2005-10 [1] | ALT-A 2005 | 13.49% | $2,546 | | $2,546 |
| ARMT 2005-10 [2] | ALT-A 2005 | 13.49% | $5,982 | | $5,982 |

Schedule 1: Allowed RMBS Cure Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 53 | ARMT 2005-10 [3] | ALT-A 2005 | 13.49% | $7,177 | | $7,177 |
| 54 | ARMT 2005-10 [4] | ALT-A 2005 | 13.49% | $2,776 | | $2,776 |
| 55 | ARMT 2005-10 [5] | ALT-A 2005 | 13.49% | $10,063 | | $10,063 |
| 56 | ARMT 2005-10 [6] | ALT-A 2005 | 13.49% | $6,278 | | $6,278 |
| 57 | ARMT 2005-11 [1] | ALT-A 2005 | 13.80% | $1,993 | | $1,993 |
| 58 | ARMT 2005-11 [2] | ALT-A 2005 | 13.80% | $9,515 | | $9,515 |
| 59 | ARMT 2005-11 [3] | ALT-A 2005 | 13.80% | $5,205 | | $5,205 |
| 60 | ARMT 2005-11 [4] | ALT-A 2005 | 13.80% | $19,342 | | $19,342 |
| 61 | ARMT 2005-11 [5] | ALT-A 2005 | 13.80% | $19,239 | | $19,239 |
| 62 | ARMT 2005-9 [1] | ALT-A 2005 | 22.06% | $6,807 | | $6,807 |
| 63 | ARMT 2005-9 [2] | ALT-A 2005 | 22.06% | $3,116 | | $3,116 |
| 64 | ARMT 2005-9 [3] | ALT-A 2005 | 22.06% | $3,199 | | $3,199 |
| 65 | ARMT 2005-9 [4] | ALT-A 2005 | 22.06% | $12,436 | | $12,436 |
| 66 | ARMT 2005-9 [5] | ALT-A 2005 | 22.06% | $26,945 | | $26,945 |
| 67 | BAFC 2005-6 [1] | Prime 2005 | 8.27% | $1,252 | | $1,252 |
| 68 | BAFC 2005-6 [2] | Prime 2005 | 8.27% | $1,308 | | $1,308 |
| 69 | BAFC 2005-8 [1] | Prime 2005 | 9.08% | $391 | | $391 |
| 70 | BAFC 2005-8 [2] | Prime 2005 | 9.08% | $1,257 | | $1,257 |
| 71 | BAFC 2005-8 [3] | Prime 2005 | 9.08% | $213 | | $213 |
| 72 | BAFC 2005-8 [4] | Prime 2005 | 9.08% | $1,070 | | $1,070 |
| 73 | BAFC 2006-1 [1] | ALT-A 2006 | 3.11% | $442 | | $442 |
| 74 | BAFC 2006-1 [2] | ALT-A 2006 | 3.11% | $190 | | $190 |
| 75 | BAFC 2006-1 [3] | ALT-A 2006 | 3.11% | $166 | | $166 |
| 76 | BAFC 2006-2 [1] | ALT-A 2006 | 0.99% | $39 | | $39 |
| 77 | BAFC 2006-2 [2] | ALT-A 2006 | 0.99% | $269 | | $269 |
| 78 | BAFC 2006-2 [3] | ALT-A 2006 | 0.99% | $65 | | $65 |
| 79 | BAFC 2006-2 [4] | ALT-A 2006 | 0.99% | $54 | | $54 |
| 80 | BAFC 2006-2 [5] | ALT-A 2006 | 0.99% | $33 | | $33 |
| 81 | BAFC 2006-2 [6] | ALT-A 2006 | 0.99% | $30 | | $30 |
| 82 | BAFC 2006-4 [Total] | ALT-A 2006 | 17.43% | $11,035 | | $11,035 |
| 83 | BAFC 2006-5 [1] | Prime 2006 | 5.76% | $577 | | $577 |
| 84 | BAFC 2006-5 [2] | Prime 2006 | 5.76% | $280 | | $280 |
| 85 | BAFC 2006-5 [3] | Prime 2006 | 5.76% | $294 | | $294 |
| 86 | BAFC 2006-5 [4] | Prime 2006 | 5.76% | $969 | | $969 |
| 87 | BAFC 2007-3 [1] | Prime 2007 | 1.84% | $992 | | $992 |
| 88 | BAFC 2007-3 [2] | Prime 2007 | 1.84% | $492 | | $492 |
| 89 | BAFC 2007-3 [3] | Prime 2007 | 1.84% | $789 | | $789 |
| 90 | BAFC 2007-3 [4] | Prime 2007 | 1.84% | $4,664 | | $4,664 |
| 91 | BAFC 2007-4 [N] | Prime 2007 | 12.13% | $11,391 | | $11,391 |
| 92 | BAFC 2007-4 [5] | Prime 2007 | 12.13% | $2,421 | | $2,421 |
| 93 | BAFC 2007-4 [S4] | Prime 2007 | 12.13% | $4,260 | | $4,260 |
| 94 | BAFC 2007-4 [S5] | Prime 2007 | 12.13% | $1,936 | | $1,936 |
| 95 | BAFC 2007-4 [T2] | Prime 2007 | 12.13% | $12,523 | | $12,523 |
| 96 | BAFC 2007-7 [1] | ALT-A 2007 | 0.71% | $326 | | $326 |
| 97 | BAFC 2007-7 [2] | ALT-A 2007 | 0.71% | $126 | | $126 |
| 98 | BAFC 2007-7 [3] | ALT-A 2007 | 0.71% | $1,332 | | $1,332 |
| 99 | BALTA 2003-1 [1] | ALT-A 2003 | 4.50% | $59 | | $59 |
| 100 | BALTA 2003-1 [2] | ALT-A 2003 | 4.50% | $46 | | $46 |
| 101 | BALTA 2004-12 [I-1] | ALT-A 2004 | 0.92% | $775 | | $775 |
| 102 | BALTA 2004-12 [I-2] | ALT-A 2004 | 0.92% | $606 | | $606 |
| 103 | BALTA 2004-12 [II-1] | ALT-A 2004 | 0.92% | $61 | | $61 |

Case 1:14-cv-03038-GBD    Document 15-1    Filed 11/06/14    Page 250 of 355

Schedule 2: Allocated Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **GMACM Servicer %** | **GMACM Claim** | **Insurer** | **GMACM Recognized Claim** |
| 104 | BALTA 2004-12  [II-2] | ALT-A 2004 | 0.92% | $211 | | $211 |
| 105 | BALTA 2004-12  [II-3] | ALT-A 2004 | 0.92% | $121 | | $121 |
| 106 | BALTA 2004-12  [II-4] | ALT-A 2004 | 0.92% | $67 | | $67 |
| 107 | BALTA 2004-4  [Total] | ALT-A 2004 | 9.05% | $3,704 | | $3,704 |
| 108 | BALTA 2004-6  [1] | ALT-A 2004 | 0.69% | $243 | | $243 |
| 109 | BALTA 2004-6  [2] | ALT-A 2004 | 0.69% | $38 | | $38 |
| 110 | BALTA 2004-6  [3] | ALT-A 2004 | 0.69% | $236 | | $236 |
| 111 | BALTA 2005-10  [1] | ALT-A 2005 | 0.06% | $174 | | $174 |
| 112 | BALTA 2005-10  [TWO_FIVE] | ALT-A 2005 | 0.06% | $65 | | $65 |
| 113 | BALTA 2005-10  [TWO_FOUR] | ALT-A 2005 | 0.06% | $79 | | $79 |
| 114 | BALTA 2005-10  [TWO_ONE] | ALT-A 2005 | 0.06% | $31 | | $31 |
| 115 | BALTA 2005-10  [TWO_THREE] | ALT-A 2005 | 0.06% | $157 | | $157 |
| 116 | BALTA 2005-10  [TWO_TWO] | ALT-A 2005 | 0.06% | $107 | | $107 |
| 117 | BALTA 2005-3  [1] | ALT-A 2005 | 16.03% | $4,314 | | $4,314 |
| 118 | BALTA 2005-3  [2] | ALT-A 2005 | 16.03% | $2,858 | | $2,858 |
| 119 | BALTA 2005-3  [3] | ALT-A 2005 | 16.03% | $15,750 | | $15,750 |
| 120 | BALTA 2005-3  [4] | ALT-A 2005 | 16.03% | $10,704 | | $10,704 |
| 121 | BALTA 2005-4  [I] | ALT-A 2005 | 0.61% | $423 | | $423 |
| 122 | BALTA 2005-4  [II1] | ALT-A 2005 | 0.61% | $219 | | $219 |
| 123 | BALTA 2005-4  [II2] | ALT-A 2005 | 0.61% | $210 | | $210 |
| 124 | BALTA 2005-4  [II3] | ALT-A 2005 | 0.61% | $1,228 | | $1,228 |
| 125 | BALTA 2005-4  [II4] | ALT-A 2005 | 0.61% | $103 | | $103 |
| 126 | BALTA 2005-4  [II5] | ALT-A 2005 | 0.61% | $70 | | $70 |
| 127 | BALTA 2005-5  [1] | ALT-A 2005 | 0.31% | $431 | | $431 |
| 128 | BALTA 2005-5  [II-1] | ALT-A 2005 | 0.31% | $56 | | $56 |
| 129 | BALTA 2005-5  [II-2] | ALT-A 2005 | 0.31% | $370 | | $370 |
| 130 | BALTA 2005-5  [II-3] | ALT-A 2005 | 0.31% | $144 | | $144 |
| 131 | BALTA 2005-5  [II-4] | ALT-A 2005 | 0.31% | $51 | | $51 |
| 132 | BALTA 2005-5  [II-5] | ALT-A 2005 | 0.31% | $112 | | $112 |
| 133 | BALTA 2005-5  [II-6] | ALT-A 2005 | 0.31% | $27 | | $27 |
| 134 | BALTA 2006-1  [I] | ALT-A 2006 | 7.43% | $22,311 | | $22,311 |
| 135 | BALTA 2006-1  [II-1] | ALT-A 2006 | 7.43% | $18,799 | | $18,799 |
| 136 | BALTA 2006-1  [II-2] | ALT-A 2006 | 7.43% | $3,599 | | $3,599 |
| 137 | BALTA 2006-1  [II-3] | ALT-A 2006 | 7.43% | $2,097 | | $2,097 |
| 138 | BALTA 2006-3  [I] | ALT-A 2006 | 4.09% | $16,135 | | $16,135 |
| 139 | BALTA 2006-3  [II1] | ALT-A 2006 | 4.09% | $6,238 | | $6,238 |
| 140 | BALTA 2006-3  [II2] | ALT-A 2006 | 4.09% | $5,980 | | $5,980 |
| 141 | BALTA 2006-3  [II3] | ALT-A 2006 | 4.09% | $6,467 | | $6,467 |
| 142 | BALTA 2006-3  [II4] | ALT-A 2006 | 4.09% | $851 | | $851 |
| 143 | BALTA 2006-3  [III1] | ALT-A 2006 | 4.09% | $4,708 | | $4,708 |
| 144 | BALTA 2006-3  [III2] | ALT-A 2006 | 4.09% | $2,202 | | $2,202 |
| 145 | BALTA 2006-3  [III3] | ALT-A 2006 | 4.09% | $1,623 | | $1,623 |
| 146 | BALTA 2006-3  [III4] | ALT-A 2006 | 4.09% | $2,523 | | $2,523 |
| 147 | BALTA 2006-3  [III5] | ALT-A 2006 | 4.09% | $2,980 | | $2,980 |
| 148 | BALTA 2006-3  [III6] | ALT-A 2006 | 4.09% | $3,498 | | $3,498 |
| 149 | BALTA 2006-4  [I1] | ALT-A 2006 | 0.19% | $891 | | $891 |
| 150 | BALTA 2006-4  [I2] | ALT-A 2006 | 0.19% | $929 | | $929 |
| 151 | BALTA 2006-4  [I3] | ALT-A 2006 | 0.19% | $633 | | $633 |
| 152 | BALTA 2006-4  [II1] | ALT-A 2006 | 0.19% | $72 | | $72 |

Schedule 2 - Advance Receivables - Cure Claims
Subject to Further Review and Due Diligence

| Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|
| BALTA 2006-4 [II2] | ALT-A 2006 | 0.19% | $572 | | $572 |
| BALTA 2006-4 [II3] | ALT-A 2006 | 0.19% | $644 | | $644 |
| BALTA 2006-4 [III1] | ALT-A 2006 | 0.19% | $144 | | $144 |
| BALTA 2006-4 [III2] | ALT-A 2006 | 0.19% | $384 | | $384 |
| BALTA 2006-4 [III3] | ALT-A 2006 | 0.19% | $547 | | $547 |
| BALTA 2006-5 [1] | ALT-A 2006 | 0.20% | $1,116 | | $1,116 |
| BALTA 2006-5 [2] | ALT-A 2006 | 0.20% | $403 | | $403 |
| BALTA 2006-8 [I] | ALT-A 2006 | 0.52% | $1,710 | | $1,710 |
| BALTA 2006-8 [II] | ALT-A 2006 | 0.52% | $1,325 | | $1,325 |
| BALTA 2006-8 [III] | ALT-A 2006 | 0.52% | $559 | | $559 |
| BAYV 2003-AA [1D] | Subprime 2003 | 2.77% | $39 | | $39 |
| BAYV 2003-AA [1N] | Subprime 2003 | 2.77% | $659 | | $659 |
| BAYV 2003-AA [2] | Subprime 2003 | 2.77% | $104 | | $104 |
| BAYV 2004-A [1] | Subprime 2004 | 4.00% | $1,496 | | $1,496 |
| BAYV 2004-A [2] | Subprime 2004 | 4.00% | $873 | | $873 |
| BAYV 2006-B [1] | Subprime 2006 | 4.63% | $1,758 | | $1,758 |
| BAYV 2006-B [2] | Subprime 2006 | 4.63% | $4,072 | | $4,072 |
| BAYV 2006-D [1A] | Subprime 2006 | 1.33% | $112 | | $112 |
| BAYV 2006-D [1F] | Subprime 2006 | 1.33% | $751 | | $751 |
| BAYV 2006-D [2A] | Subprime 2006 | 1.33% | $1,105 | | $1,105 |
| BAYV 2006-D [2F] | Subprime 2006 | 1.33% | $107 | | $107 |
| BAYV 2007-A [1] | Subprime 2007 | 5.00% | $4,424 | | $4,424 |
| BAYV 2007-A [2] | Subprime 2007 | 5.00% | $4,757 | | $4,757 |
| BAYV 2007-B [1] | Subprime 2007 | 14.45% | $9,964 | | $9,964 |
| BAYV 2007-B [2] | Subprime 2007 | 14.45% | $13,739 | | $13,739 |
| BSABS 2003-AC3 [Total] | ALT-A 2003 | 1.02% | $177 | | $177 |
| BSABS 2003-AC4 [Total] | ALT-A 2003 | 0.14% | $61 | | $61 |
| BSABS 2004-AC1 [Total] | ALT-A 2004 | 1.36% | $228 | | $228 |
| BSABS 2004-AC2 [1] | ALT-A 2004 | 0.24% | $38 | | $38 |
| BSABS 2004-AC2 [2] | ALT-A 2004 | 0.24% | $20 | | $20 |
| BSABS 2004-AC7 [Total] | ALT-A 2004 | 2.40% | $1,110 | | $1,110 |
| BSABS 2004-BO1 [1F] | Subprime 2004 | 100.00% | $218,097 | | $218,097 |
| BSABS 2004-BO1 [1S] | Subprime 2004 | 100.00% | $90,871 | | $90,871 |
| BSABS 2004-BO1 [2F] | Subprime 2004 | 100.00% | $136,469 | | $136,469 |
| BSABS 2005-AC3 [1] | ALT-A 2005 | 0.03% | $11 | | $11 |
| BSABS 2005-AC3 [2] | ALT-A 2005 | 0.03% | $13 | | $13 |
| BSABS 2005-AC7 [Total] | ALT-A 2005 | 0.27% | $222 | | $222 |
| BSABS 2006-SD2 [Total] | Subprime 2006 | 0.08% | $98 | | $98 |
| BSABS 2007-SD2 [2NEG] | Subprime 2007 | 0.01% | $3 | | $3 |
| BSABS 2007-SD2 [2NO_NEG] | Subprime 2007 | 0.01% | $9 | | $9 |
| BSABS 2007-SD2 [I] | Subprime 2007 | 0.01% | $9 | | $9 |
| BSABS 2007-SD3 [A] | Subprime 2007 | 0.71% | $1,199 | FGIC | $1,199 |
| BSABS 2007-SD3 [F] | Subprime 2007 | 0.71% | $746 | FGIC | $746 |
| BSARM 2001-4 [1] | Prime 2001 | 51.63% | $1,211 | | $1,211 |
| BSARM 2001-4 [2] | Prime 2001 | 51.63% | $263 | | $263 |
| BSARM 2002-11 [I1] | Prime 2002 | 18.40% | $236 | | $236 |
| BSARM 2002-11 [I2] | Prime 2002 | 18.40% | $304 | | $304 |
| BSARM 2002-11 [I3] | Prime 2002 | 18.40% | $23 | | $23 |
| BSARM 2002-11 [I4] | Prime 2002 | 18.40% | $29 | | $29 |
| BSARM 2002-11 [II1] | Prime 2002 | 18.40% | $72 | | $72 |
| BSARM 2002-11 [II2] | Prime 2002 | 18.40% | $120 | | $120 |

Schedule 2 Covered Trusts and Cure Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
| 204 | BSARM 2003-1 [1] | Prime 2003 | 5.04% | $100 | | $100 |
| 205 | BSARM 2003-1 [2] | Prime 2003 | 5.04% | $47 | | $47 |
| 206 | BSARM 2003-1 [3] | Prime 2003 | 5.04% | $80 | | $80 |
| 207 | BSARM 2003-1 [4] | Prime 2003 | 5.04% | $11 | | $11 |
| 208 | BSARM 2003-1 [5] | Prime 2003 | 5.04% | $70 | | $70 |
| 209 | BSARM 2003-1 [6] | Prime 2003 | 5.04% | $107 | | $107 |
| 210 | BSARM 2003-1 [7] | Prime 2003 | 5.04% | $31 | | $31 |
| 211 | BSARM 2003-1 [8] | Prime 2003 | 5.04% | $11 | | $11 |
| 212 | BSARM 2003-3 [1] | Prime 2003 | 26.07% | $50 | | $50 |
| 213 | BSARM 2003-3 [2] | Prime 2003 | 26.07% | $346 | | $346 |
| 214 | BSARM 2003-3 [3] | Prime 2003 | 26.07% | $682 | | $682 |
| 215 | BSARM 2003-3 [4] | Prime 2003 | 26.07% | $122 | | $122 |
| 216 | BSARM 2003-4 [1] | Prime 2003 | 5.43% | $24 | | $24 |
| 217 | BSARM 2003-4 [2] | Prime 2003 | 5.43% | $120 | | $120 |
| 218 | BSARM 2003-4 [3] | Prime 2003 | 5.43% | $123 | | $123 |
| 219 | BSARM 2003-5 [1-1] | Prime 2003 | 4.00% | $81 | | $81 |
| 220 | BSARM 2003-5 [1-2] | Prime 2003 | 4.00% | $108 | | $108 |
| 221 | BSARM 2003-5 [1-3] | Prime 2003 | 4.00% | $60 | | $60 |
| 222 | BSARM 2003-5 [II] | Prime 2003 | 4.00% | $215 | | $215 |
| 223 | BSARM 2003-6 [1-1] | Prime 2003 | 2.88% | $59 | | $59 |
| 224 | BSARM 2003-6 [1-2] | Prime 2003 | 2.88% | $107 | | $107 |
| 225 | BSARM 2003-6 [1-3] | Prime 2003 | 2.88% | $25 | | $25 |
| 226 | BSARM 2003-6 [II] | Prime 2003 | 2.88% | $99 | | $99 |
| 227 | BSARM 2003-7 [1] | Prime 2003 | 1.94% | $20 | | $20 |
| 228 | BSARM 2003-7 [2] | Prime 2003 | 1.94% | $71 | | $71 |
| 229 | BSARM 2003-7 [3] | Prime 2003 | 1.94% | $26 | | $26 |
| 230 | BSARM 2003-7 [4] | Prime 2003 | 1.94% | $161 | | $161 |
| 231 | BSARM 2003-7 [5] | Prime 2003 | 1.94% | $31 | | $31 |
| 232 | BSARM 2003-7 [6] | Prime 2003 | 1.94% | $156 | | $156 |
| 233 | BSARM 2003-7 [7] | Prime 2003 | 1.94% | $27 | | $27 |
| 234 | BSARM 2003-7 [8] | Prime 2003 | 1.94% | $22 | | $22 |
| 235 | BSARM 2003-7 [9] | Prime 2003 | 1.94% | $113 | | $113 |
| 236 | BSARM 2004-1 [1-1] | Prime 2004 | 0.32% | $24 | | $24 |
| 237 | BSARM 2004-1 [1-2] | Prime 2004 | 0.32% | $45 | | $45 |
| 238 | BSARM 2004-1 [1-3] | Prime 2004 | 0.32% | $10 | | $10 |
| 239 | BSARM 2004-1 [1-4] | Prime 2004 | 0.32% | $9 | | $9 |
| 240 | BSARM 2004-1 [1-5] | Prime 2004 | 0.32% | $17 | | $17 |
| 241 | BSARM 2004-1 [1-6] | Prime 2004 | 0.32% | $5 | | $5 |
| 242 | BSARM 2004-1 [1-7] | Prime 2004 | 0.32% | $9 | | $9 |
| 243 | BSARM 2004-1 [II-1] | Prime 2004 | 0.32% | $33 | | $33 |
| 244 | BSARM 2004-1 [II-2] | Prime 2004 | 0.32% | $3 | | $3 |
| 245 | BSARM 2004-1 [II-3] | Prime 2004 | 0.32% | $3 | | $3 |
| 246 | BSARM 2004-10 [1] | Prime 2004 | 19.58% | $2,551 | | $2,551 |
| 247 | BSARM 2004-10 [2] | Prime 2004 | 19.58% | $4,518 | | $4,518 |
| 248 | BSARM 2004-10 [3] | Prime 2004 | 19.58% | $1,417 | | $1,417 |
| 249 | BSARM 2004-10 [4] | Prime 2004 | 19.58% | $1,952 | | $1,952 |
| 250 | BSARM 2004-10 [5] | Prime 2004 | 19.58% | $2,097 | | $2,097 |
| 251 | BSARM 2004-10 [II1] | Prime 2004 | 19.58% | $2,598 | | $2,598 |
| 252 | BSARM 2004-10 [II2] | Prime 2004 | 19.58% | $779 | | $779 |
| 253 | BSARM 2004-10 [II3] | Prime 2004 | 19.58% | $1,799 | | $1,799 |
| 254 | BSARM 2004-10 [III1] | Prime 2004 | 19.58% | $903 | | $903 |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **GMACM Servicer %** | **GMACM Claim** | **Insurer** | **GMACM Recognized Claim** |
| 255 | BSARM 2004-10 [II2] | Prime 2004 | 19.58% | $1,427 | | $1,427 |
| 256 | BSARM 2004-12 [1] | Prime 2004 | 38.54% | $10,077 | | $10,077 |
| 257 | BSARM 2004-12 [2] | Prime 2004 | 38.54% | $25,736 | | $25,736 |
| 258 | BSARM 2004-12 [3] | Prime 2004 | 38.54% | $2,615 | | $2,615 |
| 259 | BSARM 2004-12 [4] | Prime 2004 | 38.54% | $1,968 | | $1,968 |
| 260 | BSARM 2004-5 [1] | Prime 2004 | 100.00% | $3,138 | | $3,138 |
| 261 | BSARM 2004-5 [2] | Prime 2004 | 100.00% | $14,054 | | $14,054 |
| 262 | BSARM 2004-5 [3] | Prime 2004 | 100.00% | $1,654 | | $1,654 |
| 263 | BSARM 2004-5 [4] | Prime 2004 | 100.00% | $1,116 | | $1,116 |
| 264 | BSARM 2004-9 [1] | Prime 2004 | 72.17% | $2,116 | | $2,116 |
| 265 | BSARM 2004-9 [2] | Prime 2004 | 72.17% | $5,679 | | $5,679 |
| 266 | BSARM 2004-9 [3] | Prime 2004 | 72.17% | $1,496 | | $1,496 |
| 267 | BSARM 2004-9 [4] | Prime 2004 | 72.17% | $499 | | $499 |
| 268 | BSARM 2004-9 [5] | Prime 2004 | 72.17% | $7,013 | | $7,013 |
| 269 | BSARM 2004-9 [6] | Prime 2004 | 72.17% | $907 | | $907 |
| 270 | BSARM 2004-9 [7] | Prime 2004 | 72.17% | $3,384 | | $3,384 |
| 271 | BSARM 2005-11 [1] | Prime 2005 | 70.51% | $1,484 | | $1,484 |
| 272 | BSARM 2005-11 [2] | Prime 2005 | 70.51% | $4,361 | | $4,361 |
| 273 | BSARM 2005-11 [3] | Prime 2005 | 70.51% | $3,122 | | $3,122 |
| 274 | BSARM 2005-11 [4] | Prime 2005 | 70.51% | $4,125 | | $4,125 |
| 275 | BSARM 2005-11 [5] | Prime 2005 | 70.51% | $5,476 | | $5,476 |
| 276 | BSARM 2005-12 [I-1] | Prime 2005 | 8.76% | $2,846 | | $2,846 |
| 277 | BSARM 2005-12 [I-2] | Prime 2005 | 8.76% | $6,221 | | $6,221 |
| 278 | BSARM 2005-12 [I-3] | Prime 2005 | 8.76% | $2,542 | | $2,542 |
| 279 | BSARM 2005-12 [II-1] | Prime 2005 | 8.76% | $531 | | $531 |
| 280 | BSARM 2005-12 [II-2] | Prime 2005 | 8.76% | $1,249 | | $1,249 |
| 281 | BSARM 2005-12 [II-3] | Prime 2005 | 8.76% | $2,497 | | $2,497 |
| 282 | BSARM 2005-12 [II-4] | Prime 2005 | 8.76% | $374 | | $374 |
| 283 | BSARM 2005-12 [II-5] | Prime 2005 | 8.76% | $623 | | $623 |
| 284 | BSARM 2006-2 [1] | Prime 2006 | 0.36% | $38 | | $38 |
| 285 | BSARM 2006-2 [2] | Prime 2006 | 0.36% | $411 | | $411 |
| 286 | BSARM 2006-2 [3] | Prime 2006 | 0.36% | $145 | | $145 |
| 287 | BSARM 2006-2 [4] | Prime 2006 | 0.36% | $203 | | $203 |
| 288 | CMLTI 2004-2 [1] | Prime 2004 | 1.72% | $40 | | $40 |
| 289 | CMLTI 2004-2 [2] | Prime 2004 | 1.72% | $11 | | $11 |
| 290 | CMLTI 2004-HY84 [1] | ALT-A 2004 | 21.30% | $1,156 | | $1,156 |
| 291 | CMLTI 2004-HY84 [2] | ALT-A 2004 | 21.30% | $560 | | $560 |
| 292 | CMLTI 2004-HY84 [3] | ALT-A 2004 | 21.30% | $2,507 | | $2,507 |
| 293 | CMLTI 2004-HY84 [4] | ALT-A 2004 | 21.30% | $2,211 | | $2,211 |
| 294 | CMLTI 2005-1 [I] | ALT-A 2005 | 24.89% | $2,721 | | $2,721 |
| 295 | CMLTI 2005-1 [II-1] | ALT-A 2005 | 24.89% | $3,022 | | $3,022 |
| 296 | CMLTI 2005-1 [II-2] | ALT-A 2005 | 24.89% | $2,292 | | $2,292 |
| 297 | CMLTI 2005-1 [III] | ALT-A 2005 | 24.89% | $2,749 | | $2,749 |
| 298 | CMLTI 2005-2 [I1] | ALT-A 2005 | 0.01% | $0 | | $0 |
| 299 | CMLTI 2005-2 [I2] | ALT-A 2005 | 0.01% | $2 | | $2 |
| 300 | CMLTI 2005-2 [I3] | ALT-A 2005 | 0.01% | $1 | | $1 |
| 301 | CMLTI 2005-2 [I4] | ALT-A 2005 | 0.01% | $2 | | $2 |
| 302 | CMLTI 2005-2 [I5] | ALT-A 2005 | 0.01% | $1 | | $1 |
| 303 | CMLTI 2005-2 [II1] | ALT-A 2005 | 0.01% | $0 | | $0 |
| 304 | CMLTI 2005-2 [II2] | ALT-A 2005 | 0.01% | $0 | | $0 |
| 305 | CMLTI 2005-3 [I] | ALT-A 2005 | 6.02% | $1,290 | | $1,290 |

Schedule 7 - GMACM Recognized Claims
Subject to Further Review and Due Diligence

|  | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
| 306 | CMLTI 2005-3 [II-1] | ALT-A 2005 | 6.02% | $927 | | $927 |
| 307 | CMLTI 2005-3 [II-2] | ALT-A 2005 | 6.02% | $6,077 | | $6,077 |
| 308 | CMLTI 2005-3 [II-3] | ALT-A 2005 | 6.02% | $1,260 | | $1,260 |
| 309 | CMLTI 2005-3 [II-4] | ALT-A 2005 | 6.02% | $3,316 | | $3,316 |
| 310 | CMLTI 2005-3 [III] | ALT-A 2005 | 6.02% | $1,335 | | $1,335 |
| 311 | CMLTI 2005-5 [I-1] | ALT-A 2005 | 58.96% | $2,010 | | $2,010 |
| 312 | CMLTI 2005-5 [I-2] | ALT-A 2005 | 58.96% | $8,058 | | $8,058 |
| 313 | CMLTI 2005-5 [I-3] | ALT-A 2005 | 58.96% | $2,796 | | $2,796 |
| 314 | CMLTI 2005-5 [I-4] | ALT-A 2005 | 58.96% | $8,461 | | $8,461 |
| 315 | CMLTI 2005-5 [I-5] | ALT-A 2005 | 58.96% | $1,674 | | $1,674 |
| 316 | CMLTI 2005-5 [II-1] | ALT-A 2005 | 58.96% | $22,737 | | $22,737 |
| 317 | CMLTI 2005-5 [II-2] | ALT-A 2005 | 58.96% | $2,690 | | $2,690 |
| 318 | CMLTI 2005-5 [II-3] | ALT-A 2005 | 58.96% | $5,718 | | $5,718 |
| 319 | CMLTI 2005-5 [III-1] | ALT-A 2005 | 58.96% | $12,904 | | $12,904 |
| 320 | CMLTI 2005-5 [III-2] | ALT-A 2005 | 58.96% | $5,657 | | $5,657 |
| 321 | CMLTI 2005-5 [III-3] | ALT-A 2005 | 58.96% | $14,286 | | $14,286 |
| 322 | CMLTI 2005-5 [III-4] | ALT-A 2005 | 58.96% | $7,750 | | $7,750 |
| 323 | CMLTI 2005-5 [III-5] | ALT-A 2005 | 58.96% | $7,397 | | $7,397 |
| 324 | CMLTI 2005-8 [I-1] | Prime 2005 | 3.33% | $296 | | $296 |
| 325 | CMLTI 2005-8 [I-2] | Prime 2005 | 3.33% | $213 | | $213 |
| 326 | CMLTI 2005-8 [I-3] | Prime 2005 | 3.33% | $500 | | $500 |
| 327 | CMLTI 2005-8 [I-4] | Prime 2005 | 3.33% | $1,324 | | $1,324 |
| 328 | CMLTI 2005-8 [II] | Prime 2005 | 3.33% | $1,178 | | $1,178 |
| 329 | CMLTI 2005-8 [III] | Prime 2005 | 3.33% | $416 | | $416 |
| 330 | CMLTI 2005-SHL1 [1A] | Subprime 2005 | 9.00% | $2,802 | | $2,802 |
| 331 | CMLTI 2005-SHL1 [1F] | Subprime 2005 | 9.00% | $4,329 | | $4,329 |
| 332 | CMLTI 2005-SHL1 [2] | Subprime 2005 | 9.00% | $244 | | $244 |
| 333 | CMLTI 2006-4 [1] | ALT-A 2006 | 0.07% | $8 | | $8 |
| 334 | CMLTI 2006-4 [2] | ALT-A 2006 | 0.07% | $32 | | $32 |
| 335 | CMLTI 2006-AR3 [1-1] | Prime 2006 | 0.22% | $137 | | $137 |
| 336 | CMLTI 2006-AR3 [1-2] | Prime 2006 | 0.22% | $433 | | $433 |
| 337 | CMLTI 2006-AR3 [2-1] | Prime 2006 | 0.22% | $45 | | $45 |
| 338 | CMLTI 2006-AR3 [2-2] | Prime 2006 | 0.22% | $26 | | $26 |
| 339 | CMLTI 2006-AR3 [2-3] | Prime 2006 | 0.22% | $135 | | $135 |
| 340 | CMLTI 2006-AR3 [2-4] | Prime 2006 | 0.22% | $90 | | $90 |
| 341 | CMLTI 2007-AMC2 [1A_GE36] | Subprime 2007 | 25.68% | $38,996 | | $38,996 |
| 342 | CMLTI 2007-AMC2 [1A_LE24] | Subprime 2007 | 25.68% | $64,005 | | $64,005 |
| 343 | CMLTI 2007-AMC2 [1F] | Subprime 2007 | 25.68% | $51,512 | | $51,512 |
| 344 | CMLTI 2007-AMC2 [2A_GE36] | Subprime 2007 | 25.68% | $8,608 | | $8,608 |
| 345 | CMLTI 2007-AMC2 [2A_LE24] | Subprime 2007 | 25.68% | $13,616 | | $13,616 |
| 346 | CMLTI 2007-AMC2 [2F] | Subprime 2007 | 25.68% | $14,597 | | $14,597 |
| 347 | CMLTI 2007-AMC2 [3A_GE36] | Subprime 2007 | 25.68% | $37,093 | | $37,093 |
| 348 | CMLTI 2007-AMC2 [3A_LE24] | Subprime 2007 | 25.68% | $117,616 | | $117,616 |
| 349 | CMLTI 2007-AMC2 [3F] | Subprime 2007 | 25.68% | $60,887 | | $60,887 |
| 350 | CMLTI 2007-AR1 [A] | ALT-A 2007 | 0.02% | $70 | | $70 |
| 351 | CMLTI 2007-AR1 [F] | ALT-A 2007 | 0.02% | $1 | | $1 |

Schedule 1 – Advanced Recognized Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 352 | CMLT1 2007-SHL1 [A] | Subprime 2007 | 5.00% | $14,663 | | $14,663 |
| 353 | CMLT1 2007-SHL1 [F] | Subprime 2007 | 5.00% | $6,915 | | $6,915 |
| 354 | CSFB 2002-34 [FOUR] | Prime 2002 | 5.31% | $593 | | $593 |
| 355 | CSFB 2002-34 [ONE] | Prime 2002 | 5.31% | $560 | | $560 |
| 356 | CSFB 2002-34 [THREE] | Prime 2002 | 5.31% | $1,035 | | $1,035 |
| 357 | CSFB 2002-34 [TWO] | Prime 2002 | 5.31% | $516 | | $516 |
| 358 | CSFB 2002-AR33 [FIVE] | ALT-A 2002 | 3.62% | $45 | | $45 |
| 359 | CSFB 2002-AR33 [FOUR] | ALT-A 2002 | 3.62% | $13 | | $13 |
| 360 | CSFB 2002-AR33 [ONE] | ALT-A 2002 | 3.62% | $28 | | $28 |
| 361 | CSFB 2002-AR33 [THREE] | ALT-A 2002 | 3.62% | $141 | | $141 |
| 362 | CSFB 2002-AR33 [TWO] | ALT-A 2002 | 3.62% | $34 | | $34 |
| 363 | CSFB 2003-23 [EIGHT] | Prime 2003 | 9.70% | $233 | | $233 |
| 364 | CSFB 2003-23 [FIVE] | Prime 2003 | 9.70% | $704 | | $704 |
| 365 | CSFB 2003-23 [FOUR] | Prime 2003 | 9.70% | $428 | | $428 |
| 366 | CSFB 2003-23 [ONE] | Prime 2003 | 9.70% | $1,648 | | $1,648 |
| 367 | CSFB 2003-23 [SEVEN] | Prime 2003 | 9.70% | $179 | | $179 |
| 368 | CSFB 2003-23 [SIX] | Prime 2003 | 9.70% | $546 | | $546 |
| 369 | CSFB 2003-23 [THREE] | Prime 2003 | 9.70% | $1,437 | | $1,437 |
| 370 | CSFB 2003-23 [TWO] | Prime 2003 | 9.70% | $778 | | $778 |
| 371 | CSFB 2005-10 [1] | Prime 2005 | 3.03% | $615 | | $615 |
| 372 | CSFB 2005-10 [10] | Prime 2005 | 3.03% | $719 | | $719 |
| 373 | CSFB 2005-10 [11] | Prime 2005 | 3.03% | $282 | | $282 |
| 374 | CSFB 2005-10 [12] | Prime 2005 | 3.03% | $303 | | $303 |
| 375 | CSFB 2005-10 [2] | Prime 2005 | 3.03% | $622 | | $622 |
| 376 | CSFB 2005-10 [3] | Prime 2005 | 3.03% | $740 | | $740 |
| 377 | CSFB 2005-10 [4] | Prime 2005 | 3.03% | $333 | | $333 |
| 378 | CSFB 2005-10 [5] | Prime 2005 | 3.03% | $1,318 | | $1,318 |
| 379 | CSFB 2005-10 [6] | Prime 2005 | 3.03% | $1,257 | | $1,257 |
| 380 | CSFB 2005-10 [7] | Prime 2005 | 3.03% | $117 | | $117 |
| 381 | CSFB 2005-10 [8] | Prime 2005 | 3.03% | $328 | | $328 |
| 382 | CSFB 2005-10 [9] | Prime 2005 | 3.03% | $280 | | $280 |
| 383 | CSFB 2005-11 [1] | Prime 2005 | 3.02% | $301 | | $301 |
| 384 | CSFB 2005-11 [2] | Prime 2005 | 3.02% | $429 | | $429 |
| 385 | CSFB 2005-11 [3] | Prime 2005 | 3.02% | $219 | | $219 |
| 386 | CSFB 2005-11 [4] | Prime 2005 | 3.02% | $284 | | $284 |
| 387 | CSFB 2005-11 [5] | Prime 2005 | 3.02% | $555 | | $555 |
| 388 | CSFB 2005-11 [6] | Prime 2005 | 3.02% | $543 | | $543 |
| 389 | CSFB 2005-11 [7] | Prime 2005 | 3.02% | $421 | | $421 |
| 390 | CSFB 2005-11 [8] | Prime 2005 | 3.02% | $816 | | $816 |
| 391 | CSFB 2005-12 [1] | ALT-A 2005 | 2.16% | $392 | | $392 |
| 392 | CSFB 2005-12 [2] | ALT-A 2005 | 2.16% | $793 | | $793 |
| 393 | CSFB 2005-12 [3] | ALT-A 2005 | 2.16% | $799 | | $799 |
| 394 | CSFB 2005-12 [4] | ALT-A 2005 | 2.16% | $1,736 | | $1,736 |
| 395 | CSFB 2005-12 [5] | ALT-A 2005 | 2.16% | $889 | | $889 |
| 396 | CSFB 2005-12 [6] | ALT-A 2005 | 2.16% | $1,153 | | $1,153 |
| 397 | CSFB 2005-12 [7] | ALT-A 2005 | 2.16% | $794 | | $794 |
| 398 | CSFB 2005-12 [8] | ALT-A 2005 | 2.16% | $201 | | $201 |
| 399 | CSFB 2005-3 [1] | Prime 2005 | 27.68% | $1,683 | | $1,683 |
| 400 | CSFB 2005-3 [2] | Prime 2005 | 27.68% | $1,388 | | $1,388 |
| 401 | CSFB 2005-3 [3] | Prime 2005 | 27.68% | $8,890 | | $8,890 |
| 402 | CSFB 2005-3 [4] | Prime 2005 | 27.68% | $714 | | $714 |

Schedule 7 - Advance Recognized Insured Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 403 | CSFB 2005-3 [5] | Prime 2005 | 27.68% | $1,803 | | $1,803 |
| 404 | CSFB 2005-3 [6] | Prime 2005 | 27.68% | $1,859 | | $1,859 |
| 405 | CSFB 2005-3 [7] | Prime 2005 | 27.68% | $1,600 | | $1,600 |
| 406 | CSFB 2005-4 [1] | Prime 2005 | 15.77% | $1,779 | | $1,779 |
| 407 | CSFB 2005-4 [2] | Prime 2005 | 15.77% | $2,458 | | $2,458 |
| 408 | CSFB 2005-4 [3] | Prime 2005 | 15.77% | $2,438 | | $2,438 |
| 409 | CSFB 2005-5 [1] | Prime 2005 | 2.54% | $128 | | $128 |
| 410 | CSFB 2005-5 [2] | Prime 2005 | 2.54% | $263 | | $263 |
| 411 | CSFB 2005-5 [3] | Prime 2005 | 2.54% | $138 | | $138 |
| 412 | CSFB 2005-5 [4] | Prime 2005 | 2.54% | $92 | | $92 |
| 413 | CSFB 2005-5 [5] | Prime 2005 | 2.54% | $56 | | $56 |
| 414 | CSFB 2005-5 [6] | Prime 2005 | 2.54% | $94 | | $94 |
| 415 | CSFB 2005-5 [7] | Prime 2005 | 2.54% | $131 | | $131 |
| 416 | CSFB 2005-6 [1] | Prime 2005 | 5.02% | $1,528 | | $1,528 |
| 417 | CSFB 2005-6 [2] | Prime 2005 | 5.02% | $181 | | $181 |
| 418 | CSFB 2005-6 [3] | Prime 2005 | 5.02% | $400 | | $400 |
| 419 | CSFB 2005-6 [4] | Prime 2005 | 5.02% | $507 | | $507 |
| 420 | CSFB 2005-6 [5] | Prime 2005 | 5.02% | $1,067 | | $1,067 |
| 421 | CSFB 2005-6 [6] | Prime 2005 | 5.02% | $477 | | $477 |
| 422 | CSFB 2005-6 [7] | Prime 2005 | 5.02% | $477 | | $477 |
| 423 | CSFB 2005-6 [8] | Prime 2005 | 5.02% | $291 | | $291 |
| 424 | CSFB 2005-6 [9] | Prime 2005 | 5.02% | $341 | | $341 |
| 425 | CSFB 2005-8 [1] | ALT-A 2005 | 3.33% | $1,225 | | $1,225 |
| 426 | CSFB 2005-8 [2] | ALT-A 2005 | 3.33% | $648 | | $648 |
| 427 | CSFB 2005-8 [3] | ALT-A 2005 | 3.33% | $1,475 | | $1,475 |
| 428 | CSFB 2005-8 [4] | ALT-A 2005 | 3.33% | $301 | | $301 |
| 429 | CSFB 2005-8 [5] | ALT-A 2005 | 3.33% | $768 | | $768 |
| 430 | CSFB 2005-8 [6] | ALT-A 2005 | 3.33% | $131 | | $131 |
| 431 | CSFB 2005-8 [7] | ALT-A 2005 | 3.33% | $860 | | $860 |
| 432 | CSFB 2005-8 [8] | ALT-A 2005 | 3.33% | $535 | | $535 |
| 433 | CSFB 2005-8 [9] | ALT-A 2005 | 3.33% | $1,164 | | $1,164 |
| 434 | CSFB 2005-9 [1] | ALT-A 2005 | 2.60% | $959 | | $959 |
| 435 | CSFB 2005-9 [2] | ALT-A 2005 | 2.60% | $478 | | $478 |
| 436 | CSFB 2005-9 [3] | ALT-A 2005 | 2.60% | $482 | | $482 |
| 437 | CSFB 2005-9 [4] | ALT-A 2005 | 2.60% | $544 | | $544 |
| 438 | CSFB 2005-9 [5] | ALT-A 2005 | 2.60% | $1,163 | | $1,163 |
| 439 | CSMC 2006-1 [1] | Prime 2006 | 0.19% | $115 | | $115 |
| 440 | CSMC 2006-1 [2] | Prime 2006 | 0.19% | $31 | | $31 |
| 441 | CSMC 2006-1 [3] | Prime 2006 | 0.19% | $56 | | $56 |
| 442 | CSMC 2006-1 [4] | Prime 2006 | 0.19% | $38 | | $38 |
| 443 | CSMC 2006-1 [5] | Prime 2006 | 0.19% | $76 | | $76 |
| 444 | CSMC 2006-8 [1] | Prime 2006 | 2.50% | $2,012 | | $2,012 |
| 445 | CSMC 2006-8 [2] | Prime 2006 | 2.50% | $176 | | $176 |
| 446 | CSMC 2006-9 [1] | ALT-A 2006 | 0.09% | $71 | | $71 |
| 447 | CSMC 2006-9 [2A] | ALT-A 2006 | 0.09% | $53 | | $53 |
| 448 | CSMC 2006-9 [2B] | ALT-A 2006 | 0.09% | $36 | | $36 |
| 449 | CSMC 2007-6 [Total] | ALT-A 2007 | 0.49% | $799 | | $799 |
| 450 | CSMC 2007-7 [1] | Prime 2007 | 0.21% | $84 | | $84 |
| 451 | CSMC 2007-7 [2] | Prime 2007 | 0.21% | $68 | | $68 |
| 452 | CSMC 2007-7 [3] | Prime 2007 | 0.21% | $20 | | $20 |
| 453 | DBALT 2003-2XS [Total] | ALT-A 2003 | 95.38% | $29,435 | | $29,435 |

Schedule 2 - Covered Trusts and Core Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 454 | DBALT 2003-4XS [Total] | ALT-A 2003 | 84.05% | $20,118 | MBIA | $0 |
| 455 | DBALT 2005-3 [1] | ALT-A 2005 | 2.59% | $80 | | $80 |
| 456 | DBALT 2005-3 [2] | ALT-A 2005 | 2.59% | $77 | | $77 |
| 457 | DBALT 2005-3 [3] | ALT-A 2005 | 2.59% | $57 | | $57 |
| 458 | DBALT 2005-3 [4] | ALT-A 2005 | 2.59% | $1,012 | | $1,012 |
| 459 | DBALT 2005-3 [5] | ALT-A 2005 | 2.59% | $121 | | $121 |
| 460 | DBALT 2005-4 [Total] | ALT-A 2005 | 48.82% | $30,202 | | $30,202 |
| 461 | DBALT 2005-5 [1] | ALT-A 2005 | 52.13% | $39,251 | | $39,251 |
| 462 | DBALT 2005-5 [2] | ALT-A 2005 | 52.13% | $31,333 | | $31,333 |
| 463 | DBALT 2005-6 [1] | ALT-A 2005 | 61.14% | $40,028 | | $40,028 |
| 464 | DBALT 2005-6 [2] | ALT-A 2005 | 61.14% | $52,056 | | $52,056 |
| 465 | DBALT 2005-AR1 [1] | ALT-A 2005 | 50.36% | $28,151 | | $28,151 |
| 466 | DBALT 2005-AR1 [2] | ALT-A 2005 | 50.36% | $9,306 | | $9,306 |
| 467 | DBALT 2005-AR2 [1] | ALT-A 2005 | 28.39% | $7,615 | | $7,615 |
| 468 | DBALT 2005-AR2 [2] | ALT-A 2005 | 28.39% | $3,736 | | $3,736 |
| 469 | DBALT 2005-AR2 [3] | ALT-A 2005 | 28.39% | $3,508 | | $3,508 |
| 470 | DBALT 2005-AR2 [4] | ALT-A 2005 | 28.39% | $7,236 | | $7,236 |
| 471 | DBALT 2005-AR2 [5] | ALT-A 2005 | 28.39% | $5,325 | | $5,325 |
| 472 | DBALT 2005-AR2 [6] | ALT-A 2005 | 28.39% | $2,693 | | $2,693 |
| 473 | DBALT 2005-AR2 [7] | ALT-A 2005 | 28.39% | $2,237 | | $2,237 |
| 474 | DBALT 2006-AR1 [Total] | ALT-A 2006 | 14.64% | $38,623 | FSA | $0 |
| 475 | DBALT 2006-AB3 [Total] | ALT-A 2006 | 1.45% | $3,980 | FSA | $0 |
| 476 | DBALT 2006-AF1 [A] | ALT-A 2006 | 41.00% | $121,412 | | $121,412 |
| 477 | DBALT 2006-AF1 [F] | ALT-A 2006 | 41.00% | $38,435 | | $38,435 |
| 478 | DBALT 2006-AR1 [1] | ALT-A 2006 | 33.11% | $60,258 | | $60,258 |
| 479 | DBALT 2006-AR1 [2] | ALT-A 2006 | 33.11% | $6,859 | | $6,859 |
| 480 | DBALT 2006-AR1 [3] | ALT-A 2006 | 33.11% | $19,379 | | $19,379 |
| 481 | DBALT 2006-AR1 [4] | ALT-A 2006 | 33.11% | $9,689 | | $9,689 |
| 482 | DBALT 2006-AR1 [5] | ALT-A 2006 | 33.11% | $3,762 | | $3,762 |
| 483 | DBALT 2006-AR2 [Total] | ALT-A 2006 | 46.14% | $104,986 | | $104,986 |
| 484 | DBALT 2006-AR3 [Total] | ALT-A 2006 | 79.69% | $488,221 | | $488,221 |
| 485 | DBALT 2006-AR5 [I] | ALT-A 2006 | 57.98% | $412,396 | | $412,396 |
| 486 | DBALT 2006-AR5 [II1] | ALT-A 2006 | 57.98% | $9,212 | | $9,212 |
| 487 | DBALT 2006-AR5 [II2] | ALT-A 2006 | 57.98% | $11,191 | | $11,191 |
| 488 | DBALT 2006-AR5 [II3] | ALT-A 2006 | 57.98% | $17,920 | | $17,920 |
| 489 | DBALT 2006-AR6 [Total] | ALT-A 2006 | 65.68% | $587,334 | | $587,334 |
| 490 | DBALT 2006-OA1 [Total] | Pay Option ARM 2006 | 6.11% | $25,097 | | $25,097 |
| 491 | DBALT 2007-1 [IA] | ALT-A 2007 | 38.32% | $199,687 | | $199,687 |
| 492 | DBALT 2007-1 [IF] | ALT-A 2007 | 38.32% | $203,903 | | $203,903 |
| 493 | DBALT 2007-1 [IIA] | ALT-A 2007 | 38.32% | $23,365 | | $23,365 |
| 494 | DBALT 2007-1 [IIF] | ALT-A 2007 | 38.32% | $16,469 | | $16,469 |
| 495 | DBALT 2007-3 [1] | Pay Option ARM 2007 | 94.63% | $118,392 | | $118,392 |
| 496 | DBALT 2007-3 [2] | Pay Option ARM 2007 | 94.63% | $273,873 | | $273,873 |
| 497 | DBALT 2007-AR3 [I] | ALT-A 2007 | 25.88% | $124,115 | MBIA | $0 |
| 498 | DBALT 2007-AR3 [IIA] | ALT-A 2007 | 25.88% | $189,132 | | $189,132 |
| 499 | DBALT 2007-AR3 [IIF] | ALT-A 2007 | 25.88% | $45,574 | | $45,574 |
| 500 | DBALT 2007-OA2 [Total] | Pay Option ARM 2007 | 11.92% | $28,338 | | $28,338 |
| 501 | DBALT 2007-OA3 [1] | Pay Option ARM 2007 | 32.60% | $35,069 | | $35,069 |
| 502 | DBALT 2007-OA3 [2] | Pay Option ARM 2007 | 32.60% | $81,056 | | $81,056 |
| 503 | DBALT 2007-OA3 [3] | Pay Option ARM 2007 | 32.60% | $12,839 | | $12,839 |
| 504 | DBALT 2007-OA3 [4] | Pay Option ARM 2007 | 32.60% | $54,210 | | $54,210 |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Pg 243 of 398

Case 1:14-cv-03639-GBD    Document 15-1    Filed 11/06/14    Page 258 of 355
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26

| Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|
| DBALT 2007-OA4  [1] | Pay Option ARM 2007 | 13.87% | $113,181 | | $113,181 |
| DBALT 2007-OA4  [2] | Pay Option ARM 2007 | 13.87% | $13,991 | | $13,991 |
| DBALT 2007-OA4  [3] | Pay Option ARM 2007 | 13.87% | $18,371 | | $18,371 |
| DBALT 2007-OA5  [Total] | Pay Option ARM 2007 | 97.59% | $142,719 | | $142,719 |
| DMSI 2004-1  [ONE] | ALT-A 2004 | 55.58% | $2,654 | | $2,654 |
| DMSI 2004-1  [THREE] | ALT-A 2004 | 55.58% | $12,929 | | $12,929 |
| DMSI 2004-1  [TWO] | ALT-A 2004 | 55.58% | $4,830 | | $4,830 |
| DMSI 2004-2  [Total] | ALT-A 2004 | 30.30% | $7,078 | | $7,078 |
| DMSI 2004-4  [1] | ALT-A 2004 | 6.46% | $1,210 | | $1,210 |
| DMSI 2004-4  [21] | ALT-A 2004 | 6.46% | $995 | | $995 |
| DMSI 2004-4  [22] | ALT-A 2004 | 6.46% | $875 | | $875 |
| DMSI 2004-4  [3] | ALT-A 2004 | 6.46% | $585 | | $585 |
| DMSI 2004-4  [4] | ALT-A 2004 | 6.46% | $308 | | $308 |
| DMSI 2004-4  [5] | ALT-A 2004 | 6.46% | $319 | | $319 |
| DMSI 2004-4  [6] | ALT-A 2004 | 6.46% | $146 | | $146 |
| DMSI 2004-4  [71] | ALT-A 2004 | 6.46% | $229 | | $229 |
| DMSI 2004-4  [72] | ALT-A 2004 | 6.46% | $639 | | $639 |
| DMSI 2004-5  [Total] | ALT-A 2004 | 38.89% | $33,125 | FGIC | $33,125 |
| FMRMT 2003-A  [Total] | 2003 | 50.00% | $928 | | $928 |
| FNBA 2004-AR1  [Total] | ALT-A 2004 | 100.00% | $34,860 | | $34,860 |
| FNR 2002-66  [FIVE] | Subprime 2002 | 4.50% | $1,297 | FNMA/FNMA (Agency Wrap) | $0 |
| FNR 2002-66  [FOUR] | Subprime 2002 | 4.50% | $1,832 | FNMA/FNMA (Agency Wrap) | $0 |
| FNR 2002-66  [ONE] | Subprime 2002 | 4.50% | $7,395 | FNMA/FNMA (Agency Wrap) | $0 |
| GMACM 2000-HE1  [1HEL] | Second Lien 2000 | 100.00% | $6,104 | MBIA | $0 |
| GMACM 2000-HE2  [1HELOC] | Second Lien 2000 | 100.00% | $20,376 | MBIA | $0 |
| GMACM 2000-HE2  [2HEL] | Second Lien 2000 | 100.00% | $342 | MBIA | $0 |
| GMACM 2000-HE4  [2HELOC] | Second Lien 2000 | 100.00% | $3,470 | MBIA | $0 |
| GMACM 2000-HE4  [1HEL] | Second Lien 2000 | 100.00% | $3,647 | MBIA | $0 |
| GMACM 2000-HE4  [1HELOC] | Second Lien 2000 | 100.00% | $9,398 | MBIA | $0 |
| GMACM 2000-HE4  [2HEL] | Second Lien 2000 | 100.00% | $326 | MBIA | $0 |
| GMACM 2000-HE4  [2HELOC] | Second Lien 2000 | 100.00% | $2,510 | MBIA | $0 |
| GMACM 2002-HE3  [Total] | Second Lien 2002 | 100.00% | $25,825 | MBIA | $0 |
| GMACM 2003-AR1  [1] | Prime 2003 | 100.00% | $7,513 | | $7,513 |
| GMACM 2003-AR1  [2] | Prime 2003 | 100.00% | $2,448 | | $2,448 |
| GMACM 2003-AR2  [1] | Prime 2003 | 100.00% | $1,233 | | $1,233 |
| GMACM 2003-AR2  [2] | Prime 2003 | 100.00% | $3,276 | | $3,276 |
| GMACM 2003-AR2  [3] | Prime 2003 | 100.00% | $2,824 | | $2,824 |
| GMACM 2003-AR2  [4] | Prime 2003 | 100.00% | $2,964 | | $2,964 |
| GMACM 2003-GH1  [1] | Subprime 2003 | 100.00% | $26,477 | MBIA - Insurer Exception | $26,477 |
| GMACM 2003-GH1  [2] | Subprime 2003 | 100.00% | $4,300 | MBIA - Insurer Exception | $4,300 |
| GMACM 2003-GH1  [3] | Subprime 2003 | 100.00% | $2,647 | MBIA - Insurer Exception | $2,647 |
| GMACM 2003-GH2  [1A] | Subprime 2003 | 100.00% | $4,618 | | $4,618 |
| GMACM 2003-GH2  [1F] | Subprime 2003 | 100.00% | $25,122 | | $25,122 |
| GMACM 2003-GH2  [2A] | Subprime 2003 | 100.00% | $2,166 | | $2,166 |
| GMACM 2003-GH2  [2F] | Subprime 2003 | 100.00% | $7,995 | | $7,995 |
| GMACM 2003-J10  [Total] | Prime 2003 | 100.00% | $2,797 | | $2,797 |
| GMACM 2003-J5  [Total] | Prime 2003 | 100.00% | $1,968 | | $1,968 |
| GMACM 2003-J6  [Total] | Prime 2003 | 100.00% | $6,092 | | $6,092 |

Case 14-cv-03039-GBD    Document 1-1    Filed 01/06/14    Page 239 of 395
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Pg 244 of 398

Schedule 12-12020-mg - Advances, Recognized Claims, Cure Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
| 553 | GMACM 2003-J7 [Total] | Prime 2003 | 100.00% | $6,901 | | $6,901 |
| 554 | GMACM 2003-J8 [Total] | Prime 2003 | 100.00% | $8,902 | | $8,902 |
| 555 | GMACM 2003-J9 [Total] | Prime 2003 | 100.00% | $11,469 | | $11,469 |
| 556 | GMACM 2004-AR1 [11] | Prime 2004 | 100.00% | $2,304 | | $2,304 |
| 557 | GMACM 2004-AR1 [12] | Prime 2004 | 100.00% | $10,597 | | $10,597 |
| 558 | GMACM 2004-AR1 [13] | Prime 2004 | 100.00% | $1,696 | | $1,696 |
| 559 | GMACM 2004-AR1 [14] | Prime 2004 | 100.00% | $4,369 | | $4,369 |
| 560 | GMACM 2004-AR1 [1I1] | Prime 2004 | 100.00% | $585 | | $585 |
| 561 | GMACM 2004-AR1 [1I2] | Prime 2004 | 100.00% | $2,719 | | $2,719 |
| 562 | GMACM 2004-AR1 [1I3] | Prime 2004 | 100.00% | $443 | | $443 |
| 563 | GMACM 2004-AR1 [I4] | Prime 2004 | 100.00% | $1,152 | | $1,152 |
| 564 | GMACM 2004-AR2 [1] | Prime 2004 | 100.00% | $2,032 | | $2,032 |
| 565 | GMACM 2004-AR2 [2] | Prime 2004 | 100.00% | $5,591 | | $5,591 |
| 566 | GMACM 2004-AR2 [3] | Prime 2004 | 100.00% | $9,104 | | $9,104 |
| 567 | GMACM 2004-AR2 [4] | Prime 2004 | 100.00% | $2,886 | | $2,886 |
| 568 | GMACM 2004-AR2 [5] | Prime 2004 | 100.00% | $2,767 | | $2,767 |
| 569 | GMACM 2004-GH1 [Total] | Subprime 2004 | 100.00% | $44,352 | | $44,352 |
| 570 | GMACM 2004-HE2 [Total] | CES 2004 | 100.00% | $2,764 | OLD REPUBLIC INSURANCE COMPANY (Pool Policy) | $2,764 |
| 571 | GMACM 2004-11 [Total] | Prime 2004 | 100.00% | $11,919 | MBIA - Insurer Exception | $11,919 |
| 572 | GMACM 2004-12 [Total] | Prime 2004 | 100.00% | $15,485 | MBIA - Insurer Exception | $15,485 |
| 573 | GMACM 2004-13 [Total] | Prime 2004 | 100.00% | $7,021 | | $7,021 |
| 574 | GMACM 2004-14 [Total] | Prime 2004 | 100.00% | $17,413 | | $17,413 |
| 575 | GMACM 2004-J5 [Total] | Prime 2004 | 100.00% | $12,857 | | $12,857 |
| 576 | GMACM 2004-J6 [1] | Prime 2004 | 100.00% | $1,577 | | $1,577 |
| 577 | GMACM 2004-J6 [2] | Prime 2004 | 100.00% | $2,569 | | $2,569 |
| 578 | GMACM 2005-AA1 [1] | ALT-A 2005 | 100.00% | $26,002 | | $26,002 |
| 579 | GMACM 2005-AA1 [2] | ALT-A 2005 | 100.00% | $13,734 | | $13,734 |
| 580 | GMACM 2005-AF1 [Total] | ALT-A 2005 | 100.00% | $31,157 | | $31,157 |
| 581 | GMACM 2005-AF2 [Total] | ALT-A 2005 | 100.00% | $100,100 | | $100,100 |
| 582 | GMACM 2005-AR1 [1] | Prime 2005 | 100.00% | $3,004 | | $3,004 |
| 583 | GMACM 2005-AR1 [2] | Prime 2005 | 100.00% | $5,174 | | $5,174 |
| 584 | GMACM 2005-AR1 [3] | Prime 2005 | 100.00% | $9,860 | | $9,860 |
| 585 | GMACM 2005-AR1 [4] | Prime 2005 | 100.00% | $1,359 | | $1,359 |
| 586 | GMACM 2005-AR1 [5] | Prime 2005 | 100.00% | $4,776 | | $4,776 |
| 587 | GMACM 2005-AR2 [1] | Prime 2005 | 100.00% | $3,254 | | $3,254 |
| 588 | GMACM 2005-AR2 [2] | Prime 2005 | 100.00% | $23,195 | | $23,195 |
| 589 | GMACM 2005-AR2 [3] | Prime 2005 | 100.00% | $3,191 | | $3,191 |
| 590 | GMACM 2005-AR2 [4] | Prime 2005 | 100.00% | $6,859 | | $6,859 |
| 591 | GMACM 2005-AR3 [1] | Prime 2005 | 100.00% | $2,758 | | $2,758 |
| 592 | GMACM 2005-AR3 [2] | Prime 2005 | 100.00% | $8,316 | | $8,316 |
| 593 | GMACM 2005-AR3 [3] | Prime 2005 | 100.00% | $15,545 | | $15,545 |
| 594 | GMACM 2005-AR3 [4] | Prime 2005 | 100.00% | $7,496 | | $7,496 |
| 595 | GMACM 2005-AR3 [5] | Prime 2005 | 100.00% | $9,139 | | $9,139 |
| 596 | GMACM 2005-AR4 [1] | Prime 2005 | 100.00% | $1,267 | | $1,267 |
| 597 | GMACM 2005-AR4 [2] | Prime 2005 | 100.00% | $3,942 | | $3,942 |
| 598 | GMACM 2005-AR4 [3] | Prime 2005 | 100.00% | $10,136 | | $10,136 |
| 599 | GMACM 2005-AR4 [4] | Prime 2005 | 100.00% | $3,711 | | $3,711 |
| 600 | GMACM 2005-AR4 [5] | Prime 2005 | 100.00% | $5,628 | | $5,628 |
| 601 | GMACM 2005-AR5 [1] | Prime 2005 | 100.00% | $2,675 | | $2,675 |
| 602 | GMACM 2005-AR5 [2] | Prime 2005 | 100.00% | $6,308 | | $6,308 |
| 603 | GMACM 2005-AR5 [3] | Prime 2005 | 100.00% | $16,109 | | $16,109 |

Schedule F – Covered Borrowers and Future Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **GMACM Servicer %** | **GMACM Claim** | **Insurer** | **GMACM Recognized Claim** |
| 604 | GMACM 2005-AR5 [4] | Prime 2005 | 100.00% | $7,960 | | $7,960 |
| 605 | GMACM 2005-AR5 [5] | Prime 2005 | 100.00% | $13,320 | | $13,320 |
| 606 | GMACM 2005-AR6 [1] | Prime 2005 | 100.00% | $5,098 | | $5,098 |
| 607 | GMACM 2005-AR6 [2] | Prime 2005 | 100.00% | $21,177 | | $21,177 |
| 608 | GMACM 2005-AR6 [3] | Prime 2005 | 100.00% | $11,213 | | $11,213 |
| 609 | GMACM 2005-AR6 [4] | Prime 2005 | 100.00% | $19,635 | | $19,635 |
| 610 | GMACM 2005-i1 [Total] | Prime 2005 | 100.00% | $28,192 | | $28,192 |
| 611 | GMACM 2006-AR1 [1] | Prime 2006 | 100.00% | $28,664 | | $28,664 |
| 612 | GMACM 2006-AR1 [2] | Prime 2006 | 100.00% | $15,248 | | $15,248 |
| 613 | GMACM 2006-AR1 [3] | Prime 2006 | 100.00% | $14,500 | | $14,500 |
| 614 | GMACM 2006-AR2 [1] | Prime 2006 | 100.00% | $2,398 | | $2,398 |
| 615 | GMACM 2006-AR2 [2] | Prime 2006 | 100.00% | $21,946 | | $21,946 |
| 616 | GMACM 2006-AR2 [3] | Prime 2006 | 100.00% | $7,369 | | $7,369 |
| 617 | GMACM 2006-AR2 [4] | Prime 2006 | 100.00% | $6,078 | | $6,078 |
| 618 | GMACM 2006-AR2 [5] | Prime 2006 | 100.00% | $10,453 | | $10,453 |
| 619 | GMACM 2006-HE3 [Total] | CES 2006 | 100.00% | $16,360 | FGIC | $16,360 |
| 620 | GMACM 2006-HE5 [1] | CES 2006 | 100.00% | $9,278 | FGIC | $9,278 |
| 621 | GMACM 2006-HE5 [2] | CES 2006 | 100.00% | $6,183 | FGIC | $6,183 |
| 622 | GMACM 2006-HLTV1 [Total] | Second Lien 2006 | 100.00% | $4,133 | FGIC | $4,133 |
| 623 | GMACM 2006-i1 [Total] | Prime 2006 | 100.00% | $38,475 | | $38,475 |
| 624 | GMACM 2007-HE2 [Total] | CES 2007 | 100.00% | $11,636 | FGIC | $11,636 |
| 625 | GMACM 2007-HE3 [1] | CES 2007 | 100.00% | $1,290 | | $1,290 |
| 626 | GMACM 2007-HE3 [2] | CES 2007 | 100.00% | $1,620 | | $1,620 |
| 627 | GPMF 2005-HE4 [1] | Second Lien 2005 | 100.00% | $13,827 | | $13,827 |
| 628 | GPMF 2005-HE4 [2] | Second Lien 2005 | 100.00% | $27,931 | | $27,931 |
| 629 | GPMF 2006-AR4 [P0] | ALT-A 2006 | 1.23% | $1,353 | | $1,353 |
| 630 | GPMF 2006-AR4 [P1] | ALT-A 2006 | 1.23% | $1,594 | | $1,594 |
| 631 | GPMF 2006-AR4 [P2LT3] | ALT-A 2006 | 1.23% | $21 | | $21 |
| 632 | GPMF 2006-AR4 [P3GT] | ALT-A 2006 | 1.23% | $2,640 | | $2,640 |
| 633 | GPMF 2006-AR5 [1_A1] | ALT-A 2006 | 0.13% | $157 | | $157 |
| 634 | GPMF 2006-AR5 [1_A2] | ALT-A 2006 | 0.13% | $236 | | $236 |
| 635 | GPMF 2006-AR5 [1_A3] | ALT-A 2006 | 0.13% | $2 | | $2 |
| 636 | GPMF 2006-AR5 [1_A4] | ALT-A 2006 | 0.13% | $205 | | $205 |
| 637 | GPMF 2006-AR5 [2_A1] | ALT-A 2006 | 0.13% | $7 | | $7 |
| 638 | GPMF 2006-AR5 [2_A4] | ALT-A 2006 | 0.13% | $126 | | $126 |
| 639 | GPMF 2006-AR6 [1_NDPP] | ALT-A 2006 | 0.02% | $22 | | $22 |
| 640 | GPMF 2006-AR6 [1_PP1YR] | ALT-A 2006 | 0.02% | $28 | | $28 |
| 641 | GPMF 2006-AR6 [1_PP2YR] | ALT-A 2006 | 0.02% | $0 | | $0 |
| 642 | GPMF 2006-AR6 [1_P9YR] | ALT-A 2006 | 0.02% | $25 | | $25 |
| 643 | GPMF 2006-AR6 [2_NDPP] | ALT-A 2006 | 0.02% | $1 | | $1 |
| 644 | GPMF 2006-AR6 [2_PP1YR] | ALT-A 2006 | 0.02% | $0 | | $0 |
| 645 | GPMF 2006-AR6 [2_PP9YR] | ALT-A 2006 | 0.02% | $19 | | $19 |
| 646 | GPMF 2006-AR7 [1_NDPP] | ALT-A 2006 | 1.49% | $1,277 | FSA | $0 |
| 647 | GPMF 2006-AR7 [1_PP1YR] | ALT-A 2006 | 1.49% | $1,873 | FSA | $0 |
| 648 | GPMF 2006-AR7 [1_PP2YR] | ALT-A 2006 | 1.49% | $15 | FSA | $0 |
| 649 | GPMF 2006-AR7 [1_P9YR] | ALT-A 2006 | 1.49% | $1,880 | FSA | $0 |
| 650 | GPMF 2006-AR7 [2_PP1YR] | ALT-A 2006 | 1.49% | $49 | | $49 |
| 651 | GPMF 2006-AR7 [2_P9YR] | ALT-A 2006 | 1.49% | $1,150 | | $1,150 |
| 652 | GPMF 2006-AR8 [1_NDPP] | ALT-A 2006 | 0.79% | $361 | | $361 |
| 653 | GPMF 2006-AR8 [1_PP1YR] | ALT-A 2006 | 0.79% | $763 | | $763 |
| 654 | GPMF 2006-AR8 [1_PP2YR] | ALT-A 2006 | 0.79% | $10 | | $10 |

Case 14-cv-03039-GBD    Document 15-1    Filed 01/06/14    Page 281 of 355

Schedule 2 – Advance Recovery of Cure Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 655 | GPMF 2006-AR8  [1_PP3YR] | ALT-A 2006 | 0.79% | $1,100 | | $1,100 |
| 656 | GPMF 2006-AR8  [2_NOPP] | ALT-A 2006 | 0.79% | $209 | | $209 |
| 657 | GPMF 2006-AR8  [2_PP3YR] | ALT-A 2006 | 0.79% | $202 | | $202 |
| 658 | GPMF 2007-AR2  [1_NOPPP] | Pay Option ARM 2007 | 27.58% | $15,052 | | $15,052 |
| 659 | GPMF 2007-AR2  [1_PP1YR] | Pay Option ARM 2007 | 27.58% | $20,921 | | $20,921 |
| 660 | GPMF 2007-AR2  [1_PP2YR] | Pay Option ARM 2007 | 27.58% | $1,224 | | $1,224 |
| 661 | GPMF 2007-AR2  [1_PP3YR] | Pay Option ARM 2007 | 27.58% | $31,918 | | $31,918 |
| 662 | GPMF 2007-AR2  [2_NOPPP] | Pay Option ARM 2007 | 27.58% | $20,313 | | $20,313 |
| 663 | GPMF 2007-AR2  [2_PP1YR] | Pay Option ARM 2007 | 27.58% | $29,772 | | $29,772 |
| 664 | GPMF 2007-AR2  [2_PP2YR] | Pay Option ARM 2007 | 27.58% | $1,667 | | $1,667 |
| 665 | GPMF 2007-AR2  [2_PP3YR] | Pay Option ARM 2007 | 27.58% | $31,461 | | $31,461 |
| 666 | GRCAP 1991-4  [Total] | Prime 1999 | 4.50% | $12 | | $12 |
| 667 | GSAA 2005-9  [1] | ALT-A 2005 | 19.48% | $5,101 | | $5,101 |
| 668 | GSAA 2005-9  [2] | ALT-A 2005 | 19.48% | $25,616 | | $25,616 |
| 669 | GSAMP 2004-SD1  [Total] | Subprime 2004 | 0.75% | $482 | | $482 |
| 670 | GSAMP 2004-SEA1  [Total] | Subprime 2004 | 49.85% | $18,529 | | $18,529 |
| 671 | GSMPS 2003-2  [G1] | Subprime 2003 | 2.87% | $1,415 | FHLMC | $0 |
| 672 | GSMPS 2003-2  [G2] | Subprime 2003 | 2.87% | $887 | FHLMC | $0 |
| 673 | GSMPS 2003-2  [G3] | Subprime 2003 | 2.87% | $802 | FHLMC | $0 |
| 674 | GSMPS 2003-2  [TWO] | Subprime 2003 | 2.87% | $271 | FHLMC | $0 |
| 675 | GSMPS 2003-3  [1] | Subprime 2003 | 16.16% | $6,000 | | $6,000 |
| 676 | GSMPS 2003-3  [2] | Subprime 2003 | 16.16% | $2,585 | | $2,585 |
| 677 | GSMPS 2004-1  [ARM] | Subprime 2004 | 0.75% | $26 | FHLMC | $0 |
| 678 | GSMPS 2004-1  [C1_CHASE] | Subprime 2004 | 0.75% | $166 | CHASE (Pool Policy)/FHLMC | $0 |
| 679 | GSMPS 2004-1  [C1_NONCHASE] | Subprime 2004 | 0.75% | $349 | FHLMC | $0 |
| 680 | GSMPS 2004-1  [C2_CHASE] | Subprime 2004 | 0.75% | $111 | CHASE (Pool Policy)/FHLMC | $0 |
| 681 | GSMPS 2004-1  [C2_NONCHASE] | Subprime 2004 | 0.75% | $122 | FHLMC | $0 |
| 682 | GSMPS 2004-1  [C3_CHASE] | Subprime 2004 | 0.75% | $109 | CHASE (Pool Policy)/FHLMC | $0 |
| 683 | GSMPS 2004-1  [C3_NONCHASE] | Subprime 2004 | 0.75% | $96 | FHLMC | $0 |
| 684 | GSMPS 2004-3  [G1_CHASE] | Subprime 2004 | 4.54% | $510 | CHASE (Pool Policy)/FHLMC | $0 |
| 685 | GSMPS 2004-3  [G1_NONCHASE] | Subprime 2004 | 4.54% | $2,228 | FHLMC | $0 |
| 686 | GSMPS 2004-3  [G2_CHASE] | Subprime 2004 | 4.54% | $429 | CHASE (Pool Policy)/FHLMC | $0 |
| 687 | GSMPS 2004-3  [G2_NONCHASE] | Subprime 2004 | 4.54% | $1,868 | FHLMC | $0 |
| 688 | GSMPS 2004-3  [G3_CHASE] | Subprime 2004 | 4.54% | $383 | CHASE (Pool Policy)/FHLMC | $0 |
| 689 | GSMPS 2004-3  [G3_NONCHASE] | Subprime 2004 | 4.54% | $1,158 | FHLMC | $0 |
| 690 | GSMPS 2004-3  [G4_CHASE] | Subprime 2004 | 4.54% | $183 | CHASE (Pool Policy)/FHLMC | $0 |
| 691 | GSMPS 2004-3  [G4_NONCHASE] | Subprime 2004 | 4.54% | $1,579 | FHLMC | $0 |
| 692 | GSMPS 2004-3  [POOL2] | Subprime 2004 | 4.54% | $777 | FHLMC | $0 |
| 693 | GSMPS 2004-4  [ONEA] | Subprime 2004 | 11.21% | $27,426 | | $27,426 |
| 694 | GSMPS 2004-4  [ONEB] | Subprime 2004 | 11.21% | $5,023 | | $5,023 |
| 695 | GSMPS 2004-4  [TWO] | Subprime 2004 | 11.21% | $3,620 | | $3,620 |
| 696 | GSMPS 2005-LT1  [A] | Subprime 2005 | 3.44% | $909 | | $909 |
| 697 | GSMPS 2005-LT1  [F] | Subprime 2005 | 3.44% | $10,402 | | $10,402 |
| 698 | GSMPS 2005-RP1  [ONEA] | Subprime 2005 | 1.35% | $2,756 | | $2,756 |
| 699 | GSMPS 2005-RP1  [ONEB] | Subprime 2005 | 1.35% | $287 | | $287 |
| 700 | GSMPS 2005-RP1  [TWO] | Subprime 2005 | 1.35% | $373 | | $373 |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Pg 247 of 398

Case 14-cv-03039-GBD    Document 1-1    Filed 01/06/14    Page 282 of 355
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26

Schedule 1 to ResCap Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
| 701 | GSMPS 2005-RP2 [ONEA] | Subprime 2005 | 2.36% | $5,841 | | $5,841 |
| 702 | GSMPS 2005-RP2 [ONEB] | Subprime 2005 | 2.36% | $556 | | $556 |
| 703 | GSMPS 2005-RP2 [TWO] | Subprime 2005 | 2.36% | $444 | | $444 |
| 704 | GSMPS 2005-RP3 [ONEA] | Subprime 2005 | 2.23% | $5,875 | | $5,875 |
| 705 | GSMPS 2005-RP3 [ONEB] | Subprime 2005 | 2.23% | $698 | | $698 |
| 706 | GSMPS 2005-RP3 [TWO] | Subprime 2005 | 2.23% | $789 | | $789 |
| 707 | GSMPS 2006-RP1 [I_1] | Subprime 2006 | 5.92% | $18,101 | | $18,101 |
| 708 | GSMPS 2006-RP1 [I_234] | Subprime 2006 | 5.92% | $1,679 | | $1,679 |
| 709 | GSMPS 2006-RP1 [II] | Subprime 2006 | 5.92% | $1,593 | | $1,593 |
| 710 | GSMPS 2006-RP2 [1] | Subprime 2006 | 3.55% | $4,809 | | $4,809 |
| 711 | GSMPS 2006-RP2 [2] | Subprime 2006 | 3.55% | $260 | | $260 |
| 712 | GSR 2003-2F [1] | Prime 2003 | 32.89% | $215 | | $215 |
| 713 | GSR 2003-2F [2] | Prime 2003 | 32.89% | $94 | | $94 |
| 714 | GSR 2003-2F [3] | Prime 2003 | 32.89% | $234 | | $234 |
| 715 | GSR 2004-10F [1] | Prime 2004 | 17.47% | $1,141 | | $1,141 |
| 716 | GSR 2004-10F [2] | Prime 2004 | 17.47% | $1,155 | | $1,155 |
| 717 | GSR 2005-5F [1] | Prime 2005 | 4.61% | $1,585 | | $1,585 |
| 718 | GSR 2005-5F [2] | Prime 2005 | 4.61% | $91 | | $91 |
| 719 | GSR 2005-6F [1] | Prime 2005 | 2.68% | $913 | | $913 |
| 720 | GSR 2005-6F [2] | Prime 2005 | 2.68% | $34 | | $34 |
| 721 | GSR 2005-7F [1] | Prime 2005 | 5.84% | $60 | | $60 |
| 722 | GSR 2005-7F [2] | Prime 2005 | 5.84% | $383 | | $383 |
| 723 | GSR 2005-7F [3] | Prime 2005 | 5.84% | $200 | | $200 |
| 724 | GSR 2005-8F [1] | Prime 2005 | 11.75% | $5,270 | | $5,270 |
| 725 | GSR 2005-8F [2] | Prime 2005 | 11.75% | $1,274 | | $1,274 |
| 726 | GSR 2005-8F [3] | Prime 2005 | 11.75% | $1,669 | | $1,669 |
| 727 | GSR 2005-9F [1] | Prime 2005 | 0.29% | $158 | | $158 |
| 728 | GSR 2005-9F [2] | Prime 2005 | 0.29% | $32 | | $32 |
| 729 | GSR 2005-9F [3] | Prime 2005 | 0.29% | $6 | | $6 |
| 730 | GSR 2005-AR3 [1] | Prime 2005 | 7.89% | $887 | | $887 |
| 731 | GSR 2005-AR3 [2] | Prime 2005 | 7.89% | $1,129 | | $1,129 |
| 732 | GSR 2005-AR3 [3] | Prime 2005 | 7.89% | $1,346 | | $1,346 |
| 733 | GSR 2005-AR3 [4] | Prime 2005 | 7.89% | $1,862 | | $1,862 |
| 734 | GSR 2005-AR3 [5] | Prime 2005 | 7.89% | $1,248 | | $1,248 |
| 735 | GSR 2005-AR3 [6] | Prime 2005 | 7.89% | $2,485 | | $2,485 |
| 736 | GSR 2005-AR3 [7] | Prime 2005 | 7.89% | $228 | | $228 |
| 737 | GSR 2005-AR3 [8] | Prime 2005 | 7.89% | $478 | | $478 |
| 738 | GSR 2006-2F [1] | Prime 2006 | 1.20% | $937 | | $937 |
| 739 | GSR 2006-2F [2] | Prime 2006 | 1.20% | $117 | | $117 |
| 740 | GSR 2006-3F [1] | Prime 2006 | 1.45% | $571 | | $571 |
| 741 | GSR 2006-3F [2] | Prime 2006 | 1.45% | $264 | | $264 |
| 742 | GSR 2006-4F [1] | Prime 2006 | 18.88% | $9,339 | | $9,339 |
| 743 | GSR 2006-4F [2] | Prime 2006 | 18.88% | $3,658 | | $3,658 |
| 744 | GSR 2006-4F [3] | Prime 2006 | 18.88% | $2,908 | | $2,908 |
| 745 | GSR 2006-AR1 [1] | Prime 2006 | 15.22% | $2,877 | | $2,877 |
| 746 | GSR 2006-AR1 [2] | Prime 2006 | 15.22% | $21,882 | | $21,882 |
| 747 | GSR 2006-AR1 [3] | Prime 2006 | 15.22% | $2,059 | | $2,059 |
| 748 | GSR 2006-AR2 [1] | Prime 2006 | 15.01% | $1,084 | | $1,084 |
| 749 | GSR 2006-AR2 [2] | Prime 2006 | 15.01% | $2,665 | | $2,665 |
| 750 | GSR 2006-AR2 [3] | Prime 2006 | 15.01% | $4,764 | | $4,764 |
| 751 | GSR 2006-AR2 [4] | Prime 2006 | 15.01% | $4,082 | | $4,082 |

Schedule 1 - Adjusted GMACM Recognized Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 752 | GSR 2006-AR2 [5] | Prime 2006 | 15.01% | $6,145 | | $6,145 |
| 753 | GSR 2007-4F [1] | Prime 2007 | 2.73% | $1,913 | | $1,913 |
| 754 | GSR 2007-4F [2] | Prime 2007 | 2.73% | $222 | | $222 |
| 755 | GSRPM 2002-1A [Total] | Subprime 2002 | 4.50% | $4,413 | Ambac | $4,413 |
| 756 | GSRPM 2003-2 [Total] | Subprime 2003 | 77.00% | $28,225 | | $28,225 |
| 757 | GSRPM 2004-1 [1A] | Subprime 2004 | 4.50% | $594 | | $594 |
| 758 | GSRPM 2004-1 [1F] | Subprime 2004 | 4.50% | $1,733 | | $1,733 |
| 759 | GSRPM 2004-1 [2] | Subprime 2004 | 4.50% | $96 | | $96 |
| 760 | HVMLT 2003-1 [Total] | ALT-A 2003 | 95.95% | $4,320 | | $4,320 |
| 761 | HVMLT 2004-10 [1] | ALT-A 2004 | 22.07% | $2,546 | | $2,546 |
| 762 | HVMLT 2004-10 [2] | ALT-A 2004 | 22.07% | $1,850 | | $1,850 |
| 763 | HVMLT 2004-10 [3] | ALT-A 2004 | 22.07% | $4,490 | | $4,490 |
| 764 | HVMLT 2004-10 [4] | ALT-A 2004 | 22.07% | $2,794 | | $2,794 |
| 765 | HVMLT 2004-4 [1] | ALT-A 2004 | 51.59% | $802 | | $802 |
| 766 | HVMLT 2004-4 [2] | ALT-A 2004 | 51.59% | $3,849 | | $3,849 |
| 767 | HVMLT 2004-4 [3] | ALT-A 2004 | 51.59% | $4,364 | | $4,364 |
| 768 | HVMLT 2004-5 [1] | ALT-A 2004 | 40.64% | $3,905 | | $3,905 |
| 769 | HVMLT 2004-5 [2] | ALT-A 2004 | 40.64% | $8,086 | | $8,086 |
| 770 | HVMLT 2004-5 [3] | ALT-A 2004 | 40.64% | $1,789 | | $1,789 |
| 771 | HVMLT 2004-6 [1] | ALT-A 2004 | 50.68% | $762 | | $762 |
| 772 | HVMLT 2004-6 [2] | ALT-A 2004 | 50.68% | $2,224 | | $2,224 |
| 773 | HVMLT 2004-6 [3] | ALT-A 2004 | 50.68% | $6,445 | | $6,445 |
| 774 | HVMLT 2004-6 [4] | ALT-A 2004 | 50.68% | $5,068 | | $5,068 |
| 775 | HVMLT 2004-6 [5] | ALT-A 2004 | 50.68% | $2,060 | | $2,060 |
| 776 | HVMLT 2004-7 [1] | ALT-A 2004 | 22.34% | $803 | | $803 |
| 777 | HVMLT 2004-7 [2] | ALT-A 2004 | 22.34% | $5,862 | | $5,862 |
| 778 | HVMLT 2004-7 [3] | ALT-A 2004 | 22.34% | $2,426 | | $2,426 |
| 779 | HVMLT 2004-7 [4] | ALT-A 2004 | 22.34% | $1,902 | | $1,902 |
| 780 | HVMLT 2004-8 [1] | Pay Option ARM 2004 | 10.69% | $4,112 | | $4,112 |
| 781 | HVMLT 2004-8 [2] | Pay Option ARM 2004 | 10.69% | $6,508 | | $6,508 |
| 782 | HVMLT 2004-8 [3] | Pay Option ARM 2004 | 10.69% | $1,525 | | $1,525 |
| 783 | HVMLT 2005-11 [1] | Pay Option ARM 2005 | 100.00% | $38,842 | XL | $0 |
| 784 | HVMLT 2005-11 [2] | Pay Option ARM 2005 | 100.00% | $80,960 | XL | $0 |
| 785 | HVMLT 2005-15 [1] | Pay Option ARM 2005 | 90.86% | $44,343 | XL | $0 |
| 786 | HVMLT 2005-15 [2] | Pay Option ARM 2005 | 90.86% | $111,227 | | $111,227 |
| 787 | HVMLT 2005-15 [3] | Pay Option ARM 2005 | 90.86% | $59,111 | | $59,111 |
| 788 | HVMLT 2005-4 [1] | ALT-A 2005 | 0.43% | $33 | | $33 |
| 789 | HVMLT 2005-4 [2] | ALT-A 2005 | 0.43% | $35 | | $35 |
| 790 | HVMLT 2005-4 [3] | ALT-A 2005 | 0.43% | $149 | | $149 |
| 791 | HVMLT 2005-4 [4] | ALT-A 2005 | 0.43% | $46 | | $46 |
| 792 | HVMLT 2005-4 [5] | ALT-A 2005 | 0.43% | $13 | | $13 |
| 793 | HVMLT 2005-6 [Total] | ALT-A 2005 | 19.08% | $4,090 | | $4,090 |
| 794 | HVMLT 2005-7 [1] | Pay Option ARM 2005 | 5.87% | $4,090 | | $4,090 |
| 795 | HVMLT 2005-7 [2] | Pay Option ARM 2005 | 5.87% | $7,183 | | $7,183 |
| 796 | HVMLT 2006-10 [1] | Pay Option ARM 2006 | 100.00% | $282,913 | FSA | $0 |
| 797 | HVMLT 2006-10 [2] | Pay Option ARM 2006 | 100.00% | $495,647 | FSA | $0 |
| 798 | HVMLT 2006-13 [Total] | ALT-A 2006 | 2.18% | $1,002 | | $1,002 |
| 799 | HVMLT 2006-14 [1] | Pay Option ARM 2006 | 23.22% | $73,479 | | $73,479 |
| 800 | HVMLT 2006-14 [2] | Pay Option ARM 2006 | 23.22% | $217,638 | Ambac | $217,638 |
| 801 | HVMLT 2006-8 [1] | Pay Option ARM 2006 | 2.10% | $3,898 | | $3,898 |
| 802 | HVMLT 2006-8 [2] | Pay Option ARM 2006 | 2.10% | $7,618 | | $7,618 |

Schedule 1 – Covered Loans / Cured Loans
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
| 803 | HVMLT 2006-SB1 [Total] | Pay Option ARM 2006 | 100.00% | $118,796 | | $118,796 |
| 804 | HVMLT 2007-3 [1] | Pay Option ARM 2007 | 100.00% | $178,553 | | $178,553 |
| 805 | HVMLT 2007-3 [2] | Pay Option ARM 2007 | 100.00% | $290,053 | | $290,053 |
| 806 | HVMLT 2007-4 [1] | Pay Option ARM 2007 | 89.07% | $94,977 | | $94,977 |
| 807 | HVMLT 2007-4 [2] | Pay Option ARM 2007 | 89.07% | $255,715 | | $255,715 |
| 808 | HVMLT 2007-6 [1] | Pay Option ARM 2007 | 85.17% | $94,711 | | $94,711 |
| 809 | HVMLT 2007-6 [2] | Pay Option ARM 2007 | 85.17% | $171,339 | | $171,339 |
| 810 | HVMLT 2007-5 [1] | Pay Option ARM 2007 | 25.54% | $57,364 | | $57,364 |
| 811 | HVMLT 2007-7 [2] | Pay Option ARM 2007 | 25.54% | $98,534 | | $98,534 |
| 812 | HVMLT 2007-A [Total] | CES 2007 | 5.00% | $801 | | $801 |
| 813 | IMM 2002-9F [Total] | ALT-A 2002 | 50.00% | $3,068 | | $3,068 |
| 814 | IMM 2003-2F [Total] | ALT-A 2003 | 50.00% | $3,030 | | $3,030 |
| 815 | IMM 2004-10 [1A] | ALT-A 2004 | 46.05% | $57,540 | FGIC | $57,540 |
| 816 | IMM 2004-10 [1F] | ALT-A 2004 | 46.05% | $5,185 | FGIC | $5,185 |
| 817 | IMM 2004-10 [2A] | ALT-A 2004 | 46.05% | $37,269 | FGIC | $37,269 |
| 818 | IMM 2004-10 [2F] | ALT-A 2004 | 46.05% | $3,500 | FGIC | $3,500 |
| 819 | IMM 2004-10 [2S] | ALT-A 2004 | 46.05% | $1,255 | FGIC | $1,255 |
| 820 | IMM 2004-10 [3A] | ALT-A 2004 | 46.05% | $15,003 | | $15,003 |
| 821 | IMM 2004-10 [3F] | ALT-A 2004 | 46.05% | $723 | | $723 |
| 822 | IMM 2004-10 [4A] | ALT-A 2004 | 46.05% | $10,344 | | $10,344 |
| 823 | IMM 2004-11 [1A] | ALT-A 2004 | 19.04% | $23,557 | FGIC | $23,557 |
| 824 | IMM 2004-11 [1F] | ALT-A 2004 | 19.04% | $3,111 | FGIC | $3,111 |
| 825 | IMM 2004-11 [2A] | ALT-A 2004 | 19.04% | $18,259 | | $18,259 |
| 826 | IMM 2004-11 [2F] | ALT-A 2004 | 19.04% | $1,008 | | $1,008 |
| 827 | IMM 2004-11 [2S] | ALT-A 2004 | 19.04% | $670 | | $670 |
| 828 | IMM 2004-4 [1] | ALT-A 2004 | 8.04% | $4,995 | | $4,995 |
| 829 | IMM 2004-4 [2] | ALT-A 2004 | 8.04% | $957 | | $957 |
| 830 | IMM 2004-5 [1_1ST_ARM] | ALT-A 2004 | 2.63% | $1,592 | | $1,592 |
| 831 | IMM 2004-5 [1_1ST_FIX] | ALT-A 2004 | 2.63% | $99 | | $99 |
| 832 | IMM 2004-5 [1_2ND] | ALT-A 2004 | 2.63% | $59 | | $59 |
| 833 | IMM 2004-5 [2] | ALT-A 2004 | 2.63% | $132 | | $132 |
| 834 | IMM 2004-7 [1] | ALT-A 2004 | 50.00% | $55,671 | | $55,671 |
| 835 | IMM 2004-7 [2] | ALT-A 2004 | 50.00% | $36,960 | AMBAC | $36,960 |
| 836 | IMM 2004-8 [1] | ALT-A 2004 | 46.81% | $25,125 | FGIC | $25,125 |
| 837 | IMM 2004-8 [2] | ALT-A 2004 | 46.81% | $34,226 | FGIC | $34,226 |
| 838 | IMM 2004-8 [3] | ALT-A 2004 | 46.81% | $4,049 | | $4,049 |
| 839 | IMM 2004-9 [1A] | ALT-A 2004 | 9.00% | $452 | | $452 |
| 840 | IMM 2004-9 [1F] | ALT-A 2004 | 9.00% | $48 | | $48 |
| 841 | IMM 2004-9 [1S] | ALT-A 2004 | 9.00% | $3 | | $3 |
| 842 | IMM 2004-9 [2A] | ALT-A 2004 | 9.00% | $426 | AMBAC | $426 |
| 843 | IMM 2004-9 [2F] | ALT-A 2004 | 9.00% | $23 | AMBAC | $23 |
| 844 | IMM 2004-9 [2S] | ALT-A 2004 | 9.00% | $25 | AMBAC | $25 |
| 845 | IMM 2005-1 [1A] | ALT-A 2005 | 48.73% | $42,144 | | $42,144 |
| 846 | IMM 2005-1 [1F] | ALT-A 2005 | 48.73% | $1,168 | | $1,168 |
| 847 | IMM 2005-1 [2A] | ALT-A 2005 | 48.73% | $37,825 | | $37,825 |
| 848 | IMM 2005-1 [2F] | ALT-A 2005 | 48.73% | $913 | | $913 |
| 849 | IMM 2005-2 [1A] | ALT-A 2005 | 90.84% | $146,147 | | $146,147 |
| 850 | IMM 2005-2 [1F] | ALT-A 2005 | 90.84% | $17,648 | | $17,648 |
| 851 | IMM 2005-2 [2] | ALT-A 2005 | 90.84% | $16,513 | | $16,513 |
| 852 | IMM 2005-4 [1] | ALT-A 2005 | 46.24% | $129,156 | | $129,156 |
| 853 | IMM 2005-4 [2] | ALT-A 2005 | 46.24% | $8,899 | | $8,899 |

12-12020-mg   Doc 6065-1   Filed 12/11/13   Entered 12/11/13 17:30:11   Appendix 1
Pg 250 of 398

Case 14-cv-03020-CBD   Document 15-1   Filed 01/06/14   Page 285 of 398
12-12020-mg   Doc 8019-45   Filed 01/22/15   Entered 01/22/15 18:14:28   Exhibit 26

Schedule I – Covered Loans – Recognized Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 854 | IMM 2005-8 [1] | ALT-A 2005 | 36.07% | $52,574 | | $52,574 |
| 855 | IMM 2005-8 [2] | ALT-A 2005 | 36.07% | $19,499 | | $19,499 |
| 856 | IMM 2007-A [Total] | ALT-A 2007 | 33.77% | $42,866 | Assured Guaranty | $0 |
| 857 | IMSA 2002-2 [Total] | ALT-A 2002 | 50.00% | $4,590 | | $4,590 |
| 858 | IMSA 2002-3 [Total] | ALT-A 2002 | 100.00% | $3,434 | | $3,434 |
| 859 | IMSA 2003-1 [Total] | ALT-A 2003 | 50.00% | $3,872 | | $3,872 |
| 860 | IMSA 2003-3 [Total] | ALT-A 2003 | 50.00% | $8,633 | | $8,633 |
| 861 | IMSA 2004-1 [Total] | ALT-A 2004 | 50.00% | $8,811 | | $8,811 |
| 862 | IMSA 2004-2 [Total] | ALT-A 2004 | 50.00% | $13,746 | | $13,746 |
| 863 | IMSA 2004-4 [1] | ALT-A 2004 | 100.00% | $69,852 | | $69,852 |
| 864 | IMSA 2004-4 [2] | ALT-A 2004 | 100.00% | $77,199 | | $77,199 |
| 865 | IMSA 2006-1 [1A1] | ALT-A 2006 | 32.62% | $17,477 | | $17,477 |
| 866 | IMSA 2006-1 [1A2_ARM] | ALT-A 2006 | 32.62% | $42,215 | | $42,215 |
| 867 | IMSA 2006-1 [1A2_FIX] | ALT-A 2006 | 32.62% | $22,733 | | $22,733 |
| 868 | IMSA 2006-1 [2_1T0] | ALT-A 2006 | 32.62% | $12,778 | | $12,778 |
| 869 | IMSA 2006-1 [2_REG] | ALT-A 2006 | 32.62% | $19,770 | | $19,770 |
| 870 | IMSA 2006-2 [1fA2] | ALT-A 2006 | 34.93% | $12,547 | | $12,547 |
| 871 | IMSA 2006-2 [1fA3] | ALT-A 2006 | 34.93% | $17,675 | | $17,675 |
| 872 | IMSA 2006-2 [1fA5] | ALT-A 2006 | 34.93% | $47,637 | | $47,637 |
| 873 | IMSA 2006-2 [1fFIX] | ALT-A 2006 | 34.93% | $1,511 | | $1,511 |
| 874 | IMSA 2006-2 [22REG] | ALT-A 2006 | 34.93% | $23,379 | | $23,379 |
| 875 | IMSA 2006-2 [22SPEC] | ALT-A 2006 | 34.93% | $10,440 | | $10,440 |
| 876 | IMSA 2006-4 [A1] | ALT-A 2006 | 5.00% | $501 | | $501 |
| 877 | IMSA 2006-4 [A2] | ALT-A 2006 | 5.00% | $642 | | $642 |
| 878 | IMSA 2006-4 [A3] | ALT-A 2006 | 5.00% | $19,660 | | $19,660 |
| 879 | IMSA 2006-4 [F] | ALT-A 2006 | 5.00% | $11,682 | | $11,682 |
| 880 | LXS 2006-5 [1A2] | ALT-A 2006 | 7.44% | $765 | Ambac | $765 |
| 881 | LXS 2006-5 [1A3] | ALT-A 2006 | 7.44% | $506 | Ambac | $506 |
| 882 | LXS 2006-5 [1A5] | ALT-A 2006 | 7.44% | $13,873 | Ambac | $13,873 |
| 883 | LXS 2006-5 [1F] | ALT-A 2006 | 7.44% | $15,716 | Ambac | $15,716 |
| 884 | LXS 2006-5 [2A] | ALT-A 2006 | 7.44% | $8,322 | Ambac | $8,322 |
| 885 | LXS 2006-5 [2CB] | ALT-A 2006 | 7.44% | $1,381 | Ambac | $1,381 |
| 886 | LMT 2006-7 [1] | ALT-A 2006 | 0.43% | $254 | | $254 |
| 887 | LMT 2006-7 [2] | ALT-A 2006 | 0.43% | $486 | | $486 |
| 888 | LMT 2006-7 [3] | ALT-A 2006 | 0.43% | $301 | | $301 |
| 889 | LMT 2006-7 [4] | ALT-A 2006 | 0.43% | $83 | | $83 |
| 890 | LUM 2006-4 [Total] | Pay Option ARM 2006 | 81.76% | $130,531 | | $130,531 |
| 891 | LUM 2006-5 [Total] | Pay Option ARM 2006 | 4.38% | $9,922 | | $9,922 |
| 892 | LXS 2006-10N [1_A1] | ALT-A 2006 | 0.46% | $90 | | $90 |
| 893 | LXS 2006-10N [1_A2] | ALT-A 2006 | 0.46% | $95 | | $95 |
| 894 | LXS 2006-10N [1_A3] | ALT-A 2006 | 0.46% | $49 | | $49 |
| 895 | LXS 2006-10N [1_A4] | ALT-A 2006 | 0.46% | $1,542 | | $1,542 |
| 896 | LXS 2006-10N [1_F] | ALT-A 2006 | 0.46% | $451 | | $451 |
| 897 | LXS 2006-10N [2_A1] | ALT-A 2006 | 0.46% | $484 | | $484 |
| 898 | LXS 2006-10N [2_A2] | ALT-A 2006 | 0.46% | $50 | | $50 |
| 899 | LXS 2006-10N [2_A4] | ALT-A 2006 | 0.46% | $2 | | $2 |
| 900 | LXS 2006-12N [1_A1] | ALT-A 2006 | 0.03% | $7 | | $7 |
| 901 | LXS 2006-12N [1_A2] | ALT-A 2006 | 0.03% | $60 | | $60 |
| 902 | LXS 2006-12N [1_A3] | ALT-A 2006 | 0.03% | $4 | | $4 |
| 903 | LXS 2006-12N [1_A4] | ALT-A 2006 | 0.03% | $82 | | $82 |
| 904 | LXS 2006-12N [1_F] | ALT-A 2006 | 0.03% | $34 | | $34 |

Case 14-cv-03039-GBD    Document 15-1    Filed 01/06/14    Page 286 of 355
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Pg 251 of 398

Schedule 2 - Allocation Recognized Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 905 | LXS 2006-12N [2_A1] | ALT-A 2006 | 0.03% | $5 | | $5 |
| 906 | LXS 2006-12N [2_A2] | ALT-A 2006 | 0.03% | $7 | | $7 |
| 907 | LXS 2006-12N [2_A3] | ALT-A 2006 | 0.03% | $2 | | $2 |
| 908 | LXS 2006-12N [2_A4] | ALT-A 2006 | 0.03% | $58 | | $58 |
| 909 | LXS 2006-GP1 [1] | ALT-A 2006 | 50.00% | $37,662 | | $37,662 |
| 910 | LXS 2006-GP1 [2] | ALT-A 2006 | 50.00% | $40,493 | | $40,493 |
| 911 | LXS 2006-GP1 [3] | ALT-A 2006 | 50.00% | $83,833 | | $83,833 |
| 912 | LXS 2006-GP1 [1_1] | ALT-A 2006 | 50.00% | $31,995 | | $31,995 |
| 913 | LXS 2006-GP2 [1_2] | ALT-A 2006 | 50.00% | $40,471 | | $40,471 |
| 914 | LXS 2006-GP2 [1_3] | ALT-A 2006 | 50.00% | $50,886 | | $50,886 |
| 915 | LXS 2006-GP2 [2_1] | ALT-A 2006 | 50.00% | $11,618 | | $11,618 |
| 916 | LXS 2006-GP2 [2_2] | ALT-A 2006 | 50.00% | $14,848 | | $14,848 |
| 917 | LXS 2006-GP2 [2_3] | ALT-A 2006 | 50.00% | $31,808 | | $31,808 |
| 918 | LXS 2006-GP2 [3_1] | ALT-A 2006 | 50.00% | $8,625 | | $8,625 |
| 919 | LXS 2006-GP2 [3_2] | ALT-A 2006 | 50.00% | $9,601 | | $9,601 |
| 920 | LXS 2006-GP2 [3_3] | ALT-A 2006 | 50.00% | $21,190 | | $21,190 |
| 921 | LXS 2006-GP2 [1_1] | ALT-A 2006 | 50.00% | $12,385 | | $12,385 |
| 922 | LXS 2006-GP3 [1_2] | ALT-A 2006 | 50.00% | $12,839 | | $12,839 |
| 923 | LXS 2006-GP3 [1_3] | ALT-A 2006 | 50.00% | $32,315 | | $32,315 |
| 924 | LXS 2006-GP3 [2_1] | ALT-A 2006 | 50.00% | $5,911 | | $5,911 |
| 925 | LXS 2006-GP3 [2_2] | ALT-A 2006 | 50.00% | $14,213 | | $14,213 |
| 926 | LXS 2006-GP3 [2_3] | ALT-A 2006 | 50.00% | $18,255 | | $18,255 |
| 927 | LXS 2006-GP3 [3_1] | ALT-A 2006 | 50.00% | $25,386 | | $25,386 |
| 928 | LXS 2006-GP3 [3_2] | ALT-A 2006 | 50.00% | $30,702 | | $30,702 |
| 929 | LXS 2006-GP3 [3_3] | ALT-A 2006 | 50.00% | $41,661 | | $41,661 |
| 930 | LXS 2006-GP4 [1_1] | ALT-A 2006 | 0.16% | $9 | | $9 |
| 931 | LXS 2006-GP4 [1_2] | ALT-A 2006 | 0.16% | $41 | | $41 |
| 932 | LXS 2006-GP4 [1_3] | ALT-A 2006 | 0.16% | $145 | | $145 |
| 933 | LXS 2006-GP4 [2_1] | ALT-A 2006 | 0.16% | $15 | | $15 |
| 934 | LXS 2006-GP4 [2_2] | ALT-A 2006 | 0.16% | $40 | | $40 |
| 935 | LXS 2006-GP4 [2_3] | ALT-A 2006 | 0.16% | $76 | | $76 |
| 936 | LXS 2006-GP4 [3_1] | ALT-A 2006 | 0.16% | $142 | | $142 |
| 937 | LXS 2006-GP4 [3_2] | ALT-A 2006 | 0.16% | $167 | | $167 |
| 938 | LXS 2006-GP4 [3_3] | ALT-A 2006 | 0.16% | $185 | | $185 |
| 939 | MABS 2005-AB1 [Total] | Subprime 2005 | 0.48% | $1,275 | FGIC | $1,275 |
| 940 | MALT 2002-1 [Total] | ALT-A 2002 | 60.97% | $3,300 | | $3,300 |
| 941 | MALT 2002-2 [1] | ALT-A 2002 | 66.86% | $708 | | $708 |
| 942 | MALT 2002-2 [2] | ALT-A 2002 | 66.86% | $1,467 | | $1,467 |
| 943 | MALT 2002-2 [3] | ALT-A 2002 | 66.86% | $3,291 | | $3,291 |
| 944 | MALT 2002-2 [4] | ALT-A 2002 | 66.86% | $2,216 | | $2,216 |
| 945 | MALT 2002-2 [5] | ALT-A 2002 | 66.86% | $2,084 | | $2,084 |
| 946 | MALT 2002-3 [Total] | ALT-A 2002 | 55.67% | $17,415 | MBIA | $0 |
| 947 | MALT 2003-2 [1] | ALT-A 2003 | 6.05% | $328 | | $328 |
| 948 | MALT 2003-2 [2] | ALT-A 2003 | 6.05% | $133 | | $133 |
| 949 | MALT 2003-2 [3] | ALT-A 2003 | 6.05% | $85 | | $85 |
| 950 | MALT 2003-2 [4] | ALT-A 2003 | 6.05% | $90 | | $90 |
| 951 | MALT 2003-2 [5] | ALT-A 2003 | 6.05% | $21 | | $21 |
| 952 | MALT 2003-2 [6] | ALT-A 2003 | 6.05% | $63 | | $63 |
| 953 | MALT 2003-2 [7] | ALT-A 2003 | 6.05% | $56 | | $56 |
| 954 | MALT 2003-3 [1] | ALT-A 2003 | 35.32% | $1,174 | | $1,174 |
| 955 | MALT 2003-3 [2] | ALT-A 2003 | 35.32% | $5,105 | | $5,105 |

Case 14-cv-03039-GBD    Document 15-1    Filed 11/06/14    Page 227 of 355

Schedule 1 – Allowed GMACM Cure Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
| 956 | MALT 2003-4 [1] | ALT-A 2003 | 10.89% | $464 | | $464 |
| 957 | MALT 2003-4 [2] | ALT-A 2003 | 10.89% | $158 | | $158 |
| 958 | MALT 2003-4 [3] | ALT-A 2003 | 10.89% | $308 | | $308 |
| 959 | MALT 2003-4 [4] | ALT-A 2003 | 10.89% | $307 | | $307 |
| 960 | MALT 2003-4 [5] | ALT-A 2003 | 10.89% | $133 | | $133 |
| 961 | MALT 2003-5 [EIGHT] | ALT-A 2003 | 4.50% | $48 | | $48 |
| 962 | MALT 2003-5 [FIVE] | ALT-A 2003 | 4.50% | $175 | | $175 |
| 963 | MALT 2003-5 [FOUR] | ALT-A 2003 | 4.50% | $459 | | $459 |
| 964 | MALT 2003-5 [ONE] | ALT-A 2003 | 4.50% | $136 | | $136 |
| 965 | MALT 2003-5 [SEVEN] | ALT-A 2003 | 4.50% | $182 | | $182 |
| 966 | MALT 2003-5 [SIX] | ALT-A 2003 | 4.50% | $189 | | $189 |
| 967 | MALT 2003-5 [THREE] | ALT-A 2003 | 4.50% | $163 | | $163 |
| 968 | MALT 2003-5 [TWO] | ALT-A 2003 | 4.50% | $81 | | $81 |
| 969 | MALT 2003-6 [1] | ALT-A 2003 | 22.25% | $1,342 | | $1,342 |
| 970 | MALT 2003-6 [2] | ALT-A 2003 | 22.25% | $351 | | $351 |
| 971 | MALT 2003-6 [3] | ALT-A 2003 | 22.25% | $829 | | $829 |
| 972 | MALT 2003-6 [4] | ALT-A 2003 | 22.25% | $294 | | $294 |
| 973 | MALT 2003-7 [1] | ALT-A 2003 | 6.43% | $676 | | $676 |
| 974 | MALT 2003-7 [2] | ALT-A 2003 | 6.43% | $78 | | $78 |
| 975 | MALT 2003-7 [3] | ALT-A 2003 | 6.43% | $552 | | $552 |
| 976 | MALT 2003-7 [4] | ALT-A 2003 | 6.43% | $196 | | $196 |
| 977 | MALT 2003-7 [5] | ALT-A 2003 | 6.43% | $115 | | $115 |
| 978 | MALT 2003-7 [6] | ALT-A 2003 | 6.43% | $501 | | $501 |
| 979 | MALT 2003-7 [7] | ALT-A 2003 | 6.43% | $785 | | $785 |
| 980 | MALT 2003-7 [8] | ALT-A 2003 | 6.43% | $300 | | $300 |
| 981 | MALT 2003-8 [1] | ALT-A 2003 | 3.16% | $23 | | $23 |
| 982 | MALT 2003-8 [2] | ALT-A 2003 | 3.16% | $47 | | $47 |
| 983 | MALT 2003-8 [3] | ALT-A 2003 | 3.16% | $89 | | $89 |
| 984 | MALT 2003-8 [4] | ALT-A 2003 | 3.16% | $66 | | $66 |
| 985 | MALT 2003-8 [5] | ALT-A 2003 | 3.16% | $63 | | $63 |
| 986 | MALT 2003-8 [6] | ALT-A 2003 | 3.16% | $87 | | $87 |
| 987 | MALT 2003-8 [7] | ALT-A 2003 | 7.80% | $46 | | $46 |
| 988 | MALT 2003-9 [1] | ALT-A 2003 | 7.80% | $78 | | $78 |
| 989 | MALT 2003-9 [2] | ALT-A 2003 | 7.80% | $37 | | $37 |
| 990 | MALT 2003-9 [3] | ALT-A 2003 | 7.80% | $79 | | $79 |
| 991 | MALT 2003-9 [4] | ALT-A 2003 | 7.80% | $144 | | $144 |
| 992 | MALT 2003-9 [5] | ALT-A 2003 | 7.80% | $162 | | $162 |
| 993 | MALT 2003-9 [6] | ALT-A 2003 | 7.80% | $37 | | $37 |
| 994 | MALT 2003-9 [7] | ALT-A 2003 | 7.80% | $73 | | $73 |
| 995 | MALT 2003-9 [8] | ALT-A 2003 | 7.80% | $39 | | $39 |
| 996 | MALT 2004-1 [1] | ALT-A 2004 | 8.15% | $381 | | $381 |
| 997 | MALT 2004-1 [2] | ALT-A 2004 | 8.15% | $163 | | $163 |
| 998 | MALT 2004-1 [3] | ALT-A 2004 | 8.15% | $160 | | $160 |
| 999 | MALT 2004-1 [4] | ALT-A 2004 | 8.15% | $363 | | $363 |
| 1000 | MALT 2004-10 [1] | ALT-A 2004 | 11.02% | $245 | | $245 |
| 1001 | MALT 2004-10 [2] | ALT-A 2004 | 11.02% | $667 | | $667 |
| 1002 | MALT 2004-10 [3] | ALT-A 2004 | 11.02% | $681 | | $681 |
| 1003 | MALT 2004-10 [4] | ALT-A 2004 | 11.02% | $343 | | $343 |
| 1004 | MALT 2004-10 [5] | ALT-A 2004 | 11.02% | $799 | | $799 |
| 1005 | MALT 2004-11 [1] | ALT-A 2004 | 18.18% | $932 | | $932 |
| 1006 | MALT 2004-11 [2] | ALT-A 2004 | 18.18% | $434 | | $434 |

Schedule 2 – Covered Trust Cure Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
| 1007 | MALT 2004-11 [3] | ALT-A 2004 | 18.18% | $2,523 | | $2,523 |
| 1008 | MALT 2004-11 [4] | ALT-A 2004 | 18.18% | $1,707 | | $1,707 |
| 1009 | MALT 2004-11 [5] | ALT-A 2004 | 18.18% | $947 | | $947 |
| 1010 | MALT 2004-11 [6] | ALT-A 2004 | 18.18% | $205 | | $205 |
| 1011 | MALT 2004-11 [7] | ALT-A 2004 | 18.18% | $755 | | $755 |
| 1012 | MALT 2004-11 [8] | ALT-A 2004 | 18.18% | $514 | | $514 |
| 1013 | MALT 2004-11 [9] | ALT-A 2004 | 18.18% | $478 | | $478 |
| 1014 | MALT 2004-12 [1] | ALT-A 2004 | 28.11% | $493 | | $493 |
| 1015 | MALT 2004-12 [2] | ALT-A 2004 | 28.11% | $1,229 | | $1,229 |
| 1016 | MALT 2004-12 [3] | ALT-A 2004 | 28.11% | $2,498 | | $2,498 |
| 1017 | MALT 2004-12 [4] | ALT-A 2004 | 28.11% | $779 | | $779 |
| 1018 | MALT 2004-12 [5] | ALT-A 2004 | 28.11% | $3,246 | | $3,246 |
| 1019 | MALT 2004-12 [6] | ALT-A 2004 | 28.11% | $1,614 | | $1,614 |
| 1020 | MALT 2004-13 [1] | ALT-A 2004 | 20.39% | $455 | | $455 |
| 1021 | MALT 2004-13 [10] | ALT-A 2004 | 20.39% | $1,032 | | $1,032 |
| 1022 | MALT 2004-13 [11] | ALT-A 2004 | 20.39% | $319 | | $319 |
| 1023 | MALT 2004-13 [12] | ALT-A 2004 | 20.39% | $332 | | $332 |
| 1024 | MALT 2004-13 [2] | ALT-A 2004 | 20.39% | $580 | | $580 |
| 1025 | MALT 2004-13 [3] | ALT-A 2004 | 20.39% | $260 | | $260 |
| 1026 | MALT 2004-13 [4] | ALT-A 2004 | 20.39% | $285 | | $285 |
| 1027 | MALT 2004-13 [5] | ALT-A 2004 | 20.39% | $253 | | $253 |
| 1028 | MALT 2004-13 [6] | ALT-A 2004 | 20.39% | $232 | | $232 |
| 1029 | MALT 2004-13 [7] | ALT-A 2004 | 20.39% | $274 | | $274 |
| 1030 | MALT 2004-13 [8] | ALT-A 2004 | 20.39% | $737 | | $737 |
| 1031 | MALT 2004-13 [9] | ALT-A 2004 | 20.39% | $1,011 | | $1,011 |
| 1032 | MALT 2004-2 [EIGHT] | ALT-A 2004 | 5.11% | $286 | | $286 |
| 1033 | MALT 2004-2 [FIVE] | ALT-A 2004 | 5.11% | $45 | | $45 |
| 1034 | MALT 2004-2 [FOUR] | ALT-A 2004 | 5.11% | $73 | | $73 |
| 1035 | MALT 2004-2 [ONE] | ALT-A 2004 | 5.11% | $76 | | $76 |
| 1036 | MALT 2004-2 [SEVEN] | ALT-A 2004 | 5.11% | $184 | | $184 |
| 1037 | MALT 2004-2 [SIX] | ALT-A 2004 | 5.11% | $123 | | $123 |
| 1038 | MALT 2004-2 [THREE] | ALT-A 2004 | 5.11% | $166 | | $166 |
| 1039 | MALT 2004-2 [TWO] | ALT-A 2004 | 5.11% | $169 | | $169 |
| 1040 | MALT 2004-3 [EIGHT] | ALT-A 2004 | 6.41% | $251 | | $251 |
| 1041 | MALT 2004-3 [FIVE] | ALT-A 2004 | 6.41% | $162 | | $162 |
| 1042 | MALT 2004-3 [FOUR] | ALT-A 2004 | 6.41% | $124 | | $124 |
| 1043 | MALT 2004-3 [ONE] | ALT-A 2004 | 6.41% | $148 | | $148 |
| 1044 | MALT 2004-3 [SEVEN] | ALT-A 2004 | 6.41% | $183 | | $183 |
| 1045 | MALT 2004-3 [SIX] | ALT-A 2004 | 6.41% | $146 | | $146 |
| 1046 | MALT 2004-3 [THREE] | ALT-A 2004 | 6.41% | $118 | | $118 |
| 1047 | MALT 2004-3 [TWO] | ALT-A 2004 | 6.41% | $206 | | $206 |
| 1048 | MALT 2004-4 [1] | ALT-A 2004 | 5.55% | $166 | | $166 |
| 1049 | MALT 2004-4 [10] | ALT-A 2004 | 5.55% | $62 | | $62 |
| 1050 | MALT 2004-4 [11] | ALT-A 2004 | 5.55% | $163 | | $163 |
| 1051 | MALT 2004-4 [2] | ALT-A 2004 | 5.55% | $54 | | $54 |
| 1052 | MALT 2004-4 [3] | ALT-A 2004 | 5.55% | $82 | | $82 |
| 1053 | MALT 2004-4 [4] | ALT-A 2004 | 5.55% | $97 | | $97 |
| 1054 | MALT 2004-4 [5] | ALT-A 2004 | 5.55% | $116 | | $116 |
| 1055 | MALT 2004-4 [6] | ALT-A 2004 | 5.55% | $141 | | $141 |
| 1056 | MALT 2004-4 [7] | ALT-A 2004 | 5.55% | $160 | | $160 |
| 1057 | MALT 2004-4 [8] | ALT-A 2004 | 5.55% | $70 | | $70 |

Schedule 2 - Covered Losses and Future Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
| 1058 | MALT 2004-4 [9] | ALT-A 2004 | 5.55% | $321 | | $321 |
| 1059 | MALT 2004-5 [1] | ALT-A 2004 | 11.45% | $135 | | $135 |
| 1060 | MALT 2004-5 [2] | ALT-A 2004 | 11.45% | $169 | | $169 |
| 1061 | MALT 2004-5 [3] | ALT-A 2004 | 11.45% | $128 | | $128 |
| 1062 | MALT 2004-5 [4] | ALT-A 2004 | 11.45% | $176 | | $176 |
| 1063 | MALT 2004-5 [5] | ALT-A 2004 | 11.45% | $123 | | $123 |
| 1064 | MALT 2004-5 [6] | ALT-A 2004 | 11.45% | $220 | | $220 |
| 1065 | MALT 2004-5 [7] | ALT-A 2004 | 11.45% | $209 | | $209 |
| 1066 | MALT 2004-6 [1] | ALT-A 2004 | 14.82% | $711 | | $711 |
| 1067 | MALT 2004-6 [10] | ALT-A 2004 | 14.82% | $1,046 | | $1,046 |
| 1068 | MALT 2004-6 [2] | ALT-A 2004 | 14.82% | $438 | | $438 |
| 1069 | MALT 2004-6 [3] | ALT-A 2004 | 14.82% | $400 | | $400 |
| 1070 | MALT 2004-6 [4] | ALT-A 2004 | 14.82% | $639 | | $639 |
| 1071 | MALT 2004-6 [5] | ALT-A 2004 | 14.82% | $348 | | $348 |
| 1072 | MALT 2004-6 [6] | ALT-A 2004 | 14.82% | $643 | | $643 |
| 1073 | MALT 2004-6 [7] | ALT-A 2004 | 14.82% | $1,930 | | $1,930 |
| 1074 | MALT 2004-6 [8] | ALT-A 2004 | 14.82% | $866 | | $866 |
| 1075 | MALT 2004-6 [9] | ALT-A 2004 | 14.82% | $459 | | $459 |
| 1076 | MALT 2004-7 [1] | ALT-A 2004 | 8.78% | $471 | | $471 |
| 1077 | MALT 2004-7 [10] | ALT-A 2004 | 8.78% | $81 | | $81 |
| 1078 | MALT 2004-7 [2] | ALT-A 2004 | 8.78% | $95 | | $95 |
| 1079 | MALT 2004-7 [3] | ALT-A 2004 | 8.78% | $115 | | $115 |
| 1080 | MALT 2004-7 [4] | ALT-A 2004 | 8.78% | $101 | | $101 |
| 1081 | MALT 2004-7 [5] | ALT-A 2004 | 8.78% | $63 | | $63 |
| 1082 | MALT 2004-7 [6] | ALT-A 2004 | 8.78% | $116 | | $116 |
| 1083 | MALT 2004-7 [7] | ALT-A 2004 | 8.78% | $182 | | $182 |
| 1084 | MALT 2004-7 [8] | ALT-A 2004 | 8.78% | $79 | | $79 |
| 1085 | MALT 2004-7 [9] | ALT-A 2004 | 8.78% | $351 | | $351 |
| 1086 | MALT 2004-8 [1] | ALT-A 2004 | 19.48% | $1,337 | | $1,337 |
| 1087 | MALT 2004-8 [2] | ALT-A 2004 | 19.48% | $1,192 | | $1,192 |
| 1088 | MALT 2004-8 [3] | ALT-A 2004 | 19.48% | $453 | | $453 |
| 1089 | MALT 2004-8 [4] | ALT-A 2004 | 19.48% | $439 | | $439 |
| 1090 | MALT 2004-8 [5] | ALT-A 2004 | 19.48% | $568 | | $568 |
| 1091 | MALT 2004-8 [6] | ALT-A 2004 | 19.48% | $470 | | $470 |
| 1092 | MALT 2004-8 [7] | ALT-A 2004 | 19.48% | $346 | | $346 |
| 1093 | MALT 2004-8 [8] | ALT-A 2004 | 19.48% | $382 | | $382 |
| 1094 | MALT 2004-9 [Total] | ALT-A 2004 | 8.33% | $3,288 | | $3,288 |
| 1095 | MALT 2005-1 [1] | ALT-A 2005 | 35.28% | $1,005 | | $1,005 |
| 1096 | MALT 2005-1 [2] | ALT-A 2005 | 35.28% | $1,824 | | $1,824 |
| 1097 | MALT 2005-1 [3] | ALT-A 2005 | 35.28% | $1,795 | | $1,795 |
| 1098 | MALT 2005-1 [4] | ALT-A 2005 | 35.28% | $713 | | $713 |
| 1099 | MALT 2005-1 [5] | ALT-A 2005 | 35.28% | $736 | | $736 |
| 1100 | MALT 2005-1 [6] | ALT-A 2005 | 35.28% | $6,063 | | $6,063 |
| 1101 | MALT 2005-1 [7] | ALT-A 2005 | 35.28% | $1,211 | | $1,211 |
| 1102 | MALT 2005-2 [1] | ALT-A 2005 | 28.87% | $4,717 | | $4,717 |
| 1103 | MALT 2005-2 [2] | ALT-A 2005 | 28.87% | $2,531 | | $2,531 |
| 1104 | MALT 2005-2 [3] | ALT-A 2005 | 28.87% | $692 | | $692 |
| 1105 | MALT 2005-2 [4] | ALT-A 2005 | 28.87% | $4,561 | | $4,561 |
| 1106 | MALT 2005-2 [5] | ALT-A 2005 | 28.87% | $1,325 | | $1,325 |
| 1107 | MALT 2005-2 [6] | ALT-A 2005 | 28.87% | $1,127 | | $1,127 |
| 1108 | MALT 2005-3 [1] | ALT-A 2005 | 24.62% | $2,130 | | $2,130 |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1

Schedule 2 – Covered MBS Trust Claims
Subject to Further Review and GSE Diligence

| | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 1109 | MALT 2005-3 [2] | ALT-A 2005 | 24.62% | $616 | | $616 |
| 1110 | MALT 2005-3 [3] | ALT-A 2005 | 24.62% | $863 | | $863 |
| 1111 | MALT 2005-3 [4] | ALT-A 2005 | 24.62% | $1,037 | | $1,037 |
| 1112 | MALT 2005-3 [5] | ALT-A 2005 | 24.62% | $748 | | $748 |
| 1113 | MALT 2005-3 [6] | ALT-A 2005 | 24.62% | $4,474 | | $4,474 |
| 1114 | MALT 2005-3 [7] | ALT-A 2005 | 24.62% | $598 | | $598 |
| 1115 | MALT 2005-4 [1] | ALT-A 2005 | 20.48% | $1,875 | | $1,875 |
| 1116 | MALT 2005-4 [2] | ALT-A 2005 | 20.48% | $3,653 | | $3,653 |
| 1117 | MALT 2005-4 [3] | ALT-A 2005 | 20.48% | $2,311 | | $2,311 |
| 1118 | MALT 2005-4 [4] | ALT-A 2005 | 20.48% | $1,152 | | $1,152 |
| 1119 | MALT 2005-4 [5] | ALT-A 2005 | 20.48% | $2,654 | | $2,654 |
| 1120 | MALT 2005-5 [1] | ALT-A 2005 | 13.07% | $528 | | $528 |
| 1121 | MALT 2005-5 [2] | ALT-A 2005 | 13.07% | $1,439 | | $1,439 |
| 1122 | MALT 2005-5 [3] | ALT-A 2005 | 13.07% | $3,251 | | $3,251 |
| 1123 | MALT 2005-5 [4] | ALT-A 2005 | 13.07% | $356 | | $356 |
| 1124 | MALT 2005-5 [5] | ALT-A 2005 | 13.07% | $971 | | $971 |
| 1125 | MALT 2005-6 [1] | ALT-A 2005 | 2.51% | $2,370 | | $2,370 |
| 1126 | MALT 2005-6 [2] | ALT-A 2005 | 2.51% | $295 | | $295 |
| 1127 | MALT 2006-1 [Total] | ALT-A 2006 | 0.72% | $459 | | $459 |
| 1128 | MALT 2006-3 [1] | ALT-A 2006 | 0.12% | $101 | | $101 |
| 1129 | MALT 2006-3 [2] | ALT-A 2006 | 0.12% | $12 | | $12 |
| 1130 | MALT 2007-1 [GRP_3] | ALT-A 2007 | 0.62% | $69 | | $69 |
| 1131 | MALT 2007-1 [POOL_1] | ALT-A 2007 | 0.62% | $190 | | $190 |
| 1132 | MALT 2007-HF1 [1] | ALT-A 2007 | 4.80% | $494 | | $494 |
| 1133 | MALT 2007-HF1 [2] | ALT-A 2007 | 4.80% | $1,905 | | $1,905 |
| 1134 | MALT 2007-HF1 [3] | ALT-A 2007 | 4.80% | $355 | | $355 |
| 1135 | MALT 2007-HF1 [4] | ALT-A 2007 | 4.80% | $3,043 | | $3,043 |
| 1136 | MALT 2007-HF1 [5] | ALT-A 2007 | 4.80% | $239 | | $239 |
| 1137 | MARM 2003-2 [1] | Prime 2003 | 6.62% | $56 | | $56 |
| 1138 | MARM 2003-2 [2] | Prime 2003 | 6.62% | $65 | | $65 |
| 1139 | MARM 2003-2 [3] | Prime 2003 | 6.62% | $102 | | $102 |
| 1140 | MARM 2003-2 [4] | Prime 2003 | 6.62% | $109 | | $109 |
| 1141 | MARM 2003-2 [5] | Prime 2003 | 6.62% | $43 | | $43 |
| 1142 | MARM 2003-2 [6] | Prime 2003 | 6.62% | $21 | | $21 |
| 1143 | MARM 2003-7 [FIVE] | ALT-A 2003 | 2.44% | $12 | | $12 |
| 1144 | MARM 2003-7 [FOUR] | ALT-A 2003 | 2.44% | $10 | | $10 |
| 1145 | MARM 2003-7 [ONE] | ALT-A 2003 | 2.44% | $5 | | $5 |
| 1146 | MARM 2003-7 [THREE] | ALT-A 2003 | 2.44% | $14 | | $14 |
| 1147 | MARM 2003-7 [TWO] | ALT-A 2003 | 2.44% | $7 | | $7 |
| 1148 | MARM 2004-1 [1] | Prime 2004 | 2.64% | $44 | | $44 |
| 1149 | MARM 2004-1 [2] | Prime 2004 | 2.64% | $80 | | $80 |
| 1150 | MARM 2004-1 [3] | Prime 2004 | 2.64% | $158 | | $158 |
| 1151 | MARM 2004-1 [4] | Prime 2004 | 2.64% | $84 | | $84 |
| 1152 | MARM 2004-1 [5] | Prime 2004 | 2.64% | $63 | | $63 |
| 1153 | MARM 2004-1 [6] | Prime 2004 | 2.64% | $78 | | $78 |
| 1154 | MARM 2004-10 [1] | Prime 2004 | 31.23% | $1,633 | | $1,633 |
| 1155 | MARM 2004-10 [2] | Prime 2004 | 31.23% | $2,662 | | $2,662 |
| 1156 | MARM 2004-10 [3] | Prime 2004 | 31.23% | $1,707 | | $1,707 |
| 1157 | MARM 2004-11 [1] | ALT-A 2004 | 34.51% | $10,878 | | $10,878 |
| 1158 | MARM 2004-11 [2] | ALT-A 2004 | 34.51% | $12,998 | | $12,998 |
| 1159 | MARM 2004-12 [1] | Prime 2004 | 7.61% | $199 | | $199 |

Case 14-cv-03039-GBD    Document 51-1    Filed 01/06/14    Page 231 of 355
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26

Schedule 2 (Advanced Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
| 1160 | MARM 2004-12 [2] | Prime 2004 | 7.61% | $359 | | $359 |
| 1161 | MARM 2004-12 [3] | Prime 2004 | 7.61% | $794 | | $794 |
| 1162 | MARM 2004-12 [4] | Prime 2004 | 7.61% | $362 | | $362 |
| 1163 | MARM 2004-12 [5] | Prime 2004 | 7.61% | $288 | | $288 |
| 1164 | MARM 2004-14 [1] | ALT-A 2004 | 36.97% | $11,246 | | $11,246 |
| 1165 | MARM 2004-14 [2] | ALT-A 2004 | 36.97% | $8,442 | | $8,442 |
| 1166 | MARM 2004-15 [1] | ALT-A 2004 | 37.61% | $1,980 | | $1,980 |
| 1167 | MARM 2004-15 [2] | ALT-A 2004 | 37.61% | $2,875 | | $2,875 |
| 1168 | MARM 2004-15 [3] | ALT-A 2004 | 37.61% | $983 | | $983 |
| 1169 | MARM 2004-15 [4] | ALT-A 2004 | 37.61% | $3,403 | | $3,403 |
| 1170 | MARM 2004-15 [5] | ALT-A 2004 | 37.61% | $563 | | $563 |
| 1171 | MARM 2004-15 [6] | ALT-A 2004 | 37.61% | $1,765 | | $1,765 |
| 1172 | MARM 2004-15 [7] | ALT-A 2004 | 37.61% | $1,799 | | $1,799 |
| 1173 | MARM 2004-15 [8] | ALT-A 2004 | 37.61% | $2,323 | | $2,323 |
| 1174 | MARM 2004-15 [9] | ALT-A 2004 | 37.61% | $1,853 | | $1,853 |
| 1175 | MARM 2004-2 [1] | ALT-A 2004 | 36.99% | $749 | | $749 |
| 1176 | MARM 2004-2 [2] | ALT-A 2004 | 36.99% | $1,014 | | $1,014 |
| 1177 | MARM 2004-2 [3] | ALT-A 2004 | 36.99% | $3,971 | | $3,971 |
| 1178 | MARM 2004-3 [1] | Prime 2004 | 48.47% | $622 | | $622 |
| 1179 | MARM 2004-3 [2] | Prime 2004 | 48.47% | $1,079 | | $1,079 |
| 1180 | MARM 2004-3 [3] | Prime 2004 | 48.47% | $1,379 | | $1,379 |
| 1181 | MARM 2004-3 [4] | Prime 2004 | 48.47% | $1,036 | | $1,036 |
| 1182 | MARM 2004-3 [5] | Prime 2004 | 48.47% | $861 | | $861 |
| 1183 | MARM 2004-3 [6] | Prime 2004 | 48.47% | $1,417 | | $1,417 |
| 1184 | MARM 2004-3 [7] | Prime 2004 | 48.47% | $593 | | $593 |
| 1185 | MARM 2004-3 [8] | Prime 2004 | 48.47% | $2,411 | | $2,411 |
| 1186 | MARM 2004-4 [1] | ALT-A 2004 | 58.20% | $1,132 | | $1,132 |
| 1187 | MARM 2004-4 [2] | ALT-A 2004 | 58.20% | $3,529 | | $3,529 |
| 1188 | MARM 2004-4 [3] | ALT-A 2004 | 58.20% | $1,604 | | $1,604 |
| 1189 | MARM 2004-4 [4] | ALT-A 2004 | 58.20% | $3,119 | | $3,119 |
| 1190 | MARM 2004-4 [5] | ALT-A 2004 | 58.20% | $746 | | $746 |
| 1191 | MARM 2004-5 [1] | Prime 2004 | 11.45% | $665 | | $665 |
| 1192 | MARM 2004-5 [2] | Prime 2004 | 11.45% | $215 | | $215 |
| 1193 | MARM 2004-5 [3] | Prime 2004 | 11.45% | $417 | | $417 |
| 1194 | MARM 2004-5 [4] | Prime 2004 | 11.45% | $298 | | $298 |
| 1195 | MARM 2004-5 [5] | Prime 2004 | 11.45% | $1,165 | | $1,165 |
| 1196 | MARM 2004-5 [6] | Prime 2004 | 11.45% | $709 | | $709 |
| 1197 | MARM 2004-5 [7] | Prime 2004 | 11.45% | $76 | | $76 |
| 1198 | MARM 2004-5 [8] | Prime 2004 | 11.45% | $168 | | $168 |
| 1199 | MARM 2004-5 [9] | Prime 2004 | 11.45% | $374 | | $374 |
| 1200 | MARM 2004-6 [1] | Prime 2004 | 34.37% | $852 | | $852 |
| 1201 | MARM 2004-6 [2] | Prime 2004 | 34.37% | $1,510 | | $1,510 |
| 1202 | MARM 2004-6 [3] | Prime 2004 | 34.37% | $866 | | $866 |
| 1203 | MARM 2004-6 [4] | Prime 2004 | 34.37% | $5,072 | | $5,072 |
| 1204 | MARM 2004-6 [5] | Prime 2004 | 34.37% | $463 | | $463 |
| 1205 | MARM 2004-6 [6] | Prime 2004 | 34.37% | $862 | | $862 |
| 1206 | MARM 2004-7 [1] | Prime 2004 | 36.03% | $1,385 | | $1,385 |
| 1207 | MARM 2004-7 [2] | Prime 2004 | 36.03% | $1,633 | | $1,633 |
| 1208 | MARM 2004-7 [3] | Prime 2004 | 36.03% | $5,825 | | $5,825 |
| 1209 | MARM 2004-7 [4] | Prime 2004 | 36.03% | $1,349 | | $1,349 |
| 1210 | MARM 2004-7 [5] | Prime 2004 | 36.03% | $1,153 | | $1,153 |

Schedule 2 to the RMBS Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
| 1211 | MARM 2004-7 [6] | Prime 2004 | 36.03% | $11,037 | | $11,037 |
| 1212 | MARM 2004-8 [1] | ALT-A 2004 | 44.06% | $2,407 | | $2,407 |
| 1213 | MARM 2004-8 [2] | ALT-A 2004 | 44.06% | $2,623 | | $2,623 |
| 1214 | MARM 2004-8 [3] | ALT-A 2004 | 44.06% | $1,563 | | $1,563 |
| 1215 | MARM 2004-8 [4] | ALT-A 2004 | 44.06% | $2,989 | | $2,989 |
| 1216 | MARM 2004-8 [5] | ALT-A 2004 | 44.06% | $3,102 | | $3,102 |
| 1217 | MARM 2004-8 [6] | ALT-A 2004 | 44.06% | $588 | | $588 |
| 1218 | MARM 2004-8 [7] | ALT-A 2004 | 44.06% | $724 | | $724 |
| 1219 | MARM 2004-8 [8] | ALT-A 2004 | 44.06% | $3,367 | | $3,367 |
| 1220 | MARM 2004-9 [1] | Prime 2004 | 33.16% | $15,334 | | $15,334 |
| 1221 | MARM 2004-9 [2] | Prime 2004 | 33.16% | $12,853 | | $12,853 |
| 1222 | MARM 2005-1 [1] | ALT-A 2005 | 48.18% | $3,636 | | $3,636 |
| 1223 | MARM 2005-1 [10] | ALT-A 2005 | 48.18% | $8,282 | | $8,282 |
| 1224 | MARM 2005-1 [2] | ALT-A 2005 | 48.18% | $5,123 | | $5,123 |
| 1225 | MARM 2005-1 [3] | ALT-A 2005 | 48.18% | $3,120 | | $3,120 |
| 1226 | MARM 2005-1 [4] | ALT-A 2005 | 48.18% | $11,619 | | $11,619 |
| 1227 | MARM 2005-1 [5] | ALT-A 2005 | 48.18% | $16,162 | | $16,162 |
| 1228 | MARM 2005-1 [6] | ALT-A 2005 | 48.18% | $15,282 | | $15,282 |
| 1229 | MARM 2005-1 [7] | ALT-A 2005 | 48.18% | $16,948 | | $16,948 |
| 1230 | MARM 2005-1 [8] | ALT-A 2005 | 48.18% | $4,881 | | $4,881 |
| 1231 | MARM 2005-1 [9] | ALT-A 2005 | 48.18% | $2,246 | | $2,246 |
| 1232 | MARM 2005-2 [1] | ALT-A 2005 | 30.04% | $1,772 | | $1,772 |
| 1233 | MARM 2005-2 [2] | ALT-A 2005 | 30.04% | $2,440 | | $2,440 |
| 1234 | MARM 2005-2 [3] | ALT-A 2005 | 30.04% | $8,891 | | $8,891 |
| 1235 | MARM 2005-2 [4] | ALT-A 2005 | 30.04% | $4,649 | | $4,649 |
| 1236 | MARM 2005-2 [5] | ALT-A 2005 | 30.04% | $6,431 | | $6,431 |
| 1237 | MARM 2005-2 [6] | ALT-A 2005 | 30.04% | $2,286 | | $2,286 |
| 1238 | MARM 2005-2 [7] | ALT-A 2005 | 30.04% | $5,107 | | $5,107 |
| 1239 | MARM 2005-3 [1] | ALT-A 2005 | 50.36% | $7,075 | | $7,075 |
| 1240 | MARM 2005-3 [2] | ALT-A 2005 | 50.36% | $7,902 | | $7,902 |
| 1241 | MARM 2005-3 [3] | ALT-A 2005 | 50.36% | $10,644 | | $10,644 |
| 1242 | MARM 2005-3 [4] | ALT-A 2005 | 50.36% | $1,216 | | $1,216 |
| 1243 | MARM 2005-3 [5] | ALT-A 2005 | 50.36% | $1,228 | | $1,228 |
| 1244 | MARM 2005-6 [1] | Prime 2005 | 38.40% | $5,163 | | $5,163 |
| 1245 | MARM 2005-6 [2] | Prime 2005 | 38.40% | $1,423 | | $1,423 |
| 1246 | MARM 2005-6 [3] | Prime 2005 | 38.40% | $4,141 | | $4,141 |
| 1247 | MARM 2005-6 [4] | Prime 2005 | 38.40% | $3,983 | | $3,983 |
| 1248 | MARM 2005-6 [5] | Prime 2005 | 38.40% | $10,603 | | $10,603 |
| 1249 | MARM 2005-6 [6] | Prime 2005 | 38.40% | $4,703 | | $4,703 |
| 1250 | MARM 2005-7 [7] | Prime 2005 | 48.64% | $2,223 | | $2,223 |
| 1251 | MARM 2005-7 [1] | Prime 2005 | 48.64% | $10,498 | | $10,498 |
| 1252 | MARM 2005-7 [2] | Prime 2005 | 48.64% | $32,082 | | $32,082 |
| 1253 | MARM 2005-7 [3] | Prime 2005 | 48.64% | $4,397 | | $4,397 |
| 1254 | MARM 2005-8 [11OYR] | ALT-A 2005 | 0.65% | $12 | | $12 |
| 1255 | MARM 2005-8 [12YR] | ALT-A 2005 | 0.65% | $3 | | $3 |
| 1256 | MARM 2005-8 [13YR] | ALT-A 2005 | 0.65% | $10 | | $10 |
| 1257 | MARM 2005-8 [15YR] | ALT-A 2005 | 0.65% | $83 | | $83 |
| 1258 | MARM 2005-8 [16M] | ALT-A 2005 | 0.65% | $53 | | $53 |
| 1259 | MARM 2005-8 [17YR] | ALT-A 2005 | 0.65% | $8 | | $8 |
| 1260 | MARM 2005-8 [22YR] | ALT-A 2005 | 0.65% | $5 | | $5 |
| 1261 | MARM 2005-8 [23YR] | ALT-A 2005 | 0.65% | $15 | | $15 |

Schedule 1 to Claims Recognition Procedures
Subject to Further Review and Due Diligence

| | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 1262 | MARM 2005-8 [25YR] | ALT-A 2005 | 0.65% | $411 | | $411 |
| 1263 | MARM 2005-8 [26M] | ALT-A 2005 | 0.65% | $19 | | $19 |
| 1264 | MARM 2005-8 [27YR] | ALT-A 2005 | 0.65% | $546 | | $546 |
| 1265 | MARM 2005-8 [31DYR] | ALT-A 2005 | 0.65% | $360 | | $360 |
| 1266 | MARM 2006-OA2 [1] | Pay Option ARM 2006 | 4.19% | $18,858 | FSA | $0 |
| 1267 | MARM 2006-OA2 [2] | Pay Option ARM 2006 | 4.19% | $12,218 | FSA | $0 |
| 1268 | MARM 2006-OA2 [3] | Pay Option ARM 2006 | 4.19% | $3,129 | | $3,129 |
| 1269 | MARM 2006-OA2 [4] | Pay Option ARM 2006 | 4.19% | $14,782 | FSA | $0 |
| 1270 | MARM 2007-2 [Total] | ALT-A 2007 | 0.03% | $125 | | $125 |
| 1271 | MARP 2005-1 [1A] | Subprime 2005 | 9.26% | $781 | | $781 |
| 1272 | MARP 2005-1 [1B] | Subprime 2005 | 9.26% | $2,205 | | $2,205 |
| 1273 | MARP 2005-1 [1C] | Subprime 2005 | 9.26% | $2,255 | | $2,255 |
| 1274 | MARP 2005-1 [1D] | Subprime 2005 | 9.26% | $1,591 | | $1,591 |
| 1275 | MARP 2005-1 [1E] | Subprime 2005 | 9.26% | $558 | | $558 |
| 1276 | MARP 2005-1 [1F] | Subprime 2005 | 9.26% | $498 | | $498 |
| 1277 | MARP 2005-1 [2] | Subprime 2005 | 9.26% | $402 | | $402 |
| 1278 | MARP 2005-2 [POOL1_A] | Subprime 2005 | 0.89% | $1,125 | | $1,125 |
| 1279 | MARP 2005-2 [POOL1_B] | Subprime 2005 | 0.89% | $148 | | $148 |
| 1280 | MARP 2005-2 [POOL1_C] | Subprime 2005 | 0.89% | $105 | | $105 |
| 1281 | MARP 2005-2 [POOL1_D] | Subprime 2005 | 0.89% | $96 | | $96 |
| 1282 | MARP 2005-2 [POOL2] | Subprime 2005 | 0.89% | $87 | | $87 |
| 1283 | MARP 2006-1 [1_1] | Subprime 2006 | 0.12% | $76 | | $76 |
| 1284 | MARP 2006-1 [1_234] | Subprime 2006 | 0.12% | $26 | | $26 |
| 1285 | MARP 2006-1 [II] | Subprime 2006 | 0.12% | $3 | | $3 |
| 1286 | MARP 2006-1 [1] | Subprime 2006 | 4.42% | $2,765 | | $2,765 |
| 1287 | MARP 2006-2 [2] | Subprime 2006 | 4.42% | $88 | | $88 |
| 1288 | MASD 2004-1 [1A] | Subprime 2004 | 100.00% | $10,688 | | $10,688 |
| 1289 | MASD 2004-1 [1F] | Subprime 2004 | 100.00% | $28,471 | | $28,471 |
| 1290 | MASD 2004-2 [A] | Subprime 2004 | 90.46% | $8,861 | | $8,861 |
| 1291 | MASD 2004-2 [F] | Subprime 2004 | 90.46% | $15,775 | | $15,775 |
| 1292 | MASD 2005-1 [1] | Subprime 2005 | 9.00% | $2,075 | | $2,075 |
| 1293 | MASD 2005-1 [2] | Subprime 2005 | 9.00% | $2,056 | | $2,056 |
| 1294 | MASD 2005-2 [1] | Subprime 2005 | 90.38% | $14,652 | | $14,652 |
| 1295 | MASD 2005-2 [2] | Subprime 2005 | 90.38% | $20,837 | | $20,837 |
| 1296 | MASD 2005-3 [1] | Subprime 2005 | 92.42% | $27,466 | | $27,466 |
| 1297 | MASD 2005-3 [2] | Subprime 2005 | 92.42% | $31,603 | | $31,603 |
| 1298 | MASD 2006-1 [A] | Subprime 2006 | 94.56% | $74,980 | | $74,980 |
| 1299 | MASD 2006-1 [F] | Subprime 2006 | 94.56% | $33,179 | | $33,179 |
| 1300 | MASD 2006-2 [A] | Subprime 2006 | 5.00% | $7,392 | | $7,392 |
| 1301 | MASD 2006-2 [F] | Subprime 2006 | 5.00% | $3,019 | | $3,019 |
| 1302 | MASD 2006-3 [A] | Subprime 2006 | 5.00% | $5,310 | | $5,310 |
| 1303 | MASD 2006-3 [F] | Subprime 2006 | 5.00% | $3,508 | | $3,508 |
| 1304 | MASTR 2002-7 [1] | Prime 2002 | 5.81% | $109 | | $109 |
| 1305 | MASTR 2002-7 [2] | Prime 2002 | 5.81% | $117 | | $117 |
| 1306 | MASTR 2002-7 [3] | Prime 2002 | 5.81% | $21 | | $21 |
| 1307 | MASTR 2002-8 [1] | Prime 2002 | 2.20% | $23 | | $23 |
| 1308 | MASTR 2002-8 [2] | Prime 2002 | 2.20% | $52 | | $52 |
| 1309 | MASTR 2003-10 [1] | Prime 2003 | 18.15% | $82 | | $82 |
| 1310 | MASTR 2003-10 [2] | Prime 2003 | 18.15% | $46 | | $46 |
| 1311 | MASTR 2003-10 [3] | Prime 2003 | 18.15% | $923 | | $923 |
| 1312 | MASTR 2003-10 [4] | Prime 2003 | 18.15% | $329 | | $329 |

Schedule 2 - Covered Trusts GMACM Cure Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
| 1313 | MASTR 2003-10 [5] | Prime 2003 | 18.15% | $44 | | $44 |
| 1314 | MASTR 2003-10 [6] | Prime 2003 | 18.15% | $138 | | $138 |
| 1315 | MASTR 2003-11 [1] | Prime 2003 | 2.27% | $25 | | $25 |
| 1316 | MASTR 2003-11 [10] | Prime 2003 | 2.27% | $24 | | $24 |
| 1317 | MASTR 2003-11 [2] | Prime 2003 | 2.27% | $36 | | $36 |
| 1318 | MASTR 2003-11 [3] | Prime 2003 | 2.27% | $12 | | $12 |
| 1319 | MASTR 2003-11 [4] | Prime 2003 | 2.27% | $8 | | $8 |
| 1320 | MASTR 2003-11 [5] | Prime 2003 | 2.27% | $5 | | $5 |
| 1321 | MASTR 2003-11 [6] | Prime 2003 | 2.27% | $54 | | $54 |
| 1322 | MASTR 2003-11 [7] | Prime 2003 | 2.27% | $27 | | $27 |
| 1323 | MASTR 2003-11 [8] | Prime 2003 | 2.27% | $18 | | $18 |
| 1324 | MASTR 2003-11 [9] | Prime 2003 | 2.27% | $45 | | $45 |
| 1325 | MASTR 2003-12 [1] | Prime 2003 | 7.76% | $68 | | $68 |
| 1326 | MASTR 2003-12 [2] | Prime 2003 | 7.76% | $29 | | $29 |
| 1327 | MASTR 2003-12 [3] | Prime 2003 | 7.76% | $207 | | $207 |
| 1328 | MASTR 2003-12 [4] | Prime 2003 | 7.76% | $92 | | $92 |
| 1329 | MASTR 2003-12 [5] | Prime 2003 | 7.76% | $24 | | $24 |
| 1330 | MASTR 2003-12 [6] | Prime 2003 | 7.76% | $89 | | $89 |
| 1331 | MASTR 2003-2 [ONE] | Prime 2003 | 14.62% | $122 | | $122 |
| 1332 | MASTR 2003-2 [THREE] | Prime 2003 | 14.62% | $223 | | $223 |
| 1333 | MASTR 2003-2 [TWO] | Prime 2003 | 14.62% | $181 | | $181 |
| 1334 | MASTR 2003-3 [FIVE] | Prime 2003 | 14.24% | $83 | | $83 |
| 1335 | MASTR 2003-3 [FOUR] | Prime 2003 | 14.24% | $20 | | $20 |
| 1336 | MASTR 2003-3 [ONE] | Prime 2003 | 14.24% | $93 | | $93 |
| 1337 | MASTR 2003-3 [THREE] | Prime 2003 | 14.24% | $251 | | $251 |
| 1338 | MASTR 2003-3 [TWOC] | Prime 2003 | 14.24% | $114 | | $114 |
| 1339 | MASTR 2003-3 [TWOD] | Prime 2003 | 14.24% | $3 | | $3 |
| 1340 | MASTR 2003-3 [TWONC] | Prime 2003 | 14.24% | $212 | | $212 |
| 1341 | MASTR 2003-4 [EIGHT] | Prime 2003 | 0.38% | $1 | | $1 |
| 1342 | MASTR 2003-4 [FIVE] | Prime 2003 | 0.38% | $0 | | $0 |
| 1343 | MASTR 2003-4 [FOUR] | Prime 2003 | 0.38% | $2 | | $2 |
| 1344 | MASTR 2003-4 [ONE] | Prime 2003 | 0.38% | $2 | | $2 |
| 1345 | MASTR 2003-4 [SEVEN] | Prime 2003 | 0.38% | $0 | | $0 |
| 1346 | MASTR 2003-4 [SIX] | Prime 2003 | 0.38% | $9 | | $9 |
| 1347 | MASTR 2003-4 [THREE] | Prime 2003 | 0.38% | $1 | | $1 |
| 1348 | MASTR 2003-4 [TWO] | Prime 2003 | 0.38% | $6 | | $6 |
| 1349 | MASTR 2003-5 [1] | Prime 2003 | 1.07% | $21 | | $21 |
| 1350 | MASTR 2003-5 [2] | Prime 2003 | 1.07% | $32 | | $32 |
| 1351 | MASTR 2003-5 [3] | Prime 2003 | 1.07% | $2 | | $2 |
| 1352 | MASTR 2003-5 [4] | Prime 2003 | 1.07% | $31 | | $31 |
| 1353 | MASTR 2003-5 [5] | Prime 2003 | 1.07% | $16 | | $16 |
| 1354 | MASTR 2003-6 [EIGHT] | Prime 2003 | 7.84% | $131 | | $131 |
| 1355 | MASTR 2003-6 [FIVE] | Prime 2003 | 7.84% | $124 | | $124 |
| 1356 | MASTR 2003-6 [FOUR] | Prime 2003 | 7.84% | $58 | | $58 |
| 1357 | MASTR 2003-6 [NINE] | Prime 2003 | 7.84% | $123 | | $123 |
| 1358 | MASTR 2003-6 [ONE] | Prime 2003 | 7.84% | $35 | | $35 |
| 1359 | MASTR 2003-6 [SEVEN] | Prime 2003 | 7.84% | $54 | | $54 |
| 1360 | MASTR 2003-6 [SIX] | Prime 2003 | 7.84% | $510 | | $510 |
| 1361 | MASTR 2003-6 [THREE] | Prime 2003 | 7.84% | $605 | | $605 |
| 1362 | MASTR 2003-6 [TWO] | Prime 2003 | 7.84% | $32 | | $32 |
| 1363 | MASTR 2003-7 [1] | Prime 2003 | 2.84% | $81 | | $81 |

Schedule 1 — Covered Loss and Recognized Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 1364 | MASTR 2003-7 [2] | Prime 2003 | 2.84% | $62 | | $62 |
| 1365 | MASTR 2003-7 [3] | Prime 2003 | 2.84% | $7 | | $7 |
| 1366 | MASTR 2003-7 [4] | Prime 2003 | 2.84% | $152 | | $152 |
| 1367 | MASTR 2003-7 [5] | Prime 2003 | 2.84% | $4 | | $4 |
| 1368 | MASTR 2003-8 [1] | Prime 2003 | 3.16% | $141 | | $141 |
| 1369 | MASTR 2003-8 [2] | Prime 2003 | 3.16% | $92 | | $92 |
| 1370 | MASTR 2003-8 [3] | Prime 2003 | 3.16% | $128 | MBIA | $0 |
| 1371 | MASTR 2003-8 [4] | Prime 2003 | 3.16% | $16 | | $16 |
| 1372 | MASTR 2003-8 [5] | Prime 2003 | 3.16% | $14 | | $14 |
| 1373 | MASTR 2003-8 [6] | Prime 2003 | 3.16% | $5 | | $5 |
| 1374 | MASTR 2003-8 [7] | Prime 2003 | 3.16% | $8 | | $8 |
| 1375 | MASTR 2003-8 [8] | Prime 2003 | 3.16% | $51 | | $51 |
| 1376 | MASTR 2003-9 [1] | Prime 2003 | 26.56% | $424 | | $424 |
| 1377 | MASTR 2003-9 [2] | Prime 2003 | 26.56% | $431 | | $431 |
| 1378 | MASTR 2003-9 [3] | Prime 2003 | 26.56% | $38 | | $38 |
| 1379 | MASTR 2003-9 [4] | Prime 2003 | 26.56% | $53 | | $53 |
| 1380 | MASTR 2003-9 [5] | Prime 2003 | 26.56% | $288 | | $288 |
| 1381 | MASTR 2004-1 [1] | Prime 2004 | 12.12% | $140 | | $140 |
| 1382 | MASTR 2004-1 [2] | Prime 2004 | 12.12% | $10 | | $10 |
| 1383 | MASTR 2004-1 [3] | Prime 2004 | 12.12% | $38 | | $38 |
| 1384 | MASTR 2004-1 [4] | Prime 2004 | 12.12% | $23 | | $23 |
| 1385 | MASTR 2004-1 [5] | Prime 2004 | 12.12% | $92 | | $92 |
| 1386 | MASTR 2004-10 [1] | Prime 2004 | 12.11% | $135 | | $135 |
| 1387 | MASTR 2004-10 [2] | Prime 2004 | 12.11% | $215 | | $215 |
| 1388 | MASTR 2004-10 [3] | Prime 2004 | 12.11% | $201 | | $201 |
| 1389 | MASTR 2004-10 [4] | Prime 2004 | 12.11% | $134 | | $134 |
| 1390 | MASTR 2004-10 [5] | Prime 2004 | 12.11% | $160 | | $160 |
| 1391 | MASTR 2004-10 [6] | Prime 2004 | 12.11% | $125 | | $125 |
| 1392 | MASTR 2004-11 [1] | Prime 2004 | 6.07% | $56 | | $56 |
| 1393 | MASTR 2004-11 [2] | Prime 2004 | 6.07% | $120 | | $120 |
| 1394 | MASTR 2004-11 [3] | Prime 2004 | 6.07% | $62 | | $62 |
| 1395 | MASTR 2004-11 [4] | Prime 2004 | 6.07% | $175 | | $175 |
| 1396 | MASTR 2004-11 [5] | Prime 2004 | 6.07% | $165 | | $165 |
| 1397 | MASTR 2004-3 [1] | Prime 2004 | 10.46% | $50 | | $50 |
| 1398 | MASTR 2004-3 [2] | Prime 2004 | 10.46% | $41 | | $41 |
| 1399 | MASTR 2004-3 [3] | Prime 2004 | 10.46% | $160 | | $160 |
| 1400 | MASTR 2004-3 [4] | Prime 2004 | 10.46% | $225 | | $225 |
| 1401 | MASTR 2004-3 [5] | Prime 2004 | 10.46% | $48 | | $48 |
| 1402 | MASTR 2004-4 [ONE1] | Prime 2004 | 2.65% | $41 | | $41 |
| 1403 | MASTR 2004-4 [ONE2] | Prime 2004 | 2.65% | $35 | | $35 |
| 1404 | MASTR 2004-4 [ONE3] | Prime 2004 | 2.65% | $4 | | $4 |
| 1405 | MASTR 2004-4 [THREE] | Prime 2004 | 2.65% | $25 | | $25 |
| 1406 | MASTR 2004-4 [TWO] | Prime 2004 | 2.65% | $93 | | $93 |
| 1407 | MASTR 2004-5 [1] | Prime 2004 | 2.56% | $81 | | $81 |
| 1408 | MASTR 2004-5 [2] | Prime 2004 | 2.56% | $26 | | $26 |
| 1409 | MASTR 2004-6 [1] | Prime 2004 | 2.80% | $37 | | $37 |
| 1410 | MASTR 2004-6 [2A] | Prime 2004 | 2.80% | $34 | | $34 |
| 1411 | MASTR 2004-6 [2B] | Prime 2004 | 2.80% | $32 | | $32 |
| 1412 | MASTR 2004-6 [3] | Prime 2004 | 2.80% | $25 | | $25 |
| 1413 | MASTR 2004-6 [4] | Prime 2004 | 2.80% | $36 | | $36 |
| 1414 | MASTR 2004-6 [5] | Prime 2004 | 2.80% | $54 | | $54 |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1

Case 14-cv-03039-GBD    Document 15-1    Filed 01/06/14    Page 286 of 355

12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Pg 261 of 398

Schedule 2 - Advance Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
| 1415 | MASTR 2004-6  [6] | Prime 2004 | 2.80% | $20 | | $20 |
| 1416 | MASTR 2004-6  [7] | Prime 2004 | 2.80% | $49 | | $49 |
| 1417 | MASTR 2004-8  [1] | Prime 2004 | 0.98% | $6 | | $6 |
| 1418 | MASTR 2004-8  [2] | Prime 2004 | 0.98% | $16 | | $16 |
| 1419 | MASTR 2004-8  [3] | Prime 2004 | 0.98% | $3 | | $3 |
| 1420 | MASTR 2004-8  [4] | Prime 2004 | 0.98% | $9 | | $9 |
| 1421 | MASTR 2004-9  [1] | Prime 2004 | 5.95% | $41 | | $41 |
| 1422 | MASTR 2004-9  [2] | Prime 2004 | 5.95% | $253 | | $253 |
| 1423 | MASTR 2004-9  [3] | Prime 2004 | 5.95% | $167 | | $167 |
| 1424 | MASTR 2004-9  [4] | Prime 2004 | 5.95% | $143 | | $143 |
| 1425 | MASTR 2004-9  [5] | Prime 2004 | 5.95% | $50 | | $50 |
| 1426 | MASTR 2004-9  [6] | Prime 2004 | 5.95% | $81 | | $81 |
| 1427 | MASTR 2004-9  [7] | Prime 2004 | 5.95% | $62 | | $62 |
| 1428 | MASTR 2004-9  [8] | Prime 2004 | 5.95% | $109 | | $109 |
| 1429 | MHL 2007-1  [IA] | ALT-A 2007 | 100.00% | $178,904 | | $178,904 |
| 1430 | MHL 2007-1  [IF] | ALT-A 2007 | 100.00% | $119,589 | | $119,589 |
| 1431 | MHL 2007-1  [IIA] | ALT-A 2007 | 100.00% | $336,195 | | $336,195 |
| 1432 | MHL 2007-1  [IIF] | ALT-A 2007 | 100.00% | $140,308 | | $140,308 |
| 1433 | MLMI 2003-A2  [FOUR] | Prime 2003 | 1.79% | $4 | | $4 |
| 1434 | MLMI 2003-A2  [ONE] | Prime 2003 | 1.79% | $22 | | $22 |
| 1435 | MLMI 2003-A2  [THREE] | Prime 2003 | 1.79% | $23 | | $23 |
| 1436 | MLMI 2003-A2  [TWO] | Prime 2003 | 1.79% | $11 | | $11 |
| 1437 | MLMI 2003-A4  [1] | Prime 2003 | 17.23% | $1,219 | | $1,219 |
| 1438 | MLMI 2003-A4  [2] | Prime 2003 | 17.23% | $380 | | $380 |
| 1439 | MLMI 2003-A4  [3] | Prime 2003 | 17.23% | $228 | | $228 |
| 1440 | MLMI 2003-A4  [4] | Prime 2003 | 17.23% | $26 | | $26 |
| 1441 | MLMI 2005-A6  [1] | ALT-A 2005 | 16.10% | $14,288 | | $14,288 |
| 1442 | MLMI 2005-A6  [2] | ALT-A 2005 | 16.10% | $21,898 | | $21,898 |
| 1443 | MMFT 2007-1A  [Total] | Second Lien 2007 | 100.00% | $43,588 | FSA | $0 |
| 1444 | MSSTR 2004-1  [1] | Prime 2004 | 3.36% | $150 | | $150 |
| 1445 | MSSTR 2004-1  [2] | Prime 2004 | 3.36% | $504 | | $504 |
| 1446 | MSSTR 2004-1  [3] | Prime 2004 | 3.36% | $46 | | $46 |
| 1447 | MSSTR 2004-1  [4] | Prime 2004 | 3.36% | $84 | | $84 |
| 1448 | MSSTR 2005-1  [1] | Prime 2005 | 3.91% | $520 | | $520 |
| 1449 | MSSTR 2005-1  [2] | Prime 2005 | 3.91% | $271 | | $271 |
| 1450 | MSSTR 2005-1  [3] | Prime 2005 | 3.91% | $136 | | $136 |
| 1451 | MSSTR 2005-1  [4] | Prime 2005 | 3.91% | $148 | | $148 |
| 1452 | MSSTR 2005-2  [FIVE] | Prime 2005 | 1.37% | $9 | | $9 |
| 1453 | MSSTR 2005-2  [FOUR] | Prime 2005 | 1.37% | $23 | | $23 |
| 1454 | MSSTR 2005-2  [ONE/TWO] | Prime 2005 | 1.37% | $66 | | $66 |
| 1455 | MSSTR 2005-2  [THREE] | Prime 2005 | 1.37% | $64 | | $64 |
| 1456 | NAA 2004-AP1  [Total] | ALT-A 2004 | 21.49% | $7,349 | | $7,349 |
| 1457 | NAA 2004-AP2  [Total] | ALT-A 2004 | 100.00% | $42,017 | | $42,017 |
| 1458 | NAA 2004-AR1  [1] | ALT-A 2004 | 100.00% | $4,006 | | $4,006 |
| 1459 | NAA 2004-AR1  [2] | ALT-A 2004 | 100.00% | $5,725 | | $5,725 |
| 1460 | NAA 2004-AR1  [3] | ALT-A 2004 | 100.00% | $5,910 | | $5,910 |
| 1461 | NAA 2004-AR1  [4] | ALT-A 2004 | 100.00% | $5,079 | | $5,079 |
| 1462 | NAA 2004-AR1  [5A] | ALT-A 2004 | 100.00% | $10,358 | | $10,358 |
| 1463 | NAA 2004-AR1  [5B] | ALT-A 2004 | 100.00% | $8,531 | | $8,531 |
| 1464 | NAA 2005-AP1  [1] | ALT-A 2005 | 96.07% | $26,198 | | $26,198 |
| 1465 | NAA 2005-AP1  [2] | ALT-A 2005 | 96.07% | $43,808 | | $43,808 |

| # | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 1466 | NAA 2005-AP2 [Total] | ALT-A 2005 | 100.00% | $106,844 | | $106,844 |
| 1467 | NAA 2005-AP3 [Total] | ALT-A 2005 | 99.55% | $126,894 | | $126,894 |
| 1468 | NAA 2005-S1 [Total] | ALT-A 2005 | 9.00% | $344 | | $344 |
| 1469 | NAA 2005-S2 [Total] | CES 2005 | 100.00% | $7,594 | | $7,594 |
| 1470 | NAA 2005-S3 [Total] | CES 2005 | 100.00% | $4,173 | | $4,173 |
| 1471 | NAA 2005-S4 [Total] | CES 2005 | 0.06% | $7 | | $7 |
| 1472 | NAA 2006-AR3 [Total] | ALT-A 2006 | 86.48% | $218,790 | | $218,790 |
| 1473 | NAA 2006-AR4 [Total] | ALT-A 2006 | 99.94% | $406,394 | | $406,394 |
| 1474 | NAA 2006-S1 [Total] | CES 2006 | 0.30% | $27 | | $27 |
| 1475 | NAA 2006-S2 [Total] | CES 2006 | 5.00% | $535 | | $535 |
| 1476 | NAA 2007-1 [1] | ALT-A 2007 | 61.99% | $379,281 | FSA | $0 |
| 1477 | NAA 2007-1 [2] | ALT-A 2007 | 61.99% | $359,435 | Ambac | $359,435 |
| 1478 | NAA 2007-2 [Total] | ALT-A 2007 | 99.85% | $351,848 | | $351,848 |
| 1479 | NCHET 2004-A [Total] | CES 2007 | 33.17% | $412 | Assured Guaranty | $0 |
| 1480 | NCHET 2004-A [1] | Subprime 2004 | 71.68% | $100,293 | FNMA, FGIC | $100,293 |
| 1481 | NCHET 2004-A [2] | Subprime 2004 | 71.68% | $65,649 | FGIC | $65,649 |
| 1482 | NCHET 2004-A [3A] | Subprime 2004 | 71.68% | $27,905 | FGIC | $27,905 |
| 1483 | NCHET 2004-A [3B] | Subprime 2004 | 71.68% | $37,659 | FGIC | $37,659 |
| 1484 | NHELI 2007-1 [1] | ALT-A 2007 | 99.92% | $331,387 | | $331,387 |
| 1485 | NHELI 2007-1 [2_1] | ALT-A 2007 | 99.92% | $84,868 | | $84,868 |
| 1486 | NHELI 2007-1 [2_2] | ALT-A 2007 | 99.92% | $385,132 | | $385,132 |
| 1487 | PRIME 2003-3 [Total] | Prime 2003 | 3.16% | $184 | MBIA | $0 |
| 1488 | PRIME 2004-1 [1] | Prime 2004 | 1.72% | $41 | Radian | $0 |
| 1489 | PRIME 2004-1 [2] | Prime 2004 | 1.72% | $48 | Radian | $0 |
| 1490 | PRIME 2004-CL1 [1] | Prime 2004 | 0.14% | $46 | | $46 |
| 1491 | PRIME 2004-CL1 [2] | Prime 2004 | 0.14% | $8 | | $8 |
| 1492 | PRIME 2004-CL1 [3] | Prime 2004 | 0.14% | $14 | | $14 |
| 1493 | PRIME 2004-CL2 [Total] | Prime 2004 | 12.24% | $1,023 | | $1,023 |
| 1494 | PRIME 2005-2 [1] | Subprime 2005 | 10.66% | $969 | | $969 |
| 1495 | PRIME 2005-2 [2] | Subprime 2005 | 10.66% | $981 | | $981 |
| 1496 | PRIME 2005-4 [1] | Prime 2005 | 0.75% | $76 | | $76 |
| 1497 | PRIME 2005-4 [2] | Prime 2005 | 0.75% | $117 | | $117 |
| 1498 | PRIME 2005-5 [1] | Subprime 2005 | 4.94% | $479 | | $479 |
| 1499 | PRIME 2005-5 [2] | Subprime 2005 | 4.94% | $713 | | $713 |
| 1500 | PRIME 2006-1 [Total] | ALT-A 2006 | 10.93% | $6,711 | | $6,711 |
| 1501 | PRIME 2006-CL1 [Total] | ALT-A 2006 | 12.79% | $3,784 | | $3,784 |
| 1502 | RBSGC 2005-A [1] | ALT-A 2005 | 11.01% | $532 | | $532 |
| 1503 | RBSGC 2005-A [2] | ALT-A 2005 | 11.01% | $2,689 | | $2,689 |
| 1504 | RBSGC 2005-A [3] | ALT-A 2005 | 11.01% | $1,613 | | $1,613 |
| 1505 | RBSGC 2005-A [4] | ALT-A 2005 | 11.01% | $1,070 | | $1,070 |
| 1506 | RBSGC 2005-A [5] | ALT-A 2005 | 11.01% | $1,291 | | $1,291 |
| 1507 | RBSGC 2007-B [1] | ALT-A 2007 | 0.11% | $121 | | $121 |
| 1508 | RBSGC 2007-B [2] | ALT-A 2007 | 0.11% | $6 | | $6 |
| 1509 | RBSGC 2007-B [3] | ALT-A 2007 | 0.11% | $24 | | $24 |
| 1510 | RYMS 1991-15 [Total] | Prime 1999 | 10.70% | $46 | GEMICO (Pool Policy) | $46 |
| 1511 | RYMS 1991-16 [Total] | Prime 1999 | 24.48% | $60 | GEMICO (Pool Policy) | $60 |
| 1512 | SACO 2005-GP1 [Total] | Second Lien 2005 | 100.00% | $4,458 | Assured Guaranty | $0 |
| 1513 | SACO 2005-WM1 [Total] | CES 2005 | 20.77% | $3,748 | | $3,748 |
| 1514 | SACO 2005-WM3 [Total] | CES 2005 | 20.77% | $4,948 | | $4,948 |
| 1515 | SACO 2006-1 [Total] | Second Lien 2006 | 16.36% | $491 | XL | $0 |
| 1516 | SACO 2006-10 [Total] | CES 2006 | 47.57% | $1,967 | | $1,967 |

Schedule 2: Covered Trusts — Cure Claims
Subject to Further Review and Due Diligence

Schedule 1 - Advance Claims, Cure Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 1517 | SACO 2006-12 [1] | Second Lien 2006 | 23.99% | $181 | | $181 |
| 1518 | SACO 2006-12 [2] | Second Lien 2006 | 23.99% | $444 | CIFG | $0 |
| 1519 | SACO 2006-5 [1] | CES 2006 | 41.41% | $1,384 | | $1,384 |
| 1520 | SACO 2006-5 [2] | CES 2006 | 41.41% | $2,018 | | $2,018 |
| 1521 | SACO 2006-6 [A] | CES 2006 | 26.65% | $68 | | $68 |
| 1522 | SACO 2006-6 [F] | CES 2006 | 26.65% | $2,044 | | $2,044 |
| 1523 | SACO 2006-7 [Total] | CES 2006 | 17.72% | $464 | | $464 |
| 1524 | SACO 2006-9 [A] | CES 2006 | 73.38% | $516 | | $516 |
| 1525 | SACO 2006-9 [F] | CES 2006 | 73.38% | $2,820 | | $2,820 |
| 1526 | SACO 2007-1 [1A] | CES 2007 | 73.83% | $179 | | $179 |
| 1527 | SACO 2007-1 [1F] | CES 2007 | 73.83% | $1,035 | | $1,035 |
| 1528 | SACO 2007-1 [2A] | CES 2007 | 73.83% | $51 | | $51 |
| 1529 | SACO 2007-1 [2F] | CES 2007 | 73.83% | $400 | | $400 |
| 1530 | SACO 2007-2 [1] | CES 2007 | 62.19% | $1,272 | | $1,272 |
| 1531 | SACO 2007-2 [2] | CES 2007 | 62.19% | $186 | | $186 |
| 1532 | SAIL 2005-5 [1A] | Subprime 2005 | 10.93% | $14,582 | CIFG | $0 |
| 1533 | SAIL 2005-5 [1F] | Subprime 2005 | 10.93% | $3,142 | CIFG | $0 |
| 1534 | SAIL 2005-5 [2A] | Subprime 2005 | 10.93% | $17,946 | CIFG | $0 |
| 1535 | SAIL 2005-5 [2F] | Subprime 2005 | 10.93% | $3,025 | CIFG | $0 |
| 1536 | SAIL 2005-5 [3A] | Subprime 2005 | 10.93% | $14,442 | CIFG | $0 |
| 1537 | SAIL 2005-5 [3F] | Subprime 2005 | 10.93% | $3,146 | CIFG | $0 |
| 1538 | SAIL 2005-5 [4A] | Subprime 2005 | 10.93% | $18,278 | CIFG | $0 |
| 1539 | SAIL 2005-5 [4F] | Subprime 2005 | 10.93% | $3,139 | CIFG | $0 |
| 1540 | SAIL 2005-9 [1A] | Subprime 2005 | 0.66% | $1,669 | | $1,669 |
| 1541 | SAIL 2005-9 [1F] | Subprime 2005 | 0.66% | $361 | | $361 |
| 1542 | SAIL 2005-9 [2A] | Subprime 2005 | 0.66% | $792 | | $792 |
| 1543 | SAIL 2005-9 [2F] | Subprime 2005 | 0.66% | $109 | | $109 |
| 1544 | SAIL 2005-9 [3A] | Subprime 2005 | 0.66% | $3,653 | | $3,653 |
| 1545 | SAIL 2005-9 [3F] | Subprime 2005 | 0.66% | $649 | | $649 |
| 1546 | SAIL 2006-2 [A] | Subprime 2006 | 0.78% | $5,099 | | $5,099 |
| 1547 | SAIL 2006-2 [F] | Subprime 2006 | 0.78% | $960 | | $960 |
| 1548 | SAIL 2006-3 [1A] | Subprime 2006 | 2.30% | $10,918 | | $10,918 |
| 1549 | SAIL 2006-3 [1F] | Subprime 2006 | 2.30% | $2,797 | | $2,797 |
| 1550 | SAIL 2006-3 [2A] | Subprime 2006 | 2.30% | $4,317 | | $4,317 |
| 1551 | SAIL 2006-3 [2F] | Subprime 2006 | 2.30% | $1,246 | | $1,246 |
| 1552 | SAIL 2006-3 [3A] | Subprime 2006 | 2.30% | $12,467 | | $12,467 |
| 1553 | SAIL 2006-3 [3F] | Subprime 2006 | 2.30% | $2,856 | | $2,856 |
| 1554 | SAMI 2003-AR1 [1] | Prime 2003 | 4.06% | $306 | | $306 |
| 1555 | SAMI 2003-AR1 [2] | Prime 2003 | 4.06% | $116 | | $116 |
| 1556 | SAMI 2003-AR1 [3] | Prime 2003 | 4.06% | $181 | | $181 |
| 1557 | SAMI 2003-AR1 [4] | Prime 2003 | 4.06% | $49 | | $49 |
| 1558 | SAMI 2003-AR1 [5] | Prime 2003 | 4.06% | $27 | | $27 |
| 1559 | SAMI 2004-AR6 [1] | ALT-A 2004 | 4.25% | $714 | | $714 |
| 1560 | SAMI 2004-AR6 [2] | ALT-A 2004 | 4.25% | $291 | | $291 |
| 1561 | SAMI 2004-AR6 [3] | ALT-A 2004 | 4.25% | $142 | | $142 |
| 1562 | SAMI 2005-AR1 [1] | ALT-A 2005 | 8.56% | $3,278 | | $3,278 |
| 1563 | SAMI 2005-AR1 [2] | ALT-A 2005 | 8.56% | $1,295 | | $1,295 |
| 1564 | SASC 1995-2A [1] | Prime 1999 | 27.89% | $659 | | $659 |
| 1565 | SASC 1995-2A [2] | Prime 1999 | 27.89% | $283 | FGIC | $283 |
| 1566 | SASC 2001-8A [FOUR] | Prime 2001 | 9.00% | $96 | | $96 |
| 1567 | SASC 2001-8A [ONE] | Prime 2001 | 9.00% | $40 | | $40 |

Schedule 2: Advance Recognized Cure Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 1568 | SASC 2001-8A [THREE] | Prime 2001 | 9.00% | $18 | | $18 |
| 1569 | SASC 2001-8A [TWO] | Prime 2001 | 9.00% | $19 | | $19 |
| 1570 | SASC 2001-9 [FIVED] | Prime 2001 | 4.50% | $6 | | $6 |
| 1571 | SASC 2001-9 [FIVENR] | Prime 2001 | 4.50% | $18 | | $18 |
| 1572 | SASC 2001-9 [FIVER] | Prime 2001 | 4.50% | $0 | | $0 |
| 1573 | SASC 2001-9 [FOURD] | Prime 2001 | 4.50% | $3 | MBIA | $0 |
| 1574 | SASC 2001-9 [FOURNRR] | Prime 2001 | 4.50% | $39 | MBIA | $0 |
| 1575 | SASC 2001-9 [FOURR] | Prime 2001 | 4.50% | $2 | MBIA | $0 |
| 1576 | SASC 2001-9 [ONED] | Prime 2001 | 4.50% | $0 | MBIA | $0 |
| 1577 | SASC 2001-9 [ONENR] | Prime 2001 | 4.50% | $23 | MBIA | $0 |
| 1578 | SASC 2001-9 [ONER] | Prime 2001 | 4.50% | $0 | MBIA | $0 |
| 1579 | SASC 2001-9 [SIXD] | Prime 2001 | 4.50% | $17 | MBIA | $0 |
| 1580 | SASC 2001-9 [SIXNR] | Prime 2001 | 4.50% | $23 | MBIA | $0 |
| 1581 | SASC 2001-9 [SIXR] | Prime 2001 | 4.50% | $1 | MBIA | $0 |
| 1582 | SASC 2001-9 [THREE] | Prime 2001 | 4.50% | $38 | MBIA | $0 |
| 1583 | SASC 2001-9 [TWONR] | Prime 2001 | 4.50% | $44 | MBIA | $0 |
| 1584 | SASC 2001-9 [TWOR] | Prime 2001 | 4.50% | $2 | MBIA | $0 |
| 1585 | SASC 2002-12 [1] | Prime 2002 | 9.00% | $252 | LEHMAN (Financial Guaranty)/FHLMC (Pool Policy) - Insurer Exception | $252 |
| 1586 | SASC 2002-12 [2] | Prime 2002 | 9.00% | $5,596 | LEHMAN (Financial Guaranty)/FHLMC (Pool Policy) - Insurer Exception | $5,596 |
| 1587 | SASC 2002-12 [3] | Prime 2002 | 9.00% | $483 | LEHMAN (Financial Guaranty)/FHLMC (Pool Policy) - Insurer Exception | $483 |
| 1588 | SASC 2002-12 [4] | Prime 2002 | 9.00% | $4,751 | LEHMAN (Financial Guaranty)/FHLMC (Pool Policy) - Insurer Exception | $4,751 |
| 1589 | SASC 2002-4H [1] | Subprime 2002 | 20.87% | $925 | | $925 |
| 1590 | SASC 2002-4H [2] | Subprime 2002 | 20.87% | $108 | | $108 |
| 1591 | SASC 2005-RF1 [Total] | Subprime 2005 | 2.90% | $822 | | $822 |
| 1592 | SASC 2005-RF2 [Total] | Subprime 2005 | 9.50% | $6,817 | | $6,817 |
| 1593 | SASC 2005-RF4 [Total] | Subprime 2005 | 7.49% | $7,184 | | $7,184 |
| 1594 | SASC 2005-RF6 [Total] | Subprime 2005 | 6.70% | $3,115 | | $3,115 |
| 1595 | SASC 2005-S1 [1] | CES 2005 | 7.22% | $230 | | $230 |
| 1596 | SASC 2005-S1 [2] | CES 2005 | 7.22% | $892 | United Guaranty (Pool Policy) | $892 |
| 1597 | SASC 2005-S2 [Total] | CES 2005 | 22.81% | $2,494 | | $2,494 |
| 1598 | SASC 2005-S3 [Total] | CES 2005 | 39.01% | $7,414 | | $7,414 |
| 1599 | SASC 2005-S4 [Total] | CES 2005 | 0.03% | $3 | | $3 |
| 1600 | SASC 2005-S5 [Total] | CES 2005 | 14.25% | $1,359 | | $1,359 |
| 1601 | SASC 2005-S6 [Total] | CES 2005 | 100.00% | $15,605 | | $15,605 |
| 1602 | SASC 2005-S7 [Total] | CES 2005 | 86.77% | $2,166 | United Guaranty (Pool Policy) | $2,166 |
| 1603 | SASC 2006-BC2 [1A] | Subprime 2006 | 0.90% | $2,379 | | $2,379 |
| 1604 | SASC 2006-BC2 [1F] | Subprime 2006 | 0.90% | $959 | | $959 |
| 1605 | SASC 2006-BC2 [2A] | Subprime 2006 | 0.90% | $2,452 | | $2,452 |
| 1606 | SASC 2006-BC2 [2F] | Subprime 2006 | 0.90% | $1,083 | | $1,083 |
| 1607 | SASC 2006-S1 [Total] | Prime 2006 | 4.40% | $218 | | $218 |
| 1608 | SASC 2007-TC1 [A] | Subprime 2007 | 7.75% | $2,910 | | $2,910 |
| 1609 | SASC 2007-TC1 [F] | Subprime 2007 | 7.75% | $1,667 | | $1,667 |
| 1610 | SASC 2008-RF1 [Total] | Subprime 2008 | 5.00% | $1,303 | | $1,303 |
| 1611 | SASCO 2002-9 [2FR] | Prime 2002 | 16.74% | $24 | | $24 |
| 1612 | SASCO 2002-9 [2L] | Prime 2002 | 16.74% | $4 | | $4 |
| 1613 | SASCO 2002-9 [A1-MI] | Prime 2002 | 16.74% | $824 | | $824 |
| 1614 | SASCO 2002-9 [A1-NOMI] | Prime 2002 | 16.74% | $767 | | $767 |
| 1615 | SASCO 2002-9 [B1-MI] | Prime 2002 | 16.74% | $168 | | $168 |
| 1616 | SASCO 2002-9 [B1-NOMI] | Prime 2002 | 16.74% | $648 | | $648 |
| 1617 | SASI 1993-6 [CT1] | Prime 1999 | 4.50% | $5 | | $5 |
| 1618 | SASI 1993-6 [CWF1] | Prime 1999 | 4.50% | $6 | | $6 |

12-12020-mg   Doc 6065-1   Filed 12/11/13   Entered 12/11/13 17:30:11   Appendix 1
Pg 265 of 398

Case 14-cv-03039-GBD   Document 51-1   Filed 01/06/14   Page 240 of 355
12-12020-mg   Doc 8019-45   Filed 01/22/15   Entered 01/22/15 18:14:28   Exhibit 26

Schedule 2 - Advances and Recognized Claims
Subject to Further Review and DD Diligence

| Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|
| SASI 1993-6 [GEC1] | Prime 1999 | 4.50% | $2 | | $2 |
| SASI 1993-6 [ITT2] | Prime 1999 | 4.50% | $4 | | $4 |
| SASI 1993-6 [ITT3] | Prime 1999 | 4.50% | $8 | GEMICO (Pool Policy)/FSA - Insurer Exception | $8 |
| SASI 1993-6 [ITT4] | Prime 1999 | 4.50% | $4 | | $4 |
| SASI 1993-6 [ITT5] | Prime 1999 | 4.50% | $2 | | $2 |
| SASI 1993-6 [SASC3] | Prime 1999 | 4.50% | $31 | GEMICO (Pool Policy)/FSA - Insurer Exception | $31 |
| SEMT 2004-10 [1] | Prime 2004 | 7.22% | $734 | | $734 |
| SEMT 2004-10 [2] | Prime 2004 | 7.22% | $737 | | $737 |
| SEMT 2004-11 [1] | Prime 2004 | 13.06% | $1,036 | | $1,036 |
| SEMT 2004-11 [2] | Prime 2004 | 13.06% | $205 | | $205 |
| SEMT 2004-11 [3] | Prime 2004 | 13.06% | $408 | | $408 |
| SEMT 2004-12 [1] | Prime 2004 | 14.63% | $1,842 | | $1,842 |
| SEMT 2004-12 [2] | Prime 2004 | 14.63% | $1,009 | | $1,009 |
| SEMT 2004-12 [3] | Prime 2004 | 14.63% | $1,015 | | $1,015 |
| SEMT 2004-3 [1] | Prime 2004 | 51.23% | $858 | | $858 |
| SEMT 2004-3 [2] | Prime 2004 | 51.23% | $8,038 | | $8,038 |
| SEMT 2004-4 [Total] | Prime 2004 | 2.82% | $510 | | $510 |
| SEMT 2004-5 [1] | Prime 2004 | 3.64% | $339 | | $339 |
| SEMT 2004-5 [2A] | Prime 2004 | 3.64% | $88 | | $88 |
| SEMT 2004-5 [2B] | Prime 2004 | 3.64% | $72 | | $72 |
| SEMT 2004-6 [1] | Prime 2004 | 0.11% | $13 | | $13 |
| SEMT 2004-6 [2A] | Prime 2004 | 0.11% | $3 | | $3 |
| SEMT 2004-6 [2B] | Prime 2004 | 0.11% | $2 | | $2 |
| SEMT 2004-6 [3] | Prime 2004 | 0.11% | $5 | | $5 |
| SEMT 2004-7 [1] | Prime 2004 | 0.79% | $73 | | $73 |
| SEMT 2004-7 [2] | Prime 2004 | 0.79% | $37 | | $37 |
| SEMT 2004-7 [3] | Prime 2004 | 0.79% | $37 | | $37 |
| SEMT 2004-8 [1A] | Prime 2004 | 5.38% | $322 | | $322 |
| SEMT 2004-8 [1B] | Prime 2004 | 5.38% | $286 | | $286 |
| SEMT 2004-8 [2] | Prime 2004 | 5.38% | $697 | | $697 |
| SEMT 2004-9 [1] | Prime 2004 | 7.42% | $1,033 | | $1,033 |
| SEMT 2004-9 [2] | Prime 2004 | 7.42% | $675 | | $675 |
| SEMT 2005-1 [1] | Prime 2005 | 23.83% | $1,765 | | $1,765 |
| SEMT 2005-1 [2] | Prime 2005 | 23.83% | $592 | | $592 |
| SEMT 2005-2 [1] | Prime 2005 | 13.15% | $819 | | $819 |
| SEMT 2005-2 [2] | Prime 2005 | 13.15% | $513 | | $513 |
| SEMT 2005-3 [Total] | ALT-A 2005 | 23.86% | $2,931 | | $2,931 |
| SEMT 2005-4 [1] | Prime 2005 | 2.35% | $94 | | $94 |
| SEMT 2005-4 [2] | Prime 2005 | 2.35% | $106 | | $106 |
| SEMT 2007-1 [1] | Prime 2007 | 25.14% | $1,758 | | $1,758 |
| SEMT 2007-1 [2] | Prime 2007 | 25.14% | $14,948 | | $14,948 |
| SEMT 2007-1 [3] | Prime 2007 | 25.14% | $2,183 | | $2,183 |
| SEMT 2007-1 [4] | Prime 2007 | 25.14% | $3,672 | | $3,672 |
| SEMT 2007-1 [5] | Prime 2007 | 25.14% | $5,910 | | $5,910 |
| SEMT 2007-2 [1] | Prime 2007 | 8.47% | $4,857 | | $4,857 |
| SEMT 2007-2 [2A] | Prime 2007 | 8.47% | $1,720 | | $1,720 |
| SEMT 2007-2 [2B] | Prime 2007 | 8.47% | $1,330 | | $1,330 |
| SEMT 2007-3 [1] | Prime 2007 | 27.27% | $11,325 | | $11,325 |
| SEMT 2007-3 [2A] | Prime 2007 | 27.27% | $3,631 | | $3,631 |
| SEMT 2007-3 [2B] | Prime 2007 | 27.27% | $2,169 | | $2,169 |
| SEMT 2007-3 [2C] | Prime 2007 | 27.27% | $2,059 | | $2,059 |

Schedule 2 - Covered Loan Recognized Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | GMACM Servicer % | GMACM Claim | Insurer | GMACM Recognized Claim |
|---|---|---|---|---|---|---|
| 1670 | SEMT 2007-4 [1] | Prime 2007 | 59.37% | $6,511 | | $6,511 |
| 1671 | SEMT 2007-4 [2] | Prime 2007 | 59.37% | $512 | | $512 |
| 1672 | SEMT 2007-4 [3] | Prime 2007 | 59.37% | $6,833 | | $6,833 |
| 1673 | SEMT 2007-4 [4] | Prime 2007 | 59.37% | $3,481 | | $3,481 |
| 1674 | SEMT 2007-4 [5] | Prime 2007 | 59.37% | $2,031 | | $2,031 |
| 1675 | SMART 1993-3A [1] | Prime 1999 | 4.50% | $0 | GEMICO (Pool Policy) | $0 |
| 1676 | SMART 1993-3A [2] | Prime 1999 | 4.50% | $0 | GEMICO (Pool Policy) | $0 |
| 1677 | SMART 1993-3A [3] | Prime 1999 | 4.50% | $3 | GEMICO (Pool Policy)/FGIC | $3 |
| 1678 | SMART 1993-6A [A] | Prime 1999 | 4.50% | $0 | GEMICO (Pool Policy) | $0 |
| 1679 | SMART 1993-6A [B] | Prime 1999 | 4.50% | $6 | FGIC/GEMICO (Pool Policy) | $6 |
| 1680 | SMSC 1992-2 [Total] | Prime 1999 | 8.99% | $34 | GEMICO (Pool Policy)/PMI (Pool Policy) | $34 |
| 1681 | SMSC 1992-3 [Total] | Prime 1999 | 43.13% | $190 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSI (Pool Policy) | $190 |
| 1682 | SMSC 1992-4 [Total] | Prime 1999 | 44.51% | $522 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSI (Pool Policy) | $522 |
| 1683 | SMSC 1992-6 [Total] | Prime 1999 | 47.68% | $157 | GEMICO (Pool Policy)/FSA (Pool Policy) | $157 |
| 1684 | SMSC 1994-2 [Total] | Prime 1999 | 26.35% | $90 | | $90 |
| 1685 | Southwest Savings 1988-1 [Total] | 1999 | 4.50% | $1 | | $1 |
| 1686 | SVHE 2003-2 [1] | Subprime 2003 | 53.42% | $5,317 | | $5,317 |
| 1687 | SVHE 2003-2 [2] | Subprime 2003 | 53.42% | $2,755 | | $2,755 |
| 1688 | SVHE 2005-A [Total] | Subprime 2005 | 45.96% | $7,273 | | $7,273 |
| 1689 | SVHE 2005-B [Total] | Subprime 2005 | 65.47% | $11,555 | | $11,555 |
| 1690 | TMTS 2005-13SL [1] | Second Lien 2005 | 100.00% | $884 | FGIC | $884 |
| 1691 | TMTS 2005-13SL [2] | Second Lien 2005 | 100.00% | $131 | FGIC | $131 |
| 1692 | TMTS 2005-9HGS [1] | Second Lien 2005 | 100.00% | $6,828 | | $6,828 |
| 1693 | TMTS 2005-9HGS [2] | Second Lien 2005 | 100.00% | $1,213 | | $1,213 |
| 1694 | TMTS 2006-2HGS [F] | Second Lien 2006 | 100.00% | $15,864 | FGIC | $15,864 |
| 1695 | TMTS 2006-2HGS [H] | Second Lien 2006 | 100.00% | $1,748 | FGIC | $1,748 |
| 1696 | TMTS 2006-HF1 [F] | Second Lien 2006 | 100.00% | $3,952 | | $3,952 |
| 1697 | TMTS 2006-HF1 [H] | Second Lien 2006 | 100.00% | $662 | | $662 |
| 1698 | TRUMN 2004-1 [1] | Subprime 2004 | 9.00% | $5,983 | | $5,983 |
| 1699 | TRUMN 2004-1 [2] | Subprime 2004 | 9.00% | $304 | | $304 |
| 1700 | TRUMN 2005-1 [1] | Subprime 2005 | 9.00% | $5,099 | | $5,099 |
| 1701 | TRUMN 2005-1 [2] | Subprime 2005 | 9.00% | $223 | | $223 |
| 1702 | TRUMN 2006-1 [1A] | Subprime 2006 | 5.00% | $2,045 | | $2,045 |
| 1703 | TRUMN 2006-1 [1F] | Subprime 2006 | 5.00% | $2,646 | | $2,646 |
| 1704 | TRUMN 2006-1 [2] | Subprime 2006 | 5.00% | $213 | | $213 |
| 1705 | | | | $17,790,612 | | $15,939,445 |

12-12020-mg Doc 8019-45 Filed 01/28/15 Entered 01/22/15 18:14:28 Exhibit 26
Pg 161 of 293

**Schedule 1R**

Case 14-cv-03039-GBD    Document 15-1    Filed 01/06/14    Page 283 of 355
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26

Schedule 1 to RFC Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 2 | AHM 2004-4 [1] | ALT-A 2004 | 14.48% | $5,141 | | $5,141 |
| 3 | AHM 2004-4 [2] | ALT-A 2004 | 14.48% | $11,797 | | $11,797 |
| 4 | AHM 2004-4 [3] | ALT-A 2004 | 14.48% | $11,131 | | $11,131 |
| 5 | AHM 2004-4 [4] | ALT-A 2004 | 14.48% | $17,976 | | $17,976 |
| 6 | AHM 2004-4 [5] | ALT-A 2004 | 14.48% | $11,743 | | $11,743 |
| 7 | AHM 2004-4 [6] | ALT-A 2004 | 14.48% | $7,796 | | $7,796 |
| 8 | AHM 2004-4 [7] | ALT-A 2004 | 14.48% | $4,404 | MBIA | $0 |
| 9 | BAFC 2005-3 [1] | Prime 2005 | 16.89% | $2,686 | | $2,686 |
| 10 | BAFC 2005-3 [2A] | Prime 2005 | 16.89% | $887 | | $887 |
| 11 | BAFC 2005-3 [2B] | Prime 2005 | 16.89% | $437 | | $437 |
| 12 | BAFC 2005-3 [2C] | Prime 2005 | 16.89% | $399 | | $399 |
| 13 | BAFC 2005-4 [1] | Prime 2005 | 6.30% | $274 | Assured Guaranty - Insurer Exception | $274 |
| 14 | BAFC 2005-4 [2] | Prime 2005 | 6.30% | $474 | Assured Guaranty - Insurer Exception | $474 |
| 15 | BAFC 2005-5 [1] | Prime 2005 | 16.22% | $1,247 | | $1,247 |
| 16 | BAFC 2005-5 [2] | Prime 2005 | 16.22% | $1,167 | | $1,167 |
| 17 | BAFC 2005-5 [3] | Prime 2005 | 16.22% | $592 | | $592 |
| 18 | BAFC 2005-6 [1] | Prime 2005 | 6.36% | $962 | | $962 |
| 19 | BAFC 2005-6 [2] | Prime 2005 | 6.36% | $1,006 | | $1,006 |
| 20 | BAFC 2005-7 [1] | Prime 2005 | 2.11% | $150 | | $150 |
| 21 | BAFC 2005-7 [2] | Prime 2005 | 2.11% | $133 | | $133 |
| 22 | BAFC 2005-7 [3] | Prime 2005 | 2.11% | $239 | | $239 |
| 23 | BAFC 2005-7 [4] | Prime 2005 | 2.11% | $192 | | $192 |
| 24 | BAFC 2005-8 [1] | Prime 2005 | 9.20% | $396 | | $396 |
| 25 | BAFC 2005-8 [2] | Prime 2005 | 9.20% | $1,273 | | $1,273 |
| 26 | BAFC 2005-8 [3] | Prime 2005 | 9.20% | $216 | | $216 |
| 27 | BAFC 2005-8 [4] | Prime 2005 | 9.20% | $1,084 | | $1,084 |
| 28 | BAFC 2006-1 [1] | ALT-A 2006 | 13.02% | $1,852 | | $1,852 |
| 29 | BAFC 2006-1 [2] | ALT-A 2006 | 13.02% | $794 | | $794 |
| 30 | BAFC 2006-1 [3] | ALT-A 2006 | 13.02% | $694 | | $694 |
| 31 | BAFC 2006-5 [1] | Prime 2006 | 5.76% | $577 | | $577 |
| 32 | BAFC 2006-5 [2] | Prime 2006 | 5.76% | $280 | | $280 |
| 33 | BAFC 2006-5 [3] | Prime 2006 | 5.76% | $294 | | $294 |
| 34 | BAFC 2006-5 [4] | Prime 2006 | 5.76% | $969 | | $969 |
| 35 | BALTA 2003-1 [1] | ALT-A 2003 | 4.50% | $59 | | $59 |
| 36 | BALTA 2003-1 [2] | ALT-A 2003 | 4.50% | $46 | | $46 |
| 37 | BALTA 2005-4 [I] | ALT-A 2005 | 0.03% | $20 | | $20 |
| 38 | BALTA 2005-4 [I1I] | ALT-A 2005 | 0.03% | $11 | | $11 |
| 39 | BALTA 2005-4 [I2] | ALT-A 2005 | 0.03% | $10 | | $10 |
| 40 | BALTA 2005-4 [II3] | ALT-A 2005 | 0.03% | $59 | | $59 |
| 41 | BALTA 2005-4 [II4] | ALT-A 2005 | 0.03% | $5 | | $5 |
| 42 | BALTA 2005-4 [II5] | ALT-A 2005 | 0.03% | $3 | | $3 |
| 43 | BAYV 2004-C [1A] | Subprime 2004 | 4.00% | $1,160 | | $1,160 |
| 44 | BAYV 2004-C [1F] | Subprime 2004 | 4.00% | $935 | | $935 |
| 45 | BAYV 2004-C [1LONG_ARM] | Subprime 2004 | 4.00% | $98 | | $98 |
| 46 | BAYV 2004-D [A] | Subprime 2004 | 5.00% | $1,827 | | $1,827 |
| 47 | BAYV 2004-D [F] | Subprime 2004 | 5.00% | $1,554 | | $1,554 |
| 48 | BAYV 2005-B [1] | Subprime 2005 | 3.97% | $833 | FGIC | $833 |
| 49 | BAYV 2005-B [2A] | Subprime 2005 | 3.97% | $1,088 | | $1,088 |

Schedule 1 to 1-H Recognized Claims
Part 1-H Loans
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **RFC Servicer %** | **RFC Claim** | **Insurer** | **RFC Recognized Claim** |
| 50 | BAYV 2005-B  [2F] | Subprime 2005 | 3.97% | $194 | | $194 |
| 51 | BSARM 2005-12  [I-1] | Prime 2005 | 8.76% | $2,846 | | $2,846 |
| 52 | BSARM 2005-12  [I-2] | Prime 2005 | 8.76% | $6,221 | | $6,221 |
| 53 | BSARM 2005-12  [I-3] | Prime 2005 | 8.76% | $2,542 | | $2,542 |
| 54 | BSARM 2005-12  [II-1] | Prime 2005 | 8.76% | $531 | | $531 |
| 55 | BSARM 2005-12  [II-2] | Prime 2005 | 8.76% | $1,249 | | $1,249 |
| 56 | BSARM 2005-12  [II-3] | Prime 2005 | 8.76% | $2,497 | | $2,497 |
| 57 | BSARM 2005-12  [II-4] | Prime 2005 | 8.76% | $374 | | $374 |
| 58 | BSARM 2005-12  [II-5] | Prime 2005 | 8.76% | $623 | | $623 |
| 59 | CARR 2006-RFC1  [A_2YR] | Subprime 2006 | 100.00% | $273,060 | | $273,060 |
| 60 | CARR 2006-RFC1  [A_3YR] | Subprime 2006 | 100.00% | $46,373 | | $46,373 |
| 61 | CARR 2006-RFC1  [F] | Subprime 2006 | 100.00% | $49,752 | | $49,752 |
| 62 | CARR 2007-RFC1  [1A_1] | Subprime 2007 | 100.00% | $292,254 | | $292,254 |
| 63 | CARR 2007-RFC1  [1A_2] | Subprime 2007 | 100.00% | $69,967 | | $69,967 |
| 64 | CARR 2007-RFC1  [2F] | Subprime 2007 | 100.00% | $108,421 | | $108,421 |
| 65 | CMLTI 2007-AMC2  [1A_GE36] | Subprime 2007 | 25.68% | $38,996 | | $38,996 |
| 66 | CMLTI 2007-AMC2  [1A_LE24] | Subprime 2007 | 25.68% | $64,005 | | $64,005 |
| 67 | CMLTI 2007-AMC2  [1F] | Subprime 2007 | 25.68% | $51,512 | | $51,512 |
| 68 | CMLTI 2007-AMC2  [2A_GE36] | Subprime 2007 | 25.68% | $8,608 | | $8,608 |
| 69 | CMLTI 2007-AMC2  [2A_LE24] | Subprime 2007 | 25.68% | $13,616 | | $13,616 |
| 70 | CMLTI 2007-AMC2  [2F] | Subprime 2007 | 25.68% | $14,597 | | $14,597 |
| 71 | CMLTI 2007-AMC2  [3A_GE36] | Subprime 2007 | 25.68% | $37,093 | | $37,093 |
| 72 | CMLTI 2007-AMC2  [3A_LE24] | Subprime 2007 | 25.68% | $117,616 | | $117,616 |
| 73 | CMLTI 2007-AMC2  [3F] | Subprime 2007 | 25.68% | $60,887 | | $60,887 |
| 74 | CSFB 2002-34  [FOUR] | Prime 2002 | 5.31% | $593 | | $593 |
| 75 | CSFB 2002-34  [ONE] | Prime 2002 | 5.31% | $560 | | $560 |
| 76 | CSFB 2002-34  [THREE] | Prime 2002 | 5.31% | $1,035 | | $1,035 |
| 77 | CSFB 2002-34  [TWO] | Prime 2002 | 5.31% | $516 | | $516 |
| 78 | CSFB 2002-AR33  [FIVE] | ALT-A 2002 | 3.62% | $45 | | $45 |
| 79 | CSFB 2002-AR33  [FOUR] | ALT-A 2002 | 3.62% | $13 | | $13 |
| 80 | CSFB 2002-AR33  [ONE] | ALT-A 2002 | 3.62% | $28 | | $28 |
| 81 | CSFB 2002-AR33  [THREE] | ALT-A 2002 | 3.62% | $141 | | $141 |
| 82 | CSFB 2002-AR33  [TWO] | ALT-A 2002 | 3.62% | $34 | | $34 |
| 83 | CSFB 2003-23  [EIGHT] | Prime 2003 | 9.70% | $233 | | $233 |
| 84 | CSFB 2003-23  [FIVE] | Prime 2003 | 9.70% | $704 | | $704 |
| 85 | CSFB 2003-23  [FOUR] | Prime 2003 | 9.70% | $428 | | $428 |
| 86 | CSFB 2003-23  [ONE] | Prime 2003 | 9.70% | $1,648 | | $1,648 |
| 87 | CSFB 2003-23  [SEVEN] | Prime 2003 | 9.70% | $179 | | $179 |
| 88 | CSFB 2003-23  [SIX] | Prime 2003 | 9.70% | $546 | | $546 |
| 89 | CSFB 2003-23  [THREE] | Prime 2003 | 9.70% | $1,437 | | $1,437 |
| 90 | CSFB 2003-23  [TWO] | Prime 2003 | 9.70% | $778 | | $778 |
| 91 | DBALT 2005-AR2  [1] | ALT-A 2005 | 17.87% | $4,793 | | $4,793 |
| 92 | DBALT 2005-AR2  [2] | ALT-A 2005 | 17.87% | $2,351 | | $2,351 |
| 93 | DBALT 2005-AR2  [3] | ALT-A 2005 | 17.87% | $2,208 | | $2,208 |
| 94 | DBALT 2005-AR2  [4] | ALT-A 2005 | 17.87% | $4,555 | | $4,555 |
| 95 | DBALT 2005-AR2  [5] | ALT-A 2005 | 17.87% | $3,352 | | $3,352 |
| 96 | DBALT 2005-AR2  [6] | ALT-A 2005 | 17.87% | $1,695 | | $1,695 |
| 97 | DBALT 2005-AR2  [7] | ALT-A 2005 | 17.87% | $1,408 | | $1,408 |

Case 14-cv-03039-GBD    Document 25-1    Filed 11/06/14    Page 245 of 355
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Schedule 2 – RFC Recognized Claims
Subject to Further Review and Due Diligence

|   | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 98 | DBALT 2007-RMP1 [A] | ALT-A 2007 | 100.00% | $26,508 | | $26,508 |
| 99 | DBALT 2007-RMP1 [F] | ALT-A 2007 | 100.00% | $78,434 | | $78,434 |
| 100 | DMSI 2004-5 [Total] | ALT-A 2004 | 38.89% | $33,125 | FGIC | $33,125 |
| 101 | FMRMT 2003-A [Total] | 2003 | 50.00% | $928 | | $928 |
| 102 | FNR 2002-66 [FIVE] | Subprime 2002 | 4.50% | $1,297 | FNMA/FNMA (Agency Wrap) | $0 |
| 103 | FNR 2002-66 [FOUR] | Subprime 2002 | 4.50% | $1,832 | FNMA/FNMA (Agency Wrap) | $0 |
| 104 | FNR 2002-66 [ONE] | Subprime 2002 | 4.50% | $7,395 | FNMA/FNMA (Agency Wrap) | $0 |
| 105 | GRCAP 1991-4 [Total] | Prime 1999 | 4.50% | $12 | | $12 |
| 106 | GSAMP 2004-SD1 [Total] | Subprime 2004 | 0.75% | $482 | | $482 |
| 107 | GSR 2005-AR7 [1] | Prime 2005 | 9.00% | $749 | | $749 |
| 108 | GSR 2005-AR7 [2] | Prime 2005 | 9.00% | $2,845 | | $2,845 |
| 109 | GSR 2005-AR7 [3] | Prime 2005 | 9.00% | $675 | | $675 |
| 110 | GSR 2005-AR7 [4] | Prime 2005 | 9.00% | $863 | | $863 |
| 111 | GSR 2005-AR7 [5] | Prime 2005 | 9.00% | $926 | | $926 |
| 112 | GSR 2005-AR7 [6] | Prime 2005 | 9.00% | $4,856 | | $4,856 |
| 113 | GSR 2006-AR2 [1] | Prime 2006 | 15.60% | $1,127 | | $1,127 |
| 114 | GSR 2006-AR2 [2] | Prime 2006 | 15.60% | $2,771 | | $2,771 |
| 115 | GSR 2006-AR2 [3] | Prime 2006 | 15.60% | $4,953 | | $4,953 |
| 116 | GSR 2006-AR2 [4] | Prime 2006 | 15.60% | $4,244 | | $4,244 |
| 117 | GSR 2006-AR2 [5] | Prime 2006 | 15.60% | $6,389 | | $6,389 |
| 118 | GSR 2007-AR1 [1] | Prime 2007 | 15.91% | $1,937 | | $1,937 |
| 119 | GSR 2007-AR1 [2] | Prime 2007 | 15.91% | $28,186 | | $28,186 |
| 120 | GSR 2007-AR1 [3] | Prime 2007 | 15.91% | $4,181 | | $4,181 |
| 121 | GSR 2007-AR1 [4] | Prime 2007 | 15.91% | $1,583 | | $1,583 |
| 122 | GSR 2007-AR1 [5] | Prime 2007 | 15.91% | $3,441 | | $3,441 |
| 123 | GSR 2007-AR1 [6] | Prime 2007 | 15.91% | $2,327 | | $2,327 |
| 124 | GSR 2007-HEL1 [Total] | Second Lien 2007 | 100.00% | $238 | MBIA | $0 |
| 125 | GSRPM 2002-1A [Total] | Subprime 2002 | 4.50% | $4,413 | Ambac | $4,413 |
| 126 | GSRPM 2004-1 [1A] | Subprime 2004 | 4.50% | $594 | | $594 |
| 127 | GSRPM 2004-1 [1F] | Subprime 2004 | 4.50% | $1,733 | | $1,733 |
| 128 | GSRPM 2004-1 [2] | Subprime 2004 | 4.50% | $96 | | $96 |
| 129 | HALO 2007-AR2 [I] | ALT-A 2007 | 0.33% | $22 | | $22 |
| 130 | HALO 2007-AR2 [II] | ALT-A 2007 | 0.33% | $196 | | $196 |
| 131 | HALO 2007-AR2 [III] | ALT-A 2007 | 0.33% | $95 | | $95 |
| 132 | HALO 2007-AR2 [IV] | ALT-A 2007 | 0.33% | $53 | | $53 |
| 133 | IMM 2002-9F [Total] | ALT-A 2002 | 50.00% | $3,068 | | $3,068 |
| 134 | IMM 2003-2F [Total] | ALT-A 2003 | 50.00% | $3,030 | | $3,030 |
| 135 | IMM 2003-9F [Total] | ALT-A 2003 | 56.09% | $3,874 | | $3,874 |
| 136 | IMM 2004-10 [1A] | ALT-A 2004 | 46.05% | $57,540 | FGIC | $57,540 |
| 137 | IMM 2004-10 [1F] | ALT-A 2004 | 46.05% | $5,185 | FGIC | $5,185 |
| 138 | IMM 2004-10 [2A] | ALT-A 2004 | 46.05% | $37,269 | FGIC | $37,269 |
| 139 | IMM 2004-10 [2F] | ALT-A 2004 | 46.05% | $3,500 | FGIC | $3,500 |
| 140 | IMM 2004-10 [2S] | ALT-A 2004 | 46.05% | $1,255 | FGIC | $1,255 |
| 141 | IMM 2004-10 [3A] | ALT-A 2004 | 46.05% | $15,003 | | $15,003 |
| 142 | IMM 2004-10 [3F] | ALT-A 2004 | 46.05% | $723 | | $723 |
| 143 | IMM 2004-10 [4A] | ALT-A 2004 | 46.05% | $10,344 | | $10,344 |
| 144 | IMM 2004-4 [1] | ALT-A 2004 | 8.04% | $4,995 | | $4,995 |
| 145 | IMM 2004-4 [2] | ALT-A 2004 | 8.04% | $957 | | $957 |

Case 14-cv-03039-GBD    Document 51-1    Filed 11/06/14    Page 246 of 355
12-12020-mg   Doc 8019-45   Filed 01/22/15   Entered 01/22/15 18:14:28   Exhibit 26
Pg 271 of 398

Schedule 1 - RFC Recognized Claims
Subject to Further Review and Due Diligence

| | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
|---|---|---|---|---|---|---|
| 146 | IMM 2004-5 [1_1ST_ARM] | ALT-A 2004 | 2.63% | $1,592 | | $1,592 |
| 147 | IMM 2004-5 [1_1ST_FIX] | ALT-A 2004 | 2.63% | $99 | | $99 |
| 148 | IMM 2004-5 [1_2ND] | ALT-A 2004 | 2.63% | $59 | | $59 |
| 149 | IMM 2004-5 [2] | ALT-A 2004 | 2.63% | $132 | | $132 |
| 150 | IMM 2004-7 [1] | ALT-A 2004 | 50.00% | $55,671 | | $55,671 |
| 151 | IMM 2004-7 [2] | ALT-A 2004 | 50.00% | $36,960 | AMBAC | $36,960 |
| 152 | IMM 2004-8 [1] | ALT-A 2004 | 46.81% | $25,125 | FGIC | $25,125 |
| 153 | IMM 2004-8 [2] | ALT-A 2004 | 46.81% | $34,226 | FGIC | $34,226 |
| 154 | IMM 2004-8 [3] | ALT-A 2004 | 46.81% | $4,049 | | $4,049 |
| 155 | IMM 2005-1 [1A] | ALT-A 2005 | 48.73% | $42,144 | | $42,144 |
| 156 | IMM 2005-1 [1F] | ALT-A 2005 | 48.73% | $1,168 | | $1,168 |
| 157 | IMM 2005-1 [2A] | ALT-A 2005 | 48.73% | $37,825 | | $37,825 |
| 158 | IMM 2005-1 [2F] | ALT-A 2005 | 48.73% | $913 | | $913 |
| 159 | IMM 2005-4 [1] | ALT-A 2005 | 46.24% | $129,156 | | $129,156 |
| 160 | IMM 2005-4 [2] | ALT-A 2005 | 46.24% | $8,899 | | $8,899 |
| 161 | IMM 2005-8 [1] | ALT-A 2005 | 36.07% | $52,574 | | $52,574 |
| 162 | IMM 2005-8 [2] | ALT-A 2005 | 36.07% | $19,499 | | $19,499 |
| 163 | IMSA 2002-2 [Total] | ALT-A 2002 | 50.00% | $4,590 | | $4,590 |
| 164 | IMSA 2003-1 [Total] | ALT-A 2003 | 50.00% | $3,872 | | $3,872 |
| 165 | IMSA 2003-3 [Total] | ALT-A 2003 | 50.00% | $8,633 | | $8,633 |
| 166 | IMSA 2004-1 [Total] | ALT-A 2004 | 50.00% | $8,811 | | $8,811 |
| 167 | IMSA 2004-2 [Total] | ALT-A 2004 | 50.00% | $13,746 | | $13,746 |
| 168 | IMSA 2006-1 [1A1] | ALT-A 2006 | 32.62% | $17,477 | | $17,477 |
| 169 | IMSA 2006-1 [1A2_ARM] | ALT-A 2006 | 32.62% | $42,215 | | $42,215 |
| 170 | IMSA 2006-1 [1A2_FIX] | ALT-A 2006 | 32.62% | $22,733 | | $22,733 |
| 171 | IMSA 2006-1 [2_170] | ALT-A 2006 | 32.62% | $12,778 | | $12,778 |
| 172 | IMSA 2006-1 [2_REG] | ALT-A 2006 | 32.62% | $19,770 | | $19,770 |
| 173 | IMSA 2006-2 [1IA2] | ALT-A 2006 | 34.93% | $12,547 | | $12,547 |
| 174 | IMSA 2006-2 [1IA3] | ALT-A 2006 | 34.93% | $17,675 | | $17,675 |
| 175 | IMSA 2006-2 [1IA5] | ALT-A 2006 | 34.93% | $47,637 | | $47,637 |
| 176 | IMSA 2006-2 [1IFIX] | ALT-A 2006 | 34.93% | $1,511 | | $1,511 |
| 177 | IMSA 2006-2 [22REG] | ALT-A 2006 | 34.93% | $23,379 | | $23,379 |
| 178 | IMSA 2006-2 [22SPEC] | ALT-A 2006 | 34.93% | $10,440 | | $10,440 |
| 179 | LMT 2006-7 [1] | ALT-A 2006 | 0.43% | $254 | | $254 |
| 180 | LMT 2006-7 [2] | ALT-A 2006 | 0.43% | $486 | | $486 |
| 181 | LMT 2006-7 [3] | ALT-A 2006 | 0.43% | $301 | | $301 |
| 182 | LMT 2006-7 [4] | ALT-A 2006 | 0.43% | $83 | | $83 |
| 183 | LUM 2006-3 [I_1] | ALT-A 2006 | 28.35% | $20,643 | | $20,643 |
| 184 | LUM 2006-3 [I_2] | ALT-A 2006 | 28.35% | $19,897 | | $19,897 |
| 185 | LUM 2006-3 [II_1] | ALT-A 2006 | 28.35% | $6,123 | | $6,123 |
| 186 | LUM 2006-3 [II_2] | ALT-A 2006 | 28.35% | $19,036 | | $19,036 |
| 187 | LUM 2006-3 [II_3] | ALT-A 2006 | 28.35% | $9,286 | | $9,286 |
| 188 | LUM 2006-5 [Total] | Pay Option ARM 2006 | 51.86% | $117,475 | | $117,475 |
| 189 | LXS 2006-12N [1_A1] | ALT-A 2006 | 16.77% | $4,146 | | $4,146 |
| 190 | LXS 2006-12N [1_A2] | ALT-A 2006 | 16.77% | $33,752 | | $33,752 |
| 191 | LXS 2006-12N [1_A3] | ALT-A 2006 | 16.77% | $2,499 | | $2,499 |
| 192 | LXS 2006-12N [1_A4] | ALT-A 2006 | 16.77% | $45,968 | | $45,968 |
| 193 | LXS 2006-12N [1_F] | ALT-A 2006 | 16.77% | $19,258 | | $19,258 |

12-12020-mg    Doc 6019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Pg 272 of 398

Case 1:14-cv-09030-GBD    Document 21-1    Filed 01/06/14    Page 247 of 355

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Schedule 1 - RFC Recognized Subcured Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 194 | LXS 2006-12N [2_A1] | ALT-A 2006 | 16.77% | $2,541 | | $2,541 |
| 195 | LXS 2006-12N [2_A2] | ALT-A 2006 | 16.77% | $3,791 | | $3,791 |
| 196 | LXS 2006-12N [2_A3] | ALT-A 2006 | 16.77% | $1,097 | | $1,097 |
| 197 | LXS 2006-12N [2_A4] | ALT-A 2006 | 16.77% | $32,334 | | $32,334 |
| 198 | LXS 2006-GP1 [1] | ALT-A 2006 | 50.00% | $37,662 | | $37,662 |
| 199 | LXS 2006-GP1 [2] | ALT-A 2006 | 50.00% | $40,493 | | $40,493 |
| 200 | LXS 2006-GP1 [3] | ALT-A 2006 | 50.00% | $83,833 | | $83,833 |
| 201 | LXS 2006-GP2 [1_1] | ALT-A 2006 | 50.00% | $31,995 | | $31,995 |
| 202 | LXS 2006-GP2 [1_2] | ALT-A 2006 | 50.00% | $40,471 | | $40,471 |
| 203 | LXS 2006-GP2 [1_3] | ALT-A 2006 | 50.00% | $50,886 | | $50,886 |
| 204 | LXS 2006-GP2 [2_1] | ALT-A 2006 | 50.00% | $11,618 | | $11,618 |
| 205 | LXS 2006-GP2 [2_2] | ALT-A 2006 | 50.00% | $14,848 | | $14,848 |
| 206 | LXS 2006-GP2 [2_3] | ALT-A 2006 | 50.00% | $31,808 | | $31,808 |
| 207 | LXS 2006-GP2 [3_1] | ALT-A 2006 | 50.00% | $8,625 | | $8,625 |
| 208 | LXS 2006-GP2 [3_2] | ALT-A 2006 | 50.00% | $9,601 | | $9,601 |
| 209 | LXS 2006-GP2 [3_3] | ALT-A 2006 | 50.00% | $21,190 | | $21,190 |
| 210 | LXS 2006-GP3 [1_1] | ALT-A 2006 | 50.00% | $12,385 | | $12,385 |
| 211 | LXS 2006-GP3 [1_2] | ALT-A 2006 | 50.00% | $12,839 | | $12,839 |
| 212 | LXS 2006-GP3 [1_3] | ALT-A 2006 | 50.00% | $32,315 | | $32,315 |
| 213 | LXS 2006-GP3 [2_1] | ALT-A 2006 | 50.00% | $5,911 | | $5,911 |
| 214 | LXS 2006-GP3 [2_2] | ALT-A 2006 | 50.00% | $14,213 | | $14,213 |
| 215 | LXS 2006-GP3 [2_3] | ALT-A 2006 | 50.00% | $18,255 | | $18,255 |
| 216 | LXS 2006-GP3 [3_1] | ALT-A 2006 | 50.00% | $25,386 | | $25,386 |
| 217 | LXS 2006-GP3 [3_2] | ALT-A 2006 | 50.00% | $30,702 | | $30,702 |
| 218 | LXS 2006-GP3 [3_3] | ALT-A 2006 | 50.00% | $41,661 | | $41,661 |
| 219 | MANA 2007-A2 [1] | ALT-A 2007 | 3.30% | $4,266 | | $4,266 |
| 220 | MANA 2007-A2 [2] | ALT-A 2007 | 3.30% | $4,340 | | $4,340 |
| 221 | MANA 2007-A2 [3] | ALT-A 2007 | 3.30% | $10,999 | | $10,999 |
| 222 | MANA 2007-OAR3 [Total] | Pay Option ARM 2007 | 46.88% | $96,181 | | $96,181 |
| 223 | MARM 2006-OA2 [1] | Pay Option ARM 2006 | 4.19% | $18,858 | FSA | $0 |
| 224 | MARM 2006-OA2 [2] | Pay Option ARM 2006 | 4.19% | $12,218 | FSA | $0 |
| 225 | MARM 2006-OA2 [3] | Pay Option ARM 2006 | 4.19% | $3,129 | | $3,129 |
| 226 | MARM 2006-OA2 [4] | Pay Option ARM 2006 | 4.19% | $14,782 | FSA | $0 |
| 227 | MARM 2007-1 [11M0] | ALT-A 2007 | 3.27% | $1,076 | | $1,076 |
| 228 | MARM 2007-1 [11M1] | ALT-A 2007 | 3.27% | $1,238 | | $1,238 |
| 229 | MARM 2007-1 [11M2] | ALT-A 2007 | 3.27% | $336 | | $336 |
| 230 | MARM 2007-1 [11M3] | ALT-A 2007 | 3.27% | $2,881 | | $2,881 |
| 231 | MARM 2007-1 [11T0] | ALT-A 2007 | 3.27% | $271 | | $271 |
| 232 | MARM 2007-1 [11T1] | ALT-A 2007 | 3.27% | $89 | | $89 |
| 233 | MARM 2007-1 [11T2] | ALT-A 2007 | 3.27% | $42 | | $42 |
| 234 | MARM 2007-1 [11T3] | ALT-A 2007 | 3.27% | $168 | | $168 |
| 235 | MARM 2007-1 [12M0] | ALT-A 2007 | 3.27% | $4,234 | FSA | $0 |
| 236 | MARM 2007-1 [12M1] | ALT-A 2007 | 3.27% | $3,687 | FSA | $0 |
| 237 | MARM 2007-1 [12M2] | ALT-A 2007 | 3.27% | $1,568 | FSA | $0 |
| 238 | MARM 2007-1 [12M3] | ALT-A 2007 | 3.27% | $6,996 | FSA | $0 |
| 239 | MARM 2007-1 [12T0] | ALT-A 2007 | 3.27% | $2,872 | FSA | $0 |
| 240 | MARM 2007-1 [12T1] | ALT-A 2007 | 3.27% | $618 | FSA | $0 |
| 241 | MARM 2007-1 [12T2] | ALT-A 2007 | 3.27% | $220 | FSA | $0 |

12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Pg 273 of 398
Case 1:14-cv-03039-GBD    Document 51-1    Filed 11/06/14    Page 248 of 355
12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Schedule 1 - RFC Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 242 | MARM 2007-1 [12T3] | ALT-A 2007 | 3.27% | $1,356 | FSA | $0 |
| 243 | MARM 2007-1 [2] | ALT-A 2007 | 3.27% | $2,692 | | $2,692 |
| 244 | MASD 2007-1 [A] | Subprime 2007 | 100.00% | $228,989 | | $228,989 |
| 245 | MASD 2007-1 [F] | Subprime 2007 | 100.00% | $78,179 | | $78,179 |
| 246 | MASD 2007-2 [A] | Subprime 2007 | 100.00% | $199,813 | | $199,813 |
| 247 | MASD 2007-2 [F] | Subprime 2007 | 100.00% | $55,788 | | $55,788 |
| 248 | PRIME 2006-1 [Total] | ALT-A 2006 | 10.93% | $6,711 | | $6,711 |
| 249 | RAAC 2004-RP1 [1A] | Subprime 2004 | 100.00% | $35,726 | | $35,726 |
| 250 | RAAC 2004-RP1 [1F] | Subprime 2004 | 100.00% | $28,385 | | $28,385 |
| 251 | RAAC 2004-RP1 [2A] | Subprime 2004 | 100.00% | $26,333 | | $26,333 |
| 252 | RAAC 2004-RP1 [2F] | Subprime 2004 | 100.00% | $30,022 | | $30,022 |
| 253 | RAAC 2004-SP1 [1] | ALT-A 2004 | 100.00% | $15,526 | | $15,526 |
| 254 | RAAC 2004-SP1 [2] | ALT-A 2004 | 100.00% | $8,215 | | $8,215 |
| 255 | RAAC 2004-SP2 [1] | Prime 2004 | 100.00% | $1,805 | | $1,805 |
| 256 | RAAC 2004-SP2 [2] | Prime 2004 | 100.00% | $5,468 | | $5,468 |
| 257 | RAAC 2004-SP3 [1] | ALT-A 2004 | 100.00% | $11,399 | | $11,399 |
| 258 | RAAC 2004-SP3 [2] | ALT-A 2004 | 100.00% | $13,231 | | $13,231 |
| 259 | RAAC 2005-RP1 [1] | Subprime 2005 | 100.00% | $109,256 | | $109,256 |
| 260 | RAAC 2005-RP1 [2] | Subprime 2005 | 100.00% | $77,423 | | $77,423 |
| 261 | RAAC 2005-RP2 [A] | Subprime 2005 | 100.00% | $110,752 | | $110,752 |
| 262 | RAAC 2005-RP2 [F] | Subprime 2005 | 100.00% | $93,221 | | $93,221 |
| 263 | RAAC 2005-RP3 [A] | Subprime 2005 | 100.00% | $172,072 | | $172,072 |
| 264 | RAAC 2005-RP3 [F] | Subprime 2005 | 100.00% | $89,675 | | $89,675 |
| 265 | RAAC 2005-SP1 [1] | Prime 2005 | 100.00% | $4,257 | | $4,257 |
| 266 | RAAC 2005-SP1 [2] | Prime 2005 | 100.00% | $7,094 | | $7,094 |
| 267 | RAAC 2005-SP1 [3] | Prime 2005 | 100.00% | $3,830 | | $3,830 |
| 268 | RAAC 2005-SP1 [4] | Prime 2005 | 100.00% | $2,755 | | $2,755 |
| 269 | RAAC 2005-SP2 [1A] | ALT-A 2005 | 100.00% | $31,377 | | $31,377 |
| 270 | RAAC 2005-SP2 [1F] | ALT-A 2005 | 100.00% | $11,914 | | $11,914 |
| 271 | RAAC 2005-SP2 [2A] | ALT-A 2005 | 100.00% | $51,271 | | $51,271 |
| 272 | RAAC 2005-SP2 [2F] | ALT-A 2005 | 100.00% | $20,965 | | $20,965 |
| 273 | RAAC 2005-SP3 [A] | Subprime 2005 | 100.00% | $46,045 | | $46,045 |
| 274 | RAAC 2005-SP3 [F] | Subprime 2005 | 100.00% | $45,130 | | $45,130 |
| 275 | RAAC 2006-RP1 [A] | Subprime 2006 | 100.00% | $144,788 | | $144,788 |
| 276 | RAAC 2006-RP1 [F] | Subprime 2006 | 100.00% | $89,174 | | $89,174 |
| 277 | RAAC 2006-RP2 [A] | Subprime 2006 | 100.00% | $259,369 | | $259,369 |
| 278 | RAAC 2006-RP2 [F] | Subprime 2006 | 100.00% | $128,454 | | $128,454 |
| 279 | RAAC 2006-RP3 [A] | Subprime 2006 | 100.00% | $253,430 | | $253,430 |
| 280 | RAAC 2006-RP3 [F] | Subprime 2006 | 100.00% | $102,109 | | $102,109 |
| 281 | RAAC 2006-RP4 [A] | Subprime 2006 | 100.00% | $206,098 | | $206,098 |
| 282 | RAAC 2006-RP4 [F] | Subprime 2006 | 100.00% | $113,490 | | $113,490 |
| 283 | RAAC 2006-SP1 [A] | Subprime 2006 | 100.00% | $129,663 | | $129,663 |
| 284 | RAAC 2006-SP1 [F] | Subprime 2006 | 100.00% | $29,405 | | $29,405 |
| 285 | RAAC 2006-SP2 [1F] | Subprime 2006 | 100.00% | $36,528 | | $36,528 |
| 286 | RAAC 2006-SP2 [2F] | Subprime 2006 | 100.00% | $7,727 | | $7,727 |
| 287 | RAAC 2006-SP2 [A] | Subprime 2006 | 100.00% | $110,167 | | $110,167 |
| 288 | RAAC 2006-SP3 [A] | Subprime 2006 | 100.00% | $70,221 | | $70,221 |
| 289 | RAAC 2006-SP3 [F1] | Subprime 2006 | 100.00% | $35,160 | | $35,160 |

Schedule 1.1 - RFC Recognized Claims
15.1.3 (Claims Review)
Subject to Further Review and Due Diligence

| | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
|---|---|---|---|---|---|---|
| 290 | RAAC 2006-SP3 [F2] | Subprime 2006 | 100.00% | $5,171 | | $5,171 |
| 291 | RAAC 2006-SP4 [A] | Subprime 2006 | 100.00% | $63,880 | | $63,880 |
| 292 | RAAC 2006-SP4 [F1] | Subprime 2006 | 100.00% | $30,597 | | $30,597 |
| 293 | RAAC 2006-SP4 [F2] | Subprime 2006 | 100.00% | $4,693 | | $4,693 |
| 294 | RAAC 2007-RP1 [A] | Subprime 2007 | 100.00% | $189,242 | | $189,242 |
| 295 | RAAC 2007-RP1 [F] | Subprime 2007 | 100.00% | $65,161 | | $65,161 |
| 296 | RAAC 2007-RP2 [A] | Subprime 2007 | 100.00% | $178,970 | | $178,970 |
| 297 | RAAC 2007-RP2 [F] | Subprime 2007 | 100.00% | $47,366 | | $47,366 |
| 298 | RAAC 2007-RP3 [A] | Subprime 2007 | 100.00% | $199,548 | | $199,548 |
| 299 | RAAC 2007-RP3 [F] | Subprime 2007 | 100.00% | $61,861 | | $61,861 |
| 300 | RAAC 2007-RP4 [A] | Subprime 2007 | 100.00% | $149,199 | | $149,199 |
| 301 | RAAC 2007-RP4 [F] | Subprime 2007 | 100.00% | $47,038 | | $47,038 |
| 302 | RAAC 2007-SP1 [A] | Subprime 2007 | 100.00% | $54,425 | | $54,425 |
| 303 | RAAC 2007-SP1 [F_1] | Subprime 2007 | 100.00% | $56,501 | | $56,501 |
| 304 | RAAC 2007-SP1 [F_2] | Subprime 2007 | 100.00% | $2,442 | | $2,442 |
| 305 | RAAC 2007-SP2 [A] | Subprime 2007 | 100.00% | $107,289 | | $107,289 |
| 306 | RAAC 2007-SP2 [F_1] | Subprime 2007 | 100.00% | $63,156 | | $63,156 |
| 307 | RAAC 2007-SP2 [F_2] | Subprime 2007 | 100.00% | $4,918 | | $4,918 |
| 308 | RAAC 2007-SP3 [A] | Subprime 2007 | 100.00% | $132,067 | | $132,067 |
| 309 | RAAC 2007-SP3 [F] | Subprime 2007 | 100.00% | $40,168 | | $40,168 |
| 310 | RALI 1999-QS4 [Total] | ALT-A 1999 | 100.00% | $1,726 | | $1,726 |
| 311 | RALI 2001-QS13 [Total] | ALT-A 2001 | 100.00% | $2,100 | | $2,100 |
| 312 | RALI 2001-QS16 [Total] | ALT-A 2001 | 100.00% | $5,913 | | $5,913 |
| 313 | RALI 2001-QS17 [Total] | ALT-A 2001 | 100.00% | $7,646 | MBIA - Insurer Exception | $7,646 |
| 314 | RALI 2001-QS18 [Total] | ALT-A 2001 | 100.00% | $10,300 | | $10,300 |
| 315 | RALI 2001-QS19 [Total] | ALT-A 2001 | 100.00% | $2,906 | | $2,906 |
| 316 | RALI 2002-QS1 [Total] | ALT-A 2002 | 100.00% | $7,874 | | $7,874 |
| 317 | RALI 2002-QS10 [Total] | ALT-A 2002 | 100.00% | $5,121 | | $5,121 |
| 318 | RALI 2002-QS11 [Total] | ALT-A 2002 | 100.00% | $9,818 | | $9,818 |
| 319 | RALI 2002-QS12 [Total] | ALT-A 2002 | 100.00% | $15,554 | | $15,554 |
| 320 | RALI 2002-QS13 [Total] | ALT-A 2002 | 100.00% | $2,801 | | $2,801 |
| 321 | RALI 2002-QS14 [Total] | ALT-A 2002 | 100.00% | $7,157 | | $7,157 |
| 322 | RALI 2002-QS15 [1] | ALT-A 2002 | 100.00% | $7,140 | | $7,140 |
| 323 | RALI 2002-QS15 [2] | ALT-A 2002 | 100.00% | $7,124 | MBIA - Insurer Exception | $7,124 |
| 324 | RALI 2002-QS16 [Total] | ALT-A 2002 | 100.00% | $2,540 | | $2,540 |
| 325 | RALI 2002-QS17 [1] | ALT-A 2002 | 100.00% | $9,831 | | $9,831 |
| 326 | RALI 2002-QS17 [2] | ALT-A 2002 | 100.00% | $10,023 | | $10,023 |
| 327 | RALI 2002-QS18 [Total] | ALT-A 2002 | 100.00% | $3,299 | | $3,299 |
| 328 | RALI 2002-QS19 [Total] | ALT-A 2002 | 100.00% | $31,379 | | $31,379 |
| 329 | RALI 2002-QS2 [Total] | ALT-A 2002 | 100.00% | $6,599 | | $6,599 |
| 330 | RALI 2002-QS3 [Total] | ALT-A 2002 | 100.00% | $16,049 | | $16,049 |
| 331 | RALI 2002-QS4 [Total] | ALT-A 2002 | 100.00% | $1,689 | | $1,689 |
| 332 | RALI 2002-QS5 [Total] | ALT-A 2002 | 100.00% | $16,270 | | $16,270 |
| 333 | RALI 2002-QS6 [Total] | ALT-A 2002 | 100.00% | $16,790 | | $16,790 |
| 334 | RALI 2002-QS7 [Total] | ALT-A 2002 | 100.00% | $7,847 | | $7,847 |
| 335 | RALI 2002-QS8 [Total] | ALT-A 2002 | 100.00% | $1,466 | | $1,466 |
| 336 | RALI 2002-QS9 [Total] | ALT-A 2002 | 100.00% | $9,272 | | $9,272 |
| 337 | RALI 2003-QA1 [1] | ALT-A 2003 | 100.00% | $5,622 | | $5,622 |

Case 14-cv-03039-GBD   Document 51-1   Filed 11/06/14   Page 280 of 355

Schedule 15.1a - RFC Recognized Claims
Exhibit 15
Subject to Further Review and Due Diligence

| | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
|---|---|---|---|---|---|---|
| 338 | RALI 2003-QA1 [2] | ALT-A 2003 | 100.00% | $4,211 | | $4,211 |
| 339 | RALI 2003-QS1 [Total] | ALT-A 2003 | 100.00% | $27,394 | MBIA - Insurer Exception | $27,394 |
| 340 | RALI 2003-QS10 [Total] | ALT-A 2003 | 100.00% | $26,644 | | $26,644 |
| 341 | RALI 2003-QS11 [Total] | ALT-A 2003 | 100.00% | $38,720 | | $38,720 |
| 342 | RALI 2003-QS12 [Total] | ALT-A 2003 | 100.00% | $4,216 | | $4,216 |
| 343 | RALI 2003-QS13 [Total] | ALT-A 2003 | 100.00% | $34,189 | | $34,189 |
| 344 | RALI 2003-QS14 [Total] | ALT-A 2003 | 100.00% | $3,467 | | $3,467 |
| 345 | RALI 2003-QS15 [Total] | ALT-A 2003 | 100.00% | $32,151 | | $32,151 |
| 346 | RALI 2003-QS16 [Total] | ALT-A 2003 | 100.00% | $5,258 | | $5,258 |
| 347 | RALI 2003-QS17 [1] | ALT-A 2003 | 100.00% | $6,415 | | $6,415 |
| 348 | RALI 2003-QS17 [2] | ALT-A 2003 | 100.00% | $23,142 | | $23,142 |
| 349 | RALI 2003-QS17 [3] | ALT-A 2003 | 100.00% | $8,545 | | $8,545 |
| 350 | RALI 2003-QS18 [Total] | ALT-A 2003 | 100.00% | $2,745 | | $2,745 |
| 351 | RALI 2003-QS19 [1] | ALT-A 2003 | 100.00% | $9,247 | | $9,247 |
| 352 | RALI 2003-QS19 [2] | ALT-A 2003 | 100.00% | $11,169 | | $11,169 |
| 353 | RALI 2003-QS19 [3] | ALT-A 2003 | 100.00% | $7,372 | | $7,372 |
| 354 | RALI 2003-QS2 [Total] | ALT-A 2003 | 100.00% | $18,273 | | $18,273 |
| 355 | RALI 2003-QS20 [1] | ALT-A 2003 | 100.00% | $1,028 | | $1,028 |
| 356 | RALI 2003-QS20 [2] | ALT-A 2003 | 100.00% | $3,749 | | $3,749 |
| 357 | RALI 2003-QS21 [Total] | ALT-A 2003 | 100.00% | $23,604 | | $23,604 |
| 358 | RALI 2003-QS22 [Total] | ALT-A 2003 | 100.00% | $14,282 | | $14,282 |
| 359 | RALI 2003-QS23 [Total] | ALT-A 2003 | 100.00% | $3,027 | | $3,027 |
| 360 | RALI 2003-QS3 [Total] | ALT-A 2003 | 100.00% | $2,633 | | $2,633 |
| 361 | RALI 2003-QS4 [Total] | ALT-A 2003 | 100.00% | $18,364 | | $18,364 |
| 362 | RALI 2003-QS5 [Total] | ALT-A 2003 | 100.00% | $7,189 | | $7,189 |
| 363 | RALI 2003-QS6 [Total] | ALT-A 2003 | 100.00% | $15,021 | | $15,021 |
| 364 | RALI 2003-QS7 [Total] | ALT-A 2003 | 100.00% | $13,808 | | $13,808 |
| 365 | RALI 2003-QS8 [Total] | ALT-A 2003 | 100.00% | $16,777 | MBIA - Insurer Exception | $16,777 |
| 366 | RALI 2003-QS9 [Total] | ALT-A 2003 | 100.00% | $3,062 | | $3,062 |
| 367 | RALI 2004-QA1 [1_2YR] | ALT-A 2004 | 100.00% | $1,546 | | $1,546 |
| 368 | RALI 2004-QA1 [1_3YR] | ALT-A 2004 | 100.00% | $3,804 | | $3,804 |
| 369 | RALI 2004-QA1 [1_5YR] | ALT-A 2004 | 100.00% | $4,680 | | $4,680 |
| 370 | RALI 2004-QA1 [2_2YR] | ALT-A 2004 | 100.00% | $265 | | $265 |
| 371 | RALI 2004-QA1 [2_3YR] | ALT-A 2004 | 100.00% | $1,951 | | $1,951 |
| 372 | RALI 2004-QA1 [2_5YR] | ALT-A 2004 | 100.00% | $2,130 | | $2,130 |
| 373 | RALI 2004-QA2 [1] | ALT-A 2004 | 100.00% | $26,995 | | $26,995 |
| 374 | RALI 2004-QA2 [2] | ALT-A 2004 | 100.00% | $11,937 | | $11,937 |
| 375 | RALI 2004-QA3 [CB-I] | ALT-A 2004 | 100.00% | $6,031 | | $6,031 |
| 376 | RALI 2004-QA3 [CB-II] | ALT-A 2004 | 100.00% | $6,753 | | $6,753 |
| 377 | RALI 2004-QA3 [NB-I] | ALT-A 2004 | 100.00% | $3,328 | | $3,328 |
| 378 | RALI 2004-QA3 [NB-II] | ALT-A 2004 | 100.00% | $5,318 | | $5,318 |
| 379 | RALI 2004-QA4 [CBI] | ALT-A 2004 | 100.00% | $8,529 | | $8,529 |
| 380 | RALI 2004-QA4 [NBI] | ALT-A 2004 | 100.00% | $3,016 | | $3,016 |
| 381 | RALI 2004-QA4 [NBII] | ALT-A 2004 | 100.00% | $10,512 | | $10,512 |
| 382 | RALI 2004-QA4 [NBIII] | ALT-A 2004 | 100.00% | $1,118 | | $1,118 |
| 383 | RALI 2004-QA5 [1] | ALT-A 2004 | 100.00% | $4,956 | | $4,956 |
| 384 | RALI 2004-QA5 [2] | ALT-A 2004 | 100.00% | $3,893 | | $3,893 |
| 385 | RALI 2004-QA5 [3] | ALT-A 2004 | 100.00% | $19,911 | | $19,911 |

Case 1:14-cv-08039-GBD    Document 15-1    Filed 01/06/14    Page 281 of 355

Schedule 1: RFC Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 386 | RALI 2004-QA6 [1] | ALT-A 2004 | 100.00% | $15,625 | | $15,625 |
| 387 | RALI 2004-QA6 [2] | ALT-A 2004 | 100.00% | $12,711 | | $12,711 |
| 388 | RALI 2004-QA6 [3] | ALT-A 2004 | 100.00% | $32,930 | | $32,930 |
| 389 | RALI 2004-QA6 [4] | ALT-A 2004 | 100.00% | $16,658 | | $16,658 |
| 390 | RALI 2004-QA6 [5] | ALT-A 2004 | 100.00% | $13,794 | | $13,794 |
| 391 | RALI 2004-QA6 [6] | ALT-A 2004 | 100.00% | $10,274 | | $10,274 |
| 392 | RALI 2004-QS1 [Total] | ALT-A 2004 | 100.00% | $22,588 | | $22,588 |
| 393 | RALI 2004-QS10 [Total] | ALT-A 2004 | 100.00% | $16,432 | | $16,432 |
| 394 | RALI 2004-QS11 [Total] | ALT-A 2004 | 100.00% | $12,081 | | $12,081 |
| 395 | RALI 2004-QS12 [Total] | ALT-A 2004 | 100.00% | $28,885 | | $28,885 |
| 396 | RALI 2004-QS13 [CB] | ALT-A 2004 | 100.00% | $2,585 | | $2,585 |
| 397 | RALI 2004-QS13 [NB] | ALT-A 2004 | 100.00% | $388 | | $388 |
| 398 | RALI 2004-QS14 [Total] | ALT-A 2004 | 100.00% | $16,449 | | $16,449 |
| 399 | RALI 2004-QS15 [Total] | ALT-A 2004 | 100.00% | $16,898 | | $16,898 |
| 400 | RALI 2004-QS16 [1] | ALT-A 2004 | 100.00% | $34,217 | | $34,217 |
| 401 | RALI 2004-QS16 [2] | ALT-A 2004 | 100.00% | $8,262 | | $8,262 |
| 402 | RALI 2004-QS2 [All] | ALT-A 2004 | 100.00% | $5,110 | | $5,110 |
| 403 | RALI 2004-QS2 [CB] | ALT-A 2004 | 100.00% | $18,626 | | $18,626 |
| 404 | RALI 2004-QS3 [CB] | ALT-A 2004 | 100.00% | $3,467 | | $3,467 |
| 405 | RALI 2004-QS3 [I] | ALT-A 2004 | 100.00% | $359 | | $359 |
| 406 | RALI 2004-QS3 [II] | ALT-A 2004 | 100.00% | $763 | | $763 |
| 407 | RALI 2004-QS4 [Total] | ALT-A 2004 | 100.00% | $19,161 | | $19,161 |
| 408 | RALI 2004-QS5 [Total] | ALT-A 2004 | 100.00% | $20,683 | | $20,683 |
| 409 | RALI 2004-QS6 [Total] | ALT-A 2004 | 100.00% | $4,037 | | $4,037 |
| 410 | RALI 2004-QS7 [Total] | ALT-A 2004 | 100.00% | $38,435 | | $38,435 |
| 411 | RALI 2004-QS8 [Total] | ALT-A 2004 | 100.00% | $18,618 | | $18,618 |
| 412 | RALI 2004-QS9 [Total] | ALT-A 2004 | 100.00% | $4,142 | | $4,142 |
| 413 | RALI 2005-QA1 [Total] | ALT-A 2005 | 100.00% | $42,209 | | $42,209 |
| 414 | RALI 2005-QA10 [1] | ALT-A 2005 | 100.00% | $8,842 | | $8,842 |
| 415 | RALI 2005-QA10 [2] | ALT-A 2005 | 100.00% | $35,776 | | $35,776 |
| 416 | RALI 2005-QA10 [3] | ALT-A 2005 | 100.00% | $93,696 | | $93,696 |
| 417 | RALI 2005-QA10 [4] | ALT-A 2005 | 100.00% | $32,982 | | $32,982 |
| 418 | RALI 2005-QA11 [1] | ALT-A 2005 | 100.00% | $5,903 | | $5,903 |
| 419 | RALI 2005-QA11 [2] | ALT-A 2005 | 100.00% | $19,305 | | $19,305 |
| 420 | RALI 2005-QA11 [3] | ALT-A 2005 | 100.00% | $14,092 | | $14,092 |
| 421 | RALI 2005-QA11 [4] | ALT-A 2005 | 100.00% | $48,895 | | $48,895 |
| 422 | RALI 2005-QA11 [5] | ALT-A 2005 | 100.00% | $26,203 | | $26,203 |
| 423 | RALI 2005-QA11 [6] | ALT-A 2005 | 100.00% | $10,749 | | $10,749 |
| 424 | RALI 2005-QA12 [1] | ALT-A 2005 | 100.00% | $20,273 | | $20,273 |
| 425 | RALI 2005-QA12 [2] | ALT-A 2005 | 100.00% | $13,386 | | $13,386 |
| 426 | RALI 2005-QA12 [3] | ALT-A 2005 | 100.00% | $17,307 | | $17,307 |
| 427 | RALI 2005-QA12 [4] | ALT-A 2005 | 100.00% | $11,182 | | $11,182 |
| 428 | RALI 2005-QA12 [5] | ALT-A 2005 | 100.00% | $11,681 | | $11,681 |
| 429 | RALI 2005-QA13 [1] | ALT-A 2005 | 100.00% | $30,697 | | $30,697 |
| 430 | RALI 2005-QA13 [2] | ALT-A 2005 | 100.00% | $125,662 | | $125,662 |
| 431 | RALI 2005-QA13 [3] | ALT-A 2005 | 100.00% | $15,326 | | $15,326 |
| 432 | RALI 2005-QA2 [A1I] | ALT-A 2005 | 100.00% | $6,769 | | $6,769 |
| 433 | RALI 2005-QA2 [A1II] | ALT-A 2005 | 100.00% | $8,349 | | $8,349 |

Schedule 11.1 - RFC Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 434 | RALI 2005-QA2 [CBI] | ALT-A 2005 | 100.00% | $15,783 | | $15,783 |
| 435 | RALI 2005-QA2 [CBII] | ALT-A 2005 | 100.00% | $23,797 | | $23,797 |
| 436 | RALI 2005-QA2 [NBI] | ALT-A 2005 | 100.00% | $9,841 | | $9,841 |
| 437 | RALI 2005-QA2 [NBII] | ALT-A 2005 | 100.00% | $12,513 | | $12,513 |
| 438 | RALI 2005-QA3 [1] | ALT-A 2005 | 100.00% | $23,393 | | $23,393 |
| 439 | RALI 2005-QA3 [2] | ALT-A 2005 | 100.00% | $15,900 | | $15,900 |
| 440 | RALI 2005-QA3 [3] | ALT-A 2005 | 100.00% | $20,612 | | $20,612 |
| 441 | RALI 2005-QA3 [4] | ALT-A 2005 | 100.00% | $9,969 | | $9,969 |
| 442 | RALI 2005-QA3 [5] | ALT-A 2005 | 100.00% | $2,825 | | $2,825 |
| 443 | RALI 2005-QA3 [6] | ALT-A 2005 | 100.00% | $1,541 | | $1,541 |
| 444 | RALI 2005-QA3 [7] | ALT-A 2005 | 100.00% | $8,432 | | $8,432 |
| 445 | RALI 2005-QA3 [8] | ALT-A 2005 | 100.00% | $4,674 | | $4,674 |
| 446 | RALI 2005-QA4 [1] | ALT-A 2005 | 100.00% | $21,141 | | $21,141 |
| 447 | RALI 2005-QA4 [2] | ALT-A 2005 | 100.00% | $14,839 | | $14,839 |
| 448 | RALI 2005-QA4 [3] | ALT-A 2005 | 100.00% | $27,683 | | $27,683 |
| 449 | RALI 2005-QA4 [4] | ALT-A 2005 | 100.00% | $16,288 | | $16,288 |
| 450 | RALI 2005-QA4 [5] | ALT-A 2005 | 100.00% | $4,009 | | $4,009 |
| 451 | RALI 2005-QA5 [1] | ALT-A 2005 | 100.00% | $9,060 | | $9,060 |
| 452 | RALI 2005-QA5 [2] | ALT-A 2005 | 100.00% | $8,923 | | $8,923 |
| 453 | RALI 2005-QA6 [1] | ALT-A 2005 | 100.00% | $33,022 | | $33,022 |
| 454 | RALI 2005-QA6 [2] | ALT-A 2005 | 100.00% | $22,030 | | $22,030 |
| 455 | RALI 2005-QA6 [3] | ALT-A 2005 | 100.00% | $26,899 | | $26,899 |
| 456 | RALI 2005-QA6 [4] | ALT-A 2005 | 100.00% | $17,229 | | $17,229 |
| 457 | RALI 2005-QA6 [5] | ALT-A 2005 | 100.00% | $6,423 | | $6,423 |
| 458 | RALI 2005-QA7 [1] | ALT-A 2005 | 100.00% | $20,986 | | $20,986 |
| 459 | RALI 2005-QA7 [2] | ALT-A 2005 | 100.00% | $75,529 | | $75,529 |
| 460 | RALI 2005-QA8 [1] | ALT-A 2005 | 100.00% | $21,455 | | $21,455 |
| 461 | RALI 2005-QA8 [2] | ALT-A 2005 | 100.00% | $11,588 | | $11,588 |
| 462 | RALI 2005-QA8 [3] | ALT-A 2005 | 100.00% | $34,161 | | $34,161 |
| 463 | RALI 2005-QA8 [4] | ALT-A 2005 | 100.00% | $14,590 | | $14,590 |
| 464 | RALI 2005-QA8 [5] | ALT-A 2005 | 100.00% | $9,940 | | $9,940 |
| 465 | RALI 2005-QA8 [6] | ALT-A 2005 | 100.00% | $7,200 | | $7,200 |
| 466 | RALI 2005-QA9 [1] | ALT-A 2005 | 100.00% | $24,489 | | $24,489 |
| 467 | RALI 2005-QA9 [2] | ALT-A 2005 | 100.00% | $12,696 | | $12,696 |
| 468 | RALI 2005-QA9 [3] | ALT-A 2005 | 100.00% | $80,020 | | $80,020 |
| 469 | RALI 2005-QA9 [4] | ALT-A 2005 | 100.00% | $43,548 | | $43,548 |
| 470 | RALI 2005-QO1 [Total] | Pay Option Arm 2005 | 100.00% | $187,209 | | $187,209 |
| 471 | RALI 2005-QO2 [Total] | Pay Option Arm 2005 | 100.00% | $115,989 | | $115,989 |
| 472 | RALI 2005-QO3 [Total] | Pay Option Arm 2005 | 100.00% | $150,607 | | $150,607 |
| 473 | RALI 2005-QO4 [1] | Pay Option Arm 2005 | 100.00% | $80,827 | | $80,827 |
| 474 | RALI 2005-QO4 [2] | Pay Option Arm 2005 | 100.00% | $163,587 | | $163,587 |
| 475 | RALI 2005-QO5 [Total] | Pay Option Arm 2005 | 100.00% | $457,420 | | $457,420 |
| 476 | RALI 2005-QS1 [Total] | ALT-A 2005 | 100.00% | $21,883 | | $21,883 |
| 477 | RALI 2005-QS10 [1] | ALT-A 2005 | 100.00% | $8,375 | | $8,375 |
| 478 | RALI 2005-QS10 [2] | ALT-A 2005 | 100.00% | $10,852 | | $10,852 |
| 479 | RALI 2005-QS10 [3] | ALT-A 2005 | 100.00% | $19,217 | | $19,217 |
| 480 | RALI 2005-QS11 [Total] | ALT-A 2005 | 100.00% | $33,353 | | $33,353 |
| 481 | RALI 2005-QS12 [Total] | ALT-A 2005 | 100.00% | $79,725 | | $79,725 |

12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Pg 278 of 398

Case 1:14-cv-08039-GBD    Document 51-1    Filed 11/06/14    Page 283 of 355

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1

Schedule 1 to the Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 482 | RALI 2005-QS13 [1] | ALT-A 2005 | 100.00% | $54,440 | | $54,440 |
| 483 | RALI 2005-QS13 [2] | ALT-A 2005 | 100.00% | $54,682 | | $54,682 |
| 484 | RALI 2005-QS14 [1] | ALT-A 2005 | 100.00% | $21,593 | | $21,593 |
| 485 | RALI 2005-QS14 [2] | ALT-A 2005 | 100.00% | $20,381 | | $20,381 |
| 486 | RALI 2005-QS14 [3] | ALT-A 2005 | 100.00% | $59,582 | | $59,582 |
| 487 | RALI 2005-QS15 [1] | ALT-A 2005 | 100.00% | $19,204 | | $19,204 |
| 488 | RALI 2005-QS15 [2] | ALT-A 2005 | 100.00% | $9,740 | | $9,740 |
| 489 | RALI 2005-QS15 [3] | ALT-A 2005 | 100.00% | $60,952 | | $60,952 |
| 490 | RALI 2005-QS16 [Total] | ALT-A 2005 | 100.00% | $89,810 | | $89,810 |
| 491 | RALI 2005-QS17 [Total] | ALT-A 2005 | 100.00% | $132,419 | | $132,419 |
| 492 | RALI 2005-QS2 [Total] | ALT-A 2005 | 100.00% | $24,797 | | $24,797 |
| 493 | RALI 2005-QS3 [1t1] | ALT-A 2005 | 100.00% | $13,530 | | $13,530 |
| 494 | RALI 2005-QS3 [2] | ALT-A 2005 | 100.00% | $12,012 | | $12,012 |
| 495 | RALI 2005-QS3 [3t2] | ALT-A 2005 | 100.00% | $29,396 | | $29,396 |
| 496 | RALI 2005-QS4 [Total] | ALT-A 2005 | 100.00% | $24,839 | | $24,839 |
| 497 | RALI 2005-QS5 [Total] | ALT-A 2005 | 100.00% | $31,485 | Radian | $0 |
| 498 | RALI 2005-QS6 [Total] | ALT-A 2005 | 100.00% | $39,411 | | $39,411 |
| 499 | RALI 2005-QS7 [1] | ALT-A 2005 | 100.00% | $35,825 | | $35,825 |
| 500 | RALI 2005-QS7 [2] | ALT-A 2005 | 100.00% | $14,311 | | $14,311 |
| 501 | RALI 2005-QS8 [Total] | ALT-A 2005 | 100.00% | $5,943 | | $5,943 |
| 502 | RALI 2005-QS9 [Total] | ALT-A 2005 | 100.00% | $67,038 | | $67,038 |
| 503 | RALI 2006-QA1 [1] | ALT-A 2006 | 100.00% | $37,220 | | $37,220 |
| 504 | RALI 2006-QA1 [2] | ALT-A 2006 | 100.00% | $124,155 | | $124,155 |
| 505 | RALI 2006-QA1 [3] | ALT-A 2006 | 100.00% | $35,940 | | $35,940 |
| 506 | RALI 2006-QA10 [Total] | ALT-A 2006 | 100.00% | $206,725 | | $206,725 |
| 507 | RALI 2006-QA11 [Total] | ALT-A 2006 | 100.00% | $212,485 | | $212,485 |
| 508 | RALI 2006-QA2 [1] | ALT-A 2006 | 100.00% | $116,045 | | $116,045 |
| 509 | RALI 2006-QA2 [2] | ALT-A 2006 | 100.00% | $18,656 | | $18,656 |
| 510 | RALI 2006-QA2 [3] | ALT-A 2006 | 100.00% | $13,146 | | $13,146 |
| 511 | RALI 2006-QA3 [Total] | ALT-A 2006 | 100.00% | $146,731 | | $146,731 |
| 512 | RALI 2006-QA4 [1] | ALT-A 2006 | 100.00% | $124,563 | | $124,563 |
| 513 | RALI 2006-QA5 [1] | ALT-A 2006 | 100.00% | $263,144 | | $263,144 |
| 514 | RALI 2006-QA5 [2] | ALT-A 2006 | 100.00% | $38,479 | | $38,479 |
| 515 | RALI 2006-QA6 [Total] | ALT-A 2006 | 100.00% | $275,962 | | $275,962 |
| 516 | RALI 2006-QA7 [1] | ALT-A 2006 | 100.00% | $110,915 | | $110,915 |
| 517 | RALI 2006-QA7 [2] | ALT-A 2006 | 100.00% | $164,795 | | $164,795 |
| 518 | RALI 2006-QA8 [Total] | ALT-A 2006 | 100.00% | $391,941 | | $391,941 |
| 519 | RALI 2006-QA9 [Total] | ALT-A 2006 | 100.00% | $146,306 | | $146,306 |
| 520 | RALI 2006-QS1 [Total] | ALT-A 2006 | 100.00% | $74,113 | | $74,113 |
| 521 | RALI 2006-QS10 [Total] | ALT-A 2006 | 100.00% | $163,499 | | $163,499 |
| 522 | RALI 2006-QS11 [1] | ALT-A 2006 | 100.00% | $229,859 | | $229,859 |
| 523 | RALI 2006-QS11 [2] | ALT-A 2006 | 100.00% | $12,095 | | $12,095 |
| 524 | RALI 2006-QS12 [I] | ALT-A 2006 | 100.00% | $49,299 | | $49,299 |
| 525 | RALI 2006-QS12 [II] | ALT-A 2006 | 100.00% | $144,264 | | $144,264 |
| 526 | RALI 2006-QS13 [1] | ALT-A 2006 | 100.00% | $149,677 | | $149,677 |
| 527 | RALI 2006-QS13 [2] | ALT-A 2006 | 100.00% | $29,001 | | $29,001 |
| 528 | RALI 2006-QS14 [Total] | ALT-A 2006 | 100.00% | $258,553 | | $258,553 |
| 529 | RALI 2006-QS15 [Total] | ALT-A 2006 | 100.00% | $184,129 | | $184,129 |

Schedule 15.1 to RFC's Response to Cured Claims
15.1(a) Cured Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 530 | RALI 2006-QS16 [Total] | ALT-A 2006 | 100.00% | $272,656 | | $272,656 |
| 531 | RALI 2006-QS17 [Total] | ALT-A 2006 | 100.00% | $202,851 | | $202,851 |
| 532 | RALI 2006-QS18 [1] | ALT-A 2006 | 100.00% | $131,283 | | $131,283 |
| 533 | RALI 2006-QS18 [2] | ALT-A 2006 | 100.00% | $305,867 | | $305,867 |
| 534 | RALI 2006-QS18 [3] | ALT-A 2006 | 100.00% | $42,274 | | $42,274 |
| 535 | RALI 2006-QS2 [1] | ALT-A 2006 | 100.00% | $171,033 | | $171,033 |
| 536 | RALI 2006-QS2 [2] | ALT-A 2006 | 100.00% | $26,396 | | $26,396 |
| 537 | RALI 2006-QS2 [3] | ALT-A 2006 | 100.00% | $3,571 | | $3,571 |
| 538 | RALI 2006-QS3 [1] | ALT-A 2006 | 100.00% | $132,924 | | $132,924 |
| 539 | RALI 2006-QS3 [2] | ALT-A 2006 | 100.00% | $168,397 | | $168,397 |
| 540 | RALI 2006-QS4 [Total] | ALT-A 2006 | 100.00% | $215,106 | | $215,106 |
| 541 | RALI 2006-QS5 [Total] | ALT-A 2006 | 100.00% | $210,158 | | $210,158 |
| 542 | RALI 2006-QS6 [1] | ALT-A 2006 | 100.00% | $227,700 | | $227,700 |
| 543 | RALI 2006-QS6 [2] | ALT-A 2006 | 100.00% | $32,287 | | $32,287 |
| 544 | RALI 2006-QS7 [Total] | ALT-A 2006 | 100.00% | $190,078 | | $190,078 |
| 545 | RALI 2006-QS8 [Total] | ALT-A 2006 | 100.00% | $361,089 | | $361,089 |
| 546 | RALI 2006-QS9 [1] | ALT-A 2006 | 100.00% | $146,480 | | $146,480 |
| 547 | RALI 2006-QS9 [2] | ALT-A 2006 | 100.00% | $37,247 | | $37,247 |
| 548 | RALI 2007-QA1 [Total] | ALT-A 2007 | 100.00% | $200,937 | | $200,937 |
| 549 | RALI 2007-QA2 [Total] | ALT-A 2007 | 100.00% | $186,838 | | $186,838 |
| 550 | RALI 2007-QA3 [Total] | ALT-A 2007 | 100.00% | $498,890 | | $498,890 |
| 551 | RALI 2007-QA4 [Total] | ALT-A 2007 | 100.00% | $152,802 | | $152,802 |
| 552 | RALI 2007-QA5 [1] | ALT-A 2007 | 100.00% | $132,875 | | $132,875 |
| 553 | RALI 2007-QA5 [2] | ALT-A 2007 | 100.00% | $89,821 | | $89,821 |
| 554 | RALI 2007-QA5 [3] | ALT-A 2007 | 100.00% | $27,897 | | $27,897 |
| 555 | RALI 2007-QS1 [1] | ALT-A 2007 | 100.00% | $147,720 | | $147,720 |
| 556 | RALI 2007-QS1 [2] | ALT-A 2007 | 100.00% | $297,924 | | $297,924 |
| 557 | RALI 2007-QS10 [Total] | ALT-A 2007 | 100.00% | $173,468 | | $173,468 |
| 558 | RALI 2007-QS11 [Total] | ALT-A 2007 | 100.00% | $114,477 | | $114,477 |
| 559 | RALI 2007-QS2 [Total] | ALT-A 2007 | 100.00% | $215,179 | | $215,179 |
| 560 | RALI 2007-QS3 [Total] | ALT-A 2007 | 100.00% | $429,222 | | $429,222 |
| 561 | RALI 2007-QS4 [I] | ALT-A 2007 | 100.00% | $20,327 | | $20,327 |
| 562 | RALI 2007-QS4 [II] | ALT-A 2007 | 100.00% | $79,993 | | $79,993 |
| 563 | RALI 2007-QS4 [III] | ALT-A 2007 | 100.00% | $121,534 | | $121,534 |
| 564 | RALI 2007-QS4 [IV] | ALT-A 2007 | 100.00% | $21,489 | | $21,489 |
| 565 | RALI 2007-QS4 [V] | ALT-A 2007 | 100.00% | $36,469 | | $36,469 |
| 566 | RALI 2007-QS5 [Total] | ALT-A 2007 | 100.00% | $158,754 | | $158,754 |
| 567 | RALI 2007-QS6 [Total] | ALT-A 2007 | 100.00% | $295,237 | | $295,237 |
| 568 | RALI 2007-QS7 [Total] | ALT-A 2007 | 100.00% | $186,880 | | $186,880 |
| 569 | RALI 2007-QS7 [2] | ALT-A 2007 | 100.00% | $96,097 | | $96,097 |
| 570 | RALI 2007-QS8 [Total] | ALT-A 2007 | 100.00% | $234,889 | | $234,889 |
| 571 | RALI 2007-QS9 [Total] | ALT-A 2007 | 100.00% | $268,099 | | $268,099 |
| 572 | RAMP 2001-RS2 [1] | Subprime 2001 | 100.00% | $21,615 | | $21,615 |
| 573 | RAMP 2001-RS2 [2] | Subprime 2001 | 100.00% | $15,529 | | $15,529 |
| 574 | RAMP 2002-RS2 [1] | Subprime 2002 | 100.00% | $57,455 | AMBAC - Insurer Exception | $57,455 |
| 575 | RAMP 2002-RS2 [2] | Subprime 2002 | 100.00% | $11,582 | | $11,582 |
| 576 | RAMP 2002-RS3 [1] | Subprime 2002 | 100.00% | $66,644 | | $66,644 |
| 577 | RAMP 2002-RS3 [2] | Subprime 2002 | 100.00% | $21,774 | | $21,774 |

Schedule 15 - RFC Recognized Claims
Exhibit 7A-2 - Analyzed Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **RFC Servicer %** | **RFC Claim** | **Insurer** | **RFC Recognized Claim** |
| 578 | RAMP 2002-R22 [Total] | Subprime 2002 | 100.00% | $37,943 | | $37,943 |
| 579 | RAMP 2002-R23 [Total] | Subprime 2002 | 100.00% | $64,028 | | $64,028 |
| 580 | RAMP 2002-SL1 [1] | Subprime 2002 | 100.00% | $2,395 | | $2,395 |
| 581 | RAMP 2002-SL1 [2A] | Subprime 2002 | 100.00% | $68 | | $68 |
| 582 | RAMP 2002-SL1 [2B] | Subprime 2002 | 100.00% | $162 | | $162 |
| 583 | RAMP 2002-SL1 [2C] | Subprime 2002 | 100.00% | $404 | | $404 |
| 584 | RAMP 2002-SL1 [2D] | Subprime 2002 | 100.00% | $794 | | $794 |
| 585 | RAMP 2003-RS10 [1] | Subprime 2003 | 100.00% | $91,773 | | $91,773 |
| 586 | RAMP 2003-RS10 [2A] | Subprime 2003 | 100.00% | $131,465 | | $131,465 |
| 587 | RAMP 2003-RS10 [2B] | Subprime 2003 | 100.00% | $97,968 | | $97,968 |
| 588 | RAMP 2003-R57 [1] | Subprime 2003 | 100.00% | $146,858 | AMBAC - Insurer Exception | $146,858 |
| 589 | RAMP 2003-R57 [2A] | Subprime 2003 | 100.00% | $76,149 | | $76,149 |
| 590 | RAMP 2003-R57 [2B] | Subprime 2003 | 100.00% | $43,514 | | $43,514 |
| 591 | RAMP 2003-SL1 [1] | Subprime 2003 | 100.00% | $2,187 | | $2,187 |
| 592 | RAMP 2003-SL1 [2] | Subprime 2003 | 100.00% | $966 | | $966 |
| 593 | RAMP 2003-SL1 [3] | Subprime 2003 | 100.00% | $14,658 | | $14,658 |
| 594 | RAMP 2003-SL1 [4] | Subprime 2003 | 100.00% | $5,945 | | $5,945 |
| 595 | RAMP 2004-KR1 [1] | Subprime 2004 | 100.00% | $73,469 | | $73,469 |
| 596 | RAMP 2004-KR1 [2] | Subprime 2004 | 100.00% | $73,469 | | $73,469 |
| 597 | RAMP 2004-KR2 [1] | Subprime 2004 | 100.00% | $32,425 | | $32,425 |
| 598 | RAMP 2004-KR2 [2] | Subprime 2004 | 100.00% | $32,425 | | $32,425 |
| 599 | RAMP 2004-RS10 [1] | Subprime 2004 | 100.00% | $93,898 | | $93,898 |
| 600 | RAMP 2004-RS10 [2] | Subprime 2004 | 100.00% | $297,343 | | $297,343 |
| 601 | RAMP 2004-RS11 [A] | Subprime 2004 | 100.00% | $232,761 | | $232,761 |
| 602 | RAMP 2004-RS11 [F] | Subprime 2004 | 100.00% | $64,210 | | $64,210 |
| 603 | RAMP 2004-RS12 [1] | Subprime 2004 | 100.00% | $85,896 | | $85,896 |
| 604 | RAMP 2004-RS12 [2] | Subprime 2004 | 100.00% | $218,702 | | $218,702 |
| 605 | RAMP 2004-RS2 [1] | Subprime 2004 | 100.00% | $77,587 | | $77,587 |
| 606 | RAMP 2004-RS2 [2A] | Subprime 2004 | 100.00% | $108,621 | | $108,621 |
| 607 | RAMP 2004-RS2 [2B] | Subprime 2004 | 100.00% | $60,659 | | $60,659 |
| 608 | RAMP 2004-RS3 [1] | Subprime 2004 | 100.00% | $112,209 | | $112,209 |
| 609 | RAMP 2004-RS3 [2] | Subprime 2004 | 100.00% | $22,442 | | $22,442 |
| 610 | RAMP 2004-RS4 [1] | Subprime 2004 | 100.00% | $109,884 | | $109,884 |
| 611 | RAMP 2004-RS4 [2A] | Subprime 2004 | 100.00% | $96,148 | | $96,148 |
| 612 | RAMP 2004-RS4 [2B] | Subprime 2004 | 100.00% | $96,148 | | $96,148 |
| 613 | RAMP 2004-RS6 [1] | Subprime 2004 | 100.00% | $78,327 | | $78,327 |
| 614 | RAMP 2004-RS6 [2A] | Subprime 2004 | 100.00% | $136,738 | | $136,738 |
| 615 | RAMP 2004-RS6 [2B] | Subprime 2004 | 100.00% | $46,024 | | $46,024 |
| 616 | RAMP 2004-RS8 [1] | Subprime 2004 | 100.00% | $98,436 | | $98,436 |
| 617 | RAMP 2004-RS8 [2] | Subprime 2004 | 100.00% | $154,686 | | $154,686 |
| 618 | RAMP 2004-R21 [1] | Subprime 2004 | 100.00% | $49,836 | | $49,836 |
| 619 | RAMP 2004-R21 [2] | Subprime 2004 | 100.00% | $24,535 | | $24,535 |
| 620 | RAMP 2004-R23 [1] | Subprime 2004 | 100.00% | $25,473 | | $25,473 |
| 621 | RAMP 2004-R23 [2] | Subprime 2004 | 100.00% | $28,472 | | $28,472 |
| 622 | RAMP 2004-R24 [A] | Subprime 2004 | 100.00% | $23,415 | | $23,415 |
| 623 | RAMP 2004-R24 [F] | Subprime 2004 | 100.00% | $17,561 | | $17,561 |
| 624 | RAMP 2004-SL1 [EIGHT] | Subprime 2004 | 100.00% | $12,685 | | $12,685 |
| 625 | RAMP 2004-SL1 [FIVE] | Subprime 2004 | 100.00% | $3,050 | | $3,050 |

Case 14-cv-03039-GBD   Document 51-1   Filed 11/06/14   Page 286 of 398

Schedule 15 to 23 Recognized Claims
15-18 Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 626 | RAMP 2004-SL1 [FOUR] | Subprime 2004 | 100.00% | $4,674 | | $4,674 |
| 627 | RAMP 2004-SL1 [NINE] | Subprime 2004 | 100.00% | $2,088 | | $2,088 |
| 628 | RAMP 2004-SL1 [ONE] | Subprime 2004 | 100.00% | $11,185 | | $11,185 |
| 629 | RAMP 2004-SL1 [SEVEN] | Subprime 2004 | 100.00% | $15,639 | | $15,639 |
| 630 | RAMP 2004-SL1 [SIX] | Subprime 2004 | 100.00% | $1,682 | | $1,682 |
| 631 | RAMP 2004-SL1 [THREE] | Subprime 2004 | 100.00% | $2,843 | | $2,843 |
| 632 | RAMP 2004-SL1 [TWO] | Subprime 2004 | 100.00% | $422 | | $422 |
| 633 | RAMP 2004-SL2 [1] | Subprime 2004 | 100.00% | $9,169 | | $9,169 |
| 634 | RAMP 2004-SL2 [2] | Subprime 2004 | 100.00% | $8,752 | | $8,752 |
| 635 | RAMP 2004-SL2 [3] | Subprime 2004 | 100.00% | $14,170 | | $14,170 |
| 636 | RAMP 2004-SL2 [4] | Subprime 2004 | 100.00% | $9,762 | | $9,762 |
| 637 | RAMP 2004-SL3 [1] | Subprime 2004 | 100.00% | $2,569 | | $2,569 |
| 638 | RAMP 2004-SL3 [2] | Subprime 2004 | 100.00% | $6,155 | | $6,155 |
| 639 | RAMP 2004-SL3 [3] | Subprime 2004 | 100.00% | $4,272 | | $4,272 |
| 640 | RAMP 2004-SL3 [4] | Subprime 2004 | 100.00% | $3,444 | | $3,444 |
| 641 | RAMP 2004-SL4 [1] | Subprime 2004 | 100.00% | $2,670 | | $2,670 |
| 642 | RAMP 2004-SL4 [2] | Subprime 2004 | 100.00% | $1,433 | | $1,433 |
| 643 | RAMP 2004-SL4 [3] | Subprime 2004 | 100.00% | $3,831 | | $3,831 |
| 644 | RAMP 2004-SL4 [4] | Subprime 2004 | 100.00% | $2,384 | | $2,384 |
| 645 | RAMP 2004-SL4 [5] | Subprime 2004 | 100.00% | $1,969 | | $1,969 |
| 646 | RAMP 2005-EFC1 [1A] | Subprime 2005 | 100.00% | $164,391 | | $164,391 |
| 647 | RAMP 2005-EFC1 [1F] | Subprime 2005 | 100.00% | $16,872 | | $16,872 |
| 648 | RAMP 2005-EFC1 [2A] | Subprime 2005 | 100.00% | $134,891 | | $134,891 |
| 649 | RAMP 2005-EFC1 [2F] | Subprime 2005 | 100.00% | $22,233 | | $22,233 |
| 650 | RAMP 2005-EFC2 [A] | Subprime 2005 | 100.00% | $230,103 | | $230,103 |
| 651 | RAMP 2005-EFC2 [F] | Subprime 2005 | 100.00% | $30,031 | | $30,031 |
| 652 | RAMP 2005-EFC3 [1A] | Subprime 2005 | 100.00% | $133,739 | | $133,739 |
| 653 | RAMP 2005-EFC3 [1F] | Subprime 2005 | 100.00% | $9,524 | | $9,524 |
| 654 | RAMP 2005-EFC3 [2A] | Subprime 2005 | 100.00% | $116,027 | | $116,027 |
| 655 | RAMP 2005-EFC3 [2F] | Subprime 2005 | 100.00% | $26,977 | | $26,977 |
| 656 | RAMP 2005-EFC4 [A] | Subprime 2005 | 100.00% | $252,917 | | $252,917 |
| 657 | RAMP 2005-EFC4 [F] | Subprime 2005 | 100.00% | $39,713 | | $39,713 |
| 658 | RAMP 2005-EFC5 [A] | Subprime 2005 | 100.00% | $237,531 | | $237,531 |
| 659 | RAMP 2005-EFC5 [F] | Subprime 2005 | 100.00% | $34,431 | | $34,431 |
| 660 | RAMP 2005-EFC6 [1A] | Subprime 2005 | 100.00% | $171,337 | | $171,337 |
| 661 | RAMP 2005-EFC6 [1F] | Subprime 2005 | 100.00% | $27,454 | | $27,454 |
| 662 | RAMP 2005-EFC6 [2A] | Subprime 2005 | 100.00% | $77,262 | | $77,262 |
| 663 | RAMP 2005-EFC6 [2F] | Subprime 2005 | 100.00% | $9,811 | | $9,811 |
| 664 | RAMP 2005-RS1 [1] | Subprime 2005 | 100.00% | $78,713 | | $78,713 |
| 665 | RAMP 2005-RS1 [2] | Subprime 2005 | 100.00% | $228,267 | | $228,267 |
| 666 | RAMP 2005-RS2 [1A] | Subprime 2005 | 100.00% | $148,280 | | $148,280 |
| 667 | RAMP 2005-RS2 [1F] | Subprime 2005 | 100.00% | $26,389 | | $26,389 |
| 668 | RAMP 2005-RS2 [2A] | Subprime 2005 | 100.00% | $52,018 | | $52,018 |
| 669 | RAMP 2005-RS2 [2F] | Subprime 2005 | 100.00% | $15,340 | | $15,340 |
| 670 | RAMP 2005-RS3 [1AA] | Subprime 2005 | 100.00% | $64,787 | | $64,787 |
| 671 | RAMP 2005-RS3 [1AF] | Subprime 2005 | 100.00% | $31,216 | | $31,216 |
| 672 | RAMP 2005-RS3 [1BA] | Subprime 2005 | 100.00% | $77,094 | | $77,094 |
| 673 | RAMP 2005-RS3 [1BF] | Subprime 2005 | 100.00% | $18,895 | | $18,895 |

Case 14-cv-03039-GBD    Document 15-1    Filed 01/06/14    Page 287 of 355
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26

Schedule 1 - RFC Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 674 | RAMP 2005-RS3  [2] | Subprime 2005 | 100.00% | $34,268 | | $34,268 |
| 675 | RAMP 2005-RS4  [A] | Subprime 2005 | 100.00% | $137,203 | | $137,203 |
| 676 | RAMP 2005-RS4  [F] | Subprime 2005 | 100.00% | $38,056 | | $38,056 |
| 677 | RAMP 2005-RS5  [1A] | Subprime 2005 | 100.00% | $54,047 | | $54,047 |
| 678 | RAMP 2005-RS5  [1F] | Subprime 2005 | 100.00% | $14,969 | | $14,969 |
| 679 | RAMP 2005-RS5  [2A] | Subprime 2005 | 100.00% | $59,064 | | $59,064 |
| 680 | RAMP 2005-RS5  [2F] | Subprime 2005 | 100.00% | $9,870 | | $9,870 |
| 681 | RAMP 2005-RS6  [1A] | Subprime 2005 | 100.00% | $174,589 | | $174,589 |
| 682 | RAMP 2005-RS6  [1F] | Subprime 2005 | 100.00% | $40,256 | | $40,256 |
| 683 | RAMP 2005-RS6  [2A] | Subprime 2005 | 100.00% | $143,721 | | $143,721 |
| 684 | RAMP 2005-RS6  [2F] | Subprime 2005 | 100.00% | $27,221 | | $27,221 |
| 685 | RAMP 2005-RS7  [A] | Subprime 2005 | 100.00% | $111,079 | | $111,079 |
| 686 | RAMP 2005-RS7  [F] | Subprime 2005 | 100.00% | $71,988 | | $71,988 |
| 687 | RAMP 2005-RS8  [AGS] | Subprime 2005 | 100.00% | $51,002 | | $51,002 |
| 688 | RAMP 2005-RS8  [ALS] | Subprime 2005 | 100.00% | $151,716 | | $151,716 |
| 689 | RAMP 2005-RS8  [F] | Subprime 2005 | 100.00% | $68,419 | | $68,419 |
| 690 | RAMP 2005-R21  [A] | Subprime 2005 | 100.00% | $20,873 | | $20,873 |
| 691 | RAMP 2005-R21  [F] | Subprime 2005 | 100.00% | $11,095 | | $11,095 |
| 692 | RAMP 2005-R22  [1A] | Subprime 2005 | 100.00% | $38,097 | | $38,097 |
| 693 | RAMP 2005-R22  [1F] | Subprime 2005 | 100.00% | $9,124 | | $9,124 |
| 694 | RAMP 2005-R22  [2A] | Subprime 2005 | 100.00% | $37,976 | | $37,976 |
| 695 | RAMP 2005-R22  [2F] | Subprime 2005 | 100.00% | $9,245 | | $9,245 |
| 696 | RAMP 2005-R23  [A] | Subprime 2005 | 100.00% | $109,061 | | $109,061 |
| 697 | RAMP 2005-R23  [F] | Subprime 2005 | 100.00% | $28,535 | | $28,535 |
| 698 | RAMP 2005-R24  [A] | Subprime 2005 | 100.00% | $95,731 | | $95,731 |
| 699 | RAMP 2005-R24  [F] | Subprime 2005 | 100.00% | $29,128 | | $29,128 |
| 700 | RAMP 2005-SL1  [1] | ALT-A 2005 | 100.00% | $2,852 | | $2,852 |
| 701 | RAMP 2005-SL1  [2] | ALT-A 2005 | 100.00% | $2,132 | | $2,132 |
| 702 | RAMP 2005-SL1  [3] | ALT-A 2005 | 100.00% | $3,080 | | $3,080 |
| 703 | RAMP 2005-SL1  [4] | ALT-A 2005 | 100.00% | $5,776 | | $5,776 |
| 704 | RAMP 2005-SL1  [5] | ALT-A 2005 | 100.00% | $5,307 | | $5,307 |
| 705 | RAMP 2005-SL1  [6] | ALT-A 2005 | 100.00% | $2,638 | | $2,638 |
| 706 | RAMP 2005-SL1  [7] | ALT-A 2005 | 100.00% | $9,567 | | $9,567 |
| 707 | RAMP 2005-SL2  [1] | ALT-A 2005 | 100.00% | $6,333 | | $6,333 |
| 708 | RAMP 2005-SL2  [2] | ALT-A 2005 | 100.00% | $4,513 | | $4,513 |
| 709 | RAMP 2005-SL2  [3] | ALT-A 2005 | 100.00% | $5,386 | | $5,386 |
| 710 | RAMP 2005-SL2  [4] | ALT-A 2005 | 100.00% | $6,347 | | $6,347 |
| 711 | RAMP 2005-SL2  [5] | ALT-A 2005 | 100.00% | $4,940 | | $4,940 |
| 712 | RAMP 2006-EFC1  [A] | Subprime 2006 | 100.00% | $217,597 | | $217,597 |
| 713 | RAMP 2006-EFC1  [F] | Subprime 2006 | 100.00% | $48,157 | | $48,157 |
| 714 | RAMP 2006-EFC2  [A] | Subprime 2006 | 100.00% | $138,253 | | $138,253 |
| 715 | RAMP 2006-EFC2  [F] | Subprime 2006 | 100.00% | $48,326 | | $48,326 |
| 716 | RAMP 2006-NC1  [A] | Subprime 2006 | 100.00% | $264,068 | | $264,068 |
| 717 | RAMP 2006-NC1  [F] | Subprime 2006 | 100.00% | $66,452 | | $66,452 |
| 718 | RAMP 2006-NC2  [A] | Subprime 2006 | 100.00% | $416,395 | | $416,395 |
| 719 | RAMP 2006-NC2  [F] | Subprime 2006 | 100.00% | $118,081 | | $118,081 |
| 720 | RAMP 2006-NC3  [A] | Subprime 2006 | 100.00% | $304,157 | | $304,157 |
| 721 | RAMP 2006-NC3  [F] | Subprime 2006 | 100.00% | $92,153 | | $92,153 |

Schedule 15.1 - RFC Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 722 | RAMP 2006-RS1 [1A] | Subprime 2006 | 100.00% | $274,903 | | $274,903 |
| 723 | RAMP 2006-RS1 [1F] | Subprime 2006 | 100.00% | $105,388 | | $105,388 |
| 724 | RAMP 2006-RS1 [2A] | Subprime 2006 | 100.00% | $211,218 | | $211,218 |
| 725 | RAMP 2006-RS1 [2F] | Subprime 2006 | 100.00% | $36,137 | | $36,137 |
| 726 | RAMP 2006-RS2 [A] | Subprime 2006 | 100.00% | $257,572 | | $257,572 |
| 727 | RAMP 2006-RS2 [F] | Subprime 2006 | 100.00% | $175,057 | | $175,057 |
| 728 | RAMP 2006-RS3 [A] | Subprime 2006 | 100.00% | $162,773 | MGIC (Pool Policy) | $162,773 |
| 729 | RAMP 2006-RS3 [F] | Subprime 2006 | 100.00% | $303,169 | MGIC (Pool Policy) | $303,169 |
| 730 | RAMP 2006-RS4 [A] | Subprime 2006 | 100.00% | $411,722 | | $411,722 |
| 731 | RAMP 2006-RS4 [F] | Subprime 2006 | 100.00% | $163,369 | | $163,369 |
| 732 | RAMP 2006-RS5 [A] | Subprime 2006 | 100.00% | $94,564 | | $94,564 |
| 733 | RAMP 2006-RS5 [F] | Subprime 2006 | 100.00% | $136,345 | | $136,345 |
| 734 | RAMP 2006-RS6 [A] | Subprime 2006 | 100.00% | $171,851 | | $171,851 |
| 735 | RAMP 2006-RS6 [F] | Subprime 2006 | 100.00% | $72,924 | | $72,924 |
| 736 | RAMP 2006-R21 [A] | Subprime 2006 | 100.00% | $125,774 | | $125,774 |
| 737 | RAMP 2006-R21 [F] | Subprime 2006 | 100.00% | $40,660 | | $40,660 |
| 738 | RAMP 2006-R22 [A] | Subprime 2006 | 100.00% | $131,467 | | $131,467 |
| 739 | RAMP 2006-R22 [F] | Subprime 2006 | 100.00% | $34,394 | | $34,394 |
| 740 | RAMP 2006-R23 [A] | Subprime 2006 | 100.00% | $316,280 | | $316,280 |
| 741 | RAMP 2006-R23 [F] | Subprime 2006 | 100.00% | $76,134 | | $76,134 |
| 742 | RAMP 2006-R24 [A] | Subprime 2006 | 100.00% | $366,180 | | $366,180 |
| 743 | RAMP 2006-R24 [F] | Subprime 2006 | 100.00% | $100,162 | | $100,162 |
| 744 | RAMP 2006-R25 [A] | Subprime 2006 | 100.00% | $149,305 | | $149,305 |
| 745 | RAMP 2006-R25 [F] | Subprime 2006 | 100.00% | $67,874 | | $67,874 |
| 746 | RAMP 2007-RS1 [A] | Subprime 2007 | 100.00% | $75,482 | | $75,482 |
| 747 | RAMP 2007-RS1 [F] | Subprime 2007 | 100.00% | $251,112 | | $251,112 |
| 748 | RAMP 2007-RS2 [A] | Subprime 2007 | 100.00% | $132,959 | | $132,959 |
| 749 | RAMP 2007-RS2 [F] | Subprime 2007 | 100.00% | $98,983 | | $98,983 |
| 750 | RAMP 2007-R21 [A] | Subprime 2007 | 100.00% | $106,841 | | $106,841 |
| 751 | RAMP 2007-R21 [F] | Subprime 2007 | 100.00% | $44,384 | | $44,384 |
| 752 | RASC 2001-KS2 [1] | Subprime 2001 | 100.00% | $196,734 | | $196,734 |
| 753 | RASC 2001-KS2 [2] | Subprime 2001 | 100.00% | $136,621 | | $136,621 |
| 754 | RASC 2001-KS3 [1] | Subprime 2001 | 100.00% | $181,802 | | $181,802 |
| 755 | RASC 2001-KS3 [2] | Subprime 2001 | 100.00% | $245,968 | | $245,968 |
| 756 | RASC 2002-KS2 [1] | Subprime 2002 | 100.00% | $69,572 | | $69,572 |
| 757 | RASC 2002-KS2 [2A] | Subprime 2002 | 100.00% | $85,384 | | $85,384 |
| 758 | RASC 2002-KS2 [2B] | Subprime 2002 | 100.00% | $85,384 | | $85,384 |
| 759 | RASC 2003-KS10 [1] | Subprime 2003 | 100.00% | $72,659 | | $72,659 |
| 760 | RASC 2003-KS10 [2A] | Subprime 2003 | 100.00% | $64,344 | | $64,344 |
| 761 | RASC 2003-KS10 [2B] | Subprime 2003 | 100.00% | $64,347 | | $64,347 |
| 762 | RASC 2003-KS11 [1] | Subprime 2003 | 100.00% | $76,132 | | $76,132 |
| 763 | RASC 2003-KS11 [2A] | Subprime 2003 | 100.00% | $99,923 | | $99,923 |
| 764 | RASC 2003-KS11 [2B] | Subprime 2003 | 100.00% | $118,956 | | $118,956 |
| 765 | RASC 2003-KS2 [1] | Subprime 2003 | 100.00% | $271,127 | | $271,127 |
| 766 | RASC 2003-KS2 [2A] | Subprime 2003 | 100.00% | $30,707 | | $30,707 |
| 767 | RASC 2003-KS2 [2B] | Subprime 2003 | 100.00% | $28,655 | | $28,655 |
| 768 | RASC 2003-KS3 [1] | Subprime 2003 | 100.00% | $52,600 | | $52,600 |
| 769 | RASC 2003-KS3 [2] | Subprime 2003 | 100.00% | $52,600 | | $52,600 |

Case 14-cv-03039-CBD    Document 151-1    Filed 11/06/14    Page 289 of 395

Schedule 1 - RFC Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **RFC Servicer %** | **RFC Claim** | **Insurer** | **RFC Recognized Claim** |
| 770 | RASC 2003-KS6 [1] | Subprime 2003 | 100.00% | $80,951 | | $80,951 |
| 771 | RASC 2003-KS6 [2] | Subprime 2003 | 100.00% | $39,889 | | $39,889 |
| 772 | RASC 2003-KS7 [1] | Subprime 2003 | 100.00% | $108,714 | | $108,714 |
| 773 | RASC 2003-KS7 [2A] | Subprime 2003 | 100.00% | $65,978 | | $65,978 |
| 774 | RASC 2003-KS7 [2B] | Subprime 2003 | 100.00% | $50,233 | | $50,233 |
| 775 | RASC 2003-KS8 [1] | Subprime 2003 | 100.00% | $54,952 | | $54,952 |
| 776 | RASC 2003-KS8 [2A] | Subprime 2003 | 100.00% | $51,575 | | $51,575 |
| 777 | RASC 2003-KS8 [2B] | Subprime 2003 | 100.00% | $51,575 | | $51,575 |
| 778 | RASC 2004-KS1 [1] | Subprime 2003 | 100.00% | $56,396 | | $56,396 |
| 779 | RASC 2004-KS1 [2A] | Subprime 2004 | 100.00% | $61,095 | | $61,095 |
| 780 | RASC 2004-KS1 [2B] | Subprime 2004 | 100.00% | $61,095 | | $61,095 |
| 781 | RASC 2004-KS10 [1A] | Subprime 2004 | 100.00% | $68,085 | | $68,085 |
| 782 | RASC 2004-KS10 [1F] | Subprime 2004 | 100.00% | $16,601 | | $16,601 |
| 783 | RASC 2004-KS10 [2A] | Subprime 2004 | 100.00% | $160,148 | | $160,148 |
| 784 | RASC 2004-KS10 [2F] | Subprime 2004 | 100.00% | $16,004 | | $16,004 |
| 785 | RASC 2004-KS11 [1A] | Subprime 2004 | 100.00% | $83,960 | | $83,960 |
| 786 | RASC 2004-KS11 [1F] | Subprime 2004 | 100.00% | $5,570 | | $5,570 |
| 787 | RASC 2004-KS11 [2A] | Subprime 2004 | 100.00% | $82,310 | | $82,310 |
| 788 | RASC 2004-KS11 [2F] | Subprime 2004 | 100.00% | $7,220 | | $7,220 |
| 789 | RASC 2004-KS12 [1A] | Subprime 2004 | 100.00% | $60,737 | | $60,737 |
| 790 | RASC 2004-KS12 [1F] | Subprime 2004 | 100.00% | $6,182 | | $6,182 |
| 791 | RASC 2004-KS12 [2A] | Subprime 2004 | 100.00% | $60,933 | | $60,933 |
| 792 | RASC 2004-KS12 [2F] | Subprime 2004 | 100.00% | $5,985 | | $5,985 |
| 793 | RASC 2004-KS2 [1] | Subprime 2004 | 100.00% | $61,126 | | $61,126 |
| 794 | RASC 2004-KS2 [2A] | Subprime 2004 | 100.00% | $73,769 | | $73,769 |
| 795 | RASC 2004-KS2 [2B] | Subprime 2004 | 100.00% | $73,777 | | $73,777 |
| 796 | RASC 2004-KS3 [1] | Subprime 2004 | 100.00% | $44,340 | | $44,340 |
| 797 | RASC 2004-KS3 [2A] | Subprime 2004 | 100.00% | $52,653 | | $52,653 |
| 798 | RASC 2004-KS3 [2B] | Subprime 2004 | 100.00% | $52,653 | | $52,653 |
| 799 | RASC 2004-KS5 [1] | Subprime 2004 | 100.00% | $62,989 | | $62,989 |
| 800 | RASC 2004-KS5 [2A] | Subprime 2004 | 100.00% | $91,859 | | $91,859 |
| 801 | RASC 2004-KS5 [2B] | Subprime 2004 | 100.00% | $91,859 | | $91,859 |
| 802 | RASC 2004-KS6 [1] | Subprime 2004 | 100.00% | $44,587 | | $44,587 |
| 803 | RASC 2004-KS6 [2A] | Subprime 2004 | 100.00% | $89,175 | | $89,175 |
| 804 | RASC 2004-KS6 [2B] | Subprime 2004 | 100.00% | $89,175 | | $89,175 |
| 805 | RASC 2004-KS8 [1] | Subprime 2004 | 100.00% | $42,743 | | $42,743 |
| 806 | RASC 2004-KS8 [2] | Subprime 2004 | 100.00% | $85,486 | | $85,486 |
| 807 | RASC 2005-AHL1 [A] | Subprime 2005 | 100.00% | $268,024 | | $268,024 |
| 808 | RASC 2005-AHL1 [F] | Subprime 2005 | 100.00% | $8,421 | | $8,421 |
| 809 | RASC 2005-AHL2 [A] | Subprime 2005 | 100.00% | $231,159 | | $231,159 |
| 810 | RASC 2005-AHL2 [F] | Subprime 2005 | 100.00% | $49,897 | | $49,897 |
| 811 | RASC 2005-AHL3 [A] | Subprime 2005 | 100.00% | $289,550 | | $289,550 |
| 812 | RASC 2005-AHL3 [F] | Subprime 2005 | 100.00% | $56,710 | | $56,710 |
| 813 | RASC 2005-EMX1 [1A] | Subprime 2005 | 100.00% | $60,049 | | $60,049 |
| 814 | RASC 2005-EMX1 [1F] | Subprime 2005 | 100.00% | $22,817 | | $22,817 |
| 815 | RASC 2005-EMX1 [2A] | Subprime 2005 | 100.00% | $66,320 | | $66,320 |
| 816 | RASC 2005-EMX1 [2F] | Subprime 2005 | 100.00% | $16,545 | | $16,545 |
| 817 | RASC 2005-EMX2 [A] | Subprime 2005 | 100.00% | $145,895 | | $145,895 |

Schedule 2 to RFC Recognized Claims
Exhibit A to Disclosure Statement
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 818 | RASC 2005-EMX2 [F] | Subprime 2005 | 100.00% | $49,289 | | $49,289 |
| 819 | RASC 2005-EMX3 [1A] | Subprime 2005 | 100.00% | $117,266 | | $117,266 |
| 820 | RASC 2005-EMX3 [1F] | Subprime 2005 | 100.00% | $23,601 | | $23,601 |
| 821 | RASC 2005-EMX3 [2A] | Subprime 2005 | 100.00% | $112,690 | | $112,690 |
| 822 | RASC 2005-EMX3 [2F] | Subprime 2005 | 100.00% | $28,078 | | $28,078 |
| 823 | RASC 2005-EMX4 [A] | Subprime 2005 | 100.00% | $198,256 | | $198,256 |
| 824 | RASC 2005-EMX4 [F] | Subprime 2005 | 100.00% | $44,244 | | $44,244 |
| 825 | RASC 2005-KS1 [1A] | Subprime 2005 | 100.00% | $172,606 | | $172,606 |
| 826 | RASC 2005-KS1 [1F] | Subprime 2005 | 100.00% | $21,576 | | $21,576 |
| 827 | RASC 2005-KS10 [1A] | Subprime 2005 | 100.00% | $283,412 | | $283,412 |
| 828 | RASC 2005-KS10 [1F] | Subprime 2005 | 100.00% | $41,742 | | $41,742 |
| 829 | RASC 2005-KS10 [2A] | Subprime 2005 | 100.00% | $232,734 | | $232,734 |
| 830 | RASC 2005-KS10 [2F] | Subprime 2005 | 100.00% | $57,850 | | $57,850 |
| 831 | RASC 2005-KS11 [1A] | Subprime 2005 | 100.00% | $262,312 | | $262,312 |
| 832 | RASC 2005-KS11 [1F] | Subprime 2005 | 100.00% | $59,551 | | $59,551 |
| 833 | RASC 2005-KS11 [2A] | Subprime 2005 | 100.00% | $252,943 | | $252,943 |
| 834 | RASC 2005-KS11 [2F] | Subprime 2005 | 100.00% | $68,663 | | $68,663 |
| 835 | RASC 2005-KS12 [A] | Subprime 2005 | 100.00% | $412,050 | | $412,050 |
| 836 | RASC 2005-KS12 [F] | Subprime 2005 | 100.00% | $85,476 | | $85,476 |
| 837 | RASC 2005-KS2 [1A] | Subprime 2005 | 100.00% | $73,765 | | $73,765 |
| 838 | RASC 2005-KS2 [1F] | Subprime 2005 | 100.00% | $7,044 | | $7,044 |
| 839 | RASC 2005-KS2 [2A] | Subprime 2005 | 100.00% | $73,232 | | $73,232 |
| 840 | RASC 2005-KS2 [2F] | Subprime 2005 | 100.00% | $7,677 | | $7,677 |
| 841 | RASC 2005-KS3 [A] | Subprime 2005 | 100.00% | $106,613 | | $106,613 |
| 842 | RASC 2005-KS3 [F] | Subprime 2005 | 100.00% | $15,891 | | $15,891 |
| 843 | RASC 2005-KS4 [A] | Subprime 2005 | 100.00% | $99,409 | | $99,409 |
| 844 | RASC 2005-KS4 [F] | Subprime 2005 | 100.00% | $19,197 | | $19,197 |
| 845 | RASC 2005-KS5 [A] | Subprime 2005 | 100.00% | $114,929 | | $114,929 |
| 846 | RASC 2005-KS5 [F] | Subprime 2005 | 100.00% | $19,064 | | $19,064 |
| 847 | RASC 2005-KS6 [A] | Subprime 2005 | 100.00% | $190,993 | | $190,993 |
| 848 | RASC 2005-KS6 [F] | Subprime 2005 | 100.00% | $29,500 | | $29,500 |
| 849 | RASC 2005-KS7 [A] | Subprime 2005 | 100.00% | $134,859 | | $134,859 |
| 850 | RASC 2005-KS7 [F] | Subprime 2005 | 100.00% | $20,615 | | $20,615 |
| 851 | RASC 2005-KS8 [F] | Subprime 2005 | 100.00% | $433,780 | | $433,780 |
| 852 | RASC 2005-KS8 [F] | Subprime 2005 | 100.00% | $95,983 | | $95,983 |
| 853 | RASC 2005-KS9 [A] | Subprime 2005 | 100.00% | $149,113 | | $149,113 |
| 854 | RASC 2005-KS9 [F] | Subprime 2005 | 100.00% | $34,593 | | $34,593 |
| 855 | RASC 2006-EMX1 [A] | Subprime 2006 | 100.00% | $179,723 | | $179,723 |
| 856 | RASC 2006-EMX1 [F] | Subprime 2006 | 100.00% | $49,944 | | $49,944 |
| 857 | RASC 2006-EMX2 [A] | Subprime 2006 | 100.00% | $289,024 | | $289,024 |
| 858 | RASC 2006-EMX2 [F] | Subprime 2006 | 100.00% | $63,771 | | $63,771 |
| 859 | RASC 2006-EMX3 [1A] | Subprime 2006 | 100.00% | $425,144 | | $425,144 |
| 860 | RASC 2006-EMX3 [1F] | Subprime 2006 | 100.00% | $112,059 | | $112,059 |
| 861 | RASC 2006-EMX4 [1A] | Subprime 2006 | 100.00% | $393,736 | | $393,736 |
| 862 | RASC 2006-EMX4 [1F] | Subprime 2006 | 100.00% | $107,743 | | $107,743 |
| 863 | RASC 2006-EMX5 [A] | Subprime 2006 | 100.00% | $347,207 | | $347,207 |
| 864 | RASC 2006-EMX5 [F] | Subprime 2006 | 100.00% | $105,778 | | $105,778 |
| 865 | RASC 2006-EMX6 [A] | Subprime 2006 | 100.00% | $450,853 | | $450,853 |

Schedule 15-R: Recovery of Future Claims
15-R-1 (Subprime)
Subject to Further Review and Due Diligence

|  | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 866 | RASC 2006-EMX6  [F] | Subprime 2006 | 100.00% | $109,358 | | $109,358 |
| 867 | RASC 2006-EMX7  [A] | Subprime 2006 | 100.00% | $346,669 | | $346,669 |
| 868 | RASC 2006-EMX7  [F] | Subprime 2006 | 100.00% | $94,414 | | $94,414 |
| 869 | RASC 2006-EMX8  [1A] | Subprime 2006 | 100.00% | $311,775 | | $311,775 |
| 870 | RASC 2006-EMX8  [1F] | Subprime 2006 | 100.00% | $89,584 | | $89,584 |
| 871 | RASC 2006-EMX8  [2A] | Subprime 2006 | 100.00% | $233,249 | | $233,249 |
| 872 | RASC 2006-EMX8  [2F] | Subprime 2006 | 100.00% | $63,931 | | $63,931 |
| 873 | RASC 2006-EMX9  [1A] | Subprime 2006 | 100.00% | $424,201 | | $424,201 |
| 874 | RASC 2006-EMX9  [1F] | Subprime 2006 | 100.00% | $86,596 | | $86,596 |
| 875 | RASC 2006-EMX9  [2A] | Subprime 2006 | 100.00% | $241,378 | | $241,378 |
| 876 | RASC 2006-EMX9  [2F] | Subprime 2006 | 100.00% | $44,896 | | $44,896 |
| 877 | RASC 2006-KS1  [A] | Subprime 2006 | 100.00% | $335,863 | | $335,863 |
| 878 | RASC 2006-KS1  [F] | Subprime 2006 | 100.00% | $61,498 | | $61,498 |
| 879 | RASC 2006-KS2  [A] | Subprime 2006 | 100.00% | $388,000 | | $388,000 |
| 880 | RASC 2006-KS2  [F] | Subprime 2006 | 100.00% | $68,378 | | $68,378 |
| 881 | RASC 2006-KS3  [1A] | Subprime 2006 | 100.00% | $368,298 | | $368,298 |
| 882 | RASC 2006-KS3  [1F] | Subprime 2006 | 100.00% | $95,541 | | $95,541 |
| 883 | RASC 2006-KS3  [2A] | Subprime 2006 | 100.00% | $144,739 | | $144,739 |
| 884 | RASC 2006-KS3  [2F] | Subprime 2006 | 100.00% | $19,739 | | $19,739 |
| 885 | RASC 2006-KS4  [A] | Subprime 2006 | 100.00% | $313,088 | | $313,088 |
| 886 | RASC 2006-KS4  [F] | Subprime 2006 | 100.00% | $49,029 | | $49,029 |
| 887 | RASC 2006-KS5  [A] | Subprime 2006 | 100.00% | $231,631 | | $231,631 |
| 888 | RASC 2006-KS5  [F] | Subprime 2006 | 100.00% | $104,295 | | $104,295 |
| 889 | RASC 2006-KS6  [A] | Subprime 2006 | 100.00% | $213,563 | | $213,563 |
| 890 | RASC 2006-KS6  [F] | Subprime 2006 | 100.00% | $69,188 | | $69,188 |
| 891 | RASC 2006-KS7  [A] | Subprime 2006 | 100.00% | $226,903 | | $226,903 |
| 892 | RASC 2006-KS7  [F] | Subprime 2006 | 100.00% | $61,311 | | $61,311 |
| 893 | RASC 2006-KS8  [A] | Subprime 2006 | 100.00% | $246,561 | | $246,561 |
| 894 | RASC 2006-KS8  [F] | Subprime 2006 | 100.00% | $96,075 | | $96,075 |
| 895 | RASC 2006-KS9  [1A] | Subprime 2006 | 100.00% | $557,639 | | $557,639 |
| 896 | RASC 2006-KS9  [1F] | Subprime 2006 | 100.00% | $201,023 | | $201,023 |
| 897 | RASC 2006-KS9  [2A] | Subprime 2006 | 100.00% | $112,480 | | $112,480 |
| 898 | RASC 2006-KS9  [2F] | Subprime 2006 | 100.00% | $30,256 | | $30,256 |
| 899 | RASC 2007-KS1  [A] | Subprime 2007 | 100.00% | $159,029 | | $159,029 |
| 900 | RASC 2007-KS1  [F] | Subprime 2007 | 100.00% | $64,691 | | $64,691 |
| 901 | RASC 2007-KS2  [1A] | Subprime 2007 | 100.00% | $362,163 | | $362,163 |
| 902 | RASC 2007-KS2  [1F] | Subprime 2007 | 100.00% | $128,843 | | $128,843 |
| 903 | RASC 2007-KS2  [2A] | Subprime 2007 | 100.00% | $111,776 | | $111,776 |
| 904 | RASC 2007-KS2  [2F] | Subprime 2007 | 100.00% | $24,658 | | $24,658 |
| 905 | RASC 2007-KS3  [1A] | Subprime 2007 | 100.00% | $517,135 | | $517,135 |
| 906 | RASC 2007-KS3  [1F] | Subprime 2007 | 100.00% | $209,640 | | $209,640 |
| 907 | RASC 2007-KS3  [2A] | Subprime 2007 | 100.00% | $112,899 | | $112,899 |
| 908 | RASC 2007-KS3  [2F] | Subprime 2007 | 100.00% | $30,917 | | $30,917 |
| 909 | RASC 2007-KS4  [A] | Subprime 2007 | 100.00% | $107,572 | | $107,572 |
| 910 | RASC 2007-KS4  [F] | Subprime 2007 | 100.00% | $40,347 | | $40,347 |
| 911 | RFMS1 1998-H2  [Total] | CES 1999 | 100.00% | $19,931 | | $19,931 |
| 912 | RFMS2 2002-H4  [Total] | Second Lien 2002 | 100.00% | $30,885 | | $30,885 |
| 913 | RFMS2 2002-HI5  [Total] | Second Lien 2003 | 100.00% | $34,176 | | $34,176 |

Schedule 15-1.1c - Recognized Cured Claims
(U.S. dollars)
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 914 | RFMS2 2002-HS1 [Total] | CES 2002 | 100.00% | $2,969 | | $2,969 |
| 915 | RFMS2 2002-HS2 [Total] | CES 2002 | 100.00% | $2,761 | | $2,761 |
| 916 | RFMS2 2003-H1 [Total] | Second Lien 2003 | 100.00% | $29,000 | | $29,000 |
| 917 | RFMS2 2003-H1 [Total] | Second Lien 2003 | 100.00% | $30,834 | | $30,834 |
| 918 | RFMS2 2003-H4 [1] | Second Lien 2003 | 100.00% | $14,311 | | $14,311 |
| 919 | RFMS2 2003-H4 [2] | Second Lien 2003 | 100.00% | $14,311 | | $14,311 |
| 920 | RFMS2 2003-HS3 [1] | CES 2003 | 100.00% | $7,431 | MBIA | $0 |
| 921 | RFMS2 2003-HS3 [2A] | CES 2003 | 100.00% | $2,050 | MBIA | $0 |
| 922 | RFMS2 2003-HS3 [2B] | CES 2003 | 100.00% | $2,050 | MBIA | $0 |
| 923 | RFMS2 2004-H1 [Total] | Second Lien 2004 | 100.00% | $25,768 | | $25,768 |
| 924 | RFMS2 2004-HS2 [1] | CES 2004 | 100.00% | $7,986 | MBIA | $0 |
| 925 | RFMS2 2004-HS2 [2] | CES 2004 | 100.00% | $6,534 | MBIA | $0 |
| 926 | RFMS2 2005-H2 [Total] | Second Lien 2005 | 100.00% | $7,778 | | $7,778 |
| 927 | RFMS2 2005-H3 [Total] | Second Lien 2005 | 100.00% | $3,921 | | $3,921 |
| 928 | RFMS2 2006-H1 [Total] | Second Lien 2006 | 100.00% | $3,249 | | $3,249 |
| 929 | RFMS2 2006-H3 [Total] | Second Lien 2006 | 100.00% | $3,029 | FGIC | $3,029 |
| 930 | RFMS2 2006-H4 [Total] | Second Lien 2006 | 100.00% | $3,403 | FGIC | $3,403 |
| 931 | RFMS2 2006-HSA1 [Total] | CES 2006 | 100.00% | $4,577 | FGIC | $4,577 |
| 932 | RFMS2 2006-HSA3 [Total] | Second Lien 2006 | 100.00% | $927 | FSA | $0 |
| 933 | RFMS2 2006-HSA4 [Total] | Second Lien 2006 | 100.00% | $1,791 | MBIA | $0 |
| 934 | RFMS2 2006-HSA5 [Total] | Second Lien 2006 | 100.00% | $1,081 | MBIA | $0 |
| 935 | RFMS2 2003-S10 [Total] | Prime 2003 | 100.00% | $2,703 | | $2,703 |
| 936 | RFMS2 2003-S11 [Total] | Prime 2003 | 100.00% | $1,785 | | $1,785 |
| 937 | RFMS2 2003-S12 [1] | Prime 2003 | 100.00% | $2,054 | | $2,054 |
| 938 | RFMS2 2003-S12 [2] | Prime 2003 | 100.00% | $4,320 | | $4,320 |
| 939 | RFMS2 2003-S12 [3] | Prime 2003 | 100.00% | $1,462 | | $1,462 |
| 940 | RFMS2 2003-S12 [4] | Prime 2003 | 100.00% | $1,473 | | $1,473 |
| 941 | RFMS2 2003-S13 [Total] | Prime 2003 | 100.00% | $5,298 | MBIA - Insurer Exception | $5,298 |
| 942 | RFMS2 2003-S14 [Total] | Prime 2003 | 100.00% | $821 | | $821 |
| 943 | RFMS2 2003-S15 [Total] | Prime 2003 | 100.00% | $302 | | $302 |
| 944 | RFMS2 2003-S16 [Total] | Prime 2003 | 100.00% | $929 | | $929 |
| 945 | RFMS2 2003-S17 [Total] | Prime 2003 | 100.00% | $7,252 | | $7,252 |
| 946 | RFMS2 2003-S18 [Total] | Prime 2003 | 100.00% | $1,135 | | $1,135 |
| 947 | RFMS2 2003-S19 [Total] | Prime 2003 | 100.00% | $2,919 | | $2,919 |
| 948 | RFMS2 2003-S20 [1] | Prime 2003 | 100.00% | $2,116 | Radian - Insurer Exception | $2,116 |
| 949 | RFMS2 2003-S20 [2] | Prime 2003 | 100.00% | $1,172 | | $1,172 |
| 950 | RFMS2 2003-S4 [Total] | Prime 2003 | 100.00% | $3,856 | MBIA - Insurer Exception | $3,856 |
| 951 | RFMS2 2003-S6 [Total] | Prime 2003 | 100.00% | $902 | | $902 |
| 952 | RFMS2 2003-S7 [Total] | Prime 2003 | 100.00% | $5,501 | | $5,501 |
| 953 | RFMS2 2003-S9 [Total] | Prime 2003 | 100.00% | $3,025 | | $3,025 |
| 954 | RFMS2 2004-PS1 [Total] | Prime 2004 | 100.00% | $394 | | $394 |
| 955 | RFMS2 2004-S1 [Total] | Prime 2004 | 100.00% | $3,902 | | $3,902 |
| 956 | RFMS2 2004-S2 [Total] | Prime 2004 | 100.00% | $4,672 | Radian - Insurer Exception | $4,672 |
| 957 | RFMS2 2004-S3 [Total] | Prime 2004 | 100.00% | $1,409 | | $1,409 |
| 958 | RFMS2 2004-S4 [1] | Prime 2004 | 100.00% | $3,195 | MBIA - Insurer Exception | $3,195 |
| 959 | RFMS2 2004-S4 [2] | Prime 2004 | 100.00% | $1,577 | | $1,577 |
| 960 | RFMS2 2004-S5 [1] | Prime 2004 | 100.00% | $3,091 | | $3,091 |
| 961 | RFMS2 2004-S5 [2] | Prime 2004 | 100.00% | $971 | | $971 |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Pg 288 of 398

Case 1:14-cv-03630-GBD    Document 15-1    Filed 11/06/14    Page 263 of 355
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26

Schedule 1.1 - RFC Recognized Claims
15.11 - Recognized Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 962 | RFMSI 2004-S6 [ONE] | Prime 2004 | 100.00% | $3,443 | | $3,443 |
| 963 | RFMSI 2004-S6 [THREE] | Prime 2004 | 100.00% | $3,036 | | $3,036 |
| 964 | RFMSI 2004-S6 [TWO] | Prime 2004 | 100.00% | $3,848 | | $3,848 |
| 965 | RFMSI 2004-S7 [Total] | Prime 2004 | 100.00% | $1,485 | | $1,485 |
| 966 | RFMSI 2004-S8 [Total] | Prime 2004 | 100.00% | $5,917 | | $5,917 |
| 967 | RFMSI 2004-S9 [1] | Prime 2004 | 100.00% | $15,162 | | $15,162 |
| 968 | RFMSI 2004-S9 [2] | Prime 2004 | 100.00% | $3,711 | | $3,711 |
| 969 | RFMSI 2004-SA1 [1] | Prime 2004 | 100.00% | $2,031 | | $2,031 |
| 970 | RFMSI 2004-SA1 [2] | Prime 2004 | 100.00% | $6,500 | | $6,500 |
| 971 | RFMSI 2004-SA1 [3] | Prime 2004 | 100.00% | $1,627 | | $1,627 |
| 972 | RFMSI 2005-S1 [1] | Prime 2005 | 100.00% | $7,171 | | $7,171 |
| 973 | RFMSI 2005-S1 [2] | Prime 2005 | 100.00% | $5,612 | | $5,612 |
| 974 | RFMSI 2005-S3 [Total] | Prime 2005 | 100.00% | $2,906 | | $2,906 |
| 975 | RFMSI 2005-S4 [Total] | Prime 2005 | 100.00% | $13,423 | | $13,423 |
| 976 | RFMSI 2005-S5 [Total] | Prime 2005 | 100.00% | $7,208 | Assured Guaranty - Insurer Exception | $7,208 |
| 977 | RFMSI 2005-S6 [Total] | Prime 2005 | 100.00% | $10,478 | | $10,478 |
| 978 | RFMSI 2005-S8 [Total] | Prime 2005 | 100.00% | $22,023 | | $22,023 |
| 979 | RFMSI 2005-S9 [Total] | Prime 2005 | 100.00% | $26,310 | | $26,310 |
| 980 | RFMSI 2005-SA1 [1] | Prime 2005 | 100.00% | $4,061 | | $4,061 |
| 981 | RFMSI 2005-SA1 [2] | Prime 2005 | 100.00% | $4,051 | | $4,051 |
| 982 | RFMSI 2005-SA1 [3] | Prime 2005 | 100.00% | $7,832 | | $7,832 |
| 983 | RFMSI 2005-SA2 [1] | Prime 2005 | 100.00% | $4,787 | | $4,787 |
| 984 | RFMSI 2005-SA2 [2] | Prime 2005 | 100.00% | $14,136 | | $14,136 |
| 985 | RFMSI 2005-SA2 [3] | Prime 2005 | 100.00% | $7,575 | | $7,575 |
| 986 | RFMSI 2005-SA2 [4] | Prime 2005 | 100.00% | $2,670 | | $2,670 |
| 987 | RFMSI 2005-SA2 [5] | Prime 2005 | 100.00% | $3,929 | | $3,929 |
| 988 | RFMSI 2005-SA2 [6] | Prime 2005 | 100.00% | $4,767 | | $4,767 |
| 989 | RFMSI 2005-SA3 [1] | Prime 2005 | 100.00% | $16,436 | | $16,436 |
| 990 | RFMSI 2005-SA3 [2] | Prime 2005 | 100.00% | $23,497 | | $23,497 |
| 991 | RFMSI 2005-SA3 [3] | Prime 2005 | 100.00% | $11,743 | | $11,743 |
| 992 | RFMSI 2005-SA4 [1] | Prime 2005 | 100.00% | $11,740 | | $11,740 |
| 993 | RFMSI 2005-SA4 [11] | Prime 2005 | 100.00% | $11,499 | | $11,499 |
| 994 | RFMSI 2005-SA4 [12] | Prime 2005 | 100.00% | $10,620 | | $10,620 |
| 995 | RFMSI 2005-SA4 [13] | Prime 2005 | 100.00% | $2,178 | | $2,178 |
| 996 | RFMSI 2005-SA4 [I/I1] | Prime 2005 | 100.00% | $40,885 | | $40,885 |
| 997 | RFMSI 2005-SA4 [I/I2] | Prime 2005 | 100.00% | $32,159 | | $32,159 |
| 998 | RFMSI 2005-SA5 [1] | Prime 2005 | 100.00% | $14,199 | | $14,199 |
| 999 | RFMSI 2005-SA5 [2] | Prime 2005 | 100.00% | $22,222 | | $22,222 |
| 1000 | RFMSI 2005-SA5 [3] | Prime 2005 | 100.00% | $11,456 | | $11,456 |
| 1001 | RFMSI 2006-S1 [1] | Prime 2006 | 100.00% | $21,194 | | $21,194 |
| 1002 | RFMSI 2006-S1 [2] | Prime 2006 | 100.00% | $8,419 | | $8,419 |
| 1003 | RFMSI 2006-S10 [1] | Prime 2006 | 100.00% | $60,510 | | $60,510 |
| 1004 | RFMSI 2006-S10 [2] | Prime 2006 | 100.00% | $23,829 | | $23,829 |
| 1005 | RFMSI 2006-S11 [Total] | Prime 2006 | 100.00% | $55,723 | | $55,723 |
| 1006 | RFMSI 2006-S12 [I] | Prime 2006 | 100.00% | $8,205 | | $8,205 |
| 1007 | RFMSI 2006-S12 [II] | Prime 2006 | 100.00% | $53,189 | | $53,189 |
| 1008 | RFMSI 2006-S12 [III] | Prime 2006 | 100.00% | $26,617 | | $26,617 |
| 1009 | RFMSI 2006-S2 [Total] | Prime 2006 | 100.00% | $25,261 | | $25,261 |

12-12020-mg    Doc 6019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Pg 289 of 398
Case 14-cv-03039-GBD    Document 51-1    Filed 11/06/14    Page 264 of 355
12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Schedule 15-2: RFC Recognized Cured Claims
Subject to Further Review and Due Diligence

| | A Name | B Cohort | C RFC Servicer % | D RFC Claim | E Insurer | F RFC Recognized Claim |
|---|---|---|---|---|---|---|
| 1010 | RFMSI 2006-S3 [Total] | Prime 2006 | 100.00% | $45,852 | | $45,852 |
| 1011 | RFMSI 2006-S4 [Total] | Prime 2006 | 100.00% | $24,878 | | $24,878 |
| 1012 | RFMSI 2006-S5 [Total] | Prime 2006 | 100.00% | $71,905 | | $71,905 |
| 1013 | RFMSI 2006-S6 [Total] | Prime 2006 | 100.00% | $64,279 | | $64,279 |
| 1014 | RFMSI 2006-S7 [Total] | Prime 2006 | 100.00% | $50,920 | | $50,920 |
| 1015 | RFMSI 2006-S8 [Total] | Prime 2006 | 100.00% | $42,400 | | $42,400 |
| 1016 | RFMSI 2006-S9 [Total] | Prime 2006 | 100.00% | $45,215 | | $45,215 |
| 1017 | RFMSI 2006-SA1 [1] | Prime 2006 | 100.00% | $32,246 | | $32,246 |
| 1018 | RFMSI 2006-SA1 [2] | Prime 2006 | 100.00% | $7,173 | | $7,173 |
| 1019 | RFMSI 2006-SA2 [1] | Prime 2006 | 100.00% | $12,698 | | $12,698 |
| 1020 | RFMSI 2006-SA2 [2] | Prime 2006 | 100.00% | $73,524 | | $73,524 |
| 1021 | RFMSI 2006-SA2 [3] | Prime 2006 | 100.00% | $18,547 | | $18,547 |
| 1022 | RFMSI 2006-SA2 [4] | Prime 2006 | 100.00% | $17,044 | | $17,044 |
| 1023 | RFMSI 2006-SA3 [1] | Prime 2006 | 100.00% | $3,604 | | $3,604 |
| 1024 | RFMSI 2006-SA3 [2] | Prime 2006 | 100.00% | $22,919 | | $22,919 |
| 1025 | RFMSI 2006-SA3 [3] | Prime 2006 | 100.00% | $14,729 | | $14,729 |
| 1026 | RFMSI 2006-SA3 [4] | Prime 2006 | 100.00% | $10,297 | | $10,297 |
| 1027 | RFMSI 2006-SA4 [1] | Prime 2006 | 100.00% | $4,014 | | $4,014 |
| 1028 | RFMSI 2006-SA4 [2] | Prime 2006 | 100.00% | $27,471 | | $27,471 |
| 1029 | RFMSI 2006-SA4 [3] | Prime 2006 | 100.00% | $10,430 | | $10,430 |
| 1030 | RFMSI 2007-S1 [Total] | Prime 2007 | 100.00% | $52,765 | | $52,765 |
| 1031 | RFMSI 2007-S2 [Total] | Prime 2007 | 100.00% | $45,718 | | $45,718 |
| 1032 | RFMSI 2007-S3 [1] | Prime 2007 | 100.00% | $58,229 | | $58,229 |
| 1033 | RFMSI 2007-S3 [2] | Prime 2007 | 100.00% | $5,789 | | $5,789 |
| 1034 | RFMSI 2007-S4 [Total] | Prime 2007 | 100.00% | $49,101 | | $49,101 |
| 1035 | RFMSI 2007-S5 [Total] | Prime 2007 | 100.00% | $61,629 | | $61,629 |
| 1036 | RFMSI 2007-S6 [1] | Prime 2007 | 100.00% | $51,666 | | $51,666 |
| 1037 | RFMSI 2007-S6 [2] | Prime 2007 | 100.00% | $41,356 | | $41,356 |
| 1038 | RFMSI 2007-S7 [Total] | Prime 2007 | 100.00% | $43,499 | | $43,499 |
| 1039 | RFMSI 2007-S8 [1] | Prime 2007 | 100.00% | $50,687 | | $50,687 |
| 1040 | RFMSI 2007-S8 [2] | Prime 2007 | 100.00% | $7,453 | | $7,453 |
| 1041 | RFMSI 2007-S9 [1] | Prime 2007 | 100.00% | $18,637 | | $18,637 |
| 1042 | RFMSI 2007-S9 [2] | Prime 2007 | 100.00% | $4,175 | | $4,175 |
| 1043 | RFMSI 2007-SA1 [1] | Prime 2007 | 100.00% | $2,427 | | $2,427 |
| 1044 | RFMSI 2007-SA1 [2] | Prime 2007 | 100.00% | $30,719 | | $30,719 |
| 1045 | RFMSI 2007-SA1 [3] | Prime 2007 | 100.00% | $9,557 | | $9,557 |
| 1046 | RFMSI 2007-SA1 [4] | Prime 2007 | 100.00% | $6,366 | | $6,366 |
| 1047 | RFMSI 2007-SA2 [1] | Prime 2007 | 100.00% | $4,021 | | $4,021 |
| 1048 | RFMSI 2007-SA2 [2] | Prime 2007 | 100.00% | $40,609 | | $40,609 |
| 1049 | RFMSI 2007-SA2 [3] | Prime 2007 | 100.00% | $5,852 | | $5,852 |
| 1050 | RFMSI 2007-SA2 [4] | Prime 2007 | 100.00% | $11,922 | | $11,922 |
| 1051 | RFMSI 2007-SA2 [5] | Prime 2007 | 100.00% | $5,087 | | $5,087 |
| 1052 | RFMSI 2007-SA3 [1] | Prime 2007 | 100.00% | $1,320 | | $1,320 |
| 1053 | RFMSI 2007-SA3 [2] | Prime 2007 | 100.00% | $40,754 | | $40,754 |
| 1054 | RFMSI 2007-SA3 [3] | Prime 2007 | 100.00% | $12,257 | | $12,257 |
| 1055 | RFMSI 2007-SA3 [4] | Prime 2007 | 100.00% | $8,504 | | $8,504 |
| 1056 | RFMSI 2007-SA4 [1] | Prime 2007 | 100.00% | $2,452 | | $2,452 |
| 1057 | RFMSI 2007-SA4 [2] | Prime 2007 | 100.00% | $1,215 | | $1,215 |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Pg 290 of 398

Case 1:14-cv-03039-GBD    Document 51-1    Filed 11/06/14    Page 265 of 355
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26

Schedule 15.14: RFC Recognized Insured Claims
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 1058 | RFMSI 2007-SA4 [3] | Prime 2007 | 100.00% | $39,277 | | $39,277 |
| 1059 | RFMSI 2007-SA4 [4] | Prime 2007 | 100.00% | $17,403 | | $17,403 |
| 1060 | RFMSI 2007-SA4 [5] | Prime 2007 | 100.00% | $14,496 | | $14,496 |
| 1061 | RFSC 2001-RM2 [1] | ALT-A 2001 | 100.00% | $3,453 | | $3,453 |
| 1062 | RFSC 2001-RM2 [2] | ALT-A 2001 | 100.00% | $3,270 | | $3,270 |
| 1063 | RFSC 2002-RM1 [1] | ALT-A 2002 | 100.00% | $2,429 | | $2,429 |
| 1064 | RFSC 2002-RM1 [2] | ALT-A 2002 | 100.00% | $508 | | $508 |
| 1065 | RFSC 2002-RM1 [3] | ALT-A 2002 | 100.00% | $1,078 | | $1,078 |
| 1066 | RFSC 2003-RM1 [Total] | Prime 2003 | 100.00% | $2,806 | | $2,806 |
| 1067 | RFSC 2003-RM2 [ONE] | Prime 2003 | 100.00% | $2,730 | | $2,730 |
| 1068 | RFSC 2003-RM2 [THREE] | Prime 2003 | 100.00% | $1,680 | | $1,680 |
| 1069 | RFSC 2003-RM2 [TWO] | Prime 2003 | 100.00% | $831 | | $831 |
| 1070 | SACO 2005-WM1 [Total] | CES 2005 | 20.77% | $3,748 | | $3,748 |
| 1071 | SACO 2005-WM3 [Total] | CES 2005 | 20.77% | $4,948 | | $4,948 |
| 1072 | SACO 2006-10 [Total] | CES 2006 | 47.57% | $1,967 | | $1,967 |
| 1073 | SAIL 2005-5 [1A] | Subprime 2005 | 10.93% | $14,582 | CIFG | $0 |
| 1074 | SAIL 2005-5 [1F] | Subprime 2005 | 10.93% | $3,142 | CIFG | $0 |
| 1075 | SAIL 2005-5 [2A] | Subprime 2005 | 10.93% | $17,946 | CIFG | $0 |
| 1076 | SAIL 2005-5 [2F] | Subprime 2005 | 10.93% | $3,025 | CIFG | $0 |
| 1077 | SAIL 2005-5 [3A] | Subprime 2005 | 10.93% | $14,442 | CIFG | $0 |
| 1078 | SAIL 2005-5 [3F] | Subprime 2005 | 10.93% | $3,146 | CIFG | $0 |
| 1079 | SAIL 2005-5 [4A] | Subprime 2005 | 10.93% | $18,278 | CIFG | $0 |
| 1080 | SAIL 2005-5 [4F] | Subprime 2005 | 10.93% | $3,139 | CIFG | $0 |
| 1081 | SAIL 2005-9 [1A] | Subprime 2005 | 0.66% | $1,669 | | $1,669 |
| 1082 | SAIL 2005-9 [1F] | Subprime 2005 | 0.66% | $361 | | $361 |
| 1083 | SAIL 2005-9 [2A] | Subprime 2005 | 0.66% | $792 | | $792 |
| 1084 | SAIL 2005-9 [2F] | Subprime 2005 | 0.66% | $109 | | $109 |
| 1085 | SAIL 2005-9 [3A] | Subprime 2005 | 0.66% | $3,653 | | $3,653 |
| 1086 | SAIL 2005-9 [3F] | Subprime 2005 | 0.66% | $649 | | $649 |
| 1087 | SARM 2007-3 [1] | Prime 2007 | 2.95% | $4,001 | | $4,001 |
| 1088 | SARM 2007-3 [2] | Prime 2007 | 2.95% | $1,674 | | $1,674 |
| 1089 | SARM 2007-3 [3] | Prime 2007 | 2.95% | $2,039 | | $2,039 |
| 1090 | SARM 2007-3 [4] | Prime 2007 | 2.95% | $2,905 | | $2,905 |
| 1091 | SARM 2007-6 [11] | ALT-A 2007 | 0.75% | $426 | | $426 |
| 1092 | SARM 2007-6 [12] | ALT-A 2007 | 0.75% | $1,053 | | $1,053 |
| 1093 | SARM 2007-6 [2] | ALT-A 2007 | 0.75% | $927 | | $927 |
| 1094 | SASC 2001-9 [FIVED] | Prime 2001 | 4.50% | $6 | | $6 |
| 1095 | SASC 2001-9 [FIVENR] | Prime 2001 | 4.50% | $18 | | $18 |
| 1096 | SASC 2001-9 [FIVER] | Prime 2001 | 4.50% | $0 | | $0 |
| 1097 | SASC 2001-9 [FOURD] | Prime 2001 | 4.50% | $3 | | $3 |
| 1098 | SASC 2001-9 [FOURNR] | Prime 2001 | 4.50% | $39 | | $39 |
| 1099 | SASC 2001-9 [FOURR] | Prime 2001 | 4.50% | $2 | | $2 |
| 1100 | SASC 2001-9 [ONED] | Prime 2001 | 4.50% | $0 | | $0 |
| 1101 | SASC 2001-9 [ONENR] | Prime 2001 | 4.50% | $23 | | $23 |
| 1102 | SASC 2001-9 [ONER] | Prime 2001 | 4.50% | $0 | | $0 |
| 1103 | SASC 2001-9 [SIXD] | Prime 2001 | 4.50% | $17 | | $17 |
| 1104 | SASC 2001-9 [SIXNR] | Prime 2001 | 4.50% | $23 | | $23 |
| 1105 | SASC 2001-9 [SIXR] | Prime 2001 | 4.50% | $1 | | $1 |

Schedule 2 to RFC's Recognized Claims
Exhibit B - Loan Tape Data
Subject to Further Review and Due Diligence

| | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
|---|---|---|---|---|---|---|
| 1106 | SASC 2001-9 [THREE] | Prime 2001 | 4.50% | $38 | MBIA | $0 |
| 1107 | SASC 2001-9 [TWONR] | Prime 2001 | 4.50% | $44 | MBIA | $0 |
| 1108 | SASC 2001-9 [TWOR] | Prime 2001 | 4.50% | $2 | MBIA | $0 |
| 1109 | SASC 2005-RF1 [Total] | Subprime 2005 | 2.90% | $822 | | $822 |
| 1110 | SASC 2005-RF2 [Total] | Subprime 2005 | 9.50% | $6,817 | | $6,817 |
| 1111 | SASC 2005-RF4 [Total] | Subprime 2005 | 7.49% | $7,184 | | $7,184 |
| 1112 | SASC 2005-RF6 [Total] | Subprime 2005 | 6.70% | $3,115 | | $3,115 |
| 1113 | SASC 2005-S1 [1] | CES 2005 | 7.22% | $230 | United Guaranty (Pool Policy) | $230 |
| 1114 | SASC 2005-S1 [2] | CES 2005 | 7.22% | $892 | | $892 |
| 1115 | SASC 2007-TC1 [A] | Subprime 2007 | 7.75% | $2,910 | | $2,910 |
| 1116 | SASC 2007-TC1 [F] | Subprime 2007 | 7.75% | $1,667 | | $1,667 |
| 1117 | SASCO 2002-9 [2FR] | Prime 2002 | 0.90% | $1 | | $1 |
| 1118 | SASCO 2002-9 [2L] | Prime 2002 | 0.90% | $0 | | $0 |
| 1119 | SASCO 2002-9 [A1-MI] | Prime 2002 | 0.90% | $44 | | $44 |
| 1120 | SASCO 2002-9 [A1-NOMI] | Prime 2002 | 0.90% | $41 | | $41 |
| 1121 | SASCO 2002-9 [B1-MI] | Prime 2002 | 0.90% | $9 | | $9 |
| 1122 | SASCO 2002-9 [B1-NOMI] | Prime 2002 | 0.90% | $35 | | $35 |
| 1123 | SASI 1993-6 [CIT1] | Prime 1999 | 4.50% | $5 | | $5 |
| 1124 | SASI 1993-6 [CWF1] | Prime 1999 | 4.50% | $6 | | $6 |
| 1125 | SASI 1993-6 [GEC1] | Prime 1999 | 4.50% | $2 | | $2 |
| 1126 | SASI 1993-6 [ITT2] | Prime 1999 | 4.50% | $4 | | $4 |
| 1127 | SASI 1993-6 [ITT3] | Prime 1999 | 4.50% | $8 | GEMICO (Pool Policy)/FSA - Insurer Exception | $8 |
| 1128 | SASI 1993-6 [ITT4] | Prime 1999 | 4.50% | $4 | | $4 |
| 1129 | SASI 1993-6 [ITT5] | Prime 1999 | 4.50% | $2 | | $2 |
| 1130 | SASI 1993-6 [SASC3] | Prime 1999 | 4.50% | $31 | GEMICO (Pool Policy)/FSA - Insurer Exception | $31 |
| 1131 | SEMT 2004-10 [1] | Prime 2004 | 1.87% | $190 | | $190 |
| 1132 | SEMT 2004-10 [2] | Prime 2004 | 1.87% | $191 | | $191 |
| 1133 | SEMT 2004-11 [1] | Prime 2004 | 0.15% | $12 | | $12 |
| 1134 | SEMT 2004-11 [2] | Prime 2004 | 0.15% | $2 | | $2 |
| 1135 | SEMT 2004-11 [3] | Prime 2004 | 0.15% | $5 | | $5 |
| 1136 | SEMT 2005-2 [1] | Prime 2005 | 14.64% | $912 | | $912 |
| 1137 | SEMT 2005-2 [2] | Prime 2005 | 14.64% | $571 | | $571 |
| 1138 | SEMT 2005-3 [Total] | ALT-A 2005 | 23.86% | $2,931 | | $2,931 |
| 1139 | SMART 1993-3A [1] | Prime 1999 | 4.50% | $0 | GEMICO (Pool Policy) | $0 |
| 1140 | SMART 1993-3A [2] | Prime 1999 | 4.50% | $0 | GEMICO (Pool Policy) | $0 |
| 1141 | SMART 1993-3A [3] | Prime 1999 | 4.50% | $3 | GEMICO (Pool Policy)/FGIC | $3 |
| 1142 | SMART 1993-6A [A] | Prime 1999 | 4.50% | $0 | GEMICO (Pool Policy) | $0 |
| 1143 | SMART 1993-6A [B] | Prime 1999 | 4.50% | $6 | FGIC/GEMICO (Pool Policy) | $6 |
| 1144 | SMSC 1992-3 [Total] | Prime 1999 | 43.13% | $190 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSI (Pool Policy) | $190 |
| 1145 | SMSC 1992-4 [Total] | Prime 1999 | 44.51% | $522 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSI (Pool Policy) | $522 |
| 1146 | SMSC 1992-6 [Total] | Prime 1999 | 47.68% | $157 | GEMICO (Pool Policy)/PMI (Pool Policy)/FSA (Pool Policy) | $157 |
| 1147 | SMSC 1994-2 [Total] | Prime 1999 | 26.35% | $90 | | $90 |
| 1148 | Southwest Savings 1988-1 [Total] | 1999 | 4.50% | $1 | | $1 |
| 1149 | TMTS 2005-11 [1A] | Second Lien 2005 | 9.00% | $11,356 | | $11,356 |
| 1150 | TMTS 2005-11 [1B] | Second Lien 2005 | 9.00% | $1,257 | | $1,257 |
| 1151 | TMTS 2005-11 [2A] | Second Lien 2005 | 9.00% | $5,299 | | $5,299 |
| 1152 | TMTS 2005-11 [2B] | Second Lien 2005 | 9.00% | $1,308 | | $1,308 |
| 1153 | | | | $60,439,273 | | $60,217,472 |

## Schedule 2G

Case 1:14-cv-03039-GBD    Document 51-1    Filed 11/06/14    Page 268 of 355

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1

Highly Confidential — Subject to Protective Order in RMBS Trust Settlement / Subject to FRE 408 and NY CPLR 4547 Mediation Privilege / Subject to Ongoing Due Diligence

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller % |
|---|---|---|---|---|---|---|---|---|
| GMACM 2004-AR1 [I1] | Prime 2004 | $600,831 | $600,831 | $278,249 | $124,836 | | $124,836 | 100.00% |
| GMACM 2004-AR1 [I2] | Prime 2004 | $4,474,288 | $4,474,288 | $2,214,276 | $993,430 | | $993,430 | 100.00% |
| GMACM 2004-AR1 [I3] | Prime 2004 | $382,755 | $382,755 | $209,613 | $94,043 | | $94,043 | 100.00% |
| GMACM 2004-AR1 [I4] | Prime 2004 | $1,083,378 | $1,083,378 | $624,437 | $280,152 | | $280,152 | 100.00% |
| GMACM 2004-AR1 [II1] | Prime 2004 | $101,928 | $101,928 | $52,432 | $23,523 | | $23,523 | 100.00% |
| GMACM 2004-AR1 [II2] | Prime 2004 | $1,118,424 | $1,118,424 | $584,567 | $262,265 | | $262,265 | 100.00% |
| GMACM 2004-AR1 [II3] | Prime 2004 | $82,717 | $82,717 | $49,450 | $22,186 | | $22,186 | 100.00% |
| GMACM 2004-AR1 [II4] | Prime 2004 | $592,588 | $592,588 | $319,578 | $143,378 | | $143,378 | 100.00% |
| GMACM 2004-AR2 [1] | Prime 2004 | $404,752 | $404,752 | $215,926 | $96,875 | | $96,875 | 100.00% |
| GMACM 2004-AR2 [2] | Prime 2004 | $1,678,932 | $1,678,932 | $892,546 | $400,439 | | $400,439 | 100.00% |
| GMACM 2004-AR2 [3] | Prime 2004 | $5,204,281 | $5,204,281 | $2,498,816 | $1,121,088 | | $1,121,088 | 100.00% |
| GMACM 2004-AR2 [4] | Prime 2004 | $679,112 | $679,112 | $379,679 | $170,342 | | $170,342 | 100.00% |
| GMACM 2004-AR2 [5] | Prime 2004 | $715,516 | $715,516 | $415,418 | $186,376 | | $186,376 | 100.00% |
| GMACM 2004-GH1 [Total] | Subprime 2004 | $10,167,719 | $10,167,719 | $5,700,828 | $2,557,664 | | $2,557,664 | 100.00% |
| GMACM 2004-HE1 [Total] | Second Lien 2004 | $93,657,753 | $93,657,753 | $52,420,025 | $23,518,123 | FGIC | $23,518,123 | 100.00% |
| GMACM 2004-HE2 [Total] | CES 2004 | $1,760,345 | $1,760,345 | $694,873 | $311,753 | OLD REPUBLIC INSURANCE COMPANY (Pool Policy) | $311,753 | 100.00% |
| GMACM 2004-HE3 [Tota | Second Lien 2004 | $80,341,434 | $80,341,434 | $45,075,604 | $20,223,066 | FSA | $0 | 100.00% |
| GMACM 2004-HE4 [Total] | Second Lien 2004 | $92,047,687 | $92,047,687 | $51,717,576 | $23,202,971 | MBIA | $0 | 100.00% |
| GMACM 2004-HE5 [Total] | CES 2004 | $22,329,699 | $22,329,699 | $8,555,177 | $3,838,260 | FGIC | $3,838,260 | 100.00% |
| GMACM 2004-HLTV1 [1] | Second Lien 2004 | $22,575,910 | $22,575,910 | $12,392,387 | $5,559,816 | FGIC | $5,559,816 | 100.00% |
| GMACM 2004-J1 [Total] | Prime 2004 | $2,087,993 | $2,087,993 | $1,118,351 | $501,746 | MBIA - Insurer Exception | $501,746 | 100.00% |
| GMACM 2004-J2 [Total] | Prime 2004 | $3,228,005 | $3,228,005 | $1,669,643 | $749,082 | MBIA - Insurer Exception | $749,082 | 100.00% |
| GMACM 2004-J3 [Total] | Prime 2004 | $2,371,419 | $2,371,419 | $1,378,753 | $618,574 | | $618,574 | 100.00% |
| GMACM 2004-J4 [Total] | Prime 2004 | $4,546,196 | $4,546,196 | $2,417,852 | $1,084,764 | | $1,084,764 | 100.00% |
| GMACM 2004-J5 [Total] | Prime 2004 | $3,825,887 | $3,825,887 | $2,009,520 | $901,567 | | $901,567 | 100.00% |
| GMACM 2004-J6 [1] | Prime 2004 | $805,553 | $805,553 | $416,064 | $186,666 | | $186,666 | 100.00% |
| GMACM 2004-J6 [2] | Prime 2004 | $1,518,108 | $1,518,108 | $843,240 | $378,318 | | $378,318 | 100.00% |
| GMACM 2004-VF1 [1] | Second Lien 2004 | $27,131,527 | $27,131,527 | $15,508,138 | $6,957,690 | MBIA | $0 | 100.00% |
| GMACM 2004-VF1 [2] | Second Lien 2004 | $18,333,382 | $18,333,382 | $10,601,107 | $4,756,162 | MBIA | $0 | 100.00% |
| GMACM 2005-AA1 [1] | ALT-A 2005 | $19,034,675 | $19,034,675 | $8,125,177 | $3,645,342 | | $3,645,342 | 100.00% |
| GMACM 2005-AA1 [2] | ALT-A 2005 | $6,379,178 | $6,379,178 | $2,689,326 | $1,206,560 | | $1,206,560 | 100.00% |
| GMACM 2005-AF1 [Total] | ALT-A 2005 | $20,245,375 | $20,245,375 | $8,435,517 | $3,784,575 | | $3,784,575 | 100.00% |
| GMACM 2005-AF2 [Total] | ALT-A 2005 | $48,473,380 | $48,473,380 | $21,027,865 | $9,434,103 | | $9,434,103 | 100.00% |
| GMACM 2005-AR1 [1] | Prime 2005 | $2,192,751 | $2,192,751 | $956,109 | $428,956 | | $428,956 | 100.00% |
| GMACM 2005-AR1 [2] | Prime 2005 | $4,131,487 | $4,131,487 | $1,998,016 | $896,405 | | $896,405 | 100.00% |
| GMACM 2005-AR1 [3] | Prime 2005 | $5,680,616 | $5,680,616 | $2,940,235 | $1,319,130 | | $1,319,130 | 100.00% |
| GMACM 2005-AR1 [4] | Prime 2005 | $558,393 | $558,393 | $318,927 | $143,086 | | $143,086 | 100.00% |
| GMACM 2005-AR1 [5] | Prime 2005 | $2,369,547 | $2,369,547 | $1,328,150 | $595,872 | | $595,872 | 100.00% |
| GMACM 2005-AR2 [1] | Prime 2005 | $1,753,754 | $1,753,754 | $831,946 | $373,251 | | $373,251 | 100.00% |
| GMACM 2005-AR2 [2] | Prime 2005 | $16,431,574 | $16,431,574 | $8,104,170 | $3,635,917 | | $3,635,917 | 100.00% |
| GMACM 2005-AR2 [3] | Prime 2005 | $1,762,743 | $1,762,743 | $894,807 | $401,453 | | $401,453 | 100.00% |

Case 14-cv-03039-GBD    Document 21-1    Filed 01/06/14    Page 269 of 355
Subject to FRE 408 and Confidentiality Restrictions
Subject to Rule 1006 of Diligence

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller % |
|---|---|---|---|---|---|---|---|---|
| GMACM 2005-AR2  [4] | Prime 2005 | $4,108,235 | $4,108,235 | $2,184,420 | $980,035 | | $980,035 | 100.00% |
| GMACM 2005-AR3  [1] | Prime 2005 | $1,356,862 | $1,356,862 | $629,106 | $282,247 | | $282,247 | 100.00% |
| GMACM 2005-AR3  [2] | Prime 2005 | $7,608,625 | $7,608,625 | $3,637,958 | $1,632,161 | | $1,632,161 | 100.00% |
| GMACM 2005-AR3  [3] | Prime 2005 | $8,876,679 | $8,876,679 | $4,561,903 | $2,046,687 | | $2,046,687 | 100.00% |
| GMACM 2005-AR3  [2] | Prime 2005 | $3,699,520 | $3,699,520 | $1,906,814 | $855,488 | | $855,488 | 100.00% |
| GMACM 2005-AR3  [5] | Prime 2005 | $4,354,598 | $4,354,598 | $2,351,603 | $1,055,041 | | $1,055,041 | 100.00% |
| GMACM 2005-AR4  [1] | Prime 2005 | $1,110,041 | $1,110,041 | $494,117 | $221,684 | | $221,684 | 100.00% |
| GMACM 2005-AR4  [2] | Prime 2005 | $4,329,496 | $4,329,496 | $3,033,432 | $593,192 | | $593,192 | 100.00% |
| GMACM 2005-AR4  [3] | Prime 2005 | $11,070,297 | $11,070,297 | $5,378,449 | $2,413,029 | | $2,413,029 | 100.00% |
| GMACM 2005-AR4  [4] | Prime 2005 | $2,369,820 | $2,369,820 | $1,253,732 | $562,484 | | $562,484 | 100.00% |
| GMACM 2005-AR4  [5] | Prime 2005 | $3,387,889 | $3,387,889 | $1,826,907 | $819,638 | | $819,638 | 100.00% |
| GMACM 2005-AR5  [2] | Prime 2005 | $2,354,835 | $2,354,835 | $1,092,864 | $490,311 | | $490,311 | 100.00% |
| GMACM 2005-AR5  [2] | Prime 2005 | $6,399,212 | $6,399,212 | $2,999,445 | $1,345,694 | | $1,345,694 | 100.00% |
| GMACM 2005-AR5  [3] | Prime 2005 | $12,943,405 | $12,943,405 | $6,530,963 | $2,930,101 | | $2,930,101 | 100.00% |
| GMACM 2005-AR5  [4] | Prime 2005 | $5,542,512 | $5,542,512 | $2,855,981 | $1,281,329 | | $1,281,329 | 100.00% |
| GMACM 2005-AR5  [5] | Prime 2005 | $9,239,127 | $9,239,127 | $4,901,424 | $2,199,013 | | $2,199,013 | 100.00% |
| GMACM 2005-AR6  [1] | Prime 2005 | $3,686,392 | $3,686,392 | $1,775,293 | $796,481 | | $796,481 | 100.00% |
| GMACM 2005-AR6  [2] | Prime 2005 | $20,391,512 | $20,391,512 | $9,600,732 | $4,307,346 | | $4,307,346 | 100.00% |
| GMACM 2005-AR6  [3] | Prime 2005 | $8,117,086 | $8,117,086 | $4,133,890 | $1,854,660 | | $1,854,660 | 100.00% |
| GMACM 2005-AR6  [4] | Prime 2005 | $12,402,357 | $12,402,357 | $6,700,126 | $3,005,996 | | $3,005,996 | 100.00% |
| GMACM 2005-HE1 [Total] | Second Lien 2005 | $147,193,604 | $147,193,604 | $82,211,019 | $36,883,785 | FGIC | $36,883,785 | 100.00% |
| GMACM 2005-HE2 [Total] | CES 2005 | $55,803,093 | $55,803,093 | $21,407,615 | $9,604,477 | FGIC | $9,604,477 | 100.00% |
| GMACM 2006-J1 [Total] | Second Lien 2005 | $134,006,819 | $134,006,819 | $76,038,432 | $34,114,467 | AMBAC | $34,114,467 | 100.00% |
| GMACM 2005-J1  [Total] | Prime 2006 | $15,446,805 | $15,446,805 | $7,838,299 | $3,516,635 | | $3,516,635 | 100.00% |
| GMACM 2006-AR1  [1] | Prime 2006 | $30,785,688 | $30,785,688 | $11,171,432 | $5,012,037 | | $5,012,037 | 100.00% |
| GMACM 2006-AR1  [2] | Prime 2006 | $10,881,907 | $10,881,907 | $3,925,797 | $1,761,300 | | $1,761,300 | 100.00% |
| GMACM 2006-AR1  [3] | Prime 2006 | $8,860,241 | $8,860,241 | $3,174,901 | $1,424,412 | | $1,424,412 | 100.00% |
| GMACM 2006-AR2  [1] | Prime 2006 | $1,922,838 | $1,922,838 | $698,261 | $313,273 | | $313,273 | 100.00% |
| GMACM 2006-AR2  [2] | Prime 2006 | $21,724,017 | $21,724,017 | $7,876,429 | $3,533,742 | | $3,533,742 | 100.00% |
| GMACM 2006-AR2  [3] | Prime 2006 | $7,447,843 | $7,447,843 | $2,709,007 | $1,215,390 | | $1,215,390 | 100.00% |
| GMACM 2006-AR2  [4] | Prime 2006 | $3,250,542 | $3,250,542 | $1,165,581 | $522,935 | | $522,935 | 100.00% |
| GMACM 2006-AR2  [5] | Prime 2006 | $5,228,500 | $5,228,500 | $1,871,052 | $839,443 | | $839,443 | 100.00% |
| GMACM 2006-AR1  [F] | Second Lien 2006 | $137,295,455 | $137,295,455 | $67,757,341 | $30,399,175 | FGIC | $30,399,175 | 100.00% |
| GMACM 2006-HE1  [H] GMACM 2006-HE2 [Total] | Prime 2006 | $235,105,365 | $235,105,365 | $116,089,342 | $52,083,216 | FGIC | $52,083,216 | 100.00% |
| GMACM 2006-HE3 [Total] | CES 2006 | $95,580,483 | $95,580,483 | $50,389,127 | $22,606,966 | FGIC | $22,606,966 | 100.00% |
| GMACM 2006-HE4 [Total] | CES 2006 | $166,732,648 | $166,732,648 | $88,110,893 | $39,530,749 | FGIC | $39,530,749 | 100.00% |
| GMACM 2006-J1  [Total] | Second Lien 2006 | $157,062,316 | $157,062,316 | $77,618,563 | $34,823,390 | MBIA | $0 | 100.00% |
| GMACM 2006-HE5  [1] | CES 2006 | $151,469,850 | $151,469,850 | $80,315,827 | $36,033,511 | FGIC | $36,033,511 | 100.00% |
| GMACM 2006-HLTV1 [2] | CES 2006 | $118,223,865 | $118,223,865 | $62,490,354 | $28,036,153 | FGIC | $28,036,153 | 100.00% |
| GMACM 2006-HLTV1 [Total] | Second Lien 2006 | $64,995,996 | $64,995,996 | $32,067,616 | $14,387,062 | FGIC | $14,387,062 | 100.00% |
| GMACM 2006-J1  [Total] GMACM 2007-HE1 [Total] | Prime 2006 | $32,980,554 | $32,980,554 | $11,816,068 | $5,301,252 | MBIA | $5,301,252 | 100.00% |
| GMACM 2007-HE2 [Total] | CES 2007 | $109,341,630 | $109,341,630 | $57,902,349 | $25,977,755 | MBIA | $0 | 100.00% |
| GMACM 2007-HE3  [1] | CES 2007 | $310,380,896 | $310,380,896 | $164,421,022 | $573,767,113 | FGIC | $573,767,113 | 100.00% |
| GMACM 2007-HE3  [1] | CES 2007 | $51,576,444 | $51,576,444 | $27,422,939 | $12,303,238 | | $12,303,238 | 100.00% |
| GMACM 2007-HE3  [2] | CES 2007 | $90,557,530 | $90,557,530 | $47,851,382 | $21,468,412 | | $21,468,412 | 100.00% |
| | | $2,830,065,019 | $2,830,065,019 | $1,450,096,178 | $650,582,312 | | $534,641,276 | |

**Schedule 2R**

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Case 1:14-cv-03039-GBD   Document 15-1   Filed 11/06/14   Page 271 of 359
Pg 296 of 398

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| RAAC 2004-RP1 [1A] | Subprime 2004 | $6,819,135 | $6,819,135 | $3,902,959 | $1,751,054 | | $1,751,054 | 100.00% |
| RAAC 2004-RP1 [1F] | Subprime 2004 | $6,639,525 | $6,639,525 | $3,776,527 | $1,694,330 | | $1,694,330 | 100.00% |
| RAAC 2004-RP1 [2A] | Subprime 2004 | $5,029,588 | $5,029,588 | $2,878,640 | $1,291,495 | | $1,291,495 | 100.00% |
| RAAC 2004-RP1 [2F] | Subprime 2004 | $7,000,217 | $7,000,217 | $3,982,035 | $1,786,531 | | $1,786,531 | 100.00% |
| RAAC 2004-SP1 [1] | ALT-A 2004 | $3,443,801 | $3,443,801 | $1,533,496 | $688,000 | | $688,000 | 100.00% |
| RAAC 2004-SP1 [2] | ALT-A 2004 | $2,385,842 | $2,385,842 | $1,064,178 | $477,441 | | $477,441 | 100.00% |
| RAAC 2004-SP2 [1] | Prime 2004 | $62,679 | $62,679 | $37,471 | $16,811 | | $16,811 | 100.00% |
| RAAC 2004-SP2 [2] | Prime 2004 | $777,491 | $777,491 | $415,129 | $186,247 | | $186,247 | 100.00% |
| RAAC 2004-SP3 [1] | ALT-A 2004 | $4,006,286 | $4,006,286 | $1,593,367 | $714,860 | | $714,860 | 100.00% |
| RAAC 2004-SP3 [2] | ALT-A 2004 | $5,103,783 | $5,103,783 | $2,081,340 | $933,788 | | $933,788 | 100.00% |
| RAAC 2005-RP1 [1] | Subprime 2005 | $28,853,548 | $28,853,548 | $16,446,599 | $7,378,729 | | $7,378,729 | 100.00% |
| RAAC 2005-RP2 [A] | Subprime 2005 | $16,004,981 | $16,004,981 | $9,156,110 | $4,107,868 | | $4,107,868 | 100.00% |
| RAAC 2005-RP1 [2] | Subprime 2005 | $19,189,133 | $19,189,133 | $10,917,945 | $4,898,311 | | $4,898,311 | 100.00% |
| RAAC 2005-RP2 [A] | Subprime 2005 | $23,781,826 | $23,781,826 | $13,540,728 | $6,075,016 | | $6,075,016 | 100.00% |
| RAAC 2005-RP3 [A] | Subprime 2005 | $35,443,373 | $35,443,373 | $20,241,087 | $9,081,117 | | $9,081,117 | 100.00% |
| RAAC 2005-RP3 [F] | Subprime 2005 | $22,234,270 | $22,234,270 | $12,644,501 | $5,672,926 | | $5,672,926 | 100.00% |
| RAAC 2005-SP1 [1] | Prime 2005 | $1,810,272 | $1,810,272 | $1,034,980 | $464,341 | | $464,341 | 100.00% |
| RAAC 2005-SP1 [2] | Prime 2005 | $2,935,529 | $2,935,529 | $1,632,602 | $732,463 | | $732,463 | 100.00% |
| RAAC 2005-SP1 [3] | Prime 2005 | $1,459,339 | $1,459,339 | $855,574 | $383,852 | | $383,852 | 100.00% |
| RAAC 2005-SP1 [4] | Prime 2005 | $1,084,890 | $1,084,890 | $589,608 | $264,526 | | $264,526 | 100.00% |
| RAAC 2005-SP2 [1A] | ALT-A 2005 | $14,832,654 | $14,832,654 | $6,544,717 | $2,936,272 | | $2,936,272 | 100.00% |
| RAAC 2005-SP2 [1F] | ALT-A 2005 | $7,425,283 | $7,425,283 | $3,181,119 | $1,427,202 | | $1,427,202 | 100.00% |
| RAAC 2005-SP2 [2A] | ALT-A 2005 | $13,829,955 | $13,829,955 | $5,822,909 | $2,612,435 | | $2,612,435 | 100.00% |
| RAAC 2005-SP2 [2F] | ALT-A 2005 | $7,279,528 | $7,279,528 | $3,011,539 | $1,351,120 | | $1,351,120 | 100.00% |
| RAAC 2005-SP3 [A] | Subprime 2005 | $23,432,636 | $23,432,636 | $13,390,917 | $6,007,804 | | $6,007,804 | 100.00% |
| RAAC 2005-SP3 [F] | Subprime 2005 | $17,006,694 | $17,006,694 | $9,595,288 | $4,304,904 | | $4,304,904 | 100.00% |
| RAAC 2006-RP1 [A] | Subprime 2006 | $45,526,317 | $45,526,317 | $25,301,872 | $11,351,627 | | $11,351,627 | 100.00% |
| RAAC 2006-RP2 [F] | Subprime 2006 | $24,248,759 | $24,248,759 | $13,486,799 | $6,050,821 | | $6,050,821 | 100.00% |
| RAAC 2006-RP1 [F] | Subprime 2006 | $75,097,864 | $75,097,864 | $41,732,934 | $18,723,385 | | $18,723,385 | 100.00% |
| RAAC 2006-RP2 [A] | Subprime 2006 | $37,421,418 | $37,421,418 | $20,802,706 | $9,333,086 | | $9,333,086 | 100.00% |
| RAAC 2006-RP3 [A] | Subprime 2006 | $81,624,323 | $81,624,323 | $45,359,002 | $20,350,212 | | $20,350,212 | 100.00% |
| RAAC 2006-RP4 [F] | Subprime 2006 | $36,568,727 | $36,568,727 | $20,326,629 | $9,119,495 | | $9,119,495 | 100.00% |
| RAAC 2006-RP4 [A] | Subprime 2006 | $78,725,340 | $78,725,340 | $43,758,758 | $19,632,266 | | $19,632,266 | 100.00% |
| RAAC 2006-RP4 [F] | Subprime 2006 | $45,187,577 | $45,187,577 | $25,119,998 | $11,270,029 | | $11,270,029 | 100.00% |
| RAAC 2006-SP1 [A] | Subprime 2006 | $65,485,752 | $65,485,752 | $36,390,248 | $16,326,401 | | $16,326,401 | 100.00% |
| RAAC 2006-SP1 [F] | Subprime 2006 | $13,665,444 | $13,665,444 | $7,597,436 | $3,408,572 | | $3,408,572 | 100.00% |
| RAAC 2006-SP2 [1A] | Subprime 2006 | $24,519,518 | $24,519,518 | $13,635,321 | $6,117,455 | | $6,117,455 | 100.00% |
| RAAC 2006-SP2 [2F] | Subprime 2006 | $3,561,946 | $3,561,946 | $1,978,832 | $887,799 | | $887,799 | 100.00% |
| RAAC 2006-SP2 [A] | Subprime 2006 | $62,171,520 | $62,171,520 | $34,551,802 | $15,501,586 | | $15,501,586 | 100.00% |
| RAAC 2006-SP3 [A] | Subprime 2006 | $54,051,175 | $54,051,175 | $30,041,812 | $13,478,190 | | $13,478,190 | 100.00% |
| RAAC 2006-SP3 [F1] | Subprime 2006 | $21,404,457 | $21,404,457 | $11,904,874 | $5,341,094 | | $5,341,094 | 100.00% |
| RAAC 2006-SP3 [F2] | Subprime 2006 | $2,106,430 | $2,106,430 | $1,170,396 | $525,095 | | $525,095 | 100.00% |
| RAAC 2006-SP4 [A] | Subprime 2006 | $48,399,580 | $48,399,580 | $26,903,141 | $12,070,032 | | $12,070,032 | 100.00% |
| RAAC 2006-SP4 [F1] | Subprime 2006 | $17,905,552 | $17,905,552 | $9,960,491 | $4,468,751 | | $4,468,751 | 100.00% |

Case 14-cv-03339-GBD    Document 15-1    Filed 11/06/14    Page 272 of 355
Highly Confidential — Subject to Protective Order
Subject to FRE 408 and Due Diligence

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 46 | RAAC 2006-SP4 [F2] | Subprime 2006 | $1,892,536 | $1,892,536 | $1,051,897 | $471,931 | | $471,931 | 100.00% |
| 47 | RAAC 2007-RP1 [A] | Subprime 2007 | $93,845,226 | $93,845,226 | $52,171,171 | $23,406,476 | | $23,406,476 | 100.00% |
| 48 | RAAC 2007-RP1 [F] | Subprime 2007 | $32,137,949 | $32,137,949 | $17,868,775 | $8,016,785 | | $8,016,785 | 100.00% |
| 49 | RAAC 2007-RP2 [A] | Subprime 2007 | $76,100,982 | $76,100,982 | $42,308,850 | $18,981,768 | | $18,981,768 | 100.00% |
| 50 | RAAC 2007-RP2 [F] | Subprime 2007 | $23,211,063 | $23,211,063 | $12,902,159 | $5,788,524 | | $5,788,524 | 100.00% |
| 51 | RAAC 2007-RP3 [A] | Subprime 2007 | $128,853,731 | $128,853,731 | $71,627,787 | $32,135,642 | | $32,135,642 | 100.00% |
| 52 | RAAC 2007-RP3 [F] | Subprime 2007 | $41,064,220 | $41,064,220 | $22,826,633 | $10,241,116 | | $10,241,116 | 100.00% |
| 53 | RAAC 2007-RP4 [A] | Subprime 2007 | $101,946,206 | $101,946,206 | $56,669,704 | $25,424,732 | | $25,424,732 | 100.00% |
| 54 | RAAC 2007-RP4 [F] | Subprime 2007 | $28,154,434 | $28,154,434 | $15,656,458 | $7,024,234 | | $7,024,234 | 100.00% |
| 55 | RAAC 2007-SP1 [A] | Subprime 2007 | $47,840,219 | $47,840,219 | $26,597,009 | $11,932,687 | | $11,932,687 | 100.00% |
| 56 | RAAC 2007-SP1 [F_1] | Subprime 2007 | $32,200,315 | $32,200,315 | $17,923,545 | $8,041,357 | | $8,041,357 | 100.00% |
| 57 | RAAC 2007-SP1 [F_2] | Subprime 2007 | $801,837 | $801,837 | $445,919 | $200,061 | | $200,061 | 100.00% |
| 58 | RAAC 2007-SP2 [A] | Subprime 2007 | $75,409,301 | $75,409,301 | $41,917,585 | $18,806,228 | | $18,806,228 | 100.00% |
| 59 | RAAC 2007-SP2 [F_1] | Subprime 2007 | $35,510,702 | $35,510,702 | $19,756,694 | $8,863,795 | | $8,863,795 | 100.00% |
| 60 | RAAC 2007-SP2 [F_2] | Subprime 2007 | $1,997,163 | $1,997,163 | $1,110,407 | $498,181 | | $498,181 | 100.00% |
| 61 | RAAC 2007-SP3 [A] | Subprime 2007 | $99,400,235 | $99,400,235 | $55,263,713 | $24,793,938 | | $24,793,938 | 100.00% |
| 62 | RAAC 2007-SP3 [F] | Subprime 2007 | $25,757,670 | $25,757,670 | $14,332,626 | $6,430,300 | | $6,430,300 | 100.00% |
| 63 | RALI 2004-QA1 [1_2YR] | ALT-A 2004 | $424,756 | $424,756 | $192,327 | $86,287 | | $86,287 | 100.00% |
| 64 | RALI 2004-QA1 [1_3YR] | ALT-A 2004 | $1,377,709 | $1,377,709 | $602,319 | $270,229 | | $270,229 | 100.00% |
| 65 | RALI 2004-QA1 [1_5YR] | ALT-A 2004 | $2,238,705 | $2,238,705 | $952,077 | $427,147 | | $427,147 | 100.00% |
| 66 | RALI 2004-QA1 [2_2YR] | ALT-A 2004 | $34,435 | $34,435 | $15,794 | $7,086 | | $7,086 | 100.00% |
| 67 | RALI 2004-QA1 [2_3YR] | ALT-A 2004 | $330,910 | $330,910 | $146,324 | $65,648 | | $65,648 | 100.00% |
| 68 | RALI 2004-QA1 [2_5YR] | ALT-A 2004 | $621,797 | $621,797 | $260,873 | $117,040 | | $117,040 | 100.00% |
| 69 | RALI 2004-QA2 [1] | ALT-A 2004 | $9,972,005 | $9,972,005 | $4,274,318 | $1,917,663 | | $1,917,663 | 100.00% |
| 70 | RALI 2004-QA2 [2] | ALT-A 2004 | $3,672,857 | $3,672,857 | $1,539,949 | $690,895 | | $690,895 | 100.00% |
| 71 | RALI 2004-QA3 [CB-I] | ALT-A 2004 | $2,235,760 | $2,235,760 | $975,031 | $437,445 | | $437,445 | 100.00% |
| 72 | RALI 2004-QA3 [CB-II] | ALT-A 2004 | $3,345,584 | $3,345,584 | $1,391,365 | $624,233 | | $624,233 | 100.00% |
| 73 | RALI 2004-QA3 [NB-I] | ALT-A 2004 | $675,215 | $675,215 | $295,777 | $132,699 | | $132,699 | 100.00% |
| 74 | RALI 2004-QA3 [NB-II] | ALT-A 2004 | $2,862,380 | $2,862,380 | $1,203,089 | $539,763 | | $539,763 | 100.00% |
| 75 | RALI 2004-QA4 [CBI] | ALT-A 2004 | $4,368,512 | $4,368,512 | $1,890,099 | $847,989 | | $847,989 | 100.00% |
| 76 | RALI 2004-QA4 [NBI] | ALT-A 2004 | $1,462,619 | $1,462,619 | $653,359 | $293,128 | | $293,128 | 100.00% |
| 77 | RALI 2004-QA4 [NBII] | ALT-A 2004 | $3,770,347 | $3,770,347 | $1,600,844 | $718,215 | | $718,215 | 100.00% |
| 78 | RALI 2004-QA4 [NBIII] | ALT-A 2004 | $514,134 | $514,134 | $212,298 | $95,247 | | $95,247 | 100.00% |
| 79 | RALI 2004-QA5 [1] | ALT-A 2004 | $2,186,564 | $2,186,564 | $980,316 | $439,816 | | $439,816 | 100.00% |
| 80 | RALI 2004-QA5 [2] | ALT-A 2004 | $350,247 | $350,247 | $136,529 | $61,253 | | $61,253 | 100.00% |
| 81 | RALI 2004-QA5 [3] | ALT-A 2004 | $12,002,492 | $12,002,492 | $5,091,402 | $2,284,246 | | $2,284,246 | 100.00% |
| 82 | RALI 2004-QA6 [1] | ALT-A 2004 | $6,095,206 | $6,095,206 | $2,719,305 | $1,220,010 | | $1,220,010 | 100.00% |
| 83 | RALI 2004-QA6 [2] | ALT-A 2004 | $4,312,384 | $4,312,384 | $1,937,180 | $869,111 | | $869,111 | 100.00% |
| 84 | RALI 2004-QA6 [3] | ALT-A 2004 | $15,226,210 | $15,226,210 | $6,499,705 | $2,916,078 | | $2,916,078 | 100.00% |

12-12020-mg    Doc 6065-1    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Pg 298 of 398
Case 1:14-cv-03039-GBD    Document 51-1    Filed 11/06/14    Page 273 of 355
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 12/11/13 17:30:11    Appendix 1
Subject to FRE 408 and Confidential Due Diligence

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
| 85 | RALI 2004-QA6 [4] | ALT-A 2004 | $8,401,255 | $8,401,255 | $3,593,792 | $1,612,346 | | $1,612,346 | 100.00% |
| 86 | RALI 2004-QA6 [5] | ALT-A 2004 | $4,852,056 | $4,852,056 | $2,140,539 | $960,348 | | $960,348 | 100.00% |
| 87 | RALI 2004-QA6 [6] | ALT-A 2004 | $4,998,795 | $4,998,795 | $2,144,216 | $961,997 | | $961,997 | 100.00% |
| 88 | RALI 2004-QS1 [Total] | ALT-A 2004 | $7,116,080 | $7,116,080 | $2,999,267 | $1,345,614 | | $1,345,614 | 100.00% |
| 89 | RALI 2004-QS10 [Total] | ALT-A 2004 | $6,805,929 | $6,805,929 | $2,947,235 | $1,322,270 | | $1,322,270 | 100.00% |
| 90 | RALI 2004-QS11 [Total] | ALT-A 2004 | $6,117,274 | $6,117,274 | $2,597,569 | $1,165,393 | | $1,165,393 | 100.00% |
| 91 | RALI 2004-QS12 [Total] | ALT-A 2004 | $11,958,833 | $11,958,833 | $5,061,895 | $2,271,008 | | $2,271,008 | 100.00% |
| 92 | RALI 2004-QS13 [CB] | ALT-A 2004 | $1,260,775 | $1,260,775 | $545,364 | $244,676 | | $244,676 | 100.00% |
| 93 | RALI 2004-QS13 [NB] | ALT-A 2004 | $35,924 | $35,924 | $13,945 | $6,257 | | $6,257 | 100.00% |
| 94 | RALI 2004-QS14 [Total] | ALT-A 2004 | $7,191,774 | $7,191,774 | $3,089,872 | $1,386,264 | | $1,386,264 | 100.00% |
| 95 | RALI 2004-QS15 [Total] | ALT-A 2004 | $9,037,632 | $9,037,632 | $3,947,724 | $1,771,137 | | $1,771,137 | 100.00% |
| 96 | RALI 2004-QS16 [1] | ALT-A 2004 | $16,387,668 | $16,387,668 | $7,062,848 | $3,168,731 | | $3,168,731 | 100.00% |
| 97 | RALI 2004-QS16 [2] | ALT-A 2004 | $1,610,187 | $1,610,187 | $656,931 | $294,731 | | $294,731 | 100.00% |
| 98 | RALI 2004-QS2 [A4] | ALT-A 2004 | $1,051,770 | $1,051,770 | $440,154 | $197,474 | | $197,474 | 100.00% |
| 99 | RALI 2004-QS2 [CB] | ALT-A 2004 | $6,869,011 | $6,869,011 | $2,978,470 | $1,336,284 | | $1,336,284 | 100.00% |
| 100 | RALI 2004-QS3 [CB] | ALT-A 2004 | $1,290,989 | $1,290,989 | $555,200 | $249,089 | | $249,089 | 100.00% |
| 101 | RALI 2004-QS3 [I] | ALT-A 2004 | $166,274 | $166,274 | $72,912 | $32,712 | | $32,712 | 100.00% |
| 102 | RALI 2004-QS3 [II] | ALT-A 2004 | $99,279 | $99,279 | $38,536 | $17,289 | | $17,289 | 100.00% |
| 103 | RALI 2004-QS4 [Total] | ALT-A 2004 | $7,559,444 | $7,559,444 | $3,214,118 | $1,442,007 | | $1,442,007 | 100.00% |
| 104 | RALI 2004-QS5 [Total] | ALT-A 2004 | $8,197,861 | $8,197,861 | $3,502,121 | $1,571,219 | | $1,571,219 | 100.00% |
| 105 | RALI 2004-QS6 [Total] | ALT-A 2004 | $1,342,050 | $1,342,050 | $574,277 | $257,648 | | $257,648 | 100.00% |
| 106 | RALI 2004-QS7 [Total] | ALT-A 2004 | $12,123,587 | $12,123,587 | $5,090,930 | $2,284,034 | | $2,284,034 | 100.00% |
| 107 | RALI 2004-QS8 [Total] | ALT-A 2004 | $7,532,047 | $7,532,047 | $3,196,591 | $1,434,143 | | $1,434,143 | 100.00% |
| 108 | RALI 2004-QS9 [Total] | ALT-A 2004 | $1,299,101 | $1,299,101 | $565,749 | $253,822 | | $253,822 | 100.00% |
| 109 | RALI 2005-QA1 [Total] | ALT-A 2004 | $26,941,306 | $26,941,306 | $11,653,331 | $5,228,240 | | $5,228,240 | 100.00% |
| 110 | RALI 2005-QA10 [1] | ALT-A 2005 | $1,195,787 | $1,195,787 | $541,595 | $243,147 | | $243,147 | 100.00% |
| 111 | RALI 2005-QA10 [2] | ALT-A 2005 | $20,472,692 | $20,472,692 | $9,027,565 | $4,050,196 | | $4,050,196 | 100.00% |
| 112 | RALI 2005-QA10 [3] | ALT-A 2005 | $65,470,136 | $65,470,136 | $28,318,773 | $12,705,152 | | $12,705,152 | 100.00% |
| 113 | RALI 2005-QA10 [4] | ALT-A 2005 | $18,173,357 | $18,173,357 | $7,590,261 | $3,405,353 | | $3,405,353 | 100.00% |
| 114 | RALI 2005-QA11 [1] | ALT-A 2005 | $1,218,355 | $1,218,355 | $511,348 | $229,415 | | $229,415 | 100.00% |
| 115 | RALI 2005-QA11 [2] | ALT-A 2005 | $14,986,164 | $14,986,164 | $6,580,600 | $2,952,371 | | $2,952,371 | 100.00% |
| 116 | RALI 2005-QA11 [3] | ALT-A 2005 | $9,539,923 | $9,539,923 | $4,192,399 | $1,880,910 | | $1,880,910 | 100.00% |
| 117 | RALI 2005-QA11 [4] | ALT-A 2005 | $40,351,227 | $40,351,227 | $17,501,491 | $7,852,004 | | $7,852,004 | 100.00% |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 118 | RALI 2005-QA11 [5] | ALT-A 2005 | $17,127,691 | $17,127,691 | $7,338,745 | $3,292,511 | | $3,292,511 | 100.00% |
| 119 | RALI 2005-QA11 [6] | ALT-A 2005 | $7,072,234 | $7,072,234 | $2,983,690 | $1,338,625 | | $1,338,625 | 100.00% |
| 120 | RALI 2005-QA12 [1] | ALT-A 2005 | $13,663,911 | $13,663,911 | $5,989,211 | $2,687,046 | | $2,687,046 | 100.00% |
| 121 | RALI 2005-QA12 [2] | ALT-A 2005 | $9,063,150 | $9,063,150 | $3,986,207 | $1,788,403 | | $1,788,403 | 100.00% |
| 122 | RALI 2005-QA12 [3] | ALT-A 2005 | $12,542,111 | $12,542,111 | $5,404,276 | $2,424,616 | | $2,424,616 | 100.00% |
| 123 | RALI 2005-QA12 [4] | ALT-A 2005 | $6,730,375 | $6,730,375 | $2,864,356 | $1,285,087 | | $1,285,087 | 100.00% |
| 124 | RALI 2005-QA12 [5] | ALT-A 2005 | $8,221,655 | $8,221,655 | $3,535,837 | $1,586,345 | | $1,586,345 | 100.00% |
| 125 | RALI 2005-QA13 [1] | ALT-A 2005 | $17,704,658 | $17,704,658 | $7,761,434 | $3,482,150 | | $3,482,150 | 100.00% |
| 126 | RALI 2005-QA13 [2] | ALT-A 2005 | $91,471,028 | $91,471,028 | $39,789,956 | $17,851,672 | | $17,851,672 | 100.00% |
| 127 | RALI 2005-QA13 [3] | ALT-A 2005 | $7,954,710 | $7,954,710 | $3,438,993 | $1,542,896 | | $1,542,896 | 100.00% |
| 128 | RALI 2005-QA2 [AII] | ALT-A 2005 | $5,848,448 | $5,848,448 | $2,555,237 | $1,146,401 | | $1,146,401 | 100.00% |
| 129 | RALI 2005-QA2 [AIII] | ALT-A 2005 | $6,665,344 | $6,665,344 | $2,814,867 | $1,262,884 | | $1,262,884 | 100.00% |
| 130 | RALI 2005-QA2 [CBI] | ALT-A 2005 | $7,301,527 | $7,301,527 | $3,213,102 | $1,441,551 | | $1,441,551 | 100.00% |
| 131 | RALI 2005-QA2 [CBII] | ALT-A 2005 | $14,465,864 | $14,465,864 | $6,059,443 | $2,718,555 | | $2,718,555 | 100.00% |
| 132 | RALI 2005-QA2 [NBII] | ALT-A 2005 | $3,134,660 | $3,134,660 | $1,340,329 | $601,336 | | $601,336 | 100.00% |
| 133 | RALI 2005-QA2 [NBI] | | | | | | | | |
| 134 | RALI 2005-QA3 [1] | ALT-A 2005 | $8,049,693 | $8,049,693 | $3,361,647 | $1,508,195 | | $1,508,195 | 100.00% |
| 135 | RALI 2005-QA3 [2] | ALT-A 2005 | $14,930,793 | $14,930,793 | $6,512,869 | $2,921,984 | | $2,921,984 | 100.00% |
| 136 | RALI 2005-QA3 [3] | ALT-A 2005 | $9,336,570 | $9,336,570 | $4,027,372 | $1,806,871 | | $1,806,871 | 100.00% |
| 137 | RALI 2005-QA3 [4] | ALT-A 2005 | $12,146,690 | $12,146,690 | $5,092,551 | $2,284,761 | | $2,284,761 | 100.00% |
| 138 | RALI 2005-QA3 [5] | ALT-A 2005 | $3,846,821 | $3,846,821 | $1,544,159 | $692,783 | | $692,783 | 100.00% |
| 139 | RALI 2005-QA3 [6] | ALT-A 2005 | $1,552,476 | $1,552,476 | $640,488 | $287,354 | | $287,354 | 100.00% |
| 140 | RALI 2005-QA3 [7] | ALT-A 2005 | $423,679 | $423,679 | $166,185 | $74,558 | | $74,558 | 100.00% |
| 141 | RALI 2005-QA3 [8] | ALT-A 2005 | $4,366,990 | $4,366,990 | $1,911,028 | $857,379 | | $857,379 | 100.00% |
| 142 | RALI 2005-QA4 [1] | ALT-A 2005 | $2,574,749 | $2,574,749 | $1,130,786 | $507,325 | | $507,325 | 100.00% |
| 143 | RALI 2005-QA4 [2] | ALT-A 2005 | $16,434,753 | $16,434,753 | $7,148,455 | $3,207,138 | | $3,207,138 | 100.00% |
| 144 | RALI 2005-QA4 [3] | ALT-A 2005 | $9,710,647 | $9,710,647 | $4,183,665 | $1,876,992 | | $1,876,992 | 100.00% |
| 145 | RALI 2005-QA4 [4] | ALT-A 2005 | $20,726,459 | $20,726,459 | $8,822,301 | $3,958,105 | | $3,958,105 | 100.00% |
| 146 | RALI 2005-QA4 [5] | ALT-A 2005 | $10,635,268 | $10,635,268 | $4,390,356 | $1,969,723 | | $1,969,723 | 100.00% |
| 147 | RALI 2005-QA5 [1] | ALT-A 2005 | $2,133,333 | $2,133,333 | $905,640 | $406,313 | | $406,313 | 100.00% |
| 148 | RALI 2005-QA5 [2] | ALT-A 2005 | $4,607,314 | $4,607,314 | $2,041,698 | $916,003 | | $916,003 | 100.00% |
| 149 | RALI 2005-QA6 [1] | ALT-A 2005 | $5,503,446 | $5,503,446 | $2,433,842 | $1,091,938 | | $1,091,938 | 100.00% |
| 150 | RALI 2005-QA6 [2] | ALT-A 2005 | $18,876,161 | $18,876,161 | $8,239,148 | $3,696,475 | | $3,696,475 | 100.00% |
| 151 | RALI 2005-QA6 [3] | ALT-A 2005 | $11,142,143 | $11,142,143 | $4,837,290 | $2,170,239 | | $2,170,239 | 100.00% |
| 152 | RALI 2005-QA6 [4] | ALT-A 2005 | $16,504,641 | $16,504,641 | $6,947,949 | $3,117,181 | | $3,117,181 | 100.00% |
| 153 | RALI 2005-QA6 [5] | ALT-A 2005 | $13,007,415 | $13,007,415 | $5,584,134 | $2,505,309 | | $2,505,309 | 100.00% |
| 154 | RALI 2005-QA7 [1] | ALT-A 2005 | $5,048,321 | $5,048,321 | $2,156,010 | $967,289 | | $967,289 | 100.00% |
| 155 | RALI 2005-QA7 [2] | ALT-A 2005 | $14,145,236 | $14,145,236 | $6,103,247 | $2,738,208 | | $2,738,208 | 100.00% |
| 156 | RALI 2005-QA7 [3] | ALT-A 2005 | $56,305,543 | $56,305,543 | $23,866,311 | $10,707,565 | | $10,707,565 | 100.00% |
| 157 | RALI 2005-QA8 [1] | ALT-A 2005 | $14,242,286 | $14,242,286 | $6,196,990 | $2,780,265 | | $2,780,265 | 100.00% |
| 158 | RALI 2005-QA8 [2] | ALT-A 2005 | $7,489,280 | $7,489,280 | $3,263,902 | $1,464,342 | | $1,464,342 | 100.00% |
| | RALI 2005-QA8 [3] | ALT-A 2005 | $27,002,357 | $27,002,357 | $11,650,299 | $5,226,880 | | $5,226,880 | 100.00% |

Case 14-cv-03039-GBD    Document 1-1    Filed 01/06/14    Page 275 of 355
Subject to FRE 408 and Related Confidentiality and Other Protections. Original Due Diligence

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
| 159 | RALI 2005-QA8 [4] | ALT-A 2005 | $10,109,165 | $10,109,165 | $4,286,019 | $1,927,399 | | $1,927,399 | 100.00% |
| 160 | RALI 2005-QA8 [5] | ALT-A 2005 | $7,133,298 | $7,133,298 | $3,031,023 | $1,359,862 | | $1,359,862 | 100.00% |
| 161 | RALI 2005-QA8 [6] | ALT-A 2005 | $4,106,014 | $4,106,014 | $1,705,086 | $764,983 | | $764,983 | 100.00% |
| 162 | RALI 2005-QA9 [1] | ALT-A 2005 | $15,037,724 | $15,037,724 | $6,591,186 | $2,957,121 | | $2,957,121 | 100.00% |
| 163 | RALI 2005-QA9 [2] | ALT-A 2005 | $10,497,131 | $10,497,131 | $4,696,326 | $2,106,996 | | $2,106,996 | 100.00% |
| 164 | RALI 2005-QA9 [3] | ALT-A 2005 | $55,330,017 | $55,330,017 | $23,868,985 | $10,708,765 | | $10,708,765 | 100.00% |
| 165 | RALI 2005-QA9 [4] | ALT-A 2005 | $30,038,902 | $30,038,902 | $12,876,447 | $5,776,988 | | $5,776,988 | 100.00% |
| 166 | RALI 2005-QO1 [Total] | Pay Option Arm 2005 | $121,308,683 | $121,308,683 | $33,635,129 | $15,090,323 | | $15,090,323 | 100.00% |
| 167 | RALI 2005-QO2 [Total] | Pay Option Arm 2005 | $82,682,064 | $82,682,064 | $23,234,995 | $10,424,327 | | $10,424,327 | 100.00% |
| 168 | RALI 2005-QO3 [Total] | Pay Option Arm 2005 | $109,314,347 | $109,314,347 | $31,027,729 | $13,920,519 | | $13,920,519 | 100.00% |
| 169 | RALI 2005-QO4 [1] | Pay Option Arm 2005 | $61,203,661 | $61,203,661 | $17,387,372 | $7,800,804 | | $7,800,804 | 100.00% |
| 170 | RALI 2005-QO4 [2] | Pay Option Arm 2005 | $122,250,668 | $122,250,668 | $34,759,561 | $15,594,797 | | $15,594,797 | 100.00% |
| 171 | RALI 2005-QS5 [Total] | ALT-A 2005 | $316,028,961 | $316,028,961 | $90,530,833 | $40,616,450 | | $40,616,450 | 100.00% |
| 172 | RALI 2005-QS12 [Total] | ALT-A 2005 | $14,250,968 | $14,250,968 | $5,880,447 | $2,638,249 | | $2,638,249 | 100.00% |
| 173 | RALI 2005-QS10 [1] | ALT-A 2005 | $7,139,268 | $7,139,268 | $3,035,316 | $1,361,788 | | $1,361,788 | 100.00% |
| 174 | RALI 2005-QS10 [2] | ALT-A 2005 | $6,385,476 | $6,385,476 | $2,645,377 | $1,186,842 | | $1,186,842 | 100.00% |
| 175 | RALI 2005-QS10 [3] | ALT-A 2005 | $13,346,092 | $13,346,092 | $5,662,553 | $2,540,491 | | $2,540,491 | 100.00% |
| 176 | RALI 2005-QS11 [Total] | ALT-A 2005 | $22,481,714 | $22,481,714 | $9,492,304 | $4,258,700 | | $4,258,700 | 100.00% |
| 177 | RALI 2005-QS1 [Total] | ALT-A 2005 | $55,651,247 | $55,651,247 | $23,510,977 | $10,548,146 | | $10,548,146 | 100.00% |
| 178 | RALI 2005-QS13 [1] | ALT-A 2005 | $36,963,357 | $36,963,357 | $15,660,116 | $7,025,875 | | $7,025,875 | 100.00% |
| 179 | RALI 2005-QS13 [2] | ALT-A 2005 | $38,007,610 | $38,007,610 | $16,065,219 | $7,207,624 | | $7,207,624 | 100.00% |
| 180 | RALI 2005-QS14 [1] | ALT-A 2005 | $6,198,189 | $6,198,189 | $2,510,097 | $1,126,149 | | $1,126,149 | 100.00% |
| 181 | RALI 2005-QS14 [2] | ALT-A 2005 | $17,029,066 | $17,029,066 | $7,355,305 | $3,299,941 | | $3,299,941 | 100.00% |
| 182 | RALI 2005-QS14 [3] | ALT-A 2005 | $32,326,250 | $32,326,250 | $13,627,334 | $6,113,872 | | $6,113,872 | 100.00% |
| 183 | RALI 2005-QS15 [1] | ALT-A 2005 | $13,730,503 | $13,730,503 | $5,887,828 | $2,641,560 | | $2,641,560 | 100.00% |
| 184 | RALI 2005-QS15 [2] | ALT-A 2005 | $5,782,111 | $5,782,111 | $2,474,503 | $1,110,180 | | $1,110,180 | 100.00% |
| 185 | RALI 2005-QS15 [3] | ALT-A 2005 | $35,509,146 | $35,509,146 | $15,129,077 | $6,787,626 | | $6,787,626 | 100.00% |
| 186 | RALI 2005-QS16 [Total] | ALT-A 2005 | $54,522,209 | $54,522,209 | $23,264,325 | $10,437,486 | | $10,437,486 | 100.00% |
| 187 | RALI 2005-QS17 [Total] | ALT-A 2005 | $76,335,380 | $76,335,380 | $32,761,396 | $14,698,325 | | $14,698,325 | 100.00% |
| 188 | RALI 2005-QS2 [Total] | ALT-A 2005 | $14,575,418 | $14,575,418 | $5,969,690 | $2,678,288 | | $2,678,288 | 100.00% |
| 189 | RALI 2005-QS3 [1|1] | ALT-A 2005 | $7,025,859 | $7,025,859 | $2,855,607 | $1,281,162 | | $1,281,162 | 100.00% |
| 190 | RALI 2005-QS3 [2] | ALT-A 2005 | $4,041,422 | $4,041,422 | $1,626,451 | $729,703 | | $729,703 | 100.00% |
| 191 | RALI 2005-QS3 [3|2] | ALT-A 2005 | $19,944,801 | $19,944,801 | $8,446,713 | $3,789,599 | | $3,789,599 | 100.00% |
| 192 | RALI 2005-QS4 [Total] | ALT-A 2005 | $16,353,729 | $16,353,729 | $6,803,076 | $3,052,184 | | $3,052,184 | 100.00% |
| 193 | RALI 2005-QS5 [Total] | ALT-A 2005 | $15,166,179 | $15,166,179 | $6,391,048 | $2,867,329 | Radian | $0 | 100.00% |

RFC — Summary of Origination Due Diligence
Subject to FRE 408 and Confidentiality

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| RAU 2005-QS6 | | | | | | | | |
| [Total] | ALT-A 2005 | $23,875,505 | $23,875,505 | $10,023,050 | $4,496,818 | | $4,496,818 | 100.00% |
| RAU 2005-QS7 [1] | ALT-A 2005 | $23,830,136 | $23,830,136 | $9,996,874 | $4,485,075 | | $4,485,075 | 100.00% |
| RAU 2005-QS7 [2] | ALT-A 2005 | $9,594,338 | $9,594,338 | $4,020,657 | $1,803,859 | | $1,803,859 | 100.00% |
| RAU 2005-QS8 | | | | | | | | |
| [Total] | ALT-A 2005 | $2,539,785 | $2,539,785 | $1,045,359 | $468,998 | | $468,998 | 100.00% |
| RAU 2005-QS9 | | | | | | | | |
| [Total] | ALT-A 2006 | $34,132,932 | $34,132,932 | $14,243,899 | $6,390,492 | | $6,390,492 | 100.00% |
| RAU 2006-QA1 [1] | ALT-A 2006 | $21,691,108 | $21,691,108 | $7,522,096 | $3,374,771 | | $3,374,771 | 100.00% |
| RAU 2006-QA1 [2] | ALT-A 2006 | $997,945,398 | $997,945,398 | $33,809,159 | $15,168,402 | | $15,168,402 | 100.00% |
| RAU 2006-QA1 [3] | ALT-A 2006 | $23,507,027 | $23,507,027 | $8,111,503 | $3,639,207 | | $3,639,207 | 100.00% |
| RAU 2006-QA10 | | | | | | | | |
| [Total] | ALT-A 2006 | $118,689,793 | $118,689,793 | $41,080,594 | $18,430,714 | | $18,430,714 | 100.00% |
| RAU 2006-QA11 | | | | | | | | |
| [Total] | ALT-A 2006 | $126,081,604 | $126,081,604 | $43,673,618 | $19,594,068 | | $19,594,068 | 100.00% |
| RAU 2006-QA2 [1] | ALT-A 2006 | $79,445,538 | $79,445,538 | $27,468,601 | $12,323,725 | | $12,323,725 | 100.00% |
| RAU 2006-QA2 [2] | ALT-A 2006 | $12,023,273 | $12,023,273 | $4,145,200 | $1,859,734 | | $1,859,734 | 100.00% |
| RAU 2006-QA2 [3] | ALT-A 2006 | $8,733,007 | $8,733,007 | $2,996,302 | $1,344,284 | | $1,344,284 | 100.00% |
| RAU 2006-QA3 | | | | | | | | |
| [Total] | ALT-A 2006 | $102,957,233 | $102,957,233 | $35,632,752 | $15,986,552 | | $15,986,552 | 100.00% |
| RAU 2006-QA4 [1] | ALT-A 2006 | $81,080,562 | $81,080,562 | $28,046,484 | $12,582,990 | | $12,582,990 | 100.00% |
| RAU 2006-QA4 [2] | ALT-A 2006 | $152,159,428 | $152,159,428 | $52,652,688 | $23,622,507 | | $23,622,507 | 100.00% |
| RAU 2006-QA5 [1] | ALT-A 2006 | $21,306,252 | $21,306,252 | $7,291,892 | $3,271,491 | | $3,271,491 | 100.00% |
| RAU 2006-QA6 | | | | | | | | |
| [Total] | ALT-A 2006 | $184,902,914 | $184,902,914 | $64,155,515 | $28,783,224 | | $28,783,224 | 100.00% |
| RAU 2006-QA7 [1] | ALT-A 2006 | $69,089,680 | $69,089,680 | $23,940,669 | $10,740,926 | | $10,740,926 | 100.00% |
| RAU 2006-QA7 [2] | ALT-A 2006 | $121,605,696 | $121,605,696 | $42,231,622 | $18,947,120 | | $18,947,120 | 100.00% |
| RAU 2006-QA8 | | | | | | | | |
| [Total] | ALT-A 2006 | $261,080,121 | $261,080,121 | $90,598,338 | $40,646,736 | | $40,646,736 | 100.00% |
| RAU 2006-QA9 | | | | | | | | |
| [Total] | ALT-A 2006 | $91,185,526 | $91,185,526 | $31,531,071 | $14,146,342 | | $14,146,342 | 100.00% |
| RAU 2006-QH1 | | | | | | | | |
| [Total] | Pay Option Arm 2006 | $113,291,465 | $113,291,465 | $41,425,929 | $18,585,647 | Ambac | $18,585,647 | 100.00% |
| RAU 2006-QO1 [1] | Pay Option Arm 2006 | $19,310,834 | $19,310,834 | $6,913,098 | $3,101,546 | | $3,101,546 | 100.00% |
| RAU 2006-QO1 [2] | Pay Option Arm 2006 | $57,371,456 | $57,371,456 | $20,412,006 | $9,157,800 | | $9,157,800 | 100.00% |
| RAU 2006-QO1 [3] | Pay Option Arm 2006 | $172,572,288 | $172,572,288 | $62,201,868 | $27,906,725 | | $27,906,725 | 100.00% |
| RAU 2006-QO10 [1] | Pay Option Arm 2006 | $272,652,864 | $272,652,864 | $98,319,334 | $44,110,743 | | $44,110,743 | 100.00% |
| RAU 2006-QO10 [2] | Pay Option Arm 2006 | $87,278,452 | $87,278,452 | $31,542,572 | $14,151,502 | | $14,151,502 | 100.00% |
| RAU 2006-QO2 | | | | | | | | |
| [Total] | Pay Option Arm 2006 | $187,034,845 | $187,034,845 | $66,952,310 | $30,038,000 | | $30,038,000 | 100.00% |
| RAU 2006-QO3 | | | | | | | | |
| [Total] | Pay Option Arm 2006 | $202,660,477 | $202,660,477 | $73,189,418 | $32,836,264 | | $32,836,264 | 100.00% |
| RAU 2006-QO4 [1] | Pay Option Arm 2006 | $127,155,367 | $127,155,367 | $46,103,863 | $20,684,392 | XL | $0 | 100.00% |
| RAU 2006-QO4 [2] | Pay Option Arm 2006 | $132,433,134 | $132,433,134 | $47,842,604 | $21,464,474 | XL | $0 | 100.00% |
| RAU 2006-QO5 [1] | Pay Option Arm 2006 | $137,451,270 | $137,451,270 | $49,385,744 | $22,156,800 | | $22,156,800 | 100.00% |
| RAU 2006-QO5 [2] | Pay Option Arm 2006 | $150,070,652 | $150,070,652 | $54,547,037 | $24,472,403 | | $24,472,403 | 100.00% |
| RAU 2006-QO5 [3] | Pay Option Arm 2006 | $80,725,512 | $80,725,512 | $29,029,985 | $13,024,236 | | $13,024,236 | 100.00% |
| RAU 2006-QO6 | | | | | | | | |
| [Total] | Pay Option Arm 2006 | $449,322,172 | $449,322,172 | $162,375,739 | $72,849,501 | | $72,849,501 | 100.00% |
| RAU 2006-QO7 [1] | Pay Option Arm 2006 | $237,638,133 | $237,638,133 | $86,126,429 | $58,640,424 | | $58,640,424 | 100.00% |
| RAU 2006-QO7 [2] | Pay Option Arm 2006 | $165,835,633 | $165,835,633 | $60,902,784 | $27,323,894 | | $27,323,894 | 100.00% |
| RAU 2006-QO7 | | | | | | | | |
| [Total] | Pay Option Arm 2006 | $69,918,207 | $69,918,207 | $25,080,835 | $11,252,459 | | $11,252,459 | 100.00% |
| [3_PP_1YR] | Pay Option Arm 2006 | $86,103,708 | $86,103,708 | $30,821,966 | $13,828,204 | | $13,828,204 | 100.00% |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Pg 302 of 398

12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Case 1:14-cv-03039-GBD    Document 15-1    Filed 11/06/14    Page 27 of 355

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| RALI 2006-QO7 [3_JP_3YR] | Pay Option Arm 2006 | $2,344,547 | $2,344,547 | $848,647 | $380,743 | | $380,743 | 100.00% |
| RALI 2006-QO8 [1MO_PIP] | Pay Option Arm 2006 | $47,042,154 | $47,042,154 | $16,953,835 | $7,606,299 | | $7,606,299 | 100.00% |
| RALI 2006-QO8 [1PP_1YR] | Pay Option Arm 2006 | $92,833,297 | $92,833,297 | $33,412,625 | $14,990,497 | | $14,990,497 | 100.00% |
| RALI 2006-QO8 [1PP_3YR] | Pay Option Arm 2006 | $174,400,889 | $174,400,889 | $63,264,191 | $28,383,334 | | $28,383,334 | 100.00% |
| RALI 2006-QO8 [2PP_3YR] | Pay Option Arm 2006 | $182,121,631 | $182,121,631 | $65,554,796 | $29,411,008 | | $29,411,008 | 100.00% |
| RALI 2006-QO9 [1MO_PIP] | Pay Option Arm 2006 | $32,457,431 | $32,457,431 | $11,654,960 | $5,228,971 | | $5,228,971 | 100.00% |
| RALI 2006-QO9 [1PP_1YR] | Pay Option Arm 2006 | $64,963,730 | $64,963,730 | $23,337,782 | $10,470,442 | | $10,470,442 | 100.00% |
| RALI 2006-QO9 [1PP_23YR] | Pay Option Arm 2006 | $135,010 | $135,010 | $50,891 | $22,832 | | $22,832 | 100.00% |
| RALI 2006-QO9 [1PP_3YR] | Pay Option Arm 2006 | $123,969,045 | $123,969,045 | $44,996,922 | $20,187,765 | | $20,187,765 | 100.00% |
| RALI 2006-QO9 [2PP_3YR] | Pay Option Arm 2006 | $124,821,534 | $124,821,534 | $45,231,370 | $20,292,950 | | $20,292,950 | 100.00% |
| RALI 2006-QS1 [Total] | ALT-A 2006 | $52,154,309 | $52,154,309 | $17,857,760 | $8,011,843 | | $8,011,843 | 100.00% |
| RALI 2006-QS10 [Total] | ALT-A 2006 | $100,557,075 | $100,557,075 | $34,479,649 | $15,469,215 | | $15,469,215 | 100.00% |
| RALI 2006-QS11 [1] | ALT-A 2006 | $143,611,059 | $143,611,059 | $49,325,609 | $22,129,821 | | $22,129,821 | 100.00% |
| RALI 2006-QS11 [2] | ALT-A 2006 | $10,029,044 | $10,029,044 | $3,452,998 | $1,549,180 | | $1,549,180 | 100.00% |
| RALI 2006-QS12 [I] | ALT-A 2006 | $31,241,371 | $31,241,371 | $10,798,896 | $4,844,900 | | $4,844,900 | 100.00% |
| RALI 2006-QS12 [II] | ALT-A 2006 | $93,411,164 | $93,411,164 | $32,221,326 | $14,456,024 | | $14,456,024 | 100.00% |
| RALI 2006-QS13 [1] | ALT-A 2006 | $108,835,479 | $108,835,479 | $37,447,821 | $16,800,879 | | $16,800,879 | 100.00% |
| RALI 2006-QS13 [2] | ALT-A 2006 | $9,318,118 | $9,318,118 | $3,141,170 | $1,409,279 | | $1,409,279 | 100.00% |
| RALI 2006-QS14 [Total] | ALT-A 2006 | $163,538,308 | $163,538,308 | $56,348,772 | $25,280,747 | | $25,280,747 | 100.00% |
| RALI 2006-QS15 [Total] | ALT-A 2006 | $121,625,404 | $121,625,404 | $41,928,540 | $18,811,143 | | $18,811,143 | 100.00% |
| RALI 2006-QS16 [Total] | ALT-A 2006 | $167,277,151 | $167,277,151 | $57,498,540 | $25,796,587 | | $25,796,587 | 100.00% |
| RALI 2006-QS17 [Total] | ALT-A 2006 | $126,729,837 | $126,729,837 | $43,573,311 | $19,549,066 | | $19,549,066 | 100.00% |
| RALI 2006-QS18 [1] | ALT-A 2006 | $82,781,770 | $82,781,770 | $28,518,587 | $12,794,798 | | $12,794,798 | 100.00% |
| RALI 2006-QS18 [2] | ALT-A 2006 | $192,382,426 | $192,382,426 | $66,424,032 | $29,800,989 | | $29,800,989 | 100.00% |
| RALI 2006-QS18 [3] | ALT-A 2006 | $10,594,899 | $10,594,899 | $3,576,346 | $1,604,520 | | $1,604,520 | 100.00% |
| RALI 2006-QS2 [1] | ALT-A 2006 | $128,102,001 | $128,102,001 | $43,946,639 | $19,716,558 | | $19,716,558 | 100.00% |
| RALI 2006-QS2 [2] | ALT-A 2006 | $7,195,416 | $7,195,416 | $2,421,573 | $1,086,433 | | $1,086,433 | 100.00% |
| RALI 2006-QS2 [3] | ALT-A 2006 | $1,853,466 | $1,853,466 | $623,939 | $279,929 | | $279,929 | 100.00% |
| RALI 2006-QS3 [1] | ALT-A 2006 | $80,993,173 | $80,993,173 | $27,813,146 | $12,478,304 | | $12,478,304 | 100.00% |
| RALI 2006-QS3 [2] | ALT-A 2006 | $103,895,014 | $103,895,014 | $35,837,503 | $16,078,413 | | $16,078,413 | 100.00% |
| RALI 2006-QS4 [Total] | ALT-A 2006 | $143,712,269 | $143,712,269 | $49,376,733 | $22,152,758 | | $22,152,758 | 100.00% |
| RALI 2006-QS5 [Total] | ALT-A 2006 | $139,833,975 | $139,833,975 | $48,072,553 | $21,567,640 | | $21,567,640 | 100.00% |
| RALI 2006-QS6 [1] | ALT-A 2006 | $160,579,444 | $160,579,444 | $55,373,308 | $24,843,107 | | $24,843,107 | 100.00% |
| RALI 2006-QS6 [2] | ALT-A 2006 | $9,815,273 | $9,815,273 | $3,328,583 | $1,493,361 | | $1,493,361 | 100.00% |

Case 1:14-cv-03039-GBD   Document 51-1   Filed 11/06/14   Page 278 of 355
Confidential – Subject to Protective Order in RFC/ResCap Originations Diligence

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| RALI 2006-QS7 [Total] | ALT-A 2006 | $113,855,935 | $113,855,935 | $39,215,364 | $17,593,883 | | $17,593,883 | 100.00% |
| RALI 2006-QS8 [Total] | ALT-A 2006 | $204,742,078 | $204,742,078 | $70,445,452 | $31,605,190 | | $31,605,190 | 100.00% |
| RALI 2006-QS9 [1] [Total] | ALT-A 2006 | $91,760,351 | $91,760,351 | $31,582,551 | $14,169,439 | | $14,169,439 | 100.00% |
| RALI 2006-QS9 [2] RALI 2007-QA1 | ALT-A 2006 | $22,960,068 | $22,960,068 | $7,952,391 | $3,567,822 | | $3,567,822 | 100.00% |
| RALI 2007-QA1 [Total] | ALT-A 2007 | $135,783,325 | $135,783,325 | $46,948,050 | $21,063,135 | | $21,063,135 | 100.00% |
| RALI 2007-QA2 [Total] | ALT-A 2007 | $122,561,937 | $122,561,937 | $42,455,608 | $19,047,611 | | $19,047,611 | 100.00% |
| RALI 2007-QA3 [Total] | ALT-A 2007 | $331,625,616 | $331,625,616 | $114,864,146 | $51,533,535 | | $51,533,535 | 100.00% |
| RALI 2007-QA4 [Total] | ALT-A 2007 | $87,240,592 | $87,240,592 | $30,295,539 | $13,592,024 | | $13,592,024 | 100.00% |
| RALI 2007-QA5 [1] [Total] | ALT-A 2007 | $92,481,593 | $92,481,593 | $32,014,734 | $14,363,337 | | $14,363,337 | 100.00% |
| RALI 2007-QA5 [2] [Total] | ALT-A 2007 | $59,632,841 | $59,632,841 | $20,595,938 | $9,240,320 | | $9,240,320 | 100.00% |
| RALI 2007-QA5 [3] RALI 2007-QH1 | ALT-A 2007 | $16,883,932 | $16,883,932 | $5,755,079 | $2,582,003 | | $2,582,003 | 100.00% |
| RALI 2007-QH1 [Total] | ALT-A 2007 | $202,655,058 | $202,655,058 | $69,834,430 | $31,331,056 | | $31,331,056 | 100.00% |
| RALI 2007-QH2 [Total] | ALT-A 2007 | $134,525,243 | $134,525,243 | $46,343,223 | $20,791,780 | | $20,791,780 | 100.00% |
| RALI 2007-QH3 [Total] | ALT-A 2007 | $139,167,011 | $139,167,011 | $47,962,922 | $21,518,455 | | $21,518,455 | 100.00% |
| RALI 2007-QH4 [Total] | ALT-A 2007 | $154,380,286 | $154,380,286 | $53,069,172 | $23,809,362 | | $23,809,362 | 100.00% |
| RALI 2007-QH5 [1] [Total] | ALT-A 2007 | $133,486,749 | $133,486,749 | $45,904,665 | $20,595,022 | | $20,595,022 | 100.00% |
| RALI 2007-QH5 [2] RALI 2007-QH6 | ALT-A 2007 | $63,139,530 | $63,139,530 | $21,746,397 | $9,756,471 | | $9,756,471 | 100.00% |
| RALI 2007-QH6 [Total] | ALT-A 2007 | $234,932,685 | $234,932,685 | $80,805,321 | $36,253,121 | | $36,253,121 | 100.00% |
| RALI 2007-QH7 [1] [Total] | ALT-A 2007 | $78,607,829 | $78,607,829 | $26,963,784 | $12,097,239 | | $12,097,239 | 100.00% |
| RALI 2007-QH7 [2] RALI 2007-QH8 | ALT-A 2007 | $52,959,083 | $52,959,083 | $18,194,569 | $8,162,951 | | $8,162,951 | 100.00% |
| RALI 2007-QH8 [Total] | ALT-A 2007 | $220,474,243 | $220,474,243 | $75,804,176 | $34,009,369 | | $34,009,369 | 100.00% |
| RALI 2007-QH9 [Total] | ALT-A 2007 | $228,871,769 | $228,871,769 | $78,626,391 | $35,275,549 | | $35,275,549 | 100.00% |
| RALI 2007-QO1 [Total] | Pay Option Arm 2007 | $248,001,070 | $248,001,070 | $90,084,572 | $40,416,236 | | $40,416,236 | 100.00% |
| RALI 2007-QO2 [Total] | Pay Option Arm 2007 | $213,492,089 | $213,492,089 | $77,160,670 | $34,617,957 | | $34,617,957 | 100.00% |
| RALI 2007-QO3 [Total] | Pay Option Arm 2007 | $119,591,896 | $119,591,896 | $43,464,620 | $19,500,302 | | $19,500,302 | 100.00% |
| RALI 2007-QO4 [1YPP] [Total] | Pay Option Arm 2007 | $38,775,953 | $38,775,953 | $14,078,762 | $6,316,404 | | $6,316,404 | 100.00% |
| RALI 2007-QO4 [3YPP] [Total] | Pay Option Arm 2007 | $138,102,595 | $138,102,595 | $50,463,360 | $22,640,270 | | $22,640,270 | 100.00% |
| RALI 2007-QO4 [NOPP] [Total] | Pay Option Arm 2007 | $24,595,930 | $24,595,930 | $8,904,388 | $3,994,933 | | $3,994,933 | 100.00% |
| RALI 2007-QO5 [Total] | Pay Option Arm 2007 | $95,228,288 | $95,228,288 | $34,885,606 | $15,651,347 | | $15,651,347 | 100.00% |
| RALI 2007-QS1 [1] [Total] | ALT-A 2007 | $101,160,880 | $101,160,880 | $34,622,541 | $15,533,323 | | $15,533,323 | 100.00% |
| RALI 2007-QS1 [2] RALI 2007-QS10 | ALT-A 2007 | $198,634,133 | $198,634,133 | $68,162,793 | $30,581,080 | | $30,581,080 | 100.00% |
| RALI 2007-QS10 [Total] | ALT-A 2007 | $127,891,133 | $127,891,133 | $44,021,301 | $19,750,055 | | $19,750,055 | 100.00% |
| RALI 2007-QS11 [Total] | ALT-A 2007 | $90,763,338 | $90,763,338 | $31,312,099 | $14,048,101 | | $14,048,101 | 100.00% |
| RALI 2007-QS2 [Total] | ALT-A 2007 | $126,979,943 | $126,979,943 | $43,545,056 | $19,536,389 | | $19,536,389 | 100.00% |
| RALI 2007-QS3 [Total] | ALT-A 2007 | $253,087,310 | $253,087,310 | $86,963,337 | $39,015,901 | | $39,015,901 | 100.00% |

Case 1:14-cv-03039-GBD   Document 51-1   Filed 11/06/14   Page 279 of 355
12-12020-mg   Doc 8019-45   Filed 01/22/15   Entered 01/22/15 18:14:28   Exhibit 26
Pg 304 of 398

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| RALI 2007-QS4  [I] | ALT-A 2007 | $14,357,563 | $14,357,563 | $4,931,492 | $2,212,502 | | $2,212,502 | 100.00% |
| RALI 2007-QS4  [II] | ALT-A 2007 | $62,213,846 | $62,213,846 | $21,532,637 | $9,660,568 | | $9,660,568 | 100.00% |
| RALI 2007-QS4  [III] | ALT-A 2007 | $77,717,218 | $77,717,218 | $26,600,027 | $11,934,041 | | $11,934,041 | 100.00% |
| RALI 2007-QS4  [IV] | ALT-A 2007 | $16,451,790 | $16,451,790 | $5,693,897 | $2,554,554 | | $2,554,554 | 100.00% |
| RALI 2007-QS4  [V] | ALT-A 2007 | $9,930,565 | $9,930,565 | $3,352,607 | $1,504,140 | | $1,504,140 | 100.00% |
| RALI 2007-QS5 [Total] | ALT-A 2007 | $115,597,289 | $115,597,289 | $39,663,031 | $17,794,728 | | $17,794,728 | 100.00% |
| RALI 2007-QS6 [Total] | ALT-A 2007 | $217,738,744 | $217,738,744 | $74,873,512 | $33,591,829 | | $33,591,829 | 100.00% |
| RALI 2007-QS7  [1] | ALT-A 2007 | $126,732,793 | $126,732,793 | $43,270,391 | $19,413,161 | | $19,413,161 | 100.00% |
| RALI 2007-QS7  [2] | ALT-A 2007 | $74,333,014 | $74,333,014 | $25,646,653 | $11,506,312 | | $11,506,312 | 100.00% |
| RALI 2007-QS8 [Total] | ALT-A 2007 | $165,411,041 | $165,411,041 | $56,624,303 | $25,404,363 | | $25,404,363 | 100.00% |
| RALI 2007-QS9 [Total] | ALT-A 2007 | $192,460,010 | $192,460,010 | $66,118,025 | $29,663,700 | | $29,663,700 | 100.00% |
| RAMP 2004-KR1  [1] | Subprime 2004 | $85,994,251 | $85,994,251 | $49,246,190 | $22,094,190 | | $22,094,190 | 100.00% |
| RAMP 2004-KR1  [2] | Subprime 2004 | $58,544,562 | $58,544,562 | $33,472,339 | $15,017,288 | | $15,017,288 | 100.00% |
| RAMP 2004-KR2  [1] | Subprime 2004 | $63,925,009 | $63,925,009 | $36,582,618 | $16,412,707 | | $16,412,707 | 100.00% |
| RAMP 2004-KR2  [2] | Subprime 2004 | $44,383,741 | $44,383,741 | $25,377,712 | $11,385,652 | | $11,385,652 | 100.00% |
| RAMP 2004-RS1  [1] | Subprime 2004 | $29,380,671 | $29,380,671 | $16,549,236 | $7,424,776 | AMBAC - Insurer Exception | $7,424,776 | 100.00% |
| RAMP 2004-RS1  [2A] | Subprime 2004 | $40,617,693 | $40,617,693 | $23,260,963 | $10,435,978 | | $10,435,978 | 100.00% |
| RAMP 2004-RS1  [2B] | Subprime 2004 | $26,091,838 | $26,091,838 | $14,962,698 | $6,712,980 | | $6,712,980 | 100.00% |
| RAMP 2004-RS10  [1] | Subprime 2004 | $38,819,123 | $38,819,123 | $21,998,496 | $9,869,575 | | $9,869,575 | 100.00% |
| RAMP 2004-RS10  [2] | Subprime 2004 | $111,445,050 | $111,445,050 | $63,762,807 | $28,607,037 | | $28,607,037 | 100.00% |
| RAMP 2004-RS11  [A] | Subprime 2004 | $84,515,889 | $84,515,889 | $48,320,131 | $21,678,716 | | $21,678,716 | 100.00% |
| RAMP 2004-RS11  [F] | Subprime 2004 | $23,098,024 | $23,098,024 | $13,051,043 | $5,855,320 | | $5,855,320 | 100.00% |
| RAMP 2004-RS12  [1] | Subprime 2004 | $34,409,734 | $34,409,734 | $19,480,480 | $8,739,873 | | $8,739,873 | 100.00% |
| RAMP 2004-RS12  [2] | Subprime 2004 | $86,353,687 | $86,353,687 | $49,376,376 | $22,152,597 | | $22,152,597 | 100.00% |
| RAMP 2004-RS2  [1] | Subprime 2004 | $19,921,568 | $19,921,568 | $11,238,778 | $5,042,252 | | $5,042,252 | 100.00% |
| RAMP 2004-RS2  [2A] | Subprime 2004 | $34,571,030 | $34,571,030 | $19,823,789 | $8,893,897 | | $8,893,897 | 100.00% |
| RAMP 2004-RS2  [2B] | Subprime 2004 | $19,205,710 | $19,205,710 | $11,015,030 | $4,941,868 | | $4,941,868 | 100.00% |
| RAMP 2004-RS3  [1] | Subprime 2004 | $36,014,675 | $36,014,675 | $20,344,296 | $9,127,421 | | $9,127,421 | 100.00% |
| RAMP 2004-RS3  [2] | Subprime 2004 | $7,531,579 | $7,531,579 | $4,315,797 | $1,936,272 | | $1,936,272 | 100.00% |
| RAMP 2004-RS4  [1] | Subprime 2004 | $29,306,260 | $29,306,260 | $16,517,744 | $7,410,648 | | $7,410,648 | 100.00% |
| RAMP 2004-RS4  [2A] | Subprime 2004 | $33,973,280 | $33,973,280 | $19,452,947 | $8,727,520 | | $8,727,520 | 100.00% |
| RAMP 2004-RS4  [2B] | Subprime 2004 | $32,542,213 | $32,542,213 | $18,661,651 | $8,372,507 | | $8,372,507 | 100.00% |
| RAMP 2004-RS5  [1] | Subprime 2004 | $17,682,494 | $17,682,494 | $10,112,627 | $4,537,007 | AMBAC | $4,537,007 | 100.00% |

12-12020-mg   Doc 8019-45   Filed 01/22/15   Entered 01/22/15 18:14:28   Exhibit 26
Case 1:14-cv-08030-GBD   Document 21-1   Filed 11/06/14   Page 280 of 355
Pg 305 of 398
Original Appendix —
Subject to Final Ratification & Due Diligence

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
| 336 | RAMP 2004-RS5 [2A] | Subprime 2004 | $28,685,460 | $28,685,460 | $16,425,900 | $7,369,442 | | $7,369,442 | 100.00% |
| 337 | RAMP 2004-RS5 [2B] | Subprime 2004 | $30,019,687 | $30,019,687 | $17,163,648 | $7,700,431 | | $7,700,431 | 100.00% |
| 338 | RAMP 2004-RS6 [1] | Subprime 2004 | $24,899,249 | $24,899,249 | $14,035,904 | $6,297,176 | | $6,297,176 | 100.00% |
| 339 | RAMP 2004-RS6 [2A] | Subprime 2004 | $47,007,391 | $47,007,391 | $26,902,338 | $12,069,672 | | $12,069,672 | 100.00% |
| 340 | RAMP 2004-RS6 [2B] | Subprime 2004 | $16,281,524 | $16,281,524 | $9,309,026 | $4,176,473 | | $4,176,473 | 100.00% |
| 341 | RAMP 2004-RS7 [1] | Subprime 2004 | $31,207,692 | $31,207,692 | $17,577,847 | $7,886,261 | | $7,886,261 | 100.00% |
| 342 | RAMP 2004-RS7 [2A] | Subprime 2004 | $32,717,481 | $32,717,481 | $18,755,504 | $8,414,614 | FGIC | $8,414,614 | 100.00% |
| 343 | RAMP 2004-RS7 [2B] | Subprime 2004 | $29,376,753 | $29,376,753 | $16,841,812 | $7,556,040 | FGIC | $7,556,040 | 100.00% |
| 344 | RAMP 2004-RS7 [3] | Subprime 2004 | $6,748,701 | $6,748,701 | $3,765,712 | $1,689,478 | FGIC | $1,689,478 | 100.00% |
| 345 | RAMP 2004-RS8 [1] | Subprime 2004 | $36,234,187 | $36,234,187 | $20,469,412 | $9,183,555 | FGIC | $9,183,555 | 100.00% |
| 346 | RAMP 2004-RS8 [2] | Subprime 2004 | $59,601,734 | $59,601,734 | $34,076,432 | $15,288,313 | | $15,288,313 | 100.00% |
| 347 | RAMP 2004-RS9 [1] | Subprime 2004 | $25,645,428 | $25,645,428 | $14,596,583 | $6,548,723 | AMBAC | $6,548,723 | 100.00% |
| 348 | RAMP 2004-RS9 [2] | Subprime 2004 | $72,827,221 | $72,827,221 | $41,648,474 | $18,685,492 | | $18,685,492 | 100.00% |
| 349 | RAMP 2004-R21 [1] | Subprime 2004 | $23,533,534 | $23,533,534 | $13,347,694 | $5,988,412 | | $5,988,412 | 100.00% |
| 350 | RAMP 2004-R21 [2] | Subprime 2004 | $7,755,378 | $7,755,378 | $4,440,708 | $1,992,313 | | $1,992,313 | 100.00% |
| 351 | RAMP 2004-R22 [1] | Subprime 2004 | $25,715,420 | $25,715,420 | $14,590,734 | $6,546,099 | FGIC | $6,546,099 | 100.00% |
| 352 | RAMP 2004-R22 [2] | Subprime 2004 | $10,299,774 | $10,299,774 | $5,881,618 | $2,638,774 | FGIC | $2,638,774 | 100.00% |
| 353 | RAMP 2004-R23 [1] | Subprime 2004 | $14,970,705 | $14,970,705 | $8,471,384 | $3,800,667 | | $3,800,667 | 100.00% |
| 354 | RAMP 2004-R23 [2] | Subprime 2004 | $12,444,695 | $12,444,695 | $7,101,170 | $3,185,923 | | $3,185,923 | 100.00% |
| 355 | RAMP 2004-R24 [A] | Subprime 2004 | $12,087,161 | $12,087,161 | $6,895,120 | $3,093,480 | | $3,093,480 | 100.00% |
| 356 | RAMP 2004-R24 [F] | Subprime 2004 | $14,025,985 | $14,025,985 | $7,946,157 | $3,565,025 | | $3,565,025 | 100.00% |
| 357 | RAMP 2004-SL1 [EIGHT] | Subprime 2004 | $716,664 | $716,664 | $400,050 | $179,482 | | $179,482 | 100.00% |
| 358 | RAMP 2004-SL1 [FIVE] | Subprime 2004 | $32,908 | $32,908 | $18,196 | $8,164 | | $8,164 | 100.00% |
| 359 | RAMP 2004-SL1 [FOUR] | Subprime 2004 | $78,823 | $78,823 | $43,613 | $19,567 | | $19,567 | 100.00% |
| 360 | RAMP 2004-SL1 [NINE] | Subprime 2004 | $127,433 | $127,433 | $70,463 | $31,613 | | $31,613 | 100.00% |
| 361 | RAMP 2004-SL1 [ONE] | Subprime 2004 | $4,147,997 | $4,147,997 | $2,365,239 | $1,061,159 | | $1,061,159 | 100.00% |
| 362 | RAMP 2004-SL1 [SEVEN] | Subprime 2004 | $1,307,687 | $1,307,687 | $734,790 | $329,662 | | $329,662 | 100.00% |
| 363 | RAMP 2004-SL1 [SIX] | Subprime 2004 | $464,953 | $464,953 | $263,403 | $118,175 | | $118,175 | 100.00% |
| 364 | RAMP 2004-SL1 [THREE] | Subprime 2004 | $17,161 | $17,161 | $9,676 | $4,341 | | $4,341 | 100.00% |
| 365 | RAMP 2004-SL1 [TWO] | Subprime 2004 | $16,279 | $16,279 | $9,003 | $4,039 | | $4,039 | 100.00% |
| 366 | RAMP 2004-SL2 [1] | Subprime 2004 | $118,389 | $118,389 | $65,977 | $29,600 | | $29,600 | 100.00% |

Document Cut-off Date: March 1, 2013
Subject to Ongoing Diligence
Pg 306 of 398

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
| 367 | RAMP 2004-SL2 [2] | Subprime 2004 | $495,833 | $495,833 | $274,540 | $123,172 | | $123,172 | 100.00% |
| 368 | RAMP 2004-SL2 [3] | Subprime 2004 | $1,124,730 | $1,124,730 | $629,941 | $282,622 | | $282,622 | 100.00% |
| 369 | RAMP 2004-SL2 [4] | Subprime 2004 | $5,853,802 | $5,853,802 | $3,350,968 | $1,503,404 | | $1,503,404 | 100.00% |
| 370 | RAMP 2004-SL3 [1] | Subprime 2004 | $272,919 | $272,919 | $155,993 | $69,986 | | $69,986 | 100.00% |
| 371 | RAMP 2004-SL3 [2] | Subprime 2004 | $750,273 | $750,273 | $421,457 | $189,086 | | $189,086 | 100.00% |
| 372 | RAMP 2004-SL3 [3] | Subprime 2004 | $406,291 | $406,291 | $227,291 | $101,974 | | $101,974 | 100.00% |
| 373 | RAMP 2004-SL3 [4] | Subprime 2004 | $1,699,613 | $1,699,613 | $970,892 | $435,589 | | $435,589 | 100.00% |
| 374 | RAMP 2004-SL4 [1] | Subprime 2004 | $49,965 | $49,965 | $27,628 | $12,395 | | $12,395 | 100.00% |
| 375 | RAMP 2004-SL4 [2] | Subprime 2004 | $146,088 | $146,088 | $81,723 | $36,665 | | $36,665 | 100.00% |
| 376 | RAMP 2004-SL4 [3] | Subprime 2004 | $427,877 | $427,877 | $239,051 | $107,250 | | $107,250 | 100.00% |
| 377 | RAMP 2004-SL4 [4] | Subprime 2004 | $419,724 | $419,724 | $236,139 | $105,943 | | $105,943 | 100.00% |
| 378 | RAMP 2004-SL4 [5] | Subprime 2004 | $1,397,490 | $1,397,490 | $798,230 | $358,124 | | $358,124 | 100.00% |
| 379 | RAMP 2005-EFC1 [1A] | Subprime 2005 | $69,173,063 | $69,173,063 | $39,476,680 | $17,711,121 | | $17,711,121 | 100.00% |
| 380 | RAMP 2005-EFC1 [1F] | Subprime 2005 | $12,056,960 | $12,056,960 | $6,792,828 | $3,047,587 | | $3,047,587 | 100.00% |
| 381 | RAMP 2005-EFC1 [2A] | Subprime 2005 | $61,435,263 | $61,435,263 | $35,036,182 | $15,718,902 | | $15,718,902 | 100.00% |
| 382 | RAMP 2005-EFC1 [2F] | Subprime 2005 | $16,748,008 | $16,748,008 | $9,436,379 | $4,233,610 | | $4,233,610 | 100.00% |
| 383 | RAMP 2005-EFC2 [A] | Subprime 2005 | $101,148,279 | $101,148,279 | $57,737,839 | $25,903,949 | | $25,903,949 | 100.00% |
| 384 | RAMP 2005-EFC2 [F] | Subprime 2005 | $18,270,213 | $18,270,213 | $10,289,780 | $4,616,486 | | $4,616,486 | 100.00% |
| 385 | RAMP 2005-EFC3 [1A] | Subprime 2005 | $65,312,627 | $65,312,627 | $37,251,145 | $16,712,641 | | $16,712,641 | 100.00% |
| 386 | RAMP 2005-EFC3 [1F] | Subprime 2005 | $6,628,196 | $6,628,196 | $3,745,982 | $1,680,626 | | $1,680,626 | 100.00% |
| 387 | RAMP 2005-EFC3 [2A] | Subprime 2005 | $47,266,394 | $47,266,394 | $26,935,661 | $12,084,622 | | $12,084,622 | 100.00% |
| 388 | RAMP 2005-EFC3 [2F] | Subprime 2005 | $16,573,666 | $16,573,666 | $9,350,299 | $4,194,990 | | $4,194,990 | 100.00% |
| 389 | RAMP 2005-EFC4 [A] | Subprime 2005 | $129,644,110 | $129,644,110 | $73,941,134 | $33,173,520 | | $33,173,520 | 100.00% |
| 390 | RAMP 2005-EFC4 [F] | Subprime 2005 | $23,296,896 | $23,296,896 | $13,122,812 | $5,887,520 | | $5,887,520 | 100.00% |
| 391 | RAMP 2005-EFC5 [A] | Subprime 2005 | $129,368,509 | $129,368,509 | $73,684,527 | $33,058,394 | | $33,058,394 | 100.00% |
| 392 | RAMP 2005-EFC5 [F] | Subprime 2005 | $21,624,518 | $21,624,518 | $12,201,197 | $5,474,039 | | $5,474,039 | 100.00% |
| 393 | RAMP 2005-EFC6 [1A] | Subprime 2005 | $91,772,118 | $91,772,118 | $52,375,503 | $23,498,149 | | $23,498,149 | 100.00% |
| 394 | RAMP 2005-EFC6 [1F] | Subprime 2005 | $20,769,435 | $20,769,435 | $11,745,602 | $5,269,637 | | $5,269,637 | 100.00% |
| 395 | RAMP 2005-EFC6 [2A] | Subprime 2005 | $33,689,926 | $33,689,926 | $19,163,039 | $8,597,453 | | $8,597,453 | 100.00% |
| 396 | RAMP 2005-EFC6 [2F] | Subprime 2005 | $6,436,035 | $6,436,035 | $3,626,622 | $1,627,076 | | $1,627,076 | 100.00% |
| 397 | RAMP 2005-EFC7 [1A] | Subprime 2005 | $78,138,224 | $78,138,224 | $44,506,718 | $19,967,837 | FGIC | $19,967,837 | 100.00% |
| 398 | RAMP 2005-EFC7 [1F] | Subprime 2005 | $26,092,878 | $26,092,878 | $14,753,924 | $6,619,314 | FGIC | $6,619,314 | 100.00% |
| 399 | RAMP 2005-EFC7 [2A] | Subprime 2005 | $44,058,681 | $44,058,681 | $25,177,022 | $11,295,613 | FGIC | $11,295,613 | 100.00% |
| 400 | RAMP 2005-EFC7 [2F] | Subprime 2005 | $5,066,696 | $5,066,696 | $2,876,303 | $1,290,447 | FGIC | $1,290,447 | 100.00% |
| 401 | RAMP 2005-NC1 [1A] | Subprime 2005 | $85,484,594 | $85,484,594 | $48,752,350 | $21,872,630 | FGIC | $21,872,630 | 100.00% |

12-12020-mg   Doc 8019-45   Filed 01/22/15   Entered 01/22/15 18:14:28   Exhibit 26
Pg 307 of 398
Case 1:14-cv-03039-GBD   Document 21-1   Filed 11/06/14   Page 282 of 355
Subject to FRE 408 and Other Applicable
Confidentiality Protections — Highly Confidential
Subject to Ongoing Due Diligence

| | A Name | B Cohort | C Net Total Collateral Losses | D Debtor's Attributable Portion of Net Collateral Losses | E Losses Due to Breach | F RFC Claim | G Insurer | H RFC Recognized Claim | I RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 402 | RAMP 2005-NC1 [1F] | Subprime 2005 | $25,271,470 | $25,271,470 | $14,311,132 | $6,420,656 | | $6,420,656 | 100.00% |
| 403 | RAMP 2005-NC1 [2A] | Subprime 2005 | $61,696,843 | $61,696,843 | $35,165,697 | $15,777,009 | FGIC | $15,777,009 | 100.00% |
| 404 | RAMP 2005-NC1 [2F] | Subprime 2005 | $27,149,460 | $27,149,460 | $15,360,535 | $6,891,469 | FGIC | $6,891,469 | 100.00% |
| 405 | RAMP 2005-RS1 [1] | Subprime 2005 | $40,013,212 | $40,013,212 | $22,557,518 | $10,120,378 | | $10,120,378 | 100.00% |
| 406 | RAMP 2005-RS1 [2] | Subprime 2005 | $99,244,735 | $99,244,735 | $56,626,381 | $25,405,295 | | $25,405,295 | 100.00% |
| 407 | RAMP 2005-RS2 [1A] | Subprime 2005 | $61,905,028 | $61,905,028 | $35,349,657 | $15,859,542 | | $15,859,542 | 100.00% |
| 408 | RAMP 2005-RS2 [1F] | Subprime 2005 | $16,029,124 | $16,029,124 | $9,062,453 | $4,065,849 | | $4,065,849 | 100.00% |
| 409 | RAMP 2005-RS2 [2A] | Subprime 2005 | $19,011,637 | $19,011,637 | $10,847,277 | $4,866,606 | | $4,866,606 | 100.00% |
| 410 | RAMP 2005-RS2 [2F] | Subprime 2005 | $8,736,196 | $8,736,196 | $4,929,380 | $2,211,555 | | $2,211,555 | 100.00% |
| 411 | RAMP 2005-RS3 [1AA] | Subprime 2005 | $27,193,008 | $27,193,008 | $15,511,184 | $6,959,057 | | $6,959,057 | 100.00% |
| 412 | RAMP 2005-RS3 [1AF] | Subprime 2005 | $20,917,142 | $20,917,142 | $11,794,843 | $5,291,729 | | $5,291,729 | 100.00% |
| 413 | RAMP 2005-RS3 [1BA] | Subprime 2005 | $35,292,207 | $35,292,207 | $20,079,811 | $9,008,761 | | $9,008,761 | 100.00% |
| 414 | RAMP 2005-RS3 [1BF] | Subprime 2005 | $12,710,329 | $12,710,329 | $7,166,615 | $3,215,285 | | $3,215,285 | 100.00% |
| 415 | RAMP 2005-RS3 [2] | Subprime 2005 | $15,865,140 | $15,865,140 | $8,954,061 | $4,017,219 | | $4,017,219 | 100.00% |
| 416 | RAMP 2005-RS4 [A] | Subprime 2005 | $67,024,304 | $67,024,304 | $38,201,775 | $17,139,138 | | $17,139,138 | 100.00% |
| 417 | RAMP 2005-RS4 [F] | Subprime 2005 | $20,820,533 | $20,820,533 | $11,726,878 | $5,261,237 | | $5,261,237 | 100.00% |
| 418 | RAMP 2005-RS5 [1A] | Subprime 2005 | $24,725,556 | $24,725,556 | $14,074,520 | $6,314,501 | | $6,314,501 | 100.00% |
| 419 | RAMP 2005-RS5 [1F] | Subprime 2005 | $10,630,408 | $10,630,408 | $5,989,533 | $2,687,190 | | $2,687,190 | 100.00% |
| 420 | RAMP 2005-RS5 [2A] | Subprime 2005 | $35,220,616 | $35,220,616 | $20,069,742 | $9,004,244 | | $9,004,244 | 100.00% |
| 421 | RAMP 2005-RS5 [2F] | Subprime 2005 | $8,341,665 | $8,341,665 | $4,711,851 | $2,113,961 | | $2,113,961 | 100.00% |
| 422 | RAMP 2005-RS6 [1A] | Subprime 2005 | $73,094,634 | $73,094,634 | $41,687,831 | $18,703,150 | | $18,703,150 | 100.00% |
| 423 | RAMP 2005-RS6 [1F] | Subprime 2005 | $26,872,003 | $26,872,003 | $15,151,652 | $6,797,754 | | $6,797,754 | 100.00% |
| 424 | RAMP 2005-RS6 [2A] | Subprime 2005 | $76,867,095 | $76,867,095 | $43,799,132 | $19,650,380 | | $19,650,380 | 100.00% |
| 425 | RAMP 2005-RS6 [2F] | Subprime 2005 | $19,451,317 | $19,451,317 | $11,000,927 | $4,935,541 | | $4,935,541 | 100.00% |
| 426 | RAMP 2005-RS7 [A] | Subprime 2005 | $51,845,493 | $51,845,493 | $29,504,222 | $13,237,001 | | $13,237,001 | 100.00% |
| 427 | RAMP 2005-RS7 [F] | Subprime 2005 | $38,257,195 | $38,257,195 | $21,543,421 | $9,665,406 | | $9,665,406 | 100.00% |
| 428 | RAMP 2005-RS8 [AGS] | Subprime 2005 | $32,229,039 | $32,229,039 | $18,272,471 | $8,197,902 | | $8,197,902 | 100.00% |
| 429 | RAMP 2005-RS8 [ALS] | Subprime 2005 | $78,074,733 | $78,074,733 | $44,514,432 | $19,971,298 | | $19,971,298 | 100.00% |
| 430 | RAMP 2005-RS8 [F] | Subprime 2005 | $35,390,738 | $35,390,738 | $19,958,347 | $8,954,266 | | $8,954,266 | 100.00% |
| 431 | RAMP 2005-RS9 [1A_L] | Subprime 2005 | $23,308,656 | $23,308,656 | $13,196,254 | $5,920,469 | FGIC | $5,920,469 | 100.00% |

Case 14-cv-03039-GBD    Document 15-1    Filed 11/06/14    Page 283 of 355
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Debtors' Objection Original Signatory Diligence
Subject to the 2nd Braunstein Declaration

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
| 432 | RAMP 2005-RS9 [1A_S] | Subprime 2005 | $68,738,835 | $68,738,835 | $39,126,674 | $17,554,092 | FGIC | $17,554,092 | 100.00% |
| 433 | RAMP 2005-RS9 [1F] | Subprime 2005 | $36,660,035 | $36,660,035 | $20,716,523 | $9,294,421 | FGIC | $9,294,421 | 100.00% |
| 434 | RAMP 2005-RS9 [2A_L] | Subprime 2005 | $8,853,973 | $8,853,973 | $5,024,373 | $2,254,174 | FGIC | $2,254,174 | 100.00% |
| 435 | RAMP 2005-RS9 [2A_S] | Subprime 2005 | $72,725,684 | $72,725,684 | $41,447,661 | $18,595,397 | FGIC | $18,595,397 | 100.00% |
| 436 | RAMP 2005-RS9 [2F] | Subprime 2005 | $20,427,868 | $20,427,868 | $11,578,404 | $5,194,624 | FGIC | $5,194,624 | 100.00% |
| 437 | RAMP 2005-RZ1 [A] | Subprime 2005 | $14,682,916 | $14,682,916 | $8,343,085 | $3,743,106 | | $3,743,106 | 100.00% |
| 438 | RAMP 2005-RZ1 [F] | Subprime 2005 | $11,482,144 | $11,482,144 | $6,485,526 | $2,909,717 | | $2,909,717 | 100.00% |
| 439 | RAMP 2005-RZ2 [1A] | Subprime 2005 | $22,207,688 | $22,207,688 | $12,657,089 | $5,678,574 | | $5,678,574 | 100.00% |
| 440 | RAMP 2005-RZ2 [1F] | Subprime 2005 | $6,706,532 | $6,706,532 | $3,798,736 | $1,704,294 | | $1,704,294 | 100.00% |
| 441 | RAMP 2005-RZ2 [2A] | Subprime 2005 | $25,559,677 | $25,559,677 | $14,536,377 | $6,521,712 | | $6,521,712 | 100.00% |
| 442 | RAMP 2005-RZ2 [2F] | Subprime 2005 | $7,677,029 | $7,677,029 | $4,343,140 | $1,948,540 | | $1,948,540 | 100.00% |
| 443 | RAMP 2005-RZ3 [A] | Subprime 2005 | $64,551,652 | $64,551,652 | $36,794,419 | $16,507,731 | | $16,507,731 | 100.00% |
| 444 | RAMP 2005-RZ3 [F] | Subprime 2005 | $18,799,079 | $18,799,079 | $10,624,279 | $4,766,558 | | $4,766,558 | 100.00% |
| 445 | RAMP 2005-RZ4 [A] | Subprime 2005 | $83,856,750 | $83,856,750 | $47,825,142 | $21,456,640 | | $21,456,640 | 100.00% |
| 446 | RAMP 2005-RZ4 [F] | Subprime 2005 | $25,495,934 | $25,495,934 | $14,411,718 | $6,465,784 | | $6,465,784 | 100.00% |
| 447 | RAMP 2005-SL1 [1] | ALT-A 2005 | $316,278 | $316,278 | $122,880 | $55,130 | | $55,130 | 100.00% |
| 448 | RAMP 2005-SL1 [2] | ALT-A 2005 | $214,194 | $214,194 | $84,799 | $38,045 | | $38,045 | 100.00% |
| 449 | RAMP 2005-SL1 [3] | ALT-A 2005 | $2,366,444 | $2,366,444 | $1,046,003 | $469,287 | | $469,287 | 100.00% |
| 450 | RAMP 2005-SL1 [4] | ALT-A 2005 | $1,200,472 | $1,200,472 | $495,942 | $222,503 | | $222,503 | 100.00% |
| 451 | RAMP 2005-SL1 [5] | ALT-A 2005 | $1,303,177 | $1,303,177 | $522,877 | $234,588 | | $234,588 | 100.00% |
| 452 | RAMP 2005-SL1 [6] | ALT-A 2005 | $1,189,819 | $1,189,819 | $505,205 | $226,659 | | $226,659 | 100.00% |
| 453 | RAMP 2005-SL1 [7] | ALT-A 2005 | $7,735,437 | $7,735,437 | $3,359,197 | $1,507,096 | | $1,507,096 | 100.00% |
| 454 | RAMP 2005-SL2 [1] | ALT-A 2005 | $302,438 | $302,438 | $117,395 | $52,669 | | $52,669 | 100.00% |
| 455 | RAMP 2005-SL2 [2] | ALT-A 2005 | $1,568,381 | $1,568,381 | $687,037 | $308,238 | | $308,238 | 100.00% |
| 456 | RAMP 2005-SL2 [3] | ALT-A 2005 | $1,526,436 | $1,526,436 | $632,898 | $283,948 | | $283,948 | 100.00% |
| 457 | RAMP 2005-SL2 [4] | ALT-A 2005 | $2,730,339 | $2,730,339 | $1,178,031 | $528,521 | | $528,521 | 100.00% |
| 458 | RAMP 2005-SL2 [5] | ALT-A 2005 | $3,089,817 | $3,089,817 | $1,359,518 | $609,945 | | $609,945 | 100.00% |
| 459 | RAMP 2006-EFC1 [A] | Subprime 2006 | $124,233,607 | $124,233,607 | $69,050,031 | $30,979,138 | | $30,979,138 | 100.00% |
| 460 | RAMP 2006-EFC1 [F] | Subprime 2006 | $34,786,684 | $34,786,684 | $19,342,743 | $8,678,077 | | $8,678,077 | 100.00% |
| 461 | RAMP 2006-EFC2 [A] | Subprime 2006 | $106,881,854 | $106,881,854 | $59,422,826 | $26,659,914 | | $26,659,914 | 100.00% |
| 462 | RAMP 2006-EFC2 [F] | Subprime 2006 | $39,080,119 | $39,080,119 | $21,734,983 | $9,751,350 | | $9,751,350 | 100.00% |
| 463 | RAMP 2006-NC1 [A] | Subprime 2006 | $123,559,915 | $123,559,915 | $68,662,265 | $30,805,167 | | $30,805,167 | 100.00% |
| 464 | RAMP 2006-NC1 [F] | Subprime 2006 | $35,623,267 | $35,623,267 | $19,809,915 | $8,887,673 | | $8,887,673 | 100.00% |
| 465 | RAMP 2006-NC2 [A] | Subprime 2006 | $183,384,446 | $183,384,446 | $101,918,958 | $45,725,706 | | $45,725,706 | 100.00% |
| 466 | RAMP 2006-NC2 [F] | Subprime 2006 | $57,013,026 | $57,013,026 | $31,708,467 | $14,225,931 | | $14,225,931 | 100.00% |

Case 1:14-cv-03039-GBD    Document 21-1    Filed 11/06/14    Page 284 of 355

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1

Subject to FRE 408 and its state law equivalents. Prepared at the request of counsel. Highly Confidential — Subject to Due Diligence

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
| 467 | RAMP 2006-NC3  [A] | Subprime 2006 | $129,874,502 | $129,874,502 | $72,179,832 | $32,383,315 | | $32,383,315 | 100.00% |
| 468 | RAMP 2006-NC3  [F] | Subprime 2006 | $42,661,703 | $42,661,703 | $23,727,964 | $10,645,496 | | $10,645,496 | 100.00% |
| 469 | RAMP 2006-RS1  [1A] | Subprime 2006 | $139,203,110 | $139,203,110 | $77,382,422 | $34,717,446 | | $34,717,446 | 100.00% |
| 470 | RAMP 2006-RS1  [1F] | Subprime 2006 | $59,740,546 | $59,740,546 | $33,218,548 | $14,903,425 | | $14,903,425 | 100.00% |
| 471 | RAMP 2006-RS1  [2A] | Subprime 2006 | $116,046,100 | $116,046,100 | $64,499,965 | $28,937,761 | | $28,937,761 | 100.00% |
| 472 | RAMP 2006-RS1  [2F] | Subprime 2006 | $24,143,676 | $24,143,676 | $13,425,806 | $6,023,457 | | $6,023,457 | 100.00% |
| 473 | RAMP 2006-RS2  [A] | Subprime 2006 | $150,057,328 | $150,057,328 | $83,401,888 | $37,418,065 | | $37,418,065 | 100.00% |
| 474 | RAMP 2006-RS2  [F] | Subprime 2006 | $88,757,924 | $88,757,924 | $49,365,294 | $22,147,626 | | $22,147,626 | 100.00% |
| 475 | RAMP 2006-RS3  [A] | Subprime 2006 | $76,965,669 | $76,965,669 | $42,772,864 | $19,189,947 | MGIC (Pool Policy) | $19,189,947 | 100.00% |
| 476 | RAMP 2006-RS3  [F] | Subprime 2006 | $135,543,094 | $135,543,094 | $75,385,807 | $33,821,669 | MGIC (Pool Policy) | $33,821,669 | 100.00% |
| 477 | RAMP 2006-RS4  [A] | Subprime 2006 | $246,474,867 | $246,474,867 | $136,983,995 | $61,457,554 | | $61,457,554 | 100.00% |
| 478 | RAMP 2006-RS4  [F] | Subprime 2006 | $93,300,680 | $93,300,680 | $51,879,066 | $23,275,423 | | $23,275,423 | 100.00% |
| 479 | RAMP 2006-RS5  [A] | Subprime 2006 | $58,016,723 | $58,016,723 | $32,246,505 | $14,467,320 | | $14,467,320 | 100.00% |
| 480 | RAMP 2006-RS5  [F] | Subprime 2006 | $76,811,839 | $76,811,839 | $42,719,206 | $19,165,873 | | $19,165,873 | 100.00% |
| 481 | RAMP 2006-RS6  [A] | Subprime 2006 | $109,297,956 | $109,297,956 | $60,744,923 | $27,253,070 | | $27,253,070 | 100.00% |
| 482 | RAMP 2006-RS6  [F] | Subprime 2006 | $35,952,810 | $35,952,810 | $19,994,292 | $8,970,393 | | $8,970,393 | 100.00% |
| 483 | RAMP 2006-RZ1  [A] | Subprime 2006 | $108,145,173 | $108,145,173 | $60,106,687 | $26,966,727 | | $26,966,727 | 100.00% |
| 484 | RAMP 2006-RZ1  [F] | Subprime 2006 | $34,897,714 | $34,897,714 | $19,414,969 | $8,710,481 | | $8,710,481 | 100.00% |
| 485 | RAMP 2006-RZ2  [A] | Subprime 2006 | $107,777,974 | $107,777,974 | $59,894,624 | $26,871,585 | | $26,871,585 | 100.00% |
| 486 | RAMP 2006-RZ2  [F] | Subprime 2006 | $23,618,253 | $23,618,253 | $13,137,432 | $5,894,079 | | $5,894,079 | 100.00% |
| 487 | RAMP 2006-RZ3  [A] | Subprime 2006 | $238,960,739 | $238,960,739 | $132,810,688 | $59,585,210 | | $59,585,210 | 100.00% |
| 488 | RAMP 2006-RZ3  [F] | Subprime 2006 | $48,544,187 | $48,544,187 | $27,002,010 | $12,114,390 | | $12,114,390 | 100.00% |
| 489 | RAMP 2006-RZ4  [A] | Subprime 2006 | $288,472,108 | $288,472,108 | $160,338,380 | $71,935,445 | | $71,935,445 | 100.00% |
| 490 | RAMP 2006-RZ4  [F] | Subprime 2006 | $72,876,036 | $72,876,036 | $40,532,889 | $18,184,987 | | $18,184,987 | 100.00% |
| 491 | RAMP 2006-RZ5  [A] | Subprime 2006 | $144,669,076 | $144,669,076 | $80,406,753 | $36,074,305 | | $36,074,305 | 100.00% |
| 492 | RAMP 2006-RZ5  [F] | Subprime 2006 | $62,065,277 | $62,065,277 | $34,517,197 | $15,486,061 | | $15,486,061 | 100.00% |
| 493 | RAMP 2007-RS1  [A] | Subprime 2007 | $41,524,708 | $41,524,708 | $23,086,412 | $10,357,665 | | $10,357,665 | 100.00% |
| 494 | RAMP 2007-RS1  [F] | Subprime 2007 | $139,125,561 | $139,125,561 | $77,365,399 | $34,709,808 | | $34,709,808 | 100.00% |
| 495 | RAMP 2007-RS2  [A] | Subprime 2007 | $111,193,752 | $111,193,752 | $61,805,501 | $27,728,896 | | $27,728,896 | 100.00% |
| 496 | RAMP 2007-RS2  [F] | Subprime 2007 | $67,903,369 | $67,903,369 | $37,768,301 | $16,944,661 | | $16,944,661 | 100.00% |

Case 114-cv-03093-GBD    Document 51-1    Filed 11/06/14    Page 285 of 355

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
| 497 | RAMP 2007-RZ1 [A] | Subprime 2007 | $105,384,995 | $105,384,995 | $58,575,326 | $26,279,685 | | $26,279,685 | 100.00% |
| 498 | RAMP 2007-RZ1 [F] | Subprime 2007 | $39,569,044 | $39,569,044 | $22,008,943 | $9,874,262 | | $9,874,262 | 100.00% |
| 499 | RASC 2004-KS1 [1] | Subprime 2004 | $19,904,485 | $19,904,485 | $11,217,544 | $5,032,725 | | $5,032,725 | 100.00% |
| 500 | RASC 2004-KS1 [2A] | Subprime 2004 | $16,074,227 | $16,074,227 | $9,191,542 | $4,123,764 | | $4,123,764 | 100.00% |
| 501 | RASC 2004-KS1 [2B] | Subprime 2004 | $15,599,526 | $15,599,526 | $8,929,061 | $4,006,002 | | $4,006,002 | 100.00% |
| 502 | RASC 2004-KS10 [1A] | Subprime 2004 | $18,698,074 | $18,698,074 | $10,699,373 | $4,800,249 | | $4,800,249 | 100.00% |
| 503 | RASC 2004-KS10 [1F] | Subprime 2004 | $7,347,386 | $7,347,386 | $4,150,557 | $1,862,138 | | $1,862,138 | 100.00% |
| 504 | RASC 2004-KS10 [2A] | Subprime 2004 | $50,569,433 | $50,569,433 | $28,904,741 | $12,968,045 | | $12,968,045 | 100.00% |
| 505 | RASC 2004-KS10 [2F] | Subprime 2004 | $8,156,741 | $8,156,741 | $4,604,414 | $2,065,760 | | $2,065,760 | 100.00% |
| 506 | RASC 2004-KS11 [1A] | Subprime 2004 | $28,358,503 | $28,358,503 | $16,204,003 | $7,269,889 | | $7,269,889 | 100.00% |
| 507 | RASC 2004-KS11 [1F] | Subprime 2004 | $2,921,401 | $2,921,401 | $1,650,087 | $740,308 | | $740,308 | 100.00% |
| 508 | RASC 2004-KS11 [2A] | Subprime 2004 | $27,117,556 | $27,117,556 | $15,501,315 | $6,954,629 | | $6,954,629 | 100.00% |
| 509 | RASC 2004-KS11 [2F] | Subprime 2004 | $3,473,119 | $3,473,119 | $1,964,895 | $881,546 | | $881,546 | 100.00% |
| 510 | RASC 2004-KS12 [1A] | Subprime 2004 | $23,199,991 | $23,199,991 | $13,278,977 | $5,957,582 | | $5,957,582 | 100.00% |
| 511 | RASC 2004-KS12 [1F] | Subprime 2004 | $3,429,187 | $3,429,187 | $1,942,014 | $871,280 | | $871,280 | 100.00% |
| 512 | RASC 2004-KS12 [2A] | Subprime 2004 | $21,371,105 | $21,371,105 | $12,211,553 | $5,478,685 | | $5,478,685 | 100.00% |
| 513 | RASC 2004-KS12 [2F] | Subprime 2004 | $3,380,262 | $3,380,262 | $1,907,846 | $855,951 | | $855,951 | 100.00% |
| 514 | RASC 2004-KS2 [1] | Subprime 2004 | $23,454,882 | $23,454,882 | $13,228,959 | $5,935,142 | | $5,935,142 | 100.00% |
| 515 | RASC 2004-KS2 [2A] | Subprime 2004 | $17,871,521 | $17,871,521 | $10,224,920 | $4,587,387 | | $4,587,387 | 100.00% |
| 516 | RASC 2004-KS2 [2B] | Subprime 2004 | $17,777,457 | $17,777,457 | $10,172,945 | $4,564,068 | | $4,564,068 | 100.00% |
| 517 | RASC 2004-KS3 [1] | Subprime 2004 | $15,563,536 | $15,563,536 | $8,755,851 | $3,930,087 | | $3,930,087 | 100.00% |
| 518 | RASC 2004-KS3 [2A] | Subprime 2004 | $14,157,504 | $14,157,504 | $8,093,478 | $3,631,120 | | $3,631,120 | 100.00% |
| 519 | RASC 2004-KS3 [2B] | Subprime 2004 | $14,075,780 | $14,075,780 | $8,048,290 | $3,610,847 | | $3,610,847 | 100.00% |
| 520 | RASC 2004-KS4 [1] | Subprime 2004 | $16,176,240 | $16,176,240 | $9,153,243 | $4,106,581 | AMBAC | $4,106,581 | 100.00% |
| 521 | RASC 2004-KS4 [2A] | Subprime 2004 | $21,183,761 | $21,183,761 | $12,116,244 | $5,435,925 | AMBAC | $5,435,925 | 100.00% |
| 522 | RASC 2004-KS4 [2B] | Subprime 2004 | $20,412,175 | $20,412,175 | $11,686,311 | $5,243,037 | AMBAC | $5,243,037 | 100.00% |
| 523 | RASC 2004-KS5 [1] | Subprime 2004 | $24,177,040 | $24,177,040 | $13,581,714 | $6,093,405 | | $6,093,405 | 100.00% |
| 524 | RASC 2004-KS5 [2A] | Subprime 2004 | $25,176,509 | $25,176,509 | $14,388,483 | $6,455,360 | | $6,455,360 | 100.00% |
| 525 | RASC 2004-KS6 [1] | Subprime 2004 | $24,431,449 | $24,431,449 | $13,976,509 | $6,270,528 | | $6,270,528 | 100.00% |
| 526 | RASC 2004-KS6 [2A] | Subprime 2004 | $19,572,769 | $19,572,769 | $11,033,061 | $4,949,957 | | $4,949,957 | 100.00% |
| 527 | RASC 2004-KS6 [2B] | Subprime 2004 | $26,575,817 | $26,575,817 | $15,205,535 | $6,821,928 | | $6,821,928 | 100.00% |
| 528 | RASC 2004-KS7 [1] | Subprime 2004 | $26,639,291 | $26,639,291 | $15,240,631 | $6,837,674 | FGIC | $6,837,674 | 100.00% |
| 529 | RASC 2004-KS7 [1] | Subprime 2004 | $17,950,455 | $17,950,455 | $10,117,443 | $4,539,167 | | $4,539,167 | 100.00% |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Pg 205 of 261
Case 14-cv-03030-GBD    Document 15-1    Filed 11/06/14    Page 286 of 355
Confidential — Subject to Rule 408 and Due Diligence

| | A Name | B Cohort | C Net Total Collateral Losses | D Debtor's Attributable Portion of Net Collateral Losses | E Losses Due to Breach | F RFC Claim | G Insurer | H RFC Recognized Claim | I RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 530 | RASC 2004-KS7 [2A] | Subprime 2004 | $18,698,981 | $18,698,981 | $10,683,418 | $4,793,091 | | $4,793,091 | 100.00% |
| 531 | RASC 2004-KS7 [2B] | Subprime 2004 | $19,160,076 | $19,160,076 | $10,938,376 | $4,907,477 | FGIC | $4,907,477 | 100.00% |
| 532 | RASC 2004-KS8 [1] | Subprime 2004 | $21,103,817 | $21,103,817 | $11,915,800 | $5,345,996 | | $5,345,996 | 100.00% |
| 533 | RASC 2004-KS8 [2] | Subprime 2004 | $27,836,805 | $27,836,805 | $15,937,260 | $7,150,215 | | $7,150,215 | 100.00% |
| 534 | RASC 2004-KS9 [1] | Subprime 2004 | $12,933,296 | $12,933,296 | $7,285,102 | $3,268,444 | FGIC | $3,268,444 | 100.00% |
| 535 | RASC 2004-KS9 [2] | Subprime 2004 | $27,657,220 | $27,657,220 | $15,795,876 | $7,086,783 | FGIC | $7,086,783 | 100.00% |
| 536 | RASC 2005-AHL1 [A] | Subprime 2005 | $99,458,652 | $99,458,652 | $56,707,581 | $25,441,726 | | $25,441,726 | 100.00% |
| 537 | RASC 2005-AHL1 [F] | Subprime 2005 | $4,415,699 | $4,415,699 | $2,500,106 | $1,121,667 | | $1,121,667 | 100.00% |
| 538 | RASC 2005-AHL2 [A] | Subprime 2005 | $86,152,991 | $86,152,991 | $49,191,559 | $22,069,680 | | $22,069,680 | 100.00% |
| 539 | RASC 2005-AHL2 [F] | Subprime 2005 | $20,881,172 | $20,881,172 | $11,748,861 | $5,271,099 | | $5,271,099 | 100.00% |
| 540 | RASC 2005-AHL3 [A] | Subprime 2005 | $107,860,397 | $107,860,397 | $61,569,467 | $27,622,999 | | $27,622,999 | 100.00% |
| 541 | RASC 2005-AHL3 [F] | Subprime 2005 | $22,149,846 | $22,149,846 | $12,465,105 | $5,592,441 | | $5,592,441 | 100.00% |
| 542 | RASC 2005-EMX1 [1A] | Subprime 2005 | $22,395,515 | $22,395,515 | $12,759,631 | $5,724,579 | | $5,724,579 | 100.00% |
| 543 | RASC 2005-EMX1 [1F] | Subprime 2005 | $15,177,222 | $15,177,222 | $8,535,066 | $3,829,238 | | $3,829,238 | 100.00% |
| 544 | RASC 2005-EMX1 [2A] | Subprime 2005 | $23,087,315 | $23,087,315 | $13,122,770 | $5,887,501 | | $5,887,501 | 100.00% |
| 545 | RASC 2005-EMX1 [2F] | Subprime 2005 | $9,790,923 | $9,790,923 | $5,502,829 | $2,468,831 | | $2,468,831 | 100.00% |
| 546 | RASC 2005-EMX2 [A] | Subprime 2005 | $55,167,321 | $55,167,321 | $31,369,204 | $14,073,721 | | $14,073,721 | 100.00% |
| 547 | RASC 2005-EMX2 [F] | Subprime 2005 | $29,793,128 | $29,793,128 | $16,829,542 | $7,550,535 | | $7,550,535 | 100.00% |
| 548 | RASC 2005-EMX3 [1A] | Subprime 2005 | $57,614,160 | $57,614,160 | $32,847,804 | $14,737,092 | | $14,737,092 | 100.00% |
| 549 | RASC 2005-EMX3 [1F] | Subprime 2005 | $13,386,691 | $13,386,691 | $7,601,417 | $3,410,358 | | $3,410,358 | 100.00% |
| 550 | RASC 2005-EMX3 [2A] | Subprime 2005 | $50,687,020 | $50,687,020 | $28,840,420 | $12,939,188 | | $12,939,188 | 100.00% |
| 551 | RASC 2005-EMX3 [2F] | Subprime 2005 | $14,470,596 | $14,470,596 | $8,204,078 | $3,680,741 | | $3,680,741 | 100.00% |
| 552 | RASC 2005-EMX4 [A] | Subprime 2005 | $90,679,459 | $90,679,459 | $51,605,474 | $23,152,677 | | $23,152,677 | 100.00% |
| 553 | RASC 2005-EMX4 [F] | Subprime 2005 | $32,002,070 | $32,002,070 | $18,246,900 | $8,186,430 | | $8,186,430 | 100.00% |
| 554 | RASC 2005-EMX5 [A] | Subprime 2005 | $68,387,817 | $68,387,817 | $39,004,772 | $17,499,401 | FGIC | $17,499,401 | 100.00% |
| 555 | RASC 2005-EMX5 [F] | Subprime 2005 | $26,476,260 | $26,476,260 | $15,127,530 | $6,786,931 | FGIC | $6,786,931 | 100.00% |
| 556 | RASC 2005-KS1 [1A] | Subprime 2005 | $59,781,370 | $59,781,370 | $34,094,640 | $15,296,482 | | $15,296,482 | 100.00% |
| 557 | RASC 2005-KS1 [1F] | Subprime 2005 | $13,865,151 | $13,865,151 | $7,820,617 | $3,508,702 | | $3,508,702 | 100.00% |
| 558 | RASC 2005-KS10 [1A] | Subprime 2005 | $144,539,990 | $144,539,990 | $82,494,989 | $37,011,187 | | $37,011,187 | 100.00% |
| 559 | RASC 2005-KS10 [1F] | Subprime 2005 | $26,771,885 | $26,771,885 | $15,182,221 | $6,811,469 | | $6,811,469 | 100.00% |
| 560 | RASC 2005-KS10 [2A] | Subprime 2005 | $106,210,099 | $106,210,099 | $60,515,795 | $27,150,272 | | $27,150,272 | 100.00% |
| 561 | RASC 2005-KS10 [2F] | Subprime 2005 | $34,680,249 | $34,680,249 | $19,620,541 | $8,802,711 | | $8,802,711 | 100.00% |

Case 14-cv-03039-GBD    Document 151-1    Filed 11/06/14    Page 287 of 355
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Pg 312 of 398

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
| 562 | RASC 2005-KS11 [1A] | Subprime 2005 | $138,668,473 | $138,668,473 | $79,100,329 | $35,488,181 | | $35,488,181 | 100.00% |
| 563 | RASC 2005-KS11 [1F] | Subprime 2005 | $37,848,181 | $37,848,181 | $21,478,313 | $9,636,196 | | $9,636,196 | 100.00% |
| 564 | RASC 2005-KS11 [2A] | Subprime 2005 | $121,311,413 | $121,311,413 | $69,097,720 | $31,000,533 | | $31,000,533 | 100.00% |
| 565 | RASC 2005-KS11 [2F] | Subprime 2005 | $42,055,273 | $42,055,273 | $23,802,338 | $10,678,864 | | $10,678,864 | 100.00% |
| 566 | RASC 2005-KS12 [A] | Subprime 2005 | $238,777,556 | $238,777,556 | $136,181,105 | $61,097,339 | | $61,097,339 | 100.00% |
| 567 | RASC 2005-KS12 [F] | Subprime 2005 | $58,006,933 | $58,006,933 | $32,888,726 | $14,755,451 | | $14,755,451 | 100.00% |
| 568 | RASC 2005-KS2 [1A] | Subprime 2005 | $24,203,965 | $24,203,965 | $13,809,155 | $6,195,446 | | $6,195,446 | 100.00% |
| 569 | RASC 2005-KS2 [1F] | Subprime 2005 | $3,839,594 | $3,839,594 | $2,163,731 | $970,753 | | $970,753 | 100.00% |
| 570 | RASC 2005-KS2 [2A] | Subprime 2005 | $28,000,231 | $28,000,231 | $15,959,793 | $7,160,324 | | $7,160,324 | 100.00% |
| 571 | RASC 2005-KS2 [2F] | Subprime 2005 | $4,780,228 | $4,780,228 | $2,693,225 | $1,208,309 | | $1,208,309 | 100.00% |
| 572 | RASC 2005-KS3 [A] | Subprime 2005 | $43,157,888 | $43,157,888 | $24,619,996 | $11,045,705 | | $11,045,705 | 100.00% |
| 573 | RASC 2005-KS3 [F] | Subprime 2005 | $10,087,998 | $10,087,998 | $5,684,513 | $2,550,344 | | $2,550,344 | 100.00% |
| 574 | RASC 2005-KS4 [A] | Subprime 2005 | $45,767,673 | $45,767,673 | $26,102,336 | $11,710,753 | | $11,710,753 | 100.00% |
| 575 | RASC 2005-KS4 [F] | Subprime 2005 | $10,453,781 | $10,453,781 | $5,886,363 | $2,641,801 | | $2,641,801 | 100.00% |
| 576 | RASC 2005-KS5 [A] | Subprime 2005 | $49,800,836 | $49,800,836 | $28,410,599 | $12,746,350 | | $12,746,350 | 100.00% |
| 577 | RASC 2005-KS5 [F] | Subprime 2005 | $9,999,097 | $9,999,097 | $5,639,013 | $2,529,930 | | $2,529,930 | 100.00% |
| 578 | RASC 2005-KS6 [A] | Subprime 2005 | $83,392,066 | $83,392,066 | $47,545,545 | $21,331,199 | | $21,331,199 | 100.00% |
| 579 | RASC 2005-KS6 [F] | Subprime 2005 | $16,383,428 | $16,383,428 | $9,223,572 | $4,138,134 | | $4,138,134 | 100.00% |
| 580 | RASC 2005-KS7 [A] | Subprime 2005 | $60,007,420 | $60,007,420 | $34,186,874 | $15,337,862 | | $15,337,862 | 100.00% |
| 581 | RASC 2005-KS7 [F] | Subprime 2005 | $11,993,921 | $11,993,921 | $6,767,717 | $3,036,320 | | $3,036,320 | 100.00% |
| 582 | RASC 2005-KS8 [A] | Subprime 2005 | $186,927,727 | $186,927,727 | $106,617,732 | $47,833,800 | | $47,833,800 | 100.00% |
| 583 | RASC 2005-KS8 [F] | Subprime 2005 | $45,302,813 | $45,302,813 | $25,501,448 | $11,441,166 | | $11,441,166 | 100.00% |
| 584 | RASC 2005-KS9 [A] | Subprime 2005 | $78,030,505 | $78,030,505 | $44,477,455 | $19,954,708 | | $19,954,708 | 100.00% |
| 585 | RASC 2005-KS9 [F] | Subprime 2005 | $20,622,087 | $20,622,087 | $11,596,103 | $5,203,462 | | $5,203,462 | 100.00% |
| 586 | RASC 2006-EMX1 [A] | Subprime 2006 | $87,539,690 | $87,539,690 | $48,654,675 | $21,828,808 | | $21,828,808 | 100.00% |
| 587 | RASC 2006-EMX1 [F] | Subprime 2006 | $36,722,058 | $36,722,058 | $20,413,519 | $9,158,478 | | $9,158,478 | 100.00% |
| 588 | RASC 2006-EMX2 [A] | Subprime 2006 | $136,678,579 | $136,678,579 | $75,965,994 | $34,081,968 | | $34,081,968 | 100.00% |
| 589 | RASC 2006-EMX2 [F] | Subprime 2006 | $43,888,050 | $43,888,050 | $24,393,097 | $10,943,907 | | $10,943,907 | 100.00% |
| 590 | RASC 2006-EMX3 [1A] | Subprime 2006 | $203,307,136 | $203,307,136 | $113,003,157 | $50,698,606 | | $50,698,606 | 100.00% |
| 591 | RASC 2006-EMX3 [1F] | Subprime 2006 | $83,480,875 | $83,480,875 | $46,389,526 | $20,812,554 | | $20,812,554 | 100.00% |
| 592 | RASC 2006-EMX4 [1A] | Subprime 2006 | $193,844,110 | $193,844,110 | $107,741,982 | $48,338,192 | | $48,338,192 | 100.00% |
| 593 | RASC 2006-EMX4 [1F] | Subprime 2006 | $74,645,977 | $74,645,977 | $41,480,815 | $18,610,272 | | $18,610,272 | 100.00% |
| 594 | RASC 2006-EMX5 [A] | Subprime 2006 | $173,858,045 | $173,858,045 | $96,635,569 | $43,355,326 | | $43,355,326 | 100.00% |
| 595 | RASC 2006-EMX5 [F] | Subprime 2006 | $75,101,638 | $75,101,638 | $41,732,961 | $18,723,397 | | $18,723,397 | 100.00% |
| 596 | RASC 2006-EMX6 [A] | Subprime 2006 | $211,998,050 | $211,998,050 | $117,837,431 | $52,867,492 | | $52,867,492 | 100.00% |
| 597 | RASC 2006-EMX6 [F] | Subprime 2006 | $64,427,910 | $64,427,910 | $35,805,050 | $16,063,853 | | $16,063,853 | 100.00% |

Case 14-cv-03039-GBD    Document 15-1    Filed 11/06/14    Page 288 of 355

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| RASC 2006-EMX7 [A] | Subprime 2006 | $164,270,635 | $164,270,635 | $91,312,400 | $40,967,098 | | $40,967,098 | 100.00% |
| RASC 2006-EMX7 [F] | Subprime 2006 | $64,580,018 | $64,580,018 | $35,885,196 | $16,099,810 | | $16,099,810 | 100.00% |
| RASC 2006-EMX8 [A] | Subprime 2006 | $150,320,435 | $150,320,435 | $83,557,677 | $37,487,959 | | $37,487,959 | 100.00% |
| RASC 2006-EMX8 [1F] | Subprime 2006 | $57,369,490 | $57,369,490 | $31,878,613 | $14,302,266 | | $14,302,266 | 100.00% |
| RASC 2006-EMX8 [2F] | Subprime 2006 | $100,767,235 | $100,767,235 | $56,016,226 | $25,131,551 | | $25,131,551 | 100.00% |
| RASC 2006-EMX8 [3F] | Subprime 2006 | $36,571,907 | $36,571,907 | $20,322,701 | $9,117,733 | | $9,117,733 | 100.00% |
| RASC 2006-EMX9 [1A] | Subprime 2006 | $193,253,309 | $193,253,309 | $107,424,862 | $48,195,917 | | $48,195,917 | 100.00% |
| RASC 2006-EMX9 [1F] | Subprime 2006 | $47,718,848 | $47,718,848 | $26,522,091 | $11,899,075 | | $11,899,075 | 100.00% |
| RASC 2006-EMX9 [2A] | Subprime 2006 | $104,623,664 | $104,623,664 | $58,157,014 | $26,092,010 | | $26,092,010 | 100.00% |
| RASC 2006-EMX9 [2F] | Subprime 2006 | $23,894,576 | $23,894,576 | $13,280,567 | $5,958,296 | | $5,958,296 | 100.00% |
| RASC 2006-KS1 [1A] | Subprime 2006 | $183,712,757 | $183,712,757 | $102,113,595 | $45,813,029 | | $45,813,029 | 100.00% |
| RASC 2006-KS1 [1F] | Subprime 2006 | $42,268,655 | $42,268,655 | $23,502,958 | $10,544,548 | | $10,544,548 | 100.00% |
| RASC 2006-KS2 [A] | Subprime 2006 | $226,147,206 | $226,147,206 | $125,696,938 | $56,393,642 | | $56,393,642 | 100.00% |
| RASC 2006-KS2 [F] | Subprime 2006 | $49,632,181 | $49,632,181 | $27,594,956 | $12,380,414 | | $12,380,414 | 100.00% |
| RASC 2006-KS3 [1A] | Subprime 2006 | $206,326,258 | $206,326,258 | $114,670,060 | $51,446,459 | | $51,446,459 | 100.00% |
| RASC 2006-KS3 [1F] | Subprime 2006 | $63,467,656 | $63,467,656 | $35,279,629 | $15,828,125 | | $15,828,125 | 100.00% |
| RASC 2006-KS3 [2A] | Subprime 2006 | $70,218,894 | $70,218,894 | $39,027,597 | $17,509,642 | | $17,509,642 | 100.00% |
| RASC 2006-KS3 [2F] | Subprime 2006 | $10,755,096 | $10,755,096 | $5,983,650 | $2,684,551 | | $2,684,551 | 100.00% |
| RASC 2006-KS4 [A] | Subprime 2006 | $188,843,077 | $188,843,077 | $104,967,230 | $47,093,306 | | $47,093,306 | 100.00% |
| RASC 2006-KS4 [F] | Subprime 2006 | $32,711,366 | $32,711,366 | $18,192,399 | $8,161,978 | | $8,161,978 | 100.00% |
| RASC 2006-KS5 [A] | Subprime 2006 | $162,740,637 | $162,740,637 | $90,460,976 | $40,585,109 | | $40,585,109 | 100.00% |
| RASC 2006-KS5 [F] | Subprime 2006 | $82,518,794 | $82,518,794 | $45,878,748 | $20,583,394 | | $20,583,394 | 100.00% |
| RASC 2006-KS6 [A] | Subprime 2006 | $146,676,000 | $146,676,000 | $81,533,015 | $36,579,599 | | $36,579,599 | 100.00% |
| RASC 2006-KS6 [F] | Subprime 2006 | $50,097,593 | $50,097,593 | $27,855,949 | $12,497,507 | | $12,497,507 | 100.00% |
| RASC 2006-KS7 [A] | Subprime 2006 | $154,721,524 | $154,721,524 | $86,013,506 | $38,589,761 | | $38,589,761 | 100.00% |
| RASC 2006-KS7 [F] | Subprime 2006 | $43,590,905 | $43,590,905 | $24,239,222 | $10,874,871 | | $10,874,871 | 100.00% |
| RASC 2006-KS8 [A] | Subprime 2006 | $152,685,639 | $152,685,639 | $84,875,644 | $38,079,262 | | $38,079,262 | 100.00% |
| RASC 2006-KS8 [F] | Subprime 2006 | $60,588,229 | $60,588,229 | $33,694,941 | $15,117,158 | | $15,117,158 | 100.00% |
| RASC 2006-KS9 [1A] | Subprime 2006 | $339,361,287 | $339,361,287 | $188,623,868 | $84,625,664 | | $84,625,664 | 100.00% |
| RASC 2006-KS9 [1F] | Subprime 2006 | $112,884,949 | $112,884,949 | $62,776,427 | $28,164,500 | | $28,164,500 | 100.00% |
| RASC 2006-KS9 [2A] | Subprime 2006 | $66,759,570 | $66,759,570 | $37,105,728 | $16,647,399 | | $16,647,399 | 100.00% |
| RASC 2006-KS9 [2F] | Subprime 2006 | $16,112,520 | $16,112,520 | $8,961,124 | $4,020,388 | | $4,020,388 | 100.00% |
| RASC 2007-EMX1 [1A] | Subprime 2007 | $109,901,605 | $109,901,605 | $61,101,952 | $27,413,250 | FGIC | $27,413,250 | 100.00% |
| RASC 2007-EMX1 [1F] | Subprime 2007 | $45,782,549 | $45,782,549 | $25,454,210 | $11,419,973 | FGIC | $11,419,973 | 100.00% |
| RASC 2007-EMX1 [2A] | Subprime 2007 | $101,823,988 | $101,823,988 | $56,613,314 | $25,399,433 | FGIC | $25,399,433 | 100.00% |
| RASC 2007-EMX1 [2F] | Subprime 2007 | $33,712,435 | $33,712,435 | $18,743,316 | $8,409,145 | FGIC | $8,409,145 | 100.00% |
| RASC 2007-KS1 [A] | Subprime 2007 | $126,243,405 | $126,243,405 | $70,178,981 | $31,485,638 | | $31,485,638 | 100.00% |

12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Case 14-cv-03039-GBD    Document 51-1    Filed 11/06/14    Page 289 of 355
Pg 314 of 398
Subject to FRE 408 and 26 Diligence

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
| 635 | RASC 2007-KS1 [F] | Subprime 2007 | $51,705,138 | $51,705,138 | $28,755,579 | $12,901,125 | | $12,901,125 | 100.00% |
| 636 | RASC 2007-KS2 [1A] | Subprime 2007 | $272,979,848 | $272,979,848 | $151,742,641 | $68,078,986 | | $68,078,986 | 100.00% |
| 637 | RASC 2007-KS2 [1F] | Subprime 2007 | $99,150,965 | $99,150,965 | $55,134,116 | $24,735,794 | | $24,735,794 | 100.00% |
| 638 | RASC 2007-KS2 [2A] | Subprime 2007 | $77,219,880 | $77,219,880 | $42,931,493 | $19,261,116 | | $19,261,116 | 100.00% |
| 639 | RASC 2007-KS2 [2F] | Subprime 2007 | $16,264,549 | $16,264,549 | $9,047,489 | $4,059,135 | | $4,059,135 | 100.00% |
| 640 | RASC 2007-KS3 [1A] | Subprime 2007 | $369,146,091 | $369,146,091 | $205,226,688 | $92,074,481 | | $92,074,481 | 100.00% |
| 641 | RASC 2007-KS3 [1F] | Subprime 2007 | $143,889,258 | $143,889,258 | $80,017,906 | $35,899,849 | | $35,899,849 | 100.00% |
| 642 | RASC 2007-KS3 [2A] | Subprime 2007 | $74,234,491 | $74,234,491 | $41,276,336 | $18,518,533 | | $18,518,533 | 100.00% |
| 643 | RASC 2007-KS3 [2F] | Subprime 2007 | $20,694,562 | $20,694,562 | $11,510,383 | $5,164,107 | | $5,164,107 | 100.00% |
| 644 | RASC 2007-KS4 [A] | Subprime 2007 | $88,305,253 | $88,305,253 | $49,086,523 | $22,022,556 | | $22,022,556 | 100.00% |
| 645 | RASC 2007-KS4 [F] | Subprime 2007 | $33,256,187 | $33,256,187 | $18,491,354 | $8,296,103 | | $8,296,103 | 100.00% |
| 646 | RFMS2 2004-HI1 [Total] | Second Lien 2004 | $29,067,274 | $29,067,274 | $15,797,164 | $7,087,361 | | $7,087,361 | 100.00% |
| 647 | RFMS2 2004-HI2 [Total] | Second Lien 2004 | $40,589,877 | $40,589,877 | $22,057,373 | $9,895,989 | FGIC | $9,895,989 | 100.00% |
| 648 | RFMS2 2004-HI3 [Total] | Second Lien 2004 | $34,882,879 | $34,882,879 | $19,008,197 | $8,527,984 | FGIC | $8,527,984 | 100.00% |
| 649 | RFMS2 2004-HS1 [1] | CES 2004 | $9,367,472 | $9,367,472 | $3,641,172 | $1,633,604 | FGIC | $1,633,604 | 100.00% |
| 650 | RFMS2 2004-HS1 [2] | CES 2004 | $5,299,340 | $5,299,340 | $2,065,774 | $926,805 | FGIC | $926,805 | 100.00% |
| 651 | RFMS2 2004-HS2 [1] | CES 2004 | $9,851,983 | $9,851,983 | $3,835,507 | $1,720,791 | MBIA | $0 | 100.00% |
| 652 | RFMS2 2004-HS2 [2] | CES 2004 | $10,507,019 | $10,507,019 | $4,082,467 | $1,831,589 | MBIA | $0 | 100.00% |
| 653 | RFMS2 2004-HS3 [Total] | CES 2004 | $11,688,112 | $11,688,112 | $4,539,215 | $2,036,508 | FGIC | $2,036,508 | 100.00% |
| 654 | RFMS2 2005-HI1 [Total] | Second Lien 2005 | $42,101,490 | $42,101,490 | $23,090,697 | $10,359,588 | FGIC | $10,359,588 | 100.00% |
| 655 | RFMS2 2005-HI2 [Total] | Second Lien 2005 | $47,190,282 | $47,190,282 | $26,028,238 | $11,677,509 | FGIC | $11,677,509 | 100.00% |
| 656 | RFMS2 2005-HI3 [Total] | Second Lien 2005 | $51,159,961 | $51,159,961 | $28,347,534 | $12,718,056 | FGIC | $12,718,056 | 100.00% |
| 657 | RFMS2 2005-HS1 [1] | CES 2005 | $59,788,118 | $59,788,118 | $22,920,616 | $10,283,282 | FGIC | $10,283,282 | 100.00% |
| 658 | RFMS2 2005-HS1 [2] | CES 2005 | $44,010,796 | $44,010,796 | $17,154,290 | $7,696,233 | FGIC | $7,696,233 | 100.00% |
| 659 | RFMS2 2005-HS2 [1] | CES 2005 | $44,966,151 | $44,966,151 | $17,412,906 | $7,812,260 | FGIC | $7,812,260 | 100.00% |
| 660 | RFMS2 2005-HSA1 [2] | CES 2005 | $34,972,923 | $34,972,923 | $13,693,958 | $6,143,763 | FGIC | $6,143,763 | 100.00% |
| 661 | RFMS2 2005-HSA1 [1] | CES 2005 | $23,142,910 | $23,142,910 | $9,102,978 | $4,084,030 | FGIC | $4,084,030 | 100.00% |
| 662 | RFMS2 2005-HSA1 [2] | CES 2005 | $16,251,358 | $16,251,358 | $6,396,187 | $2,869,635 | FGIC | $2,869,635 | 100.00% |
| 663 | RFMS2 2006-HI1 [Total] | Second Lien 2006 | $63,288,600 | $63,288,600 | $31,213,000 | $14,003,641 | FGIC | $14,003,641 | 100.00% |
| 664 | RFMS2 2006-HI2 [Total] | Second Lien 2006 | $69,589,653 | $69,589,653 | $34,293,493 | $15,385,697 | FGIC | $15,385,697 | 100.00% |
| 665 | RFMS2 2006-HI3 [Total] | Second Lien 2006 | $72,240,315 | $72,240,315 | $35,626,510 | $15,983,752 | FGIC | $15,983,752 | 100.00% |
| 666 | RFMS2 2006-HI4 [Total] | Second Lien 2006 | $89,713,773 | $89,713,773 | $44,205,531 | $19,832,710 | FGIC | $19,832,710 | 100.00% |

Case 14-cv-03039-GBD    Document 51-1    Filed 11/06/14    Page 290 of 355

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| 667 RFMS2 2006-HI5 [Total] | Second Lien 2006 | $84,032,631 | $84,032,631 | $41,409,834 | $18,578,426 | FGIC | $18,578,426 | 100.00% |
| 668 RFMS2 2006-HSA1 [Total] | CES 2006 | $70,178,784 | $70,178,784 | $36,895,342 | $16,553,010 | FGIC | $16,553,010 | 100.00% |
| 669 RFMS2 2006-HSA2 [1] | CES 2006 | $41,461,652 | $41,461,652 | $21,711,823 | $9,740,959 | FGIC | $9,740,959 | 100.00% |
| 670 RFMS2 2006-HSA2 [2] | CES 2006 | $32,433,678 | $32,433,678 | $16,922,877 | $7,592,410 | FGIC | $7,592,410 | 100.00% |
| 671 RFMS2 2006-HSA3 [Total] | Second Lien 2006 | $15,362,129 | $15,362,129 | $7,599,899 | $3,409,677 | FSA | $3,409,677 | 100.00% |
| 672 RFMS2 2006-HSA4 [Total] | Second Lien 2006 | $39,270,403 | $39,270,403 | $19,403,627 | $8,705,392 | MBIA | $0 | 100.00% |
| 673 RFMS2 2006-HSA5 [Total] | Second Lien 2006 | $24,828,284 | $24,828,284 | $12,274,313 | $5,506,842 | MBIA | $0 | 100.00% |
| 674 RFMS2 2007-HI1 [Total] | Second Lien 2007 | $91,281,474 | $91,281,474 | $44,979,154 | $20,179,794 | FGIC | $20,179,794 | 100.00% |
| 675 RFMS2 2007-HSA1 [Total] | Second Lien 2007 | $58,319,595 | $58,319,595 | $28,877,736 | $12,954,135 | MBIA | $0 | 100.00% |
| 676 RFMS2 2007-HSA2 [Total] | CES 2007 | $45,700,053 | $45,700,053 | $24,889,271 | $11,166,514 | MBIA | $0 | 100.00% |
| 677 RFMS2 2007-HSA3 [1] | Second Lien 2007 | $48,838,299 | $48,838,299 | $24,128,088 | $10,825,011 | MBIA | $0 | 100.00% |
| 678 RFMS2 2007-HSA3 [2] | Second Lien 2007 | $10,140,903 | $10,140,903 | $5,070,197 | $2,274,732 | MBIA | $0 | 100.00% |
| 679 RFMSI 2004-PS1 [Total] | Prime 2004 | $146,369 | $146,369 | $87,498 | $39,256 | | $39,256 | 100.00% |
| 680 RFMSI 2004-S1 [Total] | Prime 2004 | $1,124,681 | $1,124,681 | $623,808 | $279,870 | | $279,870 | 100.00% |
| 681 RFMSI 2004-S2 [Total] | Prime 2004 | $1,676,332 | $1,676,332 | $917,406 | $411,592 | Radian - Insurer Exception | $411,592 | 100.00% |
| 682 RFMSI 2004-S3 [Total] | Prime 2004 | $265,438 | $265,438 | $154,960 | $69,522 | | $69,522 | 100.00% |
| 683 RFMSI 2004-S4 [1] | Prime 2004 | $1,457,421 | $1,457,421 | $806,238 | $361,717 | MBIA - Insurer Exception | $361,717 | 100.00% |
| 684 RFMSI 2004-S4 [2] | Prime 2004 | $492,188 | $492,188 | $294,180 | $131,983 | | $131,983 | 100.00% |
| 685 RFMSI 2004-S5 [1] | Prime 2004 | $1,535,168 | $1,535,168 | $843,206 | $378,303 | | $378,303 | 100.00% |
| 686 RFMSI 2004-S5 [2] | Prime 2004 | $294,218 | $294,218 | $173,104 | $77,663 | | $77,663 | 100.00% |
| 687 RFMSI 2004-S6 [ONE] | Prime 2004 | $906,458 | $906,458 | $517,651 | $232,243 | | $232,243 | 100.00% |
| 688 RFMSI 2004-S6 [THREE] | Prime 2004 | $528,878 | $528,878 | $299,722 | $134,470 | | $134,470 | 100.00% |
| 689 RFMSI 2004-S6 [TWO] | Prime 2004 | $1,613,495 | $1,613,495 | $837,100 | $375,563 | | $375,563 | 100.00% |
| 690 RFMSI 2004-S7 [Total] | Prime 2004 | $218,428 | $218,428 | $130,546 | $58,569 | | $58,569 | 100.00% |
| 691 RFMSI 2004-S8 [Total] | Prime 2004 | $2,014,217 | $2,014,217 | $1,043,772 | $468,286 | | $468,286 | 100.00% |
| 692 RFMSI 2004-S9 [1] | Prime 2004 | $5,050,274 | $5,050,274 | $2,615,694 | $1,173,525 | | $1,173,525 | 100.00% |
| 693 RFMSI 2004-S9 [2] | Prime 2004 | $1,113,819 | $1,113,819 | $542,199 | $243,256 | | $243,256 | 100.00% |
| 694 RFMSI 2004-SA1 [1] | Prime 2004 | $538,599 | $538,599 | $258,924 | $116,166 | | $116,166 | 100.00% |
| 695 RFMSI 2004-SA1 [2] | Prime 2004 | $2,186,473 | $2,186,473 | $1,155,425 | $518,379 | | $518,379 | 100.00% |
| 696 RFMSI 2004-SA1 [3] | Prime 2004 | $366,289 | $366,289 | $205,702 | $92,288 | | $92,288 | 100.00% |
| 697 RFMSI 2005-S1 [1] | Prime 2005 | $5,020,073 | $5,020,073 | $2,571,451 | $1,153,676 | | $1,153,676 | 100.00% |
| 698 RFMSI 2005-S1 [2] | Prime 2005 | $1,325,470 | $1,325,470 | $713,592 | $320,151 | | $320,151 | 100.00% |
| 699 RFMSI 2005-S2 [Total] | Prime 2005 | $5,312,528 | $5,312,528 | $2,672,784 | $1,199,139 | FGIC - Insurer Exception | $1,199,139 | 100.00% |
| 700 RFMSI 2005-S3 [Total] | Prime 2005 | $499,929 | $499,929 | $282,445 | $126,718 | | $126,718 | 100.00% |

12-12020-mg   Doc 8019-45   Filed 01/22/15   Entered 01/22/15 18:14:28   Exhibit 26
Case 1:14-cv-03039-GBD   Document 51-1   Filed 11/06/14   Page 291 of 355
Exhibit C to the Original Engagement
Subject to FRE 408 and Confidential Due Diligence

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
| 701 | RFMSI 2005-S4 [Total] | Prime 2005 | $6,672,692 | $6,672,692 | $3,417,486 | $1,533,247 | | $1,533,247 | 100.00% |
| 702 | RFMSI 2005-S5 [Total] | Prime 2005 | $5,469,164 | $5,469,164 | $2,769,456 | $1,242,510 | Assured Guaranty - Insurer Exception | $1,242,510 | 100.00% |
| 703 | RFMSI 2005-S6 [Total] | Prime 2005 | $7,627,544 | $7,627,544 | $4,014,295 | $1,801,004 | | $1,801,004 | 100.00% |
| 704 | RFMSI 2005-S7 [Total] | Prime 2005 | $14,679,025 | $14,679,025 | $6,944,878 | $3,115,804 | FGIC | $3,115,804 | 100.00% |
| 705 | RFMSI 2005-S8 [Total] | Prime 2005 | $12,223,392 | $12,223,392 | $6,021,888 | $2,701,706 | | $2,701,706 | 100.00% |
| 706 | RFMSI 2005-S9 [Total] | Prime 2005 | $17,604,957 | $17,604,957 | $8,233,430 | $3,693,909 | | $3,693,909 | 100.00% |
| 707 | RFMSI 2005-SA1 [1] | Prime 2005 | $2,874,527 | $2,874,527 | $1,292,167 | $579,728 | | $579,728 | 100.00% |
| 708 | RFMSI 2005-SA1 [2] | Prime 2005 | $2,469,303 | $2,469,303 | $1,297,181 | $581,977 | | $581,977 | 100.00% |
| 709 | RFMSI 2005-SA1 [3] | Prime 2005 | $3,413,022 | $3,413,022 | $1,823,699 | $818,198 | | $818,198 | 100.00% |
| 710 | RFMSI 2005-SA2 [1] | Prime 2005 | $3,652,574 | $3,652,574 | $1,727,506 | $775,041 | | $775,041 | 100.00% |
| 711 | RFMSI 2005-SA2 [2] | Prime 2005 | $10,565,613 | $10,565,613 | $5,412,228 | $2,428,183 | | $2,428,183 | 100.00% |
| 712 | RFMSI 2005-SA2 [3] | Prime 2005 | $4,141,131 | $4,141,131 | $2,178,149 | $977,221 | | $977,221 | 100.00% |
| 713 | RFMSI 2005-SA2 [4] | Prime 2005 | $1,102,711 | $1,102,711 | $639,251 | $286,798 | | $286,798 | 100.00% |
| 714 | RFMSI 2005-SA2 [5] | Prime 2005 | $2,774,800 | $2,774,800 | $1,272,274 | $570,803 | | $570,803 | 100.00% |
| 715 | RFMSI 2005-SA2 [6] | Prime 2005 | $3,842,039 | $3,842,039 | $1,911,894 | $857,767 | | $857,767 | 100.00% |
| 716 | RFMSI 2005-SA3 [1] | Prime 2005 | $12,796,549 | $12,796,549 | $6,036,584 | $2,708,299 | | $2,708,299 | 100.00% |
| 717 | RFMSI 2005-SA3 [2] | Prime 2005 | $15,492,503 | $15,492,503 | $7,831,515 | $3,513,591 | | $3,513,591 | 100.00% |
| 718 | RFMSI 2005-SA3 [3] | Prime 2005 | $5,906,129 | $5,906,129 | $2,979,226 | $1,336,623 | | $1,336,623 | 100.00% |
| 719 | RFMSI 2005-SA3 [4] | Prime 2005 | $5,232,299 | $5,232,299 | $2,804,979 | $1,258,447 | | $1,258,447 | 100.00% |
| 720 | RFMSI 2005-SA3 [11] | Prime 2005 | $5,796,521 | $5,796,521 | $2,791,939 | $1,252,597 | | $1,252,597 | 100.00% |
| 721 | RFMSI 2005-SA4 [11] | Prime 2005 | $10,802,144 | $10,802,144 | $5,119,572 | $2,296,884 | | $2,296,884 | 100.00% |
| 722 | RFMSI 2005-SA4 [13] | Prime 2005 | $1,637,993 | $1,637,993 | $798,881 | $358,416 | | $358,416 | 100.00% |
| 723 | RFMSI 2005-SA4 [101] | Prime 2005 | $27,087,674 | $27,087,674 | $13,226,901 | $5,934,218 | | $5,934,218 | 100.00% |
| 724 | RFMSI 2005-SA4 [102] | Prime 2005 | $14,947,649 | $14,947,649 | $7,828,330 | $3,512,162 | | $3,512,162 | 100.00% |
| 725 | RFMSI 2005-SA5 [1] | Prime 2005 | $10,653,187 | $10,653,187 | $4,915,295 | $2,205,236 | | $2,205,236 | 100.00% |
| 726 | RFMSI 2005-SA5 [2] | Prime 2005 | $16,468,109 | $16,468,109 | $7,911,440 | $3,549,449 | | $3,549,449 | 100.00% |
| 727 | RFMSI 2005-SA5 [3] | Prime 2005 | $6,272,819 | $6,272,819 | $3,114,023 | $1,397,099 | | $1,397,099 | 100.00% |
| 728 | RFMSI 2006-S1 [1] | Prime 2006 | $16,090,685 | $16,090,685 | $5,767,133 | $2,587,411 | | $2,587,411 | 100.00% |
| 729 | RFMSI 2006-S1 [2] | Prime 2006 | $9,469,261 | $9,469,261 | $3,404,087 | $1,527,236 | | $1,527,236 | 100.00% |
| 730 | RFMSI 2006-S10 [1] | Prime 2006 | $57,211,783 | $57,211,783 | $20,607,014 | $9,245,289 | | $9,245,289 | 100.00% |
| 731 | RFMSI 2006-S10 [2] | Prime 2006 | $6,495,275 | $6,495,275 | $2,316,494 | $1,039,290 | | $1,039,290 | 100.00% |

Debtor's Attributable Portion of the Value of the Diligence
Subject to High Level Due Diligence

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| RFMSI 2006-S11 [Total] | Prime 2006 | $44,443,729 | $44,443,729 | $15,997,010 | $7,177,022 | | $7,177,022 | 100.00% |
| RFMSI 2006-S12 [I] | Prime 2006 | $1,399,478 | $1,399,478 | $492,168 | $220,810 | | $220,810 | 100.00% |
| RFMSI 2006-S12 [II] | Prime 2006 | $49,612,356 | $49,612,356 | $17,811,667 | $7,991,163 | | $7,991,163 | 100.00% |
| RFMSI 2006-S12 [III] | Prime 2006 | $30,387,587 | $30,387,587 | $10,924,449 | $4,901,229 | | $4,901,229 | 100.00% |
| RFMSI 2006-S2 [Total] | Prime 2006 | $19,792,392 | $19,792,392 | $7,116,729 | $3,192,904 | | $3,192,904 | 100.00% |
| RFMSI 2006-S3 [Total] | Prime 2006 | $29,079,076 | $29,079,076 | $10,476,944 | $4,700,457 | | $4,700,457 | 100.00% |
| RFMSI 2006-S4 [Total] | Prime 2006 | $22,071,738 | $22,071,738 | $7,923,935 | $3,555,055 | | $3,555,055 | 100.00% |
| RFMSI 2006-S5 [Total] | Prime 2006 | $54,693,301 | $54,693,301 | $19,696,279 | $8,836,690 | | $8,836,690 | 100.00% |
| RFMSI 2006-S6 [Total] | Prime 2006 | $49,382,385 | $49,382,385 | $17,815,384 | $7,992,831 | | $7,992,831 | 100.00% |
| RFMSI 2006-S7 [Total] | Prime 2006 | $37,706,573 | $37,706,573 | $13,588,282 | $6,096,351 | | $6,096,351 | 100.00% |
| RFMSI 2006-S8 [Total] | Prime 2006 | $32,108,589 | $32,108,589 | $11,549,042 | $5,181,451 | | $5,181,451 | 100.00% |
| RFMSI 2006-S9 [Total] | Prime 2006 | $30,560,226 | $30,560,226 | $11,013,905 | $4,941,363 | | $4,941,363 | 100.00% |
| RFMSI 2006-SA1 [1] | Prime 2006 | $29,541,450 | $29,541,450 | $10,667,671 | $4,786,026 | | $4,786,026 | 100.00% |
| RFMSI 2006-SA1 [2] | Prime 2006 | $5,532,410 | $5,532,410 | $1,994,519 | $894,837 | | $894,837 | 100.00% |
| RFMSI 2006-SA2 [1] | Prime 2006 | $10,648,834 | $10,648,834 | $3,846,860 | $1,725,885 | | $1,725,885 | 100.00% |
| RFMSI 2006-SA2 [2] | Prime 2006 | $75,768,791 | $75,768,791 | $27,429,233 | $12,306,062 | | $12,306,062 | 100.00% |
| RFMSI 2006-SA2 [3] | Prime 2006 | $12,779,803 | $12,779,803 | $4,595,046 | $2,061,557 | | $2,061,557 | 100.00% |
| RFMSI 2006-SA2 [4] | Prime 2006 | $9,641,939 | $9,641,939 | $3,437,387 | $1,542,176 | | $1,542,176 | 100.00% |
| RFMSI 2006-SA3 [1] | Prime 2006 | $2,864,816 | $2,864,816 | $1,032,254 | $463,119 | | $463,119 | 100.00% |
| RFMSI 2006-SA3 [2] | Prime 2006 | $19,338,635 | $19,338,635 | $6,981,735 | $3,132,339 | | $3,132,339 | 100.00% |
| RFMSI 2006-SA3 [3] | Prime 2006 | $10,738,786 | $10,738,786 | $3,876,633 | $1,739,243 | | $1,739,243 | 100.00% |
| RFMSI 2006-SA3 [4] | Prime 2006 | $6,627,569 | $6,627,569 | $2,378,152 | $1,066,953 | | $1,066,953 | 100.00% |
| RFMSI 2006-SA4 [1] | Prime 2006 | $3,006,723 | $3,006,723 | $1,089,925 | $488,992 | | $488,992 | 100.00% |
| RFMSI 2006-SA4 [2] | Prime 2006 | $24,095,438 | $24,095,438 | $8,718,913 | $3,911,720 | | $3,911,720 | 100.00% |
| RFMSI 2006-SA4 [3] | Prime 2006 | $12,629,024 | $12,629,024 | $4,572,222 | $2,051,317 | | $2,051,317 | 100.00% |
| RFMSI 2007-S1 [Total] | Prime 2007 | $43,925,697 | $43,925,697 | $15,789,882 | $7,084,094 | | $7,084,094 | 100.00% |
| RFMSI 2007-S2 [Total] | Prime 2007 | $40,886,238 | $40,886,238 | $14,682,107 | $6,587,093 | | $6,587,093 | 100.00% |
| RFMSI 2007-S3 [1] | Prime 2007 | $52,468,991 | $52,468,991 | $18,898,687 | $8,478,852 | | $8,478,852 | 100.00% |
| RFMSI 2007-S3 [2] | Prime 2007 | $941,275 | $941,275 | $333,011 | $149,404 | | $149,404 | 100.00% |
| RFMSI 2007-S4 [Total] | Prime 2007 | $31,192,233 | $31,192,233 | $11,221,345 | $5,034,430 | | $5,034,430 | 100.00% |
| RFMSI 2007-S5 [Total] | Prime 2007 | $47,491,017 | $47,491,017 | $17,031,643 | $7,641,207 | | $7,641,207 | 100.00% |
| RFMSI 2007-S6 [1] | Prime 2007 | $42,315,056 | $42,315,056 | $15,238,989 | $6,836,937 | | $6,836,937 | 100.00% |

12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Case 14-cv-03039-GBD    Document 51-1    Filed 11/06/14    Page 293 of 355
Pg 212 of 265
Debtor's Attributable Portion of Net Collateral Losses Diligence
Subject to FRE 408

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 764 | RFMSI 2007-S6 [2] | Prime 2007 | $34,381,957 | $34,381,957 | $12,386,665 | $5,557,249 | | $5,557,249 | 100.00% |
| 765 | RFMSI 2007-S7 [Total] | | | | | | | | 100.00% |
| 766 | RFMSI 2007-S8 [1] | Prime 2007 | $41,373,718 | $41,373,718 | $14,874,313 | $6,673,326 | | $6,673,326 | 100.00% |
| 767 | RFMSI 2007-S8 [2] | Prime 2007 | $46,198,891 | $46,198,891 | $16,650,252 | $7,470,097 | | $7,470,097 | 100.00% |
| 768 | RFMSI 2007-S9 [1] | Prime 2007 | $2,203,685 | $2,203,685 | $786,774 | $352,984 | | $352,984 | 100.00% |
| 769 | RFMSI 2007-S9 [2] | Prime 2007 | $15,336,106 | $15,336,106 | $5,530,596 | $2,481,289 | | $2,481,289 | 100.00% |
| 770 | RFMSI 2007-SA1 [1] | Prime 2007 | $799,247 | $799,247 | $281,172 | $126,147 | | $126,147 | 100.00% |
| 771 | RFMSI 2007-SA1 [2] | Prime 2007 | $1,684,146 | $1,684,146 | $605,786 | $271,785 | | $271,785 | 100.00% |
| 772 | RFMSI 2007-SA1 [3] | Prime 2007 | $30,551,954 | $30,551,954 | $11,062,810 | $4,963,304 | | $4,963,304 | 100.00% |
| 773 | RFMSI 2007-SA1 [4] | Prime 2007 | $10,757,394 | $10,757,394 | $3,884,554 | $1,742,796 | | $1,742,796 | 100.00% |
| 774 | RFMSI 2007-SA2 [1] | Prime 2007 | $3,308,676 | $3,308,676 | $1,176,833 | $527,983 | | $527,983 | 100.00% |
| 775 | RFMSI 2007-SA2 [2] | Prime 2007 | $4,491,985 | $4,491,985 | $1,631,998 | $732,192 | | $732,192 | 100.00% |
| 776 | RFMSI 2007-SA2 [3] | Prime 2007 | $37,281,076 | $37,281,076 | $13,487,643 | $6,051,200 | | $6,051,200 | 100.00% |
| 777 | RFMSI 2007-SA2 [4] | Prime 2007 | $7,103,673 | $7,103,673 | $2,579,153 | $1,157,131 | | $1,157,131 | 100.00% |
| 778 | RFMSI 2007-SA2 [5] | Prime 2007 | $9,977,927 | $9,977,927 | $3,591,271 | $1,611,216 | | $1,611,216 | 100.00% |
| 779 | RFMSI 2007-SA3 [1] | Prime 2007 | $2,762,880 | $2,762,880 | $985,100 | $441,963 | | $441,963 | 100.00% |
| 780 | RFMSI 2007-SA3 [2] | Prime 2007 | $1,508,913 | $1,508,913 | $545,098 | $244,557 | | $244,557 | 100.00% |
| 781 | RFMSI 2007-SA3 [3] | Prime 2007 | $43,483,069 | $43,483,069 | $15,730,477 | $7,057,442 | | $7,057,442 | 100.00% |
| 782 | RFMSI 2007-SA3 [4] | Prime 2007 | $11,720,170 | $11,720,170 | $4,240,062 | $1,902,294 | | $1,902,294 | 100.00% |
| 783 | RFMSI 2007-SA4 [1] | Prime 2007 | $5,258,106 | $5,258,106 | $1,879,383 | $843,181 | | $843,181 | 100.00% |
| 784 | RFMSI 2007-SA4 [2] | Prime 2007 | $90,694 | $90,694 | $31,893 | $14,309 | | $14,309 | 100.00% |
| 785 | RFMSI 2007-SA4 [3] | Prime 2007 | $1,095,730 | $1,095,730 | $393,866 | $176,707 | | $176,707 | 100.00% |
| 786 | RFMSI 2007-SA4 [4] | Prime 2007 | $38,283,077 | $38,283,077 | $13,832,317 | $6,205,837 | | $6,205,837 | 100.00% |
| 787 | RFMSI 2007-SA4 [5] | Prime 2007 | $14,985,634 | $14,985,634 | $5,411,667 | $2,427,932 | | $2,427,932 | 100.00% |
| 788 | | Prime 2007 | $11,620,169 | $11,620,169 | $4,173,654 | $1,872,500 | | $1,872,500 | 100.00% |
| | | | $38,420,267,482 | $38,420,267,482 | $17,941,511,184 | $8,049,417,688 | | $7,946,006,807 | |

**Schedule 3G**

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller% |
|---|---|---|---|---|---|---|---|---|
| ARMT 2004-5 [1] | ALT-A 2004 | $2,865,881 | $257,929 | $134,320 | $25,645 | | $25,645 | 4.50% |
| ARMT 2004-5 [2] | ALT-A 2004 | $8,036,747 | $723,307 | $296,478 | $66,507 | | $66,507 | 4.50% |
| ARMT 2004-5 [3] | ALT-A 2004 | $55,787,717 | $520,895 | $212,714 | $47,717 | | $47,717 | 4.50% |
| ARMT 2004-5 [4] | ALT-A 2004 | $55,572,235 | $501,501 | $198,729 | $44,580 | | $44,580 | 4.50% |
| ARMT 2004-5 [5] | ALT-A 2004 | $56,707,818 | $603,704 | $269,447 | $60,443 | | $60,443 | 4.50% |
| ARMT 2004-5 [6] | ALT-A 2004 | $59,091,981 | $818,278 | $353,801 | $79,366 | | $79,366 | 4.50% |
| ARMT 2004-5 [7A] | ALT-A 2004 | $56,451,231 | $580,611 | $259,879 | $58,297 | | $58,297 | 4.50% |
| ARMT 2004-5 [7B] | ALT-A 2004 | $11,295,496 | $1,016,595 | $453,430 | $101,715 | | $101,715 | 4.50% |
| ARMT 2005-1 [1] | ALT-A 2005 | $56,080,686 | $547,262 | $234,375 | $52,576 | | $52,576 | 4.50% |
| ARMT 2005-1 [2] | ALT-A 2005 | $13,072,540 | $1,176,529 | $472,714 | $106,041 | | $106,041 | 4.50% |
| ARMT 2005-1 [3] | ALT-A 2005 | $57,465,549 | $671,899 | $293,755 | $65,896 | | $65,896 | 4.50% |
| ARMT 2005-1 [4] | ALT-A 2005 | $13,142,774 | $1,182,850 | $499,137 | $111,968 | | $111,968 | 4.50% |
| ARMT 2005-1 [5] | ALT-A 2005 | $9,853,270 | $886,794 | $395,392 | $88,696 | | $88,696 | 4.50% |
| ARMT 2005-10 [1] | ALT-A 2005 | $57,519,348 | $1,059,338 | $580,193 | $130,302 | | $130,302 | 4.50% |
| ARMT 2005-10 [2] | ALT-A 2005 | $50,702,109 | $963,190 | $405,959 | $91,066 | | $91,066 | 4.50% |
| ARMT 2005-10 [3] | ALT-A 2005 | $30,610,085 | $2,754,908 | $1,156,765 | $259,490 | | $259,490 | 4.50% |
| ARMT 2005-10 [4] | ALT-A 2005 | $29,763,712 | $2,678,734 | $1,097,098 | $246,105 | | $246,105 | 4.50% |
| ARMT 2005-10 [5] | ALT-A 2005 | $18,143,593 | $1,632,923 | $699,953 | $157,016 | | $157,016 | 4.50% |
| ARMT 2005-10 [6] | ALT-A 2005 | $66,504,968 | $5,985,447 | $2,652,842 | $595,096 | | $595,096 | 9.00% |
| ARMT 2005-11 [1] | ALT-A 2005 | $56,870,091 | $618,308 | $262,190 | $58,816 | | $58,816 | 9.00% |
| ARMT 2005-11 [2] | ALT-A 2005 | $56,292,648 | $506,711 | $264,004 | $59,229 | | $59,229 | 9.00% |
| ARMT 2005-11 [3] | ALT-A 2005 | $34,391,270 | $3,095,214 | $1,321,417 | $296,425 | | $296,425 | 4.50% |
| ARMT 2005-11 [4] | ALT-A 2005 | $55,741,682 | $1,416,751 | $589,438 | $132,225 | | $132,225 | 4.50% |
| ARMT 2005-11 [5] | ALT-A 2005 | $83,082,789 | $7,477,451 | $3,231,419 | $724,884 | | $724,884 | 4.50% |
| ARMT 2005-9 [1] | ALT-A 2005 | $70,901,103 | $6,381,099 | $2,815,446 | $631,572 | | $631,572 | 9.00% |
| ARMT 2005-9 [2] | ALT-A 2005 | $16,726,292 | $1,505,366 | $637,631 | $286,072 | | $286,072 | 9.00% |
| ARMT 2005-9 [3] | ALT-A 2005 | $58,024,197 | $722,178 | $303,085 | $135,485 | | $135,485 | 9.00% |
| ARMT 2005-9 [4] | ALT-A 2005 | $56,292,648 | $566,338 | $523,675 | $100,351 | | $100,351 | 9.00% |
| ARMT 2005-9 [5] | ALT-A 2005 | $35,642,552 | $3,207,830 | $1,367,320 | $613,445 | | $613,445 | 9.00% |
| ARMT 2005-9 [6] | ALT-A 2005 | $67,754,304 | $6,097,887 | $2,683,166 | $1,203,796 | | $1,203,796 | 9.00% |
| BAC 2005-6 [1] | Prime 2005 | $56,275,483 | $918,103 | $469,068 | $118,960 | | $118,960 | 8.27% |
| BAC 2005-6 [2] | Prime 2005 | $57,725,474 | $1,130,237 | $563,719 | $142,965 | | $142,965 | 8.27% |
| BAC 2005-8 [1] | Prime 2005 | $52,842,891 | $519,680 | $257,911 | $57,476 | | $57,476 | 9.08% |
| BAC 2005-8 [2] | Prime 2005 | $57,193,865 | $815,404 | $691,122 | $154,018 | | $154,018 | 9.08% |
| BAC 2005-8 [3] | Prime 2005 | $81,328,402 | $5,242,832 | $122,362 | $527,268 | | $527,268 | 9.08% |
| BAC 2005-8 [4] | Prime 2005 | $56,760,354 | $1,235,793 | $618,177 | $137,762 | | $137,762 | 9.08% |
| BAC 2006-1 [1] | ALT-A 2006 | $520,430,173 | $1,618,070 | $542,291 | $125,335 | | $125,335 | 4.08% |
| BAC 2006-1 [2] | ALT-A 2006 | $11,370,616 | $900,553 | $302,457 | $69,904 | | $69,904 | 4.08% |
| BAC 2006-2 [1] | ALT-A 2006 | $11,009,803 | $871,976 | $293,888 | $67,924 | | $67,924 | 4.08% |
| BAC 2006-2 [1] | ALT-A 2006 | $57,296,507 | $572,099 | $524,363 | $510,930 | | $510,930 | 0.99% |
| BAC 2006-2 [2] | ALT-A 2006 | $55,035,429 | $104,312 | $35,208 | $15,796 | | $15,796 | 0.99% |
| BAC 2006-2 [3] | ALT-A 2006 | $58,479,549 | $583,789 | $28,253 | $12,676 | | $12,676 | 0.99% |
| BAC 2006-2 [4] | ALT-A 2006 | $56,990,679 | $569,077 | $23,369 | $10,485 | | $10,485 | 0.99% |
| BAC 2006-2 [5] | ALT-A 2006 | $3,728,574 | $36,843 | $12,395 | $5,561 | | $5,561 | 0.99% |
| BAC 2006-4 [Total] | ALT-A 2006 | $538,533,269 | $56,190,390 | $2,098,458 | $941,468 | | $941,468 | 15.90% |
| BAC 2006-5 [1] | Prime 2006 | $512,988,677 | $649,434 | $234,012 | $52,495 | | $52,495 | 2.50% |
| BAC 2006-5 [2] | Prime 2006 | $53,389,966 | $225,136 | $55,701 | $12,495 | | $12,495 | 2.50% |
| BAC 2006-5 [3] | Prime 2006 | $54,985,845 | $154,811 | $55,701 | $20,171 | | $20,171 | 2.50% |
| BAC 2007-3 [1] | Prime 2007 | $51,547,409 | $37,404 | $589,921 | $55,915 | | $55,915 | 2.42% |
| BAC 2007-3 [2] | Prime 2007 | $56,297,762 | $152,230 | $53,587 | $24,042 | | $24,042 | 2.42% |
| BAC 2007-3 [3] | Prime 2007 | $2,747,930 | $66,423 | $23,383 | $10,491 | | $10,491 | 2.42% |
| BAC 2007-3 [4] | Prime 2007 | $88,029,095 | $2,127,853 | $771,298 | $346,041 | | $346,041 | 2.42% |
| BAC 2007-7 [1] | ALT-A 2007 | $21,187,152 | $515,849 | $551,269 | $23,002 | | $23,002 | 0.71% |
| BAC 2007-7 [2] | ALT-A 2007 | $7,399,944 | $52,540 | $17,801 | $7,986 | | $7,986 | 0.71% |
| BAC 2007-7 [3] | ALT-A 2007 | $13,530,966 | $324,901 | $305,043 | $147,949 | | $147,949 | 2.42% |
| BAC 2007-7 [4] | ALT-A 2007 | $5,271,123 | $126,136 | $13,184 | $5,915 | | $5,915 | 2.42% |
| BAC 2007-7 [5] | ALT-A 2007 | $13,133,306 | $58,789 | $53,783 | $24,042 | | $24,042 | 2.42% |
| BALTA 2005-4 [3] | ALT-A 2005 | $40,360,845 | $257,319 | $111,676 | $47,810 | | $47,810 | 0.61% |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Pg 321 of 398

Case 1:14-cv-03039-GBD    Document 51-1    Filed 11/06/14    Page 296 of 359
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Pg 215 of 205

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller% |
|---|---|---|---|---|---|---|---|---|
| BALTA 2005-4 [III] | ALT-A 2005 | $21,587,644 | $137,631 | $59,437 | $25,446 | | $25,446 | 0.61% |
| BALTA 2005-4 [IV] | ALT-A 2005 | $15,573,544 | $99,289 | $42,498 | $18,194 | | $18,194 | 0.61% |
| BALTA 2005-4 [10] | ALT-A 2005 | $124,064,736 | $790,971 | $333,975 | $142,980 | | $142,980 | 0.61% |
| BALTA 2005-4 [04] | ALT-A 2005 | $8,986,500 | $57,293 | $23,409 | $10,022 | | $10,022 | 0.61% |
| BALTA 2005-4 [05] | ALT-A 2005 | $8,181,787 | $52,163 | $20,991 | $8,987 | | $8,987 | 0.61% |
| BALTA 2006-4 [1] | ALT-A 2006 | $211,487,030 | $394,358 | $137,094 | $61,507 | | $61,507 | 0.19% |
| BALTA 2006-4 [2] | ALT-A 2006 | $322,987,098 | $602,271 | $209,847 | $94,147 | | $94,147 | 0.19% |
| BALTA 2006-4 [3] | ALT-A 2006 | $222,914,989 | $415,668 | $144,646 | $64,895 | | $64,895 | 0.19% |
| BALTA 2006-4 [III] | ALT-A 2006 | $19,143,852 | $35,697 | $12,338 | $5,535 | | $5,535 | 0.19% |
| BALTA 2006-4 [02] | ALT-A 2006 | $195,195,049 | $363,978 | $125,837 | $56,456 | | $56,456 | 0.19% |
| BALTA 2006-4 [III] | ALT-A 2006 | $189,772,159 | $353,866 | $122,340 | $54,887 | | $54,887 | 0.19% |
| BALTA 2006-4 [III1] | ALT-A 2006 | $40,077,281 | $74,732 | $25,555 | $11,465 | | $11,465 | 0.19% |
| BALTA 2006-4 [V2] | ALT-A 2006 | $124,048,980 | $231,313 | $79,777 | $35,792 | | $35,792 | 0.19% |
| BALTA 2006-4 [03] | ALT-A 2006 | $128,723,884 | $240,538 | $80,707 | $40,247 | | $40,247 | 0.20% |
| BALTA 2006-5 [1] | ALT-A 2006 | $299,735,911 | $597,358 | $207,858 | $93,255 | | $93,255 | 0.20% |
| BALTA 2006-5 [2] | ALT-A 2006 | $89,092,727 | $177,557 | $60,967 | $27,353 | | $27,353 | 0.20% |
| BALTA 2006-8 [I] | ALT-A 2006 | $225,321,346 | $1,168,798 | $406,322 | $182,296 | | $182,296 | 0.52% |
| BALTA 2006-8 [II] | ALT-A 2006 | $144,847,591 | $751,361 | $259,222 | $116,299 | | $116,299 | 0.52% |
| BALTA 2006-8 [III] | ALT-A 2006 | $26,646,824 | $138,224 | $46,434 | $20,833 | | $20,833 | 0.52% |
| BSARS 2004-AC1 [Total] | ALT-A 2004 | $6,317,402 | $85,917 | $37,276 | $16,724 | | $16,724 | 1.36% |
| BSARS 2007-SD2 [Total] | ALT-A 2004 | $14,497,964 | $347,951 | $149,512 | $67,078 | | $67,078 | 2.40% |
| BSARS 2007-SD2 [2NRS] | Subprime 2007 | $20,203,400 | $2,030 | $1,129 | $507 | | $507 | 0.01% |
| BSARS 2007-SD2 [2ND_M/G] | Subprime 2007 | $44,981,385 | $4,520 | $2,513 | $1,128 | | $1,128 | 0.01% |
| BSARS 2007-SD3 [I] | Subprime 2007 | $37,090,653 | $3,728 | $2,075 | $931 | | $931 | 0.01% |
| BSARS 2007-SD3 [A] | Subprime 2007 | $382,895,923 | $585,893 | $325,838 | $146,186 | FGIC | $146,186 | 0.71% |
| BSARS 2007-SD3 [F] | Subprime 2007 | $55,303,597 | $390,875 | $217,412 | $97,541 | FGIC | $97,541 | 0.71% |
| BSSLT 2007-SV1A [Total] | CES 2007 | $525,306,659 | $26,265,333 | $13,848,235 | $3,106,489 | XL - Insurer Exception | $3,106,489 | 2.50% |
| CFR 2002-34 [FOUR] | Prime 2002 | $41,075 | $3,697 | $1,133 | $508 | | $508 | 9.00% |
| CFR 2002-34 [ONE] | Prime 2002 | $5,468,199 | $492,138 | $76,804 | $34,458 | | $34,458 | 9.00% |
| CFR 2002-34 [THREE] | Prime 2002 | $218,970 | $19,707 | $4,692 | $2,105 | | $2,105 | 9.00% |
| CFR 2002-34 [TWO] | Prime 2002 | $278,011 | $25,021 | $5,454 | $2,447 | | $2,447 | 9.00% |
| CFR 2002-4833 [FIVE] | ALT-A 2002 | $993,832 | $89,445 | $23,366 | $10,483 | | $10,483 | 9.00% |
| CFR 2002-4833 [FOUR] | ALT-A 2002 | $90,077 | $8,107 | $1,793 | $804 | | $804 | 9.00% |
| CFR 2002-4833 [ONE] | ALT-A 2002 | $110,894 | $9,980 | $2,500 | $1,122 | | $1,122 | 9.00% |
| CFR 2002-4833 [THREE] | ALT-A 2002 | $978,884 | $88,100 | $22,987 | $10,313 | | $10,313 | 9.00% |
| CFR 2002-4833 [TWO] | ALT-A 2002 | $51,290 | $4,616 | $1,021 | $458 | | $458 | 9.00% |
| CFR 2005-10 [1] | Prime 2005 | $51,451,471 | $566,496 | $538,847 | $17,428 | | $17,428 | 4.58% |
| CFR 2005-10 [10] | Prime 2005 | $19,404,020 | $888,955 | $390,835 | $175,347 | | $175,347 | 4.58% |
| CFR 2005-10 [11] | Prime 2005 | $1,432,377 | $65,621 | $35,288 | $15,832 | | $15,832 | 4.58% |
| CFR 2005-10 [12] | Prime 2005 | $687,498 | $31,496 | $18,829 | $8,448 | | $8,448 | 4.58% |
| CFR 2005-10 [2] | Prime 2005 | $2,019,510 | $92,520 | $48,182 | $21,617 | | $21,617 | 4.58% |
| CFR 2005-10 [3] | Prime 2005 | $13,269,878 | $607,932 | $284,846 | $127,795 | | $127,795 | 4.58% |
| CFR 2005-10 [4] | Prime 2005 | $12,137,507 | $565,218 | $242,798 | $108,931 | | $108,931 | 4.58% |
| CFR 2005-10 [5] | Prime 2005 | $18,512,802 | $848,126 | $403,674 | $181,107 | | $181,107 | 4.58% |
| CFR 2005-10 [6] | Prime 2005 | $9,624,418 | $440,923 | $227,505 | $102,070 | | $102,070 | 4.58% |
| CFR 2005-10 [7] | Prime 2005 | $589,462 | $54,099 | $2,450 | $1,099 | | $1,099 | 4.58% |
| CFR 2005-10 [8] | Prime 2005 | $3,948,330 | $176,303 | $82,222 | $36,889 | | $36,889 | 4.58% |
| CFR 2005-10 [9] | Prime 2005 | $54,349,091 | $591,675 | $90,078 | $40,483 | | $40,483 | 3.02% |
| CFR 2005-11 [1] | Prime 2005 | $56,958,522 | $210,141 | $92,148 | $41,342 | | $41,342 | 3.02% |
| CFR 2005-11 [2] | Prime 2005 | $7,786,460 | $235,144 | $106,704 | $47,872 | | $47,872 | 3.02% |
| CFR 2005-11 [3] | Prime 2005 | $5,241,841 | $158,299 | $70,659 | $31,701 | | $31,701 | 3.02% |
| CFR 2005-11 [4] | Prime 2005 | $10,697,461 | $323,054 | $137,104 | $61,511 | | $61,511 | 3.02% |
| CFR 2005-11 [5] | Prime 2005 | $1,614,458 | $58,755 | $25,178 | $11,296 | | $11,296 | 3.02% |

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller% |
|---|---|---|---|---|---|---|---|---|
| CSFB 2005-11 [6] | Prime 2005 | $3,324,262 | $100,390 | $50,670 | $22,733 | | $22,733 | 3.02% |
| CSFB 2005-11 [7] | Prime 2005 | $8,684,883 | $262,276 | $115,781 | $51,945 | | $51,945 | 3.02% |
| CSFB 2005-11 [8] | Prime 2005 | $3,383,953 | $102,192 | $56,264 | $25,243 | | $25,243 | 3.02% |
| CSFB 2005-12 [1] | ALT-A 2005 | $12,949,547 | $434,310 | $192,097 | $86,184 | | $86,184 | 3.35% |
| CSFB 2005-12 [2] | ALT-A 2005 | $17,002,560 | $570,243 | $247,119 | $110,870 | | $110,870 | 3.35% |
| CSFB 2005-12 [3] | ALT-A 2005 | $29,504,607 | $989,546 | $443,666 | $199,050 | | $199,050 | 3.35% |
| CSFB 2005-12 [4] | ALT-A 2005 | $42,745,795 | $1,433,636 | $618,068 | $277,295 | | $277,295 | 3.35% |
| CSFB 2005-12 [5] | ALT-A 2005 | $14,632,994 | $490,771 | $199,058 | $89,307 | | $89,307 | 3.35% |
| CSFB 2005-12 [6] | ALT-A 2005 | $19,496,510 | $653,886 | $276,164 | $123,900 | | $123,900 | 3.35% |
| CSFB 2005-12 [7] | ALT-A 2005 | $23,795,091 | $798,055 | $356,134 | $159,779 | | $159,779 | 3.35% |
| CSFB 2005-12 [8] | ALT-A 2005 | $2,956,335 | $99,151 | $41,049 | $18,417 | | $18,417 | 3.35% |
| CSFB 2005-1 [1] | Prime 2005 | $5,303,197 | $477,288 | $219,413 | $98,439 | | $98,439 | 9.00% |
| CSFB 2005-3 [1] | Prime 2005 | $3,519,216 | $287,929 | $159,929 | $60,536 | | $60,536 | 9.00% |
| CSFB 2005-3 [2] | Prime 2005 | $8,760,885 | $788,480 | $420,638 | $188,718 | | $188,718 | 9.00% |
| CSFB 2005-3 [4] | Prime 2005 | $205,581 | $18,502 | $11,060 | $4,962 | | $4,962 | 9.00% |
| CSFB 2005-3 [5] | Prime 2005 | $828,701 | $74,583 | $40,243 | $18,055 | | $18,055 | 9.00% |
| CSFB 2005-3 [6] | Prime 2005 | $3,934,972 | $354,147 | $164,698 | $73,891 | | $73,891 | 9.00% |
| CSFB 2005-3 [3] | Prime 2005 | $2,014,215 | $181,279 | $90,597 | $40,646 | | $40,646 | 9.00% |
| CSFB 2005-4 [1] | Prime 2005 | $2,570,230 | $231,321 | $122,240 | $54,843 | | $54,843 | 9.00% |
| CSFB 2005-4 [2] | Prime 2005 | $9,782,047 | $880,384 | $447,869 | $196,449 | | $196,449 | 9.00% |
| CSFB 2005-4 [3] | Prime 2005 | $5,530,924 | $497,633 | $255,345 | $114,560 | | $114,560 | 9.00% |
| CSFB 2005-5 [1] | Prime 2005 | $824,696 | $20,947 | $12,377 | $5,553 | | $5,553 | 2.54% |
| CSFB 2005-5 [2] | Prime 2005 | $54,048,598 | $118,074 | $63,667 | $28,564 | | $28,564 | 2.54% |
| CSFB 2005-5 [6] | Prime 2005 | $3,135,891 | $579,652 | $42,458 | $19,049 | | $19,049 | 2.54% |
| CSFB 2005-5 [4] | Prime 2005 | $3,081,455 | $578,269 | $37,602 | $16,870 | | $16,870 | 2.54% |
| CSFB 2005-5 [5] | Prime 2005 | $5,570,852 | $514,500 | $8,400 | $3,769 | | $3,769 | 2.54% |
| CSFB 2005-5 [3] | Prime 2005 | $3,081,355 | $526,514 | $15,628 | $57,011 | | $57,011 | 2.54% |
| CSFB 2005-6 [2] | Prime 2005 | $51,630,785 | $541,168 | $131,419 | $59,610 | | $59,610 | 2.54% |
| CSFB 2005-6 [3] | Prime 2005 | $16,998,439 | $1,296,396 | $577,632 | $259,153 | | $259,153 | 7.63% |
| CSFB 2005-6 [4] | Prime 2005 | $514,943 | $339,272 | $20,651 | $59,265 | | $59,265 | 7.63% |
| CSFB 2005-6 [9] | Prime 2005 | $494,240 | $107,322 | $53,070 | $23,810 | | $23,810 | 7.63% |
| CSFB 2005-6 [3] | Prime 2005 | $621,578 | $37,693 | $21,225 | $12,715 | | $12,715 | 7.63% |
| CSFB 2005-6 [4] | ALT-A 2005 | $18,737,911 | $634,318 | $261,814 | $117,462 | | $117,462 | 3.39% |
| CSFB 2005-6 [2] | ALT-A 2005 | $10,875,217 | $368,149 | $152,750 | $68,531 | | $68,531 | 3.39% |
| CSFB 2005-6 [8] | ALT-A 2005 | $16,052,037 | $543,396 | $238,362 | $97,968 | | $97,968 | 3.39% |
| CSFB 2005-6 [1] | ALT-A 2005 | $16,925,159 | $575,459 | $109,712 | $578,881 | | $578,881 | 3.39% |
| CSFB 2005-8 [5] | ALT-A 2005 | $17,283,411 | $605,392 | $168,315 | $575,514 | | $575,514 | 3.39% |
| CSFB 2005-8 [6] | ALT-A 2005 | $5,902,022 | $30,535 | $30,173 | $13,537 | | $13,537 | 3.39% |
| CSFB 2005-8 [9] | ALT-A 2005 | $20,367,573 | $107,322 | $33,070 | $23,810 | | $23,810 | 3.39% |
| CSFB 2005-8 [2] | ALT-A 2005 | $17,638,578 | $597,104 | $226,709 | $119,658 | | $119,658 | 3.39% |
| CSFB 2005-8 [3] | ALT-A 2005 | $15,632,250 | $529,185 | $216,605 | $97,179 | | $97,179 | 3.39% |
| CSFB 2005-8 [4] | ALT-A 2005 | $14,349,268 | $398,033 | $160,186 | $571,867 | | $571,867 | 2.77% |
| CSFB 2005-9 [5] | ALT-A 2005 | $43,956,615 | $1,792,937 | $53,565 | $552,980 | | $552,980 | 2.77% |
| CSFB 2005-9 [1] | ALT-A 2005 | $20,241,243 | $605,392 | $246,781 | $110,718 | | $110,718 | 2.77% |
| CSFB 2005-9 [4] | ALT-A 2005 | $12,219,635 | $338,959 | $138,008 | $561,917 | | $561,917 | 2.77% |
| CSFB 2005-9 [3] | Prime 2006 | $32,857,999 | $911,445 | $389,253 | $174,638 | | $174,638 | 2.77% |
| CSMC 2006-1 [1] | Prime 2006 | $1,942,102 | $49,567 | $17,791 | $57,982 | | $57,982 | 0.19% |
| CSMC 2006-1 [2] | Prime 2006 | $53,725,288 | $48,596 | $58,232 | $53,693 | | $53,693 | 0.19% |
| CSMC 2006-1 [3] | Prime 2006 | $31,654,479 | $46,718 | $56,160 | $52,764 | | $52,764 | 0.19% |
| CSMC 2006-6 [4] | Prime 2006 | $58,810,812 | $17,187 | $51,003 | $51,600 | | $51,600 | 0.19% |
| CSMC 2006-6 [1] | Prime 2006 | $45,159,578 | $45,609 | $56,496 | $57,401 | | $57,401 | 0.19% |
| CSMC 2006-6 [1] | Prime 2006 | $23,434,159 | $1,236,817 | $449,614 | $201,718 | | $201,718 | 2.50% |
| CSMC 2006-9 [1] | Prime 2006 | $49,428,629 | $48,596 | $17,483 | $57,844 | | $57,844 | 2.50% |
| CSMC 2006-9 [2A] | ALT-A 2006 | $53,621,434 | $530,975 | $10,507 | $56,990 | | $56,990 | 0.09% |
| CSMC 2006-9 [2B] | ALT-A 2006 | $31,966,184 | $27,797 | $59,536 | $54,714 | | $54,714 | 0.09% |
| CSMC 2007-6 [Total] | ALT-A 2007 | $125,841,476 | $616,515 | $211,192 | $94,751 | | $94,751 | 0.49% |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Pg 217 of 265

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Sellers % |
|---|---|---|---|---|---|---|---|---|
| CSMC 2007-7 [1] | Prime 2007 | $34,469,600 | $73,657 | $26,739 | $11,996 | | $11,996 | 0.21% |
| CSMC 2007-7 [2] | Prime 2007 | $11,128,420 | $23,780 | $8,538 | $3,831 | | $3,831 | 0.21% |
| CSMC 2007-7 [3] | Prime 2007 | $1,833,809 | $3,919 | $1,392 | $624 | | $624 | 0.21% |
| TARMT 2003-A [Total] | 2003 | $4,608,187 | $4,608,187 | $2,123,221 | $952,578 | FNMA/FNMA (Agency Wrap) | $952,578 | 100.00% |
| FNR 2002-66 [FIVE] | Subprime 2002 | $3,342,601 | $300,834 | $80,464 | $18,050 | FNMA/FNMA (Agency Wrap) | $18,050 | 4.50% |
| FNR 2002-66 [FOUR] | Subprime 2002 | $5,410,998 | $486,990 | $132,019 | $29,615 | FNMA/FNMA (Agency Wrap) | $29,615 | 4.50% |
| FNR 2002-66 [ONE] | Subprime 2002 | $6,746,831 | $607,215 | $130,877 | $29,359 | FNMA/FNMA (Agency Wrap) | $29,359 | 4.50% |
| GMACM 2000-HE2 [1HEL] | Second Lien 2000 | $3,261,253 | $3,261,253 | $857,356 | $384,651 | MBIA | $384,651 | 100.00% |
| GMACM 2000-HE2 [1HELOC] | Second Lien 2000 | $11,154,982 | $11,154,982 | $2,954,923 | $1,325,720 | MBIA | $1,325,720 | 100.00% |
| GMACM 2000-HE2 [2HEL] | Second Lien 2000 | $211,993 | $211,993 | $55,565 | $24,929 | MBIA | $24,929 | 100.00% |
| GMACM 2000-HE2 [2HELOC] | Second Lien 2000 | $2,160,494 | $2,160,494 | $566,982 | $254,375 | MBIA | $254,375 | 100.00% |
| GMACM 2000-HE4 [1HEL] | Second Lien 2000 | $2,335,186 | $2,335,186 | $618,727 | $277,590 | MBIA | $277,590 | 100.00% |
| GMACM 2000-HE4 [1HELOC] | Second Lien 2000 | $56,255,211 | $56,255,211 | $1,676,626 | $752,214 | MBIA | $752,214 | 100.00% |
| GMACM 2000-HE4 [2HEL] | Second Lien 2000 | $74,559 | $74,559 | $19,811 | $8,888 | MBIA | $8,888 | 100.00% |
| GMACM 2000-HE4 [2HELOC] | Second Lien 2000 | $594,789 | $594,789 | $159,709 | $71,653 | MBIA | $71,653 | 100.00% |
| GMACM 2001-HE2 [1AHEL] | CES 2001 | $1,699,628 | $1,699,628 | $277,649 | $124,566 | FGIC | $124,566 | 100.00% |
| GMACM 2001-HE2 [1AHELOC] | CES 2001 | $3,347,060 | $3,347,060 | $537,757 | $241,263 | FGIC | $241,263 | 100.00% |
| GMACM 2001-HE2 [1BHEL] | CES 2001 | $1,740,128 | $1,740,128 | $288,959 | $129,641 | FGIC | $129,641 | 100.00% |
| GMACM 2001-HE2 [1BHELOC] | CES 2001 | $3,281,041 | $3,281,041 | $542,901 | $243,571 | FGIC | $243,571 | 100.00% |
| GMACM 2001-HE2 [2A] | CES 2001 | $1,392,622 | $1,392,622 | $226,167 | $101,469 | FGIC | $101,469 | 100.00% |
| GMACM 2001-HE2 [2B] | CES 2001 | $3,474,359 | $3,474,359 | $560,221 | $251,342 | FGIC | $251,342 | 100.00% |
| GMACM 2001-HE3 [1] | Second Lien 2001 | $3,248,994 | $3,248,994 | $875,945 | $392,991 | FGIC | $392,991 | 100.00% |
| GMACM 2001-HE3 [2] | Second Lien 2001 | $2,216,348 | $2,216,348 | $606,873 | $272,272 | FGIC | $272,272 | 100.00% |
| GMACM 2001-HLT1 [1] | Second Lien 2001 | $29,889,371 | $29,889,371 | $7,887,113 | $3,538,535 | AMBAC | $3,538,535 | 100.00% |
| GMACM 2001-HLT1 [2] | Second Lien 2001 | $4,726 | $4,726 | $1,636 | $734 | AMBAC | $734 | 100.00% |
| GMACM 2001-HLT2 [1] | Second Lien 2001 | $17,157,370 | $17,157,370 | $4,540,807 | $2,037,222 | Ambac | $2,037,222 | 100.00% |
| GMACM 2001-HLT2 [2A] | Second Lien 2001 | $284,905 | $284,905 | $87,885 | $39,429 | Ambac | $39,429 | 100.00% |
| GMACM 2002-HE1 [1] | Second Lien 2002 | $2,251,324 | $2,251,324 | $589,633 | $264,537 | FGIC | $264,537 | 100.00% |
| GMACM 2002-HE1 [2] | Second Lien 2002 | $4,592,570 | $4,592,570 | $1,314,323 | $589,668 | FGIC | $589,668 | 100.00% |
| GMACM 2002-HE1 [3] | Second Lien 2002 | $582,597 | $582,597 | $161,533 | $72,472 | FGIC | $72,472 | 100.00% |
| GMACM 2002-HE1 [4] | Second Lien 2002 | $4,165,981 | $4,165,981 | $1,192,240 | $534,896 | FGIC | $534,896 | 100.00% |
| GMACM 2002-HE3 [Total] | Second Lien 2002 | $18,212,606 | $18,212,606 | $5,191,004 | $2,328,932 | MBIA | $2,328,932 | 100.00% |
| GMACM 2002-HE4 [Total] | Second Lien 2002 | $8,301,994 | $8,301,994 | $2,336,034 | $1,048,056 | FGIC | $1,048,056 | 100.00% |
| GMACM 2002-HLT1 [1] | Second Lien 2002 | $20,381,078 | $20,381,078 | $5,431,617 | $2,436,882 | AMBAC | $2,436,882 | 100.00% |
| GMACM 2002-HLT1 [2] | Second Lien 2002 | $35,889 | $35,889 | $12,423 | $5,574 | AMBAC | $5,574 | 100.00% |
| GMACM 2003-AR1 [1] | Prime 2003 | $1,620,098 | $1,620,098 | $490,800 | $220,196 | | $220,196 | 100.00% |
| GMACM 2003-AR1 [2] | Prime 2003 | $1,288,654 | $1,288,654 | $422,951 | $189,756 | | $189,756 | 100.00% |
| GMACM 2003-AR2 [1] | Prime 2003 | $85,755 | $85,755 | $27,618 | $12,391 | | $12,391 | 100.00% |

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller% |
|---|---|---|---|---|---|---|---|---|---|
| 218 | GMACM 2003-AR2 [2] | Prime 2003 | $1,023,963 | $1,023,963 | $313,933 | $140,845 | | $140,845 | 100.00% |
| 219 | GMACM 2003-AR2 [3] | Prime 2003 | $611,843 | $611,843 | $235,676 | $105,736 | | $105,736 | 100.00% |
| 220 | GMACM 2003-AR2 [4] | Prime 2003 | $749,369 | $749,369 | $322,554 | $144,713 | | $144,713 | 100.00% |
| 221 | GMACM 2003-GH1 [1] | Subprime 2003 | $6,048,652 | $6,048,652 | $2,599,898 | $1,166,438 | MBIA - Insurer Exception | $1,166,438 | 100.00% |
| 222 | GMACM 2003-GH1 [2] | Subprime 2003 | $677,814 | $677,814 | $287,069 | $128,793 | MBIA - Insurer Exception | $128,793 | 100.00% |
| 223 | GMACM 2003-GH1 [3] | Subprime 2003 | $331,985 | $331,985 | $138,867 | $62,302 | MBIA - Insurer Exception | $62,302 | 100.00% |
| 224 | GMACM 2003-GH2 [1A] | Subprime 2003 | $604,524 | $604,524 | $262,601 | $117,815 | | $117,815 | 100.00% |
| 225 | GMACM 2003-GH2 [1F] | Subprime 2003 | $5,420,479 | $5,420,479 | $2,374,840 | $1,065,467 | | $1,065,467 | 100.00% |
| 226 | GMACM 2003-GH2 [2A] | Subprime 2003 | $891,909 | $891,909 | $378,811 | $169,953 | | $169,953 | 100.00% |
| 227 | GMACM 2003-GH2 [2F] | Subprime 2003 | $3,710,226 | $3,710,226 | $1,583,817 | $710,576 | | $710,576 | 100.00% |
| 228 | GMACM 2003-HE1 [Total] | CES 2003 | $22,095,452 | $22,095,452 | $9,416,824 | $4,224,836 | FGIC | $4,224,836 | 100.00% |
| 229 | GMACM 2003-HE2 [Total] | Second Lien 2003 | $8,395,094 | $8,395,094 | $1,931,450 | $866,541 | FGIC | $866,541 | 100.00% |
| 230 | GMACM 2003-J10 [Total] | Prime 2003 | $96,499 | $96,499 | $44,083 | $19,778 | | $19,778 | 100.00% |
| 231 | GMACM 2003-J5 [Total] | Prime 2003 | $208,554 | $208,554 | $55,391 | $24,851 | | $24,851 | 100.00% |
| 232 | GMACM 2003-J6 [Total] | Prime 2003 | $823,235 | $823,235 | $312,716 | $140,299 | | $140,299 | 100.00% |
| 233 | GMACM 2003-J7 [Total] | Prime 2003 | $1,036,293 | $1,036,293 | $383,469 | $172,042 | | $172,042 | 100.00% |
| 234 | GMACM 2003-J8 [Total] | Prime 2003 | $1,599,442 | $1,599,442 | $548,267 | $245,979 | | $245,979 | 100.00% |
| 235 | GMACM 2003-J9 [Total] | Prime 2003 | $1,477,100 | $1,477,100 | $508,427 | $228,105 | | $228,105 | 100.00% |
| 236 | GMACM 2010-1 [Total] | Subprime 2008 | $21,539,078 | $21,539,078 | $11,050,362 | $4,957,719 | | $4,957,719 | 100.00% |
| 237 | GMACM 2010-2 [Total] | Subprime 2008 | $82,335,375 | $82,335,375 | $42,943,715 | $19,266,599 | | $19,266,599 | 100.00% |
| 238 | GPHT 2006-HE1 [F] | Second Lien 2006 | $511,506,246 | $550,628 | $524,949 | $511,193 | XL/CIFG | $50 | 0.44% |
| 239 | GPHT 2006-HE1 [P] | Second Lien 2006 | $206,142,777 | $907,028 | $446,903 | $200,502 | XL/CIFG | $50 | 0.44% |
| 240 | GSAA 2005-9 [1] | ALT-A 2005 | $13,909,988 | $2,709,242 | $1,170,003 | $524,919 | | $524,919 | 19.48% |
| 241 | GSAA 2005-9 [2] | ALT-A 2005 | $84,712,227 | $16,495,363 | $7,038,882 | $3,157,978 | | $3,157,978 | 19.48% |
| 242 | GSMPS 2004-4 [ONEA] | Subprime 2004 | $40,267,514 | $3,624,076 | $2,015,050 | $904,048 | | $904,048 | 9.00% |
| 243 | GSMPS 2004-4 [ONEB] | Subprime 2004 | $7,279,879 | $655,189 | $364,342 | $163,461 | | $163,461 | 9.00% |
| 244 | GSMPS 2004-4 [TWO] | Subprime 2004 | $55,386,338 | $484,770 | $268,983 | $120,679 | | $120,679 | 9.00% |
| 245 | GSMPS 2005-LT1 [A] | Subprime 2005 | $1,543,356 | $53,091 | $30,192 | $13,546 | | $13,546 | 3.44% |
| 246 | GSMPS 2005-LT1 [1] | Subprime 2005 | $17,924,307 | $616,596 | $350,508 | $157,254 | | $157,254 | 3.44% |
| 247 | GSMPS 2005-RP1 [ONEA] | Subprime 2005 | $64,961,109 | $876,975 | $486,350 | $218,200 | | $218,200 | 1.35% |
| 248 | GSMPS 2005-RP1 [ONEB] | Subprime 2005 | $6,680,812 | $90,191 | $50,022 | $22,442 | | $22,442 | 1.35% |
| 249 | GSMPS 2005-RP1 [TWO] | Subprime 2005 | $7,666,964 | $103,504 | $57,350 | $25,730 | | $25,730 | 1.35% |
| 250 | GSMPS 2005-RP2 [ONEA] | Subprime 2005 | $67,821,168 | $1,600,580 | $887,640 | $398,238 | | $398,238 | 2.36% |
| 251 | GSMPS 2005-RP2 [ONEB] | Subprime 2005 | $55,966,170 | $140,802 | $78,259 | $35,111 | | $35,111 | 2.36% |
| 252 | GSMPS 2005-RP2 [TWO] | Subprime 2005 | $4,458,941 | $105,231 | $58,420 | $26,210 | | $26,210 | 2.36% |
| 253 | GSMPS 2005-RP3 [ONEA] | Subprime 2005 | $68,125,751 | $1,519,204 | $842,846 | $378,141 | | $378,141 | 2.23% |
| 254 | GSMPS 2005-RP3 [ONEB] | Subprime 2005 | $7,087,511 | $158,051 | $87,659 | $39,328 | | $39,328 | 2.23% |
| 255 | GSMPS 2005-RP3 [TWO] | Subprime 2005 | $7,290,466 | $162,577 | $89,972 | $40,366 | | $40,366 | 2.23% |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Pg 216 of 265

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | |
| 2256 | GSAMP5 2006-RP1 [.] | Subprime 2006 | $75,908,429 | $3,795,421 | $2,114,829 | $948,813 | | $948,813 | 5.00% |
| 2257 | GSAMP5 2006-RP1 [.234] | Subprime 2006 | $5,968,620 | $298,431 | $166,282 | $74,602 | | $74,602 | 5.00% |
| 2258 | GSAMP5 2006-RP1 [ii] | Subprime 2006 | $5,705,610 | $285,280 | $158,955 | $71,315 | | $71,315 | 5.00% |
| 2259 | GSAMP5 2006-RP2 [1] | Subprime 2006 | $57,407,570 | $2,037,969 | $1,135,522 | $509,450 | | $509,450 | 3.55% |
| 2260 | GSAMP5 2006-RP2 [1] | Subprime 2006 | $2,805,517 | $99,596 | $55,500 | $24,900 | | $24,900 | 3.55% |
| 2261 | GSR 2003-2F [1] | Prime 2003 | $235,423 | $7,431 | $22,756 | $10,210 | | $10,210 | 32.89% |
| 2262 | GSR 2003-2F [2] | Prime 2003 | $152,220 | $50,065 | $57,426 | $57,818 | | $57,818 | 32.89% |
| 2263 | GSR 2003-3F [1] | Prime 2003 | $383,628 | $91,286 | $50,916 | $52,963 | | $52,963 | 32.89% |
| 2264 | GSR 2004-10F [1] | Prime 2004 | $1,156,574 | $202,089 | $108,127 | $48,515 | | $48,515 | 17.47% |
| 2265 | GSR 2004-10F [2] | Prime 2004 | $1,561,362 | $272,818 | $150,268 | $67,417 | | $67,417 | 17.47% |
| 2266 | GSR 2005-5F [1] | Prime 2005 | $17,201,404 | $792,985 | $438,407 | $196,690 | | $196,690 | 4.61% |
| 2267 | GSR 2005-5F [2] | Prime 2005 | $717,087 | $33,058 | $17,706 | $7,944 | | $7,944 | 4.61% |
| 2268 | GSR 2005-6F [1] | Prime 2005 | $21,726,483 | $582,270 | $299,324 | $134,291 | | $134,291 | 2.68% |
| 2269 | GSR 2005-6F [2] | Prime 2005 | $448,577 | $12,022 | $7,147 | $3,206 | | $3,206 | 2.68% |
| 2270 | GSR 2005-9F [1] | Prime 2005 | $4,459,214 | $939,529 | $523,399 | $510,049 | | $510,049 | 9.00% |
| 2271 | GSR 2005-7F [2] | Prime 2005 | $4,649,799 | $422,082 | $213,893 | $95,963 | | $95,963 | 9.00% |
| 2272 | GSR 2005-7F [3] | Prime 2005 | $2,169,122 | $195,221 | $105,721 | $47,431 | | $47,431 | 9.00% |
| 2273 | GSR 2005-8F [1] | Prime 2005 | $20,994,365 | $1,889,493 | $958,611 | $430,078 | | $430,078 | 9.00% |
| 2274 | GSR 2005-8F [2] | Prime 2005 | $1,268,980 | $114,208 | $68,277 | $30,632 | | $30,632 | 9.00% |
| 2275 | GSR 2005-8F [3] | Prime 2005 | $11,544,153 | $1,038,974 | $481,273 | $215,922 | | $215,922 | 9.00% |
| 2276 | GSR 2005-AR3 [1] | Prime 2005 | $31,131,667 | $129,376 | $61,966 | $27,801 | | $27,801 | 0.42% |
| 2277 | GSR 2005-AR3 [2] | Prime 2005 | $30,148,143 | $124,833 | $57,906 | $58,033 | | $58,033 | 0.42% |
| 2278 | GSR 2005-9F [1] | Prime 2005 | $157,399 | $3,654 | $991 | $175 | | $175 | 0.42% |
| 2279 | GSR 2005-AR3 [1] | Prime 2005 | $1,425,750 | $112,449 | $56,159 | $25,196 | | $25,196 | 7.89% |
| 2280 | GSR 2005-AR3 [2] | Prime 2005 | $745,469 | $58,795 | $29,515 | $13,242 | | $13,242 | 7.89% |
| 2281 | GSR 2005-AR3 [3] | Prime 2005 | $12,517,955 | $987,291 | $443,399 | $198,930 | | $198,930 | 7.89% |
| 2282 | GSR 2005-AR3 [4] | Prime 2005 | $10,447,499 | $823,994 | $386,555 | $173,427 | | $173,427 | 7.89% |
| 2283 | GSR 2005-AR3 [5] | Prime 2005 | $12,833,097 | $1,011,146 | $489,934 | $219,808 | | $219,808 | 7.89% |
| 2284 | GSR 2005-AR3 [6] | Prime 2005 | $10,908,734 | $1,077,815 | $483,318 | $396,398 | | $396,398 | 7.89% |
| 2285 | GSR 2005-AR3 [7] | Prime 2005 | $1,434,708 | $113,155 | $59,556 | $26,720 | | $26,720 | 7.89% |
| 2286 | GSR 2005-AR3 [8] | Prime 2005 | $2,755,213 | $217,304 | $119,203 | $53,480 | | $53,480 | 7.89% |
| 2287 | GSR 2006-2F [1] | Prime 2005 | $10,108,175 | $285,143 | $130,877 | $58,718 | | $58,718 | 2.82% |
| 2288 | GSR 2005-AR7 [2] | Prime 2005 | $22,439,063 | $632,987 | $328,933 | $147,575 | | $147,575 | 2.82% |
| 2289 | GSR 2005-AR7 [3] | Prime 2005 | $4,867,724 | $137,314 | $72,002 | $32,303 | | $32,303 | 2.82% |
| 2290 | GSR 2005-AR7 [4] | Prime 2005 | $11,550,639 | $325,975 | $153,495 | $68,865 | | $68,865 | 2.82% |
| 2291 | GSR 2005-AR7 [5] | Prime 2005 | $8,908,734 | $225,821 | $120,193 | $53,924 | | $53,924 | 2.82% |
| 2292 | GSR 2005-AR7 [6] | Prime 2005 | $28,812,703 | $812,782 | $445,151 | $199,716 | | $199,716 | 2.82% |
| 2293 | GSR 2006-2F [1] | Prime 2005 | $36,964,538 | $441,574 | $158,883 | $71,283 | | $71,283 | 1.20% |
| 2294 | GSR 2006-2F [2] | Prime 2006 | $2,043,634 | $24,524 | $8,721 | $3,913 | | $3,913 | 1.20% |
| 2295 | GSR 2006-2F [3] | Prime 2006 | $27,159,105 | $392,660 | $140,959 | $63,241 | | $63,241 | 1.45% |
| 2296 | GSR 2006-3F [1] | Prime 2006 | $12,014,268 | $373,699 | $562,304 | $527,953 | | $527,953 | 1.45% |
| 2297 | GSR 2006-3F [2] | Prime 2006 | $25,672,018 | $494,677 | $1,745,581 | $783,151 | | $783,151 | 18.88% |
| 2298 | GSR 2006-4F [1] | Prime 2006 | $19,909,714 | $1,830,765 | $603,864 | $302,381 | | $302,381 | 18.88% |
| 2299 | GSR 2006-4F [2] | Prime 2006 | $58,540,082 | $1,612,368 | $579,809 | $260,130 | | $260,130 | 18.88% |
| 2300 | GSR 2006-AR1 [1] | Prime 2006 | $16,766,862 | $838,343 | $303,943 | $136,363 | | $136,363 | 5.00% |
| 2301 | GSR 2006-AR1 [2] | Prime 2006 | $104,809,030 | $5,240,452 | $1,881,684 | $844,213 | | $844,213 | 5.00% |
| 2302 | GSR 2006-3F [2] | Prime 2006 | $7,908,392 | $395,420 | $141,120 | $63,313 | | $63,313 | 5.00% |
| 2303 | GSR 2006-AR1 [1] | Prime 2006 | $989,484 | $49,474 | $17,639 | $58,003 | | $58,003 | 5.00% |
| 2304 | GSR 2006-AR2 [2] | Prime 2006 | $3,470,332 | $173,517 | $202,691 | $117,856 | | $117,856 | 18.88% |
| 2305 | GSR 2006-AR2 [3] | Prime 2006 | $28,568,272 | $1,448,414 | $522,393 | $234,370 | | $234,370 | 5.00% |
| 2306 | GSR 2006-AR2 [4] | Prime 2006 | $23,092,225 | $1,154,611 | $415,788 | $186,542 | | $186,542 | 5.00% |
| 2307 | GSR 2006-AR2 [5] | Prime 2006 | $26,171,161 | $1,308,558 | $466,700 | $209,384 | | $209,384 | 2.73% |
| 2308 | GSR 2007-4F [1] | Prime 2007 | $54,943,435 | $1,499,956 | $538,086 | $241,411 | | $241,411 | 2.73% |
| 2309 | GSR 2007-4F [2] | Prime 2007 | $3,075,367 | $83,958 | $29,925 | $13,426 | | $13,426 | 2.73% |
| 2310 | GSR 2007-AR1 [1] | Prime 2007 | $10,043,917 | $502,196 | $181,370 | $81,371 | | $81,371 | 5.00% |
| 2311 | GSR 2007-AR1 [2] | Prime 2007 | $34,370,332 | $719,021,951 | $2,782,305 | $1,234,941 | | $1,234,941 | 18.88% |
| 2312 | GSR 2007-AR1 [3] | Prime 2007 | $54,325,032 | $716,252 | $2,257,560 | $115,554 | | $115,554 | 5.00% |
| 2313 | GSR 2007-AR1 [4] | Prime 2007 | $55,623,720 | $281,186 | $100,590 | $45,130 | | $45,130 | 5.00% |
| 2314 | GSR 2007-AR1 [5] | Prime 2007 | $8,280,024 | $414,001 | $147,185 | $66,034 | | $66,034 | 5.00% |

| | Name | Cohort | Net Total Collateral Loss Estimate | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACH Seller% |
|---|---|---|---|---|---|---|---|---|---|
| 315 | GSR 2007-AR1 [6] | Prime 2007 | $3,495,973 | $174,799 | $61,468 | $27,577 | | $27,577 | 5.00% |
| 316 | GSR 2007-HEL1 [Total] | Second Lien 2007 | $4,473,052 | $223,653 | $109,816 | $24,634 | MBIA | $50 | 2.50% |
| 317 | GSR 2007-OA2 [1] | Pay Option ARM 2007 | $123,200,992 | $6,160,050 | $2,773,934 | $1,020,195 | | $1,020,195 | 5.00% |
| 318 | GSR 2007-OA2 [2] | Pay Option ARM 2007 | $559,730,280 | $2,986,514 | $1,101,160 | $494,033 | | $494,033 | 5.00% |
| 319 | HVMLT 2003-1 [Total] | ALT-A 2003 | $880,638 | $468,235 | $164,308 | $73,716 | | $73,716 | 53.17% |
| 320 | HVMLT 2003-2 [1] | ALT-A 2003 | $1,857,620 | $2,972 | $1,154 | $518 | | $518 | 0.16% |
| 321 | HVMLT 2003-2 [2] | ALT-A 2003 | $1,539,910 | $2,464 | $843 | $378 | | $378 | 0.16% |
| 322 | HVMLT 2003-2 [3] | ALT-A 2003 | $320,339 | $513 | $178 | $80 | | $80 | 0.16% |
| 323 | HVMLT 2004-4 [1] | ALT-A 2004 | $1,110,926 | $559,101 | $525,292 | $11,347 | | $11,347 | 5.32% |
| 324 | HVMLT 2004-4 [2] | ALT-A 2004 | $3,382,123 | $179,929 | $74,562 | $33,452 | | $33,452 | 5.32% |
| 325 | HVMLT 2004-4 [3] | ALT-A 2004 | $1,874,388 | $99,717 | $43,221 | $19,391 | | $19,391 | 5.32% |
| 326 | HVMLT 2006-13 [Total] | ALT-A 2006 | $39,021,465 | $849,176 | $291,405 | $130,738 | | $130,738 | 2.18% |
| 327 | IXHM1 2007-7 [1] | Pay Option ARM 2007 | $219,963,489 | $26,527,594 | $9,879,071 | $5,432,204 | | $5,432,204 | 12.06% |
| 328 | IXHM1 2007-7 [2] | Pay Option ARM 2007 | $907,807,400 | $44,357,572 | $16,497,081 | $7,401,378 | | $7,401,378 | 12.06% |
| 329 | LMT 2005-1 [1AX] | Prime 2005 | $54,772,299 | $130,284 | $563,535 | $14,253 | | $14,253 | 1.37% |
| 330 | LMT 2005-1 [1DSC] | Prime 2005 | $3,502,828 | $595,627 | $47,276 | $10,605 | | $10,605 | 1.37% |
| 331 | LMT 2005-1 [1PAX] | Prime 2005 | $3,469,896 | $94,728 | $46,274 | $10,380 | | $10,380 | 1.37% |
| 332 | LMT 2005-1 [2AX] | Prime 2005 | $5,284,776 | $144,274 | $68,968 | $15,471 | | $15,471 | 1.37% |
| 333 | LMT 2005-1 [2DSC] | Prime 2005 | $3,444,404 | $94,032 | $45,949 | $10,307 | | $10,307 | 1.37% |
| 334 | LMT 2005-1 [2PAX] | Prime 2005 | $3,176,158 | $586,709 | $43,582 | $9,552 | | $9,552 | 1.37% |
| 335 | LMT 2005-1 [3] | Prime 2005 | $6,880,626 | $187,841 | $85,707 | $19,226 | | $19,226 | 1.37% |
| 336 | LMT 2005-1 [4AX] | Prime 2005 | $2,274,273 | $62,088 | $29,700 | $6,662 | | $6,662 | 1.37% |
| 337 | LMT 2005-1 [4PAX] | Prime 2005 | $1,033,567 | $28,216 | $14,089 | $3,161 | | $3,161 | 1.37% |
| 338 | LMT 2005-1 [5AX] | Prime 2005 | $6,182,660 | $168,787 | $74,955 | $16,834 | | $16,834 | 1.37% |
| 339 | LMT 2005-1 [5IXSC] | Prime 2005 | $2,895,511 | $79,047 | $34,963 | $7,843 | | $7,843 | 1.37% |
| 340 | LMT 2005-1 [6AX] | Prime 2005 | $3,384,303 | $55,031 | $52,685 | $602 | | $602 | 1.37% |
| 341 | LMT 2005-1 [6DSC] | Prime 2005 | $1,399,081 | $538,195 | $520,469 | $54,592 | | $54,592 | 1.37% |
| 342 | LMT 2005-1 [6PAX] | Prime 2005 | $126,814 | $3,462 | $1,852 | $415 | | $415 | 1.37% |
| 343 | LMT 2006-7 [1] | ALT-A 2006 | $43,260,724 | $2,119,775 | $728,947 | $163,520 | | $163,520 | 2.45% |
| 344 | LMT 2006-7 [2] | ALT-A 2006 | $88,701,867 | $4,346,391 | $1,493,451 | $335,017 | | $335,017 | 2.45% |
| 345 | LMT 2006-7 [3] | ALT-A 2006 | $36,380,967 | $1,782,667 | $611,745 | $137,229 | | $137,229 | 2.45% |
| 346 | LMT 2006-7 [4] | ALT-A 2006 | $6,521,560 | $315,556 | $109,337 | $24,527 | | $24,527 | 2.45% |
| 347 | LUM 2006-4 [Total] | Pay Option ARM 2006 | $134,926,422 | $16,015,766 | $5,706,799 | $2,560,342 | | $2,560,342 | 11.87% |
| 348 | LUM 2006-6 [55MC] | Pay Option ARM 2006 | $208,139,613 | $7,943,823 | $537,408,325 | $13,908,325 | | $13,908,325 | 40.10% |
| 349 | LUM 2007-2 [1] | ALT-A 2007 | $139,923,492 | $2,777,222 | $950,751 | $213,276 | | $213,276 | 0.99% |
| 350 | LUM 2007-2 [2] | ALT-A 2007 | $46,579,284 | $924,679 | $321,573 | $72,137 | | $72,137 | 0.99% |
| 351 | LXS 2006-10N [1_A1] | ALT-A 2006 | $11,949,919 | $54,970 | $19,158 | $8,595 | | $8,595 | 0.46% |
| 352 | LXS 2006-10N [1_A2] | ALT-A 2006 | $12,825,318 | $58,996 | $20,540 | $9,215 | | $9,215 | 0.46% |
| 353 | LXS 2006-10N [1_A3] | ALT-A 2006 | $7,938,154 | $36,516 | $12,616 | $5,660 | | $5,660 | 0.46% |
| 354 | LXS 2006-10N [1_A4] | ALT-A 2006 | $228,604,897 | $1,051,583 | $364,615 | $163,584 | | $163,584 | 0.46% |
| 355 | LXS 2006-10N [1_F] | ALT-A 2006 | $570,556,365 | $324,559 | $112,285 | $50,376 | | $50,376 | 0.46% |
| 356 | LXS 2006-10N [2_A1] | ALT-A 2006 | $36,924,484 | $169,853 | $58,559 | $26,272 | | $26,272 | 0.46% |
| 357 | LXS 2006-10N [2_A2] | ALT-A 2006 | $3,842,320 | $17,675 | $6,090 | $2,732 | | $2,732 | 0.46% |
| 358 | LXS 2006-10N [1_A3] | ALT-A 2006 | $117,743 | $542 | $187 | $84 | | $84 | 0.46% |
| 359 | MALT 2004-12 [1] | ALT-A 2004 | $101,129 | $55,056 | $1,963 | $440 | | $440 | 2.50% |
| 360 | MALT 2004-12 [2] | ALT-A 2004 | $2,388,183 | $419,409 | $551,116 | $11,466 | | $11,466 | 2.50% |
| 361 | MALT 2004-11 [1] | ALT-A 2004 | $5,180,106 | $259,005 | $108,376 | $24,311 | | $24,311 | 2.50% |
| 362 | MALT 2004-12 [4] | ALT-A 2004 | $1,159,534 | $57,977 | $22,763 | $5,106 | | $5,106 | 2.50% |
| 363 | MALT 2004-12 [5] | ALT-A 2004 | $3,861,040 | $193,052 | $80,355 | $18,026 | | $18,026 | 2.50% |
| 364 | MALT 2004-12 [6] | ALT-A 2004 | $1,942,089 | $97,104 | $38,802 | $8,704 | | $8,704 | 2.50% |
| 365 | MALT 2004-11 [1] | ALT-A 2004 | $1,369,173 | $565,449 | $626,076 | $55,939 | | $55,939 | 2.50% |
| 366 | MALT 2004-4 [10] | ALT-A 2004 | $288,810 | $14,441 | $5,760 | $1,292 | | $1,292 | 2.50% |
| 367 | MALT 2004-11 [11] | ALT-A 2004 | $766,889 | $38,344 | $16,274 | $3,651 | | $3,651 | 2.50% |
| 368 | MALT 2004-4 [2] | ALT-A 2004 | $476,273 | $23,814 | $9,952 | $2,232 | | $2,232 | 2.50% |
| 369 | MALT 2004-4 [3] | ALT-A 2004 | $367,149 | $18,357 | $7,126 | $1,598 | | $1,598 | 2.50% |
| 370 | MALT 2004-4 [4] | ALT-A 2004 | $501,905 | $25,095 | $10,195 | $2,287 | | $2,287 | 2.50% |

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller's % |
|---|---|---|---|---|---|---|---|---|
| MALT 2004-4 [5] | ALT-A 2004 | $655,641 | $32,782 | $13,479 | $53,024 | | 53,024 | 2.50% |
| MALT 2004-4 [6] | ALT-A 2004 | $1,280,753 | $64,038 | $25,256 | $55,666 | | 55,666 | 2.50% |
| MALT 2004-4 [7] | ALT-A 2004 | $1,775,705 | $88,785 | $37,714 | $58,460 | | 58,460 | 2.50% |
| MALT 2004-4 [8] | ALT-A 2004 | $1,296,430 | $64,821 | $28,641 | $56,425 | | 56,425 | 2.50% |
| MALT 2004-4 [9] | ALT-A 2004 | $5,970,557 | $48,528 | $19,244 | $54,317 | | 54,317 | 2.50% |
| MALT 2004-6 [1] | ALT-A 2004 | $731,599 | $64,044 | $25,004 | $55,609 | | 55,609 | 4.50% |
| MALT 2004-6 [10] | ALT-A 2004 | $2,620,503 | $235,845 | $98,390 | $22,071 | | 522,071 | 4.50% |
| MALT 2004-6 [2] | ALT-A 2004 | $74,699 | 56,723 | $2,610 | $585 | | 5,585 | 4.50% |
| MALT 2004-6 [3] | ALT-A 2004 | $763,516 | $68,716 | $26,864 | $56,026 | | 56,026 | 4.50% |
| MALT 2004-6 [4] | ALT-A 2004 | $1,102,081 | $99,187 | $40,123 | $59,001 | | 59,001 | 4.50% |
| MALT 2004-6 [5] | ALT-A 2004 | $605,915 | $54,532 | $22,171 | $54,973 | | 54,973 | 4.50% |
| MALT 2004-6 [6] | ALT-A 2004 | $2,078,379 | $187,054 | $81,031 | $18,177 | | 518,177 | 4.50% |
| MALT 2004-6 [7] | ALT-A 2004 | $4,838,506 | $435,466 | $178,441 | $40,029 | | 540,029 | 4.50% |
| MALT 2004-6 [8] | ALT-A 2004 | $2,426,287 | $593,166 | $237,904 | $37,476 | | 537,476 | 4.50% |
| MALT 2004-6 [9] | ALT-A 2004 | $1,188,107 | $106,930 | $44,008 | $59,872 | | 59,872 | 4.50% |
| MALT 2004-7 [1] | ALT-A 2004 | $4,963,932 | $446,754 | $183,960 | $41,267 | | 541,267 | 4.50% |
| MALT 2004-7 [10] | ALT-A 2004 | $422,391 | $38,015 | $15,427 | $53,461 | | 53,461 | 4.50% |
| MALT 2004-7 [2] | ALT-A 2004 | $768,568 | $69,171 | $27,900 | $56,259 | | 56,259 | 4.50% |
| MALT 2004-7 [3] | ALT-A 2004 | $1,382,732 | $124,446 | $53,126 | $11,918 | | 511,918 | 4.50% |
| MALT 2004-7 [4] | ALT-A 2004 | $596,620 | $53,696 | $21,214 | $54,759 | | 54,759 | 4.50% |
| MALT 2004-7 [5] | ALT-A 2004 | $338,139 | $30,633 | $4,128 | $55,026 | | 55,026 | 4.50% |
| MALT 2004-7 [6] | ALT-A 2004 | $342,018 | $30,782 | $12,420 | $52,786 | | 52,786 | 4.50% |
| MALT 2004-7 [7] | ALT-A 2004 | $907,688 | $81,692 | $32,914 | $57,383 | | 57,383 | 4.50% |
| MALT 2004-7 [8] | ALT-A 2004 | $394,654 | $35,519 | $14,262 | $53,199 | | 53,199 | 4.50% |
| MALT 2004-7 [9] | ALT-A 2004 | $3,712,985 | $334,169 | $195,584 | $31,312 | | 531,312 | 4.50% |
| MALT 2004-8 [1] | ALT-A 2004 | $4,255,942 | $383,035 | $164,971 | $37,007 | | 537,007 | 4.50% |
| MALT 2004-8 [2] | ALT-A 2004 | $3,075,089 | $276,758 | $119,271 | $25,858 | | 525,858 | 4.50% |
| MALT 2004-8 [3] | ALT-A 2004 | $1,648,426 | $82,421 | $37,705 | $58,458 | | 58,458 | 2.50% |
| MALT 2004-8 [4] | ALT-A 2004 | $781,886 | $70,370 | $28,982 | $56,501 | | 56,501 | 4.50% |
| MALT 2004-8 [5] | ALT-A 2004 | $981,912 | $88,372 | $36,364 | $58,157 | | 58,157 | 4.50% |
| MALT 2004-8 [6] | ALT-A 2004 | $701,074 | $63,097 | $25,297 | $55,675 | | 55,675 | 4.50% |
| MALT 2004-8 [7] | ALT-A 2004 | $483,952 | $43,556 | $17,327 | $53,887 | | 53,887 | 4.50% |
| MALT 2004-8 [8] | ALT-A 2004 | $900,527 | $81,047 | $35,418 | $57,945 | | 57,945 | 4.50% |
| MALT 2005-1 [1] | ALT-A 2005 | $10,665,943 | $533,297 | $216,590 | $48,586 | | 548,586 | 2.50% |
| MALT 2005-1 [2] | ALT-A 2005 | $2,040,439 | $102,022 | $43,433 | $59,743 | | 59,743 | 2.50% |
| MALT 2005-1 [3] | ALT-A 2005 | $5,453,845 | $545,796 | $191,387 | $43,493 | | 543,493 | 4.50% |
| MALT 2005-1 [4] | ALT-A 2005 | $54,675,166 | $420,765 | $179,990 | $40,376 | | 540,376 | 4.50% |
| MALT 2005-2 [5] | ALT-A 2005 | $4,463,070 | $401,676 | $166,775 | $37,412 | | 537,412 | 4.50% |
| MALT 2005-3 [4] | ALT-A 2005 | $1,426,584 | $128,393 | $51,075 | $11,457 | | 511,457 | 4.50% |
| MALT 2005-3 [5] | ALT-A 2005 | $5,163,310 | $464,698 | $197,676 | $44,343 | | 544,343 | 4.50% |
| MALT 2005-3 [6] | ALT-A 2005 | $401,371 | $20,069 | $7,790 | $1,747 | | 51,747 | 2.50% |
| MALT 2005-3 [7] | ALT-A 2005 | $53,151,283 | $157,564 | $62,943 | $14,120 | | 514,120 | 2.50% |
| MALT 2005-5 [2] | ALT-A 2005 | $57,634,199 | $45,786 | $19,987 | $58,083 | | 598,083 | 2.50% |
| MALT 2005-5 [3] | ALT-A 2005 | $54,675,166 | $420,765 | $179,990 | $40,376 | | 540,376 | 4.50% |
| MALT 2005-5 [4] | ALT-A 2005 | $2,466,671 | $123,334 | $52,763 | $11,836 | | 511,836 | 2.50% |
| MALT 2005-5 [5] | ALT-A 2005 | $54,848,785 | $242,439 | $100,128 | $22,461 | | 522,461 | 2.50% |
| MALT 2006-1 [Total] | ALT-A 2006 | $39,940,754 | $289,161 | $98,398 | $44,146 | | 544,146 | 0.72% |
| MALT 2007-HF1 [1] | ALT-A 2007 | $4,875,690 | $234,152 | $80,089 | $35,932 | | 535,932 | 4.80% |
| MALT 2007-HF1 [2] | ALT-A 2007 | $21,512,537 | $1,028,851 | $355,604 | $159,541 | | 5159,541 | 4.80% |
| MALT 2007-HF1 [3] | ALT-A 2007 | $3,433,536 | $164,893 | $56,475 | $25,337 | | 525,337 | 4.80% |
| MALT 2007-HF1 [4] | ALT-A 2007 | $30,547,035 | $1,467,001 | $503,523 | $225,456 | | 5225,456 | 4.80% |
| MALT 2007-HF1 [5] | ALT-A 2007 | $3,424,738 | $164,471 | $56,898 | $25,527 | | 525,527 | 4.80% |
| MAMP 2005-1 [1A] | Subprime 2005 | $3,116,005 | $280,440 | $155,472 | $69,752 | | 569,752 | 9.00% |
| MAMP 2005-1 [1B] | Subprime 2005 | $8,534,564 | $768,111 | $425,864 | $191,063 | | 5191,063 | 9.00% |
| MAMP 2005-1 [1C] | Subprime 2005 | $5,735,199 | $390,091 | $288,081 | $175,913 | | 5175,913 | 9.00% |
| MAMP 2005-1 [1D] | Subprime 2005 | $5,771,741 | $519,457 | $288,054 | $129,235 | | 5129,235 | 9.00% |
| MAMP 2005-1 [1E] | Subprime 2005 | $2,389,764 | $215,079 | $119,215 | $53,486 | | 553,486 | 9.00% |
| MAMP 2005-1 [1F] | Subprime 2005 | $1,885,178 | $169,666 | $94,074 | $42,206 | | 542,206 | 9.00% |

*Debtors' Claims Which Are Subject to Objection Due to Negligence*

| | Name | Cohort | Net Total Collateral Losses to Breach | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller% |
|---|---|---|---|---|---|---|---|---|---|
| 433 | WAMP 2005-1 [2] | Subprime 2005 | $1,177,982 | $106,018 | $58,741 | $58,741 | | $26,354 | 9.00% |
| 434 | WAMP 2005-2 | Subprime 2005 | $34,606,315 | $308,714 | $171,155 | $171,155 | | $76,788 | 0.89% |
| 435 | WAMP 2005-2 [POOL_1_A] | Subprime 2005 | $55,216,957 | $546,539 | $525,770 | $525,770 | | $511,562 | 0.89% |
| 436 | WAMP 2005-2 [POOL_1_B] | Subprime 2005 | $2,664,648 | $23,771 | $13,170 | $13,170 | | $5,909 | 0.89% |
| 437 | WAMP 2005-2 [POOL_1_C] | Subprime 2005 | $1,867,260 | $16,657 | $9,234 | $9,234 | | $4,143 | 0.89% |
| 438 | WAMP 2005-2 [POOL2] | Subprime 2005 | $2,116,394 | $18,880 | $10,472 | $10,472 | | $4,698 | 0.89% |
| 439 | WAMP 2006-1 [_1] | Subprime 2006 | $29,350,392 | $50,882 | $28,352 | $28,352 | | $12,720 | 0.17% |
| 440 | WAMP 2006-1 [_234] | Subprime 2006 | $9,640,696 | $16,713 | $9,313 | $9,313 | | $4,178 | 0.17% |
| 441 | WAMP 2006-1 [0] | Subprime 2006 | $847,986 | $1,470 | $819 | $819 | | $368 | 0.17% |
| 442 | WAMP 2006-2 [1] | Subprime 2006 | $33,429,970 | $1,478,572 | $823,856 | $823,856 | | $369,621 | 4.42% |
| 443 | WAMP 2006-2 [2] | Subprime 2006 | $636,005 | $28,130 | $15,675 | $15,675 | | $7,033 | 4.42% |
| 444 | WAMP 2002-7 [1] | Prime 2002 | $132,802 | $57,716 | $32,561 | $32,561 | | $1,061 | 5.81% |
| 445 | WAMP 2002-7 [2] | Prime 2002 | $956,491 | $529,659 | $295,659 | $295,659 | | $52,806 | 5.81% |
| 446 | WAMP 2002-7 [3] | Prime 2002 | $558,053 | $3,373 | $1,034 | $1,034 | | $464 | 5.81% |
| 447 | MASTR 2003-2 [ONE] | Prime 2003 | $593,832 | $8,445 | $3,113 | $3,113 | | $1,397 | 9.00% |
| 448 | MASTR 2003-2 [THREE] | Prime 2003 | $596,997 | $8,730 | $4,009 | $4,009 | | $1,799 | 9.00% |
| 449 | MASTR 2003-2 [TWO] | Prime 2003 | $236,011 | $12,241 | $6,522 | $6,522 | | $2,926 | 9.00% |
| 450 | MASTR 2003-4 [EIGHT] | Prime 2003 | $40,866 | $155 | $71 | $71 | | $32 | 0.38% |
| 451 | MASTR 2003-4 [FIVE] | Prime 2003 | $105,370 | $400 | $133 | $133 | | $60 | 0.38% |
| 452 | MASTR 2003-4 [FOUR] | Prime 2003 | $59,845 | $227 | $105 | $105 | | $47 | 0.38% |
| 453 | MASTR 2003-4 [ONE] | Prime 2003 | $43,095 | $164 | $76 | $76 | | $34 | 0.38% |
| 454 | MASTR 2003-4 [SIX] | Prime 2003 | $895,663 | $1,504 | $691 | $691 | | $310 | 0.38% |
| 455 | MASTR 2003-4 [THREE] | Prime 2003 | $28,064 | $107 | $49 | $49 | | $22 | 0.38% |
| 456 | MASTR 2003-4 [TWO] | Prime 2003 | $125,915 | $478 | $220 | $220 | | $99 | 0.38% |
| 457 | MASTR 2004-1 [1] | Prime 2004 | $597,293 | $53,756 | $29,137 | $29,137 | | $13,072 | 9.00% |
| 458 | MASTR 2004-1 [2] | Prime 2004 | $32,151 | $1,094 | $654 | $654 | | $293 | 9.00% |
| 459 | MASTR 2004-1 [3] | Prime 2004 | $167,481 | $15,073 | $9,011 | $9,011 | | $4,043 | 9.00% |
| 460 | MASTR 2004-1 [4] | Prime 2004 | $98,270 | $8,844 | $5,287 | $5,287 | | $2,372 | 9.00% |
| 461 | MASTR 2004-1 [5] | Prime 2004 | $425,699 | $38,113 | $21,290 | $21,290 | | $9,552 | 9.00% |
| 462 | MASTR 2004-10 [1] | Prime 2004 | $133,867 | $12,048 | $7,203 | $7,203 | | $3,231 | 9.00% |
| 463 | MASTR 2004-10 [2] | Prime 2004 | $157,957 | $14,216 | $8,499 | $8,499 | | $3,813 | 9.00% |
| 464 | MASTR 2004-10 [3] | Prime 2004 | $135,674 | $12,211 | $7,286 | $7,286 | | $3,273 | 9.00% |
| 465 | MASTR 2004-10 [4] | Prime 2004 | $161,112 | $14,500 | $8,669 | $8,669 | | $3,889 | 9.00% |
| 466 | MASTR 2004-10 [5] | Prime 2004 | $481,117 | $43,301 | $20,832 | $20,832 | | $9,346 | 9.00% |
| 467 | MASTR 2004-10 [6] | Prime 2004 | $244,873 | $22,039 | $10,711 | $10,711 | | $4,806 | 9.00% |
| 468 | MASTR 2004-11 [1] | Prime 2004 | $199,381 | $16,024 | $8,116 | $8,116 | | $3,641 | 8.04% |
| 469 | MASTR 2004-11 [2] | Prime 2004 | $179,597 | $14,434 | $8,629 | $8,629 | | $3,871 | 8.04% |
| 470 | MASTR 2004-11 [3] | Prime 2004 | $52,223 | $31,934 | $14,532 | $14,532 | | $6,520 | 8.04% |
| 471 | MASTR 2004-11 [4] | Prime 2004 | $1,041,153 | $583,676 | $541,420 | $541,420 | | $18,583 | 8.04% |
| 472 | MASTR 2004-11 [5] | Prime 2004 | $633,868 | $50,943 | $27,332 | $27,332 | | $12,262 | 8.04% |
| 473 | MASTR 2004-3 [1] | Prime 2004 | $580,694 | $57,262 | $54,342 | $54,342 | | $1,948 | 9.00% |
| 474 | MASTR 2004-3 [2] | Prime 2004 | $17,523 | $1,577 | $943 | $943 | | $423 | 9.00% |
| 475 | MASTR 2004-3 [3] | Prime 2004 | $181,588 | $16,343 | $9,770 | $9,770 | | $4,383 | 9.00% |
| 476 | MASTR 2004-3 [4] | Prime 2004 | $429,194 | $38,627 | $21,037 | $21,037 | | $9,438 | 9.00% |
| 477 | MASTR 2004-3 [5] | Prime 2004 | $17,523 | $1,577 | $943 | $943 | | $423 | 9.00% |
| 478 | MASTR 2004-4 [ONE1] | Prime 2004 | $112,309 | $2,976 | $1,778 | $1,778 | | $798 | 2.65% |
| 479 | MASTR 2004-4 [ONE2] | Prime 2004 | $112,199 | $2,973 | $1,778 | $1,778 | | $797 | 2.65% |
| 480 | MASTR 2004-4 [ONE3] | Prime 2004 | $56,633 | $176 | $105 | $105 | | $47 | 2.65% |
| 481 | MASTR 2004-4 [THREE] | Prime 2004 | $27,979 | $741 | $443 | $443 | | $199 | 2.65% |

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller % |
|---|---|---|---|---|---|---|---|---|
| WASTR 2004-4 [TWO] | Prime 2004 | $614,187 | $16,276 | $7,904 | $3,546 | | $3,546 | 2.65% |
| WASTR 2004-5 [1] | Prime 2004 | $816,208 | $26,873 | $13,945 | $6,256 | | $6,256 | 3.29% |
| WASTR 2004-5 [2] | Prime 2004 | $149,905 | $4,936 | $2,951 | $1,324 | | $1,324 | 3.29% |
| WASTR 2004-6 [1] | Prime 2004 | $278,266 | $7,803 | $4,665 | $2,093 | | $2,093 | 2.80% |
| WASTR 2004-6 [2A] | Prime 2004 | $288,103 | $8,067 | $4,312 | $1,935 | | $1,935 | 2.80% |
| WASTR 2004-6 [2B] | Prime 2004 | $205,871 | $5,764 | $3,261 | $1,463 | | $1,463 | 2.80% |
| WASTR 2004-6 [3] | Prime 2004 | $361,969 | $10,135 | $4,916 | $2,206 | | $2,206 | 2.80% |
| WASTR 2004-6 [4] | Prime 2004 | $189,702 | $5,312 | $3,175 | $1,425 | | $1,425 | 2.80% |
| WASTR 2004-6 [5] | Prime 2004 | $276,728 | $7,748 | $4,632 | $2,078 | | $2,078 | 2.80% |
| WASTR 2004-6 [6] | Prime 2004 | $137,108 | $3,839 | $2,296 | $1,030 | | $1,030 | 2.80% |
| WASTR 2004-6 [7] | Prime 2004 | $296,984 | $8,299 | $4,961 | $2,226 | | $2,226 | 2.80% |
| WASTR 2004-9 [1] | Prime 2004 | $563,233 | $3,762 | $2,249 | $1,009 | | $1,009 | 5.95% |
| WASTR 2004-9 [2] | Prime 2004 | $1,373,635 | $81,731 | $39,841 | $17,875 | | $17,875 | 5.95% |
| WASTR 2004-9 [3] | Prime 2004 | $271,308 | $16,143 | $9,651 | $4,330 | | $4,330 | 5.95% |
| WASTR 2004-9 [4] | Prime 2004 | $427,878 | $25,459 | $12,524 | $5,619 | | $5,619 | 5.95% |
| WASTR 2004-9 [5] | Prime 2004 | $44,948 | $2,674 | $1,599 | $717 | | $717 | 5.95% |
| WASTR 2004-9 [6] | Prime 2004 | $94,639 | $5,631 | $3,366 | $1,510 | | $1,510 | 5.95% |
| WASTR 2004-9 [7] | Prime 2004 | $42,169 | $2,509 | $1,500 | $673 | | $673 | 5.95% |
| WASTR 2004-9 [8] | Prime 2004 | $157,892 | $9,395 | $5,616 | $2,520 | | $2,520 | 5.95% |
| MLMI 2003-A2 [FOUR] | Prime 2003 | $435,763 | $22,261 | $5,509 | $2,472 | | $2,472 | 5.11% |
| MLMI 2003-A2 [ONE] | Prime 2003 | $259,220 | $13,242 | $4,839 | $2,171 | | $2,171 | 5.11% |
| MLMI 2003-A2 [THREE] | Prime 2003 | $449,911 | $22,983 | $10,565 | $4,740 | | $4,740 | 5.11% |
| MLMI 2003-A2 [TWO] | Prime 2003 | $93,524 | $4,778 | $2,196 | $985 | | $985 | 5.11% |
| MLMI 2003-A4 [1] | Prime 2003 | $1,799,575 | $215,300 | $55,354 | $24,834 | | $24,834 | 11.96% |
| MLMI 2003-A4 [2] | Prime 2003 | $236,366 | $28,279 | $12,047 | $5,405 | | $5,405 | 11.96% |
| MLMI 2003-A4 [3] | Prime 2003 | $166,825 | $19,959 | $8,684 | $3,896 | | $3,896 | 11.96% |
| MLMI 2003-A4 [4] | Prime 2003 | $559,820 | $57,157 | $3,290 | $1,476 | | $1,476 | 11.96% |
| ALTA 2005 [1] | ALT-A 2005 | $58,935,786 | $2,946,789 | $1,266,308 | $568,126 | | $568,126 | 5.00% |
| MLMI 2005-A6 [3] | ALT-A 2005 | $81,813,332 | $4,090,667 | $1,755,805 | $787,738 | | $787,738 | 5.00% |
| WSSTR 2005-2 [FIVE] | Prime 2005 | $78,709 | $1,078 | $645 | $289 | | $289 | 1.37% |
| WSSTR 2005-2 [FOUR] | Prime 2005 | $248,869 | $3,410 | $1,836 | $824 | | $824 | 1.37% |
| WSSTR 2005-2 [ONE/TWO] | Prime 2005 | $1,151,072 | $15,770 | $7,978 | $3,579 | | $3,579 | 1.37% |
| WSSTR 2005-2 [THREE] | Prime 2005 | $387,723 | $55,312 | $3,161 | $1,418 | | $1,418 | 1.37% |
| RBSGC 2005-A [1] | ALT-A 2005 | $1,937,065 | $174,336 | $71,062 | $15,941 | | $15,941 | 4.50% |
| RBSGC 2005-A [2] | ALT-A 2005 | $12,389,758 | $1,115,078 | $400,332 | $101,000 | | $101,000 | 4.50% |
| RBSGC 2005-A [3] | ALT-A 2005 | $10,077,956 | $907,016 | $385,491 | $86,475 | | $86,475 | 4.50% |
| RBSGC 2005-A [4] | ALT-A 2005 | $4,265,948 | $383,935 | $158,056 | $35,456 | | $35,456 | 4.50% |
| RBSGC 2005-A [5] | ALT-A 2005 | $4,996,566 | $449,691 | $193,859 | $43,487 | | $43,487 | 4.50% |
| RBSGC 2007-B [1] | ALT-A 2007 | $592,099,545 | $104,062 | $35,814 | $16,068 | | $16,068 | 0.11% |
| RBSGC 2007-B [2] | ALT-A 2007 | $53,256,816 | $51,984 | $51,264 | $5,567 | | $5,567 | 0.11% |
| RBSGC 2007-B [3] | ALT-A 2007 | $56,702,194 | $57,589 | $52,523 | $1,132 | | $1,132 | 0.11% |
| SACO 2007-1 [1A] | CES 2007 | $21,616,008 | $1,080,800 | $567,433 | $254,578 | | $254,578 | 5.00% |
| SACO 2007-1 [2A] | CES 2007 | $113,758,896 | $5,687,945 | $2,972,443 | $1,333,580 | | $1,333,580 | 5.00% |
| SACO 2007-1 [1F] | CES 2007 | $5,622,055 | $281,103 | $147,951 | $66,378 | | $66,378 | 5.00% |
| SACO 2007-1 [2F] | CES 2007 | $40,116,923 | $2,005,846 | $1,051,016 | $471,536 | | $471,536 | 5.00% |
| SAIL 2006-2 [A] | Subprime 2006 | $315,828,955 | $2,463,466 | $1,369,181 | $614,280 | | $614,280 | 0.78% |
| SAIL 2006-2 [F] | Subprime 2006 | $98,460,981 | $767,996 | $426,756 | $191,463 | | $191,463 | 0.78% |
| SARM 2004-4 [1AX] | ALT-A 2004 | $1,309,089 | $729 | $311 | $140 | | $140 | 0.06% |
| SARM 2004-4 [1PAX] | ALT-A 2004 | $1,584,710 | $882 | $364 | $164 | | $164 | 0.06% |
| SARM 2004-4 [2AX] | ALT-A 2004 | $5,347,991 | $2,977 | $1,221 | $548 | | $548 | 0.06% |
| SARM 2004-4 [2PAX] | ALT-A 2004 | $2,744,710 | $1,528 | $624 | $280 | | $280 | 0.06% |
| SARM 2004-4 [3AX] | ALT-A 2004 | $15,927,535 | $8,865 | $3,633 | $1,630 | | $1,630 | 0.06% |
| SARM 2004-4 [3PAX] | ALT-A 2004 | $6,812,790 | $3,792 | $1,523 | $683 | | $683 | 0.06% |
| SARM 2004-4 [4AX] | ALT-A 2004 | $1,433,403 | $798 | $312 | $140 | | $140 | 0.06% |

12-12020-mg   Doc 8019-45   Filed 01/22/15   Entered 01/22/15 18:14:28   Exhibit 26
Case 14-cv-03039-GBD   Document 21-1   Filed 11/06/14   Page 305 of 355
Pg 330 of 398
12-12020-mg   Doc 6065-1   Filed 12/11/13   Entered 12/11/13 17:30:11   Appendix 1   Pg 244 of 265

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 536 | SARM 2004-4 [4PAX] | ALT-A 2004 | $1,209,370 | $673 | $263 | $118 | | $118 | 0.06% |
| 537 | SARM 2004-4 [SAX] | ALT-A 2004 | $861,765 | $480 | $186 | $84 | | $84 | 0.06% |
| 538 | SARM 2004-4 [5PAX] | ALT-A 2004 | $829,129 | $461 | $179 | $80 | | $80 | 0.06% |
| 539 | SASC 2001-8A [FOUR] | Prime 2001 | $69,946 | $6,295 | $1,929 | $866 | | $866 | 9.00% |
| 540 | SASC 2001-8A [ONE] | Prime 2001 | $376,193 | $33,857 | $5,626 | $2,524 | | $2,524 | 9.00% |
| 541 | SASC 2001-8A [THREE] | Prime 2001 | $17,693 | $1,592 | $358 | $160 | | $160 | 9.00% |
| 542 | SASC 2001-8A [TWO] | Prime 2001 | $34,679 | $3,121 | $468 | $210 | | $210 | 9.00% |
| 543 | SASC 2002-12 [1] | Prime 2002 | $2,334 | $560 | $99 | $44 | LEHMAN (Financial Guaranty (FHLMC (Pool Policy) - Insurer Exception | $44 | 9.00% |
| 544 | SASC 2002-12 [2] | Prime 2002 | $442,505 | $39,825 | $5,974 | $2,680 | LEHMAN (Financial Guaranty (FHLMC (Pool Policy) - Insurer Exception | $2,680 | 9.00% |
| 545 | SASC 2002-12 [3] | Prime 2002 | $41,941 | $3,775 | $566 | $254 | LEHMAN (Financial Guaranty (FHLMC (Pool Policy) - Insurer Exception | $254 | 9.00% |
| 546 | SASC 2002-12 [4] | Prime 2002 | $461,814 | $41,563 | $6,235 | $2,797 | LEHMAN (Financial Guaranty (FHLMC (Pool Policy) - Insurer Exception | $2,797 | 9.00% |
| 547 | SASC 2002-4H [1] | Subprime 2002 | $3,112,336 | $620,096 | $178,872 | $80,251 | | $80,251 | 19.86% |
| 548 | SASC 2002-4H [2] | Subprime 2002 | $7,544 | $1,498 | $417 | $187 | | $187 | 19.86% |
| 549 | SASC 2005-RF1 [Total] | Subprime 2005 | $18,396,671 | $1,655,700 | $938,144 | $411,923 | | $411,923 | 9.00% |
| 550 | SASC 2005-RF2 [Total] | Subprime 2005 | $15,456,095 | $1,391,049 | $770,853 | $345,841 | | $345,841 | 9.00% |
| 551 | SASC 2005-RF4 [Total] | Subprime 2005 | $24,615,331 | $2,215,380 | $1,229,652 | $551,680 | | $551,680 | 9.00% |
| 552 | SASC 2005-RF6 [Total] | Subprime 2005 | $12,269,204 | $1,104,228 | $612,965 | $275,005 | | $275,005 | 9.00% |
| 553 | CES 2005 [Total] | CES 2005 | $177,035,883 | $15,933,229 | $6,182,751 | $2,773,877 | United Guaranty (Pool Policy) | $2,773,877 | 9.00% |
| 554 | SASC 2006-RK2 [1A] | Subprime 2006 | $153,649,039 | $1,383,285 | $768,919 | $344,974 | | $344,974 | 0.90% |
| 555 | SASC 2006-RK2 [1F] | Subprime 2006 | $69,603,333 | $626,631 | $348,409 | $156,313 | | $156,313 | 0.90% |
| 556 | SASC 2006-RK2 [2A] | Subprime 2006 | $159,700,421 | $1,437,765 | $799,118 | $358,522 | | $358,522 | 0.90% |
| 557 | SASC 2006-RK2 [2F] | Subprime 2006 | $72,420,451 | $651,993 | $362,568 | $162,665 | | $162,665 | 0.90% |
| 558 | SASC 2008-RF1 [Total] | Subprime 2008 | $22,474,726 | $1,123,736 | $585,612 | $262,734 | | $262,734 | 5.00% |
| 559 | SASO 2002-9 [2FR] | Prime 2002 | $1,312 | $10 | $3 | $1 | | $1 | 0.80% |
| 560 | SASO 2002-9 [2L] | Prime 2002 | $332 | $3 | $1 | $0 | | $0 | 0.80% |
| 561 | SASO 2002-9 [A1-MI] | Prime 2002 | $824,407 | $6,595 | $1,463 | $656 | | $656 | 0.80% |
| 562 | SASO 2002-9 [A1-NOM] | Prime 2002 | $811,230 | $6,490 | $1,469 | $659 | | $659 | 0.80% |
| 563 | SASO 2002-9 [B1-MI] | Prime 2002 | $225,011 | $1,800 | $397 | $178 | | $178 | 0.80% |
| 564 | SASO 2002-9 [B1-NOM] | Prime 2002 | $906,481 | $7,252 | $1,627 | $730 | | $730 | 0.80% |
| 565 | SAS3 1993-6 [CIT1] | Prime 1999 | $297,737 | $26,796 | $2,010 | $451 | | $451 | 4.50% |
| 566 | SAS3 1993-6 [CMF1] | Prime 1999 | $408,373 | $36,754 | $2,757 | $619 | | $619 | 4.50% |
| 567 | SAS3 1993-6 [GEC1] | Prime 1999 | $134,479 | $12,103 | $908 | $204 | | $204 | 4.50% |
| 568 | SAS3 1993-6 [ITT2] | Prime 1999 | $294,598 | $26,514 | $1,998 | $448 | | $448 | 4.50% |
| 569 | SAS3 1993-6 [ITT3] | Prime 1999 | $527,944 | $47,515 | $3,576 | $802 | GEMICO (Pool Policy/FSA - Insurer Exception | $802 | 4.50% |
| 570 | SAS3 1993-6 [ITT4] | Prime 1999 | $264,173 | $23,776 | $1,783 | $400 | | $400 | 4.50% |
| 571 | SAS3 1993-6 [ITT5] | Prime 1999 | $139,669 | $12,570 | $952 | $214 | | $214 | 4.50% |
| 572 | SAS3 1993-6 [SASC3] | Prime 1999 | $52,041,944 | $183,775 | $13,833 | $3,103 | GEMICO (Pool Policy/FSA- Insurer Exception | $3,103 | 4.50% |
| 573 | SEMT 2004-10 [1] | Prime 2004 | $54,869,266 | $320,372 | $101,801 | $24,869 | | $24,869 | 4.50% |
| 574 | SEMT 2004-10 [2] | Prime 2004 | $83,477,050 | $155,467 | $77,732 | $17,437 | | $17,437 | 4.50% |
| 575 | SEMT 2004-11 [1] | Prime 2004 | $54,686,120 | $135,897 | $69,614 | $15,616 | | $15,616 | 2.90% |
| 576 | SEMT 2004-11 [2] | Prime 2004 | $917,875 | $26,618 | $13,393 | $3,004 | | $3,004 | 2.90% |
| 577 | SEMT 2004-11 [3] | Prime 2004 | $1,316,313 | $38,173 | $20,242 | $4,541 | | $4,541 | 2.90% |
| 578 | SEMT 2004-12 [1] | Prime 2004 | $4,758,130 | $295,004 | $148,902 | $33,402 | | $33,402 | 3.10% |
| 579 | SEMT 2004-12 [2] | Prime 2004 | $1,959,642 | $121,498 | $60,509 | $13,574 | | $13,574 | 3.10% |
| 580 | SEMT 2004-12 [3] | Prime 2004 | $743,687 | $46,109 | $27,565 | $6,183 | | $6,183 | 3.10% |
| 581 | SEMT 2004-4 [Total] | Prime 2004 | $6,293,703 | $249,860 | $127,733 | $28,654 | | $28,654 | 1.99% |
| 582 | SEMT 2005-1 [1] | Prime 2004 | $3,349,661 | $301,469 | $155,376 | $34,854 | | $34,854 | 4.50% |
| 583 | SEMT 2005-1 [28] | Prime 2004 | $1,114,087 | $100,268 | $54,710 | $12,273 | | $12,273 | 4.50% |
| 584 | SEMT 2005-6 [1] | Prime 2004 | $573,706 | $51,634 | $26,021 | $5,972 | | $5,972 | 4.19% |
| 585 | SEMT 2005-6 [1A] | Prime 2004 | $170,383 | $15,356 | $7,769 | $38,212 | | $38,212 | 4.19% |
| 586 | SEMT 2005-6 [2A] | Prime 2004 | $1,092,058 | $99,405 | $51,617 | $11,579 | | $11,579 | 4.19% |

Case 14-cv-03039-GBD    Document 15-1    Filed 11/06/14    Page 306 of 355

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | GMACM Claim | Insurer | GMACM Recognized Claim | GMACM Seller's % |
|---|---|---|---|---|---|---|---|---|
| SEMT 2004-6 [2B] | Prime 2004 | $371,776 | $31,118 | $12,267 | $5,873 | | $5,873 | 4.19% |
| SEMT 2004-6 [3] | Prime 2004 | $891,482 | $74,617 | $41,038 | $9,206 | | $9,206 | 4.19% |
| SEMT 2004-7 [1] | Prime 2004 | $3,202,518 | $282,142 | $148,566 | $33,327 | | $33,327 | 4.41% |
| SEMT 2004-7 [2] | Prime 2004 | $2,569,941 | $226,412 | $119,449 | $26,795 | | $26,795 | 4.41% |
| SEMT 2004-7 [3] | Prime 2004 | $1,434,948 | $126,419 | $69,746 | $15,646 | | $15,646 | 4.41% |
| SEMT 2004-8 [1A] | Prime 2004 | $2,332,790 | $180,469 | $94,533 | $21,206 | | $21,206 | 3.88% |
| SEMT 2004-8 [1B] | Prime 2004 | $1,600,920 | $124,383 | $62,508 | $14,022 | | $14,022 | 3.88% |
| SEMT 2004-8 [2] | Prime 2004 | $3,739,595 | $290,548 | $148,836 | $33,388 | | $33,388 | 3.88% |
| SEMT 2004-9 [1] | Prime 2004 | $5,430,098 | $488,709 | $258,996 | $58,099 | | $58,099 | 4.50% |
| SEMT 2004-9 [2] | Prime 2004 | $3,231,985 | $290,879 | $146,504 | $32,864 | | $32,864 | 4.50% |
| SEMT 2005-1 [1] | Prime 2005 | $3,965,273 | $356,875 | $193,681 | $43,447 | | $43,447 | 4.50% |
| SEMT 2005-1 [2] | Prime 2005 | $1,899,189 | $170,927 | $82,809 | $18,576 | | $18,576 | 4.50% |
| SEMT 2005-3 [Total] | ALTA 2005 | $11,878,947 | $534,553 | $214,656 | $48,152 | | $48,152 | 4.50% |
| SEMT 2005-4 [1] | Prime 2005 | $2,017,483 | $47,414 | $58,342 | $12,716 | | $12,716 | 2.35% |
| SEMT 2005-4 [2] | Prime 2005 | $3,406,487 | $80,058 | $45,872 | $20,580 | | $20,580 | 2.35% |
| SEMT 2007-1 [1] | Prime 2007 | $4,256,044 | $140,875 | $50,429 | $11,312 | | $11,312 | 1.66% |
| SEMT 2007-1 [2] | Prime 2007 | $46,470,169 | $1,538,163 | $553,937 | $124,261 | | $124,261 | 1.66% |
| SEMT 2007-1 [3] | Prime 2007 | $5,579,093 | $184,668 | $66,270 | $14,866 | | $14,866 | 1.66% |
| SEMT 2007-1 [4] | Prime 2007 | $8,807,137 | $291,516 | $104,039 | $23,338 | | $23,338 | 1.66% |
| SEMT 2007-1 [5] | Prime 2007 | $11,572,514 | $383,050 | $137,112 | $30,757 | | $30,757 | 1.66% |
| SEMT 2007-2 [1] | Prime 2007 | $53,910,589 | $1,693,851 | $596,292 | $133,763 | | $133,763 | 2.50% |
| SEMT 2007-2 [2A] | Prime 2007 | $28,986,949 | $1,447,913 | $523,111 | $117,346 | | $117,346 | 2.50% |
| SEMT 2007-2 [2B] | Prime 2007 | $14,174,170 | $717,997 | $257,667 | $57,801 | | $57,801 | 2.50% |
| SEMT 2007-3 [1] | Prime 2007 | $23,052,570 | $1,152,628 | $407,876 | $91,496 | | $91,496 | 2.50% |
| SEMT 2007-3 [2A] | Prime 2007 | $20,762,375 | $1,038,129 | $374,833 | $84,084 | | $84,084 | 2.50% |
| SEMT 2007-3 [2B] | Prime 2007 | $11,161,856 | $558,093 | $202,054 | $45,325 | | $45,325 | 2.50% |
| SEMT 2007-3 [3] | Prime 2007 | $6,570,995 | $328,550 | $118,012 | $26,473 | | $26,473 | 2.50% |
| SEMT 2007-4 [1] | Prime 2007 | $3,515,624 | $175,781 | $62,106 | $13,932 | | $13,932 | 2.50% |
| SEMT 2007-4 [2] | Prime 2007 | $502,778 | $25,139 | $9,011 | $2,021 | | $2,021 | 2.50% |
| SEMT 2007-4 [3] | Prime 2007 | $9,255,769 | $462,788 | $167,178 | $37,502 | | $37,502 | 2.50% |
| SEMT 2007-4 [4] | Prime 2007 | $3,066,130 | $153,307 | $54,779 | $12,288 | | $12,288 | 2.50% |
| SEMT 2007-4 [5] | Prime 2007 | $1,996,714 | $99,836 | $35,520 | $7,968 | | $7,968 | 2.50% |
| STAC 2007-1 [Total] | CES 2007 | $90,453,636 | $4,522,682 | $2,390,288 | $536,199 | XL | $50 | 2.50% |
| TMTS 2005-11 [1A] | Second Lien 2005 | $152,143,074 | $13,692,877 | $7,446,816 | $1,670,498 | | $1,670,498 | 4.50% |
| TMTS 2005-11 [1B] | Second Lien 2005 | $16,793,870 | $1,511,448 | $821,610 | $184,307 | | $184,307 | 4.50% |
| TMTS 2005-11 [2A] | Second Lien 2005 | $564,478,026 | $50,803,022 | $3,174,218 | $712,053 | | $712,053 | 4.50% |
| TMTS 2005-11 [2B] | Second Lien 2005 | $16,004,638 | $1,440,417 | $788,492 | $176,878 | | $176,878 | 4.50% |
| TMTS 2005-13SL [2] | Second Lien 2005 | $11,452,424 | $1,030,718 | $534,001 | $119,789 | FGIC | $119,789 | 4.50% |
| | | $12,257,417,670 | $933,012,078 | $371,330,508 | $138,454,874 | | $132,176,369 | |

12-12020-mg    Doc 3698-13    Filed 05/12/13    Entered 05/13/13 06:34:37    Appendix 1
Pg 226 of 293

**Schedule 3R**

Case 1:14-cv-03039-GBD    Document 51-1    Filed 01/06/14    Page 308 of 355
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Subject Loans - Additional Due Diligence

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| ARMT 2004-5 [1] | ALT-A 2004 | $2,865,881 | $257,929 | $114,320 | $25,645 | | $25,645 | 4.50% |
| ARMT 2004-5 [2] | ALT-A 2004 | $8,036,747 | $723,307 | $296,478 | $66,507 | | $66,507 | 4.50% |
| ARMT 2004-5 [3] | ALT-A 2004 | $5,787,717 | $520,895 | $212,714 | $47,717 | | $47,717 | 4.50% |
| ARMT 2004-5 [4] | ALT-A 2004 | $5,572,235 | $501,501 | $198,729 | $44,580 | | $44,580 | 4.50% |
| ARMT 2004-5 [5] | ALT-A 2004 | $6,707,818 | $603,704 | $269,447 | $60,443 | | $60,443 | 4.50% |
| ARMT 2004-5 [6] | ALT-A 2004 | $9,091,981 | $818,278 | $353,801 | $79,366 | | $79,366 | 4.50% |
| ARMT 2004-5 [7A] | ALT-A 2004 | $6,451,231 | $580,611 | $259,879 | $58,297 | | $58,297 | 4.50% |
| ARMT 2004-5 [7B] | ALT-A 2004 | $11,295,496 | $1,016,595 | $453,430 | $101,715 | | $101,715 | 4.50% |
| ARMT 2005-1 [1] | ALT-A 2005 | $6,080,686 | $547,262 | $234,375 | $52,576 | | $52,576 | 4.50% |
| ARMT 2005-1 [2] | ALT-A 2005 | $13,072,540 | $1,176,529 | $472,714 | $106,041 | | $106,041 | 4.50% |
| ARMT 2005-1 [3] | ALT-A 2005 | $7,465,549 | $671,899 | $293,755 | $65,896 | | $65,896 | 4.50% |
| ARMT 2005-1 [4] | ALT-A 2005 | $13,142,774 | $1,182,850 | $499,137 | $111,968 | | $111,968 | 4.50% |
| ARMT 2005-1 [51] | ALT-A 2005 | $9,853,270 | $886,794 | $395,392 | $88,696 | | $88,696 | 4.50% |
| ARMT 2005-1 [52] | ALT-A 2005 | $21,770,428 | $1,959,338 | $863,938 | $193,802 | | $193,802 | 4.50% |
| ARMT 2005-10 [1] | ALT-A 2005 | $10,702,109 | $963,190 | $405,959 | $91,066 | | $91,066 | 4.50% |
| ARMT 2005-10 [2] | ALT-A 2005 | $30,610,085 | $2,754,908 | $1,156,765 | $259,490 | | $259,490 | 4.50% |
| ARMT 2005-10 [3] | ALT-A 2005 | $29,763,712 | $2,678,734 | $1,097,098 | $246,105 | | $246,105 | 4.50% |
| ARMT 2005-10 [4] | ALT-A 2005 | $18,143,593 | $1,632,923 | $699,953 | $157,016 | | $157,016 | 4.50% |
| ARMT 2005-10 [5] | ALT-A 2005 | $66,504,968 | $5,985,447 | $2,652,842 | $595,096 | | $595,096 | 4.50% |
| ARMT 2005-11 [1] | ALT-A 2005 | $56,870,091 | $5,118,308 | $2,162,150 | $485,216 | | $485,216 | 4.50% |
| ARMT 2005-11 [52] | ALT-A 2005 | $6,741,236 | $606,711 | $264,034 | $59,229 | | $59,229 | 4.50% |
| ARMT 2005-11 [2] | ALT-A 2005 | $34,391,236 | $3,095,214 | $1,321,417 | $296,425 | | $296,425 | 4.50% |
| ARMT 2005-11 [3] | ALT-A 2005 | $15,741,682 | $1,416,751 | $589,438 | $132,225 | | $132,225 | 4.50% |
| ARMT 2005-11 [4] | ALT-A 2005 | $83,082,789 | $7,477,451 | $3,231,419 | $724,884 | | $724,884 | 4.50% |
| ARMT 2005-11 [5] | ALT-A 2005 | $70,901,103 | $6,381,099 | $2,815,446 | $631,572 | | $631,572 | 4.50% |
| BAFC 2005-1 [1] | Prime 2005 | $3,157,294 | $135,809 | $74,842 | $33,578 | | $33,578 | 4.30% |
| BAFC 2005-1 [2A] | Prime 2005 | $114,250 | $4,914 | $2,938 | $1,318 | | $1,318 | 4.30% |
| BAFC 2005-1 [2B] | Prime 2005 | $95,437 | $4,105 | $2,454 | $1,101 | | $1,101 | 4.30% |
| BAFC 2005-1 [2C] | Prime 2005 | $291,282 | $12,529 | $7,490 | $3,361 | | $3,361 | 4.30% |
| BAFC 2005-4 [1] | Prime 2005 | $1,389,038 | $87,509 | $49,537 | $22,225 | Assured Guaranty | $22,225 | 6.30% |
| BAFC 2005-4 [2] | Prime 2005 | $2,791,134 | $175,841 | $96,611 | $43,344 | Assured Guaranty - Insurer Exception | $43,344 | 6.30% |
| BAFC 2005-5 [1] | Prime 2005 | $3,434,972 | $557,152 | $296,778 | $133,149 | | $133,149 | 16.22% |
| BAFC 2005-5 [2] | Prime 2005 | $4,582,970 | $743,358 | $383,141 | $171,895 | | $171,895 | 16.22% |
| BAFC 2005-5 [3] | Prime 2005 | $1,950,683 | $316,401 | $165,859 | $74,412 | | $74,412 | 16.22% |
| BAFC 2005-6 [1] | Prime 2005 | $6,225,493 | $918,103 | $448,606 | $91,486 | | $91,486 | 6.36% |
| BAFC 2005-6 [2] | Prime 2005 | $7,725,474 | $1,130,237 | $563,719 | $109,946 | | $109,946 | 6.36% |
| BAFC 2005-7 [1] | Prime 2005 | $5,630,681 | $146,398 | $74,090 | $33,240 | | $33,240 | 2.60% |
| BAFC 2005-7 [2] | Prime 2005 | $5,739,643 | $149,231 | $74,033 | $33,215 | | $33,215 | 2.60% |
| BAFC 2005-7 [3] | Prime 2005 | $5,582,041 | $145,133 | $76,803 | $34,457 | | $34,457 | 2.60% |
| BAFC 2005-7 [4] | Prime 2005 | $3,861,489 | $100,399 | $52,907 | $23,736 | | $23,736 | 2.60% |
| BAFC 2005-8 [1] | Prime 2005 | $2,842,891 | $519,680 | $257,911 | $58,235 | | $58,235 | 9.20% |
| BAFC 2005-8 [2] | Prime 2005 | $7,195,865 | $1,315,404 | $691,122 | $156,053 | | $156,053 | 9.20% |
| BAFC 2005-8 [3] | Prime 2005 | $1,328,402 | $242,832 | $122,362 | $27,629 | | $27,629 | 9.20% |
| BAFC 2005-8 [4] | Prime 2005 | $6,760,354 | $1,235,793 | $618,177 | $139,582 | | $139,582 | 9.20% |
| BAFC 2006-1 [1] | ALT-A 2006 | $20,430,173 | $1,618,070 | $542,291 | $117,962 | | $117,962 | 3.84% |
| BAFC 2006-1 [2] | ALT-A 2006 | $11,370,616 | $900,553 | $302,457 | $65,792 | | $65,792 | 3.84% |
| BAFC 2006-1 [3] | ALT-A 2006 | $11,009,803 | $871,976 | $293,888 | $63,928 | | $63,928 | 3.84% |
| BAFC 2006-1 [4] | Prime 2006 | $12,988,677 | $649,434 | $234,012 | $52,495 | | $52,495 | 2.50% |
| BAFC 2006-5 [1] | Prime 2006 | $3,096,225 | $154,811 | $55,701 | $12,495 | | $12,495 | 2.50% |
| BAFC 2006-5 [2] | Prime 2006 | $4,985,845 | $249,292 | $89,921 | $20,171 | | $20,171 | 2.50% |
| BAFC 2006-5 [3] | Prime 2006 | $12,969,503 | $648,475 | $232,499 | $52,155 | | $52,155 | 2.50% |
| BALTA 2005-4 [I] | ALT-A 2005 | $40,360,845 | $257,319 | $111,676 | $2,293 | | $2,293 | 0.03% |
| BALTA 2005-4 [II1] | ALT-A 2005 | $21,587,644 | $137,631 | $59,437 | $1,220 | | $1,220 | 0.03% |
| BALTA 2005-4 [II2] | ALT-A 2005 | $15,573,544 | $99,289 | $42,498 | $873 | | $873 | 0.03% |
| BALTA 2005-4 [II3] | ALT-A 2005 | $124,064,736 | $790,971 | $333,975 | $56,857 | | $56,857 | 0.03% |
| BALTA 2005-4 [II4] | ALT-A 2005 | $8,986,500 | $57,293 | $23,409 | $481 | | $481 | 0.03% |
| BALTA 2005-4 [II5] | ALT-A 2005 | $58,181,787 | $52,163 | $20,091 | $431 | | $431 | 0.03% |

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 59 | RSSLT 2007-SV1A [Total] | CES 2007 | $525,306,659 | $26,265,333 | $13,848,235 | $3,106,489 | XL - Insurer Exception | $3,106,489 | 2.50% |
| 60 | CARR 2006-RFC1 [A_2YR] | Subprime 2006 | $174,666,031 | $174,666,031 | $97,100,470 | $43,563,903 | | $43,563,903 | 100.00% |
| 61 | CARR 2006-RFC1 [A_3YR] | Subprime 2006 | $27,826,914 | $27,826,914 | $15,476,142 | $6,943,336 | | $6,943,336 | 100.00% |
| 62 | CARR 2006-RFC1 [F] | Subprime 2006 | $34,351,720 | $34,351,720 | $19,112,196 | $8,574,643 | | $8,574,643 | 100.00% |
| 63 | CARR 2007-RFC1 [1A_1] | Subprime 2007 | $219,949,374 | $219,949,374 | $122,310,482 | $54,874,316 | | $54,874,316 | 100.00% |
| 64 | CARR 2007-RFC1 [1A_2] | Subprime 2007 | $51,104,674 | $51,104,674 | $28,431,258 | $12,755,619 | | $12,755,619 | 100.00% |
| 65 | CARR 2007-RFC1 [2F] | Subprime 2007 | $70,320,717 | $70,320,717 | $39,129,645 | $17,555,425 | | $17,555,425 | 100.00% |
| 66 | FNR 2002-66 [FIVE] | Subprime 2002 | $3,342,601 | $300,834 | $80,464 | $18,050 | FNMA/FNMA (Agency Wrap) | $0 | 4.50% |
| 67 | FNR 2002-66 [FOUR] | Subprime 2002 | $5,410,998 | $486,990 | $132,019 | $29,615 | FNMA/FNMA (Agency Wrap) | $0 | 4.50% |
| 68 | FNR 2002-66 [ONE] | Subprime 2002 | $6,746,831 | $607,215 | $130,877 | $29,359 | FNMA/FNMA (Agency Wrap) | $0 | 4.50% |
| 69 | GSR 2007-HEL1 [Total] | Second Lien 2007 | $4,473,052 | $223,653 | $109,816 | $24,634 | | $0 | 2.50% |
| 70 | HALO 2007-AR2 [I] | ALT-A 2007 | $3,666,399 | $12,194 | $4,151 | $1,863 | | $1,863 | 0.33% |
| 71 | HALO 2007-AR2 [II] | ALT-A 2007 | $57,031,784 | $189,684 | $65,148 | $29,229 | | $29,229 | 0.33% |
| 72 | HALO 2007-AR2 [III] | ALT-A 2007 | $17,955,461 | $59,719 | $20,226 | $9,074 | | $9,074 | 0.33% |
| 73 | HALO 2007-AR2 [IV] | ALT-A 2007 | $12,421,672 | $41,314 | $13,997 | $6,280 | | $6,280 | 0.33% |
| 74 | HVMLT 2007-2 [1] | Pay Option ARM 2007 | $159,009,612 | $16,346,188 | $5,023,716 | $2,657,661 | AMBAC | $2,657,661 | 10.28% |
| 75 | HVMLT 2007-2 [2] | Pay Option ARM 2007 | $338,985,056 | $34,847,664 | $12,759,945 | $5,724,720 | | $5,724,720 | 10.28% |
| 76 | IMT 2005-1 [1AX] | Prime 2005 | $4,772,299 | $130,284 | $63,535 | $14,253 | | $14,253 | 1.37% |
| 77 | IMT 2005-1 [1DSC] | Prime 2005 | $3,502,828 | $95,627 | $47,276 | $10,605 | | $10,605 | 1.37% |
| 78 | IMT 2005-1 [1PAX] | Prime 2005 | $3,469,896 | $94,728 | $46,274 | $10,380 | | $10,380 | 1.37% |
| 79 | IMT 2005-1 [2AX] | Prime 2005 | $5,284,776 | $144,274 | $68,968 | $15,471 | | $15,471 | 1.37% |
| 80 | IMT 2005-1 [2DSC] | Prime 2005 | $3,444,404 | $94,032 | $45,949 | $10,307 | | $10,307 | 1.37% |
| 81 | IMT 2005-1 [2PAX] | Prime 2005 | $3,176,154 | $86,709 | $42,582 | $9,552 | | $9,552 | 1.37% |
| 82 | IMT 2005-1 [3] | Prime 2005 | $6,880,626 | $187,841 | $85,707 | $19,226 | | $19,226 | 1.37% |
| 83 | IMT 2005-1 [4AX] | Prime 2005 | $2,274,273 | $62,088 | $29,700 | $6,662 | | $6,662 | 1.37% |
| 84 | IMT 2005-1 [4PAX] | Prime 2005 | $1,033,567 | $28,216 | $14,089 | $3,161 | | $3,161 | 1.37% |
| 85 | IMT 2005-1 [5AX] | Prime 2005 | $6,182,660 | $168,787 | $74,955 | $16,814 | | $16,814 | 1.37% |
| 86 | IMT 2005-1 [5DSC] | Prime 2005 | $2,895,511 | $79,047 | $34,963 | $7,843 | | $7,843 | 1.37% |
| 87 | IMT 2005-1 [6AX] | Prime 2005 | $184,303 | $5,031 | $2,685 | $602 | | $602 | 1.37% |
| 88 | IMT 2005-1 [6DSC] | Prime 2005 | $1,399,081 | $38,195 | $20,469 | $4,592 | | $4,592 | 1.37% |
| 89 | IMT 2005-1 [6PAX] | Prime 2005 | $126,814 | $3,462 | $1,852 | $415 | | $415 | 1.37% |
| 90 | IMT 2006-7 [1] | ALT-A 2006 | $43,260,724 | $2,119,775 | $728,947 | $163,520 | | $163,520 | 2.45% |
| 91 | IMT 2006-7 [2] | ALT-A 2006 | $88,701,867 | $4,346,391 | $1,493,451 | $335,017 | | $335,017 | 2.45% |
| 92 | IMT 2006-7 [3] | ALT-A 2006 | $36,380,967 | $1,782,667 | $611,745 | $137,229 | | $137,229 | 2.45% |
| 93 | IMT 2006-7 [4] | ALT-A 2006 | $6,521,560 | $319,556 | $109,337 | $24,527 | | $24,527 | 2.45% |
| 94 | LUM 2006-3 [I_1] | ALT-A 2006 | $52,211,565 | $14,804,384 | $5,168,513 | $2,318,842 | | $2,318,842 | 28.35% |
| 95 | LUM 2006-3 [I_2] | ALT-A 2006 | $58,886,998 | $16,697,177 | $5,767,445 | $2,587,551 | | $2,587,551 | 28.35% |
| 96 | LUM 2006-3 [II_1] | ALT-A 2006 | $12,113,155 | $3,434,638 | $1,187,769 | $532,890 | | $532,890 | 28.35% |
| 97 | LUM 2006-3 [II_2] | ALT-A 2006 | $43,085,895 | $12,216,836 | $4,215,120 | $1,891,104 | | $1,891,104 | 28.35% |
| 98 | LUM 2006-3 [II_3] | ALT-A 2006 | $18,810,110 | $5,333,533 | $1,848,016 | $829,108 | | $829,108 | 28.35% |
| 99 | LUM 2006-5 [Total] | Pay Option ARM 2006 | $151,787,226 | $78,716,856 | $28,697,131 | $12,874,902 | | $12,874,902 | 51.86% |
| 100 | LUM 2006-6 [Total] | Pay Option ARM 2006 | $204,139,613 | $158,534,823 | $57,935,169 | $12,484,155 | | $12,484,155 | 37.30% |
| 101 | LUM 2007-2 [1] | ALT-A 2007 | $139,923,492 | $2,777,722 | $950,751 | $213,276 | | $213,276 | 0.99% |
| 102 | LUM 2007-2 [2] | ALT-A 2007 | $46,579,284 | $924,679 | $321,573 | $72,137 | | $72,137 | 0.99% |

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 103 | UXS 2006-12N [1_A1] | ALT-A 2006 | $12,759,272 | $2,139,730 | $746,096 | $334,734 | | $334,734 | 16.77% |
| 104 | UXS 2006-12N [1_A2] | ALT-A 2006 | $121,274,042 | $20,337,657 | $7,042,610 | $3,159,651 | | $3,159,651 | 16.77% |
| 105 | UXS 2006-12N [1_A3] | ALT-A 2006 | $9,580,485 | $1,673,727 | $577,174 | $258,948 | | $258,948 | 16.77% |
| 106 | UXS 2006-12N [1_A4] | ALT-A 2006 | $168,869,254 | $28,319,374 | $9,797,652 | $4,395,694 | | $4,395,694 | 16.77% |
| 107 | UXS 2006-12N [1_F] | ALT-A 2006 | $73,996,865 | $12,409,274 | $4,285,596 | $1,922,723 | | $1,922,723 | 16.77% |
| 108 | UXS 2006-12N [2_A1] | ALT-A 2006 | $8,758,782 | $1,468,848 | $511,009 | $229,263 | | $229,263 | 16.77% |
| 109 | UXS 2006-12N [2_A2] | ALT-A 2006 | $13,334,144 | $2,236,136 | $777,239 | $348,707 | | $348,707 | 16.77% |
| 110 | UXS 2006-12N [2_A3] | ALT-A 2006 | $4,268,275 | $715,790 | $247,722 | $111,140 | | $111,140 | 16.77% |
| 111 | UXS 2006-12N [2_A4] | ALT-A 2006 | $118,921,047 | $19,943,060 | $6,918,200 | $3,103,834 | | $3,103,834 | 16.77% |
| 112 | UXS 2007-12N [1] | Pay Option ARM 2007 | $264,852,925 | $7,233,852 | $2,637,953 | $1,183,512 | | $1,183,512 | 2.73% |
| 113 | UXS 2007-12N [2] | Pay Option ARM 2007 | $162,901,077 | $4,449,271 | $1,617,227 | $725,587 | | $725,587 | 2.73% |
| 114 | UXS 2007-12N [3] | Pay Option ARM 2007 | $81,972,681 | $2,238,896 | $826,252 | $370,696 | | $370,696 | 2.73% |
| 115 | UXS 2007-15N [FOUR_0PP] | Pay Option ARM 2007 | $48,148,709 | $7,461,372 | $2,759,790 | $1,238,174 | Ambac | $1,238,174 | 15.50% |
| 116 | UXS 2007-15N [FOUR_1PP] | Pay Option ARM 2007 | $89,905,345 | $13,932,196 | $5,207,304 | $2,336,245 | Ambac | $2,336,245 | 15.50% |
| 117 | UXS 2007-15N [FOUR_2PP] | Pay Option ARM 2007 | $10,493,561 | $1,626,136 | $601,141 | $269,701 | Ambac | $269,701 | 15.50% |
| 118 | UXS 2007-15N [FOUR_3PP] | Pay Option ARM 2007 | $177,108,227 | $27,445,605 | $10,285,073 | $4,614,374 | Ambac | $4,614,374 | 15.50% |
| 119 | UXS 2007-15N [ONE] | Pay Option ARM 2007 | $598,993,775 | $15,340,587 | $5,723,555 | $2,567,860 | | $2,567,860 | 15.50% |
| 120 | UXS 2007-15N [ONE_C] | Pay Option ARM 2007 | $121,337,676 | $18,803,113 | $6,872,049 | $3,083,129 | | $3,083,129 | 15.50% |
| 121 | UXS 2007-15N [THREE_0PP] | Pay Option ARM 2007 | $19,659,149 | $3,046,483 | $1,082,992 | $485,882 | Ambac | $485,882 | 15.50% |
| 122 | UXS 2007-15N [THREE_1PP] | Pay Option ARM 2007 | $35,652,109 | $5,524,835 | $1,958,517 | $878,684 | Ambac | $878,684 | 15.50% |
| 123 | UXS 2007-15N [THREE_2PP] | Pay Option ARM 2007 | $5,993,859 | $928,839 | $330,967 | $148,487 | Ambac | $148,487 | 15.50% |
| 124 | UXS 2007-15N [THREE_3PP] | Pay Option ARM 2007 | $100,719,466 | $15,608,008 | $5,550,007 | $2,489,998 | Ambac | $2,489,998 | 15.50% |
| 125 | UXS 2007-15N [TWO] | Pay Option ARM 2007 | $245,466,610 | $38,038,773 | $14,228,602 | $6,383,629 | | $6,383,629 | 15.50% |
| 126 | UXS 2007-2N [1_A1] | Pay Option ARM 2007 | $1,082,320 | $383,899 | $133,144 | $59,735 | | $59,735 | 35.47% |
| 127 | UXS 2007-2N [1_A2] | Pay Option ARM 2007 | $3,248,822 | $1,152,357 | $405,611 | $181,976 | | $181,976 | 35.47% |
| 128 | UXS 2007-2N [1_A3] | Pay Option ARM 2007 | $330,561 | $117,250 | $41,573 | $18,652 | | $18,652 | 35.47% |
| 129 | UXS 2007-2N [1_A4] | Pay Option ARM 2007 | $112,405,674 | $39,870,292 | $14,395,305 | $6,458,420 | | $6,458,420 | 35.47% |
| 130 | UXS 2007-2N [2_A4] | Pay Option ARM 2007 | $158,295,039 | $56,147,250 | $20,154,799 | $9,042,404 | | $9,042,404 | 35.47% |
| 131 | UXS 2007-2N [3_A1] | Pay Option ARM 2007 | $21,546,791 | $7,642,647 | $2,705,692 | $1,213,903 | | $1,213,903 | 35.47% |
| 132 | UXS 2007-2N [3_A2] | Pay Option ARM 2007 | $51,753,618 | $18,357,008 | $6,578,430 | $2,951,398 | | $2,951,398 | 35.47% |
| 133 | UXS 2007-2N [3_A3] | Pay Option ARM 2007 | $7,631,789 | $2,706,996 | $975,613 | $437,706 | | $437,706 | 35.47% |
| 134 | UXS 2007-2N [3_A4] | Pay Option ARM 2007 | $154,186,537 | $54,689,965 | $19,598,987 | $8,793,040 | | $8,793,040 | 35.47% |
| 135 | UXS 2007-4N [1A1] | Pay Option ARM 2007 | $47,412,628 | $6,936,467 | $2,467,981 | $1,107,254 | | $1,107,254 | 14.63% |
| 136 | UXS 2007-4N [1A2] | Pay Option ARM 2007 | $156,586,498 | $22,908,605 | $8,298,792 | $3,723,234 | | $3,723,234 | 14.63% |
| 137 | UXS 2007-4N [1A3] | Pay Option ARM 2007 | $18,568,569 | $2,716,582 | $982,800 | $440,931 | | $440,931 | 14.63% |
| 138 | UXS 2007-4N [2A1] | Pay Option ARM 2007 | $99,970,709 | $14,625,715 | $5,230,289 | $2,346,557 | | $2,346,557 | 14.63% |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 139 | LXS 2007-4N [2A3] | Pay Option ARM 2007 | $21,243,932 | $3,107,987 | $1,123,884 | $504,228 | | $504,228 | 14.63% |
| 140 | LXS 2007-4N [2A4] | Pay Option ARM 2007 | $235,948,818 | $34,519,312 | $12,406,217 | $5,566,021 | | $5,566,021 | 14.63% |
| 141 | LXS 2007-4N [3A4] | Pay Option ARM 2007 | $226,154,568 | $33,086,413 | $11,954,194 | $5,363,222 | | $5,363,222 | 14.63% |
| 142 | MALT 2004-12 [1] | ALT-A 2004 | $101,129 | $5,056 | $5,363 | $440 | | $440 | 2.50% |
| 143 | MALT 2004-12 [2] | ALT-A 2004 | $2,388,183 | $119,409 | $51,116 | $11,466 | | $11,466 | 2.50% |
| 144 | MALT 2004-12 [3] | ALT-A 2004 | $5,180,106 | $259,005 | $108,376 | $24,311 | | $24,311 | 2.50% |
| 145 | MALT 2004-12 [4] | ALT-A 2004 | $1,159,534 | $57,977 | $22,763 | $5,106 | | $5,106 | 2.50% |
| 146 | MALT 2004-12 [5] | ALT-A 2004 | $3,861,040 | $193,052 | $80,355 | $18,026 | | $18,026 | 2.50% |
| 147 | MALT 2004-12 [6] | ALT-A 2004 | $1,942,089 | $97,104 | $38,802 | $8,704 | | $8,704 | 2.50% |
| 148 | MALT 2004-12 [1] | ALT-A 2004 | $1,308,973 | $65,449 | $26,476 | $5,939 | | $5,939 | 2.50% |
| 149 | MALT 2004-4 [10] | ALT-A 2004 | $288,810 | $14,441 | $5,760 | $1,292 | | $1,292 | 2.50% |
| 150 | MALT 2004-4 [11] | ALT-A 2004 | $766,889 | $38,344 | $16,274 | $3,651 | | $3,651 | 2.50% |
| 151 | MALT 2004-4 [2] | ALT-A 2004 | $476,273 | $23,814 | $9,952 | $2,232 | | $2,232 | 2.50% |
| 152 | MALT 2004-4 [3] | ALT-A 2004 | $367,149 | $18,357 | $7,126 | $1,598 | | $1,598 | 2.50% |
| 153 | MALT 2004-4 [4] | ALT-A 2004 | $501,905 | $25,095 | $10,195 | $2,287 | | $2,287 | 2.50% |
| 154 | MALT 2004-4 [5] | ALT-A 2004 | $655,641 | $32,782 | $13,479 | $3,024 | | $3,024 | 2.50% |
| 155 | MALT 2004-4 [6] | ALT-A 2004 | $1,280,753 | $64,038 | $25,256 | $5,666 | | $5,666 | 2.50% |
| 156 | MALT 2004-4 [7] | ALT-A 2004 | $1,775,705 | $88,785 | $37,714 | $8,460 | | $8,460 | 2.50% |
| 157 | MALT 2004-4 [8] | ALT-A 2004 | $1,296,430 | $64,821 | $28,641 | $6,425 | | $6,425 | 2.50% |
| 158 | MALT 2004-4 [9] | ALT-A 2004 | $970,557 | $48,528 | $19,194 | $4,317 | | $4,317 | 2.50% |
| 159 | MALT 2004-6 [1] | ALT-A 2004 | $711,599 | $64,044 | $25,004 | $5,609 | | $5,609 | 4.50% |
| 160 | MALT 2004-6 [10] | ALT-A 2004 | $2,620,503 | $235,845 | $98,390 | $22,071 | | $22,071 | 4.50% |
| 161 | MALT 2004-6 [2] | ALT-A 2004 | $574,699 | $6,723 | $2,610 | $585 | | $585 | 4.50% |
| 162 | MALT 2004-6 [3] | ALT-A 2004 | $763,516 | $68,716 | $26,864 | $6,026 | | $6,026 | 4.50% |
| 163 | MALT 2004-6 [4] | ALT-A 2004 | $1,102,081 | $99,187 | $40,123 | $9,001 | | $9,001 | 4.50% |
| 164 | MALT 2004-6 [5] | ALT-A 2004 | $605,915 | $54,532 | $22,171 | $4,973 | | $4,973 | 4.50% |
| 165 | MALT 2004-6 [6] | ALT-A 2004 | $2,078,379 | $187,054 | $81,031 | $18,177 | | $18,177 | 4.50% |
| 166 | MALT 2004-6 [7] | ALT-A 2004 | $4,838,506 | $435,466 | $178,441 | $40,029 | | $40,029 | 4.50% |
| 167 | MALT 2004-6 [8] | ALT-A 2004 | $2,146,287 | $193,166 | $77,904 | $17,476 | | $17,476 | 4.50% |
| 168 | MALT 2004-6 [9] | ALT-A 2004 | $1,188,107 | $106,930 | $44,008 | $9,872 | | $9,872 | 4.50% |
| 169 | MALT 2007-1 [1] | ALT-A 2004 | $4,963,932 | $446,754 | $183,960 | $41,267 | | $41,267 | 4.50% |
| 170 | MALT 2007-1 [10] | ALT-A 2004 | $422,391 | $38,015 | $15,427 | $3,461 | | $3,461 | 4.50% |
| 171 | MALT 2007-1 [2] | ALT-A 2004 | $768,568 | $69,171 | $27,900 | $6,259 | | $6,259 | 4.50% |
| 172 | MALT 2007-1 [3] | ALT-A 2004 | $1,382,732 | $124,446 | $53,126 | $11,918 | | $11,918 | 4.50% |
| 173 | MALT 2007-1 [4] | ALT-A 2004 | $556,620 | $53,696 | $21,124 | $4,759 | | $4,759 | 4.50% |
| 174 | MALT 2007-1 [5] | ALT-A 2004 | $118,139 | $10,633 | $4,128 | $926 | | $926 | 4.50% |
| 175 | MALT 2007-1 [6] | ALT-A 2004 | $342,018 | $30,782 | $12,420 | $2,786 | | $2,786 | 4.50% |
| 176 | MALT 2007-1 [7] | ALT-A 2004 | $907,688 | $81,692 | $32,934 | $7,383 | | $7,383 | 4.50% |
| 177 | MALT 2007-1 [8] | ALT-A 2004 | $394,654 | $35,519 | $14,262 | $3,199 | | $3,199 | 4.50% |
| 178 | MALT 2007-1 [9] | ALT-A 2004 | $3,712,985 | $334,169 | $139,584 | $31,312 | | $31,312 | 4.50% |
| 179 | MALT 2008-1 [1] | ALT-A 2004 | $4,255,942 | $383,035 | $164,971 | $37,007 | | $37,007 | 4.50% |
| 180 | MALT 2008-1 [2] | ALT-A 2004 | $3,075,089 | $276,758 | $115,271 | $25,858 | | $25,858 | 4.50% |
| 181 | MALT 2008-1 [3] | ALT-A 2004 | $1,047,024 | $94,232 | $37,705 | $8,458 | | $8,458 | 4.50% |
| 182 | MALT 2008-1 [4] | ALT-A 2004 | $781,886 | $70,370 | $28,982 | $6,501 | | $6,501 | 4.50% |
| 183 | MALT 2008-1 [5] | ALT-A 2004 | $981,912 | $88,372 | $36,364 | $8,157 | | $8,157 | 4.50% |
| 184 | MALT 2008-1 [6] | ALT-A 2004 | $701,074 | $63,097 | $25,297 | $5,675 | | $5,675 | 4.50% |
| 185 | MALT 2008-1 [7] | ALT-A 2004 | $483,952 | $43,556 | $17,327 | $3,887 | | $3,887 | 4.50% |
| 186 | MALT 2008-1 [8] | ALT-A 2004 | $900,527 | $81,047 | $35,418 | $7,945 | | $7,945 | 4.50% |
| 187 | MALT 2005-3 [1] | ALT-A 2005 | $5,722,411 | $286,121 | $114,043 | $25,583 | | $25,583 | 2.50% |
| 188 | MALT 2005-3 [2] | ALT-A 2005 | $1,648,416 | $82,421 | $33,853 | $7,594 | | $7,594 | 2.50% |
| 189 | MALT 2005-3 [3] | ALT-A 2005 | $2,816,526 | $140,826 | $60,018 | $13,463 | | $13,463 | 2.50% |
| 190 | MALT 2005-3 [4] | ALT-A 2005 | $1,649,965 | $82,498 | $33,249 | $7,234 | | $7,234 | 2.50% |
| 191 | MALT 2005-3 [5] | ALT-A 2005 | $1,300,464 | $65,023 | $26,070 | $5,848 | | $5,848 | 2.50% |
| 192 | MALT 2005-3 [6] | ALT-A 2005 | $10,665,943 | $533,297 | $216,590 | $48,586 | | $48,586 | 2.50% |
| 193 | MALT 2005-3 [7] | ALT-A 2005 | $2,040,439 | $102,022 | $43,433 | $9,743 | | $9,743 | 2.50% |
| 194 | MALT 2005-4 [1] | ALT-A 2005 | $5,008,845 | $450,796 | $193,887 | $43,493 | | $43,493 | 4.50% |
| 195 | MALT 2005-4 [2] | ALT-A 2005 | $4,675,166 | $420,765 | $179,990 | $40,376 | | $40,376 | 4.50% |

Case 14-cv-03039-GBD    Document 11-1    Filed 11/06/14    Page 332 of 355
Subject to FRE 408 and Confidential Due Diligence

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 196 | MALT 2005-4 [3] | ALT-A 2005 | $4,463,070 | $401,676 | $166,775 | $37,412 | | $37,412 | 4.50% |
| 197 | MALT 2005-4 [4] | ALT-A 2005 | $1,426,584 | $128,393 | $51,075 | $11,457 | | $11,457 | 4.50% |
| 198 | MALT 2005-4 [5] | ALT-A 2005 | $5,163,310 | $464,698 | $197,676 | $44,343 | | $44,343 | 4.50% |
| 199 | MALT 2005-5 [1] | ALT-A 2005 | $401,371 | $20,069 | $57,790 | $5,747 | | $5,747 | 2.50% |
| 200 | MALT 2005-5 [2] | ALT-A 2005 | $3,151,283 | $157,564 | $62,943 | $14,120 | | $14,120 | 2.50% |
| 201 | MALT 2005-5 [3] | ALT-A 2005 | $20,915,721 | $1,045,786 | $437,240 | $98,083 | | $98,083 | 2.50% |
| 202 | MALT 2005-5 [4] | ALT-A 2005 | $2,466,671 | $123,334 | $52,763 | $11,836 | | $11,836 | 2.50% |
| 203 | MALT 2005-5 [5] | ALT-A 2005 | $4,848,785 | $242,439 | $100,128 | $22,461 | | $22,461 | 2.50% |
| 204 | RAU 1999-QS4 [Total] | ALT-A 1999 | $230,773 | $230,773 | $30,724 | $13,784 | | $13,784 | 100.00% |
| 205 | RAU 2001-QS13 [Total] | ALT-A 2001 | $346,324 | $346,324 | $91,112 | $40,877 | | $40,877 | 100.00% |
| 206 | RAU 2001-QS16 [Total] | ALT-A 2001 | $2,113,267 | $2,113,267 | $548,624 | $246,139 | | $246,139 | 100.00% |
| 207 | RAU 2001-QS17 [Total] | ALT-A 2001 | $2,187,528 | $2,187,528 | $561,927 | $252,107 | MBIA - Insurer Exception | $252,107 | 100.00% |
| 208 | RAU 2001-QS18 [Total] | ALT-A 2001 | $2,995,344 | $2,995,344 | $774,161 | $347,325 | | $347,325 | 100.00% |
| 209 | RAU 2001-QS19 [Total] | ALT-A 2001 | $350,949 | $350,949 | $91,637 | $41,113 | | $41,113 | 100.00% |
| 210 | RAU 2002-QS1 [Total] | ALT-A 2002 | $2,212,425 | $2,212,425 | $557,330 | $250,045 | | $250,045 | 100.00% |
| 211 | RAU 2002-QS10 [Total] | ALT-A 2002 | $638,581 | $638,581 | $159,531 | $71,573 | | $71,573 | 100.00% |
| 212 | RAU 2002-QS11 [Total] | ALT-A 2002 | $3,238,550 | $3,238,550 | $826,328 | $370,730 | | $370,730 | 100.00% |
| 213 | RAU 2002-QS12 [Total] | ALT-A 2002 | $3,791,820 | $3,791,820 | $954,960 | $428,441 | | $428,441 | 100.00% |
| 214 | RAU 2002-QS13 [Total] | ALT-A 2002 | $671,875 | $671,875 | $173,560 | $77,867 | | $77,867 | 100.00% |
| 215 | RAU 2002-QS14 [Total] | ALT-A 2002 | $2,318,529 | $2,318,529 | $575,662 | $258,359 | | $258,359 | 100.00% |
| 216 | RAU 2002-QS15 [1] | ALT-A 2002 | $2,591,745 | $2,591,745 | $644,412 | $289,114 | | $289,114 | 100.00% |
| 217 | RAU 2002-QS15 [2] | ALT-A 2002 | $1,167,494 | $1,167,494 | $289,364 | $129,822 | MBIA - Insurer Exception | $129,822 | 100.00% |
| 218 | RAU 2002-QS16 [Total] | ALT-A 2002 | $368,653 | $368,653 | $92,674 | $41,578 | | $41,578 | 100.00% |
| 219 | RAU 2002-QS17 [1] | ALT-A 2002 | $3,540,853 | $3,540,853 | $888,852 | $398,781 | | $398,781 | 100.00% |
| 220 | RAU 2002-QS17 [2] | ALT-A 2002 | $1,984,272 | $1,984,272 | $501,596 | $225,040 | | $225,040 | 100.00% |
| 221 | RAU 2002-QS18 [Total] | ALT-A 2002 | $793,671 | $793,671 | $200,279 | $89,855 | | $89,855 | 100.00% |
| 222 | RAU 2002-QS19 [Total] | ALT-A 2002 | $6,987,448 | $6,987,448 | $1,724,906 | $773,875 | | $773,875 | 100.00% |
| 223 | RAU 2002-QS2 [Total] | ALT-A 2002 | $1,929,280 | $1,929,280 | $491,863 | $220,673 | | $220,673 | 100.00% |
| 224 | RAU 2002-QS3 [Total] | ALT-A 2002 | $4,018,979 | $4,018,979 | $1,015,285 | $455,505 | | $455,505 | 100.00% |
| 225 | RAU 2002-QS4 [Total] | ALT-A 2002 | $489,411 | $489,411 | $127,502 | $57,203 | | $57,203 | 100.00% |
| 226 | RAU 2002-QS5 [Total] | ALT-A 2002 | $4,104,647 | $4,104,647 | $1,053,114 | $472,477 | | $472,477 | 100.00% |
| 227 | RAU 2002-QS6 [Total] | ALT-A 2002 | $4,672,740 | $4,672,740 | $1,189,908 | $533,850 | | $533,850 | 100.00% |
| 228 | RAU 2002-QS7 [Total] | ALT-A 2002 | $3,061,206 | $3,061,206 | $770,981 | $345,899 | | $345,899 | 100.00% |
| 229 | RAU 2002-QS8 [Total] | ALT-A 2002 | $401,401 | $401,401 | $104,368 | $46,825 | | $46,825 | 100.00% |
| 230 | RAU 2002-QS9 [Total] | ALT-A 2002 | $3,469,375 | $3,469,375 | $890,621 | $399,575 | | $399,575 | 100.00% |
| 231 | RAU 2003-QA1 [1] | ALT-A 2003 | $1,885,046 | $1,885,046 | $727,323 | $326,312 | | $326,312 | 100.00% |
| 232 | RAU 2003-QA1 [2] | ALT-A 2003 | $943,195 | $943,195 | $363,770 | $163,204 | | $163,204 | 100.00% |

Case 14-cv-03039-GBD    Document 15-1    Filed 11/06/14    Page 333 of 355
Subject to FRE 408 - Confidential Settlement Material - Subject to Privilege

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| RAU 2003-QS1 [Total] | ALT-A 2003 | $4,991,061 | $4,991,061 | $1,901,733 | $853,208 | MBIA - Insurer Exception | $853,208 | 100.00% |
| RAU 2003-QS10 [Total] | ALT-A 2003 | $7,555,943 | $7,555,943 | $2,808,136 | $1,259,864 | | $1,259,864 | 100.00% |
| RAU 2003-QS11 [Total] | ALT-A 2003 | $9,179,197 | $9,179,197 | $3,440,321 | $1,543,492 | | $1,543,492 | 100.00% |
| RAU 2003-QS12 [Total] | ALT-A 2003 | $819,357 | $819,357 | $308,398 | $138,362 | | $138,362 | 100.00% |
| RAU 2003-QS13 [Total] | ALT-A 2003 | $8,449,079 | $8,449,079 | $3,088,336 | $1,385,575 | | $1,385,575 | 100.00% |
| RAU 2003-QS14 [Total] | ALT-A 2003 | $778,491 | $778,491 | $293,881 | $131,849 | | $131,849 | 100.00% |
| RAU 2003-QS15 [Total] | ALT-A 2003 | $8,645,770 | $8,645,770 | $3,218,095 | $1,443,791 | | $1,443,791 | 100.00% |
| RAU 2003-QS16 [Total] | ALT-A 2003 | $1,004,680 | $1,004,680 | $376,335 | $168,842 | | $168,842 | 100.00% |
| RAU 2003-QS17 [1] | ALT-A 2003 | $1,469,720 | $1,469,720 | $533,648 | $239,420 | | $239,420 | 100.00% |
| RAU 2003-QS17 [2] | ALT-A 2003 | $7,034,848 | $7,034,848 | $2,630,344 | $1,180,098 | | $1,180,098 | 100.00% |
| RAU 2003-QS17 [3] | ALT-A 2003 | $1,060,655 | $1,060,655 | $371,690 | $166,758 | | $166,758 | 100.00% |
| RAU 2003-QS18 [Total] | ALT-A 2003 | $457,048 | $457,048 | $168,075 | $75,407 | | $75,407 | 100.00% |
| RAU 2003-QS19 [1] | ALT-A 2003 | $1,997,437 | $1,997,437 | $730,074 | $327,546 | | $327,546 | 100.00% |
| RAU 2003-QS19 [2] | ALT-A 2003 | $2,732,604 | $2,732,604 | $1,005,819 | $451,258 | | $451,258 | 100.00% |
| RAU 2003-QS19 [3] | ALT-A 2003 | $2,921,132 | $2,921,132 | $1,110,872 | $498,390 | | $498,390 | 100.00% |
| RAU 2003-QS2 [Total] | ALT-A 2003 | $4,246,654 | $4,246,654 | $1,586,257 | $711,671 | | $711,671 | 100.00% |
| RAU 2003-QS20 [1] | ALT-A 2003 | $78,920 | $78,920 | $26,181 | $11,746 | | $11,746 | 100.00% |
| RAU 2003-QS20 [2] | ALT-A 2003 | $821,353 | $821,353 | $302,944 | $135,915 | | $135,915 | 100.00% |
| RAU 2003-QS21 [Total] | ALT-A 2003 | $6,586,508 | $6,586,508 | $2,493,625 | $1,118,759 | | $1,118,759 | 100.00% |
| RAU 2003-QS22 [Total] | ALT-A 2003 | $5,473,878 | $5,473,878 | $2,054,235 | $921,628 | | $921,628 | 100.00% |
| RAU 2003-QS23 [Total] | ALT-A 2003 | $740,798 | $740,798 | $280,771 | $125,967 | | $125,967 | 100.00% |
| RAU 2003-QS3 [Total] | ALT-A 2003 | $712,343 | $712,343 | $272,950 | $122,458 | | $122,458 | 100.00% |
| RAU 2003-QS4 [Total] | ALT-A 2003 | $5,001,964 | $5,001,964 | $1,869,223 | $838,623 | | $838,623 | 100.00% |
| RAU 2003-QS5 [Total] | ALT-A 2003 | $911,196 | $911,196 | $348,817 | $156,496 | | $156,496 | 100.00% |
| RAU 2003-QS6 [Total] | ALT-A 2003 | $4,005,808 | $4,005,808 | $1,493,456 | $670,035 | | $670,035 | 100.00% |
| RAU 2003-QS7 [Total] | ALT-A 2003 | $3,777,491 | $3,777,491 | $1,419,217 | $636,728 | | $636,728 | 100.00% |
| RAU 2003-QS8 [Total] | ALT-A 2003 | $4,468,434 | $4,468,434 | $1,686,423 | $756,610 | MBIA - Insurer Exception | $756,610 | 100.00% |
| RAU 2003-QS9 [Total] | ALT-A 2003 | $602,679 | $602,679 | $221,661 | $99,448 | | $99,448 | 100.00% |
| RAMP 2001-RS1 [1] | Subprime 2001 | $14,132,854 | $14,132,854 | $3,949,951 | $1,772,137 | AMBAC | $1,772,137 | 100.00% |
| RAMP 2001-RS1 [2] | Subprime 2001 | $11,341,710 | $11,341,710 | $3,165,463 | $1,420,178 | AMBAC | $1,420,178 | 100.00% |
| RAMP 2001-RS2 [2] | Subprime 2001 | $11,907,960 | $11,907,960 | $3,327,456 | $1,492,855 | | $1,492,855 | 100.00% |
| RAMP 2001-RS8 [1] | Subprime 2001 | $21,405,338 | $21,405,338 | $5,988,384 | $2,686,675 | AMBAC | $2,686,675 | 100.00% |
| RAMP 2001-RS3 [2] | Subprime 2001 | $10,762,120 | $10,762,120 | $3,013,877 | $1,352,169 | AMBAC | $1,352,169 | 100.00% |

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 266 | RAMP 2002-RS1 [1] | Subprime 2002 | $15,650,018 | $15,650,018 | $4,381,800 | $1,965,884 | AMBAC – Insurer Exception | $1,965,884 | 100.00% |
| 267 | RAMP 2002-RS1 [2] | Subprime 2002 | $8,010,927 | $8,010,927 | $4,234,281 | $1,002,405 | | $1,002,405 | 100.00% |
| 268 | RAMP 2002-RS2 [1] | Subprime 2002 | $13,420,166 | $13,420,166 | $3,769,842 | $1,691,331 | AMBAC – Insurer Exception | $1,691,331 | 100.00% |
| 269 | RAMP 2002-RS2 [2] | Subprime 2002 | $7,613,438 | $7,613,438 | $2,123,105 | $952,526 | | $952,526 | 100.00% |
| 270 | RAMP 2002-RS3 [1] | Subprime 2002 | $13,633,615 | $13,633,615 | $3,839,770 | $1,722,704 | | $1,722,704 | 100.00% |
| 271 | RAMP 2002-RS3 [2] | Subprime 2002 | $10,936,054 | $10,936,054 | $3,054,772 | $1,370,517 | | $1,370,517 | 100.00% |
| 272 | RAMP 2002-RS4 [1] | Subprime 2002 | $11,211,680 | $11,211,680 | $3,164,609 | $1,419,794 | AMBAC | $1,419,794 | 100.00% |
| 273 | RAMP 2002-RS4 [2] | Subprime 2002 | $14,059,649 | $14,059,649 | $3,916,317 | $1,757,047 | AMBAC | $1,757,047 | 100.00% |
| 274 | RAMP 2002-RS5 [1] | Subprime 2002 | $9,234,594 | $9,234,594 | $2,615,195 | $1,173,301 | Ambac | $1,173,301 | 100.00% |
| 275 | RAMP 2002-RS5 [2] | Subprime 2002 | $10,619,297 | $10,619,297 | $2,972,842 | $1,333,759 | Ambac | $1,333,759 | 100.00% |
| 276 | RAMP 2002-RS6 [1] | Subprime 2002 | $16,016,644 | $16,016,644 | $4,543,938 | $2,038,627 | Ambac | $2,038,627 | 100.00% |
| 277 | RAMP 2002-RS6 [2] | Subprime 2002 | $15,089,905 | $15,089,905 | $4,212,280 | $1,889,830 | Ambac | $1,889,830 | 100.00% |
| 278 | RAMP 2002-RS7 [Total] | Subprime 2003 | $9,011,820 | $9,011,820 | $3,840,950 | $1,723,233 | Ambac | $1,723,233 | 100.00% |
| 279 | RAMP 2002-R22 [Total] | Subprime 2002 | $13,272,629 | $13,272,629 | $3,732,358 | $1,674,514 | | $1,674,514 | 100.00% |
| 280 | RAMP 2002-R23 [Total] | Subprime 2002 | $24,688,747 | $24,688,747 | $6,961,306 | $3,123,174 | | $3,123,174 | 100.00% |
| 281 | RAMP 2002-R24 [Total] | Subprime 2002 | $21,679,381 | $21,679,381 | $6,121,335 | $2,746,323 | Ambac | $2,746,323 | 100.00% |
| 282 | RAMP 2002-SL1 [1] | Subprime 2002 | $280,138 | $280,138 | $80,344 | $36,046 | | $36,046 | 100.00% |
| 283 | RAMP 2002-SL1 [2A] | Subprime 2002 | $10,996 | $10,996 | $3,152 | $1,414 | | $1,414 | 100.00% |
| 284 | RAMP 2002-SL1 [2B] | Subprime 2002 | $59,376 | $59,376 | $17,325 | $7,773 | | $7,773 | 100.00% |
| 285 | RAMP 2002-SL1 [2C] | Subprime 2002 | $98,547 | $98,547 | $28,551 | $12,809 | | $12,809 | 100.00% |
| 286 | RAMP 2002-SL1 [2D] | Subprime 2002 | $232,276 | $232,276 | $67,534 | $30,299 | | $30,299 | 100.00% |
| 287 | RAMP 2003-RS1 [1] | Subprime 2003 | $10,364,254 | $10,364,254 | $4,417,266 | $1,981,796 | | $1,981,796 | 100.00% |
| 288 | RAMP 2003-RS1 [2] | Subprime 2003 | $24,844,822 | $24,844,822 | $10,401,836 | $4,666,760 | Ambac | $4,666,760 | 100.00% |
| 289 | RAMP 2003-RS10 [1] | Subprime 2003 | $22,668,886 | $22,668,886 | $9,708,179 | $4,355,552 | | $4,355,552 | 100.00% |
| 290 | RAMP 2003-RS10 [2A] | Subprime 2003 | $40,179,464 | $40,179,464 | $16,827,111 | $7,549,444 | | $7,549,444 | 100.00% |
| 291 | RAMP 2003-RS10 [2B] | Subprime 2003 | $30,464,898 | $30,464,898 | $12,771,782 | $5,730,030 | | $5,730,030 | 100.00% |
| 292 | RAMP 2003-RS11 [1] | Subprime 2003 | $44,966,337 | $44,966,337 | $19,307,346 | $8,662,196 | AMBAC – Insurer Exception | $8,662,196 | 100.00% |
| 293 | RAMP 2003-RS11 [2A] | Subprime 2003 | $44,931,647 | $44,931,647 | $18,849,493 | $8,456,782 | | $8,456,782 | 100.00% |
| 294 | RAMP 2003-RS11 [2B] | Subprime 2003 | $18,066,135 | $18,066,135 | $7,582,862 | $3,402,033 | | $3,402,033 | 100.00% |
| 295 | RAMP 2003-RS2 [1] | Subprime 2003 | $22,021,385 | $22,021,385 | $9,365,718 | $4,201,908 | AMBAC | $4,201,908 | 100.00% |
| 296 | RAMP 2003-RS2 [2] | Subprime 2003 | $43,181,011 | $43,181,011 | $18,073,396 | $8,108,588 | AMBAC | $8,108,588 | 100.00% |
| 297 | RAMP 2003-RS3 [1] | Subprime 2003 | $12,523,691 | $12,523,691 | $5,329,499 | $2,391,067 | AMBAC | $2,391,067 | 100.00% |
| 298 | RAMP 2003-RS3 [2] | Subprime 2003 | $40,909,244 | $40,909,244 | $17,115,331 | $7,678,754 | AMBAC | $7,678,754 | 100.00% |

Case 14-cv-03039-GBD   Document 51-1   Filed 11/06/14   Page 335 of 355

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 299 | RAMP 2003-RS4 [1] | Subprime 2003 | $17,709,588 | $17,709,588 | $7,595,867 | $3,407,868 | AMBAC | $3,407,868 | 100.00% |
| 300 | RAMP 2003-RS4 [2A] | Subprime 2003 | $30,007,775 | $30,007,775 | $12,548,627 | $5,629,912 | AMBAC | $5,629,912 | 100.00% |
| 301 | RAMP 2003-RS5 [2B] | Subprime 2003 | $16,547,928 | $16,547,928 | $6,930,760 | $3,109,470 | AMBAC | $3,109,470 | 100.00% |
| 302 | RAMP 2003-RS5 [1] | Subprime 2003 | $25,876,571 | $25,876,571 | $11,083,386 | $4,972,536 | Ambac | $4,972,536 | 100.00% |
| 303 | RAMP 2003-RS5 [2A] | Subprime 2003 | $23,850,396 | $23,850,396 | $9,979,780 | $4,477,405 | Ambac | $4,477,405 | 100.00% |
| 304 | RAMP 2003-RS5 [2B] | Subprime 2003 | $15,570,469 | $15,570,469 | $6,520,512 | $2,925,413 | Ambac | $2,925,413 | 100.00% |
| 305 | RAMP 2003-RS6 [1] | Subprime 2003 | $21,360,746 | $21,360,746 | $9,132,558 | $4,097,301 | Ambac | $4,097,301 | 100.00% |
| 306 | RAMP 2003-RS6 [2A] | Subprime 2003 | $24,192,928 | $24,192,928 | $10,111,824 | $4,536,647 | Ambac | $4,536,647 | 100.00% |
| 307 | RAMP 2003-RS6 [2B] | Subprime 2003 | $12,830,082 | $12,830,082 | $5,381,549 | $2,414,419 | Ambac | $2,414,419 | 100.00% |
| 308 | RAMP 2003-RS7 [1] | Subprime 2003 | $29,695,244 | $29,695,244 | $12,798,855 | $5,742,177 | AMBAC - Insurer Exception | $5,742,177 | 100.00% |
| 309 | RAMP 2003-RS7 [2A] | Subprime 2003 | $27,743,671 | $27,743,671 | $11,609,845 | $5,208,730 | | $5,208,730 | 100.00% |
| 310 | RAMP 2003-RS7 [2B] | Subprime 2003 | $16,165,393 | $16,165,393 | $6,772,625 | $3,038,523 | | $3,038,523 | 100.00% |
| 311 | RAMP 2003-RS8 [1] | Subprime 2003 | $36,947,532 | $36,947,532 | $15,887,043 | $7,127,685 | Ambac - Insurer Exception | $7,127,685 | 100.00% |
| 312 | RAMP 2003-RS8 [2A] | Subprime 2003 | $28,788,872 | $28,788,872 | $12,056,797 | $5,409,254 | | $5,409,254 | 100.00% |
| 313 | RAMP 2003-RS8 [2B] | Subprime 2003 | $19,171,160 | $19,171,160 | $8,027,028 | $3,601,307 | | $3,601,307 | 100.00% |
| 314 | RAMP 2003-RS9 [1] | Subprime 2003 | $32,922,154 | $32,922,154 | $14,077,815 | $6,315,979 | AMBAC - Insurer Exception | $6,315,979 | 100.00% |
| 315 | RAMP 2003-RS9 [2A] | Subprime 2003 | $26,247,064 | $26,247,064 | $10,994,767 | $4,932,777 | | $4,932,777 | 100.00% |
| 316 | RAMP 2003-RS9 [2B] | Subprime 2003 | $21,828,237 | $21,828,237 | $9,156,296 | $4,107,951 | | $4,107,951 | 100.00% |
| 317 | RAMP 2003-R21 [1] | Subprime 2003 | $20,625,507 | $20,625,507 | $8,768,028 | $3,933,756 | AMBAC | $3,933,756 | 100.00% |
| 318 | RAMP 2003-R21 [2] | Subprime 2003 | $14,228,063 | $14,228,063 | $6,028,644 | $2,704,737 | AMBAC | $2,704,737 | 100.00% |
| 319 | RAMP 2003-R22 [Total] | Subprime 2003 | $13,651,172 | $13,651,172 | $5,810,718 | $2,606,965 | AMBAC | $2,606,965 | 100.00% |
| 320 | RAMP 2003-R23 [Total] | Subprime 2003 | $27,865,310 | $27,865,310 | $11,886,240 | $5,332,734 | Ambac - Insurer Exception | $5,332,734 | 100.00% |
| 321 | RAMP 2003-R24 [Total] | Subprime 2003 | $54,461,943 | $54,461,943 | $23,363,557 | $10,482,006 | AMBAC - Insurer Exception | $10,482,006 | 100.00% |
| 322 | RAMP 2003-R25 [1] | Subprime 2003 | $45,204,897 | $45,204,897 | $19,380,058 | $8,694,819 | AMBAC - Insurer Exception | $8,694,819 | 100.00% |
| 323 | RAMP 2003-R25 [2] | Subprime 2003 | $5,502,923 | $5,502,923 | $2,316,255 | $1,039,182 | | $1,039,182 | 100.00% |
| 324 | RAMP 2003-SL1 [1] | Subprime 2003 | $41,379 | $41,379 | $17,794 | $7,983 | | $7,983 | 100.00% |
| 325 | RAMP 2003-SL1 [2] | Subprime 2003 | $30,341 | $30,341 | $13,468 | $6,042 | | $6,042 | 100.00% |
| 326 | RAMP 2003-SL1 [3] | Subprime 2003 | $1,728,793 | $1,728,793 | $756,647 | $339,468 | | $339,468 | 100.00% |
| 327 | RAMP 2003-SL1 [4] | Subprime 2003 | $1,237,429 | $1,237,429 | $532,104 | $238,727 | | $238,727 | 100.00% |
| 328 | RASC 1999-RS1 [1] | Subprime 1999 | $3,271,293 | $3,271,293 | $458,048 | $205,502 | AMBAC | $205,502 | 100.00% |
| 329 | RASC 1999-RS1 [2] | Subprime 1999 | $1,172,316 | $1,172,316 | $165,441 | $74,225 | AMBAC | $74,225 | 100.00% |
| 330 | RASC 2001-KS1 [1] | Subprime 2001 | $61,786,753 | $61,786,753 | $17,263,424 | $7,745,195 | FGIC | $7,745,195 | 100.00% |
| 331 | RASC 2001-KS1 [2] | Subprime 2001 | $70,418,338 | $70,418,338 | $19,628,106 | $8,806,105 | FGIC | $8,806,105 | 100.00% |
| 332 | RASC 2001-KS2 [1] | Subprime 2001 | $69,532,628 | $69,532,628 | $19,446,611 | $8,724,677 | | $8,724,677 | 100.00% |
| 333 | RASC 2001-KS2 [2] | Subprime 2001 | $35,339,837 | $35,339,837 | $9,861,736 | $4,424,445 | | $4,424,445 | 100.00% |
| 334 | RASC 2001-KS3 [1] | Subprime 2001 | $67,512,554 | $67,512,554 | $18,901,985 | $8,480,332 | | $8,480,332 | 100.00% |
| 335 | RASC 2001-KS3 [2] | Subprime 2001 | $58,944,329 | $58,944,329 | $16,449,522 | $7,380,040 | | $7,380,040 | 100.00% |
| 336 | RASC 2002-KS1 [1] | Subprime 2002 | $100,533,095 | $100,533,095 | $28,127,835 | $12,619,488 | Ambac | $12,619,488 | 100.00% |

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| RASC 2002-KS1 [2A] | Subprime 2002 | $26,926,165 | $26,926,165 | $7,504,015 | $3,366,659 | Ambac | $3,366,659 | 100.00% |
| RASC 2002-KS1 [2B] | Subprime 2002 | $26,840,858 | $26,840,858 | $7,478,771 | $3,355,334 | Ambac | $3,355,334 | 100.00% |
| RASC 2002-KS2 [1] | Subprime 2002 | $44,357,508 | $44,357,508 | $12,442,338 | $5,582,226 | | $5,582,226 | 100.00% |
| RASC 2002-KS2 [2A] | Subprime 2002 | $13,595,798 | $13,595,798 | $3,780,295 | $1,696,021 | | $1,696,021 | 100.00% |
| RASC 2002-KS2 [2B] | Subprime 2002 | $13,595,809 | $13,595,809 | $3,780,298 | $1,696,022 | | $1,696,022 | 100.00% |
| RASC 2002-KS4 [1] | Subprime 2002 | $44,324,760 | $44,324,760 | $12,464,047 | $5,591,966 | AMBAC | $5,591,966 | 100.00% |
| RASC 2002-KS4 [2A] | Subprime 2002 | $34,783,228 | $34,783,228 | $9,722,434 | $4,361,948 | AMBAC | $4,361,948 | 100.00% |
| RASC 2002-KS4 [2B] | Subprime 2002 | $34,337,116 | $34,337,116 | $9,588,426 | $4,301,825 | AMBAC | $4,301,825 | 100.00% |
| RASC 2002-KS6 [1] | Subprime 2002 | $37,450,633 | $37,450,633 | $10,542,953 | $4,730,071 | AMBAC | $4,730,071 | 100.00% |
| RASC 2002-KS6 [2] | Subprime 2002 | $37,116,528 | $37,116,528 | $10,352,413 | $4,644,586 | AMBAC | $4,644,586 | 100.00% |
| RASC 2002-KS8 [Total] | Subprime 2002 | $41,213,623 | $41,213,623 | $11,524,230 | $5,170,319 | Ambac | $5,170,319 | 100.00% |
| RASC 2003-KS10 [1] | Subprime 2003 | $36,062,998 | $36,062,998 | $15,417,182 | $6,916,883 | | $6,916,883 | 100.00% |
| RASC 2003-KS11 [1] | Subprime 2003 | $25,208,245 | $25,208,245 | $10,736,647 | $4,816,075 | | $4,816,075 | 100.00% |
| RASC 2003-KS11 [2A] | Subprime 2003 | $25,164,232 | $25,164,232 | $10,548,434 | $4,732,530 | | $4,732,530 | 100.00% |
| RASC 2003-KS11 [2B] | Subprime 2003 | $30,336,825 | $30,336,825 | $12,726,069 | $5,709,522 | | $5,709,522 | 100.00% |
| RASC 2003-KS2 [1] | Subprime 2003 | $46,647,710 | $46,647,710 | $19,757,492 | $8,864,153 | | $8,864,153 | 100.00% |
| RASC 2003-KS3 [1] | Subprime 2003 | $9,847,245 | $9,847,245 | $4,133,359 | $1,854,422 | | $1,854,422 | 100.00% |
| RASC 2003-KS3 [2] | Subprime 2003 | $10,096,076 | $10,096,076 | $4,238,522 | $1,901,603 | | $1,901,603 | 100.00% |
| RASC 2003-KS4 [1] | Subprime 2003 | $36,794,295 | $36,794,295 | $15,616,612 | $7,005,460 | | $7,005,460 | 100.00% |
| RASC 2003-KS4 [2A] | Subprime 2003 | $9,417,078 | $9,417,078 | $3,947,390 | $1,770,988 | Ambac | $1,770,988 | 100.00% |
| RASC 2003-KS4 [2B] | Subprime 2003 | $7,651,177 | $7,651,177 | $3,210,074 | $1,440,192 | Ambac | $1,440,192 | 100.00% |
| RASC 2003-KS4 [3] | Subprime 2003 | $56,571,861 | $56,571,861 | $2,755,127 | $1,236,081 | Ambac | $1,236,081 | 100.00% |
| RASC 2003-KS5 [1] | Subprime 2003 | $14,238,356 | $14,238,356 | $6,071,074 | $2,723,773 | Ambac | $2,723,773 | 100.00% |
| RASC 2003-KS5 [2A] | Subprime 2003 | $11,586,959 | $11,586,959 | $4,864,246 | $2,182,333 | Ambac | $2,182,333 | 100.00% |
| RASC 2003-KS5 [2B] | Subprime 2003 | $8,969,353 | $8,969,353 | $3,762,123 | $1,687,868 | Ambac | $1,687,868 | 100.00% |
| RASC 2003-KS6z [1] | Subprime 2003 | $34,977,681 | $34,977,681 | $6,297,095 | $2,820,691 | | $2,820,691 | 100.00% |
| RASC 2003-KS7 [1] | Subprime 2003 | $56,139,116 | $56,139,116 | $2,579,958 | $1,157,492 | | $1,157,492 | 100.00% |
| RASC 2003-KS7 [1] | Subprime 2003 | $39,857,359 | $39,857,359 | $16,990,338 | $7,622,676 | | $7,622,676 | 100.00% |
| RASC 2003-KS9 [1] | Subprime 2003 | $24,992,452 | $24,992,452 | $10,654,547 | $4,780,138 | | $4,780,138 | 100.00% |
| RASC 2003-KS9 [1] | Subprime 2003 | $24,200,958 | $24,200,958 | $10,346,274 | $4,641,832 | AMBAC | $4,641,832 | 100.00% |
| RASC 2003-KS9 [2A] | Subprime 2003 | $15,741,678 | $15,741,678 | $6,600,628 | $2,961,356 | AMBAC | $2,961,356 | 100.00% |
| RASC 2003-KS9 [2A] | Subprime 2003 | $16,172,199 | $16,172,199 | $6,791,726 | $3,047,092 | AMBAC | $3,047,092 | 100.00% |
| RBSGC 2005-A [1] | ALT-A 2005 | $1,937,065 | $174,336 | $71,062 | $15,941 | | $15,941 | 4.50% |
| RBSGC 2005-A [2] | ALT-A 2005 | $12,389,758 | $1,115,078 | $450,332 | $101,020 | | $101,020 | 4.50% |
| RBSGC 2005-A [3] | ALT-A 2005 | $10,077,956 | $907,016 | $385,491 | $86,475 | | $86,475 | 4.50% |
| RBSGC 2005-A [4] | ALT-A 2005 | $4,265,948 | $383,935 | $158,056 | $35,456 | | $35,456 | 4.50% |
| RBSGC 2005-A [5] | ALT-A 2005 | $4,996,566 | $449,691 | $193,859 | $43,487 | | $43,487 | 4.50% |
| RFMS2 1998-H2 [Total] | CES 1999 | $36,874,298 | $36,874,298 | $3,072,858 | $1,378,631 | | $1,378,631 | 100.00% |
| RFMS2 1999-H1 [Total] | Second Lien 1999 | $42,090,362 | $42,090,362 | $5,532,636 | $2,482,205 | AMBAC | $2,482,205 | 100.00% |
| RFMS2 1999-H4 [Total] | Second Lien 1999 | $38,836,252 | $38,836,252 | $5,101,035 | $2,288,568 | AMBAC | $2,288,568 | 100.00% |
| RFMS2 1999-H6 [I] | Second Lien 1999 | $50,948,277 | $50,948,277 | $6,705,094 | $3,008,225 | AMBAC | $3,008,225 | 100.00% |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Pg 342 of 398

Case 14-cv-03039-GBD   Document 11-1   Filed 11/06/14   Page 357 of 398
12-12020-mg    Doc 8019-45   Filed 01/22/15   Entered 01/22/15 18:14:28   Exhibit 26
Pg 342 of 398

| | Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|---|
| 378 | RFMS2 1999-H6 [II] | Second Lien 1999 | $2,862,240 | $2,862,240 | $374,982 | $168,235 | AMBAC | $168,235 | 100.00% |
| 379 | RFMS2 1999-H8 [I] | Second Lien 1999 | $35,029,468 | $35,029,468 | $4,608,814 | $2,067,734 | AMBAC | $2,067,734 | 100.00% |
| 380 | RFMS2 1999-H8 [III] | Second Lien 1999 | $1,800,747 | $1,800,747 | $235,886 | $105,829 | AMBAC | $105,829 | 100.00% |
| 381 | RFMS2 2000-H1 [I] | Second Lien 2000 | $75,959,397 | $75,959,397 | $19,939,787 | $8,945,940 | AMBAC | $8,945,940 | 100.00% |
| 382 | RFMS2 2000-H1 [III] | Second Lien 2000 | $2,296,510 | $2,296,510 | $601,520 | $269,870 | AMBAC | $269,870 | 100.00% |
| 383 | RFMS2 2000-H2 [I] | Second Lien 2000 | $41,502,855 | $41,502,855 | $10,922,595 | $4,900,397 | AMBAC | $4,900,397 | 100.00% |
| 384 | RFMS2 2000-H2 [III] | Second Lien 2000 | $1,818,101 | $1,818,101 | $476,469 | $213,767 | AMBAC | $213,767 | 100.00% |
| 385 | RFMS2 2000-H3 [I] | Second Lien 2000 | $53,370,254 | $53,370,254 | $14,052,633 | $6,304,681 | AMBAC | $6,304,681 | 100.00% |
| 386 | RFMS2 2000-H3 [III] | Second Lien 2000 | $2,348,596 | $2,348,596 | $615,957 | $276,348 | AMBAC | $276,348 | 100.00% |
| 387 | RFMS2 2000-H4 [1] | Second Lien 2000 | $54,080,127 | $54,080,127 | $14,254,392 | $6,395,200 | AMBAC | $6,395,200 | 100.00% |
| 388 | RFMS2 2000-H4 [2] | Second Lien 2000 | $2,662,269 | $2,662,269 | $697,261 | $312,825 | AMBAC | $312,825 | 100.00% |
| 389 | RFMS2 2000-H5 [1] | Second Lien 2000 | $112,703,754 | $112,703,754 | $29,624,691 | $13,291,049 | AMBAC | $13,291,049 | 100.00% |
| 390 | RFMS2 2000-H5 [2] | Second Lien 2000 | $3,618,503 | $3,618,503 | $947,960 | $425,300 | AMBAC | $425,300 | 100.00% |
| 391 | RFMS2 2000-HL1 [1] | Second Lien 2000 | $7,296,458 | $7,296,458 | $1,921,636 | $862,137 | AMBAC | $862,137 | 100.00% |
| 392 | RFMS2 2000-HL1 [2] | Second Lien 2000 | $920,867 | $920,867 | $241,179 | $108,205 | AMBAC | $108,205 | 100.00% |
| 393 | RFMS2 2001-H1 [Total] | Second Lien 2001 | $26,300,354 | $26,300,354 | $6,942,348 | $3,114,668 | AMBAC | $3,114,668 | 100.00% |
| 394 | RFMS2 2001-H2 [1] | Second Lien 2001 | $19,416,931 | $19,416,931 | $5,120,768 | $2,297,421 | AMBAC | $2,297,421 | 100.00% |
| 395 | RFMS2 2001-H2 [2] | Second Lien 2001 | $995,853 | $995,853 | $261,995 | $117,544 | AMBAC | $117,544 | 100.00% |
| 396 | RFMS2 2001-H3 [1] | Second Lien 2001 | $42,549,229 | $42,549,229 | $11,248,887 | $5,046,787 | AMBAC | $5,046,787 | 100.00% |
| 397 | RFMS2 2001-H3 [2] | Second Lien 2001 | $1,016,029 | $1,016,029 | $266,363 | $119,503 | AMBAC | $119,503 | 100.00% |
| 398 | RFMS2 2001-H4 [Total] | Second Lien 2001 | $43,248,845 | $43,248,845 | $11,434,080 | $5,128,874 | AMBAC | $5,128,874 | 100.00% |
| 399 | RFMS2 2001-HS2 [Total] | Second Lien 2001 | $4,334,878 | $4,334,878 | $1,146,006 | $514,153 | AMBAC | $514,153 | 100.00% |
| 400 | RFMS2 2001-HS3 [1] | CES 2001 | $270,299 | $270,299 | $40,846 | $18,325 | Radian (Pool Policy) | $18,325 | 100.00% |
| 401 | RFMS2 2001-HS3 [2] | CES 2001 | $776,407 | $776,407 | $128,268 | $57,547 | AMBAC | $57,547 | 100.00% |
| 402 | RFMS2 2002-H1 [Total] | Second Lien 2002 | $38,611,429 | $38,611,429 | $10,211,802 | $4,581,502 | AMBAC | $4,581,502 | 100.00% |
| 403 | RFMS2 2002-H2 [1] | Second Lien 2002 | $19,495,372 | $19,495,372 | $5,159,585 | $2,314,836 | AMBAC | $2,314,836 | 100.00% |
| 404 | RFMS2 2002-H2 [2] | Second Lien 2002 | $8,663,456 | $8,663,456 | $2,292,732 | $1,028,629 | AMBAC | $1,028,629 | 100.00% |
| 405 | RFMS2 2002-H3 [Total] | Second Lien 2002 | $33,128,765 | $33,128,765 | $8,773,820 | $3,936,354 | AMBAC | $3,936,354 | 100.00% |
| 406 | RFMS2 2002-H4 [Total] | Second Lien 2002 | $30,137,013 | $30,137,013 | $7,985,092 | $3,582,493 | | $3,582,493 | 100.00% |
| 407 | RFMS2 2002-H5 [Total] | Second Lien 2003 | $24,109,874 | $24,109,874 | $9,612,201 | $4,312,492 | AMBAC | $4,312,492 | 100.00% |
| 408 | RFMS2 2002-HS1 [Total] | CES 2002 | $3,966,719 | $3,966,719 | $652,114 | $292,569 | AMBAC | $292,569 | 100.00% |
| 409 | RFMS2 2002-HS2 [Total] | CES 2002 | $4,008,989 | $4,008,989 | $656,166 | $294,387 | FGIC | $294,387 | 100.00% |
| 410 | RFMS2 2002-HS3 [1] | CES 2002 | $1,880,409 | $1,880,409 | $302,404 | $135,673 | | $135,673 | 100.00% |

12-12020-mg   Doc 8019-45   Filed 01/22/15   Entered 01/22/15 18:14:28   Exhibit 26
Pg 343 of 398

Case 14-cv-03039-GBD   Document 51-1   Filed 11/06/14   Page 358 of 355

12-12020-mg   Doc 6065-1   Filed 12/11/13   Entered 12/11/13 17:30:11   Appendix 1
Pg 127 of 265

Subject to FRE 408 - Additional Due Diligence

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| RFMS2 2002-HS3 [2] / RFMS2 2003-HI1 [Total] | CES 2002 | $2,494,405 | $2,494,405 | $401,188 | $179,992 | FGIC | $179,992 | 100.00% |
| [Total] | Second Lien 2003 | $22,605,058 | $22,605,058 | $9,045,679 | $4,058,323 | | $4,058,323 | 100.00% |
| RFMS2 2003-HI2 [Total] | Second Lien 2003 | $27,190,194 | $27,190,194 | $10,908,801 | $4,894,209 | | $4,894,209 | 100.00% |
| RFMS2 2003-HI3 [1] | Second Lien 2003 | $13,712,040 | $13,712,040 | $5,522,202 | $2,477,523 | AMBAC | $2,477,523 | 100.00% |
| RFMS2 2003-HI3 [2] | Second Lien 2003 | $13,661,274 | $13,661,274 | $5,495,842 | $2,465,697 | AMBAC | $2,465,697 | 100.00% |
| RFMS2 2003-HI4 [1] | Second Lien 2003 | $17,360,918 | $17,360,918 | $6,995,740 | $3,138,623 | | $3,138,623 | 100.00% |
| RFMS2 2003-HI4 [2] | Second Lien 2003 | $17,565,801 | $17,565,801 | $7,102,122 | $3,186,351 | | $3,186,351 | 100.00% |
| RFMS2 2003-HS1 [1] | CES 2003 | $5,840,571 | $5,840,571 | $1,373,509 | $616,222 | FGIC | $616,222 | 100.00% |
| RFMS2 2003-HS1 [2] | CES 2003 | $2,760,184 | $2,760,184 | $648,130 | $290,782 | FGIC | $290,782 | 100.00% |
| RFMS2 2003-HS2 [1] | CES 2003 | $6,709,170 | $6,709,170 | $1,549,221 | $695,054 | FGIC | $695,054 | 100.00% |
| RFMS2 2003-HS2 [2A] | CES 2003 | $2,458,502 | $2,458,502 | $574,447 | $257,724 | FGIC | $257,724 | 100.00% |
| RFMS2 2003-HS2 [2B] | CES 2003 | $3,276,965 | $3,276,965 | $767,758 | $344,453 | FGIC | $344,453 | 100.00% |
| RFMS2 2003-HS3 [1] | CES 2003 | $7,830,324 | $7,830,324 | $1,750,388 | $785,307 | MBIA | $0 | 100.00% |
| RFMS2 2003-HS3 [2A] | CES 2003 | $3,125,840 | $3,125,840 | $731,700 | $328,275 | MBIA | $0 | 100.00% |
| RFMS2 2003-HS3 [2B] | CES 2003 | $2,255,960 | $2,255,960 | $522,179 | $234,274 | MBIA | $0 | 100.00% |
| RFMS2 2003-HS4 [1] | Second Lien 2003 | $3,968,733 | $3,968,733 | $1,656,970 | $743,396 | AMBAC | $743,396 | 100.00% |
| RFMS2 2003-HS4 [2] | Second Lien 2003 | $2,722,738 | $2,722,738 | $1,143,638 | $513,091 | AMBAC | $513,091 | 100.00% |
| RFMS 2005-S10 [Total] | Prime 2003 | $742,602 | $742,602 | $237,774 | $106,677 | | $106,677 | 100.00% |
| RFMS 2003-S11 [Total] | Prime 2003 | $400,858 | $400,858 | $122,690 | $55,044 | | $55,044 | 100.00% |
| RFMS 2003-S12 [1] | Prime 2003 | $481,977 | $481,977 | $135,112 | $60,618 | | $60,618 | 100.00% |
| RFMS 2003-S12 [2] | Prime 2003 | $585,071 | $585,071 | $182,935 | $82,073 | | $82,073 | 100.00% |
| RFMS 2003-S12 [3] | Prime 2003 | $125,951 | $125,951 | $51,964 | $23,313 | | $23,313 | 100.00% |
| RFMS 2003-S12 [4] | Prime 2003 | $536,950 | $536,950 | $145,760 | $65,395 | | $65,395 | 100.00% |
| RFMS 2003-S13 [Total] | Prime 2003 | $1,196,219 | $1,196,219 | $367,697 | $164,967 | MBIA - Insurer Exception | $164,967 | 100.00% |
| RFMS 2003-S14 [Total] | Prime 2003 | $51,038 | $51,038 | $23,302 | $10,455 | | $10,455 | 100.00% |
| RFMS 2005-S15 [Total] | Prime 2003 | $68,054 | $68,054 | $25,107 | $11,264 | | $11,264 | 100.00% |
| RFMS 2003-S16 [Total] | Prime 2003 | $164,724 | $164,724 | $57,709 | $25,891 | | $25,891 | 100.00% |
| RFMS 2003-S17 [Total] | Prime 2003 | $1,063,034 | $1,063,034 | $421,652 | $189,173 | | $189,173 | 100.00% |
| RFMS 2003-S18 [Total] | Prime 2003 | $108,089 | $108,089 | $49,473 | $22,196 | | $22,196 | 100.00% |
| RFMS 2003-S19 [Total] | Prime 2003 | $713,351 | $713,351 | $290,683 | $130,414 | | $130,414 | 100.00% |
| RFMS 2003-S20 [1] | Prime 2003 | $700,068 | $700,068 | $214,590 | $96,275 | Radian - Insurer Exception | $96,275 | 100.00% |
| RFMS 2003-S20 [2] | Prime 2003 | $135,480 | $135,480 | $62,277 | $27,940 | | $27,940 | 100.00% |
| RFMS 2003-S4 [Total] | Prime 2003 | $632,532 | $632,532 | $229,566 | $102,994 | MBIA - Insurer Exception | $102,994 | 100.00% |

12-12020-mg   Doc 8019-45   Filed 01/22/15   Entered 01/22/15 18:14:28   Exhibit 26
Pg 344 of 398

Case 1:14-cv-03039-GBD   Document 15-1   Filed 11/06/14   Page 359 of 395

12-12020-mg   Doc 6065-1   Filed 12/11/13   Entered 12/11/13 17:30:11   Appendix 1

Subject to Additional Diligence
Pg 288 of 365

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| RFMSI 2003-S6 [Total] | Prime 2003 | $84,101 | $84,101 | $35,666 | $16,001 | | $16,001 | 100.00% |
| RFMSI 2003-S7 | Prime 2003 | $977,344 | $977,344 | $387,129 | $173,685 | | $173,685 | 100.00% |
| RFMSI 2003-S9 [Total] | Prime 2003 | $157,566 | $157,566 | $57,650 | $25,865 | | $25,865 | 100.00% |
| RFSC 2001-RM2 [1] | ALT-A 2001 | $1,682,507 | $1,682,507 | $442,916 | $198,713 | | $198,713 | 100.00% |
| RFSC 2001-RM2 [2] | ALT-A 2001 | $289,950 | $289,950 | $68,115 | $30,560 | | $30,560 | 100.00% |
| RFSC 2002-RM1 [1] | ALT-A 2002 | $464,974 | $464,974 | $114,210 | $51,240 | | $51,240 | 100.00% |
| RFSC 2002-RM1 [2] | ALT-A 2002 | $106,095 | $106,095 | $23,935 | $10,738 | | $10,738 | 100.00% |
| RFSC 2002-RP1 [1] | Subprime 2002 | $10,269,748 | $10,269,748 | $2,864,075 | $1,284,961 | AMBAC | $1,284,961 | 100.00% |
| RFSC 2002-RP1 [2] | Subprime 2002 | $7,374,045 | $7,374,045 | $2,060,022 | $934,224 | AMBAC | $934,224 | 100.00% |
| RFSC 2002-RP2 [Total] | Subprime 2002 | $18,486,483 | $18,486,483 | $5,162,881 | $2,316,315 | AMBAC | $2,316,315 | 100.00% |
| RFSC 2003-RM1 [Total] | Prime 2003 | $570,953 | $570,953 | $214,879 | $96,405 | | $96,405 | 100.00% |
| RFSC 2003-RM2 [ONE] | Prime 2003 | $441,669 | $441,669 | $166,731 | $74,803 | | $74,803 | 100.00% |
| RFSC 2003-RM2 [THREE] | Prime 2003 | $239,703 | $239,703 | $72,048 | $32,324 | | $32,324 | 100.00% |
| RFSC 2003-RM2 [TWO] | Prime 2003 | $65,592 | $65,592 | $28,952 | $12,989 | | $12,989 | 100.00% |
| RFSC 2003-RP1 [1A] | Subprime 2003 | $12,608,689 | $12,608,689 | $5,282,298 | $2,369,891 | AMBAC - Insurer Exception | $2,369,891 | 100.00% |
| RFSC 2003-RP1 [1F] | Subprime 2003 | $14,765,681 | $14,765,681 | $6,192,666 | $2,778,325 | AMBAC - Insurer Exception | $2,778,325 | 100.00% |
| RFSC 2003-RP2 [1A] | Subprime 2003 | $4,045,680 | $4,045,680 | $1,708,243 | $766,399 | AMBAC | $766,399 | 100.00% |
| RFSC 2003-RP2 [1F] | Subprime 2003 | $6,000,552 | $6,000,552 | $2,540,129 | $1,139,623 | AMBAC | $1,139,623 | 100.00% |
| RFSC 2003-RP2 [2A] | Subprime 2003 | $5,420,952 | $5,420,952 | $2,283,558 | $1,024,513 | AMBAC | $1,024,513 | 100.00% |
| RFSC 2003-RP2 [2F] | Subprime 2003 | $3,124,820 | $3,124,820 | $1,315,976 | $590,410 | | $590,410 | 100.00% |
| SARM 2007-3 [1] | Prime 2007 | $112,135,556 | $3,307,999 | $1,202,388 | $539,449 | | $539,449 | 2.95% |
| SARM 2007-3 [2] | Prime 2007 | $27,299,124 | $805,324 | $289,758 | $129,999 | | $129,999 | 2.95% |
| SARM 2007-3 [3] | Prime 2007 | $30,436,429 | $897,875 | $322,935 | $144,884 | | $144,884 | 2.95% |
| SARM 2007-3 [4] | Prime 2007 | $40,833,489 | $1,204,588 | $430,002 | $192,920 | | $192,920 | 2.95% |
| SARM 2007-6 [11] | ALT-A 2007 | $43,411,509 | $325,586 | $112,817 | $50,615 | | $50,615 | 0.75% |
| SARM 2007-6 [12] | ALT-A 2007 | $105,887,379 | $794,155 | $275,339 | $123,530 | | $123,530 | 0.75% |
| SARM 2007-6 [2] | ALT-A 2007 | $77,611,482 | $582,086 | $199,506 | $89,508 | | $89,508 | 0.75% |
| SASI 1993-6 [CIT1] | Prime 1999 | $297,737 | $26,796 | $2,010 | $451 | GEMICO [Pool Policy] | $451 | 4.50% |
| SASI 1993-6 [CWF1] | Prime 1999 | $408,373 | $36,754 | $2,757 | $619 | GEMICO [Pool Policy] | $619 | 4.50% |
| SASI 1993-6 [GEC1] | Prime 1999 | $134,479 | $12,103 | $908 | $204 | GEMICO [Pool Policy] | $204 | 4.50% |
| SASI 1993-6 [IT2] | Prime 1999 | $294,598 | $26,514 | $1,998 | $448 | | $448 | 4.50% |
| SASI 1993-6 [IT3] | Prime 1999 | $527,944 | $47,515 | $3,576 | $802 | GEMICO [Pool Policy]/FSA - Insurer Exception | $802 | 4.50% |
| SASI 1993-6 [IT4] | Prime 1999 | $264,173 | $23,776 | $1,783 | $400 | | $400 | 4.50% |
| SASI 1993-6 [IT5] | Prime 1999 | $139,669 | $12,570 | $952 | $214 | | $214 | 4.50% |
| SASI 1993-6 [SASC3] | Prime 1999 | $2,041,944 | $183,775 | $13,833 | $3,103 | GEMICO [Pool Policy]/FSA - Insurer Exception | $3,103 | 4.50% |
| SEMT 2004-10 [1] | Prime 2004 | $4,908,266 | $220,872 | $110,861 | $24,869 | | $24,869 | 4.50% |
| SEMT 2004-10 [2] | Prime 2004 | $3,877,040 | $156,467 | $77,732 | $17,437 | | $17,437 | 4.50% |
| SEMT 2004-11 [1] | Prime 2004 | $4,686,120 | $135,897 | $69,614 | $15,616 | | $15,616 | 2.90% |
| SEMT 2004-11 [2] | Prime 2004 | $917,875 | $26,618 | $13,393 | $3,004 | | $3,004 | 2.90% |
| SEMT 2004-11 [3] | Prime 2004 | $1,316,313 | $38,173 | $20,242 | $4,541 | | $4,541 | 2.90% |
| SEMT 2004-12 [1] | Prime 2004 | $4,758,130 | $295,004 | $148,902 | $33,402 | | $33,402 | 3.10% |
| SEMT 2004-12 [2] | Prime 2004 | $1,959,642 | $121,498 | $60,509 | $13,574 | | $13,574 | 3.10% |
| SEMT 2004-12 [3] | Prime 2004 | $743,687 | $46,109 | $27,565 | $6,183 | | $6,183 | 3.10% |
| SEMT 2004-4 [Total] | Prime 2004 | $56,293,703 | $249,860 | $127,733 | $28,654 | | $28,654 | 1.99% |
| SEMT 2004-5 [1] | Prime 2004 | $3,349,661 | $301,469 | $155,376 | $34,854 | | $34,854 | 4.50% |

| Name | Cohort | Net Total Collateral Losses | Debtor's Attributable Portion of Net Collateral Losses | Losses Due to Breach | RFC Claim | Insurer | RFC Recognized Claim | RFC Seller % |
|---|---|---|---|---|---|---|---|---|
| SEMT 2004-5 [2A] | Prime 2004 | $1,114,087 | $100,268 | $54,710 | $12,273 | | $12,273 | 4.50% |
| SEMT 2005-5 [2B] | Prime 2004 | $573,706 | $51,634 | $26,621 | $5,972 | | $5,972 | 4.50% |
| SEMT 2004-6 [1] | Prime 2004 | $4,262,473 | $356,769 | $170,343 | $38,212 | | $38,212 | 4.19% |
| SEMT 2004-6 [2A] | Prime 2004 | $1,092,058 | $99,405 | $51,617 | $11,579 | | $11,579 | 4.19% |
| SEMT 2004-6 [2B] | Prime 2004 | $371,776 | $31,118 | $17,267 | $3,873 | | $3,873 | 4.19% |
| SEMT 2004-6 [3] | Prime 2004 | $891,482 | $74,617 | $41,038 | $9,206 | | $9,206 | 4.19% |
| SEMT 2004-7 [1] | Prime 2004 | $3,202,518 | $282,142 | $148,566 | $33,327 | | $33,327 | 4.41% |
| SEMT 2004-7 [2] | Prime 2004 | $2,569,941 | $226,412 | $119,449 | $26,795 | | $26,795 | 4.41% |
| SEMT 2004-7 [3] | Prime 2004 | $1,434,948 | $126,419 | $69,746 | $15,646 | | $15,646 | 4.41% |
| SEMT 2004-8 [1A] | Prime 2004 | $2,322,790 | $180,469 | $94,533 | $21,206 | | $21,206 | 3.88% |
| SEMT 2004-8 [1B] | Prime 2004 | $1,600,920 | $124,383 | $62,508 | $14,022 | | $14,022 | 3.88% |
| SEMT 2004-8 [2] | Prime 2004 | $3,739,595 | $290,548 | $148,836 | $33,388 | | $33,388 | 3.88% |
| SEMT 2004-9 [1] | Prime 2004 | $5,430,098 | $488,709 | $258,996 | $58,099 | | $58,099 | 4.50% |
| SEMT 2004-9 [2] | Prime 2004 | $3,231,985 | $290,879 | $146,504 | $32,864 | | $32,864 | 4.50% |
| SEMT 2005-1 [1] | Prime 2005 | $3,965,273 | $356,875 | $193,681 | $43,447 | | $43,447 | 4.50% |
| SEMT 2005-1 [2] | Prime 2005 | $1,899,189 | $170,927 | $82,809 | $18,576 | | $18,576 | 4.50% |
| SEMT 2005-2 [1] | Prime 2005 | $2,580,437 | $232,239 | $124,685 | $55,940 | | $55,940 | 14.65% |
| SEMT 2005-2 [2] | Prime 2005 | $1,311,288 | $118,016 | $62,062 | $27,844 | | $27,844 | 14.65% |
| SEMT 2005-5 [Total] | ALT-A 2005 | $11,878,947 | $534,553 | $214,656 | $48,152 | | $48,152 | 4.50% |
| SEMT 2007-1 [1] | Prime 2007 | $4,256,044 | $140,875 | $50,429 | $11,312 | | $11,312 | 1.66% |
| SEMT 2007-1 [2] | Prime 2007 | $46,470,169 | $1,538,163 | $553,937 | $124,261 | | $124,261 | 1.66% |
| SEMT 2007-1 [3] | Prime 2007 | $5,579,093 | $184,668 | $66,270 | $14,866 | | $14,866 | 1.66% |
| SEMT 2007-1 [4] | Prime 2007 | $8,807,137 | $291,516 | $104,039 | $23,338 | | $23,338 | 1.66% |
| SEMT 2007-1 [5] | Prime 2007 | $11,572,514 | $383,050 | $137,112 | $30,757 | | $30,757 | 1.66% |
| SEMT 2007-2 [1] | Prime 2007 | $33,910,589 | $1,693,851 | $596,292 | $133,763 | | $133,763 | 2.50% |
| SEMT 2007-2 [2A] | Prime 2007 | $28,986,949 | $1,447,913 | $523,111 | $117,346 | | $117,346 | 2.50% |
| SEMT 2007-2 [2B] | Prime 2007 | $14,374,170 | $717,997 | $257,667 | $57,801 | | $57,801 | 2.50% |
| SEMT 2007-3 [1] | Prime 2007 | $23,052,570 | $1,152,628 | $407,876 | $91,496 | | $91,496 | 2.50% |
| SEMT 2007-3 [2A] | Prime 2007 | $20,762,575 | $1,038,129 | $374,833 | $84,084 | | $84,084 | 2.50% |
| SEMT 2007-3 [2B] | Prime 2007 | $11,161,856 | $558,093 | $202,054 | $45,325 | | $45,325 | 2.50% |
| SEMT 2007-3 [2C] | Prime 2007 | $6,570,995 | $328,550 | $118,012 | $26,473 | | $26,473 | 2.50% |
| SEMT 2007-4 [1] | Prime 2007 | $3,515,624 | $175,781 | $62,106 | $13,932 | | $13,932 | 2.50% |
| SEMT 2007-4 [2] | Prime 2007 | $502,778 | $25,139 | $9,011 | $2,021 | | $2,021 | 2.50% |
| SEMT 2007-4 [3] | Prime 2007 | $9,255,769 | $462,788 | $167,178 | $37,502 | | $37,502 | 2.50% |
| SEMT 2007-4 [4] | Prime 2007 | $3,066,130 | $153,307 | $54,779 | $12,288 | | $12,288 | 2.50% |
| SEMT 2007-4 [5] | Prime 2007 | $1,996,714 | $99,836 | $35,520 | $7,968 | | $7,968 | 2.50% |
| STAC 2007-1 [Total] | CES 2007 | $90,453,636 | $4,522,682 | $2,390,288 | $536,199 | XL | $0 | |
| TMTS 2005-11 [1A] | Second Lien 2005 | $152,143,074 | $13,692,877 | $7,446,816 | $1,670,498 | | $1,670,498 | 4.50% |
| TMTS 2005-11 [1B] | Second Lien 2005 | $16,793,870 | $1,511,448 | $821,610 | $184,307 | | $184,307 | 4.50% |
| TMTS 2005-11 [2A] | Second Lien 2005 | $64,478,026 | $5,803,022 | $3,174,218 | $712,053 | | $712,053 | 4.50% |
| TMTS 2005-11 [2B] | Second Lien 2005 | $16,004,638 | $1,440,417 | $788,492 | $176,878 | | $176,878 | 4.50% |
| TMTS 2005-13SL [2] | Second Lien 2005 | $11,452,424 | $1,030,718 | $534,001 | $119,789 | FGIC | $119,789 | 4.50% |
| | | $11,905,079,662 | $5,411,024,919 | $1,960,463,194 | $850,079,144 | | $848,093,430 | |

**Schedule 4G**

Schedule 4G – GMACM Recognized Unsecured Servicing Claim
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 2 | ACE 2007-SL2 [Total] | CES 2007 | 65.80% | | | $0 |
| 3 | ACE 2007-SL3 [2ND_LIEN] | Second Lien 2007 | 5.00% | | Assured Guaranty | $0 |
| 4 | ACE 2007-SL3 [HELOC] | Second Lien 2007 | 5.00% | $6 | Assured Guaranty | $0 |
| 5 | AHM 2005-1 [1] | ALT-A 2005 | 1.72% | $1,209 | | $1,209 |
| 6 | AHM 2005-1 [2] | ALT-A 2005 | 1.72% | $778 | | $778 |
| 7 | AHM 2005-1 [3] | ALT-A 2005 | 1.72% | $809 | | $809 |
| 8 | AHM 2005-1 [4] | ALT-A 2005 | 1.72% | $372 | | $372 |
| 9 | AHM 2005-1 [5] | ALT-A 2005 | 1.72% | $337 | | $337 |
| 10 | AHM 2005-1 [6] | ALT-A 2005 | 1.72% | $2,917 | | $2,917 |
| 11 | AHM 2005-1 [7] | ALT-A 2005 | 1.72% | $1,537 | | $1,537 |
| 12 | AHM 2005-1 [8] | ALT-A 2005 | 1.72% | $1,086 | | $1,086 |
| 13 | AHM 2005-1 [9] | ALT-A 2005 | 1.72% | $401 | FGIC | $401 |
| 14 | AHM 2005-2 [1] | ALT-A 2005 | 1.84% | $2,797 | | $2,797 |
| 15 | AHM 2005-2 [2C] | ALT-A 2005 | 1.84% | $1,783 | | $1,783 |
| 16 | AHM 2005-2 [2NC] | ALT-A 2005 | 1.84% | $2,152 | | $2,152 |
| 17 | AHM 2005-2 [3] | ALT-A 2005 | 1.84% | $5,058 | | $5,058 |
| 18 | AHM 2005-2 [4] | ALT-A 2005 | 1.84% | $2,285 | | $2,285 |
| 19 | AHM 2005-2 [5] | ALT-A 2005 | 1.84% | $4,690 | Ambac | $4,690 |
| 20 | AHM 2005-2 [6] | ALT-A 2005 | 1.84% | $817 | FGIC | $817 |
| 21 | ALBT 2007-OA1 [Total] | Pay Option ARM 2007 | 100.00% | $5,667 | | $5,667 |
| 22 | BSABS 2001-2 [1] | CES 2001 | 9.00% | $704 | | $704 |
| 23 | BSABS 2001-2 [2] | CES 2001 | 9.00% | $331 | | $331 |
| 24 | BSABS 2001-2 [3] | CES 2001 | 9.00% | $130 | | $130 |
| 25 | BSABS 2005-AC5 [1] | ALT-A 2005 | 0.09% | $9 | FGIC | $9 |
| 26 | BSABS 2005-AC5 [2] | ALT-A 2005 | 0.09% | $3 | | $3 |
| 27 | BSSLT 2007-1 [1] | Second Lien 2007 | 33.79% | $322 | Ambac | $322 |
| 28 | BSSLT 2007-1 [2] | Second Lien 2007 | 33.79% | $434 | Ambac | $434 |
| 29 | BSSLT 2007-1 [3] | Second Lien 2007 | 33.79% | $334 | Ambac | $334 |
| 30 | BSSLT 2007-SV1A [Total] | CES 2007 | 36.90% | $7,610 | XL – Insurer Exception | $7,610 |
| 31 | DBALT 2006-AB2 [Total] | ALT-A 2006 | 31.18% | $86,443 | Ambac | $86,443 |
| 32 | DBALT 2006-AB4 [Total] | ALT-A 2006 | 48.17% | $309,438 | FSA | $0 |
| 33 | DBALT 2006-AR4 [Total] | ALT-A 2006 | 20.26% | $671 | | $671 |
| 34 | DBALT 2007-2 [1A] | ALT-A 2007 | 34.32% | $63,434 | | $63,434 |
| 35 | DBALT 2007-2 [1F] | ALT-A 2007 | 34.32% | $20,633 | | $20,633 |
| 36 | DBALT 2007-2 [2A] | ALT-A 2007 | 34.32% | $58,500 | | $58,500 |
| 37 | DBALT 2007-2 [2F] | ALT-A 2007 | 34.32% | $53,337 | | $53,337 |
| 38 | DBALT 2007-4 [I] | Pay Option ARM 2007 | 100.00% | $40,391 | FHLMC (Agency Wrap) | $40,391 |
| 39 | DBALT 2007-4 [II] | Pay Option ARM 2007 | 100.00% | $38,796 | FHLMC (Agency Wrap) | $38,796 |
| 40 | DBALT 2007-AB1 [Total] | ALT-A 2007 | 22.99% | $76,671 | | $76,671 |

Schedule 4d – GMACM Recognized Unsecured Servicing Claim
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 41 | DBALT 2007-AR1  [Total] | ALT-A 2007 | 73.73% | $16,624 | | $16,624 |
| 42 | DBALT 2007-AR2  [Total] | ALT-A 2007 | 91.06% | $522,571 | | $522,571 |
| 43 | DBALT 2007-BAR1  [A] | ALT-A 2007 | 83.88% | $22,051 | | $22,051 |
| 44 | DBALT 2007-BAR1  [F] | ALT-A 2007 | 83.88% | $19,552 | | $19,552 |
| 45 | GMACM 2001-HE2  [1AHEL] | CES 2001 | 100.00% | $1,343  FGIC | | $1,343 |
| 46 | GMACM 2001-HE2  [1AHELOC] | CES 2001 | 100.00% | $2,503  FGIC | | $2,503 |
| 47 | GMACM 2001-HE2  [1BHEL] | CES 2001 | 100.00% | $1,528  FGIC | | $1,528 |
| 48 | GMACM 2001-HE2  [1BHELOC] | CES 2001 | 100.00% | $2,850  FGIC | | $2,850 |
| 49 | GMACM 2001-HE2  [2A] | CES 2001 | 100.00% | $2,918  FGIC | | $2,918 |
| 50 | GMACM 2001-HE2  [2B] | CES 2001 | 100.00% | $7,109  FGIC | | $7,109 |
| 51 | GMACM 2001-HE3  [1] | Second Lien 2001 | 100.00% | $4,292  FGIC | | $4,292 |
| 52 | GMACM 2001-HE3  [2] | Second Lien 2001 | 100.00% | $4,311  FGIC | | $4,311 |
| 53 | GMACM 2001-HLT1  [1] | Second Lien 2001 | 100.00% | $36,092  AMBAC | | $36,092 |
| 54 | GMACM 2001-HLT1  [2] | Second Lien 2001 | 100.00% | $3,281  AMBAC | | $3,281 |
| 55 | GMACM 2001-HLT2  [1] | Second Lien 2001 | 100.00% | $14,841  Ambac | | $14,841 |
| 56 | GMACM 2001-HLT2  [2] | Second Lien 2001 | 100.00% | $6,889  Ambac | | $6,889 |
| 57 | GMACM 2002-HE1  [1] | Second Lien 2002 | 100.00% | $4,825  FGIC | | $4,825 |
| 58 | GMACM 2002-HE1  [2] | Second Lien 2002 | 100.00% | $7,006  FGIC | | $7,006 |
| 59 | GMACM 2002-HE1  [3] | Second Lien 2002 | 100.00% | $1,021  FGIC | | $1,021 |
| 60 | GMACM 2002-HE1  [4] | Second Lien 2002 | 100.00% | $6,355  FGIC | | $6,355 |
| 61 | GMACM 2002-HE4  [Total] | Second Lien 2002 | 100.00% | $12,315  FGIC | | $12,315 |
| 62 | GMACM 2002-HLT1  [1] | Second Lien 2002 | 100.00% | $24,553  AMBAC | | $24,553 |
| 63 | GMACM 2002-HLT1  [2] | Second Lien 2002 | 100.00% | $2,714  AMBAC | | $2,714 |
| 64 | GMACM 2003-HE1  [Total] | Second Lien 2003 | 100.00% | $34,596  FGIC | | $34,596 |
| 65 | GMACM 2003-HE2  [Total] | CES 2003 | 100.00% | $10,113  FGIC | | $10,113 |
| 66 | GMACM 2004-HE1  [Total] | Second Lien 2004 | 100.00% | $119,636  FGIC | | $119,636 |
| 67 | GMACM 2004-HE3  [Total] | Second Lien 2004 | 100.00% | $65,515  FSA | | $0 |
| 68 | GMACM 2004-HE4  [Total] | Second Lien 2004 | 100.00% | $57,311  MBIA | | $0 |
| 69 | GMACM 2004-HE5  [Total] | CES 2004 | 100.00% | $12,913  FGIC | | $12,913 |
| 70 | GMACM 2004-HLTV1  [1] | Second Lien 2004 | 100.00% | $17,658  FGIC | | $17,658 |
| 71 | GMACM 2004-VF1  [1] | Second Lien 2004 | 100.00% | $23,912  MBIA | | $0 |
| 72 | GMACM 2004-VF1  [2] | Second Lien 2004 | 100.00% | $23,912  MBIA | | $0 |
| 73 | GMACM 2005-HE1  [Total] | Second Lien 2005 | 100.00% | $49,403  FGIC | | $49,403 |
| 74 | GMACM 2005-HE2  [Total] | CES 2005 | 100.00% | $17,561  FGIC | | $17,561 |
| 75 | GMACM 2005-HE3  [Total] | Second Lien 2005 | 100.00% | $25,522  AMBAC | | $25,522 |
| 76 | GMACM 2006-HE1  [F] | Second Lien 2006 | 100.00% | $16,039  FGIC | | $16,039 |
| 77 | GMACM 2006-HE1  [H] | Second Lien 2006 | 100.00% | $25,827  FGIC | | $25,827 |
| 78 | GMACM 2006-HE2  [Total] | CES 2006 | 100.00% | $9,206  FGIC | | $9,206 |
| 79 | GMACM 2006-HE4  [Total] | Second Lien 2006 | 100.00% | $16,009  MBIA | | $0 |

Schedule 4G – GMACM Recognized Claim for Unsecured Servicing Claim
Subject to Further Review and Due Diligence

| 1 | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| | **Name** | **Cohort** | **GMACM Servicer %** | **Claim** | **Insurer** | **GMACM Recognized Claim** |
| 80 | GMACM 2007-HE1  [Total] | CES 2007 | 100.00% | $6,984 | MBIA | $0 |
| 81 | GMACM 2010-1  [Total] | Subprime 2008 | 100.00% | $105,850 | | $105,850 |
| 82 | GMACM 2010-2  [Total] | Subprime 2008 | 100.00% | $1,625 | | $1,625 |
| 83 | GPMF 2006-HE1  [F] | Second Lien 2006 | 100.00% | $70 | XL/CIFG | $0 |
| 84 | GPMF 2006-HE1  [H] | Second Lien 2006 | 100.00% | $1,267 | XL/CIFG | $0 |
| 85 | GSR 2007-OA2  [1] | Pay Option ARM 2007 | 5.00% | $270 | | $270 |
| 86 | GSR 2007-OA2  [2] | Pay Option ARM 2007 | 5.00% | $153 | | $153 |
| 87 | GSRPM 2003-1  [Total] | Subprime 2003 | 2.50% | $1,121 | Ambac | $1,121 |
| 88 | HVMLT 2003-2  [1] | ALT-A 2003 | 59.98% | $1,158 | | $1,158 |
| 89 | HVMLT 2003-2  [2] | ALT-A 2003 | 59.98% | $2,054 | | $2,054 |
| 90 | HVMLT 2003-2  [3] | ALT-A 2003 | 59.98% | $529 | | $529 |
| 91 | HVMLT 2004-1  [1] | Prime 2004 | 67.73% | $783 | | $783 |
| 92 | HVMLT 2004-1  [2] | Prime 2004 | 67.73% | $623 | | $623 |
| 93 | HVMLT 2004-1  [3] | Prime 2004 | 67.73% | $460 | | $460 |
| 94 | HVMLT 2004-1  [4] | Prime 2004 | 67.73% | $384 | | $384 |
| 95 | HVMLT 2007-2  [1] | Pay Option ARM 2007 | 67.20% | $23,895 | | $23,895 |
| 96 | HVMLT 2007-2  [2] | Pay Option ARM 2007 | 67.20% | $65,048 | AMBAC | $65,048 |
| 97 | IMM 2003-4  [1] | ALT-A 2003 | 28.57% | $2,895 | AMBAC | $2,895 |
| 98 | IMM 2003-4  [2] | ALT-A 2003 | 28.57% | $137 | AMBAC | $137 |
| 99 | IMM 2003-4  [3] | ALT-A 2003 | 28.57% | $3,217 | | $3,217 |
| 100 | IMM 2004-6  [1] | ALT-A 2004 | 8.26% | $10,911 | | $10,911 |
| 101 | IMM 2004-6  [2] | ALT-A 2004 | 8.26% | $1,091 | AMBAC | $1,091 |
| 102 | IMM 2005-5  [Total] | ALT-A 2005 | 32.57% | $105,623 | AMBAC | $105,623 |
| 103 | IMM 2005-6  [1A] | ALT-A 2005 | 87.26% | $323,516 | AMBAC | $323,516 |
| 104 | IMM 2005-6  [1F] | ALT-A 2005 | 87.26% | $50,558 | AMBAC | $50,558 |
| 105 | IMM 2005-6  [2A] | ALT-A 2005 | 87.26% | $48,685 | | $48,685 |
| 106 | IMM 2005-6  [2AS] | ALT-A 2005 | 87.26% | $5,913 | | $5,913 |
| 107 | IMM 2005-7  [Total] | ALT-A 2005 | 4.50% | $29,377 | Ambac | $29,377 |
| 108 | IMSA 2005-2  [1] | ALT-A 2005 | 9.00% | $4,770 | Ambac | $4,770 |
| 109 | IMSA 2005-2  [2] | ALT-A 2005 | 9.00% | $968 | Ambac | $968 |
| 110 | IMSA 2006-3  [A] | ALT-A 2006 | 9.44% | $76,979 | Ambac | $76,979 |
| 111 | IMSA 2006-3  [F1] | ALT-A 2006 | 9.44% | $14,644 | Ambac | $14,644 |
| 112 | IMSA 2006-3  [F2] | ALT-A 2006 | 9.44% | $3,267 | Ambac | $3,267 |
| 113 | LMT 2005-1  [1AX] | Prime 2005 | 0.53% | $5 | | $5 |
| 114 | LMT 2005-1  [1DISC] | Prime 2005 | 0.53% | $3 | | $3 |
| 115 | LMT 2005-1  [1PAX] | Prime 2005 | 0.53% | $3 | | $3 |
| 116 | LMT 2005-1  [2AX] | Prime 2005 | 0.53% | $6 | | $6 |
| 117 | LMT 2005-1  [2DISC] | Prime 2005 | 0.53% | $4 | | $4 |
| 118 | LMT 2005-1  [2PAX] | Prime 2005 | 0.53% | $3 | | $3 |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Pg 350 of 398

Case 14-cv-03039-GBD    Document 15-1    Filed 11/06/14    Page 325 of 355
12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26

Schedule 4G – GMACM Recognized Unsecured Servicing Claim
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 119 | LMT 2005-1  [3] | Prime 2005 | 0.53% | $4 | | $4 |
| 120 | LMT 2005-1  [4AX] | Prime 2005 | 0.53% | $3 | | $3 |
| 121 | LMT 2005-1  [4PAX] | Prime 2005 | 0.53% | $1 | | $1 |
| 122 | LMT 2005-1  [5AX] | Prime 2005 | 0.53% | $3 | | $3 |
| 123 | LMT 2005-1  [5DISC] | Prime 2005 | 0.53% | $1 | | $1 |
| 124 | LMT 2005-1  [6AX] | Prime 2005 | 0.53% | $1 | | $1 |
| 125 | LMT 2005-1  [6DISC] | Prime 2005 | 0.53% | $6 | | $6 |
| 126 | LMT 2005-1  [6PAX] | Prime 2005 | 0.53% | $1 | | $1 |
| 127 | LUM 2007-2  [1] | ALT-A 2007 | 18.14% | $4,689 | | $4,689 |
| 128 | LUM 2007-2  [2] | ALT-A 2007 | 18.14% | $1,003 | | $1,003 |
| 129 | LXS 2007-15N  [FOUR_0PP] | Pay Option ARM 2007 | 6.24% | $5,567 | Ambac | $5,567 |
| 130 | LXS 2007-15N  [FOUR_1YPP] | Pay Option ARM 2007 | 6.24% | $9,366 | Ambac | $9,366 |
| 131 | LXS 2007-15N  [FOUR_2YPP] | Pay Option ARM 2007 | 6.24% | $1,220 | Ambac | $1,220 |
| 132 | LXS 2007-15N  [FOUR_3YPP] | Pay Option ARM 2007 | 6.24% | $17,937 | Ambac | $17,937 |
| 133 | LXS 2007-15N  [ONE] | Pay Option ARM 2007 | 6.24% | $8,091 | Ambac | $8,091 |
| 134 | LXS 2007-15N  [ONE_C] | Pay Option ARM 2007 | 6.24% | $8,341 | Ambac | $8,341 |
| 135 | LXS 2007-15N  [THREE_0PP] | Pay Option ARM 2007 | 6.24% | $2,465 | Ambac | $2,465 |
| 136 | LXS 2007-15N  [THREE_1YPP] | Pay Option ARM 2007 | 6.24% | $4,554 | Ambac | $4,554 |
| 137 | LXS 2007-15N  [THREE_2YPP] | Pay Option ARM 2007 | 6.24% | $740 | Ambac | $740 |
| 138 | LXS 2007-15N  [THREE_3YPP] | Pay Option ARM 2007 | 6.24% | $12,608 | Ambac | $12,608 |
| 139 | LXS 2007-15N  [TWO] | Pay Option ARM 2007 | 6.24% | $20,517 | | $20,517 |
| 140 | MANA 2007-AF1  [1] | ALT-A 2007 | 0.03% | $54 | | $54 |
| 141 | MANA 2007-AF1  [2] | ALT-A 2007 | 0.03% | $2 | | $2 |
| 142 | MANA 2007-AF1  [3] | ALT-A 2007 | 0.03% | $35 | | $35 |
| 143 | MHL 2004-1  [Total] | ALT-A 2004 | 100.00% | $61,400 | | $61,400 |
| 144 | MHL 2004-2  [Total] | ALT-A 2004 | 100.00% | $49,797 | | $49,797 |
| 145 | MHL 2005-1  [1] | ALT-A 2005 | 100.00% | $74,308 | | $74,308 |
| 146 | MHL 2005-1  [2] | ALT-A 2005 | 100.00% | $11,255 | | $11,255 |
| 147 | MHL 2005-2  [1] | ALT-A 2005 | 100.00% | $65,041 | | $65,041 |
| 148 | MHL 2005-2  [2] | ALT-A 2005 | 100.00% | $7,668 | | $7,668 |
| 149 | MHL 2005-3  [Total] | ALT-A 2005 | 100.00% | $123,091 | | $123,091 |
| 150 | MHL 2005-4  [Total] | ALT-A 2005 | 100.00% | $164,351 | | $164,351 |
| 151 | MHL 2005-5  [Total] | ALT-A 2005 | 100.00% | $231,909 | | $231,909 |
| 152 | MHL 2005-AR1  [Total] | Pay Option ARM 2005 | 100.00% | $112,561 | | $112,561 |
| 153 | MHL 2006-1  [1A1] | ALT-A 2006 | 100.00% | $63,122 | | $63,122 |
| 154 | MHL 2006-1  [1A2] | ALT-A 2006 | 100.00% | $99,845 | | $99,845 |
| 155 | MHL 2006-1  [TWO] | ALT-A 2006 | 100.00% | $85,816 | | $85,816 |
| 156 | MHL 2007-2  [Total] | Prime 2007 | 23.04% | $813 | | $813 |
| 157 | MSM 2005-10  [1] | Prime 2005 | 100.00% | $152 | | $152 |

Schedule 4d – GMACM's Recognized Uninsured Servicing Claim
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 158 | MSM 2005-10 [2] | Prime 2005 | 100.00% | $19 | | $19 |
| 159 | MSM 2005-10 [3] | Prime 2005 | 100.00% | $34 | | $34 |
| 160 | MSM 2005-10 [4] | Prime 2005 | 100.00% | $93 | | $93 |
| 161 | MSM 2005-11AR [1] | ALT-A 2005 | 15.31% | $1,165 | | $1,165 |
| 162 | MSM 2005-11AR [2] | ALT-A 2005 | 15.31% | $587 | | $587 |
| 163 | MSM 2005-3AR [1] | ALT-A 2005 | 15.31% | $171 | | $171 |
| 164 | MSM 2005-3AR [2] | ALT-A 2005 | 15.31% | $219 | | $219 |
| 165 | MSM 2005-3AR [3] | ALT-A 2005 | 15.31% | $133 | | $133 |
| 166 | MSM 2005-3AR [4] | ALT-A 2005 | 15.31% | $42 | | $42 |
| 167 | MSM 2005-3AR [5] | ALT-A 2005 | 15.31% | $30 | | $30 |
| 168 | MSM 2005-5AR [1A] | ALT-A 2005 | 15.31% | $1,288 | | $1,288 |
| 169 | MSM 2005-5AR [1F] | ALT-A 2005 | 15.31% | $778 | | $778 |
| 170 | MSM 2005-5AR [2] | ALT-A 2005 | 15.31% | $337 | | $337 |
| 171 | MSM 2005-5AR [3] | ALT-A 2005 | 15.31% | $300 | | $300 |
| 172 | MSM 2005-5AR [4] | ALT-A 2005 | 15.31% | $352 | | $352 |
| 173 | MSM 2005-6AR [11A] | ALT-A 2005 | 15.31% | $388 | | $388 |
| 174 | MSM 2005-6AR [11F] | ALT-A 2005 | 15.31% | $249 | | $249 |
| 175 | MSM 2005-6AR [2] | ALT-A 2005 | 15.31% | $132 | | $132 |
| 176 | MSM 2005-6AR [3] | ALT-A 2005 | 15.31% | $152 | | $152 |
| 177 | MSM 2005-6AR [4] | ALT-A 2005 | 15.31% | $45 | | $45 |
| 178 | MSM 2005-6AR [5] | ALT-A 2005 | 15.31% | $283 | | $283 |
| 179 | MSM 2005-6AR [6] | ALT-A 2005 | 15.31% | $67 | | $67 |
| 180 | MSM 2005-7 [1] | Prime 2005 | 6.25% | $3 | | $3 |
| 181 | MSM 2005-7 [2] | Prime 2005 | 6.25% | $3 | | $3 |
| 182 | MSM 2005-7 [3] | Prime 2005 | 6.25% | $12 | | $12 |
| 183 | MSM 2005-7 [4] | Prime 2005 | 6.25% | $8 | | $8 |
| 184 | MSM 2005-7 [5] | Prime 2005 | 6.25% | $2 | | $2 |
| 185 | MSM 2005-7 [6] | Prime 2005 | 6.25% | $19 | | $19 |
| 186 | MSM 2005-7 [7] | Prime 2005 | 6.25% | $20 | | $20 |
| 187 | MSM 2005-9AR [1A] | ALT-A 2005 | 15.31% | $164 | | $164 |
| 188 | MSM 2005-9AR [1F] | ALT-A 2005 | 15.31% | $89 | | $89 |
| 189 | MSM 2005-9AR [2] | ALT-A 2005 | 15.31% | $123 | | $123 |
| 190 | MSM 2005-9AR [3] | ALT-A 2005 | 15.31% | $33 | | $33 |
| 191 | MSM 2006-11 [1] | ALT-A 2006 | 10.93% | $30 | | $30 |
| 192 | MSM 2006-11 [2] | ALT-A 2006 | 10.93% | $19 | | $19 |
| 193 | MSM 2006-11 [3] | ALT-A 2006 | 10.93% | $14 | | $14 |
| 194 | MSM 2006-12XS [Total] | ALT-A 2006 | 10.93% | $306 | | $306 |
| 195 | MSM 2006-15XS [Total] | ALT-A 2006 | 10.93% | $5,097 | MBIA | $0 |
| 196 | MSM 2006-17XS [Total] | ALT-A 2006 | 10.93% | $3,914 | MBIA | $0 |

Schedule 4G – GMACM Recognized Unsecured Servicing Claim
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 197 | MSM 2006-1AR  [1A] | ALT-A 2006 | 10.93% | $3,054 | | $3,054 |
| 198 | MSM 2006-1AR  [1F] | ALT-A 2006 | 10.93% | $1,505 | | $1,505 |
| 199 | MSM 2006-1AR  [2] | ALT-A 2006 | 10.93% | $655 | | $655 |
| 200 | MSM 2006-1AR  [3] | ALT-A 2006 | 10.93% | $364 | | $364 |
| 201 | MSM 2006-1AR  [4] | ALT-A 2006 | 10.93% | $376 | | $376 |
| 202 | MSM 2006-7  [1] | ALT-A 2006 | 10.93% | $26 | | $26 |
| 203 | MSM 2006-7  [2] | ALT-A 2006 | 10.93% | $102 | | $102 |
| 204 | MSM 2006-7  [3] | ALT-A 2006 | 10.93% | $58 | | $58 |
| 205 | MSM 2006-7  [4] | ALT-A 2006 | 10.93% | $77 | | $77 |
| 206 | MSM 2007-1XS  [1] | ALT-A 2007 | 18.19% | $527 | | $527 |
| 207 | MSM 2007-1XS  [2] | ALT-A 2007 | 18.19% | $1,107 | | $1,107 |
| 208 | MSM 2007-2AX  [1] | ALT-A 2007 | 18.19% | $2,717 | | $2,717 |
| 209 | MSM 2007-2AX  [2] | ALT-A 2007 | 18.19% | $7,735 | | $7,735 |
| 210 | MSM 2007-3XS  [1] | ALT-A 2007 | 18.19% | $1,222 | | $1,222 |
| 211 | MSM 2007-3XS  [2] | ALT-A 2007 | 18.19% | $2,850 | | $2,850 |
| 212 | MSM 2007-6XS  [1] | ALT-A 2007 | 18.19% | $886 | | $886 |
| 213 | MSM 2007-6XS  [2] | ALT-A 2007 | 18.19% | $1,087 | | $1,087 |
| 214 | MSM 2007-7AX  [1] | ALT-A 2007 | 18.19% | $4,333 | | $4,333 |
| 215 | MSM 2007-7AX  [2] | ALT-A 2007 | 18.19% | $21,285 | | $21,285 |
| 216 | MSM 2007-8XS  [Total] | ALT-A 2007 | 18.19% | $6,310 | MBIA | $0 |
| 217 | NAA 2004-AP3  [Total] | ALT-A 2004 | 40.74% | $21,150 | Ambac | $21,150 |
| 218 | NAA 2005-AR3  [1] | ALT-A 2005 | 100.00% | $20,682 | | $20,682 |
| 219 | NAA 2005-AR3  [2] | ALT-A 2005 | 100.00% | $5,982 | | $5,982 |
| 220 | NAA 2005-AR3  [3] | ALT-A 2005 | 100.00% | $10,426 | | $10,426 |
| 221 | NAA 2005-AR4  [1] | ALT-A 2005 | 100.00% | $1,790 | | $1,790 |
| 222 | NAA 2005-AR4  [2] | ALT-A 2005 | 100.00% | $1,387 | | $1,387 |
| 223 | NAA 2005-AR4  [3] | ALT-A 2005 | 100.00% | $6,044 | | $6,044 |
| 224 | NAA 2005-AR4  [4] | ALT-A 2005 | 100.00% | $5,816 | | $5,816 |
| 225 | NAA 2005-AR4  [5] | ALT-A 2005 | 100.00% | $12,353 | | $12,353 |
| 226 | NAA 2005-AR5  [1] | ALT-A 2005 | 100.00% | $6,555 | | $6,555 |
| 227 | NAA 2005-AR5  [2] | ALT-A 2005 | 100.00% | $14,768 | | $14,768 |
| 228 | NAA 2005-AR5  [3] | ALT-A 2005 | 100.00% | $54,530 | | $54,530 |
| 229 | NAA 2005-AR6  [136] | ALT-A 2005 | 100.00% | $855 | | $855 |
| 230 | NAA 2005-AR6  [260] | ALT-A 2005 | 100.00% | $1,043 | | $1,043 |
| 231 | NAA 2005-AR6  [360] | ALT-A 2005 | 100.00% | $970 | | $970 |
| 232 | NAA 2005-AR6  [41] | ALT-A 2005 | 100.00% | $97 | | $97 |
| 233 | NAA 2005-AR6  [412] | ALT-A 2005 | 100.00% | $305 | | $305 |
| 234 | NAA 2005-AR6  [424] | ALT-A 2005 | 100.00% | $2,944 | | $2,944 |
| 235 | NAA 2005-AR6  [436] | ALT-A 2005 | 100.00% | $555 | | $555 |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 236 | NAA 2005-AR6  [46] | ALT-A 2005 | 100.00% | $868 | | $868 |
| 237 | NAA 2005-AR6  [460] | ALT-A 2005 | 100.00% | $324 | | $324 |
| 238 | NAA 2006-AF1  [I] | ALT-A 2006 | 100.00% | $5,653 | | $5,653 |
| 239 | NAA 2006-AF1  [II] | ALT-A 2006 | 100.00% | $324 | | $324 |
| 240 | NAA 2006-AF1  [III] | ALT-A 2006 | 100.00% | $2,235 | | $2,235 |
| 241 | NAA 2006-AF1  [IV] | ALT-A 2006 | 100.00% | $653 | | $653 |
| 242 | NAA 2006-AF1  [V] | ALT-A 2006 | 100.00% | $392 | | $392 |
| 243 | NAA 2006-AF2  [1] | ALT-A 2006 | 98.04% | $2,245 | | $2,245 |
| 244 | NAA 2006-AF2  [2] | ALT-A 2006 | 98.04% | $178 | | $178 |
| 245 | NAA 2006-AF2  [3] | ALT-A 2006 | 98.04% | $832 | | $832 |
| 246 | NAA 2006-AF2  [4] | ALT-A 2006 | 98.04% | $221 | | $221 |
| 247 | NAA 2006-AF2  [5] | ALT-A 2006 | 98.04% | $1,236 | | $1,236 |
| 248 | NAA 2006-AP1  [Total] | ALT-A 2006 | 100.00% | $3,284 | | $3,284 |
| 249 | NAA 2006-AR1  [1] | ALT-A 2006 | 100.00% | $348 | | $348 |
| 250 | NAA 2006-AR1  [2] | ALT-A 2006 | 100.00% | $1,168 | | $1,168 |
| 251 | NAA 2006-AR1  [3] | ALT-A 2006 | 100.00% | $289 | | $289 |
| 252 | NAA 2006-AR1  [4] | ALT-A 2006 | 100.00% | $193 | | $193 |
| 253 | NAA 2006-AR1  [5] | ALT-A 2006 | 100.00% | $2,477 | | $2,477 |
| 254 | NAA 2006-AR2  [1] | ALT-A 2006 | 100.00% | $399 | | $399 |
| 255 | NAA 2006-AR2  [2] | ALT-A 2006 | 100.00% | $1,578 | | $1,578 |
| 256 | NAA 2006-AR2  [3] | ALT-A 2006 | 100.00% | $2,515 | | $2,515 |
| 257 | NAA 2006-S3  [Total] | CES 2006 | 5.00% | $2 | | $2 |
| 258 | NAA 2006-S4  [Total] | CES 2006 | 78.04% | $206 | | $206 |
| 259 | NAA 2006-S5  [Total] | CES 2006 | 5.00% | $57 | | $57 |
| 260 | NAA 2007-3  [Total] | ALT-A 2007 | 100.00% | $353,099 | Ambac | $353,099 |
| 261 | NAA 2007-S1  [Total] | CES 2007 | 5.00% | $71 | | $71 |
| 262 | NHELI 2006-AF1  [Total] | Subprime 2006 | 99.56% | $5,884 | | $5,884 |
| 263 | PFCA 2002-IFC1  [Total] | Subprime 2002 | 4.50% | $133 | Ambac | $133 |
| 264 | PFCA 2002-IFC2  [Total] | Subprime 2002 | 4.50% | $95 | Ambac | $95 |
| 265 | PFCA 2003-IFC4  [Total] | Subprime 2003 | 4.50% | $110 | Ambac | $110 |
| 266 | PFCA 2003-IFC5  [Total] | Subprime 2003 | 4.50% | $146 | Ambac | $146 |
| 267 | PFCA 2003-IFC6  [Total] | Subprime 2003 | 4.50% | $268 | Ambac | $268 |
| 268 | SACO 2006-8  [Total] | Second Lien 2006 | 72.68% | $4,852 | Ambac | $4,852 |
| 269 | SARM 2004-4  [1AX] | ALT-A 2004 | 0.06% | $3 | | $3 |
| 270 | SARM 2004-4  [1PAX] | ALT-A 2004 | 0.06% | $2 | | $2 |
| 271 | SARM 2004-4  [2AX] | ALT-A 2004 | 0.06% | $4 | | $4 |
| 272 | SARM 2004-4  [2PAX] | ALT-A 2004 | 0.06% | $2 | | $2 |
| 273 | SARM 2004-4  [3AX] | ALT-A 2004 | 0.06% | $14 | | $14 |
| 274 | SARM 2004-4  [3PAX] | ALT-A 2004 | 0.06% | $6 | | $6 |

12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Case 1:14-cv-03039-GBD    Document 51-1    Filed 11/06/14    Page 329 of 355

Schedule 4G – GMACM's Recognized Unsecured Servicing Claim
Page 256 of 256
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | GMACM Servicer % | Claim | Insurer | GMACM Recognized Claim |
| 275 | SARM 2004-4  [4AX] | ALT-A 2004 | 0.06% | $1 | | $1 |
| 276 | SARM 2004-4  [4PAX] | ALT-A 2004 | 0.06% | $1 | | $1 |
| 277 | SARM 2004-4  [5AX] | ALT-A 2004 | 0.06% | $1 | | $1 |
| 278 | SARM 2004-4  [5PAX] | ALT-A 2004 | 0.06% | $0 | | $0 |
| 279 | STAC 2007-1  [Total] | $           2,007 | 2.50% | $272 | XL Capital | $0 |
| 280 | SVHE 2007-1  [1A] | Subprime 2007 | 7.61% | $366 | | $366 |
| 281 | SVHE 2007-1  [1F] | Subprime 2007 | 7.61% | $168 | | $168 |
| 282 | SVHE 2007-1  [2A] | Subprime 2007 | 7.61% | $307 | | $307 |
| 283 | SVHE 2007-1  [2F] | Subprime 2007 | 7.61% | $345 | | $345 |
| 284 | TMTS 2006-4SL  [F] | Second Lien 2006 | 100.00% | $22,408 | AMBAC | $22,408 |
| 285 | TMTS 2006-4SL  [H] | Second Lien 2006 | 100.00% | $3,180 | AMBAC | $3,180 |
| 286 | TMTS 2006-6  [1F] | Second Lien 2006 | 100.00% | $25,153 | AMBAC | $25,153 |
| 287 | TMTS 2006-6  [1H] | Second Lien 2006 | 100.00% | $3,935 | AMBAC | $3,935 |
| 288 | TMTS 2006-6  [2F] | Second Lien 2006 | 100.00% | $3,170 | | $3,170 |
| 289 | TMTS 2006-6  [2H] | Second Lien 2006 | 100.00% | $62 | | $62 |
| 290 | | | | $4,883,119 | | $4,361,722 |

12-12020-mg    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Pg 355 of 398

**Schedule 4R**

Schedule 4 - RFC Recognized Claims of Acquired Servicing Claim
Subject to Further Review and Due Diligence

Appendix 1

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **RFC Servicer %** | **RFC Claim** | **Insurer** | **RFC Recognized Claim** |
| 2 | BSSLT 2007-SV1A  [Total] | CES 2007 | 36.90% | $7,610 | XL - Insurer Exception | $7,610 |
| 3 | DBALT 2006-AR4  [Total] | ALT-A 2006 | 20.26% | $671 | | $671 |
| 4 | DBALT 2007-OA1  [Total] | Pay Option ARM 2007 | 60.86% | $21,218 | | $21,218 |
| 5 | GSRPM 2003-1  [Total] | Subprime 2003 | 2.50% | $1,121 | Ambac | $1,121 |
| 6 | HVMLT 2007-2  [1] | Pay Option ARM 2007 | 10.28% | $3,655 | | $3,655 |
| 7 | HVMLT 2007-2  [2] | Pay Option ARM 2007 | 10.28% | $9,951 | AMBAC | $9,951 |
| 8 | IMM 2003-4  [1] | ALT-A 2003 | 28.57% | $2,895 | AMBAC | $2,895 |
| 9 | IMM 2003-4  [2] | ALT-A 2003 | 28.57% | $137 | AMBAC | $137 |
| 10 | IMM 2003-4  [3] | ALT-A 2003 | 28.57% | $3,217 | AMBAC | $3,217 |
| 11 | IMM 2005-5  [Total] | ALT-A 2005 | 32.57% | $105,623 | AMBAC | $105,623 |
| 12 | IMM 2005-7  [Total] | ALT-A 2005 | 4.50% | $29,377 | Ambac | $29,377 |
| 13 | IMSA 2006-3  [A] | ALT-A 2006 | 9.44% | $76,979 | Ambac | $76,979 |
| 14 | IMSA 2006-3  [F1] | ALT-A 2006 | 9.44% | $14,644 | Ambac | $14,644 |
| 15 | IMSA 2006-3  [F2] | ALT-A 2006 | 9.44% | $3,267 | Ambac | $3,267 |
| 16 | LMT 2005-1  [1AX] | Prime 2005 | 0.53% | $5 | | $5 |
| 17 | LMT 2005-1  [1DISC] | Prime 2005 | 0.53% | $3 | | $3 |
| 18 | LMT 2005-1  [1PAX] | Prime 2005 | 0.53% | $3 | | $3 |
| 19 | LMT 2005-1  [2AX] | Prime 2005 | 0.53% | $6 | | $6 |
| 20 | LMT 2005-1  [2DISC] | Prime 2005 | 0.53% | $4 | | $4 |
| 21 | LMT 2005-1  [2PAX] | Prime 2005 | 0.53% | $3 | | $3 |
| 22 | LMT 2005-1  [3] | Prime 2005 | 0.53% | $4 | | $4 |
| 23 | LMT 2005-1  [4AX] | Prime 2005 | 0.53% | $3 | | $3 |
| 24 | LMT 2005-1  [4PAX] | Prime 2005 | 0.53% | $1 | | $1 |
| 25 | LMT 2005-1  [5AX] | Prime 2005 | 0.53% | $3 | | $3 |
| 26 | LMT 2005-1  [5DISC] | Prime 2005 | 0.53% | $1 | | $1 |
| 27 | LMT 2005-1  [6AX] | Prime 2005 | 0.53% | $1 | | $1 |
| 28 | LMT 2005-1  [6DISC] | Prime 2005 | 0.53% | $6 | | $6 |
| 29 | LMT 2005-1  [6PAX] | Prime 2005 | 0.53% | $1 | | $1 |
| 30 | LUM 2006-6  [Total] | Pay Option ARM 2006 | 77.66% | $31,606 | | $31,606 |
| 31 | LUM 2007-2  [1] | ALT-A 2007 | 18.14% | $4,689 | | $4,689 |
| 32 | LUM 2007-2  [2] | ALT-A 2007 | 18.14% | $1,003 | | $1,003 |
| 33 | LXS 2007-12N  [1] | Pay Option ARM 2007 | 2.73% | $258 | | $258 |
| 34 | LXS 2007-12N  [2] | Pay Option ARM 2007 | 2.73% | $138 | | $138 |
| 35 | LXS 2007-12N  [3] | Pay Option ARM 2007 | 2.73% | $73 | | $73 |
| 36 | LXS 2007-15N  [FOUR_0PP] | Pay Option ARM 2007 | 15.50% | $13,832 | Ambac | $13,832 |
| 37 | LXS 2007-15N  [FOUR_1YPP] | Pay Option ARM 2007 | 15.50% | $23,270 | Ambac | $23,270 |
| 38 | LXS 2007-15N  [FOUR_2YPP] | Pay Option ARM 2007 | 15.50% | $3,030 | Ambac | $3,030 |
| 39 | LXS 2007-15N  [FOUR_3YPP] | Pay Option ARM 2007 | 15.50% | $44,565 | Ambac | $44,565 |
| 40 | LXS 2007-15N  [ONE] | Pay Option ARM 2007 | 15.50% | $20,102 | | $20,102 |
| 41 | LXS 2007-15N  [ONE_C] | Pay Option ARM 2007 | 15.50% | $20,724 | | $20,724 |
| 42 | LXS 2007-15N  [THREE_0PP] | Pay Option ARM 2007 | 15.50% | $6,125 | Ambac | $6,125 |

Schedule 4F - RFC Recognized Uninsured Servicing Claim
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **RFC Servicer %** | **RFC Claim** | **Insurer** | **RFC Recognized Claim** |
| 43 | LXS 2007-15N [THREE_1YPP] | Pay Option ARM 2007 | 15.50% | $11,315 | Ambac | $11,315 |
| 44 | LXS 2007-15N [THREE_2YPP] | Pay Option ARM 2007 | 15.50% | $1,838 | Ambac | $1,838 |
| 45 | LXS 2007-15N [THREE_3YPP] | Pay Option ARM 2007 | 15.50% | $31,324 | Ambac | $31,324 |
| 46 | LXS 2007-15N [TWO] | Pay Option ARM 2007 | 15.50% | $50,976 | | $50,976 |
| 47 | LXS 2007-2N [1_A1] | Pay Option ARM 2007 | 35.47% | $18 | | $18 |
| 48 | LXS 2007-2N [1_A2] | Pay Option ARM 2007 | 35.47% | $49 | | $49 |
| 49 | LXS 2007-2N [1_A3] | Pay Option ARM 2007 | 35.47% | $5 | | $5 |
| 50 | LXS 2007-2N [1_A4] | Pay Option ARM 2007 | 35.47% | $1,420 | | $1,420 |
| 51 | LXS 2007-2N [2_A4] | Pay Option ARM 2007 | 35.47% | $1,892 | | $1,892 |
| 52 | LXS 2007-2N [3_A1] | Pay Option ARM 2007 | 35.47% | $260 | | $260 |
| 53 | LXS 2007-2N [3_A2] | Pay Option ARM 2007 | 35.47% | $575 | | $575 |
| 54 | LXS 2007-2N [3_A3] | Pay Option ARM 2007 | 35.47% | $81 | | $81 |
| 55 | LXS 2007-2N [3_A4] | Pay Option ARM 2007 | 35.47% | $1,713 | | $1,713 |
| 56 | LXS 2007-4N [1A1] | Pay Option ARM 2007 | 14.62% | $294 | | $294 |
| 57 | LXS 2007-4N [1A2] | Pay Option ARM 2007 | 14.62% | $854 | | $854 |
| 58 | LXS 2007-4N [1A3] | Pay Option ARM 2007 | 14.62% | $102 | | $102 |
| 59 | LXS 2007-4N [2A2] | Pay Option ARM 2007 | 14.62% | $476 | | $476 |
| 60 | LXS 2007-4N [2A3] | Pay Option ARM 2007 | 14.62% | $93 | | $93 |
| 61 | LXS 2007-4N [2A4] | Pay Option ARM 2007 | 14.62% | $1,086 | | $1,086 |
| 62 | LXS 2007-4N [3A4] | Pay Option ARM 2007 | 14.62% | $1,111 | | $1,111 |
| 63 | MANA 2007-OAR4 [Total] | Pay Option ARM 2007 | 63.96% | $14,370 | | $14,370 |
| 64 | MHL 2007-2 [Total] | Prime 2007 | 23.04% | $813 | | $813 |
| 65 | MSM 2005-11AR [1] | ALT-A 2005 | 15.31% | $1,165 | | $1,165 |
| 66 | MSM 2005-11AR [2] | ALT-A 2005 | 15.31% | $587 | | $587 |
| 67 | MSM 2005-3AR [1] | ALT-A 2005 | 15.31% | $171 | | $171 |
| 68 | MSM 2005-3AR [2] | ALT-A 2005 | 15.31% | $219 | | $219 |
| 69 | MSM 2005-3AR [3] | ALT-A 2005 | 15.31% | $133 | | $133 |
| 70 | MSM 2005-3AR [4] | ALT-A 2005 | 15.31% | $42 | | $42 |
| 71 | MSM 2005-3AR [5] | ALT-A 2005 | 15.31% | $30 | | $30 |
| 72 | MSM 2005-5AR [1A] | ALT-A 2005 | 15.31% | $1,288 | | $1,288 |
| 73 | MSM 2005-5AR [1F] | ALT-A 2005 | 15.31% | $778 | | $778 |
| 74 | MSM 2005-5AR [2] | ALT-A 2005 | 15.31% | $337 | | $337 |
| 75 | MSM 2005-5AR [3] | ALT-A 2005 | 15.31% | $300 | | $300 |
| 76 | MSM 2005-5AR [4] | ALT-A 2005 | 15.31% | $352 | | $352 |
| 77 | MSM 2005-6AR [11A] | ALT-A 2005 | 15.31% | $388 | | $388 |
| 78 | MSM 2005-6AR [11F] | ALT-A 2005 | 15.31% | $249 | | $249 |
| 79 | MSM 2005-6AR [2] | ALT-A 2005 | 15.31% | $132 | | $132 |
| 80 | MSM 2005-6AR [3] | ALT-A 2005 | 15.31% | $152 | | $152 |
| 81 | MSM 2005-6AR [4] | ALT-A 2005 | 15.31% | $45 | | $45 |
| 82 | MSM 2005-6AR [5] | ALT-A 2005 | 15.31% | $283 | | $283 |
| 83 | MSM 2005-6AR [6] | ALT-A 2005 | 15.31% | $67 | | $67 |

Doc 6065-1

Schedule 4: RFC Recognized Claims for Unresolved Servicing Claim
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **RFC Servicer %** | **RFC Claim** | **Insurer** | **RFC Recognized Claim** |
| 84 | MSM 2005-7 [1] | Prime 2005 | 6.25% | $3 | | $3 |
| 85 | MSM 2005-7 [2] | Prime 2005 | 6.25% | $3 | | $3 |
| 86 | MSM 2005-7 [3] | Prime 2005 | 6.25% | $12 | | $12 |
| 87 | MSM 2005-7 [4] | Prime 2005 | 6.25% | $8 | | $8 |
| 88 | MSM 2005-7 [5] | Prime 2005 | 6.25% | $2 | | $2 |
| 89 | MSM 2005-7 [6] | Prime 2005 | 6.25% | $19 | | $19 |
| 90 | MSM 2005-7 [7] | Prime 2005 | 6.25% | $20 | | $20 |
| 91 | MSM 2005-9AR [1A] | ALT-A 2005 | 15.31% | $164 | | $164 |
| 92 | MSM 2005-9AR [1F] | ALT-A 2005 | 15.31% | $89 | | $89 |
| 93 | MSM 2005-9AR [2] | ALT-A 2005 | 15.31% | $123 | | $123 |
| 94 | MSM 2005-9AR [3] | ALT-A 2005 | 15.31% | $33 | | $33 |
| 95 | MSM 2006-11 [1] | ALT-A 2006 | 10.93% | $30 | | $30 |
| 96 | MSM 2006-11 [2] | ALT-A 2006 | 10.93% | $19 | | $19 |
| 97 | MSM 2006-11 [3] | ALT-A 2006 | 10.93% | $14 | | $14 |
| 98 | MSM 2006-12XS [Total] | ALT-A 2006 | 10.93% | $306 | | $306 |
| 99 | MSM 2006-15XS [Total] | ALT-A 2006 | 10.93% | $5,097 | MBIA | $0 |
| 100 | MSM 2006-17XS [Total] | ALT-A 2006 | 10.93% | $3,914 | MBIA | $0 |
| 101 | MSM 2006-1AR [1A] | ALT-A 2006 | 10.93% | $3,054 | | $3,054 |
| 102 | MSM 2006-1AR [1F] | ALT-A 2006 | 10.93% | $1,505 | | $1,505 |
| 103 | MSM 2006-1AR [2] | ALT-A 2006 | 10.93% | $655 | | $655 |
| 104 | MSM 2006-1AR [3] | ALT-A 2006 | 10.93% | $364 | | $364 |
| 105 | MSM 2006-1AR [4] | ALT-A 2006 | 10.93% | $376 | | $376 |
| 106 | MSM 2006-7 [1] | ALT-A 2006 | 10.93% | $26 | | $26 |
| 107 | MSM 2006-7 [2] | ALT-A 2006 | 10.93% | $102 | | $102 |
| 108 | MSM 2006-7 [3] | ALT-A 2006 | 10.93% | $58 | | $58 |
| 109 | MSM 2006-7 [4] | ALT-A 2006 | 10.93% | $77 | | $77 |
| 110 | MSM 2007-1XS [1] | ALT-A 2007 | 18.19% | $527 | | $527 |
| 111 | MSM 2007-1XS [2] | ALT-A 2007 | 18.19% | $1,107 | | $1,107 |
| 112 | MSM 2007-2AX [1] | ALT-A 2007 | 18.19% | $2,717 | | $2,717 |
| 113 | MSM 2007-2AX [2] | ALT-A 2007 | 18.19% | $7,735 | | $7,735 |
| 114 | MSM 2007-3XS [1] | ALT-A 2007 | 18.19% | $1,222 | | $1,222 |
| 115 | MSM 2007-3XS [2] | ALT-A 2007 | 18.19% | $2,850 | | $2,850 |
| 116 | MSM 2007-6XS [1] | ALT-A 2007 | 18.19% | $886 | | $886 |
| 117 | MSM 2007-6XS [2] | ALT-A 2007 | 18.19% | $1,087 | | $1,087 |
| 118 | MSM 2007-7AX [1] | ALT-A 2007 | 18.19% | $4,333 | | $4,333 |
| 119 | MSM 2007-7AX [2] | ALT-A 2007 | 18.19% | $21,285 | | $21,285 |
| 120 | MSM 2007-8XS [Total] | ALT-A 2007 | 18.19% | $6,310 | MBIA | $0 |
| 121 | PFCA 2002-IFC1 [Total] | Subprime 2002 | 4.50% | $133 | Ambac | $133 |
| 122 | PFCA 2002-IFC2 [Total] | Subprime 2002 | 4.50% | $95 | Ambac | $95 |
| 123 | PFCA 2003-IFC4 [Total] | Subprime 2003 | 4.50% | $110 | Ambac | $110 |
| 124 | PFCA 2003-IFC5 [Total] | Subprime 2003 | 4.50% | $146 | Ambac | $146 |

12-12020-mg    Doc 6065-1    Doc 8019-45    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 26
Pg 359 of 398

Case 1:14-cv-03039-GBD    Document 15-1    Filed 11/06/14    Page 284 of 355

12-12020-mg    Doc 6065-1    Doc 8019-45    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1
Schedule 4R - RFC Recognized Claim vs. Alleged Servicing Claim
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **RFC Servicer %** | **RFC Claim** | **Insurer** | **RFC Recognized Claim** |
| 125 | PFCA 2003-IFC6 [Total] | Subprime 2003 | 4.50% | $268 | Ambac | $268 |
| 126 | RALI 2006-QH1 [Total] | Pay Option Arm 2006 | 100.00% | $14,921 | Ambac | $14,921 |
| 127 | RALI 2006-QO1 [1] | Pay Option Arm 2006 | 100.00% | $7,918 | | $7,918 |
| 128 | RALI 2006-QO1 [2] | Pay Option Arm 2006 | 100.00% | $16,057 | | $16,057 |
| 129 | RALI 2006-QO1 [3] | Pay Option Arm 2006 | 100.00% | $40,320 | | $40,320 |
| 130 | RALI 2006-QO10 [1] | Pay Option Arm 2006 | 100.00% | $43,286 | | $43,286 |
| 131 | RALI 2006-QO10 [2] | Pay Option Arm 2006 | 100.00% | $13,628 | | $13,628 |
| 132 | RALI 2006-QO2 [Total] | Pay Option Arm 2006 | 100.00% | $45,747 | | $45,747 |
| 133 | RALI 2006-QO3 [Total] | Pay Option Arm 2006 | 100.00% | $45,447 | | $45,447 |
| 134 | RALI 2006-QO4 [1] | Pay Option Arm 2006 | 100.00% | $34,617 | XL | $0 |
| 135 | RALI 2006-QO4 [2] | Pay Option Arm 2006 | 100.00% | $31,540 | XL | $0 |
| 136 | RALI 2006-QO5 [1] | Pay Option Arm 2006 | 100.00% | $30,223 | | $30,223 |
| 137 | RALI 2006-QO5 [2] | Pay Option Arm 2006 | 100.00% | $33,300 | | $33,300 |
| 138 | RALI 2006-QO5 [3] | Pay Option Arm 2006 | 100.00% | $19,463 | | $19,463 |
| 139 | RALI 2006-QO6 [Total] | Pay Option Arm 2006 | 100.00% | $97,257 | | $97,257 |
| 140 | RALI 2006-QO7 [1] | Pay Option Arm 2006 | 100.00% | $44,405 | | $44,405 |
| 141 | RALI 2006-QO7 [2] | Pay Option Arm 2006 | 100.00% | $32,312 | | $32,312 |
| 142 | RALI 2006-QO7 [3_PP_0YR] | Pay Option Arm 2006 | 100.00% | $14,028 | | $14,028 |
| 143 | RALI 2006-QO7 [3_PP_1YR] | Pay Option Arm 2006 | 100.00% | $17,534 | | $17,534 |
| 144 | RALI 2006-QO7 [3_PP_3YR] | Pay Option Arm 2006 | 100.00% | $440 | | $440 |
| 145 | RALI 2006-QO8 [1NO_PP] | Pay Option Arm 2006 | 100.00% | $8,739 | | $8,739 |
| 146 | RALI 2006-QO8 [1PP_1YR] | Pay Option Arm 2006 | 100.00% | $17,415 | | $17,415 |
| 147 | RALI 2006-QO8 [1PP_3YR] | Pay Option Arm 2006 | 100.00% | $30,833 | | $30,833 |
| 148 | RALI 2006-QO8 [2PP_3YR] | Pay Option Arm 2006 | 100.00% | $30,119 | | $30,119 |
| 149 | RALI 2006-QO9 [1NO_PP] | Pay Option Arm 2006 | 100.00% | $5,124 | | $5,124 |
| 150 | RALI 2006-QO9 [1PP_1YR] | Pay Option Arm 2006 | 100.00% | $10,223 | | $10,223 |
| 151 | RALI 2006-QO9 [1PP_23YR] | Pay Option Arm 2006 | 100.00% | $14 | | $14 |
| 152 | RALI 2006-QO9 [1PP_3YR] | Pay Option Arm 2006 | 100.00% | $18,051 | | $18,051 |
| 153 | RALI 2006-QO9 [2PP_3YR] | Pay Option Arm 2006 | 100.00% | $17,779 | | $17,779 |
| 154 | RALI 2007-QH1 [Total] | ALT-A 2007 | 100.00% | $20,856 | | $20,856 |
| 155 | RALI 2007-QH2 [Total] | ALT-A 2007 | 100.00% | $14,115 | | $14,115 |
| 156 | RALI 2007-QH3 [Total] | ALT-A 2007 | 100.00% | $13,235 | | $13,235 |
| 157 | RALI 2007-QH4 [Total] | ALT-A 2007 | 100.00% | $10,545 | | $10,545 |
| 158 | RALI 2007-QH5 [1] | ALT-A 2007 | 100.00% | $11,485 | | $11,485 |
| 159 | RALI 2007-QH5 [2] | ALT-A 2007 | 100.00% | $5,050 | | $5,050 |
| 160 | RALI 2007-QH6 [Total] | ALT-A 2007 | 100.00% | $15,940 | | $15,940 |
| 161 | RALI 2007-QH7 [1] | ALT-A 2007 | 100.00% | $4,537 | | $4,537 |
| 162 | RALI 2007-QH7 [2] | ALT-A 2007 | 100.00% | $2,833 | | $2,833 |
| 163 | RALI 2007-QH8 [Total] | ALT-A 2007 | 100.00% | $14,767 | | $14,767 |
| 164 | RALI 2007-QH9 [Total] | ALT-A 2007 | 100.00% | $12,958 | | $12,958 |
| 165 | RALI 2007-QO1 [Total] | Pay Option Arm 2007 | 100.00% | $36,246 | | $36,246 |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1

Schedule 4B - Recognized Claims of Accepted Servicing Claim
Subject to Further Review and Due Diligence

|  | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 166 | RALI 2007-QO2 [Total] | Pay Option Arm 2007 | 100.00% | $29,382 | | $29,382 |
| 167 | RALI 2007-QO3 [Total] | Pay Option Arm 2007 | 100.00% | $10,708 | | $10,708 |
| 168 | RALI 2007-QO4 [1YPP] | Pay Option Arm 2007 | 100.00% | $4,309 | | $4,309 |
| 169 | RALI 2007-QO4 [3YPP] | Pay Option Arm 2007 | 100.00% | $14,682 | | $14,682 |
| 170 | RALI 2007-QO4 [NOPP] | Pay Option Arm 2007 | 100.00% | $2,810 | | $2,810 |
| 171 | RALI 2007-QO5 [Total] | Pay Option Arm 2007 | 100.00% | $8,360 | | $8,360 |
| 172 | RAMP 2001-RS1 [1] | Subprime 2001 | 100.00% | $51,054 | | $51,054 |
| 173 | RAMP 2001-RS1 [2] | Subprime 2001 | 100.00% | $24,366 | AMBAC | $24,366 |
| 174 | RAMP 2001-RS3 [1] | Subprime 2001 | 100.00% | $70,395 | AMBAC | $70,395 |
| 175 | RAMP 2001-RS3 [2] | Subprime 2001 | 100.00% | $27,695 | AMBAC | $27,695 |
| 176 | RAMP 2002-RS1 [1] | Subprime 2002 | 100.00% | $66,834 | AMBAC - Insurer Exception | $66,834 |
| 177 | RAMP 2002-RS1 [2] | Subprime 2002 | 100.00% | $14,130 | | $14,130 |
| 178 | RAMP 2002-RS4 [1] | Subprime 2002 | 100.00% | $56,645 | AMBAC | $56,645 |
| 179 | RAMP 2002-RS4 [2] | Subprime 2002 | 100.00% | $27,910 | AMBAC | $27,910 |
| 180 | RAMP 2002-RS5 [1] | Subprime 2002 | 100.00% | $58,952 | Ambac | $58,952 |
| 181 | RAMP 2002-RS5 [2] | Subprime 2002 | 100.00% | $22,943 | Ambac | $22,943 |
| 182 | RAMP 2002-RS6 [1] | Subprime 2002 | 100.00% | $85,854 | Ambac | $85,854 |
| 183 | RAMP 2002-RS6 [2] | Subprime 2002 | 100.00% | $35,764 | Ambac | $35,764 |
| 184 | RAMP 2002-RS7 [Total] | Subprime 2003 | 100.00% | $43,776 | Ambac | $43,776 |
| 185 | RAMP 2002-R24 [Total] | Subprime 2002 | 100.00% | $66,238 | Ambac | $66,238 |
| 186 | RAMP 2003-RS1 [1] | Subprime 2003 | 100.00% | $61,843 | | $61,843 |
| 187 | RAMP 2003-RS1 [2] | Subprime 2003 | 100.00% | $82,457 | Ambac | $82,457 |
| 188 | RAMP 2003-RS11 [1] | Subprime 2003 | 100.00% | $175,913 | AMBAC - Insurer Exception | $175,913 |
| 189 | RAMP 2003-RS11 [2A] | Subprime 2003 | 100.00% | $146,616 | | $146,616 |
| 190 | RAMP 2003-RS11 [2B] | Subprime 2003 | 100.00% | $58,436 | | $58,436 |
| 191 | RAMP 2003-RS2 [1] | Subprime 2003 | 100.00% | $137,950 | AMBAC | $137,950 |
| 192 | RAMP 2003-RS2 [2] | Subprime 2003 | 100.00% | $137,950 | AMBAC | $137,950 |
| 193 | RAMP 2003-RS3 [1] | Subprime 2003 | 100.00% | $79,732 | AMBAC | $79,732 |
| 194 | RAMP 2003-RS3 [2] | Subprime 2003 | 100.00% | $146,176 | AMBAC | $146,176 |
| 195 | RAMP 2003-RS4 [1] | Subprime 2003 | 100.00% | $117,291 | AMBAC | $117,291 |
| 196 | RAMP 2003-RS4 [2A] | Subprime 2003 | 100.00% | $93,833 | AMBAC | $93,833 |
| 197 | RAMP 2003-RS4 [2B] | Subprime 2003 | 100.00% | $50,435 | AMBAC | $50,435 |
| 198 | RAMP 2003-RS5 [1] | Subprime 2003 | 100.00% | $140,357 | Ambac | $140,357 |
| 199 | RAMP 2003-RS5 [2A] | Subprime 2003 | 100.00% | $67,326 | Ambac | $67,326 |
| 200 | RAMP 2003-RS5 [2B] | Subprime 2003 | 100.00% | $43,362 | Ambac | $43,362 |
| 201 | RAMP 2003-RS6 [1] | Subprime 2003 | 100.00% | $123,476 | Ambac | $123,476 |
| 202 | RAMP 2003-RS6 [2A] | Subprime 2003 | 100.00% | $67,351 | Ambac | $67,351 |
| 203 | RAMP 2003-RS6 [2B] | Subprime 2003 | 100.00% | $33,675 | Ambac | $33,675 |
| 204 | RAMP 2003-RS8 [1] | Subprime 2003 | 100.00% | $146,139 | Ambac - Insurer Exception | $146,139 |
| 205 | RAMP 2003-RS8 [2A] | Subprime 2003 | 100.00% | $82,916 | | $82,916 |
| 206 | RAMP 2003-RS8 [2B] | Subprime 2003 | 100.00% | $55,430 | | $55,430 |

Schedule 4R – RFC Recognized Claim of Disputed Servicing Claim Subject to Further Review and Due Diligence

Appendix 1

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **RFC Servicer %** | **RFC Claim** | **Insurer** | **RFC Recognized Claim** |
| 207 | RAMP 2003-RS9  [1] | Subprime 2003 | 100.00% | $120,135 | AMBAC - Insurer Exception | $120,135 |
| 208 | RAMP 2003-RS9  [2A] | Subprime 2003 | 100.00% | $91,531 | | $91,531 |
| 209 | RAMP 2003-RS9  [2B] | Subprime 2003 | 100.00% | $74,369 | | $74,369 |
| 210 | RAMP 2003-RZ1  [1] | Subprime 2003 | 100.00% | $59,951 | AMBAC | $59,951 |
| 211 | RAMP 2003-RZ1  [2] | Subprime 2003 | 100.00% | $37,469 | AMBAC | $37,469 |
| 212 | RAMP 2003-RZ2  [Total] | Subprime 2003 | 100.00% | $42,533 | AMBAC | $42,533 |
| 213 | RAMP 2003-RZ3  [Total] | Subprime 2003 | 100.00% | $70,082 | Ambac - Insurer Exception | $70,082 |
| 214 | RAMP 2003-RZ4  [Total] | Subprime 2003 | 100.00% | $129,302 | AMBAC - Insurer Exception | $129,302 |
| 215 | RAMP 2003-RZ5  [1] | Subprime 2003 | 100.00% | $98,320 | AMBAC - Insurer Exception | $98,320 |
| 216 | RAMP 2003-RZ5  [2] | Subprime 2003 | 100.00% | $16,387 | | $16,387 |
| 217 | RAMP 2004-RS1  [1] | Subprime 2004 | 100.00% | $131,073 | AMBAC - Insurer Exception | $131,073 |
| 218 | RAMP 2004-RS1  [2A] | Subprime 2004 | 100.00% | $141,460 | | $141,460 |
| 219 | RAMP 2004-RS1  [2B] | Subprime 2004 | 100.00% | $94,471 | | $94,471 |
| 220 | RAMP 2004-RS5  [1] | Subprime 2004 | 100.00% | $102,935 | AMBAC | $102,935 |
| 221 | RAMP 2004-RS5  [2A] | Subprime 2004 | 100.00% | $83,635 | | $83,635 |
| 222 | RAMP 2004-RS5  [2B] | Subprime 2004 | 100.00% | $83,635 | | $83,635 |
| 223 | RAMP 2004-RS7  [1] | Subprime 2004 | 100.00% | $96,836 | FGIC | $96,836 |
| 224 | RAMP 2004-RS7  [2A] | Subprime 2004 | 100.00% | $84,732 | FGIC | $84,732 |
| 225 | RAMP 2004-RS7  [2B] | Subprime 2004 | 100.00% | $76,259 | FGIC | $76,259 |
| 226 | RAMP 2004-RS7  [3] | Subprime 2004 | 100.00% | $30,261 | FGIC | $30,261 |
| 227 | RAMP 2004-RS9  [1] | Subprime 2004 | 100.00% | $76,745 | AMBAC | $76,745 |
| 228 | RAMP 2004-RS9  [2] | Subprime 2004 | 100.00% | $188,374 | FGIC | $188,374 |
| 229 | RAMP 2004-RZ2  [1] | Subprime 2004 | 100.00% | $48,173 | FGIC | $48,173 |
| 230 | RAMP 2004-RZ2  [2] | Subprime 2004 | 100.00% | $28,101 | FGIC | $28,101 |
| 231 | RAMP 2005-EFC7  [1A] | Subprime 2005 | 100.00% | $169,698 | FGIC | $169,698 |
| 232 | RAMP 2005-EFC7  [1F] | Subprime 2005 | 100.00% | $42,539 | FGIC | $42,539 |
| 233 | RAMP 2005-EFC7  [2A] | Subprime 2005 | 100.00% | $77,711 | FGIC | $77,711 |
| 234 | RAMP 2005-EFC7  [2F] | Subprime 2005 | 100.00% | $7,123 | FGIC | $7,123 |
| 235 | RAMP 2005-NC1  [1A] | Subprime 2005 | 100.00% | $218,843 | FGIC | $218,843 |
| 236 | RAMP 2005-NC1  [1F] | Subprime 2005 | 100.00% | $49,756 | FGIC | $49,756 |
| 237 | RAMP 2005-NC1  [2A] | Subprime 2005 | 100.00% | $175,407 | FGIC | $175,407 |
| 238 | RAMP 2005-NC1  [2F] | Subprime 2005 | 100.00% | $58,161 | FGIC | $58,161 |
| 239 | RAMP 2005-RS9  [1A_L] | Subprime 2005 | 100.00% | $55,653 | FGIC | $55,653 |
| 240 | RAMP 2005-RS9  [1A_S] | Subprime 2005 | 100.00% | $202,078 | FGIC | $202,078 |
| 241 | RAMP 2005-RS9  [1F] | Subprime 2005 | 100.00% | $80,546 | FGIC | $80,546 |
| 242 | RAMP 2005-RS9  [2A_L] | Subprime 2005 | 100.00% | $19,125 | FGIC | $19,125 |
| 243 | RAMP 2005-RS9  [2A_S] | Subprime 2005 | 100.00% | $183,544 | FGIC | $183,544 |
| 244 | RAMP 2005-RS9  [2F] | Subprime 2005 | 100.00% | $42,071 | FGIC | $42,071 |
| 245 | RASC 1999-RS1  [1] | Subprime 1999 | 100.00% | $6,659 | AMBAC | $6,659 |
| 246 | RASC 1999-RS1  [2] | Subprime 1999 | 100.00% | $4,378 | AMBAC | $4,378 |
| 247 | RASC 2001-KS1  [1] | Subprime 2001 | 100.00% | $181,210 | FGIC | $181,210 |

12-12020-mg    Doc 6065-1    Filed 12/11/13    Entered 12/11/13 17:30:11    Appendix 1

Schedule 4R - RFC Recognized Alleged Breached Servicing Claim

Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 248 | RASC 2001-KS1  [2] | Subprime 2001 | 100.00% | $193,708 | FGIC | $193,708 |
| 249 | RASC 2002-KS1  [1] | Subprime 2002 | 100.00% | $261,115 | Ambac | $261,115 |
| 250 | RASC 2002-KS1  [2A] | Subprime 2002 | 100.00% | $105,690 | Ambac | $105,690 |
| 251 | RASC 2002-KS1  [2B] | Subprime 2002 | 100.00% | $105,690 | Ambac | $105,690 |
| 252 | RASC 2002-KS4  [1] | Subprime 2002 | 100.00% | $117,159 | AMBAC | $117,159 |
| 253 | RASC 2002-KS4  [2A] | Subprime 2002 | 100.00% | $154,437 | AMBAC | $154,437 |
| 254 | RASC 2002-KS4  [2B] | Subprime 2002 | 100.00% | $154,437 | AMBAC | $154,437 |
| 255 | RASC 2002-KS6  [1] | Subprime 2002 | 100.00% | $112,045 | AMBAC | $112,045 |
| 256 | RASC 2002-KS6  [2] | Subprime 2002 | 100.00% | $156,864 | AMBAC | $156,864 |
| 257 | RASC 2002-KS8  [Total] | Subprime 2002 | 100.00% | $168,071 | Ambac | $168,071 |
| 258 | RASC 2003-KS4  [1] | Subprime 2003 | 100.00% | $131,850 | | $131,850 |
| 259 | RASC 2003-KS4  [2A] | Subprime 2003 | 100.00% | $50,712 | Ambac | $50,712 |
| 260 | RASC 2003-KS4  [2B] | Subprime 2003 | 100.00% | $40,569 | Ambac | $40,569 |
| 261 | RASC 2003-KS4  [3] | Subprime 2003 | 100.00% | $40,569 | Ambac | $40,569 |
| 262 | RASC 2003-KS5  [1] | Subprime 2003 | 100.00% | $44,803 | Ambac | $44,803 |
| 263 | RASC 2003-KS5  [2A] | Subprime 2003 | 100.00% | $62,725 | Ambac | $62,725 |
| 264 | RASC 2003-KS5  [2B] | Subprime 2003 | 100.00% | $49,284 | AMBAC | $49,284 |
| 265 | RASC 2003-KS9  [1] | Subprime 2003 | 100.00% | $80,447 | AMBAC | $80,447 |
| 266 | RASC 2003-KS9  [2A] | Subprime 2003 | 100.00% | $80,447 | AMBAC | $80,447 |
| 267 | RASC 2003-KS9  [2B] | Subprime 2003 | 100.00% | $80,447 | AMBAC | $80,447 |
| 268 | RASC 2004-KS4  [1] | Subprime 2004 | 100.00% | $52,020 | AMBAC | $52,020 |
| 269 | RASC 2004-KS4  [2A] | Subprime 2004 | 100.00% | $78,031 | AMBAC | $78,031 |
| 270 | RASC 2004-KS4  [2B] | Subprime 2004 | 100.00% | $78,031 | AMBAC | $78,031 |
| 271 | RASC 2004-KS7  [1] | Subprime 2004 | 100.00% | $41,951 | FGIC | $41,951 |
| 272 | RASC 2004-KS7  [2A] | Subprime 2004 | 100.00% | $80,905 | FGIC | $80,905 |
| 273 | RASC 2004-KS7  [2B] | Subprime 2004 | 100.00% | $80,905 | FGIC | $80,905 |
| 274 | RASC 2004-KS9  [1] | Subprime 2004 | 100.00% | $37,762 | FGIC | $37,762 |
| 275 | RASC 2004-KS9  [2] | Subprime 2004 | 100.00% | $113,284 | FGIC | $113,284 |
| 276 | RASC 2005-EMX5  [A] | Subprime 2005 | 100.00% | $182,713 | FGIC | $182,713 |
| 277 | RASC 2005-EMX5  [F] | Subprime 2005 | 100.00% | $41,064 | FGIC | $41,064 |
| 278 | RASC 2007-EMX1  [1A] | Subprime 2007 | 100.00% | $213,035 | FGIC | $213,035 |
| 279 | RASC 2007-EMX1  [1F] | Subprime 2007 | 100.00% | $76,479 | FGIC | $76,479 |
| 280 | RASC 2007-EMX1  [2A] | Subprime 2007 | 100.00% | $201,675 | FGIC | $201,675 |
| 281 | RASC 2007-EMX1  [2F] | Subprime 2007 | 100.00% | $56,812 | FGIC | $56,812 |
| 282 | RFMS2 1999-H11  [Total] | Second Lien 1999 | 100.00% | $32,228 | AMBAC | $32,228 |
| 283 | RFMS2 1999-H14  [Total] | Second Lien 1999 | 100.00% | $28,865 | AMBAC | $28,865 |
| 284 | RFMS2 1999-HI6  [I] | Second Lien 1999 | 100.00% | $36,926 | AMBAC | $36,926 |
| 285 | RFMS2 1999-HI6  [II] | Second Lien 1999 | 100.00% | $2,104 | AMBAC | $2,104 |
| 286 | RFMS2 1999-HI8  [I] | Second Lien 1999 | 100.00% | $25,083 | AMBAC | $25,083 |
| 287 | RFMS2 1999-HI8  [II] | Second Lien 1999 | 100.00% | $1,311 | AMBAC | $1,311 |
| 288 | RFMS2 2000-H11  [I] | Second Lien 2000 | 100.00% | $104,627 | AMBAC | $104,627 |

Schedule 4E - RFC Recognized Claim of Proposed Segregated Servicing Claim
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Name** | **Cohort** | **RFC Servicer %** | **RFC Claim** | **Insurer** | **RFC Recognized Claim** |
| 289 | RFMS2 2000-H1 [I] | Second Lien 2000 | 100.00% | $4,295 | AMBAC | $4,295 |
| 290 | RFMS2 2000-H2 [I] | Second Lien 2000 | 100.00% | $57,536 | AMBAC | $57,536 |
| 291 | RFMS2 2000-H2 [II] | Second Lien 2000 | 100.00% | $2,554 | AMBAC | $2,554 |
| 292 | RFMS2 2000-H3 [I] | Second Lien 2000 | 100.00% | $72,664 | AMBAC | $72,664 |
| 293 | RFMS2 2000-H3 [II] | Second Lien 2000 | 100.00% | $3,238 | AMBAC | $3,238 |
| 294 | RFMS2 2000-H4 [1] | Second Lien 2000 | 100.00% | $72,512 | AMBAC | $72,512 |
| 295 | RFMS2 2000-H4 [2] | Second Lien 2000 | 100.00% | $3,642 | AMBAC | $3,642 |
| 296 | RFMS2 2000-H5 [1] | Second Lien 2000 | 100.00% | $146,553 | AMBAC | $146,553 |
| 297 | RFMS2 2000-H5 [2] | Second Lien 2000 | 100.00% | $6,661 | AMBAC | $6,661 |
| 298 | RFMS2 2000-HL1 [1] | Second Lien 2000 | 100.00% | $9,977 | AMBAC | $9,977 |
| 299 | RFMS2 2000-HL1 [2] | Second Lien 2000 | 100.00% | $1,281 | AMBAC | $1,281 |
| 300 | RFMS2 2001-H1 [Total] | Second Lien 2001 | 100.00% | $34,464 | AMBAC | $34,464 |
| 301 | RFMS2 2001-H2 [1] | Second Lien 2001 | 100.00% | $25,340 | AMBAC | $25,340 |
| 302 | RFMS2 2001-H2 [2] | Second Lien 2001 | 100.00% | $1,310 | AMBAC | $1,310 |
| 303 | RFMS2 2001-H3 [1] | Second Lien 2001 | 100.00% | $54,530 | AMBAC | $54,530 |
| 304 | RFMS2 2001-H3 [2] | Second Lien 2001 | 100.00% | $1,337 | AMBAC | $1,337 |
| 305 | RFMS2 2001-H4 [Total] | Second Lien 2001 | 100.00% | $54,258 | AMBAC | $54,258 |
| 306 | RFMS2 2001-H52 [Total] | Second Lien 2001 | 100.00% | $5,585 | AMBAC | $5,585 |
| 307 | RFMS2 2001-H53 [1] | CES 2001 | 100.00% | $2,260 | | $2,260 |
| 308 | RFMS2 2001-H53 [2] | CES 2001 | 100.00% | $778 | AMBAC | $778 |
| 309 | RFMS2 2002-H1 [Total] | Second Lien 2002 | 100.00% | $46,247 | AMBAC | $46,247 |
| 310 | RFMS2 2002-H2 [1] | Second Lien 2002 | 100.00% | $22,664 | AMBAC | $22,664 |
| 311 | RFMS2 2002-H2 [2] | Second Lien 2002 | 100.00% | $10,073 | AMBAC | $10,073 |
| 312 | RFMS2 2002-H3 [Total] | Second Lien 2002 | 100.00% | $36,431 | AMBAC | $36,431 |
| 313 | RFMS2 2002-H53 [1] | CES 2002 | 100.00% | $1,824 | FGIC | $1,824 |
| 314 | RFMS2 2002-H53 [2] | CES 2002 | 100.00% | $1,662 | FGIC | $1,662 |
| 315 | RFMS2 2003-H3 [1] | Second Lien 2003 | 100.00% | $13,360 | AMBAC | $13,360 |
| 316 | RFMS2 2003-H3 [2] | Second Lien 2003 | 100.00% | $13,360 | AMBAC | $13,360 |
| 317 | RFMS2 2003-HS1 [1] | CES 2003 | 100.00% | $5,905 | FGIC | $5,905 |
| 318 | RFMS2 2003-HS1 [2] | CES 2003 | 100.00% | $2,805 | FGIC | $2,805 |
| 319 | RFMS2 2003-H52 [1] | CES 2003 | 100.00% | $6,870 | | $6,870 |
| 320 | RFMS2 2003-H52 [2A] | CES 2003 | 100.00% | $1,740 | FGIC | $1,740 |
| 321 | RFMS2 2003-H53 [2B] | CES 2003 | 100.00% | $2,840 | FGIC | $2,840 |
| 322 | RFMS2 2003-HS4 [1] | Second Lien 2003 | 100.00% | $3,480 | AMBAC | $3,480 |
| 323 | RFMS2 2003-H54 [2] | Second Lien 2003 | 100.00% | $3,480 | AMBAC | $3,480 |
| 324 | RFMS2 2004-H2 [Total] | Second Lien 2004 | 100.00% | $27,528 | FGIC | $27,528 |
| 325 | RFMS2 2004-H3 [Total] | Second Lien 2004 | 100.00% | $16,950 | FGIC | $16,950 |
| 326 | RFMS2 2004-HS1 [1] | CES 2004 | 100.00% | $7,928 | FGIC | $7,928 |
| 327 | RFMS2 2004-HS1 [2] | CES 2004 | 100.00% | $4,419 | FGIC | $4,419 |
| 328 | RFMS2 2004-H53 [Total] | CES 2004 | 100.00% | $5,741 | FGIC | $5,741 |
| 329 | RFMS2 2005-H1 [Total] | Second Lien 2005 | 100.00% | $12,289 | FGIC | $12,289 |

Schedule 4B - RFC Recognized Unsecured Servicing Claim
Subject to Further Review and Due Diligence

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Name | Cohort | RFC Servicer % | RFC Claim | Insurer | RFC Recognized Claim |
| 330 | RFMS2 2005-HS1 [1] | CES 2005 | 100.00% | $11,344 | FGIC | $11,344 |
| 331 | RFMS2 2005-HS1 [2] | CES 2005 | 100.00% | $6,188 | FGIC | $6,188 |
| 332 | RFMS2 2005-HS2 [1] | CES 2005 | 100.00% | $6,901 | FGIC | $6,901 |
| 333 | RFMS2 2005-HS2 [2] | CES 2005 | 100.00% | $4,437 | FGIC | $4,437 |
| 334 | RFMS2 2005-HSA1 [1] | CES 2005 | 100.00% | $3,440 | FGIC | $3,440 |
| 335 | RFMS2 2005-HSA1 [2] | CES 2005 | 100.00% | $1,946 | FGIC | $1,946 |
| 336 | RFMS2 2006-HI2 [Total] | Second Lien 2006 | 100.00% | $3,240 | FGIC | $3,240 |
| 337 | RFMS2 2006-HI5 [Total] | Second Lien 2006 | 100.00% | $2,862 | FGIC | $2,862 |
| 338 | RFMS2 2006-HSA2 [1] | CES 2006 | 100.00% | $2,918 | FGIC | $2,918 |
| 339 | RFMS2 2006-HSA2 [2] | CES 2006 | 100.00% | $1,459 | FGIC | $1,459 |
| 340 | RFMS2 2007-HI1 [Total] | Second Lien 2007 | 100.00% | $2,840 | FGIC | $2,840 |
| 341 | RFMS2 2007-HSA1 [Total] | Second Lien 2007 | 100.00% | $2,430 | MBIA | $0 |
| 342 | RFMS2 2007-HSA2 [Total] | CES 2007 | 100.00% | $1,975 | MBIA | $0 |
| 343 | RFMS2 2007-HSA3 [1] | Second Lien 2007 | 100.00% | $1,361 | MBIA | $0 |
| 344 | RFMS2 2007-HSA3 [2] | Second Lien 2007 | 100.00% | $547 | MBIA | $0 |
| 345 | RFMSI 2005-S2 [Total] | Prime 2005 | 100.00% | $8,728 | FGIC - Insurer Exception | $8,728 |
| 346 | RFMSI 2005-S7 [Total] | Prime 2005 | 100.00% | $26,331 | FGIC | $26,331 |
| 347 | RFSC 2002-RP1 [1] | Subprime 2002 | 100.00% | $11,347 | AMBAC | $11,347 |
| 348 | RFSC 2002-RP1 [2] | Subprime 2002 | 100.00% | $11,635 | AMBAC | $11,635 |
| 349 | RFSC 2002-RP2 [Total] | Subprime 2002 | 100.00% | $82,515 | AMBAC | $82,515 |
| 350 | RFSC 2003-RP1 [1A] | Subprime 2003 | 100.00% | $78,140 | AMBAC - Insurer Exception | $78,140 |
| 351 | RFSC 2003-RP1 [1F] | Subprime 2003 | 100.00% | $65,891 | AMBAC - Insurer Exception | $65,891 |
| 352 | RFSC 2003-RP2 [1A] | Subprime 2003 | 100.00% | $19,461 | AMBAC | $19,461 |
| 353 | RFSC 2003-RP2 [1F] | Subprime 2003 | 100.00% | $27,428 | AMBAC | $27,428 |
| 354 | RFSC 2003-RP2 [2A] | Subprime 2003 | 100.00% | $34,685 | AMBAC | $34,685 |
| 355 | RFSC 2003-RP2 [2F] | Subprime 2003 | 100.00% | $20,091 | AMBAC | $20,091 |
| 356 | STAC 2007-1 [Total] | 2007 | 2.50% | $272 | XL Capital | $0 |
| 357 | SVHE 2007-1 [1A] | Subprime 2007 | 7.61% | $366 | | $366 |
| 358 | SVHE 2007-1 [1F] | Subprime 2007 | 7.61% | $168 | | $168 |
| 359 | SVHE 2007-1 [2A] | Subprime 2007 | 7.61% | $307 | | $307 |
| 360 | SVHE 2007-1 [2F] | Subprime 2007 | 7.61% | $345 | | $345 |
| 361 | | | | $12,886,997 | | $12,798,933 |

**Schedule 5 – NERDS and Passive Foreign Investment Company Interests**

## Non-Economic Residuals (NERDS)

| Deal Name | Registered To |
|-----------|---------------|
| 1999-RS1 | RFC |
| 2001-HE2 | GMAC Mortgage |
| 2001-HS2 | RFC |
| 2001-HS3 | RFC |
| 2001-KS2 | RFC |
| 2001-KS3 | RFC |
| 2001-RS1 | RFC |
| 2001-RS3 | RFC |
| 2002-HE4 | GMAC Mortgage |
| 2002-KS2 | RFC |
| 2002-RP2 | RFC |
| 2002-RS3 | RFC |
| 2002-RS7 | RFC |
| 2002-RZ4 | RFC |
| 2003-GH1 | GMAC Mortgage |
| 2003-GH2 | GMAC Mortgage |
| 2003-HE2 | GMAC Mortgage |
| 2003-HS3 | RFC |
| 2003-J2 | GMAC Mortgage |
| 2003-J3 | GMAC Mortgage |
| 2003KS10 | RFC |
| 2003KS11 | RFC |
| 2003-KS2 | RFC |
| 2003-KS3 | RFC |
| 2003-KS4 | RFC |
| 2003-KS9 | RFC |
| 2003-RP2 | RFC |
| 2003RS10 | RFC |
| 2003RS11 | RFC |
| 2003-RS7 | RFC |
| 2003-RS8 | RFC |
| 2003-RS9 | RFC |
| 2003-RZ2 | RFC |
| 2003-RZ5 | RFC |
| 2003-SL1 | RFC |
| 2004-GH1 | GMAC Mortgage |
| 2004-HE2 | GMAC Mortgage |
| 2004-HE5 | GMAC Mortgage |
| 2004-HS2 | RFC |
| 2004-KS1 | RFC |
| 2004KS12 | RFC |
| 2004-KS2 | RFC |
| 2004-KS6 | RFC |
| 2004-KS8 | RFC |
| 2004-RS1 | RFC |
| 2004RS11 | RFC |
| 2004RS12 | RFC |
| 2004-RS2 | RFC |
| 2004-RS6 | RFC |
| 2004-RS9 | RFC |
| 2004-RZ2 | RFC |

12-12020-mg    Doc 8319-13    Filed 02/18/15    Entered 02/18/15 18:14:28    Appendix 1
Pg 367 of 398

| | |
|---|---|
| 2004-S03 | RFC |
| 2004-SL1 | RFC |
| 2004-SL2 | RFC |
| 2004-SL3 | RFC |
| 2004-SL4 | RFC |
| 2004-SP1 | RFC |
| 2005-AA1 | GMAC Mortgage |
| 2005AHL2 | RFC |
| 2005EMX1 | RFC |
| 2005EMX2 | RFC |
| 2005-HE2 | GMAC Mortgage |
| 2005KS10 | RFC |
| 2005KS11 | RFC |
| 2005-KS7 | RFC |
| 2005-QA5 | PRAMWAVE |
| 2005QO3A | PRAMWAVE |
| 2005-RS1 | RFC |
| 2005-RS4 | RFC |
| 2005-RZ3 | RFC |
| 2005-RZ4 | RFC |
| 2005-SA5 | PRAMWAVE |
| 2005-SL2 | RFC |
| 2006-AR1 | GMAC Mortgage |
| 2006EFC1 | RFC |
| 2006EMX1 | RFC |
| 2006-HE2 | GMAC Mortgage |
| 2006-HE3 | GMAC Mortgage |
| 2006-HE5 | GMAC Mortgage |
| 2006-KS5 | RFC |
| 2007-HE1 | GMAC Mortgage |
| 2007-HE2 | GMAC Mortgage |
| 2007-HE3 | GMAC Mortgage |
| 2007-SA1 | PRAMWAVE |
| 2007-SP3 | RFC |
| 2007-HEL1 | RFC |
| 1995-2 | RFC |
| 1995-3 | RFC |
| 2003-HE3 | Pramwave |
| 2003-HE4 | Pramwave |
| 2005-HS1 | RFC |

## Passive Foreign Investment Company (PFIC)

| Deal Name | Deal Name | Registered To |
|---|---|---|
| RAAC 2006 RX1 | | |
| PREFERENCE SHRS | 2006-RX1 | Pramwave |

**Schedule 6 – Securities**

**Securities**

| Deal Name | Deal Id |
|---|---|
| SER 2004 HI2 CERT | 2004-HI2 |
| 2003 HI4 CL A COMMON | 2003-HI4 |
| 1998 HI2 CL A COMMON | 1998-HI2 |
| RFC06HI1 CERT | 2006-HI1 |
| 2003 HI2 CL A COMMON | 2003-HI2 |
| 2004 HI1 CL A COMMON | 2004-HI1 |
| RFC06HI3 CERT | 2006-HI3 |
| RFC06HI4 CERT | 2006-HI4 |
| RFC06HSA2 SBII | 2006-HSA2 |
| RFC05HI3 CERT | 2005-HI3 |
| RFC06HI5 CERT | 2006-HI5 |
| RFC05HI1 CERT | 2005-HI1 |
| RFC05HS2 SBII | 2005-HS2 II |
| SER 2005 HS1 SBII | 2005-HS1 |
| 2006-HI2 I | 06-HI2 |
| GMEN 2004-VFT | 2004-VFT |

# Schedule 7 – Common Land

**Common Land**

| City | State | Parcel # |
|------|-------|----------|
| Moreno Valley | CA | 304350025-6 |
| Moreno Valley | CA | 304240018-0 |
| Menifee | CA | 335070049-9 |
| Corona | CA | 290602021-8 |
| Orange Park | FL | 06-04-25-007869-076-00 |

12-12020-mg    Doc 8019-45    Filed 01/23/15    Entered 01/22/15 18:14:28    Exhibit 26
372 of 398

# Appendix 2

MORRISON & FOERSTER LLP
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

*Counsel for the Debtors and*
*Debtors in Possession*

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Rachael L. Ringer
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-3280
Facsimile:  (212) 715-8000

*Counsel for the Official Committee of*
*Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

In re:                                                          :      Chapter 11
                                                                :
Residential Capital, LLC, et al.,                               :      Case No. 12-12020 (MG)
                                                                :
                                    Debtors.                    :      Jointly Administered
                                                                :

------------------------------------------------------------ x

**NOTICE OF ENTRY OF CONFIRMATION ORDER AND OCCURRENCE OF**
**EFFECTIVE DATE CONFIRMING THE SECOND AMENDED JOINT CHAPTER 11**
**PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC, ET AL. AND THE**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

1.      **Confirmation of the Plan**.  On [●], 2013, the United States Bankruptcy Court for the
Southern District of New York (the "**Bankruptcy Court**") entered the *Order Confirming Second
Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official
Committee of Unsecured Creditors* [Docket No. [●]] (the "**Confirmation Order**") confirming
the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the
Official Committee of Unsecured Creditors* [Docket No. 6030-1] (as may be amended, modified
or supplemented from time to time, the "**Plan**").[1]

2.      **Effective Date**.  On [●], 2013, pursuant to the satisfaction of the conditions set forth in
Article X.B of the Plan, the Effective Date of the Plan occurred, and the Plan was substantially
consummated.

3.      **Bar Date for Administrative Claims.**  Except as otherwise provided in Article II.A of
the Plan, the Confirmation Order, or any other applicable order of the Bankruptcy Court, all

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

requests for payment of an Administrative Claim accrued on or before the Effective Date must be made in writing, conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court Southern District of New York (the "**Local Bankruptcy Rules**"), be filed with the Bankruptcy Court, and served on the Plan Proponents or the Liquidating Trust, as applicable, so as to be received **no later than January [●], 2014** (the "**Administrative Claims Bar Date**"). Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Plan Trusts, or their assets or properties, and such Administrative Claims shall be deemed discharged as of the Effective Date.

4.      **Deadline for Professional Claims**.   All final requests for payment of Professional Claims and expenses for services rendered before the Effective Date, including any holdback amounts, must be filed with the Bankruptcy Court and served on the Debtors and the Liquidating Trustee so as to be actually received **no later than March [●], 2014**, and must comply with the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules, and the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders.


**[*Remainder of Page Intentionally Left Blank*]**

5.    **Access to Court Documents.**    The Confirmation Order, the Plan, copies of the documents included in the Plan or any other document filed in these Chapter 11 Cases are available: (a) by calling the Debtors' restructuring hotline at (888) 251-2914 or by visiting the Debtors' restructuring website at www.kccllc.net/rescap, or (b) for a fee via PACER by visiting www.nysb.uscourts.gov.

Dated:  December [  ], 2013
         New York, New York

_____

Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile:  (212) 468-7900

*Counsel for the Debtors and Debtors in Possession*

-and-

Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Rachael L. Ringer
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-3280
Facsimile:  (212) 715-8000

*Counsel for the Official Committee of Unsecured Creditors*

12-12020-mg   Doc 3035-33   Filed 02/28/13   Entered 02/28/13 Page 291 Appendix 3
Pg 1 of 5

# Appendix 3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

In re:                                        :        Chapter 11
                                              :
Residential Capital, LLC, et al.,             :        Case No. 12-12020 (MG)
                                              :
                         Debtors.             :        Jointly Administered
                                              :
---------------------------------------------------------- x

## NOTICE OF THE DEADLINE AND PROCEDURES FOR
## FILING CERTAIN ADMINISTRATIVE CLAIMS

**PLEASE TAKE NOTICE THAT**, on December [●], 2013, the United States Bankruptcy Court for the Southern District of New York (the "**Court**"), having jurisdiction over the chapter 11 cases of Residential Capital, LLC and its affiliated debtors, as debtors in possession (collectively, the "**Debtors**") entered an order confirming the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6030-1] (as may be amended, modified or supplemented from time to time, the "**Plan**").[1]

Pursuant to the Plan, the Administrative Claim Bar Date shall be the first Business Day that is thirty (30) days following the Effective Date, [**January [●], 2014**] (the "**Administrative Claims Bar Date**"), unless otherwise ordered by the Bankruptcy Court.  This date, [**January [●], 2014**] is the last date and time for each person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, trusts and governmental units as defined in section 101(27) of the Bankruptcy Code) to file a request for payment (a "**Request for Payment**") for each Administrative Claim (as defined below) against any of the Debtors.

## 1.    WHO MUST FILE A REQUEST FOR PAYMENT

**You MUST file a Request for Payment if you have an Administrative Claim and it is <u>not</u> among the types of claims described in section 2 below.**

Pursuant to section 101(5) of the Bankruptcy Code and as used in this notice, the word "claim" means: (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

An **Administrative Claim** means any Claim for costs and expenses of administration under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including the actual and

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

necessary costs and expenses **incurred on and after May 14, 2012 through [December [●],
2013]** of preserving the Estates and operating the businesses of the Debtors, any indebtedness or
obligations assumed by the Debtors in connection with the conduct of their businesses, and any
Claim for goods delivered to the Debtors within twenty (20) days of the Petition Date and
entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code.

Please consult your legal advisor if you have any uncertainty as to whether your proposed
claim may constitute an Administrative Claim. The preceding explanation is intended to provide
guidance, not to serve as legal advice.

**2.    WHO NEED <u>NOT</u> FILE A REQUEST FOR PAYMENT**

You do not need to file a Request for Payment on or prior to the Administrative Claim
Bar Date if you are a:

(a)    holder of an Allowed Administrative Claim;

(b)    holder of an Administrative Claim paid in the ordinary course of business;

(c)    holder of a Claim of a Governmental Unit not required to be filed pursuant to
section 503(b)(1)(D) of the Bankruptcy Code;

(d)    holder of a Professional Claim;

(e)    holder of a Claim for U.S. Trustee Fees.

**You should not file a request for payment for an Administrative Claim if you do not
have an Administrative Claim against the Debtors, or if the Administrative Claim you held
against the Debtors has been paid in full.**

**This notice is being sent to many persons and entities that have had some
relationship with or have done business with the Debtors but may not have an unpaid claim
against the Debtors. The fact that you have received this notice does not mean that you
have an Administrative Claim or that the Debtors or the Court believe that you have an
Administrative Claim.**

**3.    WHAT TO FILE AND SERVE**

All requests for payment of an Administrative Claim must be made in writing, conform
to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court Southern
District of New York (the "**Local Bankruptcy Rules**"), be filed with the Bankruptcy Court, and
served on the Plan Proponents or the Liquidating Trust, as applicable, so as to be received **no
later than January [●], 2014**.

Any holder of an Administrative Claim against more than one debtor must file a separate
claim with respect to each such Debtor and all holders of claims must identify on their Request
for Payment the specific Debtor against which their claim is asserted and the case number of that
Debtor's bankruptcy case.

ny-1121535

4.      **CONSEQUENCES OF FAILURE TO FILE A REQUEST FOR PAYMENT BY
THE ADMINISTRATIVE CLAIM BAR DATE**

Any holder of an Administrative Claim who is required to, but does not, file and serve a Request for Payment of an Administrative Claim pursuant to the procedures specified herein on or prior to the Administrative Claim Bar Date shall be barred from asserting such Administrative Claim against the Debtors, the Plan Trusts, or their assets or properties, and such Administrative Claims shall be deemed discharged as of the Effective Date.

**A holder of a possible claim against the Debtors should consult an attorney regarding any matters not covered in this notice, such as whether the holder should file a Request for Payment.  Neither the attorneys for the Plan Proponents, the Liquidating Trust, nor the Debtors' Court-appointed noticing and claims agent, Kurtzman Carson Consultants LLC, are authorized to provide you with any legal advice.**

## RESERVATION OF RIGHTS

The Debtors and Liquidating Trust reserve the right to object to (i) any claim, whether filed or scheduled (e.g., as contingent, unliquidated or disputed), and (ii) any Administrative Claim on any ground, or to dispute, or to assert offsets against or defenses to, any claim, as to amount, liability, classification, or otherwise, and to subsequently designate any claim as disputed, contingent and/or unliquidated.

[*Remainder of Page Intentionally Left Blank*]

ny-1121535

12-12020-mg   Doc 8038-35   Filed 02/16/15   Entered 02/16/15 17:... Appendix 26
Pg 380 of 398

> **IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE, PLEASE CONTACT THE DEBTORS' RESTRUCTURING HOTLINE AT (888) 251-2914**

Dated: December [●], 2013
   New York, New York

Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile:  (212) 468-7900

*Counsel for the Debtors and*
*Debtors in Possession*

-and-

Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Rachael L. Ringer
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-3280
Facsimile:  (212) 715-8000

*Counsel for the Official Committee of*
*Unsecured Creditors*

**Exhibit B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 12-12020 |
| RESIDENTIAL CAPITAL, LLC, *et. al*. | |
| Debtors. | |

## ORDER DENYING MOTION OF FRANCINE SILVER
## FOR PAYMENT OF CLAIM #61

Pending before the Court is the *Pro Se Motion by Francine Silver for Payment of Claim #61* (ECF Doc. # 6639 and ECF Doc. # 6690) (the "Motion"). Through the Motion, Francine Silver ("Silver") seeks immediate payment of her unsecured claim no. 61 (the "Claim"). For the reasons provided below, the Motion is **DENIED**.

On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code. On August 29, 2012, the Court entered an order (the "Bar Date Order," ECF Doc. # 1309) establishing November 9, 2012 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for filing proofs of claim by virtually all creditors against the Debtors (the "General Bar Date"), and prescribing the form and manner for filing proofs of claim. On November 7, 2012, the Court entered an Order extending the General Bar Date to November 16, 2012 at 5:00 p.m. (Prevailing Eastern Time). (ECF Doc. # 2093.)

Silver timely filed a $3 million proof of claim listing Residential Capital, LLC, as the Debtor, citing "Mortgage litigation, fraud, [and] unjust enrichment" as grounds for her claim. Through the *Order Granting Debtors' Thirty-Eighth Omnibus Objection to Claims (Wrong Debtor Borrower Claims)*, this Court redesignated the Claim as one against GMAC Mortgage, LLC. (ECF Doc. # 5898.)

1212020140326000000000005

On December 11, 2013, the Court entered an *Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* (the "Confirmation Order) approving the terms of the Chapter 11 plan, as amended (the "Plan"), in these chapter 11 proceedings.  (ECF Doc. # 6065.)  The Plan became effective on December 17, 2013 (the "Effective Date").  (ECF Doc. # 6137.)  The Plan provides that the ResCap Borrower Claims Trust and Liquidating Trust have 270 days after the Effective Date to object to proofs of claim.[1]  Because the 270th day after December 17, 2013 is Saturday, September 13, 2014, the applicable deadline to object to proofs of claim is Monday, September 15, 2014 ("Claims Objection Deadline").  Silver filed the instant motion on March 7, 2014.

Although the Debtors did not object to Silver's claim before the Court issued the Confirmation Order, the objection deadline has not passed.  Therefore, the Borrower Claims Trust, the Debtors' successor-in-interest established "for the benefit of Allowed Borrower Claims," may still object to her claim.  (Plan at 12.)  Though Silver contends otherwise, her claim has not been deemed allowed.  Pursuant to Bankruptcy Code section 502, "[a] claim or interest . . . is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502.  Indeed, the Motion quotes directly from the Plan which provides, in relevant part, that an "allowed claim" is a claim against any Debtor "evidenced by a valid Proof of Claim . . . and as to which the Debtors or other parties-in-interest have not filed an objection to the allowance thereof by the Claims Objection Deadline . . . ."  (*See* Plan at 2; Motion at 5.)

Silver is only entitled to receive payment on her Claim in the event that her Claim is allowed, and a distribution is made to other creditors.  *See* FED. R. BANKR. P. 3021 ("[A]fter a

---

[1]    The Motion alludes to both the Liquidating Trust and the Borrower Claims Trust.  Silver holds a Borrower Claim, and as such, any disbursement for her Claim would come from the Borrower Claims Trust.  (*See* Plan at 12 (defining "Borrower Claims" as claims "arising from or relating to any alleged act or omission or any other basis of liability of any Debtor (or any predecessor) in connection with the origination, sale, and/or servicing of a mortgage loan . . . by any Debtor.")

plan is confirmed, distribution shall be made to creditors whose claims have been allowed, to

interest holders whose interests have not been disallowed, and to indenture trustees who have

filed claims under Rule 3003(c)(5) that have been allowed.").  Because her Claim is still subject

to objection and has not been deemed allowed, Silver is not presently entitled to any distribution.

Therefore, the Court **DENIES** the Motion.

**IT IS SO ORDERED.**

Dated:  March 26, 2014
          New York, New York

_____**/s/Martin Glenn**_____
MARTIN GLENN
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 12-12020 |
| RESIDENTIAL CAPITAL, LLC, *et. al*. | |
| Debtors. | |

## ORDER DENYING FRANCINE SILVER'S MOTION TO RECONSIDER ORDER DENYING MOTION FOR PAYMENT OF CLAIM NO. 61

Pending before the Court is Francine Silver's *Motion to Reconsider the Order Denying the Pro Se Motion for Payment of Claim No. 61*(the "Motion for Reconsideration," ECF Doc. # 6774).  Silver asks the Court to reconsider its *Order Denying Motion of Francine Silver for Payment of Claim # 61* (the "Order," ECF Doc. # 6706), which denied the *Pro Se Motion By Francine Silver For Payment of Claim # 61* (the "Motion for Payment," ECF Doc. # 6639).  For the following reasons, the Motion for Reconsideration is **DENIED.**

The Court denied the Motion for Payment on March 26, 2014.  Silver filed the Motion for Reconsideration on April 9, 2014.  Silver seeks reconsideration of the Order, relying primarily on arguments made in the Motion for Payment and already rejected by the Court in the Order.  Arguments previously made and rejected are not proper subjects for a motion for reconsideration.

Rule 9023 of the Federal Rules of Bankruptcy Procedure incorporates Rule 59 of the Federal Rules of Civil Procedure, which governs motions for amendment of a judgment.  Under Rule 9023, "reconsideration is proper 'to correct a clear error of law or prevent manifest injustice.'"  *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (internal citations omitted).  "Generally, motions for reconsideration are not granted unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that

1212020140424000000000001

might reasonably be expected to alter the conclusion reached by the court." *Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC)*, 330 F.3d 111, 123 (2d Cir. 2003) (internal quotation marks and citation omitted). A motion for reconsideration may not be used "to enable a party to complete presenting his case after the court has ruled against him." *Frietsch v. Refco, Inc.*, 56 F.3d 825, 828 (7th Cir. 1995). Under Rule 9023, "[a] court may reconsider an earlier decision when a party can point to 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *In re Miller*, No. 07-13481, 2008 Bankr. LEXIS 3631, at *3 (Bankr. S.D.N.Y. Feb. 28, 2008) (citing *Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 55 (2d Cir. 2004)).

Additionally, Rule 9024 incorporates Rule 60 of the Federal Rules of Civil Procedure, which establishes the grounds on which a court may grant relief from a final order. Rule 9024 provides that relief may be granted for a clerical mistake or for "mistake, inadvertence, surprise, excusable neglect," newly-discovered evidence, fraud, misrepresentation, misconduct, where the order is void or has been satisfied, released, or discharged or "is no longer equitable, or for any other reason that justifies relief" from the order. FED. R. CIV. P. 60(a), (b). A motion for reconsideration "is generally not favored and is properly granted only upon a showing of exceptional circumstances." *Marrero Pichardo*, 374 F.3d at 55 (citation omitted). "A motion for reconsideration should be granted *only* when the [moving party] identifies 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)) (emphasis added).

Even considering that Silver is *pro se* and that the Motion for Reconsideration is
therefore held "to less stringent standards than formal pleadings drafted by lawyers," *Haines v.
Kerner*, 404 U.S. 519, 520(1972), the Motion for Reconsideration fails to identify adequate
grounds for relief.  Silver has not cited any intervening change of controlling law, and she does
not rely on newly available evidence.  To prevail, Silver must demonstrate the need to correct a
clear error or prevent manifest injustice.  *See YLL Irrevocable Trust*, 729 F.3d at 104 (quotations
omitted).  She fails to do so.

Silver argues—yet again—that the Debtors can no longer object to her claim (Claim No.
61), and thus, her claim should be allowed.  (Motion for Reconsideration at 2–3).  She contends
that since the Debtors had not objected to her claim as of the Effective Date[1] of the Plan, the
claim is "deemed allowed" and "can no longer be objected to."  (*Id.* at 2.)  But, as previously
explained in the Order, the objection deadline has not yet passed.  (Order at 2.)  The Plan does
not require the Debtors to object to all claims *before* the Effective Date; to the contrary, the Plan
explicitly contemplates that claims objections may occur *after* the Effective Date.  The
appropriate deadline for an objection to Silver's claim is Monday, September 15, 2014, unless
that deadline is extended by further order of the Court.

Silver is only entitled to receive payment on her claim in the event that the claim is
allowed, and even then, only as part of a *pro rata* distribution to similarly situated creditors.  *See*
Fed. R. Bankr. P. 3021 ("[A]fter a plan is confirmed, distribution shall be made to creditors
whose claims have been allowed, to interest holders whose interests have not been disallowed,
and to indenture trustees who have filed claims under Rule 3003(c)(5) that have been allowed.").
Because her claim is still subject to objection, Silver is not presently entitled to any distribution.

---

[1]     December 17, 2013.  (*See* ECF Doc. # 6137.)

The remaining arguments raised by Silver in the Motion for Reconsideration are completely without merit and require no discussion.

Because Silver has not satisfied the standards for reconsideration, her The Motion for Reconsideration is **DENIED**.

**IT IS SO ORDERED.**

Dated:  April 24, 2014
New York, New York

_____/s/Martin Glenn_____
MARTIN GLENN
United States Bankruptcy Judge

**Exhibit C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Francine Silver
_____

*(In the space above enter the full name(s) of the plaintiff(s)/petitioner(s).)*

___ Civ. 1212020   (MG) ( __ )

- against -

Reidential Capital, LLC, - GMAC.
_____
_____
_____

*(In the space above enter the full name(s) of the defendant(s)/respondent(s).)*

**NOTICE OF APPEAL
IN A CIVIL CASE**

R E C E I V E D

APR 2 4 2014

U.S. BANKRUPTCY COURT
SO DIST OF NEW YORK

Notice is hereby given that Francine Silver
_____
*(party)*

hereby appeals to the United States Court of Appeals for the Second Circuit from the Judgment

Denying motion for payment of Allowed Claim #61.
_____
*(describe the judgment)*

Order fails to address Plaintiff's arguments and instead asserts a defense for Debtors who decided not to respond

and whose Counsel have previously worked with the Judge in this very case raising concerns of impartiality.

entered in this action on the 26th _____ day of March _____, 2014 .
            *(date)*                    *(month)*        *(year)*

Signature

8613 Franklin Ave
_____
*Address*

Los Angeles, CA 90069
_____
*City, State & Zip Code*

DATED: April _____ 23 , 2014 ___   ( 310 ) 945 - 6105
                                        *Telephone Number*

**NOTE:** To take an appeal, this form must be received by the *Pro Se* Office of the Southern District of New York within thirty
(30) days of the date on which the judgment was entered, or sixty (60) days if the United States or an officer or agency of the
United States is a party.

*Rev. 05/2007*



1212020140424000000000004

Thurgood Marshall U.S. Courthouse     40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

## MOTION INFORMATION STATEMENT

Docket Number(s): **6706, 6774, 6690, 6639**               Caption [use short title]

Motion for: **Payment of claim as per settlement**          UNITED STATES BANKRUPTCY COURT
**agreement and to proceed forma pauperis**               SOUTHERN DISTRICT OF NEW YORK

In re: RESIDENTIAL CAPITAL, LLC, et al.
Honorable Judge Martin Glenn Presiding.
Case No. 12-12020 (MG)

Set forth below precise, complete statement of relief sought:

I would like my Allowed claim # 61 to be paid as per the Settlement      APPEAL FROM ORDER DENYING  PAYMENT

Agreement which was approved and went effective on December

17th, 2013. The plan calls for the holders of allowed claims to

be paid on the effective date or as soon as practicable thereafter.

The claim was never objected to, the deadline to object has

now passed and the claim should now be paid immediately.

MOVING PARTY: **Francine Silver**                    OPPOSING PARTY: **Residential Capital, LLC - GMAC**
  [✓] Plaintiff            [ ] Defendant
  [ ] Appellant/Petitioner  [ ] Appellee/Respondent
MOVING ATTORNEY: **Pro se Francine Silver**              OPPOSING ATTORNEY: **Gary S. Lee**
                    [name of attorney, with firm, address, phone number and e-mail]

**8613 Franklin Ave**                            **Morrison & Foerster LLP**

**Los Angeles, CA 90069**                         **1290 Avenue of the Americas, New York, NY 10104**

**310 945 6105 marcussilver@sbcglobal.net**        **212 468 8042 glee@mofo.com**

Court-Judge/Agency appealed from: **United States Bankruptcy Court, Honorable Judge Martin Glenn - Southern District of New York**

Please check appropriate boxes:                    FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND
                                                   INJUNCTIONS PENDING APPEAL:
Has movant notified opposing counsel (required by Local Rule 27.1):   Has request for relief been made below?        [ ] Yes [ ] No
  [✓] Yes [ ] No (explain): _____         Has this relief been previously sought in this Court? [ ] Yes [ ] No
                                                   Requested return date and explanation of emergency: _____

Opposing counsel's position on motion:
  [ ] Unopposed [ ] Opposed [✓] Don't Know          _____
Does opposing counsel intend to file a response:
  [ ] Yes [ ] No [✓] Don't Know                     _____

                                                   _____

Is oral argument on motion requested?    [ ] Yes [✓] No   (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    [ ] Yes [✓] No   If yes, enter date: _____

Signature of Moving Attorney:                      Date: **April 23, 2014**    Service by: [ ] CM/ECF   [✓] Other [Attach proof of service]
_Francine Silver_  PRO SE

**Form T-1080** (rev. 12-13)

## STATEMENT REGARDING MERITS OF APPEAL AND ISSUES RAISED BY FRANCINE SILVER.

The Appeal has merit for numerous reasons:

The Honorable Judge Martin Glenn's impartiality is questionable. The Honorable Judge James Peck was a colleague of Judge Glenn and actively worked on and helped mediate the very settlement plan the terms of which are now in dispute. Judge Peck retired from the bench and joined the law firm of Debtors Counsel in the very same week my motion was filed. The rules listed on NYCOURTS.gov state " *Most important of all, judges are impartial decision-makers in the pursuit of justice. We have what is known as an adversarial system of justice - legal cases are contests between opposing sides, which ensures that evidence and legal arguments will be fully and forcefully presented. The judge, however, remains above the fray, providing an independent and impartial assessment of the facts and how the law applies to those facts. "*

*"Impartiality" denotes absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintaining an open mind in considering issues that may come before the judge. (B) A judge shall not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment.*

*(7) A judge shall dispose of all judicial matters promptly, efficiently and fairly.*

*(E) Disqualification. (1) A judge shall disqualify himself or herself in a proceeding in which the judge's <u>impartiality might reasonably be questioned</u>, including but not limited to instances where: (a) (i) the judge has a personal bias or prejudice concerning a party or (ii) the judge has personal knowledge of disputed evidentiary facts concerning the proceeding; (b) the judge knows that (i) the judge served as a lawyer in the matter in controversy, or (ii) <u>a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter</u>, or (iii) the judge has been a material witness concerning it;"*

At issue is whether the Judge should have disqualified himself and seeing as he decided to continue presiding, whether he was impartial.

Being that the Debtor's counsel refer to themselves as a leading global law firm and have an army of extremely highly qualified lawyers at their disposal, it is difficult or impossible to explain why they would not respond to my motion unless they conceded the merit of my arguments or else for some reason felt it unnecessary to respond. The Judge's actions do not appear to be impartial when instead of disqualifying himself due to his relationship with Judge Peck, he continues to preside and even asserts an argument on Debtor's behalf while ignoring most of my arguments and then rules in favor of the Debtors despite their failure to even respond. For these reasons alone the Judge's impartiality may be reasonably questioned and my appeal should be granted.

The Judge also failed to address my argument regarding promissory estoppel and my reliance on having the claim paid as called for in the plan and as I was led to believe it would be. I have already been a fraud victim for many years and continue to suffer physically, emotionally and financially while Debtor's ignore the law and terms of the settlement agreement. My argument for promissory estoppel is an issue.

The Judge ignores the definition of what an allowed claim is and when it should be paid. The plan states *"Allowed" means, with respect to a Claim against any Debtor, except as otherwise provided herein, (a) a Claim that is (i) listed in the Schedules as of the Effective Date as neither disputed, contingent nor unliquidated, and for which no Proof of Claim has been timely filed, or (ii) evidenced by a valid Proof of Claim or request for payment of Administrative Claim, as applicable, Filed by the applicable Bar Date, and as to which the Debtors or other parties-in-interest have not Filed an objection to the allowance thereof by the Claims Objection Deadline, or (b) a Claim that is Allowed under the Plan or any stipulation or settlement approved by, or Final Order of, the Bankruptcy Court; provided, however, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed Claims" under the Plan, provided further, however, any Claims expunged or disallowed under the Plan or otherwise shall not be Allowed Claims. If a Claim is Allowed only in part references to Allowed Claims include and are limited to the Allowed portion of such Claim. Notwithstanding anything to the contrary herein, no Claim that is disallowed in accordance with Bankruptcy Rule 3003 or section 502(d) of the Bankruptcy Code is*

*Allowed and each such Claim shall be expunged without further action by the Debtors and*

*without further notice to any party or action, approval, or order of the Bankruptcy Court.*

In reference to the above, section (b). My claim was not solely for the purpose of voting

nor was it expunged or disallowed for any reason including under Bankruptcy Rule 3003

or section 502(d) of the bankruptcy code. Therefore my claim clearly meets the

requirements under section (b) of a claim that is "allowed". Moreover, the claim has also

never been contested in any way and contains very well documented evidence in support.

Also, under 11 U.S.C. § 502(a) ("*A claim or interest, proof of which is filed under section*

*501 of this title, is deemed allowed, unless a party in interest ... objects.*") There were no

objections by the effective date. There is no supporting language for further approval or

review by the Court or Trustee in order for the claim to be considered allowed. To the

contrary the plan states in ARTICLE VIII. PROCEDURES FOR RESOLVING

DISPUTED CLAIMS. 2. Allowance of Claims "*On or after the Effective Date, the*

*Liquidating Trust shall have and shall retain any and all rights and defenses that the*

*Debtors had with respect to any Claim, **except with respect to any Claim (i) deemed***

***Allowed as of the Effective Date** or (ii) waived, relinquished, exculpated, released,*

*compromised, settled, or* Allowed in the Plan *or in a Final Order. Except as otherwise*

*provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective*

*Date, including* the Confirmation Order*, no Claim shall become an Allowed Claim unless*

*and until such Claim is deemed Allowed (a)* under the Plan *or the Bankruptcy Code or (b)*

*by Final Order of the Bankruptcy Court, including* the Confirmation Order.

ARTICLE VIII governs in the event of a dispute and states, "<u>The provisions of this
Article VIII shall govern the resolution of Disputed Claims to the extent not otherwise
provided for in this Plan or in any other trust agreement.</u>"

The plan also states "(a) <u>*As soon as practicable following the Effective Date, the
Borrower Claims Trust shall make a Borrower Claims Payment to each holder of a
Borrower Claim that is Allowed as of the Effective Date.*</u>" (b) *Each holder of a Borrower
Claim that was not Allowed as of the Effective Date and that is subsequently Allowed, in
whole or in part, shall receive from the Disputed Claims Reserve a Borrower Claims
Payment in respect of such Claim following the date such Claim becomes Allowed. Such
Borrower Claims Payments shall be made at such time and from time to time as
determined by the Trust Committee, provided that a Borrower Claims <u>Payment shall be
made no later than ninety (90) days following date on which the respective Borrower
Claim becomes Allowed.</u>"*

The definition and interpretation of an "allowed" claim is an issue because the Judge seeks
to assign my claim to a new status not addressed in the plan of "Not allowed but not
Disputed".

The time frame for payment of allowed claims is an issue because as mentioned above the
plan calls for payment on the effective date or as soon as practicable thereafter but the
Judge argues on behalf of Debtors that even allowed claims are subject to a 270 day

objection deadline. This assertion contradicts Article VIII – 2 of the plan which prevents

allowed claims from being objected to after the December 17th, 2013 confirmation date.

Article VIII is therfore an issue.


The Judge ignores the fact that Debtors purportedly transferred my Deed of Trust to US

Bank on March 25, 2013 for valuable consideration and that this transfer was apparently

not reported to or approved by the Bankruptcy Court and is apparently an example of on

going fraud and continued fabrication of documents. This is also an issue.


My Appeal has merit due to the above mentioned reasons and my damages are on going

while Debtors refuse to settle the claim as agreed.


Sincerely,

Francine Silver

## PROOF OF SERVICE
### Case No. 12-12020 (MG) In re Residential Capital, LLC et al.

**Delivery by U.S. Mail**: Proof of Service by Mail.

I, Marcus Silver, declare that I am over the age of eighteen years and not a party to the action. My address is 8613 Franklin Avenue, Los Angeles, CA 90069.

On April 23, 2014, I served conforming copies of the Notice of Appeal for Claim # 61 by placing a true copy in the United States mail enclosed in a sealed envelope with postage fully prepaid, addressed to as follows:

**United States Bankruptcy Court**
Honorable Judge Martin Glenn
Southern District of New York
One Bowling Green
New York, NY 10004

**Counsel to the Debtors**
Gary S. Lee
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY 10104

### UNITED STATES COURT OF APPEALS FOR SECOND CIRCUIT
Thurgood Marshall U.S. Courthouse
40 Foley Square, New York, NY 10007

*PRO SE* OFFICE
**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF NEW YORK
DANIEL PATRICK MOYNIHAN UNITED STATES COURTHOUSE
500 PEARL STREET, ROOM 230
NEW YORK, NEW YORK 10007

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on April 23, 2014 in Los Angeles, California.

_____
Signature

MARCUS SILVER
Type or Print Name