1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10            Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            January 12, 2015

19            4:02 PM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2   Telephone Conference, on the Record, Regarding Mack Claims

3   Objection

4

5   Pre-motion Conference by Telephone

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Sharona Shapiro

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        425 Market Street

6        San Francisco, CA 94105

7

8  BY:   ADAM A. LEWIS, ESQ. (TELEPHONICALLY)

9

10

11  DAVID F. GARBER, P.A.

12        Attorneys for Mack Creditors

13        700 Eleventh Street South

14        Naples, FL 34102

15

16  BY:   DAVID F. GARBER, ESQ. (TELEPHONICALLY)

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  All right.  This is Judge Glenn.  We're on

3    the record in Residential Capital, number 12-12020.  This is a

4    case management conference regarding the ResCap Borrower Claims

5    Trust objection to claim number 386 filed by Barry and Cheryl

6    Mack.

7            May I have your appearances, please?

8            MR. LEWIS:  Yes, Your Honor.  Adam Lewis of Morrison &

9    Foerster for the ResCap Borrower Claims Trust.

10           THE COURT:  Thank you.

11           MR. GARBER:  And David Garber, Your Honor, on behalf

12   of the claimants, Barry and the estate of Cheryl Mack.

13           THE COURT:  All right.  Thank you very much to both of

14   you.  Happy New Year to both of you.

15           MR. LEWIS:  Thank you, Your Honor.

16           MR. GARBER:  Thank you.

17           THE COURT:  So Mr. Lewis, why don't you first give me

18   an update, from your perspective, on where things stand?  Well,

19   I have your letter about wanting to make a partial summary

20   judgment motion, but we'll come to that, but why don't you

21   update me on status generally, okay?

22           MR. LEWIS:  Sure, Your Honor.  Discovery has closed;

23   it closed around Christmas, and I'm done with discovery.  The

24   parties had a timely conference on experts, and each side

25   agreed it was not going to be calling any experts, and so there

1  will be no expert reports and no expert discovery.

2          The last gesture towards settlement was a letter that

3  I wrote, about a seven-page letter, to Mr. Garber, that I

4  e-mailed to him on the 23rd of December, explaining my views of

5  major issues in the case, and inviting him to call me to

6  discuss a resolution.  And that's kind of where it stands.

7          The other relevant piece of information, from my

8  perspective, Your Honor, is whatever else may happen, I'm going

9  to be out of the country in Morocco from the 16th to the 31st.

10          THE COURT:  January 16th through the 31st?

11          MR. LEWIS:  Correct, Your Honor.

12          THE COURT:  Can we come with you?

13          MR. LEWIS:  Pardon me?

14          THE COURT:  Can we come with you?

15          MR. LEWIS:  I would love to have you all come with me.

16  I understand it's a wonderful trip, from the people I know who

17  have made it.

18          THE COURT:  Is this vacation, I hope?

19          MR. LEWIS:  It is vacation.

20          THE COURT:  Okay.  No, I hope you have a nice trip.

21  It's a country that I would very much like to visit at some

22  point.

23          MR. LEWIS:  Well, when the appropriate time comes, I

24  will certainly fill you in on what we experienced.

25          THE COURT:  Okay.  All right.  Anything else you want

RESIDENTIAL CAPITAL, LLC, et al.                                          6

1   to add, at this point, Mr. Lewis?

2           MR. LEWIS:  I think Mr. Garber may have an issue on

3   discovery, but I'll let him speak for himself on that.

4           THE COURT:  Okay.  I was going to turn to Mr. Garber

5   next, so go ahead, Mr. Garber.

6           MR. GARBER:  Yes.  Yes, Your Honor, we do have an

7   issue.  We have filed interrogatories asking the names of the

8   people who worked on this foreclosure and who made the decision

9   to foreclose.  One of the defenses that ResCap is making is, as

10  I understand it, they never received a copy of the qualified

11  written request that the Macks sent out in 2009.  And I want to

12  find out who dealt with this at their facility -- I think it

13  was in Fort Washington in Pennsylvania -- so I can know what

14  the motive would be or what their reasoning would be behind not

15  being very careful to attend to that qualified written request.

16          I sent out those interrogatories probably sometime in

17  late September or early October, and I raised this issue with

18  the Court at our case management conference.  I think that was

19  done somewhere near the end of October, about the 29th.  And at

20  that time, Mr. Lewis was requesting back records, even before

21  the qualified written request, on Mrs. Mack, concerning her

22  health.  And I raised the issue that we wanted information

23  concerning the lead-up to the foreclosure and the handling of

24  the foreclosure.

25          And it was my understanding that the Court, at that

1  time, said that Mr. Lewis would have a right to get back

2  information about Mrs. Mack, even before she sent out her

3  qualified written request, and to the same extent, the Macks

4  would have a right to get information about leading up to the

5  foreclosure.  We have not taken any depositions.  We've never

6  been given the name of anybody that has any of this

7  information.  The interrogatories were all objected to and were

8  not otherwise answered.

9          And so we feel like we haven't done any discovery at

10  all.  I thought that after the Court gave its opinion, on the

11  29th -- I believe that was 29th of October -- that that

12  information would be forthcoming, but it never has.

13          And do I need to file a motion to compel?

14          THE COURT:  I don't allow motions, so we'll resolve

15  that one easily.  And when I say I don't allow discovery

16  motions, I resolve them without motions, Mr. Garber.

17          Let me hear from Mr. -- have you finished, Mr. Garber?

18  I'm sorry.

19          MR. GARBER:  No, Your Honor, that's all.

20          THE COURT:  Okay.  Mr. Lewis, do you want to respond

21  to that?

22          MR. LEWIS:  Yeah, Adam Lewis for the Trust.

23          Your Honor, I think it's important to get a complete

24  picture of the timing here.  The Court entered its scheduling

25  order on the 27th of August.  Mr. Garber sent out his

1  interrogatories in mid-October.  Our responses weren't even due

2  until mid-November.  In fact, we served them in a timely

3  fashion on the 17th of November.

4          Mr. Garber has not raised the issue he now raises

5  since that time, since he received our responses, has only just

6  raised them through a letter to me last Friday afternoon, long

7  after discovery closed, and knowing that the Court, right from

8  the start, invited the parties to promptly apply to it for a

9  resolution of any disagreements, given the short discovery

10  schedule, four months.  The Court, as it has today indicated,

11  would generally deal with things fairly summarily.

12          So from my perspective, just on a procedural basis, I

13  think Mr. Garber has slept on his rights, and it's a little

14  late to be wanting to get into discovery now on the merits,

15  Your Honor.  There's a big difference between comparing Mrs.

16  Mack's health before and after the QWR episode, and the

17  foreclosure and the QWR, which are essentially totally

18  unrelated --

19          THE COURT:  May I ask --

20          MR. LEWIS:  -- except --

21          THE COURT:  I don't want to get in -- look, Mr. Lewis,

22  I'm not resolving this on the basis of whether you asked for

23  and got responses about Mrs. Mack's health before or after any

24  particular time.  I don't trade off one discovery issue against

25  another discovery issue.

1        What's your objection to providing the information

2   that Mr. Garber asked for?

3        MR. LEWIS:  Well, Your Honor, let me answer that in

4   two pieces, if I may.  The first would be my objection, as

5   such, and the second would be to tell you what I know about

6   what the answers would be if we had to give them.

7        My objection is I think that the discovery that Mr.

8   Garber asked for was far afield, and I was not anxious to

9   encourage him to be asking for a lot of material that I think

10  is totally irrelevant to the issues before this Court.  And by

11  the way, I didn't think of the Court as trading off one issue

12  against the other.  Mr. Garber tried to relate the fact that we

13  got pre-QWR medical information to the idea that he should get

14  pre-QWR foreclosure information.  I think that's a total non

15  sequitur.

16       THE COURT:  Well --

17       MR. LEWIS:  In any case --

18       THE COURT:  You know, Mr. Lewis, I plan to resolve the

19  issues on the merits, and it seems to me -- look, discovery and

20  admissibility at trial are two different things, so I don't

21  decide admissibility at trial, relevance for trial at this

22  stage.  But it does seem to me that Mr. Garber asking for

23  information about ResCap's decision to proceed with

24  foreclosure, who was involved, the timing of who -- who made

25  the decision and when, is an appropriate subject for discovery.

1          I know, from your letter of December 23, that

2     there's -- one of the issues that you raise is whether the

3     October 26th, 2009 letter from the Macks to GMAC can qualify as

4     a qualified written request.  And I certainly understand that.

5     I'm sure we'll get to your request for a summary judgment

6     motion.  But how quickly can you --

7          I'm, A, surprised, Mr. Garber, that you waited until

8     now to raise this issue with me.  It sounds like this has been

9     an issue that you've known about since mid-Decem -- mid-

10    November, when Mr. Lewis responded.  And here we are in mid-

11    January, with discovery closed.

12         So I would take slight umbrage with Mr. Lewis'

13    suggestion that I summarily deal with discovery; I deal with it

14    in what I consider a very considered and careful way; I just do

15    it without a lot of paper and expense for each side to incur in

16    doing it.

17         So why did you wait until now, Mr. Garber, to raise

18    the issue?

19         MR. GARBER:  Your Honor, I thought that the matter had

20    been resolved by the Court in October, and I thought that the

21    information would be forthcoming.  I know Mr. Lewis and I have

22    had some telephone conversations over this issue, and I just

23    assumed he would give me the information.  I don't know the

24    names of people to ask for their deposition; I have to get that

25    information from him.

1      THE COURT:  Well, but your time to take depositions is

2    closed.  I mean, it's one thing if you believe you were

3    entitled to receive interrogatory answers when there was a

4    cutoff of fact discovery.  If you were planning to take any

5    depositions and you had interrogatories seeking to identify

6    potential witnesses, it was incumbent on you to get the

7    information before so that you could take any deposition you

8    wanted to take before discovery.

9      Not only do you want answers to the interrogatories,

10   but the next thing I'm going to hear is you want to take

11   somebody's deposition that -- which is clear as day your time

12   to take discovery has expired.  Why do you think --

13     MR. GARBER:  Your Honor, I will be --

14     THE COURT:  Go ahead, I'm sorry.

15     MR. GARBER:  Yes, Your Honor, that is true; I would

16   want to take depositions, because just the names themselves

17   would do nothing for me, which is what I've asked for, the

18   names.

19     THE COURT:  I'm not really --

20     MR. LEWIS:  Your Honor, it's Adam Lewis.

21     THE COURT:  No, stop, Mr. Lewis.

22     MR. LEWIS:  No, I just --

23     THE COURT:  Mr. Lewis, stop.

24     MR. LEWIS:  I'm sorry.

25     THE COURT:  Stop.

RESIDENTIAL CAPITAL, LLC, et al.                    12

1          I'm not reopening discovery.  I mean, it's as simple

2     as that.  I mean, I set cutoffs of fact discovery; it's very

3     clear what it means.

4          On the other hand, Mr. Lewis, I'm not particularly

5     happy hearing today that you didn't provide a response to what

6     seems to me a pretty simple and straightforward question.

7          Did you produce the servicing notes to Mr. Garber?

8          MR. LEWIS:  Yes, Mr. Garber has the servicing notes

9     from two sources, from the earlier litigation and from us.

10          THE COURT:  And do the servicing notes reveal who was

11     involved in the decision to --

12          MR. LEWIS:  No, Your Honor.

13          THE COURT:  -- proceed with the foreclosure?

14          MR. LEWIS:  Let me explain how I understand things

15     work, because I don't think there's going to be a name.  It's

16     my understanding that the way things worked was the following.

17     The process was essentially -- of initiating a foreclosure was

18     essentially automated.  That is to say, in their system, they

19     would enter various pieces of information, or the fact that

20     certain information had not been entered by a certain deadline

21     would be noted by the system as well, for example, if the

22     payment weren't made by a particular date.

23          In those cases -- in some cases, those bits of

24     information would come together, so to speak, to create a

25     profile that would mean that a foreclosure should be initiated.

1  The system would then send a signal to someone who is called a

2  teller.  Why called a teller, I don't know.  And that person

3  would just enter a signal into the system to begin a

4  foreclosure.  So --

5          THE COURT:  Who hired --

6          MR. LEWIS:  -- there's not --

7          THE COURT:  Who hired Stern?

8          MR. LEWIS:  That I don't know off the top of my head.

9          THE COURT:  I mean, a computer can't --

10         MR. LEWIS:  But whoever hired Stern hired Stern after

11 the foreclosure -- the decision to make the foreclosure was

12 begun -- was made.

13         THE COURT:  Yeah, but I mean, somebody had to make a

14 decision to hire Stern.

15         MR. LEWIS:  I'm sure that's true, but that, once

16 again, would have been after the system initiated the

17 foreclosure process.  My understanding, and I've talked with

18 the people again today, in anticipation of this call, is that's

19 how it worked.  It was automated; there were some quality

20 controls.  I don't yet know what went wrong in this instance,

21 whether someone mistakenly entered something or failed to enter

22 something or whatever it was that triggered a foreclosure

23 signal that shouldn't have been triggered.  But there is no

24 specific person who made the decision to start the foreclosure.

25 It was a process -- basically a computerized process which, in

1  part, depended on the entry of correct information by people at

2  various points, and once those pieces of information created a

3  certain profile, the system signaled a foreclosure.

4          That's my understanding of how it worked.  So there

5  would be no specific person.  We have a teller number for the

6  person who entered the actual final instruction, but that

7  person was just following protocol from the computer system.

8  That's my understanding.

9          And again, the reason I was not anxious to provide

10  this information is it seemed to me to be very far afield, not

11  even reasonably calculated to lead to the discovery of

12  admissible evidence.  And so I was trying to keep discovery

13  under control and costs under control.  And --

14          THE COURT:  Well --

15          MR. LEWIS:  -- as --

16          THE COURT:  -- let -- I'm going to resolve this

17  discovery dispute by requiring, Mr. Lewis, that you respond to

18  the interrogatory.

19          I'm not reopening disc -- I don't know how much good

20  it's going to do you, Mr. Garber, because I'm not reopening

21  discovery for depositions.  But I'm going to direct Mr. Lewis

22  to respond to that interrogatory.  I'm overruling the objection

23  to the interrogatory.

24          How quickly can you provide a response, Mr. Lewis?

25          MR. LEWIS:  Well, Your Honor, certainly before the end

1    of this week, because I'm gone.

2              THE COURT:  Okay.

3              MR. LEWIS:  Probably in the next day or two.  I just

4    want to --

5              THE COURT:  Well, you know you --

6              MR. LEWIS:  I just want to confirm something; I don't

7    want to be giving bad information.

8              THE COURT:  Okay.  Look, you --

9              MR. LEWIS:  I just want to confirm something, and once

10   I do that, I'll be able to respond to it.

11             THE COURT:  You may be gone --

12             MR. LEWIS:  I can respond to it --

13             THE COURT:  -- in Morocco, but there are a lot of

14   Morrison & Foerster lawyers who aren't going with you.

15             MR. LEWIS:  Yeah, but I'm the one who knows about this

16   case.  Yeah, I'm sure there are.

17             But one other quick thing, Your Honor, if I may, when

18   I said "summarily", I didn't mean carelessly; I meant --

19             THE COURT:  Oh, Mr. --

20             MR. LEWIS:  -- like a summary procedure.

21             THE COURT:  Mr. Lewis, that's the disadvantage of

22   being on the phone; you can't see me smile when I say it.

23             MR. LEWIS:  Yeah, well, I would have flown to New York

24   to see that.

25             THE COURT:  No, I -- so don't take it personally.  I

1  was --

2          MR. LEWIS:  I just don't ever want to offend the

3  Court.  I actually admire the way --

4          THE COURT:  I --

5          MR. LEWIS:  -- the Court handles things.

6          THE COURT:  I should follow the advice of avoiding

7  humor.

8          MR. LEWIS:  No, humor's important.

9          MR. GARBER:  Your Honor, may I ask Mr. Lewis a

10  question about the foreclosure issue?

11          THE COURT:  Sure, go ahead.

12          MR. GARBER:  The question would be this.  As I

13  understand it, the computer takes certain guidelines in and

14  spits out the instructions to foreclose.  Is that what you just

15  said, Mr. Lewis?

16          MR. LEWIS:  Essentially.  People enter things or don't

17  enter things into the computer, along the way, for a particular

18  account.  At some point, in some cases, the entries add up to

19  something that fits some kind of a profile, which I certainly

20  can't specify for you, that indicates a foreclosure should be

21  begun, and so the computer generates a signal which then goes

22  to the teller who then enters something in the system.

23          But it's not a -- it's not -- the human-made decisions

24  are probably what the profile looks like, what should be

25  entered into the system in terms of categories, but it's not a

1   human decision to actually begin the foreclosure.  It's a human

2   decision --

3           MR. GARBER:  So if --

4           MR. LEWIS:  -- which lawyer to pick, I suppose.

5           MR. GARBER:  Right.  But in the Macks' case, they had

6   made all their payments.

7           MR. LEWIS:  I understand; I can't  --

8           MR. GARBER:  So what factors --

9           MR. LEWIS:  I can't tell you what went wrong, Mr.

10  Garber.  I think I indicated that a little bit earlier.

11  Obviously, something did go wrong.  Somebody either didn't

12  enter something in a timely fashion or made a mistake in entry

13  or something like that, and so the profile got filled out, so

14  to speak, when it shouldn't have been.

15          THE COURT:  All right.  So look, here's what's going

16  to -- with respect to this issue, I'm directing that the

17  outstanding interrogatory -- I don't know whether it's one or

18  more than one interrogatory in this issue -- that the Trust

19  respond to the interrogatory by Friday at 5 p.m., San Francisco

20  time, so -- and hopefully you can do it before then.

21          But I'm not reopening deposition discovery, so I don't

22  know -- look, it's been undisputed all along that an error,

23  perhaps a grievous error, was made when this foreclosure was

24  initiated, because the Macks were not in default.  It happened.

25          But so I'm directing, Mr. Lewis, that you respond to

RESIDENTIAL CAPITAL, LLC, et al.                18

1  the interrogatory, not with the objection, with information, by

2  Friday at 5 or get --

3          MR. LEWIS:  I'll do that, Your Honor.

4          THE COURT:  -- or get one of your colleagues to take

5  care of it for you.

6          All right.  Mr. Garber, other than this issue, have

7  you completed all of your discovery?

8          MR. GARBER:  Your Honor, yes; the answer would be yes.

9  We already have a great deal of information from the motions

10 that were raised in the previous case and depositions.  So it's

11 not that we don't have any information.

12         THE COURT:  Sure.

13         MR. GARBER:  We have a lot of information.

14         THE COURT:  Sure.  Okay.  Now, let me ask, I have Mr.

15 Lewis' December 23rd letter in front of me; I'm sure you've

16 reviewed it, Mr. Garber.  Do you want to tell me what your

17 position is?

18         MR. GARBER:  Your Honor, he -- you're referring to the

19 request for consideration of summary judgment based on two

20 issues?

21         THE COURT:  Yes, correct.

22         MR. GARBER:  The first issue has to do with whether or

23 not punitive damages would be allowed, and I thought that we've

24 already discussed that, and it would be -- I do not anticipate

25 that the Macks would provide any significant opposition to

1  that, not that they would just agree to it, but I think there

2  is no good law, that the Macks are aware of, that could

3  reasonably persuade the judge not to enter summary judgment on

4  that point.

5          With respect to the second issue --

6          THE COURT:  And then --

7          MR. GARBER:  -- the second issue is whether this --

8          THE COURT:  Let me stop you just to deal --

9          MR. GARBER:  -- is what --

10         THE COURT:  I want -- look, in one of the ResCap

11  matters -- and it's cited in Mr. Garb -- excuse me, in Mr.

12  Lewis' letter -- I had already, in one matter, the Reed matter,

13  precluded punitive damages.  Mr. Lewis cites a lot of authority

14  about it.  Is it -- may I -- let me ask you this.  I'm trying

15  to avoid unnecessary papers from either side; do you have any

16  objection to my considering Mr. Lewis' December 23rd letter as

17  a motion for partial summary judgment to preclude a claim for

18  punitive damages?

19         MR. GARBER:  No, Your Honor, I would have no objection

20  to that.

21         THE COURT:  Do you plan to file a response to it, or

22  are you just going to stand on what you've told me today?

23         MR. GARBER:  Your Honor, if I filed a response, it

24  would be pro forma, because I have looked into this issue, and

25  I believe that Mr. Lewis has cited the applicable law.  And I

1  understand the reasoning of those courts; whether I might like

2  it or agree with it, I understand the reasoning of those

3  courts.

4          THE COURT:  All right.  Then unless you want time to

5  put something in writing, I'm prepared to rule now, basically,

6  granting partial summary judgment to preclude an award of

7  punitive damages.  If you want to file something, I'll give you

8  a chance to do that, but I'm not sure that it's worth your time

9  or effort to do that.

10         MR. GARBER:  I don't think I would have anything

11 significant --

12         THE COURT:  Okay.

13         MR. GARBER:  -- for the Court.

14         THE COURT:  All right.  So I'll just -- this is on the

15 record today, so I'm not going to enter a separate written

16 order.  I'll just so order the transcript that treating the

17 December 23, 2014 letter from Mr. Lewis on the issue of partial

18 summary judgment, precluding an award of punitive damages to

19 the Macks, that's granted, for the reasons and on the

20 authorities set forth in Mr. Lewis' letter.

21         But now, go ahead, Mr. Garber, and address the second

22 issue about the QWR.

23         MR. GARBER:  The second issue is whether or not the

24 Macks' letter of October 26th, 2009, would qualified as a

25 qualified written request under RESPA.  And Mr. Lewis has cited

1   a case, a Second Circuit case, in which a lawyer sent several

2   communications to the bank, in that case Citibank, sent several

3   communications to them, and said they were qualified written

4   requests, but he didn't use the address that the bank had

5   indicated on their correspondence to the debtor that should be

6   used.  And because of that, the Court found it was proper, on

7   that grounds, among other grounds, to not count those letters

8   to be qualified written requests.

9          Now, in our case, we believe the facts are going to be

10  different, therefore, we would oppose a summary judgment that

11  the Macks' letter of October 26th was not a qualified written

12  request.  And I can go into more detail in writing, but

13  basically, the Macks were instructed that if they had any

14  correspondence about their account, they should send it to the

15  address that they used.

16         The basis that Mr. Lewis will be going forward on is

17  that in the monthly billing statements there is a list of many

18  different addresses on the back of the bill, and it has an

19  address they should use for what they call general inquiries,

20  one for insurance policies, one for tax bills, one for tax

21  bills and PA, and then it has a paragraph called qualified

22  written request.  And it says, under RESPA, a qualified written

23  request must be sent only to this address, and it's P.O. Box

24  1330 Waterloo, Iowa, with a zip code.  Now, the Macks did not

25  send it to that P.O. Box; they sent it to P.O. Box 4622 in

1   Waterloo, Iowa, the same place but a different post office box,

2   believing they were making a general inquiry.

3          We don't believe that the facts of the Citibank case,

4   that was cited by Mr. Lewis, are the same as the facts that we

5   have here, and therefore we don't believe that -- RESPA does

6   not say that you have to use a certain address -- we don't

7   believe that the import of that case should apply to our case.

8   So we will oppose --

9          THE COURT:  Well, let --

10         MR. GARBER:  -- a summary judgment --

11         THE COURT:  -- let --

12         MR. GARBER:  -- against the Macks.

13         THE COURT:  I think I can resolve this issue today, so

14  I'm going to treat Mr. Lewis' December 23rd, 2014 letter as a

15  motion for partial summary judgment on the issue described with

16  respect to whether the October 26, 2009 letter from the Macks

17  can qualify as a qualified written request under 12 U.S.C.,

18  Section 2605(e).  I'm going to treat the letter as a motion for

19  partial summary judgment.  I'm going to deny it without

20  prejudice.  I will consider this issue at the time of trial of

21  the matter.  So I don't want -- and that's going to be the

22  Court's disposition.

23         I don't need to get a written response from you, Mr.

24  Garber.  So --

25         MR. GARBER:  Thank you, Your Honor.

1        THE COURT:  -- my question to both of you is when are

2   you going to be ready to go to trial?

3        Mr. Garber, I think the last time we spoke you had

4   indicated you didn't -- and you both told me today you don't --

5   neither side is going to have an expert.  I assume you're going

6   to call Mr. Mack.  Do you have other witnesses you're going to

7   call, Mr. Garber?

8        MR. GARBER:  Yes, Your Honor, we anticipate calling

9   Mr. Mack and his sister-in-law.  His sister-in-law was the one

10  that did a lot of the work.  Her deposition was taken.

11        Additionally, there was a Dr. Leech (sic) -- or Dr.

12  Leachy (ph.), I guess his name was, and we didn't take his

13  deposition but we agreed that his records, including his

14  letters, would be admissible to the Court, and stand in place

15  instead of anything that he might testify to.

16        We have been attempting to get a social worker in New

17  Jersey, who worked with Mrs. Mack while she was under hospice

18  care.  And so far, that person has refused to answer calls, and

19  we do not have an address to send a subpoena to, to get her, or

20  we haven't been able to get one yet.  But we would like to

21  still work on that and make sure we get that information to Mr.

22  Lewis.  I think we still have sixty days on the expert aspect.

23        THE COURT:  Well --

24        MR. LEWIS:  Expert?

25        THE COURT:  -- let me -- Dr. Leachy -- Mr. Lewis, do

1    you agree that his records will be admitted in evidence --

2              MR. LEWIS:  Yes --

3              THE COURT:  -- without his testimony?

4              MR. LEWIS:  -- in fact, what happened, Your Honor, was

5    I wanted to take Dr. Leachy's deposition in Florida.  We

6    finally got him subpoenaed.  He was not too anxious to spend

7    time on it.  I had a discussion with Mr. Garber about whether

8    we could admit his handwritten records, with a transcript of

9    them that he made, that he, Dr. Leachy, made, along with a kind

10   of a vocabulary of terms, in lieu of taking his deposition.

11   And Mr. Garber agreed.  So both of us are going to rely on his

12   records, I think, rather extensively, perhaps, at trial, as

13   speaking for themselves.  But he's not going to be appearing as

14   an expert; he's going to be appearing, essentially, as --

15             THE COURT:  That's fine.

16             MR. LEWIS:  -- as a percipient witness.

17             THE COURT:  Let me just -- how many witnesses are

18   going to testify live at trial?  So Mr. Mack and his sister-in-

19   law, and Mr. Garber, you're trying to see whether you can find

20   the social worker, is that right?

21             MR. GARBER:  Yes, Your Honor.  So we would anticipate

22   three.  I would tell the Court my clients have told me that the

23   son of Mr. Mack has information.  I tried to talk with him.  I

24   can't think that he's worthwhile.  I've mentioned him also to

25   Mr. Lewis.  I don't think Mr. Lewis thinks he's worthwhile

RESIDENTIAL CAPITAL, LLC, et al.                    25

1    either.

2            THE COURT:  All right.  Mr. Lewis, how many

3    witnesses --

4            MR. LEWIS:  Yeah, I agree with that, Your Honor.

5            THE COURT:  How many witnesses do you intend to call,

6    Mr. Lewis?

7            MR. LEWIS:  At the moment, I'm thinking just one, and

8    the one would be on the QWR address issue, to establish that

9    this address, on the back of each and every account statement,

10    was on the back of each and every of their packets at the time,

11    and I have a few sample statements from the months after the

12    month at issue.  And everything else, I think, is going to be

13    pretty much deposition testimony and medical records, which we

14    also agreed would be generally admissible --

15            THE COURT:  Right.  How many depositions have been

16    take --

17            MR. LEWIS:  -- including the med --

18            THE COURT:  How many depositions have been taken?

19            MR. LEWIS:  In this particular proceeding?

20            THE COURT:  Yes.

21            MR. LEWIS:  Only two, Your Honor.  I took Mr. Mack's

22    and his sister-in-law.

23            MR. GARBER:  Your Honor, we took about eight

24    depositions in the proceedings that were in the court down here

25    in Florida.  And the two most important ones, that I would want

RESIDENTIAL CAPITAL, LLC, et al.                    26

1  to introduce, are the deposition of Mrs. Mack, and she is

2  videotaped, so you can actually see her.  Mr. Mack's deposition

3  was also taken, but he'll be at trial, so I don't anticipate

4  we'll use that.

5          THE COURT:  Okay.  And --

6          MR. LEWIS:  Your Honor, I would anticipate using

7  material from both Mrs. Mack's deposition and from Mr. Mack's

8  deposition.  There's a lot of very useful stuff in it.

9          THE COURT:  Okay.  Mr. Lewis, I take it from what

10 you've just said you're not -- well, let me ask, are you going

11 to have an objection to Mr. Garber offering, and the Court

12 admitting, Mrs. Mack's state court deposition?

13         MR. LEWIS:  In principle, no, Your Honor.  There may

14 be specific passages, depending on what they're being offered

15 for, but I'm sure we can clear that in advance, or most of it

16 in advance.

17         THE COURT:  Okay.  So --

18         MR. LEWIS:  I won't be objecting simply on the basis

19 that she's not present.

20         THE COURT:  Yeah, well, that's for sure.

21         MR. LEWIS:  Yeah.

22         THE COURT:  If you both look at the Court's Web site,

23 under my chambers' rules, you will see a template for a joint

24 pre-trial conference order.  While this is not an adversary

25 proceeding -- it's a claim objection -- I also utilize that

1  template for contested matters on claim objections.  And so I

2  would ask that the two of you confer and complete the joint

3  pre-trial conference order.  It includes the usual stuff.  You

4  need your exhibit lists and identify witnesses and -- so you're

5  going to be away, Mr. Lewis, for about half of this month.

6  That's fine with me.  What I would like the two of you to do is

7  discuss and see if you can agree on -- take a look -- Mr.

8  Garber, look at the Web site and pull down the pre-trial

9  conference order; I don't think any of it is going to be a

10  surprise to you.

11       And I'd like one of you to advise my chambers of a

12  reasonable period when you believe you can lodge with the Court

13  a completed proposed joint pre-trial conference order.  What I

14  generally require is that all exhibits be pre-marked.  Here the

15  claimant, Mr. Mack, will use numbers, and the Trust will use

16  letters.  Every exhibit has to have a unique identifier.  They

17  all need to be pre-marked.  We don't have a reporter who stamps

18  exhibits in the courtroom.  You submit them all a week in

19  advance of the trial.  You need to identify whether there are

20  any objections to exhibits and what -- because I try to resolve

21  those before we actually begin taking testimony.  And I would

22  like pre-trial memoranda of law that address the claims and

23  defenses that each of you are asserting.  And again, I like to

24  get all of that, the exhibits, your trial briefs a week before

25  the trial.

1    I'm prepared to schedule -- given the very few

2    witnesses, and I anticipate you'll agree on admissibility of

3    exhibits, it sounds like we're talking about a day, or at most

4    two-day trial.  And I will give you a trial date pretty

5    quickly.  So you -- the two of you ought to give me -- because

6    you're both out of town, and I'm sure neither of you is

7    particularly thrilled about having a trial in New York in the

8    winter, but that's what's going to happen.

9    So you ought to confer, in your respective schedules,

10   and then you talk with one of my law clerks and we'll try and

11   firm up dates for a trial.  And we'll do a final pre-trial

12   conference hearing, which we can -- again, I think we can do it

13   by telephone.  I mean, you've been agreeing on most everything,

14   so I don't anticipate that you need to show up in the courtroom

15   for the hearing.  We can do it by telephone.

16   But I'd like, in the first instance, the two ought to

17   confer as to when you can submit the joint pre-trial conference

18   order, when you want to have a telephonic joint final pre-trial

19   conference, and give us some dates when the two of you would be

20   available, two consecutive days when you'd be available for

21   trial.  Is that workable?

22   MR. LEWIS:  Yes, Your Honor.  May I ask a question

23   about the Court's procedure at trial?

24   THE COURT:  Sure.

25   MR. LEWIS:  Obviously, from what we've been talking

1   about, a lot of material is going to be documentary, and

2   deposition transcripts, and apparently videotaped transcripts

3   as well.  Does the Court have the parties read those

4   transcripts into the record and -- or are we just going to

5   submit material on top of live testimony?  I'm just trying to

6   determine, in terms of planning.

7           THE COURT:  Absolutely a fair question.  My general

8   practice is not to have a responsive reading of deposition

9   transcripts in the courtroom.  So you would submit the

10  transcripts, and it sounds like, what, there's a video

11  deposition of Mrs. Mack.  You'd submit it in advance.  I will

12  have read and reviewed, in advance; unless one of you believes

13  that it should be -- I should watch a video from the bench,

14  with you both in the courtroom, I would ordinarily not do that.

15  And it would be helpful if you could submit the deposition on a

16  DVD, rather than in videotape, because then I can watch it on

17  my computer.

18          MR. LEWIS:  Well, it sounds like it's kind of a

19  combination of live testimony and summary judgment.

20          THE COURT:  Well, whatever witnesses you're going to

21  put on live we'll do in the courtroom, and you'll cross-

22  examine --

23          MR. LEWIS:  Yep.

24          THE COURT:  -- in the courtroom.  And --

25          MR. LEWIS:  Right.

1          THE COURT:  -- anything that's in the deposition

2    transcript, I'll take it and read it and will have read it

3    before you come to trial.

4          MR. LEWIS:  Very well, Your Honor.  Thank you.

5          THE COURT:  Mr. Garber, is that an acceptable

6    approach?

7          MR. LEWIS:  Thank you, Your Honor.

8          THE COURT:  Okay.

9          MR. GARBER:  Yes, Your Honor, that is acceptable.

10          And to just throw out a date, I know Mr. Lewis is

11   leaving shortly on his trip -- do you think we could do that

12   pre-trial order by the 15th of February?  Is that --

13          MR. LEWIS:  Well --

14          MR. GARBER:  -- too soon?

15          MR. LEWIS:  -- Mr. Garber, I need to see what's in it

16   before I can respond, but you can def -- I'm willing to do it

17   just as fast as reasonably possible.

18          THE COURT:  Well, let me suggest this.

19          MR. GARBER:  We'd like to take this --

20          THE COURT:  Let me suggest this.  The two of you talk

21   offline, today or tomorrow, go look at my pre-trial conference

22   order, talk about it, see when -- and you can -- if you agree

23   on dates, contact one of my law clerks, and we'll work out --

24   within reason.  Look, I want to move this one and get this

25   resolved for Mr. Mack and for the Trust.  I also want to be

RESIDENTIAL CAPITAL, LLC, et al.                    31

1    reasonable to both of you.  So why don't the two of you confer,

2    see if you can work out the dates.  If you can't, contact one

3    of my law clerks and, in all likelihood, I'll agree.

4              MR. LEWIS:  Yes, Your Honor.

5              MR. GARBER:  Thank you, Your Honor.

6              MR. LEWIS:  Thank you very much.

7              THE COURT:  Okay.  Thanks very much both of you.

8              All right.  We're adjourned.

9         (Whereupon these proceedings were concluded at 4:41 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

3                              RULINGS

4                                        PAGE      LINE

5  Mr. Lewis' December 23, 2014 request for    20        15

6  partial summary judgment precluding an award

7  of punitive damages to the Macks is granted

8  Mr. Lewis' December 23, 2014 request for    22        14

9  partial summary judgment regarding whether

10 the Macks' October 26, 2009 letter was

11 a qualified written request is denied

12 without prejudice

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8    _Sharona Shapiro_

9

10   _____

11   SHARONA SHAPIRO

12   AAERT Certified Electronic Transcriber CET**D 492

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  January 13, 2015

19

20

21

22

23

24

25