1

1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 Case No. 12-12020-mg

5 - - - - - - - - - - - - - - - - - - - -x

6 In the Matter of:

7

8 RESIDENTIAL CAPITAL, LLC, et al.,

9

10          Debtors.

11

12 - - - - - - - - - - - - - - - - - - - -x

13

14          United States Bankruptcy Court

15          One Bowling Green

16          New York, New York

17

18          January 14, 2015

19          10:03 AM

20

21 B E F O R E:

22 HON. MARTIN GLENN

23 U.S. BANKRUPTCY JUDGE

24

25

1

2 (CC:  Doc# 7552, 7842) ResCap Borrower Claims Trust's Seventy-

3 Fifth Omnibus Objection to Claims (No Liability Borrower

4 Claims).  Going forward as to claim of Rhonda Gosselin.

5

6 (CC: Doc# 7736) ResCap Borrower Claims Trust's Seventy-Sixth

7 Omnibus Objection to Claims (No Liability Borrower Claims).

8

9 (CC: Doc# 7841) Motion for Omnibus Objection to Claim(s)/The

10 ResCap Liquidating Trust's Seventy-Ninth Omnibus Claims

11 Objection (Purported Administrative Claims).

12

13 (CC: Doc# 7793) ResCap Borrower Claims Trust's Objection to

14 Claim Number 2009 Filed by Teddy Halstead.

15

16

17

18

19

20 Transcribed by:  Aliza Chodoff

21 eScribers, LLC

22 700 West 192nd Street, Suite #607

23 New York, NY 10040

24 (973)406-2250

25 operations@escribers.net

1

2    A P P E A R A N C E S :

3    MORRISON & FOERSTER LLP

4          Attorneys for ResCap Borrower Claims Trust

5          250 West 55th Street

6          New York, NY 10019

7

8    BY:    JORDAN A. WISHNEW, ESQ.

9          MERYL L. ROTHCHILD, ESQ.

10

11

12    BUSTOS & ASSOCIATES, P.C.

13          Attorneys for Conrad Burnett, Jr.

14          225 Broadway

15          39th Floor

16          New York, NY 10007

17

18    BY:    PABLO E. BUSTOS, ESQ.

19

20

21

22

23

24

25

1

2   ALSO PRESENT:

3         KRISTIN E. KARMAZYN, Party Pro Se (TELEPHONICALLY)

4         KATHY PRIORE, ResCap Liquidating Trust (TELEPHONICALLY)

5         KENNETH C. THOMAS, Party Pro Se (TELEPHONICALLY)

6         ELDA M. THOMPSON, Party Pro Se

7         MARIA M. THOMPSON, Party Pro Se

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, et al.                                    5

1                      P R O C E E D I N G S

2        (Audio starts mid-sentence)

3            MR. WISHNEW:  -- for the ResCap borrower claim trust.

4            Your Honor, on this morning's agenda, we'll skip ahead

5    to II on page 4.  There are four items going forward.  I will

6    address items 1 and 2 and then turn over items 3 and 4 to my

7    colleague, Meryl Rothchild.

8            THE COURT:  Okay.

9            MR. WISHNEW:  With regards to item number 1, ResCap

10   Borrower Claim Trust's seventy-fifth omnibus objection to

11   claims, which is docketed at 7552.  The only claim going

12   forward with regards to this objection is that of Rhonda

13   Gosselin.  It's a carryover from a prior hearing.

14           The Borrower Trust filed its reply and supplemental

15   objection to address one issue not originally raised in its

16   initial objection.  The Borrower Trust coordinated a briefing

17   schedule with the claimant and her counsel to allow the

18   claimant an opportunity to respond to the additional arguments

19   made in the supplemental objection.  The timing for briefing

20   was set forth in a notice of adjournment which was docketed at

21   docket entry 7801.

22           The Borrower Trust filed its reply on December 8th,

23   and the claimant never responded by the agreed-upon deadline of

24   December 29th.  Your Honor, through the seventy-fifth omnibus

25   claims objection, the Borrower Trust seeks to expunge those

1  claims that do not represent valid pre-petition claims against

2  the debtors because they do not prove by a preponderance of the

3  evidence any specific wrongdoing by the debtors.  The Borrower

4  Trust thoroughly examined the debtors' books and records in an

5  effort to validate the accuracy of the allegations made in the

6  response and the claims at issue and determined the books and

7  records do not show any liability due and owing to Ms.

8  Gosselin.

9        In support of the objection and the reply and

10  supplemental objection, the Borrower Trust submit a

11  supplemental declaration by Ms. Deanna Horst, chief claims

12  officer to the ResCap liquidating trust, as Exhibit 1 to the

13  reply and supplemental objection.  Ms. Horst is in the court

14  today and available to answer any questions the Court may have

15  for her.

16        For the reasons set forth in the objection and the

17  reply, Ms. Gosselin has not demonstrated any liability of the

18  debtors related to the origination of the loan.  Ms. Gosselin

19  alleges a purportedly inaccurate finance charge, which the

20  Borrower Trust has addressed through both the objection and the

21  supplemental objection.

22        Issues relating to servicing, there was a misdirected

23  transfer.  The Borrower Trust acknowledged that there was, in

24  fact, a misdirected transfer by the debtors, but that the

25  debtors subsequently took steps to correct it and even offered

1  mitigation alternatives to Ms. Gosselin, which did not result

2  in any damages to her.

3         In addition, she questioned a foreclosure -- the

4  ability of the debtors to foreclose.  And through both the

5  objection and the reply, the Borrower Trust addressed the

6  proper standing to commence the foreclosure.  Therefore, Ms.

7  Gosselin did not raise -- I'm sorry, did not sufficiently meet

8  her burden of demonstrating by a preponderance of the evidence

9  a valid claim, on these bases, against the debtors.

10         As noted in the reply, the objection did not address

11  Ms. Gosselin's allegations that the debtors are purportedly

12  liable for providing her with a loan she could not afford.  In

13  the supplemental objection, the Borrower Trust notes that Ms.

14  Gosselin was approved for the loan in June 2006 based on both

15  her credit score and the loan-to-value ratio, which was forty-

16  seven percent at the time the loan closed, based on the

17  appraisal of her property.

18         Ms. Gosselin chose to pull equity out of her home to

19  pay down her credit card debt.  As noted, her credit score at

20  the time deemed her a worthy borrower, and the value of her

21  home in 2006 provided adequate equity to warrant the loan.  She

22  has not responded to any of those points.  Therefore, Ms.

23  Gosselin has not met her burden in showing that the debtor has

24  engaged in any unfair and deceptive trade practices relating to

25  the origination of her loan and has not substantiated any other

1  grounds asserted for the debtors' purportedly liability.

2  Therefore, consistent with our request in the seventy-fifth

3  omnibus objection, as well as the supplemental objection and

4  reply, we ask that this claim be disallowed and expunged.

5       THE COURT:  Is anybody here on behalf of Ms. Gosselin?

6       I have a few questions.  Just bear with me for a

7  second, okay?

8    (Pause)

9       THE COURT:  What evidence do I have showing that the

10  debtors considered Ms. Gosselin's ability to repay the loan at

11  the time that she received it?  I understand it was a

12  refinance, and it reduced her monthly payments considerably.

13       MR. WISHNEW:  Um-hum.

14       THE COURT:  But the question I have is, what evidence

15  do you rely on that the debtors considered her ability to repay

16  the loan at the time the loan was granted -- made to her?

17       MR. WISHNEW:  Your Honor, what we do have, we have a

18  credit score that deemed her a worthwhile borrower.

19       THE COURT:  What was the credit score?

20       MR. WISHNEW:  One moment, Your Honor.

21       THE COURT:  So what I'm focusing on is the Chapter

22  93(a) claim --

23       MR. WISHNEW:  Um-hum.

24       THE COURT:  -- where Gosselin asserts as an unfair and

25  deceptive practice, improperly extending credit to her without

1  regard for her ability to pay.  She goes on from there, but I

2  just want to focus on the issue of ability to pay.

3          In the Massachusetts Supreme Judicial Court decision

4  in Drakopoulos, 991 N.E.2d 1086 (2013), the Court said, "A

5  lender may be liable under Chapter 93(a) for the origination of

6  a home mortgage loan that the lender should recognize at the

7  outset that the borrower is not likely to be able to repay."

8          And so that's why I want to focus on what

9  evidence -- and you've indicated her credit score.  I mean, the

10  value of the property would not indicate her ability to repay,

11  in my view, at least as applied by the Massachusetts courts.

12  It would focus on her creditworthiness.  And so I'm not -- I

13  think credit scores is clearly relevant to her ability -- to

14  evaluating her ability to repay, and you indicate that the

15  debtors looked at that.  And that's why I want to know what was

16  her credit score.

17          MR. WISHNEW:  Standing here at this moment, Your

18  Honor, I'm not a hundred percent certain, but I'd be happy to

19  validate that immediately after the hearing and --

20          THE COURT:  See, you say --

21          MR. WISHNEW:  -- notify the Court.

22          THE COURT:  -- in paragraph 29 in the reply --

23          MR. WISHNEW:  Um-hum.

24          THE COURT:  -- that GMACM extended the loan to

25  Gosselin on the basis of her credit score and the loan-to-value

RESIDENTIAL CAPITAL, LLC, et al.                    10

1   ratio, which was forty-seven percent at the time of closing

2   based on appraisal of the property.  It's at paragraph 29 of

3   the reply.

4           MR. WISHNEW:  Yes, Your Honor.

5           THE COURT:  And what I'm looking for is a declaration

6   or an authenticated exhibit that would be competent evidence,

7   because the reply, in itself, is not.  It's not evidence; it's

8   an argument.

9           MR. WISHNEW:  Um-hum.

10          THE COURT:  Perhaps, a quite valid argument, but

11  nevertheless, an argument.

12          MR. WISHNEW:  Yeah.

13          THE COURT:  And so that's what I'm looking for.  Is

14  there an affidavit that says that --

15          MR. WISHNEW:  There is Ms. Priore's supplemental

16  declaration filed at docket number 7842-1.

17          THE COURT:  Um-hum, and she says what?

18          MR. WISHNEW:  In paragraph 7, she says that Ms.

19  Gosselin was approved based on her credit score and loan-to-

20  value ratio.

21          THE COURT:  Well, that's very nice, but that's

22  clearly --

23          MR. WISHNEW:  I recognize that, Your Honor.

24          THE COURT:  -- hearsay and --

25          MR. WISHNEW:  Yes.

RESIDENTIAL CAPITAL, LLC, et al.                    11

1          THE COURT:  -- not competent evidence to establish

2    that that was the basis.  If there are servicing notes -- I

3    mean, if Ms. Priore was basing her statement --

4          MR. WISHNEW:  I would imagine --

5          THE COURT:  -- on --

6          MR. WISHNEW:  -- she was absolutely basing her

7    statement on her review of certain of the debtors' records, so

8    we will follow up with Ms. Priore and validate the source

9    document that was the basis of her knowledge.  And what we can

10   do is file a brief supplemental declaration to that point.

11         THE COURT:  That's fine.  Let me just see if I have

12   any other questions about --

13      (Pause)

14         THE COURT:  So what I would like addressed is what was

15   her credit score and why that indicates her ability to repay

16   the loan.  So in Ms. Horst's supplemental declaration, it

17   refers to the HUD-1 statement that Gosselin completed.  And it

18   certainly shows that she was reducing her monthly payments by

19   863 dollars.  But it doesn't reflect -- the HUD statement

20   doesn't reflect Ms. Gosselin's income at the time the loan was

21   originated; it's in Horst's supplemental declaration, Exhibit

22   C.

23         MR. WISHNEW:  Um-hum.

24         THE COURT:  Nor does it state that GMACM considered

25   her income at the time it extended the loan.  And it

1    didn't -- nothing indicated what Ms. Gosselin's credit score

2    was at the time the loan was originated, nor does it assert

3    that her credit score established her ability to repay.

4          It may well be that her credit score did support her

5    ability to repay.  And if you can provide evidence of what the

6    credit score was, and then a declaration with competent

7    evidence that a credit score, whatever hers was at the time,

8    would indicate her ability to repay, I'll be satisfied at that

9    point.

10         MR. WISHNEW:  Understood, Your Honor.

11         THE COURT:  I must say, the evolution -- I think it is

12   evolution -- of the law in Massachusetts on 93(a) has not

13   followed a smooth path, and I think, certainly, to this point

14   of whether a lender has a duty to evaluate a prospective

15   buyer's ability to repay at the time of the loan was granted.

16   So I referred to the 2013 Massachusetts Supreme Judicial Court

17   decision in Drakopoulos.  It quotes from an earlier decision in

18   that same court from 2008 in Commonwealth v. Fremont Investment

19   Loan, 897 N.E.2d 548 at 560.

20         I think your papers argue there is no duty -- or was

21   no duty at the time on a lender to evaluate the borrower's

22   likely ability to repay the loan.  I'll just express some

23   moderate discomfort with the use of authority in the brief

24   supporting that proposition, because it seems to me that the

25   Massachusetts Supreme Judicial Court, both later and referring

1    to an earlier decision, seems to recognize there was such a

2    duty.

3             MR. WISHNEW:  Understood, Your Honor.

4             THE COURT:  I'm not -- I think that this whole issue

5    about 93(a) is sufficiently confused, in my view, that -- let

6    me just stop my comment there.

7             All right.  So is a week enough time to get that in?

8             MR. WISHNEW:  Yes, Your Honor.

9             THE COURT:  Okay.  All right.  Put it on ECF and send

10   a copy to chambers, as well, so we have it easily.  I'll either

11   decide the matter then or perhaps give Ms. Gosselin a further

12   chance to respond to it.  But I want to see that, okay?

13            MR. WISHNEW:  Okay.

14            THE COURT:  All right.  So I'm going to --

15            MR. WISHNEW:  Very good, Your Honor.

16            THE COURT:  With respect to the Gosselin matter, we'll

17   continue it until I see the additional filing.

18            MR. WISHNEW:  Okay.

19            THE COURT:  Okay?

20            MR. WISHNEW:  Thank you, Your Honor.

21            Your Honor, the next matter on today's calendar is

22   item 2 on page 5, the ResCap Borrower Claims Trust's seventy-

23   sixth omnibus objection to claims.  There were three -- sorry,

24   the borrower -- the omnibus objection was filed on November

25   10th, 2014 at docket number 7736.  The Borrower Trust received

RESIDENTIAL CAPITAL, LLC, et al.                          14

1    four responses and is addressing three of those responses

2    today.

3          The Borrower Trust filed a reply in support of the

4    objection at docket number 7967 as to claim numbers 3728, filed

5    by Mr. and Mrs. Thompson, who I believe are in the court today,

6    claim 2055, filed by Michael and Kristin Karmazyn -- I believe

7    Mrs. Karmazyn is on the phone today -- and claim 7862, filed by

8    Mr. Kenneth Thomas, who I also believe is on the phone today,

9    Your Honor.

10          THE COURT:  All right.  Let me just say first, with

11   respect to the nine claims -- there's thirteen claims that are

12   covered by the seventy-sixth omnibus objection.

13          MR. WISHNEW:  Correct, Your Honor.

14          THE COURT:  And as to four of them, there are

15   responses, and I'll deal with each of those.  As to the other

16   nine, the objection's sustained, and their claims expunged.

17          So let's go through and let's deal with each of the

18   other -- the objections as to which responses were filed.

19          MR. WISHNEW:  That's --

20          THE COURT:  So I'd like first to deal with the Maria

21   M. and Elda Thompson claim number 1083.  Are the Thompsons

22   here?

23          Why don't you come on up?

24          Why don't you have a seat?

25          And Mr. Wishnew, with respect to the claims that I've

1  sustained in the objection, submit an order that deals with

2  those claims.  The ones as to which -- the claims as to which

3  responses were filed, I'm going to deal with in separate

4  orders.  Okay?

5          MR. WISHNEW:  Very good, Your Honor.

6          THE COURT:  Okay.  As to the ones that I've sustained

7  the objection, you'll submit an order and submit it.

8          MR. WISHNEW:  Absolutely.

9          THE COURT:  Okay?

10         All right.  Could you identify yourselves, please?

11 Pull the microphone closer, okay?

12         MS. E. THOMPSON:  I'm Elda M. Thompson.

13         THE COURT:  Okay.

14         MS. M. THOMPSON:  Maria M. Thompson.

15         THE COURT:  Okay.  All right.  Thank you.

16         MS. M. THOMPSON:  There is no Mr. Thompson.

17         THE COURT:  Oh, I'm sorry.

18         MR. WISHNEW:  My mistake, Your Honor.

19         THE COURT:  My mistake, as well.  I apologize for

20 that.  Okay?

21         All right.  Go ahead, Mr. Wishnew.

22         MR. WISHNEW:  Thank you.

23         THE COURT:  So the way we're going to proceed, I'm

24 going to let -- since it's the Trust's objection, I'm going to

25 let them argue first, and then I'm going to let one or both of

1  you argue.  Okay?

2          All right.  So go ahead, Mr. Wishnew.

3          MR. E. THOMPSON:  Thank you, Your Honor.

4          MR. WISHNEW:  Thank you, Your Honor.

5          Your Honor, without going through every argument made

6  in the objection, and it's the Borrower Trust's position that

7  the numerous allegations made against the debtors by Maria and

8  Elda Thompson, in support of their general unsecured claim of

9  658,336 dollars, are not substantiated by any valid evidence.

10 There are arguments concerning that the mortgage is an illegal

11 document based upon a stamp that was placed on it.  Again,

12 there's no proof in the record that this stamp somehow

13 invalidates the mortgage or that the debtors are somehow

14 responsible for placing that stamp on the document.

15         There was allegations of improper fees and interest.

16 Again, Your Honor, with regards to -- as set forth in both the

17 objection as well as in the supplemental reply -- or in the

18 reply, the interest rates that were charged were consistent

19 with the terms of the note.

20         In terms of enforcing the wrong loan, there might be a

21 misunderstanding on the claimants' behalf, and we tried to

22 address that through both the objection and the reply.  The

23 loan at issue that was being serviced by the debtors was a

24 refinance loan.  It had paid off a prior loan through J.P.

25 Morgan, and a new loan was undertaken, which was originated in

1   June 2005 by Ameriquest Mortgage.  It is that loan that was

2   being enforced.  It was not the prior loan that had been paid

3   off through the refinancing that was being enforced.

4        With regards to setting up an escrow account, as the

5   Borrower Trust explains, there were back taxes owing.  So an

6   escrow account was set up.

7        In addition, Your Honor, the Borrower Trust took an

8   exhaustive approach to the objection, set forth in great detail

9   in Exhibit A, all the points that have been raised by Maria and

10  Elda Thompson in their response to our June 2013 diligence

11  request.  We explained what they believe to be purported

12  errors, and the only response we got to our objection was

13  essentially a reiteration of the diligence response.  There are

14  no new arguments.  There's no evidence to counter our

15  arguments.

16       So for the reasons set forth in both the objection, as

17  well as in the reply, we would ask that the Court disallow and

18  expunge this claim.

19       THE COURT:  I have some factual questions I'd --

20       MR. WISHNEW:  Okay.

21       THE COURT:  -- like you to address.  And so I

22  know -- and I have in front of me right now a copy of the

23  foreclosure complaint that was filed in August 2007, the

24  plaintiff at Citigroup Global Markets Realty Corporation

25  against the Thompsons.  What hap -- and there's nothing in your

RESIDENTIAL CAPITAL, LLC, et al.                    18

1  papers to indicate what was the disposition of that case was.

2  It's quite confusing to me, Mr. Wishnew.  It appears that --

3  I'm surmising from the papers that a second foreclosure action

4  was filed in 2011, but I can't be sure of that.  I have no

5  foreclosure complaint from 2011 is included.

6          Reading the papers, there's a reference to this August

7  2007 foreclosure complaint, and there's also, in the detailed

8  loan history that's provided, an indication that the Thompsons,

9  after that foreclosure action was filed, they become current on

10  their loan.  But there's nothing to indicate whether that 2007

11  foreclosure action was dismissed, with or without prejudice.

12          What happened to it?  Can you tell me that?

13          MR. WISHNEW:  I cannot tell you, Your Honor.  I just

14  know that there were, between 2007 and 2010 -- or in 2010,

15  there were lost mitigation efforts.  To the best of my

16  knowledge, the foreclosure did not go forward.  But I'd have to

17  go back and validate that.

18          THE COURT:  What does that mean, didn't go forward?  I

19  mean, was the foreclosure action dismissed?  The second

20  question, was a second foreclosure action filed in 2011?  Who

21  was the plaintiff?  When was it filed?  Can you tell me that?

22          You give me an exhaustive history, but there -- one of

23  the claims that the Thompsons have asserted is for wrongful

24  foreclosure.  I don't -- can you tell me this?  I know that

25  Ocwen is servicing the loan and not --

RESIDENTIAL CAPITAL, LLC, et al.                          19

1           MR. WISHNEW:  Um-hum.

2           THE COURT:  -- GMACM.  Has a foreclosure ever been

3    completed?

4           MR. WISHNEW:  To my knowledge, the debtors never

5    completed a foreclosure.  I can't speak for what has happened

6    since servicing transferred to Ocwen.

7           THE COURT: Do you know whether there was a second

8    foreclosure action that was filed in 2011?

9           MR. WISHNEW:  I don't know.  I know there was simply a

10   referral; but beyond that, there were workout packages that

11   were exchanged, but I don't know if there was actual

12   commencement of a foreclosure in 2011.

13       (Pause)

14          THE COURT:  In the Thompsons' opposition in Exhibits I

15   through K, there appears to be correspondence from Ocwen to the

16   Thompsons, advising them that loan serving had been transferred

17   from GMACM to Ocwen but that the account was referred to

18   foreclosure under GMACM's control on July 7, 2011.  Can you

19   shed -- this is in Thompson -- I think this is the Thompson

20   opposition, page 9.  Can you shed any light on whether GMACM

21   referred the matter to foreclosure in 2011, before servicing

22   was transferred to Ocwen?  Because the Thompsons say that Ocwen

23   referred them to the Zucker Goldberg firm and the Thompsons

24   allege that they contacted the attorneys, who claim they had no

25   knowledge of Ocwen and that the foreclosure was never filed

RESIDENTIAL CAPITAL, LLC, et al.                    20

1    against the property, presently or in the past.  That's at the

2    Thompson opposition, at page 9.  Can you shed any light on

3    that?

4                MR. WISHNEW:  I cannot, Your Honor.

5                THE COURT:  So with respect to the 2007 foreclosure

6    action with Citigroup Global Markets Realty Corp. as the

7    plaintiff, the evidence before me would establish an assignment

8    of the mortgage to Citigroup Global Markets Realty in 2005,

9    although it wasn't recorded.  But the assignment -- I've seen

10   the assignment; it's dated 2005.  My understanding of -- I

11   guess I'm referring, in the foreclosure complaint, to paragraph

12   4(a):  "by assignment of mortgage from Ameriquest Mortgage

13   Company to Citigroup Global Markets Realty Corp. ('Plaintiff'

14   herein), which is unrecorded at this time".  So I've seen the

15   assignment; it is dated in 2005; it is from Ameriquest to

16   Citigroup Global Markets Realty Corp., the plaintiff.

17               And my understanding of New Jersey standing law

18   they've cited to, that mortgage, before the foreclosure was

19   filed, would give Citigroup Global Markets Realty Corp.

20   standing to bring a foreclosure action.  But I don't know

21   whether this is the foreclosure that's in dispute on this claim

22   or whether it's a subsequent -- and was there a second one?

23   Was this one dismissed?  If it was dismissed without a

24   foreclosure, hard to see that there was any wrongful

25   foreclosure.  I know your papers establish at some length the

1    efforts to work out a modification and the forbearance and all

2    that, but --

3            Additional question I have:  Part of the Thompsons'

4    claim is that GMACM incorrectly charged, collected and applied

5    payments.  The trust asserts that it charged, collected and

6    applied payments in accordance with the terms of the mortgage

7    note, the adjustable-rate mortgage rider, and the adjustable-

8    rate mortgage letters, sent to the Thompsons.  You haven't

9    provided -- if I didn't see -- in the exhibits, the adjustable-

10   rate letters that were sent to the Thompsons.  Do you have

11   those?  Maybe -- if I missed -- there's a lot of paper in

12   today's hearing.  If I missed it, tell me.  But I didn't see

13   those.  You referred to them and I'd like to see them.

14           MR. WISHNEW:  We can provide those to Your Honor, not

15   standing here today, but we can supplement the record.

16           THE COURT:  Anything else you want to add?

17           MR. WISHNEW:  Nothing at this time, Your Honor.

18           THE COURT:  All right.  Ms. Thompson, you can -- you

19   don't have to get up; you can -- just pull the microphone

20   close -- whoever is going to -- whichever one of you wants to

21   speak is fine with me.  You just need to -- when you start to

22   speak, you just need to give your name again so that we have a

23   clear record.  Just pull the microphone --

24           Help her put the microphone right in front of her.

25   It's got to be a little -- actually, see if you can --

1    The chair's okay; just push the microphone -- okay, go

2    ahead.

3    MS. E. THOMPSON:  My name is Elda M. Thompson.

4    THE COURT:  Okay.  Fine.

5    MS. E. THOMPSON:  Okay.  Regarding the 2007

6    foreclosure --

7    THE COURT:  Yes.

8    MS. E. THOMPSON:  -- I became ill with systemic lupus,

9    and at that time I was placed on disability and I had missed

10   one month; and they in turn placed me in foreclosure, claiming

11   that I hadn't paid six months.  Okay, at that time we didn't

12   notice the issue and we paid the agreement (sic), which was

13   2,000 every month.  At the end of that agreement, they sent us

14   a letter saying that, yes, that I did pay those months and that

15   they were mistaken, but they didn't send the money back.

16   THE COURT:  They sent what letter that they were

17   mistaken?

18   MS. E. THOMPSON:  They were mistaken with the

19   foreclosure, that I had paid those six months, that I was only

20   late one month.

21   THE COURT:  May I ask you this?  So I have a copy of

22   the foreclosure -- I referred to this during Mr. Wishnew's --

23   MS. E. THOMPSON:  Um-hum.

24   THE COURT:  -- presentation -- a copy of the

25   foreclosure complaint from 2007, but I haven't seen anything

RESIDENTIAL CAPITAL, LLC, et al.                    23

1  about what happened to that case.

2          MS. E. THOMPSON:  Well --

3          THE COURT:  Was it dismissed?

4          MS. E. THOMPSON:  It was dismissed.

5          THE COURT:  Okay.  Do you know when?

6          MS. M. THOMPSON:  July 20th, '13.

7          MS. E. THOMPSON:  July 20th, '13.

8          THE COURT:  2013?

9          MS. E. THOMPSON:  Um-hum.  They tried ten times.  The

10 problem is that the actual mortgage was never registered.  So

11 when you go on the Westlaw, the only thing that appears is

12 Citigroup paid off, and my name on the deed.  The -- Ameriquest

13 doesn't appear on the register.

14         THE COURT:  So -- let me make sure I understand -- in

15 2005 you refinanced your existing loan --

16         MS. E. THOMPSON:  Right.

17         THE COURT:  -- and the refinance was with Ameriquest?

18         MS. E. THOMPSON:  Right.

19         THE COURT:  Okay.  And --

20         MS. E. THOMPSON:  The mortgage wasn't registered,

21 but --

22         THE COURT:  Well, but it was --

23         MS. E. THOMPSON:  -- everything else was.

24         THE COURT:  Have you seen the -- there's a document

25 in -- there's a lot of paper on this, and I understand.

RESIDENTIAL CAPITAL, LLC, et al.                              24

1          MS. E. THOMPSON:  Yeah.

2          THE COURT:  -- where the mortgage was assigned by

3    Ameriquest to Citigroup, I believe, on July 5, 2005?

4          MS. E. THOMPSON:  Well, the problem with that is that

5    Citigroup was paid off and they --

6          THE COURT:  Citi --

7          MS. E. THOMPSON:  -- claimed that they had nothing to

8    do with the mortgage.

9          THE COURT:  That's not what any of the papers before

10   me show.  I mean --

11         MS. E. THOMPSON:  No, I understand that.

12         THE COURT:  -- Citigroup was the -- bear with me a

13   second.

14         In July 2005, shortly after you got the loan from

15   Ameriquest, the mortgage was transferred to a securitization

16   trust.

17         MS. E. THOMPSON:  Oh.  We didn't know that.

18         THE COURT:  Okay.  And the papers before me do show

19   that that occurred and that the mortgage was assigned to

20   Citigroup.  Citigroup had nothing to do with your earlier loan

21   that was paid off, you agree with that --

22         MS. E. THOMPSON:  Um-hum.

23         THE COURT:  -- I take it?

24         MS. E. THOMPSON:  Yes.

25         THE COURT:  Okay.  Let me just -- I'll give you a

1    chance to make whatever argument you want, but I'm trying -- I
2    really am trying to make sure I understand --
3              MS. E. THOMPSON:  No, I understand.
4              THE COURT:  -- the facts.  How many foreclosure
5    complaints were filed?
6              MS. E. THOMPSON:  I have a box about this big, with
7    that many papers.  And every time it's dismissed because the
8    complication was that when Ameriquest put in the papers, they
9    never registered the mortgage; and then the one that was
10   registered was for another person, under us, for some reason.
11   So they sent us that mortgage.  Then everything got transferred
12   over to GMAC.  I didn't see anything for Citigroup.  The only
13   thing that I received was that I had to send the payments to
14   GMAC.
15             THE COURT:  Right.  So -- and GMAC became the
16   servicer, the loan servicer.
17             MS. E. THOMPSON:  Oh, right.
18             THE COURT:  Okay?  That doesn't appear -- that's not
19   unusual -- that's quite common, okay?
20             MS. E. THOMPSON:  Hmm.
21             THE COURT:  They didn't own the loan.  They were not
22   named in the mortgage, either assigned or otherwise.  They
23   serviced the loan.
24             MS. E. THOMPSON:  Right.
25             THE COURT:  And that's common.  So you get a notice to

1    send your payments to GMAC every month.

2                MS. E. THOMPSON:  Well, I never stopped paying on

3    time.  The only reason I haven't paid is because their lawyer

4    informed me that there were six violations on the loan and they

5    couldn't take my payments anymore.

6                THE COURT:  Right.

7                MS. E. THOMPSON:  So they sent back my payments,

8    saying that the loan wasn't valid and they couldn't take the

9    payments.

10               THE COURT:  But here's what I'm -- I think I

11   understand -- okay.  Look, from reading the papers and looking

12   at the documents, it appears that you fell behind on the

13   mortgage, in 2006.

14               MS. E. THOMPSON:  No.  Unh-unh.  It was always --

15               THE COURT:  You had --

16               MS. E. THOMPSON:  -- paid on time.

17               THE COURT:  You sent --

18               MS. E. THOMPSON:  I have bank statements that --

19               THE COURT:  There's documents --

20               MS. E. THOMPSON:  -- show it.

21               THE COURT:  But there's documents that show that --

22               MS. E. THOMPSON:  Yeah, the --

23               THE COURT:  -- you sent checks and they were returned

24   for insufficient --

25               MS. E. THOMPSON:  Oh, no.

1           THE COURT:  -- funds.

2           MS. E. THOMPSON:  I have all the ones from Wells

3   Fargo.  They even -- Wells Fargo even said that --

4           THE COURT:  Wells Fargo's got enough --

5           MS. E. THOMPSON:  -- if they have to, they would --

6           THE COURT:  That's your bank?

7           MS. E. THOMPSON:  Yes.

8           THE COURT:  Okay.

9           MS. E. THOMPSON:  And it shows -- because I did it

10  through Bill Pay (ph.), automatic, because they're connected to

11  them.  And they show all the payments, because we -- we had to

12  go through that argument.  Then they found the payments,

13  because that was the same thing -- issue in 2007.  And then

14  they found the payments six months later and they said it was

15  an error from one of their officers.  And after that I kept

16  records of everything, because of that issue.  And everything

17  was always paid on time, until they stopped accepting payments

18  in 2011.  September 2011 they stopped accepting payments

19  because they said that their lawyers said that there was an

20  issue with the loan and it couldn't be foreclosed but, because

21  of the issue, they couldn't accept any more payments because of

22  the violations on the loan.

23      (Pause)

24          THE COURT:  Let me come back to this question.  A

25  foreclosure complaint was filed against you in 2007.

RESIDENTIAL CAPITAL, LLC, et al.                    28

1          MS. E. THOMPSON:  Right.

2          THE COURT:  And you say it wasn't dismissed until

3     2013?

4          MS. E. THOMPSON:  Yes.

5          THE COURT:  Was there a second foreclosure action that

6     was filed --

7          MS. E. THOMPSON:  Yes.

8          THE COURT:  -- against you in 2011?

9          MS. E. THOMPSON:  Yes.  And that one was dismissed, as

10    well.  They filed -- they tried to file it, ten times.

11         THE COURT:  Do you have a copy of the 2011 complaint?

12         MS. E. THOMPSON:  We didn't get those foreclosures.

13         MS. M. THOMPSON:  We didn't get --

14         MS. E. THOMPSON:  We didn't get a copy of those.  We

15    learned about those foreclosures when we went to --

16         MS. M. THOMPSON:  This year.

17         MS. E. THOMPSON:  -- to the court this year.

18         THE COURT:  Which court did you go to?

19         MS. E. THOMPSON:  What is it?

20         MS. M. THOMPSON:  We went to the court in --

21         THE COURT:  Just identify your name when you --

22         MS. M. THOMPSON:  Maria M. Thompson.

23         THE COURT:  Go ahead.

24         MS. M. THOMPSON:  In -- when was that -- December

25    5 -- December 5th in 2014, we went to --

RESIDENTIAL CAPITAL, LLC, et al.                    29

1           THE COURT:  Did you go to Superior Court Chancery
2   Division, or --
3           MS. M. THOMPSON:  I beg your pardon?
4           THE COURT:  The Superior Court Chancery Division?
5           MS. M. THOMPSON:  Yes.  It was held in Mount Holly.
6           THE COURT:  Okay.
7           MS. M. THOMPSON:  And the attorney for the --
8           MS. E. THOMPSON:  Ocwen.
9           MS. M. THOMPSON:  The attorney for Ocwen --
10          THE COURT:  Ocwen.  Um-hum.
11          MS. M. THOMPSON:  -- Ocwen -- we filed a motion to add
12  Ocwen to our claim against GMAC, because to us it was one
13  company, not two different companies.
14          THE COURT:  It's two different companies.
15          MS. M. THOMPSON:  So it -- well --
16          THE COURT:  But that's --
17          MS. M. THOMPSON:  Yeah, that's --
18          THE COURT:  That's not for me.
19          MS. M. THOMPSON:  Um-hum.  So at that time I filed a
20  motion to add both as defendants.  So the attorney that they
21  found after three or four attorneys, telling us that they
22  wouldn't take their case, that -- to wait until they find an
23  attorney to take their case.  When we finally went to that
24  hearing, there we learned that they never intended to do a
25  foreclosure, according to their attorney, and that the

RESIDENTIAL CAPITAL, LLC, et al.                    30

1   foreclo -- the attempted foreclosure was dismissed.  And then
2   the judge at that time told us that the foreclosure was one
3   foreclosure, 2007, and they were requested to submit documents
4   to support the foreclosure, but they couldn't.  And that was
5   the ten times.  They tried in my name, they tried in my ex-
6   husband's name, as her husband instead of her filing, as my
7   heirs -- ten names.
8          And in July 2013 the court closed the case.  And so
9   far we haven't heard any more, until the bankruptcy-court
10  notification that they are planning to disallow our claims
11  against them and that if -- we've been dealing with this since
12  2010, I believe, when the bankrupt -- when these people,
13  ResCap, took over the bankruptcy claim of GMAC.  And we --
14          THE COURT:  Bankruptcy was filed in 2012 --
15          MS. M. THOMPSON:  Well --
16          THE COURT:  -- May 2012.
17          MS. M. THOMPSON:  -- anyway.  The -- we -- I sent a
18  letter to the people, the ResCap, and ResCap sent us a letter
19  saying that we have no proof that that wasn't done.  So I sent
20  them another letter with documents to show that the only
21  document that appeared to be a legal document, without any
22  alteration, was the deed that was signed when I transferred my
23  ownership to Elda.
24          So then after that, they recognized our claim, until a
25  month ago, in -- I believe, in December or November, telling us

RESIDENTIAL CAPITAL, LLC, et al.                     31

1  that today they have this hearing to disallow completely our

2  claim and that if we oppose to (sic) that disallowance, we will

3  have to come in in person.

4          THE COURT:  And you're here.

5          MS. M. THOMPSON:  And that's why we're here.

6          THE COURT:  Okay.

7      (Pause)

8          THE COURT:  Ms. Thompson, let me focus on this issue

9  of whether you made payments in 2006 and 2007 that were

10  returned to you because there were insufficient funds in your

11  account.  You say that's not so?

12          MS. E. THOMPSON:  Not --

13          MS. M. THOMPSON:  No.

14          MS. E. THOMPSON:  I have proof from Wells Fargo

15  sending me all the problems of the past --

16          THE COURT:  Okay, what -- tell me what proof -- so

17  when you say proof from Wells Fargo on the payments, are you

18  telling me that you believe you made the payments and that --

19          MS. E. THOMPSON:  No, they --

20          THE COURT:  Wait; stop, stop.  Let me finish.  Okay?

21  I'm sometimes a little slow in getting my questions out.  Okay?

22          But I want to understand whether -- were you making

23  the payments by check or by automatic payment?

24          MS. E. THOMPSON:  The Bill Pay made automatic

25  payments.  Every time my check came in, they took a check

1    out --

2            THE COURT:  Just turn the microphone a little closer

3    to you.

4            MS. E. THOMPSON:  Sorry.  Every time my check was

5    deposited in my account, it automatically took out the mortgage

6    and paid through Bill Pay.

7            THE COURT:  All right.

8            MS. E. THOMPSON:  And I did it through Bill Pay

9    because at the time, I was working fourteen-, sixteen-hour days

10   as a manager, and so I wouldn't forget, I put it automatically.

11           THE COURT:  Okay.  So let me -- have you -- I didn't

12   see those.  Do you have --

13           MS. E. THOMPSON:  I didn't bring them --

14           THE COURT:  -- whether you have them --

15           MS. E. THOMPSON:  -- I didn't bring that.

16           THE COURT:  Okay, stop.

17           MS. E. THOMPSON:  I didn't know that that was --

18           THE COURT:  You believe you have Wells Fargo Bank

19   records for your account --

20           MS. E. THOMPSON:  Yeah, I have.

21           THE COURT:  -- that show that the payments were made

22   to GMAC-M.  Correct?

23           MS. M. THOMPSON:  Yes.

24           MS. E. THOMPSON:  Um-hum.

25           THE COURT:  And -- do I understand you correctly, that

1  at no time were checks returned to you for insufficient funds?

2          MS. E. THOMPSON:  No.  At no time they were returned

3  to me.

4          MS. M. THOMPSON:  And the record shows that.

5          MS. E. THOMPSON:  We went through this with GMAC

6  and --

7          THE COURT:  Okay --

8          MS. E. THOMPSON:  -- when I sent them the --

9          THE COURT:  -- and you're going through it with me

10  now.  That's --

11          MS. E. THOMPSON:  No, I know.  But I want --

12          THE COURT:  -- and I want to know about it.

13          MS. E. THOMPSON:  No, I know.  When we went -- they

14  did the same question, GMAC --

15          THE COURT:  Okay.

16          MS. E. THOMPSON:  -- and I sent them all the copies of

17  Wells Fargo.

18          THE COURT:  Okay.  Let me --

19          MS. E. THOMPSON:  Because --

20          THE COURT:  -- let me ask you this.  Have you ever

21  given any of --

22          MS. E. THOMPSON:  To them?

23          THE COURT:  Yeah, have you --

24          MS. E. THOMPSON:  No, not those.  Because that was

25  settled in 2007.

1          MS. M. THOMPSON:  They never asked for any of --

2          MS. E. THOMPSON:  2008.  Actually, in 2010, it was

3    when they were sent, because they wanted to do a loan

4    modification.

5          THE COURT:  Yes.

6          MS. E. THOMPSON:  But then at first, they -- it

7    wasn't -- it didn't go through, so then we went to a lawyer and

8    asked why is the problem.  And they said because the mortgage

9    is not registered, that's why they couldn't do the loan

10   modification.

11         THE COURT:  So let me shift to this issue of the tax

12   escrow.

13         MS. E. THOMPSON:  Um-hum.

14         THE COURT:  Okay?  So Mr. Wishnew and his colleagues

15   have provided the Court with evidence that you hadn't -- you

16   had not paid the third and fourth installments for 2009

17   property taxes as well as the first and second installments for

18   2010 property taxes, and that GMAC-M paid those taxes.  That's

19   pretty -- I'm not saying -- so if, in fact, you hadn't paid the

20   taxes, GMAC-M would get notice of that from the City.

21         MS. E. THOMPSON:  Um-hum.

22         THE COURT:  Okay.  And to protect the mortgagee's

23   interest, they ordinarily pay it, and then they would set up an

24   escrow to require you to repay it.  And I -- you disputed -- as

25   I understand it, you disputed whether there was -- whether you

RESIDENTIAL CAPITAL, LLC, et al.                    35

1    were behind in paying the property tax.  But what they say is,

2    you gave them -- you gave GMAC-M copies of 2007 and 2008 proof

3    of having paid, but not the 2009 and 2010 taxes.  So --

4            MS. E. THOMPSON:  No, we gave them all the proof.  The

5    problem with that is, that I was paying and they were paying.

6            THE COURT:  Well, that's -- it's clear that only one

7    of you should have been paying.  You should have been paying,

8    and if they had notice that you didn't, GMAC-M would pay.

9    Okay?  So --

10           MS. E. THOMPSON:  We -- we --

11           THE COURT:  -- they said -- you disputed establishing

12   the tax escrow and you sent them information to show you paid

13   the taxes, but they -- what they say is you gave them evidence

14   that you had paid earlier years' taxes, but not the ones that

15   they were disputing.

16           MS. E. THOMPSON:  No, we have --

17           MS. M. THOMPSON:  No, that --

18           MS. E. THOMPSON:  -- the evidence for those.  They

19   both paid -- we both paid.  But Newark is not going to give me

20   back my money saying, you know, it was double paid.  What they

21   did is they moved it forward.  When I -- I showed them copies

22   of all that into 2010 --

23           THE COURT:  Okay, let me ask you --

24           MS. E. THOMPSON:  -- when they asked.

25           THE COURT:  Okay.  Do you have those records?

RESIDENTIAL CAPITAL, LLC, et al.                    36

1          MS. M. THOMPSON:  Yes.

2          MS. E. THOMPSON:  Yes.  We have those records.

3   Because they also claimed that we didn't pay the insurance, and

4   I have the records for that, too.

5          MS. M. THOMPSON:  Right, right, right.

6          MS. E. THOMPSON:  The account was really screwed up,

7   to say the least.

8          THE COURT:  That's one thing I can really agree on.

9          MS. E. THOMPSON:  It was really screwed up.

10         THE COURT:  Okay.  Because I'm having a really hard

11  time.

12         MS. E. THOMPSON:  Yeah, I know.

13         THE COURT:  Okay.  I'm having a hard time, but I want

14  to assure you, I am trying to make sure --

15         MS. E. THOMPSON:  No, I know.

16         THE COURT:  -- I understand completely.

17         MS. E. THOMPSON:  It's -- it's really screwed up.

18  It's really screwed up.

19         THE COURT:  You've answered my questions.  I want to

20  give you a chance to tell me anything else you want to tell me,

21  okay, without me interrupting you.

22         MS. E. THOMPSON:  Well --

23         THE COURT:  Okay.

24         MS. E. THOMPSON:  -- with all these issues, I have

25  systemic lupus.  And I have informed them and tried to work

RESIDENTIAL CAPITAL, LLC, et al.                    37

1  with them.  But to them, all I've gotten so far is other

2  people's mortgage, with their name and signature --

3           THE COURT:  That happened once.  I understand that.

4  That was -- they say that was inadvertent.  Things happen

5  sometimes.

6           MS. E. THOMPSON:  I've gotten stamps saying that I

7  signed, and the day that I signed it was the same day that that

8  wasn't signed, because they were signed in June -- July, and

9  they had the date signed for June, and they said, oh, that was

10  an error.  And every time we show them the papers, then I got

11  papers with two different account numbers.  Okay?

12           And every time they ask for requests, I send them in.

13  Every time they ask for something I send it in.  And then in

14  2011 in September, I said well, you know, if we -- we need to

15  refinance according to -- this is the interest.  That's when we

16  went to the City -- Legal Aid -- and that's when we found out

17  that it wasn't registered, and that's why we were having so

18  many problems with the -- trying to do the loan modification.

19           THE COURT:  Who were you -- who were you trying to do

20  the loan modification with?

21           MS. E. THOMPSON:  Who referred me to the loan?

22           THE COURT:  No, who were you dealing with on the loan

23  modification?

24           MS. E. THOMPSON:  Oh, GMAC.

25           THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    38

1        MS. E. THOMPSON:  I was dealing with GMAC.

2        THE COURT:  Okay.

3        MS. E. THOMPSON:  And that's when they tried to open

4  an escrow account, because they said with the -- with the loan

5  modification, you have to have an escrow account.

6        THE COURT:  Okay.

7        MS. E. THOMPSON:  They didn't tell us that it had to

8  do with the taxes.  They told us that it was attached to the

9  loan modification, that according to the regulations on the

10  loan modification, you have to have an escrow account, and

11  that's why they opened the escrow account, according to them.

12        THE COURT:  Okay.  Anything else you want to tell me?

13        MS. E. THOMPSON:  No.  No.

14        THE COURT:  Okay, Mr. Wishnew.  Go ahead.

15        MR. WISHNEW:   I was just going to add one point for

16  the record, Your Honor.  There was a question about whether the

17  mortgage was recorded.  Attached as Exhibit D, as in dog, to

18  our reply -- just one moment, Your Honor -- is the mortgage

19  recorded on October 3rd, 2005, borrower identified as Maria M.

20  Thompson, Elda Thompson --

21        THE COURT:  Yeah, it was recorded in the name of

22  Ameriquest, right?

23        MR. WISHNEW:  That's correct, Your Honor.  Yes, lender

24  is Ameriquest Mortgage.

25        THE COURT:  But it was never -- the transfer of the

RESIDENTIAL CAPITAL, LLC, et al.                    39

1   mortgage to Citigroup was never recorded.  I mean, the

2   complaint, the foreclosure complaint filed in 2007 says it

3   wasn't recorded.  It refers to the assignment -- this is

4   paragraph 4(a).  It says:  "By assignment of mortgage from

5   Ameriquest Mortgage Company to Citigroup Global Markets Realty

6   Corp., plaintiff herein, which is unrecorded at this time."

7   That's in August 2007.

8           Was it ever -- was the assignment ever recorded?

9           MR. WISHNEW:  I'd have to go back and validate the

10  records, Your Honor.  There was a -- yes, there was a

11  submission of -- attached to the assignment of mortgage at

12  Exhibit E, is a recording information sheet, and that

13  was -- that filed the assignment of mortgage that Your Honor is

14  referring to.

15          THE COURT:  When was that -- what's the date of the

16  recording?

17          MR. WISHNEW:  July 6th, 2012, Your Honor.

18          THE COURT:  Okay.  So it was -- the assignment was not

19  recorded until 2012.  The assignment which occurred in 2005

20  wasn't recorded until 2012, correct?

21          MR. WISHNEW:  Based on -- based on what I see that I

22  have before me, Your Honor, yes, that's what the evidence

23  currently shows.

24      (Pause)

25          THE COURT:  I'm -- your objection sets out at

RESIDENTIAL CAPITAL, LLC, et al.                    40

1    considerable length details about payments that were made by

2    the Thompsons and returned for insufficient funds, yet Ms.

3    Thompson said the payments were made by automatic payment.  The

4    bank isn't going to automatically pay if the funds aren't

5    there.  And she says she's got records to show it.  Have you

6    ever seen the records?

7              MR. WISHNEW:  I have not, Your Honor.

8              THE COURT:  Okay.  I'm going to adjourn the objection

9    to the Thompsons' claim.  That means I'm not deciding it today.

10   Okay?

11             And Ms. Thompson, are you -- you don't have an

12   attorney, correct?

13             MS. E. THOMPSON:  No, we couldn't --

14             THE COURT:  That's okay.

15             MS. E. THOMPSON:  -- because it was complex.

16             MS. M. THOMPSON:  They didn't accept it.

17             THE COURT:  Yeah, I understand.  Okay.  Are you

18   willing to sit down with either Mr. Wishnew or one of his

19   colleagues --

20             MS. E. THOMPSON:  Oh, sure.

21             THE COURT:  -- or somebody from the Trust, and go

22   through your documents?

23             MS. E. THOMPSON:  Oh, yeah.

24             THE COURT:  Okay?  Because you indicate that you have

25   the documents showing --

1          MS. E. THOMPSON:  I gave them to GMAC.  I don't know

2    why they didn't give them to them.

3          THE COURT:  Well, you know, GMAC doesn't really exist

4    anymore.

5          MS. E. THOMPSON:  Oh.

6          THE COURT:  Okay?

7          MS. E. THOMPSON:  Okay.

8          THE COURT:  And I want to fairly resolve these issues.

9    And it may be that there are disputed issues of fact, and we're

10   going to have to set down an evidentiary hearing.  I'm not sure

11   we have to get there yet.  Okay?

12         But the reason I ask about an attorney, if you had an

13   attorney, they couldn't sit down and talk to you.  Without an

14   attorney they can.  And I don't know whether they want Ms.

15   Horst to do it or who you want to do it.  But I want somebody,

16   Mr. Wishnew, to sit down with the Thompsons and go through and

17   let them lay out -- if they've got documents from their Wells

18   Fargo Bank statements that show they paid -- it wouldn't be the

19   first time that double payments are made and not recognized and

20   don't get properly credited and things like that.  So that

21   sometimes happens, right?

22         I want that to happen.  I want you -- I want somebody

23   to -- when we finish today -- to try and work out with -- and

24   it's obvious that Ms. Thompson has some physical impairments

25   that limit her mobility.  And so you go to her.  When I say

1   "you" it doesn't have to be you personally.  Somebody is going

2   to come see you at a place that's convenient for you, Ms.

3   Thompson.  Okay?

4           And you'll make that arrangement.  And I want somebody

5   to go through with the Thompsons, the paper record that they

6   have that they believe supports the position they've set forth

7   in their opposition to your objection.

8           So they contest whether they missed payments because

9   of insufficient funds.  They said they made the payments.

10  Well, somebody's got to check whether the payment's credited,

11  miscredited, misapplied, I don't know.  Okay?

12          But I want to see the docket sheet for any foreclosure

13  action that was ever filed against the Thompsons.  I have the

14  complaint from docket number 19337-07.  That's the 2007

15  foreclosure complaint.  You don't have any -- you weren't able

16  to provide me with any information about what the disposition

17  of that case was.  Ms. Thompson told me it was dismissed on

18  July 20th, 2013.  I don't know; maybe it was.  I don't know if

19  it was the same one or not.

20          From reading your papers, it sounded like there was a

21  second foreclosure in 2011.  I don't know whether there was or

22  wasn't.  I want a docket sheet for -- and I want an

23  affidavit -- declaration that makes clear the who, what, where,

24  when, and why of any foreclosure action started against the

25  Thompsons.  And if they became current on their loan in 2007,

RESIDENTIAL CAPITAL, LLC, et al.                    43

1    which the papers seem to say, why -- if it wasn't dismissed,

2    why wasn't it dismissed?  What happened to it?  I don't

3    understand what happened to it.

4            And if somebody's meeting with the

5    Thompsons -- somebody on behalf of the Trust, meet with the

6    Thompsons and find that yes there are some problems with the

7    Trust's position, I hope you'll try and resolve it

8    consensually.

9            MR. WISHNEW:  Um-hum.  Absolutely, Your Honor.

10           THE COURT:  So what I would like is a status letter,

11   it seems to me with -- a status letter to just tell me what's

12   happening.  Okay?  And you'll work out who's going to meet with

13   you and when, and you'll -- where do you have your documents?

14   At home?

15           MS. E. THOMPSON:  I have them at my mother's because

16   my house is under -- being fixed right now.

17           THE COURT:  Okay.

18           MS. E. THOMPSON:  So they're in Willingboro.

19           THE COURT:  Well, you tell them where you want them to

20   come.

21           MS. E. THOMPSON:  Okay.

22           THE COURT:  Because I want you to have your -- when

23   somebody comes to visit you, I want you to have your documents

24   there.

25           MS. E. THOMPSON:  Oh, no, we have --

RESIDENTIAL CAPITAL, LLC, et al.                    44

1          THE COURT:  You can --

2          MS. E. THOMPSON:  -- I have a bucket.

3          THE COURT:  You've indicated -- you're indicating

4    about three feet of documents.

5          MS. E. THOMPSON:  Yes.

6          THE COURT:  So --

7          MS. M. THOMPSON:  Back and forth.

8          THE COURT:  Okay.  So I want a status letter within

9    thirty days of today.  And we'll see -- we may have to have

10   another hearing.  We'll work it out at a time that's convenient

11   for you, okay, if we have to have another hearing about it.

12         MS. M. THOMPSON:  Okay.

13         THE COURT:  Okay?  So that's going to be -- I'm

14   adjourning the objection to the Thompsons' claim pending

15   further submissions by the Trust and a meet-and-confer between

16   the Thompsons and a representative of the Trust.  All right?

17         Thank you very much.

18         MS. M. THOMPSON:  Thank you, Your Honor.

19         MS. E. THOMPSON:  Thank you.

20         THE COURT:  Okay.  So the next one is Karmazyn claim

21   2055?

22         MR. WISHNEW:  That's correct, Your Honor.  Your Honor,

23   this is a claim --

24         THE COURT:  Well, why don't you -- let's give the

25   Thompsons a chance --

1          MS. E. THOMPSON:  Sorry.

2          THE COURT:  No, that's okay.  Take your time.

3          Thank you very much for appearing and responding to my

4     questions.  Okay?

5          MS. E. THOMPSON:  Thank you.

6          THE COURT:  All right.  Is anybody on the telephone

7     for Karmazyn?

8          Is it your understanding that somebody was appearing?

9          MR. WISHNEW:  I thought before we started the hearing,

10    I heard Ms. Karmazyn's name announced.

11         THE COURT:  Yes, Mr. Karmazyn --

12         MS. KARMAZYN:  I am on the phone.

13         THE COURT:  -- I see you on the telephone list,

14    Kristin Karmazyn.  Are you on the phone?

15         MS. KARMAZYN:  Yes.

16         THE COURT:  All right.  Thank you very much.

17         Okay.  Go ahead, Mr. Wishnew.

18         So the way we'll proceed, Ms. Karmazyn, I'm going to

19    give Mr. Wishnew a chance to address the issues, and then I'm

20    going to give you a chance to respond, okay?

21         MS. KARMAZYN:  Yes, sir.

22         THE COURT:  Okay.  Go ahead, Mr. Wishnew.

23         MR. WISHNEW:  Thank you, Your Honor.

24         Your Honor, the next claim being addressed in

25    connection with the seventy-sixth omnibus objection is the

RESIDENTIAL CAPITAL, LLC, et al.                    46

1   claim 2055 of Michael and Kristin Karmazyn in the amount of

2   389,000 dollars, a general unsecured claim filed against GMAC

3   Mortgage.

4          The debtors' connection to this loan was that

5   Homecomings serviced the loan from October 2005 through July

6   1st, 2009 and GMAC Mortgage subsequently took over servicing.

7   The allegations of purported wrongdoing seem to relate to a

8   misapplication of payments or a lack of notice concerning a

9   foreclosure sale and a wrongful eviction.

10         The claimants allege they were evicted by a sheriff in

11  connection with a foreclosure sale on August 4th, 2009 when, in

12  fact, the foreclosure sale occurred on October 7th, 2009 and it

13  was sold to a third party, Solutions for Real Estate.  The

14  debtors have no -- the debtors' books and records reflect no

15  evidence of the debtors actually evicting the Karmazyns from

16  the property.

17         With regards to any purported liability for wrongful

18  foreclosure, the fact is the claimants were past due on their

19  account and had not satisfied the requirement to bring the

20  account current.  They failed to make the repayment plan

21  payments on or before September 24th, 2009.  And in terms of

22  any sort of purported misapplication of payments, the fact of

23  the matter is, either incorrect amounts were remitted to the

24  debtors or the required payment method, for instance certified

25  funds, was not followed and so that the debtors were not in a

RESIDENTIAL CAPITAL, LLC, et al.                    47

1    position to accept the payments.

2              Finally --

3              THE COURT:  And why were certified funds required?

4              MR. WISHNEW:  I think as a matter of practice, we

5    wanted to make sure the funds were good, to the extent that

6    they were going to address the past liability and that there

7    wasn't a risk of any sort of check bouncing.

8              THE COURT:  Okay.

9              MR. WISHNEW:  To the extent that the Karmazyns infer

10   that the debtors are liable because of their involvement with

11   the independent foreclosure review, the fact of the matter is,

12   as this Court has noted in prior matters, the independent

13   foreclosure review is a nondebtor program and it has absolutely

14   no imputation of liability to the debtors.

15             So for those reasons, Your Honor, we would ask that

16   the claim be disallowed and expunged.

17             THE COURT:  All right.  Ms. Karmazyn, do you want to

18   be heard?

19             MS. KARMAZYN:  I absolutely do, Your Honor.

20             THE COURT:  Go ahead.

21             MS. KARMAZYN:  I have six bullet points I'd like to

22   bring up and it's referencing the package we all received on

23   January 9th, docket 7967-1 (sic), referencing ResCap's own

24   documents that I'd like to review with you.

25             THE COURT:  Sure, go ahead.

RESIDENTIAL CAPITAL, LLC, et al.                    48

1          MS. KARMAZYN:  On page 7 of 11 on Exhibit 1, paragraph

2     16, ResCap references the documents for the modification.  The

3     thousands of documents we've got, they've never supplied us

4     with the modification and that was the whole problem in the

5     beginning.  We never got anything in writing.  So each

6     time -- each month, I'd have to call and ask how much I owed.

7     Each month I made a payment to them.

8          If you go to Exhibit A, page 92 of 105, there is a

9     repayment plan, and this is the first time it's ever been

10     submitted to court and it was dated on September of 2009.  And

11     on this repayment plan that we never received -- we never

12     signed it -- it has no indication that I had to send certified

13     funds as they stated in paragraph 16.

14          So regardless, I was making all my payments every

15     month to them.  They were applying them and then they would

16     reverse them.  And, you know, I have more on that because we

17     didn't receive half of them back.  But the one modification

18     they are referring to is on page 92 of 105 and that says

19     nothing about certified funds.  For ten years, I made payments

20     with personal checks and they took them.

21          But the problem is, Your Honor, we never got the

22     modification documents.  For nine months, they never sent us

23     anything.  So I made the original payment because they wouldn't

24     send us the modification.  And even in their own paragraph it

25     says, "Refer to Exhibit A, modification documents," they're not

RESIDENTIAL CAPITAL, LLC, et al.                    49

 1  in any of these thousands of papers they sent us.  That's my

 2  first claim.  Do you want me to keep going?

 3          THE COURT:  Well, let me stop you for a second.  When

 4  you're referring to the repayment plan, what date are you

 5  referring to?

 6          MS. KARMAZYN:  This all started in January of 2009,

 7  when we -- when I -- my company folded and I tried the

 8  modification.  They verbally told me -- we verbally worked on

 9  the phone on this.  So from January 2009 to September of 2009,

10  we never got any documents on this modification.  It was all

11  verbal.

12          THE COURT:  Well, let me just stop you because the

13  debtors' submission shows that you were approved for a loan

14  modification on January 15th, 2009 and that the loan

15  modification required checks with certified funds and that they

16  mailed you the loan modification documents on January 21, 2009

17  and that you returned a signed copy of it on January 30th, 2009

18  with a personal check for 2,000 dollars.

19          So if you didn't receive it, you couldn't have sent it

20  back.  What's your response to that?

21          MS. KARMAZYN:  We never sent it back.  It's not in

22  this packet.  That's been the whole thing.  There's no -- we

23  never received the loan modification.  The signatures that are

24  in this new packet are from the 2005 refinancing.  That is not

25  the loan modification.  That's -- they never sent us the

RESIDENTIAL CAPITAL, LLC, et al.          50

1   modification.  I made payments so I wouldn't go into

2   foreclosure.  There's -- I went through every single document

3   from the last two years last night.  There is no modification

4   in any of these packets.  And -- and they're going to tell you

5   that because I can tell you that the repayment agreement, this

6   is the first time, this week, I've ever seen this.

7          THE COURT:  In addition to that January 2009 loan

8   modification, the debtors say that on March 20th, 2009, you

9   were approved for a traditional three-month trial plan which

10  required payment of 4,000 dollars and a monthly contribution of

11  2,035 and they say they received a signed agreement for the

12  trial plan on March 26th, 2009.  Did you sign and return on

13  March 26th, 2009, the trial plan that you signed?

14         MS. KARMAZYN:  Your Honor, no.  I -- I -- it was

15  verbally.  I sent them 4,000 dollars.  There -- there was

16  nothing that's signed.  And -- and I'd like to put on the

17  record that my husband started this claim; he has died.  So

18  there is -- there's a little heartache here on me trying to

19  figure out what's going on.

20         THE COURT:  Sure.

21         MS. KARMAZYN:  But from everything I can find, and

22  from my personal memory, and per ResCap's documents, there is

23  no March 2009 agreement.

24         THE COURT:  Let me -- I'm going to interrupt you for a

25  minute, Ms. Karmazyn.  I'm going to give you a further chance

RESIDENTIAL CAPITAL, LLC, et al.                    51

1  but I want to ask Mr. Wishnew, who is representing the trust,

2  do I have -- your papers are referring to two separate

3  signed -- signed by the Karmazyns -- modification agreements,

4  one from January 2009 and one from March 2009.

5           MR. WISHNEW:  Right, Your Honor, and --

6           THE COURT:  Do I have those?

7           MR. WISHNEW:  I don't know if you have those.  I

8  believe our evidence of that is taken from the servicing notes

9  attached as Exhibit J.

10          THE COURT:  Well, you know, the servicing notes are

11 not a copy of a signed -- do you have -- what do the servicing

12 notes say?

13          MR. WISHNEW:  So the servicing notes say, dated

14 January 30th, 2009, "Received signed mod. doc. notified."

15          THE COURT:  You've got to keep your voice up.

16          MR. WISHNEW:  All right.  Let me apologize.  January

17 30th, 2009, there's a line entry.  It looks like it was entered

18 by a Ms. Lucy Kelly (ph.), and the line item says, received or

19 "Rec'd signed mod. doc. notified."  That's the January

20 agreement.

21          THE COURT:  Okay.

22          MR. WISHNEW:  And then with regards to -- I'm sorry,

23 Your Honor; that is at page 17 of 17 of Exhibit J, which is

24 docket number 7967-11.

25          THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    52

1          MR. WISHNEW:  Earlier in that document, we do have the

2    March -- there are March 26th entries, and again on March 26th,

3    there's a slightly shaded line item on page 14 of 17 that says,

4    "Repay deposit received."  And then two lines below that,

5    "Trial mod. executed," and a line below that, "Rec'd executed

6    docs," again March 26th, 2009.  It looks like the entry was put

7    in by Ashantee McLoughlin (ph.).

8          THE COURT:  Okay.

9          All right, Ms. Karmazyn, look, let me ask you this

10   question.  So when did your husband pass away?

11         MS. KARMAZYN:  He passed away on October 2013.  I

12   filed with you all his medical records --

13         THE COURT:  Sure.

14         MS. KARMAZYN:  -- and his death certificate --

15         THE COURT:  Yeah.

16         MS. KARMAZYN:  -- and cause of death.

17         THE COURT:  So do you know whether, during his

18   lifetime, in January 2009 and March 2009, whether your husband

19   signed and returned the first modification, the loan

20   modification in January and then the trial plan in March?

21         MS. KARMAZYN:  No, it was in both our names.  Neither

22   one of us signed it.

23         THE COURT:  Well --

24         MS. KARMAZYN:  And I've asked numerous times for these

25   copies.  They're not in the package, Your Honor.  And that's

1   been the whole problem.  Everything we did was verbally.

2           THE COURT:  Do you occupy -- I know that it's been

3   foreclosed -- did you occupy the home that was the subject of

4   the mortgage and the repayment plans?

5           MS. KARMAZYN:  Absolutely, with three children, yes.

6           THE COURT:  Okay.  And what was the address?

7           MS. KARMAZYN:  52 -- the foreclosure house?

8           THE COURT:  Yes.

9           MS. KARMAZYN:  5153 South Ukraine Street, Aurora,

10   Colorado 80015.

11           THE COURT:  Do the servicing notes indicate where the

12   documents were sent to, Mr. Wishnew?

13           MR. WISHNEW:  One moment, Your Honor.

14       (Pause)

15           MR. WISHNEW:  Your Honor, an address is not specified

16   in the servicing notes.  All there is is a docket -- I'm sorry,

17   a line entry, again referring to page 17 of 17, January 21st,

18   that says, "Send X docs completed January 21st, 2009."  It

19   looks like that entry was put in by a Tylec Bladestorm (ph.).

20           THE COURT:  Ms. Karmazyn, let me ask you this.  The

21   debtors' papers in support of the objection indicates

22   that -- I'll give you an example.  They say that you sent a

23   personal check of 2,000 dollars on April 21, 2009 and that

24   because it was not in certified funds, the debtors returned the

25   payments to you and mailed a letter informing them why the

RESIDENTIAL CAPITAL, LLC, et al.          54

1  payment was returned.  Did you get your payment back with a
2  letter that explained why it was returned?
3          MS. KARMAZYN:  No, the only letter we got back and
4  it's in their documents was for the last one, the 1,244.65.
5  There are other -- in all the documents that they sent, there
6  was no other letter showing a return payment.  The only letter
7  is on Exhibit K, page 2 of 2, the one letter.
8          Now, what I will tell you about the 2,000 is I cannot
9  see that we did send you a 2,000 -- I don't believe this 2,000-
10 dollar check is right.  Their statements don't match, Your
11 Honor, and I can show you that later on.  But there is no
12 letter stating they sent me a 2,000 check back, only the one
13 letter in this -- all these documents.  And I agree with the
14 one letter, that they did send that certified check back on the
15 one letter.
16      (Pause)
17          THE COURT:  Ms. Karmazyn, you made payments to GMAC
18 and they say they returned them.  You're telling me that you
19 only got one check back?
20          MS. KARMAZYN:  Got the certified funds back on the
21 last payment when they foreclosed on us.
22          THE COURT:  Okay.  So let me ask you this, if you paid
23 by check and they didn't deposit it, the funds would never have
24 been drawn down from your account.  And so do you have account
25 statements?  Did you review your account statements to see

1    whether it shows that payments were received and deposited by

2    GMAC or -- I mean, your balance never would have reduced?

3              MS. KARMAZYN:  Well, no, I have -- it was my husband's

4    Chase account.  I have the statements.  In order for me to get

5    the checks, which I've left twelve messages to their attorney

6    and to ours, the attorneys for the estate, with no return

7    calls, Arapahoe County and Chase Bank need a letter from the

8    judge just saying this is detrimental, that we get the checks

9    from my husband's Chase account.

10             THE COURT:  Well, let me --

11             MS. KARMAZYN:  That's all I need.

12             THE COURT:  Besides this, do you have the account

13   statements?

14             MS. KARMAZYN:  I have account statements, but they

15   show the withdrawals but, you know, back then, the Chase, it

16   doesn't say "may paid to" because it wasn't bill pay, it was

17   checks.  So --

18             THE COURT:  Well, it wouldn't show up on your -- if

19   you wrote a check and they returned it, nothing would ever show

20   up on your account statement because it just -- the funds

21   never -- the checks wouldn't have been deposited.

22             MS. KARMAZYN:  No, I can show you the statements.  I

23   just can't show you who it's made out to.  It shows the amount.

24   But in order -- if you want to see the canceled checks, the

25   cashed checks --

RESIDENTIAL CAPITAL, LLC, et al.                    56

1          THE COURT:  No, I don't want to see the canceled

2    checks.

3          MS. KARMAZYN:  Okay.

4          THE COURT:  I mean they say they never deposited the

5    funds, okay?

6          MS. KARMAZYN:  Okay.

7          THE COURT:  And what I am inquiring about, if one were

8    to look at your husband's bank account statements for the

9    period that we're talking about, if he kept writing checks and

10   they never got deposited -- the debtors said they returned

11   them -- the account statement would never show that checks in

12   the amount were written were paid.  That would -- the bank

13   wouldn't know.  You could write all the checks in the world.

14   If they just sit out there, and never get deposited, your

15   account doesn't get reduced by that.

16         MS. KARMAZYN:  No, it's reduced.  I can show you

17   statements.  I just -- it doesn't identify who they were made

18   out to but if you want to see that, I can.

19         THE COURT:  I see.  Well, the amounts would show

20   you --

21         MS. KARMAZYN:  Yes, absolutely.

22         THE COURT:  -- if they don't show who they were made

23   out to, if there are withdrawals from the account in the

24   amounts of the payments that were being made to GMAC.

25         MS. KARMAZYN:  Correct.

RESIDENTIAL CAPITAL, LLC, et al.                    57

1          THE COURT:  And you say you have those.

2          MS. KARMAZYN:  I have statements.  I have all the

3    statements in the world.  I just don't have the cashed checks

4    that I thought you would need, which I can't get a hold of

5    unless I get a court letter.

6          THE COURT:  All right.  Anything else you want to tell

7    me, Ms. Karmazyn?

8          MS. KARMAZYN:  I do.  I do.

9          THE COURT:  Go ahead.

10         MS. KARMAZYN:  If you -- you know, this all happened

11   because we never received the modifications like they said we

12   did, and I made every payment every month without the

13   modification in the regular amount, so this wouldn't happen.

14         In October -- I think my husband put October -- August

15   4th, it was supposed to be October 4th that we were evicted,

16   and it was the new owner of the house that bought it on the 5th

17   with the sheriff kicking us out.

18         On October 7th, I called GMAC and I asked why they

19   foreclosed.  They said I sent a cashier's check of 1,244.65 and

20   that was the wrong amount.  Again, we had no documentation.

21   This was told to me verbally.  If you go to this repayment plan

22   that they just put in the package, you can see the amount right

23   there, that's the 1,244.65 is what she told me.  They changed

24   the October payment plan to 1,530, which -- and it is why they

25   foreclosed on me.  I made the payment, but they still

RESIDENTIAL CAPITAL, LLC, et al.                    58

1  foreclosed on me.

2          THE COURT:  Anything else you want to tell me?

3          MS. KARMAZYN:  No.

4          THE COURT:  Okay.

5          MS. KARMAZYN:  A lot of it has all been said.

6          THE COURT:  All right.  I will give you -- I have some

7  questions for Mr. Wishnew.  Let me give him a chance to

8  respond.

9          MR. WISHNEW:  Sure, Your Honor.  One thing, to address

10 Ms. Karmazyn's argument, while it's not in the record before

11 the Court, we can provide both Ms. Karmazyn and the Court with

12 an executed copy of the March 23rd, 2009 repayment plan as

13 executed both by Mr. Michael A. Karmazyn and Kristin E.

14 Karmazyn.  It is actually -- it's signed and dated, dated March

15 30th, 2009, requiring three payments, first a payment of 4,000

16 dollars and then two subsequent payments of 2,035 dollars.  I

17 can show Your Honor an electronic copy now, but I realize

18 that --

19         THE COURT:  No, because Ms. Karmazyn's not here, so I

20 don't want to --

21         MR. WISHNEW:  I recognize that, Your Honor.

22         THE COURT:  -- look at anything that she doesn't see.

23 Does it say it has to be payments in certified funds?

24         MR. WISHNEW:  One moment, Your Honor.  Yes, it does,

25 Your Honor, on page 2 of 2, in bold letters under the date and

RESIDENTIAL CAPITAL, LLC, et al.                    59

1    amount payments it says, "All payments remitted under this

2    trial plan must be in the form of certified funds (cashier's

3    check, money order, or Western Union Quick Collect).

4              THE COURT:  All right.  And you say that the copy that

5    you're looking at electronically, which is not in the exhibits,

6    right?

7              MR. WISHNEW:  That's correct, Your Honor, yes.

8              THE COURT:  Okay, -- shows -- bears signatures that

9    appear to be both Karmazyns' signatures, you've told me that,

10   right?

11             MR. WISHNEW:  That is correct, Your Honor.

12             THE COURT:  And they dated it March 26th, 2009?

13             MR. WISHNEW:  They dated it March 30th, 2009, Your

14   Honor.

15             THE COURT:  Okay.

16             MR. WISHNEW:  The document itself is dated March 23rd,

17   2009.

18             THE COURT:  Okay.  Do you know whether the trust has

19   available to it the January 2009 loan modification, because

20   your --

21             MR. WISHNEW:  I'm --

22             THE COURT:  -- papers say that it was returned to you

23   by the Karmazyns on January 21st, 2009.

24             MR. WISHNEW:  At this moment, Your Honor, I don't

25   know, but we will certainly check our records.

1          THE COURT:  So here's what -- I'm concerned about

2    this, because there appears to be contested issues of fact.  I

3    want the Trust to do a supplemental filing with a declaration

4    that supports it.  It may be business records; it's not going

5    to be a percipient witness, but that would support the records

6    that have been maintained that show the -- any of these signed

7    documents.  There's supposedly two modifications -- a loan

8    modification and a trial plan.  You referred specifically to

9    one that you have electronically that shows both of the

10   Karmazyns' signatures and it's dated.

11          Ms. Karmazyn, I'm going to give you a chance to

12   respond in writing to whatever the Trust puts in.  I guess, it

13   would seem to me to follow logically that if, in fact, they say

14   they sent you the trial plan and that it was signed by you and

15   your husband and sent back, that would indicate you received

16   it.  I'm not going to -- I'm not deciding any issues today, but

17   I think you can understand why that conclusion would seem to

18   follow.

19          But what I want you to do, Mr. Wishnew, is any other

20   documents -- because there are also disputes about whether

21   checks that were returned to the Karmazyns.  If you've

22   got -- if there are business records of correspondence with the

23   Karmazyns, showing how it was addressed.  I don't know whether

24   those records ordinarily would have been retained or not.

25          MR. WISHNEW:  Right.

RESIDENTIAL CAPITAL, LLC, et al.                    61

1        THE COURT:  Electronic copies of -- but I want to see

2   whatever documents the Trust can locate that deal with either

3   the correspondence or signed agreements with the Karmazyns.

4   And then -- how much time do you want to provide that?  Is two

5   weeks enough?

6        MR. WISHNEW:  I was about to say two weeks, Your

7   Honor.

8        THE COURT:  All right.

9        I'm just going to look something up on my calendar,

10  Ms. Karmazyn.  I haven't disappeared.

11       All right.  So the Trust will submit, on or before 5

12  p.m. January 28th, a declaration and any other supporting

13  evidence regarding agreements or correspondence with the

14  Karmazyns.

15       And then two weeks after that, Ms. Karmazyn, is

16  Wednesday, February 11th, so by 5 o'clock New York time,

17  Wednesday, February 11th, you could provide any response you

18  wish to provide to whatever the Trust puts in.  Okay?

19       MS. KARMAZYN:  Are they saying that that modification

20  is in all these exhibits?

21       THE COURT:  What -- look, they're -- you've told

22  me -- the Trust indicates that you and your husband -- and this

23  is in the papers -- that you and your husband signed and

24  returned a loan modification agreement.  You've told me you've

25  never received it, never signed it, never returned it.

1          MS. KARMAZYN:  Okay.

2          THE COURT:  Mr. Wishnew, who's here in court, was able

3    to look on his computer and find a copy electronically.  I have

4    not looked at it.  I won't look at it now, because you're not

5    here.  I'm not going to look at anything that you don't --

6          MS. KARMAZYN:  Okay.

7          THE COURT:  -- have an opportunity to review as well.

8          MS. KARMAZYN:  Can you tell me what exhibit and what

9    page?

10         THE COURT:  He's going -- it's not one of the exhibits

11   now.

12         MS. KARMAZYN:  Oh.

13         THE COURT:  So I'm requiring that --

14         MS. KARMAZYN:  Okay, all right, this will be good,

15   okay.

16         THE COURT:  -- the Trust, within two weeks from today,

17   submit a declaration and copies of any additional documents

18   they have between you and GMAC.

19         MS. KARMAZYN:  Absolutely.  Okay, thank you.

20         THE COURT:  Okay, and then I'm giving you two weeks to

21   respond in writing to it.

22         MS. KARMAZYN:  I will.

23         THE COURT:  Okay?

24         MS. KARMAZYN:  Yeah.

25         THE COURT:  I want to be sure.

RESIDENTIAL CAPITAL, LLC, et al.                    63

1           MS. KARMAZYN:  Yes, I under --

2           THE COURT:  I'm not -- they're not going to submit

3    anything to me that you don't see, and I'm not going to rule on

4    anything that you haven't had a chance to see and respond to.

5           MS. KARMAZYN:  Absolutely.  I understand, thank you.

6           THE COURT:  Okay?

7           MS. KARMAZYN:  Yes.

8           THE COURT:  So we'll go forward on that schedule --

9           MR. WISHNEW:  Yes.

10          THE COURT:  -- Mr. Wishnew, and after I receive the

11   Trust's supplemental submission and any additional response Ms.

12   Karmazyn wants, I'll either decide the matter based on the

13   papers that I have or schedule another hearing.

14          MR. WISHNEW:  Your Honor, for the sake of

15   memorializing those dates, would you like us to put those dates

16   in today's order?

17          THE COURT:  It would.

18          MR. WISHNEW:  Okay.

19          THE COURT:  Please do that.

20          MR. WISHNEW:  Okay.  We'll do that, yes.

21          THE COURT:  All right.

22          Ms. Karmazyn, is there anything you want to add now?

23   You're going to get another --

24          MS. KARMAZYN:  Well, I under --

25          THE COURT:  -- chance to file a response.

RESIDENTIAL CAPITAL, LLC, et al.                    64

1          MS. KARMAZYN:  No, I understand.

2          THE COURT:  Okay, all right.  Thank you very much for

3    participating by telephone.

4          MS. KARMAZYN:  Thank you for your help.

5          THE COURT:  Okay.

6          MR. WISHNEW:  Thank you, Your Honor.

7          Lastly, Your Honor, is the claim of Kenneth Thomas.

8          THE COURT:  Okay, is Mr. Thomas here or on the phone?

9          MR. WISHNEW:  I think he's on the phone.

10         MR. THOMAS:  Yes, sir.  Yes, I am.

11         THE COURT:  All right, so we'll proceed the same way,

12   Mr. Thomas.  I'm sorry you've had to wait so long for this, but

13   you kind of got the drift of how this goes.  So I'm going to

14   give Mr. Wishnew a chance to address the issues that the Trust

15   has raised, and then I'm going to give you a chance to respond.

16   Okay?

17         MR. THOMAS:  All right.

18         THE COURT:  Okay.

19         Go ahead, Mr. Wishnew.

20         MR. WISHNEW:  Thank you, Your Honor.  Your Honor, this

21   deals with claim number 3728, filed by Kenneth C. Thomas, a

22   general unsecured claim in the amount of 291,472 dollars filed

23   against GMAC Mortgage.  The gist of the claimant's claim

24   against the debtors is that GMAC Mortgage wrongfully denied a

25   loan modification and he was purportedly harmed, even though he

1    got a subsequent loan modification from his current servicer,

2    Ocwen, that decreased his monthly payment.  Contrary to the

3    claimant's assertions that the debtors improperly denied him

4    for a loan modification, the debtors' books and records don't

5    reflect applications from him, even though workout packages

6    were sent to him in 2010 and 2011.

7             With regards to somehow our liability related to

8    Ocwen's modification, the debtors cannot be liable, or it's the

9    Borrowers Trust position the debtors cannot be liable for

10   Ocwen's alleged failure to grant him a HAMP or a HARP

11   modification because Ocwen is not a debtor entity.  Also the

12   debtors cannot be liable for failing to review him for a HAMP

13   modification, because he never applied to one.  The

14   modification he did receive was a traditional modification,

15   which was done at the request of Fannie Mae.

16            Additionally, Mr. Thomas does not provide what the

17   alleged better terms were that he was purportedly entitled to.

18   The modification he did receive reduced his interest rate and

19   his monthly payment.  The modification did increase his

20   principal balance, but that was due to the capitalization of

21   unpaid amounts.  Moreover, the length of the loan was increased

22   to make his monthly payments more affordable.

23            So it is unclear to the Borrower Trust how the debtors

24   have any responsibility or liability to him and would ask that

25   the claim be disallowed on that basis.

1           THE COURT:  All right.

2           Mr. Thomas, do you want to go ahead and respond?

3           MR. THOMAS:  I'm sorry?

4           THE COURT:  Do you want to go ahead and respond?

5           MR. THOMAS:  Yes, sir.  I -- in my response or

6    objection, I noted that in 2009 I became unemployed.  From that

7    period, April 2009 until 2011, I believe July, I actually made

8    payments -- full payments, because I pretty much depleted my

9    401(k) and then other resources that I had.  So throughout this

10   whole process, I'd been honest and forthright in doing what I

11   was supposed to do.

12          But when I started working with GMAC -- and this was

13   early in the process, almost immediately after I became

14   unemployed -- to try and get a loan modification, they denied

15   me.  And I, too, did most of the back-and-forth with GMAC via

16   the phone.  They did send me information and workout packages

17   after I was unable to make payment, which was in 2011.  But

18   never once was a loan modification taken into consideration.

19          What they wanted was to bring the account current,

20   which I wasn't able to do financially.  I couldn't make lump

21   sum payments.  This also happened once the foreclosure

22   occurred, when I tried to work out terms with their attorney,

23   who sent me back to GMAC.  They only -- they told me that the

24   only thing that they would accept would be full payment, so

25   there was no way I could do that.

1          Later, I found out, in conversation with a GMAC

2     representative, that the investor, Fannie Mae, would not

3     approve a loan modification for whatever reason.  Ocwen did,

4     towards the -- I guess, end of 2012, but this was after GMAC

5     went into bankruptcy, and I assumed that it was because it was

6     conditioned on the sale to Ocwen that Fannie Mae provide this

7     to me.  But then I also found out later that it was required by

8     the government, the U.S. government, that Fannie Mae and

9     Freddie Mac offer this to borrowers who were delinquent or in

10    default.

11         So basically, what I'm saying is that I could have

12    been saved a lot of this had GMAC worked with me early on in

13    this process.  Like I said, I became unemployed in April of

14    2009, and I started seeking a loan modification immediately

15    thereafter.  But I was stymied all along.

16         THE COURT:  May I ask you this?  From reviewing the

17    papers, it appears that you were approved for a traditional

18    trial loan modification plan on May 14th, 2012.  And that

19    required payments from you of $1,703.69 to be made on June 1st,

20    July 1st, and August 1st of 2012.  Did you receive that

21    modification?

22         MR. THOMAS:  To be honest with you, sir, I don't

23    recall seeing that.

24         THE COURT:  Okay.  And they -- because they then say

25    that on July 10th, 2012, the plan was canceled after you failed

1  to submit the first required payment.  Do you have any

2  recollection about -- and they've submitted documents to

3  support what I've just read to you.

4           MR. THOMAS:  I don't recall that.  I mean, I

5  don't -- the only modifications that I actually remember is the

6  one that I acted upon, which was, I guess, the second one that

7  I received.

8           THE COURT:  So you --

9           MR. THOMAS:  I don't recall.

10          THE COURT:  Because Ocwen -- you were approved for a

11  permanent loan modification by Ocwen in April 2013, is that

12  correct?

13          MR. THOMAS:  Yes.

14          THE COURT:  Okay.

15          MR. THOMAS:  But from what I understand it was GMAC,

16  and it was on their letterhead that the offer came through.

17  Ocwen approved it, but when I received the modification papers,

18  it was from GMAC.

19          THE COURT:  Well, that's why I want to -- it looked to

20  me, from what I've read, that that one was approved, but there

21  was this earlier one in November 2012 -- excuse me, in May

22  2012, where you were approved for a loan modification.  It

23  required payments, and it was canceled after you didn't make

24  any -- make the payments.  That's what I wanted to ask you

25  about.

RESIDENTIAL CAPITAL, LLC, et al.                    69

1          MR. THOMAS:  Right.  I don't recall seeing that.  I

2     don't recall getting that.

3          THE COURT:  Okay.  All right.

4          MR. THOMAS:  And you know, there had been a lot of

5     mix-up with addresses and what have you.  I just don't recall

6     getting that one.  I got the one that I acted upon, and had I

7     gotten that one, I would have acted on that.

8          THE COURT:  All right.  Anything else you want to tell

9     me?

10         MR. THOMAS:  I'm sorry?

11         THE COURT:  Is there anything else you would like to

12    tell me about?

13         MR. THOMAS:  Other than the fact that I -- I mean,

14    like I said, I could have gotten, I think, a better outcome had

15    GMAC been able to -- had been able to work with me earlier on

16    than they did.  I started to request a loan modification, like

17    I said, in 2009.  And I didn't really get one until 2012.

18         THE COURT:  The --

19         MR. THOMAS:  And --

20         THE COURT:  The loan servicer, if they don't own the

21    loan, they have to follow the investor guidelines.  If a loan

22    is owned by Fannie Mae, they have to follow Fannie Mae's

23    guidelines for when they'll approve a modification.  Did you

24    understand that?

25         MR. THOMAS:  So -- okay, yeah.  I -- if that's it,

RESIDENTIAL CAPITAL, LLC, et al.                    70

1    then, I mean, that's it.  But I'm -- it looks as though to me

2    like I could have gotten a better outcome than I did eventually

3    get.  So it's due to Fannie Mae's guidelines that -- because

4    they wouldn't approve --

5         THE COURT:  Well, that's what I want to ask -- I'm

6    going to ask Mr. Wishnew about that.  But that's the -- the

7    usual circumstance is, if an investor, whether it's Fannie Mae

8    or someone else, owns the loan, they have their own guidelines

9    for when they'll approve a loan modification.  The question in

10   the case of Fannie Mae, it's a government-sponsored enterprise,

11   so isn't even -- it isn't like a private investor even.  It's a

12   so-called GSE, government-sponsored enterprise.  And they had

13   guidelines for loan modifications, and a servicer can only do

14   what those guidelines provide.  But let me ask Mr. Wishnew.

15        Could you address that, Mr. Wishnew?

16        MR. WISHNEW:  Your Honor, I would absolutely agree

17   with your characterization --

18        THE COURT:  Just pull the microphone slightly closer

19   to you.

20        MR. WISHNEW:  Your Honor, I would absolutely agree

21   with your characterization of the facts.  As a servicer, GMAC

22   Mortgage operates or services the loan for the benefit of the

23   investor.  It does not necessarily have its independent

24   discretion.  It's required to follow the investor's guidelines.

25   And if the guidelines do not allow for a modification, then

RESIDENTIAL CAPITAL, LLC, et al.                    71

1  GMAC cannot override the investor's guidelines.

2          THE COURT:  And what were the Fannie Mae guidelines in

3  2010, 2011, '12?

4          MR. WISHNEW:  Your Honor, I believe that there would

5  have been certain guidelines that dealt with income -- the

6  ratio of income to liabilities.  There may have also been a

7  loan-to-value ratio.  The exact details, I don't know, standing

8  here right now.

9          THE COURT:  Let me ask you, because your papers refer

10  to a loan modification in May 2012.  Did Mr. Thomas -- that he

11  was approved for a traditional loan modification on May 14th,

12  2012.  Did he countersign that?  Did he ever act on it?  It was

13  canceled when the payment wasn't made, but is there any

14  indication that he had accepted that plan?

15          MR. WISHNEW:  Not to my knowledge, Your Honor, but I

16  don't have a copy --

17          THE COURT:  Because he says he doesn't have any

18  recollection about that.

19          MR. WISHNEW:  I would add for the record, Your Honor,

20  is that this was a modification, which was actually done at the

21  request of Fannie Mae.  It wasn't -- in paragraph 32 of the

22  reply, we note that.  And just for the record, what we state in

23  a footnote there is that it was the practice of Fannie Mae to

24  occasionally designate certain loans or request that they be

25  reviewed to see whether they meet modification guidelines and,

RESIDENTIAL CAPITAL, LLC, et al.                                    72

1    if so, reach out to these borrowers whose accounts met the

2    guidelines and offer them a modification without the need for

3    the borrower to submit financials.

4           That was the case here.

5           THE COURT:  And yeah, that's what --

6           MR. THOMAS:  I never submitted financials; I was never

7    asked about financials, which I thought was kind of strange.

8    They -- what they did was they sent me a dollar figure, saying

9    that I would have to pay that for, I think, three months to be

10   considered for a loan modification.  So I was never called to

11   find out -- which happened previously when I would contact

12   GMAC; they would run through my financials and ultimately tell

13   me that I couldn't get a loan modification approval for this

14   reason or that reason, and then, later the Fannie Mae issue

15   came up.

16          But with the approval, the modification, I -- no one

17   ever asked me anything about my financial situation.

18         THE COURT:  All right.  I'm going to take this matter

19   under submission.  I'm going to enter a written order or

20   decision.

21         Mr. Thomas, thank you very much for participating by

22   telephone.

23         MR. THOMAS:  Okay, thank you.

24         THE COURT:  All right.

25         MR. WISHNEW:  Your Honor, thank you very much for your

RESIDENTIAL CAPITAL, LLC, et al.                    73

1    time.

2              THE COURT:  Thank you.

3              All right.  Now, we go to the seventy-ninth omnibus?

4              MR. WISHNEW:  That's correct, Your Honor.  So I'll

5    return the podium over to my colleague, Meryl Rothchild.

6              THE COURT:  Okay.

7              MS. ROTHCHILD:  Afternoon, Your Honor.  Meryl

8    Rothchild of Morrison & Foerster on behalf of the ResCap

9    Liquidating Trust.

10             THE COURT:  This is going forward against Mr. Burnett,

11   right?

12             MS. ROTHCHILD:  Yes, it is.

13             THE COURT:  Mr. Burnett, are you here?

14             MS. ROTHCHILD:  Mr. Burnett's counsel --

15             MR. BUSTOS:  Yeah.

16             MS. ROTHCHILD:  -- I believe -- Mr. Bustos is.

17             THE COURT:  Or counsel, whoever's representing Mr.

18   Burnett, come on up.

19             MS. ROTHCHILD:  So Your Honor --

20             THE COURT:  Let me get the appearance first --

21             MS. ROTHCHILD:  Oh, of course.

22             THE COURT:  -- okay?

23             This is the only one that -- this is the only --

24             MS. ROTHCHILD:  Contested.

25             THE COURT:  -- objection that's going forward in the

1   seventy-ninth, correct?

2          MS. ROTHCHILD:  Correct.

3          THE COURT:  Okay.

4          And you are, sir?

5          MR. BUSTOS:  Pablo Bustos, 225 Broadway, 39th Floor,

6   New York, New York 10007.  I represent --

7          THE COURT:  Okay.  And you're representing --

8          MR. BUSTOS:  -- Mr. Burnett, yes, I am.

9          THE COURT:  Okay.  Have a seat.  Thank you.

10         Go ahead, Ms. Rothchild.

11         MS. ROTHCHILD:  So Your Honor, the Trust's seventy-

12  ninth omnibus claims objection was to purported administrative

13  claims filed at docket number 7841.  And through this

14  objection, the Trust seeks to expunge a total of ten claims

15  that each failed to sufficiently demonstrate that they are

16  valid administrative expense claims pursuant to Section 503 of

17  the Code.

18         In support of the objection, the Trust submitted two

19  declarations:  the first of Deanna Horst, chief claims officer

20  of the ResCap Liquidating Trust attached as Exhibit 1A to the

21  objection, and the other declaration by Joseph Morrow, director

22  of corporate restructuring services of KCC, attached as Exhibit

23  1B to the objection.  The responses to the seventy-ninth

24  omnibus claims objection were due on December 29th.  Claimant

25  Martha Panaszewicz, holder of claim number 7466, filed a

RESIDENTIAL CAPITAL, LLC, et al.                    75

1   request to extend the response deadline to January 28th.  The

2   Trust did not oppose the extension and filed a notice of

3   adjournment as to that claim at docket number 7951.  So at

4   present, Ms. Panaszewicz's claim will be going forward on

5   February 11th.

6           As we just mentioned, the objection prompted just one

7   response:  that by Mr. Conrad Burnett, holder of claim number

8   7413, styled as a motion seeking leave to amend claim number

9   7413 and filed at docket number 7881.  Pursuant to the request

10  made by the claimant, this filing was to serve both as a

11  response to the omnibus claims objection, as well as a motion

12  requesting leave to amend Mr. Burnett's purported

13  administrative claim.

14          On January 9th, the Liquidating Trust filed a reply to

15  these papers at docket number 7972.

16          THE COURT:  Let me just stop you for a second.

17          MS. ROTHCHILD:  Of course.

18          THE COURT:  We're going to go forward with the

19  argument on Mr. Burnett's claim.  You adjourned the hearing

20  with respect to which claim, now?

21          MS. ROTHCHILD:  Ms. Martha Panaszewicz.

22          THE COURT:  Okay.

23          MS. ROTHCHILD:  I believe her claim is number 7466.

24          THE COURT:  All right.

25          MS. ROTHCHILD:  She's listed on Exhibit A to the

1  objection.

2           THE COURT:  And is it going for -- it's going forward

3  as to all other --

4           MS. ROTHCHILD:  Correct.

5           THE COURT:  -- claimants.  So there were a total of

6  what?

7           MS. ROTHCHILD:  A total of ten and, taking away Mrs.

8  Panaszewicz's claim, that's nine, and Mr. Burnett's would round

9  that out.

10           THE COURT:  All right.  So the objection's sustained

11  to everyone other than the one that's adjourned, and Mr.

12  Burnett's claim.  And submit an order to that effect.  And

13  there'll be a separate order at some point dealing with Mr.

14  Burnett's.

15           So now, you can go ahead and argue about Mr. Burnett's

16  claim.

17           MS. ROTHCHILD:  Thank you, Your Honor.

18           So in both Mr. Burnett's initial request for payment

19  of an administrative expense claim reflected in claim number

20  7413 and in the motion, Mr. Burnett fails to meet the legal

21  standards required to assert a valid administrative expense

22  claim under Section 503.

23           As originally filed, claim number 7413 alleges "debtor

24  owes Conrad P. Burnett, claimant, for" 7- -- sorry, I take that

25  back -- "claimant 375,395 dollars for failed mortgage servicing

RESIDENTIAL CAPITAL, LLC, et al.                    77

1   rendered in the ordinary course of business between May 14th,

2   2012, and December 17th, 2013."  The form of order appended to

3   this filing stated that these administrative expenses should be

4   allowed specifically as to legal fees, filing fees, attorneys'

5   fees and proof of claim.

6          In this initial submission, Mr. Burnett did not offer

7   sufficient evidence to show that the debtors improperly

8   serviced Mr. Burnett's mortgage loan, post-petition, nor did

9   Mr. Burnett offer any factual or legal basis to demonstrate why

10  any of the asserted attorneys' fees purportedly incurred post-

11  petition on account of defending Mr. Burnett's claims against

12  the debtors should be reimbursed by the estates.

13         As detailed in the objection, Mr. Burnett filed a

14  number of subsequent documents purportedly to amend or

15  supplement claim number 7413 without leave of the Court.  The

16  objection was thereafter filed on December 8th and, a week

17  later, on December 15th, the motion seeking leave to amend was

18  filed in an effort to amend the very claim that was the subject

19  of the seventy-ninth omnibus claims objection.

20         The proposed amendment to claim number 7413 is

21  asserted in the amount of 58,933 dollars --

22         THE COURT:  Can I just stop you for a second?  Mr.

23  Bustos --

24         MS. ROTHCHILD:  Of course.

25         THE COURT:  -- put away your phone.

1          MR. BUSTOS:  Sorry.  Sorry.

2          THE COURT:  Put it away.  It's disrespectful --

3          MR. BUSTOS:  Okay.  I was just taking --

4          THE COURT:  -- for you to sit there and play with your

5    phone.

6          MR. BUSTOS:  -- taking notes.  I'm sorry.

7          THE COURT:  You understand?

8          MR. BUSTOS:  I understand.

9          THE COURT:  Okay.

10         MS. ROTHCHILD:  The proposed amendment was asserted in

11   an amount of $58,933.33 against debtor Residential Capital, LLC

12   and purported to represent only attorneys' fees for both the

13   pre-petition and post-petition activities of Mr. Burnett's

14   lawyer to enforce the creditor's rights under a contract and

15   consumer fraud.

16         Both claim number 71 -- sorry, 7413 and the motion

17   itself include statements that are general, conclusory and

18   completely unsubstantiated and, therefore, fail to assert

19   sufficient proof that the debtors did any sort of post-petition

20   wrongful actions, and they fail to substantiate any damages

21   incurred by Mr. Burnett.  The debtors did do an exhaustive look

22   of their books and records, and those records indicate no

23   amounts owing to Mr. Burnett on account of any post-petition

24   liabilities, either related to servicing activity or in

25   connection with any agreement to pay Mr. Burnett's legal fees.

RESIDENTIAL CAPITAL, LLC, et al.                    79

1          With respect to the proposed amendment to the claim,

2    Mr. Burnett has not designated what portion of those

3    approximate 59,000 dollars of legal fees were incurred post-

4    petition were incurred pre-petition, nor have there been any

5    evidence -- any in -- excuse me -- nor has there been any

6    submission of evidence in the form of invoices or otherwise to

7    show that those amounts were actually paid by Mr. Burnett, the

8    dates those amounts were paid, and for what matter they

9    actually related to.

10          Importantly, Mr. Burnett has not provided any legal

11   authority to show that the legal fees he purportedly incurred

12   in connection with any litigation with the debtors may be

13   shifted to and reimbursed by the Liquidating Trust.  Mr.

14   Burnett's counsel never submitted an application for

15   professional fees pursuant to Section 503(b)(D)(3) (sic) of the

16   Bankruptcy Code.  And even if he did, the Liquidating Trust

17   believes he falls far short of the substantial contribution

18   standard that would be required for a creditor's attorney to be

19   paid by the estate.

20          So with that, the Liquidating Trust also believes that

21   Mr. Burnett does not meet the legal standards to even amend the

22   claim since he has failed to prove that he is entitled to an

23   allowed administrative expense claim for the reasons just

24   presented.  His request to amend an otherwise invalid claim is

25   moot.

RESIDENTIAL CAPITAL, LLC, et al.                    80

1          THE COURT:  Thank you very, Ms. Rothchild.

2          Mr. Bustos?

3          MR. BUSTOS:  And I actually have my notes on my phone.

4          THE COURT:  Okay.  That, you can use it for it.

5          MR. BUSTOS:  Okay.  Okay.  Now, I understand that

6    there's an ongoing objections for several claims.

7          THE COURT:  Well, you're trying to get an

8    administrative claim.  What is it that was done that benefitted

9    the estate?

10          MR. BUSTOS:  Well, this has been going for seven

11   years.  He has yet a petition --

12          THE COURT:  I don't care whether it's been going for

13   seven years or seven months.  I want to know what it is that

14   you believe entitles your client to recover attorneys' fees for

15   post-petition activity.  You don't -- you understand for -- you

16   can't assert an administrative claim for any pre-petition fees.

17   You understand that?

18          MR. BUSTOS:  Okay.  No, I --

19          THE COURT:  Do you?

20          MR. BUSTOS:  I --

21          THE COURT:  Yes or no?

22          MR. BUSTOS:  I understand it now.  I didn't --

23          THE COURT:  Do you have any authority that your client

24   would be entitled to fees as an administrative expense for pre-

25   petition activities?

RESIDENTIAL CAPITAL, LLC, et al.                    81

1              MR. BUSTOS:  No.

2              THE COURT:  I'll give you a chance.  Do you have

3    any --

4              MR. BUSTOS:  No, no.  But what I do --

5              THE COURT:  Stop.

6              MR. BUSTOS:  Okay.

7              THE COURT:  Do you have any authority that would

8    support the payment of an administrative claim for anything

9    that was done or incurred pre-petition?  Yes or no?

10             MR. BUSTOS:  No, no.

11             THE COURT:  Okay.  So what is it that you believe

12   entitles your client to recover an administrative claim for

13   post-petition actions?

14             MR. BUSTOS:  Well, all the work that we've done after

15   the petition was filed.

16             THE COURT:  All the work that was done relates to a

17   pre-petition claim, correct?

18             MR. BUSTOS:  No, no.  They were -- he made after -- he

19   made a claim after the petition.

20             THE COURT:  What does his claim derive from?

21             MR. BUSTOS:  Well, from the -- it derived from the

22   pre-petition -- from the foreclosure of the -- the false

23   foreclosure.

24             THE COURT:  The only basis for his claim is about

25   foreclosure before the petition was filed -- the bankruptcy --

1          MR. BUSTOS:  Yes, that's correct.

2          THE COURT:  -- petition, right?

3          MR. BUSTOS:  Yes.

4          THE COURT:  And do you have any authority that the
5    work that you did after the petition was filed that related to
6    a foreclosure before would somehow entitle your client to
7    recover an administrative claim?

8          MR. BUSTOS:  I don't have it now, but I believe I'd be
9    able to find it because it --

10          THE COURT:  No, no, no.

11          MR. BUSTOS:  -- it makes sense --

12          THE COURT:  This is the hearing.  You got notice, you
13   had the objection.  There was a response deadline, okay?  As
14   you stand there now --

15          MR. BUSTOS:  Um-hum.

16          THE COURT:  -- do you have any legal authority that
17   would support the award of attorneys' fees as an administrative
18   expense that relate to pre-petition claims?

19          MR. BUSTOS:  No, I wouldn't have that.  No.

20          THE COURT:  Go ahead with your argument.

21          MR. BUSTOS:  Well, that is the -- that is our
22   argument.

23          THE COURT:  That's it?  But you have no legal support
24   for it.

25          MR. BUSTOS:  No, I wouldn't be able to cite case law

RESIDENTIAL CAPITAL, LLC, et al.                    83

1   or statute.

2           THE COURT:  Do you have a statute or case law or any

3   legal authority that would support the award of an

4   administrative claim for activity relating to a pre-petition

5   claim that was filed?

6           MR. BUSTOS:  No, no, no, not on us right now.  I --

7           THE COURT:  So why is that you think you can -- your

8   client can get an administrative claim?

9           MR. BUSTOS:  Well, because it -- the only reason that

10  he made a post-petition because the -- they filed a

11  bankruptcy -- they filed bankruptcy, GMAC.  That's the only

12  reason.

13          THE COURT:  Anything else you want to say?

14          MR. BUSTOS:  Well, we've asked for an adjournment, if

15  we could.

16          THE COURT:  You've asked for an adjournment?

17          MR. BUSTOS:  Yeah, we've asked if we could.

18          THE COURT:  Why?

19          MR. BUSTOS:  Because I believe we put in -- we show

20  all the work that was done and the reasons for it that we'd be

21  entitled to it.

22          THE COURT:  The adjournment's denied.

23          MR. BUSTOS:  Okay.

24          THE COURT:  Today was the day -- the response that you

25  filed was the time to respond and give me any grounds, legal or

1  factual, why your client believes he was entitled to an

2  administrative claim.

3         Are you a bankruptcy lawyer?

4         MR. BUSTOS:  I don't only -- no, I don't do mainly

5  bankruptcy.  That's not my main area of practice.

6         THE COURT:  Did you do any research about the legal

7  basis for an administrative claim?

8         MR. BUSTOS:  I -- the only thing I did is what I put

9  in the papers.

10        THE COURT:  Could you answer my question?  Did you do

11  any legal research --

12        MR. BUSTOS:  No, minimal.

13        THE COURT:  -- about what the requirements are --

14        MR. BUSTOS:  No.

15        THE COURT:  -- for an administrative claim in

16  bankruptcy?

17        MR. BUSTOS:  No, I thought it should -- it would

18  fall --

19        THE COURT:  So without doing any research, you filed

20  this claim, you put the debtor -- the Trust to the task and the

21  expense of objecting to an administrative claim, and you have

22  absolutely no legal authority to support it?

23        MR. BUSTOS:  But we talked to them before.

24        THE COURT:  You put them to the burden and expense of

25  filing an objection to your claim -- the administrative claim

RESIDENTIAL CAPITAL, LLC, et al.                          85

1  without any legal authority whatsoever to support your client's

2  entitlement to an administrative claim.  Is that a fair

3  statement?

4          MR. BUSTOS:  I believed we had authority, but --

5          THE COURT:  You do?  Where?  Point me to it.

6          MR. BUSTOS:  I just thought that the fact that there

7  was a claim before that it was connected to the next one.  But

8  that's --

9          THE COURT:  Ms. Rothchild, do you want to reply?

10          MS. ROTHCHILD:  The Liquidating Trust has nothing

11  further to add, Your Honor.

12          THE COURT:  I'll take it under submission and enter an

13  appropriate order.

14          MS. ROTHCHILD:  Thank you, Your Honor.

15          THE COURT:  All right.  Does that complete us for

16  today, Mr. Wishnew or Ms. Rothchild?

17          MS. ROTHCHILD:  Actually, Your Honor, we have one last

18  one, the --

19          THE COURT:  Okay.

20          MS. ROTHCHILD:  -- Borrower Claims Trust objection

21  against the claim filed by Teddy Halstead, claim number --

22          THE COURT:  Oh, yes.

23          MS. ROTHCHILD:  -- 2009.

24          THE COURT:  Yes.

25          Is Mr. Halstead on the phone?

1        No?  Is anyone appearing on behalf of Teddy Halstead?

2   This is the Borrower Claims Trust's objection to claim 2009

3   filed by Teddy Halstead.

4        No appearance has been made in court or in person.  I

5   will take the matter under submission without argument and

6   enter an appropriate order.

7        MS. ROTHCHILD:  Thank you, Your Honor.

8        THE COURT:  Thank you very much.

9        MR. WISHNEW:  Thank you for your time, Your Honor.

10       THE COURT:  Thank you very much.

11       MR. HEAL:  Your Honor?

12       THE COURT:  Who is on the phone?

13       MR. HEAL:  This is Laird Heal (ph.).  I was to --

14   calling to appear for Rhonda Gosselin, but I was cut off at --

15   during the seventy-fifth omnibus.  So I didn't know if she was

16   called for.

17       MR. WISHNEW:  Your Honor, that was the first matter we

18   addressed at 10 o'clock.

19       THE COURT:  It was called, and you're not even on the

20   CourtCall appearance list.  Did you make arrangements to appear

21   by telephone?

22       MR. HEAL:  I tried to.  But then, by the time that

23   I -- I was filing the instructions, but then I couldn't talk to

24   the clerk in time.

25       THE COURT:  I'm taking the matter under submission.

1         MR. WISHNEW:  Thank you, Your Honor.

2         THE COURT:  We're adjourned.

3     (Whereupon these proceedings were concluded at 12:06 PM)

1

2                                     I N D E X

3

4                                    RULINGS

5                                                   PAGE      LINE

6    Debtors' seventy-sixth omnibus objection to  14        16

7    nine claims with no responses sustained and

8    the claims expunged

9    Trust will send Court status letter on         44        8

10   Thompson claim objection within thirty days

11   Debtors' seventy-ninth omnibus objections to 76        10

12   nine claims with no responses sustained and

13   the claims expunged

14   Creditor Burnett's motion for adjournment      83        22

15   denied

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4   I, Aliza Chodoff, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

9

10  _____

11  ALIZA CHODOFF

12  AAERT Certified Electronic Transcriber CET**D-634

13

14  eScribers

15  700 West 192nd Street, Suite #607

16  New York, NY 10040

17

18  Date:  January 15, 2015

19

20

21

22

23

24

25