## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | **Case No. 12-12020(MG)** |
| **RESIDENTIAL CAPITAL, LLC, et al.** | **Chapter 11** |
| **Debtors** | **Jointly Administered** |

v.

**MONTY ALLEN and HEATHER ALLEN**

**Creditors**

## CREDITIORS, MONTY AND HEATHER ALLEN'S OBJECTION TO MODIFICATION AND REDUCTION OF CLAIM #6768 FILED BY DEBTOR HOMECOMINGS FINANCIAL LLC AND/OR GMAC LLC

1.     Monty and Heather Allen filed a claim based on a pending lawsuit in Lauderdale County Case No. CV 09-900073, <u>Monty Allen & Heather Allen v. Homecomings Financial, et al.</u>

2.     The complaint includes claims for:

        a.    Breach of Contract;

        b.    Fraud;

        c.    Fraud/Willful Misrepresentation of Material Fact Alabama Code §6-5-101;

        d.    Conspiracy To Commit Fraud;

        e.    Reckless Misrepresentation §6-5-101;

        f.    Mistaken Misrepresentation §6-5-101;

        g.    Concealment §6-5-102;

        h.    Deceit Alabama Code §6-5-103; and

        i.    Willful Deceit With Intent to Induce Injury or Risk Alabama Code §6-5-104;  (See attached Exhibit A).

3.     Although the breach of contract claim may arguably be subject to a reduction, the other counts of the complaint include the possibility of punitive damages and damages for emotional distress.

4.     Therefore, damages may exceed the breach of contract calculations.

5.     This case involved the sale of a residential home. Pursuant to Alabama law, punitive damages and emotional distress damages are recoverable in litigation involving the sale of a residential home.

6.     Contracts dealing with residences are in a special category and are exceptions to the general damages rule applied in contract cases, which generally prohibits recovery for mental anguish.  Damages for annoyance and inconvenience may be awarded and the mental anguish does not need to be corroborated by physical symptoms. B&M Homes, Inc. v. Hogan, 376 So.2d 667, 672-673 (Ala. 1979).  (See attached Exhibit B).

7.     A Plaintiff may recover compensatory damages for mental anguish, even when mental anguish is the only injury visited upon the plaintiff. George H. Lanier Memorial Hospital v. Andrews, 901 So.2d 714, 725 (Ala. 2004).  (See attached Exhibit C).

8.     Punitive damages may be awarded when it is proved by clear and convincing evidence the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice. Alabama Code §6-11-20.  (See attached Exhibit D).

9.     Wantonness is defined as conduct which is carried on with a reckless or conscious disregard of the rights or safety of others.  Alabama Code §6-11-20(b)(3).  (See attached Exhibit D).

10.     Mental anguish is recoverable in a breach of contract case if the breach of contract involves tortuous conduct, or when the contractual duty is so coupled with matters of mental concern or solitude or with the feelings of the party to which the duty is owed, that the breach of that duty will necessarily or reasonably result in mental anguish and suffering.

Based on the above stated grounds and attached exhibits, Monty Allen and Heather Allen's claim should not be reduced or modified.

Jeffrey B. Austin (AUS013)
austin@bellsouth.net
Attorney for Monty and Heather Allen
211 S. Cedar Street
Florence, AL 35630
(256) 766-1354

## CERTIFICATE OF SERVICE

I hereby certify I have on this_____4th_____ day of ___February___ 2015 served a copy of the foregoing on the following attorneys and/or parties listed below:

Honorable Martin Glenn
United States Bankruptcy Court
Southern District of New York
Alexander Hamilton Custom House
1 Bowling Green
New York, NY 10004-1408

ResCap Liquidating Trust, Morrison & Foerster LLP
Attn: Norman S. Rosenbaum and Jordan A. Wishnew
250 West 55th Street
New York, NY 10019

ResCap Liquidating Trust, Kramer Levin Naftalis & Frankel LLP
Attn: Kenneth H. Eckstein, Douglas H. Mannal, and Joseph A. Shifer
1177 Avenue of the Americas
New York, NY 10036

Office of the United States Trustee for the Southern District of New York
U. S. Federal Office Building
Attn: Linda A. Riffkin and Brian S. Masumoto
201 Varick Street, Suite 1006
New York, NY 10014

The ResCap Liquidating Trust
Attn: Jeffrey Brodsky
Quest Turnaround Advisors
800 Westchester Ave., Suite S-520
Rye Brook, NY 10573

_____
Jeffrey B. Austin

# Exhibit A

ELECTRONICALLY FILED
4/21/2009 8:42 AM
CV-2009-900073.00
CIRCUIT COURT OF
LAUDERDALE COUNTY, ALABAMA
MISSY HOMAN HIBBETT, CLERK

## IN THE CIRCUIT COURT OF LAUDERDALE COUNTY, ALABAMA

**MONTY ALLEN**

**and**

**HEATHER ALLEN**

　　　**PLAINTIFFS**

**V.**　　　　　　　　　　　　　　　　　**CIVIL ACTION NO:  CV 09-_____**

**HOMECOMINGS FINANCIAL, L.L.C.,**
**RE/MAX, INC.,**
**RE/MAX HUNTSVILLE, INC.,**
**RISE REALTY, INC.,**
**RISE REALTY PARKWAY PLAZA, INC.,**
**VICTOR ENGLERT,**
**CHARLES LANZA,**
**JIM BAKER,**
**TOMMY ADAMS,**
**PATRICK MCCLAIN,**
**THE BANK OF NEW YORK TRUST**
**COMPANY, INC. as successor to JP MORGAN CHASE BANK, INC.,**
**and fictitious parties XYZ, an individual firm, partnership, corporation, whose names are**
**otherwise unknown but whose correct names will be added by amendment when**
**ascertained, whether singular or plural, that entity or those entities, other than those**
**entities described above, which is the successor in interest of any of the entities of the**
**entities described above; whether singular or plural, that entity or those entities, other than**
**those entities described above, which was the predecessor corporation of any of the entities**
**described above or any other entity or entities responsible for the damages claimed.**

　　　**DEFENDANTS**

## COMPLAINT

## GENERAL AVERMENTS

　　　1.　　　On or about May 18, 2007, the plaintiffs, Monty and Heather Allen, executed a

contract to purchase property and a home located at 608 West Lakeside Drive, Florence,

Alabama 35630.

　　　2.　　　At the time Monty and Heather Allen executed the contract to purchase,

the mortgagee had foreclosed the property.

3.      The original contract signed by Monty and Heather Allen was subject to redemption.

4.      By May 18, 2007, Homecomings Financial, L.L.C., and/or the Bank of New York Trust Company, Inc. as successor to JP Morgan Chase Bank, Inc. or some other unknown 3rd party owned the property through foreclosure proceedings or had the right to sell the property through foreclosure proceedings.

5.      The sellers originally listed the property with Re/max Huntsville, Inc.

6.      Heather and Monty Allen contracted to purchase the home and property for $125,000.

7.      On or about May 17, 2007, Monty Allen mailed a signed contract and earnest money in the amount of $3,000 to purchase the property to Charles Lanza at Re/max Huntsville, Inc.

8.      Patrick McClain signed the contract as the seller on May 24, 2007.

9.      Charles Lanza is the managing broker and owner of Re/max Huntsville, Inc. in Madison, Alabama.

10.     Re/max Huntsville, Inc. is a franchise of Re/max, Inc.

11.     Jim Baker worked for listing broker Charles Lanza and/or Re/max Huntsville, Inc.

12.     On or about June 14, 2007, the sellers scheduled a closing to finalize the purchase.

13.     On June 14, 2007, agents for the sellers executed an addendum to the original contract extending the closing to June 26, 2007.

14.    Monty and Heather Allen prepared a loan application through Bank Independent to finance the purchase of the home and property.

15.    On or about June 24, 2007, Jim Baker told Monty Allen the owners would not sign the addendum extending the closing to June 26, 2007.

16.    Jim Baker told Monty Allen the right of the original owners to redeem expired in December of 2007.

17.    **Sometime** between October and December of 2007, Jim Baker left his employment with Re/max Huntsville, Inc. and began working for Rise Realty Parkway Plaza, Inc.

18.    Rise Realty Parkway Plaza, Inc. is/was a franchise of Rise Realty, Inc.

19.    Victor Englert is/was the managing Broker for Rise Realty Parkway Plaza, Inc.

20.    In December of 2007, Jim Baker relisted the property with Rise Realty Parkway Plaza, Inc.

21.    Tommy Adams owns Rise Realty Parkway Plaza, Inc.

22.    On December 18, 2007, at the insistence of Rise Realty Parkway Plaza, Inc. and/or Jim Baker, Monty Allen executed a second contract to purchase the home and property and provided a second "approval letter" from Bank Independent.

23.    This 2nd contract was identical to the 1st contract executed on May 18, 2007.

24.    The contract indentified Monty Allen as the buyer and Homecomings Financial, L.L.C. and Bank of New York Trust Company as successor to JP Morgan Chase Bank, Inc. as the sellers.

25.     On December 19, 2007, Monty Allen sent a faxed copy of the earnest money
check which had been previously sent to Re/max Huntsville, Inc. to Rise Realty Parkway Plaza,
Inc.

26.     The sellers cancelled the closing and refused to honor the contracts executed by
Heather and Monty Allen.

27.     The sellers eventually sold the property to Johnny Wright in December of 2007.

28.     Before Johnny Wright bought the property, Monty Allen demanded enforcement
of the previously executed contracts.

29.     Johnny Wright purchased the home and property in exactly the same condition for
approximately $127,000 on or about January 18, 2008.

30.     Victor Englert was aware of the plaintiffs' competing contract before the home
was sold to Johnny Wright.

31.     Agents for the sellers told Monty Allen they were selling the home despite Monty
and Heather Allen's contract.

32.     Re/max Huntsville, Inc. broker, Charles Lanza, has retained and never refunded
the $3,000 earnest money.

33.     Re/max Huntsville, Inc., and/or Charles Lanza individually, or as agent for
Re/max Huntsville, Inc., and/or Jim Baker individually, or as agent for Re/max Huntsville, Inc.,
or as agent for Rise Realty Parkway Plaza, Inc., and/or Rise Realty Parkway Plaza Inc., and/or
Tommy Adams individually, or as owner of Rise Realty Parkway Plaza, Inc., and/or Victor
Englert as broker and agent for Rise Realty Parkway Plaza, Inc., and/or Homecomings Financial,
L.L.C. or Bank of New York Trust Company as successor to JP Morgan Chase Bank, Inc.

fraudulently, willfully, deceitfully, and/or intentionally failed to honor the contract executed between the sellers and Monty and Heather Allen.

34.    Based on the pending contract to purchase the home made the basis of this lawsuit, Monty Allen missed the opportunity to purchase another property for $130,000.

35.    Monty Allen discovered the fraud on or about December 21, 2007.

36.    Jim Baker led Monty and Heather Allen to believe their contract was not accepted by the sellers.

37.    These actions and representations by the defendants were an attempt to induce the plaintiffs to forego their contract on the home.

38.    Jim Baker has a pattern and practice of accepting contracts and then selling the home to another unrelated 3rd party for an amount greater than the original contract executed between the parties.

39.    The home is currently valued at approximately $175,000.

40.    Charles Lanza, at all pertinent times, was an agent for Re/max, Inc., and/or Re/max Huntsville, Inc., and/or the sellers.

41.    Tommy Adams, at all pertinent times, was an agent for Rise Realty, Inc., and/or Rise Realty Parkway Plaza, Inc., and/or the sellers.

42.    Victor Englert, at all pertinent times was an agent for Rise Realty Parkway Plaza, Inc., and/or Rise Realty, Inc., and/or the sellers.

43.    Jim Baker, at all pertinent times, was an agent for Re/max Inc., and/or Re/max Huntsville, Inc., and/or Rise Realty Parkway Plaza, Inc., and/or Rise Realty, Inc., and/or the sellers.

44.    All defendants, at all pertinent times, were agents for the sellers.

45.     Rise Realty, Inc. ratified the conduct and actions of Jim Baker, and/or Tommy Adams, and/or Victor Englert.

46.     Tommy Adams ratified the conduct and actions of Jim Baker.

47.     Tommy Adams ratified the conduct and actions of Victor Englert.

48.     Rise Realty Parkway Plaza, Inc. ratified the conduct and actions of Jim Baker and Victor Englert.

49.     Rise Realty, Inc. had a duty and responsibility to supervise and prohibit the fraudulent conduct and actions of Tommy Adams and/or Victor Englert.

50.     Rise Realty, Inc. had a duty and responsibility to supervise and prohibit the fraudulent conduct and actions of Jim Baker.

51.     Tommy Adams had a duty and responsibility to supervise and prohibit the conduct and actions of Victor Englert.

52.     Rise Realty Parkway Plaza, Inc., and/or Tommy Adams, and/or Victor Englert had a duty and responsibility to supervise and prohibit the fraudulent conduct and actions of Jim Baker.

53.     Re/max, Inc. ratified the actions and conduct of Jim Baker.

54.     Re/max, Inc. ratified the conduct and actions of Charles Lanza.

55.     Charles Lanza ratified the conduct and actions of Jim Baker.

56.     Re/max, Inc. had a duty and responsibility to supervise and prohibit the fraudulent conduct and actions of Charles Lanza.

57.     Re/max, Inc. had a duty and responsibility to supervise and prohibit the fraudulent conduct and actions of Jim Baker.

58.     Re/max Huntsville, Inc. ratified the conduct and actions of Jim Baker.

59.    Charles Lanza had a duty and responsibility to supervise and prohibit the fraudulent conduct and actions of Jim Baker.

60.    The plaintiffs relied upon the fraudulent conduct and misrepresentations of the defendants to their detriment.

61.    The defendants misrepresented the need to execute a second contract and the status of the contracts executed by the plaintiffs.

62.    The defendants' actions were intended to induce the plaintiffs to withdraw their offer to purchase or to rescind their contract and/or intended to coerce the plaintiffs to make a higher offer to purchase the home.

63.    The defendants consciously or deliberately engaged in oppressive, fraudulent, wanton, and/or malicious conduct.

64.    The defendants authorized and/or benefited from the conduct of their respective agents.

65.    The actions of the agent did or were calculated to benefit the respective principal.

66.    Homecomings Financial, L.L.C. routinely paid Jim Baker to remodel homes being sold by Homecomings Financial, L.L.C.

67.    The defendants had a duty to properly train and supervise their respective agents.

## COUNT I

### BREACH OF CONTRACT

68.    The plaintiffs reallege all general averments as if fully set out herein.

69.    The defendants fraudulently, willfully, deceitfully, intentionally, and/or deliberately refused to honor the contract entered into and executed by all parties.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

## <u>COUNT II</u>

### FRAUD

70.    The plaintiffs reallege all general averments as if fully set out herein.

71.    On or about May 14, 2007, the plaintiffs agreed to purchase and the defendants agreed to sell property located at 608 West Lakeside Drive, Florence, Alabama 35630.

72.    The defendants fraudulently, willfully, deceitfully and/or intentionally refused to honor the contract executed between the parties.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury

## COUNT III

### RE/MAX HUNTSVILLE, INC.'S NEGLIGENCE/NEGLIGENT SUPERVISION OF JIM BAKER

73.    The plaintiffs reallege all general averments as if fully set out herein.

74.    Jim Baker has a pattern and practice of obtaining contracts and then refusing to honor the contracts if a 3rd party makes higher offer before closing.

75.    Re/max Huntsville, Inc. and/or Charles Lanza had a duty and obligation to properly supervise and train their agents.

76.    The defendants knew or should have known of Jim Baker's pattern and practice.

77.    The defendants had a duty to prevent the conduct and actions which led to the house being sold to a 3rd party.

78.    The defendants had a duty to prevent the house being sold to a 3rd party.

79.    The defendants had a duty to prevent the actions of Jim Baker.

80.    The defendants failed to prevent Jim Baker from committing the acts set forth in the general averments.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

**Page 9 of 30**

## COUNT IV

### RE/MAX, INC.'S NEGLIGENCE/NEGLIGENT SUPERVISION
### OF RE/MAX HUNTSVILLE, INC. AND RE/MAX HUNTSVILLE, INC. AGENTS

81.    The plaintiffs reallege all general averments as if fully set out herein.

82.    Re/max, Inc. has a duty and obligation to supervise and train its Brokers/Owners.

83.    Jim Baker has a pattern and practice of obtaining contracts and then refusing to honor the contracts if a 3rd party makes higher offer before closing.

84.    The defendants knew or should have known of Jim Baker's pattern and practice.

85.    The defendants had a duty to prevent the conduct and actions which led to the house being sold to a 3rd party.

86.    The defendants had a duty to prevent the actions of Jim Baker.

87.    The defendants had a duty to prevent the house being sold to a 3rd party.

88.    Re/max, Inc. had a duty and obligation to supervise Charles Lanza and a duty to require Charles Lanza to discover and prevent the actions of Jim Baker.

89.    Re/max, Inc. failed to properly supervise and train Charles Lanza, and/or Jim Baker, and/or Re/max Huntsville, Inc.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

## COUNT V

### RE/MAX, INC.'S NEGLIGENT SUPERVISION OF AGENTS

90.        The plaintiffs reallege all general averments as if fully set out herein.

91.     Re/max, Inc. had a duty to properly supervise and train its agents.

92.     The defendants had a duty to prevent the house being sold to a 3rd party.

93.     The defendants had a duty to prevent the conduct and actions which led to the house being sold to a 3rd party.

94.     Re/max, Inc. knew or should have known of Charles Lanza's and/or Re/max Huntsville, Inc.'s failure to properly supervise the franchise.

95.     Charles Lanza and/or Re/max Huntsville, Inc. failed to properly supervise the agents of Re/max Huntsville, Inc.

96.     Charles Lanza and/or Re/max Huntsville, Inc. had a duty to properly supervise and manage the agents of Re/max Huntsville, Inc.

97.     Charles Lanza and/or Re/max Huntsville, Inc. failed to properly supervise and manage the agents of Re/max Huntsville, Inc.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

**Page 11 of 30**

## COUNT VI

### CHARLES LANZA'S NEGLIGENCE/NEGLIGENT SUPERVISION
### OF JIM BAKER

98.    The plaintiffs reallege all general averments as if fully set out herein.

99.    Charles Lanza had a duty and obligation to properly supervise and train his agents.

100.    Jim Baker has a pattern and practice of obtaining contracts and then refusing to honor the contracts if a 3rd party makes higher offer before closing.

101.    Charles Lanza knew or should have known of Jim Baker's pattern and practice.

102.    Charles Lanza had a duty to prevent the acts of Jim Baker.

103.    The defendants had a duty to prevent the conduct and actions which led to the house being sold to a 3rd party.

104.    The defendants had a duty to prevent the house being sold to a 3rd party.

105.    Charles Lanza failed to properly supervise and train Jim Baker.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

## COUNT VII

### RISE REALTY, INC.'S NEGLIGENCE/NEGLIGENT SUPERVISION

106.    The plaintiffs reallege all general averments as if fully set out herein.

107.    Tommy Adams and/or Rise Realty, Inc. had a duty and obligation to properly supervise and train their agents.

108.    Rise Realty, Inc. had a duty and obligation to supervise its owners and brokers.

109.    Jim Baker has a pattern and practice of obtaining contracts and then refusing to honor the contracts if a 3rd party makes higher offer before closing.

110.    The defendants knew or should have known of Jim Baker's pattern and practice.

111.    The defendants had a duty to prevent the acts of Jim Baker.

112.    The defendants had a duty to prevent the house being sold to a 3rd party.

113.    The defendants had a duty to prevent the conduct and actions which led to the house being sold to a 3rd party.

114.    Rise Realty, Inc. had a duty and obligation to supervise and train Tommy Adams and a duty to require Tommy Adams to discover and prevent the actions of Jim Baker.

115.    Rise Realty, Inc. failed to properly supervise Tommy Adams, and/or Jim Baker, and/or Rise Realty Parkway Plaza, Inc.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to

**Page 13 of 30**

Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

## COUNT VIII

### RISE REALTY, INC.'S NEGLIGENCE/NEGLIGENT SUPERVISION OF TOMMY ADAMS AND/OR VICTOR ENGLERT

116.    The plaintiffs reallege all general averments as if fully set out herein.

117.    Tommy Adams had a duty and obligation to properly supervise and train his agents.

118.    Rise Realty, Inc. had a duty and obligation to supervise and train its Owners and Brokers.

119.    Jim Baker has a pattern and practice of obtaining contracts and then refusing to honor the contracts if a 3rd party makes higher offer before closing.

120.    The defendants knew or should have known of Jim Baker's pattern and practice.

121.    The defendants had a duty to prevent the acts of Jim Baker.

122.    The defendants had a duty to prevent the house being sold to a 3rd party.

123.    The defendants had a duty to prevent the conduct and actions which led to the house being sold to a 3rd party.

124.    Rise Realty, Inc. had a duty and obligation to supervise Tommy Adams and a duty to require Tommy Adams to discover and prevent the actions of Jim Baker.

125.    Rise Realty, Inc. failed to properly supervise and train Tommy Adams, and/or Jim Baker, and/or Rise Realty Parkway Plaza, Inc.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the

protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

### COUNT IX

**TOMMY ADAMS AND/OR RISE REALTY PARKWAY PLAZA, INC.'S NEGLIGENT SUPERVISION OF JIM BAKER**

126.    The plaintiffs reallege all general averments as if fully set out herein.

127.    Tommy Adams and/or Rise Realty Parkway Plaza, Inc. had a duty and obligation to properly train and supervise his agents.

128.    Jim Baker has a pattern and practice of obtaining contracts and then refusing to honor the contracts if a 3rd party makes higher offer before closing.

129.    Tommy Adams and/or Rise Realty Parkway Plaza, Inc. knew or should have known of Jim Baker's pattern and practice.

130.    Tommy Adams and/or Rise Realty Parkway Plaza, Inc. had a duty to prevent the acts of Jim Baker.

131.    The defendants had a duty to prevent the house being sold to a 3rd party.

132.    The defendants had a duty to prevent the conduct and actions which led to the house being sold to a 3rd party.

133.    Tommy Adams and/or Rise Realty Parkway Plaza, Inc. failed to properly train and supervise Jim Baker.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the

protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

## COUNT X

### RISE REALTY PARKWAY PLAZA, INC.'S NEGLIGENCE/NEGLIGENT SUPERVISION OF VICTOR ENGLERT

134.    The plaintiffs reallege all general averments as if fully set out herein.

135.    Rise Realty Parkway Plaza, Inc. and/or Tommy Adams had a duty and obligation to supervise and properly train the brokers.

136.    Jim Baker has a pattern and practice of obtaining contracts and then refusing to honor the contracts if a 3rd party makes higher offer before closing.

137.    The defendants knew or should have known of Jim Baker's pattern and practice.

138.    The defendants had a duty to prevent the acts of Jim Baker.

139.    The defendants had a duty to prevent the house being sold to a 3rd party.

140.    The defendants had a duty to prevent the conduct and actions which led to the house being sold to a 3rd party.

141.    Rise Realty Parkway Plaza, Inc. had a duty and obligation to supervise Victor Englert and a duty to require Victor Englert to discover and prevent the actions of Jim Baker.

142.    Rise Realty Parkway Plaza, Inc. failed to properly supervise and train Victor Englert and/or Jim Baker.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the

protection of the public by deterring these defendants and others from doing such wrong in the

future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to

Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees.

The plaintiffs demand trial by struck jury.

## COUNT XI

### VICTOR ENGLERT'S NEGLIGENCE/NEGLIGENT SUPERVISION OF JIM BAKER

143.    The plaintiffs reallege all general averments as if fully set out herein.

144.    Rise Realty Parkway Plaza, Inc. had a duty and obligation to supervise and

properly train its owners and brokers.

145.    Jim Baker has a pattern and practice of obtaining contracts and then refusing to

honor the contracts if a 3rd party makes higher offer before closing.

146.    The defendants knew or should have known of Jim Baker's pattern and practice.

147.    The defendants had a duty to prevent the acts of Jim Baker.

148.    The defendants had a duty to prevent the house being sold to a 3rd party.

149.    The defendants had a duty to prevent the conduct and actions which led to the

house being sold to a 3rd party.

150.    Victor Englert had a duty and obligation to supervise Jim Baker and a duty to

discover and prevent the actions of Jim Baker.

151.    Victor Englert failed to properly supervise and train Jim Baker and all other

agents involved in the sale of the home made the basis of this complaint.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and

punitive damages in such type and quantity as a jury may find appropriate under the

circumstances of this case and the purposes allowed by law, including but not limited to the

protection of the public by deterring these defendants and others from doing such wrong in the

future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to

Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees.

The plaintiffs demand trial by struck jury.

## COUNT XII

### TOMMY ADAMS' NEGLIGENT SUPERVISION OF VICTOR ENGLERT

152.    The plaintiffs reallege all general averments as if fully set out herein.

153.    Tommy Adams had a duty and obligation to properly supervise his agents.

154.    Tommy Adams had a duty to properly train and supervise Victor Englert.

155.    Tommy Adams failed to properly train and supervise Victor Englert.

156.    Jim Baker has a pattern and practice of obtaining contracts and then refusing to

honor the contracts if a 3rd party makes higher offer before closing.

157.    Tommy Adams knew or should have known of Jim Baker's pattern and practice.

158.    Tommy Adams had a duty to prevent the acts of Jim Baker.

159.    The defendants had a duty to prevent the house being sold to a 3rd party.

160.    The defendants had a duty to prevent the conduct and actions which led to the

house being sold to a 3rd party.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and

punitive damages in such type and quantity as a jury may find appropriate under the

circumstances of this case and the purposes allowed by law, including but not limited to the

protection of the public by deterring these defendants and others from doing such wrong in the

future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to

Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees.

The plaintiffs demand trial by struck jury.

## COUNT XIII

## RISE REALTY PARKWAY PLAZA, INC.'S NEGLIGENT SUPERVISION OF AGENTS

161.    The plaintiffs reallege all general averments as if fully set out herein.

162.    Rise Realty Parkway Plaza, Inc. had a duty to properly supervise and train its agents.

163.    The defendants had a duty to prevent the house being sold to a 3rd party.

164.    The defendants had a duty to prevent the conduct and actions which led to the house being sold to a 3rd party.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

## COUNT XIV

## FRAUD/ WILLFUL MISREPRESENTATION OF MATERIAL FACT
## ALABAMA CODE §6-5-101

165.    The plaintiffs reallege all general averments as if fully set out herein.

166.    Re/max, Inc., or an agent thereof, and/or Rise Realty, Inc., or an agent thereof, was advised of the binding contract executed by Monty and Heather Allen but despite this knowledge sold the home and property to a 3rd party.

**Page 19 of 30**

167.    The acts committed by Jim Baker were done in the course of his employment with Re/max, Inc., and/or Rise Realty, Inc., and/or Re/max Huntsville, Inc., and/or Rise Realty Parkway Plaza, Inc .

168.    Re/max Huntsville, Inc. and/or Rise Realty Parkway Plaza, Inc. ratified the actions of agent Jim Baker.

169.    The defendants deliberately and intentionally sold the home to a 3rd party with full knowledge of Monty and Heather Allen's contract.

170.    The defendants deliberately and/or intentionally refused to honor the contract entered and executed by all parties.

171.    The defendants told the plaintiffs a second contract was needed.  The defendants represented the sellers did not accept their offer.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages.  The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8.  The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

### COUNT XV

### CONSPIRACY TO COMMIT FRAUD

172.    The plaintiffs reallege all general averments as if fully set out herein.

173.    The defendants conspired to sell the home to another buyer at a higher price despite the preexisting valid contract between Monty and Heather Allen and the sellers.

174.    Re/max Huntsville, Inc., or an agent thereof, and/or Rise Realty Parkway Plaza, Inc., or an agent thereof, was advised of the contract executed by Monty and Heather Allen but despite this knowledge sold the home and property to a 3rd party.

175.    The acts committed by Jim Baker were done in the course of his employment with Re/max Huntsville, Inc. and/or Rise Realty Parkway Plaza, Inc.

176.    Re/max Huntsville, Inc. and/or Rise Realty Parkway Plaza, Inc. ratified the actions of agent Jim Baker.

177.    The defendants deliberately and intentionally sold the home to a 3rd party with knowledge of Monty and Heather Allen's contract.

178.    The defendants deliberately and/or intentionally refused to honor the contract entered and executed by all parties.

179.    Agent Jim Baker led Monty and Heather Allen to believe their contract was not accepted by the sellers.

180.    These actions and representations by the defendants were an attempt to induce the plaintiffs to forego their contract on the home and/or an attempt to make the plaintiffs make a higher offer to purchase the home.

181.    Agent Jim Baker has a pattern in practice of accepting contracts and then selling the home to another unrelated 3rd party for an amount greater than the original contract executed between the parties.

182.    All actions committed by the defendants related to this lawsuit were done maliciously.

183.    The original contract purchase price was $125,000. Johnny Wright bought the home in exactly the same condition for approximately $127,000.

**Page 21 of 30**

184.    The home is currently valued at approximately $175,000.

Plaintiffs demand compensatory, emotional and mental distress and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

## COUNT XVI

### FRAUD/ WILLFUL MISREPRESENTATION OF MATERIAL FACT
### ALABAMA CODE §6-5-101

185.    The plaintiffs reallege all general averments as if fully set out herein.

186.    Re/max Huntsville, Inc., or an agent thereof, and/or Rise Realty Parkway Plaza, Inc., or an agent thereof, was advised of the binding contract executed by Monty and Heather Allen but despite this knowledge sold the home and property to a 3rd party.

187.    The defendants willfully and/or intentionally misrepresented the status of the closing and contract.

188.    The defendants intended to induce the plaintiffs to withdraw their offer or to rescind their contract to allow the sellers to sell the property to a 3rd party at a higher price and/or intended to coerce the plaintiffs to make a higher offer to purchase the home.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the

future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

**COUNT XVII**

**RECKLESS MISREPRESENTATION §6-5-101**

189.    The plaintiffs reallege all general averments as if fully set out herein.

190.    Re/max Huntsville, Inc., or an agent thereof, and/or Rise Realty Parkway Plaza, Inc., or an agent thereof, was advised of the contract executed by Monty and Heather Allen but despite this knowledge sold the home and property to a 3rd party.

191.    The defendants recklessly misrepresented the need to execute a second contract and the status of the contracts executed by the plaintiffs.

192.    These misrepresentations were made with the intent to induce the plaintiffs to withdraw their offer to purchase or rescind their contract to allow the defendants to sell the home to a 3rd party at a higher price and/or with the intent to coerce the plaintiffs to make a higher offer to purchase the home.

193.    The defendants' actions proximately caused damages to the plaintiffs.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

## COUNT XVIII

### MISTAKEN MISREPRESENTATION §6-5-101

194.    The plaintiffs reallege all general averments as if fully set out herein.

195.    Re/max Huntsville, Inc., or an agent thereof, and/or Rise Realty Parkway Plaza, Inc., or an agent thereof, was advised of the contract executed by Monty and Heather Allen but despite this knowledge sold the home and property to a 3rd party.

196.    The defendants mistakenly misrepresented the need to execute a second contract and the status of the sale of the home.

197.    These misrepresentations were made with the intent to induce the plaintiffs to withdraw their offer to purchase or rescind their contract to allow the defendants to sell the home to a 3rd party at a higher price and/or with the intent to coerce the plaintiffs to make a higher offer to purchase the home.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

## COUNT XIX

### CONCEALMENT §6-5-102

198.    The plaintiffs reallege all general averments as if fully set out herein.

199. Re/max Huntsville, Inc., or an agent thereof, and/or Rise Realty Parkway Plaza, Inc., or an agent thereof, was advised of the binding contract executed by Monty and Heather Allen but despite this knowledge sold the home and property to a 3rd party.

200. The defendants concealed the fact a 3rd party had executed a contract on the same home from the plaintiffs.

201. This concealment was an attempt to prevent the plaintiffs from enforcing their contract thereby allowing the defendants to sell the home to a 3rd party at a higher price and/or an attempt to coerce the plaintiffs to make a higher offer to purchase the home.

202. These concealments were made with the intent to induce the plaintiffs to withdraw their offer to purchase or rescind their contract to allow the defendants to sell the home to a 3rd party at a higher price and/or with the intent to coerce the plaintiffs to make a higher offer to purchase the home.

203. The defendants had a duty to inform the other defendants and the plaintiffs of the competing contract.

204. The defendants concealed these facts with the intent to induce the plaintiffs and/or the sellers to forego the original binding contract to allow the defendants to sell the home to a 3rd party at a higher price and/or with the intent to coerce the plaintiffs to make a higher offer to purchase the home.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to

Alabama Code §8-8-8.  The plaintiffs also claim from the defendants cost and attorney's fees.

The plaintiffs demand trial by struck jury.

## COUNT XX

### DECEIT ALABAMA CODE §6-5-103

205.    The plaintiffs reallege all general averments as if fully set out herein.

206.    Re/max Huntsville, Inc., or an agent thereof, and/or Rise Realty Parkway Plaza,

Inc., or an agent thereof,  was advised of the binding contract executed by Monty and Heather

Allen but despite this knowledge sold the home and property to a 3rd party.

207.    The defendants deceived the plaintiffs (by a willful representation of a material

fact as true which they knew to be untrue) or (by the reckless representation of a material fact as

true which they did not know to be false) to induce the plaintiffs to act and that plaintiffs acted to

their injury by not purchasing the home.

208.    The defendants knew of the falsehood or recklessly represented facts as true

which the defendants did not know to be false, with the intent to deceive the plaintiffs.

209.    Jim Baker told the plaintiffs a second contract was necessary.  This was a false

statement.

210.    Jim Baker told the plaintiffs the sellers refused to extend the closing deadline.

This was a false statement.

211.    Jim Baker told the plaintiffs the sellers refused to accept their contract.  This was

a false statement.

212.    The defendants committed the deceitful conduct with the intent to induce the

plaintiffs to withdraw their offer to purchase or rescind their contract to allow the defendants to

**Page 26 of 30**

sell the home to a 3rd party at a higher price and/or with the intent to coerce the plaintiffs to make a higher offer to purchase the home.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

## COUNT XXI

### WILLFULL DECEIT WITH INTENT TO INDUCE INJURY OR RISK
### ALABAMA CODE §6-5-104

213.    The plaintiffs reallege all general averments as if fully set out herein.

214.    The defendants entered into a contract with the plaintiffs without any intention of performance.

215.    Re/max Huntsville, Inc., or an agent thereof, and/or Rise Realty Parkway Plaza, Inc., or an agent thereof, was advised of the contract executed by Monty and Heather Allen but despite this knowledge sold the home and property to a 3rd party.

216.    Jim Baker told the plaintiffs a second contract was necessary. This was a false statement.

217.    Jim Baker told the plaintiffs the sellers refused to extend the closing deadline. This was a false statement.

218.    Jim Baker told the plaintiffs the sellers refused to accept their contract. This was a false statement.

**Page 27 of 30**

219.    These misrepresentations were made with the intent to induce the plaintiffs to withdraw their offer to purchase or rescind their contract to allow the defendants to sell the home to a 3rd party at a higher price and/or with the intent to coerce the plaintiffs to make a higher offer to purchase the home.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

## COUNT XXII

### MONEY OWED BY RE/MAX HUNTSVILLE, INC. AND/OR CHARLES LANZA

220.    The plaintiffs reallege all general averments as if fully set out herein.

221.    Re/max Huntsville, Inc., or an agent thereof, and/or Charles Lanza owe Monty and Heather Allen $3,000 for the earnest money paid upon execution of the contract to purchase the home and property.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to

Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees.

The plaintiffs demand trial by struck jury.

## COUNT XXIII

### INTERFERENCE WITH CONTRACTUAL RELATIONS

222.    The plaintiffs reallege all general averments as if fully set out herein.

223.    The defendants interfered with the contractual relations between the plaintiffs and the sellers.

224.    The defendants consciously and/or deliberately engaged in oppressive, fraudulent, wanton, and/or malicious conduct.

225.    The defendants knew of the contract existing between the plaintiffs and the sellers.

226.    The defendants intentionally interfered with this contract and/or business relationship existing between the plaintiffs and the sellers.

227.    The defendants' interference was not justified.

228.    The plaintiffs suffered damages as a result of this intentional unjustified interference.

Plaintiffs demand compensatory, emotional and mental distress, consequential, and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the protection of the public by deterring these defendants and others from doing such wrong in the future, and as exemplary damages. The plaintiffs claim prejudgment interest pursuant to Alabama Code §8-8-8. The plaintiffs also claim from the defendants cost and attorney's fees. The plaintiffs demand trial by struck jury.

Dated this 20th day of April _____ 2009.

Jeffrey B. Austin (AUS013)
Attorney for Plaintiffs
WINBORN & AUSTIN
102 South Court Street, Ste. 600
Florence, AL  35630
256-764-0582


The Plaintiffs demand trial by struck jury in this cause.

Jeffrey B. Austin (AUS013)

The Plaintiffs request service by certified mail.

Jeffrey B. Austin (AUS013)

**Page 30 of 30**

# Exhibit B

## Alabama Case Law

B & M HOMES, INC. v. HOGAN, 376 So.2d 667 (Ala. 1979)

376 So.2d 667

B & M HOMES, INC., a corp. v. Thomas J. HOGAN et al.

Kenneth R. MORROW v. Thomas J. HOGAN et al.

77-797, 77-804.

Supreme Court of Alabama.

September 14, 1979.

As Modified on Denial of Rehearing November 2, 1979.

**Page 668**

Appeal from the Circuit Court, Mobile County, William D. Bolling, J.

**Page 669**

Ray G. Riley, Jr. of McFadden, Riley & Parker, Mobile, for appellant B & M Homes, Inc.

Irvin J. Langford for Howell, Johnston, Langford, Finkbohner & Lawler, Mobile, for appellant Kenneth R. Morrow.

Fred W. Killion, Jr. and Stephen J. Flynn, Mobile, for appellees Thomas J. Hogan and Carol Ann Hogan.

EMBRY, Justice.

These appeals, consolidated pursuant to Rule 3 (b) by stipulation of appellants/defendants B & M Homes, Inc. and Kenneth R. Morrow, are from a judgment in favor of appellees/plaintiffs Thomas J. Hogan and Carol Ann

Documents provided by www.Loislaw.com

Hogan. The judgment was entered on a jury verdict for $75,000 reduced
by remittitur to $50,000. Although the Hogans accepted the remittitur, B & M
and Morrow appeal and the Hogans urge reinstatement of the original verdict.
See Rule 59 (f), ARCP.

**Page 670**


We affirm but reinstate the verdict in the full amount of $75,000.

The Hogans' action was submitted to the jury on two theories: (1) breach of a
covenant, implied within their written purchase contract, to build their home in
a workmanlike manner using first class materials; and (2) breach of an express
warranty to build their home in substantial conformity to plans
and specifications approved by the FHA (Federal Housing Administration) or
the VA (Veterans Administration).

The issues are: (1) whether damages for mental anguish may be recovered in
an action for breach of contract or breach of warranty to construct a house; (2)
whether the trial court committed reversible error by admitting in evidence,
over objection, certain hearsay testimony; (3) whether the trial court committed
reversible error by failing to grant a directed verdict in favor of appellants on
grounds of variance between appellees' pleadings and proof; (4) whether the
trial court erred by admitting parol evidence as to B & M Homes' liability on
the purchase contract; (5) whether the trial court committed reversible error by
admitting evidence regarding appellees' VA financing; (6) whether the trial
court erred by not entering summary judgment in behalf of, or directing a
verdict for, appellant Morrow; and (7) whether the original jury verdict should
be reinstated.

This is the second appeal to this court of this case. See *B & M Homes, Inc. v.
Hogan*, 347 So.2d 1331 (Ala. 1977). On the first appeal we reversed on the sole
basis that a remittitur was ordered without affording the Hogans an opportunity
to choose it or a new trial.

On remand a corrected order of remittitur was entered and the remitted
judgment was accepted by the Hogans. Nonetheless, B & M Homes and
Morrow each perfected their appeal.

The Hogans entered into a written agreement to buy both a lot and a house to
be constructed on that lot. Both of them signed the agreement as purchasers,
and appellant, Morrow, later signed as seller without any indication he was
acting in a representative capacity. The agreed purchase price was $37,500. At

Documents provided by www.Loislaw.com

the time of the execution of the contract, Morrow was secretary of B & M Homes, Inc., and acting as its agent. All negotiations by the Hogans were conducted with Morrow. The Hogans testified they thought they were buying the lot from Morrow because he indicated to them that he owned the lot. The evidence is undisputed that title to the lot in question was actually held by B & M Homes, Inc., when the purchase agreement was executed. There is also evidence there was a B & M Homes sign on the lot; but there is no evidence the Hogans saw such a sign, and Mrs. Hogan testified she did not recall seeing such a sign. The evidence shows that after the contract was executed the Hogans were made aware of the fact that B & M Homes was the builder of their home; however, they continued to direct all communications, complaints, and inquiries concerning it to Morrow. The evidence is undisputed that Morrow had actual authority to represent B & M Homes.

During the construction of the house, Mrs. Hogan discovered a hairline crack in the concrete slab that extended from the front porch through the den and informed Morrow of this. He informed her that such cracks were common and told her not to worry about it. B & M Homes completed construction of the house and the Hogans received a warranty of completion of construction signed by Morrow on behalf of B & M Homes. The Hogans then moved into the house. After they moved in they reported several defects in the house to Morrow and repairmen were sent to fix those defects. After a couple of months the crack in the slab widened and extended through the house causing severe damage.

Again, Morrow was notified. He sent a man to repair some of the damage caused by the crack in the slab; however, nothing was done to repair the slab itself. There is expert testimony to the effect the slab probably could not be permanently repaired. There is also testimony the defective slab seriously decreased the value of the house; the Hogans' expert witness

**Page 671**

testified the defective slab made the house worthless. Evidence of what caused the crack in the slab is in conflict.

I  Appellants contend the trial court erred by failing to grant their motion to strike mental anguish as an element of damages from the Hogans' complaint. We find mental anguish a proper element of damages in this case.

As noted at the outset, the Hogans' case was submitted to the jury on two theories stated in separate counts: one for breach of an implied covenant, to their written purchase contract, to build their home in a workmanlike manner using first class materials; and one for breach of express warranty. In

Documents provided by www.Loislaw.com

both counts, appellees alleged damages for mental anguish as follows:

"* * * the plaintiffs have suffered mental anguish and are still suffering mental anguish with regard to the condition of such home in that they fear for their safety in the house not being structurally sound; * * *."

At the close of the trial, B & M Homes filed a motion to strike the above allegation from both causes of action. The motion was denied. It can be assumed the jury awarded damages for mental anguish since the verdict was for $75,000 and the highest appraisal of the value of the house had it been built without defects was $42,500.

Evidence was introduced, over appellants' objection, that the Hogans were worried and concerned for their safety due to these facts: (1) the house was structurally defective and they believed its defective condition might cause the gas and water lines to burst; and (2) they were forced to live in the defective house because they could not afford to move.

In Alabama the general rule is that mental anguish is not a recoverable element of damages arising from breach of contract. *Sanford v. Western Life Insurance Co.*, 368 So.2d 260 (Ala. 1979); *Stead v. Blue Cross-Blue Shield of Alabama*, 346 So.2d 1140 (Ala. 1977). This court, however, has traditionally recognized exceptions to this rule in certain cases. *Sanford v. Western Life Insurance Co.*, supra; *Stead v. Blue Cross-Blue Shield of Alabama*, supra; *Alabama Water Service Co. v. Wakefield*, 231 Ala. 112, 163 So. 626 (1935); *Becker Roofing Co. v. Pike*, 230 Ala. 289, 160 So. 692 (1935); *F. Becker Asphaltum Roofing Co. v. Murphy*, 224 Ala. 655, 141 So. 630 (1932); *Birmingham Water Works Co. v. Ferguson*, 164 Ala. 494, 51 So. 150 (1909). The exceptions are stated in the following excerpt from *F. Becker Asphaltum Roofing Co. v. Murphy*, supra, which was quoted in *Stead v. Blue Cross-Blue Shield of Alabama*, supra:

"The general rule is that damages cannot be recovered for mental anguish in an action of assumpsit. *Birmingham Water Works Co. v. Vinter*, 164 Ala. 490, 51 So. 356. The ground on which the right to recover such damages is denied, is that they are too remote, were not within the contemplation of the parties, and that the breach of the contract is not such as will naturally cause mental anguish. *Westesen v. Olathe State Bank*, 78 Colo. 217, 240 P. 689, 44 A.L.R. 1484. `Yet where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, it is just that damages therefor be taken into

Documents provided by Loislaw.com

consideration and awarded.' 8 R.C.L. p. 529, § 83; *Southern Ry. Co. v. Rowe*, 198 Ala. 353, 73 So. 634; *McConnell v. United States Express Co.*, 179 Mich. 522,146 N.W. 428, Ann.Cas. 1915D, 80; *Westesen v. Olathe State Bank*, 78 Colo. 217, 240 P. 689, 44 A.L.R. 1484; *Burrus v. Nevada-California-Oregon Ry. Co.*, 38 Nev. 156, 145 P. 926, L.R.A. 1917D, 750.

"Another exception is where the breach of the contract is tortious, or attended with personal injury, damages for mental anguish may be awarded. *Vinson v. Southern Bell Tel. & Tel. Co.*, 188 Ala. 292, 66 So. 100, L.R.A. 1915C, 450.

"The facts of this case, if the plaintiff's evidence was believed, brings the case within these two exceptions.
**Page 672**

"The contract related to placing a roof on the plaintiff's residence, her `castle,' the habitation which she had provided to protect her against the elements, and to shelter her belongings that she thought essential to her comfort and well-being, the very things against which she made the contract to protect herself and her property, and as a result of the breach of the obligation which defendants assumed, the roof leaked to such extent that she was disturbed in her comfort, her household belongings were soaked with water, her house was made damp, she was made sick, as the jury were authorized to find. And the defendants, though repeatedly notified, took no steps to meet their obligation, were not only guilty of a breach of the contract, but were negligent in respect to the performance of the duty which it imposed on them. Charge 12 was therefore refused without error.

"She was also entitled to recover for inconvenience and annoyance, resulting proximately from such breach. *Alabama Water Co. v. Knowles*, 220 Ala. 61, 124 So. 96." 224 Ala. 655 at 657, 141 So. 630 at 631, quoted in 346 So.2d 1140 at 1143.

This case clearly falls within the first exception delineated in *F. Becker Asphaltum*. It was reasonably foreseeable by appellants that faulty construction of appellees' house would cause them severe mental anguish. The largest single investment the average American family will make is the purchase of a home. The purchase of a home by an individual or family places the purchaser in debt for a period ranging from twenty (20) to thirty (30) years. While one might expect to take the risk of acquiring a defective home if that person bought an older home, he or she certainly would not expect severe defects to exist in a home they contracted to have newly built. Consequently, any reasonable builder

Documents provided by www.Loislaw.com

could easily foresee that an individual would undergo extreme mental anguish if their newly constructed house contained defects as severe as those shown to exist in this case. In any event, this court long ago set down the principle that the person who contracts to do work concerning a person's residence subjects himself to possible liability for mental anguish if that work is improperly performed and causes severe defects in that residence or home. The court clearly indicated this when it referred to the plaintiff's residence in *F. Becker Asphaltum* as "* * * her `castle,' the habitation which she had provided to protect her against the elements * * *." 224 Ala. at 657, 141 So. at 631. While such language might be dramatic, it is a clear indication that contracts dealing with residences are in a special category and are exceptions to the general damages rule applied in contract cases which prohibits recovery for mental anguish.

In the recent case of *Hill v. Sereneck*, <u>355 So.2d 1129</u> (Ala.Civ.App. 1978), the Court of Civil Appeals dealt with the issue of damages for mental anguish where a builder had breached an agreement to build a residence in a workmanlike manner. The major defects in the house in *Hill* were almost exactly the same as the major defects in the house in this case. The appellate court in *Hill* found that cases of this type fall within the first exception set out in *F. Becker Asphaltum* and that evidence of mental anguish caused by such defects was relevant and admissible. The *Hill* court stated:

"* * * Such evidence was relevant to the first exception to the general proposition that damages cannot be recovered for mental anguish in a civil action for breach of contract. In instances where it is demonstrated that the breach of the contractual duty actually caused the complaining party mental anguish or suffering and that the breach was such that it would necessarily result in emotional or mental detriment to the plaintiff, damages for annoyance and inconvenience may be awarded." 355 So.2d at 1132.

We concur with the Court of Civil Appeals in the accuracy of the above statement. Appellants contend, that before recovery for mental anguish or suffering can be allowed, the mental anguish has to be corroborated by physical symptoms, i.e., becoming physically sick or ill. We reject

**Page 673**

this contention. The cases have not required mental anguish to be corroborated by the presence of physical symptoms. This is demonstrated by the fact that the cases have allowed recovery for annoyance and inconvenience. See *Alabama Water Service Co. v. Wakefield*, supra; *F. Becker Asphaltum Roofing Co. v. Murphy,*, supra; and *Birmingham Water Works Co. v. Ferguson*, supra. Appellees were only required to present evidence of their mental anguish,

which they did; the question of damages for mental anguish then became a question of fact for the jury to decide.

II  Appellants' second contention is that the court committed reversible error by allowing in, over objection, certain hearsay evidence. The evidence in question involved the following testimony by Mr. Hogan concerning a statement made by an unidentified workman sent by appellant, Morrow, to repair certain cracks in appellees' home caused by the defective slab:

"Q Now did you ever bring that to the attention of the defendants?

"A Yes, sir.

"Q Did they come out and attempt to take care of any of that condition that you've been telling us about, please, sir?

"A Yes, sir.

"Q Would you tell the jury what they did, please, sir, in attempting to remedy that defect?

"A A young man came out with a caulking gun and he re-caulked it.

"Q Was there any conversation between that man and yourself — did he make any statements about it?

"A Yes, he did.

"Q What was that, please, sir?

"MR. RILEY: Your Honor, I object to any hearsay statements.

"THE COURT: Who was it — who was he?

"MR. KILLION: This was the man sent out by the defendants, please, sir, to fix it?

"A By Mr. Morrow.

"THE COURT: You don't know his name?

"WITNESS: No, sir.

"THE COURT: He was an employee of Mr. Morrow?

"WITNESS: Yes, sir.

"THE COURT: Overrule the objection.

"MR. KILLION: What did he say to you, please, sir?

"A He says, `He's done this before,' and he says, `I'm just wasting my time; it will happen again.'"

Appellants contend it was error to admit such hearsay testimony. They state the general rule that statements of an agent are not binding as admissions upon his principal unless made within the scope of the authority of the agent, during the continuance of the agency, and in the discharge of the duties thereof. 29 *Am.Jur.*2d, *Evidence*, § 665. Appellants contend there was no showing the employee in question was acting for B & M Homes or that he was acting within the scope of his authority. They further contend the statement was prejudicial to their case because it tended to prove the cracks were irreparable and appellants had knowledge of them. Even if it be conceded the testimony was inadmissible, which the Hogans do not, we find its admission was harmless error because other testimony of the same substance had previously been admitted without objection or motion to exclude.

In Alabama the rule is that prejudicial error may not be predicated upon the admission of evidence which has been admitted at some other stage of the trial without objection or motion to exclude. *Loftin's Rent-All, Inc. v. Universal Petroleum*, 344 So.2d 781 (Ala.Civ.App. 1977); *Coker v. Ryder Truck Lines*, 287 Ala. 150, 249 So.2d 810 (1971); and *Turner v. Blanton*, 277 Ala. 536, 173 So.2d 80 (1965). In this case, prior to the subject testimony of Mr. Hogan, Mrs. Hogan had testified as follows:

"Q Let's go, please, m'am, to — we've covered the cracks in the slab and that kind of thing; how about the walls of the interior of the house, have you noticed —
**Page 674**


"A The molding, where they meet, you know, that part in the den —

"Q Kind of like that molding up here on this wall —

"A Right. In the corners over the fireplace, it's parting — has big cracks in it.

"Q Have they come out and taken any action on that?

"A They did try to patch up with mortar, I guess, in some spots on the den ceiling — it's a cathedral ceiling — he tried to patch it up but it just cracked right open; in fact, the guy who came out to repair it said, `This is silly; it's not going to hold.' He said, `It's going to —'" (emphasis added)

This testimony of Mrs. Hogan was not objected to by appellants and was testimony of the same nature and about the same incident or occurrence as the testimony of Mr. Hogan. Because appellants did not object or move to exclude the testimony of Mrs. Hogan, the trial judge did not later commit reversible error when he let Mr. Hogan testify to a similar statement made during the same incident or occurrence.

III   B & M Homes' third contention is that the trial court committed reversible error by failing to grant B & M Homes' motion for directed verdict, as to appellees' two causes of action, on the ground of variance. In support of its contention appellant B & M Homes makes the following arguments:

(1) *Jim Walter Corporation v. Gilbert*, 47 Ala. App. 376, 255 So.2d 46 (1971), held that if a joint cause of action is charged in the complaint, then a joint cause of action must be proved. The defendants are either liable jointly or not at all; consequently, if a plaintiff suing joint defendants on a contract can only prove his case against one defendant, failure to prove the charge alleged against both defendants in the particular count of the complaint is a fatal variance which will entitle both defendants to a directed verdict, even against the defendant who has been proved liable.

(2) The Hogans' first cause of action is based on the contract of August 6, 1973, and the implied covenant therein to construct the house in a workmanlike manner using first class materials which was only signed by Morrow; therefore, only Morrow was liable on the contract.

(3) The Hogans' fourth cause of action for breach of warranty is based upon VA/FHA warranty contract which was signed by Kenneth R. Morrow as agent of B & M Homes, Inc.; consequently, only B & M Homes is liable on the warranty.

(4) Because the Hogans sued both Morrow and B & M Homes jointly in

Documents provided by www.Loislaw.com

counts one and four, but only one defendant was liable on each contract, there is a fatal variance between pleading and proof; therefore, the Hogans' claims for breach of contract and breach of warranty must be dismissed under the authority of *Jim Walter Corporation v. Gilbert*, supra.

We reject the appellants' contention that the trial judge committed reversible error. The cases relied on in the *Jim Walter Corporation* case are all based on the harsh and strict rules of common law pleading. When this court adopted the Alabama Rules of Civil Procedure, it abolished the harsh technicalities of the old forms of pleading. The new rules are to be construed liberally to effect the purpose of the rules. The purpose of such rules as Rule 15 is to allow the maximum opportunity for the parties to state each claim and have those claims decided on the merits while insuring the parties have adequate notice of the issues to be tried. *Vernon Carpet Mills v. Rossville Spinning Corp.*, <u>344 So.2d 1205</u> (Ala. 1977); *Hawk v. Bavarian Motor Works*, <u>342 So.2d 355</u> (Ala. 1977).

The appellees should have made a motion to amend their complaint as to cause of action four, as permitted by Rule 15 (b), since the appellants objected to the VA/FHA warranty contract being introduced into evidence on grounds of variance; however, the trial court did not commit reversible error by admitting the contract or by denying B & M Homes' motion for

**Page 675**

directed verdict because neither appellant was prejudiced. Even though the appellees did not amend their complaint as to the joint liability allegation in cause of action four, the trial judge corrected any possible error or prejudice by instructing the jury that only B & M Homes could be held liable for breach of the express written warranty. The trial court's instruction to the jury prevented Morrow from being prejudiced by the variance in the Hogans' complaint. Furthermore, the variance was not reversible error due to the fact the jury returned a general verdict against both defendants. The evidence was amply sufficient for the jury to have returned a verdict against both Morrow and B & M Homes on count one, for breach of contract. See *Citizens Bank v. Routh*, <u>351 So.2d 594</u> (Ala.Civ.App. 1977). In this case, since the jury returned a verdict against both Morrow and B & M Homes, we will presume the jury found that both Morrow and B & M Homes breached their contract with the Hogans and thus based their verdict on the Hogans' cause of action one, which was a breach of contract allegation.

We further note that only B & M Homes contends the variance in the Hogans' complaint was reversible error. The variance could not have been prejudicial to B & M Homes since the evidence was sufficient so that the jury could have returned a verdict against B & M Homes on both counts. Likewise, there is no

Documents provided by www.Loislaw.com

merit to B & M Homes' argument that there was a variance between the
pleading and proof as to appellees' cause of action one since the evidence, as
will be discussed later, was sufficient to prove that both B & M Homes and
Morrow could be held liable for breach of the implied covenant to build
the house in a workmanlike manner.

Appellant, B & M Homes, further contends the trial judge committed
reversible error by allowing appellees to amend their complaint, after the trial
began, by adding a description of certain additional minor defects and by
refusing to grant their motion for a continuance. There is no merit in this
contention. Rule 15, ARCP, clearly permits liberal amendment of
pleadings. Further, the grant or denial of a motion to amend or a request for
continuance is a matter within the discretion of the trial court, subject to
reversal on appeal only where there is an abuse of discretion. *Walker v.
Traughber*, 351 So.2d 917 (Ala. 1977). We find no evidence that appellants
were prejudiced or that the trial court abused its discretion by allowing
the amendment. The record is clear that appellants had actual knowledge before
trial of the claimed defects which were added to the allegations of the complaint
by the amendment.

IV   B & M Homes contends the trial court committed error by admitting parol
evidence to show that B & M Homes was a party to the purchase contract
because Morrow was acting as its agent when he executed it. We need not
address this contention because B & M Homes admitted in its answer that
Morrow was at all times acting as its agent. The trial court committed no error
by admitting in evidence facts which B & M Homes had already admitted. See
*Watson v. McGee*, 348 So.2d 461 (Ala. 1977).

V   B & M Homes asserts the trial court committed reversible error by
admitting evidence which disclosed that appellees had financed their house with
VA financing and they would not be able to obtain future VA financing for the
purchase of another home. B & M Homes objected to such evidence as being
immaterial and irrelevant. We cannot agree with this contention. Damages for
breach of contract or warranty should restore the injured party to the condition
he or she would have occupied if the contract had not been breached, or had
been fully performed. *Geohagan v. General Motors Corp.*, 291 Ala. 167, 279
So.2d 436 (1973). VA financing is a pecuniary benefit to those eligible to
receive it because of the low interest rate applicable to the loan. Consequently,
evidence as to the Hogans' inability to obtain additional

**Page 676**

VA financing was relevant because other evidence disclosed the house could
not be repaired; thus, the probability the Hogans would be compelled to

Documents provided by www.Loislaw.com

purchase another.

We also reject the argument by B & M Homes that appellees did not prove their damages. There is ample evidence in the record to authorize the jury to arrive at the amount of damages reflected by its verdict.

VI    Appellant Morrow contends the trial court should have either entered summary judgment for him or directed a verdict in his favor. He contends that he and B & M Homes both could not be liable on the purchase contract. We do not agree.

The cases relied on by Morrow are cases involving a disclosed principal where the agent contracts *merely* as the agent of a disclosed principal. It is clear in Alabama the agent for a disclosed principal can personally bind himself to the contract if he intends to add his personal guarantee. *Chandler v. Hunter*, 340 So.2d 818 (Ala.Civ.App. 1976). See *Sealy v. McElroy*, 288 Ala. 93, 257 So.2d 340 (1972). Here there was sufficient conflicting testimony to create a jury question as to whether Morrow personally guaranteed the purchase contract. The issue of Morrow's liability was also properly submitted to the jury because from the evidence it is questionable whether Morrow disclosed he was acting as an agent at the time appellees signed the purchase contract. The fact Morrow signed the purchase contract in his own name would indicate he did not disclose he was acting as an agent. It is a well settled principle of law that an agent who executes a contract on behalf of an undisclosed principal is liable on that contract if he fails to disclose the identity of his principal at the time of making the contract. 3 Am.Jur.2d, Agency, § 317. Furthermore, the fact Morrow signed the contract in his own name could in itself create personal liability on his part. See *Lutz v. Van Heynigen Brokerage Co.*, 199 Ala. 620, 75 So. 284 (1917); 3 Am.Jur.2d, Agency, §§ 188-192. We, therefore hold it was not error to submit to the jury the question of Morrow's liability on appellees' cause of action for breach of contract.

VII    The final question we address is whether the original jury verdict of $75,000 should be reinstated. We consider that it should. Only when it is shown that a verdict is based on bias, passion, prejudice, corruption or other improper motive does a court have authority to order a remittitur. The verdict may not be set aside because the trial court is of the opinion the jury awarded too much. *Central of Georgia Railway Co. v. Steed*, 287 Ala. 64, 248 So.2d 110 (1971). The trial judge may not substitute his personal preference for the judgment of the jury. *Holcombe v. Whitaker*, 294 Ala. 430, 318 So.2d 289 (1975). We find the jury award of $75,000 neither excessive nor based upon improper motive, prejudice, bias, passion or corruption. We, therefore, reinstate the original jury

Documents provided by www.Loislaw.com

award of $75,000 and direct that the judgment be modified accordingly.

For the reasons assigned the jury award of $75,000 is due to be, and is hereby, reinstated and the judgment below is hereby directed to be modified to that extent and is hereby affirmed as modified.

MODIFIED AND AFFIRMED.

BLOODWORTH, FAULKNER and ALMON, JJ., concur.

TORBERT, C.J., concurs specially.

TORBERT, Chief Justice, concurring specially:

I agree with the result reached by the majority, but I feel the time has come for this court to recognize that the Alabama Rules of Civil Procedure explicitly, as well as implicitly, abrogate the archaic common law pleading rule that where a joint cause of action is alleged in the complaint a joint cause of action must be proved or the case must be dismissed because of the fatal variance between the pleading and proof.
**Page 677**


The majority of this court rejects the appellants' contention that the trial court committed reversible error by denying appellant B & M Homes' motion for a directed verdict on the ground of variance. The appellants rely on *Jim Walter Corporation v. Gilbert*, 47 Ala. App. 376, 255 So.2d 46 (1971), for the proposition that where a joint cause of action is charged in the complaint, a joint cause of action must be proved and in such a case a judgment can not be rendered against one defendant and not the other. The majority of the court correctly rejects this argument and takes note that:

The cases relied on in the *Jim Walter Corporation* case are all based on the harsh and strict rules of common law pleading. When this court adopted the Alabama Rules of Civil Procedure, it abolished the harsh technicalities of the old forms of pleading. The new rules are to be construed liberally to effect the purpose of the rules.

I agree with the above language, but I want to take the further step of pointing out that Rule 20 ARCP which became effective on July 3, 1973, after the *Jim Walter Corporation* case was released, specifically abrogates this common law rule of variance stated in the *Jim Walter Corporation* opinion:

Rule 20.

Permissive joinder of parties.

(a) Permissive joinder. All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action. All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. A PLAINTIFF OR DEFENDANT NEED NOT BE INTERESTED IN OBTAINING OR DEFENDING AGAINST ALL THE RELIEF DEMANDED. JUDGMENT MAY BE GIVEN FOR ONE OR MORE OF THE PLAINTIFFS ACCORDING TO THEIR RESPECTIVE RIGHTS TO RELIEF, AND AGAINST ONE OR MORE DEFENDANTS ACCORDING TO THEIR RESPECTIVE LIABILITIES. [Emphasis added]

The committee comments to this rule state that the purpose of the rule is to "prevent a multiplicity of suits, and expedite the final determination of litigation by inclusion in one suit of all parties directly interested in the controversy despite technical objections previously existing in many situations." See also *Hooper v. Huey*, 293 Ala. 63, 300 So.2d 100 (1974). It is obvious that this variance rule, by requiring a joint cause of action to be proved where a joint cause is alleged in the complaint or the entire action dismissed, encourages multiplicity of suits and is one of the "technical objections previously existing" which this rule was intended to abrogate.

ON REHEARING   EMBRY, Justice.

The original opinion is hereby modified by striking the concluding paragraph and substituting therefor the following: For the reasons assigned, the original verdict and judgment of $75,000 are hereby reinstated by the judgment of this court. The trial court in all other respects is hereby affirmed.

APPLICATION FOR REHEARING OVERRULED.

TORBERT, C.J., and BLOODWORTH, FAULKNER and ALMON, JJ., concur.

Documents provided by www.Loislaw.com

Copyright © 2014 CCH Incorporated or its affiliates

# Exhibit C

## Alabama Case Law

GEORGE H. LANIER MEMORIAL HOSP. v. ANDREWS, 901 So.2d 714
(Ala. 2004)

GEORGE H. LANIER MEMORIAL HOSPITAL and Jason Ivey v. Steven
ANDREWS and

Cynthia Shealey.

1021885.

Supreme Court of Alabama.

November 19, 2004.

Appeal from the Chambers Circuit Court, No. CV-97-085, Philip Dale
Segrest, J.
**Page 715**

[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES
ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE
THEY ARE NOT DISPLAYED.]
**Page 716**

[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES
ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE
THEY ARE NOT DISPLAYED.]
**Page 717**

Robert C. (Mike) Brock and Ben C. Wilson of Rushton, Stakely, Johnston &
Garrett, P.A., Montgomery; and Claud E. (Skip) McCoy of Johnson, Caldwell
& McCoy, Lanett, for appellants.

James V. Green, Jr., and Jill T. Karle, Alabaster; and S. Sanford Holliday,

Roanoke, for appellees.

HARWOOD, Justice.

George H. Lanier Memorial Hospital ("the hospital") and Jason Ivey, R.N., appeal from the denial of a renewed motion for a judgment as a matter of law and the denial of their motion for remittitur or, alternatively, for a new trial. A jury found the hospital and Ivey liable for the negligent or wanton removal of the corneas of a deceased minor and awarded $200,000 in compensatory damages. We affirm.

On December 21, 1996, Cynthia Shealey brought her 12-year-old son Steven Shealey to the hospital's emergency room; Steven was suffering from a severe asthma attack. At approximately 6:28 a.m. that morning,[fn1] Steven died as the result of cardiac arrest secondary to the asthma attack.

After Cynthia was notified of Steven's death, nurse Jeani West requested that Cynthia sign various forms; among those forms was a form necessary to release Steven's body to a funeral home, which Cynthia signed at 7:20 a.m. West also asked whether Cynthia would like to donate any of Steven's organs. Ivey, a nurse who had come on duty around 6:45 a.m., was standing nearby and overheard the conversation between West and Cynthia. He testified that Cynthia expressed to West a willingness to donate Steven's organs. Another nurse, Shannon Strength, also saw West and Cynthia talking, but did not hear their discussion. Cynthia testified that when West asked her about organ donation, she simply stated that it "really didn't matter."

West began searching for an organ-donation consent form, and because she could not immediately find the form, she led Cynthia to a nearby room, known as the "quiet room," where Cynthia waited for West to return. After approximately 20 minutes, Cynthia left the quiet room, informed West that she was leaving the hospital, and departed. Shortly thereafter, West's shift ended. At this time, Ivey took over as the charge nurse.

Unaware that Cynthia had left the hospital, Ivey took an organ-donation consent form to the quiet room for Cynthia's signature. Discovering that Cynthia had left the hospital, Ivey proceeded on the assumption that Cynthia desired to donate Steven's organs, although Ivey did not regard

**Page 718**

Cynthia's earlier statements as unequivocally manifesting consent.

Ivey telephoned the Alabama Organ Center, representing that Steven was "a

Documents provided by www.Loislaw.com

potential donor." The Alabama Organ Center notified Ivey that Steven did not qualify for organ donation and suggested that Ivey telephone the Alabama Eye Bank ("the Eye Bank").

Ivey directed Strength to telephone the Eye Bank, which she did. Strength left a message with the Eye Bank's answering service. Shortly thereafter, at approximately 9:00 a.m., Paul Cau, an employee of the Eye Bank, telephoned the hospital and spoke with Ivey. Ivey informed Cau that the hospital had "a possible [cornea] donor" and that he was in the process of obtaining telephone consent for the organ donation. After some discussion, the two determined that the consent form the hospital had on file for the Eye Bank was outdated. Cau faxed an updated form to the hospital, directed to Ivey's attention.

While these events were occurring at the hospital, Cynthia drove to the home of Steven's father, Steven Andrews, to inform him of their son's death.[fn2] She arrived at Andrews's house around 8:00 a.m. She informed Andrews of Steven's death, and some 30 minutes later, when he prepared to go to the hospital, she left for her house. Cynthia arrived at her house, which was approximately a 15-minute drive from Andrews's house, at roughly 9:00 a.m. Andrews, meanwhile, left for the hospital, where he arrived around 9:00 a.m.

At the hospital, between 9:00 a.m. and 9:20 a.m., Ivey received the faxed copy of the updated consent form from Cau at the Eye Bank. Ivey located Strength and brought her to the nurse's station to secure telephonic consent from Cynthia. Ivey dialed the number given by Cynthia, which was actually the telephone number of Cynthia's neighbor in her apartment complex. The neighbor answered the telephone and summoned Cynthia to the telephone.

When Cynthia was on the line, Ivey began to talk to her about organ donation. He asked her the questions on the Eye Bank consent form; Cynthia answered each question, and Ivey noted her response. At this point, Strength joined the conversation on another telephone so that Cynthia, Ivey, and Strength were simultaneously on the same line. Ivey then told Cynthia that if she desired to donate Steven's organs, she needed to state the words, "I give permission for Steven Shealey to be an organ donor."

According to both Ivey and Strength, Cynthia repeated that statement or a statement of substantially similar import, thereby consenting to donate Steven's organs. Further, both Ivey and Strength testified that no mention of Andrews was made during that telephone conversation, either by them or by Cynthia. Rather, they each testified, Andrews arrived after Cynthia

Documents provided by www.Loislaw.com

had consented to donation. Ivey testified that he personally informed Andrews of Cynthia's consent and requested Andrews's signature on the consent form so that the hospital would have in-person consent. Ivey further testified that Andrews immediately handed back the consent form and told Ivey, "I don't want to deal with this right now."

Cynthia and Andrews's account of events is very different. Andrews testified that when Ivey asked him for his consent, he immediately handed the consent form back and responded simply, "No." Cynthia

**Page 719**

testified that she received the telephone call from the hospital after Andrews had been approached for consent. She said that when she talked with Ivey, she answered Ivey's preliminary questions, but that when he asked for her consent, her response was that "it still really didn't matter." Additionally, Cynthia testified that Ivey sought her help in changing Andrews's mind about consenting to the donation of Steven's corneas. According to Cynthia, her response to Ivey was that if Andrews had said no to organ donation, her answer was also no.

Around 9:20 that morning, Cau at the Eye Bank telephoned the hospital. He spoke with Ivey, who informed him that Cynthia had given her telephonic consent to the donation of Steven's corneas. Around 9:30 a.m., Cau left the Eye Bank in Montgomery and traveled to the hospital. He arrived around 11:00 a.m., and at approximately 11:45 a.m., he removed Steven's corneas.

Cynthia and Andrews filed this action in the Chambers Circuit Court against the hospital, Ivey, and Strength, alleging several different theories of tort liability. The first time the case was tried, the jury awarded Cynthia and Andrews damages. This Court reversed the judgment and remanded the cause for a new trial based on the determination that the trial court's instruction to the jury, taken from a criminal statute concerning the treatment of corpses, was prejudicial to the defendants. *George H. Lanier Mem'l Hosp. v. Andrews*, 809 So.2d 802 (Ala. 2001).

On remand, Cynthia and Andrews relied only on the count alleging negligence/wantonness. At the close of all evidence at the second trial, the hospital, Ivey, and Strength moved for judgment as a matter of law ("JML"), which motion the trial court denied. The court then instructed the jury; among the instructions given was a statement that the law allowed only four methods by which consent to donate organs could be effectuated.

The jury rendered a verdict in favor of Strength but finding the hospital and

Ivey (hereinafter "the defendants") liable and awarding Cynthia and Andrews $100,000 each. The defendants renewed their motion for a JML, and, alternatively, filed a motion for a remittitur or for a new trial. The trial court allowed those motions to be denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P. The hospital and Ivey appeal.

*Standard of Review*   "'When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used  initially in granting or denying the motion. *Palm  Harbor Homes, Inc. v. Crawford*, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate  issue is whether the nonmovant has presented  sufficient evidence to allow the case or issue to be submitted to the jury for a factual resolution. *Carter v. Henderson*, 598 So.2d 1350 (Ala. 1992). In  an action filed after June 11, 1987, the nonmovant  must present substantial evidence to withstand a JML. See § 12-21-12, Ala. Code 1975; *West v. Founders Life  Assurance Co. of Florida*, 547 So.2d 870, 871 (Ala.  1989). A reviewing court must determine whether the  party who bears the burden of proof has produced  substantial evidence creating a factual dispute  requiring resolution by the jury. *Carter*,  598 So.2d at 1353. In reviewing a ruling on a motion for a JML,  this Court views the evidence in the light most  favorable to the nonmovant and entertains such  reasonable inferences as the jury would have been  free to draw. *Id*. If the question is one of law,  this Court
**Page 720**
indulges no presumption of correctness as to the  trial court's ruling. *Ricwil, Inc. v. S.L. Pappas &  Co.*, 599 So.2d 1126 (Ala. 1992).'

"*Ex parte Alfa Mut. Fire Ins. Co.*, 742 So.2d 1237,  1240 (Ala. 1999)."

*Alabama Dep't of Transp. v. Land Energy, Ltd.*, 886 So.2d 787, 791-92 (Ala. 2004).

In reviewing jury instructions, we must keep in mind that

"'"[a] party is entitled to proper jury instructions  regarding the issues presented, and an incorrect or  misleading charge may be the basis for the granting  of a new trial."' *King v. W.A. Brown & Sons, Inc.*,  585 So.2d 10, 12 (Ala. 1991) (citation omitted). When  an objection to a jury charge has been properly  preserved for review on appeal, as this one was, we  '"look to the entirety of the [jury] charge to see if  there was reversible error,"' and reversal is  warranted only if the error is prejudicial. *King*,  585 So.2d at 12."

*Andrews*, 809 So.2d at 806.

*I. Applicable Law*  The defendants' first argument on appeal is that they were entitled to judgment as a matter of law because, they say, Cynthia and Andrews failed to present substantial evidence indicating that either the hospital or Ivey had breached any applicable duty of care. Specifically, the defendants argue that the Alabama Medical Liability Act, Ala. Code 1975, §§ 6-5-480 to -488, as supplemented by Ala. Code 1975, §§ 6-5-540 to -552 ("the AMLA"), governs their conduct and imposes the applicable standard of care. They further argue that Cynthia and Andrews have failed to present any evidence whatsoever indicating that the defendants violated this standard of care. Cynthia and Andrews counter that the AMLA does not apply because neither of them was in a patient-provider relationship with the hospital or Ivey.

The AMLA governs medical-malpractice actions in Alabama. *Mock v. Allen,* 783 So.2d 828, 832 (Ala. 2000). Its purpose is, among other things, to impose a duty upon health-care providers "to exercise such reasonable care, diligence and skill" as other health-care providers in the same general line of practice. Ala. Code 1975, § 6-5-484; see also § 6-5-548(a). The AMLA applies "[i]n any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care." Ala. Code 1975, § 6-5-548(a). The AMLA includes within the definition of a health-care provider "[a] . . . hospital□ or other health care provider as [that term is] defined in Section 6-5-481." Ala. Code 1975, § 6-5-542. Section 6-5-481, in turn, includes within the definition of "other health care provider" a "person employed by . . . hospitals who [is] directly involved in the delivery of health care services."

Application of the AMLA, however, is limited to fewer situations than those broad definitions may suggest. First, Ala. Code 1975, § 6-5-484(a), requires physicians, surgeons, and dentists to exercise a duty of care "to the patient," and requires a hospital to exercise its duty of care in "rendering services to a patient." Additionally, this Court has narrowly interpreted certain aspects of the AMLA. We have held that the AMLA does not apply to all injuries caused by health-care providers, but only to "medical injuries." *Taylor v. Smith,* 892 So.2d 887, 893 (Ala. 2004). In addition, we have interpreted § 6-5-484(a) to limit a health-care provider's duty. In *Thomasson v. Diethelm,* 457 So.2d 397 (Ala. 1984), Thomasson, a respiratory therapist, treated a patient, unaware that the patient suffered from hepatitis. As a result of her exposure to the patient, Thomasson

**Page 721**

contracted hepatitis. She brought an action under the AMLA against the patient's doctors, alleging that they had a duty to warn her that the patient had

Documents provided by www.Lolslaw.com

hepatitis. We examined § 6-5-484(a) and concluded that the statute intended to impose liability only in a doctor-patient and/or hospital-patient relationship. Consequently, we held that the AMLA did not apply to Thomasson's action against the doctors because she was not a patient. *Thomasson*, 457 So.2d at 399.

In 1987, the Legislature supplemented the original Alabama Medical Liability Act with the Alabama Medical Liability Act of 1987, Ala. Code 1975, §§ 6-5-540 to -552. The AMLA as supplemented effected major changes to the original act, such as raising the burden of proof from a scintilla to substantial evidence, Ala. Code 1975, § 6-5-548(a); explicitly defining the applicable standard of care to be provided by health-care providers, Ala. Code 1975, § 6-5-542(2); and limiting testimony defining the applicable standard of care to that offered by "similarly situated" health-care providers, Ala. Code 1975, § 6-5-548(e). However, the statute that actually imposes the duty of care remains Ala. Code 1975, § 6-5-484. *Breaux v. Thurston*, 888 So.2d 1208, 1213 (Ala. 2003); *Wells v. Storey*, 792 So.2d 1034, 1037 (Ala. 1999).

Consequently, the standard of care in the AMLA continues to dictate that a health-care provider must offer reasonable care, skill, and diligence "to a patient." In this case, it is plain that the complained-of actions were not performed in the course of providing health-care services to a patient. Furthermore, common sense dictates that a health-care provider cannot inflict a "medical injury" upon a person who is already deceased. For these reasons, we hold that the AMLA does not apply to a health-care provider's actions in dealing with a deceased person, even when the deceased was a patient up until his death.

Because the AMLA does not apply to the defendants' conduct in their contacts with Cynthia and with Andrews, the trial court did not err in denying the defendants' renewed motion for a JML on this ground.

*II. Defendants' Duty*   The defendants have additionally argued that they were entitled to a JML because they acted in good faith under the Lifesaving Organ Procurement Act, Ala. Code 1975, §§ 22-19-140 to -144 ("the LOPA"), in arranging for the procurement of Steven's corneas. Cynthia and Andrews argue, however, that because they expressly withheld consent to the donation of Steven's corneas, it was not possible for the defendants to have acted in good faith.

In 1986, the Legislature enacted the LOPA. There is no dispute that a cornea, being tissue, is included within the definition of an organ in the LOPA. Ala.

Documents provided by www.loislaw.com

Code 1975, § 22-19-141(1). Section 22-19-142(a) provides, in pertinent part:

"When death occurs in a hospital to a patient who has  not made an anatomical gift to take effect upon  death, the hospital administrator, or designated representative, *shall request [either parent]* . . ., in the absence of actual notice of contrary  indication by the decedent . . ., *to consent* to the  gift of organs of the decedent's body as an  anatomical gift."

(Emphasis added.)

Subsections (c) and (d) of § 22-19-142 provide exceptions to the requirement that such a request be made. Although inapplicable here, these subsections relieve a hospital administrator or designated representative from the duty to request donation of an organ, either because no organ would be suitable for donation or because of other factors that lead the attending

**Page 722**

physician to conclude that no request for donation should be made.

Section 22-19-143 provides:

"A person who acts in good faith in accord with the  terms of this article or with the anatomical gift  laws of this state, or another state, or a foreign  country shall not be liable for damages in any civil  action. . . ."

This Court has defined "good faith" as an "'honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage.'" *Andrews v. Alabama Eye Bank*, 727 So.2d 62, 65 (Ala. 1999) (quoting *Nicoletta v. Rochester Eye & Human Parts Bank, Inc.*, 136 Misc.2d 1065, 519 N.Y.S.2d 928 (Sup.Ct. 1987)). Presumably, the good-faith exception absolves hospital administrators or other designated representatives from liability for failing to request donation when they believe that one of the exceptions enumerated in § 22-19-142(c) or (d) applies.

Ivey argues that § 22-19-143 offers him good-faith immunity because, he says, he acted on an honest belief that Cynthia had consented to donating Steven's corneas. We agree that Ivey complied with the LOPA, regardless of the good-faith-immunity provision. However, we reach that conclusion because we take a narrow view of the requirements of the LOPA. It is clear from looking to the statute in search of its plain meaning that the LOPA imposes only one duty upon a hospital administrator or its designated representative: the duty of inquiry. The LOPA imposes no duty upon the inquirer or the institution to actually follow through and implement the instructions of the parties from

whom consent is requested. "It is true that looking at a statute we might sometimes think that the ramifications of the words are inefficient or unusual. However, it is our job to say what the law is, not to say what it should be." *DeKalb County LP Gas Co. v. Suburban Gas, Inc.*, 729 So.2d 270, 276 (Ala. 1998). Consequently, once Ivey requested consent from Cynthia, he had technically fulfilled the mandate of the LOPA.

This determination, however, does not end the inquiry. Ivey's complete fulfillment of the discrete duty imposed by the LOPA does not necessarily mean that he fulfilled all applicable duties of care. Under our standard of review of a ruling on a motion for a JML, we are compelled to view the facts in the light most favorable to Cynthia and Andrews, as the nonmovants, and to draw from those facts every reasonable inference. *Carter v. Henderson*, 598 So.2d 1350 (Ala. 1992). Although the time frame of the events here is compatible with the testimony of both parties, so that either party's story is independently plausible, we must view the facts in a light most favorable to the nonmovants. We thus must conclude that the following events occurred in the following order. Andrews arrived at the hospital before the nurses telephoned Cynthia seeking her consent. When Ivey asked Andrews for consent to donate, Andrews told Ivey, "No." After this encounter, Ivey and Strength telephoned Cynthia, who in response to their question as to whether she would consent to donate Steven's organs initially said that it did not matter, but who, when pressed for a more definite answer, replied that if Andrews refused to consent then she also refused to consent. Ultimately, we must view both Cynthia's and Andrews's acts as refusing consent to donate any of Steven's organs, including his corneas. After fulfilling his duty under the LOPA to request consent, Ivey voluntarily undertook to serve as an intermediary, attempting to obtain consent for the Eye Bank.
**Page 723**

Since at least 1911, Alabama has recognized a duty to "'exercise the measure of care and skill appropriate'" to all voluntary undertakings. *Beasley v. MacDonald Eng'g Co.*, 287 Ala. 189, 193, 249 So.2d 844, 846 (1971) (quoting *H.H. Parker & Bro. v. Hodgson*, 172 Ala. 632, 635, 55 So. 818, 819 (1911)). This is the duty the defendants owed Cynthia and Andrews. The defendants' act of arranging for procurement went beyond the reach of the LOPA, and all other statutory guidelines, placing the defendants squarely within the realm of the common law. See *Williams v. Hill*, 658 So.2d 381, 383 (Ala. 1995) ("Because we find that there was no statutory cause of action, we now consider whether there could be an action under the common law. . . .").

Because we must treat both Cynthia and Andrews as having withheld consent to donate Steven's corneas, we hold that the defendants' actions in representing that Cynthia had consented and in allowing the Eye Bank to procure Steven's corneas was a breach of their duty. Thus Ivey, and derivatively, the hospital, have not shown that they are entitled to good-faith immunity. Given that the defendants essentially concede causation and some resulting damages, the trial court did not err in denying their renewed motion for a JML on this issue.

*III. Jury Instructions*    The defendants next present two arguments concerning the trial court's jury instructions. First, they argue that they are entitled to a new trial because the trial court refused to instruct the jury as to the applicability of the LOPA. Second, they argue that the court erred in instructing the jury on the available methods by which to record a consent to donate.

*A. LOPA Instruction*    At trial, the hospital, Ivey, and Strength presented to the trial court requested jury instruction numbers 27, 28, and 29, which were drawn from the LOPA but which the trial court declined to give. Although instruction number 29 is not in issue on appeal, the defendants complain of the denial of the other two requested instructions. Requested instruction number 27 consisted of the language of Ala. Code 1975, § 22-19-142(a); requested instruction number 28 consisted of the language of Ala. Code 1975, § 22-19-140(a). The record reflects that before closing arguments counsel for the hospital, Ivey, and Strength stated to the court, "We do have defendants' charges 27, 28 and 29 that we would like to file with the Court at this point in time." The trial court responded to explain how it proposed to cover the subject matter in its oral charge, and no further comments were addressed to those proposed charges at that time.

After the trial court instructed the jury, the hospital, Ivey, and Strength purported to "renew" an objection to the trial court's failure to give instructions 27 and 28, although they were in fact objecting for the first time. The defense stated:

"Finally, the defense renews objection to the Court's refusal to give charges 27 through 29, which are, again, based on the [LOPA] and the legislative intent underlying [the LOPA]. We believe [they] are correct and applicable charges."

The trial court noted and overruled the objection by the hospital, Ivey, and Strength.

Documents provided by www.Loislaw.com

"`"The ground that a jury instruction is a correct statement of law is insufficient to preserve an objection to the trial court's refusal to give the instruction."'" *Vaughan v. Oliver*, 822 So.2d 1163, 1177 (Ala. 2001) (quoting *Ex parte R.D.W.*, 773 So.2d 426, 429 n. 3 (Ala. 2000) (quoting in turn *Knight v. State*,

**Page 724**

710 So.2d 511, 513 (Ala.Crim.App. 1997))). The objection made by the hospital, Ivey, and Strength that their requested instructions were "correct" failed to preserve the objection. Further, the additional statement that the charges were applicable "suffers the same lack of particularity" as the statement regarding the correctness of the instructions. *Vaughan*, 822 So.2d at 1177. Consequently, this ground of objection has not been properly preserved for appeal.

   *B. Instruction Regarding Telephonic Consent*   The defendants also argue that Cynthia and Andrews presented only one issue before the jury: whether Cynthia actually consented to the donation of Steven's corneas. They argue that the jury should not have been called on to consider whether Cynthia's consent, if given, was in the proper form. The defendants argue that Cynthia and Andrews distanced themselves from the issue whether consent was in the correct form and argued that the dispositive issue was whether Cynthia actually did consent.

   At trial, after the plaintiffs had rested their case, the hospital, Ivey, and Strength moved for a JML. In responding to this motion, Stanford Holliday, one of the counsel for the plaintiffs, stated:

   "Judge, we want the record clear, please, sir, that this case boils down to the issue of whether or not Cynthia Shealey and Steven Andrews gave any consent for organ donation, not whether or not it was verbal and was it recorded properly. . . . We don't want this case to ever be reviewed on the issue of whether or not verbal consent is adequate."

   Based on this comment, defense counsel suggested that Cynthia and Andrews stipulate that the "witnessed telephone consent [was] adequate if given." The parties did not agree to such a stipulation, however, and the court did not order such a stipulation. Consequently, the hospital, Ivey, and Strength proceeded to call and ask witnesses on direct examination whether Ivey and Strength obtained consent in the proper fashion.

   During closing arguments, in the plaintiffs' rebuttal, they again stated, "We are not arguing if phone consent is okay, because they didn't consent by phone or otherwise." Intermittently in closing arguments, however, the plaintiffs implied

Documents Provided by www.Loislaw.com

that the method of obtaining consent was indeed an issue before the jury.

Before the trial court instructed the jury, defense counsel referred to the statement in the plaintiffs' closing arguments and requested the court to "change the jury charge to reflect that stipulation as opposed to giving them the options of which type of the various ways that consent could be taken." Plaintiffs' counsel responded, "[Y]ou can argue the facts any way you want to and it is up to the jury to decide." The trial court denied the motion of the hospital, Ivey, and Strength and stated that it would be listing "four statutory possibilities for consent," stating that the jury should determine the "factual issue."

The trial court then instructed the jury as follows:

"Under the law, as it applies to this case, either parent may give all or any part of the decedent child's body. . . . *Any gift by a parent shall be made* by, one, a document signed by the parent; two, by the parent's telegraphic message; three, *by the parent's recorded telephonic message;* or four, by the parent's other recorded message."

(Emphasis added.)

The defendants argue that by the previous statements made by Cynthia and Andrews's counsel, they removed from consideration

**Page 725**

the issue whether consent was obtained in the proper manner. They contend that Cynthia and Andrews effectively stipulated that whether consent was given — not the manner in which it was given — was the sole issue, and that the jury should not have been called upon to consider the technical aspects of how such consent could be obtained. Further, the argument goes, the trial court's instructions, in specifying limited methods by which the defendants could obtain consent, inserted into the case an issue not "germane" to the case.

The issue we confront is whether the plaintiffs' statements before both the trial court and the jury constituted a stipulation or a concession of the issue. We have explained that one must make a "distinct, formal solemn admission made for the express purpose of relieving [the opposing party] from establishing" an element of his claim or defense. *Cook v. Morton,* 254 Ala. 112, 116, 47 So.2d 471, 475 (1950). However, this Court has also found that where defense counsel in a criminal trial concedes that his client has previously been convicted of a crime, an element of the crime for which he is currently on trial, this admission "relieved the State from the burden of proving any of the matters that ordinarily would attend establishing the prior conviction." *Donahay v. State,* 287 Ala. 716,

718, 255 So.2d 599, 601 (1971). The Court of Criminal Appeals has discussed these two cases and their correlation, holding that, as a general rule, such admissions must be "distinct, formal, and unequivocal acts which rise to the level of an admission." *Johnson v. State*, 508 So.2d 1192, 1195 (Ala.Crim.App. 1986).

On the record before us, we simply cannot conclude that Cynthia and Andrews's counsel made such a "distinct, formal, and unequivocal act" that could constitute an admission. Cynthia and Andrews did not expressly stipulate that only the issue of whether consent was given would be litigated. Rather, counsel for Cynthia and Andrews would suggest in one moment that the manner of consent was irrelevant, yet, moments later, suggest that consent had been improperly obtained. Because Cynthia and Andrews's actions simply did not rise to the level of an admission, the trial court could properly regard the issue as germane; thus it did not err to reversal in denying the defendants' motion for a new trial on this ground.

*IV. Excessiveness of Compensatory Damages*   The defendants' final argument is that the jury verdict of $200,000 was excessive. They argue that the award was entirely attributable to damages for mental anguish, and they contend that insufficient evidence was presented at trial to support such a verdict.

It is well settled that a plaintiff may recover compensatory damages for mental anguish, even when mental anguish is the only injury visited upon the plaintiff. *Kmart v. Kyles*, 723 So.2d 572, 578 (Ala. 1998); *Alabama Power Co. v. Harmon*, 483 So.2d 386, 389 (Ala. 1986). Once the plaintiff has presented some evidence of mental anguish, the question whether he should recover for such mental anguish, and, if so, how much, is a question reserved for the jury. *National Ins. Assoc. v. Sockwell*, 829 So.2d 111, 133 (Ala. 2002); *Kmart*, 723 So.2d at 578. This Court views the evidence of mental anguish claimed by each plaintiff to determine if that particular person should recover; one plaintiff's mental anguish cannot bootstrap the awarding of damages to the other plaintiff or plaintiffs. *Alabama Power Co. v. Murray*, 751 So.2d 494, 500-01 (Ala. 1999). A jury's verdict is presumed correct, and that presumption is strengthened
**Page 726**
upon the trial court's denial of a motion for new trial. 751 So.2d at 500-01. On the other hand, that presumption is weakened and we strictly scrutinize such a verdict when a plaintiff who claims damages solely for mental anguish fails to offer his own testimony of the mental anguish he has suffered. *Sockwell*, 829 So.2d at 133-34; *Kmart*, 723 So.2d at 578.

Documents provided by www.loislaw.com

Despite our great deference to the jury's award of compensatory damages for mental anguish, we have not hesitated to remit such damages where the plaintiff has produced little or no evidence indicating that he has suffered such mental anguish. *Orkin Exterminating Co. v. Jeter*, 832 So.2d 25, 36-37 (Ala. 2001). The inquiry is not whether traumatic events have occurred, but whether the plaintiff has actually suffered as a result of those events. 832 So.2d at 37. When a plaintiff's testimony amounts to little more than the obvious notion that dealing with the traumatic event was "hard" or "humiliating," we have consistently remitted damages. *Delchamps, Inc. v. Bryant*, 738 So.2d 824, 837 (Ala. 1999). Additionally, when a plaintiff testifies merely that he suffered "a lot" of mental anguish, we have similarly remitted damages. *Oliver v. Towns*, 770 So.2d 1059, 1061 (Ala. 2000); *Foster v. Life Ins. Co. of Georgia*, 656 So.2d 333, 336-37 (Ala. 1994).

In the case before us, however, the record is replete with testimony of the plaintiffs' mental anguish. Cynthia testified that the removal of Steven's corneas "has affected us a whole lot" and proceeded to state that she felt like someone had taken advantage of her. She testified to having dreams of Steven, yet she never sees his face anymore. In addition to her personal testimony, Dr. Kenneth Wade, her counselor, testified that the taking of Steven's corneas "greatly compound[ed] . . . the difficulty of [Cynthia's] work at recovering" from Steven's death.

Andrews testified that thinking about the removal of Steven's corneas made him both angry and depressed. He felt that his depression over the cornea removal was separate from his depression over the loss of his son. Although Andrews was "glad" that two individuals were able to see as a result of the donation of Steven's corneas, that emotion did not negate or diminish his depression caused by the removal of Steven's corneas. Most striking is Andrews's testimony that he had a recurring dream that Steven sat up in his casket at the funeral, crying tears of blood. He testified that in his other recurring dream he finds himself in a hospital, where he "runs off" several doctors to find Steven on "the table." That testimony is also strong evidence of mental anguish.

With regard to both Cynthia and Andrews, we believe that the jury had enough evidence before it to award $100,000 in compensatory damages to each. We hold that each plaintiff presented substantial evidence that he or she suffered mental anguish. The fact that the trial court denied the defendants' motion for a new trial further strengthens the presumption of correctness we afford the jury's verdict. Consequently, the trial court did not err in denying the defendants' motion for remittitur and its alternative motion for a new trial.

*Conclusion*   The trial court did not err in denying the defendants' renewed motion for a JML. The trial court also did not err in denying either the motion for a remittitur or the motion for a new trial.

AFFIRMED.

NABERS, C.J., and JOHNSTONE and STUART, JJ., concur.
**Page 727**

SEE, J., concurs specially.

BROWN, J., recuses herself.

[fn1] The hospital is located in Valley, Alabama, on the Alabama-Georgia border. The hospital, as well as many other locations in and around Valley, Alabama, considers itself to be in the eastern time zone. Consequently, all pertinent times will be stated according to eastern standard time.

[fn2] The telephone at Andrews's home had malfunctioned, and Andrews could not be reached by telephone, neither when Cynthia first took Steven to the hospital nor after Steven's death when Cynthia attempted to telephone Andrews from the hospital.

SEE, Justice (concurring specially).

I fully concur in the main opinion. I write only to clarify why I believe that the Alabama Medical Liability Act, Ala. Code 1975, § 6-5-480 et seq., as supplemented by § 6-5-540 et seq. ("the AMLA"), does not apply to this case.

The AMLA provides that "[a] breach of the standard of care is the failure by a health care provider to comply with the standard of care, which failure proximately causes personal injury or wrongful death." § 6-5-542(2), Ala. Code 1975. A person who is already dead cannot sustain a personal injury or be wrongfully killed. *See Bauer v. North Fulton Med. Ctr., Inc.*, 241 Ga.App. 568, 527 S.E.2d 240 (1999); *State v. Yoder*, 200 Wis.2d 463, 546 N.W.2d 575 (Ct.App. 1996).[fn3] Because a medical procedure performed on a person who

Documents provided by www.Loislaw.com

is already dead cannot "proximately cause☐ [the] personal injury or wrongful death" of that person, the performance of such a procedure on a person who is already dead cannot be a breach of the standard of care under the AMLA.

An individual who has "sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead." § 22-31-1, Ala. Code 1975. In the case before us, Steven Shealey was pronounced dead at 6:48 a.m., eastern standard time, after a severe asthma attack. There is no suggestion that Steven Shealey was still alive at the time of the procedure, nor is there any suggestion that the cornea procedure was related to any effort to keep him alive, to revive him, or to complete a medical procedure undertaken in such an effort or necessitated by it. The alleged injury therefore arose from a medical procedure performed on the already deceased Steven Shealey.

Because the AMLA governs claims involving personal injury or death, the standard of care found in the AMLA is not the appropriate standard of care in the case before us.

[fn3] I also note that "Section 6-5-462 does not permit the filing of a personal-injury claim on behalf of a person after he or she is dead." *Bassie v. Obstetrics & Gynecology Assocs. of Northwest Alabama, P.C.*, 828 So.2d 280, 283 (Ala. 2002); *see also* § 6-5-462, Ala. Code 1975.

---

Copyright © 2014 CCH Incorporated or its affiliates

# Exhibit D

Documents provided by www.loislaw.com

# Alabama Statutes

📁 **Alabama Statutes**

**TITLE 6. CIVIL PRACTICE.**

📁 **CHAPTER 11. DAMAGES.**

📁 **ARTICLE 2. PUNITIVE DAMAGES.**

### § 6-11-20. Punitive damages not to be awarded other than where clear and convincing evidence proven; definitions.

(a) Punitive damages may not be awarded in any civil action, except civil actions for wrongful death pursuant to Sections 6-5-391 and 6-5-410, other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff. Nothing contained in this article is to be construed as creating any claim for punitive damages which is not now present under the law of the State of Alabama.

(b) As used in this article, the following definitions shall apply:

(1) FRAUD. An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury.

(2) MALICE. The intentional doing of a wrongful act without just cause or excuse, either:

a. With an intent to injure the person or property of another person or entity, or

b. Under such circumstances that the law will imply an evil intent.

Documents provided by www.Loislaw.com

(3) WANTONNESS. Conduct which is carried on with a reckless or conscious disregard of the rights or safety of others.

(4) CLEAR AND CONVINCING EVIDENCE. Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.

(5) OPPRESSION. Subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights.

(Acts 1987, No. 87-185, p. 251, § 1.)

---

Copyright © 2014 CCH Incorporated or its affiliates