Hearing Date: February 11, 2015 at 10:00 A.M. (ET)

MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Norman S. Rosenbaum
Jordan A. Wishnew
Jessica J. Arett

*Counsel for the ResCap Borrower Claims Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |

---------------------------------------------------------------

**RESCAP BORROWER CLAIMS TRUST'S OMNIBUS REPLY IN SUPPORT OF ITS
EIGHTIETH OMNIBUS OBJECTION TO CLAIMS (NO-LIABILITY BORROWER
CLAIMS) AS TO CLAIM NOS. 345, 1533, 1660, AND 3743**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND ...............................................................................................2

    A.    Burnett Claims ......................................................................3

    B.    Sullivan Claim .......................................................................7

    C.    Johnson Claim .......................................................................9

REPLY ..........................................................................................................15

    D.    Burnett Claims ....................................................................16

    E.    Sullivan Claim .....................................................................21

    F.    Johnson Claim .....................................................................21

CONCLUSION ...............................................................................................25

EXHIBITS

Exhibit 1        Supplemental Declaration

ny-1172294

# TABLE OF AUTHORITIES

Page(s)

CASES

Feinberg v. Bank of N.Y. (In re Feinberg),
    442 B.R. 215 (Bankr. S.D.N.Y. 2010) ...................................................................15

Ikelionwu v. United States,
    150 F.3d 233 (2d Cir. 1998) ...........................................................................18, 19

In re Adelphia Commc'ns Corp.,
    Case No. 02-41729 (REG), 2007 Bankr. LEXIS 660 (Bankr. S.D.N.Y. Feb. 20, 2007) ........15

In re Allegheny Int'l, Inc.,
    954 F.2d 167 (3d Cir. 1992) ...........................................................................15

In re Asia Global Crossing, Ltd.,
    324 B.R. 503 (Bankr. S.D.N.Y. 2005) ...................................................................17

Integrated Res., Inc. v. Ameritrust Co., N.A. (In re Integrated Res., Inc.),
    157 B.R. 66 (S.D.N.Y. 1993) ...........................................................................17

Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.),
    419 F.3d 115 (2d Cir. 2005) ...........................................................................17

In re Oneida Ltd.,
    400 B.R. 384 (Bankr. S.D.N.Y. 2009) ...................................................................15

In re Residential Capital, LLC,
    507 B.R. 477 (Bankr. S.D.N.Y. 2014) ...................................................................15

In re Rockefeller Ctr. Props.,
    272 B.R. 524 (Bankr. S.D.N.Y. 2000) ...................................................................15

Tapia v. U.S. Bank, N.A.,
    718 F. Supp. 2d 689 (E.D. Va. 2010) ...................................................................20

STATUTES

11 U.S.C. § 502(a) .............................................................................................15

11 U.S.C. § 502(b)(1) ..........................................................................................15

12 U.S.C. § 2605(f) ............................................................................................19

12 U.S.C. § 2614 ..............................................................................................19

VA. CODE ANN. §§ 55-59.1 through 55-59.4 .........................................................................20

ii

**OTHER AUTHORITIES**

U.S. Securities and Exchange Commission, *available at* http://www.sec.gov/cgi-
bin/browse-edgar?action=getcompany&CIK=0001359592&owner=exclude&
count=40&hidefilings=0 (last visited Feb. 4, 2015)..............................................................16

The ResCap Borrower Claims Trust (the "Borrower Trust"), established pursuant to the terms of the Plan[1] filed in the above-captioned Chapter 11 Cases, as successor in interest to the above-captioned Debtors with respect to Borrower Claims, by and through its undersigned counsel, hereby submits this reply (the "Reply") and the Supplemental Declaration of Kathy Priore, Associate Counsel to the ResCap Liquidating Trust (the "Supplemental Declaration"), annexed hereto as Exhibit 1, to the responses filed by: (i) Conrad P. Burnett ("Mr. Burnett") [Docket No. 7938][2] (the "Burnett Response"), (ii) Leslie G. Sullivan ("Mr. Sullivan") [Docket No. 7955] (the "Sullivan Response"), and (iii) Nikki Johnson ("Ms. Johnson" and collectively with Mr. Burnett and Mr. Sullivan, the "Respondents") [Docket No. 8023] (the "Johnson Response" and collectively with the Burnett Response and the Sullivan Response, the "Responses") to the *ResCap Borrower Claims Trust's Eightieth Omnibus Objection to Claims (No Liability Borrower Claims)* [Docket No. 7922] (the "Objection") and in further support of the Objection. The Borrower Trust respectfully states as follows:

## PRELIMINARY STATEMENT

1.    The Borrower Trust examined the Responses and the statements submitted in support thereof. For purposes of this Reply and the Objection, the Borrower Trust takes these statements at face value. If the Court is not prepared to rule on the Objection with respect to Respondents, then the Borrower Trust reserves the right to take discovery from the Respondents.

2.    As described herein and in the Supplemental Declaration, the Borrower Trust thoroughly examined the Debtors' books and records that were prepared and kept in the course of their regularly conducted business activities (the "Books and Records") in an effort to

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Objection.

[2] On January 28, 2015, Mr. Burnett filed an *Affidavit of David M. Petrovich in Support of Creditor Conrad P. Burnett's Reply to Liquidating Trust's 80th Omnibus Objection* [Docket No. 8036] (the "Petrovich Affidavit"). The Borrower Trust is treating the Petrovich Affidavit as part of the Burnett Response.

validate the accuracy of the allegations made in the Responses and the claims at issue, and for the reasons described herein, the Books and Records do not show any liability due and owing to any of the Respondents.

3.  Moreover, as the Objection shifted the burden of proof back to the Respondents, the Respondents must demonstrate a valid claim against the Debtors' estates by a preponderance of the evidence.  For the reasons set forth in the Objection, this Reply, and the Supplemental Declaration, the Respondents have failed to provide any explanation as to why their respective claims are valid and should be allowed against the Debtors' estates.  For example, Mr. Burnett failed to respond to any of the arguments made by the Borrower Trust in the Objection, and his response, which raises entirely new bases for liability that were not including in the Burnett Claims, fails to put forward any evidence of wrongdoing by a debtor entity.  In addition, Mr. Sullivan's allegations that the Debtors were responsible for loss in rental income are not supported by the facts, as the Debtors' records show Mr. Sullivan's loan was properly referred to foreclosure and that his renters stopped paying rent prior to the initiation of any foreclosure proceeding.  Finally, Ms. Johnson's response raises entirely new bases for liability and, except for one incident, fails to provide evidence of any wrongdoing by any Debtor entity.  Therefore, the Respondents have failed to meet their burden of proof, and the relief sought in the Objection should be granted with respect to each of the Respondents.

## **BACKGROUND**

4.  In connection with the claims reconciliation process, the Borrower Trust identified certain claims filed by Borrowers that it believed did not constitute valid liabilities of the Debtors (together, the "No Liability Borrower Clams").  See Supplemental Declaration ¶ 5.

5.  The Debtors sent Request Letters to certain Borrowers, including all of the Respondents, requesting additional documentation in support of the No Liability Borrower

2

Claims.[3]  See Supplemental Declaration ¶ 6.  The Request Letters state that the claimant must respond within 30 days with an explanation that states the legal and factual reasons why the claimant believes he or she is owed money or is entitled to other relief from the Debtors, and the claimant must provide copies of any and all documentation that the claimant believes supports the basis for his or her claim.  The Request Letters further state that if the claimant does not provide the requested explanation and supporting documentation within 30 days, the Debtors may file a formal objection to the claimant's claim, seeking to have the claim disallowed and permanently expunged.  See Supplemental Declaration ¶ 6.

6.      The Debtors received responses to the Request Letters from the Respondents[4]  (the "Diligence Responses"), copies of which are attached to the Supplemental Declaration as Exhibit A.  However, the Diligence Responses fail to allege bases for claims against the Debtors' estates.  Further, as stated in the Objection, the Books and Records do not show any liability due and owing to the Respondents.  See Supplemental Declaration ¶ 7.

### Background Facts

#### A.      Burnett Claims

7.      On or around July 31, 2012, Mr. Burnett filed a proof of claim against Debtor GMAC Mortgage, LLC ("GMACM"), designated as Claim No. 345 asserting a priority claim for $352,000.00.  On November 8, 2012, Mr. Burnett filed another proof of claim against GMACM, designated as Claim No. 3743 (together with Claim No. 345, the "Burnett Claims"), asserting a secured claim for $352,000.00.   See Exhibit B to the Supplemental Declaration; see

---

[3] A Request Letter was sent to Mr. Burnett regarding claim 345 on May 20, 3013 and to Mr. Sullivan, Ms. Johnson, and Mr. Burnett regarding claim 3743 on July 24, 2013.  See Supplemental Declaration n. 3.

[4] The Debtors received a Diligence Response from Mr. Burnett on June 20 and July 24, 2013, from Mr. Sullivan on July 8, 2013, and from Ms. Johnson on July 16, 2013. See Supplemental Declaration n. 4.  The Diligence Response from Mr. Sullivan included medical records, which have been removed from the version of the Reply filed on the court's docket.

also Exhibit A to the proposed order to the Objection ("Exhibit A to the Objection").    The

Burnett Claims each relate to alleged pre-petition conduct involving the same property and loan

account. See Burnett Claims. The basis for the Objection, as further explained in this Reply,

addresses the allegations in both of the Burnett Claims.

8.    According to the Debtors' books and records, non-Debtor Homestead

Funding Corp. ("Homestead") originated a loan to Mr. Burnett on April 10, 2006 (the "Burnett

Loan"), secured by a mortgage on property located at 458 Lakeview Lane, Boyce, VA 22620

(the "Burnett Property").    See Exhibit A to the Objection; see also Burnett Note, attached to the

Supplemental Declaration as Exhibit C, and Burnett Mortgage, attached to the Supplemental

Declaration as Exhibit D.    Debtor Residential Funding Company, LLC ("RFC") purchased the

loan from Homestead and then transferred its interest  on or about May 1, 2006 when the loan

was securitized and Deutsche Bank Trust Company Americas was appointed as Trustee.    See

Exhibit A to the Objection, see also Supplemental Declaration ¶ 9. Debtor Homecomings

Financial ("Homecomings") serviced the loan from May 10, 2006 until servicing transferred to

GMACM on July 1, 2009.  GMACM serviced the loan until the foreclosure on August 19, 2009

and subsequent sale out of REO on December 15, 2010.   See Exhibit A to the Objection.

9.    A substitute trustee's deed was recorded on August 28, 2009 naming

Specialized, Inc. as substitute trustee.  See Substitute of Trustee, attached to the Supplemental

Declaration as Exhibit E.  The substitute trustee was executed with proper authority on behalf of

MERS, as the signatory, Jeffrey Stephan, who had proper authority under a MERS corporate

resolution.   See MERS Corporate Resolution, attached to the Supplemental Declaration as

Exhibit F.

4

10.     On September 4, 2007, the Debtors mailed a breach letter to Mr. Burnett as his account was owing for the July through September 2007 payments.  See Burnett Servicing Notes, attached to the Supplemental Declaration as Exhibit G.  On October 22, 2007, the Debtors spoke to Mr. Burnett and he made a payment over the phone and brought the account current. See id.

11.     On February 27, 2008, the Debtors were notified by Mr. Burnett's bank that a payment made on February 15, 2008 in the amount of $2,650 was being returned for insufficient funds. See Burnett Servicing Notes. The Debtors mailed a letter to Mr. Burnett on February 28, 2008 informing him of the returned payment.  See id.

12.     On April 4, 2008, the Debtors mailed a breach letter to Mr. Burnett, as the account was owing for the February through April 2008 payments.  See Burnett Servicing Notes. On April 16, 2008, Mr. Burnett applied for a loan modification through a HOPE representative. See Supplemental Declaration ¶ 14. On April 18, 2008, the Debtors approved Mr. Burnett for a traditional trial plan (the "April 2008 Trial Plan").  See id. However, on May 13, 2008, the April 2008 Trial Plan was cancelled because Mr. Burnett did not provide the initial payment.  See May 13 Letter, attached to the Supplemental Declaration as Exhibit H.

13.     On June 4, 2008, the Debtors approved Mr. Burnett for another traditional trial plan (the "June 2008 Trial Plan").  See June 2008 Trial Plan, attached to the Supplemental Declaration as Exhibit I. However, the Debtors cancelled the June 2008 Trial Plan on September 17, 2008 because Mr. Burnett did not make the trial payment due July 18, 2008.  See Burnett Servicing Notes.

5

14.     On September 23, 2008, the Debtors referred the Burnett Loan to foreclosure, as it was owing for the March 1, 2008 through September 1, 2008 payments.  <u>See</u> Burnett Servicing Notes.

15.     The Debtors set up a new traditional trial plan on October 17, 2008 and received a signed traditional trial agreement from Mr. Burnett on October 22, 2008 (the "<u>October 2008 Trial Plan</u>").  <u>See</u> October 2008 Trial Plan, attached to the Supplemental Declaration as <u>Exhibit J</u>.  The October 2008 Trial Plan was cancelled on November 24, 2008 due to the Burnett Loan being approved for a permanent traditional modification, as discussed below.  <u>See</u> Burnett Servicing Notes.

16.     On November 24, 2008, the Debtors received a letter from Mr. Burnett dated November 11, 2008 (the "<u>Burnett 2008 Letter</u>").  <u>See</u> Burnett 2008 Letter, attached to the Supplemental Declaration as <u>Exhibit K</u>. However, the Burnett 2008 Letter was incorrectly imaged as a workout package and there was no response sent to Mr. Burnett.  <u>See</u> Burnett Servicing Notes.

17.     On December 8, 2008, the Debtors provided a traditional modification to Mr. Burnett that reduced his monthly payment from $2,371.49 to $2,227.79 and his interest rate from 7.125% to 5.781% (the "<u>December 2008 Modification</u>").  <u>See</u> December 2008 Modification, attached to the Supplemental Declaration as <u>Exhibit L</u>; <u>see also</u> .  This brought Mr. Burnett's account current, making the account owing for the January 1, 2009 payment.  <u>See</u> Burnett Servicing Notes.

18.     There is nothing in the Debtors' books and records indicating a letter being received by the Debtors from Mr. Burnett on or around February 2, 2009.  <u>See</u> Burnett Servicing Notes.

19.    The Debtors referred Mr. Burnett's account to foreclosure on April 9, 2009, as it was owing for the January 1, 2009 through April 1, 2009 payments. <u>See</u> Burnett Servicing Notes.

20.    Additional workout packages were sent to Mr. Burnett on April 13, 2009 and July 30, 2009; however, the Debtors never received a response from Mr. Burnett. <u>See</u> Burnett Servicing Notes. The July 30, 2009 workout package does not make any reference to Mr. Burnett's foreclosure. <u>See</u> Letter for July Workout Package, p. 4 of the Burnett Diligence Response.

21.    On August 19, 2009, the Burnett Property was sold at a foreclosure sale and the property reverted to Deutsche Bank Trust Company Americas, as Trustee. <u>See</u> Supplemental Declaration ¶ 23. At the time of the sale, Mr. Burnett's account was owing for the January 1, 2009 payment. <u>See id</u>.

22.    On December 15, 2010, the Burnett Property was sold out of REO to a bona-fide third party purchaser. <u>See</u> Supplemental Declaration ¶ 24.

**B.    Sullivan Claim**

23.    On or around October 22, 2012, Mr. Sullivan filed a proof of claim against GMACM, designated as Claim No. 1533 (the "<u>Sullivan Claim</u>"), asserting a secured claim for $200,000.00.[5]  <u>See</u> <u>Exhibit M</u> to the Supplemental Declaration; <u>see</u> <u>also</u> <u>Exhibit A</u> to the Objection.

24.    According to the Debtors' books and records, non-Debtor Home Savings of America, FA ("<u>Home Savings</u>") originated a loan to Mr. Sullivan on November 13, 1989 (the "<u>Sullivan Loan</u>"), secured by a deed of trust on 650 Royalty Court, Kissammee, FL 34759 (the

---

[5] The Sullivan Claim contained medical records, which have been removed from the version of the Reply filed on the court's docket.

"Sullivan Property"). See Exhibit A to the Objection; see also Sullivan Note, attached to the Supplemental Declaration as Exhibit N, and Sullivan Deed of Trust, attached to the Supplemental Declaration as Exhibit O.

25.    RFC purchased the Sullivan Loan from Washington Mutual Bank, F.A. (who was the successor to Home Savings) and transferred its interest in the Sullivan Loan when it was securitized on or around July 1, 2005 where J.P Morgan Chase Bank, NA was appointed as trustee. See Exhibit A to the Objection; see also Sullivan Note. GMACM serviced the loan from February 24, 2005 until servicing was transferred to Ocwen Loan Servicing, LLC ("Ocwen") on February 16, 2013. See Exhibit A to the Objection.

26.    On January 31, 2008, the Debtors mailed an Options to Avoid Foreclosure letter to Mr. Sullivan, as Mr. Sullivan's account was owing for the December 2007 payment. See Exhibit A to the Objection. On February 1, 2008, the Debtors spoke with Mr. Sullivan over the phone, at which time he informed the Debtors that his tenant was not making rent payments. See id; see also Sullivan Servicing Notes, attached to the Supplemental Declaration as Exhibit P.

27.    As discussed in Exhibit A to the Objection, the Debtors attempted numerous times to work with Mr. Sullivan to bring his account current, including mailing Options to Avoid Foreclosure letters, delaying foreclosure to allow him time to reinstate his account, and taking his financial information to determine if he qualified for loss mitigation options. See Exhibit A to the Objection.

28.    On September 15, 2008, Mr. Sullivan spoke with the Debtors over the phone and stated he was waiting for funds to come in from a 401(k) account in order to reinstate his account. See Exhibit A to the Objection; see also Sullivan Servicing Notes. On September

18, 2008, the Debtors referred the account to foreclosure, as the funds were not received, and the account was owing for the June through September 2008 payments.  See id.

29.    On October 6, 2008, Mr. Sullivan spoke with the Debtors over the phone and stated he would be able to reinstate the account in November as he is in the process of evicting his tenant (who was not paying rent) from the property. See Sullivan Servicing Notes. At this time, Mr. Sullivan agreed to a repayment plan that would bring the account current. See id.  On October 16, 2008, Mr. Sullivan made the required payment under the Repayment Plan, and the Debtors closed the foreclosure on his account. See id.

30.    The Sullivan Loan was current at the time servicing was transferred to Ocwen in February 2013. See Supplemental Declaration ¶ 30.

**C.    Johnson Claim**

31.    On or around October 24, 2012, Ms. Johnson filed a proof of claim against Debtor Residential Capital, LLC ("ResCap"), designated as Claim No. 1660 (the "Johnson Claim"), asserting a general unsecured claim in an unliquidated amount.  See Exhibit Q to the Supplemental Declaration.  See Exhibit A to the Objection.  The Johnson Claim was reclassified as a general unsecured claim against GMACM pursuant to the Court's *Supplemental Order Granting Debtors' Thirty-Eighth Omnibus Objection to Claims (Wrong Debtor Borrower Claims)* [Docket No. 5898], entered November 20, 2013.

32.    According to the Debtors' books and records, non-Debtor USAA Federal Savings Bank ("USAA") originated a loan to Ms. Johnson on April 25, 2002 (the "Johnson Loan").  See Exhibit A to the Objection; see also Johnson Note, attached to the Supplemental Declaration as Exhibit R, and Johnson Mortgage, attached to the Supplemental Declaration as Exhibit S.  GMACM purchased the Johnson Loan from USAA and subsequently transferred its interest to Fannie Mae. See Exhibit A to the Objection.  GMACM serviced the Johnson Loan

9

from April 25, 2002 until servicing was transferred to Greentree Servicing, LLC ("Greentree")
on February 1, 2013. See id.

33.    On or about February 6, 2007, the Debtors referred the Johnson Loan to
foreclosure as it was owing for the October 2006 payment. See Supplemental Declaration ¶ 33.
On February 21, 2007, the Debtors spoke with Ms. Johnson over the phone, at which time Ms.
Johnson indicated that she was in the process of finding a job and did not have the funds to apply
toward the delinquency. See id. The Debtors took her financial information in order to consider
her for a forbearance plan. See id. However, on March 19, 2007, the Debtors determined that
forbearance was not an option as Ms. Johnson's finances were insufficient to support any
repayment plan. See id.

34.    On November 3, 2007, the Debtors again spoke to Ms. Johnson over the
phone and she requested a repayment plan. See Supplemental Declaration ¶ 34. The Debtors set
up a repayment plan on Ms. Johnson's account on November 5, 2007 with a $15,000
contribution payment due November 12, 2007 and twelve remaining payments of $4,192.09.
See id. The Debtors mailed the repayment plan agreement to Ms. Johnson on November 5, 2007.
See id. The Debtors attempted to call Ms. Johnson on November 6, 2012 to advise her of the
repayment plan but there was no answer. See id. The Debtors cancelled the repayment plan on
November 12, 2007 when the payment was not received. See id. The Debtors mailed a letter to
Ms. Johnson informing her of the cancelled plan. See id.

35.    On November 13, 2007, the Debtors were notified that Ms. Johnson had
filed for Chapter 13 bankruptcy protection on November 12, 2007 in the Eastern District of
Wisconsin (the "Wisconsin Bankruptcy Court"), case number 07-29029. See Supplemental
Declaration ¶ 35.

ny-1172294

36.     On February 15, 2008, the Wisconsin Bankruptcy Court issued an order confirming Ms. Johnson's Chapter 13 plan (the "Chapter 13 Plan").  See Johnson Bankruptcy Docket, attached to the Supplemental Declaration as Exhibit T.  Under the terms of the Chapter 13 Plan, all of Ms. Johnson's delinquent pre-petition payments would be paid by Ms. Johnson's Chapter 13 trustee, and all of the post-petition payments would be paid by Ms. Johnson.  See Johnson Chapter 13 Plan, attached to the Supplemental Declaration as Exhibit U.

37.     On September 18, 2008, the Debtors filed a motion for relief from the automatic stay (the "Stay Relief Motion") in Ms. Johnson's bankruptcy case because the Debtors' records showed that Ms. Johnson had not made the July through September 2008 payments.  See Stay Relief Motion, attached to the Supplemental Declaration as Exhibit V.  On October 2, 2008, Ms. Johnson filed an objection to the Stay Relief Motion, stating that she believed she had only missed the payments for August and September 2008.  See Objection to Stay Relief Motion, attached to the Supplemental Declaration as Exhibit W.  On October 20, 2008, Ms. Johnson and the Debtors entered into a stipulation that was entered by the Court that same day (the "2008 Johnson Stipulation").  See Johnson Bankruptcy Docket.  The Johnson Stipulation provided that the Debtors would file a supplemental claim (the "2008 Johnson Supplemental Claim") in Ms. Johnson's bankruptcy for the delinquent payments, and that commencing in November 2008 and continuing through April 2009, Ms. Johnson would make all monthly payments on or before the sixteenth day of each month, and that if any payment is not received in a timely manner, the Debtors may submit an affidavit of default.  The 2008 Johnson Stipulation also provided that attorney's fees and costs in the amount of $800 were to be included in the amount of the 2008 Johnson Supplemental Claim. See Johnson Stipulation, attached to the Supplemental Declaration as Exhibit X.

11

38.    Ms. Johnson contacted the Debtors indicating that there was an error in the calculation of the Johnson Supplemental Claim, as it included one payment that she had made. See Supplemental Declaration ¶ 38.[6] As a result, the Debtors amended the Johnson Supplemental Claim on February 3, 2009 to make this adjustment.  See id.  A summary of all of the payments made by Ms. Johnson during her bankruptcy proceeding, which was prepared during Ms. Johnson's bankruptcy proceeding by the responsible foreclosure attorney and kept as part of the Debtors' books and records, is attached to the Supplemental Declaration as Exhibit Y.

39.    On August 11, 2009, the Debtors filed an affidavit of default (the "August 2009 Affidavit of Default") in Ms. Johnson's bankruptcy case because Ms. Johnson had failed to comply with the Johnson Stipulation by not making her April through July 2009 payments.  See August Affidavit of Default, attached to the Supplemental Declaration as Exhibit Z.  The legal fees associated with the August 2009 Affidavit of Default were $150.  On August 13, 2009, Ms. Johnson filed an objection to the August 2009 Affidavit of Default, in which she acknowledged that she paid the April payment late, but asserted that a representative for GMACM told her it would not be a problem as long as the payment was received by the end of April.  She also alleged that the May and June payments were accepted by the Debtors. See Objection to August 2009 Affidavit of Default, attached to the Supplemental Declaration as Exhibit AA.

40.    On September 18, 2009, the Debtors and Ms. Johnson entered into an agreed order (the "Johnson 2009 Agreed Order") whereupon it was agreed that Ms. Johnson

---

[6] Ms. Johnson's monthly payment increased from $2,457.01 to $2,577.50 in June 2008.  When Ms. Johnson made her June 2008 payment on June 26, 2008, she only paid $2,457.01 (the old payment amount).  See Summary of Bankruptcy Payments, attached to the Priore Declaration as Exhibit Z.  This resulted in the entire amount being put in a suspense account, as it was not the full amount due. See id. When Ms. Johnson made the July 2008 payment of $2,577.50 on September 5, 2008, $120.49 of that payment went to cover the remaining amount owed for the June 2008 payment.  As a result, the payment made on September 5, 2008 was not sufficient to pay the entire July 2008 payment, and the remaining $2,457.01 was placed in suspense on the account. See id.  This amount was not properly credited on the Supplemental Proof of Claim. See id.

would make two monthly mortgage payments, and that the Debtors would file a Supplemental Proof of Claim for the remaining arrearage. See Johnson 2009 Agreed Order, attached to the Supplemental Declaration as Exhibit BB. On October 13, 2009, the Debtors filed a supplemental proof of claim (the "2009 Supplemental Proof of Claim") in the amount of $3,281.13.  See 2009 Supplemental Proof of Claim, attached to the Supplemental Declaration as Exhibit CC.  The 2009 Supplemental Proof of Claim shows that Ms. Johnson was credited with payments made on May 1, 2009, May 29, 2009, and August 6, 2009, which addressed her April, May, and June 2009 monthly payments. See id. It also shows that Ms. Johnson was credited with a payment she made on September 25, 2009 in the amount of $5,071.92, which was the amount required to be paid under the Johnson 2009 Agreed Order. See id. The amount of attorney's fees and costs included in the 2009 Supplemental Proof of Claim was $500.  See id.

41.    On February 11, 2010, the Debtors filed an Affidavit of Default (the "February 2010 Affidavit of Default") in Ms. Johnson's bankruptcy due to the mistaken belief that she had not made the December and January payments required under her Chapter 13 Plan.[7] See February 2010 Affidavit of Default, attached to the Supplemental Declaration as Exhibit DD.  Ms. Johnson filed an objection to the Affidavit of Default on February 15, 2010, which provided evidence of her payments.  See Objection to February 2010 Affidavit of Default, attached to the Supplemental Declaration as Exhibit EE.  On February 26, 2010, the Debtors withdrew the February 2010 Affidavit of Default.  See Johnson Bankruptcy Docket.  The attorney's fees incurred as a result of the February 2010 Affidavit of Default were $150, which

---

[7] Payments made during a bankruptcy would be reflected in a different place in the Debtors records than other payments.  The error was made because Debtor's bankruptcy counsel did not look in the appropriate place in the Debtors' books and records, and therefore did not see the payments that Ms. Johnson had made during her bankruptcy.

13

the Debtor waived upon discovery of the error.  <u>See</u> Johnson Servicing Notes, attached to the

Supplemental Declaration as <u>Exhibit FF</u>.

42.    On February 29, 2012, Ms. Johnson's bankruptcy case was dismissed

because Ms. Johnson was not making the necessary payments under her Chapter 13 plan.  <u>See</u>

Johnson Dismissal Order, attached to the Supplemental Declaration as <u>Exhibit GG</u>.

43.    On March 16, 2012, the debtors mailed Ms. Johnson an Options to Avoid

Foreclosure Letter. <u>See</u> Supplemental Declaration ¶ 43. The Debtors also mailed Ms. Johnson

workout packages on March 20, April 5, April 20, and May 4, 2012.  <u>See</u> <u>id</u>.

44.    On June 29, 2012, the Debtors received a workout package from Ms.

Johnson and received all of the necessary documents for review of the modification on August

13, 2012. <u>See</u> Supplemental Declaration ¶ 44. On August 24, 2012, the Debtors approved Ms.

Johnson for a HAMP trial modification plan, which required three monthly payments to be made

in the amount of $1,083.31.  <u>See</u> <u>id</u>.

45.    Ms. Johnson completed the HAMP Trial Plan on December 6, 2012 and

the Debtors approved Ms. Johnson for a permanent HAMP modification on December 31, 2012.

<u>See</u> Supplemental Declaration ¶ 45 The modification reduced her interest rate from 6.75% to 2%,

with a ceiling of 3.375% and reduced her monthly payment from $2,746.75 to $1,083.18. <u>See</u> <u>id</u>.

On January 10, 2013, the Debtors received the signed permanent modification from Ms.

Johnson. <u>See</u> Johnson HAMP Modification, attached to the Supplemental Declaration as <u>Exhibit</u>

<u>HH</u>.

46.    Ms. Johnson's account was current when servicing transferred to

Greentree on February 1, 2013.  <u>See</u> <u>id</u>.

**REPLY**

47.     A filed proof of claim is "deemed allowed, unless a party in interest …

objects." 11 U.S.C. § 502(a).  Section 502(b)(1) of the Bankruptcy Code provides, in relevant

part, that a claim may not be allowed to the extent that "such claim is unenforceable against the

debtor and property of the debtor, under any agreement or applicable law…." 11 U.S.C. §

502(b)(1).  As noted previously by the Court, claims objections have a shifting burden of proof.

Pursuant to Federal Rule of Bankruptcy Procedure 3001(f), a claimant establishes a prima facie

case against a debtor upon filing a proof of claim alleging facts sufficient to support the claim.

The objecting party is thereafter required to produce evidence equal in force to that provided by

the claimant to rebut the presumption of the claimant's prima facie case. In re Residential

Capital, LLC, 507 B.R. 477, 490 (Bankr. S.D.N.Y. 2014).  See also In re Allegheny Int'l, Inc.,

954 F.2d 167, 173-74 (3d Cir. 1992).

48.     Once an objection refutes an essential allegation of the claim, the burden

of persuasion is on the holder of a proof of claim to establish a valid claim against a debtor by a

preponderance of the evidence.  Residential Capital, 507 B.R at 490; Feinberg v. Bank of N.Y.

(In re Feinberg), 442 B.R. 215, 220-22 (Bankr. S.D.N.Y. 2010); In re Oneida Ltd., 400 B.R. 384,

389 (Bankr. S.D.N.Y. 2009); In re Adelphia Commc'ns Corp., Case  No. 02-41729 (REG), 2007

Bankr. LEXIS 660, at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); In re Rockefeller Ctr. Props., 272

B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

ny-1172294

### D.    Burnett Claims

*The Burnett Response is an Improper Amendment to the Burnett Claims*

49.    In the Burnett Response, Mr. Burnett fails to address the basis of the objection to the Burnett Claims, which was that (i) the Debtors were not liable for not exercising the interest rate reduction clause in the Pooling and Servicing Agreement ("PSA") for loan modifications because there was no such requirement in the PSA[8] and the Debtors offered Mr. Burnett an interest rate reduction as part of the December Modification (see December Modification); (ii) Mr. Burnett's allegations related to the Substitute Trustee are not true, and furthermore Mr. Burnett has failed to demonstrate how he was damaged by the alleged actions; (iii) the Debtors cannot be liable for breaching the terms of a letter sent to Mr. Burnett because the letter does not make the promises that Mr. Burnett alleges; and (iv) the Debtors made numerous attempts to provide Mr. Burnett with a loan modification, and therefore cannot be liable for not giving him the opportunity to modify his loan.

50.    Rather than address the merits of the Objection, Mr. Burnett offers eleven "affirmative defenses" to the Objection, each asserting a purported new basis of liability. However, all of these so-called affirmative defenses are being raised for the first time in the Burnett Response.    These "affirmative defenses" include allegations that there was no consideration offered in exchange for an unspecified loan modification, the Debtors provided false statements to the government to obtain federal funding, the Debtors violated Section 8 of the Clayton Act, the Objection is barred by the doctrine of laches, the mortgage and note are illegal under the Real Estate Settlement Procedures Act ("RESPA"), the Debtors' failure to

---

[8] All the documents related to the securitization deal can be found at the U.S. Securities and Exchange Commission, available at: http://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001359592&owner=exclude&count=40&hidefilings=0 (last visited Feb. 4, 2015).

ny-1172294

respond to letters sent by Mr. Burnett, the Borrower Trust does not have standing to object to the Burnett Claims, the Debtors breached a contract with Mr. Burnett by failing to provide the original promissory note, the Debtors did not comply with FHA loan servicing requirements, the Debtors failed to comply with the Single-Family Loan Insurance Program, the mortgage was unconscionable because it waives rights Mr. Burnett was entitled to, and the Debtors are not permitted to profit from their own inequity.

51.    None of these allegations were raised in the Burnett Claims or in the Diligence Response received from Mr. Burnett. As a result, the Burnett Response is improperly seeking to amend the Burnett Claims. When a bar date has passed, and a creditor seeks to file an amended proof of claim "[t]he decision to allow the amendment of the claim is committed to the discretion of the bankruptcy judge." In re Asia Global Crossing, Ltd., 324 B.R. 503, 507 (Bankr. S.D.N.Y. 2005). In the Second Circuit, the court may only allow a late amended proof of claim when there was an "assertion of a similar claim or demand evidencing an intention to hold the estate liable." Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 133 (2d Cir. 2005) (quoting Integrated Res., Inc. v. Ameritrust Co., N.A. (In re Integrated Res., Inc.), 157 B.R. 66, 70 (S.D.N.Y. 1993)). See also this Court's *Memorandum Opinion and Order Sustaining Borrower Claims Trust's Objection to Claim No. 5282 of Michelle Lawson* [Docket No. 7328].

52.    In this case, nothing in the Burnett Claims demonstrates an intention to hold the estates liable for any of the "affirmative defenses" in the Burnett Response. As a result, these new bases should be barred as untimely because they fail to satisfy the applicable standards relating to amendments to proofs of claim and work significant prejudice against the Debtors' estates.

17

*None of the "Affirmative Defenses" State a Valid Claim Against the Debtors*

53.     Even if the allegations in the Burnett Response were considered, Mr.
Burnett has not stated a valid basis for liability of the Debtors in the Burnett Response.  The
allegation that there was no consideration offered in exchange for the loan modification has no
basis because Mr. Burnett has not shown how this allegation creates a liability of the Debtors.
Furthermore, contrary to Mr. Burnett's assertion, the Debtors provided consideration for the
December 2008 Modification offered to Mr. Burnett in the form of a reduced interest rate and
monthly payment, but Mr. Burnett failed to meet his obligation under such modification when he
did not make the initial payment. See ¶ 17 *supra*.

54.     Mr. Burnett also alleges that the Debtors are liable under the False Claims
Act for alleged false statements to the government. Mr. Burnett provides nothing more than
conclusory allegations of these purported false statements, and does not allege what the alleged
false statements were or when they were purportedly made.  Furthermore, Mr. Burnett alleges
that the Debtors provided the alleged false statements to the United States government, not Mr.
Burnett.  As a result, Mr. Burnett has failed to demonstrate any liability of the Debtors arising
from the False Claims Act.

55.     Mr. Burnett's third affirmative defense makes references to the Clayton
Act.  However, Mr. Burnett does not specify how the Debtors purportedly violated the Clayton
Act, nor how Mr. Burnett was damaged by any alleged violations.  As a result, Mr. Burnett has
failed to demonstrate any liability of the Debtors arising from the Clayton Act.

56.     Mr. Burnett, confusingly, alleges that the Objection is barred by the
equitable doctrine of laches.  Laches "is an equitable defense that bars a plaintiff's … claim
where he is guilty of unreasonably and inexcusable delay that has resulted in prejudice to the

ny-1172294

defendant." Ikelionwu v. United States, 150 F.3d 233, 237 (2d Cir. 1998) (citation and internal

quotations omitted).  However, Mr. Burnett, in asserting his proof of claim, is the plaintiff in this

situation.  Furthermore, the Borrower Trust clearly is permitted to object to the claim pursuant to

Art. VIII.A.3. of the Plan, and the deadline for objecting to claims has not yet passed. See Plan

[Docket No. 6065].  Mr. Burnett does not state how he was harmed by any alleged delay in filing

the Objection.  As a result, Mr. Burnett has failed to demonstrate that the Objection is barred by

the equitable doctrine of laches.  Furthermore, Art. VIII.A.3 of the Plan specifically grants the

Borrower Trust standing to bring the Objection, and therefore Mr. Burnett's allegations that the

Borrower Trust lacks standing because it "failed to join an indispensable party" lacks merit.

57.    The Debtors are not liable for Mr. Burnett's allegations regarding alleged

RESPA violations related to the origination of the Burnett Loan or that the mortgage or deed of

trust was unconscionable or inequitable because the Debtors did not originate the Burnett Loan,

and therefore cannot be liable for any purported issues with the loan's origination.

58.    In the Petrovich Affidavit (included in the Burnett Response), while there

is no mention of RESPA, it appears that Mr. Burnett is arguing that the Debtors failed to respond

to the Burnett 2008 Letter, as well as a letter allegedly sent to the Debtors on February 2, 2009,

as required by 12 U.S.C. § 2605(e).  However, the assertion of a cause of action under the

RESPA requires a showing of actual damages, which Mr. Burnett has not alleged.  See 12 U.S.C.

§ 2605(f).  Furthermore, a cause of action under 12 U.S.C. § 2605 is barred by a three year

statute of limitations that runs from the date of the violation.  See 12 U.S.C. § 2614.  The alleged

violation occurred on December 24, 2008, thirty days after the Burnett 2008 Letter was received.

Therefore, the three year statute of limitations had expired prior to the Petition Date.  Similarly,

while the Debtors' records do not reflect a letter being received from Mr. Burnett on or around

19

February 2, 2009, even if such a letter was received, the three year statute of limitations would

have run prior to the Petition Date.

59.     Mr. Burnett further argues that the Debtors are liable for breach of

contract because they did not provide the original promissory note when filing the foreclosure

suit, and as a result the foreclosure is invalid.  However, there is nothing under the note or deed

of trust that requires the Debtors to file the original promissory note when filing a foreclosure

suit.  See Burnett Note and Burnett Deed of Trust.  Additionally, there is nothing under Virginia

state law that requires the original promissory note to be provided in order to commence a non-

judicial foreclosure.  See Tapia v. U.S. Bank, N.A., 718 F. Supp. 2d 689, 698 (E.D. Va. 2010)

("Virginia is a non-judicial foreclosure state.  Sections 55-59.1 through 55-59.4, which set forth

the procedural requirements for a non-judicial foreclosure, do not require an interested party to

prove "standing" in a court of law before initiating the foreclosure process."); see also VA. CODE

ANN. §§ 55-59.1 through 55-59.4.  Thus, Mr. Burnett has failed to demonstrate any liability of

the Debtors for breach of contract.

60.     The Burnett Response also alleges that the Debtors did not comply with

the servicing requirements for loans insured by the Federal Housing Administration ("FHA"),

nor did they comply with the requirements of the requirements of 12 U.S.C. § 1709, which lists

the eligibility requirements for FHA insured loans.  However, the Burnett Loan is not insured by

FHA, see Supplemental Declaration ¶ 9, and therefore is not subject to these requirements.

61.     As a result, even if the "affirmative defenses" raised in the Burnett

Response were not improper amendments to the Burnett Claims, they still fail to state any basis

for liability of the Debtors to Mr. Burnett.

### E.    Sullivan Claim

62.    In the Sullivan Response, Mr. Sullivan fails to address the basis for the Objection, namely that the foreclosure action was entirely proper because Mr. Sullivan's account was delinquent at the time the account was referred to foreclosure, and the Debtors are not liable for lost rental income arising from the foreclosure because the Debtors records show that Mr. Sullivan's tenants were not paying rent prior to Mr. Sullivan's account being referred to foreclosure.  Rather, the Sullivan Response merely makes conclusory allegations that the Debtors acted carelessly and improperly, and restates the allegation that the Debtors are liable for Mr. Sullivan's renters not paying rent and for his credit score being lowered.

63.    As was demonstrated in ¶ 28 *supra* and <u>Exhibit A</u> to the Objection, the Debtors properly referred Mr. Sullivan's account to foreclosure, as it was owing for the June through September 2008 payments.  Therefore, any problems that the foreclosure caused to Mr. Sullivan are not the result of any wrongdoing on the part of the Debtors, but are the result of his failure to make his required loan payments.  Furthermore, as discussed in ¶ 26 *supra*, the Debtors' records show that Mr. Sullivan's tenants had stopped paying rent long before the account was referred to foreclosure, and that this was one of the reasons he could not make the required payments.  Therefore, any lost rental income was not caused by the foreclosure, but, according to Mr. Sullivan, was caused by his tenants refusing to provide or not providing Mr. Sullivan with rental payments.  As a result, Mr. Sullivan has failed to show any wrongdoing on the part of any Debtor entity.

### F.    Johnson Claim

64.    In the Johnson Response, Ms. Johnson states that her claim was filed "with the understanding that the Independent Foreclosure review process found my claim was valid and was going to investigate to determine the financial injury as a result of the errors or

other problems during the foreclosure process." She states that the amount she received from the Independent Foreclosure Review was not sufficient to account for the damages she incurred, which allegedly stem from attorney's fees associated with the Affidavit of Default filed in her bankruptcy case. See Johnson Response p. 1. She also alleges that she is owed approximately $5,000 on "credits on her mortgage," and that she should be reimbursed for fees incurred for making her payments over the phone. See Johnson Response p. 2.

65.    As an initial matter, none of these allegations were raised in the Johnson Claim or in the response Ms. Johnson submitted to the Debtors' request letter. As a result, the Johnson Response is improperly amending the Johnson Claim for the same reasons discussed in ¶¶ 49-51 *supra*. Nothing in the Johnson Claim indicated to the Debtors that Ms. Johnson was intending to hold the Debtors liable for anything other than a determination made by the independent foreclosure review, and did not describe any wrongdoing by the Debtors in either the Johnson Claim or Ms. Johnson's response to the Debtors' Request Letter. As a result, these new bases should be barred as untimely because they fail to satisfy the applicable standards relating to amendments to proofs of claim and work significant prejudice against the Debtors' estates.

66.    Notwithstanding, as discussed in Exhibit A to the Objection, the Debtors can have no liability for any determination made by the Independent Foreclosure Review because it is a non-Debtor related program that does not have the authority or ability to impute liability to the Debtors for the benefit of a Claimant in connection with the Debtors' chapter 11 cases. Therefore, because the only allegations in the properly filed Johnson Claim stem from liability resulting from the Independent Foreclosure Review, the Johnson Claim fails to state any liability arising from any action of the Debtors.

67.    However, if the Court is so inclined to allow the Johnson Response to amend the Johnson Claim, the Debtors submit that, except for one instance, Ms. Johnson has not demonstrated any liability arising from any of the Debtors' actions.

68.    Regarding the Stay Relief Motion, although the Debtors may have incorrectly calculated the amount that was owed at the time, there is no question that Ms. Johnson was in default of her obligations when the Stay Relief Motion was filed.  As a result, the Debtors' error was not the cause of any attorney's fees incurred in relation to the Stay Relief Motion, as Ms. Johnson would have still incurred such fees even if the error had not occurred.  As a result, the Debtors' estates cannot be liable for any attorney's fees resulting from the Stay Relief Motion.

69.    Similarly, while the Debtors may have improperly calculated the amount that was owed by Ms. Johnson in the August 2009 Affidavit of Default, there is no question that Ms. Johnson was in default of her obligations at the time the August Affidavit of Default was filed, and therefore the Debtors' cannot be liable for the attorney's fees incurred for the August 2009 Affidavit of Default for the same reasons as are stated above.

70.    With regards to the February 2010 Affidavit of Default, the Debtors admit that this was filed in error, and that as a result the Debtors could be liable for any damages incurred by Ms. Johnson on account of that error.   Ms. Johnson submits that she incurred attorney's fees both from GMACM's counsel and from her own counsel.  See Johnson Response p. 3. As noted in ¶ 41 *supra*, the Debtors removed the charges for attorney's fees associated with the February 2010 Affidavit of Default.  As a result, Ms. Johnson at most is entitled to receive an allowed claim for the attorney's fees that she paid to her own counsel.  According to the documentation submitted by Ms. Johnson, attorney's fees of $3,179.25 were paid by her

23

personally, and some of these fees were incurred for services performed that were not related to the February 2010 Affidavit of Default.    Therefore, if the Court determines Ms. Johnson is entitled to a claim, the Debtors submit that, Ms. Johnson is only entitled to a claim for a portion of this amount.

71.    Ms. Johnson also attaches a bill from April 14, 2011 for $868.20 that references services performed by her attorney for matters that have nothing to do with the Debtors, and therefore these charges cannot impute liability on the Debtors' estates.

72.    Ms. Johnson also alleges that there were $5,000 of payments made during her Chapter 13 bankruptcy that she was not credited for.    Ms. Johnson does not allege which payments were not credited, and the Borrower Trust is not able to find any evidence in the Debtors' books and records that any payments were not credited.    See Summary of Johnson Bankruptcy Payments; see also Johnson Servicing Notes.    As a result, the Debtors' estates cannot be liable for charging Ms. Johnson more than she was owed during her Chapter 13 Bankruptcy.

73.    Finally, Ms. Johnson alleges that she is entitled to be reimbursed for all of the charges she incurred for having to make her payments over the phone.[9]    However, as stated on p. 3 of the Johnson Response, Ms. Johnson voluntarily chose to make the payments over the phone, and therefore the Debtors' estates cannot be liable for such charges.

74.    As a result, the Johnson Claim should be disallowed and expunged because the Debtors' estates cannot be liable for any finding of liability from the Independent Foreclosure Review, and all of Ms. Johnson's other allegations are barred as improper amendments to the Johnson Claim.    Furthermore, even if the Court were to permit the Johnson Response to amend the Johnson Claim, the Debtors submit that the Debtors' estates can only be

---

[9] The Debtors' books and records show that Ms. Johnson incurred $450 in charges for making payments over the phone.

ny-1172294

liable for the portion of attorney's fees Ms. Johnson incurred with regard to the February 2010

Affidavit of Default.

## **CONCLUSION**

75.    WHEREFORE, the Borrower Trust respectfully submits that the relief

requested in the Objection should be granted in its entirety.


Dated: February 5, 2015                    /s/ Norman S. Rosenbaum
      New York, New York                 Norman S. Rosenbaum
                                   Jordan A. Wishnew
                                   Jessica J. Arett
                                   MORRISON & FOERSTER LLP
                                   250 West 55th Street
                                   New York, New York 10019
                                   Telephone: (212) 468-8000
                                   Facsimile: (212) 468-7900

                                   *Counsel for the ResCap Borrower Claims Trust*

25

ny-1172294