**Hearing Date and Time: March 12, 2015 at 10:00 a.m. (prevailing Eastern Time)**
**Response Deadline: March 3, 2015 at 4:00 p.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Joseph A. Shifer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

BRADLEY ARANT BOULT
CUMMINGS LLP
100 N. Tryon Street
Suite 2690
Charlotte, North Carolina 28202
Telephone: (704) 338-6000
Facsimile: (704) 332-8858
Christian W. Hancock

*Counsel for the ResCap Liquidating Trust*

*Counsel for the ResCap Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

-------------------------------------------------------------

**NOTICE OF RESCAP LIQUIDATING TRUST'S OBJECTION**
**TO PROOF OF CLAIM NO. 788 FILED BY PETRA FINANCE, LLC**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On February 10, 2015, the ResCap Liquidating Trust filed its *Objection to Proof of Claim No. 788 filed by Petra Finance, LLC* (the "**Objection**").

2.      A hearing (the "**Hearing**") to consider the Objection shall be held before the Honorable Martin Glenn, United States Bankruptcy Judge, in Room 501 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York, 10004-1408, on **March 12, 2015 at 10:00 a.m.** (prevailing Eastern Time).

3.      Any responses to the Objection must be made in writing, conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules of the Southern District of New York, and the Notice, Case Management, and Administrative Procedures approved by the Bankruptcy Court [Docket No. 141], be filed electronically by registered users of the Bankruptcy Court's electronic filing system, and be served, so as to be received no later than **March 3, 2015 at 4:00 p.m.** (prevailing Eastern Time) upon (a) Chambers of the Honorable Martin Glenn, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408; (b) co-counsel to the ResCap Liquidating Trust, Kramer Levin Naftalis & Frankel, LLP, 1177 Avenue of the

Americas, New York, NY 10036 (Attention: Kenneth H. Eckstein, Douglas H. Mannal, Joseph A. Shifer); (c) co-counsel to the ResCap Liquidating Trust, Morrison & Foerster LLP, 250 West 55th Street, New York, NY 10019 (Attention: Gary S. Lee, Norman S. Rosenbaum, Jordan A. Wishnew and Meryl L. Rothchild) (d) co-counsel to the ResCap Liquidating Trust, Bradley Arant Boult Cummings LLP, 100 N. Tryon Street, Suite 2690, Charlotte, NC 28202 (Attention: Christian W. Hancock); (e) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attention: Linda Riffkin and Brian S. Masumoto); and (f) The ResCap Liquidating Trust, Quest Turnaround Advisors, 800 Westchester Ave., Suite S-520, Rye Brook, NY 10573 (Attention: Jeffrey Brodsky).

4.    If no responses to the Objection are timely filed and served to the relief requested in the Objection, the Bankruptcy Court may deem any opposition waived, treat the Objection as conceded, and enter an order granting the relief requested in the Objection without further notice or hearing.

5.    A copy of the Objection can be obtained or viewed for a fee via PACER at www.pacer.gov or (without charge) on the Debtors' restructuring website at www.kccllc.net/rescap.

Dated: New York, New York
       February 10, 2015

/s/ Joseph A. Shifer
KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Joseph A. Shifer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the ResCap Liquidating Trust*

-and-

BRADLEY ARANT BOULT CUMMINGS LLP
100 N. Tryon Street
Suite 2690
Charlotte, North Carolina 28202
Telephone:  704) 338-6000
Facsimile:  704) 332-8858
Christian W. Hancock

*Counsel for the ResCap Liquidating Trust*

**Hearing Date and Time: March 12, 2015 at 10:00 a.m. (prevailing Eastern Time)**
**Response Deadline: March 3, 2015 at 4:00 p.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Joseph A. Shifer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

BRADLEY ARANT BOULT
CUMMINGS LLP
100 N. Tryon Street
Suite 2690
Charlotte, North Carolina 28202
Telephone:  (704) 338-6000
Facsimile:  (704) 332-8858
Christian W. Hancock

*Counsel for the ResCap Liquidating Trust*

*Counsel for the ResCap Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et</u> <u>al</u>., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

-------------------------------------------------------------

## <u>RESCAP LIQUIDATING TRUST'S OBJECTION TO</u> <u>PROOF OF  CLAIM NO. 788 FILED BY PETRA FINANCE, LLC</u>

# TABLE OF CONTENTS

**Pages**

TABLE OF AUTHORITIES .................................................................................ii

JURISDICTION, VENUE AND STATUTORY PREDICATE ................................... 1

PRELIMINARY STATEMENT ........................................................................ 2

BACKGROUND ............................................................................................ 2

    A. GMACM's Servicing Agreement With ARE ............................................ 4

    B. Petra's Allegations .......................................................................... 5

    C. GMACM's Actions In 2008 Regarding Petra And ARE........................... 7

    D. The Florida Action ......................................................................... 12

    E. The Petra Claim ............................................................................. 12

RELIEF REQUESTED.................................................................................. 13

OBJECTION TO PETRA CLAIM .................................................................. 13

    I.    THE PETRA CLAIM FAILS TO SATISFY BASIC PLEADING
        STANDARDS.......................................................................... 14

    II.   THE AMENDED COMPLAINT FAILS TO PLEAD A BASIS FOR
        BREACH OF AN ORAL CONTRACT (COUNT I) ......................... 15

    III.  PETRA FAILS TO STATE A CLAIM FOR CONVERSION........................... 18

    IV.  PETRA CANNOT STATE A CLAIM FOR BREACH OF FIDUCIARY
        DUTY ................................................................................... 20

NOTICE................................................................................................... 22

CONCLUSION.......................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acosta v. District Bd. of Trs. of Miami-Dade Cmty. Coll.,*
　905 So. 2d 226 (Fla. Dist. Ct. App. 2005) ...............................................................15

*Am. Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc.,*
　390 F. Supp. 2d 1170 (M.D. Fla. 2005) ..................................................................21

*Argonaut Dev. Group, Inc. v. SWH Funding Corp.,*
　150 F. Supp. 2d 1357 (S.D. Fla. 2001) ...................................................................21

*Belford Trucking Co. v. Zagar,*
　243 So. 2d 646 (Fla. Dist. Ct. App. 1970) ........................................................18, 19

*Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.,*
　302 So. 2d 404 (Fla. 1974)......................................................................................15

*Detwiler v. Bank of Cent. Fla.,*
　736 So. 2d 757 (Fla. Dist. Ct. App. 1999) ........................................................21, 22

*In re DJK Residential LLC,*
　416 B.R. 100 (Bankr. S.D.N.Y. 2009) ....................................................................14

*In re Energy Smart, Inc.,*
　381 B.R. 359 (M.D. Fla. 2007) ...............................................................................18

*Fla. Desk, Inv. v. Mitchell Int'l, Inc.,*
　817 So. 2d 1059 (Fla. Dist. Ct. App. 2002) ......................................................19, 20

*Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.),*
　398 B.R. 736 (Bankr. S.D.N.Y. 2008) ....................................................................14

*Gasparini v. Pordomingo,*
　972 So. 2d 1053 (Fla. Dist. Ct. App. 2008) ............................................................19

*Gracey v. Eaker,*
　837 So. 2d. 348 (Fla. 2002)....................................................................................20

*Greater N.Y. Corp. v. Cenvill Miami Beach Corp.,*
　620 So. 2d 1068 (Fla. Dist. Ct. App. 1993) ............................................................15

*Hazen v. Cobb,*
　117 So. 853 (Fla. 1928)..........................................................................................17

*In re Hess,*
　404 B.R. 747 (Bankr. S.D.N.Y. 2009) ....................................................................14

*Jacksonville Port Auth. v. W.R. Johnson Enters., Inc.*,
    625 So. 2d 313 (Fla. Dist. Ct. App. 1993) ....................................................15, 17

*Jaffe v. Bank of Am., N.A.*,
    667 F. Supp. 2d 1299 (S.D. Fla. 2009) ...................................................21

*Kee v. Nat'l Reserve Life Ins. Co.*,
    918 F.2d 1538 (11th Cir. 1990) ...................................................18, 19

*McCutcheon v. Kidder, Peabody & Co., Inc.*,
    938 F. Supp. 820 (S.D. Fla. 1996) ...................................................22

*McKinney-Green, Inc v. Davis*,
    606 So. 2d 393 (Fla. Dist. Ct. App. 1992) ...................................................16

*In re Rockefeller Ctr. Props.*,
    272 B.R. 529 (Bankr. S.D.N.Y. 2000), *aff'd sub nom., NBC v. Rockefeller Ctr. Props.*
    (*In re Rockefeller Ctr. Props.*, 226 B.R. 52 (S.D.N.Y. 2001), *aff'd*, 46 F. App'x 40
    (2d Cir.2002).................................................................................14

*Rollins, Inc. v. Butland*,
    951 So. 2d 860 (Fla. Dist. Ct. App. 2006) ...................................................15

*Roy L. Willard, Inc. v. Miller*,
    8 So. 2d 489 (Fla. 1942).................................................................16

*St. Joe Corp. v. McIver*,
    875 So. 2d 375 (Fla. 2004)...............................................................15

*Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*,
    850 So. 2d 536 (Fla. Dist. Ct. App. 2003) ...................................................20, 21

*Thomas v. Hertz Corp.*,
    890 So. 2d 448 (Fla. Dist. Ct. App. 2004) ...................................................18

*Vanston Bondholders Protective Comm. v. Green*,
    329 U.S. 156 (1946)......................................................................14

*Watkins v. NCNB Nat'l Bank of Fla., N.A.*,
    622 So. 2d 1063 (Fla. Dist. Ct. App. 1993) ...................................................20

*In re W.R. Grace & Co.*,
    346 B.R. 672 (Bankr. D. Del. 2006) ...................................................13

*W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*,
    728 So. 2d 297 (Fla. Dist. Ct. App. 1999) ...................................................15

**STATUTES**

11 U.S.C. § 502(a) ...................................................................................................13

11 U.S.C. § 502(b) ................................................................................................1, 13

28 U.S.C. § 157(b) ....................................................................................................1

28 U.S.C. § 1334 .......................................................................................................1

28 U.S.C. § 1408 .......................................................................................................1

28 U.S.C. § 1409 .......................................................................................................1

Fla. Stat. § 698.01 ...................................................................................................17

Fla. Stat. § 725.01 ..............................................................................................17, 18

Fla. Stat. § 215.422(3)(b) .......................................................................................13

Fla. Stat. § 337.141(3) ...........................................................................................13

Fla. Stat. § 687.01 ...................................................................................................13

Fed. R. Bankr. P. 1015(b) .........................................................................................2

Fed. R. Bankr. P. 3007(a) .........................................................................................1

Fed. R. Bankr. P. 3001(f) ........................................................................................13

**OTHER AUTHORITIES**

4 *Collier on Bankruptcy* ¶ 502.02[2] (16th ed. rev. 2012)..........................................13

**TO THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

The ResCap Liquidating Trust (the "**Liquidating Trust**"), as successor in interest to the debtors (collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**"),[1] hereby files this objection (the "**Objection**") seeking to disallow and expunge Proof of Claim No. 788 filed by Petra Finance, LLC ("**Petra**") against Debtor GMAC Mortgage, LLC ("**GMACM**") in the amount of $764,110.57 (the "**Petra Claim**," attached hereto as **Exhibit 1**) pursuant to section 502(b) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 3007(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") on the grounds that the Petra Claim is without merit and does not contain colorable claims against GMACM.[2]  The Liquidating Trust seeks entry of an order, substantially in the form attached hereto as **Exhibit 2** (the "**Proposed Order**"), granting the requested relief.  In support of the Objection, the Liquidating Trust submits the *Declaration of Deanna Horst in Support of ResCap Liquidating Trust's Objection to Claim No. 788 filed by Petra Finance, LLC* (annexed hereto as **Exhibit 3**, the "**Horst Declaration**").  The Liquidating Trust respectfully represents as follows:

**JURISDICTION, VENUE AND STATUTORY PREDICATE**

1.    This Court has jurisdiction over this Objection under 28 U.S.C. § 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief requested herein are section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007(a).

---

[1] Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 Cases or the relief requested in this Objection may refer to http://www.kccllc.net/rescap for additional information.

[2] The Liquidating Trust reserves all of its rights to object on any other basis to the Petra Claim not set forth in this Objection, and the Liquidating Trust reserves all of its rights to amend this Objection should any further bases come to light.

## PRELIMINARY STATEMENT

3.       The Petra Claim asserts a general unsecured claim for $764,110.57 against GMACM for "Failure to Remit Monies" and is predicated on a state court case pending in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida regarding a commercial dispute between Petra and GMACM (the "**Florida Action**").

4.       In the Florida Action, Petra asserts three causes of action against GMACM: (i) breach of an oral contract, (ii) conversion of money, and (iii) breach of fiduciary duty.  For the reasons discussed in greater detail below, pursuant to applicable Florida and Federal law, the Petra Claim should be disallowed and expunged from the Debtors' claims registry in its entirety, because the Petra Claim fails to state a cognizable claim for relief in that:

    **A.**       **Petra's breach of an oral contract claim fails because it is barred by the statute of frauds and because Petra fails to sufficiently demonstrate the existence of a contract between Petra and GMACM;**

    **B.**       **Petra's conversion claim is barred by the economic loss rule and because Petra cannot identify specific and identifiable money that GMACM misappropriated; and**

    **C.**       **Petra's breach of fiduciary duty claim fails because Petra cannot establish that GMACM owed Petra any sort of fiduciary duty.**

## BACKGROUND

5.       On May 14, 2012, each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

6.       On May 16, 2012, the United States Trustee for the Southern District of New York appointed a nine member official committee of unsecured creditors [Docket No. 102].

7.       On June 20, 2012, this Court directed that an examiner be appointed, and on July 3, 2012, this Court approved Arthur J. Gonzalez as the examiner (the "**Examiner**") [Docket Nos.

- 2 -

454, 674]. On May 13, 2013, the Examiner filed his report under seal and, on June 26, 2013, this

Court entered an order unsealing the report [Docket Nos. 3698, 4099].

8.      On July 17, 2012, this Court entered an order [Docket No. 798] appointing

Kurtzman Carson Consultants LLC ("**KCC**") as the notice and claims agent in the Chapter 11

Cases. Among other things, KCC is authorized to (a) receive, maintain, record, and otherwise

administer the proofs of claim filed in the Chapter 11 Cases and (b) maintain official claims

registers for each of the Debtors.

9.      On August 29, 2012, this Court entered an order approving the Debtors' motion to

establish procedures for filing proofs of claim in the Chapter 11 Cases [Docket No. 1309] (the

"**Bar Date Order**").[3]

10.     On December 11, 2013, the Court entered the *Order Confirming Second Amended

Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of

Unsecured Creditors* (the "**Confirmation Order**") [Docket No. 6065] approving the terms of

the Chapter 11 plan, as amended (the "**Plan**"), filed in these Chapter 11 Cases [Docket No. 6065-

1].[4] On December 17, 2013, the Effective Date of the Plan occurred, and the Liquidating Trust

was established [Docket No. 6137].

11.     The Liquidating Trust was established to, among other things, wind down the

affairs of the Debtors. *See* Plan, Art. VI. Pursuant to the Plan, the Liquidating Trust has the

exclusive authority to "[f]ile, withdraw, or litigate to judgment, objections to Claims or Equity

---

[3] The Bar Date Order established, among other things, (i) November 9, 2012 at 5:00 p.m. (prevailing Eastern Time)
as the deadline to file proofs of claim by virtually all creditors against the Debtors (the "**General Bar Date**") and
prescribing the form and manner for filing proofs of claim; and (ii) November 30, 2012 at 5:00 p.m. (Prevailing
Eastern Time) as the deadline for governmental units to file proofs of claim (the "**Governmental Bar Date**"). (Bar
Date Order ¶¶ 2, 3.) On November 7, 2012, this Court entered an order extending the General Bar Date to November
16, 2012 at 5:00 p.m. (prevailing Eastern Time) [Docket No. 2093]. The Governmental Bar Date was not extended.
To date, over 7,400 proofs of claim have been filed in the Chapter 11 Cases.

[4] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Plan.

Interests (other than Borrower Claims, Private Securities Claims, and the NJ Carpenters Claims)." Plan, Art. VIII.A.3.

### A.    GMACM's Servicing Agreement With ARE

12.     On or about July 29, 2004, GMACM entered into a written loan servicing agreement (the "**Servicing Agreement**") with American Residential Equities C, LLC ("**ARE**") to service and administer a group of "fixed and adjustable rate, sub-prime residential mortgage loans" owned by ARE (the "**ARE Loans**"). *See* Servicing Agreement § 9.06.[5] ("With respect to each Mortgage Loan, [ARE] is the owner of all right, title, and interest in and to the Mortgage Loan (and the servicing rights appurtenant thereto).").  GMACM's rights and responsibilities under the agreement included: the right to collect mortgage payments, payment of taxes and insurance for the mortgaged properties, and payments to ARE as the owner of the subject assets.

13.     GMACM agreed to undertake the responsibilities set forth in the Servicing Agreement until either: "(1) the later of the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan or the disposition of any REO Property with respect to the last Mortgage Loan and the remittance of all funds hereunder; or (ii) mutual consent of [GMACM] and [ARE] in writing." *See* Servicing Agreement § 6.01.  Petra is not a party to the Servicing Agreement, and the Servicing Agreement makes no mention of Petra.  In addition, the Servicing Agreement, specifically prohibits transfer of the ownership of any of the subject loans without the execution of an assignment and assumption agreement and delivery of the same to GMACM. *Id.,* § 8.05.

---

[5] The servicing agreement is a confidential agreement, but has been produced to Petra in the Florida Action and relevant portions are attached as **Annex A** to the Horst Declaration.

### B.    Petra's Allegations

14.    Petra, however, alleges that it was the rightful owner of the ARE Loans and that ARE only had "pass-through" ownership of the assets. Amended Complaint, ¶¶ 8, 12.  The Amended Complaint is included in the Petra Claim, attached hereto as **Exhibit 1**.  According to Petra, it invested substantial funds with ARE beginning in August 2006, but this relationship apparently soured in February 2008 when Petra alleges it discovered that ARE had defrauded it. *Id.* ¶¶ 9-10, 13.

15.    Shortly after February 14, 2008, Petra alleges that it contacted GMACM to relay "what had occurred and what ARE had done with Petra's assets" and asserts that "it was reconfirmed that Petra was the true, rightful and equitable owner of all the assets which GMACM was servicing on behalf of ARE." *Id.* ¶ 14.  GMACM, however, had no knowledge at that time of any investment relationship between Petra and ARE concerning the ARE Loans. Horst Declaration, ¶ 4.  Petra alleges that it provided GMACM with a list of approximately one-hundred eighty-nine (189) assets that were to be transferred from ARE to Petra, but that GMACM "refused to give Petra its assets and refused to service such assets until Petra had paid ARE's bill in full as to the [ARE Loans]."  Amended Complaint, ¶¶ 15-16.

16.    Accordingly, Petra alleges that, on or about February 28, 2008,[6] GMACM "expressly agreed," via an oral arrangement, to (a) recognize Petra as the true owner of the ARE Loans; (b) transfer the ARE Loans to Petra; and (c) pay Petra, or hold in trust for Petra's benefit, any sums generated by the ARE Loans from February 28, 2008 and onwards.  *Id.* ¶ 18.  Petra alleges that it then paid GMACM $2,380,613.73 to resolve ARE's debt to GMACM via three (3)

---

[6] Petra, in its Amended Complaint, cites February 28, 2009 as the date on which they notified GMACM.  GMACM believes that counsel meant to refer to February 28, 2008 in the Amended Complaint. *See* Amended Complaint, ¶ 18.

separate payments: $738,947.52 on March 5, 2008; $1,528,601.97 on April 3, 2008; and $113,064.24 on October 23, 2008. *Id.* ¶ 19.

17.     Petra alleges that GMACM then breached the February 28, 2008 oral agreement by failing to transfer the proceeds from five (5) of the ARE loans (the "**Subject Loans**")[7] to Petra and "instead continu[ing] to pay over funds generated from the subject assets to ARE during its monthly distributions subsequent to February 28, 200[8]." *Id.* ¶ 21. Specifically, Petra asserts that GMACM wrongfully paid $593,311.41 in net proceeds for the Subject Loans to ARE instead of Petra, which forms the basis of the Petra Claim. *Id.* ¶ 22.

18.     The Subject Loans consist of the ownership rights to the following five (5) mortgage loans:

Loan No. ---1153 ("Harris Loan");
Loan No. ---5829 ("Ness Loan");
Loan No. ---1173 ("Nichols Loan");
Loan No. ---1178 ("Powley Loan");
Loan No. ---1152 ("Stephens Loan").

*See* Horst Declaration, ¶ 6.

---

[7] As of February 28, 2008, each of these loans in the Subject Loans category had been through foreclosure, with two of the loans having already been liquidated through GMACM's REO process. Horst Declaration, ¶ 6.    The remaining three loans were liquidated by April 4, 2008. *See* Annexes D and E to the Horst Declaration.

C.    **GMACM's Actions In 2008 Regarding Petra And ARE**

*Overview of GMAC/Petra/ARE Relationship*

19.    Petra's allegations relating to its history with GMACM in 2008 are demonstrably false, as Petra misconstrues the purpose of the payments Petra made to GMACM, and fails to identify any payment to GMACM related specifically to the Subject Loans, which are the sole basis of the Petra Claim.  As such, Petra's claims all fail as a matter of law.

20.    Petra first approached GMACM in February 2008 for information (not payment) regarding loans it claimed to own through ARE (*i.e.*, the ARE Loans).  *See* Horst Declaration, ¶ 4; 2-27-08 Email, attached as **Annex B** to the Horst Declaration.  Jeffrey Kirsh at ARE specifically consented to GMACM sharing this information with Petra on March 1, 2008. *See* Horst Declaration, ¶ 5; 3-4-08 Email, attached as **Annex C** to the Horst Declaration.  Most notably, Petra did not request that GMACM distribute proceeds from any of the ARE Loans to Petra instead of ARE until **after** GMACM had already remitted the Subject Loans to ARE. Horst Declaration, ¶ 7; 4-24-08 Email, attached as **Annex F** to the Horst Declaration.  Finally, as detailed herein, all of Petra's payments to GMACM were for specifically identified loans **other than** the Subject Loans. Horst Declaration, ¶¶ 9-11.

*Details of the GMAC/Petra/ARE Relationships and the Subject Loans*

21.    Erick Magno at Petra first contacted GMACM and claimed that Petra equitably owned specific loans that GMACM was servicing on February 27, 2008.  Horst Declaration ¶ 4; 2-27-08 Email.  This initial communication only requested that GMACM provide data and information on certain ARE loans.  *Id.*  Two (2) days later, Petra claimed that "all assets on the list provided to you yesterday are equitably owned by the petra fund" and, therefore, "[P]etra is entitled to receive any and all information regarding those loans directly from GMACM." *See* Horst Declaration, ¶ 5; 3-4-08 Email Chain.  The following day on March 1, 2008, Jeffrey Kirsch

of ARE advised GMACM that ARE did not take issue with GMAC providing information regarding the ARE Loans to Petra. *Id.* ARE, however, further stated that "there maybe [sic] a RESPA or servicing agreement issue involved since **Petra does not have a direct relationship with GMAC**. If there is no violation you may proceed accordingly." *Id.* (emphasis added). On March 4, 2008, after reviewing the legality of providing the requested information to Petra, GMACM sought approval from ARE to send the requested loan information to Petra through a secure portal. *See* 3-4-08 Email Chain. On that same day, Petra expressly asked GMACM if it was interested in entering into a direct servicing relationship with Petra for the loans Petra claimed to own. *Id.*

22.    Although GMACM provided information to Petra following its request, it continued its relationship with ARE pursuant to the terms of the Servicing Agreement. Therefore, in March 2008, GMACM remitted monies to via wire for three (3) of the Subject Loans: (i) $54,109.32 for the Nichols Loan; (ii) $84,823.37 for the Powley Loan, and (iii) $7,587.39 for the Ness Loan. Horst Declaration, ¶ 6; Payment Records and Correspondence, attached as **Annex D** to the Horst Declaration. These loans had all been liquidated through foreclosure and REO sales. *Id.* GMACM remitted these funds to ARE pursuant to the terms of its Servicing Agreement and, at that point, GMACM had not been given any direction to the contrary from ARE or Petra. *Id.*

23.    Similarly, on April 2 and April 4, 2008, GMACM remitted monies to ARE for the remaining two (2) loans of the Subject Loans: (i) $222,200.22 for the Stephens Loan and (ii) $224,591.11 for the Harris Loan. Horst Declaration, ¶ 6, Payment Screen, attached as **Annex E** to the Horst Declaration. Like the other three Subject Loans, these loans had all had been liquidated through foreclosure and REO sales. *Id.* Again, GMACM remitted these funds to ARE

pursuant to the terms of its Servicing Agreement and, at that point, GMACM still had not been given any direction to the contrary from ARE or Petra. *Id*.

24.     Then, on April 24, 2008, ***after*** GMACM had already made payments to ARE for the Subject Loans, Petra claimed ownership of twenty-three (23) specific loans, including the five (5) Subject Loans, and, for the first time, Petra requested that any proceeds relating to these assets be sent to Petra and not ARE. *Id*. ¶ 7; 4-28-08 Email. That same day, Petra informed ARE that GMACM required ARE's consent to the assignment of the servicing of these twenty-three (23) assets to Petra in order to begin servicing these assets directs for Petra on a temporary basis and "effective immediately." *Id*.

25.     Specifically, Petra advised ARE that what GMACM "require[s] is written confirmation from ARE agreeing to the [assignment] of the servicing of these 23 assets to Petra effective immediately. Please confirm AREs agreement of the servicing of these 23 assets to Petra by replying in the affirmative to this email." Horst Declaration, ¶ 7; 4-28-08 Email. In response, Jeff Kirsch at ARE advised Petra "We would be more than willing to have GMAC service these for you on a temporary basis. These assets can be assigned from ARE C to Petra. Petra should have a temporary servicing agreement with GMAC. **The remit should go to Petra so we are no longer in the middle**." *Id*. (emphasis added). This e-mail was then forwarded to GMACM. *Id*.

26.     This April 24, 2008 email is the first written document **from ARE** directing and authorizing GMACM to remit payments for the ARE Loans, including the Subject Loans, to Petra, and it came after GMACM had already remitted the funds at issue in the Petra Claim to ARE. *See Id*. At no point did GMACM and Petra enter into a written agreement concerning the Subject Loans or any of the ARE Loans. Horst Declaration, ¶ 9.

27.     After receiving ARE's consent, GMACM advised Petra that the proceeds from the liquidation of the five (5) Subject Loans had already been previously remitted to ARE, but nevertheless GMACM agreed to service the remaining eighteen (18) assets for Petra on a temporary basis. *See* 4-25-08 Email, Annex F to the Horst Declaration.  ("The loan count will be less than the 23 though. A couple of those REO settlements took place in February and one was in March. Those are likely to be remitted previously.").  In turn, Erick Magno at Petra advised Alba Castillo at GMACM that "we'll follow up on our side to collect the appropriate proceeds from ARE before it disappears" and that "[w]e need to know how much was remitted to ARE for these 5 assets so we can go straight to them for collection." *See* 4-25-08 and 4-28-08 Emails, Annex F to the Horst Declaration.  As such, by April 25, 2008, GMACM agreed that the proceeds from the eighteen (18) remaining identified ARE Loans would be remitted to Petra and not ARE, and Petra further acknowledged that it would look to ARE for the proceeds from the liquidation of the Subject Loans. *Id*.

28.     On May 1, 2008, however, Erick Magno reversed course, alleging that GMACM had agreed to remit the proceeds from twenty-three (23) of the specific ARE Loans to Petra and not ARE, despite the fact that GMACM had previously informed him that the proceeds from the liquidation of the five (5) Subject Loans had already been remitted to ARE on March 12, 2008 and April 11, 2008.  *See* Horst Declaration, ¶ 8; 5-1-08 Email, attached as **Annex G** to the Horst Declaration.  Magno further stated: "FYI: almost $600,000 in proceeds for the 5 Petra assets that you indicated were 'sold' and credited in March and April to ARE have NOT been returned to Petra and ARE refuses to return such proceeds despite numerous requests…" *Id*.

29.    For the Court's convenience, the following diagram depicts the timeline of events relating to communications with Petra and the payments related to the Subject Loans.



### *Petra's Payments to GMACM were unrelated to the Subject Loans*

30.    In its Amended Complaint, Petra asserts that it paid GMACM $2,380,613.73 to resolve ARE's debt to GMACM via three (3) separate payments: $738,947.52 on March 5, 2008; $1,528,601.97 on April 3, 2008; and $113,064.24 on October 23, 2008. Amended Complaint, ¶ 19. Petra mischaracterizes the nature of these payments, and strategically omits that these payments were tied to other specific loans, none of which were the five (5) Subject Loans.

31.    On March 5, 2008, GMACM received a payment from Petra for $738,947.52. *See* Horst Declaration, ¶ 10; Spreadsheet, attached as **Annex H** to the Horst Declaration. As evidenced by the spreadsheet provided by Petra's counsel, this payment was tied to twenty-eight (28) specific loans, none of which are the (5) Subject Loans. *Id*. This payment was comprised of corporate and escrow advances owed by ARE to GMACM for the twenty-eight (28) specific loans. *Id*.

32.    On April 4, 2008, Petra reimbursed GMACM for $1,528,116.97 in advances it incurred in servicing another sixty-five (65) specific loans. *See* Horst Declaration, ¶ 11;

Spreadsheet, attached as **Annex I** to the Horst Declaration.[8]  As evidenced by the spreadsheet provided by Petra's counsel, this payment was tied to sixty-five (65) specific loans, none of which are the Subject Loans.  *See* Annex I to the Horst Declaration.[9]

### D.    The Florida Action

33.    On January 13, 2009, before the commencement of the Chapter 11 Cases, Petra filed its complaint against GMACM in the Florida Action. Horst Declaration, ¶ 13.  Petra then filed an amended complaint (the "**Amended Complaint**") against GMACM.

34.    The Amended Complaint asserts three causes of action against GMACM: (a) "Breach of the Oral Contract Between PETRA and GMACM" ("Count I"); (b) "Conversion" ("Count II"); and (c) "Breach of Fiduciary Duty" ("Count III").  The parties exchanged some initial written discovery but no depositions were taken.  Petra did not actively pursue the case and in 2011 the parties agreed to stay the case.  On May 21, 2012, GMACM filed its Suggestion of Bankruptcy.

### E.    The Petra Claim

35.    On October 3, 2012, Petra filed the Petra Claim against GMACM, asserting an unsecured claim in the amount of $764,110.57 for "Failure to Remit Monies." *See* Petra Claim, at 1.  The Petra Claim simply attaches the Amended Complaint, as well as a "Statement

---

[8] Petra made another payment to GMACM in October 2008. The parties agree this payment was comprised of the application of $74,962.07 held by GMACM and an actual payment of $38,102.17.  *See* Amended Complaint, ¶ 19; Horst Declaration, ¶ 12, and Annex J to the Horst Declaration.

[9] For unknown reasons, Petra's allegation in the Amended Complaint totals $1,528,601.97; however, GMACM only confirms receipt of $1,528,116.97.

Itemizing Interest" setting forth the principal claim of $593,311.41 and a calculation of accrued interest under Florida's judgment interest rates.[10] *Id.*

36.    As discussed above, the basis of the Petra Claim and the Amended Complaint is GMACM's remittance of the proceeds from the liquidation of the Subject Loans, totaling $593,311.41, to ARE instead of Petra on March 12, 2008 and April 11, 2008.

## RELIEF REQUESTED

37.    The Liquidating Trust files this Objection seeking to disallow and expunge the Petra Claim pursuant to section 502(b) of the Bankruptcy Code for failure to state a claim upon which relief can be granted against the Debtors under applicable law.

## OBJECTION TO PETRA CLAIM

38.    A filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).  A properly completed proof of claim is *prima facie* evidence of validity and amount of a claim.  *See* Fed. R. Bankr. P. 3001(f).  A party in interest may object to a proof of claim, and once an objection is made, the court must determine whether the objection is well founded. *See* 4 *Collier on Bankruptcy* ¶ 502.02[2] (16th ed. rev. 2012).

39.    Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1).  Whether a claim is allowable "generally is determined by applicable nonbankruptcy law. . . ." *In re W.R. Grace & Co.*, 346 B.R. 672, 673 (Bankr. D. Del. 2006).  "What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition is filed, is a question which, in

_____

[10] Sections 215.422(3)(b), 337.141(3) and 687.01 of the Florida Statutes require the use of certain rates for the payment of interest for cases where a rate of interest is not specified in a contract.  The rate is set each year by the state's Chief Financial Officer.

the absence of overruling federal law, is to be determined by reference to state law." *In re Hess*, 404 B.R. 747, 749 (Bankr. S.D.N.Y. 2009) (quoting *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161 (1946)). For the reasons set forth below, the Petra Claim fails to state a claim against any of the Debtors under applicable law and should be disallowed and expunged in its entirety.

## I.    THE PETRA CLAIM FAILS TO SATISFY BASIC PLEADING STANDARDS

40.    Several courts, including those in this district, have applied the federal pleading standards when assessing the validity of a proof of claim. *See In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure.") (citing *In re Rockefeller Ctr. Props.*, 272 B.R. 529, 542 n.17 (Bankr. S.D.N.Y. 2000), *aff'd sub nom.*, *NBC v. Rockefeller Ctr. Props. (In re Rockefeller Ctr. Props.)*, 226 B.R. 52 (S.D.N.Y. 2001), *aff'd*, 46 F. App'x 40 (2d Cir. 2002)); *Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, 398 B.R. 736, 748 (Bankr. S.D.N.Y. 2008) ("The documents attached to the proofs of claim should be treated, for purposes of a motion to disallow claims, like documents that are attached to or relied upon in a complaint are treated on a Rule 12(b)(6) motion to dismiss. . . .") (citation omitted).

41.    The Liquidating Trust seeks to expunge the Petra Claim in its entirety. Because the Petra Claim essentially incorporates by reference the Amended Complaint and does not add any additional substantive bases in support of the Petra Claim, this Objection addresses the merits of each count of the Amended Complaint in detail below. Accordingly, the validity of the Petra Claim, which is based wholly on the assertions made in the Amended Complaint, should be adjudged under the pleading standards applicable to the Amended Complaint.

## II.    THE AMENDED COMPLAINT FAILS TO PLEAD A BASIS FOR BREACH OF AN ORAL CONTRACT (COUNT I)

42.    Petra alleges that it entered into an oral agreement with GMACM on or about February 28, 2008, pursuant to which GMACM allegedly agreed to transfer ownership of the Subject Loans to Petra upon Petra's payment of ARE's debt to GMACM. Amended Complaint, ¶¶ 24-26.  It further alleges that GMACM breached this agreement by transferring the proceeds from the liquidation of the Subject Loans to ARE rather than to Petra.  *Id.* ¶ 26.

43.    The elements of an action for breach of contract in Florida are: (1) the existence of a contract, (2) a breach of the contract, and (3) damages from the resulting breach. *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006).  To establish the existence of a contract, a plaintiff must plead offer, acceptance, and consideration, as well as sufficient specification of essential terms. *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004) "[A] meeting of the minds of the parties on all essential elements is a prerequisite to the existence of an enforceable contract . . . ." *Acosta v. District Bd. of Trs. of Miami-Dade Cmty. Coll.*, 905 So. 2d 226, 228 (Fla. Dist. Ct. App. 2005) (quoting *Greater N.Y. Corp. v. Cenvill Miami Beach Corp.*, 620 So. 2d 1068, 1070 (Fla. Dist. Ct. App. 1993)).  In determining whether there has been a meeting of the minds, Florida courts look not to "the agreement of two minds in one intention, but on the agreement of two sets of external signs-not on the parties having meant the same thing but on their having said the same thing." *Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 407 (Fla. 1974) (quoting *Gendzier v. Bielecki*, 97 So. 2d 604, 608 (Fla. 1957)).  As such, when dealing with an oral contract, "a plaintiff is required to allege facts that, it taken as true, demonstrate that the parties mutually assented to 'a certain and definite proposition' and left no essential terms open." *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 300 (Fla. Dist. Ct. App. 1999) (citing *Jacksonville Port Auth. v.*

*W.R. Johnson Enters., Inc.*, 625 So. 2d 313 (Fla. Dist. Ct. App. 1993)).  As there is no written

contract between Petra and GMACM, Petra must demonstrate certain, definite terms in order to

prevail—and this it cannot do. Horst Declaration, ¶ 9.

44.    The undisputed facts demonstrate that Petra's claim fails as a substantive matter

of law. Petra premises its claim on payments related to the five (5) specific Subject Loans.

GMACM, however, had already remitted the funds for the Subject Loans to ARE pursuant to the

terms of its Servicing Agreement **before** Petra ever asserted any right to payment of these funds.

Horst Declaration, ¶¶ 6-7.  Rather, Petra was aware that GMACM was remitting funds to ARE

pursuant to the Servicing Agreement and failed to timely notify GMACM that it was claiming a

payment interest in the proceeds from the Subject Loans. *Id.* ¶ 7.  Instead, Petra attempts to

misconstrue the purpose of payments related to other distinct assets in order to seek recourse

from GMACM because it has been unable to recover the disputed proceeds directly from ARE.

*See* Amended Complaint. Petra's damages, if any, are based on its relationship with ARE, its

own negligence, and have nothing to do with any alleged fault of GMACM.

45.    More importantly, Petra's Amended Complaint fails to meet Florida's threshold

requirement for stating a cause of action for breach of oral contract.  A party seeking relief for

breach of contract must allege the elements of a contract with precision. *McKinney-Green, Inc v.

Davis*, 606 So. 2d 393, 395 (Fla. Dist. Ct. App. 1992); *Roy L. Willard, Inc. v. Miller*, 8 So. 2d

489, 492 (Fla. 1942).  Petra, however, fails to allege facts demonstrating that the parties reached

an unequivocal agreement with certain terms on February 28, 2008.  Petra, in conclusory fashion,

simply alleges that GMACM "expressly agreed" to recognize Petra as the owner of the ARE

Loans if Petra agreed to pay ARE's outstanding debt, Amended Complaint, ¶ 18, but Petra fails

to set forth any of the critical details of this alleged "express agreement," including the amount

of ARE's outstanding debt.  In particular, Petra fails to identify (a) the specific individuals that negotiated the alleged contract on behalf of GMACM, (b) the time, method, and manner for transferring the ARE Loans to Petra, and (c) the time and terms for payment to GMACM. These omissions are fatal to Petra's Claim. *See Jacksonville Port Auth.*, 624 So. 2d at 315; s*ee also Hazen v. Cobb*, 117 So. 853, 856 (Fla. 1928) ("The essential facts constituting a breach of contract should be set forth in unequivocal terms, and with sufficient certainty as will apprise the defendant in what particular he has failed to perform.").  Moreover, Petra fails to even allege when the oral contract was to conclude or what specific services GMACM was to provide regarding the ARE Loans. Petra cannot allege that there was a "meeting of the minds" as to all essential terms on February 28, 2008, because the undisputed written evidence demonstrates that the parties were engaged in ongoing discussions regarding these "essential terms" throughout much of 2008 for GMACM to continue servicing certain of the ARE Assets under either a sub-servicing agreement or a tri-party agreement with ARE. Horst Declaration, ¶¶ 4-7.

46.    Furthermore, Petra's breach of contract claim is prohibited by the statute of frauds. Contracts concerning the transfer of real property or any interest therein are not enforceable unless there is a signed, written contract. *See* Fla. Stat. § 725.01; Fla. Stat. § 698.01. Similarly, contracts concerning one party's promise to pay or answer for the debt of another must be in a signed writing to be enforceable. *Id.* § 725.01.  In this case, Petra alleges GMACM orally agreed to convey certain interests in real property in exchange for Petra's promise to pay ARE's debt, which GMACM breached by "failing to transfer the five properties" and "failing to pay Petra or retain on account . . . the net proceeds" for those properties. Amended Complaint, ¶ 26. Pursuant to Florida law, however, both of these alleged promises must be in a signed writing to be enforceable. *See* Fla. Stat. §§ 725.01 and 698.01.  Because the alleged contract was not

reduced to a signed, written agreement, enforcement of any alleged oral contract is barred by the statute of frauds. *See id.* § 725.01.

47.     Thus, Count I, for breach of an oral agreement, fails to state a claim against the Debtors and the Petra Claim should be expunged.

## III.    PETRA FAILS TO STATE A CLAIM FOR CONVERSION

48.     In Count II of the Amended Complaint, Petra alleges that GMACM converted Petra's property by remitting funds from liquidation of the Subject Loans to ARE rather than Petra. Amended Complaint ¶¶ 29-33.   Under Florida law, conversion is "an act of dominion wrongfully asserted over another's property inconsistent with his ownership  therein." *Thomas v. Hertz Corp.*, 890 So. 2d 448, 449 (Fla. Dist. Ct. App. 2004) (internal quotation marks omitted). To recover on a claim for civil conversion, a plaintiff generally must demonstrate by a preponderance of the evidence: (1) a right to property; (2) a demand for the return of that property; and (3) the defendant's refusal to return the property.  *In re Energy Smart, Inc.*, 381 B.R. 359, 377 (M.D. Fla. 2007).   Where the claim is for conversion of money, a plaintiff must establish four additional elements: (1) specific and identifiable money; (2) possession or an immediate right to possess that money; (3) an unauthorized act which deprives plaintiff of that money; and (4) a demand for return of the money and a refusal to do so. *Id.*

49.     Here, Petra's conversion claim fails for several reasons.  First, the economic loss rule bars Petra's conversion claim because the tort of conversion is not designed to remedy a contractual default. *See Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1541 (11th Cir. 1990). "Neither an obligation to pay money nor a breach of contract generally gives rise to a claim of conversion in tort." *Id.*   Because Petra's conversion claim is premised on breach of an alleged oral agreement, it is prohibited by the economic loss doctrine. *See Belford Trucking Co. v.*

*Zagar*, 243 So. 2d 646, 648 (Fla. Dist. Ct. App. 1970) ("[A]n action in tort is inappropriate where the basis of the suit is a contract, either express or implied.").

50.     Second, Petra cannot maintain a claim for conversion because it cannot point to "specific and identifiable money" in GMACM's possession that should have Petra's name on it. Generally, an obligation to pay money does not give rise to a conversion claim. *Kee*, 918 F.2d at 1541.  Money may be the subject of a conversion claim only where "it consists of specific money capable of identification." *Belford*, 243 So. 2d at 648 (discussing as examples money kept in a sealed envelope or deposit bag and money held in constructive trust until the occurrence of a specified event as grounds for a conversion claim).  "Money is capable of identification where it is delivered at one time, by one act and in one mass . . . ." *Id.* Moreover, "[t]he fact that the amount is certain does not make an 'identifiable fund.'" *Fla. Desk, Inv. v. Mitchell Int'l, Inc.*, 817 So. 2d 1059, 1061 (Fla. Dist. Ct. App. 2002).  Rather, there must be an obligation to hold the money for a party's benefit.  *Id.*  GMACM, however, was under no obligation to hold the $591,311.41 in net proceeds from the Subject Loans for Petra's benefit.  Rather, GMACM was contractually obligated to remit these proceeds to ARE pursuant to the Servicing Agreement, which it did in March and early April 2008. *See* Horst Declaration, ¶¶ 6-7.  It was not until April 24, 2008, that Petra asked ARE for its consent to allow GMACM to service the Subject Loans and remit the related funds to Petra instead of ARE.  This is well after GMACM had already remitted the proceeds at issue to ARE. *Id.*  Accordingly, Petra cannot demonstrate that it had a right to the proceeds in question or that it expected GMACM to hold the proceeds at issue for Petra's benefit before April 24, 2008.  Because GMACM did not owe Petra any duty at the time the proceeds in question were remitted to ARE, Petra's conversion claim against GMACM must fail. *See Gasparini v. Pordomingo*, 972 So. 2d 1053, 1056 (Fla. Dist. Ct. App. 2008) (finding no

conversion claim where the parties did not contemplate keeping funds in a separate account, nor was there any obligation to hold any funds in a trust or escrow account); *see also Fla. Desk*, 817 So. 2d at 1061 ("[T]here is no evidence that there was any obligation on [the defendant's] part to keep intact or hold a specific fund to deliver to [the plaintiff].").

51.    Finally, Petra fails to allege that it demanded the subject funds that GMACM allegedly converted.  Thus, Count II for conversion fails to state a claim against the Debtors and the Petra Claim should be expunged.

## IV.    PETRA CANNOT STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY

52.    Petra also asserts that GMACM breached its fiduciary duty to Petra "through the abuse of their relationship through improper action, the use of its fiduciary position to secure benefits at the expense of Petra, and through the failure to take necessary action on behalf of Petra."  Amended Complaint, ¶ 37.  Petra, however, fails to allege any facts demonstrating that GMACM owed any duty to Petra, let alone a fiduciary duty.  Under Florida law, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty or relationship, (2) breach of that fiduciary duty, and (3) resulting damages. *Gracey v. Eaker*, 837 So. 2d. 348, 353 (Fla. 2002).

53.    To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party. *Watkins v. NCNB Nat'l Bank of Fla., N.A.*, 622 So. 2d 1063, 1065 (Fla. Dist. Ct. App. 1993).  "When the parties are dealing at arm's length, a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other." *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 541 (Fla. Dist. Ct. App. 2003).  The fact that one party places trust or confidence in the other does not create a fiduciary relationship in the absence of some recognition, acceptance, or undertaking of the duties of a fiduciary on the

part of the other party. *Am. Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc.*, 390 F.

Supp. 2d 1170, 1179 (M.D. Fla. 2005).  As such, a party cannot unilaterally impose a fiduciary

relationship. *Jaffe v. Bank of Am., N.A.*, 667 F. Supp. 2d 1299, 1319 (S.D. Fla. 2009).  Among

other things, there must be circumstances exceeding an ordinary commercial transaction. *Id.*

(citation omitted) (internal quotation marks omitted).

54.    Here, Petra fails to point to any facts which establish the existence of a fiduciary

relationship between itself and GMACM.  Petra does not allege any facts demonstrating a

relationship of trust and confidence between GMACM and Petra.  Nor does Petra allege that it

was dependent on GMACM to advise, counsel, or protect it.  Rather, the undisputed facts

demonstrate that the parties enjoyed an arm's-length relationship and nothing more, which is

insufficient to establish a fiduciary duty. *Taylor*, 850 So. 2d at 541; *see also Argonaut Dev.*

*Group, Inc. v. SWH Funding Corp.*, 150 F. Supp. 2d 1357, 1363 (S.D. Fla. 2001) ("[T]here is no

case law which suggest that a fiduciary duty arises between arms-length parties to a proposed

contract.").  As such, Petra's conclusory allegations that a fiduciary relationship existed are

insufficient because they are unsupported by any factual assertions. *Am. Honda Motor Co.*, 390

F. Supp. 2d at 1180.

55.    As with the conversion claim, the economic loss rule also prohibits Petra's breach

of fiduciary duty claim.  "Under Florida law, a cause of action for breach of fiduciary duty will

not lie where the claim of breach is dependent upon the existence of a contractual relationship

between the parties."  *Detwiler v. Bank of Cent. Fla.*, 736 So. 2d 757, 759 (Fla. Dist. Ct. App.

1999).  Petra's breach of fiduciary duty claim is based upon and inextricably intertwined with its

breach of contract claim.  Both claims are premised upon GMACM's alleged failure to pay Petra

funds associated with certain real estate assets.  *See* Amended Complaint, ¶¶ 26, 37.  Because

Petra's claim arises solely as a result of an alleged oral contract between the parties, Petra's breach of fiduciary duty claim is barred by the economic loss rule. *See Detwiler*, 736 So. 2d at 759; *see also McCutcheon v. Kidder, Peabody & Co., Inc.*, 938 F. Supp. 820, 823-24 (S.D. Fla. 1996).

56. Thus, Count III for breach of fiduciary duty fails to state a claim against GMACM and the Petra Claim should be expunged.

## NOTICE

57. The Liquidating Trust has provided notice of the Objection in accordance with the Case Management Procedures [Docket No. 141] and the Claims Objection Procedures Order. The Liquidating Trust submits that no other or further notice need be provided.

## CONCLUSION

WHEREFORE, the Liquidating Trust respectfully requests entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem proper.

Dated: February 10, 2015

/s/ Joseph A. Shifer
KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Joseph A. Shifer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the ResCap Liquidating Trust*

-and-

BRADLEY ARANT BOULT CUMMINGS LLP
100 N. Tryon Street
Suite 2690
Charlotte, North Carolina 28202
Telephone:  704) 338-6000
Facsimile:  704) 332-8858
Christian W. Hancock

*Counsel for the ResCap Liquidating Trust*

## Exhibit 1

**Proof of Claim**

B 10 (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT     Southern District of New York | | PROOF OF CLAIM |
|---|---|---|
| Name of Debtor:<br>GMAC Mortgage, LLC | Case Number:<br>12-12032 (MG) | |

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Petra Finance, LLC | |
|---|---|
| Name and address where notices should be sent:<br>Petra Finance, LLC c/o Thomas A. Conrad, Esq.<br>7777 Glades Road, Suite 400<br>Boca Raton, Florida  33434<br><br>Telephone number: (561) 477-7800    email: taconrad@sbwlawfirm.com | **COURT USE ONLY**<br><br>❏ Check this box if this claim amends a previously filed claim.<br><br>Court Claim Number:_____<br>(*If known*)<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br>Telephone number:        email: | ❏ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim.  Attach copy of statement giving particulars. |

**1. Amount of Claim as of Date Case Filed:**     $               764,110.57

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☑Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:**   Failure to Remit Monies (see attached)
    (See instruction #2)

| 3.  Last four digits of any number by which creditor identifies debtor: | 3a. Debtor may have scheduled account as:<br>_____<br>(See instruction #3a) | 3b. Uniform Claim Identifier (optional):<br>_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _<br>(See instruction #3b) |
|---|---|---|

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:**
$_____

**Nature of property or right of setoff:** ❏Real Estate  ❏Motor Vehicle  ❏Other
**Describe:**

**Basis for perfection:** _____

**Value of Property:** $_____

**Amount of Secured Claim:** $_____

**Annual Interest Rate_____% ❏Fixed  or  ❏Variable**
**(when case was filed)**

**Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

❏ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

❏ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

❏ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

**Amount entitled to priority:**

❏ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

❏ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

❏ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__).

$_____

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this pr



1212032121003000000000001

B 10 (Official Form 10) (12/11)

2

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.    ☑ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor,    ☐ I am a guarantor, surety, indorser, or other codebtor.
                          (Attach copy of power of attorney, if any.)    or their authorized agent.    (See Bankruptcy Rule 3005.)
                                                                          (See Bankruptcy Rule 3004.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:   Thomas A. Conrad, Esq.
Title:        Attorney for Creditor
Company:      Shapiro Blasi Wasserman & Gora, P.A.
Address and telephone number (if different from notice address above):
     7777 Glades Road, Suite 400
     Boca Raton, Florida  33434

(Signature)                                     10/3/12
                                                (Date)

Telephone number: (561) 477-7800    email: taconrad@sbwlawfirm.com

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

**INSTRUCTIONS FOR PROOF OF CLAIM FORM**

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

## STATEMENT ITEMIZING INTEREST

Amount of Claim (principal):                                          $ 593,311.41

Interest from 05/01/2008 - 12/31/2008 @ 11%:      $  43,509.50

Interest from 01/01/2009 - 12/31/2009 @ 8%:           47,464.91

Interest from 01/01/2010 - 12/31/2010 @ 6%:           35,598.68

Interest from 01/01/2011 - 09/30/2011 @ 6%:           26,699.01

Interest from 10/01/2011 - 05/14/2012 @ 4.75%:        17,527.06

Total Interest Claimed:                                               $ 170,799.16
                                                                     ===========

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

### CASE NO. 09-03606 CA20

PETRA FINANCE, LLC

      Plaintiff

vs.

GMAC MORTGAGE, LLC,

      Defendant

_____/

### AMENDED COMPLAINT

COMES NOW the Plaintiff, PETRA FINANCE, LLC, a Florida limited liability company, by and through its undersigned attorney and sues GMAC MORTGAGE, LLC, a Delaware limited liability company, and would allege as follows:

### Jurisdiction, Parties and Venue

1.    This is an action for damages in excess of $15,000.

2.    PETRA FINANCE, LLC, formerly known as PETRA OPPORTUNITY FUND, hereinafter "PETRA", is a Florida limited liability company operating and with headquarters in Miami-Dade county.

3.    GMAC MORTGAGE, LLC, hereinafter "GMACM" is a Delaware limited liability company authorized to do business in the State of Florida and operating within Miami-Dade County.

4.    AMERICAN RESIDENTIAL EQUITIES C, LLC, hereinafter "ARE", is a Delaware limited liability company that is not a defendant in this action, but which, at all

Case No. 09-03606 CA20
Amended Complaint

times relevant hereto, operated and had its headquarters in Miami-Dade county and is related to this action for reasons set forth herein.

     5.     Venue of this action is proper in this Circuit, pursuant to Sections 47.011, 47.041 and 47.051, Fla. Stat. (2008), because GMACM has, or usually keeps, an agent or other representative in Miami-Dade County, and the causes of action sued upon otherwise accrued in Miami-Dade County, Florida.

     6.     All conditions precedent to this action, if any, have occurred, been performed or been waived.

     7.     PETRA has retained the law firm of Shapiro, Blasi, Wasserman & Gora, P.A. to represent it in this matter and has agreed and become obligated to pay said law firm a reasonable attorney's fee for its services.

### Statement of Facts

     8.     During the Spring of 2006, ARE approached PETRA representing itself as providing investors with opportunities for ARE's management of pass-through ownership of specific mortgage pools, individual mortgages and other real estate assets.

     9.     On or about August 21, 2006, PETRA and ARE entered into an investment relationship in which PETRA invested approximately $45 Million with ARE.

     10.     After August 21, 2006 PETRA continued to make investments with ARE from time-to-time such that ARE was, at all times relevant hereto, managing on average $50 Million of PETRA's funds at any given time.

Case No. 09-03606 CA20
Amended Complaint

11.    At all times relevant hereto, GMACM and ARE had a written agreement whereby GMACM provided mortgage servicing and other services to ARE for the assets PETRA purchased and had ARE manage. PETRA was not permitted a copy of this agreement, which was described by ARE and GMACM as being confidential. Both entities have declined to provide a copy of this agreement to PETRA despite repeated demands for same. Notwithstanding, PETRA will endeavor to obtain this agreement via discovery in this action.

12.    Since at least 2007 and likely earlier, GMACM was fully aware that PETRA was the true, rightful and equitable owner of all of the assets which GMACM was servicing on behalf of ARE.

13.    On or about February 14, 2008, PETRA discovered that ARE had defrauded it and had stolen, deceived and intentionally mismanaged Petra's investments in a total amount exceeding $20 Million.

14.    Shortly thereafter, PETRA had a series of telephone calls and emails with employees of GMACM, including but not limited to ALBA CASTILLO, LYNNE GENTNER, and MARK ELLIOT, during which PETRA informed GMACM in very specific terms what had occurred and what ARE had done with PETRA's assets. Further, during the course of these communications it was reconfirmed that PETRA was the true, rightful and equitable owner of all of the assets which GMACM was servicing on behalf of ARE. Shortly thereafter, ARE contacted GMACM and reconfirmed that

Case No. 09-03606 CA20
Amended Complaint

PETRA was the owner of these assets and that all of these assets had been purchased
with PETRA's funds.

15.    During the conversations described in Paragraph 14, GMACM was given
a list of assets that were to be transferred from ARE to PETRA, hereinafter the "ASSET
LIST". A copy of this list is attached hereto as **Exhibit A**.

16.    GMACM, upon receiving the ASSET LIST and various instructions from
both PETRA and ARE to transfer the assets listed thereon to PETRA, refused to give
PETRA its assets and refused to service such assets until PETRA had paid ARE's bill in
full as to the assets listed on the ASSET LIST.

17.    ARE was unable to pay the amounts it owed to GMACM.

18.    As such, GMACM expressly agreed on or about February 28, 2009 that if
PETRA agreed to pay GMACM the outstanding debt owed by ARE, GMACM would
immediately recognize PETRA as the owner of the assets listed on the ASSET LIST as
of February 28, 2009 and would transfer said assets to PETRA. GMACM further
agreed that from February 28, 2009 forward, that all sums that had been or would be
generated by said assets and any other sums which were owed by GMACM to ARE as
of said date would be paid by GMACM to PETRA or held on account until such time as
the specific asset was transferred to PETRA. PETRA agreed to this arrangement.

Case No. 09-03606 CA20
Amended Complaint

19.    On or about March 5, 2008, April 3, 2008, and October 23, 2008, PETRA paid $738,947.52, $1,528,601.97 and $113,064.24,[1] respectively, for a total of $2,380,613.73 to GMACM to fully resolve the debt owed by ARE to GMACM.

20.    PETRA made the aforementioned payments for the sole purpose of protecting its interests in the subject assets and said payments were not made voluntarily.

21.    Notwithstanding, GMACM failed to transfer certain assets to PETRA. Further, GMACM failed to pay to PETRA or retain on account amounts generated by the subject assets and/or amounts which were owed by GMACM to ARE as of February 28, 2009, and instead continued to pay over funds generated from the subject assets to ARE during its monthly distributions subsequent to February 28, 2009.

22.    In particular, GMACM paid ARE net proceeds in the amount of $593,311.41 subsequent to February 28, 2009 for five of the subject assets, which are listed on Exhibit B hereto.

## Count I – Breach of the Oral Contract Between PETRA and GMACM

23.    PETRA restates and realleges Paragraphs 1 through 22 as if fully set forth herein.

24.    PETRA and GMACM entered into an oral contract on or about February 28, 2009 as more specifically alleged in paragraph 18 herein.

---

[1]The $113,064.24 paid by PETRA to GMACM consisted of application of a credit due to PETRA in the amount of $74,962.07 plus an additional payment of $38,102.17.

25.    PETRA fully performed its obligations under the subject agreement by paying GMACM a total of $2,380,613.73, which GMACM represented to be the sum due and owing from ARE.  Specifically, PETRA paid GMACM the sum of $738,947.52 on or about March 5, 2008, $1,528,601.97 on or about April 3, 2008 and $113,064.24 on or about October 23, 2008.

26.    Notwithstanding, GMACM has breached the subject contract by:

a.    Failing to transfer the five properties listed on *Exhibit B* to PETRA; and

b.    Failing to pay PETRA or retain on account the $593,311.41 in net proceeds obtained by GMACM for the five properties listed on *Exhibit B* and instead paying said funds to ARE subsequent to February 28, 2008.

27.    As a direct and proximate result of GMACM's aforementioned breaches of the subject contract, PETRA has suffered damages.

WHEREFORE, PETRA demands judgment against GMACM for damages, together with interest, pre- and post-judgment costs, and such other and further relief as this Court may deem just, equitable and proper.

### Count II -- Conversion

28.    Petra restates and realleges Paragraphs 1 through 17 and 19 through 22 as if fully set forth herein.

Case No. 09-03606 CA20
Amended Complaint

29.    The funds which GMACM collected on behalf of PETRA in connection with the assets specified in **Exhibit B** hereto were or should have been held in escrow and/or in trust by GMACM for the benefit of PETRA.

30.    At all times material hereto, PETRA was the rightful owner of said funds, and was lawfully entitled to the immediate possession of same.

31.    GMACM undertook actions with said funds against PETRA's interests that were not authorized and contrary to PETRA's instructions.  In particular, GMACM failed to pay PETRA or retain on account the $593,311.41 in net proceeds obtained by GMACM for the five properties listed on **Exhibit B**.  Instead, GMACM paid these sums to ARE.

32.    As such, GMACM has deprived and continues to deprive PETRA of said property.

33.    GMACM's deprivation of PETRA's property and assets is inconsistent with PETRA's ownership of same.

WHEREFORE, Petra demands judgment against GMACM for damages, together with pre and post judgment interest, costs, and any other and further relief this Court deems equitable, just and proper.

## Count III - Breach of Fiduciary Duty

34.    PETRA restates and realleges Paragraphs 1 through 22 as if fully set forth herein.

35.    By agreeing to collect monies on behalf of PETRA, to safegurd such funds for PETRA's benefit, to pay such funds to PETRA and not to any third party or to retain such funds on account, GMACM undertook a duty to act in PETRA's best interests and to advise, counsel and protect PETRA with respect to the assets owned by PETRA that were placed in GMACM's care.

36.    As such, PETRA and GMACM shared a relationship whereby PETRA reposed a trust and confidence in GMACM and GMACM recognized and accepted that trust.

37.    GMACM breached its duties to PETRA through the abuse of their relationship through improper action, the use of its fiduciary position to secure benefits at the expense of PETRA, and through the failure to take necessary action on behalf of PETRA. In particular, GMACM breached its fiduciary duty to PETRA by failing to pay PETRA or retain on account the $593,311.41 in net proceeds obtained by GMACM for the five properties listed on *Exhibit B* and instead paying said funds to ARE subsequent to February 28, 2008.

38.    Such actions and/or inactions on the part of GMACM constitute a conscious disregard for the best interests of PETRA.

39.    As a direct and proximate result of GMACM's aforementioned breaches of the fiduciary duties it owed to PETRA, PETRA has suffered damages.

WHEREFORE, PETRA demands judgment against GMACM for damages, together with pre and post judgment interest, costs, and any other and further relief this Court deems equitable, just and proper.

### Jury Demand

PETRA demands trial by jury for all counts herein so triable.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Amended Complaint has been sent via facsimile and U.S. Mail to: H. Keith Thomerson, Esq., Hinshaw & Culbertson, LLP, 50 N. Laura St., Suite 4100, Jacksonville, FL 32202-3621 this __16th__ day of September, 2009.

SHAPIRO, BLASI, WASSERMAN & GORA, P.A.
Attorneys for Plaintiff
Corporate Centre at Boca Raton
7777 Glades Road, Suite 400
Boca Raton, FL 33434
Telephone:   (561) 477-7800
Facsimile:   (561) 477-7722

By: _____
DAVID LLOYD MERRILL, ESQ.
Fla. Bar No. 99155
E-mail: dlmerrill@sbwlawfirm.com
BRIAN M. BECHER, ESQ.
Florida Bar No. 160393
E-mail: bmbecher@sbwlawfirm.com

**OMITTED**

**<u>Exhibit 2</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ORDER GRANTING THE RESCAP LIQUIDATING TRUST'S**
**OBJECTION TO  CLAIM NO. 788 FILED BY PETRA FINANCE, LLC**

Upon the objection (the "**Objection**")[1] filed by the ResCap Liquidating Trust (the

"**Liquidating Trust**") established pursuant to the terms of the confirmed Plan filed in the above-

referenced Chapter 11 Cases and as successor in interest to the Debtors, seeking entry of an

order, pursuant to section 502(b) of title 11 of the United States Code (the "**Bankruptcy Code**")

and Rule 3007(a) of the Federal Rules of Bankruptcy Procedure, disallowing and expunging

proof of claim no. 788 (the "**Claim**") filed by Petra Finance, LLC ("**Petra**"), as more fully

described in the Objection; and it appearing that this Court has jurisdiction to consider the

Objection pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Objection and the

relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Objection having been provided, and it appearing that no other or further notice need be

provided; and upon consideration of the Objection and the *Declaration of Deanna Horst in*

*Support of ResCap Liquidating Trust's Objection to Claim No. 788 Filed by Petra Finance, LLC*

annexed to the Objection as **Exhibit 3**; and the Court having found and determined that the relief

---

[1]    Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms
       in the Objection.

sought in the Objection is in the best interests of the Liquidating Trust, the Liquidating Trust's beneficiaries, the Debtors, and all parties in interest and that the legal and factual bases set forth in the Objection establish just cause for the relief granted herein; and the Court having determined that the Objection complies with the Claims Objection Procedures Order; and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The relief requested in the Objection is granted to the extent provided herein.

2.      Pursuant to section 502(b) of the Bankruptcy Code, the Claim is hereby disallowed and expunged in its entirety with prejudice.

3.      Kurtzman Carson Consultants LLC ("**KCC**"), the Debtors' claims and noticing agent, is directed to disallow and expunge the Claim so that it is no longer maintained on the Debtors' Claims Register.

4.      The Liquidating Trust and KCC are authorized and empowered to take all actions as may be necessary and appropriate to implement the terms of this Order.

5.      Notice of the Objection as provided therein shall be deemed good and sufficient notice of such objection, and the requirements of Bankruptcy Rule 3007(a), the Case Management Procedures entered on May 23, 2012 [Docket No. 141], the Claims Objection Procedures Order, and the Local Bankruptcy Rules of this Court are satisfied by such notice.

6.      This Order has no res judicata, estoppel, or other effect on the allowance of any claim other than the Claim, and all rights of the Liquidating Trust or any other party to object on any basis are expressly reserved with respect to any claim that other than the Claim.

7.      This Order shall be a final order with respect to the Claim.

8.      This Court shall retain jurisdiction to hear and determine all matters

arising from or related to this Order.

Dated:_____, 2015
        New York, New York

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 3

**Horst Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DECLARATION OF DEANNA HORST IN SUPPORT OF RESCAP LIQUIDATING**
**TRUST'S OBJECTION TO CLAIM NO. 788 FILED BY PETRA FINANCE, LLC**

I, Deanna Horst, hereby declare as follows:

1.       I am the Chief Claims Officer for the ResCap Liquidating Trust (the

"**Liquidating Trust**"), and previously served as Chief Claims Officer for Residential Capital,

LLC and its affiliates (collectively, "**ResCap**"), a limited liability company organized under the

laws of the state of Delaware and the parent of the other post-effective date debtors in the above-

captioned Chapter 11 Cases (collectively, the "**Debtors**").  I was employed by ResCap beginning

in August of 2001.  In June 2012, I became Senior Director of Claims Management for ResCap

and became Chief Claims Officer of ResCap in October of 2013.  I began my association with

ResCap in 2001 as the Director, Responsible Lending Manager, charged with managing the

Debtors' responsible lending on-site due diligence program.  In 2002, I became the Director of

Quality Asset Management, managing Client Repurchase, Quality Assurance and Compliance—

a position I held until 2006, at which time I became the Vice President of the Credit Risk Group,

managing Correspondent and Broker approval and monitoring.  In 2011, I became the Vice

President, Business Risk and Controls, and supported GMAC Mortgage, LLC and Ally Bank in

this role.  In my current position, I am responsible for Claims Management and Reconciliation

and Client Recovery. I am authorized to submit this declaration (the "**Declaration**") in support

of the *ResCap Liquidating Trust's Objection to Claim No. 788 Filed by Petra Finance, LLC* (the

"**Objection**").[1]

2.      Except as otherwise indicated, all facts set forth in this Declaration are

based upon my personal knowledge of the Debtors' operations and finances, information learned

from my review of relevant documents, communications, and information I have received

through my discussions with other members of the Debtors' management or other employees of

the Debtors, the Debtors' professionals and consultants, and/or Kurtzman Carson Consultants

LLC ("**KCC**"), the Debtors' notice and claims agent.  If I were called upon to testify, I could and

would testify competently to the facts set forth in the Objection on that basis.

### A.    GMACM/ARE/Petra Relationship

3.      On or about July 29, 2004, GMAC Mortgage Corporation ("**GMACM**")[2]

entered into a written loan servicing agreement with American Residential Equities C, LLC

("**ARE**") to service and administer a group of "fixed and adjustable rate, sub-prime residential

mortgage loans" owned by ARE (the "**ARE Loans**").  A true and correct copy of the servicing

agreement is attached hereto as **Annex A** and incorporated herein by reference.

4.      On February 27, 2008, GMACM received an e-mail from Erick Magno of

Petra, which was the first notice received by GMACM that Petra claimed equitable ownership of

the ARE Loans.  In this initial communication, Petra only requested data on the ARE Loans from

GMACM.  A true and correct copy of the February 27, 2008 e-mail is attached hereto as **Annex

B** and incorporated herein by reference.

---

[1] Defined terms used but not defined herein shall have the meanings ascribed to such terms as set forth in the
Objection.

[2] GMAC Mortgage Corporation later became GMAC Mortgage, LLC.

5.    On March 4, 2008, after receiving ARE's approval to provide Petra with information on the ARE Loans, GMACM agreed to provide Petra with the requested information.  A true and accurate copy of the e-mail exchanges documenting the same is attached hereto as **<u>Annex C</u>** and incorporated herein by reference.

6.    In March and April 2008, GMACM remitted payments to ARE on five (5) loans: (i) Loan No. ---1153 ("**<u>Harris Loan</u>**"); (ii) Loan No. ---5829 ("**<u>Ness Loan</u>**"); (iii) Loan No. ---1173 ("**<u>Nichols Loan</u>**"); (iv) Loan No. ---1178 ("**<u>Powley Loan</u>**"); and (v) Loan No. ---1152 ("**<u>Stephens Loan</u>**") (collectively, the "**<u>Subject Loans</u>**").  Specifically, in March 2008, GMACM remitted $54,109.32 to ARE via wire for the Nichols Loan, $84,823.37 for the Powley Loan, and $7,587.39 for the Ness Loan.  A true and correct copy of GMACM's records and correspondence regarding the liquidation of these loans are attached hereto as **<u>Annex D</u>**.  Then, on April 2 and April 4 2008, GMAC remitted $222,200.22 for the Stephens Loan and $224,591.11 for the Harris Loan.  These payments represent the net proceeds from the liquidation of these loans through foreclosure and REO sales.  A true and correct copy of GMACM's records regarding the five (5) Subject Loans is attached hereto as **<u>Annex E</u>** and incorporated herein by reference. GMACM made these payments pursuant to the terms of the Servicing Agreement and, at the time these payments were made, GMACM had not been given any direction to the contrary from ARE or Petra.

7.    On April 24, 2008, GMACM received an e-mail from Petra expressly requesting that GMACM service twenty-three (23) of the certain ARE Loans for Petra on a temporary basis, including the Subject Loans.  In addition, for the first time Petra requested that the proceeds from these loans be remitted directly to Petra and not ARE.  After receiving ARE's consent, GMACM agreed to service eighteen (18) of the certain ARE Loans for Petra on a

temporary basis.  The Subject Loans, however, were not included in this agreement, as the monies had been previously remitted to ARE. Petra expressly stated, via email communication, that it would seek recourse from ARE regarding the Subject Loans.  A true and correct copy of the e-mail exchanges between GMACM and Petra regarding the Subject Loans is included in **Annex F**.

8.    On May 1, 2008, GMACM received an e-mail from Petra mischaracterizing the parties' previous communications set forth in Annex D and purporting to assert that GMACM agreed that the proceeds from the liquidation of the five (5) Subject Loans would not be sent to ARE. A true and correct copy of the e-mail correspondence documenting the same is attached hereto as **Annex G** and incorporated herein by reference.

9.    At no point did Petra and GMACM enter into any sort of written servicing agreement.

### B.    Petra's Payments to GMACM

10.    On March 5, 2008, GMACM received a payment from Petra in the amount of $738,947.52 as reimbursement for corporate and escrow advances owed by ARE to GMACM for twenty-eight (28) of the specific ARE Loans, none of which are the Subject Loans.  Copies of the excel spreadsheet (as provided by counsel for Petra) breaking down this payment and the bank statement reflecting the payment are attached hereto collectively as **Annex H** and incorporated herein by reference.

11.    On April 4, 2008, GMACM received a payment from Petra in the amount of $1,528,116.97 as reimbursement for corporate and escrow advances owned by ARE to GMACM for sixty-five (65) of the specific ARE Loans, none of which are the Subject Loans.[3]

---

[3] Petra asserts that the payment was $1,528.601.97,  Amended Complaint, ¶ 19; however, as indicated by the attached exhibit, GMACM's records reflected receipt of $1,528,116.97.  *See* Annex I.

Copies of the excel spreadsheet (as provided by Petra's counsel) breaking down this payment are attached hereto collectively as **<u>Annex I</u>** and incorporated herein by reference.

12.     Petra made a third payment to GMACM on October 23, 2008.   This payment was comprised of the application of $74,960.07 held by GMACM and an actual payment of $38,102.17.   True and correct copies of the emails surrounding this exchange are attached as **<u>Annex J</u>**.

13.     Petra initially filed suit against GMAC Mortgage, LLC on January 13, 2009.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 10, 2015

<u>/s/ Deanna Horst</u>
Deanna Horst
Chief Claims Officer for the ResCap
Liquidating Trust

**<u>Annex A</u>**

SERVICING AGREEMENT

among

AMERICAN RESIDENTIAL EQUITIES, LLC
Owner

and

GMAC MORTGAGE CORPORATION
Servicer

Dated as of July 29, 2004

FIXED AND ADJUSTABLE RATE, SUB-PRIME RESIDENTIAL MORTGAGE LOANS

TABLE OF CONTENTS

Page

ARTICLE I

DEFINITIONS

Section 1.01    Definitions..............................................................................................1

ARTICLE II

SERVICING

Section 2.01    Servicer to Act as Servicer............................................................12
Section 2.02    Liquidation of Mortgage Loans. ...................................................13
Section 2.03    Collection of Mortgage Loan Payments. ......................................15
Section 2.04    Establishment of and Deposits to Custodial Account....................15
Section 2.05    Permitted Withdrawals From Custodial Account. .........................16
Section 2.06    Establishment of and Deposits to Escrow Account. ......................17
Section 2.07    Permitted Withdrawals From Escrow Account. ............................18
Section 2.08    Payment of Taxes, Insurance and Other Charges. ........................18
Section 2.09    Protection of Accounts....................................................................19
Section 2.10    Maintenance of Hazard Insurance. ...............................................19
Section 2.11    Maintenance of Blanket Hazard Insurance Coverage....................21
Section 2.12    Maintenance of Fidelity Bond and Errors and Omissions Insurance. ...............21
Section 2.13    Inspections. ....................................................................................22
Section 2.14    Restoration of Mortgaged Property. .............................................22
Section 2.15    Title, Management and Disposition of REO Property.....................22
Section 2.16    Permitted Withdrawals with Respect to REO Property. .................23
Section 2.17    Real Estate Owned Reports. ..........................................................24
Section 2.18    Liquidation Reports. ......................................................................24
Section 2.19    Reports of Foreclosures and Abandonments of Mortgaged Property................24
Section 2.20    Notification of Adjustments............................................................24

ARTICLE III

PAYMENTS TO OWNER

Section 3.01    Remittances....................................................................................24
Section 3.02    Statements to Owner. .....................................................................25
Section 3.03    Advances by Servicer. ...................................................................25
Section 3.04    [Reserved] ......................................................................................26
Section 3.05    [Reserved] ......................................................................................26

# ARTICLE IV

## GENERAL SERVICING PROCEDURES

| | | |
|---|---|---|
| Section 4.01 | Transfers of Mortgaged Property. | 26 |
| Section 4.02 | Satisfaction of Mortgages and Release of Mortgage Files. | 27 |
| Section 4.03 | Servicing Compensation. | 27 |
| Section 4.04 | Annual Statement as to Compliance. | 27 |
| Section 4.05 | Annual Independent Public Accountants' Servicing Report. | 27 |
| Section 4.06 | Right to Examine Servicer Records. | 28 |
| Section 4.07 | Compliance with Gramm-Leach-Bliley Act of 1999. | 28 |
| Section 4.08 | Losses and Expenses | 28 |

# ARTICLE V

## SERVICER TO COOPERATE

| | | |
|---|---|---|
| Section 5.01 | Provision of Information. | 29 |
| Section 5.02 | Financial Statements; Servicing Facilities. | 30 |

# ARTICLE VI

## TERMINATION

| | | |
|---|---|---|
| Section 6.01 | Termination. | 30 |
| Section 6.02 | Transfer Procedures. | 31 |

# ARTICLE VII

## BOOKS AND RECORDS

| | | |
|---|---|---|
| Section 7.01 | Possession of Servicing Files Prior to the related Transfer Date. | 32 |

# ARTICLE VIII

## INDEMNIFICATION AND ASSIGNMENT

| | | |
|---|---|---|
| Section 8.01 | Indemnification. | 33 |
| Section 8.02 | Limitation on Liability of Servicer and Others. | 35 |
| Section 8.03 | Limitation on Assignment and Resignation by Servicer. | 36 |
| Section 8.04 | Operation of Indemnities. | 36 |
| Section 8.05 | Assignment by Owner. | 37 |
| Section 8.06 | Merger or Consolidation of the Servicer. | 37 |

## ARTICLE IX

### REPRESENTATIONS, WARRANTIES AND COVENANTS OF OWNER

| | | |
|---|---|---|
| Section 9.01 | Organization and Good Standing; Licensing. | 38 |
| Section 9.02 | Authorization; Binding Obligations. | 38 |
| Section 9.03 | No Consent Required. | 38 |
| Section 9.04 | No Violations. | 38 |
| Section 9.05 | Litigation. | 38 |
| Section 9.06 | Ownership. | 38 |
| Section 9.07 | Service Contacts. | 39 |
| Section 9.08 | Accuracy. | 39 |

## ARTICLE X

### REPRESENTATIONS AND WARRANTIES OF SERVICER

| | | |
|---|---|---|
| Section 10.01 | Due Organization and Authority. | 39 |
| Section 10.02 | Ordinary Course of Business. | 39 |
| Section 10.03 | No Violation. | 39 |
| Section 10.04 | Ability to Service. | 40 |
| Section 10.05 | Ability to Perform. | 40 |
| Section 10.06 | Litigation. | 40 |
| Section 10.07 | No Consent Required. | 40 |

## ARTICLE XI

### DEFAULT

| | | |
|---|---|---|
| Section 11.01 | Events of Default. | 40 |
| Section 11.02 | Waiver of Defaults. | 42 |

## ARTICLE XII

### CLOSING

| | | |
|---|---|---|
| Section 12.01 | Closing Documents. | 42 |

## ARTICLE XIII

### MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| Section 13.01 | Notices. | 43 |
| Section 13.02 | Waivers | 44 |
| Section 13.03 | Entire Agreement; Amendment. | 44 |
| Section 13.04 | Execution; Binding Effect. | 44 |

Section 13.05    Confidentiality of Information...........................................................................44
Section 13.06    Headings. ...................................................................................................46
Section 13.07    Applicable Law. ...........................................................................................46
Section 13.08    Relationship of Parties. ...................................................................................46
Section 13.09    Severability of Provisions. ...............................................................................46
Section 13.10    Recordation of Assignments of Mortgage. ...........................................................46
Section 13.11    Exhibits. .....................................................................................................46
Section 13.12    Counterparts. ...............................................................................................46
Section 13.13    No Solicitation. ............................................................................................46
Section 13.14    Cooperation of Servicer with a Reconstitution. .....................................................47
Section 13.15    Force Majeure ..............................................................................................49
Section 13.16    Waiver of Trial by Jury. ..................................................................................49
Section 13.17    LIMITATION OF DAMAGES. ........................................................................49
Section 13.18    SUBMISSION TO JURISDICTION; WAIVERS..............................................49

EXHIBITS

EXHIBIT 1    FORM OF TRIAL BALANCE
EXHIBIT 2    FORM OF CUSTODIAL ACCOUNT CERTIFICATION
EXHIBIT 3    FORM OF CUSTODIAL ACCOUNT LETTER AGREEMENT
EXHIBIT 4    FORM OF ESCROW ACCOUNT CERTIFICATION
EXHIBIT 5    FORM OF ESCROW ACCOUNT LETTER AGREEMENT
EXHIBIT 6    FORM OF OPINION OF COUNSEL TO THE SERVICER
EXHIBIT 7    FORM OF OFFICER'S CERTIFICATE
EXHIBIT 8    MORTGAGE LOAN DOCUMENTS
EXHIBIT 9    MORTGAGE LOAN SCHEDULE
EXHIBIT 10   TRANSFER INSTRUCTIONS
EXHIBIT 11   ELIGIBILITY CRITERIA
EXHIBIT 12   FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT
EXHIBIT 13   FORM OF CORPORATE RESOLUTION
EXHIBIT 14   FORM OF OPINION OF COUNSEL TO THE SERVICER FOR
             RECONSTITUTION
EXHIBIT 15   TERM SHEET
EXHIBIT 16   SERVICING PERFORMANCE STANDARDS

<u>SERVICING AGREEMENT</u>

This Servicing Agreement ("<u>Servicing Agreement</u>" or "<u>Agreement</u>") is entered into as of July 29, 2004, by and among GMAC MORTGAGE CORPORATION, a Pennsylvania corporation (the "<u>Servicer</u>") and AMERICAN RESIDENTIAL EQUITIES, LLC, a Delaware limited liability corporation (the "<u>Owner</u>").

WHEREAS, the Owner has purchased and will purchase in the future conventional, residential, fixed and adjustable rate first- and second-lien mortgage loans (the "<u>Mortgage Loans</u>"); and

WHEREAS, the Owner and Servicer entered into a letter agreement dated April 7, 2004 ("the Letter Agreement") wherein the Servicer agreed to subservice certain mortgage loans on behalf of Owner on an interim basis until such time that the parties enter into a definitive subservicing agreement; and

WHEREAS, the Servicer regularly services residential mortgage loans and has agreed to service the mortgage loans that become subject to this Agreement, including the mortgage loans serviced pursuant to the Letter Agreement, and the parties desire to provide the terms and conditions of such servicing by the Servicer.

NOW, THEREFORE, in consideration of the mutual premises and agreements set forth herein and for other good and valuable consideration, the receipt and the sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

Section 1.01    <u>Definitions</u>.  The following terms are defined as follows:

<u>Accepted Servicing Practices</u>:  With respect to any Mortgage Loan or REO Property, those mortgage servicing practices of mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located, exercising the same care in performing those practices that the Servicer customarily employs and exercises in servicing and administering mortgage loans for its own account (including, compliance with all applicable federal, state and local laws).

<u>Adjustable Rate Mortgage Loan</u>:  An adjustable rate Mortgage Loan.

<u>Affiliate</u>:  With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Ancillary Income: All income derived from the Mortgage Loans other than payments of principal, interest and Escrow Payments (excluding Servicing Fees and prepayment penalties attributable to the Mortgage Loans), including but not limited to interest received on funds deposited in the Custodial Account or any Escrow Account (to the extent permitted by applicable law), all late charges, assumption fees, escrow account benefits, reinstatement fees, fees received with respect to checks on bank drafts returned by the related bank for insufficient funds, assumption fees, and similar types of fees arising from or in connection with any Mortgage Loan to the extent not otherwise payable to the Mortgagor under applicable law or pursuant to the terms of the related Mortgage Note.

Appraised Value: The value of the Mortgaged Property at the time of the Mortgage Loan's origination as used by the originating lender in underwriting such Mortgage Loan.

Assignment of Mortgage: An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the sale of the Mortgage to the Owner.

BPO: A broker price opinion.

Business Day: Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions are closed for business in the States of New York, New Jersey or Pennsylvania.

Catastrophic Advance: A Servicing Advance made in good faith by the Servicer that would not be a Nonrecoverable Advance except for the later occurrence of a catastrophic event (e.g., a natural disaster) that substantially reduces the value of the Mortgaged Property.

Code: Internal Revenue Code of 1986, as amended.

Condemnation Proceeds: All awards or settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation, to the extent not required to be released to a Mortgagor in accordance with the terms of the related Mortgage Loan Documents.

Custodial Account: The separate account or accounts created and maintained pursuant to Section 2.06.

Custodial Agreement: The agreement governing the retention of the originals of each Mortgage Note, Mortgage, Assignment of Mortgage and other Mortgage Loan Documents.

Custodian: The custodian of the Mortgage Loan Documents as specified under the related Custodial Agreement.

Deboarding Fee: With respect to each Mortgage Loan, the deboarding fee set forth in the Term Sheet.

-2-

Default: A Mortgage Loan shall be considered in default where more than one Monthly Payment is due.

Determination Date: The last Business Day of the month prior to the related Remittance Date.

Due Date: The day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

Due Period: With respect to each Remittance Date, the period commencing on the day after the Determination Date prior to the immediately prior Determination Date and ending on the immediately prior Determination Date.

Eligibility Criteria: The eligibility criteria for residential mortgage loans to be delivered by Owner after the the date of this Agreement to be serviced by Servicer under this Agreement, as specified in **Exhibit 11**, as the same may be amended from time to time with the mutual consent of both parties.

Eligible Investments: Any one or more of the obligations and securities listed below which investment provides for a date of maturity not later than one day prior to the Remittance Date in each month (or such other date as permitted under this Agreement):

(i)    direct obligations of, and obligations fully guaranteed as to timely payment of principal and interest by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America ("Direct Obligations");

(ii)    federal funds, demand and time deposits in, certificates of deposits of, or bankers' acceptances issued by, any depository institution or trust company (including U.S. subsidiaries of foreign depositories) incorporated or organized under the laws of the United States of America or any state thereof and subject to supervision and examination by federal or state banking authorities, so long as at the time of such investment or the contractual commitment providing for such investment the commercial paper or other short-term debt obligations of such depository institution or trust company (or, in the case of a depository institution or trust company which is the principal subsidiary of a holding company, the commercial paper or other short-term debt or deposit obligations of such holding company or deposit institution, as the case may be) have been rated by each Rating Agency in its highest short-term rating category or one of its two highest long-term rating categories;

(iii)    repurchase agreements collateralized by Direct Obligations or securities guaranteed by Fannie Mae or Freddie Mac with any registered broker/dealer subject to Securities Investors' Protection Corporation jurisdiction or any commercial bank insured by the FDIC, if such broker/dealer or bank has an uninsured, unsecured and unguaranteed obligation rated by each Rating Agency in its highest short-term rating category;

-3-

(iv)    securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof which have a credit rating from each Rating Agency, at the time of investment or the contractual commitment providing for such investment, at least equal to one of the two highest long-term credit rating categories of each Rating Agency; *provided, however,* that securities issued by any particular corporation will not be Eligible Investments to the extent that investment therein will cause the then outstanding principal amount of securities issued by such corporation to exceed 20% of the aggregate principal amount of all Eligible Investments in the Custodial Accounts and the Escrow Accounts; provided, further, that such securities will not be Eligible Investments if they are published as being under review with negative implications from either Rating Agency;

(v)    commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than 180 days after the date of issuance thereof) rated by each Rating Agency in its highest short-term rating category;

(vi)    certificates or receipts representing direct ownership interests in future interest or principal payments on obligations of the United States of America or its agencies or instrumentalities (which obligations are backed by the full faith and credit of the United States of America) held by a custodian in safekeeping on behalf of the holders of such receipts; and

(vii)    any other demand, money market, common trust fund or time deposit or obligation, or interest-bearing or other security or investment rated in the highest rating category by each Rating Agency;

*provided, however*, that (a) any such instrument shall be acceptable to the Rating Agencies, and (b) no such instrument shall be an Eligible Investment if such instrument evidences either (i) a right to receive only interest payments with respect to the obligations underlying such instrument, or (ii) both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity of greater than 120% of the yield to maturity at par of such underlying obligations.

Errors and Omissions Insurance Policy:  An errors and omissions insurance policy to be maintained by the Servicer pursuant to Section 2.12.

Escrow Account:   The separate account or accounts created and maintained pursuant to Section 2.06.

Escrow Payment:  With respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and any other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to the Mortgage or any other document.

Event of Default:  Any one of the conditions or circumstances enumerated in Section 11.01.

Fannie Mae:  The Federal National Mortgage Association, or any successor thereto.

Fannie Mae Guides:  The Fannie Mae Sellers' Guide and the Fannie Mae Servicers' Guide and all amendments or additions thereto.

FDIC:  The Federal Deposit Insurance Corporation, or any successor thereto.

FHA:  The Federal Housing Authority, or any successor thereto.

FHLMC or Freddie Mac:  The Federal Home Loan Mortgage Corporation, or any successor thereto.

Fidelity Bond:  A fidelity bond to be maintained by the Servicer pursuant to Section 2.12.

Fitch:  Fitch, Inc., or its successor in interest.

Forbearance:  Shall have the meaning set forth in Section 2.01(a).

Foreclosure Commencement:  The delivery of the applicable file to the Servicer's foreclosure counsel for initiation of foreclosure proceedings.

Freddie Mac:  The Federal Home Loan Mortgage Corporation, or any successor thereto.

Gross Margin:  With respect to each Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note which amount is added to the Index in accordance with the terms of the related Mortgage Note to determine on each Interest Rate Adjustment Date the Mortgage Interest Rate for such Mortgage Loan.

HOEPA Loan:  A Mortgage Loan subject to the Home Ownership and Equity Protection Act of 1994 ("HOEPA").

Index:  With respect to each Adjustable Rate Mortgage Loan, the index set forth in the related Mortgage Note.

Insurance Proceeds:  With respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property.

Interest Rate Adjustment Date:  With respect to each Adjustable Rate Mortgage Loan, the date, specified in the related Mortgage Note and the Mortgage Loan Schedule, on which the Mortgage Interest Rate is adjusted.

Lifetime Rate Cap:  The provision of each Mortgage Note related to an Adjustable Rate Mortgage Loan which provides for an absolute maximum Mortgage Interest

-5-

Rate thereunder. The Mortgage Interest Rate during the terms of each Adjustable Rate Mortgage Loan shall not at any time exceed the Mortgage Interest Rate at the time of origination of such Adjustable Rate Mortgage Loan by more than the amount per annum set forth on the Mortgage Loan Schedule.

Liquidation Proceeds: Cash received in connection with the liquidation of a defaulted Mortgage Loan, whether through the sale or assignment of such Mortgage Loan, trustee's sale, foreclosure sale or otherwise, or the sale of the related Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage Loan.

Loan-to-Value Ratio or LTV: With respect to any Mortgage Loan, the most recent ratio (expressed as a percentage) of the outstanding principal amount of the Mortgage Loan, to the lesser of (a) the Appraised Value and (b) if the Mortgage Loan was made to finance the acquisition of the related Mortgaged Property, the purchase price of the Mortgaged Property.

MERS: Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the state of Delaware, or any successor thereto.

Monthly Payment: The scheduled monthly payment of principal and interest on a Mortgage Loan.

Monthly Remittance Advice: As described in Section 3.02.

Moody's: Moody's Investors Service, Inc., and any successor thereto.

Mortgage: The mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first or second lien, as applicable, on an unsubordinated estate in fee simple in real property securing the Mortgage Note; except that with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely-accepted practice, the mortgage, deed of trust or other instrument securing the Mortgage Note may secure and create a first or second lien, as applicable, upon a leasehold estate of the Mortgagor.

Mortgage File: The items pertaining to a particular Mortgage Loan referred to as the Mortgage File in Exhibit 8 annexed hereto to the extent received by the Servicer from the prior servicer, sub-servicer or originator, and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

Mortgage Interest Rate: The annual rate of interest borne on a Mortgage Note with respect to each Mortgage Loan.

Mortgage Loan: An individual mortgage loan which is the subject of this Agreement, including those mortgage loans subserviced by Servicer pursuant to the Letter Agreement, each mortgage loan originally sold and subject to this Agreement being identified on the Mortgage Loan Schedule, which mortgage moan includes without limitation the Mortgage File, the Monthly Payments, Principal Prepayments, Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, Servicing Rights and all other rights, benefits, proceeds and

-6-

obligations arising from or in connection with such mortgage loan, excluding replaced or repurchased mortgage loans.

Mortgage Loan Documents: The documents listed on Exhibit 8 attached hereto pertaining to any Mortgage Loan.

Mortgage Loan Schedule: The schedule of Mortgage Loans, provided by the prior Servicer, setting forth, to the extent available, the following information with respect to each Mortgage Loan: (1) the loan seller's Mortgage Loan identifying number; (2) the Mortgagor's name; (3) the street address of the Mortgaged Property including the city, state and zip code; (4) a code indicating whether the Mortgaged Property is owner-occupied, a second home or investment property; (5) the number and type of residential units constituting the Mortgaged Property (i.e. a single family residence, a 2-4 family residence, a unit in a condominium project or a unit in a planned unit development, manufactured housing); (6) the original months to maturity or the remaining months to maturity from the Transfer Date, in any case based on the original amortization schedule and, if different, the maturity expressed in the same manner but based on the actual amortization schedule; (7) the Loan-to-Value Ratio at origination; (8) with respect to First Lien Loans, the LTV and with respect to second lien loans, the CLTV; (9) the Mortgage Interest Rate as of the Transfer Date; (10) the date on which the Monthly Payment was due on the Mortgage Loan and, if such date is not consistent with the Due Date currently in effect, such Due Date; (11) the stated maturity date; (12) the amount of the Monthly Payment as of the Transfer Date; (13) the last payment date on which a Monthly Payment was actually applied to pay interest and the outstanding principal balance; (14) the original principal amount of the Mortgage Loan; (15) the principal balance of the Mortgage Loan as of the close of business on the Transfer Date, after deduction of payments of principal due and collected on or before the Transfer Date; (16) with respect to Adjustable Rate Mortgage Loans, the Interest Rate Adjustment Date; (17) with respect to Adjustable Rate Mortgage Loans, the Gross Margin; (18) with respect to Adjustable Rate Mortgage Loans, the Lifetime Rate Cap under the terms of the Mortgage Note; (19) with respect to Adjustable Rate Mortgage Loans, a code indicating the type of Index; (20) with respect to Adjustable Rate Mortgage Loans, the Periodic Rate Cap under the terms of the Mortgage Note; (21) with respect to Adjustable Rate Mortgage Loans, the Periodic Rate Floor under the terms of the Mortgage Note; (22) the type of Mortgage Loan (i.e., fixed rate, adjustable rate, first lien, second lien); (23) a code indicating the purpose of the loan (i.e., purchase, rate and term refinance, equity take-out refinance); (24) a code indicating the documentation style (i.e. full, alternative or reduced); (25) the loan credit classification (as described in the underwriting guidelines); (26) whether such Mortgage Loan provides for a prepayment penalty; (27) the prepayment penalty period of such Mortgage Loan, if applicable; (28) ) a description of the prepayment penalty, if applicable; (29) the Mortgage Interest Rate as of origination; (30) the credit risk score (FICO score) at origination; (31) the date of origination; (32) the Mortgage Interest Rate adjustment period; (33) the Mortgage Interest Rate adjustment percentage; (34) the Mortgage Interest Rate floor; (35) the Mortgage Interest Rate calculation method (i.e., 30/360, simple interest, other); (36) a code indicating whether the Mortgage Loan is a HOEPA Loan; (37) a code indicating whether the Mortgage Loan is assumable; (38) a code indicating whether the Mortgage Loan has been modified; (39) the one year payment history; (40) the Due Date for the first Monthly Payment; (41) the original Monthly Payment due; (42) with respect to the related Mortgagor, the debt-to-income ratio; (43) the Appraised Value of the Mortgaged Property; (44) the sales price of the Mortgaged Property if the Mortgage Loan was

-7-

originated in connection with the purchase of the Mortgaged Property; (45) with respect to second lien loans, the outstanding principal balance of the superior lien; (46) a twelve month history for the Mortgage Loan and the number of times thirty, sixty, and ninety days delinquent in the past twelve months; (47) a code indicating the payment status of the Mortgage Loan (i.e. bankruptcy, foreclosure, REO, other litigation); (48) a twelve month history for the prior Mortgage Loan and the number of times thirty, sixty, and ninety days delinquent in the past twelve months; and (49) if subject to a Forbearance, the terms of such Forbearance. With respect to the Mortgage Loans in the aggregate, the Mortgage Loan Schedule shall set forth the following information: (1) the number of Mortgage Loans; (2) the current aggregate outstanding principal balance of the Mortgage Loans; (3) the weighted average Mortgage Interest Rate of the Mortgage Loans; and (4) the weighted average maturity of the Mortgage Loans.

Mortgage Note:  The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgaged Property:  The real property (or leasehold estate, if applicable) securing repayment of the debt evidenced by a Mortgage Note.

Mortgagor:  The obligor on a Mortgage Note.

New Loan Data File:  With respect to each Mortgage Loan delivered, or caused to be delivered, after the date of this Agreement by Owner to be subserviced by Servicer under this Agreement, the data file produced by Owner or the prior servicer pursuant to the Transfer Instructions, which is used to enable Servicer to set up each Mortgage Loan on its loan servicing system.

Nonrecoverable Advance:  Any Servicing Advance previously made or proposed to be made in respect of a Mortgage Loan which, in the good faith judgment of the Servicer, will not or, in the case of a proposed advance, would not, be ultimately recoverable from related Insurance Proceeds, Liquidation Proceeds or otherwise from such Mortgage Loan.  The determination by the Servicer that it has made a Nonrecoverable Advance or that any proposed advance, if made, would constitute a Nonrecoverable Advance, shall be evidenced by an Officer's Certificate delivered to the Owner.

Officer's Certificate:  A certificate signed by the Chairman of the Board or the Vice Chairman of the Board or a President or Vice President or Senior Vice President and by the Treasurer or the Secretary or one of the Assistant Treasurers or Assistant Secretaries of the Servicer, and delivered to the Owner.

Opinion of Counsel:  A written opinion of counsel, who may be counsel for the Servicer, reasonably acceptable to the Owner.

Originator:  With respect to a Mortgage Loan, the originator of the related Mortgage Loan.

Pass-Through Transfer:  The direct or indirect sale or transfer of some or all of the Mortgage Loans by the Owner to a trust to be formed as part of a publicly offered or privately placed mortgage-backed securities transaction.

-8-

Periodic Rate Cap: With respect to each Adjustable Rate Mortgage Loan, the provision of each Mortgage Note which provides for an absolute maximum amount by which the Mortgage Interest Rate therein may increase on an Interest Rate Adjustment Date above the Mortgage Interest Rate previously in effect.

Periodic Rate Floor: With respect to each Adjustable Rate Mortgage Loan, the provision of each Mortgage Note which provides for an absolute maximum amount by which the Mortgage Interest Rate therein may decrease on an Interest Rate Adjustment Date below the Mortgage Interest Rate previously in effect.

Person: Any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

Prime Rate: The prime rate announced to be in effect from time to time, as published as the average rate in The Wall Street Journal (Northeast edition).

Principal Prepayment: Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any prepayment penalty or premium thereon and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Principal Prepayment Period: The month preceding the month in which the related Remittance Date occurs.

Qualified Depository: A depository the accounts of which are insured by the FDIC.

Rating Agency: Any of Fitch, Moody's or Standard & Poor's, or their respective successors designated by the Owner.

Reconstitution: Either a Whole Loan Transfer or a Pass-Through Transfer.

Reconstitution Agreements: As defined in Section 13.13 hereof.

Reconstitution Date: As defined in Section 13.13 hereof.

Recourse Obligation: With respect to any Mortgage Loan, any obligation or liability (actual or contingent) of the Servicer or its Affiliates, as applicable (i) for loss of principal incurred in connection with the foreclosure or other disposition of, or other realization or attempt to realize upon the collateral securing such Mortgage Loan (including, but not limited to, damages relating to loss mitigation, obtaining deeds in lieu of foreclosure, VA No_Bid Instructions, or VA partial guaranties); (ii) to repurchase such Mortgage Loan in the event that the Mortgagor of such Mortgage Loan has filed for bankruptcy protection, the Mortgaged Property is the subject of foreclosure or other litigation proceedings; or (iii) to repurchase such Mortgage Loan in the event of a delinquency or other payment default thereunder by the Mortgagor.

-9-

REMIC: A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

REMIC Provisions: Provisions of the federal income tax law relating to a REMIC, which appear at Section 860A through 860G of Subchapter M of Chapter 1, Subtitle A of the Code, and related provisions and regulations, rulings or pronouncements promulgated thereunder, as the foregoing may be in effect from time to time.

Remittance Date: The 18th day (or if such 18th day is not a Business Day, the Business Day immediately following such 18th day) of the month following the Determination Date.

REO Property: A Mortgaged Property acquired by the Servicer on behalf of the Owner through foreclosure or by deed in lieu of foreclosure, as described in Section 2.15.

RESPA: Real Estate Settlement Procedures Act, as amended from time to time.

Securitization Servicing Fee: The servicing fee payable to the Servicer in a Pass-Through Transfer as agreed by the Servicer and the Owner.

Servicer Employees: As defined in Section 2.12 hereof.

Servicing Advances: All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance by the Servicer of its servicing obligations, including, but not limited to, the cost of (a) the preservation, restoration and protection of the Mortgaged Property, (b) any fees relating to any enforcement or judicial proceedings, excluding foreclosures, (c) foreclosure actions per FHLMC attorney fees and costs guidelines, (d) the management and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage, (e) taxes, assessments, water rates, sewer rents and other charges which are or may become a lien upon the Mortgaged Property and (f) compliance with the obligations pursuant to the provisions of this Agreement.

Servicing Fee: With respect to each Mortgage Loan, the amount of the fee the Owner shall pay to the Servicer, as set forth in the Term Sheet.

Servicing File: With respect to each Mortgage Loan, the file retained by the Servicer consisting of originals, if provided, or copies of all documents in the Mortgage File which are not delivered to the Owner, its designee or the Custodian and copies of the Mortgage Loan Documents.

Servicing Performance Standards: The servicing standards set forth on Exhibit 16.

Servicing Rights: Any and all of the following: (a) any and all rights to service the Mortgage Loans; (b) any payments to or monies received by the Servicer for servicing the Mortgage Loans; (c) any Ancillary Income with respect to the Mortgage Loans; (d) all agreements or documents creating, defining or evidencing any such servicing rights to the extent

-10-

they relate to such servicing rights and all rights of the Servicer thereunder; (e) any and all rights to and in the Escrow Payments or other similar payments with respect to the Mortgage Loans and any amounts actually collected by the Servicer with respect thereto; (f) all accounts and other rights to payment related to any of the property described in this paragraph; and (g) any and all documents, files, records, servicing files, servicing documents, servicing records, data tapes, computer records, or other information pertaining to the Mortgage Loans or pertaining to the past, present or prospective servicing of the Mortgage Loans.

Servicing Transfer Date:  The date on or dates which the physical servicing of the Mortgage Loans is transferred to the Servicer pursuant to this Agreement.

Standard & Poor's:  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies Inc., and any successor thereto.

Stated Principal Balance:  As to each Mortgage Loan, (i) the principal balance of the Mortgage Loan at the Transfer Date after giving effect to payments of principal due on or before such date, whether or not received, minus (ii) all amounts previously distributed to the Owner with respect to the related Mortgage Loan representing payments or recoveries of principal or advances in lieu thereof.

Term Sheet:  The Term Sheet attached hereto as Exhibit 15.

Transfer Date:  With respect to each Mortgage Loan, the date Servicer physically assumes its obligations of servicing pursuant to this Agreeement.

Transfer Instructions:  The transfer instructions used by the Servicer provided in connection with any given transfer of additional Mortgage Loans for servicing under this Agreement, attached as Exhibit 10.

VA:  The United States Department of Veterans Affairs, or any successor thereto.

VA No-Bid Instruction:  An instruction given by the VA to the effect that the VA will not accept conveyance of the REO Property related to the foreclosure of a Mortgage Loan or when the VA pays all or part of the difference between the net sale proceeds and the total indebtedness on a VA guaranteed loan following the private sale of the property where the proceeds are insufficient to fully payoff the existing Mortgage.

Whole Loan Transfer:  The sale or transfer by Owner of some or all of the Mortgage Loans in a whole loan or participation format.

## ARTICLE II.

## SERVICING

Section 2.01    Servicer to Act as Servicer.

From and after the date of this Agreement, the Servicer, as an independent contractor, shall service and administer each Mortgage Loan, including those Mortgage Loans subserviced pursuant to the Letter Agreement, and shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which the Servicer may deem necessary or desirable, consistent with the terms of this Agreement, Accepted Servicing Practices and the Servicing Performance Standards. Servicer shall only modify Mortgage Loans in accordance with Fannie Mae Guides.

From and after the date of this Agreement, Servicer shall assume responsibility under this Agreement to subservice and administer additional Mortgage Loans upon the delivery, in accordance with the Transfer Instructions, of the related New Loan Data File and all related Mortgage Loan documentation by or on behalf of Owner (including deliveries by the applicable prior servicer pursuant to directions by Owner) provided that any new Mortgage Loans that Owner desires to make subject to this Agreement meet the Eligibility Criteria then in effect. Owner shall provide or cause to be provided by the applicable prior servicer, the New Loan Data File for each Mortgage Loan to Servicer promptly upon purchase or origination of the Mortgage Loan by Owner, and in no event later than five (5) days before Servicer is expected to perform subservicing on that Mortgage Loan. Owner shall notify Servicer within two (2) Business Days, in writing, of any changes in the information contained in the New Loan Data File. Owner agrees to provide Servicer, within two (2) Business Days after Servicer's request, copies of the Mortgage Note, the Mortgage or any other documents Owner has with respect to a Mortgage Loan that Servicer deems reasonably necessary in connection with its performance of the Servicing of said Mortgage Loan.

In servicing and administering the Mortgage Loans, the Servicer shall employ Accepted Servicing Practices except and to the extent that such practices conflict with the requirements of this Agreement. The Servicer shall retain adequate personnel to effect such servicing and administration of the Mortgage Loans.

In the event that any Mortgage in Default or, in the judgment of the Servicer, such a Default is reasonably foreseeable, the Servicer, consistent with Accepted Servicing Practices, may also waive, modify or vary any term of such Mortgage Loan (including modifications that would change the Mortgage Interest Rate, forgive the payment of principal or interest, or waive, in whole or in part, a prepayment penalty), accept payment from the related Mortgagor of an amount less than the Stated Principal Balance in final satisfaction of such Mortgage Loan, or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any Mortgagor (any and all such waivers, modifications, payment plans, variances, forgiveness of principal or interest, postponements, or indulgences collectively referred to herein as "Forbearance"). The Servicer's analysis supporting any Forbearance and the conclusion that any Forbearance meets the standards of this section shall be reflected as appropriate in the Servicer's records.

-12-

Without limiting the generality of the foregoing, the Servicer shall continue, and is hereby authorized and empowered, to execute and deliver on behalf of itself and the Owner, all instruments and documents necessary to carry out its servicing and administrative duties under this Agreement including but not limited to instruments in connection with foreclosures; satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Properties. The Owner shall furnish the Servicer with a corporate resolution in the form of Exhibit 13 appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement. If reasonably required by the Servicer, the Owner shall furnish the Servicer with any powers of attorney and other documents necessary or appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement.

The Servicer's computer system shall clearly reflect the ownership of each Mortgage Loan. The Servicer shall release from its custody the contents of any Servicing File retained by it only in accordance with this Agreement or at the written direction of the Owner.

With respect to the performance of any service required to be provided for Servicer hereunder, including, without limitation, the obtainment of credit report data, the provision of field or other inspections, the provision of title-related services, and the sale or management of REO properties, the Servicer may obtain such services from an Affiliate if such services are provided on a commercially reasonable basis with respect to the price and quality of such services.

Section 2.02    Liquidation of Mortgage Loans.

In the event that any payment due under any Mortgage Loan and not postponed pursuant to Section 2.01 is not paid when the same becomes due and payable, or in the event the Mortgagor fails to perform any other covenant or obligation under the Mortgage Loan and such failure continues beyond any applicable grace period, the Servicer shall take such action as is consistent with Accepted Servicing Practices. In the event that any payment due under any Mortgage Loan is not postponed pursuant to Section 2.01 and remains delinquent for a period of 90 days or any other default continues for a period of 90 days beyond the expiration of any grace or cure period (or such other period as is required by law in the jurisdiction where the related Mortgaged Property is located) or earlier as determined by the Servicer, the Servicer shall cause a Foreclosure Commencement in accordance with Accepted Servicing Practices. In such connection, the Servicer shall from its own funds make all necessary and proper Servicing Advances, provided, however, that the Servicer shall not be required to expend its own funds in connection with any foreclosure or towards the restoration or preservation of any Mortgaged Property, unless it shall determine (a) that such preservation, restoration and/or foreclosure will increase the proceeds of liquidation of the Mortgage Loan to Owner after reimbursement to itself for such expenses and (b) that such expenses will be recoverable by it either through Liquidation Proceeds (respecting which it shall have priority for purposes of withdrawals from the Custodial Account pursuant to Section 2.05) or through Insurance Proceeds (respecting which it shall have similar priority).

-13-

The Servicer shall provide the Owner with access to its online mortgage loan servicing data system (the "Data System") during business hours (generally, Monday through Friday, between 7 a.m. and 9 p.m. EST, and Saturday between 8 a.m. and 2 p.m. EST) with respect to the Mortgage Loans; provided, that Owner shall be responsible for all costs associated with such access.

The Servicer acknowledges and agrees that it shall take and initiate any legal actions with respect to any Mortgage Loans and REO Properties, including, without limitation, any foreclosure actions, acceptance of deeds-in-lieu of foreclosure, and any collection actions with respect to any Mortgage Loans or REO Properties on behalf of the Owner, but only in the name of the Servicer and without reference to the Owner. Except as otherwise required by law or with the consent of the Owner, under no circumstances shall any such action be taken in the name of, or with any reference to, the Owner. The Servicer shall provide prior written notice to the Owner if the Servicer is required by applicable law to take any legal actions with respect to the Mortgage Loan or REO Properties in the name of, or with reference to, the Owner. Owner agrees to provide all the documentation, appropriately recorded, if applicable, necessary for Servicer to initiate legal actions in its own name. Owner agrees to reimburse Servicer for any costs or expenses associated with assigning Mortgage Loans to Servicer or MERS as the case may be.

Notwithstanding anything to the contrary contained herein, (a) all actions must be approved by the Owner relating to any Mortgaged Property that is determined to be contaminated by hazardous or toxic substances or wastes and (b), in connection with a foreclosure, in the event the Servicer has reasonable cause to believe that a Mortgaged Property is contaminated by hazardous or toxic substances or wastes, or if the Owner otherwise requests an environmental inspection or review of such Mortgaged Property to be conducted by a qualified inspector the Servicer shall cause the Mortgaged Property to be so inspected at the Owner's expense. Upon completion of the inspection, the Servicer shall promptly provide the Owner with a written report of the environmental inspection.

Notwithstanding anything to the contrary contained herein, after reviewing the environmental inspection report, the Owner shall determine how the Servicer shall proceed with respect to the Mortgaged Property; provided, that Servicer may determine in its sole discretion that it will not proceed with a foreclosure or acceptance of a deed in lieu of foreclosure with respect to a Mortgaged Property that has been determined to be contaminated by hazardous or toxic substances or wastes and with respect to which Servicer would be expected to take title in its own name. In the event (a) the environmental inspection report indicates that the Mortgaged Property is contaminated by hazardous or toxic substances or wastes and (b) the Owner directs the Servicer to proceed with foreclosure or acceptance of a deed in lieu of foreclosure, the Servicer shall be reimbursed for all reasonable costs associated with such foreclosure or acceptance of a deed in lieu of foreclosure and any related environmental clean up costs, as applicable, from the related Liquidation Proceeds, or if the Liquidation Proceeds are insufficient to fully reimburse the Servicer, the Servicer shall be entitled to be reimbursed from amounts in the Custodial Account pursuant to Section 2.05 hereof. In the event the Owner directs the Servicer not to proceed with foreclosure or acceptance of a deed in lieu of foreclosure, the Servicer shall be reimbursed for all Servicing Advances made with respect to the related Mortgaged Property from the Custodial Account pursuant to Section 2.05 hereof.

-14-

With respect to any Mortgage Loan that is collateralized by a Mortgaged Property and the Servicer is not proceeding to liquidation as a result of environmental contamination, the Servicer shall be entitled to be reimbursed for its Servicing Advances from amounts in the Custodial Account pursuant to Section 2.05 hereof.

Section 2.03    Collection of Mortgage Loan Payments.

Following the date of this Agreement, the Servicer shall proceed diligently to collect all payments due under each of the related Mortgage Loans when the same shall become due and payable and shall take reasonable care in ascertaining and estimating Escrow Payments, to the extent applicable, and all other charges that will become due and payable with respect to the Mortgage Loans and each related Mortgaged Property, to the extent that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.

Section 2.04    Establishment of and Deposits to Custodial Account.

The Servicer shall segregate and hold all funds collected and received pursuant to the Mortgage Loans separate and apart from any of its own funds and general assets and shall establish one or more Custodial Accounts, in the form of time deposit or demand accounts, titled "GMAC Mortgage Corporation, in trust for [                    ] re: Fixed and Adjustable Rate B/C Residential Mortgage Loans". The Custodial Account shall be established with a Qualified Depository acceptable to the Owner, it being acknowledged that any Qualified Depository that is an Affiliate of Servicer is hereby deemed acceptable to the Owner. Any funds deposited in the Custodial Account shall at all times be fully insured to the full extent permitted under applicable law and any amounts therein may be invested in Eligible Investments. The creation of any Custodial Account shall be evidenced by a certification in the form of Exhibit 2 hereto, in the case of an account established with the Servicer, or by a letter agreement in the form of Exhibit 3 hereto, in the case of an account held by a depository other than the Servicer. A copy of such certification or letter agreement shall be furnished to the Owner and, upon request, to any subsequent Owner.

The Servicer shall deposit in the Custodial Account no more than two (2) Business Days following receipt thereof, and retain therein, the following collections received by the Servicer and payments made by the Servicer after the applicable Transfer Date, other than payments of principal and interest due on or before the related Transfer Date, or received by the Servicer prior to the related Transfer Date but allocable to a period subsequent thereto:

(i)    all payments on account of principal on the Mortgage Loans, including all Principal Prepayments;

(ii)    all payments on account of interest on the Mortgage;

(iii)    all Liquidation Proceeds and any amount received with respect to REO Property;

(iv)    all Insurance Proceeds including amounts required to be deposited pursuant to Section 2.10 (other than proceeds to be held in a suspense account and applied to the restoration

-15-

or repair of the Mortgaged Property or released to the Mortgagor in accordance with Section 2.14), and Section 2.13;

(v) all Condemnation Proceeds which are not applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with Section 2.14;

(vi) any amount required to be deposited in the Custodial Account pursuant to Section 2.09, 2.12, 2.16, 3.01, 3.04 or 4.02;

(vii) any prepayment penalties received with respect to any Mortgage Loan; and

(viii) any amounts required to be deposited by the Servicer pursuant to Section 2.11 in connection with the deductible clause in any blanket hazard insurance policy.

The foregoing requirements for deposit into the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, unless otherwise provided herein, payments in the nature of the Servicing Fee and Ancillary Income need not be deposited by the Servicer into the Custodial Account. Any interest paid on funds deposited in the Custodial Account by the depository institution or any other non-interest benefits shall accrue to the benefit of the Servicer and the Servicer shall be entitled to retain and withdraw such interest from the Custodial Account pursuant to Section 2.05 or retain such other benefits, as the case may be.

Section 2.05    Permitted Withdrawals From Custodial Account.

Subject to Section 3.01, the Servicer shall be entitled to withdraw funds from the Custodial Account for the following purposes:

(i) to make payments to the Owner in the amounts and in the manner provided Section 3.01;

(ii) [reserved];

(iii) to pay to itself the Servicing Fee (to the extent the Servicer has not retained the Servicing Fee);

(iv) to reimburse itself for unreimbursed Servicing Advances (except to the extent reimbursed pursuant to Section 2.07), any accrued but unpaid Servicing Fees and for unreimbursed advances of Servicer funds made pursuant to Section 2.15, the Servicer's right to reimburse itself pursuant to this subclause (iii) with respect to any Mortgage Loan being limited to related Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds and such other amounts as may be collected by the Servicer from the Mortgagor or otherwise relating to the Mortgage Loan, it being understood that, in the case of any such reimbursement, the Servicer's right thereto shall be prior to the rights of the Owner;

(v) following the liquidation of a Mortgage Loan, to reimburse itself from amounts unrelated to the Mortgage Loan for any unpaid Servicing Fees to the extent not

-16-

recoverable from Liquidation Proceeds, Insurance Proceeds or other amounts received with respect to the related Mortgage Loan under Section 2.05(iii);

(vi) to reimburse itself for any unreimbursed Nonrecoverable Advances made by the Servicer in accordance with this Agreement;

(vii) to invest funds in Eligible Investments in accordance with Section 2.09;

(viii) to withdraw funds deposited in error;

(ix) to pay itself any interest earned on funds deposited in the Custodial Account (all such interest to be withdrawn monthly not later than each Remittance Date); and

(x) to clear and terminate the Custodial Account upon the termination of this Agreement.

Section 2.06    Establishment of and Deposits to Escrow Account.

The Servicer shall segregate and hold all funds collected and received pursuant to a Mortgage Loan constituting Escrow Payments separate and apart from any of its own funds and general assets and shall establish and maintain one or more Escrow Accounts, in the form of time deposit or demand accounts, titled, "GMAC Mortgage Corporation, in trust for Owners of Residential Fixed and Adjustable Rate Mortgage Loans, and various Mortgagors". The Escrow Account shall be established with a Qualified Depository, in a manner which shall provide maximum available insurance thereunder. Funds deposited in the Escrow Accounts may be drawn on by the Servicer in accordance with Section 2.07. The creation of any Escrow Account shall be evidenced by a certification in the form of Exhibit 4 hereto, in the case of an account established with the Servicer, or by a letter agreement in the form of Exhibit 5 hereto, in the case of an account held by a depository other than the Servicer. A copy of such certification shall be furnished to the Owner and, upon request, to any subsequent Owner.

The Servicer shall deposit in the Escrow Account or Accounts on a daily basis, and retain therein all Escrow Payments collected on account of the Mortgage Loans, for the purpose of effecting timely payment of any such items as required under the terms of this Agreement.

The Servicer shall deposit in a suspense account on a daily basis, and retain therein all amounts representing Insurance Proceeds or Condemnation Proceeds which are to be applied to the restoration or repair of any Mortgaged Property. The suspense account shall be established with a Qualified Depository, in a manner which shall provide maximum available insurance thereunder.

The Servicer shall make withdrawals from the Escrow Account only to effect such payments as are required under this Agreement, as set forth in Section 2.07. The Servicer shall be entitled to retain any interest paid on funds deposited in the Escrow Account or a suspense account by the depository institution, other than interest on escrowed funds required by law to be paid to the Mortgagor. To the extent required by law, the Servicer shall pay from its own funds interest on escrowed funds to the Mortgagor notwithstanding that the Escrow Account may be non-interest bearing or that interest paid thereon is insufficient for such purposes.

-17-

Section 2.07    <u>Permitted Withdrawals From Escrow Account.</u>

Withdrawals from the Escrow Account or Accounts may be made by the Servicer only:

(i)    to effect timely payments of ground rents, taxes, assessments, water rates, mortgage insurance premiums, condominium charges, fire and hazard insurance premiums or other items constituting Escrow Payments for the related Mortgage;

(ii)    to reimburse the Servicer for any Servicing Advance made by the Servicer pursuant to <u>Section 2.10</u> with respect to a related Mortgage Loan, but only from amounts received on the related Mortgage Loan which represent late collections of Escrow Payments thereunder;

(iii)    to refund to any Mortgagor any funds found to be in excess of the amounts required under the terms of the related Mortgage Loan or applicable federal or state law or judicial or administrative ruling;

(iv)    for transfer to the Custodial Account and application to reduce the principal balance of the Mortgage Loan in accordance with the terms of the related Mortgage and Mortgage Note;

(v)    [Reserved];

(vi)    to pay to the Servicer, or any Mortgagor to the extent required by law, any interest paid on the funds deposited in the Escrow Account; and

(vii)    to clear and terminate the Escrow Account on the termination of this Agreement.

Section 2.08    <u>Payment of Taxes, Insurance and Other Charges.</u>

With respect to each Mortgage Loan that provides for Escrow Payments, the Servicer shall maintain accurate records reflecting the status of ground rents, taxes, assessments, water rates, sewer rents, and other charges which are or may become a lien upon the Mortgaged Property and the status fire and hazard insurance coverage and shall obtain, from time to time, all bills for the payment of such charges (including renewal premiums) and shall effect payment thereof prior to the applicable penalty or termination date, employing for such purpose deposits of the Mortgagor in the Escrow Account which shall have been estimated and accumulated by the Servicer in amounts sufficient for such purposes, as allowed under the terms of the Mortgage.

To the extent that any Mortgage Loan does not provide for Escrow Payments, the Servicer shall determine that any such payments are made by the Mortgagor.  With respect to each Mortgage Loan, subject to Accepted Servicing Practices, the Servicer assumes full responsibility for the timely payment of all such bills and shall effect payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments and shall make Servicing Advances from its own funds to effect such payments within the time period required to avoid penalties and interest and no later than to avoid the loss of the related Mortgaged Property by foreclosure from a tax or other lien.

-18-

Notwithstanding the foregoing, if the Servicer determines that such Servicing Advance would be a Nonrecoverable Advance, the Servicer shall have no obligation to make such Servicing Advance. If Servicer fails to make a Servicing Advance with respect to any payment prior to the date on which any late payment penalties or costs related to protecting the lien accrue, except in the case of a Nonrecoverable Advance, the Servicer shall pay any such penalties or costs which accrued after the date which was thirty (30) Business Days after the date on which the Servicer had knowledge that such payment had not been made by the Mortgagor.

Section 2.09    Protection of Accounts.

The Servicer may transfer the Custodial Account or the Escrow Account to a different Qualified Depository from time to time. Such transfer shall be made only upon obtaining the consent of the Owner, which consent shall not be withheld unreasonably.

The Servicer shall bear any expenses, losses or damages sustained by the Owner because the Custodial Account and/or Escrow Account are not demand deposit accounts.

Amounts on deposit in the Custodial Account may at the option of the Servicer be invested in Eligible Investments. Any such Eligible Investment shall mature no later than one day prior to the Remittance Date in each month; *provided, however*, that if such Eligible Investment is an obligation of a Qualified Depository (other than the Servicer) that maintains the Custodial Account, then such Eligible Investment may mature on the related Remittance Date. Any such Eligible Investment shall be made in the name of the Servicer in trust for the benefit of the Owner. All income on or gain realized from any such Eligible Investment shall be for the benefit of the Servicer and may be withdrawn at any time by the Servicer. Any losses incurred in respect of any such investment shall be deposited in the Custodial Account, by the Servicer out of its own funds immediately as realized. If, at any time, the amount on deposit in the Custodial Account exceeds the amount of the applicable FDIC insurance, such excess above the amount of the applicable FDIC insurance shall be invested in Eligible Investments.

All suspense and clearing account in which funds relating to the Mortgage Loans are deposited shall be established with a Qualified Depository, in a manner which shall provide maximum available insurance thereunder.

Section 2.10    Maintenance of Hazard Insurance.

The Servicer shall cause to be maintained for each Mortgage Loan, hazard insurance such that all buildings upon the Mortgaged Property are insured by a generally acceptable insurer acceptable under the Fannie Mae Guides against loss by fire, hazards of extended coverage and such other hazards as are required to be insured pursuant to the Fannie Mae Guides, in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements securing such Mortgage Loan or (ii) the outstanding principal balance of the Mortgage Loan provided that such amount represents at least 80% of the insurable value of the Mortgaged Property.

If required by the National Flood Insurance Act of 1968, as amended, each Mortgage Loan is, and shall continue to be, covered by a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration is in effect with a generally acceptable insurance carrier acceptable under the Fannie Mae Guides in an amount representing coverage not less than the lesser of (i) the aggregate unpaid principal balance of the Mortgage Loan, (ii) maximum amount of insurance which is available under the National Flood Insurance Act of 1968, as amended (regardless of whether the area in which such Mortgaged Property is located is participating in such program), and (iii) the full replacement value of the improvements which are part of such Mortgaged Property. If a Mortgaged Property is located in a special flood hazard area and is not covered by flood insurance or is covered in an amount less than the amount required by the National Flood Insurance Act of 1968, as amended, the Servicer shall notify the related Mortgagor that the Mortgagor must obtain such flood insurance coverage, and if said Mortgagor fails to obtain the required flood insurance coverage within forty five (45) days after such notification, the Servicer shall immediately force place the required flood insurance on the Mortgagor's behalf.

If a Mortgage is secured by a unit in a condominium project, the Servicer shall verify that the coverage required of the owner's association, including hazard, flood, liability, and fidelity coverage, is being maintained in accordance with then current Fannie Mae requirements, and secure from the owner's association its agreement to notify the Servicer promptly of any change in the insurance coverage or of any condemnation or casualty loss that may have a material effect on the value of the Mortgaged Property as security.

The Servicer shall cause to be maintained on each Mortgaged Property such other or additional insurance as may be required pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance, or pursuant to the requirements of any private mortgage guaranty insurer, or as may be required to conform with Accepted Servicing Practices.

In the event that the Owner or the Servicer shall determine that the Mortgaged Property should be insured against loss or damage by hazards and risks not covered by the insurance required to be maintained by the Mortgagor pursuant to the terms of the Mortgage, the Servicer shall communicate and consult with the Mortgagor with respect to the need for such insurance and bring to the Mortgagor's attention the desirability of protection of the Mortgaged Property.

All policies required hereunder shall name the Servicer and its successors and assigns as a mortgagee and loss payee and shall be endorsed with non contributory standard or New York mortgagee clauses which shall provide for at least 30 days prior written notice of any cancellation, reduction in amount or material change in coverage.

The Servicer shall not interfere with the Mortgagor's freedom of choice in selecting either his insurance carrier or agent, provided, however, that the Servicer shall not accept any such insurance policies from insurance companies unless such companies are acceptable under the Fannie Mae Guides and are licensed to do business in the jurisdiction in which the Mortgaged Property is located. The Servicer shall determine that such policies provide sufficient risk coverage and amounts as required pursuant to the Fannie Mae Guides, that

-20-

they insure the property owner, and that they properly describe the property address. The Servicer shall furnish to the Mortgagor a formal notice of expiration of any such insurance in conformance with Servicer's standard practices; provided, however, that in the event that no such notice is furnished by the Servicer, the Servicer shall ensure that replacement insurance policies (whether forced placed or other insurance policies) are in place in the required coverages and the Servicer shall be solely liable for any losses in the event coverage is not provided.

Pursuant to Section 2.06, any amounts collected by the Servicer under any such policies (other than amounts to be deposited in a suspense account and applied to the restoration or repair of the related Mortgaged Property, or property acquired in liquidation of the Mortgage Loan, or to be released to the Mortgagor, in accordance with the Servicer's normal servicing procedures as specified in Section 2.14) shall be deposited in the Custodial Account subject to withdrawal pursuant to Section 2.05.

Section 2.11    Maintenance of Blanket Hazard Insurance Coverage.

In the event that the Servicer shall obtain and maintain a blanket policy insuring against losses arising from fire and hazards covered under extended coverage on all of the Mortgage Loans, then, to the extent such policy provides coverage in an amount equal to the amount required pursuant to Section 2.10 and otherwise complies with all other requirements of Section 2.10, it shall conclusively be deemed to have satisfied its obligations as set forth in Section 2.10. Any amounts collected by the Servicer under any such policy relating to a Mortgage Loan shall be deposited in the Custodial Account subject to withdrawal pursuant to Section 2.05. Such policy may contain a deductible clause, in which case, in the event that there shall not have been maintained on the related Mortgaged Property a policy complying with Section 2.10, and there shall have been a loss which would have been covered by such policy, the Servicer shall deposit in the Custodial Account at the time of such loss the amount not otherwise payable under the blanket policy because of such deductible clause, such amount to be deposited from the Servicer's funds, without reimbursement therefor. Upon request of the Owner, the Servicer shall cause to be delivered to the Owner a certified true copy of such policy and a statement from the insurer thereunder that such policy shall in no event be terminated or materially modified without 30 days' prior written notice to the Owner.

Section 2.12    Maintenance of Fidelity Bond and Errors and Omissions Insurance.

The Servicer shall maintain with responsible companies, at its own expense, a blanket Fidelity Bond and an Errors and Omissions Insurance Policy, with broad coverage on all officers, employees or other persons acting in any capacity requiring such persons to handle funds, money, documents or papers relating to the Mortgage Loans ("Servicer Employees"). Any such Fidelity Bond and Errors and Omissions Insurance Policy shall be in the form of the Mortgage Banker's Blanket Bond and shall protect and insure the Servicer against losses, including forgery, theft, embezzlement, fraud, errors and omissions and negligent acts of such Servicer Employees. Such Fidelity Bond and Errors and Omissions Insurance Policy also shall protect and insure the Servicer against losses in connection with the release or satisfaction of a Mortgage Loan without having obtained payment in full of the indebtedness secured thereby. No provision of this Section 2.12 requiring such Fidelity Bond and Errors and Omissions Insurance Policy shall diminish or relieve the Servicer from its duties and obligations as set forth

-21-

in this Agreement. The Servicer shall maintain minimum coverage amounts under any such Fidelity Bond and Errors and Omissions Insurance Policy acceptable to Fannie Mae and Freddie Mac. Upon the request of the Owner, the Servicer shall cause to be delivered to the Owner a certified true copy of such Fidelity Bond and Errors and Omissions Insurance Policy.

Section 2.13    Inspections.

The Servicer shall inspect the Mortgaged Property as often as is deemed necessary by the Servicer to assure itself that the value of the Mortgaged Property is being preserved; provided that, if any Mortgage Loan is more than 60 days delinquent, the Servicer shall immediately inspect the Mortgaged Property and shall conduct subsequent inspections as often as is deemed necessary by the Servicer to assure itself that the value of the Mortgaged Property is being preserved in accordance with Accepted Servicing Practices; provided further that if the Servicer determines that any Mortgage Property is vacant, the Servicer shall immediately inspect the Mortgaged Property and shall conduct subsequent inspections every 25 to 35 days to assure itself that the value of the Mortgaged Property is being preserved in accordance with Accepted Servicing Practices. The Servicer shall maintain appropriate records of each such inspection.

Section 2.14    Restoration of Mortgaged Property.

The Servicer need not obtain the approval of the Owner prior to releasing any Insurance Proceeds or Condemnation Proceeds to the Mortgagor to be applied to the restoration or repair of the Mortgaged Property if such release is in accordance with Accepted Servicing Practices and the terms of this Agreement. At a minimum, the Servicer shall comply with the following conditions in connection with any such release of Insurance Proceeds or Condemnation Proceeds:

(i) the Servicer shall receive satisfactory independent verification of completion of repairs and issuance of any required approvals with respect thereto;

(ii) the Servicer shall take all steps necessary to preserve the priority of the lien of the Mortgage, including, but not limited to requiring waivers with respect to mechanics' and materialmen's liens;

(iii) the Servicer shall verify that the Mortgage Loan is not in default; and

(iv) pending repairs or restoration, the Servicer shall place the Insurance Proceeds or Condemnation Proceeds in a suspense account.

If the Owner is named as an additional loss payee, the Servicer is hereby empowered to endorse any loss draft issued in respect of such a claim in the name of the Owner.

Section 2.15    Title, Management and Disposition of REO Property.

In the event that title to any Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be taken in the name of the Servicer on behalf of the Owner and without reference to the Owner except as otherwise required

-22-

by law. The Person or Persons holding such title other than the Owner shall acknowledge in writing that such title is being held as nominee for the Owner.

The Servicer shall manage, conserve, protect and operate each REO Property for the Owner solely for the purpose of its prompt disposition and sale. The Servicer, either itself or through an agent selected by the Servicer, shall manage, conserve, protect and operate the REO Property in the same manner that it manages, conserves, protects and operates other foreclosed property for its own account. The Servicer shall attempt to sell the same (and may temporarily rent the same for a period not greater than one year, except as otherwise provided below) on such terms and conditions as the Servicer deems to be in the best interest of the Owner. The Servicer shall notify the Owner from time to time as to the status of each REO Property.

The Servicer shall use its commercially reasonable efforts to dispose of the REO Property as soon as possible and shall sell such REO Property in any event within one year after title has been taken to such REO Property, unless the Servicer determines, and gives an appropriate notice to the Owner to such effect, that a longer period is necessary for the orderly liquidation of such REO Property. If a period longer than one year is permitted under the foregoing sentence and is necessary to sell any REO Property, the Servicer shall report monthly to the Owner as to the progress being made in selling such REO Property.

The Servicer shall also maintain on each REO Property fire and hazard insurance with extended coverage in an amount which is at least equal to the maximum insurable value of the improvements which are a part of such property, liability insurance and, to the extent required and available under the National Flood Insurance Act of 1968, as amended, flood insurance in the amount required in Section 2.10 hereof.

The disposition of REO Property shall be carried out by the Servicer at such price, and upon such terms and conditions, as the Servicer deems to be in the best interests of the Owner. The proceeds of sale of the REO Property shall be promptly deposited in the Custodial Account. As soon as practical thereafter, the expenses of such sale shall be paid and the Servicer shall reimburse itself for any related unreimbursed Servicing Advances and unpaid Servicing Fees made pursuant to this Section, and on the Remittance Date immediately following the Principal Prepayment Period in which such sale proceeds are received the net cash proceeds of such sale remaining in the Custodial Account shall be distributed to the Owner.

With respect to each REO Property, the Servicer shall hold all funds collected and received in connection with the operation of the REO Property in the Custodial Account. The Servicer shall cause to be deposited on a daily basis upon the receipt thereof in each Custodial Account all revenues received with respect to the conservation and disposition of the related REO Property.

Section 2.16    Permitted Withdrawals with Respect to REO Property.

The Servicer shall withdraw funds on deposit in the Custodial Account with respect to each related REO Property necessary for the proper operation, management and maintenance of the REO Property, including the cost of maintaining any hazard insurance pursuant to Section 2.10 and the fees of any managing agent acting on behalf of the Servicer.

-23-

The Servicer shall make monthly distributions on each Remittance Date to the Owner of the net cash flow from the REO Property (which shall equal the revenues from such REO Property net of the expenses described in <u>Section 2.17</u> and of any reserves reasonably required from time to time to be maintained to satisfy anticipated liabilities for such expenses).

Section 2.17      <u>Real Estate Owned Reports.</u>

Together with the statement furnished pursuant to <u>Section 2.19</u>, the Servicer shall furnish to the Owner on or before the 5th Business Day of each month a statement with respect to any REO Property covering the operation of such REO Property for the previous month and the Servicer's efforts in connection with the sale of such REO Property and any rental of such REO Property incidental to the sale thereof for the previous month. That statement shall be accompanied by such other information as the Owner shall reasonably request.

Section 2.18      <u>Liquidation Reports.</u>

Upon the foreclosure sale of any Mortgaged Property or the acquisition thereof by the Owner pursuant to a deed in lieu of foreclosure, the Servicer shall submit to the Owner a liquidation report with respect to such Mortgaged Property.

Section 2.19      <u>Reports of Foreclosures and Abandonments of Mortgaged Property.</u>

Following the foreclosure sale or abandonment of any Mortgaged Property, the Servicer shall report such foreclosure or abandonment as required pursuant to Section 6050J of the Code.

Section 2.20      <u>Notification of Adjustments.</u>

With respect to each Adjustable Rate Mortgage Loan, the Servicer shall adjust the Mortgage Interest Rate on the related Interest Rate Adjustment Date in compliance with the requirements of applicable law and the related Mortgage and Mortgage Note. The Servicer shall execute and deliver any and all necessary notices required under applicable law and the terms of the related Mortgage Note and Mortgage regarding the Mortgage Interest Rate and the Monthly Payment adjustments. The Servicer shall promptly upon written request thereof, deliver to the Owner any applicable data regarding such adjustments and the methods used to calculate and implement such adjustments. Upon the discovery by the Servicer, or the Owner that the Servicer has failed to adjust a Mortgage Interest Rate or a Monthly Payment pursuant to the terms of the related Mortgage Note and Mortgage, the Servicer shall immediately deposit in the Custodial Account from its own funds the amount of any interest loss caused the Owner thereby.

## ARTICLE III.

## PAYMENTS TO OWNER

Section 3.01      <u>Remittances.</u>

On each Remittance Date the Servicer shall remit by wire transfer of immediately available funds to the Owner (a) all amounts deposited in the Custodial Account as of the close of business on the Determination Date (net of charges against or withdrawals from the Custodial Account pursuant to Section 2.05), plus (b) all amounts, if any, which the Servicer is obligated to distribute pursuant to Section 3.04.

With respect to any funds deposited in the Custodial Account after the Business Day following the Business Day on which such deposit was required to be made, the Servicer shall pay to the Owner interest on any such late payment at an annual rate equal to the Prime Rate, adjusted as of the date of each change, plus one percentage point, but in no event greater than the maximum amount permitted by applicable law. Such interest shall be deposited in the Custodial Account by the Servicer on the date such late payment is made and shall cover the period commencing with the Business Day following the Business Day on which such payment was due and ending with the Business Day on which such payment is made, both inclusive. Such interest shall be remitted along with the distribution payable on the next succeeding Remittance Date. The payment by the Servicer of any such interest shall not be deemed an extension of time for payment or a waiver of any Event of Default by the Servicer.

Section 3.02    Statements to Owner.

Not later than each Remittance Date, the Servicer shall furnish to the Owner a Remittance Advice, with a trial balance report attached thereto, in the form of Exhibit 1 annexed hereto in hard copy and electronic medium mutually acceptable to the parties as to the preceding remittance and the period ending on the preceding Determination Date.

In addition, not more than 90 days after the end of each calendar year, the Servicer shall furnish to each Person who was a Owner at any time during such calendar year an annual statement in accordance with the requirements of applicable federal income tax law as to the aggregate of remittances for the applicable portion of such year.

Such obligation of the Servicer shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Servicer pursuant to any requirements of the Internal Revenue Code as from time to time are in force.

The Servicer shall prepare and file any and all tax returns, information statements or other filings required to be delivered to any governmental taxing authority or to the Owner pursuant to any applicable law with respect to the Mortgage Loans and the transactions contemplated hereby. In addition, the Servicer shall provide the Owner with such information concerning the Mortgage Loans as is necessary for the Owner to prepare its federal income tax return as the Owner may reasonably request from time to time and which is reasonably available to the Servicer.

Section 3.03    Advances by Servicer.

Except as otherwise provided herein, the Servicer shall be entitled to first priority reimbursement pursuant to Section 2.05 hereof for Servicing Advances from recoveries from the related Mortgagor or from all Liquidation Proceeds and other payments or recoveries (including Insurance Proceeds and Condemnation Proceeds) with respect to the related Mortgage Loan.

-25-

Section 3.04      [Reserved]

Section 3.05      [Reserved]


# ARTICLE IV.

## GENERAL SERVICING PROCEDURES

Section 4.01      Transfers of Mortgaged Property.

The Servicer shall be required to enforce any "due-on-sale" provision contained in any Mortgage or Mortgage Note and to deny assumption by the person to whom the Mortgaged Property has been or is about to be sold whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains liable on the Mortgage and the Mortgage Note. When the Mortgaged Property has been conveyed by the Mortgagor, the Servicer shall, to the extent it has knowledge of such conveyance, exercise its rights to accelerate the maturity of such Mortgage Loan under the "due-on-sale" clause applicable thereto, provided, however, that the Servicer shall not exercise such rights if prohibited by law from doing so.

If the Servicer reasonably believes it is unable under applicable law to enforce such "due-on-sale" clause, the Servicer, shall, to the extent permitted by applicable law, enter into (i) an assumption and modification agreement with the person to whom such property has been conveyed, pursuant to which such person becomes liable under the Mortgage Note and the original Mortgagor remains liable thereon or (ii) in the event the Servicer is unable under applicable law to require that the original Mortgagor remain liable under the Mortgage Note and the Servicer has the prior consent of the primary mortgage guarantee insurer, a substitution of liability agreement with the purchaser of the Mortgaged Property pursuant to which the original Mortgagor is released from liability and the purchaser of the Mortgaged Property is substituted as Mortgagor and becomes liable under the Mortgage Note. If an assumption fee is collected by the Servicer for entering into an assumption agreement, such fee will be retained by the Servicer as additional servicing compensation. In connection with any such assumption, neither the Mortgage Interest Rate borne by the related Mortgage Note, the term of the Mortgage Loan nor the outstanding principal amount of the Mortgage Loan shall be changed.

To the extent that any Mortgage Loan is assumable, the Servicer shall inquire diligently into the creditworthiness of the proposed transferee, and shall follow Accepted Servicing Practices including but not limited to Servicer conducting a review of the credit and financial capacity of the individual receiving the property, and may approve the assumption if it believes the recipient is capable of assuming the mortgage obligations. If the credit of the proposed transferee does not satisfy the relevant underwriting criteria and the transfer of ownership actually occurs, the Servicer diligently shall, to the extent permitted by the Mortgage or the Mortgage Note and by applicable law, accelerate the maturity of the Mortgage Loan.

-26-

Section 4.02    Satisfaction of Mortgages and Release of Mortgage Files.

Upon the payment in full of any Mortgage Loan, or the receipt by the Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, the Servicer shall notify the Owner in the Monthly Remittance Advice as provided in Section 3.02, and may request the release of any Mortgage Loan Documents from the Owner in accordance with this Section 4.02 hereof.  The Servicer shall obtain discharge of the related Mortgage Loan as of record within any related time limit required by applicable law; provided that the Owner has provided, or caused to be provided, all necessary documents requested by the Servicer.

If the Servicer satisfies or releases a Mortgage without first having obtained payment in full of the indebtedness secured by the Mortgage (or such lesser amount in connection with a discounted payoff accepted by the Servicer with respect to a defaulted Mortgage Loan) or should the Servicer otherwise prejudice any rights the Owner may have under the mortgage instruments, upon written demand of the Owner, the Servicer shall deposit the amount of any shortfall thereof in the Custodial Account within 5 Business Days of receipt of such demand by the Owner or such longer period if the Servicer is able to reasonably demonstrate that it will be able to cause the amount of the unpaid indebtedness to be reinstated and secured under the related Mortgage.  The Servicer shall maintain the Fidelity Bond and Errors and Omissions Insurance Policy as provided for in Section 2.14 insuring the Servicer against any loss it may sustain with respect to any Mortgage Loan not satisfied in accordance with the procedures set forth herein.

Section 4.03    Servicing Compensation.

As consideration for servicing the Mortgage Loans pursuant to this Agreement, the Servicer shall be entitled to retain the applicable Servicing Fee from payments on the Mortgage Loans or to withdraw the applicable Servicing Fee with respect to each Mortgage Loan from the Custodial Account pursuant to Section 2.05 hereof.

Additional servicing compensation in the form of Ancillary Income shall be retained by the Servicer to the extent not required to be deposited in the Custodial Account. The Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement thereof except as specifically provided for herein.

Section 4.04    Annual Statement as to Compliance.

The Servicer shall deliver to the Owner, on or before March 31st each year beginning March 31, 2005, and on the final Transfer Date, an Officer's Certificate, stating that (i) a review of the activities of the Servicer during the preceding calendar year and of performance under this Agreement has been made under such officer's supervision, and (ii) to the best of such officer's knowledge, based on such review, the Servicer has fulfilled all its obligations under this Agreement throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof and the action being taken by the Servicer to cure such default.

Section 4.05    Annual Independent Public Accountants' Servicing Report.

-27-

On or before March 31st of each year beginning March 31, 2005, the Servicer, at its expense, shall cause a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to furnish a statement to the Owner to the effect that such firm has examined certain documents and records for the preceding fiscal year (or during the period from the date of commencement of such Servicer's duties hereunder until the end of such preceding fiscal year in the case of the first such certificate), and that, on the basis of such examination conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers, such firm is of the opinion that the Servicer's overall servicing operations have been conducted in compliance with the Uniform Single Attestation Program for Mortgage Bankers except for such exceptions that, in the opinion of such firm, the Uniform Single Attestation Program for Mortgage Bankers requires it to report, in which case such exceptions shall be set forth in such statement.

Section 4.06    Right to Examine Servicer Records.

The Owner shall have the right to examine and audit any and all of the books, records, or other information of the Servicer, whether held by the Servicer or by another on its behalf, with respect to or concerning this Agreement or the Mortgage Loans, during normal business hours or as otherwise acceptable to the Servicer, upon reasonable advance notice; provided that the Owner shall not so audit more than once per quarter.

Section 4.07    Compliance with Gramm-Leach-Bliley Act of 1999.

With respect to each Mortgage Loan and the related Mortgagor, each party shall as required comply with Title V of the Gramm-Leach-Bliley Act of 1999 and all applicable regulations promulgated thereunder, and shall provide all notices required of the party thereunder.

Section 4.08    Losses and Expenses.

(a)    Subject to Section 4.08(b) and (c) hereof (and except as may otherwise be expressly provided in this Agreement), Owner shall remain responsible, as between Owner and Servicer, for losses related to Owner's investment in the Servicing or, as applicable, the Mortgage Loans owned by Owner, as distinct from (and which shall not include) costs and expenses related to the performance of the Servicing duties delegated to Servicer hereunder, for which Servicer shall be responsible. Losses of the type referred to above for which Owner shall remain responsible include, but are not limited to:  investor repurchase demands, Recourse Obligations, pool insurance premiums, special hazard insurance premiums, earthquake losses, losses resulting from the absence or inadequacy of hazard insurance or flood insurance for a Mortgaged Property in accordance with Accepted Servicing Practices, foreclosure losses, REO losses, VA No-Bid Instructions, VA partial guaranties, interest shortfalls due to timing of prepayments and liquidations required under the terms of the Fannie Mae Guides, which are in excess of the amounts specified in Section 2.3(c)(ii), Servicing Advances, Nonrecoverable Advances and Catastrophic Advances, including, without limitation, those that may be required in connection with the Soldiers and Sailors Relief Act.

-28-

(b)    Owner shall reimburse Servicer for the following reimbursable expenses ("Reimbursable Expenses"):    (i) any out-of-pocket expense Servicer incurs with the prior approval of Owner in connection with its servicing and administrative obligations set forth in this Agreement to the extent such expense is not ordinary to the servicing function (but not including salaries, rent and other general operating expenses of Owner normally classified as overhead); (ii) expenses that Owner has expressly agreed to pay or be liable for hereunder; and (iii) expenses incurred in connection with the performance by Servicer at the request of Owner of any activity that is not specifically required to be performed by Servicer under this Agreement and is not reasonably ancillary to any specific requirements of Owner under this Agreement.  Except as otherwise expressly provided in this Agreement, each Party shall pay its own expenses incurred in connection with the preparation of and performance under this Agreement, including, without limitation, its own legal fees and expenses of preparing and delivering the notices, documents, reports, accountings and any other information required of it hereunder.

Out-of-pocket collection expenses incurred by Servicer to and billed by third parties on a monthly basis that will be reimbursed by Owner without approval of Owner include Reimbursable Expenses associated with the following: appraisals (pre- and post-foreclosure), title work, attorney fees (foreclosure, bankruptcy, and other), legal filing fees, inspection fees (interviews, drive-bys, clean out inspections after vacated, professional services such as property surveys, repair inspections, Environmental Protection Agency inspections, etc.), property maintenance (utilities, lawn care, snow removal, securing costs, repairs, winterization, removal of debris, clean-up after vacated), condominium expenses (condo fees, association fees, etc.), insurance (premiums and deductibles), taxes (property, estate, assessments), photographs, loss drafts, and travel (transportation, meals, lodging, rental cars).

(c)    (i)    Owner shall be solely responsible for all guaranty fees, credit enhancement fees, custodial fees (and related shipping costs), and trustee fees.

(ii)    Except as otherwise expressly set forth in this Agreement, Servicer shall be solely responsible for the direct and indirect internal and administrative costs associated with its obligations as subservicer of the Mortgage Loans hereunder, said costs to include but not be limited to: personnel, facilities; supplies; mailing and electronic data processing) system expenses, regardless of whether Servicer elects to contract with third party vendors to perform all or any portion of such internal and administrative functions.  Servicer shall pay interest due to Mortgagors on amounts held in tax and insurance escrow accounts in accordance with Applicable Requirements .

## ARTICLE V.

### SERVICER TO COOPERATE

Section 5.01    Provision of Information.

During the term of this Agreement, the Servicer shall furnish to the Owner all reports required hereunder, including those set forth on Exhibit 11 hereto, and such other periodic, special, or other reports or information, whether or not provided for herein, as shall be reasonably requested by the Owner or the purposes of this Agreement to the extent such reports

-29-

or information are readily accessible to the Servicer without undue expense. All such reports or information shall be provided by and in accordance with all reasonable instructions and directions which the Owner may give.

The Servicer shall execute and deliver all such instruments and take all such action as the Owner may reasonably request from time to time, in order to effectuate the purposes and to carry out the terms of this Agreement.

Section 5.02    Financial Statements; Servicing Facilities.

In connection with marketing the Mortgage Loans or a proposed Reconstitution, the Owner may make available to a prospective purchaser audited financial statements of the consolidated group that includes the Servicer for the most recently completed five fiscal years for which such statements are available, as well as a Consolidated Statement of Condition at the end of the last two fiscal years covered by any Consolidated Statement of Operations; provided that this requirement shall not apply for any year in which Servicer's financial statements are consolidated into those of a corporation subject to the periodic reporting requirements of the Securities Act of 1934. The Servicer also shall make available any comparable interim statements to the extent any such statements have been prepared by or on behalf of the corporate group that includes the Servicer (and are available upon request to members or stockholders of the corporate group that includes the Servicer or to the public at large). The Servicer shall furnish promptly to the Owner or a prospective purchaser copies of the statements specified above.

The Servicer shall make available to the Owner or any prospective Owner a knowledgeable financial or accounting officer for the purpose of answering questions respecting recent developments affecting the Servicer or the financial statements of the corporate group that includes the Servicer, and to permit any prospective purchaser to inspect the Servicer's servicing facilities for the purpose of satisfying such prospective purchaser that the Servicer has the ability to service the Mortgage Loans as provided in this Agreement.

## ARTICLE VI.

## TERMINATION

Section 6.01    Termination.

(a) This Agreement shall terminate upon either: (i) the later of the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan or the disposition of any REO Property with respect to the last Mortgage Loan and the remittance of all funds due hereunder; or (ii) mutual consent of the Servicer and the Owner in writing.

(b) The Owner may terminate, at its sole option, the Agreement with respect to some or all of the Mortgage Loans or REO Property, without cause. The Owner shall use its best efforts to provide written notice of such termination to the Servicer by registered mail at least 30 days prior to the effective date of termination; provided that in no event shall the Owner

-30-

provide such notice less than 20 days prior to the effective date of such termination. In the event the Owner terminates the Servicer without cause with respect to some or all of the Mortgage Loans, the Owner shall be required to pay to the Servicer the applicable Deboarding Fee, all related costs and expenses of transfer (including, but not limited to, costs and expenses associated with (i) preparing, delivering and/or recording assignments, or (ii) effecting beneficiary name changes on Mortgage Loans registered with MERS, each as applicable) and amounts due under Section 6.02(b).

(c) Servicer may terminate, at its sole option, the Agreement with respect to some or all of the Mortgage Loans or REO Property, without cause. Such termination shall not be become effective until the earlier of: (i) 90 days after the date on which notice of termination is provided by the Servicer in writing and delivered to the Owner by registered mail, or (ii) a successor shall have assumed the Servicer's responsibilities and obligations hereunder in the manner provided in Section 6.02. In the event the Servicer terminates the Agreement without cause with respect to some or all of the Mortgage Loans, the Owner shall not be required to pay to the Servicer the applicable Deboarding Fee and Servicer shall pay all its costs and expenses of transfer; provided, however, that the Servicer shall be entitled to reimbursement of amounts due under Section 6.02(b) hereof.

(d) Servicer may terminate this Agreement upon the determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by the Servicer. Any such determination permitting the resignation of the Servicer shall be evidenced by an Opinion of Counsel to such effect delivered to the Owner. No such resignation shall become effective until a successor shall have assumed the Servicer's responsibilities and obligations hereunder in the manner provided in Section 6.02.

Section 6.02    Transfer Procedures.

In the event the Servicer is replaced pursuant to the terms of this Agreement, the Servicer agrees to cooperate reasonably with the Owner and with any party designated as the successor servicer or subservicer in transferring the servicing to such successor servicer. In addition, the Servicer shall be responsible for notifying the related mortgagors of any transfer of servicing in accordance with the requirements of RESPA and the Cranston Gonzalez National Affordable Housing Act of 1990. On or before the date upon which servicing is transferred from the Servicer to any successor servicer (the "Transfer Date"), the Servicer shall prepare, execute and deliver to the successor servicer any and all documents and other instruments, place in such successor's possession all Mortgage Loan Documents in the possession of the Servicer which are necessary or appropriate to effect the purposes of such notice of termination, including but not limited to the transfer and endorsement or assignment of the related Mortgage Loans and related documents. The Servicer shall reasonably cooperate with the Owner and such successor in effecting the termination of the Servicer's responsibilities and rights hereunder.

On the related Transfer Date, the Servicer shall comply with all of the provisions of this Agreement to effect a complete transfer of the servicing with respect to the related Mortgage Loans. Except as otherwise provided in this Agreement, on the related Transfer Date for each related Mortgage Loan, this Agreement, except for Articles VI, VIII, IX and X and

-31-

Sections 13.01, 13.05, 13.11, 13.14 and 13.15 which shall survive the related Transfer Date, shall terminate with respect to such Mortgage Loan.

(a)  Mortgage Loans in Foreclosure.  The servicing with respect to Mortgage Loans in foreclosure on or before the related Transfer Date shall not be transferred from the Servicer to the Owner or the successor servicer, as the case may be, and such Mortgage Loans shall continue to be serviced by the Servicer pursuant to the terms of this Agreement.  However, if the Owner so elects, the Owner may waive the provisions of this paragraph (a) and accept transfer of servicing of such Mortgage Loans and all amounts received by the Servicer thereunder.

(b)  Servicing Advances.  The Servicer shall be entitled to be reimbursed for all unreimbursed Servicing Advances and any other advances made by the Servicer pursuant to this Agreement with respect to any Mortgage Loan on the related Transfer Date, but only if the servicer after the related Transfer Date is not the Servicer or an Affiliate.  In addition, the Owner shall cause the Servicer to be reimbursed for any accrued and unpaid Servicing Fees and for any trailing expenses representing Servicing Advances for which invoices are received by the Servicer after the Transfer Date; provided, that the Owner shall not be liable for any amounts pursuant to this paragraph unless the Servicer has requested reimbursement and delivered appropriate evidence of such reimbursable expense.

## ARTICLE VII.

## BOOKS AND RECORDS

Section 7.01    Possession of Servicing Files Prior to the related Transfer Date.

Prior to the related Transfer Date, the contents of each Servicing File are and shall be held in trust by the Servicer for the benefit of the Owner as the owner thereof.  The Servicer shall maintain in the Servicing File a copy of the contents of each Mortgage File and the originals of the documents in each Mortgage File not delivered to the Owner.  The possession of the Servicing File by the Servicer is at the will of the Owner for the sole purpose of servicing the related Mortgage Loan, pursuant to this Agreement, and such retention and possession by the Servicer is in its capacity as Servicer only and at the election of the Owner; provided that Servicer may keep copies of any records it deems necessary for compliance with any state or federal record retention requirements or as it deems advisable for use in defending any litigation, action or claim.  The Servicer shall release its custody of the contents of any Servicing File only in accordance with written instructions from the Owner, unless such release is required as incidental to the Servicer's servicing of the Mortgage Loans pursuant to this Agreement.

The Servicer shall be responsible for maintaining, and shall maintain, a complete set of books and records for each Mortgage Loan which shall be marked clearly to reflect the ownership of each Mortgage Loan by the Owner.  In particular, the Servicer shall maintain in its possession, available for inspection by the Owner or its designee, and shall deliver to the Owner or its designee upon demand, evidence of compliance with this Agreement, with all federal, state and local laws, rules and regulations, including but not limited to documentation as to the

-32-

method used in determining the applicability of the provisions of the National Flood Insurance Act of 1968, as amended, to the Mortgaged Property, documentation evidencing insurance coverage and eligibility of any condominium project for approval by Fannie Mae and periodic inspection reports as required by <u>Section 2.13</u>.  To the extent that original documents (other than documents evidencing the Mortgage Loans) are not required for purposes of realization of Liquidation Proceeds or Insurance Proceeds, documents maintained by the Servicer may be in the form of microfilm or microfiche or such other reliable means of recreating original documents, including but not limited to, optical imagery techniques so long as the Servicer complies with the requirements of the Fannie Mae Guide.

The Servicer shall keep at its servicing office books and records in which, subject to such reasonable regulations as it may prescribe, the Servicer shall note transfers of Mortgage Loans.  With respect to any assignment or transfer made by the Owner pursuant to <u>Section 8.05</u> of this Agreement, upon receipt of notice of such assignment or transfer, the Servicer shall cause its books and records to reflect the ownership of the Mortgage Loans of such assignee, and shall release the previous Owner from its obligations hereunder with respect to the Mortgage Loans sold or transferred arising following the date of such sale or transfer.  For the purposes of this Agreement, the Servicer shall be under no obligation to deal with any person with respect to this Agreement or the Mortgage Loans unless the books and records show such person as the owner of the Mortgage Loan.

## ARTICLE VIII.

## INDEMNIFICATION AND ASSIGNMENT

Section 8.01       <u>Indemnification.</u>

(a)  The Servicer shall defend and indemnify the Owner, its employees, officers, Affiliates, agents and representatives against any and all assessments, judgments, claims (brought by any Person including, without limitation, any third parties, including any governmental authorities), liabilities, losses, costs, damages or expenses whatsoever (including, without limitation, interest penalties and reasonable attorneys' fees, expenses and disbursements in connection with any action, suit or proceeding and any such reasonable attorneys' fees, expenses and disbursements incurred in enforcing any right of indemnification against any indemnitor) (each a "Liability"), sustained by Owner or any of the Persons or entities referenced above resulting from or related to the failure of the Servicer to perform its duties under this Agreement or the Servicer's breach of the terms of this Agreement, including any of the Servicer's representations, warranties, or covenants contained in this Agreement.

(b)  [Reserved.]

(c)  The Owner shall defend and indemnify the Servicer, its employees, officers, affiliates, agents and representatives (the "<u>Servicer Indemnified Parties</u>"), against any and all Liability that the Servicer Indemnified Parties may sustain which are caused by or result from (directly or indirectly, in whole or in part):

-33-

   (i)   (A) the Servicer taking any action, or refraining from taking any action, with respect to any Mortgage Loan or REO Property at or in conformity with the express written direction of the Owner or this Agreement or (B) the Servicer taking and initiating any legal actions with respect to any Mortgage Loans and REO Properties or taking title to any REO Properties on behalf of the Owner, in the name of the Servicer or an Affiliate thereof (in each case, unless such action or omission is taken with a standard of care in contravention of any standard of care required under the Agreement and such contravention is the proximate cause of the claim or action);

   (ii)   any breach by the Owner of the terms of this Agreement, including any of the Owner's representations, warranties or covenants contained in this Agreement;

   (iii)   the refusal of the Owner or any trustee or custodian in possession of original Mortgage Loan Documents to provide to the Servicer the originals of any Mortgage Loan Documents within a reasonable amount of time after a request for such documents has been received in order to allow the Servicer sufficient time to process satisfactions, payoffs and releases;

   (iv)   any act or omission to act of any servicer, sub-servicer, owner or originator of a Mortgage Loan or Mortgaged Property (or any other Person) prior to the Servicing Transfer Date, including, without limitation, any data integrity issue (and any related costs of correcting such issues); provided, however, should the Servicer have actual knowledge of any data integrity error which is likely to materially affect any Mortgage Loan, the Servicer, in consultation with the Owner and at the Owner's expense, will take reasonable efforts to correct such error;

   (v)   perpetuating the acts or omissions of prior servicers, including, without limitation, any debt-collector related liability (including, without limitation, effects of abusive or deceptive collection costs, improperly initiated foreclosures and imposition of improper fees or interest charges) unless (A) the Servicer has actual knowledge that perpetuating such act or omission will result in Liability to the Servicer and in conscious disregard of such actual knowledge, nonetheless perpetuates such act or omission, (B) the Servicer knowingly performs an act or omission and such act or omission as a singular act, not in combination with any other act or omission of any prior servicer(s), results in Liability to the Servicer, or (C) the acts or omissions are based on a mistaken or false conception of the law that is obvious, gross and significant and the Servicer, over a period of time, in more than a single instance, continues in its course of servicing to perpetuate such acts or omissions;

   (vi)   a prior servicer's failure to comply with the Servicer's Transfer Instructions;

   (vii)   advances initially assumed by the Servicer that ultimately are not recoverable from the Mortgagor or other proceeds;

   (viii)   a Mortgage Loan being classified as "high cost" under the Home Ownership and Equity Protection Act of 1994; or "high cost", or "predatory" under any other applicable state, federal or local law.

-34-

(ix)  any Environmental Liability.

The term "Environmental Liability" shall mean any and all claims, losses, damages, liabilities, judgments, penalties, fines, forfeitures, reasonable legal fees and expenses, and any and all related costs and/or expenses of litigation, administrative and/or regulatory agency proceedings, and any other costs, fees and expenses, suffered or incurred by the Servicer or Owner arising out of or resulting from the introduction of environmentally hazardous materials on any Mortgaged Property before and/or after the date of the Servicer's knowledge thereof, including, without limitation, (a) any liability under or on account of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., as the same may be amended from time to time, and/or any other federal or state environmental laws, and specifically including, without limitation, any liability relating to asbestos and asbestos containing materials, polychlorinated biphenyls, radon gas, petroleum and petroleum products, urea formaldehyde and any substances classified as being "in inventory", "usable work in process" or similar classification which would, if classified as unusable, be included in the foregoing definition, including the assertion of any lien thereunder, (b) claims brought by third parties for loss or damage incurred or sustained subsequent to the date hereof, and (c) liability with respect to any other matter affecting the Mortgaged Property within the jurisdiction of the federal Environmental Protection Agency or state environmental regulatory agencies pursuant to any state laws, and in the regulations adopted pursuant to any of said laws; provided, however, that the indemnity for Environmental Liability shall not be effective with respect to any liability caused by the Servicer that would otherwise be imposed by reason of the Servicer's willful misfeasance or bad faith in the performance of or failure to perform its duties hereunder.

The Owner shall not be required to indemnify, or otherwise be liable to, the Servicer or those referenced above, however, for any Liability which the Servicer is required to indemnify for pursuant to  Section 8.01(a) above.

Section 8.02     Limitation on Liability of Servicer and Others.

(a)     Notwithstanding  Section 8.01, neither the Servicer nor any of the directors, officers, employees or agents of the Servicer shall be under any liability to the Owner for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment, provided, however, that this provision shall not protect the Servicer or any such Person against any breach of warranties or representations made herein, its own negligent actions, or failure to perform its obligations in compliance with any standard of care set forth in this Agreement, or any liability which would otherwise be imposed by reason of any breach of the terms and conditions of this Agreement.  The Servicer and any director, officer, employee or agent of the Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder.  The Servicer shall not be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service the Mortgage Loans in accordance with this Agreement and which in its opinion may involve it in any expense or liability, provided, however, that the Servicer may undertake any such action which it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto. In such event, the Servicer shall be entitled to reimbursement from the Owner of the reasonable legal expenses and costs of such action.

-35-

(b)    Notwithstanding <u>Section 8.01</u>, the Servicer shall not be required to indemnify, or otherwise be liable to, the Owner or those referenced above for any Liability which the Owner is required to indemnify for pursuant to <u>Section 8.01(c)</u> above.

Section 8.03    <u>Limitation on Assignment and Resignation by Servicer.</u>

The Owner has entered into this Agreement with the Servicer and subsequent purchasers will purchase the Mortgage Loans in reliance upon the independent status of the Servicer, and the representations as to the adequacy of its servicing facilities, plant, personnel, records and procedures, its integrity, reputation and financial standing, and the continuance thereof. Therefore, the Servicer shall not (a) assign this Agreement or the servicing hereunder or delegate its rights hereunder or any portion hereof without the prior written consent of the Owner, which consent shall not be unreasonably withheld; provided that the Servicer may assign this Agreement to an Affiliate controlled by General Motors Corporation and capable of performing all of the Servicer's obligations hereunder without the consent of the Owner; or (b) sell or otherwise dispose of all or substantially all of its property or assets without providing at least 90 days written notice to the Owner.

Notwithstanding the foregoing, the Servicer may, without the consent of the Owner, retain third party contractors to perform certain servicing and loan administration functions, including without limitation, hazard insurance administration, tax payment and administration, flood certification and administration, collection services and similar functions; provided, that the retention of such contractors by Servicer shall not limit the obligation of the Servicer to service the Mortgage Loans pursuant to the terms and conditions of this Agreement.

Without in any way limiting the generality of this <u>Section 8.03</u>, in the event that the Servicer either shall assign this Agreement or the servicing responsibilities hereunder or delegate its duties hereunder or any portion thereof without the prior written consent of the Owner (other than to an Affiliate as permitted by <u>Section 8.03(a)</u>) or sell or otherwise dispose of all or substantially all of its property or assets without providing 90 days written notice to the Owner, then the Owner shall have the right to terminate this Agreement upon notice given as set forth in <u>Section 6.01</u> hereof, without any payment of any penalty or damages and without any liability whatsoever to the Servicer or any third party.

Notwithstanding any provision in this Agreement to the contrary, the Servicer may at any time upon notice to the Owner, or trustee in the case of a Reconstitution, and without the consent of any party, solely in connection with a financing or other facility (any such arrangement, an "Advance Facility"), assign as collateral security or pledge to another Person all its rights, title and interest under this Agreement to the Servicing Rights and its rights to reimbursement of Servicing Advances.

Except as provided for in <u>Section 6.01</u> of this Agreement, the Servicer shall not resign from the obligations and duties hereby imposed on it.

Section 8.04    <u>Operation of Indemnities.</u>

If any Person has made any indemnity payments to any other Person pursuant to this <u>Article VIII</u> and such other Person thereafter collects any of such amounts from others, such

-36-

other Person will repay such amounts collected, together with any interest collected thereon. The provisions of this Article VIII shall survive any termination of this Agreement, the liquidation of any Mortgage Loan, or the transfer or assignment by the Owner to another Person of any Mortgage Loan or REO Property or any interest in any Mortgage Loan or REO Property.

Section 8.05    Assignment by Owner.

No transfer of a Mortgage Loan may be made unless such transfer is in compliance with the terms hereof. The Owner shall have the right to assign its interest under this Agreement with respect to some or all of the Mortgage Loans, and designate any Person to exercise any rights of the Owner hereunder; provided that (a) Owner and such Person execute a mutually agreeable Assignment and Assumption Agreement substantially in the form of Exhibit 12 and such agreement is delivered to the Servicer; (b) such Person has a tangible net worth of $20 million or such Person is otherwise acceptable to the Servicer, in its sole and absolute discretion, (c) there shall not be more than three owners of the Mortgage Loans exclusive of the Mortgage Loans included in a Pass-Through Transfer, and (d) the Owner provides the Servicer with written notice of the transfer 30 days prior to the effective date of such transfer.

Upon such assignment of rights and assumption of obligations, the assignee or designee shall accede to the rights and obligations hereunder of the Owner with respect to such Mortgage Loans and the Owner as assignor shall be released from all obligations hereunder with respect to such Mortgage Loans from and after the date of such assignment and assumption (except that Articles VI, VIII, IX and X and Sections 13.01, 13.05, 13.11, 13.14 and 13.15 shall survive such transfer). All references to the Owner in this Agreement shall be deemed to include its permitted assignee or designee.

Section 8.06    Merger or Consolidation of the Servicer.

Any Person into which the Servicer may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any Person succeeding to the business of the Servicer, shall be the successor of the Servicer hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, however, that the successor or surviving Person shall be an institution whose deposits are insured by FDIC or a company whose business includes the servicing of mortgage loans and shall have a tangible net worth not less than $25,000,000.

## ARTICLE IX.

## REPRESENTATIONS, WARRANTIES AND COVENANTS OF OWNER

As of the date of this Agreement, the Owner warrants and represents to, and covenants and agrees with, the Servicer as follows:

-37-

Section 9.01        Organization and Good Standing; Licensing.

The Owner is a Delaware limited liability corporation duly organized and validly existing and has the power and authority to own its assets and to transact the business in which it is currently engaged.

Section 9.02        Authorization; Binding Obligations.

The Owner has the power and authority to make, execute, deliver and perform this Agreement, and perform all of the transactions contemplated to be performed by it under this Agreement, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement.  When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of the Owner enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies.

Section 9.03        No Consent Required.

The Owner is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement, except such as have been obtained or made or as to which the failure to obtain or make will not materially adversely affect the ability of the Owner to perform all obligations hereunder.

Section 9.04        No Violations.

The execution, delivery and performance of this Agreement by the Owner will not violate any provision of any existing law or regulation or any order or decree of any court applicable to the Owner, except for violations that will not adversely affect the Owner's ability to perform its obligations under this Agreement or the certificate of incorporation of the Owner, or constitute a material breach of any mortgage, indenture, contract or other agreement to which the Owner is a party or by which the Owner may be bound.

Section 9.05        Litigation.

No litigation or administrative proceeding of or before any court, tribunal or governmental body is currently pending or to the knowledge of the Owner threatened, against the Owner or with respect to this Agreement, which if adversely determined would have a material adverse effect on the transactions contemplated by this Agreement.

Section 9.06        Ownership.

With respect to each Mortgage Loan, Owner is the owner of all right, title, and interest in and to the Mortgage Loan (and the servicing rights appurtenant thereto).  Each Mortgage Loan is a valid and collectible obligation of the respective Mortgagor; and no Mortgage Loan is subject to the Home Ownership and Equity Protection Act of 1994.

-38-

Section 9.07    Service Contracts.

The Owner shall reimburse the Servicer for any costs or expenses incurred to transfer tax service contracts and flood service contracts or to obtain contracts that are not existing or transferable to the Servicer.

Section 9.08    Accuracy.

To the Owner's knowledge, the information provided in the Mortgage Loan Schedule is, in the aggregate, true and correct in all material respects as of the Servicing Transfer Date.

## ARTICLE X.

## REPRESENTATIONS AND WARRANTIES OF SERVICER

As of the date of this Agreement, the Servicer warrants and represents to, and covenants and agrees with, the Owner as follows:

Section 10.01    Due Organization and Authority.

The Servicer is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation as now being conducted and is licensed, qualified and in good standing in each state where a Mortgaged Property is located if the laws of such state require licensing or qualification in order to conduct business of the type conducted by the Servicer, and in any event the Servicer is in compliance with the laws of any such state to the extent necessary to ensure the enforceability of the related Mortgage Loan in accordance with the terms of this Agreement. The Servicer has the power and authority to make, execute, deliver and perform this Agreement, and perform all of the transactions contemplated to be performed by it under this Agreement, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement. When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of the Servicer enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies.

Section 10.02    Ordinary Course of Business.

The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Servicer.

Section 10.03    No Violation.

The execution, delivery and performance of this Agreement by the Servicer will not violate any provision of any existing law or regulation or any order or decree of any court applicable to the Servicer, except for violations that will not adversely affect the Servicer's ability to perform its obligations under this Agreement or the certificate of incorporation of the Servicer, or constitute a material breach of any mortgage, indenture, contract or other agreement

-39-

to which the Servicer is a party or by which the Servicer may be bound.

Section 10.04    Ability to Service.

The Servicer has the facilities, procedures, and experienced personnel necessary for the sound servicing of mortgage loans of the same type as the Mortgage Loans. The Servicer is in good standing to enforce and service mortgage loans in the jurisdiction wherein the Mortgaged Properties are located.

Section 10.05    Ability to Perform.

The Servicer does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement.

Section 10.06    Litigation.

No litigation or administrative proceeding of or before any court, tribunal or governmental body is currently pending or to the knowledge of the Servicer threatened, against the Servicer or with respect to this Agreement, which if adversely determined would have a material adverse effect on the transactions contemplated by this Agreement.

Section 10.07    No Consent Required.

The Servicer is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement, except such as have been obtained or made or as to which the failure to obtain or make will not materially adversely affect the ability of the Servicer to perform all obligations hereunder.

## ARTICLE XI.

## DEFAULT

Section 11.01    Events of Default.

The following shall constitute an Event of Default under this Agreement on the part of the Servicer:

(a)    any failure by the Servicer to remit to the Owner any payment required to be made under the terms of this Agreement which continues unremedied for a period of two Business Days after the date upon which notice of such failure is given to the Servicer, requiring the same to be remedied, shall have been given to the Servicer by the Owner; or

(b)    the failure by the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer set forth in this Agreement or in the Custodial Agreement which continues unremedied for a period of 30 days after the date on which notice of such failure, requiring the same to be remedied, shall have been

-40-

given to the Servicer by the Owner (the date of delivery of such notice, the "Notice Date"); *provided, however,* that in the case of a failure that cannot be cured within thirty (30) days after the Notice Date, the cure period may be extended if the Servicer can demonstrate to the reasonable satisfaction of the Owner that the failure can be cured and the Servicer is diligently pursuing remedial action; or

(c)  a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of 60 days; or

(d)  the Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Servicer or of or relating to all or substantially all of its property; or

(e)  the Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(f)  the Servicer fails to maintain its license to do business or service residential mortgage loans in any jurisdiction where the Mortgaged Properties are located which failure continues unremedied for a period of 45 days after receiving actual notice of such failure and such failure has a material and adverse effect on the Servicer's ability to perform its obligations under the Agreement; or

(g)  the Servicer attempts to assign its right to servicing compensation hereunder or the Servicer attempts, without the consent of the Owner, to assign this Agreement or the servicing responsibilities hereunder or to delegate its duties hereunder or any portion thereof in a manner not permitted under this Agreement.

In each and every such case, so long as an Event of Default shall not have been remedied, in addition to whatsoever rights the Owner may have at law or equity to damages, including injunctive relief and specific performance, the Owner, by notice in writing to the Servicer, may terminate without compensation all the rights and obligations of the Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof.

Upon receipt by the Servicer of such written notice, all authority and power of the Servicer under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the successor appointed pursuant to Section 6.02. Upon written request from the Owner, the Servicer shall prepare, execute and deliver any and all documents and other instruments, place in such successor's possession all Mortgage Files, and do or accomplish all other acts or things reasonably necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage

-41-

Loans and related documents, or otherwise, at the Servicer's sole expense. The Servicer agrees to cooperate reasonably with the Owner and such successor in effecting the termination of the Servicer's responsibilities and rights hereunder, including, without limitation, the transfer to such successor for administration by it of all cash amounts which shall at the time be credited by the Servicer to the Custodial Account or Escrow Account or thereafter received with respect to the Mortgage Loans.

Section 11.02    Waiver of Defaults.

The Owner may waive any default by the Servicer in the performance of its obligations hereunder and its consequences. Upon any such waiver of a past default, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived.

## ARTICLE XII.

## CLOSING

Section 12.01    Closing Documents.

The Closing Documents for the Mortgage Loans to be serviced hereunder shall consist of fully executed originals of the following documents:

1.      this Agreement (to be executed and delivered only as of the date of this Agreement);

2.      with respect to the date hereof a custodial account letter agreement or a custodial account certification, as applicable, as required hereunder, in the form of either Exhibit 2 or 3 hereto;

3.      with respect to the date hereof an escrow account letter agreement or an escrow account certification, as applicable, as required hereunder, in the form of either Exhibit 4 or 5 hereto;

4.      with respect to the date hereof an officer's certificate, in the form of Exhibit 7 hereto, with respect to the Servicer, including all attachments thereto; with respect to subsequent dates, an officer's certificate upon request of the Owner;

5.      with respect to the date hereof, an opinion of counsel to the Servicer (who may be an employee of the Servicer), in the form of Exhibit 6 hereto ("Opinion of Counsel to the Servicer"); and

6.      with respect to the date hereof, a corporate resolution in the form of Exhibit 13 hereto.

-42-

# ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

Section 13.01    Notices.

All notices, requests, demands and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given upon the delivery or mailing thereof, as the case may be, sent by registered or certified mail, return receipt requested:

(a)    If to Owner to:

American Residential Equities, LLC
848 Brickell Ave.
Miami, FL  33131
Attention:  Russell Johnson
Telecopier No:  (305) 374 6941

(b)    If to Servicer:

GMAC Mortgage Corporation
100 Witmer Road
Horsham, PA  19044
Attention: Executive Vice President of National Loan Administration
Telecopier No:  (215) 682 1300

With a Copy to:

GMAC Mortgage Corporation
3451 Hammond Ave.
Waterloo, IA  50702-5345
Attention: General Manager
Telecopier No: (319) 236-5175

With a Copy to:

GMAC Mortgage Corporation
100 Witmer Road
Horsham, PA  19044
Attention: General Counsel
Telecopier No:  (215) 682-1467

Section 13.02 Waivers.

The Servicer or the Owner may, by written notice to the others:

-43-

(a) Waive compliance with any of the terms, conditions or covenants required to be complied with by the others hereunder; and

(b) Waive or modify performance of any of the obligations of the others hereunder.

The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other subsequent breach.

Section 13.03    Entire Agreement; Amendment.

This Agreement, including all documents and exhibits incorporated by reference herein, constitutes the entire agreement between the parties with respect to servicing of the Mortgage Loans. This Agreement may be amended and any provision hereof waived, but, only in writing signed by the party against whom such enforcement is sought.

Section 13.04    Execution; Binding Effect.

This Agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement. Subject to Sections 8.03 and 8.04, this Agreement shall inure to the benefit of and be binding upon the Servicer and the Owner and their respective permitted successors and assigns.

Section 13.05    Confidentiality of Information.

The Servicer and the Owner each agree that any information and documents that are furnished for the purposes of performing under this Agreement or that are produced or are otherwise furnished to or come to the attention of either party are proprietary and shall be used only for the purposes of this Agreement. This information includes the terms of this Agreement, technical specifications and operating manuals, services and information concerning current, future, or proposed products and services and combinations of products and services; product and services descriptions; financial information; information related to mergers or acquisitions; passwords and security procedures; computer programs, loan servicing systems, software, and software documentation; customer and/or prospective client lists , mortgage loan files, and all other information relating in any way to the customer and/or prospective client; printouts; records; policies, practices and procedures; and any or all other information, data or materials relating to the business, trade secrets and technology of either party, its customers, clients, employees, business affairs, affiliates, subsidiaries and the affiliates of its parent organization (all of the foregoing collectively referred to as "Confidential Information").

Each party shall maintain the Confidential Information of the other in confidence using the same care and discretion to avoid disclosure of Confidential Information as it uses to protect its own confidential information that it does not want disclosed, but in no event less than a reasonable standard of care. The Owner specifically agrees that it will not use non-public personal information about the Servicer's customers in any manner prohibited by the Gramm-Leach-Bliley Act. Each party further agrees to (a) restrict disclosure of Confidential Information of the disclosing party solely to persons who need to know the Confidential Information to perform under this Agreement, (b) not to disclose any Confidential Information to any third party or copy Confidential Information without written approval of the disclosing party, and (c) inform

-44-

those third parties and other persons who receive Confidential Information of its confidential nature and obtain their agreement to abide by the obligations set forth herein.

The obligations imposed under this Agreement shall not apply to Confidential Information that is (a) made public by the party whose Confidential Information is disclosed, (b) generally available to the public other than by a breach of this Agreement by the receiving party, its employees or agents, or (c) rightfully received from a third person having the legal right to disclose the Confidential Information free of any obligation of confidence, nor shall the section be deemed to prohibit any disclosure by a party that is necessary or appropriate in such party's work with legal counsel, accountants, auditor or as required by applicable law or regulation. In the event that the receiving party, or any of such party's agents or employees, becomes legally compelled (by deposition, interrogatory, request for documents, subpoena, civil or criminal investigative demand or similar process) to disclose any Confidential Information of the disclosing party, such receiving party shall provide prompt prior notice to the disclosing party so that it may seek a protective order or other appropriate remedy. In the event that such protective order or other remedy is not obtained, or that the disclosing party waives compliance with the provisions of this section the receiving party will furnish only that portion of the Confidential Information which in the judgment of its counsel is legally required and will exercise reasonable efforts to obtain assurances that confidential treatment will be accorded the Confidential Information.

Each party acknowledges and agrees that any breach or threatened breach of any of the provisions of this section by the other party will result in immediate and irreparable harm and that any remedies at law in such event will be inadequate. The parties agree that such breaches, whether threatened or actual, will give the disclosing party the right to obtain injunctive relief to restrain such disclosure or use. This right shall, however, be in addition to and not in lieu of any other remedies at law or in equity.

Upon termination of the Agreement, all copies of the Confidential Information will either be destroyed or returned to the disclosing party immediately upon such party's request. Each party agrees that it will not retain any copy, summary or extract of the Confidential Information or any related work papers on any storage medium whatsoever. Notwithstanding anything to the contrary contained herein, Servicer shall in no event have any obligation hereunder to destroy Mortgage Loan files or any documents related thereto.

Section 13.06    Headings.

Headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

Section 13.07    Applicable Law.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA AND THE OBLIGATIONS, RIGHTS AND REMEDIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE COMMONWEALTH**

OF PENNSYLVANIA (WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES), EXCEPT TO THE EXTENT PREEMPTED BY FEDERAL LAW.

Section 13.08    Relationship of Parties.

Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties. The duties and responsibilities of the Servicer shall be rendered by it as an independent contractor and not as an agent of the Owner. The Servicer shall have full control of all of its acts, doings, proceedings, relating to or requisite in connection with the discharge of its duties and responsibilities under this Agreement.

Section 13.09    Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

Section 13.10    Recordation of Assignments of Mortgage.

To the extent permitted by applicable law, each of the Assignments of Mortgage is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Owner or the Owner's designee.

Section 13.11    Exhibits.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are integral parts of this Agreement.

Section 13.12    Counterparts.

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 13.13    No Solicitation.

From and after the date hereof, neither the Servicer nor any Affiliate of the Servicer shall solicit the Mortgagors for purposes of prepayment or refinance or modification of the Mortgage Loans, except as otherwise provided herein. Nothing in this Section 13.11 shall prohibit the Servicer from generalized advertising, including on its website, monthly account statements which are not targeted exclusively at the Mortgagors, or VRU (i.e. voice response unit) recorded communications or otherwise engaging in a program directed to the general public at large to encourage or recommend mortgage loan products and other products and services provided by the Servicer or such Affiliate or from taking applications for refinance from

-46-

Mortgagors as a result therefrom. Servicer may solicit the Mortgagors for non-mortgage loan products with the consent of the Owner, which consent shall not be unreasonably withheld.

Section 13.14    Cooperation of Servicer with a Reconstitution.

The Servicer and the Owner agree that with respect to some or all of the Mortgage Loans, the Owner may effect either:

(1)    one or more Whole Loan Transfers;

(2)    one or more Pass-Through Transfers.

The Servicer and the Owner acknowledge and agree that the Servicer is not obligated hereunder to act as servicer in any Reconstitution and the Owner is not obligated hereunder to offer the Servicer the opportunity to act as servicer in any Reconstitution.

The Servicer shall reasonably cooperate with the Owner in connection with any Whole Loan Transfer or Pass-Through Transfer contemplated by the Owner pursuant to this Section 13.13, provided, however, that under no circumstances and in no event shall such cooperation include any act of the Servicer or any event affecting the Servicer which would materially increase the Servicer's liabilities or obligations beyond those liabilities and obligations contained in this Agreement (except as otherwise set forth in this Section 13.12).

In connection with any Reconstitution in which the Owner and the Servicer have agreed that the Servicer shall act as the servicer in the Reconstitution, the Owner shall deliver any agreement (the "Reconstitution Agreement") or other document related to the Whole Loan Transfer or Pass Through Transfer to the Servicer at least 20 Business Days prior to such transfer; the Servicer's refusal to cooperate with Owner based on late delivery of such documents shall result in no liability to the Servicer.  Such Reconstitution Agreement may, in the Owner's discretion, contain contractual provisions not set forth in this Agreement, including, but not limited to, (i) customary certificate payment delays, (ii) servicer advance requirements for the advancing of delinquent scheduled payments of principal and interest through liquidation (unless deemed non-recoverable), (iii) servicer obligations to pay compensating interest for prepayment interest shortfalls (to the extent of the monthly servicing fee payable to the servicer), (iv) representations and warranties (dated as of the Reconstitution Date) of the Servicer conforming in all material respects to the representations and warranties in this Agreement, and (v) such provisions with regard to servicing responsibilities, investor reporting, segregation and deposit of principal and interest payments, custody of the Mortgage Loans, and other provisions that conform to secondary market standards for mortgage-backed securities backed by mortgage loans similar to the Mortgage Loans or as may be required by one or more Rating Agencies. The Servicer shall promptly review such Reconstitution Agreement and/or related documents, and provided that such Reconstitution Agreement contains servicing provisions substantially similar to those herein or otherwise acceptable to the Servicer in its sole discretion, shall execute such Reconstitution Agreement and/or related documents.  The Servicer's refusal to execute any Reconstitution Agreement or related documents may be based on any provision which materially (a) increases the liability of the Servicer and/or (b) affects Servicer's profitability from that contemplated in this Agreement.  The Owner hereby agrees to pay the Servicer for reasonable

-47-

expenses incurred by the Servicer that relate to reviewing and commenting on the Reconstitution Agreement for such Whole Loan Transfer or Pass-Through Transfer in the amount of (i) $2,500 if Servicer uses internal counsel or (ii) $10,000 if Servicer uses external counsel.    Any cooperation from the Servicer in connection with any Whole Loan Transfer or Pass-Through Transfer contemplated by this Section shall include delivery of a legal opinion relating to the Servicer substantially similar to that attached hereto as Exhibit 14, the furnishing of information for use in an offering document for such Pass-Through Transfer, conforming to market standards for Pass-Through Transfers of this type, relating to the Servicer and its servicing practices and portfolio (the "Servicer Information") substantially similar to that attached hereto as Exhibit 14. The Servicer shall indemnify the Owner, each Affiliate of the Owner participating in any such Reconstitution and each Person who controls the Owner or such Affiliate, and their respective officers and directors, and hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that each of them may sustain in any way related to the Servicer Information. The Owner shall indemnify the Servicer and each Person who controls the Servicer or such Affiliate and hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that each of them may sustain in any way related to any information provided by the Owner in any offering document prepared in connection with any Reconstitution.

If requested by the Owner in connection with any Reconstitution, the Servicer and the Owner shall execute a letter agreement setting forth the indemnification obligations set forth in this Section 13.12. In the event that the Servicer is not the master servicer, servicer or sub-servicer with respect to a Reconstitution, any and all reasonable costs, fees and expenses incurred by Servicer in connection with the foregoing shall be reimbursed by Owner after receipt of an invoice therefor in accordance with Section 6.4. Any execution of a subservicing agreement or pooling and servicing agreement by the Servicer shall be conditioned on the Servicer receiving the Securitization Servicing Fee or such other servicing fee acceptable to Servicer. Notwithstanding any provision to the contrary in this Agreement, in the event that the Servicer is the master servicer, servicer or sub-servicer with respect to a Reconstitution, the Owner agrees that in such Reconstitution any servicing performance termination triggers shall be approved by the Servicer in its reasonable discretion; provided, that in the event that the Servicer does not approve any servicing performance termination triggers, the Owner shall, with respect to the Reconstitution, have the right to terminate the Servicer hereunder (a "Servicing Performance Trigger Termination") and designate a successor servicer to act as master servicer, servicer or sub-servicer.  In the event of a Servicing Performance Trigger Termination, (a) if the successor servicer charges a boarding fee or other similar fee to assume the servicing of the Mortgage Loans, the Servicer shall entitled to an amount equal to one-half of the applicable Deboarding Fee with respect to such Mortgage Loans, and (b) if the successor servicer does not charge a boarding fee or other similar fee, the Servicer shall be entitled to the applicable Deboarding Fee.

All Mortgage Loans not sold or transferred pursuant to a Whole Loan Transfer or Pass-Through Transfer shall be subject to this Agreement and shall continue to be serviced in accordance with the terms of this Agreement and with respect thereto this Agreement shall remain in full force and effect.

-48-

Section 13.15    Force Majeure.

A Party will not be responsible for delays or failures in performance of its obligations under this Agreement resulting from acts of God, strikes, riots, acts of war, terrorism, earthquakes or other similar events. A Party excused from performance pursuant to this Section shall exercise reasonable efforts to continue to perform its obligations hereunder and shall thereafter continue with reasonable due diligence and good faith to remedy its inability to so perform, except that nothing herein shall obligate either Party to settle a strike or labor dispute when it does not wish to do so

Section 13.16    Waiver of Trial by Jury.

THE SERVICER AND THE OWNER EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.17    LIMITATION OF DAMAGES.

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PARTIES AGREE THAT NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), OR ANY OTHER LEGAL OR EQUITABLE PRINCIPLE, PROVIDED, HOWEVER, THAT SUCH LIMITATION SHALL NOT BE APPLICABLE WITH RESPECT TO THIRD PARTY CLAIMS MADE AGAINST A PARTY.

Section 13.18    SUBMISSION TO JURISDICTION; WAIVERS.

The Servicer hereby irrevocably and unconditionally:

(a) SUBMITS FOR ITSELF IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE COMMONWEALTH OF PENNSYLVANIA, THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE EASTERN DISTRICT OF PENNSYLVANIA, AND APPELLATE COURTS FROM ANY THEREOF;

(b) CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND, TO THE EXTENT PERMITTED BY LAW, WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME;

(c) AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION.

[SIGNATURES APPEAR ON NEXT PAGE]

IN WITNESS WHEREOF, the parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

AMERICAN RESIDENTIAL EQUITIES, LLC
(Owner)


By:_____
    Name: _____
    Title: _____


GMAC MORTGAGE CORPORATION
(Servicer)


By:_____
    Name: _____
    Title: _____

**<u>Annex B</u>**

## GMAC

| | |
|---|---|
| **From:** | Erick Magno [emagno@magnolaw.com] |
| **Sent:** | Wednesday, February 27, 2008 4:54 PM |
| **To:** | Castillo, Alba - TX |
| **Subject:** | GMAC_ARE_C_PETRA.xls |
| **Attachments:** | GMAC_ARE_C_PETRA.xls |

Dear Alba,

Attached is a list of certain residential loans and/or REO that Petra equitably owns through ARE. It would be a tremendous help for us if you could arrange for GMAC to confirm the most current data in the empty columns.

We do need this information urgently so please advise if there is anything you need from me or ARE to expedite this report. The report must come directly from GMAC to me in order to be valid. If there are any additional fees or charges required for this type of report please advise and I will obtain immediate approval for payment.

Unfortunately, we will also need that report requested yesterday regarding the 28 REO assets containing a description and date of all the accumulated corporate and escrow advances for all the assets on this list.

I greatly appreciate your help with these urgent matters. Please contact me as soon as possible if you anticipate any problems with getting this information from GMAC.

Kind regards,

Erick S. Magno
801 Brickell Avenue, Suite 2320
Miami, FL 33131
Tel: 305 379 4400
Fax: 305 379 4802
E-mail: emagno@magnolaw.com

Notice of Confidentiality:  This e-mail communication and the attachment(s) hereto, if any, are intended solely for the information and use of the addressee(s) identified above and may contain information which is legally privileged from disclosure and/or otherwise confidential. If a recipient of this e-mail communication is not an addressee (or an authorized representative of an addressee), such recipient is hereby advised that any review, disclosure, reproduction, re-transmission or other dissemination or use of this e-mail communication (or any information contained herein) is strictly prohibited. If you are not an addressee and have received this e-mail communication in error, please advise the sender of that circumstance either by reply e-mail or by telephone at (305) 379-4400, immediately delete this e-mail communication from any computer and destroy all physical copies of same.

Notice Under U.S. Treasury Department Circular 230:  To the extent that this e-mail communication and the attachment(s) hereto, if any, may contain written advice concerning or relating to a Federal (U.S.) tax issue, United States Treasury Department Regulations (Circular 230) require that we (and we do hereby) advise and disclose to you that, unless we expressly state otherwise in writing, such tax advice is not written or intended to be used, and cannot be used by you (the addressee), or other person(s), for purposes of (1) avoiding penalties imposed under the United States Internal Revenue Code or (2) promoting, marketing or recommending to any other person(s) the (or any of the) transaction(s) or matter(s) addressed, discussed or referenced herein.

**<u>Annex C</u>**

## GMAC

| | |
|---|---|
| **From:** | Morris, Ray - MA |
| **Sent:** | Tuesday, March 04, 2008 10:44 AM |
| **To:** | Gentner, Lynne - PA; Elliott, Mark - IA |
| **Cc:** | Rousselow, Julie -IA; Castillo, Alba - TX |
| **Subject:** | RE: Petra assets held by ARE |

Lynne,

Please give him Mark's contact info.  Mark, lets talk later today on this.

Ray

Ray Morris
Director of Sales and Marketing
GMAC Mortgage, LLC.  Subservicing
Office:508-679-0388
Cell:  401-935-9157
Fax:  866-628-2716

Email:  Ray.Morris@GMACM.com

Gmacsolutions.com

The information contained in this communication is confidential and privileged proprietary information intended only for the personal and confidential use of the individual or entity to whom it is addressed.  If you are not the addressee indicated in this message (or an agent responsible for delivery of the message to such person), you are hereby notified that you have received this communication in error and that any review, dissemination, copying or unauthorized use of this message is strictly prohibited.  In such case, you should destroy this message and kindly notify the sender by reply e-mail.

Please advise immediately if you or your employer do not consent to Internet e-mail for messages of this kind. Opinions, conclusions and other information in this message that do not relate to the official business of the Company shall be understood as neither given nor endorsed by it. It is the Company's policy that e-mails are intended for and should be used for business purposes only.

**From:** Gentner, Lynne - PA
**Sent:** Tuesday, March 04, 2008 11:37 AM
**To:** Elliott, Mark - IA; Morris, Ray - MA
**Cc:** Rousselow, Julie -IA; Castillo, Alba - TX
**Subject:** FW: Petra assets held by ARE

Mark/Ray, see the below request from Erick Magno @ Petra, investor on apx 150 ARE assets (sub-prime).  Let me know how you would like us to proceed.  Thanks

**Lynne Gentner**
Client Relations Manager
Subservicing
GMAC Mortgage, LLC

215-734-5368 office
215-435-7876 cell
866-316-7574 fax
Lynne.Gentner@gmacm.com
gmacsolutions.com

7/15/2011

**From:** Castillo, Alba - TX
**Sent:** Tuesday, March 04, 2008 11:11 AM
**To:** Gentner, Lynne - PA
**Subject:** FW: Petra assets held by ARE

Lynne, Can you see below? It's about 150 loans or so.
Let me know. Thanks.

**Alba N. Castillo**
Client Relations Advocate
Subservicing
GMAC Mortgage, LLC

214.874.6390
214.701.2074 Cell
866.543.2416 Fax
alba.castillo@gmacm.com
gmacsolutions.com

---

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** Tuesday, March 04, 2008 10:08 AM
**To:** Castillo, Alba - TX
**Subject:** RE: Petra assets held by ARE

Alba,

Is GMAC interested in entering into a direct servcing relationship with Petra as the equitable owner of all of these assets?
Petra is willing to enter into a direct servicing agreement with GMAC to continue servicing its assets on essentially the
same terms and consitions as the ARE contract. If so, please send me a draft contract ASAP.

Thank you.

Erick S. Magno
801 Brickell Avenue, Suite 2320
Miami, FL 33131
Tel: 305 379 4400
Fax: 305 379 4802
E-mail: emagno@magnolaw.com

---

Notice of Confidentiality:  This e-mail communication and the attachment(s) hereto, if any, are intended solely for the information and use of the addressee(s)
identified above and may contain information which is legally privileged from disclosure and/or otherwise confidential. If a recipient of this e-mail communication is
not an addressee (or an authorized representative of an addressee), such recipient is hereby advised that any review, disclosure, reproduction, re-transmission or
other dissemination or use of this e-mail communication (or any information contained herein) is strictly prohibited. If you are not an addressee and have received
this e-mail communication in error, please advise the sender of that circumstance either by reply e-mail or by telephone at (305) 379-4400, immediately delete this
e-mail communication from any computer and destroy all physical copies of same.

Notice Under U.S. Treasury Department Circular 230:  To the extent that this e-mail communication and the attachment(s) hereto, if any, may contain written
advice concerning or relating to a Federal (U.S.) tax issue, United States Treasury Department Regulations (Circular 230) require that we (and we do hereby)
advise and disclose to you that, unless we expressly state otherwise in writing, such tax advice is not written or intended to be used, and cannot be used by you
(the addressee), or other person(s), for purposes of (1) avoiding penalties imposed under the United States Internal Revenue Code or (2) promoting, marketing or
recommending to any other person(s) the (or any of the) transaction(s) or matter(s) addressed, discussed or referenced herein.

---

**From:** Castillo, Alba - TX [mailto:Alba.Castillo@gmacm.com]
**Sent:** 03/04/2008 10:41 AM
**To:** Shea, Denise - Arenow; Jeffrey Kirsch
**Cc:** Erick Magno; Merrill, David - Arenow; Vanhorn, Steven - Arenow
**Subject:** RE: Petra assets held by ARE

Will do.

Erick, This information will be send through our secure portal by the EOB tomorrow. Thanks.

**Alba N. Castillo**
Client Relations Advocate
Subservicing
GMAC Mortgage, LLC

214.874.6390
214.701.2074 Cell
866.543.2416 Fax
alba.castillo@gmacm.com
gmacsolutions.com

---

**From:** Shea, Denise - Arenow
**Sent:** Tuesday, March 04, 2008 9:20 AM
**To:** Castillo, Alba - TX; Jeffrey Kirsch
**Cc:** Erick Magno; Merrill, David - Arenow; Vanhorn, Steven - Arenow
**Subject:** RE: Petra assets held by ARE

Alba, thank you for double checking the legality of providing this information to a non-contracted entity.  As long as it is not in violation of our servicing agreement, RESPA or Graham Leachy, you can provide the information to Petra.  For your own protection please remove borrower names and social security numbers-please identify asset by loan number and or property address.  Thanks.

*Denise Shea*
*Senior Vice President*
*American Residential Equities*
*848 Brickell Ave, Penthouse*
*Miami, FL  33131*
*305-577-1011 x 203 phone*
*305-374-6941 fax*

---

**From:** Castillo, Alba - TX [mailto:Alba.Castillo@gmacm.com]
**Sent:** Tuesday, March 04, 2008 10:12 AM
**To:** Jeffrey Kirsch; Denise Shea
**Subject:** FW: Petra assets held by ARE

I discussed this issue with our legal group, there is no RESPA violation. It is more of a privacy issue. We would not be able to provide any identifiable borrower information to the Petra. Since our relationship is with ARE, we will need your approval. Please let me know how you would like me to proceed.

**Alba N. Castillo**
Client Relations Advocate
Subservicing
GMAC Mortgage, LLC

214.874.6390
214.701.2074 Cell
866.543.2416 Fax
alba.castillo@gmacm.com
gmacsolutions.com

---

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** Monday, March 03, 2008 2:46 PM
**To:** Castillo, Alba - TX
**Subject:** FW: Petra assets held by ARE

---

7/15/2011

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** 03/03/2008 3:44 PM
**To:** 'alba.castill@gmacm.com'
**Cc:** 'Jeffrey Kirsch'
**Subject:** RE: Petra assets held by ARE

Alba,

For the time being, can you at least send us the latest BPOs on the GMAC serviced loans included on the loan list I send to you last week? We can not complete our annual audit without that information which our auditors require to come directly from GMAC.

Erick S. Magno
801 Brickell Avenue, Suite 2320
Miami, FL 33131
Tel: 305 379 4400
Fax: 305 379 4802
E-mail: emagno@magnolaw.com

Notice of Confidentiality:  This e-mail communication and the attachment(s) hereto, if any, are intended solely for the information and use of the addressee(s) identified above and may contain information which is legally privileged from disclosure and/or otherwise confidential. If a recipient of this e-mail communication is not an addressee (or an authorized representative of an addressee), such recipient is hereby advised that any review, disclosure, reproduction, re-transmission or other dissemination or use of this e-mail communication (or any information contained herein) is strictly prohibited. If you are not an addressee and have received this e-mail communication in error, please advise the sender of that circumstance either by reply e-mail or by telephone at (305) 379-4400, immediately delete this e-mail communication from any computer and destroy all physical copies of same.

Notice Under U.S. Treasury Department Circular 230:  To the extent that this e-mail communication and the attachment(s) hereto, if any, may contain written advice concerning or relating to a Federal (U.S.) tax issue, United States Treasury Department Regulations (Circular 230) require that we (and we do hereby) advise and disclose to you that, unless we expressly state otherwise in writing, such tax advice is not written or intended to be used, and cannot be used by you (the addressee), or other person(s), for purposes of (1) avoiding penalties imposed under the United States Internal Revenue Code or (2) promoting, marketing or recommending to any other person(s the (or any of the) transaction(s) or matter(s) addressed, discussed or referenced herein.

---

**From:** Jeffrey Kirsch [mailto:jkirsch@arenow.com]
**Sent:** 03/01/2008 5:32 PM
**To:** emagno@magnolaw.com; alba.castill@gmacm.com
**Subject:** RE: Petra assets held by ARE

Alba

From our perspective ,we do not have an issue with GMAC disseminating information on ARE C loans to Petra which is also being given to ARE. However, there maybe a RESPA or servicing agreement issue involved since Petra does not have a direct relationship with GMAC. If there is no violation you may proceed accordingly.

---

**From:** emagno@magnolaw.com [mailto:emagno@magnolaw.com]
**Sent:** Fri 2/29/2008 5:41 PM
**To:** alba.castillo@gmacm.com; Jeffrey Kirsch; Denise Shea
**Subject:** Petra assets held by ARE

Alba,
As we discussed, all assets on the list provided to you yesterday are equitably owned by the petra fund. As such, petra is entitled to receive any and all information regarding those loans directly from GMAC. Per your request, the parties copied on this email will confirm to you by responding to this message within 24 hours that petra is to receive any and all information requested regarding these loans directly from GMAC. No information provided via ARE will be accepted. If you do not receive this confirmation, GMAC will be contacted on Monday with other instructions.

Thank you.
Sent via BlackBerry by AT&T

**Annex D**

| Remitted Billing Month | ARE Pool # | calc | GMAC Loan # | Description | Transaction Date | Proceeds Amount | From Sara Waite REO Sale Price | From Sara Waite Property Market Value | UPB at Time of Liquidation calc | Total Escrow | Goldman Escrow | ARE Escrow | Total Corporate Advances | Goldman Corporate Advances | ARE Corporate Advances | Net Liquidation Proceeds Due Client | Disposition Fee | Total Proceeds Due Client |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Feb-2008 | ARE C | | 1173 | REO Sales | 02/18/08 | 64,438.24 | 70,000.00 | | 89,100.00 | (11,672.92) | | (11,672.92) | 1,344.00 | | 1,344.00 | 54,109.32 | 1,000.00 | 54,109.32 |
| Feb-2008 | ARE C | | 5829 | REO Sales | 02/25/08 | 33,336.46 | 47,500.00 | | 39,552.43 | (9,334.26) | | (9,334.26) | (16,414.81) | | (16,414.81) | 7,587.39 | 1,000.00 | 7,587.39 |
| Feb-2008 | ARE C | | 1178 | REO Sales | 03/03/08 | 94,977.64 | | | | (710.00) | | (710.00) | (9,444.27) | | (9,444.27) | 84,823.37 | 1,000.00 | 84,823.37 |
| Mar-2008 | ARE C | | 1152 | Reo Sale | 04/01/08 | 244,195.27 | 268,000.00 | 310,000.00 | | (6,386.69) | | (6,386.69) | (15,608.36) | | (15,608.36) | 222,200.22 | 1,000.00 | 222,200.22 |
| Mar-2008 | ARE C | | 1153 | Reo Sale | 04/04/08 | 246,393.27 | 263,000.00 | 318,000.00 | | (7,911.95) | | (7,911.95) | (13,890.21) | 0.00 | (13,890.21) | 224,591.11 | 1,000.00 | 224,591.11 |

updated for

Interim Report 071003.xls

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** Monday, April 28, 2008 9:31 AM
**To:** Castillo, Alba - TX
**Subject:** Re: 23 PETRA ASSETS AT GMAC

Alba,

We need to know how much was remitted to ARE for these 5 assets so we can go straight to them for collection.

Thanks.
Erick

----- Original Message -----
**From:** Castillo, Alba - TX
**To:** Erick Magno ; Elliott, Mark - IA
**Sent:** Friday, April 25, 2008 2:24 PM
**Subject:** RE: 23 PETRA ASSETS AT GMAC

It seems that all of these loans had already been processed. The date placed on our servicing system which is what I referenced is not accurate. It seems the funds are received sooner than this date so it's remitted within that month the funds are received. Investor Reporting confirmed that the all the loans have been remitted to ARE. See below.
Thanks.

5829 and ▮▮1173 were given to ARE on the February remittance
1152, ▮▮1153 and ▮▮178 were given to ARE on the March remittance.

**Alba N. Castillo**
Client Relations Advocate
Subservicing
GMAC Mortgage, LLC

214.874.6390
214.701.2074 Cell
866.543.2416 Fax
alba.castillo@gmacm.com
gmacsolutions.com

**<u>Annex E</u>**

**Loan History**

Date Data as-of: January 21, 2015

| Account Number | Name Primary Borrower | Name Secondary Borrower | Property Address | Mailing Address |
|---|---|---|---|---|
| ███153 | LAMONT CHARLES HARRIS | EVA ELAINE HARRIS | 1541 TALMAGE COURT | 12362 LORALEEN STREET |
| | | | UKIAH | GARDEN GROVE |
| | | | CA | CA |
| | | | 95482-0000 | 92841 |

**Investor Info**

| | |
|---|---|
| Investor Acct No - Prim | ███349 |
| Investor Number | 41812 |
| Investor Name Full | AMERICAN RESIDENTIAL EQUITIES |
| Investor Id | ARE-C |

**Previous Servicer Info**

| | |
|---|---|
| Seller Company Name | OCWEN LOAN SERVICING, LLC |

| Loan Info | | Dates | | Current Balances | | Uncollected | | Year-To-Date | |
|---|---|---|---|---|---|---|---|---|---|
| Arm Flag | Y | Int Collected To | 03/01/2006 | Principal | $0.00 | Late Charges | $0.00 | Interest | $0.00 |
| Loan Type | Conventional | Next Due | 04/01/2006 | Escrow | $0.00 | Interest | $0.00 | Taxes | $0.00 |
| Lien Position | 01 | Last Payment | | Unapplied | $0.00 | Fees | $0.00 | | |
| Interest Rate | 7.125% | Last Activity | 10/23/2008 | Buydown | $0.00 | Opt | $0.00 | | |
| Collection Status | PO | Setup Date | 09/21/2006 | | | | | | |
| | | Maturity Date | 12/01/2035 | | | | | | |

| Account Number | Area ID | Trans Added Date | Trans Type | Transaction Message | Trans User Name |
|---|---|---|---|---|---|
| 0836001153 | REO90 | 04/04/2008 | CIT | 008 NEW CIT 918 | TAISHA JONES |
| 0836001153 | REO90 | 04/04/2008 | CIT | RECEIVED REO PROCEEDS IAO $246,393,27. SENT PW | TAISHA JONES |
| 0836001153 | REO90 | 04/04/2008 | CIT | FOR ADVANCES IAO $21,802.16. PLEASE MOVE | TAISHA JONES |
| 0836001153 | REO90 | 04/04/2008 | CIT | $224,591.11 TO P&I. | TAISHA JONES |
| 0836001153 | REO90 | 04/04/2008 | CIT | 006 DONE 04/04/08 BY TLR 08872 | TAISHA JONES |

**Loan History**

Date Data as-of:   January 21, 2015

| Account Number | Name Primary Borrower | Name Secondary Borrower | Property Address | Mailing Address |
|---|---|---|---|---|
| ███152 | BRIAN STEPHENS | | 1620 TURTLE POND DRIVE | 1738 HONEY TREE PL |
| | | | HOSCHTON | HOSCHTON |
| | | | GA | GA |
| | | | 30548-0000 | 30548 |

| Investor Info | | Previous Servicer Info | |
|---|---|---|---|
| Investor Acct No - Prim | ███513 | | |
| Investor Number | 41812 | Seller Company Name | OCWEN LOAN SERVICING, LLC |
| Investor Name Full | AMERICAN RESIDENTIAL EQUITIES | | |
| Investor Id | ARE-C | | |

| Loan Info | | Dates | | Current Balances | | Uncollected | | Year-To-Date | |
|---|---|---|---|---|---|---|---|---|---|
| Arm Flag | Y | Int Collected To | 02/01/2008 | Principal | $0.00 | Late Charges | $0.00 | Interest | $0.00 |
| Loan Type | Conventional | Next Due | 03/01/2008 | Escrow | $0.00 | Interest | $0.00 | Taxes | $0.00 |
| Lien Position | 01 | Last Payment | | Unapplied | $0.00 | Fees | $0.00 | | |
| Interest Rate | 8.815% | Last Activity | 10/23/2008 | Buydown | $0.00 | Opt | $0.00 | | |
| Collection Status | PO | Setup Date | 09/21/2006 | | | | | | |
| | | Maturity Date | 11/01/2035 | | | | | | |

| Account Number | Area ID | Trans Added Date | Trans Type | Transaction Message | | Trans User Name |
|---|---|---|---|---|---|---|
| 0836001152 | INV | 04/02/2008 | CIT | 009 cit # 918 moved $ 222,200.22 from default | | BETTY HELMICH |
| 0836001152 | INV | 04/02/2008 | CIT | clearing to P&I | | BETTY HELMICH |
| 0836001152 | | 04/01/2008 | CLM | FILE P/W OR O/C | (1691) COMPLETED 04/01/08 | TAISHA JONES |
| 0836001152 | | 04/01/2008 | CLM | REO SALE DATE | (1089) COMPLETED 04/01/08 | TAISHA JONES |

**Annex F**

## GMAC

---

**From:** Erick Magno [emagno@magnolaw.com]

**Sent:** Tuesday, July 01, 2008 11:40 AM

**To:** Castillo, Alba - TX

**Cc:** Elliott, Mark - IA; Gentner, Lynne - PA

**Subject:** Re: Escamila and 5 Petra assets previously liquidated by GMAC

how about the closing or pay-off statements for these assets? any documentation really that identifies the asset, the seller/lender, buyer/borrower, and reconciles the gross proceeds versus net proceeds realized.

> ----- Original Message -----
> **From:** Castillo, Alba - TX
> **To:** Erick Magno
> **Cc:** Elliott, Mark - IA ; Gentner, Lynne - PA
> **Sent:** Tuesday, July 01, 2008 11:58 AM
> **Subject:** RE: Escamila and 5 Petra assets previously liquidated by GMAC
>
> Erick, Please specify what you are referring to as proof of payment.  The funds were remitted to ARE and were included in their monthly reporting. There is no additional information provided to ARE. Thanks.
>
> **Alba N. Castillo**
> Client Relations Advocate
> Subservicing
> GMAC Mortgage, LLC
>
> 214.874.6390
> 214.701.2074 Cell
> 866.543.2416 Fax
> alba.castillo@gmacm.com
> gmacsolutions.com
>
> ---
>
> **From:** Erick Magno [mailto:emagno@magnolaw.com]
> **Sent:** Tuesday, July 01, 2008 10:45 AM
> **To:** Castillo, Alba - TX
> **Cc:** Elliott, Mark - IA
> **Subject:** Re: Escamila and 5 Petra assets previously liquidated by GMAC
>
> Alba,
>
> We will get back to you by tomorrow on whether to approve the charge-off of the Escamilla loan you requested.
>
> We urgently need proof of payment for the 5 Petra assets noted below which GMAC previously confirmed as liquidated by GMAC. Please email me copies of the closing documents as well.
>
> Thank you.
>
> Erick
>
>
> ----- Original Message -----
> > **From:** Castillo, Alba - TX
> > **To:** Erick Magno
> > **Cc:** Elliott, Mark - IA
> > **Sent:** Monday, April 28, 2008 11:42 AM
> > **Subject:** RE: 23 PETRA ASSETS AT GMAC

Erick, See below for amounts. Thanks.

5829 $ 7,587.39
1173 $ 54,109.32
1178 $ 84,823.37
1152 $ 222,200.22
1153 $ 224,591.11

**Alba N. Castillo**
Client Relations Advocate
Subservicing
GMAC Mortgage, LLC

214.874.6390
214.701.2074 Cell
866.543.2416 Fax
alba.castillo@gmacm.com
gmacsolutions.com

---

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** Monday, April 28, 2008 9:31 AM
**To:** Castillo, Alba - TX
**Subject:** Re: 23 PETRA ASSETS AT GMAC

Alba,

We need to know how much was remitted to ARE for these 5 assets so we can go straight to them for collection.

Thanks.
Erick

> ----- Original Message -----
> **From:** Castillo, Alba - TX
> **To:** Erick Magno ; Elliott, Mark - IA
> **Sent:** Friday, April 25, 2008 2:24 PM
> **Subject:** RE: 23 PETRA ASSETS AT GMAC
>
> It seems that all of these loans had already been processed. The date placed on our servicing system which is what I referenced is not accurate. It seems the funds are received sooner than this date so it's remitted within that month the funds are received. Investor Reporting confirmed that the all the loans have been remitted to ARE. See below. Thanks.
>
> 5829 and     1173 were given to ARE on the February remittance
> 1152,     1153 and     1178 were given to ARE on the March remittance.
>
> **Alba N. Castillo**
> Client Relations Advocate
> Subservicing
> GMAC Mortgage, LLC
>
> 214.874.6390
> 214.701.2074 Cell
> 866.543.2416 Fax
> alba.castillo@gmacm.com
> gmacsolutions.com

---

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** Friday, April 25, 2008 11:18 AM
**To:** Elliott, Mark - IA

**Cc:** Castillo, Alba - TX
**Subject:** Re: 23 PETRA ASSETS AT GMAC

Thank you very much. That's already a big help. At least Petra does not have to worry about losing more assets for the time being. That should at least stop the bleeding for now. Can someone please confirm which of the REO sales and net proceeds from Feb and March have already been remitted to ARE? I understand that the Harris and Stephens assets were sold 3/31 which I believe would not have made the March remit to ARE since the usual cut-off is on the 28th? If Alba can confirm, we'll follow up on our side to collect the appropriate proceeds from ARE before it disappears.

----- Original Message -----
**From:** Elliott, Mark - IA
**To:** Erick Magno
**Cc:** Castillo, Alba - TX
**Sent:** Friday, April 25, 2008 12:02 PM
**Subject:** RE: 23 PETRA ASSETS AT GMAC

We need to work up the assignment but we can draw the line at remittances on your remaining loans.  The loan count will be less than the 23 though.  A couple of those REO settlements took place in February and one was in March.  Those are likely to be remitted previously.  The April sold REOs will not be included in a remittance to ARE.

**Mark Elliott**
Sales Director
Subservicing
Office:  319.236.7506
Cell:  319.212.0405
Fax:  866.439.6851
mark.elliott@gmacm.com
www.gmacsolutions.com

The information contained in this communication is confidential and privileged proprietary information intended only for the personal and confidential use of the individual or entity to whom it is addressed.  If you are not the addressee indicated in this message (or an agent responsible for delivery of the message to such person), you are hereby notified that you have received this communication in error and that any review, dissemination, copying or unauthorized use of this message is strictly prohibited.  In such case, you should destroy this message and kindly notify the sender by reply e-mail.

Please advise immediately if you or your employer do not consent to Internet e-mail for messages of this kind. Opinions, conclusions and other information in this message that do not relate to the official business of the Company shall be understood as neither given nor endorsed by it. It is the Company's policy that e-mails are intended for and should be used for business purposes only.

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** Thursday, April 24, 2008 5:03 PM
**To:** Elliott, Mark - IA
**Cc:** Castillo, Alba - TX
**Subject:** RE: 23 PETRA ASSETS AT GMAC

Do we have an agreement in principal that no remits pertaining to these 23 assets will go to ARE in the meantime? Naturally, Petra will assume any supportable GMAC advances owed against these assets just as it has with the other Petra assets at GMAC that were recently deboarded in which Petra paid about $2.3 million directly to GMAC.

Erick S. Magno
801 Brickell Avenue, Suite 2320
Miami, FL 33131
Tel: 305 379 4400
Fax: 305 379 4802
E-mail: emagno@magnolaw.com

Notice of Confidentiality:  This e-mail communication and the attachment(s) hereto, if any, are intended solely for the information and use of the addressee(s) identified above and may contain information which is legally privileged from disclosure and/or otherwise confidential. If a recipient of this e-mail communication is not an addressee (or an authorized representative of an addressee), such recipient is hereby advised that any review, disclosure, reproduction, re-transmission or other dissemination or use of this e-mail communication (or any information contained herein) is strictly prohibited. If you are not an addressee and have received this e-mail communication in error, please advise the sender of that circumstance either by reply e-mail or by

telephone at (305) 379-4400, immediately delete this e-mail communication from any computer and destroy all physical copies of same.

Notice Under U.S. Treasury Department Circular 230:  To the extent that this e-mail communication and the attachment(s) hereto, if any, may contain written advice concerning or relating to a Federal (U.S.) tax issue, United States Treasury Department Regulations (Circular 230) require that we (and we do hereby) advise and disclose to you that, unless we expressly state otherwise in writing, such tax advice is not written or intended to be used, and cannot be used by you (the addressee), or other person(s), for purposes of (1) avoiding penalties imposed under the United States Internal Revenue Code or (2) promoting, marketing or recommending to any other person(s) the (or any of the) transaction(s) or matter(s) addressed, discussed or referenced herein.

**From:** Elliott, Mark - IA [mailto:mark.elliott@gmacm.com]
**Sent:** 04/24/2008 5:15 PM
**To:** Erick Magno
**Cc:** Castillo, Alba - TX
**Subject:** RE: 23 PETRA ASSETS AT GMAC

Hi Erick, I'll reach out to you in the morning.  I don't think we'll have an assignment put together tomorrow though.

**Mark Elliott**
Sales Director
Subservicing
Office:  319.236.7506
Cell:  319.212.0405
Fax:  866.439.6851
mark.elliott@gmacm.com
www.gmacsolutions.com

The information contained in this communication is confidential and privileged proprietary information intended only for the personal and confidential use of the individual or entity to whom it is addressed.  If you are not the addressee indicated in this message (or an agent responsible for delivery of the message to such person), you are hereby notified that you have received this communication in error and that any review, dissemination, copying or unauthorized use of this message is strictly prohibited.  In such case, you should destroy this message and kindly notify the sender by reply e-mail.

Please advise immediately if you or your employer do not consent to Internet e-mail for messages of this kind. Opinions, conclusions and other information in this message that do not relate to the official business of the Company shall be understood as neither given nor endorsed by it. It is the Company's policy that e-mails are intended for and should be used for business purposes only.

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** Thursday, April 24, 2008 3:05 PM
**To:** Elliott, Mark - IA
**Cc:** Castillo, Alba - TX
**Subject:** Re: 23 PETRA ASSETS AT GMAC

Are we OK for now with GMAC servicing those 23 assets directly for Petra on a temporary basis?

----- Original Message -----
**From:** Erick Magno
**To:** Elliott, Mark - IA
**Cc:** Castillo, Alba - TX
**Sent:** Thursday, April 24, 2008 2:31 PM
**Subject:** Fw: 23 PETRA ASSETS AT GMAC

FYI. I presume you know that Jeff Kirsch is Denise's boss and owner/founder of ARE.
----- Original Message -----
**From:** Jeffrey Kirsch
**To:** Erick Magno
**Sent:** Thursday, April 24, 2008 12:46 PM
**Subject:** RE: 23 PETRA ASSETS AT GMAC

Erick

We would be more than willing to have GMAC service these for you on a temporary basis. These assets can be assigned from ARE C to Petra. Petra should have a temporary servicing agreement with GMAC. The remit should go to Petra so we are no longer in the middle. Is this going to work for you?

---

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** 04/24/2008 11:45 AM
**To:** 'Denise Shea'
**Cc:** 'Jeffrey Kirsch'; 'Elliott, Mark - IA'
**Subject:** RE: 23 PETRA ASSETS AT GMAC

Denise,

GMAC has agreed to service these assets directly for Petra on a temporary basis so we can deboard/transfer them from ARE to Petra today as we previously discussed without having to worry about licensing and/or foreclosure delays since they will remain at GMAC for the time being. All they require is written confirmation from ARE agreeing to the assignment of the servicing of these 23 assets to Petra effective immediately.

Please confirm ARE's agreement to the assignment of the servicing of these 23 assets to Petra by replying in the affirmative to this email.

Regards,

Erick S. Magno
801 Brickell Avenue, Suite 2320
Miami, FL 33131
Tel: 305 379 4400
Fax: 305 379 4802
E-mail: emagno@magnolaw.com

Notice of Confidentiality:  This e-mail communication and the attachment(s) hereto, if any, are intended solely for the information and use of the addressee(s) identified above and may contain information which is legally privileged from disclosure and/or otherwise confidential. If a recipient of this e-mail communication is not an addressee (or an authorized representative of an addressee), such recipient is hereby advised that any review, disclosure, reproduction, re-transmission or other dissemination or use of this e-mail communication (or any information contained herein) is strictly prohibited. If you are not an addressee and have received this e-mail communication in error, please advise the sender of that circumstance either by reply e-mail or by telephone at (305) 379-4400, immediately delete this e-mail communication from any computer and destroy all physical copies of same.

Notice Under U.S. Treasury Department Circular 230:  To the extent that this e-mail communication and the attachment(s) hereto, if any, may contain written advice concerning or relating to a Federal (U.S.) tax issue, United States Treasury Department Regulations (Circular 230) require that we (and we do hereby) advise and disclose to you that, unless we expressly state otherwise in writing, such tax advice is not written or intended to be used, and cannot be used by you (the addressee), or other person(s), for purposes of (1) avoiding penalties imposed under the United States Internal Revenue Code or (2) promoting, marketing or recommending to any other person(s) the (or any of the) transaction(s) or matter(s) addressed, discussed or referenced herein.

**<u>Annex G</u>**

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** Thursday, May 01, 2008 10:18 AM
**To:** Castillo, Alba - TX; mark.elliot@gmacm.com
**Subject:** Re: ARE C additional loans to be transfered from GMAC to SRG

You confirmed last week that GMAC would service the remaining 23 loans directly for Petra on a temporary basis and just needed a few days to complete an assignment of servicing for these assets. IS THERE A PROBLEM NOW? GMAC also confirmed that no additional proceeds and/or credits of any kind would be forwarded to ARE with respect to these 23 assets.

FYI: almost $600,000 in proceeds for the 5 Petra assets that you indicated were "sold" and credited in March and April to ARE have NOT been returned to Petra and ARE refuses to return such proceeds despite numerous requests and acknowledgement of proof of Petra's ownership of those assets by ARE, GMAC, etc. This is nothing short of grand theft and conversion and must be dealt with accordingly. I hope this makes you appreciate the gravity of the situation and why no proceeds/credits can be remitted to ARE. As a reminder, the Nicholson loan (#███████1173) now scheduled for transfer to SRG is set for sale on May 8, 2008. PROCEEDS MUST NOT GO TO ARE UNDER ANY CIRCUMSTANCES.

As we've discussed, the reason why Petra did not transfer these particular 23 assets to SRG and Petra before was due to some licensing gaps at SRG and some strict law dates in States like Connnecticut and other States such as New York where we have been told that transfer of legal title to the collateral could create foreclosure delays in excess of 1 year. However, if GMAC holds legal title to these assets (which I have been told is the case--PLEASE CONFIRM THIS IS SO) then there appears to be no reason for Petra to suffer another year of delay in completing foreclosure proceedings. GMAC could continue servicing these assets on behalf of Petra directly (NOT ARE) and GMAC could continue to hold legal title to the assets on behalf of Petra (NOT ARE). THIS WAS THE INTENT BEHIND SERVICING THESE ASSETS AT GMAC DIRECTLY FOR PETRA. OBVIOUSLY, IF PETRA HAS TO CHOOSE BETWEEN HAVING ITS ASSETS STOLEN OR DELAYING FORECLOSURE A YEAR, IT WOULD CHOOSE THE LATTER  BUT IT SHOULD NOT HAVE TO MAKE THAT CHOICE.

**<u>Annex H</u>**

| GMAC LOAN NUMBER | SHORT NAME | RIN BALANCE | ESCROW BALANCE | PPLIED FUN | UNCOLL LC | FEES RECEIVABLE | | TOTAL |
|---|---|---|---|---|---|---|---|---|
| 1987 | BROUGHTON | 223813.3 | -1048.82 | 0 | 0 | -27984.58 | $ | (29,033.40) |
| 7534 | BURCHETT | 825500 | 989.02 | 0 | 0 | -61408.88 | $ | (60,419.86) |
| 1715 | BURGHARDT | 62900 | -2514.05 | 0 | 0 | -9210.7 | $ | (11,724.75) |
| 1208 | BUTTS | 96938.15 | -906 | 0 | 0 | -9021.53 | $ | (9,927.53) |
| 8552 | CADE | 116450 | 2944 | 0 | -467.72 | -15289.51 | $ | (12,345.51) |
| 1175 | CARPENTER | 199839.3 | -8378.76 | 0 | 0 | -17433.91 | $ | (25,812.67) |
| 5925 | CHERRY | 53944.97 | -4071.47 | 0 | -22.4 | -3560.95 | $ | (7,632.42) |
| 2825 | CODLING | 81608.02 | -10786.68 | 0 | -58.4 | -12521.69 | $ | (23,308.37) |
| 1151 | DAVIS | 119734.8 | -2362.2 | 0 | -62.12 | -10331.54 | $ | (12,693.74) |
| 1187 | FARNAN | 195200 | 4236.77 | 0 | 0 | -15774.91 | $ | (11,538.14) |
| 1226 | GATES | 134100 | -2984.41 | 0 | 0 | -13258.19 | $ | (16,242.60) |
| 1147 | HERNANDEZ | 108585.2 | 802.53 | 2036.04 | 0 | -7297.61 | $ | (6,495.08) |
| 1533 | LANE | 337500 | 5914 | 0 | 0 | -26050.33 | $ | (20,136.33) |
| 1133 | LAZARO | 499025.6 | -5204.94 | 0 | 0 | -36675.94 | $ | (41,880.88) |
| 1174 | LECLAIR | 53971.71 | -3887.19 | 0 | 0 | -13436.28 | $ | (17,323.47) |
| 7648 | MADISON | 247306.9 | -5861.71 | 0 | -84.41 | -14260.82 | $ | (20,122.53) |
| 2993 | MIJANGOS | 351875 | 4484.51 | 0 | -65.18 | -30748.72 | $ | (26,264.21) |
| 1148 | PARK | 500000 | -5495.72 | 0 | 0 | -36135.03 | $ | (41,630.75) |
| 1876 | REIFF | 750000 | -56441.23 | 0 | 0 | -90186.59 | $ | (146,627.82) |
| 3122 | RICH | 127860.3 | 1813 | 0 | 0 | -15047.11 | $ | (13,234.11) |
| 1210 | RODGERS | 144000 | -1969 | 0 | 0 | -10143.06 | $ | (12,112.06) |
| 8606 | RUSSELL | 84676.23 | -9456.73 | 0 | 0 | -12513.09 | $ | (21,969.82) |
| 2713 | SMITH | 67570.35 | -12457.81 | 0 | -76.02 | -12802.42 | $ | (25,260.23) |
| 1254 | STANFEL | 42500 | -1938.19 | 0 | 0 | -6402.1 | $ | (8,340.29) |
| 1249 | TURNER | 177451.9 | 4770.93 | 0 | -1316.96 | -25766.64 | $ | (20,995.71) |
| 3056 | WALKER | 216000 | -8413.54 | 0 | -84.33 | -18848.6 | $ | (27,262.14) |
| 6581 | WILLS | 910000 | 18047 | 0 | 0 | -64542.71 | $ | (46,495.71) |
| 1156 | WORKMAN | 300552.5 | 6485.95 | 0 | 0 | -28603.34 | $ | (22,117.39) |
| | | | -$93,690.74 | 2036.04 | | -645256.78 | $ | (738,947.52) |
| | | | | | | -$738,947.52 | | |



## Corporate Checking

01    ████ 2642  752  114       0  121      1,569

**WACHOVIA**

GMAC MORTGAGE, LLC OF PA IN TRUST FOR
MORTGAGORS AND INVESTORS                    CB
1100 VIRGINIA DRIVE, MC: 190-FTW-C85
ATTN: BANK RECON                              APR 15 2008
FORT WASHINGTON, PA 19034

## Corporate Checking                                     3/01/2008 thru 3/31/2008

Account number:        ████ 2642
Account owner(s):      GMAC MORTGAGE, LLC OF PA IN TRUST FOR
                       MORTGAGORS AND INVESTORS

## Account Summary

| | |
|---|---|
| Opening balance 3/01 | $458,999.04 |
| Deposits and other credits | 8,958,358.78 |
| Other withdrawals and service fees | 7,935,857.95 |
| Closing balance 3/31 | $1,481,619.87 |

## Deposits and Other Credits

| Date | Amount | Description |
|---|---|---|
| 3/03 | 22,445.97 | AUTOMATED CREDIT GMAC MORTGAGE  INV DDA CO. ID. 9860002000 080308 PPD MISC 881000 |
| 3/04 | 112,742.17 | FUNDS TRANSFER (ADVICE 200803040005004980) RCVD FROM BANK OF AMERICAN/BANK OF AMERICA ORG=FIRST COLLATERAL SERVICES INC. RFB=SERVICING WIRE  OBI REF= GMAC MTG ALLIAN REF=20080304002349995/03/04/08  04:06PM ET |
| 3/04 | 159,899.88 | FUNDS TRANSFER (ADVICE 200803040000584427) RCVD FROM  GMAC MORTGAGE LLC ORG= REB=01322646       OBI=FUNDS NEEDED TO REIM REF=H84G35051400002D 03/04/08 04:38PM ET |
| 3/04 | 4,892,782.25 | AUTOMATED CREDIT GMAC MORTGAGE  INV DDA CO. ID. 9860002000 080304 PPD MISC 881000 |
| 3/05 | 28,943.17 | FUNDS TRANSFER (ADVICE 200803050000040294) RCVD FROM AMERICAN RESIDENT ORG=AMERICAN RES EQUITIES RFB=ADVANCES-ARE  OBI=PLEASE ADVISE ALBA C REF=20007568AMERESEQ 03/05/08 01:41PM ET |
| 3/05 | 35,531.07 | AUTOMATED CREDIT GMAC MORTGAGE  INV DDA CO. ID. 9860002000 080305 PPD MISC 881000 |
| 3/05 | 738,947.52 | FUNDS TRANSFER (ADVICE 200803050000512254) RCVD FROM CITIBANK NEW YORK/MORGAN STANLEY A ORG=PETRA OPPORTUNITY FUND RFB=LCT80851502100  OBI REF=LCT80851502100   03/05/08 03:23PM ET |

*Deposits and Other Credits continued on next page.*

*[handwritten: Transfer ID 380-0021808]*

*[handwritten: ARE]*

*[handwritten: PETRA]*

*[handwritten: 2 wires cleared via bankmans done on 3/7/08 + 3/10/08]*

**Annex I**

| GMAC LOAN NUMBER | SHORT NAME | PRIN BALANCE | TI PAYMENT | ESCROW BALANCE | UNAPPLIED FUNDS 1 | UNAPPLIED FUNDS 2 | UNAPPLIED FUNDS 4 | UNAPPLIED FUNDS 5 | FEES RECEIVABLE | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 6885 | ALVARADO | 70,500.00 | | (34,587.64) | | | | | (328,198.40) | (328,158.46) |
| 1238 | ANDADO | 164,000.00 | | (34,189.48) | | | | | (24,117.89) | (24,117.89) |
| 3926 | ARMBRUSTER | 325,000.00 | | (2,456.54) | 180.55 | | | | (2,962.25) | (37,151.73) |
| 8995 | BASINGER | 132,379.62 | | (2,455.54) | | | | | (2,438.75) | (4,717.43) |
| 6929 | BRADHO | 368,000.00 | 124.86 | (7,862.96) | | | | | (30,664.88) | (38,664.88) |
| 678 | BRETRICK | 92,272.99 | | (4,986.63) | | | | | (6,196.89) | (10,183.32) |
| 8932 | BROOKS | 208,000.00 | | (6,666.02) | | | | | (5,272.83) | (11,958.55) |
| 167 | BURNETT | 55,622.07 | | | | | | | (1,561.08) | (1,561.08) |
| 8999 | CAMACHO | 326,000.00 | | | 161.25 | | | | (4,307.51) | (4,146.66) |
| 183 | CAMPBELL | 141,065.97 | | 919.00 | | | | | 18,704.29 | (17,785.29) |
| 3038 | CAVIN | 180,012.52 | 364.98 | (4,555.87) | | 648.72 | | | (4,840.04) | (8,779.19) |
| 6586 | COLFORGE | 278,355.72 | | (23,785.56) | | | | | (3,562.25) | (36,694.72) |
| 6890 | COLEMAN | 98,486.11 | | (4,060.71) | | | | | 1,778.75) | (5,839.46) |
| 5097 | COMBS | 127,167.20 | | (3,670.60) | 208.74 | | | | (9,543.55) | (13,005.30) |
| 149 | CONWAY | 118,863.32 | | (5,638.91) | | 0.96 | | | (9,148.77) | (15,146.77) |
| 181 | DAKAVAYE | 250,000.00 | | (1,443.38) | | | | | (16,977.10) | (18,334.12) |
| 3924 | ESTATE | 76,704.54 | | | | | | | (111.25) | (111.25) |
| 5396 | FIFNER | 174,806.76 | | | | | | | (3,653.70) | (3,653.70) |
| 5127 | FOSTER | 113,036.14 | | | | | | | (9,663.86) | (9,663.86) |
| 706 | GAMBLE | 435,489.83 | | (9,896.54) | | | | | (7,419.76) | (17,316.58) |
| 5686 | GANT | 41,250.00 | | | | | | | (2,206.19) | (2,206.19) |
| 8886 | GARDNER | 141,892.29 | | (272.20) | | 67.25 | | | (3,134.50) | (3,193.45) |
| 8886 | HERNANDEZ | 31,250.00 | | | | | | | (6,305.20) | (6,305.20) |
| 3007 | JAGGON | 167,627.15 | | (18,253.20) | | | | | (10,430.76) | (28,683.96) |
| 146 | JENKINS | 85,900.00 | | (3,198.48) | | | | | (12,057.02) | (14,255.57) |
| 4360 | JPAN | 167,500.00 | | (1,965.09) | | | | | (17,397.28) | (3,397.19) |
| 1443 | JENSEN | 226,872.04 | | (1,781.00) | | | | | 27,630.04) | (28,411.04) |
| 6655 | JETER | 134,438.54 | 148.98 | (1,386.94) | | | | | (8,914.57) | (10,301.51) |
| 2852 | JENAO | 184,850.00 | | (1,664.00) | | | | | 2,662.26) | (4,817.26) |
| 190 | JORDAN | 177,000.00 | | (3,461.00) | 362.41 | | | | (23,182.45) | (26,281.04) |
| 1705 | LAZAGA | 769,658.06 | | (5,013.54) | | | | | (2,023.25) | (7,036.79) |
| 537 | LE | 187,500.00 | | (407.74) | | | | | (6,460.86) | (6,480.60) |
| 193 | LEDESMA | 47,450.00 | | | | | 1,046.65 | | (263,690.47) | (283,643.82) |
| 3155 | LEE | 488,000.00 | | (2,858.79) | | | | | (48,254.83) | (51,116.62) |
| 196 | LYONS | 94,350.00 | | (2,826.43) | | | | | (16,043.87) | (18,643.87) |
| 5666 | MANSON | 65,000.00 | | (10,478.08) | | | | | (10,478.67) | (13,397.22) |
| 180 | MAPKS | 283,437.15 | | (3,461.00) | | | | | (12,824.93) | (16,285.93) |
| 651 | MCCASKILL | 291,176.20 | 387.60 | (3,786.51) | | | | | (34,380.40) | (38,180.77) |
| 8664 | MCCREEDY | 112,048.15 | 650.58 | (10,100.00) | | | | | (18,977.22) | (18,977.22) |
| 697 | MOLINA | 381,900.00 | | (15,176.44) | | | | | (2,064.80) | (17,241.24) |
| 6024 | NICHOLS | 65,875.52 | | 1,010.95 | | | | | (11,262.57) | (10,251.62) |
| 190 | ORTEGA | 164,800.00 | | 3,578.06 | | | | | (17,609.73) | (14,031.37) |
| 180 | PASCO | 89,050.00 | | | | 5,781.73 | | | 860.75 | 4,890.58 |
| 2002 | RACZKA | 296,750.00 | | (11,858.21) | | | | | (19,919.49) | (31,777.70) |
| 146 | RENDON | 184,594.65 | | | 708.95 | | | | (3,909.60) | (3,200.65) |
| 2255 | REYNOLDS | 167,966.67 | | (789.00) | | | | | (3,836.15) | (4,625.15) |
| 2836 | RILEY | 392,400.00 | | (16,153.97) | | | | | (5,256.52) | (21,410.89) |
| 8092 | RILEY | 98,100.00 | | | | | | | (1,629.00) | (1,629.00) |
| 141 | RIVERA | 115,350.52 | | (3,260.10) | | | | | (25,344.90) | (28,344.90) |
| 6591 | RYAN | 101,000.00 | | (2,595.58) | | | | | (4,616.13) | (7,215.71) |
| 2911 | SANTONASTA | 296,524.52 | | (17,467.41) | | | | | (3,743.75) | (21,231.16) |
| 5025 | SAWYER | 195,000.00 | | (4,622.33) | | | | | (2,466.86) | (7,289.19) |
| 6592 | SCOLAND | 221,350.00 | | (4,635.00) | | | | | (9,882.30) | (14,717.90) |
| 1725 | SIEGEL | 247,343.94 | 791.62 | (57,003.65) | | | | | (32,872.95) | (70,876.90) |
| 1537 | SMITH | 120,418.31 | 576.17 | (12,676.04) | | | | | (5,990.50) | (18,666.54) |
| 5860 | SMITH | 570,000.00 | | 2,665.17 | | | | | (24,672.71) | (22,017.54) |
| 6632 | STAFFORD | 95,030.00 | | (3,802.45) | | | | | (1,485.78) | (5,369.63) |
| 701 | STEWART | 142,988.97 | 510.45 | (2,940.00) | | | | | (20,766.48) | (23,707.16) |
| 7113 | STRACHER | 120,000.00 | | 1,182.00 | | | | | (1,551.00) | (1,561.00) |
| 8647 | SULLIVAN | 165,000.00 | 246.45 | (4,111.80) | | | | | (2,070.69) | (10,888.86) |
| 9914 | THOMAS | 627,443.00 | | | | | | | (8,632.69) | (8,632.69) |
| 1168 | TURNER | 45,000.00 | | 2,044.25 | | | | | (10,830.93) | (8,786.00) |
| 1199 | TURNER | 70,165.31 | 114.64 | | | | | | (1,308.17) | (4,213.00) |
| 2259 | WASHER | 149,830.00 | | | | | | 7,305.06 | (7,305.06) | (8,786.00) |
| 1170 | WASHINGTON | 56,123.00 | | (1,444.09) | 207.57 | 670.96 | | | (3,271.56) | (4,445.10) |
| 2282 | WESTERN | 79,638.24 | | (4,485.71) | | | | | .982.89) | (5,797.93) |
| | | | | (31,546.36) | 1,828.78 | 17,894.78 | 1,046.65 | 7,305.06 | (51,243,272.56) | (1,225,691.07) |

**Annex J**

salesforce.com

Setup • System Log • Help & Training • Logout

Sales

Home   Accounts   Contacts   Leads   Opportunities   Change Mgmts   CI Projects   Client Requirements   Reports   Dashboards   Contracts   Renewal Analyses   Products   Content   Workspaces

**GMAC Mortgage**
SUBSERVICING

**Task**
**Email: RE: Funds Due from Petra**

Edit Layout | Help for this Page

**Search**

Search All
[ Go! ]

☐ Limit to items I own

Advanced Search...

**Quick Entry Check**

First Name: [        ]
Last Name: [        ]
Company: [        ]
Email: [        ]

[ Check ]
Powered by DataTrim

[ Create New... ]

**Messages and Alerts**

**Recent Items**

Petra Fund
Petra Fund - ARE
402
406
405
407
404
401
403
645

**Links**
- CRM Contacts
- Freq Used Web Links
- GMAC Websites
- Prop Pres - BPO
- Technology Agreement

**Reports**
- Active Leads
- Activity Summary - Leads
- Pipeline: All Open Opportunities Report
- Activity Summary - Opportunities
- Contract Pipeline
- Total Open Case Report
- Sales CM Report

**Recycle Bin**

**Task Detail**     [ Edit ] [ Delete ] [ Create Follow Up Task ] [ Create Follow Up Event ]

**Task Information**

| | | | |
|---|---|---|---|
| Assigned To | Lynne Gentner | Status | Cancelled |
| Subject | Email: RE: Funds Due from Petra | Name | Erick Magno |
| Due Date | 10/21/2008 | Related To | |
| Phone | (305) 379-4400 | Email | emagno@magnolaw.com |
| Priority | Normal | Type | Email |
| Contact Reason | Requests for reimbursement | SFDC Object | |

**Description Information**

Comments

From: Gentner, Lynne - PA Lynne.Gentner@GMACM.COM
To: 'Erick Magno'<emagno@magnolaw.com>;Castillo, Alba - TX<Alba.Castillo@gmacm.com>
CC: Rousselow, Julie -IA<julie.rousselow@gmacm.com>
Received at: 10/21/2008 6:13:00 PM
Erick, please see the attached e-mail where I clearly stated GMACM was charging a servicing fee of $200 per loan per month on the Petra assets and the e-mail where you clearly state Petra agrees to pay GMACM these fees. Please let me know your reasoning behind reneging on our agreement? As we previously stated, GMACM is expecting to be reimbursed in full totaling $46,102.17. Your cooperation in this matter is greatly appreciated. Thanks

Lynne Gentner

Client Relations Manager

Subservicing

GMAC Mortgage, LLC

215-734-5368 office

215-435-7876 cell

866-316-7574 fax

Lynne.Gentner@gmacm.com

gmacsolutions.com

_____

From: Erick Magno [mailto:emagno@magnolaw.com]
Sent: Tuesday, October 21, 2008 5:36 PM
To: Castillo, Alba - TX
Cc: Gentner, Lynne - PA
Subject: Re: Funds Due from Petra

That's unfortunate.

----- Original Message -----

From: Castillo, Alba - TX <mailto:Alba.Castillo@gmacm.com>

To: Erick Magno <mailto:emagno@magnolaw.com>

Cc: Gentner, Lynne - PA <mailto:Lynne.Gentner@GMACM.COM>

Sent: Tuesday, October 21, 2008 5:03 PM

Subject: RE: Funds Due from Petra

As stated below, GMAC will hold Petra responsible for $200 per loan servicing fee and owe GMAC 46,102.17. Until the funds are received, GMAC will not execute the deeds to Petra. Thanks.

Alba N. Castillo

Client Relations Advocate

Subservicing

GMAC Mortgage, LLC

214.874.6390

214.701.2074 Cell

866.543.2416 Fax

alba.castillo@gmacm.com

gmacsolutions.com

---

From: Erick Magno [mailto:emagno@magnolaw.com]
Sent: Tuesday, October 21, 2008 3:38 PM
To: Castillo, Alba - TX
Cc: Gentner, Lynne - PA
Subject: Re: Funds Due from Petra

sorry, I couldn't get approval for that.

----- Original Message -----

From: Castillo, Alba - TX <mailto:Alba.Castillo@gmacm.com>

To: emagno@magnolaw.com

Cc: Gentner, Lynne - PA <mailto:Lynne.Gentner@GMACM.COM>

Sent: Tuesday, October 21, 2008 1:06 PM

Subject: RE: Funds Due from Petra

Erick, If funds are wired by EOB today, Management will agree to lower the fee to $150 per loan and Petra would need to wire $42,102.17. If not paid today, GMAC will hold Petra responsible for $200 per loan servicing fee and owe GMAC 46,102.17. Thanks.

Alba N. Castillo

Client Relations Advocate

Subservicing

GMAC Mortgage, LLC

214.874.6390

214.701.2074 Cell

866.543.2416 Fax

alba.castillo@gmacm.com

gmacsolutions.com

---

From: emagno@magnolaw.com [mailto:emagno@magnolaw.com]
Sent: Tuesday, October 21, 2008 11:52 AM
To: Castillo, Alba - TX
Cc: Gentner, Lynne - PA
Subject: Re: Funds Due from Petra

Yes if all is in order

Sent via BlackBerry by AT&T

---

From: "Castillo, Alba - TX" <Alba.Castillo@gmacm.com>
Date: Tue, 21 Oct 2008 11:39:05 -0500
To: Erick Magno<emagno@magnolaw.com>
CC: Gentner, Lynne - PA<Lynne.Gentner@GMACM.COM>
Subject: RE: Funds Due from Petra

If GMAC agrees to lower servicing fee, will the funds be wired today?

Thanks.

Alba N. Castillo

Client Relations Advocate

Subservicing

GMAC Mortgage, LLC

214.874.6390

214.701.2074 Cell

866.543.2416 Fax

alba.castillo@gmacm.com

gmacsolutions.com

---

From: Erick Magno [mailto:emagno@magnolaw.com]
Sent: Tuesday, October 21, 2008 11:29 AM
To: Castillo, Alba - TX
Cc: Gentner, Lynne - PA
Subject: Re: Funds Due from Petra


We understand your position however Petra is only prepared to pay $38,102 (which would include $8,000 for GMAC servicing fees) assuming the files are confirmed to be in order.

----- Original Message -----

From: Castillo, Alba - TX <mailto:Alba.Castillo@gmacm.com>

To: Erick Magno <mailto:emagno@magnolaw.com>

Cc: Gentner, Lynne - PA <mailto:Lynne.Gentner@GMACM.COM>

Sent: Tuesday, October 21, 2008 12:14 PM

Subject: RE: Funds Due fromPetra


Erick, The title issues need to be resolved between ARE and Petra. The servicing fee is the charge for GMAC servicing these assets directly for Petra instead of ARE. GMAC charged a $200 per loan fee during the months of April - September. As previously communicated, GMAC will need to be reimbursed for all the out of pocket expenses relating to Petra loans before releasing any deeds to Petra/SRG. Please wire the 46,102.17 by EOB today. Thanks.


Alba N. Castillo

Client Relations Advocate

Subservicing

GMAC Mortgage, LLC


214.874.6390

214.701.2074 Cell

866.543.2416 Fax

alba.castillo@gmacm.com

gmacsolutions.com


---

From: Erick Magno [mailto:emagno@magnolaw.com]
Sent: Tuesday, October 21, 2008 11:04 AM
To: Castillo, Alba - TX
Cc: Gentner, Lynne - PA
Subject: Re: Funds Due from Petra


Alba,


I'm waiting for confirmation from SRG that they received everything they are supposed to receive and that there are no material title defects which we may not be able to resolve. I expect to confirm this today. Also, we need to discuss the $16k of servicing fees GMAC is charging for these 11 Petra assets which is not reasonable in light of everything that's happened with Petra's assets. I can probably get approval for half of that amount ($8k) assuming everything else is in order.

Let me know if that is acceptable.

----- Original Message -----

From: Castillo, Alba - TX <mailto:Alba.Castillo@gmacm.com>

To: Erick Magno <mailto:emagno@magnolaw.com>

Cc: Gentner, Lynne - PA <mailto:Lynne.Gentner@GMACM.COM>

Sent: Tuesday, October 21, 2008 11:02 AM

Subject: RE: Funds Due fromPetra


Erick, Please provide the Fed Reference# for the wire below. Thanks.


Alba N. Castillo

Client Relations Advocate

Subservicing

GMAC Mortgage, LLC


214.874.6390

214.701.2074 Cell

866.543.2416 Fax

alba.castillo@gmacm.com

gmacsolutions.com

_____

From: Castillo, Alba - TX
Sent: Friday, October 17, 2008 11:50 AM
To: 'emagno@magnolaw.com'
Cc: Gentner, Lynne - PA
Subject: Funds Due from Petra

Erick, GMAC will apply the 74,962.07 from the monthly remittances we have been holding to the funds outstanding for Petra transfers.
Petra/SRG is responsible for wiring the difference of 46,102.17 by EOB on Tuesday, 10/21. Attached is the breakdown of the funds. Thanks.

Wachovia Bank, Philadelphia, PA

ABA #▮▮▮ 1467

Acct #▮▮▮▮▮ 2642

Beneficiary: GMAC Mortgage Corp.

Alba N. Castillo

Client Relations Advocate

Subservicing

GMAC Mortgage, LLC

214.874.6390

214.701.2074 Cell

866.543.2416 Fax

alba.castillo@gmacm.com

gmacsolutions.com

The information contained in this communication is confidential and privileged proprietary information intended only for the personal and
confidential use of the individual or entity to whom it is addressed. If you are not the addressee indicated in this message (or an agent
responsible for delivery of the message to such person), you are hereby notified that you have received this communication in error and that
any review, dissemination, copying or unauthorized use of this message is strictly prohibited. In such case, you should destroy this message
and kindly notify the sender by reply e-mail.

Please advise immediately if you or your employer do not consent to Internet e-mail for messages of this kind. Opinions, conclusions and other
information in this message that do not relate to the official business of the Company shall be understood as neither given nor endorsed by it. It
is the Company's policy that e-mails are intended for and should be used for business purposes only.

**Project Request Tracking**

| Reporting Product | | Resource | |
|---|---|---|---|
| Reporting Layout | | Draft Received | |
| Reporting Complexity | | 1st Draft Pass Rate | |
| CPR# | | Draft Sent | |
| CPR Submit Date | | Requirement Change Date | |
| Date Needed By | | Client Approved | |
| Sample# | | Production Date | |
| Open Date | 10/21/2008 | | |
| EFT Request Date | | | |
| EFT Complete Date | | | |
| FTP Process | | | |

**Project Cycle Days**

| Open to CPR Days | 0 | Draft Sent to Client Approved Days | |
|---|---|---|---|
| CPR to Draft Days | 0 | Client Approved to Production Days | |
| Draft Recvd to Draft Sent Days | | CPR to Production Days | 0 |

**System Information**

| Created By | Lynne Gentner, 10/21/2008 5:13 PM | Last Modified By | Lynne Gentner, 10/21/2008 5:14 PM |
|---|---|---|---|
| Subject1 | | Subject2 | |

**Reminder**

| Reminder | ☐ |
|---|---|

[Edit] [Delete] [Create Follow Up Task] [Create Follow Up Event]

Home | Accounts | Contacts | Leads | Opportunities | Change Mgmts | CI Projects | Client Requirements | Reports | Dashboards | Contracts | Renewal Analyses | Products | Content |
Workspaces | All Tabs

4 of 5                                                                                                                         6/14/2010 3:45 PM

12-12020-mg    Doc 8104    Filed 02/10/15    Entered 02/10/15 16:16:58    Main Document
Pg 144 of 153

Copyright © 2000-2010 salesforce.com, inc. All rights reserved. | Privacy Statement | Security Statement | Terms of Use | 508 Compliance

6/14/2010 3:45 PM

## Palmer, Melisa

| | |
|---|---|
| **From:** | Castillo, Alba - TX [IMCEAEX-_O=GMAC+20MORTGAGE+20CORP_OU=DALLAS-IT_CN=RECIPIENTS_CN=ALBA+2ECASTILLO@gmacrescap.com] |
| **Sent:** | Friday, October 24, 2008 11:25 AM |
| **To:** | Helmich, Elizabeth - PA |
| **Cc:** | Siess-Gannon, Laura - PA |
| **Subject:** | FW: Funds Due from Petra |
| **Attachments:** | ARE Loans 102208.xls |

Betty, Please see below. CRM agreed to take $100 servicing fee for the Petra loans instead of the $200.  The funds have been wired to GMAC.  Please move the 8k to the sales account. Let me know if you have any questions. Thanks!

**Alba N. Castillo**
Client Relations Advocate
Subservicing
GMAC Mortgage, LLC

214.874.6390
214.701.2074 Cell
866.543.2416 Fax
alba.castillo@gmacm.com
gmacsolutions.com

---

**From:** Quinn, Michael - PENNSYLVANIA
**Sent:** Friday, October 24, 2008 10:12 AM
**To:** Castillo, Alba - TX
**Subject:** RE: Funds Due from Petra

Yes it was received yesterday.

Michael Quinn
Bank Reconciliation/Investor Reporting
GMAC Mortgage, LLC
(215)734-5051
Michael.Quinn@gmacm.com



---

**From:** Castillo, Alba - TX
**Sent:** Friday, October 24, 2008 10:21 AM
**To:** Quinn, Michael - PENNSYLVANIA
**Subject:** FW: Funds Due from Petra

Michael, Can you confirm if we received a wire for 38,102.17? Thanks.

**Alba N. Castillo**
Client Relations Advocate
Subservicing
GMAC Mortgage, LLC

214.874.6390
214.701.2074 Cell
866.543.2416 Fax
alba.castillo@gmacm.com
gmacsolutions.com

**From:** Gentner, Lynne - PA
**Sent:** Thursday, October 23, 2008 2:42 PM
**To:** Castillo, Alba - TX
**Cc:** Rousselow, Julie -IA; Gentner, Lynne - PA
**Subject:** FW: Funds Due from Petra

Alba, see below from Erick.  Can you please check with Investor Reporting tomorrow to confirm receipt of the wire and amount of the wire (we know how Erick is☺) and keep Julie and I posted.  Thanks and let me know of any questions.

**Lynne Gentner**
Client Relations Manager
Subservicing
GMAC Mortgage, LLC

215-734-5368 office
215-435-7876 cell
866-316-7574 fax
Lynne.Gentner@gmacm.com
gmacsolutions.com

---

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** Thursday, October 23, 2008 3:26 PM
**To:** Gentner, Lynne - PA
**Subject:** Re: Funds Due from Petra

yes, wire went out. Pmt #22351091.

----- Original Message -----
**From:** Gentner, Lynne - PA
**To:** Gentner, Lynne - PA ; emagno@magnolaw.com
**Cc:** Castillo, Alba - TX ; Rousselow, Julie -IA
**Sent:** Thursday, October 23, 2008 2:53 PM
**Subject:** RE: Funds Due from Petra

Erick, please let us know if you wired GMACM the $38,102.17?  Thanks

**Lynne Gentner**
Client Relations Manager
Subservicing
GMAC Mortgage, LLC

215-734-5368 office
215-435-7876 cell
866-316-7574 fax
Lynne.Gentner@gmacm.com
gmacsolutions.com

---

**From:** Gentner, Lynne - PA
**Sent:** Thursday, October 23, 2008 10:02 AM

**To:** ['emagno@magnolaw.com'](mailto:emagno@magnolaw.com)
**Cc:** Castillo, Alba - TX; Rousselow, Julie -IA
**Subject:** RE: Funds Due from Petra

Please provide the fed ref #.  Thanks

**Lynne Gentner**
Client Relations Manager
Subservicing
GMAC Mortgage, LLC

215-734-5368 office
215-435-7876 cell
866-316-7574 fax
[Lynne.Gentner@gmacm.com](mailto:Lynne.Gentner@gmacm.com)
gmacsolutions.com

---

**From:** emagno@magnolaw.com [mailto:emagno@magnolaw.com]
**Sent:** Thursday, October 23, 2008 10:00 AM
**To:** Gentner, Lynne - PA
**Subject:** Re: Funds Due from Petra

Ok

Sent via BlackBerry by AT&T

---

**From:** "Gentner, Lynne - PA" <Lynne.Gentner@GMACM.COM>
**Date**: Thu, 23 Oct 2008 08:54:48 -0500
**To:** 'emagno@magnolaw.com'<emagno@magnolaw.com>; Castillo, Alba - TX<Alba.Castillo@gmacm.com>
**CC**: Rousselow, Julie -IA<julie.rousselow@gmacm.com>
**Subject**: RE: Funds Due from Petra
If the $38,102.17 is wired to GMACM today, then yes this is an acceptable resolution.  Will you have the $38,102.17 wired today?

**Lynne Gentner**
Client Relations Manager
Subservicing
GMAC Mortgage, LLC

215-734-5368 office
215-435-7876 cell
866-316-7574 fax
[Lynne.Gentner@gmacm.com](mailto:Lynne.Gentner@gmacm.com)
gmacsolutions.com

---

**From:** emagno@magnolaw.com [mailto:emagno@magnolaw.com]
**Sent:** Thursday, October 23, 2008 9:48 AM
**To:** Gentner, Lynne - PA; Castillo, Alba - TX

**Cc:** Rousselow, Julie -IA
**Subject:** Re: Funds Due from Petra

Is the 38,102 an acceptable resolution to this?

Sent via BlackBerry by AT&T

---

**From:** "Gentner, Lynne - PA" <Lynne.Gentner@GMACM.COM>
**Date:** Thu, 23 Oct 2008 08:45:23 -0500
**To:** 'emagno@magnolaw.com'<emagno@magnolaw.com>; Castillo, Alba - TX<Alba.Castillo@gmacm.com>
**CC:** Rousselow, Julie -IA<julie.rousselow@gmacm.com>
**Subject:** RE: Funds Due from Petra
Thank you.  Please provide the fed ref #.

**Lynne Gentner**
Client Relations Manager
Subservicing
GMAC Mortgage, LLC

215-734-5368 office
215-435-7876 cell
866-316-7574 fax
Lynne.Gentner@gmacm.com
gmacsolutions.com

---

**From:** emagno@magnolaw.com [mailto:emagno@magnolaw.com]
**Sent:** Thursday, October 23, 2008 9:42 AM
**To:** Gentner, Lynne - PA; Castillo, Alba - TX
**Cc:** Rousselow, Julie -IA
**Subject:** Re: Funds Due from Petra

Yes

Sent via BlackBerry by AT&T

---

**From:** "Gentner, Lynne - PA" <Lynne.Gentner@GMACM.COM>
**Date:** Thu, 23 Oct 2008 08:35:36 -0500
**To:** 'Erick Magno'<emagno@magnolaw.com>; Castillo, Alba - TX<Alba.Castillo@gmacm.com>
**CC:** Rousselow, Julie -IA<julie.rousselow@gmacm.com>
**Subject:** RE: Funds Due from Petra
Erick, can you wire the $38,102.17 today?  Below are the wire instructions.  Please let me know asap.  Thanks

Wachovia Bank, Philadelphia, PA
ABA # ███████1467
Acct # 2 █████████2642
Beneficiary:  GMAC Mortgage Corp.

**Lynne Gentner**

Client Relations Manager
Subservicing
GMAC Mortgage, LLC

215-734-5368 office
215-435-7876 cell
866-316-7574 fax
Lynne.Gentner@gmacm.com
gmacsolutions.com

---

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** Wednesday, October 22, 2008 5:20 PM
**To:** Gentner, Lynne - PA; Castillo, Alba - TX
**Cc:** Rousselow, Julie -IA
**Subject:** Re: Funds Due from Petra

Lynne,

I know we tried to reach an agreement covering several issues but were never able to agree on the appropriate language and as a result no final agreement was ever executed. That's not to say that GMAC is not entitled to reasonable fees since the fact remains that those Petra assets were boarded with GMAC. We've been informed that those Petra assets were boarded with GMAC. We've been informed that $100 per month per asset is higher than average (indeed higher than what SRG is currently charging Petra for much more active servicing of the assets) and higher than what ARE is charged under its servicing agreement which governed these assets until recently. I only have approval to pay the 8k in fees.

----- Original Message -----
**From:** Gentner, Lynne - PA
**To:** Gentner, Lynne - PA ; 'Erick Magno' ; Castillo, Alba - TX
**Cc:** Rousselow, Julie -IA
**Sent:** Wednesday, October 22, 2008 4:51 PM
**Subject:** RE: Funds Due from Petra

Erick, you have yet to respond to the below.  Please let me know your intentions.  Thanks

**Lynne Gentner**
Client Relations Manager
Subservicing
GMAC Mortgage, LLC

215-734-5368 office
215-435-7876 cell
866-316-7574 fax
Lynne.Gentner@gmacm.com
gmacsolutions.com

---

**From:** Gentner, Lynne - PA
**Sent:** Tuesday, October 21, 2008 6:14 PM
**To:** 'Erick Magno'; Castillo, Alba - TX
**Cc:** Rousselow, Julie -IA
**Subject:** RE: Funds Due from Petra

Erick, please see the attached e-mail where I clearly stated GMACM was charging a servicing fee of $200 per loan per month on the Petra assets and the e-mail where you clearly state Petra agrees to pay GMACM these fees.  Please let me know your reasoning behind reneging on our agreement?  As we previously stated, GMACM is expecting to be reimbursed in full totaling $46,102.17.  Your cooperation in this matter is greatly appreciated.  Thanks

**Lynne Gentner**
Client Relations Manager
Subservicing
GMAC Mortgage, LLC

215-734-5368 office
215-435-7876 cell
866-316-7574 fax
Lynne.Gentner@gmacm.com
gmacsolutions.com

---

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** Tuesday, October 21, 2008 5:36 PM
**To:** Castillo, Alba - TX
**Cc:** Gentner, Lynne - PA
**Subject:** Re: Funds Due from Petra

That's unfortunate.

----- Original Message -----
**From:** Castillo, Alba - TX
**To:** Erick Magno
**Cc:** Gentner, Lynne - PA
**Sent:** Tuesday, October 21, 2008 5:03 PM
**Subject:** RE: Funds Due from Petra

As stated below, GMAC will hold Petra responsible for $200 per loan servicing fee and owe GMAC 46,102.17.  Until the funds are received, GMAC will not execute the deeds to Petra. Thanks.

**Alba N. Castillo**
Client Relations Advocate
Subservicing
GMAC Mortgage, LLC

214.874.6390
214.701.2074 Cell
866.543.2416 Fax
alba.castillo@gmacm.com
gmacsolutions.com

---

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** Tuesday, October 21, 2008 3:38 PM
**To:** Castillo, Alba - TX
**Cc:** Gentner, Lynne - PA
**Subject:** Re: Funds Due from Petra

sorry, I couldn't get approval for that.

----- Original Message -----
**From:** Castillo, Alba - TX

**To:** emagno@magnolaw.com
**Cc:** Gentner, Lynne - PA
**Sent:** Tuesday, October 21, 2008 1:06 PM
**Subject:** RE: Funds Due from Petra

Erick, If funds are wired by EOB today, Management will agree to lower the fee to $150 per loan and Petra would need to wire $42,102.17. If not paid today, GMAC will hold Petra responsible for $200 per loan servicing fee and owe GMAC 46,102.17. Thanks.

**Alba N. Castillo**
Client Relations Advocate
Subservicing
GMAC Mortgage, LLC

214.874.6390
214.701.2074 Cell
866.543.2416 Fax
alba.castillo@gmacm.com
gmacsolutions.com

---

**From:** emagno@magnolaw.com [mailto:emagno@magnolaw.com]
**Sent:** Tuesday, October 21, 2008 11:52 AM
**To:** Castillo, Alba - TX
**Cc:** Gentner, Lynne - PA
**Subject:** Re: Funds Due from Petra

Yes if all is in order

Sent via BlackBerry by AT&T

---

**From**: "Castillo, Alba - TX" <Alba.Castillo@gmacm.com>
**Date**: Tue, 21 Oct 2008 11:39:05 -0500
**To**: Erick Magno<emagno@magnolaw.com>
**CC**: Gentner, Lynne - PA<Lynne.Gentner@GMACM.COM>
**Subject**: RE: Funds Due from Petra
If GMAC agrees to lower servicing fee, will the funds be wired today?
Thanks.

**Alba N. Castillo**
Client Relations Advocate
Subservicing
GMAC Mortgage, LLC

214.874.6390
214.701.2074 Cell
866.543.2416 Fax
alba.castillo@gmacm.com
gmacsolutions.com

---

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** Tuesday, October 21, 2008 11:29 AM
**To:** Castillo, Alba - TX
**Cc:** Gentner, Lynne - PA
**Subject:** Re: Funds Due from Petra

We understand your position however Petra is only prepared to pay $38,102 (which would include $8,000 for GMAC servicing fees) assuming the files are confirmed to be in order.

----- Original Message -----
**From:** Castillo, Alba - TX
**To:** Erick Magno
**Cc:** Gentner, Lynne - PA
**Sent:** Tuesday, October 21, 2008 12:14 PM
**Subject:** RE: Funds Due fromPetra

Erick, The title issues need to be resolved between ARE and Petra. The servicing fee is the charge for GMAC servicing these assets directly for Petra instead of ARE.  GMAC charged a $200 per loan fee during the months of April - September.  As previously communicated, GMAC will need to be reimbursed for all the out of pocket expenses relating to Petra loans before releasing any deeds to Petra/SRG. Please wire the 46,102.17 by EOB today. Thanks.

**Alba N. Castillo**
Client Relations Advocate
Subservicing
GMAC Mortgage, LLC

214.874.6390
214.701.2074 Cell
866.543.2416 Fax
alba.castillo@gmacm.com
gmacsolutions.com

---

**From:** Erick Magno [mailto:emagno@magnolaw.com]
**Sent:** Tuesday, October 21, 2008 11:04 AM
**To:** Castillo, Alba - TX
**Cc:** Gentner, Lynne - PA
**Subject:** Re: Funds Due from Petra

Alba,

I'm waiting for confirmation from SRG that they received everything they are supposed to receive and that there are no material title defects which we may not be able to resolve. I expect to confirm this today. Also, we need to discuss the $16k of servicing fees GMAC is charging for these 11 Petra assets which is not reasonable in light of everything that's happened with Petra's assets. I can probably get approval for half of that amount ($8k) assuming everything else is in order.
Let me know if that is acceptable.

----- Original Message -----
**From:** Castillo, Alba - TX
**To:** Erick Magno
**Cc:** Gentner, Lynne - PA
**Sent:** Tuesday, October 21, 2008 11:02 AM
**Subject:** RE: Funds Due fromPetra

Erick, Please provide the Fed Reference# for the wire below. Thanks.

**Alba N. Castillo**
Client Relations Advocate
Subservicing
GMAC Mortgage, LLC

214.874.6390
214.701.2074 Cell
866.543.2416 Fax

alba.castillo@gmacm.com
gmacsolutions.com

---

**From:** Castillo, Alba - TX
**Sent:** Friday, October 17, 2008 11:50 AM
**To:** 'emagno@magnolaw.com'
**Cc:** Gentner, Lynne - PA
**Subject:** Funds Due from Petra

Erick, GMAC will apply the 74,962.07 from the monthly remittances we have been holding to the funds outstanding for Petra transfers. Petra/SRG is responsible for wiring the difference of 46,102.17 by EOB on Tuesday, 10/21. Attached is the breakdown of the funds. Thanks.

Wachovia Bank, Philadelphia, PA
ABA #0███1467
Acct #███████2642
Beneficiary:  GMAC Mortgage Corp.


**Alba N. Castillo**
Client Relations Advocate
Subservicing
GMAC Mortgage, LLC

214.874.6390
214.701.2074 Cell
866.543.2416 Fax
alba.castillo@gmacm.com
gmacsolutions.com

The information contained in this communication is confidential and privileged proprietary information intended only for the personal and confidential use of the individual or entity to whom it is addressed.  If you are not the addressee indicated in this message (or an agent responsible for delivery of the message to such person), you are hereby notified that you have received this communication in error and that any review, dissemination, copying or unauthorized use of this message is strictly prohibited.  In such case, you should destroy this message and kindly notify the sender by reply e-mail.

Please advise immediately if you or your employer do not consent to Internet e-mail for messages of this kind. Opinions, conclusions and other information in this message that do not relate to the official business of the Company shall be understood as neither given nor endorsed by it. It is the Company's policy that e-mails are intended for and should be used for business purposes only.