**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## RESPONSE BY FRANCINE SILVER TO THE OBJECTION OF THE RESCAP BORROWER CLAIMS TRUST TO THE PROOF OF CLAIM <u>FILED BY FRANCINE CLAIMANT (CLAIM NO. 61)</u>



RECEIVED

FEB 1 0 2015

U.S. BANKRUPTCY COURT
SO DIST OF NEW YORK

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.............................................................5

JURISDICTION, VENUE, AND STATUTORY PREDICATE ................. 7

BACKGROUND..............................................................................8

    A. General Background .................................................................8
    B. Illegal Foreclosure Activity .......................................................10
    C. Silver's Bankruptcy Filing .........................................................13
    D. Silver v. GMACM Litigation ......................................................16
    E. Proof of Claim-Related Background ...........................................20
    F. Claimant's Prior Motions Before the Court and Related Appeals ......24

ARGUMENT .................................................................................30
    A – THE DOCTRINE OF UNCLEAN HANDS ...........................30

    B - THE CLAIM HAS MERIT.................................................35

    C - THE CLAIM WAS DEEMED ALLOWED.............................36

    D – THE CLAIM SHOULD ALREADY HAVE BEEN PAID.........;....38

    E - THE CLAIMS OBJECTION DEADLINE DOES NOT APPLY......42

    F - THE RESPONSE TO THE REQUEST LETTER SATISFIES........43

    G - CLAIMANTS ARGUMENTS WERE CONCEDED TO BY

    DEBTORS FAILURE TO RESPOND.........................................45

    H – QUIET TITLE AND WRONGFUL FORECLOSURE IS NOT AN

    ISSUE FOR THIS COURT.....................................................48

    I – DEBTOR NEVER OWNED THE SERVICING RIGHTS.............52

    J – MORTGAGE LITIGATION...............................................60

K – UNJUST ENRICHMENT……………………………….……………61

L – CLAIMANT PROVED FRAUD IN THE DOCUMENTS…………63

M – CLAIMANT DOES NOT SEEK NON-MONETARY DAMAGES.63

N – CLAIMANT SUFFERED MONETARY DAMAGES…..…………63


CONCLUSSION…………………………………………………………65

## TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

Bank of Italy N. T. &S.A. Assn. v. Bentley………………………………………….32

Case 9:03-cv-01256-LES-GJD Document 69 Filed 12/09/2005………….47

Frazier v. Aegis Wholesale Corp., 2011 U.S. Dist.…………………………,49

Gomes v. Countrywide Home Loans, Inc., 192 Cal.App.4th 1149……..48, 49

Hedging Concepts, Inc. v. First Alliance …………49 Cal. Rptr. 2d 191,..66

In Cabassa v. Smith et al, 9:08cv480,………………………..………………46

In re MF Global Holdings, Ltd., Nos. 11-15059 (MG),

11-02790 (MG) (SIPA), 2012 WL 5499847, at * 3

(Bankr.S.D.N.Y. Nov. 13, 2012)…………………………………………37

*Johnson* v. *HSBC Bank USA*……………………………....………………....…54

*O'Keefe v. Arbon Equip. Corp.*, 399 F. Supp. 2d 478, 482…………..………48

U.S. Bank, N.A. v. Skeleton (In re Salazar)…………………………………32

Vogan v. Wells Fargo Ban/c, N.A. (E.D.Cal.) …………………………..…54

2011 US Dist LEXIS 132944 at *17………………………....………………...54, 55

## STATUTES

11 U.S.C. § 502(a)……………………………….………………………36

198 (Cal. Ct. App. 1996)……………………………………………………66

Bankruptcy Rule 3003……………………………………………………38, 41

Banruptcy Rule 3020(e)…………………………...............………..41, 65

Bankruptcy Rule 3003(c)(5)………………………………………………......41

Civil Code§ 2932.5…………………………………………………………..32

Fed. R. Civ. P. 9(b)…………………………………………………36

Federal Rule of Civil Procedure 12………………………………….……..46

FED. R. CIV. P. 12(h)(1)(B)……………………………………………48

J.P.M.L. Rules of Procedure 6.1(c)…………………………………..……47

Local Rule 15(k) Middle District of North Carolina………………....…..46

Local Civil Rule 55.2 …………………………………………………......46

Local Rule 56.1(b),……………………………………………………..47

Local Rule 56.1(c)……………………………………………………..47

N.D.N.Y.L.R. 7.1(b)(3)……………………………………………………46

N.D.N.Y.L.R. 56.2……………………………………………..……………46

TITLE VII. Rule 55………………………………….…………………48

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The Opposition argues that Claimant defaulted on her loan and should have
expected to be foreclosed on but this could not be further from the truth. At
the age of almost 90 years old Claimant had excellent credit her entire life
until having the misfortune to have to deal with GMAC. As soon as GMAC
started servicing the loan the billing mistakes began. A false mortgage late
was recorded on Claimants credit report even though she had never been
late. She did not find out about the false recording until she needed a
mortgage on an investment property and had her credit checked. Eventually
GMAC acknowledged the mistake and apologized and after some time and
effort the mortgage late was removed but only after Claimant had missed
out on a lucrative investment. Unfortunately that was just the beginning of
the problems. For some reason in year 3 of the loan Debtors started
crossing out the interest only payment option on the loan even though it had
a 5 year interest only option. With the belief that this obvious violation of the
terms of the loan would be corrected, Claimant put up with being over-
billed by approximately $3,000 per month which wreaked havoc on her
cash flow projections and inhibited her ability to make investments.
Claimant spent hours phoning and writing letters – (Exhibit 5-B page 47 of

the Opposition) but was still unable to get the billing mistake corrected or even a straight answer as why she was being over-billed and being denied the interest only option on her loan.  She was hung up on or told "we'll have to get back to you on that" which they eventually did by filing a notice of default. Claimant was at the time unaware of the securitization process and wanted to find out who the loan was being serviced for but the original bank "Nationwide" from whom she obtained the loan apparently no longer existed and Claimant wanted the mysterious new owner of the loan to either find a different servicer or else instruct GMAC to start servicing in accordance with the terms of the loan. Claimant's son searched the MERS database but there was no record of the loan at least initially but then in future searches loans started popping up including loans that pre-dated ownership of the property but none were the loan in question – See Declaration by Marcus Silver (Exhibit 3-G page 49 of Opposition)

It became very clear that Claimant would not get a straight answer from GMAC nor would they correct the billing mistakes or abide by the terms of the loan. Claimant was convinced she was the victim of massive fraud and was intentionally being driven into default. This was further evidenced by the fact that Debtors also incorrectly advised Claimant her payment could

adjust up by up to 9.95% each adjustment period (Exhibit 5-B page 41 of the Opposition) but the lifetime cap of the loan was 9.95% as per the note (Exhibit 3-A paragraph 2 of the Opposition). It was only after it became clear that Debtors would blatantly refuse to abide by the loan terms, correct the billing errors or explain who they were servicing the loan for that Claimant stopped making payment.

Claimant was forced into bankruptcy and had her livelihood destroyed as a direct result of Debtors fraudulent over-billing, wrongful foreclosure and refusal to abide by the terms of a loan it turns out they had absolutely no right to service in the first place. Claimant's livelihood and credit have been decimated and a claim she was led to believe would be paid over a year ago, as argued in her motion for payment [Docket Nos. 6639, 6690] is now subject to an objection that is in violation of the terms of the plan and is also fatally defective for numerous reasons that will be discussed

## JURISDICTION, VENUE, AND STATUTORY PREDICATE

This Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are Bankruptcy

Code section 502(b) and Bankruptcy Rule 3007.

## BACKGROUND

### A. General Background

On May 14, 2012 (the "Petition Date"), each of the Debtors filed a

voluntary petition with the United States Bankruptcy Court for the Southern

District of New York (the "Court") for relief under chapter 11 of the

Bankruptcy Code. On the Petition Date, the Court entered an order jointly

administering the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

On July 13, 2012, the Court entered the *Final Supplemental Order Under

Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a), and 1108 and

Bankruptcy Rule 9019 (I) Authorizing the Debtors to Continue

Implementing Loss Mitigation Programs; (II) Approving Procedures for

Compromise and Settlement of Certain Claims, Litigations and Causes of

Action; (III) Granting Limited Stay Relief to Permit Foreclosure and

Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to

Proceed; and (IV) Authorizing and Directing the Debtors to Pay

Securitization Trustee Fees and* Expenses [Docket No. 774] (the

"Supplemental Servicing Order") approving the Debtors' supplemental

servicing motion [Docket No. 181]. Pursuant to the Supplemental Servicing Order, the Debtors may commence, continue or complete foreclosure actions against parties post-petition. See Supplemental Servicing Order ¶ 14. The Supplemental Servicing Order, among other relief, also grants borrowers expansive stay relief to allow them to defend against, and/or raise claims and counter-claims relating to, foreclosure actions on property that is the subject of a loan owned or serviced by a Debtor, eviction proceedings and actions involving the amount, validity, and/or priority of liens. See id. ¶¶ 14, 17. However, the relief granted by the Supplemental Servicing Order prevents parties from pursuing direct claims or counter-claims for damages in the form of monetary relief from the Debtors in connection with the defense of a foreclosure (unless asserting such claim is required to defend against the foreclosure at issue).

On December 11, 2013, the Court entered the *Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* [Docket No. 6065] (the "Confirmation Order") approving the terms of the chapter 11 plan, as amended (the "Plan"), filed in these Chapter 11 Cases. On December 17, 2013, the Effective Date (as such term is defined in the Plan) of the Plan

occurred, and, among other things, the Borrower Trust was established The Plan provides for the creation and implementation of the Borrower Trust, which is established for the benefit of Borrowers who filed Borrower Claims to the extent such claims are ultimately allowed either through settlement with the Trustee for the Borrower Trust or pursuant to an Order of the Court. including confirmation of the plan See Plan, at Art. IV and Art VIII Section 2. The Borrower Trust was established to, among other things, "(i) direct the processing, liquidation and payment of the Allowed Borrower Claims in accordance with the Plan, and the distribution procedures established under the Borrower Claims Trust Agreement, and (ii) preserve, hold, and manage the assets of the Borrower Claims Trust for use in satisfying Allowed Borrower Claims."

**Illegal Foreclosure Activity**

On March 15, 2006, as part of a refinancing of the existing secured debt on her real property located at 8613 Franklin Avenue, Los Angeles, California, 90069 (the "Property"), Claimant executed a note in the amount of $1,300,000 (the "Note") with Nationwide Lending Group ("Nationwide") as lender and Land America Commonwealth as trustee, secured by a deed of trust (the "Deed of Trust"). See Priore Declaration Exhibit 3 of the

Opposition.

On or about December 7, 2006, GMACM was purportedly designated as
the successor servicer to Greenpoint Mortgage Funding. See Priore
Declaration – Exhibit 3 of the Opposition.

On July 5, 2011, MERS purportedly assigned the Note and Deed of Trust to
GMACM, an assignment purportedly signed by a purported but untraceable
Jacqueline Keeley as "Assistant Secretary of MERS." See Priore
Declaration see also Keeley Declaration Exhibit 4 of the Opposition. This
purported assignment, which was recorded in the official records of Los
Angeles County on July 13, 2011, did not transfer ownership of the loan,
but rather only assigned the right to GMACM, as a beneficial holder of the
Note, to take legal measures to enforce the terms of the Note. This
purported assignment was later found in California litigation to be fraudulent
by both Federal Court Judge Donovan and State Court Judge Goodman
who along with a handwriting expert  all agreed that Jacqueline Keeley's
signatures were not done by the same person. Furthermore, any such
assignment would violate  NY law and the Pool Service Agreement which
means the assignment could not have occurred even if the signatures were

not forged.

On July 6, 2011, GMACM executed a Substitution of Trustee, appointing ETS as the party to provide Trustee services, executed by a purported Jacqueline Keeley as "GMAC[M] Authorized Officer."

On July 22, 2011, a Notice of Default was recorded against the Property and foreclosure proceedings were initiated. See Priore Declaration ¶ 7;

On October 21, 2011, Claimant was served with a Notice of Trustee's Sale, which was scheduled to be held on November 21, 2011. See Priore Declaration ¶ 8;  The sale was preempted by Claimant's bankruptcy filing. A new Notice of Trustee's Sale was recorded on the Property on October 5, 2012. See Priore Declaration ¶ 8

On February 6, 2013, GMACM notified Claimant that servicing of the loan would be transferred to Ocwen Loan Servicing, LLC ("Ocwen") as of February 16, 2013. See Priore Declaration ¶ 9.

On March 25, 2013, the Deed of Trust was purportedly assigned to U.S.

Bank. See Priore Declaration and Exhibit 3-E of the Opposition. This sale was apparently not authorized or reported to the Bankruptcy Court.

**Claimant's Bankruptcy Filing**

On November 14, 2011, one week before the foreclosure sale was scheduled to occur, Claimant filed for bankruptcy protection under chapter 7 under the Bankruptcy Code (the "Claimant Bankruptcy Case") with the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "California Bk Court"), Case No. 2-11-bk-57082-TD

On January 26, 2012, GMACM filed a motion for relief from the automatic stay, alleging that its interest in the Property was not adequately protected (the "Stay Relief Motion").

On February 8, 2012, Claimant opposed the Stay Relief Motion, asserting that GMACM failed to demonstrate standing as assignee of the beneficial holder of the Note so that it could proceed with foreclosure,

On or about February 29, 2012, after a hearing held on February 23, 2012, the California Bankruptvy Court entered an order denying the Stay Relief

Motion, and finding at the time of the motion, GMACM lacked standing to seek relief from the stay because questions remained as to the authenticity of the Keeley signature included on MERS's purported assignment of a beneficial interest in the Note to GMACM. See Order Denying Stay Relief Motion, - Exhibit 10 of the Opposition.

On March 6, 2012, the California Bankruptcy Court issued a Discharge of Debtor. Also on March 6, 2012, Claimant amended her Schedule B to include an adversary proceeding complaint (the "Adversary Complaint") in the Claimant Bankruptcy Case, filed on that same date, Adv. Pro. Case No. 2:12-ap-01352-TD, seeking to quiet title to real property against GMACM and alleging that "MERS had no record of the loan" at any time prior to February 11, 2011. See Adversary Complaint, Exhibit 12 of the Opposition. Additionally, Claimant alleged that MERS was not specifically authorized by the then current beneficiary of the Deed of Trust and Note to assign the same, and therefore was unable to transfer a valid interest in the Note and Deed of Trust to GMACM despite the recorded purported assignment dated July 5, 2011. Claimant also alleged that the signatures of the signing officer on the Assignment and/or Substitution of Trustee are forgeries, and questioned the validity of these documents. Claimant also argued that

GMACM is not the current owner of the beneficial interest in the mortgage loan and wrongfully foreclosed against the Property.

On May 23, 2012, Claimant Bankruptcy Case was closed.

On May 31, 2012, GMACM filed a Notice of Bankruptcy and Effect of the Automatic Stay in Claimant Bankruptcy Case, notifying Claimant of the Debtors' Chapter 11 Cases. See Notice of Bankruptcy, Exhibit 14 of the Opposition. To date, Claimant has not as of yet sought relief from the automatic stay in the Chapter 11 Cases but continues to reevaluate her position.

On August 6, 2012, GMACM filed a motion to dismiss the Adversary Complaint asserting, among other things, that (i) the California Bk Court lacked subject matter jurisdiction over the action as Claimant Bankruptcy Case has been discharged and the case closed, and (ii) each cause of action should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure because Claimant failed to state a claim under relevant federal or state law.

On August 23, 2012, Claimant filed an opposition to the motion to dismiss.


**Silver v. GMACM Litigation**

On September 17, 2012, Claimant filed a Complaint for Declaratory and

Injunctive Relief (the "Complaint") against GMACM with the Superior

Court of the State of California, no other claim for monetary damages

against the Debtors was made in this matter due to Debtors bankruptcy

stay. See Exhibit 5-A of the Opposition. County of Los Angeles ("Superior

Court"), Case No. SC 118412 (the "Wrongful Foreclosure Action").

Claimant alleged wrongful foreclosure, claiming GMACM was not a party

with due authority to foreclose on the Property.  Similar to the relief sought

in the Adversary Complaint, Claimant sought (i) declaratory relief that

GMACM's Notice of Default is void and that GMACM has no right, title, or

interest in the Property, and (ii) injunctive relief temporarily and permanently

enjoining GMACM and its respective successors and assigns from taking

further action to foreclose on the Property.


On November 2, 2012, Claimant filed a motion in the Wrongful Foreclosure

Action seeking a preliminary injunction (the "Preliminary Injunction

Motion") to halt the sale of the Property from going forward.

On November 5, 2012, and to prevent parties from continuing illegal

foreclosure activities in connection with the Property, the parties attempted

to settle the matter and the hearing date for the Preliminary Injunction

Motion was eventually continued to May 23, 2014. The settlement

negotiations did not conclude in a settlement.

On June 25, 2013, Claimant filed a First Amended and Supplemental

Complaint for Declaratory and Injunctive Relief, and Damages in the

Wrongful Foreclosure Action (the "First Amended Complaint"), alleging

GMACM wrongfully foreclosed on the Property because it is not a proper

party with standing to commence foreclosure. The Amended Complaint,

was attached as Exhibit 5-C to the Liu Declaration in the Opposition. The

First Amended Complaint also named Ocwen Loan Servicing, LLC

("Ocwen") as a defendant and alleged a claim for violation of the California

Fair Debt Collection Practices Act ("FDCPA") against Ocwen. In addition,

Claimant once again sought similar declaratory and injunctive relief against

GMACM as in the prior version of the complaint. Claimant further seeks

actual and statutory damages, as well as attorney fees against Ocwen (but

none against GMACM due to their BK stay). Because Claimant's claims in

the First Amended Complaint were proceeding under the Supplemental Servicing Order, once Ocwen succeeded GMACM as servicer, all of the litigation activity involving GMACM in the Wrongful Foreclosure Action has been conducted by Ocwen as successor servicer. See Liu Declaration ¶ 6. This however does not absolve GMAC from liability up to the point of the purported transfer to Ocwen which is what Claimant bases her claim on.

On August 30, 2013, Claimant served on GMACM discovery requests, including interrogatories and requests for admission. See Exhibit-5 and 5-D of the Opposition, the Liu Declaration ¶ 7;

On March 31, 2014, GMACM responded to these requests, maintaining that there were no issues with the assignment of the Deed of Trust and Substitution of Trustee documents.

On April 16, 2014, Claimant filed a Second Amended and Supplemental Complaint for Declarative and Injunctive Relief in the Wrongful Foreclosure Action (the "Second Amended Complaint"), and states the same allegations against GMACM, challenging GMACM's right to foreclose based on alleged securitization issues and a faulty assignment of the Deed of Trust. See Liu

Declaration ¶ 9; see also Second Amended Complaint, attached as Exhibit 5-F to the Liu Declaration in the Opposition. Claimant continues to allege that the assignments, based on the signatures of Jacqueline Keeley on the assignment of Deed of Trust and Substitution of Trustee, are fraudulent because according to Judge Donovan (Exhibit 5-A of the Opposition), Judge Goodman (Exhibit 5-H of the Opposition) and a handwriting expert (3-G of the Opposition), the signatures are not signed by the same person.

On May 12, 2014, GMACM objected to the Preliminary Injunction Motion. See Liu Declaration ¶ 10; see also Objection to Preliminary Injunction Motion, attached as Exhibit [5-G] to the Liu Declaration. At a hearing held on May 23, 2014, the Superior Court granted the Preliminary Injunction Motion, finding, among other things, that it appeared questionable as to whether the Jacqueline Keeley signatures did come from the same person. See Liu Declaration see also Order Granting Preliminary Injunction Motion, dated June 10, 2014, See Exhibit 5-H in the Opposition.

On May 21, 2014, GMACM filed a demurrer to the Second Amended Complaint, which is currently scheduled for a hearing on May 14, 2015.

**Proof of Claim-Related Background**

On June 4, 2012, Claimant, acting *pro se*, filed a $3,000,000 proof of claim
as a general unsecured claim against Debtor Residential Capital, LLC,
designated as Claim No. 61 (the "Claim"), citing "Mortgage litigation, fraud,
[and] unjust enrichment" as grounds for the Claim. See Exhibit 1 of the
Opposition. Claimant appended to the proof of claim form, among other
things, (i) the complaint filed in the Adversary Proceeding commenced in
Claimant Bankruptcy Case, (ii) Claimant's memorandum of points and
authorities opposing GMACM's lift stay motion, (iii) Claimant's voluntary
chapter 7 petition and the related schedules, and (iv) copies of the Note and
Deed of Trust and related documents.

On March 21, 2013, the Court entered an order [Docket No. 3294] (the
"Procedures Order") approving, among other things, certain procedures to
be applied in connection with objections to claims filed by current or former
Borrowers (the "Borrower Claims Procedures"). The Procedures Order
includes specific protections for Borrowers and sets forth a process for the
Debtors to follow before objecting to certain categories of Borrower
Claims. For example, the Borrower Claims Procedures require that, prior to
objecting to certain categories of Borrower Claims, individual Borrowers

must be furnished with a letter requesting additional documentation in
support of the purported claim (a "Request Letter"). See Procedures
Order at 4.

On May 16, 2012, the Court entered an order [Docket No. 96] appointing
Kurtzman Carson Consultants LLC ("KCC") as the notice and claims agent
in these Chapter 11 Cases. Among other things, KCC is authorized to
(a) receive, maintain, and record and otherwise administer the proofs of
claim filed in these Chapter 11 Cases and (b) maintain the official claims
register for the Debtors (the "Claims Register").

On August 29, 2012, this Court entered an order approving the Debtors'
motion to establish procedures for filing proofs of claim in the Chapter 11
Cases [Docket No. 1309] (the "Bar Date Order"). The Bar Date Order
established, among other things, (i) November 9, 2012 at 5:00 p.m.
(Prevailing Eastern Time) as the deadline to file proofs of claim by virtually
all creditors against the Debtors (the "General Bar Date") and prescribing
the form and manner for filing proofs of claim. Bar Date Order ¶¶ 2, 3. On
November 7, 2012, the Court entered an order extending the General Bar
Date to November 16, 2012 at 5:00 p.m. (Prevailing Eastern Time)

[Docket No. 2093].  categories of Borrower Claims, individual Borrowers must be furnished with a letter requesting additional documentation in support of the purported claim (a "Request Letter"). See Procedures Order at 4.

On June 21, 2013, pursuant to the Procedures Order, the Debtors mailed Claimant a Request Letter, the form of which was annexed to the Priore Declaration as Objection Exhibit 3-F of the Opposition, requesting additional information and documentation in support of the Claim. See Priore Declaration ¶ 12; See also Rosenbaum Declaration ¶ 3. The Request Letter states that the claimant must respond within 30 days with an explanation setting forth the legal and factual reasons why the claimant believes she is owed money or is entitled to other relief from the Debtors and that the claimant must provide copies of all supporting documents that she believes support the basis for the Claim. See Request Letter at 1. The Request Letter further provides that if the claimant fails to provide an explanation and the supporting documentation, the Debtors may file a formal objection to the proof(s) of claim, seeking to have the proof(s) of claim disallowed and permanently expunged. The aforementioned paragraph only allows an objection to be filed if the claimant fails to provide an explanation and

supporting documentation.

On July 9, 2013, Claimant submitted to the Debtors a detailed response

including an explanation and supporting documentation to the Request

Letter. See Priore Declaration ¶ 13; see also Response at Exhibit 3-G

annexed to the Priore Declaration. Claimant included in her response (i) her

loan payment history, (ii) the First Amended Complaint, (iii) the exhibits to

the TRO application she filed, and (iv) a forensic audit report.

On November 20, 2013, through the *Order Granting Debtors' Thirty-*

*Eighth Omnibus Objection to Claims (Wrong Debtor Borrower Claims)*

[Docket No. 5898], the Bankruptcy Court re-designated the Claim as one

against Debtor GMAC Mortgage, LLC. The Debtors' right to object to the

Claim on any and all bases was expressly preserved by this order.

On December 17, 2013 the plan was confirmed and the deadline to object to

claims deemed allowed ended as per article VIII-2 of the plan, and payment

to holders of allowed claims should have been immediately made.

### Claimant's Prior Motions Before the Court and Related Appeals

(i) *Motions Before the Court*

On March 7, 2014, Claimant filed the *Pro Se Motion by Francine Claimant for Payment of Claim #61* [Docket Nos. 6639, 6690] (the "Motion for Payment") seeking immediate payment from the Borrower Trust on account of her Claim, which Claimant asserted was an "Allowed Claim" under the Plan because the Debtors did not object to it before the Effective Date as per Article VIII-2 of the plan.

On March 26, 2014, the Court denied the Motion for Payment [Docket No. 6706].

On April 9, 2014, Claimant filed a motion for reconsideration of this order denying her request for immediate payment on her Claim [Docket No. 6774] (the "Motion for Reconsideration"). In the Motion for Reconsideration, Claimant relied not only on arguments made but ignored in the Motion for Payment and also new evidence bringing the Judge's impartiality due to his association with Judge James Peck who retired from the bench after acting as a mediator in this very case and subsequently joined the law firm of Debtors counsel.

On April 24 2014, the Court denied the Motion for Reconsideration [Docket No. 6818] (together with Docket No. 6706, the "Orders").

On April 24, 2014, Claimant filed a notice of appeal of the Orders with the United States District Court for the Southern District of New York (the "District Court") [Docket No. 6820] (the "Appeal"),

On June 2, 2014, Claimant filed her brief in support of the Appeal (Case No. 14-cv-03630-GBD, Docket No. 6) ("Appeal Brief"). See Appeal Brief, Exhibit 18 of the Opposition.

On May 23, 2014, the District Court entered a scheduling order for the Appeal setting deadlines by which Claimant and the Borrower Trust were required to submit their respective memorandum of law regarding the Appeal

On June 5, 2014, Claimant filed a motion with the District Court seeking to certify the Appeal to the Second Circuit (Case No. 14-cv-03630-GBD, Docket No. 8). See Certification Motion - Exhibit 20 of the Opposition.

On June 20, 2014, the Borrower Trust belatedly filed a brief in

opposition to Claimant's motion for direct appeal (Docket No. 10). See

Opposition to Certification Motion - Exhibit 21 of the Opposition.


On June 19, 2014, Claimant filed a motion for default judgment (Case No.

14-cv-03630-GBD, Docket No. 9), alleging that the Borrower Trust missed

its deadline to respond to the Appeal. See Motion for Default Judgment, -

Exhibit 22. Of the Opposition.


On June 27th, 2014, for some reason, without formal request the response

time for the Debtors to file their brief was changed from 6/16/2014 to

November 6, 2014. See Docket sheets Exhibit 31 page 18, 20. Of the

Opposition.


On July 3, 2014, the Borrower Trust again belatedly filed a letter in

opposition to this motion (Docket No. 15). See Letter Opposing Motion for

Default Judgment, - Exhibit 23 of the Opposition.


On July 3, 2014, Claimant filed a letter in further support of her motion for

default judgment (Docket No. 16). See Response Letter, Exhibit 24 of the
Opposition.

On July 9, 2014, the District Court entered an order denying Claimant's
motion for default judgment (the "District Court Order"), confirming that
the Borrower Trust had until November 6, 2014 to file its memorandum of
law in response to the Appeal, and denying Claimant's motion for direct
appeal to the Second Circuit because it does not meet the standards imposed
by 28 U.S.C. § 158(d)(2)(A) (Docket No. 17). The Borrower Trust
ultimately filed its memorandum of law within the allowed period under the
"modified" Scheduling Order but failed to ever file a brief.  See ResCap
Borrower Claims Trust's Memorandum of Law in Opposition to Francine
Claimant's Appeal Pursuant to Bankruptcy Rules 8001 and 8003 and 28
U.S.C. § 158(a), Case No.14-cv-3630 (GDB), Docket No. 21, - Exhibit 26
of the Opposition..

On July 23, 2014, Claimant filed an appeal of the District Court Order with
the Second Circuit, Case No. 14-2664. See Case No. 14-cv-3630 (GDB),
Docket No. 18, -  Exhibit 27 of the Opposition.

On September 4, 2014, Claimant filed her opening brief in connection with this appeal. See Opening Brief, (Exhibit 28 of the Opposition)

On November 6, 2014, Claimant filed a motion for "default judgment" with the Second Circuit, claiming the Borrower Trust failed timely to respond to her appellate brief. See Default Judgment Motion, (Exhibit 29 of the Opposition).

On November 17, 2014, the Borrower Trust filed a combined response to Claimant's motion for default judgment and a motion to dismiss the appeal. See Case No. 14-2664, Docket No. 30 (Exhibit 30 of the Opposition).

On November 20, 2014, Claimant filed an opposition to the Borrower Trust's motion to dismiss. See Case No. 14-2664, Docket No. 35, (Exhibit 31 of the Opposition).

On December 1, 2014, the Borrower Trust filed a reply in support of its motion to dismiss the appeal. Case No. 14-2664, Docket No. 38, (Exhibit 32 of the Opposition).

On December 24, 2014, Claimant filed a second motion for default
judgment in the District Court alleging that the Borrower Trust neglected to
file a reply brief as called for in either the original or modified Scheduling
Orders. See Case No. 14-cv-03630-GBD, Docket No. 23,

On December 31, 2014, Claimant filed her memorandum of law in support
Exhibit 33 of the Opposition.

On January 9, 2015, the Borrower Trust filed an opposition to this motion.
See Case No. 14-cv-03630-GBD, Docket No. 26, (Exhibit 34 of the
Opposition).

On January 15, 2015, Claimant filed a reply in support of her motion. See
Case No. 14- cv-03630-GBD, Docket No. 28, (Exhibit 35 of the
Opposition).

On January 20, 2015, Claimant filed her Memorandum of law in support
with the District Court docket 1:14-cv-03630-GBD. The case remains
pending.

## ARGUMENT

## A. DOCTRINE OF UNCLEAN HANDS

The Debtors have acted unethically and fraudulently in their quest for

wrongful foreclosure. This is evidenced at a minimum by their over-billing

and refusal to abide by the loan terms, disparity in the Keeley signatures, a

subsequent expert handwriting analysis (Exhibit 3-G of Opposition), a

forensic loan audit (Exhibit 3-G of Opposition) and findings of fraud in two

California Courts. There is extensive documentation in Claimants Proof of

Claim and included in Exhibit 3-G of the Opposition and Proof of Claim that

confirms fraud, document fabrication and over billing.  Debtors do not have

clean hands and consequently are prevented from asserting a valid

Objection. Debtors also base their opposition primarily on the declaration of

a purported "Jacqueline Keeley, whose wildly dissimilar signatures helped

establish the finding of fraud by Judge Donovan in California Bankruptcy

Court – See Exhibit 5-C page 15 of the Opposition "**I would have to

conclude that either somebody was forging signatures, or this is a

blatant example of robo-signing. I don't know which, I don't know

why, but that's what the evidence establishes.**" Judge Goodman in

California Superior Court also found fraud.- See Exhibit 5-H page 2 of the

Objection where the Judge rules "The matter having been argued and evidence having been presented to the Court by both parties, the Court finds that there is **substantial evidence that one or more documents on which defendants rely for their claims are fraudulent or contain fraudulent signatures".** It is absolutely no wonder the Keeley declaration (Exhibit 4 of the Opposition) is not signed or there would undoubtedly be a third wildly dissimilar signature, Debtors have refused to provide the contact information for Keeley – See Special Interrogatory and RESPONSE TO SPECIAL INTERROGATORY NO. 13 on page 26 of Exhibit 5-E in the Objection. Claimant has been unable to confirm Keeley's employment at Ocwen and has reason to doubt her very existence. Furthermore, handwriting expert Sheila Lowe also found the signature of Keeley to have been signed by different people – See Exhibit 3-G page 132 of the Opposition. It is also highly unlikely that any person anywhere on the planet would conclude the two Keeley signatures (See Exhibi 3-G page 136, 137 of the Opposition)t) on which much of the Debtor's objection is based were done by the same person. Furthermore a forensic loan audit (Exhibit 3-G of the Opposition) proves that even if her signature was not forged, a valid assignment still could not have been made without violating the Pool Servicing Agreement and relevant New York law. If the Judge is inclined to give any consideration to Keeley's declaration, as she states she "could and

would testify", she should be required to do exactly that and explain the disparity in her purported signatures.

GMAC's evidence should not be taken at face value and under the unclean hands doctrine it should be ignored in entirety. If the Judge does decide considering GMAC' s evidence, he should scrutinize it and the court should bear in mind, as other courts have done, problems endemic to the residential foreclosure process and <u>specific to GMAC's role</u>. See, e.g., *U.S. Bank, N.A. v. Skeleton (In re Salazar),* 448 B.R. 814 (Bankr. S.D. Cal 2011) (holding that Civil Code§ 2932.5, which requires recordation of a foreclosing encumbrancer's status before the sale, applies to deeds of trust as well as mortgages). After analyzing the statutory language and California Supreme Court authority, including *Bank of Italy N. T. &S.A. Assn. v. Bentley,* 217 Cal. 644, 656 (legal title under a deed of trust, though held by the trustee to the extent necessary to execute the trust, does not carry any "incidents of ownership of the property"), the court added: The borrower concern addressed by Civil Code section 2932.5-that it be able to identify the assignee of its loan-is more exigent, not less, than it was during the Great Depression, when *Bank of Italy* was decided. Problems with the residential mortgage foreclosure process have been widely chronicled. See Katherine Porter, Misbehavior and Mistake in Bankruptcy Mortgage Claims, 87 Tex. L.Rev. 121, 148-49 (2008), cited in *Ameriquest Mortg. Co. v. Nosek(ln re Nosek),* 609 F.3d 6, 9 (1st Cir. 2010) (noting mortgage holders and servicer's

"(c)onfussion and lack of knowledge, or perhaps sloppiness, as to their roles is

not unique in the residential mortgage industry"); Andrew J. Kazakes,

Developments in the Law: the Home Mortgage Crisis, 43 Loy. L.A. L. Rev.

1383, 1430 (2010) (citing David Streitfeld, Bank of America to Freeze

Foreclosure Cases, N.Y. Times, Oct. 2, 2010, at Bl) (explaining that after

publication of Katherine Porter's study several Banks froze foreclosures); Eric

Dash, A Paperwork Fiasco, N.Y. Times, Oct. 23, 2010, at WK5 (reporting the

repeal of the initial freeze and the problems banks faced in clearing up

foreclosure paperwork); Office of the Special Inspector General for the

Troubled Asset Relief Program, Quarterly Report to Congress 12 (Jan. 26,

2011 ), available at http://www.sigtarp.gov/ (follow link for "Quarterly Report

to Congress"). Specifically in the context of loan assignments, there are

"serious distributional consequences to all parties in a bankruptcy if a

mortgagee cannot prove it holds a valid security interest." See Porter, *supra,*

at 148-49. 10 448 B.R. at 821-822. **GMAC' s residential loan foreclosure**

**problems, in particular, have been the subject of an April 2011 Federal**

**Reserve Board Consent Order, available at**

http://www.federalreserve.gov/newsevents/press/enforcement/enf201104 l 3a3.

pdf, which requires reviews of foreclosures by independent auditors. **More**

**specifically, GMAC fraud in documenting residential loan assignments**

**has been reported**. An examination of New York court records by the

investigative journalism bureau Pro Publica found hundreds of assignment

documents that were filed in the name of Ameriquest Mortgage Company by

GMAC and other mortgage servicers years after Ameriquest had ceased to exist. In at least one incident, in June 2011, a GMAC employee reportedly proposed filling the gap left by a defunct lender by filing a false "lost assignment" affidavit. (ProPublica's report can be found at http://www.propublica.org/article/ gmac-mortgage-whistleblower-foreclosure.) And all this is on top of the widely reported disclosure that GMAC employees had been "robo-signing" thousands of affidavits in which they claimed to have reviewed loan documentation and verified that it was correct. See, e.g., David Streitfield, "GMAC Errors Leave Foreclosures in Doubt," N.Y.TIMES, Sep. 25, 2010 (describing testimony by Jeffrey Stephan, the head of GMAC's "Document Execution" unit, that he had personally signed as many as 10,000 affidavits per month), available at http://www.nytimes.com/2010/09/25/business/25mortgage.html?scp=3&sq=g mac%20jeffrey%20stephan%20foreclosure&st=Search.

There is even more evidence submitted in the Opposition that establishes beyond doubt that Debtors not only have unclean hands but that they are so filthy even  a hazmat suit wouldn't help. The Keeley signatures are a blatant example of fraudulent assignments. Debtors also purportedly assigned claimants Deed of Trust to US Bank on March 25, 2013 for "valuable consideration" but this assignment was apparently not reported to or approved by the court and claimant believes it is yet another example of fraudulent assignments.

What Ford did for the mass production of the automobile, Debtor has done for the mass production of fraudulent documentation. Under the doctrine of unclean hands neither the Debtor or anything in the Opposition has any credibility and the Objection should therefore be dismissed in entirety.

## B - THE CLAIM HAS MERIT

Debtor argues that the claim must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Claimant in her proof of claim stated mortgage litigation, fraud and unjust enrichment." The Debtors sent Claimant a Request Letter on June 21, 2013. (Exhibit 3-F of the Objection) Claimant responded on July 9, 2013 and stated "The Basis of Claim is: "Debtor received mortgage payments of approximately $300,000 that they were not entitled to receive and were only received by fraud and misrepresentation. Debtors fraudulently recorded false mortgage late payments, over-billed on a loan they had no right to service and 1hen attempted to illegally foreclose driving creditor into BK and out of business as a RE investor. Debtor bas continued to illegally foreclose and damages are being incurred on an on-going basis." The requirement for a short, plain statement was satisfied. A valid, viable and detailed proof of claim has been submitted that states a claim upon which relief can be granted and that the pleader is entitled to relief. Debtor argues that Under Rule 9(b), for

allegations involving fraud, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Claimant believes this has been established by the purported Keeley signatures, forensic loan audit, and all the evidence contained in the proof of claim including finding of Fraud by Judge Donovan. The required elements of Fed. R. Civ. P. 9(b) were all met and exceeded. Claimant was defrauded, over-billed, forced into bankruptcy and out of business as a real estate investor, all due to Debtors fraud, over-billing, refusal to abide by the loan terms and wrongful foreclosure actions. The claim has merit.


## C - THE CLAIM WAS DEEMED ALLOWED

The applicable legal standard is that a filed proof of claim is "deemed allowed, unless a party in interest objects." 11 U.S.C. § 502(a). **The party objecting to the proof of claim "bears the initial burden of providing evidence to show that the proof of claim should not be allowed."** In re MF Global Holdings, Ltd., Nos. 11-15059 (MG), 11-02790 (MG) (SIPA), 2012 WL 5499847, at * 3 (Bankr.S.D.N.Y. Nov. 13, 2012) The Debtor has completely failed to meet this burden nor can they due to their unclean hands. The extensive documentation of the litigation Debtors have included in support of their Objection only helps prove how Claimant has a valid

claim and how Debtors engaged in fraud of biblical proportions but does nothing to satisfy Debtors initial burden to provide evidence of why the claim should not be allowed.

The plan, on which any decisions must be based, states *"Allowed" means, with respect to a Claim against any Debtor, except as otherwise provided herein, (a) a Claim that is (i) listed in the Schedules as of the Effective Date as neither disputed, contingent nor un-liquidated, and for which no Proof of Claim has been timely filed, or {ii} evidenced by a valid Proof of Claim or request for payment of Administrative Claim, as applicable, Filed by the applicable Bar Date, and as to which the Debtors or other parties-in-interest have not Filed an objection to the allowance thereof by the Claims Objection Deadline, or (b) a Claim that is Allowed under tile Plan or a11)' stipulation or settlement approved by, or Final Order of, the Bankruptcy Court; provided, however, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed Claims" under the Plan, provided farther, however, any Claims expunged or disallowed under the Plan or otherwise shall not be Allowed Claims. If a Claim is Allowed only in part references to Allowed Claims include and are limited to the Allowed portion of such Claim. Notwithstanding anything to the contrary herein, no Claim that is disallowed in accordance with Bankruptcy Rule 3003 or section 502{d} of the Bankruptcy Code is Allowed and each such Claim shall be*

*expunged without further action by the Debtors and without further notice to*

*any party or action, approval, or order of the Bankruptcy Court.*

In reference to the above, section (b). Claim 61 was not solely for the purpose

of voting nor was it expunged or disallowed for any reason including under

Bankruptcy Rule 3003 or section 502(d) of the bankruptcy code. The claim

was not listed in the Schedules as of the Effective Date as either disputed,

contingent nor un-liquidated, **rather <u>it was listed as allowed and therefore</u>**

**<u>met both the plan definition and the 502(a) elements of an allowed</u>**

**<u>claim on the effective date.</u>** No further approval by the Court, Trust Judge

or any other party was required for the claim to be deemed allowed under

the rules of the plan or 11 U.S.C. § 502(a). There is no language in the plan

to support an argument that any type of further approval is needed. In any

event, Debtor's do not seem to argue that the claim is allowed but rather

that the claim is still subject to the Claims Objection Deadline. They are

mistaken because claims deemed allowed on the effective date can no

longer be objected without violating  the governing language in Article VIII

of the plan which amongst other things controls the claims objection

deadlines as will be discussed.


## D - THE CLAIM SHOULD ALREADY HAVE BEEN PAID AND THE OBJECTION VIOLATES ARTICLE VIII-2 OF THE PLAN

ARTICLE VIII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS.

**1. Applicability** <u>The provisions of this Article VIII shall govern the</u> <u>resolution of Disputed Claims to the extent not otherwise provided for in</u> <u>this Plan or in any other trust agreement</u> (such as the RMBS Claims Trust Agreement, the Private Securities Claims Trust Agreement or the Borrower Claims Trust Agreement) or plan of allocation (such as the RMBS Trust Allocation Protocol) approved under this Plan. To the extent the provisions of any such trust agreement or plan of allocation address specifically matters set forth in this Article VIII, the provision of such trust agreement or plan of allocation shall govern.

**2. Allowance of Claims** "*On or after the Effective Date, the Liquidating Trust shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, **<u>except with respect to any Claim deemed Allowed as of the Effective Date</u>** or (ii) waived, relinquished, exculpated, released, compromised, settled. or Allowed in the Plan or in a Final Order. Except as otherwise provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, including fhe Confirmation Order, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed (a<u>) under the Plan or the Bankruptcy Code or (b) by Final Order of the Bankruptcy Court, including the Confirmation Order.</u>*

The above paragraph makes it very clear that the claims objection deadline

applies to any claim EXCEPT WITH RESPECT TO CLAIMS DEEMED ALLOWED ON THE EFFECTIVE DATE (like claim 61).

**ARTI CLE VIII governs in the event of a dispute** and states, "The provisions of this Article VIII shall govern the resolution of Disputed Claims to the extent not otherwise provided for in this Plan or in any other trust agreement." The plan also states "*(a) As soon as practicable following the Effective Date. The Borrower Claims Trust shall make a Borrower Claims Payment to each holder of a Borrower Claim that is Allowed as of the Effective Date.* " *(b) Each holder of a Borrower Claim that was not Allowed as of the Effective Date and that is subsequently Allowed, in whole or in part, shall receive from the Disputed Claims Reserve a Borrower Claims Payment in respect of such Claim following the date such Claim becomes Allowed. Such Borrower Claims Payments shall be made at such time and from time to time as determined by the Trust Committee, provided that a Borrower Claims Payment shall be made no later than ninety (90 days following date on which the respective Borrower Claim becomes Allowed* "

Although Article VIII is mentioned no less than 44 times in the Opposition, Claimants arguments as to the relevance of Article VIII have never been addressed but should be especially as it contains the **controlling language** of the plan. For these reasons the claim was deemed allowed on the effective

date – No further approval was required by the Trust, Court, Judge or any

other party nor is there language anywhere in the plan to support an

argument that additional approval would be required. Furthermore Rule

3020(e), states "after a plan is confirmed, distribution shall be made to

creditors whose claims have been allowed, to interest holders whose interests

have not been disallowed, and to indenture trustees who have filed claims

under Rule 3003(c)(5) that have been allowed. For purposes of this rule,

creditors include holders of bonds, debentures, notes, and other debt

securities, and interest holders include the holders of stock and other equity

securities, of record at the time of commencement of distribution, unless a

different time is fixed by the plan or the order confirming the plan" Finally

also see  in the plan **Article III-F Distributions on Account of Allowed**

**Claims and Interests.** "Except as otherwise provided in this Plan, on the

Effective Date or as soon as practicable thereafter (or if a Claim is not an

Allowed Claim on the Effective Date, on the date that such a Claim becomes

an Allowed Claim, or as soon as reasonably practicable thereafter), each

holder of an Allowed Claim against the Debtors shall receive the

distributions that this Plan provides for Allowed Claims in the applicable

Class from either the Liquidating Trust, RMBS Claims Trust, Borrower

Claims Trust, or Private Securities Claims Trust, as applicable and as set

forth below. Distributions on account of Disputed Claims of Liquidating

Trust Unit Beneficiaries that become Allowed shall be made from the

Disputed Claims Reserve pursuant to the Plan. Except as otherwise

provided herein, holders of Claims shall not be entitled to interest, dividends,

or accruals on the distributions regardless of whether such distributions are

delivered on or at any time after the Effective Date."

**In accordance with aforementioned applicable rules, laws and the**

**voted on and confirmed plan rules, the claim was an allowed claim on**

**the effective date, can no longer be objected to and quite clearly should**

**have already been paid.**


## E - THE CLAIMS OBJECTION DEADLINE DOES NOT APPLY.

The claims objection deadline cannot apply to claims that were allowed on the

effective date without violating the controlling language of Article VIII-2. The

deadline can only apply to claims that as of the effective date were listed on

the schedules as either disputed, contingent or un0liquidated. As of the

effective date claim 61 was on the allowed list and as discussed it is now too

late to object without violating the **controlling language** of Article VIII -2.

Debtor has missed the relevant claims objection deadline for claims. that were

"deemed" allowed on the effective date. As discussed the claim met the plan

definition of an allowed claim and was deemed allowed on the effective date,

there is no requirement for additional approval by the Court or the Trust. –

See Article VIII -  6. Deadline to File Claims Objections "Any objections to

Claims shall be filed by no later than the applicable claims objection

deadline" This language confirms the existence of different deadlines. The
applicable deadline for claims deemed allowed on the effective date was the
effective date. The claims objection deadline is now only applicable to
claims that were timely disputed, un-liquidated or contingent claims. The
objection deadline clearly does not and cannot apply to allowed claims
without violating the controlling language in ARTICLE VIII. The Objection
therefore has no merit and is in breach of the settlement agreement.

## F - THE RESPONSE TO THE REQUEST LETTER MORE THAN SATISFIES AND EXCEEDS ANY REASONABLE STANDARD FOR PROOF OF CLAIM

The Debtors sent Claimant a Request Letter on June 21, 2013. (Exhibit 3-F
of the Objection) Claimant responded on July 9, 2013 and stated "The Basis
of Claim is: "Debtor received mortgage payments of approximately
$300,000 that they were not entitled to receive and were only received by
fraud and misrepresentation. Debtors fraudulently recorded false mortgage
late payments, over-billed on a loan they had no right to service and 1hen
attempted to illegally foreclose driving creditor into BK and out of business as
a RE investor. Debtor bas continued to illegally foreclose and damages are
being incurred on an on-going basis."

Claimant also submitted substantial documentation in her proof of claim

(Exhibit 3-G of Opposition) This documentation included the payment
history, first amended complaint (which includes the finding of fraud by Judge
Donovan), forensic loan audit, payment history, memorandum of points and
authorities in support of application for order to show cause re preliminary
injunction, declaration of Marcus Silver in support of application for order to
show cause re preliminary injunction, the note, deed of trust, a letter from
GMAC giving false information, inconsistencies and absences with MERS
reporting, a letter from claimant to GMAC regarding the over-billing, the
proposed preliminary injunction, expert testimony from a handwriting expert
confirming the Keeeley signatures were done by different people , the notice
of default, notice of trustee sale,  declaration of Ehud Gersten in support of
application for order to show cause re: preliminary injunction, and a  transcript
of proceedings before the Honorable Thomas B. Donovan United States
Bankruptcy Judge in which the Judge found fraud. (for the complete
transcript see EXHIBIT 5-A page 9 of the Opposition).

The response more than satisfies and exceeds any possible reasonable
standards for proof of claim. It lays out a very detailed explanation setting
forth the legal and factual reasons why the claimant believes she is owed
money. It more than satisfies 502(b) of the Bankruptcy Code by stating a
valid basis for liability against the Debtors under applicable law.

The Request Letter provides that **if** the claimant fails to provide an explanation and the supporting documentation, the Debtors **may** file a formal objection to the proof(s) of claim, seeking to have the proof(s) of claim disallowed and permanently expunged. Had Claimant failed to respond within 30 days the Debtors **may** have been able to file an objection if they desired but as Claimant responded in detail within 30 days on July 9, 2014 Debtors **may not** object. They also may not object because of the unclean hands doctrine, their arguments lack merit, Article VIII, and at a minimum nothing related to the purported Keeley signatures can be believed.

## G - CLAIMANTS ARGUMENTS WERE CONCEDED TO BY DEBTORS FAILURE TO RESPOND TO THE MOTION FOR PAYMENT.

Claimant filed a motion for payment with this Court [Docket Nos. 6639, 6690] This motion contained many of the arguments raised in this response including the definition of an allowed claim and relevance of Article-VIII. Debtors decided not to respond and although the Court denied the motion, Debtors failure to respond is regarded as their conceding to the arguments and these arguments can no longer be re-visited. It is well established that a failure to respond to a motion is usually viewed as consenting to it and **also a waiver of future defenses** See Local Civil Rule 55.2 and Federal Rule of

Civil Procedure 12 –The failure to file an answer or respond within the time specified in this rule shall constitute a waiver of the right thereafter to file an answer or respond, except upon a showing of excusable neglect. Due to defendants failure to respond as the law requires, a default judgment will be entered against defendant. The failure to respond or responding late, not based upon excusable neglect, is a waiver by defendant and is a fatal defect in their defense and judgment will be granted to Plaintiffs as a matter of law. Local Rule 15(k) Middle District of North Carolina holds: The failure to file a brief or response within the time specified in this rule shall constitute a waiver of the right thereafter to file such brief or response, except upon a showing of excusable neglect. Further, "if a respondent fails to file a response within the time required by this rule, the Motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice". In Cabassa v. Smith et al, 9:08cv480, it was stated "to clearly advise pro se litigants of their obligations in responding to such motion and the result of their failure to do so. Id.; see N.D.N.Y.L.R. 56.2. Thus, it is clear that plaintiff was sufficiently apprised ... ... 7.1(b)(3), which provides that, absent a showing of good cause, failure to respond to a m otion shall be deemed consent to the relief ... Also *See* J.P.M.L. Rules of Procedure 6.1(c) ("Failure to respond to a motion shall be treated as that

party's acquiescence to it."). Again in Case 9:03-cv-01256-LES-GJD

Document 69 Filed 12/09/2005 "Failure to respond to Defendants' motion

may result in the court granting the motion, in which there will not be a trial.

See N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed

and the court determines that the moving party has met its burden

demonstrating entitlement to the relief requested therein, failure by the non-

moving party to file or serve any papers as required by this Rule shall be

deemed by the court as consent to the granting or denial of the motion, as the

case my be, unless good cause is shown.").Dated: Albany, New York

December 8, 2005 ELIOT SPITZER Attorney General of the State of New

York. It is well-settled that a non-movant's failure to respond to a motion, as

mandated by Local Rule 56.1(b), permits the court to admit any material fact

listed in Plaintiffs' Rule 56.1 Statement "unless specifically controverted by

a correspondingly numbered paragraph in the statement required to be

served by the opposing party." *O'Keefe v. Arbon Equip. Corp.*, 399 F. Supp.

2d 478, 482 (S.D.N.Y. 2005) quoting Local Rule 56.1(c). The Federal Rules

of Civil Procedure TITLE VII. Rule 55. states "When a party against whom

a judgment for affirmative relief is sought has failed to plead or otherwise

defend, and that failure is shown by affidavit or otherwise, the clerk must

enter the party's default. Under FED. R. CIV. P. 12(h)(1)(B) (a party waives

certain defenses, by "failing to either: (i) make it by motion under this rule; or (ii) include it in a responsive pleading").

**It is now too late for Debtors to argue points conceded to by their failure to respond. The claim is deemed allowed and can no longer be objected to under Article VIII-2, 6 of the plan.**

## H - QUIET TITLE AND WRONGFUL FORECLOSURE IS NOT AN ISSUE FOR THIS COURT

Debtor attacks Claimant's quiet title action on several fronts but this is not an issue for this court to determine as there is pending litigation in California. Claimant only requests from this Court payment of her allowed claim for damages as a result of mortgage litigation, fraud and unjust enrichment. Even if only for the purpose of enlightening the Court about the Debtors fraudulent business practices, Claimant will still address Debtor's misguided and off-point arguments about the purported assignments and Pool Trust Agreement (PSA) Debtor argues, citing California cases such as *Gomes v. Countrywide Home Loans, Inc.*, 192 Cal.App.4th 1149 (2011), in which the court held that the plaintiff had no right to question the legal authority of the foreclosing entity in a non-judicial foreclosure. Although defendants such as GMAC cite *Gomes* as the Holy Grail for concealment of foreclosure malfeasance, the scope of that ruling is now being questioned. Some courts have realized that a

broad reading of *Gomes* creates nothing less than a "get out of jail free card" for fraud. *Frazier v. Aegis Wholesale Corp.*, 2011 U.S. Dist. LEXIS 145210 (N.D. Cal.) held that, although *Gomes* seemed to support the defendant, *Gomes* did not create a complete shield to judicial review: The holding in *Gomes* may not be so sweeping. Simply because the California legislature set up a non judicial foreclosure process does not mean that that process is entirely immunized from judicial review, *particularly where the claim is that the foreclosing party has no authority to foreclose in the first instance*. Thus, *Gomes* itself seems to leave open the possibility that, under certain circumstances, a plaintiff may bring a claim for lack of authority to foreclose—i.e., where the plaintiff has identified in his or her complaint "a specific factual basis for alleging that the foreclosure was not initiated by the correct party." or is based on fraudulent transfers or forged signatures..

Not only is *Gomes* distinguishable on its facts, the *Gomes* court actually suggested that a cause of action for wrongful foreclosure might survive if "the plaintiff's complaint identified a *specific factual basis* for alleging that the foreclosure was not initiated by the correct party." In this case, claimants have alleged just such a specific factual basis including the purported Keeley signatures – See handwriting analysis Exhibit 3-G of the Opposition.

For some reason Debtor argues about the assignment of the deed of trust and purported assignments made by the purported Keeley but these

arguments are off point and not relevant in the matter at hand. Furthermore the assignments were already found to be fraudulent by two Judges in California and as acknowledged in the Opposition. Also off point is the argument about the trust Pool Service Agreement. Claimant does not seek to litigate regarding the PSA but simply points out that even if the Keeley signatures were by the same person, which obviously they were not, the trust was closed and there could be no valid assignment without violating the laws regarding the Trust See Gersten Declaration Exhibit 3-G of opposition "A typical securitization proceeds as follows. First, the lender, or "originator," sells the loan to a sponsor, typically an investment bank. The sponsor aggregates the loans it buys into pools and transfers them to an intermediary called a depositor. The depositor creates a "special purpose vehicle," a trust, also known as a Real Estate Mortgage Investment Conduit ("REMIC"), which exists only to make the loan part of a security pool. The trust issues certificates representing shares of the pool. The pool has a cutoff date, by which time all loans to be included in the pool must have been identified, and a closing date, by which time all the assets in the pool (the promissory notes and their security interests in recordable form) must have been transferred to the trust. The sponsor, serving as an underwriter, divides the pool into tranches according to the perceived credit risk of the loans in each tranche, prices the certificates accordingly, and sells them to investors. The sponsor also contracts with an entity that services the individual loans,

aggregating loan payments and performing other duties under the "Pooling

and Servicing Agreement." Subject to governing law, the Pooling and

Servicing Agreement sets the terms of the trust. The servicer remits

payments to the trustee for the trust, which remits net revenues to the

investors. Thus title to individual loans vests in the trust. Based on the findings

of a securitization audit by the firm Certified Forensic Loan Auditors, LLC,

plaintiff is informed and believes that her loan became, through securitization,

an asset of Greenpoint Mortgage Funding Trust 2006-AR7 (the "Trust"); that

the trustee for the Trust was U.S. Banlc, N .A.; that the Trust was formed and

to be governed by the laws of the State of New York; and tha1 the Trust's

closing date was November 30, 2006. Plaintiff is informed and believes that at

**no time did U.S. Bank have any power to transfer plaintiff's loan, and**

**that any transfer after the closing date would have been null and void**

**as a violation of both the Pooling and Service Agreement and New**

**York law..** Nevertheless, based on a creditor's claim As part of my

investigation foe this case, I caused a securitization audit of plaintiff's loan by

the firm Certified Forensic Loan Auditors, LLC ("CFLA") .The audit showed

that the loan became, through securitization, an asset of Greenpoint Mortgage

Funding Trust 2006-AR7 (the "Trust"); that the trust was formed under a

"Pooling and Service Agreement ('PSA')"; that the trustee was US Bank,

N.A.; that the Trust was formed under and to be governed by the laws of the

State of New York; and that the Trust's closing date was November 30, 2006.

A copy of the CFLA audit is attached as Exhibit A to this declaration." Also

see the Forensic Loan Audit confirming the Gersten Declaration – Exhibit 5-B page 61 of the Opposition.

Claimant also believes the purported March 25, 2013 assignment of Claimants Deed of Trust – Exhibit 3-E of the Opposition, was also fraudulent because Debtors lacked both authority and possession of the Deed of Trust and also because it was apparently not authorized by or reported to the Court, the Court should clarify.

There is pending litigation in California that will determine Claimants right to quiet title but again the Debtor arguments are not relevant in the case at hand other than to note that if as Debtor argues, that under California Law claimant has no standing to challenge a non judicial foreclosure, then she may well lose her home and the only party she can recover from is the Debtor and it is they who defrauded her in the first place so her claim should therefore be honored and paid in full immediately.

## I - DEBTOR NEVER OWNED THE SERVICING RIGHTS AND LACKED AUTHORITY TO MAKE ASSIGNMENTS OR COLLECT PAYMENTS.

Even if the Keeley signatures were not signed by different people, the

assignment could never have happened without violating the Pool Trust agreement (PSA) – See the first amended and supplemental complaint and declaration by Ehud Gersten in the response to the request letter - Exhibit 3-G of the Opposition:

> "Plaintiff is informed and believes that GMAC did not in fact own the servicing rights Ocwen purportedly acquired On or about February 16,2013, Ocwen sent plaintiff a letter stating that it was attempting to collect the subject debt on behalf of Aurora Loan Services, LLC, "which currently owns the interest in your account." By means of a document dated March 25, 2013, titled "Assignment of Deed of Trust," and executed by a person signing as "Keli D. Smith, Authorized Officer", GMAC purported to transfer all beneficial interest in the Deed of Trust to "U.S. Bank National Association, as Trustee for Greenpoint Mortgage Funding Trust Mortgage Pass- Through Certifiicates, Series 2006-AR7. On or about April 9, 2013, Ocwen sent plaintiff a letter stating that "[d]ue to a computer programming error, the creditor for the referenced account was possibly misidentified. As part of our error correcting procedures, we are writing to inform you that the creditor to whom the debt is owed is U.S. Bank, [N.A.], as Trustee [etc.]." There is evidence that "Jacqueline Keeley," if she existed at all, purported to be both an officer of MERS and an officer of GMAC. If so, it would appear that GMAC derived no interest in the loan from MERS (acting on behalf of a principal it did not know) but was in reality simply assigning the loan to

itself. Further, there is evidence that the loan was securitized and was owned by US Bank as trustee on behalf of investors in a pool of securitized loans. The purported assignment to GMAC occurred long after the closing date of the mortgage-backed security pool, "giving rise to a plausible inference that at least some part of the recorded assignment was fabricated." *Vogan* v. *Wells Fargo Banc, N.A.* (E.D.Cal.) 2011 US Dist LEXIS 132944 at *17. See also *Johnson* v. *HSBC Bank USA* (S.D. Cal.) 2012 US Dist LEXIS 36798. In *Vogan, supra,* the plaintiff, facing foreclosure, sought a declaratory judgment to determine who owned his mortgage loan. Wells Fargo Bank, the original lender, claimed that it had sold the loan to US Bank as Trustee for a mortgage-backed securitization trust, and had recorded the assignment of the deed of trust, in 2011. But the plaintiff alleged that the securitzation trust had a closing date in 2005, after which, under the terms of the Pooling and Service Agreement ("PSA"), no more property could be transferred to it According to the plaintiff, the purported assignment had been fabricated to deceive him as to his creditor's actual identity. Based on these allegations, the court denied Wells Fargo's motion to dismiss the complaint. *Id*. at *20-21. Similarly in *Johnson, supra,* the plaintiff sought a declaratory judgment as to who owned his loan. The original lender was Fremont Investment & Loan. MERS was the nominee beneficiary. In 2008, HSBC, as trustee for a mortgage-backed securitization trust, recorded a purported assignment from MERS. The plaintiff alleged, however, that the document was

fraudulent, in part because it was executed after the closing date of the trust. The plaintiff also alleged that the MERS board of directors had not authorized the purported MERS officer who executed the document to make such assignments, and that thousands of property record documents had been signed without any authority. *Id,* 2012 US Dist LEXIS 36798, pp. *7-*8. The court held that these allegations stated a viable claim for declaratory relief. *Id*. at 11. Here too, as in *Vogan* and *Johnson*, plaintiff alleges that the purported assignment of her loan that had apparently been securitized was fraudulent, and she bases this claim in part on the fact that the assignment was executed long after the closing date for the trust, violating the PSA. Here, however, plaintiff does not claim that a purported assignment to a trust was fraudulent, but rather the opposite: that a purported assignment from an unknown successor mortgagee, by way of MERS, was fraudulent and did not in fact occur. **If her loan was securiitized, as it appears to have been, a sale or transfer to another entity (to GMAC, or a predecessor) would have violated the PSA and therefore would have been invalid A potential assignee who checked the chain of title would have known that the PSA would bar the assignment, and so would not have given value for it. Thus the fact that the purported assignment to GMAC was not made until well after the trust closed supports an inference that the assignment was fraudulent and never occurred.**

The inference that tile recorded assignment is fraudulent is further

supported by other facts noted above. MERS apparently had no record

of the loan's ownership until long after the loan was made and it became

the nominee beneficiary. The purported MERS officer who signed the

assignment was apparently also a GMAC officer, which meant that

GMAC executed tile assignment to itself. <u>And the purported signatures</u>

<u>on tbe assignment and tile substitution of trustee were either outright</u>

<u>forgeries or robo-signed by persons without knowledge of any</u>

<u>assignment</u>. If the purported assignment is fraudulent, as these several

pieces of evidence suggest, then **<u>GMAC is a stranger to plaintiff's</u>**

**<u>loan and has no right to substitute a trustee or to order a</u>**

**<u>foreclosure.</u>".**

The Gersten Declaration (Exhibit 3-G of the Opposition):

I Ehud Gersten, declare: I am an active member of the California State

Bar and am the attorney of record for Francine Silver, the plaintiff in this

case and the movant in this proceeding. On January 31, 2012, I caused a

search to be made in the Secretary of State's business search databases

under the name "Nationwide Lending Group" ("Nationwide"). The

results showed that a corporation called "Nationwide Mortgage Lending

Group" forfeited its corporate license on May 31, 2007. The search found

no other entity with a name so closely similar to Nationwide's, and no

other entity with a similar name that had an active license after 2006.

From this search, I infer that Nationwide went out of business in 2007.
Plaintiff believes that Nationwide sold or resold her loan into the
secondary mortgage market in a series of transactions known as
"securitization." In recent years, securitization has greatly expanded the
oapital available fur residential mortgage loans and  has become the most
common source of capital to fund the loans. As part of my investigation
for this case, I caused a secudtization audit of plaintiffs loan 'by the firm
Certified Forensic Loan Auditors, LLC ("CFLA"). The audit showed that
the loan became, through securitization, an asset of Greenpolnt Mortgage
Funding Trust 2006..:AR? (the "Trust"); that the trust was formed under
a "Pooling and Service Agreement ('P.SA')"; that the trustee was US
.Bank, N.A.; that the Trust was formed under and to be governed by the
laws of the State of New York; and that the Trust's closing date was
November 30, 2006. A copy of the CFLA audit is attached as Exhibit A
to this declaration, Under the terms of the Pooling and Service
Agreement, US Bank, N.A., would have had no power to transfer a loan
after the Trust's closing date.GMAC's claim to the beneficial interest in
plaintiff's loan is based on MERS's purported assignment by MERS on
July 5, 201 l. On or about December 1, 2011, I submitted scanned copies
of two documents in this case to Sheila Lowe, a qualified handwriting
analyst, for a comparison of signatures. One document, dated July 5,
2011, is the "Assignment of Deed of Trust" from Mortgage Electronic
Registration System ("MERS") to GMAC Mortgage, LLC ("GMAC")

and bears the signature of "Jacquellne Keeley," Assistant Secretary for

Mortgage Electronic Registration Systems, Inc. The other document,

dated July 6, 2011, is a Substitution of Trustee and bears the signature

"Jacqueline Keeley", Authorized Officer of GMAC ·Mortgage, LLC. MS.

Lowe concluded that the two signatures were probably written by two

different people. A copy of MS. Lowe's report is attached as Exhibit B to

this declaration. Plaintiffs petition for bankruptcy protection triggered an

automatic ·stay of the foreclosure sale that had been scheduled for

November 21, 2011. GMAC moved for relief from the automatic stay on

the ground that its alleged interest in the property was not adequately

protected. The bankruptcy court denied the motion on the ground that

GMAC had failed to prove its interest in the property. Specifically, the

court found that "Jacqueline Keeley's" two signatures had not been

written by the same person, and that "either someone is forging

signatures or this is a blatant example of robo-signing." GMAC fraud in

documenting residential loan assignments has been reported. An

examination of New York court records by the investigative journalism

bureau ProPublica found hundreds of assignment documents that were

filed in the name of Ameriquest Mortgage Company by GMAC and

other mortgage servicers years after Ameriquest had ceased to exist. In at

least one incident, in June 2011, a GMAC employee reportedly proposed

filling the gap left by a defunct lender by filing a false "lost assignment"

affidavit. (ProPublica's report can be found at

<http://www.propublica.org/article/gmac~ mortgage-whistleblower-foreclosure. In late 2011, Phil Ting, Assessor-Recorder of the City and Cmmty of San Francisco, retained Aequitas Compliance Solutions, Inc., a mortgage regulatory compliance and consulting~ to review 382 residential loan transactions that resulted in foreclosure sales during the period from January 2009 through October 2011. The loans that were reviewed were about 16% of all the loans that resulted in foreclosure sales. Phil Ting published the Aequitas report in February 2012. Among the findings: In 23% of the loans, the foreclosure documents filed at the county recorder's office contradict the :findings of a securitization audit as to who is the true, current owner of the loan. Report, p. 6. In 45% of the loans, the property was sold to an entity purporting to be the beneficiary of the deed of trust when that entity was not the original beneficiary and either 91) no assignment of a beneficial interest in the loan was *ever* recorded, or (2) such an assignment was recorded only *after* the sale. *Id.,* p. 12.. The MERS database identified an investor in 192 loans. In 58% of those loans, the investor in the MERS database was not the foreclosing beneficiary as named in the trustee's deed upon sale. *Id.,* p. 13. 20. Plaintiff is informed and believes that, when MERS purported to assign the deed of trust and promissory note to GMAC, MERS lacked reliable information to determine who then owned the beneficial interest in the loan.. Plaintiff is further informed and believes that MERS was not specifically authorized by the then-current beneficiary of the deed of 1rust

to assign the deed of trust and promissory note to GMAC. Plaintiff is
further informed and believes that GMAC is not the current owner of the
beneficial interest in her loan.

The above mentioned facts, declarations, laws and events establish that
debtor never owned the servicing rights and lacked authority to make
assignments including the apparently unreported, purported March 25th,
2013 assignment of Claimants Deed of Trust to US Bank. Exhibit.

## J - MORTGAGE LITIGATION

At 1,579 pages, the lengthy opposition does nothing to help Debtors
establish a valid objection but it does help document what claimant has been
forced to endure and establish Claimants claim for mortgage litigation. As
the Objection documents, Claimant has been forced to endure extensive
litigation to save her home from wrongful foreclosure and due to Debtors
fraudulent assignments, Claimant continues having to litigate.

Not only has Claimant been forced into bankruptcy and litigation to stop an
illegal foreclosure, she cant' get a clear answer as to whether she was
under surveillance by Debtors – See Exhibit 5-E Page 10 of the Opposition.
Claimant has endured repeated, severe computer hacking which may or

may not be linked to Debtors but occurred at coincidental timing of being served by email. Claimant has also endured shifting goal posts in her litigation with regard to Court Docket deadline response times being changed See Exhibit 31 pages 18,20 of the Opposition. These are all factors that lead increased litigation and to severe emotional distress, which to date, she has not sought relief from stay for damages. Claimant has avoided significant litigation for most of her almost 90 years and wants to enjoy her golden years without the headache of litigation but she feels she suffered significant damages and is determined to have her allowed claim to be paid as per the voted upon, agreed and confirmed plan. Apparently the Debtors feel they can act with impunity not only in regards to violating the loan terms, over-billing and "robo-signing" but also with regard to violating the settlement plan rules. Claimant has established her claim for mortgage litigation and will continue litigating until she gets justice and her claim is paid.


## K - UNJUST ENRICHMENT

The elements of a cause of action for unjust enrichment are: the enrichment of the party accused of unjust enrichment; that such enrichment was at the expense of the party seeking restitution; and the circumstances were such

that in equity and good conscience restitution should be made. Claimant claims unjust enrichment because when she first acquired her home that the loan is tied to, the home was uninhabitable and needed a major remodeling. Between the remodeling, her initial down payment to purchase the home, carrying costs and $300,000 in mortgage payments she made but that were fraudulently obtained by Debtors, Claimant has invested at least $750,000 and her life savings into a home that if Debtors arguments are correct she will lose in pending litigation as a result of their fraudulent assignments and her lack of standing to challenge. What is unjust is that GMAC misrepresented itself and the loan terms in order to obtain $300,000 in mortgage payments it turns out they had no right to collect in the first place. They have also purportedly assigned the Claimants Deed of Trust to US Bank for unknown "valuable consideration" in an apparently unreported and unapproved sale. Claimant argues that Debtor keeping $300,000 in fraudulently obtained mortgage payments plus the valuable consideration they received from the purported transfer of the Deed of Trust and servicing rights constitutes unjust enrichment. Whether or not there was unjust enrichment is moot because fraud and mortgage litigation have clearly been established and as already discussed the claim was an allowed claim, can no longer be objected to and should have already been paid.

## L - CLAIMANT PROVED FRAUD IN THE DOCUMENTS

Debtor argues that Claimant has not demonstrated that there was materially inaccurate information contained in the documents. Perhaps they should review again, especially the forensic loan audit, purported Keeley signatures, the first amended complaint and related exhibits as well as the findings of fraud in two California Courts. Debtors argument is devoid of merit.

## M - CLAIMANT DOES NOT SEEK NON-MONETARY DAMAGES

Debtor argues that "As GMACM no longer services Claimant's loan, GMACM is unable to provide non-monetary relief to the claimant." Claimant is not seeking non-monetary damages in this court, she is simply seeking payment of her allowed claim from this Court and as per the terms of the confirmed, effective settlement plan.

## N - CLAIMANT SUFFERED MONETARY DAMAGES

Claimant does not dispute the fact that she refinanced her home with the loan obtained from Nationwide and that she has an obligation to repay it but as already discussed Debtor was not the correct party to have collected $300,000 in mortgage payments on a loan they were a stranger to. Claimant is not looking for a financial windfall but has suffered serious financial

losses that exceed the loan amount and are entirely due to the Debtors

unrelenting fraudulent business practices. Claimant was forced into

bankruptcy due to GMAC's intentional, on-going refusal to correct the

billing mistakes or abide by the terms of the loan agreement, they had no

right to service in the first place Furthermore her ability to continue earning

her livelihood as a real estate investor was and remains decimated because

her credit and reputation have been destroyed. The nexus between having

ones credit destroyed and the consequential economic damage should not be

hard to fathom for anyone, least of all a financial institution or Bankruptcy

Court. Based, amongst other things, on the lucrative investment

opportunities Claimant missed out on, fraud, over-billing, litigation expenses,

the decimation of her credit and livelihood and the fact that she may still

lose her home to wrongful foreclosure, the claim seems reasonable and was

arrived at as a good faith estimate of what would be an appropriate amount

to put her back in a similar financial position as she could have expected to

be in had she not been defrauded.  Although the exact amount of damages

may be hard to quantify, it is moot because for the numerous reasons

already discussed it is also to late to object to the claim, alter or modify the

claim or claim amount. Claimant suffered the most serious financial

catastrophe anyone could face – She was driven into bankruptcy as a direct

result of Debtor's fraudulent over-billing. Claimant has suffered excessive damages including loss of livelihood, that are on-going as the claim remains unpaid. The claim should be paid in full immediately.

## CONCLUSSION

The plan states 5 "**Order Binding on All Parties.** Subject to Article X.A of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062 or otherwise, <u>upon the occurrence of the Effective Date, the terms of the Plan and this Order shall be immediately effective and enforceable and deemed binding upon, and inure to the benefit of: (a) the Debtors; (b) the Plan Trusts; (c) any and all holders of Claims or Equity Interests</u>"

The plan also states in the Borrower Claims Trust Agreement "On or before the Effective Date, the Borrower Claims Trust Agreement, in a form reasonably acceptable to the Plan Proponents, Ally and the Kessler Class Claimants, shall be executed, and all other necessary steps shall be taken to establish the Borrower Claims Trust and the interests therein, which shall be for the benefit of the holders of Allowed Borrower Claims. <u>In the event of any conflict between the terms of the Plan with respect to the Borrower Claims Trust and the terms of the Borrower Claims Trust Agreement, the</u>

<u>Borrower Claims Trust Agreement shall govern"</u>.


The Debtors should be aware of and act in accordance with what they agreed to in the plan as it was negotiated in good faith, voted on and confirmed making it too late to renege. See Implementation of the Plan section Z. page 18 of the order confirming the second amended joint chapter 11 plan: "*All documents and agreements necessary to implement the Plan, including, but not limited to, the Plan Documents, are essential elements of the Plan and consummation of each agreement is in the best interests of the Debtors, the Estates and holders of Claims. <u>The Debtors have exercised reasonable business judgment in determining to enter into the Plan Documents, and each of the Plan Documents have been negotiated in good faith, at arm's length, are fair and reasonable, and shall, upon execution and upon the occurrence of the Effective Date, constitute legal, valid, binding, enforceable, and authorized obligations of the respective parties thereto and will be enforceable in accordance with their terms</u>*

Also, in section YY. **Objections.** *All parties have had a full and fair opportunity to litigate all issues raised in the objections (excluding any <u>timely filed</u> objections that relate solely to the assumption of any executory contract), or which might have been raised, and the objections (excluding*

any *timely filed objections* that relate solely to the assumption of any

executory contract) have been fully and fairly litigated.

Debtors correctly argue in their Opposition "When parties have an actual

contract covering a subject, a court cannot – not even under the guise of

equity jurisprudence – substitute the court's own concepts of fairness

regarding that subject in place of the parties' own contract." Hedging

Concepts, Inc. v. First Alliance Mortg. Co., 49 Cal. Rptr. 2d 191, 198 (Cal.

Ct. App. 1996).

The confirmed plan created a legally binding contract and all the rules of the

plan should be enforced, especially the controlling language in Article VIII.

Claimant respectfully concludes that the Objection is baseless, devoid of merit,

in violation of Article VIII, over a year too late and based heavily on blatantly

fraudulent documentation making it void under the Doctrine of Unclean

Hands. In conformity with the relevant rules, laws and controlling language of

the plan the claim can't be objected to and should already have been paid.

Claimant is suffering on-going damages while Debtors remain in breach of the

settlement agreement. Claimant respectfully requests for the Objection to be

denied and for her allowed claim to be paid in full immediately.


Respectfully,

Francine Silver