**Response Date and Time:  March 13, 2015**

MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
Todd M. Goren
Jamie A. Levitt
Jonathan C. Rothberg
Meryl L. Rothchild

*Counsel to The ResCap Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |

---------------------------------------------------------------

**THE RESCAP LIQUIDATING TRUST'S OBJECTION TO OCWEN LOAN
SERVICING, LLC'S REQUEST FOR PAYMENT ON
ADMINISTRATIVE EXPENSE CLAIMS**

# TABLE OF CONTENTS

RELIEF REQUESTED ...................................................................................................1

PRELIMINARY STATEMENT ......................................................................................2

JURISDICTION ..............................................................................................................3

BACKGROUND ..............................................................................................................3

BASIS FOR RELIEF ......................................................................................................8

    I.     ARGUMENT .........................................................................................8

        A.     General Arguments..........................................................................8

        B.     Ocwen's Claims Asserted Under the APA Lack Merit...........................12

        C.     Ocwen's Reimbursement Claims  Under Paragraph 35 of the Sale Order Lack Merit ...................................................................................24

    II.    ADDITIONAL DEFENSES AND RESERVATION OF RIGHTS....................26

        A.     The Liquidating Trust Has a Right to Assert the Defense of Recoupment.....................................................................................26

        B.     Reservation of Rights .........................................................................28

NOTICE ........................................................................................................................29

CONCLUSION .............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ASM Capital, LP v. Ames Dep't Stores, Inc. (In re Ames Dept. Stores, Inc.),*
    582 F.3d 422 (2d Cir. 2009) ................................................................................. 8

*Bull v. United States,*
    295 U.S. 247 (1935) ............................................................................................ 28

*Helen-May Holdings, LLC v. Geltzer (In re Kollel Mateh Efraim, LLC),*
    456 B.R. 185 (S.D.N.Y. 2011), *aff'd,* 582 Fed. Appx. 61 (2d Cir. 2014) ............... 9

*In re Nat'l Health & Safety Corp.,*
    No. 99-18339 (DWS), 2000 WL 968778 (Bankr. E.D. Pa. July 5, 2000) .............. 10

*In re Old Carco LLC,*
    424 B.R. 650 (Bankr. S.D.N.Y. 2010) ................................................................. 10

*In re Rock & Republic Enters.,*
    No. 10-11728 (AJG), 2011 WL 4756571 (Bankr. S.D.N.Y. Oct. 7, 2011) .......... 8, 9

*In re Silvus,*
    329 B.R. 193 (Bankr. E.D. Va. 2005) .................................................................... 9

*Malinowski v. New York State Dep't of Labor (In re Malinowski),*
    156 F.3d 131 (2d Cir. 1998) ............................................................................... 28

*Reiter v. Cooper,*
    507 U.S. 258 (1993) ............................................................................................ 28

*Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.),*
    479 F.3d 167 (2d Cir. 2007) ................................................................................. 9

*Trs. of Amalgamated Ins. Fund v. McFarlin's, Inc.,*
    789 F.2d 98 (2d Cir. 1986) ................................................................................... 9

*Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.),*
    973 F.2d 1065 (3d Cir. 1992) ............................................................................. 28

*US Bank Nat'l Ass'n v. Guillaume,*
    38 A.3d 570 (N.J. 2012) ..................................................................................... 12

*W.W.W Assocs., Inc. v. Giancontieri,*
    566 N.E.2d 639 (N.Y. 1990) ............................................................................... 11

*Westinghouse Credit Corp. v. D'Urso,*
    278 F.3d 138 (2d Cir. 2002) ............................................................................... 28

STATUTES

11 U.S.C. § 502(b)(1) ..............................................................................................................11

11 U.S.C. § 503(b)(1)(A) ..........................................................................................................9

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The ResCap Liquidating Trust (the "<u>Liquidating Trust</u>"), established pursuant to

terms of the Plan (defined below) confirmed in the above-captioned chapter 11 cases (the

"<u>Chapter 11 Cases</u>"), as successor in interest to the Debtors (defined below), respectfully

represents:

## **<u>RELIEF REQUESTED</u>**

1.    The Liquidating Trust files this claims objection (the "<u>Objection</u>")

pursuant to section 502(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rule

3007(d) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), Article II.A

of the Plan and the Confirmation Order (defined below), the Asset Purchase Agreement, dated

as of November 2, 2012, as amended from time to time, by and between Ocwen Loan

Servicing, LLC ("<u>Ocwen</u>") and certain of the Debtors (the "<u>APA</u>"), the *Order Under 11 U.S.C.*

*§§ 105, 363, and 365 and Fed. Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of*

*Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B)*

*Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other*

*Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired*

*Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief* [Docket No. 2246]

(the "<u>Sale Order</u>"), and various documents relating thereto, seeking entry of an order (the

"<u>Proposed Order</u>"), in a form substantially similar to that attached hereto as <u>Exhibit 2</u>,

disallowing and expunging Ocwen's purported administrative expense claims.[1]  In support of

this Objection, the Liquidating Trust submits the declaration of Tammy Hamzehpour, Chief

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms as set forth in the
APA, the Sale Order, the Plan, or the Confirmation Order, as applicable.

Business Officer of the Liquidating Trust (the "<u>Hamzehpour Decl.</u>"), annexed hereto as <u>Exhibit 1</u>. In further support of the Objection, the Liquidating Trust respectfully states as follows:

<div align="center"><u>**PRELIMINARY STATEMENT**</u></div>

2.    As the Court is aware, subsequent to a successful auction of the Debtors' mortgage loan servicing and origination platform assets, certain of the Debtors and Ocwen entered into the APA and certain ancillary agreements in connection therewith.  The APA and the related agreements, as well as the Sale Order, included carefully negotiated language that specifically set forth the nature and terms of the transaction and the respective rights and obligations of the parties.  The APA states in no uncertain terms that the Debtors' sale of assets to Ocwen is, and remains, an "As Is, Where Is" transaction, one with a very specific and limited defined set of "Core Representations" that would survive the closing of the Sale (defined below).[2]  *See* APA §§ 1.1 and 2.14.

3.    On January 16, 2014, on the Administrative Claim Bar Date (as defined below), Ocwen asserted a number of administrative expense claims against the Debtors, which seek claims far in excess of the rights granted to Ocwen in the APA and the Sale Order.  Despite the very limited ability of Ocwen to assert claims under the APA, Ocwen's Administrative Claim Requests (as defined below) attempts to expand the scope of the Core Representations by claiming certain expenses and potential damages it incurred, or may incur, but which do not fall under the limited scope of any of the Core Representations.

---

[2]    "<u>Core Representations</u>" is a term defined in the APA as: (i) Section 4.4(a) (Financial Statements); (ii) Section 4.5 (Absence of Certain Changes or Events); (iii) Section 4.6 (Title to Assets); (iv) Section 4.7 (Purchased Assets Used in the Business); (v) Section 4.8 (Real Property Leases), limited to the first sentence thereof and clause (ii) of the third sentence thereof; (vi) Section 4.9(a)-(e) (Mortgage Servicing Portfolio; Servicing Agreements; the Business); (vii) Section 4.10 (Material Contracts), limited to the first two sentences thereof; (viii) Section 4.14 (Litigation and Claims), limited to clause (ii) thereof; (ix) Section 4.15 (Intellectual Property), limited to subsection (a) and, with respect to any IP rights included with the Transferred IT Assets, subsection (c); and (x) Section 4.17 (Ginnie Mae Loans).

4.       Moreover, a number of Ocwen's claims are contingent in nature. Through these claims, Ocwen is attempting to reserve its right to bring indemnification claims not yet discovered beyond this one-year period, all without any evidence substantiating these claims.  A right to assert claims of open-ended duration was not the parties' intent when entering into the APA and would eviscerate the carefully negotiated deadlines in the APA and Sale Order for asserting such claims.

5.       For the reasons stated in the Objection, and as demonstrated below, the administrative expense claims asserted by Ocwen lack merit and should be disallowed by the Court.

## JURISDICTION

6.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

7.       On May 14, 2012, each of the debtors in the Chapter 11 Cases (the "Debtors") filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  These Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

8.       On November 2, 2012, Ocwen and the Debtors entered into the APA (as amended from time to time) pursuant to which certain of the Debtors sold substantially all of their mortgage servicing assets, and corresponding rights and obligations, to Ocwen (the "Sale").  The APA includes several key provisions, including the following, briefly summarized:

- <u>Section 2.14 ("'As Is, Where Is'" Transaction")</u>: provides that the Sale is an "As Is, Where Is" transaction, in that there are only certain specific representations and warranties made to the Purchaser, including that Sellers disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of Purchased Assets.

- <u>Section 11.1 ("Indemnification by Sellers")</u>:  provides for the Purchaser's sole remedy for a breach or inaccuracy of the Core Representations.  The Purchaser's recourse is limited to the Indemnity Escrow Amount, which is equal to 1% of the Purchase Price for the Sale of mortgage servicing assets (approximately $21 million).

- <u>Section 11.6 ("Survival")</u>: provides that all representations and warranties, other than "Core Representations," expire on the Closing Date, *i.e.*, February 15, 2013.  The APA provides that the Core Representations survive for one year past the Closing Date.

- <u>Section 12.1 ("Expenses")</u>:  provides that any breaches of "Sellers' obligations pursuant to the APA" constitute administrative expense claims.  It **does not** expand the Sellers' liability in any way under the APA as to matters for which they are not responsible thereunder.

9.  On November 21, 2012, the Court entered the Sale Order approving, among other things, the APA.  The Sale Order adds only one category of potential claims to those that may exist under the APA – paragraph 35 of the Sale Order requires the Sellers to reimburse Ocwen for any indemnification it must make to certain RMBS trustees for pre-Closing Date acts or omissions, but only if Ocwen seeks reimbursement first from the relevant RMBS Trust and that reimbursement is denied.[3]

10.  On February 15, 2013, the Sale's Closing Date occurred.

11.  On December 11, 2013, the Court entered an *Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* (the "<u>Confirmation Order</u>") approving the terms of the Chapter 11 plan, as amended (the "<u>Plan</u>"), filed in these Chapter 11 Cases [Docket No. 6065].

---

[3]    Also, as discussed herein, these reimbursement claims must have been asserted and substantiated by Ocwen no later than the administrative claim bar date (*i.e.*, January 16, 2014).

On December 17, 2013, the Effective Date (as defined in the Plan) of the Plan occurred, and, among other things, the Liquidating Trust was established [Docket No. 6137].

12.     The Confirmation Order required holders of purported Administrative Claims (as such term is defined in the Plan, Art. I.A.4) to file their "requests for the payment of such Administrative Claims not already Allowed by Final Order in accordance with the procedures specified in the Confirmation Order, on or before the first Business Day that is thirty (30) days following the Effective Date. . . ." *See* Confirmation Order ¶ 50(f).  The Confirmation Order provided that the APA "shall vest in the Liquidating Trust in accordance with the Plan and the Sale Order" and that "[n]othing in the Plan Documents or this Confirmation Order shall, or shall . . . alter . . . the terms and provisions of the Ocwen APA and Ocwen's, the Debtors', and the Liquidating Trust's rights, as applicable, thereunder. . . ." *See id.* ¶ 31.  In addition, "Ocwen shall not be required to file an Administrative Claim to preserve its rights or Claims arising after the Effective Date from or related to the Ocwen APA." *See id.* (emphasis added).

13.     In addition, on the Effective Date, in accordance with the Plan, the Debtors filed the *Notice of Entry of the Confirmation Order Confirming the Second Amended Joint Chapter 11 Plan Proposed by the Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors and Occurrence of the Effective Date* [Docket No. 6137], which set January 16, 2014 as the deadline by which holders of administrative claims could file requests for payment of such purported claims (the "Administrative Claim Bar Date").[4] Thereafter, potential claimants and other parties in interest received the *Notice of Deadline and*

---

[4]     The Confirmation Order provides that "holders of Administrative Claims that arose prior to the Effective Date (other than holders of Administrative Claims paid in the ordinary course of business . . .) must File and serve . . . requests for the payment of such Administrative Claims not already Allowed by Final Order . . . ." Confirmation Order ¶ 50(f).

*Procedures for Filing Certain Administrative Claims* [Docket No. 6138], which provided the

procedures for filing Administrative Claims.

        14.      On January 16, 2014, Ocwen filed requests for payment of

administrative expense claims [Docket Nos. 6296 and 6297] (collectively, the "Administrative

Claim Requests").  The Administrative Claim Requests are attached hereto as Exhibit 3-A

(Docket No. 6296) and Exhibit 3-B (Docket No. 6297).  In its Administrative Claim Requests,

Ocwen requests payment on account of asserted claims that purportedly arise under the APA

and the Sale Order, including: (i) a claim in connection with the RM SOW (the "RM SOW

Claim"); (ii) a contingent, unliquidated claim for retained liabilities for litigation concerning

borrower Kenneth Taggart pending in the Montgomery County court (the "Taggart Litigation

Claim"); (iii) a claim for fees incurred but not paid under an agreement between GMAC

Mortgage, LLC ("GMACM") and Kasork.com, provider of real estate owned ("REO") auction

listing services (the "Kasork Claim"); (iv) a claim for costs of remediating certain GMACM

loans in connection with curing purportedly defective notices of intention to foreclose

("NOIs") sent to borrowers in New Jersey, including contingent unliquidated amounts for

prospective fees (the "NJ NOI Claim"); (v) a claim for potential damages in connection with a

patent infringement suit filed against Ocwen by Secure Axcess, LLC with respect to the use of

certain technology (the "Secure Axcess Claim"); (vi) a claim for costs associated with Ocwen's

remediation of certain REO property code violations (the "REO Violations Claim"); (vii) a

contingent, unliquidated claim for any potential obligations under section 363(o) of the

Bankruptcy Code in connection with a lawsuit filed by borrower Simona Robinson against

GMACM for alleged prepetition servicing misconduct (the "363(o) Claim"); (viii) a

contingent, unliquidated claim for any breach of the Core Representations related to Section

4.9 (Mortgage Servicing Portfolio; Servicing Agreements; the Business) of the APA (the

"Servicing Advances Claim"); (ix) a contingent claim to the extent that Ocwen is obligated to

pay or indemnify Deutsche Bank National Trust Company in a lawsuit filed by the City of Los

Angeles in connection with alleged REO property code violations (the "DB Indemnification

Claim"); (x) a contingent claim to the extent that Ocwen is obligated to pay amounts related to

a request to indemnify an unnamed RMBS Trustee (the "RMBS Trustee Indemnification

Claim"); (xi) a contingent claim to the extent that Ocwen is obligated to indemnify Bank of

New York Mellon in connection with *King v. Bank of New York Mellon* (the "BONY Mellon

Indemnification Claim"); (xii) a contingent claim to the extent that Ocwen is obligated to pay

or indemnify Deutsche Bank for any amounts in connection with the litigation between

Deutsche Bank and borrower Barry F. Mack (the "Mack Indemnification Claim"); (xiii) a

contingent, unliquidated claim for any and all indemnification payments Ocwen is, or becomes,

obligated to make to the extent such claims are not reimbursed by the applicable RMBS Trust

(the "RMBS Trust Indemnification Claim" and, together with the RMBS Trustee

Indemnification Claim, DB Indemnification Claim, the BONY Mellon Indemnification Claim,

and the Mack Indemnification Claim, the "Contingent RMBS Trust Indemnification Claims");

(xiv) a claim for amounts allegedly paid erroneously to ResCap for usage of SAS Institute Inc.

("SAS") software and for any amounts asserted by SAS to be owing by Ocwen in connection

with the purported unauthorized use of the SAS software license (the "SAS License Claim");

and (xv) a contingent, unliquidated claim to the extent Ocwen sustains damages with respect to

the Debtors' purported abandonment of non-economic residual interests in REMICs (the

"REMIC Claim"). *See generally* Administrative Claim Requests, Docket Nos. 6296 and 6297.

15.     Based on recent discussions with Ocwen, the Liquidating Trust

understands that Ocwen has withdrawn a number of its purported administrative expense

claims, including: (i) the Taggart Litigation Claim; (ii) the Kasork Claim; (iii) the REO

7

Violations Claim; (iv) the 363(o) Claim; (v) the DB Indemnification Claim; (vi) the BONY

Mellon Indemnification Claim; (vii) the Mack Indemnification Claim; and (viii) the REMIC

Claim.  Accordingly, the aforementioned claims are not addressed herein.[5]

16.     On February 14, 2014, Ocwen sent a letter to the Liquidating Trust

providing notice of various asserted indemnification claims, inclusive of claims already raised

in the Administrative Claims Requests, under the APA (the "Notice Letter").  A copy of the

Notice Letter is attached hereto as Exhibit 4.

17.     On October 24, 2014, Ocwen filed an adversary proceeding in the

Chapter 11 Cases, styled *Ocwen v. The ResCap Liquidating Trust*, Adv. Pro. No. 14-02388 (the

"Adversary Proceeding").  In the Adversary Proceeding, Ocwen re-asserts the RM SOW

Claim.

18.     Although Ocwen asserts additional facts, arguments, and alleged

damages in the Notice Letter and Adversary Proceeding that are not included in the

Administrative Claim Requests (which predates both), the Liquidating Trust is treating them as

incorporated therein to ensure the full and fair resolution of all of Ocwen's claims against the

Liquidating Trust in this proceeding.

## BASIS FOR RELIEF

## I.    ARGUMENT

### A.    General Arguments

19.     Requests for payment of administrative expenses and the allowance

thereof are governed by section 503 of the Bankruptcy Code.  *ASM Capital, LP v. Ames Dep't*

*Stores, Inc. (In re Ames Dept. Stores, Inc.)*, 582 F.3d 422, 428 (2d Cir. 2009); *In re Rock &*

---

[5]     The Liquidating Trust reserves the right to supplement the Objection should Ocwen fail to withdraw these
purported administrative expense claims in their entirety.

ny-1165105

*Republic Enters.*, No. 10-11728 (AJG), 2011 WL 4756571, at *3 (Bankr. S.D.N.Y. Oct. 7,

2011) (Gonzalez, J.).  Section 503(b)(1)(A) of the Bankruptcy Code defines an administrative

expense as the "actual, necessary costs and expenses of preserving the estate. . . ." 11 U.S.C. §

503(b)(1)(A).  To be entitled to administrative expense priority, a creditor must satisfy a two-

prong test: (i) the expense must have arisen out of a postpetition transaction between it and the

debtors in possession; and (ii) the expense must have been actual and necessary, incurred to

benefit or to preserve the bankruptcy estates.  *See* 11 U.S.C. 503(b)(1)(A); *see also  Supplee v.*

*Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 479 F.3d 167, 172 (2d Cir. 2007) ("[A]n

expense is administrative only if it arises out of a transaction between the creditor and the

[debtor] and only to the extent that the consideration supporting the claimant's right to

payment was both supplied to and beneficial to the [debtor] in the operation of the business.")

(quoting *Trs. of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986)).

      20.      Unlike prepetition claims asserted under section 502 of the Bankruptcy

Code, a filed administrative expense claim is not allowed on a *prima facie* basis.  *See In re*

*Rock & Republic Enters.*, 2011 WL 4756571, at *4; *In re Silvus*, 329 B.R. 193, 205 (Bankr.

E.D. Va. 2005) ("[A] request for administrative expenses, unlike a proof of claim, is not

deemed allowed in the absence of an objection and does not constitute *prima facie* evidence of

the validity and amount of the request.") (citation and internal quotation marks omitted).

Instead, the party seeking administrative priority carries the burden of proof to justify

administrative priority for its claim.  *See  Bethlehem Steel Corp.*, 479 F.3d at172  and *Helen-*

*May Holdings, LLC v. Geltzer (In re Kollel Mateh Efraim, LLC)*, 456 B.R. 185, 194 (S.D.N.Y.

2011), *aff'd*, 582 Fed. Appx. 61 (2d Cir. 2014); *see also* APA § 11.2 (Notice of Claims)

(providing that Purchaser seeking indemnification has the burden to give both reasonably

detailed notice and supporting documentation to Seller in support of claim for

ny-1165105

indemnification).  Courts in this District have held that section 503(b)(1)(A) should be

narrowly construed due to "the bankruptcy goal of providing equal distribution of a debtor's

assets to all creditors . . . ."  *In re Old Carco LLC*, 424 B.R. 650, 656 (Bankr. S.D.N.Y. 2010);

*see also In re Nat'l Health & Safety Corp.*, No. 99-18339 (DWS), 2000 WL 968778, at *4

(Bankr. E.D. Pa. July 5, 2000) ("[I]t is not within the Debtor's power to award priority

claims.").

       21.     Moreover, both the Sale Order and the APA require that if Ocwen seeks

to assert a claim for indemnification or reimbursement against the Debtors' estates, it must not

only describe in reasonable detail the facts underlying the claim, it must also provide

documents, instruments, or other evidence in connection therewith and in support thereof.  *See*

Sale Order ¶ 35(B); *see also* APA § 11.2 (Notice of Claims).  Ocwen failed to provide

sufficient information and documentation in support of each of its asserted claims set forth in

the Administrative Expense Requests and the Notice Letter.  Further, despite the Liquidating

Trust's requests for such supporting documentation, Ocwen has not produced any information

to substantiate its claims.  Nor has Ocwen sought estimation of any of its contingent claims.

*See* Sale Order ¶ 35(B).  Thus, Ocwen has failed to meet its burden to establish that it is

entitled to payment on account of these asserted administrative expense claims.  As a result,

these claims are without merit and should be disallowed.

       22.     Ocwen's asserted claims against the Debtors' estates, administrative

priority or otherwise, are without merit.  The Debtors and the Liquidating Trust, as applicable,

have fully performed, and continue to fully perform, all of their obligations under the Sale

Order, APA, and related documents, and Ocwen does not have any claim under the Sale Order

or under any of those agreements against the estates.  The APA and related agreements are all

governed by New York law, which provides that contracts should be enforced according to

their clear terms.  *See, e.g.*, *W.W.W Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 641 (N.Y. 1990) (stating that "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.").  Here, as discussed below, Ocwen's asserted claims are not supported by the terms of any of the aforementioned agreements, the Sale Order, Plan, or Confirmation Order.  Further, a number of such claims are speculative and contingent, which, if not disallowed, could permit Ocwen to improperly delay the release of the Indemnity Escrow Account to the Liquidating Trust.  This result was not contemplated by the APA or Sale Order, and, accordingly, such claims should be disallowed.

23.    Moreover, Ocwen improperly filed its Administrative Claim Requests in an omnibus fashion by filing identical motions against a selection of Debtor entities.  11 U.S.C. § 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1).  Ocwen is required to file each of its claims against the appropriate Debtor entity.  Specifically, the Administrative Claim Bar Date Notice provides:

> Any holder of an Administrative Claim against more than one debtor must file a separate claim with respect to each such Debtor and all holders of claims must identify on their Request for Payment the specific Debtor against which their claim is asserted and the case number of that Debtor's bankruptcy case.

Administrative Claim Bar Date Notice at 2.  However, Ocwen failed to identify in its Administrative Claim Requests the specific Debtor against which each of its claims apply.  Ocwen's Administrative Claim Requests, therefore, fail to demonstrate the liability of any particular Debtor on its claims.  For these reasons, in addition to those discussed herein, the Administrative Claim Requests should be disallowed.

11

### B.    Ocwen's Claims Asserted Under the APA Lack Merit

#### (i)    RM SOW Claim

24.    The Liquidating Trust's arguments for the rejection and disallowance of this claim are fully set forth in its motion for summary judgment, filed in the Adversary Proceeding simultaneously herewith, and are fully incorporated herein.[6]  For the reasons set forth in its motion, the Liquidating Trust has no obligation to Ocwen for the RM SOW claim, and the claim should be disallowed in its entirety.

#### (ii)    NJ NOI Claim

25.    *Asserted Claim.*  Ocwen claims that the Debtors breached representations and warranties under the APA in connection with curing certain defective notice practices in the State of New Jersey.  *See* Administrative Claim Request at Exhibit 3-B, Docket No. 6297 ¶¶ 16-21; *see also* Notice Letter at Exhibit 4 ¶ 4. New Jersey's Fair Foreclosure Act ("FFA") provides for certain requirements relating to notices of intention to foreclose ("NOI").  Subsequent court decisions found that a failure to identify a lender in an NOI renders the NOI defective, but provided that a servicer could file an order to show cause ("OTSC") allowing it to cure all defective NOIs.  *See US Bank Nat'l Ass'n v. Guillaume*, 38 A.3d 570 (N.J. 2012).  Ocwen asserts that GMACM filed an OTSC for over 2,644 loans in October 2012, to which approximately 70 objections were filed.  *See* Docket No. 6297 ¶ 19; *see also* Notice Letter ¶ 4.  As GMACM's OTSC was granted by the New Jersey court in ***April 2013*** (post-Closing Date), Ocwen claims that it, as servicer, was required to perform the remediation of these loans, and asserts a claim in the aggregate amount of $66,684.41

---

[6]    *See Ocwen Loan Serv., LLC v. The ResCap Liquidating Trust*, Adv. Pro. No. 14-02388 (MG) (Bankr. S.D.N.Y. Oct. 24, 2014).  In connection with the Objection, the Liquidating Trust is simultaneously filing a motion for summary judgment on the Adversary Complaint issues.  The Objection and Adversary Proceeding are subject to the Case Management and Scheduling Order entered by the Court on December 22, 2014.  *See id.*, Docket No. 6.

ny-1165105

comprised of (i) $43,381.64 for related fees, (ii) $22,065.27 plus contingent, unliquidated

amounts for current and prospective fees for New Jersey Special Master's counsel, and (iii)

$1,237.50 plus contingent, unliquidated amounts for monitor fees.  Docket No. 6297 ¶¶ 20-21.

26.    *Asserted Basis.* Ocwen relies on Section 11.1 (Indemnification by

Sellers) and Section 12.1 (Expenses) of the APA to assert this indemnification claim against

the Debtors' estates, and alleges that the Debtors breached the Sellers' representations provided

in Section 4.9 (Mortgage Servicing Portfolio; Servicing Agreements; the Business) and Section

4.14 (Litigation and Claims) of the APA in connection therewith.  *See* Notice Letter ¶ 4.

27.    *Liquidating Trust's Objection.*  Ocwen erroneously relies on the APA's

Core Representations relating to the Debtors' servicing business (*see* APA § 4.9) and various

litigation and claims.  However, as discussed below, Section 4.9 is inapplicable to this matter.

In addition, Section 4.14 is only applicable to litigation and claims that would "***materially and***

***adversely*** affect the Sellers' ability to consummate the transactions contemplated by [the

APA]" (*see* APA § 4.14 (emphasis added)).  Thus, the language of these APA provisions

clearly provides no basis for the NJ NOI Claim.

28.    Section 4.9 of the APA states that the Sellers represent that they have

provided the Purchaser with true and complete lists of (i) loan level information in connection

with the loans that comprise the Sellers' Mortgage Servicing Portfolio, (ii) all Servicing

Agreements, Agency Contracts, and ETS Contracts to which each Seller is a party, whereby, to

the Sellers' knowledge, no party is seeking to terminate such agreements and no party is in

breach thereof, and (iii) data files related to Servicing Advances and Servicing Files on a loan

level basis.  In addition, the Sellers represent that Servicing Escrow Accounts and Servicing

Custodial Accounts are maintained according to Applicable Requirements in all material

respects.  *See* APA § 4.9.  It is unclear how this representation even applies to the NJ NOI

Claim, and Ocwen did not assert this as a basis for this claim in its subsequent correspondence

to the Liquidating Trust.

29.     Nor does Section 4.14 of the APA provide a basis for the NJ NOI Claim,

as the language of this provision makes clear that the Debtors did not breach this Core

Representation.  Section 4.14 of the APA provides:

> Except as listed on Section 4.14 of the Disclosure Memorandum, as of the date of
> this Agreement, (i) there is no action, suit, demand, inquiry, proceeding, claim,
> cease and desist letter, hearing or investigation by or before any Government
> Entity pending, or, to the Knowledge of Sellers, threatened in respect of the
> Business that could materially and adversely affect the ability of Sellers to
> complete the transactions contemplated by this Agreement, and (ii) no Purchased
> Asset is subject to any Order other than the Consent Order or the DOJ/AG
> Settlement.

APA § 4.14.

30.     First, with respect to Section 4.14(i), the NJ NOI matter does not qualify

as an "action, suit, demand, inquiry, proceeding, claim, cease and desist letter, hearing or

investigation by or before any Government Entity pending, . . . or threatened."  APA § 4.14(i).

Even if the filing of the OTSC by the Debtors were to arguably fall under Section 4.14(i), it

would have to "materially and adversely affect the ability of the Sellers to complete the

transactions contemplated" by the APA to be a breach.  *Id.*  The amounts in connection with

this claim, approximately $66,684.41, are clearly not material in the context of this matter, and

regardless, did not impact Ocwen's ability to close the Sale.  Thus, the NJ NOI matter cannot

possibly amount to a breach of Section 4.14(i).

31.     With respect to Section 4.14(ii), until an Order is actually entered by a

court of competent jurisdiction, a Purchased Asset is not subject to said Order.  For this reason,

the OTSC, which was entered on ***April 2013*** (post-Closing Date), is not an Order that existed

as of the date of the APA (*i.e.*, November 2, 2012) or the Closing Date (*i.e.*, February 15,

2013), as the New Jersey Supreme Court only issued it after the Closing Date (*i.e.*, April of

2013).  Accordingly, since no Purchased Asset was subject to the OTSC as of the Closing

Date, the Debtors also did not breach Section 4.14(ii) of the APA by failing to disclose a

pending <u>motion</u> related to the OTSC in the APA.

32.    Ocwen has misapplied the provisions of the APA in an effort to assert

purported administrative expense claims against the Debtors' estates.  The NJ NOI Claim is

entirely without merit and should be disallowed.

<div align="center">(iii)    <b>Secure Axcess Claim</b></div>

33.    *Asserted Claim*.  Ocwen notified the Liquidating Trust of the lawsuit

that Secure Axcess, LLC ("<u>Secure Axcess</u>") filed against Ocwen on December 16, 2013 (the

"<u>Secure Axcess Lawsuit</u>") for which Ocwen is seeking indemnification from the Liquidating

Trust.  *See* Administrative Claim Request at <u>Exhibit 3-B</u>, Docket No. 6297 ¶ 22; *see also*

Notice Letter at <u>Exhibit 4</u> ¶ 5.  Ocwen states that:  (a) Ocwen acquired from ResCap certain

contracts, rights, and licenses under the APA that relate to certain multifactor authentication

technology (the "<u>MFA Technology</u>") and are used by the gmacmortgage.com site and certain

private label sites; (b) Secure Axcess alleges in the complaint filed in the Secure Axcess

Lawsuit (the "<u>Complaint</u>") that the MFA Technology infringes upon Secure Axcess' patent

rights;[7] and (c) the Liquidating Trust must indemnify Ocwen for potential damages relating to

the Secure Axcess Lawsuit in the amount of at least $2,550,000.00 (plus fees and expenses).

*See* Administrative Claim Request, Docket No. 6297 ¶ 22; *see also* Notice Letter at <u>Exhibit 4</u>

¶ 5.

34.    *Asserted Basis.*  Ocwen asserts that the Liquidating Trust is obligated to

indemnify Ocwen pursuant to the provisions of Section 11.1 (Indemnification of Sellers) of the

---

[7]    In the complaint, Secure Axcess alleges infringement of its patent rights set forth in U.S. Patent Number
7,631,191 B2 (the "<u>'191 Patent</u>").

APA because the Secure Axcess Lawsuit arises from ResCap's breach of its representations and warranties set forth in Sections 4.6 (Title to Assets), 4.7 (Purchased Assets Used in Business), and 4.15 (Intellectual Property) of the APA.  *See* Administrative Claim Request, Docket No. 6297 ¶ 22; *see also* Notice Letter at <u>Exhibit 4</u> ¶ 5.

35.    *Liquidating Trust's Objection.*  Ocwen's indemnification claim relating to the Secure Axcess Lawsuit is without merit.  Specifically, and as discussed in greater detail below, the basic structure of the APA makes clear that there is no breach here.  Section 4.15 of the APA is the Core Representation that deals with the representations and warranties of the Debtors in connection with Transferred IP Assets, including, relevant to this dispute, that the Debtors did not receive any notice of IP infringement prior to the Closing Date.  *See* APA § 4.15; *see also* Hamzehpour Decl. ¶ 3.  The APA, however, does <u>not</u> contain a representation that the Transferred IP Assets do not infringe on any patent.  Ocwen's attempt to reach into other indemnification provisions of the APA to shoehorn its IP claims is clearly beyond the scope of the APA in light of the separate provision of the APA (Section 4.15) that specifically deals with such IP-related issues.  *See id.* Accordingly, neither Section 4.6 nor Section 4.7 applies in this instance.  *See* APA §§ 4.6 and 4.7.

36.    Moreover, neither of Ocwen's Administrative Expense Requests nor its Notice Letter sufficiently describes in reasonable detail, as required by Section 11.2 (Notice of Claims) of the APA, how the representations and warranties in Sections 4.6, 4.7, and 4.15 of the APA were in fact breached.  This failure alone warrants the disallowance of this purported administrative expense claim.  Regardless, consistent with the basic structure of the APA discussed above, the Liquidating Trust will demonstrate why none of these representations and warranties has been breached.

37.    ***Section 4.6***:  Pursuant to Section 4.6 of the APA, ResCap represented and warranted that at the Closing Date, ResCap "shall transfer . . . good, valid and marketable title . . . to, or a valid lease or license interest in, the Purchased Assets free and clear of any Claim or Lien, other than Permitted Liens."  *See* APA § 4.6.  ResCap did not breach Section 4.6 of the APA because ResCap transferred good, valid and marketable title to all of the Purchased Assets.  S*ee* Hamzehpour Decl. ¶ 3.  In fact, the MFA Technology was not a Purchased Asset.  The MFA Technology was licensed to Ally Financial Inc. ("<u>AFI</u>"), and ResCap did not have a separate license to use the MFA Technology.  *See* Hamzehpour Decl. ¶ 3. The Liquidating Trust's understanding is that Ocwen obtained the right to use the MFA Technology via the Transition Services Agreement into which Ocwen entered with AFI (the "<u>AFI Transition Services Agreement</u>") or some other related agreement.  *See id.*  Since a license to use the MFA Technology was not a Purchased Asset, ResCap did not, as alleged by Ocwen, breach the representation and warranty set forth in Section 4.6 of the APA.

38.    ***Section 4.7***:  Pursuant to Section 4.7 of the APA, ResCap represented and warranted that, except for the Excluded Assets listed on Schedule Q of the APA and any services to be provided by Sellers under the TSA, and by AFI under the AFI Transition Services Agreement, the Purchased Assets comprise all of the assets, properties, and rights used by ResCap as of the date of the APA (*i.e.*, November 2, 2012) and necessary to conduct ResCap's business in the manner conducted as of that date.  ResCap did not breach Section 4.7 of the APA because, as mentioned above, the Liquidating Trust's understanding is that Ocwen did in fact obtain the right to use the MFA Technology via the AFI Transition Services Agreement or some other agreement, and such right was the same right that ResCap had to use the MFA Technology.  Section 4.7 does not require ResCap to obtain any assets, properties and/or rights that ResCap did not own or have the right to use.  *See* APA § 4.7.  Moreover,

17

given that Ocwen discontinued using the MFA Technology shortly after the February 15, 2013

Closing Date (*see* Hamzehpour Decl. ¶ 3), the MFA Technology likely is excluded from this

representation and warranty for not being "necessary to conduct of the ResCap's business."  In

other words, if the MFA Technology was necessary to the conduct of ResCap's business,

Ocwen would not have discontinued its use shortly after the Closing Date.

39.     ***Section 4.15***:  Pursuant to Section 4.15 of the APA, ResCap represented

and warranted, among other things, that (a) ResCap had not received any material written

notices from any third party claiming that any Transferred Intellectual Property (as defined in

APA) infringes upon and/or misappropriates such third party's intellectual property and (b) to

ResCap's knowledge, the Sellers have not infringed, misappropriated, or otherwise violated

any intellectual property of any third parties in the United States.  ResCap did not breach

Section 4.15 because not only did ResCap not receive any written notice of infringement from

Secure Axcess prior to the Closing Date, ResCap was completely unaware of any such patent

infringement claim by Secure Axcess.  *See* Hamzehpour Decl. ¶ 3.

40.     Accordingly, the alleged infringement claim by Secure Axcess does not

amount to a breach of a Core Representation under the APA, even if proven true.  As a result,

Ocwen has failed to meet its burden to demonstrate the merits of this purported administrative

expense claim, and, therefore, this claim should be disallowed in its entirety.

**(iv)     Servicing Advances**

41.     *Asserted Claim.*  This claim arises in connection with alleged losses

from certain Servicing Advances conveyed to Ocwen pursuant to the Ocwen APA.  *See*

Administrative Claim Request at <u>Exhibit 3-B</u>, Docket No. 6297 ¶ 28; *see also* Notice Letter at

18

Exhibit 4 ¶ 2.[8]  The Notice Letter included additional detail with respect to the Servicing

Advances Claim involving Ocwen's alleged losses incurred in connection with Servicing

Advances that were conveyed by the Debtors to Ocwen in the Sale, but which Ocwen believes

to be invalid and not recoverable.  *See* Notice Letter ¶ 2.  In the Notice Letter, Ocwen claims

damages with respect to the Servicing Advances Claim in the amount of $2,211,962.17.

Ocwen alleges that certain Servicing Advances conveyed by the Sellers were not "valid and

subsisting amounts" and not recoverable because, prior to the Closing Date, the recordation of

the related notes was not effected within the requisite period after the execution of those notes

by the applicable borrowers.

42.    *Asserted Basis.*  Ocwen asserts that this claim constitutes a breach of

Section 4.9 (Mortgage Servicing Portfolio; Servicing Agreements; the Business) of the APA.

Ocwen also makes reference to Section 11.4 (Claims Against the Indemnity Escrowed Funds)

of the APA, as well as Section 11.1 (Indemnification of Sellers) and Section 12.1 (Expenses)

of the APA.

43.    *Liquidating Trust's Objection.*  In order to substantiate the merits of this

claim, Ocwen has the burden to demonstrate why *each* Servicing Advance amounts to a breach

of a Core Representation.  Ocwen has not provided sufficient information to substantiate any

component of this claim in either the Administrative Claim Requests or the Notice Letter.  *See*

Hamzehpour Decl. ¶ 4.  On a number of occasions, the Liquidating Trust requested that Ocwen

promptly provide the Liquidating Trust with detail as to (i) why each Servicing Advance has

been deemed uncollectible, and (ii) how the purported uncollectability renders the Debtors in

---

[8]    The Administrative Claim Request does not specifically note a breach of the APA in connection with Servicing
Advances, but does assert a contingent administrative expense claim in an unliquidated amount for any alleged
breaches of the APA, which would appear to cover the Servicing Advances Claim.  Ocwen alleges a breach of
the APA regarding Servicing Advances in the Notice Letter, and therefore, this claim ties to the Administrative
Claim Request.

ny-1165105

breach of a specific Core Representation of the APA. *See id.* To date, Ocwen has not responded to any of the Liquidating Trust's requests for this detailed information, nor has Ocwen made an effort to show sufficient evidence in support of this asserted claim. *See id.*

44.     Notably, while Section 4.9(c) provides that each Servicing Advance is a "valid and subsisting amount" owing to a Debtor, "and is a legal, valid and binding reimbursement right" entitled to be paid, nowhere in this provision do the Debtors represent or provide a guarantee of the collectability of these Servicing Advances.

45.     Accordingly, because the Debtors did not provide a guarantee of collectability of Servicing Advances, nor did Ocwen provide the information and documentation necessary for the Liquidating Trust to evaluate the merits of this particular claim and Ocwen has not provided any information to date to support this particular claim, the Servicing Advances Claim should be disallowed in its entirety.

        **(v)    SAS License Claim**

46.     *Asserted Claim.* This administrative expense claim is based on amounts that Ocwen claims it erroneously paid to the Debtors in connection with the SAS Institute Inc.'s ("SAS") software license. *See generally* Administrative Claim Request at <u>Exhibit 3-A</u>, Docket No. 6296. Ocwen asserts that, even though the SAS License was assumed and assigned to Ocwen pursuant to the APA and was Ocwen's property, ResCap wrongfully charged Ocwen for amounts owed in connection with the use of the license. According to Ocwen, this resulted in Ocwen's "double payment" for the use of the licensed software, as it made a payment to ResCap for its pro rata use of the software, and subsequently made a separate payment to SAS under a separate agreement for such use. SAS has apparently also asserted a claim against Ocwen in connection with purported unauthorized use of the SAS license by the Debtors and AFI in connection with certain transition services agreements.

20

Accordingly, Ocwen reserves its rights and seeks reimbursement from the Trust for the

amounts paid to the Debtors by Ocwen on account of SAS's claim.  Ocwen asserts this claim

in the amount of $136,928.82.

47.    *Asserted Basis*.  Ocwen relies on Section 12.1 (Expenses) of the APA as

well as paragraph 23 of the Sale Order (No Successor Liability) in asserting this claim.

48.    *Liquidating Trust's Objection*.  By way of background, Debtor RFC

signed a master license agreement with SAS on October 24, 1995 for use of certain software by

RFC.  *See* Hamzehpour Decl. ¶ 5.  Given that SAS's software was used to support the Debtors'

operations, the Debtors included the SAS contracts as those that they would potentially assume

and assign, and so notified SAS of the proposed treatment of its contracts.  *See Notice of (I)*

*Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of*

*Personal Property, and Unexpired Leases of Nonresidential Real Property and (II) Cure*

*Amounts Related Thereto* [Docket No. 924], Ex. 2 at p. 63 of 81; *see also* Schedule O to APA.

SAS did not file an objection to the proposed assumption and assignment of its contracts.  The

master license agreement with SAS and any supplements thereto, which were renewed

annually, were up for renewal on October 24, 2012.  *See* Hamzehpour Decl. ¶ 5.  As of October

2012, however, the Debtors did not renew the contracts because they and Ocwen had not

finalized decisions regarding their future business needs.  *See id*.  In December 2012, the SAS

contracts were identified as contracts to be assumed by Ocwen under the APA.  *See id.*  On the

Closing Date of the Sale, Ocwen assumed the SAS contracts.  *See id.*

49.    Prior to renewing the contracts, the Debtors and Ocwen agreed that the

costs for using the SAS license would be allocated to all parties using SAS's software.  *See*

Hamzehpour Decl. ¶ 6.  Once the parties agreed that there would be an allocation of costs, the

Debtors ultimately renewed the SAS contracts, and, on February 28, 2013, paid two payments

21

to SAS in the amounts of $49,371.74 and $265,959.45, which represented the annual software

maintenance expenses for October 2012–2013 and November 2012–2013, respectively.  *See id.*

Copies of the relevant invoices from SAS are annexed to the Hamzehpour Decl. as <u>Exhibit A</u>.

In subsequent discussions held at the end of May 2013, the Debtors and Ocwen agreed that the

costs of using the SAS software would be allocated based on the date on which

Ocwen assumed the SAS contract.  *See id.*; *see also* correspondence to Jeffrey Hall, Sandy

Warden, Brian L. Holmlund, and Connie Kane at Ocwen confirming agreed upon allocation

method and Excel attachment outlining allocation, dated May 31, 2013, annexed as <u>Exhibit B</u>

to the Hamzehpour Decl.  While ResCap would continue to use the SAS software post-closing,

it would pay for such use under the TSA and not be directly allocated any post-closing costs.

*See* Hamzehpour Decl. ¶ 6. As a result, Ocwen agreed to pay $136,928.82 of the annual

contract costs, which represented its allocation of the software maintenance costs following the

Closing Date of the Sale.  *See* Hamzehpour Decl. ¶ 6; *see also* confirmation from Jeff Hall[9] at

Ocwen agreeing to SAS cost allocation calculation and Ocwen's payment of $136,928.82,

annexed as <u>Exhibit C</u> to the Hamzehpour Decl.

50.    Pursuant to the parties' express agreement (*see* <u>Exhibit C</u> annexed to

Hamzehpour Decl.), the Debtors billed Ocwen for $136,928.82 in June 2013 for Ocwen's

allocation of the SAS software maintenance costs.  *See* Hamzehpour Decl. ¶ 7.  Ocwen

subsequently made this payment to the Debtors.  *See id.*

51.    It is unclear how Ocwen's claim for amounts allegedly erroneously paid

to the Debtors in connection with the SAS software license purports to be a breach of an

obligation under the APA or the Sale Order.  The Liquidating Trust and Ocwen reached an

---

[9]    Jeff Hall was Ocwen's Senior IT Finance Leader, whose position was responsible for reviewing and approving
IT vendor payments.  *See* Hamzehpour Decl. ¶ 6 n.2.

understanding whereby following the Closing Date, the Debtors would pay SAS for the cost of

using the SAS software license for the benefit of Ocwen so long as Ocwen agreed to repay the

Debtors.  *See* Hamzehpour Decl. ¶ 7.  The SAS license agreements were properly assumed and

assigned to Ocwen under the APA, and both Ocwen and SAS received notice of the

assumption and assignment.  *See* Docket No. 924.  Thus, the Liquidating Trust believes the

amounts paid by Ocwen to the Liquidating Trust were properly paid and consistent with the

parties' understanding.

52.    Neither Section 12.1 of the APA nor paragraph 23 of the Sale Order

provides a basis for this claim.  As discussed above, Section 12.1 of the APA applies to

breaches of the APA, and Ocwen has not identified one.  The "No Successor Liability"

provision of the Sale Order does not permit Ocwen to assert claims for reimbursement for

payments made by Ocwen to SAS on account of certain obligations purportedly owed to SAS.

The "No Successor Liability" provisions of the Sale Order and APA only relieve Ocwen of any

liability for itself for this matter.  *See infra* Section I.B.  For these reasons, the SAS License

Claim against the Liquidating Trust is without merit and should be disallowed in its entirety.

**(vi)    Contingent/Unliquidated Claims**

53.    In the Administrative Claim Request, Ocwen asserts a number of

contingent, unliquidated claims against the Debtors' estates.  In particular, Ocwen asserts a

contingent administrative expense claim in an unliquidated amount in connection with any

breaches of the APA, and reserves the right to enforce Ocwen's rights relating to, among other

things, any alleged breaches of the "Mortgage Servicing Portfolio; Servicing Agreements; the

Business" representations and warranties pursuant to Section 4.9 of the APA.  *See*

Administrative Claim Request at Exhibit 3-B ¶ 28.

23

54.    Given that these claims remain unidentified to date, there is no basis to seek payment of these contingent and/or unliquidated claims.  The claims are speculative and contingent and not supported by any evidence, as required by applicable law and the APA. Accordingly, to the extent Ocwen continues to assert such claims, they should be disallowed.

## C.    Ocwen's Reimbursement Claims  Under Paragraph 35 of the Sale Order Lack Merit

55.    *Asserted Claims.*  Ocwen asserts the following claims relating to RMBS Trustee reimbursement requests that Ocwen purportedly has made, or intends to make, to the appropriate RMBS Trust.

### a.    Trustee Reimbursement Claims

56.    Ocwen claims that it received a request to indemnify an RMBS Trustee in the amount of $1,924,331.98 pursuant to paragraph 35 of the Sale Order.  *See* Administrative Claim Request at Exhibit 3-B, Docket No. 6297 ¶ 36. Ocwen did not and has not identified the basis for this claim.  Ocwen acknowledges that it is in the process of investigating the claim, but asserts that to the extent (i) Ocwen is obligated to pay such amounts to said RMBS Trustee, and (ii) such amounts arise from acts or omissions of the Debtors on or before the Closing Date, Ocwen asserts an administrative expense claim against the Debtors' estates.

### b.    Contingent/Unliquidated Claims

57.    Ocwen asserts a contingent claim in an unliquidated amount for any and all indemnification payments that Ocwen is or becomes obligated to make that is not reimbursed by the applicable RMBS Trust.  *See* Administrative Claim Request at Exhibit 3-B, Docket No. 6297 ¶ 42.  Specifically, this amount includes amounts in respect of (i) a foreclosure action filed by U.S. Bank as trustee in Broward County, Florida (Case No. CACE-09-006803) against borrowers Saddy and Rosalina Bulls, and (ii) a case captioned *Gary M.*

24

*Leger v. U.S. Bank, National Association as Trustee for RAMP 2006-NCI co/GMACMortgage;*

*Ocwen Mortgage/Servicing; Deutsche Zentral – Genossenschaftbank, New York Branch dba*

*DZ Bank AG, New York Branch, DG Holding Trust.*

58.    *Asserted Basis.*   Ocwen relies on paragraph 35 of the Sale Order for the

reimbursement for indemnification payments made to certain RMBS Trustees for pre-Closing

Date acts/omissions, where Ocwen is not reimbursed by the applicable RMBS Trust.

59.    *Liquidating Trust's Objection.*   Pursuant to paragraph 35 of the Sale

Order, Ocwen is only entitled to assert RMBS Trustee claims against the Debtors' estates

where Ocwen (i) has <u>actually paid</u> any amounts to the RMBS Trustees on account of these

claims, and (ii) such amounts are not reimbursed to Ocwen by the applicable RMBS Trust

under the applicable Servicing Agreements after seeking reimbursement therefor from the

applicable RMBS Trusts.   Even though approximately two (2) years have now passed since the

Closing Date, it does not appear that Ocwen has yet paid <u>any</u> indemnification claims to RMBS

Trustees.   *See* Hamzehpour Decl. ¶ 8.   Moreover, Ocwen has failed to provide the Liquidating

Trust with supporting documentation in connection with any of these claims, as required by the

Sale Order.   *See* Sale Order ¶ 35(B); *see also* Hamzehpour Decl. ¶¶ 8-9.   As with Ocwen's

other asserted claims, since the Administrative Claims Bar Date, the Liquidating Trust has

requested from Ocwen notice of all amounts actually paid to the RMBS Trustee, if/when it has

sought reimbursement for those amounts, and, if applicable, whether such reimbursement

request was denied.   *See id.* ¶ 8.   To date, Ocwen has not provided any evidence to show that it

actually paid any amounts to a certain RMBS Trustee on account of such claims, let alone that

the applicable RMBS Trust has challenged such reimbursement.   *See id.* ¶¶ 8, 9.   The

Liquidating Trust believes that had Ocwen paid any amounts to a particular RMBS Trustee,

such amounts should be properly reimbursable through the RMBS Trusts.   *See id.*   For these

25

reasons, there is no basis to assert these claims, particularly without any evidence in support thereof.

60.     Moreover, Ocwen has not sought to estimate these claims, claims that were clearly contingent and unliquidated when initially asserted in the Administrative Claim Request.  While the Sale Order also gives Ocwen the right to seek estimation of the unliquidated amount of any such RMBS Trustee indemnification claim, the time for such a motion is well past.  Ocwen is required to substantiate these claims under the Sale Order and cannot hold these Contingent RMBS Trust Indemnification Claims open indefinitely (*see infra* Section I.B).

61.     Given that these claims remain unresolved to date, there is no basis to seek payment of these contingent and/or unliquidated claims, particularly those that were not identified by the Administrative Claim Bar Date, under the Sale Order.  For these reasons, the Contingent RMBS Trust Indemnification Claims are without merit and should be disallowed.

## II.    ADDITIONAL DEFENSES AND RESERVATION OF RIGHTS

### A.    The Liquidating Trust Has a Right to Assert the Defense of Recoupment

62.     Since the Closing Date, Ocwen has failed to perform certain of its obligations under the APA and the Sale Order.  The Liquidating Trust has notified Ocwen of these failures and requested that Ocwen correct the same.

63.     Specifically, Ocwen, as the Debtors' successor servicer, is failing to service the loans of borrowers whose loans Ocwen claims were excluded from the Sale notwithstanding language specifically negotiated in the Sale Order requiring Ocwen to perform all such servicing activities.  *See* Sale Order ¶ P.  Ocwen fundamentally misunderstands its obligations under the APA and certain provisions of the Sale Order, which require Ocwen to perform *all* servicing obligations under the assumed Servicing Agreements (regardless of

26

whether the particular loan was active as of the Closing Date).  In particular, paragraph P of the

Sale Order states, in relevant part:

> For avoidance of doubt, notwithstanding anything to the contrary contained in this
> Order or in the Ocwen APA, upon the assignment of the Servicing Agreements to
> Purchaser, Purchaser shall perform all of the obligations under the Servicing
> Agreements (but not perform any obligations or have any liabilities arising under
> the Other Agreements) from and after the Closing Date; provided, however, that
> Purchaser shall not incur any liability that arises out of or relates to any act or
> omission of the Debtors (whether as originator, servicer, or otherwise) that
> occurred before the Closing Date.

Sale Order ¶ P.

64.     Beginning October 2014, Ocwen began forwarding certain of its

servicing obligations to the Liquidating Trust instead of fulfilling them itself as successor

servicer.  *See* Hamzehpour Decl. ¶ 10.  As the Debtors' estates are in liquidation, it is

imperative that securitization trustees and borrowers alike can rely on the successor servicers to

handle ongoing servicing issues that arise in the platform of mortgage servicing rights sold to

Ocwen.  *Id.*  Moreover, the Debtors have surrendered their servicing licenses in all relevant

jurisdictions, no longer have access to the records to research and confirm the appropriateness

of such service requests, and, therefore, the Liquidating Trust in most instances simply cannot

act on those third-party servicing-related requests.  *Id.*

65.     Also beginning in October 2014, Ocwen has refused to accept requests

tendered by Mortgage Electronic Registration Systems, Inc. ("MERS") and other third parties

relating to loans in the MERS system that were inactive as of the Closing Date of the Sale.  *See*

Hamzehpour Decl. ¶ 11.  For that reason, MERS and such third parties have continued to

tender requests for assignments and to defend various lawsuits to the Liquidating Trust.  *See id.*

The Liquidating Trust provided MERS with informal notice, and subsequently formal notice in

a letter dated January 20, 2015, that the Debtors no longer hold servicing licenses or have

access to the loan servicing records, as such records have been transferred to Ocwen, as

27

successor servicer.  *See id.*; *see also* Liquidating Trust Letter to MERS, at <u>Exhibit D</u> annexed

to Hamzehpour Decl.  The Liquidating Trust further notified MERS that Ocwen, as successor

servicer, is responsible to respond to and act upon requests tendered by MERS, and that the

Liquidating Trust has no remaining obligations to do so.   *See* Hamzehpour Decl. ¶ 11.

        66.     Any potential claims relating to Ocwen's failure to properly service

borrower loans or respond to MERS' requests are eligible to be recouped against Ocwen's

administrative expense claims.  Specifically, the Liquidating Trust's claims against Ocwen

relating to Ocwen's failure to properly service certain borrower claims relates to Ocwen's

breach of the servicing obligations that it assumed under the APA and provisions of the Sale

Order (*see* Sale Order ¶ P), and, therefore, damages incurred by the Liquidating Trust in

connection therewith should reduce any exposure the estates have to Ocwen.  *See, e.g.*, *Reiter*

*v. Cooper*, 507 U.S. 258, 265 (1993); *Bull v. United States*, 295 U.S. 247, 262 (1935) (stating

"recoupment is in the nature of a defense arising out of some feature of the transaction upon

which the plaintiff's action is grounded"); *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138,

147 (2d Cir. 2002) ("Recoupment may only be applied in bankruptcy where 'both debts . . .

arise out of a single integrated transaction so that it would be *inequitable* for the debtor to

enjoy the benefits of that transaction without also meeting its obligations.'") (citing *Malinowski*

*v. New York State Dep't of Labor (In re Malinowski)*, 156 F.3d 131, 133 (2d Cir. 1998)

(quoting *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1081 (3d Cir.

1992)).

      **B.**    <u>**Reservation of Rights**</u>

        67.     The Liquidating Trust also has substantial claims against Ocwen for

Ocwen's failure to properly service loans owned by the Liquidating Trust in accordance with

the servicing agreement executed between Ocwen and ResCap.  *See* Hamzehpour Decl. ¶ 12.

Among other things, Ocwen has failed to properly service certain assets and loans in accordance with the applicable servicing standards, manage vendors such that the contractual servicing standards are met, and indemnify ResCap against related losses and damages. *Id.* The Liquidating Trust believes that the amount of such claims exceeds the aggregate amount asserted by Ocwen in the Administrative Claim Requests. *Id.* Because the obligations between the Debtors and Ocwen are mutual, the Liquidating Trust's claims may be offset against any amounts that the Debtors' estates owe to Ocwen should the Court determine that the Liquidating Trust is liable on account of any of Ocwen's purported administrative expense claims.[10]

### NOTICE

68.    The Liquidating Trust has served notice of this Objection in accordance with the Case Management Procedures [Docket No. 141] and the Procedures Order. The Liquidating Trust submits that no other or further notice need be provided.

*[Remainder of Page Intentionally Left Blank]*

---

[10] Should the Court find that recoupment is inapplicable with respect to the Liquidating Trust's claims in connection with Ocwen's borrower loan servicing failures, the Liquidating Trust submits that setoff would apply to offset any amounts the parties owe to one another on account of their enforceable claims.

## **CONCLUSION**

WHEREFORE, the Liquidating Trust respectfully requests that the Court enter an

order substantially in the form of the Proposed Order granting the relief requested herein and

granting such other relief as is just and proper.

Dated:  February 13, 2015
New York, New York

<div style="margin-left: 50%;">

 /s/ Todd M. Goren
Todd M. Goren
Jamie A. Levitt
Jonathan C. Rothberg
Meryl L. Rothchild
**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

*Counsel to The ResCap Liquidating Trust*

</div>

30