**<u>Exhibit 1</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ )
                                                             )
In re:                                                       )    Case No. 12-12020 (MG)
                                                             )
RESIDENTIAL CAPITAL, LLC, et al.,                            )    Chapter 11
                                                             )
                                         Debtors.            )    Jointly Administered
                                                             )
------------------------------------------------------------ )

**DECLARATION OF TAMMY HAMZEHPOUR IN SUPPORT OF THE RESCAP**
**LIQUIDATING TRUST'S OBJECTION TO OCWEN LOAN SERVICING, LLC'S**
**REQUEST FOR PAYMENT ON ADMINISTRATIVE EXPENSE CLAIMS**

I, Tammy Hamzehpour, hereby declare as follows:

1.      I am the Chief Business Officer of for The ResCap Liquidating Trust (the

"Liquidating Trust"), and previously served as General Counsel for Residential Capital, LLC and

its affiliates ("ResCap"), a limited liability company organized under the laws of the state of

Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases

(collectively, the "Debtors").  I have held my current title since February 2013, and until then

had been General Counsel since October 2007.  Since joining ResCap in 1998, I have held

various legal positions covering both Mergers & Acquisitions and ResCap's International

Business Group.  I am authorized to submit this declaration (the "Declaration") in support of *The*

*ResCap Liquidating Trust's Objection to Ocwen Loan Servicing LLC's Request for Payment on*

*Administrative Expense Claims* (the "Objection").[1]

2.      Except as otherwise indicated, all facts set forth in this Declaration are

based upon my personal knowledge of the Debtors' operations and finances, information learned

from my review of relevant documents and information I have received through my discussions

---

[1]    Defined terms used but not defined herein shall have the meanings ascribed to such terms as set forth in the
Objection.

with other former members of the Debtors' management or other former employees of the

Debtors, and the Liquidating Trust's professionals and consultants.   In connection with such

review and analysis, where applicable, I or the Liquidating Trust personnel under my

supervision, and the Liquidating Trust's professional advisors have reviewed information

supplied or verified by former personnel in departments within the Debtors' various business

units, and the Debtors' books and records.  If I were called upon to testify, I could and would

testify competently to the facts set forth in the Objection on that basis.

**Secure Axcess Claim**

3.     The Debtors did not receive any written notice of an IP patent

infringement claim from Secure Axcess prior to the Closing Date, nor was ResCap aware of any

such patent infringement claim.  ResCap transferred good, valid and marketable title to all of the

Purchased Assets.  In fact, the MFA Technology at issue was not a Purchased Asset.  The MFA

Technology was licensed to Ally Financial Inc. ("AFI") and ResCap did not have a separate

license to use the MFA Technology.  It is my understanding that Ocwen obtained the right to use

the MFA Technology via the Transition Services Agreement into which Ocwen entered with AFI

(the "AFI Transition Services Agreement") or some other related agreement.  I also understand

that Ocwen discontinued using the MFA Technology shortly after the February 15, 2013 Closing

Date.

**Servicing Advances Claim**

4.     Ocwen has not provided sufficient information to substantiate any

component of this claim in either the Administrative Claim Requests or the Notice Letter.  On a

number of occasions, the Liquidating Trust requested that Ocwen promptly provide the

Liquidating Trust with detail as to (i) why each Servicing Advance has been deemed

uncollectible, and (ii) how the purported uncollectibility renders the Debtors in breach of a specific Core Representation of the APA.  To date, Ocwen has not responded to any of these requests, nor has Ocwen made an effort to show sufficient evidence in support of this asserted claim.

**SAS License Claim**

5.    Debtor RFC signed a master license agreement with SAS on October 24, 1995 for use of certain software by RFC.  This contract and any supplements thereto, which were renewed annually, were up for renewal on October 24, 2012.  Given that SAS's software was used to support the Debtors' operations, the Debtors included the SAS contracts as those that they would potentially assume and assign, and so notified SAS of the proposed treatment of its contracts.  *See Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property, and Unexpired Leases of Nonresidential Real Property and (II) Cure Amounts Related Thereto* [Docket No. 924], Ex. 2 at p. 63 of 81; *see also* Schedule O to APA.  SAS did not file an objection to the proposed assumption and assignment of its contracts.  The master license agreement with SAS and any supplements thereto, which were renewed annually, were up for renewal on October 24, 2012.  *See id*.  As of October 2012, however, the Debtors did not renew the contracts because they and Ocwen had not finalized decisions regarding their future business needs.  In December 2012, the SAS contracts were identified as contracts to be assumed by Ocwen under the APA.  On the Closing Date of the Sale, Ocwen assumed the SAS contracts.

6.    Prior to renewing the contracts, the Debtors and Ocwen agreed that the costs for using the SAS license would be allocated to all parties using SAS's software.  Once the parties agreed that there would be an allocation of costs, the Debtors ultimately renewed the SAS

contracts, and, on February 28, 2013, paid two payments to SAS in the amounts of $49,371.74 and $265,959.45, which represented the annual software maintenance expenses for October 2012–2013 and November 2012–2013, respectively.  Copies of the relevant invoices from SAS are annexed hereto as Exhibit A.  In subsequent discussions held at the end of May 2013, the Debtors and Ocwen agreed that the costs of using the SAS software would be allocated based on the date on which Ocwen assumed the SAS contract.  *See* correspondence to Jeffrey Hall, Sandy Warden, Brian L. Holmlund, and Connie Kane at Ocwen confirming agreed upon allocation method and Excel attachment outlining allocation, dated May 31, 2013, annexed as Exhibit B hereto.  While ResCap would continue to use the SAS software post-closing, it would pay for such use under the TSA and not be directly allocated any post-closing costs.  As a result, Ocwen agreed to pay $136,928.82 of the annual contract costs, which represented its allocation of the software maintenance costs following the Closing Date of the Sale.  *See* confirmation from Jeff Hall[2] at Ocwen agreeing to SAS cost allocation calculation and Ocwen's payment of $136,928.82, annexed as Exhibit C hereto.

7.      Pursuant to the parties' express agreement (*see* Exhibit C annexed hereto), the Debtors billed Ocwen for $136,928.82 in June 2013 for Ocwen's allocation of the SAS software maintenance costs.  Ocwen subsequently made this payment to the Debtors. Accordingly, the Liquidating Trust believes these amounts paid by Ocwen were properly paid and consistent with the parties' understanding.  For these reasons, the Liquidating Trust is not liable to Ocwen for this claim, and the SAS License Claim should be disallowed in its entirety.

---

[2] Jeff Hall was Ocwen's Senior IT Finance Leader, whose position was responsible for reviewing and approving IT vendor payments.

ny-1171170

**Contingent RMBS Trust Indemnification Claims**

8.      To date, the Liquidating Trust has not received from Ocwen any supporting documentation relating to RMBS Trust Indemnification Claims, as required by the Sale Order.  *See* Sale Order ¶ 35(B).  Accordingly, even though approximately two (2) years have now passed since the Closing Date, it does not appear that Ocwen has yet paid any indemnification claims to RMBS Trustees.  As with Ocwen's other asserted claims, since the Administrative Claims Bar Date, the Liquidating Trust has requested from Ocwen notice of all amounts actually paid to the RMBS Trustee, if/when it has sought reimbursement for those amounts, and, if applicable, whether such reimbursement request was denied.  In response, Ocwen has not provided any evidence to show that it actually paid any amounts to a certain RMBS Trustee on account of such claims, let alone that the applicable RMBS Trust has challenged such reimbursement.  It is my view that had Ocwen paid any amounts to a particular RMBS Trustee, such amounts should be properly reimbursable through the RMBS Trusts.

9.      For these reasons, there is no basis to assert any of Ocwen's purported administrative expense claims, particularly without any documentation in support thereof.  Accordingly, based upon this review and in consultation with the Liquidating Trust, and for the reasons set forth in the Objection, I have determined that each of Ocwen's claims that is the subject of the Objection should be accorded the proposed treatment described in the Objection.

**Liquidating Trust's Claims Against Ocwen**

10.      Beginning October 2014, Ocwen began forwarding certain of its servicing obligations to the Liquidating Trust instead of fulfilling them itself as successor servicer.  As the Debtors' estates are in liquidation, it is imperative that securitization trustees and borrowers alike can rely on the successor servicers to handle ongoing servicing issues that arise in the platform of

mortgage servicing rights sold to Ocwen.   Moreover, the Debtors have surrendered their servicing licenses in all relevant jurisdictions, no longer have access to the records to research and confirm the appropriateness of such service requests, and, therefore, the Liquidating Trust in most instances simply cannot act on those third-party servicing-related requests.

11.    Also beginning in October 2014, Ocwen has refused to accept requests tendered by Mortgage Electronic Registration Systems, Inc. ("MERS") and other third parties relating to loans in the MERS system that were inactive as of the Closing Date of the Sale.   For that reason, MERS and such third parties have continued to tender requests for assignments and to defend various lawsuits to the Liquidating Trust.   The Liquidating Trust provided MERS with informal notice, and subsequently formal notice in a letter dated January 20, 2015, that the Debtors no longer hold servicing licenses or have access to the loan servicing records, as such records have been transferred to Ocwen, as successor servicer.   *See* Liquidating Trust Letter to MERS, at Exhibit D annexed hereto.   The Liquidating Trust further notified MERS that Ocwen, as successor servicer, is responsible to respond to and act upon requests tendered by MERS, and that the Liquidating Trust has no remaining obligations to do so.   *See id.*

12.    The Liquidating Trust also has substantial claims against Ocwen for Ocwen's failure to properly service loans owned by the Liquidating Trust in accordance with the servicing agreement executed between Ocwen and ResCap.   Among other things, Ocwen has failed to properly service certain assets and loans in accordance with the applicable servicing standards, manage vendors such that the contractual servicing standards are met, and indemnify ResCap against related losses and damages.   Based on a preliminary analysis conducted by the Liquidating Trust, I believe that the amount of such claims exceeds the aggregate amount asserted by Ocwen in the Administrative Claim Requests.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing
is true and correct.

Dated:  February 13, 2015

 /s/ Tammy Hamzehpour
Tammy Hamzehpour
Chief Business Officer for ResCap
Liquidating Trust

## Exhibit A

GIDB

# §.sas.

SAS INSTITUTE INC.
SAS Campus Drive
Cary, NC 27513 USA.
Tel: 919 677 8000
Fax: 919 677 4444
www.sas.com

# Invoice 7378758
License Agreement No.: 31976

Customer No.:   47605        Page 1 of 1

Federal ID No. 561133017    Accounts Receivable: (919) 531 9400
Customer Support: (800) 727 0025 US

**Invoice To:**

Dale Burdick
Residential Funding Corp
1100 Virginia Dr
PO Box 8300
Fort Washington, PA 19034-8300

**SAS Installation Rep:**

Dale Burdick
Residential Funding Corp
1100 Virginia Dr
PO Box 8300
Fort Washington, PA 19034-8300

**Payment Instructions**
Reference invoice #7378758 on your remittance.

| | |
|---|---|
| ■ Mail Payment Only To: | SAS Institute Inc. PO Box 406922 Atlanta, GA 30384-6922 |
| ■ Transfer Payment To: | Bank of America Account #: ▮▮▮▮8108 Routing #: 053-000-196 (ACH) Routing #: 026-009-593 (WIRE); Swift:BOFAUS3N Name: SAS Institute Inc. |

| Invoice Date | Purchase Order No. | Customer Contract No. | Terms of Payment |
|---|---|---|---|
| 09-OCT-12 | PO9432 | | Net 30 days |

| Submit name and/or address corrections to Customer Support at support.sas.com/adminservices/ or call 800-727-0025. | Total Amount Due $265,959.45 |
|---|---|

| ID | Description | Amount |
|---|---|---|
| 77554 | 31DEC2012 - 30DEC2013 UXWN64-8P1C | |
| | Enterprise Guide | 10,210.00 |
| | --- 50 users | |
| | HP6I SAS BI Server | 69,090.00 |
| | HP6I SAS/ACCESS Interface to Microsoft SQL Server | 14,660.00 |
| | HP6I SAS/ACCESS Interface to Oracle | 14,660.00 |
| | HP6I SAS/ACCESS Interface to PC Files | 14,660.00 |
| | HP6I SAS/CONNECT | 14,660.00 |
| | HP6I SAS/ETS | 15,210.00 |
| | HP6I SAS/FSP | 14,660.00 |
| | HP6I SAS/IML | 15,210.00 |
| | HP6I SAS/IntrNet | 32,800.00 |
| | HP6I SAS/SHARE | 14,660.00 |
| | HP6I SAS/STAT | 15,210.00 |
| | | |
| | Tax Summary | |
| | ---------------------------------- | |
| | CITY - 2.00 % | 4,913.80 |
| | STATE - 6.25 % | 15,355.65 |

| Total Tax   (Tax Location : Lewisville TX  Denton County) | $20,269.45 |
|---|---|
| **Total** | U.S. Funds | **$265,959.45** |

Internal Information
EMDROB/FINL/QH /NOAUTO

SAS and all other SAS Institute Inc. product or service names are registered trademarks or trademarks of SAS Institute Inc. in the USA and other countries.
® indicates USA registration. Other brand and product names are trademarks of their respective companies.

*GIDB*

# §.sas.

SAS INSTITUTE INC.
SAS Campus Drive
Cary, NC 27513 USA
Tel:  919 677 8000
Fax: 919 677 4444
www.sas.com

# Invoice 7381196

License Agreement No.:  57077

Customer No.:  392174          Page 1 of 1

**Federal ID No.  561133017**          **Accounts Receivable: (919) 531 9400**
**Customer Support: (800) 727 0025 US**

**Invoice To:**

Dale Burdick
GMAC LLC
1100 Virginia Dr
PO Box 8300
Fort Washington, PA 19034-8300

**SAS Installation Rep:**

Dale Burdick
GMAC LLC
1100 Virginia Dr
PO Box 8300
Fort Washington, PA 19034-8300

**Payment Instructions**

Reference invoice #7381196 on your remittance.

| | Mail Payment Only To: | SAS Institute Inc.<br>PO Box 406922<br>Atlanta, GA 30384-6922 |
|---|---|---|
| ■ | **Credit Card Payments:  https://www.sas.com/paysas** | |
| ■ | Transfer Payment To: | Bank of America<br>Account #:████████8108<br>Routing #: 053-000-196 (ACH)<br>Routing #: 026-009-593 (WIRE); Swift:BOFAUS3N<br>Name: SAS Institute Inc. |

| Invoice Date<br>06-NOV-12 | Purchase Order No.<br>PO9432 | Customer Contract No. | Terms of Payment<br>Net 30 days |
|---|---|---|---|
| Submit name and/or address corrections to Customer Support at<br>support.sas.com/adminservices/ or call 800-727-0025. | | | **Total Amount Due**<br>$49,371.74 |

| ID | Description | Amount |
|---|---|---|
| 554756 | 15DEC2012 - 14DEC2013<br>S9107-6P2C<br>HP6I SAS Analytics Pro<br>HP6I SAS/ACCESS Interface to Microsoft SQL Server<br>HP6I SAS/ACCESS Interface to Oracle | 23,750.00<br>11,700.00<br>10,360.00 |
| | Tax Summary<br>----------------------------------------------------------------------------------------------<br>CITY - 0.50 %<br>COUNTY - 0.40 %<br>STATE - 6.88 % | 229.05<br>183.25<br>3,149.44 |

| Total Tax    (Tax Location : Minneapolis MN  Hennepin County) | $    3,561.74 |
|---|---|
| **Total** | **U.S. Funds**    **$49,371.74** |

Internal Information
EMDROB/FINL/QH /NOAUTO

SAS and all other SAS Institute Inc. product or service names are registered trademarks or trademarks of SAS Institute Inc. in the USA and other countries.
® indicates USA registration. Other brand and product names are trademarks of their respective companies.

**Exhibit B**

**Guido, Laura**

| | |
|---|---|
| **From:** | Colette Wahl <Colette.Wahl@rescapestate.com> |
| **Sent:** | Friday, February 13, 2015 9:28 AM |
| **To:** | Rothchild, Meryl L. |
| **Subject:** | FW: CLEAN Email from Lori - re: SAS Cost Allocation |

---

**From:** DeVincent, Lori - PA
**Sent:** Friday, May 31, 2013 2:11 PM
**To:** DeVincent, Lori - PA; Hall, Jeffrey - PA; Warden, Sandy - PA; Holmlund, Brian L.; Kane, Connie
**Cc:** Burdick, Dale - PA
**Subject:** RE: SAS Cost Allocation

Please see the attached for the final break down and let me know if you have any questions.

**Lori M. DeVincent**



IT Program Director | Administration Office
1100 Virginia Drive, Suite 250   Fort Washington, PA  19034

Office: 215.734.5836
Mobile: 215.485.8979
lori.devincent@gmacrescap.com

---

**From:** DeVincent, Lori - PA
**Sent:** Friday, May 31, 2013 10:15 AM
**To:** DeVincent, Lori - PA; Hall, Jeffrey - PA; Warden, Sandy - PA; Holmlund, Brian L.; Kane, Connie
**Cc:** Burdick, Dale - PA
**Subject:** RE: SAS Cost Allocation

Thanks to everyone for making time to talk through this.  Below is a summary of what we all agreed to.

The cost for SAS falls into EARC Cost center for enterprise tools.   Agreed to allocate presales portion to the Estate and the rest allocated back to Walter and Ocwen 50/50.  The ongoing costs fro SAS are already being paid for though the SOW and therefore there is no further allocation back to Ally or the Estate.

Below is the breakdown of SAS invoices and the periods they cover.

$49,371.74      12/15/12- 12/14/13

$265,959.45     12/31/12 -12/30/13

I will share this with the Estate finance team and request that they cut a new invoice to the entities to reflect this change in allocation.

Please let me know if you have any additions or corrections.


**Lori M. DeVincent**



IT Program Director | Administration Office
1100 Virginia Drive, Suite 250   Fort Washington, PA  19034

Office: 215.734.5836
Mobile: 215.485.8979
lori.devincent@gmacrescap.com



-----Original Appointment-----
**From:** DeVincent, Lori - PA
**Sent:** Wednesday, May 29, 2013 4:17 PM
**To:** DeVincent, Lori - PA; Hall, Jeffrey - PA; Warden, Sandy - PA; Holmlund, Brian L.; Kane, Connie
**Cc:** Burdick, Dale - PA
**Subject:** SAS Cost Allocation
**When:** Friday, May 31, 2013 9:30 AM-10:00 AM (GMT-05:00) Eastern Time (US & Canada).
**Where:** (866)203-0920x6210770290#


Let's get together to agree on the allocation of costs of this contract.

**Per ARC Schedule:**

|     | Estate | Ocwen  | Walter  | Ally   | Total   | Amt Pd  | Pd wh |
|-----|--------|--------|---------|--------|---------|---------|-------|
| SAS | -      | 79,000 | 158,000 | 79,000 | 316,000 | 315,331 | 2     |

**Per Contract Meeting with all Entities:**
AFI 100 users (73% of total)
Ocwen 17 users (12% of total)
Walter/GT 6 users  (4% of total)
Rescap Estate 14 users(10% of total)
Total 137 users(100%)

3/22:
Leon - need to know what the 49 is and then will go solve for this.  To follow up with Connie Cane to scope problem and come back.

4/12:  Leon to provide more info
4/19: Lori DeVincent:   Estate only has 9 SAS users and it is included in the SOW from Walter to Estate and therefore we do no  expect to incur charges above and beyond what we are already paying for in the SOW.
4/19:  To be closed

**Per Jeff Hall's Research:**

| Vendor | Description | Purpose | Total Spend | Allocation Method | Comments |
|--------|-------------|---------|-------------|-------------------|----------|

| SAS | Annual software maintenance support for SAS Analytics | Highly specialized platform for predictive modeling and forecasting | $316K | Risk is primary user for Lending support, but also used for Servicing | Trying to confirm if charges should just be split between Ocwen and Walter; allocation handled in SOW after that (ITEARC split 50-50, but actual license usage includes Ally).... |

====================================================================

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail MRothchild@mofo.com, and delete the message.

**SAS Cost Allocation**

| Invoice Amount | monthly | Ocwen | Ocwen | Walter | Walter | Estate |
|---|---|---|---|---|---|---|
| $ 49,371.74 | $ 4,114.31 | 50% less 2 months | $ 20,571.56 | 50% less 1.5 months | $ 21,600.14 | $ 7,200.05 |
| $ 265,959.45 | $ 22,163.29 | 50% less 1.5 months | $ 116,357.26 | 50% less 1 month | $ 121,898.08 | $ 27,704.11 |
| $ 315,331.19 | | | $ 136,928.82 | | $ 143,498.22 | $ 34,904.15 |

**Exhibit C**

## Guido, Laura

| | |
|---|---|
| **From:** | Hall, Jeffrey - PA <IMCEAEX-_O=GMAC+20MORTGAGE+20CORP_OU=DALLAS-IT_CN=EXCHANGE+20MIGRATION_CN=RECIPIENTS_CN=RESIDENTIAL_CN=JEFF+5FHALL@RSCS24.local> |
| **Sent:** | Friday, May 31, 2013 2:45 PM |
| **To:** | DeVincent, Lori - PA; Warden, Sandy - PA; Holmlund, Brian L.; Kane, Connie |
| **Cc:** | Burdick, Dale - PA |
| **Subject:** | RE: SAS Cost Allocation |

Calc looks right to me per our discussions..


Jeffrey G Hall | Senior Financial Analyst, IT Finance
**Ocwen Financial Corporation**
1100 Virginia Drive | Fort Washington, PA 19034
P: (215)-734-4292
email | jeffrey.hall@ocwen1.com


---

**From:** DeVincent, Lori - PA
**Sent:** Friday, May 31, 2013 2:11 PM
**To:** DeVincent, Lori - PA; Hall, Jeffrey - PA; Warden, Sandy - PA; Holmlund, Brian L.; Kane, Connie
**Cc:** Burdick, Dale - PA
**Subject:** RE: SAS Cost Allocation


Please see the attached for the final break down and let me know if you have any questions.


<< File: sas breakdown.xlsx >>

**Lori M. DeVincent**



IT Program Director | Administration Office
1100 Virginia Drive, Suite 250   Fort Washington, PA  19034

Office: 215.734.5836
Mobile: 215.485.8979
lori.devincent@gmacrescap.com


---

**From:** DeVincent, Lori - PA
**Sent:** Friday, May 31, 2013 10:15 AM
**To:** DeVincent, Lori - PA; Hall, Jeffrey - PA; Warden, Sandy - PA; Holmlund, Brian L.; Kane, Connie
**Cc:** Burdick, Dale - PA
**Subject:** RE: SAS Cost Allocation


Thanks to everyone for making time to talk through this.  Below is a summary of what we all agreed to.

The cost for SAS falls into EARC Cost center for enterprise tools.   Agreed to allocate presales portion to the Estate and the rest allocated back to Walter and Ocwen 50/50.  The ongoing costs fro SAS are already being paid for though the SOW and therefore there is no further allocation back to Ally or the Estate.

Below is the breakdown of SAS invoices and the periods they cover.

$49,371.74      12/15/12- 12/14/13

$265,959.45     12/31/12 -12/30/13

I will share this with the Estate finance team and request that they cut a new invoice to the entities to reflect this change in allocation.

Please let me know if you have any additions or corrections.


**Lori M. DeVincent**



IT Program Director | Administration Office
1100 Virginia Drive, Suite 250   Fort Washington, PA  19034

Office: 215.734.5836
Mobile: 215.485.8979
lori.devincent@gmacrescap.com


-----Original Appointment-----
**From:** DeVincent, Lori - PA
**Sent:** Wednesday, May 29, 2013 4:17 PM
**To:** DeVincent, Lori - PA; Hall, Jeffrey - PA; Warden, Sandy - PA; Holmlund, Brian L.; Kane, Connie
**Cc:** Burdick, Dale - PA
**Subject:** SAS Cost Allocation
**When:** Friday, May 31, 2013 9:30 AM-10:00 AM (GMT-05:00) Eastern Time (US & Canada).
**Where:** (866)203-0920x6210770290#


Let's get together to agree on the allocation of costs of this contract.


**Per ARC Schedule:**

|  | Estate | Ocwen | Walter | Ally | Total | Amt Pd | Pd wh |
|---|---|---|---|---|---|---|---|
| SAS | - | 79,000 | 158,000 | 79,000 | 316,000 | 315,331 | 2 |

**Per Contract Meeting with all Entities:**
AFI 100 users (73% of total)
Ocwen 17 users (12% of total)
Walter/GT 6 users  (4% of total)
Rescap Estate 14 users(10% of total)
Total 137 users(100%)

3/22:

Leon - need to know what the 49 is and then will go solve for this.  To follow up with Connie Cane to scope problem and come back.


4/12:  Leon to provide more info
4/19: Lori DeVincent:   Estate only has 9 SAS users and it is included in the SOW from Walter to Estate and therefore we do not  expect to incur charges above and beyond what we are already paying for in the SOW.
4/19:  To be closed

**Per Jeff Hall's Research:**

| Vendor | Description | Purpose | Total Spend | Allocation Method | Comments |
|--------|-------------|---------|-------------|-------------------|----------|
| SAS | Annual software maintenance support for SAS Analytics | Highly specialized platform for predictive modeling and forecasting | $316K | Risk is primary user for Lending support, but also used for Servicing | Trying to confirm if charges should just be split between Ocwen and Walter; allocation handled in SOW after that (ITEARC split 50-50, but actual license usage includes Ally).... |

**<u>Exhibit D</u>**

# ResCap

January 20, 2015

**VIA email**

Mr. Timothy Renner
MERSCORP Holdings, Inc.
1818 Library Street, Suite 300
Reston, Virginia 20190

      Re: MERS Org. IDs 1000375 and 1000440

Dear Mr. Renner:

      As MERSCORP is aware, on May 14, 2012, Residential Capital, LLC ("ResCap"), and certain of its direct and indirect subsidiaries, including Residential Funding Company, LLC and GMAC Mortgage, LLC (collectively, "Debtors"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. On January 31, 2013 and February 15, 2013 (the "Sale Dates"), as MERSCORP is also aware, ResCap sold substantially all of its servicing portfolio to Walter Investment Management Corp. and Ocwen Loan Servicing, LLC, respectively (together, the "Successor Servicers"). On December 11, 2013, the Bankruptcy Court entered its Order confirming a final Plan (the "Plan") for the liquidation of Debtors' business and assets. The Plan became effective on December 17, 2013, and all bar dates for the filing of various types of claims against the Debtors have long passed.

      We have granted the Successor Servicers broad powers of attorney to act on behalf of the Debtors in respect of all loans subject to pooling and servicing agreements assumed by them. We understand, however, that Ocwen has refused to accept requests tendered by MERS relating to loans that were inactive as of its Sale Date. For that reason, MERS has continued to tender requests for assignments and various lawsuits to the ResCap Liquidating Trust as successor-in-interest to the Debtors ("RLT"). As of the date of this letter, various RLT employees have received in the aggregate over 1,600 of such tendered emails.

      We have informed certain of your representatives informally, but hereby inform MERS formally, that the Debtors no longer hold servicing licenses and that, with the exception of loans that continue to be owned by RLT, the staff of RLT no longer has access to the loan servicing records necessary to research whether assignments of mortgage or other actions included in the tendered requests are appropriate, as all such records remain on the systems or in the records acquired by the Successor Servicers. If RLT nevertheless were to succumb to pressure to make any such requested entries or changes in the MERS system, neither RL nor MERS could be sure that the actions were proper, thereby exposing both RLT and MERS to potential liability. We do not believe that approach, therefore, to be in the best interest of borrowers, MERS or any other party.

Timothy Renner
January 20, 2015
Page 2

In addition, we believe that Ocwen, as a Successor Servicer, is responsible to respond to and act upon the requests tendered by MERS even if they relate to loans that were inactive as of the Sale Date. We have shared our position on this issue with Ocwen, most recently in a letter sent from RLT to Ocwen dated October 16, 2014. For reference, a copy of this letter is annexed hereto as Annex I.

Accordingly, for the aforementioned reasons, we believe that RLT has no remaining obligations to take such actions, including defend against any such claims, except in respect of loans that it still owns, as its servicing obligations were assumed by a Successor Servicer. We also believe that RLT has no obligation to indemnify MERS in connection with any claim brought against MERS or Ocwen with respect to any MERS loan registered on the MERS System. We strongly recommend that MERS continue to work with Ocwen on the previously tendered requests so that borrowers, MERS and others can be sure that only proper actions are taken in respect of such loans on the MERS system.

Sincerely yours,

RESCAP LIQUIDATING TRUST

William R. Thompson
General Counsel

# RESCAP

## LIQUIDATING TRUST

October 16, 2014

(VIA FEDERAL EXPRESS)

Timothy Hayes, Esq.
General Counsel
Ocwen Financial Corporation
1661 Worthington Road, Suite 100
West Palm Beach, FL 33409

      Re:    Ocwen as Successor Servicer

Dear Mr. Hayes:

We have noted recently that a number of Ocwen servicing personnel are forwarding customary servicing-related issues related to loans that are or were serviced under one of the Servicing Agreements referenced below to our employees (or to third parties who subsequently forward such inquiries to our employees), with the following response:

> "Thank you for your inquiry regarding your prior GMAC Mortgage, LLC (GMACM) serviced loan. As you may be aware, Ocwen Loan Servicing, LLC (Ocwen) purchased certain servicing rights from GMACM in Case No. 12-12020 (MG), filed on May 14, 2012, in the United States Bankruptcy Court for the Southern District of New York (the Bankruptcy Case). According to Ocwen's systems and records, your loan was not part of the servicing rights purchased by Ocwen from GMACM in the Bankruptcy Case. As a result, Ocwen did not acquire any interest in your loan that would allow Ocwen to assist you related to your inquiry."

We believe Ocwen has a misunderstanding of the agreements executed in connection with the sale of ResCap's servicing platform to Ocwen and of certain provisions of the Bankruptcy Court's Section 363 Sale Order approving consummation of the Asset Purchase Agreement dated November 2, 2012 ("Ocwen APA") among Ocwen, ResCap and certain ResCap subsidiaries. We do not agree that Ocwen need not or cannot take action, as servicer, under the Servicing Agreements (as defined in the Ocwen APA) assumed and assigned to Ocwen pursuant to the Ocwen APA, with respect to facts and circumstances that arose prior to the Closing Date, but for which notice or discovery occurs after the Closing Date. In particular, we refer you to Paragraph P of the Sale Order, which states in relevant part:

> "For avoidance of doubt, notwithstanding anything to the contrary contained in this Order or in the Ocwen APA, upon the assignment of the Servicing Agreements to Purchaser, Purchaser shall perform all of the obligations under the Servicing Agreements (but not perform any obligations or have any liabilities arising under the Other Agreements) from and after the Closing Date; provided, however, that Purchaser shall not incur any liability that arises out of or relates to any act or omission of the Debtors (whether as originator, servicer, or otherwise) that occurred before the Closing Date."

ANNEX 1

Timothy Hayes, Esq.
October 16, 2014
Page 2

This language was heavily negotiated among the debtors, the securitization trustees and Ocwen and was one of the final conditions, the satisfaction of which removed the securitization trustees' objection to the sale. Ocwen appears to be drawing a distinction between active loans servicing transferred to it at the time of the Sale and those that were paid off or otherwise deemed by Ocwen not included in the Sale. Paragraph P of the Sale Order, however, makes no such distinction. Rather, it requires Ocwen to perform *all* servicing obligations under the Servicing Agreements. It does not limit that obligation solely to current or a delimited set of loans on the Closing Date. The servicing obligations that your servicing officers are forwarding to our staff in error are precisely what a successor servicer does as successor, and the need for them by trustees, borrowers and others is the reason ResCap appointed, at Ocwen's request, dozens of Ocwen employees as on-going servicing officers with the power to act on behalf of GMAC Mortgage, LLC and Residential Funding Company, LLC. Indeed, assurance that these obligations would be fulfilled by Ocwen was the crux of the securitization trustees' consent to Ocwen's appointment as successor servicer. With ResCap and the other debtors transforming into liquidating and unlicensed entities (which such entities have no servicing staff), the securitization trustees needed to rely on the successor servicers to handle on-going servicing issues that arise and are inherent in the course of servicing a large and distressed platform of mortgage loans, some of which naturally are a result of facts that occurred prior to the Closing Date. By adopting an inaccurate interpretation of the Ocwen APA and the Sale Order, Ocwen is creating harm for borrowers by requiring them to hire lawyers, file quiet title actions or engage in other expensive proceedings to accomplish what should be routine servicing matters.

To be clear, all ResCap entities have surrendered their servicing licenses in all relevant jurisdictions. As a result, the ResCap Liquidating Trust cannot act on any third party servicing-related requests and will direct any inquiring party to follow up with Ocwen as the successor servicer. Because the important issues referenced herein relate to hundreds of outstanding securitizations that were assumed and assigned to Ocwen pursuant to the Ocwen APA, and insofar as the ResCap Liquidating Trust is a bondholder in some of those securitizations, we are also copying the securitization trustees in order to clarify this situation for them.

Sincerely Yours,

RESCAP LIQUIDATING TRUST

William R. Thompson
General Counsel

cc:    Gary S. Lee, Esq.
       Todd M. Goren, Esq.
       U.S. Bank National Association
       Deutsche Bank National Trust Company
       Deutsche Bank Trust Company Americas
       The Bank of New York Mellon
       The Bank of New York Mellon Trust Company, N.A.
       Wells Fargo Bank, N.A.
       Consumer Financial Protection Bureau
       Federal Trade Commission
       Tammy Hamzehpour