# Exhibit C

*Execution Copy*

---

# Transition Services Agreement

### by and between

### Residential Capital, LLC
### and
### Ocwen Loan Servicing, LLC

### Dated as of February 15, 2013

---

la-1200776

*1.*    **DEFINITIONS.** ................................................................................................ *1*
    **1.1**   Definitions. ........................................................................................ 1
*2.*    **TERM AND RENEWAL** ................................................................................ *5*
    **2.1**   Initial Term. ....................................................................................... 5
    **2.2**   Renewal. ............................................................................................. 5
*3.*    **SERVICES.** ....................................................................................................... *5*
    **3.1**   Services. ............................................................................................. 5
    **3.2**   Additional Services. ........................................................................... 7
    **3.3**   Changes to Services/Change Control Procedures. ............................. 7
    **3.4**   Recipients' Obligations. ..................................................................... 8
    **3.5**   Required Consents. ............................................................................ 8
    **3.6**   Security Level; Additional Security Measures. ................................. 9
*4.*    **USE OF AFFILIATES AND SUBCONTRACTORS.** ................................... *9*
    **4.1**   Affiliates and Subcontractors............................................................ 9
    **4.2**   Compliance. ..................................................................................... 10
*5.*    **RELATIONSHIP MANAGEMENT.** ........................................................... *10*
    **5.1**   Relationship Managers. ................................................................... 10
    **5.2**   Governance Model. .......................................................................... 10
    **5.3**   Reports. ............................................................................................ 10
    **5.4**   Regulatory Review. ......................................................................... 11
    **5.5**   Books and Records; Audit. .............................................................. 11
    **5.6**   Books and Records; Audit. .............................................................. 11
    **5.7**   Informal Dispute Resolution Procedures. ....................................... 11
    **5.8**   Continued Performance. .................................................................. 11
*6.*    **FACILITIES.** ................................................................................................. *13*
    **6.1**   Use of Recipient Facilities. ............................................................. 13
    **6.2**   Supplier Facilities and Systems. ..................................................... 14
    **6.3**   Physical Security for Facilities. ...................................................... 14
*7.*    **INTELLECTUAL PROPERTY AND PROPRIETARY RIGHTS**................ *14*
    **7.1**   Ownership of Intellectual Property. ................................................ 14
    **7.2**   Development of Intellectual Property. ............................................. 14
    **7.3**   Limited License to Use Supplier Work Processes and Software. ..... 15
    **7.4**   No Implied Licenses. ....................................................................... 15
*8.*    **RECIPIENT DATA.** ...................................................................................... *15*
    **8.1**   Definition. ........................................................................................ 15
    **8.2**   Ownership. ....................................................................................... 15
    **8.3**   Data Security. .................................................................................. 16
*9.*    **CONFIDENTIALITY.** .................................................................................. *16*
    **9.1**   Obligations. ..................................................................................... 16
    **9.2**   Excluded Information. ..................................................................... 17
    **9.3**   Compelled Disclosure. .................................................................... 17
    **9.4**   Return of Information. ..................................................................... 17
    **9.5**   Exception. ........................................................................................ 18

i

| | 9.6 | Obligations. | 18 |
| | 9.7 | Loss of Confidential Information. | 18 |
| | 9.8 | No Implied Rights. | 18 |
| 10. | | COMPENSATION. | 18 |
| | 10.1 | General. | 18 |
| | 10.2 | Taxes. | 19 |
| | 10.3 | Invoicing and Payment. | 19 |
| 11. | | REPRESENTATIONS AND WARRANTIES. | 19 |
| | 11.1 | Services. | 19 |
| | 11.2 | Maintenance. | 19 |
| | 11.3 | Authorization. | 20 |
| | 11.4 | Viruses. | 20 |
| | 11.5 | Disclaimer. | 20 |
| 12. | | INSURANCE; RISK OF LOSS. | 20 |
| | 12.1 | Insurance. | 20 |
| | 12.2 | Risk of Loss. | 20 |
| 13. | | INDEMNIFICATION AND LIMITATIONS ON LIABILITY. | 21 |
| | 13.1 | Indemnification. | 21 |
| | 13.2 | Limitations on Liability. | 23 |
| | 13.3 | Indemnification and Limitations on Liability Relating to Negligence and Strict Liability. | 25 |
| | 13.4 | Exclusive Remedy. | 25 |
| | 13.5 | Insurance. | 25 |
| 14. | | TERMINATION. | 25 |
| | 14.1 | Termination. | 25 |
| | 14.2 | Election of Terminating Party. | 26 |
| | 14.3 | Survival. | 26 |
| | 14.4 | Rights Upon Termination or Expiration. | 27 |
| 15. | | GENERAL. | 27 |
| | 15.1 | Acknowledgement. | 27 |
| | 15.2 | Binding Effect; No Assignment. | 28 |
| | 15.3 | Counterparts. | 28 |
| | 15.4 | Entire Agreement. | 28 |
| | 15.5 | Force Majeure. | 28 |
| | 15.6 | Further Assurances. | 29 |
| | 15.7 | Governing Law; Jurisdiction and Forum; Waiver Of Jury Trial. | 29 |
| | 15.8 | Headings. | 29 |
| | 15.9 | Independent Contractors. | 29 |
| | 15.10 | Notices. | 30 |
| | 15.11 | Public Announcements. | 30 |
| | 15.12 | Amendments and Waivers. | 31 |
| | 15.13 | Severability. | 31 |
| | 15.14 | No Third Party Beneficiaries. | 31 |
| | 15.15 | Order of Precedence. | 31 |

la-1200776

## SCHEDULES

| | |
|---|---|
| Schedule A-1 | ResCap Services |
| Schedule A-2 | Ocwen Services |
| Schedule B | Governance Model |
| Schedule C | Pricing Methodology |
| Schedule C-1 | Pricing for ResCap Services |
| Schedule C-2 | Pricing for Ocwen Services |
| Schedule D-1 | List of Ocwen Recipients and Supported Facilities |
| Schedule D-2 | List of ResCap Recipients and Supported Facilities |
| Schedule E | Form of Supplement |

la-1200776

**TRANSITION SERVICES AGREEMENT**

This Transition Services Agreement (this "**Agreement**") is entered into on February 15, 2013 and effective from and after the Closing (the "**Effective Date**") by and between Residential Capital, LLC, a Delaware limited liability company ("**ResCap**") and Ocwen Loan Servicing, LLC, a Delaware limited liability company ("**Ocwen**").

**WHEREAS**, Ocwen, on the one hand, and ResCap and various affiliates of ResCap, on the other hand, entered into that certain Asset Purchase Agreement, dated as of November 2, 2012 (as amended from time to time in accordance with its terms, the "**APA**"), pursuant to which Ocwen agreed to purchase certain assets of ResCap.

**WHEREAS**, in connection with the transactions contemplated by the APA, Ocwen desires ResCap to provide certain transition services from and after the Closing, and ResCap desires Ocwen to provide certain transition services from and after the Closing, upon the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows.

## 1.    DEFINITIONS.

**1.1** <u>Definitions</u>. As used in this Agreement, the following terms have the following meanings:

"**Acquired ResCap Business**" means the business that is acquired by Ocwen pursuant to the APA.

"**Additional Services**" has the meaning set forth in **<u>Section 3.2</u>**.

"**Affiliate**" means, with respect to any specified Person, (a) those other Persons with respect to which such specified Person directly or indirectly owns or controls more than 50% of the voting equity securities of such other Person, (b) those other Persons that directly or indirectly own or control more than 50% of the voting equity securities of such specified Person, and (c) as to the Persons identified in the preceding clauses (a) and (b), those Persons that directly or indirectly own or control more than 50% of the voting equity securities of such identified Persons.

"**AFI**" means Ally Financial, Inc., a Delaware corporation.

"**Agreement**" has the meaning set forth in the preamble.

"**APA**" has the meaning set forth in the Recitals.

"**Assisting Party**" has the meaning set forth in **<u>Section 5.10</u>**.

"**Bankruptcy Court**" means the bankruptcy court in which the chapter 11 case(s) of ResCap and/or its Subsidiaries are pending.

"**Business Change Event**" has the meaning set forth in **<u>Schedule C</u>**.

"**Charges**" has the meaning set forth in **<u>Schedule C</u>**.

la-1200776

"**Claim**" has the meaning set forth in **Section 13.1(d)(1)**.

"**Claim Notice**" has the meaning set forth in **Section 13.1(d)(1)**.

"**Closing**" has the meaning set forth in the APA.

"**Confidential Information**" has the meaning set forth in **Section 9.1**.

"**Customized Services**" has the meaning set forth in **Section 3.3(a)**.

"**Damages**" has the meaning set forth in **Section 13.1(a)**.

"**Effective Date**" has the meaning set forth in the preamble.

"**Equipment**" means computer and telecommunications equipment (without regard to the entity owning or leasing such equipment) including: (a) servers, personal computers, and associated attachments, accessories, peripheral devices, printers, cabling and other equipment; and (b) private branch exchanges, multiplexors, modems, CSUs/DSUs, hubs, bridges, routers, switches and other telecommunications equipment.

"**Force Majeure Event**" has the meaning set forth in **Section 15.5(a)**.

"**Functional Service Areas**" means the categories of ResCap Services or Ocwen Services that are set forth under **Schedule C-1** or **Schedule C-2**, as applicable.

"**Governmental Authority**" means any government or political subdivision, board, commission or other instrumentality thereof, whether federal, state, local or foreign.

"**Include**" and its derivatives means including without limitation. This term is as defined whether or not capitalized in this Agreement.

"**Indemnified Parties**" has the meaning set forth **Section 13.1(a)**.

"**Indemnifying Party**" has the meaning set forth **Section 13.1(d)**.

"**Initial Term**" has the meaning set forth in **Section 2.1**.

"**Intellectual Property**" means any of the following, whether subsisting now or in the future anywhere in the world: (a) patents and pending patent applications; (b) trademarks, service marks, trade names and trade dress, and associated goodwill and rights of publicity and all rights associated therewith; (c) copyrights, including copyrights in works of authorship and computer Software; (d) confidential and proprietary information, including trade secrets and proprietary algorithms; (e) data base rights; (f) design rights and rights in designs; (g) rights in domain names; (h) rights in know-how; (i) all other intellectual property rights subsisting now or in the future, anywhere in the world; and (j) registrations, right to register and pending applications for registration of the foregoing, renewals, extensions, continuations, divisions or reissues thereof now or hereafter in force throughout the world (including rights in any of the foregoing); and (k) any and all causes of action arising from or related to any of the foregoing.

"**Intellectual Property Rights**" means any and all common law, statutory and other rights in Intellectual Property honored and/or enforceable under any Laws.

"**Law**" means any applicable order, writ, injunction, decree, judgment, ruling, statute, law, rule or regulation of any federal, state, municipal or local government, Governmental Authority, regulatory or administrative agency, governmental commission, department, board, bureau, court or tribunal or any arbitrator or arbitral body.

la-1200776

"**Migration Assistance Services**" has the meaning set forth in **Section 14.4(a)**.

"**Migration Services Periods**" has the meaning set forth in **Section 14.4(a)**.

"**Monthly Fixed Charges**" has the meaning set forth in **Schedule C**.

"**Monthly Variable Charges**" has the meaning set forth in **Schedule C**.

"**New Developments**" means new Systems implemented by Supplier that are substantially different from the existing Systems, including major replacements to existing Systems and any directly related major replacements to work processes, policies and procedures implemented by Supplier.

"**Ocwen**" has the meaning set forth in the preamble.

"**Ocwen Services**" has the meaning set forth in **Section 3.1(a)**.

"**Parties**" means Ocwen and ResCap.

"**Pass-Through Expenses**" has the meaning set forth in **Schedule C**.

"**Person**" means any individual, partnership, firm, corporation, association, joint venture, limited liability company, trust or other entity, or any governmental entity.

"**Price Adjustment Event**" has the meaning set forth in **Schedule C**.

"**Price Adjustment Process**" has the meaning set forth in **Schedule C**.

"**Recipient**" (i) in the case of ResCap Services means ResCap and its Affiliates listed on **Schedule D-1**, and (ii) in the case of Ocwen Services means Ocwen and its Affiliates listed on **Schedule D-2**.

"**Recipient Data**" has the meaning set forth in **Section 8.1**.

"**Recipient Equipment**" means all Equipment owned or leased by a Recipient and used in connection with the Services.

"**Recipient Facilities**" has the meaning set forth in **Section 6.1(a)**.

"**Recipient Indemnified Parties**" has the meaning set forth in **Section 13.1(b)**.

"**Recipient Software**" means all Software owned by, or provided under license to, Recipient and used in connection with the Services (and all modifications, replacements, upgrades, enhancements, documentation, materials and media relating to the foregoing).

"**Recipient System**" means an interconnected grouping of Recipient Equipment and/or Recipient Software used in connection with the Services, and all additions, modifications, substitutions, upgrades or enhancements thereto.

"**Relationship Manager**" has the meaning set forth in **Section 5.1**.

"**Relocation/Alteration Request**" has the meaning set forth in **Section 6.1(b)**.

"**Requesting Party**" has the meaning set forth in **Section 5.10**.

"**Required Consents**" means the consents, if any, required from third parties in connection with Supplier's provision, and Recipient's receipt, of the Services.

"**ResCap**" has the meaning set forth in the preamble.

"**ResCap Services**" has the meaning set forth in **Section 3.1(a)**.

"**Service Management Team**" has the meaning set forth in **Schedule B**.

"**Services**" means all or any of ResCap Services, Ocwen Services, Customized Services, Additional Services and Migration Assistance Services, provided by a Supplier, as applicable given the context.

"**Software**" means programs and programming (including the supporting documentation, media, on-line help facilities and tutorials).

"**Statement(s) of Work**" means the mutually agreed internal documents that set forth the Services in respect of the Functional Service Areas that are identified in **Schedule A-1** or **Schedule A-2**, as applicable.

"**Stranded Costs**" has the meaning set forth in **Schedule C**.

"**Subcontractors**" means Supplier's contractors or other agents of Supplier that perform a portion of the Services.

"**Subsidiaries**" means, with respect to any specified Person, those other Persons with respect to which such specified Person directly or indirectly owns or controls more than 50% of the voting equity securities of such other Person.

"**Supplement**" has the meaning set forth in **Section 3.2**.

"**Supplier**" means (i) in the case of ResCap Services, Ocwen and any Ocwen Affiliates that provide such Services, and (ii) in the case of Ocwen Services, ResCap, and any ResCap Affiliates that provide such Services. For purposes of clarity, all references to "Supplier" refer only to the Party that is acting as the "Supplier" with respect to the Equipment, Software and other applicable responsibilities for the Services being performed by such Party in its capacity as the "Supplier".

"**Supplier Equipment**" means Equipment owned or leased by the Party that is acting in its capacity as the "Supplier" hereunder, or an Affiliate or Subcontractor of such Party, and used in connection with the Services.

"**Supplier Facilities**" has the meaning given in **Section 6.2**.

"**Supplier Indemnified Parties**" has the meaning set forth in **Section 13.1(a)**.

"**Supplier Materials**" has the meaning set forth in **Section 8.2**.

"**Supplier Personnel**" means those employees, representatives, contractors, Subcontractors and agents of the Party that is acting in its capacity as the "Supplier" hereunder, who perform any Services under this Agreement.

"**Supplier Software**" means all software programs and programming owned by, or provided under license to, the Party that is acting in its capacity as the "Supplier" and used to provide the Services (and all modifications, replacements, upgrades, enhancements, documentation, materials and media relating to the foregoing).

"**Supplier System**" means an interconnected grouping of Supplier Equipment and/or Supplier Software used in connection with the Services, and all additions, modifications, substitutions, upgrades or enhancements thereto.

4

la-1200776

"**Suspension Right**" has the meaning set forth in **Section 5.10**.

"**Systems**" means Recipient Systems and Supplier Systems or any of them.

"**Term**" has the meaning set forth in **Section** 2.

"**Third Party Claim**" has the meaning set forth in **Section 13.1(d)(1)**.

"**Third Party Claim Notice**" has the meaning set forth in **Section 13.1(d)(1)**.

"**Total Monthly Shared Services Charge**" has the meaning set forth in **Schedule C**.

## 2.    TERM AND RENEWAL

**2.1**   Initial Term.   The initial term of this Agreement begins on the Effective Date and continues through and until midnight Eastern Time on the last day in which any Statement of Work issued hereunder remains in effect as determined by the expiration dates for all of the Statements of Work set forth on **Schedules A-1** and/or **A-2**; provided, however, that if any Statement of Work does not have an expiration date, it shall expire on July 31, 2013 (the "**Initial Term**"), unless earlier terminated or extended in accordance with the terms of this Agreement and except for any Service that has been terminated in accordance with the terms of this Agreement.

**2.2**   Renewal.   The Initial Term will be automatically extended for additional periods of six (6) months each unless either Party provides to the other Party written notice of nonrenewal at least two (2) month prior to the expiration of the then-current Term. The Initial Term as extended by any such additional period(s) (if any) shall be referred to as the "**Term**". If the Term exceeds three (3) years in duration, the Parties shall then-meet and discuss in good faith whether, and to what extent, the Charges should be adjusted to reflect increases and/or decreases in the cost of providing the Services to each other.

## 3.    SERVICES.

**3.1**   Services.

**(a)** Performance.   ResCap will provide the Services within each of the Functional Service Areas listed in **Schedule A-1** (the "**ResCap Services**"), and Ocwen will provide the Services within each of the Functional Service Areas listed in **Schedule A-2** (the "**Ocwen Services**"), in each case beginning on the Effective Date.   Subject to receipt of Recipient's approval, if any, required pursuant **Section 4.1**, Services provided by a Supplier under this Agreement may be provided by that Supplier directly or through any of its Affiliates and/or Subcontractors at Supplier's discretion.   A Supplier will not be relieved of any of its obligations under this Agreement as a result of the provision of Services by any of Supplier's Affiliates or other Supplier Personnel pursuant to this **Section 3.1(a)**.   Supplier agrees that it will not enter into any new Subcontracting arrangement that would involve the transfer to a Subcontractor or another third party of Recipient's personal information, without the prior written consent of the other Party.   The Supplier Personnel providing Services will at all times be qualified to provide the Services assigned to them.

5

**(b)** <u>Recipients and Facilities</u>.  Supplier will provide the Services to Recipient at the Recipient Facilities for which such Services are provided as of the Effective Date or, with respect to any particular Services, such other locations as may be specifically identified with respect to such Services in **Schedule D-1** or **Schedule D-2**, the applicable Statement of Work or as provided pursuant to **Section 6.1(b)**.  Supplier will negotiate in good faith to provide Services in support of any additional Recipient Facility, but shall not be obligated to provide Services to additional Recipient Facilities unless the pricing and terms for such additional Recipient facilities has been agreed upon by the Parties.

**(c)** <u>Service Standards</u>.  Supplier will perform or cause to be performed the Services referenced in the applicable Statement(s) of Work, to Recipient (i) with reasonable skill, care and diligence; and (ii) performed in substantially the same manner (including historic levels of service, historical usage levels and geographic provisioning) that such Services were generally performed by ResCap immediately prior to the Effective Date, or as may be mutually agreed through the Parties' change control principles pursuant to **Sections 3.2** and **3.3**).  In no event will Supplier be required to make any customization to the Services (or Supplier's associated Systems or processes) that are unique to Recipient, except for customizations that are expressly agreed upon in accordance with **Sections 3.2** and **3.3**.  Each Party acting in its capacity as Recipient shall, and such Party shall cause all of its Affiliates that are Recipients to, comply with any applicable terms and conditions of third party contracts used by Supplier in connection with the Services upon receiving written notice thereof.  Supplier will perform its obligations under this Agreement in accordance with applicable Law.  However, except as may be expressly provided in a Statement of Work, Recipient shall be solely responsible for its own compliance with applicable Law, and nothing in this Agreement shall constitute or be construed as a representation or warranty by Supplier that any Service provided by Supplier is sufficient to satisfy any of Recipient's obligations under any applicable Law.

**(d)** <u>Implied Services</u>.  If any services, functions or responsibilities performed by Supplier for Recipient as of the Effective Date are not specifically described in this Agreement but are necessary for Supplier to perform or provide the Services described in this Agreement in accordance with **Section 3.1(c)**, such services, functions or responsibilities shall be deemed to be included within the scope of the Services to the same extent and in the same manner as if specifically described in this Agreement, except to the extent otherwise specified in this Agreement and excluding all services, functions and responsibilities of Recipient under this Agreement (including any services, functions or responsibilities not specifically described in this Agreement but are necessary for Recipient to perform or provide such services, functions and responsibilities described in this Agreement).  Except as otherwise expressly provided in this Agreement, as between the Parties, Supplier shall be responsible for providing the facilities, personnel and other resources as necessary to provide the Services consistent with the requirements of **Section 3.1(c)**.

**(e)** <u>Not a Requirements Contract</u>.  This Agreement will not be construed as a requirements contract and will not be interpreted to prevent Recipient from obtaining from third parties, or providing itself, any or all of the Services or similar services.

**(f)** Supplier Modifications. Supplier may reasonably supplement, modify, substitute or otherwise alter any of the Services from time to time in a manner consistent with supplements, modifications, substitutions or alterations made for similar services provided or otherwise made available by Supplier or its Affiliates to itself or its Affiliates; provided that the Services continue to be provided in accordance with the standards set forth in **Section 3.1(c)** and the applicable Statement of Work notwithstanding such supplements, modifications, substitutions or alterations and such supplements, modifications, substitutions or alterations shall not materially diminish the scope or quality of the Services.

**3.2**    Additional Services. A Party may, from time to time during the Term, upon at least thirty (30) days prior written notice to the other Party, request that the other Party provide additional services, functions and responsibilities not within the scope of the Services provided by the performing Party ("**Additional Services**"). Upon such request, the Parties shall discuss in good faith the scope and nature of such request and related issues, including any potential additional Charges, it being understood and agreed that neither Party shall be obligated to agree to provide any Additional Services. Any such Additional Services agreed to by the Parties will be provided under supplements to **Schedule A-1** or **Schedule A-2**, as applicable, entered into by the Parties ("**Supplements**") for the Charges set forth therein and mutually agreed upon. Supplements shall be in the form of **Schedule E**. During the thirty (30) day period after the Effective Date, the Parties will work together to define a process reasonably satisfactory to the Parties that will be used to (a) submit and prioritize requests for Additional Services and (b) create and execute Supplements for Additional Services. Such processes include meetings between the transition leads appointed by each Party to review all Additional Services requests, processes for work with the appropriate business leads as well as any other necessary resources and processes for amending relevant SOWs as agreed upon by the Parties.

**3.3**    Changes to Services/Change Control Procedures.

**(a)** Customized Services. Supplier shall only provide Services customized for Recipient ("**Customized Services**") to the extent required pursuant to this **Section 3.3**, and shall not otherwise be required to make customizations to the Services or Supplier Systems.

**(b)** Changes Requested by Recipients. Recipient from time to time, upon at least thirty (30) days' notice, may require that Supplier decrease or reasonably increase the volume of the Services provided to Recipient and the Charges shall be modified in accordance with the procedures set forth in **Schedule C**. A Party may, from time to time during the Term, upon at least thirty (30) days prior written notice to the other Party, request that the other Party provide Customized Services. Upon such request, the Parties shall discuss in good faith the scope and nature of such request and related issues, it being understood and agreed that neither Party shall be obligated to agree to provide Customized Services. If the Parties mutually agree on the provision of Customized Services, such request for Customized Services and such Customized Services will be provided under Supplements to **Schedule A-1** or **Schedule A-2**, as applicable. Before Supplier is required to provide any Customized Services, the Parties shall jointly agree on the applicable Charges for any agreed Customized Services, including any Charges that may be required to equitably compensate

7

Supplier for any additional costs it may reasonably incur in connection with any changes to the Services.

       (c) <u>Changes Required by Applicable Law</u>.    If Customized Services are necessary in order to comply with applicable Laws or changes to Supplier's third party contracts, Supplier will provide such Customized Services unless (i) such Customized Services require a material change to a Supplier System, or the implementation of a new Supplier System, or (ii) providing such Customized Services is not practicable given the then-current characteristics of the Supplier Systems, and the use thereof for Supplier and its Affiliates, and subject to the Parties jointly agreeing on the applicable Charges for such Customized Services.  Any such Customized Services will be provided under Supplements to **Schedule A-1** or **Schedule A-2**, as applicable.  The Parties will negotiate in good faith in order to promptly agree on the applicable Charges for any such necessary Customized Services.  If providing such Customized Services is not practicable given the Supplier Systems, Recipient may purchase such services from a third party, and in connection therewith the Parties shall agree on (A) the activities required to transition the affected Services from Supplier to such third party, (B) the impact on the remaining Services, and (C) the Charges associated with removing such Services and (D) the Charges for the remaining Services.

      **3.4**  <u>Recipients' Obligations</u>.  Supplier's failure to perform its obligations under this Agreement will be excused (and any rights of Recipient arising as a consequence of such failure will not be exercised by Recipient) if and to the extent such Supplier non-performance is caused by (a) the wrongful or tortious actions of Recipient or any third party other than a Subcontractor or Affiliate of Supplier, or (b) the failure of Recipient or such a third party contractor to perform such Recipient's obligations under this Agreement.  Recipient will be responsible for any additional costs incurred by Supplier in connection with providing the Services as a result of any such failure.  Supplier will use commercially reasonable efforts to perform its obligations notwithstanding such failure, provided that Recipient works with Supplier through the Relationship Managers to remedy the failure.

      **3.5**  <u>Required Consents</u>.

       (a) <u>Responsibility</u>.  Subject to the terms of the APA that relate to obtaining consents from third parties, each Party will be responsible for obtaining any Required Consents required under its own third party contracts pertaining to any Software, Equipment, Systems or other materials or associated services required in connection with the Services under this Agreement, with such responsibility to include the administrative activities necessary to obtain the Required Consents and payment of the fees and/or expenses associated with obtaining the Required Consents.

       (b) <u>Contingent Arrangements</u>.    If, despite using commercially reasonable efforts, either Party is unable to obtain a Required Consent for which it is responsible under **Section 3.5(a)**, such Party will use commercially reasonable efforts to obtain a replacement license, product or right, as applicable.  If such replacement cannot be obtained using commercially reasonable efforts, the Parties will work together in good faith to develop a mutually acceptable alternative arrangement that is sufficient to enable Supplier to provide,

and Recipient to receive, the Services without such Required Consent. The Party responsible for obtaining the Required Consent pursuant to **Section 3.5(a)** will be financially responsible for the costs of such alternative arrangement. If the Parties can not reach a resolution under this **Section 3.5** or such alternative arrangement is required for a period longer than one hundred eighty (180) days following the Effective Date, either Party may require that the affected Services be discontinued in which case the Charges for Services will be equitably adjusted to account for such discontinuation.

**3.6** Security Level; Additional Security Measures. Supplier may take physical or information security measures (a) that affect the manner in which the Services are provided to maintain Supplier's current level (or, if greater, an industry-standard level) of physical and electronic security (including data security and data privacy) during the Term and (b) that address any new security-related issues, including compliance with applicable Law and governmental orders related to security and issues in connection with new technologies or threats. Supplier shall provide Recipient reasonable, prior written notice of any such physical or information security measures that are material to Supplier's delivery of the Services. Recipient shall provide all assistance reasonably requested by Supplier in connection with such security measures. Recipient shall pay to Supplier increased Charges for the applicable Services that are required to equitably compensate Supplier for any additional costs it may reasonably incur in connection with such security measures with respect to the Services provided to Recipient under this Agreement.

**4.    USE OF AFFILIATES AND SUBCONTRACTORS.**

**4.1** Affiliates and Subcontractors.

**(a)** Use of Affiliates and Subcontractors. Subject to **Section 3.1(a)**, Supplier will have the right to use Affiliates and Subcontractors to assist Supplier in the provision of the Services. Supplier shall adhere to Supplier's then-current third-party vendor management policies when engaging Subcontractors to perform Services under this Agreement. In respect of any material Services for which Supplier desires to engage a Subcontractor (other than Altisource Portfolio Solutions S.A. and its Affiliates), Supplier shall seek and obtain Recipient's approval of such Subcontractor, which approval Recipient shall not unreasonably withhold, condition or delay; provided, however, that all Subcontractors engaged or otherwise performing services for Supplier as of the Effective Date are hereby deemed approved by Recipient.

**(b)** Supplier Responsibility for Affiliates and Subcontractors. Supplier shall remain responsible for the Services performed by its Affiliates and Subcontractors to the same extent as if such Services were performed by such Supplier. Additionally, Supplier must exercise any rights that it may have under its contract with the applicable Subcontractor to cause the Subcontractor to resolve or cure any such failure within a reasonable time period in the same manner that Supplier responds to such failure with respect to the services such Subcontractor provides for Supplier or Supplier's Affiliates' businesses, taking into consideration the circumstances of such failure, the nature of the services and the impact that such failure has on Recipient. If such failure is not resolved or cured within a reasonable time period, Supplier will exercise any rights that it may have under its contract with the

9

Subcontractor in the same manner that Supplier responds to such failure with respect to the services such Subcontractor provides for Supplier or Supplier's Affiliates businesses, taking into consideration the circumstances of such failure, the nature of the services and the impact that such failure has on Recipient. Supplier shall be Recipient's sole point of contact regarding the Services, including with respect to payment. In addition, each Party, in its capacity as Supplier, will monitor and manage (including any necessary audits as to data privacy and security) its Subcontractors being used to perform Services for Recipient in compliance with Supplier's third party vendor management policies and procedures throughout the Term and any renewal or extension of the Agreement.

**4.2** <u>Compliance</u>. Supplier will cause its employees and agents as well as the employees of its Affiliates and Subcontractors while at Recipient Facilities, to comply with the personnel, operational, safety and security procedures, policies, rules and regulations applicable to Recipient employees and agents and the Recipient Facilities, of which they have been given notice in advance by Recipient, or in the absence of such advance notice, with such procedures, policies, rules and regulations addressing similar issues in place at Supplier's facilities.

**5.    RELATIONSHIP MANAGEMENT.**

**5.1** <u>Relationship Managers</u>. Each Party will appoint an individual (each, a "**Relationship Manager**") who, from the Effective Date until replaced by the appointing Party, will serve as that Party's representative under this Agreement. Each Relationship Manager will (a) have overall responsibility for managing and coordinating the performance of the appointing Party's obligations under this Agreement, and (b) be authorized to act for and on behalf of the appointing Party concerning all matters relating to this Agreement. Neither Party will reassign a Relationship Manager, unless it provides reasonable prior written notice to the other Party. If a Relationship Manager ceases to be employed by the Party that appointed it or is reassigned by such Party, such Party will promptly appoint a new Relationship Manager and provide written notice to the other Party of the new Relationship Manager so appointed.

**5.2** <u>Governance Model</u>. The Parties will conduct meetings and manage interactions in accordance with the governance model described in **Schedule B**.

**5.3** <u>Reports</u>. Each Party will provide to the other Party the reports described in the applicable Statement of Work, in the format and at the frequencies specified therein.

**5.4** <u>Other Reports and Information</u>. Without limiting the obligations of the Parties set forth in Sections 6.4 and 6.21 of the APA, each Party will provide the other Party (and any successor in interest) access to such information, documents and reports about ResCap and its Affiliates or the Acquired ResCap Businesses (which information and reports are in the possession or under the control of such Party or any of its direct and indirect Affiliates), as such other Party may reasonably request from time to time for regulatory reporting, audit, risk management, compliance, corporate governance, bank and/or bank holding company supervision and/or examination, administration of the bankruptcy proceedings of ResCap and its debtor-Affiliates, or other business purposes, subject to appropriate confidentiality

la-1200776

protections. In connection therewith, subject to appropriate confidentiality protections and upon two (2) business days' prior written notice, Ocwen shall provide ResCap and its debtor-Affiliates (and any successor in interest) with reasonable access during normal business hours to the pre-petition and post-petition books and records of ResCap and each of its debtor-Affiliates and Subsidiaries that are in the possession or under the control of Ocwen for the purpose of facilitating the administration of ResCap's and its debtor-Affiliates' bankruptcy proceeding and the subsequent wind down of the affairs of ResCap and each of its debtor-Affiliates and Subsidiaries, including, without limitation, pending and future litigation, examinations, discovery requests, and reconciliation and objection to claims.

**5.5**  Regulatory Review.  Each Party will notify the other promptly of any formal request or order by a governmental agency or regulator or any internal or external audit examination or request to examine records regarding Recipient that are maintained by Supplier or to audit Supplier's performance of the Services. Supplier will cooperate with any such examination or audit. Recipient will reimburse Supplier for the actual and reasonable out-of-pocket costs Supplier incurs in connection with such examination or audit.

**5.6**  Books and Records; Audit.  Each Party acting in its capacity as a Supplier will, and will cause its Affiliates providing Services hereunder to, keep books of account and other records, in reasonable detail and in accordance with generally accepted accounting principles, consistently applied, as to the Charges for providing the Services to Recipient pursuant to this Agreement, and shall make such books of account and other records available to Recipient (and to any Governmental Authority that desires to audit Recipient) for inspection during normal business hours in a non-disruptive manner so as not to disrupt Supplier's business operations during the Term and for twenty-four (24) months thereafter for the purpose of performing audits and inspections of Supplier, related to the Services performed under this Agreement to verify the accuracy of Charges and invoices.

**5.7**  Audit Assistance.  Each Party acting in its capacity as a Supplier shall, and will cause its Affiliates providing Services hereunder to, use commercially reasonable efforts to provide to such auditors, inspectors, regulators, and representatives, at Recipient's sole cost and expense, such assistance as they reasonably require. Recipient's auditors and other representatives shall comply with Supplier's security and confidentiality policies, procedures and requirements. Except for regulatory or governmental inspections or audits, all such inspections or audits may be performed only by an independent third party auditing firm of national standing that has a written agreement with Recipient in which such third party agrees (i) to confidentiality obligations no less protective of Supplier than Recipient's confidentiality obligations under this Agreement and (ii) not to share with Recipient the Supplier information provided in connection with such inspection or audit, other than the findings and conclusions of the audit report.

**5.8**  Informal Dispute Resolution Procedures.  The informal dispute resolution procedures applicable to disputes under or in connection with this Agreement are set forth in **Schedule B**.

**5.9**  Continued Performance. Each Party agrees that it will, unless otherwise directed by the other Party, continue performing its obligations under this Agreement while any dispute

11

is being resolved until this Agreement expires or is terminated in accordance with its terms, provided, however, that in the case of a dispute with regards to a Party's alleged failure to pay amounts in excess of two (2) times the average monthly Charges for the particular Services that are subject to such dispute and provided hereunder to such Party or its Affiliates, Supplier may suspend its performance of such Services until the earlier of such dispute is resolved or this Agreement is terminated; provided, further, that if Recipient pays such disputed amounts, (a) Supplier will continue to perform its obligations under this Agreement and (b) such payment will not constitute a waiver of any claims Recipient may have with respect to such disputed amounts.

**5.10** Reasonable Cooperation and Assistance. In addition to its other obligations under this Agreement, each Party hereby agrees to reasonably cooperate with and assist the other party and its Affiliates in order (a) to effectuate a complete transition of the Acquired ResCap Business to Ocwen and (b) to facilitate the administration of ResCap's bankruptcy proceeding and the subsequent wind down of the affairs of ResCap and each of its debtor-Affiliates and Subsidiaries.   To the extent that a Party requests (the "**Requesting Party**") reasonable cooperation and/or assistance from the other Party (the "**Assisting Party**") and such cooperation and/or assistance is not covered by any of the then-existing Statements of Work, the Assisting Party shall reasonably cooperate and/or assist (as the case may be) the Requesting Party.   The Assisting Party shall not receive any additional consideration for providing any cooperation, assistance or access under this **Section 5.10**; provided, however, if the Assisting Party reasonably believes that it is being unduly burdened by providing such cooperation, access and/or assistance to the Requesting Party without charge, the Assisting Party shall have the right (the "**Suspension Right**"), upon thirty (30) days' written notice to the Requesting Party, to suspend such cooperation, access and/or assistance pending resolution, using the informal dispute resolution procedures set forth in **Schedule B**, of a determination as to whether (i) the Requesting Party's request for assistance is reasonable and (ii) the Requesting Party should pay the Assisting Party for such cooperation, access and/or assistance (it being understood and agreed that such determination as to payment shall not be solely prospective but shall include periods during which such cooperation, access and/or assistance was rendered before the date of such determination and it is further understood and agreed that, if the Parties determine in good faith that the Assisting Party is being unduly burdened by providing such cooperation, access and/or assistance, such additional cooperation, access and/or assistance shall be deemed to be a Customized Service and the Parties shall prepare a Statement of Work and the corresponding Charges therefor in accordance with the provisions set forth above in Section 3.3(b)).   Additionally, subject to the provisions of this **Section 5.10** (including the Suspension Right), Ocwen, as the Assisting Party, shall provide ResCap and its debtor-Affiliates and Subsidiaries with reasonable access to the Ocwen personnel who formerly were personnel of ResCap or its Affiliates in order to assist in facilitating the administration of ResCap's and its debtor-Affiliates' bankruptcy proceedings and the subsequent wind down of the affairs of ResCap and each of its debtor-Affiliates and Subsidiaries.  Subject to the provisions of this **Section 5.10** (including the Suspension Right), such access shall include, without limitation, making such persons reasonably available in connection with pending and future discovery and examinations, and for testimony as a witness in connection with pending and future litigation, contested matters and/or administrative proceedings.

## 6.    FACILITIES.

### 6.1    Use of Recipient Facilities.

(a)    General.    Except as expressly set forth otherwise in any applicable Statement(s) of Work, each Party, acting in its capacity as "Recipient", will, and will cause its Affiliates to provide to Supplier, at no charge, the space, office furnishings, janitorial service, telephone service, utilities (including air conditioning) and office-related equipment, supplies, and duplicating services at Recipient's premises that Supplier may reasonably need to provide the Services (collectively, the "**Recipient Facilities**").    Supplier's employees will have reasonable access to the Recipient Facilities twenty-four hours a day, seven days a week; provided, however, that in times of emergency or significant maintenance or construction activity, access may be restricted or denied if not required in connection with such emergency, maintenance or construction.    In such an event, Supplier will be excused from its performance of the Services to the extent Supplier is unable to provide the Services in accordance with the requirements of this Agreement as a result of such restricted access.

(b)    Relocation.    If Recipient contemplates or makes a final decision to alter or relocate any of the Recipient Facilities that will require Supplier to relocate any of its personnel or Equipment from any Recipient Facility and the alteration or relocation could reasonably be expected to impact the Services (including the cost to perform, timing, ability to perform or level of performance) or Recipient desires Supplier to provide a Service to a new or different Recipient Facility or other location (each, a "**Relocation/Alteration Request**") then Recipient will provide Supplier with sufficient advance notice of that fact to allow Supplier a reasonable amount of time to prepare for and implement the Relocation/Alteration Request as it impacts Supplier.    The Parties will work together in good faith for a planned and orderly process for such Relocation/Alteration Request, timed as much as possible to coincide with the scheduled completion of migration of all of the applicable Services provided by each of them for the other from such facility, and each Party will bear its own relocation costs and expenses.    Before requiring Supplier to comply with a Relocation/Alteration Request, the Parties will agree on any adjustments to (i) the Services that may be required as a result of the Relocation/Alteration Request, and (ii) Supplier's Charges that may be required to equitably compensate Supplier for any additional costs it may reasonably incur in connection with the Relocation/Alteration Request.

(c)    Supplier's Obligations.    Supplier will (i) keep the Recipient Facilities in good order, and (ii) not commit waste or damage to those facilities or use those facilities for any purpose other than providing the Services (and appropriate incidental use for internal Supplier administrative tasks unrelated to other customer accounts or Supplier marketing efforts).

(d)    Access to Recipient Systems.    Supplier will limit its, and will require all Supplier Personnel who have access to Recipient Systems to limit their, access to those portions of such Recipient Systems for which they are authorized in connection with the Services.    Supplier will limit such access to those Supplier Personnel who are needed in order to provide the Services.    Supplier will cooperate with Recipient in the investigation of any apparent unauthorized access by Supplier Personnel to the Recipient Systems.

la-1200776

**6.2** Supplier Facilities and Systems.

(a) Supplier Facilities. Supplier may perform the Services in such facilities maintained by or for Supplier or its Affiliates or Subcontractors (collectively, "**Supplier Facilities**") as Supplier reasonably deems appropriate, so long as appropriate security procedures have been implemented and are being observed at the Supplier Facilities. While at Supplier Facilities, each Party will, and will cause its and its Affiliates' personnel to, in its capacity as "Recipient", comply with Supplier's reasonable security requirements and other relevant policies of which they have been given notice, or in the absence of such notice, with such security requirements and other relevant policies addressing similar issues in place at Recipient's facilities.

(b) Access to Supplier Systems. Each Party in its capacity as Recipient will limit its, and will require all Recipient personnel who have access to Supplier's computer or electronic data storage systems to limit their, access to those portions of such systems for which they are authorized in connection with their receipt and use of the Services. Each Party in its capacity as Recipient will (i) limit such access to those Recipient personnel who are authorized to use the Services, (ii) subject to Recipient's record retention policy, make available, upon Supplier's request, to Supplier a written list of the names of each individual who has been granted such access, and (iii) adhere to Supplier's security rules and procedures for use of Supplier's systems. All user identification numbers and passwords disclosed to Recipients to permit Recipient personnel to access the Supplier systems will be deemed to be, and will be treated as, Supplier's Confidential Information. Recipient will cooperate with Supplier in the investigation of any apparent unauthorized access by Recipient personnel to Supplier's systems.

**6.3** Physical Security for Facilities. Supplier will be responsible for all security procedures at any Supplier Facilities. Each Party as Recipient will provide all necessary security personnel and security equipment at the Recipient Facilities. While at the Recipient Facilities, each Party as Supplier will cause all Supplier Personnel to comply with Recipient's physical security procedures, as made known to Supplier's Relationship Manager, or in the absence of such notice, with such security requirements and other relevant policies addressing similar issues in place at Supplier's Facilities.

## 7.    INTELLECTUAL PROPERTY AND PROPRIETARY RIGHTS

**7.1** Ownership of Intellectual Property. Except as expressly provided in **Sections 7.2**, and **7.3**, nothing in this Agreement shall grant or transfer any rights, title or interests in any Intellectual Property invented or created before, on or after the Effective Date by or on behalf of a Party and/or its Affiliates or otherwise controlled by or licensed to such Party and/or its Affiliates. A Party's use of the other Party's Intellectual Property shall not modify the ownership rights set forth above.

**7.2** Development of Intellectual Property. Subject to **Article 8**, as between the Parties (and without affecting Recipient's right, title and interest in and to Recipient Data or any Confidential Information of Recipient), all Intellectual Property developed or acquired by or for Supplier or any of its Affiliates in connection with providing the Services shall be owned

14

by Supplier. Any services that rely on New Developments are outside the scope of the Services under this Agreement and therefore would have to be separately negotiated and agreed upon by the Parties.

    **7.3** <u>Limited License to Use Supplier Work Processes and Software</u>. Supplier grants to Recipient a limited, non-exclusive, non-assignable license, with the right for Recipient to grant sublicenses to its Affiliates, to use the work processes and Software owned by Supplier and/or its Affiliates that are provided to Recipient in connection with the Services solely to the extent necessary for Recipient to receive Services, and perform its responsibilities under this Agreement during the Term. THE SUPPLIER WORK PROCESSES AND SOFTWARE AND ALL DELIVERABLES ARE PROVIDED BY SUPPLIER ON AN AS-IS BASIS. SUPPLIER EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO SUCH WORK PROCESSES AND SOFTWARE AND DELIVERABLES.

    **7.4** <u>No Implied Licenses</u>. Except as expressly specified in this Agreement, nothing in this Agreement will be deemed to grant to one Party, by implication, estoppel or otherwise, license rights, ownership rights or any other Intellectual Property Rights in any work processes, Software or other materials, data or information owned by the other Party or any Affiliate of the other Party.

**8.**     **RECIPIENT DATA.**

    **8.1** <u>Definition</u>. The term "**Recipient Data**" means (i) any data or information of Recipient or its respective vendors, customers or other business partners that is provided to or obtained by Supplier in the performance of its obligations under this Agreement, including data and information regarding Recipient's businesses, customers, operations, facilities, products, consumer markets, assets and finances in whatever form or format, including in the form of any analysis or compilation of such data, and (ii) any data or information collected or processed in connection with the Services, even if such data or information is contained in reports, documentation, compilations or analyses provided to Recipient as part of the Services, in each case excluding any data or information acquired by Ocwen as a Purchased Asset (as such term is defined in the APA) pursuant to the APA. For the avoidance of doubt, Supplier retains ownership of data pertaining to its performance of Services, including data pertaining to the volume and quality of the Services. For the avoidance of doubt, nothing in this Agreement shall be deemed to affect Supplier's or its Affiliates' use of data obtained outside of the performance of Supplier's obligations under this Agreement, even if that data includes data or information which is similar or identical to data or information included in the Recipient Data.

    **8.2** <u>Ownership</u>. As between Recipient and Supplier, Recipient owns and will continue to own all right, title and interest in and to all Recipient Data. To the extent that Recipient Data is embedded or incorporated into reports and other documentation, analyses, compilations and other materials (including code or software) owned or licensed by Supplier ("**Supplier Materials**") and provided to and for use by Recipient as part of the Services, Supplier will not be deemed to have assigned or transferred any of its right, title or interest in or to any underlying Intellectual Property Rights thereto. Supplier hereby grants to Recipient

a perpetual, irrevocable, royalty free, non-transferable license to use, reproduce, display and perform (whether publicly or otherwise) and modify such Supplier Materials solely as necessary for Recipient's use in the ordinary course of its mortgage related business. Recipient's use of the Supplier Materials is subject to the confidentiality obligations set forth below in **Article 9** and any third-party restrictions imposed on any Supplier Materials of which Supplier provides Recipient prior written notice. Additionally, Recipient's ownership of the Recipient Data reflected in Supplier Materials shall not serve to transfer or otherwise affect any of Supplier's right, title and/or interest in and/or to any of underlying Intellectual Property Rights in any Supplier Materials. Supplier may not use Recipient Data for any purpose except: (x) to provide the Services; (y) as required by a Party to meet its financial and regulatory reporting obligations; or (z) as otherwise permitted under this Agreement, nor may Supplier sell, assign, lease or otherwise dispose of or commercially exploit Recipient Data. Supplier acknowledges that Recipient is not restricted from using or disseminating Recipient Data in the format in which it is provided by Supplier or any different format. For the avoidance of doubt, the restrictions on Supplier in this **Section 8.2** shall not apply to any data or information generated by Supplier or its Affiliates that is of a technical or administrative nature to the extent relating generally to the operation of the Services infrastructure or to Supplier or its Affiliates' Intellectual Property, and to the extent not relating to the Recipient or based on or incorporating Recipient Confidential Information.

**8.3** Data Security. Supplier will establish and maintain safeguards against the destruction, loss or alteration of Recipient Data in its possession that are no less rigorous than those for Supplier's operations. If Recipient reasonably requests additional safeguards for Recipient Data, Supplier will provide those additional safeguards as Additional Services under a new Supplement subject to **Sections 3.2** and **3.3**. Recipient has established backup security for data and keeps backup data files in its possession. If Recipient chooses to establish additional backup security and backup data files, it may do so, except that if such activities increase Supplier's cost of providing the Services or require Additional Services or Customized Services, such activities will be subject to **Sections 3.2** and **3.3**. In all instances, Recipient will ensure that Supplier will have access to the backup data files as Supplier reasonably needs to provide the Services.

## 9.    CONFIDENTIALITY.

**9.1** Obligations. Each Party will retain the other Party's non-public, proprietary and confidential information with the same degree of care as it uses to avoid unauthorized use, disclosure, publication or dissemination of its own confidential information of a similar nature ("**Confidential Information**") in confidence and not disclose the same to any third party nor use the same, except as expressly permitted in this **Article 9**. As used in this Agreement, "**Confidential Information**" shall include (i) all non-public information, in any form, furnished or made available directly or indirectly by one Party to the other that is (a) marked confidential, restricted, proprietary and/or with a similar designation and/or (b) provided under circumstances reasonably indicating that it is confidential, restricted and/or proprietary; and (ii) all borrower-specific information in any form, furnished or made available directly or indirectly by one Party to the other under this Agreement. The terms and conditions of this Agreement, including, without limitation, the pricing for the Services and service descriptions and other details regarding service delivery, levels and performance, shall be deemed

16

Confidential Information. In the case of either Party, Confidential Information also shall include, whether or not designated "Confidential Information", (i) Software, materials and other Intellectual Property owned by the disclosing Party, and (ii) all non-public information concerning the operations, affairs and businesses of a Party or its Affiliates, the financial affairs of a Party or its Affiliates, and the relations of a Party or its Affiliates with its customers, employees and service providers (including customer lists, customer information, account information and consumer markets). Notwithstanding anything contained in this **Article 9** to the contrary, the provisions of this **Article 9** are not intended to and shall not impose any obligation on either Party with respect to any information provided to the other Party solely in connection with the APA.

**9.2** Excluded Information. Excepted from the obligations of confidence and non-use under this **Article 9** is that information which:

**(a)** the receiving Party is legally required to disclose, which disclosure shall be made in accordance with the below provisions of **Section 9.3**;

**(b)** is independently developed by the receiving Party without reference to Confidential Information of the disclosing Party;

**(c)** was, at the time of disclosure to it, in the public domain;

**(d)** after disclosure to it, is published or otherwise becomes part of the public domain through no fault of the receiving Party;

**(e)** was in the possession of the receiving Party at the time of disclosure to it without any obligation of confidentiality; or

**(f)** was received after disclosure to it from a third party who had a lawful right to disclose such information to it without any obligation to restrict its further use or disclosure.

**9.3** Compelled Disclosure. Notwithstanding the provisions of this **Article 9** to the contrary, if the receiving Party becomes legally compelled to disclose any of the disclosing Party's Confidential Information, the receiving Party will, to the extent not prohibited by Law, promptly advise the disclosing Party of such legal requirement to disclose Confidential Information in order that the disclosing Party (at the sole expense of the disclosing Party) may seek a protective order, may interpose an objection to such disclosure, take action to assure confidential handling of the Confidential Information, or take such other action as it deems appropriate to protect the Confidential Information in the circumstances. The receiving Party will disclose only that portion of the disclosing Party's Confidential Information that it is legally required to disclose.

**9.4** Return of Information. Except for Confidential Information for which a continuing license is granted to the receiving Party under this Agreement, upon written request by the disclosing Party or upon termination or conclusion of the Agreement, all of the disclosing Party's Confidential Information in whatever form will be returned to the disclosing Party or destroyed by the receiving Party and certified as such to the disclosing Party, without

17

retaining copies thereof, except as required to comply with internal compliance policies or instances of such Confidential Information in an archived form that are commercially impractical to return may be retained so long as the receiving Party does not access or make use of such Confidential Information after receipt of the written request for return from the disclosing Party.

**9.5** Exception. Notwithstanding anything else in this **Article 9** to the contrary, Supplier will have a right to disclose Recipient's Confidential Information to third parties to the extent reasonably necessary for Supplier (a) to comply with its obligations under applicable Law, including its ordinary-course reporting obligations under applicable Law, and, in the case of Ocwen, to use Confidential Information of ResCap to operate Ocwen's business, consistent with the manner such Confidential Information was used by ResCap prior to the Effective Date and (b) with the prior written consent of Recipient, to disclose Recipient's Confidential Information to third parties to the extent reasonably necessary for Supplier to accomplish its responsibilities contemplated hereunder; provided, however, that such disclosure to third parties will be made under confidentiality terms and conditions that are no less favorable to Recipient than the provisions of this **Article 9** or, if less favorable, that are consistent with Recipient's customary practice for the nature of the third party receiving Recipient's Confidential Information.

**9.6** Obligations.

**(a)** Each Party's Confidential Information shall remain the property of that Party except as expressly provided otherwise by the other provisions of this Agreement. Except as otherwise provided in this Agreement, each Party shall use at least the same degree of care, but in any event no less than a reasonable degree of care, to prevent disclosing to third parties the Confidential Information of the other as it employs to avoid unauthorized disclosure, publication or dissemination of its own information of a similar nature.

**(b)** In the event of any disclosure or loss of any Confidential Information of the disclosing Party, the receiving Party shall notify the disclosing Party promptly upon becoming aware thereof.

**9.7** Loss of Confidential Information. In the event of any disclosure or loss of any Confidential Information of the disclosing Party due to the fault of the receiving Party, the receiving Party shall promptly, at its own expense: (a) notify the disclosing Party in writing; and (b) cooperate in all reasonable respects with the disclosing Party to minimize the violation and any damage resulting therefrom.

**9.8** No Implied Rights. Nothing contained in this **Article 9** shall be construed as obligating a Party to disclose its Confidential Information to the other Party, or as granting to or conferring on a Party, expressly or impliedly, any rights or license to the Confidential Information of the other Party.

## 10.    COMPENSATION.

**10.1** General. Ocwen will pay to ResCap the Charges as set forth in **Schedule C-1a** and elsewhere in **Schedule C**, and ResCap will pay to Ocwen the Charges as set forth in

**Schedule C-2a** and elsewhere in **Schedule C**.  Supplier will provide Recipient with estimated invoices (with information linking the Services delivered to the invoice amounts) on a monthly basis on or before the last day of each calendar month for all Services performed by Supplier and all related Charges incurred by Recipient during that month.  The last business day of the calendar month is the cut-off for delivered Services and related Charges to be invoiced in the next calendar month. The estimated charges will be adjusted to actual charged by the last day of the following month. Recipient will pay the estimated and adjusted actual invoices within 45 days of the receipt of an invoice from Supplier.  Any payment by Recipient is without prejudice of its right to contest the accuracy of any Charges.

**10.2** Taxes.  In addition to the prices determined pursuant to **Schedule C**, each Party will pay, and hold the other Party harmless against, all goods and services, sales, use, excise and other taxes, and other fees or assessments imposed by Law in connection with the provision of the Services by the other Party, other than taxes measured by the other Party's net income.  The Parties will cooperate with each other and use commercially reasonable efforts to assist the other in entering into such arrangements as the other may reasonably request in order to minimize, to the extent lawful and feasible, the payment or assessment of any taxes relating to the transactions contemplated by this Agreement; provided, however, that nothing in this **Section 10.2** will obligate Supplier to cooperate with, or assist, Recipient in any arrangement proposed by Recipient that would, in Supplier's sole discretion, have a detrimental effect on Supplier or any of Supplier's Affiliates.

**10.3** Invoicing and Payment.  Supplier will invoice Recipient in accordance with **Schedule C**.  Payments for amounts past due will bear interest calculated on a per annum basis from the due date to the date of actual payment at a fluctuating interest rate equal at all times to the prime rate of interest announced publicly from time to time by Citibank, N.A. plus two percent (2%), but in no case higher than the maximum rate permitted by Law.  Each Party will make payments under this Agreement by electronic funds transfer in accordance with payment instructions provided by the other Party in its capacity as Supplier from time to time.

## 11.    REPRESENTATIONS AND WARRANTIES.

**11.1** Services.  Supplier represents and warrants to Recipient that it will use the level of care in providing the Services required by **Section 3.1(c)**, or with respect to Services that are dedicated to Recipient (i.e., where Supplier does not provide similar services to itself or its Affiliates), Supplier will provide such Services using commercially reasonable efforts and in a workmanlike manner, and in accordance with commercially reasonable practices.

**11.2** Maintenance.  Supplier represents and warrants to Recipient that it shall provide for the maintenance of the Supplier Systems, Supplier Equipment and Supplier Software in the same manner that such functions were generally performed by ResCap immediately prior to the Effective Date and thereafter in a manner consistent with the standard of performance required by **Section 3.1(c)**, for such items to generally operate in accordance with the manner in which they operated in the past or in the manner in which they operate in the future in support of Supplier and its Affiliates.

19

la-1200776

**11.3** Authorization.  Each Party represents and warrants to the other Party that:  (a) it has the requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated by this Agreement; and (b) the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement have been duly authorized by the requisite corporate action on the part of such Party.

**11.4** Viruses.  Each Party represents and warrants to the other Party that it shall use the same efforts that it uses with respect to its own users and Systems, but in each instance, at least reasonable efforts, to avoid computer viruses from being introduced into the Systems of the other Party under this Agreement or the Systems that such Party is using to perform Services hereunder.

**11.5** Disclaimer.  EXCEPT AS EXPRESSLY SET FORTH IN THIS **ARTICLE 11**, NONE OF SUPPLIER, ITS AFFILIATES OR ANY OF THEIR RESPECTIVE REPRESENTATIVES MAKE OR HAVE MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE SERVICES, INCLUDING WITH RESPECT TO (A) MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE, (B) THE USE OF THE SERVICES BY RECIPIENT AFTER THE RECEIPT THEREOF, OR (C) THE PROBABLE SUCCESS OR PROFITABILITY OF RECIPIENT'S OR ANY OF RECIPIENT'S BUSINESS AFTER THE RECEIPT OF THE SERVICES.

## 12.    INSURANCE; RISK OF LOSS.

**12.1** Insurance.  At all times during the Term, Ocwen will procure and maintain in full force and effect its own insurance policy at its own expense and for its own benefit, as determined by Ocwen independently, but consistent with any and all applicable federal, state and local Laws or regulations.  At all times during the Term, ResCap shall, or shall cause AFI to, procure and maintain in full force and effect an insurance policy for ResCap at AFI's and/or ResCap's expense and for ResCap's benefit.  As between ResCap and Ocwen, such insurance policy shall be determined by ResCap independently, but consistent with any and all applicable federal, state and local Laws or regulations.

**12.2** Policies.  Upon request, no more often than on an annual basis, both Parties will furnish the other with a certificate(s) from the insurance carrier(s) (having a minimum AM Best rating of A-) showing the coverages set forth above to be in force and effect.

**12.3** Risk of Loss.  Supplier will be responsible for the risk of loss of, or damage to, any property of Recipient at a Supplier facility, unless and to the extent that such loss or damage was caused by the acts or omissions of Recipient and/or Recipient's Affiliates, and/or its and/or their employees, agents and/or Subcontractors.  Recipient will be responsible for the risk of loss of, or damage to, any property of Supplier at a Recipient facility unless and to the extent that such loss or damage was caused by the acts or omissions of Supplier and/or Supplier's Affiliates, and/or its and/or their employees, agents and/or Subcontractors.  The risk of loss of, or damage to, property in transit will remain with the Party arranging the shipment.

la-1200776

## 13.    INDEMNIFICATION AND LIMITATIONS ON LIABILITY.

13.1 Indemnification.

(a) Indemnification by Recipient. Recipient will indemnify, hold harmless and defend Supplier and its Affiliates and their respective directors, officers, members, managers and employees (collectively, the "**Supplier Indemnified Parties**"), from and against any and all liabilities, damages, penalties, judgments, assessments, losses, costs and expenses in any case, whether arising under strict liability or otherwise (including reasonable outside attorneys' fees) (collectively, "**Damages**") suffered or otherwise incurred due to a Third Party Claim arising from or out of or relating to this Agreement, including the performance (or failure to perform) by Recipient of its obligations under this Agreement; provided, however, that to the extent and in the proportion Damages also arise out of or relate to the gross negligence or willful misconduct of any Supplier Indemnified Party, then the indemnity under this **Section 13.1(a)** will not apply.

(b) Indemnification by Supplier.  Supplier will indemnify, hold harmless and defend Recipient and its Affiliates and their respective directors, officers, members, managers and employees (collectively, the "**Recipient Indemnified Parties**") from and against any and all Damages suffered or otherwise incurred due to a Third Party Claim to the extent arising from or out of or relating to the gross negligence or willful misconduct of any Supplier Indemnified Parties; provided, however, that to the extent and in the proportion Damages also arise from or out of or relate to the performance (or failure to perform) by any Recipient Indemnified Party of any of its obligations under this Agreement, then Supplier's indemnity under this **Section 13.1(b)** will not apply.

(c) Infringement.

(1)    Indemnity. Supplier will indemnify, hold harmless and defend the Recipient Indemnified Parties, and Recipient will indemnify, hold harmless and defend the Supplier Indemnified Parties, from and against any and all Damages due to a Third Party Claim to the extent that the claim alleges that any information, services or materials provided by the Indemnifying Party to the Indemnified Party under this Agreement infringes or misappropriates any Intellectual Property Right of such third party in any country in which Services are performed or received under this Agreement.

(2)    Exclusions. Neither Party shall have any obligation or liability to the other Party to the extent any infringement or misappropriation is caused by:

(i)    modifications to any such information or materials made by the other Party, its Affiliates, or its third party contractors;

(ii)    any combination of the allegedly infringing information or materials with items not provided by the Indemnifying Party , unless such combination was approved or directed in writing by the Indemnifying Party;

(iii)    a breach of this Agreement by the other Party;

la-1200776

(iv)    the failure of the other Party to use corrections or modifications provided by the Indemnifying Party offering equivalent features and functionality to the extent the Indemnifying Party notified the other Party that the failure to do so could result in infringement liability;

(v)    the content provided by the other Party and not resulting from the Indemnifying Party's modification of that content without the other Party's approval; or

(vi)    third party Software, except to the extent that such infringement or misappropriation arises from the failure of the Indemnifying Party to obtain the necessary licenses or to abide by the limitations of the applicable third party Software licenses.

(3)    <u>Third Party Software Indemnities</u>.    As specified in **<u>Section 13.1(c)(2)(vi)</u>**, the foregoing infringement indemnification does not apply to third party Software.  With respect to third party Software provided by Supplier or its Subcontractors pursuant to this Agreement, Supplier and its Subcontractors shall use commercially reasonable efforts to obtain Intellectual Property indemnification for Recipient (or obtain Intellectual Property indemnification for itself and enforce such indemnification on behalf of Recipient) from the suppliers of such Software comparable to the Intellectual Property indemnification generally available in the industry for the same Software products.  With respect to third party Software provided by Recipient pursuant to this Agreement, Recipient shall use commercially reasonable efforts to obtain Intellectual Property indemnification for Supplier and its Affiliates (or obtain Intellectual Property indemnification for itself and enforce such indemnification on behalf of the Supplier and its Affiliates) from the suppliers of such Software comparable to the Intellectual Property indemnification generally available in the industry for the same Software products.

**(d)** <u>Indemnification Procedure</u>.  The Party making a claim for indemnification under this **<u>Section 13.1</u>** is referred to as the "**Indemnified Party**" and the Party against whom such claims are asserted under this **<u>Article 13</u>** are referred to as the "**Indemnifying Party**."  All claims by any Indemnified Party under this **<u>Article 13</u>** will be asserted and resolved as follows:

(1)    In the event that any right, demand, claim, action and cause of action, assertion, notice of claim or assertion, complaint, litigation, suit, proceeding, formal investigation, inquiry, audit or review of any nature, civil, criminal, regulatory, administrative or otherwise, or any grievance or arbitration (each, a "**Claim**") is asserted or instituted in writing by any Person other than the Parties or their Affiliates that could give rise to Damages for which an Indemnifying Party could be liable to an Indemnified Party under this Agreement (such Claim, a "**Third Party Claim**"), the Indemnified Party will promptly send to the Indemnifying Party a written notice specifying the nature of such Third Party Claim, together with all information reasonably available to the Indemnified Party with respect to such Third Party Claim (a "**Third Party Claim Notice**"); provided, however, that a delay in notifying the Indemnifying Party will not relieve the Indemnifying Party of its obligations under this Agreement, except to the extent that such failure will have caused actual prejudice to the Indemnifying Party.

(2)    In the event of a Third Party Claim, the Indemnifying Party will have ten (10) business days  after receipt of the Third Party Claim Notice relating to such Third

Party Claim to elect to undertake, conduct and control, through counsel of its own choosing (provided that such counsel is reasonably acceptable to the Indemnified Party) and at its own expense, the settlement or defense of such Third Party Claim (in which case the Indemnifying Party will not thereafter be responsible for the fees and expenses of any separate counsel retained by any Indemnified Party except as set forth below).  Notwithstanding an Indemnifying Party's election to appoint counsel to represent an Indemnified Party in connection with a Third Party Claim, an Indemnified Party will have the right to employ separate counsel, and the Indemnifying Party will bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the Indemnifying Party to represent the Indemnified Party would present such counsel with a conflict of interest, or (ii) the Indemnifying Party will not have employed counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such Third Party Claim.  If the Indemnifying Party elects to undertake such defense, it will promptly assume and hold such Indemnified Party harmless from and against the full amount of any Damages resulting from such Third Party Claim to the extent provided herein. If the Indemnifying Party elects to undertake such defense, (x) the Indemnified Party agrees to cooperate with the Indemnifying Party and its counsel in contesting such Third Party Claim, and, if appropriate and related to such Third Party Claim, the Indemnifying Party and the Indemnified Party will reasonably cooperate with each other in connection with defending such Third Party Claim, and (y) such Third Party Claim may not be settled or compromised by the Indemnifying Party without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed; provided, however, that in the event any Indemnified Party settles or compromises or consents to the entry of any judgment with respect to any Third Party Claim without the prior written consent of the Indemnifying Party, such Indemnified Party will be deemed to have waived all rights against the Indemnifying Party for indemnification under this **Article 13**.  If the Indemnifying Party does not undertake the defense of such Third Party Claim, the Indemnified Party will have the right to contest, settle, compromise or consent to the entry of any judgment with respect to such Third Party Claim, and, in doing so, will not thereby waive any right to recourse therefor pursuant to this Agreement; provided, however, that at any time during the course of the matter the Indemnifying Party may assume the defense of such Third Party Claim by written notice of the same to the Indemnified Party.

        **(3)**     In the event of a Third Party Claim, from and after the delivery of a Claim Notice under this Agreement, at the request of the Indemnifying Party, the Indemnified Party will grant the Indemnifying Party and its representatives all reasonable access to the books, records and properties of such Indemnified Party to the extent reasonably related to the matters to which the Claim Notice relates.  All such access will be granted during normal business hours and will be granted under conditions that will not unreasonably interfere with the businesses and operations of such Indemnified Party.  Except for use solely in connection with such Claim Notice or such Third Party Claim, the Indemnifying Party will, and will cause its representatives to, treat as Confidential Information in accordance with **Article 9** any non-public information obtained pursuant to this **Section 13.1(c)(3)** that is designated by the Indemnified Party as (or provided under circumstances in reasonably indicating that it is) confidential.

    **13.2** Limitations on Liability.

        **(a)**     Subject to the specific provisions and limitations of this **Section 13.2**, it is the intent of the Parties that each Party will be liable to the other Party for all Damages incurred

23

by the non-breaching Party arising out of the breach of or failure to perform any of the breaching Party's agreements, covenants or obligations under this Agreement. If a Party has a Claim for such Damages, it will promptly send to the breaching Party a written notice specifying the nature of such Claim, together with all information reasonably available to such non-breaching Party with respect to such Claim (a "**Claim Notice**"); provided, however, that a delay in notifying the breaching Party will not relieve the breaching Party of its obligations under this Agreement, except to the extent that such failure will have caused actual prejudice to the breaching Party. In the event of such a Claim, the breaching Party will notify the non-breaching Party within forty-five (45) days of receipt of a Claim Notice whether or not the breaching Party disputes such Claim.

(b)    The total aggregate liability of Supplier under or in connection with this Agreement, regardless of the form of the action or the theory of the recovery, will be limited to:

(1)    With respect to Damages arising out of or relating to the failure by Supplier to meet the standards set forth in **Section 11.1**, subject to **Section 13.2(b)(2)**, at Recipient's option, which option Recipient shall exercise in good faith and in its reasonable discretion after consulting with Supplier and after exhausting the escalation process set forth in **Schedule B**, the replacement of (if applicable) or re-performance of, or repayment of the price paid for, such Service during the period such Service did not meet the standard set forth in **Section 11.1**; provided, however, that if Recipient requests the replacement of or re-performance of such Service, Supplier shall, instead have the option of refunding to Recipient the price paid for such Service during the period such Service did not meet the standard set forth in **Section 11.1** in those instances where re-performance or replacement of the Services cannot, in Supplier's good faith opinion be completed in a commercially reasonable manner. In instances where Supplier reasonably determines that it cannot replace or re-perform the Services in a commercially reasonable manner, Recipient shall have the option to terminate such Services without cost to Supplier other than the refund for the Services not performed in accordance with the Agreement. In any such instance, Recipient may elect to terminate and no longer have any obligation to pay for those specific Services under the Agreement, and Supplier's obligation with respect to such terminated Service will be limited to a refund for the Services not performed and any reasonable cooperation requested by Recipient in the transition of the terminated Services to Recipient or a third party.

(2)    With respect to indemnity Claims under **Section 13.1** or other Claims arising out of or relating to the gross negligence or willful misconduct of Supplier, the fees actually received by Supplier from Recipient for Services during the twelve (12) months preceding the last act or omission giving rise to such Claims or, in the event such last act or omission occurs during the first twelve (12) months following the date hereof, an amount equal to twelve (12) times the fees paid for Services in the month preceding such last act or omission;

(3)    With respect to all other Damages under or in connection with this Agreement, the fees actually received by Supplier from Recipient for Services during the twelve (12) months preceding the last act or omission giving rise to such Damages or, in the event such last act or omission occurs during the first twelve (12) months following the date hereof, an amount equal to twelve (12) times the fees paid for Services in the month preceding such last act or omission.

la-1200776

(c)    Each Party will use its commercially reasonable efforts to mitigate Damages for which it seeks recourse hereunder, including by promptly pursuing recovery under available insurance policies, provided, however, that the failure of such Party to successfully mitigate such Damages will not affect such Party's right to seek recourse with respect to such Damages so long as such Party will have used its commercially reasonable efforts to mitigate.

(d)    Any amounts payable under **Article 13** will be calculated after giving effect to any proceeds received from insurance policies covering the Damages.

(e)    IN NO EVENT SHALL EITHER PARTY, ITS AFFILIATES OR ANY OF ITS OR THEIR DIRECTORS, OFFICERS, MEMBERS, MANAGERS, EMPLOYEES OR AGENTS BE RESPONSIBLE OR LIABLE TO THE OTHER PARTY OR ITS AFFILIATES FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES, OR FOR ANY LOSS OF PROFITS, LOSS OF REVENUE, LOSS RESULTING FROM INTERRUPTION OF BUSINESS OR LOSS OF USE OR DATA, EVEN IF THAT PARTY, ITS AFFILIATES OR ANY OF THEIR DIRECTORS, OFFICERS, MEMBERS, MANAGERS, EMPLOYEES OR AGENTS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY OF ANY KIND, UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER THEORY, ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR ITS IMPLEMENTATION, PROVIDED THAT THE FOREGOING SHALL NOT APPLY WITH RESPECT TO THIRD PARTY CLAIMS FOR DAMAGES FOR WHICH A PARTY IS INDEMNIFIED PURSUANT TO **SECTION 13.1** TO THE EXTENT SUCH DAMAGES ARE AWARDED TO THE THIRD PARTY BRINGING SUCH CLAIM BY A COURT OF COMPETENT JURISDICTION.

**13.3** Indemnification and Limitations on Liability Relating to Negligence and Strict Liability.    ALL INDEMNITIES AND LIMITATIONS ON LIABILITY CONTAINED IN THIS **ARTICLE 13** WILL APPLY WHETHER OR NOT THE INDEMNITEE OR PARTY CLAIMING DAMAGES WAS OR IS CLAIMED TO BE PASSIVELY, CONCURRENTLY OR ACTIVELY NEGLIGENT, AND REGARDLESS OF WHETHER LIABILITY WITHOUT FAULT IS IMPOSED OR SOUGHT TO BE IMPOSED ON SUCH INDEMNITEE OR PARTY.

**13.4** Exclusive Remedy.    Neither Party will have any remedy arising out of or relating to the breach of this Agreement other than the indemnification remedies set forth in **Section 13.1** and Claims for direct damages referred to in **Section 13.2**, in each case subject to the limitations and exclusions set forth in this **Article 13**.

**13.5** Insurance.    Each Party will cause its insurers to waive their rights of subrogation against the other Party with respect to any Claim.

## 14.    TERMINATION.

**14.1** Termination.    Without limiting the rights of the Parties under any other provision of this Agreement, this Agreement or any Service to be provided under this Agreement may be terminated as follows:

la-1200776

**(a)** by either Party acting in its capacity as "Supplier", upon written notice to the other Party if, after Recipient fails to pay the Charges for such Service when due in accordance with this Agreement, the terminating Party sends to the other Party an initial notice of such failure and the other Party fails to pay such Charges within forty-five (45) days of receipt of such initial notice, provided that such termination will be only with respect to the particular Service(s) for which such Charges have not been paid;

**(b)** by either Party acting in its capacity as "Supplier", upon written notice to the other Party if, following a material breach by Recipient of this Agreement other than a payment default covered by clause (a) above, the terminating Party sends to the other Party a notice of such material breach and the other Party fails to cure such material breach within thirty (30) days; provided however, that if cure cannot reasonably be accomplished within such 30-day period, neither this Agreement nor any Service may be terminated by reason of such breach for so long as the other Party commences a cure within such 30-day period and pursues such cure diligently to completion and such completion occurs within ninety (90) days of such written notice;

**(c)** by either Party acting in its capacity as "Recipient", upon written notice to the other Party if, following a material breach by Supplier of this Agreement, the terminating Party sends to the other Party an initial notice of such material breach and the other Party fails to cure such material breach within 30 days of receipt of such initial notice; provided, however, that if cure cannot reasonably be accomplished within such 30-day period, neither this Agreement nor any Service may be terminated by reason of such breach for so long as the other Party commences a cure within such 30-day period and pursues such cure diligently to completion and such completion occurs within ninety (90) days of such written notice, provided that such termination will be only with respect to the Service(s) provided to such Party acting in its capacity as "Recipient" that are identified in the written notice;

**(d)** by either Party acting in its capacity as "Recipient", upon at least thirty (30) days prior written notice to the other Party, provided that such termination will be only with respect to the Service(s) provided to such Party acting in its capacity as "Recipient" that are identified in the written notice; or

**(e)** otherwise upon mutual agreement of the Parties.

**14.2** Election of Terminating Party.  In connection with any termination pursuant to this **Article 14**, the Party exercising such termination rights may elect to continue to receive the Services (other than Services so terminated) that the other Party provides to it.

**14.3** Survival.  Any provision of this Agreement which contemplates performance or observance subsequent to any termination or expiration of this Agreement will survive any termination or expiration of this Agreement and continue in full force and effect including, but not limited to, the following:  **Sections 8.2** (Ownership), **9** (Confidentiality), **10** (Compensation), **11** (Representations and Warranties), **12** (Insurance), **13** (Indemnification and Limitations on Liability), **14.3** (Survival), **14.4** (Rights Upon Termination or Expiration), **15.3** (Counterparts), **15.5** (Force Majeure), **15.6** (Further Assurances), **15.7** (Governing Law;

la-1200776

Jurisdiction and Forum; Waiver of Jury Trial), **15.8** (Headings), **15.11** (Public Announcements), and **15.13** (Severability)].

    14.4 <u>Rights Upon Termination or Expiration</u>.

        **(a)** <u>Termination or Expiration</u>.    Commencing two (2) months prior to expiration of the Term or any extension thereof, or upon either Party receiving any notice of termination from the other Party pursuant to the above provisions of **Section 14.1**:

        **(1)**    At Recipient's option, Supplier will provide to Recipient the migration assistance reasonably requested by Recipient to allow the Services to continue, and to facilitate the orderly transfer of responsibility for performance of the Services, including any migration of Recipient Data, to Recipient (collectively, "**Migration Assistance Services**"), for a period of up to two (2) months after the effective date of such termination of Services or expiration of the Term (the "**Migration Services Periods**").

        **(2)**    The Migration Assistance Services to be provided during the Migration Services Periods may include, as and if reasonably required by Recipient, the following, among other Services:  (i) developing, together with Recipient, a plan for the orderly transition of the performance of the Services, including the migration of Recipient Data from Supplier to Recipient or to a third party designated by Recipient; (ii) providing reasonable training for personnel of Recipient in the performance of the Services then being transitioned to Recipient or the third party designated by Recipient, to the extent Services are being assumed by that third party; and (iii) providing cooperation to Recipient to facilitate the transition of the performance of the Services to Recipient or to a third party designated by Recipient, in accordance with a mutually agreed upon transition plan for the applicable Services.  If Supplier provides any access to Supplier facilities, Systems or resources in connection with the execution of such plan, Recipient will, and will cause its personnel and any third parties having such access to, comply with Supplier's security and confidentiality requirements.    Notwithstanding the foregoing, Supplier shall not be required to grant access to or share any of Supplier's proprietary information, data or technology with any third party.

        **(b)** <u>Charges</u>.  ResCap will pay to Ocwen Charges for the Services described in **Section 14.4(a)** as provided in **Schedule C**, including during the Migration Services Periods. Ocwen will pay to ResCap Charges for the Services described in **Section 14.4(a)** as provided in **Schedule C**, including during the Migration Services Periods.    In the event of any termination of Services by Supplier for cause, Charges for the related Migration Assistance Services will be paid by Recipient monthly in advance.

**15.    GENERAL.**

    **15.1** <u>Acknowledgement</u>.  The Parties acknowledge that the terms and conditions of this Agreement have been the subject of active and complete negotiations, and that this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring either Party by virtue of the authorship of any provision of this Agreement.

la-1200776

**15.2** Binding Effect; No Assignment.   This Agreement is binding upon and inures to the benefit of the Parties and their respective successors, permitted assigns and legal representatives.   This Agreement is not assignable by either Party without the prior written consent of the other Party, and any other purported assignment will be null and void.

**15.3** Counterparts.   This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which will be considered one and the same agreement, and will become effective when one or more counterparts have been signed by each of the Parties and delivered (including by facsimile) to the other Parties.

**15.4** Entire Agreement.   This Agreement, including the Schedules hereto, which are each hereby incorporated herein and made a part hereof, contains the entire agreement between the Parties with respect to the subject matter hereof.   While purchase orders, invoices or similar routine documents may be used to implement or administer provisions of this Agreement, any provisions of such documents that add to, vary, modify or are at conflict with the provisions of this Agreement will be deemed deleted and will have no force or effect on either Party's rights or obligations under this Agreement.

**15.5** Force Majeure.

(a) "**Force Majeure Event**" means any event beyond the reasonable control of the Party affected that significantly interferes with the performance by such Party of its obligations under this Agreement, including acts of God, strikes, lockouts or industrial disputes or disturbances, civil disturbances, arrests or restraint from rulers or people, interruptions by government or court orders or present and future valid orders of any regulatory body having proper jurisdiction (other than any such interruption arising from the failure by the Party claiming force majeure to comply with any applicable regulation or to obtain and comply with any required permit), acts of the public enemy, wars, riots, blockades, insurrections, inability to secure labor or secure materials upon terms deemed practicable by the Party affected (including by reason of allocations, voluntary or involuntary, promulgated by authorized governmental agencies), epidemics, landslides, lightning, earthquakes, fire, storm, floods, washouts, explosions, breakage or accident to machinery.

(b) If a Force Majeure Event is claimed by either Party, the Party making such claim will orally notify the other Party as soon as reasonably possible after the occurrence of such Force Majeure Event and, in addition, will provide the other Party with written notice of such Force Majeure Event within three (3) days after the occurrence of such Force Majeure Event.

(c) Except for a Party's obligations to make payments hereunder (including those obligations of **Section 10.3**), neither Party will be liable for any nonperformance or delay in performance of the terms of this Agreement when such failure is due to a Force Majeure Event and the Charges payable by Recipient shall be equitably adjusted such that Recipient is not obligated to pay any Charges for any Services to the extent not performed due to a Force Majeure Event.   If either Party relies on the occurrence of a Force Majeure Event as a basis for being excused from performance of its obligations hereunder, such Party

28

relying on the Force Majeure Event will (i) provide an estimate of the expected duration of the Force Majeure Event and its probable impact on performance of such Party's obligations hereunder and (ii) provide prompt notice to the other Party of the cessation of the Force Majeure Event.

(d) Upon the occurrence of a Force Majeure Event, the same will, so far as possible, be remedied as expeditiously as possible using commercially reasonable efforts. It is understood and agreed that nothing in this **Section 15.5(d)** will require the settlement of strikes, lockouts or industrial disputes or disturbances by acceding to the demands of any opposing party therein when such course is inadvisable in the discretion of the Party having the difficulty.

15.6 Further Assurances. Each Party covenants and agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each Party will execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.

15.7 Governing Law; Jurisdiction and Forum; Waiver Of Jury Trial.

(a) This Agreement will be governed by and construed in accordance with the Laws of the State of New York without reference to the choice of law principles thereof.

(b) Each Party irrevocably submits to the jurisdiction of the Bankruptcy Court in any action arising out of or relating to this Agreement, and hereby irrevocably agrees that all claims in respect of such action may be heard and determined in the Bankruptcy Court. Each Party hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. The Parties further agree, to the extent permitted by Law, that final and unappealable judgment against any of them in any proceeding contemplated above will be conclusive and may be enforced in any other jurisdiction within or outside the United States by suit on the judgment, a certified copy of which will be conclusive evidence of the fact and amount of such judgment.

(c) Each Party waives, to the fullest extent permitted by Law, any right it may have to a trial by jury in respect of any action, suit or proceeding arising out of or relating to this Agreement. Each Party certifies that it has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications set forth above in this **Section 15.7**.

15.8 Headings. The Article and Section headings contained in this Agreement are inserted for convenience of reference only and do not affect the meaning or interpretation of this Agreement. All references to Articles or Sections contained herein mean Articles and Sections of this Agreement, as the case may be, unless otherwise stated and except in the Schedules hereto, wherein references to Articles or Sections mean Articles and Sections of such Schedule, as the case may be, unless otherwise stated.

15.9 Independent Contractors. Supplier is an independent contractor, with all of the attendant rights and liabilities of an independent contractor, and not an agent or employee of

29

Recipient. Any provision in this Agreement, or any action by Recipient, that may appear to give Recipient the right to direct or control Supplier in performing under this Agreement means that Supplier will follow the desires of Recipient in results only.

**15.10** _Notices_. All notices and other communications to be given to any Party hereunder are sufficiently given for all purposes hereunder if in writing and delivered by hand, courier or overnight delivery service or three days after being mailed by certified or registered mail, return receipt requested, with appropriate postage prepaid, or when received in the form of a facsimile or e-mail transmission and will be directed to the physical address, facsimile number or e-mail address set forth below (or at such other address or facsimile number as such Party will designate by like notice):

**IF TO RESCAP:**

> Residential Capital, LLC
> 8400 Normandale Lake Boulevard
> Minneapolis, MN 55437
> Attention: Tammy Hamzehpour
> E-Mail Address: Tammy.Hamzehpour@gmacm.com

> With a copy to:
> Residential Capital, LLC
> 1100 Virginia Drive
> Fort Washington, PA 19034
> Attention: William Thompson
> E-mail Address: William.Thompson@gmacm.com

**IF TO OCWEN:**

> Ocwen Financial Corporation
> 1661 Worthington Road, Suite 100
> West Palm Beach, FL 33409
> Attention: Secretary
> Telecopy Number: (561) 682-8177
> Confirmation Number: (561) 682-8957

**15.11** _Public Announcements_. Except as otherwise required by Law, each of Ocwen and ResCap will consult with the other and obtain the prior written consent of the other before issuing, or permitting any agent or Affiliate to issue, any press releases or otherwise making, or permitting any agent or Affiliate to make, any public statements with respect to this Agreement or the transactions contemplated hereby; _provided_, _however_, that the prior written consent of the other Party is not required hereunder with respect to any press release, public announcement or communication that is substantially similar to a press release, public announcement or communication previously issued with the prior written consent of the other Party.

la-1200776

**15.12** <u>Amendments and Waivers</u>.  This Agreement may not be modified or amended except by an instrument or instruments in writing signed by both Parties.  The Parties may, only by an instrument in writing, waive compliance by the other Party with any term or provision of this Agreement on the part of such other Party to be performed or complied with.  The waiver by either Party of a breach of any term or provision of this Agreement will not be construed as a waiver of any subsequent breach.  Except as otherwise expressly provided herein, no failure to exercise, delay in exercising or single or partial exercise of any right, power or remedy by either Party, and no course of dealing between the Parties, will constitute a waiver of any such right, power or remedy.

**15.13** <u>Severability</u>.  If any provision of this Agreement is held invalid, illegal or unenforceable, the validity, legality or enforceability of the other provisions of this Agreement will not be affected thereby, and there will be deemed substituted for the provision at issue a valid, legal and enforceable provision as similar as possible to the provision at issue.

**15.14** <u>No Third Party Beneficiaries</u>.  This Agreement is entered into solely between, and, except with respect to the rights of the Supplier Indemnified Parties and the Recipient Indemnified Parties under **Article 13**, may be enforced only by, Recipient and Supplier.  This Agreement does not create any rights or causes of action in or on behalf of any third parties, including employees, suppliers, customers, Affiliates or Subcontractors of a Party, or create any obligations of a Party to any such third parties, except that either Party is entitled to include as part of its Damages under this Agreement the Damages incurred by its Affiliates or Subcontractors in connection with a breach by the other Party of this Agreement.

**15.15** <u>Order of Precedence</u>.  In the event of a conflict, this Agreement takes precedence over the Schedules.

*[Signature Page Follows]*

31

la-1200776

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized representatives, to be effective as of the Effective Date.

**Residential Capital, LLC**                    **Ocwen Loan Servicing, LLC**

By: _____            By: _____

Name:   James Whitlinger                         Name:   Kenneth D. Najour

Title:   Chief Financial Officer                    Title:   Secretary and Treasurer

*Signature Page to ResCap-Ocwen TSA*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized representatives, to be effective as of the Effective Date.

**Residential Capital, LLC**                         **Ocwen Loan Servicing, LLC**

By: _____              By: _____

Name:   James Whitlinger                            Name:   Kenneth D. Najour

Title:   Chief Financial Officer                        Title:   Secretary and Treasurer

*Signature Page to ResCap-Ocwen TSA*

**Schedule A-1**

**ResCap Services**

**The following Statements of Work are governed by the Agreement.**

**ResCap to Ocwen Statements of Work by Functional Service Area**

| # | Functional Service Area | SOW Name | SOW Number | Expected Termination Date |
|---|---|---|---|---|
| 1 | ETS | Executive Trustee Services (ETS) Services | E-O ETS2 | 12/31/2013 |
| 2 | Records Management Storage | Records Management Services * | O-E RM1 | 8/31/2014 |
| 3 | Facilities | Facilities Use and Occupancy Rights | E-O FAC1 | 05/31/2013 |
| 4 | Finance | Finance Shared Services (P2P) | E-O GL1 | 05/31/2013 |
| 5 | ITG | IT Application Access, Development, and Support Services | E-O ITG1 | 12/31/2013 |
| 6 | Legal | Legal Services | E-O LEG1 | 07/31/2013 |

* Represents storage costs reimbursement related to the Ocwen to Estate Records Management SOW.

la-1200776

**Schedule A-2**

**Ocwen Services**

**The following Statements of Work are governed by the Agreement.**

**Ocwen to ResCap Statements of Work by Functional Service Area**

|   | Functional Service Area | SOW Name | SOW Number | Expected Termination Date |
|---|---|---|---|---|
| 1 | Accounting | Accounts Payable Cutoff Services | O-E AP1 | 05/31/2013 |
| 2 | Accounting | Accounting Services | O-E FIN1 | 5/31/2013 |
| 3 | Capital Markets | Capital Markets Services | O-E CM1 | 12/31/2013 |
| 4 | Consumer Lending | Consumer Lending Services | O-E CL1 | 06/30/2013 |
| 5 | Facilities | Facilities Services | O-E FAC1 | 12/31/2014 |
| 6 | ITG | IT Application Access, Development, and Support Services | O-E ITG1 | 2/15/2020 * |
| 7 | ETS | Executive Trustee Services (ETS) | O-E ETS1 | 12/31/2013 |
| 8 | Servicing | Servicing Data Support | O-E CLAIMS1 | 2/15/2020 * |
| 9 | Records Management | Records Management Services | O-E RM1 | 2/15/2016 |

\* Termination date set to coincide with the term of the Cooperation Side Letter among AFI,
ResCap Walter and Ocwen.

**Schedule B**

**Governance Model**

1.    **INTRODUCTION**

This **Schedule B** (this "**Schedule B**") is incorporated by reference and attached to the Transition Services Agreement by and between ResCap and Ocwen dated February 15, 2013 (the "**Agreement**").

2.    **AGREEMENT COVERAGE**

This **Schedule B** sets out the service management model for Supplier and Recipient, related to the Services provided under the Agreement.

3.    **OVERVIEW**

Supplier and Recipient will each appoint responsible, knowledgeable persons to serve as their representatives to oversee the performance of the Agreement (such persons and each Party's Relationship Manager shall collectively constitute the "**Service Management Team**").

The Service Management Team members will work informally on a regular basis, but the Relationship Managers, and such additional Service Management Team members as the Relationship Managers may designate from time to time, will meet formally at least monthly.    These monthly meetings will review such topics as significant operational concerns, performance metrics as developed by the Service Management Team, future service needs, transition service progress and pricing.    In addition, the Relationship Managers may from time to time designate Service Management Team members to meet in sub-teams either on a temporary or ongoing basis, to deal with specific issues under the Agreement.    The Relationship Managers will share the responsibility for organizing the meetings and ensuring the effectiveness of the meetings.

Each Party will staff its Service Management Team as necessary to represent the areas of services offered.

4.    **SCOPE**

The Service Management Team will be responsible for overseeing the overall execution of the Agreement to ensure that each Party performs its responsibilities as expected.

The Service Management Team's responsibilities shall include the following:

(a)    <u>Strategy and Direction</u>.    The Service Management Team may make recommendations as to strategic direction and provide critical input for business planning decisions between Supplier and Recipient.

(b)     <u>General Service Management</u>.  The Service Management Team may review the status of projects and prioritize work.  The Service Management Team will also be a forum for discussions between Supplier and Recipient regarding service changes and opportunities for Additional Services, and will coordinate with management and service delivery teams to ensure appropriate execution of such service changes or Additional Services.

(c)     <u>Issue Resolution</u>.  The Service Management Team will be responsible for resolving problems, concerns or inefficiencies in their execution as they arise, and will escalate unresolved issues as described below.

## 5.    ESCALATION

Issues that cannot be resolved within a reasonable period of time (which period of time shall not exceed twenty (20) days) by the Parties' respective Service Management Team members responsible for the applicable subject area must be first be escalated to the Relationship Managers.  If the Relationship Managers are unable to resolve an issue within ten (10) days, then either Party's Relationship Manager may, upon prior written notice to the other Relationship Manager, escalate such issue to Recipient's and Supplier's executive management representative for resolution.  Neither Party may initiate any formal legal proceedings for resolution of such issue until ten (10) business days after such issue has been escalated to each Party's executive management representatives.

The provisions and time periods specified in this **Article 5** will not be construed to prevent a Party from instituting, and a Party is authorized to institute, formal proceedings earlier to (A) avoid the expiration of any applicable limitations period, (B) preserve a superior position with respect to other creditors, or (C) address a claim arising out of the breach of a Party's obligations under **Article 9** of the Agreement or a dispute with respect to Intellectual Property Rights.

Schedule C

Pricing Methodology

1.    **INTRODUCTION**

This **Schedule C** (this "**Schedule C**") is incorporated by reference and attached to the Transition Services Agreement by and between ResCap and Ocwen dated February 15, 2013 (the "**Agreement**").

1.1    Charges.  This **Schedule C** describes the Charges, and the methodologies for their calculation, with respect to the Services.

1.2    Order of Precedence.  The Parties acknowledge that certain obligations may be set forth in both this Schedule and elsewhere in the Agreement, and in the event of a conflict, such conflict shall be resolved in accordance with **Section 15.15** of the Agreement.

1.3    Section and Article References.  Unless otherwise specified, Section references in this **Schedule C** refer to the Sections of this **Schedule C**.

1.4    Definitions.  Capitalized terms have the meanings assigned below.  Any other capitalized terms used and not otherwise defined in this **Schedule C** have the meanings given them in the Agreement.

(a)    "**Business Change Event**" means any change in the products or services offered by Recipient or the expansion or closure of any Facility of any Recipient, or a decrease or increase in Recipient's level of consumption of the Services from the historical usage levels of its business, in any case that has a material impact on the cost to Supplier of providing any impacted Services.

(b)    "**Charges**" means:

(i)    any Total Shared Services Charge;

(ii)    amounts to be paid by Recipient as Pass-Through Expenses;

(iii)    the charges for Additional Services that may be agreed upon by the Parties pursuant to a signed Supplement from time to time;

(iv)    the charges for the Customized Services that may be agreed upon by the Parties pursuant to a signed Supplement from time to time; and

(v)    the charges for Migration Assistance Services.

(c)     **"Monthly Fixed Charges"** means, for a given month and Service, the amount reflected in **Schedule C-1b** or **C-2b** for such Service. This amount does not include amounts to be paid by Recipient as Monthly Variable Charges or Pass-Through Expenses.

(d)     **"Monthly Variable Charges"** means, for a given month and Service, the (i) total actual costs incurred by Supplier for the Service, multiplied by (ii) the Recipient cost allocation percentage for such Service that was agreed upon between the Parties, as reflected in **Schedule C-1b** or **C-2b**, as applicable. This amount does not include amounts to be paid by Recipient as Pass-Through Expenses.

(e)     **"Pass-Through Expenses"** as referenced in **Schedule C-1b** and **C-2b** means those third-party, out-of-pocket expenses actually incurred by Supplier in connection with a given Service (e.g., external audit fees, training for consent orders, consent order direct vendor costs), which will be either (i) approved by Recipient prior to being incurred by Supplier; provided, that if Recipient does not approve any such expense Supplier will have no obligation to procure or provide the goods or services associated with such expense, (ii) approved by Recipient in advance as being within a category or for a Service already approved by the Parties as for a billed-as-incurred expense, or (iii) for a good or service reasonably necessary to allow Supplier to deliver the Services contemplated under this Agreement.

(f)     **"Price Adjustment Event"** means any of the following:

(i)     a Business Change Event occurs; or

(ii)    a Service has been terminated pursuant to **Article 3** or **Article 14** of the Agreement.

(g)     **"Price Adjustment Process"** means the process described in **Section 3.4** of this **Schedule C**.

(h)     **"Stranded Costs"** has the meaning set forth in **Section 3.4** of this **Schedule C**.

(i)     **"Total Monthly Shared Services Charge"** means, in respect of any individual Service, the monthly Charge for that Service, which shall be applicable from the Effective Date until the termination date for such Service, as such Charges are listed on **Schedule C-1a** or **Schedule C-2a** and may be adjusted in accordance with any Price Adjustment Event and/or Price Adjustment Process. The Total Shared Services Charge represents the aggregate of the Total Base Costs, Third Party Costs and IT Projects as referenced on **Schedule C-1a** and **Schedule C-2a**. The Total Base Costs are equal to an amount representing Employee Costs, IT Costs,

Platform Costs and the Indirect Support Costs for that Functional Service Area, as described below:

i) Employee Costs means compensation, benefits, travel and other non-compensation related personnel costs;

ii) IT Costs means those costs associated with IT services under Schedule A-1 and **Schedule A-2**;

iii) Platform Costs means the Charges to the Recipient for use of the IT services on Supplier's platform related to depreciation and amortization in respect of IT infrastructure; and

iv) Indirect Support Costs means, for Ocwen, an amount equal to the percentage of the total of Employee Costs, IT Costs and Platform Costs set forth in **Schedule C-1b**, and for ResCap means an amount equal to the percentage of the total of Employee Costs, IT Costs and Platform Costs set forth in **Schedule C-2b**. Such percentages in each case are those referenced in the formulas in the Pricing Methodology Spreadsheets titled "Billing Method by Service - Ocwen Services" (Ocwen to ResCap) and "Billing Method by Service - ResCap Services" (ResCap to Ocwen).

These amounts are set forth in **Schedule C-1a** and **Schedule C-2a** on a monthly basis as the Total Monthly Shared Services Charge. The Total Monthly Shared Services Charges do not include any (i) Charges for Additional Services or Customized Services, (ii) Migration Assistance Services or (iii) Pass-Through Expenses.

Pricing for the Services set forth on **Schedule C-1a** and **Schedule C-2a** can change on a monthly basis, depending upon whether the Service is priced on the basis of Monthly Fixed Charges or Monthly Variable Charges, as indicated on **Schedule C-1b** and **Schedule C-2b**. Any such calculations will be made by reference to and in accordance with the formulas in the Pricing Methodology Spreadsheets titled "Billing Method by Service - Ocwen Services" (Ocwen to ResCap) and "Billing Method by Service - ResCap Services" (ResCap to Ocwen).

1.5    <u>General</u>.

(a)    Unless specifically stated otherwise, each Party will be financially responsible for all costs and expenses associated with performing its responsibilities under this Agreement.

(b)    Unless the Parties otherwise agree, for the purpose of calculating Charges, any Services that start on a day other than the first day of a month or are discontinued before the last day of a month shall be prorated for such month.

1.6    <u>Attachments</u>. Attached to this **Schedule C** are the following Attachments:

**Schedule C-1a** – Pricing for ResCap Services

**Schedule C-2a** – Pricing for Ocwen Services

**Schedule C-1b** –Billing Method by Service – ResCap Services

**Schedule C-2b** –Billing Method by Service – Ocwen Services

2.    **COMMENCEMENT OF CHARGES.**

The Total Shared Services Charges will begin on the Effective Date and are set forth in **Schedule C-1a** and **Schedule C-2a**.    Charges for Additional Services, Customized Services, and Migration Assistance Services shall begin on the date such Services begin to be performed by Supplier.

3.    **PRICING METHODOLOGY.**

3.1    Total Monthly Shared Services Charges.    All Total Monthly Shared Services Charges will only be adjusted in accordance with the Price Adjustment Process.

3.2    Additional Services.    Charges for Additional Services will be set forth in the applicable Supplement for such Services.    To the extent the Additional Services are ongoing, the Charge may also or in the alternative be added as a separate item in **Schedule C-1a** or **Schedule C-2a**, as applicable and, if so included as a separate item, will be subject to the Price Adjustment Process just as any other Total Shared Services Charges would be.

3.3    Customized Services.    Charges for Customized Services will be set forth in the applicable Supplement for such Services.    To the extent the Customized Services are ongoing, the Charge may also or in the alternative be added as a separate item in **Schedule C-1a** or **Schedule C-2a**, as applicable and, if so included as a separate item, will be subject to the Price Adjustment Process just as any other Total Shared Services Charges would be.

3.4    Price Adjustment Process.    The Price Adjustment Process described in this **Section 3.4** will be followed by the Parties upon either Party's written request in the event of a Price Adjustment Event.    The Price Adjustment Process for Business Change Events is subject to any approval right or termination right that Supplier may have with respect to such change in Services pursuant to **Article 3** or **14** of the Agreement.

(a)    The Price Adjustment Process will be initiated immediately following a Price Adjustment Event and the resulting change to the Charges will take effect as soon as practical and will be retroactive to the point in time that the Price Adjustment Event occurs.

(b)    When a Price Adjustment Process is initiated, the Parties shall meet as soon as reasonably practicable to mutually determine in good faith the

la-1200776

appropriate adjustments to pricing hereunder to take into account the applicable Price Adjustment Event. Any unresolved dispute in connection with a Price Adjustment Process shall be subject to the escalation procedures set forth in **Schedule B**.

If the Price Adjustment Process is initiated in connection with a termination of Service, the starting assumption is that Recipient will no longer be charged for that Service; provided, however, that Supplier may be entitled to reimbursement from Recipient of all costs previously paid by Recipient for such Service that Supplier is not able to eliminate, for example, costs for physical assets which cannot be reduced (i.e. leasing expenses or rental expenses which cannot be eliminated), third party costs (i.e. minimum revenue commitments which are required under a third party agreement) or any other non-internal costs ("**Stranded Costs**") which the Parties using appropriate due diligence and commercially reasonable efforts can not eliminate. If, after using such efforts the Parties are unable to eliminate 100% of any Stranded Costs, the Parties will meet and discuss the remaining Stranded Costs to be reimbursed by Recipient to Supplier.

(c)     The Total Shared Services Charges set forth in Schedule C-1a and Schedule C-2a were determined by allocating to Recipient a portion of Supplier's underlying costs of performing the applicable Service (such cost allocation, the "Initial Cost Allocations"). In the event the Price Adjustment Process is initiated solely due to a Business Change Event and does not involve a termination of the applicable Service, then during the Price Adjustment Process, Supplier will (i) use the cost allocation methodology that was used to determine the Initial Cost Allocation for such Service, to determine a new cost allocation reflecting Recipient's then-current level of consumption of such Service, taking into account material increases or decreases (if any) in Supplier's overall costs that are a direct result of the change in Recipient's level of consumption of such Service (a "New Cost Allocation"), and (ii) if the New Cost Allocation differs from the Initial Cost Allocation for such Service, adjust the Total Shared Services Charge for such Service accordingly. Except as otherwise agreed by the Parties, the cost allocation determination described above shall only be performed for the area impacted by the Business Change Event and such cost allocation determination per Functional Service Area shall not be performed more than once per month. At Recipient's request, Supplier will provide Recipient with all supporting calculations of the effects of such Business Change Event on Supplier's costs of performing the Services.

3.6     Charges for Extensions of Term. The pricing in this **Schedule C** as of the Effective Date includes only the pricing for the Services during the Initial Term.

Any extensions of the Term are subject to the Parties reaching agreement of the pricing during such extension period.

3.7    Migration Assistance Services.  If requested by Recipient, Supplier will provide Migration Assistance Services in accordance with **Section 14.4** of the Agreement. The price of Migration Assistance Services shall be documented in a Supplement to **Schedule A-1** or **Schedule A-2**. In addition to any Charges otherwise provided for in the Agreement or **Schedule C**, Recipient will reimburse Supplier for all incremental additional resource and other costs and expenses required or incurred by Supplier to provide Migration Assistance Services.

Schedule C-1:

Pricing for ResCap Services

**Schedule C-1**

**Pricing for ResCap Services** [1]
**Effective 2/15/2013**

| ResCap to Ocwen | | Monthly Total Shared Services Charges (US $) | | | |
| Functional Service Area | Statement of Work | Total Base Costs (2) | Third Party Costs | IT Projects | Total Shared Services |
|---|---|---|---|---|---|
| Executive Trustee Services | ETS2 | $            - | $            - | $            - | $            - |
| Records Management - Storage | O-E RM1 | - | 110,234 | - | 110,234 |
| Legal | LEG1 | 12,562 | - | - | 12,562 |
| IT | ITG1 | 89,098 | - | - | 89,098 |
| Finance Shared Services | FSS1 | 15,671 | - | - | 15,671 |
| Facilities | FAC1 | - | 486,729 | - | 486,729 |
| Subtotal | | $    117,332 | $    596,963 | $            - | $    714,295 |

[1] Approximate costs of services  - refer to supporting exhibits C1-a and C1-b

[2] Includes Employee Costs and 2.9% indirect support

**Schedule C-1a**

**Pricing for ResCap Services**

**Schedule C-1a**
**Pricing for ResCap Services [1]**
**Effective 2/15/2013**

| Functional Area | Statement of Work | Employee [1] (A) | IT Costs (B) | Platform Costs (C) | Indirect Support Costs (D) = 2.9% of (A) + (B) + (C) | Total Base Costs (E) = (A) + (B) + (C) + (D) | Third Party Costs (F) | IT Projects (G) | Total As Incurred (H) = (F) + (G) | Total Shared Services (I) = (E) + (H) |
|---|---|---|---|---|---|---|---|---|---|---|
| Executive Trustee Services | ETS2 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Records Management - Storage | O-E RM1 | - | - | - | - | - | 110,234 | - | 110,234 | 110,234 |
| Legal | LEG1 | 12,208 | - | - | 354 | 12,562 | - | - | - | 12,562 |
| IT | ITG1 | 89,098 | - | - | - | 89,098 | - | - | - | 89,098 |
| Finance Shared Services | FSS1 | 15,230 | - | - | 442 | 15,671 | - | - | - | 15,671 |
| Facilities [2] | FAC1 | - | - | - | - | - | 486,729 | - | 486,729 | 486,729 |
| **Total AFI** | | **$ 116,536** | **$ -** | **$ -** | **$ 796** | **$ 117,332** | **$ 596,963** | **$ -** | **$ 596,963** | **$ 714,295** |

[1] Employee Costs include Compensation and Benefits plus costs for T&E, Facilities, Office and Communications, Training and other employee related expenses
[2] Represents first month's charge

## Schedule C-1b

## Billing Method by Service – ResCap Services

**Schedule C-1b**

**Pricing for ResCap Services** [1]
**Effective**
**2/15/2013**

| Function | Statement of Work | Service | Monthly Total Shared Service Charge (US$) | Monthly Billing Methodology |
|---|---|---|---|---|
| **ResCap to Ocwen Pricing** | | | | |
| Executive Trustee Services | ETS2 | All Services | $          0 | No Charges - ResCap receives trustee revenues |
| Records Management - Storage | O-E RM1 | Records Storage | $     110,234 | Monthly Variable |
| Legal | LEG1 | All Services | $      12,562 | Monthly Fixed |
| IT | ITG1 | All Services | $      89,098 | Monthly Fixed |
| Finance Shared Services | FSS1 | All Services | $      15,671 | Monthly Fixed |
| Facilities | FAC1 | All Services | $     486,729 | Monthly Variable for 4 months (As Incurred) |

Total Monthly Shared
Service Charge                    $     714,295

la-1200776

## Schedule C-2

## Pricing for Ocwen Services

**Schedule C-2**

**Pricing for Ocwen Services** [1]

**Effective 2/15/2013**

| Ocwen to ResCap | | Monthly Total Shared Services Charges (US $) | | | |
|---|---|---|---|---|---|
| **Functional Service Area** | **Statement of Work** | **Total Base Costs (2)** | **Total Party Costs** | **IT Projects** | **Total Shared Services** |
| Records Management | O-E RM1 | $     11,390 | $     172,190 | $     - | $     183,581 |
| Servicing Data Support | O-E SERV1 | 42,018 | - | - | 42,018 |
| Facilities *** | O-E FAC1 | 10,073 | - | - | 10,073 |
| Finance/General Accounting ** | O-E FIN1 | 114,977 | - | - | 114,977 |
| Finance/AP Cutoff | O-E AP1 | - | - | - | - |
| Executive Trustee Services | O-E ETS1 | - | - | - | - |
| ITG | O-E ITG1 | 24,088 | - | - | 24,088 |
| Consumer Lending | O-E CL1 | 1,029 | - | - | 1,029 |
| Capital Markets * | O-E CM1 | - | - | - | - |
| **Subtotal** | | $     203,576 | $     172,190 | $     - | $     375,766 |

[1] Approximate costs of services  - refer to supporting exhibts C2-a and C2-b

[2] Includes Employee Costs and 2.9% indirect support

Notes:
*     Services will be charged as incurred
**   Amount represents average of first 4 months
*** Amounts represents average of first 11 months

**Schedule C-2a**

**Pricing for Ocwen Services**

**Schedule C-2a**
**Pricing for Ocwen Services** [1]
Effective 2/15/2013

| Functional Area | Statement of Work | Employee (1) Costs (A) | IT Costs (B) | Platform Costs (C) | Indirect Support Costs (D) = 2.9% of (A) + (B) + (C) | Total Base Costs (E) = (A) + (B) + (C) + (D) | Third Party Costs (F) | IT Projects (G) | Total As Incurred (H) = (F) + (G) | Total Shared Services (I) = (E) + (H) |
|---|---|---|---|---|---|---|---|---|---|---|
| Records Management | O-E RM1 | $ 11,069 | $ - | $ - | $ 321 | $ 11,390 | $ 172,190 | $ - | $ 172,190 | $ 183,581 |
| Servicing Data Support | O-E SERV1 | 40,833 | - | - | 1,184 | 42,018 | - | - | - | 42,018 |
| Facilities *** | O-E FAC1 | 10,073 | - | - | - | 10,073 | - | - | - | 10,073 |
| Finance/General Accounting ** | O-E FIN1 | 111,737 | - | - | 3,240 | 114,977 | - | - | - | 114,977 |
| Finance/AP Cutoff | O-E AP1 | - | - | - | - | - | - | - | - | - |
| Executive Trustee Services | O-E ETS1 | - | - | - | - | - | - | - | - | - |
| ITG | O-E ITG1 | 24,088 | - | - | - | 24,088 | - | - | - | 24,088 |
| Consumer Lending | O-E CL1 | 1,000 | - | - | 29 | 1,029 | - | - | - | 1,029 |
| Capital Markets * | O-E CM1 | - | - | - | - | - | - | - | - | - |
| **Total ResCap** | | $ 198,801 | $ - | $ - | $ 4,775 | $ 203,576 | $ 172,190 | $ - | $ 172,190 | $ 375,766 |

(1) Employee Costs include Compensation and Benefits plus costs for T&E, Facilities, Office and Communications, Training and other errmployee related expenses
(2) Direct third party costs represent pass-through costs based on diligence and negotiations

Notes:
* Services will be charged as incurred
** Amount represents average of first 4 months
*** Amounts represents average of first 11 months

## Schedule C-2b

### Billing Method by Service – Ocwen Services

**Schedule C-2b**

**Pricing for Ocwen Services [1]**
**Effective**
**2/15/2013**

| Function | Statement of Work | Service | Monthly Total Shared Service Charge (US$) | Monthly Billing Methodology |
|---|---|---|---|---|
| **Ocwen to ResCap Pricing** | | | | |
| Records Management | O-E RM1 | All Services | $ 183,581 | Monthly Variable |
| Servicing Data Support | O-E SERV1 | All Services | $ 42,018 | Monthly Variable |
| Facilities *** | O-E FAC1 | All Services | $ 10,073 | Monthly Variable |
| Finance/General Accounting ** | O-E FIN1 | All Services | $ 114,977 | Monthly Variable |
| Finance/AP Cutoff | O-E AP1 | All Services | $ 0 | Monthly Variable |
| Executive Trustee Services | O-E ETS1 | All Services | $ 0 | Passthrough Only |
| ITG | O-E ITG1 | All Services | $ 24,088 | Monthly Fixed |
| Consumer Lending | O-E CL1 | All Services | $ 1,029 | Monthly Variable for 3 Months |
| Capital Markets * | O-E CM1 | All Services | $ 0 | Monthly Variable |

Total Monthly Shared Service Charge    $ 375,767

Notes:
* Services will be charged as incurred
** Amount represents average of first 4 months
*** Amounts represents average of first 11 months

la-1200776

**Schedule D-1**

**List of Ocwen and Supported Facilities**

**As kept by the Corporate Real Estate Office as of the Effective Date**

**Schedule D-2**

**List of ResCap and Supported Facilities**

**As kept by the Corporate Real Estate Office as of the Effective Date**

**Schedule E**

**Form of Supplement**

_____

**Supplement [X]**

This Supplement __ (this "**Supplement**") is made and entered into as of _____ __, ____
(the "**Supplement Effective Date**") by and between Ocwen Loan Servicing, LLC., a
_____ limited liability company ("**Ocwen**") and Residential Capital, LLC, a Delaware
limited liability company ("**ResCap**") (together with Ocwen, the "**Parties**").

**1.      BACKGROUND**

This Supplement is entered into pursuant to the terms of the Shared Services Agreement
between Ocwen and ResCap dated [•] (the "**Agreement**") and constitutes a Supplement
under the Agreement. Capitalized terms used but not defined in this Supplement have the
meanings assigned to those terms in the Agreement.

**2.      SERVICES DESCRIPTION AND CHARGES**

Supplier will provide [*Insert brief description of the services here.*]____ services as
[Additional Services]/[Customized Services][, which shall be described in more detail in
_____, for the Charges set forth [therein]/[in **Schedule C** to the Agreement].

**3.      CHANGES**

[*Refer to the clauses in the Agreement relating to Services and incorporate here as
appropriate and agreed as the clauses in the Agreement do not apply to the Additional
Services or Customized Services being added pursuant to this Supplement.*]

**4.      TERM AND TERMINATION**

[*Term and notice provisions to be inserted as appropriate.*]

**5.      [OTHER TERMS**

*The Parties further agree:*

[*Insert any other terms and conditions applicable to the Additional Services or
Customized Services to be performed under this Supplement.* ]

**6.      MISCELLANEOUS**

This Supplement is incorporated by reference into the Agreement. In the event of any
conflict between the terms of this Supplement and the Agreement, the terms of this

Supplement shall only prevail to the extent that this Supplement expressly states that it is intended to override a term of the Agreement.

SPACE BELOW INTENTIONALLY BLANK – SIGNATURE PAGE FOLLOWS

la-1200776

**IN WITNESS WHEREOF**, the Parties have caused this Supplement to be executed by their respective duly authorized representatives as of the Supplement Effective Date.

**Residential Capital, LLC**                **Ocwen Loan Servicing, LLC**

By_____     By: _____

Name:_____     Name: _____

Title:_____     Title: _____

la-1200776