**Exhibit A**

B 10 (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT for the Southern District of New York | | PROOF OF CLAIM |
|---|---|---|

**Name of Debtor:**
Residential Capital LLC

**Case Number:**
No. 12-12020

**RECEIVED**
**NOV 1 6 2012**
**KURTZMAN CARSON CONSULTANTS**

COURT USE ONLY

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

**Name of Creditor** (the person or other entity to whom the debtor owes money or property):
Inmer E. Campos Carranza on behalf of himself and on behalf of all others similarly situated

**Name and address where notices should be sent:**
Leonard A. Bennett, Esq.
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd. Suite 1-A
Telephone number: (757) 930-3660   email: lenbennett@clalegal.com, srotkis@clalegal.com

❏ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
   (*If known*)

Filed on:_____

**Name and address where payment should be sent** (if different from above):




Telephone number:          email:

❏ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:**          $_____5,000,000.00_____

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

❏ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** __Individual and Class liability based on wrongful foreclosure__
   (See instruction #2)

| **3. Last four digits of any number by which creditor identifies debtor:** | **3a. Debtor may have scheduled account as:** | **3b. Uniform Claim Identifier (optional):** |
|---|---|---|
| __ __ __ __  — __ __ __ __  — __ __ __ __ | (See instruction #3a) | (See instruction #3b) |

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:**
   $_____

**Nature of property or right of setoff:** ❏Real Estate  ❏Motor Vehicle  ❏Other
**Describe:**

**Basis for perfection:** _____

**Value of Property:** $_____

**Amount of Secured Claim:** $_____

**Annual Interest Rate_____% ❏Fixed or ❏Variable
(when case was filed)**

**Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

❏ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

❏ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

❏ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

**Amount entitled to priority:**

❏ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

❏ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

❏ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__).

$_____

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

1212020121116000000000019

B 10 (Official Form 10) (12/11)                                                                                     2

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**RECEIVED**

**NOV 16 2012**

**KURTZMAN CARSON CONSULTANTS**

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.  ☑ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor,  ☐ I am a guarantor, surety, indorser, or other codebtor.
                  (Attach copy of power of attorney, if any.)     or their authorized agent.     (See Bankruptcy Rule 3005.)
                                           (See Bankruptcy Rule 3004.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  Susan M. Rotkis
Title:  Attorney
Company:  Consumer Litigation Associates, P.C.
Address and telephone number (if different from notice address above):
  763 J. Clyde Morris Blvd. 1-A
  Newport News, VA 23601

(Signature)                                          (Date) 11/15/2012

Telephone number: (757) 930-3660    email: srotkis@clalegal.com

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

**INSTRUCTIONS FOR PROOF OF CLAIM FORM**
*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*
**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check the appropriate box if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

# Consumer Litigation Associates, P.C.

ATTORNEYS AND COUNSELORS AT LAW

A PROFESSIONAL CORPORATION

**HAMPTON ROADS OFFICE:**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, Virginia 23601

**NORTHERN VIRGINIA OFFICE:**
1800 Diagonal Road
Alexandria, Virginia 22314

Leonard A Bennett, Esquire
lenbennett@clalegal.com
(757) 930-3660 Phone
(757) 930-3662 Facsimile

**REPLY TO: HAMPTON ROADSOFFICE**

November 15, 2012

Hon. Ruby J. Krajick, Clerk
United States District Court
Southern District of New York
Manhattan Office
One Bowling Green
New York, New York  10004

> Re:  Residential Capital LLC, *et al.* Case No. 12-12020(MG) (Bankr. S.D.N.Y.)
> (Chapter 11) (Jointly Administered)

> Related Cases:

> Inmer E. Campos-Carranza, *individually and on behalf of others similarly
> Situated* v. Federal Home Loan Mortgage Corporation (d/b/a Freddie Mac),
> *et al*
> Civil Action No:  4:12cv94

> Moore v. Shaprio Brown & Alt, *et al.*, 4:11cv122 (E.D. Va.)

Dear Ms. Krajick:

Enclosed herewith is the Proof of Claim on behalf on Inmer Campos Carranza, on behalf of himself and all other similarly situated, in the above-captioned matter.

Thank you for your attention in this regard.

Sincerely,

Susan M. Rotkis
Counsel for Mr. Campos Carranza and Class

SMR/dmc
Enclosures

Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
SUROVELL ISAACS PETERSEN & LEVY PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Telephone 703.251.5400
Facsimile 703.591.9285
kkelly@siplfirm.com
aguzzo@siplfirm.com

Leonard A. Bennett, VSB#37523
Susan M. Rotkis, VSB#40693
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, VA 23601
 Telephone (757) 930-3660
Facsimile (757) 930-3662 Facsimile
Email: lenbennett@clalegal.com
Email: srotkis@clalegal.com

Dale W. Pittman, VSB#15673
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
(804) 861-6000
(804) 861-3368 Facsimile
dale@pittmanlawoffice.com

Matthew J. Erausquin, VSB #65434
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Rd, Suite 600
Alexandria, VA 22314
(703) 273-7770
(888) 892-3512 Facsimile
matt@clalegal.com

*Counsel for Creditor Inmer Campos Carranza and the putative class*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |

)    Jointly Administered

)

---

**ATTACHMENTS IN SUPPORT OF PROOF OF CLAIM FOR CLASS RELIEF**

Inmer Campos Carranza, a creditor, on behalf of himself and all similarly situated individuals, hereby submits the following attachments in support of his proof of claim on behalf of the putative class:

(1)      Complaint (Doc. 1) *Campos Carranza v. Federal Home Loan Mortgage Corporation, et al.*, Civil No. 4:12CV94 (E.D. Va. Newport News Division, filed 6/14/2012).

(2)      Order of Stay (Doc. 25) *Moore v. Shapiro Brown & Alt, et al.*, Civil No. 4:11CV122 (E.D. Va. Newport News Division, entered 8/17/2012).

(3)      Proposed Amended Class Complaint (not yet filed) *Campos Carranza v. Federal Home Loan Mortgage Corporation, et al.*, Civil No. 4:12CV94 (E.D. Va. Newport News Division).

Inmer Campos Carranza is the Plaintiff in a case now pending in the Eastern District of Virginia, Newport News Division, against several defendants including GMAC. On July 10, 2012, Counsel for Defendant GMAC filed a Notice of Bankruptcy and Effect of Automatic Stay in re: Residential Capital LLC, No. 12-12020. (Doc. 7 in 4:12CV94). Thereafter, the Campos Carranza case was consolidated with similar cases and stayed by the District Court for the conduct of formal mediation for claims against defendants other than GMAC. Formal mediation has concluded and the parties in the consolidated action have not settled the cases. The parties intend to seek relief from the stay in order to proceed to litigate the case. Inmer Campos Carranza is a class representative and class member who has present and valuable class claims against GMAC. Because the consolidated cases are under an Order staying the matters, Campos Carranza has not yet amended the Complaint to add class allegations. The parties will jointly

2

move for a relief from the stay and Campos Carranza will move for leave to file a proposed

Amended Complaint with class allegations against GMAC. Campos Carranza now files a proof

of claim on behalf of himself, as well as the putative class.

Respectfully submitted,
INMER E. CAMPOS-CARRANZA,

By: _Susan M Rotk___
Counsel

Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
SUROVELL ISAACS PETERSEN & LEVY PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Telephone 703.251.5400
Facsimile 703.591.9285
kkelly@siplfirm.com
aguzzo@siplfirm.com

Leonard A. Bennett, VSB#37523
Susan M. Rotkis, VSB#40693
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, VA 23601
Telephone (757) 930-3660
Facsimile (757) 930-3662 Facsimile
Email: lenbennett@clalegal.com
Email: srotkis@clalegal.com

Dale W. Pittman, VSB#15673
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
(804) 861-6000
(804) 861-3368 Facsimile
dale@pittmanlawoffice.com

Matthew J. Erausquin, VSB #65434
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Rd, Suite 600
Alexandria, VA 22314
(703) 273-7770
(888) 892-3512 Facsimile
matt@clalegal.com

12-12020-mg    Doc 8143-4    Filed 02/18/15    Entered 02/18/15 14:34:36    Exhibit A
Case 4:12-cv-00094-MSD-TEM    Document 1    Filed 06/14/12    Page 1 of 20 PageID# 1

Pg 8 of 87

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

```
FILED

JUN 14 2012

CLERK, US DISTRICT COURT
NEWPORT NEWS, VA
```

| | |
|---|---|
| INMER E. CAMPOS-CARRANZA,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | |
| v.    ) | Civil Action No. 4:12-CV-94 |
| ) | |
| FEDERAL HOME LOAN MORTGAGE    ) | |
| CORPORATION (d/b/a Freddie Mac)    ) | |
| SERVE:    Hyacinth Kucik, VP Litigation    ) | |
| 8200 Jones Branch Drive    ) | |
| McLean, VA 22102    ) | |
| ) | |
| GMAC MORTGAGE, LLC,    ) | |
| SERVE:    Corporation Service Company,    ) | |
| Registered Agent    ) | |
| 1111 East Main Street,    ) | |
| Bank of America Center, 16th Floor    ) | |
| Richmond, VA 23219    ) | |
| ) | |
| LAW OFFICES OF SHAPIRO BROWN & ALT,    ) | |
| LLP F/K/A LAW OFFICES OF SHAPIRO &    ) | |
| BURSON, LLP    ) | |
| SERVE:    John Burson    ) | |
| Registered Agent    ) | |
| 1816 N. VanBuren Street,    ) | |
| Arlington, Va 22213    ) | |
| ) | |
| ) | |
| PROFESSIONAL FORECLOSURE    ) | |
| CORPORATION OF VIRGINIA,    ) | |
| SERVE:    Edward Farnsworth, Jr.    ) | |
| Registered Agent    ) | |
| 236 Clearfield Ave, Suite 215    ) | |
| Virginia Beach, VA 23462    ) | |
| ) | |
| HELMAND INVESTMENT, LLC    ) | |
| SERVE:    Sharif Shafik    ) | |
| Registered Agent    ) | |
| 511 N. Lombardy Street    ) | |
| Arlington, VA 22203    ) | |
| Defendants.    ) | |

EXHIBIT
**1**
12-12020

## COMPLAINT

The Plaintiff, INMER E. CAMPOS-CARRANZA ("Plaintiff"), by counsel, moves for

judgment against the Defendants and states as follows:

1.      This action arises from the damages caused by Defendants' unlawful attempts to

collect a delinquent home mortgage debt allegedly owed by Plaintiff in violation of the Fair Debt

Collection Practices Act, 15 U.S.C. § 1692 *et seq*., and the wrongful foreclosure that eventually

occurred. Defendants wrongfully foreclosed on Plaintiff's home without complying with all the

conditions precedent to foreclosure under Plaintiff's Deed of Trust and through its refusal to

accept Plaintiff's payment as requested in its default notice. Defendants also conducted the

foreclosure even though Plaintiff was improperly denied for loan modification.

## JURISDICTION

2.      Federal question jurisdiction is proper pursuant to 28 U.S.C. § 1331.

3.      This court also has supplemental jurisdiction over the state law claims pursuant to

28 U.S.C. §1367.

## PARTIES

4.      Plaintiff, INMER E. CAMPOS-CARRANZA ("Plaintiff"), is a natural person and

a resident of the Commonwealth of Virginia.

5.      Defendant GMAC MORTGAGE, LLC ("GMAC") is a foreign limited liability

doing business as a mortgage originator and servicer. At all relevant times hereto, GMAC was

the servicer of Plaintiff's mortgage loan.

6.      Defendant FEDERAL HOME LOAN MORTGAGE CORPORATION ("Freddie

Mac") is a federally chartered corporation headquartered in McLean and authorized to do

business in Virginia. It engages in the business of purchasing and pooling residential mortgage

2

loans that have been originated according to its specification. At all relevant times hereto, Freddie Mac was the owner of Plaintiff's mortgage loan.

7.    Defendant LAW OFFICES OF SHAPIRO BROWN & ALT, LLP ("Shapiro Brown & Alt") is a professional foreclosure law firm located in Virginia, the principal purpose of its business is the collection of debts. Freddie Mac has designated it as a law firm that can be used to foreclose on their home loans secured by property located in Virginia. Shapiro Brown & Alt was formally known as the Law Offices of Shapiro & Burson, LLP.

8.    Defendant PROFESSIONAL FORECLOSURE CORPORATION OF VIRGINIA ("Professional Foreclosure Corporation") is a company whose sole purpose is to serve as the substitute trustee for mortgage loans that are referred to Shapiro, Brown & Alt, for the purpose of collecting delinquent debts and/or conducting foreclosure sales for which it purports to be a substitute trustee. Its principal place of business is located at 236 Clearfield Avenue, Suite 215, Virginia Beach, Virginia 23462.   At all times relevant to this case, Professional Foreclosure Company of Virginia was operating as an alternate voice and alter ego of Shapiro.   For all purposes herein they were one and the same

9.    Defendant HELMAND INVESTMENT, LLC ("Helmand") is a Virginia limited liability company headquartered in Fairfax, Virginia. Defendant Helmand purports to have purchased Plaintiff's property at the foreclosure sale that was wrongfully commenced on March 20, 2012.

## STATEMENT OF FACTS

10.    On or around September 14, 2005, Plaintiff purchased his home located at 3207 Berkley Lane, Woodbridge, Virginia 22193 ("Property").

3

11.    On May 9, 2007, Plaintiff refinanced his home loan. As a result of the refinance of the Property, Plaintiff owed a principal sum of $237,000.00, evidenced by a note (the "Note"). A copy of the Note is attached hereto as EXHIBIT 1.

12.    The Note is secured by a Deed of Trust on the Property dated May 9, 2007, and recorded in the Circuit Court Clerk's Office. A copy of the Deed of Trust is attached hereto as EXHIBIT 2.

13.    Plaintiff's Note and Deed of Trust obligated him to repay Reliance Lending, Inc.

14.    Freddie Mac purchased Plaintiff's loan subsequent to its origination. As provided by the Deed of Trust, Freddie Mac provided no documentation of the sale to Plaintiff.

15.    After the sale of Plaintiff's loan to Freddie Mac, GMAC was given the responsibility of performing certain functions (commonly known in the mortgage industry as "servicing") related to Plaintiff's loan in accordance with its contract with Freddie Mac. Among its responsibilities as the servicer, GMAC was responsible for collecting payments from Plaintiff, communicating with Plaintiff regarding loss mitigation alternatives, and responding to any default by Plaintiff, including by hiring and managing foreclosure counsel. The servicing responsibilities were governed by Freddie Mac's Single Family Seller/Servicer Guide (the "Guide").

16.    The contract obligated GMAC to follow Freddie Mac's instructions for servicing the loan, particularly the instructions detailed in the Guide. This contract, and the direction it imposed on GMAC, had the effect of making GMAC an agent of Freddie Mac to perform servicing functions.

4

17.    The Guide gave GMAC, on behalf of Freddie Mac, the authority to commence foreclosure on Plaintiff's home in case of his default on his obligations under the Note and Deed of Trust.

18.    The Guide and other instructions from Freddie Mac detailed when GMAC was to commence proceedings and how they were to supervise foreclosure counsel. The Guide further provided instructions to Professional Foreclosure Corporation and Shapiro, Brown & Alt on its requirements prior to commencing a foreclosure sale.

19.    Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008, and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (collectively referred to as the "Act"). 12 USCS § 5201 *et seq.* On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable Program.

20.    The Making Home Affordable program consists of two subprograms. The first subprogram relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program ("HARP").

21.    The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program ("HAMP").

22.    HAMP is funded by the federal government.

23.    Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.

24.    Should a servicer elect to participate in HAMP, they execute a Servicer Participation Agreement ("SPA") with the federal government.

25.    On April 13, 2009, the president of GMAC, Anthony Renzi, executed an SPA, thereby making GMAC a participating servicer in HAMP.

26.    The SPA executed by GMAC incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of participating servicers. This includes Freddie Mac's Guide and any subsequent bulletins or updates.

### *Plaintiff Experiences Financial Hardship*

27.    Plaintiff made his monthly payments in accordance with the Note and Deed of Trust until he began to suffer significant hardship due to a medical emergency that required his wife to undergo immediate surgery.

28.    The surgery required Plaintiff's wife, Rosalbina M. Campos ("Ms. Campos"), to unexpectedly miss approximately three months of work. Ms. Campos is a non-salaried employee at a hotel where she works as a cleaner; therefore, she did not receive any compensation while undergoing her medical treatment.

29.    The loss of Ms. Campos's income for three months and the costs associated with her treatment placed an extreme financial burden on the couple.

30.    Plaintiff made efforts to enter into repayment plans and cure any arrearages, but his requests were denied by GMAC.

31.    In September 2011, Plaintiff was behind on his mortgage payment as a result of his financial struggles created by his wife's medical condition.

6

32.    On or around October 12, 2011, GMAC sent Plaintiff a notice of default. This notice demanded payment in the amount of $2,210.76. This sum included his September 2011 payment and October 2011 payment. In addition, GMAC also sought payment in the amount of $311.46 for "fees, costs, and other accrued to date." A copy of the correspondence dated October 12, 2011, is attached hereto as EXHIBIT 3.

33.    Pursuant to Paragraph 6 of the Note, GMAC was allowed to send Plaintiff written notice of default "telling [him] that if [he] does not pay *the overdue amount* by a certain date, the Note Holder may require [him] to pay immediately the full amount of Principal which has not been paid and all the interest that [he] owes on that amount." *See* Exhibit 1 ¶ 6(C) (emphasis added).

34.    Paragraph 6 further provides "*[i]f the Note Holder has required me to pay immediately* in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law." Id. at ¶ 6(E). Thus, GMAC's cannot assess any costs or expenses until after the Plaintiff fails to comply with the notice of default.

35.    GMAC also improperly calculated the late fees that it could charge pursuant to Paragraph 6(A) of the Note, which states that Plaintiff would be charged 5.000% on overdue payments of principal and interest – "but only once on each late payment." *Id.* at ¶ 6(A).

36.    Because of this, the notice of default does not state the actual amount that Plaintiff needed to pay to avoid acceleration.

37.    Prior to even receiving the default notice, Plaintiff paid GMAC $1,621.82 on or around October 12, 2011. Thus, even assuming GMAC's notice of default provided the correct

7

amount of overdue charges that it was entitled to collect, Plaintiff was only in arrears by $588.94

pursuant to the notice of default dated October 12, 2011.

38.     In early November 2011, Plaintiff contacted GMAC to pay the $588.94 balance

plus his November 2011 mortgage payment. However, GMAC refused to accept any payments

tendered by Plaintiff. Instead, GMAC told Plaintiff that he was required to pay approximately

$3,000.00 to cure the default, which included his payments for November 2011 and additional

costs which were not provided for in the Note.

### Plaintiff's Efforts to Keep His Home

39.     After GMAC refused to accept Plaintiff's payments to cure his default, Plaintiff

contact GMAC in January 2012 regarding loss mitigation alternatives, including HAMP.

40.     On January 30, 2012, Plaintiff submitted complete application for a loan

modification under HAMP.

41.     As part of the application package, Plaintiff signed under the penalty of perjury a

document entitled "Acknowledgment and Agreement."

42.     This agreement provided that Plaintiff understood that "the Servicer will not refer

the account to foreclosure or conduct the foreclosure sale if already referred, while it is being

reviewed for the Making Home Affordable program unless required by your investor."

43.     This Agreement is consistent with the servicing guidelines for HAMP, which bind

GMAC as a result of its SPA.

44.     These guidelines include the following requirement:

> "[a] servicer may not refer any loan to foreclosure or conduct a
> schedule foreclosure sale unless and until at least one of the
> following circumstances exists... the borrower is evaluated for
> HAMP and is determined to be ineligible for the program...."

8

45.    Nevertheless, on or around February 27, 2012, Shapiro Brown & Alt sent Plaintiff a foreclosure notice indicating that his home would be foreclosed on March 20, 2012.

46.    Plaintiff received this notice while he was still under review for his HAMP modification.

47.    In correspondence dated March 14, 2012, which Plaintiff did not receive until after the foreclosure sale, GMAC indicated it could not offer Plaintiff a loan modification because it "service[s] [his] loan on behalf of an investor or group of investors that has not given [GMAC] authority to modify [his] loan."

48.    This was a false statement as Freddie Mac was his investor and has expressly provided GMAC authority to modify its mortgages.

49.    Defendants foreclosed on Plaintiff's home on March 20, 2012.

### Shapiro Brown & Alt and Professional Foreclosure Corporation's Fiduciary Duties

50.    Shapiro Brown & Alt is a law firm whose practice is focused on the collection of debts.

51.    In this capacity, Shapiro Brown & Alt regularly collects home loan debts.

52.    Shapiro Brown & Alt regularly demand payments from consumers of alleged arrearages and provide to consumers reinstatement quotes and itemizations of amounts that Defendants are attempting to collect.

53.    Shapiro Brown & Alt regularly indicates in its correspondence to consumers that "this is an attempt to collect a debt and any information obtained will be used for that purpose," and details specific amounts of money to be paid and regularly accepts payment for their lender claims.

9

54.    Shapiro Brown & Alt and Professional Foreclosure Corporation are fiduciaries to both the creditor and the homeowner.

55.    Shapiro Brown & Alt and Professional Foreclosure Corporation are also designated    counsel    for    loans    owned    by    Freddie    Mac.    *See* http://www.freddiemac.com/service/msp/exh79_va.html (last visited June 12, 2012).

56.    All Freddie Mac designated counsel must have the original note, copies of the deed of trust and copies of breach /acceleration demand letter(s) within 2 days of the referral. *Id.*

57.    On January 23, 2012, Shapiro Brown & Alt sent Plaintiff a dunning letter that stated it was instructed to initiate legal action based upon the alleged default under the terms of the loan agreement.

58.    No later than January 25, 2012, Shapiro Brown & Alt and Professional Foreclosure Corporation should have had the Plaintiff's deed of trust, note and notice of intent to accelerate in its possession.

59.    Under the Guide, Shapiro Brown & Alt and Professional Foreclosure Corporation have to request a copy of the original note from Freddie Mac's document custodian.

60.    A review of these documents would indicate that 1) the Notice of Intent to Accelerate is inaccurate and the condition precedent to foreclosure has not been met and 2) that Freddie Mac is the investor, noteholder, and beneficiary of this deed of trust.

61.    In addition, under the Freddie Mac Bulletin 2011-11, "Servicer must send a written certification to the attorney/trustee **at least seven, but no more than 15 days prior to a foreclosure sale date**" that there is no payment arrangement or pending alternative to foreclosure offer. (emphasis in original).

62.    Upon information and belief, Shapiro Brown & Alt and Professional Foreclosure Corporation of Virginia were aware of this requirement for loans owned by Freddie Mac but did not receive any certification from GMAC as the Plaintiff was still under review for HAMP seven days prior to the foreclosure sale.

### *Shapiro Brown & Alt's Violations of the FDCPA*

63.    The January 23, 2012, correspondence included the following information was being provided to Plaintiff as required by the Federal Fair Debt Collection Practices Act:

> "(1) [a]s of January 23, 2012, the creditor has advised that the amount of the debt is $243,947.72.
>
> (2) [t]he creditor to whom the debt is owed is <u>GMAC MORTGAGE, LLC.</u>
>
> (5) [t]he Fair Debt Collection Practices Act does not require that we wait until thirty (30) days from the date you receive this notice before we initiate foreclosure proceedings to foreclosure on the subject loan. In the event we do initiate foreclosure proceedings to foreclose on the subject loan, within thirty (30) days from the date you receive this notice, you still retain the right to dispute the debt, or any portion thereof, and you also retain the right to request the name of the original creditor if the original creditor is different from the current creditor, <u>GMAC Mortgage, LLC</u>"

64.    The correspondence dated January 23, 2012, further indicated that "GMAC Mortgage, LLC has referred your loan to us for foreclosure."

65.    Plaintiff did not owe that amount at on January 23, 2012.

66.    In addition, the creditor to whom the debt was owed was Freddie Mac, not GMAC.

67.    Shapiro Brown & Alt knew or should have known that this and each of the foregoing misrepresentations that it made were false.

11

68.    Shapiro Brown & Alt forwarded correspondence dated February 27, 2012 to Plainitff notifying him that a foreclosure sale is scheduled for his property for March 20, 2012.

69.    This correspondence included a Substitution of Trustees Deed dated October 25, 2011.

70.    The Appointment Substitution of Trustees Deed stated that GMAC Mortgage, LLC, is the Noteholder.

### Count I: Violation of the FDCPA, 15 U.S.C. § 1692g
### (Defendant Shapiro Brown & Alt)

71.    The foregoing allegations of the Complaint are incorporated by reference.

72.    By failing to disclose the amount of the actual amount of the debt and the identity of the creditor in their January 23, 2012 correspondence, Defendant violated 15 U.S.C. § 1692g(a)(1) and 1692g(a)(2).

73.    As a result, Plaintiff is entitled to recover statutory damages, actual damages, reasonable attorneys' fees, and costs against Defendant pursuant to 15 U.S.C. § 1692k.

### Count II: Violation of the FDCPA, 15 U.S.C. § 1692e
### (Defendant Shapiro Brown & Alt)

74.    The foregoing allegations of the Complaint are incorporated by reference.

75.    By falsely stating the identity of the creditor to whom the debt was owed and the amount of the debt, Defendant violated 15 U.S.C. § 1692e(2), e(5), and/or e(10).

76.    As a result, Plaintiff is entitled to recover statutory damages, actual damages, reasonable attorneys' fees, and costs against Defendant pursuant to 15 U.S.C. § 1692k.

### Count III: Violation of the FDCPA, 15 U.S.C. § 1692f
### (Defendant Shapiro Brown & Alt)

77.    The foregoing allegations of the Complaint are incorporated by reference.

12-12020-mg    Doc 8143-4    Filed 02/18/15    Entered 02/18/15 14:34:36    Exhibit A
Case 4:12-cv-00094-MSD-TEM    Document 1    Filed 06/14/12    Page 13 of 20 PageID# 13

Pg 20 of 87

78.    The sending of notices indicating they were initiating foreclosure proceedings was a nonjudicial action that sought to permanently deprive Plaintiff of his ownership rights in his home.

79.    Upon information and belief GMAC had no authority to appoint the Defendants as a substitute trustee because they were not the actual beneficiary of the deed of trust and/or Noteholder.

80.    Because they were not validly appointed as a substitute trustee by the noteholder in compliance with the terms of the Note and Deed of Trust, the Defendants had no right to conduct the foreclosure sale, or to transfer the property.

81.    In addition, because the loan was never accelerated pursuant to the Deed of Trust, the Defendants could not conduct a foreclosure sale.

82.    Defendants threatened and took nonjudicial action to effect dispossession or disablement of the subject property at a time when they had and there was no present right to possession of the property claimed as collateral through an enforceable security interest, in violation of 15 U.S.C. § 1692f(6).

83.    As a result, Plaintiff is entitled to recover statutory damages, actual damages, reasonable attorneys' fees, and costs against Defendant pursuant to 15 U.S.C. § 1692k.

### Count IV: Breach of Contract
### (Defendants Freddie Mac and GMAC)

84.    The foregoing allegations of the Complaint are incorporated by reference.

85.    At all times relevant to this Complaint, GMAC has actual and/or apparent authority to serve as Freddie Mac's agent for purposes of servicing Plaintiff's loan and modifying the Note and Deed of Trust.

13

86.     As a precondition to foreclosure under the terms of the Deed of Trust, Freddie Mac was required to give Plaintiff notice specifying, among other things, the default and the action required to cure the default.

87.     Freddie Mac and GMAC breached the Note and Deed of Trust because they did not satisfy the preconditions to foreclosure by providing a notice of default informing Plaintiff of the proper amount that needed to be paid to cure the default.

88.     Instead, Freddie Mac and GMAC improperly required Plaintiff to pay costs and expenses in order to avoid preacceleration of his Note.

89.     Despite the improper calculations, Plaintiff was willing and able to pay the amount provided in the October 12, 2011 correspondence.

90.     Nevertheless, GMAC refused to accept Plaintiff's payments in the beginning of November 2011. Instead, GMAC refused to accept payment unless Plaintiff tendered approximately $3,000.

91.     Freddie Mac and GMAC were not entitled to collect $3,000 pursuant to the Deed of Trust and/or the October 12, 2011 correspondence.

92.     GMAC's refusal to accept payment breached the Deed of Trust.

93.     Moreover, GMAC breached the Deed of Trust by demanding payments for sums that it was not entitled to collect.

94.     As a result, Freddie Mac and GMAC did not fulfill the conditions precedent to foreclosure; therefore, did not have the power to foreclose on Plaintiff's home in March 2012.

95.     Freddie Mac and GMAC's breaches of the Note and Deed of Trust have caused Plaintiff to suffer economic damages for which there is no adequate remedy at law, and for which Freddie Mac and GMAC should be held liable.

96.    Such damages amount to sums in excess of $250,000.00 in the aggregate and include losses relating to the loss of his home, the degradation of his credit and the imposition of fees related to the foreclosure sale and eviction proceedings when Plaintiff was not in default.

97.    In addition and in the alternative, the Note and Deed of Trust were all valid and fair contracts requiring mutuality of obligation and performance. Plaintiff's property is unique and has served as his home for over seven years. Thus, his home cannot be adequately substituted with money recoverable only as legal damages.

98.    As a result, Plaintiff requests that the Court enter a decree ordering Defendant Freddie Mac to specifically perform the terms of the contract; that the Plaintiff be awarded judgment for his costs incurred in this matter; and that the Court award the Plaintiff such other relief as may seem appropriate to the Court.

99.    Alternatively, the Plaintiff requests that judgment be entered in his favor against the Defendant Freddie Mac and GMAC for breach of contract in the amount of the value of their home as determined by the Court, plus interest and costs and other legal and equitable relief that the Court deems appropriate.

### Count V: Breach of Implied Covenant of Good Faith and Fair Dealing
### (Defendants Freddie Mac and GMAC)

100.    The foregoing allegations of the Complaint are incorporated by reference.

101.    The Note and the Deed of Trust contain an implied covenant obligating Freddie Mac and GMAC to treat Plaintiff with good faith and fair dealing.

102.    Freddie Mac and GMAC failed to treat Plaintiff with good faith and fair dealing by, among other things, improperly demanding payment for fees and other charges in its notice of default dated October 12, 2011, refusing to accept Plaintiff's payment in November 2011 unless he paid such charges in addition to other unaccounted for expenses, inviting and

15

encouraging him to participate in HAMP and then denying him on an illegitimate basis, by failing to postpone the foreclosure sale while Plaintiff was being evaluated for HAMP, and by referring his home to foreclosure without satisfying the conditions precedent to foreclosure.

103.    Such conduct constitutes a breach of the duty to act in good faith and deal fairly with Plaintiff under the terms of the Note and Deed of Trust.

104.    Because of their breaches of the implied covenant of good faith and fair dealing, Freddie Mac and GMAC are not entitled to exercise its remedy of foreclosure under the Deed of Trust.

105.    Plaintiff also suffered actual damages and is threatened with additional harm from the breaches of the covenant of good faith and fair dealing. By relying on Freddie Mac and GMAC's representations, Plaintiff lost other remedies that might have been pursued to save his home, such as entering into a repayment plan, borrowing from family and friends, restricting his debt under the bankruptcy code, or pursuing other strategies to avoid default, such as selling his home.

106.    To the extent that actual damages will not fully and fairly compensate Plaintiff, he is also entitled to specific performance and other appropriate injunctive relief.

107.    Plaintiff requests actual damages, reinstatement of his mortgage, rescission of the foreclosure sale and specific performance of his Deed of Trust.

### Count VI: Breach of Fiduciary Duty
**(Defendants Shapiro Brown & Alt and Professional Foreclosure Corporation)**

108.    The foregoing allegations in the Complaint are herein incorporated by reference.

109.    Professional Foreclosure Corporation was the substitute trustee to the Deed of Trust granted by Plaintiff.

110.   At all relevant times, Shapiro Brown & Alt was the agent, attorney, and fiduciary for Professional Foreclosure Corporation in its capacity as the substitute trustee for Plaintiff's Deed of Trust.

111.   A trustee is an agent of both the homeowner and the lender, and in this dual capacity, a trustee must act impartiality respecting the two competing interests.

112.   As the trustee, Shapiro Brown & Alt and Professional Foreclosure Corporation had a fiduciary duty to Plaintiff, which required it to act in good faith and utilize discretion in the management of the trust that a prudent man of discretion and intelligence would in exercising his own affairs. Additionally, the trustee has the right to invoke the aid and direction of the court of equity in the execution of the trust.

113.   Under the Deed of Trust, Defendants' obligations are subject to and governed by "Applicable Law".

114.   Defendants repeatedly breached their fiduciary duty to Plaintiff, including but not limited to the following conduct:

      a.   By threatening to foreclose on Plaintiff's home when he was proceeding through loss mitigation alternatives;

      b.   By refusing to stay the foreclosure action despite its knowledge that Plaintiff was being evaluated for HAMP;

      c.   By scheduling a foreclosure sale on Plaintiff's home while he was being evaluated for HAMP and other loss mitigation alternatives;

      d.   By failing to postpone Plaintiff's foreclosure sale while he was being evaluated for HAMP and other loss mitigation alternatives;

      e.   By failing to verify that Plaintiff was in default;

17

   f.  By conducting the foreclosure even though the preconditions to foreclosure had not been satisfied under the terms of the Note and Deed of Trust;

   g.  By failing to properly investigate the status of Plaintiff's loan prior to scheduling the foreclosure sale.

  115. Plaintiff has been damaged due to Shapiro Brown & Alt and Professional Foreclosure Corporation's breaches of its fiduciary duty.

  116. The foreclosure sale should be set aside as a result of the breach of fiduciary duty.

  117. Plaintiff demands judgment against Shapiro Brown & Alt and Professional Foreclosure Corporation in his favor in an amount of compensatory damages not less than $250,000.00, punitive damages in an amount sufficient to punish Shapiro Brown & Alt and Professional Foreclosure Corporation and to prevent both from engaging in such conduct again but not less than $350,000.00, costs in this action and reasonable attorneys' fees, and such further legal and equitable relief as the Court deems appropriate.

**Count VI: Declaratory Judgment**
**(All Defendants)**

  118. The foregoing allegations in the Complaint are herein incorporated by reference.

  119. The dispute and controversy is a justiciable matter which is not speculative, and a resolution by this court will determine the rights and interests of the parties to the Property in issue as well as the legal effect, if any, of the purported foreclosure sale on the property.

  120. All parties are or claim interest in this matter and a determination of the respective interests in the Property will determine which party has the right to enforce the instrument and avoid future litigation.

18

121.    Pursuant to Va. Code Ann. §§ 8.01-184 and 8.01-191, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the ownership interests of each of the parties hereto to the Property.

122.    Plaintiff respectfully moves for entry of a declaratory judgment to determine the purported foreclosure sale was void, alternatively that it was voidable and that the purported Foreclosure Deed was void, alternatively voidable; that Plaintiff is entitled to appointment of a constructive trustee with instructions to convey title of the home to them, subject to the Deed of Trust; and such further legal and equitable relief as this Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for actual, statutory and punitive damages against the Defendants as requested herein, for his attorneys' fees and costs; for prejudgment and post-judgment interest at the judgment rate, and such other relief as the Court deems just and proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
INMER E. CAMPOS-CARRANZA,

_Susan M. Rotkis_

Leonard A. Bennett, VSB#37523
Susan M. Rotkis, VSB#40693
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, VA  23601
Telephone (757) 930-3660
Facsimile (757) 930-3662 Facsimile
Email: lenbennett@clalegal.com
Email: srotkis@clalegal.com
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
19

SUROVELL ISAACS PETERSEN & LEVY PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Telephone 703.251.5400
Facsimile 703.591.9285
kkelly@siplfirm.com
aguzzo@siplfirm.com


Dale W. Pittman, VSB#15673
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
(804) 861-6000
(804) 861-3368 Facsimile
dale@pittmanlawoffice.com

Matthew J. Erausquin, VSB #65434
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Rd, Suite 600
Alexandria, VA 22314
(703) 273-7770
(888) 892-3512 Facsimile
matt@clalegal.com

Counsel for Plaintiffs

*Exhibit "1"*

MIN: ████████9797        **NOTE**        Loan Number: ███████9512

MAY 9, 2007                    ANNANDALE                    VIRGINIA
[Date]                         [City]                       [State]

3207 BERKLEY LN, WOODBRIDGE, VIRGINIA 22193
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $237,000.00        (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is RELIANCE LENDING, INC., A VIRGINIA CORPORATION (CFL # MLB-954)
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of   6.500    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the  1st   day of each month beginning on JULY 1 2007 .  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal.  If, on JUNE 1, 2037       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 7700 LITTLE RIVER TURNPIKE STE. 201, ANNANDALE, VIRGINIA 22003
                                    or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ 1,498.00

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment."  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge.  The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note.  If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

Vs3247.not

**5.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.    BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of  15 calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be   5.000   % of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)  No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

**7.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

VIRGINIA FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3247 1/01                                    Page 2 of 4

DocMagic *eFirms* 800-649-1362
www.docmagic.com

Va3247.mm

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor and waive the benefit of the homestead exemption as to the Property described in the Security Instrument (as defined below).  "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

VIRGINIA FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3247 1/01                    Page 3 of 4

DocMagic eRumns  800-649-1362
www.docmagic.com

Va3247.nta

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
INMER E CAMPOS CARRANZA   -Borrower                                   -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                   -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                   -Borrower

*[Sign Original Only]*

This is to certify that this is the Note described in and secured by a Deed of Trust dated MAY   9
2007            , on the Property located in   PRINCE WILLIAM                    , Virginia.
                                               WOODBRIDGE

My Commission Expires:  *June 30, 2009*

_____
                Notary Public

VIRGINIA FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3247 1/01                    Page 4 of 4

DocMagic eForms  800-649-1362
www.docmagic.com

Va3247.not

*Exhibit "2"*

Prepared by The Mason Law Firm, PLC    Pg. 34 of 87

UNIVERSAL TITLE
7611 Little River Turnpike, Suite 201W
Annandale, Virginia 22003

*(left margin, rotated)* Tax Map ID: 8291-37-1345
Case#: 36264-CA/SL

*(left margin, rotated)* Prepared By Lender

This instrument prepared by:

After Recording Return To:
RELIANCE LENDING, INC.
7700 LITTLE RIVER TURNPIKE STE. 201
ANNANDALE, VIRGINIA 22003
Loan Number: 6018009512

Tax Map Reference No.:

PIN:

———————————————— [Space Above This Line For Recording Data] ————————————————

# DEED OF TRUST

MIN: ██████████9797

The following information, as further defined below, is provided in accordance with Virginia law:

This Deed of Trust is given by   INMER E CAMPOS-CARRANZA

as Borrower (trustor), to   ARUN SAPRA

as Trustee, for the benefit of Mortgage Electronic Registration Systems, Inc., as beneficiary.

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)   "Security Instrument" means this document, which is dated   MAY 9, 2007                        , together with all Riders to this document.
(B)   "Borrower" is   INMER E CAMPOS-CARRANZA

Borrower is the trustor under this Security Instrument.
(C)   "Lender" is RELIANCE LENDING, INC.

Lender is a   A VIRGINIA CORPORATION                                        organized
and existing under the laws of   VIRGINIA
Lender's address is   7700 LITTLE RIVER TURNPIKE STE. 201, ANNANDALE, VIRGINIA 22003

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01                               Page 1 of 15               DocMagic ☎Forms 800-649-1362
                                                                        www.docmagic.com

Va3047.mzd

(D)    "Trustee" is   ARUN SAPRA

Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered corporation whose principal office is located in Virginia. Trustee's address is   7700 LITTLE RIVER TURNPIKE STE 201, ANNANDALE, VIRGINIA 22003

(E)    "MERS" is Mortgage Electronic Registration Systems, Inc.   MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.   MERS is the beneficiary under this Security Instrument.   MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F)    "Note" means the promissory note signed by Borrower and dated   MAY 9, 2007
The Note states that Borrower owes Lender   TWO HUNDRED THIRTY-SEVEN THOUSAND AND 00/100                            Dollars (U.S. $   237,000.00           ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   JUNE 1, 2037

(G)    "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)    "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)    "Riders" means all Riders to this Security Instrument that are executed by Borrower.   The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Planned Unit Development Rider | |
| ☐ Balloon Rider | ☐ Biweekly Payment Rider | |
| ☐ 1-4 Family Rider | ☐ Second Home Rider | |
| ☐ Condominium Rider | ☐ Other(s) [specify] | |

(J)    "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)    "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)    "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.   Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)    "Escrow Items" mean those items that are described in Section 3.

(N)    "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)    "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)    "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01                                         Page 2 of 15                          DocMagic &#8471;&#8473;&#8470;&#8480; 800-649-1362
                                                                                            www.docmagic.com

Va3047.mzd

(Q)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS.  This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                        of                    PRINCE WILLIAM                        :
　　　[Type of Recording Jurisdiction]                        [Name of Recording Jurisdiction]
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS
EXHIBIT "A".

which currently has the address of                    3207 BERKLEY LN
                                                                          [Street]

WOODBRIDGE                    , Virginia        22193        ("Property Address"):
　　　[City]                                                        [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Vs3047.mzd

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1.    **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.    **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.    **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver,

Va3047.mzd

Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.    Charges; Liens.  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.    Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards

including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

Va3047.mzd

6.    **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.    **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.    **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.    **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to; (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.    **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the

Va3047.mzd

Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.    Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01                                    Page 8 of 15                         DocMagic eForms 800-649-1362
                                                                                      www.docmagic.com

Va3047.mzd

Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Va3047.mzd

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14.   **Loan Charges.**  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note).  Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15.   **Notices.**  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.  Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means.  Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise.  The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender.  Borrower shall promptly notify Lender of Borrower's change of address.  If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure.  There may be only one designated notice address under this Security Instrument at any one time.  Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower.  Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16.   **Governing Law; Severability; Rules of Construction.**  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17.   **Borrower's Copy.**  Borrower shall be given one copy of the Note and of this Security Instrument.

18.   **Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

---

VIRGINIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01                                                    Page 10 of 15

DocMagic *eForms* 800-649-1362
www.docmagic.com

V-3047. used

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances:

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01                                Page 11 of 15

DocMagic €Forms 800-649-1362
www.docmagic.com

Va3047.mzd

gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.

Va3047.mzd

Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any liens of record inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

23.  **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24.  **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01
Page 13 of 15
DocMagic €Forms 800-649-1362
www.docmagic.com

Va3047.mzd

NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS
THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE
PROPERTY CONVEYED.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security
Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)          _____ (Seal)
INMER E. CAMPOS CARRANZA -Borrower                                         -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                         -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                         -Borrower

Witness:                                        Witness:

_____                 _____

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS      DocMagic 800-649-1362
Form 3047 1/01                    Page 14 of 15                                www.docmagic.com

Vn3047.mzd

———————————— [Space Below This Line For Acknowledgment] ————————————

State of Virginia

County of __FAIRFAX_____

      The foregoing instrument was acknowledged before me this __9th day of May 2007_____

by __INMER E CAMPOS-CARRANZA_____

_____

_____

He/She/They is/are personally known to me or has/have produced _____

_____

as identification.

                                          _____
                                          Signature of Person Taking Acknowledgement

                                          _Settlement Officer_____
                                          Title or Rank

                                          _____
                                          Serial Number, if any

                                          My commission expires the __30th__ day of

              (Seal)                      __June 2009_____ .

Va3047.mzd

*Exhibit "3"*

**GMAC Mortgage**

GMAC Mortgage
3451 Hammond Ave
PO Box 780
Waterloo, IA 50704-0780

October 12, 2011



05C29/11 10 00 3  000158 20111013 GJ2NC169 GMACDUPL 1 OZ DCM GJ2NC10000* 1/2375  CM

INMER E CAMPOS-CARRANZA
3207 BERKLEY LN
WOODBRIDGE VA  22193-1305

RE:    Account Number        ▮9512
       Property Address    3207 BERKLEY LN
                           WOODBRIDGE VA 22193

Dear INMER E CAMPOS-CARRANZA:

We have not received your mortgage payments for the months of 09/01/11 through 10/01/11. This means your account is now in default. This is a demand for payment of the total amount due as of October 12, 2011:

| | |
|---|---|
| Payments | $  2301.58 |
| Late charges | $  230.68 |
| Fees, costs, and other accrued to date | $  311.46 |
| Suspense | $ - 632.96 |
| Total Amount Due | $  2210.76 |

To avoid foreclosure, you need to pay this amount no later than 30 days from the date of this notice. You also need to pay for all additional payments and fees that accumulate during this period.

Unless we receive full payment of all past-due amounts within 30 days from the date of this notice, we will require immediate payment of your entire loan and begin foreclosure proceedings. This could result in the loss of your home. You may have the right to bring a court action to challenge the default, or assert other defenses to immediate payment and sale that may be available in your mortgage documents or under state law.

If your payment is not accepted for any reason or your payment is for less than the total amount due (which we may accept without waiving any of our rights), this matter will not be resolved.

(Continued on next page)



October 12, 2011
Account Number          9512
Page Two

Once in foreclosure, you have the right to reinstate your account up to five days before the foreclosure sale of your home if: 1) you pay the total amount due plus any fees, costs, and other amounts that accumulate through the reinstatement date, and 2) you take any other action reasonably required by us to assure the security of the property. Your obligations under the loan documents will still apply during this time.

Your credit rating may be negatively affected if you do not resolve this matter. We may visit your property from time to time to determine its condition and occupancy status. You will be responsible for the costs of these inspections.

HUD-approved counseling is available on FHA guaranteed loans by calling 1-800-569-4287. If you would like to discuss this letter, we encourage you to contact our loan counselors immediately at 800-850-4622 (weekdays, 8:00 a.m. - 11:00 p.m. CT; Saturday, 8:00 a.m. - 12:00 p.m.).

Sincerely,


Collection Department
Loan Servicing


Please Note:
This is an attempt to collect a debt and any information obtained will be used for that purpose.

If you have filed for bankruptcy and your case is still active or if you have received an order of discharge, please be advised that this is not an attempt to collect a pre-petition or discharged debt. Any action taken by us is for the sole purpose of protecting our lien interest in your property and is not to recover any amounts from you personally. If you have surrendered your property during your bankruptcy case, please disregard this notice.

If you are currently in bankruptcy under Chapter 13, you should continue to make payments in accordance with your Chapter 13 Plan and disregard this notice.

5020

**CIVIL COVER SHEET**

JS 44 (Rev. 12/07)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Inmer E. Campos-Carranza

**DEFENDANTS**
Federal Home Loan Mortgage Corporation (d/b/a Freddie Mac), GMAC Mortgage, LLC, Law Offices of Shapiro Brown & Alt, LLP f/k/a Law Offices of Shapiro & Burson, LLP, Professional Foreclosure Corporation of VA, Helmand Investment, LLC

**(b)** County of Residence of First Listed Plaintiff   Prince William
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Fairfax
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Susan M. Rotkis,Esq.,Consumer Litigation Associates, PC
763 J. Clyde Morris Blvd.,Suite 1-A,Newport News,VA 23601

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. 1692
Brief description of cause:
Violation of the Fair Debt Collections Practices Act

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions):
JUDGE  Allen
DOCKET NUMBER  4:11CV122

DATE  June 14, 2012
SIGNATURE OF ATTORNEY OF RECORD  Susan M Rotk

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

# Consumer Litigation Associates, P.C.

### ATTORNEYS AND COUNSELORS AT LAW
A PROFESSIONAL CORPORATION

**HAMPTON ROADS OFFICE:**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, Virginia 23601

**NORTHERN VIRGINIA OFFICE:**
1800 Diagonal Road
Alexandria, Virginia 22314

Leonard A Bennett, Esquire
lenbennett@clalegal.com
(757) 930-3660 Phone
(757) 930-3662 Facsimile

**REPLY TO: HAMPTON ROADS OFFICE**

June 14, 2012

Fernando Galindo, Clerk
United States District Court
for the Eastern District of Virginia
Newport News Division
2400 West Avenue
Newport News, VA  23607

*via:  Hand-Delivery*

      Re:   Immer E. Campos-Carranza v. Federal Home Mortgage Corporation, et al

Dear Mr. Galindo:

     Enclosed please find the following with regard to the above-referenced matter for filing and processing for service:

1. Original Civil Cover Sheet.
2. Original and one copy of the Summons in a Civil Action for each Defendant.
3. Original and five copies of the Complaint.
4. Filing fee check in the amount of $350.00, payable to Clerk of Court.

     Please forward the service copies of each of the Summons and Complaints back to our office so that we may forward for service.

     Thank you for your assistance in this matter, I remain

Very truly yours,

Susan M. Rotkis

SMR/vlw
Enclosures

SD-TEM   Document 1-6    Filed 06/14/12    F

```
Court Name: U S District Court
Division: 4
Receipt Number: 44683803603
Cashier ID: karniste
Transaction Date: 06/14/2012
Payer Name: CONSUMER LITIGATION ASSOCIAT
ES
-----------------------------------
CIVIL FILING FEE
 For: CONSUMER LITIGATION ASSOCIATES
 Amount:        $350.00
-----------------------------------
CHECK
 Check/Money Order Num: 14528
 Amt Tendered:  $350.00
-----------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00

Inner E. Campos-Carranza

v.

Federal Home Loan Mortgage
Corporation, etc., et al


4:12-cv-94
```



FILED

AUG 17 2012

CLERK, US DISTRICT COURT
NORFOLK, VA

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

ERIC S. MOORE, *et al.*,
    Plaintiffs,

    v.                                  Civil No. 4:11cv122
                                         LEAD

SHAPIRO & BURSON, LLP,
    Defendant.

SANDRA WATERS-LEVY
    Plaintiff,

    v.                                    Civil No. 4:12cv45

LAW OFFICES of SHAPIRO
& BURSON, LLP,
    Defendant.

CHRISTIAN ANDRADE, *et al.*,
    Plaintiffs,

    v.                                    Civil No. 2:11cv523

SHAPIRO & BURSON, LLP,
    Defendant.

GLENN T. MacNAUGHTON,
    Plaintiffs,

    v.                                    Civil No. 4:12cv95

SHAPIRO & BURSON, LLP, *et al.*,
    Defendants.

EXHIBIT
2
12-12020

INMER E. CAMPOS-CARRANZA,
        Plaintiff,

        v.                                                    Civil No. 4:12cv94

SHAPIRO & BURSON, LLP, *et al.*,
        Defendants;

_____

VALENTYNA GUDYM,
        Plaintiff,

        v.                                                    Civil No. 4:12cv85

SHAPIRO & BURSON, LLP, *et al.*,
        Defendants.

_____

### ORDER

Having reviewed the action and briefing filed in MacNAUGHTON v. SHAPIRO &
BURSON, LLP, *et al.*, Civil No. 4:12cv95; CAMPOS-CARRANZA v. SHAPIRO & BURSON,
LLP, *et al.*, Civil No. 4:12cv94; and GUDYM v. SHAPIRO & BURSON, LLP, *et al.*, Civil No.
4:12cv85, it is hereby **ORDERED** that these actions shall be assigned to the undersigned and
shall be consolidated for pretrial and settlement purposes only.  All future pleadings shall be
filed under the style *Moore, et al., v. Shapiro & Burson LLP*, Civil Action No. 4:11cv122-
LEAD.

The case *Akbar v. Law Offices of Shapiro & Burson, LLP*, Civil Action No. 4:12-cv-53,
which was reassigned to this Court, is not consolidated with the above-consolidated actions.
Plaintiffs' failure to file a Reply brief in that matter addressing Defendant's objections to
consolidation – despite explicit direction to do so by this Court – is noted.

The consolidated actions are **STAYED** pursuant to the Order entered in the LEAD case [ECF 36]. However, counsel in the LEAD case are **ORDERED** to file Joint Status Reports every thirty days. These reports shall advise the Court of the status of the mediation efforts.

The Clerk is **DIRECTED** to forward copies of this Order to all counsel of record of the consolidated cases, and to the counsel in *Akbar v. Law Offices of Shapiro & Burson, LLP*, Civil Action No. 4:12-cv-53.

**IT IS SO ORDERED.**

August 17, 2012

Norfolk, Virginia

ARENDA L. WRIGHT ALLEN
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

INMER E. CAMPOS-CARRANZA,
*individually and on behalf of other
similarly situated*,
                    Plaintiff,

    v.

FEDERAL HOME LOAN MORTGAGE
CORPORATION (d/b/a/ Freddie Mac)


GMAC MORTGAGE, LLC,

LAW OFFICES OF SHAPIRO BROWN & ALT,


LLP F/K/A LAW OFFICES OF SHAPIRO &
BURSON, LLP


PROFESSIONAL FORECLOSURE
CORPORATION OF VIRGINIA,


HELMAND INVESTMENT, LLC
                    Defendants.

Civil Action No. 4:12CV94

Related Cases: *Moore v. Shapiro Brown
& Alt, et al.,* 4:11CV122 (E.D. Va.)

    *and*

*In re: Residential Capital LLC, et al.,*
Case No. 12-12020(MG)
  (Bankr. S.D.N.Y) (Chapter 11)
(Jointly Administered)

## PROPOSED AMENEDED CLASS ACTION COMPLAINT

COMES NOW the Plaintiff, INMER E. CAMPOS-CARRANZA ("Plaintiff"),

*individually and on behalf of others similarly situated*, by counsel, and moves for judgment

against the Defendant and states as follows:

    1.    This is a class action for actual and punitive damages, costs, and attorneys' fees

brought against GMAC MORTGAGE, LLC ("GMAC Mortgage") based on GMAC's regular



EXHIBIT
**3**
12-12020

and routine failure to comply with all the conditions precedent to foreclosure for mortgage loans serviced by GMAC in Virginia, including but not limited to: GMAC's improper demand for payment of late fees, costs, and other charges when sending notices of default to Virginia homeowners pursuant to homeowners' notes; GMAC's misrepresentation of the amount of charges accrued on late payments; and GMAC's refusal to accept the actual sums due within the 30 days provided in the notices of default.

2.     Additionally, Plaintiff also asserts claims against Defendants Shapiro Brown & Alt, LLP and Professional Foreclosure Corporation for unlawful attempts to collect a delinquent home mortgage debt allegedly owed by Plaintiff in violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, and against all Defendants for the wrongful foreclosure that eventually occurred. Defendants wrongfully foreclosed on Plaintiff's home without complying with all the conditions precedent to foreclosure under Plaintiff's Deed of Trust and through its refusal to accept Plaintiff's payment as requested in its default notice. Defendants also conducted the foreclosure even though Plaintiff was improperly denied for loan modification.

## JURISDICTION

3.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331.

4.     This court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

## PARTIES

5.     Plaintiff, INMER E. CAMPOS-CARRANZA ("Plaintiff"), is a natural person and a resident of the Commonwealth of Virginia.

2

6.    Defendant GMAC MORTGAGE, LLC ("GMAC") is a Delaware limited liability company with its principal place of business located at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034. At all times relevant hereto, GMAC was the servicer of Plaintiff's mortgage loan. At all times relevant to this Complaint, GMAC had actual and/or apparent authority to serve as Freddie Mac's agent for purposes of servicing Plaintiffs' loan and modifying the Note and Deed of Trust.

7.    Defendant FEDERAL HOME LOAN MORTGAGE CORPORATION ("Freddie Mac") is a federally chartered corporation headquartered in McLean and authorized to do business in Virginia. It engages in the business of purchasing and pooling residential mortgage loans that have been originated according to its specification. At all relevant times hereto, Freddie Mac was the owner of Plaintiff's mortgage loan.

8.    Defendant LAW OFFICES OF SHAPIRO BROWN & ALT, LLP ("Shapiro Brown & Alt") is a professional foreclosure law firm located in Virginia, the principal purpose of its business is the collection of debts. Freddie Mac has designated it as a law firm that can be used to foreclose on their home loans secured by property located in Virginia. Shapiro Brown & Alt was formally known as the Law Offices of Shapiro & Burson, LLP.

9.    Defendant PROFESSIONAL FORECLOSURE CORPORATION OF VIRGINIA ("Professional Foreclosure Corporation") is a company whose sole purpose is to serve as the substitute trustee for mortgage loans that are referred to Shapiro, Brown & Alt, for the purpose of collecting delinquent debts and/or conducting foreclosure sales for which it purports to be a substitute trustee. Its principal place of business is located at 236 Clearfield Avenue, Suite 215, Virginia Beach, Virginia 23462. At all times relevant to this case, Professional Foreclosure

3

Company of Virginia was operating as an alternate voice and alter ego of Shapiro. For all purposes herein they were one and the same

10.     Defendant HELMAND INVESTMENT, LLC ("Helmand") is a Virginia limited liability company headquartered in Fairfax, Virginia. Defendant Helmand purports to have purchased Plaintiff's property at the foreclosure sale that was wrongfully commenced on March 20, 2012.

## STATEMENT OF FACTS

11.     On or around September 14, 2005, Plaintiff purchased his home located at 3207 Berkley Lane, Woodbridge, Virginia 22193 ("Property").

12.     On May 9, 2007, Plaintiff refinanced his home loan. As a result of the refinance of the Property, Plaintiff owed a principal sum of $237,000.00, evidenced by a note (the "Note").

13.     The Note is secured by a Deed of Trust on the Property dated May 9, 2007, and recorded in the Circuit Court of Prince William County Clerk's Office.

14.     Plaintiff's Note and Deed of Trust obligated him to repay Reliance Lending, Inc.

15.     Freddie Mac purchased Plaintiff's loan subsequent to its origination. As provided by the Deed of Trust, Freddie Mac provided no documentation of the sale to Plaintiff.

16.     After the sale of Plaintiff's loan, Freddie Mac appointed GMAC with the responsibility of performing certain functions (commonly known in the mortgage industry as "servicing") related to Plaintiff's loan in accordance with its contract with Freddie Mac. Among its responsibilities as the servicer, GMAC was responsible for collecting payments from Plaintiff, communicating with Plaintiff regarding loss mitigation alternatives, and responding to any default by Plaintiff, including by hiring and managing foreclosure counsel. The servicing

4

responsibilities were governed by Freddie Mac's Single Family Seller/Servicer Guide (the "Guide").

17.    The contract obligated GMAC to follow Freddie Mac's instructions for servicing the loan, particularly the instructions detailed in the Guide. This contract, and the direction it imposed on GMAC, had the effect of making GMAC an agent of Freddie Mac to perform servicing functions.

18.    The Guide gave GMAC, on behalf of Freddie Mac, the authority to commence foreclosure on Plaintiff's home in case of his default on his obligations under the Note and Deed of Trust.

19.    The Guide and other instructions from Freddie Mac detailed when GMAC was to commence proceedings and how they were to supervise foreclosure counsel. The Guide further provided instructions to Professional Foreclosure Corporation and Shapiro, Brown & Alt on its requirements prior to commencing a foreclosure sale.

20.    On February 17, 2009, Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008, and amended it with the American Recovery and Reinvestment Act of 2009 (collectively referred to as the "Act"). 12 USCS § 5201 *et seq.*

21.    Pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable Program on February 18, 2009.

22.    The Making Home Affordable program consists of two subprograms. The first subprogram relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program ("HARP").

5

23.    The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program ("HAMP").

24.    HAMP is funded by the federal government.

25.    Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.

26.    Should a servicer elect to participate in HAMP, they execute a Servicer Participation Agreement ("SPA") with the federal government.

27.    On April 13, 2009, the president of GMAC, Anthony Renzi, executed an SPA, thereby making GMAC a participating servicer in HAMP.

28.    The SPA executed by GMAC incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of participating servicers. This includes Freddie Mac's Guide and any subsequent bulletins or updates.

### *Plaintiff Experiences Financial Hardship*

29.    Plaintiff made his monthly payments in accordance with the Note and Deed of Trust until he began to suffer significant hardship due to a medical emergency that required his wife to undergo immediate surgery.

30.    The surgery required Plaintiff's wife, Rosalbina M. Campos ("Mrs. Campos"), to unexpectedly miss approximately three months of work. Mrs. Campos is a non-salaried

employee at a hotel where she works as a cleaner; therefore, she did not receive any compensation while undergoing her medical treatment.

31.    The loss of Mrs. Campos's income for three months and the costs associated with her treatment placed an extreme financial burden on the couple.

32.    Plaintiff made efforts to enter into repayment plans and cure any arrearages, but his requests were denied by GMAC.

33.    In September 2011, Plaintiff missed a mortgage payment due to financial struggles created by his wife's medical condition.

34.    Because of the missed September payment, GMAC sent Plaintiff a notice of default ("Notice of Default") dated October 12, 2011, pursuant to Paragraph 6 of the Plaintiff's mortgage note ("Note").

35.    This Notice of Default demanded payment in the amount of $2,210.76. As stated in the Notice of Default, this sum included his September 2011 payment and October 2011 payment and late charges in the amount of $230.68. In addition, the Notice of Default also sought payment in the amount of $311.46 for "fees, costs, and other accrued to date."

36.    The Notice of Default did not comply with the terms of Plaintiff's Note. Specifically, pursuant to Paragraph 6 of the Note, GMAC was allowed to send Plaintiff written notice of default according to the following terms:

**(B)  Default**

If I do not pay the full *amount* of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay *the overdue amount* by a certain date, the Note Holder may

7

require me to pay ***immediately the full amount*** of Principal which has not been paid and all the Interest that I owe on that amount.

...

**(E)  Payment of Note Holder's Costs and Expenses**

      If the Note Holder has ***required me to pay immediately in full*** as described above, the Note Holder will have ***the right to be paid back by me for all of its costs and expenses*** in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonably attorneys' fees.

*See* Ex. 1 (emphasis added).

      37.     Thus, GMAC's Notice of Default improperly demanded payment in the amount of $311.46 for "fees, costs, and other accrued to date" because Paragraph 6 (E) only granted the Note Holder the right to collect its costs and expenses once Plaintiff was required to pay in full.

      38.     Additionally, GMAC's notice also improperly calculated the late charges pursuant to Paragraph 6(A) of the Note, which states that Plaintiff would be charged 5.000% on overdue payments of principal and interest – "but only once on each late payment." *Id.* at ¶ 6(A).

      39.     Thus, Plaintiff could not have owed late charges in the amount of $230.68 based on late payments from September and October 2011.

      40.     Moreover, the Note also expressly indicates that a late charge is only assessed if the full amount of any monthly payment is not received 15 calendar days after the date it was due. Therefore, GMAC was not entitled to charge late fees on the October payment as of October 12, 2012.

      41.     Thus, the maximum amount that Plaintiff could have owed would have been 5% of his September payment amount.

      42.     Prior to even receiving the default notice, Plaintiff paid GMAC $1,621.82 on or around October 12, 2011. Thus, even assuming GMAC's notice of default provided the correct

amount of overdue charges that it was entitled to collect, Plaintiff was only in arrears by $588.94 pursuant to the notice of default dated October 12, 2011. Thus, the Notice of Default failed to state the actual amount Plaintiff needed to pay to avoid the acceleration of his loan.

43.    In early November 2011, Plaintiff contacted GMAC to pay any remaining balance plus his November 2011 mortgage payment. However, GMAC refused to accept any payments tendered by Plaintiff. Instead, GMAC told Plaintiff that he was required to pay approximately $3,000.00 to cure the default, which included his payments for November 2011, additional late charges, and costs which were not provided for in the Note.

44.    Because of GMAC's improper calculations, Plaintiff did not owe the $3,000.00 demanded by GMAC.

### *Plaintiff's Efforts to Keep His Home*

45.    After GMAC refused to accept Plaintiff's payments to cure his default, Plaintiff contact GMAC in December 2011 regarding loss mitigation alternatives, including HAMP.

46.    On January 30, 2012, Plaintiff submitted complete application for a loan modification under HAMP.

47.    As part of the application package, Plaintiff signed under the penalty of perjury a document entitled "Acknowledgment and Agreement."

48.    This agreement provided that Plaintiff understood that "the Servicer will not refer the account to foreclosure or conduct the foreclosure sale if already referred, while it is being reviewed for the Making Home Affordable program unless required by your investor."

49.    This is also consistent with GMAC's representations to Plaintiff in correspondence, including correspondence dated December 2, 2012, where GMAC stated "we

will not refer the account to foreclosure or conduct a foreclosure sale if already referred" while

Plaintiff is reviewed for HAMP.

50.     GMAC's representation in the "Acknowledgment and Agreement" and its

correspondence to Plaintiff was also consistent with the servicing guidelines for HAMP, which

bind GMAC as a result of its SPA.

51.     These guidelines include the following requirement:

> "[a] servicer may not refer any loan to foreclosure or conduct a
> schedule foreclosure sale unless and until at least one of the
> following circumstances exists... the borrower is evaluated for
> HAMP and is determined to be ineligible for the program...."

52.     Nevertheless, on or around February 27, 2012, Shapiro Brown & Alt sent Plaintiff

a foreclosure notice indicating that his home would be foreclosed on March 20, 2012.

53.     Plaintiff received this notice while he was still under review for his HAMP

modification.

54.     In correspondence dated March 14, 2012, which Plaintiff did not receive until

after the foreclosure sale, GMAC indicated it could not offer Plaintiff a loan modification

because it "service[s] [his] loan on behalf of an investor or group of investors that has not given

[GMAC] authority to modify [his] loan."

55.     This was a misrepresentation because Freddie Mac was his investor and has

expressly provided GMAC authority to modify its mortgages pursuant to HAMP. Moreover, the

correspondence dated March 14, 2012 indicated that the Plaintiff's creditor was GMAC

Mortgage, LLC.

56.     Plaintiff's home was foreclosed on March 20, 2012.

57.    Helmand purports to have purchased Plaintiff's home at the foreclosure sale. Helmand has filed an unlawful detainer action against Plaintiff in Prince William County General District Court.

58.    On November 9, 2012, Helmand was awarded possession of Plaintiff's home in Prince William County General District Court.

### *Shapiro Brown & Alt and Professional Foreclosure Corporation's Fiduciary Duties*

59.    Shapiro Brown & Alt is a law firm whose practice is focused on the collection of debts.

60.    In this capacity, Shapiro Brown & Alt regularly collects home loan debts.

61.    Shapiro Brown & Alt regularly demand payments from consumers of alleged arrearages and provide to consumers reinstatement quotes and itemizations of amounts that Defendants are attempting to collect.

62.    Shapiro Brown & Alt regularly indicates in its correspondence to consumers that "this is an attempt to collect a debt and any information obtained will be used for that purpose," and details specific amounts of money to be paid and regularly accepts payment for their lender claims.

63.    Shapiro Brown & Alt and Professional Foreclosure Corporation are fiduciaries to both the creditor and the homeowner.

64.    Shapiro Brown & Alt and Professional Foreclosure Corporation are also designated counsel for loans owned by Freddie Mac. *See* http://www.freddiemac.com/service/msp/exh79_va.html (last visited June 12, 2012).

65.    All Freddie Mac designated counsel must have the original note, copies of the deed of trust and copies of breach /acceleration demand letter(s) within 2 days of the referral. *Id.*

11

66.    On January 23, 2012, Shapiro Brown & Alt sent Plaintiff a dunning letter that stated it was instructed to initiate legal action based upon the alleged default under the terms of the loan agreement.

67.    No later than January 25, 2012, Shapiro Brown & Alt and Professional Foreclosure Corporation should have had the Plaintiff's deed of trust, note and notice of intent to accelerate in its possession.

68.    Under the Guide, Shapiro Brown & Alt and Professional Foreclosure Corporation have to request a copy of the original note from Freddie Mac's document custodian.

69.    A review of these documents would indicate that 1) the Notice of Intent to Accelerate is inaccurate and the condition precedent to foreclosure has not been met and 2) that Freddie Mac is the investor, noteholder, and beneficiary of this deed of trust.

70.    In addition, under the Freddie Mac Bulletin 2011-11, "Servicer must send a written certification to the attorney/trustee **at least seven, but no more than 15 days prior to a foreclosure sale date**" that there is no payment arrangement or pending alternative to foreclosure offer. (emphasis in original).

71.    Upon information and belief, Shapiro Brown & Alt and Professional Foreclosure Corporation of Virginia were aware of this requirement for loans owned by Freddie Mac but did not receive any certification from GMAC as the Plaintiff was still under review for HAMP seven days prior to the foreclosure sale.

### *Shapiro Brown & Alt's Violations of the FDCPA*

72.    The January 23, 2012, correspondence included the following information was being provided to Plaintiff as required by the Federal Fair Debt Collection Practices Act:

> "(1) [a]s of January 23, 2012, the creditor has advised that the amount of the debt is $243,947.72.

12

(2) [t]he creditor to whom the debt is owed is <u>GMAC MORTGAGE, LLC.</u>

(5) [t]he Fair Debt Collection Practices Act does not require that we wait until thirty (30) days from the date you receive this notice before we initiate foreclosure proceedings to foreclosure on the subject loan. In the event we do initiate foreclosure proceedings to foreclose on the subject loan, within thirty (30) days from the date you receive this notice, you still retain the right to dispute the debt, or any portion thereof, and you also retain the right to request the name of the original creditor if the original creditor is different from the current creditor, <u>GMAC Mortgage, LLC</u>"

73.    The correspondence dated January 23, 2012, further indicated that "GMAC Mortgage, LLC has referred your loan to us for foreclosure."

74.    Plaintiff did not owe that amount at on January 23, 2012.

75.    In addition, the creditor to whom the debt was owed was Freddie Mac, not GMAC.

76.    Shapiro Brown & Alt knew or should have known that this and each of the foregoing misrepresentations that it made were false.

77.    Shapiro Brown & Alt forwarded correspondence dated February 27, 2012 to Plainitff notifying him that a foreclosure sale is scheduled for his property for March 20, 2012.

78.    This correspondence included a Substitution of Trustees Deed dated October 25, 2011.

79.    The Appointment Substitution of Trustees Deed stated that GMAC Mortgage, LLC, is the Noteholder.

## CLASS ACTION ALLEGATIONS AGAINST GMAC

80.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this class action for himself and on behalf of a class initially defined as follows:

**Late Charge Class:** All natural persons who were parties to promissory notes for mortgage related debts serviced by Defendant within the past

13

two years, and for whom Defendant mailed a letter on behalf of a lender or note holder, where there was a demand for payment of late charges in excess of that permitted by the homeowners' note.

**Costs and Expenses Class**: All natural persons who were parties to promissory notes for mortgage related debts serviced by Defendant within the past two years, and for whom Defendant mailed a notice of default demanding for payment for costs and expenses prior to acceleration of the homeowners' note.

**Foreclosure Class**: All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded deed of trust secured payment of a note who applied for a HAMP modification, and for whom Defendant foreclosed or referred the loan to foreclosure while the HAMP modification was under review.

81.    **Numerosity.** **Fed. R. Civ. P 23(a)(1)** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendant, as well as through the public records of the Land Records in the Circuit Courts in the Commonwealth of Virginia, and the class members may be notified of the pendency of this action by published and/or mailed notice.

82.    **Predominance of Common Questions of Law and Fact.** **FED. R. CIV. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. They include, without limitation, the most central question: whether Defendant's standardized collection letters and uniform practices violated homeowners' notes.

83.    **Typicality.** **FED. R. CIV. P. 23(a)(3)** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of

action as the other members of the putative class. His claim will rise and fall on the exact same questions of fact and law as the putative class.

84.    **Adequacy of Representation.** FED. R. CIV. P. **23(a)(4)** Plaintiff is an adequate representative of the putative class, because her interests coincide with, and are not antagonistic to, the interests of the members of the Class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the Class.

85.    **Superiority.** FED. R. CIV. P. **23(b)(3)** Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive, given the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

**Count I: Violation of the FDCPA, 15 U.S.C. § 1692g**
**(Defendant Shapiro Brown & Alt)**
**(Individual Claim)**

15

86.     The foregoing allegations of the Complaint are incorporated by reference.

87.     By failing to disclose the amount of the actual amount of the debt and the identity of the creditor in their January 23, 2012 correspondence, Defendant violated 15 U.S.C. § 1692g(a)(1) and 1692g(a)(2).

88.     As a result, Plaintiff is entitled to recover statutory damages, actual damages, reasonable attorneys' fees, and costs against Defendant pursuant to 15 U.S.C. § 1692k.

## Count II: Violation of the FDCPA, 15 U.S.C. § 1692e
### (Defendant Shapiro Brown & Alt)
### (Individual Claim)

89.     The foregoing allegations of the Complaint are incorporated by reference.

90.     By falsely stating the identity of the creditor to whom the debt was owed and the amount of the debt, Defendant violated 15 U.S.C. § 1692e(2), e(5), and/or e(10).

91.     As a result, Plaintiff is entitled to recover statutory damages, actual damages, reasonable attorneys' fees, and costs against Defendant pursuant to 15 U.S.C. § 1692k.

## Count III: Violation of the FDCPA, 15 U.S.C. § 1692f
### (Defendant Shapiro Brown & Alt)
### (Individual Claim)

92.     The foregoing allegations of the Complaint are incorporated by reference.

93.     The sending of notices indicating they were initiating foreclosure proceedings was a nonjudicial action that sought to permanently deprive Plaintiff of his ownership rights in his home.

94.     Upon information and belief GMAC had no authority to appoint the Defendants as a substitute trustee because they were not the actual beneficiary of the deed of trust and/or Noteholder.

16

95.     Because they were not validly appointed as a substitute trustee by the noteholder in compliance with the terms of the Note and Deed of Trust, the Defendants had no right to conduct the foreclosure sale, or to transfer the property.

96.     In addition, because the loan was never accelerated pursuant to the Deed of Trust, the Defendants could not conduct a foreclosure sale.

97.     Defendants threatened and took nonjudicial action to effect dispossession or disablement of the subject property at a time when they had and there was no present right to possession of the property claimed as collateral through an enforceable security interest, in violation of 15 U.S.C. § 1692f(6).

98.     As a result, Plaintiff is entitled to recover statutory damages, actual damages, reasonable attorneys' fees, and costs against Defendant pursuant to 15 U.S.C. § 1692k.

### Count IV: Breach of Contract
### (Defendants Freddie Mac and GMAC)
### (Individual Claim)

99.     The foregoing allegations of the Complaint are incorporated by reference.

100.    At all times relevant to this Complaint, GMAC has actual and/or apparent authority to serve as Freddie Mac's agent for purposes of servicing Plaintiff's loan and modifying the Note and Deed of Trust.

101.    As a precondition to foreclosure under the terms of the Deed of Trust, Freddie Mac was required to give Plaintiff notice specifying, among other things, the default and the action required to cure the default.

102.    Freddie Mac and GMAC breached the Note and Deed of Trust because they did not satisfy the preconditions to foreclosure by providing a notice of default informing Plaintiff of the proper amount that needed to be paid to cure the default.

17

103.   Instead, Freddie Mac and GMAC improperly required Plaintiff to pay costs and expenses in order to avoid preacceleration of his Note.

104.   Despite the improper calculations, Plaintiff was willing and able to pay the amount provided in the October 12, 2011 correspondence.

105.   Nevertheless, GMAC refused to accept Plaintiff's payments in the beginning of November 2011. Instead, GMAC refused to accept payment unless Plaintiff tendered approximately $3,000.

106.   Freddie Mac and GMAC were not entitled to collect $3,000 pursuant to the Deed of Trust and/or the October 12, 2011 correspondence.

107.   GMAC's refusal to accept payment breached the Deed of Trust.

108.   Moreover, GMAC breached the Deed of Trust by demanding payments for sums that it was not entitled to collect.

109.   As a result, Freddie Mac and GMAC did not fulfill the conditions precedent to foreclosure; therefore, did not have the power to foreclose on Plaintiff's home in March 2012.

110.   Freddie Mac and GMAC's breaches of the Note and Deed of Trust have caused Plaintiff to suffer economic damages for which there is no adequate remedy at law, and for which Freddie Mac and GMAC should be held liable.

111.   Such damages amount to sums in excess of $250,000.00 in the aggregate and include losses relating to the loss of his home, the degradation of his credit and the imposition of fees related to the foreclosure sale and eviction proceedings when Plaintiff was not in default.

112.   In addition and in the alternative, the Note and Deed of Trust were all valid and fair contracts requiring mutuality of obligation and performance. Plaintiff's property is unique

18

and has served as his home for over seven years. Thus, his home cannot be adequately substituted with money recoverable only as legal damages.

113.    As a result, Plaintiff requests that the Court enter a decree ordering Defendant Freddie Mac to specifically perform the terms of the contract; that the Plaintiff be awarded judgment for his costs incurred in this matter; and that the Court award the Plaintiff such other relief as may seem appropriate to the Court.

114.    Alternatively, the Plaintiff requests that judgment be entered in his favor against the Defendant Freddie Mac and GMAC for breach of contract in the amount of the value of their home as determined by the Court, plus interest and costs and other legal and equitable relief that the Court deems appropriate.

## Count V: Breach of Fiduciary Duty
**(Defendants Shapiro Brown & Alt and Professional Foreclosure Corporation)**
**(Individual Claim)**

115.    The foregoing allegations in the Complaint are herein incorporated by reference.

116.    Professional Foreclosure Corporation was the substitute trustee to the Deed of Trust granted by Plaintiff.

117.    At all relevant times, Shapiro Brown & Alt was the agent, attorney, and fiduciary for Professional Foreclosure Corporation in its capacity as the substitute trustee for Plaintiff's Deed of Trust.

118.    A trustee is an agent of both the homeowner and the lender, and in this dual capacity, a trustee must act impartiality respecting the two competing interests.

119.    As the trustee, Shapiro Brown & Alt and Professional Foreclosure Corporation had a fiduciary duty to Plaintiff, which required it to act in good faith and utilize discretion in the management of the trust that a prudent man of discretion and intelligence would in exercising his

19

own affairs. Additionally, the trustee has the right to invoke the aid and direction of the court of equity in the execution of the trust.

120.    Under the Deed of Trust, Defendants' obligations are subject to and governed by "Applicable Law".

121.    Defendants repeatedly breached their fiduciary duty to Plaintiff, including but not limited to the following conduct:

  a. By threatening to foreclose on Plaintiff's home when he was proceeding through loss mitigation alternatives;

  b. By refusing to stay the foreclosure action despite its knowledge that Plaintiff was being evaluated for HAMP;

  c. By scheduling a foreclosure sale on Plaintiff's home while he was being evaluated for HAMP and other loss mitigation alternatives;

  d. By failing to postpone Plaintiff's foreclosure sale while he was being evaluated for HAMP and other loss mitigation alternatives;

  e. By failing to verify that Plaintiff was in default;

  f. By conducting the foreclosure even though the preconditions to foreclosure had not been satisfied under the terms of the Note and Deed of Trust;

  g. By failing to properly investigate the status of Plaintiff's loan prior to scheduling the foreclosure sale.

122.    Plaintiff has been damaged due to Shapiro Brown & Alt and Professional Foreclosure Corporation's breaches of its fiduciary duty.

123.    The foreclosure sale should be set aside as a result of the breach of fiduciary duty.

124.    Plaintiff demands judgment against Shapiro Brown & Alt and Professional Foreclosure Corporation in his favor in an amount of compensatory damages not less than $250,000.00, punitive damages in an amount sufficient to punish Shapiro Brown & Alt and Professional Foreclosure Corporation and to prevent both from engaging in such conduct again but not less than $350,000.00, costs in this action and reasonable attorneys' fees, and such further legal and equitable relief as the Court deems appropriate.

## Count VI: Fraud
### (Defendants Freddie Mac and GMAC)
### (Individual Claim)

125.    The foregoing allegations in the Complaint are herein incorporated by reference.

126.    In early November 2012, GMAC represented that Plaintiff owed more than $3,000.00 to cure the deficiency in his mortgage.

127.    GMAC's representation was false because GMAC failed to properly account for the payment made on October 12, 2012.

128.    In addition, GMAC also improperly represented that Plaintiff was required to pay $311.36 for "fees, costs, and other" to avoid acceleration of his entire loan and that he owed $230.68 in late fees.

129.    This representation was false because Plaintiff's Note did not obligate him to pay "fees, costs, and other" charges unless acceleration occurred. Moreover, GMAC improperly represented the amount of late fees accrued by calculating interest in excessive of 5.000% as required by Paragraph 6 of the Note.

130.    Plaintiff relied on the representations GMAC when he tendered his payment in November 2011 and participated in the loan modification process despite the fact that Plaintiff could have paid his outstanding obligations if GMAC had properly calculated the amounts.

21

131.   GMAC knew, or should have known, that Plaintiff was relying on its representations regarding the amounts to cure the alleged default.

132.   GMAC made these false statements of fact with intent to deceive Plaintiff into thinking he could prevent the acceleration of his Note.

133.   These representations were untrue as evidenced by the October 12, 2011 notice, the Note, and basic arithmetic.

134.   Moreover, GMAC, consistent with HAMP also represented to Plaintiff that his home would not be foreclosed or referred to foreclosure while his eligibility for a modification was under review.

135.   Plaintiff relied on the representations of GMAC that he would be reviewed for a loan modification and his home would not be foreclosed while his HAMP eligibility was determined.

136.   GMAC knew, or should have known, that Plaintiff was relying on these representations that the foreclosure would not occur while he was under review for a loan modification.

137.   The representations made by GMAC were untrue, as evidence by the foreclosure of Plaintiff's home while he was under review for HAMP.

138.   GMAC made these false statements of fact with the intent to deceive Plaintiff from foregoing other options to save his home.

139.   Plaintiff was damaged by losing his home and the equity in his home as a result of GMAC's misrepresentations.

140.   Accordingly, Plaintiff requests the Court to declare the foreclosure sale void or in the alternative voidable, impose a resulting trust, or in the alternative, a constructive trust for his

benefit so that his home can be deeded back to him, an award of actual damages for the loss of his home, punitive damages of $350,000.00, attorneys' fees and costs, and other relief as this Court deems appropriate.

## Count VII: Constructive Fraud
### (Defendants Freddie Mac and GMAC)
### (Individual Claim)

141.    The foregoing allegations in the Complaint are herein incorporated by reference.

142.    GMAC intended that Plaintiff rely on the misrepresentations of material fact as asserted above.

143.    Plaintiff relied on the misrepresentations to his detriment, as evidenced by the acceleration of his Note and the loss of his home by foreclosure sale.

144.    Therefore, Plaintiff asserts in the alternative to Count II that the material misrepresentations of GMAC constitute constructive fraud.

145.    Accordingly, Plaintiff requests the Court to declare the foreclosure sale void or in the alternative voidable, impose a resulting trust, or in the alternative, a constructive trust for his benefit so that his home can be deeded back to him, an award of actual damages for the loss of his home, punitive damages of $350,000.00, attorneys' fees and costs, and other relief as this Court deems appropriate.

## Count VIII: Breach of Implied Covenant of Good Faith and Fair Dealing
### (Defendants Freddie Mac and GMAC)
### (Individual Claim)

146.    The foregoing allegations of the Complaint are incorporated by reference.

147.    The Note and the Deed of Trust contain an implied covenant obligating Freddie Mac and GMAC to treat Plaintiff with good faith and fair dealing.

148.    Freddie Mac and GMAC failed to treat Plaintiff with good faith and fair dealing by, among other things, improperly demanding payment for fees and other charges in its notice of default dated October 12, 2011, refusing to accept Plaintiff's payment in November 2011 unless he paid such charges in addition to other unaccounted for expenses, inviting and encouraging him to participate in HAMP and then denying him on an illegitimate basis, by referring the loan to foreclosure while Plaintiff was being evaluated for HAMP despite its representations to the contrary, by referring his home to foreclosure without satisfying the conditions precedent to foreclosure, and by proceeding with the foreclosure sale despite the fact that none of the events required by the HAMP guidelines had taken place.

149.    Such conduct constitutes a breach of the duty to act in good faith and deal fairly with Plaintiff under the terms of the Note and Deed of Trust.

150.    Because of the breaches of the implied covenant of good faith and fair dealing, Freddie Mac and GMAC were not entitled to exercise its remedy of foreclosure under the Deed of Trust.

151.    Plaintiff also suffered actual damages and is threatened with additional harm from the breaches of the covenant of good faith and fair dealing. By relying on Freddie Mac and GMAC's representations, Plaintiff lost other remedies that might have been pursued to save his home, such as entering into a repayment plan, borrowing from family and friends, restricting his debt under the bankruptcy code, or pursuing other strategies to avoid default, such as selling his home.

152.    To the extent that actual damages will not fully and fairly compensate Plaintiff, he is also entitled to specific performance and other appropriate injunctive relief.

153.    Plaintiff requests actual damages, reinstatement of his mortgage, rescission of the foreclosure sale and specific performance of his Deed of Trust.

## Count IX: Declaratory Judgment
### (All Defendants)

154.    The foregoing allegations in the Complaint are herein incorporated by reference.

155.    The dispute and controversy is a justiciable matter which is not speculative, and a resolution by this court will determine the rights and interests of the parties to the Property in issue as well as the legal effect, if any, of the purported foreclosure sale on the property.

156.    All parties are or claim interest in this matter and a determination of the respective interests in the Property will determine which party has the right to enforce the instrument and avoid future litigation.

157.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the ownership interests of each of the parties hereto to the Property.

158.    Plaintiff respectfully moves for entry of a declaratory judgment to determine the purported foreclosure sale was void, alternatively that it was voidable and that the purported Foreclosure Deed was void, alternatively voidable; that Plaintiff is entitled to appointment of a constructive trustee with instructions to convey title of the home to them, subject to the Deed of Trust; and such further legal and equitable relief as this Court deems appropriate.

## Count X: Unjust Enrichment
### (GMAC)
### (Class Claim)

159.    The foregoing allegations in the Complaint are herein incorporated by reference.

160.    This matter is brought as a class action on behalf a second class – the "Late Charge Class," the "Cost and Expenses Class" and the "Foreclosure Class" - initially defined as follows:

**Late Charge Class:** All natural persons who were parties to promissory notes for mortgage related debts serviced by Defendant within the past two years, and for whom Defendant mailed a letter on behalf of a lender or note holder, where there was a demand for payment of late charges in excess of that permitted by the homeowners' note.

**Costs and Expenses Class**: All natural persons who were parties to promissory notes for mortgage related debts serviced by Defendant within the past two years, and for whom Defendant mailed a notice of default demanding for payment for costs and expenses prior to acceleration of the homeowners' note.

**Foreclosure Class**: All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded deed of trust secured payment of a note who applied for a HAMP modification, and for whom Defendant foreclosed or referred the loan to foreclosure while the HAMP modification was under review.

161.    Plaintiff, the Late Charge Putative class, and the Costs and Expenses Putative Class conferred a benefit upon Defendant through payment of amounts that were not under the contractual terms of the notes.

162.    Defendant knew of the benefit it received by collecting the improper amounts it demanded and should have reasonably expected to repay Plaintiff, the Late Charge Putative class, and the Costs and Expenses Putative Class.

163.    Defendant accepted and retained the benefits of the payments without paying or accounting for the proper value of such payments.

164.    Plaintiff incorporates his prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

165.    Defendant has serviced thousands of mortgage related loan in Virginia.

26

166.    Plaintiff alleges that Defendant uniformly used the set of fraudulent processes and business actions, as demonstrated in this case, across all servicing files.

167.    There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members. For example, and without limitation: (a.) whether Defendant properly calculated interest under class members' notes; (b.) whether Defendant properly demanded payment for costs and expenses prior to acceleration of class members' notes; (c.) what remedies are available for such violations.

168.    Plaintiff's claims are typical of those of the class members. All are based on the same facts and legal theories. The notice of default letters, and late payment correspondence are standardized and used across all Virginia jurisdictions and the full class period. The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

169.    The Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of his responsibilities to the putative class and has accepted such responsibilities.

170.    Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is appropriate. Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Moreover, Defendant's ongoing petition makes it extremely difficult for class members to

prosecute their individual claims against the Defendant. The primary asset available for all class members is the assets listed by the Trustee and any insurance funds held by Defendant.

171.    Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate relief with respect to the class as a whole.

172.    Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.    As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually. Further, most consumers who Defendants improperly charged and contacted would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation. As well, individual litigation of the uniform issues in this case would be a waste of resources – class counsels', Defendants' and the Court's. The issues at the core of this case are classwide and should be resolved one time. One win for one consumer would set the law as for every similarly situated consumer.

173.    By means of example only, Plaintiff and members of the putative class lost their homes or were forced to pay funds to prevent acceleration of their loans from occurring as a

28

direct result of the Defendant's misrepresentations.

174.   Moreover, Plaintiff and putative class members were injured as a result of the Defendant's misrepresentation of those late charges, costs, and fees associated with Defendant's servicing of their notes and are entitled to treble their actual damages, the cost of this suit, and reasonable attorneys' fees.

175.   Plaintiff and the putative class members are therefore entitled to actual damages for each class member who has incurred such damages, and statutory damages against Defendant, as well as their reasonably attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for actual and punitive damages against the Defendants as requested herein, for his attorneys' fees and costs; for prejudgment and post-judgment interest at the judgment rate, and such other relief as the Court deems just and proper.

**TRIAL BY JURY IS DEMANDED**.

Respectfully submitted,
INMER E. CAMPOS-CARRANZA,

By:_____
               Counsel

Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
SUROVELL ISAACS PETERSEN & LEVY PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Telephone 703.251.5400
Facsimile 703.591.9285
kkelly@siplfirm.com
aguzzo@siplfirm.com

Leonard A. Bennett, VSB#37523
Susan M. Rotkis, VSB#40693
CONSUMER LITIGATION ASSOCIATES, P.C.

29

763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, VA  23601
 Telephone (757) 930-3660
Facsimile (757) 930-3662 Facsimile
Email: lenbennett@clalegal.com
Email: srotkis@clalegal.com

Dale W. Pittman, VSB#15673
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
(804) 861-6000
(804) 861-3368 Facsimile
dale@pittmanlawoffice.com

Matthew J. Erausquin, VSB #65434
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Rd, Suite 600
Alexandria, VA 22314
(703) 273-7770
(888) 892-3512 Facsimile
matt@clalegal.com

*Counsel for Plaintiffs*