# EXHIBIT "A"

B 10 Modified (Official Form 10) (12/11)

Claim #5257    Date Filed: 11/15/2012

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number:
**Residential Capital, LLC, Case No. 12-12020**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Residential Capital, LLC - GMAC Mortgage, LLC

☐ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

Kenneth Taggart , 45 Heron Rd, Holland, Pa. 18966

**RECEIVED**
NOV 1 7 2012
**KURTZMAN CARSON CONSULTANTS**

Court Claim Number:
(If known)

Filed on: Nov 13,2012

Telephone number: 215-774-1585          email: appraisal1s@verizon.net

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Name and address where payment should be sent (if different from above):

Telephone number:          email:

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

1. Amount of Claim as of Date Case Filed: $ 450,000,000

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☑ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: Adversary Complaint 11-13-12 & All claims made in complaints in Cases attached ,
(See instruction #2)

3. Last four digits of any number by which creditor identifies debtor:
3466

3a. Debtor may have scheduled account as:
see complaints filed
(See instruction #3a)

3b. Uniform Claim Identifier (optional):
(See instruction #3b)

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☑ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe:
Value of Property: $ 350000     Annual Interest Rate 6.5 % ☑ Fixed ☐ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $ 225000 estimate          Basis for perfection: Fraud - False Claims

Amount of Secured Claim: $          Amount Unsecured: $

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

Amount entitled to priority:
$ 450,000,000,

6. Claim Pursuant to 11 U.S.C. § 503(b)(9):
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$          (See instruction #6)

7. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain.

* Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

9. Signature: (See instruction #9) Check the appropriate box.
☑ I am the creditor.  ☐ I am the creditor's authorized agent.
(Attach copy of power of attorney, if any.)

☐ I am the trustee, or the debtor, or their authorized agent.
(See Bankruptcy Rule 3004.)

☐ I am a guarantor, surety, indorser, or other codebtor.
(See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: KENNETH TAGGART
Title:
Company:          (Signature)          11/13/12 (Date)
Address and telephone number (if different from notice address above):
45 heron rd. holland pa 18966
45 heron rd. holland pa 18966
Telephone number: 215-774-1585          Email: appraisal1s@verizon.net

COURT USE ONLY

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

1212020121115000000000098

# United States Bankruptcy Court

# Southern District of New York

### Proof of Claim – Addendum of Kenneth Taggart, Creditor

**_Residential Capital, LLC, Case No. 12-12020_**

_All claims made in Cases filed in the following cases & courts are part of The Proof of Claims form filed with this court._

1) GMAC v Taggart, Court of Common Pleas, Montgomery County Pennsylvania,

(##2009-25338)


2) Taggart v GMAC Mortgage, LLC , et al,

2:2012cv00415 – District Court for The Eastern District of Pennsylvania


3) Taggart v Montgomery County, et al,

2:2012cv01913 - District Court for The Eastern District of Pennsylvania


4) All Claims made in The Adversary complaint filed by Kenneth Taggart

In this court regarding this case. United States Bankruptcy Court – Southern

District of New York.  ResCap 12-12020


Kenneth Taggart,  Nov 13, 2012

# EXHIBIT "B"

### *Sworn Affidavit*

*Commonwealth of Pennsylvania    )*
                                               *)SS:*
*County of ___BUCKS_____    )*

*Before me, the undersigned notary public, this day, personally, appeared Jeffrey Delp_ to me known, who being duly sworn according to law, deposes the following:*

I Jeffrey Delp, of Delp Insurance, have provided Home Owners Insurance on the property located at: 521 Cowpath Rd, Telford, Pa 18969, for the duration of the loan originated on July 11, 2008 to the present time. The owner of the property is Kenneth Taggart. There has never been a lapse in coverage on the property. The property has maintained coverage of $660,000 since the inception of the loan on July 11, 2008. The only change request I have had from a lender was for a change to the Loss Payee to GMAC Mortgage, LLC in September 2008.

*Affiant's Statement)*

*(Signature of Affiant)*

*Subscribed and sworn to before me this __14th__ day of __February__, 19 __2012__*

*Notary Public*

```
COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
MAUREEN SULLIVAN-BAHR, Notary Public
Lower Southampton Twp., Bucks County
My Commission Expires January 11, 2014
```

6MPO-A1

## Ken Taggart

From:    ~~[redacted]~~
Date:    Tuesday, January 31, 2012 9:42 PM
To:      ~~[redacted]~~
Attach:  ~~[redacted]~~.pdf
Subject: Dec

*From Jeff Delp Insurance Agent*

Ok here is what I have. In July two people a Bruce and Nan contacted the office requesting dec pages.

At that time the mortgage company was LBA Financial Group. I don't know who they worked for and they did not request at that time we change anything, only that we send proof of insurance with coverages.

We never heard another word from them. Then in Sept the renewal bill due in August was overdue and MaryEllen called your cell. However somebody from GMAC had called because the mortgagee was changed 08/09/2008 to GMAC I numbered those Dec pages 1 and 2 At no time were the properties without insurance as you can see from the policy numbers. Like I said the policies were overdue but GMAC

did pay them! Jennifer at GMAC insurance ctr 800-256-9962 put a "rush" on the payments so policies wouldn't cancel. She also had all insurance information. Like I said no lapses in coverage and they def had

all insurance info showing continuous coverage. Don't know if this helps or not but I think the guy Bruce worked for GMAC. Also like I said he never requested we change anything, just show proof of insurance. Oh GMAC actually shorted the payment you paid the shortage of $16 check # 747 dated 08/02/2008

E-MAIL CONFIDENTIALITY NOTICE: The contents of this e-mail message and any attachments are intended solely for the addressee (s) and may contain confidential and/or legally privileged information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying, or storage of this message or any attachment is strictly prohibited.

GMPO-A2

1/31/2012

# FAX TRANSMISSION

**DATE:**    July 10, 2008

**ATTENTION:** Nan
## 215-728-1339

**FROM:** JEFFREY A DELP, CLU     FAX NUMBER - 215-364-9144

TELEPHONE NUMBER - 215-355-9660

# NUMBER OF PAGES:    (INCLUDING THIS PAGE) - 6

# MESSAGE:

Kenneth Taggert
521 Cowpath Road
Telford, PA 18969
Policy #'s: ███225 & ███227

Attached please find an Evidence of Insurance stamped paid.  Also, please find renewal bills for the above policy numbers.

Any questions, please call the number above.

Thank you.

Maryellen

Delp Insurance
1035 Millcreek Drive, 1st floor
Feasterville, PA 19053

GMPO-A3

**Philadelphia Contributionship**

THE PHILADELPHIA CONTRIBUTIONSHIP INSURANCE COMPANY
DECLARATIONS FOR POLICY ███225/12

Effective date 08-09-2008    Expiration date 08-09-2009    Amended date 08-09-2008
mailing address                          property address
KENNETH TAGGERT
45 HERON RD
HOLLAND PA 18966-2109                521 COWPATH RD SIDE
                                     TELFORD, PA 18969-7100

AGENT 6111, JEFFREY A. DELP INSURANCE SERVICES INC.
   ***** description of dwelling *****
Year Construction    Prot. Cl Zone
1930 FRAME           05        45

***** coverages and limits of liability *****

| FORM | (A) | (B) | (C) | (D) | (E) | (F) | (MP) |
|------|-----|-----|-----|-----|-----|-----|------|
| DP 01 | $330,000 | $0 | $0 | $0 | $0 | $100,000 | $1,000 |
| DEDUCTIBLE | $1,000 | | | | | | |
| PREMIUM | $978 | | | | | | |

| FORM NO | EDITION | DESCRIPTION | LIMITS |
|---------|---------|-------------|--------|
| EC | 12/02 | EXTENDED COVERAGE | $330000 |
| V&MM | 12/02 | VANDALISM & MALICIOUS MISCHIEF | |
| FEF | 01/05 | FUEL EXCLUSION ENDORSEMENT | |
| DP-05 38 | 08/06 | CAP ON LOSSES FROM CERTIFIED ACT | $584 |
| DL-24 01 | 7/88 | PERSONAL LIABILITY | |
| DL-24 03 | 7/88 | PERSONAL LIABILITY SCHEDULE | |
| DL-24 16 | 7/88 | NO COVERAGE FOR HOME DAY CARE BU | |
| DL-25 37 | 05/99 | SPECIAL PROVISIONS-PA | |
| DL-24 11 | 7/88 | PREMISES LIABILITY (NON-OWNER OC | |
| DP-01 37 | 06/07 | SPECIAL PROVISIONS - PA | |
| DP-02 04 | 12/03 | CANCELLATION AND NONRENEWAL | |
| SFP-1 | 9/86 | STANDARD FIRE POLICY ENDORSEMENT | |
| IL 09 10 | 12/03 | PA NOTICE | |
| DP-04 76 | 12/02 | ACTUAL CASH VALUE LOSS SETTLEMEN | |

***** mortgage information *****
FIRST MORTGAGEE: GMAC MORTGAGE, LLC (4547)
               ISAOA
               PO BOX 4025
               CORAOPOLIS, PA 15108-6942
               LOAN NUMBER :0602083957

***** END OF FAX *****

GMPO-A4

## D E S Q F A X   T R A N S M I S S I O N

**Date: 31 JAN 2012**                              **Time: 01:11 PM**

**From: Lisa Sawyer**          **Tel # 215-627-1752**
      **PCIC**
      **210 South 4th Street**          **Fax # 215-627-5354**
      **Philadelphia, PA 19106**

   **To:**                              **Fax # 12153649144**


**Subject: POLICY ▓▓227/11 DECLARATIONS**

                                               **Pages:    2**

GMPO - A5

THE PHILADELPHIA CONTRIBUTIONSHIP INSURANCE COMPANY
DECLARATIONS FOR POLICY ███227/11

Effective date 08-09-2008    Expiration date 08-09-2009    Amended date 09-16-2008
mailing address                        property address
KENNETH TAGGART
45 HERON RD
7606 BUSTLETON AVE                  521 COWPATH RD FRNT
SOUTHAMPTON PA 18966-2109           TELFORD, PA 18969-7100

AGENT 6111, JEFFREY A. DELP INSURANCE SERVICES INC.
      ***** description of dwelling *****
Year Construction    Prot. Cl Zone
1935 MASONRY         05      45

***** coverages and limits of liability *****

| FORM | (A) | (B) | (C) | (D) | (E) | (F) | (MP) |
|------|-----|-----|-----|-----|-----|-----|------|
| DP 01 | $330,000 | $0 | $0 | $0 | $0 | $100,000 | $1,000 |
| DEDUCTIBLE | $1,000 | | | | | | |
| PREMIUM | $925 | | | | | | |

| FORM NO | EDITION | DESCRIPTION | LIMITS |
|---------|---------|-------------|--------|
| EC | 12/02 | EXTENDED COVERAGE | $330000 |
| V&MM | 12/02 | VANDALISM & MALICIOUS MISCHIEF | |
| FEF | 01/05 | FUEL EXCLUSION ENDORSEMENT | |
| DP-05 38 | 08/06 | CAP ON LOSSES FROM CERTIFIED ACT | $482 |
| DL-24 01 | 7/88 | PERSONAL LIABILITY | |
| DL-24 03 | 7/88 | PERSONAL LIABILITY SCHEDULE | |
| DL-24 16 | 7/88 | NO COVERAGE FOR HOME DAY CARE BU | |
| DL-25 37 | 05/99 | SPECIAL PROVISIONS-PA | |
| DL-24 11 | 7/88 | PREMISES LIABILITY (NON-OWNER OC | |
| DP-01 37 | 06/07 | SPECIAL PROVISIONS - PA | |
| DP-02 04 | 12/03 | CANCELLATION AND NONRENEWAL | |
| SFP-1 | 9/86 | STANDARD FIRE POLICY ENDORSEMENT | |
| IL 09 10 | 12/03 | PA NOTICE | |
| DP-04 76 | 12/02 | ACTUAL CASH VALUE LOSS SETTLEMEN | |

***** mortgage information *****
FIRST MORTGAGEE: GMAC MORTGAGE, LLC (4547)
                ISAOA
                PO BOX 4025
                CORAOPOLIS, PA 15108-6942
                LOAN NUMBER :0602083957

***** END OF FAX *****

GMPO - A6

### D E S Q F A X   T R A N S M I S S I O N

Date: 31 JAN 2012                           Time: 01:12 PM

From: Lisa Sawyer
PCIC
210 South 4th Street
Philadelphia, PA 19106

Tel # 215-627-1752

Fax # 215-627-5354

To:

Fax # 12153649144

Subject: POLICY 726225/12 DECLARATIONS

Pages:   2

GMPO -A7

**THE PHILADELPHIA CONTRIBUTIONSHIP
INSURANCE COMPANY**
210 SOUTH FOURTH STREET
PHILADELPHIA, PA 19106

**DECLARATIONS**

| Policy Number | Policy Type | Policy Effective | Policy Expiration |
|---|---|---|---|
| 227 | Dwelling | 08-09-2008 12:01AM | 08-09-2009 12:01AM |

| Insured | Producer | Property Location |
|---|---|---|
| KENNETH TAGGART<br>45 HERON RD<br>7606 BUSTLETON AVE<br>SOUTHAMPTON, PA<br>18966-2109 | JEFFREY A. DELP<br>(215)355-9660<br>1035 MILL CREEK DRIVE, 1ST FLR<br>FEASTERVILLE, PA<br>19053<br>(215) 355-9660 | 521 COWPATH RD FRNT<br>TELFORD, PA<br>18969-7100 |

| Mortgagee | Address | Loan No. |
|---|---|---|
| GMAC MORTGAGE, LLC ISAOA | PO BOX 4025 CORAOPOLIS, PA 15108-6942 | 0602083957 |

| Basic Coverage Premium | Scheduled Property Coverage | Total Policy Premium |
|---|---|---|
| $925 | $0 | $925 |

| Deductible Section 1 | Policy Cov. Form | Construction Type | Construction Year | Number of Families | Protection Class | Terr. |
|---|---|---|---|---|---|---|
| $1,000 | DP-0001 | Masonry | 1935 | 2 | 05 | 45 |

| | | | COVERAGE LIMITS | | | |
|---|---|---|---|---|---|---|
| Dwelling | Other Structures | Contents | Loss of Use | Additional Living Expenses | Liability | Med Pay |
| 330,000 | 0 | 0 | 0 | 0 | 100,000 | 1,000 |

### POLICY FORMS AND ENDORSEMENTS

| Number | Description | Limit |
|---|---|---|
| | See SUPPLEMENT for Policy Forms and Endorsements | |

| Amended Date | Premium Balance |
|---|---|
| 09-16-2008 | $925.00 |

GMPO - A8

P. 1

x  x  x  Communication Result Report ( Jul. 10. 2008 10:50AM ) x  x  x

Fax Header)  DELP INSURANCE

Date/Time: Jul. 10. 2008 10:48AM

| File No. | Mode | Destination | | Pg(s) | Result | Page Not Sent |
|------|------|-------------|--|-------|--------|----------------|
| 2227 | Memory TX | 2157281339 | | P. 6 | OK | |

--------------------------------------------------------------------------------

Reason for error
  E. 1) Hang up or line fail
  E. 3) No answer
  E. 5) Exceeded max. E-mail size

  E. 2) Busy
  E. 4) No facsimile connection

## FAX TRANSMISSION

DATE: July 10, 2008

ATTENTION: Nan
215-728-1339

FROM: JEFFREY A DELP, CLU    FAX NUMBER - 215-364-9144
                             TELEPHONE NUMBER - 215-355-8660

NUMBER OF PAGES: (INCLUDING THIS PAGE) - 6

MESSAGE:

Kenneth Taggert
523 Cowpath Road
Telford, PA 18969
Policy #'s: 736225 & 736227

Attached please find an Evidence of Insurance stamped paid. Also, please find renewal bills for the above policy numbers.

Any questions, please call the number above.

Thank you.

Maryellen

Delp Insurance
1035 Millcreek Drive, 1st floor
Feasterville, PA 19053

GMPO-A9

Policy Number: 736225 & 736227

## EVIDENCE OF PROPERTY INSURANCE

| DATE (MM/DD/YYYY) |
| --- |
| 7/10/2008 |

THIS EVIDENCE OF PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE OF PROPERTY INSURANCE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

| AGENCY | PHONE (A/C, No, Ext): (215) 355-9660 | COMPANY |
| --- | --- | --- |
| Delp Insurance Services FIRST FLOOR 1035 MILL CREEK DRIVE FEASTERVILLE PA 19053 | | THE PHILA CONTRIBUTIONSHIP 210 SOUTH FOURTH STREET PHILADELPHIA, PA 19106 |

| FAX (A/C, No): (215) 364-9144 | E-MAIL ADDRESS: DELPINS@VERIZON.NET |
| --- | --- |
| CODE: | SUB CODE: |
| AGENCY CUSTOMER ID #: | |

| INSURED    KENNETH TAGGERT | LOAN NUMBER | POLICY NUMBER ***225 & ***227 |
| --- | --- | --- |
| 45 HERON ROAD HOLLAND, PA 18966 | EFFECTIVE DATE 8/9/2007 | EXPIRATION DATE 08/ 9/2008 |
| | | CONTINUED UNTIL TERMINATED IF CHECKED  ☒ |
| | THIS REPLACES PRIOR EVIDENCE DATED: | |

## PROPERTY INFORMATION

| LOCATION/DESCRIPTION |
| --- |
| 521 COWPATH RD TELFORD PA 18969 |

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF PROPERTY INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

## COVERAGE INFORMATION

| COVERAGE / PERILS / FORMS | AMOUNT OF INSURANCE | DEDUCTIBLE |
| --- | --- | --- |
| DWELLING | $660,000 | |
| LIABILITY | $100,000 | |
| MEDICAL PAYMENTS TO OTHERS | $  1,000 | |
| | | $1700 |

## REMARKS (Including Special Conditions)

PAID

## CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL _____ DAYS WRITTEN NOTICE TO THE ADDITIONAL INTEREST NAMED BELOW, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.

## ADDITIONAL INTEREST

| NAME AND ADDRESS | ☒ MORTGAGEE | ADDITIONAL INSURED |
| --- | --- | --- |
| L B A FINANCIAL GROUP LLC 1681 KENNETH RD YORK PA 17408 | LOSS PAYEE LOAN # | |
| | AUTHORIZED REPRESENTATIVE | JEFFREY DELP |

ACORD 27 (2006/07)

© ACORD CORPORATION 1993-2006. All rights reserved.
The ACORD name and logo are registered marks of ACORD

Produced using Forms Boss Plus software. www.FormsBoss.com. Impressive Publishing 800-208-1977

GMPO -A10

717·767·1899

## EVIDENCE OF PROPERTY INSURANCE

Policy Number: 736225 & 736227

DATE (MM/DD/YYYY)
7/10/2008

THIS EVIDENCE OF PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE OF PROPERTY INSURANCE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

| AGENCY | COMPANY |
|---|---|
| PHONE (A/C, No, Ext): (215) 355-9660 | |
| Delp Insurance Services | THE PHILA CONTRIBUTIONSHIP |
| FIRST FLOOR | 210 SOUTH FOURTH STREET |
| 1035 MILL CREEK DRIVE | PHILADELPHIA, PA 19106 |
| FEASTERVILLE PA 19053 | |
| FAX (A/C, No): (215)364-9144   E-MAIL ADDRESS: DELPINS@VERIZON.NET | |
| CODE:              SUB CODE: | |
| AGENCY CUSTOMER ID #: | |

| INSURED | LOAN NUMBER | POLICY NUMBER |
|---|---|---|
| KENNETH TAGGERT | | 736225 & 736227 |
| 45 HERON ROAD | EFFECTIVE DATE | EXPIRATION DATE | |
| HOLLAND, PA 18966 | 8/9/2007 | 8/9/2008 | CONTINUED UNTIL TERMINATED IF CHECKED [X] |
| | THIS REPLACES PRIOR EVIDENCE DATED: | | |

### PROPERTY INFORMATION

LOCATION/DESCRIPTION
521 COWPATH RD TELFORD PA 18969

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF PROPERTY INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

### COVERAGE INFORMATION

| COVERAGE / PERILS / FORMS | AMOUNT OF INSURANCE | DEDUCTIBLE |
|---|---|---|
| DWELLING | $660,000 | |
| LIABILITY | $100,000 | |
| MEDICAL PAYMENTS TO OTHERS | $  1,000 | |
| | | |
| PREMIUM $1,700.00 | | |

### REMARKS (Including Special Conditions)

### CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL _____ DAYS WRITTEN NOTICE TO THE ADDITIONAL INTEREST NAMED BELOW, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.

### ADDITIONAL INTEREST

| NAME AND ADDRESS | | |
|---|---|---|
| L B A FINANCIAL GROUP LLC | [X] MORTGAGEE | ADDITIONAL INSURED |
| 1681 KENNETH RD | LOSS PAYEE | |
| YORK PA 17408 | LOAN # | |
| | AUTHORIZED REPRESENTATIVE | JEFFREY DELP |

ACORD 27 (2006/07)                                © ACORD CORPORATION 1993-2006. All rights reserved.

The ACORD name and logo are registered marks of ACORD
Produced using Forms Boss Plus software www.FormsBoss.com; Impressive Publishing 800-208-1977

6MPO-All

# EVIDENCE OF PROPERTY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 7/10/2008 |

THIS EVIDENCE OF PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE OF PROPERTY INSURANCE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

**AGENCY**
Delp Insurance Services
FIRST FLOOR
1035 MILL CREEK DRIVE
FEASTERVILLE PA 19053
PHONE (A/C, No, Ext): (215) 355-9660
FAX (A/C, No): (215) 364-9144
E-MAIL ADDRESS: WELKINS@VERIZON.NET
CODE:    SUB CODE:
AGENCY CUSTOMER ID:

**COMPANY**
THE PHILA CONTRIBUTIONSHIP
210 SOUTH FOURTH STREET
PHILADELPHIA, PA 19106

**INSURED**
KENNETH TAGGERT
45 HERON ROAD
HOLLAND, PA 18966

LOAN NUMBER

POLICY NUMBER
736225 & 736227

EFFECTIVE DATE: 8/9/2007
EXPIRATION DATE: 08/9/2008
CONTINUED UNTIL TERMINATED IF CHECKED: ☒
THIS REPLACES PRIOR EVIDENCE DATED:

## PROPERTY INFORMATION
LOCATION/DESCRIPTION
521 COWPATH RD TELFORD PA 18969

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF PROPERTY INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

## COVERAGE INFORMATION

| COVERAGE / PERILS / FORMS | AMOUNT OF INSURANCE | DEDUCTIBLE |
|---|---|---|
| DWELLING | $660,000 | |
| LIABILITY | $200,000 | |
| MEDICAL PAYMENTS TO OTHERS | $ 1,000 | |

*PREMIUM:*    $1700

## REMARKS (including Special Conditions)

PAID

## CANCELLATION
SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL ___ DAYS WRITTEN NOTICE TO THE ADDITIONAL INTEREST NAMED BELOW, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.

## ADDITIONAL INTEREST
NAME AND ADDRESS
L B A FINANCIAL GROUP LLC
1681 KENNETH RD
YORK PA 17408

☒ MORTGAGEE
☐ LOSS PAYEE
☐ ADDITIONAL INSURED
LOAN #

AUTHORIZED REPRESENTATIVE

ACORD 27 (2006/07)

© ACORD CORPORATION 1993-2006. All rights reserved.
The ACORD name and logo are registered marks of ACORD

Produced using Forms Boss Plus software. www.FormsBoss.com; Impressive Publishing 800-208-1977

GMPO -A15

Received Time Jul. 10.  11:17AM



412

JUL. 10. 2008 3:58PM   DELP INSURANCE

No. 2261   P. 1
+17··467-1899

Policy Number  225 &  227

# EVIDENCE OF PROPERTY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 7/10/2008 |

THIS EVIDENCE OF PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE OF PROPERTY INSURANCE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

| AGENCY | PHONE (A/C, No, Ext): (215) 355-9660 | COMPANY |
|---|---|---|
| Delp Insurance Services<br>FIRST FLOOR<br>1035 MILL CREEK DRIVE<br>FEASTERVILLE PA 19053 | | THE PHILA CONTRIBUTIONSHIP<br>210 SOUTH FOURTH STREET<br>PHILADELPHIA, PA 19106 |

| FAX (A/C, No): (215) 364-9144 | E-MAIL ADDRESS: DELPINS@VERIZON.NET |
|---|---|
| CODE: | SUB CODE: |
| AGENCY CUSTOMER ID #: | |

| INSURED | | |
|---|---|---|
| KENNETH TAGGERT<br><br>45 HERON ROAD<br>HOLLAND, PA 18966 | LOAN NUMBER | POLICY NUMBER  225 &  227 |

| EFFECTIVE DATE | EXPIRATION DATE | CONTINUED UNTIL TERMINATED IF CHECKED |
|---|---|---|
| 8/9/2007 | 8/9/2008 | ☒ |

THIS REPLACES PRIOR EVIDENCE DATED:

## PROPERTY INFORMATION

| LOCATION/DESCRIPTION |
|---|
| 521 COWPATH RD TELFORD PA 18969 |

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF PROPERTY INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

## COVERAGE INFORMATION

| COVERAGE / PERILS / FORMS | AMOUNT OF INSURANCE | DEDUCTIBLE |
|---|---|---|
| DWELLING | $660,000 | |
| LIABILITY | $100,000 | |
| MEDICAL PAYMENTS TO OTHERS | $ 1,000 | |
| | | |
| PREMIUM $1,700.00 | | |

## REMARKS (Including Special Conditions)

## CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL _____ DAYS WRITTEN NOTICE TO THE ADDITIONAL INTEREST NAMED BELOW, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.

## ADDITIONAL INTEREST

| NAME AND ADDRESS | | |
|---|---|---|
| L B A FINANCIAL GROUP LLC<br>1681 KENNETH RD<br>YORK PA 17408 | ☒ MORTGAGEE<br>☐ LOSS PAYEE<br>LOAN # | ☐ ADDITIONAL INSURED |
| | AUTHORIZED REPRESENTATIVE | JEFFREY USLY |

ACORD 27 (2006/07)

© ACORD CORPORATION 1993-2006. All rights reserved.

The ACORD name and logo are registered marks of ACORD

1112

JUL. 10. 2008  3:38PM    DELP INSURANCE

No. 2261   P. 1

717-767-1899

Policy Number 225 & 227

# EVIDENCE OF PROPERTY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 7/10/2008 |

THIS EVIDENCE OF PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE OF PROPERTY INSURANCE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

| AGENCY | | COMPANY |
|---|---|---|
| PHONE (A/C, No, Ext): (215) 355-9660 | | |
| Delp Insurance Services | | THE PHILA CONTRIBUTIONSHIP |
| FIRST FLOOR | | 210 SOUTH FOURTH STREET |
| 1035 MILL CREEK DRIVE | | PHILADELPHIA, PA 19106 |
| FEASTERVILLE PA 19053 | | |
| FAX (A/C, No): (215) 364-9148   E-MAIL ADDRESS: DELPINS@VERIZON.NET | | |
| CODE:   SUB CODE: | | |
| AGENCY CUSTOMER ID #: | | |

| INSURED | | LOAN NUMBER | | POLICY NUMBER |
|---|---|---|---|---|
| KENNETH TAGGERT | | | | 225 & 227 |
| | | EFFECTIVE DATE | EXPIRATION DATE | |
| 45 HERON ROAD | | 8/9/2007 | 8/9/2008 | ☒ CONTINUED UNTIL TERMINATED IF CHECKED |
| HOLLAND, PA 18966 | | | | |
| | | THIS REPLACES PRIOR EVIDENCE DATED: | | |

## PROPERTY INFORMATION

LOCATION/DESCRIPTION
521 COWPATH RD TELFORD PA 18969

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF PROPERTY INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

## COVERAGE INFORMATION

| COVERAGE / PERILS / FORMS | AMOUNT OF INSURANCE | DEDUCTIBLE |
|---|---|---|
| DWELLING | $660,000 | |
| LIABILITY | $100,000 | |
| MEDICAL PAYMENTS TO OTHERS | $  1,000 | |
| | | |
| PREMIUM $1,700.00 | | |

## REMARKS (Including Special Conditions)

## CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL _____ DAYS WRITTEN NOTICE TO THE ADDITIONAL INTEREST NAMED BELOW, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.

## ADDITIONAL INTEREST

| NAME AND ADDRESS | | | |
|---|---|---|---|
| L S A FINANCIAL GROUP LLC | ☒ MORTGAGEE | | ☐ ADDITIONAL INSURED |
| 1681 KENNETH RD | ☐ LOSS PAYEE | | |
| YORK PA 17408 | LOAN # | | |
| | AUTHORIZED REPRESENTATIVE | | JEFFREY DELP |

ACORD 27 (2008/07)    Received Time Jul. 10.  3:41PM

© ACORD CORPORATION 1993-2006. All rights reserved.
The ACORD name and logo are registered marks of ACORD

A6

GMPO - A17

284

# EXHIBIT "C"

## FRANCONIA TOWNSHIP TAX COLLECTOR
### GERALD R. DELONG
671 Allentown Road
Telford, Pa. 18969
215.723.2024

## DUPLICATE TAX RECEIPT

This document serves as a valid receipt showing that taxes were paid in full on the date(s) shown.

June 25, 2012

Owner of record: Taggert, Kenneth
Property location: 521 Cowpath Rd. (Franconia Township)
          Telford, Pa.
Parcel # 34-00-01078-00-4

2008 County/ Township tax for Montgomery County & Franconia Township is paid.
Amount paid: $1266.16 at discount on 03/25/08 (Face amount $1292.15)
2008-09 School tax for Souderton Area School District is paid.
Amount paid: $8389.77 at discount on 07/23/08 (Face amount $8561.00)
2009 County/Township tax for Montgomery County & Franconia Township is paid
Amount paid: $1280.22 at discount on 03/25/09 (Face amount $1306.50)
2009-10 School tax for Souderton Area School District is paid.
Amount paid: $8557.84 at discount on 08/25/09 (Face amount $8732.50)
2010 County/Township tax for Montgomery County & Franconia Township is paid.
Amount paid: $1295.56 at discount on 03/26/10 (Face amount $1322.15)
2010-11 School tax for Souderton Area School District is paid.
Amount paid: $8893.10 at discount non 08/24/10 (Face amount $9074.59)
2011 County/Township tax for Montgomery County & Franconia Township is paid.
Amount paid: $966.83 at discount on 03/23/11 (Face amount $986.97)
2011-12 School tax for Souderton Area School District is paid.
Amount paid: $6728.14 at discount on 08/24/11 (Face amount $6865.48)
2012 County/Township tax for Montgomery County & Franconia Township is paid.
Amount paid: $1105.58 at discount on 03/22/12 (Face amount $1128.22)

Gerald R. DeLong
Franconia Township
Tax Collector

# FRANCONIA TOWNSHIP TAX COLLECTOR
## GERALD R. DELONG
### 671 ALLENTOWN ROAD
### TELFORD, PA. 18969
215.723-2024

County/Township tax face amounts are due by May 31 for years 2008-2012

School tax face amounts are due by October 31 for years 2008-2012

Gerald R. DeLong
Franconia Township
Tax Collector

# EXHIBIT "D"



# Expert Opinion Report

**Prepared by:**
Chip Cummings, CMC
Northwind International Corp.
5005 Plainfield Ave. NE, Suite 300
Grand Rapids, MI 49525
(616) 977-7900

**Prepared for:**
Ken Taggart
45 Heron Rd.
Holland, PA 18996

**RE: GMAC v Taggart**          **Montgomery County, PA Court #2009-25338**

## Introduction & Scope

I am the CEO of Northwind International Corp., a mortgage training and consulting firm located in Grand Rapids, Michigan. We specialize in mortgage fraud investigation, mortgage loan quality control analysis, regulatory compliance, and mortgage lending operations. I have over 30 years experience in the real estate and mortgage lending industries, and we have been involved in thousands of mortgage transactions.

We were contracted by Mr. Taggart to perform an analysis of the GMAC mortgage loan (#0602083957) based upon documentation supplied to us by Mr. Taggart for the period of April 2008 through projected March, 2010 *(reflected by GMAC)*.

For the purpose of this analysis, no loan file documentation was reviewed, including but not limited to origination, processing, underwriting, closing, or collateral valuation. No case exhibits, interviews, depositions or other reports were reviewed in the preparation of this Report.

The information in this Report is based on general principles of law applying to borrowers and lenders in the course of loan servicing, but it is not offered for the purpose of providing individualized legal advice, and the Examiners are not attorneys.

## Analysis & Findings

Based upon information supplied by Mr. Taggart, we analyzed an Initial Escrow Account Disclosure Statement dated May 12, 2009 prepared by GMAC ("Disclosure").

The Disclosure indicates that the loan is an FHA-insured loan, which requires the collection and disbursement of real estate taxes, hazard insurance, and mortgage insurance.

The estimated annual disbursements used to create the Disclosure by GMAC are as follows:

| Disbursement | Monthly Amount* | Annual Amount |
|---|---|---|
| FHA Mortgage Insurance | $269.42 | $3,233.04 |
| Hazard insurance (2 policies) | $158.58 | $1,903.00 |
| Summer Tax (school) | $699.15 | $8,389.77 |
| Winter Tax (City/Twp) | $106.69 | $1,280.22 |

*Total monthly escrow rounded to $1,233.83 by GMAC*

We performed an Escrow Analysis based upon these figures *(see Attachment A – Current Analysis)* to verify their calculations. Based upon their stated disbursement dates, we verified their calculations as stated *(within a few cents due to rounding)*. Based upon GMAC's initial calculations, they projected the following:

| Initial Required Balance | $7,399.54 |
|---|---|
| Estimated Shortage | $2,508.02 |
| Monthly increase due to shortage | $209.00 |

Mr. Taggart contends that the Tax disbursement dates were incorrectly calculated, as the School/Summer disbursement should have been in October, and the City-Twp./Spring Tax should have been paid in May. We performed an Escrow Analysis based upon an October disbursement for the School/Summer Tax and a May disbursement for the City-Twp./Spring Tax *(see Attachment B – Revised Analysis)* to calculate the effect on the Escrow account, and resulting shortage. To account for the May disbursement *(which was paid in March 2009, prior to the GMAC analysis date)*, an amount of $1280.22 was credit to the initial balance. Based upon our calculations, we projected the following *(includes forced-placed insurance)*:

| Initial Required Balance | $5,486.02 |
|---|---|
| Estimated Shortage | $594.50 |
| Monthly increase due to shortage | $49.54 |

Furthermore, it was indicated that Hazard Insurance was force-placed on the property. With this amount reversed out of the Escrow account, the actual shortage would have been negligible, resulting in an escrow differential of $1.46 per month.

| Force-placement of insurance (1/09) | $7,915.84 |
|---|---|
| Estimated Shortage | $17.50 |
| Monthly increase due to shortage | $1.46 |

## Conclusion

Based upon the difference in the calculations, the borrower, Mr. Taggart should have only been charged $5,486.02 for the initial escrow balance. This is a difference of $1,913.52 to the credit of Mr. Taggart. The monthly payment should have been reduced by $159.46. This amount would be even greater without the forced-placed insurance.

|  | Total | Monthly |
|---|---|---|
| GMAC Calculated Shortage | $2,508.02 | $209.00 |
| Shortage with corrected Tax Disbursement | $594.50 | $49.54 |
| Shortage with corrected Tax Disbursement and reversal of force-placed insurance | $17.50 | $1.46 |

Improper disclosure or excess retention of Escrow funds is a violation of the Real Estate Settlement Procedures Act (RESPA).

It is my opinion, based upon the information and documentation supplied by Mr. Taggart, that the escrow analysis was prepared improperly and should have been revised.

Respectfully Submitted,

Chip Cummings, CMC
*Dated: June 22, 2012*

*The information contained herein is based upon the information provided to the undersigned as well as recognized and published industry standards, and regulatory and compliance guidelines. All opinions expressed herein are based upon information available to the undersigned at the time of this report and the undersigned's technical training, experience and acquired knowledge in this field of expertise. Should more information become available in the future, additional opinions may be rendered and opinions expressed here may be subject to modification. No part of this report is to be considered as legal advice. Northwind International Corp. nor its officers, employees and/or their heirs assume responsibility for errors or omissions or any and all damages that may result from the reliance of same.*

## INITIAL ESCROW ANALYSIS

| | | | | |
|---|---|---|---|---|
| Name(s): | Ken Taggart | | | |
| Loan #: | | | | **Current Analysis** |
| Date: | 6/22/2012 | | | **done by GMAC 5/12/09** |
| 1st Loan Pymt: | | April | | |

| | Effective as of April 1, 2009 | | | | | |
|---|---|---|---|---|---|---|
| **1000** | | | | | | |
| 1001 | Escrow shortage calculation - April balance | | | | | $7,399.52 |
| 1002 | Homeowner's insurance | 9 | months @ | $158.58 | per month $1,427.25 | $0.00 |
| 1004 | Property Taxes | 7 | months @ | $805.83 | per month $5,972.27 | |
| 1007 | Aggregate Adjustment | | | | $0.00 | |

| | Payment | Select Cushion (0, 1, or 2) | Monthly Payment | Cushion | Month Due |
|---|---|---|---|---|---|
| Annual Hazard Ins: | $1,903.00 | 2 | $158.58 | $317.17 | August |
| Annual Mortgage Ins: | $3,233.04 | 0 | $269.42 | $0.00 | July |
| 1st Half County Taxes: | $8,389.77 | 2 | $699.15 | $1,398.30 | August |
| 2nd Half County Taxes: | $1,280.22 | 2 | $106.69 | $213.37 | March |
| Total: | $14,806.03 | | $1,233.84 | $1,928.83 | |

### AGGREGATE ANALYSIS

STEP #1  INITIAL TRIAL

| MONTH | PAY IN | PAY OUT | BALANCE |
|---|---|---|---|
| | 0 | | $0.00 |
| April | $1,233.84 | $269.42 | $964.42 |
| May | $1,233.84 | $269.42 | $1,928.83 |
| June | $1,233.84 | $269.42 | $2,893.25 |
| July | $1,233.84 | $269.42 | $3,857.66 |
| August | $1,233.84 | $10,562.19 | ($5,470.69) |
| September | $1,233.84 | $269.42 | ($4,506.26) |
| October | $1,233.84 | $269.42 | ($3,541.86) |
| November | $1,233.84 | $269.42 | ($2,577.44) |
| December | $1,233.84 | $269.42 | ($1,613.03) |
| January | $1,233.84 | $269.42 | ($648.61) |
| February | $1,233.84 | $269.42 | $315.80 |
| March | $1,233.84 | $1,549.64 | ($0.00) |

STEP #2  ADJUSTED TRIAL BALANCE

| PAY IN | PAY OUT | BALANCE |
|---|---|---|
| 0 | | $5,470.69 |
| $1,233.84 | $269.42 | $6,435.11 |
| $1,233.84 | $269.42 | $7,399.52 |
| $1,233.84 | $269.42 | $8,363.94 |
| $1,233.84 | $269.42 | $9,328.35 |
| $1,233.84 | $10,562.19 | ($0.00) |
| $1,233.84 | $269.42 | $964.42 |
| $1,233.84 | $269.42 | $1,928.83 |
| $1,233.84 | $269.42 | $2,893.25 |
| $1,233.84 | $269.42 | $3,857.66 |
| $1,233.84 | $269.42 | $4,822.08 |
| $1,233.84 | $269.42 | $5,786.50 |
| $1,233.84 | $1,549.64 | $5,470.69 |

STEP #3  TRIAL BAL WITH CUSHION

| PAY IN | PAY OUT | BALANCE |
|---|---|---|
| 0 | | $7,399.52 |
| $1,233.84 | $269.42 | $8,363.94 |
| $1,233.84 | $269.42 | $9,328.35 |
| $1,233.84 | $269.42 | $10,292.77 |
| $1,233.84 | $269.42 | $11,257.19 |
| $1,233.84 | $10,562.19 | $1,928.83 |
| $1,233.84 | $269.42 | $2,893.25 |
| $1,233.84 | $269.42 | $3,857.66 |
| $1,233.84 | $269.42 | $4,822.08 |
| $1,233.84 | $269.42 | $5,786.50 |
| $1,233.84 | $269.42 | $6,750.91 |
| $1,233.84 | $269.42 | $7,715.33 |
| $1,233.84 | $1,549.64 | $7,399.52 |

### SINGLE-ITEM ANALYSIS

MORTGAGE INSURANCE STEP #1  INITIAL TRIAL

| MONTH | PAY IN | PAY OUT | BALANCE |
|---|---|---|---|
| | 0 | | 0 |
| April | $269.42 | $269.42 | $0.00 |
| May | $269.42 | $269.42 | $0.00 |
| June | $269.42 | $269.42 | $0.00 |
| July | $269.42 | $269.42 | $0.00 |
| August | $269.42 | $269.42 | $0.00 |
| September | $269.42 | $269.42 | $0.00 |
| October | $269.42 | $269.42 | $0.00 |
| November | $269.42 | $269.42 | $0.00 |
| December | $269.42 | $269.42 | $0.00 |
| January | $269.42 | $269.42 | $0.00 |
| February | $269.42 | $269.42 | $0.00 |
| March | $269.42 | $269.42 | $0.00 |

STEP #2  ADJUSTED TRIAL BALANCE

| PAY IN | PAY OUT | BALANCE |
|---|---|---|
| 0 | | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |

STEP #3  TRIAL BAL WITH CUSHION

| PAY IN | PAY OUT | BALANCE |
|---|---|---|
| 0 | | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |
| $269.42 | $269.42 | $0.00 |

### SINGLE-ITEM ANALYSIS

HAZARD INSURANCE    STEP #1  INITIAL TRIAL

| MONTH | PAY IN | PAY OUT | BALANCE |
|---|---|---|---|
| | 0 | | 0 |
| April | $158.58 | $0.00 | $158.58 |
| May | $158.58 | $0.00 | $317.17 |
| June | $158.58 | $0.00 | $475.75 |
| July | $158.58 | $0.00 | $834.33 |
| August | $158.58 | $1,903.00 | ($1,110.08) |
| September | $158.58 | $0.00 | ($951.50) |
| October | $158.58 | $0.00 | ($792.92) |
| November | $158.58 | $0.00 | ($634.33) |

STEP #2  ADJUSTED TRIAL BALANCE

| PAY IN | PAY OUT | BALANCE |
|---|---|---|
| 0 | | $1,110.08 |
| $158.58 | $0.00 | $1,268.67 |
| $158.58 | $0.00 | $1,427.25 |
| $158.58 | $0.00 | $1,585.83 |
| $158.58 | $0.00 | $1,744.42 |
| $158.58 | $1,903.00 | ($0.00) |
| $158.58 | $0.00 | $158.58 |
| $158.58 | $0.00 | $317.17 |
| $158.58 | $0.00 | $475.75 |

STEP #3  TRIAL BAL WITH CUSHION

| PAY IN | PAY OUT | BALANCE |
|---|---|---|
| 0 | | $1,427.25 |
| $158.58 | $0.00 | $1,585.83 |
| $158.58 | $0.00 | $1,744.42 |
| $158.58 | $0.00 | $1,903.00 |
| $158.58 | $0.00 | $2,061.58 |
| $158.58 | $1,903.00 | $317.17 |
| $158.58 | $0.00 | $475.75 |
| $158.58 | $0.00 | $834.33 |
| $158.58 | $0.00 | $792.92 |

INITIAL    CROW ANALYSIS

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| November | $805.83 | $0.00 | ($1,943.11) | $805.83 | $0.00 | $2,417.50 | $805.83 | $0.00 | $4,029.16 |
| December | $805.83 | $0.00 | ($1,137.28) | $805.83 | $0.00 | $3,223.33 | $805.83 | $0.00 | $4,835.00 |
| January | $805.83 | $0.00 | ($331.45) | $805.83 | $0.00 | $4,029.16 | $805.83 | $0.00 | $5,640.83 |
| February | $805.83 | $0.00 | $474.39 | $805.83 | $0.00 | $4,835.00 | $805.83 | $0.00 | $6,446.66 |
| March | $805.83 | $1,280.22 | ($0.00) | $805.83 | $1,260.22 | $4,360.61 | $805.83 | $1,280.22 | $5,972.27 |

## INITIAL ESCROW ANALYSIS

| | |
|---|---|
| Name(s): | Ken Taggart |
| Loan #: | |
| Date: | 6/22/2012 |
| 1st Loan Pymt: | April |

**Revised Analysis with tax payment in May/October**

| 1000 | Effective as of April 1, 2009 | | |
|---|---|---|---|
| 1001 | Escrow shortage calculation - A | balance | $5,486.02 |
| 1002 | Homeowner's insurance | 9 months @ $158.58 per month $1,427.25 | $0.00 |
| 1004 | Property Taxes | 7 months @ $808.02 per month $5,656.16 | |
| 1007 | Aggregate Adjustment | -$1,597.39 | |

| | Payment | Select (0, 1, 2) | | Monthly Payment | Cushion | Month Due |
|---|---|---|---|---|---|---|
| Annual Hazard Ins: | $1,903.00 | | shion | $158.58 | $317.17 | August |
| Annual Mortgage Ins: | $3,233.04 | | | $269.42 | $0.00 | July |
| 1st Half County Taxes: | $8,389.77 | | | $699.15 | $1,398.30 | October |
| 2nd Half County Taxes: | $1,306.50 | | | $108.88 | $217.75 | May |
| Total: | $14,832.31 | | | $1,236.03 | $1,933.21 | |

### AGGREGATE ANALYSIS

| | STEP #1  INITIAL TRIAL | | | STEP #2  ADJUSTED TRIAL BALANCE | | | STEP #3  TRIAL BAL WITH CUSHION | | |
|---|---|---|---|---|---|---|---|---|---|
| MONTH | PAY IN | PAY OUT | BALANCE | PAY IN | PAY OUT | BALANCE | PAY IN | PAY OUT | BALANCE |
| | 1280.22 | | $1,280.22 | 0 | | $3,552.81 | 0 | | $5,486.02 |
| April | $1,236.03 | $269.42 | $2,246.83 | $1,236.03 | $269.42 | $4,519.42 | $1,236.03 | $269.42 | $6,452.63 |
| May | $1,236.03 | $1,575.92 | $1,906.93 | $1,236.03 | $1,575.92 | $4,179.52 | $1,236.03 | $1,575.92 | $6,112.73 |
| June | $1,236.03 | $269.42 | $2,873.54 | $1,236.03 | $269.42 | $5,146.13 | $1,236.03 | $269.42 | $7,079.34 |
| July | $1,236.03 | $269.42 | $3,840.14 | $1,236.03 | $269.42 | $6,112.73 | $1,236.03 | $269.42 | $8,045.94 |
| August | $1,236.03 | $2,172.42 | $2,903.75 | $1,236.03 | $2,172.42 | $5,176.34 | $1,236.03 | $2,172.42 | $7,109.55 |
| September | $1,236.03 | $269.42 | $3,870.36 | $1,236.03 | $269.42 | $6,142.94 | $1,236.03 | $269.42 | $8,076.16 |
| October | $1,236.03 | $8,659.19 | ($3,552.81) | $1,236.03 | $8,659.19 | ($1,280.22) | $1,236.03 | $8,659.19 | $652.98 |
| November | $1,236.03 | $269.42 | ($2,586.20) | $1,236.03 | $269.42 | ($313.61) | $1,236.03 | $269.42 | $1,619.60 |
| December | $1,236.03 | $269.42 | ($1,619.60) | $1,236.03 | $269.42 | $652.99 | $1,236.03 | $269.42 | $2,586.20 |
| January | $1,236.03 | $269.42 | ($652.99) | $1,236.03 | $269.42 | $1,619.60 | $1,236.03 | $269.42 | $3,552.81 |
| February | $1,236.03 | $269.42 | $313.61 | $1,236.03 | $269.42 | $2,586.20 | $1,236.03 | $269.42 | $4,519.42 |
| March | $1,236.03 | $269.42 | $1,280.22 | $1,236.03 | $269.42 | $3,552.81 | $1,236.03 | $269.42 | $5,486.02 |

### SINGLE-ITEM ANALYSIS

**MORTGAGE INSURANCE**

| | STEP #1  INITIAL TRIAL | | | STEP #2  ADJUSTED TRIAL BALANCE | | | STEP #3  TRIAL BAL WITH CUSHION | | |
|---|---|---|---|---|---|---|---|---|---|
| MONTH | PAY IN | PAY OUT | BALANCE | PAY IN | PAY OUT | BALANCE | PAY IN | PAY OUT | BALANCE |
| | 0 | | 0 | 0 | | $0.00 | 0 | | $0.00 |
| April | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 |
| May | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 |
| June | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 |
| July | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 |
| August | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 |
| September | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 |
| October | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 |
| November | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 |
| December | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 |
| January | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 |
| February | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 |
| March | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 |

**HAZARD INSURANCE**

| | STEP #1  INITIAL TRIAL | | | STEP #2  ADJUSTED TRIAL BALANCE | | | STEP #3  TRIAL BAL WITH CUSHION | | |
|---|---|---|---|---|---|---|---|---|---|
| MONTH | PAY IN | PAY OUT | BALANCE | PAY IN | PAY OUT | BALANCE | PAY IN | PAY OUT | BALANCE |
| | 0 | | 0 | 0 | | $1,110.08 | 0 | | $1,427.25 |
| April | $158.58 | $0.00 | $158.58 | $158.58 | $0.00 | $1,268.67 | $158.58 | $0.00 | $1,585.83 |
| May | $158.58 | $0.00 | $317.17 | $158.58 | $0.00 | $1,585.63 | $158.58 | $0.00 | $1,744.42 |
| June | $158.58 | $0.00 | $475.75 | $158.58 | $0.00 | $1,585.83 | $158.58 | $0.00 | $1,903.00 |
| July | $158.58 | $0.00 | $634.33 | $158.58 | $0.00 | $1,744.42 | $158.58 | $0.00 | $2,061.58 |
| August | $158.58 | $1,903.00 | ($1,110.08) | $158.58 | $1,903.00 | ($0.00) | $158.58 | $1,903.00 | $317.17 |
| September | $158.58 | $0.00 | ($951.50) | $158.58 | $0.00 | $158.58 | $158.58 | $0.00 | $475.75 |
| October | $158.58 | $0.00 | ($792.92) | $158.58 | $0.00 | $317.17 | $158.58 | $0.00 | $634.33 |
| November | $158.58 | $0.00 | ($634.33) | $158.58 | $0.00 | $475.75 | $158.58 | $0.00 | $792.92 |
| December | $158.58 | $0.00 | ($475.75) | $158.58 | $0.00 | $634.33 | $158.58 | $0.00 | $951.50 |

## INITIAL ESCROW ANALYSIS

| | | |
|---|---|---|
| December | $808.02 | $0.00 | ($2,424.07) |
| January | $808.02 | $0.00 | ($1,616.05) |
| February | $808.02 | $0.00 | ($808.02) |
| March | $808.02 | $0.00 | $0.00 |

| | | |
|---|---|---|
| $808.02 | $0.00 | $1,616.05 |
| $808.02 | $0.00 | $2,424.07 |
| $808.02 | $0.00 | $3,232.09 |
| $808.02 | $0.00 | $4,040.11 |

| | | |
|---|---|---|
| $808.02 | $0.00 | $3,232.09 |
| $808.02 | $0.00 | $4,040.11 |
| $808.02 | $0.00 | $4,848.14 |
| $808.02 | $0.00 | $5,656.16 |

## INITIAL ESCROW ANALYSIS

| Name(s): | Ken Taggart |
|---|---|
| Loan #: | |
| Date: | 6/22/2012 |
| 1st Loan Pymt: | April |

**Current Ana** is is
**with shortage + force** in urance
May / October disb...

| | Effective as of April 1, 2009 | | | | |
|---|---|---|---|---|---|
| 1000 | | | | | $1.50 |
| 1001 | Escrow shortage calculation - April balance | | | | |
| 1002 | Homeowner's insurance | 9 | months @ | $158.58 per month $1,427.25 | $1.00 |
| 1004 | Property Taxes | 7 | months @ | $808.02 per month $5,656.16 | |
| 1007 | Aggregate Adjustment | | | ######## | |

| | Payment | Select Cushion (0, 1, or 2) | Monthly Payment | Cushion | nth: Due |
|---|---|---|---|---|---|
| Annual Hazard Ins: | $1,903.00 | 2 | $158.58 | $317.17 | us |
| Annual Mortgage Ins: | $3,233.04 | 0 | $269.42 | $0.00 | |
| 1st Half County Taxes: | $8,389.77 | 2 | $699.15 | $1,398.30 | ob |
| 2nd Half County Taxes: | $1,306.50 | 2 | $108.88 | $217.75 | |
| Total: | $14,832.31 | | $1,236.03 | $1,933.21 | |

### AGGREGATE ANALYSIS

| | STEP #1 INITIAL TRIAL | | | STEP #2 ADJUSTED TRIAL BALANCE | | | STEP #3 TR.. BA.. .NT.. .. |
|---|---|---|---|---|---|---|---|
| MONTH | PAY IN | PAY OUT | BALANCE | PAY IN | PAY OUT | BALANCE | PAY IN |
| | 6748.74 | | $6,748.74 | 0 | | ($1,915.71) | 0 |
| April | $1,236.03 | $269.42 | $7,715.35 | $1,236.03 | $269.42 | ($949.10) | $1,236.03 |
| May | $1,236.03 | $1,575.92 | $7,375.46 | $1,236.03 | $1,575.92 | ($1,289.00) | $1,236.03 |
| June | $1,236.03 | $269.42 | $8,342.08 | $1,236.03 | $269.42 | ($322.39) | $1,236.03 |
| July | $1,236.03 | $269.42 | $9,308.66 | $1,236.03 | $269.42 | $644.21 | $1,236.03 |
| August | $1,236.03 | $2,172.42 | $8,372.27 | $1,236.03 | $2,172.42 | ($292.15) | $1,236.03 |
| September | $1,236.03 | $269.42 | $9,338.88 | $1,236.03 | $269.42 | $674.42 | $1,236.03 |
| October | $1,236.03 | $8,659.19 | $1,915.71 | $1,236.03 | $8,659.19 | ($6,748.74) | $1,236.03 |
| November | $1,236.03 | $269.42 | $2,882.32 | $1,236.03 | $269.42 | ($5,782.13) | $1,236.03 |
| December | $1,236.03 | $269.42 | $3,848.92 | $1,236.03 | $269.42 | ($4,815.53) | $1,236.03 |
| January | $1,236.03 | $269.42 | $4,815.53 | $1,236.03 | $269.42 | ($3,848.92) | $1,236.03 |
| February | $1,236.03 | $269.42 | $5,782.13 | $1,236.03 | $269.42 | ($2,882.32) | $1,236.03 |
| March | $1,236.03 | $269.42 | $6,748.74 | $1,236.03 | $269.42 | ($1,915.71) | $1,236.03 |

### SINGLE-ITEM ANALYSIS
**MORTGAGE INSURANCE** STEP #1 INITIAL TRIAL

| MONTH | PAY IN | PAY OUT | BALANCE | PAY IN | PAY OUT | BALANCE | PAY IN |
|---|---|---|---|---|---|---|---|
| | 0 | | 0 | 0 | | $0.00 | 0 |
| April | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 |
| May | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 |
| June | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 |
| July | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 |
| August | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 |
| September | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 |
| October | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 |
| November | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 |
| December | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 |
| January | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 |
| February | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 |
| March | $269.42 | $269.42 | $0.00 | $269.42 | $269.42 | $0.00 | $269.42 |

### SINGLE-ITEM ANALYSIS
**HAZARD INSURANCE** STEP #1 INITIAL TRIAL

| MONTH | PAY IN | PAY OUT | BALANCE | PAY IN | PAY OUT | BALANCE | PAY IN |
|---|---|---|---|---|---|---|---|
| | 0 | | 0 | 0 | | $1,110.08 | 0 |
| April | $158.58 | $0.00 | $158.58 | $158.58 | $0.00 | $1,268.67 | $158.58 |
| May | $158.58 | $0.00 | $317.17 | $158.58 | $0.00 | $1,427.25 | $158.58 |
| June | $158.58 | $0.00 | $475.75 | $158.58 | $0.00 | $1,585.83 | $158.58 |
| July | $158.58 | $0.00 | $634.33 | $158.58 | $0.00 | $1,744.42 | $158.58 |
| August | $158.58 | $1,903.00 | ($1,110.08) | $158.58 | $1,903.00 | ($0.00) | $158.58 |
| September | $158.58 | $0.00 | ($951.50) | $158.58 | $0.00 | $158.58 | $158.58 |
| October | $158.58 | $0.00 | ($792.92) | $158.58 | $0.00 | $317.17 | $158.58 |
| November | $158.58 | $0.00 | ($634.35) | $158.58 | $0.00 | $475.75 | $158.58 |

## INITIAL ESCROW ANALYSIS

| Month | | | |
|---|---|---|---|
| November | $808.02 | $0.00 | ($3,232.09) |
| December | $808.02 | $0.00 | ($2,424.07) |
| January | $808.02 | $0.00 | ($1,616.05) |
| February | $808.02 | $0.00 | ($808.02) |
| March | $808.02 | $0.00 | $0.00 |

| | | |
|---|---|---|
| $808.02 | $0.00 | $808.02 |
| $808.02 | $0.00 | $1,616.05 |
| $808.02 | $0.00 | $2,424.07 |
| $808.02 | $0.00 | $3,232.09 |
| $808.02 | $0.00 | $4,040.11 |

| | | | |
|---|---|---|---|
| $808.02 | $0.00 | 12 | 117 |
| $808.02 | $0.00 | 13 | 219 |
| $808.02 | $0.00 | 14 | 11 |
| $808.02 | $0.00 | 14 | 84 |
| $808.02 | $0.00 | 15 | 18 |

# EXHIBIT "E"

Phelan Hallinan & Schmieg, LLP
Lawrence T. Phelan, Esq., Id. No. 32227
Francis S. Hallinan, Esq., Id. No. 62695
Daniel G. Schmieg, Esq., Id. No. 62205
Michele M. Bradford, Esq., Id. No. 69849
Judith T. Romano, Esq., Id. No. 58745
Sheetal R. Shah-Jani, Esq., Id. No. 81760
Jenine R. Davey, Esq., Id. No. 87077
Lauren R. Tabas, Esq., Id. No. 93337
Vivek Srivastava, Esq., Id. No. 202331
Jay B. Jones, Esq., Id. No. 86657
Peter J. Mulcahy, Esq., Id. No. 61791
Andrew L. Spivack, Esq., Id. No. 84439
Jaime McGuinness, Esq., Id. No. 90134
Chrisovalante P. Fliakos, Esq., Id. No. 94620
Joshua I. Goldman, Esq., Id. No. 205047
Courtenay R. Dunn, Esq., Id. No. 206779
Andrew C. Bramblett, Esq., Id. No. 208375
1617 JFK Boulevard, Suite 1400
One Penn Center Plaza
Philadelphia, PA 19103
215-563-7000



2009-25338-0003
9/8/2009 10:27:34 AM
Praecipe for Substitution of
Receipt#    Z740284
Mark Levy - Montgomery County Prothonotary

ATTORNEY FOR PLAINTIFF

| | | |
|---|---|---|
| GMAC MORTGAGE, LLC | : | COURT OF COMMON PLEAS |
| | : | |
| Plaintiff | : | CIVIL DIVISION |
| | : | |
| vs. | : | NO. 09-25338 |
| | : | |
| KENNETH TAGGART | : | MONTGOMERY COUNTY |
| | : | |
| Defendant(s) | : | |
| | : | |
| | : | |

PHS #: 213964

## PRAECIPE TO SUBSTITUTE VERIFICATION
## TO CIVIL ACTION COMPLAINT
## IN MORTGAGE FORECLOSURE

TO THE PROTHONOTARY:

    Kindly substitute the attached verification for the verification originally filed with the complaint in the instant matter.

                Phelan Hallinan & Schmieg, LLP
                Attorney for Plaintiff

                By: _____

- [ ] Lawrence T. Phelan, Esq., Id. No. 32227
- [ ] Francis S. Hallinan, Esq., Id. No. 62695
- [ ] Daniel G. Schmieg, Esq., Id. No. 62205
- [ ] Michele M. Bradford, Esq., Id. No. 69849
- [ ] Judith T. Romano, Esq., Id. No. 58745
- [ ] Sheetal R. Shah-Jani, Esq., Id. No. 81760
- [x] Jenine R. Davey, Esq., Id. No. 87077
- [ ] Lauren R. Tabas, Esq., Id. No. 93337
- [ ] Vivek Srivastava, Esq., Id. No. 202331
- [ ] Jay B. Jones, Esq., Id. No. 86657
- [ ] Peter J. Mulcahy, Esq., Id. No. 61791
- [ ] Andrew L. Spivack, Esq., Id. No. 84439
- [ ] Jaime McGuinness, Esq., Id. No. 90134
- [ ] Chrisovalante P. Fliakos, Esq., Id. No. 94620
- [ ] Joshua I. Goldman, Esq., Id. No. 205047
- [ ] Courtenay R. Dunn, Esq., Id. No. 206779
- [ ] Andrew C. Bramblett, Esq., Id. No. 208375

Date: 9-4-09

PHS #: 213964

## VERIFICATION

Jeffrey Stephan
Limited Signing Officer    hereby states that he/she is

_____ CSO _____ of GMAC MORTGAGE, LLC, servicing agent for Plaintiff in

this matter, that he/she is authorized to take this Verification, and that the statements made in the

foregoing Civil Action in Mortgage Foreclosure are true and correct to the best of his/her

knowledge, information and belief.  The undersigned understands that this statement is made

subject to the penalties of 18 Pa. C.S. Sec. 4904 relating to unsworn falsification to authorities.

DATE: August 19, 2009

Name:
Title:    Jeffrey Stephan
          Limited Signing Officer

Company: GMAC MORTGAGE, LLC

**SUMMARY OF KEY PORTIONS OF TESTIMONY OF JEFFERY STEPHAN AT HIS DEPOSTION TAKEN ON JUNE 7, 2010**

P. 33, line 24

Q. Do you have any knowledge of how summary judgment affidavits are used in judicial foreclosure case?

A. No.

Q. Are you aware that they are given to a judge?

A. Yes.

Q. And do you understand that a judge relies upon them?

A. Yes

P. 34, line16

Q. Has the manner in which you perform your duties as team lead for the document execution team changed in any way over the period from August 5, 2009 to the present date?

A. No.

P. 54

Q. When you sign a summary judgment affidavit, do you check to see if all of the exhibits are attached to it?

A. No.

Q. When you sign a summary judgment affidavit, do you inspect any of the exhibits attached to it.

A. No.

Q. Does anybody in your department check to see if all of the exhibits are attached to it?

A. No.

Q. When you sign a summary judgment affidavit, do you inspect any exhibits attached to it?

A. No.

**EXHIBIT 1**

1

P. 56, line 56

Q. My question to you is where does a summary judgment affidavit go after you sign it?

A. After I sign it, it is handed back to my staff. My staff hands it to a notary for notarization. They send it back to the attorney network requesting any type of affidavit.

Q. So you do not appear before the notary; is that correct.

A. I do not.

P. 58, line 13

Q. Your department does not do an independent check of the accuracy of the information on summary judgment affidavits coming to you; isn't that correct?

A. I review, quickly, the figures. Other than that, that's about it.

P. 61, line 14

Q. And you just testified that you look at principal, interest, late charges and escrow, is that correct?

A. That is correct.

Q. Is there anything else that you look at in your computer system when your signing a summary judgment affidavit?

A. The only thing I review other than that is who the borrower is.

Q. When you receive a summary judgment affidavit to sign, do you read every paragraph of it?

A. No.

Q. What do you read?

A. I look at the figures.

Q. That's all that you look at when you sign a summary judgment affidavit?

A. Yes, to ensure that the figures are accurate.

2

P. 62, line 11

Q. Is it fair to say that when you sign a summary judgment affidavit, you do not know what information it contains other than the figures that are set forth within it?

A. Other than the borrower's name and if I have signing authority for that entity. That is correct.

P. 67, line 21

Q. So other than the due date and the balances due, is it correct that you do not know whether any other part of the affidavit that you sign is true.

A. That could be correct.

Q. Is it correct?

A. That is correct.

3

# EXHIBIT "F"

Stephen Maxwell

Page 1

IN THE COURT OF COMMON PLEAS

OF MONTGOMERY COUNTY, PENNSYLVANIA

CIVIL TRIAL DIVISION

— — —

GMAC MORTGAGE, LLC,                    :
                                       :
        Plaintiff,                     :
                                       :
    vs.                                :
                                       :
KENNETH J. TAGGART,                    :
PRO SE,                                :
                                       :
        Defendant,                     :
                                       :
    vs.                                :
                                       :
EAGLE NATIONWIDE                       :
MORTGAGE CO.,                          :
                                       :
    Third-Party                        :
        Defendant.          :NO. 09-25338

— — —

Newtown, Pennsylvania
March 7, 2012
— — —

Deposition of STEPHEN MAXWELL,
held at Strehlow & Associates, 258 South State
Street, Rear Building, First Floor, on the above
date, beginning at approximately 10:30 a.m., before
Danielle Brand, a Court Reporter and Notary Public.

— — —

STREHLOW & ASSOCIATES, INC.
COURT REPORTERS - VIDEOGRAPHERS
258 SOUTH STATE STREET
REAR BUILDING, FIRST FLOOR
NEWTOWN, PENNSYLVANIA 18940
(215) 504-4622    FAX (215) 504-7155
www.strehlowcourtreporting.com

Stephen Maxwell

Page 2

```
1   APPEARANCES:
2   FLEISCHER, FLEISCHER & SUGLIA
    BY: NICOLA G. SUGLIA, ESQUIRE
3   Plaza 1000 at Main Street
    Suite 208
4   Voorhees, New Jersey 08043
    856.489.8977
5   Counsel for Plaintiff
6
7   KEN TAGGART
    45 Heron Road
8   Holland, Pennsylvania 18966
    215.772.1717
9
10
11  ALSO PRESENT:
12
13  TREY JORDAN, ESQUIRE
14  CAROL BONELLO, PARALEGAL
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1       Answers to Kenneth Taggart's
2       First Set of Interrogatories
3   Defendant's-6  Documents A1 to A12      34
4       and B1 to B9
5
6   Defendant's-7  Documents GMPO-B1 to GMPO-B83  85
7
8   Defendant's-8  Complaint in Mortgage      141
9       Foreclosure
10  Defendant's-9  Praecipe to Substitute     164
11      I N D E X (Continued)
12  No.      Description        Page
13  Defendant's-10  Documents GMPO-D14       168
        and GMPO-D15
14
15  Defendant's-11  Truth in Lending      173
        Disclosure Statement
16
17      DEPOSITION SUPPORT INDEX
18  Direction To Witness Not To Answer
19  Page  Line
20  36    9
    41    21
21  52    13
    89    20
22  122   12
    172   3
23
24
```

Page 3

```
1           I N D E X
2   WITNESS:             Page
3       STEPHEN MAXWELL
4   By Mr. Taggart          6
5
6         E X H I B I T S
7
8   No.     Description     Page
9
10  Defendant's-1  Defendant's First       9
11      Set of Document
        Requests Directed
12      to Plaintiff GMAC
13      Mortgage, LLC
14
15  Defendant's-2  Documents 1 to 542      9
16
17
18  Defendant's-3  Plaintiff GMAC Mortgage,  10
19      LLC's Answers to Kenneth
        Taggart's First Set
20      of Interrogatories
21  Defendant's-4  Defendant's First       11
        Set of Interrogatories
22      Directed to Plaintiff
        GMAC Mortgage, LLC
23
24  Defendant's-5  Plaintiff GMAC Mortgage,  31
        LLC's Supplemental
```

Page 5

```
1           - - -
2
3       ...STEPHEN MAXWELL, after having
4
5   been duly sworn, was examined and
6
7   testified as follows:
8
9           - - -
10      EXAMINATION
11          - - -
12      MR. TAGGART:  Could we go with the
13  normal stipulations?
14      MR. SUGLIA:  What's your understanding
15  of the normal stipulations?
16      MR. TAGGART:  In the normal
17  stipulations, we have an agreement on as far
18  as any type of redactions or review of the
19  deposition prior to final public update.
20      MR. SUGLIA:  To the extent we're going
21  to hold any objections other than form,
22  privilege, foundation until the time of trial,
23  that's fine.  But we're going to have to get
24  more specific to the extent you want to do
```

2 (Pages 2 to 5)

Stephen Maxwell

**Page 6**

1          MR. SUGLIA: Form, privilege and
2    foundation.
3          MR. TAGGART: -- and foundation. And
4    you can object to today?
5          MR. SUGLIA: That's correct.
6    Everything else will be preserved until the
7    time of trial, which sir, is my understanding
8    of the usual stipulations. But to the extent
9    you're understanding something different, I'd
10   be happy to discuss that with you.
11         MR. TAGGART: As fas as today, that's
12   fine, as far as stipulations. Do you have any
13   other stipulations?
14         MR. SUGLIA: I don't.
15         MR TAGGART: No? Okay.
16   BY MR. TAGGART:
17    Q.   My name is Ken Taggart, Plaintiff in
18   the case, versus GMAC. We are at a deposition today
19   regarding this case with Mr. Stephen Maxwell; is that
20   correct?
21    A.   That is my name. I believe the case is
22   with GMAC, though.
23    Q.   Yes, it is GMAC versus Taggart.
24    A.   Right.

**Page 7**

1     Q.   Okay. Case Number: Court of Common
2    Pleas, Montgomery County Civil Division, 09-25338.
3          And we're deposing Mr. Maxwell as the
4    custodian of records, correct?
5     A.   Yes, sir.
6     Q.   And also corporate representative?
7     A.   Yes, sir.
8     Q.   Okay. All right. In document requests
9    which I provided you a copy of February 12, 2010 was
10   sent to GMAC.
11         Do you have a copy of that in front of
12   you?
13    A.   Yes, I do.
14         MR. TAGGART: Okay. Can we make that
15   exhibit -- do you want to start with -- do you
16   want to number them A, B, C?
17         MR. SUGLIA: I have no objection to
18   that.
19   BY MR. TAGGART:
20    Q.   All right. Okay. We'll say Exhibit A,
21   the document requests sent to GMAC, six pages, dated
22   February 12, 2010.
23         MR. SUGLIA: Can we go off the record
24   just for a second?

**Page 8**

1          - - -
2    (A discussion off the record occurred.)
3          - - -
4          MR. SUGLIA: Mr. Taggart, to the extent
5    I misspeak what we just discussed based on
6    what we have just discussed off the record,
7    please let me know that. But what I believe
8    we have agreed to do was mark -- you gave us a
9    stack of documents, which were purportedly
10   produced by my firm --
11         MR. TAGGART: Correct.
12         MR. SUGLIA: -- marked 1 through 542.
13         MR. TAGGART: Correct.
14         MR. SUGLIA: We are going to mark those
15   collectively as Plaintiff's Exhibit -- I mean,
16   I'm sorry. GMAC is the Plaintiff. I don't
17   know if you want to mark them Defendant's
18   Exhibit-1, or whatever your preference is.
19         MR. TAGGART: We can mark them
20   Defendant's Exhibit-2.
21         MR. SUGLIA: Okay. Let's mark 1 first
22   then. So it's my understanding that
23   Defendant's First Set of Document Requests
24   Directed to Plaintiff GMAC Mortgage, LLC, is

**Page 9**

1    being marked as Defendant's Exhibit-1; is that
2    correct?
3          MR. TAGGART: Defendant's Exhibit-1
4    will be the document requests sent by
5    Plaintiff, dated February 12, 2010, the
6    document requests sent by Defendant Taggart to
7    GMAC Mortgage. That's going to be marked as
8    Exhibit-1.
9          - - -
10   (Defendant's-1, Defendant's First Set of Document
11   Requests Directed to Plaintiff GMAC Mortgage, LLC,
12   was marked for identification.)
13         - - -
14         MR. TAGGART: All right. We're going
15   to mark Exhibit-2, collectively, the documents
16   provided today 1 through 542. That's all
17   going to be Exhibit-2, collectively. They are
18   documents that were provided to myself,
19   Taggart, by GMAC in response to the document
20   requests in Exhibit-1.
21         - - -
22   (Defendant's-2, a set of documents 1 to 542, were
23   marked for identification.)
24         - - -

3  (Pages 6 to 9)

Stephen Maxwell

Page 10

1    (A discussion off the record occurred.)
2         - - -
3         MR. TAGGART: Back on the record. I
4    just provided you with a document dated May
5    12, 2010 which is Answers to Kenneth Taggart's
6    First Set of Interrogatories and that's by
7    Plaintiff GMAC.
8         Do you have a copy of that?
9         MR. SUGLIA: I do.
10   BY MR. TAGGART:
11        Q.   Do you have a copy, Steve?
12        A.   Yes, sir.
13        Q.   Okay. And we're going to mark that --
14   we're up to Exhibit-3, right?
15        - - -
16   (Defendant's-3, Plaintiff GMAC Mortgage, LLC's
17   Answers to Kenneth Taggart's First Set of
18   Interrogatories, was marked for identification.)
19        - - -
20   BY MR. TAGGART:
21        Q.   Exhibit-4 is Defendant's First Set of
22   Interrogatories Directed to Plaintiff GMAC. On
23   Exhibit-4, would you turn to page five?
24        A.   It goes from three to six.

Page 11

1         Q.   It should be -- on which Exhibit?
2         A.   Exhibit-4. There's no page two or --
3         Q.   On Exhibit-4?
4         A.   Four or five or seven.
5         Q.   There should be 22 pages on Exhibit-4.
6         MR. TAGGART: Mr. Suglia, do you have
7    22 pages on Exhibit-4?
8         MR. SUGLIA: I appear to have them.
9         MR. TAGGART: You do? Okay. All
10   right. And I'll just give you this copy to
11   mark.
12        - - -
13   (Defendant's-4, Defendant's First Set of
14   Interrogatories Directed to Plaintiff GMAC Mortgage,
15   LLC, was marked for identification.)
16        - - -
17   (A discussion off the record occurred.)
18        - - -
19   BY MR. TAGGART:
20        Q.   All right. So you do have page five on
21   Exhibit-4?
22        A.   Yes, sir.
23        Q.   Mr. Maxwell, I just want to go over the
24   Interrogatory questions. According to the Answers,

Page 12

1    which I have Exhibit-3 right next to me, which is the
2    Answers that were provided by GMAC, do you have that?
3         A.   I do.
4         Q.   Okay. All right. So good. I hope we
5    can run through this. I see the response. It says,
6    "Give name and address and title of individuals
7    answering Interrogatories." And GMAC responded,
8    "Scott Zeitz."
9         Okay? Is that correct there?
10        A.   Yes, sir.
11        Q.   Okay. Litigation Analyst, GMAC
12   Mortgage. Do you have the title that Scott Zeitz
13   held when this was answered?
14        A.   I do.
15        Q.   You do? Okay. Is Scott Zeitz still
16   with the company or still a custodian or you've just
17   taken over this file?
18        A.   It's my belief he is still with the
19   company. However, a request was given to me to
20   attend this deposition, so that's why I am here
21   today.
22        Q.   Okay. Are you both -- yourself and
23   Scott Zeitz the custodians for this file, or is there
24   --

Page 13

1         MR. SUGLIA: I have to object to that
2    line of questioning to the extent that Mr.
3    Maxwell is not here to respond to questions
4    regarding Mr. Zeitz's employment, nor is he
5    capable of doing so.
6         He's here as a custodian of records, as
7    well as a corporate witness.
8         To the extent there are factually based
9    questions to be asked, he'll be permitted to
10   answer those.
11        But with respect to the employment or
12   the current position of another employee,
13   that's an inappropriate question for this
14   particular witness.
15   BY MR. TAGGART:
16        Q.   I'm just trying to establish at this
17   point are both of you custodians of these files?
18        MR. SUGLIA: Same objection. He can
19   answer for himself, but I'm not going to allow
20   him to answer as to Mr. Zeitz's role in the
21   company or anything like that.
22        MR. TAGGART: But not a role in the
23   company, just regarding this file. You're not
24   going to answer that?

4  (Pages 10 to 13)

Stephen Maxwell

---

**Page 14**

1        MR. SUGLIA: He can answer as to --
2    BY MR. TAGGART:
3        Q.    Your role?
4        A.    I can only respond to my position --
5        Q.    To your role? So you are the custodian
6    of the entire file right now?
7        A.    I am a custodian of record for this
8    file, yes, sir.
9        Q.    For this file, okay. So you're
10   responding that you're a custodian, but not the only
11   custodian for this file?
12       A.    Correct. I, myself, am a custodian of
13   record for this file.
14       Q.    Okay. Question number two, the
15   response in Exhibit-3 just said, "See Documents
16   1-542." And I believe I've asked you this, and I
17   just want to clarify.
18            These documents were provided quite a
19   long while ago, probably over a year ago. I just
20   have to ask you again, is there any other documents
21   that, you know, discovery is ongoing, that's part of
22   this case that have not been provided?
23       A.    It's my belief that everything that was
24   requested has been provided.

---

**Page 15**

1        Q.    So there's no other documents that are
2    a part of this case since these documents were
3    provided back in May of 2010?
4        A.    Again, it's my belief that everything
5    that was requested has been provided as of today.
6        Q.    So your response is there are no other
7    documents?
8            MR. SUGLIA: Objection. It's been
9        asked and answered.
10           MR. TAGGART: Okay. Can we go off the
11       record for a second?
12                    - - -
13   (A discussion off the record occurred.)
14                    - - -
15   BY MR. TAGGART:
16       Q.    Back on the record. Okay. So
17   Mr. Maxwell, right now in this deposition you're
18   responding, and I'm just clarifying, as custodian of
19   record and also as corporate representative. And I
20   just want to go back to Exhibit-4 and run through
21   those questions again.
22       A.    Okay.
23       Q.    Okay. Question number two, we answered
24   that number two -- oh, I'm sorry.

---

**Page 16**

1            Number two says, "Give the name of
2    person or persons at GMAC Mortgage, LLC who were
3    assigned or responsible for the purchasing and or
4    transferring the loan from LBA Financial, LLC to GMAC
5    Mortgage, LLC."
6            Do you have that information?
7            MR. SUGLIA: I'm going to object to the
8        questioning in that the Plaintiff stands by
9        the responses that were provided to the
10       discovery.
11           Again, to the extent there are factual
12       questions relating to what may or may not be
13       found in these documents, that's appropriate.
14           But to ask the witness a broad
15       open-ended question in this regard in order to
16       -- well, I'll stop there, isn't inappropriate.
17           MR. TAGGART: All right. So you're
18       objecting to that? Okay.
19   BY MR. TAGGART:
20       Q.    Are you in possession of any
21   information regarding the transfer of the loan to
22   GMAC from LBA Financial?
23           MR. SUGLIA: I believe that's been
24       asked and answered to the extent that all

---

**Page 17**

1    discoverable information has been provided and
2    has been marked as Defendant's Exhibit-2.
3    BY MR. TAGGART:
4        Q.    Okay. We're going to go down to number
5    eight, question eight. In the response on Exhibit-3,
6    is that the response to that question number eight?
7    I'll give you a second to read it.
8        A.    You're asking is this my response?
9        Q.    Is that GMAC's response?
10           MR. SUGLIA: I will stipulate for the
11       record that the responses provided on May 12,
12       2010 to the Interrogatories are GMAC's
13       responses to the Interrogatories that were
14       propounded by Defendant.
15           MR. TAGGART: Okay. So your response
16       is -- it looks like from 8 and you're going
17       all the way to number 24 and the same
18       response. It looks like you're objecting to
19       the statement that's in number 8 and also
20       number 26, 27 and 28. All right.
21           So that's correct, you're objecting to
22       that in number 8?
23           MR. SUGLIA: Again, GMAC stands by the
24       responses.

---

5 (Pages 14 to 17)

Stephen Maxwell

---

Page 18

1  BY MR. TAGGART:
2      Q.    Just confirming. Okay. I'm going to
3  go to number 31 in Exhibit-3 and Exhibit-4. Yeah,
4  I'm sorry, 31. And it said, "Did you receive any
5  disputes, questions or documentation from Kenneth J.
6  Taggart via telephone or in writing?" And your
7  responses were "See documents 1 through 542."
8          Is that your response or do you have
9  anything further or that's it?
10     A.    My response is consistent with
11 Exhibit-4 here.
12     Q.    Okay. And number 32, "Do you have any
13 question or inquires as to monthly payments, escrows
14 or any other matter regarding this loan?" And it
15 says, "See documents 1 through 542."
16         And that's your responses?
17     A.    Yes, sir.
18     Q.    Okay, 33. You're confirming that
19 response, number 33, "See documents 1 to 542"?
20     A.    Correct.
21     Q.    Okay. All right. Maybe to save time,
22 whether you want to take a break or take a few
23 moments, I just want to ask you in Exhibit-4 all the
24 questions there and the responses in Exhibit-3, I

---

Page 19

1  just want to see if all those responses at this time
2  are accurate and just confirming all those responses.
3          There's no changes or errors in those
4  responses?
5      A.    To the best of my knowledge, my
6  testimony today will be consistent with our
7  responses. Unless there is something specific in
8  there that you want to ask me about, I'm not sure
9  exactly what you would be referring to would be
10 inconsistent.
11     Q.    I'm basically asking that the responses
12 were made May 12, 2010. So I just want to make sure
13 that those responses are still your responses, you
14 stand by them.
15         There's nothing that's changed, no
16 errors?
17     MR. SUGLIA: I think that's been asked
18     and answered.
19 BY MR. TAGGART:
20     Q.    Yeah, okay. I'm just confirming. I'm
21 just trying to save a lot of time, rather than -- you
22 know, we can go through it.
23         So do you need a second to look through
24 this to confirm they're your responses?

---

Page 20

1      MR. SUGLIA: I will certainly defer to
2  Mr. Maxwell whether he needs some time to take
3  a look at it. However, I've stated for the
4  record, I believe Mr. Maxwell stated for
5  the record, that D-3 we agree are the
6  Interrogatory responses. We stand by these
7  responses.
8          To the extent that's a factual issue or
9  some inconsistency or perceived inconsistency
10 that you would like to explore further, that's
11 fine.
12         But in terms of going through and
13 asking with each question if the corresponding
14 response is still accurate, I don't believe
15 that's necessary.
16 BY MR. TAGGART:
17     Q.    Okay. I'm just -- you know, as I said,
18 I'm trying to save time. Rather than sit here for
19 three hours and, you know, go over each one, save
20 everybody time, if you would need time to look
21 through that.
22         But you're saying you stand by that
23 and we're okay?
24     A.    It's my belief that we can amend

---

Page 21

1  responses up until the time of trial. I don't know
2  if that's actually correct or not if there are
3  factual issues.
4      Q.    Yeah, I understand --
5      A.    As of right now, though, we're
6  consistent with our responses to that.
7      Q.    I understand that you can amend
8  responses. I'm trying to ascertain from the time
9  this was filled out until today, none of these
10 answers have changed or you --
11     A.    Right. I would stand by our former
12 responses to the questions.
13     Q.    All right. So we're good there.
14         I do have some specific questions
15 regarding number 38.
16     A.    On which?
17     Q.    Well, 38 would be the question in
18 Exhibit-4. The answer is in Exhibit-3.
19         Let me read the question to you,
20 "Please provide detailed explanation why forced
21 insurance was placed on the account when adequate
22 insurance was already in place by Kenneth Taggart and
23 paid for by GMAC Mortgage out of the escrow account."
24         And the response in 38 was "See

---

6 (Pages 18 to 21)

Stephen Maxwell

Page 22

1  documents 1 to 6, sent as first response of proof of
2  hazard insurance October 9 second request." I'm
3  reading that.
4        Can you read that? Is that correct or
5  you're verifying that?
6     A.    Again, yes. My answer is consistent
7  with the answer we provided.
8     Q.    Okay. So I'm just clarifying your
9  response as GMAC's corporate representative is that
10  there was a need to put forced insurance on the
11  property; is that correct?
12     A.    I believe the documents that this is
13  referring to will speak for themselves as far as the
14  information that you're requesting.
15     Q.    Okay. So it does read that there was a
16  need, and you did place forced insurance?
17        And the response in 38, the second part
18  of the paragraph says that "GMAC cancelled the
19  lender-based insurance as of August 9, 2008 once GMAC
20  finally received information from Defendant about
21  duplicate coverage. However, insurance between the
22  period of July 11, 2008 and August 9, 2008 remained
23  in effect due to the lack of documentation supporting
24  insurance coverage during that time period." And

Page 23

1  then is says refer to 1 to 542.
2        So the way I read this is GMAC, once
3  they received proof that insurance was obtained on
4  the property, they removed the forced insurance
5  except for the time period between July 11, 2008 and
6  July 9, 2008.
7     A.    You mean August 9 --
8        MR. SUGLIA: I have to object to the
9  form of the question.
10        To the extent, first and foremost, I
11  would object to the extent that the question
12  has been asked and answered on numerous
13  occasions.
14        Again, I reiterate that the responses
15  that correspond to the questions are in GMAC's
16  responses. We stipulated to that. And I
17  reiterate that once again.
18        Also, to the extent that there is a
19  certain characterization of the responses that
20  Mr. Taggart is making, that question is
21  inappropriate for this witness. This witness
22  can respond factually to the extent there is
23  any perceived inconsistency with the
24  information Mr. Taggart has and the

Page 24

1  information contained in these responses.
2        Mr. Taggart is certainly allowed to and
3  able to review those perceived
4  inconsistencies. But to say something to the
5  effect of -- and I'm quoting, "I read this
6  as," and then ask Mr. Maxwell if that's
7  appropriate -- if that's correct is
8  inappropriate questioning for this witness.
9        MR. TAGGART: May I proceed?
10        MR. SUGLIA: Please.
11  BY MR. TAGGART:
12     Q.    Okay. As custodian or corporate
13  representative, do you document each -- how do you
14  document each document that is sent to your company?
15  Is that marked with a time date stamp? Does somebody
16  sign it? Enter it into the computer?
17        MR. SUGLIA: Objection as to form, but
18  you can answer if you're able.
19        THE WITNESS: Okay. The first part of
20  the question, yes. When we receive a
21  document, it is stamped with when we receive
22  that. It is scanned into our electronic
23  record systems. And at that point, you know,
24  we maintain an electronic record of that.

Page 25

1  BY MR. TAGGART:
2     Q.    Okay. So it is stamped with a date and
3  time or your company stamp? Can you just --
4     A.    Well, the electronic record will
5  contain the time and date of that, so it's part of
6  the electronic record.
7     Q.    Okay. So in other words, all these
8  documents that you provided me, 1 through -- whatever
9  the number was, 542, there's a time and date stamped
10  on that document? Is there a time and date on each
11  of these documents when they were received by GMAC?
12     A.    I do not know.
13     Q.    You just --
14     A.    Many of these were sent to you. You
15  asked me if correspondence that we receive is dated
16  in our systems and it is. However, when we send
17  something out to you, we don't stamp the time when we
18  send it to you. So it will contain the date.
19     Q.    Okay. Maybe I'm a little -- maybe I
20  want to be a little clearer on that question.
21        The documents -- these are documents
22  that you, GMAC, sent to me 1 through 542, all the
23  documents that are here as Exhibit-2, right? I don't
24  see a time stamp or any type of time, date or person

7  (Pages 22 to 25)

Stephen Maxwell

Page 26

1  that -- any documentation on when they were received
2  by GMAC. But are you -- on the documents that GMAC
3  has in your file, let's say this document number 1
4  from 542.
5       A.   Okay.
6       Q.   Is there like a time stamp somewhere?
7  I don't see any on here when you received that.
8       A.   It's not going to print out on the
9  physical document. It's part of the electronic
10 record. It will state when it was entered, when it
11 was scanned in. It will have the date in the
12 electronic record.
13      Q.   Oh, okay. In the Interrogatory and
14 Document Requests, I did request all information and
15 documents regarding this case. Was -- I don't see
16 any log or documentation on when all these documents
17 were received by GMAC.
18           Is that something that was not
19 provided?
20      A.   No. The log, I believe, would be part
21 of our company's record, which is proprietary
22 information. The log you're asking about, there is
23 no log. It does not exist.
24           There are system notes that I believe

Page 27

1  we provided, which show the records of the file. So
2  if we receive something contemporary to when we
3  receive that, we will enter that into the system.
4           The program that the documents are
5  viewed from will have the information as far as just
6  when it was received. But that is, I believe,
7  proprietary as it's part of our business.
8       Q.   So the way -- let me just make sure I
9  understand what you're saying.
10           You have these documents in your
11 internal files that would have stamps on it? Time,
12 date --
13      A.   No, we don't.
14           MR. SUGLIA: Objection. I don't
15      believe that accurately characterizes the
16      witness' testimony.
17 BY MR. TAGGART:
18      Q.   Could I ask you to characterize then to
19 me how all your documents are managed in the system
20 as far as how would you know when a particular
21 document was received by GMAC?
22           MR. SUGLIA: I'm going to object. It's
23      been asked and answered.
24           Nonetheless, to the extent you answer

Page 28

1  the question, you can answer the question if
2  you understand the question. You're permitted
3  to go ahead and answer it.
4           THE WITNESS: Okay. I believe that was
5  what I explained. When a document is
6  received, we scan that into the system. The
7  date that is scanned into the system is in the
8  part of the details when you go to open the
9  document out of the records.
10           So it's not something that there is a
11 log of just dates. It's just a list of the
12 documents and part of the details of the
13 document are when we received it, when we
14 scanned it in.
15           So that's not something that's
16 printable, I guess. It's not something that's
17 a document itself. It's just part of our
18 computer system, which again, I believe is
19 proprietary.
20 BY MR. TAGGART:
21      Q.   So your testimony is that it's in your
22 log or that information is in your system and has not
23 been provided, because it's proprietary?
24           MR. SUGLIA: I am going to object to

Page 29

1  the question, because I don't believe it
2  accurately characterizes the witness'
3  testimony.
4           There was not an objection made in the
5  Interrogatories with respect to whether it's
6  proprietary or not.
7           The question was asked how GMAC knows
8  when a particular document came in. That
9  question has been answered a couple of times
10 already. But the way it was characterized by
11 Mr. Taggart mischaracterizes the testimony of
12 the witness.
13 BY MR. TAGGART:
14      Q.   If I needed to know on any of these
15 particular documents that were provided what the date
16 and time they came in to GMAC, you don't have that in
17 front of you, but GMAC would be able to tell me that.
18           Is that what you are saying, I guess?
19           MR. SUGLIA: I would object to the form
20      of the question in that it's a hypothetical.
21           But to the extent, Mr. Taggart, you
22      have a particular document in mind that you'd
23      like to ask Mr. Maxwell about I certainly have
24      no objection to that.

8 (Pages 26 to 29)

Stephen Maxwell

Page 30

```
1    BY MR. TAGGART:
2         Q.   I might have to come back to that.
3         All right.  I see question 39 in
4    Exhibit-4, "Provide explanation how escrow portions
5    of the payment increased by $209.00 on May 12, 2009."
6         And it simply said refer to documents 1
7    through 542.  Is that your response?
8         A.   Yes, sir.
9              MR. SUGLIA:  Again, to the extent that
10        there is a particular document you would like
11        to question Mr. Maxwell about, I have no
12        objection to that.
13             MR. TAGGART:  Okay.  Does anybody need
14        a break or anything?
15             MR. SUGLIA:  I'm okay.  Why don't you
16        just keep going through?
17             MR. TAGGART:  All right.
18             MR. SUGLIA:  Thank you.
19   BY MR. TAGGART:
20        Q.   All right.  That's it on this for now.
21        A.   On 3?
22        Q.   For now, yeah.
23             MR. TAGGART:  Can we go off the record
24        for just a second?
```

Page 31

```
1              - - -
2    (A discussion off the record occurred.)
3              - - -
4    BY MR. TAGGART:
5         Q.   All right.  I have a document I'm going
6    to mark Exhibit-5 and that is dated November 10, 2011
7    and that is Plaintiff GMAC Mortgage, LLC's
8    Supplemental Answers to Kenneth Taggart's First Set
9    of Interrogatories.
10             - - -
11   (Defendant's-5, Plaintiff GMAC Mortgage, LLC's
12   Supplemental Answers to Kenneth Taggart's First Set
13   of Interrogatories, was marked for identification.)
14             - - -
15             MR. SUGLIA:  Just for the clarity of
16        the record, I would state that the
17        Supplemental Answers to the Document Requests
18        is also attached as part of this document.
19             THE WITNESS:  It's the last four pages.
20   BY MR. TAGGART:
21        Q.   The last four pages, yes, very good.
22   The last four pages are Supplemental Responses to the
23   document requests, including a Verification on the
24   last page it looks like signed by Scott Zeitz, Senior
```

Page 32

```
1    Litigator Analyst.
2              What I'd like to do is give Mr. Maxwell
3    a few minutes, if you need as much time to let me
4    know, to look over that.  Let me know if you concur
5    with all those responses, and let me know if there's
6    any changes since they were submitted on November 10.
7    If you want to take a minute to look through those,
8    let me know.
9              MR. SUGLIA:  I have to object to that
10        form of questioning, in that to the extent
11        there is a particular question based on some
12        factual issue, that's an appropriate question.
13             But to ask Mr. Maxwell to read through
14        these and give a blanket response to a number
15        of questions is inappropriate.
16             Nonetheless, I will state again for the
17        record that these Supplemental Responses are
18        GMAC's -- we will stipulate that these are
19        GMAC's Supplemental Responses to Mr. Taggart's
20        Interrogatories and Document Requests so there
21        is no confusion in that regard.
22             MR. TAGGART:  So GMAC is stipulating
23        that they are in fact Supplemental Responses
24        to the Interrogatories and Document Requests?
```

Page 33

```
1              MR. SUGLIA:  Correct.
2              MR. TAGGART:  Okay.  All right.  So
3    you're stipulating that those are your
4    responses as of that date?
5              MR. SUGLIA:  They are the responses
6    I've supplemented, yes, absolutely.
7    BY MR. TAGGART:
8         Q.   Again, I'm just trying to save time.
9    Is there anything in here that has changed to any of
10   these responses since you responded?
11             MR. SUGLIA:  I would have the same
12        objection, but I'm trying to save time as
13        well.  I'm telling you --
14             MR. TAGGART:  We could be here until
15        tomorrow if we go through each one and that's
16        fine with me.
17             MR. SUGLIA:  I'm telling you D-5 is
18        stipulated to be GMAC's Supplemental Responses
19        to your Interrogatories and Document Requests.
20             MR. TAGGART:  Okay.
21             MR. SUGLIA:  And at least from my
22        perspective I think that made your job a
23        little bit easier.
24             MR. TAGGART:  I'm trying to make it a
```

9 (Pages 30 to 33)

Stephen Maxwell

Page 34

1    little easier for everybody. All right. So
2    you're stipulating that's your responses.
3        Could we take a break for say a few
4    minutes?
5        MR. SUGLIA: Certainly.
6        - - -
7    (A brief recess occurred.)
8        - - -
9    BY MR. TAGGART:
10    Q.    All right. Back on the record. I'm
11    going to introduce collectively Exhibit-6, which is a
12    group of documents regarding payments and insurance.
13    And they're marked A1 through A12 and B1 through B9.
14        - - -
15    (Defendant's Exhibit-6, documents marked A1 to A12
16    and B1 to B9 were marked for identification.)
17        - - -
18    BY MR. TAGGART:
19    Q.    Okay. Mr. Maxwell, on the first page
20    A1 and A2, that is a printout of the mortgage in
21    question of the payment history from July 31, 2008
22    and it goes until June 24, 2010.
23        MR. SUGLIA: Mr. Taggart, I'm going to
24    ask you to just clarify for the record that

Page 35

1    this does not appear to be a document that was
2    produced by GMAC.
3        Would I be correct?
4        MR. TAGGART: It was not a document
5    that was produced by GMAC.
6        MR. SUGLIA: Okay.
7        MR. TAGGART: It was printed out on
8    www.gmacmortgage.com website regarding the
9    account in question.
10        MR. SUGLIA: Okay. I'm going to object
11    to any questioning of the witness relating to
12    this document, because it's not a document
13    that was provided to him prior to the
14    deposition. But it's also not a document that
15    was -- the foundation has been laid for.
16        To the extent you have specific factual
17    questions, that's fine.
18        MR. TAGGART: I do. I was just going
19    to ask specific questions regarding
20    the document, it's easier to do it that way.
21        Are we ready?
22        THE WITNESS: Sure.
23    BY MR. TAGGART:
24    Q.    A1 and A2, I just want to point out

Page 36

1    here where it says 02/23/10 city taxes paid
2    $1,295.56. It looks like it was paid on the account
3    by GMAC on February 23, 2010.
4        Would you say that's correct?
5        MR. SUGLIA: I'm going to object to
6    that question based -- to the extent the
7    witness is answering based on what this
8    document says, I'm going to instruct him not
9    to answer.
10        MR. TAGGART: Okay.
11        MR. SUGLIA: Because this document was
12    not produced by GMAC and was not prepared by
13    GMAC, no foundation has been laid.
14        MR. TAGGART: Okay.
15        MR. SUGLIA: I'll leave it up to you
16    how you want to proceed from there.
17    BY MR. TAGGART:
18    Q.    All right. We'll move on to A3, which
19    is a document provided by GMAC, which document 541
20    in the group of documents that GMAC provided.
21        Would you confirm that's number 541,
22    that's what was provided by GMAC?
23    A.    Yes, I believe they are the same
24    document.

Page 37

1    Q.    Okay. All right. So let's proceed on
2    document A3, also 541 provided by GMAC. And I just
3    want to ask you about this document. It states that
4    "Lender requires you to obtain insurance in
5    connection with this loan on the Property. The
6    insurance is available through Lender. The purchase
7    of the insurance from Lender is not a condition of
8    the loan and will not affect current or future credit
9    decisions. You have the right of free choice in the
10    selection of the agent and insurer through or by
11    which such insurance is to be placed."
12        Do you see that?
13    A.    I do.
14    Q.    Okay. All right. So you would agree
15    that it says that I am required to have insurance on
16    the property?
17        MR. SUGLIA: Objection as to the form
18    of the question. The document speaks for
19    itself.
20        MR. TAGGART: Okay.
21        MR. SUGLIA: I will stipulate that the
22    portion of the document you read, you did not
23    read the entire document. But the portion of
24    the document that you did you read, you read

10 (Pages 34 to 37)

Stephen Maxwell

---

Page 38

1  accurately.
2      I would also point out for the clarity
3  of the record that this document would appear
4  to relate to origination of this loan. I
5  believe there is no dispute among the parties
6  that GMAC is not involved in the origination,
7  as set forth in the document itself. It would
8  appear to be originated by LBA Financial
9  Group, LLC.
10 BY MR. TAGGART:
11     Q.   It's agreed that this is an origination
12 document provided by LBA Financial Group, LLC, which
13 is now Dufont, I believe to be Dufont.
14         Would you know if LBA Financial Group,
15 LLC was at one time or at this time owned at least in
16 part by GMAC Mortgage?
17         MR. SUGLIA:  You're asking the witness
18     if he knows if that's the case?
19         MR. TAGGART:  Yes.
20         THE WITNESS:  I do not know.
21 BY MR. TAGGART:
22     Q.   You do not know?  Okay.
23         I'm going to ask you if you'd like to
24 stipulate, just basically reading the next part of

---

Page 39

1  the document, "You should be aware that an original
2  policy or binder may take several weeks to procure
3  and so you should not delay contacting your agent or
4  insurer. FAILURE TO PROCURE A POLICY OR BINDER WILL
5  DELAY YOUR LOAN CLOSING."
6      Do you see that?
7      A.   Yes.
8          MR. SUGLIA:  Yes.  And I concur with
9      you that what you read you read accurately.
10         However, I can't take a position nor
11     can the witness take a position with respect
12     to anything further on this document in light
13     of the fact that it wasn't a document -- it
14     was created by GMAC and GMAC was not involved
15     in the origination of this loan.
16         MR. TAGGART:  Well, I'm objecting to
17     that, because it was part of the loan package
18     that GMAC -- when they bought the loan, this
19     was part of the origination packet when you
20     purchased the loan.
21         MR. SUGLIA:  Mr. Taggart, you can make
22     whatever argument you deem is appropriate
23     based on the evidence for the purposes of
24     today.

---

Page 40

1          I'm objecting to the questioning of
2  this witness as it relates to the origination
3  of this loan, this company for which Mr.
4  Maxwell is here was not involved with the
5  origination of this loan.
6          MR. TAGGART:  Understood.  The loan
7  documents states that the borrower, which is
8  Defendant Taggart, myself, is required to have
9  insurance otherwise you could not close on the
10 loan.
11         Would you --
12         MR. SUGLIA:  I can't agree with that.
13         MR. TAGGART:  You can't agree with
14 that?
15         MR. SUGLIA:  I have said that the
16 document speaks for itself.  I have concurred
17 with you in that the portions you have read,
18 you read accurately.  Whatever
19 characterization you're going to give them,
20 again, I'm not going to tell you how to do
21 your deposition.
22         But I believe it's inappropriate for
23 today's purposes in terms of making argument.
24 You are certainly entitled to make whatever

---

Page 41

1  arguments you deem are appropriate based on
2  the evidence.
3          But as we sit here today, the objection
4  for the record still stands.
5  BY MR. TAGGART:
6      Q.   Okay.  Line 2, "Pennsylvania law (40
7  P.S. Section 310.76) requires that you be informed of
8  the following," which is what I read prior to that,
9  which basically states that a Lender cannot force you
10 to buy insurance from them.
11         Can I ask why insurance was placed on
12 this loan?
13         MR. SUGLIA:  Okay.  I just want to
14 clarify for the record, just so there's no
15 miscommunication or confusion here.
16         It's unclear to me, and I'd like to get
17 clarification for the record whether you're
18 asking Mr. Maxwell about 40 P.S. Section
19 310.76, which would be a legal conclusion, and
20 I would instruct him not to answer, or whether
21 you're asking Mr. Maxwell a factually based
22 question which would relate to why insurance
23 was placed on this account.
24 BY MR. TAGGART:

---

11  (Pages 38 to 41)

Stephen Maxwell

Page 42

1    Q.    Okay. I'm going to ask you a question.
2        Did I, Mr. Taggart, ever ask GMAC
3    Mortgage to procure insurance for me at any time
4    during this loan?
5        A.    I don't believe so.
6        Q.    It's your response that I've never
7    asked GMAC to procure insurance for me?
8        A.    I don't believe you requested that from
9    us.
10        Q.    Okay. All right. So you have no
11    documentation that I requested insurance?
12            MR. SUGLIA: Objection. Asked and
13        answered.
14    BY MR. TAGGART:
15        Q.    Okay. All right. There was forced
16    placed insurance placed on the account, and there was
17    a policy in force as you responded to in your
18    deposition.
19        I also asked for a copy of that
20    insurance policy, since it was something that was
21    placed for me. I haven't seen in all of the
22    documents you've provided here, there's no copy of
23    that policy.
24        Could you tell me where that policy is

Page 43

1    since you told me that you provided all of the
2    documents?
3        A.    I don't know.
4        Q.    You don't know? You charged me for
5    insurance, but you don't know where the policy is?
6        A.    The actual physical papers of the
7    policy?
8        Q.    Any information. A declaration page,
9    the physical policy. Any information regarding my
10    name on this property and this account.
11        Where's the policy?
12        A.    I don't know.
13        Q.    Okay. So since you provided all the
14    documentation that means there was never a policy.
15            MR. SUGLIA: Objection. To the extent
16        that's a pending question. The documents have
17        been produced.
18        Again, you can make whatever argument
19        you deem appropriate. The question has been
20        asked and answered. I would ask that you move
21        on.
22    BY MR. TAGGART:
23        Q.    Okay. So you have no documentation?
24            MR. SUGLIA: That's been asked and

Page 44

1    answered.
2    BY MR. TAGGART:
3        Q.    Okay.
4        A.    My answer is I don't know where the
5    policy is if we have it, where it would be located.
6    I don't know --
7        Q.    But you're a custodian of records so
8    you would know where it is; is that correct? If you
9    had a policy as custodian, you would know where that
10    information is, correct?
11        A.    I'm telling you I don't know where your
12    specific policy is. You asked me a question --
13        Q.    But I asked you earlier is this all the
14    documents, and you said yes. So one of the two is
15    not correct.
16        A.    Sir, I believe we could --
17        Q.    One of the two is not correct.
18            MR. SUGLIA: I'm going to object to the
19        question. The question is argumentative. The
20        record is clear. You asked a question; the
21        question has been answered. You asked another
22        question; the question has been answered.
23        To the extent you believe there is some
24        inconsistency in the responses, that's fine,

Page 45

1    make the argument.
2            MR. TAGGART: I'm clarifying the
3        inconsistency, because there is one.
4            MR. SUGLIA: I would ask that you
5        clarify the inconsistency. Don't attack the
6        witness. Don't make the question --
7            MR. TAGGART: I apologize personally.
8        But, you know, I'm just trying to clarify.
9            MR. SUGLIA: I understand it's an
10        emotional situation for you. But we're here
11        to go over these documents, and you're
12        entitled to ask whatever questions you deem
13        appropriate within the Court rules.
14        But to the extent you're making
15        argument here today in an attempt to sway the
16        witness one particular way or another, it's
17        inappropriate.
18            MR. TAGGART: I'm clarifying an
19        inconsistency.
20            MR. SUGLIA: Go ahead.
21            MR. TAGGART: Which I believe he
22        clarified.
23            MR. SUGLIA: All right. Then I will --
24            MR. TAGGART: And I hope he clarified.

12  (Pages 42 to 45)

Stephen Maxwell

Page 46

1    MR. SUGLIA: Okay.
2    MR. TAGGART: Can I ask at this time
3 since discovery is ongoing that you provide
4 all copies of insurance, any documentation
5 whatsoever, from the alleged Balboa insurance
6 that was obtained on the property? I need
7 copies of that.
8    MR. SUGLIA: I made a note of the
9 request.
10 BY MR. TAGGART:
11    Q.    Does GMAC Mortgage -- is Balboa
12 Insurance, I'm sorry, owned by GMAC Mortgage?
13    A.    I do not believe so.
14    Q.    You don't believe so? When there's
15 forced placed insurance on a property, is that always
16 obtained through Balboa Insurance?
17    A.    I don't think I can answer to every
18 single loan that we service or own. In this case, it
19 was Balboa that the insurance policy was through.
20    Q.    Could you give me a percentage? I
21 mean, just --
22    A.    No, I can't give you a percentage.
23    Q.    Is there a --
24    MR. SUGLIA: Mr. Taggart, one second.

Page 47

1    I want go give you one more instruction.
2 Don't or try to avoid talking over each other
3 so that the court reporter can take down the
4 testimony accurately.
5    MR. TAGGART: Okay.
6    MR. SUGLIA: I'm sorry. Go ahead, I
7 interrupted.
8    MR. TAGGART: No, that's fine.
9 BY MR. TAGGART:
10    Q.    I'm just trying to ascertain. I mean,
11 is there 1 company? 10 companies? 50 companies?
12 When GMAC puts forced placed insurance on a property,
13 how do they determine which company to use for that?
14    A.    In my experience, through my different
15 positions and this position in GMAC, Balboa is
16 generally the one used. However, I cannot answer to
17 every single loan that we service or own.
18    Q.    So you're saying mostly Balboa?
19    MR. SUGLIA: No. Objection to the form
20 of the question.
21    MR. TAGGART: Okay. I'm trying to --
22    MR. SUGLIA: Hold on, hold on, hold on,
23 hold on, hold on. The characterization of the
24 testimony mischaracterizes the testimony by

Page 48

1 the witness.
2    Go ahead, you can ask the question now.
3 BY MR. TAGGART:
4    Q.    I was actually just trying to clarify
5 your statement as far as you said it seems like most
6 of the loans -- I'm trying to, you know, I'll ask the
7 question. You can object, you know, like I said.
8 Just give me a number, an estimated number, on how
9 many insurance companies you use for forced placed
10 insurance when you have to obtain insurance.
11    Is is 1? Is it 100? Is it 50? Is it
12 3?
13    A.    I can't --
14    Q.    I'm just giving you an estimate.
15    A.    I can't speculate on that.
16    Q.    Okay. So you have no idea how many
17 different insurance companies, none at all?
18    A.    That's not what I said. I said I can't
19 speculate on that.
20    Q.    I'm just asking. I'm not asking you to
21 speculate --
22    MR. SUGLIA: I'm going to instruct you
23 not to guess. It's inappropriate for the
24 witness to take a guess at something to the

Page 49

1 extent he had a --
2    MR. TAGGART: Could you get me that
3 answer then as part of this deposition?
4    MR. SUGLIA: I'll make a note of the
5 request. Can you repeat for me what exactly
6 the request is?
7    MR. TAGGART: I have a few. Regarding
8 forced placed insurance, one, could you tell
9 me how many companies that GMAC uses when
10 forced placed insurance is acquired, the
11 number of companies?
12    And what percentage of business goes to
13 Balboa Insurance?
14    MR. SUGLIA: Okay. I'm going to ask
15 you upon completion of the deposition -- I'm
16 taking note of your request, but I would ask
17 that you also put a request in writing to me
18 exactly what the requests are so that they can
19 be responded to appropriately.
20 BY MR. TAGGART:
21    Q.    All right. Okay. Let's move to A4.
22 All right. A4, that's also document 412 provided by
23 GMAC Mortgage, correct, looking at the Evidence of
24 Property Insurance? Oh, okay. You're just verifying

13 (Pages 46 to 49)

Stephen Maxwell

| Page 50 |
| --- |

1  that.
2    A.    This does look to be the same document.
3    Q.    Okay.
4    A.    I'm sorry. Can you repeat your
5  question?
6    Q.    Yeah, okay. Just referring to document
7  A4, which is number 412 of the documents that GMAC
8  provided me, so it's in GMAC's file. And I just had
9  a few questions regarding that document.
10    Do you see at the top where it says
11  "Evidence of Property Insurance"?
12    A.    I do.
13    Q.    You do? Okay. And it looks like at
14  the top right-hand corner it says date 7/10/2008; is
15  that correct?
16    A.    Yes, sir.
17    Q.    Okay. It looks like there is Evidence
18  of Insurance of Property starting July 10, 2008. The
19  agent was Delp Insurance.
20    Do you see that agent at the top
21  left-hand corner?
22    A.    Yes.
23    Q.    Company Philadelphia Contributionship.
24  And it is regarding 521 Cowpath Road, the property in

| Page 51 |
| --- |

1  question. And it looks like at the top here, there
2  is a fax date here.
3    Do you see that, July 10, 2008, 10:49
4  a.m., Delp Insurance?
5    A.    I do.
6    Q.    And it looks like it says number 2227,
7  page two. I'm just looking at the fax, okay? And in
8  the middle here there is a signature. I can't read
9  whose signature it is. But it says paid, there's a
10  stamp paid on it. And it looks like there's a
11  premium of $1,700.00. And it's insuring the dwelling
12  for $660,000.00, correct? I'm just going over this.
13    MR. SUGLIA: Well, to the extent --
14  BY MR. TAGGART:
15    Q.    I'm just verifying that you -- I'm not
16  saying you agree with that. I'm just confirming that
17  you --
18    A.    That that's what this is on this paper?
19    Q.    That that's what this says, yeah.
20    A.    Okay.
21    MR. SUGLIA: To the extent -- and I
22  apologize, I need to put this on the record.
23    To the extent your questioning is, and
24  it has been thus far, as to the contents of

| Page 52 |
| --- |

1  the document, I have no objection to Mr.
2  Maxwell confirming whether you were reading it
3  accurately. Although, I think the exercise is
4  unnecessary, regardless.
5    But to the extent --
6    MR. TAGGART: Okay.
7    MR. SUGLIA: Hold on a second. To the
8  extent that you're questioning Mr. Maxwell
9  with respect to the correctness or the
10  validity or the existence of this document,
11  they are questions beyond the scope of his
12  knowledge, and I would instruct him not to
13  answer those.
14    MR. TAGGART: Okay, I understood. And
15  the objection is fine. I'm clarifying that we
16  have the correct document, and I'm just going
17  over the information. I'm not saying that you
18  concur with what is in there.
19  BY MR. TAGGART:
20    Q.    Is this a typical document that's
21  provided to GMAC for evidence of insurance, it's
22  something routine?
23    A.    This looks --
24    MR. SUGLIA: Objection to the form.

| Page 53 |
| --- |

1    MR. TAGGART: To the form. Can I
2  rephrase it?
3    MR. SUGLIA: Go ahead, please.
4  BY MR. TAGGART:
5    Q.    Okay. GMAC required on this loan or
6  part of the loan agreement or contract states that
7  the borrower carry home owner's insurance on the
8  property.
9    Is this something that is typical on a
10  normal loan that's provided as evidence, a
11  declaration page like this?
12    A.    What I read is that this is Evidence of
13  Property Insurance. However, this document was not
14  created nor given directly to GMAC. It looks like
15  this was done through LBA Financial Group. And so I
16  cannot, as my Counsel has stated, I can't attest to
17  the validity of the document.
18    However, this does look like Evidence
19  of Property Insurance that I would see in a loan
20  origination file.
21    Q.    Okay, right. On a loan file this is
22  what you would normally get would be an acceptable
23  form of proof of insurance?
24    A.    This does --

14 (Pages 50 to 53)

Stephen Maxwell

Page 54

1        MR. SUGLIA: Objection as to the form
2   of the question, but you can answer if you're
3   able.
4        THE WITNESS: This does look similar to
5   a document that would be in an origination
6   file.
7   BY MR. TAGGART:
8        Q.   All right. Would you happen to know
9   the date and time that you obtained this document
10  since GMAC purchased this? An estimate, not exact,
11  but maybe say about a month after the loan closed or
12  this document was originated.
13       Do you -- I'm just asking do you know
14  when GMAC obtained this document that's in your file?
15       MR. SUGLIA: I have to object to the
16  form of the question. There is quite a number
17  of different components to that question.
18       But to the extent you're asking if
19  Mr. Maxwell knows when this actual document
20  was received by GMAC, I'll allow him to answer
21  that.
22       THE WITNESS: I do not know the exact
23  time this was received. However, I believe
24  this was -- if this is included in part of the

Page 55

1   origination package then we would have
2   received it with the origination package.
3        However, without a system in front of
4   me, I don't know exactly the day that we
5   actually received this.
6   BY MR. TAGGART:
7        Q.   All right. Again, to save time, could
8   I run through a list of the things since you don't
9   have the time, run through a list of the date and
10  time you said specifically that you obtained this
11  document? Or is it your testimony that it was
12  received in the loan package?
13       A.   My -- oh, I'm sorry.
14       MR. SUGLIA: To the extent you want to
15  make a request, you can request whatever you
16  want, it will be responded to as appropriate.
17       To the extent you have a specific
18  question on this document --
19  BY MR. TAGGART:
20       Q.   The specific question is I'm not sure
21  if you answered it. When did you receive this
22  document?
23       A.   I don't know exactly when this was
24  received.

Page 56

1        Q.   Okay. I need to know when it was
2   received and whom you received it from since that
3   would be in your records as custodian, correct?
4        A.   Okay. Again, my answer to your
5   previous question would come in here where I said
6   this would normally be part of an origination package
7   that we would receive.
8        However, without just that system in
9   front of me being able to see the exact date that we
10  actually took hold of this, I do not know that exact
11  date.
12       But just for, I guess, your question,
13  the origination file is something that we get
14  contemporary when we obtain the loan. To your
15  estimation on around a month after this date here, I
16  would have to agree with you that that's when we
17  would have gotten the origination file.
18       Q.   So you've obtained this through the
19  docket in the origination file from LBA Financial?
20       A.   No. I do not know if we received this
21  exact document. That's what I'm telling you.
22       Q.   Well, I mean, it's one of your
23  documents so that's, you know...
24       MR. SUGLIA: Well, for clarification,

Page 57

1   the document was in fact produced by GMAC.
2   The document was not generated by GMAC. The
3   document was not created by GMAC. The
4   question I believe was --
5   BY MR. TAGGART:
6        Q.   When did you get it?
7        MR. SUGLIA: Right. Hold on a second.
8   The question was "When did you get it?" I
9   believe the testimony was "I don't know."
10  There was some discussion regarding perhaps
11  procedurally when it may have come.
12       But at least as I understand it, Mr.
13  Maxwell will tell me if I'm incorrect, there's
14  speculation on the part of Mr. Maxwell which
15  will be inappropriate under the circumstances.
16       To the extent Mr. Taggart has a
17  specific request as it relates to the
18  document, you're entitled to make the request.
19       MR. TAGGART: Well, I have a specific
20  request. And in order to save time on, you
21  know, as part of the ongoing discovery is
22  since Mr. Maxwell is custodian is to check his
23  records since you said, your system, on what
24  date and time and it was received and by whom.

15 (Pages 54 to 57)

Stephen Maxwell

Page 58

1       MR. SUGLIA: I understand. I
2   understand. Please believe me, I'm just
3   trying to do this for the clarity of the
4   record. I have taken -- made note of the
5   request.
6       I would ask that you also give me a
7   written request when we're done, today,
8   tomorrow, whenever you deem it appropriate.
9   You will get responses to that request as
10  appropriate.
11  BY MR. TAGGART:
12      Q.   I mean, I'm fine. We can move on.
13  I'll just clarify what I need here on A4, A5 and A6
14  the date and time that it was received and by whom.
15      What was the argument? Who did you
16  receive it from? So they're all basically evidence
17  of insurance and they're all your documents.
18  Document 412 --
19      MR. SUGLIA: No, no. They're not our
20  documents. They're documents that we have on
21  file.
22      MR. TAGGART: I'm sorry. The documents
23  that you provided on file. I'm sorry.
24      MR. SUGLIA: And again, I've made note

Page 59

1   of the request.
2   BY MR. TAGGART:
3       Q.   All right. Document 412, 413 and 284,
4   they're all insurance. You testified just a few
5   minutes ago that normally you get something like this
6   when you purchase a loan file from a company like LBA
7   or any company. And you said normally insurance is
8   part of the --
9       A.   I said that looks similar to something
10  that I have seen in an origination file.
11      Q.   So this is -- what I'm saying is it's
12  typical when you purchase a loan in an origination
13  file that origination file contains proof of
14  insurance, is that -- when GMAC purchases a loan like
15  this or similar, is proof of insurance normally in
16  that origination file that you purchase?
17      A.   I can't estimate on what might or might
18  not -- I mean, that's hypothetical, so I --
19      Q.   Well, it's not hypothetical, because
20  I'm sure that your company has a policy when you go
21  to purchase a loan from LBA Financial or from any
22  other company. Obviously, they just don't pick up a
23  loan file and say yes, we're going to buy this loan
24  and they sign off. There's obviously quality control

Page 60

1   or requirements that GMAC has what is to be included
2   in that loan file.
3       Could you tell me if insurance is one
4   of those?
5       MR. SUGLIA: I'm going to object to the
6   question to the extent that it's based on
7   facts that are not in evidence here.
8       MR. TAGGART: Okay. I'm sorry. I
9   apologize, go ahead.
10      MR. SUGLIA: The question that was
11  previously asked was whether the document that
12  you've shown Mr. Maxwell is typical of an
13  insurance document he may see in an
14  origination file.
15      And I believe the response was
16  typically, yes. He's not taking the position
17  with respect to this particular document.
18  That's the objection.
19      MR. TAGGART: I think you
20  misunderstood. If not, I apologize. I'm not
21  asking about specifically this document that
22  we're talking about.
23  BY MR. TAGGART:
24      Q.   My question is, when GMAC purchases a

Page 61

1   loan, okay, do they -- what is the quality control
2   procedure to check on what is in that file when they
3   purchase a loan from any other party? There has to
4   be -- I mean, do you check to make sure the note is
5   there?
6       I'm asking what's your quality control
7   procedure? Do you check to make sure proof of
8   insurance is in the file? That is admissible
9   evidence that could lead to discovery. That's very
10  important. And I -- you know, you can object to it,
11  but that's important because the mortgage company, if
12  that's -- GMAC's obviously not going to buy a loan or
13  any other mortgage company from anybody if that loan
14  does not meet quality control standards or is
15  deficient in any way. That's why I'm asking that
16  question.
17      I'm sorry, go ahead.
18      MR. SUGLIA: I'm objecting first and
19  foremost, to the form of the question.
20      However, to the extent Mr. Taggart
21  asked you about as he termed it, "quality
22  control procedures," aside from the objection
23  or subject to the objection, I will allow you
24  to answer that question if you are able.

16 (Pages 58 to 61)

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Stephen Maxwell

Page 62

1    However, with respect to the
2    characterizations as to GMAC's policy that
3    were made by you, Mr. Taggart in questioning
4    him, that takes into account facts that aren't
5    in evidence and is not based on knowledge of
6    this witness. It's based on statements that
7    you're making in terms of your knowledge, or
8    your understanding of the particular process.
9    However, to the extent you can answer
10   the question regarding the quality control as
11   that term was used by Mr. Taggart, subject to
12   my objection to the form, you can answer that
13   question.
14   THE WITNESS: It's my belief that the
15   procedures necessary to obtain this loan were
16   followed.
17   However, I do not originate loans, so I
18   do not know the exact quality procedure that
19   is followed as a part of that. Without that
20   knowledge, I can't answer, you know, exactly
21   which steps are taken, what all is encompassed
22   in that because that would be speculation.
23   I have an idea. However, that's not
24   something that I could put forth as testimony,

Page 63

1    because I do not know that as fact.
2    MR. SUGLIA: As I've advised the
3    witness, I don't want you to guess. It's
4    inappropriate pursuant to the rules. Go
5    ahead.
6    BY MR. TAGGART:
7    Q.   All right. Let me start by just giving
8    you the reason for the question, and it is
9    discoverable evidence.
10   Earlier in the deposition requests
11   there was forced insurance placed per GMAC on the
12   property --
13   MR. SUGLIA: Do you want to do this on
14   the record?
15   MR. TAGGART: Oh, yes.
16   MR. SUGLIA: Okay. Go ahead.
17   BY MR. TAGGART:
18   Q.   There was forced insurance as GMAC
19   testified on the property, and it stated that once
20   insurance was provided that the forced insurance was
21   removed, okay? With the exception of a small window
22   which was between July of '08 until August of '08
23   they maintained that insurance was never provided by
24   me, Mr. Taggart.

Page 64

1    It is my testimony that there was
2    always insurance. It was provided at closing,
3    because it was required to be provided at closing,
4    otherwise LBA Financial would not let you close on
5    the loan. It was provided.
6    So therefore, it is important to know
7    if insurance documents, which we have here that are
8    in question, it is important to know when they were
9    obtained.
10   Also, is GMAC liable because it is
11   their responsibility when they buy the loan, purchase
12   the loan, to see if that insurance is in the loan
13   package. And that is an important question on what
14   your procedure is because GMAC is alleging that no
15   insurance was on the property. It's been provided at
16   closing, and several times subsequent to that. And
17   GMAC, according to the testimony now, still alleges
18   that no insurance was in place and in fact did not
19   credit me at that time. Okay?
20   So it is important to know since they
21   were in the loan package and provided to LBA
22   Financial. It's important for me to know if they
23   were in there and what your procedure on checking to
24   see if that's in there. It's very important.

Page 65

1    So it's important that I know the steps
2    taken in quality control and when these insurance
3    documents were obtained, when and from whom. So GMAC
4    is putting the onus on me when they were provided at
5    closing, they were provided subsequent to closing,
6    and GMAC is still claiming that I didn't have
7    insurance as of right now for that period of time.
8    So since you cannot as a corporation
9    representation provide me, Mr. Maxwell, with the
10   quality control standards then I need to know the
11   name of the person who can testify as to what those
12   standards are.
13   MR. SUGLIA: Are you done?
14   MR. TAGGART: Do have you a name of a
15   person who can do that since Mr. Maxwell
16   cannot answer those questions?
17   MR. SUGLIA: First and foremost, it
18   isn't my place here today to argue the merits
19   of the case with you. I'm not suggesting.
20   Okay?
21   You're asking certain factually based
22   questions. You're getting accurate responses
23   from this witness.
24   To the extent you feel like you need

17 (Pages 62 to 65)

Stephen Maxwell

Page 66

1    additional information, make the request.
2    Now --
3    MR. TAGGART: I'm making the request.
4    I just did.
5    MR. SUGLIA: You put it on the record.
6    I have to respond for the record.
7    MR. TAGGART: I'm sorry.
8    MR. SUGLIA: You make the request. The
9    request will be responded to as appropriate.
10   It may be relevant; it may not be relevant.
11   It may be produced; it may not be produced. I
12   can't tell you that as I sit here today. And
13   I'm not suggesting that while I may not agree
14   with your theory of the case, I am not here
15   today to...
16   MR. TAGGART: You're objecting that I'm
17   making the request?
18   MR. SUGLIA: What I am saying to you is
19   you asked certain questions. You're getting
20   responses. You're getting responses to the
21   best of this witness' ability. You may
22   believe you're entitled to something
23   different. You may not be happy with the
24   responses you're getting.

Page 67

1    But the procedure here today is for me
2    to object. The witness is giving you the
3    answers. And I mean this honestly with all
4    due respect.
5    To the extent you ask a question, the
6    same question three or four times in a
7    different way, the response is the same.
8    So you can make the request. I'm
9    making note of the request. Again, for the
10   record, I would ask that you send me a written
11   request just to avoid any confusion. And
12   we'll go from there.
13   I don't mean to be condescending in any
14   way, and that is certainly not -- I think I've
15   treated you with the utmost respect in this
16   deposition. I understand perhaps procedurally
17   that you are somewhat unsure of the process
18   and how the process works. That is in large
19   part the reason why I am being so much more
20   vocal today than I might be otherwise.
21   Because I -- my job here today on behalf of my
22   client is to try to keep things within the
23   proper framework to the best of my ability,
24   that's all.

Page 68

1    MR. TAGGART: Yeah, that's fine. We
2    can move on. For the record, you're
3    objecting.
4    MR. Maxwell just testified that he was
5    not -- could not testify as to the quality
6    control or procedures when purchasing a loan
7    that was originated. So...
8    MR. SUGLIA: The testimony is what it
9    is.
10   MR. TAGGART: Yeah. So on the record,
11   I'm making the request. Okay. All right. We
12   can move on.
13   BY MR. TAGGART:
14   Q.    All right. Document A7 and A8, which
15   is also documents 1 and 2 obtained from GMAC, are
16   they both -- I'm trying to speed things along.
17   The first one, A7, it says, "Important
18   Insurance Information." It is a GMAC Mortgage letter
19   to Kenneth Taggart, Notification Date 10/09/2008,
20   basically saying that "we have no evidence of a
21   current hazard insurance."
22   Do you see what document I'm --
23   A.    I do.
24   Q.    Okay. And also the next one dated

Page 69

1    11/23/2008 is basically the same thing. And they're
2    both telling me there's no evidence of hazard
3    insurance.
4    Now, I'm confused on why these were
5    sent out in October and November of '08 when GMAC
6    paid two insurance policies out of the escrow account
7    in August and September of '08. So they paid the
8    insurance policy. They obviously had the insurance
9    bill and policy, and they paid it.
10   So could you tell me why they were
11   still asking for insurance two months later?
12   A.    Can you --
13   MR. SUGLIA: Objection as to the form
14   of the question. I'm sorry, go ahead.
15   THE WITNESS: I was just going to ask
16   can you show me which payments that you were
17   speaking of?
18   BY MR. TAGGART:
19   Q.    Let's see if they're in here. Well,
20   your Counsel objected to the -- let's see. Since
21   this is not a GMAC document, I'll show you. But on
22   August 12, '08 --
23   MR. SUGLIA: I'm sorry. For the
24   record, we're looking at D-6 A2.

18 (Pages 66 to 69)

Stephen Maxwell

Page 70

1          MR. TAGGART: B6 you mean? That
2      actually might be the same. I'm looking at B3
3      and B4.
4          MR. SUGLIA: Okay.
5          MR. TAGGART: "B" as in boy, B3 and B4.
6          MR. SUGLIA: Of "D" as in dog, 6.
7      BY MR. TAGGART:
8      Q.   So you have that?
9      A.   Okay.
10     Q.   August 12, 2008 fire insurance paid of
11     $978.00 and September 18, 2008 fire insurance paid of
12     $925.00.
13          Do you see that on B4?
14     A.   I do.
15     Q.   So in August and September, GMAC paid
16     for the home owner's insurance. So if they paid the
17     bill, they were obviously aware that there was
18     insurance; is that correct?
19          MR. SUGLIA: Objection as to the form.
20          MR. TAGGART: As to the form, okay.
21     BY MR. TAGGART:
22     Q.   So are you -- would you --
23          MR. SUGLIA: I object to the form.
24     BY MR. TAGGART:

Page 71

1      Q.   Would you testify that GMAC paid fire
2      insurance on September 18, 2008 of $925.00?
3          MR. SUGLIA: I'm going to rely on the
4      same objection as before to the extent, or in
5      light of the fact that this was not a document
6      that was generated by GMAC.
7          MR. TAGGART: All right. In order to
8      save time and discovery is ongoing, could I
9      follow-up in a letter to confirm on August 12,
10     2008, the fire insurance was paid in the
11     amount of $978.00 by GMAC? And September 18,
12     2008, the fire insurance was paid by GMAC of
13     $925.00 on behalf of Kenneth Taggart, okay?
14          So could I have you respond to that?
15          MR. SUGLIA: The request is noted.
16     BY MR. TAGGART:
17     Q.   Okay. All right. So we can move on
18     from that. We're just going to move on, let's see,
19     A10 and A11.
20          In A10 it says, Notice of Placement
21     Insurance from GMAC. So it looks like they put
22     forced placed insurance in the amount of $7,261.00;
23     is that correct?
24     A.   Yes, sir, that's what this shows.

Page 72

1      Q.   Okay. When a typical insurance policy
2      is about $1,800.00 to $2,000.00 for this property,
3      could you tell me why there was a need to obtain a
4      policy with such a high premium? It's about four to
5      five times the typical premium for this type of
6      property.
7          MR. SUGLIA: Objection to the form of
8      the question. It's based on facts not in
9      evidence.
10     BY MR. TAGGART:
11     Q.   Okay. So you're not going to respond
12     on why the premium apparently appeared to be high,
13     $7,261.00 for insurance?
14          MR. SUGLIA: Objection as to the form.
15     He didn't say he wasn't going to respond.
16          MR. TAGGART: Okay. I'll try to
17     rephrase. I'm not trying to give you a hard
18     time. I'm just --
19          MR. SUGLIA: No, no.
20          MR. TAGGART: Because you're going to
21     object, you know. I'm just going to -- I'm
22     not trying to -- again, give you a hard time.
23     I'm just trying to ask the question and I'll
24     get what I need and you'll read within the

Page 73

1      rules.
2      BY MR. TAGGART:
3      Q.   The premium was $7,261.00. Does that
4      premium appear to be high?
5          MR. SUGLIA: Objection as to the form.
6      You can answer it if you're able.
7          THE WITNESS: I have seen insurance
8      policies for varying amounts over many loans.
9      So it doesn't seem high or low. It is what it
10     is.
11     BY MR. TAGGART:
12     Q.   It doesn't seem high? Okay. For this
13     type of property when there was insurance on the
14     property, which I believe was approximately $1,700.00
15     to the $2,000.00 range, do you think that -- you
16     don't think $7,261.00 is a high premium?
17          MR. SUGLIA: Objection. I'm not going
18     to let him speculate as to -- based on facts
19     that aren't in evidence.
20     BY MR. TAGGART:
21     Q.   Okay. And that was -- I'm trying to
22     look here in the document. That was also the Balboa
23     Insurance that you placed. The document notification
24     is January 11, 2009.

19 (Pages 70 to 73)

Stephen Maxwell

Page 74

1    So does in fact this document state
2 there was insurance as of that date with Balboa
3 Insurance? And that is the policy that you're going
4 to obtain from Balboa as we stated earlier.
5    So okay, we'll move on from that.
6 You're going to provide that.
7    A.    Did you say I'm going to provide
8 something?
9    MR. SUGLIA: Don't worry about it.
10 BY MR. TAGGART:
11    Q.    We discussed earlier which you're aware
12 of what I'm talking about, right?
13    MR. SUGLIA: As I indicated, I'm making
14    note of the request. I'm just going to ask
15    you again to confirm in writing.
16    MR. TAGGART: Okay.
17 BY MR. TAGGART:
18    Q.    All right. So forced placed insurance,
19 we just went over the document, it was January 11,
20 2009.
21    And January 22, 2009, which is A12,
22 there was a cancellation notice sent out that they
23 cancelled the insurance. So they did in fact cancel
24 the insurance 11 days later with the exception of the

Page 75

1 period between July 11, 2008 through August 9, 2008.
2 So GMAC somehow got proof of insurance at that time.
3    Is that why they sent this out, because
4 they did have proof of insurance at that time? Is
5 that --
6    MR. SUGLIA: Objection as to the form.
7    You can answer it if you're able.
8    THE WITNESS: Usually when we cancel
9    the policy that's when we receive written
10    notice indicating, you know, whatever time
11    periods were covered.
12 BY MR. TAGGART:
13    Q.    So as of January 22, 2009, GMAC had in
14 their possession adequate proof of insurance with the
15 exception of this time period, which they noted at
16 the bottom, July 7, 2008 through August 9, 2008?
17    MR. SUGLIA: Objection as to the form.
18    You asked him what the significance of a
19    document like this is. He answered that.
20    You have to understand, Mr. Taggart,
21    there are many, many loans out there.
22    The purpose of this witness is not to
23    answer specific questions as to what
24    transpired necessarily on this particular

Page 76

1 loan, if you're asking him when and why a
2 letter such as this goes out, which I think
3 you did and I think he answered. That's fine.
4    But asking in terms of specific numbers
5 and dates I believe it's inappropriate for
6 this witness, unless you have a particular
7 document you'd like to show him otherwise.
8 With that being said, I think he did answer
9 your question.
10    MR. TAGGART: Well, I respectfully
11 disagree because you stated earlier if you
12 want to know something specific, please ask.
13 And that's what I'm doing about this
14 particular document.
15    And it's very relevant, because this
16 short time period is the time period that I am
17 actually -- GMAC is allegedly charging me for
18 insurance still for this time period, which
19 they still allege there was never any
20 coverage, and that's very important.
21    MR. SUGLIA: I understand your
22 position. The question was asked whether a
23 notice such as this would suggest that there
24 was proof of insurance being in place and that

Page 77

1 would be the reason for the cancellation. The
2 response was yes, if you receive a document
3 like this it would generally mean for some
4 reason the policy has been cancelled.
5    I will also point out that it says in
6 the document here a duplicate coverage.
7    MR. TAGGART: Okay. All right. Well,
8 then that's fine.
9 BY MR. TAGGART:
10    Q.    All right. Let me jump ahead just a
11 little bit to B2, which is GMAC document 477 at the
12 bottom, provided by GMAC. It's a First Payment
13 Letter and Mailing Address Certification.
14    Do you see that document?
15    A.    I do.
16    Q.    Okay. Again, I'll stipulate it was not
17 originated, this document, by GMAC, but it was in
18 your possession. That would just be another request
19 on when you -- the date and time when you obtained
20 this documentation on 477.
21    And I do have a few questions on the
22 document. I'm just going to go over what's on here.
23 I'm not saying you agree with it. It says here
24 initial -- see how it says initial amount of payment,

20 (Pages 74 to 77)

Stephen Maxwell

Page 78

1    initial monthly payment as provided in the note.
2         Do you see that?
3    A.    I do.
4    Q.    All right.  $4,169.42, okay?  Do you
5    see that?
6    A.    I do.
7    Q.    Okay.  Monthly hazard insurance
8    $141.67, as well as monthly insurance reserve of
9    $269.42, tax reserve $107.33, then it says other
10   amount $713.42.
11        Do you see all that?  Is that correct?
12   A.    I do.
13   Q.    All right.  And it says at the bottom
14   the total monthly payment is $5,401.00; is that
15   correct?  Do you see that?
16   A.    And 26 cents, yes, sir.
17   Q.    Okay, 26 cents, correct.  All right.
18   So according to this document, which is provided by
19   LBA Financial in the origination, it states that the
20   -- adding all of this together, principal, interest,
21   taxes, as well as mortgage insurance is $5,401.26,
22   okay?  I'm not asking that you agree with it.  It's
23   provided by LBA.
24   A.    That's what's in the document.

Page 79

1    Q.    Okay.  You said it was also in the
2    document.  Okay, that's all.
3         Document B5, this was also 479 of GMAC.
4    And it was originated as a document by LBA Financial.
5    And it basically shows the monthly escrow that's
6    going in, and it lays out from September of '08 until
7    August of '09?
8         Do you see that?
9    A.    I do.
10   Q.    And basically what it says is the
11   escrow amount per month is $1,231.84, correct?
12        Do you see that?
13   A.    I see that.
14        MR. SUGLIA:  I'm going to object to the
15   line of questioning.  Again, this document has
16   not been generated by GMAC, but it was
17   produced by GMAC.  GMAC had no involvement in
18   the origination of this loan.
19        We have gone through the exercise a
20   number of times where Mr. Taggart reads the
21   document into the record and asks the witness
22   whether or not his reading of the document is
23   appropriate or -- I'm sorry, is correct.
24        However, I object to the line of

Page 80

1    questioning, because it's inappropriate in the
2    sense that Mr. Maxwell is here as a custodian
3    of records, he's here as a corporate witness.
4         To the extent that document -- the
5    questioning on a particular document is solely
6    the contents thereof.  I'm not going to allow
7    this witness to further answer these questions
8    particularly based on the fact that these are
9    not documents that were generated by GMAC.
10   The documents are what they are.  They state
11   what they state.  They speak for themselves.
12        MR. TAGGART:  Well, I'm going to object
13   to that, because GMAC has obtained the loan.
14   And even though it was produced by LBA
15   Financial, GMAC has liability.
16        And since this is pertinent information
17   to the claims made, I think it is appropriate
18   for me to ask since it could lead to discovery
19   and important information regarding the case.
20        MR. SUGLIA:  No.  Mr. Taggart, what
21   you're asking -- you're reading a document and
22   you're asking him if you read it accurately.
23   It's not further in bold in any way.  The
24   document is what it is.

Page 81

1         To the extent you desire at the time of
2    trial to move this document into evidence, it
3    may or may not be objected to.  It will be
4    addressed at that point if you want it.  If to
5    the extent you have a factual question, that's
6    fine.
7         But to ask Mr. Maxwell to read along in
8    this document with you and just advise --
9         MR. TAGGART:  We'll take that up later.
10   We'll move on, all right?
11   BY MR. TAGGART:
12   Q.    Okay.  All right.  B6, this is a
13   printout on the account from gmacmortgage.com.  It
14   wasn't provided by GMAC.  And it states the payment
15   of $5,612.25, which is the monthly payment.
16   And my question is, on April 1, 2009, could you tell
17   me why there was a payment of $5,612.25 due when the
18   documents at origination was $5,401.26?  Could you
19   tell me why you're charging a higher payment?
20        MR. SUGLIA:  Based on this document
21   that would be speculation, because we have not
22   established that this was the amount that was
23   actually requested by GMAC.
24        MR. TAGGART:  I'm sorry.  Which amount

21  (Pages 78 to 81)

Stephen Maxwell

Page 82

```
 1   was not requested?
 2          MR. SUGLIA: This document. The point
 3   being this document was not produced by GMAC.
 4   I have no indicia of its reliability, of it's
 5   validity --
 6          MR. TAGGART: B6 you mean?
 7          MR. SUGLIA: Yes.
 8          MR. TAGGART: Okay. So you're not
 9   saying -- so at this time you're saying we
10   haven't established that GMAC is requesting
11   this?
12          MR. SUGLIA: It may or may not be. To
13   the extent there's a different document in
14   there.
15          MR. TAGGART: I'll get onto that. We
16   have a different document, so we'll just move
17   on. How's that?
18   BY MR. TAGGART:
19      Q.   Okay. All right. B7, it's not a
20   document produced by GMAC -- well, it was. It's not
21   one of the documents you produced to me, but it's on
22   GMAC's letterhead sent to me, which is for 2009, it's
23   basically your 1098, and it says taxes paid. I'm
24   just verifying.
```

Page 83

```
 1          Is this a document that -- is that
 2   correct on B7 from GMAC?
 3          MR. SUGLIA: Verifying whether that's
 4   what it reads?
 5          MR. TAGGART: Yes.
 6          MR. SUGLIA: I'll stipulate that that's
 7   what the document reads, yes.
 8          MR. TAGGART: $9,838.06 for taxes?
 9          MR. SUGLIA: Yes.
10   BY MR. TAGGART:
11      Q.   Okay. All right. B8, April 24, 2009,
12   GMAC -- when I went to make a payment their payment
13   amount they requested was $6,669.09 for the April 1
14   payment.
15          Could you tell me how it went up from
16   $5,400.00 to $6,669.09?
17          MR. SUGLIA: I object to the form of
18   the question. Can you answer the question?
19   To the extent you can answer the question, you
20   can answer it.
21          THE WITNESS: In the mortgage it does
22   state that if there are any late fees, any
23   kind of fees, they will be added to the
24   payment. So that would be my -- I don't have
```

Page 84

```
 1   the, you know, history in front of me to look
 2   on what exactly was added as far as
 3   incrementally.
 4          But just from looking at this, there
 5   must be some fees or other amounts that were
 6   included.
 7   BY MR. TAGGART:
 8      Q.   If possible, I'd like to -- in order to
 9   clarify some of this information, and in order to
10   save time today, we can waste a lot of time, but if
11   you have the statements, the mortgage statements for
12   the bill from the time in question, which would be
13   January of '09 to say September of '09 on each
14   statement that was sent a breakdown of the mortgage,
15   principal, interest, escrow.
16          Do you know what I mean?
17          MR. SUGLIA: I've made note of the
18   request.
19          MR. TAGGART: Okay. I'm just trying to
20   save time so that we can -- it's something
21   we're going to run into so...
22                    - - -
23   (A discussion off the record occurred.)
24                    - - -
```

Page 85

```
 1          THE WITNESS: Are you putting that
 2   whole exhibit away, B6?
 3          MR. TAGGART: Yeah, we're done with
 4   those.
 5                    - - -
 6   (A recess occurred.)
 7                    - - -
 8   BY MR. TAGGART:
 9      Q.   All right. We have Exhibit-7 we're
10   going to go over, a collection of documents which is
11   GMPO-B1, and it goes all the way up to GMPO-B83.
12                    - - -
13   (Defendant's-7, Documents GMPO-B1 to GMPO-B83, were
14   marked for identification.)
15                    - - -
16   BY MR. TAGGART:
17      Q.   A few more questions on -- I'm going to
18   try not to be repetitious. Again, I'm not trying to
19   give you a hard time.
20          MR. SUGLIA: Not at all. Not at all.
21   I'm not perceiving it as such.
22   BY MR. TAGGART:
23      Q.   Okay. All right. Regarding the many
24   escrow changes or changes to the escrow account and
```

22 (Pages 82 to 85)

Stephen Maxwell

Page 86

1    part of the payment from about January of '09 up
2    until about September of '09, there was many changes.
3        Do you know who the person or persons
4    are that would best be able to represent any of the
5    changes or explain the documents? Would that be
6    yourself or another person? Or is there somebody
7    that specializes in that in your company?
8        MR. SUGLIA: To the extent that there's
9    a specific document, I think Mr. Maxwell's
10    able to respond to it.
11   BY MR. TAGGART:
12       Q.    Okay. So Mr. Maxwell will respond to a
13   specific document, okay. We'll skip B1, that's just
14   on my calculations, estimates.
15       Not to be repetitious, I'm just going
16   to point out document GMPO-B2, which is also
17   document 477, and that letter from LBA Financial
18   stating the First Payment Letter. I'm not saying to
19   give you a hard time, but we were just trying to
20   establish what the monthly payment is now that GMAC
21   alleges is the monthly payment. So I'm just pointing
22   that out for the record.
23       I'm not saying -- do you know what I'm
24   saying?

Page 87

1        B3 and B4 we'll skip. I'm sorry if
2    some of this is repetitious, so...
3        MR. SUGLIA: It's your deposition, Mr.
4    Taggart, no problem.
5    BY MR. TAGGART:
6        Q.    All right. We're going to skip ahead
7    to GMPO-B6, and that was printed out at
8    gmacmortgage.com. And I believe you stated you
9    weren't sure what -- if we had any documentation on
10   what GMAC was alleging my payment was at this time.
11       I'm just going to skip ahead a little
12   bit. I apologize. Which is GMPO-B23, a letter from
13   Fleischer, Fleischer & Suglia, dated March 29, 2010.
14       MR. SUGLIA: I'm sorry. I don't have
15   that document here.
16       MR. TAGGART: You don't? Okay.
17       MR. SUGLIA: Actually, I do, but
18   they're out of order. Hold on one second.
19       MR. TAGGART: Oh, okay.
20       MR. SUGLIA: Just for the record, I
21   would note that it does not appear that I have
22   total comprehensive documents.
23       MR. TAGGART: Okay. Do you want to
24   review? Do you want to flip through and make

Page 88

1    sure?
2        MR. SUGLIA: But I do have 22, if you
3    want to start there. Isn't that the one you
4    --
5        MR. TAGGART: 23.
6        MR. SUGLIA: 23, that I have.
7        MR. TAGGART: Okay.
8    BY MR. TAGGART:
9        Q.    All right. Right, a letter from
10   Counsel dated March 29, 2010, and looking at the
11   calculations of payments down below, and as of --
12   let's see.
13       Do you see where it says, "Please be
14   advised that the amount required to reinstate the
15   mortgage through April 1, 2010 is $78,144.84"?
16   And then it shows the calculations of payments. This
17   says 12 payments of $5,612.25 and 1 payment of
18   $5,612.25. So would it be safe to say this is from
19   Counsel that they're saying that a monthly payment is
20   $5,612.25?
21       MR. SUGLIA: However, I have to point
22   out -- I'm sorry. I have to object to this
23   document, because it's clearly marked "For
24   Settlement Purposes Only."

Page 89

1        As of that time on March 29, 2010, it
2    would appear that you requested a
3    reinstatement figure in an effort to resolve
4    the matter that was provided. This document
5    is not appropriately in litigation. It's
6    specifically marked "For Settlement Purposes
7    Only."
8        MR. TAGGART: Okay. So you're
9    objecting, because it's for settlement. But
10   even though it's "For Settlement Purposes
11   Only," you could object, but it says a payment
12   of $5,612.00. You could object to it, but...
13       MR. SUGLIA: The document says what it
14   says, yes.
15   BY MR. TAGGART:
16       Q.    All right. So are you alleging that as
17   of March 29th of 2010 GMAC is not asserting a payment
18   due of $5,612.25 a month, is that what you're saying?
19       MR. SUGLIA: I'm going to instruct the
20   witness not to answer based on this document,
21   because it was a document that was forwarded
22   in connection with settlement negotiations.
23       MR. TAGGART: All right. I'm going to
24   make a request while we're on that with

23 (Pages 86 to 89)

Stephen Maxwell

Page 90

1   Counsel and provide a document pursuant to
2   Respa Section 6 that it is not for settlement
3   purposes only that will state what the monthly
4   payment was.
5        Well, I've asked for statements, again,
6   another request. You can object, but for the
7   monthly statements from January of 2009 to
8   September of 2009, the monthly statements,
9   which would show what the principal, interest,
10  escrow, you know, all the breakdown.
11       MR. SUGLIA: I noted that request.
12       MR. TAGGART: Okay. And could you also
13  state, effective today, what the monthly
14  payment would be pursuant to the contract, the
15  principal, interest and escrow each month?
16       Do you understand what I'm saying?
17       MR. SUGLIA: I understand what you're
18  saying. I don't know if it's appropriately
19  characterizing it, but I've made a note of the
20  request.
21  BY MR. TAGGART:
22       Q.   Okay. We'll jump ahead to GMPO-B46.
23       MR. SUGLIA: Before you start the
24  question, just bear with me here for a second.

Page 91

1        MR. TAGGART: Sure.
2        MR. SUGLIA: I'm finding some pages,
3   but they're out of sync. I'm sorry, sir.
4   Which one are we looking at?
5        MR. TAGGART: B46.
6             - - -
7   (A recess occurred.)
8             - - -
9   BY MR. TAGGART:
10       Q.   And at the top is it says GMAC
11  Mortgage, the letter from GMAC. It says, "Dear
12  Kenneth Taggart, A recent review of your account has
13  indicated a need for an adjustment due to your
14  request. Effective April 1, 2009, your new payment
15  will be $5,612.25."
16       Do you see that?
17       A.   I do.
18       Q.   Okay. All right. Do you acknowledge
19  that this document came from GMAC?
20       A.   It is on our letterhead, so yes, sir.
21       Q.   All right. And it says $5,612.25 is
22  the payment, correct?
23       A.   Yes, sir.
24       Q.   Now, that was back in May of '09, and

Page 92

1   you're confirming that today that statement is still
2   correct, the payment is $5,612.25?
3        MR. SUGLIA: That wasn't the testimony.
4   The testimony was that as of May 12, 2009 the
5   document says $5,612.25. The testimony was
6   further that it is a GMAC Mortgage document.
7        MR. TAGGART: Okay. So you're saying
8   it is a GMAC Mortgage document?
9        MR. SUGLIA: Yes, sir.
10       MR. TAGGART: Okay.
11       MR. SUGLIA: That was the testimony.
12       MR. TAGGART: Well, his testimony said
13  it was on GMAC letterhead, but I'm confirming
14  this is --
15       MR. SUGLIA: You know what? You're
16  right, to the extent he said it was on GMAC
17  Mortgage letterhead.
18       MR. TAGGART: Well, you can stipulate,
19  but yes, this is the letter from GMAC.
20       MR. SUGLIA: I think you asked the
21  question, and I think it was answered.
22  BY MR. TAGGART:
23       Q.   Could you clarify that answer?
24       MR. SUGLIA: I can't. You're going to

Page 93

1   have to ask the witness.
2   BY MR. TAGGART:
3        Q.   Is this --
4        A.   I believe by the fact that it's on our
5   letterhead that this did come from GMAC.
6        Q.   To the best of your knowledge, this is
7   from GMAC?
8        A.   Yes, sir, to the best my knowledge.
9        Q.   All right. So $5,612.25, as of April
10  1, 2009 -- I'm sorry, $5,612.25. Okay. All right.
11  I just want to jump ahead so...
12       A.   Okay.
13       Q.   All right. Let's roll back to B6.
14       MR. SUGLIA: Is that B6 in Exhibit D-7?
15       THE WITNESS: Of the GMPO-B6 that we
16  were referring to?
17       MR. TAGGART: Yes, they're all GMPOs.
18  BY MR. TAGGART:
19       Q.   All right. This came from gmac.com
20  online statement. It shows -- it does confirm a
21  payment of $5,612.25. We'll just move on from that.
22  I won't ask you any questions on that.
23       We'll jump ahead to B8. All right. As
24  of April 1, your online system -- I'm sorry, the

24 (Pages 90 to 93)

Stephen Maxwell

Page 94

1    payment date of 4/24/09. I attempted to make a
2    payment online, and the amount due says $6,669.09 as
3    the monthly payment. And that says number of
4    payments, one.
5         Could you tell me why it's $6,669.09?
6         MR. SUGLIA: I'm going to object to
7    this document in that it's not a document
8    produced by GMAC.
9         However, to the extent the witness can
10    answer, you can go ahead and do so.
11         THE WITNESS: Just from looking at
12    this, I can't tell why the amount is what it
13    is. Again, kind of back to what I had said
14    previously, you know, based on the terms of
15    the note and the mortgage if there are any
16    additional late fees, any possible mortgage
17    insurance, things like that, those will be
18    included in the total payment.
19         So my -- I guess answer would be that
20    if there was a difference in the amount than
21    the amount that you're talking about then
22    there must have been some additional fees or
23    costs that were included.
24    BY MR. TAGGART:

Page 95

1         Q.    You think they are late fees, but you
2    don't know for a fact?
3         A.    Just from looking at this I can't tell,
4    you know, what amounts were added, because it just
5    gives me $6,669.09.
6         Q.    Well, this says number of full
7    payments. So it's alleging that a full payment, that
8    doesn't include late fees of $6,669.09.
9         MR. SUGLIA: Objection. That hasn't
10    been established.
11    BY MR. TAGGART:
12         Q.    All right. We'll move on from that.
13    I'll try to skip over some of the stuff that we
14    already did here so...
15         MR. SUGLIA: Like I said, no problem,
16    your show.
17         THE WITNESS: Did you say skip B9 or
18    skip ahead to B9?
19         MR. TAGGART: I'm skipping ahead to
20    A18.
21    BY MR. TAGGART:
22         Q.    All right, A18.
23         MR. SUGLIA: I'm sorry, A18?
24         MR. TAGGART: You know what? When this

Page 96

1    got copied -- I apologize. It kind of says
2    A18, but it's also...
3         THE WITNESS: It looks like the bottom
4    got chopped off.
5         MR. TAGGART: Yeah, I'm sorry, when it
6    got copied. It's GMPO --
7         MR. SUGLIA: What's the next document?
8         MR. TAGGART: It's B12. The next
9    document would be B13. It's this one right
10    here, Escrow Analysis. (Indicating.) It
11    actually says A18 in the center.
12         MR. SUGLIA: I have it. Okay, thank
13    you.
14    BY MR. TAGGART:
15         Q.    Okay. All right. This is on a letter
16    from GMAC. Would you say that this looks like a
17    letter from GMAC or confirm that?
18         A.    Again, this does appear to be something
19    that came from us, since it does have our letterhead.
20         Q.    Okay. So analysis dated May 12, 2009,
21    they allege at that time there was a shortage of
22    $2,508.02, and that's right here in the center.
23    (Indicating.)
24         And the documents -- could you explain

Page 97

1    to me how there was a shortage when the initial
2    escrow account disclosure statement -- you can object
3    -- provided by LBA showed that for the next year
4    until August of '09, it would be the same escrow
5    amount paid each month?
6         How did this --
7         A.    Which document?
8         Q.    I'm sorry. I'm referring to GMPO-B10.
9    So preparing those two documents...
10         MR. SUGLIA: I need to object on a
11    couple of basis. First, the document is not a
12    document that is generated by GMAC, the B10.
13         In addition, the document states itself
14    that it is an estimate of escrow activity. So
15    I would submit that this document does not
16    establish anything with any degree of
17    certainty.
18         MR. TAGGART: I would object. It does
19    establish at closing a good faith estimate of
20    what the escrow would be.
21         MR. SUGLIA: We can agree or disagree.
22         MR. TAGGART: Okay. I'm going to
23    disagree with that. But I'm basically asking
24    you the question on your document here why

25 (Pages 94 to 97)

Stephen Maxwell

Page 98

1   your escrow analysis as of May 2009 was
2   $2,508.00 difference?
3        MR. SUGLIA: Sir, your asking -- the
4   question, at least as it was presented to this
5   witness, was why is the escrow shortage, why
6   was there an escrow shortage based on the
7   numbers in GMPO-B10, which is clearly an
8   estimate in the document that was issued by
9   the originating company, which GMAC is not
10  involved in.
11       If you have another document, and the
12  document is somewhere to ask him about, that's
13  fine. But I'm not going let him answer a
14  question where the premise is based on a
15  document that says it's an estimate.
16       MR. TAGGART: I'm going to rephrase the
17  question, and hopefully it will keep you
18  happy. GMPO-B10 on this --
19       MR. SUGLIA: Sir, it's not a question
20  of keeping me happy. It's a question of
21  making sure the record's clear with respect to
22  these documents that the factual assertions
23  that are upon which they're based. But go
24  ahead.

Page 99

1   BY MR. TAGGART:
2        Q.   Okay, sorry about that. Referring back
3   to this document, would you say that this estimate
4   was inaccurate?
5        MR. SUGLIA: I'm not going to let him
6   answer that for the same reason. He has no
7   knowledge sitting here today whether this is
8   accurate or not.
9        MR. TAGGART: He's the custodian of
10  record. He knows --
11       MR. SUGLIA: That's not our record,
12  sir.
13       MR. TAGGART: It's not your record; it
14  becomes part of the record. You obtain a
15  loan --
16       MR. SUGLIA: You can make your
17  argument.
18       MR. TAGGART: I'm going to make the
19  argument. It was part of the record.
20       MR. SUGLIA: With all due respect --
21       MR. TAGGART: It is part of the record.
22  BY MR. TAGGART:
23       Q.   Okay. All right. So GMPO-B12, you're
24  just confirming that that is a letter from GMAC? And

Page 100

1   that's all I'll ask on that.
2        A.   Yes, it does appear to be so.
3        Q.   On page two of that letter, the next --
4   on A19. I'm sorry, B13, I apologize, it was the next
5   page. I see there was a payment made for forced
6   insurance as we discussed earlier of $7,915.84.
7        Do you see that here? That looks like
8   it was January 1, $7,915.84. Do you see that right
9   here? (Indicating.)
10       A.   Okay, I see that.
11       Q.   All right. And then it looks like two
12  entries down, and that also looks like January 1 of
13  '09, there's a credit of $7,261.00, also for
14  insurance.
15       MR. SUGLIA: I have to object to the
16  characterization as "forced insurance." I see
17  that there is a notation there, which
18  presumably is Mr. Taggart's notation it's
19  forced insurance.
20       I assume, and Mr. Taggart, correct me
21  if I'm wrong, we're looking at the lines, one
22  of them says payment $7,915.00, and it looks
23  like 84 cents. I'm not sure, because there's
24  handwritten notations on here.

Page 101

1        And the next one you were referencing
2   is described as fire, and it's a credit of
3   $7,261.00.
4   BY MR. TAGGART:
5        Q.   All right. Then I'm going to pose the
6   question that credit of $7,261.00, which looks like
7   it was made on the same day, those two entries in
8   there for the escrow, again, can you -- well, the
9   first payment of January 1, charged $7,915.84, that
10  was for the forced insurance; is that correct?
11       A.   I can't tell just based on the fact
12  that it says payment. There's no escrow code for me
13  to indicate what that payment was to. It could have
14  been to, you know, multiple different entities,
15  because there are taxes and insurance that are
16  escrowed. So just based on this, I can't tell
17  exactly what that payment was to.
18       MR. TAGGART: Okay. While we're on
19  this, can we add this to the list? I'm trying
20  to save time. Do you know what I'm saying?
21       MR. SUGLIA: You can add whatever you
22  want.
23       MR. TAGGART: I'll send you a letter
24  what it is. But on this document, GMPO-B13,

26 (Pages 98 to 101)

Stephen Maxwell

Page 102

1  and the two entries here that I have marked,
2  it's my writing forced insurance, the two
3  entries on January 1, what those -- there was
4  a payment amount and then a credit amount.
5  And the credit amount was less than what was
6  paid.
7       So rather then go on, could I make that
8  a request?
9       MR. SUGLIA: You can make the request.
10  The request will be addressed as appropriate
11  by GMAC.
12       MR. TAGGART: Sure, okay.
13  BY MR. TAGGART:
14       Q.  Okay. It looks like 13 and 14 are all
15  part of that. 15, which was cut off at the bottom
16  here copy. All right. 16, okay, so they're all --
17  17. GMPO-18, it's actually cut off on the copy.
18       A.  What did you say, A28?
19       Q.  Yes, exactly. This was an escrow
20  analysis done early on February 9, 2009. Let's see,
21  it's kind of the same thing.
22       It looks like it's a four-page
23  document, and you would say this is from GMAC, looks
24  like it came from GMAC? `

Page 103

1       A.  Which four pages are you referring to,
2  all four of these?
3       Q.  Yes, I'm just saying.
4       A.  Okay.
5       MR. SUGLIA: Are you saying A18 through
6  21?
7  BY MR. TAGGART:
8       Q.  Yes. That was another escrow analysis
9  done by GMAC February 9, 2009?
10       Do you see that up here? (Indicating.)
11       A.  Yes, this does appear.
12       Q.  So that document was the same thing,
13  another escrow analysis.
14       All right. So in February, this
15  document concurs that there's an escrow shortage in
16  the amount of $7,943.23.
17       Do you see that right here?
18  (Indicating.)
19       A.  Okay.
20       MR. SUGLIA: I'm sorry. I missed it.
21  Where are we looking?
22       THE WITNESS: Right here.
23       MR. TAGGART: Okay. You have it?
24       MR. SUGLIA: I see.

Page 104

1  BY MR. TAGGART:
2       Q.  Okay. Now, that shortage appears to be
3  based on if you look at the description here, one,
4  two, three down, June of 2009 -- or I'm sorry. The
5  fourth one, it says "Fire," and there's $7,261.00
6  paid for fire insurance.
7       So that was the forced insurance that
8  was charged?
9       A.  I believe this was the insurance policy
10  for hazard insurance that was placed on there.
11       Q.  The $7,261.00, that matched the same
12  amount that it says for July of 2009. All right. So
13  it appears that this shortage of $7,943.00, most of
14  which is increased because of this forced insurance;
15  is that correct?
16       A.  I'm sorry. What was the question?
17       Q.  All right. On February 9, there was a
18  shortage of $7,943.23.
19       A.  Okay.
20       Q.  That's what GMAC says they're short in
21  the escrow account.
22       A.  Okay.
23       Q.  I'm asking you, it seems like the
24  reason why it appears to be that short is because

Page 105

1  they placed forced insurance here of $7,261.00, which
2  is almost the same amount? So that's most of the
3  reason why it's gone up, there's a shortage in that
4  amount?
5       MR. SUGLIA: I have to object to the
6  form of the question. To the extent you
7  understand it, you can answer it.
8  BY MR. TAGGART:
9       Q.  Do you understand the question?
10       A.  I think I understand what your meaning
11  is.
12       MR. SUGLIA: I want you to be sure what
13  the question is.
14       THE WITNESS: Okay. And your asking
15  basically if this amount is in this amount --
16  BY MR. TAGGART:
17       Q.  Yes.
18       A.  -- if the $7,261.00 is in with the
19  $7,943.23. Based on this document, it does appear
20  so. However, I do not show any comprehensive
21  financial transactions that accompany this that would
22  also show any possible credits on the account.
23       Q.  Page two is what you sent me on part,
24  you know, which is their analysis.

27 (Pages 102 to 105)

Stephen Maxwell

Page 106

```
 1      A.   Okay.
 2      Q.   On the second page, the fourth entry,
 3   $7,261.00 for 07/01/09, so that's the forced
 4   insurance.
 5      A.   Was that a question?
 6      Q.   Well, I was pointing out to you that on
 7   page two, the fourth entry, 07/01/09.
 8           Do you see what I'm talking about?
 9      A.   The entry, yes, sir.
10      Q.   $7,261.00. All right. My question is,
11   in other words, GMAC, according to what I'm reading
12   here, projected that there would be a payment of
13   $7,261.00 on July 1 for insurance, because they're
14   estimating an escrow?
15           MR. SUGLIA:  I object to the form of
16      the question. You can answer if you're able.
17           THE WITNESS:  I believe that the escrow
18      amount for the year, that was their
19      projection. And then, you know, obviously
20      broken down into payments that would be
21      subsequently made.
22           But just from this I can't gather why
23      they picked that amount, why that was the
24      estimate, rather.
```

Page 107

```
 1   BY MR. TAGGART:
 2      Q.   Well, they chose a $7,261.00 estimate,
 3   which was the exact same price as the forced
 4   insurance, but yet, the forced insurance was dropped
 5   in January of '09, and this escrow analysis was done
 6   February 9th of '09. So it was done after the forced
 7   insurance was dropped, but yet, they calculated
 8   forced insurance into this escrow analysis.
 9           MR. SUGLIA:  Objection to the form of
10      the question, to the extent the question is
11      even pending.
12           Mr. Taggart, you're making certain
13      characterizations as to what this number is
14      based on your understanding. I can't let the
15      witness answer a question based on the premise
16      of what your understanding is.
17           MR. TAGGART:  You're objecting to which
18      number?
19           MR. SUGLIA:  I'm objecting to the
20      question. You gave a synopsis of what you
21      characterized this document to be, and what
22      you characterized certain numbers to be.
23           I can't let the witness respond based
24      on a premise which may or may not be true,
```

Page 108

```
 1      because it's based on your understanding and
 2      your characterization.
 3           MR. TAGGART:  Okay. All right. It
 4      just wastes a lot more time. We'll run
 5      through each on individually.
 6   BY MR. TAGGART:
 7      Q.   Page one right here, which is actually
 8   B18, could you please tell me what this entry is,
 9   one, two, three, four down, where it says "Fire, July
10   2009," and an entry of $7,261.00? Could you tell
11   what that's for, please?
12      A.   In my belief, based on this document,
13   it is the amount projected for the escrow for fire
14   hazard insurance for that year at this time.
15      Q.   That's the projected amount for fire
16   insurance?
17      A.   I believe fire and hazard would both be
18   comprehensive.
19      Q.   Okay. Could you tell me why they would
20   project fire insurance to be $7,261.00?
21      A.   I can't.
22      Q.   When they paid a policy of about
23   $1,700.00 in August and September of '08, do you
24   think that $7,261.00 is a high estimate when previous
```

Page 109

```
 1   insurance was only about $1,700.00?
 2           MR. SUGLIA:  Objection. Asked and
 3      answered.
 4           MR. TAGGART:  I don't believe it was
 5      answered.
 6           MR. SUGLIA:  I believe it was. There
 7      was testimony earlier on in the deposition
 8      regarding the cause for forced insurance --
 9           MR. TAGGART:  Okay.
10           MR. SUGLIA:  -- and he advised that
11      he's seen more, he's seen less, he's not sure.
12           MR. TAGGART:  All right, excellent.
13      Let's move on.
14   BY MR. TAGGART:
15      Q.   Now, when you do escrow analysis for
16   GMAC, when they're preparing -- when they do their
17   review, their annual review, and they project -- a
18   projection should be based on previous costs, or
19   estimated costs, based on some reliable source,
20   correct? I mean, you can't just --
21           MR. SUGLIA:  Objection to the form of
22      the questioning.
23   BY MR. TAGGART:
24      Q.   All right. If a typical loan, the
```

28 (Pages 106 to 109)

Stephen Maxwell

Page 110

1    mortgage or -- I'm sorry, the insurance is $1,700.00
2    for a year, and they want to project next year as the
3    following year's escrow, how do they determine --
4    estimate what next year's insurance would be?
5        A.    I do not know the exact procedure of
6    how the insurance is projected. I would say that the
7    previous year's amounts are taken into account, but I
8    do not know what they, you know, if there is a
9    formula, or if there's a specific procedure that they
10   follow. And to that extent, I don't know what
11   information they include in that. So it's a
12   projection.
13       I do know that if there is a
14   discrepancy at the end of the year that amount can be
15   adjusted and credited back to the account.
16       Q.    But they take the previous amount into
17   consideration?
18       A.    I believe so.
19       Q.    Okay. When the projected amount of
20   $7,261.00 was entered in the estimate, could you tell
21   me where they got that number? I mean, they had to
22   take a prior history into consideration, so, how did
23   they arrive at that number?
24       MR. SUGLIA: Objection. Asked and

Page 111

1    answered.
2        MR. TAGGART: I don't think it was
3    answered.
4        MR. SUGLIA: It was answered. It was
5    answered, and the response was something to
6    the effect of he believes that the previous
7    year's costs are a consideration. There may
8    be other considerations, but he's not sure.
9    BY MR. TAGGART:
10       Q.    Okay. You're the point man to answer
11   these questions. So the previous insurance on this
12   property was about $1,700.00 or $1,800.00 for the
13   year, but yet, they projected $7,261.00.
14       And you're saying that's an honest
15   estimate?
16       MR. SUGLIA: Objection as to the form
17   of the question as it mischaracterizes the
18   witness' testimony.
19   BY MR. TAGGART:
20       Q.    All right. We're going to go down here
21   to the payments down here, escrow shortage, about
22   three-quarters of the way down. (Indicating.)
23       So they're calculating the new payment
24   of $6,669.09? Do you see that?

Page 112

1        A.    Yes, sir.
2        Q.    Okay. And the original payment it does
3    state. So this is a GMAC document. It does state
4    the prior analysis showed a payment of $5,401.26. So
5    that was the prior payment. So we have established
6    that the prior payment GMAC is confirming was
7    $5,401.26 prior to that, prior to February 9, 2009.
8        But now they're alleging with the
9    escrow shortage it would be $6,669.09, right?
10       A.    Basically, if you're looking at that as
11   that was your payment, I believe that's incorrect.
12   This says prior analysis, a total payment of
13   $5,401.26. So that does not say your previous
14   monthly payment was this amount. This is based on
15   the analysis --
16       Q.    In February, I was already paying for
17   six months, and I paid $5,401.26. So if I paid that,
18   I never received any record that it wasn't my
19   payment.
20       MR. SUGLIA: Mr. Taggart, that may or
21   may not be the case. You asked him a question
22   based on this document, and he answered your
23   question based on this document.
24   BY MR. TAGGART:

Page 113

1        Q.    Okay. But it states prior analysis was
2    $5,401.26, okay. And now they're saying that in
3    February, $6,669.09.
4        All Right. We'll move on to the next,
5    GMPO-B22. It's a shame the bottom was cut off. This
6    was run from Equifax of my credit report.
7        Do you see where it says GMAC Mortgage?
8        A.    Yes.
9        Q.    It says date open 7 of '08, date
10   reported 8 of '09, August '09. So as of August '09,
11   the scheduled payment was $5,401.00 that you're
12   reporting to Equifax.
13       So are you reporting to Equifax as of 8
14   of '09 that my payment was $5,401.00?
15       MR. SUGLIA: No, I'm going to object to
16   this document. First and foremost, there are
17   a number of redactions on here, I'm not sure
18   what they are.
19       Second of all, there has been no
20   foundation base to this document.
21       MR. TAGGART: Where is --
22       MR. SUGLIA: There is no foundation for
23   this document. In addition, this appears to
24   be page 8 of 33 pages.

29   (Pages 110 to 113)

Page 114

1    So to the extent that we want to put
2  the whole document in front of the witness,
3  and he's able to respond to specific
4  inquiries, that's fine.
5    But I'm not going to let him answer
6  based on 1 page of 33 when no foundation's
7  been laid. I don't know what we're looking at
8  here. I'm not going to allow him to answer a
9  question based on this.
10 BY MR. TAGGART:
11   Q.  Okay. I can ask you the question right
12 now.
13    As of August of '09, were you reporting
14 a payment of $5,401.00 to any of the credit bureaus?
15   A.  I do not know.
16   Q.  So August of 2009 you can't tell me if
17 you're reporting a payment of $5,401.00 as a payment
18 on this loan?
19    MR. SUGLIA: Asked and answered.
20 BY MR. TAGGART:
21   Q.  Don't know, okay.
22   A.  And I can clarify it, if you'd like.
23    MR. SUGLIA: There's no question
24 pending, but --

Page 115

1    THE WITNESS: Well, the credit
2  reporting will show, you know, what we have
3  reported. And if the payment past due, if the
4  payment has increased since a payment past due
5  has been increased, whatever the amount of the
6  past due payment would be what was reported.
7    So if you're saying in August 2009 that
8  might not be the payment that you were
9  referring to. So based on this document, I
10 don't know if that's what we reported.
11 BY MR. TAGGART:
12   Q.  Okay. I'll take your testimony that
13 you're not sure, and we'll move on from that.
14    Okay, GMPO-25 and 26.
15    MR. SUGLIA: Mine appear to be cut off.
16 Can I just take a look at what you have so
17 we're looking at the same thing?
18    MR. TAGGART: Yeah, mine is cut off
19 right here. (Indicating.)
20    MR. SUGLIA: Okay.
21    MR. TAGGART: Do you have it?
22    MR. SUGLIA: Yes, I do.
23 BY MR. TAGGART:
24   Q.  All right. And this is a letter from

Page 116

1  GMAC Mortgage.
2    Does that look like a letter from GMAC
3  Mortgage? Is that something you send out?
4    A.  It does look like a letter from us.
5    Q.  All right. At the top right-hand
6  corner, it's referring to "The Equity Accelerator
7  Program."
8    Do you see that?
9    A.  I do.
10   Q.  All right. And that's something that
11 GMAC does and offers as a service to customers to try
12 to solicit business?
13    MR. SUGLIA: I'm going to object to the
14 form of the question, but to the extent you're
15 able to answer.
16    THE WITNESS: I'm unfamiliar with the
17 Equity Accelerator Program as far as why we
18 provide that service.
19 BY MR. TAGGART:
20   Q.  All right. At the top right-hand
21 corner of this particular document it's dated March
22 26, 2009. If you look at the little grid here, at
23 the box, it says "Your Current Monthly Payment," and
24 then it's comparing how much you can save, "Your New

Page 117

1  Payoff Schedule, Your Personal Financial Rewards."
2    Do you see what I'm talking about, the
3  grid there?
4    A.  I do.
5    Q.  All right. Do you see where it says
6  "Your Current Monthly Payment," and it says a payment
7  of $5,401.26?
8    A.  I do.
9    Q.  Okay. So as of March 26, 2009, GMAC is
10 saying that the payment is $5,401.26.
11    Am I reading that correctly?
12   A.  From this document, you appear to be
13 correct.
14   Q.  So I'm reading that correctly, that as
15 of March 26 they're telling me my payment is
16 $5,401.26?
17   A.  Based on this document, yes.
18   Q.  Okay. All right. Things are changing
19 quickly.
20    MR. SUGLIA: I'll just point out for
21 the record that there's language right above
22 that box that says "Here is a customized
23 example of how this system can work for you,"
24 which would appear to be an illustration,

30 (Pages 114 to 117)

Stephen Maxwell

Page 118

1    but...
2            MR. TAGGART: It shows an
3    illustration, but it still says "Your Current
4    Monthly Payment." That's exactly what it says
5    in the box.
6            MR. SUGLIA: It would appear to be an
7    illustration to me.
8            MR. TAGGART: Well, I object to that.
9            MR. SUGLIA: Okay. I guess the
10    objection is noted, but we can characterize
11    it. We'll have to agree to disagree on how
12    it's characterized.
13    BY MR. TAGGART:
14        Q.    Okay. And we're going to go to the
15    second page of this document, which is B26. It also
16    says "Your Current Home Loan Monthly Payment
17    $5,401.26," again, correct?
18        Am I reading that correctly?
19        A.    Yes, you are.
20        Q.    Okay. No further questions on that.
21            MR. SUGLIA: I would also point out for
22    the record on that it states, "PLEASE NOTE:
23    Recent payment changes (if any) may not be
24    included."

Page 119

1            MR. TAGGART: Where would it say that?
2            MR. SUGLIA: I'm looking at B26.
3            MR. TAGGART: Okay.
4            MR. SUGLIA: I'm looking where there is
5    a redaction where it says "Reference." Under
6    that it says "Prepared as of: 03/18/2009."
7            MR. TAGGART: Correct, I see that.
8            MR. SUGLIA: Under that there is a box
9    that discusses "Summary of Your Program
10    Savings." Under that there's a box that says
11    "Your Current Home Loan."
12        If you look all the way over to the
13    right of that page of that line it says,
14    "PLEASE NOTE: Recent payment changes (if any)
15    may not be included."
16            MR. TAGGART: Can you point to that?
17            MR. SUGLIA: Right here. (Indicating.)
18            MR. TAGGART: Oh.
19    BY MR. TAGGART:
20        Q.    GMPO-B30. Does that look like a
21    mortgage statement sent out by GMAC?
22        A.    Yes, it does.
23        Q.    It does, okay. And it looks like the
24    current statement date is March 18, 2009.

Page 120

1            That's the statement date, the current
2    statement date, March 18?
3        A.    Yes, sir.
4        Q.    And could you tell me what the monthly
5    payment is as of March 18?
6        A.    The total amount due?
7        Q.    No, just the monthly payment.
8        Do you see down here it says, "Due Date
9    03/01/09," and then it says "Mortgage Payment"?
10    (Indicating.)
11        A.    Okay. I believe that says $6,669.09.
12        Q.    Correct. All right. So GMAC sent out
13    this mortgage statement dated March 18, and it showed
14    a payment due March 1 of $6,689.00?
15        A.    Yeah, that might be 89. I just can't
16    see that small type. I might have been wrong on my
17    first read of that number.
18        Q.    I'm sorry. $6,669.09, yes. But you
19    can read out $6,669.09, correct?
20        A.    Yes, sir.
21        Q.    Okay. All right. So that's a
22    statement sent by GMAC to me of March 18, correct?
23        A.    Yes, it appears so.
24        Q.    Okay. All right. GMPO-B31. You can

Page 121

1    note your objections, but I'm just going to ask a few
2    questions on it.
3        This is a bill paid GMAC. Are you
4    familiar with where people pay online?
5        A.    I have seen the website, yes, sir.
6        Q.    Okay. Now, does this look like what
7    would be printed out or what the website would look
8    like when you go to make a payment online?
9        A.    I have never actually made a payment,
10    so I'm not really sure what would pop up after the
11    payment would be made. So I don't know --
12        Q.    Is there any way your computer system
13    would have a record of online payments or a
14    transaction history online?
15        A.    Absolutely. We would have a
16    transaction history of everything.
17        Q.    Of everything. Now, this was a
18    document where I attempted to make a payment, but it
19    would not take the payment because it would only
20    accept a payment of $6,669.09. It would -- that's
21    the payment that GMAC asserted was the payment due.
22    It would not accept anything less. I tried to make a
23    payment of the $5,401.00, whatever the normal payment
24    should have been, $5,401.00, something.

31 (Pages 118 to 121)

Page 122

1    Would your computer system have a
2  record of any online activity, let's say?
3    A.    Of a payment --
4    Q.    Of payments, or if I went on to try to
5  make a payment, would it be able to tell me if
6  somebody tried to make the payment? Anything like
7  that?
8    MR. SUGLIA: Hold on a second. To the
9  extent your response it based on the premises
10  that a lessor payment wouldn't be accepted,
11  I'm going to instruct you not to answer,
12  because this document did not reflect that.
13    To the extent your answer is just based
14  on your knowledge and experience, as to
15  whether attempted payments are also recorded,
16  you're free to go ahead and answer that.
17    THE WITNESS: Based on my previous
18  experience, I do know that if we receive a
19  check or a money order or something of that
20  nature for an amount less than what is
21  acceptable for a payment, those are returned
22  and that is recorded in our system.
23    I do not know if it reflects the same
24  if it's rejected based on my previous

Page 123

1  experience, because I did not see that.
2  BY MR. TAGGART:
3    Q.    Yeah. My point is it would not accept.
4  It just came up here's the amount due and it puts it
5  in there and it won't -- you can't -- it won't accept
6  anything less. I can't change that. I just wanted
7  to know.
8    In other words, basically, how detailed
9  is your online transaction history or transcript?
10    MR. SUGLIA: I believe that's been
11  asked and answered with respect to that
12  inquiry.
13    MR. TAGGART: I don't think he --
14    MR. SUGLIA: I think he --
15    MR. TAGGART: Well, I'll leave that go
16  for now.
17  BY MR. TAGGART:
18    Q.    Could I get a transcript of that?
19    A.    I'm not sure what you are asking for.
20    Q.    Could I get a transcript of my online
21  history for this account?
22    A.    I don't know --
23    Q.    Which would show --
24    A.    If you're asking for your financial

Page 124

1  transactions, I don't know that that's going to
2  reflect whether they're online or not.
3    If you want to make a request for a
4  transaction history, I believe you can do so, and I
5  think that we can provide that for you if we already
6  haven't. But what you're asking for I don't think
7  exists.
8    Q.    I understand what you're saying. I'm
9  looking more for an activity history. Because
10  obviously, there wasn't a transaction made, even
11  though I was online attempting to make a payment.
12    Therefore, I'm asking if there is an
13  activity log in your computer system that would show
14  that, you know, that somebody logged on and attempted
15  to make a payment or something to that effect.
16    MR. SUGLIA: I would object to the
17  question in that it's been asked and answered
18  and this witness has no knowledge.
19    MR. TAGGART: All right. I'm asking
20  again, as continuing the deposition that I
21  would like to request a log, not just the
22  payment history online, but of the activity
23  log, which would show whether it was online or
24  not, so...

Page 125

1    MR. SUGLIA: The request is noted.
2    MR. TAGGART: Okay.
3  BY MR. TAGGART:
4    Q.    Okay. GMPO-B46 through 48, GMPO-B46,
5  B47 and B48.
6    Do you have it?
7    A.    Yes, sir.
8    Q.    Is that a letter from GMAC would you
9  say?
10    A.    You said B47?
11    Q.    46, 47 and 48.
12    A.    Yes, it appears so.
13    Q.    Okay. And it says that the new payment
14  effective April 1 is $5,612.25, correct?
15    A.    Yes.
16    Q.    Okay. That's all I need to know. And
17  that's a letter from GMAC you're confirming?
18    A.    Yes, sir, it appears so.
19    Q.    All right. GMPO-B52 to B54. Do you
20  have it?
21    A.    Yes, sir.
22    Q.    And yet another escrow analysis dated
23  May 12, 2009.
24    Do you see at the top up here, this

32  (Pages 122 to 125)

Stephen Maxwell

Page 126

1 little box? (Indicating.) Would you say that was
2 something sent from GMAC Mortgage?
3       A.    It also appears so, yes.
4       Q.    So that appears to be something from
5 GMAC Mortgage, an escrow analysis?
6       A.    Yes.
7       Q.    And referring to this little box here
8 in the center.
9             See where it says "Payment change," and
10 then it compares the new payment to prior analysis?
11      A.    Yes, sir.
12      Q.    Okay. Again, it's stating the new
13 payment is $5,612.25. And it says prior analysis
14 again, $5,401.26; is that correct? So you're saying
15 effective May 1, the payment is $5,612.25?
16      A.    I believe it states April 1.
17      Q.    Let me see. It says "effective with
18 your April 1, 2009 payment." So effective April 1,
19 the new payment will be $5,612.25, and the prior
20 analysis of $5,401.26. So on May 12, they're telling
21 me what my April 1 payment would be; is that correct?
22      A.    Based on this document, yes, sir.
23      Q.    Yeah. So this document is basically
24 telling me in May what my April payment should be,

Page 127

1 correct?
2       A.    Yes, sir.
3       Q.    I just want to make sure I had that
4 right.
5             And GMPO-B54, kind of towards the
6 bottom here it's circled two payments were made and
7 also confirming on your documentation that fire
8 insurance was paid, it looks like 08/01/08 for
9 $978.00 and 09/01/08 for $925.00, correct?
10      A.    I see.
11      Q.    It's in your analysis, it's there. And
12 they're showing that they paid the fire insurance.
13 Okay?
14      MR. SUGLIA: I just want to make sure
15 we're looking at the same thing here.
16      MR. TAGGART: Yeah.
17      MR. SUGLIA: Because the one that I'm
18 looking at is showing a credit. That's the
19 same document.
20      MR. TAGGART: That's what I said. I
21 mean, it's previous amount, previous balance.
22 It's your document, that's why I'm asking the
23 question.
24      MR. SUGLIA: To the extent you

Page 128

1 understand the question and recall the
2 question, that's fine.
3       THE WITNESS: I mean, I believe your
4 assessment does show an amount of $978.00 and
5 $925.00 on the dates you suggested for fire,
6 which would be hazard insurance.
7 BY MR. TAGGART:
8       Q.    So that was paid out of the escrow
9 account and that's what it's showing.
10      A.    It appears from this that it was
11 credited to the escrow account.
12      Q.    It's kind of, you know, you're right,
13 it could be a little confusing, that's why I'm
14 clarifying.
15             Previous documents in your payment
16 history shows that on those dates there was payment
17 made by GMAC for a fire insurance premium of $925.00
18 and $978.00. So I'm just confirming that that's what
19 it says there.
20      MR. SUGLIA: I don't know if there was
21 a question pending. But to the extent there
22 was, I would object to the reference that any
23 other document you're not looking at now.
24 BY MR TAGGART:

Page 129

1       Q.    All right. We'll move on. GMPO-B58.
2       A.    Okay.
3       Q.    This looks like -- I mean, it's a
4 letter from GMAC to me; is that correct? That's a
5 GMAC letter?
6       A.    Yes, it appears to be so.
7       Q.    All right. And I'm going to read it,
8 "In response to your request, we updated our records
9 to reflect your inquiry was received. Enclosed is a
10 copy of the most recent escrow analysis statement.
11 Please indicate the items needing to be adjusted."
12 Okay? And that's dated July 15 of '09.
13             So it looks like they did that and they
14 included the May 12 escrow analysis. So basically, I
15 guess they just sent this. Okay. I don't have any
16 questions confirming this was a GMAC letter of July
17 15.
18      A.    It appears so, yes.
19      Q.    Okay. All right. GMPO-B61, it's also
20 document 10 from GMAC Mortgage what they provided in
21 their files.
22             Do you have a copy of that?
23      A.    I do.
24      Q.    So June 29 you received -- well, it's a

33 (Pages 126 to 129)

Stephen Maxwell

## Page 130

1    letter dated June 29, sent to GMAC. I can't confirm
2    what date they received it, but these handwritten
3    notes are not mine right here, only the signature.
4    (Indicating.)
5            I don't know who made these notes. Do
6    you know who made those notes at all?
7        A.    No.
8        Q.    It looks like they have payments for
9    insurance and taxes and noted stuff here, correct?
10   Is that somebody's --
11       A.    I have no idea what this means.
12       Q.    You don't know who -- it looks like
13   somebody's initials here.
14       A.    It appears that this was a letter that
15   you sent us.
16       Q.    Yeah.
17       A.    So I can't confirm or deny that that's
18   not your or someone within your realm.
19       Q.    Yeah, I understand. I just -- I know
20   it's not my writing. I don't know who --
21       A.    Right. I don't know if it was on our
22   side or...
23       Q.    All right. But you received the
24   letter, okay.

## Page 131

1            GMPO-B62, that's in your records, and
2    it looks like an internal file. That's your records,
3    correct? Is that an internal file?
4        A.    I believe so.
5        Q.    Okay. And it looks like this part
6    circled down here, 05/05/09, "Please perform ESAN
7    effective for the 04/09 payment based on updated
8    insurance premium amounts Leigh F."
9            Do you know what that -- can you
10   explain that to me?
11       A.    Which part?
12       Q.    This bottom part, insurance premium, it
13   looks like amounts. (Indicating.)
14       A.    I believe this, that you're pointing to
15   with your pen, is just the name of the person who
16   entered that, that note and their teller number.
17       Q.    Leigh F. 5378, is that like an employee
18   identification number or something?
19       A.    I believe that's generally the last
20   four digits of her ID number.
21       Q.    Okay. So you would say that that's the
22   person who entered that?
23       A.    Correct.
24       Q.    So 05/05 they're saying "Please perform

## Page 132

1    ESAN."
2            Is that escrow analysis?
3        A.    Yes.
4        Q.    Short for that? Okay. Effective of
5    04/09. So that's the internal order stating to
6    perform an escrow analysis as of 04/09, okay. Enough
7    on that one.
8            I'll just try to run through these.
9    63, 64, 65, these are just all --
10       A.    I'm sorry?
11       Q.    These are just internal documents? I'm
12   just going over these three here, B63, 64, 65.
13   (Indicating.)
14           They're just internal documents showing
15   the payment history? Is that what that is?
16       A.    I believe this is more accurately
17   described as a transaction history.
18       Q.    Okay, transaction history. And it
19   looks like B66 is also your internal document? B67,
20   they're all...
21           B63 to B69, that's all internal
22   documents?
23       A.    It appears so, yes, sir.
24       Q.    And they were supplied by you, which is

## Page 133

1    39, 40 and 41? I'm just confirming.
2            Are they your documents, 39, 40 and 41?
3        A.    Yes, sir, they would appear to be so.
4        Q.    All right. 79, 80, 81 and 82?
5        A.    Yes, sir.
6        Q.    All right. So they're all your
7    internal documents. Okay.
8                    - - -
9    (A recess occurred.)
10                   - - -
11   BY MR. TAGGART:
12       Q.    Ready?
13       A.    Yes, sir.
14       Q.    BMPO-B70, which is your internal
15   document, 83?
16       A.    Yes, sir.
17       Q.    And it's an Act 6 Notice, and it says
18   "Monthly Payments," from 04/01/09 to 06/01/09.
19           Do you see that?
20       A.    I do.
21       Q.    And it says "Monthly Payments
22   $16,836.75," total.
23           And that would be for three monthly
24   payments?

34  (Pages 130 to 133)

Stephen Maxwell

Page 134

1    A.    For the months of April, May and June
2 of 2009, I believe so.
3        MR. TAGGART: Okay. I did have a
4 calculator. Does anybody have a calculator
5 around? Here we go.
6 BY MR. TAGGART:
7    Q.    This document is dated June 2, 2009 at
8 the top right-hand corner; is that correct?
9    A.    Yes, sir.
10    Q.    All right. So the three monthly
11 payments totaling $16,836.75 divided by three, that
12 would indicate a payment of $5,612.25.
13        Would you like to check that? I'm
14 saying your payment here is for three months.
15        MR. SUGLIA: No, I understand. I mean,
16 are you --
17        MR. TAGGART: I'm confirming and I'm
18 clarifying.
19        MR. SUGLIA: The number is what it is.
20 I mean, he doesn't need to make a rendering
21 opinion as to whether you multiplied
22 correctly.
23        MR. TAGGART: Well, no, I think it's
24 important whether it's multiplied correctly.

Page 135

1 It's a simple question.
2        MR. SUGLIA: No, the document is what
3 it is, is my point. The document states what
4 it states. Whether or not this witness says
5 that your division is correct is irrelevant to
6 the point.
7        MR. TAGGART: I'm asking you are there
8 any errors? Are you stating this document is
9 correct, and it has no errors then? I'm
10 giving you opportunities to correct the
11 errors.
12        MR. SUGLIA: Don't put words in my
13 mouth. What I'm saying is, you took the
14 number 16,836.75, you divided by three.
15        MR. TAGGART: Yes.
16        MR. SUGLIA: You came up with 5612.25.
17        MR. TAGGART: Yes.
18        MR. SUGLIA: Okay. That's what it
19 says, yes.
20        Now, whether you're asking the witness
21 -- go ahead.
22        MR. TAGGART: I'm just confirming. And
23 if you're confirming this document, then your
24 stating that the payment is $5,612.25 as of

Page 136

1 June 2 of '09?
2        MR. SUGLIA: That would be your
3 argument. What I'm saying to you is, there's
4 no reason to make it here, sir.
5 BY MR. TAGGART:
6    Q.    All right. We'll move on.
7        Also it says home owner's name and
8 address. It looks like it has an address of PO
9 Box 411, Telford, PA 18969.
10        Did you send this document to any other
11 address?
12    A.    That particular document I believe
13 would have gone to that address.
14    Q.    Yeah. But I mean, did you send it to
15 any other addresses?
16    A.    Not that I'm aware of.
17    Q.    Okay. All right. We'll move on.
18        And just confirming again, GMPO-B70,
19 it's your document 90? Do you have that in front of
20 you? As of May 12, 2009 it also states a payment of
21 $5,612.25; is that correct?
22    A.    That's what it says, yes.
23        MR. SUGLIA: Just for clarity, though,
24 I think you said B70. It's B71, right?

Page 137

1        MR. TAGGART: It's B71. I'm not sure
2 what I said.
3        MR. SUGLIA: That's fine, just to make
4 sure we're talking about the same thing.
5        MR. TAGGART: Yep.
6 BY MR. TAGGART:
7    Q.    Okay, it's clarified. GMPO-B72, that's
8 also one of your documents, document 91?
9    A.    It appears to be the second page of the
10 previous document, yes, sir.
11    Q.    The second page, and it also states the
12 payment amount of $5,612.25, okay?
13        I'm just going to confirm these
14 documents, GMPO-B77, 78 and 79, and they're your
15 internal documents 256, 257 and 258. They're all
16 your documents, though? I'm just confirming that,
17 right?
18        MR. SUGLIA: Objection to the form of
19 the question. It would appear they were
20 documents that were produced by GMAC.
21        However, they would appear to be loan
22 closing instructions, which would relate to
23 the origination of this loan, and GMAC was not
24 part of that process.

35 (Pages 134 to 137)

Stephen Maxwell

**Page 138**

1    MR. TAGGART: Right. Okay, no problem.
2    BY MR. TAGGART:
3        Q.    The last GMPO, B80, 81, 82 and 83,
4    they're all documents that you provided me that were
5    actually closing documents. It looks like LBA
6    Financial.
7        MR. SUGLIA: Based on the number at the
8    bottom, it would appear to be part of the same
9    loan closing package, loan closing
10   instructions. Although, my package only goes
11   up to 7 of 8.
12       MR. TAGGART: I'm sorry, say that
13   again.
14       MR. SUGLIA: I was just clarifying for
15   the record that based on the number at the
16   bottom of the page, it would appear to be a
17   continuation of GMPO-B77.
18       MR. TAGGART: Yes.
19       MR. SUGLIA: Which is entitled
20   "Supplemental Closing Instructions." It goes
21   pages one of eight. I only have from pages
22   seven of eight, which you also may only have.
23       THE WITNESS: I do as well, 7 of 8.
24       MR. TAGGART: Yes, exactly.

**Page 139**

1    BY MR. TAGGART:
2        Q.    Okay. I just want to ask a question
3    here on GMPO-B83.
4        And do you see where it's checked
5    hazard insurance?
6        A.    I see that.
7        Q.    I know it was provided by LBA
8    Financial, but it says "Hazard Insurance for
9    Refinance. At loan closing you must provide a copy
10   of the existing insurance policy with a minimum
11   coverage equal to the lesser of $659,648.00 or the
12   replacement cost of the improvements. If the
13   existing policy is due to expire within 60 days of
14   closing, you must also provide a paid receipt for
15   next year's premium."
16       So do you see that box checked that's
17   closing instructions that I must have insurance?
18       A.    I see that, yes, sir.
19       Q.    Okay. That's what I need.
20       MR. TAGGART: Okay. Can we take a
21   break for ten minutes or so?
22       MR. SUGLIA: That's fine.
23       - - -
24   (A recess occurred.)

**Page 140**

1        - - -
2    BY MR. TAGGART:
3        Q.    Mr. Maxwell, how many of these do you
4    do a week or a day, as far as --
5        MR. SUGLIA: Depositions?
6    BY MR. TAGGART:
7        Q.    Depositions or testimony?
8        MR. SUGLIA: What's the relevance of
9    that?
10   BY MR. TAGGART:
11       Q.    Just how familiar are you with the
12   file? How much time do you take to review the
13   documents on a typical file?
14       MR. SUGLIA: I don't know that that's
15   an appropriate question.
16       To the extent there's a question on
17   specific documents, that's fine. But I think
18   we're delving dangerously close into work
19   product.
20       MR. TAGGART: I think it's appropriate
21   to ask how much time he spent reviewing the
22   loan file and the documents.
23       MR. SUGLIA: No. I'm not going to let
24   him answer that.

**Page 141**

1    BY MR. TAGGART:
2        Q.    Okay. This is a document filed by
3    GMAC, "Complaint in Mortgage Foreclosure."
4        So you're familiar with that?
5        - - -
6    (Defendant's-8, Complaint in Mortgage Foreclosure,
7    was marked for identification.)
8        - - -
9        THE WITNESS: This appears to be the
10   Complaint.
11   BY MR. TAGGART:
12       Q.    Are you familiar with the Complaint,
13   the mortgage foreclosure?
14       A.    I have reviewed it.
15       Q.    I'm sorry?
16       A.    I have reviewed it.
17       Q.    You have reviewed it, okay. And you
18   reviewed all eight pages, including the Verification?
19       A.    Yes. Do you want me to turn to page
20   eight?
21       Q.    No. I'm just clarifying up to that
22   point.
23       On page three it states that the
24   Plaintiff is GMAC Mortgage, LLC, your company.

36 (Pages 138 to 141)

Stephen Maxwell

---

Page 142

1    Does GMAC in fact hold the mortgage on
2  this loan?
3    A.    I believe we are in possession of it.
4    Q.    You're in possession of the note, but
5  you're not sure?
6    A.    Did you ask for the note or the
7  mortgage?
8    Q.    Both.
9    A.    I believe we are in possession.
10  However, I do not know their exact location.
11    Q.    So your testimony is that you are in
12  possession of the note and the mortgage on this
13  property in question?
14    A.    I know that, like I said before, I
15  believe we are in possession. But I do not know the
16  whereabouts of those documents if you're asking me,
17  just if I believe we are in possession, yes.
18    Q.    Do you have a copy of the original note
19  and mortgage?
20    A.    I did not bring anything with me today.
21    Q.    Not a copy with you, but you have a
22  copy of the original note and mortgage, the original
23  one signed?
24    A.    In our system records, I believe so.

Page 143

1    Q.    You believe so? Either you do know or
2  you don't know.
3    A.    In our system records we have a copy of
4  the note and the mortgage.
5    Q.    So in your records, you have the
6  original?
7    MR. SUGLIA: Hold on a second.
8  BY MR. TAGGART:
9    Q.    The original note and mortgage.
10    MR. SUGLIA: I have to object to the
11  form of the question, because the scope of the
12  question is changing.
13  BY MR. TAGGART:
14    Q.    I'm asking do you have the original
15  note and the original mortgage? Not a copy, the
16  original note --
17    MR. SUGLIA: And I believe Mr. Maxwell
18  testified that it's his understanding that
19  GMAC is in possession of the original
20  mortgage, the original note, and I believe as
21  he sits here today, he's not aware of the
22  exact whereabouts.
23    I believe that's the testimony, unless
24  I'm wrong.

Page 144

1    THE WITNESS: Yes.
2    MR. TAGGART:  Okay.  I'm not trying to
3  give you a hard time, I'm just clarifying.
4    MR. SUGLIA: No, no.  Not at all.
5  BY MR. TAGGART:
6    Q.    So your testimony is that you are in
7  possession of the mortgage note and the mortgage
8  itself, the original mortgage itself, GMAC has
9  possession of that, you just don't know the
10  whereabouts of it.
11    Is that what you are saying?
12    A.    That's my understanding, yes, sir.
13    Q.    So you have it, but you don't know
14  where it is.
15    As custodian of record, isn't that your
16  job to know where that is on this file?
17    A.    I believe if you asked us to produce
18  those that we could possibly do that.  But I do not
19  know where the originals are located at this time.
20  That is information that I have access to.
21    Q.    Now, is that original note, that would
22  be -- technically, the original would be in the name
23  of LBA Financial?
24    A.    If I had the document in front me right

Page 145

1  now I can further answer your question.
2    Q.    Okay.  So you don't know, because you
3  don't have it in front of you?
4    A.    Correct.
5    Q.    And it's your alleging that GMAC is the
6  owner of the note right now?
7    A.    That's not what I said.
8    Q.    Okay, I'm sorry.  Then I apologize, I
9  misunderstood.
10    GMAC does not own the note right now?
11    MR. SUGLIA:  Again, I have to object.
12  I think your mischaracterizing the testimony.
13  You didn't ask that question.
14    To the extent that's the question, I
15  would ask that you clearly ask him what it is
16  that you want to know.
17    The questions again are changing in
18  scope -- what's purported to be the same
19  question is changing in scope as we go.
20    Is the question that's pending whether
21  GMAC holds this mortgage?
22  BY MR. TAGGART:
23    Q.    Does GMAC own this mortgage, yes or no?
24    A.    I can't answer that.  That's asking for

37 (Pages 142 to 145)

Stephen Maxwell

Page 146

1 a legal conclusion.
2     Q.    That's not asking for a legal
3 conclusion.
4     A.    Yes, it is.
5     Q.    No, it's not.  Are you objecting?
6     A.    We can agree or disagree on that, but
7 it's a legal conclusion --
8     Q.    Well, Counsel hasn't objected to it.
9 Does GMAC --
10     A.    That's my answer to you, sir.
11         MR. SUGLIA:  The question pending is
12 whether GMAC owns this mortgage.
13         Are you able to answer that question as
14 you sit here today, Mr. Maxwell?
15         THE WITNESS:  No.  Because in my
16 experience in this position, asking directly
17 if we own the note would be a legal
18 conclusion, and I cannot answer that.  I can
19 answer that we have possession.
20 BY MR. TAGGART:
21     Q.    You filed a claim, and you need
22 standing to own the note if you want to file a claim
23 in mortgage foreclosure.
24         MR. SUGLIA:  That's correct.

Page 147

1 BY MR. TAGGART:
2     Q.    So do you own the note?
3         MR. SUGLIA:  He answered your question.
4 To the extent -- no arrangements have been
5 made, no request has been made, at least to my
6 knowledge to review the original note and
7 mortgage in this case.
8         MR. TAGGART:  Okay.
9         MR. SUGLIA:  To the extent that request
10 is made, it will be addressed appropriately.
11 You asked the witness a question.  He gave you
12 the answer.
13         That's not to suggest as we sit here
14 today that there is no standing from a legal
15 perspective to prove this claim.
16         MR. TAGGART:  Well, why don't we
17 request that right now, and I'm going to
18 request the original note and mortgage.  So
19 I'll address that right now then.
20         MR. SUGLIA:  And again, I'm going to
21 ask you to set forth a comprehensive list of
22 all the requests being made.
23 BY MR. TAGGART:
24     Q.    Okay.  On page GMPO-G3, number three,

Page 148

1 it says on 07/11/08, it looks like the mortgage was
2 delivered in the name of "Mortgage Electronic
3 Registration Systems, Incorporated as a Nominee for
4 LBA Financial Group, LLC," which was recorded in
5 Montgomery County, PA.
6         So am I reading that correctly, that
7 LBA Financial nominated Mortgage Electronic
8 Registration Systems as the owner of the note at that
9 point?
10         MR. SUGLIA:  Sir, I'm going to object
11 to the question.  The words that your reading
12 have a certain legal significance, and for
13 that reason this is a -- the question as it's
14 posed, seeks a conclusion of law, which is
15 inappropriate for this witness to answer.
16 BY MR. TAGGART:
17     Q.    All right.  Could you tell me exactly
18 when GMAC Mortgage obtained the mortgage and the
19 note?
20     A.    Physical possession?
21     Q.    Well, both physical possession and the
22 date that it was transferred -- or you purchased or
23 it was transferred into GMAC Mortgage's name?
24     A.    As far as the physical position, no, I

Page 149

1 cannot.  That was what I believe we referred to
2 previously with the origination file.  I do not know
3 exactly when that was received.
4         However, based on my review of the
5 account, I believe the loan we received in or around
6 August of -- I believe it was 2008.  So I'm not sure
7 of the exact day without my notes in front of me,
8 but...
9     Q.    Say that again, I missed it.  2008?
10     A.    I believe that was when.  However, I
11 just do not have my notes in front of me from my
12 review.  So I do not know just from memory --
13     Q.    Your saying your review when GMAC
14 obtained ownership of the mortgage and the note?
15     A.    No.  That's -- you asked when we took
16 possession.  Your asking me a different question then
17 you asked me previously.
18     Q.    Okay.  All right.  My apology for the
19 --
20     A.    It's okay.
21     Q.    -- using the wrong word there.  Okay.
22         When did GMAC Mortgage become owner of
23 the note?
24     A.    Again, that's asking me to come to a

38  (Pages 146 to 149)

Stephen Maxwell

Page 150

1  legal conclusion, and I can't answer that.
2      Q.    Well, it's a legitimate question,
3  because to have standing to foreclose on a property,
4  you need to be owner of the note.
5          So I'm asking you when -- if you can't
6  tell me that your even owner of the note, you really
7  have -- he's going to object.  You have no legal
8  standing to file the Complaint.
9          Are you owner of the mortgage and the
10 note right now, today?
11     A.    Again, your asking me --
12         MR. SUGLIA:  Sir, I've already objected
13 to that question, and stated that it requests
14 a legal conclusion, which this witness is not
15 in a position to make.
16         The Complaint was filed in the name of
17 GMAC Mortgage.  You know, your entitled to do
18 whatever you deem appropriate from that
19 response and proceed accordingly.
20 BY MR. TAGGART:
21     Q.    Okay.  Since lenders are required to
22 show a chain of title, how they obtained the
23 mortgage, could you tell me from the point it was
24 originated until now how you obtained title to the

Page 151

1  mortgage and the note?
2      A.    If I had a document --
3          MR. SUGLIA:  First and foremost -- I'm
4  sorry.  I need to object, because to the
5  extent the question is based on certain
6  premises or legal conclusions based on Mr.
7  Taggart's understanding of how the process
8  works, I'm not going to let Mr. Maxwell answer
9  based on those premises.
10         MR. TAGGART:  Counsel, it's a simple
11 conclusion.  You know, you can object, but
12 we'll take it to Court.
13         MR. SUGLIA:  Sir, it's not simple in
14 any sense.
15         MR. TAGGART:  It most definitely is.
16         MR. SUGLIA:  No, it's not.  Because
17 what your attempting to do here is, at least
18 in part, trying to attack this Complaint on
19 technicality.  And --
20         MR. TAGGART:  No, no, no.
21         MR. SUGLIA:  Excuse me.  Let me finish.
22         MR. TAGGART:  Go ahead.
23         MR. SUGLIA:  Let me finish.  And what I
24 know here is I'm here to protect my client's

Page 152

1  interest.  I'm here to put the appropriate
2  objections on the record.  The question has
3  been answered.
4          To the extent you're suggesting that
5  GMAC isn't the appropriate party, or that you
6  shouldn't have to pay this note because
7  somebody doesn't have the mortgage, I think is
8  disingenuous.
9          But you are entitled to ask your
10 questions, you are getting your responses.
11 Let's proceed accordingly, please.
12         MR. TAGGART:  Well, Counsel, as you'll
13 see later, I think the only one disingenuous
14 is your client, and we'll get to that.
15         MR. SUGLIA:  Okay.
16         MR. TAGGART:  I'm not trying to get out
17 of paying the note from technicality.  It's a
18 legal standing.  And Counsel, you know better
19 than anybody here, okay?
20         I have every right to do that, and I'm
21 doing it.
22         MR. SUGLIA:  When you make the
23 appropriate application to the Court, if the
24 Court thinks there isn't standing, that's

Page 153

1  fine.  You know, you certainly have an
2  opportunity to present that argument.
3          MR. TAGGART:  Okay.  All right.  I see
4  you're going to dodge those questions, so I
5  won't take them up.
6          MR. SUGLIA:  For the record, I take
7  exception with the characterization of anybody
8  dodging anything.
9          To the extent, Mr. Taggart, that you
10 are asking questions that aren't appropriate
11 or aren't appropriately phrased, I can't take
12 responsibility for that, sir.
13 BY MR. TAGGART:
14     Q.    Okay.  I'm going to try this again.
15 I'm not trying to give you a hard time, but I'd
16 rather try to get it done right now than keep coming
17 back.
18     A.    Where are we at?
19     Q.    We're still on page three.  We're going
20 to go back and use different words and -- could you
21 tell me what date this mortgage was assigned to GMAC
22 Mortgage?
23     A.    If I had the assignment in front of me
24 then yes, I could.

39 (Pages 150 to 153)

Stephen Maxwell

Page 154

1    Q.   So you don't know what date it was
2    assigned to GMAC?
3         MR. SUGLIA:  Sir, that wasn't the
4    response.  The response was if he had the
5    assignment in front of him, he could.
6         MR. TAGGART:  But he can't answer that
7    now.
8         MR. SUGLIA:  Sir, is there a document
9    you'd like to put before him in that regard?
10         MR. TAGGART:  No.  I asked him a
11    question regarding this document.
12         MR. SUGLIA:  And that's been asked and
13    answered.
14         MR. TAGGART:  All right.  And perhaps
15    -- I'm not trying to give you a hard time.
16         MR. SUGLIA:  Mr. Taggart, you are not
17    giving me a hard time.
18         MR. TAGGART:  Okay.
19         MR. SUGLIA:  I'm not perceiving it in
20    that way, and I'm not trying to give you a
21    hard time, sir.
22         MR. TAGGART:  All right.
23    BY MR. TAGGART:
24         Q.   So these documents we're going over

Page 155

1    collectively, you did say you reviewed them?
2         A.   Correct.
3         Q.   Okay.  And would you say that they are
4    accurate?
5         A.   To the best of my knowledge.
6         Q.   Okay.  So you're telling me all these
7    -- I'm sorry.  On page 24, you're telling me all
8    these figures here on item six is correct?
9         MR. SUGLIA:  Are we talking as of the
10    date this was --
11         MR. TAGGART:  As of the date it was
12    prepared.  And I was also going to supplement
13    that and ask, you know, is there, you know, at
14    least as to the date this was prepared, are
15    they all correct, all these figures?
16         MR. SUGLIA:  Unfortunately, Mr. Maxwell
17    isn't the person that verified this, so I
18    don't know.  He may be able to answer that.
19         MR. TAGGART:  Well, can you tell me the
20    one that verified this?
21         MR. SUGLIA:  Let me finish.  You have
22    to let me finish.
23         To the extent that he can respond,
24    that's fine.  To the extent that he doesn't

Page 156

1    know, that is what it is.
2         MR. TAGGART:  All right.  Could you
3    tell me who verified this, this information?
4         He told me he was familiar with the
5    document, so I think it's legitimate to ask
6    him.  If he reviewed them, he obviously knows
7    if it's accurate or not, and I'm asking him
8    that question.
9    BY MR. TAGGART:
10         Q.   Is this accurate?  If you reviewed it,
11    you'll know if it's accurate.
12         A.   I reviewed this document, and based on
13    the fact that it comes from our system records, I
14    believe that it is accurate.
15         Q.   Oh, wait a minute.  So this comes from
16    your system records.  That's where you're getting
17    that information from?
18         A.   Amounts that are from the principal
19    balance, interest, those amounts, yes.  They come
20    from our records.
21         Q.   How about all the other figures?  Is
22    that all your system records?
23         MR. SUGLIA:  Is there a specific figure
24    you want him to address, sir?

Page 157

1         MR. TAGGART:  Every one of them.
2         MR. SUGLIA:  All right.  Let's go
3    through them.
4    BY MR. TAGGART:
5         Q.   The first one, principal balance,
6    $655,405.27, is that accurate?
7         MR. SUGLIA:  Sir, that wasn't the
8    question.  You're changing the question.
9         MR. TAGGART:  I'm giving you the
10    opportunity rather than waste a lot of time.
11    I'm asking are all these figures accurate?
12         MR. SUGLIA:  Sir, I appreciate the
13    opportunity that you are giving me.  However,
14    you asked a question as to where these figures
15    come from.  Now that he's answering the
16    question, you are changing the question on
17    him.  You're asking him if it's accurate --
18         MR. TAGGART:  I'm asking him two
19    different questions.
20         MR. SUGLIA:  Okay.  Let's -- first of
21    all, we need to not talk over each other.
22         Second of all, if you have a question,
23    please ask the question.  Let him answer it.
24    You are certainly entitled to move on to you

40  (Pages 154 to 157)

Stephen Maxwell

Page 158

1  next question.
2       MR. TAGGART: All right.
3       MR. SUGLIA: With all due respect,
4  you're being inconsistent in the questions.
5  And I don't want that to be interpreted as
6  incorrect responses on the witness' part.
7       MR. TAGGART: I'm not doing it
8  intentionally sir, I apologize.
9       MR. SUGLIA: I understand. I
10 understand. But I need for that reason to put
11 these objections on the record. I'm not
12 suggesting you are doing it intentionally.
13 And I understand this is emotional for you,
14 but you are getting aggravated with me. You
15 made the characterization that I'm trying to
16 dodge your particular question. I need to
17 cover myself. I need to cover my client. I'm
18 not looking to give you a hard time, but you
19 need to be consistent with the questions.
20       MR. TAGGART: All right.
21 MR. TAGGART:
22    Q.  We're going to go back here to the
23 figures, okay?
24    A.  Okay.

Page 159

1    Q.  And just to clarify, you stated you
2  reviewed this entire document, and you're saying that
3  it's accurate?
4    A.  To the best of my knowledge, yes, sir.
5    Q.  Okay. All right. Now, each one of
6  these figures, you said they came from your computer
7  system; is that correct?
8    A.  I said that figures come from our
9  records. There are a number of figures on here,
10 however.
11   Q.  Okay. Could you tell me where each of
12 these figures are obtained? You said on your
13 computer -- can I ask the name of your computer
14 system?
15   A.  It's called Loan Serve.
16   Q.  Loan Serve, okay. So Loan Serve --
17 when this was prepared, whoever prepared this went
18 through Loan Serve and got the principal balance; is
19 that correct?
20   A.  I'm not sure what they did. I don't
21 know what the person who prepared this did.
22       MR. TAGGART: All right. Okay. I'm
23 just -- he confirmed that they are all right,
24 but now he's saying that he don't know what

Page 160

1  they did.
2       MR. SUGLIA: Based on the question you
3  asked, if I may, you asked if the person that
4  prepared this document, sir, went into the
5  system and got this document from the system.
6       MR. TAGGART: Um-hum.
7       MR. SUGLIA: Sir, this is a legal
8  document. It was prepared by Counsel.
9       MR. TAGGART: It was prepared by
10 Counsel?
11       MR. SUGLIA: Predecessor Counsel, okay.
12       Now, to the extent that certain numbers
13 were from whatever source, that's not the
14 question you're asking him. You're making
15 characterizations --
16       MR. TAGGART: I'm asking different
17 questions. I'm entitled to do that.
18       MR. SUGLIA: You are entitled to do
19 that. But to the extent that the
20 characterizations you're making are not
21 accurate or not supported, I have to continue
22 to object.
23       MR. TAGGART: Okay.
24 BY MR. TAGGART:

Page 161

1    Q.  All right. You've confirmed, and not
2  to repeat, that you reviewed all these documents, and
3  you say that all these figures are accurate?
4    A.  To the best of my knowledge, yes, sir.
5    Q.  Now, could you tell me who prepared
6  these figures in this document?
7    A.  I cannot.
8    Q.  You don't know, okay. Can you tell me
9  if they are accurate?
10       MR. SUGLIA: It's been asked and
11 answered.
12 BY MR. TAGGART:
13    Q.  But they are all accurate?
14       MR. SUGLIA: To the best of his
15 knowledge.
16 BY MR. TAGGART:
17    Q.  Okay. I'll ask each one individually
18 starting here, principal balance, $655,405.27; is
19 that correct? That's accurate?
20    A.  To the best of my knowledge.
21    Q.  Interest from 03/01/09 to 08/12/09 is
22 $19,526.10?
23    A.  To the best of my knowledge.
24    Q.  Okay. Attorneys' fees $1,300.00?

41 (Pages 158 to 161)

Stephen Maxwell

Page 162

1    A.    I am unaware of what the prior Counsel
2    would have charged or what their fees would have
3    been.
4    Q.    So you can't tell me specifically what
5    those attorneys' fees are?
6    A.    No. However, I have to rely on our
7    Counsel to prepare this with their accurate
8    information as well.
9    Q.    All right. So you don't have a
10    breakdown there. Accumulative charges from 07/11/08
11    to 08/12/09, and it says $1,762.16.
12    Can you tell me what those charges are?
13    A.    I believe it states accumulative late
14    charges.
15    Q.    Okay, all late charges. Property
16    inspections, $16.88.
17    Can you tell me what they're for?
18    A.    To inspect the property, make sure --
19    Q.    For what purpose?
20    A.    To make sure that it's occupied.
21    Q.    To make sure that it's occupied. Can
22    you tell me what authority you have to do that and
23    charge that?
24    A.    I believe that's in the mortgage.

Page 163

1    Q.    Do you have a specific section that
2    states that?
3    A.    If I had the mortgage in front of me I
4    could locate that for you.
5    Q.    Okay. You're alleging that it's
6    permitted in the mortgage?
7    A.    Yes, sir.
8    Q.    Okay. Do you have the dates that those
9    inspections occurred?
10    A.    Based on this document, no.
11    Q.    Cost of title and search, $750.00 it
12    looks like -- I'm sorry. Cost of suit and title
13    search. So I guess that's filing fees and title
14    search, $750.00.
15    Do you know what the breakdown is for
16    the cost of suit and the title search and how much is
17    each one?
18    A.    No, I don't.
19    Q.    You don't. Okay. I see there's an
20    escrow deficit of $6,916.42. Can you tell me what
21    that deficit -- what dates that deficit occurred or
22    breakdown of that?
23    A.    Not without some documentation.
24    Q.    Okay. Could you tell me -- let's see.

Page 164

1    It got verified by J. McGuiness. Isn't there a
2    document that's required for somebody at GMAC to
3    verify this information and file it with the Court?
4    MR. SUGLIA: Sir, you're asking this
5    witness a question on the legal procedure, and
6    it's inappropriate.
7    BY MR. TAGGART:
8    Q.    Let's see. What Exhibit are we up to,
9    9?
- - -
10
11    (Defendant's-9, Praecipe to Substitute Verification,
12    was marked for identification.)
13    - - -
14    BY MR. TAGGART:
15    Q.    All right. Exhibit-9 is three pages.
16    All right. This is a court filing for the
17    Verification of the mortgage of the filing. And it
18    says, "The undersigned understands that this
19    statement is made subject to the penalties of 18 Pa.
20    C.S. Sec. 4904 relating to unsworn falsification to
21    authorities."
22    So this document followed the mortgage
23    foreclosure, the Complaint. Are you relying on this
24    to verify that this information is correct? Are you

Page 165

1    relying on Exhibit-9?
2    MR. SUGLIA: Sir, no. I'm going to
3    have to object to the question.
4    MR. TAGGART: You can object all you
5    want.
6    MR. SUGLIA: Then I'm doing that.
7    MR. TAGGART: Okay.
8    MR. SUGLIA: This document is not
9    signed by Mr. Maxwell. He's not relying on
10    anything.
11    MR. TAGGART: I asked a question. He
12    could say yes or not. I asked if he was
13    relying on this document.
14    MR. SUGLIA: I don't want to go down a
15    path that is inappropriate for this client.
16    Now, again, you need to understand this
17    is a document. It's filed with the Court to
18    put forth our claim. Then there are processes
19    and procedures, pursuant to which we put as
20    evidence before the Court. The Court makes a
21    determination one way or the other.
22    This witness is here as a corporate
23    witness on behalf of GMAC and as custodian of
24    record.

42 (Pages 162 to 165)

Page 166

1       MR. TAGGART: Okay.
2       MR. SUGLIA: To the extent your asking
3   him questions relating to procedural issues
4   relating to the filing of the lawsuit, then it
5   beyond the scope of his knowledge as to the
6   reason he's here.
7       MR. TAGGART: But it says here, it's
8   verifying that all the statements made in
9   preparing the civil action are true and
10  correct.
11      MR. SUGLIA: That has been verified on
12  behalf of GMAC, that's correct.
13      MR. TAGGART: Really? Okay.
14  BY MR. TAGGART:
15      Q.   Are you familiar with Exhibit-9, Mr.
16  Maxwell?
17      A.   I have reviewed the Court file, yes,
18  sir.
19      Q.   Oh, you have reviewed it? Okay, good,
20  so you're familiar it. Which is filed by Phelan
21  Hallinan & Schmieg, by Jenine R. Davey, Esquire,
22  signed by one Jeffrey Stephan, Limited Signing
23  Officer.
24      Isn't this document supposed to be

Page 167

1   notarized to be valid in Court?
2       MR. SUGLIA: Objection. I'm not going
3   to let him answer that. It calls for a legal
4   conclusion.
5       MR. TAGGART: Okay.
6       MR. SUGLIA: I'm not going to let him
7   answer that.
8   BY MR. TAGGART:
9       Q.   All right. Do you know Jeffrey
10  Stephan?
11      A.   No.
12      Q.   You don't. Okay. How long have you
13  worked at GMAC?
14      A.   Almost three years.
15      Q.   Three years. You don't know Jeffrey
16  Stephan at all?
17      MR. SUGLIA: Sir, it's been asked and
18  answered.
19  BY MR. TAGGART:
20      Q.   Okay. You can object to this if you
21  want, but I'm going to ask it.
22      On October 12, 2010 and several other
23  times subsequent to that, GMAC has been under fire
24  for --

Page 168

1       A.   Is this an exhibit?
2       Q.   Yes, I'm sorry. Reviews on
3   Foreclosures, which we'll make Exhibit-10.
4                   - - -
5   (Defendant's-10, Documents GMPO-D14 and GMPO-D15,
6   were marked for identification.)
7                   - - -
8   BY MR. TAGGART:
9       Q.   GMAC has admitted that they've had
10  problems in the foreclosure process.
11      Could you tell me if anything in this
12  foreclosure process do you feel is flawed? Do you
13  think at all? You're saying everything is
14  legitimate?
15      MR. SUGLIA: Absolutely not. The
16  question --
17      MR. TAGGART: I'm going to ask. You
18  can object --
19      MR. SUGLIA: You can ask whatever you
20  want. You're asking questions based on a --
21  what appears to be a press release --
22      MR. TAGGART: That's fine.
23      MR. SUGLIA: Hold on a second. It
24  appears to be a press release. There's no

Page 169

1   judicial liability here. You're trying to
2   take a specific, very specific limited issue
3   and turn it into something -- this witness is
4   not here for that purpose.
5       MR. TAGGART: Okay.
6       MR. SUGLIA: This is an inappropriate
7   question. I'm not going to allow him to
8   answer that.
9       MR. TAGGART: Good. While we're on the
10  record, what we're going to need to do to
11  clarify this is we're going to get a request
12  here for a Mr. Jeffrey Stephan. And why don't
13  we request and we'll depose him prior to
14  Court.
15      MR. SUGLIA: Sir, you've made the
16  request to the Court.
17      MR. TAGGART: I didn't make that
18  request to the Court.
19      MR. SUGLIA: Excuse me, sir. You made
20  the request to the Court for a particular
21  witnesses. The Court made a ruling with
22  respect to these specific witnesses that you
23  were entitled to. The Court said that you
24  were entitled to a custodian of records. The

43 (Pages 166 to 169)

Stephen Maxwell

---

Page 170

1    Court said that you were entitled to a
2    corporate witness. The Court also stated that
3    that person could be one in the same, which in
4    this case, it is.
5         To the extent you want to make another
6    application to the Court, you want to make a
7    request, it's your prerogative to do whatever
8    you need.
9         MR. TAGGART: Okay. I'm entitled to
10   ask questions about the review process of
11   foreclosures of GMAC.
12        MR. SUGLIA: Sir, I'm not going --
13        MR. TAGGART: There's been noted
14   problems with the Government.
15        MR. SUGLIA: I'm not going to sit here
16   --
17        MR. TAGGART: I'm going to ask the
18   questions, and then you can object to each
19   one.
20        MR. SUGLIA: I'm not going to sit here
21   and debate the law with you or the merits of
22   your case.
23        MR. TAGGART: Okay.
24        MR. SUGLIA: You're entitled to ask

---

Page 171

1    your questions. I'm not going to let you ask
2    inappropriate questions.
3    BY MR. TAGGART:
4    Q.   I'm going to ask a few questions and
5    you can object.
6         MR. SUGLIA: Sir, you can ask --
7    BY MR. TAGGART:
8    Q.   Okay.
9    A.   What are we looking at here?
10   Q.   He's going to object to this document,
11   so I'll just ask you questions regarding the whole
12   foreclosure process since you're custodian of records
13   and corporate representative.
14   A.   Okay.
15   Q.   Has this case been reviewed that all
16   the proper steps were taken during this foreclosure
17   process and verified properly?
18        MR. SUGLIA: I'm going to object --
19   BY MR. TAGGART:
20   Q.   I'm going to repeat that you're under
21   oath.
22        MR. SUGLIA: I'm going to object to the
23   question, because it calls for a legal
24   conclusion. It's inappropriate for this

---

Page 172

1    witness to make such a legal conclusion. So
2    I'm going to instruct him not to answer.
3         MR. TAGGART: Okay.
4         MR. SUGLIA: In addition, I would also
5    like to point out for the record that I do
6    take exception to the reminder that he's
7    "under oath," in an attempt to intimidate this
8    witness. The witness has been nothing less
9    than forthcoming and truthful to all your
10   questions.
11        MR. TAGGART: That's debatable. That's
12   a legal conclusion.
13        MR. SUGLIA: Well, sir, you're entitled
14   to proceed however you deem it appropriate.
15   BY MR. TAGGART:
16   Q.   All right. We'll move onto the next
17   one for now.
18        While we're on that subject, are you
19   telling me that I'm not able to depose anybody else
20   except for here?
21        MR. SUGLIA: Sir, I put my objections
22   to your questions on the record. I'm not
23   going to tell you how to handle your case.
24        MR. TAGGART: Well, we're on the

---

Page 173

1    record. I'm asking if I can depose Mr.
2    Jeffrey Stephan?
3         MR. SUGLIA: I'm not going to tell you
4    how to do your case, sir.
5         MR. TAGGART: I'm asking if you're on
6    the record opposing that, yes or no?
7         MR. SUGLIA: Sir, you can make the
8    request, and it will be addressed accordingly.
9         MR. TAGGART: Okay. It certainly will,
10   and all parties will be held accountable.
11        MR. SUGLIA: I'm not sure exactly what
12   that means, but...
13        MR. TAGGART: You'll find out later.
14   BY MR. TAGGART:
15   Q.   The next one, which is Exhibit 11-1,
16   this was -- I'm sure Counsel will object. It is a
17   Truth In Lending Disclosure by LBA Financial, dated
18   July 14, 2008.
19        Do you see the annual percentage rate,
20   7.092?
21            - - -
22   (Defendant's-11, Truth in Lending Disclosure
23   Statement, was marked for identification.)
24            - - -

44 (Pages 170 to 173)

Stephen Maxwell

Page 174

1    THE WITNESS: I see that.
2 BY MR. TAGGART:
3    Q.    Okay. And the finance charge says
4 $884,573.35. And the amount financed is $632,187.36,
5 correct?
6    A.    That is what it says.
7    Q.    All right. And comparing those same
8 figures with the other document on page six which is
9 on the 10th, you can see that those numbers are
10 different. Is that correct, holding them up?
11    A.    Yes, I do see there is a change.
12    Q.    Okay. And the second one that I read
13 off -- the first one I read off, was that July 14 or
14 July 10? I'm sorry.
15    A.    Where's the date?
16    Q.    At the bottom here. (Indicating.)
17    A.    The first one I have A5 as the 14th,
18 and the second page B6, that is dated 7/10 based on
19 the handwriting on there.
20    Q.    Now, you can see the documents, the one
21 dated on the 10th at closing, the closing date was
22 actually I believe the 11th of July. And the APR was
23 7.091, but after closing -- this document was
24 provided after closing on July 14 with an APR of

Page 175

1 7.092.
2    MR. SUGLIA: Mr. Taggart, I'm not going
3 to let the witness answer to this document.
4 Again, it's a document that was not produced
5 by GMAC --
6    MR. TAGGART: Okay.
7    MR. SUGLIA: -- not generated by GMAC.
8 And it goes to the origination of this --
9 well, which GMAC was not involved.
10    MR. TAGGART: No, no, no, no, no.
11 You're legally liable. Okay?
12    MR. SUGLIA: Sir, I'm not here to --
13    MR. TAGGART: You're legally liable.
14    MR. SUGLIA: I'm not here to --
15    MR. TAGGART: We'll file a motion to
16 compel then, because you're legally liable,
17 even though you didn't originate it. You have
18 to answer the question. I'll take it to the
19 judge, that's fine.
20    Your legally liable to answer it and
21 you are responsible and you are supposed to
22 answer these. We're on the record for that,
23 and your on the record. You want to file your
24 objections --

Page 176

1    MR. SUGLIA: Sir, I am well aware that
2 I am on the record. First of all, whatever
3 you think that the legal obligation is on
4 behalf of GMAC, that's fine. It's your
5 prerogative to think whatever you want to
6 think.
7    You want to make the appropriate motion
8 to compel, make the motion. This document was
9 a document that was not generated by my
10 client, not prepared by my client --
11    MR. TAGGART: I'll take your objection.
12 I mean, I disagree.
13    MR. SUGLIA: Sir, you have to let me
14 finish, because the court reporter is trying
15 to take us both down.
16    MR. TAGGART: Go ahead.
17    MR. SUGLIA: To the extent you want my
18 client to opine about a perceived discrepancy,
19 because it could be any number of things, I'm
20 not going to let him do that. This isn't his
21 document.
22    MR. TAGGART: Um-hum.
23    MR. SUGLIA: So you can go ahead --
24    MR. TAGGART: So you're going to --

Page 177

1 okay, I'll file my objection, that's fine.
2 BY MR. TAGGART:
3    Q.    I just have a question that I'm not
4 sure if Mr. Maxwell knows or not.
5    But on Exhibit-9, page three, I'm not
6 sure if you're aware, but I know Mr. Suglia is that
7 Mr. Jeffrey Stephan is a known robo-signer of GMAC
8 and he has signed thousands of documents and has
9 never verified them.
10    Are you relying on his information when
11 you tell me you verified the information?
12    MR. SUGLIA: I'm going to object to the
13 form of the question. That was not the
14 testimony that was put forth by this witness.
15 Your question was whether GMAC relied on this
16 Verification in filing the Complaint. The
17 Verification was there.
18    MR. TAGGART: Okay.
19    MR. SUGLIA: Deduce whatever legal
20 ramifications you want from that.
21    Mr. TAGGART: So GMAC is relying on Mr.
22 Jeffrey Stephan; is that correct? Yes or no?
23 Yes or no?
24    MR. SUGLIA: Sir, I'm not going to be

45 (Pages 174 to 177)

Stephen Maxwell

Page 178

1  limited in my response in terms that you want
2  me to first of all.
3      MR. TAGGART: Mr. Fleischer and you,
4  Mr. Suglia, know Mr. Stephan very well.
5      MR. SUGLIA: Sir, I have never met Mr.
6  Stephan.
7      MR. TAGGART: Mr. Fleischer has; I know
8  he has. And you know who he is.
9      MR. SUGLIA: You know what? It is
10  irrelevant to your point here today what you
11  think happened with respect to Mr. Stephan or
12  didn't happen.
13      MR. TAGGART: No, what I know happened
14  and what you know happened.
15      MR. SUGLIA: Sir, what happened here is
16  that you didn't pay on your mortgage. That's
17  what happened.
18      MR. TAGGART: You're making conclusions
19  of law.
20      MR. SUGLIA: That's what happened here.
21      MR. TAGGART: Because you raised the
22  escrow amount, and then you robo-signed it.
23  So you're covering up for your forced
24  insurance. All right. I've had enough.

Page 179

1  We're done.
2      MR. SUGLIA: You're finished here
3  today?
4      MR. TAGGART: Yep.
5      MR. SUGLIA: You're sure you're done?
6      MR. TAGGART: No. Give me about 15
7  minutes. I think I have a few more.
8          - - -
9  (A discussion off the record occurred.)
10          - - -
11      MR. SUGLIA: Mr. Taggart, do you have
12  anything else to say?
13      MR. TAGGART: I'm going to review. I
14  may have a few more questions.
15      MR. SUGLIA: No, no, no, sir. I'm
16  referring to the comments regarding somebody
17  being despicable and comments being despicable
18  you made while we were off the record.
19      MR. TAGGART: I'd be glad to make
20  comments that GMAC is despicable.
21      MR. SUGLIA: Sir, I am not trying to
22  provoke you. I am not trying to get you to
23  say something. But to the extent that there
24  was something you would like to discuss, we

Page 180

1  prefer everything on the record. Short of
2  that, we'll take our break --
3      MR. TAGGART: Yeah. Would you like to
4  go on the record? I'll put anything on the
5  record.
6      MR. SUGLIA: Sir, we're on the record
7  now.
8      MR. TAGGART: Okay. Since GMAC has
9  fraudulently filed thousands of foreclosure
10  cases including this one by Mr. Jeffrey
11  Stephan, who has been documented at several
12  depositions that he hasn't verified the
13  information, could you tell me why you're
14  pursuing a foreclosure complaint when you know
15  that it's fraud?
16      MR. SUGLIA: Sir, I'm not going to
17  justify that question with an answer.
18      MR. TAGGART: Well, you asked me if I
19  had a, you know...
20      MR. SUGLIA: Is there anything else?
21      MR. TAGGART: Yeah. I have a few more
22  questions.
23      MR. SUGLIA: Aside from the question
24  you had, is there anything else you'd like to

Page 181

1  discuss right now before we take our break?
2      MR. TAGGART: No. Not before we take
3  our break, after we take our break.
4          - - -
5  (A recess occurred.)
6          - - -
7      MR. TAGGART: The only other thing I
8  have, just to finish back on the record, Mr.
9  Suglia, is that GMAC has known apparently I
10  just realized, that this foreclosure, which
11  initially was to cover up for forced placed
12  insurance, as well as escrow calculations that
13  were inaccurately calculated, to cover up for
14  that you illegally foreclosed.
15      Not only that, GMAC has intentionally
16  filed false documents with the Court and
17  maintains to pursue a foreclosure with false
18  documents with Mr. Jeffrey Stephan. You've
19  known this for two and a half years. And Mr.
20  Suglia, your partner, Mr. Fleischer, was
21  present during his testimony and both of you
22  know this.
23      And Members of the Court, it's fraud.
24  You are intentionally filing false documents.

46 (Pages 178 to 181)

Stephen Maxwell

Page 182

1   Not just GMAC Mortgage, but Mr. Suglia, if you
2   didn't know, I believe you do. Your partner
3   Mr. Fleischer knows that it's false documents.
4        You've done it. I'll take appropriate
5   action. That's all for today.
6        MR. SUGLIA: Are we finished?
7        MR. TAGGART: Yeah.
8        MR. SUGLIA: Okay. Let the record
9   reflect it is 3:30 p.m.
10  (Witness excused.)
11  (Deposition concluded at approximately 3:30 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

STREHLOW & ASSOCIATES, INC.
(215) 504-4622