UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                    :

In re:                          :       Chapter 11 Case No.
                                 :

RESIDENTIAL CAPITAL, LLC, *et al.*,   :     12-12020 (MG)
                                 :

       Debtor.             :    (Jointly Administered)
                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PARTIAL WITHDRAWAL OF RESPONSE & OPPOSITION OF CLAIMANT, OTIS L. COLLIER, JR., TO RESCAP BORROWER CLAIMS TRUST'S SIXTY-NINTH OMNIBUS OBJECTION TO CLAIMS & REQUEST FOR OPPORTUNITY FOR DISCOVERY & EVIDENTIARY HEARING

On August 1, 2014, Claimant Otis L. Collier, Jr. ("Claimant") filed Document No. 7351 entitled *Response to Motion & Opposition of Claimant, Otis L. Collier, Jr.* ("Response & Opposition"). In the Response & Opposition, Claimant stated that he believed he had the following ten (10) claims against GMAC Mortgage, LLC ("GMAC") in paragraph 16, thereof: (a) breach of oral contact, (b) breach of implied covenant of good faith and fair dealing, (c) promissory estoppel, (d) fraud based on misrepresentation, (e) negligence, (f) unfair and deceptive business practices, (g) negligent infliction of emotional distress, (h) Truth in Lending Action (TILA) violations, (i) predatory and discriminatory lending practices, and (j) Fair Debt Collection Practices Act (FDCPA) violation.

Claimant hereby withdraws the following claims stated in the Opposition: (a) breach of oral contract; (b) breach of implied covenant of good faith and fair dealing; (c) unfair and deceptive business practices; (d) negligent infliction of emotional distress; (e) TILA violations; (f) predatory and discriminatory lending practices; and (g) FDCPA violation. Accordingly, after withdrawal of the foregoing claims, the following claims are the remaining claims which

Claimant believes he has against GMAC: (a) promissory estoppel; (b) fraud based on

misrepresentation; and (c) negligence.

## A. Promissory Estoppel

Claimant believes he has a claim against GMAC for promissory estoppel because he

relied to his detriment on GMAC's representation that it would provide him with a certain loan

modification.  "When a party makes an oral promise to sign a written instrument complying with

the statute of frauds, the promise will be enforced, provided the promissor should have expected

that the promisee would detrimentally rely on such promise." *Maginn v. Norwest Mortgage,

Inc.*, 919 S.W.2d 164, 167-168 (Tex. App. 1996) (copy attached as <u>Exhibit A</u>).

## B. Fraud Based on Misrepresentation

Claimant believes he has a claim against GMAC for fraud based on misrepresentation

because he relied on GMAC's representation that it would provide a particular loan modification

to his detriment.  But for GMAC's misrepresentation, Claimant asserts that he would have

obtained a different suitable loan modification (such as a V.A. loan because he is a veteran) in a

timely manner.  A lender may become liable for fraud by misrepresenting a material fact or by

making a promise with the intent not to perform that promise when a debtor reasonably relies on

the representation to his or her detriment.  *Clardy Mfg. Co. v. Marine Midland Business Loans

Inc.,* 88 F.3d 347, 349 (5th Cir. 1996) (copy attached as <u>Exhibit B</u>), applying Texas law.

## C. Negligence

Claimant believes he has a claim against GMAC for negligence based on GMAC's

dealings with him with respect to a potential loan modification.  In *Federal Land Bank Assn. of

Tyler v. Sloane*, 825 S.W.2d 439 (Tex. 1991) (copy attached as <u>Exhibit C</u>), relying on a

representation from the bank that it would loan him money to renovate his farm, plaintiff

incurred expenses upgrading his chicken coups.  *Id.*  After the bank refused to loan the money,

the Court found that where the bank officer had in fact made representations with the knowledge

that the plaintiffs were incurring indebtedness and otherwise being damaged by his

representations, a claim for misrepresentation was made and provided.  *Id.*  Here, Claimant

asserts that a GMAC representative negligently represented to Claimant that he would receive a

particular loan modification, and Claimant relied on the representation to his detriment.


Dated: New York, New York
       March 9, 2015

                                    By:   /s/ Stephen Z. Starr
                                        Stephen Z. Starr, Esq.
                                        STARR & STARR, PLLC
                                        260 Madison Ave., 17th Fl.
                                        New York, NY 10016
                                        tel.: (212) 867-8165
                                        fax: (212) 867-8139

                                        *Attorneys for Otis L. Collier, Jr.*

## <u>DECLARATION OF SERVICE</u>

I, Stephen Z. Starr, declare as follows:

1. I am not a party to the action, am over 18 years of age and have a business address at 260 Madison Ave., 17th Fl., New York, NY 10016.

2. On March 9, 2015, I caused a true copy of the Partial Withdrawal of Response & Opposition of Claimant, Otis L. Collier, Jr., to ResCap Borrower Claims & Request for Opportunity for Discovery & Evidentiary Hearing  to be served by electronic mail upon Norman S. Rosenbaum at the e-mail address of nrosenbaum@mofo.com and Jordan A. Wishnew at the e-mail address of jwishnew@mofo.com.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Executed at New York, New York on March 9, 2015

By: <u>/s/ Stephen Z. Starr</u>
 Stephen Z. Starr, Esq.
 STARR & STARR, PLLC
 260 Madison Ave., 17th Fl.
 New York, NY 10016
 tel.: (212) 867-8165
 fax: (212) 867-8139

 *Attorneys for Otis L. Collier, Jr.*

# EXHIBIT

# A

Court of Appeals of Texas, Austin.

# MAGINN v. NORWEST MORTG. INC

### 919 S.W.2d 164 (Tex. App. 1996)

Michael **MAGINN** and Kimberly **Maginn, Appellants, v. NORWEST MORTGAGE, INC., Appellee.**

No. 03-95-00485-CV.

Court of Appeals of Texas, Austin.

March 20, 1996. Rehearing Overruled April 24, 1996.

Appeal from 98th Judicial District Court, Travis County, Peter M. Lowry, J. *165

Howard J. Siegel, Kiester Lockwood, L.L.P., Austin, for appellants.

Mitchel D. Savrick, Howmann, Werner Taube, L.L.P., Austin, for appellee.

Before POWERS, ABOUSSIE and KIDD, JJ.

---

ABOUSSIE, Justice.

Appellants sued appellee for breach of written contract, breach of oral contract, promissory estoppel, violations of the Deceptive Trade Practices Act ("DTPA"), negligence, gross negligence, fraud, and negligent misrepresentation. The controversy arose when appellee ("Norwest") declined to offer appellants a mortgage loan. The trial court granted summary judgment against appellants on the DTPA claim, ruling that appellants were not "consumers" for purposes of the act. The trial court also granted summary judgment against appellants on the contract and tort claims, ruling that they were barred by the statute of frauds. Appellants non-suited their promissory estoppel claim and appeal the final judgment below. We will affirm the trial court's judgment in part and reverse and remand in part.

*166

## BACKGROUND

Appellants applied for a mortgage loan from Norwest. In connection with their application, appellants provided Norwest with a variety of credit information. In conducting its credit check, on May 18, 1993, Norwest faxed a letter to appellants' real estate broker stating that appellants' credit report was acceptable and that "final loan approval is contingent upon" a number of factors. Appellants claim that Norwest informed them that the loan transaction, in an amount exceeding $100,000, would close by the end of June 1993. On June 23, 1993, Norwest advised appellants' real estate agent that it declined to provide a mortgage loan to appellants.

## DISCUSSION

The standards for reviewing a motion for summary judgment are well established: (1) the movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and (3) every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548-49



MAGINN v. NORWEST MORTG. INC, 919 S.W.2d 164 (Tex. App. 1996)

(Tex. 1985). Furthermore, when a trial court grants summary judgment without stating the grounds, the summary judgment will be affirmed on any meritorious theory set out in the motion. *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex. 1989).

*DTPA Claims*

In their third point of error, appellants contend that the trial court improperly granted summary judgment against their DTPA claims because they were in fact "consumers" for purposes of the act. Appellants allege that, under the DTPA, they were consumers of various banking services ancillary to the application for a Norwest mortgage loan.

To qualify as a consumer under the DTPA, a person must have sought or acquired goods or services by purchase or lease, and the goods or services must form the basis of the complaint. *Cameron v. Terrell Garrett, Inc.,* 618 S.W.2d 535, 539 (Tex. 1981). For purposes of the DTPA, a loan is not a good or service. *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 174-75 (Tex. 1980). Therefore, we are called upon to answer whether Norwest's actions in evaluating appellants' credit history and assisting in the closing of the home sale constitute "services" under the DTPA.

On a prior occasion, this Court has addressed the distinction between the objective of a transaction and actions merely incidental to that objective:

> All transactions involve human service to some extent, the cost of which is included in the price of the transaction. Arguably, then all services in any transaction are purchased "services" under the DTPA. Under this approach, any service involved in a . . . loan transaction would give rise to DTPA consumer status even though the actual . . . loan could not. . . .

*First State Bank v. Keilman,* 851 S.W.2d 914, 929 (Tex.App. — Austin 1993, writ denied) (quoting *FDIC v. Munn,* 804 F.2d 860, 863-64 (5th Cir. 1986)). This Court

further noted that, "the key principle in determining consumer status is that the goods or services purchased must be an *objective* of the transaction, not merely incidental to it." *Keilman,* 851 S.W.2d at 929 (emphasis in the original).

To support their argument that Norwest's ancillary banking services constituted "services" for the purposes of the DTPA, appellants principally rely on *Herndon v. First Nat'l Bank,* 802 S.W.2d 396 (Tex.App. — Amarillo 1991, writ denied). In *Herndon,* the borrower claimed that he sought to acquire from the lender a variety of financial services. These services included financial advice on when and where to obtain financing, whether to abstain from borrowing, and how to structure various financial agreements of his business operations. The court held that the Bank's financial advice constituted services for purposes of the DTPA. *Id.* at 399.

*167 *Herndon* is distinguishable from the instant case. Financial advice on when to borrow, whether to borrow, and how to structure financial arrangements of business operations is not typically incidental to the loan itself. Such financial advice constitutes an objective independent of the loan transaction. However, in the instant case, the end and aim of appellants' dealings with Norwest was to obtain a mortgage loan. Norwest's ancillary services served no purpose apart from facilitating a mortgage loan. Therefore, we conclude that any services provided by Norwest were, as a matter of law, incidental to the contemplated mortgage loan; they were not an objective of the transaction. As such, appellants were not consumers for purposes of the DTPA. We overrule point of error three.

*Contract Claims*

In point of error one, appellants claim that the trial court erred in ruling that the statute of frauds bars their breach of contract claims. Section 26.02(b) of the Texas Business and Commerce Code (the "Code") provides:



MAGINN v. NORWEST MORTG. INC, 919 S.W.2d 164 (Tex. App. 1996)

A loan agreement in which the amount involved in the loan agreement exceeds $50,000 in value is not enforceable unless the agreement is in writing and signed by the party to be bound or by the party's authorized representative.

Tex.Bus. Com. Code Ann. § 26.02(b) (West Supp. 1996). In support of their argument, appellants maintain that (1) there existed a written instrument evidencing a contract between Norwest and appellants to provide a mortgage loan; (2) the doctrine of promissory estoppel prevents Norwest from raising a statute of frauds defense; (3) Norwest failed to comply with § 26.02(e) of the Code, and thus § 26.02(f) bars it from raising a statute of frauds defense; and (4) Norwest failed to comply with § 26.02(g) of the Code and is thus barred from raising a statute of frauds defense.

*Written Memorandum Evidencing a Contract*

Appellants argue that a letter from Paula Moss, an agent of Norwest, constituted a written instrument evidencing a contract between Norwest and appellants to provide a mortgage loan. Moss faxed the memorandum to appellants' real estate broker on May 18, 1993. The memorandum indicated that appellants had made a loan application, that their credit was acceptable, and that based on the information in the application, their income-to-debt ratio was in line with FHA guidelines to qualify for a thirty-year mortgage loan in the amount of $105,000. The latter statement was made contingent on various factors, including further credit verifications.

Whether a contract comes within the statute of frauds is a question of law. *Bratcher v. Dozier,* 162 Tex. 319,346 S.W.2d 795, 796 (1961). The statute of frauds does not require that the contract itself be in writing. Instead, the written instrument merely furnishes written evidence of a contract and its essential terms. *EP Operating Co. v. MJC Energy Co.,* 883 S.W.2d 263, 267 (Tex.App. — Corpus Christi 1994, writ denied). The statute of frauds requires the written agreement or

memorandum to be complete within itself in every material detail and to contain all of the essential elements of the agreement so that the contract can be ascertained from the writings without resort to oral testimony. *Cohen v. McCutchin,* 565 S.W.2d 230, 232 (Tex. 1978).

The Moss memorandum contains neither a promise, an agreement, nor a commitment to loan appellants any money. The document merely states that appellants appear to have good credit, but that further credit inquiries must be undertaken. Having examined the "four corners" of the document, we conclude, as a matter of law, that the letter does not satisfy the statute of frauds.

*Promissory Estoppel*

In claiming that Norwest is barred from raising a statute of frauds defense, appellants evoke the promissory estoppel doctrine as exemplified in *Cobb v. West Texas Microwave Co.,* 700 S.W.2d 615 (Tex.App. — Austin 1985, writ ref'd n.r.e.); *see also Nagle v. Nagle,* 633 S.W.2d 796, 800 (Tex. 1982). When a party makes an oral promise to sign a written instrument complying with the statute of frauds, the promise will be *168 enforced, provided the promisor should have expected that the promisee would detrimentally rely on such promise. *Cobb,* 700 S.W.2d at 616. Appellants contend that (1) Norwest orally promised to later execute a written instrument evidencing a contract to provide a mortgage loan, and (2) appellants relied on such promise.

In *Cobb,* the summary-judgment evidence suggested that there was a promise to reduce the oral agreement to a written instrument. *Id.* at 616. In the instant case, taken in the light most favorable to the nonmovant, the summary-judgment evidence suggests that Norwest orally agreed to close the mortgage deal near the end of June 1993. However, there is nothing in the summary-judgment evidence to suggest that Norwest orally agreed to reduce any such promise to a *writ-*



MAGINN v. NORWEST MORTG. INC, 919 S.W.2d 164 (Tex. App. 1996)

ten agreement. Therefore, we hold that the doctrine of promissory estoppel does not defeat Norwest's statute of frauds defense.

### Section 26.02(e) (f)

Section 26.02(e) of the Code requires that written loan agreements involving more than $50,000 contain a "merger" clause. *See* Tex.Bus. Com. Code Ann. § 26.02(e) (West Supp. 1996). Section 26.02(f) of the Code goes on to explain the consequences of failing to adhere to § 26.02(e). If the written loan agreement has no merger clause, then § 26.02 "does not apply to the loan agreement, but the validity and enforceability of the loan agreement and the rights and obligations of the parties are not impaired or affected." Tex.Bus. Com. Code Ann. § 26.02(f) (West Supp. 1996).

Appellant contends that Norwest did not comply with s 26.02(e) because it failed to include a merger clause. Therefore, appellants argue, § 26.02(f) removes the loan agreement from the requirements of the statute of frauds. We disagree. By its own terms, § 26.02(e) presupposes a written instrument. In the absence of a written agreement, any requirement of a merger clause is nonsensical; oral agreements cannot "merge" into a written document which does not exist.

Section 26.02(f) must be read in conjunction with § 26.02(c) (d) which prevent written agreements from being controverted by parol evidence. Tex.Bus. Com. Code Ann. §26.02(c)(d) (West Supp. 1996). Examining the statute as a whole, we conclude that the penalty for failing to comply with § 26.02(e) is to allow the written contract to be controverted by parol evidence. We do not read § 26.02(f) as removing a loan agreement from the statute of frauds when there is no merger clause in a non-existent written document. *See Durish v. Channelview Bank,* 809 S.W.2d 273, 275 (Tex.App. — Austin 1991, writ denied) (statute should be construed as a whole and not through an examination of isolated provisions).

### Section 26.02(g)

Appellants argue that because Norwest failed to post notices as required by § 26.02(g), it is estopped from raising a statute of frauds defense. We disagree. Section 26.02(g) of the Code provides:

> All financial institutions shall conspicuously post notices that inform borrowers of the provisions of this section. The notices shall be located in such a manner and in places in the institutions so as to fully inform borrowers of the provisions of this section. The Finance Commission of Texas shall prescribe the language of the notice.

Tex.Bus. Com. Code Ann. § 26.02(g) (West Supp. 1996).

Unlike § 26.02(e) (f), § 26.02(g) does not prescribe any penalty for failure to adhere to the statute. The Legislature chose to provide a penalty for the failure to comply with § 26.02(e), but it did not do so for the failure to comply with § 26.02(g). Hence, the Legislature recognized the issue of a penalty for failing to comply with certain provisions of the statute. Examining the statute in its entirety, we conclude that the Legislature did not intend to withhold the statute of frauds defense from financial institutions which failed to adhere to § 26.02(g).

For the foregoing reasons, we overrule appellants' first point of error.

### Tort Claims

In point of error two, appellants claim that the trial court erred in ruling that *169 the statute of frauds bars their various tort claims. When tort claims have their nucleus in an alleged oral contract which is unenforceable under the statute of frauds, the statute of frauds bars the tort claims as well. *Collins v. Allied Pharmacy Management, Inc.,* 871 S.W.2d 929, 936 (Tex.App. — Houston [14th Dist.] 1994, no writ). Having found that appellants' tort claims had their nucleus in the previously held unenforceable oral contract, the trial court ruled the tort claims were barred as well.



MAGINN v. NORWEST MORTG. INC, 919 S.W.2d 164 (Tex. App. 1996)

Appellants argue that their tort claims do not derive from any alleged breach of contractual loan agreements by Norwest. Instead, appellants claim that Norwest has a duty to use reasonable care whenever it provides information to its customers or potential customers. Appellants maintain that Norwest breached its duty when it allegedly caused appellants to incur expenses in reliance on Norwest's representations that the loan deal would close in a few weeks.

More specifically, appellants contend that Norwest assured them that the loan transaction would close at the end of June 1993. Furthermore, appellants contend that as a result of Norwest's representations, they gave notice to their landlord to vacate their apartment on June 30, 1993. Appellants concede that they were able to secure financing for their home purchase shortly after Norwest declined to provide them with a mortgage loan. However, appellants insist they incurred additional rental expenses and lost wages due to the delay in purchasing their new home which appellants contend was the result of Norwest's misrepresentations.

The summary judgment evidence, viewed most favorably to the nonmovant, suggests that (1) Norwest represented to appellants that they would receive a mortgage loan by June 23, 1993; (2) Norwest did not provide appellants with a mortgage loan; and (3) appellants incurred additional rental and lost wage expenses resulting from the delay in purchasing their new home caused by Norwest's misrepresentations.

The instant case is remarkably similar to *Federal Land Bank v. Sloane*, 825 S.W.2d 439 (Tex. 1991). In *Sloane*, a jury found that the bank had represented to Sloane that it would loan him money to renovate his farm. Relying on this representation, Sloane incurred expenses upgrading his chicken coops. Eventually, the bank declined to loan Sloane the money. When Sloane sued the bank on a negligent misrepresentation theory, the bank argued that the statute of frauds barred

the action because the grievance arose out of a contract dispute. The court disagreed, noting:

> The Sloanes do not claim that the bank agreed to loan them money and then breached that agreement; rather, they claim that the bank did not agree to loan them money, yet negligently misrepresented that it had made such an agreement. . . . Although a claim of negligent misrepresentation may not be used to circumvent the statute of frauds, under the circumstances of this case, the Sloane's claim does not fall within the statute of frauds.

*Id.* at 442.

Appellants' *tort* claims are nearly identical to those in *Sloane.* Irrespective of their contract claims, appellants' alternative tort claims do not allege that Norwest contracted to loan them money and then breached that contract. Instead, appellants allege that Norwest never did agree to loan them money, but negligently misrepresented that it would. Because we find *Sloane* to be controlling, we sustain appellants' second point of error.

## CONCLUSION

Having overruled appellants' first and third points of error, we affirm the trial court's judgment with respect to the DTPA and contract claims. Insofar as we sustain appellants' second point of error, we reverse the trial court's judgment with respect to appellants' tort claims and remand the cause to the court below for proceedings not inconsistent with this opinion. The remainder of the judgment is affirmed.

---



# EXHIBIT B

« up

88 F.3d 347

# CLARDY MANUFACTURING COMPANY, Plaintiff-Appellee/Cross-Appellant,

v.

# MARINE MIDLAND BUSINESS LOANS INC, Defendant-Appellant/Cross-Appellee,

and

# Jim L. Ely, Movant.

*No. 95-10688.*

## United States Court of Appeals,
## Fifth Circuit.

*July 22, 1996.*

Stephen L. Tatum, Beale B. Dean, Richard Wayne Wiseman, Grant Liser, Brown, Herman, Scott, Dean & Miles, Fort Worth, TX, Terri Kay Oliver, Office of the Attorney General, Austin, TX, for Clardy Mfg. Co.

James E. Essig, John L. Hill, Jr., Liddell, Sapp, Zivley, Hill & LaBoon, Houston, TX, Edwin R. DeYoung, Michael Silvey Linscott, Liddell, Sapp, Zivley, Hill & LaBoon, Dallas, TX, for Marine Midland Business Loans, Inc.

Appeal from the United States District Court for the Northern District of Texas.

Before WISDOM, EMILIO M. GARZA and PARKER, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

1    Plaintiff Clardy Manufacturing Company ("Clardy Manufacturing") sued Marine Midland Business Loans, Inc. ("Marine"), alleging that Marine breached its commitment to lend under a satisfaction contract. Following a bench trial, the district court concluded that Marine had obligated itself to make a loan to Clardy Manufacturing under the satisfaction contract once certain creditworthiness criteria had been satisfied and awarded damages in favor of Clardy Manufacturing. Marine now appeals. Clardy Manufacturing cross-appeals the district court's denial of its claim under the Texas Deceptive Trade Practices Act ("DTPA") and the district court's failure to consider its alternative common law claims for fraudulent misrepresentation, negligent misrepresentation, and promissory estoppel. Concluding that there was no satisfaction contract obligating Marine to make a loan, and that Clardy Manufacturing's remaining claims fail as a matter of law, we reverse in part, affirm in part, and render judgment in favor of Marine.

2    * Clardy Manufacturing Company is a family owned business that makes and sells after-market air conditioners for automobiles. In 1989, John Clardy, Jr., began looking for new financing for the company, primarily in order to purchase the shares of the company's retiring founder, his father John Clardy, Sr., and thereby take over ownership of the company. The company also needed financing in order to effect a merger with Premier Parts, Inc.,[1] to refinance its existing debt, and to obtain additional working capital.[2] Clardy Manufacturing unsuccessfully sought financing

from at least six different lenders. The company was eventually referred to Marine, an asset-based lender with an office in Dallas, Texas. In contrast to a commercial bank, which primarily makes loans based on a company's cash flow, an asset-based lender like Marine makes loans on the basis of a company's collateral.

3      In the middle of 1990, Clardy Manufacturing discussed a potential loan with Michael Norvet, the senior business development officer for Marine's Dallas office. After Clardy Manufacturing submitted some preliminary financial information, Norvet informed the company that it did not meet Marine's minimum loan requirements. Discussions resumed, however, in the fall of 1991, after Marine reduced its minimum loan requirements from $5 million to $3 million. Clardy Manufacturing had not yet been able to secure financing, and John Clardy, Jr., and Norvet discussed the possibility of a $4 million loan. John Clardy, Jr., provided Norvet with additional financial information about the company, and he also completed Marine's pre-loan questionnaire and submitted the required financial projections.

4      In early January 1992, representatives from Clardy Manufacturing and Marine met in Dallas to discuss the loan application. John Clardy, Jr., arrived with Richard Berman, the President of Premier Air Parts. Norvet introduced the two men to Jim Ely, Marine's senior regional manager of the Dallas office, and Frank Mederos, Marine's national marketing director. There was conflicting evidence presented at trial regarding what exactly the Marine representatives told John Clardy, Jr., and Berman regarding Marine's credit approval process. Nevertheless, the parties agree that at the close of the meeting, Mederos authorized the issuance of a proposal letter, which would permit Marine to proceed further in evaluating Clardy Manufacturing's loan application. Accordingly, at another meeting ten days later, a proposal letter, or letter agreement, was signed by John Clardy, Jr., and Norvet. Clardy Manufacturing argues that this letter constituted a "satisfaction contract," while Marine, on the other hand, contends that it was merely an agreement to undertake due diligence.

5      Marine proceeded to conduct due diligence aimed at evaluating the financial health of Clardy Manufacturing, as well as the company's collateral that would form the basis for the $4 million loan. As part of this effort, Marine had appraisals made of Clardy Manufacturing's real property, inventory, and equipment. Marine's auditors also conducted a field examination of Clardy Manufacturing's books and records. In April of 1992, the resulting due diligence information was analyzed by David Boyd, the senior officer at Marine's Dallas office. Boyd's responsibility was to generate the "PCREF," Marine's computer generated, credit evaluation form. Based on the computer analysis, Boyd concluded that Clardy Manufacturing did not meet all of Marine's credit approval requirements, and as a consequence the loan application would have to go through an additional level of home office approval. Nevertheless, Boyd, who did not have any credit approval authority, recommended that the loan be approved.

6      Clardy Manufacturing's loan application and the PCREF results were then reviewed by Kurt Putkonen, who was administrative vice-president and territory manager for Marine. Putkonen also had no credit approval authority. After making an independent evaluation of the loan documents, Putkonen decided not to recommend to the home office that Clardy Manufacturing's loan application be approved,[3] and in the middle of June 1992, Norvet communicated to John Clardy, Jr., that the credit approval process had come to an end.

7      In the middle of March 1992, while Marine was still conducting due diligence, John Clardy, Jr., introduced Norvet at a lunch meeting to Graeme McDougall, the Chairman of Environmental Products Amalgamated ("Environmental Products"), an Australian company that sold freon recovery and recycling equipment. John Clardy, Jr., was considering entering into a licencing agreement with Environmental Products. Although the Environmental Products deal was not part of the proposed Marine loan package, Berman testified at trial that Clardy Manufacturing, as a matter of priorities,

was not going to enter into the Environmental Products deal unless the Marine loan was approved. At this lunch meeting, Norvet is alleged to have assured John Clardy, Jr., and McDougall that a "commitment letter" would be issued within the next two to five days, or in other words, that the loan would be approved within a matter of days. John Clardy, Jr., claims that based on this assurance, he entered into the contemplated licencing agreement with Environmental Products two days later. According to Clardy Manufacturing, Marine's failure to approve the loan made it impossible for the company to make timely payments as called for in the Environmental Products licencing agreement.

8    Clardy Manufacturing eventually brought suit against Marine alleging breach of contract, fraudulent misrepresentation, negligent misrepresentation, and promissory estoppel. After a bench trial, the district court awarded Clardy Manufacturing $8,111,467 on its breach of contract claim, rejected the DTPA claim, and declined to consider Clardy Manufacturing's alternative common law theories of recovery. Marine appeals from the award of damages, and Clardy Manufacturing cross-appeals from the district court's denial of its DTPA claim and failure to consider its alternative common law claims.

II

9    * Marine contends that the district court erred in concluding that the January 1992 letter agreement was a satisfaction contract. The interpretation of an unambiguous contract is a question of law which we review de novo. Guidry v. Halliburton Geophysical Servs., Inc., 976 F.2d 938, 940 (5th Cir.1992). However, when a contract is ambiguous and its construction turns on the consideration of extrinsic evidence, we review the district court's interpretation for clear error only. Id. The initial determination that a contract is ambiguous, such that its interpretation warrants the consideration of extrinsic evidence, is itself a legal conclusion subject to de novo review. Id. We look to state law to provide the rules of contract interpretation. Matter of Haber Oil Co., Inc., 12 F.3d 426, 443 (5th Cir.1994).

10    Under Texas law, a contract is ambiguous if, after applying established rules of interpretation, the written instrument "remains reasonably susceptible to more than one meaning." R & P Enterprises v. LaGuarta, Gavrel & Kirk, 596 S.W.2d 517, 519 (Tex.1980); see also Towers of Texas, Inc. v. J & J Systems, Inc., 834 S.W.2d 1, 2 (Tex.1992) ("A written instrument is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning, taking into consideration the circumstances present when the instrument was executed."); Harris v. Rowe, 593 S.W.2d 303, 306 (Tex.1979) (requiring a "genuine uncertainty" as to which of two meanings is proper). On the other hand, if a contract is worded so that a court can give it a certain or definite legal meaning or interpretation, it is not ambiguous. R & P Enterprises, 596 S.W.2d at 519. Where the contract is unambiguous, extrinsic evidence "will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." Universal C.I.T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154, 157 (1951); Lewis v. East Texas Finance Co., 136 Tex. 149, 146 S.W.2d 977, 980 (1941).

11    We must enforce the unambiguous language in a contract as written, and the applicable standard is "the objective intent" evidenced by the language used, rather than the subjective intent of the parties. Sun Oil Co. (Delaware) v. Madeley, 626 S.W.2d 726, 731 (Tex.1981). In determining whether the language of the contract is unambiguous, however, we "should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." Coker v. Coker, 650 S.W.2d 391, 393 (Tex.1983) (emphasis in original). Furthermore, "[n]o single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." Id. With these rules of construction in mind, we turn now to the January 1992 letter agreement

between Clardy Manufacturing and Marine.

B

12    The letter agreement begins by stating that its purpose is to "set forth the financial accommodations that Marine would be willing to consider in addressing CM's [Clardy Manufacturing's] financial needs." The letter proceeds to describe these financial accommodations, or "Credit Facilities," in some detail: "Marine would consider offering CM a 3 year revolving credit facility";[4]   "Marine would consider offering the Company a 3 year term loan facility."[5]   The letter states when the "Credit Facility" and "Term Loan" would be repayable, what interest would be applicable to the principle outstanding, how collections would be processed, and what secured interests in collateral and personal guarantees would be required.[6]   Under the heading "Fees: Prepayment Premium," the letter states, "If the Credit Facilities are approved and funded, CM would be required to pay to Marine" certain origination fees and unused line fees. The letter also states, "If the Credit Facilities are approved and funded, Marine would require CM to provide" certain monthly financial statements and other periodic financial reporting as specified.

13    In setting forth the financial accommodations that Marine would be willing to consider, the letter also frames the proposed terms and conditions in conditional language. Marine would consider offering Clardy Manufacturing a revolving credit facility and term loan. The letter notes that if the Credit Facilities are approved and funded, then these would be the terms and conditions. The conditional or proposed nature of the financial accommodations is underscored by the bold language that follows the recitation of potential terms and conditions, where the letter states, "Non-Binding Proposal Only: Due Diligence Required" and "THIS PROPOSAL LETTER IS NOT A COMMITMENT TO LEND." Clardy Manufacturing argues that this language merely establishes that the letter agreement is not yet a firm commitment to lend, and that the commitment to lend does become binding once Clardy Manufacturing satisfies Marine's due diligence requirements.

14    The letter does set out a number of events that would have to precede the issuance of a commitment letter obligating Marine to extend the loan to Clardy Manufacturing:

15    Prior to the issuance of any commitment letter, Marine would perform a field examination of CM, perform background investigations of CM management and shareholders, complete Marine's internal credit approval process, review financial information with CM, evaluate current appraisal information, and verify the Company's compliance with all regulations, rules, and directives of all local state, and federal regulatory and licensing agencies, including, without limitation, environmental agencies. Marine would require CM to prepare a long-range business and strategic plan, in form and substance satisfactory to Marine, including monthly forecast for the first twelve (12) months following the Closing Date, encompassing all segments of CM's business. Issuance of a commitment letter would be subject to, among other things, your completion of all of the foregoing items, to Marine's satisfaction and all of the matters discussed in this letter.

16    We do not find that it is reasonable, however, to read this language to suggest that a commitment letter would necessarily issue upon the completion of these enumerated items. They are neither so definite nor so all inclusive as to warrant such a conclusion. In fact, the list concludes with the statement that issuance of a commitment letter would be subject to the completion of, among other things, the foregoing items.[7]   This language clearly signals that Marine's credit approval process will consist of more steps than are set out in this proposal letter.

17    The agreement that Clardy Manufacturing and Marine reached in this letter is clear and unambiguous. Under the heading "Execution of Proposal Letter," the letter states

that "Marine will undertake further efforts to assess whether CM satisfies Marine's criteria for the extension of the Credit Facilities outlined herein only if" Clardy Manufacturing signs the letter and deposits $25,000 with Marine to be applied toward the cost of conducting due diligence. In other words, Marine agreed to undertake further efforts towards determining Clardy Manufacturing's eligibility for a loan if the company agreed to pay for the related expense.[8] There is nothing in this agreement which suggests that Marine was binding itself to issue a commitment letter upon the successful completion of the due diligence outlined in the letter. Such a conclusion would require us, unreasonably, to believe that Marine had contracted away the normal and customary subjective decision making which enters into the final stages of a loan approval process.[9] This reading of the proposal letter is belied even by the language covering the return of the $25,000 deposit. The letter states, "If the Credit Facilities close," any remaining deposit after costs will be applied to the facilities fee. However, "If Marine declines to close the Credit Facilities," the deposit will be returned less costs. If the issuance of a commitment letter was guaranteed upon the successful completion of due diligence, Marine would have no power to decline to close the credit facilities.

18    Having considered the entire writing, we conclude that the language of the letter agreement between Clardy Manufacturing and Marine is reasonably susceptible to only one meaning. In part, the proposal letter serves to set out the terms and conditions of the credit facilities, or loans, that Marine is considering extending to Clardy Manufacturing. Beyond this, the letter also contains an agreement by Marine to undertake further efforts to assess whether Clardy Manufacturing satisfied its credit criteria by conducting due diligence as outlined in the letter. The letter does not, however, constitute a satisfaction contract. We find that the letter agreement between Clardy Manufacturing and Marine is unambiguous and does not require us to consider extrinsic evidence to determine its meaning.

19    The district court concluded that the letter agreement was ambiguous as to "what, if anything, was Marine obligated to do if it became satisfied with Clardy Manufacturing's demonstration of creditworthiness?" This conclusion, however, flows from the faulty assumption that the letter agreement was intended to address each and every step leading up to the issuance of the commitment letter. As we have found, the proposal letter unambiguously memorializes the agreement that Marine should undertake further due diligence as part of its effort to evaluate Clardy Manufacturing's loan application. The letter agreement's failure to address what further steps Marine would undertake as part of its internal credit approval process once it had become satisfied with Clardy Manufacturing's creditworthiness does not necessarily render ambiguous the agreement to undertake due diligence. As the letter agreement did not obligate Marine to take further steps upon the successful completion of due diligence, the writing had no need to speak to this issue. While it may seem unfair to suggest that Marine was free to simply walk away following the completion of due diligence, the letter agreement's silence on this issue does not destabilize the letter's clear and unambiguous language.

20    Although we will not consider extrinsic evidence for the purpose of creating an ambiguity in what we perceive to be the clear meaning of the letter agreement's language, see Universal C.I.T. Credit Corp., 243 S.W.2d at 157, we note that the extrinsic evidence relied on by the district court does not cast doubt on our reading of the document. Drawing on a comparison between the letter agreement and language required by Marine's credit policy manual, the district court concluded that Norvet intended to make the letter agreement sound "more binding" than the normal proposal letter. The district court noted that according to Marine's policy manual, a letter of intent or a preliminary proposal "must contain language substantially in conformance with the following:"

21    Please note that this letter is not a binding commitment of [borrower] or [Marine], nor does it define all of the terms and conditions of the financing, but is a framework

upon which the documentation for this transaction shall be structured, and is a basis for further discussion and negotiation of the terms as may be appropriate. The credit shall be subject to due diligence review of the business and financial affairs of [borrower] with [borrower's] management, the approval of the proposed terms and conditions by the [Marine] credit authorities, and the execution and delivery of documentation satisfactory in form and substance to [Marine's] legal counsel.

22    Although the language in the policy manual is perhaps worded more pointedly than the January 1992 letter agreement, we disagree with the district court that the letter agreement does not contain language substantially in conformance with this paragraph. Moreover, in contrast to the typical letter of intent contemplated by the language in Marine's policy manual, the proposal letter in this case does contain a definite agreement between the parties, namely to have further due diligence conducted as part of the credit approval process.[10]

23    The district court further erred by relying, at the outset, on the rule of strict construction against the drafter to hold that Marine was required to honor the "more binding" language drafted by Norvet. We note that the rule contra proferentem "is not one of the favored rules of construction. Indeed, it is said that it is to be resorted to only when the other rules fail." Smith v. Davis, 453 S.W.2d 340, 344 (Tex.App.--Fort Worth 1970, writ ref'd n.r.e.) (internal quotation marks omitted); see also id. (refusing to apply the rule even though there was an ambiguity in the contract). Certainly, "the rule has no application where ... the intent of the parties is clear and a resort to the rule will defeat that intent." Modular Technology Corp., Metal Bd. Division v. City of Lubbock, 529 S.W.2d 273, 276 (Tex.App.--Amarillo 1975, writ ref'd n.r.e.). Accordingly, we find that the district court erred in concluding that the letter agreement was a satisfaction contract. Because there is no underlying satisfaction contract, there can be no damages for breach of that contract. We therefore vacate the district court's award of damages on Clardy Manufacturing's contract claim.

III

24    On cross-appeal, Clardy Manufacturing contends that the district court erred in concluding that it failed to state a claim under the Texas Deceptive Trade Practices Act. TEX.BUS. & COM. CODE.ANN. § 17.41 et seq. In order to state a claim under the DTPA, the plaintiff must establish that he is a "consumer" as defined by the Act. Riverside Nat'l Bank v. Lewis, 603 S.W.2d 169, 173 (Tex.1980). The district court concluded that Clardy Manufacturing did not qualify as a "consumer" under the Act. Whether a plaintiff is a "consumer" under the Act is a question of law which we review de novo. Schmueser v. Burkburnett Bank, 937 F.2d 1025, 1028 (5th Cir.1991).

25    The Act defines "consumer" as an individual "who seeks or acquires by purchase or lease, any goods or services." TEX.BUS. & COM.CODE.ANN. § 17.45(4). Moreover, the purchased goods or services must form the basis of the complaint. Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535, 539 (Tex.1981). The DTPA defines "goods" as "tangible chattels or real property purchased or leased for use." TEX.BUS. & COM.CODE.ANN. § 17.45(1). And "services" are defined as "work, labor or service purchased or leased for use, including services furnished in connection with the sale or repair." TEX.BUS. & COM.CODE.ANN. § 17.45(2). In Riverside, the Texas Supreme Court has held that the extension of credit does not constitute "goods" or "services" under the Act. Riverside, 603 S.W.2d at 175; see also FDIC v. Munn, 804 F.2d 860, 863 (5th Cir.1986) (summarizing Texas law as holding that "goods" and "services" do not include intangible chattel such as stocks, money, or loans).

26    The court in Riverside, however, left open the question whether activities related to the loan transaction, such as financial counseling, could constitute "services" under the Act. Riverside, 603 S.W.2d at 175 n. 5. Texas courts have generally limited Riverside 's holding to cases where the loan was the plaintiff's main objective and forms the sole

basis of the complaint. See Munn, 804 F.2d at 864 (citing cases).[11]  Clardy Manufacturing claims that it qualifies as a "consumer" under the Act in that it sought to purchase the "loan services" Marine provided. The loan application process, however, was never an objective of Clardy Manufacturing's separate and distinct from the credit facilities which the company hoped to obtain from Marine.[12]  The sole basis of Clardy Manufacturing's complaint is the denial of the credit facilities. Accordingly, we affirm the district court's determination that Clardy Manufacturing has failed to state a claim under the Texas DTPA.

IV

27    Clardy Manufacturing also cross-appeals from the district court's failure to address its alternative common law claims for fraudulent misrepresentation, negligent misrepresentation, and promissory estoppel. Evidence was submitted at trial in support of each of these alternative theories of recovery. Having granted Clardy Manufacturing full recover under its contract claim, the district court declined to reach these alternative claims. If we were to remand this case, it would only remain for the district court to enter findings of fact and conclusions of law as to these alternative claims. We conclude, however, that remand in this case is unnecessary because Clardy Manufacturing's alternative claims all fail as a matter of law. See Halbert v. City of Sherman, Texas, 33 F.3d 526, 530 (5th Cir.1994) (declining to remand claims to district court where plaintiff would be unable to prevail even if afforded the opportunity to amend his pleadings); Brown v. Texas A & M University, 804 F.2d 327, 334 (5th Cir.1986) (same).

28    * Under Texas law, the elements of a cause of action for negligent misrepresentation are:

29    (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

30    Federal Land Bank Ass'n of Tyler v. Sloane, 825 S.W.2d 439, 442 (Tex.1991) (citing the Restatement (Second) of Torts (1977)); see also Inglish v. Union State Bank, 911 S.W.2d 829, 837 (Tex.App.--Corpus Christi 1995, writ requested).

31    Clardy Manufacturing's claims of negligent or fraudulent misrepresentation are based primarily on two sets of statements by a Marine representative. As to one instance, John Clardy, Jr., testified at trial that at the Wednesday lunch meeting with Graeme McDougall, the Chairman of the Australian company Environmental Products, Norvet "stated that I would have a commitment letter by Friday or the following Monday or Tuesday."[13]  McDougall testified that Norvet had said that he "expected" a letter of commitment to be issued within the next two to five days because "from Marine Midland's point of view everything looked good. The audit was good. All the other relevant documentation that had to be done looked good." John Clardy, Jr., claims that he detrimentally relied on this representation by entering into a licencing agreement with Environmental Products two days later.[14]

32    A claim for negligent misrepresentation under Texas law contemplates that the "false information" provided by the defendant is a misstatement of existing fact. Airborne Freight Corp. v. C.R. Lee Enterprises, 847 S.W.2d 289, 294 (Tex.App.--El Paso 1992, writ denied). "Negligent misrepresentation does not occur when a defendant simply makes a guess as to a future, unknown event." Sergeant Oil & Gas Co. v. National Maintenance & Repair, Inc., 861 F.Supp. 1351, 1360 (S.D.Tex.1994) (applying Texas law); see id. (holding that defendant's representation that the barge could be loaded in

eighteen to twenty-four hours was not actionable under a theory of negligent misrepresentation); City of Beaumont v. Excavators & Constructors, Inc., 870 S.W.2d 123, 138 (Tex.App.--Beaumont 1993, writ denied) (holding that statements as to how long a work project would take to complete were not "false information").

33      In at least one case, a successful claim for negligent misrepresentation was based on a loan officer's statement that his bank had approved plaintiffs' loan. Federal Land Bank Ass'n of Tyler v. Sloane, 825 S.W.2d at 441-42. The facts of Sloane, however, were distinguished by the court in Alpha Road v. NCNB Texas National Bank, 879 F.Supp. 655 (N.D.Tex.1995). In Alpha Road, the bank officer had represented that he needed additional authority, but that the loan was a "done deal" and that it would be renewed at the end of four months. 879 F.Supp. at 665. The court in Alpha Road concluded that unlike the representation in Sloane, the bank officer's assurances referred to the bank's future performance, and were therefore not actionable under a theory of negligent misrepresentation. Id. The facts in this case are in accord with those in Alpha Road.

34      Clardy Manufacturing does not contend that Norvet represented that the loan had in fact been approved, or that the commitment letter had already been issued. Even if we assume that Norvet said that the commitment letter would issue within two to five days, as we must,[15]  rather than that he "expected" the letter to issue within this time frame, we nevertheless conclude that this statement is not actionable as a misstatement of existing fact. At most, Norvet's representation was a misstatement as to a future action by Marine.[16]

35      Moreover, under a claim for negligent misrepresentation, the plaintiff must prove "justifiable reliance" on the misrepresentation. Geosearch, Inc. v. Howell Petroleum Corp., 819 F.2d 521, 526 (5th Cir.1987) (applying Texas law). This requirement, also known as the "materiality" element, has two aspects: "the plaintiff must in fact have relied; and this reliance must have been reasonable." Id. In other words, "there must be a reasonable relation between the contents of the defendant's misrepresentation and the action the plaintiff took in reliance." Id. "The justifiableness of the reliance is judged in light of the plaintiff's intelligence and experience." Scottish Heritable Trust, PLC v. Peat Marwick Main & Co., 81 F.3d 606, 615 (5th Cir.1996). A plaintiff's reliance is unjustified when the reliance is in effect an act of negligence on the plaintiff's part. Id.

36      When viewed against all of the surrounding circumstances and the plaintiff's business experience, Clardy Manufacturing's reliance on Norvet's representation was, as a matter of law, unjustified. In other words, we find that no reasonable fact finder could conclude otherwise. John Clardy, Jr., and his advisor, Berman, knew at all times that Norvet had no credit approval authority. From the time he graduated from college in 1977, John Clardy, Jr., had been involved in managing the company his father founded, and as President of the company he had handled the task of negotiating with lenders for additional financing since 1989. Berman, aside from holding the position as President of Premier Air Parts, Inc., was also a former chairman of the board of a commercial bank, with twelve years of lending experience prior to that. Rather than waiting an additional two or three days to verify that a commitment letter did in fact issue, John Clardy, Jr., decided to enter into the licencing agreement with McDougall that Friday.[17] We find, as a matter of law, that there is no reasonable relationship between Norvet's assurances and Clardy Manufacturing's decision to enter into the licencing agreement two days later. To the extent that John Clardy, Jr., in fact relied on Norvet's representation, this reliance was, under the circumstances and in light of John Clardy, Jr., and Berman's business sophistication, an act of negligence.

37      The other set of misrepresentations underlying Clardy Manufacturing's alternative claims focuses on what the company was told regarding Marine's credit approval process. Both John Clardy, Jr., and Berman testified that Norvet told them, prior to signing the letter agreement, that the loan would be signed and approved in the Dallas office, and then shipped to Wilmington, Delaware, to be "rubber stamped," that is,

reviewed for form and content. In fact, no one in the Dallas office had credit approval
authority, and a loan application required two or more signatures by Marine officials
before it could be approved. John Clardy, Jr., testified at trial that he would not have
entered into the letter agreement if he had known that the ultimate credit approval
would have to come from an office outside Dallas.[18]  We conclude, however, that no
reasonable trier of fact would believe that John Clardy, Jr., in fact relied on Norvet's
representations regarding the loan approval process.[19]  In other words, no reasonable
trier of fact would conclude that Clardy Manufacturing, which for several years had
been unsuccessfully seeking financing from numerous lenders,[20] would not have
entered into the letter agreement if Marine had made explicit the fact that credit
approval had to come from outside of Dallas.[21]  Clardy Manufacturing can therefore not
show that the representation was "material" to its decision to enter into the agreement.
Moreover, to the extent that John Clardy, Jr., would not have entered into the
agreement had he known the full extent of the credit approval process, we find that such
reliance would have been, as a matter of law, unreasonable. No reasonable businessman
in John Clardy, Jr., circumstances would have made such an irrational decision.
Accordingly, this second set of representations will also not support a claim for
negligent misrepresentation.

B

38       Under Texas law, to recover for fraud, the plaintiff must establish that:

39       (1) a material representation was made; (2) it was false when made; (3) the speaker
knew it was false, or made it recklessly without knowledge of its truth and as a positive
assertion; (4) the speaker made it with the intent that it should be acted upon; and (5)
the party acted in reliance and suffered injury as a result.

40       Roberts v. United New Mexico Bank at Roswell, 14 F.3d 1076, 1078 (5th Cir.1994). To
be actionable, the misrepresentation must be "one concerning a material fact; a pure
expression of opinion will not support an action for fraud." Transport Ins. Co. v.
Faircloth, 898 S.W.2d 269, 276 (Tex.1995). An opinion may constitute fraud, however,
if the speaker knows that it is false. Sergeant Oil & Gas Co. v. National Maintenance &
Repair, Inc., 861 F.Supp. 1351, 1358 (S.D.Tex.1994). "An expression of an opinion as to
the happening of a future event may also constitute fraud where the speaker purports to
have special knowledge of facts that will occur or exist in the future." Trenholm v.
Ratcliff, 646 S.W.2d 927, 930 (Tex.1983). A promise to do an act in the future, on the
other hand, is fraud "only when made with the intention, design and purpose of
deceiving, and with no intention of performing the act" at the time the promise was
made. Airborne Freight Corp. v. C.R. Lee Enterprises, Inc., 847 S.W.2d 289, 294
(Tex.App.--El Paso 1992, writ denied).

41       Clardy Manufacturing failed to present any evidence that at the time Norvet allegedly
represented that a commitment letter would issue within two to five days: (1) that
Norvet knew that his representation was false; (2) that Norvet had special knowledge of
future facts bearing on the issuance of the commitment letter; or (3) that Norvet or
Marine had no intention of issuing the commitment letter or approving Clardy
Manufacturing's loan application. "Failure to perform, standing alone, is no evidence of
the promisor's intent not to perform when the promise was made." Id. Clardy
Manufacturing has not presented any additional circumstantial evidence which would
permit a reasonable trier of fact to find that Norvet's representation to John Clardy, Jr.,
and McDougall was fraudulent at the time it was made. Cf. T.O. Stanley Boot Co. v. Bank
of El Paso, 847 S.W.2d 218, 222 (Tex.1992) (concluding that plaintiffs had presented
insufficient evidence that the bank had no intention to perform at the time its
representative made the promise that bank would loan plaintiffs $50,000).

42       A plaintiff in a fraud action must also show that his reliance was justifiable as well as
actual. Id. "To determine justifiability, courts inquire whether--given a fraud plaintiff's

individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud--it is extremely unlikely that there is actual reliance on the plaintiff's part." Haralson v. E.F. Hutton Group, Inc., 919 F.2d 1014, 1026 (5th Cir.1990).[22] For the same reasons set out above under Clardy Manufacturing's negligent misrepresentation claim, we also conclude that Clardy Manufacturing has failed, as a matter of law, to establish that Norvet's representations regarding the credit approval process were material to its decision to enter into the letter agreement. That is, no reasonable trier of fact could conclude that Clardy Manufacturing's reliance was actual and justifiable under the circumstances. Accordingly, neither set of alleged misrepresentations will support a claim of fraud.

C

43    Clardy Manufacturing's final alternative common law claim is for promissory estoppel. Under Texas law, the basic requirements of a promissory estoppel claim are: " (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." English v. Fischer, 660 S.W.2d 521, 524 (Tex.1983). Texas courts have also established a fourth and separate requirement of a "definite finding that injustice can be avoided only by the enforcement of the promise." City of Beaumont v. Excavators & Constructors, Inc., 870 S.W.2d 123, 137 (Tex.App.-- Beaumont 1993, writ denied) (emphasis in original). In addition, the courts have emphasized that "estoppel requires a reasonable or justified reliance on the conduct or statement of the person sought to be estopped by the person seeking the benefits of the doctrine." Traco Inc. v. Arrow Glass Co., 814 S.W.2d 186, 190 (Tex.App.--San Antonio 1991, writ denied) (emphasis in original and internal quotation marks omitted).

44    The only alleged promise in this case is Norvet's assurance to John Clardy, Jr., and McDougall that the commitment letter would issue within the next two to five days. For the reasons set out above, we conclude as a matter of law that Clardy Manufacturing has not shown any reasonable or justified reliance on this alleged promise. Cf. Bluebonnet Savings Bank, F.S.B. v. Grayridge Apartment Homes, Inc., 907 S.W.2d 904, 912 (Tex.App.--Houston [1st Dist.] 1995, no writ) (holding that there was no basis to support a claim for promissory estoppel where the plaintiffs had failed to establish justifiable reliance under a claim for negligent misrepresentation). Accordingly, Clardy Manufacturing has also failed to state a claim for promissory estoppel.

V

45    For the foregoing reasons, we REVERSE the district court's judgment on Clardy Manufacturing's satisfaction contract claim. We AFFIRM the district court's determination that Clardy Manufacturing failed to state a claim under the Texas DTPA. Having found that there is no theory under which Clardy Manufacturing could recover, we RENDER judgment in favor of Marine.

---

[1]   Premier Air Parts, Inc., which was also in the after-market air conditioner business, sold air conditioner parts to customers of Clardy Manufacturing and its competitors

---

[2]   On sales of nearly $16 million in 1989, the company suffered a loss of $663,000

---

[3]   Putkonen explained at trial that he had been concerned about the company's history of losses during the previous three years, that the company was significantly behind in its current year plan, that there were potential problems with dilution of the company's accounts receivable collateral, and that the company was just beginning to implement a perpetual inventory system, which Marine considered critical to Clardy Manufacturing's slow-moving inventory. Putkonen also noted that only a small portion of the loan would be going towards additional working capital, and the rest would be used for "non-growth" business purposes such as buying the stock of John Clardy, Sr., and paying off existing debt

4   Under the "Revolving Credit" line, Marine stated that it would consider offering advances in
    an aggregate principal amount at any time outstanding equal to the lesser of $3 million, or
    up to eighty percent (80%) of the company's eligible accounts receivable plus up to fifty
    percent (50%) of the lower of cost or market value of Clardy Manufacturing's eligible
    finished goods inventory, but that in no event would inventory advances exceed $1 million

5   Under the "Term Loan," Marine stated that the loan would be in a principle amount equal to
    the lesser of $1 million or the sum of (i) up to sixty percent (60%) of the auction value of the
    Company's eligible machinery and equipment and (ii) up to fifty percent (50%) of the fair
    market value of the Company's real property

6   The letter also states, "Proceeds from the credit facilities would be used to refinance bank
    debt, acquire certain assets of Premier Air Parts, Inc., purchase capital stock from John
    Clardy Sr. and provide continuing working capital."

7   In addition, the letter does not spell out the details of "Marine's internal credit approval
    process," which must also be completed before a commitment letter will be issued

8   Marine eventually returned $6,840.35 to Clardy Manufacturing, which represented the
    unused portion of the $25,000 deposit

9   Under Texas law, a contract's language may be construed in light of "surrounding
    circumstances," which includes "what the particular industry considered to be the norm or
    reasonable or prudent at the time." Staff Indus., Inc. v. Hallmark Contracting, Inc., 846
    S.W.2d 542, 546 (Tex.App.--Corpus Christi 1993, no writ). Berman acknowledged at trial that
    the analysis of a loan application was necessarily a somewhat subjective procedure. See
    generally DAVID A. ROBINSON, ACCOUNTS RECEIVABLE AND INVENTORY LENDING
    10 (3d ed.1987) (offering guidance regarding the "sophisticated credit judgments" that bear
    on accounts receivable and inventory lending)

10  The presence of this agreement in what is otherwise a proposal letter also helps explain why
    the district court is mislead in its reliance on another piece of extrinsic evidence. The district
    court focussed on the fact that the letter agreement contained a signature line for Clardy
    Manufacturing with the recitation, "ACKNOWLEDGED AND AGREED TO," similar to
    Marine's form commitment letter which has a signature line for the borrower and the
    recitation, "Accepted and Agreed to." In light of the agreement between the parties in this
    case to have further due diligence undertaken, we do not find that the inclusion of a
    signature line and "agreed to" language casts any doubt on our conclusion as to the
    unambiguous meaning of the proposal letter

    Clardy Manufacturing also argues that evidence that approval of the loan was contingent
    upon the satisfactory completion of due diligence can be found in the required payment of the
    $25,000 deposit and the confidentiality clause, which, Clardy Manufacturing claims, were
    "intended to prevent Clardy Manufacturing from looking elsewhere." At trial, Marine's
    representatives acknowledged that the confidentiality clause was intended to prevent Clardy
    Manufacturing from "shopping" these loan terms and conditions with other banks. Even if
    we accept that these provisions were intended to keep Clardy Manufacturing from seeking
    financing elsewhere, we fail to perceive how this evidences an intent on Marine's part to
    enter into a satisfaction contract.

11  See, e.g., Flenniken v. Longview Bank and Trust Co., 661 S.W.2d 705, 708 (Tex.1983)
    (concluding from a series of transactions that plaintiffs sought to acquire a house, not a
    loan, and that this formed the basis of their complaint); First Federal Savings & Loan Ass'n
    of San Antonio v. Ritenour, 704 S.W.2d 895, 900 (Tex.App.--Corpus Christi 1986, writ ref'd
    n.r.e.) (concluding that the plaintiff's claim was based on the purchase of financial
    counseling separate from the certificate of deposit)

12  In fact, we agree with the district court that the "loan services," or the due diligence, was

solely for Marine's benefit, and that Clardy Manufacturing would have gladly bypassed this step and gone straight to the issuance of the commitment letter if permitted. Nor is Clardy Manufacturing claiming that the due diligence was not performed, or that it was performed inadequately. Rather, the company is merely complaining that Putkonen, in deciding not to recommend the loan application for approval, reached the wrong conclusion based on this due diligence

13  Berman also testified that Norvet had reported that "he had assured John Clardy, Jr., that we would be getting a commitment letter within the next two to five days."

14  We note, however, that the agreement with Environmental Products was not referenced in the letter agreement, and that Berman acknowledged at trial that it would not have made any difference with respect to the business he did with Environmental Products whether the proposed loan went through or not

15  In determining whether Clardy Manufacturing has presented sufficient evidence from which a reasonable fact finder could find in its favor on the alternative common law claims, we "must review the evidence in the light and with all reasonable inferences most favorable to" Clardy Manufacturing. Roberts v. United New Mexico Bank at Roswell, 14 F.3d 1076, 1078 (5th Cir.1994) (internal quotation marks omitted). "If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, [judgment as a matter of law] is proper." Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969) (en banc). There must be a conflict in "substantial evidence" to create a jury question. Id. at 375

16  As will be discussed infra, there is also no evidence in the record to indicate that Norvet did not believe what he said at the time he made the representation. Nor did Clardy Manufacturing present any evidence establishing that Norvet was reckless to believe, at this time, that the commitment letter would issue shortly

17  Evidence at trial established that McDougall, who had been in the United States for two months by the time of the lunch meeting, was anxious to return home to Australia for business and personal reasons. McDougall also testified that it would have been possible to sign the contract in Australia by fax machine and teleconference, or to have signed an agreement in principle conditioned on the issuance of the commitment letter, but that he "chose, while I was here, to complete the job that I came to do."

18  John Clardy, Jr., testified that he felt it was important to establish a personal relationship with the people making the credit approval decision. We note that John Clardy, Jr., acknowledged that Frank Mederos was introduced at the January 7 meeting as someone from Marine's home office in Wilmington, Delaware, who would be a significant factor in the home office evaluation of the credit. Berman also acknowledged that Mederos was introduced to him as someone from the home office who would have some input into the credit package, and that Mederos told them that he would review the credit package at his home office

19  Cf. Brown v. Ford Motor Co., 479 F.2d 521, 523 (5th Cir.1973) (reversing the jury's verdict because no reasonable jury could have disbelieved witness's uncontradicted testimony as to the alleged defect)

20  In one instance, John Clardy, Jr., had traveled to Houston in an attempt to seek financing from Hong Kong Bank, an affiliate of the Hong Kong and Shanghai Banking Corporation

21  Clardy Manufacturing also claims that it relied on Norvet's representation at these early meetings that the loan could be approved and closed as early as February 28 and as late as March 31, 1992. As discussed above, however, this statement is not actionable inasmuch as it is merely an opinion as to a future event, not a misstatement of existing fact

In addition, Clardy Manufacturing claims that Marine failed to disclose (1) that it was in the

process of changing its credit approval process in late 1991 and early 1992 from a "committee process" to an individual signature process; (2) that Marine, along with its five other regional offices, were undergoing a reorganization that began in January 1992; and (3) that Jim Ely had left the Dallas office and that Kurt Putkonen, the credit manager for the Atlanta office, had assumed Ely's responsibilities for evaluating Clardy Manufacturing's loan application. Clardy Manufacturing has failed to identify any affirmative duty on Marine's part to disclose this information to Clardy Manufacturing. See Emerald Texas, Inc. v. Peel, 920 S.W.2d 398, 403 (Tex.App.--Houston [1st Dist.] 1996, no writ) ("[A] failure to disclose information is not fraudulent unless one has an affirmative duty to disclose, such as where a confidential or fiduciary relationship exists."); see also Federal Deposit Ins. Corp. v. Coleman, 795 S.W.2d 706, 708-09 (Tex.1990) (concluding that a duty of good faith is only imposed where a "special relationship" exists marked by a shared trust or imbalance in bargaining power, and does not exist between a lender and its borrower).

---

22    Because the justifiable reliance element of a claim for negligent misrepresentation is generally equated with contributory negligence, some courts have concluded that "justifiable reliance" in the context of fraud represents a lesser burden on the plaintiff than in the context of negligent misrepresentation. See, e.g., Haralson, 919 F.2d at 1025 & n. 5; Dupuy v. Dupuy, 551 F.2d 1005, 1018 (5th Cir.), cert. denied, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977)



CC⊘ | TRANSFORMED BY PUBLIC.RESOURCE.ORG

# EXHIBIT C

# FEDERAL LAND BANK ASS'N OF TYLER v. SLOANE

*NO. D-0307.*

*825 S.W.2d 439 (1991)*

## FEDERAL LAND BANK ASSOCIATION OF TYLER, Petitioner, v. William C. SLOANE, Lettie Sloane, and Robert C. Sloane, Respondents.

*Supreme Court of Texas.*
*Rehearing Overruled April 8, 1992.*

*G. Patrick Garrett, Oklahoma City, Okl., John L. Price, Center, Karen B. Jewell, Charles T. Newton, David M. Bond, Christopher W. Byrd, Houston, Ms. Rose Guerra Reyna, McAllen, for petitioner.*

*Blair A. Bisbey, Jasper, for respondents.*

### OPINION

GONZALEZ, Justice.

The primary issues in this case are (1) whether the statute of frauds shields a bank from liability for negligently misrepresenting that it had approved a loan secured by real property; and (2) assuming that the statute of frauds does not apply, whether the prospective borrowers can recover damages for mental anguish attributable to the bank's alleged negligent misrepresentation. After a jury trial, the trial court rendered judgment for the prospective borrowers. The court of appeals affirmed in part and reversed and rendered in part. Specifically, the court of appeals held that the statute of frauds did not bar the claim, affirmed the part of the judgment awarding mental anguish damages, and reversed and rendered that part of the judgment awarding damages for lost profits. 793 S.W.2d 692. We reverse that part of the court of appeals' judgment with regard to the award of mental anguish damages and otherwise affirm. This cause is remanded to the trial court for rendition of a judgment that conforms with this opinion.

In early 1986, William, Lettie, and Robert Sloane had been out of the business of raising chickens for two years when they learned they could get a contract from Pilgrim's Pride to raise broilers for the company on the condition that they build new chicken houses on their farm.[1] On March 7, 1986, the Sloanes applied for a $141,000

**[825 S.W.2d 441]**

loan from the Federal Land Bank Association of Tyler. During the application process, the Sloanes obtained an estimate of $105,000 for the costs of necessary equipment and the construction of two chicken houses. They also obtained a letter from Pilgrim's Pride stating that the company agreed to "feed out broilers" for the Sloanes once the houses were constructed according to specifications provided by Pilgrim's Pride. The Sloanes subsequently sent the construction estimate and the letter from Pilgrim's Pride to their loan officer at the bank.

Approximately a month after the Sloanes had applied for the loan, the loan officer informed them that the bank's board had approved the loan, and that the Sloanes could go ahead with site preparation work. The contractor hired by the Sloanes to build the new chicken houses contacted the bank's loan officer to see if he should begin construction, notwithstanding the pending nature of the loan. The loan officer said that there was "no problem," and that "there was not any reason for them not to continue at that point." (The bank officer disputes these statements; however, the jury resolved this issue in the Sloanes' favor, and the bank subsequently did not challenge on appeal the legal or factual sufficiency of the evidence supporting the fact).

In June 1986, the Sloanes had one of their old chicken houses demolished, and they paid approximately $9,000 for further site preparation. As the work progressed they supplied the bank with receipts. In August, 1986, the Sloanes

received a letter from the bank denying their loan application, giving as reasons the fact that they failed to include two outstanding debts on their application, and that they incurred additional liability for a car purchase while the loan was being processed.[2] The Sloanes subsequently failed to obtain other financing. They then sued the bank alleging that the loan officer had negligently misrepresented that the bank would approve their loan application. Their claims included the financial and property damages suffered in preparing to build the chicken houses, the loss of the Pilgrim's Pride contract, and the mental anguish caused by the bank's allegedly negligent conduct.[3]

The case was tried before a jury which found that: (1) the bank negligently misrepresented to the Sloanes that the bank had approved their loan application; (2) the Sloanes justifiably relied on such misrepresentation; and (3) reliance upon such misrepresentation caused the Sloanes pecuniary loss. The jury assessed damages against the bank amounting to $26,500 for past and future monetary losses other than lost profits, $28,500 for past and future lost profits, and $15,000 for mental anguish.

The trial court rendered an $81,974.48 judgment for the Sloanes, which included $11,974.48 in prejudgment interest. The court of appeals subsequently held that there was no evidence of lost profits and certain other expenditures, and thus the court affirmed the balance of the judgment after reformation. The bank now asserts that, as a matter of law, the statute of frauds bars the Sloanes' cause of action for all damages. The Sloanes counter that their cause of action sounds in tort, and thus the statute of frauds does not apply. They also assert that the court of appeals

**[825 S.W.2d 442]**

erred in reversing the trial court's award of damages for lost profits.

The statute of frauds requires that certain specified classes of contracts be in writing to be enforceable. Tex.Bus. & Com. Code § 26.01. The Sloanes do not claim that the bank agreed to loan them money and then breached that agreement; rather, they claim that the bank did not agree to loan them money, yet negligently misrepresented that it had made such an agreement. Moreover, the Sloanes do not seek damages for breach of the loan agreement never made, but for their reasonable reliance upon the bank's misrepresentation. Although a claim of negligent misrepresentation may not be used to circumvent the statute of frauds, under the circumstances of this case, the Sloanes' claim does not fall within the statute of frauds. To the contrary, the premise of the claim is that the Sloanes and the bank never reached an agreement, oral or written.

### NEGLIGENT MISREPRESENTATION

The Sloanes claim that the bank has a duty to use reasonable care whenever it provides information to its customers or potential customers, and that the bank breached this duty when it allegedly encouraged the Sloanes to incur expenses in reliance on the information related to their loan application. The Sloanes further allege that the bank misrepresented an existing fact rather than a promise of future conduct. Both the bank and the Sloanes rely on Restatement (Second) of Torts § 552 (1977) to define the scope of this duty. We agree with the Restatement's definition, as have several courts of appeal that have previously considered this question. *See, e.g., Cook Consultants, Inc. v. Larson*, 677 S.W.2d 718 (Tex.App—Dallas 1984), *rev'd on other grounds*, 690 S.W.2d 567 (Tex.1985), *on remand*, 700 S.W.2d 231, 234 (Tex.App.—Dallas 1985, writ ref'd n.r.e.); *Traylor v. Gray*, 547 S.W.2d 644, 656 (Tex.Civ.App—Corpus Christi 1977, writ ref'd n.r.e.); *Rosenthal v. Blum*, 529 S.W.2d 102, 104-05 (Tex.Civ.App.—Waco 1975, writ ref'd n.r.e.) (citing an earlier draft of the Restatement).

The elements of a cause of action for the breach of this duty are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. Issues substantially conforming to these elements were submitted to the jury, which returned a verdict favorable to the Sloanes. The bank makes no challenge to the sufficiency of the evidence of liability, so the remaining issue is what damages are available for this tort.

### DAMAGES

The Restatement provides damages for this tort as follows:

(1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is legal cause, including

(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

(b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

(2) the damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.

RESTATEMENT (SECOND) OF TORTS § 552b (1977).

While the Sloanes adopt the Restatement's terminology to support the basic elements of their cause of action, they reject the language of Restatement section 552B which limits damages to pecuniary loss alone. Specifically, the Sloanes argue that this court should allow them damages for mental anguish. The Restatement advances several policy reasons for limiting damages, including a lower degree of fault

**[825 S.W.2d 443]**

indicated by a less culpable mental state and the need to keep liability proportional to risk. Restatement (Second) of Torts § 552, comment a. There has been no trend to reject the pecuniary loss rule in what is essentially a commercial tort.[4] We decline to extend damages beyond those limits provided in Restatement section 552B.[5]

The Sloanes complain that they should receive damages for the profits they anticipated from the Pilgrim's Pride contract. As discussed above, Restatement (Second) section 552B allows for damages suffered in reliance upon negligent misrepresentation, but not for the failure to obtain the benefit of the bargain. Restatement (Second) §§ 552B(1)(a) & (2). The Sloanes would not have received the contract regardless of whether the misrepresentation was made. Under the legal theory of this section of the Restatement, they should not, therefore, receive the benefit of a bargain that would never have taken place. The sole reason the Sloanes did not get the Pilgrim's Pride contract is because the bank did not give them the loan money to build acceptable chicken houses. The Sloanes' claim to these damages is impermissibly predicated on giving them the benefit of the loan.[6]

For the foregoing reasons, we reverse the judgment of the court of appeals insofar as it includes an award for mental anguish. In all other respects, the judgment of the court of appeals is affirmed. We remand this cause to the trial court for rendition of judgment for $11,427.03 for past pecuniary losses other than lost profits, plus prejudgment interest.

MAUZY, Justice, concurring and dissenting.

I agree that the statute of frauds does not shield the bank from liability for negligent misrepresentation. I disagree, however, with the court's conclusion that damages for negligent misrepresentation can never include lost profits. I would hold that the Sloanes are entitled to recover damages sufficient to give them the benefit of their contract with Pilgrim's Pride.

**[825 S.W.2d 444]**

In a number of jurisdictions, benefit-of-the-bargain damages are clearly available in actions for fraudulent misrepresentation. *See, e.g., Freeman v. Bonnes Trucking,* 337 N.W.2d 871, 879 (Iowa 1983). Under the circumstances of this case, I disagree with the suggestion that negligent

misrepresentation is a lesser cause for concern than fraudulent misrepresentation.

The distinction between negligent misrepresentation and fraudulent misrepresentation is a thin one. Texas courts have recognized the negligent misrepresentation action as a form of "remedial fraud." *See Rosenthal v. Blum,* 529 S.W.2d 102, 104 (Tex.Civ.App.—Waco 1975, writ ref'd n.r.e.), and cases cited therein. Where circumstances are such that the defendant is presumed to know the facts to which his misrepresentation relates, a misrepresentation is fraudulent even if it is not made knowingly, willfully, or with actual intent to deceive. *See Dugan v. Jones,* 615 P.2d 1239, 1250 (Utah 1980).

I see no reason to maintain an artificial distinction between remedial fraud actions and actions for fraudulent misrepresentation. Here, the bank was in complete control of the Sloanes' loan application, and presumably knew the facts to which its misrepresentation related. Since the Sloanes altered their position in reliance on the bank's representations, they are entitled to damages based on the benefit-ofthe-bargain rule. *See LeFlore v. Reflections of Tulsa,* 708 P.2d 1068, 1076 (Okla.1985). Thus, I would affirm the trial court's judgment on the jury verdict awarding the Sloanes damages for lost profits.

## FOOTNOTES