# EXHIBIT C

# EXHIBIT C

DISTRICT COURT

CLARK COUNTY, NEVADA

MAURICE SHARPE,                          )
                                         )
                        Plaintiff,       )
                                         )
      v.                                 ) CASE NO. A602043
                                         ) DEPT. NO. XVIII
GMAC MORTGAGE; SSAFE MORTGAGE;           )
FIDELITY NATIONAL TITLE AGENCY OF)
NEVADA; and DOES I-X, inclusive; )
ROE CORPORATIONS XI-XX,                  )
inclusive,                               )
                                         )
                        Defendants.      )
_____)

DEPOSITION OF

MAURICE SHARPE

LAS VEGAS, NEVADA

TUESDAY, JUNE 29, 2010

Reported By Kele R. Smith, NV CCR No. 672, CA CSR No. 13405

LST Job No. 1-123759

MAURICE SHARPE - 6/29/2010

```
 1              DEPOSITION OF MAURICE SHARPE,
 2    taken at 3883 Howard Hughes Parkway, Suite 1100, Las
 3    Vegas, Nevada, on Tuesday, June 29, 2010, at 9:46
 4    a.m., before Kele R. Smith, Certified Court Reporter,
 5    in and for the State of Nevada.
 6
 7    APPEARANCES:
 8    For the Plaintiff:
 9              DAVID J. WINTERTON & ASSOCIATES
              BY:  DAVID WINTERTON, ESQ.
10              211 North Buffalo Drive
              Suite A
11              Las Vegas, Nevada  89
              (702)  363-0317
12
      For the Defendant GMAC:
13
              PITE DUNCAN
14              BY:  CHRISTINA BHIRUD, ESQ.
              701 East Bridger Avenue
15              Suite 700
              Las Vegas, Nevada 89101
16              (702) 991-4634
17    For the Defendant Fidelity National Title Agency of
      Nevada:
18
              SNELL & WILMER
19              BY:  ERICA STUTMAN, ESQ.
              3883 Howard Hughes Parkway
20              Suite 1100
              Las Vegas, Nevada  89169
21              (702) 784-5200
              estutman@swlaw.com
22
23
24
25
```

MAURICE SHARPE – 6/29/2010

1                          I  N  D  E  X

2

3    WITNESS:  MAURICE SHARPE

4

5    EXAMINATION                              PAGE

6    By Ms. Stutman                           5, 92

7    By Ms. Bhirud                            72

8

9

10

11

12                          EXHIBITS

13   NUMBER                                  MARKED

14     1     Grant, Bargain, and Sale Deed      37

15     2     Grant, Bargain, and Sale Deed
             Dated 10/31/05                     39

16     3     Grant, Bargain, and Sale Deed
             Dated 1/30/08                      41

17     4     Grant, Bargain, and Sale Deed
             Dated 1/30/08                      43

18     5     Grant, Bargain, and Sale Deed
             Dated 2/15/08                      44

19     6     Grant, Bargain, and Sale Deed
             Dated 2/15/08                      46

20     7     Police Report                      49

21     8     Police Report                      51

22     9     ID Theft Affidavit                 51

23    10     Photocopy of Driver License        55

24    11     Photocopy of Social Security Card  57

25    12     Letter Dated 4/14/09               58

MAURICE SHARPE - 6/29/2010

1

2                             EXHIBITS

3    NUMBER                                      MARKED

4     13     Letter Dated 9/30/09                   61

5     14     Statement of Information               62

6     15     Request For Verification of
             Employment                             64
7     16     Letter Dated 3/3/08                    66

8     17     Complaint                              67

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAURICE SHARPE - 6/29/2010

1            LAS VEGAS, NEVADA; TUESDAY, JUNE 29, 2010

2                        9:46 A.M.

3                         -oOo-

4            (The Reporter was relieved of her duties

5    under NRCP 30(b)(4).)

6    Whereupon,

7                    MAURICE SHARPE,

8    having first been called as a witness, was duly sworn

9    and testified as follows:

10

11                    DIRECT EXAMINATION

12   BY MS. STUTMAN:

13      Q.   Hi.  My name is Erica Stutman.  I represent

14   Fidelity National Title Agency of Nevada.  I'm going

15   to use the word Fidelity and I'm referring to the

16   entity Fidelity National Title Agency of Nevada.

17           It's currently 9:45 a.m.  This deposition

18   was Noticed for 9:30 a.m.  A copy of the Notice was

19   sent to Spencer Judd, counsel for defendant Ssafe

20   Mortgage.  I also just gave him a telephone call to

21   see if he'd be attending, but the call went to

22   voicemail, so I left a message.

23           Can you please state and spell your full

24   name?

25      A.   Maurice Sharpe, M-A-U-R-I-C-E, S-H-A-R-P-E.

MAURICE SHARPE - 6/29/2010

1        A.    I'm not sure.  Maybe three months or so.

2    I'm not sure.

3        Q.    **Less than a year?**

4        A.    Yes.

5        Q.    **Where did you live before that, before your**

6    **current address?**

7        A.    How long back you want to go?

8        Q.    **I'm sorry.  What did you say your current**

9    **address was?**

10       A.    2105 Grand Island Court.

11       Q.    **And how long have you lived there?**

12       A.    Ten years.

13       Q.    **Before Mr. Cantinelli lived there?**

14       A.    Antinelli.

15       Q.    **Sorry.  Did anybody else live with you prior**

16   **to him?**

17       A.    Yes.

18       Q.    **Who?**

19       A.    Tracy Sharpe and Jalyn Sharpe.  That's my

20   son.

21       Q.    **When did Tracy move out?**

22       A.    March of '09, I think it was.

23       Q.    **Why did she move out?**

24       A.    She was ready to go.

25       Q.    **What is -- what's Tracy's relation to you?**

MAURICE SHARPE - 6/29/2010

1      A.    There is no relationship.  We was just -- I

2   don't know how you would explain it.  We was just

3   together.  She was my girlfriend, I guess you would

4   say.

5      Q.    **Was her name always Tracy Sharpe?**

6      A.    No, it wasn't.

7      Q.    **What was her name?**

8      A.    Tracy Johnson.

9      Q.    **When did she change it to Tracy Sharpe?**

10     A.    Don't remember.

11     Q.    **It was after she met you?**

12     A.    Yes.

13     Q.    **Were you married?**

14     A.    No.

15     Q.    **Why did she change her name to your last**

16  **name?**

17     A.    I don't know why she did it.  I guess she

18  figured we was living together, we was common law.

19  Come to find out later, there's no such thing in Las

20  Vegas -- excuse me -- Nevada.

21     Q.    **Did she discuss with you changing her name**

22  **before she did so?**

23     A.    No, she didn't.

24     Q.    **Do you know when she changed it?**

25     A.    I don't remember.

MAURICE SHARPE - 6/29/2010

1  Q. How long was she your girlfriend?

2  A. About eight and a half, nine years.

3  Q. Where did you meet Tracy?

4  A. I think I met her here in Las Vegas.

5  Q. Do you remember how you met?

6  A. Through a mutual friend.

7  Q. How long after you met did you start dating,

8 I guess?

9  A. Don't remember.

10  Q. Was it less than a year?

11  A. Yes.

12  Q. Was it about a month or more than a month?

13  A. I believe it was more than a month, but I'm

14 not sure.

15  Q. Think it was less than six months?

16  A. Oh, yes.  Definitely less than six months.

17  Q. And how long after you began dating did she

18 move in with you?

19  A. Maybe about a -- eight months.  Six to eight

20 months later.  Not exactly sure about the time.

21  Q. And you said you never got married, that you

22 never had a marriage license?

23  A. No.

24  Q. Did you call her your wife?

25  A. Yes, I did.

MAURICE SHARPE - 6/29/2010

Page 12

1      Q.   Even though you didn't have a marriage
2   license, did you consider yourselves married?
3      A.   Yes.
4      Q.   Okay.  I'm actually going to change the
5   topic for a moment.
6           What did you do to prepare for today's
7   deposition?  Except don't tell me about any
8   conversations you had with your attorney.
9      A.   Nothing.
10     Q.   Did you look at any documents?
11     A.   No.
12     Q.   You didn't talk to anybody?
13     A.   I asked people what a deposition was.
14     Q.   Who did you ask?
15     A.   I asked Mike Antinelli.
16     Q.   Did he know what it was?
17     A.   Yes, he did.
18     Q.   What did he tell you?
19     A.   That you go in a room and they ask you a
20   bunch of questions.
21          MR. WINTERTON:  Is she living up to it?
22          MS. STUTMAN:  I think he was right.
23   BY MS. STUTMAN:
24     Q.   Did you speak with anyone else?
25     A.   About the procedure, no.  I told friends

MAURICE SHARPE - 6/29/2010

1      A.    No.  I was still paying it.

2      Q.    **You were still paying it until when?**

3      A.    Until somebody took another loan on my

4    house.

5      Q.    **Was your property that you're living in, was**

6    **that foreclosed upon?**

7      A.    Yes.

8      Q.    **It was sold to somebody else?**

9      A.    Yes.

10     Q.    **When was it sold?**

11     A.    I don't know the date.

12     Q.    **But you're still living in it?**

13     A.    Yes.  I think it says it's owned by Fannie

14   Mae.

15     Q.    **You said that Tracy Sharpe moved out in**

16   **around March 2009.  What was your relationship to her**

17   **when she moved out?  Was she no longer your**

18   **girlfriend?  Did you break up?**

19     A.    Yes.  We had broke up.

20     Q.    **When did you break up?**

21     A.    In March.

22     Q.    **Of 2009?**

23     A.    Yes.

24     Q.    **When was the last time you spoke with Tracy?**

25     A.    I spoke with her -- I think it was yesterday

MAURICE SHARPE - 6/29/2010

1    Q.   Did he tell you where they were now?

2    A.   No, but I found out on the computer.

3    Q.   What did you find out?

4    A.   That they were in Mexico.

5    Q.   How did you find out?  Internet search?

6    A.   No.  Actually, Mike Antinelli, he showed it

7  to me.

8    Q.   Did you -- did he look for where they were

9  after you spoke with the guy at Ssafe Mortgage?

10    A.   Yes.  This was afterwards.

11    Q.   So that's how you got their names?

12    A.   Yeah.

13    Q.   So did Mike do a search on the Internet?

14    A.   I couldn't tell you how he found it.  I

15  really don't know.  He knows way more about the

16  computer than I do.

17    Q.   Do you know the name of the lender on this

18  loan that was taken out on your property in March

19  2008?

20    A.   Wouldn't that be GMAC?  I don't know.

21  You're asking me stuff I have no knowledge of.

22    Q.   You said earlier that you never spoke with,

23  met, communicated in any manner with anyone at

24  Fidelity before you found out that the loan was taken

25  out.  Correct?

MAURICE SHARPE - 6/29/2010

1    A.    Yes.

2    Q.    **How did you find out that a loan had been**

3    **taken out in March of 2008 on your property?**

4    A.    Mike Antinelli.

5    Q.    **How did he know?**

6    A.    He pulled up my credit report, I think it

7    was.

8    Q.    **Why did he pull up your credit report?**

9    A.    Because I told him that I wanted to pay my

10    mortgage.  Tracy had been paying all the bills, so I

11    had no idea what nothing was, and I couldn't get in

12    contact to get the information.  I asked if he could

13    find it for me, and he said he could in a matter of

14    minutes.

15    Q.    **So you wanted to pay the mortgage.  So this**

16    **was when?**

17    A.    For the month of April.

18    Q.    **In 2008?**

19    A.    No.  2009.

20    Q.    **The loan was taken out March 2008 and you**

21    **didn't know about it -- the first time you figured**

22    **out was April 2009?**

23    A.    Yes.

24    Q.    **And this was after Tracy moved out.  Is that**

25    **correct?**

MAURICE SHARPE - 6/29/2010

```
1       A.    Yes.

2       Q.    So when Tracy moved out, did she stop paying

3  all the bills?

4       A.    Yes.

5       Q.    Okay.  So you asked Mike Antinelli to pull

6  your credit report or to find out who --

7       A.    Find out the name of the company that I was

8  supposed to send my mortgage to.

9       Q.    And what did he find?

10      A.    That the loan was refinanced.

11      Q.    So what did you do at that time when you

12 found out?

13      A.    I contacted the police.  I contacted GMAC

14 and pulled the rest of the hair out of my head that I

15 had left.

16            MR. WINTERTON:  For the record, he's bald.

17 BY MS. STUTMAN:

18      Q.    So this is April 2009.  So did you

19 immediately contact the police?  Do you remember how

20 long after you found out how many days, weeks,

21 months?

22      A.    No.  It was -- I want to say it was within

23 hours, but I'll say days to be safe.

24      Q.    And you said you contacted GMAC.  Is that

25 correct?
```

MAURICE SHARPE - 6/29/2010

```
1    2008, Tracy --

2        A.   Yes.

3        Q.   -- was still your common law wife?

4        A.   Yes.

5        Q.   So after you realized that the loan was

6    taken out, did you make any further mortgage payments

7    to anyone?

8        A.   No.

9        Q.   Did you receive any mortgage statements in

10   the mail?

11       A.   No.

12       Q.   For any loan?

13       A.   None.

14       Q.   What is the current status -- you had

15   mentioned earlier that you had contacted the police,

16   and what happened?  Was there an investigation?

17       A.   Yes.

18       Q.   And what -- is the investigation ongoing?

19       A.   I couldn't tell you that.  I'm having my

20   attorney try and get in contact with them to find out

21   what's the situation, but in September I talked to --

22   I think his name was Michael Moss.

23       Q.   Michael Moss?

24       A.   I think that's what it was.  Detective

25   Michael Moss, and he said that he was doing his
```

MAURICE SHARPE - 6/29/2010

1    investigation and it was obvious what had transpired.

2        Q.    **Were they going to do anything about it?**

3        A.    You're asking the wrong person.

4        Q.    **And you said he said it was obvious what**

5    **transpired.  Do they know who was involved?**

6        A.    I think he said Tracy.

7        Q.    **Anyone else?**

8        A.    No, huh-uh.

9        Q.    **Did you recognize the man in the picture of**

10    **the fake driver's license?**

11        A.    No.

12        Q.    **Were you ever a sales manager?**

13        A.    No.

14        Q.    **Did you ever work somewhere called Dial**

15    **International?**

16        A.    No.

17            (Exhibit 1 was marked.)

18    BY MS. STUTMAN:

19        Q.    **This document is called Grant, Bargain, and**

20    **Sale Deed.  And this is -- it says that James Mosley**

21    **grants property to Maurice Sharpe and Tracy Sharpe,**

22    **husband and wife, as joint tenants.  Have you ever**

23    **seen this document before?**

24        A.    Yes.

25        Q.    **Is this the original deed when you purchased**

MAURICE SHARPE - 6/29/2010

1    A.   I guess.  I don't know what a purchase
2  agreement is.
3    Q.   **Did you -- do you recall signing any**
4  **documents where you said that you were going to buy**
5  **his property?**
6    A.   Yes.
7    Q.   **Do you recall whether you signed the**
8  **documents alone or if Tracy did as well?**
9    A.   I think I did it alone.  I told her to put
10  her name on it too.
11    Q.   **Why did you want her name on there also?**
12    A.   I thought she was my wife.
13    MS. STUTMAN:  I'm handing to the court
14  reporter Exhibit 2 and giving copy to counsel.
15    (Exhibit 2 was marked.)
16  BY MS. STUTMAN:
17    Q.   **This document is also entitled Grant,**
18  **Bargain, Sale Deed.  It's dated -- the date it was**
19  **recorded is October 31st, 2005.  Do you recognize**
20  **this document?**
21    A.   I don't recognize it, but that was about the
22  time that I was doing the loan.
23    Q.   **Do you know when you started living there?**
24    A.   2000.  April.
25    Q.   **2000?**

MAURICE SHARPE - 6/29/2010

1    A.    Yes.  Well, she made all the payments.  She
2    handled all the bills.

3    Q.    **Were the payments made from a bank account**
4    **that was yours, or was it both of yours?**

5    A.    Both of ours.

6    Q.    **So it was a joint account?**

7    A.    Yes.

8    Q.    **Did you both contribute money to the bank**
9    **account?**

10    A.    Yes.

11    (Exhibit 3 was marked.)

12    Q.    **Handing you another document, which will be**
13    **Exhibit 3, which is also called a grant, bargain, and**
14    **sale deed, recorded on January 30, 2008.**

15    **Have you had a chance to look this over,**
16    **Mr. Sharpe?**

17    A.    Uh-huh.

18    Q.    **Is that your signature at the bottom?**

19    A.    No.

20    Q.    **No?**

21    A.    No.

22    Q.    **So this document says that --**

23    A.    It's not mine.  I don't know whose it is.
24    It's not mine.

25    Q.    **Have you ever seen it before?**

MAURICE SHARPE - 6/29/2010

1  had spoken to your wife?

2       A.    Uh-huh.

3            MS. STUTMAN:   The next exhibit is going to

4  be Exhibit No. 8.

5            (Exhibit 8 was marked.)

6  BY MS. STUTMAN:

7       Q.    And this -- at the bottom the number is 90,

8  the Bates stamp number.

9       A.    I recognize that.   That's easy.

10      Q.    At the bottom, is that your signature?

11      A.    Yes.

12      Q.    Next exhibit I'm going to hand you is

13  Exhibit No. 9.

14           (Exhibit 9 was marked.)

15  BY MS. STUTMAN:

16      Q.    It says at the top, "ID Theft Affidavit."

17  Take a second to look at it.

18      A.    (Complies.)

19      Q.    Do you recognize this document?

20      A.    Uh-huh.   Yes.

21      Q.    Is this your handwriting?

22      A.    Yes.

23      Q.    Can you please look at Page 2 of the ID

24  Theft Affidavit.   The bottom is marked Bates number

25  93.

MAURICE SHARPE - 6/29/2010

1      A.   Uh-huh, yes.

2      Q.   No. 14 says, "To the best of my knowledge

3  and belief, the following person used my information

4  (for example, my name, address, date of birth,

5  existing account numbers, social security number,

6  mother's maiden names, etc.) or identification

7  documents to get money, credit, loans, goods or

8  services without my knowledge or authorization" and

9  you wrote down Tracy Sharpe.

10     A.   Yes.

11     Q.   Is that your handwriting?

12     A.   No.  That's not my handwriting.  That's Mike

13  Antinelli's handwriting.

14     Q.   Was it your handwriting on Page 1?

15     A.   Yes.

16     Q.   Why did Mike write on Page 2?

17     A.   Because his writing is more legible than

18  mine.

19     Q.   But you told him to write that?

20     A.   Yes.

21     Q.   Okay.  So at the time that you filled out

22  this ID theft affidavit, did you believe that Tracy

23  had --

24     A.   Yes, I did.

25     Q.   -- taken your information?

MAURICE SHARPE - 6/29/2010

1    relationship, did you discuss who was now going to

2    pay the bills?

3         A.    There was nothing to discuss.  My home, my

4    bills.

5         Q.    Right.  But you said previously she was the

6    one who took care of paying them.

7         A.    She took care of all the bills at the house.

8    Every bill that came through, she took care of it.

9         Q.    So when she moved out, who took care of it?

10        A.    It was for me to take care of.

11        Q.    So you did discuss it?

12        A.    There was nothing to discuss.  They were my

13    bills.  I was going to take care of it.  I take care

14    of my bills.

15        Q.    Did Tracy keep your checkbook when you were

16    together?

17        A.    She always had the checkbook.  I never had

18    the checkbook.

19        Q.    You never wrote checks from the account when

20    you were still together?

21        A.    No.  Never wrote checks or made withdrawals

22    or deposits.  I added my name onto her account so it

23    will make it easier for her to take care of the

24    bills.

25             MS. STUTMAN:  This is going to be Exhibit --

MAURICE SHARPE - 6/29/2010

1    sure that's not mine.  And mine has a signature on

2    it.

3         Q.    Is that your Social Security number?

4         A.    That's my Social Security number.

5         Q.    Is your name spelled correctly?

6         A.    Yes.  The name is spelled correctly.  Unless

7    you got that recently, it's not mine.  I just went

8    and got mine.

9         Q.    Okay.  This is now going to be Exhibit 12.

10            (Exhibit 12 was marked.)

11   BY MS. STUTMAN:

12        Q.    That is Bates marked at the bottom 88.  This

13   is a letter from the Las Vegas Metropolitan Police to

14   Maurice Sharpe, dated April 14, 2009.

15            Mr. Sharpe, do you recognize the letter?

16        A.    Yes.

17        Q.    Did you receive this letter?

18        A.    Yes, I did.

19        Q.    Around April 2009?

20        A.    Yes, I did.

21        Q.    And this letter -- can you read the first

22   paragraph?

23        A.    This letter is to inform you that your case

24   event number has been reviewed and has been suspended

25   until get more information on how the loan was

MAURICE SHARPE - 6/29/2010

1    Q.    Was it --

2    A.    Michael Moss.

3    Q.    He called you?

4    A.    He left a message -- actually, GMAC left a

5    message for me to contact him.

6    Q.    And so you called him?

7    A.    Yes, I did.  And GMAC also sent me a letter

8    saying to contact him.

9    Q.    Did they tell you that they no longer

10   thought that Tracy, your wife, had opened the

11   account?

12   A.    No.

13   Q.    They didn't tell you that?

14   A.    No.

15   Q.    So as far as the police are concerned, Tracy

16   may still be involved.  Is that correct?

17   A.    I think so.

18   Q.    Is there a reason why you didn't name Tracy

19   as a defendant in the lawsuit?

20   A.    I don't want to sue my son.

21   Q.    What do you mean you don't want to sue your

22   son?

23   A.    Whatever she had I figure goes to him, so I

24   didn't see no need for it.

25            MS. BHIRUD:  Can we take one more quick

MAURICE SHARPE - 6/29/2010

1    A.    No.

2    Q.    Did you make a payment over the phone?

3    A.    She handled all the bills.  I don't know how
4    she paid it.

5    Q.    But you never made a payment over the phone?

6    A.    Never.  Don't know how.

7    Q.    Okay.  The next page, No. 213, it says, "I'm
8    Maurice Sharpe.  I would like to explain the increase
9    on my credit due to I was shopping for the rate on
10   the refinance of the home."

11        This is also dated March 3rd, 2008.  Did you
12   ever shop around for a refinance rate?

13   A.    No.

14   Q.    When you first got the property, did you
15   ever have any other loan on the property?

16   A.    No.

17   Q.    Okay.  I had one more question, I think.
18   I'm handing you a copy of the complaint in this case.

19        (Exhibit 17 was marked.)

20   BY MS. STUTMAN:

21   Q.    Do you recognize this document?

22   A.    Yes.

23   Q.    Have you seen this before?

24   A.    Yes.

25   Q.    When the complaint was filed, did you review

MAURICE SHARPE - 6/29/2010

1    between 2008 or between the time that you stopped
2    working full time for Euro-Tech and the time you
3    started working for Credit Doctors?
4        A.    Yes.  I did a lot of odds and ends jobs.  I
5    worked with my brother sometimes.
6        Q.    How were you paying for food?
7        A.    I worked with my brother sometimes.
8        Q.    So were you being paid in cash?
9        A.    Yes.
10       Q.    Were you using cash to pay for food and
11   daily expenses?
12       A.    Yes.
13       Q.    Did you use money in your bank account?
14       A.    I never used the bank account.
15       Q.    Okay.  You mentioned, though, that you and
16   Tracy had a joint bank account?
17       A.    Yes.
18       Q.    Did you have more than one joint bank
19   account?
20       A.    No.
21       Q.    Just one?
22       A.    Yes.
23       Q.    Did you review statements from that account?
24       A.    No.
25       Q.    Did you ever check the balance?

MAURICE SHARPE - 6/29/2010

1    A.   No.

2    Q.   Did you make deposits into that account?

3    A.   No.

4    Q.   Did you make withdrawals from that account?

5    A.   No.

6    Q.   So if we checked those bank records --

7    A.   Please do.

8    Q.   -- there wouldn't be any deposits from you?

9    A.   Please do.

10   Q.   We'll have to propound discovery first.

11   There wouldn't be any deposits from you?

12   A.   No.

13   Q.   But didn't you say that you did deposit

14   money into those accounts?

15   A.   Never said that.

16   Q.   You said that you both contribute to the

17   joint account?

18   A.   That's what I said.

19   Q.   So how do you contribute to the joint

20   account if you don't make any deposits?

21   A.   I'd give it to her.  She'd make the

22   deposits.  She was in control.

23   Q.   You essentially give Tracy cash and she'd

24   make deposits?

25   A.   I don't deal with banks.

MAURICE SHARPE - 6/29/2010

Page 77

1      Q.    How have you been paying your bills?

2      A.    She paid it.

3      Q.    How did you pay your bills before you were

4    with Tracy?

5      A.    Money orders.

6      Q.    You paid every bill with a money order?

7      A.    Yes.

8      Q.    Did you have a bank account?

9      A.    No.

10     Q.    How have you paid your bills since?

11     A.    Money orders.

12     Q.    You don't have a bank account?

13     A.    I don't have a bank account.

14     Q.    Okay.   So is it your testimony that Tracy

15   was the only person who made the mortgage payments,

16   even though she wasn't on the mortgage?

17     A.    Yes.

18     Q.    But you haven't paid your mortgage?

19     A.    No.

20     Q.    Who paid your mortgage before you and Tracy

21   were dating?

22     A.    I paid my own.

23     Q.    How?

24     A.    My money orders.   Actually, I paid the

25   lease.   The guy I was getting the house from, he paid

MAURICE SHARPE - 6/29/2010

```
 1    the mortgage.

 2        Q.    So you haven't seen any --

 3        A.    None, no statements whatsoever.

 4        Q.    How do you know what I'm going to ask you?

 5        A.    I'm sorry.  Go ahead.

 6        Q.    So you took out your original mortgage loan

 7    for the home at 2105 Grand Island in 2005?

 8        A.    Yes.

 9        Q.    Where were the statements sent?

10        A.    I would imagine they would be sent to my

11    house.

12        Q.    Do you check your mail?

13        A.    No.  She handled all the bills.

14        Q.    Do you check your mail?

15        A.    I check the mail now, but prior to that, no.

16        Q.    You didn't check your own mail?

17        A.    I didn't even have a key to the mailbox.

18        Q.    Okay.  And then the same would be true from

19    2008 forward?  You didn't check your mail?

20        A.    Not until she left in 2009 did I start

21    checking the mail.

22        Q.    When in 2009 did you start checking your own

23    mail?

24        A.    Late March, early April.

25        Q.    Of late 2009?
```

MAURICE SHARPE - 6/29/2010

1    account number is.  Right?

2        A.   No.

3        Q.   If I gave you a copy of the wiring

4    instructions from the closing of the loan that you're

5    contesting, you wouldn't recognize the number?

6        A.   No.

7        Q.   How did you find the bank account statement

8    to pull up online?

9        A.   I gave my brother the information.

10       Q.   How did you have the information?

11       A.   I knew what my name was, and I gave him that

12   and my Social Security number and date of birth.

13   Let's see.  What else did he use.  I think we had a

14   canceled check at the house he used.  He said the

15   bottom numbers, I can get the account from there.  I

16   don't know exactly how he did it.

17       Q.   Did you close your joint account with Tracy

18   after you learned that this loan had been originated?

19       A.   No.  I didn't close anything.

20       Q.   Why not?

21       A.   I don't use the bank.

22       Q.   You said that you learned in court that a

23   deposit had been made in the amount of $200,000 into

24   your joint bank account?

25       A.   I saw there was a large amount deposited.  I

MAURICE SHARPE - 6/29/2010

1    don't know exactly what it was.

2         Q.    You saw that when you looked at your bank

3    account statement?

4         A.    Yes.

5         Q.    Did you close the account after seeing that?

6         A.    No.

7         Q.    Why not?

8         A.    I don't use it.

9         Q.    But your name's on it?

10        A.    Yes.  I figured if I didn't use it, it would

11   make no never mind.

12        Q.    Did you contact Tracy after you saw there

13   was this large --

14        A.    I attempted to.

15        Q.    And?

16        A.    I couldn't get in touch with her.

17        Q.    Have you spoken to her since that time?

18        A.    Yes, I have.

19        Q.    Have you discussed it with her?

20        A.    I asked her about it repeatedly.

21        Q.    What did she say?

22        A.    She has no knowledge of it.

23        Q.    Does anyone else have access to that

24   account?

25        A.    No.  Not that I know of.

MAURICE SHARPE - 6/29/2010

1     Q.   You still aren't -- so please explain why

2    you didn't name Tracy as a defendant in this lawsuit.

3         MR. WINTERTON:  Objection.  Asked and

4    answered.

5     A.   I didn't want to sue my son.

6    BY MS. BHIRUD:

7     Q.   But you believe that Tracy perhaps was

8    involved in taking out this loan?

9         MR. WINTERTON:  Objection.  Asked and

10    answered three times.

11     A.   I don't know.

12    BY MS. BHIRUD:

13     Q.   What makes you think that Ssafe Mortgage had

14    anything to do with this, with the allegations in

15    your complaint?

16     A.   I think I explained that to you earlier too.

17    Because how shoddy the paperwork was.

18     Q.   Have you ever asked -- did you review where

19    the money was being spent or when the money was being

20    taken out of your joint account when you pulled up

21    the statement?  Did you look at the history and see

22    when money came in and when it left the account?

23     A.   I wouldn't know how to do that.

24     Q.   Would your brother know how to do that?

25     A.   He probably would.