**Hearing Date: April 30, 2015 at 10:00 a.m. (ET)**
**Objection Deadline: April 6, 2015 at 4:00 p.m. (ET)**

MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Norman S. Rosenbaum
Jordan A. Wishnew
James A. Newton

*Counsel for the ResCap Borrower*
*Claims Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------

| | ) | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

-------------------------------------------------------------

**RESCAP BORROWER CLAIMS TRUST'S OBJECTION TO**
**PROOF OF CLAIM NO. 725 FILED BY WILLIAM J. FUTRELL**

ny-1173972

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................1

JURISDICTION, VENUE AND STATUTORY PREDICATE ....................................3

BACKGROUND ....................................................................................3

    I.      General Overview ........................................................................3

    II.     Claim Specific Background ..........................................................5

          A.      The Loan and the Property .....................................................5

          B.      The Debtors' Loss Mitigation Efforts ........................................7

          C.      Claimant's Escrow Account ...................................................12

          D.      Claimant's Purported Qualified Written Requests ........................14

    III.    The Debtors' Prior Claim Objection .............................................14

RELIEF REQUESTED ..........................................................................15

OBJECTION ....................................................................................15

    I.      GMAC Mortgage Did Not Violate RESPA in Connection with Claimant's
Loan ....................................................................................15

          A.      No Private Right of Action Exists under RESPA Provisions
Relating to Good Faith Estimates (12 U.S.C. § 2604) or Escrow
Accounting (12 U.S.C. § 2609) ..............................................15

          B.      Nearly All of Claimant's Allegations Regarding Kickbacks and
Unearned Fees are Barred by RESPA's One Year Statute of
Limitations ......................................................................17

          C.      Even if a Private Right of Action Did Exist Under 12 U.S.C.
§ 2609, Claimant Cannot Maintain a Claim Under That Section of
RESPA ............................................................................17

          D.      RESPA's GFE Provision (12 U.S.C. § 2604) and Kickback and
Unearned Fees Provision (12 U.S.C. § 2607) Do Not Apply to
Post-Origination Activities ...................................................18

          E.      GMAC Mortgage Complied with RESPA by Timely Responding
to Claimant's Only Qualified Written Request .............................20

    II.     GMAC Mortgage Did Not Violate the Fair Debt Collection Practices Act
in Connection With the Loan ......................................................23

          A.      Claimant's FDCPA Claims Are Barred by the Statute of
Limitations ......................................................................23

          B.      Claimant's Allegations of Improper Communications and Debt
Validation are Facially Inapplicable to any Allegations Contained
in the Futrell Response ........................................................25

# TABLE OF CONTENTS
(continued)

**Page**

C.    Claimant's Allegations of Harassment, Unfair Practices and Misrepresentations are Unsupported by the Futrell Response or Claim .................................................................................................26

III.    Claimant's Fraud Claims are Also Woefully Inadequate....................................30

IV.    Claimant Has Failed to Quantify or Otherwise Support Any Damages..............31

NOTICE .........................................................................................................................33

CONCLUSION ...............................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allison v. Liberty Savs.*,
    695 F.2d 1086 (7th Cir. 1982) ................................................................. 16, 18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................ 28

*AutoXchange.com, Inc. v. Dreyer & Reinbold, Inc.*,
    816 N.E.2d 40, *as amended*, No. 49A05-0402-CV-108, 2004 Ind. App. LEXIS 2314
    (Ind. Ct. App. Nov. 19, 2004) ................................................................. 30

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................ 28, 29

*Berneike v. CitiMortgage, Inc.*,
    708 F.3d 1141 (10th Cir. 2013) ............................................................. 20, 21

*Childress v. CitiMortgage*,
    No. 1:08-cv-01137-MCA-RMS, 2010 U.S. Dist. LEXIS 145683 (D.N.M. Feb. 19,
    2010) ....................................................................................................... 22

*Clayton v. Raleigh Fed. Savs. Bank*,
    No. 96-1696, 1997 U.S. App. LEXIS 3503 (4th Cir. Feb. 27, 1997) .................... 16

*Collins v. FMHA-USDA*,
    105 F.3d 1366 (11th Cir. 1997) ............................................................. 15

*Craig v. Saxon Mortg. Servs., Inc.*,
    No. 13-CV-4526 (SJF) (GRB), 2015 WL 171234 (E.D.N.Y. Jan. 13, 2015) ......... 24

*Egbarin v. Lewis, Lewis & Ferraro LLC*,
    No. CIV. A. 3:00-CV-1043, 2006 WL 236846 (D. Conn. Jan. 31, 2006) ............ 24

*George v. Smith*,
    507 F.3d 605 (7th Cir. 2007) ................................................................. 28

*Glover v. Fremont Inv. & Loan*,
    No. C-09-03922 (JCS), 2009 WL 5114001 (N.D. Cal. Dec. 18, 2009) ................ 16

*Heller v. First Town Mortg. Corp.*,
    No. 97 CIV. 8575 (JSM), 1998 WL 614197 (S.D.N.Y. Sept. 14, 1998) ......... 15, 17

*In re DJK Residential LLC*,
    416 B.R. 100 (Bankr. S.D.N.Y. 2009) .................................................. 24, 28

*In re Rockefeller Ctr. Props.*, 272 B.R. 524 (Bankr. S.D.N.Y. 2000), *aff'd sub nom., NBC v. Rockefeller Ctr. Props. (In re Rockefeller Ctr. Props.)*, 226 B.R. 52 (S.D.N.Y. 2001), *aff'd*, 46 Fed. Appx. 40 (2d Cir. 2002)........................................................24

*Khadher v. PNC Bank, N.A.*,
    577 Fed. Appx. 470 (6th Cir. 2014) ...................................................... 16

*Louisiana v. Litton Mortg. Co.*,
    50 F.3d 1298 (5th Cir. 1995) ................................................................ 16

*Madonna v. Academy Collection Serv., Inc.*,
    No. 3:95CV00875 (AVC), 1997 WL 530101 (D. Conn. Aug. 12, 1997) .............................27

*McDonnell v. Bank of Am.*,
    No. 2:12-CV-0096 KJM EFB, 2013 WL 3013658 (E.D. Cal. June 14, 2013) .....................20

*Mercado v. Playa Realty Corp.*,
    No. 03–cv–3427 (JO), 2005 WL 1594306 (E.D.N.Y. July 7, 2005)................................15, 16

*Mizrahi v. Network Recovery Servs., Inc.*,
    No. 98-CV-4528 (ERK) (JLC), 1999 WL 33127737 (E.D.N.Y. Nov. 5, 1999) .....................27

*Robinson v. Transworld Sys., Inc.*,
    876 F. Supp. 385 (N.D.N.Y. 1995) .......................................................... 33

*Roth v. CitiMortgage Inc.*,
    756 F.3d 178 (2d Cir. 2014) ......................................................20, 21, 22

*Shahin v. PNC Bank, N.A.*,
    Civ. No. 13-1404-LPS, 2014 WL 5106094 (D. Del. Oct. 9, 2014), *reargument denied*,
    No. CV 13-1404-LPS, 2015 WL 167180 (D. Del. Jan. 13, 2015) ........................................ 16

*Shetiwy v. Midland Credit Mgmt.*,
    980 F. Supp. 2d 461 (S.D.N.Y. 2013) ...................................................... 26

*Vega v. First Fed. Savs. & Loan Ass'n of Detroit*,
    622 F.2d 918 (6th Cir. 1980) ................................................................ 16

*Williams v. Goldman & Steinberg, Inc.*,
    No. Civ. A. No. 03-CV-2132 (DGT), 2006 WL 2053715 (E.D.N.Y. July 21, 2006)............27

## STATUTES

735 ILCS § 5/15-1101 *et. seq.*..................................................................27

12 U.S.C. 2605(b)....................................................................................5

12 U.S.C. 2605(c)....................................................................................6

iv

12 U.S.C. § 2604 ..................................................................................................... 16, 18

12 U.S.C. § 2694(c) ...................................................................................................... 19

12 U.S.C. § 2605(e) ...................................................................................................... 14

12 U.S.C. § 2605(e)(1)-(2) ........................................................................................... 20

12 U.S.C. § 2605(e)(1)(B) ......................................................................................20, 21

12 U.S.C. § 2607 ......................................................................................................18, 19

12 U.S.C. § 2614 ........................................................................................................... 17

15 U.S.C. § 1692a(6)(F)(iii) ......................................................................................... 23

15 U.S.C. § 1692e ......................................................................................................... 28

15 U.S.C. § 1692e(6)(B) ............................................................................................... 27

15 U.S.C. § 1692f ......................................................................................................... 27

15 U.S.C. § 1692g ......................................................................................................... 25

15 U.S.C. § 1692k ......................................................................................................... 26

15 U.S.C. § 1692k(d) .................................................................................................... 24

## OTHER AUTHORITIES

24 C.F.R. 3500.7 ........................................................................................................... 16

24 C.F.R. § 3500.2 ........................................................................................................ 19

24 C.F.R. § 3500.7(a)-(b) ............................................................................................. 19

24 C.F.R. § 3500.14 ..................................................................................................17, 19

24 C.F.R. § 3500.21(e) .............................................................................................21, 23

Fed. R. Civ. P. 9 ........................................................................................................... 30

Ind. R. Trial P. 9(B) ..................................................................................................... 30

Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111–203 §
    1463(c), 124 Stat. 1376, 2184 (2010) (the "**Dodd-Frank Act**") ........................... 20

Real Estate Settlement Procedures Act, Section 6, Transfer of Servicing of Mortgage
    Loans (Regulation X), 59 Fed. Reg. 65,442, 65,446 (Dec. 19, 1994) ...................... 21

v

**TO THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

The ResCap Borrower Claims Trust (the "**Borrower Trust**"), established pursuant to the terms of the chapter 11 plan confirmed in the above captioned bankruptcy cases (the "**Chapter 11 Cases**") [Docket No. 6065], as successor in interest to the above captioned debtors (collectively, the "**Debtors**") with respect to Borrower Claims,[1] hereby submits this objection (the "**Objection**") seeking to disallow and expunge, without leave to amend, proof of claim number 725 (the "**Claim**") filed by William J. Futrell ("**Claimant**") against Debtor GMAC Mortgage LLC ("**GMAC Mortgage**")[2] pursuant to section 502(b) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 3007(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") on the ground that the Claim fails to state a claim against the Debtors. The Borrower Trust seeks entry of an order, substantially in the form attached hereto as Exhibit 1 (the "**Proposed Order**"), granting the requested relief. In support of the Objection, the Borrower Trust submits the Declaration of Kathy Priore (the "**Priore Decl.**"), attached hereto as Exhibit 2, and respectfully represents as follows:

**PRELIMINARY STATEMENT**[3]

1.      The Claim, filed by a delinquent borrower, asserts a myriad of meritless claims against the Debtors in connection with mistakes that have long been rectified by the Debtor. In fact, Claimant was provided with a loan modification in June 2010 to bring him current. In this instance, in addition to alleging several technical violations of RESPA and the FDCPA,

---

[1] As used herein, the terms "**Borrower**" and "**Borrower Claims**" have the meanings ascribed to them in the Plan (defined below).
[2] The Claim also identifies "Residential Capital LLC" in the box entitled "Name of Debtor." However, none of the allegations in the Claim or the Futrell Response (defined below) appear to relate to Residential Capital, LLC. As a result, the Borrower Trust has limited its Objection to addressing purported claims against GMAC Mortgage (and the Borrower Trust as successor). The Borrower Trust reserves the right to object on any and all bases to any claims Claimant asserts against Residential Capital LLC, to the extent that it becomes clear that Claimant intended to assert any such claims.
[3] Capitalized terms used in this Preliminary Statement shall have the meanings ascribed to such terms below.

Claimant's primary complaint relates to a mistake in his escrow calculation that he contends was not corrected for "over 12 months," (*see* Futrell Response at 1, 3, 5), and GMAC Mortgage's alleged failure to accept payments from Claimant under what he refers to as a Repayment Plan.

2.      As described below, Claimant's contention that the escrow mistake was not corrected for over twelve months is simply incorrect.  While a typographical error led to an escrow mistake in connection with Claimant's Loan, the escrow mistake was quickly acknowledged by GMAC Mortgage and Claimant, his wife, and his counsel were informed no less than four times that Claimant's then pending loan modification application would either need to be withdrawn and restarted, or completed before the escrow issue could be addressed and Claimant's escrow payment adjusted accordingly.  Indeed, less than one week after Claimant was denied a loan modification (for failing to sign and return the paperwork), a new escrow analysis was conducted and the issue was corrected, as GMAC Mortgage promised.

3.      Claimant's alleged claim arising from GMAC Mortgage's purported failure to accept an appropriate payment under a temporary stop gap (or, as he calls it, the Repayment Plan) plan is also mistaken.  The temporary stop gap plan was set up to allow time for Claimant to be considered for more permanent solutions.  As described further below, just days after the temporary stop gap plan was set up, Claimant was approved for a trial loan modification (which could ultimately result in a permanent modification), abrogating the need for the temporary stop gap plan and it was cancelled in favor of the approved loan modification.  GMAC Mortgage attempted to reach Claimant by phone twice in the following week, but there was no answer, and also notified him by mail of his loan modification approval.  However, Claimant attempted to continue to pay the reduced, temporary stop gap plan payment.  Nonetheless, GMAC Mortgage

2

continued to work with the Claimant during the subsequent weeks and Claimant received a

permanent loan modification resulting in the waiver of all past fees and charges.

4.       Notwithstanding the Debtors' efforts to provide the Claimant with a loan

modification in June of 2010 (and their efforts to provide Claimant with loan modifications on

multiple occasions after his subsequent default – efforts that were rejected by Claimant),

Claimant now asserts a litany of purported claims against GMAC Mortgage.  As described

further below, many of the purported claims are asserted under statutory provisions that are

facially inapplicable here, and each of the other claims lacks merit and are inadequately pled.

Accordingly, the Claim should be disallowed and expunged.

## JURISDICTION, VENUE AND STATUTORY PREDICATE

5.       This Court has jurisdiction over this Objection under 28 U.S.C. § 1334.  This

matter is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before this Court under

28 U.S.C. §§ 1408 and 1409.

6.       The statutory predicates for the relief requested herein are section 502(b) of the

Bankruptcy Code and Bankruptcy Rule 3007(a).

## BACKGROUND

**I.       General Overview**

7.       On May 14, 2012, each of the Debtors filed a voluntary petition in this Court for

relief under chapter 11 of the Bankruptcy Code.  These Chapter 11 Cases are being jointly

administered pursuant to Bankruptcy Rule 1015(b).

8.       On May 16, 2012, the Court entered an order [Docket No. 96] appointing

Kurtzman Carson Consultants LLC ("**KCC**") as the notice and claims agent in these Chapter 11

Cases.  Among other things, KCC is authorized to (a) receive, maintain, and record and

otherwise administer the proofs of claim filed in these Chapter 11 Cases and (b) maintain the official claims register for the Debtors (the "**Claims Register**").

9.      On March 21, 2013, this Court entered an order approving procedures for the filing of objections to proofs of claim filed in these Chapter 11 Cases [Docket No. 3294] (the "**Procedures Order**").  The Procedures Order includes specific protections for Borrowers and sets forth a process for the Debtors to follow before objecting to certain categories of Borrower Claims (the "**Borrower Claim Procedures**").

10.     On December 11, 2013, the Court entered the *Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* [Docket No. 6065] (the "**Confirmation Order**") approving the terms of the chapter 11 plan (as amended, the "**Plan**"), filed in these Chapter 11 Cases.  On December 17, 2013, the Effective Date (as defined in the Plan) of the Plan occurred [See Docket No. 6137].

11.     The Plan provides for the creation and implementation of the Borrower Trust, which is established for the benefit of Borrowers who filed claims to the extent such claims are ultimately allowed either through settlement or pursuant to an Order of the Court.  See Plan, Art. IV.F.  The Borrower Trust was established to, among other things, "(i) direct the processing, liquidation and payment of the Allowed Borrower Claims in accordance with the Plan, and the distribution procedures established under the Borrower Claims Trust Agreement, and (ii) preserve, hold, and manage the assets of the Borrower Claims Trust for use in satisfying the Allowed Borrower Claims."  See id.

4

## II.    Claim Specific Background

### A.    The Loan and the Property

12.    On or about February 23, 2001, Claimant executed a note (the "**Note**") in favor of Aegis Mortgage Corporation d/b/a UC Lending ("**Aegis**") in connection with a $76,500 home loan.  *See* Priore Decl. ¶ 5, Exhibit A.  Claimant's obligations under the Note were secured by a Mortgage in favor of Mortgage Electronic Registration Systems, Inc. ("**MERS**") as nominee for Aegis and its successors and assigns (the "**Mortgage**" and together with the Note, the "**Loan**"), which Mortgage encumbered property located at 8391 N 550 W, Bryant, IN 47326 (the "**Property**").  *See* Priore Decl. ¶ 5, Exhibit B.

13.    Debtor Homecomings Financial, LLC ("**Homecomings**") began servicing the Loan on March 9, 2001.  *See* Priore Decl. ¶ 5.

14.    On June 10, 2009, in connection with the transfer of servicing of Claimant's Loan to GMAC Mortgage and as required by law, Homecomings sent Claimant a letter informing Claimant that the servicing of his Loan would be transferred to GMAC Mortgage, effective July 1, 2009.  *See* Futrell Response,[4] Exhibit 29 (copy of June 10 letter); 12 U.S.C. 2605(b) (setting forth contents of notice required to be sent by transferor of loan servicing "not less than 15 days before the effective date" of the servicing transfer).  In its letter, Homecomings informed Claimant that the "principal balance" of his Loan as of June 4, 2009 was $71,251.99, with an escrow balance of $0.  *See* Futrell Response, Exhibit 29 at 1.

15.    In connection with the transfer of servicing of the Loan (and also as required by law), GMAC Mortgage also sent Claimant a debt validation letter, dated June 10, 2009, informing him that GMAC Mortgage would become the new servicer of his Loan, effective July

---

[4] As described further infra, the Futrell Response refers to a response filed by Claimant to a prior omnibus objection that included an objection to the Claim.  The Futrell Response provided information regarding the nature of Claimant's alleged Claim in addition to the information contained in Claimant's proof of claim form.

ny-1173972

1, 2009.  Futrell Response, Exhibit 28 at 1; 12 U.S.C. 2605(c) (setting forth contents of notice

required to be sent by transferee of loan servicing "not more than 15 days after the effective

date" of the servicing transfer).  In its letter, GMAC Mortgage informed Claimant that the "total

amount of the debt" outstanding as of June 4, 2009 was $73,341.47.  *See id.*  The GMAC

Mortgage letter specifically stated that "[i]nterest, late charges, legal costs and fees and other

charges may be included in the total amount of the debt."  *See id.*  The $73,341.47 amount stated

in GMAC Mortgage's debt validation letter included Claimant's $71,251.99 principal balance, as

referenced in Homecomings June 10, 2009 letter, as well as $591.48 in late charges,[5] $183.50 in

charges incurred in connection with property inspections and a broker price opinion, and

$1,314.50 representing past due May and June, 2009 payments.  *See* Priore Decl. ¶ 7.

16.     The Note was subsequently endorsed in blank and transferred to Residential

Funding Company, LLC.  *See* Priore Decl. ¶ 6, Exhibit A at 4.  Thereafter, the Note was

transferred to Bank One National Association, as Trustee for RASC 2001-KS1, in connection

with the March 1, 2001 securitization of the RASC 2001-KS1 trust.  *See* Priore Decl. ¶ 6.

17.     On September 13, 2012, the Mortgage was assigned by MERS, as nominee for

Aegis, to The Bank of New York Mellon Trust Company, National Association fka The Bank of

New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A., successor by

Merger to Bank One National Association, as Trustee for RASC 2001-KS1.  *See* Priore Decl.

¶ 8, Exhibit C.

---

[5] From 2007 through 2010, Claimant failed to make more than twenty-five payments within the 15-day grace period
provided by Homecomings and GMAC Mortgage.  *See* Priore Decl. ¶ 7 n. 5, Exhibit A at 2 (describing late
charges).  As described further infra, all remaining late charges were waived when Claimant entered into a
permanent loan modification in June 2010.

6

18.     Servicing of the Loan was transferred to Ocwen Loan Servicing, LLC ("**Ocwen**")
on or about February 15, 2013 in connection with the closing of the sale of the Debtors'
mortgage servicing platform.  *See* Priore Decl. ¶ 9.

**B.     The Debtors' Loss Mitigation Efforts**

19.     The Loan went into default when Claimant failed to remit the installment payment
of principal and interest that became due for the Loan on December 1, 2007.  The Claimant did
not become current on the Loan until he received a permanent loan modification in June 2010, as
described herein.  *See* Priore Decl. ¶ 10.  The allegations contained in the Futrell Response arise
from a number of interactions and communications during 2009 and 2010.  Consequently, this
background section focuses on the Debtors' loss mitigation efforts with the Claimant during that
time period.

20.     On or around January 23, 2009, Homecomings received a workout package for
Claimant from a "HOPE" representative.[6]  *See* Priore Decl. ¶ 11, <u>Exhibit D</u> at 129.
Homecomings thereafter spoke with Claimant on February 24, 2009 and offered to set up a
repayment plan that would bring Claimant current on the Loan (the "**February Repayment
Plan**").  *See* Priore Decl. ¶ 11, <u>Exhibit D</u> at 127-128.  Homecomings set up a repayment plan
requiring Claimant to make payments of $657.25 on each of February 28, March 15 and March
28, 2009, after which the Claimant's account would become current.  *See* Priore Decl. ¶ 11.  A
letter memorializing the February Repayment Plan was sent to Claimant the same day.  *See*
Priore Decl. ¶ 11, <u>Exhibit E</u>, <u>Exhibit D</u> at 127.

---

[6] HOPE was a third party organization that assisted borrowers in filling out paperwork associated with loss
mitigation efforts.  *See* Priore Decl. ¶ 11 n. 7.  These representatives would meet with borrowers face to face or
setup phone calls to assist the borrower.  *See Id*.

21.     Claimant made the February 28, 2009 payment by phone on February 27, 2009, but failed to make the March 15, 2009 payment.  *See* Priore Decl. ¶ 12, Exhibit D at 127.  As a result, the February Repayment Plan was cancelled.  *See* Priore Decl. ¶ 12.

22.     On April 16, 2009, Claimant contacted Homecomings requesting a loan modification, and indicating that he could not afford a repayment plan.  *See* Priore Decl., Exhibit D at 125-126.  Claimant was advised to obtain a workout package from the Debtors' website and submit it as soon as possible.  *See id.*

23.     On June 2, 2009, Claimant spoke with Homecomings regarding his account and, as a result of that conversation, Homecomings set up a five-month special forbearance plan intended to provide Claimant with time to complete and return a workout package.  The June 2, 2009 special forbearance plan required five monthly payments of $657.25.  *See* Priore Decl. ¶ 14, Exhibit D at 123.  On or about June 10, 2009, Homecomings received a workout package from Claimant by facsimile.  *See* Priore Decl., Exhibit D at 122.  Homecomings contacted Claimant by phone the same day to advise him that the workout package was missing documentation, including an income tax return.  *See id.*

24.     After receiving the requested documentation, Homecomings commenced the loan modification review process and, on June 19, 2009, set up a three-month HAMP loan modification trial plan requiring payments of $730.76 due on first of each of August, September and October of 2009.  *See* Priore Decl. ¶ 15, Exhibit D at 119.  The HAMP trial plan replaced the June 2, 2009 special forbearance plan.

25.     Claimant completed the trial plan and a permanent loan modification was approved by GMAC Mortgage on October 8, 2009.  The permanent loan modification provided a

8

reduction of Claimant's interest rate from 9.75% to 7.75%, resulting in monthly payments for

principal, interest, taxes and insurance of $730.42 commencing on November 1, 2009.[7]

26.    Claimant was informed that he had been approved for a permanent loan

modification by letter dated October 14, 2009.  *See* Priore Decl. ¶ 16, <u>Exhibit F</u>.  A follow-up

letter dated December 17, 2009 regarding Claimant's approval for a permanent loan modification

was subsequently sent.  *See* Futrell Response, <u>Exhibit 34</u>.  However, Claimant failed to sign and

return the permanent loan modification agreement attached to either communication and,

consequently, the loan modification was denied on January 29, 2010.  *See* Priore Decl. ¶ 16,

<u>Exhibit D</u> at 102.

27.    Claimant was informed of the permanent loan modification denial by letter dated

February 3, 2010.  *See* Priore Decl. ¶ 17, <u>Exhibit G</u>.

28.    On February 12, 2010, GMAC Mortgage received a facsimile from Claimant

containing a new HAMP workout package.  *See* Priore Decl. ¶ 18, <u>Exhibit D</u> at 100.  On

February 16, 2010, an employee of GMAC Mortgage's customer advocacy group spoke with

Claimant's wife and advised her that Claimant would not be able to qualify for a HAMP loan

modification at that juncture because he was deriving income from short term disability.[8]  *See id.*

at 99-100.  The customer advocacy employee also informed Claimant's wife that perhaps GMAC

Mortgage could be set up with a "stop gap plan" while a longer term solution was explored.  *See*

Priore Decl. ¶ 18, <u>Exhibit D</u> at 98-99.

29.    On February 17, 2010, Claimant was set up with a temporary stop gap plan

requiring the payment of $355 per month on the first of each of March, April and May of 2010 to

avoid referral of the Loan to foreclosure.  *See* Priore Decl. ¶ 19, <u>Exhibit D</u> at 97.  Claimant was

---

[7] As described further *infra*, the increased monthly payment resulted from increased anticipated escrow payments.
[8] HAMP regulations required that a borrower have a permanent source of income in order to receive a HAMP loan modification.

9

also formally advised of the HAMP modification denial by letter dated February 17, 2010.  *See*

Priore Decl. ¶ 19, Exhibit D at 97, Exhibit H.

30.     On February 18, 2010, GMAC Mortgage spoke with Claimant by phone and

advised him that his Loan was being considered for a non-HAMP (or traditional) loan

modification.  *See* Priore Decl. ¶ 20, Exhibit D at 96.  On February 19, 2010, Claimant was

approved for a traditional loan modification trial plan, requiring payments of $704.23 on each of

April, May and June 1, 2010.  *See* Priore Decl. ¶ 20, Exhibit D at 94-95.  In connection with the

approval of a trial loan modification, the previously implemented repayment plan – which was

set up to allow Claimant to be considered for more permanent options – was cancelled.  *See*

Priore Decl. ¶ 20.  GMAC Mortgage attempted to contact Claimant by phone on February 22 and

February 24, but no one answered.  *See* Priore Decl. ¶ 20.

31.     On April 8, 2010, the traditional loan modification trial plan was mistakenly

cancelled because GMAC Mortgage did not believe it had received the completed loan

modification paperwork from the Claimant as required.  *See* Priore Decl. ¶ 21, Exhibit D at 93.

Claimant was informed of the cancellation by letter dated April 14, 2010.  *See* Priore Decl. ¶ 21,

Exhibit D at 93; Exhibit I at 2.  In fact, the executed traditional loan modification trial plan

agreement had been returned by Claimant on March 30, 2010.  *See* Priore Decl. ¶ 21, Exhibit D

at 94.

32.     Also on April 14, 2010, Claimant's authorized representative contacted a GMAC

Mortgage customer advocacy employee to inquire as to the status of the traditional loan

modification.  *See* Priore Decl. ¶ 22, Exhibit D at 93.  Claimant's representative informed

GMAC Mortgage that the first payment had been made and that the loan modification documents

had been returned.  *See* Priore Decl. ¶ 22, Exhibit D at 93.  GMAC Mortgage responded by

10

reinstating the trial loan modification for the remaining two payments, and Claimant's

representative was informed that Claimant should continue to remit the trial modification

payments on May 1 and June 1, 2010.  *See* Priore Decl. ¶ 22, Exhibit D at 91.

33.     By letter dated May 20, 2010, Claimant was informed that, subject to certain

conditions set forth in the letter, he had been approved for a permanent, traditional loan

modification.  As set forth in the letter, Claimant was required to execute and return the enclosed

loan modification agreement and payment of a "contribution amount" of $704.23, in each case

by June 1, 2010.  Subject to those conditions precedent, the interest rate on the Claimant's Loan

would be reduced to 8.50% and his account – which was past due for October 2009 through May

2010 payments – would be brought current, resulting in a monthly principal, interest and escrow

payment of $705.53.  *See* Priore Decl., Exhibit J at 1.

34.     Claimant was also informed by telephone on May 21, 2010 that the permanent

loan modification had been approved and was advised of the loan modification agreement due

date and payment amounts.  *See* Priore Decl. ¶ 24, Exhibit D at 83.

35.     On June 3, 2010, GMAC Mortgage received the executed permanent loan

modification agreement and a required contribution payment.  *See* Priore Decl. ¶ 25, Exhibit D at

82, Exhibit K.

36.     At various points after Claimant's entry into the permanent loan modification in

June 2010, Claimant, submitted and GMAC Mortgage considered, additional workout packages

or loss mitigation offers.  Claimant was considered for, but denied, loan modifications on several

occasions during 2011, among other reasons, because he did not have sufficient income to make

the modified loan payments.  *See, e.g.,* Priore Decl. ¶ 26, Exhibit D at 69-70 (July 2011

consideration for loan modification), 52 & 59 (September and October 2011).  Additionally,

Claimant was offered the ability to pay-off the Loan for approximately 35% of the Loan's

principal balance, or $27,000. *See, e.g.,* Priore Decl. ¶ 26, Exhibit D at 50.

37.    Claimant was ***approved*** for a further trial loan modification in April and

November of 2012, pursuant to which his monthly payments would have been $529.75 and

$693.25, respectively, but the trial modification plans were cancelled in each case as a result of

Claimant's failure to make the first trial plan payment. *See, e.g.,* Priore Decl. ¶ 27, Exhibit D at

38 & 43 (approval for trial modification in April 2012), 20 & 26 (approval for trial modification

in November 2012).  If these trial plans had been completed and Claimant had been approved for

a permanent loan modification, his delinquencies would have been cured and all various

outstanding fees and charges, including any late charges, would have been eliminated.

### C.    Claimant's Escrow Account

38.    On June 17, 2009, in the ordinary course of its mortgage servicing business,

GMAC Mortgage conducted an escrow analysis in connection with the Loan.  Due to an

inadvertent typographical error, the escrow analysis projected a disbursement of $1,352.53 from

Claimant's escrow account in November 2009 to pay for fire insurance covering the Property

(*see* Priore Decl. ¶ 28; Futrell Response Exhibit 4A- 4E), although the estimated November

payment should have been approximately $352.53.  *See* Priore Decl., Exhibit 28; accord Exhibit

D at 6 (showing November 2009 fire insurance disbursement of $352.37).  As a result of the

typographical error, the escrow analysis indicated that, commencing on August 1, 2009, the

principal, interest and escrow portions of Claimant's monthly mortgage payment (i.e., excluding

any fees and charges) would increase from $657.25 to $886.36 if Claimant did not pay the

anticipated resulting $1,249.71 escrow deficiency in advance.  *See* Futrell Response Exhibit 4A.

The advanced notice informed Claimant that, alternatively, he could pay the anticipated escrow

shortage in advance, in which case his monthly principal, interest and escrow payment would

12

increase only to $782.22. *See id.* A copy of the June 17, 2009 escrow analysis was sent to

Claimant shortly thereafter and well in advance of the increase in Claimant' s monthly payment.

*See* Priore Decl., Exhibit D at 120 (indicating escrow analysis had been sent to a vendor for

mailing); Futrell Response Exhibit 4A- 4E (copy of escrow analysis received by Claimant).

39.    On July 2, 2009, Claimant's wife, an authorized party for the Loan, contacted

GMAC Mortgage to inquire about the escrow analysis. *See* Priore Decl. 29, Exhibit D at 118-

119. Claimant's wife was informed that the loan modification review process had to be

completed before a new escrow analysis could be conducted. *See* Priore Decl. ¶ 29, Exhibit D at

118-119. Claimant was again informed, by a responsive letter dated December 3, 2009, that due

to restrictions imposed by the investor on the Loan, a new escrow analysis could not be

undertaken until GMAC Mortgage's review in connection with Claimant's June 10, 2009 request

for a loan modification (then in the middle of the trial plan process) had been completed. *See*

Futrell Response Exhibit 22. Claimant's wife once again spoke with GMAC Mortgage on

January 8, 2010, and was informed once again that an escrow analysis could only be conducted

once the loan modification process was completed. *See* Priore Decl. ¶ 29, Exhibit D at 104-105.

At that juncture, the permanent loan modification documents were with Claimant for his

execution and return. *See* Priore Decl., Exhibit D at 104-105. GMAC Mortgage also advised

Claimant's counsel, by letter dated January 12, 2010, that a new escrow analysis could not be

conducted until the loan modification process was completed. Futrell Response, Exhibit 23.

40.    As indicated above, on January 29, 2010, having not received the executed

permanent loan modification documents that it had sent approximately two months earlier,

GMAC Mortgage denied the Claimant's request for a loan modification. *See* Priore Decl. ¶ 30,

Exhibit D at 101-102. Thereafter, on February 3, 2010, GMAC Mortgage conducted a new

escrow analysis and Claimant's escrow payment was reduced from $229.11 to $50.83,

decreasing Claimant's total principal, interest and escrow payment from $886.367 under the June

2009 escrow analysis to $708.08.  *See* Priore Decl.  ¶ 30, Exhibit D at 101; *compare* Futrell

Response Exhibit 4A- 4E *with* Priore Decl., Exhibit L.

41.     Escrow analyses were subsequently conducted on June 7, 2010, shortly after

Claimant returned his executed permanent loan modification documents, and approximately

yearly thereafter in accordance with GMAC Mortgage's ordinary business practices.  *See* Priore

Decl.  ¶ 32.

###### D.     **Claimant's Purported Qualified Written Requests**

42.     The Futrell Response contains copies of seven letters that Claimant contends

represent qualified written requests, in accordance with the Real Estate Settlement Procedures

Act ("**RESPA**") (*see* 12 U.S.C. § 2605(e)), as well as a reference to October 23 and October 31,

2009 letters that are not included in the Futrell Response.  *See* Futrell Response at 2, Exhibits 14,

15, 16, 17, 18, 19 & 20.  Information pertinent to those letters is set forth in Exhibit 3 hereto.

### III.    **The Debtors' Prior Claim Objection**

43.     On September 20, 2013, the Debtors filed their *Forty-Ninth Omnibus Objection to*

*Claims (No Liability Borrower Claims – Books and Records)* [Docket No. 5161], wherein the

Debtors sought to disallow the Claim along with a number of other claims.

44.     On October 22, 2013, Claimant filed his *Response to the Objection of Futrell*

*Claim* [Docket No. 5485] (the "**Futrell Response**"), attaching additional information and

documents regarding Claimant's purported Claim.  Claimant filed a Supplement [Docket

No. 6023] on December 5, 2013 containing further additional documents.

45.    In order to permit the Borrower Trust time to consider the additional information

contained in Claimant's response and supplement, on February 28, 2014, the Borrower Trust

agreed to withdraw the Forty-Ninth Omnibus Objection as it related to the Claim.

## RELIEF REQUESTED

46.    The Borrower Trust files this Objection pursuant to section 502(b) of the

Bankruptcy Code, seeking to disallow and expunge in its entirety the Claim from the Debtors'

Claims Register.

## OBJECTION

I.    **GMAC Mortgage Did Not Violate RESPA in Connection with Claimant's Loan**[9]

    A.    **No Private Right of Action Exists under RESPA Provisions Relating to Good Faith Estimates (12 U.S.C. § 2604) or Escrow Accounting (12 U.S.C. § 2609)**[10]

47.    RESPA explicitly creates a private right of action under 12 U.S.C. §§ 2605

(related to servicing of mortgage loans), 2607 (relating to kickbacks and unearned fees) and 2608

(relating to conditioning loan on obtaining insurance from a particular title company).  However,

RESPA does not explicitly create a private right of action under either 12 U.S.C. §§ 2604

(relating to Good Faith Estimates of settlement costs, or GFEs) or 2609 (relating to Escrow

Accounting).  Although the Second Circuit has not considered whether an implied right of action

exists under either of these sections (*see, e.g., Mercado v. Playa Realty Corp.,* No. 03–cv–3427

(JO), 2005 WL 1594306, at *9 (E.D.N.Y. July 7, 2005) ("[Section 2604] does not explicitly

authorize a private right of action, and the Second Circuit has not ruled on whether it creates an

implied private right of action."); *Heller v. First Town Mortg. Corp.*, No. 97 CIV. 8575 (JSM),

---

[9] Although Homecomings previously serviced Claimant's loan, his allegations do not relate to Homecomings and the Claim is not asserted against Homecomings.  Consequently, this Objection focuses on Claimant's allegations as they relate to GMAC Mortgage.

[10] The Futrell Response cites to certain regulations (24 C.F.R. § 3500.1 *et seq.*) implementing RESPA.  Throughout this Objection, the Borrower Trust generally cites to the associate statutory provision contained in RESPA and, where applicable, the implementing regulations.

1998 WL 614197, at *2 (S.D.N.Y. Sept. 14, 1998)), courts have resoundingly concluded that no

implied right of action exists under either section of RESPA.

48.     First, courts have consistently concluded that no private right of action exists with

respect to a claim under 12 U.S.C. §§ 2604 or its implementing regulation, 24 C.F.R. 3500.7,

imposing certain requirements upon lenders and mortgage brokers to disclose estimated

settlement costs associated with the closing of a mortgage loan, or GFEs.  *See, e.g., Khadher v.*

*PNC Bank, N.A.*, 577 Fed. Appx. 470, 480 (6th Cir. 2014); *Collins v. FMHA-USDA*, 105 F.3d

1366 (11th Cir. 1997); *Shahin v. PNC Bank, N.A.*, Civ. No. 13-1404-LPS, 2014 WL 5106094, at

*2 (D. Del. Oct. 9, 2014), *reargument denied,* No. CV 13-1404-LPS, 2015 WL 167180 (D. Del.

Jan. 13, 2015); *Glover v. Fremont Inv. & Loan,* No. C-09-03922 (JCS), 2009 WL 5114001, at *5

(N.D. Cal. Dec. 18, 2009) ("RESPA creates a private right of action for only three types of

wrongful acts: 1) payment of a kickback for real estate settlement services, 12 U.S.C. § 2607(d);

2) requiring a buyer to use a title insurer selected by the seller, 12 U.S.C. § 2608(b); and 3)

failure by a loan servicer to give proper notice of a transfer of servicing rights or to respond to a

qualified written request for information about a loan, 12 U.S.C. § 2605(f)."); *Mercado v. Playa*

*Realty Corp.,* 2005 WL 1594306, at *9 (although the Second Circuit has not considered the

issue, "[a]ll other courts that have considered this question have refused to find an implied

private right of action under [Section 2604].").

49.     Similarly, the majority of circuit courts that have considered whether a private

right of action exists under 12 U.S.C. § 2609 have concluded that no such right exists.  *Clayton*

*v. Raleigh Fed. Savs. Bank*, No. 96-1696, 1997 U.S. App. LEXIS 3503, at *3 (4th Cir. Feb. 27,

1997); *Louisiana v. Litton Mortg. Co.*, 50 F.3d 1298, 1301 (5th Cir. 1995); *Allison v. Liberty*

*Savs.*, 695 F.2d 1086 (7th Cir. 1982); *but see, Vega v. First Fed. Savs. & Loan Ass'n of Detroit,*

16

622 F.2d 918, 925 n.8 (6th Cir. 1980) (concluding, without analysis, that 12 U.S.C. § 2609

created an implied private right of action); *Heller v. First Town Mortg. Corp.*, 1998 WL 614197,

at *2.

50.    Because no private right of action exists under 12 U.S.C. §§ 2604 and 2609, any

claims alleged under those provisions must be disallowed.

**B.    Nearly All of Claimant's Allegations Regarding Kickbacks and Unearned Fees are Barred by RESPA's One Year Statute of Limitations**

51.    RESPA creates a one year statute of limitations for claims under 12 U.S.C. § 2604

and its implementing regulation, 24 C.F.R. § 3500.14.  *See* 12 U.S.C. § 2614.  The Futrell

Response referenced any number of purportedly improper charges and fees.  However, the vast

majority of these fees and charges, including **all** fees allegedly improperly charged by GMAC

Mortgage, were imposed in 2009 and 2010.  *See* Futrell Response at 5 (describing allegedly

improper fees in Exhibits 1, 5, 10, 11, 12 and 13 thereto), Exhibit 1 (charges on April 2009

invoice); Exhibit 5 (charges on February 2010 invoice); Exhibit 11 (December 2010 invoice

containing no new charges); Exhibit 12 (charges on January 2011 invoice).  Any claims based on

these charges are barred by RESPA's one year statute of limitations, which ran long before the

Petition Date.[11]

**C.    Even if a Private Right of Action Did Exist Under 12 U.S.C. § 2609, Claimant Cannot Maintain a Claim Under That Section of RESPA**

52.    Even assuming arguendo that a private right of action existed under 12 U.S.C.

§ 2609, Claimant cannot succeed on a claim under that section.  Claimant alleges that GMAC

Mortgage violated 12 U.S.C. § 2609 (and/or its implementing regulation, 24 C.F.R. § 3500.17)

by sending an escrow statement that included an incorrect escrow charge.  However, Judge

---

[11] As described further infra, RESPA's kickbacks and unearned fees provisions also do not apply to these fees and charges.  Moreover, the 2013 fees that Claimant alleges were improperly imposed were charged by Ocwen after the transfer of servicing for Claimant's loan.  *See* Futrell Response, Exhibit 13 (containing invoice from Ocwen).

Posner in his dissent in *Allison v. Liberty Savings*, explained that even if a private right of action

existed under 12 U.S.C. § 2609, that provision would provide for "a suit based on unjust

enrichment—a suit for restitution," in which a claimant could obtain the return of overpayments

and interest thereon. *See Allison v. Liberty Savs.*, 695 F.2d at 1092 (Posner, J., dissenting).

53.     Here, Claimant never paid any of the disputed escrow charges, and GMAC

Mortgage did not attempt to collect the escrow amounts after it was informed of the error.[12]

Instead, GMAC Mortgage informed Claimant, his wife and his counsel on at least four occasions

that the escrow charge was in error and that it would be corrected after Claimant's pending

application for a loan modification had been resolved. *See supra* at ¶ 39.  Indeed, the escrow

analysis was corrected just days after Claimant was denied a permanent loan modification for

failing to sign and return the necessary documents, without the Claimant having ever made any

payment of even a portion of the inadvertently high escrow charge. *See* Priore Decl.  ¶ 30,

Exhibit D at 101.  Consequently, Claimant was never required to pay, and indeed never did pay,

any excess escrow deposit amounts in violation of 12 U.S.C. § 2609.

**D.     RESPA's GFE Provision (12 U.S.C. § 2604) and Kickback and Unearned
         Fees Provision (12 U.S.C. § 2607) Do Not Apply to Post-Origination Activities**

54.     The Claim's assertions under 24 C.F.R. §§ 3500.7 and 3500.14 also fail because

the RESPA provisions that those regulations implement relate to origination activities and,

therefore, are inapplicable by their own terms to the actions described by Claimant, which

occurred more than eight years after the Loan was originated. *See* 12 U.S.C. § 2604 (regarding

GFEs – implemented by 24 C.F.R. § 3500.7); 12 U.S.C. § 2607 (regarding kickbacks and

unearned fees – implemented by 24 C.F.R. § 3500.14).  For example, 12 U.S.C. § 2607 prohibits

---

[12] Claimant had also been in default for approximately one-and-a-half years by the time the June 2009 escrow
analysis was sent to him. *See supra* at ¶ 19.  Consequently, any argument that the mistaken escrow invoice caused
Claimant to default must fail.  Moreover, Claimant was brought current on his Loan and all remaining fees and
charges were waived when he entered into the June 2010 loan modification.

certain fees and kickbacks in connection with a loan "settlement service." *See* 12 U.S.C.A.

§ 2607, 24 C.F.R. § 3500.14.  Settlement services are defined by RESPA to include certain

services provided in connection with a "settlement," or loan origination closing.  24 C.F.R.

§ 3500.2 (defining "settlement service" to include certain services provided in connection with a

"settlement" and defining "settlement" to mean "the process of executing legally binding

documents regarding a lien on property that is subject to a federally related mortgage loan.  This

process may also be called 'closing' or 'escrow' in different jurisdictions.") .  RESPA's

kickbacks and unearned fees provisions have nothing to do with post-closing servicing fees and,

as a result, the inspection fees and late charges complained of by Claimant, even if improper –

which they were not – do not give rise to a claim under  12 U.S.C. § 2604 or 24 C.F.R.

§ 3500.7.[13]

55.    Likewise, 12 U.S.C. § 2604 relates to certain disclosures and good faith estimates

of loan closing settlement costs by "lenders" and "mortgage brokers," as defined in RESPA,  but

not "servicers" – also a defined term in RESPA.  *See* 24 C.F.R. § 3500.7(a)-(b) & 12 U.S.C.

§ 2604(c); 24 C.F.R. § 3500.2 (defining good faith estimate, defining "mortgage broker" as one

that "renders origination services . . ." and generally defining "lender" to mean "the person to

whom the obligation [under a debt obligation creating a lien] is initially assigned or settled at or

after settlement."); *accord McDonnell v. Bank of Am.*, No. 2:12-CV-0096 KJM EFB, 2013 WL

---

[13] The inspection fees relate to "drive-by" inspections, which would be conducted each month after a Loan became more than 45 days delinquent, although the fees were not charged to a borrower's account until later.  The drive-by inspections were intended to protect the Debtors' collateral by ensuring that, among other things, the property continued to be occupied and was being properly maintained, despite the underlying loan being in default.  In the monthly statements attached to the Futrell Response, the cost charged by GMAC Mortgage for drive-by inspections ranged from $1.53 to $13.00 and were permitted by the Mortgage.  *See,e.g.,* Futrell Response, Exhibit 5; Priore Decl., Exhibit B at 7 (describing lender's rights to protect its interest in the Property).  The late charges were valid charges imposed when Claimant failed to timely make his monthly mortgage payment.  *See* Priore Decl., Exhibit A at 2 (permitting late charge of up to 5.00% of the overdue payment of principal and interest)  Moreover, as described above, late charges and inspection fees charged prior to the June 2010 modification of Claimant's Loan were waived when the loan modification became final, and the 2013 charges Claimant contends were improper were imposed after servicing of the Loan had transferred to Ocwen.  *See* Priore Decl. ¶ 25 (waiver of prior charges); Futrell Response, Exhibit 13 (showing fees charged by Ocwen).

ny-1173972

3013658, at *3 (E.D. Cal. June 14, 2013) (GFE claim, if one existed, "arose with the origination

of either the first or second loan . . . ."). Consequently, RESPA's GFE provision is also not

applicable to activities occurring eight years after origination in 2009 and 2010 – the purported

crux of the Claim – and the Claim fails to state a viable claim under 12 U.S.C. § 2604.

### E.    GMAC Mortgage Complied with RESPA by Timely Responding to Claimant's Only Qualified Written Request

56.    Claimant also appears to contend that GMAC Mortgage either failed to respond to

a number of purported Qualified Written Requests, or responded insufficiently. However,

despite repeatedly being informed of the correct address to which to direct qualified written

requests ("**QWRs**"), Claimant and his counsel failed to send their purported QWRs to the

designated address on all but one occasion. On that occasion (among others and despite not

being obligated by RESPA to respond), GMAC Mortgage timely and sufficiently responded to

the inquiry. Consequently, Claimant's allegations under 12 U.S.C. § 2605(e) also fail.

57.    RESPA requires servicers of certain types of mortgage loans to respond within

certain specified, relatively short time periods to certain inquiries meeting the definition of a

QWR. See 12 U.S.C. § 2605(e)(1)-(2).[14]    Pursuant to 12 U.S.C. § 2605(e)(1)(B):

> For purposes of this subsection, a qualified written request shall be
> a written correspondence, other than notice on a payment coupon
> or other payment medium supplied by the servicer, that—
>
> > (i) includes, or otherwise enables the servicer to identify,
> > the name and account of the borrower; and

---

[14] The time periods and certain other provisions of RESPA were amended by the Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111–203 § 1463(c), 124 Stat. 1376, 2184 (2010) (the "**Dodd-Frank Act**"). However, the provisions of the Dodd-Frank Act amending RESPA did not become effective until the Consumer Financial Protection Bureau assumed responsibility for administering RESPA, promulgated and proposed rules under RESPA, and those rules became final and effective on January 10, 2014. *See Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1145 n.3 (10th Cir. 2013) (describing the timeline leading up to the effectiveness of the Dodd-Frank Act's amendments to RESPA); *accord Roth v. CitiMortgage Inc.*, 756 F.3d 178, 182 n.3 (2d Cir. 2014) (noting that the shortened timeframes specified in the Dodd-Frank Act amendments to RESPA applied "[a]s of January 10, 2014….").

ny-1173972

> (ii) includes a statement of the reasons for the belief of the
> borrower, to the extent applicable, that the account is in
> error or provides sufficient detail to the servicer regarding
> other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).

Because of the relatively short time periods within which mortgage servicers are required to

respond to inquiries submitted pursuant to RESPA, "RESPA's implementing regulations allow

(but do not require) servicers to establish a designated address for QWRs." *Roth v.*

*CitiMortgage*, 756 F.3d at 181 (citing 24 C.F.R. § 3500.21(e)(1)). Such an "exclusive office and

address for the receipt and handling of [QWRs]" may be "either included in the Notice of

Transfer or separately delivered by first-class mail, postage prepaid . . . ." 24 C.F.R.

§ 3500.21(e). "[I]f a servicer establishes a designated QWR address, "then the borrower ***must***

deliver its request to that office in order for the inquiry to be a 'qualified written request.'" *Roth*

*v. CitiMortgage*, 756 F.3d at 181 (citing Real Estate Settlement Procedures Act, Section 6,

Transfer of Servicing of Mortgage Loans (Regulation X), 59 Fed. Reg. 65,442, 65,446 (Dec. 19,

1994)) (emphasis added). Therefore, "[f]ailure to send the [request] to the designated address ...

does not trigger the servicer's duties under RESPA." *Roth v. CitiMortgage*, 756 F.3d at 182

(quoting *Berneike v. CitiMortgage, Inc.*, 708 F.3d at 1148-49) (alterations in <u>*Roth*</u>).

    58. Here, Claimant was repeatedly informed of the designated address for QWRs on

each of his monthly mortgage statements:

> **Qualified Written Request** - Under the Real Estate Settlement
> Procedures Act, a qualified written request is a written
> correspondence, other than notice on your payment coupon or
> other payment medium supplied by us, regarding the servicing of
> your loan which includes your name, account number, and your
> reasons for the request. Any qualified written request you wish to
> submit must be sent to: **GMAC Mortgage, Attn: Customer Care,
> PO Box 1330, Waterloo, IA 50704-1330.**

21

*See, e.g.,* Priore Decl., <u>Exhibit M</u> at 2; <u>Exhibit N</u> at 2; <u>Exhibit O</u> at 2; <u>Exhibit O</u> at 2; <u>Exhibit Q</u> at

2.  Under Second Circuit law, Claimant was required to submit any QWRs to the address

specified by GMAC Mortgage.  *Roth v. CitiMortgage*, 756 F.3d at 181 (explaining that borrower

must deliver requests to a specified address and that notification of a specified address in

monthly mortgage statement provided borrower with sufficient notice of the address); *accord*

*Childress v. CitiMortgage, Inc.*, No. 1:08-cv-01137-MCA-RMS, 2010 U.S. Dist. LEXIS 145683,

at *23-24 (D.N.M. Feb. 19, 2010) (holding that Citi's QWR notice, listed on the reverse side of

its monthly mortgage statement, complied with § 3500.21(e)(1)).  In addition to being on the

reverse side of Claimant's monthly mortgage statement, Claimant was clearly aware of the

proper QWR address, since Claimant's counsel directed one of his earliest inquiries – dated

October 30, 2009 – to the correct address.  *Compare* Futrell Response <u>Exhibit 16</u> *with* Priore

Decl., <u>Exhibit M</u> at 2.  However, Claimant and his counsel failed on all other occasions to send

their inquiries to the designated GMAC Mortgage QWR inquiry address.  *Compare* Futrell

Response <u>Exhibit 16</u> (directed to the correct address); Priore Decl., <u>Exhibit M</u> at 2 *with* Futrell

Response <u>Exhibits 14-15</u> & <u>17-20</u> (directed to various other addresses and fax numbers)

(summary provided in <u>Exhibit 3</u> hereto).   Consequently, none of Claimant's or his counsel's

inquiries other than the October 30, 2009 letter "trigger[ed] [GMAC Mortgage's] duties under

RESPA," and these inquiries cannot form the basis for a claim under RESPA.  *See Roth v.*

*CitiMortgage*, 756 F.3d at 182 (citation omitted).

59.    GMAC Mortgage properly and timely responded to the only letter to which it was

required to respond pursuant to RESPA – Claimant's October 30, 2009 letter – by responsive

letter dated November 13, 2009, less than two weeks after receipt of Claimant's inquiry and well

within 60 days permitted by RESPA.  *See* 24 C.F.R. § 3500.21(e)(3).  A copy of GMAC

ny-1173972

Mortgage's responsive letter is attached as <u>Exhibit 21B</u> to the Futrell Response and Claimant has

failed to identify any deficiencies with GMAC Mortgage's responsive letter. Because GMAC

Mortgage responded appropriately to the only QWR sent by Claimant or his counsel, his Claim

under 12 U.S.C. § 2605(e) and 24 C.F.R. § 3500.21(e)(1) fails as a matter of law.[15]

## II.    GMAC Mortgage Did Not Violate the Fair Debt Collection Practices Act in Connection With the Loan

60.    The Futrell Response next lists a number of provisions of the Fair Debt Collection

Practices Act (15 U.S.C. § 1692) ("**FDCPA**") that he contends were violated by GMAC

Mortgage. Several of these provisions are facially inapplicable, not remotely supported by

allegations contained in the Futrell Response and/or border on frivolous. Each of the alleged

FDCPA violations is addressed below.[16]

### A.    Claimant's FDCPA Claims Are Barred by the Statute of Limitations

61.    Many, if not all, of Claimant's FDCPA claims are barred by the FDCPA's one-

year statute of limitations. Claimant's vague allegations, containing virtually no dates, and a

blanket assertion that "[a]ny statute of limitations under FDCPA should be a non-issue," do not

provide an adequate legal basis for a conclusion to the contrary.

62.    Although not clear, Claimant's FDCPA allegations appear to relate to allegedly

harassing communications between GMAC Mortgage and the Borrower and the inadvertent

typographical error contained in the June 17, 2009 escrow analysis, and appear to be related

primarily to the 2009 and 2010 time period. *See* Futrell Response at 8-9 (15 U.S.C. §§ 1692c

---

[15] Although not required to respond to any of the other correspondence to comply with RESPA because none of the other inquiries constituted QWRs, GMAC Mortgage did indeed respond to other inquiries from Claimant and his counsel, to the extent that GMAC Mortgage could decipher the substance of the inquiries. *See, e.g.,* Futrell Response <u>Exhibits 21A</u> & <u>23</u>; Priore Decl., <u>Exhibit R</u>.

[16] For the most part, GMAC Mortgage is not a "debt collector," as defined in the FDCPA, with respect to any loan that it began servicing before such loan went into default. *See* 15 U.S.C. § 1692a(6)(F)(iii). While the Debtors do not contend that GMAC Mortgage is excluded from FDCPA's definition of "debt collector" for purposes of the Loan, the Borrower Trust reserves the right to assert in any and all other claims objections that the FDCPA is inapplicable and to object to any and all FDCPA claims on any other applicable grounds.

(FDCPA § 805) and 1692d (FDCPA § 806), 1692f (FDCPA § 808) and 1692g (FDCPA § 809)

references containing no timeframes), 9 (15 U.S.C. § 1692e (FDCPA § 807) references

describing communications in 2010).[17]

63.    FDCPA contains a one year statute of limitations.  15 U.S.C. § 1692k(d).  The

statute of limitations on Claimant's 15 U.S.C. § 1692e claim, referring solely to communications

in 2010, expired well before the Petition Date.  Moreover, although Claimant fails to provide

sufficient allegations regarding the remaining claims to satisfy Rule 8 of the Federal Rules of

Civil Procedure (which is, itself sufficient to disallow those claims[18]), each of those claims

appear to be centered around the same time period in 2009 and 2010 when Claimant was being

considered for loan modifications and raised an issue with his escrow account.  Each of these

Claims is barred by FDCPA's one-year statute of limitations.  *See* 15 U.S.C. § 1692k(d).[19]

---

[17] The Futrell Response refers to sections of the FDCPA as numbered in the Act passed by Congress.  The Borrower Trust cites to the provisions of the FDCPA as compiled in the United States Code, with cross-references to the provisions referenced by Claimant.

[18] *See In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure.") (*citing In re Rockefeller Ctr. Props.*, 272 B.R. 524, 542 n.17 (Bankr. S.D.N.Y. 2000), *aff'd sub nom., NBC v. Rockefeller Ctr. Props. (In re Rockefeller Ctr. Props.)*, 226 B.R. 52 (S.D.N.Y. 2001), *aff'd*, 46 Fed. Appx. 40 (2d Cir. 2002)).

[19] The Futrell Response attempts to avoid FDCPA's statute of limitations by referencing an allegedly continuing course of conduct by GMAC Mortgage.  *See* Futrell Response at 10.  However, the only support for a finding of such a "course of conduct" is a reference to alleged QWRs sent to GMAC Mortgage and Ocwen in 2011 and 2013, respectively.  FDCPA has no application to QWRs, and Claimant provides absolutely no legal support to suggest that the sending of a QWR, or GMAC Mortgage's failure to respond to a QWR, tolls the statute of limitations under FDCPA – even assuming that the 2011 and 2013 letters were QWRs (which, as described above, they are not).  The law in the Second Circuit does not support such a result.  *Craig v. Saxon Mortg. Servs., Inc.*, No. 13-CV-4526 (SJF) (GRB), 2015 WL 171234, at *9 (E.D.N.Y. Jan. 13, 2015) (dismissing FDCPA claims in the face of "continuing violation" argument where "all facts alleged in the complaint and those evident from Plaintiff's own documents indicate her awareness of problems concerning her loan well over one year prior to the commencement of this action." (citation omitted)); *Egbarin v. Lewis, Lewis & Ferraro LLC*, No. CIV. A. 3:00-CV-1043, 2006 WL 236846, at *10 (D. Conn. Jan. 31, 2006) ("Although a few district courts within the Second Circuit have discussed the possibility of a continuing violation theory under the FDCPA, none have found the doctrine applicable.").

**B.      Claimant's Allegations of Improper Communications and Debt Validation are Facially Inapplicable to any Allegations Contained in the Futrell Response**

64.      The Futrell Response asserts that GMAC Mortgage violated FDCPA provisions relating to communications in connection with debt collections (15 U.S.C. §§ 1692c (FDCPA § 805)) by allegedly contacting Claimant and his wife more than they would prefer.  Futrell Response at 8.  Additionally, Claimant contends that GMAC Mortgage violated FDCPA's validation of debts provisions (1692g (FDCPA § 809)) as a result of "the matter of the escrow, and other essential terms for any loan modification."  Futrell Response at 9.  Even a cursory review of FDCPA reveals that neither of these provisions is remotely directed at the factual allegations asserted and that these claims must be dismissed.

65.      Section 1692c makes it a violation of FDCPA to contact a consumer at an unusual time or place, or to contact a consumer if he or she is represented by an attorney with respect to the debt.  This section contains no prohibition on the number or frequency of communications, which is the only alleged basis in the Futrell Response for asserting a claim under this provision.  As a result, Claimant's alleged claim under section 1692c fails as a matter of law.

66.      Similarly, Section 1692g relates to debt validations notices that are required to be sent to a consumer "[w]ithin five days after the initial communication with [the] consumer . . . ."  15 U.S.C. § 1692g.  Claimant's vague allegations about the "matter of the escrow, and other essential terms for any loan modification" provide absolutely no basis for a claim under FDCPA section 1692g.  GMAC Mortgage sent Claimant the required Debt Validation Letter on June 10, 2009 (*see* Futrell Response, Exhibit 28).  Claimant does not appear to have objected at that time to the amount contained in the Debt Validation Letter, and instead objected to an escrow analysis conducted thereafter.  The typographical error identified by Claimant was rectified shortly after he was denied a permanent loan modification for failing to sign and return the agreement.

25

Moreover, any such error was not intentional and resulted from a bone fide error for which

GMAC Mortgage (and the Borrower Trust) cannot be held liable.  *See* 15 U.S.C. § 1692k.

67.    FDCPA does not provide a claim on the basis of these allegations.

**C.    Claimant's Allegations of Harassment, Unfair Practices and Misrepresentations are Unsupported by the Futrell Response or Claim**

**(i)    Claimant Has Failed to Identify Any Improper Communications With Claimant or Improper Contents in Connection with Such Communications**

68.    Claimant next alleges that GMAC Mortgage's communications with him and his

wife violated 15 U.S.C. § 1692d (FDCPA § 806), which prohibits harassing and abusive

communications in connection with the collection of a debt, and 15 U.S.C. § 1692f (FDCPA

§ 808), allegedly by threatening foreclosure legal process if Claimant failed to pay his debt.

69.    The Futrell Response contains no evidence, and in fact provides only conclusory

allegations that GMAC Mortgage contacted Claimant too much and, presumably, the frequency

of GMAC Mortgage's calls to Claimant purportedly made them harassing or abusive.[20]  In fact,

these unfounded allegations could not be further from the truth.  Admittedly, GMAC Mortgage

contacted Claimant to inquire regarding the status of the Loan, but as Claimant acknowledges,

most of the calls were "in the context of any number of calls that were *initiated* by the borrower

and/or his spouse."  Futrell Response at 8 (emphasis added).  Indeed, the conversations often

related to efforts to explore loss mitigation possibilities or were responses to inquiries from

Claimant or counsel.

---

[20] The Futrell Response is cryptic and clearly does not satisfy Rule 8 of the Federal Rules of Civil Procedure.  *See Shetiwy v. Midland Credit Mgmt.*, 980 F. Supp. 2d 461, 472 (S.D.N.Y. 2013) (dismissing FDCPA claim in complaint containing only conclusory allegations regarding communications, such as "[p]rior to being sued [consumer] received harassing calls at home and work by [debt collector's] representatives, and various mailings" and "[p]rior to his being sued [consumer] received harassing calls at home and work and various mailings ....") (citation omitted).  Claimant's FDCPA claims should also be disallowed for this reason, as described above.

26

70.    Additionally, Claimant alleges that GMAC Mortgage made "threats to take the

mortgage into legal process" to "cajole, coerce or [do] anything to collect on the mortgage," and

that such actions violated 15 U.S.C. § 1692e, presumably because GMAC Mortgage had no

present intention to take possession of the property when such statements are made.  *See* Futrell

Response at 9 (citing to 15 U.S.C. § 1692e(6)(B)).  However, 15 U.S.C. § 1692e(6)(B) relates

only to threatened **nonjudicial** action, not threats to "take the mortgage into legal process."  *See*

Futrell Response at 9.[21]  Moreover, nothing in the FDCPA precludes a debt collector from

informing a consumer of likely legal action if the consumer fails to pay its debts.  *See, e.g.,*

*Williams v. Goldman & Steinberg, Inc.*, No. Civ. A. No. 03-CV-2132 (DGT), 2006 WL

2053715, at *6 (E.D.N.Y. July 21, 2006); *Mizrahi v. Network Recovery Servs., Inc.,* No. 98-CV-

4528 (ERK) (JLC), 1999 WL 33127737, at *5 (E.D.N.Y. Nov. 5, 1999) (threat that "[l]egal

action may follow if you fail to respond" not a violation of section 1692e(5)); *Madonna v.*

*Academy Collection Serv., Inc.,* No. 3:95CV00875 (AVC), 1997 WL 530101, at *7 (D. Conn.

Aug. 12, 1997) (statement that legal action may be pursued not violation of the FDCPA since it

is a statement of an option "clearly available to the creditor"); *Robinson v. Transworld Sys., Inc.,*

876 F. Supp. 385, 392 (N.D.N.Y. 1995) (no actionable threat found in letters stating possibility

of "PROTRACTED AND UNPLEASANT COLLECTION EFFORT" or threatening

recommendation to transfer file to the Credit Management Services Office nearest debtor).

71.    Therefore, in order to sustain a claim under 15 U.S.C. § 1692f, Claimant must

show the use of "unfair or unconscionable means to collect or attempt to collect a[] debt."  15

U.S.C. § 1692f.  Claimant has failed to demonstrate that any such means were used.  Claimant's

conclusory allegations that GMAC Mortgage told him that a foreclosure may be commenced if

---

[21] It is worth noting that Illinois is a judicial foreclosure state, so a nonjudicial foreclosure would not have been
available.  *See generally* 735 ILCS § 5/15-1101 *et. seq.* (Illinois Mortgage Foreclosure Act).

ny-1173972

he failed to pay his mortgage – even if true – fall far short of any alleged conduct that could be called "unfair or unconscionable." [22]

> **(ii)    Claimant's Allegations of Misrepresentations Also Fall Far Short of Carrying His Burden Under the FDCPA**

72.    Section 1692e of the FDCPA (15 U.S.C. § 1692e) imposes liability upon a debt collector for using "false, deceptive, or misleading representation or means in connection with the collection" of a debt.  15 U.S.C. § 1692e.  In the Futrell Response, Claimant appears to contend that GMAC Mortgage violated this provision of the FDCPA by (i) "misstat[ing] the essential facts" related to a loan modification, (ii) making a statement in October 2010 that Claimant was current on his loan, (iii) making a statement that an "underwater mortgage refinance program" was available, and (iv) failing to accept a refinance request from borrowers. Claimant's allegations fail for several reasons.

73.    In the first instance, like many other purported claims in the Futrell Response, each of the allegations fail to provide sufficient "detail to illuminate the nature of the claim and allow [the Borrower Trust] to respond[]," (*George v. Smith*, 507 F.3d 605, 608 (7th Cir. 2007))[23] and, for this reason, the Claim should be disallowed to the extent it asserts a claim under 15 U.S.C. § 1692e.  *See, e.g., In re DJK Residential LLC*, 416 B.R. at 106.  GMAC Mortgage's loss mitigation efforts with Claimant spanned more than four years and involved at least four offers to modify Claimant's Loan.  Yet, with the exception of one allegation regarding purported violations of the FDCPA, Claimant does not even identify a year in which the alleged

---

[22] *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (citations and internal quotations omitted); *Memorandum Opinion and Order Sustaining in Part and Overruling in Part The ResCap Borrower Claims Trust's Objection to Claim Numbers 345 and 3743 Filed by Conrad P. Burnett, In re Residential Capital, LLC* at 11, No. 12-12020 (MG) (Bankr. S.D.N.Y. Feb. 26, 2015) [D.I. 8206].

[23] *Accord Ashcroft v. Iqbal*, 556 U.S. at 678 (rule 8(a) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." (citation omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561 (2007) (It is insufficient for a complaint to simply "le[ave] open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery.").

28

misrepresentations were made, let alone what it was that GMAC Mortgage employees told

him.[24]  The vague allegations contained in the Futrell Response simply do not "illuminate the

nature of the claim" in order to allow the Borrower Trust to respond.  Nevertheless, the Borrower

Trust will attempt to do so.

74.    In addition to woefully failing to meet federal pleading requirement or sufficiently

inform the Borrower Trust of GMAC Mortgage's alleged wrongdoing, the allegations in the

Futrell Response do not "le[ave] open the possibility that [Claimant] might later establish some

'set of [undisclosed] facts' to support recovery" (which the Supreme Court has stated is

insufficient to overcome a motion to dismiss).  *See Bell Atl. Corp. v. Twombly*, 550 U.S. at 561.

For instance, Claimant alleges that GMAC Mortgage made a misrepresentation in an October

2010 statement when it indicated that Claimant was current, but Claimant was actually behind on

his November and December payments.  Since Claimant entered into a loan modification in June

of 2010, no delinquencies could have existed for November or December of 2009 or any prior

year.  *See* Priore Decl. ¶ 25 (June 2010 loan modification brought Claimant current).

Additionally, it is unclear how any October 2010 statement that Claimant was then current could

be said to contain a misrepresentation regarding delinquencies in the ***future*** months of November

and December.  As a result, these allegations do not provide even an arguable basis for liability.

75.    Likewise, Claimant's allegations of misrepresentations based on a statement that

an "underwater mortgage refinance program" was available to Claimant and based on GMAC

Mortgage's refusal to accept a refinance offer from Claimant do not support a claim under ***any***

set of additional facts that could be reasonably inferred.  The latter purported action, for instance,

is not even a misrepresentation, but an alleged outright refusal.  The former, which would

---

[24] Similarly, only one allegation provides information regarding the identity of the GMAC Mortgage employee
purportedly misrepresenting facts to Claimant.

apparently require Claimant to show that no loan modification program was available, would be

impossible to prove because GMAC Mortgage offered loan modifications  to Claimant on no less

than four occasions (including on one occasion a HAMP loan modification) and Claimant even

entered into a loan modification in June 2010.  As a result, Claimant's allegations of

misrepresentations in violation of the FDCPA lack merit and should be rejected.

### III.    Claimant's Fraud Claims are Also Woefully Inadequate

76.    Claimant also alleges a claim for fraud.  These claims, like many of the other

alleged claims in the Futrell Response are baseless,[25] do not remotely satisfy federal pleading

standards, and border on frivolous.

77.    In Indiana, "[t]o successfully sustain an action for common law fraud, a party

must prove five essential elements: (1) a material misrepresentation, (2) of past or existing facts,

(3) the falsity of the representation, (4) the representation was made with knowledge or reckless

ignorance of its falsity, (5) and detrimental reliance on the representations."  *AutoXchange.com,*

*Inc. v. Dreyer & Reinbold, Inc.*, 816 N.E.2d 40, 51, *as amended*, No. 49A05-0402-CV-108, 2004

Ind. App. LEXIS 2314 (Ind. Ct. App. Nov. 19, 2004) (citation omitted).

78.    Although not clear, Claimant appears to allege three bases for his purported fraud

claim, including that (i) a loan modification was never a possibility, but instead "was an illusory

promise," (ii) GMAC Mortgage sent Claimant an information sheet with an illustrative 3.88%

interest rate even though that interest rate was not a possibility, and (iii) GMAC Mortgage

fraudulently overcharged Claimant's escrow account.  *See* Futrell Response at 10.

79.    Each allegation is easily dismissed.  First, as described above, Claimant ***received***

a permanent loan modification in June of 2010 and was subsequently offered two additional loan

---

[25] Although Claimant's Claim of fraud should be denied for failure to provide the underlying facts with particularity (*see* FRCP 9, Ind. R. Trial P. 9(B)), the Borrower Trust has nevertheless addressed this claim below.

ny-1173972

modifications (subject to completion of a trial loan modification and further approval) in 2012,
which Claimant did not follow-up on.  Consequently, any fraud claim based on representations
regarding Claimant's entitlement to a loan modification (none of which are identified) cannot be
sustained; the fact that Claimant received a loan modification and was offered trial loan
modifications on at least three other occasions (once in 2009 and twice in 2012) demonstrate that
the Debtors' efforts to modify Claimant's loan were anything but "an illusory promise."

80.    Second, the information sheet sent to Claimant was exactly that, an illustrative
sheet "provided for [Claimant's] information only and ha[d] no bearing on the outcome of the
modification decision."  *See* Futrell Response, <u>Exhibit 36</u>.[26]  Similarly, although GMAC
Mortgage made a mistake in connection with the June 17, 2009 escrow analysis, it immediately
acknowledged that the calculation was a mistake when Claimant's wife called on July 2, 2009
(and on at least three subsequent occasions), then fixed at the first possible opportunity the
mistake as it had ensured Claimant, his wife and his counsel would occur.  *See* Priore Decl. ¶ 29.
Consequently, Claimant cannot identify a single representation that could remotely be viewed as
knowing or recklessly made materially misrepresentations.  Claimant's fraud claim is without
merit.

## IV.    Claimant Has Failed to Quantify or Otherwise Support Any Damages

81.    The Futrell Response also fails to quantify or support any alleged damages.  In
keeping with his cryptic and conclusory allegations, Claimant contends that he is entitled to
damages on account of (i)  allegedly improper fees, (ii) depreciation of the value of the Property,
(iii) Claimant's withdrawal of $10,000 from his 401k account and sale of other unspecified
personal property in order to allegedly pay his Loan, (iv) borrowings from third parties, and

---

[26] Moreover, as far as the Borrower Trust has been able to ascertain from a review of the Debtors' records, the
Information Sheet was sent to Claimant with letters informing him that he had been denied a loan modification,
which he excluded from the exhibits to the Futrell Response.

ny-1173972

(v) lost wages due to the inability of Claimant's wife to work "where the actions of the servicers precluded that ability, in the main," along with (vi) attorneys' fees in connection with his claim under RESPA's QWR provisions.  *See* Futrell Response at 8.[27]

82.    However, Claimant provides no calculation of these damages and, in any event, none of the amounts represent "actual damages" attributable to any wrongdoing of GMAC Mortgage, even had some wrongdoing occurred.  As described above, the fees Claimant identifies as allegedly improper were indeed proper, did not violate any provision or RESPA, and at least a portion of them were waived (and, thus, Claimant never paid).  *See* supra at ¶ 54 n.13. Similarly, GMAC Mortgage responded appropriately and in a timely manner to the single QWR that Claimant sent and, as a result, Claimant is not entitled to attorneys' fees under RESPA's QWR provision.  *See* supra at ¶¶ 56-59.  More importantly, however, Claimant's suggestion that he and his wife are entitled to damages on account of depreciation in the value of the Property (which would have occurred whether or not any alleged wrongdoing had occurred) and withdrawal or 401k funds or the sale of personal property to pay a valid debt are puzzling, and Claimant provides no support for his entitlement to such amounts.  Finally, Claimant has provided no legal basis for his entitlement to receive damages due to his wife's inability to work, where Claimant's wife is not even a party to the Note or Mortgage, GMAC Mortgage had no contractual relationship with her and the Note and Mortgage do not make her a third-party beneficiary.  For all of these reasons, Claimant's damages, even if the Court were to find a violation of RESPA or FDCPA, would be limited to the modest statutory damages provided under the relevant statute.

---

[27] The Futrell Response also inexplicably suggests that the Borrower Trust is obligated to Claimant "for any public assistance."  The Borrower Trust fails to see how Claimant could possibly be entitled to receive additional amounts from GMAC Mortgage or the Borrower Trust on account of public assistance *received* by Claimant.

ny-1173972

## NOTICE

The Borrower Trust has provided notice of this Motion in accordance with the Case Management Procedures Order approved by this Court on May 23, 2012 [Docket No. 141] and the Claims Procedures Order [Docket No. 3294].

## CONCLUSION

WHEREFORE, the Borrower Trust respectfully requests entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem proper.

Dated: March 16, 2015

/s/ Norman S. Rosenbaum
Norman S. Rosenbaum
Jordan A. Wishnew
James A. Newton
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

*Counsel for the ResCap Borrower Claims Trust*

ny-1173972