# **EXHIBIT 2**

**Priore Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DECLARATION OF KATHY PRIORE IN SUPPORT OF**
**THE RESCAP BORROWER CLAIMS TRUST'S OBJECTION TO**
**PROOF OF CLAIM NO. 725 FILED BY WILLIAM J. FUTRELL**

I, Kathy Priore, hereby declare as follows:

1. I serve as Associate Counsel for The ResCap Liquidating Trust (the "**Liquidating Trust**"), established pursuant to the terms of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al., and the Official Committee of Unsecured Creditors* [Docket No. 6030] confirmed in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"). During the Chapter 11 Cases, I served as Associate Counsel in the legal department at Residential Capital, LLC ("**ResCap**"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases (collectively, the "**Debtors**"). I joined ResCap on May 1, 2008 as in-house litigation counsel. Prior to my in-house litigation counsel position, I held various roles within the legal department at ResCap.

2. In my role as Associate Counsel of ResCap, I was responsible for the management of residential mortgage-related litigation. In connection with ResCap's chapter 11 filing, I also assisted the Debtors and their professional advisors in connection with the administration of the Chapter 11 Cases, including the borrower litigation matters pending before this Court. In my current position as Associate Counsel to the Liquidating Trust, among my

1

ny-1175164

other duties, I continue to assist the Liquidating Trust and Borrower Claims Trust (the "**Borrower Trust**") in connection with the claims reconciliation process.[1] I am authorized to submit this declaration (the "**Declaration**") in support of the *ResCap Borrower Claims Trust's Objection to Proof of Claim No. 725 Filed by William J. Futrell* (the "**Objection**").[2]

3. In my current and former capacities as Associate Counsel to the Liquidating Trust and ResCap, I am intimately familiar with the Debtors' claims reconciliation process. Except as otherwise indicated, all statements in this Declaration are based on my familiarity with the Debtors' Books and Records (the "**Books and Records**"), as well as the Debtors' schedules of assets and liabilities and statements of financial affairs filed in these Chapter 11 Cases (collectively, the "**Schedules**"), my review and reconciliation of claims, and/or my review of relevant documents. I or other Liquidating Trust personnel have reviewed and analyzed the proof of claim form and supporting documentation filed by the Claimant. Since the Plan went effective and the Borrower Trust was established, I, along with other members of the Liquidating Trust have consulted with the Borrower Trust to continue the claims reconciliation process, analyze claims and determine the appropriate treatment of the same. In connection with such review and analysis, where applicable, I or other Liquidating Trust personnel, together with professional advisors, have reviewed (i) information supplied or verified by former personnel in departments within the Debtors' various business units, (ii) the Books and Records, (iii) the Schedules, (iv) other filed proofs of claim, and/or (v) the official claims register maintained in the Debtors' Chapter 11 Cases.

---

[1] The ResCap Liquidating Trust and the ResCap Borrower Claims Trust are parties to an Access and Cooperation Agreement, dated as of December 17, 2013, which, among of things, provides the Borrower Trust with access to the books and records held by the Liquidating Trust and Liquidating Trust's personnel to assist the Borrower Trust in performing its obligations.
[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Objection.

2

ny-1175164

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations, information learned from my review of relevant documents and information I have received through my discussions with other former members of the Debtors' management or other former employees of the Debtors, the Liquidating Trust, and the Borrower Trust's professionals and consultants. If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration on that basis.

I.    **The Loan and the Property**

5. On or about February 23, 2001, Claimant executed a note (the "**Note**") in favor of Aegis Mortgage Corporation d/b/a UC Lending ("**Aegis**") in connection with a $76,500 home loan.[3]  Claimant's obligations under the Note were secured by a Mortgage in favor of Mortgage Electronic Registration Systems, Inc. ("**MERS**") as nominee for Aegis and its successors and assigns (the "**Mortgage**" and together with the Note, the "**Loan**"), which Mortgage encumbered property located at 8391 N 550 W, Bryant, IN 47326 (the "**Property**").[4]  Debtor Homecomings Financial, LLC ("**Homecomings**") began servicing the Loan on March 9, 2001.

6. The Note was subsequently endorsed in blank and transferred to Residential Funding Company, LLC. Thereafter, the Note was transferred to Bank One National Association, as Trustee for RASC 2001-KS1, in connection with the March 1, 2001 securitization of the RASC 2001-KS1 trust.

7. Servicing of Claimant's Loan was transferred from Homecomings to GMAC Mortgage, effective July 1, 2009. As of the June 10, 2009, shortly before the transfer of

---

[3] A copy of the Note is attached hereto as Exhibit A.
[4] A copy of the Mortgage is attached hereto as Exhibit B.

3

ny-1175164

servicing, Claimant's total debt under the Loan amounted to $73,341.47, representing $71,251.99 principal balance, as well as $591.48 in late charges,[5] $183.50 in charges incurred in connection with property inspections and a broker price opinion, and $1,314.50 representing past due May and June, 2009 payments.

8.    On September 13, 2012, the Mortgage was assigned by MERS, as nominee for Aegis, to The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A., successor by Merger to Bank One National Association, as Trustee for RASC 2001-KS1.[6]

9.    Servicing of the Loan was transferred to Ocwen on or about February 15, 2013 in connection with the closing of the sale of the Debtors' mortgage servicing platform.

**II.    The Debtors' Loss Mitigation Efforts**

10.    The Loan went into default when Claimant failed to remit the installment payment of principal and interest that became due for the Loan on December 1, 2007. The Claimant did not become current on the Loan until he received a permanent loan modification in June 2010, as described herein.

11.    On or around January 23, 2009, Homecomings received a workout package for Claimant from a "HOPE" representative.[7] See Servicing Notes at 129.[8] Homecomings thereafter spoke with Claimant on February 24, 2009 and offered to set up a repayment plan that would bring Claimant current on the Loan (the "February Repayment

---

[5] From 2007 through 2010, Claimant failed to make more than twenty-five payments within the 15-day grace period provided by Homecomings and GMAC Mortgage.
[6] The Assignment of Mortgage is attached hereto as Exhibit C.
[7] HOPE was a third party organization that assisted borrowers in filling out paperwork associated with loss mitigation efforts. These representatives would meet with borrowers face to face or setup phone calls to assist the borrower.
[8] A copy of the Servicing Notes for the Loan through the February 15, 2013 transfer of servicing is attached hereto as Exhibit D.

4

ny-1175164

Plan"). See id. at 127-128. Homecomings set up a repayment plan requiring Claimant to make payments of $657.25 on each of February 28, March 15 and March 28, 2009, after which the Claimant's account would become current. A letter memorializing the February Repayment Plan was sent to Claimant the same day.[9] See Servicing Notes at 127.

12. Claimant made the February 28, 2009 payment by phone on February 27, 2009, but failed to make the March 15, 2009 payment. See id. As a result, the February Repayment Plan was cancelled.

13. On April 16, 2009, Claimant contacted Homecomings requesting a loan modification, and indicating that he could not afford a repayment plan. See id. at 125-126. Claimant was advised to obtain a workout package from the Debtors' website and submit it as soon as possible. See id.

14. On June 2, 2009, Claimant spoke with Homecomings regarding his account and, as a result of that conversation, Homecomings set up a five-month special forbearance plan intended to provide Claimant with time to complete and return a workout package. The June 2, 2009 special forbearance plan required five monthly payments of $657.25. See id. at 123. On or about June 10, 2009, Homecomings received a workout package from Claimant by facsimile. See id. at 122. Homecomings contacted Claimant by phone the same day to advise him that the workout package was missing documentation, including an income tax return. See id.

15. After receiving the requested documentation, Homecomings commenced the loan modification review process and, on June 19, 2009, set up a three-month HAMP loan modification trial plan requiring payments of $730.76 due on the first of each of August, September and October of 2009. See Servicing Notes at 119.

---

[9] A copy of the February 24, 2009 repayment plan letter is attached hereto as Exhibit E.

5

ny-1175164

16. Claimant was informed that he had been approved for a permanent loan modification by letter dated October 14, 2009[10]. A follow-up letter regarding Claimant's approval for a permanent loan modification was also subsequently sent. However, Claimant failed to sign and return the permanent loan modification agreement attached to either communication and, consequently, the loan modification was denied on January 29, 2010. See Servicing Notes at 102.

17. Claimant was informed of the permanent loan modification denial by letter dated February 3, 2010.[11]

18. On February 12, 2010, GMAC Mortgage received a facsimile from Claimant containing a new HAMP workout package. See Servicing Notes at 100. On February 16, 2010, an employee of GMAC Mortgage's customer advocacy group spoke with Claimant's wife and advised her that Claimant would not be able to qualify for a HAMP loan modification at that juncture because he was deriving income from short term disability. See id. at 99-100. The customer advocacy employee also informed Claimant's wife, an authorized party for the Loan, that perhaps GMAC Mortgage could set up with a "stop gap plan" while a longer term solution was explored. See id. at 98-99.

19. On February 17, 2010, Claimant was set up with a temporary stop gap plan requiring the payment of $355 per month on the first of each of March, April and May of 2010 to avoid referral of the Loan to foreclosure. See Servicing Notes at 97. Claimant was also formally advised of the HAMP modification denial by letter dated February 17, 2010. See id.; see also February 17, 2010 HAMP Denial Letter.[12]

---

[10] A copy of the October 14, 2009 loan modification approval letter is attached hereto as Exhibit F.
[11] A copy of the February 3, 2010 denial letter is attached hereto as Exhibit G.
[12] The February 17, 2010 HAMP Denial Letter is attached hereto as Exhibit H.

6

ny-1175164

20.     On February 18, 2010, GMAC Mortgage spoke with Claimant by phone and advised him that his Loan was being considered for a non-HAMP (or traditional) loan modification. See Servicing Notes at 96. On February 19, 2010, Claimant was approved for a traditional loan modification trial plan, requiring payments of $704.23 on each of April, May and June 1, 2010. See id. at 94-95. In connection with the approval of a trial loan modification, the previously implemented repayment plan – which was set up to allow Claimant to be considered for more permanent options – was cancelled. GMAC Mortgage attempted to contact Claimant by phone on February 22 and February 24, but no one answered.

21.     On April 8, 2010, the traditional loan modification trial plan was mistakenly cancelled because GMAC Mortgage did not believe it had received the completed loan modification paperwork from the Claimant as required. See id. at 93. Claimant was informed of this decision by letter dated April 14, 2010[13]. See id. In fact, the executed traditional loan modification trial plan agreement had been returned by Claimant on March 30, 2010. See Servicing Notes at 94.

22.     Also on April 14, 2010, Claimant's authorized representative contacted a GMAC Mortgage customer advocacy employee to inquire as to the status of the traditional loan modification. See Servicing Notes at 93. Claimant's representative informed GMAC Mortgage that the first payment had been made and that the loan modification documents had been returned. See id. GMAC Mortgage responded by reinstating the traditional loan modification trial plan for the remaining two payments, and Claimant's representative was informed that Claimant should continue to remit the trial modification payments on May 1 and June 1, 2010. See id. at 91.

---

[13] The April 14, 2010 Loan Modification Denial Letter is attached hereto as Exhibit I.

7

ny-1175164

23. By letter dated May 20, 2010, Claimant was informed that, subject to certain conditions set forth in the letter, he had been approved for a permanent, traditional loan modification.[14] As set forth in the letter, Claimant was required to execute and return the enclosed loan modification agreement and pay a "contribution amount" of $704.23, in each case by June 1, 2010. Subject to those conditions precedent, the interest rate on the Claimant's Loan would be reduced to 8.50% and his account – which was past due for the October 2009 through May 2010 payments – would be brought current, resulting in a monthly principal, interest and escrow payment of $705.53.

24. Claimant was also informed by telephone on May 21, 2010 that the permanent loan modification had been approved and was advised of the loan modification agreement due date and payment amounts. See Servicing Notes at 83.

25. On June 3, 2010, GMAC Mortgage received the executed permanent loan modification agreement and a required contribution payment.[15] See Servicing Notes at 82. Outstanding late charges and inspection fees charged prior to the June 2010 modification of Claimant's Loan were waived when the loan modification became final.

26. At various points after Claimant's entry into the permanent loan modification in June 2010, GMAC Mortgage considered additional workout packages or loss mitigation offers. Claimant was considered for, but denied, loan modifications on several occasions during 2011, among other reasons, because he did not have sufficient income to make the modified loan payments. See Servicing Notes at 69-70 (July 2011 consideration for loan modification), 52 & 59 (September and October 2011). Additionally, Claimant was offered the

---

[14] A copy of the May 20, 2010 loan modification approval letter is attached hereto as Exhibit J.
[15] A copy of the executed permanent modification documents are attached hereto as Exhibit K.

8

ny-1175164

ability to pay-off the Loan for approximately 35% of the Loan's principal balance, or $27,000. See Servicing Notes at 50.

27. Claimant was *approved* for a further trial loan modification in April and November of 2012, pursuant to which his monthly payments would have been $529.75 and $693.25, respectively, but the trial modification plans were cancelled in each case as a result of Claimant's failure to make the first trial plan payment. See Servicing Notes at 38 and 43. (approval for trial modification in April 2012), 20 & 26 (approval for trial modification in November 2012). If these trial plans had been completed and Claimant had been approved for a permanent loan modification, his delinquencies would have been cured and all outstanding fees and charges, including any late charges, would have been eliminated.

III.    **Claimant's Escrow Account**

28. On June 17, 2009, in the ordinary course of its mortgage servicing business, GMAC Mortgage conducted an escrow analysis in connection with the Loan. Due to an inadvertent typographical error, the escrow analysis projected a disbursement of $1,352.53 from Claimant's escrow account in November 2009 to pay for fire insurance covering the Property. A copy of the June 17, 2009 escrow analysis was sent to Claimant shortly thereafter. See Servicing Notes at 120 (indicating escrow analysis had been sent to a vendor for mailing).

29. On July 2, 2009, Claimant's wife, an authorized party for the Loan, contacted GMAC Mortgage to inquire about the escrow analysis. See Servicing Notes at 118-119. Claimant's wife was informed that the loan modification review process had to be completed before a new escrow analysis could be conducted. See Servicing Notes at 118-119. Claimant's wife again spoke with GMAC Mortgage on January 8, 2010, and was informed again that an escrow analysis could only be conducted once the loan modification process was

9

completed. See Servicing Notes at 104-105. At that juncture, the permanent loan modification documents were with Claimant for his execution and return. See id.

30.   As indicated above, on January 29, 2010, having not received the executed permanent loan modification documents that it had sent approximately two months earlier, GMAC Mortgage denied the Claimant's request for a loan modification. See id. at 101-102. Thereafter, on February 3, 2010, GMAC Mortgage conducted a new escrow analysis and Claimant's escrow payment was reduced from $229.11 to $50.83, decreasing Claimant's total principal, interest and escrow payment from $886.367 under the June 2009 escrow analysis to $708.08. See Servicing Notes at 101.[16]

31.   Claimant never paid any of the disputed escrow charges, and GMAC Mortgage did not attempt to collect the escrow amounts after it was informed of the error.

32.   Escrow analyses were subsequently conducted on June 7, 2010, shortly after Claimant returned his executed permanent loan modification documents, and approximately yearly thereafter in accordance with GMAC Mortgage's ordinary business practices.

**IV.   Claimant Was Informed of GMAC Mortgage's Designated Address for Qualified Written Requests**

33.   Claimant was repeatedly informed of the designated address for QWRs on each of his monthly mortgage statements. Copies of his March 19, 2012 Statement, April 18, 2012 Statement, July 18, 2012 Statement, August 20, 2012, and February 18, 2013 Statement are attached hereto as Exhibits M-Q.

34.   Attached hereto as Exhibit R is a copy of September 19, 2012 letter responding to another of Claimant's inquiries.

---

[16] A copy of the February 3, 2010 escrow analysis is attached hereto as Exhibit L.

x

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated: March 16, 2015

      /s/ Kathy Priore
Kathy Priore
Associate Litigation Counsel for
The ResCap Liquidating Trust

ny-1175164

# **EXHIBIT LIST**

| | |
|---|---|
| Exhibit A | Note |
| Exhibit B | Mortgage |
| Exhibit C | Assignment of Mortgage |
| Exhibit D | Servicing Notes |
| Exhibit E | February 24, 2009 Repayment Plan Letter |
| Exhibit F | October 14, 2009 Loan Modification Approval Letter |
| Exhibit G | February 3, 2010 Denial Letter |
| Exhibit H | February 17, 2010 HAMP Denial Letter |
| Exhibit I | April 14, 2010 Loan Modification Denial Letter |
| Exhibit J | May 20, 2010 Loan Modification Approval Letter |
| Exhibit K | Executed Permanent Modification Documents |
| Exhibit L | February 3, 2010 Escrow Analysis |
| Exhibit M | March 19, 2012 Statement |
| Exhibit N | April 18, 2012 Statement |
| Exhibit O | July 18, 2012 Statement |
| Exhibit P | August 20, 2012 Statement |
| Exhibit Q | February 18, 2013 Statement |
| Exhibit R | September 19, 2012 Letter |