1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -x

In the Matters of:

RESIDENTIAL CAPITAL, LLC, et al.,          Case No. 12-12020-mg

              Debtors.

- - - - - - - - - - - - - - - - - - - -x

RESCAP LIQUIDATING TRUST,

              Plaintiff,

       - against -                    Adv. No. 14-02004-mg

MORTGAGE INVESTORS GROUP, INC., et al.,

              Defendants.

- - - - - - - - - - - - - - - - - - - -x

ALLY FINANCIAL, INC.,

              Plaintiff,

       - against -                    Adv. No. 14-02435-mg

WELLS FARGO BANK, N.A.,

              Defendant.

- - - - - - - - - - - - - - - - - - - -x

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14                    United States Bankruptcy Court

15                    One Bowling Green

16                    New York, New York

17

18                    February 25, 2015

19                    10:04 AM

20

21    B E F O R E:

22    HON. MARTIN GLENN

23    U.S. BANKRUPTCY JUDGE

24

25

3

1

2   Objection of the ResCap Borrower Claims Trust to Proof of Claim

3   Filed by Francine Silver (Claim No. 61) [Docket No. 8019]

4

5   The ResCap Borrower Claims Trust's Objection to Claim Number

6   2267 Filed by Abosede Eboweme [Docket No. 8018]

7

8   ResCap Liquidating Trust's Eighty-First Omnibus Objection to

9   Claims ((A) Duplicate Claim; (B) Insufficient Documentation

10  Claims; (C) No Liability Claims; (D) Redesignate and Allow

11  Claim; and (E) Reduce and Allow Claims) [Docket No. 8013]

12

13  ResCap Borrower Claims Trust's Objection to Claim No. 4222

14  Filed by Todd Silber [Docket No. 7979]

15

16  Letter dated February 5, 2015 to Judge Glenn from Jordan A.

17  Wishnew regarding Settlement of Claim No. 5286 Filed by Ailette

18  Cornelius [Not Docketed]

19

20  Adversary Proceeding 14-02004 Ally Financial, Inc. v. Wells

21  Fargo Bank, N.A.

22  Pre-Trial Conference

23

24

25

4

1

2   Adversary Proceeding 14-02435 ResCap Liquidating Trust v.

3   Mortgage Investors Group, Inc., et al.

4   Pre-Trial Conference

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

5

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4        Attorneys for ResCap Borrower Trust and

5        ResCap Liquidating Trust

6        250 West 55th Street

7        New York, NY 10019

8

9   BY:    JORDAN A. WISHNEW, ESQ.

10        MERYL L. ROTHCHILD, ESQ.

11        JESSICA J. ARETT, ESQ.

12

13

14   QUINN EMANUEL URQUHART & SULLIVAN, LLP

15        Attorneys for ResCap Liquidating Trust

16        51 Madison Avenue

17        22nd Floor

18        New York, NY 10010

19

20   BY:    YELENA KONANOVA, ESQ.

21

22

23

24

25

6

1

2   SEVERSON & WERSON, APC

3        Special Counsel to Residential Capital, LLC, et al.

4        19100 Von Karman Avenue

5        Suite 700

6        Irvine, CA 92612

7

8   BY:   DAVID M. LIU, ESQ. (TELEPHONICALLY)

9

10

11   TODD SILBER

12        Pro Se

13

14

15   AILETTE CORNELIUS

16        Pro se

17

18

19   KORNSTEIN VEISZ WEXLER & POLLARD, LLP

20        Attorneys for Ally Financial, Inc.

21        757 Third Avenue

22        New York, NY 10017

23

24   BY:   WILLIAM B. POLLARD, III, ESQ.

25        AMY C. GROSS, ESQ.

7

1

2  BAKER & MCKENZIE LLP

3       Attorneys for Wells Fargo Bank

4       452 Fifth Avenue

5       New York, NY 10018

6

7  BY:   JACOB M. KAPLAN, ESQ.

8

9

10  PALMER, LOMBARDI & DONOHUE LL

11       Attorneys for Mortgage Investors Group

12       515 South Flower Street

13       Suite 2100

14       Los Angeles, CA 90071

15

16  BY:   ROLAND P. REYNOLDS, ESQ.

17

18

19  ALSO PRESENT:  (TELEPHONICALLY)

20       DEANNA HORST, Residential Capital

21       JACQUELINE KEELEY, Ocwen Loan Servicing

22       KATHY PRIORE, ResCap Liquidating Trust

23

24

25

**RESIDENTIAL CAPITAL, LLC, ET AL.**

8

1                              P R O C E E D I N G S

2                  THE COURT:  All right, please be seated.  All right,

3     we're here in Residential Capital, number 12-12020.  What we're

4     going to do first is take the status conferences in two of the

5     adversary proceedings.

6                  First is 14-02435, Ally Financial v. Wells Fargo Bank.

7     Can I have appearances, please?

8                  MR. POLLARD:  Good morning, Your Honor.  William

9     Pollard, Kornstein Veisz Wexler & Pollard, for Ally Financial.

10                 THE COURT:  Thank you.

11                 MR. KAPLAN:  Jacob Kaplan of Baker & McKenzie for

12     Wells Fargo.

13                 THE COURT:  Thank you.

14                 Go ahead, Mr. Pollard.

15                 MR. POLLARD:  Your Honor, first I'd like to tell the

16     Court the nature of the dispute that brings us here today.

17                 THE COURT:  I've read the complaint.

18                 MR. POLLARD:  All right.  Well, fine.  The issues,

19     then, Your Honor, you know, is that there is an amendment to

20     the depository agreement that Wells Fargo says it could use to

21     take nearly half a million dollars from Ally Financial's

22     account for the legal fees purportedly incurred by Wells Fargo

23     with respect to the ResCap bankruptcy.

24                 Now, as Your Honor I'm sure will remember, when James

25     Donnell was here, you on more than one occasion, asked him what

**RESIDENTIAL CAPITAL, LLC, ET AL.**

9

1  Wells Fargo's interest was in the bankruptcy.  And perhaps like

2  you, we're still waiting to figure out what that is.  But they

3  took our money, and we want it back.

4        So the dispute revolves over whether or not the

5  amendment to the depository agreement is valid and whether they

6  can take the money that they took.

7        There's a threshold issue, Your Honor, that has to be

8  addressed with respect to the motion to dismiss that Wells

9  Fargo has made.  And that is, what law applies to this dispute?

10       The depository agreement says that the law of the

11  state in which the account was opened applies.  More than a

12  month ago, I asked Mr. Donnell if he would supply us with the

13  records -- bank's records, so we could see what state law

14  applies.  He said he would look into it.  A month later, we

15  still don't know what law applies.  I have had conversations

16  with Mr. Donnell and his partner, Mr. Kaplan saying will you

17  stipulate to a particular law of a particular jurisdiction to

18  govern the dispute?

19       Now, Mr. Donnell a week or so ago said, we'll

20  stipulate to New York law with respect to motion to dismiss.  I

21  said no.  We need to know what law controls the dispute.  So --

22       THE COURT:  But let me ask you this.  What states are

23  potentially involved?

24       MR. POLLARD:  Well, I don't know, because the

25  agreement says "as shown on the bank's records" where the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    account was opened.  "As shown on the bank's records where the

2    accounts were opened."  Those are the states whose law applies.

3         Now, we know that Wachovia, which was then the bank,

4    was in North Carolina.  We know that Ally is in Michigan.  We

5    know that some of the transactions involved New York.  So

6    those --

7         THE COURT:  So that -- but you're telling me some of

8    the transactions involved New York, but you're telling me

9    that's not what the account agreement said as to the

10   controlling law.

11        MR. POLLARD:  Well, honestly -- I missed --

12        THE COURT:  So my question -- look, I don't know

13   whether it's going to make a difference, because if there's no

14   difference in the law of North Carolina, New York, Michigan, is

15   it going to make a difference?

16        MR. POLLARD:  I agree with that, Your Honor, if

17   there's no difference.  But here's the problem.  Counsel says

18   well, if Ally prevails on this motion, then it has reserved its

19   right to try to figure out what law applies to all these

20   agreements and to then relitigate the whole issue of validity.

21        THE COURT:  No, we're only doing it once.

22        MR. POLLARD:  That is exactly my point, Your Honor.

23        THE COURT:  We're only doing it once.

24        MR. POLLARD:  That is exactly my point.  And the once

25   has to be throughout the dispute.  I cannot be in a position

**RESIDENTIAL CAPITAL, LLC, ET AL.**

11

1   where I prevail here --

2          THE COURT:  Okay.  Let me ask you -- let me ask you

3   this, Mr. Pollard.

4          MR. POLLARD:  All right.

5          THE COURT:  Is there any discovery that you wish to

6   take?  First off, let me make clear to both sides, I don't stay

7   discovery because there's a pending motion to dismiss.  Okay?

8   I've read the complaint.  In reading the complaint, it didn't

9   seem to me that there were going to be disputed issues of fact,

10  but maybe there are.  I wasn't aware of your inability to agree

11  on what state's law applies.  Perhaps that is going to raise an

12  issue as to which discovery has to be taken.

13          Is there any discovery, Mr. Pollard, that you wish to

14  take?

15          MR. POLLARD:  Yes, Your Honor, there is discovery we

16  wish to take.

17          THE COURT:  What's the discovery you wish to take?

18          MR. POLLARD:  Your Honor, we want to focus on how this

19  amendment came about.  That's one of the things we want to

20  focus on.  Take --

21          THE COURT:  What difference does it make?

22          MR. POLLARD:  Because, Your Honor, it goes to good

23  faith.  This is a one-off agreement that we think was drafted

24  specifically by Ally -- specifically by Wells Fargo --

25          THE COURT:  As a mat -- what's your -- as a matter of

**RESIDENTIAL CAPITAL, LLC, ET AL.**

12

1    law, does the reason that the amendment came about make a

2    difference?

3            MR. POLLARD:  I think so, Your Honor.

4            THE COURT:  Okay.  From reading your complaint, you

5    allege that Wells Fargo could not unilaterally amend or modify

6    the account agreement.

7            MR. POLLARD:  In the way it did; yes.

8            THE COURT:  And then you alleged that they gave you

9    insufficient time to close the accounts from when they gave you

10   notice --

11           MR. POLLARD:  Yes.

12           THE COURT:  -- okay.  So if -- the issue whether, as a

13   matter of law, they could unilaterally amend the account

14   agreement, does seem to me to be an issue of law.

15           MR. POLLARD:  Well, Judge, it's --

16           THE COURT:  What are the facts -- what facts bear on

17   that issue?

18           MR. POLLARD:  Judge, it is an issue of law, but the

19   law also tells us the covenant of good-faith --

20           THE COURT:  Okay.

21           MR. POLLARD:  -- when people make contracts.

22           THE COURT:  All right.

23           MR. POLLARD:  And here, Your Honor, we believe this is

24   what happened.  That as the ResCap entities approached

25   bankruptcy, Wells Fargo and its counsel, then Winston & Strawn,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

13

1    devised a way to shift the obligation to pay for any legal fees

2    that Wells Fargo legitimately incurred with respect to the

3    bankruptcy onto Ally Financial, because they realized that the

4    ResCap entities would not be able to pay them.  And that they

5    then created an amendment that goes far beyond anything having

6    to do with our banking relationship.

7        For example, Your Honor, the amendment says that Wells

8    Fargo now has a security interest in every asset of Ally

9    Financial worldwide.  That, Your Honor, has nothing to do with

10   the depository relationship between Ally Financial and Wells

11   Fargo.  It imposes this guaranty for third parties on us.

12       We think that this is a factual issue that has to be

13   explored --

14       THE COURT:  Okay.  What discovery do you wish to take?

15       MR. POLLARD:  We wish to take discovery concerning how

16   the amendment came about.  We wish to take discovery concerning

17   how these fees relate.

18       THE COURT:  Say that again?

19       MR. POLLARD:  We wish to take discovery concerning how

20   this amendment came about.

21       THE COURT:  That I got.  What was the second one?

22       MR. POLLARD:  We wish to take discovery concerning the

23   alleged relationship between these fees and the ResCap

24   bankruptcy, because the amendment is limited to fees that have

25   to do with protecting their interest.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

14

1            We want to take discovery, Your Honor, regarding the

2    reasonableness of the fees.  You know, a half a million

3    dollars, almost, for coming down and monitoring and protecting

4    an interest that they can't even articulate existed.  These are

5    some of the things we want to take discovery about, Judge.

6            And honestly, the choice of law.  And with respect to

7    the choice of law, Judge, we cannot start to prepare our

8    response to the motion to dismiss until we know what law

9    applies.  And when we were negotiating the scheduling of the

10   motion, we explicitly said to Mr. Kaplan and Mr. Donnell that,

11   look, these dates are conditioned upon a quick resolution of

12   the choice of law issue.

13           Now, we don't have that resolved.  And one of the

14   things, Judge, we need to do, is that to reset our time to

15   respond to a period after we know what law applies.  If that

16   means taking discovery on the law from Wells Fargo first --

17           THE COURT:  Tell me the -- again, the language of the

18   deposit agreement that relates to the applicable choice of law?

19           MR. POLLARD:  Yes, Judge.  Just give me one moment,

20   please?

21           THE COURT:  Sure.

22           MR. POLLARD:  The applicable law is --

23           THE COURT:  Tell me where you're reading from?

24           MR. POLLARD:  I'm sorry.  I'm reading from page 7 of

25   the original -- well, page 7 of the 2010 commercial deposit

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   agreement.  Page 7 section 18, at the bottom of the page 7:

2   "The applicable law is the law of the state in which your

3   account was opened as identified in our records."

4          Now, there are many accounts that are involved here.

5   And one of the issues that --

6          THE COURT:  How many accounts?

7          MR. POLLARD:  I don't -- I can't tell you off the top

8   of my head, Judge, a number.

9          And one of the issues that we are going to sort out is

10  counsel takes the position that if he prevails on any -- the

11  amendment being valid for any accounts, it's valid for all

12  accounts.

13         THE COURT:  Let me ask you this, Mr. Pollard.  The

14  500,000, approximately, that was withdrawn from Ally accounts,

15  did it come from one specific account or multiple accounts?

16  You must know that.

17         MR. POLLARD:  I believe -- I believe it came from one

18  account but I --

19         THE COURT:  Okay.  So do I have to deal with any

20  accounts other than the one from which the money was withdrawn?

21         MR. POLLARD:  Well, they say that if it comes -- that

22  if any -- if the amendment is effective as to any account, then

23  they can take money from any account.

24         THE COURT:  But they took the money from one account?

25         MR. POLLARD:  Correct.

1          THE COURT:  You've read from an account agreement.

2          MR. POLLARD:  Right.

3          THE COURT:  Was it the same account agreement for each

4    account?

5          MR. POLLARD:  Yes, and no.  It is the -- the agreement

6    is -- the agreement is depository-specific.  It covers multiple

7    customers within Ally.  But it is --

8          THE COURT:  Okay, stop for a second.  You're telling

9    me that all of the money was withdrawn from a single account?

10          MR. POLLARD:  I believe it --

11          THE COURT:  Who was the accountholder for that

12    account?

13          MR. POLLARD:  That was -- it was an Ally Financial,

14    Inc. account.

15          THE COURT:  Okay.  And why -- why is it relevant about

16    any other account other than the one from which the money was

17    withdrawn?

18          MR. POLLARD:  Because counsel takes the position that

19    if the depository agreement for that account is invalid, but a

20    depository agreement for another account of Ally Financial is

21    valid, that gives them the right to take money from any Ally

22    account.

23          THE COURT:  May I ask you this?

24          MR. POLLARD:  Yes, sir.

25          THE COURT:  Has Ally closed all of the accounts?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

17

1              MR. POLLARD:  My understanding is all the accounts

2      have been closed.

3              THE COURT:  So there's no money for them -- if somehow

4      the Court were to decide that the account from which they took

5      the money, they couldn't do it, they can't grab money from

6      another account because it's not there anymore.

7              MR. POLLARD:  But the terms --

8              THE COURT: Why do I have to deal with anything more

9      than the one account from which they withdrew the money?

10             MR. POLLARD:  Because if -- because we want the money

11     back that they took.

12             THE COURT:  I understand you want the money back.

13     Okay?

14             MR. POLLARD:  Their position --

15             THE COURT:  They withdrew money from one account.  If

16     I determine you're correct as to that account, isn't that the

17     end of the dispute?

18             MR. POLLARD:  No.  From my perspective, yes, but not

19     from their perspective.  Their perspective --

20             THE COURT:  Well, I'll --

21             MR. POLLARD:  -- as I understand it, is --

22             THE COURT:  -- Mr. Kaplan's going to have to tell me

23     why.  Because it does seem to me, that if the money was -- if

24     you told me it was withdrawn from ten different accounts, I'd

25     have to look at all ten accounts.  But if the money is

**RESIDENTIAL CAPITAL, LLC, ET AL.**

18

1   withdrawn from one account, you are entitled to know what law

2   do they claim applies to that account.

3         MR. POLLARD:  If that's the issue --

4         THE COURT:  Okay?

5         MR. POLLARD:  -- to litigate, Judge --

6         THE COURT:  And we're going to get an answer to that

7   question quickly.  All right?  And if there's a dispute about

8   it, we'll resolve that issue very quickly.  Okay?

9         Where do you believe Ally opened the one account from

10  which the funds were withdrawn?

11        MR. POLLARD:  I have --

12        THE COURT:  What's your position?

13        MR. POLLARD:  I have inquired, and we cannot tell.

14  The reason we cannot tell is very simple, Judge.  Wachovia

15  opened these accounts.  Yes, we went to Wachovia and we entered

16  into this agreements.

17        THE COURT:  In Michigan?  Did they have a branch in

18  Michigan?

19        MR. POLLARD:  Yes.

20        THE COURT:  And is that where Ally -- where were the

21  Wachovia officers with whom Ally financial dealt in opening the

22  account?  Have you ascertained that?  I would assume --

23        MR. POLLARD:  I believe -- again, I believe some --

24  Ms. Gross, who's here with me, corrected me.  I believe that

25  the --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

19

1              THE COURT:  Why don't you inquire before you answer

2      that.

3              MR. POLLARD:  Okay.  I'm told, Judge, we do not know.

4      Wachovia was based in North Carolina.

5              THE COURT:  They had branches in Michigan, though?

6              MR. POLLARD:  They had -- they -- that's my

7      understanding.

8              Ally acted from Michigan.  That I will tell the Court.

9      That's why -- look, Michigan law or North Carolina law may

10     be --

11             THE COURT:  Okay, if Michigan law applies, have you

12     looked to see whether Michigan law permits a bank to

13     unilaterally amend a deposit agreement?

14             MR. POLLARD:  We have looked at Michigan law, Judge.

15     I believe we have some defenses, but I --

16             THE COURT:  You're not answering my question.

17             MR. POLLARD:  -- but I have not yet -- I have not

18     completed the research on that, in part, because I don't want

19     to spend my time -- did not want to spend my time

20     researching --

21             THE COURT:  What law do you think applies?

22             MR. POLLARD:  Frankly, I do not know.  That's why I --

23             THE COURT:  Come on.

24             MR. POLLARD:  -- that's why -- I'm being honest.

25     Judge --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

20

1          THE COURT:  That's unacceptable to me.

2          MR. POLLARD:  Judge, but --

3          THE COURT:  You filed a -- no, stop.  Don't interrupt.

4          You filed a complaint.  You say it was improper for

5   them to unilaterally amend or modify the account agreement, and

6   you have no position as to what law applies?  Come on.  I can't

7   believe that.

8          MR. POLLARD:  Judge, look, I think -- New York or

9   Michigan law or North Carolina law should be the law that

10  applies.

11         THE COURT:  Okay, and have you looked to see whether

12  the law in those three states, what is the -- what do the --

13  what does the law of those states indicate with respect to a

14  bank unilaterally amending the deposit agreement?

15         MR. POLLARD:  I don't think they can amend it in the

16  way that they did to the scope that they did.

17         THE COURT:  Under either -- under any of the three

18  states' law.

19         MR. POLLARD:  I believe so.

20         THE COURT:  You think the law in all three states is

21  the same?

22         MR. POLLARD:  I don't know if it's the same.  I know

23  that there's some certain differences.  But I believe at the

24  end of the day, that Ally will prevail if the law of one of

25  those three states is applied.  But, Judge --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

21

1          THE COURT:  Does it matter to you which of those three

2     states' law applies, if it's one of those three?

3          MR. POLLARD:  Well, I think not.  One of the things

4     that we raised was picking New York law because there is a

5     connection to New York, and everybody in this room is more

6     familiar with New York law then they are the law of Michigan or

7     North Carolina.  Counsel --

8          THE COURT:  Well, the parties can certainly agree --

9     can stipulate that for purposes of the case -- not for purposes

10    of the motion to dismiss, because it's got to be -- we're not

11    going to do this more than once -- counsel can agree that for

12    purposes of the case, New York law will apply.

13         MR. POLLARD:  That's fine.  They wanted to stipulate

14    for the purpose of the motion that New York law was applied.

15    And I said no, it has to be for the purposes of the case.

16    So --

17         THE COURT:  Yeah, we're not -- we're not switching,

18    okay.

19         MR. POLLARD:  Yeah.

20         THE COURT:  So if the parties can agree on what state

21    law applies, I'll accept that -- if those three states that you

22    identified each has a connection to the dispute, I believe the

23    parties can select -- agree upon the law that will apply, and

24    the Court will honor that selection.  But we're not going to

25    switch as the case goes on.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

22

1              Mr. Kaplan?

2              MR. KAPLAN:  It's not necessarily a matter of

3    switching.  It may be that there are multiple -- he's claiming

4    multiple accounts; he's claiming that --

5              THE COURT:  Look, you took money from one account, why

6    do the other accounts -- why does anything other than the one

7    account from which you took the money matter?

8              MR. KAPLAN:  They're seeking a declaratory judgment

9    that all -- related to all thirty of the --

10             THE COURT:  Does it make any difference what the

11   law -- what the situation is as to -- you took money -- you

12   took all the money -- you agree you took the money from one

13   account?

14             MR. KAPLAN:  Understood.

15             THE COURT:  Okay.

16             MR. KAPLAN:  Understood.

17             THE COURT:  Why does -- why do I care what the law is

18   as to any other account other than the one from which you took

19   the money?

20             MR. KAPLAN:  Understood.  There's --

21             THE COURT:  Do you disagree with that?

22             MR. KAPLAN:  There's --

23             THE COURT:  Do you disagree with that?

24             MR. KAPLAN:  Yes, Your Honor.

25             THE COURT:  Why?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

23

1          MR. KAPLAN:  There's a guarantee and indemnification,

2    so it's not necessarily that the money has to be in an account.

3    We can go to Ally Financial, if there is --

4          THE COURT:  How many accounts were there?

5          MR. KAPLAN:  My understanding, based in part on the

6    complaint, is that there were over thirty accounts.

7          THE COURT:  Okay.  And do you agree that New York law

8    applies to all thirty accounts?

9          MR. KAPLAN:  Your Honor --

10          THE COURT:  Will you agree that New York law --

11    whether -- so as to avoid an unnecessary --

12          MR. KAPLAN:  I'm authorized for purposes of this

13    motion to --

14          THE COURT:  No, we're not dealing -- I want to make

15    clear to you --

16          MR. KAPLAN:  Yeah, in --

17          THE COURT:  -- we're only doing it once.  If there has

18    to be a court determination of the applicable law, I will do

19    that.  I am going to require that you indicate within seven

20    days from today, the law that Wells Fargo believes is

21    applicable to each of the accounts and why.  Okay?  You've got

22    seven days to do that.  No extensions will be given.  This

23    should have been resolved beforehand.  Okay?

24          You have the list of all thirty accounts?

25          MR. KAPLAN:  No, I haven't.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

24

1          MR. POLLARD:  Mr. Pollard, you give him the list of

2     every account that you believe that Ally had with Wells Fargo.

3     Can you do that by close of business tomorrow?

4          MR. POLLARD:  Um --

5          THE COURT:  This is not rocket science.

6          MR. POLLARD:  No, no, I understand.  Judge, I will

7     make -- I will -- Judge, I don't want to say absolutely yes,

8     without talking to the client, just in terms of finding the

9     information.  But I will make every effort that I can to make

10    sure we get it to them by tomorrow.

11         THE COURT:  Do you have --

12         MR. POLLARD:  Whatever we have, we will --

13         THE COURT:  -- do you have account records --

14         MR. POLLARD:  -- he will have by tomorrow.

15         THE COURT:  -- for each account that Ally had with

16    Wells Fargo?

17         MR. POLLARD:  I assume that we do, Judge.  I assume

18    that we do.

19         THE COURT:  You and your firm, do you have account

20    records?

21         MR. POLLARD:  Oh, no, no, no.  No, no.  My firm has

22    not --

23         THE COURT:  You haven't bothered to get it?  You filed

24    a complaint, you didn't bother to look at the accounts?

25         MR. POLLARD:  No, we talked to the client, Judge.  It

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   was -- we talked to the client.  It was -- and even -- Judge,

2   we talked to the client.  I will -- whatever I can get my hands

3   on by tomorrow --

4           THE COURT:  No, I am ordering you --

5           MR. POLLARD:  I understand that.

6           THE COURT:  -- that by tomorrow at 5 o'clock, you give

7   Mr. Kaplan a list of each of the accounts that Ally had with

8   Wells Fargo.

9           MR. POLLARD:  Yes, Your Honor.

10          THE COURT:  Okay.  And Mr. Kaplan, you have until 5

11  p.m. seven days from today to file on the docket a statement of

12  Wells Fargo's position as to the law applicable to each of the

13  accounts, and why.

14          If the two of you can agree to resolve the issue by

15  agreeing as to which state's law will apply to the dispute as

16  to all accounts, that would simplify it.  Unless there's an

17  actual conflict between the law of the potential states that

18  are involved, I believe the Court is authorized to apply New

19  York law to the dispute and we don't have to waste a lot of

20  time going through a choice-of-law fight.

21          I agree with Mr. Pollard that Ally should not have to

22  plead further until they know what law applies.  So we're going

23  to settle that issue first.  Discovery can go forward.  I don't

24  stay discovery while a motion to dismiss is pending.  If you

25  want, we'll talk about how much time you each believe you need

**RESIDENTIAL CAPITAL, LLC, ET AL.**

26

1    for discovery.  We're going to go forward with that.  But we're

2    going to get this issue of choice of law resolved.  The best

3    way to resolve it is for the two of you, obviously, with the

4    agreement of your clients, to agree on the applicable law that

5    will apply.

6            What other discovery do you wish to take?

7            MR. POLLARD:  Well, Judge, I think that there's

8    probably going to be a 30(b)(6) deposition.

9            THE COURT:  No, I want to know what -- okay, a

10    30(b)(6) on what issues?

11            MR. POLLARD:  The -- how the account came to be

12    opened.  The fees tied to the --

13            THE COURT:  The same issues that you've addressed?

14            MR. POLLARD:  Yes.  Yes, Your -- in general, yes, Your

15    Honor.

16            THE COURT:  So when I asked you about what issues you

17    want to take discovery on, you're -- in addition to whatever

18    written discovery, you want to take a 30(b)(6) deposition?

19            MR. POLLARD:  At least one, Judge, on that issue.  You

20    know, there's an issue as to -- as I was saying about the

21    reasonableness of the fees.  And I understand they're arguing

22    that there's a release on that.  And we'll deal with that when

23    the motion comes around.

24            But in terms of taking discovery, Judge, obviously

25    once we see the documents, we may have other issues that we

**RESIDENTIAL CAPITAL, LLC, ET AL.**

27

1   want to pursue on that.

2           And since we're talking about discovery, I also want

3   to raise a somewhat delicate issue, and that is, Mr. Donnell

4   may well be a witness in this.  When Mr. Donnell and I first

5   spoke, I told him that I didn't -- I had no position regarding

6   what should happen, but I wanted to raise with him, since the

7   reasonableness of the fees, and the necessity of the fees were

8   pled in the complaint, he may be a witness in this case.

9           I'm not waiving any of our rights.  And I'm very

10  sensitive to raising issues like this, but as I said, I've

11  spoken with Mr. Donnell about this when this case was first

12  filed.

13          Now, whether we go forward --

14          THE COURT:  If you're going to move to disqualify

15  counsel, you need to do it promptly --

16          MR. POLLARD:  Well --

17          THE COURT:  Okay -- no.  I just -- there's no ifs ands

18  or buts.  If you're going to move to disqualify counsel, you

19  need to do it promptly.

20          MR. POLLARD:  All right.

21          THE COURT:  Okay?  We're not going to get --

22          MR. POLLARD:  No.

23          THE COURT:  -- three months or six months down the

24  road and then have a disqualification motion.

25          MR. POLLARD:  I don't do that, Judge.  That's why I'm

**RESIDENTIAL CAPITAL, LLC, ET AL.**

28

1    raising it now.  That's why I'm raising it now.

2              THE COURT:  And I'm telling you that if you're going

3    to do it --

4              MR. POLLARD:  I see.

5              THE COURT:  -- you need to do it --

6              MR. POLLARD:  I will --

7              THE COURT:  -- promptly.

8              MR. POLLARD:  -- we will address that, sir.

9              THE COURT:  Okay.  Any other discovery that you

10   believe you wish to take?

11             MR. POLLARD:  Not at this time, Judge.  I think

12   they're given in broad strokes, what we --

13             THE COURT:  When you say "not at this time", I'm going

14   to enter a case management and scheduling order.  It's going to

15   provide a cut off of fact discovery and of expert discovery.

16             MR. POLLARD:  Right.

17             THE COURT:  And so you're not going to be able to sort

18   of sit back and wait and see very long, because I don't just

19   simply extend time.  Okay?  So if there's -- what I'm going to

20   require --

21             MR. KAPLAN:  Your Honor --

22             THE COURT:  No, you'll get your chance.

23             When I enter my case management and scheduling order,

24   it's going to include a provision under Rule 26(f)(3) that I'm

25   going to require a discovery plan.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

29

1              MR. POLLARD:  Yes.

2              THE COURT:  Okay.  Most of the issues -- from reading

3    the complaint, it seemed to me these were going to be primarily

4    legal issues.  If there are factual issues, I need to -- that's

5    why I'm going to press Mr. Kaplan as well about what discovery

6    he wants to take.

7              How much time do you believe you need for fact

8    discovery?

9              MR. POLLARD:  Your Honor, we had conversations -- Ms.

10   Gross had a conversation with Mr. Kaplan yesterday, and we

11   understand you have 120-day rule.

12             THE COURT:  Right.

13             MR. POLLARD:  The main issue that --

14             THE COURT:  Well, I would say that I have a

15   presumptive time of 120 days, which I do adjust when the matter

16   appropriately calls for that.

17             MR. POLLARD:  The main issue for us -- and we've

18   talked to Mr. Kaplan about this -- is that -- let me -- we did

19   a draft case management order which would have to be revised in

20   light of some of Your Honor's comments.  But one of the things

21   in it is that the parties agree to act in good faith to try to

22   substantially complete document discovery within forty-five

23   days of the service of the document demand, now, because that

24   then drives what happens next.

25             In order to get finished in the 120 days, I have to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

30

1    get documents, and presumably he needs to get his -- my

2    documents as well --

3              THE COURT:  Right.

4              MR. POLLARD:  So we can then figure out what

5    depositions may be called for, what follow-up discovery may be

6    qualified.  So as I said, I don't have a problem with the 120

7    days.  But I do need that the order include that -- and there's

8    some language that we worked out -- the order include a good-

9    faith effort to complete document discovery within that forty-

10   five-day period.

11             THE COURT:  Okay.

12             MR. KAPLAN:  Your Honor?

13             THE COURT:  Anything else you want to raise now,

14   before I turn to Mr. Kaplan?

15             MR. POLLARD:  Could I just have a moment, Judge?

16             THE COURT:  Sure.

17             MR. POLLARD:  No, Judge, I don't think so.  Not at

18   this time.

19             THE COURT:  Okay, thank you.

20             All right, Mr. Kaplan?

21             MR. KAPLAN:  Your Honor, the forty-five-day period --

22             THE COURT:  Come on up to the microphone.  Okay?

23             MR. KAPLAN:  The forty-five-day period that Mr.

24   Pollard was discussing was based on an agreement between the

25   parties based in part of the size of the dispute that discovery

**RESIDENTIAL CAPITAL, LLC, ET AL.**

31

1    would be stayed by agreement of the parties until a ruling on

2    the motion --

3                    THE COURT:  It's not.

4                    MR. KAPLAN:  I mean, I understand --

5                    THE COURT:  It's not.

6                    MR. KAPLAN:  -- I understand Your Honor's --

7                    THE COURT:  I don't stay discovery.

8                    MR. KAPLAN:  -- policy.  There are a few issues,

9    though, with the scope of the discovery, specifically with

10   respect to what Mr. Pollard raised about his issue with Mr.

11   Donnell being a witness.  All of this information about the

12   reasonableness of the fees was settled.  The parties reached a

13   settlement agreement.  And that settlement agreement is part of

14   our motion to dismiss.

15                   THE COURT:  Which parties reached an agreement?

16                   MR. KAPLAN:  Ally Financial and Wells Fargo have

17   entered into a partial settlement agreement.  And that partial

18   settlement agreement said that anything about the fees, aside

19   from whether or not the amendment itself is valid, all those

20   issues are -- have been settled.  So basically, the only issue

21   left is, is the amendment valid?  If it is, we return the

22   money; if it is not, we keep the money.

23                   So all of what Mr. Pollard --

24                   THE COURT:  Okay.

25                   MR. KAPLAN:  -- wants to get into -- and the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

32

1    problematic discovery here --

2              THE COURT:  Do you have that settlement agreement with

3    you?

4              MR. KAPLAN:  I do, Your Honor.

5              THE COURT:  May I see that --

6              MR. KAPLAN:  Yes, you may.

7              THE COURT:  -- language you're referring to?

8              MR. KAPLAN:  Exhibit 1 to our motion papers.

9              THE COURT:  Is there a specific place in the --

10             MR. KAPLAN:  Yeah.

11             THE COURT:  If you point it out now, then we'll make

12   sure that Mr. Pollard also knows what you're pointing to.

13             MR. KAPLAN:  Your Honor, may we approach?

14             THE COURT:  Sure.

15             MR. KAPLAN:  It's in the December 10, 2013 settlement

16   agreement on page 2.

17             THE COURT:  Okay.

18             MR. KAPLAN:  It's paragraph -- I've marked it.  And it

19   makes a reference to reasonableness of fees, and that's what --

20             THE COURT:  Sure.

21             MR. KAPLAN:  -- Mr. Pollard is talking about.

22        (Pause)

23             THE COURT:  All right.  Let me leave it up here for a

24   minute.  Do you need it back now?

25             MR. KAPLAN:  No, Your Honor.  No.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

33

1           THE COURT:  I'll give it back to you before we end.

2           So tell me, what discovery do you believe Wells Fargo

3    needs to take from Ally?

4           MR. KAPLAN:  We believe this can be done as a matter

5    of law.  The good-faith discovery that they're talking about,

6    under -- and we've cited it in our motion papers -- but under

7    both New York law and the laws of a number of different

8    circuits that we've put in here, that is none of that good-

9    faith issue -- there's no -- if you've got a contract that's

10   clear and unambiguous on its face you can't get around those

11   terms by pleading that there's been a breach of good faith.

12          And that's what that discovery is aimed at.  So

13   that's -- again, we think that that's dealt with in the

14   motion --

15          THE COURT:  Is your position that if -- does the

16   deposit agreement include a provision that allows Wells Fargo

17   to unilaterally alter the terms?

18          MR. KAPLAN:  Yes.

19          THE COURT:  Does that mean that today you could alter

20   the terms that would would be impossible to accomplish within

21   120 days, that you could say it's effective as of tomorrow, and

22   if you don't close the account by tomorrow, you waive any

23   rights?

24          MR. KAPLAN:  No, that's a good point, Your Honor.  The

25   parties agreed to that --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

34

1              THE COURT:  I don't want to -- is that your position?

2              MR. KAPLAN:  The parties --

3              THE COURT:  Is that your position?

4              MR. KAPLAN:  Yes, Your Honor.  The parties agreed to a

5      term -- a thirty-day termination provision.  So either side

6      unilaterally could terminate the entire agreement on thirty

7      days.  And these are sophisticated parties that negotiated it.

8              THE COURT:  Okay.  All right.  I just wanted to --

9              MR. KAPLAN:  So the ability to amend --

10             THE COURT:  -- just wanted to understand your

11     position.

12             MR. KAPLAN:  -- within thirty days.

13             THE COURT:  Okay.

14             MR. KAPLAN:  It's a lesser included.

15             THE COURT:  All right.  So the account agreement

16     included a provision that allowed thirty-days' notice of

17     change?

18             MR. KAPLAN:  Correct.

19             THE COURT:  Okay.  And your position is that the plain

20     language of the agreement controls, and so they had thirty

21     days, and if they wanted to change it, they could withdraw

22     their money, close the account?

23             MR. KAPLAN:  Correct.

24             THE COURT:  Okay.  What discovery do you wish to take?

25             MR. KAPLAN:  Our understanding -- and again, this was

**RESIDENTIAL CAPITAL, LLC, ET AL.**

35

1    by agreement of the parties -- and now I understand that

2    that's -- that -- I thought this was going to be dealt with by

3    motion and I'm not sure if there was going to be any discovery

4    afterwards.

5        THE COURT:  Well, let me -- look.  If the two of you

6    can't resolve the issue of what state's law applies, that is

7    going to be -- I take it you agree that the language of the

8    deposit agreement -- that Mr. Pollard fairly read the language

9    with respect to what state law applies?

10       MR. KAPLAN:  He truncated it.  But it said that the

11   applicable law that the contract -- the terms of the contract

12   apply following that -- center of law, following that you had

13   banking terms and --

14       THE COURT:  Okay.

15       MR. KAPLAN:  -- and then following that you had state

16   law, if applicable.

17       THE COURT:  Look, if there has to be -- if you can't

18   agree on what state's -- when I say "you agree", the two of you

19   agree on what state law will be deemed to apply to the dispute,

20   then there's going -- I understand Mr. Pollard's position that

21   there's going to need to be discovery on it.  Okay?

22       MR. KAPLAN:  And I understand that.  I don't think

23   there's much -- there's going to be much difference about plain

24   language of a contract --

25       THE COURT:  So may I ask you, do you think it's

**RESIDENTIAL CAPITAL, LLC, ET AL.**

36

1    possibly more than Michigan, New York, or North Carolina law

2    that applies?

3            MR. KAPLAN:  There's a possibility of Pennsylvania and

4    a possibility of Delaware.  But I haven't heard in any --

5            THE COURT:  And --

6            MR. KAPLAN:  -- discussions any --

7            THE COURT:  -- have you looked to see whether the law

8    of those states differs on the issues in dispute?

9            MR. KAPLAN:  My understanding is that they all find

10   that if a contract is clear and unambiguous on its face, it's

11   to be applied.

12           THE COURT:  Are there any other state principles of

13   law, in your view, that have to be applied in resolving the

14   dispute?

15           MR. KAPLAN:  The question of whether you can plead a

16   good faith to get around that.  And we've -- basically, again,

17   that's uniform throughout the circuits that we discussed.

18           THE COURT:  Okay.  So you don't believe that there is

19   an actual conflict between the laws of the possibly applicable

20   states?

21           MR. KAPLAN:  Correct, Your Honor.

22           THE COURT:  That's your position?

23           MR. KAPLAN:  Correct, Your Honor.

24           THE COURT:  Okay.  Do you agree that if that's true,

25   that the Court can simply determine that it'll apply forum law,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

37

1    New York law?  That's what I understand the -- where there's a

2    choice-of-law issue, it only becomes relevant if there's an

3    actual conflict.  In the absence of an actual conflict, the

4    Court can choose to apply New York law, because that's where I

5    sit.  Do you agree or disagree with that?

6           MR. KAPLAN:  I have not checked the --

7           THE COURT:  Okay.

8           MR. KAPLAN:  -- choice-of-law rules.

9           THE COURT:  Fair enough.  Fair enough.  Okay.

10          As you stand there now, are there any other issues as

11   to which you wish to take discovery?

12          MR. KAPLAN:  Your Honor, I'll need to go back and

13   consider what issues -- if we're not going to wait until after

14   the motion's decided, I'll have to consider --

15          THE COURT:  We're not going to wait until after the

16   motion's --

17          MR. KAPLAN:  Understood, Your Honor.

18          THE COURT:  Okay.  How much time to you believe you

19   need for discovery?

20          MR. KAPLAN:  I think the 120-day period is reasonable.

21          THE COURT:  So let me just briefly describe to both of

22   you how I -- because that's -- the template for my case

23   management and scheduling order which appears on the Web site

24   includes the 120 days.  And that's sort of the presumptive

25   amount of time I use.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    In more complicated cases, yes, I do even initially

2    provide longer.  I think the longest -- well, once or twice

3    I've used six months, because it was a particularly complex

4    dispute.  So the last paragraph of that case management order

5    requires that at least five days before the end of the period,

6    parties move -- if they're going to request an extension of

7    time, they do it -- it probably ought to be even before that.

8    And the question I always ask before deciding whether

9    to extend time is, what discovery have you done so far and what

10    remains to be done.  So where the parties have been proceeding

11    in good faith, and there -- it's turned out additional issues

12    show up, it's required additional discovery, I try to be

13    reasonable.  I don't simply say no, no extension of discovery.

14    Where people get into problems is when they wait till

15    the 110th day of the 120-day period, they haven't done any

16    discovery, and they agree with their adversary, oh, let's

17    extend the time by three months.  It doesn't happen.  Okay?  I

18    just want to make that clear.

19    I always try to be reasonable.  And look, there's

20    always -- it frequently is the case that there's problems

21    scheduling a deposition, because people's travel schedules or

22    whatever; there's a few clean-up items that have to be done.  I

23    try to be reasonable about it.  So the thing -- it isn't enough

24    to just come to me and say we've agreed to extend discovery --

25    fact discovery by thirty or sixty days.  The question is, what

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   have you done; what remains to be done?  Okay, so that's

2   basically how it works.

3          The language that is not in the template that's on the

4   Web site, but it's in another form that I use, adds a paragraph

5   on a discovery plan.  And in this case I'm going to require

6   that as well.

7          Anything else you want to say at this point?

8          MR. KAPLAN:  No, Your Honor.

9          THE COURT:  All right, Mr. Pollard, what about --

10   before I give Mr. Kaplan back his copy of the motion to dismiss

11   which attached what he described as the settlement -- partial

12   settlement between Ally and Wells, it sure looks to me the

13   paragraph he pointed out on page 2 in paragraph 2, appears to

14   reflect an agreement that there will not be a further challenge

15   to the reasonableness of Winston's fees and expenses in

16   representing Wells Fargo regarding the debtors and Ally?

17          MR. POLLARD:  First, Your Honor, that document you're

18   reading has been sealed.  It's a confidential document.

19   That's -- I have to put that on the record, Judge.

20          THE COURT:  You know, when you appear before me, and I

21   ask a question --

22          MR. POLLARD:  Yes, sir.

23          THE COURT:  -- so I want to see it.  I've seen it.

24   So --

25          MR. POLLARD:  No, no.  I'm not --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

40

1      THE COURT:  -- the document can remain sealed, but my

2  question nevertheless remains.

3      MR. POLLARD:  I --

4      THE COURT:  This language of this sealed document

5  appears to resolve the issue of the reasonableness of the fees.

6  You've got lots to fight about, but not the reasonableness of

7  the fees.

8      MR. POLLARD:  Your Honor, I think, in part, that also

9  goes to the validity of the underlying agreement.  Because our

10  theory is that this was a one-off agreement that Wells Fargo --

11      THE COURT:  Are you telling me that the December 10,

12  2013 agreement --

13      MR. POLLARD:  No.

14      THE COURT:  -- is a one -- it may be a one-off

15  agreement --

16      MR. POLLARD:  No.

17      THE COURT:  -- but it resolves issues in part between

18  the two parties.  And it seems to resolve the issue and put to

19  rest the issue of the reasonableness of the fees.  Agreed or

20  disagreed?

21      MR. POLLARD:  I'm speaking of a different agreement.

22      THE COURT:  I'm asking about this agreement.

23      MR. POLLARD:  That agreement, Your Honor, with respect

24  to resolving the reasonableness of the fees, does not resolve

25  the issue regarding their lack of good faith in entering into

**RESIDENTIAL CAPITAL, LLC, ET AL.**

41

1  the contract.

2          THE COURT:  That may be.

3          MR. POLLARD:  I mean, in amending the contract.

4          THE COURT:  That may be.  That's what you -- the two

5  of you are fighting about.  But what it seems to me to resolve

6  is the issue -- assuming they prevail on the contract

7  interpretation issues, that the reasonableness of the fees --

8  of Winston's fees and expenses in representing Wells Fargo

9  regarding the debtors and Ally, that issue had been resolved

10  between the parties.  Agreed or disagreed?

11          MR. POLLARD:  If that's how Your Honor reads the

12  agreement --

13          THE COURT:  Well, I'm -- but I asked -- no.  I'm

14  asking you.  You have the language in the front of you?

15          MR. POLLARD:  Yes, Your Honor.

16          THE COURT:  I have the language in front of me.

17          MR. POLLARD:  Yes, Your Honor.

18          THE COURT:  Do you agree that the parties resolved the

19  issue of the reasonableness of the fees?  It leaves open the

20  issue of whether the agreement is valid or not, but as to the

21  reasonableness of the fees, that issue has been resolved by the

22  parties as of -- what did I say, December 10th -- December --

23  February -- well, what's the -- the date of the letter is

24  December 10th --

25          MR. POLLARD:  December 10th, 2013.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

42

1      THE COURT:  -- 2013.  That appears to have resolved

2  the issue of the reasonableness.  Not any of the other issues

3  you've raised, but as to the reasonableness of the fees.

4  Agreed or disagreed?

5      MR. POLLARD:  Disagreed to this extent -- to this

6  extent.  I believe that the unreasonableness of the fees is

7  relevant to the validity of the agreement.  It goes to the

8  good-faith nature of the amendment.  It also goes to our theory

9  that the amendment, which is in a letter form, is a one-off

10  agreement that was put together in order to unfairly and

11  illegally shift the cost that Wells Fargo wanted to incur.

12      THE COURT:  Tell me this.  Was Timothy Devine chief

13  counsel --

14      MR. POLLARD:  Yes.

15      THE COURT:  -- litigation --

16      MR. POLLARD:  Yes, Judge.

17      THE COURT:  -- authorized to enter into the December

18  10th, 2013 agreement?

19      MR. POLLARD:  I have not asked him about that, but I

20  assume that he was, Judge.

21      THE COURT:  All right.  There will be no discovery, at

22  this stage in the case, about the reasonableness of the fees.

23      MR. POLLARD:  Yes, Judge.

24      THE COURT:  You're going to have an uphill battle to

25  persuade me that that issue remains in the case.  It appears to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

43

1    me that the December 10th, 2013 letter signed by Mr. Devine on

2    behalf of Ally Financial, Inc., and signed by Paul Nobel (ph.)

3    on behalf of Wells Fargo, resolves that issue.  Before you

4    endeavor to take any discovery about the reasonableness of the

5    fees, you're going to have to come back to me about it.

6              MR. POLLARD:  Understood.

7              THE COURT:  All right.  So what I'm going to do, I'm

8    going to enter a scheduling order providing for 120 days of

9    fact discovery, 45 days of expert discovery thereafter.  You

10   can give us the language the two of you have agreed on -- I'll

11   look at it -- with respect to the good-faith effort to produce

12   documents within forty-five days.  I will look at it and decide

13   whether to include it.  I don't have -- I don't think I oppose

14   it, but I will -- if it should be included, I'll include it.

15             MR. KAPLAN:  It was really based on if there was going

16   to be a stay of discovery --

17             THE COURT:  Well, we're not staying discovery.

18             MR. KAPLAN:  Understood.  So I don't think it's

19   necessary to have that in the order, Judge.

20             MR. POLLARD:  Well, I think the -- the issue, Judge,

21   is that if we're going to do 120 days to complete fact

22   discovery, I need to get the documents --

23             THE COURT:  Let me see the language, and I'll decide

24   whether to put it in.  All right?

25             MR. POLLARD:  We'll show it to you, Judge.  If you

**RESIDENTIAL CAPITAL, LLC, ET AL.**

44

1    want, I'll read it to you.

2           THE COURT:  No, I'm going to -- this is going to get

3    entered on our computer and --

4           MR. POLLARD:  Understood.

5           THE COURT:  -- so we want to see it.

6           MR. POLLARD:  We'll get that to you today.

7           THE COURT:  We want to see it.

8           Okay, anything else?

9           All right.  So I have given you time to identify each

10   of the accounts, and I've given Wells' counsel time to indicate

11   what law they believe applies and why.  And what I'm hoping is,

12   is that the two of you can simply resolve this issue.  I mean,

13   there isn't a whole lot of difference in most states' law with

14   respect to how to interpret -- the principles for interpreted

15   contracts.  See if you can resolve it.  Okay?

16          MR. POLLARD:  And as I understand it, Judge, our time

17   to respond to the motion to dismiss is going to be reset once

18   the choice of law issue is resolved?

19          THE COURT:  It will.

20          MR. POLLARD:  Thank you.

21          THE COURT:  All right.  That took longer than I

22   thought it was going to; but let's take ResCap Liquidating

23   Trust v. Mortgage Investors Group, adversary proceeding

24   14-02004.

25          MS. KONANOVA:  Good morning, Your Honor.  Yelena

**RESIDENTIAL CAPITAL, LLC, ET AL.**

45

1  Konanova, Quinn Emanuel, for the Trust.

2          THE COURT:  Good morning.

3          MS. KONANOVA:  The second amended complaint was filed

4  and served here on --

5          THE COURT:  You know, we tried -- you got on a plane

6  to come?

7          MR. REYNOLDS:  I was on a plane.

8          THE COURT:  I apologize about it.  I tried to avoid

9  it, but I guess you were on the plane already.

10          MR. REYNOLDS:  I did.  Never mind.

11          THE COURT:  So nice to see you anyway.

12          Let me get both appearances.  You -- I've got your

13  appearance in.

14          MR. REYNOLDS:  Roland Reynolds for Mortgage Investors

15  Group, a General Partnership; Mortgage Investors Group, Inc.;

16  and American Real Estate.

17          THE COURT:  So you're appearing for all the defendant?

18          MR. REYNOLDS:  All the defendants.

19          THE COURT:  Okay, thanks very much.  And again I -- go

20  ahead.

21          Is there anything that we have to agree on today?

22          MR. REYNOLDS:  No, we just need to -- the CMO doesn't

23  provide for bringing new parties into it.  A prior one did.  So

24  we have two new parties.  So we just have to say they're going

25  to be part of that CMO.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  Could I ask you to do this, one of you, is

2    just prepare a proposed order that --

3          MR. REYNOLDS:  All right.

4          THE COURT:  -- provides that the -- I don't remember

5    what number we're on, on the CMO at this point -- three?  I

6    don't know -- shall apply to the new parties.  That's what

7    should be done.  Okay?

8          MR. REYNOLDS:  Great.

9          THE COURT:  Okay, and again, I'm sorry that -- where

10   did you fly from?

11         MR. REYNOLDS:  Los Angeles.  I get to be in New York.

12   That's always good.

13         THE COURT:  Yeah, we've had such wonderful weather,

14   I'm sure you wanted to be here.  But --

15         MR. REYNOLDS:  Yeah.

16         THE COURT:  -- it's a little warmer today, so.

17         MR. REYNOLDS:  Right.

18         THE COURT:  Not much.

19         MR. REYNOLDS:  All right.

20         THE COURT:  Again.  I'm always happy to have counsel

21   appear in person if you're -- if you make a motion and you're

22   going to argue a motion, I do want you here to do that.  It's a

23   little more difficult to do it over the phone.  If you're

24   just -- if you're appearing in connection with another motion

25   and you're not the principal advocate, I permit people to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

47

1    appear by telephone.  Okay?

2           MR. REYNOLDS:  I appreciate that, Your Honor.

3           THE COURT:  Okay.

4           MR. REYNOLDS:  Obviously, for this sort of thing, I

5    had to be, but --

6           THE COURT:  Okay.

7           MR. REYNOLDS:  -- I'll take advantage of that.

8           THE COURT:  All right.

9           MR. REYNOLDS:  Appreciate it.

10          THE COURT:  It's a lot warmer -- you having warm

11   weather in California?

12          MR. REYNOLDS:  I have to admit --

13          THE COURT:  Warmer and very dry weather.

14          MR. REYNOLDS:  -- it's pretty nice.  I roll the

15   windows down in the car on the way in yesterday.  So --

16          THE COURT:  Okay.  Well, thanks again.  Okay, thank

17   you very much.

18          MS. KONANOVA:  Thank you.

19          THE COURT:  All right, so just agree on the form of

20   the order and submit it to chambers, and we'll get it entered.

21   Okay?

22          MR. REYNOLDS:  Okay.

23          THE COURT:  Thanks very much.

24          All right, Mr. Wishnew?

25          MR. WISHNEW:  Thank you, Your Honor.  Good morning,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Your Honor, Jordan Wishnew, Morrison & Foerster, for the ResCap

2  Borrower Claims Trust.

3      We move now to III on page 9 of this morning's agenda,

4  the objection of the ResCap Borrower Claims Trust to the proof

5  of claim filed by Francine Silver, claim number 61.

6      THE COURT:  Is someone -- is Ms. Silver here?

7      MS. WISHNEW:  I don't -- I don't know if her or her

8  son might be appearing telephonically.

9      THE COURT:  All right, is anybody appearing for

10  Francine Silver?

11     (Garbled speech on phone line)

12     THE COURT:  I'm sorry, I couldn't understand you.

13     (Garbled speech on phone line)

14     THE COURT:  If you're making an appearance for Ms.

15  Silver, you need to identify yourself clearly.

16     One last effort; is anyone appearing on behalf of

17  Francine Silver?

18     Go ahead, Mr. Wishnew.

19     MR. WISHNEW:  Thank you, Your Honor.  In support of

20  the objection, the Borrower Trust submitted four declarations:

21  one by Ms. Priore, associate counsel of the ResCap Liquidating

22  Trust; one by Ms. Jacqueline Keeley, former employee of GMAC

23  Mortgage; another by David Liu, of Severson & Werson; and one

24  by Mr. Rosenbaum from Morrison & Foerster.  Ms. Priore, Mr.

25  Liu, and Ms. Keeley are all on the phone today.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          The objection was filed --

2          THE COURT:  Since Ms. Silver is not appearing --

3          MR. WISHNEW:  Sure, Your Honor.

4          THE COURT:  -- let me ask some specific questions.

5          MR. WISHNEW:  Okay.

6          THE COURT:  Okay?  Because I've read everything.

7          MR. WISHNEW:  Yes.

8          THE COURT:  So as I understand it, GMAC filed a
9    demurrer to the second amended complaint, on May 21, 2014, in
10   the Los Angeles Superior Court, and the demurrer is scheduled
11   for argument on May 14th, 2005 -- 2015; excuse me.

12         MR. WISHNEW:  Correct, Your Honor, yes.

13         THE COURT:  Why is it taking so long to get a hearing
14   on a demurrer?

15         MR. WISHNEW:  I would have to defer to Mr. Liu on
16   that; I don't know.  Often it's, frankly, a matter of the
17   court's docket.  I really don't have a full understanding of
18   the California court scheduling.

19         MR. LIU:  Your Honor, this is David Liu, L-I-U, on
20   CourtCall.

21         THE COURT:  Yes.

22         MR. LIU:  I can just advise that the demurrer is set
23   in the Santa Monica courthouse, and it's just extremely,
24   extremely backed up.

25         THE COURT:  Okay.  So scheduling it has just been a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

50

1  matter of the court's schedule, as opposed to the parties

2  agreeing to delay the hearing?

3          MR. LIU:  That's correct, Your Honor.  I can't

4  remember when we filed it, but I --

5          THE COURT:  Filed it May 21 --

6          MR. LIU:  Yeah, that's correct, Your Honor.

7          THE COURT:  -- 2014.  So it's essentially almost a

8  year to get a hearing on a demurrer.

9          MR. LIU:  That's right, Your Honor.

10         THE COURT:  Before whom is the motion pending?

11         MR. LIU:  Judge Allan Goodman, Your Honor.

12         THE COURT:  Okay.  Mr. Wishnew?

13         MR. WISHNEW:  Yes, Your Honor.

14         THE COURT:  So the demurrer raises the issue, as I

15 understand it, of Ms. Silver's standing to challenge the

16 nonjudicial foreclosure, standing to challenge any

17 securitization of the deed of trust, and Silver's showing with

18 respect to whether there's been an assignment of the deed of

19 trust.  Do you agree?

20         MR. WISHNEW:  Yes, Your Honor.

21         THE COURT:  The objection that's pending before me

22 also seeks to resolve the issue of the validity of the

23 assignment, correct?

24         MR. WISHNEW:  Yes, Your Honor.

25         THE COURT:  I'm always reluctant to try and decide --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

51

1    to decide a matter that's pending before another court.  On the

2    other hand, if it's taken a year just to get a hearing, and

3    there's no indication how quickly it would be resolved, I

4    wanted to raise that issue, because it is of concern to me.

5           With respect to the issue of the validity of the

6    assignments of the deed of trust, as I understand it, that

7    issue focuses on whether Ms. Keeley was authorized to and did

8    execute the assignments; is that a fair statement?

9           MR. WISHNEW:  Yes, Your Honor.

10           THE COURT:  And I further understand that two

11    different judges, the bankruptcy judge, in Ms. Silver's

12    bankruptcy case, and a state court judge, in the action pending

13    in Los Angeles Superior Court, have both raised the issue

14    whether the assignment includes a forgery; is that a fair

15    statement?

16           MR. WISHNEW:  Yes, Your Honor.

17           THE COURT:  And what may be different is you've

18    provided me with a Keeley declaration.

19           MR. WISHNEW:  I would absolutely agree on that point,

20    Your Honor.

21           THE COURT:  Okay.  Is Ms. Keeley still employed by one

22    of the -- by the Trust or by one of the --

23           MR. WISHNEW:  No --

24           THE COURT:  -- former debtors?

25           MR. WISHNEW:  -- Your Honor, she's actually, I

**RESIDENTIAL CAPITAL, LLC, ET AL.**

52

1   believe, currently employed by Ocwen Financial.

2              THE COURT:  Okay.  In what state?

3              MR. WISHNEW:  I believe in Pennsylvania.  I believe

4   it's out of the Fort Washington office.

5              But Ms. Keeley, I think you're on the phone.  Is that

6   correct?

7              MS. KEELEY:  Yes, that's correct.

8              MR. WISHNEW:  Thank you.

9              THE COURT:  All right.  In light of the decisions of

10  the two judges, the bankruptcy judge and the superior court

11  judge, raising what they believe were substantial questions

12  about whether the assignments included a forgery, I'm going to

13  schedule a limited evidentiary hearing on the issue of the

14  validity of the assignments.  And -- because I would like Ms.

15  Keeley here to testify about -- you provided the declaration.

16  We're not going to go through a deposition.  If Ms. Silver

17  wants to show up and cross-examine, she can.

18             MR. WISHNEW:  Okay.

19             THE COURT:  But I want to hear the testimony myself.

20  You may be familiar with my colleague Judge Drain's recent

21  decision involving Wells Fargo, and alleged forgery of

22  assignments on behalf of MERS.  If you're not familiar with it,

23  become familiar with it.

24             MR. WISHNEW:  Absolutely, Your Honor.

25             THE COURT:  Bear with me a second.

1          To be specific, I'm referring to Judge Drain's January

2    28th, 2015 decision in In re: Cynthia Carrsow-Franklin, case

3    number 10-20010, Memorandum of Decision on Debtor's Objection

4    to Claim of Wells Fargo Bank N.A.

5          What I'd ask you to do is speak with Ms. Keeley --

6          MR. WISHNEW:  Um-hum.

7          THE COURT:  -- and try to coordinate with her, and

8    with one of my law clerks, a date on which we can go forward

9    with an evidentiary hearing.  I don't anticipate that it will

10   last more than two hours.  I don't think it will last two

11   hours.

12         MS. ARETT:  Okay.

13         THE COURT:  If it's on an omnibus day, you can put it

14   on an afternoon of an omnibus day, not when there are other

15   matters on the calendar.  I want to try -- since Ms. Keeley is

16   not employed by any of the debtors, but by Ocwen, I want to try

17   and accommodate her schedule and your schedule.  Work out the

18   dates.  Since Ms. Silver is not on the phone, we'll -- once the

19   date is set for the hearing, we'll post notice of it.  And I

20   would direct you to also serve the notice on her.

21         If she wishes to appear and cross-examine, she has to

22   appear in person; I don't permit examination of witnesses over

23   the telephone.  So the order will provide that she needs -- if

24   she's going to appear, she needs to appear in person.  The

25   hearing will go forward whether she's here or not.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

54

1        I want to hear the testimony about the execution of

2   the assignments.  Obviously, two judges, comparing signatures

3   on a number of documents, thought that they weren't the same.

4        MR. WISHNEW:  Understood, Your Honor.

5        THE COURT:  Okay?

6        MR. WISHNEW:  Yep.

7        THE COURT:  I don't need to hear argument about any of

8   the other issues concerning the Francine Silver claim.  This is

9   the Trust's objection to claim number 61, filed by Francine

10  Silver.  Okay?

11       MR. WISHNEW:  Very good, Your Honor.  I will turn the

12  podium over to my colleague Meryl Rothchild.

13       THE COURT:  Ms. Keeley, you're excused, if you wish

14  to, though you can stay on.  Thank you for participating by

15  telephone.

16       MS. KEELEY:  Thank you.

17       MR. WISHNEW:  And could we also release Mr. Liu as

18  well?

19       THE COURT:  Yes, absolutely.

20       MR. WISHNEW:  Thank you.

21       THE COURT:  Thank you, Mr. Liu.

22       MR. LIU:  Thank you, Your Honor.

23       MS. KEELEY:  Thank you.

24       MR. WISHNEW:  So I will turn the podium over to my

25  colleague, Ms. Meryl Rothchild, who will handle item number 2

**RESIDENTIAL CAPITAL, LLC, ET AL.**

55

1    on page 10.

2              THE COURT:  Okay.

3              MR. SILBER:  Excuse my tardiness.  Do I have to

4    announce that I'm here or --

5              THE COURT:  No.  Tell me your name.

6              MR. SILBER:  Todd Silber, claim 4222 --

7              THE COURT:  We'll get to yours.  When I call yours,

8    you'll --

9              MR. SILBER:  Sorry for my tardiness.

10             THE COURT:  You're here in plenty of time.

11             MR. SILBER:  Thank you.

12             THE COURT:  Okay?

13             MR. SILBER:  Okay.

14             THE COURT:  Go ahead, Ms. Rothchild.

15             MS. ROTHCHILD:  Thank you, Your Honor.  Good morning.

16             As Mr. Wishnew stated, the next matter, on the claims

17   objections list going forward, is number 2, on page 10 of the

18   agenda, the objection of the ResCap Borrower Claims Trust to

19   claim number 2267, filed by Abosede Eboweme, and that is at

20   docket number 8018.

21             THE COURT:  I don't know -- is it a he or a she?

22             MS. ROTHCHILD:  I believe it's a she, Your Honor.

23             THE COURT:  All right.  Is Ms. Eboweme in court or on

24   the telephone?  Is anyone appearing on behalf of Ms. Eboweme?

25   This is the Trust's objection to claim number 2267.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

56

1          Go ahead, Ms. Rothchild.

2          MS. ROTHCHILD:  Thank you, Your Honor.  In support of

3    the objection, the Trust submitted two declarations, one by Ms.

4    Kathy Priore, for the ResCap Liquidating Trust, attached as

5    Exhibit 3 to the objection, and the other by Mr. Jon Patterson

6    of Bradley Arant Boult Cummings, attached as number 4.

7          The response deadline for the objection was February

8    12th.  On or about February 18th, Ms. Eboweme filed a letter

9    directed to the Court, at docket number 8144.  Ms. Eboweme

10   stated, among other things, in this letter, that she objects to

11   Ocwen and ResCap filing a motion against her.  She also alleges

12   that she didn't get a copy of the objection, and further states

13   that she has nothing to do with Ocwen and ResCap, as neither

14   should be in her case with Bank of America.

15          THE COURT:  Well, she has a case against Bank of

16   America.

17          MS. ROTHCHILD:  Correct.

18          THE COURT:  Okay.  But she filed a proof of claim

19   here.

20          MS. ROTHCHILD:  She did.  She filed -- exactly.  She

21   filed --

22          THE COURT:  Okay.

23          MS. ROTHCHILD:  -- a singular proof of claim with no

24   documents appended to that claim.

25          So as an initial matter, Ms. Eboweme was properly

**RESIDENTIAL CAPITAL, LLC, ET AL.**

57

1  served with the objection.  The Borrower Trust's noticing and

2  claims agent filed an affidavit of service on the docket at

3  docket number 8029, and Ms. Eboweme was served by mail and

4  overnight mail.

5      THE COURT:  Okay.  And you checked the address, and

6  the address is correct?

7      MS. ROTHCHILD:  Yes, Your Honor, we confirmed all of

8  that, and nothing was returned as undeliverable.

9      So Your Honor, claim number 2267, as I just mentioned,

10 only consists of a proof of claim form.  Ms. Eboweme didn't

11 include any document in support, nor did she append any

12 documents in connection with her letter that she filed on the

13 docket just last week.  The Borrower Trust conducted an

14 exhaustive examination of the debtors' books and records, their

15 servicing notes, as well as Ms. Eboweme's litigation history,

16 to assess the allegations that Ms. Eboweme has made.  And the

17 Trust concluded that the debtors' prior conduct, in connection

18 with Ms. Eboweme's loan documents, is entirely consistent with

19 their respective vested rights with those loan documents.

20     Therefore, the Borrower Trust believes it's addressed

21 and rebutted each of the claims raised by Ms. Eboweme and

22 respectfully requests that the claim be expunged.

23     THE COURT:  Can I ask you this?  Ms. Eboweme had filed

24 a Chapter 13 case in bankruptcy court in Texas --

25     MS. ROTHCHILD:  Yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

58

1        THE COURT:  -- correct?  Am I correct that the Texas

2  bankruptcy court, on three separate occasions, granted Bank of

3  America relief from stay?

4        MS. ROTHCHILD:  I believe two separate occasions.

5        THE COURT:  Okay, because I'm seeing September 13th,

6  2010 --

7        MS. ROTHCHILD:  Um-hum.

8        THE COURT:  -- granted the motion of BoA to foreclose

9  on the property.  On February 14th, 2011, granted BoA's stay

10  relief motion.  And on March 7th, 2011 -- oh, no, okay.

11  Well -- no, those are the two occasions; I thought there was a

12  third one.

13        MS. ROTHCHILD:  Right, so there are two.  Again, I

14  believe Ms. Eboweme, and I'm not sure what relation her -- the

15  other person, who is a co-borrower --

16        THE COURT:  Yeah.

17        MS. ROTHCHILD:  -- so Bank of America filed two

18  motions for stay relief, which were, for all intents and

19  purposes, identical.

20        THE COURT:  Okay.

21        MS. ROTHCHILD:  And it just took, I guess, awhile for

22  the court --

23        THE COURT:  All right.

24        MS. ROTHCHILD:  -- to enter those orders.

25        THE COURT:  Okay.  Let me see if I have other

**RESIDENTIAL CAPITAL, LLC, ET AL.**

59

1    questions.  So in March 2012, Ms. Eboweme filed an action in

2    the state court in Texas, alleging causes of actions for

3    wrongful foreclosure, lack of standing to foreclose, violations

4    of the bankruptcy stay, intentional infliction of emotional

5    distress, violations of RESPA, Texas Finance Code, Sections

6    392.30 and 392.304, and also the Texas Deceptive Practices Act.

7    It named GMAC, Bank of America, Bank of New York Mellon, and

8    Ferguson Christopher.

9         MS. ROTHCHILD:  Correct.

10        THE COURT:  And so in the claim that she's asserted

11   here, does it raise each of the causes of action that were

12   raised in her Texas state court complaint?

13        MS. ROTHCHILD:  Her proof of claim form does not list

14   all of those causes of action.  What we did, though, is we

15   reviewed -- she did file a response to the request letter that

16   the Borrower Trust had mailed out to her.

17        THE COURT:  Referring to the Texas action.

18        MS. ROTHCHILD:  Referring to it, and subsequently just

19   outlining --

20        THE COURT:  Okay.

21        MS. ROTHCHILD:  -- those very --

22        THE COURT:  So those are what I have to deal with.

23        MS. ROTHCHILD:  Correct.  And that is what the Trust

24   addressed --

25        THE COURT:  Yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

60

1          MS. ROTHCHILD:  -- in its objection.  And if Your

2     Honor would like, I can give a status update as to that

3     action --

4          THE COURT:  Sure.

5          MS. ROTHCHILD:  -- as there was a hearing on, I

6     believe, January 30th --

7          THE COURT:  Yes.

8          MS. ROTHCHILD:  -- of this year.  It is my

9     understanding that the judge is delaying his ruling because he

10    has asked that BABC put together an affidavit from Ocwen.

11    Ocwen has been asked to join that proceeding.  That would put

12    into evidence Ms. Eboweme's loan history and would effectively

13    track the evidence of her loan being part of the sale of loans

14    from GMAC Mortgage over to Ocwen.  It's taking some time.

15         THE COURT:  Well, the loan wasn't sold; the servicing

16    was sold.

17         MS. ROTHCHILD:  The ser -- excuse me, yes, the

18    servicing was sold.  That is expected to be submitted in the

19    next couple of weeks, and it is my understanding, though I

20    don't have a transcript before me, that the Court said that

21    once he receives this particular affidavit, that he will be

22    ready to rule, and that Ms. Eboweme has not refuted any of the

23    evidence that has been presented --

24         THE COURT:  Okay.

25         MS. ROTHCHILD:  -- and that she hasn't paid her loan,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    and the foreclosure is proper.

2            THE COURT:  All right.  I'm going to take the Eboweme

3    matter under submission.

4            MS. ROTHCHILD:  Okay.

5            THE COURT:  Thank you very much, Ms. Rothchild.

6            MS. ROTHCHILD:  Thank you, Your Honor.

7            My colleague, Jessica Arett, will be taking the next

8    matter on the agenda.

9            THE COURT:  Thank you very much.

10            MS. ARETT:  Good morning, Your Honor.  Jessica Arett

11    of Morrison & Foerster on behalf of the ResCap Liquidating

12    Trust.

13            The next claims objection matter on the agenda is

14    number 3, on page 10 of the agenda, the eighty-first omnibus

15    claims objection: duplicate claim, insufficient documentation

16    claims, no liability claims, redesignate and allow claim, and

17    reduce and allow claims.  It was filed at docket number 8013.

18    And it's going forward on an uncontested basis.

19            The purpose of this objection is multifold.  Through

20    the eighty-first omnibus claims objection, the Trust seeks to

21    expunge a total of 120 claims, reflected on Exhibits A, B, and

22    C, on grounds that they were substantially duplicative of

23    another claim filed by the same claimant, lacked sufficient

24    supporting documentation as to the validity and amount, and had

25    no basis in the debtors' books and records, or were not

**RESIDENTIAL CAPITAL, LLC, ET AL.**

62

1  reflected in the debtors' historical amounts payable.

2      THE COURT:  Let me ask you this.  I thought that this

3  was going forward as to Monty and Heather Allen.

4      MS. ARETT:  Yes, Your Honor, but the Trust

5  consensually resolved the Allen claim, and as a result, both

6  resolving the objection and --

7      THE COURT:  It would have been nice --

8      MS. ARETT:  -- the stay relief motion.

9      THE COURT:  --  if I knew this --

10      MS. ARETT:  I believe --

11      THE COURT:  -- before my law clerks and I had spent a

12  considerable amount of time preparing for the Allen issue.

13      MS. ARETT:  I apologize, Your Honor.  We resolved

14  it -- I believe the stipulation was signed yesterday.

15      THE COURT:  The way I learn, if you want to call it

16  that, is when reading the agenda.  On page 10, it shows the

17  eighty-first omnibus and says status: the hearing -- and it

18  lists the response from Monty and Heather Allen, and then it

19  says the matter is going forward on an uncontested basis.

20  Well, that' interesting; I'm glad we spent all this time

21  preparing.

22      MS. ARETT:  I apologize, Your Honor.

23      THE COURT:  Okay.  Well, you didn't get it resolved

24  until yesterday.  Okay.  Then let me short circuit the

25  discussion.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

63

1          So pending before the Court is the ResCap Liquidating

2    Trust's eighty-first omnibus objection to claims:

3    (A) Duplicative claims; (B) Insufficient documentation claims;

4    (C) No liability claims; (D) Redesignate and allow claim; and

5    (E) Reduce and allow claims.  It's at ECF 8013.

6          The Trust objects to one claim on the grounds that it

7    is duplicative of another claim.  See objection Exhibit 2A.

8          The Trust objects to ninety-three claims on the

9    grounds of insufficient documentation to support the claims.

10   See Exhibit 2B.

11         The Trust objects to twenty-seven claims on the ground

12   that the claims fail to establish liability on the part of the

13   debtors.  See Exhibit 2C.

14         The Trust seeks to redesignate and allow one claim,

15   Exhibit 2D, as well as to reduce and allow five claims, Exhibit

16   2E.

17         The objection is supported by the declaration of

18   Deanna Horst; that's at ECF 8031-2.

19         Two claims -- I think this remains correct.  Two

20   claims, 2091, by Wilson & Associates, and 434, by Fein, Such,

21   are not going forward.

22         Am I correct?

23         MS. ARETT:  The Trust has reached settlements with

24   both of these claimants --

25         THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MS. ARETT:  -- and to allow their claim in a modified

2     amount.

3          THE COURT:  All right.

4          MS. ARETT:  And these modifications will be reflected

5     on the updated exhibits that the Trust will provide to the

6     Court.

7          THE COURT:  Okay.  And you've advised me that claim

8     6768, filed by Monty and Heather Allen, has now been resolved.

9          MS. ARETT:  Correct.

10          THE COURT:  All right.  So the Court has -- I mean, if

11     there's something else you want to tell me --

12          MS. ARETT:  I think you covered it all, Your Honor.

13          THE COURT:  Okay.  So the Court has reviewed the

14     eighty-first omnibus objection, and other than those claims

15     that are not going forward today, the Court concludes that the

16     objections are properly supported and well taken, and the

17     objection is sustained.

18          MS. ARETT:  Thank you, Your Honor.

19          THE COURT:  Okay.  Thank you.

20          Mr. Silber, I think we're up to you.

21          MR. WISHNEW:  Jordan Wishnew for the ResCap Borrower

22     Claims Trust.

23          Again, Your Honor, my apologies for our office not

24     apprising you sooner of the Allen resolution.

25          THE COURT:  I'm happy it's resolved.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

65

 1          MR. WISHNEW:  As --

 2          THE COURT:  Sooner is always better than later, but --

 3          MR. WISHNEW:  Absolutely, Your Honor.

 4          THE COURT:  -- but resolved is better than not

 5   resolved; let me put it that way.

 6          Let me get the appearance on this.

 7          MR. WISHNEW:  Absolutely, Your Honor.

 8          Again, Jordan Wishnew for the ResCap Borrower Claims

 9   Trust, concerning item 4 on page 10, the ResCap Borrower Claims

10   Trust's objection to claim number 4222, filed by Todd Silber,

11   S-I-L-B-E-R.

12          THE COURT:  All right.  Mr. Silber, you want to make

13   your appearance?

14          MR. SILBER:  Good morning, Your Honor.  Again, sorry

15   for my tardiness.  I traveled --

16          THE COURT:  You weren't tardy.

17          MR. SILBER:  Okay.  Thank you.

18          THE COURT:  I just called your matter now.

19          MR. SILBER:  Okay.

20          THE COURT:  So --

21          MR. SILBER:  Excellent.  Todd Silber, pro se claimant,

22   for 4222.

23          THE COURT:  Okay.  Why don't you have a seat, and I'll

24   give you a chance --

25          MR. SILBER:  Thank You.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

66

1          THE COURT:  -- to respond, okay?

2          MR. WISHNEW:  Thank you, Your Honor.  Your Honor, so

3  the objection to Mr. Silber's claim was filed at docket number

4  7979.  Mr. Silber filed a response on January --

5          THE COURT:  This is claim 4222?

6          MR. WISHNEW:  Yes, Your Honor.

7          THE COURT:  Okay.

8          MR. WISHNEW:  Mr. Silber filed a response to the

9  objection on January 30th, which was docketed at 8024.  The

10  Trust filed its reply on February 20th at docket number 8160.

11          Your Honor, through this objection, the Borrower Trust

12  seeks to expunge Mr. Silber's claim.  The Borrower Trust

13  asserts the allegations in the proof of claim are without

14  merit, as Mr. Silber has failed to allege how the debtors' pre-

15  petition actions give rise to liability for the stated causes

16  of action.  Accordingly, the Borrower Trust believes the claim

17  does not represent a valid pre-petition claim against the

18  debtors' estates.

19          In support of the objection, the Borrower Trust

20  submitted two declarations from Ms. Priore, who was associate

21  counsel to the ResCap Liquidating Trust.  The first is attached

22  as Exhibit 2 to the objection, and the second -- our

23  supplemental declaration is Exhibit 1 to the reply.  Ms.

24  Priore's on the phone today and available to answer any

25  questions the Court might have.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

67

1           Your Honor, what this claim is really about is whether

2    or not GMAC Mortgage properly did its job as servicer of Mr.

3    Silber's mortgage loan.  It is our contention that we did, that

4    there was multiple loan modification efforts that were

5    undertaken, that when paperwork was submitted by Mr. Silber to

6    substantiate a possible modification, what was submitted was

7    not sufficient to allow GMAC Mortgage, as servicer, to grant a

8    modification consistent with the guidelines that bind -- within

9    which it had to operate.

10          THE COURT:  So what guidelines did it have to operate

11   under?

12          MR. WISHNEW:  So specifically, Your Honor, we're

13   talking about the HAMP guidelines.  And what's at issue is that

14   Mr. Silber had been receiving unemployment income, and -- at

15   the time that the modification was requested, and the HAMP

16   guidelines require there be evidence of nine months of

17   unemployment income, and what we received was short of that

18   nine months, and so we -- consistent with the guidelines, we

19   couldn't agree to a modification where the information that was

20   being provided was not consistent with the guidelines that were

21   outlined.

22          THE COURT:  May I ask you this?

23          MR. WISHNEW:  Sure.

24          THE COURT:  So if a borrower is receiving state

25   unemployment benefits, and three months into receiving the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

68

1  benefits, they seek a loan modification, do they have to show

2  that they were assured of nine months of benefits from the

3  first time -- from the time they first received it or nine

4  months of benefits going forward from the time that they're

5  seeking the modification?

6      MR. WISHNEW:  I would argue the latter, Your Honor.

7  If you look to --

8      THE COURT:  Is that -- that's in the guidelines?

9      MR. WISHNEW:  That is in the guidelines, and I'll

10 reference my reason.  If you look to Exhibit T, to Ms. Priore's

11 declaration, docketed at 7979-23, specifically page 8 of the

12 guidelines, which has been stamped page 9 of 39 to the exhibit,

13 it says, "If the borrower receives public assistance or

14 collects unemployment; acceptable documentation includes

15 letters, exhibits, or a benefit statement from the provider

16 that states the amount, frequency, and duration of the benefit.

17 The servicer must determine that the income will continue for

18 at least nine months."  So I think that phrase suggests that

19 it's nine months starting at the time of the modification

20 request.

21     THE COURT:  Um-hum.  May I ask this?  At any point,

22 did the debtors provide Mr. Silber with a copy of the HAMP

23 guidelines?  And I know, I read, I see that there are issues as

24 to when you received notice of what, whether he was told that

25 unemployment benefits could or couldn't be considered; but my

**RESIDENTIAL CAPITAL, LLC, ET AL.**

69

1    specific question is -- and this I don't seem to -- was he

2    actually provided with a copy of the guidelines?

3          MR. WISHNEW:  As Your Honor notes, we were -- I

4    believe our reply at paragraph 17 addresses that we informed

5    him of the requirements.  I'm not certain whether we actually

6    provided him with a hard copy of the requirements.  I would

7    need to go back and check.

8          THE COURT:  Tell me again which exhibit has the HAMP

9    guidelines?  I'm at the --

10         MR. WISHNEW:  Yes, Your Honor.  It's Exhibit T as in

11   Tom.

12         THE COURT:  Okay, just a second.  Just give me a

13   second.

14         MR. SILBER:  Which document is that?  Is that your

15   original complaint or your second reply?

16         MR. WISHNEW:  First.

17         MR. SILBER:  I mean, I'm sorry, your first objection?

18         MR. WISHNEW:  It's the first one.  Yeah.

19         THE COURT:  Well, let's make sure that Mr. Silber has

20   what we're focusing on.

21         MR. SILBER:  Would that be the Exhibit that has "HAMP"

22   on the -- across the top of it?

23         MR. WISHNEW:  Yeah, hold on one minute.

24         MR. SILBER:  Okay.  No, that's fine.  No, I know which

25   one you're talking about.  Okay.  I know what they're talking

**RESIDENTIAL CAPITAL, LLC, ET AL.**

70

1  about.

2          THE COURT:  You have it?

3          MR. SILBER:  I don't require it, because it doesn't

4  pertain to me.

5          THE COURT:  Okay.  I just -- when I have a hearing and

6  the counsel is referring to a document, I want to be sure that

7  if the other side wants it, they have it in front of them.

8          MR. SILBER:  I have -- I have it, Your Honor.

9          THE COURT:  Okay.  All right.

10          MR. SILBER:  I do know -- I do know what they're

11  referring to.

12          THE COURT:  Go ahead.  Go ahead, Mr. Wishnew.

13          MR. WISHNEW:  Your Honor --

14          THE COURT:  What paragraph, what page?

15          MR. WISHNEW:  Oh, I'm sorry, Your Honor.  Yes.  It's

16  page 8 of the supplemental directive, marked as 9 of 39.

17          THE COURT:  Okay.  And your focus --

18          MR. WISHNEW:  It's the top -- very top of the page,

19  starting with, "If the borrower receives public assistance or

20  collects unemployment."

21          THE COURT:  Okay.  I see what you're talking about.

22          Let me ask this:  Because one of the claims that Mr.

23  Silber asserts is breach of contract.

24          MR. WISHNEW:  Yes, Your Honor.

25          THE COURT:  And he refers, specifically, to the note.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MR. WISHNEW:  Yes, Your Honor.

2          THE COURT:  What is the Trust's position -- and he

3    argues, I guess, both breach of contract and breach of covenant

4    of good faith and fair dealing.

5          MR. WISHNEW:  Um-hum.

6          THE COURT:  But both refer to a contract.

7          MR. WISHNEW:  Um-hum.

8          THE COURT:  What is the Trust's position as to whether

9    the HAMP guidelines are incorporated into the terms of the

10   note, expressly or by implication?

11         MR. WISHNEW:  And up -- right.

12         THE COURT:  Where's the note?  Look at the note.

13         MR. WISHNEW:  Sure.  The note is Exhibit C, as in

14   Carl --

15         THE COURT:  Okay.

16         MR. WISHNEW:  -- to Ms. Priore's declaration.

17         THE COURT:  Show -- let's make sure we're all looking

18   at the same thing.  Show him --

19         Mr. Silber, do you know what I'm talking about, now?

20         MR. SILBER:  That's the note that I'm disputing is not

21   the correct one, Your Honor.  There's one that I included in my

22   reply, which is the correct note.

23         THE COURT:  Well --

24         MR. SILBER:  I believe --

25         THE COURT:  I'm not -- I'm not getting into whether

**RESIDENTIAL CAPITAL, LLC, ET AL.**

72

1    it's --

2         MR. SILBER:  I believe the writing in the note's the

3    same.

4         THE COURT:  Look, the typed text of the notes are

5    not -- don't differ.

6         MR. SILBER:  Correct.

7         THE COURT:  You have a dispute about endorsements.

8         MR. SILBER:  Correct.

9         THE COURT:  So am I correct that you do not dispute

10   the typed terms of the note?

11        MR. SILBER:  Correct.

12        THE COURT:  Got it.  Okay.

13        So on this issue of whether the HAMP guidelines are --

14   should be incorporated within the terms of the note, what's

15   your position on that?

16        MR. WISHNEW:  Our position is that there's nothing on

17   the face of the note that incorporates the HAMP guidelines.

18     (Pause)

19        THE COURT:  If you look at paragraph 6, capital B.

20        MR. WISHNEW:  Um-hum.

21        THE COURT:  "If borrower defaults by failing to pay in

22   full any monthly payments, then lender may, except when limited

23   by regulations of the Secretary in the case of payment

24   defaults, require immediate payment in full of the principal

25   balance remaining due and all accrued interest."  Well, let

**RESIDENTIAL CAPITAL, LLC, ET AL.**

73

1    me -- hold on.  And then it goes -- I'll leave some language

2    out.

3              MR. WISHNEW:  Sure.

4              THE COURT:  And then it says, in that same paragraph,

5    "This note does not authorize acceleration when not permitted

6    by HUD regulations."

7              MR. WISHNEW:  Right.

8              THE COURT:  So the reference to -- the references to

9    "the Secretary", who is that to?

10             MR. WISHNEW:  So if you look at the sentence after the

11   one you just referenced, Your Honor, at the end of section

12   6B --

13             THE COURT:  Yes.

14             MR. WISHNEW:  -- of the note, it says, "As used in

15   the" -- sorry.  "As used in this note, 'Secretary' means

16   Secretary of Housing and Urban Development or his or her

17   designee."

18             THE COURT:  Okay.  Who issued HAMP?

19             MR. WISHNEW:  HAMP, I believe, was a Congressional

20   action, Your Honor.

21             THE COURT:  No.

22             MR. SILBER:  Your Honor, I think I can settle the

23   conf --

24             THE COURT:  No.  I'll give you a chance, Mr. Silber.

25             MR. SILBER:  Okay.  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

74

1              THE COURT:  Isn't it the Department of Housing and

2    Urban Development that's issued the HAMP regulations and has

3    modified them from time to time?

4              MR. WISHNEW:  On further --

5              THE COURT:  I used to follow all the modifications.

6              MR. WISHNEW:  Right, I --

7              THE COURT:  I haven't, of late, but that was my

8    understanding.

9              MR. WISHNEW:  I think --

10              THE COURT:  If I'm wrong, you'll correct me.

11              MR. WISHNEW:  I might have misstated that, Your Honor.

12    I believe your understanding is correct.

13              THE COURT:  It was executive action, the HAMP program

14    was created by --

15              MR. WISHNEW:  Right.

16              THE COURT:  -- the Department of Housing and Urban

17    Development, and the regs have been modified from time to time.

18    That's why -- so let me ask the question -- and obviously,

19    "this note does not authorize acceleration when not permitted

20    by HUD regulations."  That's why I asked my question, whether

21    the note incorporates the HAMP regulations as in effect from

22    time to time by virtue of paragraph 6B.

23              Well, so what I'm -- here's what I'm -- it's not

24    intended as a trick question.  What I'm trying to figure out in

25    my mind --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

75

1              MR. WISHNEW:  Sure.

2              THE COURT:  Mr. Silber argues GMAC breached the

3    contract.

4              MR. WISHNEW:  Um-hum.

5              THE COURT:  He refers to the note.

6              MR. WISHNEW:  Um-hum.

7              THE COURT:  It does seem to me that the note -- not

8    crystal clear, but does seem to incorporate HUD regulations.

9    If HAMP or HUD regulations, okay, then I've got to look to

10   those, as well.

11             MR. WISHNEW:  Um-hum.

12             THE COURT:  Then the issue becomes, did GMAC comply

13   with the HUD regulations?

14             MR. WISHNEW:  Um-hum.

15             THE COURT:  You say they did.

16             MR. WISHNEW:  Um-hum.

17             THE COURT:  Mr. Silber says they didn't.  Is that a

18   fair --

19             MR. WISHNEW:  I would say that's a fair

20   characterization.

21             THE COURT:  Okay.  And so I need to know what your

22   position is -- may -- for purposes of deciding this motion, may

23   the Court consider the HAMP regulations as incorporated into

24   the terms of the note?  I'm not asking you to decide for all

25   matters --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1            MR. WISHNEW:  No, no, I underst --

2            THE COURT:  Otherwise you're going to wind up briefing

3    an issue --

4            MR. WISHNEW:  Right, no.

5            THE COURT:  -- and I don't think you want to.

6            MR. WISHNEW:  Understood, Your Honor.  I just want to

7    briefly --

8            THE COURT:  I mean, you take the position you did

9    comply.

10            MR. WISHNEW:  That's exactly right, Your Honor.  I

11   mean, I think it is clear that we did comply, so I don't see

12   any reason why we shouldn't concede it, but I just want to make

13   sure that the language would be consistent with that.  And I

14   think that, to the extent HAMP is a regulation issued by HUD,

15   and to the extent that there are two particular circumstance in

16   which the HUD regulations have to be considered by the lender,

17   then, yes, HAMP is incorporated.

18            And what I mean by that, Your Honor, is that -- it

19   says, "In many circumstance regulations issued by the Secretary

20   will limit lenders' rights to require immediate payment in

21   full.  This note does not authorize acceleration when not

22   permitted by HUD regulations."

23            THE COURT:  Let me make sure I'm not missing anything,

24   because in the first paragraph of Exhibit T, the HAMP program,

25   it refers to Treasury announced the modification, it doesn't

**RESIDENTIAL CAPITAL, LLC, ET AL.**

77

1     say HUD.  So I don't want -- I'm not trying to get you to agree

2     to something that you shouldn't.

3          MR. WISHNEW:  You know, as Your Honor points out, it

4     does say -- again, referring to the first page of Exhibit T,

5     "As part of this plan the Treasury Department announced a

6     national modification program."  Next sentence begins:  "On

7     March 4th, 2009, the Treasury issued uniform guidance for loan

8     modifications across the mortgage industry."  Following

9     sentence:  "This supplemental directive provides additional

10    guidance to servicers for" --

11          THE COURT:  Wait, I just -- let me stop you there.  My

12    law clerk has just handed me a note that the HAMP Web site says

13    it is an official program of the Department of Treasury and

14    HUD.

15          MR. WISHNEW:  That would be consistent with the

16    background -- the first --

17          THE COURT:  Okay.

18          MR. WISHNEW:  -- paragraph of the background.

19          THE COURT:  All right.  So I just wanted to look at

20    the Web site, but without the necessity of briefing --

21          MR. WISHNEW:  Of course, Your Honor.

22          THE COURT:  -- the issue, for purposes of this matter

23    only --

24          MR. WISHNEW:  Yes.

25          THE COURT:  -- may the Court consider the HAMP

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    guidelines as incorporated into the note for purposes of

2    analyzing the breach of contract, breach of covenant, of good

3    faith and fair dealing claims?

4            MR. WISHNEW:  Yes, Your Honor.

5            THE COURT:  Okay.  All right.  That just makes it a

6    little -- I want to be sure I understand what -- because look,

7    in other matters, I've held clear there is no private right of

8    action under HAMP.

9            MR. WISHNEW:  Right.

10           THE COURT:  That's well established.  But the issue of

11   whether a breach of contract claim can support a violation is a

12   different issue.

13           MR. WISHNEW:  Um-hum.

14           THE COURT:  Okay.  All right.  Go ahead.

15           MR. WISHNEW:  Your Honor, I mean, we are comfortable

16   relying on our papers, both in the objection and the reply.

17   Unless Your Honor has other questions, I'm happy to defer to

18   Mr. Silber and address any points he raises.

19           THE COURT:  All right.  Let me -- I think I have some

20   more questions.  Let me --

21       (Pause)

22           THE COURT:  A focus of my consideration is whether

23   there are disputed issues of fact that cannot be resolved on

24   your current motion, the objection.  Issues which may or may

25   not fall into that category are whether Mr. Silber provided

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    satisfactory proof of unemployment income at various times,

2    because he had multiple work-out packages that he submitted.

3        He also raises the issues, which you really -- this

4    part of it, you don't dispute -- regarding the December 8th

5    2010 e-mail from the -- to the Assistant Attorney General of

6    Connecticut in which the GMAC employee stated that unemployment

7    income could not be considered in the review of a loan

8    modification.  You don't dispute that that e-mail exists.  What

9    you argue is that both before and after that e-mail, both

10   orally and in writing, GMAC advised Mr. Silber about what

11   evidence he would have to provide for GMAC to consider

12   unemployment income in evaluating a modification.  Is that a

13   fair statement?

14        MR. WISHNEW:  That's a fair statement, Your Honor.

15        THE COURT:  The other -- before I let Mr. Silber

16   argue --

17      (Pause)

18        THE COURT:  There are two causes of action that do not

19   appear to be addressed in the Trust's papers.  One -- and this

20   relates to Mr. Silber's allegations regarding false

21   representations.  And it seems to me there are three potential

22   causes of action that have to be examined:  defamation, fraud,

23   and negligent misrepresentation, and the Trust didn't address

24   negligent misrepresentation in its papers.  The other cause of

25   action that isn't addressed is the Connecticut Unfair Trade

**RESIDENTIAL CAPITAL, LLC, ET AL.**

80

1  Practices Act.

2          It seems to me that all three -- when I say all three,

3  the breach of contract -- and I'm including good faith and fair

4  dealing because that falls within the breach of contract.  The

5  breach of contract, negligent misrepresentation, Unfair Trade

6  Practices Act:  all three of those hinge on the same facts, as

7  to which it appears to me that there are disputed issues.  The

8  Trust comes forward with documents to support its arguments.

9          Mr. Silber, let me ask you this:  you're not a lawyer,

10  correct?

11          MR. SILBER:  No, sir.

12          THE COURT:  Okay, so you did a good job with your

13  papers, okay?

14          MR. SILBER:  Thank you.

15          THE COURT:  But you didn't provide the Court with an

16  affidavit or a declaration, which is a sworn statement.  Am I

17  correct that whatever factual assertions you put in your

18  response to the objection, you would be prepared to testify to,

19  under oath?

20          MR. SILBER:  Yes, sir.  I thought I included that in

21  my response to their objection, as well, underneath penalty of

22  perjury, to the best of my knowledge.

23          THE COURT:  Okay.

24          MR. SILBER:  I believe it's on the last page.

25          THE COURT:  All right.  I'm assuming -- I may --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

81

1          MR. SILBER:  But I would do that today --

2          THE COURT:  I may have missed it.

3          MR. SILBER:  -- as well, Your Honor.

4          THE COURT:  I was assuming that whatever you put in

5    here, that was a -- purports to be a statement of fact, that

6    you're prepared to testify under oath.

7          MR. SILBER:  Yes, sir.

8          THE COURT:  Okay.  You know, there are some of the

9    claims that Mr. Silber asserts that appear to be barred by

10   statute of limitations.  I'm going to hear Mr. Silber's

11   argument.

12          I'm mainly focused, Mr. Silber, on the breach of

13   contract claim, the negligent misrepresentation claim, and the

14   Connecticut Unfair Trade Practices Act claim.  You can argue --

15   I'm not limiting your argument to that.

16          MR. SILBER:  Right, we're talking about that right

17   now.  I understand.

18          THE COURT:  All right.  It, frankly, seems to me, Mr.

19   Wishnew, that all three -- as I said, all three of those claims

20   hinge on the same facts.  And while I haven't made a final

21   decision about it, I'm uncomfortable -- it appears to me, Mr.

22   Silber's entitled to an opportunity to testify from the witness

23   stand, give his testimony, have you cross-examine him if you

24   choose to cross-examine him, and then the Court decide those

25   claims with the factual record.  It seems to me that -- if I

**RESIDENTIAL CAPITAL, LLC, ET AL.**

82

1   were to hold an evidentiary hearing, Mr. Wishnew, who would

2   testify on behalf of the Trust, do you know?  Do you know at

3   this point?

4           MR. WISHNEW:  My instinct --

5           THE COURT:  Most of these are relying on business

6   records, I think.

7           MR. WISHNEW:  Yeah.  My guess would be it would

8   probably be Ms. Priore --

9           THE COURT:  Okay.

10          MR. WISHNEW:  -- who would -- because much -- really,

11  her declaration is derived from the servicing notes which we

12  attached to the reply, and so she would -- and so her knowledge

13  would be based upon the servicing notes and she would interpret

14  the servicing notes to say, this is what happened on this day

15  based upon the contemporaneous recording put into the servicing

16  notes, based on my communication that either was had with Mr.

17  Silber or went out to Mr. Silber or the like.

18          THE COURT:  Mr. Silber disputes the Trust's position

19  about what was said during the mediation in Connecticut.  Who

20  appeared on behalf of GMAC in the Connecticut mediation?  Do

21  you know?

22          MR. WISHNEW:  I don't know offhand, Your Honor.

23          THE COURT:  Mr. Silber?

24          MR. SILBER:  Your Honor, nobody appeared in the

25  mediation.  Every time they needed to step out, they stepped

**RESIDENTIAL CAPITAL, LLC, ET AL.**

83

1   out of the room with the mediator as the only witness and made

2   a phone call.

3         THE COURT:  It's not a witness.  They -- GMAC had

4   somebody who just appeared by telephone?

5         MR. WISHNEW:  That's right, Your Honor.

6         MR. SILBER:  Not in the room during the time.

7         THE COURT:  Yeah.

8         MR. SILBER:  They kept stepping out of the room and

9   walking away.

10        MR. WISHNEW:  What --

11        MR. SILBER:  So we had no idea what was going on.  It

12  wasn't like a conference call or a speaker-phone.

13        THE COURT:  No, no, no.  But he -- somebody --

14        MR. WISHNEW:  There was a representative --

15        THE COURT:  A representative --

16        MR. WISHNEW:  -- on the phone.

17        THE COURT:  -- was either in person or on the

18  telephone.

19        MR. SILBER:  Not every time, Your Honor.  Not every

20  time.  There's two -- there's two times where mediation was

21  not -- was deemed to be not enforceable.  They weren't able to

22  collect fees on that because they didn't bring the proper

23  documents to mediation, and GMAC wasn't re --

24        THE COURT:  Well, there was also a time when you

25  didn't show up, either.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

84

1          MR. SILBER:  Well, I gave the reason for that, Your

2     Honor.  There was no further point to --

3          THE COURT:  I'm not getting into that.

4          MR. SILBER:  -- waste anybody else's time.

5          THE COURT:  No, but you're saying that --

6          MR. SILBER:  I also am not charging to be there.

7          THE COURT:  But you're -- one of the arguably factual

8     disputes is to what was the mediator told by each side?

9          MR. SILBER:  Correct.

10          THE COURT:  Okay.  And so, Mr. Wishnew, you may need

11    to call, figure out who was the representative who appeared for

12    the debtor at the mediation.  It does seem to me, some of Mr.

13    Silber's assertions regarding the mediation are the same

14    underlying facts that are disputed with respect to the breach

15    of contract, Unfair and Deceptive Trade Practices Act, and

16    negligent misrepresentations claims.  Okay?

17          It seems to me, Mr. Silber, if I decide -- what I'll

18    do is, I'm going to enter an order -- not today, but I'm going

19    to enter an order after this hearing, and if I conclude that we

20    need to have a factual -- an evidentiary hearing, you'll show

21    up?  Is there anybody other than yourself who is testifying on

22    your behalf?

23          MR. SILBER:  I think I can call the court-appointed

24    mediator.

25          THE COURT:  You can't.  There's -- mediators have a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

85

1    privilege.  You can't, but --

2              MR. SILBER:  Very well.  I don't know.  It would just

3    be me and my word --

4              THE COURT:  Okay.

5              MR. SILBER:  -- but I was there through the whole

6    thing.

7              THE COURT:  Well, that's what happens in court

8    sometimes.

9              MR. SILBER:  Yes, sir.

10             THE COURT:  But, Mr. Wishnew, you may need to call

11   somebody to testify from the Trust's -- from the former

12   debtors' --

13             MR. WISHNEW:  Um-hum.

14             THE COURT:  -- standpoint --

15             MR. WISHNEW:  Okay.

16             THE COURT:  -- about that.  Okay.  Let me hear from

17   Mr. Silber, okay?

18             Go ahead, Mr. Silber.

19             MR. SILBER:  Your Honor, it's my po --

20             THE COURT:  You've got a lot of papers, so if you want

21   to do it from there, you can --

22             MR. SILBER:  I'm just doing -- I'm only touching base

23   on what we touched base on so far, which is --

24             THE COURT:  Okay.

25             MR. SILBER:  -- the HAMP.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

86

1          THE COURT:  That's fine.

2          MR. SILBER:  Or the -- okay.  It's my position, Your

3    Honor -- first of all, they replied to my reply, and I only got

4    that reply Monday afternoon, so I had no time to reply to that.

5    Since they --

6          THE COURT:  Ordinarily, I don't allow a reply to a

7    reply, okay?  But go ahead.

8          MR. SILBER:  They replied to my reply.

9          THE COURT:  They get to do that.

10          MR. SILBER:  Okay.

11          THE COURT:  So the way it goes, they file an

12    objection, you file your response, the get to reply.  But go

13    ahead.

14          MR. SILBER:  Based on that, Your Honor, underneath --

15    pursuant to Rule 15 of amended and supplemented pleadings, I

16    don't require any new evidence or argument to be brought

17    forward, just a few more complaints to be put onto the docket.

18          THE COURT:  Well, all right --

19          MR. SILBER:  And based on objections during a trial, a

20    party objects to evidence that's not within the issue raised in

21    the pleadings, the court may permit the pleadings to be

22    amended.

23          THE COURT:  I don't, okay?  You had to put -- what I

24    go by is what's in your -- I'm going to listen to you, okay?

25    But I start with your proof of claim --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1              MR. SILBER:  Correct.

2              THE COURT:  -- and how that's been supplemented by --

3    or providing additional information to the Trust and the Court.

4    Okay?  That's what the Court decides whether you've stated the

5    claim and whether I have to have an evidentiary hearing.  But

6    why don't you tell me -- go ahead.  Don't let me interrupt you.

7              MR. SILBER:  Your Honor, this is just based off of,

8    they never filed the reply to my original complaint.

9              THE COURT:  I -- but go --

10             MR. SILBER:  That was stayed, and I couldn't amend it,

11   and now they're filing an objection underneath Section 2 of

12   Rule 15 saying that what I'm saying doesn't apply to those

13   laws.  They're saying underneath a matter of Connecticut law --

14             THE COURT:  Just make your argument.

15             MR. SILBER:  Okay.  A breach of fiduciary duty for the

16   same reasons as defamation, false representation --

17             THE COURT:  They don't owe you -- they don't owe you a

18   fiduciary duty.  They don't.

19             MR. SILBER:  Okay.  Defamation, as you already stated,

20   and then with the evidence they brought forward from the phone

21   logs, the phone calls in their latest reply, harassment.

22             THE COURT:  Harassment?

23             MR. SILBER:  Yes, sir.  Unwarranted phone calls.

24   Countless phone calls meant to harass, frustrate, and wear down

25   the plaintiff's patience, the acts of -- the act of systematic

**RESIDENTIAL CAPITAL, LLC, ET AL.**

88

1    and/or continuing unwarranted and annoying actions of one party

2    or group, including threats and demands.

3              THE COURT:  Okay, I'm not going to permit that to be

4    asserted.  Okay?  You --

5              MR. SILBER:  Very well.  Def --

6              THE COURT:  You could have asserted that long ago.

7              MR. SILBER:  I had to wait for them to object to my --

8              THE COURT:  No, you didn't.

9              MR. SILBER:  -- complaint.

10             THE COURT:  No, you didn't.  If --

11             MR. SILBER:  Very well.

12             THE COURT:  If that was the basis for your claim, you

13   could have asserted that as the basis for a claim.

14             MR. SILBER:  Okay.

15             THE COURT:  Okay.  The way it works in bankruptcy,

16   creditors get to file a proof of claim.  I understand you don't

17   have a lawyer.  I'm not holding you to the legal --

18             MR. SILBER:  Oh, I --

19             THE COURT:  -- technicalities.

20             MR. SILBER:  I understand that, Your Honor.  I

21   understand.

22             THE COURT:  Okay.

23             MR. SILBER:  I thought that this would be -- I

24   thought -- I'd have -- it's my own fault.  I thought today was

25   counted as my court date, which would happen in my federal

**RESIDENTIAL CAPITAL, LLC, ET AL.**

89

1    court, but it's being heard here, instead.  So, this isn't --

2    we're at -- we're not at this step, yet.  I understand that.

3              THE COURT:  Okay.

4              MR. SILBER:  Or maybe it will be permitted in the

5    future.

6              THE COURT:  All right.

7              MR. SILBER:  No problem.

8              THE COURT:  Go ahead.

9              MR. SILBER:  My position is that I did everything I

10   could to work with them, and you can see the countless letters

11   and the countless attempts.  The reason why there was multiple

12   applications sent month after month is because one day I was

13   speaking to one person and the next day I was speaking to

14   another person.

15              There's also the misconception that they keep

16   referring to HAMP.  There's FHA HAMP, which is different.  And

17   FHA HAMP does show that I only have to show reasonable

18   assurance of when the time of the unemployment benefits started

19   until it's over.  Reasonable assurance.  My declaration is they

20   had no methodology to determine reasonable assurance when they

21   thought they only had to be nine months, and their applications

22   were nine months when, indeed, it was twelve months.

23              Now, point be told, I showed them the letters and the

24   extensions that are acceptable as reasonable assurance.  I

25   showed them the extensions from the state.  I showed them

**RESIDENTIAL CAPITAL, LLC, ET AL.**

90

1    letters from the Massachusetts Department of Unemployment,

2    which has been included in these replies that they submitted as

3    evidence.  Reasonable assurance is just that -- reasonable

4    assurance.

5            THE COURT:  Well, I mean --

6            MR. SILBER:  So --

7            THE COURT:  Go ahead.

8            MR. SILBER:  They can't -- it's -- with all due

9    respect, whatever GMAC's position is on what I need to give

10   them has very little merit or relevance, it's what HUD's

11   requiring.  And in my position, they knew the requirements for

12   FHA HAMP, they knew the requirements for HAMP, they knew the

13   requirements for this modification, and this modification, and

14   each time they put me into one, they put me into one that I

15   knew that they knew I would be disqualified for.

16           There is plenty opportunity underneath HUD mortgage

17   letters that shows that they have to do X, Y, and Z, and they

18   didn't.  It shows that there's -- whenever a stipulation isn't

19   met -- let's say it was nine months of unemployment and I am

20   showing them eight months, Connecticut mediation Senate House

21   Bill 5270, An Act Concerning Foreclosure Mediation, says

22   demonstrating reasonable efforts by the mortgagee or its agent

23   to obtain a waiver of those restrictions.  We have something

24   called a variance compliance request that FHA has.

25           And that's just it.  When there's a thirty-one percent

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  debt-to-income or a fifty-five percent back income, those are

2  just guidelines.

3        THE COURT:  Let me ask you this:  what is your

4  position, if your unemployment insur -- payments were included

5  in your income, would you have satisfied the thirty-one percent

6  standard in HAMP?

7        MR. SILBER:  Including the waterfall program, it would

8  have been thirty-three percent, in which case a variance

9  compliance request could have been filed.  And according to

10  FHA, they went up to forty-five percent at times.  They were

11  not using my unemployment as income when they sent it over.

12  They were only using the rental income I was getting from my

13  girlfriend at the time, the mother of my children at the time.

14  That's all that they were using.

15        And then, we also have, not only did they hinder me

16  from participating in these programs, but I have cut and dry

17  ev -- well, I have all the evidence today about the EHLP

18  program that doesn't have to do the FHA or HUD.  It's a

19  Connecticut CHFA program, only.  And they gave them the wrong

20  information; and the dollar amount they told them was about

21  4,000 dollars more than what the program allowed, and it

22  terminated me from participating in that program.

23        THE COURT:  So that's the issue of whether you owed

24  more than 50,000 dollars, right?

25        MR. SILBER:  Your Honor, the program was they would

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**92**

1  pay the past due arrearages, and then they would help you with

2  the payment.  There's a letter

3        THE COURT:  But arrearages

4        MR. SILBER:  Correct.

5        THE COURT:  So, look, as I understand your dispute

6  with the Trust, you have only con    in determining whether

7  you're under that    it's a 50,000-dollar threshold, right?

8        MR. SILBER:  I had an approval    yes, sir.

9        THE COURT:  Okay.  The issue there is whether they

10  look at only unpaid principal or unpaid principal plus all

11  accrued interest.  The Trust's position, as I understand it,

12  was that with unpaid principal and interest the amount that you

13  owed exceeded 50,000 dollars.  Do you agree or disagree to that

14  as a factual matter?

15        MR. SILBER:  Disagree.  Disagree.

16        THE COURT:  Okay.

17        MR. SILBER:  And I think    I think only because they

18  determine a portion of your mortgage payment to be paid.  They

19  determine that my payment would be 878 and CHFA would pay

20  1,112.  The minimum requirements for that program is they have

21  to be able to help you for six months.  So when you take the

22  amount that they were going to pay, plus the amount that they

23  gave them, that exceeded the 50,000 dollars by 494 dollars.

24        That money that they gave them, the 43,000, Your

25  Honor, included a payment that was due for September when they

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  told them this on August 25th.  That payment was not due on

2  that date, it's not past due until the 15th, and that amount

3  doesn't get added into what's past due until the 25th in their

4  system.  Their evidence that they provided shows that.  Late

5  payments from the month that are due on the 1st isn't even

6  added to the 25th, so they double-dipped.  Let alone, the

7  reinstatement figure given to CHFA specifically asked total

8  past due less fees.  They included an inspection fee, which I

9  had no idea, which I want an itemization on; advances for 15/7,

10  which I have no idea, and I'd like an itemization on.

11          THE COURT:  How much were the amount of the advances?

12          MR. SILBER:  1,577.30.

13          THE COURT:  How were your property taxes being paid?

14          MR. SILBER:  Through escrows through them.  And they

15  actually   there's no dispute with the escrow, Your Honor.

16  The escrow's included in the past due amount up here.  The

17  escrows is included in the total amount past due less fees.

18          THE COURT:  I don't know, I'm not   I'm speaking

19  hypothetically now.

20          MR. SILBER:  I have the documentation to show you.

21          THE COURT:  I'm not speaking about the specific facts

22  in your matter.  A mortgagee ordinarily advances past due taxes

23  to avoid a lien, and then that gets added to the amount of

24  mortgage debt.  Is that what is at stake here   at issue

25          MR. SILBER:  As of

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    THE COURT:     with respect to the advances?

2    MR. SILBER:  I'm disputing the escrow because they're

3  already putting in the total fees.  Here's a declaration they

4  gave me as of 8/9/2011, and it shows the past due amount is

5  2,637, and then what you add in the escrow of 9,443, it starts

6  putting us closer to that ballpark with the additional pre-

7  accelerated late charges.  I have no idea what that is.  That

8  puts us closer     that puts us at the 37,000-dollar mark.  If

9  you take the 37,000 plus the six payments that CHFA would have

10  paid, that only puts me at 44,000 dollars as far as that 50,000

11  dollars is concerned.

12    They also said there's no guarantee I would pay that.

13  However, we know the year before that I paid 955 for six months

14  in the forbearance plan.

15    THE COURT:  All right.  I'm not     look, I'm not

16  resolving factual issues today.

17    MR. SILBER:  Okay.  All right, I'm sorry.  I

18    THE COURT:  I'm trying     no, no, no, that's fine.

19  Your argument's fine.

20    MR. SILBER:  There's also

21    THE COURT:  Look, Mr. Silber, I'm trying to understand

22  I want to be sure I understand what are the factual issues.

23  That if we go forward with an evidentiary hearing, what is it

24  that I'm going to hear about, okay.  That's what I'm trying to

25  do now.  I'm not deciding

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MR. SILBER:  Okay.

2          THE COURT:  I mean, I   the fiduciary duty point that
3    I know the law, they don't owe you a fiduciary duty.  Okay.  So
4    you're not adding that to your argument.

5          MR. SILBER:  I don't mean to pick at it.

6          THE COURT:  Then don't.

7          MR. SILBER:  And if your word is final, I don't want
8    to argue.

9          THE COURT:  Let's go on.

10          MR. SILBER:  Okay, sorry.

11          Also in the total past due fees, they included that
12    September payment which wasn't due at that time.

13          THE COURT:  Go ahead.

14          MR. SILBER:  Let alone they included it again, because
15    CHFA specifically asked next due amount PI, next due amount
16    PITI 1990.80, which was my next payment.  So they added it in.

17          There's also foreclosure advances in the amount of
18    1,991.  But CHFA specifically makes mention that when they
19    asked for the past due arrearages there may be additional fees,
20    reasonable attorney fees, because they weren't   they weren't
21    determining that these fees were valid.  And as we know, the
22    fees that the attorneys asked for was not awarded in full by
23    the end.

24          At this point there were four mediation sessions, 250
25    dollars a session.  Two of those mediation sessions were not

**RESIDENTIAL CAPITAL, LLC, ET AL.**

96

1    awarded because they weren't bringing the proper documents

2    according to Senate House Bill 5270.  Those proper documents

3    also kept me in the dark of what was past due, what the total

4    amount was.  With all the effort I put in to get a modification

5    and some help, if I knew 494 dollars was all it would have

6    taken, I would have paid it easily.  Why wouldn't I?  And they

7    hindered me from day one and cost me the opportunity

8            THE COURT:  Okay, calm down.  Calm down.

9            MR. SILBER:  I'm sorry.

10           THE COURT:  No    look

11           MR. SILBER:  There's further

12           THE COURT:  Look, I know this is important to you, and

13   it's important to me.

14           MR. SILBER:  It's very important.

15           THE COURT:  Okay.  I want you to understand that.

16           MR. SILBER:  Your Honor, the EHLP program would have

17   brought my mortgage current.  Whether they can say I couldn't

18   make payments is not their concern.  Payments are being made

19   and the mortgage is current.  They make an argument there's no

20   guarantee I can pay it, but history shows I paid 955 in one of

21   their temporary forbearance plans.  So I could easily pay 878.

22   I have my documents today to show I was on unemployment until

23   July of 2011.

24           THE COURT:  Are you working now?

25           MR. SILBER:  Yes, sir.  I still couldn't find a job in

**RESIDENTIAL CAPITAL, LLC, ET AL.**

97

1    the auto business, I started my own business, Your Honor.

2            THE COURT:  Okay.

3            MR. SILBER:  I'm not happy about being on unemployment

4    that long.  And, for the record, I paid my mortgage in full

5    from February of 2009 to November of 2009 on my savings alone.

6    I didn't even start asking for unemployment until August,

7    because I was embarrassed.  And I didn't ask for help from the

8    bank until I couldn't do it anymore.

9            Upon completion of the EHLP program, Your Honor, CHFA

10   had programs called Connecticut Families First.  And I have

11   information on that today if anybody wants to disregard it or

12   you're telling me I might not need it.  But there's a program

13   called Connecticut Families First.  That program's no longer

14   valid.  And what it was, it was a program that was taking your

15   prime mortgage FICO score before your financial hardship, where

16   mine was about an 800.  They were taking that, they were

17   redoing people's loans through local banks in Connecticut.

18   CHFA understood how impossible it was for FHA mortgages to get

19   modifications because of my accusations of FHA insurance

20   capitalization.

21            They were taking

22            THE COURT:  Tell me this   let me interrupt you.  Was

23   foreclosure completed on your house?

24            MR. SILBER:  No, Your Honor.

25            THE COURT:  Are you still in it?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MR. SILBER:  I am, Your Honor.

2          THE COURT:  Okay.

3          MR. SILBER:  But I'm past due, and I get a payment

4    booklet from Ocwen for 370,000 dollars, and it goes up 3,500 a

5    month.

6          THE COURT:  Has there ever been a mod   after what

7    you're fighting about here, has your loan ever been modified?

8          MR. SILBER:  No, Your Honor, I'm not    I can't

9    qualify for any programs.   The only program that would even

10   get me close, because the dollar amount's so far out of whack

11   would be a streamlined finance, but you can't be past due more

12   than twelve months.

13         THE COURT:  How much are your current arrears,

14   approximately?

15         MR. SILBER:  What do I owe?

16         THE COURT:  Yeah.

17         MR. SILBER:  Oh, I got a letter yesterday from Ocwen

18   bank.  They've stopped sending me a payment, and they're just

19   asking for the full dollar amount in full.  As of 2/16/2015,

20   Your Honor, 353,484 dollars.

21         THE COURT:  That's the total?

22         MR. SILBER:  That's the total, they don't even send me

23   a requested payment.  This is how much I need.

24         THE COURT:  How much were you in arrears on mortgage

25   payments, not what the total amount    total balance due is, do

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    you know, approximately?

2           MR. SILBER:  I have a principal balance of 234, that's

3    pretty similar to what the refinance was when I first signed

4    the papers

5           THE COURT:  Right.

6           MR. SILBER:    in 2008.

7           THE COURT:  How many months have you missed?

8           MR. SILBER:  As of today?

9           THE COURT:  Yeah.

10          MR. SILBER:  Seventy-eight months minus two months

11   that they took out for the forbearance plan.  And then there's

12   a 1,750 credit that was inherited.

13          THE COURT:  Okay.

14          MR. SILBER:  But there's no programs that I qualify

15   for.  I understand your question.

16          Anyway, upon comple

17          THE COURT:  Look, I'm just trying to    it doesn't

18   bear specifically on the claim that you've asserted here, but

19          MR. SILBER:  I just lost friends over this that

20          THE COURT:  I wanted to understand what your situation

21   is.

22          MR. SILBER:  My situation is I'm buried in this house

23   with my investments.

24          Now, they've also made the declaration that because I

25   fought and I had said that I wanted to go into this house, and

**RESIDENTIAL CAPITAL, LLC, ET AL.**

100

1    take my children out of a bad neighborhood, there's no reason

2    why I would have rescinded the note had I known I was doing

3    business with GMAC in 2008.  But they're not understanding that

4    this is a refinance.  I actually bought the house in 2006, put

5    all my savings into in 2006 --

6          THE COURT: -- Okay.

7          MR. SILBER: -- and it wasn't even an FHA loan.  It was

8    with Webster Bank, Your Honor.

9          THE COURT:  All right.

10          MR. SILBER:  Now, back to the EHLP program, I'm sorry,

11    because it's not just the EHLP program that they cost me.  Upon

12    completion of this program Connecticut Families First CHFA had

13    programs where they were taking people away from these big FHA

14    banks, Wells Fargo, all the big ones.  And there were internal

15    banks such as Hartford Federal Credit Union, Webster Bank, who

16    my loan was with before, and they were taking these FHA loans

17    and giving them internal loans using their prime FICO score

18    before their hardship.  Rates were as low as 3.75 percent.

19    They were extending loans to forty percent.  They are forgiving

20    them.  The only requirement was your mortgage needed to be

21    current.

22          THE COURT:  Can I ask you this?  Is there a recent

23    appraisal of your home?

24          MR. SILBER:  No.  Even the appraisal they gave at the

25    time of the foreclosure wasn't even accurate.  It's like an '82

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  station wagon and third driveway.  There's no recent appraisal,

2  Your Honor.  If you're asking what I think it's worth, I'd say

3  190,000 dollars.  It's maybe gone up 10,000 since 2012.

4          THE COURT:  All right.

5          MR. SILBER:  And I've maintained the property and kept

6  it, because I have no    I have no

7          THE COURT:  All right.  Let's go back to the specific

8  is there any additional argument you want to make?

9          MR. SILBER:  The EHLP program, Your Honor, again,

10  isn't just -- I don't want to fixate on oh, it was 50,000

11  dollars.  It was a way to bring my mortgage current, which

12  would have entitled me to further privileges or programs to

13  participate in.  And the only guarantee would be I wouldn't be

14  standing here right now talking to you, as lovely as your

15  courtroom is.  I wouldn't be here, I'd be doing business with

16  Webster Bank, making modified payments without all this    all

17  this going on.

18          THE COURT:  Okay.  Anything else you want to

19          MR. SILBER:  As far as all the other complaints?

20          THE COURT:  Yeah.

21          MR. SILBER:  Your Honor, I think the bank note.  I

22  know you said you don't like to touch base on the bank note,

23  but the bank note, itself, has an illegal transfer on it.  And

24  I don't    it's my position that

25          THE COURT:  I

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MR. SILBER:  Your Honor

2          THE COURT:  You've got an uphill road, I'm not

3   deciding it now.  But

4          MR. SILBER:  The bank wasn't determined transferred,

5   the bank was    the bank note was canceled.  When they won the

6   motion for summary judgment, they gave a different bank note to

7   the judge.  Judge Robaina made    because I didn't have a copy

8   of the original bank note, which I submitted, it shows right

9   there that my full intent was to do business with Wells Fargo,

10  not GMAC.  That's why they put Wells Fargo in there.

11         Now, I refinanced my loan, because it was going to

12  FHA.  You had FHA insurance.  There

13         THE COURT:  Why don't you address any other issues

14  that you want besides that.  I understand, I've read your

15  argument with respect to the validity of the note, and the

16  endorsements.  But I    any other arguments you want to raise?

17         MR. SILBER:  Yeah.  All the arguments they're making

18  in their response to my complaint is contradicted by the phone

19  records that they    they kept saying unemployment couldn't be

20  used.  They're saying, they only said it that one time, but

21  their phone records    their phone records, Your Honor, in

22  their recent reply shows that they were still saying that all

23  the way to 2012.

24         They weren't saying my unemployment was insignificant.

25  They kept saying unemployment cannot be used as verifiable

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    income with an FHA loan.  And that's incorrect.  The HUD says

2    that it can, and my bank note says they're bound by HUD.  And

3    they didn't take advantage

4          THE COURT:  Well, HUD says it can if you provide

5    evidence that it's    that it's

6          MR. SILBER:  Reasonable assurance.

7          THE COURT:     will be in place for nine months.

8    That's the HUD.  That's HAMP.

9          MR. SILBER:  It's actually    well, HAMP is nine

10   months, which my house is FHA, so it's FHA HAMP.  So reasonable

11   assurance for twelve months.  But because they didn't    they

12   never even tried to apply for that.  Had they sent them the

13   letter for eight months, and filed a variance compliance

14   request

15         THE COURT:  Well, you've got to get it for them, not

16   they get it for you.  I mean

17         MR. SILBER:  I got to get what, Your Honor?

18         THE COURT:  You got to provide them with evidence

19   regarding your unemployment.

20         MR. SILBER:  I

21         THE COURT:  They don't have to affirmatively go out

22         MR. SILBER:  Oh, I did,  Your Honor.  I'm not asking

23         THE COURT:  I understand the issue as to whether

24   there's an issue that the Court will have to decide, whether

25   you sufficiently com    satisfactorily complied with whatever

1    the applicable law was with respect to establishing

2    unemployment.  I understand your position.

3            MR. SILBER:  All right.

4            THE COURT:  And I understand their position.  I'm not

5    resolving it today.  Okay.

6            MR. SILBER:  I understand that.

7            My point was is that once they have the packet from

8    me, and they determine unemployment's only eight months, or

9    whatever they're saying it was, or DTI, or debt to income, or

10   whatever, there's an avenue where they can file a variance

11   compliance request to get around those guidelines through FHA,

12   and they're bound by that by the act of concerning a

13   foreclosure.  They're supposed to do this stuff.  And FHA

14   requires it.

15           THE COURT:  The issue of   it's not clear to me, Mr.

16   Silber, that they're required to seek a variance.

17           MR. SILBER:  According to Connecticut

18           THE COURT:  Don't   I don't want to hear argument

19   about it now.  Okay.

20           MR. SILBER:  Okay.

21           THE COURT:  It's not   I'm not ruling one way or the

22   other about it.  If you complied with the applicable

23   guidelines, and Mr. Wishnew's going to tell me about FHA HAMP,

24   if there is such a thing

25           MR. SILBER:  I have   I have the HUD note   I have

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    the HUD

2              THE COURT:  Okay.

3              MR. SILBER:    released statement for that FHA HAMP,

4    Your Honor.

5              THE COURT:  I don't    I haven't seen anything that

6    establishes an affirmative obligation on the mortgagee or the

7    loan servicer to seek a variance.  If you've complied with

8    applicable regulations, that's one thing.  Okay.  I'm not

9    deciding any of that today, okay.

10             Let me just    because we need to finish up.  Are

11   there any other legal issues that you want to address?

12             MR. SILBER:  I mean, just legal issues, just all their

13   arguments are incor    I have

14             THE COURT:  Okay.  I've read all the papers.  I

15   understand you're not represented by a lawyer, but you filed a

16   lot    you filed a lot of papers, and I understand your

17   arguments.

18             Mr.  Wishnew.

19             MR. SILBER:  I have the forbearance plan as well, Your

20   Honor.  I'd like to submit it.

21             THE COURT:  I know.  And there I understand what the

22   issues are about the forbearance plan.  And they incorrectly

23   returned a payment, you argue, that wasn't corrected for a

24   while.  They argue it was corrected immediately.  I understand

25   that issue.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MR. SILBER:  Their phone records show it wasn't

2     corrected for a while.  The records they presented in the their

3     last reply.

4          THE COURT:  Okay.  All right.

5          Mr. Wishnew, what about    are there different

6     guidelines for loan modification that are applicable to Mr.

7     Silber's loan?  Was it an FHA loan, FHA guaranteed loan?

8          MR. SILBER:  Yes.

9        (Pause)

10          THE COURT:  Mr. Silber, was it FHA guaranteed loan?

11          MR. SILBER:  Yes, sir, it was an FHA loan.  I have the

12     mortgage letters that show the outlines for FHA HAMP, opposed

13     to the HAMP itself.

14          THE COURT:  Why don't you bring it up.

15          MR. SILBER:  Yes, sir.

16          THE COURT:  Let me just look at it.  Okay.

17          MR. SILBER:  Yes, sir.  Here's one mortgage letter

18          THE COURT:  I just want to see the HAMP.  The FHA

19          MR. SILBER:  These are all concerning

20          THE COURT:  Yes.

21          MR. SILBER:    FHA.  So here's the FHA HAMP

22     guidelines, and here's some    here's the different guidelines

23     between what the HAMP is, Your Honor.  And it will show you

24          THE COURT:  Okay.

25          MR. SILBER:    the unemployment is supposed to be

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    twelve months, not nine months.

2        (Pause)

3        THE COURT:  Mr. Silber, just come back up for a

4    second.  Show me with respect to unemployment insurance, where

5    is that -- unemployment payments, where is that covered in the

6    FHA HAMP.

7        MR. SILBER:  Well, I have a letter from a HUD

8    representative, I have an e-mail I included as an exhibit, Your

9    Honor.  It shows them telling Lisa Pirot (ph.) of Connors &

10   Larson's (ph.) office, that unemployment can be used in the

11   prior installments.  My arguments is that they kept saying

12   unemployment couldn't be used.

13       THE COURT:  Well, that's    all right.

14       MR. SILBER:  Okay.  Well, as

15       THE COURT:  You told me that the FHA HAMP standard is

16   different.  It only requires a reasonable assurance, not nine

17   months.

18       MR. SILBER:  That's correct, I'll get to it, it's in

19   here, Your Honor.  I'm sorry

20       THE COURT:  That's what I was specifically asking

21   about.

22       MR. SILBER:  It's underneath the underwriting.

23       THE COURT:  Okay.  If you can't find it now, that's

24   okay.  We'll have to get it resolved.

25       MR. SILBER:  Was the letter from HUD, the Lisa Pirot

**RESIDENTIAL CAPITAL, LLC, ET AL.**

108

1   had sent, would be dismissed as hearsay.

2          THE COURT:  No.  Do you have a letter, you want to

3   show it to me?

4          MR. SILBER:  I do.  I'll get it for Your Honor.  And

5   I'll look through this

6          THE COURT:  This is not an evidentiary hearing today,

7   so I'm not ruling on evidence

8          MR. SILBER:  Okay.  It's just it's outlined what's in

9   this packet

10          THE COURT:  Okay.

11          MR. SILBER:    I'll find this in a second for you.

12          THE COURT:  All right.  Mr. Wishnew, can you shed any

13   light on this issue?

14          MR. WISHNEW:  Your Honor, looking at both the note and

15   the mortgage, I don't see any specific language about this

16   being an FHA guaranteed loan.  With regards to whether if it's

17   an FHA HAMP is it different from HAMP, I'm not aware that it's

18   different.  And with regards to Mr. Silber's argument that even

19   if there are distinct guidelines, one guideline is nine months,

20   another is twelve months, I think that our argument is still

21   the same, if he couldn't provide

22          THE COURT:  I understand.  But his oral argument

23          MR. WISHNEW:  Sure.

24          THE COURT:   was that FHA HAMP guidelines only

25   require a reasonable assurance, not nine months of

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    unemployment.

2           MR. WISHNEW:  I thought his testimony was reasonable

3    assurance of twelve months.

4           THE COURT: Well, it wasn't testimony.

5           MR. WISHNEW:  Oh, I'm sorry.

6           THE COURT:  It wasn't testimony.

7           MR. WISHNEW:  His argument was

8           MR. SILBER:  Here you go, Your Honor.

9           THE COURT:  All right.  I'll give these back to you.

10          MR. SILBER:  It's a little shaky, I'll find the actual

11   copy of it right here for you.

12          THE COURT:  What Mr. Silber has handed to me

13          MR. SILBER:  I have it, Your Honor.  I have the

14   original from the Web site.

15          THE COURT:  Okay.  Is ECF docket number 7979-19, an

16   exhibit to    Exhibit P to the Priore declaration, page 14 of

17   21.  And it's specifically pointing to a question, and the

18   answer to it.

19          "How long must unemployment benefits last to be

20   considered income?"

21          "Unemployment income must be documented with

22   reasonable assurance of its continuance for at least twelve

23   months."

24          That's what it says.

25          Let me give this back to you.  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

110

1              MR. SILBER:  Okay.

2              THE COURT:  I'm not going to resolve this issue today.

3     I think it's going to take me a little time, Mr. Silber, to go

4     through.  And I think what will happen is the Court will

5     resolve some of the issues of this claim objection in writing.

6     As to others, it seems to me that there are disputed issues of

7     fact as to which I'd need to have an evidentiary hearing.

8              On this issue of consideration of unemployment

9     insurance payments    uninsurance (sic) payments

10    unemployment insurance payments, before the evidentiary hearing

11    you ought to seek to resolve, Mr. Wishnew, if it's an FHA

12    guaranteed loan -- in which case the FHA HAMP guidelines would

13    apply -- and how they differ.

14             You know, in one respect    I'm not making a

15    determination about it, Mr. Silber, but one respect seems to

16    work against you because the HAMP guidelines were nine months,

17    this is FHA HAMP twelve months.

18             MR. SILBER:  Your Honor, it was my position I could

19    show twelve months reasonable assurance.  And when I pointed

20    that out that's when they began saying unemployment cannot be

21    used at all.  That's my argument.

22             THE COURT:  All right.  So once I issue an order,

23    let's assume I'm going to schedule an evidentiary hearing.

24    What hours do you work, Mr. Silber, I want to try to

25    inconvenience you as little as possible.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

111

1      MR. SILBER:  Your Honor, this is the utmost important

2  thing in my life right now.

3      THE COURT:  I understand

4      MR. SILBER:  So whatever time I'll be there.

5      THE COURT:  Are you self-employed now?  Is that --

6      MR. SILBER:  Yes, sir, I work for myself.  I go to

7  Oklahoma March 27th till April 8th, I believe    let's just

8  call it March 20th to April 10th I'll be in Oklahoma.

9      THE COURT:  I'm not sure when I'm going to get the

10  order out.

11      Let's assume that I conclude we need to have an

12  evidentiary hearing, I want to get this resolved reasonably

13  promptly, Mr. Wishnew.

14      MR. WISHNEW:  Um-hum.  Absolutely, Your Honor.

15      THE COURT:  You should confer with Mr. Silber.  It

16  seems to me in all likelihood we're talking about a three-

17  witness hearing:  Mr. Silber and Ms. Priore, and whoever was

18  the representative in the mediation.

19      MR. SILBER:  Your Honor, why would Ms. Priore have any

20  relevance, I never spoke to her

21      THE COURT:  Because she could

22      MR. SILBER:    she never handled my claim, Your

23  Honor.

24      THE COURT:  But she can    a lot of what the Trust

25  relies on are business documents, records.  And they're

**RESIDENTIAL CAPITAL, LLC, ET AL.**

112

1    entitled    I won't get into the    I can't    I can't give you

2    legal advice.

3            MR. SILBER:  I understand.

4            THE COURT:  It has to do with

5            MR. SILBER:  I'll have a chance to argue the validity

6    of

7            THE COURT:  No, it has to do with authenticating

8    business records.  The documents

9            MR. SILBER:  Authentication.

10           THE COURT:  Yes.

11           MR. SILBER:  Not just some phone record they could

12    give me willy-nilly.

13           THE COURT:  So they have loan servicing notes as part

14    of their business records.  And the Court has admitted them in

15    other proceedings.

16           You may be able to resolve some of those issues with

17    Mr. Silber to authenticate documents.  But what I want to

18    happen is once I've entered an order ruling    if I schedule an

19    evidentiary hearing, you and Mr. Wishnew should discuss

20    scheduling.  It sounds to me that this is a three-evidence

21    three-witness hearing, and that an afternoon will be

22    sufficient.  So

23           MR. SILBER:  Do we know which issues we're talking

24    about?

25           MR. WISHNEW:  That will be defined by the judge's

**RESIDENTIAL CAPITAL, LLC, ET AL.**

113

1    order.

2         THE COURT:  We will -- that will be clear in the order

3    that I

4         MR. WISHNEW:  He's going to issue an order and he'll

5    define the specific issues.

6         THE COURT:  I'm going to issue an order.  Okay?  So

7    you know, we're not scheduling it till I issue an order.  Okay.

8         MR. SILBER:  So you're going to issue and order, Your

9    Honor.  And in my claim or my    in my complaint, so you're

10   going to determine what has no validity, and what does.

11        THE COURT:  Correct.  That's correct.

12        MR. SILBER:  Okay.  So, but my only

13        THE COURT:  When I say what has validity

14        MR. SILBER:  Well, what has

15        THE COURT:  What is sufficient to go to an evidentiary

16   hearing because there were disputed issues, or because I can't

17   resolve the legal issue based solely on the papers.  So you'll

18   know    you're not going to go into this blind, you'll know

19   what you have to prepare for.

20        MR. SILBER:  Well, it does seem that some of the

21   issues that they objected to, we didn't touch base on.

22        THE COURT:  I'm going to decide them on    I got your

23   arguments, and their arguments in the papers, and I'll resolve

24   them.  Some of these are pure issues of law, statute of

25   limitations issue, some other issues, I'll resolve.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

114

1           The ones    I've already indicated which are the

2    issues that I've got to decide whether you're entitled to an

3    evidentiary hearing because of factual disputes:  breach of

4    contract, negligent misrepresentation, Connecticut Unfair

5    Deceptive Trade Practices Act, okay.  We'll go forward with a

6    hear    you'll know what you have to prepare for.

7           Mr. Wishnew, it seems to me that we're talking about

8    an afternoon.

9           Is afternoon or morning better for you?

10           MR. SILBER:  Morning's better, Your Honor, because I

11    can get on a train at 6:30 and be here for 9:30    well

12           THE COURT:  Okay.  We will try and do

13           MR. SILBER:    10:15 it looks like.

14           THE COURT:  Mr. Wishnew, and he can talk with my law

15    clerks about scheduling.  We'll find a day where I don't have a

16    hearing in the morning.  We'll schedule an evidentiary hearing,

17    a date that's convenient for both of you, and the other

18    witnesses.  Okay.  And that's how we're going to proceed.

19    Okay.

20           MR. SILBER:  So we're not going to talk about the bank

21    note at all, you're going to make a decision on that based on

22    the information already presented?

23           THE COURT:  I'm going to resolve all the other issues

24    based on the papers I have before me.  Okay.  And I'll issue a

25    written order, you'll know exactly what    where we're going

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    from here.  Okay.

2              MR. SILBER:  I have new information regarding the bank

3    note, Your Honor, can I submit that or no?

4              THE COURT:  No.  Well, tell me what it is?

5              MR. SILBER:  It's the Uniform Commercial Code that

6    shows the difference between transferring and canceling.  And

7    it shows my right of rescission when those aren't followed.

8              THE COURT:  You don't have the right to rescind.  They

9    can    as a matter of law, the mortgagor has a right to

10   transfer your note and you have no say over it.  Okay.  It's as

11   simple as that.

12             MR. SILBER:  He didn't transfer it, Your Honor, they

13   canceled it.

14             THE COURT:  You have something that says canceled?

15             MR. SILBER:  Yes, Your Honor.  I have the bank note,

16   it says canceled right on it.

17             THE COURT:  Let me see it.

18             MR. SILBER:  That's the whole issue, Your Honor.  It's

19   not what I signed.  I signed to do business with Wells Fargo

20   not GMAC.  And they canceled it without my knowledge.  They

21   said that this was the note I signed at    sorry, I don't mean

22   to be up here yelling at you, I'm sorry.

23             They said that that's

24             THE COURT:  That's an endorsement.  Your note

25             MR. SILBER:  That's not the original note, Your Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1              THE COURT:  Stop.  Your note is with Norwich

2      Commercial Group.  Norwich Commercial Group can assign the

3      note.

4              MR. SILBER:  Not if they've already assigned it to

5      Wells Fargo, Your Honor.  There has to be a

6              THE COURT:  All right.

7              MR. SILBER:    transfer back, don't you think?

8              THE COURT:  Take it back.

9              MR. SILBER:  Can I show you the original bank note?

10             THE COURT:  Take it back.  I understand about

11     endorsements.  I know all about the law of endorsements.  Okay.

12     I'm going to resolve the issue of who is the noteholder.  Okay.

13             Don't express your exasperation at me.

14             MR. SILBER:  Sorry.  I'm sorry.  It's just not the

15     correct bank note.

16             THE COURT:  When you appear in my court I will let you

17     make your arguments, I will let you testify.  If you're unhappy

18     with my rulings, that's the way it goes.  Okay.  So

19             MR. SILBER:  Yes, Your Honor.

20             THE COURT:    I understand the issues from reading

21     the papers about the endorsements on the note.  Your note was

22     not with Wells Fargo; your note indicates who the mortgagor

23     was.

24             MR. SILBER:  Can I show you the original note

25             THE COURT:  No.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MR. SILBER:    where it shows Wells Fargo?  You asked

2    me for the note that was canceled, Your Honor.  I have the

3    original note that says it was Wells Fargo.

4          THE COURT:  Let's see the original note.

5          MR. SILBER:  Thank you, and I apologize.

6          THE COURT:  The mortgagor is indicated in the first or

7    second line of the note, not in the endorsement.

8          MR. SILBER:  Sorry.  I'm not disputing that.

9          THE COURT:  You have no control over who they assign

10   the note to, cancel assignments, reassign it.

11         MR. SILBER:  There still has to be a correct paper

12   trail, no?

13         THE COURT:  Let's see.

14         MR. SILBER:  There's three document    there's one

15   more documentation

16         THE COURT:  Stay here.  Stay here.

17         MR. SILBER:  Sorry.  And then it shows at the time of

18   close

19         THE COURT:  Stop.  You are showing me a note that

20   shows that the lender is Norwich Commercial Group, that's the

21   lender.  They have the right to assign the note, and they can

22   also cancel the assignment.

23         MR. SILBER:  Without notification of who they assigned

24   it to, Your Honor?

25         THE COURT:  If it's properly done.  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1       The hearing is adjourned.  I will enter an appropriate

2  order.

3       The last thing I would say to both of you, I don't

4  know whether you made any effort to try and resolve this matter

5  by settlement.  As always, I urge the parties to seek    to try

6  and see if they can resolve it.  It's going to be expensive for

7  the Trust to have to go forward with an evidentiary hearing.

8  And there's a lot at stake for both sides on that.

9       If we have to go forward -- if I order an evidentiary

10  hearing, we'll go forward with it and we'll deal with it that

11  way.  We're adjourned.

12       MR. WISHNEW:  Understood, Your Honor.

13       Your Honor, there's one last matter on today's

14  calendar.

15       THE COURT:  Okay, sorry.

16       MR. WISHNEW:  Sorry.  Page 11, IV, the status

17  conference.  This deals with a letter we received from Ms.

18  Ailette Cornelius.

19       THE COURT:  They're in the back, and they've had to

20  sit here and wait all this time.

21       MR. WISHNEW:  Sorry.

22       THE COURT:  Come on up.  Come on up.  I apologize that

23  you've had to wait this long.  You've been very patient.

24       MS. CORNELIUS:  I'm prepared for the day.

25       THE COURT:  Tell me which matter we're looking at now.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

119

1          MR. WISHNEW:  Sure, Your Honor.  Under IV on page 11,

2     this was --

3          THE COURT:  This is Cornelius.

4          MR. WISHNEW:  This is Ms. Cornelius.  She had --

5          THE COURT:  Are you Ms. Cornelius?

6          MS. CORNELIUS:  Yes, sir.

7          THE COURT:  Okay.

8          MR. WISHNEW:  She had reached out -- we had -- just by

9     way of background, we had put her claim in an omnibus objection

10    back in 2013.

11         THE COURT:  Um-hum.

12         MR. WISHNEW:  After an initial hearing on it, we came

13    to a consensual resolution with her and fixed the allowed

14    amount of her claim.  At this point in time, it's been the

15    Borrower's Trust's understanding that we have a binding

16    settlement agreement with her for a fixed claim against GMAC

17    mortgage.

18         THE COURT:  Is it in writing and signed?

19         MR. WISHNEW:  It is, Your Honor, yes.  And I'm not

20    quite clear what Ms. Cornelius' issue is, but I wanted to make

21    sure she had her day in court --

22         THE COURT:  Okay.

23         MR. WISHNEW:  -- to address it.

24         THE COURT:  All right.  So we're talking about claim

25    number 5286.  So tell me your position, Ms. Cornelius?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

120

1    MS. CORNELIUS:  Yes, Your Honor.  I -- when they

2  called me up about this, I did not understand nothing about it.

3  Mr. Beck, he called me up and he offered me an amount.  And he

4  said he would send something.  So I got it from my phone, and I

5  signed it, and I sent it back to him.  And then afterwards,

6  because nobody explained anything to me, to say how this works,

7  et cetera, I didn't even -- if you notice my claim form there,

8  you'll see that I made -- where they asked me what's my claim,

9  you know, I gave my opinion, not knowing how to respond to it,

10  but I didn't want it to pass me round, and so therefore, I put

11  in the claim argument.

12    Okay, so I was supposed to come to court here, and

13  then a day or two before I was supposed to come here, Mr. Beck

14  called me and he offered me an amount, which is 13,000 dollars.

15  I told him, yes, you know, I'll take it; is there any more that

16  I could get?  He said, no, he's offering me the best offer.  I

17  said, well, you know, I -- I'm going to sign it, because I

18  didn't want him to say -- I was telling the truth.  I was happy

19  to hear him say that --

20    THE COURT:  Sure.

21    MS. CORNELIUS:  -- you know, that he was offering me

22  something there, because I didn't know the circumstances

23  surrounding the case.

24    But then when I got some mail, I read, and I found out

25  that there was some other things that I could do.  I could see

**RESIDENTIAL CAPITAL, LLC, ET AL.**

121

1  the judge, and the judge could make a determination on how much

2  I am to get.

3          THE COURT:  You know, sometimes what happens, Ms.

4  Cornelius, is you don't do as well with the judge, as you do

5  when you resolve it.  That's not a threat or anything, I'm

6  just --

7          MS. CORNELIUS:  Yeah, I understand; I understand.

8          THE COURT:  Understand that, having the matter proceed

9  before the judge, you're always rolling the dice because you

10  may win, you may lose, you may win something, but less than

11  what you resolved by settlement, so I don't know any -- I'll

12  tell you right now, I know nothing about the merits of your

13  claim, okay.

14          MS. CORNELIUS:  Oh, you don't know anything?

15          THE COURT:  So that is not intended in any way to get

16  you either to do anything, okay.  I just want to make clear

17  that --

18          MS. CORNELIUS:  I understand.

19          THE COURT:  -- you wouldn't be the first person to

20  have turned down a settlement, only to go forward, and wind up

21  with little or nothing.  So, but that's --

22          MS. CORNELIUS:  That's up to me and counsel.

23          THE COURT:  So the issue -- the Trust has to decide

24  and you need to decide; if the Trust believes that it has a

25  binding settlement agreement with you, in writing, signed by

**RESIDENTIAL CAPITAL, LLC, ET AL.**

122

1   you, they can seek to enforce it and not permit you to have

2   buyer's remorse.  I suspect you've heard that term about

3   buyer's remorse.  You buy a car and then you're -- and you take

4   home and then you decide I really shouldn't have bought this

5   car.  Well, it may be too late.

6          So you and Mr. Wishnew or one of his colleagues need

7   to discuss how this matter is going to proceed.  If you want

8   out of the deal and they want to enforce it, they can seek to

9   have a Court determination that it's enforceable, and you can

10  argue why it's not, and I'll have to make a legal determination

11  about that.

12         If you want out, and they agree that you're out, and

13  they're going to object to you -- and they object to your

14  claim, that'll come back before me at another hearing and I'll

15  proceed to decide the matter.  So have you decided what you

16  want to do?

17         MS. CORNELIUS:  You asking me or him?

18         THE COURT:  Yes, I'm asking you.

19         MS. CORNELIUS:  Okay, I was just saying that I used to

20  work with the government up there in Connecticut.  I worked

21  here first and then I moved to Connecticut.

22         THE COURT:  Um-hum.

23         MS. CORNELIUS:  And I was out for a while -- a whole

24  long time, and I called GMAC and I tried to get legal

25  moderation --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

123

1            THE COURT:  Modification.

2            MS. CORNELIUS:  And --

3            THE COURT:  That's what Mr. Silber's been -- he lives

4    in Connecticut too.

5            MS. CORNELIUS:  Yes, and they wouldn't give it to me.

6            THE COURT:  Okay.

7            MS. CORNELIUS:  They said my income wasn't enough at

8    that time to receive it, and so I had to go for months and

9    months and months, until I got my -- one of my little grandson

10   to come stay with me, and his income --

11           THE COURT:  Yeah.

12           MS. CORNELIUS:  -- kind of made up what I was getting,

13   and it was at that time when they gave that moderation --

14           MR. WISHNEW:  Modification.

15           THE COURT:  Modification.

16           MS. CORNELIUS:  -- modification to me.

17           THE COURT:  I -- look --

18           MS. CORNELIUS:  And --

19           THE COURT:  I don't want to get into the merits of

20   what your claim is now --

21           MS. CORNELIUS:  Yes.

22           THE COURT:  -- because -- and I don't expect you to

23   tell me right now what your decision is, but you need to decide

24   whether, in effect, you're going to seek to revoke your

25   agreement on the settlement.  And if so, if the Trust wants to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    seek to enforce it, they'll bring a motion before me, and I'll

2    have to -- you'll have to respond to the motion, and I'll

3    decide.

4            MS. CORNELIUS:  So --

5            THE COURT:  Ordinarily, I will just --

6            MS. CORNELIUS:  Okay.

7            THE COURT:  I'm not saying in your case -- ordinarily

8    when two parties are in a dispute, and they sign a written

9    settlement agreement, unless there's been misrepresentations in

10   getting somebody to sign an agreement, it's ordinarily

11   enforceable.  I'm not saying yours is or not.  I'm not -- I

12   can't give -- I'm not giving you legal advice.  I'm not telling

13   what position you ought to take.  Think long and hard about

14   it -- not too long -- think about it.  Talk to Mr. Wishnew.

15           And Mr. Wishnew, what's the Trust -- does -- do you

16   know what the Trust's position at this point is, as to

17   whether --

18           MR. WISHNEW:  At this point we are intending to honor

19   the settlement agreement.

20           THE COURT:  Okay.

21           MS. CORNELIUS:  I spoke to them several times about

22   it.

23           THE COURT:  Okay.

24           MS. CORNELIUS:  And they -- they refused to up it a

25   little.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

125

1          THE COURT:  They probably -- no, that's -- I'm not

2    going to get in the middle of it.

3          MS. CORNELIUS:  Well, let me say this, Judge.

4          THE COURT:  I'm not going to get into the middle of

5    it.  Here's what we going to do.

6          MS. CORNELIUS:  Okay.

7          THE COURT:  I'm going to recess.

8          MR. WISHNEW:  Yup.

9          THE COURT:  If you want to -- you don't have a lawyer,

10   I take it?

11         MS. CORNELIUS:  No, sir.

12         THE COURT:  So talk to Mr. Wishnew for a few minutes

13   now.  You've got to get this resolved.  It sounds to me -- I

14   don't know -- unless the Trust changes it position, that it's

15   going to seek to enforce the written agreement.

16         MS. CORNELIUS:  Oh, the Court would seek to enforce

17   it?

18         THE COURT:  No, they will seek to enforce it.  They'll

19   come before me with a motion to enforce a settlement agreement.

20   Usually where these disputes are, is where there's an oral

21   agreement.  Somebody says I did settle; I didn't settle and it

22   wasn't the final agreement.  But ordinarily, where there's a

23   written agreement signed by both parties, if the terms are

24   specific and definite --

25         MS. CORNELIUS:  I understand, Judge.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

126

1           THE COURT:  Okay.  So I'm not -- but I'm not

2    deciding -- I want to make clear:  I'm not deciding anything

3    today.

4           MS. CORNELIUS:  Okay, sir.

5           THE COURT:  You need to talk with Mr. Wishnew and

6    decide how this is going to proceed.  If the Trust decides it's

7    going to -- it wants to enforce the agreement, they'll bring

8    the matter before me.  You'll have an opportunity to appear.

9    You'll have an opportunity to file anything in opposition.

10          MS. CORNELIUS:  So --

11          THE COURT:  The law does not support buyer's remorse;

12   let me put it that way.

13          MS. CORNELIUS:  They don't support -- you see, I just

14   didn't understand it how to respond to that.

15          THE COURT:  I'm not going to -- I don't want to get

16   into the merits.

17          MS. CORNELIUS:  So that's the only reason why I --

18          THE COURT:  I don't want to get --

19          MS. CORNELIUS:  -- signed up -- signed on to that.

20          THE COURT:  I don't want to get into the merits of it

21   today, one way or the other.

22          MS. CORNELIUS:  Okay, so --

23          THE COURT:  So see if you can resolve the matter.  If

24   you can't, it'll come before me.  You'll have notice of when

25   the hearing is, and you'll have a chance to file -- if they

**RESIDENTIAL CAPITAL, LLC, ET AL.**

127

 1    file a motion to enforce it, and you want to oppose it, you'll

 2    file something in writing -- why it should -- why you're

 3    opposing it.  It'll come before me; I'll have to decide, okay.

 4            MS. CORNELIUS:  Okay, okay, Judge.  Thank you so much.

 5            THE COURT:  Thank you, again.  I apologize --

 6            MS. CORNELIUS:  Thank you, sir.

 7            THE COURT:  -- that you were -- you sat here and

 8    waited, but you got to see what goes on in this court.

 9            MS. CORNELIUS:  That's okay; I wanted to see too, so

10    it's okay for me.  Thank you.

11            THE COURT:  Okay, all right.  We're adjourned.

12            MS. CORNELIUS:  God bless.

13            MR. WISHNEW:  Thank you very much for your time, Your

14    Honor.

15            MR. SILBER:  Your Honor, I just want to apologize for

16    my frustration.

17            THE COURT:  Mr. Silber --

18            MR. SILBER:  And I believe -- you told me to work

19    something out with the clerk as far as my -- one of my loans,

20    FHA or not?

21            THE COURT:  No, you --

22            MR. SILBER:  You want me to tell the clerk?

23            THE COURT:  See if you can --

24            MR. SILBER:  Oh, okay, because it's FHA.  I have proof

25    here if you want.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

128

1          THE COURT:  Okay, show it to Mr. Wishnew.

2          MR. SILBER:  Okay, thank you for your time.

3          THE COURT:  All right.

4          MR. SILBER:  Again, I apologize.

5          THE COURT:  Okay.

6     (Whereupon these proceedings were concluded at 12:34 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

129

I N D E X


RULINGS

|  | PAGE | LINE |
|---|---|---|
| Ally Financial will provide a list of Wells Fargo accounts to defendant by 5 p.m. 2/26/15 | 25 | 5 |
| Wells Fargo will file a statement of applicable law for all Ally accounts within seven days | 25 | 11 |
| The Court will enter a scheduling order in the Ally Financial v. Wells Fargo adversary proceeding. | 43 | 8 |
| Parties in ResCap Liquidating Trust v. Mortgage Investors Group will prepare an order stating the CMO shall apply to the new parties. | 46 | 2 |
| Eighty-first omnibus objection sustained | 64 | 13 |

130

1

2                    C E R T I F I C A T I O N

3

4   I, Penina Wolicki, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

9

10

_____

11

PENINA WOLICKI

12

AAERT Certified Electronic Transcriber CET**D-569

13

14

eScribers

15

700 West 192nd Street, Suite #607

16

New York, NY 10040

17

18

Date:  February 27, 2015

19

20

21

22

23

24

25

12-12020-mg    Doc 8368    Filed 03/26/15    Entered 03/26/15 16:51:04    Main Document
RESIDENTIAL CAPITAL, LLC, et al.                          Adv. No. 14-02004-mg, Adv. No. 14-02435-mg
Case No. 12-12020-mg                    Pg 131 of 149
                                                                        February 25, 2015

# #

**#607 (1)**
4:22

## [

**[Docket (4)**
3:3,6,11,14
**[Not (1)**
3:18

## A

**ability (1)**
34:9
**able (5)**
13:4;28:17;83:21;
92:21;112:16
**Abosede (2)**
3:6;55:19
**absence (1)**
37:3
**absolutely (7)**
24:7;51:19;52:24;
54:19;65:3,7;111:14
**accelerated (1)**
94:7
**acceleration (3)**
73:5;74:19;76:21
**accept (1)**
21:21
**acceptable (2)**
68:14;89:24
**accommodate (1)**
53:17
**accomplish (1)**
33:20
**according (3)**
91:9;96:2;104:17
**Accordingly (1)**
66:16
**account (45)**
8:22;9:11;10:1,9;
12:6,13;15:3,15,18,
22,23,24;16:1,3,4,9,
12,14,16,19,20,22;
17:4,6,9,15,16;18:1,
2,9,22;20:5;22:5,7,
13,18;23:2;24:2,13,
15,19;26:11;33:22;
34:15,22
**accountholder (1)**
16:11
**accounts (26)**
10:2;12:9;15:4,6,
11,12,14,15,20;
16:25;17:1,24,25;
18:15;22:4,6;23:4,6,
8,21,24;24:24;25:7,
13,16;44:10
**accrued (2)**

**72:25;92:11**
**accurate (1)**
100:25
**accusations (1)**
97:19
**across (2)**
69:22;77:8
**act (10)**
29:21;59:6;80:1,6;
81:14;84:15;87:25;
90:21;104:12;114:5
**acted (1)**
19:8
**action (13)**
51:12;59:1,11,14,
17;60:3;66:16;73:20;
74:13;78:8;79:18,22,
25
**actions (3)**
59:2;66:15;88:1
**acts (1)**
87:25
**actual (6)**
25:17;36:19;37:3,
3;109:10
**actually (6)**
51:25;69:2,5;
93:15;100:4;103:9
**add (1)**
94:5
**added (4)**
93:3,6,23;95:16
**adding (1)**
95:4
**addition (1)**
26:17
**additional (7)**
38:11,12;77:9;
87:3;94:6;95:19;
101:8
**address (8)**
28:8;57:5,6;78:18;
79:23;102:13;
105:11;119:23
**addressed (6)**
9:8;26:13;57:10;
59:24;79:19,25
**addresses (1)**
69:4
**adds (1)**
39:4
**adjourned (3)**
118:1,11;127:11
**adjust (1)**
29:15
**admit (1)**
47:12
**admitted (1)**
112:14
**advances (5)**
93:9,11,22;94:1;
95:17
**advantage (2)**

**47:7;103:3**
**Adversary (5)**
3:20;4:2;8:5;
38:16;44:23
**advice (2)**
112:2;124:12
**advise (1)**
49:22
**advised (2)**
64:7;79:10
**advocate (1)**
46:25
**affidavit (1)**
57:2;60:10,21;
80:16
**affirmative (1)**
105:6
**affirmatively (1)**
103:21
**afternoon (5)**
53:14;86:4;112:21;
114:8,9
**afterwards (2)**
35:4;120:5
**again (20)**
13:18;14:17;18:23;
33:13;34:25;36:16;
45:19;46:9,20;47:16;
58:13;64:23;65:8,14;
69:8;77:4;95:14;
101:9;127:5;128:4
**against (5)**
56:11,15;66:17;
110:16;119:16
**agenda (6)**
48:3;55:18;61:8,
13,14;62:16
**agent (2)**
57:2;90:22
**ago (3)**
9:12,19;88:6
**agree (29)**
10:16;11:10;21:8,
11,20,23;22:12;23:7,
10;25:14,21;26:4;
29:21;35:7,18,18,19;
36:24;37:5;38:16;
41:18;45:21;47:19;
50:19;51:19;67:19;
77:1;92:13;122:12
**agreed (7)**
33:25;34:4;38:24;
40:19;41:10;42:4;
43:10
**agreeing (2)**
25:15;50:2
**agreement (60)**
8:20;9:5,10,25;
10:9;11:23;12:6,14;
14:18;15:1;16:1,3,5,
6,19,20;19:16;19:19;
14;26:4;30:24;31:1,
13,13,15,17,18;32:2,

**16;33:16;34:6,15,20;**
**35:1,8;39:14;40:9,10,**
**12,15,21,22;42:7,10,18;**
**119:16;121:25;**
**123:25;124:9,10,19;**
**125:15,19,21,22,23;**
**126:7**
**agreements (2)**
10:20;18:16
**ahead (15)**
8:14;45:20;48:18;
55:14;56:1;70:12,12;
78:14;85:18;86:7,13;
87:6;89:8;90:7;95:13
**Ailette (3)**
3:17;6:15;118:18
**aimed (1)**
33:12
**al (2)**
4:3;6:3
**Allan (1)**
50:11
**allegations (3)**
57:16;66:13;79:20
**allege (2)**
12:5;66:14
**alleged (3)**
12:8;13:23;52:21
**alleges (1)**
56:11
**alleging (1)**
59:2
**Allen (6)**
62:3,5,12,18;64:8,
24
**Allow (11)**
3:10,11;61:16,17;
63:4,5,14,15;64:1;
67:7;86:6
**allowed (3)**
34:16;91:21;
119:13
**allows (1)**
33:16
**Ally (33)**
3:20;6:20;8:6,9,21;
10:4,18;11:24;13:3,8,
10;15:14;16:7,13,20,
21,25;18:9,20,21;
19:8;20:24;23:3;
24:2,15;25:7,21;
31:16;33:3;39:12,16;
41:9;43:2
**almost (2)**
14:3;50:7
**alone (3)**
93:6;95:14;97:5
**alter (2)**
33:17,19
**always (9)**
38:8,19,20;46:12,
20;50:25;65:2;118:5;

**121:9**
**amend (7)**
12:5,13;19:13;
20:5,15;34:9;87:10
**amended (4)**
45:3;49:9;86:15,22
**amending (1)**
20:14;41:3
**amendment (15)**
8:19;9:5;11:19;
12:1;13:5,7,16,20,24;
15:11,22;31:19,21;
42:8,9
**America (5)**
56:14,16;58:3,17;
59:7
**American (1)**
45:16
**among (1)**
56:10
**amount (24)**
37:25;61:24;62:12;
64:2;68:16;91:20;
92:12,22,22;93:2,11,
16,17,23;94:4;95:15,
15,17;96:4;98:19,25;
119:14;120:3,14
**amounts (1)**
62:1
**amount's (1)**
98:10
**AMY (1)**
6:25
**analyzing (1)**
78:2
**and/or (1)**
88:1
**ands (1)**
27:17
**Angeles (4)**
7:14;46:11;49:10;
51:13
**announce (1)**
55:4
**announced (2)**
76:25;77:5
**annoying (1)**
88:1
**anticipate (1)**
53:9
**anymore (2)**
17:6;97:8
**APC (1)**
6:2
**apologies (1)**
64:23
**apologize (8)**
45:8;62:13,22;
117:5;118:22;127:5,
15;128:4
**appear (11)**
39:20;46:21;47:1;
53:21,22,24,24;

79:19;81:9;116:16;
126:8
**appearance (4)**
45:13;48:14;65:6,
13
**appearances (2)**
8:7;45:12
**appeared (4)**
82:20,24;83:4;
84:11
**appearing (7)**
45:17;46:24;48:8,
9,16;49:2;55:24
**appears (7)**
37:23;39:13;40:5;
42:1,25;80:7;81:21
**append (1)**
57:11
**appended (1)**
56:24
**applicable (14)**
14:18,22;15:2;
23:18,21;25:12;26:4;
35:11,16;36:19;
104:1,22;105:8;
106:6
**applications (2)**
89:12,21
**applied (4)**
20:25;21:14;36:11,
13
**applies (22)**
9:9,11,14,15;10:2,
19;11:11;14:9,15;
18:2;19:11,21;20:6,
10;21:2,21;23:8;
25:22;35:6,9;36:2;
44:11
**apply (13)**
21:12,23;25:15,18;
26:5;35:12,19;36:25;
37:4;46:6;87:12;
103:12;110:13
**appraisal (3)**
100:23,24;101:1
**appreciate (2)**
47:2,9
**apprising (1)**
64:24
**approach (1)**
32:13
**approached (1)**
12:24
**appropriate (1)**
118:1
**appropriately (1)**
29:16
**approval (1)**
92:8
**approximately (3)**
15:14;98:14;99:1
**April (2)**
111:7,8

**Arant (1)**
56:6
**ARETT (15)**
53:12;61:7,10,10;
62:4,8,10,13,22;
63:23;64:1,4,9,12,18
**arguably (1)**
84:7
**argue (10)**
46:22;68:6;79:9,
16;81:14;95:8;
105:23,24;112:5;
122:10
**argues (2)**
71:3;75:2
**arguing (1)**
26:21
**argument (17)**
49:11;54:7;81:11,
15;86:16;87:14;95:4;
96:19;101:8;102:15;
104:18;108:18,20,22;
109:7;110:21;120:11
**arguments (9)**
80:8;102:16,17;
105:13,17;107:11;
113:23,23;116:17
**argument's (1)**
94:19
**around (4)**
26:23;33:10;36:16;
104:11
**arrearages (3)**
92:1,3;95:19
**arrears (2)**
98:13,24
**articulate (1)**
14:4
**ascertained (1)**
18:22
**aside (1)**
31:18
**asserted (5)**
59:10;88:4,6,13;
99:18
**assertions (2)**
80:17;84:13
**asserts (3)**
66:13;70:23;81:9
**assess (1)**
57:16
**asset (1)**
13:8
**assign (3)**
116:2;117:9,21
**assigned (2)**
116:4;117:23
**assignment (4)**
50:18,23;51:14;
117:22
**assignments (7)**
51:6,8;52:12,14,
22;54:2;117:10

**assistance (2)**
68:13;70:19
**Assistant (1)**
79:5
**associate (2)**
48:21;66:20
**Associates (1)**
63:20
**assume (6)**
18:22;24:17,17;
42:20;110:23;111:11
**assuming (3)**
41:6;80:25;81:4
**assurance (3)**
89:18,19,20,24;
90:3,4;103:6,11;
107:16;108:25;
109:3,22;110:19
**assured (1)**
68:2
**attached (5)**
39:11;56:4,6;
66:21;82:12
**attempts (1)**
89:11
**Attorney (2)**
79:5;95:20
**Attorneys (4)**
6:20;7:3,11;95:22
**August (2)**
93:1;97:6
**authenticate (1)**
112:17
**authenticating (1)**
112:7
**Authentication (1)**
112:9
**authorize (3)**
73:5;74:19;76:21
**authorized (4)**
23:12;25:18;42:17;
51:7
**auto (1)**
97:1
**available (1)**
66:24
**Avenue (4)**
6:4,21;7:4;104:10
**avoid (3)**
23:11;45:8;93:23
**awarded (2)**
95:22;96:1
**aware (2)**
11:10;108:17
**away (2)**
83:9;100:13
**awhile (1)**
58:21

**B**

**BABC (1)**
60:10

**back (23)**
9:3;17:11,12;
28:18;32:24;33:1;
37:12;39:10;43:5;
69:7;91:1;100:10;
101:7;107:3;109:9,
25;116:7,8,10;
118:19;119:10;
120:5;122:14
**backed (1)**
49:24
**background (3)**
77:16,18;119:9
**bad (1)**
100:1
**BAKER (2)**
7:2;8:11
**balance (3)**
72:25;98:25;99:2
**ballpark (1)**
94:6
**Bank (32)**
3:21;7:3;8:6;10:3;
19:12;20:14;53:4;
56:14,15;58:2,17;
59:7,7;97:8;98:18;
100:8,15;101:16,21,
22,23;102:4,5,5,6,8;
103:2;114:20;115:2,
15;116:9,15
**banking (2)**
13:6;35:13
**Bankruptcy (14)**
2:14,23;8:23;9:1;
12:25;13:3,24;51:11,
12;52:10;57:24;58:2;
59:4;88:15
**banks (3)**
97:17;100:14,15
**bank's (3)**
9:13,25;10:1
**barred (1)**
81:9
**base (4)**
85:22,23;101:22;
113:21
**based (14)**
19:4;23:5;30:24,
25;43:15;82:13,15,
16;86:14,19;87:7;
113:17;114:21,24
**basically (3)**
31:20;36:16;39:2
**basis (3)**
61:18,25;62:19;
88:12,13
**battle (1)**
42:24
**bear (3)**
12:16;52:25;99:18
**Beck (2)**
120:3,13
**become (1)**

52:23
**becomes (2)**
37:2;75:12
**beforehand (1)**
23:23
**began (1)**
110:20
**begins (1)**
77:6
**behalf (9)**
43:2,3;48:16;
52:22;55:24;61:11;
82:2,20;84:22
**believes (4)**
23:20;57:20;66:16;
121:24
**benefit (2)**
68:15,16
**benefits (7)**
67:25;68:1,2,4,25;
89:18;109:19
**besides (1)**
102:14
**best (3)**
26:2;80:22;120:16
**better (4)**
65:2,4;114:9,10
**beyond (1)**
13:5
**big (2)**
100:13,14
**Bill (2)**
90:21;96:2
**bind (1)**
67:8
**binding (2)**
119:15;121:25
**bless (1)**
127:12
**blind (1)**
113:18
**BoA (1)**
58:8
**BoA's (1)**
58:9
**booklet (1)**
98:4
**books (2)**
57:14;61:25
**Borrower (22)**
3:2,5,13;48:2,4,20;
55:18;57:1,13,20;
59:16;64:21;65:8,9;
66:11,12,16,19;
67:24;68:13;70:19;
72:21
**Borrower's (1)**
119:15
**both (17)**
11:6;33:7;37:21;
45:12;51:13;62:5;
63:24;71:3,6;78:16;
79:9,9;108:14;

12-12020-mg    Doc 8368    Filed 03/26/15    Entered 03/26/15 16:51:04    Main Document
RESIDENTIAL CAPITAL, LLC, et al.                    Adv. No. 14-02004-mg, Adv. No. 14-02435-mg
Case No. 12-12020-mg                    Pg 133 of 149                    February 25, 2015

114:17;118:3,8;
125:23
**bother (1)**
24:24
**bothered (1)**
24:23
**bottom (1)**
15:1
**bought (2)**
100:4;122:4
**Boult (1)**
56:6
**bound (2)**
103:2;104:12
**Bowling (1)**
2:15
**Bradley (1)**
56:6
**branch (1)**
18:17
**branches (1)**
19:5
**breach (14)**
33:11;70:23;71:3,
3;78:2,2,11;80:3,4,5;
81:12;84:14;87:15;
114:3
**breached (1)**
75:2
**briefing (2)**
76:2;77:20
**briefly (2)**
37:21;76:7
**bring (5)**
83:22;101:11;
106:14;124:1;126:7
**bringing (2)**
45:23;96:1
**brings (1)**
8:16
**broad (1)**
28:12
**brought (3)**
86:16;87:20;96:17
**buried (1)**
99:22
**business (11)**
24:3;82:5;97:1,1;
100:3;101:15;102:9;
111:25;112:8,14;
115:19
**buts (1)**
27:18
**buy (1)**
122:3
**buyer's (3)**
122:2,3;126:11

**C**

**CA (2)**
6:6;7:14
**calendar (2)**

53:15;118:14
**California (2)**
47:11;49:18
**call (8)**
55:7;62:15;83:2,
12;84:11,23;85:10;
111:8
**called (9)**
30:5;65:18;90:24;
97:10,13;120:2,3,14;
122:24
**calls (4)**
29:16;87:21,23,24
**Calm (2)**
96:8,8
**came (7)**
11:19;12:1;13:16,
20;15:17;26:11;
119:12
**Can (60)**
8:7;9:6;15:23;
20:15;21:8,9,11,20,
23;23:3;24:3,9;25:2,
14,23;30:4;33:4;
36:15,25;37:4;40:1;
43:10;44:12,15;
49:22;52:17;53:8,13;
54:14;57:23;60:2;
73:22;78:11;81:14;
84:23;85:21;89:10;
96:17,20;100:22;
103:2,4;104:10;
107:10;108:12;
111:24;114:11,14;
115:3,9;116:2,9,24;
117:21;118:6;122:1,
8,9;126:23;127:23
**cancel (1)**
117:10,22
**canceled (6)**
102:5;115:13,14,
16,20;117:2
**canceling (1)**
115:6
**Capital (4)**
6:3;7:20;8:3;72:19
**capitalization (1)**
97:20
**car (3)**
47:15;122:3,5
**care (1)**
22:17
**Carl (1)**
71:14
**Carolina (7)**
10:4,14;19:4,9;
20:9;21:7;36:1
**Carrsow-Franklin (1)**
53:2
**case (25)**
21:9,12,15,25;27:8,
11;28:14,23;29:19;
37:22;38:4,20;39:5;

42:22,25;51:12;53:2;
56:14,15;57:24;
72:23;91:8;110:12;
120:23;124:7
**cases (1)**
38:1
**category (1)**
78:25
**cause (1)**
79:24
**causes (6)**
59:2,11,14;66:15;
79:18,22
**center (1)**
35:12
**certain (2)**
20:23;69:5
**certainly (1)**
21:8
**cetera (1)**
120:7
**challenge (3)**
39:14;50:15,16
**chambers (1)**
47:20
**chance (5)**
28:22;65:24;73:24;
112:5;126:25
**change (2)**
34:17,21
**changes (1)**
125:14
**Chapter (1)**
57:24
**characterization (1)**
75:20
**charges (1)**
94:7
**charging (1)**
84:6
**check (1)**
69:7
**checked (2)**
37:6;57:5
**CHFA (9)**
91:19;92:19;93:7;
94:9;95:15,18;97:9,
18;100:12
**chief (1)**
42:12
**children (2)**
91:13;100:1
**choice (6)**
14:6,7,12,18;26:2;
44:18
**choice-of-law (3)**
25:20;37:2,8
**choose (2)**
37:4;81:24
**Christopher (1)**
59:8
**circuit (1)**
62:24

**circuits (2)**
33:8;36:17
**circumstance (2)**
76:15,19
**circumstances (1)**
120:22
**cited (1)**
33:6
**Claim (65)**
3:2,3,5,9,11,13,17;
18:2;48:5,5;53:4;
54:8,9;55:6,19,25;
56:18,23,24;57:9,10,
22;59:10,13;61:15,
16,23;62:5;63:4,6,7,
14;64:1,7;65:10;
66:3,5,12,13,16,17;
67:1;78:11;81:13,13,
14;86:25;87:5;88:12,
13,16;99:18;110:5;
111:22;113:9;119:9,
14,16,24;120:7,8,11;
121:13;122:14;
123:20
**claimant (2)**
61:23;65:21
**claimants (1)**
63:24
**claiming (2)**
22:3,4
**Claims (42)**
3:2,5,9,10,10,11,
13;48:2,4;55:16,18;
57:2,21;61:13,15,16,
16,17,20,21;63:2,3,3,
4,5,8,9,11,12,15,19,
20;64:14,22;65:8,9;
70:22;78:3;81:9,19,
25;84:16
**clean-up (1)**
38:22
**clear (13)**
11:6;23:15;33:10;
36:10;38:18;75:8;
76:11;78:7;104:15;
113:2;119:20;
121:16;126:2
**clearly (1)**
48:15
**clerk (3)**
77:12;127:19,22
**clerks (3)**
53:8;62:11;114:15
**client (4)**
24:8,25;25:1,2
**clients (1)**
26:4
**close (6)**
12:9;24:3;33:22;
34:22;98:10;117:18
**closed (2)**
16:25;17:2
**closer (2)**

94:6,8
**CMO (3)**
45:22,25;46:5
**co-borrower (1)**
58:15
**Code (2)**
59:5;115:5
**colleague (4)**
52:20;54:12,25;
61:7
**colleagues (1)**
122:6
**collect (1)**
83:22
**collects (2)**
68:14;70:20
**com (1)**
103:25
**comfortable (1)**
78:15
**coming (1)**
14:3
**comments (1)**
29:20
**commercial (5)**
14:25;115:5;116:2,
2;117:20
**communication (1)**
82:16
**comparing (1)**
54:2
**complaint (17)**
8:17;11:8,8;12:4;
20:4;23:6;24:24;
27:8;29:3;45:3;49:9;
59:12;69:15;87:8;
88:9;102:18;113:9
**complaints (2)**
86:17;101:19
**comple (1)**
99:16
**complete (3)**
29:22;30:9;43:21
**completed (2)**
19:18;97:23
**completion (2)**
97:9;100:12
**complex (1)**
38:3
**compliance (4)**
90:24;91:9;103:13;
104:11
**complicated (1)**
38:1
**complied (3)**
103:25;104:22;
105:7
**comply (3)**
75:12;76:9,11
**computer (1)**
44:3
**con (1)**
92:6

**concede (1)**
76:12
**concern (2)**
51:4;96:18
**concerned (1)**
94:11
**concerning (9)**
13:15,16,19,22;
54:8;65:9;90:21;
104:12;106:19
**conclude (2)**
84:19;111:11
**concluded (2)**
57:17;128:6
**concludes (1)**
64:15
**conditioned (1)**
14:11
**conduct (1)**
57:17
**conducted (1)**
57:13
**conf (1)**
73:23
**confer (1)**
111:15
**Conference (4)**
3:22;4:4;83:12;
118:17
**conferences (1)**
8:4
**confidential (1)**
39:18
**confirmed (1)**
57:7
**conflict (4)**
25:17;36:19;37:3,3
**Congressional (1)**
73:19
**Connecticut (17)**
79:6,25;81:14;
82:19,20;87:13;
90:20;91:19;97:10,
13,17;100:12;
104:17;114:4;
122:20,21;123:4
**connection (5)**
21:5,22;46:24;
57:12,17
**Connors (1)**
107:9
**consensual (1)**
119:13
**consensually (1)**
62:5
**consider (5)**
37:13,14;75:23;
77:25;79:11
**considerable (1)**
62:12
**consideration (2)**
78:22;110:8
**considered (4)**

68:25;76:16;79:7;
109:20
**consistent (6)**
57:18;67:8,18,20;
76:13;77:15
**consists (1)**
57:10
**contemporaneous (1)**
82:15
**contention (1)**
67:3
**continuance (1)**
109:22
**continue (1)**
68:17
**continuing (1)**
88:1
**contract (20)**
33:9;35:11,11,24;
36:10;41:1,3,6;
70:23;71:3,6;75:3;
78:2,11;80:3,4,5;
81:13;84:15;114:4
**contracts (2)**
12:21;44:15
**contradicted (1)**
102:18
**control (1)**
117:9
**controlling (1)**
10:10
**controls (2)**
9:21;34:20
**convenient (1)**
114:17
**conversation (1)**
29:10
**conversations (2)**
9:15;29:9
**coordinate (1)**
53:7
**copy (7)**
39:10;56:12;68:22;
69:2,6;102:7;109:11
**Cornelius (45)**
3:18;6:15;18:18,
24;119:3,4,5,6,25;
120:1,21;121:4,7,14,
18,22;122:17,19,23;
123:2,5,7,12,16,18,
21;124:4,6,21,24;
125:3,6,11,16,25;
126:4,10,13,17,19,
22;127:4,6,9,12
**Cornelius' (1)**
119:20
**corrected (4)**
18:24;105:23,24;
106:2
**cost (3)**
42:11;96:7;100:11
**Counsel (16)**
6:3;10:17;12:25;

15:10;16:18;21:7,11;
27:15,18;42:13;
44:10;46:20;48:21;
66:21;70:6;121:22
**counted (1)**
88:25
**Countless (3)**
87:24;89:10,11
**couple (1)**
60:19
**course (1)**
77:21
**Court (629)**
2:14;8:2,10,13,16,
17;9:22;10:7,12,21,
23;11:2,5,17,21,25;
12:4,8,12,16,20,22;
13:14,18,21;14:17,
21,23;15:6,13,19,24;
16:1,3,8,11,15,23,25;
17:3,4,8,12,15,20,22;
18:4,6,12,17,20;19:1,
5,8,11,16,21,23;20:1,
3,11,17,20;21:5,10,15,17,
20,24;22:5,10,15,17,
21,23,25;23:4,7,10,
14,17,18,24;5,11,13,
15,19,23;25:4,6,10,
18;26:9,13,16;27:14,
17,21,23;28:2,5,7,9,
13,17,22;29:2,12,14;
30:3,11,13,16,19,22;
31:3,5,7,15,24;32:2,
5,7,9,11,14,17,20,23;
33:1,15,19;34:1,3,8,
10,13,15,19,24;35:5,
14,17,25;36:5,7,12,
18,22,24,25;37:4,7,9,
15,18,21;39:9,20,23;
40:1,4,11,14,17,22;
41:2,4,13,16,18;42:1,
12,15,17,21,24;43:7,
17,23;44:2,5,7,19,21;
45:2,5,8,11,17,19;
46:1,4,9,13,16,18,20;
47:3,6,8,10,13,16,19,
23;48:6,9,12,14;49:2,
4,6,8,10,13,18,21,25;
50:5,7,10,12,14,21,
25;51:1,10,12,13,17,
21,24;52:2,9,10,19,
25;53:7,13;54:5,7,13,
19,21;55:2,5,7,10,12,
14,21,23,23;56:9,15,
18,22;57:5,23,24;
58:1,2,5,8,16,20,22,
23,25;59:2,10,12,17,
20,22,25;60:4,7,15,
20,24;61:2,5,9;62:2,
7,9,11,15,23;63:1,25;
64:3,6,7,10,10,13,13,
15,19,25;65:2,4,12,
16,18,20,23;66:1,5,7,

25;67:10,22,24;68:8,
21;69:8,12,19;70:2,5,
9,12,14,17,21,25;
71:2,6,8,12,15,17,23,
25;72:4,7,9,12,19,21;
73:4,8,13,18,21,24;
74:1,5,7,10,13,16;
75:2,5,7,12,15,17,21,
23;76:2,5,8,23;77:11,
17,19,22,25,25;78:5,
10,14,19,22;79:15,
18;80:12,15,15,23,
25;81:2,4,8,18,24;
82:5,9,18,23;83:3,7,
13,15,17,24;84:3,5,7,
10,25;85:4,7,7,10,14,
16,20,24;86:1,6,9,11,
18,21,23;87:2,3,4,9,
14,17,22;88:3,6,8,10,
12,15,19,22,25;89:1,
3,6,8;90:5,7;91:3,23;
92:3,5,9,16;93:11,13,
18,21;94:1,15,18,21;
95:2,6,9,13;96:8,10,
12,15,24;97:2,22,25;
98:2,6,13,16,21,24;
99:5,7,9,13,17,20;
100:6,9,22;101:4,7,
18,20,25;102:2,13;
103:4,7,15,18,21,23,
24;104:4,15,18,21;
105:2,5,14,21;106:4,
10,14,16,18,20,24;
107:3,13,15,20,23;
108:2,6,10,12,22,24;
109:4,6,9,12,15;
110:2,4,22;111:3,5,9,
15,21,24;112:4,7,10,
13,14;113:2,6,11,13,
15,22;114:12,14,23;
115:4,8,14,17,24;
116:1,6,8,10,16,16,
20,25;117:4,6,9,13,
16,19,25;118:15,19,
22,25;119:3,5,7,11,
18,21,22,24;120:12,
20;121:3,8,15,19,23;
122:9,18,22;123:1,3,
6,11,15,17,19,22;
124:5,7,20,23;125:1,
4,7,9,12,16,18;126:1,
5,11,15,18,20,23;
127:5,7,8,11,17,21,
23;128:1,3,5
**court-appointed (1)**
84:23
**CourtCall (1)**
49:20
**courthouse (1)**
49:23
**courtroom (1)**
101:15
**court's (2)**

25;67:10,22,24;68:8,
... [continued in next column]
**concede (1)**
49:17;50:1
**covenant (3)**
12:19;71:3;78:2
**covered (2)**
64:12;107:5
**covers (1)**
16:6
**created (2)**
13:5;74:14
**credit (2)**
99:12;100:15
**creditors (1)**
88:16
**cross-examine (4)**
52:17;53:21;81:23,
24
**crystal (1)**
75:8
**Cummings (1)**
56:6
**current (6)**
78:24;96:17,19;
98:13;100:21;101:11
**currently (1)**
52:1
**customers (1)**
16:7
**cut (2)**
28:15;91:16
**Cynthia (1)**
53:2

## D

**dark (1)**
96:3
**date (6)**
41:23;53:8,19;
88:25;93:2;114:17
**dated (1)**
3:16
**dates (2)**
14:11;53:18
**DAVID (3)**
6:8;48:23;49:19
**day (12)**
20:24;38:15;53:13,
14;82:14;89:12,13;
96:7;114:15;118:24;
119:21;120:13
**days (18)**
23:20,22;25:11;
29:15,23,25;30:7;
33:21;34:7,12,21;
37:24;38:5,25;43:8,9,
12,21
**deadline (1)**
56:7
**deal (6)**
15:19;17:8;26:22;
59:22;118:10;122:8
**dealing (4)**
23:14;71:4;78:3;

12-12020-mg    Doc 8368    Filed 03/26/15    Entered 03/26/15 16:51:04    Main Document
RESIDENTIAL CAPITAL, LLC, et al.                    Adv. No. 14-02004-mg, Adv. No. 14-02435-mg
Case No. 12-12020-mg                    Pg 135 of 149                    February 25, 2015

80:4
**deals (1)**
118:17
**dealt (3)**
18:21;33:13;35:2
**DEANNA (2)**
7:20;63:18
**debt (2)**
93:24;104:9
**debtor (1)**
84:12
**debtors (6)**
39:16;41:9;51:24;
53:16;63:13;68:22
**debtors' (7)**
57:14,17;61:25;
62:1;66:14,18;85:12
**Debtor's (1)**
53:3
**debt-to-income (1)**
91:1
**December (9)**
32:15;40:11;41:22,
22,24,25;42:17;43:1;
79:4
**Deceptive (3)**
59:6;84:15;114:5
**decide (19)**
17:4;43:12,23;
50:25;51:1;75:24;
81:24;84:17;103:24;
113:22;114:2;
121:23,24;122:4,15;
123:23;124:3;126:6;
127:3
**decided (2)**
37:14;122:15
**decides (2)**
87:4;126:6
**deciding (7)**
38:8;75:22;94:25;
102:3;105:9;126:2,2
**decision (6)**
52:21;53:2,3;
81:21;114:21;123:23
**decisions (1)**
52:9
**declaration (12)**
51:18;52:15;63:17;
66:23;68:11;71:16;
80:16;82:11;89:19;
94:3;99:24;109:16
**declarations (3)**
48:20;56:3;66:20
**declaratory (1)**
22:8
**deed (3)**
50:17,18;51:6
**deemed (2)**
35:19;83:21
**Def (1)**
88:5
**defamation (3)**

79:22;87:16,19
**defaults (1)**
72:21,24
**defendant (1)**
45:17
**defendants (1)**
45:18
**defenses (1)**
19:15
**defer (2)**
49:15;78:17
**define (1)**
113:5
**defined (1)**
112:25
**definite (1)**
125:24
**Delaware (1)**
36:4
**delay (1)**
50:2
**delaying (1)**
60:9
**delicate (1)**
27:3
**demand (1)**
29:23
**demands (1)**
88:2
**demonstrating (1)**
90:22
**demurrer (6)**
49:9,10,14,22;50:8,
14
**Department (5)**
74:1,16;77:5,13;
90:1
**deposit (6)**
14:18,25;19:13;
20:14;33:16;35:8
**deposition (4)**
26:8,18;38:21;
52:16
**depositions (1)**
30:5
**depository (6)**
8:20;9:5,10;13:10;
16:19,20
**depository-specific (1)**
16:6
**derived (1)**
82:11
**describe (1)**
37:21
**described (1)**
39:11
**designee (1)**
73:17
**determination (5)**
23:18;110:15;
121:1;122:9,10
**determine (8)**
17:16;36:25;68:17;

89:20;92:18,19;
104:8;113:10
**determined (1)**
102:4
**determining (2)**
92:6;95:21
**Development (3)**
73:16;74:2,17
**Devine (2)**
42:12;43:1
**devised (1)**
13:1
**dice (1)**
121:9
**differ (2)**
72:5;110:13
**difference (10)**
10:13,14,15,17;
11:21;12:2;22:10;
35:23;44:13;115:6
**differences (1)**
20:23
**different (13)**
17:24;33:7;40:21;
51:11,17;78:12;
89:16;102:6;106:5,
22;107:16;108:17,18
**differs (1)**
36:8
**difficult (1)**
46:23
**direct (1)**
53:20
**directed (1)**
56:9
**directive (2)**
70:16;77:9
**disagree (6)**
22:21,23;37:5;
92:13,15,15
**disagreed (4)**
40:20;41:10;42:4,5
**discovery (57)**
11:5,7,12,13,15,17;
13:14,15,16,19,22;
14:1,5,16;25:23,24;
26:1,6,17,18,24;27:2;
28:9,15,15,25;29:5,8,
22;30:5,9,25;31:7,9;
32:1;33:2,5,12;
34:24;35:3,21;37:11,
19;38:9,12,13,16,24,
25;39:5;42:21;43:4,
9,9,16,17,22
**discuss (2)**
112:19;122:7
**discussed (1)**
36:17
**discussing (1)**
30:24
**discussion (1)**
62:25
**discussions (1)**

36:6
**dismiss (9)**
9:8,20;11:7;14:8;
21:10;25:24;31:14;
39:10;44:17
**dismissed (1)**
108:1
**dispute (23)**
8:16;9:4,9,18,21;
10:25;17:17;18:7;
21:22;25:15,19;
30:25;35:19;36:8,14;
38:4;72:7,9;79:4,8;
92:5;93:15;124:8
**disputed (6)**
11:9;78:23;80:7;
84:14;110:6;113:16
**disputes (4)**
82:18;84:8;114:3;
125:20
**disputing (3)**
71:20;94:2;117:8
**disqualification (1)**
27:24
**disqualified (1)**
90:15
**disqualify (2)**
27:14,18
**disregard (1)**
97:11
**distinct (1)**
108:19
**distress (1)**
59:5
**docket (12)**
25:11;49:17;55:20;
56:9;57:2,3,13;
61:17;66:3,10;86:17;
109:15
**docketed (2)**
66:9;68:11
**Docketed] (1)**
3:18
**document (11)**
29:22,23;30:9;
39:17,18;40:1,4;
57:11;69:14;70:6;
117:14
**Documentation (8)**
3:9;61:15,24;63:3,
9;68:14;93:20;
117:15
**documented (1)**
109:21
**documents (18)**
26:25;30:1,2;
43:12,22;54:3;56:24;
57:12,18,19;80:8;
83:23;96:1,2,22;
111:25;112:8,17
**dollar (3)**
91:20;98:10,19
**dollars (16)**

8:21;14:3;91:21,
24;92:13,23,23;
94:10,11;95:25;96:5;
98:4,20;101:3,11;
120:14
**done (9)**
33:4;38:9,10,15,
22;39:1,1;46:7;
117:25
**Donnell (9)**
8:25;9:12,16,19;
14:10;27:3,4,11;
31:11
**DONOHUE (1)**
7:10
**double-dipped (1)**
93:6
**down (7)**
14:3;27:23;47:15;
87:24;96:8,8;121:20
**draft (1)**
29:19
**drafted (1)**
11:23
**Drain's (2)**
52:20;53:1
**drives (1)**
29:24
**driveway (1)**
101:1
**dry (2)**
47:13;91:16
**DTI (1)**
104:9
**due (22)**
72:25;90:8;92:1,
25;93:1,2,3,5,8,16,17,
22;94:4;95:11,12,15,
15,19;96:3;98:3,11,
25
**Duplicate (2)**
3:9;61:15
**duplicative (3)**
61:22;63:3,7
**duration (1)**
68:16
**during (3)**
82:19;83:6;86:19
**duty (2)**
87:15,18;95:2,3

**E**

**easily (2)**
96:6,21
**Eboweme (16)**
3:6;55:19,23,24;
56:8,9,25;57:3,10,16,
21,23;58:14;59:1;
60:22;61:2
**Eboweme's (3)**
57:15,18;60:12
**ECF (3)**

63:5,18;109:15

118:1

**effect (2)**
74:21;123:24
**effective (2)**
15:22;33:21
**effectively (1)**
60:12
**effort (6)**
24:9;30:9;43:11;
48:16;96:4;118:4
**efforts (2)**
67:4;90:22
**EHLP (6)**
91:17;96:16;97:9;
100:10,11;101:9
**eight (3)**
90:20;103:13;
104:8
**Eighty-First (6)**
3:8;61:14,20;
62:17;63:2;64:14
**either (6)**
20:17;34:5;82:16;
83:17,25;121:16
**else (5)**
30:13;39:7;44:8;
64:11;101:18
**else's (1)**
84:4
**e-mail (4)**
79:5,8,9;107:8
**Emanuel (1)**
45:1
**embarrassed (1)**
97:7
**emotional (1)**
59:4
**employed (3)**
51:21;52:1;53:16
**employee (2)**
48:22;79:6
**end (6)**
17:17;20:24;33:1;
38:5;73:11;95:23
**endeavor (1)**
43:4
**endorsement (2)**
115:24;117:7
**endorsements (5)**
72:7;102:16;
116:11,11,21
**enforce (9)**
122:1,8;124:1;
125:15,16,18,19;
126:7;127:1
**enforceable (5)**
83:21;122:9;
124:11
**enough (4)**
37:9,9;38:23;123:7
**enter (8)**
28:14,23;42:17;
43:8;58:24;84:18,19;

**entered (5)**
18:15;31:17;44:3;
47:20;112:18
**entering (1)**
40:25
**entire (1)**
34:6
**entirely (1)**
57:18
**entities (2)**
12:24;13:4
**entitled (5)**
18:1;81:22;101:12;
112:1;114:2
**eScribers (1)**
4:21
**escrow (3)**
93:15;94:2,5
**escrows (2)**
93:14,17
**escrow's (1)**
93:16
**ESQ (5)**
6:8,24,25;7:7,16
**essentially (1)**
50:7
**establish (1)**
63:12
**established (1)**
78:10
**establishes (1)**
105:6
**establishing (1)**
104:1
**Estate (1)**
45:16
**estates (1)**
66:18
**et (3)**
4:3;6:3;120:7
**ev (1)**
91:17
**evaluating (1)**
79:12
**even (14)**
14:4;25:1;38:1,7;
93:5;97:6;98:9,22;
100:7,24,25;103:12;
108:18;120:7
**everybody (1)**
21:5
**evidence (14)**
60:12,13,23;67:16;
79:11;86:16,20;
87:20;90:3;91:17;
93:4;103:5,18;108:7
**evidentiary (17)**
52:13;53:9;82:1;
84:20;87:5;94:23;
108:6;110:7,10,23;
111:12;112:19;
113:15;114:3,16;

118:7,9

**exactly (5)**
10:22,24;56:20;
76:10;114:25
**examination (2)**
53:22;57:14
**examined (1)**
79:22
**example (1)**
13:7
**exasperation (1)**
116:13
**exceeded (2)**
92:13,23
**Excellent (1)**
65:21
**except (1)**
72:22
**excuse (3)**
49:11;55:3;60:17
**excused (1)**
54:13
**execute (1)**
51:8
**execution (1)**
54:1
**executive (1)**
74:13
**exhaustive (1)**
57:14
**Exhibit (20)**
32:8;56:5;63:7,10,
13,15,15;66:22,23;
68:10,12;69:8,10,21;
71:13;76:24;77:4;
107:8;109:16,16
**Exhibits (3)**
61:21;64:5;68:15
**existed (1)**
14:4
**exists (1)**
79:8
**expect (1)**
123:22
**expected (1)**
60:18
**expenses (2)**
39:15;41:8
**expensive (1)**
118:6
**expert (2)**
28:15;43:9
**explained (1)**
120:6
**explicitly (1)**
14:10
**explored (1)**
13:13
**express (1)**
116:13
**expressly (1)**
71:10
**expunge (2)**

61:21;66:12

**expunged (1)**
57:22
**extend (4)**
28:19;38:9,17,24
**extending (1)**
100:19
**extension (2)**
38:6,13
**extensions (3)**
23:22;89:24,25
**extent (4)**
42:5,6;76:14,15
**extremely (2)**
49:23,24

---

## F

**face (3)**
33:10;36:10;72:17
**fact (9)**
11:9;28:15;29:7;
38:25;43:9,21;78:23;
81:5;110:7
**facts (6)**
12:16,16;80:6;
81:20;84:14;93:21
**factual (10)**
13:12;29:4;80:17;
81:25;84:7,20;92:14;
94:16,22;114:3
**fail (1)**
63:12
**failed (1)**
66:14
**failing (1)**
72:21
**Fair (1)**
37:9,9;51:8,14;
71:4;75:18,19;78:3;
79:13,14;80:3
**fairly (1)**
35:8
**faith (11)**
11:23;29:21;30:9;
33:9,11;36:16;38:11;
40:25;71:4;78:3;80:3
**fall (1)**
78:25
**falls (1)**
80:4
**false (2)**
79:20;87:16
**familiar (4)**
21:6;52:20,22,23
**Families (1)**
97:10,13;100:12
**far (7)**
13:5;38:9;85:23;
94:10;98:10;101:19;
127:19
**Fargo (36)**
3:21;7:3;8:6,12,20,

22;9:9;11:24;12:5,
25;13:2,8,11;14:16;
23:20;24:2,16;25:8;
31:16;33:2,16;39:16;
40:10;41:8;42:11;
43:3;52:21;53:4;
100:14;102:9,10;
115:19;116:5,22;
117:1,3

**Fargo's (2)**
9:1;25:12
**fault (1)**
88:24
**February (8)**
2:18;3:16;41:23;
56:7,8;58:9;66:10;
97:5
**federal (2)**
88:25;100:15
**fee (1)**
93:8
**fees (35)**
8:22;13:1,17,23,
24;14:2;26:12,21;
27:7,7;31:12,18;
32:19;39:15;40:5,7,
19,24;41:7,8,19,21;
42:3,6,22;43:5;
83:22;93:8,17;94:3;
95:11,19,20,21,22
**Fein (1)**
63:20
**Ferguson (1)**
59:8
**few (4)**
31:8;38:22;86:17;
125:12
**FHA (38)**
89:16,17;90:12,24;
91:10,18;97:18,19;
100:7,13,16;102:12,
12;103:1,10,10;
104:11,13,23;105:3;
106:7,10,11,12,18,
21,21;107:6,15;
108:16,17,24;110:11,
12,17;127:20,24
**FICO (2)**
97:15;100:17
**fiduciary (4)**
87:15,18;95:2,3
**Fifth (1)**
7:4
**fifty-five (1)**
91:1
**fight (2)**
25:20;40:6
**fighting (2)**
41:5;98:7
**figure (6)**
9:2;10:19;30:4;
74:24;84:11;93:7
**file (10)**

25:11;59:15;86:11,
12;88:16;104:10;
126:9,25;127:1,2
**Filed (38)**
3:3,6,14,17;20:3,4;
24:23;27:12;45:3;
48:5;49:1,8;50:4,5;
54:9;55:19;56:8,18,
20,21;57:2,12,23;
58:17;59:1;61:17,23;
64:8;65:10;66:3,4,8,
10;87:8;91:9;103:13;
105:15,16
**filing (2)**
56:11;87:11
**final (3)**
81:20;95:7;125:22
**Finance (2)**
59:5;98:11
**Financial (15)**
3:20;6:20;8:6,9;
13:3,9,10;16:13,20;
18:21;23:3;31:16;
43:2;52:1;97:15
**Financial's (1)**
8:21
**find (6)**
36:9;96:25;107:23;
108:11;109:10;
114:15
**finding (1)**
24:8
**fine (6)**
8:18;21:13;69:24;
86:1;94:18,19
**finish (1)**
105:10
**finished (1)**
29:25
**firm (2)**
24:19,21
**first (26)**
8:4,6,15;11:6;
14:16;25:23;27:4,11;
39:17;66:21;68:3,3;
69:16,17,18;76:24;
77:4,16;86:3;97:10,
13;99:3;100:12;
117:6;121:19;122:21
**five (2)**
38:5;63:15
**five-day (1)**
30:10
**fixate (1)**
101:10
**fixed (2)**
119:13,16
**Flower (1)**
7:12
**fly (1)**
46:10
**focus (4)**
11:18,20;70:17;

78:22
**focused (1)**
81:12
**focuses (1)**
51:7
**focusing (1)**
69:20
**Foerster (3)**
48:1,24;61:11
**follow (1)**
74:5
**followed (1)**
115:7
**following (4)**
35:12,12,15;77:8
**follow-up (1)**
30:5
**forbearance (5)**
94:14;96:21;99:11;
105:19,22
**foreclose (2)**
58:8;59:3
**foreclosure (8)**
50:16;59:3;61:1;
90:21;95:17;97:23;
100:25;104:13
**forgery (3)**
51:14;52:12,21
**forgiving (1)**
100:19
**form (6)**
39:4;42:9;47:19;
57:10;59:13;120:7
**former (3)**
48:22;51:24;85:11
**Fort (1)**
52:4
**forty (1)**
100:19
**forty- (1)**
30:9
**forty-five (3)**
29:22;43:12;91:10
**forty-five-day (2)**
30:21,23
**forum (1)**
36:25
**forward (21)**
25:23;26:1;27:13;
53:8,25;55:17;61:18;
62:3,19;63:21;64:15;
68:4;80:8;86:17;
87:20;94:23;114:5;
118:7,9,10;121:20
**fought (1)**
99:25
**found (1)**
120:24
**four (2)**
48:20;95:24
**Francine (6)**
3:3;48:5,10,17;
54:8,9

**Frankly (3)**
19:22;49:16;81:18
**fraud (1)**
79:22
**frequency (1)**
68:16
**frequently (1)**
38:20
**friends (1)**
99:19
**front (3)**
41:14,16;70:7
**frustrate (1)**
87:24
**frustration (1)**
127:16
**full (9)**
49:17;72:22,24;
76:21;95:22;97:4;
98:19,19;102:9
**funds (1)**
18:10
**further (8)**
25:22;39:14;51:10;
56:12;74:4;84:2;
96:11;101:12
**future (1)**
89:5

**G**

**Garbled (2)**
48:11,13
**gave (11)**
12:8,9;84:1;91:19;
92:23,24;94:4;
100:24;102:6;120:9;
123:13
**general (3)**
26:14;45:15;79:5
**gets (1)**
93:23
**girlfriend (1)**
91:13
**given (5)**
23:22;28:12;44:9,
10;93:7
**gives (1)**
16:21
**giving (2)**
100:17;124:12
**glad (1)**
62:20
**GLENN (2)**
2:22;3:16
**GMAC (19)**
48:22;49:8;59:7;
60:14;67:2,7;75:2,
12;79:6,10,11;82:20;
83:3,23;100:3;
102:10;115:20;
119:16;122:24
**GMAC's (1)**

90:9
**God (1)**
127:12
**goes (11)**
11:22;13:5;21:25;
40:9;42:7,8;73:1;
86:11;98:4;116:18;
127:8
**Good (20)**
8:8;11:22;29:21;
33:11,24;36:16;
38:11;40:25;44:25;
45:2;46:12;47:25;
54:11;55:15;61:10;
65:14;71:4;78:2;
80:3,12
**good- (2)**
30:8;33:8
**good-faith (4)**
12:19;33:5;42:8;
43:11
**Goodman (1)**
50:11
**govern (1)**
9:18
**government (1)**
122:20
**grab (1)**
17:5
**grandson (1)**
123:9
**grant (1)**
67:7
**granted (3)**
58:2,8,9
**Great (1)**
46:8
**Green (1)**
2:15
**GROSS (3)**
6:25;18:24;29:10
**ground (1)**
63:11
**grounds (3)**
61:22;63:6,9
**Group (9)**
4:3;7:11;44:23;
45:15,15;88:2;116:2,
2;117:20
**guarantee (4)**
23:1;94:12;96:20;
101:13
**guaranteed (4)**
106:7,10;108:16;
110:12
**guaranty (1)**
13:11
**guess (4)**
45:9;58:21;71:3;
82:7
**guidance (2)**
77:7,10
**guideline (1)**

108:19
**guidelines (26)**
67:8,10,13,16,18,
20;68:8,9,12,23;69:2,
9;71:9;72:13,17;
78:1;91:2;104:11,23;
106:6,22,22;108:19,
24;110:12,16

**H**

**half (2)**
8:21;14:2
**HAMP (46)**
67:13,15;68:22;
69:8,21;71:9;72:13,
17;73:18,19;74:2,13,
21;75:9,23;76:14,17,
24;77:12,25;78:8;
85:25;89:16,16,17;
90:12,12;91:6;103:8,
9,10;104:23;105:3;
106:12,13,18,21,23;
107:6,15;108:17,17,
24;110:12,16,17
**hand (1)**
51:2
**handed (2)**
77:12;109:12
**handle (1)**
54:25
**handled (1)**
111:22
**hands (1)**
25:2
**happen (5)**
27:6;38:17;88:25;
110:4;112:18
**happened (2)**
12:24;82:14
**happens (3)**
29:24;85:7;121:3
**happy (5)**
46:20;64:25;78:17;
97:3;120:18
**harass (1)**
87:24
**harassment (2)**
87:21,22
**hard (2)**
69:6;124:13
**hardship (2)**
97:15;100:18
**Hartford (1)**
100:15
**head (1)**
15:8
**hear (9)**
52:19;54:1,7;
81:10;85:16;94:24;
104:18;114:6;120:19
**heard (3)**
36:4;89:1;122:2

**hearing (34)**
49:13;50:2,8;51:2;
52:13;53:9,19,25;
60:5;62:17;70:5;
82:1;84:19,20;87:5;
94:23;108:6;110:7,
10,23;111:12,17;
112:19,21;113:16;
114:3,16,16;118:1,7,
10;119:12;122:14;
126:25
**hearsay (1)**
108:1
**Heather (3)**
62:3,18;64:8
**held (1)**
78:7
**help (4)**
92:1,21;96:5;97:7
**here's (8)**
10:17;74:23;94:3;
106:17,21,22,22;
125:5
**hinder (1)**
91:15
**hindered (1)**
96:7
**hinge (2)**
80:6;81:20
**historical (1)**
62:1
**history (3)**
57:15;60:12;96:20
**hold (3)**
69:23;73:1;82:1
**holding (1)**
88:17
**home (2)**
100:23;122:4
**HON (1)**
2:22
**honest (1)**
19:24
**honestly (2)**
10:11;14:6
**Honor (170)**
8:8,15,19,24;9:7;
10:16,22;11:15,18,
22;12:3,23;13:7,9;
14:1;21:24;22:24;
23:9;25:9;26:15;
28:21;29:9;30:12,21;
32:4,13,25;33:24;
34:4;36:21,23;37:12,
17;39:8,17;40:8,23;
41:11,15,17;44:25;
47:2,25;48:1,19;49:3,
12,19;50:3,6,9,11,13,
20,24;51:9,16,20,25;
52:24;54:4,11,22;
55:15,22;56:2;57:7,
9;60:2;61:6,10;62:4,
13,22;64:12,18,23;
65:3,7,14;66:2,2,6,
11;67:1,12;68:6;
69:3,10;70:8,13,15,
24;71:1,21;73:11,20,
22;74:11;76:6,10,18;
77:3,21;78:4,15,17;
79:14;81:3;82:22,24;
83:5,19;84:2;85:19;
86:3,14;87:7;88:20;
91:25;92:25;93:15;
96:16;97:1,9,24;98:1,
8,20;100:8;101:2,9,
21;102:1,21;103:17,
22;105:4,20;106:23;
107:9,19;108:4,14;
109:8,13;110:18;
111:1,14,19,23;
113:9;114:10;115:3,
12,15,18,25;116:5,
19;117:2,24;118:12,
13;119:1,19;120:1;
124:18;127:14,15
**Honor's (2)**
29:20;31:6
**hoping (1)**
44:11
**HORST (2)**
7:20;63:18
**hours (3)**
53:10,11;110:24
**House (7)**
90:20;96:2;97:23;
99:22,25;100:4;
103:10
**Housing (3)**
73:16;74:1,16
**HUD (20)**
73:6;74:20;75:8,9,
13;76:14,16,22;77:1,
14;90:16;91:18;
103:1,2,4,8;104:25;
105:1;107:7,25
**HUD's (1)**
90:10
**hypothetically (1)**
93:19

**I**

**idea (4)**
83:11;93:9,10;94:7
**identical (1)**
58:19
**identified (2)**
15:3;21:22
**identify (2)**
44:9;48:15
**ifs (1)**
27:17
**III (2)**
6:24;48:3
**illegal (1)**
101:23

**illegally (1)**
42:11
**immediate (2)**
72:24;76:20
**immediately (1)**
105:24
**implication (1)**
71:10
**important (4)**
96:12,13,14;111:1
**imposes (1)**
13:11
**impossible (2)**
33:20;97:18
**improper (1)**
20:4
**inability (1)**
11:10
**Inc (6)**
3:20;4:3;6:20;
16:14;43:2;45:15
**include (7)**
28:24;30:7,8;
33:16;43:13,14;
57:11
**included (15)**
34:14,16;43:14;
52:12;71:21;80:20;
90:2;91:4;92:25;
93:8,16,17;95:11,14;
107:8
**includes (3)**
37:24;51:14;68:14
**including (3)**
80:3;88:2;91:7
**income (16)**
67:14,17;68:17;
79:1,7,12;91:1,5,11,
12;103:1;104:9;
109:20,21;123:7,10
**inconvenience (1)**
110:25
**incor (1)**
105:13
**incorporate (1)**
75:8
**incorporated (5)**
71:9;72:14;75:23;
76:17;78:1
**incorporates (2)**
72:17;74:21
**incorrect (1)**
103:1
**incorrectly (1)**
105:22
**incur (1)**
42:11
**incurred (2)**
8:22;13:2
**indeed (1)**
89:22
**indemnification (1)**
23:1

**indicate (3)**
20:13;23:19;44:10
**indicated (2)**
114:1;117:6
**indicates (1)**
116:22
**indication (1)**
51:3
**industry (1)**
77:8
**infliction (1)**
59:4
**information (8)**
24:9;31:11;67:19;
87:3;91:20;97:11;
114:22;115:2
**informed (1)**
69:4
**inherited (1)**
99:12
**initial (2)**
56:25;119:12
**initially (1)**
38:1
**inquire (1)**
19:1
**inquired (1)**
18:13
**insignificant (1)**
102:24
**inspection (1)**
93:8
**installments (1)**
107:11
**instead (1)**
89:1
**instinct (1)**
82:4
**Insufficient (5)**
3:9;12:9;61:15;
63:3,9
**insur (1)**
91:4
**insurance (5)**
97:19;102:12;
107:4;110:9,10
**intended (2)**
74:24;121:15
**intending (1)**
124:18
**intent (1)**
102:9
**intentional (1)**
59:4
**intents (1)**
58:18
**interest (7)**
9:1;13:8,25;14:4;
72:25;92:11,12
**interesting (1)**
62:20
**internal (2)**
100:14,17

**interpret (2)**
44:14;82:13
**interpretation (1)**
41:7
**interpreted (1)**
44:14
**interrupt (3)**
20:3;87:6;97:22
**into (28)**
9:14;18:16;31:17,
25;38:14;40:25;
42:17;45:23;60:12;
67:25;71:9,25;75:23;
78:1,25;82:15;84:3;
90:14,14;93:3;99:25;
100:5;112:1;113:18;
123:19;125:4;
126:16,20
**invalid (1)**
16:19
**investments (1)**
99:23
**Investors (5)**
4:3;7:11;44:23;
45:14,15
**involved (5)**
9:23;10:5,8;15:4;
25:18
**involving (1)**
52:21
**Irvine (1)**
6:6
**issue (77)**
9:7;10:20;11:12;
12:12,14,17,18;
13:12;14:12;18:3,8;
25:14,23;26:2,19,20;
27:3;29:13,17;31:10,
20;33:9;35:6;37:2;
40:5,18,19,25;41:6,9,
19,20,21;42:2,25;
43:3,20;44:12,18;
50:14,22;51:4,5,7,13;
52:13;62:12;67:13;
72:13;75:12;76:3;
77:22;78:10,12;
86:20;91:23;92:9;
93:24;103:23,24;
104:15;105:25;
108:13;110:2,8,22;
113:4,6,7,8,17,25;
114:24;115:18;
116:12;119:20;
121:23
**issued (5)**
73:18;74:2;76:14,
19;77:7
**issues (45)**
8:18;11:9;15:5,9;
26:10,13,16,25;
27:10;29:2,4,4;31:8,
20;36:8;37:10,13;
38:11;40:17;41:7;

12-12020-mg    Doc 8368    Filed 03/26/15    Entered 03/26/15 16:51:04    Main Document
RESIDENTIAL CAPITAL, LLC, et al.                    Pg 139 of 149
Case No. 12-12020-mg                    Adv. No. 14-02004-mg, Adv. No. 14-02435-mg
February 25, 2015

42:2;54:8;68:23;
78:23,24;79:3;80:7;
94:16,22;102:13;
105:11,12,22;110:5,
6;112:16,23;113:5,
16,21,24,25;114:2,
23;116:20
**item (2)**
54:25;65:9
**itemization (2)**
93:9,10
**items (1)**
38:22
**IV (2)**
118:16;119:1

**J**

**JACOB (2)**
7:7;8:11
**JACQUELINE (2)**
7:21;48:22
**James (1)**
8:24
**January (4)**
53:1;60:6;66:4,9
**Jessica (2)**
61:7,10
**job (3)**
67:2;80:12;96:25
**join (1)**
60:11
**Jon (1)**
56:5
**Jordan (4)**
3:16;48:1;64:21;
65:8
**JUDGE (54)**
2:23;3:16;12:15,
18;14:5,7,14,19;15:8;
18:5,14;19:3,14,25;
20:2,8,25;24:6,7,17,
25;25:1;26:7,19,24;
27:25;28:11;30:15,
17;39:19;42:16,20,
23;43:19,20,25;
44:16;50:11;51:11,
12;52:10,11,20;53:1;
60:9;102:7,7;121:1,1,
4,9;125:3,25;127:4
**judges (3)**
51:11;52:10;54:2
**judge's (1)**
112:25
**judgment (2)**
22:8;102:6
**July (1)**
96:23
**jurisdiction (1)**
9:17

**K**

**KAPLAN (73)**
7:7;8:11,11;9:16;
14:10;22:1,2,8,14,16,
20,22,24;23:1,5,9,12,
16,25;25:7,10;28:21;
29:5,10,18;30:12,14,
20,21,23;31:4,6,8,16,
25;32:4,6,8,10,15,15,
18,21,25;33:4,18,24;
34:2,4,9,12,14,18,23,
25;35:10,15,22;36:3,
6,9,15,21,23;37:6,8,
12,17,20;39:8,10;
43:15,18
**Kaplan's (1)**
17:22
**Karman (1)**
6:4
**KATHY (2)**
7:22;56:4
**KEELEY (14)**
7:21;48:22,25;
51:7,18,21;52:5,7,15;
53:5,15;54:13,16,23
**keep (2)**
31:22;89:15
**kept (6)**
83:8;96:3;101:5;
102:19,25;107:11
**kind (1)**
123:12
**knew (7)**
62:9;90:11,12,12,
15,15;96:5
**knowing (1)**
120:9
**knowledge (3)**
80:22;82:12;
115:20
**known (1)**
100:2
**knows (1)**
32:12
**KONANOVA (4)**
44:25;45:1,3;47:18
**KORNSTEIN (2)**
6:19;8:9

**L**

**lack (2)**
40:25;59:3
**lacked (1)**
61:23
**language (16)**
14:17;30:8;32:7;
34:20;35:7,8,24;
39:3;40:4;41:14,16;
43:10,23;73:1;76:13;
108:15
**Larson's (1)**
107:10
**last (10)**

38:4;48:16;53:10,
10;57:13;80:24;
106:3;109:19;118:3,
13
**late (4)**
74:7;93:4;94:7;
122:5
**later (2)**
9:14;65:2
**latest (1)**
87:21
**latter (1)**
68:6
**law (92)**
9:9,10,13,15,17,20,
21;10:2,10,14,19;
11:11;12:1,13,14,18,
19;14:6,7,8,12,15,16,
18,22;15:2,2;18:1;
19:9,9,11,12,14,21;
20:6,9,9,9,11,12,
20,24;21:2,4,6,6,12,
14,21,23;22:11,17;
23:7,10,18,20;25:12,
15,17,19,22;26:2,4;
33:5,7;35:6,9,11,12,
16,19;36:1,7,13,25;
37:1,4;44:11,13,18;
53:8;62:11;77:12;
87:13;95:3;104:1;
113:24;114:14;
115:9;116:11;126:11
**laws (3)**
33:7;36:19;87:13
**lawyer (4)**
80:9;88:17;105:15;
125:9
**learn (1)**
62:15
**least (4)**
26:19;38:5;68:18;
109:22
**leave (2)**
32:23;73:1
**leaves (1)**
41:19
**left (1)**
31:21
**legal (11)**
8:22;13:1;29:4;
88:17;105:11,12;
112:2;113:17;
122:10,24;124:12
**legitimately (1)**
13:2
**lender (4)**
72:22;76:16;
117:20,21
**lenders' (1)**
76:20
**less (2)**
93:8,17;121:10
**lesser (1)**

34:14
**Letter (16)**
3:16;41:23;42:9;
43:1;56:8,10;57:12;
59:15;92:2;98:17;
103:13;106:17;
107:7,25;108:2;
118:17
**letters (6)**
68:15;89:10,23;
90:1,17;106:12
**Liability (5)**
3:10;61:16;63:4,
12;66:15
**lien (1)**
93:23
**life (1)**
111:2
**light (3)**
29:20;52:9;108:13
**likelihood (1)**
111:16
**limit (1)**
76:20
**limitations (2)**
81:10;113:25
**limited (3)**
13:24;52:13;72:22
**limiting (1)**
81:15
**line (3)**
48:11,13;117:7
**Liquidating (9)**
3:8;4:2;7:22;
44:22;48:21;56:4;
61:11;63:1;66:21
**Lisa (2)**
107:9,25
**list (5)**
23:24;24:1;25:7;
55:17;59:13
**listen (1)**
86:24
**lists (1)**
62:18
**litigate (1)**
18:5
**litigation (2)**
42:15;57:15
**little (10)**
46:16,23;78:6;
90:10;109:10;110:3,
25;121:21;123:9;
124:25
**LIU (14)**
6:8;48:23,25;
49:15,19,19,22;50:3,
6,9,11;54:17,21,22
**L-I-U (1)**
49:19
**lives (1)**
123:3
**LL (1)**

7:10
**LLC (2)**
4:21;6:3
**LLP (2)**
6:19;7:2
**Loan (27)**
7:21;57:18,19;
60:12,13,15,25;67:3,
4;68:1;77:7;79:7;
98:7;100:7,16;
102:11;103:1;105:7;
106:6,7,7,7,10,11;
108:16;110:12;
112:13
**loans (6)**
60:13;97:17;
100:16,17,19;127:19
**local (1)**
97:17
**logs (1)**
87:21
**LOMBARDI (1)**
7:10
**long (9)**
28:18;49:13;88:6;
97:4;109:19;118:23;
122:24;124:13,14
**longer (3)**
38:2;44:21;97:13
**longest (1)**
38:2
**look (32)**
9:14;10:12;14:11;
17:25;19:9;20:8;
22:5;24:24;35:5,17;
38:19;43:11,12;68:7,
10;71:12;72:4,19;
73:10;75:9;77:19;
78:6;92:5,10;94:15,
21;96:10,12;99:17;
106:16;108:5;123:17
**looked (4)**
19:12,14;20:11;
36:7
**looking (3)**
71:17;108:14;
118:25
**looks (2)**
39:12;114:13
**Los (4)**
7:14;46:11;49:10;
51:13
**lose (1)**
121:10
**lost (1)**
99:19
**lot (9)**
25:19;44:13;47:10;
85:20;105:16,16;
111:24;118:8
**lots (1)**
40:6
**lovely (1)**

12-12020-mg    Doc 8368    Filed 03/26/15    Entered 03/26/15 16:51:04    Main Document

RESIDENTIAL CAPITAL, LLC, et al.    Pg 140 of 149    Adv. No. 14-02004-mg, Adv. No. 14-02435-mg

Case No. 12-12020-mg    February 25, 2015

101:14

**low (1)**
100:18

## M

**mail (3)**
57:3,4;120:24
**mailed (1)**
59:16
**main (2)**
29:13,17
**mainly (1)**
81:12
**maintained (1)**
101:5
**makes (3)**
32:19;78:5;95:18
**making (4)**
48:14;101:16;
102:17;110:14
**management (5)**
28:14,23;29:19;
37:23;38:4
**many (5)**
15:4,6;23:4;76:19;
99:7
**March (5)**
58:10;59:1;77:7;
111:7,8
**mark (1)**
94:8
**marked (2)**
32:18;70:16
**MARTIN (1)**
2:22
**Massachusetts (1)**
90:1
**mat (1)**
11:25
**matter (30)**
11:25;12:13;21:1;
22:2,7;29:15;33:4;
49:16;50:1;51:1;
55:16;56:25;61:3,8,
13;62:19;65:18;
77:22;87:13;92:14;
93:22;115:9;118:4,
13,25;121:8;122:7,
15;126:8,23
**matters (3)**
53:15;75:25;78:7
**May (39)**
16:23;19:9;22:3;
26:25;27:4,8;30:5,5;
32:5,6,13;35:25;
40:14;41:2,4;49:9,
11;50:5;51:17;52:20;
67:22;68:21;72:22;
75:22,22;77:25;
78:24,24;80:25;81:2;
84:10;85:10;86:21;
95:19;112:16;

121:10,10,10;122:5
**maybe (3)**
11:10;89:4;101:3
**MCKENZIE (2)**
7:2;8:11
**mean (16)**
31:4;33:19;41:3;
44:12;64:10;69:17;
76:8,11,18;78:15;
90:5;95:2,5;103:16;
105:12;115:21
**means (2)**
14:16;73:15
**meant (1)**
87:24
**mediation (12)**
82:19,20,25;83:20,
23;84:12,13;90:20,
21;95:24,25;111:18
**mediator (3)**
83:1;84:8,24
**mediators (1)**
84:25
**Mellon (1)**
59:7
**Memorandum (1)**
53:3
**mention (1)**
95:18
**mentioned (1)**
57:9
**merit (2)**
66:14;90:10
**merits (4)**
121:12;123:19;
126:16,20
**MERS (1)**
52:22
**Meryl (2)**
54:12,25
**met (1)**
90:19
**methodology (1)**
89:20
**Michigan (13)**
10:4,14;18:17,18;
19:5,8,9,11,12,14;
20:9;21:6;36:1
**microphone (1)**
30:22
**middle (2)**
125:2,4
**might (4)**
48:8;66:25;74:11;
97:12
**million (2)**
8:21;14:2
**mind (2)**
45:10;74:25
**mine (1)**
97:16
**minimum (1)**
92:20

**minus (1)**
99:10
**minute (2)**
32:24;69:23
**minutes (1)**
125:12
**misconception (1)**
89:15
**misrepresentation (5)**
79:23,24;80:5;
81:13;114:4
**misrepresentations (2)**
84:16;124:9
**missed (3)**
10:11;81:2;99:7
**missing (1)**
76:23
**misstated (1)**
74:11
**mod (1)**
98:6
**moderation (2)**
122:25;123:13
**modification (20)**
67:4,6,8,15,19;
68:1,5,19;76:25;
77:6;79:8,12;90:13,
13;96:4;106:6;123:1,
14,15,16
**modifications (4)**
64:4;74:5;77:8;
97:19
**modified (5)**
64:1;74:3,17;98:7;
101:16
**modify (2)**
12:5;20:5
**moment (2)**
14:19;30:15
**Monday (1)**
86:4
**money (28)**
9:3,6;15:20,23,24;
16:9,16,21;17:3,5,5,
9,10,12,15,23,25;
22:5,7,11,12,12,19;
23:2;31:22,22;34:22;
92:24
**Monica (1)**
49:23
**monitoring (1)**
14:3
**month (6)**
9:12,14;89:12,12;
93:5;98:5
**monthly (1)**
72:22
**months (41)**
27:23,23;38:3,17;
67:16,18,25;68:2,4,
18,19;89:21,22,22;
90:19,20;92:21;
94:13;98:12;99:7,10,

10;103:7,10,11,13;
104:8;107:1,1,17;
108:19,20,25;109:3,
23;110:16,17,19;
123:8,9,9
**Monty (3)**
62:3,18;64:8
**more (16)**
8:25;9:11;17:8;
21:5,11;36:1;38:1;
46:23;53:10;78:20;
86:17;91:21,24;
98:11;117:15;120:15
**morning (9)**
8:8;44:25;45:2;
47:25;55:15;61:10;
65:14;114:9,16
**morning's (2)**
48:3;114:10
**Morrison (3)**
48:1,24;61:11
**Mortgage (25)**
4:3;7:11;44:23;
45:14,15;48:23;
60:14;67:2,3,7;77:8;
90:16;92:18;93:24;
96:17,19;97:4,15;
98:24;100:20;
101:11;106:12,17;
108:15;119:17
**mortgagee (3)**
90:22;93:22;105:6
**mortgages (1)**
97:18
**mortgagor (3)**
115:9;116:22;
117:6
**Most (5)**
29:2;44:13;82:5
**mother (1)**
91:13
**motion (35)**
9:8,20;10:18;11:7;
14:8,10;21:10,14;
23:13;25:24;26:23;
27:24;31:2,14;32:8;
33:6,14;35:3;39:10;
44:17;46:21,22,24;
50:10;56:11;58:8,10;
62:8;75:22;78:24;
102:6;124:1,2;
125:19;127:1
**motions (1)**
58:18
**motion's (2)**
37:14,16
**move (4)**
27:14,18;38:6;48:3
**moved (1)**
122:21
**much (19)**
25:25;29:7;35:23,
23;37:18;45:19;

46:18;47:17,23;61:5,
9;82:10;93:11;98:13,
23,24;121:1;127:4,13
**multifold (1)**
61:19
**multiple (7)**
15:15;16:6;22:3,4;
67:4;79:2;89:11
**must (4)**
15:16;68:17;
109:19,21
**myself (2)**
52:19;111:6

## N

**NA (2)**
3:21;53:4
**name (1)**
55:5
**named (1)**
59:7
**national (1)**
77:6
**nature (2)**
8:16;42:8
**nearly (1)**
8:21
**necessarily (2)**
22:2;23:2
**necessary (1)**
43:19
**necessity (2)**
27:7;77:20
**need (32)**
9:21;14:14;25:25;
27:15,19;28:5;29:4,
7;30:7;32:24;35:21;
37:12,19;43:22;
45:22;48:15;54:7;
69:7;75:21;84:10,20;
85:10;90:9;97:12;
98:23;105:10;110:7;
111:11;121:24;
122:6;123:23;126:5
**needed (2)**
82:25;100:20
**needs (4)**
30:1;33:3;53:23,24
**negligent (6)**
79:23,24;80:5;
81:13;84:16;114:4
**negotiated (1)**
34:7
**negotiating (1)**
14:9
**neighborhood (1)**
100:1
**neither (1)**
56:13
**nevertheless (1)**
40:2
**New (29)**

2:16,16;4:23;6:22;
7:5;9:20;10:5,8,14;
20:8;21:4,5,6,12,14;
23:7,10,25:18;33:7;
36:1;37:1,4;45:23,
24;46:6,11;59:7;
86:16;115:2
**next (10)**
29:24;55:16;60:19;
61:7,13;77:6;89:13;
95:15,15,16
**nice (3)**
45:11;47:14;62:7
**nine (16)**
67:16,18;68:2,3,18,
19;89:21,22;90:19;
103:7,9;107:1,16;
108:19,25;110:16
**ninety-three (1)**
63:8
**Nobel (1)**
43:2
**nobody (2)**
82:24;120:6
**none (1)**
33:8
**nonjudicial (1)**
50:16
**nor (1)**
57:11
**North (7)**
10:4,14;19:4,9;
20:9;21:7;36:1
**Norwich (3)**
116:1,2;117:20
**note (54)**
70:25;71:10,12,12,
13,20,22;72:10,14,
17;73:5,14,15;74:19,
21;75:5,7,24;76:21;
77:12;78:1;100:2;
101:21,22,23;102:5,
6,8,15;103:2;104:25;
108:14;114:21;
115:3,10,15,21,24,
25;116:1,3,9,15,21,
21,22,24;117:2,3,4,7,
10,19,21
**noteholder (1)**
116:12
**notes (8)**
57:15;69:3;72:4;
82:11,13,14,16;
112:13
**note's (1)**
72:2
**notice (7)**
12:10;34:16;53:19,
20;68:24;120:7;
126:24
**noticing (1)**
57:1
**notification (1)**

117:23
**November (1)**
97:5
**Number (25)**
3:5;8:3;15:8;33:7;
46:5;48:5;53:3;54:3,
9,25;55:17,19,20,25;
56:6,9;57:3,9;61:14,
17;65:10;66:3,10;
109:15;119:25
**NY (3)**
4:23;6:22;7:5

## O

**oath (2)**
80:19;81:6
**object (2)**
88:7;122:13,13
**objected (1)**
113:21
**Objection (43)**
3:2,5,8,13;48:4,20;
49:1;50:21;53:3;
54:9;55:18,25;56:3,5,
7,12;57:1;60:1;
61:13,15,19,20;62:6;
63:2,7,17;64:14,17;
65:10;66:3,9,11,19,
22;69:17;78:16,24;
80:18,21;86:12;
87:11;110:5;119:9
**objections (3)**
55:17;64:16;86:19
**objects (5)**
56:10;63:6,8,11;
86:20
**obligation (2)**
13:1;105:6
**obtain (1)**
90:23
**obviously (5)**
26:3,24;47:4;54:2;
74:18
**occasion (1)**
8:25
**occasions (3)**
58:2,4,11
**o'clock (1)**
25:6
**Ocwen (10)**
7:21;52:1;53:16;
56:11,13;60:10,11,
14;98:4,17
**off (4)**
11:6;15:7;28:15;
87:7
**offer (1)**
120:16
**offered (2)**
120:3,14
**offering (2)**
120:16,21

**offhand (1)**
82:22
**office (3)**
52:4;64:23;107:10
**officers (1)**
18:21
**official (1)**
77:13
**Often (1)**
49:16
**Oklahoma (1)**
111:7,8
**Omnibus (9)**
3:8;53:13,14;
61:14,20;62:17;63:2;
64:14;119:9
**once (13)**
10:21,23,24;21:11;
23:17;26:25;38:2;
44:17;53:18;60:21;
104:7;110:22;112:18
**One (69)**
2:15;8:25;11:19;
13:21;14:13,19;15:5,
9,15,17,20,24;16:16;
17:9,15;18:1,9;
20:24;21:2,3,22:5,6,
12,18;26:19;29:20;
40:14;45:23;46:1;
48:16,21,22,23;
51:21,22;53:8;56:3;
58:12;63:6,14;69:18,
23,25;70:22;71:21,
21;73:11;79:19;84:7;
88:1;89:12,13;90:14,
14;96:7,20;102:20;
104:21;105:8;
106:17;108:19;
110:14,15;117:14;
118:13;122:6;123:9;
126:21;127:19
**one-off (4)**
11:23;40:10,14;
42:9
**ones (2)**
100:14;114:1
**only (29)**
10:21,23;23:17;
31:20;37:2;57:10;
77:23;83:1;85:22;
86:3;89:17,21;91:12,
15,19;92:6,10,17;
94:10;98:9;100:20;
101:13;102:20;
104:8;107:16;
108:24;113:12;
121:20;126:17
**onto (2)**
13:3;86:17
**open (1)**
41:19
**opened (7)**
9:11;10:1,2;15:3;

18:9,15;26:12
**opening (1)**
18:21
**operate (2)**
67:9,10
**operations@escribersnet (1)**
4:25
**opinion (1)**
120:9
**opportunity (5)**
81:22;90:16;96:7;
126:8,9
**oppose (2)**
43:13;127:1
**opposed (2)**
50:1;106:12
**opposing (1)**
127:3
**opposition (1)**
126:9
**oral (2)**
108:22;125:20
**orally (1)**
79:10
**order (28)**
28:14,23;29:19,25;
30:7,8;37:23;38:4;
42:10;43:8,19;46:2;
47:20;53:23;84:18,
19;110:22;111:10;
112:18;113:1,2,4,6,7,
8;114:25;118:2,9
**ordering (1)**
25:4
**orders (1)**
58:24
**Ordinarily (6)**
86:6;93:22;124:5,
7,10;125:22
**original (10)**
14:25;69:15;87:8;
102:8;109:14;
115:25;116:9,24;
117:3,4
**others (1)**
110:6
**Otherwise (1)**
76:2
**ought (3)**
38:7;110:11;
124:13
**out (32)**
9:2;10:19;15:9;
30:4,8;32:11;38:11;
39:13;52:4;53:17;
59:16;73:2;74:24;
77:3;82:17,25;83:1,
8;84:11;98:10;99:11;
100:1;103:21;
110:20;111:10;
119:8;120:24;122:8,
12,12,23;127:19
**outlined (2)**

67:21;108:8
**outlines (1)**
106:12
**outlining (1)**
59:19
**over (12)**
9:4;23:6;46:23;
53:22;54:12,24;
60:14;89:19;91:11;
99:19;115:10;117:9
**overnight (1)**
57:4
**owe (4)**
87:17,17;95:3;
98:15
**owed (2)**
91:23;92:13
**own (2)**
88:24;97:1

## P

**packages (1)**
79:2
**packet (2)**
104:7;108:9
**page (22)**
14:24,25;15:1,1;
12:16;39:13;48:3;
55:1,17;61:14;62:16;
65:9;68:11,12;70:14,
16,18;77:4;80:24;
109:16;118:16;119:1
**paid (8)**
60:25;92:18;93:13;
94:10,13;96:6,20;
97:4
**PALMER (1)**
7:10
**paper (1)**
117:11
**papers (14)**
32:8;33:6;78:16;
79:19,24;80:13;
85:20;99:4;105:14,
16;113:17,23;
114:24;116:21
**paperwork (1)**
67:5
**paragraph (12)**
32:18;38:4;39:4,
13,13;69:4;70:14;
72:19;73:4;74:22;
76:24;77:18
**part (12)**
19:18;23:5;30:25;
31:13;40:8,17;45:25;
60:13;63:12;77:5;
79:4;112:13
**partial (3)**
31:17,17;39:11
**participate (1)**
101:13

participating (3)
54:14;91:16,22
particular (4)
9:17,17;60:21;
76:15
particularly (1)
38:3
parties (27)
13:11;21:8,20,23;
29:21;30:25;31:1,12,
15;33:25;34:2,4,7;
35:1;38:6,10;40:18;
41:10,18,22;45:23,
24;46:6;50:1;118:5;
124:8;125:23
partner (1)
9:16
Partnership (1)
45:15
party (2)
86:20;88:1
pass (1)
120:10
past (13)
92:1;93:2,3,8,16,
17,22;94:4;95:11,19;
96:3;98:3,11
patience (1)
87:25
patient (1)
118:23
Patterson (1)
56:5
Paul (1)
43:2
Pause (6)
32:22;72:18;78:21;
79:17;106:9;107:2
pay (9)
13:1,4;72:21;92:1,
19,22;94:12;96:20,21
payable (1)
62:1
payment (14)
72:23,24;76:20;
92:2,18,19,25;93:1;
95:12,16;98:3,18,23;
105:23
payments (12)
72:22;91:4;93:5;
94:9;96:18,18;98:25;
101:16;107:5;110:9,
9,10
penalty (1)
80:21
pending (7)
11:7;25:24;50:10,
21;51:1,12;63:1
Penina (1)
4:20
Pennsylvania (2)
36:3;52:3
people (4)

12:21;38:14;46:25;
100:13
people's (2)
38:21;97:17
percent (7)
90:25;91:1,5,8,10;
100:18,19
perhaps (2)
9:1;11:11
period (7)
14:15;30:10,21,23;
37:20;38:5,15
perjury (1)
80:22
permit (5)
46:25;53:22;86:21;
88:3;122:1
permits (1)
19:12
permitted (4)
73:5;74:19;76:22;
89:4
person (8)
46:21;53:22,24;
58:15;83:17;89:13,
14;121:19
perspective (3)
17:18,19,19
persuade (1)
42:25
pertain (1)
70:4
petition (1)
66:15
ph (3)
43:2;107:9,10
phone (19)
46:23;48:11,13,25;
52:5;53:18;66:24;
83:2,16;87:20,21,23,
24;102:18,21,21;
106:1;112:11;120:4
phrase (1)
68:18
PI (1)
95:15
pick (1)
95:5
picking (1)
21:4
Pirot (2)
107:9,25
PITI (1)
95:16
place (2)
32:9;103:7
plain (1)
34:19;35:23
plaintiff's (1)
87:25
plan (7)
28:25;39:5;77:5;
94:14;99:11;105:19,

22
plane (3)
45:5,7,9
plans (1)
96:21
plead (2)
25:22;36:15
pleading (1)
33:11
pleadings (3)
86:15,21,21
please (3)
8:2,7;14:20
pled (1)
27:8
plenty (2)
55:10;90:16
plus (3)
92:10,22;94:9
pm (2)
25:11;128:6
po (1)
85:19
podium (2)
54:12,24
point (17)
10:22,24;32:11;
33:24;39:7;46:5;
51:19;68:21;82:3;
84:2;89:23;95:2,24;
104:7;119:14;
124:16,18
pointed (2)
39:13;110:19
pointing (2)
32:12;109:17
points (2)
77:3;78:18
policy (1)
31:8
POLLARD (134)
6:19,24;8:8,9,9,14,
15,18;9:24;10:11,16,
22,24;11:3,4,13,15,
18,22;12:3,7,11,15,
18,21,23;13:15,19,
22;14:19,22,24;15:7,
13,17,21,25;16:2,5,
10,13,18,24;17:1,7,
10,14,18,21;18:3,5,
11,13,19,23;19:3,6,
14,17,22,24;20:2,8,
15,19,22;21:3,13,19;
24:1,1,4,6,12,14,17,
21,25;25:5,9,21;26:7,
11,14,19;27:16,20,
22,25;28:4,6,8,11,16;
29:1,9,13,17;30:4,15,
17,24;31:10,23;
32:12,21;35:8;39:9,
17,22,25;40:3,8,13,
16,21,23;41:3,11,15,
17,25;42:5,14,16,19,

23;43:6,20,25;44:4,6,
16,20
Pollard's (1)
35:20
portion (1)
92:18
position (36)
10:25;15:10;16:18;
17:14;18:12;20:6;
25:12;27:5;33:15;
34:1,3,11,19;35:20;
36:22;71:2,8;72:15,
16;75:22;76:8;82:18;
86:2;89:9;90:9,11;
91:4;92:11;101:24;
104:2,4;110:18;
119:25;124:13,16;
125:14
possibility (2)
36:3,4
possible (2)
67:6;110:25
possibly (2)
36:1,19
post (1)
53:19
potential (2)
25:17;79:21
potentially (1)
9:23
Practices (6)
59:6;80:1,6;81:14;
84:15;114:5
pre- (2)
66:14;94:6
prepare (4)
14:7;46:2;113:19;
114:6
prepared (3)
80:18;81:6;118:24
preparing (2)
62:12,21
pre-petition (1)
66:17
PRESENT (1)
7:19
presented (3)
60:23;106:2;
114:22
press (1)
29:5
presumably (1)
30:1
presumptive (2)
29:15;37:24
Pre-Trial (2)
3:22;4:4
pretty (2)
47:14;99:3
prevail (3)
11:1;20:24;41:6
prevails (2)
10:18;15:10

primarily (1)
29:3
prime (2)
97:15;100:17
principal (6)
46:25;72:24;92:10,
10,12;99:2
principles (2)
36:12;44:14
prior (3)
45:23;57:17;
107:11
PRIORE (9)
7:22;48:21,24;
56:4;66:20;82:8;
109:16;111:17,19
Priore's (3)
66:24;68:10;71:16
private (1)
78:7
privilege (1)
85:1
privileges (1)
101:12
Pro (3)
6:12,16;65:21
probably (4)
26:8;38:7;82:8;
125:1
problem (3)
10:17;30:6;89:7
problematic (1)
32:1
problems (2)
38:14,20
proceed (5)
114:18;121:8;
122:7,15;126:6
Proceeding (5)
3:20;4:2;38:10;
44:23;60:11
proceedings (3)
8:5;112:15;128:6
produce (1)
43:11
program (20)
74:13;76:24;77:6,
13;91:7,18,19,21,22,
25;92:20;96:16;97:9,
12,14;98:9;100:10,
11,12;101:9
programs (6)
91:16;97:10;98:9;
99:14;100:13;101:12
program's (1)
97:13
promptly (4)
27:15,19;28:7;
111:13
Proof (11)
3:2;48:4;56:18,23;
57:10;59:13;66:13;
79:1;86:25;88:16;

127:24

**proper (4)**
61:1;83:22;96:1,2

**properly (4)**
56:25;64:16;67:2;
117:25

**property (3)**
58:9;93:13;101:5

**proposed (1)**
46:2

**protecting (2)**
13:25;14:3

**provide (11)**
28:15;38:2;45:23;
53:23;64:5;68:22;
79:11;80:15;103:4,
18;108:21

**provided (7)**
51:18;52:15;67:20;
69:2,6;78:25;93:4

**provider (1)**
68:15

**provides (2)**
46:4;77:9

**providing (2)**
43:8;87:3

**provision (4)**
28:24;33:16;34:5,
16

**public (2)**
68:13;70:19

**pure (1)**
113:24

**purportedly (1)**
8:22

**purports (1)**
81:5

**purpose (2)**
21:14;61:19

**purposes (9)**
21:9,9,12,15;
23:12;58:19;75:22;
77:22;78:1

**pursuant (1)**
86:15

**pursue (1)**
27:1

**put (22)**
33:8;39:19;40:18;
42:10;43:24;53:13;
60:10,11;65:5;80:17;
81:4;82:15;86:17,23;
90:14,14;96:4;100:4;
102:10;119:9;
120:10;126:12

**puts (3)**
94:8,8,10

**putting (2)**
94:3,6

# Q

**qualified (1)**

30:6

**qualify (2)**
98:9;99:14

**quick (1)**
14:11

**quickly (3)**
18:7,8;51:3

**Quinn (1)**
45:1

**quite (1)**
119:20

# R

**raise (7)**
11:11;27:3,6;
30:13;51:4;59:11;
102:16

**raised (7)**
21:4;31:10;42:3;
51:13;57:21;59:12;
86:20

**raises (3)**
50:14;78:18;79:3

**raising (4)**
27:10;28:1,1;52:11

**Rates (1)**
100:18

**re (2)**
53:2;83:23

**reached (4)**
31:12,15;63:23;
119:8

**read (10)**
8:17;11:8;16:1;
35:8;44:1;49:6;
68:23;102:14;
105:14;120:24

**reading (8)**
11:8;12:4;14:23,
24;29:2;39:18;62:16;
116:20

**reads (1)**
41:11

**ready (1)**
60:22

**Real (1)**
45:16

**realized (1)**
13:3

**really (6)**
43:15;49:17;67:1;
79:3;82:10;122:4

**reason (8)**
12:1;18:14;68:10;
76:12;84:1;89:11;
100:1;126:17

**reasonable (19)**
37:20;38:13,19,23;
89:17,19,20,24;90:3,
3,22;95:20;103:6,10;
107:16;108:25;
109:2,22;110:19

**reasonableness (17)**
14:2;26:21;27:7;
31:12;32:19;39:15;
40:5,6,19,24;41:7,19,
21;42:2,3,22;43:4

**reasonably (1)**
111:12

**reasons (1)**
87:16

**reassign (1)**
117:10

**rebutted (1)**
57:21

**receive (1)**
123:8

**received (4)**
67:17;68:3,24;
118:17

**receives (3)**
60:21;68:13;70:19

**receiving (3)**
67:14,24,25

**recent (4)**
52:20;100:22;
101:1;102:22

**recess (1)**
125:7

**record (4)**
39:19;81:25;97:4;
112:11

**recording (1)**
82:15

**records (18)**
9:13,13,25;10:1;
15:3;24:13,20;57:14;
61:25;82:6;102:19,
21,21;106:1,2;
111:25;112:8,14

**Redesignate (4)**
3:10;61:16;63:4,14

**redoing (1)**
97:17

**Reduce (4)**
3:11;61:17;63:5,15

**refer (1)**
71:6

**reference (3)**
32:19;68:10;73:8

**referenced (1)**
73:11

**references (1)**
73:8

**referring (8)**
32:7;53:1;59:17,
18;70:6,11;77:4;
89:16

**refers (3)**
70:25;75:5;76:25

**refinance (2)**
99:3;100:4

**refinanced (1)**
102:11

**reflect (1)**

39:14

**reflected (3)**
61:21;62:1;64:4

**refused (1)**
124:24

**refuted (1)**
60:22

**regarding (11)**
3:17;14:1;27:5;
39:16;40:25;41:9;
79:4,20;84:13;
103:19;115:2

**regards (2)**
108:16,18

**regs (1)**
74:17

**regulation (1)**
76:14

**regulations (13)**
72:23;73:6;74:2,
20,21;75:8,9,13,23;
76:16,19,22;105:8

**reinstatement (1)**
93:7

**relate (1)**
13:17

**related (1)**
22:9

**relates (2)**
14:18;79:20

**relation (1)**
58:14

**relationship (3)**
13:6,10,23

**release (2)**
26:22;54:17

**released (1)**
105:3

**relevance (2)**
90:10;111:20

**relevant (3)**
16:15;37:2;42:7

**relief (4)**
58:3,10,18;62:8

**relies (1)**
111:25

**relitigate (1)**
10:20

**reluctant (1)**
50:25

**relying (2)**
78:16;82:5

**remain (1)**
40:1

**remaining (1)**
72:25

**remains (5)**
38:10;39:1;40:2;
42:25;63:19

**remember (3)**
8:24;46:4;50:4

**remorse (3)**
122:2,3;126:11

**rental (1)**
91:12

**replied (2)**
86:3,8

**replies (1)**
90:2

**reply (18)**
66:10,23;69:4,15;
71:22;78:16;82:12;
86:3,4,4,6,7,8,12;
87:8,21;102:22;
106:3

**represent (1)**
66:17

**representation (1)**
87:16

**representations (1)**
79:21

**representative (5)**
83:14,15;84:11;
107:8;111:18

**represented (1)**
105:15

**representing (2)**
39:16;41:8

**request (7)**
38:6;59:15;68:20;
90:24;91:9;103:14;
104:11

**requested (2)**
67:15;98:23

**requests (1)**
57:22

**require (10)**
23:19;28:20,25;
39:5;67:16;70:3;
72:24;76:20;86:16;
108:25

**required (2)**
38:12;104:16

**requirement (1)**
100:20

**requirements (6)**
69:5,6;90:11,12,
13;92:20

**requires (3)**
38:5;104:14;
107:16

**requiring (1)**
90:11

**ResCap (24)**
3:2,5,8,13;4:2;
7:22;8:23;12:24;
13:4,23;44:22;48:1,4,
21;55:18;56:4,11,13;
61:11;63:1;64:21;
65:8,9;66:21

**rescind (1)**
115:8

**rescinded (1)**
100:2

**rescission (1)**
115:7

**research (1)**
19:18

**researching (1)**
19:20

**reserved (1)**
10:18

**reset (2)**
14:14;44:17

**Residential (3)**
6:3;7:20;8:3

**resolution (3)**
14:11;64:24;
119:13

**resolve (24)**
18:8;25:14;26:3;
35:6;40:5,18,24;
41:5;44:12,15;50:22;
110:2,5,11;112:16;
113:17,23,25;114:23;
116:12;118:4,6;
121:5;126:23

**resolved (21)**
14:13;23:23;26:2;
41:9,18,21;42:1;
44:18;51:3;62:5,13,
23;64:8,25;65:4,5;
78:23;107:24;
111:12;121:11;
125:13

**resolves (2)**
40:17;43:3

**resolving (5)**
36:13;40:24;62:6;
94:16;104:5

**RESPA (1)**
59:5

**respect (21)**
8:23;9:8,20;13:2;
14:6;20:13;31:10;
35:9;40:23;43:11;
44:14;50:18;51:5;
84:14;90:9;94:1;
102:15;104:1;107:4;
110:14,15

**respectfully (1)**
57:22

**respective (1)**
57:19

**respond (6)**
14:15;44:17;66:1;
120:9;124:2;126:14

**response (10)**
14:8;56:7;59:15;
62:18;66:4,8;80:18,
21;86:12;102:18

**rest (1)**
40:19

**restrictions (1)**
90:23

**result (1)**
62:5

**return (1)**
31:21

**returned (2)**
57:8;105:23

**review (1)**
79:7

**reviewed (2)**
59:15;64:13

**revised (1)**
29:19

**revoke (1)**
123:24

**revolves (1)**
9:4

**REYNOLDS (20)**
7:16;45:7,10,14,14,
18,22;46:3,8,11,15,
17,19;47:2,4,7,9,12,
14,22

**right (88)**
8:2,2,18;10:19;
11:4;12:22;16:2,21;
18:7;27:20;28:16;
29:12;30:3,20;32:23;
34:8,15;39:9;42:21;
43:7,24;44:9,21;46:3,
17,19;47:8,19,24;
48:9;50:9;52:9;
55:23;58:13,23;61:2;
64:3,10;65:12;70:9;
71:11;73:7;74:6,15;
76:4,10;77:19;78:5,7,
9,14,19;80:25;81:16,
16,18;83:5;86:18;
89:6;91:24;92:7;
94:15,17;99:5;100:9;
101:4,7,14;102:8;
104:3;106:4;107:13;
108:12;109:9,11;
110:22;111:2;115:7,
8,9,16;116:6;117:21;
119:24;121:12;
123:23;127:11;128:3

**rights (4)**
27:9;33:23;57:19;
76:20

**rise (1)**
66:15

**road (2)**
27:24;102:2

**Robaina (1)**
102:7

**rocket (1)**
24:5

**ROLAND (2)**
7:16;45:14

**roll (1)**
47:14

**rolling (1)**
121:9

**room (4)**
21:5;83:1,6,8

**Rosenbaum (1)**
48:24

**Rothchild (31)**

**round (1)**
120:10

**Rule (5)**
28:24;29:11;60:22;
86:15;87:12

**rules (1)**
37:8

**ruling (5)**
31:1;60:9;104:21;
108:7;112:18

**rulings (1)**
116:18

**S**

**sale (1)**
60:13

**same (14)**
16:3;20:21,22;
26:13;54:3;61:23;
71:18;72:3;73:4;
80:6;81:20;84:13;
87:16;108:21

**Santa (1)**
49:23

**sat (1)**
127:7

**satisfactorily (1)**
103:25

**satisfactory (1)**
79:1

**satisfied (1)**
91:5

**savings (2)**
97:5;100:5

**saying (17)**
9:16;26:20;84:5;
87:12,12,13;102:19,
20,22,24,25;104:9;
107:11;110:20;
122:19;124:7,11

**schedule (7)**
50:1;52:13;53:17,
17;110:23;112:18;
114:16

**scheduled (1)**
49:10

**schedules (1)**
38:21

**scheduling (11)**
14:9;28:14,23;
37:23;38:21;43:8;
49:18,25;112:20;
113:7;114:15

**science (1)**
24:5

**scope (2)**

**54:12,25;55:14,15,
22;56:1,2,17,20,23;
57:7,25;58:4,7,13,17,
21,24;59:9,13,18,21,
23;60:1,5,8,17,25;
61:4,5,6**

**20:16;31:9**

**score (2)**
97:15;100:17

**Se (3)**
6:12,16;65:21

**sealed (3)**
39:18;40:1,4

**seat (1)**
65:23

**seated (1)**
8:2

**second (12)**
13:21;16:8;45:3;
49:9;52:25;66:22;
69:12,13,15;107:4;
108:11;117:7

**Secretary (4)**
72:23;73:9,16;
76:19

**Secretary' (1)**
73:15

**section (3)**
15:1;73:11;87:11

**Sections (1)**
59:5

**securitization (1)**
50:17

**security (1)**
13:8

**seeing (1)**
58:5

**seek (12)**
68:1;104:16;105:7;
110:11;118:5;122:1,
8;123:24;124:1;
125:15,16,18

**seeking (2)**
22:8;68:5

**seeks (4)**
50:22;61:20;63:14;
66:12

**seem (8)**
11:9;12:14;17:23;
69:1;75:7,8;84:12;
113:20

**seemed (1)**
29:3

**seems (11)**
40:18;41:5;79:21;
80:2;81:18,25;84:17;
110:6,15;111:16;
114:7

**select (1)**
21:23

**selection (1)**
21:24

**self-employed (1)**
111:5

**Senate (2)**
90:20;96:2

**send (2)**
98:22;120:4

**sending (1)**

**98:18**

**sensitive (1)**
27:10

**sent (5)**
89:12;91:11;
103:12;108:1;120:5

**sentence (3)**
73:10;77:6,9

**separate (2)**
58:2,4

**September (3)**
58:5;92:25;95:12

**ser (1)**
60:17

**serve (1)**
53:20

**served (3)**
45:4;57:1,3

**service (2)**
29:23;57:2

**servicer (4)**
67:2,7;68:17;105:7

**servicers (1)**
77:10

**Servicing (9)**
7:21;57:15;60:15,
18;82:11,13,14,15;
112:13

**session (1)**
95:25

**sessions (2)**
95:24,25

**set (2)**
49:22;53:19

**settle (4)**
25:23;73:22;
125:21,21

**settled (2)**
31:12,20

**Settlement (18)**
3:17;31:13,13,17,
18;32:2,15;39:11,12;
118:5;119:16;
121:11,20,25;123:25;
124:9,19;125:19

**settlements (1)**
63:23

**seven (3)**
23:19,22;25:11

**Seventy-eight (1)**
99:10

**several (1)**
124:21

**SEVERSON (2)**
6:2;48:23

**shaky (1)**
109:10

**shall (1)**
46:6

**shed (1)**
108:12

**shift (2)**
13:1;42:11

12-12020-mg    Doc 8368    Filed 03/26/15    Entered 03/26/15 16:51:04    Main Document
RESIDENTIAL CAPITAL, LLC, et al.                    Pg 145 of 149
Case No. 12-12020-mg                                                    Adv. No. 14-02004-mg, Adv. No. 14-02435-mg
                                                                                        February 25, 2015

**short (2)**
62:24;67:17
**show (21)**
38:12;43:25;52:17;
68:1;71:17,18;83:25;
84:20;89:17,17;
93:20;96:22;106:1,
12,23;107:4;108:3;
110:19;116:9,24;
128:1
**showed (3)**
89:23,25,25
**showing (3)**
50:17;90:20;
117:19
**shown (2)**
9:25;10:1
**shows (14)**
62:16;90:17,18;
93:4;94:4;96:20;
102:8,22;107:9;
115:6,7;117:1,17,20
**sic (1)**
110:9
**side (3)**
34:5;70:7;84:8
**sides (2)**
11:6;118:8
**sign (3)**
120:17;124:8,10
**signatures (1)**
54:2
**signed (13)**
43:1,2;62:14;99:3;
115:19,19,21;119:18;
120:5;121:25;
125:23;126:19,19
**Silber (242)**
3:14;6:11;55:3,6,6,
9,11,13;64:20;65:10,
12,14,17,19,21,21,25;
66:4,8,14;67:5,14;
68:22;69:14,17,19,
21,24;70:3,8,10,23;
71:19,20,24;72:2,6,8,
11;73:22,24,25;75:2,
17;78:18,25;79:10,
15;80:9,11,14,20,24;
81:1,3,7,9,12,16;
82:17,17,18,23,24;
83:6,8,11,19;84:1,4,
6,9,17,23;85:2,5,9,17,
18,19,22,25;86:2,8,
10,14,19;87:1,7,10,
15,19,23;88:5,7,9,11,
14,18,20,23;89:4,7,9;
90:6,8;91:7,25;92:4,
8,15,17;93:12,14,20,
25;94:2,17,20,21;
95:1,5,7,10,14;96:9,
11,14,16,25;97:3,24;
98:1,3,8,15,17,22;
99:2,6,8,10,14,19,22;
100:7,10,24;101:5,9,
19,21;102:1,4,17;
103:6,9,17,20,22;
104:3,6,16,17,20,25;
105:3,12,19;106:1,8,
10,11,15,17,19,21,25;
107:3,7,14,18,22,25;
108:4,8,11;109:8,10,
12,13;110:1,3,15,18,
24;111:1,4,6,15,17,
19,22;112:3,5,9,11,
17,23;113:8,12,14,
20;114:10,13,20;
115:2,5,12,15,18,25;
116:4,7,9,14,19,24;
117:1,5,8,11,14,17,
23;127:15,17,18,22,
24;128:2,4
**S-I-L-B-E-R (1)**
65:11
**Silber's (10)**
66:3,12;67:3;
79:20;81:10,22;
84:13;106:7;108:18;
123:3
**Silver (11)**
3:3;48:5,6,10,15,
17;49:2;52:16;53:18;
54:8,10
**Silver's (3)**
50:15,17;51:11
**similar (1)**
99:3
**simple (2)**
18:14;115:11
**simplify (1)**
25:16
**simply (4)**
28:19;36:25;38:13;
44:12
**single (1)**
16:9
**singular (1)**
56:23
**sit (3)**
28:18;37:5;118:20
**site (5)**
37:23;39:4;77:12,
20;109:14
**situation (3)**
22:11;99:20,22
**six (5)**
27:23;38:3;92:21;
94:9,13
**sixty (1)**
38:25
**size (1)**
30:25
**sold (3)**
60:15,16,18
**solely (1)**
113:17
**somebody (5)**

83:4,13;85:11;
124:10;125:21
**somehow (1)**
17:3
**someone (1)**
48:6
**sometimes (2)**
85:8;121:3
**somewhat (1)**
27:3
**son (1)**
48:8
**sooner (2)**
64:24;65:2
**sophisticated (1)**
34:7
**sorry (23)**
14:24;46:9;48:12;
55:9;65:14;69:17;
70:15;73:15;94:17;
95:10;96:9;100:10;
107:19;109:5;
115:21,22;116:14,14;
117:8,17;118:15,16,
21
**sort (4)**
15:9;28:17;37:24;
47:4
**sounds (2)**
112:20;125:13
**South (1)**
7:12
**speak (1)**
53:5
**speaker-phone (1)**
83:12
**speaking (5)**
40:21;89:13,13;
93:18,21
**Special (1)**
6:3
**specific (10)**
15:15;32:9;49:4;
53:1;69:1;93:21;
101:7;108:15;113:5;
125:24
**specifically (12)**
11:24,24;31:9;
67:12;68:11;70:25;
93:7;95:15,18;99:18;
107:20;109:17
**speech (2)**
48:11,13
**spend (2)**
19:19,19
**spent (2)**
62:11,20
**spoke (3)**
27:5;111:20;
124:21
**spoken (1)**
27:11
**stage (1)**

42:22
**stake (2)**
93:24;118:8
**stamped (1)**
68:12
**stand (2)**
37:10;81:23
**standard (2)**
91:6;107:15
**standing (4)**
50:15,16;59:3;
101:14
**standpoint (1)**
85:14
**start (3)**
14:7;86:25;97:6
**started (2)**
89:18;97:1
**starting (2)**
68:19;70:19
**starts (1)**
94:5
**state (14)**
9:11,13;15:2;
21:20;35:9,15,19;
36:12;51:12;52:2;
59:2,12;67:24;89:25
**stated (6)**
55:16;56:10;66:15;
79:6;87:4,19
**statement (9)**
25:11;51:8,15;
68:15;79:13,14;
80:16;81:5;105:3
**States (13)**
2:14;9:22;10:2;
20:12,13,20,25;
21:21;25:17;36:8,20;
56:12;68:16
**states' (3)**
20:18;21:2;44:13
**state's (4)**
11:11;25:15;35:6,
18
**station (1)**
101:1
**status (4)**
8:4;60:2;62:17;
118:16
**statute (2)**
81:10;113:24
**stay (13)**
11:6;25:24;31:7;
43:16;54:14;58:3,9,
18;59:4;62:8;117:16,
16;123:10
**stayed (2)**
31:1;87:10
**staying (1)**
43:17
**step (2)**
82:25;89:2
**stepped (1)**

82:25
**stepping (1)**
83:8
**still (8)**
9:2,15;51:21;
96:25;97:25;102:22;
108:20;117:11
**stipulate (4)**
9:17,20;21:9,13
**stipulation (2)**
62:14;90:18
**stop (5)**
16:8;20:3;77:11;
116:1;117:19
**stopped (1)**
98:18
**Strawn (1)**
12:25
**streamlined (1)**
98:11
**Street (2)**
4:22;7:12
**strokes (1)**
28:12
**stuff (1)**
104:13
**submission (1)**
61:3
**submit (2)**
47:20;105:20;
115:3
**submitted (9)**
48:20;56:3;60:18;
66:20;67:5,6;79:2;
90:2;102:8
**subsequently (1)**
59:18
**substantial (1)**
52:11
**substantially (2)**
29:22;61:22
**substantiate (1)**
67:6
**sufficient (4)**
61:23;67:7;112:22;
113:15
**sufficiently (1)**
103:25
**suggests (1)**
68:18
**Suite (3)**
4:22;6:5;7:13
**summary (1)**
102:6
**Superior (3)**
49:10;51:13;52:10
**supplemental (3)**
66:23;70:16;77:9
**supplemented (2)**
86:15;87:2
**supply (1)**
9:12
**support (9)**

12-12020-mg    Doc 8368    Filed 03/26/15    Entered 03/26/15 16:51:04    Main Document
RESIDENTIAL CAPITAL, LLC, et al.                     Pg 146 of 149
Case No. 12-12020-mg                                                    Adv. No. 14-02004-mg, Adv. No. 14-02435-mg
                                                                        February 25, 2015

48:19;56:2;57:11;
63:9;66:19;78:11;
80:8;126:11,13

**supported (2)**
63:17;64:16

**supporting (1)**
61:24

**supposed (4)**
104:13;106:25;
120:12,13

**sure (29)**
8:24;14:21;24:10;
30:16;32:12,14,20;
35:3;39:12;46:14;
49:3;58:14;60:4;
67:23;69:19;70:6;
71:13,17;73:3;75:1;
76:13,23;78:6;94:22;
108:23;111:9;119:1,
21;120:20

**surrounding (1)**
120:23

**suspect (1)**
122:2

**sustained (1)**
64:17

**switch (1)**
21:25

**switching (2)**
21:17;22:3

**sworn (1)**
80:16

**system (1)**
93:4

**systematic (1)**
87:25

## T

**talk (6)**
25:25;114:14,20;
124:14;125:12;126:5

**talked (4)**
24:25;25:1,2;29:18

**talking (15)**
24:8;27:2;32:21;
33:5;67:13;69:25,25;
70:21;71:19;81:16;
101:14;111:16;
112:23;114:7;119:24

**tardiness (3)**
55:3,9;65:15

**tardy (1)**
65:16

**taxes (2)**
93:13,22

**technicalities (1)**
88:19

**telephone (6)**
47:1;53:23;54:15;
55:24;83:4,18

**TELEPHONICALLY (3)**
6:8;7:19;48:8

**telling (9)**
10:7,8;16:8;28:2;
40:11;97:12;107:9;
120:18;124:12

**tells (1)**
12:19

**template (2)**
37:22;39:3

**temporary (1)**
96:21

**ten (2)**
17:24,25

**term (2)**
34:5;122:2

**terminate (1)**
34:6

**terminated (1)**
91:22

**termination (1)**
34:5

**terms (13)**
17:7;24:8;26:24;
33:11,17,20;35:11,
13;71:9;72:10,14;
75:24;125:23

**testify (1)**
52:15;80:18;81:6,
22;82:2;85:11;
116:17

**testifying (1)**
84:21

**testimony (6)**
52:19;54:1;81:23;
109:2,4,6

**Texas (7)**
57:24;58:1;59:2,5,
6,12,17

**thanks (3)**
45:19;47:16,23

**that' (1)**
62:20

**that'll (1)**
122:14

**theory (2)**
40:10;42:8

**thereafter (1)**
43:9

**Therefore (2)**
57:20;120:10

**Third (4)**
6:21;13:11;58:12;
101:1

**thirty (8)**
22:9;23:6,8,24;
34:6,12,20;38:25

**thirty-day (1)**
34:5

**thirty-days' (1)**
34:16

**thirty-one (2)**
90:25;91:5

**thirty-three (1)**
91:8

**though (5)**
19:5;31:9;54:14;
59:14;60:19

**thought (11)**
35:2;44:22;54:3;
58:11;62:2;80:20;
88:23,24,24;89:21;
109:2

**threat (1)**
121:5

**threats (1)**
88:2

**three (19)**
20:12,17,20,25;
21:1,2,21;27:23;
38:17;46:5;58:2;
67:25;79:21;80:2,2,
6;81:19,19;117:14

**three- (1)**
111:16

**three-evidence (1)**
112:20

**three-witness (1)**
112:21

**threshold (2)**
9:7;92:7

**throughout (2)**
10:25;36:17

**tied (1)**
26:12

**till (3)**
38:14;111:7;113:7

**times (4)**
79:1;83:20;91:10;
124:21

**Timothy (1)**
42:12

**today (24)**
8:16;23:20;25:11;
33:19;44:6;45:21;
46:16;48:25;64:15;
66:24;81:1;84:18;
88:24;91:17;94:16;
96:22;97:11;99:8;
104:5;105:9;108:6;
110:2;126:3,21

**today's (1)**
118:13

**Todd (5)**
3:14;6:11;55:6;
65:10,21

**together (2)**
42:10;60:10

**told (11)**
17:24;19:3;27:5;
68:24;84:8;89:23;
91:20;93:1;107:15;
120:15;127:18

**Tom (1)**
69:11

**tomorrow (7)**
24:3,10,14;25:3,6;
33:21,22

**took (14)**
9:3,6;15:24;17:4,
11;22:5,7,11,12,12,
18;44:21;58:21;
99:11

**top (4)**
15:7;69:22;70:18,
18

**total (10)**
61:21;93:7,17;
94:3;95:11;96:3;
98:21,22,25,25

**touch (2)**
101:22;113:21

**touched (1)**
85:23

**touching (1)**
85:22

**track (1)**
60:13

**Trade (5)**
79:25;80:5;81:14;
84:15;114:5

**trail (1)**
117:12

**train (1)**
114:11

**transactions (2)**
10:5,8

**Transcribed (1)**
4:20

**transcript (1)**
60:20

**transfer (4)**
101:23;115:10,12;
116:7

**transferred (1)**
102:4

**transferring (1)**
115:6

**travel (1)**
38:21

**traveled (1)**
65:15

**Treasury (4)**
76:25;77:5,7,13

**trial (1)**
86:19

**trick (1)**
74:24

**tried (4)**
45:5,8;103:12;
122:24

**true (1)**
36:24

**truncated (1)**
35:10

**Trust (51)**
3:2;4:2;7:22;
44:23;45:1;48:2,4,20,
22;50:17,19;51:6,22;
55:18;56:3,4;57:13,
17,20;59:16,23;

61:12,20;62:4;63:6,8,
11,14,23;64:5,22;
65:9;66:10,11,12,16,
19,21;79:23;80:8;
82:2;87:3;92:6;
111:24;118:7;
121:23,24;123:25;
124:15;125:14;126:6

**Trust's (16)**
3:5,8,13;54:9;
55:25;57:1;63:2;
65:10;71:2,8;79:19;
82:18;85:11;92:11;
119:15;124:16

**truth (1)**
120:18

**try (13)**
10:19;29:21;38:12,
19,23;50:25;53:7,15,
16;110:24;114:12;
118:4,5

**trying (6)**
74:24;77:1;94:18,
21,24;99:17

**turn (3)**
30:14;54:11,24

**turned (1)**
38:11;121:20

**twelve (9)**
89:22;98:12;
103:11;107:1;
108:20;109:3,22;
110:17,19

**twenty-seven (1)**
63:11

**twice (1)**
38:2

**two (31)**
8:4;25:14;26:3;
35:5,18;40:18;41:4;
43:10;44:12;45:24;
51:10;52:10;53:10,
10;54:2;56:3;58:4,
11,13,17;63:19,19;
66:20;76:15;79:18;
83:20,20;95:25;
99:10;120:13;124:8

**typed (2)**
72:4,10

## U

**Um (1)**
24:4

**Um-hum (16)**
53:6;58:7;68:21;
71:5,7;72:20;75:4,6,
11,14,16;78:13;
85:13;111:14;
119:11;122:22

**unacceptable (1)**
20:1

**unambiguous (2)**

33:10;36:10

**uncomfortable (1)**
81:21

**uncontested (2)**
61:18;62:19

**undeliverable (1)**
57:8

**Under (12)**
20:17,17;28:24;
33:6,6;61:3;67:11;
78:8;80:19;81:6;
92:7;119:1

**underlying (2)**
40:9;84:14

**underneath (6)**
80:21;86:14;87:11,
13;90:16;107:22

**underst (1)**
76:1

**Understood (11)**
22:14,16,20;37:17;
43:6,18;44:4;54:4;
76:6;97:18;118:12

**undertaken (1)**
67:5

**underwriting (1)**
107:22

**unemployment (33)**
67:14,17,25;68:14,
25;70:20;79:1,6,12;
89:18;90:1,19;91:4,
11;96:22;97:3,6;
102:19,24,25;103:19;
104:2;106:25;107:4,
5,10,12;109:1,19,21;
110:8,10,20

**unemployment's (1)**
104:8

**Unfair (5)**
79:25;80:5;81:14;
84:15;114:4

**unfairly (1)**
42:10

**unhappy (1)**
116:17

**uniform (3)**
36:17;77:7;115:5

**unilaterally (7)**
12:5,13;19:13;
20:5,14;33:17;34:6

**uninsurance (1)**
110:9

**Union (1)**
100:15

**United (1)**
2:14

**Unless (4)**
25:16;78:17;124:9;
125:14

**unnecessary (1)**
23:11

**unpaid (3)**
92:10,10,12

**unreasonableness (1)**
42:6

**Unwarranted (2)**
87:23;88:1

**up (28)**
30:22;32:23;38:12;
49:24;52:17;64:20;
71:11;76:2;83:25;
84:21;91:10;93:16;
98:4;101:3;105:10;
106:14;107:3;
115:22;118:22,22;
120:2,3;121:20,22;
122:20;123:12;
124:24;126:19

**update (1)**
60:2

**updated (1)**
64:5

**uphill (2)**
42:24;102:2

**upon (7)**
14:11;21:23;82:13,
15;97:9;99:16;
100:11

**Urban (3)**
73:16;74:2,16

**urge (1)**
118:5

**use (3)**
8:20;37:25;39:4

**used (10)**
38:3;73:14,15;
74:5;102:20,25;
107:10,12;110:21;
122:19

**using (4)**
91:11,12,14;
100:17

**Usually (1)**
125:20

**utmost (1)**
111:1

**V**

**valid (10)**
9:5;15:11,11;
16:21;31:19,21;
41:20;66:17;95:21;
97:14

**validity (11)**
10:20;40:9;42:7;
50:22;51:5;52:14;
61:24;102:15;112:5;
113:10,13

**variance (6)**
90:24;91:8;103:13;
104:10,16;105:7

**various (1)**
79:1

**VEISZ (2)**
6:19;8:9

**verifiable (1)**
102:25

**vested (1)**
57:19

**view (1)**
36:13

**violation (1)**
78:11

**violations (2)**
59:3,5

**virtue (1)**
74:22

**Von (1)**
6:4

**W**

**Wachovia (5)**
10:3;18:14,15,21;
19:4

**wagon (1)**
101:1

**wait (8)**
28:18;37:13,15;
38:14;77:11;88:7;
118:20,23

**waited (1)**
127:8

**waiting (1)**
9:2

**waive (1)**
33:22

**waiver (1)**
90:23

**waiving (1)**
27:9

**walking (1)**
83:9

**wants (7)**
29:6;31:25;52:17;
70:7;97:11;123:25;
126:7

**warm (1)**
47:10

**warmer (3)**
46:16;47:10,13

**Washington (1)**
52:4

**waste (2)**
25:19;84:4

**waterfall (1)**
91:7

**way (18)**
12:7;13:1;20:16;
26:3;47:15;62:15;
65:5;86:11;88:15;
101:11;102:23;
104:21;116:18;
118:11;119:9;
121:15;126:12,21

**wear (1)**
87:24

**weather (3)**

46:13;47:11,13

**Web (5)**
37:23;39:4;77:12,
20;109:14

**Webster (3)**
100:8,15;101:16

**week (2)**
9:19;57:13

**weeks (1)**
60:19

**Wells (39)**
3:20;7:3;8:6,12,20,
22;9:1,8;11:24;12:5,
25;13:2,7,10;14:16;
23:20;24:2,16;25:8,
12;31:16;33:2,16;
39:12,16;40:10;41:8;
42:11;43:3;52:21;
53:4;100:14;102:9,
10;115:19;116:5,22;
117:1,3

**Wells' (1)**
44:10

**weren't (7)**
54:3;65:16;83:21;
95:20,20;96:1;
102:24

**WERSON (2)**
6:2;48:23

**West (1)**
4:22

**WEXLER (2)**
6:19;8:9

**whack (1)**
98:10

**What's (11)**
11:17,25;18:12;
41:23;67:13;72:14;
86:24;93:3;108:8;
120:8;124:15

**whenever (1)**
90:18

**Where's (1)**
71:12

**Whereupon (1)**
128:6

**whole (5)**
10:20;44:13;85:5;
115:18;122:23

**who's (1)**
18:24

**whose (1)**
10:2

**WILLIAM (2)**
6:24;8:8

**willy-nilly (1)**
112:12

**Wilson (1)**
63:20

**win (2)**
121:10,10

**wind (2)**
76:2;121:20

**windows (1)**
47:15

**Winston (1)**
12:25

**Winston's (2)**
39:15;41:8

**wish (14)**
11:5,13,16,17;
13:14,15,16,19,22;
26:6;28:10;34:24;
37:11;54:13

**wishes (1)**
53:21

**Wishnew (144)**
3:17;47:24,25;
48:1,7,18,19;49:3,5,
7,12,15,19,19,23,25;
24;51:9,16,19,23,25;
52:3,8,18,24;53:6;
54:4,6,11,17,20,24;
55:16;64:21,21;65:1,
3,7,8;66:2,6,8;67:12,
23;68:6,9;69:3,10,16,
18,23;70:12,13,15,
18,24;71:1,5,7,11,13,
16;72:16,20;73:3,7,
10,14,19;74:4,6,9,11,
15;75:1,4,6,11,14,16,
19;76:1,4,6,10;77:3,
15,18,21,24;78:4,9,
13,15;79:14;81:19;
82:1,4,7,10,22;83:5,
10,14,16;84:10;
85:10,13,15;105:18;
106:5;108:12,14,23;
109:2,5,7;110:11;
111:13,14;112:19,25;
113:4;114:7,14;
118:12,16,21;119:1,
4,8,12,19,23;122:6;
123:14;124:14,15,18;
125:8,12;126:5;
127:13;128:1

**Wishnew's (1)**
104:23

**withdraw (1)**
34:21

**withdrawn (7)**
15:14,20;16:9,17;
17:24;18:1,10

**withdrew (2)**
17:9,15

**within (11)**
16:7;23:19;29:22;
30:9;33:20;34:12;
43:12;67:8;72:14;
80:4;86:20

**without (6)**
24:8;66:13;77:20;
101:16;115:20;
117:23

**witness (7)**
27:4,8;31:11;

81:22;83:1,3;111:17
**witnesses (2)**
53:22;114:18
**Wolicki (1)**
4:20
**won (1)**
102:5
**wonderful (1)**
46:13
**word (2)**
85:3;95:7
**Work (7)**
53:17;89:10;
110:16,24;111:6;
122:20;127:18
**worked (2)**
30:8;122:20
**working (1)**
96:24
**work-out (1)**
79:2
**works (3)**
39:2;88:15;120:6
**worldwide (1)**
13:9
**worth (1)**
101:2
**writing (6)**
72:2;79:10;110:5;
119:18;121:25;127:2
**written (5)**
26:18;114:25;
124:8;125:15,23
**wrong (2)**
74:10;91:19
**wrongful (1)**
59:3

## Y

**year (4)**
50:8;51:2;60:8;
94:13
**Yelena (1)**
44:25
**yelling (1)**
115:22
**Yep (1)**
54:6
**yesterday (5)**
29:10;47:15;62:14,
24;98:17
**York (24)**
2:16,16;4:23;6:22;
7:5;9:20;10:5,8,14;
20:8;21:4,5,6,12,14;
23:7,10;25:19;33:7;
36:1;37:1,4;46:11;
59:7
**Yup (1)**
125:8

## 1

**1 (2)**
32:8;66:23
**1,112 (1)**
92:20
**1,577.30 (1)**
93:12
**1,750 (1)**
99:12
**1,991 (1)**
95:18
**10 (7)**
32:15;40:11;55:1,
17;61:14;62:16;65:9
**10,000 (1)**
101:3
**10:04 (1)**
2:19
**10:15 (1)**
114:13
**10017 (1)**
6:22
**10018 (1)**
7:5
**10040 (1)**
4:23
**10-20010 (1)**
53:3
**10th (6)**
41:22,24,25;42:18;
43:1;111:8
**11 (2)**
118:16;119:1
**110th (1)**
38:15
**12:34 (1)**
128:6
**120 (8)**
29:15,25;30:6;
33:21;37:24;43:8,21;
61:21
**120-day (3)**
29:11;37:20;38:15
**12-12020 (1)**
8:3
**12th (1)**
56:8
**13 (1)**
57:24
**13,000 (1)**
120:14
**13th (1)**
58:5
**14 (1)**
109:16
**14-02004 (2)**
3:20;44:24
**14-02435 (2)**
4:2;8:6
**14th (2)**
49:11;58:9

**15 (2)**
86:15;87:12
**15/7 (1)**
93:9
**15th (1)**
93:2
**17 (1)**
69:4
**18 (1)**
15:1
**18th (1)**
56:8
**190,000 (1)**
101:3
**19100 (1)**
6:4
**192nd (1)**
4:22
**1990.80 (1)**
95:16
**1st (1)**
93:5

## 2

**2 (7)**
32:16;39:13,13;
54:25;55:17;66:22;
87:11
**2,637 (1)**
94:5
**2/16/2015 (1)**
98:19
**2005 (1)**
49:11
**2006 (2)**
100:4,5
**2008 (2)**
99:6;100:3
**2009 (3)**
77:7;97:5,5
**2010 (3)**
14:25;58:6;79:5
**2011 (3)**
58:9,10;96:23
**2012 (3)**
59:1;101:3;102:23
**2013 (7)**
32:15;40:12;41:25;
42:1,18;43:1;119:10
**2014 (2)**
49:9;50:7
**2015 (4)**
2:18;3:16;49:11;
53:2
**2091 (1)**
63:20
**20th (2)**
66:10;111:8
**21 (3)**
49:9;50:5;109:17
**2100 (1)**
7:13

**2267 (4)**
3:6;55:19,25;57:9
**234 (1)**
99:2
**25 (1)**
2:18
**250 (1)**
95:24
**25th (3)**
93:1,3,6
**26f3 (1)**
28:24
**27th (1)**
111:7
**28th (1)**
53:2
**2A (1)**
63:7
**2B (1)**
63:10
**2C (1)**
63:13
**2D (1)**
63:15
**2E (1)**
63:16

## 3

**3 (2)**
56:5;61:14
**3,500 (1)**
98:4
**3.75 (1)**
100:18
**30b6 (3)**
26:8,10,18
**30th (2)**
60:6;66:9
**353,484 (1)**
98:20
**37,000 (1)**
94:9
**37,000-dollar (1)**
94:8
**370,000 (1)**
98:4
**39 (2)**
68:12;70:16
**392.30 (1)**
59:6
**392.304 (1)**
59:6

## 4

**4 (2)**
56:6;65:9
**4,000 (1)**
91:21
**4222 (5)**
3:13;55:6;65:10,
22;66:5

**43,000 (1)**
92:24
**434 (1)**
63:20
**44,000 (1)**
94:10
**45 (1)**
43:9
**452 (1)**
7:4
**494 (2)**
92:23;96:5
**4th (1)**
77:7

## 5

**5 (3)**
3:16;25:6,10
**50,000 (5)**
91:24;92:13,23;
94:10;101:10
**50,000-dollar (1)**
92:7
**500,000 (1)**
15:14
**515 (1)**
7:12
**5270 (2)**
90:21;96:2
**5286 (2)**
3:17;119:25

## 6

**6 (1)**
72:19
**6:30 (1)**
114:11
**61 (3)**
3:3;48:5;54:9
**6768 (1)**
64:8
**6B (2)**
73:12;74:22

## 7

**7 (4)**
14:24,25;15:1,1
**700 (2)**
4:22;6:5
**757 (1)**
6:21
**7979 (1)**
66:4
**7979] (1)**
3:14
**7979-19 (1)**
109:15
**7979-23 (1)**
68:11
**7th (1)**

58:10

## 8

**8 (2)**
  68:11;70:16
**8/9/2011 (1)**
  94:4
**800 (1)**
  97:16
**8013 (2)**
  61:17;63:5
**8013] (1)**
  3:11
**8018 (1)**
  55:20
**8018] (1)**
  3:6
**8019] (1)**
  3:3
**8024 (1)**
  66:9
**8029 (1)**
  57:3
**8031-2 (1)**
  63:18
**8144 (1)**
  56:9
**8160 (1)**
  66:10
**82 (1)**
  100:25
**878 (2)**
  92:19;96:21
**8th (2)**
  79:4;111:7

## 9

**9 (3)**
  48:3;68:12;70:16
**9,443 (1)**
  94:5
**9:30 (1)**
  114:11
**90071 (1)**
  7:14
**92612 (1)**
  6:6
**955 (2)**
  94:13;96:20
**973406-2250 (1)**
  4:24