**Exhibit 1**
**Erlinda Abibas Aniel Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| In Re: RESIDENTIAL CAPITAL, LLC, et al.. Debtors. | Case No. 12-12020-MG<br>**Chapter 11**<br>Jointly Administered |
|---|---|

**DECLARATION OF ERLINDA ABIBAS ANIEL IN SUPPORT FOR CLAIMANT'S OPPOSITION AND RESPONSE TO THE RESCAP LIQUIDATING TRUST'S AND RESCAP BORROWER CLAIMS TRUST'S OBJECTION CLAIM NOS. 112, 114, 416, AND 417 FILED BY ERLINDA ABIBAS ANIEL, FERMIN SOLIS ANIEL, AND MARC JASON ANIEL**

I, Erlinda Abibas Aniel, declare:

1. That I am the Claimant in the above-referenced matter and I have personal knowledge of the facts contained on this declaration and I am willing and competent to testify to their truth if called as a witness.

2. That I am one of the owners of the property located at 75 Tobin Clark Drive., Hillsborough, CA 94010, which is a single-family residence.

3. That I have owned this property since June 5, 2005.

4. On or around September 2009, after learning that HSBC Bank as Trustee for DALT2007-OA5 claimed to be the owner of the loan, I called HSBC Bank, to confirm if in fact they are my creditor. I was told by a representative, "Marianne" that she could not find any information that HSBC as Trustee for DALT2007-OA5 owns the loan to my

property. My Property address, social security information, loan number, my name, zip code, or any other identification was not found in their database.

5. I learned that DALT2007-OA5 is a securitized Trust. That the trust has a Pooling and Servicing Agreement ("PSA"), which states that all qualified mortgage loans must be transferred to the Trust before the closing date.

6. I believe the closing date to be July 30, 2007 based on my reading of the PSA.

7. That on or around December 2010, the United States Bankruptcy Court issued a discharged of all of my, and my husband, Fermin Solis Aniel, debt in our Chapter 7. On or around February 2010, the bankruptcy trustee discharged the bankruptcy estates, and the case was closed.

8. On or around January 2010, my credit report shows that a debt $2,051,000.00 has been discharged against GMAC Mortgage, LLC.

9. That on or around May 2012, I received the Notice of Default, which accompanied a letter from Defendant, Executive Trustee Services, LLC dba as ETS Services, LLC, which was debt validation notice, dated April 30, 2012, that I had 30 days to dispute the debt, otherwise defendants will assume the debt as valid.

10. On or around May 10, 2012, I sent out a disputed debt validation letter disputing the amount because I questioned whether I owed any debt to GMAC, who was merely a previous sub-servicer of our mortgage. I have never received any letter in response to my debt validation letter.

11. That I do not owe any money on the 75 Tobin Clark Drive, Hillsborough property. That based on information and knowledge, the loan has been charged off, paid off, canceled and/or discharged as a matter of law.

12. I am also one of the owners of the property commonly known as 801 Foothill Drive, San Mateo, CA 94402 along with Raul Estiva, who is now deceased, and Corazon Estiva.

13. My interest in the property is as follows:
   a.    1% title in the property through a Grant Deed
   b.    50% interest in the property as agreed upon with the Estivas.

14. I believe the Foothill loan was sold in the secondary market and was never transferred into any Securitized Trust.   The said property is currently listed at $1,850,000.00 as of March 22, 2015.

15. That I learned that on May 14, 2012, GMAC and ETS filed their bankruptcy petition at Southern District of New York with case numbers of 12-12032 for GMAC Mortgage LLC, and 12-12028 for ETS.

16. That I have read both of their petitions for their bankruptcy, and their scheduled assets. Based on that information, I believe that asset of the loan secured by my home that is the subject of this litigation is not part of either of their bankruptcy asset.

I declare under penalty of perjury under the laws of the United States of America and pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Date: March 23, 2015

Erlinda Abibas Aniel

**Exhibit 2**
**Deposition of Jeffrey Stephan**

MAINE DISTRICT COURT, DISTRICT NINE
DIVISION OF NORTHERN CUMBERLAND

- - -

FEDERAL NATIONAL MORTGAGE ASSOCIATION
Plaintiff
: DOCKET NO. BRI-RE-09-65

v.

NICOLE M. BRADBURY
Defendant

and

GMAC MORTGAGE, LLC d/b/a DITECH, LLC.COM and BANK OF AMERICA, NA:
Parties in Interest:

- - -

June 7, 2010

- - -

Oral deposition of JEFFREY D. STEPHAN, taken pursuant to notice, was held at the law offices of LUNDY FLITTER BELDECOS & BERGER, P.C., 450 N. Narberth Avenue, Narberth, Pennsylvania 19072, commencing at 10:10 a.m., on the above date, before Susan B. Berkowitz, a Registered Professional Reporter and Notary Public in the Commonwealth of Pennsylvania.

- - -

APPEARANCES:

BRIAN M. FLEISCHER, ESQUIRE
FLEISCHER, FLEISCHER & SUGLIA, P.C.
Plaza 1000 at Main Street
Suite 208
Voorhees, New Jersey 08043
(856) 489-8977
bfleischer@fleischerlaw.com
Counsel for GMAC

THOMAS A. COX, ESQUIRE
LAW OFFICES OF THOMAS A. COX
P.O. Box 1315
Portland, Maine 04104
(207) 749-6671
tac@gwi.net
Counsel for Defendant,
Nicole M. Bradbury

VIA TELEPHONE:
JULIA G. PITNEY, ESQUIRE
DRUMMOND & DRUMMOND
One Monument Way
Portland, Maine 04101
(207) 774-0317
JPitney@ddlaw.com
Counsel for GMAC and Fannie Mae

(Document marked Exhibit-1 for identification.)

\- - -

(It is hereby stipulated and agreed by and between counsel that sealing, filing and certification are waived; and that all objections, except as to the form of questions, be reserved until the time of trial.)

\- - -

JEFFREY D. STEPHAN, after having been duly sworn, was examined and testified as follows:

\- - -

MS. PITNEY: I would like to put on the record that we requested a stipulation, and Attorney Cox has denied our request for that stipulation. And that would be a stipulation that this deposition transcript be used for this case, FNMA versus Bradbury, only.

STEPHAN

MR. COX: Mr. Fleischer, we understand that Julia Pitney represents the plaintiff in this case. Who do you represent today?

MR. FLEISCHER: I believe Ms. Pitney both represents Fannie Mae and GMAC, and I am here on GMAC's behalf.

MR. COX: GMAC is neither a plaintiff nor defendant in this case, so we may have some issues around that, but we'll cross that bridge when we get to it.

\- - -

EXAMINATION

\- - -

BY MR. COX:

Q. Mr. Stephan, for the record, would you state your full name, please?
A. Jeffrey Stephan.
Q. How old are you?
A. I am 41, in June.
Q. You live in Sellersville, Pennsylvania?

STEPHAN

A. That is correct.
Q. Have you had your deposition taken previously?
A. In other cases, yes.
Q. How many other cases?
A. This will be my third time.
Q. What other cases were you deposed in, to your recollection?
A. In what kind of cases?
Q. Well, can you remember the names of the cases?
A. No, I don't.
Q. When is the last time that you've had your deposition taken?
A. I would approximate two, three months ago.
Q. Was that in Florida?
A. No. That was in New Jersey.
Q. That would have been in 2010?
A. Yes.
Q. Then you were deposed in Florida in December of 2009?
A. That is correct.

STEPHAN

Q. When was the other deposition, the third deposition?

A. This one today is the third.

Q. Have you testified in court as a witness before?

A. No.

Q. Did you review any documents to prepare for this deposition?

A. Yes.

Q. What documents did you review?

A. I looked at the deposition that was sent to me. And I went over the Complaint with Brian.

THE WITNESS: When was that, Thursday, Wednesday?

MR. FLEISCHER: You're directed not to say anything with regard to what we spoke about, but, yes, you can answer to what you looked at.

THE WITNESS: Yes.

MS. PITNEY: I'm sorry to interrupt. I'm just having a

STEPHAN

little difficulty hearing you. Is there any way to push the phone a little closer to Mr. Stephan?

MR. FLEISCHER: Okay. And, Julia, let me know during the course if there's still a problem.

MS. PITNEY: You were doing fine, and then it got a little fuzzy.

THE WITNESS: I'll talk louder.

MS. PITNEY: Thank you.

BY MR. COX:

Q. What deposition did you look at?

A. The deposition for this case.

Q. The Deposition Notice?

A. Right, the Deposition Notice.

Q. It was not another deposition transcript --

A. No.

Q. -- that you were referring

STEPHAN

to?

A. No.

MR. FLEISCHER: Let him finish the question, and then respond, because it makes it cleaner for the transcript.

THE WITNESS: Thank you.

BY MR. COX:

Q. What is your educational background?

A. I have a four-year degree at Penn State University in liberal arts.

Q. When did you go to work for GMAC?

A. I began work at GMAC September 30th of '04.

Q. What was your work history, in a summary form, before you went to work for GMAC?

A. I have done collections and mortgage foreclosures for other companies.

Q. Who have you done mortgage foreclosure work for?

STEPHAN

A. ContiMortgage, Fairbanks Capital, GMAC.

Q. The first one, I'm not sure about. Is that Conti, C-O-N-T-E (sic)?

A. C-O-N-T-I.

Q. What period of time did you work for ContiMortgage?

A. I began there in '92. I believe I left there in '98.

Q. What years, approximately, did you work for Fairbanks Capital?

A. '98 to '04.

Q. You work in the GMAC Mortgage office in Fort Washington, Pennsylvania; is that correct?

A. That is correct.

Q. Approximately, how many people work in that office?

A. I can't estimate the number of people. I can say my department, approximately 50 to 60 people.

Q. What's the name of your department?

A. Foreclosures.

STEPHAN

Q. When you began working for GMAC Mortgage in 2004, what position did you begin working in?

A. I was a foreclosure specialist.

Q. What kinds of duties did that involve?

A. That involved the day-to-day handling and servicing of a portfolio of loans that fell into a foreclosure category.

Q. What kinds of duties did you carry out with respect to those matters?

MS. PITNEY: Object to form.

MR. COX: You have to answer.

MS. PITNEY: You can answer the question.

THE WITNESS: The everyday servicing of the file, from contacting the attorney, supplying an attorney who's handling a case within my portfolio with any information they may need, a copy

STEPHAN

of documents that may be needed through a fax form or e-mail form, the calculation of figures for judgments, reporting sale results at that time, and properly conveying properties to the proper departments for post sale action.

BY MR. COX:

Q. How long did you hold the position of foreclosure specialist?

A. With GMAC, three years.

Q. So you would have assumed a new position sometime in 2007?

A. Yes.

Q. What position did you assume in 2007?

A. I became a team lead within the foreclosure department.

Q. What duties did you assume as the team lead in the foreclosure department?

A. At that time, GMAC segregated our department into teams, and I was put into place as the supervisor or

STEPHAN

team lead for our bidding team, which would be a team of individuals who calculate the bids for sales.

Q. Calculate the bids for sales of mortgage --

A. Foreclosure sales.

MR. FLEISCHER: Again, let him finish the question.

BY MR. COX:

Q. Just so I can understand it, your role in that position was to help GMAC calculate what it was going to bid at any given foreclosure sale?

A. That would be correct.

Q. The foreclosure department -- is that what it's called?

A. Yes.

Q. That has units within it?

A. Yes.

Q. And when you were doing the bidding work, what unit were you a part of at that time?

A. The bid team.

Q. How long did you serve on

STEPHAN

the bid team?

A. I'm going to estimate six months to a year, at the most.

Q. Does it sound roughly correct that sometime in 2008, you assumed a new position?

A. Yes.

Q. What was the next position that you held after working on the bid team?

A. My present position, which is the team lead of the document execution team.

Q. Is there also a service transfer unit?

A. Yes, there is.

Q. Are you the team lead of that as well?

A. Yes, I am. That falls into the document execution team.

Q. So I talk your language, there's a foreclosure department?

A. Yes.

Q. And the subdivisions within

STEPHAN

that, do you call them teams or units?
A. Teams.
Q. So there's a foreclosure department, and then within it are a group of teams that do different functions; is that correct?
A. That is correct.
Q. What does the document execution team do?
MR. FLEISCHER: Objection as to form.
THE WITNESS: Can you rephrase that?
BY MR. COX:
Q. What are the functions of the document execution team?
A. The functions of my document execution team is, I have staff that prints documents, from our computer system, that are submitted from our attorney network. I have staff, also, on that team who prepares the documents which have already received figures from our attorneys. So there are completed

STEPHAN

documents. They fill in the blanks, they stamp names. They ensure that all of the notary lines are completed properly once it's returned from the notary. And that staff also is in charge of making sure they Federal Express the document back to the designated attorney within our network.
Q. What does the service transfer team do?
A. The service transfer team receives a list of loans from our transfer management team, which is located in Iowa. The service transfer team within foreclosure only handles loans that fall into a bankruptcy or foreclosure category. They prepare files or CDs, and transfer them to the new servicer. So they're loans that are either acquired, or they're loans that are being transferred to a new servicer for service.
Q. How many employees are on the document execution team?

STEPHAN

A. 14.
Q. Including yourself?
A. No; including me, 15.
Q. What training have you received from GMAC to function in your capacity as the team lead for the document execution team?
MS. PITNEY: Object to form.
BY MR. COX:
Q. Let me restate the question. Have you received any training from GMAC to use in conjunction with your performance as the team lead for the document execution team?
A. Yes.
Q. What training have you received?
A. I received side-by-side training from another team lead to instruct me on how to review the documents when they are received from my staff.
Q. Who was that person?
A. That person, at the time, I

STEPHAN

believe was a gentleman by the name of Kenneth Ugwuadu, U-G-W-U-A-D-U. He is no longer with GMAC.
Q. How long did that training last?
A. Three days.
Q. Were there any written or printed training materials or manuals used as a part of that training?
A. No.
Q. Again, just so I understand what your testimony was, that training involved your learning how to review the documents that were being processed through your hands; is that correct?
A. That's correct.
Q. What were you trained to do with respect to those documents by that gentleman?
A. Basically, how to review the system, which I already basically knew from preparing documents in my prior position before becoming a team lead. So it was more or less a rehash, let's say,

STEPHAN

or retraining, to confirm that I was looking at things correctly in the system.

Q. When you refer to a system, you're referring to a computer system?

A. Yes.

Q. Other than what you might call it when you're not happy, does that system have a name?

A. Yes. That system is called Fiserv, F-I-S-E-R-V.

Q. Have you received any training on how to use that system?

A. Yes, when I was hired.

Q. Are there any manuals or training materials associated with your training on that system?

A. Yes, there is.

Q. Do you have those manuals in your possession?

A. Presently, no.

Q. Do they exist in your office at GMAC?

A. I honestly don't know.

STEPHAN

Q. In your role as team lead for the document execution team, do you have any duties with respect to the receipt, application, or counting for loan payments?

A. No.

MS. PITNEY: Object to the form of the question.

BY MR. COX:

Q. What department has that responsibility?

A. To my understanding, that would be customer service. And within customer service, I believe there is a cash unit.

Q. Have you ever worked in that cash unit?

A. No.

Q. Have you ever worked in that customer service department?

A. No.

Q. Have you ever had any training in how that department and unit work?

STEPHAN

A. No.

Q. In your capacity as team lead for the document execution team, do you have any responsibility for data entry into the computer system regarding payments received by GMAC?

A. No.

Q. In your capacity as the team lead for the document execution team, do you have any role in the foreclosure process at GMAC, other than the signing of documents?

MR. FLEISCHER: Objection as to the form of the question.

THE WITNESS: Can you rephrase?

BY MR. COX:

Q. In your capacity as the team lead for the document execution team, do you have any role in the foreclosure process, other than the signing of documents?

A. No.

Q. I'm going to hand you what

STEPHAN

we have marked as Deposition Exhibit Number 1, which is your affidavit in this case, dated August 5, 2009.

MS. PITNEY: Excuse me, Tom. This is Julia. Am I to presume that this is the only exhibit you're going to be introducing? Because I haven't received any exhibits that you plan to produce at this deposition today.

MR. COX: I had no idea you were going to be participating today, Julia.

MS. PITNEY: Well, I represent the plaintiff. It shouldn't come as any surprise.

MR. COX: We're not going to have a debate on the record. The exhibits are here. You're welcome to come see them. I had no idea that you were going to participate in this fashion.

MS. PITNEY: You had no idea?

STEPHAN

MR. COX: I'm not going to have this exchange on the record with you. If you want to go off the record for a minute, I'll be happy to do it.

MS. PITNEY: No, we're going to stay right on the record, Tom.

MR. COX: That's fine.

MS. PITNEY: Is it your intent to introduce these exhibits that have not been produced to the opposing party?

MR. COX: I'm not going to respond to that. I will entertain objections that you are going to make. But I'm not going to respond to your questions on the record.

MS. PITNEY: I'm going to object to each and every exhibit.

MR. COX: That's your right to do that.

BY MR. COX:

Q. I've handed you Deposition

STEPHAN

Exhibit Number 1, Mr. Stephan. Is that a document signed by you?

A. Yes, that is my signature.

Q. And that's dated August 5, 2009?

A. That is correct.

Q. Do you have any memory of signing that document?

A. No, I do not.

MS. PITNEY: I'd like to take a brief break and speak with Attorney Fleischer separately. There's no question pending.

(Whereupon, a short recess was taken.)

MR. COX: I gather you have something you want to say on the record, Julia?

MS. PITNEY: Yes. I object to not being provided copies of the documents that you intend to introduce in this deposition. And in an effort to make things more efficient, my proposal is that --

STEPHAN

I understand there's not a large number of documents. I propose that we have Attorney Fleischer fax them to me, or e-mail, in bulk, or we're going to have to stop. I would object. And each time I'm going to stop and have each document sent to me.

MR. COX: Your objection is noted.

MR. FLEISCHER: Why don't we at least just deal with the one document that's in front of us at this point, which is the affidavit, and then we'll address each one as they come up.

MS. PITNEY: Fair enough.

BY MR. COX:

Q. Mr. Stephan, you've testified that in addition to yourself, there are 14 other employees in your document execution team.

A. That is correct.

Q. You have a title of limited

STEPHAN

signing officer; is that correct?

A. That is correct.

Q. How long have you been a limited signing officer for GMAC Mortgage?

A. I'm going to estimate, two years.

Q. Are there any other limited signing officers among the 14 people on your team?

A. No, not amongst my 14 people.

Q. Exhibit-1, on the bottom of the first page, says: I have under my custody and control the records relating to the mortgage transaction referenced below.

What records does GMAC maintain with respect to mortgage transactions?

MS. PITNEY: Object to the form.

THE WITNESS: Please rephrase.

STEPHAN

BY MR. COX:

Q. What records does GMAC maintain with respect to mortgage loans?

A. We keep our records for the foreclosure department and the rest of the company on our Fiserv system for availability throughout our company.

Q. Do paper records exist anywhere within GMAC Mortgage?

A. Yes, they do.

Q. Where do they exist?

A. I believe they are housed either in our Iowa office or in Minnesota, or with any of our custodians involved within the company.

Q. Do you have any responsibilities for making entries in the Fiserv system?

A. Other than just usual notes, no.

Q. What kind of usual notes do you enter?

MS. PITNEY: Object. I'm objecting to the form of the

STEPHAN

question. And, furthermore, I'm objecting to the extent that you're basically asking him an incredibly broad-based question here, Tom. If you want to ask him about this case and any entries he made with respect to this case, then that's fine. But your question is pretty sweeping there.

BY MR. COX:

Q. What is your usual business practice and routine with respect to making usual notes in the Fiserv system?

A. If a customer were to call in, I would make a note in our computer system.

Q. Do customers call you in your capacity as team lead for the document execution team?

A. No, they do not.

Q. So if that's the only kind of notes that you would make in the system, is it fair to say that you don't make notes in that system?

STEPHAN

A. That would be correct.

Q. And you have no role in the entry of any other data into that system; isn't that correct?

A. That is correct.

Q. What department maintains that system?

MR. FLEISCHER: Objection as to form.

BY MR. COX:

Q. Do you know what department maintains that system?

A. The system is used by the entire company.

Q. Do you know what department maintains the security for that system?

A. The IT department.

Q. Where is that located?

A. Throughout the entire country.

Q. Do you know what department makes entries into that system?

A. Numerous departments.

Q. Do you know what departments

STEPHAN

have the ability to change entries in that system?

A. Nobody has the ability to change an entry in the system, as far as a note would go.

Q. What do you mean by that?

A. Such as if a customer calls in, you type in the system. Once you type it, it's entered.

Q. Does GMAC keep a paper record of loan payments made by mortgage customers?

A. I do not know.

Q. I think you said that the cash department receives payments -- customer payments; is that correct?

A. To my knowledge, yes.

Q. That's the department that you've said you have not worked in; is that correct?

A. That is correct.

Q. So you don't have firsthand knowledge about how it operates; is that correct?

STEPHAN

A. That is correct.

MS. PITNEY: Object.

BY MR. COX:

Q. Do you have any knowledge about how the data relating to those payments are entered into the system?

A. I do not have that knowledge.

Q. Do you have any knowledge about how GMAC ensures the accuracy of the data entered into the system?

A. No, I do not.

Q. Do you have any knowledge as to what measures GMAC takes to preserve the integrity and security of the system?

A. No, I do not.

MS. PITNEY: Object to the form of that question.

BY MR. COX:

Q. In your capacity as team lead for the document execution team, what kinds of documents do you sign?

A. The types of documents I sign are assignments of mortgage,

STEPHAN

numerous types of affidavits, deeds that need to be done post sale, a substitution of trustees. And that covers it in a general span.

Q. You said you sign a variety of affidavits. What kinds of affidavits do you sign?

A. I sign judgment affidavits for judicial foreclosure actions. I will sign an affidavit verifying military duty. I sign affidavits in reference to -- if GMAC has exhausted all options through lost mitigation upon reviewing notes in our Fiserv system. That's a general description of different types of affidavits.

Q. Your document execution team provides documents for foreclosures in what states?

A. Throughout the country.

Q. Are there other document execution teams within the GMAC system?

A. I believe our bankruptcy unit also has a document execution team.

STEPHAN

Q. That's the only other document execution team that you're aware of?

A. To my knowledge, yes.

Q. When you referred in one of your answers a few moments ago to judgment affidavits, are you referring to the type of affidavit in front of you, as Deposition Exhibit-1?

A. That is a similar type of affidavit, yes. This states Affidavit in Support of the Plaintiff's Motion for Summary Judgment.

Q. Have you received any training regarding the summary judgment process in judicial foreclosure states?

A. No.

Q. Do you have any knowledge as to what a summary judgment affidavit is used for in the State of Maine?

MR. FLEISCHER: Objection as to form.

BY MR. COX:

Q. Would you please answer the

STEPHAN

question?

A. To my knowledge, a borrower would have filed a contested answer. And this would be our next step within the process, to confirm the amount that is due to support the summary judgment.

Q. Do you understand how the affidavit is used, that is, Deposition Exhibit Number 1?

MS. PITNEY: Objection. Tom, you're getting dangerously close here to the privileged area. I mean, this affidavit, in itself, was prepared in preparation for litigation -- in litigation; not even preparation for it, but during litigation.

MR. COX: I have not the slightest interest in getting into attorney/client privilege. I'll rephrase the question.

BY MR. COX:

Q. Do you have any knowledge of how summary judgment affidavits are used

STEPHAN

in judicial foreclosure states?
A. No.
Q. Are you aware that they are given to a judge?
A. Yes.
Q. And do you understand that the judge relies upon them?
A. Yes.
Q. At the time that you executed Deposition Exhibit-1 on August 5, 2009, you were, at that time, in your position as team lead for the document execution department?
A. Yes.
Q. Has the manner in which you perform your duties as the team lead for the document execution department changed in any way over the period from August 5, 2009 to the present date?
A. No.
Q. Has your job description changed in any manner during that time?
A. I assumed the responsibility at that time of also handling the service

STEPHAN

transfer team as an additional responsibility; other than document execution, no.
Q. In your usual business practice as a team lead for the document execution team, how does a summary judgment affidavit come to you, such as the one that is Deposition Exhibit Number 1?
MS. PITNEY: Objection. Tom, if you'd like to ask him about how this specific affidavit came to him, that's fine. But, again, you're asking way too broad.
BY MR. COX:
Q. Do you know how this specific affidavit got to you, Mr. Stephan?
A. We have a process in place that if our attorney network needs an affidavit, they will upload it into our system, which is called LPS. We have another system, which is a communication

STEPHAN

tool, between our attorneys. They load it into a process called signature required.
MS. PITNEY: Jeff, I'm going to interrupt you right there. To the extent that this answer or anything else that you say has to do with your communication between you and your attorney -- GMAC and its attorney, it's attorney/client privilege.
THE WITNESS: So I won't answer.
MR. COX: Well, let's go back and ask the question again.
MS. PITNEY: He's answered the question. He gets the affidavit from the attorney.
BY MR. COX:
Q. What is the LPS system?
A. That is a communication tool with our attorney network.
Q. Is LPS a separate company?
A. Yes.

STEPHAN

MS. PITNEY: Objection. The means by which he communicates any details about -- the means by which he communicates with his attorneys is privileged.
BY MR. COX:
Q. What does LPS do?
MS. PITNEY: I'm going to object again on privilege grounds. Same objection. Do not answer that question.
THE WITNESS: Okay.
BY MR. COX:
Q. Is the source of what you know about what LPS does based upon any communication that you've had with lawyers?
A. Sorry. Please rephrase that. I don't understand your question.
Q. Do you know what LPS does with respect to documents processed by your unit?
MS. PITNEY: Objection. Same objection.

STEPHAN

MR. COX: He can answer that yes or no.

THE WITNESS: I still don't understand what you're asking.

BY MR. COX:

Q. You've mentioned LPS.

A. Right.

Q. That's a separate company; is that correct?

A. It's a system that we have acquired from a company by the name of Fidelity, in order to have communication between our attorneys.

Q. Do you have any memory of specifically receiving Deposition Exhibit-1?

A. No.

Q. Again, I'm asking you, based upon that, to describe what the usual business practice is within your unit, as far as how affidavits, such as Deposition Exhibit-1, come to you.

A. Our attorney will load it to the LPS system. Members of my team will

STEPHAN

print it. Other members will prepare it. The figures have already been loaded from our network of attorneys. So my team does not have any input on the affidavit, other than filling in my name. They bring it to me. I review it against our Fiserv system, execute it, hand it back. They get it notarized. It's Federal Expressed back to the individual attorney asking.

Q. Do you keep a log of any sort of what documents you execute?

MS. PITNEY: I'm sorry. Can you repeat the question, Tom? I could not hear that.

BY MR. COX:

Q. Do you keep a log of any sort of what documents you execute?

MS. PITNEY: Objection. Work product. Any type of log that he keeps relative to these affidavits is prepared in preparation for litigation; to the extent that one even exists.

STEPHAN

MR. COX: He can answer the question of whether or not he keeps a log, before I ask him what goes into the log.

MS. PITNEY: Fine.

THE WITNESS: No, I don't have a log.

BY MR. COX:

Q. Does anybody keep a log of what documents you sign?

MS. PITNEY: Object to the form of that question.

THE WITNESS: Please rephrase.

BY MR. COX:

Q. Do you know if anybody keeps a log of what documents you execute?

A. We have notaries in our department, approximately six, who keep a log for what they notarize.

Q. These are notaries within your department?

A. That is correct.

Q. As I understand it, the

STEPHAN

first step is, in your department, a document comes in on the LPS system from the outside lawyer; is that correct?

A. That is correct.

Q. And then an employee in your department prints it out; is that correct?

A. That is correct.

Q. And then you said that the employee prepares the document. What does that mean?

MS. PITNEY: Objection. The document is prepared for litigation. It is privileged. How it is prepared is privileged. Do not answer that question.

BY MR. COX:

Q. Do your employees have any direct communication with outside counsel?

A. Yes, through the LPS system.

MS. PITNEY: Objection. How and what he communicates with his attorney is privileged, Tom.

STEPHAN

MR. COX: I haven't asked for the content. I asked if it happens.

BY MR. COX:

Q. Would you answer the question, please?

A. Yes, through the LPS system.

Q. Is anything done to a document submitted to the LPS system by an outside lawyer before it reaches your hands?

MS. PITNEY: Objection. Preparation of the document is privileged. It's for litigation. Do not answer the question.

BY MR. COX:

Q. Is the document that is received in the LPS system from outside counsel presented to you in exactly the form that it is received in from outside counsel?

MS. PITNEY: Objection. Same objection.

MR. COX: Is it an



STEPHAN

objection, or are you instructing him not to answer?

MS. PITNEY: I'm instructing him not to answer, to the extent you're asking him questions about a document that was prepared specifically during the course of litigation. It's protected by privilege, and you can't ask him questions about it.

BY MR. COX:

Q. Deposition Exhibit-1 has your name stamped on it with a stamp; is that correct?

A. That is correct.

Q. And below your name, the words "limited signing officer" appear; is that correct?

A. That is correct.

Q. Who puts that stamp on these affidavits?

A. My team.

Q. On this particular affidavit, your name and title is stamped



STEPHAN

twice on the first page, and once on the signature page for you; is that correct?

A. That is correct.

Q. And then it's stamped again on the notary page; is that correct?

A. That is correct.

Q. So as I understand it, an affidavit, such as Deposition Exhibit-1, is initially prepared by outside counsel?

MS. PITNEY: Objection.

BY MR. COX:

Q. Is that correct?

A. Yes, that is correct.

Q. Does anybody on your team verify the accuracy of any of the contents of the affidavit before it reaches your hands?

MS. PITNEY: Objection again. How the document is prepared -- you can ask him questions about the document and what's stated in the document. The preparation of the document, which is prepared for litigation,



STEPHAN

is privileged. Do not answer the question, Jeff.

BY MR. COX:

Q. Mr. Stephan, do you recall testifying in your Florida deposition in December, with regard to your employees, and you said, quote, they do not go into the system and verify the information as accurate?

A. That is correct.

MS. PITNEY: I'm sorry. Tom, could you please repeat what you just said? I just couldn't hear.

MR. COX: Quote: They do not go into the system and verify the information as accurate.

BY MR. COX:

Q. Is that correct?

A. That is correct.

MR. FLEISCHER: Tom, can you reference what litigation that was in, do you know?

MR. COX: The Florida case

STEPHAN

that he testified in.

MR. FLEISCHER: I just thought you might have a reference there.

MR. COX: I'll get it shortly.

BY MR. COX:

Q. Do you and your 14-person team all work in the same physical space?

A. Yes. We're all in the same department.

Q. Do you have an office or a cubicle, or what?

A. Cubicle.

Q. Do the employees bring documents to you to sign?

A. That is correct.

Q. How many do they bring to you at a time, on average?

A. For a month, anywhere from six to 8,000 documents.

Q. Do you recall testifying in your Florida deposition in December that you estimated it was 10,000 documents a

STEPHAN

month?

A. I do not recall. I'm going off of numbers within the past month or so.

Q. Have those numbers gone down in the past month or so?

A. There has been a decrease.

Q. Back in December, were you signing in the range of 10,000 documents a month?

A. I may have been.

Q. Back in August of 2009, roughly, how many documents a month were you signing?

A. I cannot estimate. I don't know.

Q. Do you believe that it was more or less than the number you were signing in December?

A. I'm going to assume, more.

Q. And on a given day, I understand an employee brings you a group of documents for you to sign; is that correct?

STEPHAN

A. That would be correct.

Q. Roughly, how many are brought to you in a group, on average?

A. Throughout a day, I believe we are averaging approximately 400 new requests coming in from our attorney network. So I would say approximately 400 per day.

Q. This sounds very basic. But, physically, are you handed a pile of 100 documents, 300 documents? How does that work?

A. They bring them to me in individual folders from each one of the members of my team. I do not count how many are in the files.

Q. So each team employee has a folder of document; is that correct?

A. That is correct.

Q. When you receive a summary judgment affidavit to be signed by you, is it accompanied by any other documents relating to the loan?

MS. PITNEY: Objection. The

STEPHAN

document is prepared for litigation. And anything he does when he's preparing it is privileged.

MR. COX: Are you telling him not to answer?

MS. PITNEY: I am. Tom, if you want to ask him about general procedures, which you have been, then I'm not going to object as much. But if you want to ask him about what goes into preparing a document that was used for summary judgment, that's clearly prepared for litigation, and it's privileged and protected.

MR. COX: I think you haven't heard my question, Julia. I'll state it again.

BY MR. COX:

Q. When you receive a summary judgment document for your execution, is it accompanied by any other documents?

MS. PITNEY: My objection is

STEPHAN

-- you can answer that question, Jeff.

THE WITNESS: There are times when it has the Complaint connected. There are times when it is brought to me just as the affidavit.

BY MR. COX:

Q. When you say that there are times when it comes to you with a Complaint connected, you mean attached as an exhibit?

A. Such as this one, yes.

Q. When you say "this one," you're referring to Deposition Exhibit-1?

A. Yes, that is correct.

Q. Deposition Exhibit-1 has several exhibits attached to it; is that correct?

MS. PITNEY: Could you please tell me what the exhibits that are attached are, because I don't have the benefit of having them in front of me?

STEPHAN

THE WITNESS: Exhibit-A is a copy of the note and the --

MR. COX: Julia, this is your summary judgment affidavit.

MS. PITNEY: I'm not doubting that it is. I just don't know what these other exhibits attached are.

MR. COX: Don't you have your copy?

MS. PITNEY: You're the one verifying if they're the same as the one I'm looking at, Tom.

THE WITNESS: Exhibit-B is the mortgage. Exhibit-C is the assignment of note and mortgage. Exhibit-D -- I believe we're looking at the demand, or the breach letter. And those are the four documents that are connected to this affidavit of summary judgment.

BY MR. COX:

Q. In your usual practice, are

STEPHAN

those exhibits attached to the affidavit at the time that you sign them?

MS. PITNEY: Objection. You're asking about a document that was prepared by an attorney. Anything that comes with it that he's asked to review is privileged -- the communication between a client and an attorney. Do not answer the question.

BY MR. COX:

Q. Mr. Stephan, would you please look at Paragraph 3 of Exhibit-1. Do you see there the statement: That a true and correct copy of which is attached hereto is Exhibit-A?

A. Where are you looking?

Q. Paragraph 3. Do you see that statement?

A. Yes, I do.

Q. When you sign an affidavit such as Exhibit-1, are the exhibits attached to it?

MS. PITNEY: Objection. A

STEPHAN

document that's provided to him by an attorney is privileged.

MR. COX: Are you telling him not to answer that question?

MS. PITNEY: Yes. I'll say again, Tom, if you would like to ask him about the facts that are in the affidavit, the details about this loan -- which I might remind you involves a woman by the name of Nicole Bradbury -- then I'm sure Jeff will answer your question?

MR. COX: Well, he has the affidavit in front of him in this case. And the affidavit which he swore to says a true and correct copy of the note is attached to it. And I'm asking him if that document was attached to it at the time that he signed it.

BY MR. COX:

Q. Would you please answer that question?

STEPHAN
A. To my knowledge, I do not recall.
Q. Is it your usual business practice to have exhibits attached to affidavits that you sign?
A. Yes.
Q. All exhibits?
MS. PITNEY: Object to form.
THE WITNESS: I do not know.
BY MR. COX:
Q. When you sign a summary judgment affidavit, do you check to see if all the exhibits are attached to it?
A. No.
Q. Does anybody in your department check to see if all the exhibits are attached to it at the time that it is presented to you for your signature?
A. No.
Q. When you sign a summary judgment affidavit, do you inspect any exhibits attached to it?
A. No.

STEPHAN
MS. PITNEY: Could you repeat the question, Tom? Did you say -- or can you have it read back, please?
(Whereupon, the pertinent portion of the record was read.)
MS. PITNEY: Object to the form.
BY MR. COX:
Q. What happens to an affidavit in your department after you sign it?
MS. PITNEY: Objection. What happens to the document afterwards is -- it's in the course of litigation. The same objection as I said before. Where it goes is privileged.
MR. COX: Where it goes is not a communication. It is not privileged.
MS. PITNEY: You don't know that.
MR. COX: Pardon me?
MS. PITNEY: You don't

STEPHAN
necessarily know that.
MR. COX: The physical movement of a document is not a communication. It's a fact.
BY MR. COX:
Q. My question to you is, where does a summary judgment go after you sign it?
A. After I sign it, it is handed back to my staff. My staff hands it to a notary for notarization. It is then handed back to my staff. They send it back to the network attorney requesting any type of affidavit.
Q. So you do not appear before the notary; is that correct?
A. I do not.
Q. What does your staff do with a summary judgment affidavit, such as Deposition Exhibit-1, after it receives it back from the notary?
A. They go into our LPS system, close out process, stating it's being sent back to --

STEPHAN
MS. PITNEY: Objection. Sorry. I don't mean to interrupt you, Jeff. I'm going to instruct you not to answer anything else, because you've already testified that the LPS system is the means by which you communicate with your attorney. The attorney/client communication is privileged. So don't continue to answer the question.
Actually, if there is no question, pending, I'd like to take a brief break to discuss something with Brian Fleischer.
(Whereupon, a short recess was taken.)
BY MR. COX:
Q. Mr. Stephan, do you recall testifying in your Florida deposition in December that you rely on your attorney network to ensure that the documents that you receive are correct and accurate?
A. That is correct.

STEPHAN

Q. And is that, in fact, the case?

A. Yes.

Q. And your department does not do any independent accuracy check of those records; isn't that correct?

MR. FLEISCHER: Objection as form.

THE WITNESS: Can you rephrase?

BY MR. COX:

Q. Your department does not do any independent check of the accuracy of the information on the summary judgments coming to you; isn't that correct?

A. I review, quickly, the figures. Other than that, that's about it.

Q. Do you recall testifying in your Florida deposition in December, that the affidavits that you sign are not based upon your own personal knowledge?

A. I do not recall.

MS. PITNEY: Objection to

STEPHAN

the form.

BY MR. COX:

Q. You do not recall that?

A. I do not recall.

Q. When you receive a summary judgment affidavit from one of your staff members, what do you do with it?

A. I will first review it against our computer system, which is Fiserv, in general terms, to verify that the figures are correct. And then I will execute it and hand it back to my staff to have it notarized.

Q. You say "in general terms" you review it. What do you mean?

MS. PITNEY: Objection.

THE WITNESS: I compare the principal balance. I review the interests. I take a look at the late charges. I look at the outstanding escrow amounts. When I say "general terms," I mean I'm not looking at the escrow and breaking it down to the penny.

STEPHAN

I'm saying, yes, it looks correct in my computer system.

BY MR. COX:

Q. Is there anything else that you look at in your computer system when you're signing a summary judgment affidavit?

MS. PITNEY: I'm sorry. I couldn't hear the last part of that.

BY MR. COX:

Q. Is there anything else that you look at in your computer system at the time that you sign a summary judgment affidavit?

A. The only other thing I can --

MS. PITNEY: One second. Are we talking about the computer system, the communication system? I just was asking for clarification of --

MR. COX: Let me clarify it.

MS. PITNEY: What computer

STEPHAN

communication system Tom was asking him about.

BY MR. COX:

Q. You testify that you go into the First Serve (sic) system; is that correct?

A. Yes, Fiserv.

Q. Fiserv. Do you go into any other computer system at the time that you're signing a summary judgment affidavit?

A. No.

Q. And you just testified that you look at principal, interest, late charges and escrow; is that correct?

A. That is correct.

Q. Is there anything else that you look at in your computer system when you're signing a summary judgment affidavit?

A. The only thing I review, other than that, is who the borrower is.

Q. When you receive a summary judgment affidavit to sign, do you read

STEPHAN

every paragraph of it?

A. No.

Q. What do you read?

A. I look for the figures.

Q. That's all that you look at when you sign a summary judgment affidavit?

A. Yes, to ensure that the figures are correct.

Q. Is it fair to say then that when you sign a summary judgment affidavit, you do not know what it says, other than what the figures are that are contained within it?

MR. FLEISCHER: Objection as to form.

MS. PITNEY: Objection to the form of the question.

THE WITNESS: Please rephrase.

BY MR. COX:

Q. It fair to say that when you sign a summary judgment affidavit, you don't know what information it contains,

STEPHAN

other than the figures that are set forth within it?

A. Other than the borrower's name, and if I have signing authority for that entity. That is correct.

Q. The practice that you've just described for signing summary judgment affidavits is the practice that you use signing all summary judgment affidavits that you handle; is that correct?

MR. FLEISCHER: Again, I'm going to object to the form of the question.

BY MR. COX:

Q. Is that correct?

A. The practice that I use for summary judgment affidavits is the same practice that I use for all affidavits.

Q. And that's the one that you've just described?

A. Yes.

Q. Is any part of your compensation at GMAC Mortgage tied to the

STEPHAN

volume of documents that you sign?

A. No.

Q. Is any part of your compensation tied to the volume of documents that your department processes?

A. No.

Q. Is it your understanding that the process that you follow in signing summary judgment affidavits is in accordance with the policies and procedures required of you by GMAC Mortgage?

A. Yes.

Q. Does GMAC do any quality assurance training for your department?

A. Presently, no.

Q. Has it in the past?

A. I do not know.

Q. You don't recall any?

A. I never received any.

Q. Do you have any memory of checking the numbers on the Bradbury affidavit that's in front of you as Deposition Exhibit-1?

STEPHAN

A. I do not recall.

Q. If a loan has been modified, does that show up in the Fiserv system that you look at?

A. When you say "modified," are you stating a loan modification?

Q. Yes.

A. Yes.

Q. Does that show up?

A. Yes.

Q. If a loan has been modified, is any information put in the summary judgment affidavits that you sign about that?

MR. FLEISCHER: Objection. Are you talking about modified, or his term was loan modification. I just want to make sure we're clear.

MR. COX: That's fine.

BY MR. COX:

Q. If there's a loan modification, does information about a loan modification appear in the summary

STEPHAN

judgment affidavits that you sign?

A. I do not know.

MS. PITNEY: In all of them, or in this one?

MR. COX: In any of them.

THE WITNESS: I don't know.

BY MR. COX:

Q. Based upon your testimony, Mr. Stephan, is it correct that when you sign a summary judgment affidavit, such as Deposition Exhibit-1 that is in front of you, you don't know whether any portion of it is true, other than the paragraph containing the numbers that you just described; is that correct?

MS. PITNEY: Object to the form. Tom, are you asking him about this affidavit?

MR. COX: Well, he's testified that doesn't recall signing this particular affidavit, so that was not my question. Let me restate it.

BY MR. COX:

STEPHAN

Q. In your practice of signing summary judgment affidavits, Mr. Stephan, is it correct that they always have a paragraph containing the numbers of the amounts claiming to be due?

A. That would be correct.

Q. And is it correct that when you sign those affidavits, you don't know whether any other part of the affidavit is true or correct?

A. Please advise me. What do you mean by "any other part"?

Q. Any other paragraph, other than the one containing the numbers.

A. I review it for the due date, if that's included in there.

Q. So all of them --

A. So that would be the numbers.

Q. So other than the due date and the balances due, is it correct that you do not know whether any other part of the affidavit that you sign is true?

A. That could be correct.

STEPHAN

Q. Is it correct?

A. That is correct.

Q. And isn't it also correct that you do not check the numbers on every single summary judgment affidavit that you sign?

A. That is not correct.

Q. You check every single one?

A. Yes.

Q. How long does it take you, on average, to process the execution of a summary judgment affidavit?

MS. PITNEY: Object to the form.

MR. COX: Please answer.

THE WITNESS: Anywhere from five to 10 minutes, off the top of my head.

MR. COX: If we can take a break. I may be done, but we can take a break for five minutes.

(Whereupon, a short recess was taken.)

BY MR. COX:

STEPHAN

Q. Mr. Stephan, referring you again to the bottom line on Page 1 of Exhibit-1, it states: I have under my custody and control, the records relating to the mortgage transaction referenced below.

It's correct, is it not, that you did not have in your custody any records of GMAC at the time that you signed a summary judgment affidavit?

MS. PITNEY: Objection to the form.

THE WITNESS: I have the electronic record. I do not have papers.

BY MR. COX:

Q. You have access to a computer. Is that what you mean?

A. Yes.

Q. You have no control over that system, do you?

MR. FLEISCHER: Objection as to form.

BY MR. COX:

STEPHAN

Q. You have no control over that Fiserv computer system, do you?

A. No, I do not.

Q. And someone else within GMAC is responsible for ensuring the accuracy of that system; isn't that correct?

A. That would be correct.

MR. COX: I have no further questions.

MR. FLEISCHER: We're done, Julia, unless you have something to add.

MS. PITNEY: No.

(Witness excused.)

\- - -

(Whereupon, the deposition concluded at 11:45 a.m.)

INDEX

Testimony of: Jeffrey Stephan
By Mr. Cox . . . . . . . . . 4

\- - -

EXHIBITS

\- - -

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | Affidavit August 5, 2009 | 3 |

I have read the foregoing transcript of my deposition given on June 7, 2010, and it is true, correct and complete, to the best of my knowledge, recollection and belief, except for the corrections noted hereon and/or list of corrections, if any, attached on a separate sheet herewith.

______________________
JEFFREY STEPHAN

Subscribed and sworn to before me this ____ day of ______________, 2010.

______________________
Notary Public

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

Susan B. Berkowitz, a
Registered Professional Reporter
and Notary Public
Dated: June 9, 2010

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

74

LAWYER'S NOTES

20 (Page 74)

DiscoveryWorks Global 888.557.8650 www.dw-global.com

A

**ability** 29:2,4
**access** 69:18
**accompanied** 48:23 49:24
**accuracy** 30:11 44:16 58:6,14 70:6
**accurate** 45:10,18 57:24
**acquired** 15:21 38:12
**action** 11:8
**actions** 31:10
**add** 70:13
**addition** 24:21
**additional** 35:2
**address** 24:16
**advise** 67:12
**affidavit** 21:3 24:16 31:11 32:9,12,12 32:20 33:9,14 35:8,13,19,23 36:19 39:5 43:25 44:9,17 48:22 50:8 51:5,22 52:2 52:22 53:9,16,17 54:13,23 55:11 56:15,20 59:7 60:8,16 61:12,21 61:25 62:8,13,24 64:24 66:11,19,22 67:10,24 68:6,13 69:11 71:13
**affidavits** 31:2,7,7,9 31:12,17 32:8 33:25 38:22 39:23 43:22 54:6 58:22 63:9,11,19,20 64:10 65:14 66:2 67:3,9
**ago** 5:17 32:7
**agreed** 3:6
**AMERICA** 1:9
**amount** 33:6
**amounts** 59:22 67:6
**and/or** 72:6 73:21
**answer** 6:21 10:17 10:18 32:25 33:4 36:7,14 37:11 38:2 40:2 41:17 42:6,16 43:3,5 45:2 49:7 50:2 52:11 53:5,13,24 57:5,11 68:16
**answered** 36:17
**answers** 32:7
**anybody** 40:10,17 44:15 54:16
**appear** 43:18 56:16 65:25
**APPEARANCES** 2:2
**application** 19:5
**apply** 73:19
**approximate** 5:16
**approximately** 9:11 9:18,22 40:20 48:6,8
**area** 33:13
**arts** 8:13
**asked** 42:2,3 52:8
**asking** 27:4 35:15 38:5,19 39:11 43:6 52:5 53:20 60:22 61:3 66:18
**assignment** 51:17
**assignments** 30:25
**associated** 18:17
**ASSOCIATION** 1:4
**assume** 11:16,20 47:21
**assumed** 11:13 13:7 34:24
**assurance** 64:16
**attached** 50:12,19 50:23 51:9 52:2 52:17,24 53:19,21 54:5,14,18,24 72:7
**attorney** 3:20 10:22 10:23 14:22 15:8 23:13 24:4 35:22 36:10,11,19,23 38:24 39:10 41:25 48:7 52:6,10 53:3 56:14 57:9,22
**attorneys** 14:25 36:2 37:6 38:14 39:4
**attorney/client** 33:21 36:11 57:9
**August** 21:4 23:5 34:11,19 47:13 71:14
**authority** 63:5
**availability** 26:8
**Avenue** 1:17
**average** 46:20 48:4 68:12
**averaging** 48:6
**aware** 32:3 34:4
**a.m** 1:18 70:18

B

**B** 1:19 71:8 73:10
**back** 15:7 36:16 39:8,10 47:9,13 55:5 56:11,13,14 56:22,25 59:13
**background** 8:11
**balance** 59:19
**balances** 67:22
**BANK** 1:9
**bankruptcy** 15:17 31:24
**based** 37:16 38:19 58:23 66:9
**basic** 48:10
**basically** 17:21,22 27:4
**becoming** 17:24
**began** 8:16 9:9 10:2
**behalf** 4:9
**BELDECOS** 1:16
**belief** 72:5
**believe** 4:6 9:10 17:2 19:15 26:13 31:24 47:18 48:5 51:18
**benefit** 50:24
**BERGER** 1:16
**Berkowitz** 1:19 73:10
**best** 72:5
**bfleischer@fleisch...** 2:6
**bid** 12:13,24 13:2,10
**bidding** 12:2,22
**bids** 12:4,5
**blanks** 15:2
**borrower** 33:3 61:23
**borrower's** 63:4
**bottom** 25:14 69:3
**Box** 2:10
**Bradbury** 1:6 2:13 3:25 53:12 64:23
**breach** 51:20
**break** 23:12 57:15 68:21,22
**breaking** 59:25
**Brian** 2:3 6:15 57:16
**bridge** 4:14
**brief** 23:12 57:15
**bring** 39:7 46:16,19 48:14
**brings** 47:23
**BRI-RE-09-65** 1:4
**broad** 35:16
**broad-based** 27:5
**brought** 48:4 50:7
**bulk** 24:6
**business** 27:12 35:5 38:21 54:4

C

**calculate** 12:4,5,13
**calculation** 11:4
**call** 14:2 18:9 27:15 27:18
**called** 12:17 18:11 35:24 36:3
**calls** 29:8
**capacity** 16:7 20:3,9 20:19 27:19 30:21
**Capital** 9:3,12
**carry** 10:14
**case** 3:24 4:5,12 7:18 10:23 21:4 27:7,8 45:25 53:17 58:3
**cases** 5:5,6,8,10,12
**cash** 19:16,18 29:16
**category** 10:12 15:18
**CDs** 15:19
**CERTIFICATE** 73:2
**certification** 3:7 73:18
**CERTIFY** 73:3
**certifying** 73:22
**change** 29:2,5
**changed** 34:18,23
**charge** 15:6
**charges** 59:21 61:16
**check** 54:13,17 58:6 58:14 68:5,9
**checking** 64:23
**claiming** 67:6
**clarification** 60:23
**clarify** 60:24
**cleaner** 8:7
**clear** 65:20
**clearly** 49:15
**client** 52:10
**close** 33:13 56:24
**closer** 7:4
**collections** 8:21
**come** 21:17,21 24:17 35:8 38:23
**comes** 41:3 50:11 52:7
**coming** 48:7 58:16
**commencing** 1:18
**Commonwealth** 1:21
**communicate** 57:8
**communicates** 37:3 37:5 41:24
**communication** 35:25 36:9,22 37:17 38:13 41:20 52:9 55:20 56:5 57:10 60:21 61:2
**companies** 8:23
**company** 26:7,8,16 28:15 36:24 38:9 38:12
**compare** 59:18
**compensation** 63:25 64:5
**Complaint** 6:15 50:5,12
**complete** 72:4
**completed** 14:25 15:4
**computer** 14:20 18:6 20:6 27:16 59:10 60:3,6,14 60:20,25 61:10,19 69:19 70:3
**concluded** 70:18
**confirm** 18:2 33:6
**conjunction** 16:13
**connected** 50:6,12 51:21
**contacting** 10:22
**contained** 62:15
**containing** 66:15 67:5,15
**contains** 62:25
**content** 42:3
**contents** 44:17
**contested** 33:4
**Conti** 9:5
**ContiMortgage** 9:2 9:8
**continue** 57:11
**control** 25:16 69:5 69:21 70:2 73:21
**conveying** 11:7
**copies** 23:21
**copy** 10:25 51:3,11 52:16 53:19
**correct** 5:2,25 9:16 9:17 12:15 13:6 14:7,8 17:16,17 23:7 24:24 25:2,3 28:2,5,6 29:17,21 29:22,25 30:2 38:10 40:24 41:4 41:5,8,9 43:15,16

43:19,20 44:3,4,6 44:7,13,14 45:11 45:20,21 46:18 47:25 48:2,19,20 50:17,20 52:16 53:18 56:17 57:24 57:25 58:7,16 59:12 60:2 61:7 61:16,17 62:10 63:6,12,17 66:10 66:16 67:4,7,8,11 67:22,25 68:2,3,4 68:8 69:8 70:7,8 72:4
**corrections** 72:6,7
**correctly** 18:3
**counsel** 2:7,12,19 3:6 41:21 42:20 42:22 44:10
**count** 48:16
**counting** 19:5
**country** 28:21 31:21
**course** 7:7 43:8 55:16
**court** 1:2 6:5
**covers** 31:4
**Cox** 2:9,10 3:20 4:2 4:10,18 7:14 8:9 10:16 11:9 12:10 14:15 16:10 19:10 20:18 21:12,18 22:2,9,14,22,24 23:17 24:10,19 26:2 27:11 28:11 30:4,20 32:24 33:19,23 35:17 36:15,20 37:7,14 38:2,6 39:17 40:2 40:9,16 41:18 42:2,5,17,25 43:12 44:12 45:4 45:16,19,25 46:6 46:8 49:6,18,21 50:9 51:4,10,24 52:12 53:4,15,23 54:11 55:10,19,24 56:3,6 57:19 58:12 59:3 60:4 60:12,24 61:4 62:22 63:16 65:21 65:22 66:6,8,20 66:25 68:16,20,25 69:17,25 70:9 71:4
**cross** 4:13
**cubicle** 46:14,15
**CUMBERLAND** 1:2
**custodians** 26:15
**custody** 25:16 69:5 69:9
**customer** 19:14,15 19:21 27:15 29:8 29:17
**customers** 27:18 29:13
**C-O-N-T-E** 9:5
**C-O-N-T-I** 9:6

**D**

**D** 1:13 3:13 71:2
**dangerously** 33:12
**data** 20:5 28:4 30:6 30:12
**date** 1:19 34:20 67:17,21
**dated** 21:4 23:5 73:12
**day** 47:22 48:5,9 72:18
**days** 17:7
**day-to-day** 10:9
**deal** 24:13
**debate** 21:19
**December** 5:24 45:7 46:24 47:9,20 57:22 58:21
**decrease** 47:8
**deeds** 31:2
**defendant** 1:7 2:12 4:11
**degree** 8:12
**demand** 51:19
**denied** 3:20
**department** 9:21,24 11:19,22,24 12:17 13:23 14:5 19:11 19:21,24 26:6 28:7,12,16,18,22 29:16,19 34:14,18 40:20,23 41:2,7 46:12 54:17 55:12 58:5,13 64:6,16
**departments** 11:8 28:24,25
**deposed** 5:9,23
**deposition** 1:13 3:23 5:3,15 6:3,3,9,13 7:15,17,19,20,23 21:2,11 22:25 23:23 32:10 33:9 34:11 35:9 38:16 38:22 43:13 44:9 45:6 46:24 50:16 50:18 56:21 57:21 58:21 64:25 66:12 70:17 72:3 73:5
**describe** 38:20
**described** 63:8,22 66:16
**description** 31:16 34:22 71:11
**designated** 15:8
**details** 37:4 53:9
**different** 14:6 31:16
**difficulty** 7:2
**direct** 41:20 73:21
**directed** 6:19
**discuss** 57:15
**DISTRICT** 1:2,2
**DITECH** 1:8
**DIVISION** 1:2
**DOCKET** 1:4
**document** 3:2 13:13 13:21 14:9,17,18 15:7,25 16:8,15 19:3 20:4,10,20 23:3,9 24:9,14,23 27:20 30:22 31:18 31:22,25 32:3 34:13,18 35:3,6 41:3,11,14 42:10 42:14,18 43:7 44:20,22,23,24 48:19 49:2,14,23 52:5 53:2,21 55:14 56:4
**documents** 6:8,11 11:2 14:20,23 15:2 16:22 17:15 17:19,23 20:13,23 23:22 24:3 30:23 30:24 31:19 37:22 39:13,19 40:11,18 46:17,22,25 47:10 47:14,24 48:12,12 48:23 49:24 51:21 57:23 64:2,6
**doing** 7:8 12:21
**doubting** 51:7
**DRUMMOND** 2:16 2:16
**due** 33:7 67:6,16,21 67:22
**duly** 3:14 73:4
**duties** 10:7,13 11:20 19:4 34:17
**duty** 31:12
**d/b/a** 1:8

**E**

**E** 71:2,8
**educational** 8:10
**efficient** 23:25
**effort** 23:24
**either** 15:21 26:14
**electronic** 69:15
**employee** 41:6,11 47:23 48:18
**employees** 15:24 24:22 41:19 45:7 46:16
**ensure** 15:3 57:23 62:9
**ensures** 30:11
**ensuring** 70:6
**enter** 26:23
**entered** 29:10 30:7 30:12
**entertain** 22:15
**entire** 28:15,20
**entity** 63:6
**entries** 26:18 27:7 28:23 29:2
**entry** 20:6 28:4 29:5
**escrow** 59:22,24 61:16
**ESQUIRE** 2:3,9,16
**estimate** 9:20 13:3 25:7 47:16
**estimated** 46:25
**everyday** 10:20
**exactly** 42:20
**EXAMINATION** 4:16
**examined** 3:15
**exchange** 22:3
**Excuse** 21:5
**excused** 70:15
**execute** 39:8,13,19 40:18 59:13
**executed** 34:11
**execution** 13:14,21 14:10,17,19 15:25 16:8,15 19:3 20:4 20:10,20 24:23 27:20 30:22 31:18 31:23,25 32:3 34:14,18 35:4,7 49:23 68:12
**exhausted** 31:13
**exhibit** 21:2,7 22:21 23:2 33:10 35:9 50:13
**exhibits** 21:10,20 22:11 50:19,22 51:8 52:2,23 54:5 54:8,14,18,24
**Exhibit-A** 51:2 52:17
**Exhibit-B** 51:15
**Exhibit-C** 51:16
**Exhibit-D** 51:18
**Exhibit-1** 3:2 25:14 32:10 34:11 38:17 38:23 43:13 44:9 50:16,18 52:14,23 56:21 64:25 66:12 69:4
**exist** 18:23 26:9,12
**exists** 39:25
**Express** 15:7
**Expressed** 39:10
**extent** 27:3 36:7 39:25 43:5
**e-mail** 11:3 24:5

**F**

**fact** 56:5 58:2
**facts** 53:8
**fair** 24:18 27:24 62:11,23
**Fairbanks** 9:2,12
**fall** 15:17
**falls** 13:20
**Fannie** 2:19 4:7
**far** 29:5 38:22
**fashion** 21:23
**fax** 11:3 24:5
**Federal** 1:3 15:7 39:9
**fell** 10:11
**Fidelity** 38:13
**figures** 11:4 14:24 39:3 58:18 59:12 62:5,10,14 63:2
**file** 10:21
**filed** 33:4
**files** 15:18 48:17
**filing** 3:7
**fill** 15:2
**filling** 39:6
**fine** 7:9 22:9 27:9 35:14 40:6 65:21
**finish** 8:5 12:9
**first** 9:4 25:15 41:2 44:2 59:9 61:6
**firsthand** 29:23
**Fiserv** 18:12 26:7,19 27:14 31:15 39:8 59:11 61:8,9 65:4 70:3
**five** 68:18,22
**Fleischer** 2:3,4,4 4:2 4:6 6:18 7:5 8:4

12:8 14:11 20:14 23:13 24:4,12 28:9 32:22 45:22 46:3 57:16 58:8 62:16 63:13 65:16 69:23 70:11
**FLITTER** 1:15
**Florida** 5:18,24 45:6 45:25 46:24 57:21 58:21
**FNMA** 3:24
**folder** 48:19
**folders** 48:15
**follow** 64:9
**follows** 3:15
**foreclosure** 8:25 10:5,11 11:11,19 11:21 12:7,14,16 13:23 14:4 15:16 15:18 20:11,21 26:6 31:10 32:17 34:2
**foreclosures** 8:22 9:25 31:19
**foregoing** 72:2 73:18
**form** 3:9 8:19 10:15 11:3,3 14:12 16:9 19:9 20:15 25:23 26:25 28:10 30:19 32:23 40:13 42:21 54:9 55:9 58:9 59:2 62:17,19 63:14 66:18 68:15 69:13,24
**Fort** 9:15
**forth** 63:2
**four** 51:21
**four-year** 8:12
**front** 24:14 32:9 50:25 53:16 64:24 66:12
**full** 4:20
**function** 16:6
**functions** 14:7,16,18
**further** 70:9
**furthermore** 27:2
**fuzzy** 7:10
**F-I-S-E-R-V** 18:12

G

**G** 2:16
**gather** 23:17
**general** 31:5,16 49:9 59:11,15,23
**gentleman** 17:2,20
**getting** 33:12,20
**given** 12:14 34:5 47:22 72:3 73:6
**GMAC** 1:8 2:7,19 4:8,10 8:15,16,20 9:3,14 10:3 11:12 11:23 12:13 16:6 16:12 17:4 18:24 20:7,12 25:5,19 26:3,10 29:11 30:11,15 31:13,23 36:10 63:25 64:12 64:15 69:10 70:5
**GMAC's** 4:9
**go** 8:14 22:4 29:6 36:15 45:8,17 56:8,23 61:5,9
**goes** 40:5 49:13 55:18,19
**going** 12:13 13:3 20:25 21:8,13,18 21:22 22:2,7,14 22:16,17,20 24:6 24:8 25:7 36:5 37:9 47:3,21 49:11 57:4 63:14
**grounds** 37:10
**group** 14:6 47:23 48:4

H

**H** 71:8
**hand** 20:25 39:8 59:13
**handed** 22:25 48:11 56:11,13
**handle** 63:11
**handles** 15:16
**handling** 10:10,23 34:25
**hands** 17:16 42:12 44:18 56:11
**happens** 42:4 55:11 55:14
**happy** 18:9 22:6
**head** 68:19
**hear** 39:16 45:15 60:10
**heard** 49:19
**hearing** 7:2
**held** 1:15 13:10
**help** 12:12
**hereon** 72:6
**hereto** 52:17
**herewith** 72:8
**hired** 18:15
**history** 8:18
**hold** 11:10
**honestly** 18:25
**housed** 26:13

I

**idea** 21:12,21,25
**identification** 3:3
**included** 67:17
**including** 16:3,4
**incredibly** 27:5
**independent** 58:6 58:14
**individual** 39:10 48:15
**individuals** 12:3
**information** 10:25 45:9,18 58:15 62:25 65:13,24
**initially** 44:10
**input** 39:5
**inspect** 54:23
**instruct** 16:21 57:4
**instructing** 43:2,4
**integrity** 30:16
**intend** 23:22
**intent** 22:11
**interest** 1:9 33:20 61:15
**interests** 59:20
**interrupt** 6:25 36:6 57:3
**introduce** 22:11 23:23
**introducing** 21:8
**involve** 10:8
**involved** 10:9 17:14 26:16
**involves** 53:11
**Iowa** 15:15 26:14
**issues** 4:12

J

**Jeff** 36:5 45:3 50:3 53:13 57:4
**Jeffrey** 1:13 3:13 4:21 71:3 72:12
**Jersey** 2:5 5:19
**job** 34:22
**JPitney@ddlaw.c...** 2:18
**judge** 34:5,8
**judgment** 31:9 32:8 32:14,16,20 33:7 33:25 35:8 48:22 49:15,23 51:5,23 54:13,23 56:8,20 59:7 60:7,15 61:11,20,25 62:7 62:12,24 63:9,10 63:19 64:10 65:14 66:2,11 67:3 68:6 68:13 69:11
**judgments** 11:5 58:15
**judicial** 31:10 32:17 34:2
**Julia** 2:16 4:3 7:6 21:6,14 23:19 49:19 51:4 70:12
**June** 1:11 4:23 72:3 73:12

K

**keep** 26:5 29:11 39:12,18 40:10,20
**keeps** 39:22 40:4,17
**Kenneth** 17:3
**kind** 5:10 26:22 27:22
**kinds** 10:7,13 30:23 31:7
**knew** 17:22
**know** 7:6 18:25 28:12,16,22,25 29:14 35:18 37:16 37:21 40:17 45:24 47:17 51:8 54:10 55:22 56:2 62:13 62:25 64:19 66:3 66:7,13 67:9,23
**knowledge** 29:18,24 30:5,9,10,14 32:5 32:19 33:3,24 54:2 58:23 72:5

L

**language** 13:22
**large** 24:2
**late** 59:21 61:15
**law** 1:15 2:10
**lawyer** 41:4 42:11
**lawyers** 37:18
**LAWYER'S** 74:2
**lead** 11:18,21 12:2 13:13,18 16:7,14 16:20 17:24 19:2 20:4,10,20 27:19 30:22 34:13,17 35:6
**learning** 17:14
**left** 9:10
**letter** 51:20
**let's** 17:25 36:15
**liberal** 8:13
**limited** 24:25 25:5,9 43:18
**line** 69:3
**lines** 15:4
**list** 15:13 72:7
**litigation** 33:16,16 33:18 39:24 41:15 42:15 43:9 44:25 45:23 49:3,16 55:16
**little** 7:2,4,9
**live** 4:24
**LLC** 1:8
**LLC.COM** 1:8
**load** 36:2 38:24
**loaded** 39:3
**loan** 19:6 29:12 48:24 53:10 65:3 65:7,12,18,23,25
**loans** 10:11 15:13 15:17,20,21 26:4
**located** 15:15 28:19
**log** 39:12,18,21 40:4 40:5,8,10,18,21
**long** 11:10 12:25 17:5 25:4 68:11
**longer** 17:4
**look** 7:15 52:14 59:20,21 60:6,14 61:15,19 62:5,6 65:5
**looked** 6:13,22
**looking** 18:3 51:14 51:19 52:18 59:24
**looks** 60:2
**lost** 31:14
**louder** 7:12
**LPS** 35:24 36:21,24 37:8,16,21 38:7 38:25 41:3,22 42:8,10,19 56:23 57:7
**LUNDY** 1:15

M

**M** 1:6 2:3,13
**Mae** 2:19 4:8
**Main** 2:4
**Maine** 1:2 2:11,17 32:21
**maintain** 25:20 26:4
**maintains** 28:7,13 28:17
**making** 15:6 26:18 27:14
**management** 15:14
**manner** 34:16,23
**manuals** 17:9 18:16

18:20
**marked** 3:2 21:2
**materials** 17:9 18:17
**matters** 10:14
**mean** 29:7 33:14 41:12 50:12 57:3 59:16,23 67:13 69:19
**means** 37:3,4 57:7 73:20
**measures** 30:15
**members** 38:25 39:2 48:16 59:8
**memory** 23:8 38:15 64:22
**mentioned** 38:7
**military** 31:11
**Minnesota** 26:15
**minute** 22:5
**minutes** 68:18,22
**mitigation** 31:14
**modification** 65:7 65:18,24,25
**modified** 65:3,6,12 65:17
**moments** 32:7
**month** 46:21 47:2,4 47:7,11,14
**months** 5:17 13:4
**Monument** 2:17
**mortgage** 1:4,8 8:22 8:24 9:15 10:3 12:6 25:6,17,20 26:4,10 29:12 30:25 51:16,17 63:25 64:13 69:6
**Motion** 32:13
**movement** 56:4

**N**

**N** 1:16 71:2
**name** 4:20 9:23 17:2 18:10 38:12 39:6 43:14,17,25 53:12 63:5
**names** 5:12 15:3
**Narberth** 1:16,17
**NATIONAL** 1:3
**necessarily** 56:2
**need** 10:25 31:3
**needed** 11:2
**needs** 35:22
**neither** 4:10
**network** 14:22 15:9 35:22 36:23 39:4 48:8 56:14 57:23
**never** 64:21
**new** 2:5 5:19 11:14 13:7 15:19,22 48:6
**Nicole** 1:6 2:13 53:12
**NINE** 1:2
**NORTHERN** 1:2
**notaries** 40:19,22
**notarization** 56:12
**notarize** 40:21
**notarized** 39:9 59:14
**notary** 1:21 15:4,5 44:6 56:12,17,22 72:23 73:11
**note** 27:16 29:6 51:3 51:17 53:19
**noted** 24:11 72:6
**notes** 26:20,22 27:14,23,25 31:15 74:2
**notice** 1:14 7:19,21
**number** 9:20 21:3 23:2 24:3 33:10 35:9 47:19
**numbers** 47:4,6 64:23 66:15 67:5 67:15,20 68:5
**numerous** 28:24 31:2

**O**

**object** 10:15 16:9 19:8 22:21 23:20 24:7 25:22 26:24 30:3,18 37:10 40:12 49:11 54:9 55:8 63:14 66:17 68:14
**objecting** 26:25 27:3
**objection** 14:11 20:14 24:10 28:9 32:22 33:11 35:11 37:2,11,24,25 39:20 41:13,23 42:13,23,24 43:2 44:11,19 48:25 49:25 52:4,25 55:13,17 57:2 58:8,25 59:17 62:16,18 65:16 69:12,23
**objections** 3:9 22:16
**office** 9:15,19 18:23 26:14 46:13
**officer** 25:2,5 43:18
**officers** 25:10
**offices** 1:15 2:10
**Okay** 7:5 37:13
**old** 4:22
**once** 15:4 29:9 44:2
**operates** 29:24
**opposing** 22:13
**options** 31:13
**Oral** 1:13
**order** 38:13
**outside** 41:4,20 42:11,19,21 44:10
**outstanding** 59:22

**P**

**page** 25:15 44:2,3,6 69:3 71:11
**paper** 26:9 29:11
**papers** 69:16
**paragraph** 52:14,19 62:2 66:15 67:5 67:14
**Pardon** 55:24
**part** 12:22 17:10 60:10 63:24 64:4 67:10,13,23
**participate** 21:22
**participating** 21:13
**particular** 43:24 66:22
**Parties** 1:9
**party** 22:13
**payments** 19:6 20:7 29:12,16,17 30:7
**pending** 23:14 57:14
**Penn** 8:13
**Pennsylvania** 1:17 1:22 4:25 9:16
**penny** 59:25
**people** 9:19,21,22 25:10,13
**perform** 34:17
**performance** 16:14
**period** 9:7 34:19
**person** 16:24,25
**personal** 58:23
**pertinent** 55:6
**phone** 7:3
**physical** 46:10 56:3
**physically** 48:11
**pile** 48:11
**Pitney** 2:16 3:17 4:3 4:7 6:24 7:8,13 10:15,18 16:9 19:8 21:5,15,24 22:7,10,20 23:11 23:20 24:18 25:22 26:24 30:3,18 33:11 35:11 36:5 36:17 37:2,9,24 39:14,20 40:6,12 41:13,23 42:13,23 43:4 44:11,19 45:12 48:25 49:8 49:25 50:21 51:6 51:12 52:4,25 53:6 54:9 55:2,8 55:13,22,25 57:2 58:25 59:17 60:9 60:19,25 62:18 66:4,17 68:14 69:12 70:14
**place** 11:25 35:21
**plaintiff** 1:4 4:4,11 21:16
**Plaintiff's** 32:13
**plan** 21:10
**Plaza** 2:4
**please** 4:20 25:24 32:25 37:19 40:14 42:7 45:13 50:22 52:14 53:24 55:5 62:20 67:12 68:16
**point** 24:15
**policies** 64:11
**portfolio** 10:10,24
**portion** 55:7 66:14
**Portland** 2:11,17
**position** 10:3 11:11 11:14,16 12:12 13:7,9,12 17:24 34:13
**possession** 18:21
**post** 11:8 31:3
**practice** 27:13 35:6 38:21 51:25 54:5 63:7,9,18,20 67:2
**preparation** 33:15 33:17 39:24 42:14 44:24
**prepare** 6:9 15:18 39:2
**prepared** 33:15 39:23 41:14,16 43:7 44:10,21,25 49:2,15 52:6
**prepares** 14:23 41:11
**preparing** 17:23 49:4,13
**present** 13:12 34:20
**presented** 42:20 54:19
**Presently** 18:22 64:17
**preserve** 30:15
**presume** 21:6
**pretty** 27:10
**previously** 5:4
**principal** 59:19 61:15
**print** 39:2
**printed** 17:9
**prints** 14:20 41:7
**prior** 17:23
**privilege** 33:21 36:12 37:10 43:10
**privileged** 33:13 37:6 41:15,16,25 42:15 45:2 49:5 49:17 52:9 53:3 55:18,21 57:10
**problem** 7:7
**procedures** 49:10 64:12
**process** 20:12,22 32:17 33:6 35:21 36:3 56:24 64:9 68:12
**processed** 17:15 37:22
**processes** 64:6
**produce** 21:10
**produced** 22:12
**product** 39:21
**Professional** 1:20 73:11
**proper** 11:7
**properly** 11:6 15:4
**properties** 11:7
**proposal** 23:25
**propose** 24:3
**protected** 43:9 49:17
**provided** 23:21 53:2
**provides** 31:19
**Public** 1:21 72:23 73:11
**pursuant** 1:14
**push** 7:3
**put** 3:18 11:25 65:13
**puts** 43:21
**P.C** 1:16 2:4
**P.O** 2:10

**Q**

**quality** 64:15
**question** 8:5 10:19

12:9 16:11 19:9 20:15 23:14 27:2 27:5,10 30:19 33:2,22 36:16,18 37:12,20 39:15 40:3,13 41:17 42:7,16 45:3 49:19 50:2 52:11 53:5,14,25 55:3 56:7 57:12,14 62:19 63:15 66:23
**questions** 3:10 22:18 43:6,11 44:22 70:10
**quickly** 58:17
**quote** 45:8,16

**R**

**range** 47:10
**reaches** 42:11 44:18
**read** 55:4,7 61:25 62:4 72:2
**recall** 45:5 46:23 47:3 54:3 57:20 58:20,24 59:4,5 64:20 65:2 66:21
**receipt** 19:5
**receive** 48:21 49:22 57:24 59:6 61:24
**received** 14:24 16:6 16:12,18,19,22 18:13 20:7 21:9 32:15 42:19,21 64:21
**receives** 15:13 29:16 56:21
**receiving** 38:16
**recess** 23:15 57:17 68:23
**recollection** 5:9 72:5
**record** 3:18 4:19 21:19 22:3,5,8,19 23:19 29:12 55:7 69:15 73:5
**records** 25:16,19 26:3,5,9 58:7 69:5 69:10
**refer** 18:5
**reference** 31:12 45:23 46:4
**referenced** 25:17 69:6
**referred** 32:6
**referring** 7:25 18:6 32:8 50:16 69:2
**regard** 6:20 45:7
**regarding** 20:6
32:16
**Registered** 1:20 73:11
**rehash** 17:25
**relating** 25:16 30:6 48:24 69:5
**relative** 39:22
**relies** 34:8
**rely** 57:22
**remember** 5:11
**remind** 53:11
**repeat** 39:15 45:13 55:3
**rephrase** 14:14 20:17 25:25 33:22 37:19 40:15 58:11 62:21
**reporter** 1:20 73:11 73:23
**reporting** 11:5
**represent** 4:5 21:16
**represents** 4:4,7
**reproduction** 73:20
**request** 3:21
**requested** 3:19
**requesting** 56:15
**requests** 48:7
**required** 36:4 64:12
**reserved** 3:10
**respect** 10:14 17:19 19:4 25:20 26:4 27:8,13 37:22
**respond** 8:6 22:15 22:18
**responsibilities** 26:18
**responsibility** 19:12 20:5 34:24 35:3
**responsible** 70:6
**rest** 26:6
**restate** 16:11 66:24
**results** 11:5
**retraining** 18:2
**returned** 15:5
**review** 6:8,12 16:21 17:14,21 39:7 52:8 58:17 59:9 59:16,19 61:22 67:16
**reviewing** 31:14
**right** 7:20 22:8,22 36:6 38:8
**role** 12:12 19:2 20:11,21 28:3
**roughly** 13:5 47:14 48:3
**routine** 27:13

**S**

**S** 71:8
**sale** 11:5,8 12:14 31:3
**sales** 12:4,5,7
**saying** 60:2
**says** 25:15 53:18 62:13
**sealing** 3:7
**second** 60:19
**security** 28:17 30:16
**see** 21:21 52:15,19 54:13,17
**segregated** 11:24
**Sellersville** 4:24
**send** 56:13
**sent** 6:14 24:9 56:25
**separate** 36:24 38:9 72:8
**separately** 23:13
**September** 8:17
**serve** 12:25 61:6
**service** 13:15 15:10 15:12,15,23 19:14 19:15,21 34:25
**servicer** 15:20,22
**servicing** 10:10,21
**set** 63:2
**sheet** 72:8
**short** 23:15 57:17 68:23
**shortly** 46:7
**show** 65:4,10
**sic** 9:5 61:6
**side-by-side** 16:19
**sign** 30:23,25 31:6,8 31:9,11,12 40:11 46:17 47:24 52:3 52:22 54:6,12,22 55:12 56:8,10 58:22 60:15 61:25 62:7,12,24 64:2 65:14 66:2,11 67:9,24 68:7
**signature** 23:4 36:3 44:3 54:20
**signed** 23:3 48:22 53:22 69:11
**signing** 20:12,22 23:9 25:2,5,10 43:18 47:10,15,20 60:7 61:11,20 63:5,8,10 64:10 66:22 67:2
**similar** 32:11
**single** 68:6,9
**six** 13:3 40:20 46:22
**slightest** 33:20
**sorry** 6:24 37:19 39:14 45:12 57:3 60:9
**sort** 39:13,19
**sound** 13:5
**sounds** 48:10
**source** 37:15
**space** 46:10
**span** 31:5
**speak** 23:12
**specialist** 10:6 11:11
**specific** 35:13,19
**specifically** 38:16 43:8
**spoke** 6:20
**staff** 14:19,22 15:6 16:23 56:11,11,13 56:19 59:7,13
**stamp** 15:3 43:14,21
**stamped** 43:14,25 44:5
**state** 4:20 8:13 32:21 49:20
**stated** 44:23
**statement** 52:15,20
**states** 31:20 32:12 32:17 34:2 69:4
**stating** 56:24 65:7
**stay** 22:8
**step** 33:5 41:2
**Stephan** 1:14 3:13 4:1,19,21 5:1 6:1 7:1,4 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1,2 24:1,20 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1,20 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1,5 46:1 47:1 48:1 49:1 50:1 51:1 52:1,13 53:1 54:1 55:1 56:1 57:1,20 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1,10 67:1,3 68:1 69:1,2 70:1 71:3 72:12
**stipulated** 3:5
**stipulation** 3:19,21 3:22
**stop** 24:7,8
**Street** 2:4
**subdivisions** 13:25
**submitted** 14:21 42:10
**Subscribed** 72:17
**substitution** 31:3
**SUGLIA** 2:4
**Suite** 2:5
**summary** 8:19 32:14,16,20 33:7 33:25 35:7 48:21 49:14,22 51:5,22 54:12,22 56:8,20 58:15 59:6 60:7 60:15 61:11,20,24 62:7,12,24 63:8 63:10,19 64:10 65:13,25 66:11 67:3 68:6,13 69:11
**supervision** 73:22
**supervisor** 11:25
**supplying** 10:22
**support** 32:13 33:7
**sure** 9:4 15:6 53:13 65:19
**surprise** 21:17
**Susan** 1:19 73:10
**sweeping** 27:10
**swore** 53:18
**sworn** 3:14 72:17 73:4
**system** 14:21 17:22 18:4,5,6,10,11,14 18:18 20:6 26:7 26:19 27:14,17,24 27:25 28:4,8,13 28:14,17,23 29:3 29:5,9 30:7,12,16 31:15,23 35:24,25 36:21 38:11,25 39:8 41:3,22 42:8 42:10,19 45:9,17 56:23 57:7 59:10 60:3,6,14,21,21 61:2,6,10,19 65:4 69:22 70:3,7

**T**

**T** 71:8
**tac@gwi.net** 2:12
**take** 23:12 57:15 59:20 68:11,20,22
**taken** 1:14 5:4,15 23:16 57:18 68:24

**takes** 30:15
**talk** 7:11 13:22
**talking** 60:20 65:17
**team** 11:18,21 12:2 12:2,3,24 13:2,11 13:13,14,18,21 14:10,17,19,23 15:11,12,14,16,25 16:7,8,14,15,20 17:24 19:2,3 20:3 20:4,9,10,19,20 24:23 25:11 27:19 27:20 30:21,22 31:18,25 32:3 34:13,17 35:2,6,7 38:25 39:4 43:23 44:15 46:10 48:16 48:18
**teams** 11:24 14:2,3 14:6 31:23
**TELEPHONE** 2:15
**tell** 50:22
**telling** 49:6 53:4
**term** 65:18
**terms** 59:11,15,23
**testified** 3:15 6:5 24:21 46:2 57:6 61:14 66:21
**testify** 61:5
**testifying** 45:6 46:23 57:21 58:20
**testimony** 17:13 66:9 71:3 73:6
**Thank** 7:13 8:8
**thing** 60:17 61:22
**things** 18:3 23:24
**think** 29:15 49:18
**third** 5:7 6:3,4
**THOMAS** 2:9,10
**thought** 46:4
**three** 5:17 11:12 17:7
**Thursday** 6:17
**tied** 63:25 64:5
**time** 3:11 5:7,14 9:7 11:6,23 12:23 16:25 24:8 34:10 34:12,23,25 46:20 52:3 53:22 54:18 60:15 61:10 69:10
**times** 50:5,6,11
**title** 24:25 43:25
**today** 4:5 6:4 21:11 21:14
**Tom** 21:5 22:8 27:6 33:12 35:12 39:15 41:25 45:13,22 49:8 51:14 53:7 55:3 61:2 66:18
**tool** 36:2,22
**top** 68:18
**trained** 17:18
**training** 16:5,12,17 16:20 17:5,9,10 17:13 18:14,17,18 19:24 32:16 64:16
**transaction** 25:17 69:6
**transactions** 25:21
**transcript** 3:23 7:23 8:7 72:2 73:19
**transfer** 13:16 15:11,12,14,15,19 35:2
**transferred** 15:22
**trial** 3:11
**true** 52:16 53:18 66:14 67:11,24 72:4 73:5
**trustees** 31:4
**twice** 44:2
**two** 5:16 25:7
**type** 29:9,10 32:9,11 39:21 56:15
**types** 30:24 31:2,16

**U**

**Ugwuadu** 17:3
**understand** 4:3 12:11 17:12 24:2 33:8 34:7 37:20 38:5 40:25 44:8 47:23
**understanding** 19:13 64:8
**unit** 12:22 13:16 19:16,18,24 31:25 37:23 38:21
**units** 12:19 14:2
**University** 8:13
**upload** 35:23
**use** 16:13 18:14 63:10,18,20
**usual** 26:20,22 27:12,14 35:5 38:20 51:25 54:4
**U-G-W-U-A-D-U** 17:3

**V**

**V** 1:5
**variety** 31:6
**verify** 44:16 45:9,17 59:11
**verifying** 31:11 51:13
**versus** 3:24
**volume** 64:2,5
**Voorhees** 2:5

**W**

**waived** 3:8
**want** 22:4 23:18 27:6 49:9,12 65:19
**Washington** 9:15
**way** 2:17 7:3 34:19 35:15
**Wednesday** 6:17
**welcome** 21:20
**went** 6:14 8:19
**we'll** 4:13 24:16
**we're** 21:18 22:7 24:6 46:11 51:18 65:19 70:11
**witness** 6:6,16,23 7:11 8:8 10:20 14:13 20:16 25:24 36:13 37:13 38:4 40:7,14 50:4 51:2 51:15 54:10 58:10 59:18 62:20 66:7 68:17 69:14 70:15 73:3,6
**woman** 53:11
**words** 43:18
**work** 8:14,16,18,20 8:25 9:8,12,14,19 12:22 19:25 39:21 46:10 48:13
**worked** 19:17,20 29:20
**working** 10:2,4 13:10
**written** 17:8

**X**

**X** 71:2,8

**Y**

**year** 13:4
**years** 9:11 11:12 25:8

**0**

**04** 8:17 9:13
**04101** 2:17
**04104** 2:11
**08043** 2:5

**1**

**1** 21:3 23:2 33:10 35:10 69:3 71:13
**10** 68:18
**10,000** 46:25 47:10
**10:10** 1:18
**100** 48:12
**1000** 2:4
**11:45** 70:18
**1315** 2:10
**14** 16:2 24:22 25:10 25:12
**14-person** 46:9
**15** 16:4
**19072** 1:17

**2**

**2004** 10:3
**2007** 11:14,17
**2008** 13:6
**2009** 5:24 21:4 23:6 34:12,20 47:13 71:14
**2010** 1:11 5:21 72:3 72:19 73:12
**207** 2:11,18
**208** 2:5

**3**

**3** 52:14,19 71:13
**30th** 8:17
**300** 48:12

**4**

**4** 71:4
**400** 48:6,9
**41** 4:23
**450** 1:16
**489-8977** 2:6

**5**

**5** 21:4 23:5 34:12,19 71:14
**50** 9:22

**6**

**60** 9:22

**7**

**7** 1:11 72:3
**749-6671** 2:11
**774-0317** 2:18

**8**

**8,000** 46:22
**856** 2:6

**9**

**9** 73:12
**92** 9:9
**98** 9:10,13

**Exhibit 3**
**Deed of Trust**

Hillsborough Property

2007-088561
01:24pm 06/08/07 DT Fee: 67.00
Count of pages 21
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

* 2 0 0 7 0 0 8 8 5 6 1 A R *

**RECORD AND RETURN TO:**
MORTGAGEIT, INC.
1350 DEMING WAY, 3RD FLOOR
MIDDLETON, WI 53562

Recording Requested By:
MORTGAGEIT, INC.
1855 GATEWAY BLVD. SUITE 650
CONCORD, CALIFORNIA 94520

This Document Was Prepared By:
DERRICK BAUTISTA
MORTGAGEIT
1855 GATEWAY BLVD., #650
CONCORD, CA 94520

9565875

[Space Above This Line for Recording Data]

40761137

MIN: 100112065738048632

# DEED OF TRUST

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated JUNE 4, 2007 , together with all Riders to this document.

**(B) "Borrower"** is
**FERMIN ANIEL AND ERLINDA ANIEL, HUSBAND AND WIFE AND MARC JASON ANIEL, A SINGLE MAN, ALL AS JOINT TENANTS**

Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is
MORTGAGEIT, INC.

Lender is a CORPORATION
organized and existing under the laws of NEW YORK

40761137

Lender's address is
**33 MAIDEN LANE, 6TH FLOOR, NEW YORK, NEW YORK 10038**

(D) **"Trustee"** is
**FIDELITY NATIONAL TITLE**

(E) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. [illegible] under this Security [illegible]. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, Michigan 48501-2026, tel. (888) 679-MERS.
(F) **"Note"** means the promissory note signed by Borrower and dated **JUNE 4, 2007**
The Note states that Borrower owes Lender
**TWO MILLION AND NO / 100**

Dollars (U.S. $ **2,000,000.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **JULY 01, 2037**
(G) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider [ ] Condominium Rider [ ] Second Home Rider
[ ] Balloon Rider [ ] Planned Unit Development Rider [ ] Biweekly Payment Rider
[ ] 1-4 Family Rider
[ ] Other(s) [specify]

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) **"Escrow Items"** means those items that are described in Section 3.
(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. s2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As

40761137

used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as a nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **COUNTY**

[Type of Recording Jurisdiction]

of **SAN MATEO** :

[Name of Recording Jurisdiction]

**LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF. 038-352-040**

which currently has the address of **75 TOBIN CLARK DRIVE**

[Street]

**HILLSBOROUGH** , California **94010** ("Property Address"):

[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal [illegible] granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of [illegible] the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally [illegible] claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

40761137

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and

40761137

assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such

40761137

proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall

40761137

not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and

40761137

rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that

derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third

party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by

direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those

conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not

40761137

do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes

evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at it's option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers, and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and convenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

**BORROWERS:**

_______________________________ (Seal)
ERLINDA ANIEL - Borrower

_______________________________ (Seal)
FERMIN ANIEL - Borrower

_______________________________ (Seal)
MARC JASON ANIEL - Borrower

_______________________________ (Seal)
- Borrower

_______________________________ (Seal)
- Borrower

_______________________________ (Seal)
- Borrower

40761137

[Space Below This Line for Acknowledgment]

STATE OF CALIFORNIA

COUNTY OF San Mateo

On June 4, 2007 before me, Carolyn Chan, Notary Public, personally appeared ERLINDA ANIEL AND FERMIN ANIEL AND MARC JASON ANIEL

~~personally known to me~~ or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

CAROLYN CHAN
COMM. # 1423040
NOTARY PUBLIC-CALIFORNIA
SAN FRANCISCO COUNTY
COMM. EXP. JUNE 8, 2007

Carolyn Chan (Seal)

CA85 : 02/03

**Exhibit 4**
**Assignment of the Deed of Trust in 2011**

Hillsborough Property

RECORDING REQUESTED BY
FIRST AMERICAN TITLE COMPANY
AS AN ACCOMMODATION ONLY

Requested and Prepared by:
ETS Services, LLC

When Recorded Mail To:
ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120

2011-016800
11:18 am 02/08/11 AT Fee: 15.00
Count of Pages 1
Recorded in Official Records
County of San Mateo
Mark Church
Assessor-County Clerk-Recorder
* R 0 0 0 1 1 3 5 6 8 7 *

3879875
Loan No.: 0713288492
TS NO: GM-164602-C

**ASSIGNMENT OF DEED OF TRUST**

For Value Received, the undersigned corporation hereby grants, assigns, and transfers to:

GMAC MORTGAGE, LLC FKA GMAC MORTGAGE CORPORATION

all beneficial interest under that certain Deed of Trust dated: 6/4/2007 executed by FERMIN ANIEL AND ERLINDA ANIEL, HUSBAND AND WIFE AND MARC JASON ANIEL, A SINGLE MAN, ALL AS JOINT TENANTS, as Trustor(s), to FIDELITY NATIONAL TITLE, as Trustee, and recorded as Instrument No. 2007-088561, on 6/8/2007, in Book XX, Page XX of Official Records, in the office of the County Recorder of San Mateo County, California together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

DATE: February 1, 2011

HSBC Bank USA, National Association as Trustee for DALT2007-OA5

Mira Smoot
Authorized Officer

State of Pennsylvania } ss.
County of Montgomery }

On FEB 01 2011 before me, Mary Lynch Notary Public, personally appeared Mira Smoot who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of Pennsylvania that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature] (Seal)

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Mary Lynch, Notary Public
Upper Dublin Twp., Montgomery County
My Commission Expires Nov. 3, 2014
Member, Pennsylvania Association of Notaries