**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ORDER OVERRULING THE RESCAP BORROWER CLAIMS TRUST'S OBJECTION TO CLAIM NUMBER 2055 FILED BY MICHAEL AND KRISTIN KARMAZYN**

Pending before the Court is the objection of the ResCap Borrower Claims Trust (the "Trust") to claim number 2055 (the "Claim") filed by Michael and Kristin Karmazyn (the "Karmazyns"). The objection is included as part of the *ResCap Borrower Claims Trust's Seventy-Sixth Omnibus Objection to Claims (No Liability Borrower Claims)* (the "Objection," ECF Doc. # 7736). It is supported by the declarations of Kathy Priore (the "Priore Declaration," ECF Doc. # 7736-3) and Norman S. Rosenbaum (the "Rosenbaum Declaration," ECF Doc. # 7736-4). Kristin Karmazyn[1] filed an opposition to the Objection (the "Opposition," ECF Doc. # 7866.) The Trust filed a reply (the "Reply," ECF Doc. # 7967), supported by a supplemental declaration of Ms. Priore (the "Priore Supplemental Declaration," ECF Doc. # 7967-1).

The Court held a hearing on January 14, 2015 and took the Objection to the Claim under submission. At the hearing, the Court directed the Trust to file a supplemental declaration in support of the Objection and informed Karmazyn that she could respond to the Trust's submission. (*See* Jan. 14, 2015 Hr'g Tr. 60:1–24, ECF Doc. # 8021.) Accordingly, the Trust filed the declaration of Deanna Horst in further support of the Objection (the "Horst

---

[1] Michael Karmazyn, Kristin Karmazyn's husband, died after the Claim was filed. (*See* Jan. 14, 2015 Hr'g Tr. 50:16–17, ECF Doc. # 8021.) Accordingly, references herein to "Karmazyn" refer to Kristin Karmazyn.

Declaration," ECF Doc. # 8038). Karmazyn subsequently filed a response (the "Karmazyn Supplement," ECF Doc. # 8183). This Order overrules the Objection to Karmazyn's Claim due to disputed issues of fact that must be resolved through an evidentiary hearing.

### A.     The Claim

On October 31, 2012, the Karmazyns filed the Claim against Debtor Residential Capital, LLC ("ResCap"), asserting a general unsecured claim in the amount of $389,000.10. (Reply ¶ 15.) An earlier Order reclassified the Claim as a claim against Debtor GMAC Mortgage, LLC ("GMACM") (ECF Doc. # 5898). (*Id.* ¶ 15.) The stated basis for the Claim is "[w]rongful foreclosure by GMAC[M], determined by Independent Foreclosure Review." (Obj. Ex. 1-A at 19; Prior Supp. Ex. G.)

The Karmazyns attached a letter to their proof of claim explaining the basis for the Claim. (Priore Supp. Ex. G at 3.) First, the Karmazyns allege that an individual arrived at their house on August 1, 2009, indicating that he had bought their house in a foreclosure sale. (*Id.*) According to the Karmazyns, they subsequently contacted the Debtors and stated that they had made all required Loan payments, but the Debtors asserted that the Karmazyns did not pay certain fees in connection with their modified Loan. (*Id.*) The Karmazyns state that they did not receive information regarding such fees from the Debtors. (*See id.*) The Debtors' representative allegedly said that they "[w]ere not [the Karmazyns'] babysitter" and hung up the telephone. (*Id.*) The Karmazyns further assert that the Debtors misapplied or wrongfully "reversed" mortgage payments they made without an explanation. (*Id.*) In support, the Karmazyns attach to the Claim their loan account statements for the relevant period. (*See* Priore Supp. Ex. G at 6–20.)

The Karmazyns also state that they never received notice of the foreclosure sale, stating that they scoured newspapers in Colorado but could not find such notice published. (*Id.* at 3.)

2

As a result of the foreclosure, the Karmazyns assert that they have suffered loss of credit and paid a total of $39,000 in rent and deposits, and $12,130 for the mental health care of their eight year old daughter, who allegedly suffered severe depression from being forced to move. (*Id.*) The Karmazyns also seek $125,000 for lost equity in their home and $250,000 in emotional distress damages resulting from a strain on their marriage. (*See id.*) Even assuming the Karmazyns stated a claim, it is unclear what damages would be recoverable.

### B. The Karmazyns' Loan History

On August 5, 2005, Equifirst Corporation ("Equifirst") originated a loan (the "Loan") to the Karmazyns, secured by a deed of trust on real property located at 5153 South Ukraine Street, Aurora, Colorado 80015 (the "Property"). (Reply ¶ 16; *see* Priore Supp. Exs. H–I.) Debtor Residential Funding Company, LLC ("RFC") purchased the Loan from Equifirst, and on May 1, 2007, transferred its interest in the Loan to a securitization trust, with U.S. Bank, N.A. as trustee. (Reply ¶ 17.) Debtor Homecomings Financial, LLC ("Homecomings") serviced the Loan from October 1, 2005 until it transferred servicing rights to GMACM on July 1, 2009. (*Id.*) GMACM serviced the Loan until the October 7, 2009 foreclosure sale of the Property. (*Id.*)

On January 15, 2009, the Debtors approved the Loan for a traditional modification (the "Loan Modification," Horst Decl. Ex. B). (Reply ¶ 18.) The Loan Modification (i) required a contribution of $1,979.14 in certified funds by January 25, 2009; (ii) reduced the applicable interest rate from 9.10% to 4.85%; and (iii) added to the principal balance $12,407.30 for interest and escrow that had accrued since the Karmazyns' last Loan payment to bring the Loan current. (Obj. Ex. 1-A at 21–22.) The Trust asserts that the Debtors mailed the Loan Modification documents to the Karmazyns on January 21, 2009, and they were returned on January 30, 2009 with a personal check for $2,000. (Reply ¶ 18; *see* Horst Decl. Ex. C.) According to the Trust, because the contribution amount was not sent to the Debtors in certified funds, the Debtors did

3

not accept or cash the Karmazyns' check and the Loan Modification was terminated. (Reply ¶ 18.) On March 11, 2009, the Debtors received another personal check from the Karmazyns in the amount of $4,000. (*Id.*) The Debtors returned the payment to the Karmazyns and mailed them a letter informing them of the reason why the payment was returned. (*Id.*; *see* Horst Decl. Ex. D.)

On March 20, 2009, the Debtors approved the Loan for a traditional three-month trial plan (the "Trial Plan," Horst Decl. Ex. E), which required a contribution payment of $4,000 and a monthly contribution of $2,035. (Reply ¶ 19.) The Debtors received the Karmazyns' signed agreement for the Trial Plan on March 26, 2009, and a personal check in the amount of $2,000 on April 21, 2009. (Obj. Ex. 1-A, at 22.) According to the Trust, because the contribution amount was not sent to the Debtors in certified funds, the Debtors returned the payment to the Karmazyns and mailed them a letter informing them why the payment was returned. (*Id.*; *see* Horst Decl. Ex. F.) Nonetheless, on May 4, 2009, the Karmazyns called the Debtors and inquired why the April 2009 payment was returned. (Reply ¶ 19.) According to the Trust, the Debtors explained that payments must be made in certified funds and the Karmazyns represented that they would make a payment that day. (*Id.*) On May 14, 2009, the Debtors cancelled the Trial Plan and denied loan modification review after the Karmazyns failed to send the Debtors a payment required under the Trial Plan. (*Id.*; Horst Decl. Ex. G.)

On June 2, 2009, the Karmazyns sent the Debtors a $2,000 payment via Western Union; however, according to the Trust, because the payment amount was insufficient to bring the Loan current, the payment was returned to the Karmazyns. (Reply ¶ 20.) Subsequently, the Debtors received workout packages from the Karmazyns on June 10, June 15, and June 29, 2009. (Obj. Ex. 1-A at 23.) On July 29, 2009, the Debtors' representative spoke by telephone with the

4

Karmazyns and set up a five-month foreclosure repayment plan (the "First Foreclosure Plan," Horst Decl. Ex. H) to allow the Karmazyns time to submit missing documents required for loan modification review. (Obj. Ex. 1-A at 23.) The First Foreclosure Plan required monthly payments of $1,528.92; however, after the Karmazyns failed to make the required contribution payment, the Debtors cancelled the First Foreclosure Plan on September 15, 2009. (*Id.*) On September 17, 2009, the Debtors mailed a letter to the Karmazyns, informing them that the First Foreclosure Plan was terminated. (*Id.*; *see* Horst Decl. Ex. I.) The Karmazyns then sent the Debtors a check in the amount of $1,530 on September 23, 2009, but the check was returned because the First Foreclosure Plan was no longer active and the funds were not sufficient to reinstate the account. (Obj. Ex. 1-A at 23; *see* Horst Decl. Ex. J.)

On September 24, 2009, the Debtors sent the Karmazyns a new foreclosure repayment plan (the "Second Foreclosure Plan," Horst Decl. Ex. K) and informed them that a $1,244.65 payment was due by October 5, 2009 (Horst Decl. ¶ 13), followed by three more payments of $1,244.65 due on November 5, 2009, December 5, 2009, and January 5, 2010 (Obj. Ex. 1-A at 23). The Debtors informed the Karmazyns that a foreclosure sale of the Property was scheduled for October 7, 2009 and that the initial payment under the Second Foreclosure Plan would need to be received by October 5, 2009 in order to halt foreclosure. (Reply ¶ 22.) The Trust asserts that the Karmazyns sent the Debtors a check payment in the amount of $1,244.65, which the Debtors returned on October 7, 2009 because it was in an insufficient amount. (*Id.*; *see* Horst Decl. Ex. L.) The Debtors completed a foreclosure sale of the Property on October 7, 2009. (Reply ¶ 23.) At the time of the foreclosure sale, the Loan had an unpaid principal balance in the amount of $285,480.45, and the account was delinquent for payments from November 2008 through October 2009. (*Id.*)

### C. The Parties' Arguments

The Karmazyns argue that they never received the payments returned by GMACM, nor did they receive notifications regarding the Loan modifications or the foreclosure sale of the Property. (Opp. at 1.) Additionally, Karmazyn asserts that her husband died as a result of esophagus cancer, which she alleges was caused by stress relating to GMACM's servicing of their Loan. (*See id.*)

The Trust argues that it has not found any evidence corroborating the Karmazyns' alleged version of events, and therefore the Karmazyns have not met their burden of establishing liability on the part of any Debtor. (Reply ¶¶ 47–50.) With respect to the Karmazyns' assertion that they did not receive returned payments from GMACM, the Trust contends that the Debtors' servicing notes (the "Servicing Notes," Horst Decl. Ex. A) indicate the return of such payments, and the Karmazyns' account statement attached to their proof of claim does not indicate otherwise. (Reply ¶ 47.) According to the Trust, the Karmazyns' account statement "shows that every payment the Debtors returned either was never applied to [their] account or was reversed off their account." (*Id.*)

With respect to the Karmazyns' allegations that they never received notification regarding the Loan modifications or foreclosure sale, the Trust contends that the Debtors' books and records indicate that GMACM notified the Karmazyns of the Second Foreclosure Plan by telephone.[2] (*Id.* ¶ 48.) Additionally, the Trust asserts that the Debtors mailed the Karmazyns a "Combined Notice of Sale and Right to Cure and Redeem, which was also published in a newspaper of general circulation in Arapahoe County, the county where the [P]roperty was

---

[2] The Trust acknowledges that the Objection erroneously states that this notification was provided by letter rather than by telephone. (*Id.* n.10.)

6

located." (*Id.* ¶ 49.) Furthermore, the Trust asserts that the Debtors' books and records indicate that the Debtors informed the Karmazyns of the pending sale by telephone on September 24, 2009. (*Id.*) Accordingly, the Trust contends, the Karmazyns have not met their burden of establishing that the Debtors are liable on the Claim, as the Karmazyns have not offered sufficient support for the allegations made in their Claim. (*See id.* ¶¶ 47–50.)

   **D. The Supplemental Filings**

At the hearing on the Objection, Karmazyn maintained that the Karmazyns never received the Loan modification plans and stated that she "made every payment every month without the modification in the regular amount . . . ." (Jan. 14 Hr'g Tr. 57:10–13.) In response, the Trust stated that while the Trial Plan was not in the record before the Court, the Trust could provide Karmazyn and the Court with a copy of the Trial Plan executed by both of the Karmazyns (*id.* 58:9–14), purportedly indicating that payments must be made in certified funds (*id.* 58:24–59:3). The Court expressed its concern that contested issues of fact existed based on the record before the Court and directed the Trust to file a supplemental declaration in support of the Trust's assertions. (*Id.* 60:1–24.) The Court also stated that Karmazyn would have an opportunity to respond to the Trust's supplemental filing. (*Id.* 60:11–16.)

The Trust timely filed the Horst Declaration on January 28, 2015 as directed by the Court at the Hearing. Attached to the Horst Declaration are the Debtors' Servicing Notes for the Karmazyns' account and several documents relating to the Loan modification agreements and the returned payments. (*See* Horst Decl. Exs. A–L.) Specifically, the Horst Declaration attaches: (1) a notarized copy of the January 15, 2009 Loan Modification executed by the Karmazyns and Homecomings (*id.* Ex. B); (2) a copy of the March 20, 2009 Trial Plan executed by the Karmazyns (*id.* Ex. E); (3) a copy of the July 29, 2009 First Foreclosure Plan executed by the Karmazyns and GMACM (*id.* Ex. H); and (4) a copy of the September 24, 2009 Second

7

Foreclosure Plan executed by the Karmazyns and GMACM (*id.* Ex. K). With the exception of the Loan Modification, each of the documents indicates that payments must be made in the form of certified funds. (*See id.* Ex. E ¶ 5; *id.* Ex. H at 3; *id.* Ex. K ¶ 7.) The Horst Declaration also attaches letters that GMACM sent to the Karmazyns, referencing the payments GMACM returned to the Karmazyns and setting forth the basis for returning the payments. (*See id.* Exs. C, D, F, J, L.) Specifically, these exhibits include: (i) a letter dated January 30, 2009, referencing a returned personal check in the amount of $2,000 and the reasons for the Debtors' non-acceptance (*id.* Ex. C); (ii) a letter dated March 11, 2009, referencing a returned personal check in the amount of $4,000 and the reasons for the Debtors' non-acceptance (*id.* Ex. D); (iii) a letter dated April 21, 2009, referencing a returned personal check in the amount of $2,000 and the reasons for the Debtors' non-acceptance (*id.* Ex. F); (iv) a letter dated September 23, 2009, referencing a returned official check in the amount of $1,530 and the reasons for the Debtors' non-acceptance (*id.* Ex. J); and (v) a letter dated October 7, 2009, referencing a returned official check in the amount of $1,244.65 and the reasons for the Debtors' non-acceptance (*id.* Ex. L). Finally, the Horst Declaration attaches letters that GMACM sent to the Karmazyns, indicating GMACM's cancellation of the Trial Plan (*id.* Ex. G), and the First Foreclosure Plan (*id.* Ex. I). Both of these letters set forth the reasons why GMACM cancelled these repayment plans. (*See id.* Exs. G, I.)

The Karmazyn Supplement challenges the accuracy of the Trust's version of events. Karmazyn asserts that the Second Foreclosure Plan provides that the lender under the Note must receive the initial installment in the amount of $1,244.65 (*see* Karmazyn Supp. at 1 (citing Horst Decl. Ex. K, ¶ 5)), and, according to Karmazyn, a money order in that amount was sent and received by the Debtors on October 3, 2009 (*see id.*). Karmazyn also asserts that certain Loan payments she made in 2009 were accepted and applied to her account by the Debtors. (*See id.*)

8

She cites to the Servicing Notes, arguing that they reflect that her March, April, May, and August 2009 Loan payments were applied to her account by the Debtors.  (*See id.*)  According to Karmazyn, on October 23, 2009, she called the Debtors and was told that they did not need to reimburse her for the Loan payments she made, but instead, the Debtors could apply those payments to their loss.  (*Id.*)  Karmazyn further asserts that she has attempted to obtain records of her husband's bank account records; however, she was informed that the records have been expunged and cannot be accessed without a court order.  (*See id.*)

### E. The Objection to the Claim Is Overruled

Correctly filed proofs of claim "constitute prima facie evidence of the validity and amount of the claim . . . .  To overcome this prima facie evidence, an objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000).  By producing "evidence equal in force to the prima facie case," an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant to "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Creamer v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*, No. 12 Civ. 6074 (RJS), 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted).  If the objector does not "introduce[] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim."  4 COLLIER ON BANKRUPTCY ¶ 502.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).

Bankruptcy Code section 502(b)(1) provides that claims may be disallowed if "unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1).  To determine whether a claim is allowable by law, bankruptcy

9

courts look to "applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006).

The Karmazyn Supplement raises issues of fact whether Karmazyn properly made the initial installment required under the Second Foreclosure Plan and whether the Debtors' rejection of such payment and foreclosure of the Property subjects them to liability on the Claim. The Second Foreclosure Plan sets forth that foreclosure proceedings will be suspended, but not terminated, if the Debtors receive "the executed [Second Foreclosure Plan] Agreement and . . . the initial installment in the amount of $1244.65 no later than MONTHLY." (Horst Decl. Ex. K ¶ 5.) The Second Foreclosure Plan refers to a payment schedule that is not attached to the exhibit submitted by the Trust. (*See id.* ¶ 6.) While the Second Foreclosure Plan does not define the term "MONTHLY," the Trust asserts that the initial payment under the Second Foreclosure Plan was required to be received by October 5, 2009 in order to suspend foreclosure. (Reply ¶ 22.) Karmazyn asserts that she sent the Debtors a payment of $1,244.65, which was received by the Debtors on October 3, 2009. (Karmazyn Supp. at 1.) The Trust does not argue that Karmazyn's payment was not timely received, instead asserting that the Debtors returned such payment because it was in an insufficient amount. (*See* Reply ¶ 22.) However, this payment was allegedly made in the exact amount specified in the Second Foreclosure Plan. (*See* Horst Decl. Ex. K ¶ 5.) Whether the Debtors' refusal to accept this payment followed by the foreclosure on October 7, 2009 may give rise to liability to the Karmazyns requires factual determinations that cannot be made at this time. While the parties have not addressed the legal theories on which liability could be based, it appears that Karmazyn may state a claim for breach of contract (the Second Foreclosure Plan) and perhaps on other grounds as well.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

For the foregoing reasons, the Court **OVERRULES** the Objection with respect to the Karmazyns' Claim.  The Trust's counsel shall confer with Karmazyn within fourteen (14) days from the date of this Order regarding the scheduling of any discovery and an evidentiary hearing, as well as a further briefing schedule to address the legal bases for the Claim, and shall promptly thereafter file a status letter advising the Court of the proposed schedule.  Counsel for the Trust shall also set this matter for a further status conference during the next available Omnibus Hearing date; Karmazyn may participate in the conference by telephone.

**IT IS SO ORDERED.**

Dated:    April 1, 2015
         New York, New York

                                         _____/s/Martin Glenn_____
                                         MARTIN GLENN
                                         United States Bankruptcy Judge