**Exhibit 2**

**Priore Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DECLARATION OF KATHY PRIORE WITH RESPECT TO**
**OBJECTION OF THE RESCAP BORROWER CLAIMS TRUST**
**TO CLAIM NUMBERS 5610 AND 5612 FILED BY RICHARD D. RODE**

I, Kathy Priore, hereby declare as follows:

**A.    Declarant's Background and Qualifications**

1.    I serve as Associate Counsel for The ResCap Liquidating Trust (the "Liquidating Trust"), established pursuant to the terms of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al., and the Official Committee of Unsecured Creditors* [Docket No. 6030] confirmed in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). During the Chapter 11 Cases, I served as Associate Counsel in the legal department at Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases (collectively, the "Debtors"). I joined ResCap on May 1, 2008 as in-house litigation counsel. Prior to my in-house litigation counsel position, I held various roles within the legal department at ResCap.

2.    In my role as Associate Counsel at ResCap, I was responsible for the management of residential mortgage-related litigation. In connection with ResCap's chapter 11 filing, I also assisted the Debtors and their professional advisors in connection with the administration of the Chapter 11 Cases, including the borrower litigation matters pending before

ny-1170967

this Court. In my current position as Associate Counsel to the Liquidating Trust, among my other duties, I continue to assist the Liquidating Trust and Borrower Claims Trust (the "Borrower Trust") in connection with the claims reconciliation process.[1] I am authorized to submit this Declaration with respect to the *Objection of the ResCap Borrower Claims Trust to Claim Numbers 5610 and 5612 Filed by Richard D. Rode* (the "Objection").[2]

3. In my current and former capacities as Associate Counsel to the Liquidating Trust and ResCap, I am intimately familiar with the Debtors' claims reconciliation process. Except as otherwise indicated, all statements in this Declaration are based on my familiarity with the Debtors' Books and Records (the "Books and Records"), as well as the Debtors' schedules of assets and liabilities and statements of financial affairs filed in these Chapter 11 Cases (collectively, the "Schedules"), my review and reconciliation of claims, and/or my review of relevant documents. I, or other Liquidating Trust personnel, have reviewed and analyzed the proof of claim form and supporting documentation filed by Rode. Since the Plan went effective and the Borrower Trust was established, I, along with other members of the Liquidating Trust, have consulted with the Borrower Trust to continue the claims reconciliation process, analyze claims and determine the appropriate treatment of the same. In connection with such review and analysis, where applicable, I, or other Liquidating Trust personnel, together with professional advisors, have reviewed (i) information supplied or verified by former personnel in departments within the Debtors' various business units, (ii) the Books and Records, (iii) the

---

[1] The ResCap Liquidating Trust and the ResCap Borrower Trust are parties to an Access and Cooperation Agreement, dated as December 17, 2013, which, among other things, provides the Borrower Trust with access to the Books and Records held by the Liquidating Trust and the Liquidating Trust's personnel to assist the Borrower Trust in performing its obligations.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Objection.

Schedules, (iv) other filed proofs of claim, and/or (v) the official claims register maintained in the Debtors' Chapter 11 Cases.

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my familiarity with the Debtors' Books and Records, information learned from my review of relevant documents, and information I received through my discussions with other former members of the Debtors' management or other former employees of the Debtors and/or the Liquidating Trust's or Borrower Trust's professionals and consultants. If I were called upon to testify, I could and would testify competently to the facts set forth in the Objection on that basis.

5. The Liquidating Trust's personnel have examined the Rode Claims and supplemental materials submitted by Rode in support of the Rode Claims, as well as the Debtors' Books and Records in order to (a) assess the allegations made in the Rode Claims, and (b) verify that the Debtors followed the applicable guidelines and policies regarding loan modifications and escrow accounts with respect to the Rode Claims. Specifically, the Liquidating Trust reviewed, among other documents, the payment history with respect to the Rode Loan, analyses of the escrow account associated with the Rode Loan, the Debtors' internal servicing notes, and correspondence between Rode and the Debtor Defendants with respect to the foregoing. In addition, the Liquidating Trust reviewed documents filed in connection with the Rode Litigation.

**B.     The Rode Loan**

6. Rode is a borrower under a residential mortgage loan (the "Rode Loan") that was originated by Southtrust Mortgage Corporation ("Southtrust"), on March 18, 2003. The Rode Loan is evidenced by a note in the amount of $265,175.00 (the "Note"), which was secured by a deed of Trust (the "Deed of Trust") of real property located at 2301 West Lawther Lane,

Deer Park Texas, 77536 (the "Property"). Debtor Residential Funding Corporation ("RFC") purchased the Rode Loan from Southtrust, and transferred its interest on or about June 1, 2003 to Deutsche Bank Trust Company Americas ("Deutsche Bank") as trustee in connection with the securitization of the Rode Loan. The Note was endorsed by Southtrust to RFC and from RFC to Deutsche Bank, as trustee. An assignment of the Deed of Trust was executed on April 16, 2010 from MERS to Deutsche Bank. Copies of the Note, Deed of Trust and Assignment of Deed of Trust are annexed hereto as **Exhibits A**, **B** and **C**, respectively.

7. Homecomings serviced the Rode Loan from April 18, 2003 until May 2007. In May 2007, GMACM began servicing the Rode Loan for Deutsche Bank. GMACM transferred servicing to Ocwen Loan Servicing, LLC on February 16, 2013 in connection with the Debtors' sale of their servicing platform.

1. **Administration of the Escrow Account**

8. The summary of transactions related to the Rode Loan's escrow account contained in the Objection was prepared based on the Debtors' Books and Records, and is a true and accurate summary of the information contained in those materials. Based on the Liquidating Trust's review of the Debtors' relevant Books and Records, the Liquidating Trust has found no indications that there were any improprieties related to the handling of Rode's escrow account.

9. The March 20, 2007 "Hazard Insurance Disbursement" relates to a lender-placed insurance policy that was in force on the Property at an annual premium of $6,480.67. See Letter dated August 28, 2009, annexed hereto as **Exhibit D**. This policy provided coverage from December 30, 2006 to December 30, 2007. Id. GMACM received an insurance policy from Rode showing coverage on the Property from September 21, 2007 to December 30, 2007 and, as a result, issued a refund to the escrow account of $1,794.67 on January 10, 2008. Id.

However, there remained a lapse in insurance coverage on the Property from December 30, 2006 to September 20, 2007, which was funded from the escrow account. Id.

10. The July 18, 2008 "Hazard Insurance Disbursement" relates to a lender-placed insurance policy that was in force on the Property at a total premium of $2,519.00. See Letter dated July 20, 2008, annexed hereto as **Exhibit E**. This policy provided coverage from April 15, 2008 to April 15, 2009. Id. On August 1, 2008, GMACM issued a refund to escrow of $1,918.00 upon receiving proof of coverage from July 12, 2008 to April 15, 2009.

11. On September 24, 2009, GMACM sent a letter to Rode's counsel advising that Rode had provided an insurance policy showing coverage from December 30, 2006 to September 20, 2007 and had therefore been issued a refund to escrow of $4,686.00. See Letter dated September 24, 2009, annexed hereto as **Exhibit F**. Pursuant to that letter, GMACM indicated that there was still a lapse in documented insurance coverage on the Property from April 15, 2008 to July 11, 2008, which resulted in a lapse charge of $601.00 against the escrow account. Id.

  **2. Loss Mitigation Efforts**

12. Rode applied for a loan modification in 2008. On October 14, 2008, a permanent modification was approved and the non-HAMP permanent modification documents were sent to Rode, due back by November 10, 2008. See servicing notes, annexed hereto as **Exhibit G**, at 24. These documents included Rode's ex-wife as a signatory. On October 29, 2008, Rode requested new documents be issued removing her name. Id. Rode was informed via phone by a GMACM employee on October 29, 2008 and again on December 2, 2008 that a quit claim deed needed to be sent in for her to be removed from the documents. Id. at 24, 27.

13. On or about December 5, 2008, GMACM received a quit claim deed (dated as of November 18, 2008) from Rode. Id. at 27.

14. Due to delays in finalizing the loan modification documents, on March 6, 2009, the non-HAMP modification had to be reworked because the modification as initially approved would have no longer brought the account current. Id. at 28. New loan modification documents were mailed to Rode on or about March 10, 2009, due back by May 1, 2009. Id. at 29.

15. On March 13, 2009 and March 18, 2009, Rode contacted GMACM stating that the new loan modification documents still listed his ex-wife as signatory and requested that a new modification agreement be sent. Id. at 29. On March 24, 2009, Rode contacted GMACM and stated that he had not yet received an updated modification package removing his ex-wife as signatory. Id. On April 30, 2009, Rode again contacted GMACM and advised that he had only received one page of the modification agreement and that it still listed his ex-wife as a signatory. Id. at 30.

16. On May 15, 2009, GMACM advised Rode that the modification had to be reset again as the terms had expired. Id. at 31.

17. GMACM received the expired March 2009 modification package from Rode on or about June 25, 2009. Id. at 33. Rode was again informed that the terms had expired and needed to be reset via phone on July 8, 2009. Id. Rode indicated that he was re-married and asked whether his new wife's financial information could be considered in the review. Id. GMACM confirmed that it could, provided that Rode submitted new proof of income so the modification could be reworked. Id. Rode never submitted the requested proof of income.

18. GMACM received a letter from Claimant's attorney on August 3, 2009 threatening a lawsuit against GMACM unless a modification was offered. GMACM reopened the loan modification review on August 20, 2009 using the original information received in the March 2009 workout package. See Letter dated July 29, 2009, annexed hereto as **Exhibit H**. GMACM approved a new loan modification on August 24, 2009, with a payment due date of October 1, 2009. Id. at 34-35. At the time the modification was approved, the escrow account—which reflected amounts that had already been advanced by GMACM in its capacity as servicer—had a negative balance of $9,650.15. That negative balance was primarily the product of two factors: (1) lender-placed insurance premiums for periods as to which Rode had not provided evidence of coverage, and (b) real estate taxes due on the Property, which had substantially increased from prior years. Under the August 2009 modification terms, GMACM would have capitalized $5,189.97 of overdrawn escrow amounts, thereby reducing Rode's total loan payment from $3,968.46 to $3,013.70.

19. New permanent modification documents based on this account status were sent to Rode on August 26, 2009 (the "August 2009 Modification Agreement"), due back October 1, 2009. Id. at 35; Letter dated August 26, 2009, annexed hereto as **Exhibit I**.

20. Rode returned the signed August 2009 Modification Agreement to GMACM on October 5, 2009.[3] **Exhibit G** at 37; Fixed Rate Loan Modification Agreement, annexed hereto as **Exhibit K**.

21. On October 7, 2009, GMACM countersigned the August 2009 Modification Agreement. See Fixed Rate Loan Modification Agreement, annexed hereto as

---

[3] On October 5, 2009, GMACM resent the August 2009 Modification Agreement to Rode because his ex-wife's signature had not been provided. See **Exhibit G** at 37. On October 6, 2009, a note was added to the account noting that, in light of the quit claim deed Rode had previously sent in, his ex-wife's signature was not necessary to process the modification. Id.; Quit Claim Deed annexed hereto as **Exhibit J**.

**Exhibit L**. However, on that same date, GMACM processed an insurance refund of $4,686.00, leaving a negative escrow balance of $4,964.15. Under the August 2009 Modification Agreement, $10,000 in debt forgiveness was to be posted to escrow along with the $5,189.97 in escrow amounts that were to be capitalized, which would have resulted in an escrow surplus of $5,035.85. GMACM determined that initial escrow analysis had likely been performed incorrectly and finalizing the modification would have resulted in an impermissibly large surplus in the escrow account. See **Exhibit G** at 38. In effect, consummating the modification on the terms set forth in the August 2009 Modification Agreement meant that GMACM would write off the overdrawn escrow balances and then refund Rode for the escrow surplus created by the write-off and refund out of its own pocket. Id.

22. To avoid this inequitable and plainly illogical outcome, GMACM backed off the modification and determined that it would be necessary to recalculate the terms of the modification taking into account all of the insurance refunds and escrow adjustments. Id. at 37-38. Upon processing the final modification documentation, GMACM also determined that Rode had not submitted new paystubs for the proof of income as directed on July 8, 2009, which also required backing off the modification. Id. at 39. GMACM therefore voided the August 2009 Modification Agreement and did not return a copy of the fully executed agreement to Rode.

23. Pursuant to letters dated October 29, 2009 and October 30, 2009 from Rode's counsel to the Debtors, Rode acknowledged that he had not received a countersigned copy of the August 2009 Modification Agreement and indicated that, as a result, he did not intend to perform under the terms of that agreement. See Letter dated October 29, 2009, annexed hereto as **Exhibit M**; Letter dated October 30, 2009, annexed hereto as **Exhibit N**.

24. GMACM restarted the loan modification review process, and ultimately approved Rode for a loan modification on revised terms in August 2010, subject to receiving appropriate documentation from Rode. However, that modification was never completed because Rode never submitted the requisite documents.

### 3. Foreclosure Proceedings

25. When servicing of the Loan was transferred to GMACM in May 2007, both the April 2007 and May 2007 payments were due and owing on the Rode Loan. Accordingly, Rode's account was already 30 days delinquent when GMACM became servicer for the Rode Loan, and was never brought current. See **Exhibit G**, at 1. Rode's last mortgage payment was for October 2008.[4] Id. Accordingly, at the time Rode returned the August 2009 Modification Agreement to GMACM on October 5, 2009, the account was owing for twelve payments, from November 2008 through October 2009 payments. On or about February 24, 2010, the Rode Loan was referred to foreclosure. Id. at 41.

26. On April 20, 2010, the foreclosure was put on hold while the account continued to be reviewed for a loan modification. As stated above, a loan modification was approved in August 2010; however, Rode never provided the requisite documents.

27. Based on information and belief, Rode has declined to pursue a loan modification with Ocwen, which is the current servicer for the Rode Loan, and Ocwen is currently seeking to foreclose on the Property.

---

[4] The Debtors received a payment of $3,026 from Rode on January 8, 2009, but the amount received was insufficient to post as a payment and the money was placed in a suspense account. The Debtors received a payment of $5,426.67 from Rode on June 12, 2009, which was initially applied to the suspense account. On June 23, 2009, funds were taken out of suspense and posted to Rode's account on account of four payments for July 2008 through October 2008. The Debtors also received a payment of $3,025 from Rode on September 14, 2009, but the amount received was insufficient to post as a payment and the money was placed in a suspense account. See Payment History, annexed hereto as **Exhibit O**.

### 4. The Rode Litigation

28. On July 21, 2011, Rode filed a petition (the "Petition") in the District Court of Harris County Texas, 125th Judicial District, commencing a lawsuit against Homecomings and GMACM (together, the "Debtor Defendants"), captioned Rode v. Homecomings Financial, LLC and GMAC Mortgage, LLC, Cause No. 2011-43161 (the "Rode Litigation"). See Petition, annexed hereto as **Exhibit P**.

29. The Debtor Defendants filed their answer to the Petition on August 11, 2011. See Answer, annexed hereto as **Exhibit Q**.

30. On February 6, 2012, Rode's counsel sent a settlement demand.

31. Also on February 6, 2012, Rode filed a First Amended Petition (the "Amended Petition"). See Amended Petition, annexed hereto as **Exhibit R**.

32. On February 9, 2012, the Rode Litigation was removed to the United States District Court for the Southern District of Texas (the "District Court"), Civil Action No. 4:12-cv-00390. See Notice of Removal, annexed hereto as **Exhibit S**.

33. Also on February 9, 2012, the Debtor Defendants filed their answer to the Amended Petition. See Defendants' Answer To Plaintiff's First Amended Complaint, annexed hereto as **Exhibit T**.

34. On April 2, 2012, the District Court entered a scheduling order (the "Scheduling Order"), which provided that discovery was to conclude by December 31, 2012, and trial would commence on April 1, 2013. See Scheduling Order, annexed hereto as **Exhibit U**.

35. Rode was provided with an accounting of his escrow account via discovery materials produced to him in connection with the Rode Litigation.

36. The Rode Litigation was stayed upon the commencement of the Debtors' chapter 11 cases. The Debtor Defendants filed a notice of bankruptcy on May 22, 2012. See

Notice of Bankruptcy and Effect of Automatic Stay, annexed hereto as **Exhibit V**.  On February 26, 2013, the District Court entered an order dismissing the Rode Litigation without prejudice in light of the Debtors' pending bankruptcy cases.  See Order of Stay on Suggestion of Bankruptcy, annexed hereto as **Exhibit W**.  At the time of dismissal, the Rode Litigation was still in its preliminary stages, and no dispositive briefing had yet been filed.  See Docket Report, annexed hereto as **Exhibit X**.

      5.      **Borrower Claims Procedures**

      37.      Pursuant to the Borrower Claims Procedures, the Debtors sent Rode a Request Letter with respect to each of the Rode Claims on or about June 20, 2013.  See Request Letters, annexed hereto as **Exhibit Y**.  In response to the Request Letters, Rode provided a copy of the Amended Petition.

Dated:  April 9, 2015

                                                    /s/ Kathy Priore
                                                  Kathy Priore
                                                  Associate Counsel for
                                                  The ResCap Liquidating Trust