**Hearing Date: April 16, 2015 at 10:00 A.M. (ET)**

MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Norman S. Rosenbaum
Jordan A. Wishnew
Jessica J. Arett

*Counsel for the ResCap Borrower Claims Trust*
*and the ResCap Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------ ) | | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------------------------ ) | | |

**RESCAP BORROWER CLAIMS TRUST'S REPLY IN SUPPORT OF ITS**
**EIGHTY-SECOND OMNIBUS OBJECTION TO CLAIMS**
**(NO-LIABILITY BORROWER CLAIMS) AS TO CLAIM NO. 3732**
**FILED BY KENNETH DLIN AND RESCAP LIQUIDATING TRUST'S**
**OBJECTION TO KENNETH DLIN'S MOTION FOR RELIEF FROM THE**
**<u>AUTOMATIC STAY UNDER 11 U.S.C § 362</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 2

REPLY ................................................................................................................................. 12

CONCLUSION ...................................................................................................................... 22

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Allegheny Int'l, Inc. v. Snyder (In re Allegheny Int'l, Inc.),
    954 F.2d 167 (3d Cir. 1992) ............................................................. 12

Brody v. Bock,
    897 P.2d 769 (Colo. 1995).............................................................. 13

Capital Commc'ns Fed. Credit Union v. Boodrow (In re Boodrow),
    126 F.3d 43 (2d Cir. 1997)........................................................... 18, 19

Columbus Invs. v. Lewis,
    48 P.3d 1222 (Colo. 2002)............................................................. 16

Feinberg v. Bank of N.Y. (In re Feinberg),
    442 B.R. 215 (Bankr. S.D.N.Y. 2010) .............................................. 12

Goodwin v. District Court,
    779 P.2d 837 (Colo. 1989)............................................................. 16

In re Adelphia Commc'ns Corp.,
    Case No. 02-41729 (REG), 2007 Bankr. LEXIS 660 (Bankr. S.D.N.Y. Feb. 20, 2007) ........ 12

In re Leibowitz,
    147 B.R. 341 (Bankr. S.D.N.Y. 1992) .............................................. 18

In re Oneida Ltd.,
    400 B.R. 384 (Bankr. S.D.N.Y. 2009) .............................................. 12

In re Residential Capital, LLC,
    501 B.R. 624 (Bankr. S.D.N.Y. 2013) .......................................... 17, 21

In re Residential Capital, LLC,
    507 B.R. 477 (Bankr. S.D.N.Y. 2014) .............................................. 12

In re Rockefeller Ctr. Props.,
    272 B.R. 524 (Bankr. S.D.N.Y. 2000) .............................................. 13

Lawrence v. Motors Liquidation Co. (In re Motors Liquidation Co.),
    Case. No. 10 Civ. 36 (RJH), 2010 WL 4966018 (S.D.N.Y. Nov. 8, 2010) ............... 18

Mazzeo v. Lenhart (In re Mazzeo),
    167 F.3d 139 (2d Cir. 1999) ........................................................... 18

Midlantic Nat'l Bank v. N. J. Dep't of Envtl. Prot.,
    474 U.S. 494 (1986) ...................................................................... 17

Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.),
        980 F.2d 110 (2d Cir. 1992) ........................................................................... 17, 21

Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.,
        62 P.3d 142 (Col. 2003) .................................................................................... 13

Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.),
        907 F.2d 1280 (2d Cir. 1990) ............................................................................ 18

**STATUTES**

11 U.S.C. § 362(d)(1) ....................................................................................................... 17

11 U.S.C. 502(b)(1) .......................................................................................................... 12

11 U.S.C. § 502(a) ........................................................................................................... 12

C.R.S. § 38-38-100.3 ....................................................................................................... 16

ny-1182129

The ResCap Borrower Claims Trust (the "Borrower Trust"), established pursuant to the terms of the Plan[1] in the above-captioned Chapter 11 Cases, as successor in interest to the above-captioned Debtors with respect to Borrower Claims, together with the Liquidating Trust, by and through undersigned counsel, hereby submits this reply (the "Dlin Reply") and the Supplemental Declaration of Kathy Priore, Associate Counsel for the ResCap Liquidating Trust (the "Supplemental Declaration"), annexed hereto as Exhibit 1, both (i) to the response filed by Kenneth Dlin ("Mr. Dlin") [Docket No. 8355] (the "Dlin Response") to the *ResCap Borrower Claims Trust's Eighty-Second Omnibus Objection to Claims (No Liability Borrower Claims)* [Docket No. 8042] (the "Objection") and (ii) Mr. Dlin's *Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362* (the "Motion").[2]  The Trusts respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Borrower Trust examined the Dlin Response and the statements submitted in support thereof.  For purposes of the Dlin Reply and the Objection, the Borrower Trust takes these statements at face value.  If the Court is not prepared to rule on the Objection with respect to Mr. Dlin, then the Borrower Trust reserves the right to take discovery from the Mr. Dlin.

2.      As described herein and in the Supplemental Declaration, the Borrower Trust thoroughly examined the Debtors' books and records that were prepared and kept in the course of their regularly conducted business activities (the "Books and Records") in an effort to validate the accuracy of the allegations made in the Dlin Response and the Claim.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Objection.

[2] The Motion is attached to the Dlin Response.

3.      Through the Dlin Response, Mr. Dlin asserted two bases for the Debtors' liability: (1) statements made by the Debtors that Mr. Dlin's loan would need to be in default in order to be considered for a loan modification, and (2) that the Debtors improperly conducted a foreclosure sale on Mr. Dlin's property when a third party had made an offer pursuant to a short sale.

4.      Mr. Dlin's allegations do not demonstrate any liability of the Debtors' estates.  During each of the **eight** inquiries made by Mr. Dlin on November 19, 2008, the Debtors consistently informed Mr. Dlin of the requirements to be considered for a loan modification.  If Mr. Dlin misinterpreted what he was being told by the Debtors' representatives, then the fault lies with Mr. Dlin and the Debtors cannot be liable for making any misrepresentations to Mr. Dlin.  Further, Mr. Dlin has not demonstrated why the Debtors have any liability related to the short sale process, as there was no requirement that the Debtors put the foreclosure sale on hold while a short sale offer was available.  Moreover, at the time of the foreclosure sale, there were no acceptable short sale offers for the property.  As a result, Mr. Dlin has failed to demonstrate any actions of the Debtors that create liability to Mr. Dlin.

5.      Mr. Dlin also seeks relief from the automatic stay to pursue his causes of action in Colorado state court.  However, Mr. Dlin has failed to provide any justifiable reason, especially considering that the proceeding in Colorado is no further along than Mr. Dlin's claim. As a result, the Court should deny Mr. Dlin's request for relief from the automatic stay.

## BACKGROUND

6.      In connection with the claims reconciliation process, the Borrower Trust identified certain claims filed by Borrowers that it believed did not constitute valid liabilities of the Debtors (together, the "No Liability Borrower Clams").  See Objection ¶ 16.

ny-1182129

7.      The Debtors sent a Request Letter to Mr. Dlin requesting additional documentation in support of the Claim.  See Supplemental Declaration ¶ 6.  The Request Letter stated that Mr. Dlin must respond within 30 days with an explanation that states the legal and factual reasons why he believes he is owed money or is entitled to other relief from the Debtors, and he must provide copies of any and all documentation that he believes supports the basis for his claim.  The Request Letter further stated that if Mr. Dlin does not provide the requested explanation and supporting documentation within 30 days, the Debtors may file a formal objection to the Claim, seeking to have the Claim disallowed and permanently expunged.  See Supplemental Declaration ¶ 6.

8.      The Debtors received a response to the Request Letter from Mr. Dlin on July 22, 2013 (the "Diligence Response"). A copy of the Diligence Response is attached to the Supplemental Declaration as Exhibit A.  However, the Diligence Response failed to allege bases for claims against the Debtors' estates.  Further, as stated in the Objection, the Books and Records do not show any liability due and owing to Mr. Dlin.  See Supplemental Declaration ¶ 7.

### Background Facts

9.      On or around November 8, 2012, Mr. Dlin filed a proof of claim against Debtor GMAC Mortgage, LLC ("GMACM"), designated as Claim No. 3732 (the "Claim"), asserting a general unsecured claim for $971,770.00.  See Exhibit B to the Supplemental Declaration; see also Exhibit A to the proposed order to the Objection ("Exhibit A to the Objection").

10.     According to the Books and Records, non-Debtor Greenpoint Mortgage Funding Inc. ("Greenpoint") originated a first lien loan in the amount of $633,000.00 to Mr. Dlin

ny-1182129

on February 20, 2004 (the "Loan"), secured by a mortgage on property located at 3431 Welch

Ave., Kittredge, CO 80457 (the "Property").  See Exhibit A to the Objection; see also Note,

attached to the Supplemental Declaration as Exhibit C, and Deed of Trust, attached to the

Supplemental Declaration as Exhibit D.  GMACM purchased the loan from Greenpoint and

transferred the Loan when it was securitized in which HSBC Bank, NA was appointed as Trustee

on or about April 1, 2004.  See Exhibit A to the Objection.

     11.    GMACM serviced the Loan from July 1, 2004 until servicing was

transferred to Ocwen Loan Servicing, LLC on February 16, 2013.  See Exhibit A to the

Objection.

     12.    On November 19, 2008, the Mr. Dlin spoke with an associate of the

Debtors via phone.  See Dlin Servicing Notes, attached to the Supplemental Declaration as

Exhibit E, p. 56.  At the time, Mr. Dlin stated that he would like to know about a loan

modification. See id. The Debtors' associate advised him to call back the next month if he was

still having trouble making payments.  See id.

     13.    That same day, Mr. Dlin again spoke to a different associate of the

Debtors via phone, again stating that he was interested in a loan modification. See Dlin Servicing

Notes, p. 56. The Debtors' associate explained that since the account was current, Mr. Dlin can

call back next month when the loan is due for a payment as there are no options since no

payment is due.  See id. During this call, Mr. Dlin stated that he wants a payment setup right

away, and was advised by the Debtors' associate that no payment arrangement could be offered

at that time.  See id.

     14.    Also on November 19, 2008, Mr. Dlin spoke to a third representative of

the Debtors via the phone, at which time Mr. Dlin again stated that he was interested in payment

options. See Dlin Servicing Notes, pp. 55-56. Like others before him, the Debtor associate

advised Mr. Dlin that there will be no payment options available until next month. See id. At that

time, Mr. Dlin requested to be transferred to a supervisor. See id.

15.     Mr. Dlin spoke with a fourth representative of the Debtors on November

19, 2008 via phone and stated he would like a loan modification. See Dlin Servicing Notes, p.

55. Once again, Mr. Dlin was advised that a loan modification is a default option and the account

is currently not in default and thus a modification is not available.  See id.

16.     Mr. Dlin spoke with a fifth representative of the Debtors on November 19,

2008 via phone. See Dlin Servicing Notes, p. 55. During that call, the Debtors' representative

advised Mr. Dlin that his account is current and that he should call back once the account is due

as there were no payment options available at that time. See id.

17.     Mr. Dlin spoke with a sixth representative of the Debtors on November

19, 2008 via phone, also to request a loan modification. See Dlin Servicing Notes, p. 55. Like

his/her colleagues, the Debtors' associate advised that a loan modification option is not available

until the account is due for two months or more, and that if the Debtors referred his account for

loan modification review, it would be denied because the account was current. See id.

18.     Mr. Dlin spoke to a seventh representative of the Debtors on November

19, 2008 via phone.  See Dlin Servicing Notes, pp. 54-55. During that conversation, the Debtors

advised Mr. Dlin that his account is current and that there is nothing to offer him at that time.

See id.  When the Debtors' representative offered to transfer him to direct lending he stated that a

refinance is not going to happen. See id.

19.     Mr. Dlin spoke to an eighth representative of the Debtors on November

19, 2008 via phone, at which time Mr. Dlin restated his desire for a loan modification. See Dlin

Servicing Notes, p. 54. During the call, the Debtors' associate advised Mr. Dlin that his account

was current and that he could call back when his account was thirty days or more late.  See id.

The representative also noted that if Mr. Dlin was late, he would be charged a late fee and his

credit could be affected.  The representative told him to call the Hope for Homeowners program

and gave him the phone number.  See Dlin Servicing Notes p. 54.

20.    Mr. Dlin did not make his December 2008 payment.  See Dlin Servicing

Notes.  On January 6, 2009, the Debtors spoke to Mr. Dlin via phone, and advised Mr. Dlin that

a loan modification was not available at that time. See Dlin Servicing Notes, p. 53. The Debtors

advised him that new modification options may be available in February for which Mr. Dlin

could be considered. See id.

21.    On January 30, 2009, the Debtors spoke to Mr. Dlin over the phone, at

which time the Debtors took Mr. Dlin's financial information and referred his account to loan

modification review. See Dlin Servicing Notes, p. 51. On February 4, 2009, Mr. Dlin's account

was denied for a loan modification because, based on the information he provided, he did not

have sufficient income.  See id. p. 50.

22.    On February 17, 2009, the Debtors spoke with Mr. Dlin via phone, at

which time Mr. Dlin stated that the financial information he had previously provided was

incorrect, and he provided the Debtors with updated financial information. See Dlin Servicing

Notes, p. 49.   With this information, the Debtors again referred Mr. Dlin's account for

modification review.  See id.

23.    On February 27, 2009, the Debtors approved Mr. Dlin's account for a

traditional loan modification. See Dlin Servicing Notes, pp. 47-48. The terms included a

payment contribution of $3,483.46 due on March 15, 2009 and a monthly principal and interest

payment of $3,138.56. See id. The modification capitalized $13,324.29 in past due interest to the principal balance, reduced the interest rate from 5.375% to 3.2% and brought the account current for the past due payments of December 2008 through April 2009. See id. Mr. Dlin's monthly principal and interest payment prior to the modification was $2,834.51.  See id.  The monthly payment increased because, prior to the modification, Mr. Dlin had an interest only loan, and at the time of the modification, the Debtors were not able to offer interest-only loan modifications under the investor guidelines.  See id.

24.    The Debtors spoke with the Claimant on March 9, 2009 via phone, at which time Mr. Dlin questioned why the proposed monthly payment increased, and the Debtors explained the terms of the modification and that there were no modification options available that would lower the monthly payment.  See Dlin Servicing Notes, p. 46.

25.    The Debtors again spoke to Mr. Dlin on March 19, 2009, at which time Mr. Dlin stated that the modification offer does not help him, and the Debtors explained that Mr. Dlin could either accept the proposed modification or pay the delinquent balance on the loan. See Dlin Servicing Notes, p. 45.

26.    The Debtors received the first payment under the modification plan on March 27, 2009 and the signed traditional modification documents on March 20, 2009.  See Modification Agreement, attached to the Supplemental Declaration as Exhibit F; see also Dlin Servicing Notes, pp. 44-45.

27.    On November 16, 2009, the Debtors were contacted by Mr. Dlin's real estate agent, Norma Loyd ("Ms. Loyd"), who advised the Debtors that Mr. Dlin was interested in a short sale.  See Dlin Servicing Notes, p. 41.

7

28.     On November 17, 2009, the Debtors began the short sale process by ordering an internal broker price option (BPO) on the Property.  See Dlin Servicing Notes, p. 40. On November 24, 2009, the Debtors received the results of the BPO, which valued the property at $580,000.00.  See November 2009 BPO, attached to the Supplemental Declaration as Exhibit G.

29.     On December 2, 2009, the Debtors mailed a breach letter to Mr. Dlin. See December 2 Breach Letter, attached to the Supplemental Declaration as Exhibit H. On January 6, 2010, the Debtors referred Mr. Dlin's account to foreclosure as it was owing for the October 1, 2009 payment.  See Dlin Servicing Notes, p. 39.  It was not the Debtors' practice to place a foreclosure on hold during a short sale review.  See Supplemental Declaration ¶ 28.

30.     On January 13, 2010, the Debtors commenced a foreclosure action against the Property by filing a Notice of Election and Demand for Sale with the Jefferson County Public Trustee, a copy of which is attached to the Supplemental Declaration as Exhibit I.

31.     On January 29, 2010, the Debtors spoke with Ms. Loyd via phone, at which time she informed the Debtors that the listing price for the Property had been dropped to around $500,000.  See Dlin Servicing Notes, p. 56.

32.     On or around February 8, 2010, the Debtors received a short sale offer for $400,000, which would have provided the loan investor with net proceeds of $331,441.70.  See February 8 Short Sale Package, attached to the Supplemental Declaration as Exhibit J.[3]  The offer was not approved because the investor of the Dlin Loan required short sale offers to net at

_____

[3] The net proceeds would have been the proceeds available from the sale after certain deductions, including the allocation to the second lien holder, taxes, commissions to the realtor, fees for appraisal, and fees to the title company.

ny-1182129

least 85% of the market value of the property, as determined by a BPO.  See Dlin Servicing

Notes, p. 36.

33.    On February 23, 2010, the Debtors spoke with Ms. Loyd via telephone

and informed her that the investor did not approve the short sale offer because the investor

required the offer to net the investor at least 85% of fair market value.  See Dlin Servicing Notes

at p. 36.  Ms. Loyd discussed possibly lowering the listing price by $50,000 and the Debtors

advised her that the investor would not accept such an offer because it required offers to net at

least 85% of the market value of the property.  See Dlin Servicing Notes, p. 36.

34.    On March 26, 2010, the Debtors received the results of a new BPO

conducted on the property which valued the Property at $500,000.  See March 16, 2010 BPO,

attached to the Supplemental Declaration as Exhibit K.

35.    Also on March 26, 2010, the Debtors filed a Verified Motion for Order

Authorizing Sale (the "Rule 120 Motion") in the District Court of Jefferson County (the "District

Court") pursuant to C.R.C.P. 120.   See Rule 120 Motion, attached to the Supplemental

Declaration as Exhibit L.

36.    On April 5, 2010, the Debtors received a short sale offer for $450,000 (the

"April Offer"), which would have provided the investor with a net of $380,632.44.[4]  See April 5

Short Sale Package, attached to the Priore Declaration as Exhibit M.  The Debtors responded that

the investor would not accept the offer because it was not at least 85% of the fair market value of

the property.  See Dlin Servicing Notes, pp. 34-35.

---

[4] The amount projected to be received by the investor was calculated based on the closing costs for the sale, as well
as the amount that would be required to be paid to the holder of the second lien on the Dlin Loan, Bank of America.
See Supplemental Declaration n. 4. Bank of America's approval was required in order for a short sale to be
completed.  See id. n. 5.

9

37.     On April 12, 2010, Mr. Dlin filed a response to the Rule 120 Motion in which he challenged GMACM's standing to foreclose.  See Dlin Response to Rule 120 Motion, attached to the Supplemental Declaration as Exhibit N.

38.     On May 24, 2010, Mr. Dlin filed an amended response to the Rule 120 Motion in which he again challenged GMACM's standing to foreclose.  See Dlin Amended Response to Rule 120 Motion, attached to the Supplemental Declaration as Exhibit O.

39.     On May 25, 2010, the Debtors received another offer in the amount of $450,000 (the "May Offer"), which would net the investor $374,473.24.[5]  See May 25, 2010 Offer HUD-1 Statement, attached to the Supplemental Declaration as Exhibit P.

40.     On May 27, 2010, the foreclosure sale was postponed to June 16, 2010 to allow additional time for a possible short sale offer that would be accepted by the investor.  See Dlin Servicing Notes p. 28.

41.     On May 27, 2010, a hearing was held in the District Court pursuant to Colorado Rule of Civil Procedure 120.  See Rule 120 Proceeding Docket, attached to the Supplemental Declaration as Exhibit Q.  At the hearing, the District Court granted an Order Authorizing Sale, finding that the Debtors were the holder of the Note and Deed of Trust, and that Mr. Dlin was in default on his obligation thereunder.  See Rule 120 Order, attached to the Supplemental Declaration as Exhibit R.

42.     On June 13, 2010, Ms. Loyd presented an offer of $525,000 to the Debtors.  See June 13 Email, attached to the Supplemental Declaration as Exhibit S.  The

---

[5] This amount is lower than the net amount that was calculated for the April Offer because at the time the May Offer was received the county taxes due on the property had increased and the amount allocated to Bank of America as the second lien holder increased from $36,000 to $39,000.

ny-1182129

Debtors submitted the updated offer for investor approval on June 24, 2010.  See Dlin Servicing Notes p. 22.

43.    On June 14, 2010, the foreclosure sale was postponed until July 14, 2010, and on July 6, 2010 the foreclosure sale was again postponed to July 28, 2010.  See Dlin Servicing Notes pp. 21-22.

44.    On July 7, 2010, the Debtors emailed Ms. Loyd to ask if Bank of America, the holder of the second lien on the property (the "Second Lien Holder"), had approved the short sale, and advised that the investor would not consider the offer unless the Second Lien Holder approved.[6]  See Dlin Servicing Notes, pp. 20-21.  The Debtors followed up on July 9, 2010 through email, at which time the Debtors informed Ms. Loyd that the sale is scheduled for July 28, 2010.  See id.

45.    On July 20, 2010 the Debtors contacted Ms. Loyd through email, advising Ms. Loyd that the investor of the Dlin Loan would not postpone the sale without getting approval from the Second Lien Holder. See id, pp. 18-19.

46.    On July 27, 2010, the Debtors received an email from Ms. Loyd informing the Debtors that she was still waiting for authorization from the Second Lien Holder.  See July 27, 2010 Email, attached to the Supplemental Declaration as Exhibit T.  Ms. Loyd acknowledged in that email that the foreclosure sale was set for the next day.  See id.

47.    On July 28, 2010, a foreclosure sale was conducted as approval was not received from the Second Lien Holder.  See Dlin Servicing Notes, p. 16. The Debtors were the successful bidder of the Property for $477,000.  See Supplemental Declaration ¶ 46.

---

[6] It was the responsibility of Mr. Dlin and Ms. Loyd to get approval from the Second Lien Holder for any short sale offer.  See Supplemental Declaration ¶ 45.

ny-1182129

48.     On June 1, 2011, the Debtors initiated an eviction action against Mr. Dlin in the County Court of Jefferson County Colorado, case number 2011C48857 (the "Eviction Action").  See Eviction Action Docket, attached to the Supplemental Declaration as Exhibit U. On June 8, 2011, Mr. Dlin filed an answer and counterclaim, and on June 15, 2011, the case was transferred to the District Court, case number 2011CV2611.  See id.   On June 28, 2011, the Debtors filed an answer to Mr. Dlin's counterclaims.  See District Court Docket, attached to the Supplemental Declaration as Exhibit V.

49.     On May 31, 2012, the Debtors filed a notice of bankruptcy in the District Court case.  See District Court Docket.  On information and belief, Ocwen has taken over on the Eviction Action, and a trial as to solely that action has been set for May 18, 2015.

## REPLY

50.     A filed proof of claim is "deemed allowed, unless a party in interest … objects."  11 U.S.C. § 502(a).  Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law…."  11 U.S.C. 502(b)(1).  As noted previously by the Court, claims objections have a shifting burden of proof. Pursuant to Federal Rule of Bankruptcy Procedure 3001(f), a claimant establishes a prima facie case against a debtor upon filing a proof of claim alleging facts sufficient to support the claim. The objecting party is thereafter required to produce evidence equal in force to that provided by the claimant to rebut the presumption of the claimant's prima facie case. In re Residential Capital, LLC, 507 B.R. 477, 490 (Bankr. S.D.N.Y. 2014).  See also Allegheny Int'l, Inc. v. Snyder (In re Allegheny Int'l, Inc.), 954 F.2d 167, 173-74 (3d Cir. 1992).

51.     Once an objection refutes an essential allegation of the claim, the burden of persuasion is on the holder of a proof of claim to establish a valid claim against a debtor by a

preponderance of the evidence.  Residential Capital, 507 B.R at 490; Feinberg v. Bank of N.Y.

(In re Feinberg), 442 B.R. 215, 220-22 (Bankr. S.D.N.Y. 2010); In re Oneida Ltd., 400 B.R. 384,

389 (Bankr. S.D.N.Y. 2009); In re Adelphia Commc'ns Corp., Case  No. 02-41729 (REG), 2007

Bankr. LEXIS 660, at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); In re Rockefeller Ctr. Props., 272

B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

*The Claimant Has Failed to Sufficiently Plead Causes of Action for Deceptive Trade Practices, Fraudulent Conduct, or Wrongful Foreclosure*

52.    In Count 1 of the Dlin Response, Mr. Dlin asserts causes of action for

deceptive trade practices and fraudulent conduct.  See Dlin Response ¶¶ 4-14.  To assert a cause

of action for fraud in Colorado, "A plaintiff must present evidence that the defendant made a

false representation of a material fact; that the party making the representation knew it was false;

that the party to whom the representation was made did not know of the falsity; that the

representation was made with the intent that it be acted upon; and that the representation resulted

in damages."  Brody v. Bock, 897 P.2d 769, 775-76 (Colo. 1995) (citation omitted).  Similarly,

to assert a cause of action for deceptive trade practices, a plaintiff must assert that "a defendant

knowingly made a misrepresentation that induced a party's action or inaction…"  Rhino Linings

USA, Inc. v. Rocky Mountain Rhino Lining, Inc., 62 P.3d 142, 147 (Col. 2003).    A

misrepresentation is a false or misleading statement that induces the recipient to act or refrain

from acting, and is actionable when it is made "either with knowledge of its untruth, or

recklessly and willfully made without regard to its consequences, and with an intent to mislead

and deceive the plaintiff."  See id (citation omitted).

53.    Mr. Dlin asserts that there were two misrepresentations made by the

Debtors: (1) that he needed to be in default in order to qualify for a loan modification (and

instructed him to do so) and (2) if he defaulted, a loan modification would be offered to him. See Dlin Response ¶¶ 6, 9.

54.    At no time did the Debtors tell Mr. Dlin that he should go into default or promise that if he did default a loan modification would be offered. See Dlin Servicing Notes. Rather, the Debtors consistently informed Mr. Dlin (i.e., eight separate times on November 19, 2008) that he would be considered for a loan modification only if he was in default, as was required by the investor guidelines.

55.    Furthermore, even if Mr. Dlin's allegations that the Debtors instructed him to default are true (which they are not), Mr. Dlin has failed to demonstrate any misrepresentation made by the Debtors.  At the time Mr. Dlin inquired about a loan modification, the investor guidelines on his loan required that he be behind on his payments in order to qualify for a loan modification.  While Mr. Dlin may have been frustrated at being told this, the Debtors were not misrepresenting anything when they told Mr. Dlin about this requirement.

56.    Four years after the fact, Mr. Dlin alleges that the Debtors misrepresented to him that if he did go into default, a loan modification would be offered to him.  As stated above, the Debtors' books and records do not demonstrate that such representations were ever made to Mr. Dlin, and Mr. Dlin fails to demonstrate otherwise.  In fact, as previously noted in ¶ 26 *supra*, the Debtors provided Mr. Dlin with a loan modification after he defaulted on his loan and Mr. Dlin accepted that modification.

57.    Mr. Dlin alleges that the Debtors are liable for not explaining that the guidelines for the underwriter prohibited other types of loans and that his payment would increase. See Dlin Response ¶ 10.  However, Mr. Dlin was informed by the Debtors on March 9, 2009 of the reasons for the increase in the monthly payment and that no other type of loan

modification was available.  See ¶ 24 *supra*.  While the loan modification increased his monthly payment, this was because $13,324.29 in delinquent interest was added to the principal balance, allowing him to pay his past due balance over time rather than all at once at the end of the loan term.  Nowhere does Mr. Dlin allege that the Debtors told him a loan modification would reduce his monthly payment nor does he allege that the Debtors knew that the payment would increase when the loan modification was being discussed prior to his default.  As a result, Mr. Dlin fails to demonstrate that the Debtors ever made a misrepresentation to him, and therefore fails to assert a cause of action for either fraud or deceptive trade practices.

58.    Count 2 of the Dlin Response asserts a cause of action for wrongful foreclosure.  However, this cause of action is premised on the same allegations as in Count 1, and therefore the claim for wrongful foreclosure should fail for the same reasons.

*The Debtors Have No Liability for Wrongfully Denying the Dlin Property for a Short Sale*

59.    Mr. Dlin asserts that the Debtors are liable for foreclosing on the property while a short sale offer had been tendered.  However, no evidence is proffered to demonstrate the Debtors are required to place the foreclosure sale on hold, nor has Mr. Dlin presented any evidence that the Debtors improperly rejected a short sale offer.  As previously noted, the Debtors postponed the foreclosure sale multiple times to give Mr. Dlin the chance to obtain an offer that would be acceptable to the investor and to the Second Lien Holder.  See ¶¶ 39, 42 *supra*.  As discussed in ¶¶ 33, 36, 43, and 44 *supra*, the investor for the Dlin Loan required that the short sale offer be both 85% of the market value of the Property and approved by the Second Lien Holder.  After nearly four months of being on the market, Mr. Dlin's agent did not get approval from the Second Lien Holder prior to the foreclosure sale, even though she was informed that the foreclosure sale would not be postponed again without the Second Lien

15

Holder's approval.  Therefore, without the approval of the Second Lien Holder, the Debtors were well within their rights to continue with the foreclosure sale pursuant to the terms of the Dlin Deed of Trust. As a result, Mr. Dlin fails to demonstrate any liability arising from the short sale process.

60.    In the Complaint attached to the Claim, Mr. Dlin asserts causes of action for breach of contract, breach of duty of good faith and fair dealing, promissory estoppel, breach of fiduciary duty, negligent misrepresentation, deceptive trade practices, negligence, interference with contract, negligent infliction of emotional distress, and fraud.  See Claim.  These causes of action are all premised on the same allegations as Count 1 and Count 3 in the Dlin Response, and therefore fail for the reasons stated above and discussed in Exhibit A to the Objection.

61.    Additionally, in the Complaint attached to the Claim, Mr. Dlin asserts causes of action for violation of the Colorado Consumer Protection Act and Civil Conspiracy, both premised on the allegation that GMACM was not the holder of the Note.  See Complaint ¶¶ 70, 89.  However, as stated in Exhibit A to the Objection, the Debtors complied with all state laws regarding the foreclosure and had standing to foreclose.  In accordance with Col. R. Civ. Proc. 120,[7] GMACM filed the Rule 120 Motion stating that it was the holder of the Note and the Deed of Trust[8]  Mr. Dlin was permitted under Col. R. Civ. Proc. 120(c) to dispute whether GMACM is the "real party in interest" entitled to move for the sale.  See Goodwin v. District Court, 779 P.2d 837 (Colo. 1989) (recognizing the "real party in interest" defense to a Rule 120

---

[7] Col. R. Civ. Proc. 120 is the rule governing court orders authorizing sales under a power of sale in a security instrument.

[8] C.R.S. § 38-38-100.3 defines "holder" as a person in actual possession of or person entitled to enforce an evidence of debt.  GMACM was the holder of the Note at the time of the foreclosure sale.  In Colorado, the holder of the Note is also the holder of the Deed of Trust.  See Columbus Invs. v. Lewis, 48 P.3d 1222, 1226 n. 4 (Colo. 2002) ("Between the parties to a transfer, the assignment or negotiation of the note itself is all that must be done.  It is unnecessary to have any separate document purporting to transfer or assign the mortgage on the real estate, for it will follow the obligation automatically.")

motion). Mr. Dlin submitted responses to the Rule 120 Motion challenging GMACM's standing

to foreclose. <u>See</u> Dlin Response and Amended Response to Rule 120 Motion. Notwithstanding

this challenge, the District Court determined that GMACM was the holder of the Note and the

Deed of Trust and issued an order authorizing the sale. <u>See</u> Order Authorizing Sale.

62.    In sum, Mr. Dlin fails to demonstrate a valid claim against the Debtors'

estates. Therefore, the Claim should be disallowed and expunged.

## <u>OBJECTION TO MOTION FOR RELIEF FROM THE AUTOMATIC STAY</u>

63.    The automatic stay affords "one of the fundamental debtor protections

provided by the bankruptcy laws." <u>Midlantic Nat'l Bank v. N. J. Dep't of Envtl. Prot.</u>, 474 U.S.

494, 503 (1986) (citation and internal quotation marks omitted). The automatic stay also furthers

the "strong bankruptcy code policy that favors centralized and efficient administration of all

claims in the bankruptcy court." <u>Publicker Indus. Inc. v. United States (In re Cuyahoga Equip.</u>

<u>Corp.)</u>, 980 F.2d 110, 117 (2d Cir. 1992); <u>In re Residential Capital, LLC</u>, 501 B.R. 624, 644

(Bankr. S.D.N.Y. 2013).

64.    Section 362(d)(1) of the Bankruptcy Code provides that a court may

grant relief from the automatic stay for "cause." <u>See</u> 11 U.S.C. § 362(d)(1). In the context of

stayed prepetition litigation, the Second Circuit has outlined the following 12-factor test (each a

"<u>Sonnax Factor</u>") to determine whether good cause exists to lift the stay to allow the litigation to

proceed:

> (1) whether relief would result in a partial or complete resolution of the issues;
> (2) lack of any connection with or interference with the bankruptcy case;
> (3) whether the other proceeding involves the debtor as a fiduciary;
> (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;
> (5) whether the debtor's insurer has assumed full responsibility for defending [the action];
> (6) whether the action primarily involves third parties;

17

(7) whether litigation in another forum would prejudice the interests of other creditors;

(8) whether the judgment claim arising from the other action is subject to equitable subordination;

(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;

(10) the interests of judicial economy and the expeditious and economical resolution of litigation;

(11) whether the parties are ready for trial in the other proceeding; and

(12) the impact of the stay on the parties and the balance of harms.

Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.), 907 F.2d 1280, 1286 (2d Cir. 1990); see also Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 143 (2d Cir. 1999).  In a given case, however, not all of the factors will be relevant, and the court may disregard irrelevant factors.  See Mazzeo, 167 F.3d at 143.

65.    The moving party bears the initial burden to demonstrate, using the relevant Sonnax factors, that good cause exists for lifting the stay.[9]  The movant's burden is especially heavy if it is an unsecured creditor.  "The general rule is that claims that are not viewed as secured in the context of § 362(d)(1) should not be granted relief from the stay unless extraordinary circumstances are established to justify such relief."[10]

66.    Not only does Mr. Dlin fail to identify the Sonnax factors in the Motion or attempt to demonstrate that "cause" exists under those factors, he also fails to provide *any* justification for granting relief from the stay.  Mr. Dlin simply states, without any extraordinary justification, that he moves the court for entry of an order modifying the automatic stay "to permit his counter suit in Jefferson County District Court, Case number 2011 CV 2611."

---

[9] See Sonnax, 907 F.2d at 1285; Capital Commc'ns Fed. Credit Union v. Boodrow (In re Boodrow), 126 F.3d 43, 48 (2d Cir. 1997) ("We have emphasized that a bankruptcy court should deny relief from the stay if the movant fails to make an initial showing of cause."  (citation and quotation omitted)).

[10] In re Leibowitz, 147 B.R. 341, 345 (Bankr. S.D.N.Y. 1992); see also Lawrence v. Motors Liquidation Co. (In re Motors Liquidation Co.), Case. No. 10 Civ. 36 (RJH), 2010 WL 4966018, at *4 (S.D.N.Y. Nov. 8, 2010).

ny-1182129

Motion, p. 1.  However, as discussed herein, Mr. Dlin provides no basis upon which the Court

may conclude that "cause" exists for the relief requested.

67.     Therefore, the Court should deny the Motion based solely on Mr. Dlin's

failure to provide any legal or factual bases upon which relief from the stay may be granted, as

demonstrated above.    See In re Boodrow, 126 F.3d at 48 ("We have emphasized that a

bankruptcy court should deny relief from the stay if the movant fails to make an initial showing

of cause." (quotation omitted)).

68.     Relief from the automatic stay to permit Mr. Dlin to proceed with his

counterclaims in District Court could result in the complete resolution of the issues (Sonnax

Factor 1); however, this issue could just as easily (and likely much more efficiently and

economically) be resolved consensually or through the claims resolution process before this

Court.  On balance, as discussed herein, the relevant Sonnax factors weigh in favor of resolving

Mr. Dlin's counterclaims before this Court and denying Mr. Dlin's request for stay relief.

69.     The District Court is not in any better position than this Court to render a

determination regarding the validity of Mr. Dlin's counterclaims against the Debtors.  While

limited discovery has been completed, the District Court has not heard any evidence related to

the counterclaims or even determined whether the counterclaims can survive a motion for

summary judgment.  See Supplemental Declaration ¶ 48.  Furthermore, the counsel that was

originally representing the Debtors prior to the bankruptcy stay is no longer practicing, and as a

result the Trusts would be required to hire entirely new counsel in Colorado, who would then

need time to understand the issues in the case, further delaying a final determination on the

matter.  Additionally, lifting the stay and sending the claims back to the District Court could hold

up the Eviction Action, which has progressed to the point that a trial has been set.  The Eviction

Action is wholly separate from the counterclaims, and lifting the stay would serve only to delay a determination on both the counterclaims (which can be dealt with more expeditiously in this Court) and the Eviction Action.

70.    The Borrower Trust expects that should the District Court action proceed, completing briefing and, if necessary, further discovery on the counterclaims would take a significant amount of time, with additional time required for potential mediation, and dispositive motions followed by a trial (each as necessary).  See Supplemental Declaration ¶ 50.  In this Court, on the other hand, the Borrower Trust has had the benefit of being able to resolve extraordinarily complex claims much more quickly, and without the need for expensive formal discovery and extended trials.[11]  Over the past two years, the Debtors and Plan Trusts have been working tirelessly to expeditiously resolve all proofs of claim filed against the Debtors' chapter 11 estates.  In just over two years since this Court approved claims resolution procedures [see Docket No. 3294], the Plan Trusts estimate that they (and the Debtors) have collectively resolved (or addressed) in excess of 2,697 out of 3,039 filed borrower proofs of claim.  See Supplemental Declaration ¶ 51.  In many instances, the Debtors or Plan Trusts have been able to resolve claims consensually.  See id.  In other cases where consensual resolution was not possible, the claims resolution process has provided an appropriate forum for the expeditious exchange of informal discovery and an expeditious resolution of the disputes between the parties.  See id.

71.    Furthermore, the Borrower Trust is currently attempting to resolve the Claim through the claims resolution process, having objected to the Claim as part of the Eighty-Second Omnibus Objection.  Given the Borrower Trust's fixed resources, resolution of the Claim

---

[11] See, e.g., Motion of Citibank, N.A. for an Order (I) Determining that it is Entitled to Post-Petition Interest on its Oversecured MSR Facility Claims at the Contractual Default, and (II) Directing Debtors to Pay Such Interest as well as Citibank's Due and Unpaid Counsel Fees and Expenses [Docket No. 6174], filed on December 23, 2013, and Memorandum Opinion and Order Granting Citibank's Motion for Default Interest and Counsel Fees and Expenses [Docket No. 6811], entered on April 22, 2014.

ny-1182129

before this Court is the most cost-effective, efficient, and timely manner for determining the validity of the claim and, if necessary, quantifying any damages, and in the interest of all of the Borrower Trust's stakeholders.  For instance, in connection with resolution of other borrower claims, the Court has permitted the parties to submit position statements to facilitate the Court's determination of the Debtors' liability for the underlying claims and to fix any such liability.[12] These procedures fostered productive discussions between the parties that, in certain cases, produced a consensual resolution.  See Supplemental Declaration ¶ 51.   In short, proceeding before this Court affords flexibility to utilize efficient and cost-effective mechanisms for resolution of the Claim if no consensual resolution can be reached.

72.    Additionally, resolution of the Claim in this Court will further the important bankruptcy goal of an efficient and centralized administration of claims (see In re Cuyahoga Equip. Corp., 980 F.2d at 117; In re Residential Capital, LLC, 501 B.R. at 644).

73.    Moreover, the determination of the validity of Mr. Dlin's claim in the District Court (and the associated costs described above) will have a direct effect on the Borrower Trust and the assets remaining for the Debtors' other creditors.  Mr. Dlin's causes of action are directly against GMACM, and any resulting claim will be against the Borrower Trust, especially since no insurer has assumed responsibility for defending the District Court action. Thus, Sonnax Factors 2 (connection with the bankruptcy case), 5 (whether the debtor's defense has been assumed by an insurer) and 6 (whether the action involves primarily third parties) all weigh in favor of resolving the Claim in this Court, where the Claim can be resolved in an efficient and cost-effective manner if a consensual resolution cannot be reached between the parties.  Moreover, for the same reasons, Sonnax Factors 7 (prejudice to creditors from litigation

---

[12] See Order Establishing Procedures for the Adjudication of the Claims of William and Keiran Walker, Freddie Scott, Ron Bejaraon, and Paul and Marge Pfunder in Connection with the Debtors' Twenty-Second, Twenty-Seventh, and Thirteenth Omnibus Objections to Claims [Docket No. 5390].

in another forum), 10 (interests of judicial economy) and 11 (whether the parties are ready for trial) weigh heavily against lifting the automatic stay.

74.    None of the other <u>Sonnax</u> factors weigh in favor of lifting the stay and accordingly, the Court should deny the Motion and require the liquidation of the Claim through the claims resolution process being overseen by the Court.  The District Court Action does not involve GMACM as a fiduciary (<u>Sonnax</u> Factor 3) and no specialized tribunal is required to resolve the ordinary state law causes of action raised in Mr. Dlin's complaint (<u>Sonnax</u> Factor 4).

75.    Additionally, <u>Sonnax</u> Factor 12 does not weigh in favor of lifting the automatic stay.  Mr. Dlin will experience little, if any, harm from not having his counterclaim resolved in the District Court action at this juncture.  The Borrower Trust is presently working to resolve the Claim through the claims resolution process, and as a result it is difficult to understand how Mr. Dlin will be harmed by having the Claim liquidated through this process rather than in the more expensive and time consuming District Court action.  The resolution of the Claim in the District Court will, in all likelihood, take longer than resolving the Claim in this Court, and therefore will actually delay, rather than expedite, any distribution to Mr. Dlin on account of the Claim.

## **CONCLUSION**

76.    WHEREFORE, the Trusts respectfully submit that the relief requested in the Objection should be granted in its entirety and that the Motion should be denied.

ny-1182129

Dated:  April 13, 2015
        New York, New York

/s/ Norman S. Rosenbaum
Norman S. Rosenbaum
Jordan A. Wishnew
Jessica J. Arett
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the ResCap Borrower Claims Trust*

23