**Exhibit 1**

**Supplemental Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DECLARATION OF KATHY PRIORE IN SUPPORT OF THE RESCAP BORROWER CLAIMS TRUST'S REPLY IN SUPPORT OF ITS EIGHTY-SECOND OMNIBUS OBJECTION TO CLAIMS (NO-LIABILITY BORROWER CLAIMS) AS TO CLAIM NO. 3732 FILED BY KENNETH DLIN AND RESCAP LIQUIDATING TRUST'S OBJECTION TO KENNETH DLIN'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C § 362**

I, Kathy Priore, hereby declare as follows:

1. I serve as Associate Counsel for the ResCap Liquidating Trust (the "Liquidating Trust"), established pursuant to the terms of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6030] confirmed in the above-captioned Chapter 11 Cases. During the Chapter 11 Cases, I served as Associate Counsel in the legal department of Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases (collectively, the "Debtors"). I joined ResCap on May 1, 2008 as in-house litigation counsel. Prior to my in-house litigation counsel position, I held various roles within the legal department at ResCap.

2. In my role as Associate Counsel at ResCap, I was responsible for the management of litigation, including, among others, residential mortgage-related litigation. In connection with ResCap's chapter 11 filing, I also assisted the Debtors and their professional advisors in connection with the administration of the chapter 11 cases, including the borrower

1

ny-1183409

litigation matters pending before this Court. In my current position as Associate Counsel to the Liquidating Trust, among my other duties, I continue to assist the Liquidating Trust and the Borrower Claims Trust (the "Borrower Trust") in connection with the claims reconciliation process.[1] I am authorized to submit this declaration (the "Declaration") in support of the *Rescap Borrower Claims Trust's Reply In Support of Its Eighty-Second Omnibus Objection to Claims (No-Liability Borrower Claims) As To Claim No. 3732 Filed by Kenneth Dlin and ResCap Liquidating Trust's Objection to Kenneth Dlin's Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362* (the "Reply").[2]

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations, information learned from my review of relevant documents and information I have received through my discussions with other former members of the Debtors' management or other former employees of the Debtors, the Liquidating Trust, and the Borrower Trust's professionals and consultants. If I were called upon to testify, I could and would testify competently to the facts set forth in the Objection on that basis.

4. In my current and former capacities as Associate Counsel to the Liquidating Trust and ResCap, I am intimately familiar with the Debtors' claims reconciliation process. Except as otherwise indicated, all statements in this Declaration are based upon my familiarity with the Debtors' Books and Records (the "Books and Records"), as well as the Debtors' schedules of assets and liabilities and statements of financial affairs filed in these Chapter 11 Cases (collectively, the "Schedules"), my review and reconciliation of claims, and/or

---

[1] The ResCap Liquidating Trust and the ResCap Borrower Claims Trust are parties to an Access and Cooperation Agreement, dated as December 17, 2013, which, among other things, provides the Borrower Trust with access to the books and records held by the Liquidating Trust and Liquidating Trust's personnel to assist the Borrower Trust in performing its obligations.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Reply.

2

my review of relevant documents. I or other Liquidating Trust personnel have reviewed and analyzed the proof of claim form and supporting documentation filed by the Claimant. Since the Plan went effective and the Borrower Trust was established, I, along with other members of the Liquidating Trust have consulted with the Borrower Trust to continue the claims reconciliation process, analyze claims, and determine the appropriate treatment of the same. In connection with such review and analysis, where applicable, I or other Liquidating Trust personnel, together with professional advisors, have reviewed (i) information supplied or verified by former personnel in departments within the Debtors' various business units, (ii) the Books and Records, (iii) the Schedules, (iv) other filed proofs of claim, and/or (vi) the official claims register maintained in the Debtors' Chapter 11 Cases.

5. In connection with the claims reconciliation process, the Borrower Trust identified certain claims filed by Borrowers that are not liabilities of the Debtors (together, the "No Liability Borrower Claims").

6. The Debtors sent Request Letters to certain Borrowers, including Mr. Dlin, requesting additional documentation in support of the No Liability Borrower Claims. The Request Letters state that the claimant must respond within 30 days with an explanation that states the legal and factual reasons why the claimant believes he is owed money or is entitled to other relief from the Debtors, and the claimant must provide copies of any and all documentation that the claimant believes supports the basis for his claim. The Request Letters further state that if the claimant does not provide the requested explanation and supporting documentation within 30 days, the Debtors may file a formal objection to the claimant's claim, seeking to have the claim disallowed and permanently expunged.

ny-1183409

7. The Debtors received a response to the Request Letter from the Mr. Dlin on July 22, 2013 (the "Diligence Response"), attached hereto as Exhibit A. However, the Diligence Response fails to allege bases for valid claims against the Debtors' estates. Further, as stated in the Objection, the Books and Records do not show any liability due and owing to the Respondents.

8. On or around November 8, 2012, Mr. Dlin filed a proof of claim against Debtor GMAC Mortgage, LLC ("GMACM"), designated as Claim No. 3732 (the "Claim"), asserting a general unsecured claim for $971,770.00. See Exhibit B attached hereto.

9. According to the Books and Records, non-Debtor Greenpoint Mortgage Funding Inc. ("Greenpoint") originated a first lien loan in the amount of $633,000.00 to Mr. Dlin on February 20, 2004 (the "Loan"), secured by a mortgage on property located at 3431 Welch Ave., Kittredge, CO 80457 (the "Property"). See Note, attached hereto as Exhibit C, and Deed of Trust, attached hereto as Exhibit D.

10. On November 19, 2008, the Mr. Dlin spoke with an associate of the Debtors via phone. See Dlin Servicing Notes, attached hereto as Exhibit E, p. 56. At the time, Mr. Dlin stated that he would like to know about a loan modification. See id. The Debtors' associate advised him to call back the next month if he was still having trouble making payments. See id.

11. That same day, Mr. Dlin again spoke to a different associate of the Debtors via phone, again stating that he was interest in a loan modification. See Dlin Servicing Notes, p. 56. The Debtors' associate explained that since the account was current, Mr. Dlin can call back next month when the loan is due for a payment as there are no options since no payment is due. See id. During this call, Mr. Dlin stated that he wants a payment setup right

4

away, and was advised by the Debtors' associate that no payment arrangement could be offered at that time. See id.

12. Also on November 19, 2008, Mr. Dlin spoke to a third representative of the Debtors via the phone, at which time Mr. Dlin again stated that he was interested in payment options. See Dlin Servicing Notes, pp. 55-56. Like others before him, the Debtor associate advised Mr. Dlin that there will be no payment options available until next month. See id. At that time, Mr. Dlin requested to be transferred to a supervisor. See id.

13. Mr. Dlin spoke with a fourth representative of the Debtors on November 19, 2008 via phone and stated he would like a loan modification. See Dlin Servicing Notes, p. 55. Once again, Mr. Dlin was advised that a loan modification is a default option and the account is currently not in default and thus a modification is not available. See id.

14. Mr. Dlin spoke with a fifth representative of the Debtors on November 19, 2008 via phone. See Dlin Servicing Notes, p. 55. During that call, the Debtors' representative advised Mr. Dlin that his account is current and that he should call back once the account is due as there were no payment options available at that time. See id.

15. Mr. Dlin spoke with a sixth representative of the Debtors on November 19, 2008 via phone, also to request a loan modification. See Dlin Servicing Notes, p. 55. Like his/her colleagues, the Debtors' associate advised that a loan modification option is not available until the account is due for two months or more, and that if the Debtors referred his account for loan modification review, it would be denied because the account was current. See id.

16. Mr. Dlin spoke to a seventh representative of the Debtors on November 19, 2008 via phone. See Dlin Servicing Notes, pp. 54-55. During that conversation, the Debtors advised Mr. Dlin that his account is current and that there is nothing to offer him at that time.

5

ny-1183409

See id. When the Debtors' representative offered to transfer him to direct lending he stated that a refinance is not going to happen. See id.

17. Mr. Dlin spoke to an eighth representative of the Debtors on November 19, 2008 via phone, at which time Mr. Dlin restated his desire for a loan modification. See Dlin Servicing Notes, p. 54. During the call, the Debtors' associate advised Mr. Dlin that his account was current and that he could call back when his account was thirty days or more late if he wanted a repayment plan. The representative also noted that if Mr. Dlin was late, he would be charged a late fee and his credit could be affected. The representative told him to call the Hope for Homeowners program and gave him the phone number. See id.

18. Mr. Dlin did not make his December 2008 payment. See Dlin Servicing Notes. On January 6, 2009, the Debtors spoke to Mr. Dlin via phone, and advised Mr. Dlin that a loan modification was not available at that time. See Dlin Servicing Notes, p. 53. The Debtors advised him that new modification options may be available in February for which Mr. Dlin could be considered. See id.

19. On January 30, 2009, the Debtors spoke to Mr. Dlin over the phone, at which time the Debtors took Mr. Dlin's financial information and referred his account to loan modification review. See Dlin Servicing Notes, p. 51. On February 4, 2009, Mr. Dlin's account was denied for a loan modification because, based on the information he provided, he did not have sufficient income. See id. p. 50.

20. On February 17, 2009, the Debtors spoke with Mr. Dlin via phone, at which time Mr. Dlin stated that the financial information he had previously provided was incorrect, and he provided the Debtors with updated financial information. See Dlin Servicing

6

ny-1183409

Notes, p. 49. With this information, the Debtors again referred Mr. Dlin's account for modification review. See id.

21. On February 27, 2009, the Debtors approved Mr. Dlin's account for a traditional loan modification. See Dlin Servicing Notes, pp. 47-48. The terms included a payment contribution of $3,483.46 due on March 15, 2009 and a monthly principal and interest payment of $3,138.56. See id. The modification capitalized $13,324.29 in past due interest to the principal balance, reduced the interest rate from 5.375% to 3.2% and brought the account current for the past due payments of December 2008 through April 2009. See id. Mr. Dlin's monthly principal and interest payment prior to the modification was $2,834.51. See id. The monthly payment increased because, prior to the modification, Mr. Dlin had an interest only loan, and at the time of the modification, the Debtors were not able to offer interest only loan modifications under the investor guidelines. See id.

22. The Debtors spoke with the Claimant on March 9, 2009 via phone, at which time Mr. Dlin questioned why the proposed monthly payment increased, and the Debtors explained the terms of the modification and that there were no modification options available that would lower the monthly payment. See Dlin Servicing Notes, p. 46.

23. The Debtors again spoke to Mr. Dlin on March 19, 2009, at which time Mr. Dlin stated that the modification offer does not help him, and the Debtors explained that Mr. Dlin could either accept the proposed modification or pay the delinquent balance on the loan. See Dlin Servicing Notes, p. 45.

24. The Debtors received the first payment under the modification plan on March 27, 2009 and the signed traditional modification documents on March 20, 2009. See Modification Agreement, attached hereto as Exhibit F; see also Dlin Servicing Notes, pp. 44-45.

7

ny-1183409

25. On November 16, 2009, the Debtors were contacted by Mr. Dlin's real estate agent, Norma Loyd ("Ms. Loyd"), who advised the Debtors that Mr. Dlin was interested in a short sale. See Dlin Servicing Notes, p. 41.

26. On November 17, 2009, the Debtors began the short sale process by ordering an internal broker price option (BPO) on the Property. See Dlin Servicing Notes, p. 40. On November 24, 2009, the Debtors received the results of the BPO, which valued the property at $580,000.00. See November 2009 BPO, attached hereto as Exhibit G.

27. On December 2, 2009, the Debtors mailed a breach letter to Mr. Dlin. See December 2 Breach Letter, attached hereto as Exhibit H. On January 6, 2010, the Debtors referred Mr. Dlin's account to foreclosure as it was owing for the October 1, 2009 payment. See Dlin Servicing Notes, p. 39.

28. It was not the Debtors' practice to place a foreclosure on hold during a short sale review.

29. On January 13, 2010, the Debtors commenced a foreclosure action against the Property by filing a Notice of Election and Demand for Sale with the Jefferson County Public Trustee, a copy of which is attached hereto as Exhibit I.

30. On January 29, 2010, the Debtors spoke with Ms. Loyd via phone, at which time she informed the Debtors that the listing price for the Property had been dropped to around $500,000. See Dlin Servicing Notes, p. 56.

31. On or around February 8, 2010, the Debtors received a short sale offer for $400,000, which would have provided the loan investor with net proceeds of $331,441.70. See

February 8 Short Sale Package, attached hereto as <u>Exhibit J</u>.[3]  The offer was not approved because the investor of the Dlin Loan required short sale offers to net at least 85% of the market value of the property, as determined by a BPO.  <u>See</u> Dlin Servicing Notes, p. 36

32.  On February 23, 2010, the Debtors spoke with Ms. Loyd via telephone and informed her that the investor did not approve the short sale offer because the investor required the offer to net the investor at least 85% of fair market value.  <u>See</u> Dlin Servicing Notes at p. 36.  Ms. Loyd discussed possibly lowering the listing price by $50,000 and the Debtors advised her that the investor would not accept such an offer because it required offers to net at least 85% of the market value of the property.  <u>See</u> Dlin Servicing Notes, p. 36.

33.  On March 26, 2010, the Debtors received the results of a new BPO conducted on the property which valued the Property at $500,000.  <u>See</u> March 16 BPO, attached hereto as <u>Exhibit K</u>.

34.  Also on March 26, 2010, the Debtors filed a Verified Motion for Order Authorizing Sale (the "<u>Rule 120 Motion</u>") in the District Court of Jefferson County (the "<u>District Court</u>") pursuant to C.R.C.P. 120.  <u>See</u> Rule 120 Motion, attached hereto as <u>Exhibit L</u>.

35.  On April 5, 2010, the Debtors received a short sale offer for $450,000 (the "<u>April Offer</u>"), which would have provided the investor with a net of $380,632.44.[4]  <u>See</u> April 5 Short Sale Package, attached to the Priore Declaration as <u>Exhibit M</u>.  The Debtors responded that the investor would not accept the offer because it was not at least 85% of the fair market value of the property.  <u>See</u> Dlin Servicing Notes, pp. 34-35.

---

[3] The net proceeds would have been the proceeds available from the sale after certain deductions, including the allocation to the second lien holder, taxes, commissions to the realtor, fees for appraisal, and fees to the title company.

[4] The amount projected to be received by the investor was calculated based on the closing costs for the sale, as well as the amount that would be required to be paid to the holder of the second lien on the Dlin Loan, Bank of America. Bank of America's approval was required in order for a short sale to be completed.

9

ny-1183409

36. On April 12, 2010, Mr. Dlin filed a response to the Rule 120 Motion in which he challenged GMACM's standing to foreclose. See Dlin Response to Rule 120 Motion, attached hereto as Exhibit N.

37. On May 24, 2010, Mr. Dlin filed an amended response to the Rule 120 Motion in which he again challenged GMACM's standing to foreclose. See Dlin Amended Response to Rule 120 Motion, attached hereto as Exhibit O.

38. On May 25, 2010, the Debtors received another offer in the amount of $450,000 (the "May Offer"), which would net the investor $374,473.24.[5] See May 25, 2010 Offer HUD-1 Statement, attached hereto as Exhibit P.

39. On May 27, 2010, the foreclosure sale was postponed to June 16, 2010 to allow additional time for a possible short sale offer that would be accepted by the investor. See Dlin Servicing Notes p. 28.

40. On May 27, 2010, a hearing was held in the District Court pursuant to Colorado Rule of Civil Procedure 120. See Rule 120 Proceeding Docket, attached hereto as Exhibit Q. At the hearing, the District Court granted an Order Authorizing Sale, finding that the Debtors were the holder of the Note and Deed of Trust, and that Mr. Dlin was in default on his obligation thereunder. See Rule 120 Order, attached hereto as Exhibit R.

41. On June 13, 2010, Ms. Loyd presented an offer of $525,000 to the Debtors. See June 13 Email, attached hereto as Exhibit S. The Debtors submitted the updated offer for investor approval on June 24, 2010. See Dlin Servicing Notes p. 22.

---

[5] This amount is lower than the net amount that was calculated for the April Offer because at the time the May Offer was received the county taxes due on the property had increased and the amount allocated to Bank of America as the second lien holder increased from $36,000 to $39,000.

10

ny-1183409

42. On June 14, 2010, the foreclosure sale was postponed until July 14, 2010, and on July 6, 2010 the foreclosure sale was again postponed to July 28, 2010. See Dlin Servicing Notes pp. 21-22.

43. On July 7, 2010, the Debtors emailed Ms. Loyd to ask if Bank of America, the holder of the second lien on the property (the "Second Lien Holder"), had approved the short sale, and advised that the investor would not consider the offer unless the Second Lien Holder approved. See Dlin Servicing Notes, pp. 20-21.[6] The Debtors followed up on July 9, 2010 through email, at which time the Debtors informed Ms. Loyd that the sale is scheduled for July 28, 2010. See id.

44. On July 20, 2010 the Debtors contacted Ms. Loyd through email, advising Ms. Loyd that the investor of the Dlin Loan would not postpone the sale without getting approval from the Second Lien Holder. See Dlin Servicing Notes, pp. 18-19.

45. Where a short sale required the approval of a non-Debtor entity as the holder of a second lien, it was the responsibility of the borrower or the borrower's agent to get the approval of said second lien holder.

46. On July 27, 2010, the Debtors received an email from Ms. Loyd in which she informed the Debtors she was still waiting for authorization from the Second Lien Holder. See July 27, 2010 Email, attached hereto as Exhibit T. Ms. Loyd acknowledged that the foreclosure sale was set for the next day. See id.

47. On July 28, 2010, a foreclosure sale was conducted as approval was not received from the Second Lien Holder. See Dlin Servicing Notes, p. 16. The Debtors were the successful bidder of the Property for $477,000.

---

[6] Emails sent by the Debtors to real estate agents were recorded in the Debtors' servicing notes through a system called Equator.

11

ny-1183409

48. On June 1, 2011, the Debtors initiated an eviction action against Mr. Dlin in the County Court of Jefferson County Colorado, case number 2011C48857 (the "Eviction Action"). See Eviction Action Docket, attached hereto as Exhibit U. On June 28, 2011, the Debtors filed an answer to Mr. Dlin's counterclaims. See District Court Docket, attached hereto as Exhibit V.

49. On information and belief, between August and December, 2011, the Debtors and Mr. Dlin exchanged written discovery and Mr. Dlin inspected the collateral file, including the original Note.

50. On information and belief, Ocwen has taken over on the Eviction Action, and a trial as to solely that action has been set for May 18, 2015.

51. Should the District Court action proceed, completing briefing and, if necessary, further discovery on the counterclaims would take a significant amount of time, with additional time required for potential mediation, and dispositive motions followed by a trial (each as necessary). After the notice of bankruptcy was filed, the Debtors' counsel ceased practicing law, and as a result, if this matter proceeded in the District Court, the Trusts would be forced to hire new counsel entirely unfamiliar with the case.

52. Over the past two years, the Debtors and Plan Trusts have been working tirelessly to expeditiously resolve all proofs of claim filed against the Debtors' chapter 11 estates. In just over two years since this Court approved claims resolution procedures, the Plan Trusts estimate that they (and the Debtors) have collectively resolved (or addressed) in excess of 2,697 of 3,039 Borrower Claims. In many instances, the Debtors or Plan Trusts have been able to resolve claims consensually. In other cases where consensual resolution was not possible, the

claims resolution process has provided an appropriate forum for the expeditious exchange of informal discovery and an expeditious resolution of the disputes between the parties.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 13, 2015

/s/ Kathy Priore
Kathy Priore
Associate Counsel for ResCap Liquidating Trust