**<u>Exhibit B</u>**

Claim #3732  Date Filed: 11/8/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

**Name of Debtor:** GMAC MORTGAGE LLC    **Case Number:** 12-12032 (MG)

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

**Name of Creditor** (the person or other entity to whom the debtor owes money or property):
Brian H. Wilson

**Name and address where notices should be sent:**    NameID: 10853654
Brian H. Wilson
KENNETH DLIN VS GMAC MORTGAGE LLC
43 Bulldigger Court
Bailey, CO 80421

Telephone number:    email:

**Name and address where payment should be sent (if different from above):**

Telephone number:    email:

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
(If known)

Filed on:_____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ 971,770.00
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** BREACH OF CONTRACT
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:** 7670

**3a. Debtor may have scheduled account as:**
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):**
(See instruction #3b)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe:
**Value of Property:** $_____  Annual Interest Rate_____% ☐ Fixed ☐ Variable
(when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $_____    Basis for perfection: _____

**Amount of Secured Claim:** $_____    **Amount Unsecured:** $_____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____    (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature: (See instruction #9)** Check the appropriate box.
☐ I am the creditor.  ☑ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor, or their authorized agent.  ☐ I am a guarantor, surety, indorser, or other codebtor.
(Attach copy of power of attorney, if any.)  (See Bankruptcy Rule 3004.)  (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: BRIAN HERBERT WILSON JR.
Title: ATTORNEY
Company: WILSON LAW OFFICE P.C. (Signature)    (Date) 5 NOV 12
Address and telephone number (if different from notice address above):
43 Bulldigger Ct.
Bailey, CO 80421
Telephone number: 303 816 9493    Email: bwilson@law.da.edu

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

* Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**RECEIVED**
NOV 0 8 2012
KURTZMAN CARSON CONSULTANTS
COURT USE ONLY

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

001KC0002 51765-1 domestic 17/025324/151940    121202012083017353105552 21

2010738737   08/27/2010 12:52:37 PM
PGS   2    $16.00   DF $0
Electronically Recorded Jefferson County CO
Pam Anderson, Clerk and Recorder    TD1000 N

# CONFIRMATION DEED
## (CRS §38-38-502)
## Public Trustee's Foreclosure Sale No. J1000226

THIS DEED is made August 27, 2010 between Margaret T. Chapman as the Public Trustee in and for the County of Jefferson, State of Colorado, grantor and GMAC MORTGAGE, LLC, grantee, the holder of the certificate of purchase whose legal address is 1100 Virginia Drive, Fort Washington, PA 19034.

WHEREAS, the Grantor(s) described below did convey to the public trustee, in trust, the property hereinafter described to secure the payment of the indebtness provided in said deed of trust:

| | |
|---|---|
| Original Grantor(s) | Kenneth Dlin |
| Original Beneficiary(ies) | Mortgage Electronic Registration Systems, Inc., as nominee for GreenPoint Mortgage Funding, Inc. |
| Current Holder of Evidence of Debt | GMAC MORTGAGE, LLC |
| Date of Deed of Trust | February 20, 2004 |
| County of Recording | Jefferson |
| Recording Date of Deed of Trust | March 01, 2004 |
| Recording Information (Reception and/or Book & Page) | F1973637*** |

WHEREAS, a violation was made in certain of the terms and covenants of said deed of trust as shown by the notice of election and demand for sale filed with the Public Trustee; the said property was advertised for public sale at the place and in the manner provided by law and by said deed of trust; combined notice of sale and right to cure and redeem was given as required by law; said property was sold according to said combined notice; and a certificate of purchase thereof was made and recorded in the office of said county Clerk and Recorder; and

WHEREAS, all periods of redemption have expired.

NOW, THEREFORE, the Public Trustee, pursuant to the power and authority vested by law and by the said deed of trust, confirms the foreclosure sale and sells and conveys to grantee the following described property located in the County of Jefferson, State of Colorado, to wit:

SEE EXHIBIT A ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE

***LOAN MODIFICATION AGREEMENT SIGNED BY KENNETH DLIN ON MARCH 20, 2009.

Also known by street and number as: 3431 Welch Avenue, Kittredge, CO 80457

To have and to hold the same, with all appurtenances, forever.

Executed on: August 27, 2010

Margaret T. Chapman, Public Trustee in and for the County of Jefferson, State of Colorado

By: Desiree Peterson, Deputy, for Public Trustee

When Recorded Return to:  Jefferson County Public Trustee

© Colorado Public Trustees' Association Revised 12/2009

EXHIBIT 2

CLERK AND RECORDER OF JEFFERSON COUNTY CERTIFIED TO BE FULL TRUE AND CORRECT COPY OF THE ORIGINAL DOCUMENT IN MY CUSTODY. DATE 9-14-2011
PAM ANDERSON, JEFFERSON COUNTY CLERK AND RECORDER    DEPUTY CLERK
BY:

GMAC ~ 58

J1000226

# EXHIBIT A

ALL THAT PART LOTS 33 AND 34 LYING SOUTH OF THE CENTER OF THE CHANNEL OF BEAR CREEK;
THE N 1/2 OF LOT 47; ALL OF LOT 48, THAT PART OF LOT 599 LYING WEST OF WELCH AVENUE; ALL
OF LOT 49; THE WEST 35 FEET OF LOT 650, KITTREDGE, ACCORDING TO THE AMENDED MAP
THEREOF, RECORDED IN PLAT BOOK 3 AT PAGE 39, COUNTY OF JEFFERSON, STATE OF COLORADO.



**GRANTED** The moving party is hereby ORDERED to provide a copy of this Order to any pro se parties who have entered an appearance in this action within 10 days from the date of this order.



**Jane Tidball**
**Jefferson District Court Judge**
CERTIFIED DEGREE INDICATED ON ATTACHMENT
CO Jefferson County District Court 1st JD
Filing Date: Aug 23 2010 10:44AM MDT
Filing ID: 32805631
Review Clerk: Matt J Forbes

| | |
|---|---|
| DISTRICT COURT, JEFFERSON COUNTY, COLORADO<br>Court Address: 100 Jefferson County Pkwy.<br>                Golden, CO 80401 | |
| IN THE MATTER OF THE MOTION OF GMAC MORTGAGE, LLC FOR AN ORDER AUTHORIZING THE PUBLIC TRUSTEE TO SELL CERTAIN REAL ESTATE UNDER A POWER OF SALE CONTAINED WITHIN A DEED OF TRUST | ▲COURT USE ONLY▲<br>Case Number: 2010CV1486<br><br><br>Division: |

## ORDER APPROVING SALE

THE COURT, having considered the Return of Sale, the Court's file herein and being otherwise fully advised in the premises, hereby,

ORDERS that the said Return of Sale is approved.  The Court neither approves nor disapproves the deficiency, if any.

DONE this _____ day of _____, _____

BY THE COURT:

_____

DISTRICT COURT JUDGE/MAGISTRATE

Dlin / 10-00427

GMAC Disclosures 32

GMAC ~ 60

This document constitutes a ruling of the court and should be treated as such.

|  |  |
|---|---|
| **Court:** | CO Jefferson County District Court 1st JD |
| **Judge:** | Jane A Tidball |
| **Alternate Judge:** | Unassigned |
| **File & Serve Transaction ID:** | 32759208 |
| **Current Date:** | Aug 23, 2010 |
| **Case Number:** | 2010CV1486 |
| **Case Name:** | GMAC MORTGAGE LLC vs. DLIN, KENNETH |
| **Court Authorizer:** | Jane A Tidball |

/s/ Judge Jane A Tidball

2010006250? 07/30/2010 08:55:17 AM
PGS  W  $51.00  DF $0
Electronically Recorded Jefferson County CO
Pam Anderson, Clerk and Recorder    TD1000 N

## PUBLIC TRUSTEE'S CERTIFICATE OF PURCHASE
### (CRS §38-38-401)
### Public Trustee Foreclosure Sale No. J1000226

I, the undersigned Public Trustee, certify that pursuant to the power and authority vested in me by law and by the Deed of Trust described as follows:

| | |
|---|---|
| Original Grantor(s) | Kenneth Dlin |
| Original Beneficiary(ies) | Mortgage Electronic Registration Systems, Inc., as nominee for GreenPoint Mortgage Funding, Inc. |
| Current Holder of Evidence of Debt | GMAC MORTGAGE, LLC |
| Date of Deed of Trust | February 20, 2004 |
| County of Recording | Jefferson |
| Recording Date of Deed of Trust | March 01, 2004 |
| Reception No. and/or Book No. and Page No. | F1973637*** |
| Original Principal Amount | $ 633,000.00 |

AND, upon Notice of Election and Demand being filed with me and recorded in said County as follows:

| | |
|---|---|
| Recording Date of Notice of Election and Demand | January 28, 2010 |
| Recording Reception No. | 2010008516 |

Pursuant to §38-38-103, I first mailed a Combined Notice to the original grantor(s) of said Deed of Trust and to any persons required to be notified by CRS §38-38-100.3, §38-38-103, and §38-38-305. I further published the Combined Notice, in Canyon Courier, a newspaper of general circulation in said Jefferson County as prescribed by law.

AND, on July 28, 2010 at 10:00 A.M., at the Office of the Public Trustee, 100 Jefferson County Parkway, Suite 1540 Golden, CO 80419, I exposed to public sale the property situate in the aforesaid Jefferson County, State of Colorado, described as follows:

SEE EXHIBIT A ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE

***LOAN MODIFICATION AGREEMENT SIGNED BY KENNETH DLIN ON MARCH 20, 2009.
Also known by street and number as: 3431 Welch Avenue, Kittredge, CO 80457

At said sale, GMAC MORTGAGE, LLC, hereinafter "Purchaser", whose legal address is 1100 Virginia Drive, Fort Washington, PA 19034, bid the sum of $477,000.00 for said property. Being the highest and best bid received therefor, the said property was struck off and sold to the said Purchaser. Unless a redemption is made, the said Purchaser or assignee of the Certificate of Purchase shall be entitled to a confirmation deed for said property at the end of all redemption periods allowed by law to all subsequent lienors, and other persons entitled to redeem.

The bid submitted by the holder of the evidence of debt was a deficiency bid.
The amount of the deficiency as a result of the successful bid at sale is $191,743.68.

A copy of the executed Order Authorizing Sale and the Mailing List(s) submitted to the Public Trustee for this foreclosure are attached to and made a part of this Certificate of Purchase.

The public trustee shall retain the recorded certificate of purchase in the public trustee's records.

Executed on July 28, 2010    Public Trustee in and for the County of Jefferson, State of Colorado

*Margaret T. Chapman*

By: Margaret T Chapman Public Trustee

When Recorded Return to: Jefferson County Public Trustee

© Colorado Public Trustees' Association Revised 12/2009

EXHIBIT 1

CLERK AND RECORDER OF JEFFERSON COUNTY CERTIFIED TO BE FULL TRUE AND CORRECT COPY OF THE ORIGINAL DOCUMENT IN MY CUSTODY. DATE 9-14-2011
PAM ANDERSON, JEFFERSON COUNTY CLERK AND RECORDER    DEPUTY CLERK
BY

GMAC ~ 62

J1000226

# EXHIBIT A

ALL THAT PART LOTS 33 AND 34 LYING SOUTH OF THE CENTER OF THE CHANNEL OF BEAR CREEK;
THE N 1/2 OF LOT 47; ALL OF LOT 48, THAT PART OF LOT 599 LYING WEST OF WELCH AVENUE; ALL
OF LOT 49; THE WEST 35 FEET OF LOT 650, KITTREDGE, ACCORDING TO THE AMENDED MAP
THEREOF, RECORDED IN PLAT BOOK 3 AT PAGE 39, COUNTY OF JEFFERSON, STATE OF COLORADO.

GRANTED   The matter herein is hereby ORDERED
Page 9 of 77   to provide a copy of this Order to any pro
se parties who have entered an
appearance in this action within 10 days
from the date of this order.

Jane Tidball
Jefferson District Court Judge
EFFORTS BEING INDICATED ON ATTACHMENT
CO Jefferson County District Court 1st JD
Filing Date: May 27 2010 10:13AM MDT
Filing ID: 31342396
Review of the Issue, York

DISTRICT COURT, JEFFERSON COUNTY,
COLORADO
Court Address: 100 Jefferson County Pkwy.
Golden, CO 80401

IN THE MATTER OF THE MOTION OF GMAC
MORTGAGE, LLC FOR AN ORDER AUTHORIZING
THE PUBLIC TRUSTEE TO SELL CERTAIN REAL
ESTATE UNDER A POWER OF SALE CONTAINED
WITHIN A DEED OF TRUST

▲ COURT USE ONLY ▲

Case Number:

Division:

ORDER AUTHORIZING SALE

THE REVIEW AND HEARING IN THIS MATTER having been completed by the
Court on April 15, 2010:

WHEREAS, Kenneth Dlin, Grantor(s) by Deed of Trust dated February 20, 2004,
recorded March 1, 2004 at Reception No. F1973637*** in the records of the County of
Jefferson, Colorado, to secure to Mortgage Electronic Registration Systems, Inc., as nominee for
GreenPoint Mortgage Funding, Inc. the payment of a Promissory Note of even date therewith for
the principal sum of $633,000.00 as provided in said Deed of Trust, conveyed to the Jefferson
County Public Trustee, on the terms set forth in said Note and Deed of Trust, the following
described real property ("Property") situate in said County to-wit:

**SEE EXHIBIT A ATTACHED HERETO AND INCORPORATED HEREIN BY
REFERENCE**
**\*\*\*LOAN MODIFICATION AGREEMENT SIGNED BY KENNETH DLIN ON MARCH
20, 2009.**
**WHICH HAS THE ADDRESS OF 3431 Welch Avenue Kittredge, CO 80457**

THE COURT FINDS that there is reasonable probability that: a default exists as alleged
in the Motion in order to invoke the power of sale in said Deed of Trust; that the provisions of
C.R.C.P. Rule 120 and the Servicemembers Civil Relief Act, as amended, have been complied
with; that the venue in this action is proper; and that the order authorizing sale should be granted.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that a sale of the
Property by the Public Trustee in the above said County in the State of Colorado, under a power
of sale, pursuant to statute and the provisions of that certain Deed of Trust described above, be
and the same hereby is authorized by this Court.
It is further ordered that a return of such sale shall be made to this Court for its approval.

J1000226

GMAC ~ 64

DONE this Fifteenth day of April, 2010

BY THE COURT:

_____

Judge/Magistrate

Dlin / 10-00427

J1000226

GMAC ~ 65

# EXHIBIT A

ALL THAT PART LOTS 33 AND 34 LYING SOUTH OF THE CENTER OF THE CHANNEL OF BEAR CREEK;
THE N 1/2 OF LOT 47; ALL OF LOT 48, THAT PART OF LOT 599 LYING WEST OF WELCH AVENUE; ALL
OF LOT 49; THE WEST 35 FEET OF LOT 650, KITTREDGE, ACCORDING TO THE AMENDED MAP
THEREOF, RECORDED IN PLAT BOOK 3 AT PAGE 36, COUNTY OF JEFFERSON, STATE OF COLORADO.

J1000226

GMAC ~ 66

This document constitutes a ruling of the court and should be treated as such.

|  |  |
|---|---|
| **Court:** | CO Jefferson County District Court 1st JD |
| **Judge:** | Jane A Tidball |
| **Alternate Judge:** | Unassigned |
| **File & Serve Transaction ID:** | 30279869 |
| **Current Date:** | May 27, 2010 |
| **Case Number:** | 2010CV1486 |
| **Case Name:** | GMAC MORTGAGE LLC vs. DLIN, KENNETH |
| **Court Authorizer:** | Jane A Tidball |

/s/ Judge Jane A Tidball

J1000226

GMAC ~ 67

**J1000226**                              MAILING LIST

10-00427

GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA  19034

Margaret T. Chapman
Public Trustee of Jefferson County
100 Jefferson County Parkway
Golden, CO  80419

Castle Meinhold & Stawiarski, LLC
999 18th Street, Suite 2201
Denver, CO  80202

Owner
3431 Welch Avenue
Kittredge, CO  80457

Occupant
3431 Welch Avenue
Kittredge, CO  80457

Lessee
3431 Welch Avenue
Kittredge, CO  80457

Kenneth  Dlin
3431 Welch
Kittredge, CO  80457

Kenneth  Dlin
PO Box 601
Kittredge, CO  80457

Kenneth  Dlin
3431 Welch Avenue
Kittredge, CO  80457

In the event you do not receive a separate Amended Mailing List from our office at least 60 days prior to the first
scheduled sale date, you are instructed to mail a Combined Notice as described in C.R.S. 38-38-103 (4) to the
persons set forth in the Mailing List as defined by C.R.S. 38-38-100.3 (14).

1st AMENDED MAILING LIST

10-00427
J1000226

GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA 19034

Margaret T. Chapman
Public Trustee of Jefferson County
100 Jefferson County Parkway
Golden, CO 80419

Castle Meinhold & Stawiarski, LLC
999 18th Street, Suite 2201
Denver, CO 80202

Owner
3431 Welch Avenue
Kittredge, CO 80457

Occupant
3431 Welch Avenue
Kittredge, CO 80457

Lessee
3431 Welch Avenue
Kittredge, CO 80457

Kenneth Dlia
3431 Welch Avenue
Kittredge, CO 80457

Kenneth Dlin
PO Box 601
Kittredge, CO 80457

Kenneth Dlia
3431 Welch
Kittredge, CO 80457

Mortgage Electronic Registration Systems, Inc., as nominee for
Countrywide Home Loans, Inc.
P.O. Box 2026
Flint, MI 48501-2026

Countrywide Home Loans, Inc.
Attn: MS SV-79 Document Processing
P.O. Box 10423
Van Nuys, CA 91410-0423

Countrywide Home Loans, Inc.
4500 Park Granada
Calabasas, CA 91302-1613

Countrywide Home Loans, Inc.
Attn: John Tamert
5401 N Beach St, FWBS-164 (SLRM)
Fort Worth, TX 76137

Countrywide Home Loans, Inc.
c/o Mortgage Electronic Registration Systems, Inc
P.O Box 2026
Flint, MI 48501-2026

Mortgage Electronic Registration Systems, Inc
P.O Box 2026
Flint, MI 48501-2026

Mountain States Telephone & Telegraph Company
931 14th Street
Denver, CO 80202

GMAC ~ 69

10-80427
J1000226

Mountain States Telephone & Telegraph Company
1801 California Street ste 5100
Denver, CO 80202

Mountain States Telephone & Telegraph Company
c/o David B Hahn
P.O Box 218
Kittredge, CO 80457

Mountain States Telephone & Telegraph Company
c/o Document Control Center
P.O Box 1976 Room 1130
Denver, CO 80202

Page 2 of 2

STATEMENT BY ATTORNEY FOR QUALIFIED HOLDER PURSUANT TO 38-38-101, C.R.S.

I, **Keith A. Gantenbein, Jr.**, of Castle Meinhold & Stawiarski, LLC as attorneys for GMAC MORTGAGE, LLC ("Qualified Holder"), provides the below Statement to the County Public Trustee of Jefferson County, Colorado, that the following is true and correct, to the best of our knowledge, following reasonable inquiry:

Check applicable boxes:

1. GMAC MORTGAGE, LLC ("Qualified Holder") is the holder of the original evidence of debt. A true and correct copy of the original evidence of debt is attached hereto.

2. GMAC MORTGAGE, LLC ("Qualified Holder") is the current beneficiary of the Deed of Trust. A true and correct copy of the recorded Deed of Trust is attached hereto.

3. GMAC MORTGAGE, LLC, is a Qualified Holder pursuant to Section 38-38-100.3(20), C.R.S. A true and correct copy(ies) of modification(s) is attached hereto.

4. GMAC MORTGAGE, LLC is a Qualified Holder pursuant to Section 38-38-100.5(20), C.R.S. A true and correct copy of the recorded partial release of the deed of trust is attached hereto.

5. GMAC MORTGAGE, LLC ("Qualified Holder") is one of the following entities described in Section 38-38-100.3 (20), C.R.S.:

  (a). A bank, as defined in section 11-101-401(5), C.R.S.;
  (b). An industrial bank, as defined in section 11-108-101(1) C.R.S.;
  (c). A federally chartered savings and loan association doing business in Colorado or a savings and loan association chartered under the "Savings and Loan Association Law", articles 40 to 46 of Title II, C.R.S.;
  (d). A supervised lender, as defined in 5-1-301(46) C.R.S., that is licensed to make supervised loans pursuant to 5-2-302 C.R.S., that is either (I) a public entity, defined as an entity that has issued voting securities that are listed on a national securities exchange registered under the Federal "Securities Exchange Act of 1934" as amended, or (II) an entity in which all of the outstanding voting securities are held, directly or indirectly, by a public entity;
  (e). An entity in which all of the outstanding voting securities are held, directly or indirectly, by a public entity also owning, directly or indirectly, all of the voting securities of a supervised lender, as defined in Section 5-1-301(46) C.R.S., that is licensed to make supervised loans pursuant to Section 5-2-302 C.R.S.;
  (f). A Federal Housing Administration approved mortgagee;
  (g). A federally chartered credit union doing business in Colorado or a state chartered credit union, as defined in Section 11-30-101 C.R.S.;
  (h). An agency of the federal government;
  (i). An entity created or sponsored by the federal or state government that originates, insures, guarantees, or purchases loans or a person acting on behalf of such an entity to enforce an evidence of debt or deed of trust securing an evidence of debt; or
  (j). Any entity listed in paragraphs (a) to (I) of this subsection (20) acting in the capacity of agent, nominee except as otherwise specified in subsection (10) of this section, or trustee for another person.

6. The Qualified Holder of the evidence of debt agrees that it is obligated to indemnify and defend any person liable for repayment of any portion of the original evidence of debt in the event that the original evidence of debt is presented for payment to the extent of any amount other than the amount of a deficiency remaining under the evidence of debt after deducting the bid amount at sale, and any person who sustains a loss due to any title defect that results from reliance upon a foreclosure sale at which the original evidence of debt was not presented, subject to the limitations set forth in 38-38-101 (2) (a)-(c), C.R.S.

GMAC MORTGAGE, LLC
QUALIFIED HOLDER/CURRENT HOLDER OF THE EVIDENCE OF DEBT

_____
Name and Title of Agent or Officer of Qualified Holder

1100 Virginia Drive
Fort Washington, PA 19034
Address of Qualified Holder

_____
Signature
Castle Meinhold & Stawiarski, LLC
Attorneys for GMAC MORTGAGE, LLC

Keith A. Gantenbein, Jr.
#39213

Grantor: Kenneth Dtin
Date of Deed of Trust:    February 20, 2004
Recording Date of Deed of Trust: March 1, 2004
Recording Information:    at Reception No. F1973637***
County: Jefferson

Dtin / 10-00427

After recording please return to:

**GreenPoint Mortgage Funding, Inc.**
*[Company Name]*


*[Name of Natural Person]*

**33 San Pablo Avenue**
*[Street Address]*

**San Rafael, CA 94903**
*[City, State  Zip Code]*

THIS DOCUMENT IS
CERTIFIED TO BE A
TRUE AND EXACT
COPY OF THE ORIGINAL

AMERICAN TITLE GROUP

———————————— *[Space Above This Line For Recording Data]* ————————————

# DEED OF TRUST

MIN: ▮▮▮▮7670

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)    "Security Instrument" means this document, which is dated **February 20, 2004**, together with all Riders to this document.

(B)    "Borrower" is Kenneth Dlin

. Borrower is the trustor under this Security Instrument.

(C)    "Lender" is GreenPoint Mortgage Funding, Inc.

Lender is a **Corporation** organized and existing under the laws of
**the State of New York.** Lender's address is **100 Wood Hollow Drive, Novato, CA 94945**

(D)    "Trustee" is the Public Trustee of **Jefferson** County, Colorado.

(E)    "MERS" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, Michigan 48501-2026, tel. (888) 679-MERS.

(F)    "Note" means the promissory note signed by Borrower and dated **February 20, 2004.**
The Note states that Borrower owes Lender **Six Hundred Thirty Three Thousand  and 00/100ths**

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                         Page 1 of 15                                   14301CO 08/00
          www.compliancesource.com                                                          © 2000, The Compliance Source, Inc.



G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

Dollars (U.S. $633,000.00)
plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **March 01, 2034.**

**(G)**    "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)**    "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)**    "**Riders**" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower *[check box as applicable]*:

☒ Adjustable Rate Rider        ☐ Condominium Rider                ☐ Second Home Rider
☐ Balloon Rider                       ☐ Planned Unit Development Rider    ☐ Biweekly Payment Rider
☐ 1-4 Family Rider                  ☐ Revocable Trust Rider
☐ Other(s) *[specify]*

**(J)**    "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)**    "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)**    "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)**    "**Escrow Items**" means those items that are described in Section 3.

**(N)**    "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)**    "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)**    "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)**    "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all



**Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                    MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                                        Page 2 of 15                                              14301CO 08/00
www.compliancesource.com                                                                                                  © 2000, The Compliance Source, Inc.

G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)**     **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as a nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS.  This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower, in consideration of the debt and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County of Jefferson**:

        *[Type of Recording Jurisdiction]*          *[Name of Recording Jurisdiction]*
**As more particularly described in exhibit "A" attached hereto and made a part hereof.**

ALL THAT PART LOTS 33 AND 34 LYING SOUTH OF THE CENTER OF THE CHANNEL OF BEAR CREEK; THE N 1/2 OF LOT 47; ALL OF LOT 48, THAT PART OF LOT 599 LYING WEST OF WELCH AVENUE; ALL OF LOT 49; THE WEST 35 FEET OF LOT 650, KITTREDGE, ACCORDING TO THE AMENDED MAP THEREOF, RECORDED IN PLAT BOOK 3 AT PAGE 39, COUNTY OF JEFFERSON, STATE OF COLORADO.

which currently has the address of 3431 Welch Avenue

                                                     *[Street]*

**Kittredge** , Colorado 80457 ("Property Address"):
            *[City]*                           *[Zip Code]*

        TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."  Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:  to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

        BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record and liens for taxes for the current year not yet due and payable.



Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                        Page 3 of 15                                14301CO 08/00
www.compliancesource.com                                                              © 2000, The Compliance Source, Inc.

G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.    **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.    **Application of Payments or Proceeds.**  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.    **Funds for Escrow Items.**  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—    Page 4 of 15
www.compliancesource.com

MERS Modified Form 3006 01/01
1401CO 08/00
© 2000, The Compliance Source, Inc.



GPMWD20081676717 7

promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.



Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 5 of 15
MERS Modified Form 3006 01/01
14301CO 08/00
© 2000, The Compliance Source, Inc.





G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 6 of 15
MERS Modified Form 3006 01/01
14301CO 08/00
© 2000, The Compliance Source, Inc.



rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.



G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.  Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)**  Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

**(b)**  Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11.  Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration



G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.



GMAC ~ 36

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such

GPMWD02008167671117

Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period, which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Lender shall mail a copy of the notice to Borrower as provided in Section 15. Trustee shall record a copy of the notice in the county in which the Property is located. Trustee shall publish a notice of sale for the time and in the manner provided by Applicable Law and shall**

G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

mail copies of the notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's certificate describing the Property and the time the purchaser will be entitled to Trustee's deed. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request that Trustee release this Security Instrument and shall produce for Trustee, duly cancelled, all notes evidencing debts secured by this Security Instrument. Trustee shall release this Security Instrument without further inquiry or liability. Borrower shall pay any recordation costs and the statutory Trustee's fees.

24. **Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

---

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 13 of 15

MERS Modified Form 3006 01/01
14301CO 08/00
© 2000, The Compliance Source, Inc.



GPMWD020081676711 7

GMAC ~ 39

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                            **Kenneth Dlin**                   -Borrower

                                            Mailing Address:
                                            **3431 Welch**
                                            **Kittredge, CO 80457 USA**

_____          _____ (Seal)
                                                                              -Borrower

                                            Mailing Address:

                                            _____ (Seal)
                                                                              -Borrower

                                            Mailing Address:

                                            _____ (Seal)
                                                                              -Borrower

                                            Mailing Address:

——————————————— *[Acknowledgment on Following Page]* ———————————————



G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

GMAC ~ 40

State of COLORADO                    §
                                     §
County of JefferSon                  §

Before me the undersigned authority, on this day personally appeared    Kenneth Olin

known to me (or proved to me through an identity card or other document)
to be the person(s) whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they executed
the same for the purposes and consideration therein expressed.
    Given under my hand and seal on this    20th    day of    FEBRUARY    ,    2004

(Seal)
MICHELLE NOBLE
NOTARY PUBLIC
STATE OF COLORADO
MY COMMISSION EXPIRES 01/03/2006

Notary Public
My Commission Expires: 1/3/06



G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

GMAC ~ 41

COUNTY COURT, COUNTY OF JEFFERSON
STATE OF COLORADO
100 Jefferson County Parkway
Golden, CO 80421

**Plaintiff: GMAC Mortgage, LLC** (Aka Ally Bank)

v.

**Defendant: Ken Dlin**

**v. Third Party Defendant**: GreenPoint Mortgage
Funding, Inc., Mortgage Electronic Registration Systems,
Inc., as nominee for GreenPoint Mortgage, and as of yet
unknown third party holders of the securitized note,
herein, John and Jane Doe, Underwriters.

σ COURT USE ONLY σ

Case No:

11 C 48857

Attorney for Defendant Brian Herbert Wilson, Jr. # 37237
Law Office of Brian Herbert Wilson, Jr.
43 Bulldogger Ct.
Bailey, CO 80421
Phone Number: 303-816-9493 FAX: 303-838-8054
E-mail: bwilson@brianherbertwilson.com
Atty. Reg. #: 37237

DIV:

Courtroom:

## DEFENDANT ANSWER TO COMPLAINT IN FORCIBLE ENTRY AND UNLAWFUL DETAINER AND COUNTERCLAIMS FOR DAMAGES BASED ON BREACH OF CONTRACT, BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

Defendant Ken Dlin, by and through counsel, Brian Herbert Wilson, Jr. submits this

Answer to Complaint for Forcible Entry and Unlawful Detainer and to submit his counterclaims

for damages of an alleged injury caused by the Plaintiffs on the basis of lender liability regarding

a mortgage that was either foreclosed or attempted to be foreclosed by the Plaintiffs and Third

Party Defendant(s), accordingly the Defendant Dlin state as follows:

## THE JURISDICTION AND VENUE

1

(1)    The jurisdiction of this court is not correct.  While typically Forcible Entry and Unlawful Detainer (FED) actions are proper for the County Court, the counter claims, and Possible cross claims and third party claims exceed $ 15,000.00.

(2)    This Court has combined jurisdiction over the subject matter of the initial complaint, however, since the matter includes counter claims in excess of the jurisdictional limit of the county court, the District court has authority to hear all cases and controversies that arise in contract law or because of tort liability. The matter in question also has to do with a piece of real property located in the county of Jefferson, the home of the Defendant and Counterclaimant (s).

(3)    Venue is correct for the District Court pursuant to C.R.C.P 98 (a).  The amount in controversy exceeds $15,000.00, the claim arises due to a tort or a contract that occurred within Jefferson County, Colorado.

(4)    The Defendant respectfully request this matter be moved to the District Court for adjudication accordingly.

## THE PARTIES (REQUEST OF JOINDER OF PARTIES PURSUANT TO C.R.C.P. 14 & COUNTY COURT RULE 319)

(5)    The Defendant (s) to this action is Mr. Ken Dlin, who is currently residing at 3431 Welch Avenue, Kittredge CO, 80457.

(6)    There is only one named Plaintiff to this action under FED; however, the Defendant respectfully request that the following parties be made Co-Plaintiffs and

2

accordingly subject to the counterclaims of the Defendant. The parties named herein all

had a part in either the transactions, or the same claims under Breach of Contract or Tort

claims of the Plaintiff(s) ; (1) GMAC Mortgage LLC,  1100 Virginia Drive, Fort

Washington, PA, 19034,  (2) GreenPoint Mortgage Funding, Inc.,  AKA John and Jane

Doe.

(7)        All Plaintiffs, and Third Party Defendant or Co-Plaintiffs are in the business of

either banking, mortgage management or underwriting of loans and mortgages.


## GENERAL ALLEGATIONS AND FACTS


(8)        The history of this case has been ongoing in this court starting with a Rule 120

hearing and culminating with above captioned case.

(9)        Mr. Dlin the Defendant to this current action has argued in every respect, pro se,

that the actions of the Bank were not based on sound law and facts.

(10)        This case and its previous pleadings both in this court and in the Federal Court

are of the offspring of an elaborate and complicated banking scheme that took shape

during a post 9/11 era. Namely, that many mortgages became part of a Mortgage Backed

Security (MBS) concept, wherein, the mortgage was bundled into a larger group of

securitized loans and given a name, in the present case, it is believed this Mortgage

became part of a "bundle" of loans.

(11)    As a part of the securitizing, the promissory note was either lost or deliberately

destroyed and the bundle of loans was passed to another lender as a part of a purchase or

buyout for example.

(12)    While the GreenPoint Mortgage may be properly registered as the "mortgage

Holder" in the legal sense of the word, it is no longer an entity, meaning, that there is no

longer an entity known as GreenPoint that can be sued or enforce the note.

(13)    Accordingly the Plaintiff, GMAC is essentially acting Trustee for the Bundle of

loans and is not the owner of the note, but merely a service provider processing the

payments.

(14)    GMAC, by and through counsel Castle Stawiarski, has sought to foreclose on the

mortgage in Jefferson County, and did so on July 28th 2010, however was not the true

owner of the note either.

(15)    Subsequently, the Defendant Ken Dlin, pro se, filed a law suit in Federal Court,

Civil Action No. 10-cv-01200-MSK-BNB, on a theory that amongst others that fraud

occurred in the execution and or representations of the Bank regarding negotiations with

the Bank.   The law suit in Federal District Court was filed on March 22nd 2010.  That

case is ongoing.  It should be noted that this action and the subsequent responses,

defenses and counter claims do not directly over lap, however since both actions arise

from the same transaction or occurrence, this court should be put on notice of the sister

action in the Federal Court.

(16)    The Bank, has sought to have the Current Tenant to evict or quit possession.

(17)      The Defendant Mr. Dlin argued against the foreclosure noting his objection

during the rule 120 hearing; however the judge granted the foreclosure based on the

prima facie case and the pleadings.


## ANSWER TO COMPLAINT IN FORCIBLE ENTRY AND UNLAWFUL DETAINER


(18)      The Defendant deny the statement in section one (1) of the complaint and aver

that any purported ownership is based on deceptive conduct of the Plaintiffs.  To the

extent that the Plaintiffs refer to Exhibit A the Defendant admits this is an accurate

description of the property in question.

(19)      Section two (2) of the Complaint, Defendant admit that a deed of trust was

recorded as security on the subject property however cannot admit nor deny whether the

dates and reception numbers are accurate or at least the Defendant does not have

knowledge sufficient to either admit or deny, and therefore denies the same.

(20)      The Defendant denies the statement in section three (3) to the extent that the Deed

of Trust granted power to sell at the public trustee of Jefferson County Colorado.  To the

extent that a trustee sale occurred, without admitting the correctness or the authority, the

Defendant cannot admit or deny because the Defendant are without sufficient knowledge

or information that the property was sold and to whom it was sold.  The Defendant does

not have adequate knowledge to admit or to deny that a Certificate of Purchase was

issued and so to that extent deny this last statement.

(21)     The Defendant does not have adequate knowledge or information to admit or to

deny the statements in sections four through eleven (4-11) and therefore deny the same

and reserve the right to amend their answer as information becomes available.

## DEFENDANT KEN DLIN'S DEFENSES AND AFFIRMATIVE DEFENSES

(22)     Plaintiffs Complaint fails to state a claim upon which relief can be granted.

(23)     Plaintiffs Complaint fails to mitigate their damages, if any as required by law.

(24)     Plaintiffs' claims may be barred in whole or in part by the doctrine of unclean

hands, waiver or estoppel.

(25)     Plaintiffs' claims may be barred, in whole or in part, for lack of damages suffered.

(26)     Plaintiffs' claims may be barred in whole or in part by failure of a condition

precedent.  For example, but without limitation, Plaintiff (s) may have failed to comply

with one or more provisions of the contract.

(27)     Plaintiff may be barred in whole or in part by one or more terms and provisions of

the contract.

(28)     Plaintiffs are not the real party in interest and lack standing.

(29)     Plaintiffs seek to enforce under fraud, including fraudulent misrepresentation that

the Bank is the party under contract with the Defendant.

(30)     Defendant reserves the right to assert any further defenses or to delete any

presently pleaded affirmative defenses after discovery and or investigation in this action

may warrant.

Wherefore, the Defendant Ken Dlin having fully answered the Plaintiff's Complaint in Forcible Entry and Detainer, request this court to enter an order moving this matter to District Court for further adjudication and enter an order of protection stopping the removal of the Defendant from the subject property until a full and final decision is made on the merits of the case in front of a jury as is provided by Colorado law.

## DEFENDANT KEN DLIN'S COUNTERCLAIMS

Defendant Ken Dlin as parties in interest to the subject property, by and through the undersigned counsel, the Law Office of Brian Herbert Wilson Jr., for their counterclaims against the Plaintiff GMAC MORTGAGE LLC, and other Joined Third Party co-Defendant (or joined plaintiffs) including GreenPoint Mortgage Funding, and as of yet unknown third party holders of the securitized interest or underwriters.

## GENERAL ALLEGATIONS

(1)    Mr. Ken Dlin is a resident of Jefferson County, Colorado and resides at 3431 Welch Avenue, Kittredge, CO 80457.

(2)    Mr. Ken Dlin is the borrower and the Defendant to the complaint under forcible entry and detainer.

(3)    At all times, Mr. Dlin has been the occupant of the property and the party in interest to the property as the person named on the deed to the real property.

(4)    Mr. Dlin originally financed his home with GreenPoint on February 20th 2004. The loan was 633,000 (Six Hundred Thirty Three Thousand Dollars).

(5)    The original lender on the loan was GreenPoint.

(6)    The true owner of the "note" at this point in time is not currently ascertainable.

(7)    The Petitioner filed with this court a verified motion pursuant to Rule 120 of the C.R.C.P., averring amongst other things that GMAC was the owner or assignee in interest to the mortgage under a "Trust" scheme and possessed the right to seek an order of this court to authorize a Public Trustee's sale.

(8)    At that hearing, the court ruled in favor of GMAC and the sale date was set.

(9)    The Promissory Note has not yet been produced.

(10)    The assignment of the promissory note was the Mortgage Electronic Registration System (MERS) from GreenPoint Mortgage as nominee, and the Public Trustees Certificate of purchase as alleged points to GMAC as the current holder of the evidence of debt.

(11)    There are no records available to demonstrate that MERS as nominee was ever assigned or nominated or that the deed of trust was transferred to GMAC.

## COUNTERCLAIMANT

## FIRST COUNTERCLAIM FOR RELIEF

## (BREACH OF EXPRESSED CONTRACT (BY ALL PLAINTIFFS & THIRD PARTY DEFENDANTS)

(12)        The Counterclaimant hereby incorporates the above paragraphs and general allegations as set forth above herein.

(13)        The Counterclaimant entered into a contract under secured transaction between themselves and the original lenders and then subsequently with GMAC under the Deed of Trust dated the February 20th 2004.  The Counterclaimant and the Plaintiff did not enter into any contract or agreement directly.  The Third Party Defendant GreenPoint, was the mortgagor and mortgagee Mr. Dlin, respectively on real property that was secured by a security interest by way of a deed of trust.

(14)        Plaintiff GMAC accelerated the loan making it due and payable in breach of the agreement between the Plaintiffs and Counterclaimant.

(15)        The Plaintiff, GMAC as the purported successor in interest stepped into the shoes of the original party GreenPoint, and became subsequently responsible for the carrying out of the responsibilities of the original contract based on the assumption or the assignment of the note.

(16)        The Plaintiff GMAC both failed to fulfill their expressed agreement under contract by accelerating the loan making it due and payable and failed to mitigate any harm that occurred to the Counterclaimant / Defendant Mr. Dlin.

(17)        The Counterclaimant was ready willing and able to comply with their end of the bargain and in fact has produced a buyer who was ready willing and able to purchase the property, that would have excused the Counterclaimant from performance by the oral promises of the agents of the Bank (GMAC).

(18)    The Counterclaimant has suffered economic loss, legal costs, legal defenses and consequential damages as a direct and proximate result of the Breach of Contract by the Plaintiffs.

(19)    Due directly to the conduct of the Plaintiff, it calls into question the proper and just possession of the property and the matter should be adjudicated accordingly.

Wherefore, the Counterclaimant prays for relief by this court for the Breach of Contract as a fair and just remedy in an amount to be determined at trial plus any other remedy this court deems just and fair given the circumstances.

## SECOND CLAIM FOR RELIEF

## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING ( BY ALL PLAINTIFFS & THIRD PARTY DEFENDANTS)

(20)    The Counterclaimant hereby incorporates the above paragraphs and general allegations as set forth above.

(21)    The Plaintiff's and the Counterclaimant either directly or indirectly entered into a contract for a mortgage or were purportedly the successors in interest.

(22)    The Plaintiffs, (all) are in the business of Banking and as such are subject to the implied duty of good faith and fair dealing.

(23)     The Counterclaimant entered into contracts based on mortgages in the state of

Colorado.  As such the parties had a duty to not breach the covenant of Good faith and

fair dealing pursuant to Colorado Statutes, § 4-1-304. (Obligation of good faith).

(24)     The covenant imposes on each party to the contract the duty to refrain from doing

anything which would render performance of the contract impossible by any act of his

own, and also the duty to do everything that the contract presupposes that each party will

do to accomplish its purpose.

(25)     The Counterclaimant completed the required tasks regarding the contract, and

even with the subsequent oral promises made to the Counterclaimant by the Bank,

completed every task required of them.

(26)     The Plaintiff collectively interfered with the performance of the Counterclaimant

by either failing to follow through or ignoring Mr. Dlin even upon repeated requests for

the Plaintiffs to fulfill their obligations.  In particular, GMAC, its agents and

representatives gave oral promises and assurances that a loan "work out" was going to

happen and would be in the best interest of the Counterclaimant Dlin.

(27)     GMAC stopped communication with the Counterclaimant directly and has

repeatedly denied that any duty exists on their part, however the Verified Motion

submitted to this court clearly represents that GMAC is "Trustee" for the holder of the

note.

(28)     The Counterclaimant Dlin was damaged financially by the Breach of Good Faith

and suffered financial loss as a direct result and proximate result of the breach.

Wherefore, the Counterclaimant Dlin prays for relief by this court for the Breach of Implied covenant as a fair and just remedy in an amount to be determined at trial plus any other remedy this court deems just and fair given the circumstances.

## THIRD CLAIM FOR RELIEF

## PROMISSORY ESTOPPEL (GMAC)

(29)    The Counterclaimant hereby incorporates the above paragraphs and general allegations as set forth above herein.

(30)    The Counterclaimant entered into a contract under secured transaction between themselves and the GMAC Financing where a mortgage on real property was secured by a security interest by way of a deed of trust.

(31)    GMAC (Bank) deemed the loan to be in default and accordingly accelerated the loan making it due and payable treating the contract as having ceased and the Counterclaimant was in breach of the agreement between the Plaintiffs and Counterclaimant.

(32)    The Counterclaimant was made certain promises regarding the conduct of the Bank. These promises include the oral promise of a loan workout, lower interest rates and the cooperation of GMAC Financing toward the Counterclaimant.

(33)    Under this claim for relief, even if no contract exists at this point in time, oral promises were made to the Counterclaimant that would be unfair not to have the Plaintiff and Third Party Defendants be required to enforce.

(34)    The elements of Promissory Estoppel include; A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

(35)    The remedy granted for breach of a promise may be limited as justice requires.

(36)    The Counterclaimant was injured by the promises made by GMAC and not honored by MERS either by way of making a loan or some sort of workout agreement in a way that would make the Counterclaimant whole.

(37)    Because of the failure to follow through with the promises made, the Counterclaimant has suffered in injury that if this court were to enforce the promise would make the Counterclaimant whole.  If the Counterclaimant were to be removed from the home, prior to a fair and just adjudication, it would irreparably harm the Counterclaimant.

Wherefore, the Counterclaimant pray for relief by this court under a theory of Promissory Estoppel, to enforce the promises and to adjudicate the matter fully as a fair and just remedy in an amount to be determined at trial plus any other remedy this court deems just and fair given the circumstances.

## FOURTH CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTY (GMAC)

(38)    The Counterclaimant Dlin, hereby incorporates the above paragraphs and general allegations as set forth above.

(39)    Plaintiffs owed the Counterclaimant either directly or indirectly a fiduciary duty since as a bank, or bankers, the Plaintiffs were acting in the capacity as trustees of both the payments made toward the mortgage and toward documents to be filed either at the state or the federal level.

(40)    While unclear who actually holds the note, both GMAC, GreenPoint and MERS owe a duty to the Counterclaimant as financial fiduciaries.

(41)    The Plaintiffs breached the fiduciary duty owed to the Counterclaimant Dlin by using failing to fulfill the duties of the Bank under the fiduciary responsibilities as understood in business practice.

(42)    Counterclaimant was injured and has been subjected to an ongoing injury that has caused him economic hardship, financial loss and expenses.

(43)    The Plaintiffs are the direct cause of the injury, in that, as a direct result of their actions, the Counterclaimant Dlin was actually injured.

(44)    The Counterclaimant seeks damages for the breach of the fiduciary responsibility to the Counterclaimant.

Wherefore, the Counterclaimant pray for relief by this court for Breach of the Fiduciary Duty as a fair and just remedy in an amount to be determined at trial, plus any other remedy this court deems just and fair under the circumstances.

## FIFTH CLAIM FOR RELIEF

14

## NEGLIGENT MISREPRESENTATION (GMAC)

(45)    The Counterclaimant Dlin hereby incorporates the above paragraphs and general

allegations as set forth above.

(46)    All the Plaintiffs named under this claim are in the business of Banking,

underwriting or managing mortgages and the like.

(47)    The Plaintiffs owed a duty of care to the Counterclaimant Dlin because as a Bank

or Banking institution, the standard of care is to act truthfully and honestly with the facts

and to respond to inquiries in a straightforward way.

(48)    The Plaintiffs gave false information to the Counterclaimant on several occasions

and were not honest in dealing with the facts on the whole. This includes the fact that the

mortgage became part of a securitized mortgage.

(49)    The Plaintiffs gave this information to the Counterclaimant in the course of

business under a professional inquiry as a part of the ongoing transaction in which the

Plaintiffs stood to gain financially based on the transaction.

(50)    The Plaintiff(s) was negligent in giving or in obtaining the information or in

communicating the information to the Counterclaimant Dlin.

(51)    The Plaintiff(s) gave the information with the knowledge or intent that the

Counterclaimant would act or make a decision in reliance upon the information that was

given out from the Plaintiff(s).

(52)    The Counterclaimant Dlin relied upon the statements of the Plaintiffs that had

been supplied.

(53)     The reliance by the Counterclaimant Dlin upon the statements made by the

Plaintiff(s) was the direct cause of the damages to the Mr. Dlin.

(54)     The Counterclaimant Dlin seek damages, both special and general for the injury

caused by the Plaintiff(s).


Wherefore, the Counterclaimant prays for relief by this court for the Negligent

Misrepresentation by the Plaintiff(s) as a fair and just remedy in an amount to be

determined at trial plus any other remedy this court deems just and fair under the

circumstances including attorney fees and costs.


## SIXTH CLAIM FOR RELIEF (COUNT ONE)

## DECEPTIVE TRADE PRACTIES (COLORADO CONSUMER PROTECTION ACT

## (ALL PLAINTIFFS AND THIRD PARTY DEFENDANTS)


(55)     The Counterclaimant Dlin hereby incorporates the above paragraphs and general

allegations as set forth above.

(56)     The Colorado Consumer Protection Act (CCPA) § § 6-1-101 et seq., C.R.S.

protects consumers both public and private from usurpations in consumer transactions.

(57)     A private cause of action is granted under statute § 6-1-113(1)(a) provides that

actual or potential consumers may bring an action under this Act.

(58)     The Counterclaimant brings this action timely under the Act.

(59)    The Plaintiff(s) engaged either directly or caused another to engage in a deceptive

trade practice that caused the Counterclaimant to become injured. In particular, the agents

and representatives with GMAC financing encouraged the Counterclaimant to "go into

default" to help him get a loan workout.

(60)    The deceptive trade practice occurred in the normal course of business.

(61)    The deceptive trade practice significantly impacted the Counterclaimant as an

actual or potential customer or consumer of the Plaintiff(s).

(62)    The Counterclaimant Ken Dlin, was a consumer of the Plaintiff(s) and was

injured in his business and or occupations as a direct result of the deceptive trade

practice, and;

(63)    The deceptive trade practice caused actual damages or losses to the

Counterclaimant Dlin.

(64)    The Plaintiff and the Third Party Defendant specifically used deceptive practices

in suggesting that a loan work out could be given to the Counterclaimant if he were in

default on their loan. It was related to the Counterclaimant Dlin that he would not be

offered such a loan workout "unless" he went into default.

(65)    The Counterclaimant seeks relief based on the Consumer Protection Act based on

the Actual damages of the claim.


Wherefore, the Counterclaimant pray for relief by this court for the violation of the

Consumer Protection Act Plaintiff(s) as a fair and just remedy in an amount to be

determined at trial plus treble damages as is allowed by statute upon the showing of clear

and convincing evidence that the Plaintiff(s) engaged in Bad Faith Conduct, plus any

other remedy this court deems just and fair under the circumstances including attorney

fees and costs.

## SIXTH CLAIM FOR RELIEF (COUNT TWO)

## DECEPTIVE TRADE PRACTIES (COLORADO CONSUMER PROTECTION ACT

## (ALL PLAINTIFFS AND THIRD PARTY DEFENDANT)

(66)    The Counterclaimant Dlin hereby incorporates the above paragraphs and general

allegations as set forth above.

(67)    The Colorado Consumer Protection Act (CCPA) § § 6-1-101 et seq., C.R.S.

protects consumers both public and private from usurpations in consumer transactions.

(68)    A private cause of action is granted under statute § 6-1-113(1)(a) provides that

actual or potential consumers may bring an action under this Act.

(69)    The Counterclaimant brings this action timely under the Act.

(70)    The Plaintiff(s) engaged either directly or caused another to engage in a deceptive

trade practice that caused the Counterclaimant to become injured. In particular, the agents

and representatives with GMAC together with GreenPoint have averred to the court that

GMAC was the owner of or the holder of the evidence of debt. The Plaintiff and the

Third Party Defendant have misled the court into believing that MERS as nominee for

GreenPoint has subsequently nominated GMAC as an entity with the power to foreclose, however it is not.

(71)    The deceptive trade practice occurred in the normal course of business.

(72)    The deceptive trade practice significantly impacted the Counterclaimant as an actual or potential customer or consumer of the Plaintiff(s).

(73)    The Counterclaimant Ken Dlin, was a consumer of the Plaintiff(s) and was injured in his business and or occupation as a direct result of the deceptive trade practice, and;

(74)    The deceptive trade practice caused actual damages or losses to the Counterclaimant Dlin.

(75)    The Counterclaimant Dlin was specifically injured by the Plaintiff and the Third Party Defendant by predatory and dishonest lending practices that included the use of Mortgage Backed Securities wherein, their mortgage was bundled into a securitized and traded stock market commodity.  As such, the promissory note was stripped from the Deed of Trust and the Counterclaimant could not have a fair and unbiased process in getting a loan workout potential.

(76)    The Counterclaimant seeks relief based on the Consumer Protection Act based on the Actual damages of the claim.

Wherefore, the Counterclaimant pray for relief by this court for the violation of the Consumer Protection Act Plaintiff(s) as a fair and just remedy in an amount to be determined at trial plus treble damages as is allowed by statute upon the

showing of clear and convincing evidence that the Plaintiff(s) engaged in Bad

Faith Conduct, plus any other remedy this court deems just and fair under the

circumstances including attorney fees and costs

## EIGHTH CLAIM FOR RELIEF

## NEGLIGENCE PER SE (GMAC)

(77)    The Counterclaimant Dlin hereby incorporates the above paragraphs and general

allegations as set forth above.

(78)    At the time of the occurrence, The Colorado Consumer Protection Act (CCPA) §

§ 6-1-101 et seq., C.R.S. was in force that sought to protect consumers both public and

private from usurpations in consumer transactions.

(79)    A violation of this statute that was specifically designed to protect consumers is

on its face negligence.

(80)    The elements of Negligence Per Se are: 1) The Plaintiff violated the statute; (2)

the statute is a safety statute intended to protect the public from certain types of conduct,

(3) the act caused the kind of harm the statute was designed to prevent, and (4) the

plaintiff was within the zone of risk of the kind of harm the statute intended to protect.

(81)    The Plaintiff(s) engaged in either directly or caused another to engage in a

deceptive trade practice that was protected under statute.

(82)    The deceptive trade practice occurred in the normal course of business.

(83)    The deceptive trade practice significantly impacted the counterclaimant as an actual or potential customer or consumer of the Plaintiff(s).

(84)    The Counterclaimant Ken Dlin, was a consumer of the Plaintiff(s) and was injured in their business and or occupation as a direct result of the deceptive trade practice, and;

(85)    The deceptive trade practice caused actual damages or losses to the Counterclaimant Dlin.

(86)    The Counterclaimant seeks relief based on the Negligence Per Se based on the Actual damages and losses of the claim.


Wherefore, the Counterclaimant pray for relief by this court under a theory of Negligence Per Se, by the Plaintiff(s) as a fair and just remedy in an amount to be determined at trial any other remedy this court deems just and fair under the circumstances including attorney fees and costs.


## NINTH CLAIM FOR RELIEF

## CIVIL CONSPIRACY (ALL PLAINTIFFS AND THIRD PARTY DEFENDANT)


(87)    The Counterclaimant hereby incorporates the above paragraphs and general allegations as set forth above.

(88)    Counterclaimant seeks recovery based on civil conspiracy.  The Plaintiffs and

Third Party Defendants collectively agreed either by action or by conduct to accomplish

an unlawful goal.

(89)    The Plaintiff(s) knew that no proof of Holder in due course status has ever been

produced either to the Counterclaimant or to the County Trustee, yet agreed that it would

be averred as though proof existed.

(90)    The Plaintiffs GMAC and Third Party Defendants, either directly or indirectly

agreed or in conduct made false representations of a past or present fact, that in particular

GMAC financing was a successor party in interest, however the securitized interest had

been bundled into a larger security, not a "Trust".

(91)    The fact that GMAC Financing nor MERS has never proved its successor interest

yet continued on as though it was in furtherance of the unlawful goal. In other words, the

note under which the power to enforce the collection of the Mortgage has not and cannot

be produced.

(92)    At the time the assertion was made to the court and to the county, the Plaintiff

knew that the representation was false even though the practice was used throughout the

industry.

(93)    The Plaintiffs made the statements, knowing that the court and the county would

rely upon them.

(94)    The Counterclaimant was injured by the acts performed to accomplish the

unlawful goal.

(95)      The Plaintiffs collectively interfered with the truth by failing to disclose the true

holder of the note to the court.

(96)      The Counterclaimant Dlin was damaged financially by the civil conspiracy and

suffered financial loss as a direct result and proximate result of the fraud.


Wherefore, the Counterclaimant Dlin prays for relief by this court for the civil conspiracy

a fair and just remedy in an amount to be determined at trial plus any other remedy this

court deems just and fair given the circumstances.


## TENTH CLAIM FOR RELIEF

## INTERFERENCE WITH CONTRACT (GMAC)


(97)      Plaintiff hereby incorporates the above paragraphs and general allegations as set

forth above.

(98)      The Counterclaimant seeks relief under a theory of intentional interference with

contractual obligations.

(99)      The Counterclaimant and the original lender entered into a contract.  Plaintiffs

aver they are the successor in interests, even though have never demonstrated the

existence of the assignment papers or the Promissory Note.

(100)      The Plaintiff(s) knew or should have known of the existence of the contract that

existed between the original underwriters and the bank and the Counterclaimant.

(101)    Agents and representatives of GMAC suggested that the Counterclaimant should

use default to help them get a loan work out.  Subsequently, the Plaintiffs GMAC through

agents of the Bank sought to interfere with the original contract by both intentionally

seeking the Counterclaimant not to perform under the terms of the agreement.  In

particular, agents or representatives of the Bank told the Counterclaimant to go into

default by not paying the mortgage payment when it became due.

(102)    The Plaintiff's interference with the contractual obligations was improper.

(103)    The interference became the basis for the injury to the Counterclaimant.  The

Counterclaimant suffered both economic losses directly and indirectly as a direct and

proximate cause of the interference by the Plaintiffs.


Wherefore, the Counterclaimant Dlin prays for relief by this court for the intentional

interference with contractual obligations, a fair and just remedy in an amount to be

determined at trial plus any other remedy this court deems just and fair given the

circumstances including attorney fees and costs.


## ELEVENTH CLAIM FOR RELIEF

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (GMAC)

(104)    The Counterclaimant hereby incorporates the above paragraphs and general

allegations as set forth above.


(105)    Counterclaimant has suffered emotional distress caused by the negligence of

Plaintiff(s).

(106)    Counterclaimant is of a class of person(s) who would reasonably be expected to

be harmed emotionally by the negligent act of the Plaintiffs.

(107)    Plaintiffs engaged in negligent conduct or a willful violation of a statutory

standard pursuant to statute, (Colorado Consumer Protection Act).

(108)    Plaintiff's negligent conduct or willful violation of the statutory standard was the

direct and proximate cause of the serious emotional distress the Counterclaimant has

suffered.

(109)    The emotional distress suffered by the Counterclaimant was an emotional reaction

typical to the kind of circumstances caused by the Plaintiffs.

(110)    A reasonable person would be unable to cope with the mental distress caused by

this circumstance.

(111)    Counterclaimant seeks actual damages associated with the actual injury they have

sustained and the future loss based on the gross negligence that leads to severe emotional

distress.


Wherefore, the Counterclaimant prays for relief by this court under a theory of

Negligence infliction of emotional distress, by the Plaintiff(s) as a fair and just remedy in

an amount to be determined at trial any other remedy this court deems just and fair under

the circumstances including attorney fees and costs.

## TWELFTH CLAIM FOR RELIEF

## CIVIL FRAUD – WRONGFUL FORECLOSURE (GMAC)

(112)    The Counterclaimant hereby incorporates the above paragraphs and general

allegations as set forth above.

(113)    Counterclaimant seeks recovery based on wrongful foreclosure.  The Plaintiffs

foreclosed based on a deceit perpetrated on the court and the county government by

averring that the Plaintiffs were the holders in due course on the note.

(114)    No proof of Holder status has ever been produced either to the Counterclaimant or

to the County Trustee.

(115)    The Plaintiffs, either directly or indirectly, made false representations of a past or

present fact, that in particular neither GreenPoint, nor MERS established that GMAC was

a successor party in interest to the note and or deed of trust.

(116)    The fact that neither GreenPoint the original financing Bank nor GMAC has ever

proved its successor interest exists due to the missing promissory note, this is material

because the promissory note was bundled into an MBS, *(infra at page 4)*.

(117)    At the time the assertion was made to the court and to the county, the Plaintiff

knew that the representation was false even though the practice was used throughout the

industry.

(118)    The Plaintiffs made the statements, knowing that the court and the county would

rely upon them.

(119)    The court and the county did rely upon them in granting the right to foreclose.

(120)    The Counterclaimant was injured by the reliance the court placed upon the

statement and the county relied upon the court's ruling as well.

(121)    The Plaintiffs collectively interfered with the truth by failing to disclose the true

holder of the note to the court.

(122)    The Counterclaimant Dlin was damaged financially by the wrongful foreclosure

and suffered financial loss as a direct result and proximate result of the fraud.


Wherefore, the Counterclaimant Dlin prays for relief by this court for wrongful

foreclosure a fair and just remedy in an amount to be determined at trial plus any other

remedy this court deems just and fair given the circumstances.


### THIRTEENTH CLAIM FOR RELIEF

### CIVIL FRAUD – FRAUD IN THE FACTUM (GMAC)

(123)    The Counterclaimant hereby incorporates the above paragraphs and general

allegations as set forth above.

(124)    Counterclaimant seeks recovery based on fraud in the factum. The Plaintiffs

made a false representation to the Counterclaimant that led them to take an action that

they would have not taken if they had known the truth.

(125)    In particular, the Plaintiff(s) agents discussed on the telephone options concerning

the difficulty in paying the mortgage. Prior to any potential default, the agents for the

Plaintiff(s) represented to the Counterclaimant that it was "best" to be in default to get

better loan workouts and other available incentives from the Federal Government's

special programs.  It was further related to the Counterclaimant, that unless the loan went

into default the Bank could not help them.  The agent for the Bank clearly explained and

encouraged the Counterclaimant to "go into default" on several occasions.

(126)    The Counterclaimant believed this statement to be true and acted on the advice of

the Banks representatives. Plaintiffs, either directly or indirectly, made false

representations or made false promises regarding the outcome of the default by the

Counterclaimant.

(127)    At the time the false statement, the Plaintiff, knew that the representation was

false even though the practice was used throughout the industry.

(128)    The Plaintiffs made the statements, knowing that the Counterclaimant would rely

upon the false statement.

(129)    The Counterclaimant did rely upon the statements and went into default.

(130)    The Counterclaimant was injured by the reliance placed upon the statement by the

Agents of the Bank.

(131)    The Counterclaimant Dlin was damaged financially by the Fraud in the Factum

and suffered financial loss as a direct result and proximate result of the fraud.


Wherefore, the Counterclaimant Dlin prays for relief by this court for fraud in the factum,

a fair and just remedy in an amount to be determined at trial plus any other remedy this

court deems just and fair given the circumstances.

## CONCLUSION

Wherefore, the Plaintiff Ken Dlin Prays:

1. This Court enters a judgment in favor of the Counterclaimant Ken Dlin, on all claims for relief.

2. The Counterclaimant Dlin request this matter be moved to the District Court of Jefferson County for further adjudication.

3. The Counterclaimant Dlin respectfully request that this honorable court allow the inclusion of the other plaintiffs to this action, Successors in interest to GreenPoint Mortgage Funding MERS and John and Jane Doe, as of yet unknown holders of the securitized interest. Pursuant to Colorado Statute it is proper to include the appropriate parties to this action.

4. The Counterclaimant Dlin requests this court place a temporary injunction on GMAC concerning this matter pursuant to statute protecting the real property from any further actions or from the forcible removal of the Defendant / Counterclaimant peace from being disturbed until this matter can be fully determined by this court.

5. Counterclaimant Dlin asks for a Jury Trial on all matters and will pay the fee accordingly.

6. This Court award all damages in an amount to be determined at trial, compensatory, consequential, general and special damages recognized by the State of Colorado and this court against the Co-Defendant's for each claim for relief as this honorable court sees fit and just for the circumstance up to the maximum allowed by statute including all adjustments for increase based on inflation pursuant to (C.R.S. § 13-21-102.5) plus any other remedy including but not limited to attorney fees and costs and any other remedy this court deems just and fair.

7. This Court award attorney's fees, costs and expenses associated with this complaint to Counterclaimant Ken Dlin together with any other award or relief this court deems just and reasonable for the circumstances.

8. The Counterclaimant respectfully requests that the matters of the FED and the Counterclaims be Consolidated pursuant to C.R.C.P. 42(a) since the matter comes before this court and the Counterclaimant avers the matter in question sits squarely on the right to possess real property.

DATED this 8th day of June 2011

Submitted Respectfully,


The Law Office of Brian Herbert Wilson, Jr.


*Duly Signed Copy of this pleading is on file with the Office of Brian Herbert Wilson, Jr.* *.


By /s/    Brian Herbert Wilson, Jr.
        Brian Herbert Wilson, Jr. # 37237


Address of the Plaintiff:
Mr. Ken Dlin
3431 Welch Ave.
Kittredge CO 80457


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the above Answer to Complaint and Counterclaims was served on the other party or parties legal counsel of Record Lexis File and serve or by placing it in the United States Postal Service Certified Return Receipt Requested or if applicable by service of process on all third party Defendant if applicable according to C.R.C.P 4 on this 17th day of April 2011 to:

Castle Meinhold & Stawiarski
999 18th Street Suite 2201
Denver CO 80202

/s/ Brian Herbert Wilson Jr.


Counsel for the Plaintiff(s)  GMAC:

Castle Stawiarski, LLC
 999 18th Street Suite 2201
Denver, CO 80202

* In accordance with C.R.C.P 121 § 1-26(7), A printed copy of this document bearing the original signatures is being kept by the filing party and will be made available for inspection by the other parties or the Court upon request.

After recording please return to:

GreenPoint Mortgage Funding, Inc.
[Company Name]

[Name of Natural Person]

33 San Pablo Avenue
[Street Address]

San Rafael, CA 94903
[City, State  Zip Code]

RECEPTION NO.  F1973637
3/01/2004 15:58:38  PG: 001-018
PG FEE:   91.00 STATE DOC.FEE:   0.00
RECORDED IN JEFFERSON COUNTY, COLORADO

———————————— [Space Above This Line For Recording Data] ————————————

# DEED OF TRUST

**MIN:** ████████████

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)**    "**Security Instrument**" means this document, which is dated **February 20, 2004**, together with all Riders to this document.

**(B)**    "**Borrower**" is **Kenneth Dlin**

. Borrower is the trustor under this Security Instrument.

**(C)**    "**Lender**" is **GreenPoint Mortgage Funding, Inc.**

Lender is a **Corporation** organized and existing under the laws of
**the State of New York.  Lender's address is 100 Wood Hollow Drive, Novato, CA 94945**

**(D)**    "**Trustee**" is the Public Trustee of **Jefferson** County, Colorado.

**(E)**    "**MERS**" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  **MERS is the beneficiary under this Security Instrument.**  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, Michigan 48501-2026, tel. (888) 679-MERS.

**(F)**    "**Note**" means the promissory note signed by Borrower and dated **February 20, 2004.**
The Note states that Borrower owes Lender **Six Hundred Thirty Three Thousand  and 00/100ths**

---

Colorado Deed of Trust-Single Family-Fannie Mac/Freddie Mac **UNIFORM INSTRUMENT**                    MERS Modified Form 3006 01/01
—THE COMPLIANCE SOURCE, INC.—                              Page 1 of 15                                    14361CO 08/00
www.compliancesource.com                                                                        © 2000, The Compliance Source, Inc.



G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

GMAC ~ 9

Dollars (U.S. $633,000.00)
plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later
than **March 01, 2034.**

**(G)**   "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)**   "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the
Note, and all sums due under this Security Instrument, plus interest.

**(I)**   "**Riders**" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to
be executed by Borrower *[check box as applicable]*:

☒ Adjustable Rate Rider    ☐ Condominium Rider          ☐ Second Home Rider
☐ Balloon Rider            ☐ Planned Unit Development Rider  ☐ Biweekly Payment Rider
☐ 1-4 Family Rider         ☐ Revocable Trust Rider
☐ Other(s) *[specify]*

**(J)**   "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and
administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)**   "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that
are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)**   "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or
similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape
so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited
to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and
automated clearinghouse transfers.

**(M)**   "**Escrow Items**" means those items that are described in Section 3.

**(N)**   "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third
party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of,
the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or
(iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)**   "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)**   "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus
(ii) any amounts under Section 3 of this Security Instrument.

**(Q)**   "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing
regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor
legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all



G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)**    **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

### TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as a nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower, in consideration of the debt and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County of Jefferson:**

    [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]
**As more particularly described in exhibit "A"attached hereto and made a part hereof.**

ALL THAT PART LOTS 33 AND 34 LYING SOUTH OF THE CENTER OF THE CHANNEL OF BEAR CREEK; THE N 1/2 OF LOT 47; ALL OF LOT 48, THAT PART OF LOT 599 LYING WEST OF WELCH AVENUE; ALL OF LOT 49; THE WEST 35 FEET OF LOT 650, KITTREDGE, ACCORDING TO THE AMENDED MAP THEREOF, RECORDED IN PLAT BOOK 3 AT PAGE 39, COUNTY OF JEFFERSON, STATE OF COLORADO.

which currently has the address of **3431 Welch Avenue**

                                                              [Street]

**Kittredge** , Colorado 80457 ("Property Address"):
        [City]                              [Zip Code]

        TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

        BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record and liens for taxes for the current year not yet due and payable.

GPMWD02008167671 17

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall



promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.  Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.



G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.    Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds.  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's



rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.   Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.   Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.   Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.



GMAC ~ 15

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)** Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

**(b)** Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration

Colorado Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                                    Page 8 of 15
www.compliancesource.com

MERS Modified Form 3006 01/01
14301CO 08/00
©2000, The Compliance Source, Inc.



GMAC ~ 16

period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.    Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.



GMAC ~ 17

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.



As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such



Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period, which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

    **21.  Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

    Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

    Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to; any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

    NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

    **22.  Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

    **If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Lender shall mail a copy of the notice to Borrower as provided in Section 15. Trustee shall record a copy of the notice in the county in which the Property is located. Trustee shall publish a notice of sale for the time and in the manner provided by Applicable Law and shall**



mail copies of the notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

13

Trustee shall deliver to the purchaser Trustee's certificate describing the Property and the time the purchaser will be entitled to Trustee's deed. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request that Trustee release this Security Instrument and shall produce for Trustee, duly cancelled, all notes evidencing debts secured by this Security Instrument. Trustee shall release this Security Instrument without further inquiry or liability. Borrower shall pay any recordation costs and the statutory Trustee's fees.

24. **Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.



GMAC ~ 21

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

14

_____          _____ (Seal)
                                  Kenneth Dlin          -Borrower

                                  Mailing Address:
                                  3431 Welch
                                  Kittredge, CO 80457 USA

_____          _____ (Seal)
                                                        -Borrower

                                  Mailing Address:


                                  _____ (Seal)
                                                        -Borrower

                                  Mailing Address:


                                  _____ (Seal)
                                                        -Borrower

                                  Mailing Address:


——————————— [Acknowledgment on Following Page] ———————————



G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

GMAC ~ 22

State of _Colorado_    §
                       §
County of              §

15

Before me the undersigned authority, on this day personally appeared    _Kenneth Olin_

known to me (or proved to me through an identity card or other document)
to be the person(s) whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they executed
the same for the purposes and consideration therein expressed.
    Given under my hand and seal on this    _20th_    day of    _FEBRUARY_    , _2004_

(Seal)
**MICHELLE NOBLE**
**NOTARY PUBLIC**
**STATE OF COLORADO**
MY COMMISSION EXPIRES 01/03/2006

Notary Public
My Commission Expires: _1/3/06_



G P M W D 0 2 0 0 8 1 6 7 6 7 1 1 7

GMAC ~ 23