THOMAS P. BEKO, ESQ. (SBN 01250)
ERICKSON, THORPE & SWAINSTON, LTD.
99 W. Arroyo Street
Post Office Box 3559
Reno, NV 89505
Ph: (775) 786-3930; Fax: (775) 786-4160
*Attorneys for Claimants Pamela D. Longoni,*
*Lacey Longoni and Jean M. Gagnon*

# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF NEW YORK

In re:                                              Case No. 12-12020 (MG)

RESIDENTIAL CAPITAL, LLC, et al.,         Chapter 11

            Debtors.                               Jointly Administered
_____/

## RESPONSE TO OBJECTION OF THE RESCAP BORROWER CLAIMS TO PROOF OF CLAIM FILED BY PAMELA D. LONGONI AND JEAN GAGNON CLAIM NOS. 2291, 2294, 2295 AND 2357

COME NOW, PAMELA D. LONGONI, individually and as the Guardian Ad

Litem for LACEY LONGONI, and JEAN M. GAGNON, by and through their attorneys,

ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and hereby

submit the following response to the Objection to the Proof of Claims filed by Pamela D.

Longoni and Jean Gagnon.

DATED this 15th day of April, 2015.

ERICKSON, THORPE & SWAINSTON, LTD.

By    /s/ Thomas P. Beko
            THOMAS P. BEKO, ESQ.
            *Attorneys for Claimants*
            *Pamela D. Longoni, Lacey Longoni*
            *and Jean M. Gagnon*

Erickson, Thorpe & Swainston, Ltd.
P.O. Box 3559
Reno, Nevada 89505
Tel. (775) 786-3930 Fax (775) 786-4160

1

# **TABLE OF CONTENTS**

2

Table of Contents.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

I. Summary of the Claims and the Debtors' Objection . . . . . . . . . . . . . . . . . . . . 4

II.    The Debtors have failed to establish that they had any legal right to
       commence the non-judicial foreclosure.  Therefore, they cannot negate
       an essential allegation of any of the claimants' claims, let alone all
       of them  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       A.  Procedural Authority  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       B. The Debtors' Objection  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       C. Substantive Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.   The Debtors Were Obligated to Comply with Nevada's Mandatory
       Foreclosure Mediation Program as the Debtors Have Readily Admitted
       hat the Foreclosure Process Should Have Been Recommenced after
       GMACM Accepted Additional Payments from the Claimants . . . . . . . . . . . . . . 12

IV.    The Debtors Cannot Prove That They Complied with the Provision
       of Nevada Revised Statutes §107.085 and §107.089 Which Were in
       Existence since 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.     The Evidence Is Irrefutable That Multiple GMAC Representatives
       Informed the Claimants That GMACM Proposed Loan Modifications
       Were, in Fact, Fully Approved.  The Evidence Is Also Irrefutable That
       GMACM Repeatedly Informed Longoni That All Foreclosure Actions
       Were on Hold . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VI.    The Claimants' Fraud and Misrepresentation Claims Are Valid . . . . . . . . . . . 42

VII.   The Plaintiffs' Negligent Misrepresentation Claims Are Entirely Valid. . . . . . . 44

       A.     Negligence per se is a not a separate form of negligence liability . . . . . . 44

       B.     A claim for common law negligence is stated . . . . . . . . . . . . . . . . . . . . 45

       C.     Negligent misrepresentation is properly stated .. . . . . . . . . . . . . . . . . . 46

       D.     Even assuming a "no duty" rule applicable to lenders, an exception
              to such "no duty" rule is stated by the complaint's averment . . . . . . . . . . 47

       E.     A claim for negligent infliction of emotional distress is also stated . . . . . 47

VIII.  The Claimants' Breach of Contract and Promissory Estoppel Claims are
       Entirely Valid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

A.    The claimants' Promissory Estoppel Claim is fully established by the record in this matter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

IX.    Longoni's Intentional Infliction of Emotional Distress Claim has Already Been Determined to be Valid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

X.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

iii

# TABLE OF AUTHORITIES
## Cases

Adelson v. Hananel
    2009 WL 2835119, *3 (D. Nev.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Anderson v. Baltrusaitis
    113 Nev. 963, 965, 944 P.2d 797, 799 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . 44

Barmettler v. Reno Air, Inc.
    114 Nev. 441, 449, 956 P.2d. 1382, 1387 (1998),
    quoting Rest. 2d of Torts, § 552(1)(1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Betsinger v. D.R. Horton, Inc.
    232 P.3d at 436 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Bronner v. Park Place Entm't Corp.
    137 F. Supp. 2d 306, 312 (S.D.N.Y.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Cervantes v. Countrywide Home Loans, Inc.
    656 F. 3d 1034, 1039, (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Collins v. Union Federal Sav. & Loan Ass'n
    99 Nev. 284, 304, 662 P.2d 610, 623 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Dynalectric Co. V. Clark & Sullivan Constructors, Inc.
    127 Nev. Adv. Op. No. 41, 255 P. 3d 286, 288 (2011),
    quoting Restatement (Second) of Contracts, sec. 90(1)(1981) . . . . . . . . . . . . . . 50

Edelstein v. Bank of New York Mellon
    128 Nev. Adv. Op. 48, 286 P.3d 249, *7, 254, (Sept. 27, 2012) . . . . . . . 10, 11, 12

Fidelity Mortgage Trustee Service, Inc. v. Ridgegate East Homeowners Assoc.
    27 Cal. App. 4th 503, 506, 32 Cal. Rptr. 2d. 521, 523 (1994) . . . . . . . . . . . . . . . 46

Franchise Tax Board v. Hyatt
    130 Nev. Adv. Op. 71, 335 P.3d 125 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Ghervescu v. Wells Fargo Home Mortgage Co.
    2008 WL 660248, **1-3, 6 (Cal. App. 4th) (unpublished) . . . . . . . . . . . . . . . . . 46

Gordon v. Beck & Gregg Hardware Co.
    40 S.E.2d 428, 432 (Ga. App. 1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Gunsul v. Countywide Home Loans, Inc.
    2006 WL 3586091, **2-6 (Wash.App.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

In re: Metex Mfg. Corp.
    510 B.R. 735, 740 ( Bankr.S.D.N.Y. June 13, 2014) . . . . . . . . . . . . . . . . . . . . . . 4

In re Residential Capital, LLC
    2014 WL 1414136, *5 (Bankr. S.D.N.Y. April 10, 2014) . . . . . . . . . . . . . . . . . . . 4

iv

In re Residential Capital, LLC
    524 B.R. 465 (Bankr. S.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Lenett v. World Sav. Bank, FSB
    2008 WL 2009757, *2 (Cal. App. 2d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Leyva v. National Default Servicing Corp.
    127 Nev. Op. 40, 255 P.3d 1275, 1279 (2011) . . . . . . . . . . . . . . . . . . . . . . . 11

Longoni v. GMAC Mortg.
    2010 WL 5186091, at *4, *6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 52

Nieto v. Litton Loan Servicing LP
    2011 WL 797496, * 3 (D. Nev. Feb. 23, 2011) . . . . . . . . . . . . . . . . . . . . . . . 50

Pasillas v. HSBC Bank USA
    127 Nev. Adv. Op. 39, 255 P.3d 1281 (2011) . . . . . . . . . . . . . . . . . . . . . . . . 12

Rodriguez v. Prima Donna Co., LLC
    216 P.3d. 793, 799 (Nev. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Sattari v. Wash. Mut.
    2010 WL 3896146, *4 (D. Nev.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Simon v. B of A, 2010 WL 2609436, *12 (D.Nev.)
    citing, Betsinger v. D.R. Horton, Inc.
    126 Nev. 17, 232 P.3d 43, 436 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

T & Beer, Inc., v. Wine Source Selections, LLC
    2012 WL 360286, *3 (N.J.Super. A.D. (Unpublished opinion) . . . . . . . . . . . . . 50

Tene v. BAC Home Loan Servicing, LP
    2012 WL 222920, *2 (D. Nev. Jan. 25, 2012) . . . . . . . . . . . . . . . . . . . . . . . . 48

Weingartner v. Chase Home Finance, LLC
    702 F. Supp. 2d 1276, 1290, 1291 (D.Nev 2010) . . . . . . . . . . . . . . . . . . . . . 44

Wiseman v. Hallham
    113 Nev. 1266, 1270, 945 P.2d. 945, 947-48 (1997) . . . . . . . . . . . . . . . . . . . 47
    the Nevada Supreme Court adopted the Restatement
    (Second) of Torts § 323 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

### Statutes/Rules

11 U.S.C.  502(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Nevada Revised Statute  §11.220 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Nevada Revised Statute §107.080 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 18, 44

Nevada Revised Statute  §107.085 .. . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 17, 18

Nevada Revised Statute   §107.086 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Nevada Revised Statute   §107.087 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

1

Nevada Revised Statute  §107.089 ...................................... 12. 16

Nevada Revised Statute  §107.090 ...................................... 12

NRS 107.091 through NRS 107.100 ...................................... 44

Nevada Revised Statute §111.220  ...................................... 48

Nevada Revised Statute §719.100 ...................................... 49

Nevada Revised Statute §719.240 ...................................... 49

Restatement (Second) of Contracts §90 ................................... 50

Restatement (Second) of Torts § 323 .................................... 47

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

vi

THOMAS P. BEKO, ESQ. (SBN 01250)
ERICKSON, THORPE & SWAINSTON, LTD.
99 W. Arroyo Street
Post Office Box 3559
Reno, NV 89505
Ph: (775) 786-3930; Fax: (775) 786-4160
*Attorneys for Claimants Pamela D. Longoni,*
*Lacey Longoni and Jean M. Gagnon*

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |
| _____/ | |

### RESPONSE TO OBJECTION OF THE RESCAP BORROWER CLAIMS TO PROOF OF CLAIM FILED BY PAMELA D. LONGONI AND JEAN GAGNON CLAIM NOS. 2291, 2294, 2295 AND 2357

COME NOW, PAMELA D. LONGONI, individually and as the Guardian Ad Litem for LACEY LONGONI, and JEAN M. GAGNON, by and through their attorneys, ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and hereby submit the following response to the Objection to the Proof of Claims filed by Pamela D. Longoni and Jean Gagnon.[1]  As will be set forth hereinbelow, the debtors have failed to establish a necessary predicate to the defenses they have asserted against the plaintiffs' claims.  As a result, they have failed to meet their burden of refuting an essential allegation of the plaintiffs' claims.  Therefore, this Court should deny the current motion.

Moreover, as this Court will see, the plaintiffs' claims are, as a matter of law, entirely valid and therefore this Court should enter an order establishing this fact.

I.    **Summary of the Claims and the Debtors' Objection.**

1.    As the debtors have aptly noted, the claims of Pamela Longoni and Jean

---

[1] The claimant Pamela D. Longoni has asserted claims on behalf of her minor daughter, Lacey Longoni.

1

Gagnon arise as a result of the sale of their home following a nonjudicial foreclosure that the claimants allege was wrongfully undertaken by the debtors GMAC Mortgage, LLC ("GMACM") and Executive Trustee Services ("ETS"). That foreclosure began in February of 2009, and resulted in the sale of the claimants' home on August 14, 2009. The claimants brought suit alleging various claims based upon the substantive law of the State of Nevada.

2.    Generally speaking, the claimants' action was premised upon three simple concepts. First and foremost, the plaintiffs alleged that when conducting the foreclosure, GMACM and ETS violated Nevada law which required that any party conducting a foreclosure must be possessed of both the promissory note and the deed of trust. The claimants alleged neither GMACM nor ETS had those necessary rights. The claimants further alleged that the defendants' foreclosure activities violated various provisions of Nevada statutory law, including provisions which adopted a mandatory mediation program, which were an absolute prerequisite to the commencement of any nonjudicial foreclosure.

3.    In addition to challenging the debtors right to even commence a foreclosure upon the plaintiffs' property, the claimants also alleged that GMACM had, in fact, agreed to a modification of the claimants' existing home loan. And despite that fact, GMACM directed ETS to move forward with the foreclosure sale of their home. Secondly, the claimants allege that GMACM directed ETS to move forward with the foreclosure despite the fact that GMACM representatives had repeatedly promised Pamela Longoni (Longoni) that foreclosure activities were on hold. Based upon these acts, the plaintiffs alleged various tort and contractual claims.

4.    In their current motion, the debtors assert two basic arguments. First, the debtors argue that regardless of anything that GMACM's representatives may have said or done during the loan mitigation process, the foreclosure was proper since the claimants had breached their original loan agreement. They further assert that the debtors thereafter properly conducted the nonjudicial foreclosure. Alternatively, the debtors argue that the claimants cannot factually prove that there was an agreed upon loan modification, and even if they could, all the claims would be barred by reason of the statute of frauds. For the

2

1  reasons set forth herein, these arguments are fatally flawed.

2      5.      In making their current objection, the debtors have intentionally omitted any
3  discussion of the fundamental prerequisite to any of their claimed defenses, namely their
4  right to commence *any* nonjudicial foreclosure.  As alluded to above, Nevada law clearly
5  requires that before any party may foreclose upon a residential deed of trust, that party must
6  be possessed of both the promissory note and the deed of trust.  In this case, the defendants
7  have never been able to establish this threshold requirement.  As will be detailed herein, in
8  over a year of litigation, the debtors could never identify who held the plaintiffs' promissory
9  note.  During the course of discovery, they gave conflicting sworn answers to questions
10 which sought that basic information.  Now, in making their current arguments, they have
11 simply glossed over this fundamental requirement.

12     6.      Because the debtors cannot prove that they had *any* right to commence the
13 foreclosure, the issue of their subsequent compliance with Nevada's statutory requirements
14 is entirely superfluous.  Neither GMACM nor ETS had the rights under both the promissory
15 note and the deed of trust.  As a result, neither had any legal right to commence the
16 foreclosure upon the claimants' property.  For this simply reason, their current motion must
17 be summarily denied.

18     7.      Beyond this obvious flaw, the claimants will fully demonstrate that there was,
19 in fact, an enforceable agreement to modify their previous loan.  They will also show that
20 they fully and completely relied upon representations made by several GMACM
21 representatives that their home would not be foreclosed upon, and that such reliance
22 establishes fully enforceable legal rights under Nevada law.

23     8.      And finally, the claimants will show that immediately after the foreclosure sale
24 was completed, GMACM fully admitted that it had wrongfully foreclosed upon the
25 claimants' home, and that it thereafter undertook efforts to recover the home.  Unfortunately,
26 the new purchaser refused to sell the home back. When that occurred, GMACM then
27 undertook efforts to minimize the claimants' damages.  They first promised to, and did, in
28 fact, remove all negative credit references which they had placed upon the claimants' credit

3

history (both as to their loan default and the foreclose). Next they promised to reimburse the claimants for all costs they incurred as a result of having to move on 5 days' notice. However, when the claimants refused to provide the debtors will a complete release in exchange for such payments, the debtors reneged on that promise as well.

**II.     The Debtors Have Failed to Establish That They Had Any Legal Right to Commence the Non-judicial Foreclosure. Therefore, They Cannot Negate an Essential Allegation of Any of the Claimants' Claims, Let Alone All of Them.**

9.     The debtors failed to establish that they had a legal right to commence any non-judicial foreclosure. This failure completely precludes the debtors from the relief they seek in this matter. The claimants will first address the complete lack of a substantive basis to allow foreclosure. Following this discussion, the claimants will thereafter review the mountain of irrefutable evidence which unequivocally proves the validity of the plaintiffs' claims, which in turn are based upon representations made by GMACM representatives during the loan modification process.

**A.     Procedural Authority.**

10.     "Courts in the Second Circuit apply a burden shifting framework for claims objections." *In re: Metex Mfg. Corp.*, 510 B.R. 735, 740 ( Bankr.S.D.N.Y. June 13, 2014).

> A properly filed proof of claim constitutes *prima facie* evidence of the claim's amount and validity. When a valid proof of claim is properly filed, the party in interest objecting to the claim carries the burden of putting forth evidence sufficient to refute the validity of the claim. After the objector does so, the burden shifts to the claimant to establish the validity and amount of its claim by a preponderance of the evidence.

Id., 510 B.R. at 740. (Internal citations omitted.)

11.     In this regard, a properly filed claim is deemed allowed, unless a party in interest objects. 11 U.S.C. 502(a). "If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of

the claim. *In re Residential Capital, LLC*, 2014 WL 1414136, *5 (Bankr. S.D.N.Y. April 10, 2014). However, if the objector does *not* introduce evidence as to the invalidity of the claim, the claimant need offer no further proof on the merits of the claim. *In re Residential Capital, LLC.*, 524 B.R. 465 (Bankr. S.D.N.Y. 2015).

12.     As revealed above, in this case the objectors have failed to establish a fundamental predicate to their right to engage in *any* foreclosure activity. Because they cannot prove that they had the legal right, under Nevada law, to ever commence a nonjudicial foreclosure, as a matter of necessity they cannot defeat any of the claims asserted. Because of the inability to make this threshold showing, the burden would never shift back to the claimants to prove the validity of their claims (or show that the debtors objections are not sustainable). For purposes of completeness, however, the claimants will do both.

**B.    The Debtors' Objection.**

13.     To support their arguments that the foreclosure upon the claimants' home was lawful, the debtors offer two paragraphs of wholly unsupported facts. In paragraph 16, they properly note that on September 29, 2005, Longoni executed a promissory note and deed of trust on certain real property located at 5540 Twin Creeks Drive, Reno, Nevada ("Property"). *See, attached Exhibit 1.* The debtors declare to this Court that the deed of trust was "in favor" of Equifirst Corporation. However, as will be explained below, in truth, the beneficiary of the deed of trust is not Equifirst Corporation, but rather, it is Mortgage Electronic Registration System, Inc. ("MERS"). Next, debtors claim that the "loan" was placed into a securitized trust in December 2005, under which Residential Funding Corporation acted as the master servicer. They claim that Homecomings Financial LLC, and later, GMACM, acted as the sub-servicer on the loan from 2005 to 2013.

14.     Next, they claim that following several defaults under this original promissory note and deed of trust, in November of 2007, Longoni entered into a loan modification

1  agreement with Homecomings Financial, LLC.[2]  They claim that Longoni then defaulted on

2  that modified loan in December of 2008.  These claimed facts are true.  In footnote 10, the

3  debtors declare that "Homecomings Financial LLC service transferred all loans to GMAC

4  Mortgage LLC."  Notably, they offer no evidence to support this claim.

5     15.    Then, in paragraph 17, the debtors allege that due to Longoni's failure to make

6  the required payments, GMACM declared the loan in default and sent a notice of default to

7  Longoni on January 2, 2009.  They then claim that when Longoni failed to cure the default,

8  the "trustee, Debtor Executive Trustee Services, LLC ("ETS"), formally recorded a Notice

9  of Breach and Default and Election to Cause Sale [sic] of Real Property Under Deed of Trust

10 on February 26, 2009."[3]  Finally, they claim that this Notice was sent to Longoni at the

11 Property address on March 4, 2009.[4]  The recording of this Notice of Breach and Default was

12 the commencement of the non-judicial foreclosure.

13    16.    When making the argument that they properly performed the foreclosure upon

14 the claimants' home, GMACM or ETS failed to demonstrate that they possessed the

15 necessary legal rights to even commence that process.  The failure to prove this basic

16 underlying right renders all their remaining arguments superfluous.

17    17.    As is set forth in the claimants' Third Amended Complaint, there are numerous

18 allegations that the debtors (and others whom the debtor's claimed owned the promissory

19 note and deed of trust) never had the legal standing to commence the non-judicial

20 foreclosure.  *See, Third Amended Complaint, ¶ ¶ 22 (neither GMAC MORTGAGE, LLC nor*

21 *EXECUTIVE TRUSTEE SERVICES, LLC., had legal standing to commence non-judicial*

22 *foreclosure proceedings against the plaintiffs' real property).  Therefore, GMAC*

23 *MORTGAGE, LLC and EXECUTIVE TRUSTEE SERVICES, LLC wrongfully foreclosed*

24

25    [2] This agreement was also signed by the Claimant Gagnon.  This is the source of
   his rights in this litigation.

26

27    [3] The notice used the word "Sell" rather than "Sale"

28    [4] As will be demonstrated below, what the debtors forgot to tell this Court was that
   this Notice came back unclaimed.

6

*upon the plaintiffs' real property. See, also, ¶ ¶ 31, 32, and 71.*[5] The debtors' failure to establish their legal right to even begin the foreclosure process is fatal to their current motion.

18.    To understand the significance of this issue, it is important for this Court to review some of the history of the underlying litigation. When the plaintiffs commenced this action in April of 2010, they originally named GMACM and ETS as the only defendants. They named GMACM because that is the entity that the claimants had dealt with during the loan modification process and because their representative told Longoni that they had foreclosed upon her home. They named ETS because post foreclosure sale, they discovered that said entity had recorded all the public notices. In truth, the plaintiffs had no idea how GMACM or ETS were involved in their loan as the last entity that they had dealt with was Homecomings Financial who was listed as the lender in their 2007 loan modification.

19.    After the defendants finally answered the complaint, the plaintiff served the defendants with their first set of interrogatories which asked the defendants to identify each owner of the note and deed of trust. *See, attached Exhibit 2.* On December 2, 2010, GMACM responded as follows:

**Interrogatory No. 1:**

> Please identify each individual or entity who currently has or has had, or who has claimed to have had, possession and/or an ownership interest in the Note (GMAC-01-0129-0138) and Deed of Trust (GMAC-01-0088-0108) executed by the plaintiffs on or about September 29, 2005, relative to the property at 5540 Twin Creeks Drive, Reno, Nevada. Further state, the following:
>
> a)    The date upon which said person or entity obtained possession and/or ownership of said Note and/or Deed of Trust;
>
> b)    The date which said person or entity transferred possession or ownership of said documents;
>
> c)    The person or entity from which the person or entity obtained possession or a legal interest in the Note and/or Deed of Trust;
>
> d)    The person or entity to whom the Note and/or

---

[5] This Complaint is attached as Exhibit 1 to the debtors' Objection.

Deed of Trust were transferred.

**Response No. 1:**

| 9/29/05 | Equifirst Corp | Origination |
| 10/17/05 | Loan registered with MERS | Loan originated with MERS as nominee |
| 1/05/06 | Residential Funding Co, LLC as Trustees | Transfer of beneficial rights from EC |
| 10/08/06 | Residential Funding Co, LLC | Transfer of servicing rights from EC |

20.    Based upon this rather evasive response, the undersigned sought leave to amend the complaint to add claims against Residential Funding as it was assumed that as the holder of the plaintiff's note and deed of trust, that entity must have been responsible for the plaintiffs' wrongful eviction.  The Court granted leave for such filing, and on February 25, 2011, the plaintiffs filed their Second Amended Complaint adding Residential Funding as a defendant.[6]

21.    On July 29, 2011, the parties appeared before the United States Magistrate Judge on an unrelated matter.  During the course of that hearing, the debtors' counsel informed the court that he had received information from his clients that the owner of the note was not Residential Funding, but rather the note was owned by a company called Residential Asset Mortgage Products, Inc.  The debtors' counsel informed the court that he did not know where the entity was located.  *See, Minute Order, Doc. #80, attached hereto as Exhibit 3.*

22.    Soon thereafter, on August 5, 2011, GMACM served the plaintiffs with its Amended Response to Plaintiffs' First Set of Interrogatories.  In these responses, GMACM gave a completely different answer to the question of who owned the plaintiffs' promissory note and deed of trust.  In this amended response, GMACM stated as follows:

**(Amended) Response No. 1:**

On September 29, 2005, Equifirst Corporation originated the Note and Deed of Trust in the amount of $432,000.00; said Deed of Trust was recorded on October 7, 2005.  MERS was

---

[6] To avoid excessive exhibits, the claimants have not attached this pleading.  It is, of course accessible to the Court through the PACER system.

8

listed as "Nominee" on the Deed of Trust. Residential Funding Corporation, LLC ("RFC") purchased the Loan from Equifirst in November, 2005. On December 1, 2005, the Pooling and Servicing Agreement between Residential Asset Mortgage Products, Inc., (RFC), and U.S. Bank ("the PSA") was executed. The closing date of the PSA was December 28, 2005, and that is the date all of the Loans became securitized. Also on December 28, 2005, the Assignment and Assumption Agreement between RFC and Residential Asset Mortgage Products, Inc. was generated. That document has been previously produced as part of documents labeled RFC-002. That Assignment and Assumption Agreement provided for a transfer of ownership of the loans from RFC to Residential Asset Mortgage Products, Inc., and then an automatic transfer of ownership to the Trust of the loans for a stated period of time. Pursuant to the Assignment and Assumption Agreement, ownership of the loan at issue transferred to the Trust on that date – December 28, 2005. GMAC Mortgage, LLC obtained the right to service the loan on behalf of RFC on May 1, 2007. The investor on the loan currently is the Trust, RAMP 2205-EFC7, RFC is the Master Servicer, and GMAC is the second tier servicer.

23.    In response to this late disclosure, the undersigned was again forced to amend the complaint. Thus, the plaintiffs filed their Third Amended Complaint.[7] And, while it is true that the plaintiffs did file multiple complaints in this matter, the reason therefore was because the debtors could not identify who owned the plaintiffs' promissory note and deed of trust. To date, debtors have never provided any evidence of the actual transfer of rights (or possession) of the promissory note to either GMACM or ETS.

24.    After filing their Third Amended Complaint, the undersigned then took the depositions of the individuals identified as the person most knowledgeable for GMACM and ETS.[8] GMACM identified Mr. Juan Aguirre as its Person Most Knowledgeable. He first testified that he had no idea of the difference between Residential Funding Company, LLC.,

---

[7] Because Residential Asset Mortgage Products, Inc., and Residential Funding Company, LLC., had been identified as the owners of the promissory notes, the undersigned asserted bankruptcy claims against those entities as well. However, this Court previously dismissed those claims. *See, Supplemental Order, Doc. No. 6258.*.

[8] The individual identified as the Person Most Knowledgeable for GMACM also claimed that he was the PMK for Residential Funding Corporation. *See, Excerpts of the Deposition of Juan Aguirre, taken September 1, 2011, p. 8, attached hereto as Exhibit 4.*

9

and Residential Funding Corporation, however, he believed that at one point Residential Funding Corporation (which he identified as "RFC") owned the claimants' promissory note. *See, Exhibit 4, at pp. 62-63.* He believed that("RFC") owned the notes for a short period of time, (approximately 30 days). *Id. at pp. 62, 72-73.* Later on, however, Mr. Aguirre testified that RFC was merely the master servicer to the loan, and that GMACM was their subservicer. *Id. at pp. 65-66.*

25.    Mr. Aguirre later testified that after owning the plaintiffs' promissory note for the month, FRC sold the note to Residential Asset Mortgage Products, Inc., who thereafter transferred the note into a trust which he believed continued to own the note. *Id. at pp. 103-105.[9]* Mr. Aguirre further testified that despite these transfers, GMACM's computer system showed that Residential Funding Corporation was the custodian of the plaintiffs' note. *Id. at p. 94.* He admitted that he had never seen the note, nor did he know where it was at that time. *Id. at p. 87.*

26.    ETS's Person Most Knowledgeable, Mr. Myron Ravelo testified that he had no knowledge of any transfer of the claimants' promissory note to the ETS from either the trust (RAMP 2005EFC), Residential Asset Mortgage Products, Inc., Residential Funding Company, LLC, Residential Funding Corporation, GMACM or Homecomings Financial. *See, Excerpts of Ravelo deposition, pp. 21-22, attached Exhibit 5.* He further acknowledged that he had no idea who owned or held the claimants' promissory note when ETS got the foreclosure assignment from GMACM. In fact, he admitted that he was not aware that anyone had even inquired into the issue a the time. *Id. at pp. 62-63.*

27.    Notably, Mr. Ravelo also admitted that after October of 2010, ETS did not foreclose upon property until it had received a formal assignment of the deed of trust from MERS. *Id. at pp. 83-85.* After October of 2010, they only filed the Notice of Default after they had received such an assignment. *Id. at 85.* That had not occurred with regard to the

---

[9] It is interesting to note that Mr. Aguirre acknowledged that because of these transfers, when Homecomings Financial modified the claimants loan in 2008, they did not own that loan at the time. The rights to that loan had been sold to RAMPI in 2005. *Id. at pp. 124-125.*

10

1    Longoni's foreclosure.

2    **C.    Substantive Law.**

3    28.    Under Nevada law, it is clear that before any party can lawfully commence a

4    non-judicial foreclosure, that party must possess the legal rights to both the promissory note

5    and the deed of trust. In *Edelstein v. Bank of New York Mellon*, 128 Nev. Adv. Op. 48, 286 P.3d

6    249 (Sept. 27, 2012), the Nevada Supreme made it clear that when MERS is designated as the

7    original beneficiary on a deed of trust (which, of course, they were in this case, *see, Exhibit*

8    *1*), the note and deed of trust have been split making nonjudicial foreclosure by either party

9    improper. *Id. at *7.*  In reaching this decision, the Nevada Court found that such a division

10    was not irreparable.   However, the Court concluded that before a lawful nonjudicial

11    foreclosure could be commenced, the promissory note and deed of trust had to be reunited

12    in the same party.  Again, that never occurred in this case.

13    29.    Relying on the frequently cited decision of *Cervantes v. Countrywide Home*

14    *Loans, Inc.,* 656 F. 3d 1034, 1039, (9th Cir. 2011), the Nevada Supreme Court explained that

15    "[t]he deed and note must be held together because the holder of the note is only entitled to

16    repayment, and does not have the right under the deed to use the property as a means of

17    satisfying repayment." *Edelstein*, 286 P.3d at 254.  "Conversely, the holder of the deed alone

18    does not have a right to repayment and, thus, does not have an interest in foreclosing on the

19    property to satisfy repayment." Id. *See, also, Leyva v. National Default Servicing Corp.,* 127

20    Nev. Adv. Op. 40, 255 P.3d 1275, 1279 (2011) (recognizing note and deed of trust must be

21    held by same person to foreclose).

22    30.    In the underlying case, GMACM and ETS never established that either party

23    held both the  deed of trust and the promissory note.  Without proof of the reunification of

24    the deed and trust by either GMACM or ETS, neither had the legal right to foreclose upon

25    the plaintiffs' real property. In their current Objection, the debtors have once again failed to

26    make this requisite showing.  Because they cannot prove that they had the legal right to

27    commence *any* foreclosure upon the plaintiffs' home, they necessarily cannot prove that the

28

11

1    plaintiffs' claims are invalid.[10]

2    ///

3

4    **III.   The Debtors Were Obligated to Comply with Nevada's Mandatory**

5    **Foreclosure Mediation Program as the Debtors Have Readily Admitted That the**

6    **Foreclosure Process Should Have Been Recommenced after GMACM Accepted**

7    **Additional Payments from the Claimants.**

8    31.    In their underlying action, the plaintiffs' first claim for relief was founded upon

9    the defendants' failure to comply with certain provisions of the Nevada Revised Statutes,

10   namely sections 107.080, 107.085, 107.086, 107.087 and 107.090.  As the debtors alluded

11   to in their Objection, in 2009, Nevada adopted what is known as its mandatory Foreclosure

12   Mediation Program.  The essential terms of this program were codified through amendments

13   to certain sections of the Nevada Revised Statutes, primarily NRS §107.080, §107.085, and

14   §107.090.  More significantly, Nevada added two key statutes which related primarily to the

15   foreclosure mediation program, namely NRS §107.086 and §107.087.

16   32.    As was explained by the Nevada Supreme Court in *Edelstein v. Bank of New York*

17   *Mellon*, 128 Nev. Adv. Op. 48, 286 P.3d 249 (Sept. 27, 2012), the legislative changes increased

18   the owner's redemption period and created the Foreclosure Mediation Program which

19   required the foreclosing trustee to participate in a mediation program *before* proceeding

20   forward with a foreclosure.  To lawfully commence a foreclosure action, the trustee was first

21   required to obtain a Certification establishing that it he/she had participated in the program

22   in good faith.  Only when armed with such a certification could the trustee proceed forward

23   with the foreclosure.  *See, also, Pasillas v. HSBC Bank USA,* 127 Nev. Adv. Op. 39, 255

24   P.3d 1281 (2011).

25   33.    In this case, the debtors' single argument relative to these statutes is that they

26

27   _____

     [10] Undoubtedly, the debtors will attempt to present evidence to this Court which
     they never proffered in their current motion, or produced in the underlying litigation.  The
28   Court should reject any such untimely submission.

1   are inapplicable because these statutes only became effective as of July 1, 2009, and since

2   their Notice of Default was Recorded on February 29, 2009, the statues do not apply.  To

3   some extent, this argument is correct.[11]   However, what the debtors have failed to disclose

4   is that the debtors have admitted that once GMACM engaged in loan modification

5   discussions and accepted payments from the claimants, ETS was obligated to restart that

6   foreclosure process.   By taking additional funds from the plaintiff (which they never

7   refunded), the default amounts changed.  According to ETS's Person Most Knowledgeable,

8   Myron Ravelo, that required ETS to start the process anew.  Had they done so, they would

9   have been required to comply with Nevada's newly adopted mediation program.  Admittedly,

10  they did not.

11          34.    As the debtors have observed, in March of 2009, GMACM began working with

12  the claimants on a loan modification program.  It is undisputed that as part of that process,

13  the claimants made, and GMACM accepted three separate payments of $1,600.00.  Those

14  funds were never returned to the claimants.  *See, attached Affidavit of Pamela D. Longoni,*

15  *¶ 33, Exhibit 6.*   As noted above, once GMACM accepted those funds, the foreclosure

16  process should have been restarted.   In this regard, Mr. Ravelo testified as follows:

18  Q      Okay.  And when you say as long as the default amounts don't change, if
        GMAC on behalf of the lender receives additional funds, would the default
        amount change?

19

20  A      If the payment, and if the monies were applied, yes, it would change.

21  Q      Well, if they received them, whether they apply them or not, the amount in
        default would change, correct?

22  A      I can't make that statement.

23  Q      Why not?

24  A      If they don't apply to the loan and return it to the borrower the next day, then
        it doesn't –

25

26
_____

27      [11] The Notice of Default which ETS filed and recorded failed to comply with the
    provisions of NRS 107.085 which were in existence since 2003.  The 2009 amendments
    added additional requirements to §107.085, but did not eliminate those preexisting

28  requirements.  This issue will be discussed in greater detail below.

13

| | | |
|---|---|---|
| 1 | Q | Oh, sure, I totally understand that, sure. If GMAC receives money from the borrower and keeps the money, doesn't give it back to the borrower, then the default amount would change, correct? |
| 2 | | |
| 3 | A | That would be a fair assumption, yes. |
| 4 | Q | All right. And in that situation, you believe that ETS would need to go back and issue a new Notice of Default, is that correct? |
| 5 | | |
| | A | Yes. |
| 6 | | |
| | Q | And that was never done in this case? |
| 7 | | |
| | A | Which portion, I'm sorry? |
| 8 | | |
| | Q | Was there ever a new Notice of Default issued in this case? |
| 9 | | |
| | A | Not that I can recall, no. |
| 10 | | |
| | Q | And do you know why not? |
| 11 | | |
| | A | From my understanding, the amounts, the defaulted amounts did not change. |
| 12 | | |
| | Q | Okay. Do you know whether or not GMAC actually received additional funds from the borrowers, Ms. Longoni and Mr. Gagnon? |
| 13 | | |
| 14 | A | No, we were not aware of that. |

15   *See, Ravelo Depo, pp. 122-123, attached Exhibit 5.*

16   Mr. Ravelo further explained as follows:

| | | |
|---|---|---|
| 17 | Q | Okay. If, in fact, GMAC has received funds, but not enough to cure the default, then under that situation you then start the process over with a new Notice of Default providing those new numbers and continuing forward from there, is that right? |
| 18 | | |
| 19 | | |
| | A | We would have to get, we would have to get approval from GMAC, because if it changes the payment amounts, it technically isn't a valid foreclosure, period, regardless of what it is, so we would then have to refer it back to GMAC and they would have to refer it back to us. That is what I'm trying to - |
| 20 | | |
| 21 | | |
| 22 | Q | Right. That makes sense to me. If you started the process and there was a certain amount owed and the lender gets some money back from the borrower, then you have got to start anew, right? |
| 23 | | |
| 24 | A | From my understanding, yes. |
| 25 | Q | Okay. Do you have any explanation, I will submit to you that there were payments that were received by GMAC in this case from Ms. Longoni and Mr. Gagnon and the money was kept. It was never returned to them. Do you know why the foreclosure process wasn't started anew? |
| 26 | | |
| 27 | | |
| | A | No. |
| 28 | | |

14

*Ravelo Depo, pp. 127, attached Exhibit 5.*

35.    Through this testimony, the debtors have fully admitted that the foreclosure process should have been restarted after GMACM received additional monies from the claimants as part of the loan modification process. Undisputedly, they did not. *See, Aguirre deposition, Exhibit 4, p. 140, and Ravelo deposition, Exhibit 5, p. 137* Had they done what ETS's Person Most Knowledgeable testified they should have done, the foreclosure process would have been within Nevada's mandatory Foreclosure Mediation Program.

36.    It should be noted that the debtors have attempted to avoid the implications of these facts by arguing that the claim would be barred by reason of certain provisions which were contained within a *proposed* Foreclosure Repayment Agreement which contained a provision which provided that "In the event we do not receive timely payment called for under the Agreement, Lender may, without further notice to Customer, undertake or continue collection of foreclosure activities. . ." *See, Objection, ¶ 20.*

37.    However, the debtors fully admit that the claimants never executed this agreement. *See, Objection ¶ 19.* In fact, Longoni expressly rejected this agreement when it was proposed as she knew that they would never be able to make the requested payments, especially a huge balloon payment. *See, Longoni Affidavit, ¶ 10, attached Exhibit 6.* When Longoni informed Mr. Stephenson of this fact, he then said he was going to then propose a loan modification to GMACM which called for a $1,600.00 monthly payment. Stephenson advised Longoni that once that agreement was prepared, he would forward it to her for signature. At no time did he ever say that there would be any balloon payment, nor did he say that there was a time limit on the proposed plan. In fact, he repeatedly stated that if the plan was approved it would become permanent. He never provided Longoni with any written agreement.

38.    As will be explained below, GMACM's Repayment Plans were intended to allow a borrower to catch up on missed payments. This would require the borrower to pay a temporary increased monthly payment, but would necessarily entail a balloon payment at the end to catch up on the arrearage. However, a loan modification resulted in an actual

15

change to the loan documents but would not include any balloon payment. Anye deficiency would be capitalized into the loan. This is precisely why Mr. Stephenson never, ever referenced a balloon payment, and why he never stated that there was a limit on the number of trial payments.

39.     To try and justify their actions in this matter, GMACM now seeks to mislead this Court into believing that the loan modification plan was somehow terminated when Longoni did not make a balloon payment before July 1, 2009. In truth, because Mr. Stephenson removed the claimants from a "Repayment Plan" and instead placed them into a loan modification, there would be no limit on the number of payments, nor would there be any balloon payments. Any deficiency would simply be placed back into the loan. GMACM's attempt to convince this Court that the claimants failed in the Repayment Plan, thus justifying a deviation from their promise to keep her foreclosure on hold, is nothing short of outright fraud upon this Court.

40.     Mr. Stephenson rejected the "Repayment Plan" once he realized that the claimants would never be able to perform the balloon payment. He then sought to qualify the claimants for a loan modification. As detailed below, he repeatedly advised Longoni that everything appeared to indicate that the loan modification would be approved. Now, when the debtors have realized that they wrongfully foreclosed upon the claimants' property, they seek to combine elements of two entirely separate and distinct programs. Truth of the matter is, the claimants were never placed into a "Repayment Plan." The debtors' attempt to rely upon a breach of such a plan is noting more than a thinly-veiled attempt to cover up their wrongful foreclosure actions.

41.     Because the debtors failed to comply with Nevada's Mandatory Foreclosure Mediation Program, their defenses must necessarily fail. Thus, their instant motion must be denied.

**IV.     The Debtors Cannot Prove That They Complied with the Provision of Nevada Revised Statutes §107.085 and §107.089 Which Were in Existence since 2003.**

42.     As noted above, in paragraphs 46 through 48 of their Objection, the debtors

16

have challenged the plaintiffs' First Claim for Relief upon the grounds that the statutory

sections relied upon were not in effect until July 1, 2009, and since the foreclosure on the

plaintiffs' home was started in February of 2009, these laws simply did not apply.  While it

is true that there were certain amendments to the cited statues which did not become effective

until July 1, 2009, one statute, namely NRS §107.085, was in full force and effect since

2003.[12] Because the debtors failed to comply with this statute, they cannot prove that their

foreclosure action was lawful

43.    Pursuant to NRS section 107.085, certain property owners were entitled to an

additional notice.  *See, NRS107.085(2).*  Under this statutory section, no later than 60 days

before the date of the sale, the defendants were required to personally serve a notice which

contained the following information:

NOTICE
YOU ARE IN DANGER OF LOSING YOUR HOME

Your home loan is being foreclosed.  In 60 days your home will be sold and you will be forced to move.  For help, call:

Consumer Credit Counseling _____
The Attorney General _____
The Division of Financial Institutions _____
Legal Services _____
Your Lender _____
Nevada Fair Housing _____

44.    In this case, GMACM and ETS would have been required to personally serve

both Longoni and Gagnon with this notice no later than 60 days before August 14, 2009.

They have made no claim or showing that they did so.  For this wholly independent reason,

the foreclosure was unlawful and the plaintiffs' claims are valid.

45.    In addition, pursuant to the provisions of NRS §107.080(4)(a) (which had been

in effect for several years before 2009), the debtors were obligated to provide the claimants

with notice of the proposed trustee's sale either by certified or registered mail.  In this case,

the debtors claim that on July 23, 2009, they filed a Notice of Trustee sale in Washoe County

---

[12] For the convenience of this Court the claimants have attached a copy of the pre-2009 version of NRS §107.085.  *See, attached Exhibit 8.*

17

and posted a copy in three public places. They further claim that they published the notice in the Sparks Tribune (a city sister to Reno, Nevada). However, the debtors have made no showing that such notice was served upon the plaintiffs by registered or certified mail.

46. Because of this defect, the debtors have failed to prove that their foreclosure sale on August 14, 2009, was lawful. Thus, the plaintiffs' claims would be valid.

47. The debtors have provided this Court with copies of each of the notices which they claim were served upon the claimants. However, they have made no showing that they personally served any of the claimants with a Notice of Sale as required by NRS §107.085, nor have the shown that the served the plaintiffs with said notice by registered or certified mail, in violation of NRS 107.080.

48. Based upon this fact, the debtors cannot show that the plaintiffs' First Claim for Relief was invalid. Therefore, this Court should deny their instant motion.

**V.     The Evidence Is Irrefutable That Multiple Gmac Representatives Informed the Claimants That GMACM's Proposed Loan Modifications Were, in Fact, Fully Approved. The Evidence Is Also Irrefutable That GMACM Repeatedly Informed Longoni That All Foreclosure Actions Were on Hold.**

49. In their efforts to convince this Court that the claimants' claims lack merit, the debtors have highlighted certain chosen facts, whilst ignoring those which are most damaging. In this regard, the debtors seek to convince this Court that their own employee's notification to the claimants that the request for a loan modification had been approved is entirely immaterial because the claimants were in default of an erroneously claimed repayment plan. As discussed briefly above, the plaintiffs were not in a "Repayment Plan," but rather they were being considered for a loan modification. The debtors' argument that the claimants were in some type of "trial three-month" repayment plan which they failed to satisfy is simply erroneous.

50. As will be demonstrated herein, this is a classic example of the right hand not knowing what the left hand was doing. The process admittedly begins with GMACM proposing the plaintiffs enter into a "Repayment Plan." However, as alluded to above, that

1  plan was rejected in favor of a loan modification.  As will be shown in detail below, after Mr.

2  Stephenson proposed such a plan to GMACM, he repeatedly informed the claimants that all

3  signs indicated that GMACM would approve the plan.  Undisputedly, this process culminated

4  in Mr. Stephenson sending Longoni an email on June 30, 2009, telling her that he had

5  received an email indicating that GMACM had, in fact, approved her loan modification.

6      51.    In an effort to discredit Mr. Stephenson and to distance themselves from legal

7  ramifications of Mr. Stephenson's statements, the debtors argue that somehow Mr.

8  Stephenson lacked the ability to speak on behalf of GMACM because he had been assigned

9  to a new team.  The evidence, however, fails to support such a conclusion.  While it is true

10  that Mr. Stephenson did indicate that he was moving to a new team, he neither said nor did

11  anything that would suggest that he lacked authority to speak on behalf of GMACM.  As the

12  evidence will show, Mr. Stephenson acknowledged in writing that he sent an email inquiring

13  about the status of the claimants' loan application, and he received an email back stating that

14  the application had been approved.  If Stephenson lacked authority to act on behalf of

15  GMACM, why were his supervisors providing him information about the claimants' loan

16  modification application?

17      52.    GMACM also relies heavily upon the fact that nine days after Mr. Stephenson

18  notified Longoni in writing that their loan application had been approved, a different

19  GMACM representative (Henry Casas) informed Longoni that their loan modification

20  application had *not* been approved.  The parties vigorously disagree on the effects of this

21  subsequent statement.  The plaintiffs take the position that GMACM's agreement to modify

22  their loan was fully consummated on June 30, 2009, when Mr. Stephenson informed Longoni

23  in writing that he had received an email which stated that her modification had been

24  approved.[13]  The plaintiffs further contend that when Mr. Casas subsequently informed

25  Longoni that GMACM had not approved their loan modification request, what he did was

26

27      [13] As will be detailed below, the plaintiffs reject the debtors' arguments that the

28  statute of frauds invalidates this claim as the email exchanges between Longoni and Mr.
    Stephenson fully satisfy Nevada's writing requirement.

19

1  actually repudiate (and breach) the previously consummated agreement. Thus, in the matter

2  of nine days, GMACM entered into, and subsequently breached, the agreement to modify the

3  plaintiffs' loan. The plaintiffs made three $1,600.00 payments toward this loan modification

4  request and thus GMACM's promise was fully supported by valid consideration.

5      53.    In a related, but legally distinct matter, the evidence in this case is clear that

6  every GMACM agent who spoke with Ms. Longoni during this process informed her that

7  GMACM's foreclosure activities were on hold.    In reliance upon these repeated

8  representations, the claimants relied heavily to their detriment, both when making continued

9  $1,600.00 payments, and by failing to take steps to otherwise protect themselves against the

10  loss of their home.    These repeated promises were not only legally enforceable under the

11  doctrine of promissory estoppel, they also establish the basis for independent fraud and

12  misrepresentation claims. The claimants will now demonstrate the true undisputed facts.

13  They are as follows:

14      54.    It is undisputed that in January of 2009, Longoni first contacted the entity

15  which she was led to believe was servicing their loan, Homecomings Financial. *See, Longoni*

16  *Affidavit,  ¶6, attached Exhibit 6.* Pursuant to their direction, she sent them a letter requesting

17  a modification of their loan. *See, attached Exhibit 7.*  Over the next three months, Longoni

18  began working with the GMACM's loan specialist, Nate Stephenson. Initially, Stephenson

19  proposed what GMACM refers to as a "Repayment Plan." This repayment plan does not

20  actually modify a borrower's loan, but rather, it temporarily restructures a borrower's

21  payment plan to allow the borrower an opportunity to "catch up" on deficiencies in their loan.

22      55.    During their discussions, Stephenson sent Longoni a proposed agreement

23  entitled Foreclosure Repayment Agreement. This agreement required the claimants to make

24  three payments of $2,270.00 followed by a $19,420.00 balloon payment.    Longoni

25  immediately notified Ms. Stephenson that such a plan would never work as they would never

26  have the financial means to make that balloon payment. Longoni disclosed to Stephenson

27  that the most that she felt they could pay on a monthly basis was $1,600.00.

28      56.    In discussions which followed, Mr. Stephenson then advised Longoni that there

20

was another option which was available and that was a loan modification. Under the loan modification, the terms of her loan would be significantly changed. First, the amount of her monthly payment would be reduced, her interest rate would be reduced and a huge amount of the principal would be written off. Mr. Stephenson then instructed her to begin making monthly payments of $1,600.00. He informed her that he would submit a request for such a modification, and that she should continue to make the $1,600.00 payments. At no time did he ever indicate to her that this program was temporary, limited or would include any balloon payment. In fact, he expressly stated just the opposite. *See, Longoni Affidavit, ¶ ¶ 7-12, attached Exhibit 6.*

57.    Over a span of three months, the claimants made the requested payments. However, on each occasion Longoni encountered problems, none of which were her fault. She did request a brief extension on the first payment, which was fully accepted by GMACM. When she attempted to make the second payment in the same fashion as the first, GMACM refused to accept the payment. Thus, she was forced to make the payment via Western Union. During the entire process, Longoni had continued contact with Mr. Stephenson. On every occasion he assured her that he had submitted her request for modification and that everything he saw indicated that it was going to be approved. He repeatedly informed her that once the approval was obtained, he would be providing her with a written agreement confirming the terms.

58.    Undisputedly, near the end of May, 2009, Mr. Stephenson informed Longoni that he was going to be transferred to a different department the following week. He told that he was not sure who her loan was going to be assigned to, however, he told her he would let her know who she should contact. Over the next month, Longoni made several attempts to contact her new specialist. When she had no success, on June 30, 2009, she again emailed Mr. Stephenson, who told her that the new representative was Landon Huck. When Ms. Longoni asked for Mr. Huck's contact information, Mr. Stephenson informed her that he could not give her that information, however, he did say that he had actually received an email the prior day indicating that her loan modification had, in fact, been approved the prior

21

day.

59.     Over the next six days, Longoni attempted, without success, to make her next $1,600.00 payment.  On July 9, 2009, she was finally able to reach a live person who identified himself as Henry.  Longoni told Henry that she had been told on June 30, that her request for a loan modification had been rejected.  Henry responded and said that her application had not been approved. He further told her that they owed something in the nature of $19,000.00 or they would sell her house.  Critically, Henry also told her that GMACM was going to attempt to get her into an "Obama" plan and that she had 60 days within which to qualify for the program.  He specifically informed her that the foreclosure was on hold.

60.     Having received conflicting information, Ms. Longoni immediately sent a follow up  email to Mr. Stephenson advising him of  what Henry was saying.  Although he said nothing about whether GMACM had actually approved the loan modification request, Mr. Stephenson did confirm that GMAC was trying to get her into an Obama plan.  More significantly, he confirmed Henry's representation that the foreclosure was on hold.  He added that GMAC did not want to take her home.

61.     Unbeknownst to the claimants, ETS had restarted the foreclosure which was initially commenced on February 29, 2009.  On July 23, 2009, ETS recorded a Notice of Trustee's Sale  setting a sale date of August 14, 2009.  Three days later (July 26, 2009), GMAC shipped an "Obama" package to the plaintiff via Fed Ex Express.  The package was delivered to Longoni on August 2, 2009.  With that package, GMACM included a letter dated July 30, 2009, which stated that she needed to return the requested information.  The letter contained a notation "30 days to sale."  This seemed consistent with what Henry had told her previously when he said they had 60 days to complete the Obama application process.  Longoni completed the requested information and returned it to GMACM on August 10, 2009..

62.     Contrary to what Henry, Nate and the July 30, 2009 letter had stated GMACM and ETS did not wait 30 days.  They sold the plaintiffs' home at a trustee's sale on August

22

14, 2009.  On August 24, 2009, Longoni called GMACM to inquire into the status of her Obama application.  She was then told that her home had been sold at foreclosure on August 14, 2009. Longoni informed the representative that she had been repeatedly told that any foreclosure was on hold pending their Obama modification.  Longoni further informed the representative that she wanted her home returned.  Longoni was told that the matter would be referred to a supervisor.

63.    The following day (August 25, 2009), Longoni's 13-year old daughter Lacey received a 5-day notice to vacate her premises.   Over the next week, Longoni scrambled to find a new home for herself and her daughter.  It was just prior to the start of the school year. The next contact from GMACM came via a telephone call from GMACM's counsel, Mr. Michael Knapp.  In that call, Mr. Knapp admitted that GMACM had made a terrible mistake and that they were attempting to get her home back.

64.    Apparently, GMACM engaged in some negotiations with the new purchaser, however, the purchaser was unwilling to reconvey the property to GMACM for a price acceptable to GMACM.  Thereafter, GMACM's counsel undertook efforts to removal all negative credit references from the claimants' credit history.  They also offered to pay all the claimants' moving related expenses, however, when the claimants would not sign a full release for such payments, GMACM reneged on that offer.  The instant lawsuit followed.

65.    The evidence used to support the claimants' arguments herein is truly uncontroverted.  It consists primarily of email communications between Ms. Longoni and Loan Specialist, Nate Stephenson.  It also is supported by debtors' own internal Log Notes (or diary). Although the diary was created by various GMACM representatives, ETS had full access to this database.[14]   Finally, the claimants' allegations are supported by the debtor's own written correspondence.  The evidence is as follows:

66.    On February 18, 2009, GMACM's notes reflect that a "workout package" was

---

[14] GMACM and ETS representative both testified that these notes reflect ongoing communications between GMACM and ETS. *See, deposition of Aguirre, pp. 39-40, Exhibit 4 and deposition of Ravelo, p.155 Exhibit 5.*

23

sent to the claimants. *See, attached Exhibit 9, bates page GMAC-01-0065.* The very next day, (February 19, 2009) GMACM referred the matter to ETS to commence foreclosure. *Id. See, also, Ravelo deposition, Ex. 5, p. 63.* On March 5, 2009, GMACM received the claimants' completed financial package. *See, Exhibit 9, bates page GMAC-01-0067.* On March 10, 2009, GMACM approved the matter for their loss mitigation program. *See, Exhibit 9, bates page GMAC-01-0068.* GMACM's March 10, 2009, notes further reflect that they were going to pursue a Repayment Plan. *See, Exhibit 9, bates page GMAC-01-0068.* This plan consisted of 3 monthly payments of $2,270.00, followed by a balloon payment of $19,421.76 *Id.* Attached hereto as *Exhibit 10* is the proposed Foreclosure Repayment Agreement. The addendum describes the payment schedule.

67.    Before proceeding forward, the claimants believe it is important for this Court to gain an understanding of what GMACM did as part of its Loss Mitigation practices. To assist its Loss Mitigation Specialists, GMACM adopted its own internal guidelines which they refer to as Servicer Guide. *See, attached Exhibit 11. See, also, Deposition testimony of Aguirre, pp. 158-159, Exhibit 4.* This guide identified the various options which are available for loss mitigation. The options included "Temporary Indulgence," "Repayment Plan," "Special Forbearance Relief Agreement," "Deed-In-Lieu of Foreclosure," "Write Offs," "Bankruptcy" and, of course, "Foreclosure." Each had their own terms and conditions.

68.    As set forth in GMACM's materials, their "Repayment Plan simply allowed a borrower to increase his/her payments over time to make up for a deficiency. Under a repayment plan, the loan would *not* be modified and there would be no write off or debt forgiveness. *See, Exhibit 11, bates p. RFC-001-000300, 369.* A "Loan Modification," however, occurred where there was a change in one or more terms of the original mortgage note. Such changes could entail a change to the interest rate, payment amount, maturity date, or the principal balance of the loan. *See, Exhibit 11, bates p. RFC-001-000378.* Loan modifications could be done under several plans such as "Traditional," "HAMP," "Second Lien Bulk" or "Framework (Bush)." *See, Exhibit 11, bates GMAC-02-000193.*

24

69.    According to the GMACM's Person Most Knowledgeable, loan modifications started as "trial" modifications and then changed to "permanent" modifications. *See, Aguirre Deposition pp. 185-186, Exhibit 4.* HAMP modifications (which are synonymous with "Obama" modifications) came into effect in March of 2009, but GMACM did start to use them until May of 2009. *Id. at 164-165. 194.* GMACM Loan Specialists could utilize either Traditional plans or HAMP plans depending upon which option worked best for the borrower. *Id. at* 165. According to Aguirre, the specialist would look first to the Traditional modification, however, when the HAMP program was enacted, it was used as the terms were more liberal for the borrower (i.e., reduced interest rates, extended terms, etc.). *Id. at 188-189.* This is precisely what occurred in this case.

70.    As GMACM's own record reveals, Mr. Stephenson first proposed a Repayment Plan which required three payments of $2,270, followed by a balloon payment which was over $19,000.00. However, when it became clear that the claimants could never successfully complete such a plan, Mr. Stephenson immediately moved the claimants into a Loan Modification plan. As the records reveal, that plan started as a "trial" modification which was only dependent upon final approval. Later, on June 29, 2009, final approval for the plan made it permanent.

71.    The debtors' efforts to now convince this court that the only loss mitigation plan GMACM ever proposed was a Repayment Plan is obviously nothing more than a thinly-veiled rouse which is intended to create a pretextual justification for the wrongful foreclosure. GMACM's current claim that the claimants "breached" the repayment plan is obviously nothing more than a cover for GMACM's failure to inform ETS that it was changing the plaintiffs' Loan Modification plan from a Traditional Plan to an Obama Plan.

72.    The record plainly reveals that Messrs. Stephenson and Casas both informed the plaintiff that the foreclosure was on hold pending the claimants' application for an Obama modification. Unfortunately, no one at GMACM took the time to tell ETS not to proceed forward with the foreclosure. Having subsequently realized their mistake, GMACM attempted to recover the plaintiffs' home from the trustee's sale. When they failed in that

25

endeavor, they had no choice but to manufacture a defense.   Unfortunately, for the debtors, their skills of deception are matched only by their level of incompetence.

73.    Returning to a review of the debtor's own evidence.  When it became obvious that a Repayment Plan was not a viable option, Mr. Stephenson decided to pursue a Loan Modification.  GMACM's log notes from March 19, 2009, clearly reflect that change.  *See, Exhibit 9, bates page GMAC-01-0072.*  This note reads as follows:

> The borrower does not have enough savings to reinstate the loan
> and their financials do not support a repayment plan.

On the following page (*GMAC-01-0072*), GMACM's notes reflect the fact that a "trial" loan modification was being proposed.   That note reads as follows:

> Proposed Solution: GMAC Mortgage proposes a 3 month trial
> **modification** consisting of a down payment of $1600 and a
> monthly contribution of $1600.  Upon successful completion of
> the trial the estimated mod terms will be: Mod Type; Cap:
> Interest Rate Type: ARM to ARM; Interest Rate: 3.25; Index
> Rate 3.9; Margin: -0.65; Arm Freeze: 5 year Freeze; NPV
> $10,737.80.  (Emphasis added)

74.    Clearly these notes reflect a complete remodeling of the claimants' loan.   By the same token, they completely dispel the notion that this was a Repayment Plan which would do nothing more than allow the borrower to "catch up" a deficiency.   According to PMK Aguirre, the letters "Cap" meant that any deficiency would be capitalized into the loan. *Aguirre deposition at p. 231, Exhibit 4.*   The plan was set to commence on March 30, 2009. The interest rate would be frozen for 5 years.   As this Court likely noticed, according to GMACM's own Servicer Guide, Repayment Plans were for a maximum of 18 months.  *See, Exhibit 11.*

75.    GMACM's diary further reflect that on March 27, 2009, Longoni contacted GMACM and requested a couple more days to make the first payment. *See, Exhibit 9, bates p. GMAC-01-0073.*   The notes reflect that Mr. Stephenson granted Longoni an extension

until April 3, 2009, and Longoni made her payment within that time.   Longoni's Affidavit

confirms these entries.  *See, Longoni Affidavit, Exhibit 6, ¶ 12.*

76.    GMACM's notes of March 30, 2009, are further proof that the plan to allow

$1,600.00 payments was not part of a Repayment Plan, but rather, were the first step in a

Loan Modification.  As this Court can see, Mr. Stephenson's note confirmed that he had

requested a debt forgiveness of $186,000.00 which was sent for approval.  *Exhibit 9, bates

page GMAC-01-0073.*  Repayment plans made no provision whatsoever for debt forgiveness.

Obviously, he had abandoned any idea of using the loss mitigation technique of Repayment

Plan.

77.    From this point forward, the communications between Stephenson and Longoni

are further confirmed by email communications.  These communications are attached hereto

in *Exhibit 10*.  The undersigned will now review those communications as they correspond

to GMACM's internal notes.  Their communications begin on April 2, 2009, after Longoni

had made the claimants first $1,600.00 payment.  Emphasis has been added to the most

pertinent remarks.

| 4/2/09 | Pam to Nate | Hi Nate, So I got this weird call this a.m. at the house from Homecomings leading me through all these prompts to make the $1600 payment.  So I followed the steps and made the payment accordingly.  My confirmation number is 684165546.  The payment was $1600 plus a $7.50 transaction fee.  Whew!  I'm glad that's over.  And now I don't have to go hassle with Western Union.  So when is my next payment due?  Thanks for everything!  You rock! |
|---|---|---|
| 4/2/09 | Nate to Pam | That's great!!!  Your next payment is due 4/30/09 for $1600. **All that I am awaiting on in order to make this a permanent change (next 5 yrs) is approval from the Vice President of the Bank.** I should know the outcome in the next month (ish) :).  Thanks, Nate. |
| 4/2/09 | Pam to Nate | Oh?? I thought this was a "for sure" thing.  There's a chance it will not go through? |
| 4/2/09 | Nate to Pam | Your **trial modification is approved, but since I am trying to write off $176K from your loan, I need to get approval from our Vice President.**  There is a chance that she may come back and say no.  **I have done the analysis already and it seems to be a win win situation, so I am fairly confident that it will get approved for a permanent modification.** |

| 4/20/09 | Pam to Nate | Hello Nate, how are you? I'm just following up. I will make another payment of $1600 next Thursday the 30th. I still have not received any documentation regarding the modification. I know you told me not to worry, but I'm just weird that way! Do you still feel confident that this will go through? I am absolutely certain that anything higher than $1600 a month will just make it a matter of time before we would have to mail you the keys – yuck. Have a great week. Pam |
| --- | --- | --- |
| 4/21/09 | Nate to Pam | Hi Pam, sorry to take so long to get back to you. I have been out sick. I am still waiting on approval from our VP. Things are a little backed up here due to the current state of the housing market. I'll let you know as soon as I hear anything. Hope all is well. Thanks, Nate |
| 4/21/09 | Pam to Nate | Nate, sorry to hear you aren't feeling well. I will wait to hear back from you. Tell that VP not to let me lose my house! Ha. Take care, Pam |
| 4/21/09 | Nate to Pam | I'll let her know. Thanks, Nate |
| 4/28/09 | Pam to Nate | Hi Nate, I was just looking at my mortgage information on line, and it indicates that the last payment of $1600 was received, as well as the $7.50 fee for processing. Then on April 7th it indicates that the fees in the amount of $2316.30 have been charged to the account. What does this mean, and am I responsible to pay that? I will be making another payment of $1600 on Thursday. Thanks! Pam |
| 4/28/09 | Nate to Pam | Hi Pam, the $2316.30 is actually the escrow shortage. I have added that back into the loan already. **I just took a look at the notes on your loan and it looks as if one manager looked at it and agreed that it was a win win situation, but because it is $186K that we are trying to write off, it has to go a little higher**. Thanks, Nate. |
| 4/29/09 | Pam to Nate | Hi Nate, what has to go a little higher? Can you tell me the balance of the loan? |
| 4/28/09 | Nate to Pam | Hi, it has to go to higher management, due to the amount. The balance that I am showing is $439177.63. **If we get this MOD approved your balance will drop to $269,677.03 for five years.** |
| 4/28/09 | Pam to Nate | Hi again, Ok, I get it – sort of. So $439,000 minus $186,000 is $253,000 (and change) not $269,000, right? And so what happens after five years? The interest rate goes up, and the principal goes back? I know, I'm such a pest. I owe you. Pam |
| 4/28/09 | Nate to Pam | **The $186K includes $15K in interest. So the actual principal that is being written off is around $169K. After 5 yrs your rate will increase by no more than 1% per year. The highest it can go is 13.875%. The principle will be gone forever.** Don't worry about being a pest, that's what I'm here for!!! Let me know if you can think of anything else. |

78.     From this exchange several things are made clear.  First and foremost, Mr. Stephenson always referred to this as a loan modification.  Never once did he describe it as a Repayment Plan.  Never once did he say that the $1,600.00 payments would be followed by any sort of balloon payment.  He confirmed that the "trial modification" had been approved and all he was waiting on was approval from a VP to make it permanent.  He confirmed that he had done the analysis and that it was a "win-win" situation.  He confirmed that when approved it would drop the principal on their loan which would remain constant for 5 years (obviously far longer than 18 months).

79.     The debtors' representations to this Court that GMACM was only proposing a Repayment Plan is nothing short of out and out misrepresentation.  GMACM's diary during this time period contain no reference whatsoever to any repayment plan.  What they do show is that certain remarks have been redacted.  *See, Exhibit 9, bates page GMAC-01-0074.*  The redacted sections undoubtedly prove that this was a Loan Modification rather than a Repayment Plan.

80.     On May 1, 2009, Longoni attempted to make her second payment to GMACM.  *See, Longoni Affidavit, Exhibit 6, ¶ 17.*  She had made the first payment via an on-line payment system, however, she was unable to do so a second time.  She also attempted to make the payment by directly contacting a phone representative, however, that request was refused.  Thus, the plaintiff again contacted Mr. Stephenson and the following exchange occurred.

| 5/1/09 | Nate to Pam | Hi Pam, it looks like someone put a "Certified Funds Flag" on your acct.  Basically that means that the only pymt that we can take has to be certified.  I have removed that flag.  Could you please try one more time and see if that solved the problem.  Please let me know what happens and we'll go from there.  Hope all is good.  Thanks, Nate |
|--------|-------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 5/5/09 | Pam to Nate | Hi Nate, so I made my payment of $1600 on Friday, May 1st via Western Union.  I just got a call from Homecomings stating that my payment has not been received.  Can you please check for me? Thanks, Pam |

29

| 5/5/09 | Nate to Pam | **According to what I see we rcv'd $1600 yesterday. You're good to go!!! It doesn't look like our VP has had a chance to look at this yet. (We are swamped!!!!!!!!!!) The notes that I saw are good though (indicating that it makes sense to do the Modification). We still have 2 months before I would have to set up a plan. So everything is still sort of on hold.** Hope all is well. Let me know if you have any other questions. Thanks, Nate |

81.    As noted above, in this exchange, Mr. Stephenson specifically advised Longoni that everything looked good on the modification. He added that they still had two months before he would have to "set up a plan." He did not define what that phrase meant. He further confirmed that everything was on hold.

82.    As this Court will recall, according to GMACM's PMK Aguirre, GMACM started to implement the HAMP program in May of 2009. *See, Aguirre Deposition, p. 165, Exhibit 4.* GMACM's Log Notes of May 22, 2009, confirms this testimony through the following notation "Home Affordable Modification program sent to borrower." *Exhibit 9, bates page GMAC-01-0076.* By May 26, 2009, the claimants had still received no documentation from GMACM regarding the modification. So Longoni sent a follow-up email communication to Mr. Stephenson.

| 5/26/09 | Pam to Nate | Hi Nate, I hope all is well. I will be making my third payment of $1600 on Friday. However, I still have not received any paperwork re: the modification. Do you have an update for me? And do I still continue the $1600 next month? I hope so. I would never be able to afford more. I also have a friend who has a loan with Homecomings/ GMAC. His situation is very similar to mine. Can I refer him to you and see if you can help him? Thanks, Pam |
| 5/26/09 | Nate to Pam | E-mail: Hi Pam, hope that you are doing well. I don't have an update for you yet. **You should continue to make the $1600 pmt. We should be getting an update fairly soon. Once the decision has been made then paperwork will be sent out with the new terms.** I am actually moving to a different team next week so I will not be able to help your friend, but if he just calls in someone will be able to help him with his situation. Let me know if you can think of any other questions. Have a good one!! Thanks, Nate |

83.    Mr. Stephenson confirmed that she should continue to make the $1,600.00 payments. He indicated that he expected an update soon and that once a decision had been

30

made he would forward her the "paperwork." And, while it is true that Mr. Stephenson indicated that he was going to be moving to a new team, he never indicated that he would have no authority to speak on behalf of GMACM.

84.    GMACM now seeks to distance itself from any of Mr. Stephenson's further comments claiming that he no longer had any authority to speak on behalf of GMACM. While it may be true that he had been reassigned, he never once indicated to Longoni that he lacked the authority to act on behalf of the company, or that she should not rely upon what he was telling her.

85.    In accordance with Mr. Stephenson's instructions, Longoni made her June payment on June 1, 2009. Still she heard nothing. *See, Longoni Affidavit, Exhibit 6, ¶ 18.* GMACM's logs notes of June 12, 2009, reflect the following: "FORECLOSURE STARTED." *Exhibit 9, bates page GMAC-01-0077.* A note of June 30, 2009, indicated "PROMISE PLAN 29 BROKEN" and "ACTION/RESULT CD CHANGED FROM LMDC TO DT 6/30/09.[15] GMACM now claims that the claimants breached the Repayment Plan which prompted them to recommence the foreclosure process. However, a note of July 2, 2009, suggests otherwise. A note from LHUCK (presumably Landon Huck) states the following, "CALLED HOME LEFT MESSAGE. WILL NEED NEW HMP IN ORDER TO REVIEW FOR MOD. PLS HAVE BWR FAX TO 866-709-4744.*" Exhibit 9, bates page GMAC-01-0077.* A note which followed indicated that Huck had requested that a new HAMP workout be sent to the claimants mailing address.

86.    This Court should recall that these notes are occurring after the date that GMACM now claims the decision had been made to reinstate the foreclosure proceedings because the claimants had breached their repayment plan by failing to make a $19,000.00 balloon payment. To support this argument, they have been forced to misrepresent to this Court that there was, in fact, a Repayment Plan in place. Clearly there was not. That plan

---

[15] GMACM's PMK did not know what these notes meant. A deposition of those individuals knowledgeable about these notes was sent to commence on May 24, 2012, however, the depositions were vacated when GMACM served notice of the bankruptcy on May 17, 2012.

had been rejected way back in March of 2009, when the Loan Modification process was commenced. The entire argument regarding a breach by way of a failed balloon payment is obviously a fabrication to justify the wrongful foreclosure.

87.    During the later part of June, Longoni had made several attempts to speak to a new Loan Specialist, however, she could not find anyone who knew the status of their request. Therefore, she again reached out to Mr. Stephenson. The following email exchange occurred.

| 6/29/09 | Pam to Nate | Nate, I can't seem to get a hold of anyone who knows anything about the modification you were working on. Homecomings sent me information indicating that my payment was as it was before, and the balance was the same. Please help!!!! |
| 6/30/09 | Nate to Pam | Hi Pam, I e-mailed my old dept yesterday and they responded that the file has been sent for final management approval. The person handling the file is Landon Huck. I hope that this helps you. Good luck. |
| 6/30/09 | Pam to Nate | Hi Nate, do you have any contact information for Landon? Thank you for still helping us. Hope you are having a nice summer. Pam |
| 6/30/09 | Nate to Pam | Hi Pam, I am sorry I am not able to give you the contact info. **I did, however, rcv an e-mail stating that the MOD had been approved yesterday, but that is all I know.** You may want to call in and see if you can get some more details. Thanks, Nate |
| 6/30/09 | Pam to Nate | Nate, when I call the regular Homecomings 800 number, no one knows any information. Do you have a suggestion as to what department I could start with? So it was approved? Does that mean the $1600 payment and the principal reduction? Wow! |
| 6/30/09 | Nate to Pam | You might be able to try 1 800 799 9250 |
| 6/30/09 | Pam to Nate | So "approved" means $1600 a month and the principal reduction? |
| 6/30/09 | Nate to Pam | That is the way that I had it set up, however, I am not sure if that was how it was approved or not. Thanks, Nate |

88.    As alluded to above, although Mr. Stephenson informed Ms. Longoni that an individual by the name of Landon Huck was now handling her file. He stated that he had sent an email to his old department inquiring into the status. Far more importantly, he expressly stated to Longoni that he had received an email the day before indicating that her

32

1    MOD had been approved.  Although he stated that he did not know if it had been approved

2    as they had discussed, he did state that it was how he had set it up.

3        89.    Critically, GMACM's PMK Aguirre acknowledged that there was only one

4    Loan Modification Plan ever proposed by Mr. Stephenson, and that was the one which

5    Stephenson had described to Longoni, namely $1600 payments, with a $186,000.00 write

6    down.  *See, Aguirre Deposition pp. 264-266, attached Exhibit 4.*  Thus, there could have

7    been no other plan that Stephenson was referring to.

8        90.    Beginning on July 1, 2009, Longoni attempted to make her next payment of

9    $1,600.00.  However, the system would not accept that payment.  On July 9, she was finally

10   able to make contact with a representative of GMACM.  The individual she spoke with was

11   named Henry.  *See, Longoni Affidavit, Exhibit 6, ¶ 21.*  During that call, she asked Henry

12   about the status of her loan modification as she had been told on June 30, 2009, that it had,

13   in fact, been approved.  Much to her shock and amazement, Henry then told her that it was

14   *not* approved, that she owed approximately $19,000.00 and that if she did not pay it, they

15   would sell their home.  She attempted to make the next payment of $1,600.00, however, he

16   refused to accept it.  He told her that it was only set up for three months.  Critically, no one

17   had ever told her that the payment plan was only for three months, and no one ever told her

18   that there would be a $19,000.00 balloon.   *Id.*  This entire concept is clearly something

19   which GMACM has manufactured after the fact to justify ETS's actions.

20       91.    As the undersigned indicated earlier, this case is a classic example of the right

21   hand not knowing what the left hand was doing.  The undersigned referred to GMACM as

22   the right hand, and ETS as the left hand.  In reality, even within GMACM one agent was not

23   aware of what the other was doing.  It appears that Huck did not realize that Stephenson had

24   abandoned the Repayment Plan in favor of a Loan Modification.  This explains why he was

25   telling Longoni that there was a balloon payment.  That balloon payment related to the

26   Repayment Plan that Stephenson had originally proposed, but clearly abandoned in lieu of

27   the Loan Modification plan.

28       92.    Despite his apparent confusion, Henry nevertheless advised Longoni to submit

33

a new workout package as per the Obama Modification plan. *See, Longoni Affidavit, Exhibit 6, ¶ 21.* He told her that they had 60 days to continue to pursue a loan modification through this new federal program. <u>He specifically told her that the foreclosure was on hold</u>. *Id.* As set forth in Longoni's Affidavit, she believed that under the worst case scenario, they had until at least until September 9, 2009, to qualify for new federal modification program.

93.    Longoni's conversation with "Henry" was confirmed in an email she sent to Nate Stephenson that very same day. This email exchange reads as follows:

| 7/9/09 | Pam to Nate | Nate, I have been trying to make the $1600 payment for SIX days, and to no avail. I finally reached financial services this morning and was told by some guy named Henry that our modification was NOT APPROVED and we owe $19,0000 some odd dollars or they will sell our house!! He would not accept the $1600 payment and said that was only set up for three months. Nate, you assured me that this was approved and everything would be okay. Please help. I can't get anyone at GMAC/Homecomings to understand our situation. Now what do we do? I can't lose my house. If I do, my ex will take my kids away from me. Please e-mail or call me. |
| --- | --- | --- |
| 7/9/09 | Nate to Pam | Pam, It looks like they are trying to put you onto an Obama Modification. **Your Foreclosure is on Hold. GMAC does not want to take your house.** When we last talked I said that from the information that I could gather from my old dept. this was waiting to be approved by management. I am not sure what happened with that, but when I had originally set you up it was a traditional GMAC Mod. We are now trying to put everyone into the Obama plan. Per the notes that I saw Landon Huck gave you a call on 7/02. There is an Obama pckg that you can download from <u>www.gmacmortgage.com.</u> Go to Resource Center, then go to Homeowner Help, Download the financial analysis PDF. You can fax it to 866-709-4744. There will be a check list for the items that we need. I am sure that we have most of it, but please try to send it all to be sure. I want you to know that we will try to do everything we can before we proceed with a foreclosure. Unfortunately, I can't do anything with the file myself because I am no longer with this group. I hope this helps you a little bit. Sorry for all of the confusion. Thanks, Nate. |
| 7/9/09 | Pam to Nate | Nate, I know you are no longer with this group, but you are the only contact I have. I have NEVER received a call from Landon Huck. How can I reach him? Can you e-mail him and have him contact me? I was out of town on 7/2... but never had a message or anything. What is an Obama Modification? Thx, P |

34

| 7/9/09 | Nate to Pam | Hi Pam, I will e-mail Landon and have him give you a call. The Obama Modification is a program that the govt came out with in mid April, and we started doing them in mid May. It is basically a subsidized program that allows us to drop payments down to 31% of the borrowers gross income. **It allows us to be a little more aggressive with our rates and debt forgiveness**. Thanks, Nate |
|--------|-------------|------|

94.    Longoni's description of her exchange with "Henry" is fully confirmed in GMACM's log notes. An entry of July 9, 2009, reads as follows:

> TTB1 [means telephone call with borrower] VAI [means verified account information] CI BC WANTED TO INQ MOD THAT WAS APPROVED RECENTLY.  ADV NT TRUE. ADV PREV REPAY PLAN IS COMPLETED.  ADV TO RETURN WOUT PCK ASAP, TAT IS 60 DAYS, NO GUARANTEED. I TRIED TO UPDATE DTI CALC BUT B DID NT KNOW HER GROSS INCOME. SD SHE WOULD CB TOMO SHE HAD TO GO TO WORK.
>
> *    *    *
>
> PAYCUT START: 9/2008 ONGOING. M/I; 1800 A MONTH. **ADV F/C SALE DT ON HOLD**, L/C AND C/R CONT. HCASAS.

*See, Exhibit 9, bates page GMAC-01-0078.*

95.    GMACM's PMK, Aguirre confirmed that this was a note written by Henry Casas. *See, Aguirre Deposition, Exhibit 4, pp. 247-248.* Based upon Stephenson's email communication and GMACM's diary notes it is undisputable that both Henry Casas and Nate Stephenson advised Longoni that the foreclosure was on hold. There is absolutely no evidence that anyone ever told the claimants anything different. What is also clear from these exchanges is that GMACM was telling Longoni that the HAMP program was actually better than the Traditional program that, according to Stephenson, the claimants had been approved for. Thus, regardless of any claim that Stephenson lacked authority to speak on behalf of GMACM, it is clear that his promises of deferral of the foreclosure were fully confirmed by another, purported fully authorized GMACM representative.

96.    GMACM's actions to continue to have the claimants *requalified* for the HAMP program are confirmed through another entry in GMACM's diary. In a note dated July 13, 2009, yet another GMACM representative telephoned Longoni and left a message saying that

35

they needed a completed Obama package back to review the account for a possible loan modification. *See, Exhibit 9, bates page GMAC-01-0079.*

97.    All these communications are especially noteworthy in light of GMACM's current claim that as of July 1, 2009, Longoni had breached the "Repayment Plan," thus justifying ETS's foreclosure activities. If it were true that the claimants had breached their Repayment Plan thus authorizing foreclosure, why where GMACM's employees still actively pursuing the HAMP modification. Truth of the matter is, when Landon Huck picked up the file, he erroneously believed that the claimants had been placed into a Repayment Plan. He did not realize that Stephenson had abandoned the Repayment Plan and thereafter pursued a Loan Modification. GMACM's own documents prove this fact.

98.    As set forth in Exhibit 13, on July 16, 2009, GMACM sent the claimants an automated letter which stated that "[T]he repayment plan we previously established at your request has been cancelled for one or more of the following reasons:"

> [[x]] The payment was not received by the payment date as specified in the signed repayment agreement.

Of course, there never was a signed repayment agreement as the Repayment Plan was abandoned in March of 2009.

99.    GMACM now claims that the foreclosure was properly restarted because the claimants failed to make the required balloon payment (*See, Objection, ¶ ¶ 18-21).* Despite the fact that GMACM had directed ETS to recommence the foreclosure process, GMACM continued to mislead the claimants into believing that a loan modification was available. On July 29, 2009, GMACM directed the sending of a letter with an Obama Workout Package. *See, Exhibit 9, bates page GMAC-01-0081.* GMACM's log note on this issue is very telling. That note reads as follows:

> obama workout package provided in today 30 days to sale (no contact) letter.

100.    Having heard nothing further, on August 3, 2009, Longoni sent another email to Nate Stephenson. Their exchange reads as follows:

36

| 8/3/09 | Pam to Nate | Nate, I hate to bother you but I have no alternative. I am absolutely unable to get any assistance from GMAC at all and now I am getting notices in my mail from some place called ETS saying my house is being sold at auction on the 18th. Why is this happening? I thought everything was going smoothly. I have NEVER received anything from GMAC. Please Nate, please help. Thanks, Pam |
|--------|-------------|-----|
| 8/3/09 | Nate to Pam | Hi Pam, apparently, you need to send in the workout package that you can download from our website. Once we get that then they can work on it. The instructions are below. Hope that this helps. Also please include your acct number on everything that you send. Thanks, Nate |

101.    Notably, Mr. Stephenson did not tell her that it was true that her home was going to be sold. Instead, he told her to send in the Obama workout package. The following day (August 4, 2009), Longoni received a package from Fed Ex Express. *See, Longoni Affidavit, Exhibit 6, ¶ 27.* Along with a Financial Analysis Form, Longoni received the letter referenced in GMACM's July 29, 2009 log note. That letter is attached hereto as *Exhibit 14.* As the Court will note, that letter specifically contained a note which reiterated the "30 days to sale" notation that was referenced in the GMACM log notes. GMACM and ETS, of course, did not give the claimants 30 days to complete the new Obama process, instead they sold their home at auction on August 14, 2009.

102.    Not knowing that her home had actually been sold, on August 24, 2009, Longoni telephoned GMACM to inquire about the status of her loan modification request. *See, Longoni Affidavit, Exhibit 6, ¶ 29.* She advised the representative that she had received an email from Nate Stephenson on July 9, 2009, stating that the foreclosure was on hold and that she believed GMACM was trying to get them qualified under HAMP program. At that time, the representative told her that her home had been sold at foreclosure on August 14, 2009. Longoni told her that she wanted her home back, however, was told that she would need to speak with the representative's supervisor who was gone for the day. *Id.*

103.    Again, GMACM's log notes fully confirm Longoni's testimony. *See, Exhibit 9, bates pages GMAC-01-0086-87.* In pertinent part, this note reads as follows:

". . . B1 [borrower 1] SAID THAT SHE RCVD

37

1    AN EMAIL FROM A L/M RP ON 7/9 STATING

2    THAT THE FCL WAS ON HOLD AND WE

3    WERE TRYING TO GET THEM MODIFIED

4    UNDER THE HMP PROGRAM. THE

5    PROPERTY WENT TO FCL ON 8/14.

6    TURNED ACCOUNT OVER TO SUPER

7    FTOLBERT.

8    This diary note is critical for several reasons. First it shows that Longoni does not know her

9    home has been sold at foreclosure. It also shows that Longoni specifically referenced the

10   July 9, 2009 email that she undisputedly received from Nate Stephenson on that day. The

11   note also confirmed that this representative had turned the matter over to a supervisor

12   identified as FTOLBERT.

13       104.    At three points in their instant Objection, the debtors quite recklessly claim that

14   Longoni fraudulently fabricated an email which purported to prove that on August 3, 2009,

15   Stephenson had sent her an email which purportedly stated "Don't worry your foreclosure

16   is on hold." *See, Objection paragraph 38 (wherein the debtor's counsel actually quotes the*

17   *alleged fraudulent representations, as well as paragraphs 74, and 76.* To support this

18   preposterous allegation, the debtor's counsel attaches (as Exhibit 37) the email which they

19   claim came from Pamela Longoni on August 3, 2009.[16] However, a review of this purported

20   email clearly reveals that GMACM's representations are false. The only reference to an

21   email is one dated August 24, 2009, which is a *forwarded* email (See, FW in Subject line)

22   of Longoni's previous August 3, 2009 email to Nate Stephenson. This email most certainly

23   does not contain the phrase quoted by GMACM's counsel (i.e., Don't worry your foreclosure

24   _____

25   [16]    It is also interesting to note that the debtors seek to authenticate this email
through the affidavit of an associate attorney (Avery Simmons) who purportedly worked
for the firm of Bradley Arant Boult Cummings, LLP in the underlying litigation. *See,*

26   *Exhibit 3 to Objection.* In this affidavit, Simmons claims that before this litigation,
Longoni forwarded an "alleged email chain she had with Nate Stephenson." She claimed

27   that Exhibit 37 was a true and accurate copy of that email. Clearly, she would not be
competent to make these representations. Moreover, one must ask the rhetorical question

28   of why it was that debtors never produced this email during the course of the litigation.

1  is on hold"). This is an out and out misrepresentation by GMAC's counsel.

2      105.  Longoni did not "materially alter evidence," "forge a key document" or "falsify

3  an August 3, 2009 email with Nate Stephenson" as the debtors now suggest. Longoni did

4  nothing more than *forward* her exact email communications from Nate Stephenson between

5  July 9, 2009 and August 3, 2009.  At no point in time has Longoni ever alleged that anyone

6  told her on August 3, 2009, that foreclosure activities were on hold.  *See, Plaintiff's Third*

7  *Amended Complaint, paragraphs 37 through 46 and esp. paragraph 46.*  Her claims are

8  based entirely upon the July 9, 2009 representations of Mr. Stephenson and Mr. Casas, which

9  are fully confirmed by both Mr. Stephenson's email and GMACM's internal diary.

10     106.  What is especially significant about debtor's Exhibit 37 is the fact that they

11  never previously disclosed this email chain.  The reason therefore is obvious since it fully

12  verifies all of the plaintiffs' allegations.  Further on down this chain, the Court will see an

13  August 26, 2009 email that GMACM employee Logan Gill sent to Benjamin Willis.  In that

14  email, Mr. Gill stated the following:

15          Hopefully you can help me out with this. Basically the long and
16          skinny is that Nate told this lady the foreclosure was on hold
            when it is not and it went to 3rd party sale. He now knows not
17          to email borrowers/3rd parties and will definitely be held
            responsible for his actions, but would this fall under the mod
18          teams cost center as far as the rescind process is concerned? I
            am willing to do the leg work on it if I need to but I just need to
19          figure out where this would fall. Thanks in advance for all your
            help.

20     107.  After GMACM's efforts to recover the plaintiffs' home from the trustee sale

21  purchaser failed and this litigation was commenced, GMACM did everything humanly

22  possible to avoid acknowledging responsibility for their wrongful actions.  For more than a

23  year, GMACM denied knowledge of the whereabouts of Nate Stephenson.  More

24  significantly, GMACM claimed that they did not have the email communication that Mr.

25  Stephenson had received on June 29, 2009, which indicated that the claimants' loan

26  modification request had been approved.

27     108.  During the course of the underlying litigation, the plaintiffs made repeated

28  requests for the email Mr. Stephenson described in his June 30, 2009, email.  The debtors

claimed they did not have it.   However, during the deposition of GMACM's PMK's, Mr. Aguirre admitted that he had never been asked to look for it. *Aguirre deposition, pp. 170-171.* He further admitted that he was aware of no efforts being made by anyone to try and find that email, or efforts to capture and preserve such emails. *Id. At pp. 176-177.* Thus, it is not surprising that the debtors could not produce that email.  Undoubtedly, GMAMC did the same thing to this email that they did to Mr. Stephenson – they disposed of it.

109.   Despite GMACM's efforts to prevent the plaintiffs from contacting Mr. Stephenson, just prior to the debtors declaring bankruptcy, the undersigned finally located Mr. Stephenson.   Mr. Stephenson revealed that after this incident with the claimants, GMACM fired him, purportedly because his "production numbers were low."   According to Mr. Stephenson, GMACM's stated justification for his termination was a pretext, that the real reason he was fired was because he had disclosed the fact that Ms. Longoni's loan modification had, in fact, been approved by GMACM.  This, of course, is fully verified by Mr. Gill's email communication wherein he states that Mr. Stephenson would "definitely be held responsible for his actions."

110.   Attached hereto as *Exhibit 15* is a sworn affidavit from Mr. Stephenson confirming the facts just as Ms. Longoni claims.  Ironically, this affidavit was signed just two days prior to the day when the debtors filed notice of their bankruptcy.  In his affidavit, Mr. Stephenson confirmed that on June 30, 2009, he did, in fact, send an email to his former department inquiring into the status of Longoni's loan modification request. *See, Stephenson Affidavit ¶ 7.* He further confirmed that he received a responsive email stating that the Ms. Longoni's final loan modification had, in fact, been approved. *Id. at ¶ 8.* From this, it is clear that GMACM's denial of the existence of a final approval of the claimants' loan modification is nothing short of an out and out lie.

111.   The debtor' conduct after the August 14, 2009, foreclosure also prove their admission of liability.  As set forth in Ms. Longoni's attached Affidavit, on September 9, 2009, she received an unsolicited telephone call from GMACM's counsel Michael Knapp who told her in no uncertain terms that GMACM made a terrible mistake.  He told her that

40

they were attempting to recover her home and that she would not have to move out. *See, Longoni Affidavit, Exhibit 6, ¶ 35.* In this litigation, the debtors initially denied the allegation that after the trustee sale they tried to recover the claimants' home. However, both Messrs. Aguirre and Ravelo testified that they were fully aware that such actions had been undertaken. *See, Aguirre deposition, pp. 255-56, Exhibit 4 and Ravelo deposition, pp. 127-129, Exhibit 5.* However, he refused to answer questions as to why such actions were taken, claiming the attorney-client privilege.

112.    During the course of discovery, the claimants recovered further evidence of the debtors' efforts to recover the plaintiffs' home after the foreclosure sale. In this regard, they located a proposed Settlement Agreement pursuant to which GMACM would by back the plaintiffs' home. *See, attached Exhibit 16.* Apparently, the purchaser wanted more than the $4,000.00 that GMACM was willing to pay for the return of the home.

113.    When efforts to recover the plaintiffs' home failed, GMACM undertook efforts to minimize the plaintiffs' damages. First, they took steps to completely remove from the claimants' credit records all negative references, both as to any default in their loan as well as the foreclosure. Attached hereto as *Exhibit 17* are letters and emails sent by GMACM's counsel to the claimants outlining the actions they were taking to minimize the claimants' harm. *See, also, Longoni Affidavit, Exhibit 6, ¶ 37.* However, when GMACM's counsel sought to extract a release from the plaintiffs in exchange for these payments, they refused and the debtors then reneged on their promise to reimburse them for these expenses.

114.    These actions on the part of GMACM are not inadmissible settlement negotiations – they are clear, unequivocal admissions that the debtors' actions toward the claimants were wrongful. Attorney Knapp fully admitted that GMACM had made errors and in accordance therewith he sought to recover the plaintiffs' home. When that occurred, GMACM then undertook efforts not to settle this matter, but to mitigate the plaintiffs' recoverable damages. Discussions about settlement only occurred once GMACM sought to render a cash payment to the plaintiffs. Since that time, the debtors have refused to formally acknowledge their errors. They have been obsessed with protecting their image. Instead,

41

they spent hundreds of thousands of dollars evading legitimate discovery requests and providing incomplete and evasive discovery responses. It is no wonder they were forced to declare bankruptcy. And, as the current Objection reveals, as long as there is a pot of money to pay their attorneys, they continue their efforts to avoid any accountability.

115. Based upon this detailed review of the evidence in this case, several things are irrefutable. First, the claimants never defaulted upon any Repayment Plan by failing to make a balloon payment. The proposed Repayment Plan was abandoned in March of 2009 in favor of a Loan Modification. Second, the claimants made each of the $1,600 payments called for under the "Trial" modification plan and as of June 29, 2009, GMACM had approved their request for a permanent loan modification. Third, after June 29, 2009, GMACM, and only GMACM decided to change the claimants' loan modification plan from the Traditional plan (which GMACM had already approved) to a HAMP modification. Fourth, as part of this process, both Nate Stephenson and Henry Casas informed Ms. Longoni that all foreclosure efforts were on hold and the claimants were never told otherwise.[17] And finally, after GMACM discovered that ETS had sold the plaintiffs' home, their counsel informed Longoni that they had made a terrible error. Thereafter, GMACM attempted to recover the plaintiffs' home from the third party purchaser, however, when that action failed, GMACM took action to remove from the claimants' credit all negative references which GMACM had caused to be placed upon their record.

116. Based upon these undisputed facts, the plaintiffs' claims are all valid and therefore the Debtors' current objection should be denied.

## VI.    The Claimants' Fraud and Misrepresentation Claims are Valid.

117. The debtors made the very same challenge to the plaintiffs' Fraud and Misrepresentation claims before the Nevada District Court and the court expressly found that

---

[17] While Longoni acknowledged in her August 3, 2009 email to Stephenson that she had received some notice from "ETS" that her home was going to be sold on August 19, 2009, she believed that such notice had to be in error as GMACM had told her that her modification was approved and they were still working to get them approved for a HAMP modification. *See, Longoni Affidavit, ¶ 29.* It is also undisputed that the formal Notice of Trustee's Sale came back to ETS as undelivered. *See, attached Exhibit xx*

the claims stated a valid claim for relief. *See, Longoni v. GMAC Mortg., 2010 WL 5186091, at \*4.* The debtors now seek to reargue the law of the case claiming that the only false statement of fact that the claimants can remotely point to is Mr. Stephenson's June 30, 2009 statement that he had received an email stating that their modification had been approved the prior day. The debtors claim that he corrected his error that same day. *See, Objection ¶ 56.* This is simply untrue.

118. After Mr. Stephenson told Longoni that the request for a permanent modification had been approved, all he did was tell her that he was not certain of the exact terms of the modification. He did say that it was how it was he had it set up. This clearly is not a repudiation of any previous statement. The moment that Mr. Stephenson advised Ms. Longoni that their loan modification had been approved, an enforceable agreement was created. In reliance upon what Mr. Stephenson had told her to do, she and Mr. Gagnon made three payments of $1,600.00. They made these payments as part of their request for a permanent loan modification. As will be addressed below, contrary to the debtors' current arguments, that agreement was not in violation of the statute of frauds as it is clearly proven through writings, including Mr. Stephenson's June 30, 2009 email communication and GMACM's own diary notes.

119. GMACM now seeks to deny the existence of this agreement by claiming that 9 days after Mr. Stephenson told Longoni that their request for a permanent loan modification had been approved, Henry Casas told Ms. Longoni that there was no such approval. Such a claim is erroneous. As stated above, a fully enforceable agreement was formed on June 9, 2009, when Mr. Stephenson advised the claimants that the loan modification request was finally approved. What Mr. Casas did on July 9, 2009, was repudiate that agreement. Thus, Mr. Stephenson's promises were made, but they turned out to be false when they were repudiated by Mr. Casas and the plaintiffs relied to their detriment upon his statements. The fraud claim is clearly valid.

120. Additionally, GMACM's representation that the claimants are asserting only one false promise as the basis for their fraud claim is also quite erroneous. As was aptly

43

noted by the Nevada District Court when it denied the debtors' first motion to dismiss, the plaintiffs' fraud claim was based upon **two** alleged false representations. The first related to the promise that the loan modification had been approved. There was a second false promise and that was that the foreclosure was on hold. As the Nevada Court properly concluded, the plaintiffs relied upon these statements in making the $1,600.00 payments *and* by making no preparations to leave their home thereby incurring additional moving costs and rental expenses. Moreover, as is set forth in Longoni's attached Affidavit, had she known that the promises of a stayed foreclosure were false, she would have pursued other means by which to bring the home out of foreclosure. *See, Longoni Affidavit, Exhibit 6, ¶ 43.* She quite reasonably relied upon the representations of both Messrs Stephenson and Casas. As such, the fraud and misrepresentations claims are clearly valid.

**VII.    The Plaintiffs' Negligent Misrepresentation Claims Are Entirely Valid.**

121.    Debtors claim that the Plaintiffs' fourth claim for relief entitled "Negligence and Negligent Misrepresentation" fails to state a viable claim because the debtors owed the plaintiffs no duty of due care. However, the specific roles of the parties within this action illustrate both a duty, and a myriad of viable negligence claims.

**A.    Negligence per se is a not a separate form of negligence liability.**

122.    As the debtors argue, a lender generally owes no duty of care to its borrower. However, "this is only true in a lender's conventional role as a mere lender of money. It does not indicate that lenders (or others such as ETS who had no lender-borrower relationship with the plaintiffs) have no duty of care in foreclosure proceedings." *Weingartner v. Chase Home Finance, LLC*, 702 F. Supp. 2d 1276, 1290 (D.Nev 2010). The duty of care applicable to foreclosures is, at a minimum, defined by Nevada's foreclosure statutes found at NRS 107.080 through NRS 107.100. "These statutes set the floor of the duty of care for a foreclosing entity." *Weingartner, Id*. at 1291.

123.    The standards of negligence *per se* are well established at Nevada law. "A violation of statute establishes the duty and breach element of negligence only if the injured party belongs to the *class* of persons that the statute was intended to protect, and the injury

44

is of the *type* against which the statute was intended to protect." *Anderson v. Baltrusaitis*, 113 Nev. 963, 965, 944 P.2d 797, 799 (1997)

124.    The amended complaint reflects violations of various sections of the foreclosure code, NRS 107.080, *et seq.*, which establish negligence *per se* type claims. (*See,* #32, ¶¶ 27-34;  ¶¶64-66.)  This alleged violation of statutory duties in and of itself is sufficient to state a negligence claim.  "Although sometimes pled as such, negligence per se is not a separate cause of action, but a doctrine whereby the floor of the duty of care is set as a matter of law, removing from the fact-finder the 'reasonable person' determination and leaving to the fact-finder only a determination of causation and damages. . ." *Weingartner,* 702 F.Supp. at 1290.  Thus a negligence claim is stated precluding dismissal.

### B.    A claim for common law negligence is stated.

125.    Even in the absence of a statutory duty, Plaintiffs maintain that this lender, in its role as a forecloser of property, has a duty to exercise reasonable care, especially when those standards have been so clearly codified. (*See,* # 32, ¶¶ 63-66.)  This is especially true in cases such as this where the lender goes above and beyond the normal lender role and negotiates a loan modification.  In such situations, the lender's duties significantly increase.

126.    Nevada has held that the a hotel proprietor has a duty to effectuate a reasonable eviction.  "When evicting a person from the premises, a proprietor has a duty to act reasonably under the circumstances." *Rodriguez v. Prima Donna Co., LLC,* 216 P.3d. 793, 799 (Nev. 2009).  As alleged within the Complaint, Plaintiffs received a five-day notice to vacate the premises and were evicted.  (*See,* #32, ¶ 20.)  It simply does not seem to be a quantum leap in reasoning that if a proprietor has a duty to act reasonably in evicting a person from a hotel premises, then a mortgage forecloser would have a similar duty to act reasonably in evicting someone from *their home.*

127.    Moreover, claims for negligent foreclosure have been allowed to proceed to trial before a jury. *See, Gunsul v. Countywide Home Loans, Inc.,* 2006 WL 3586091, **2-6 (Wash.App.) (negligent foreclosure claim allowed to proceed due to material issue of fact as to whether a lender failed to timely provide exact pay off information required to stop

foreclosure); *Lenett v. World Sav. Bank*, FSB, 2008 WL 2009757, *2 (Cal. App. 2d) (case submitted to trial against lender on claim of negligent foreclosure).

128.    On a related note, "wrongful foreclosure" also potentially involves an element of negligence, and probably negligence per se when statutory violations are involved.    This cause of action is recognized at Nevada law.    "An action for the tort of wrongful foreclosure will lie if the trustor or mortgagor can establish that at the time the power of sale was exercised or the foreclosure occurred, no breach of condition or failure of performance existed on the mortgagor's or trustor's part which would have authorized the foreclosure or exercise of the power of sale." *Collins v. Union Federal Sav. & Loan Ass'n*, 99 Nev. 284, 304, 662 P.2d 610, 623 (1983).

### C.    Negligent misrepresentation is also properly stated.

129.    Negligent misrepresentation in Nevada is defined as follows:

> One who, in the course of his business, profession, or employment, or in any other action in which he or she has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he or she fails to exercise reasonable care or competence in obtaining or communicating the information.

*Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 449, 956 P.2d. 1382, 1387 (1998), *quoting* Rest. 2d of Torts, § 552(1)(1976).

130.    Elements toward satisfying these requirements of negligent misrepresentation may be found within the Third Amended Complaint.   Very similar factual circumstances to those alleged herein have been found to state viable causes of action for negligent misrepresentation.   For example, in *Ghervescu v. Wells Fargo Home Mortgage Co.*, 2008 WL 660248 (Cal. App. 4th) (unpublished), a property owner was given misinformation about a notice of default.   He was in the process of applying for a forbearance agreement, and was never told that the application had been denied.   He was further told that he would have ample time to "make arrangements" to cure any default and reinstate the loan since any trustee sale could not be held earlier than a certain fixed date. *Id.*, **1-2.   Instead, and approximately five weeks prior to that fixed date, the property owner, when following up

regarding his pending application, was told that the Trustee Sale had already been held. *Id.*, *2.

131.    The California court applied a negligent misrepresentation standard all but identical with Nevada's. *Id.*, *3. With an eye toward these allegations, that court allowed the plaintiff's negligent misrepresentation claim to proceed for the lower court's consideration. Id., *6. *See also, of similar effect, Fidelity Mortgage Trustee Service, Inc. v. Ridgegate East Homeowners Assoc.*, 27 Cal. App. 4th 503, 506, 32 Cal. Rptr. 2d. 521, 523 (1994) (claim as to whether mortgage trustee had negligently misrepresented that foreclosure proceedings would be delayed allowed to proceed to the jury).

132.    Based upon the foregoing, the plaintiffs have clearly stated a viable claim for negligent misrepresentation. The evidence unequivocally demonstrates that the debtors made false statements of fact which were relied upon by the claimants to their great detriment. Thus, the claims are valid.

**D.    Even assuming a "no duty" rule applicable to lenders, an exception to such "no duty" rule is stated by the complaint's averment.**

133.    Moreover, based on the same misrepresentations, and purported efforts towards loan modification reflected within the Third Amended Complaint, said averments fall within an exception to any purported "no duty" rule. For example, within *Wiseman v. Hallham*, 113 Nev. 1266, 1270, 945 P.2d. 945, 947-48 (1997) the Nevada Supreme Court adopted the Restatement (Second) of Torts § 323 (1965), which appears equally applicable here. That section provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other persons or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:
>
> (a)    the failure to exercise such care increases the risk of such harm; or
>
> (b)    the harm is suffered because of the other's reliance upon the undertaking.

*Id.* This theory of negligence liability is pled at in paragraphs ¶¶ 113-114.

47

134.    Here, when GMACM undertook efforts at loan modification, which were relied upon by the plaintiff, GMACM fell within the parameters of the above-referenced exception to the "no duty" rule.  Reliance may be shown by tendering loan payments in compliance with the  understanding of the loan modification plan.

**E.    A claim for negligent infliction of emotional distress is also stated.**

135.    To state a claim for NIED within the wrongful foreclosure context, the plaintiffs "must establish, at the very least, the traditional elements of negligence, and allege verifiable physical manifestations of emotional distress."  *Simon v. B of A*, 2010 WL 2609436, *12 (D.Nev.), *citing, Betsinger v. D.R. Horton, Inc*., 126 Nev. 17, 232 P.3d 433 (2010).

136.    The plaintiffs have pled all such elements, and as is set forth below, they have shown the requisite physical manifestations of necessary for an award of damages under a negligent infliction of emotional distress claim.  *See also, Betsinger v. D.R. Horton, Inc*., 232 P.3d at 436 (putative mortgagor's jury award against mortgagee reversed, since putative mortgagor had failed to present any evidence that he had suffered physical manifestation of emotional distress).[18]  Furthermore, plaintiffs have averred a legally sufficient claim that the underlying foreclosure was wrongful, which also establishes a properly plead claim.  *See*, e.g., *Sattari v. Wash. Mut*., 2010 WL 3896146, *4 (D. Nev.)(summary judgment on NIED claim granted where plaintiff failed to raise genuine issue of fact that defendant acted improperly in foreclosure process).

**VIII.   The Claimants' Breach of Contract and Promissory Estoppel Claims are entirely valid.**

---

[18] The mere allegations reflected within the complaint, wherein the plaintiffs' home was wrongfully sold from underneath their feet, constitutes extreme and outrageous behavior.  Notably the *Betsinger* case made no contention that "extreme and outrageous" behavior was not shown within context of the failed real estate transaction.  It reflects that the Nevada Supreme Court will recognize  emotional distress claims within the mortgagor/mortgagee context, and this federal court, as one sitting in diversity jurisdiction, must apply the substantive law of the forum state in which it resides. *Adelson v. Hananel*, 2009 WL 2835119, *3 (D. Nev.).

137.    As the debtors have properly noted, to prove the breach of contract claim, they need only show the existence of a valid agreement or contract between the parties, a breach of contractual terms by the defendant, and damages. *Tene v. BAC Home Loan Servicing, LP,* 2012 WL 222920, *2 (D. Nev. Jan. 25, 2012).    In this case, the evidence set forth above clearly proves there was an agreement to modify the claimants' mortgage loan.    However, the debtors erroneously claim that this agreement is unenforceable under Nevada's applicable statute of frauds, namely NRS §111.220(1) since it would be an agreement which by its terms cannot be performed within one year from its execution.    Again, these arguments are erroneous.

138.    First, the agreement which the plaintiff's claim was breached was the agreement to enter into a loan modification.    That agreement could, and would have been performed within one year.    Had GMACM fulfilled its promise, that agreement would have be fully performed immediately.    Without question, the underlying loan modification could have extended longer than one year, but it cannot be said that it could not be fully performed within one year.    The claimants could have immediately sold the home to another or refinanced the loan through another lender.    Thus, it is simply cannot be said that the agreement could not be performed within one year.

139.    Secondly, the debtors have erroneously argued that the agreement itself had to be in writing and signed by the party to be charged.    However, this is incorrect.    Writings which satisfy the statute of frauds do not necessarily equate with common notions of what does, or does not, constitute a contract or written agreement.    First, NRS 11.220 itself references merely "notes or memorandums" of the agreement being in writing.    The exchange of a series of email correspondence between GMACM and Longoni satisfies all elements of contract formation and all essential elements of the contract.    The emails reflect terms, dates sent, identity of the drafters, and signatures.

140.    Under Nevada law, this exchange of electronic communications is sufficient for contract formation.    *See*, NRS 719.240(3)("If a law requires a record to be in writing, an electronic record satisfies the law."); NRS 719.100 ("'Electronic signature' means an

49

electronic sound, symbol or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record.")  This concept is unique to Nevada.  *See, Bronner v. Park Place Entm't Corp.*, 137 F. Supp. 2d 306, 312 (S.D.N.Y.2001)(a series of correspondence and memoranda may constitute an agreement that satisfies the Statute of Frauds);  *Gordon v. Beck & Gregg Hardware Co.*, 40 S.E.2d 428, 432 (Ga. App. 1946)(statute of frauds may be satisfied by series of writings internally connected and intelligible without parol aid and showing an agreement coextensive with the stipulations of the alleged contract).

141.    Indeed, to whatever extent the former mortgage requires that modification be in writing, these subsequent exchanges also comply with the terms of the initial mortgage.  *See, T & Beer, Inc., v. Wine Source Selections*, LLC 2012 WL 360286, *3 (N.J.Super. A.D. (Unpublished opinion)(series of e-mails satisfied requirement that modification of terms of agreement must be in wringing and signed by the parties).

142.    Based upon the foregoing, it is clear that an enforceable contract was formed between the claimants and GMACM. That agreement is not rendered unenforceable by Nevada's Statute of Frauds.

### A. The claimants' Promissory Estoppel Claim is also fully established by the record in this matter.

143.    Even if this court feels that the writing requirement is not met, promissory estoppel renders the promises made by GMACM fully enforceable. As the debtors have fully acknowledged, promissory estoppel may serve as an exception to the statute of frauds in very particular circumstances.  *Nieto v. Litton Loan Servicing*, LP, 2011 WL 797496, * 3 (D. Nev. Feb. 23, 2011).   Nevada follows the doctrine of promissory estoppel articulated in the Restatement (Second) of Contracts §90 which provides as follows:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach may be limited as justice requires.

50

1    *Dynalectric Co. V. Clark & Sullivan Constructors, Inc.,* 127 Nev. Adv. Op. No. 41, 255 P.

2    3d 286, 288 (2011), *quoting* Restatement (Second) of Contracts, sec. 90(1)(1981).

3        144.    In this case, there can be no doubt but that GMACM's employees made

4    multiple promises to the claimants.  First, Mr. Stephenson promised the claimants that

5    GMACM had approved their loan modification request. Secondly, both Mr. Stephenson and

6    Mr. Casas promised the claimants that efforts to foreclose were on hold.

7        145.    To defeat these obvious claims, they argue that Longoni admitted in an August

8    3, 2009 email to Stephenson that she had received a notice from an unrecognized entity

9    saying that they were going to sell her home on August 18, 2009.  This fact is entirely

10   immaterial.  The promises of forbearance began in March of 2009, and were reiterated until

11   well after July 23, 2009, when ETS recorded its notice of sale.  GMACM employees

12   repeatedly told Longoni that the foreclosure was on hold, and even after Mr. Casas

13   repudiated the representation that he loan modification had been approved (which occurred

14   on July 9, 2009), GMACM continued to tell her to submit her HAMP (or Obama)

15   application.  These representations continued up through July 30, 2009, when they sent her

16   a letter telling her that the sale would not occur for 30 days.  The claimants relied to their

17   great detriment upon these promises.  It is beyond question but that any reasonable person

18   would have done so. As a result, the promissory estoppel claims are valid.

19       146.    The debtors claim that the claimants Gagnon and Lacey Longoni cannot prevail

20   upon their claims for promissory estoppel because they had no contact with GMACM.  Not

21   surprisingly, GMACM cites no authority for this ridiculous proposition.  Once GMACM

22   made the promises to Longoni, she and Gagnon relied upon those representations.  Lacey

23   Longoni was merely a minor child who would be a third party beneficiary of those

24   representations.

25       147.    GMACM also contends that the plaintiffs' promissory estoppel claim is barred

26   because the alleged statements surrounding loan modification were too vague and ambiguous

27   to be enforceable.  This again, is ridiculous.  Mr. Stephenson's email communications, and

28   especially his April 28, 2009, email communications clearly identify the modified loan terms.

51

The monthly payments would $1,600.00 per month with a principal reduction of $186,000. After 5 years the interest rate would increase by no more than 1% per year, never to exceed $13.875. Additionally, the repeated promises that the foreclosure process was on hold is eminently clear.

148. Finally, the debtors seek to this Court's blessing for them to ignore their promises by arguing that no injustice would be suffered by not forcing the debtors to honor their word because of Longoni's fraud upon GMACM through her alleged falsified or altered emails. This issue was discussed in detail above and needs no further comment.

## IX. Longoni's Intentional Infliction of Emotional Distress Claim Has Already Been Determined to Be Valid.

149. Finally, the debtors challenge Longoni's intentional infliction emotional distress claim claiming that the conduct alleged cannot be deemed outrageous as a matter of law. Once again, the Nevada District Court has already rejected this argument. *See, Longoni v. GMAC Mortg., 2010 WL 5186091, at *6.* In this regard, the Nevada court stated as follows:

> [t]he court finds that under the facts alleged in the complaint,
> namely that defendants requested plaintiffs apply for a different
> loan modification and assured plaintiffs that the foreclosure was
> on hold during this new application process, plaintiffs have
> alleged extreme and outrageous conduct sufficient to state a
> claim for intentional infliction of emotional distress by the
> subsequent trustee's sale less than a month later

Based upon this previous ruling, this issue has been adversely determined against the debtors.

150. Next, the debtors allege that there is noting in the factual record put forth by Longoni indicating that she manifested any physical symptoms from the debtors conduct. This is clearly incorrect. During her deposition, and in her attached Affidavit, Longoni has testified that following her eviction from her home of 14 years, she suffered an almost immediate loss of 13 pounds. *See, Longoni Affidavit, Exhibit 6, paragraphs 38-42, and*

52

*Excerpts of her Deposition, at Exhibit 4.* She was forced to take prescription medications for her anxiety. On one occasion when she discovered that some of her property had been stolen when she was forced out of her home, she actually vomited upon the discovery.

151.    Longoni further described how devastating this was to her 13 year old daughter who had been in the home her entire life. On August 25, 2009, an unknown man came to her home with a 5-day eviction notice. As is typical with GMACM, their callous attitude toward this obviously devastating event is manifest. Had this matter proceeded before a jury, they would have had little trouble accepting the fact that this event was utterly devastating to the claimants.

152.    As the Nevada Supreme Court has recently held, a sliding scale approach should be employed with testing a plaintiff's IIED claim. *See, Franchise Tax Board v. Hyatt,* 130 Nev. Adv. Op. 71, 335 P.3d 125 (2014). Under this standard, a plaintiff need only set forth "objective verifiable indicia" to establish that the plaintiffs "actually suffered extreme or severe emotional distress." Under this sliding scale approach, the more extreme the severity of the conduct, the less the Court will require in the way of proof that emotional distress was suffered.

153.    While the debtors and their counsel suggest that the claimants should have suffered no distress when they were torn from their 14-year home on 5-days' notice, this Court must conclude otherwise. Any rational person would be thoroughly devastated by the events underlying this action. The claimants were not some money-hungry investor who made multiple purchases hoping to profit off the ever increasing real estate bubble. Nor were they individuals who had recklessly purchased a property for which they could never qualify. They were ordinary citizens who lost their home of 14 years after making years of payments on the loan. They only failed to continue to do so because Mr. Gagnon was forced by his employment to move to Las Vegas.

## X.    Conclusion.

154.    Based upon the foregoing, this Court should find that the debtors have completely failed in their obligation to prove the invalidity of the plaintiffs' claims. The

1   facts of this case cry out for relief.  The actions of the debtors to mislead and mischaracterize

2   the evidence should be offensive to this Court.  The debtors' efforts to manufacture the

3   defense that the claimants breached an agreed upon Repayment Plan is nothing short of

4   reprehensible.   The evidence is clear that there was no Repayment Plan.   The only

5   Repayment Plan was abandoned in March of 2009.  Obviously, Landon Huch (or whomever

6   else took over the handling of the claimants' request for a loan modification) failed to

7   recognize this fact and no one stopped ETS from moving forward with the foreclosure.

8        155.    Had a jury heard the evidence in this case, the verdict would have been far, far

9   in excess of the highly conservative $600,000.00 value the claimants placed upon their

10  claims. This Court should summarily deny the current motion and find, as a matter of law,

11  that the claims are valid as stated.

12        DATED this 15th day of April, 2015.

13                                                ERICKSON, THORPE & SWAINSTON, LTD.

14

15                                                By    /s/ Thomas P. Beko

16

17

18

19

20

21

22

23

24

25

26

27

28

54

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:                                               Case No. 12-12020 (MG)

RESIDENTIAL CAPITAL, LLC, et al.,                    Chapter 11

                    Debtors.                          Jointly Administered

_____/

**EXHIBITS TO**

**RESPONSE TO OBJECTION OF THE RESCAP BORROWER CLAIMS TO
PROOF OF CLAIM FILED BY PAMELA D. LONGONI AND JEAN GAGNON
CLAIM NOS. 2291, 2294, 2295 AND 2357**

**Exhibit Index**

1.  Promissory Note and Deed of Trust re: 5540 Twin Creeks Drive, Reno, Nevada, dated September 29, 2005.

2.  GMACM Response to Plaintiffs' First Set of Interrogatories

3.  Minute Order, Doc. No. 80, July 29, 2011

4.  Excerpt, Deposition of Juan Aguirre, September 1, 2011
    8, 9, 39-40, 62-63, 65-66, 72-73, 87, 94, 103-105, 124-125
    137, 140, 144, 158-159, 164-165, 170-171, 176-177,
    185-186, 188-189,194, 231, 247-248, 255-256

5.  Excerpts, deposition of Myron Ravelo, September 8, 2011
    21-22, 62-63, 83-85, 122-123, 127-129, 137, 155

6.  Affidavit of Pamela Longoni

7.  Pre-2009 version of N.R.S. §107.085

8.   January 15, 2009, letter from claimants to Homecomings Financial

9.  GMACM Log Notes (Diary)

10. Proposed Foreclosure Repayment Agreement

11. GMACM Servicer Guide

12. Emails between Longoni and Stephenson

13. GMACM Automated letter to claimants, July 16, 2009

14. GMACM letter dated July 30, 2009

15. Affidavit of Nate Stephenson

16. Proposed Settlement Agreement with National Real Estate Services

17. Letters and emails sent by GMACM's counsel

18.   Returned Notice of Trustee Sale

**Exhibits Noted in Longoni Affidavit**

19.   Federal Express confirmation.

20.   July 30, 2009, letter from GMACM to Longoini

21.   Modification Package

22.   Verizon billing records