# EXHIBIT 4

# EXHIBIT 4


SUNSHINE

Litigation
SERVICES
Discovery + Depositions + Decisions

Las Vegas

Reno

Carson City

CERTIFIED
COPY

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA - RENO DIVISION

-oOo-

PAMELA D. LONGONI, individually,
and as Guardian Ad Litem for LACEY
LONGONI, and JEAN M. GAGNON,

        Case No.
        3:10-CV-00297-LRH-(VPC)

        Plaintiffs,

    vs.

GMAC MORTGAGE, LLC, a Delaware
Limitied Liability Company, et al.,

        Defendants.

---

DEPOSITION OF

MOST KNOWLEDGEABLE WITNESS ON
BEHALF OF GMAC MORTGAGE, LLC

JUAN AGUIRRE

September 1, 2011

Reno, Nevada

REPORTED BY: DEBORA L. CECERE NV CCR, #324, RPR

JOB NO.  143998

t 775.323.3411
f 775.323.2749

www.litigationservices.com

151 Country Estates Circle
Reno, Nevada 89511

JUAN AGUIRRE - 9/1/2011

Page 8

1       Number 1 for identification to this deposition.

2                    (Exhibit Number 1 was marked for

3                    identification.)

4    BY MR. BEKO:

5        Q      And ask you whether or not you recognize that,

6    what's depicted in that document.

7        A      I haven't seen the notice itself.

8        Q      You haven't seen that before?

9        A      Not the notice, no.

10       Q      Okay.  We'll come back to it in a little bit.

11              Is it your understanding, sir, that you are here

12   today as a, a designated appointee under the Federal Rules

13   as the person most knowledgeable with regard to General

14   Motors or GMAC Mortgage, LLC?

15       A      Yes.

16       Q      All right.  Now, my understanding from your

17   counsel is that you also occupy that same position and

18   title with regard to the additional defendant in this case,

19   Residential Funding Company, LLC.

20              Is that your understanding as well?

21       A      Yes.

22       Q      Okay.  We'll come back to that exhibit here in a

23   little bit.

24              What's your current address, sir?

25       A      My work address?

JUAN AGUIRRE - 9/1/2011

```
1      Q      Sure.
2      A      2711 North Haskell, Suite 900, Dallas, Texas
3   750 -- 75204.  Sorry.
4      Q      All right.  You indicated that you've been
5   deposed approximately 25 times in the past; is that
6   correct?
7      A      Correct.
8      Q      Okay.  I'm going to explain to you a few things
9   about this deposition process so that you and I don't have
10  any misunderstanding about the nature of our proceeding.
11  Okay?
12             You understand you've been placed under oath by
13  the court reporter that's seated to my left, and that the
14  oath that she administered to you is the same oath you'd
15  receive if you were testifying in a court of law before a
16  judge and a jury.
17             Do you understand that?
18     A      Yes.
19     Q      Do you understand that oath carries with it the
20  penalties for perjury?
21     A      Yes.
22     Q      Do you understand that perjury is a felony in
23  the State of Nevada?
24     A      Now I do.
25     Q      During the course of the deposition I'm simply
```

JUAN AGUIRRE - 9/1/2011

1    Q    At the Bates page 8, there's another individual

2    by the name of Sandra Guevara, G-U-E-V-A-R-A.

3         Do you know that person?

4    A    I do not.

5    Q    There's also, in the next entry it looks like

6    Joselita Aquisay, A-Q-U-I-S-A-Y.

7         Do you know that person?

8    A    I do not.

9    Q    The Bates page 11, there is a Connie Canada.

10        Do you know who that person is?

11   A    I do not.

12   Q    Okay.  Showing you what's marked as Exhibit

13   Number 5 for identification.

14        (Exhibit Number 5 was marked for

15        identification.)

16        THE WITNESS:  Okay.  Thank you.

17   BY MR. BEKO:

18   Q    Do you recognize this document?

19   A    Yes, I do.

20   Q    And what is Exhibit 5?

21   A    This is the payment history and note history.

22   Also known as the history of the account.

23   Q    Okay.  Where, where is this information?  This

24   appears to be a computer-generated document.

25   A    Correct.

JUAN AGUIRRE - 9/1/2011

Page 40

```
 1        Q        Where is the information that was used to create

 2   this document?  Where is it stored?

 3        A        This comes from our MortgageServ, Fiserv

 4   system --

 5        Q        Okay.

 6        A        -- that we talked about earlier.

 7        Q        Okay.

 8        A        Um-hum.

 9        Q        So when you go in, and like you said you did in

10   preparing for this deposition, that you went in and looked

11   at the Fiserv program, is this what you saw in there?

12        A        This is the printout.  But this information is

13   in that system itself, yes.

14        Q        So when you see it in the system, it doesn't

15   look like this?

16        A        Not exactly like this.  Not with the heading,

17   with a name like this, and this breakdown here on the

18   principal.  But all the entries are the same.

19        Q        Okay.

20        A        Yeah.

21        Q        While we're here, I'm just going to ask you some

22   general questions about this.

23        A        Okay.

24        Q        This contains that same number, that 7440353498.

25   That's the same loan number as on the other document,
```

JUAN AGUIRRE - 9/1/2011

Page 62

1    Residential Funding Corporation?

2        A       To my knowledge, yes.

3        Q       All right.   What is it?

4        A       Residential Funding Corporation -- I don't know

5    how exactly to explain it.   All I know is that at one point

6    they owned loans and were the investor of loans.   That's

7    all I know --

8        Q       All right.

9        A       -- regarding that.

10       Q       Do you know, is it a corporation?

11       A       I don't know if it's a corporation or what it

12   is.   No, I do not.

13       Q       Do you know where it's located?

14       A       The last time I remember seeing an address was

15   in Minnesota.

16       Q       Now, there's also a name that's frequently used

17   that I've seen in lots of documents called Residential

18   Funding Company, LLC.

19       A       Okay.

20       Q       Do you know -- what do you know about that

21   company?

22       A       I don't know about Residential Funding Company.

23       Q       Do you know what the difference is between

24   Residential Funding Corporation and Residential Funding

25   Company, LLC?

JUAN AGUIRRE - 9/1/2011

1      A      No.

2      Q      Do you -- you don't even know whether they're

3  two different companies or if they're in any way related or

4  anything at all; is that correct?

5      A      Correct.  I don't know if they're related at

6  all, no.

7      Q      Okay.  All you know, I guess, as I understand

8  it, is that what you believe to be Residential Funding is

9  located somewhere in Minnesota and that they own certain

10  loans?

11      A      Correct.

12      Q      Do you know about a company -- well, let me ask

13  you first.

14              As far as Residential Funding Corporation, do

15  you know what its relationship to GMAC is?

16      A      Yes.

17      Q      What is its relationship to GMAC?

18      A      Relationship -- regarding this loan, is what I'm

19  answering to.  Is that what you mean?

20      Q      No.  No.  What is its -- is it in any way

21  related to General Motors -- GMAC Mortgage, LLC?

22              In other words, is it owned -- does one of these

23  companies own the other company, does one of the companies

24  have some interest in it?

25              Do you know anything at all about the

JUAN AGUIRRE - 9/1/2011

1    same page here.

2         A    Okay.

3         Q    When you say Residential Funding, you don't know

4    if you're really referring to Residential Funding Company,

5    LLC, or Residential Funding Corporation, correct?

6         A    I'm referring to Residential Funding Corporation

7    when I'm talking about RFC.

8         Q    Okay.  All right.  And to your knowledge,

9    Residential Funding Corporation still is in existence

10   today?

11        A    That is my understanding.

12        Q    All right.  You started to explain to me what

13   you thought Residential Funding -- and I'm just going to

14   say -- call it RFC from this point forward.

15        A    Okay.

16        Q    And you're always going to be talking about

17   Residential Funding Corporation, correct?

18        A    Correct.

19        Q    Okay.  What is RFC's relationship to GMAC as far

20   as this loan is concerned?

21        A    Regarding this loan, we are the subservicer.  We

22   service on their behalf.  They are the master servicer to

23   this loan, and we have been designated as the subservicer

24   to service the loan for them.

25        Q    Okay.  Let me see if I am following you.  GMAC

JUAN AGUIRRE - 9/1/2011

Page 66

1    is a subservicer for this loan, and the actual servicer was

2    RFC?

3              MR. BASHFORD:  Objection.

4              THE WITNESS:  The master servicer is RFC.

5    BY MR. BEKO:

6         Q    Right.

7         A    And we, meaning GMAC, are the subservicers to

8    this loan, correct.

9         Q    Okay.  So, you recall the testimony before about

10   GMAC not actually owning any of the loans, instead it was

11   simply contracting with the owner to provide servicing

12   services for that loan.

13             Do you recall that testimony?

14        A    Yes.

15        Q    Okay.  If I understand what you're saying to me

16   now, is, is that GMAC did not contract directly with the

17   owner of the loan, but instead GMAC has a contractual

18   arrangement with RFC that it's going to perform RFC's

19   servicing obligations on behalf of RFC, and RFC had some

20   kind of agreement with the owner that it was supposed to be

21   the servicer.  Is that right?

22        A    My understanding is, yes, we do have an

23   agreement with -- I think it's in the exhibits -- the

24   Servicer Guide to service the loans for RFC, who is the

25   master servicer for the owner, or the investor, as they

JUAN AGUIRRE - 9/1/2011

Page 72

1    that's how I have to the best of my knowledge.

2        Q    In your information, all the information you

3    have as to who held and who owned this note and the

4    mortgage came from this paralegal Rosemary?

5        A    Correct.

6        Q    And upon belief in the accuracy of what she told

7    you, you then verified these answers?

8        A    Correct.

9        Q    Okay.  So as we look here, we see something

10   happening, apparently -- if one were to read the accuracy,

11   read this accurately, 1/5 of '06, Residential Funding

12   Company, LLC, as trustee, gets beneficial rights from EC on

13   1/5/06.  And then on 10/8 of '06 Residential Funding Co.,

14   LLC, but not as trustee, gets transfer of servicing rights

15   from EC.

16            Do you see that?

17       A    I do.

18       Q    Do you have any idea, sir, what the difference

19   is between Residential Funding Company, LLC, as trustee,

20   and Residential Funding Co. as LLC?

21       A    Not right now, no.

22       Q    All right.  Do you have any idea what

23   "beneficial rights" mean?

24       A    My understanding at that point was that the

25   rights to the loans were transferred from EquiFirst over to

JUAN AGUIRRE - 9/1/2011

1    RFC.

2        Q    Okay.  Loan, meaning the promissory note?

3        A    The promissory note and the whole loan itself

4    was transferred over to RFC.

5        Q    Okay.  And what, what -- would you define for me

6    what you mean as "the whole loan itself"?

7             What does that encompass?

8        A    Well, the rights to the note itself.  The rights

9    to owning the note at that point.  They're the new

10   beneficiary or the new owner of the note, yes.

11       Q    Okay.  Do you understand -- is there any

12   difference in your mind, sir, between the owner of the note

13   and the beneficiary of the note?

14            MR. BASHFORD:  Objection.

15            THE WITNESS:  No.  To me, the beneficiary and

16   the owner of the note, to me, it means that they own the

17   note, that they hold the note, yes.

18   BY MR. BEKO:

19       Q    Okay.  Do you understand there to be any legal

20   significance of the word "holder" of a note?

21            MR. BASHFORD:  Objection.

22   BY MR. BEKO:

23       Q    Do you have any knowledge of the legal

24   significance of the word "holder" of the note?

25       A    I'm not an attorney, legal language.  Yeah.

JUAN AGUIRRE - 9/1/2011

1       A       Correct.

2       Q       Have you seen, at any time in your career with

3   these companies, the original promissory note?

4       A       No.

5       Q       Do you have any idea where that original

6   promissory note is today?

7       A       Nope.  Sorry.  No.

8       Q       That's okay.  Thank you.

9               Have you ever seen a copy of that promissory

10  note?

11      A       The one that we had a copy of or what's out

12  there today?

13      Q       Let's talk about -- if there's something

14  different, let's talk about -- it's a good answer.

15              Let's talk first about the one you say "we had."

16  And when you say "we," who is "we"?

17      A       Well, a copy of it, as you stated.  I mean, we,

18  GMAC, had a copy imaged in our system of the promissory

19  note.  That's in the Looking Glass, as I stated earlier.

20      Q       Okay.

21              MR. BEKO:  And I'm going to go ahead and mark as

22  an exhibit this document.

23              (Exhibit Number 8 was marked for

24              identification.)

25  ///

JUAN AGUIRRE - 9/1/2011

Page 94

1      A      I don't know if it's the back side. Again, I
2  think we discussed that earlier, that to me the images are
3  just showing, you know, in my imaging system as one page.

4      Q      Okay.  But so we're clear --

5      A      Okay.

6      Q      -- when you see this document in your imaging
7  system, it's the only place that you know that you can go
8  to, to find this document, correct?

9      A      Yes.

10     Q      You couldn't walk down the hall, open the door
11  and go out and pull it out and look at the actual hard
12  copy.

13            You don't know that that document exists
14  anywhere where you can go do that, correct?

15     A      Not in my office.  I think we discussed earlier
16  that it's kept with the custodian in, in their office or
17  wherever they keep it.

18     Q      And who is the custodian?

19     A      I think we discussed it was RFC.

20     Q      Okay.  So you think that it's possible that you
21  could go to RFC's office -- and that's in Minnesota, right?

22     A      Correct.

23     Q      And you think you could go to their office and
24  you think you could find this note, the original note, in
25  their office?

JUAN AGUIRRE - 9/1/2011

1      A      If there's more to it, I don't know.

2      Q      All right.  Let's take a moment, sir, and talk

3   for a second about this apparent company, Residential Asset

4   Mortgage Products, Inc.

5          What do you know about that company?

6      A      All I know is that they purchased the loans,

7   which happened to be also the Longoni loan along with it,

8   and they purchased the pool of loans.  That's my

9   understanding.

10     Q      Okay.

11     A      They assumed the loans, I guess.

12     Q      Do you know what Residential Asset Management

13  Products, Inc. is from the standpoint of a business entity?

14  For instance, is it a corporation, is it an LLC?

15     A      Well, my understanding, per the document, it's a

16  Delaware corporation.

17     Q      Okay. And do you know when it was created?

18     A      No, I do not.

19     Q      Do you know where its business -- where its

20  principal place of business is?

21     A      No, I do not.

22     Q      Have you ever been there, to any offices of

23  Residential Asset Management Products, Inc.?

24     A      No, I have not.

25     Q      To your knowledge, does it even have a business

JUAN AGUIRRE - 9/1/2011

Page 104

1    address anywhere?

2          A      I do not know.

3          Q      Do you know how many employees it has?

4          A      I do not.

5          Q      Have you ever heard, sir, of, of a trust known

6    as RAMPI 2005 EFC7?

7          A      Yes.

8          Q      What is that?

9          A      My understanding is when RAMPI, or Residential

10   Asset Mortgage Products, took the loans, they put it into a

11   trust, and they are what we call the investor now.  That's

12   my understanding.

13         Q      So it's your understanding -- let me just ask

14   you this basic question.

15         A      Sure.

16         Q      Do you understand what a trust is?

17         MR. BASHFORD:  Objection.

18         THE WITNESS:  A trust is, to my understanding,

19   is -- and this we learned in the mortgage.  There's loans

20   and there's investors, individuals who invest in those

21   loans.  And -- I guess I'm going back to what a trust and a

22   trustee is with regular individuals, and U.S. Bank being

23   the trustee that oversees that trust and what's going on

24   with the loan.

25   ///

JUAN AGUIRRE - 9/1/2011

Page 105.

1    BY MR. BEKO:

2        Q     In a legal sense, a trust is a separate legal

3    entity, like a corporation or a limited liability company.

4    It's created as a separate legal entity.   And then

5    sometimes people talk about putting money or something in a

6    trust fund, which is just like an account.   It doesn't

7    create a separate legal entity.

8              Do you know whether or not this RAMPI that's

9    described as a trust, or, excuse me, RAMPI 2005 EFC7, is

10   actually a separate legal entity?

11             MR. BASHFORD:   Objection.

12             THE WITNESS:   My understanding is it's a

13   separate entity from the Residential Asset -- sorry,

14   Mortgage Products, RAMPI.   It's a totally different entity.

15   That is my understanding.   Yes.

16   BY MR. BEKO:

17       Q     And when was that trust formed?

18       A     I don't know the exact date that I recall.

19       Q     But, but that trust, to your knowledge, as the

20   person most knowledgeable with GMAC, is the owner of the,

21   of the note, the promissory note, the Longoni promissory

22   note.   Is that your understanding?

23       A     That's my understanding.

24       Q     If you look, sir, at Exhibit Number 10 --

25       A     Okay.

JUAN AGUIRRE - 9/1/2011

Page 124

1    Number 14.

2        A    Okay.

3        Q    Is this the document that modified the original

4    promissory note, to your knowledge?

5        A    Yes.

6        Q    All right.  And according to this, this

7    modification occurs on the 2nd day of November, 2007,

8    correct?

9        A    Sorry.  My eyes are a little blurry right now.

10       Q    That's okay.

11       A    November 2007, effective, yes.  The 2nd day,

12   correct.

13       Q    All right.  And at that time, November 2nd of

14   2007, Homecomings Financial, LLC, certainly was not the

15   lender because RFC bought the loan from EquiFirst, and then

16   in December of 2005 sold the loan to RAMPI.

17       A    Correct.

18       Q    So where this document lists Homecoming

19   Financials as the lender, they weren't the lender, were

20   they?

21           MR. BASHFORD:  Objection.

22           THE WITNESS:  Not on November 2nd, 2007.

23   BY MR. BEKO:

24       Q    Okay.  If you see the second paragraph of this

25   document, it says:

JUAN AGUIRRE - 9/1/2011

1                    Borrower acknowledges that lender is

2                    the legal holder and the owner of the

3                    note and security instrument, and

4                    further acknowledges that if lender

5                    transfers the note as amended by this

6                    agreement, the transferee shall be

7                    the lender as defined in the

8                    agreement.

9              Correct?

10     A     That's what it says, yes.

11     Q     All right.  Clearly in November 2nd, 2007,

12  Homecomings Financial did not -- or was not the legal

13  holder and owner of the note and security interest, were

14  they?

15              MR. BASHFORD:  Objection.

16              THE WITNESS:  Not November 2nd, 2007.

17  BY MR. BEKO:

18     Q     Okay.  To your knowledge, has anyone ever

19  questioned or raised how it is that Homecomings Financial

20  is out there modifying a note and security interest that

21  they didn't own anymore?

22     A     They didn't own it, but Homecomings Financial at

23  that point was the subservicer.

24     Q     Okay.

25     A     So Homecomings Financial, who is now GMAC, was

1    mortgage amount is.

2        A    Correct.

3        Q    Modification team, explain to me how that

4    differs from the, quote/unquote, repayment plan team.

5        A    A modification team is where the loan is

6    actually being modified, where the interest rates are

7    either being lowered or capping some arrears into the loan,

8    where the loan is being modified.  Maybe the terms of the

9    loan are being changed.  There's some modification being

10   done to the loan.

11       Q    Okay.

12       A    Repayment plan or -- that area is more of either

13   you're going to repay all of your debt in a certain amount

14   of time, or you make certain payments until we can see if

15   we can work some other type of loss mitigation option for

16   you.

17       Q    Okay.  Are all of these things that you've

18   described under the umbrella of loss mitigation?

19       A    Yes.

20       Q    All right.  Any other, any other divisions

21   within what, I guess, you'd call loss mitigation?

22       A    Areas?

23       Q    Yes.

24       A    Those are the only ones with regard to loss

25   mitigation.  They're either a loan mod, sort sale, deed in

JUAN AGUIRRE - 9/1/2011

Page 140

1      started out.

2            Q        It makes good sense to me.

3            A        It used to be like that in the olden days.

4            Q        Seems to me if they had that in this case we

5      wouldn't be here.

6            A        Let me see.  That's all I can think of.

7            Q        Okay.

8            A        I'm sure there's more departments out there.

9            Q        What is the -- what's the mediations department?

10     What do those people do?

11           A        Those individuals are -- work with the

12     foreclosure department, and foreclosure loans, loans that

13     are on foreclosure that are going to be mediated prior to

14     maybe going into foreclosure, see if they can work with

15     them.  They try to work some sort of modification or some

16     sort of repayment plan at the mediation itself.

17           Q        Are those typically court-ordered mediations or

18     are they --

19           A        My understanding, certain states are court

20     ordered and some states are voluntary.

21           Q        Okay.  In this case, this never went through a

22     mediation here in Nevada, did it?

23           A        Not that I'm aware of.

24           Q        Do you know why not?

25           A        No, I do not.

JUAN AGUIRRE - 9/1/2011

Page 144

```
 1    modified.  It's considered current.  They've either capped
 2    their arrearage or forgave some debt or whatever they did
 3    to bring the loan current at that point regarding
 4    remodifying the loan.  So it leaves loss mitigation.
 5    There's no need for loss mitigation.  It's complete.  And
 6    it goes back to the regular cycle.
 7        Q      When did it come back to loss mitigation then?
 8        A      My understanding is that modification, it was --
 9    November of -- 2008, I think it was like November or
10    December of 2008 is when they started falling delinquent
11    again.  And at that point, that's when they started seeking
12    assistance, if I'm correct.
13        Q      And your knowledge about that comes only well
14    after the fact in going back and trying to look at records
15    or something; is that right?
16        A      Yes.
17        Q      You were not involved in any aspect of dealing
18    with the Longoni/Gagnon loan at any time until after this
19    litigation ensues; is that correct?
20        A      Correct.
21        Q      Okay.  So any knowledge that you may have had
22    about how it was being handled or whatever comes as a
23    result of getting information from someone else?
24        A      Information from someone else, and the
25    documents, correct.
```

JUAN AGUIRRE - 9/1/2011

Page 158

```
1        A        As stated earlier, in the Servicer Guide over

2    here, which I'm -- it's part of the production.

3        Q        Okay.  Let's kind of go through that.

4        A        Okay.

5        Q        I'm going to show you a document that's marked

6    as Exhibit Number 15.

7        A        Okay.

8                 (Exhibit Number 15 was marked for

9                 identification.)

10               MR. BEKO:  And just for the record, that is

11   Bates numbers RFC 1293 through RFC 571, although I think

12   there are some -- it's hard to tell with the Bates, but I

13   think there are some omissions.

14   BY MR. BEKO:

15       Q        Do you recognize this document?

16       A        Yes.

17       Q        All right.  Now, your testimony is that at some

18   point in time during this loan modification request from

19   the Longonis, this document, Exhibit Number 15, was what

20   was followed by loss mitigation employees of GMAC when

21   requested to modify the Longoni loan?

22       A        This is a, what, the guide, yes, to working a, a

23   modification.  We would follow the rules from here,

24   correct.

25       Q        All right.  Now, this Servicer Guide says -- it
```

JUAN AGUIRRE - 9/1/2011

1    has on here "GMAC-RFC."

2            Do you see that?

3    A    Yes, I do.

4    Q    Do you know why -- I mean, who actually prepared

5    this?

6    A    The document itself?

7    Q    Yeah.

8    A    I don't know the person who prepared it, but

9    just by reading the document at the bottom, it's a 2008

10   Residential Funding Corporation, all rights reserved.

11   So --

12   Q    And I certainly see that.

13   A    Um-hum.

14   Q    But it -- what I understand was that RFC was the

15   master servicer; it was the one that was calling the shots

16   as far as the servicing was concerned.   Correct?

17   A    They delegated the authority to us to service

18   the loan and work the loans if modifications needed to be

19   done.

20   Q    Right.

21   A    Again, like I stated earlier, if there was a

22   certain level above the authority, then of course, you

23   know, we had to work up.

24   Q    Right.   And I think I understand what you're

25   saying.

JUAN AGUIRRE - 9/1/2011

Page 164

1       Q       Gagnon?

2       A       -- Mr. Gagnon maybe were qualified for a

3   different type of modification.

4       Q       All right.  And that's kind of what my question

5   is.

6       A       Okay.

7       Q       Was there some point -- let me ask you this.

8               Exhibit 15 was what we started with in 2009 as

9   far as loan modifications were concerned.  That's what

10  governed the decision-making process of GMAC employees when

11  2009 started, correct?

12      A       Right, when 2009 started.  This started in 2008.

13  Correct.

14      Q       Okay.  Was this Servicer Guide, these rules,

15  guidelines, whatever, were they discontinued when HMP came

16  into place, or were they simply supplemented by HMP, being

17  an additional method or means by which to review loan

18  modification?

19      A       HMP was a different method, totally different

20  modification, different guidelines that we would have to

21  follow for a different type of modification.  But these

22  were not discontinued.  They were still in effect.

23      Q       Okay.  So is it your understanding that the

24  employees of GMAC who were dealing with loan modification

25  could consider it under either the original GMAC-RFC

1    Servicer Guide, Exhibit 15, or they could do it under HMP

2    as well?

3        A    Yes.  We would look at both options to see what

4    would be best for the borrower.

5        Q    Okay.

6            MR. BEKO:  You know what?  I'm sorry.  I never

7    gave you the copy.  And part of it is on yellow because of

8    copy machine failure.

9    BY MR. BEKO:

10       Q    Do you know who -- strike that.

11           Was a decision ever made, to your knowledge,

12   that the Longonis -- or Pam Longoni could not qualify under

13   the GMAC guidelines?

14       A    My understanding is that they were reviewing her

15   loan for a modification when she called in and informed us

16   of her financial difficulties.  But they were reviewing.

17   That was, that's my understanding at that point.

18           And then at a certain point then they stated

19   that they were going to maybe look at a HMP modification.

20       Q    And when does HMP come into play?  When does it

21   take effect, the new guidelines that they --

22       A    I remember HMP coming in, actually, in the world

23   back in March of 2009.  And I think it was sometime in May

24   of 2009, is when we started working with the HMP

25   modifications, is what I recall.

JUAN AGUIRRE - 9/1/2011

Page 170

1    page.

2              MR. BASHFORD:  Well, I'm going to object to

3    asking him questions about an incorrect e-mail chain,

4    because the first page --

5              MR. BEKO:  Well, you can make whatever objection

6    you want.

7              (Exhibit Number 16 was marked for

8              identification.)

9    BY MR. BEKO:

10       Q     Mr. Aguirre, I'm showing you what's been marked

11   Exhibit Number 16 for identification.

12       A     Okay.

13             MR. BASHFORD:  All right.  I continue my

14   objection.  This is an incomplete e-mail.

15             MR. BEKO:  Okay.

16             (Exhibit Number 17 was marked for

17             identification.)

18   BY MR. BEKO:

19       Q     Again, directing your attention to this, this

20   e-mail from Mr. Stephenson indicating where he saw an

21   e-mail stating that the mod had been approved yesterday but

22   that's all he knows, do you see that?

23       A     I do see that.

24       Q     Who wrote that e-mail that approved the mod on

25   June 29th?

JUAN AGUIRRE - 9/1/2011

1       A       I don't know.

2       Q       Have you ever seen that e-mail?

3       A       No, I have not.

4       Q       Have you ever looked for it?

5       A       I have not.

6       Q       Do you know, has anybody ever looked for it?

7       A       I don't know.

8       Q       Do you know whether or not e-mail communications

9   from your GMAC employees are kept by GMAC?

10      A       They are not kept by GMAC.  An e-mail, just like

11  any e-mail from Outlook, it can be saved or it can be

12  deleted by the individual.

13      Q       Is what their e-mail system is, is Outlook?

14      A       That's what we use, or GMAC uses.

15              (Exhibit Number 18 was marked for

16              identification.)

17  BY MR. BEKO:

18      Q       Showing you what's marked as Exhibit Number 18

19  for identification.

20              MR. BASHFORD:  Are we on 18?

21              THE WITNESS:  No.  This should be 17.

22              MR. BEKO:  I already marked a different one 17.

23              THE WITNESS:  Okay.

24  BY MR. BEKO:

25      Q       Do you recognize this document?

JUAN AGUIRRE — 9/1/2011

Page 176

```
 1    BY MR. BEKO:

 2         Q       Okay.

 3         A       -- that 27 is here.

 4         Q       To your knowledge, has anyone ever made an

 5    attempt to locate that e-mail?

 6         A       To my knowledge, I don't know of anyone.

 7         Q       Okay.  Were you ever asked to assemble records

 8    responsive to the requests for production of documents?

 9         A       No.

10         Q       Who was responsible for assembling the documents

11    in response to the request for production?

12         A       I cannot give a specific name.  The only name

13    that might pop up would be probably Rosemary Meeker, since

14    she's in the legal department and would assist with these

15    kind of requests.

16         Q       Was there ever, to your knowledge, any hold

17    placed of any type of the e-mail account of Nate Stephenson

18    or other employees who worked on the Longoni matter?

19         A       Hold on e-mail accounts?  Can you explain what

20    you mean by hold?

21         Q       Sure.  Was there ever any attempt to capture

22    their e-mail communications, these people that worked,

23    especially Nate Stephenson, on this loan modification?

24                 Was there ever any attempt to capture their

25    e-mail communications --
```

JUAN AGUIRRE - 9/1/2011

1              MR. BASHFORD:    Objection.

2    BY MR. BEKO:

3         Q      -- so they wouldn't be lost?

4         A      That, I don't know.

5         Q      You didn't undertake any effort to try to

6    capture those and preserve them?

7         A      No.  I wouldn't do that, no.

8         Q      And no one ever asked you to do that?

9         A      No.

10        Q      Were you aware before you came here today that

11   there was an e-mail communication from Nate Stephenson

12   saying that their mod had been approved?

13        A      I had read some e-mail communications which were

14   in the documents regarding this e-mail, if I'm correct, in

15   there somewhere, I think, where he stated that there was a

16   modification approved.

17        Q      So just within the last week or so, since last

18   week, is when you first saw that e-mail noting that the

19   modification had been approved?

20        A      The first time I saw the e-mail was last week,

21   yes.

22        Q      Okay.  Any idea what happened?  Assuming that

23   Mr. Stephenson is being truthful in his report on this

24   e-mail communication to Ms. Longoni, do you have any idea

25   what happened to that approved modification?

JUAN AGUIRRE - 9/1/2011

Page 185

1    employees how to handle loan modifications, et cetera,

2    under the Servicer Guide, Exhibit 15.

3        A    Correct.

4        Q    Okay.  Exhibit 21 is a training tool to instruct

5    employees how to handle home modification under the HMP

6    program, correct?

7        A    Correct.

8        Q    Is there a document that describes the HMP

9    program that is similar to Exhibit Number 15?

10        A    I know there's another document regarding the

11    HMP program, which is also with the documents in discovery,

12    which I saw when I was reviewing.  Not that thick as the

13    servicer guidelines, but there is another document.

14            (Exhibit Number 22 was marked for

15            identification.)

16    BY MR. BEKO:

17        Q    Showing you what's marked as Exhibit Number 22

18    for identification.

19            MR. BEKO:  Counsel, again, this is GMAC 02-193

20    through 236.

21    BY MR. BEKO:

22        Q    What, what is Exhibit Number 22?

23        A    Exhibit 22 is -- it's actually a, a set of

24    checklists on how to go about doing certain modifications.

25    Like we have a, a trial modification, permanent

JUAN AGUIRRE - 9/1/2011

Page 186

1    modification approval.  It's a checklist on how to go into

2    our system and what needs to be requested, a step-by-step

3    checklist for the individuals working the modifications.

4         Q      So this would apply to the, both the, I guess,

5    the GMAC type refinance as reflected in Exhibit 15 as well

6    as the HMP as well?  Is that right?

7         A      Not refinance, but loan modification.

8         Q      Loan modification.

9         A      Yes.  And the HMP.  Also there's a checklist

10   here for the HMP as well included.

11        Q      Right.  Okay.  So tell me how, how do these two

12   interplay with one another, Exhibit 22 and 15?

13        A      Well, this is the checklist.  This is how we go

14   into our system and how to go into screens and see if they

15   qualify for certain programs.  It's part of the servicing

16   of the loan, which would fall into part of the servicing

17   guides and how we should service loans.

18        Q      Okay.  That is not a description of the HMP

19   program like Exhibit 15 is for the GMAC traditional?

20        A      No, no.  This is just a checklist on how to

21   conduct certain modifications.  There's several different

22   checklists in here.  There's not one checklist.  There's

23   actually several, like you have the trial permanent

24   modification checklist, and if you keep going, special

25   servicing checklist.

JUAN AGUIRRE - 9/1/2011

Page 188

1      A    Yes.  That would be a non-HMP modification,

2   which would be traditional.  Irregular modification on a

3   loan, correct.

4      Q    **Was there anything other than traditional**

5   **modification that was being used by GMAC before HMP came**

6   **along?**

7      A    In terms of modifications, it was a -- we had

8   what was called a trial modification, which was kind of

9   sort of like a repayment plan where there was maybe three

10  payments to see if the borrower can afford something while

11  we looked at the traditional modification.  But not --

12  until HMP came along, then we started doing HMP

13  modifications.

14     Q    **Along with the traditional one, correct?**

15     A    We were also doing -- at the same time, yes.

16     Q    **Okay.  And there was nothing, as far as you**

17  **know, that required any of your employees to choose one**

18  **plan over the other?**

19     A    Well, what we do is we look at the finances, the

20  hardship, what the borrower can afford.  If they don't fall

21  within a traditional modification, of course, at that point

22  when HMP came around it was a little bit more -- what's the

23  word I'm trying to use -- be aggressive, or we can change

24  more.

25     Q    **More liberal?**

JUAN AGUIRRE – 9/1/2011

1        A        More liberal.  We can reduce the interest more,

2    maybe extend the terms a little bit more.

3        Q        All right.

4        A        So if they couldn't afford it in the

5    traditional, we would then, by all means, try and see if

6    they would fit into a HMP modification.

7        Q        All right.  And was there some benefit to GMAC

8    financially if they modified or agreed to a modification

9    for a homeowner?

10                In other words, did GMAC ever receive any kind

11    of compensation, federal or otherwise, for putting people

12    into these programs?

13        A        From reading my documents, yes, there were

14    incentives to the servicer when they were -- when there was

15    a successful completed modification, both in a traditional

16    and on the HMP as well.

17        Q        All right.  And how about compensation from the

18    federal government?  Did, did, did GMAC or the investor, to

19    your knowledge, ever receive any type of federal funds in

20    response to any -- and especially with regard to the

21    Longoni loan -- did they ever receive any kind of

22    compensation, payment, anything?

23        A        From the government?

24        Q        Um-hum.

25        A        I wouldn't know.  Not that I'm aware of.  But

JUAN AGUIRRE - 9/1/2011

Page 194

```
 1    says, you know:

 2                    Understand the background of the

 3                    Making Home Affordable Program, Obama

 4                    Mod HMP.

 5                    Is it your understanding the Obama Mod and HMP

 6    is the same thing?

 7        A    Yes.

 8        Q    Okay.  Now, this shows that it has a date on it

 9    of 3/8 of '10.

10        A    Correct.

11        Q    Is this a training material didn't come about

12    until March of '10?

13        A    Yes, because that's when the program was

14    starting to -- well, I'm sorry.  That's 2010.

15                    March of 2009 is when the program started

16    rolling out.  So I don't know if this was a revised copy or

17    not.  It doesn't say revised.

18                    MR. BASHFORD:  I'll make a copy now.

19                    (Whereupon a recess was taken.)

20                    MR. BEKO:  Back on the record.

21                    (Exhibit Number 26 was marked for

22                    identification.)

23    BY MR. BEKO:

24        Q    Showing you what's marked as Exhibit Number 26

25    for identification.
```

JUAN AGUIRRE - 9/1/2011

1                          contribution of 1600.

2                    Is that correct?

3        A      That's correct.

4        Q      All right.

5                    Upon successful completion of the

6                    trial the estimated mod terms will be

7                    mod type.

8                    What does that mean?   Cap?

9        A      Cap, they're going to capitalize the

10   delinquency.   The remaining balance would be capped onto

11   the loan.

12       Q      Okay.

13                   Interest rate type.   ARM to ARM.

14       A      It was an adjustable rate mortgage, and it was

15   going to be kept as an adjustable rate mortgage if it went

16   to modification.

17       Q      Okay.   The interest rate would be 3.25?

18       A      Correct.

19       Q      Index rate was 3.9?

20       A      Correct.

21       Q      What is an index rate 3.9?

22       A      I'll be honest with you, index rate and margin

23   rates, those are two things that I don't know the

24   calculations of those.

25       Q      Okay.   ARM freeze meaning it's a five-year

```
 1                    60 days.  No guarantees.  I tried to
 2                    update DTI calculator but borrower
 3                    did not know her gross income.  Said
 4                    she would call back tomorrow because
 5                    she had to go to work.
 6          Q     All right.  Apparently something else is going
 7     on down there.  I don't know if it's a further extension.
 8     We see a 1025 -- 10:25:
 9                    Do you know what those numbers relate to?
10          A     No.  I'm not going to guess.  No, I don't.
11          Q     All right.  Do you see this?  It says:
12                    Pay cuts start 9/28.  Ongoing.
13                    Tell me what that note means to you.
14          A     That's a continuation from the one above it,
15     where it says reason for default.  SPS.  I don't know what
16     the SPS means.  Had to get another job and took a pay cut.
17     Start on 9/2008 ongoing.
18                    I don't know what the MI stands for, but:
19                    $1800 a month.  Advised foreclosure
20                    sale date on hold.  Late charges and
21                    credit reporting continues.
22                    H. Casas.
23                    I don't know who that is.
24          Q     Let's see if we can figure that out.
25          A     Okay.
```

JUAN AGUIRRE - 9/1/2011

Page 248

1      Q      Henry Casas?

2      A      Correct.

3      Q      Okay.  The following day you go down and it --

4      on 7/10/09?

5      A      Um-hum.

6      Q      2928.  It says:

7             Repay plan cancelled automatic.

8      A      Okay.

9      Q      And explain to me what that is.

10     A      There was four payment plans to that repayment

11     plan, the $1600, March 30th, April 30th, June 30th -- wait.

12     Sorry.  March, April, May, June 30th was that balloon

13     payment that we talked about.  That payment was not made so

14     instead of manually like the last one we saw where someone

15     manually cancelled it, the system automatically cancelled

16     it when we don't receive that full amount.

17     Q      Okay.  So that would have actually been -- that

18     would have been effective as of June 1st.

19     A      Which one?

20     Q      The failure to make the payment would have been

21     on June 1st?

22     A      March 30th.  April, May, June 30th was when her

23     final payment was due.  So July 1st would have been

24     considered late.  So the payment plan was cancelled after

25     that payment wasn't received, the June 30th balloon payment

JUAN AGUIRRE - 9/1/2011

```
 1              Obama Workout Package provided to

 2              date.  30 days to sale.  No contact

 3              letter.

 4      A    I see that it says 30 days to sale.  But I don't

 5   see it in the body of the letter.

 6      Q    You can see it at the bottom?

 7      A    I see it at the bottom.  30 days to sale.

 8      Q    Okay.

 9      A    Exactly.

10      Q    Were you involved -- strike that.

11           Did you ever know that there was an effort made

12   to try to get this property back after the sale?

13      A    There was an understanding -- I have an

14   understanding that they were trying to get the property

15   back, yes.

16      Q    Why?

17      A    I don't know.  All I know is that they were

18   trying to get the property back at one point.

19      Q    Were you at involved in the negotiation process

20   with the purchaser where GMAC was trying to get the

21   property back?

22      A    No.

23      Q    Did anybody ever tell you that GMAC made a

24   mistake with regard to foreclosing on this property?

25           MR. BASHFORD:  Objection to the extent it calls
```

JUAN AGUIRRE - 9/1/2011

Page 256

1    for privileged information.

2    BY MR. ADAMS:

3        Q       Did anybody ever -- other than an attorney --

4    tell you that GMAC made a mistake in foreclosing on this

5    property?

6        A       No.

7        Q       Who did you talk with about this attempt to get

8    the property back?

9        A       I wasn't talking -- it was just in conversation.

10   Ms. DeSilva mentioned something at one time.  And --

11              MR. BASHFORD:  Objection.

12   BY MR. BEKO:

13       Q       Okay.  She's an attorney, right?

14       A       Yes.

15       Q       I don't know want you to tell me about what an

16   attorney for GMAC told you.  If you had a discussion with

17   anyone other than an attorney about the attempt to get the

18   property back, that's what I'm looking for.

19       A       Rosemary Meeker.  She's not an attorney.

20       Q       Okay.  What did Rosemary Meeker tell you?

21              MR. BASHFORD:  Objection.

22              THE WITNESS:  That at one point that they were

23   trying to get the property back.  That's what I was

24   informed.

25   ///

Page 277

```
 1    STATE OF NEVADA     )
                           )  ss.
 2    WASHOE COUNTY        )

 3         I, DEBORA L. CECERE, a Certified Court Reporter, State

 4    of Nevada, do hereby certify:

 5         That on Thursday, the 1st day of September, 2011, at

 6    the hour of 8:57 A.M. Of said day, at 99 West Arroyo

 7    Street, Reno, Nevada, personally appeared JUAN AGUIRRE, who

 8    was duly sworn by me to testify the truth, the whole truth,

 9    and nothing but the truth, and thereupon was deposed in the

10    matter entitled herein;

11         That I am not a relative, employee or independent

12    contractor of counsel to any of the parties; or a relative,

13    employee or independent contractor of the parties involved

14    in the proceeding, or a person financially interested in

15    the proceeding;

16         That said deposition was taken in verbatim stenotype

17    notes by me, a Certified Court Reporter, and thereafter

18    transcribed into typewriting as herein appears;

19         That the foregoing transcript, consisting of pages 1

20    through 277 is a full, true and correct transcription of my

21    stenotype notes of said deposition.

22         DATED:  At Reno, Nevada this 12th day of September,

23    2011.

24                      DEBORA L. CECERE, NV CCR #324, CA CSR #8821

25
```

SUNSHINE REPORTING - 775-323-3411