**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ) | **NOT FOR PUBLICATION** |
| In re: ) | |
| ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, ) | |
| ) | Chapter 11 |
| Debtors. ) | |
| ) | Jointly Administered |

## MEMORANDUM OPINION AND ORDER SUSTAINING IN PART AND OVERRULING IN PART THE RESCAP BORROWER CLAIMS TRUST'S OBJECTION TO CLAIM NUMBER 3732 FILED BY KENNETH DLIN

Pending before the Court is the ResCap Borrower Claims Trust's (the "Trust") objection to Claim Number 3732 (the "Claim," Priore Supp. Ex. B) filed by Kenneth Dlin ("Dlin"). The objection is included in the *ResCap Borrower Claims Trust's Eighty-Second Omnibus Claims Objection to Claims (No Liability Borrower Claims)* (the "Objection," ECF Doc. #8042).[1] Dlin filed an opposition (the "Opposition," ECF Doc. # 8355) and the Trust filed a reply (the "Reply," ECF Doc. # 8485).[2] The Court held a hearing on the Objection on April 16, 2015 (the "Hearing") and took the Objection to the Claim under submission.

The dispute here focuses on what Dlin alleges he was told by representatives of Debtor GMAC Mortgage, LLC ("GMACM") regarding the reasons Dlin was denied a requested loan modification; specifically, whether he was told that his mortgage had to be 60 days or more in default before he could be considered for a loan modification. Dlin alleges that he was current on his mortgage payments when he requested the modification, and was told by the GMACM representatives to default on the loan to be considered for a modification. When Dlin defaulted

---

[1]     The Objection is supported by the declarations of Kathy Priore (the "Priore Decl.," ECF Doc. # 8042-3) and Norman S. Rosenbaum (ECF Doc. # 8042-4).

[2]     The Reply is supported by the supplemental declaration of Kathy Priore (the "Priore Supp.," ECF Doc. # 8485-1).

and was finally approved for a modification, Dlin states his monthly mortgage payments actually

increased, not providing him the help he needed.  According to Dlin, GMACM's representatives

attributed this requirement that his loan be 60 days or more in default to the applicable "investor

guidelines."

The Trust's Objection relies in part upon the applicable investor guidelines for Dlin's

loan, contending that GMACM's actions as the loan's servicer were required to follow the

guidelines.  But the Trust failed to provide competent evidence of the investor guidelines with its

Objection and Reply, instead relying upon inadmissible hearsay contained in the Priore

Declaration and GMACM's servicing notes for Dlin's loan.    In light of Dlin's allegations about

what he was told, the Court concludes that the evidence proffered by the Trust is insufficient to

resolve disputed issues of fact.  The Objection is therefore **OVERRULED** without prejudice to

the extent provided below.  The Objection, however, is **SUSTAINED** as to Dlin's standing-

related arguments that Dlin's counsel abandoned on the record at the Hearing.

## I.    BACKGROUND

### A.    Dlin's Loan History

Non-debtor Greenpoint Mortgage Funding Inc. ("Greenpoint") originated Dlin's

$633,000.00 loan (the "Loan") on February 20, 2004.  (Obj. Ex. 1-A at 2.)  The Loan is

evidenced by a note (the "Note," Priore Supp. Ex. C) and secured by a deed of trust (the "Deed

of Trust," Priore Supp. Ex. D) on property located at 3431 Welch Avenue, Kittredge, Colorado

80457 (the "Property").  (Obj. Ex. 1-A at 2; Priore Supp. Ex. B at 8.)  GMACM purchased the

Loan from Greenpoint and then transferred the Loan on April 1, 2004 to a securitization trust

with HSBC Bank USA as trustee.  (Obj. Ex. 1-A at 2.)  GMACM serviced the Loan from July 1,

2004 until February 16, 2013, when servicing was transferred to non-debtor Ocwen Loan

Servicing, LLC ("Ocwen").  (*Id.*)  Dlin obtained a second lien loan on the Property from

Countrywide Home Loans on February 28, 2006; the Debtors never held an interest in or

serviced this second lien loan.  (*Id.*)

On November 19, 2008, Dlin and GMACM representatives had *eight* separate telephone

conversations:  (1) According to Dlin, he requested information about loan modification

options—GMACM's representative told Dlin to call back the next month if he was still having

trouble making payments. (Reply ¶ 12 (citing Priore Supp. Ex. E at 56).)  Dlin was current on his

Loan obligations at the time.  (*See* Reply ¶ 13–19.)  (2) Dlin called again about loan modification

options and the GMACM representative told him that since Dlin's account was current, Dlin

could call back the next month when the Loan was due for its next payment.  (*Id.* ¶ 13 (citing

Priore Supp. Ex. E at 56).)  Dlin explained that he wanted to set up a new payment schedule right

away, but GMACM's representative stated that no new payment arrangement could be offered at

the time.  (*Id.*)  (3) Dlin called GMACM again, explaining that he was interested in payment

options—he was told there were no payment options available until the next month.  Dlin was

dissatisfied and requested to be transferred to a supervisor.  (*Id.* ¶ 14 (citing Priore Supp. Ex. E at

55–56).)  (4) Dlin spoke with another GMACM representative about loan modification options—

he was told that a loan modification is a default option, and because the account was not in

default at the time, Dlin could not get a modification.  (*Id.* ¶ 15 (citing Priore Supp. Ex. E at 55).)

(5) Dlin called GMACM and was again told that because his account was current, he should call

back once the account was due for the next payment; he was told that no loan modification

options were available for him at the time.  (*Id.* ¶ 16 (citing Priore Supp. Ex. E at 55).)  (6) Dlin

was certainly persistent—he called GMACM again, spoke with still another GMACM

representative, requested a loan modification, and was told that he could not obtain a loan

3

modification until the account was due for two months or more.  Dlin alleges that he was also

told that if GMACM referred his account for loan modification review at the present time, it

would be denied because the account was current.  (*Id.* ¶ 17 (citing Priore Supp. Ex. E at 55).)

(7) Dlin called GMACM again—GMACM's representative told him that because his account

was current, there was nothing GMACM could offer him at the time; the representative offered

to transfer Dlin to the direct lending department, but Dlin stated that a refinance was not going to

happen.  (*Id.* ¶ 18 (citing Priore Supp. Ex. E at 54–55).)  (8) Dlin called GMACM once again and

was again advised that because his account was current, he could call back when his account was

thirty days or more late; but Dlin was also informed that if he was late with his mortgage

payments, he would be charged a late fee and his credit would be affected.  (*Id.* ¶ 19 (citing

Priore Supp. Ex. E at 54).)  Dlin was further advised that he should call the Hope for

Homeowners program; he was provided with the phone number for this program.  (*Id.*)

Dlin did not make his December 2008 payment.  (*Id.* ¶ 20 (citing Priore Supp. Ex. E).)

On January 6, 2009, Dlin spoke with a GMACM representative over the phone again.  (*Id.* at 6.)

He was told that a loan modification was not available at the time, but that there may be new

traditional loan modification options available for him in February for which he could qualify.

(*Id.*)  On January 30, 2009, Dlin spoke by telephone with a GMACM representative who took

Dlin's financial information and referred his account for loan modification review.  (*Id.*; Reply

¶ 21 (citing Priore Supp. Ex. E at 51).)  Based on the financial information provided by Dlin,

GMACM denied the loan modification on February 3, 2009 because Dlin's financial obligations

exceeded his financial resources.  (Reply ¶ 21 (citing Priore Supp. Ex. E at 50).)  On February

17, 2009, Dlin told GMACM's representative that Dlin had previously provided incorrect

4

financial information.  (*Id.* ¶ 22 (citing Priore Supp. Ex. E at 49).)  Dlin corrected the financial

information and GMACM again referred the account for loan modification review.  (*Id.*)

GMACM approved Dlin's Loan for a traditional loan modification on February 27, 2009.

(*Id.* ¶ 23 (citing Priore Supp. Ex. E at 47–48).)  Dlin was required to make a contribution

payment of $3,483.46 by March 15, 2009; $13,324.29 in past due interest was capitalized to

principal; and the interest rate was reduced from 5.375% to 3.2%.  (*Id.*)  The modification

brought Dlin current for the past due payments from December 2008 through April 2009.  (*Id.*)

The original Loan terms required Dlin to make monthly principal and interest payments of

$2,834.51.  (*Id.*)  The modification agreement increased Dlin's monthly payments to $3,138.56.

(*Id.*)  The permanent loan modification agreement was mailed to Dlin on March 3, 2009.  (Obj.

Ex. 1-A at 7.)

Dlin spoke to GMACM on March 9, 2009, and requested information about how to send

in the permanent modification documents.  (*Id.*)  He also questioned why his monthly payment

increased.  (Reply ¶ 24 (citing Priore Supp. Ex. E at 46).)  A GMACM representative explained

the terms of the modification and told Dlin that no modification options were available that

would lower the monthly payment.  (*Id.*)  Dlin was told that the modification documents and

contribution payment needed to be received by March 31, 2009.  (Obj. Ex. 1-A at 7.)

Dlin spoke with GMACM again on March 19, 2009.  He told GMACM's representative

that the modification doesn't help him; Dlin said he was told either to accept the proposed

modification or pay the delinquent balance on the Loan.  (Reply ¶ 25 (citing Priore Supp. Ex. E

at 45).)  Dlin paid the first contribution payment on March 27, 2009 and returned the signed

traditional permanent modification documents on March 30, 2009.  (*Id.* ¶ 26 (citing Priore Supp.

Ex. F; *id.* Ex. E at 44–45).)

Dlin became delinquent on his modified Loan obligations on October 1, 2009.  (Obj. Ex.

1-A at 2.)  On November 16, 2009, Dlin's real estate agent, Norma Loyd ("Loyd"), contacted

GMACM, advising that Dlin was interested in a short sale.  (Reply ¶ 27 (citing Priore Supp. Ex.

E at 41).)  The Trust alleges that GMACM mailed Dlin a short sale package on November 13,

2009, but this date may be incorrect.  (Obj. Ex. 1-A at 8.)  GMACM ordered a broker price

opinion (the "BPO") on November 17, 2009 and received it on November 24, 2009; it estimated

the value of the Property at $580,000.  (Reply ¶ 28 (citing Priore Supp. Ex. E at 40; *id.* Ex. G).)

On November 30, 2009, GMACM's representative spoke with Loyd, advising her to drop the

listing price to match the fair market value of the Property based on the BPO.  (Obj. Ex. 1-A at

8.)

On December 2, 2009, GMACM mailed Dlin a breach letter because of his failure to

make Loan payments since October 1, 2009.  (Reply ¶ 29 (citing Priore Supp. Exs. E at 39 &

H).)  The Loan was referred to foreclosure on January 6, 2010.  (Obj. Ex. 1-A at 2; Reply ¶ 29

(citing Priore Supp. Ex. E at 39).)   Dlin had not received any short sale offers and had not made

arrangements to bring the account current.  (Obj. Ex. 1-A at 8.)

On January 13, 2010, GMACM commenced a foreclosure action against the Property by

filing a notice of election and demand for sale with the Jefferson County Public Trustee.  (Reply

¶ 30 (citing Priore Supp. Ex. I).)  A short sale was still an option at the time of the foreclosure

sale.  (Obj. Ex. 1-A at 8.)  But it was not GMACM's business practice to place foreclosure sales

on hold during a short sale review.  (Reply ¶ 29.)

On January 29, 2010, Loyd advised GMACM that she had lowered the Property's listing

price to $500,000, but still had not received any offers; she said she hoped to have an offer

within a week, as there was a scheduled showing approaching.  (*Id.* at 8; Reply ¶ 32 (citing

Priore Supp. Ex. E at 56).)  The same day, GMACM and Loyd spoke again; Loyd informed

GMACM that she had an offer on the Property.  (Obj. Ex. 1-A at 8–9.)  GMACM advised Loyd

to go back to the purchaser for their highest and best offer because the offer was too low and did

not comply with the investor guidelines.  (*Id.* at 9.)

On February 8, 2010, GMACM received a short sale offer for $400,000 that would have

provided the investor with net proceeds of $331,441.70.  (*Id.* ¶ 32 (citing Priore Supp. Ex. J).)

GMACM did not approve the short sale because, the Trust asserts, the investor guidelines

required that the investor net at least 85% of the market value of the property, as determined by

the BPO.  (*Id.* (citing Priore Supp. Ex. E at 36).)

On February 23, 2010, GMACM told Loyd that the investor of the Loan requires at least

an 85% net price based on the BPO.  (Reply ¶ 33 (citing Priore Supp. Ex. E at 36).)  GMACM

ordered a second BPO on March 15, 2009; it valued the Property at $500,000.  (Obj. Ex. 1-A at

9; Reply ¶ 34 (citing Priore Supp. Ex. K).)

On March 26, 2015, the same day the second BPO was received, GMACM filed a

verified motion in the District Court of Jefferson County (the "District Court") for an order

authorizing the foreclosure sale (the "Rule 120 Motion").  (Reply ¶ 35 (citing Priore Supp. Ex.

L).)  The broker sent GMACM a new short sale offer on April 5, 2010 that would have provided

the investor with $450,000 after closing costs and fees.  (*Id.* ¶ 36 (citing Priore Supp. Ex. M).)

GMACM emailed the realtor and informed her that the offer was below the investor's

requirement.  (*Id.* (citing Priore Supp. Ex. E at 34–35).)  With no acceptable short sale offer or

other arrangements by Dlin to bring his account current, GMACM proceeded with the

foreclosure sale. (Obj. Ex. 1-A at 9.)

On April 12, 2010, Dlin filed a response to GMACM's Rule 120 Motion in the District

Court, challenging GMACM's standing to foreclose.  (Reply ¶ 37 (citing Priore Supp. Ex. N).)

On May 24, 2010, Dlin filed an amended response, again challenging GMACM's standing to

foreclose.  (*Id.* ¶ 38 (citing Priore Supp. Ex. O).)  On May 25, 2010, GMACM received a copy of

another offer to purchase the Property for $450,000 that would have netted the investor

$374,473.24.  (*Id.* ¶ 39 (citing Priore Supp. Ex. P).)

On May 27, 2010, the Colorado state court entered an order granting GMACM's Rule

120 Motion and authorizing the sale of the Property.  (Obj. Ex. 1-A; Reply ¶ 41 (citing Priore

Supp. Exs. Q–R).)  The Trust alleges that the foreclosure sale was postponed to June 16, 2010 to

allow additional time for a possible short sale offer that would be acceptable to the investor.

(Reply ¶ 40 (citing Priore Supp. Ex. E at 28).)

On June 13, 2010, Loyd presented GMACM with a $525,000 offer; GMACM submitted

the offer for investor approval on June 24, 2010.  (*Id.* ¶ 42 (citing Priore Supp. Ex. S; *id.* Ex. E at

22).)  On June 14, 2010, the foreclosure sale was again postponed until July 14, 2010, and on

July 6, 2010, the foreclosure sale was postponed to July 28, 2010.  (*Id.* ¶43 (citing Priore Supp.

Ex. E at 21–22).)

On July 7, 2010, GMACM emailed Loyd asking whether Bank of America ("BoA"), the

holder of the second lien on the Property, had approved the short sale; GMACM advised Loyd

that the investor would not consider the short sale offer unless BoA approved the sale.  (*Id.* ¶ 44

(citing Priore Supp. Ex. E at 20–21).)  On July 9, 2010, GMACM sent another email to Loyd,

informing her that the foreclosure sale was scheduled for July 28, 2010.  (*Id.*)  On July 20, 2010,

GMACM again emailed Loyd, advising her that the investor would not postpone the foreclosure

sale without receiving  short sale approval from BoA.  (*Id.* ¶ 45 (citing Priore Supp. Ex. E at 18–

19).)  On July 27, 2010, Loyd finally responded with an email informing GMACM that she was

still waiting for authorization from BoA; she acknowledged that the foreclosure sale was set for

the next day.  (*Id.* ¶ 46 (citing Priore Supp. Ex. T).)  No evidence has been provided that Loyd

contacted GMACM again before the scheduled foreclosure sale.

The foreclosure sale was completed through the Public Trustee's Office on July 28, 2010.

(Obj. Ex. 1-A at 2–3; Reply ¶ 47 (citing Priore Supp. Ex. E at 16).)  GMACM repurchased the

Property for $477,000, putting it in real estate owned ("REO") for sale.  (Obj. Ex. 1-A at 2–3;

Reply ¶ 47 (citing Priore Supp. ¶ 46).)  A foreclosure deficiency bid of $191,743.68 was

submitted to the Public Trustee.  (*Id.* at 3.)  No deficiency judgment has been entered by the

Colorado state court because no action was filed to obtain one.  (*Id.*)

After the foreclosure sale, Dlin did not vacate the Property.  GMACM filed a possession

and eviction action against Dlin on June 1, 2011 in the County Court of Jefferson County,

Colorado (the "State Court Action").  (Reply ¶ 48 (citing Priore Supp. Ex. U).)  Dlin filed an

answer and counterclaim, and on June 15, 2011, the case was transferred to the District Court.

(*Id.*)  GMACM filed an answer to Dlin's counterclaims.  (*Id.* (citing Priore Supp. Ex. V).)

GMACM filed a notice of its bankruptcy in the District Court on May 31, 2012.  (*Id.* ¶ 49 (citing

Priore Supp. Ex. V).)  The Trust alleges that Ocwen has taken over in the State Court Action and

a trial solely for the eviction portion of the action has been set for May 18, 2015.  (*Id.*)

### B.    The Claim

Dlin timely filed the Claim on November 8, 2012, asserting a general unsecured claim

against GMACM in the amount of $971,770.  (Claim at 1.)  Several documents are attached to

the proof of claim, including Dlin's answer to the complaint in the State Court Action.  (*See

generally id.*)  In the State Court Action, Dlin asserted thirteen causes of action by way of

counterclaims against GMACM, among other defendants, including:  breach of contract, breach

of the duty of good faith and fair dealing, promissory estoppel, breach of fiduciary duty,

negligent misrepresentation, violations of the Colorado Consumer Protection Act (the "CCPA"),

negligence per se, civil conspiracy, tortious interference with contract, negligent infliction of

emotional distress, fraudulent wrongful foreclosure, and fraud in the factum.  (*Id.* at 39–58.)

Many of the causes of action are based on similar factual allegations such that Dlin's Claim can

be narrowed down to three main theories of relief:  (1) that GMACM's agents made

representations to Dlin that he should default on his Loan obligations in order to obtain a loan

modification and that if he defaulted, he would obtain a loan modification (the "Coerced Default

Theory"); (2) that GMACM wrongfully denied certain short sale offers made on the Property and

thereafter wrongfully foreclosed on the Property while an offer was pending (the "Short Sale

Theory"); and (3) that GMACM lacked standing to foreclose (the "Standing Theory").[3]

### C.      The Objection

The Trust seeks to disallow and expunge the Claim in its entirety.  The Trust first argues

that the Debtors are not liable for Dlin's wrongful foreclosure allegations.  (Obj. Ex. 1-A at 2–3.)

According to the Trust, GMACM gave proper notice and complied with Colorado law in

pursuing the foreclosure.  (*Id.*)  The Trust further argues that Dlin rests his damages for his

counterclaims upon an alleged default or deficiency judgment granted against him personally on

the first and second lien loans.  (*Id.* at 3.)  The Trust asserts that no such actual judgment has

been entered and Dlin fails to allege GMACM's connection to the second lien loan.  (*Id.*)

---

[3]      At the hearing, Dlin's counsel conceded that he was not in fact asserting that GMACM lacked standing to
foreclose on the Property.  Rather, he argued that GMACM's "inequitable" conduct should prevent it from
foreclosing.  Therefore, the Standing Theory is deemed to be abandoned and the Objection to the Claim to the extent
it is based on this theory is **SUSTAINED**.

10

Second, the Trust argues that GMACM is not liable for Dlin's allegations that

GMACM's representatives told him to default on his Loan. (*Id.* at 3–4.)  The Trust asserts that

GMACM's records show that GMACM's representatives never advised Dlin to stop making

payments or that he would be guaranteed a loan modification if he became delinquent on his

account. (*Id.* at 4.)  Instead, the Trust argues, GMACM's representatives advised Dlin that a

borrower can only be considered for a loss mitigation option if the borrower is at least two

months past due, consistent with the investor's guidelines. (*Id.*)

Third, the Trust asserts that GMACM is not liable for the increase in Dlin's mortgage

payments resulting from the loan modification because GMACM "offered [Dlin] the only

payment option available to [Dlin] under the investor's modification guidelines." (*Id.*)  Even

with the lowered interest rate, when applied to the increased principal balance after capitalizing

the prior payment defaults, higher monthly payments resulted.  According to the Trust, the

modification benefited Dlin economically because it reduced his interest rate, created payment

terms that allowed him to pay his past due balance over time, and eliminated the delinquency on

the account. (*Id.* at 4–5.)  The Trust also points out that Dlin agreed to the terms of the

modification and was aware of the reasons for the increased payment prior to executing the

agreement. (*Id.* at 5.)

Fourth, the Trust asserts that GMACM is not liable for Dlin's allegation that GMACM

wrongfully denied him a short sale or failed to assist him with a short sale. (*Id.* at 7–8.)  The

Trust argues that each time the short sale was denied, GMACM followed the investor guidelines

providing that a short sale could not be approved if the net proceeds from the sale would be less

than 85% of the BPO after closing costs, commissions, and fees. (*Id.* at 8.)

11

Finally, the Trust argues that the Claim does not give rise to liability for any of the thirteen causes of action Dlin asserts against GMACM.  (*Id.* at 9–10.)

### D.    The Opposition

Dlin's Opposition generally asserts that his proof of claim provides prima facie evidence that GMACM is liable to Dlin for economic harm.  (Opp. at 2.)  According to Dlin, his causes of action sound in both contract and tort—the torts committed by GMACM are the "primary reason for the economic injury," and he has been stripped of his day in court (presumably due to the bankruptcy stay) to pursue his Claim based on the wrongful foreclosure on the Property.  (*Id.*)

Dlin's Opposition discusses three of his thirteen causes of action.  (*Id.* ¶¶ 4–14.)  With respect to the deceptive trade practice and fraudulent conduct claims, Dlin alleges that he contacted GMACM in September and October 2008 to inquire about loan modification options and GMACM advised that they could not help him because he was current on his Loan obligations.  (*Id.* ¶ 4.)  He alleges that he contacted GMACM in November 2008, at which time the GMACM agent "specifically instructed Mr. Dlin to go into default to qualify for a loan modification."  (*Id.* ¶ 5.)  Dlin further alleges that based on this representation, he stopped making Loan payments and became in default in March 2009.  (*Id.* ¶ 6.)  Dlin contacted GMACM in March 2009 to discuss loan modification options and GMACM offered Dlin a modification that increased his monthly payments.  (*Id.* ¶¶ 7–8.)  Dlin also alleges that GMACM foreclosed on the Property on July 28, 2010 "in spite of repeated assurances from representatives of GMAC[M] that if the Creditor Dlin was in default, a loan modification would be offered to help the beleaguered borrower and help him keep his home."  (*Id.* ¶ 9.)  Dlin alleges that GMACM never advised Dlin that the investor's guidelines prohibited other types of loan modifications or that they required or would cause the payments to increase.  (*Id.* ¶ 10.)

With respect to his wrongful foreclosure claim, Dlin alleges that he was injured by the foreclosure on his Property, which never would have happened if GMACM's representatives had not advised him to become delinquent in his mortgage payments. (*Id.* ¶¶ 15–20.) Prior to that advice, Dlin alleges that he had been "an excellent payer with a perfect track record." (*Id.* ¶ 16.) Dlin also alleges that GMACM coerced him into the new modification which made his payments larger and put him into a position where he could not afford to pay his Loan due to the false representations and promises made by GMACM. (*Id.* ¶ 17.) Dlin further alleges that after the foreclosure, the holder of the second lien mortgage sued Dlin and obtained a judgment against him for over $300,000; this too would not have happened if GMACM did not fraudulently foreclose on the Property. (*Id.* ¶ 18.)

Dlin also complains that GMACM failed to act on the short sale offers. (*Id.* ¶¶ 21–24.) Dlin alleges that he contacted a short sale specialist in the Evergreen, Colorado area to list his house and sell it. (*Id.* ¶ 21.) During the seven months the specialist worked on selling his Property, not one of the offers received was accepted. (*Id.* ¶ 22.) Dlin alleges that prior to the foreclosure sale, the specialist contacted GMACM to find out the amount that GMACM would accept for the short sale. (*Id.* ¶ 23.) Weeks before the foreclosure sale was conducted, the specialist sent a short sale package to GMACM to process. (*Id.* ¶ 23.) Dlin alleges that despite this pending short sale offer, GMACM foreclosed on the Property. (*Id.* ¶ 24.)

Dlin also appears to request that the Court allow him to pursue his Claim in Colorado state court.[4]

---

[4]     Along with the Opposition, Dlin's counsel also filed a motion to lift the stay. The filing fee for the lift stay motion was never paid; the Court advised Dlin's counsel that the Court would not hear the lift stay motion unless the filing fee was paid. With or without the lift stay motion, the Court will not permit the Claim to be pursued in any court other than the bankruptcy court.

### E.    The Reply

The Trust argues in its Reply that Dlin fails to sufficiently plead causes of action for

deceptive trade practices, fraud, and wrongful foreclosure.  (Reply ¶¶ 52–58.)  These three

causes of action are premised on two alleged misrepresentations:  (1) Dlin needed to be in default

in order to qualify for a loan modification and GMACM instructed him to default on the Loan;

and (2) if he defaulted, a loan modification would be offered to him.  (*Id.* ¶ 53 (citing Opp. ¶¶ 6,

9).)  The Trust argues that no such representations were made to Dlin.  Rather, the Trust argues,

GMACM's representatives consistently told Dlin he would be considered for a loan modification

only if he was in default, as was required by the investor guidelines.  (*Id.* ¶ 54.)  The Trust

further argues that even if GMACM's representatives made the representations alleged by Dlin,

those statements were not misrepresentations because:  (1) at the time Dlin requested a

modification, the investor guidelines required that he be behind on his Loan payments to qualify

for a modification; and (2) when Dlin defaulted on the Loan, GMACM offered him a

modification.  (*Id.* ¶¶ 55–56).  The Trust also addresses Dlin's allegation that GMACM is liable

for not explaining that the investor guidelines prohibited other types of loans and that his

payments would increase once a modification was approved.  (*Id.* ¶ 57 (citing Opp. ¶ 10).)  The

Trust contends that Dlin was informed on March 9, 2009 of the reasons for the increased

monthly payments and that no other type of loan modification was available.  (*Id.* ¶ 57.)  The

Trust also argues that Dlin fails to allege that GMACM represented that it would reduce his

monthly payments; nor does Dlin allege that GMACM knew that the payment would increase

when the modification was being discussed prior to his default.  (*Id.*)

The Trust also addresses Dlin's allegations that GMACM is liable for wrongfully

denying the short sale offers.  (*Id.* ¶ 59.)  According to the Trust, Dlin provides no evidence

demonstrating that GMACM was required to put the foreclosure sale on hold, nor does Dlin

present any evidence that the Debtors improperly rejected a short sale offer. (*Id.*) The Trust

argues that GMACM placed the foreclosure sale on hold multiple times to give Dlin a chance to

obtain a sufficient and acceptable short sale offer; Dlin's realtor failed to obtain the required

approval of BoA in time and the foreclosure sale was then conducted. (*Id.*) The fault, the Trust

argues, is not on the part of GMACM. (*Id.*)

The Trust further asserts that Dlin's causes of action for breach of contract, breach of

duty of good faith and fair dealing, promissory estoppel, breach of fiduciary duty, negligent

misrepresentation, deceptive trade practices, negligence, interference with contract, negligent

infliction of emotional distress, and fraud are all premised on the same allegations of

misrepresentations regarding the modification and defaulting on his Loan, as well as GMACM's

failure to accept short sale offers. (*Id.* ¶ 60.) As a result, these causes of action fail for the same

reasons. (*Id.*)

## II.      DISCUSSION

### A.      Dlin's Coerced Default Theory

Ten of Dlin's causes of action rely in whole or in part upon the Coerced Default theory:

breach of contract, breach of the duty of good faith and fair dealing, promissory estoppel, breach

of fiduciary duty, negligent misrepresentation, violation of the CCPA, negligence per se,

interference with contract, negligent infliction of emotional distress, and fraud in the factum.   In

support of this theory, Dlin alleges that in November 2008, a GMACM agent "specifically

instructed Mr. Dlin to go into default to qualify for a loan modification." (Opp. ¶ 5.) Dlin also

alleges that he received "repeated assurances [from GMACM] that if [he] was in default, a loan

modification would be offered to help the beleaguered borrower and help him keep his home."

(*Id.* ¶ 9.) Dlin alleges that he relied on these representations, stopped making the monthly

payments for his Loan, obtained a modification that increased his monthly payments that he could not afford to make, and ultimately lost his home through GMACM's pursuit of a foreclosure sale.  (*Id.* ¶¶ 5–10.)

The Trust argues that GMACM's representatives that spoke with Dlin did not make the misrepresentations Dlin alleges; instead, they merely stated that a borrower can only be considered for a loss mitigation option if the borrower is at least two months past due on his account.  (Obj. Ex. 1-A at 3–4.)  The Trust also argues that GMACM is not liable for approving Dlin for a modification with increased payments—the modification economically benefited Dlin, for example, by providing a lower interest rate.  (*Id.* at 4–5.)  The Trust argues that neither of the alleged representations was a false statement because it was true at the time of the November 2008 phone calls that the investor guidelines required that a borrower be behind on his mortgage payments to qualify for a modification; and, when Dlin defaulted, he obtained a modification. (Reply ¶¶ 54–56.)  The Trust also argues that Dlin fails to allege that GMACM represented that it would reduce his monthly payments or that GMACM knew the payments would increase once the modification review had been conducted.  (Reply ¶ 57.)

Based on the parties' arguments and the record before the Court at this time, there are disputed issues of fact precluding the resolution of this theory without an evidentiary hearing. The issues whether GMACM's representatives stated that Dlin should default on his Loan obligations, and, if he defaulted, that he would obtain a loan modification are disputed.  The Trust bases its argument on the Coerced Default Theory upon GMACM representatives accurately telling Dlin that GMACM was following the investor guidelines that precluded GMACM, acting as servicer, from providing a loan modification to a borrower unless the borrower's account was in default for at least two months.  The Trust, however, has failed to

16

provide a copy of the investor guidelines to Dlin's counsel or to the Court; the Trust merely

relies upon inadmissible hearsay in the Priore Declaration and GMACM's servicing notes for

Dlin's Loan.  This proffered evidence is insufficient to resolve the factual issues underlying the

Coerced Default Theory.  Therefore, the Objection is **OVERRULED** without prejudice to the

extent the Claim is based on the Coerced Default Theory.

### B.    Dlin's Short Sale Theory

Dlin also bases his breach of contract and breach of fiduciary duty claims in part on his

Short Sale Theory.  According to Dlin, his short sale specialist (presumably Loyd) provided

offers to GMACM that were never accepted over the course of seven months.  (Opp. ¶¶ 21–24.)

Dlin alleges that weeks before the foreclosure sale was conducted, the specialist sent GMACM a

short sale package, but while this offer was pending, GMACM wrongfully foreclosed on the

Property.  (*Id.* ¶¶ 23–24.)  The Trust argues that each time a short sale offer was denied,

GMACM acted lawfully and in accordance with the investor guidelines.  (Obj. Ex. 1-A at 8.)

The Trust also argues that Dlin fails to demonstrate that GMACM had a duty to stay the

foreclosure sale in light of the pending short sale offer; and, in any event, GMACM did stay the

foreclosure more than once to allow the short sale offer to be processed before it foreclosed.

(Reply ¶ 59.)  According to the Trust, the pending short sale offer remained outstanding because

Loyd failed to obtain the required approval of BoA, the holder of the second lien, before the

scheduled foreclosure sale.  (*Id.*)

The Trust's argument again hinges on the requirements of the investor guidelines for

approval of a short sale offer.  According to the Trust, the investor guidelines required that two

specific conditions be satisfied for the short sale offer to be accepted:  (1) the net proceeds to the

investor from the short sale must be at least 85% of the BPO or market value of the property

17

after closing costs, commissions, and fees; and (2) the second lien holder, here BoA, must

approve of the short sale offer.  The parties agree that the last short sale offer Loyd provided to

GMACM that remained pending at the time the foreclosure sale was conducted met the first of

these two requirements.  The dispute under the Short Sale Theory, therefore, lies in the second of

these requirements.

     Without competent evidence of the investor guidelines, the Court cannot resolve the issue

whether the foreclosure sale was wrongful because it was held while the short sale offer was

pending.  Thus, the Objection is **OVERRULED** without prejudice to the extent the Claim is

based on the Short Sale Theory.

### III.    <u>CONCLUSION</u>

     For the foregoing reasons, the Court **SUSTAINS** the Objection in part and **OVERRULES**

the Objection in part.  To the extent the Objection to Dlin's Claim is overruled, it is overruled

without prejudice.  The Court **ORDERS** that the parties meet and confer and provide a letter to

the Court on or before May 15, 2015, scheduling an evidentiary hearing to resolve the remaining

portions of Dlin's Claim.  The parties are also directed to meet and confer about settlement of the

remaining claims.  The parties shall provide the Court with a status letter at least one week

before the scheduled evidentiary hearing.

    **IT IS SO ORDERED.**

Dated:   April 21, 2015
        New York, New York

                                        **/s/Martin Glenn**
                                        MARTIN GLENN
                       United States Bankruptcy Judge