UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) ) ) | **FOR PUBLICATION** |

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |
| | ) | Jointly Administered |

**MEMORANDUM OPINION AND ORDER SUSTAINING IN PART AND
OVERRULING IN PART THE RESCAP BORROWER CLAIMS TRUST'S
OBJECTION TO CLAIM NUMBER 3862 FILED BY RHONDA GOSSELIN**

*A P P E A R A N C E S:*

MORRISON & FOERSTER LLP
*Attorneys for ResCap Borrower Claims Trust*
250 West 55th Street
New York, New York 10019
By:     Norman S. Rosenbaum, Esq.
        Jordan A. Wishnew, Esq.
        Jessica J. Arett, Esq.

LAIRD J. HEAL, ESQ.
*Attorney for Rhonda Gosselin*
120 Chandler Street
Suite 2R
Worcester, Massachusetts 01609
By:     Laird J. Heal, Esq.

**MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the ResCap Borrower Claims Trust's (the "Trust") objection

to Claim Number 3862 (the "Claim," ECF Doc. # 7752-3, Ex. A) filed by Rhonda Gosselin

("Gosselin"). The objection to the Claim is included in the *ResCap Borrower Claims Trust's*

*Seventy-Fifth Omnibus Objection to Claims (No Liability Borrower Claims)* (the "Objection,"

ECF Doc. # 7552). The Objection is supported by the declarations of Deanna Horst (the "Horst

Declaration," ECF Doc. # 7552-3) and Norman S. Rosenbaum (the "Rosenbaum Declaration,"

ECF Doc. # 7552-4).  Gosselin filed an opposition to the Objection (the "Opposition," ECF Doc.

# 7652).  The Trust filed a reply (the "Reply," ECF Doc. # 7842), supported by the supplemental

declaration of Deanna Horst (the "Supplemental Horst Declaration," ECF Doc. # 7842-1).  The

Court held a hearing on the Objection on January 14, 2015 (the "Hearing") and took the matter

under submission.[1]  This Opinion sustains in part and overrules in part the Objection to

Gosselin's Claim.

## I.    BACKGROUND

### A.    The Loan History

Debtor GMAC Mortgage, LLC ("GMACM") originated an $85,000 loan to Gosselin on

July 26, 2006 (the "Loan"), evidenced by a note (the "Note," Horst Supp. Ex. B) and secured by

a mortgage (the "Mortgage") on Gosselin's primary residence located at 16 Rolf Avenue,

Chicopee, Massachusetts 01020 (the "Property").  (*See* Horst Supp. ¶ 7.)  The Loan was a cash-

out refinancing of the then-existing mortgage loan for the Property.  (*See id.*)  Gosselin was

provided with a Truth in Lending Act ("TILA") disclosure (the "TILA Disclosure," *id.* Ex. E) at

the time the Loan was originated.  (Horst Supp. ¶ 8.)  GMACM transferred the Loan to the

Federal National Mortgage Association ("Fannie Mae") on September 15, 2006.  (Obj. Ex. 1-A

at 36.)  GMACM serviced the Loan from July 26, 2006 until servicing rights were transferred to

Green Tree Servicing LLC ("Green Tree") on February 1, 2013.  (*Id.*)

According to the Trust, Gosselin's Loan was approved by GMACM on the basis of her

credit score and the 47% loan-to-value ratio at the time of closing.  (Horst Supp. ¶ 7.)  Gosselin

signed a loan application and HUD-1 settlement statement (the "HUD-1 Statement," *id.* Ex. C),

indicating that the Loan paid off a prior lien on the Property in the amount of $24,559.46 as well

---

[1]    Gosselin's counsel did not make an appearance at the Hearing.

as credit card debt totaling $41,528.45. (Horst Supp. ¶ 7; *see id.* Ex. C.) Gosselin also received

$14,523.72 in cash from the Loan proceeds. (*See* Horst Supp. ¶ 7.) Before the origination of the

Loan, Gosselin's monthly mortgage payment was $511.00 and her monthly credit card payments

were $1,703.00 in the aggregate, totaling $2,214.00. (*Id.*) After the Loan closed, Gosselin's

monthly mortgage payment was $813.37 and her monthly payments on other debts were

$538.00, totaling $1,351.37. (*Id.*) Accordingly, the Loan reduced Gosselin's monthly debt

payments by $863.00. (*Id.*)

The Loan was in default as of June 4, 2007, based on nonpayment of the April through

June 2007 payments. (*Id.* ¶ 9.) Gosselin informed the Debtors that she would not be able to

make all three delinquent payments, and the Debtors agreed to allow her to make the April and

May payments in June 2007 and the June payment in July 2007. (*Id.*) On July 9, 2007, Gosselin

made a payment toward the April and May amounts due. (*Id.*) The Debtors accidentally

transferred the payment to another customer (the "Misdirected Payment"), and that customer

refused to return the payment to the Debtors.[2] (*Id.*) A GMACM employee advised Gosselin to

put a "stop payment" on the Misdirected Payment check, and GMACM informed her that it

would cover any related costs, amend her credit report if it was affected by the Misdirected

Payment, waive any late charges, and offer to enroll her in a privacy guard. (*Id.*) On June 25,

2007, Gosselin made another payment toward the delinquent April and May payments, and the

Debtors accepted this payment and brought her account current. (*Id.*)

Gosselin again defaulted on the Loan and was notified of a breach on July 3, 2007 after

the June and July 2007 Loan payments were not made. (*See* Reply ¶ 10.) Also in July 2007,

---

[2]        The Debtors erroneously attempted to return the payment to Gosselin because the amount of the
Misdirected Payment was not sufficient to bring her account current. (*Id.* n.3.)

Gosselin's escrow payment (paid along with principal and interest) increased as a result of higher than estimated taxes. (Horst Supp. ¶ 10.) The original escrow payment covered taxes on an estimated basis; the amount of principal or interest did not change, and the increase was not connected to the Misdirected Payment. (*Id.*)

The Loan was referred to foreclosure on August 9, 2007. (Obj. Ex. 1-A at 36.) Gosselin entered into a forbearance plan (the "Forbearance Plan") on November 2, 2007. (Reply ¶ 10.) On November 15, 2007, GMACM placed a hold on the foreclosure due to the Forbearance Plan. (*Id.*) Gosselin made payments under the Forbearance Plan on November 13, 2007 in the amount of $1,900.00, and on December 8, 2007, January 15, 2008, and February 14, 2008 in the amount of $800.00 each. (Obj. Ex. 1-A at 36.) As a result of Gosselin's compliance with the Forbearance Plan, she was approved for a traditional permanent modification (the "Loan Modification") on February 20, 2008. (*Id.*) Gosselin was required to execute and return the Loan Modification papers by February 29, 2008, but she failed to return the necessary documents. (*Id.*) On May 15, 2008, because Gosselin failed to submit executed Loan Modification documents, the Loan Modification was denied and the hold on the foreclosure was removed. (*Id.*) Foreclosure was restarted but again put on hold because GMACM received a demand letter (the "Chapter 93A Demand Letter") from Gosselin pursuant to chapter 93A of the Massachusetts General Laws ("Chapter 93A"). (*See* Obj. Ex. 1-A at 36–37.) On June 30, 2008, GMACM responded to the Chapter 93A Demand Letter; foreclosure proceedings remained on hold until August 18, 2008. (*Id.* at 37.)

B.    **Gosselin's Bankruptcy Cases**

After foreclosure proceedings were reinitiated, foreclosure was placed on hold after Gosselin filed a chapter 13 bankruptcy petition on September 18, 2008 (the "Chapter 13 Case").

(*Id.*)  Gosselin's Chapter 13 Case was dismissed, and foreclosure proceedings were once again

restarted.  (*Id.*)  In April 2010, Gosselin filed a chapter 7 bankruptcy petition (the "Chapter 7

Case") in the United States Bankruptcy Court for the District of Massachusetts (the

"Massachusetts Bankruptcy Court"), again staying foreclosure proceedings.  (*See id.*)  Gosselin

filed an adversary proceeding in her Chapter 7 Case against GMACM among other defendants

(the "Adversary Proceeding").  (*See also* the "Complaint," Horst Supp. Ex. A at 8–16; Obj. Ex.

1-A at 3; Horst Supp. Ex. A at 8–16.)

        The Complaint filed in the Adversary Proceeding asserted claims for money damages,

costs, and attorney's fees for breach of contract, negligence, wrongful foreclosure, violations of

Chapter 93A, and breach of the implied covenant of good faith and fair dealing against

defendants GMACM, Fannie Mae, and MERS.  It also sought a declaration that the foreclosure

proceedings on the Property were void.  (*See* Horst Supp. Ex. A at 8–16.)  Gosselin amended her

Complaint (the "Amended Complaint," *id.* at 17–24), adding a claim for violation of the

Massachusetts Consumer Credit Cost Disclosure Act (the "MCCCDA") and a count for

declaratory relief.  (*See id.*)  The Amended Complaint also sought: (i) an accounting of the Loan

and payments made by Gosselin; (ii) rescission of the Loan; and (iii) a declaration that the

applicable Mortgage and Note are bifurcated and that the Mortgage securing the Loan is void.

(*See id.* at 23–24.)  On April 18, 2012, the Adversary Proceeding was dismissed without

prejudice because Gosselin lacked standing.  (*See* Reply ¶ 12; Horst Supp. Ex. F (dismissal

order).)  No foreclosure on the Property had been completed at the time GMACM transferred

servicing rights to the Loan to Green Tree.  (Obj. Ex. 1-A at 37.)

### C.    The Claim

Gosselin filed her Claim on November 9, 2012, asserting a $153,669 secured claim and a

$165,980 general unsecured claim against GMACM.  (Horst Supp. ¶ 6; *id.* Ex. A.)  The Claim is

based on the causes of action asserted in the Adversary Proceeding and includes annexed copies

of the Complaint and Amended Complaint.  (*See id.* Ex. A at 8–24.)  Gosselin's Claim therefore

asserts claims for breach of contract, breach of the implied covenant of good faith and fair

dealing, negligence, wrongful foreclosure, violations of Chapter 93A, violations of the MCCDA,

and declaratory relief.  (*See id.*)

### D.    The Objection

The Trust argues that the Debtors have no liability for Gosselin's general servicing-based

claims because the Debtors' records show that the Loan was in default on the date servicing

rights were transferred to Green Tree.  (Obj. Ex. 1-A at 37.)  Gosselin's Complaint alleges that

GMACM returned two of Gosselin's payments to the wrong borrower.  (*Id.*)  The Trust admits

that GMACM returned the $1,516.90 Misdirected Payment to another customer on June 9, 2007,

and that such other customer refused to return the Misdirected Payment to GMACM.  (*Id.*)

GMACM advised Gosselin to stop payment on the check and said it would cover any costs

associated with this error.  (*Id.*)  GMACM also agreed to amend Gosselin's credit report if

necessary and waive any late charges; it also offered to enroll Gosselin in privacy guard at

GMACM's expense because of the error.  (*Id.*)  Additionally, on July 3, 2007, GMACM wrote

Gosselin a letter advising that she could enroll in one free year of identity theft prevention.  (*Id.*)

No other erroneous returned payments are reflected in the Debtors' records.  (*Id.*)

The Trust contends that GMACM is not liable for wrongful foreclosure because

GMACM had standing to foreclose on the Loan.  (*Id.*)  The Trust argues that (i) MERS was the

original mortgagee under the mortgage securing the Loan (the "Mortgage") (*id.*); (ii) MERS

assigned the Mortgage to Fannie Mae pursuant to an assignment recorded June 6, 2008 (*id.*); (iii)

Fannie Mae assigned the Mortgage to GMACM pursuant to an assignment recorded October 17,

2012 (*id.*); and (iv) GMACM assigned the Mortgage to Green Tree pursuant to an assignment

recorded September 11, 2013 (*id.* at 37–38).

The Trust argues that GMACM is not liable for Gosselin's origination-based claims

because the Debtors' books and records demonstrate that there was no disclosure violation in the

TILA Disclosure. (*Id.* at 38.) Additionally, the Trust argues that any claim for negligent lending

is time-barred. (*Id.*)

Finally, the Trust argues that summary judgment was granted dismissing Gosselin's

Adversary Proceeding on April 18, 2012. (*Id.*) According to the Trust, the Massachusetts

Bankruptcy Court held that Gosselin lacked standing to bring the Adversary Proceeding in

bankruptcy court because Gosselin's bankruptcy estate no longer had any interest in the claims

asserted in the Adversary Proceeding in light of the chapter 7 trustee's abandonment of such

claims and the fact that she had already been granted a discharge. (*Id.*) The Trust asserts that the

dismissal of the Adversary Proceeding left Gosselin to pursue her claims in state court, but there

is no indication that another lawsuit was ever filed. (*Id.*)

### E.    The Opposition

Gosselin states that her Mortgage was granted to MERS and recorded on July 31, 2006.

(Opp. at 2.) The first assignment of the Mortgage from MERS to Fannie Mae was recorded on

June 7, 2008 and signed by Andrew Harmon, Esq.; Gosselin alleges that Harmon has been

criticized for improper prosecution of foreclosures. (*Id*. at 3.) The second assignment of the

Mortgage from Fannie Mae to GMACM was recorded on October 17, 2012. (*Id*.) A third

assignment of the Mortgage, dated September 5, 2013, was recorded on September 11, 2013; Gosselin does not indicate to whom this assignment was made. (*Id.*) Gosselin asserts that she filed her Claim on November 9, 2012, after the second assignment was recorded but before the third assignment was executed. (*See id.*)

Gosselin argues that her Claim against GMACM is not time barred. First, she argues that 28 U.S.C. § 1367(d) provides a 30-day tolling of the statute of limitations for any claim dismissed by a federal court declining to exercise supplemental jurisdiction over such claim. (*Id.*) Second, she argues that Massachusetts law affords her one year to file her Claim after a case is dismissed under "circumstances such as this." (*Id.* at 3–4 (citing *Cannonball Fund, Ltd. v. Dutchess Capital Mgmt., LLC*, 993 N.E.2d 350, 354 (Mass. App. Ct. 2013).) Third, she argues that the applicable limitations periods were tolled by section 108(c)(1) of the Bankruptcy Code when the Debtors filed their chapter 11 cases. (*Id.* at 4.) According to Gosselin, GMACM's liability to her "was fixed when the time for objection to the claims of Ms. Gosselin was expired, and upon the confirmation of the Plan, her rights were established." (*Id.*)

Additionally, Gosselin argues that GMACM is liable for the full amount of the Claim, including her claim for rescission, because GMACM accepted the assignment of the Mortgage from Fannie Mae, "uniting the equity and the legal significance in Massachusetts." (*Id.* (citing *U.S. Bank, Nat'l Ass'n v. Ibanez*, 941 N.E.2d 40, 51 (Mass. 2011).) She argues that since the Mortgage was assigned to GMACM before her Claim was filed, all of the allegations in the Claim are properly targeted at GMACM. (*Id.*)

Gosselin also argues that the substance of her Claim is not precluded since the Massachusetts Bankruptcy Court did not reach the merits of her Amended Complaint. (*See id.*) She also asserts that after GMACM returned her check to the wrong person, she received a check

sent from a dentist in Arizona, and then GMACM started demanding that she make larger Loan payments, which she could not afford. (*Id*.) She contends that she could not file a state court action because the Debtors filed for bankruptcy shortly after the order dismissing her Adversary Proceeding was entered. (*Id*. at 6.)

### F.    The Reply

The Trust characterizes Gosselin's Claim, to the extent it relates to the Misdirected Payment, as asserting servicing-related breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, and Chapter 93A claims for which the Debtors are not liable. (*See* Reply ¶ 15.) The Trust asserts that Gosselin fails to state a claim for negligence because she has not shown how she was damaged by the Debtors' actions. (*Id*. ¶ 17.) The Trust admits that the Misdirected Payment was made in error, but it contends that the Debtors' correction of the error and offer to cover any associated costs negated any damage to Gosselin. (*See id.*) According to the Trust, Gosselin's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair and deceptive trade practices under Chapter 93A each fail for the same reason—she has not adequately alleged how she was damaged by the Debtors' error concerning the Misdirected Payment. (*See id.* ¶¶ 18–19.) While Gosselin asserts that the Debtors demanded increased payments following the Misdirected Payment, the Debtors contend that these were "the result of an increase in the amount of escrow required because the original escrow for taxes was only estimated." (*Id*. ¶ 20.)

The Trust characterizes Gosselin's Claim relating to the Debtors' standing to foreclose on her Property as foreclosure-related negligence, wrongful foreclosure, Chapter 93A, and declaratory judgment claims for which the Debtors have no liability. (*See id.* ¶ 21.) According to the Trust, Gosselin alleges that GMACM, in its capacity as servicer for Fannie Mae, lacked

9

standing to foreclose on her Loan because it was never assigned the Mortgage.  The Trust contends that there was a proper chain of title from MERS to Fannie Mae, and from Fannie Mae to GMACM.  (*Id.*)  The Trust argues that a foreclosure initiated before June 22, 2012 is valid under Massachusetts law as long as the mortgage assignment was recorded or executed prior to the initial date on which the foreclosure notice was published.  (*Id.* ¶ 22 (citing *Abraham v. Am. Home Mortg. Servicing, Inc.*, No. 11-10854, 2012 WL 4482236, at *2 (D. Mass. Sept. 27, 2012).)  Because the Mortgage was assigned to Fannie Mae well before the initial publication of foreclosure notices on March 18, 2012, Gosselin has not shown that the Debtors lacked standing to foreclose, and her foreclosure-based claims therefore fail.  (*Id.*)

The Trust also objects to Gosselin's purported origination-based claims for negligence, unfair and deceptive trade practices under Chapter 93A, and violations of the MCCCDA.  (*Id.* ¶ 23.)

First, the Trust addresses Gosselin's allegation that GMACM's TILA Disclosure violated section 10(i)(2) of the MCCCDA, which provides that a TILA disclosure is inaccurate if the finance charge contained therein varies from the actual finance charge by more than $35.00; according to Gosselin, the finance change for her Loan was $63.07 greater than the amount stated in the TILA Disclosure.  (*Id.*)  The Trust explained that Gosselin's calculation failed to account for a $55.00 document delivery fee charged by a third party vendor.  (*Id.* ¶ 24.)  The Trust contends that such charge does not constitute a finance charge under TILA "because it is an amount charged by a third party and the third party was not required to be used by the lender, nor was the charge retained by the lender."  (*Id.*)  Even if Gosselin's other calculations are accurate, her finance charge was understated by no greater than $8.07, and the TILA Disclosure is accurate for purposes of section 10(i)(2) of the MCCCDA.  (*Id.*)

Second, the Trust contends that, contrary to Gosselin's assertion that she was only

provided one copy of the TILA notice of right to cancel, the Debtors' books and records indicate

that she was provided two copies of this notice.  (*Id.* ¶ 25.)  Indeed, Gosselin admits in her

Amended Complaint that she signed an acknowledgment that she received two copies of the

TILA notice of right to cancel.  (*Id.* (citing Horst Supp. Ex. A at 22).)

Third, the Trust argues that any claim for negligent lending is time-barred.  (*Id.* ¶ 26.)

Massachusetts has a three year statute of limitations for negligence claims, and the Debtors

originated her Loan on July 26, 2006, four years before July 26, 2010, the date on which

Gosselin filed the Amended Complaint.  (*Id.*)

Finally, the Trust raises a novel objection to Gosselin's allegation that the Debtors

engaged in unfair and deceptive practices by extending her credit without regard to her ability to

pay.  (*Id.* ¶ 28.)  Because this objection is raised for the first time in the Reply, the Trust indicates

that "Gosselin will be given the opportunity to respond to the . . . Trust's arguments solely with

regards to this allegation."  (*Id.*)  According to the Trust, Gosselin was approved for the Loan

based on both her credit score and the loan-to-value ratio, which was 47% at the time of closing.

(*Id.* ¶ 29.)  At the time the Loan was originated, Massachusetts law did not require a lender to

investigate the suitability of a loan and Gosselin has never alleged that the Loan deviated from

industry standards.  (*Id.*)  The Trust alleges that Gosselin chose to take equity out of her home to

pay down her consumer debt and improve her credit score and that the value of her Property in

2006 warranted the extension of the Loan.  (*See id.*)  Moreover, the Trust points out that Gosselin

has not provided evidence that she could not afford her Loan payments at the time of origination.

(*Id.* ¶ 30.)  To the contrary, the Trust argues that the Loan reduced Gosselin's monthly debt

payments by $863.00, and she successfully made Loan payments for a year and a half before

defaulting on the Loan.  (*Id.*)  As a result, the Trust contends that Gosselin has failed to show any

liability on the part of the Debtors for unfair and deceptive practices relating to their assessment

of her ability to afford the Loan.  (*See id.*)

### G.    The Supplemental Filing

At the Hearing, the Court asked what evidence the Trust provided to demonstrate that the

Debtors considered Gosselin's ability to repay the Loan at the time of origination, such that the

Debtors are not liable for violating Chapter 93A.  (*See* Jan. 14, 2014 Hr'g Tr. 8:9–3, ECF Doc.

# 8021.)  The Trust's counsel stated that the Loan was approved based on Gosselin's credit score

and loan-to-value ratio.  (*Id.* 10:18–20.)  The Court permitted the Trust to file a supplemental

declaration addressing the source documents considered by the Debtors in originating the Loan.

(*See id.* 11:6–10.)  The Court directed the Trust to address Gosselin's credit score at the time of

Loan origination and why it indicated her ability to repay the Loan.  (*Id.* 11:14–12:9.)  The Court

provided Gosselin a chance to respond to the Trust's supplemental filing.  (*Id.* 13:9–12.)

On January 21, 2015, the Trust filed the declaration of Deanna Horst in further support of

the Objection and Reply (the "Second Supplemental Horst Declaration," ECF Doc. # 8007).  The

Second Supplemental Horst Declaration attaches (i) a product matrix utilized by GMACM to vet

a borrower's eligibility for a loan (the "GMACM Loan Matrix," *id.* Ex. A); (ii) a findings report

generated after entering Gosselin's Loan information into an automated underwriting tool (the

"Findings Report," *id.* Ex. B); and (iii) Gosselin's credit report (*id.* Ex. C).  Thereafter, the Court

entered an order permitting Gosselin to respond to the Second Supplemental Horst Declaration

within seven days.  (*See* ECF Doc. # 8112.)  Gosselin did not submit a response.

# II.    DISCUSSION

## A.    Claims Objections

Correctly filed proofs of claim "constitute prima facie evidence of the validity and

amount of the claim . . . .  To overcome this prima facie evidence, an objecting party must come

forth with evidence which, if believed, would refute at least one of the allegations essential to the

claim." *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000).  By

producing "evidence equal in force to the prima facie case," an objector can negate a claim's

presumptive legal validity, thereby shifting the burden back to the claimant to "prove by a

preponderance of the evidence that under applicable law the claim should be allowed." *Creamer*

*v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*, No. 12 Civ. 6074 (RJS),

2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted).  If the

objector does not "introduce[] evidence as to the invalidity of the claim or the excessiveness of

its amount, the claimant need offer no further proof of the merits of the claim."  4 Collier on

Bankruptcy ¶ 502.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).

Bankruptcy Code section 502(b)(1) provides that claims may be disallowed if

"unenforceable against the debtor and property of the debtor, under any agreement or applicable

law."  11 U.S.C. § 502(b)(1).  To determine whether a claim is allowable by law, bankruptcy

courts look to "applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674

(Bankr. D. Del. 2006).

Federal pleading standards apply when assessing the validity of a proof of claim. *See,*

*e.g.*, *In re Residential Capital, LLC*, 518 B.R. 720, 731 (Bankr. S.D.N.Y. 2014); *In re DJK*

*Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party

has met their burden in connection with a proof of claim, bankruptcy courts have looked to the

pleading requirements set forth in the Federal Rules of Civil Procedure." (citations omitted)).

Accordingly, a claimant must allege "enough facts to state a claim for relief that is plausible on

its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Where a complaint pleads facts that are merely

consistent with a defendant's liability, it stops short of the line between possibility and

plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation

marks omitted). Plausibility "is not akin to a probability requirement," but rather requires "more

than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation and internal

quotation marks omitted). The court must accept all factual allegations as true, discounting legal

conclusions clothed in factual garb. *See, e.g.*, *id.* at 677–78; *Kiobel v. Royal Dutch Petroleum

Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded,

nonconclusory factual allegations in the complaint to be true" (citing *Iqbal*, 556 U.S. at 678)).

The court must then determine if these well-pleaded factual allegations state a "plausible claim

for relief." *Iqbal*, 556 U.S. at 679 (citation omitted).

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

(citation omitted). A claim is plausible when the factual allegations permit "the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation

omitted). A claim that pleads only facts that are "merely consistent with a defendant's liability"

does not meet the plausibility requirement. *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 557 (2007)). "A pleading that offers labels and conclusions or a formulaic recitation of

the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal

quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice." *Id.* (citation omitted).  "The pleadings must

create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l*

*Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

Although "[claims] drafted by *pro se* [claimants] are to be construed liberally, [] they

must nonetheless be supported by specific and detailed factual allegations sufficient to provide

the court and the defendant with 'a fair understanding of what the [claimant] is complaining

about and . . . whether there is a legal basis for recovery.'"  *Kimber v. GMAC Mortgage, LLC (In*

*re Residential Capital, LLC)*, 489 B.R. 489, 494 (Bankr. S.D.N.Y. 2013) (ellipsis in original)

(quoting *Iwachiw v. New York City Bd. of Elections*, 126 F. App'x 27, 29 (2d Cir. 2005)).

## B.    Breach of Contract

Gosselin does not state a breach of contract claim against GMACM.  "In order to assert a

claim for breach of contract in Massachusetts, plaintiffs must allege 'that there was a valid

contract, that the defendant breached its duties under its contractual agreement, and that the

breach caused the plaintiff damage.'"  *Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342,

351 (D. Mass. 2011) (quoting *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 316 (D. Mass.

1997)).  In the Amended Complaint, Gosselin asserts that the Note and Mortgage define the

method by which monthly installment payments are to be applied to her account.  (Horst Supp.

Ex. A at 19.)  She states in conclusory fashion that "the method of servicing her loan throughout

the term of the loan is in contravention of [her] rights under the note and mortgage" (*id.*); she

does not allege how GMACM contravened the terms of her Note and Mortgage.  Gosselin asserts

that in or around May 2009, she "obtained a payment history from GMAC[M], which shows that

many of her payments were not posted to her account correctly, or were not posted at all."  (*Id.*)

While she also argues that GMACM "improperly credited monies, or delayed crediting monies, to interest and principal," (*id.* at 21), these allegations are rebutted by the Trust. Specifically, the Trust explains that the Misdirected Payment was sent to a third party rather than applied to Gosselin's Loan, but that this was the only instance of a misdirected payment. The Debtors offered to make Gosselin whole for any losses associated with this error. (*See* Obj. Ex. 1-A at 37.) In her Opposition, Gosselin does not provide any further allegations concerning how GMACM misapplied her Loan payments. Without more specific allegations, Gosselin's breach of contract claim is too vague and fails to meet the applicable pleading standards. The Objection is **SUSTAINED** as to Gosselin's breach of contract claim.

### C.    Breach of the Implied Covenant of Good Faith and Fair Dealing

Gosselin also fails to state a claim for breach of the implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing "is present in every contract made in Massachusetts and requires that no party to a contract undertake actions which would prejudice the others in their enjoyment of the fruits of the agreement." *Henning v. Wachovia Mortg., FSB*, 969 F. Supp. 2d 135, 148–49 (D. Mass. 2013) (citation omitted). "To succeed with a claim based on the implied covenant, the plaintiff must 'present[] evidence of bad faith or an absence of good faith.'" *Lass v. Bank of Am., N.A.*, 695 F.3d 129, 138 (1st Cir. 2012) (quoting *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 924 N.E.2d 696, 706 (Mass. 2010)). Gosselin's claim for breach of the implied covenant of good faith and fair dealing is based on the same allegations as her breach of contract claim, (*see* Horst Supp. Ex. A at 21), and as a result, does not sufficiently present evidence of bad faith on the part of GMACM. As set forth above, the Trust asserts that the Misdirected Payment was made in error, and GMACM promptly corrected the error and offered to cover any associated costs Gosselin endured as a result. Because Gosselin

has not provided any additional evidence establishing GMACM's bad faith in servicing her

Loan, the Objection is **SUSTAINED** as to Gosselin's claim for breach of the implied covenant

of good faith and fair dealing.

### D.    Negligence

"To prevail on a claim of negligence, a 'plaintiff must allege that the defendant (1) owed

a legal duty to the plaintiff, (2) breached that duty and (3) was the proximate or legal cause of (4)

actual damage or injury.'"  *Gaul v. Aurora Loan Servs. LLC*, No. 12-10129 (NMG), 2013 WL

1213065, at *8 (D. Mass. Feb. 7, 2013) (quoting *Speleos v. BAC Home Loans Servicing, L.P.*,

755 F. Supp. 2d 304, 310 (D. Mass. 2010)).  With respect to ordinary negligence claims,

Massachusetts courts apply the economic loss doctrine, which provides that "purely economic

losses are unrecoverable in tort and strict liability actions in the absence of personal injury or

property damage."  *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 24 (1st Cir. 2001) (quoting *FMR

Corp. v. Boston Edison Co.*, 613 N.E.2d 902, 903 (Mass. 1993); *Garweth Corp. v. Boston Edison

Co.*, 613 N.E.2d 92, 93–94 (Mass. 1993)).  Gosselin's Amended Complaint seeks damages for

emotional distress.  (*See, e.g.*, Horst Supp. Ex. A at 21 ("Defendants, by their improper behavior,

caused the Plaintiff severe emotional upset and anxiety.").)  However, "absent any 'physical

harm manifested by objective symptomatology,'" her allegations are "not sufficient to establish

the personal injury requirement of a negligence claim."  *Gaul*, 2013 WL 1213065, at *8 n.4

(citing *Brown v. Quest Diagnostics, LLC*, No. 08-11517 (RGS), 2008 WL 5236033, at *3 (D.

Mass. Dec. 16, 2008)) (holding that mortgagors' allegations that loan servicer harmed their credit

scores and "caused emotional distress" failed to state a claim for negligence).  Because Gosselin

does not allege any type of physical harm caused by GMACM, the Objection is **SUSTAINED**

with respect to Gosselin's negligence claim.

17

### E.    Wrongful Foreclosure

In support of her wrongful foreclosure cause of action, Gosselin asserts in her Amended

Complaint the following allegations:  (i) the defendants, including GMACM, sent her notices

indicating "that they intended to exercise the statutory power of sale contained in M.G.L. c. 183,

§21, under procedures required by M.G.L. c. 244, §14" (Horst Supp. Ex. A at 20); (ii) such

notices "do not meet the statutory requirements and are void and without legal effect" (*id.*); (ii)

in order to act as an assignee of the Mortgage, the defendants are required to possess such written

assignment (*see id.*); and (iv) the defendants, including GMACM, represented that they had

authority to foreclose based on assignments that did not exist at the time and therefore the

defendants did not exercise good faith and/or reasonable diligence in violation of chapters 183

and 244 of the Massachusetts General Laws (*id.*).

Under Massachusetts law, a party seeking to foreclose pursuant a mortgage's power of

sale must strictly adhere to its terms.  *See U.S. Bank Nat'l Ass'n v. Ibanez*, 941 N.E.2d 40, 50

(Mass. 2011) (citation omitted).  "If he fails to do so there is no valid execution of the power, and

the sale is wholly void."  *Id.* (quoting *Moore v. Dick*, 72 N.E. 967, 968 (Mass. 1905)).  The

Massachusetts General Laws provide a statutory power of sale that may be incorporated in any

mortgage by reference.  *See* MASS. GEN. LAWS ch. 183, § 21 (West 2015).  "The 'statutory

power of sale' can be exercised by 'the mortgagee or his executors, administrators, successors or

assigns.'"  *Ibanez*, 941 N.E.2d at 50 (quoting MASS. GEN. LAWS ch. 183, § 21).  Additionally,

section 14 of chapter 244 of the Massachusetts General Laws provides that the statutory power

of sale may be exercised by "[t]he mortgagee or person having his estate in the land mortgaged,

or a person authorized by the power of sale, or the attorney duly authorized by a writing under

seal, or the legal guardian or conservator of such mortgagee or person acting in the name of such

18

mortgagee or person . . . ."  MASS. GEN. LAWS ch. 244, § 14.  "Any effort to foreclose by a party

lacking 'jurisdiction and authority' to carry out a foreclosure under these statutes is void."

*Ibanez*, 941 N.E.2d at 50 (citations omitted).

Additionally, a party seeking to foreclose pursuant to the power of sale must strictly

adhere to the notice requirement set forth in section 14 of chapter 244 of the Massachusetts

General Laws.  *See id.* (citing MASS. GEN. LAWS ch. 244, § 14).  "That statute provides that 'no

sale under such power shall be effectual to foreclose a mortgage, unless, previous to such sale,'

advance notice of the foreclosure sale has been provided to the mortgagor, to other interested

parties, and by publication in a newspaper published in the town where the mortgaged land lies

or of general circulation in that town."  *Id.* (quoting MASS. GEN. LAWS ch. 244, § 14).

An assignee of a mortgage has the authority to exercise the power of sale only if it was

the assignee "at the time of the notice of sale and the subsequent foreclosure sale."  *Id.* at 51.

"Massachusetts law requires only that the assignment of mortgage be executed and recorded

prior to the publication of the notice of sale."  *Akar v. Fed. Nat'l Mortg. Ass'n*, 845 F. Supp. 2d

381, 396 (D. Mass. 2012) (quoting *Kiah v. Aurora Loan Servs., LLC*, No. 10-40161 (FDS), 2011

WL 841282, at *6 (D. Mass. Mar. 4, 2011) (finding that because mortgagee had valid assignment

of mortgage "at the time of the notice of sale, it had the authority to conduct the foreclosure

sale").

While the Trust has not submitted copies of the Mortgage assignments,[3] the Trust admits

that the Mortgage assignment from MERS to Fannie Mae was not recorded until June 6, 2008.

(Reply ¶ 5.)  However, Gosselin asserts that Fannie Mae initiated foreclosure proceedings in

October 2007, before it was assigned the Mortgage.  (Horst Supp. Ex. A at 18.)  Since the Trust

---

[3]     Indeed, the Trust has not even submitted a copy of Gosselin's Mortgage.

has not submitted evidence of the Mortgage assignments sufficient to rebut Gosselin's

allegations, the Objection is **OVERRULED** without prejudice with respect to Gosselin's

wrongful foreclosure claim.

      **F.**    **Chapter 93A**

To state a claim under Chapter 93A, "some form of deceptive or unfair conduct must be

alleged." *States Res. Corp. v. Architectural Team, Inc.*, 433 F.3d 73, 84 (1st Cir. 2005) (citing

MASS. GEN. LAWS ch. 93A, § 2 (declaring "[u]nfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce" unlawful)). "[A] practice or

act will be unfair under [Chapter 93A] if it is (1) within the penumbra of a common law,

statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or

unscrupulous; or (3) causes substantial injury to competitors or other business people." *Akar*,

845 F. Supp. 2d at 404 (citation and internal quotation marks omitted). "A practice may be

deceptive if it reasonably could be found to have caused the plaintiff to act differently than he

otherwise would have acted." *Id.* (citing *Declersaint v. Fed. Nat'l Mortg. Ass'n*, 696 N.E.2d

536, 540 (Mass. 1998)).

Gosselin asserts that GMACM engaged in unfair or deceptive practices within the

meaning of Chapter 93A by "improperly extending credit to [her] without regard to her ability to

pay, failing to protect her confidential and private information, failing to properly service the

[L]oan and attempting to foreclose on the [P]roperty without the authority to do so." (Horst

Supp. Ex. A at 21.) The Trust argues that Gosselin's Chapter 93A claim fails because she has

failed to adequately allege how she was damaged by GMACM's actions. (Reply ¶ 19.)

The Massachusetts Supreme Judicial Court has stated that Chapter 93A "'create[s] a legal

right, the invasion of which, without more, constitutes an injury,' and 'under circumstances

where there has been an invasion of a legally protected interest, but no harm for which actual

damages can be awarded . . . the statute provides for the recovery of minimum damages in the

amount of [twenty-five dollars].'" *Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476, 490–91

(Mass. 2004) (quoting *Leardi v. Brown*, 474 N.E.2d 1094, 1102 (Mass. 1985)) (affirming lower

court's certification of class of cigarette purchasers bringing Chapter 93A claim against cigarette

manufacturer, notwithstanding defendants' argument that plaintiffs have not established

damages).  However, the First Circuit has since surveyed decisions of the Supreme Judicial

Court and held that "the most recent . . . cases in point appear to have returned to the notion that

injury under chapter 93A means economic injury in the traditional sense . . . ." *Rule v. Fort

Dodge Animal Health, Inc.*, 607 F.3d 250, 255 (1st Cir. 2010).  "Examples of such injuries in the

context of a chapter 93A claim based on mishandling a forbearance agreement and a borrower's

attempts to obtain a permanent loan modification under HAMP include a loss of equity in the

borrower's 'home and damage to her credit and her ability to obtain loans or credit in the future'

as well as an 'increase in interest rates she will have to pay on any existing or future loans and

credit card accounts.'"  *Charest v. Fed. Nat'l Mortg. Ass'n*, 9 F. Supp. 3d 114, 128 (D. Mass.

2014) (quoting *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 241 (1st Cir. 2013)).

        In Massachusetts, "a lender may be liable under [Chapter] 93A for 'the origination of a

home mortgage loan that the lender should recognize at the outset that the borrower is not likely

to be able to repay.'"  *Drakopoulos v. U.S. Bank Nat'l Ass'n*, 991 N.E.2d 1086, 1094 (Mass.

2013) (quoting *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 560 (Mass. 2008)).  In

*Fremont*, the Supreme Judicial Court affirmed the lower court's grant of a preliminary injunction

restricting a mortgage servicer's ability to foreclose on certain "presumptively unfair" loans.  *See*

21

*Fremont*, 897 N.E.2d at 551.  In granting the preliminary injunction, the lower court found that

the Massachusetts Attorney General

> was likely to prevail on the claim that . . . loans featuring a
> combination of the following four characteristics qualified as
> "unfair" under [Chapter 93A], § 2: (1) the loans were ARM loans
> with an introductory rate period of three years or less; (2) they
> featured an introductory rate for the initial period that was at least
> three per cent below the fully indexed rate; (3) they were made to
> borrowers for whom the debt-to-income ratio would have exceeded
> fifty per cent had Fremont measured the borrower's debt by the
> monthly payments that would be due at the fully indexed rate
> rather than under the introductory rate; and (4) the loan-to-value
> ratio was one hundred per cent, or the loan featured a substantial
> prepayment penalty . . . or a prepayment penalty that extended
> beyond the introductory rate period.

*Id.* at 554.  In *Drakopoulos*, the Supreme Judicial Court clarified that "[n]othing in [its] decision

in *Fremont* . . . was intended to suggest that the universe of predatory home loans is limited only

to those meeting the four criteria present in that case." *Drakopoulos*, 991 N.E.2d at 1095.

"Rather, [t]he holding of *Fremont* was that [Chapter] 93A prohibits 'the origination of a home

mortgage loan that the lender should recognize at the outset that the borrower is not likely to be

able to repay.'" *Id.* (quoting *Frappier v. Countrywide Home Loans, Inc.*, 645 F.3d 51, 56 (1st

Cir. 2011)).  The *Drakopoulos* court vacated and remanded the lower court's order granting

summary judgment in favor of the trustee of a mortgage loan securitization trust, finding that

factual issues regarding whether the loan originator acted unfairly or deceptively existed because

the record contained documentation indicating that the lender artificially inflated the borrower's

income and issued the borrower "a loan with monthly payments exceeding the plaintiff's total

monthly income." *Id.* at 787.

    The Trust states that GMACM extended the Loan to Gosselin on the basis of her credit

score and the loan-to-value ratio, which was 47% at the time of closing based on an appraisal of

22

the Property.  (Reply ¶ 29.)  The Trust asserts that the minimum credit score permitted under the

guidelines of the GMACM Loan Matrix was 660 and the maximum loan-to-value ratio as a cash

out refinance was 90%.  (Second Horst Supp. ¶ 6.)  According to the Trust, Gosselin was

approved for the Loan because (i) her credit score of 679 exceeded the minimum threshold of

660; (ii) her loan-to-value ratio of 47% was significantly less than the maximum loan-to-value

ratio of 90% permitted under the GMACM Loan Matrix; (iii) the new Loan payment was only

1.75 times her pre-existing loan payment; and (iv) her pre-existing loan payment history

reflected no late payments.  (*Id.* ¶ 7.)  Additionally, the Trust asserts that, based on the HUD-1

Statement Gosselin completed, the Loan reduced Gosselin's monthly debt payment obligations

by $863.00 per month.  (Horst Supp. ¶ 8.)

However, the HUD-1 Statement does not reflect Gosselin's income at the time the Loan

was originated.  (*See* Horst Supp. Ex. C.)  Nor does the Trust state that GMACM considered her

income at the time it extended her the Loan.  To be sure, the Trust states that GMACM did not

require verification of income, assets, or employment in originating the type of loan extended to

Gosselin.  (*See* Second Horst Supp. ¶ 6.)  Furthermore, the Trust does not explain why her credit

score established her ability to repay the Loan.  At this stage of the contested matter, the Court is

unable to conclude that Gosselin has failed to state a plausible claim against the Debtors for

violating Chapter 93A by originating her Loan without properly assessing her ability to repay the

Loan.

Additionally, while a Chapter 93A claim is required to be commenced within four years

from the date such cause of action accrues, *see* MASS. GEN. LAWS ANN. ch. 260, § 5A, "under

Massachusetts law, if an action is duly commenced within the limitations period and then

dismissed for 'any matter of form,' the plaintiff is entitled to 'commence a new action for the

same cause within one year after the dismissal,'" *Rodi v. S. New Engl. Sch. of Law*, 389 F.3d 5,

18 (1st Cir. 2004) (quoting MASS. GEN. LAWS ch. 260, § 32).  Massachusetts's "savings statute

applies, inter alia, to an action originally filed and dismissed in a court of another state or in a

federal district court." *Id.* (citations omitted); *see Corliss v. City of Fall River*, 397 F. Supp. 2d

260, 266 (D. Mass. 2005) ("Dismissing an action for want of subject matter jurisdiction because

it is brought in the wrong court is plainly 'a matter of form' within the meaning of Mass. Gen.

Laws ch. 260, § 32.").  Gosselin's Chapter 93A claim was timely asserted at the time she filed

her original Complaint, as it was brought within four years of the origination date of her Loan.

While the Massachusetts Bankruptcy Court declined to exercise jurisdiction over the Adversary

Proceeding and dismissed Gosselin's Adversary Proceeding on April 18, 2012 (*see* Horst Supp.

Ex. F), case law suggests that this dismissal constitutes a dismissal for a "matter of form" within

the meaning of Massachusetts's savings statute.  *See, e.g.*, *Corliss*, 397 F. Supp. 2d at 266 ("In

cases considering whether or not a case was dismissed for a 'matter of form', Massachusetts

courts have focused on the question of whether or not the dismissal concerned the merits.").

Accordingly, Gosselin had one year from April 18, 2012 to refile her Chapter 93A claims against

the Debtors under the Massachusetts savings statute; the commencement of the Debtors' chapter

11 cases less than one month later tolled this limitations period.  *See* 11 U.S.C. § 108(c)

(extending period for asserting claim against the debtor if applicable nonbankruptcy law provides

a limitations period "and such period has not expired before the date of the filing of the

petition").  The Objection is **OVERRULED** with respect to Gosselin's Chapter 93A claim to the

extent it is based on allegations concerning origination of the Loan.

Additionally, the Trust has not rebutted the prima facie validity of Gosselin's Chapter

93A claim to the extent it relates to the Debtors' handling of the Misdirected Payment.  While

the Trust contends that GMACM offered to remedy any costs incurred by Gosselin as a result of

the Misdirected Payment, whether she actually suffered any economic damages as a result raises

a factual issue.  The Objection is therefore **OVERRULED** with respect to Gosselin's Chapter

93A claim to the extent it is based on allegations concerning the Misdirected Payment.

Finally, because the Court overrules the Objection to Gosselin's wrongful foreclosure

claim, it will allow Gosselin's Chapter 93A claim to proceed to the extent it relates to allegations

of wrongful foreclosure.  Thus, the Objection is **OVERRULED** with respect to Gosselin's

Chapter 93A claim premised on GMACM's allegedly wrongful foreclosure.

### G.    The MCCCDA

The MCCCDA affords individuals who grant a mortgage on their principal dwelling a

right to rescind their mortgage loan if the required statutory disclosures are not provided by the

lender.  *See McDermott v. Mortg. Elec. Registration Sys., Inc.*, No. 08-12121 (GAO), 2010 WL

3895460, at *2 (D. Mass. Sept. 30, 2010) (citing MASS. GEN. LAWS ch. 140D, § 10(a)).  "A

consumer may exercise that right until midnight of the third business day following

consummation of the loan or the delivery of all required disclosures and written notice of the

rescission right."  *Id.* (citing MASS. GEN. LAWS ch. 140D, § 10(a)).  Even where statutorily

required disclosures are not made, however, a mortgagor's rescission right "shall expire four

years after consummation, upon transfer of all the consumer's interest in the property, or upon

sale of the property, whichever occurs first."  *Id.* (citing 209 MASS. CODE REGS. 32.23); *see*

*Ferreira v. Mortg. Elec. Registration Sys., Inc.*, 794 F. Supp. 2d 297, 302 (D. Mass. 2011)

("If . . . the lender fails to provide the required disclosures, the right to rescind does not expire

until four years after the consummation of the transaction.").

25

The MCCCDA requires disclosure of certain "material disclosures," including "the annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments, and the due dates or periods of payments scheduled to repay the indebtedness." *McDermott*, 2010 WL 3895460, at *2 (citing MASS. GEN. LAWS ch. 140D, § 1.).  The finance charge "includes any charge payable by the consumer and imposed by the creditor as an incident to the extension of credit." *Id.* (citing 209 MASS. CODE REGS. 32.04(1)).  Before foreclosure proceedings have been commenced, an understatement of the applicable finance charge on a loan is considered accurate if it is within one-half percent of the amount of credit extended, *see id.* (citing MASS. GEN. LAWS ch. 140D, § 4(f)(2)(a)); "[h]owever, once foreclosure has been initiated, the finance charge and other disclosures affected by the finance charge are considered accurate only if the disclosed finance charge does not vary from the actual finance charge by more than thirty-five dollars," *id.* (citing MASS. GEN. LAWS ch. 140D, § 10(i)(2)).

Gosselin's TILA Disclosure is dated July 25, 2006.  Gosselin challenges GMACM's calculation of the "Amount Financed," arguing that it "omits at least a $55 charge for document delivery, which is not excludible."  (Horst Supp. Ex. A at 22.)  Gosselin argues this $55 understatement, coupled with an additional $8.07 understatement (*see id.*), varies the actual finance charge by more than thirty-five dollars so the TILA Disclosure is inaccurate; she argues she may, therefore, rescind her Loan within four years from the date of origination (*see id.*).  The Trust contends that the contested document delivery fee was charged by a third party, and is excludable from the calculation of the finance charge under TILA.  (Reply ¶ 24.)

The Trust is correct.  Under the applicable TILA regulation, the finance charge includes fees charged by a third party only if the lender "(i) [r]equires the use of a third party as a condition of or an incident to the extension of credit, even if the consumer can choose the third party; or (ii) [r]etains a portion of the third-party charge, to the extent of the portion retained." 12 C.F.R. § 226.4.  According to the Trust, GMACM neither required the use of this third party document delivery service in extending the Loan to Gosselin, nor did the Trust retain any portion of the document delivery charge.  (Reply ¶ 24.)  Accordingly, the understatement of the finance charge attributable to the document delivery charge does not render the TILA Disclosure inaccurate.

To the extent Gosselin's MCCCDA claim is based on allegations that she did not receive a TILA notice of right to cancel, it is untimely to the extent she received such notice more than three days prior to commencing her Adversary Proceeding.  In her Amended Complaint she acknowledges receiving at least one TILA notice of right to cancel from GMACM, (*see* Horst Supp. Ex. A at 22 ("[T]here is only one Notice of Right to Cancel to be found in her mortgage papers.")), and she admits that she possesses a "receipt signed by her acknowledging that she received two copies of the Notice of Right to Cancel," (*id.*).  With respect to the requisite number of copies of a notice of right to cancel to be provided to a mortgage borrower, Massachusetts courts have held that "as long as a borrower receives one such notice, the rescission period is not extended."  *McKenna v. Wells Fargo Bank, N.A.*, No. 10-10417 (JLT), 2011 WL 1100160, at *2 (D. Mass. Mar. 21, 2011), *aff'd*, 693 F.3d 207 (1st Cir. 2012).  In *McKenna*, the First Circuit stated that

> [t]he Massachusetts rescission statute may not cleanly resolve the matter but it says nothing about the lack of multiple copies being a basis for rescission; the time period for rescission is only extended from three days to four years if the borrower does not receive an

27

> appropriate 'written notice' (singular), Mass. Gen. Laws ch. 140D,
> § 10(h), (i)(1)(B); and the relevant regulations specify the
> conditions under which a borrower has an extended right of
> rescission, 209 Mass. Code Regs. § 32.15(1)(c)-(d), in a different
> subsection than the multiple-copy requirement, *id.* § 32.15(2).

*McKenna*, 693 F.3d at 216. The First Circuit affirmed the district court's ruling that the plaintiffs' rescission right was not extended on the basis that they only received one notice of right to cancel, finding that "the purpose of the four-year extension is to give the consumer the information needed to decide intelligently whether to cancel; one copy performs this function as well as two, at least in a case where the [plaintiffs] never parted with their first copy of the form." *Id.*

Because Gosselin admits that she received at least one TILA notice of right to cancel in her Amended Complaint, and that she signed a receipt acknowledging that two notices were received by her, her rescission right expired within three days of her receipt of such notice. However, since the Trust has not provided any evidence about when Gosselin received a TILA notice of right to cancel, the Objection is **OVERRULED** with respect to Gosselin's MCCCDA claim.[4]

### H.    Declaratory Judgment

Because the Debtors no longer have any interest in the Loan and do not service the Loan (*see* Reply ¶ 8), any declaratory relief is moot as to the Debtors. Accordingly, the Objection is **SUSTAINED** to the extent Gosselin seeks declaratory relief.

---

[4]        Additionally, because Gosselin asserted her MCCCDA Claim within four years of the date on which her Loan was originated, it is timely for the reasons stated in section II.F of this Opinion.

### III.    <u>CONCLUSION</u>

The Objection is **SUSTAINED** in part and **OVERRULED** in part.  Gosselin's Claim may proceed to an evidentiary hearing with respect to her wrongful foreclosure, Chapter 93A, and MCCCDA causes of action to the extent set forth above.

The Trust's counsel shall confer with Gosselin's counsel within fourteen (14) days from the date of this Opinion to discuss possible settlement of the remaining issues in this dispute.

Additionally, counsel shall confer regarding the scheduling of any discovery and an evidentiary hearing, as well as further briefing before trial.  Following such conference, counsel shall promptly file a status letter advising the Court of the proposed schedule.  The Trust's counsel shall also set this matter for a further status conference during the next available Omnibus Hearing date; Gosselin's counsel may participate in the conference by telephone.  The Court will enter a scheduling order following that conference.

**IT IS SO ORDERED.**

Dated:    April 21, 2015
          New York, New York

_Martin Glenn_
MARTIN GLENN
United States Bankruptcy Judge