**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | **NOT FOR PUBLICATION** |
|  | ) |  |
|  | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) |  |
|  | ) | Chapter 11 |
| Debtors. | ) |  |
|  | ) | Jointly Administered |

**MEMORANDUM OPINION AND ORDER OVERRULING**
**THE RESCAP BORROWER CLAIMS TRUST'S OBJECTION TO**
**CLAIM NUMBER 2079 FILED BY MAURICE SHARPE**

Pending before the Court is the ResCap Borrower Claims Trust's (the "Trust") objection

to Claim Number 2079 (the "Claim") filed by Maurice Sharpe ("Sharpe"). The objection is

included in the *ResCap Borrower Claims Trust's Sixty-Ninth Omnibus Claims Objection to*

*Claims (No Liability Borrower Claims)* (the "Objection," ECF Doc. # 7188).[1] Sharpe filed an

opposition (the "Opposition," ECF Doc. # 7335).[2] The Trust then filed a supplemental objection

to the Claim (the "Supplemental Objection," ECF Doc. # 8288),[3] Sharpe filed an opposition to

the Supplemental Objection (the "Supplemental Opposition," ECF Doc. # 8393), and the Trust

filed a reply (the "Reply," ECF Doc. # 8483). The Court held a hearing on the Objection on

April 16, 2015 (the "Hearing") and took the Objection to the Claim under submission.

The Claim stems from the refinancing of Sharpe's mortgage loan that Sharpe alleges was

fraudulently procured by his now ex-girlfriend using his personal information. After receiving

---

[1]     The Objection is supported by the declarations of Deanna Horst (the "Horst Decl.," ECF Doc. # 7188-2), P. Joseph Morrow IV (ECF Doc. # 7188-3), and Norman S. Rosenbaum (ECF Doc. # 7188-3).

[2]     The Opposition is supported by the declaration of David J. Winterton, one of Sharpe's attorneys (the "Winterton Decl.," ECF Doc. # 7336).

[3]     The Supplemental Objection is supported by the declarations of Kathy Priore (the "Priore Decl.," ECF Doc. # 8288-1) and Laurel I. Handley (the "Handley Decl.," ECF Doc. # 8288-10).

notice of Sharpe's identity theft and forgery allegations, Debtor GMAC Mortgage, LLC

("GMACM"), the servicer of the refinanced loan, foreclosed on Sharpe's home.  Although the

parties agree that the mere notice of the forgery allegations did not impose a legal duty upon

GMACM not to foreclose, the parties disagree whether GMACM should ultimately bear the risk

of loss on Sharpe's wrongful foreclosure claim should the refinanced loan be deemed void due to

forgery.

    The Trust raises several arguments against the Claim, including untimeliness, claim

preclusion, issue preclusion, estoppel, and waiver.  Applicable Nevada law, however,

substantiates none of these arguments.  The Trust also contests the Claim on its merits, but fails

to establish that the Claim should be disallowed and expunged as a matter of Nevada law.  The

Objection to the Claim is therefore **OVERRULED** in its entirety.  To the extent the Objection

contests the merits of the Claim, the Objection is overruled without prejudice; an evidentiary

hearing is required to resolve remaining disputed issues of fact.

## I.    BACKGROUND

### A.    Sharpe's Loan History

    Sharpe became the record owner of real property located at 2105 Grand Island Court, Las

Vegas, Nevada 89117 (the "Property") in November 2004.  (Supp. Obj. ¶ 12 (citing Handley

Decl. Ex. F).)  On October 24, 2005, Sharpe financed the purchase of the Property with a

$191,000.00 loan (the "Original Loan") from Hometown Lending, evidenced by a note secured

by a deed of trust encumbering the Property (Handley Decl. Ex. G); only Sharpe was listed as the

borrower.  In March 2008, the Original Loan was refinanced with Ssafe Mortgage, Inc. ("Ssafe

Mortgage").  (Supp. Obj. ¶ 14 (citing Handley Decl. Exs. A, Q ¶¶ 18–35).)  The validity, or lack

thereof, of this refinancing is the crux of Sharpe's Claim.

1.    *Sharpe's Domestic Relationship with Tracy Sharpe*

Sharpe dated a woman named Tracy Johnson ("Tracy"), beginning in 2000 or 2001,

through March 2009.  (Supp. Obj. ¶ 6 (citing Handley Decl. Ex. C at 9:15–12:3, 26:15–23, 39:7–

12).)  The couple lived together and Tracy changed her last name to Sharpe, but the couple never

legally married.  (*Id.*)  While the couple lived together, Tracy was responsible for and paid all of

the couple's bills, including the monthly mortgage payments despite the mortgage only being in

Sharpe's name.  (*Id.* ¶¶ 7–8 (citing Handley Decl. Ex. C at 31:9–12, 41:1–2, 54:7–8, 67:3–4,

77:14–17).)  The couple had a joint checking account, but according to Sharpe, Tracy had full

control of the account, and to Sharpe's knowledge, no one other than Tracy and himself had

access to the joint account.  (*Id.* ¶ 9 (citing Handley Ex. C at 41:3–10, 7515–76:25, 88:23–25; *id.*

Exs. D–E).)  Tracy kept possession of the couple's checkbook and wrote all of their checks.  (*Id.*

¶ 10 (citing Handley Ex. C at 54:15–24).)  Only Tracy checked the couple's mail while they

lived together.  (*Id.* ¶ 11 (citing Handley Decl. Ex. C at 78:12–24).)

2.    *The Refinancing Process Through Its Closing*

Tracy and another individual (the "Man"), which was either Sharpe or another man

impersonating him, applied to refinance the Original Loan with Ssafe Mortgage.  (*Id.* ¶14 (citing

Handley Decl. Exs. A, Q ¶¶ 18–35).)  The Man completed a loan application using Sharpe's

social security number.  (*Id.* (citing Handley Ex. H).)  Two of Ssafe Mortgage's brokers, Silvano

Barragan and Suzy Barragan, assisted Tracy and the Man.  (*Id.* (citing Handley Decl. Ex. Q

¶¶ 18–35).)

On February 11, 2008, Ssafe Mortgage ordered a title report from Fidelity National Title

Insurance Company of Nevada ("Fidelity"); it listed Tracy and the Man as the proposed

borrowers.  (*Id.* ¶ 15 (citing Handley Ex. I).)  On February 13, 2008, Fidelity opened an escrow

account, listing the borrowers as Tracy and Sharpe.  (*Id.* (citing Handley Ex. J).)

 With Sharpe's identification, the Man qualified for a $417,000 loan (the "Refinance

Loan") from Mountain View Mortgage secured by a deed of trust on the Property.  (*Id.* ¶ 16

(citing Handley Ex. Q ¶ 34).)  The closing for the Refinance Loan took place on March 17, 2008.

Vicki Longden ("Longden") acted as the escrow officer.  The Man was present and provided

proof of identification in the form of a Nevada driver's license in Sharpe's name.  (*Id.* (citing

Handley Ex. Q ¶ 49).)  Sharpe's Original Loan was paid off and Fidelity wired the remaining

$202,547.92 to a joint bank account held by Tracy and Sharpe.  (*Id.* ¶ 18 (citing Handley Decl.

Ex. K; id. Ex. D).)  These excess loan proceeds were used in part to pay closing costs, pay off

Sharpe's credit cards, which had accumulated to $24,086 and exceeded his credit limits, and pay

past due taxes on the Property in the amount of $18,423.21.  (*Id.* ¶ 19 (citing Handley Decl. Ex.

K).)  The joint bank account statements indicate, however, that approximately $49,000 was

withdrawn the day after the closing, and approximately $72,000 was withdrawn the day after

that.  (*Id.* ¶ 21 (citing Handley Decl. Ex. D).)  Within a month after the Refinance Loan proceeds

were deposited into the couple's joint bank account, the couple had made payments or

withdrawals reducing the balance in the account to $31,000.  (*Id.*)

 After the closing, Fidelity mailed a letter to Sharpe at the Property stating that the escrow

had in fact closed.  (*Id.* ¶ 20 (citing Handley Decl. Ex. L).)  One of the Ssafe Mortgage brokers

also sent an email to Fidelity's closing officer, Longden, in April 2008, stating "she says she got

a bill on the tax on her property."  (*Id.* (citing Handley Decl. Ex. M).)

 None of the Debtors, including GMACM, participated in the origination of the Original

Loan or the Refinance Loan.  (*Id.* ¶ 17 (citing Priore Decl. ¶ 7).)  After the March 17, 2008

closing, GMACM purchased the Refinance Loan.  (*Id.* ¶ 17.)  GMACM later sold the Refinance

Loan, but retained the servicing rights.  (*Id.*)

### 3.    *The Delinquency of Sharpe's Account*

The first four payments on the Refinance Loan were timely made in April, May, June,

and July 2008.  The Refinance Loan became delinquent as of August 2008.  (*Id.* ¶ 22.)  On

December 10, 2008, Debtor Executive Trustee Services, LLC ("ETS"), the substitute trustee,

recorded a notice of default and election to sell the Property.  (*Id.* ¶ 23 (citing Priore Decl. ¶ 9,

Ex. A).)  ETS scheduled a foreclosure sale for April 2, 2009.  (*Id.* ¶ 24 (Priore Decl. ¶ 10, Ex.

B).)

In early March 2009, GMACM received a fax from Deborah Feltner from Foreclosure

Short Sale Specialist that included an authorization signed by Sharpe to release information and

to discuss Sharpe's loan with Danijela Mikulic ("Mikulic") and Debbie Paaren ("Paaren").  (*Id.*

¶ 25 (citing Priore Decl. Ex. 11, Ex. C).)  On March 25, 2009, an individual named "Debbie"

called GMACM to discuss the foreclosure notices received by Sharpe.[4]  (*Id.* ¶ 26 (citing Priore

Decl. ¶ 12).)  The call was transferred to GMACM's loss mitigation department.  "Debbie" told

GMACM that the borrower was requesting a loan modification, explaining that the default

resulted from a loss of income by the borrower's wife.  (*Id.* ¶ 26 (citing Priore Decl. ¶ 12).)

"Debbie" called GMACM again on the same day requesting that the foreclosure be postponed

since a loan modification was going to be considered.  (*Id.* ¶ 27 (citing Priore Decl. ¶ 13).)

On March 30, 2009, GMACM sent Sharp information about the Home Affordable

Modification Program ("HAMP").  (*Id.* ¶ 28 (citing Priore Decl. ¶¶ 14–15).)  On March 31,

---

[4]      It is not clear from the Supplemental Objection or the Priore Declaration whether "Debbie" refers to
Deborah Feltner or Debbie Paaren.

2009, GMACM authorized ETS to postpone the foreclosure sale to May 4, 2009.  (*Id.*)  Mikulic

contacted GMACM on April 1, 2009, confirming that he is an authorized third party to discuss

Sharpe's account.  (*Id.* ¶ 29 (citing Priore Decl. ¶ 16).)  On April 6, 2009, either Paaren or

Mikulic called GMACM to discuss the account, but GMACM's servicing notes do not reflect the

substance of the conversation.  (*Id.* ¶ 30 (citing Priore Decl. ¶ 17).)

On April 9, 2009, GMACM sent Sharpe a letter enclosing a financial analysis form for

him to complete and return to assist in determining available loss mitigation options for his

account.  (*Id.* ¶ 31 (citing Priore Decl. ¶ 18, Ex. D).)  On April 10, 2009, GMACM called Sharpe

and left a message advising that he needed to return the HAMP information for GMACM to

review his loan for modification.  (*Id.* ¶ 32 (citing Priore Decl. ¶ 19).)  That same day GMACM

requested that ETS postpone the foreclosure sale for an additional 30 days.  (*Id.*)  On April 13,

2009, GMACM again attempted to contact Sharpe and left another voice message.  (*Id.* ¶ 33

(citing Priore Decl. ¶ 20).)  Sharpe never submitted the financial analysis form or any

documentation for the loss mitigation review.  (*Id.* ¶ 34 (citing Priore Decl. ¶ 21).)

On April 14, 2009, Sharpe, himself, contacted GMACM to inform it that someone had

fraudulently used his personal information to obtain the Refinance Loan.  (*Id.* ¶ 35 (Priore Decl.

¶ 22).)  He also said he had contacted the police regarding the alleged identity theft.  (*Id.*)  Sharpe

alleges that he discovered the Refinance Loan on April 14, 2009, after Tracy moved out of their

home and Sharpe checked his credit report to figure out to whom he was supposed to make

mortgage payments.  (*Id.* ¶ 36 (citing Handley Decl. Ex. C at 32:2–33:10).)  Sharpe contacted

GMACM again on April 16, 2009; he advised GMACM of the alleged identity theft and inquired

whether the foreclosure sale would go forward.  (*Id.* ¶ 37 (citing Priore Decl. ¶ 23).)

Sharpe contacted Ssafe Mortgage as well. (*Id.* ¶ 38 (citing Priore Decl. Ex. E).) Ssafe

Mortgage provided Sharpe with its closing file. (*Id.*) It included a copy of a Nevada driver's

license in Sharpe's name; the photo on the license showed an Hispanic male (Sharpe is African-

American) and the driver's license number was different from Sharpe's. (*Id.*.) Sharpe also

alleges that the signatures on the documents from the Original Loan and the Refinance Loan are

different, and the date of birth listed for Sharpe is different. (Opp. ¶¶ 24–27.)

### 4. The Investigations into the Alleged Identity Theft

The Las Vegas police department began an investigation of the alleged identity theft but

informed Sharpe that the District Attorney would not prosecute the case if his "wife" opened the

account to refinance the house. (Supp. Obj. ¶ 39 (citing Handley Decl. Ex. N; *id.* Ex. C at 58:9–

20).) The police department ultimately concluded that Tracy was involved in the refinancing;

Sharpe admits that Tracy was involved. (*Id.* ¶ 41 (citing Handley Decl. Ex. C at 60:18–24, 89:1–

5).)

GMACM postponed the foreclosure sale and undertook an investigation. (*Id.* ¶ 42.)

GMACM requested that Sharpe provide GMACM with additional documentation, including an

identity theft affidavit, police report, and proof of identification. (*Id.*) Sharpe gave the

information to GMACM on April 20, 2009, including an affidavit stating that Sharpe believed

Tracy was the culprit. (*Id.* (citing Priore Decl. ¶ 24, Ex. E); *id.* ¶ 43 (citing Handley Decl. Ex. O;

*id.* Ex. C at 51:12–25).)

Sharpe called GMACM on June 3, 2009 and asked about the status of the investigation;

GMACM replied that it was ongoing. (*Id.* ¶ 44 (citing Priore Decl. ¶ 25).) On June 12, 2009,

Paaren called GMACM to discuss loan modification options. (*Id.* ¶ 45.) GMACM told Paaren

that it had not received a workout package from Sharpe and could not review the loan for modification without it. (*Id.* (citing Priore Decl. ¶ 26).)

On September 1, 2009, GMACM called Sharpe and left a message with the person who answered the phone to have Sharpe contact GMACM as soon as possible.  (*Id.* ¶ 46 (citing Priore Decl. ¶ 27).)  On September 3, 2009, GMACM sent Sharpe a letter advising him that, according to the police, Sharpe failed to return phone calls regarding the alleged identity theft and that, if Sharpe did not make contact with the police by September 15, 2009, GMACM's investigation will be terminated.  (*Id.* ¶ 47 (citing Priore Decl. ¶ 28, Ex. F).)

Sharpe sent a letter to the detective on the case requesting an update and assuring him that Sharpe was willing to provide further information.  (Winterton Decl. Ex. C.)  Winterton, Sharpe's Nevada counsel, also wrote a letter to the police department asking what information or documentation the police needed to further prosecute the matter.  (Opp. ¶ 12 (citing Winterton Decl. ¶ 9).)  The police department did not respond to Sharpe or Winterton.  (*Id.*)  Winterton also called Police Detective Moss and told him that Sharpe was willing to provide whatever information the police needed.  (*Id.* ¶ 13 (citing Winterton Decl. ¶ 10).)  Detective Moss advised that the police were not pursuing identity theft charges because they believed that the individual responsible for the Refinance Loan had a domestic relationship with Sharpe and it would be more appropriately handled as a civil matter.  (Id.)

On September 24, 2009, GMACM advised Sharpe that there was insufficient evidence to support his claim of identity theft.  (Supp. Obj. ¶ 48 (citing Priore Decl. ¶ 29, Ex. G).)  According to Winterton, GMACM advised that it would proceed with foreclosure because the police department was not proceeding with an identity theft prosecution.  (Opp. ¶ 16 (citing

Winterton Decl. ¶ 13).)  GMACM subsequently reinitiated foreclosure proceedings.  (Supp. Obj.

¶ 49 (citing Priore Decl. ¶ 30).)

### 5.    Resulting State Court Litigation and Foreclosure

On October 29, 2009, Sharpe filed a complaint against GMACM, Ssafe Mortgage, and

Fidelity in Nevada state court (the "State Court Action"), alleging causes of action against all

defendants for fraud, quiet title, negligence, slander of title, and seeking an injunction to stop the

foreclosure sale.  (*Id.* ¶ 50 (citing Handley Ex. A).)  Sharpe filed a motion for preliminary

injunction that was heard on January 12, 2010.  (*Id.* ¶ 51 (citing Handley Decl. ¶ 4).)  The

Nevada state court granted the motion; it ordered Sharpe to post a $35,000 bond by January 26,

2010, as required by Nevada law, to obtain the injunction.  (*Id.*)  Sharpe failed to post the

required bond by the deadline, but alleges he could have posted the bond the day after the

deadline had passed.  (*Id.*)

Despite Sharpe's failure to post the bond, GMACM voluntarily postponed foreclosure

until April 23, 2010.  (*Id.* ¶ 52 (citing Handley Decl. ¶ 5).)  Sharpe did not seek leave from the

Nevada state court to post the bond late or to reduce the required bond.  (*Id.*)

The foreclosure sale was conducted on April 16, 2010.  (*Id.* ¶ 53.)  No explanation is

provided why the sale was held on August 16 despite the stated postponement until April 23.

The Property was conveyed to Federal National Mortgage Association via a Trustee's Deed

Upon Sale.  (*Id.* (citing Handley Decl. Ex. P).)

On April 13, 2011, almost one year after the foreclosure sale, Sharpe filed an amended

complaint (the "Amended Complaint," Handley Decl. Ex. Q), adding new parties and new

claims, and dismissing the fraud, quiet title, and injunction causes of action against GMACM.

The Amended Complaint therefore only includes causes of action against GMACM for

negligence, slander of title, and wrongful foreclosure and eviction.  (Supp. Obj. ¶ 57 (citing

Handley Ex. Q ¶¶ 78, 92–99, 101–113).)  Sharpe seeks damages and a declaration that he has

title to the Property "free and clear" even though he dismissed the quiet title claim.  (*Id.* ¶ 61

(citing Handley Ex. Q).)

On February 15, 2012, Fidelity, GMACM, and Sharpe participated in a private

mediation.  (*Id.* ¶ 63 (citing Handley Decl. ¶ 21).)  The parties signed a mediation statement (the

"Mediation Statement," Handley Ex. R) in which Fidelity agreed to pay Sharpe $60,000 in

exchange for the dismissal of Sharpe's claims of negligence against Fidelity and GMACM, and

slander of title claim against GMACM; the Mediation Statement expressly retained Sharpe's

wrongful foreclosure claim against GMACM.  (*Id.* ¶ 64 (citing Handley Ex. R).)

Fidelity then filed a motion for a determination of good faith settlement and to extinguish

any contribution claims GMACM may have had against Fidelity.  (*Id.* ¶ 65 (citing Handley Decl.

¶ 23, Ex. S).)  The motion was granted on April 27, 2012; the court order granting the motion

stated that the settlement was made and entered into in good faith and that all joint tortfeasors are

barred from asserting any present or future claims against Fidelity related to the facts at issue in

the State Court Action, including claims for contribution or indemnification.  (*Id.* ¶ 66 (citing

Handley Ex. T).)

Sharpe then filed a motion for partial summary judgment against GMACM, arguing that

the note and deed of trust for the Refinance Loan were void due to forgery and lack of

consideration.  (*Id.* ¶ 67.)  GMACM opposed the motion, but it was never ruled upon because

GMACM filed for bankruptcy and the automatic stay went into effect.  (*Id.* (citing Handley Decl.

¶ 25).)

On July 27, 2012, Fidelity and Sharpe filed a stipulation and order for dismissal with prejudice of Fidelity only (the "Stipulation," Handley Decl. Ex. V).  Because of GMACM's bankruptcy, the parties have not filed a stipulation of dismissal of the negligence and slander of title causes of action against GMACM.  (Supp. Obj. ¶ 70.)

On February 5, 2014, Sharpe filed an application for a default judgment against the new defendants added in the Amended Complaint:  Tracy, Suzy Barragan, Silvano Barragan, and Mountain View Mortgage Company.  (*Id.* ¶ 71 (citing Handley Decl. ¶ 30).)  The Amended Complaint asserts claims for fraud, conspiracy to commit fraud, conversion, negligence, and slander of title against these defendants.  (*Id.*)  The court entered a default judgment against these defendants, awarding Sharpe actual damages of $1,178,628.23 and $64,114.50 in attorney's fees and costs, plus pre- and post-judgment interest until paid in full.  (Winterton Decl. Ex. E).

### B.    The Claim

Sharpe asserts a $3,200,000.00 general unsecured claim against GMACM, stating "Lawsuit – damages" as the basis for relief.  (Claim at 1.)  The Claim is based on the State Court Action and the Amended Complaint, asserting claims against GMACM for negligence, slander of title, and wrongful foreclosure.  (Handley Ex. Q.)  The negligence and slander of title claims were settled as between Sharpe and GMACM through a private mediation.  (*See* Handley Ex. R.)  Though the parties have not formally memorialized the settlement in a stipulation, the agreement is largely reflected in the written and signed Mediation Statement.  (*Id.*)  The only remaining cause of action Sharpe asserts against GMACM is wrongful foreclosure.  (*See id.*; Handley Ex. Q.)  Sharpe's oppositions to the Objection and Supplemental Objection indicate that Sharpe seeks at least $1,242,742.73 from GMACM, calculated using the damages awarded pursuant to

the default judgment against other defendants in the State Court Action.  (Opp. ¶¶ 38–40; Supp.

Opp. ¶ 27.)

### C.    The Objection

The Trust seeks to disallow and expunge the Claim in its entirety.  According to the

Trust, the Debtors are not liable for the bases for relief asserted in the Claim because the

Refinance Loan had not been paid since August 2008; the account was referred to foreclosure on

December 10, 2008 and the Property was sold through a foreclosure sale in April 2010.  (Obj.

Ex. 1 at 1.)  The Objection vaguely states that (1) Sharpe alleged the Refinance Loan was taken

out fraudulently without his knowledge, (2) GMACM and the police tried to contact Sharpe for

information with respect to their investigations into the alleged identity theft, but they were

unable to get in contact with Sharpe, and (3) GMACM advised Sharpe on September 26, 2009

that foreclosure would be reinstated because he failed to provide sufficient evidence of identity

theft.  (*Id.*)

### D.    The Opposition

Sharpe argues that GMACM was clearly on notice that the Refinance Loan was

fraudulent in light of the major inconsistencies in the loan documents and driver's licenses,

which GMACM acknowledged, and yet still proceeded to foreclose on the Property.  (Opp.

¶ 34.)  Sharpe obtained an expert report in the State Court Action from Corporate Mortgage

Advisors dated September 25, 2010 (the "Expert Report," Winterton Decl. Ex. D), concluding

that GMACM and others were negligent, did not adhere to generally accepted industry standards,

and missed several opportunities to catch the obvious fraud.  (Opp. ¶ 36.)  GMACM was

provided with this report.  (*Id.*)  Sharpe argues that the foreclosure was wrongful and that the

damages awarded pursuant to the default judgment against the other defendants should be

awarded against GMACM as well because the damages arrived at were determined after an evidentiary hearing.  (*Id.* ¶¶ 37–40.)

### E.    The Supplemental Objection

The Trust submitted the Supplemental Objection because it admittedly did not address Sharpe's allegations that GMACM is liable for completing a purportedly wrongful foreclosure on the Property based on the fact that the Refinance Loan secured by the Property was purportedly procured by fraud.  (Supp. Obj. ¶ 4.)  According to the Trust, Sharpe raises an unprecedented legal argument in support of his wrongful foreclosure claim that GMACM, which was on notice of the fraudulent mortgage, had some duty to stay the foreclosure on the Property until the investigation into the fraud was complete.  (*Id.* ¶¶ 83–85.)  The Trust argues that this theory has no support in Nevada law and that GMACM did not have a legal duty to stop the foreclosure to further investigate the fraud allegations.  (*Id.* ¶ 85.)  The Trust also asserts that there was no adjudication that fraud occurred; only allegations of fraud had been raised at the time the foreclosure sale was conducted.  (*Id.* ¶ 84–88.)

The Trust further argues that Sharpe waived his wrongful foreclosure claim because he failed to post the required bond enjoining the foreclosure sale.  (*Id.* ¶¶ 89–95.)  The Trust argues that when a litigant has the opportunity to prevent foreclosure and foregoes the opportunity, he is thereafter estopped from claiming that the foreclosure was wrongful.  (*Id.* ¶ 93.)  Since Sharpe failed to obtain the injunction or move to reduce or eliminate the bond required to obtain such injunction, the Trust asserts that Sharpe cannot assert wrongful foreclosure against GMACM. (*Id.*)

The Trust also asserts that the wrongful foreclosure claim is barred by the applicable statute of limitations.  (*Id.* ¶¶ 96–97.)  According to the Trust, the wrongful foreclosure claim

was not added to the Amended Complaint until almost a year after the foreclosure sale occurred, but under Nevada law, a foreclosure sale can only be set aside if an action is filed within 45 days after a foreclosure sale occurs and a Lis Pendens is recorded with the county recorder within 15 days after commencement of the action.  (*Id.* ¶ 96 (citing NEV. R. STAT. § 107.080(5)(b)).)

The Trust concludes by arguing that the wrongful foreclosure claim is somehow barred by claim or issue preclusion.  (*Id.* ¶¶ 98–118.)  According to the Trust, the issue underlying the slander of title and negligence claims, which were apparently settled in the Mediation Statement, was whether the Refinance Loan was procured by fraud.  (*Id.* ¶ 116.)  The Trust therefore argues that because the other claims are based on this issue and were resolved, Sharpe cannot continue with his wrongful foreclosure claim based on the same underlying facts.  (*Id.* ¶¶ 98–118.)  The Trust further asserts that although these doctrines are typically litigated in the context of a second lawsuit on the same claims or issues, "there is no reason the doctrines should not also apply within the context of the same litigation, as here."  (*Id.* ¶ 117.)  No legal support for this argument is provided.

### F.    The Supplemental Opposition

Sharpe first argues that the Trust's waiver argument is unsubstantiated because it is based on Sharpe's Stipulation with Fidelity, not GMACM.  (Supp. Opp. ¶ 1.)  The Mediation Statement and Stipulation specifically carve out and reserve Sharpe's rights to the wrongful foreclosure claim.  (*Id.*)  Sharpe also argues that the Trust's assertion that Sharpe fails to state a wrongful foreclosure claim under Nevada law is incorrect.  (*Id.* ¶¶ 2–5.)  Sharpe acknowledges that the Trust is correct that Nevada courts do look to whether there is past due arrearage that was not cured, but Sharpe argues that courts also examine whether there is an underlying defect in the note and deed of trust that would excuse performance.  (*Id.* ¶ 4.)  Sharpe also argues that

he did not need to seek a judgment invalidating the note and deed of trust before bringing the wrongful foreclosure claim against GMACM; such a requirement would turn a wrongful foreclosure claim on its head when really the only prerequisite to the claim is that there was a completed foreclosure sale.  (*Id.* ¶¶ 2–4.)  According to Sharpe, he was excused from tendering the amount of any of the Refinance Loan payments because the note and deed of trust for that Refinance Loan were obtained by fraud.  (*Id.* ¶ 6.)

Sharpe asserts that he did not seek to reduce the amount of the required bond or to obtain an extension of time to post the bond to enjoin the foreclosure sale because "the court was very clear about the timing requirement" and the court refused a reduction of the bond on the record. (*Id.* ¶ 14.)  Sharpe asserts that without the injunction, the Trust is correct that GMACM was not under a legal duty to stay the foreclosure.  (*Id.* ¶ 15.)  However, Sharpe asserts that GMACM foreclosed at its own risk; GMACM was on notice of the fraud allegations excusing Sharpe's performance and proceeded with the foreclosure though it could ultimately be liable for wrongful foreclosure.  (*Id.* ¶ 15.)

Sharpe refutes the Trust's argument that by failing to enjoin the foreclosure sale before it took place somehow barred Sharpe's wrongful foreclosure claim.  (*Id.* ¶ 16.)  Sharpe reiterates Nevada's requirement that there be an actual foreclosure sale conducted for a plaintiff to have standing to assert a wrongful foreclosure claim.  (*Id.*)  Sharpe also contends that his wrongful foreclosure claim is not time-barred because he is seeking damages, not rescission of the sale. (*Id.* ¶ 17.)

Sharpe further asserts that the Trust's reliance on claim and issue preclusion defies logic. (*Id.* ¶¶ 18–25.)  Sharpe contends that the Stipulation with Fidelity does not preclude litigating the

wrongful foreclosure claim against GMACM because it specifically reserves that claim for Sharpe to pursue.  (*Id.*)

### G.      The Reply

In addition to repeating its prior arguments, the Trust argues that Sharpe already dismissed his fraud and quiet title claims against GMACM and is obligated to dismiss his negligence and slander of title claims under the Stipulation and Mediation Statement.  (*Id.* ¶ 3.)  These dismissals, the Trust asserts, act as a "retraxit," also known as a dismissal with prejudice and "'equivalent to a judgment on the merits and as such bars further litigation on the same subject matter between the parties.'"  (*Id.* (quoting *Le Parc Cmty. Ass'n v. Workers' Comp. Appeals Bd.*, 2 Cal. Rptr. 3d 408, 414–15 (Cal. Ct. App. 2003)).)  According to the Trust, each of the claims against GMACM challenges the validity of the note and deed of trust of the Refinance Loan and the dismissal with prejudice of the negligence and slander of title claims precludes further litigation of his wrongful foreclosure claim because the claim is predicated on and involves the same subject matter as the dismissed claim.  (*Id.* ¶ 4.)  The Trust asserts that its position is that Sharpe cannot pursue a wrongful foreclosure claim without having the validity of the note and deed of trust first adjudicated, which he cannot do now after dismissing those claims; and without an adjudication that the note and deed of trust are invalid, Sharpe cannot claim that GMACM acted improperly in proceeding to the foreclosure sale.  (*Id.* ¶ 7.)  GMACM argues that its knowledge of Sharpe's allegations of fraud is insufficient to impose a duty on GMACM to stop the foreclosure sale.  (*Id.*)  According to the Trust, without the underlying claims challenging the validity of the Note and Deed of Trust, there can be no wrongful foreclosure claim.  (*Id.* ¶¶ 14, 20.)

The Trust further argues that Sharpe cannot carve out certain claims in a settlement because, in the Trust's view, a "'single cause of action may not be split and separate actions maintained.'"  (*Id.* ¶ 25 (quoting *Smith v. Hutchins*, 566 P.2d 1136, 1137 (D. Nev. 1977)).)

## II.    **DISCUSSION**

Sharpe's Claim rests on his wrongful foreclosure cause of action.  Most of the Trust's arguments attempting to disallow the Claim center on the assertion—unsupported by Nevada law—that the wrongful foreclosure claim fails without a prior adjudication that the Refinance Loan note and deed of trust are void due to the alleged fraud, an adjudication that the Trust argues cannot now be done because of the settled and/or dismissed claims.  For the reasons explained below, the Objection is **OVERRULED** in its entirety.

### A.    **Claims Objections**

Bankruptcy Code section 502(b)(1) provides that claims may be disallowed if "unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  To determine whether a claim is allowable by law, bankruptcy courts look to "applicable nonbankruptcy law."[5]  *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006).

Federal pleading standards apply when assessing the validity of a proof of claim.  *See, e.g.*, *In re Residential Capital, LLC*, 518 B.R. 720, 731 (Bankr. S.D.N.Y. 2014); *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party

---

[5]    Nevada law governs the Objection and the Claim.  Nevada courts often look to precedent from other jurisdictions, particularly California, to fill in gaps in Nevada law, as Nevada did not have an appellate level court until January 2015.  *See JPMorgan Chase Bank, N.A. v. KB Home*, 740 F. Supp. 2d 1192, 1198 (D. Nev. 2010) ("Nevada looks to 'the law of other jurisdictions, particularly California, for guidance.'" (citation omitted)); *see also* Katherine Henderson & Pamela G. Roberts, State Bar of Nevada, NEVADA CIVIL PRACTICE MANUAL § 1.03 (2012) ("California law has been a prominent source of Nevada law since the inception of statehood.").  This Opinion therefore cites to Nevada law, as well as California and others states' laws.

has met their burden in connection with a proof of claim, bankruptcy courts have looked to the

pleading requirements set forth in the Federal Rules of Civil Procedure." (citations omitted)).

Accordingly, Sharpe must allege "enough facts to state a claim for relief that is plausible on its

face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009)). "Where a complaint pleads facts that are merely consistent

with a defendant's liability, it stops short of the line between possibility and plausibility of

entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).

Plausibility "is not akin to a probability requirement," but rather requires "more than a sheer

possibility that a defendant has acted unlawfully." *Id.* (citation and internal quotation marks

omitted). The court must accept all factual allegations as true, discounting legal conclusions

clothed in factual garb. *See, e.g.*, *id.* at 677–78; *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d

111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory

factual allegations in the complaint to be true" (citing *Iqbal*, 556 U.S. at 678)). The court must

then determine if these well-pleaded factual allegations state a "plausible claim for relief." *Iqbal*,

556 U.S. at 679 (citation omitted).

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

(citation omitted). A claim is plausible when the factual allegations permit "the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation

omitted). A claim that pleads only facts that are "merely consistent with a defendant's liability"

does not meet the plausibility requirement. *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 557 (2007)). "A pleading that offers labels and conclusions or a formulaic recitation of

the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal

18

quotation marks omitted).  "Threadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice." *Id.* (citation omitted).  "The pleadings must

create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l

Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

### B.        Statute of Limitations

The Trust argues in the Supplemental Objection that the wrongful foreclosure claim is

time-barred by the 90-day statute of limitations set forth in Nevada Revised Statutes section

107.080.  *See* NEV. REV. STAT. § 107.080.  Sharpe asserts and the Trust conceded at the Hearing

that this statute of limitations only applies to wrongful foreclosure claims seeking to rescind a

foreclosure sale.  Sharpe's Claim demands monetary damages and therefore is asserted pursuant

to section 107.560 of the Nevada Revised Statutes.  *See* NEV. REV. STAT. § 107.560.  Such a

claim, the Trust concedes, is governed by a longer statute of limitations and is not time-barred.[6]

Thus, the Trust's Objection to the Claim on this basis is **OVERRULED**.

### C.        Estoppel, Waiver, and Preclusion

The majority of the Trust's Objection argues that Sharpe's course of action in the Nevada

state court proceedings now estops, waives, or precludes his wrongful foreclosure cause of

action.  The Court concludes that Sharpe's actions do not prevent Sharpe from pursuing his

wrongful foreclosure claim and **OVERRULES** the Objection to the extent it rests on this issue.

---

[6]        At the Hearing, the Trust's counsel represented that Sharpe's wrongful foreclosure claim would be
governed by a one-year statute of limitations applicable to tort claims.  Nevada law, however, provides a plaintiff
asserting a wrongful foreclosure claim under section 170.560 three years from the date the claim accrues to file such
claim.  *See* NEV. REV. STAT. § 11.190 (". . . [A]ctions other than those for the recovery of real property, unless
further limited by specific statute, may only be commenced as follows: . . . 3. Within 3 years:  (a) An action upon a
liability created by statute, other than a penalty or forfeiture.").  Regardless of which of these statute of limitations
periods applies, Sharpe's wrongful foreclosure claim was timely asserted.

First, the Trust fails to establish that Sharpe should be estopped from pursuing his wrongful foreclosure claim because Sharpe did not post the required bond or contest or attempt to reduce the amount of the bond to obtain a preliminary injunction to stop the foreclosure sale. A bond may be required for an injunction; payment of a filing fee is all that is required to bring a damages action. The case law the Trust cites in support of this argument is inapposite. *See Weinberg v. Safeco Ins. Co. of Am.*, 8 Cal. Rptr. 3d 224, 228 (Cal. Ct. App. 2004); *Louise Gardens of Encino Homeowners' Ass'n, Inc. v. Truck Inc. Exch., Inc.*, 98 Cal. Rptr. 2d 378, 385 (Cal. Ct. App. 2000); *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 637 (Cal. 1995). In two of the cases, one party sought to confirm an arbitration award in state court and the party against whom the award was granted failed to timely file a motion to vacate the award, but then attempted to contest the validity and/or scope of the award in its opposition to confirmation. *Weinberg*, 8 Cal. Rptr. at 228; *Louise Gardens of Encino Homeowners' Ass'n, Inc.*, 98 Cal. Rptr. 2d at 385. The statutory scheme specifically gave a party to an arbitration 100 days to move to vacate and contest the award. *Weinberg*, 8 Cal. Rptr. at 228; *Louise Gardens of Encino Homeowners' Ass'n, Inc.*, 98 Cal. Rptr. 2d at 385. The failure to timely file such a motion precluded that party from challenging the validity or scope of the award in response to the confirmation motion. *Weinberg*, 8 Cal. Rptr. at 228; *Louise Gardens of Encino Homeowners' Ass'n, Inc.*, 98 Cal. Rptr. 2d at 385. The holding in the last case the Trust cited in support of waiver and estoppel was specifically limited to insurance law and has no relevance here. *See Waller*, 900 P.2d at 637. This argument, therefore, is wholly unsubstantiated.

Second, while the three settled claims asserted against GMACM in the Amended Complaint are predicated on the invalidity of the Refinance Loan's note and deed of trust based on fraud, the Trust fails to demonstrate that the settlement of the negligence and slander of title

claims against GMACM through the Mediation Statement and Stipulation between Sharpe and

Fidelity effectively waives Sharpe's wrongful foreclosure claim against GMACM.  "'[W]aiver is

the intentional relinquishment of a known right after knowledge of the facts.'  [Citations.]  The

burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing

evidence that does not leave the matter to speculation, and 'doubtful cases will be decided

against a waiver' [citation]."  *Id.*  Sharpe's actions in the underlying State Court Action establish

that Sharpe had every intention of continuing to pursue the wrongful foreclosure claim against

GMACM had the bankruptcy stay not been imposed—that claim was expressly carved out from

the settlement of the negligence and slander of title claims against GMACM.  The Trust,

therefore, fails to meet its burden on the issue of waiver.  The Trust's argument that Sharpe is

seeking to "split" the wrongful foreclosure cause of action from his other causes of action is

unpersuasive.  Sharpe is simply seeking to pursue a separate cause of action.  The settlement

only resolved some of the claims as to some of the parties; it does not limit Sharpe's ability to

pursue the wrongful foreclosure claim that has yet to be resolved.[7]

Finally, the Trust fails to establish that either claim or issue preclusion requires the

dismissal of Sharpe's wrongful foreclosure claim.  The Trust argues that because Sharpe

---

[7]    The Trust supports its claim-splitting argument by citing a Nevada Supreme Court case that states the
unremarkable principle that "[a]s a general proposition, a single cause of action may not be split and separate actions
maintained."  *Smith*, 566 P.2d at 1137.  In *Smith*, the plaintiff had commenced a state district court action to recover
damages in connection with personal injury claims arising from an automobile collision.  *Id.* at 1136–37.  While the
action was pending, an insurance provider filed a separate action in the state justice court in the plaintiff's name to
recover for property loss sustained in the same collision.  *Id.*  A judgment was obtained in the justice court action
awarding monetary damages, costs, and attorney's fees.  *Id.*  As a result of the judgment in the justice court action,
the defendant in the district court action moved for summary judgment.  *Id.*  According to the defendant, "the
plaintiff had a single cause of action for personal injury and property damage arising from a single tort which could
not be split and thereby become the subject of separate actions."  *Id.* at 1137.  Ultimately, the defendant's motion for
summary judgment was denied because it was the insurance provider, not the plaintiff and an entity the plaintiff
cannot control, who filed the second action.  *Id.*  While the Trust is correct that *Smith* stands for the proposition that
a single cause of action may not be split, the Trust fails to adequately refute the fact that *Smith* involves two separate
actions—here there is only one.

voluntarily dismissed with prejudice (1) his quiet title and fraud claims when he amended his

complaint, and (2) his negligence and slander of title claims by way of the Mediation Statement

and Stipulation, claim and issue preclusion bar him from litigating his wrongful foreclosure

claim premised on the same issue as those dismissed claims (i.e. the validity of the Refinance

Loan).  This argument fails for two reasons.  First, the Trust conceded at the Hearing that the

parties never stipulated to the relevant facts underlying Sharpe's Claim—without an agreement

whether the Refinance Loan is void, Sharpe's wrongful foreclosure claim, premised on this very

issue, cannot be precluded.  Second, the Trust fails to demonstrate that claim and issue

preclusion, traditionally used only when a party is attempting to re-litigate a claim or issue in a

second and separate action, should apply to preclude Sharpe's wrongful foreclosure claim, which

he asserted in the same State Court Action as the other claims that were dismissed.  *See Five Star

Capital Corp. v. Ruby*, 194 P.3d 709, 711–14 (Nev. 2008) (discussing the history of issue and

claim preclusion under Nevada law and stating that there is a "second action," "second suit,"

"second complaint," or "second case" involved in their application); *see also S.O.V. v. People in

Interest of M.C.*, 914 P.2d 355, 355 (Colo. 1996) ("The principles of res judicata and collateral

estoppel have no applicability to prior rulings in the same pending case."); *Kuhn v. State Dep't of

Revenue*, 897 P.2d 792 (Colo. 1995) ("Because res judicata is not applicable to an earlier

decision in the same lawsuit, the trial court erred in applying the doctrine."); *In re Marriage of

Ebel*, 116 P.3d 1254 (Colo. Ct. App. 2005) ("The doctrine of res judicata or claim preclusion

does not precisely apply here because husband's present request for maintenance is not a

proceeding independent of the dissolution case."); *In re Marriage of Mallon*, 956 P.2d 642, 645

(Colo. Ct. App. 1998) ("However, res judicata and collateral estoppel are applicable only to later,

independent proceedings; these doctrines are not to be applied to bar a party's later assertions in

the same litigation.  Normally, it is the 'law of the case' and not res judicata or collateral

estoppel, that is to be applied to progressive arguments made in the same action.").  That these

cases do not involve a retraxit is irrelevant.  A retraxit is a "legal fiction," and although it obtains

status as a final judgment for purposes of res judicata, a retraxit should not be treated any

differently than other types of final judgments.  *See Alpha Mech., Heating & Air Conditioning,*

*Inc. v. Travelers Cas. & Sur. Co. of Am.*, 35 Cal. Rptr. 3d 496, 501–02 (Cal. Ct. App. 2005) ("A

retraxit arising from a dismissal with prejudice thus operates as a legal fiction, and it is given the

same finality as if the matter were adjudicated and proceeded to a final judgment on the

merits."); *Le Parc Cmty. Ass'n*, 2 Cal. Rptr. 3d at 414–15 ("A retraxit is equivalent to a judgment

on the merits and as such bars further litigation on the same subject matter between the parties.

Accordingly, the determination whether Curren's dismissal of his civil action bars subsequent

litigation of his workers' compensation claim must be analyzed under traditional principles of res

judicata and collateral estoppel.").  The only cases the Trust and Sharpe provide discussing

retraxit involve the voluntary dismissal with prejudice of an entire action or a defendant's entire

list of affirmative defenses; none of them involve a situation in which a claim or claims remain

after a voluntary dismissal.  *See Alpha Mech., Heating & Air Conditioning, Inc.*, 35 Cal. Rptr. 3d

at 501–02; *Le Parc Cmty. Ass'n*, 2 Cal. Rptr. 3d at 414–15.

The Trust's attempt to disallow and expunge the Claim on these grounds falls short.  The

Objection to the Claim on grounds of estoppel, waiver, and preclusion is **OVERRULED.**

### D.    Failure to State a Claim

The Trust argues that Sharpe fails to plead the required elements for a wrongful

foreclosure claim.  The parties agree that GMACM did not owe a legal duty to Sharpe to stay

foreclosure while the fraud and identity theft allegations remained pending.  The parties disagree,

however, whether Sharpe adequately pleads a wrongful foreclosure claim under Nevada law.

Does GMACM, rather than Sharpe, bear the risk of loss if GMACM foreclosed based on the

Refinance Loan if that loan was void based on fraud?

Under Nevada law, a wrongful foreclosure claim consists of two elements: "(1)

defendant exercised a power of sale or foreclosed on plaintiff's property and (2) at the time

defendant exercised a power of sale, there was no breach of a condition or failure of performance

existing on the plaintiff's part that would have authorized the foreclosure or exercise of power of

sale." *North v. Bank of Am. Corp.*, No. 2:11-cv-00136-RLH-PAL, 2011 WL 3419515, at *3 (D.

Nev. July 29, 2011); *see also Collins v. Union Fed. Sav. & Loan Ass'n*, 662 P.2d 610, 623 (Nev.

1983). The parties agree that the first element is satisfied; the material dispute is whether Sharpe

meets the second element.

The Trust emphasizes the Nevada Supreme Court's recognition that "the material issue of

fact in a wrongful foreclosure claim is whether the trustor was in default when the power of sale

was exercised." *Collins*, 662 P.2d at 623. According to the Trust, Sharpe was in default under

the Refinance Loan when the foreclosure sale was conducted and, as a result, Sharpe cannot

satisfy the second element of his wrongful foreclosure claim. Sharpe argues that the Refinance

Loan is void because it was procured by fraud and, consequently, Sharpe cannot be in default of

an obligation that is a nullity.

The Trust's argument erroneously assumes that the Refinance Loan was valid. While the

Nevada Supreme Court stresses the importance of whether the borrower was in default at the

time the foreclosure sale was conducted, the Court also recognizes that a borrower may refute

allegations of default by establishing that the borrower's performance under the mortgage was

excused.  *See id.*  If the Refinance Loan is void, Sharpe's failure to make monthly payments would not constitute a default precluding the pursuit of his wrongful foreclosure claim.

The validity of the Refinance Loan turns on (1) whether the signatures bearing Sharpe's name on the note and deed of trust of the Refinance Loan were unauthorized signatures, or forgeries; and (2) if the signatures are forgeries, whether Sharpe ratified the signatures, thereby validating the Refinance Loan.  Under the Uniform Commercial Code, adopted by Nevada, an "unauthorized signature" is a signature made by an individual exceeding actual or apparent authority and includes a forgery.  NEV. REV. STAT. § 1-201(43).  An "unauthorized signature is ineffective . . . [unless it is] ratified . . . ," *id.* § 104.3403(1), and renders the "'negotiable instrument . . . void, a nullity, and wholly inoperative,'" *Johnstown Sch. Emps. Fed. Credit Union v. Mock*, 47 Pa. D. & C. 2d 703, 7 UCC Rep. Serv. 311, 316 (Pa. Ct. Comm. Pleas 1969) (quoting 11 AM. JUR. 2D BILLS & NOTES § 704 at 783).

"Ratification is a retroactive adoption of the unauthorized signature by the person whose name is signed and may be found from conduct as well as from express statement.  For example, it may be found from the retention of benefits received in the transaction with knowledge of the unauthorized signature."  NEV. REV. STAT. § 104.3403 cmt. 3.  To prove ratification, there must be evidence of "intent to ratify plus full knowledge of all material facts."  *Eustler v. First Nat'l Bank Payhuska*, 639 P.2d 1245, 1247 (Okla. 1982).  Ratification is a question of fact.  *Polles v. Fed. Deposit Ins. Corp.*, 749 F. Supp. 136, 140 (N.D. Miss. 1990); *see also In re Bates*, 71 U.C.C. Rep. Serv. 2d 833, 2010 WL 2203634, at *8 (Bankr. S.D. Miss. May 27, 2010) ("Whether there has been a ratification of an unauthorized signature is often a question of fact and, thus, not usually fodder for summary judgment.").  Some courts have found ratification established as a matter of law, but in such cases "the record very clearly reveals when the

plaintiff learned of the unauthorized signature, not just when he notified the bank, and describes

what actions the plaintiff took once he made the discovery." *Polles*, 749 F. Supp. at 141–42; *In

re Bates*, 2010 WL 2203634, at *8–9 ("It is worth noting that in those cases in which a court has

found ratification established as a matter of law, the evidence clearly showed when the plaintiff

learned of the unauthorized signature and what actions the plaintiff took once the discovery was

made.").

Here, the record establishes that:  (i) the closing for the Refinance Loan occurred on

March 17, 2008 (Supp. Obj. ¶ 16); (ii) Fidelity mailed a letter to Sharpe at the Property stating

that the escrow for the Refinance Loan had closed (*id.* ¶ 20 (citing Handley Decl. Ex. L)); (iii)

$202,547.92 of the Refinance Loan proceeds was wired by Fidelity to a joint bank account held

by Tracy and Sharpe (*id.* ¶ 18 (citing Handley Decl. Ex. K; id. Ex. D)); (iv) some of the

remaining Refinance Loan proceeds were used to pay closing costs, $24,086 of Sharpe's credit

card debt, and $18,423.21 in past due taxes on the Property (*id.*); (v) approximately $49,000 was

withdrawn from the joint bank account on March 18, 2008 and approximately $72,000 was

withdrawn from the same account on March 19, 2008 (*id.* ¶ 21 (citing Handley Decl. Ex. D));

(vi) within a month of the Refinance Loan's closing, the joint bank account had been depleted to

$31,000 (*id.*); (vii) the first four payments on the Refinance Loan were timely made in April,

May, June, and July 2008, but the August 2008 payment was the first payment missed (*id.* ¶ 22);

(viii) in March 2009, Sharpe authorized individuals to speak with GMACM about loan

modification options (*id.* ¶¶ 25–34 (citing Priore Decl. ¶¶ 11–21)); (ix) on April 14, 2009, Sharpe

contacted GMACM and the police to advise that someone had fraudulently used his personal

information to obtain the Refinance Loan (*id.* ¶ 35 (citing Priore Decl. ¶ 22)); (x) Sharpe

contacted GMACM again about the alleged identity theft on April 16, 2009 (*id.* ¶ 37 (citing

Priore Decl. ¶ 23)); and (xi) Sharpe filed the State Court Action on October 29, 2009 and moved

for a preliminary injunction to stop the foreclosure sale on January 12, 2010, which ultimately

was not obtained because Sharpe failed to post the required bond (*id.* ¶¶ 50–51 (citing Handley

Decl. ¶ 4, Ex. A)).

The record does not establish:  (i) whether Sharpe or an unauthorized signatory signed the

note and deed of trust and, consequently, whether the note and deed of trust are void due to

forgery; and (ii) if the Refinance Loan documents were indeed forged, whether Sharpe ratified

the Refinance Loan.  The second issue depends on disputed issues of fact, including:  (a) whether

Sharpe knew about the Refinance Loan or the alleged forgery before April 14, 2009, in light of

Tracy's domination of the couple's finances, bills, and receipt of mail; (b) whether Sharpe knew

about or was involved in the withdrawal of the Refinance Loan proceeds that were deposited into

the couple's joint bank account such that he benefited from those proceeds; (c) whether Sharpe

knew about or was involved in the use of the Refinance Loan proceeds to pay off his credit card

debt and past due property taxes such that he benefited from those proceeds.

The Court cannot resolve the merits of the wrongful foreclosure claim as a matter of law.

Therefore, the Objection on this basis is **OVERRULED** without prejudice.

### III.    CONCLUSION

For the foregoing reasons, the Court **OVERRULES** the Objection.  The Trust shall confer

with Sharpe's counsel within fourteen (14) days from the date of this Opinion to discuss possible

settlement of the Claim.  Additionally, counsel shall confer regarding the scheduling of any

discovery and an evidentiary hearing, as well as further briefing before trial.  Counsel shall

thereafter promptly file a status letter advising the Court of the proposed schedule.  The Trust's

counsel shall set this matter for a further status conference during the next available Omnibus

Hearing date.  Sharpe's local counsel must appear in person, but his Nevada counsel may

participate by telephone.  The Court will enter a scheduling order following that conference.

**IT IS SO ORDERED.**

Dated:    April 23, 2015
          New York, New York

_____/s/Martin Glenn_____
MARTIN GLENN
United States Bankruptcy Judge