**Hearing Date and Time:  June 23, 2015 at 10:00 a.m. (Prevailing Eastern Time)**
**Response Deadline:  May 18, 2015 at 4:00 p.m. (Prevailing Eastern Time)**

| | |
|---|---|
| MORRISON & FOERSTER LLP | BRADLEY ARANT BOULT CUMMINGS LLP |
| 250 West 55th Street | One Federal Place |
| New York, New York 10019 | 1819 Fifth Avenue North |
| Telephone:     (212) 468-8000 | Birmingham, Alabama 35203 |
| Facsimile:     (212) 468-7900 | Telephone: (205) 521-8521 |
| Norman S. Rosenbaum | Facsimile: (205) 488-6521 |
| Jordan A. Wishnew | John W. Smith T (admitted *pro hac vice*) |

*Counsel for the ResCap Liquidating Trust*   *Co-Counsel for the ResCap Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------- | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------------- | ) | |

**RESCAP LIQUIDATING TRUST'S OBJECTION TO**
**PROOFS OF CLAIM NOS. 5275 AND 7464**
**FILED BY THE LAW OFFICES OF DAVID J. STERN, P.A.**

1

# TABLE OF CONTENTS

**Page**

JURISDICTION, VENUE AND STATUTORY PREDICATE ......................................2

PRELIMINARY STATEMENT ................................................................2

BACKGROUND .......................................................................................4

    (1)    GMAC Mortgage's Relationship With The Law Offices of David J. Stern, P.A. ..................................................................5

    (2)    Stern's Improper Business Practices .........................................9

    (3)    Curative Work .......................................................................11

    (4)    Prepetition Litigation Between GMACM And DJSPA..............13

    (5)    Proof of Claim No. 5275 .......................................................15

    (6)    Proof of Claim No. 7464 .......................................................16

RELIEF REQUESTED ..........................................................................16

OBJECTION ..........................................................................................16

    (a)    DELAWARE LAW BARS ANY RECOVERY BY DJSPA.............18

        (1)    *Delaware Law Recognizes The First Material Breach Doctrine.*............18

        (2)    *DJSPA Committed Numerous Material Breaches of the Contract with GMACM.* ..................................................20

            a.    Florida Attorney General/Florida Bar Investigation. ..................20

            b.    Losing FNMA/FHLMC Designation. ..........................................22

            c.    Failure to Provide Competent Legal Services in Accordance with Good Industry Practices. ..................23

            d.    Failure to Provide Adequate Oversight and Suitable Training. ..................................................26

            e.    Assigning Obligations Without Approval. ...................................28

            f.    Offshoring of Work. ...................................................................28

         (3)    In Related Litigation, DJSPA has been Barred from Recovery as a Result of its Material Breaches....................29

    (b)    THE CLAIMS ARE OVERSTATED AND SUBJECT TO OFFSETS. ............29

        (1)    *Stern Is Not Entitled To Recover Certain Elements Of The Claims.*.........29

            a.    Sums Related to FNMA & FHLMC Loans...................................29

            b.    Further Reductions to Asserted Claim Amounts...........................30

         (2)    Potential Offsets Against Any Allowed Claim Amounts.........................32

            a.    Timeline Penalties. ....................................................................33

ny-1165375

## TABLE OF CONTENTS
### (continued)

|  |  |  | Page |
|---|---|---|---|
| | b. | File Transfer Costs. | 34 |
| | c. | Stern's Negligent Handling of Loan Files. | 35 |
| (c) | | DJSPA'S CLAIMS FOR OPEN ACCOUNT OR ACCOUNT STATED ARE REDUNDANT AND OTHERWISE INVALID. | 36 |
| NOTICE | | | 38 |
| CONCLUSION | | | 38 |

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Asset Recovery Servs., Inc. v. Process Sys., Integration, Inc.*,
No. CIV.A1999-10-124, 2002 WL 31999347 (Del. Ct. Com. Pl. Feb. 6, 2002) ............. 18, 19

*BioLife Solutions, Inc. v. Endocare, Inc.*,
838 A.2d 268 (Del. Ch. 2003) ........................................................................................ 19

*Breezy Bay, Inc. v. Indusria Maquiladora Mexicana, S.A.*,
361 So. 2d 440 (Fla. Dist. Ct. App. 1978) ..................................................................... 37

*Carroll v. Cohen*,
91 A. 1001 (Del. Super. Ct. 1914) .................................................................................. 32

*Commonwealth Constr. Co. v. Cornerstone Fellowship Baptist Church, Inc.*,
No. 04L-10-101-RRC, 2006 WL 2567916 (Del. Super. Ct. Aug. 31, 2006) ................... 18

*Creamer v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*,
No. 12 Civ. 6074 (RJS), 2013 WL 5549643 (S.D.N.Y. Sept. 26, 2013) ........................ 17

*Direct Mail Holding, LLC v. Bush*,
No. 8:12-CV-145-T-30EAJ, 2012 WL 1344823 (M.D. Fla. Mar. 8, 2012) ..................... 18

*Edelstein v. Goldstein*,
No. 09C-05-034 (DCS) , 2011 WL 721490 (Del. Super. Ct. Mar. 1, 2011) ............... 18, 20

*Emmett S. Hickman Co. v. Emilio Capaldi Developer, Inc.*,
251 A.2d 571 (Del. Super. Ct. 1969) .............................................................................. 32

*Eureka VIII LLC v Niagara Falls Holdings LLC*,
899 A.2d 95 (Del. Ch. 2006), *aff'd*, 918 A.2d 1171 (Del. 2007) ................................... 19

*Frunzi v. Paoli Servs., Inc.*,
No. N11A-08-001-MMJ, 2012 WL 2691164 (Del. Super. Ct. July 6, 2012) ............... 32, 33

*Harold R. Clune, Inc. v. Healthco Med. Supply*,
78 A.D.2d 914 (1980) ...................................................................................................... 37

*H.D. Williams Cooperage Co. v. Scofield*,
115 F. 119 (8th Cir. 1902) .............................................................................................. 19

*Hudson v. D & V Mason Contractors, Inc.*,
252 A.2d 166 (Del. Super. Ct. 1969) .......................................................................... 18, 19

*In re Hess*,
404 B.R. 747 (Bankr. S.D.N.Y. 2009) ............................................................................ 18

*In re MF Global Holdings, Ltd.*,
    Nos. 11-15059 (MG) ................................................................................................ 16

*In re Oneida Ltd.*,
    400 B.R. 384 (Bankr. S.D.N.Y. 2009), *aff'd sub nom.*, *Peter J. Solomon Co. v.*
    *Oneida, Ltd.*, No. 09-cv-2229 (DC), 2010 WL 234827 S.D.N.Y. Jan. 22, 2010).................. 17

*In re Smith*,
    No. 12-10142, 2013 WL 665991 (Bankr. D. Vt. Feb. 22, 2013) .......................................... 16

*In re W.R. Grace & Co.*,
    346 B.R. 672 (Bankr. D. Del. 2006).................................................................................... 17

*Ocean Ridge Dev. Corp. v. Quality Plastering, Inc.*,
    247 So. 2d 72 (Fla. Dist. Ct. App. 1971) ........................................................................... 32

*Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*,
    No. 5886VCP, 2013 WL 3934992 (Del. Ch. July 24, 2013)................................................ 18

*Reserves Dev. LLC v. Crystal Props., LLC*,
    986 A.2d 362 (Del. 2009)....................................................................................... 32, 33

*Robert W. Gottfried, Inc. v. Cole*,
    454 So. 2d 695 (Fla. Dist. Ct. App. 1984)........................................................................... 36

*Rothensies v. Elec. Storage Battery Co.*,
    329 U.S. 296 (1946) ............................................................................................................ 33

*Trader v. Grampp Builders, Inc.*,
    263 A.2d 304 (Del. Super. Ct. 1970).................................................................................. 32

*Vanston Bondholders Protective Comm. v. Green*,
    329 U.S. 156 (1946) ............................................................................................................ 18

## STATUTES

11 U.S.C. § 502(a)................................................................................................................ 16

11 U.S.C. § 502(b)(1) .......................................................................................................... 17

5 Brunner & O'Connor Construction Law § 18:16 (2014) ................................................... 18

## OTHER AUTHORITIES

4 COLLIER ON BANKRUPTCY ¶ 502.02[2] (16th ed. rev. 2012)...................................... 16

14 Williston on Contracts § 43:12 (4th ed. 2014) ............................................................... 19

23 Williston on Contracts § 63:3 (4th ed. 2014) ................................................................. 18

23 Williston on Contracts § 63:8 (4th ed. 2014) ................................................................... 18, 19

17A Am. Jur. 2d Contracts § 606 (2015) ................................................................................. 18

Restatement (Second) of Contracts § 241 (1981) .................................................................... 19

FED. R. BANKR. P. 3001(f) ...................................................................................................... 16

Florida Secretary of State,
   http://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=
   COR%5C2009%5C1005%5C00209278.Tif ............................................................................ 9

**TO THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

The ResCap Liquidating Trust (the "Liquidating Trust"), established pursuant to the terms of the Chapter 11 plan confirmed in the above captioned bankruptcy cases (the "Chapter 11 Cases") [Docket No. 6065], as successor in interest to the above captioned debtors (collectively, the "Debtors"), hereby submits this objection (the "Objection") seeking to expunge and disallow (i) proof of claim No. 5275 (the "Initial Claim") filed against Debtor GMAC Mortgage, LLC ("GMACM") by James Malphurs on behalf of The Law Office of David J. Stern, P.A. ("DJSPA" or "Claimant") as well as (ii) proof of claim No. 7464 (the "Amended Claim," together with the Initial Claim, the "Stern Claims") against GMACM filed by Jeffrey Tew on behalf of DJSPA, pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") on the grounds that the Stern Claims are without merit and do not include colorable claims against GMACM.[1]   Accordingly, the Liquidating Trust seeks entry of an order substantially in the form annexed hereto as Exhibit 1 (the "Proposed Order") granting the requested relief.   In support of the Objection, the Liquidating Trust submits the Declaration of David Cunningham (annexed hereto as Exhibit 2-A, the "Cunningham Decl.") and the Declaration of John W. Smith T (annexed hereto as Exhibit 2-B, the "Smith T Decl.") and respectfully represents as follows:

---

[1] The Liquidating Trust reserves all its rights to amend this Objection should any further bases come to light.

## JURISDICTION, VENUE AND STATUTORY PREDICATE

1.      This Court has jurisdiction over this Objection under 28 U.S.C. § 1334.   This matter is a core proceeding under 28 U.S.C. § 157(b).   Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicate for the relief requested herein is section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007(a).

## PRELIMINARY STATEMENT

3.      DJSPA was one of GMACM's highest-volume legal service providers in Florida, especially as it concerns pursuing foreclosures against delinquent borrowers.  It filed a claim against GMACM in excess of $6 million for alleged unpaid prepetition invoices.  However, the Claimant's prepetition course of conduct nullifies its entitlement to any sums from GMACM, because its material breaches of the terms of the Master Services Agreement and related Statements of Work with GMACM absolve GMACM of any responsibility to DJSPA for any outstanding sums.  Controlling law is clear that a party who materially breaches a contract cannot complain if the other party subsequently refuses to itself perform.   The Master Services Agreement between GMACM and the Claimant contains numerous material promises by the Claimant that formed the foundation of the parties' relationship.   For example, DJSPA contractually agreed that its ability to provide legal services would never be compromised by investigations, ethical violations, or loss of authorizations needed to represent GMACM.  DJSPA also promised that it would always perform legal services in a diligent manner consistent with industry practices, utilizing personnel of proper training and skill; however, DJSPA repeatedly flouted these and other material obligations during its handling of GMACM matters.   For example, as described more fully below, in 2009, DJSPA attorneys failed to give notice or provide any defense against a borrower's counterclaims, which led to a substantial default

2

judgment being entered on a loan serviced by GMACM.  In its order denying GMACM's request to vacate the award to the borrowers, the court found that there was a "complete breakdown of the system at the Stern Firm" and that "the Stern Firm was guilty of gross negligence."  As described in greater detail herein, DJSPA's material breaches of the MSA (and related SOWs) were numerous and were committed over an extended period of time.  The consequence of the Claimant's actions is that DJSPA should be barred from any recovery on the Stern Claims.

4.      The $6.1 million proof of claim at issue is comprised of four elements: (i) invoices related to loans owned by the Federal National Mortgage Association ("FNMA") allegedly totaling $411,687.15; (ii) invoices related to loans owned by the Federal Home Loan Mortgage Corporation ("FHLMC") allegedly totaling $271,820.73; (iii) invoices for services rendered on non-GSE loans allegedly totaling $2,498,475.82; and (iv) sums purportedly due and owing for "curative work" discussed by DJSPA and GMACM in fall 2010 allegedly totaling $2,979,500.  For reasons discussed in greater detail herein, due to a prior stipulation of the parties in pending litigation, the Claimant agreed that it would not recover from GMACM damage categories (i) and (ii).  In addition, a substantial portion of the alleged unpaid invoices are resubmissions by the Claimant of invoices previously rejected by GMACM, some of which date back to 2007.  Those invoices are no more valid at this time than they were when first rejected by the Debtors.  Moreover, DJSPA is not entitled to any payment for the "curative work" because the firm never fulfilled its agreed-upon services.

5.      Even if not barred by the material antecedent breach doctrine, DJSPA is, at most, left with a general unsecured claim of $1,339,590.78. *See* ¶¶ 68-71 *infra*.  However, this figure does not account for the millions of dollars of GMACM's counterclaims and offsets, which include timeline penalties paid to FNMA and FHLMC, the costs to transfer thousands of loans to

3

new law firms in late 2010 once the Claimant lost its ability to handle FNMA and FHLMC-backed loans, as well as damages GMACM incurred arising from the Claimant's gross incompetence and blatant mishandling of loan files. Ultimately, the Liquidating Trust has no residual liability to DJSPA. In fact, DJSPA actually owes GMACM for all the damage it caused GMACM in the past four years due to its overwhelming malfeasance.

6.      Therefore, the Stern Claims are entirely without merit and should be disallowed and expunged in their entirety.[2]

## BACKGROUND

7.      On May 14, 2012, each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code. These Chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

8.      On May 16, 2012, the Court entered an order [Docket No. 96] appointing Kurtzman Carson Consultants LLC ("KCC") as the notice and claims agent in these Chapter 11 Cases. Among other things, KCC is authorized to (a) receive, maintain, and record and otherwise administer the proofs of claim filed in these Chapter 11 Cases and (b) maintain the official Claims Register for the Debtors (the "Claims Register").

9.      On August 29, 2012, this Court entered the Bar Date Order, which established, among other things, (i) November 9, 2012 at 5:00 p.m. (Prevailing Eastern Time) as the deadline to file proofs of claim by virtually all creditors against the Debtors (the "General Bar Date") and prescribed the form and manner for filing proofs of claim; and (ii) November 30, 2012 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for governmental units to file proofs of claim (the "Governmental Bar Date" and, together with the General Bar Date, as applicable, the "Bar

---

[2] At the appropriate time, the Liquidating Trust will file an appropriate proceeding before the Court in order to effectuate the release of the funds currently held in escrow to the Liquidating Trust.

ny-1165375

Date"). (Bar Date Order ¶¶ 2, 3). On November 7, 2012, the Court entered an order extending

the General Bar Date to November 16, 2012 at 5:00 p.m. (Prevailing Eastern Time) [Docket No.

2093]. The Governmental Bar Date was not extended.

10.    On March 21, 2013, this Court entered an order approving procedures for the

filing of objections to proofs of claim filed in these Chapter 11 Cases [Docket No. 3294] (the

"Procedures Order").

11.    On December 11, 2013, the Court entered the Order Confirming Second

Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official

Committee of Unsecured Creditors (the "Confirmation Order") approving the terms of the

Chapter 11 plan, as amended (the "Plan"), filed in these Chapter 11 cases [Docket No. 6065].

On December 17, 2013, the Effective Date (as defined in the Plan) of the Plan occurred [Docket

No. 6137].

12.    The Plan provides for the creation and implementation of the Liquidating Trust,

which, among other things, is "authorized to make distributions and other payments in

accordance with the Plan and the Liquidating Trust Agreement" and is responsible for the wind

down of the affairs of the Debtors' estates. *See* Plan, Art. VI.A-D; see also Confirmation Order ¶

22. Pursuant to the Confirmation Order and the Plan, the Liquidating Trust was vested with

broad authority over the post-confirmation liquidation and distribution of the Debtors' assets.

*See* generally, Confirmation Order ¶¶ 26, 30, 48; Plan, Art. VI.

**(1)    GMAC Mortgage's Relationship With The Law Offices of David J. Stern, P.A.**

13.    DJSPA is a Florida law firm that held itself out as specialists in handling

residential mortgage foreclosures, bankruptcy, evictions, the sale of real estate owned properties

by foreclosing lenders, and other foreclosure-related litigation in Florida.  At all relevant times,

David J. Stern ("Stern") was the principal of DJSPA.[3]  *See* Cunningham Decl. at ¶ 5.

14.     GMACM retained DJSPA to provide legal services in connection with mortgage

loans for Florida properties that GMACM was servicing on behalf of various financial

institutions, including, but not limited to, FNMA and FHLMC.  On January 17, 2007, GMACM

formalized its pre-existing attorney-client relationship with DJSPA and entered into a Master

Services Agreement ("MSA") and Statement of Work ("SOW"), which was amended and

modified from time-to-time, and obligated DJSPA to handle residential mortgage foreclosures,

bankruptcy, evictions, and the sale of real estate owned properties in the State of Florida.  *See*

Cunningham Decl. at ¶ 6.  A copy of the MSA and the subsequent SOWs (entered into prior to

the 2010 termination of the GMACM relationship) are collectively attached to the Cunningham

Decl. as Exhibit A.

15.     Among other things, pursuant to the MSA between DJSPA and GMACM,

DJSPA[4] agreed as follows:

> 6.1     Company represents and warrants that the Services will be
> performed in a diligent and workmanlike manner in accordance
> with good industry practices, by individuals of suitable training
> and skill.
>
> 6.2     Company represents and warrants that the Services and all
> Deliverables provided under this Agreement shall comply with and
> function in accordance with the requirements set forth in this
> Agreement and the Statement of Work.
>
> …..

---

[3] The Florida Secretary of State's website confirms that DJSPA was organized in 1993 and until 2011, Stern was the lone director and registered agent.  As of 2014, Stern remains the sole director of the company. (*See* Smith T Decl. at ¶ 6).

[4] DJSPA is designated as "Company" in the MSA and as the "Supplier" in the SOW.

6

6.4     Company represents and warrants that Company's actions and performance of the Services are and will be in full compliance with all applicable federal, state, and local requirements, including but not limited to, federal banking laws, federal consumer protection and privacy laws; all applicable state laws and regulations; any valid and effective order (including regulatory orders), verdict, judgment, consent decree or agreement.

…..

6.6     Company represents and warrants that it has, and will maintain throughout the Term of this Agreement, all licenses, franchises, permits, authorizations and approvals materially necessary for the lawful conduct of its business.

…..

6.8     Company represents and warrants that there is no action, suit, claim, investigation or proceeding pending or, to the best of its knowledge, threatened against it that, if adversely decided, might adversely affect Company's ability to enter into this Agreement or performance of its obligations hereunder.

…..

8.1     **Place of Performance:** Performance by Company of the Services shall take place in the fifty (50) states of the United States of America or the District of Columbia (the "United States"). Company may perform any of the Services outside of the United States, and on such additional terms and conditions as may be acceptable to Client, only if expressly agreed to by Client in the Statement of Work or otherwise.

…..

8.8     Company shall take appropriate measures to select, supervise and monitor the personnel performing Services.  Company shall maintain current employment eligibility verification records, including necessary certification and documentation and insurance for its employees performing Services hereunder.  Company will not conduct disciplinary actions with respect to Company personnel while on Client's premises, including but not limited to terminating employment of Company personnel.

….

7

13.2    **Indemnification.** Each party (each an "Indemnitor") shall, at its own expense, defend, indemnify and hold harmless the other party and its employees, officers, directors, licensees, representatives, attorneys, parents, subsidiaries, successors, assigns and agents (each of the foregoing an "Indemnitee") from and against any and all liabilities, claims, actions, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) relating to or arising out of any third-party claims(s) for bodily injury to or death of any person or for damage, loss or destruction of tangible real property or tangible personal property caused by the negligent acts or omissions, recklessness or willful misconduct of Indemnitor and its employees, agents, and representatives. The Indemnitor will defend Indemnitee against such claims at Indemnitor's sole expense and pay all court awarded damages relating to such claims. The Indemnitee agrees to notify the Indemnitor in a timely manner in writing of the claim, and grant Indemnitor the right to control the defense and disposition of such claims provided that no settlement requiring any financial payment from Indemnitee or admission of liability by Indemnitee shall be made without Indemnitee's prior written approval.

….

18.1    Company shall not assign, in whole or part, any of its obligations under this Agreement without Client's written consent. Company shall not subcontract any portion of its performance obligations under this Agreement without Client's prior written approval. Client's approval with respect to any subcontracting shall not relieve Company of its responsibility for the performance of its obligations under the Agreement.

(Ex. A (MSA)). The MSA further provides that it is to be governed by Delaware law (*id.*, at ¶ 19), that it was negotiated at arm's length, and that it is to be interpreted neutrally (*id.*, at ¶ 21.9).

16.    The MSA further incorporates GMACM's expectation guidelines (the "Guidelines"), which provide additional requirements that outside counsel are expected to meet in providing legal services on behalf of GMACM. (Ex. A (SOW), at ¶ VII).

17.    According to the invoices submitted by DJSPA that purport to substantiate the Stern Claims, during the period from 2007 until November 2010, DJSPA performed legal work

8

on thousands of mortgage files serviced by GMACM.  Certain support services for the legal

work that was to be provided by DJSPA to GMACM were instead performed by one or more

separately-incorporated entities in which Stern held a substantial personal interest and over

which Stern maintained substantial control.  One of these entities was DJS Processing, LLC,

which was created by DJSPA to provide non-legal services needed to process foreclosure files

and ancillary services for DJSPA.[5]

### (2)    Stern's Improper Business Practices

18.    On August 10, 2010, the Florida Attorney General publicly announced an

investigation into allegations of unfair and deceptive actions by DJSPA regarding its handling of

foreclosure cases in Florida.[6]  Subsequent news reports were circulating, detailing more

"questionable practices" by DJSPA.[7]  Among other things, sworn deposition testimony from

employees of DJSPA became publicly available, describing unethical foreclosure-related

practices engaged in by DJSPA, including widespread and improper practices in the preparation,

execution and submission of assignments, affidavits of indebtedness and other papers in

mortgage related cases that had been handled over the years by DJSPA in Florida.  (*See, e.g.*,

Smith T Decl. at ¶¶ 7, 9 (*citing* testimony of DJSPA employees Cheryl Sammons, Tammy Lou

Kapusta and Kelly Scott)).

---

[5]  According to the Florida Secretary of State's website, DJSPA is the managing member of DJS Processing, LLC, which is a Delaware entity that was organized in 2009.  (*See* Smith T Decl. at ¶ 6, *available at* http://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2009%5C1005%5C0 0209278.Tif&documentNumber=M09000003832 (last visited April 23, 2015)).

[6]  These reports and many other details surrounding DJSPA's misconduct are detailed in publicly filed documents, including the investigation into Stern attorneys and several of the firm's administrators conducted by the Florida Bar; and in numerous related lawsuits. *See* Federal Home Loan Mortgage Corporation's Answer and Affirmative Defenses to Plaintiff's Amended Complaint and Defendant/Counter Plaintiff's Counterclaim at ¶¶ 18-39, *The Law Offices of David J. Stern, P.A. v. Federal Home Loan Mortgage Corp.*, No. 11-CV-60623-RSR (S.D. Fla. Mar. 30, 2012 (ECF No. 63).  (*See* Smith T Decl. at ¶¶ 7-8 & 12).

[7]  (*See* Smith T Decl. at ¶ 9).

9

19.     These reports and related events, which were highly publicized, led FNMA, FHLMC and other mortgage service providers to terminate their relationships with DJSPA. FHLMC terminated its relationship with DJSPA by letter dated November 1, 2010, which meant that DJSPA was no longer authorized to participate in the designated counsel program with FHLMC.  (*See* Smith T Decl. at ¶ 12 (*citing* FHLMC Suit, at Doc. 63-2)).  On November 10, 2010, FNMA notified GMACM that FNMA had "terminated its relationship with the Law Offices of David J. Stern, P.A." and barred all loan servicers from referring "any future Fannie Mae matters to the Stern Firm."  (*See* Cunningham Decl. at ¶ 14).  Both FHLMC and FNMA required GMACM to transfer all matters to other approved firms and that such files should be the first priority for file set-up and review at the new firm(s). *Id.*

20.     After confirming that DJSPA was the subject of a formal investigation by the Florida Attorney General, in connection with DJSPA's loss of approval to prosecute foreclosures of loans owned by FNMA and FHLMC, and because of the serious ethical cloud hanging over DJSPA, GMACM terminated its relationship with DJSPA in November 2010.  (*See* Cunningham Decl. at ¶ 15).

21.     GMACM sought to and ultimately did recover substantially all of its files from DJSPA.  DJSPA refused to release any files to GMACM until GMACM placed funds allegedly owed to DJSPA into escrow.  In light of GMACM's need to expeditiously transition its loan files to new law firms to be serviced, on November 5, 2010, GMACM agreed to enter into an Escrow Agreement with DJSPA, wherein the law firm of Bradley Arant Boult Cummings LLP ("<u>BABC</u>") agreed to serve as Escrow Agent and hold the sum of $3 million in escrow while GMACM and DJSPA resolved their dispute over attorneys' fees and expenses.  These funds remain in escrow with BABC at this time.  (*See* Cunningham Decl. at ¶ 13).  Section 2 of the

10

Escrow Agreement provides, in pertinent part, that "Upon receipt and approval of … any Court Order from a Court of competent jurisdiction, after appeals have been exhausted, Escrow Agent shall remit the Attorney Fee & Expense Funds in accordance with any agreement or Court Order." (*See* Exh. D to Cunningham Decl.).[8]

22.    GMACM subsequently transitioned its files to other law firms and directed these firms to review the recovered files and to take appropriate steps to attempt to remedy any errors committed by DJSPA.   In connection with this review and through other developments, GMACM discovered that DJSPA had committed serious acts of malpractice in the handling of a number of GMACM matters, acts that pre-dated the termination of the relationship between GMACM and DJSPA. (*See* Smith T Decl. at ¶ 14).   These instances of malpractice and negligence are described in greater detail below.[9]

**(3)    Curative Work**

23.    During the time period of the Florida Attorney General's investigation of DJSPA, GMACM became aware of potentially improper or questionable affidavits that had been filed in connection with GMACM's mortgage loan files.  On or about August 23, 2010, GMACM sent attorneys and staff to meet with Stern at DJSPA's offices to discuss the potential defects with affidavits of indebtedness (the "Affidavits") submitted in judicial foreclosures in Florida. GMACM thereafter immediately sought to address remediation of the Affidavits, including submitting corrected affidavits.  (*See* Cunningham Decl. at ¶ 9).

24.    On September 27, 2010, Stern sent a letter to GMACM (the "September 27 Letter") requesting flat fee billing for specific services that DJSPA proposed to provide to assist

---

[8] The Liquidating Trust expressly reserves all rights with respect to the escrow maintained with BABC, including the right to challenge the validity of the escrow and the necessity to maintain it.
[9] *See* ¶ 79 infra.

GMACM with completing remediation. (*See* Exh. B to the Cunningham Decl.). The September 27 Letter contemplated a specific flat fee for services for each population of foreclosure files that required affidavit remediation. (*See id.*). The scope of services varied depending on the procedural status of the foreclosure file. For example, for those matters in which a motion for entry of a foreclosure judgment was filed (but no hearing was pending), DJSPA was required to prepare and file a notice as well as filing an amended affidavit containing current judgment figures. By comparison, for those matters in which a foreclosure judgment was entered and a foreclosure sale conducted, DJSPA was required to file a motion with the court to reveal the defect in the affidavit as well as prepare a motion to cancel the foreclosure sale. (*See Id.*). On October 14, 2010, GMACM responded to DJSPA's billing proposal agreeing generally to the proposed rates so long as DJSPA met specific timing expectations. (*See* Exh. C to the Cunningham Decl. (the "GMACM Letter")). The GMACM Letter made clear, however, that DJSPA was only authorized to proceed with work on a portion of the files requiring remediation. (*See* Cunningham Decl. at ¶ 10).

25.     As part of its ongoing remediation efforts at the time, GMACM had both its own employees as well as outside counsel on site at DJSPA's offices reviewing the loan files and the affidavits in need of remediation. Because the work provided by DJSPA was incomplete and untimely, GMACM's in-house personnel ultimately prepared the information (rather than using DJSPA) and thereafter, supplied DJSPA with a letter documenting the corrections made to each original affidavit. Therefore, the only "curative" services DJSPA provided were limited to pulling files, providing original or copies of affidavits and simply incorporating the changes needed to correct the affidavits, which was significantly less than the scope of curative services agreed to by GMACM. Furthermore, as a result of the files having to be transferred to other

12

firms due to DJSPA's misconduct, not one of the "corrected" affidavits that were drafted by DJSPA was ever used to remediate the subject foreclosure matters based upon the terms agreed to in the September 27 Letter. (*See* Cunningham Decl. at ¶ 12).

26.      On or about February 25, 2011, DJSPA sent GMACM a letter demanding the sum of $6,161,483.70 for unpaid legal services it purportedly provided to GMACM. When the demand went unsatisfied, DJSPA commenced a lawsuit against GMACM. (*See* Cunningham Decl. at ¶ 16).

27.      On March 4, 2011, DJSPA sent correspondence to the judges of the various judicial circuits in which it was the firm of record concerning thousands of mortgage-related cases pending throughout Florida. The correspondence stated that the "firm suffered a tremendous reduction of both clients and personnel," requiring it to "withdraw from approximately 100,000 files statewide." The correspondence further stated that DJSPA would be "ceasing the servicing of clients with respect to all pending foreclosure matters in the State of Florida as of March 31, 2011." (*See* Smith T Decl. at ¶ 8 (*citing* Complaint at ¶ 100, *The Florida Bar v. David James Stern*, Florida Bar File Nos. 20-51,725(17I) (Fla. 2013)).

**(4)      Prepetition Litigation Between GMACM And DJSPA**

28.      On June 2, 2011, DJSPA filed a Complaint in Florida state court against GMACM alleging Breach of Contract (Count I), Open Account (Count II), and Account Stated (Count III) (the "Florida Lawsuit"). The Complaint seeks $6,161,483.70, the amount DJSPA contends GMACM owes for legal work that DJSPA allegedly performed. (*See* Smith T Decl. at ¶ 11).

29.      On July 11, 2011, GMACM removed the case to the U.S. District Court for the Southern District of Florida, and the case was assigned to U.S. District Judge Marcia G. Cooke. GMACM also answered and filed counter-claims against DJSPA alleging Legal Malpractice

13

(Count I), Breach of Contract (Count II), Breach of Fiduciary Duty (Count III), violations of Florida's Deceptive and Unfair Trade and Practices Act (Count IV), and Misrepresentation/Suppression (Count V).    More specifically, GMACM's contract claims/defenses are based upon the MSA and related SOWs.  In its answer and counterclaims, GMACM asserted as a defense that DJSPA's material breaches of the MSA and SOW barred DJSPA's recovery.  (*See* Smith T Decl. at ¶ 11).

30.    GMACM's counterclaims against DJSPA in the Florida Lawsuit are based, in part, on DJSPA's negligence and breach of fiduciary responsibilities owed to GMACM.  (*See* Smith T Decl. at ¶ 14 (*citing* GMACM Answer and Counterclaim)).  For example, in one foreclosure matter assigned to DJSPA for handling in August 2009, DJSPA failed to communicate to GMACM that counterclaims had been filed by the borrowers on September 11, 2009.[10]  DJSPA neglected to answer or defend such counterclaims, with the result that a default judgment was entered against the loan investor on October 21, 2009 and made final on May 5, 2011 in the amount of $469,470.27.  DJSPA has acknowledged that it was obligated but failed to defend against the counterclaims or provide any notice to GMACM.  (*See* Smith T Decl. at ¶ 14 (*citing* Deposition of Forrest McSurdy, at 20–21 & 72-74; and Transcript of Testimony of Forrest McSurdy, at 16-18 & 21)). [11]

31.    GMACM subsequently hired outside counsel to seek to have the judgment vacated.  On February 26, 2013, the Florida Circuit Court for the Twentieth Judicial Circuit for

---

[10] (Smith T Decl. at ¶ 14(a)).  The case is entitled *Deutsche Bank Trust Co. Americas as Trustee for RALI 2007QS3 v. Barry F. Mack, et al.*, 09-7336-CA (20th Judicial Circuit for Collier County, Florida) (the "Mack Case"). GMACM was the servicer on the loan at issue in the Mack Case, which is the subject of contested Proof of Claim #386 filed on August 8, 2012 by Creditors Barry F. and Cheryl M. Mack, in the amount of $32,850,000.00, against GMACM, of which $30 million is on account of alleged punitive damages.

[11] DJSPA billed GMACM for its work on the Mack case.  (*See* Smith T Decl. at ¶ 14 (*citing* McSurdy Depo., at 22:72–74)).

Collier County ("Florida Trial Court") vacated a portion of the judgment but affirmed $321,970.77 of the original award.  After receiving the evidence, including testimony from DJSPA, the trial court found "conclusively . . . that there was a complete breakdown of the system at the Stern Firm." (*See* Smith T Decl. at ¶ 14(a) (*citing* Final Order on Plaintiff's Motion to Set Aside Final Judgment and Set New Trial, entered Feb. 26, 2013) (the "Final Order")).  The court ruled that "the Stern Firm was guilty of gross negligence" through its failure to defend the counterclaims beginning in September 2009 when the counterclaims were filed. (Final Order at 2).  GMACM incurred considerable attorney's fees and expenses, as a result of DJSPA's malpractice, in opposing these rulings.  (Exhibit S to Smith T Decl. at ¶ 14).  DJSPA has at all times declined to defend or indemnify GMACM pursuant to its obligations under the MSA.

33.    On May 25, 2011, the parties mediated their dispute, but the mediation was unsuccessful.  (*See* Smith T Decl. at ¶ 11).

34.    Prior to the Petition Date, the parties engaged in initial written discovery and document productions but no depositions or other discovery occurred as of the Petition Date, at which time the Florida Lawsuit was judicially stayed and remains stayed.  (*See* Smith T Decl. at ¶ 11).

**(5)    Proof of Claim No. 5275**

35.    The Claimant filed proof of claim number 5275 against GMACM in the amount of $6,161,483.70 on account of outstanding sum purportedly due and owing as of February 2011. A copy is attached hereto as Exhibit 3.  The Claim is premised on the Complaint filed in the

15

Circuit Court of the 17th Judicial District, In and For Broward County, Florida against GMACM

on June 2, 2011, alleging Breach of Contract (Count I), Open Account (Count II), and Account

Stated (Count III).  There are multiple components to the Claim: alleged unpaid invoices for (a)

"curative" work GMACM requested of the Claimant in 2010 (in the amount of $2,979,500), (b)

services rendered before GMACM terminated its relationship with the Claimant (in the amount

of $2,498,475.82), and (c) sums related to FNMA and FHLMC matters (in the amount of

$683,507.88).

**(6)    Proof of Claim No. 7464**

36.    On May 12, 2014, DJSPA filed Claim No. 7464, which amended Claim No. 5275.

There were no substantive changes to Claim No. 5275.  The only changes reflect new contact

information for Jeffrey Tew, DJSPA's authorized agent.

## RELIEF REQUESTED

37.    The Liquidating Trust files this Objection pursuant to section 502(b) of the

Bankruptcy Code to expunge and disallow each of the Stern Claims in their entirety and have the

Court authorize the release of funds currently being held in escrow to the Liquidating Trust.

## OBJECTION

38.    A filed proof of claim is "deemed allowed, unless a party in interest . . . objects."

11 U.S.C. § 502(a).  A properly completed proof of claim is *prima facie* evidence of the validity

and amount of a claim.  *See* FED. R. BANKR. P. 3001(f).  A party in interest may object to a proof

of claim, and once an objection is made, the court must determine whether the objection is well

founded.  *See* 4 COLLIER ON BANKRUPTCY ¶ 502.02[2] (16th ed. rev. 2012).

39.    Although Bankruptcy Rule 3001(f) establishes the initial evidentiary effect of a

filed claim, the burden of proof "[r]ests on different parties at different times."  *In re Smith*,

No. 12-10142, 2013 WL 665991, at *6 (Bankr. D. Vt. Feb. 22, 2013) (citation omitted).  The

16

party objecting to the proof of claim "bears the initial burden of providing evidence to show that the proof of claim should not be allowed." *In re MF Global Holdings, Ltd.*, Nos. 11-15059 (MG), 11-02790 (MG) (SIPA), 2012 WL 5499847, at * 3 (Bankr. S.D.N.Y. Nov. 13, 2012). If the objecting party produces "evidence equal in force to the prima facie case," then the objector can negate a claim's presumptive legal validity and shift the evidentiary burden back to the claimant. *See Creamer v. Motors Liquidation Co. GUC Trust* (*In re Motors Liquidation Co.*), No. 12 Civ. 6074 (RJS), 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013). If the objecting party satisfies its initial burden and the presumption of *prima facie* validity is overcome—*e.g.*, the objecting party establishes that the proof of claim lacks a sound legal basis—the burden shifts to the claimant to support its proof of claim and demonstrate why the claim should be allowed. *Id.* (citing *In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd sub nom.*, *Peter J. Solomon Co. v. Oneida, Ltd.*, No. 09-cv-2229 (DC), 2010 WL 234827 S.D.N.Y. Jan. 22, 2010)) ("A proof of claim is prima facie evidence of the validity and amount of a claim, and the objector bears the initial burden of persuasion. The burden then shifts to the claimant if the objector produces evidence equal in force to the prima facie case . . . which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.")). Once the burden is shifted back to the claimant, it must prove its claim by a preponderance of the evidence. *Motors Liquidation Co.*, 2013 WL 5549643, at *3.

40.    Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law…." 11 U.S.C. § 502(b)(1). Whether a claim is allowable "generally is determined by applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006). "What claims of creditors are

ny-1165375

valid and subsisting obligations against the bankrupt at the time a petition is filed, is a question

which, in the absence of overruling federal law, is to be determined by reference to state law."

*In re Hess*, 404 B.R. 747, 749 (Bankr. S.D.N.Y. 2009) (quoting *Vanston Bondholders Protective*

*Comm. v. Green*, 329 U.S. 156, 161 (1946)).

(a)    **DELAWARE LAW BARS ANY RECOVERY BY DJSPA**

     (1)    <u>*Delaware Law Recognizes The First Material Breach Doctrine*</u>.

    41.    Delaware courts have held that "[a]s a general rule, the party first guilty of a

material breach cannot complain if the other party subsequently refuses to perform." *Edelstein v.*

*Goldstein*, No. 09C-05-034 (DCS) , 2011 WL 721490, at *5 (Del. Super. Ct. Mar. 1, 2011)

(*quoting Hudson v. D & V Mason Contractors, Inc.*, 252 A.2d 166 (Del. Super. Ct. 1969)); *see*

*Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, No. 5886VCP, 2013 WL 3934992, at *2

(Del. Ch. July 24, 2013) (finding that the party who breached first was barred from recovery on

the contract); *see Asset Recovery Servs., Inc. v. Process Sys., Integration, Inc.*, No. CIV.A1999-

10-124, 2002 WL 31999347, at *3 (Del. Ct. Com. Pl. Feb. 6, 2002); *Commonwealth Constr. Co.*

*v. Cornerstone Fellowship Baptist Church, Inc.*, No. 04L-10-101-RRC, 2006 WL 2567916, at

*19 (Del. Super. Ct. Aug. 31, 2006) (excusing contractor who stopped work after the owner

materially breached the contract by failing to pay the contractor for work completed). *See also*

17A Am. Jur. 2d Contracts § 606 (2015); 23 Williston on Contracts §§ 63:3, 63:8 (4th ed. 2014);

5 Brunner & O'Connor Construction Law § 18:16 (2014).

    42.    A Florida federal district court, sitting in diversity and hearing a contractual

dispute based on Delaware law, has also recognized this rule. *Direct Mail Holding, LLC v. Bush*,

No. 8:12-CV-145-T-30EAJ, 2012 WL 1344823, at *5 (M.D. Fla. Mar. 8, 2012) ("A party may

be excused from its obligations under a contract by a material, antecedent breach of another

party.").

43.     The breach must be material, meaning it "go[es] to the essence of the contract [and not] only to a minor part of the consideration." 17A Am. Jur. 2d Contracts § 606; *see* 23 Williston on Contracts § 63:8.  Delaware courts utilize several factors to determine whether a failure to render performance is material and thus justifying repudiation of the contract.

> These factors include: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003) (*quoting* Restatement (Second) of Contracts § 241 (1981).

44.     There is no legal significance to whether a later breaching party knew or did not know of the first party's material breach of the contract at the time of the later breach. 14 Williston on Contracts § 43:12 (4th ed. 2014) (*quoting H.D. Williams Cooperage Co. v. Scofield*, 115 F. 119, 121 (8th Cir. 1902) ("The legal effect of an act amounting to a breach of contract must be the same whether it is known or unknown to the opposite contracting party. Indeed, when it becomes known to the opposite party, he may in turn do some act that will operate as a waiver of the breach, which he cannot well do until he is aware of the breach.")). In fact, "[a]ll that the plaintiff must show is freedom from fault with respect to performance of dependent promises, counterpromises or conditions precedent."   *Hudson*, 252 A.2d at 170 (citation omitted).

45.     Several Delaware courts have applied the first material breach doctrine. *See Eureka VIII LLC v Niagara Falls Holdings LLC*, 899 A.2d 95, 117 (Del. Ch. 2006), *aff'd*, 918

19

A.2d 1171 (Del. 2007) (barring limited liability company member from recovery against another member because of prior "material[] breach" of LLC agreement); *Asset Recovery Servs., Inc.,* 2002 WL 31999347, at *3 (finding a material breach when a purchaser put a stop payment on a payment check and applying the first material breach doctrine). Delaware courts have applied this rule to disputes involving contracts for legal services. *See Edelstein*, 2011 WL 721490, at *5 ("As a general rule the party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to perform." (internal quotations omitted)).

46.    As described herein, even without the benefit of full discovery, it is clear that DJSPA materially breached the Contract with GMACM in several material respects, including, for example, by allowing its attorneys to engage in widespread misconduct. As the evidence presented below demonstrates, the material breaches committed by DJSPA involve conduct dating back to the formation of the parties' contractual relationship. These material breaches comprise widespread ethical misconduct by DJSPA attorneys and staff resulting in bar investigations and, ultimately, disbarment; acts of negligence and malpractice in the handling of GMACM loan files; and other clear violations of the MSA and SOW, all of which materially impacted DJSPA's ability to provide competent legal services to GMACM to such a degree that GMACM could no longer work with DJSPA and was forced, at great expense to GMACM, to transfer thousands of loan files to new law firms. Consequently, the Stern Claims should be denied *in toto*.

**(2)**    *DJSPA Committed Numerous Material Breaches of the Contract with GMACM.*

a.    Florida Attorney General/Florida Bar Investigation.

47.    The MSA states: "[DJSPA] represents and warrants that there is no action, suit, claim, investigation or proceeding pending or, to the best of its knowledge, threatened against it that, if adversely decided, might adversely affect [DJSPA's] ability to enter into this Agreement

20

or performance of its obligations thereunder." *Id*. at ¶ 6.8.  The MSA also states that the "terms and conditions of this [MSA] shall be applicable to each Project and are incorporated by references into each Statement of Work." *Id*. at ¶ 1.

48.      The Florida Attorney General launched an investigation into DJSPA, entitled *In re: Investigation of Law Offices of David J. Stern, P.A.*, AG#L10-3-1145, issuing a subpoena duces tecum on August 6, 2010.  (*See* Smith T Decl. at ¶ 7(a)).[12]   The subpoena sought documents relating to various business practices of DJSPA's handling of mortgage foreclosure cases dating back to 2007.  Shortly after issuing the subpoena, the Florida Attorney General deposed several DJSPA employees as part of its investigation.[13]

49.      At about the same time – and prior to or contemporaneous with the termination of the relationship between DJSPA and GMACM -- numerous instances of unethical conduct led to bar grievance investigations being pursued against Stern, which were ultimately consolidated before the Supreme Court of Florida in a 2013 filing, *The Florida Bar v. David James Stern*, 2010-51,725(17I), et al. ("the Florida Bar Investigations").  (*See* Smith T Decl. at ¶ 8).  The Florida Bar also conducted investigations into the actions of other DJSPA attorneys, including Gail Trenk and Miriam Mendieta, who was suspended from the practice of law in Florida in connection with her work at DJSPA.  (*See* Smith T Decl. at ¶ 8(b) (*citing* Report of Referee, at 16) and ¶ 8(e) (*citing* Order of Suspension)).  The Florida Bar also investigated DJSPA's paid consultants such as Jorge Luis Suarez who entered a guilty plea for a consent judgment in *The Florida Bar v. Jorge Luis Suarez*, Florida Bar File No. 2012-51,389(17I) (Fla.  Jan. 14, 2014).

---

[12]   The Florida Court of Appeals subsequently ruled, on January 6, 2012, that the subpoena had been improvidently issued.  (*See* Smith T Decl. at ¶ 7(a)).
[13]   Among those deposed were paralegals Tammy Kapusta on September 22, 2010; and Kelly Scott on October 4, 2010.  (*See* Smith T Decl. at ¶ 7).

(*See* Smith T Decl. at ¶ 8 (*citing* Report of referee, at 19)).   Suarez admitted to executing

thousands of improper affidavits while performing work for DJSPA's clients at DJSPA's

direction during the years 2006-10, in violation of numerous Rules Regulating the Florida Bar.

(*See* Smith T Decl. at ¶ 8 (*citing* Conditional Guilty Plea For Consent Judgment, at 2-5)).

50.     These investigations reached all aspects of DJSPA's mortgage foreclosure law

practice covering legal work performed over many years for all of the firm's clients.   The

investigations uncovered numerous violations of the Florida rules of professional conduct

governing DJSPA's attorneys and resulted in discipline of DJSPA attorneys, including Stern.

The Florida Supreme Court disbarred Stern on January 7, 2014.  (*See* Smith T Decl. at ¶ 8 (*The

Florida Bar v. David James Stern*, Case No. SC13-643 (Fla. Jan. 7, 2014)).   Consequently, there

is no doubt that at the time they began, these investigations were likely to result in adverse

decisions affecting DJSPA's ability to perform its obligations owed to GMACM, thereby

breaching ¶ 6.8 of the MSA between DJSPA and GMACM.

       b.     <u>Losing FNMA/FHLMC Designation</u>**.**

51.     The MSA also provides, in pertinent part, that "[DJSPA] represents and warrants

that it has, and will maintain throughout the Term of this Agreement, all licenses, franchises,

permits, authorizations and approvals materially necessary for the lawful conduct of its

business."   MSA at ¶ 6.6.   Over the years, Stern and other attorneys working for DJSPA

committed numerous violations of their obligations under the applicable Florida Rules of

Professional Conduct that resulted in the loss of their licenses to practice in Florida.  (*See*

discussion *supra* at ¶¶ 49-50; Smith T Decl. at ¶ 8).   In addition, the firm was denied permission

to prosecute FHLMC and FNMA foreclosures in November 2010.  (*See* Cunningham Decl. at ¶

14 (*citing* FNMA Servicing Notice, Nov. 10, 2010); Smith T Decl. at ¶ 12).   GMACM frequently

represented FHLMC and FNMA in connection with mortgage loans guaranteed by those entities.

22

For example, in 2010, GMACM's inventory of Florida loans in foreclosure totaled 15,412.  Of that loan population, there were 1,483 FHLMC loans and 2,995 FNMA loans.  DJSPA handled the majority of GMACM's Florida loans in foreclosure.  *See* Cunningham Decl. at ¶ 7.  As a result, DJSPA's removal from the approved attorney network list of FHLMC and FNMA meant that DJSPA was no longer authorized to manage thousands of foreclosed loans for GMACM.  In fact, Stern admits that within two weeks of FNMA and FHLMC disqualifying DJSPA, most, if not all, of the other servicers pulled their business from DJSPA. (*See* Smith T Decl. at ¶ 10 (*citing* Stern Depo., 186:22–25)). This constitutes a material breach of ¶ 6.6 of the MSA between DJSPA and GMACM, thereby barring DJSPA from recovery.

      c.    <u>Failure to Provide Competent Legal Services in Accordance with Good Industry Practices</u>**.**

52.      Paragraph 6.1 of the MSA requires DJSPA to provide services "in a diligent and workmanlike manner in accordance with good industry practices, by individuals of suitable training and skill."  Paragraph 6.4 of the MSA further provides that DJSPA's actions and performance of the work will comply with all applicable federal, state and local requirements," which includes of course, the attorneys' professional obligations as set forth in the Florida Rules of Professional Conduct and the Rules Regulating the Florida Bar.

53.      The Referee, who reviewed the considerable evidence compiled during the Florida Bar investigation into the numerous grievances against DJSPA, including the testimony of numerous attorneys and non-attorney supervisors at DJSPA, observed that the widespread incompetence and unethical conduct by DJSPA persisted between 2005 and 2009, and in some instances, extended as far back as 1999.  (*See* Smith T Decl. at ¶ 8 (*citing* Report of Referee, at 16-17)).

54.     For example, as recounted in the Florida Bar investigations, DJSPA's failure to appear for court-ordered hearings and conferences are described in an Order entered on October 20, 2009 by the Honorable Stanley H. Griffis III, in *BAC v. Noonan-Smith*, 2009CA000126 (Gilchrist Co. Cir. Ct.).   Judge Griffis' order summarizes the fifteen previous lawsuits that the court had dismissed due to DJSPA's "failure to appear at court ordered hearings."  (*See* Smith T Decl. at ¶ 8 (Complaint of the Florida Bar, at ¶¶ 66-69)).[14]

55.     On October 28, 2013, a Florida Bar Referee issued a Report as to the seventeen-count Complaint, concluding that "one attorney, David Stern, either in his capacity as the sole managing partner of his firm or in his individual capacity, created chaos on the courts of the State of Florida, *prejudicing the system as a whole*."   (*See* Smith T Decl. at ¶ 8 (Report of Referee, at p. 4 (emphasis added)).  The Referee's lengthy and detailed report is, in all respects, damning of DJSPA's extensive and protracted misconduct, observing that all of the "mishandling and inaction are on the Stern firm."  (*Id.* (*citing* Report of Referee, at p. 13)).

56.     For example, there was unrefuted evidence, in the form of testimony from DJSPA employees, that before clients would come to audit the files being handled by the firm, DJSPA employees would "chang[e] the client code in the file and hid[e] [the files] from the client."  (*See* Smith T Decl. at ¶ 7 (*citing* Deposition of Kelly Scott, 39:13–18)).  Ms. Scott elaborated

> If certain files weren't updated correctly and there was lack of process, they would change the client code in the file by – if it was Countrywide they would change it into a different client name with a sticker and print it out and then these files were transferred into a room where they would hide them and then keep them behind closed doors until the client would leave.

---

[14] Similar lapses by DJSPA in other courts are recounted throughout the Complaint of the Florida Bar, including in 10 separate cases pending in Florida's Second Judicial Circuit between July 28, 2010 and September 10, 2010.  (*See* Smith T Decl. at ¶ 8 (*citing* Complaint of the Florida Bar, at ¶ 94)).  As described elsewhere further below, DJSPA's gross incompetence and malpractice are known to have occurred as to GMACM files. *See* discussion at ¶¶ 31-32 & 80 herein.

(*Id*. at 39:21–25, 40:1–2).

57.    Additionally, employees report that the signing and notarizing systems in the firm did not conform to good industry practices. It was determined that DJSPA submitted attorney affidavits to support the recovery of attorney's fees in mortgage foreclosure actions that "contain[ed] falsehoods" and were plagued by other "improprieties and irregularities." (*See* Smith T Decl. at ¶ 8 (*citing* Complaint of the Florida Bar, at ¶¶ 62-63)).    With regards to notaries, Ms. Kapusta acknowledged, "[a]s far as notaries go…I don't think any notary actually used their own notary stamp. The team used them." (*See* Smith T Decl. at ¶ 7 (*citing* Kapusta Depo., 22:12–14)).    When documents were ready for an authorized signature, documents would be placed on a conference table and twice each day, the authorized signer would come by and sign thousands of documents, without reading or reviewing them.    (*See* Smith T Decl. at ¶ 7 (*citing* Scott Depo., 12-15)).    Further, the execution and the notarization would not occur contemporaneously. (*Id*.)    Witnesses who had not been present when the document was signed would sign their names as witnesses anyway. (*Id*.)

58.    As the Complaint in the Florida Bar investigation and the Report of the Referee demonstrate, the malfeasance perpetrated by DJSPA's staff, under Stern's direction and control, pervaded the culture of the firm throughout the period of time when DJSPA represented GMACM.    (*See* Smith T Decl. at ¶ 8 (Complaint of the Florida Bar, at ¶¶ 34, 45-53, 56-62; Report of Referee, at 31)).    The Referee found that Stern personally was guilty of numerous violations of the rules of professional conduct, much of which involved intentionally deceiving the clients of DJSPA about the status of their files.    (*Id*.; Report of Referee, at 19-24, 31).    The Referee recommended disbarment of Stern.    (*Id*. at 29-33).

59.     Although the Florida Bar investigation implicates the entirety of the DJSPA

operation in its representation of all of its mortgage lender clients, GMACM is able to

demonstrate numerous instances of misconduct perpetrated by DJSPA on GMACM matters

thereby violating the MSA.  Without the benefit of full discovery, the matters of which GMACM

presently has knowledge involving negligence by DJSPA are summarized in Exhibit S to Smith

T Decl. and are described elsewhere herein.

        d.     <u>Failure to Provide Adequate Oversight and Suitable Training</u>**.**

60.     As noted above, Paragraph 6.1 of the MSA requires DJSPA to utilize "individuals

of suitable training and skill."   Paragraph 8.8 of the Contract requires DJSPA "to select,

supervise and monitor the personnel performing" the work for GMACM.

61.     Among other things, the Florida Bar Referee pointed out that the "root cause" of

many of the problems behind the widespread misconduct of DJSPA was the firm's decision to

handle an "excessive volume of files," a decision that was within "the exclusive authority of its

sole managing partner, David Stern."   (*See* Smith T Decl. at ¶ 8 (*citing* Report of Referee, at p.

13)).  According to the Report, the inevitable result was that the firm failed to provide "proper

support, mentoring, and supervision," such that firm "associates were being 'set up for failure.'"

(*Id.* at 14 (emphasis supplied)).[15]

62.     In sworn deposition testimony, numerous DJSPA employees described the gross

lack of training and supervision at DJSPA.  Paralegals were trained by non-lawyers on how to

---

[15] The Referee found that Stern was "the only partner and sole managing partner" who bore "ultimate responsibility for his firm," under Rule 4-5.3(c) of the Rules Regulating the Florida Bar.  (*Id.* at 20).  The Referee found "the lack of supervision" to be "massive" which represented "the culture of the firm, as to the low level of competence and ethics." (*Id.* at 31).  She recommended that Stern be found guilty for violating, *inter alia*, Rules 4-5.1 and 4-5.3, which govern his duties to supervise others to act in conformance with the attorney's professional obligations.  (*Id.* at 27-28).

prepare motions and defaults.  (*See* Smith T Decl. at ¶ 7 (Depo. of Kelly Scott, at 54)).  Ms. Kapusta acknowledged

> [w]e had a lot of people that were hired in the firm that were just hired as warm bodies  to do work. The training process was very stupid and ridiculous. The girls would come out on the floor not knowing what they were doing. Mortgages would get placed in different files. They would get thrown out. There was just no real organization when it came to original documents. (*See* Smith T Decl. at ¶ 7 (*citing* Depo. of Tammy Lou Kapusta, 44:2–11)).

These examples demonstrate the lack of care in selecting, training and supervising employees, which constitutes an obvious and material breach of the MSA.

63.      The Florida Bar finding that DJSPA failed to train and supervise its personnel manifested itself in cases DJSPA handled for GMACM, including the *Mack* case.  As the pleadings reflect, one of the DJSPA attorneys assigned to supervise the *Mack* case was Miriam L. Mendieta.  (*See* Smith T Decl. at ¶ 14 (*citing* Answer to Complaint to Foreclose Mortgage, Affirmative Defenses and Counterclaims of Barry and Cheryl Mack)).  Mendieta was suspended by the Supreme Court of Florida, which ruled that as a supervising attorney for the Law Offices of David J. Stern, P.A., Mendieta failed to exercise her authority to ensure that the actions of those she managed comported with Florida Bar rules.  (*See* Smith T Decl. at ¶ 8 (*citing* Order of Suspension, *The Florida Bar v. Miriam L. Mendieta*, Case No. SC13-2424 (Fla. Feb. 10, 2014), *available                                                                                                at* http://www.floridabar.org/DIVADM/ME/MPDisAct.nsf/DisActFS?OpenFrameSet&Frame=Dis ActToC&Src=%2FDIVADM%2FME%2FMPDisAct.nsf%2FdaToc!OpenForm%26AutoFramed %26MFL%3DMiriam%2520L%2520Mendieta%26ICN%3D201150538%26DAD%3DSuspensi on)).  Those actions included a failure of attorneys she supervised to appear in court for conferences or hearings and inadequate oversight and handling of mortgage foreclosure files.

27

(*Id.*)  This is exactly what happened in the *Mack* case in which counterclaims, default judgments, discovery requests, court notices, and numerous correspondence from opposing counsel went unanswered during the period from September 2009 until May 2011.  (*See* Smith T Decl. at ¶ 14 (*citing* Final Order on Plaintiff's Motion to Set Aside Final Judgment and Set New Trial)).

> e.    Assigning Obligations Without Approval.

64.    The MSA also states that "[DJSPA] shall not assign, in whole or part, any of its obligations under this Agreement without Client's written consent.    [DJSPA] shall not subcontract any portion of its performance obligations under this Agreement without [GMACM's] prior written approval."  *Id.* at ¶ 18.1.  In 2009, Stern divested his "back office" operations into several separate publicly-traded entities, including DJSP Enterprises, which Stern exclusively used from that point to assist in the foreclosure processing.  (*See* Smith T Decl. at ¶ 10 (citing Deposition of David J. Stern, *The Law Offices of David J. Stern, P.A. v. Bank of America, Corp.*, No. aa-21349-CIV-MORENO, dated Aug. 16, 2012 at 21)).  As noted above, under the MSA, DJSPA was prohibited from assigning out such functions absent written approval by GMACM and, therefore, this too constitutes a material breach of the MSA between DJSPA and GMACM.  Upon information and belief, GMACM never consented to allowing DJSPA to assign its obligations under the MSA to a third party. (*See* Cunningham Decl. at ¶ 8).

> f.    Offshoring of Work.

65.    The MSA states that DJSPA "may perform . . . Services outside of the United States, . . . ***only if*** expressly agreed to by [GMACM] in the Statement of Work or otherwise."  MSA at ¶ 8.1 (emphasis added).  Stern admitted under oath that DJSPA outsourced work on files DJSPA handled to individuals working in the Philippines, starting as early as 2007.  (*See* Smith T Decl. at ¶ 10 (*citing* Stern Depo. 177:10–12, 17–25; 178:1)).  The employees in the Philippines inputted all of the information into the software that created the foreclosure documents.  (*See*

28

Smith T Decl. at ¶ 7 (*citing* Depo. of Tammy Lou Kapusta, 69: 4–8)).  Kapusta acknowledged

that this created "huge problem[s]" for the firm's handling of matters because of educational

differences.  (*Id.* at 69:11–13).  GMACM was not informed of and did not approve – expressly or

otherwise -- this offshoring operation. (*See* Cunningham Decl. at ¶ 8).

> **(3)**     **In Related Litigation, DJSPA has been Barred from Recovery as a Result of
> its Material Breaches**.

66.     DJSPA represented numerous mortgage service providers, including

CitiMortgage, Inc. ("CMI").  At about the same time it sued GMACM, on March 18, 2011,

DJSPA also brought suit against CMI, claiming CMI owed $4,439,794.53 for unpaid legal

services.  CMI moved for summary judgment, and on February 20, 2013, Judge Cooke entered

an order granting summary judgment to CMI against DJSPA's claims.  The filings were

submitted under seal and the Judge's opinion is not publicly available.

**(b)**     **THE CLAIMS ARE OVERSTATED AND SUBJECT TO OFFSETS**.

> **(1)**     *Stern Is Not Entitled To Recover Certain Elements Of The Claims*.

> a.     Sums Related to FNMA & FHLMC Loans**.**

67.     As of the Petition Date, DJSPA asserted that sums were due and owing to them by

GMACM related to 10,203 outstanding invoices.  Two thousand four hundred sixty-eight (2,468)

of these invoices related to agency loans[16] and 7,735 invoices pertain to non-agency loans.  More

specifically, DJSPA asserts that $411,687.15 is owed for work related to FNMA loans and

$271,820.75 is owed for work related to FHLMC loans.

68.     As noted above, contemporaneous with the prosecution of the Florida Lawsuit

between DJSPA and GMACM, DJSPA was also in litigation involving alleged unpaid fees for

legal services against FHLMC and FNMA as well as other mortgage lenders.  (*See* Smith T Decl.

---

[16] Agency loans mean those loans owned by either FNMA or FHLMC.

at ¶ 12-13 (*citing The Law Offices of David J. Stern, P.A. v. Federal Home Loan Mortgage Corp.*, Case No. 11-60623-CIV-Seitz/Simonton (U.S. Dist. Ct. S.D. Fla. Mar. 23, 2011) (the "FHLMC Suit"); Federal National Mortgage Assoc. a/k/a Fannie Mae v. The Law Offices of David J. Stern, P.A., No. 32-194Y-0016411 (American Arbitration Association) (the "FNMA Arbitration")).   In connection with their legal disputes, FHLMC and FNMA requested that DJSPA invoices relating to FHLMC and FNMA loans (except those invoices relating to "curative work" as described below) be transferred, respectively, to the FHLMC Suit and FNMA Arbitration.   (*See* Smith T Decl. at ¶13).   Pursuant to filed stipulations of DJSPA and GMACM, the FHLMC and FNMA loans were transferred from the Florida Lawsuit to the FHLMC Suit and the FNMA Arbitration and were no longer part of the Florida Lawsuit at the time of the filing of these Chapter 11 cases.[17]   (*See Id.*).   Therefore, the total sum of $683,507.90 is not recoverable through Claim Nos. 5275 and 7464 filed by DJSPA.

       b.      **Further Reductions to Asserted Claim Amounts.**

69.   Therefore, only two elements of the claim remain – "curative" work and other alleged outstanding amounts.   As noted above, DJSPA asserts GMACM failed to pay his firm $2,498,475.82 for services provided before the Petition Date.

70.   Upon information and belief, among the invoices for which DJSPA seeks payment are ones in the collective amount of $1,158,885.04 that were submitted to (and denied by) GMACM before the Petition Date.   (*See* Cunningham Decl. at ¶ 19).   It was GMACM's practice to provide their outside counsel, such as DJSPA, with fee payment guidelines that set forth the items that counsel could and could not bill to GMACM.   These guidelines were encompassed within an "Attorney Expectation Document."   GMACM issued this document

---

[17]   To the extent any work performed on these loans related to curative work, such invoices remained a part of the Florida Lawsuit.

because, as a loan servicer, it managed an enormous volume of loan files and had its servicing

costs (including fees of its outside foreclosure counsel) reimbursed by the investor for the

underlying loan.  Therefore, in order to ensure that GMACM could obtain reimbursements from

the investors equivalent to the costs it incurred, GMACM issued a set of guidelines for its

outside attorneys that described the services that the firms could bill for, how much could be

billed for the particular services and the time within which bills had to be submitted to GMACM

for repayment, as well as the consequences of failing to submit timely invoices.  This document

provides, in pertinent part, that charges by counsel over the amount allowed for investor

reimbursement that do not have GMACM/investor approval will not be paid by GMACM.  In

addition, within the Attorney Expectation Document, GMACM advises counsel that GMACM

reserves the right to decline payment of the invoice if it is not submitted within the required

timelines. (*See* Cunningham Decl. at ¶ 19).  DJSPA invoices totaling $1,158,885.04 were denied

for payment because either the invoice amounts were above the payment thresholds set by the

applicable investor(s) and/or the invoices were not submitted on a timely basis to GMACM.

(*See Id.*).  Therefore, even if the Stern Claims are not disallowed in their entirety under the first

breach doctrine, DJSPA may be entitled to a claim of no greater than $1,339,590.78 on account

of unpaid prepetition invoices.

71.    As previously noted, DJSPA seeks $2,979,500 from GMACM for the "curative

work" it contends to have performed at GMACM's request.  As described above, as part of its

ongoing remediation efforts at the time, GMACM had both its own employees as well as outside

counsel on site at DJSPA's offices reviewing files in the fall 2010.  In fact, the curative work

provided by DJSPA was untimely and of a very low quality.  In order to complete the initial

process of securing a corrective affidavit, GMACM's in-house personnel (and <u>not</u> DJSPA)

prepared the information and thereafter, supplied DJSPA with a letter documenting the corrections made to the original affidavit. Therefore, the only purported curative services DJSPA provided were limited to pulling files, providing original or copies of affidavits and making corrections to affidavits, which was significantly less than the scope of curative services ultimately invoiced by DJSPA and contemplated by the September 27 Letter. Furthermore, as a result of the files being transferred to other firms, not one of the affidavits that were drafted by DJSPA were used by other firms or DJSPA to remediate loans as required by GMACM. (*See* Cunningham Decl. at ¶ 12). As a result of DJSPA not providing the services for which it is seeking payment, DJSPA is not entitled to the amounts requested in the Stern Claims related to curative work purportedly performed in the fall of 2010.

### (2)    Potential Offsets Against Any Allowed Claim Amounts.

72.    Delaware courts make clear that "in order to recover damages for . . . breach of contract, plaintiff must demonstrate substantial compliance with all the provisions of the contract." *Emmett S. Hickman Co. v. Emilio Capaldi Developer, Inc.*, 251 A.2d 571, 573 (Del. Super. Ct. 1969) (citing *Carroll v. Cohen*, 91 A. 1001, 1003 (Del. Super. Ct. 1914)). A contract has been substantially performed "where all the essentials necessary to the full accomplishment of the purposes for which the thing contracted for…" are performed. *Trader v. Grampp Builders, Inc.*, 263 A.2d 304, 305 (Del. Super. Ct. 1970).

73.    Relatedly, Delaware courts determine damages in a breach of contract action "as if the parties had fully performed the contract." *Reserves Dev. LLC v. Crystal Props., LLC*, 986 A.2d 362, 367 (Del. 2009). If the performance of the party bringing the breach of contract action does not meet the contractual requirements, the trial judge shall deduct from the damages amount, an amount attributed to the non-conforming work. *Id.*; *see also Frunzi v. Paoli Servs., Inc.*, No. N11A-08-001-MMJ, 2012 WL 2691164, at *9 (Del. Super. Ct. July 6, 2012) (reducing

ny-1165375

contract damages by the cost of the work that was not fully performed). Florida courts also apply the same offsetting principle. *Ocean Ridge Dev. Corp. v. Quality Plastering, Inc.*, 247 So. 2d 72, 75 (Fla. Dist. Ct. App. 1971) ("Substantial performance is that of a contract which, while not full performance, is so nearly equivalent to what was bargained for that it would be unreasonable to deny the promise the full contract price subject to the promisor's right to recover whatever damages may have been occasioned him by the promisee's failure to render full performance.")

74.    Delaware contract law further provides that any damages awarded to a party claiming breach of contract be offset against amounts incurred by the other party to the contract. *Reserves Dev.*, 986 A.2d at 367; *Frunzi*, 2012 WL 2691164, at *9; *Rothensies v. Elec. Storage Battery Co.*, 329 U.S. 296, 299 (1946).

75.    Accordingly, if the Court does not disallow the Claims in their entirety due to DJSPA's material breaches of the MSA and SOWs, then any amounts that the Court determines DJSPA is entitled to recover must be offset against GMACM's damages flowing from DJSPA's failure to provide substantial performance.

76.    In particular, as a result of the Claimant's inability to provide the requisite services contemplated by the MSA, GMACM not only had to retain new counsel, at a significant cost, to handle all of the foreclosure files being handled by the Claimant, but also had to pay significant monetary penalties to both FNMA and FHLMC because of the delay in prosecuting foreclosures being handled by the Claimant, as well as other costs associated with litigations mishandled by the Claimant prior to the termination of its relationship with GMACM.

a.    Timeline Penalties.

77.    From February 2011 through February 2013, GMACM was delayed in pursuing foreclosure proceedings against delinquent borrowers because i) appropriate procedures were not followed by DJSPA during the time such files were in its possession and under its responsibility,

which required other firms to perform new foreclosure services and initiate new actions or amend prior actions, and ii) the courts became backlogged due to a significant amount of new or amended actions having to be filed with the court in order to remedy DJSPA's mistakes. As a result of having to reassign the files being managed by DJSPA and incurring delays pursuing foreclosures, GMACM incurred timeline penalties of $1,220,865.96, which it had to pay to FNMA and FHLMC. More specifically, there are 21 FHLMC loans that took more than two years (and in some instance, five years) to complete the foreclosure sale from the date when the loan was first referred to foreclosure, which led to penalties of $345,570.00. Similarly, there are 58 FNMA loans that took more than two years (and, in some instances, well over four years) to complete the foreclosure sale from the date when the loan was first referred to foreclosure, which led to penalties of $875,295.56. Therefore, but for DJSPA's actions, GMACM would not have incurred such penalties. (*See* Cunningham Decl. at ¶ 19).

   b.  File Transfer Costs**.**

  78.  Upon the termination of its professional relationship with the Claimant, GMACM had to transfer 9,206 loan files that were being handled by Claimant to new law firms. This included 6,549 non-agency loans (i.e., loans where neither Fannie Mae nor Freddie Mac were the investor). At the time, GMACM and the new firms agreed that GMACM would pay each firm $300 per loan file to cover the time the firm would need to familiarize itself with the facts of each file. GMACM was not entitled to have these file transfer costs reimbursed by the loan investors. As a result, GMACM was damaged in the amount of $1,964,700 (the "Transfer Costs"). But for the Claimant's inability to provide the professional services it promised to GMACM, which required GMACM to transfer all of its files to new law firms, GMACM would never have incurred these costs. (*See* Cunningham Decl. at ¶ 22). Therefore, GMACM is

entitled to offset the Transfer Costs against any allowed claim the Claimant may have against

GMACM in these Chapter 11 cases.

    Stern's Negligent Handling of Loan Files.

    79.    As referenced above, GMACM's investigation has documented numerous

instances in which loan files were poorly managed and mishandled by DJSPA, resulting in

damage to GMACM.  (*See* supra ¶¶ 30-32).  These matters are summarized in Exhibit S to the

Smith T Decl and incorporated herein.   These matters involved the submission of invalid

documentation by the Claimant to the Florida courts, loss of loan documents, failure to respond

to discovery propounded by adversaries, failure to respond to dispositive motions, and failure to

respond to counterclaims which, in several instances, resulted in default judgments being entered

as to loans owned or serviced by GMACM.   GMACM was prejudiced by DJSPA's acts of

malpractice, including having to pay legal counsel to attempt to correct DJSPA's flagrant errors.

The amount of damages presently known to GMACM resulting from DJSPA's negligence is at

least $865,104.33.

    80.    Beyond its inability to properly manage litigation on behalf of GMACM, the

Claimant failed to recover costs from borrowers that the servicer was rightly entitled to receive

when it enforced its remedies against the borrower.   For example, in chapter 13 cases, the

Claimant failed to recoup from the debtor-borrower all of the costs incurred by GMACM in

enforcing the loan terms because the borrower completed a chapter 13 repayment plan that was

predicated on a cure amount that was not inclusive of all of GMACM's costs.  As a result,

GMACM paid the Claimant for its work, yet the Claimant never took the appropriate steps to

ensure that GMACM was made whole.  Similarly, the Claimant would file a stay relief motion

against the borrower, but fail to include all of GMACM's costs in the order granting relief from

the automatic stay that also awarded GMACM its costs.  In other instances, the Claimant would

file a motion for stay relief against a borrower that was not warranted yet still invoice GMACM

for its time on a meritless motion.  On other occasions, the Claimant took so long to foreclose on

a property that the loan investor (e.g., the Veterans Administration or "VA") would not

reimburse GMACM for its property preservation costs because the inordinate delay in

foreclosing on the loan was beyond the acceptable foreclosure period permitted by under VA

servicing guidelines.  As a result, GMACM lost the opportunity to have its costs reimbursed in

these circumstances.  Similarly, other investors had their own limited timeframes within which

they would reimburse a servicer for its costs, including professional fees.  Accordingly, in certain

instances, the Claimant submitted bills beyond an investor's deadline, GMACM paid the

Claimant but lost the ability to have that cost reimbursed.  In sum, GMACM was damaged by the

Claimant because, but for the Claimant's actions, GMACM would have been able to rightfully

recover the fees it paid to the Claimant.  These matters are identified by Loan ID # in the

Cunningham Decl. and incorporated herein.    The amount of damages presently known to

GMACM resulting from DJSPA's negligence is at least $57,139.98. (*See* Cunningham Decl. at ¶

21).

(c)    **DJSPA'S CLAIMS FOR OPEN ACCOUNT OR ACCOUNT STATED ARE
REDUNDANT AND OTHERWISE INVALID**.

81.    In the Florida Lawsuit, DJSPA also asserted causes of action for Open Account

and Account Stated, but these claims are redundant to its Breach of Contract claim.  The Stern

Claims do not suggest that these additional claims seek amounts any different from the amounts

sought pursuant to the alleged breach of contract claim.  Nor could they, since the parties'

relationship was expressly made subject to the written agreements between them.  (MSA, 21.11

(providing for Exclusion of Other Terms and Conditions).

36

82.     Regardless, a claim for Open Account is unavailable to DJSPA since there must be at least some expectation that the parties will work together again in the future. *See Robert W. Gottfried, Inc. v. Cole,* 454 So. 2d 695, 696 (Fla. Dist. Ct. App. 1984) (explaining that open account requires "the expectation of further transactions subject to future settlement and adjustment").  As Stern has been individually disbarred and DJSPA dissolved, there is of course no chance that the parties will resume working together in the future.[18]

83.     Second, for an account stated to exist as a matter of law, there must be an agreement between the parties that a certain balance is correct and due and an express or implicit promise to pay this balance. *Harold R. Clune, Inc. v. Healthco Med. Supply*, 78 A.D.2d 914 (1980). Something more than one party simply sending hundreds of invoices is required for the court to find an agreement between the parties that a certain balance is correct and due. *Breezy Bay, Inc. v. Indusria Maquiladora Mexicana, S.A.*, 361 So. 2d 440 (Fla. Dist. Ct. App. 1978). Here, DJSPA cannot prove that it did the work shown on the claimed invoices and GMACM never agreed, explicitly or implicitly, to pay a certain balance. Thus, to the extent that DJSPA is entitled to seek recovery, it must do so under breach of contract, not open account or account stated.

---

[18] Stern wrote GMACM on March 1, 2011 confirming that the widespread firings of the firm by firm clients resulted in DJSPA being prevented "from performing any services to facilitate keeping [GMACM] cases active" and informing GMACM that "as of March 31, 2011 [sic], this firm will completely cease any and all services on [GMACM's] behalf."  (*See* Cunningham Decl. at ¶ 17).

37

## NOTICE

84.     The Liquidating Trust has provided notice of this Objection in accordance with the Case Management Procedures Order, approved by this Court on May 23, 2012 [Docket No. 141] and the Procedures Order.

## CONCLUSION

WHEREFORE, the Liquidating Trust respectfully request entry of the Proposed Order (i) disallowing the Stern Claims in their entirety with prejudice, and (ii) such other and further relief as the Court may deem proper.

Dated: April 27, 2015

/s/ Jordan A. Wishnew
Norman S. Rosenbaum
Jordan A. Wishnew
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

- *And* -

John W. Smith T (admitted *pro hac vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8521
Facsimile: (205) 488-6521

*Counsel for the ResCap Liquidating Trust*

ny-1165375