**<u>Exhibit 2-A</u>**

**Cunningham Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DECLARATION OF DAVID CUNNINGHAM IN SUPPORT OF**
**RESCAP LIQUIDATING CLAIMS TRUST'S OBJECTION TO**
**PROOFS OF CLAIM NOS. 5275 AND 7464**
<u>**FILED BY THE LAW OFFICES OF DAVID J. STERN, P.A.**</u>

I, David Cunningham, hereby declare as follows:

   1.  I serve as Director of Regulatory and Compliance for the ResCap Liquidating Trust (the "<u>Liquidating Trust</u>"), established pursuant to the terms of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6030] confirmed in the above-captioned Chapter 11 Cases. During the Chapter 11 Cases, I served as Director for Residential Capital, LLC ("<u>ResCap</u>"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases (collectively, the "<u>Debtors</u>"). I have been employed by affiliates of ResCap since August of 2001. I began my association with ResCap in 2001 working as a Foreclosure Specialist in the Loan Servicing Operation. In 2002, I became a Team Leader in the Foreclosure Department, a position I held until 2003 when I became a Manager. In 2007, I became the Director, Foreclosure Operations. In February of 2013, I became Director of Regulatory and Compliance. In my current position, I am responsible for ensuring that ResCap satisfies its obligations under settlements entered into

1

ny-1165872

with the Department of Justice and the Federal Reserve Board. I am authorized to submit this declaration (the "Declaration") in support of the *ResCap Liquidating Trust's Objection To Proofs of Claim Nos. 5275 and 7464 Filed By David J. Stern* (the "Objection").[1]

   2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations, information learned from my review of relevant documents and information I have received through my discussions with other former members of the Debtors' management or other former employees of the Debtors, the Liquidating Trust, its professionals and consultants. If I were called upon to testify, I could and would testify competently to the facts set forth in the Objection on that basis.

   3. In my capacity as Director, I am familiar with the claims reconciliation process in these Chapter 11 Cases and I assist the Liquidating Trust with the claims reconciliation process. Except as otherwise indicated, all statements in this Declaration are based upon my familiarity with the Debtors' books and records, the Debtors' schedules of assets and liabilities and statements of financial affairs filed in these Chapter 11 Cases (collectively, the "Schedules"), and/or my review of relevant documents. I or my designee at my direction have reviewed and analyzed the proof of claim form and supporting documentation filed by the Claimant. Since the Plan went effective and the Liquidating Trust was established, I, along with other members of the Liquidating Trust have participated in the claims reconciliation process, analyzed claims, and determined the appropriate treatment of the same. In connection with such review and analysis, where applicable, I or other Liquidating Trust personnel, together with professional advisors, have reviewed (i) information supplied or verified by former personnel in departments within the Debtors' various business units, (ii) the Books and Records, and (iii) the Schedules.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Objection.

4.      The Claimant filed proof of claim number 5275 against GMACM in the amount of $6,161,483.70 on account of outstanding sums purportedly due and owing as of February 2011.  The Claim is premised on the Complaint filed on June 2, 2011 in the Circuit Court of the 17th Judicial District, In and For Broward County, Florida against GMACM, which alleged Breach of Contract (Count I), Open Account (Count II), and Account Stated (Count III). The Complaint seeks $6,161,483.70 (plus interest and costs), which Stern contends GMACM owes his firm for legal work allegedly performed but for which he was not compensated. There are multiple components to the Claims: alleged unpaid invoices for (a) "curative" work GMACM requested of the Claimant in 2010, (b) services rendered before GMACM terminated its relationship with the Claimant, and (c) sums related to Fannie Mae and Freddie Mac matters.

**GMAC Mortgage's Relationship With The Law Offices of David J. Stern, P.A.**

5.      The Claimant, Law Offices of David J. Stern, P.A. ("DJSPA"), is a Florida law firm that held itself as specialists in handling residential mortgage foreclosures, bankruptcy, evictions, the sale of real estate owned properties by foreclosing lenders, and other foreclosure-related litigation in Florida.  At all relevant times, David J. Stern ("Stern") was the principal of DJSPA.

6.      GMACM retained DJSPA to provide legal services in connection with mortgage loans for Florida properties that GMACM was servicing on behalf of various financial institutions, including, but not limited to, Federal National Mortgage Association (a/k/a Fannie Mae, hereafter "FNMA") and Federal Home Loan Mortgage Corp. (a/k/a Freddie Mac, hereafter "FHLMC").  On January 17, 2007, GMACM formalized its pre-existing attorney-client relationship with DJSPA and entered into a Master Services Agreement ("MSA") and Statement of Work ("SOW"), which was amended and modified from time-to-time, and provided for

3

ny-1165872

DJSPA to handle residential mortgage foreclosures, bankruptcy, evictions, and the sale of real estate owned properties in the State of Florida. A copy of the MSA and the subsequent SOWs (entered into prior to the 2010 termination of the GMACM relationship) are collectively attached hereto as **Exhibit A**.

7.      According to the invoices submitted by DJSPA that purport to substantiate the Stern Claims, during the period from 2007 until November 2010, DJSPA performed legal work on thousands of mortgage files serviced by GMACM.  For example, in 2010, GMACM's inventory of Florida loans in foreclosure totaled 15,412.  Of that loan population, there were 1,483 FHLMC loans and 2,995 FNMA loans.  DJSPA handled the majority of GMACM's Florida loans in foreclosure.  Certain support services for the legal work provided by DJSPA to GMACM were performed by one or more separately-incorporated entities in which Stern held a substantial interest and over which Stern maintained substantial control.  One of these entities was DJS Processing, LLC, which was created by DJSPA to provide non-legal services needed to process foreclosure files and ancillary services for DJSPA.[2]

8.      Under the MSA, DJSPA was prohibited from assigning out such functions absent written approval by GMACM.  Upon information and belief, GMACM never consented to allowing DJSPA to assign its obligations under the MSA to a third party.  The MSA further states that Stern "may perform . . . Services outside of the United States, . . . ***only if*** expressly agreed to by [GMACM] in the Statement of Work or otherwise."  MSA at ¶ 8.1.  Upon information and belief, GMACM was not informed of and did not approve – expressly or otherwise -- this offshoring operation.

---

[2] According to the Florida Secretary of State's website, DJSPA is the managing member of DJS Processing, LLC, which is a Delaware entity that was organized in 2009.  See Smith T Decl. at ¶ 6 (DJS Processing, LLC Application for Authorization to Transact Business in Florida, FLORIDA DEPARTMENT OF STATE – DIVISION OF CORPORATIONS, http://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2009%5C1005%5C00209278.Tif&documentNumber=M09000003832).

**Curative Work**

9.      During the time period of the Florida Attorney General's investigation of DJSPA, GMACM became aware of problems with the potentially improper or questionable affidavits that had been filed on GMACM's mortgage loan files. On or about August 23, 2010, GMACM sent attorneys and staff to meet with Mr. Stern at DJSPA's offices to discuss the potential defects with affidavits of indebtedness (the "Affidavits") submitted in judicial foreclosures in Florida. GMACM thereafter immediately sought to address remediation of the Affidavits, including submitting corrected affidavits.

10.     On September 27, 2010, David Stern sent a letter to GMACM (the "September 27 Letter") requesting flat fee billing for specific services that DJSPA proposed to provide to assist GMACM with completing remediation. (*See* **Exhibit B** hereto). The September 27 Letter contemplated a specific flat fee for services for each population of loans that required affidavit remediation. (*See Id*.). On October 14, 2010, GMACM responded to DJSPA's billing proposal agreeing generally to the proposed rates so long as DJSPA met specific timing expectations. (*See* **Exhibit C** hereto (the "GMACM Letter")). The GMACM Letter made clear, however, that DJSPA was only authorized to proceed with work on a portion of the files requiring remediation.

11.     Based on my review of the Debtors' books and records, it is my understanding that four thousand two hundred and ten (4,210) Affidavits required remediation, which included two thousand nine hundred forty-one (2,941) foreclosures that were filed against a borrower but for which no judgment was entered as well as one thousand two hundred sixty-nine (1,269) foreclosures in which a judgment has been entered but for which a sale had not yet been held.

5

ny-1165872

12. As part of its ongoing remediation efforts at the time, GMACM had both its own employees as well as outside counsel on site at DJSPA's offices reviewing the files in the Fall of 2010. The curative work provided by DJSPA was untimely and of a very low quality. In order to complete the initial process of securing a corrective affidavit, GMACM's in-house personnel (and not DJSPA) prepared the information and thereafter, supplied DJSPA with a letter documenting the corrections made to the original affidavit. Therefore, the only purported curative services DJSPA provided were limited to pulling files, providing original or copies of affidavits and making corrections to affidavits, which was significantly less than the scope of curative services ultimately invoiced by DJSPA and contemplated by the September 27 Letter. Furthermore, as a result of the files being transferred to other firms, not one of the "corrected" affidavits that were drafted by DJSPA were used by other firms or DJSPA to remediate loans as required by GMACM. As a result, DJSPA is not entitled to any sums for its efforts in fall 2010 to provide curative work.

**Termination of Relationship With Claimant**

13. In light of GMACM's need to terminate its professional relationship with DJSPA and obtain possession of the loan files and move them to new law firms to be serviced, on November 5, 2010, GMAC and DJSPA entered into an Escrow Agreement (a copy of which is attached hereto as **Exhibit D**), wherein the law firm of Bradley Arant Boult Cummings LLP ("BABC") agreed to serve as Escrow Agent and hold the sum of $3 million in escrow while GMACM and DJSPA resolved their dispute over attorneys' fees and expenses. These funds remain in escrow with BABC at this time. With the Escrow Agreement in place, GMACM instructed DJSPA to return all of GMACM's files.

14. FHLMC terminated its relationship with DJSPA by letter dated November 1, 2010, which meant that DJSPA was no longer authorized to participate in the designated counsel program with FHLMC. On November 10, 2010, FNMA notified GMACM that FNMA had "terminated its relationship with the Law Offices of David J. Stern, P.A." and barred all loan servicers from referring "any future Fannie Mae matters to the Stern Firm." (*See* Servicing Notice, Nov. 10, 2010), attached hereto as **Exhibit E**).

15. In light of the serious ethical cloud hanging over DJSPA arising from the formal investigation by the Florida Attorney General, together with DJSPA's loss of approval to prosecute foreclosures of loans owned by FNMA and FHLMC, GMACM officially terminated its relationship with DJSPA on or about November 15, 2010.

16. Thereafter, on or about February 25, 2011, DJSPA sent GMACM a letter demanding the sum of $6,161,483.70 for unpaid legal services it purportedly provided to GMACM. When the demand went unsatisfied, DJSPA commenced a lawsuit against GMACM.

17. Moreover, on March 1, 2011,[3] Stern wrote GMACM (and all of the other firms DJSPA did work for in Florida) confirming that the widespread firings of the firm by firm clients resulted in DJSPA being prevented "from performing any services to facilitate keeping [GMACM] cases active" and informing GMACM that "as of March 31, 2011 [sic], this firm will completely cease any and all services on [GMACM's] behalf." (*see* Letter dated from DJSPA attached hereto as **Exhibit F**).

---

[3] The letter was incorrectly dated March 1, 2010.

**Unpaid Invoices**

18. As of the Petition Date, DJSPA asserted that sums were due and owing to them by GMACM related to 10,203 outstanding invoices. Two thousand four hundred sixty-eight (2,468) of these loans related to agency loans, and seven thousand seven hundred thirty-five loans (7,735) were non-agency loans.

19. Upon information and belief, among the invoices for which DJSPA seeks payment are ones in the collective amount of $1,158,885.04 that were submitted to GMACM before the Petition Date (and denied by GMACM before the Petition Date). It is my understanding that such invoices were denied for payment because either the invoice amounts were above the payment thresholds set by the applicable investor(s) and/or the invoices were not submitted on a timely basis to GMACM. More specifically, based on the loan-level detail maintained in the Debtors' books and records, DJSPA re-invoiced GMACM for 1,515 loans totaling $647,175.94 that had been submitted previously to GMACM for payment and denied, and submitted 1,384 invoices totaling $511,709.10 well after the permissible period of time for reimbursement.[4] It was GMACM's practice to provide its outside counsel, such as DJSPA, with fee payment guidelines that set forth the items that counsel could and could not bill to GMACM. These guidelines were encompassed within an "Attorney Expectation Document." GMACM regularly issued this document because, as a loan servicer, it managed an enormous volume of loan files and had its servicing costs (including fees of its outside foreclosure counsel) reimbursed by the investor for the underlying loan. Therefore, in order to ensure that GMACM could obtain reimbursements from the investors equivalent to the costs it incurred, GMACM issued a set of guidelines (that was updated and distributed to DJSPA periodically) for its outside

---

[4] Due to the sheer volume of paper that would be required to substantiate this statement, the Trust has not attached is to the declaration, but it can be made available to DJSPA or the Court upon request.

8

ny-1165872

attorneys that described the services that the firms could bill for, how much could be billed for the particular services and the time within which bills had to be submitted to GMACM for repayment, as well as the consequences of failing to submit timely invoices. This document provides, in pertinent part, that charges by counsel over the amount allowed for investor reimbursement that do not have GMACM/investor approval will not be paid by GMACM. In addition, within the Attorney Expectation Document, GMACM advises counsel that GMACM reserves the right to decline payment of the invoice if it is not submitted within the pre-determined timelines. A copy of the most recent Attorney Expectation Document that was provided to DJSPA in March 2010 is attached hereto as **Exhibit G**.

**Timeline Penalties**

20. From February 2011 through February 2013, GMACM was delayed in pursuing foreclosure proceedings against delinquent borrowers because i) appropriate procedures were not followed by DJSPA during the time such files were in its possession and under its responsibility, which required other firms to perform new foreclosure services and initiate new actions or amend prior actions, and ii) the courts became backlogged due to a significant amount of new or amended actions having to be filed with the court in order to remedy DJSPA's mistakes. Servicing guidelines set by FHLMC and FNMA impose deadlines by which a servicer, such as GMACM, must obtain a foreclosure judgment on delinquent loans for which either FNMA or FHLMC is the investor.[5] If the deadline is not met, then FNMA and FHLMC are entitled to compensatory damages from the loan servicer in the form of a per diem fee.

---

[5] *See* excerpt from FNMA Servicing Guide, dated August 31, 2010, which discusses foreclosure time frames and compensatory fees for breach of servicing obligations. Based on my servicing experience, FHLMC's servicing practices, as it relates to foreclosure time frames and compensatory fees, are generally consistent with those of FNMA. A copy of the excerpt is attached hereto as **Exhibit H**.

9

ny-1165872

FNMA and FHLMC regularly provided compensatory damage reports to GMACM, which were maintained in GMACM's books and records.

21.  As a result of having to reassign the files being managed by DJSPA and incurring the aforementioned delays pursuing foreclosures, GMACM incurred timeline penalties of approximately $1,220,865.96, which it had to pay to FNMA and FHLMC. More specifically, there are 21 FHLMC loans that took more than two years (and in some instance, five years) to complete the foreclosure sale from the date when the loan was first referred to foreclosure, which led to penalties of $345,570.00. Similarly, there are 58 FNMA loans in which it took more than two years (and in some instances, well over four years) to complete the foreclosure sale from the date when the loan was first referred to foreclosure, which led to penalties of $875,295.56. Therefore, it is my understanding that but for DJSPA's actions, GMACM would not have incurred such penalties. A worksheet, together with the relevant loan level data, setting forth the information above is attached hereto as **Exhibit I**.

**Transfer Fees**

22.  Upon the termination of its professional relationship with the Claimant, GMACM had to transfer 9,206 loan files that were being handled by Claimant to new law firms. This included 6,549 non-agency loans (i.e., loans where neither FNMA nor FHLMC were the investor). At the time, GMACM and the new firms agreed that GMACM would pay each firm $300 per loan file to cover the time the firm would need to familiarize itself with the facts of each file. GMACM was not entitled to have these file transfer costs reimbursed by the loan investors. As a result, GMACM was damaged in the amount of $1,964,700 (the "Transfer Costs"). But for the Claimant's inability to provide the professional services if promised to GMACM, which required GMACM to transfer all of its files to new law firms, GMACM would

10

never have incurred these costs. A worksheet, together with the relevant loan transfer data, is attached hereto as **Exhibit J**.

### Other Sums Owed by Claimant

23. The Claimant failed to recover costs from borrowers that the servicer was rightly entitled to receive when it enforced its remedies against the borrower. For example, in chapter 13 cases, the Claimant failed to recoup from the debtor-borrower all of the costs incurred by GMACM in enforcing the loan terms because the borrower completed their chapter 13 repayment plan that was predicated on a cure amount that was not inclusive of all of GMACM's costs. As a result, GMACM paid the Claimant for his time, yet the Claimant never took the appropriate steps to ensure that GMACM was made whole. Similarly, the Claimant would file a stay relief motion against the borrower, but fail to include all of GMACM's costs in the order granting relief from the automatic stay that also awarded GMACM its costs. In other instances, the Claimant would file a motion for stay relief against a borrower that was not warranted yet still invoice GMACM for its time on a meritless motion. On other occasions, the Claimant took so long to foreclose on a property that the loan investor (i.e., the Veterans Administration ("VA")) would not reimburse GMACM for its property preservation costs because the inordinate delay in foreclosing on the loan was beyond the acceptable foreclosure period permitted under VA servicing guidelines. As a result, GMACM lost the opportunity to have its costs reimbursed in these circumstances. Similarly, other investors had their own limited timeframe within which they would reimburse a servicer for its costs, including professional fees. Accordingly, in certain instances, the Claimant submitted bills beyond an investor's deadline, GMACM paid the Claimant but lost the ability to have that cost reimbursed. In sum, GMACM was damaged by the Claimant because, but for the Claimant's actions, GMACM would have been able to rightfully

11

ny-1165872

recover the fees it paid to the Claimant. In the ordinary course of the Debtors' business, these matters were tracked in the Loss Control Database ("LCD"), which was utilized by GMACM's loan servicing group. The relevant losses, which are itemized in **Exhibit K** hereto, are identified by Loan ID number and include excerpts from the LCD that were inputted at the time of the loss by an associate in GMACM's loan servicing department. The amount of damages presently known to GMACM resulting from DJSPA's negligence is at least $57,139.98.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 24, 2015

/s/ David Cunningham  
David Cunningham  
Director for ResCap Liquidating Trust

13

ny-1165872