## Exhibit A

# MASTER SERVICES AGREEMENT
## LAW-04018

This Master Services Agreement (the "Agreement") is made as of January 17, 2007, , (the "Effective Date") by and between **GMAC Mortgage Group, LLC**, a limited liability company, having a place of business at 100 Witmer Road, Horsham, PA 19044, and **Law Firm of David J. Stern**, a Florida corporation, having its principal place of business at 801 S. University Drive, Suite 500, Plantation, FL 33324 ("Company").

### RECITALS

**WHEREAS**, GMAC Mortgage Group, LLC wishes to engage the services of Company, to provide certain services, as defined below, upon the terms and conditions specified herein, for the benefit of GMAC Mortgage Group, LLC ("Client") and the direct and indirect subsidiaries of Residential Capital, LLC (collectively "GMACR")

**WHEREAS**, it is the intention of the parties to establish this Agreement to govern the respective rights, duties and obligations of the parties.

**THEREFORE**, in consideration of the mutual covenants, agreements, warranties, and representations made and contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereby agree as follows.

Services shall be performed in accordance with the attached Terms and Conditions, Statement(s) of Work and all other documentation referred to herein and attached hereto.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

GMAC Mortgage Group, LLC8

By: _William J. Maguire_

Printed Name  **William J. Maguire**
**Senior Vice President**

Title _____

Law Firm of David J. Stern

By: _____

Printed Name David J. Stern,

Title  President

This Agreement has been approved by the following Client business unit:

Business Unit: _____

By: _____

Printed Name _____

Title _____

Address for legal notice:

GMAC Mortgage Group, LLC
100 Witmer Road
Horsham, PA 19044
ATTN:  General Counsel

Law Firm of David L. Stern
801 S. University Drive
Suite 500
Plantation, FL 33324
ATTN: David J. Stern

Version: MSA 10/27/06

# TERMS AND CONDITIONS

# FOR THE MASTER SERVICES AGREEMENT

1. **Project:** During the Term (as defined herein), Client or Company may identify services that Company can provide to the Client ("Project(s)"). Each Project may include provisions of services ("Services") and/or delivery of certain products or other items ("Deliverables"). Each Project will be described, along with any terms and conditions that are additional to the terms and conditions of this Agreement, in a Statement of Work, which may contain specifications, schedules, milestones, payments, or any other terms and conditions mutually agreed upon by the parties. The terms and conditions of this Agreement shall be applicable to each Project and are incorporated by reference into each Statement of Work. Incorporation of third-party products or services into a specific Project must be approved in advance and in writing by Client. If Client agrees that any third-party products or services are necessary for integration into a specific Project, Client will provide Company with reasonable access to the vendor of such third-party products or services, when Client, in its sole discretion, agrees that it is necessary and appropriate. During the Term of this Agreement and until the expiration of the applicable warranty period, Company will respond diligently and within a commercially reasonable period of time to all inquiries and requests for assistance by the Client. Client does not guarantee that Company will be asked to perform any minimum amount of Services hereunder.

2. **Pricing and Invoices:**

   2.1. **Pricing:** Client agrees to pay the fees set forth in the Statement of Work for Services satisfactorily performed, in U.S. dollars.

   2.2. **Taxes:** Except for those taxes noted herein, no extra charges of any kind, including without limitation, transportation charges, shall be allowed unless agreed to in writing by Client prior to the performance of the Services. Client shall pay all sales, excise, or use taxes due on the transactions hereunder or provide Company customary proof that the transactions are exempt from sales taxes. Invoices shall separately identify any tax and shall include either Company's sales tax or use tax permit number. Company shall pay any other taxes and charges, including without limitation, assessments or fines arising from Company's performance of the Services under the Agreement, including taxes based upon Company's net income and penalties or fees imposed due to failure to file or pay collected sales or use taxes, failure to verify taxability of a purchase, or failure to calculate or remit taxes in a timely manner.

   2.3. **Invoices:** Company shall invoice Client for Services within thirty (30) days from completion of the Services. Each invoice shall include identification information required by Client, a description of the services provided, and shall be subject to approval by the Client. Undisputed invoices shall be due thirty (30) days from receipt by Client.

   2.4. **Interest:** Interest on undisputed past due amounts will be charged at the rate of one percent (1%) per month or the maximum rate allowable by law, whichever is less, provided that Company has given written notice of such default and an opportunity to cure in accordance with Section 3.3.1. Neither this provision, nor any other penalty and/or termination provision contained within this Agreement, shall apply if Client withholds payment because a good faith dispute exists regarding a material duty, obligation or term contained in this Agreement. Unless otherwise requested by Client, Company shall continue to perform fully under this Agreement while any dispute between the parties is being resolved.

   2.5. **Acceptance:** No payment made by Client shall be considered an acceptance of satisfactory performance of Company's obligations under this Agreement, nor shall any payment be construed as relieving Company from its full responsibility under this Agreement.

3. **Term and Termination:**

   3.1. **Term:** The term of this Agreement (the "Term") shall commence on the Effective Date as stated above and will remain in force unless terminated in accordance with provisions of the Agreement.

   3.2. **Termination for Convenience:** Unless otherwise provided herein, Client may terminate the Agreement or any Statement of Work issued hereunder without cause, by providing at least thirty (30)

Version: MSA 10/27/06

01/24/2007 13:08 FAX 17278940107       ☑ 003/013
12-12020-mg   Doc 8531-4   Filed 04/27/15   Entered 04/27/15 16:52:56   Cunningham
Decl. Exhibit A   Pg 4 of 38

days written notice of such termination to Company. Upon such termination, Company shall recover, as its sole remedy, payment for work satisfactorily completed and not previously paid. Company hereby waives and forfeits all other claims for payment and damages including without limitation, anticipated profits or revenue or other economic loss arising out of or resulting from such termination.

  3.3.   **Termination for Default:**

    3.3.1. Either party may terminate this Agreement for cause upon a material default by the other party (including any default for which specific remedies are provided herein), which default remains uncured thirty (30) days after written notice thereof is given to the defaulting party.

    3.3.2. If either party becomes or is declared insolvent or bankrupt, is the subject of any proceedings relating to its liquidation or insolvency or for the appointment of a receiver for it, makes an assignment for the benefit of all or substantially all of its creditors, or enters into an agreement for the composition, extension, or readjustment of all or substantially all of its obligations, then the other party may, by giving written notice thereof to such party, terminate this Agreement as of a date specified in such notice of termination.

    3.3.3. If any of the insurance coverage or policies required to be maintained by Company under this Agreement is terminated, lapses or for any reason does not remain in full force and effect, or any such coverage or policy is replaced or materially modified without the prior written consent of Client, then Client may, by giving written notice thereof to Company, terminate this Agreement upon the date specified in the notice, which date may be the date of the notice.

    3.3.4. If Company or its employees appear on or are members of any organization that appears on any government list, including, but not limited to, the Control List prepared by the Office of Foreign Assets Control ("OFAC") of the Department of the Treasury, then Client may take all measures authorized under applicable law and may, by giving written notice thereof to Company, terminate this Agreement upon the date specified in the notice, which date may be the date of the notice.

  3.4.   **Termination Assistance:** In connection with the termination of this Agreement for any reason, and notwithstanding any dispute between the parties, Company shall provide to Client such termination assistance as it may reasonably request in order to provide an orderly transition from Company to another provider (the "Termination Services"). If any such Termination Services requires resources in addition to those being used by Company in the performance of the Services, Client shall pay Company therefore on a mutually acceptable basis. Client shall continue to pay for all Termination Services requested by Client and performed by Company after the termination date, provided that if termination was by reason of a payment default by Client, Company shall be entitled to reasonable assurances acceptable to it prior to commencing such Termination Services that it will be fully compensated for such Termination Services.

4. **Non-Exclusivity:** The Agreement is a non-exclusive arrangement to purchase specified Services from Company.

5. **Future Acquisitions:** If during the term of the Agreement, Client acquires control of an entity ("Acquired Entity") under an existing contract with Company covering or relating to the subject matter of the Agreement, Client, at its option, may (a) keep the Acquired Entity's existing contract in effect until the date of termination of the existing contract, after which, such Acquired Entity may receive the benefits of the Agreement; (b) immediately cancel such existing contract after which, such Acquired Entity may receive the benefits of the Agreement or (c) assume the better of the contracts.

6. **Representations and Warranties:**

  6.1.   Company represents and warrants that the Services will be performed in a diligent and workmanlike manner in accordance with good industry practices, by individuals of suitable training and skill.

  6.2.   Company represents and warrants that the Services and all Deliverables provided under this Agreement shall comply with and function in accordance with the requirements set forth in this Agreement and the Statement of Work.

  6.3.   Company represents and warrants that its performance of Services and provision of Deliverables and Client's subsequent use of such Services and Deliverables does not and will not violate any copyright,

patent, trade secret, trademark or other intellectual property or proprietary right of any third party.

6.4. Company represents and warrants that Company's actions and performance of the Services are and will be in full compliance with all applicable federal, state, and local requirements, including but not limited to, federal banking laws, federal consumer protection and privacy laws; all applicable state laws and regulations; any valid and effective order (including regulatory orders), verdict, judgment, consent decree or agreement.

6.5. Company warrants that the prices charged to Client shall be no less favorable than those currently extended to any other customer of Company for similar services.

6.6. Company represents and warrants that it has, and will maintain throughout the Term of this Agreement, all licenses, franchises, permits, authorizations and approvals materially necessary for the lawful conduct of its business.

6.7. Company and Client each represent and warrant to the other that the execution, delivery and performance of this Agreement by such party (a) has been duly authorized by all necessary corporate action (b) does not conflict with, or result in a material breach of, the articles of incorporation or by-laws of such party, and any material agreement by which such party is bound, or any law, regulation, rule, judgment or decree of any governmental instrumentality or court having jurisdiction over such party, and (c) and constitutes a valid and legally binding obligation of such party enforceable in accordance with its terms.

6.8. Company represents and warrants that there is no action, suit, claim, investigation or proceeding pending or, to the best of its knowledge, threatened against it that, if adversely decided, might adversely affect Company's ability to enter into this Agreement or performance of its obligations hereunder.

6.9. Company represents and warrants that no representation or warranty contained in this Agreement (including in any Attachment or addendum hereto) contains any untrue statement of material fact or omits to state a material fact necessary to make the statements and facts contained herein not materially misleading.

6.10. The warranties provided herein are cumulative of and in addition to any other warranties provided by law. The representations and warranties shall survive expiration or termination of this Agreement.

7. **Security and Use of Client Systems:** When Company is performing Services on Client's premises, Company shall comply with Client's security, safety, and fire protection procedures. If Company is given a key, code, combination or other access device to Client's premises, Company shall: (a) safeguard it with the same degree of care as Company safeguards keys to its own premises, but in no event with less than reasonable care; (b) account for all keys and access devices whenever requested to do so by Client; (c) maintain a log of the names of personnel and times when they have possession of such keys or access devices, and (d) return all such keys and access devices immediately upon request by Client. Client shall have the right to inspect the contents of all containers or packages being brought into or removed from Client's locations. Company's and its employees, agents and subcontractors use of Client's computers, equipment and systems ("Client Systems") shall be only to the extent necessary to perform the Services hereunder. Client may monitor such use of the Client Systems. In the event Client, in its sole discretion, determines that Company failed to comply with this provision, Client may immediately terminate this Agreement or take such action as it deems appropriate, and Client's sole liability shall be for payment of Services already rendered.

8. **Performance and Personnel:**

   8.1. **Place of Performance:** Performance by Company of the Services shall take place in any of the fifty (50) states of the United States of America or the District of Columbia (the "United States"). Company may perform any of the Services outside of the United States, and on such additional terms and conditions as may be acceptable to Client, only if expressly agreed to by Client in the Statement of Work or otherwise.

   8.2. **Contact List:** Company shall provide Client with a contact list for servicing needs containing the names, addresses, telephone and fax numbers, mobile and pager numbers, e-mail or Internet addresses and such other information as Client may reasonably request.

Version: MSA 10/27/06

01/24/2007 13:09 FAX 17278940107 ☒005/013

12-12020-mg    Doc 8531-4    Filed 04/27/15    Entered 04/27/15 16:52:56    Cunningham
Decl. Exhibit A    Pg 6 of 38

8.3.   At the request of Client, Company shall provide assurances satisfactory to Client, that Company's personnel meet the rules and requirements of Client pertaining to work history and qualifications.

8.4.   Company shall provide Client with the name of each person assigned to work on Client's premises, and shall immediately update such information whenever changes occur.

8.5.   While at any Client location or if Company or its agents or representatives are given access to any Client computing equipment, applications or the Client computer network, Company and Company's personnel shall follow all reasonable directions and instructions given by Client. Upon the request of Client, Company shall reassign or otherwise arrange so that a particular employee or agent of Company does not work at any Client location.

8.6.   Client may require that Company submit any and all Company personnel to be assigned in connection with the performance of Services hereunder to a screening process, including but not limited to, employment eligibility verification and criminal background investigation. Company represents that all such investigations, inquiries, or tests required by Client will be conducted as a precondition of assignment to the performance of Services and provision of Deliverables hereunder, with the knowledge and consent of Company's personnel involved, and in compliance with all applicable state and federal laws and regulations. In addition to any criminal background checks that Client may require pursuant to the foregoing, it is mandatory for Company to conduct, and document in Company's files, a criminal background check for Company personnel performing Services for Client who has key or card key access to Client's offices. The background check must take place prior to such individual beginning to perform Services on Client's premises or networks. The background check should be conducted in accordance with Client's current policies.

8.7.   Company's personnel must carry identification identifying themselves as employees of the Company.

8.8.   Company shall take appropriate measures to select, supervise and monitor the personnel performing Services. Company shall maintain current employment eligibility verification records, including necessary certification and documentation and insurance for its employees performing Services hereunder. Company will not conduct disciplinary actions with respect to Company personnel while on Client's premises, including but not limited to terminating employment of Company personnel.

9.   **Independent Contractor Status:**

9.1.   The Services of Company are to be rendered as an independent contractor. Company and Company's employees, consultants, subcontractors, agents and representatives shall not be, or represent themselves to be, officers, employees, agents or representatives of Client and shall not bind, or attempt to bind, Client to any agreement, liability or obligation of any nature.

9.2.   Company's personnel shall not be considered employees of Client within the meaning or application of any federal, state, or local laws or regulations. Company shall be responsible for the payment of wages, salaries, and other amounts due its employees in connection with the services performed hereunder, and shall be responsible for all payroll reports and obligations, including but not limited to withholding, social security, unemployment insurance, workers' compensation, immigration and naturalization, and similar items.

10.   **Change Orders:** Both parties acknowledge that the scope of work for the Services to be provided by Company under a Statement of Work may change over the course of a project, and agree that no additional fees shall be due for any changes that do not materially alter the obligations of Company relating to such Statement of Work. Company will not charge additional fees until such changes are greater than a five percent (5%) increase of the time and materials specified in the Statement of Work. If the Client requests Company to provide additional services resulting in fees of greater than five percent (5%) for such increased time and materials, then Company may, as mutually agreed upon by the parties, respond to such requests from the Client as a change in order ("Change Order"), provided however, that all Change Orders must be agreed upon in writing and signed by an authorized representative of both parties prior to commencing such additional services. Such Change Orders shall be amendments to the current Project and Statement of Work and will be paid as mutually agreed upon by the parties but in no event less than thirty (30) days following receipt of an undisputed invoice.

11.   **Remedies Relating to Services:** Client shall have the right to reject the Services and/or Deliverables based upon Company's non-compliance with any term of this Agreement, including without limitation a breach of any

Version: MSA 10/27/06

of the representations and warranties set forth herein. This remedy shall be cumulative of and is in addition to
any other remedies provided herein or existing at law or in equity.

12. **Ownership:**

    12.1. **Work for Hire:** Company agrees that all right, title, and interest in and to the Services and
Deliverables, including, without limitation, source and object code and all works derivative thereof,
and all documentation thereof, and all intellectual property rights therein (the "Work") shall be the
sole and exclusive property of Client and shall be deemed "Works Made For Hire" under Title 17 of
the United States Code as it may be revised and amended from time to time. To the extent such Work
or any portion thereof does not qualify as Work Made For Hire, Company hereby assigns all right, title
and interest, including but not limited to all intellectual property rights and proprietary rights
Company may have, whether directly or appurtenant thereto, in the Work to Client without further
compensation than that specified in the applicable Statement of Work. Company will, at its own
expense, cause any and all of its employees, independent consultants, and all other parties it engages
for the Projects to undertake all actions and execute all appropriate documents necessary to carry out
the intent of the paragraphs of this Section, including but not limited to, waivers, releases of liens and
assignments. Company agrees to indemnify, waive and release Client against any third-party liens on
the Work.

    12.2. **Excluded Property:** Notwithstanding Section 12.1, excluded from the Work shall be the following:
ideas, concepts, know-how, techniques and processes of a general nature that are discovered, invented,
created, conceived, made or reduced to practice by Company (a) prior to performing Services or
providing Deliverables; or (b) that are not a part of the Deliverables or necessary to the Deliverables or
the function of the Deliverables, but (i) were developed by Company in support of the build effort as a
tool, test, platform or development method and not as a specific function or feature of the actual
application of the Deliverables; and (ii) are not based on or derived from Client Confidential
Information (collectively the "Company Property").

    12.3. **License to Company Property:** As part of the consideration tendered by the Client to Company for
any Project, Company grants to Client a fully-paid, royalty-free, irrevocable, perpetual, unlimited,
worldwide, non-exclusive license to the Company Property to use, execute, perform, display,
reproduce, transfer, modify, and create derivative work of such Company Property as part of or in
connection with the Client Property. Unless otherwise provided in an applicable Statement of Work,
all licenses granted under this Agreement also include the right for the GMACR entities to use such
license provided hereunder in accordance with this Agreement . Client is responsible for compliance
by the GMACR entities with the terms and conditions set forth in this Agreement unless otherwise
specified in a Statement of Work. Except as set forth herein, all right, title and interest in Company
Property remains with Company.

    12.4. **Third Party Escrow:** As necessary during a Project, Company agrees to promptly disclose to Client
all Company Property and establish a third-party escrow account for any such Company Property
source code determined by Client to be required. The terms of any third-party escrow account shall be
as mutually agreed between the parties.

    12.5. **Assistance in Enforcement:** Company agrees to provide all assistance reasonably requested by
Client in the establishment, preservation and enforcement of Client's copyright, trade secret, and other
proprietary interests in the Work, including executing documents, testifying, and all similar activity,
such assistance to be provided at Client's expense.

13. **Indemnification:**

    13.1. **Infringement Indemnification by Company:** Company shall, at its own expense, defend, indemnify
and hold harmless GMACR and its employees, officers, directors, licensees, representatives, attorneys,
parents, subsidiaries, successors, assigns and agents from and against any and all liabilities, claims,
actions, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and
disbursements) relating to or arising out of any third-party claim(s) that the Services and Deliverables
provided pursuant to this Agreement by Company or any of its employees, agents, representatives, or
contractors, subcontractors, and/or consultants infringe any United States patent, or any license,
trademark, copyright, trade secret or any other intellectual property right. Company will defend

Version: MSA 10/27/06

007/013

GMACR against such claims at Company's sole expense and pay all court awarded damages relating to such claims. GMACR agrees to notify Company in a timely manner in writing of the claim, and grant Company the right to control the defense and disposition of such claims provided that no settlement requiring any financial payment from GMACR or admission of liability by GMACR shall be made without GMACR's prior written approval. If an infringement claim is made or appears possible, Company will, at GMACR's sole option: (i) secure for GMACR the right to continue to use the Services and/or Deliverables; (ii) modify or replace the Services and/or Deliverables so that they are non-infringing but functionally equivalent; or (iii) accept the return of the Services or Deliverables from GMACR and provide a refund of fees paid by GMACR. However, Company has no obligation to the extent any claim is based in whole on modification of the Services or Deliverables by GMACR not otherwise authorized or directed by Company. A failure by GMACR under this Section 13.1 shall only affect Company's obligations under this Section to the extent such failure materially prejudices Company's ability to defend a claim under this Section 13.1.

13.2. **Indemnification:** Each party (each an "Indemnitor") shall, at its own expense, defend, indemnify and hold harmless the other party and its employees, officers, directors, licensees, representatives, attorneys, parents, subsidiaries, successors, assigns and agents (each of the foregoing an "Indemnitee") from and against any and all liabilities, claims, actions, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) relating to or arising out of any third-party claim(s) for bodily injury to or death of any person or for damage, loss or destruction of tangible real property or tangible personal property caused by the negligent acts or omissions, recklessness or willful misconduct of Indemnitor and its employees, agents, and representatives. The Indemnitor will defend Indemnitee against such claims at Indemnitor's sole expense and pay all court awarded damages relating to such claims. The Indemnitee agrees to notify the Indemnitor in a timely manner in writing of the claim, and grant Indemnitor the right to control the defense and disposition of such claims provided that no settlement requiring any financial payment from Indemnitee or admission of liability by Indemnitee shall be made without Indemnitee's prior written approval.

13.3. **Survival:** The provisions of this Section 13 shall survive the termination or expiration of all or any part of this Agreement. To the extent that GMACR is named in a legal action covered under this indemnification, GMACR reserves the right to approve counsel selected by Company.

14. **Insurance:** For and during the Term of this Agreement, Company shall secure and maintain at its own expense insurance of the type and in the amounts set forth below.

14.1. Workers' Compensation in accordance with all federal and state statutory requirements and Employer's Liability Insurance in an amount of not less than $500,000 per accident for bodily injury by accident and $500,000 per employee/aggregate for bodily injury by disease. Company and its underwriter shall waive subrogation against Client.

14.2. Commercial General Liability Insurance in an amount of not less than $1,000,000 per occurrence, subject to a $2,000,000 aggregate covering bodily injury (including death), personal injury, property damage including, and without limitation, all contractual liability for such injury or damage assumed by Company under this Agreement. This policy shall cover liability arising from premises and operations, independent contractors, products/completed operations, personal and advertising injury, and blanket contractual liability.

14.3. Commercial Automobile Liability Insurance in an amount of not less than $5,000,000 combined single limit covering bodily injury (including death) and property damage for all owned, hired and non-owned vehicles used by Company, including all statutory coverage for all provinces of operation.

14.4. Umbrella Liability Insurance with respect to Workers' Compensation, Commercial General Liability, and Commercial Automobile Liability in an amount of not less than $5,000,000 combined single limit.

14.5. Blanket Crime Coverage including employee dishonesty covering liability against direct and verifiable losses of money, securities, products, equipment, material and other property of Client caused by theft or forgery by identifiable employees of Company acting alone or in collusion with others, in an amount of not less than $250,000.

14.6. Professional Errors and Omissions Liability Insurance appropriate to Company's profession.

Coverage should be for a professional error, act or omission arising out of the scope of services shown in this Agreement, in an amount not less than $1,000,000 per occurrence.

14.7.  Client, its directors, officers, employees, agents, subsidiaries and affiliates shall be named as additional insured on the Commercial General Liability and Commercial Automobile Liability policies. All of the foregoing policies shall be issued by insurance companies having an "A" rating by A.M. Best Company. These insurance provisions set forth the minimum amounts and scopes of coverage to be maintained by Company and are not to be construed in any way as a limitation or release of Company's liability under this Agreement or as a representation that coverage and limits will necessarily be adequate to protect Company. Company shall not self-insure any of its obligations under this Agreement without full disclosure to Client of its intention to self-insure and without obtaining Client's prior written consent. Any and all deductibles specified in the above-referenced insurance policies shall be assumed by, for the account of, and at the sole risk of Company.   All policies of insurance procured by Company shall be written as primary policies, not contributing with, nor in excess of coverage carried by Client.

14.8.  Upon request from Client, Company shall furnish Certificates of Insurance evidencing all of the forgoing insurance coverage. All of the above-described policies shall provide that no less than thirty (30) days prior written notice of cancellation, material modification, reduction in coverage or non-renewal shall be given to Client. In the event that any Services under this Agreement are to be rendered by persons other than the Company's own employees, Company shall arrange for such persons to forward to Client prior to commencement of Services by them, Certificates of Insurance evidencing such amounts, in such form, and with such insurance companies as are satisfactory to Client.

15. **Confidential Information:**

15.1.  For the purpose of this Section, the "Discloser" is the party disclosing its Confidential Information and the "Recipient" is the party receiving and/or accessing Confidential Information. Client and Company each agree that any information and documents that are furnished for the purposes of performing under this Agreement or which are produced or come to the attention of either party are proprietary to the disclosing party and shall be used only for the purposes of this Agreement. This information includes, without limitation: the terms of this Agreement, technical specifications and operating manuals, services and information concerning current, future, or proposed products and services; product and services descriptions; financial information; information related to mergers or acquisitions; passwords and security procedures; computer programs, software, and software documentation; customer and/or prospective client lists , mortgage loan files, and all other information relating in any way to the customer and/or prospective client; printouts; records; policies, practices and procedures; and any or all other information, data or materials relating to the business, trade secrets and technology of either party, its customers, clients, employees, business affairs, affiliates, subsidiaries and the affiliates of its parent organization (all of the foregoing collectively referred to as "Confidential Information"). Client may require that any representative, agent or subcontractor of Company shall enter into a non-disclosure agreement with Client to protect the Confidential Information of Client and Company shall comply with such request.   If and to the extent such Confidential Information consists of information related to Discloser's customers, including without limitation any "nonpublic personal information" as defined under the Gramm-Leach-Bliley Act of 1999 (Public Law 106-102, 113 Stat. 1138), as amended from time to time (the "GLB Act") and regulations promulgated thereunder in any form, whether or not owned or developed by the Discloser (collectively "Nonpublic Personal Information"), the requirements set forth in Exhibit A to Master Services Agreement, Confidentiality, Non-Disclosure and Security Requirements, attached hereto and incorporated herewith, shall apply to such Nonpublic Personal Information in addition to the provisions of this Section 15. In the event of a conflict between the provisions set forth in Exhibit A and those set forth herein, the provisions set forth in Exhibit A shall control for such Nonpublic Personal Information.

15.2.  Each party shall maintain the Confidential Information of the other in confidence using the same care and discretion to avoid disclosure of Confidential Information as it uses to protect its own confidential information that it does not want disclosed. Each party further agrees to restrict disclosure of

Version: MSA 10/27/06

Confidential Information of Discloser solely to (i) persons who need to know the Confidential Information to perform under this Agreement, all of whom shall be under a written obligation of confidentiality, which is no less stringent that those set forth herein , and (ii) regulators and auditors. Recipient agrees that it shall remain fully responsible for any disclosure of Confidential Information. Each party shall, as soon as reasonably practicable, notify the other party of any unauthorized possession, disclosure, use or knowledge, or attempt thereof, of the other party's Confidential Information of which it becomes aware, including any material breach of security on a system, LAN or telecommunications network which contains, processes or transmits Confidential Information. Each party shall, as soon as reasonably practicable, furnish to the other full details of the unauthorized possession, disclosure, use or knowledge, or attempt thereof, and use reasonable efforts to assist the other in investigating or preventing the recurrence of any unauthorized possession, disclosure, use or knowledge, or attempt thereof, of the other party's Confidential Information.

15.3.   The obligations imposed under this Agreement shall not apply to Confidential Information that is (a) made public by Discloser, (b) generally available to the public other than by a breach of this Agreement by Recipient, its employees, agents or contractors, and/or (c) rightfully received from a third person having the legal right to disclose the Confidential Information free of any obligation of confidence. In the event that Recipient, or any of such party's agents, contractor's or employees, becomes legally compelled (by deposition, interrogatory, request for documents, subpoena, civil or criminal investigative demand or similar process) to disclose any Confidential Information of Discloser, such Recipient shall provide prompt prior notice to Discloser so that it may seek a protective order or other appropriate remedy. In the event that such protective order or other remedy is not obtained, or that Discloser waives compliance with the provisions of this Section 15, the Recipient will furnish only that portion of the Confidential Information which is legally required and will exercise reasonable efforts to obtain assurances that confidential treatment will be accorded such Confidential Information.

15.4.   Each party acknowledges and agrees that any breach or threatened breach of any of the provisions of this Section 15 by the other party will result in immediate and irreparable harm and that any remedies at law in such event will be inadequate. The parties agree that such breaches, whether threatened or actual, will give Discloser the right to terminate this Agreement immediately and obtain injunctive relief to restrain such disclosure or use. This right shall, however, be in addition to and not in lieu of any other remedies at law or in equity.

15.5.   Upon termination of the Agreement, all copies of the Confidential Information will either be destroyed or returned to Discloser immediately upon Discloser's request. Notwithstanding anything to the contrary contained herein, Client shall in no event have any obligation hereunder to destroy mortgage loan files or any documents related thereto.

15.6.   The provisions of this Section 15 shall survive the termination or expiration of this Agreement.

16.  **Audits:** The audit personnel of Client, as well as examiners and representatives of Client's regulatory agencies, will have the right to make examinations and inspections, upon reasonable written notice, of Company's financial records, facilities, procedures, technology security policies and procedures and such other documentation pertaining to Company's Services under this Agreement. Company may require such persons to provide reasonable evidence of their authority before being admitted to Company's facilities. Company shall preserve for a period of three (3) years after the completion or termination of services under this Agreement all documents related to the Services hereunder which shall be made available to Client at Client's request.

17.  **Force Majeure:** Any failure or delay by a party in the performance of its obligations under the Agreement shall not be deemed to be a default under the Agreement provided that such failure or delay could not have been prevented by reasonable precautions and cannot reasonably be circumvented by the non-performing party through the use of alternate sources, work-around plans or other means to the extent such failure or delay is caused by fire, flood, earthquake, elements of nature or acts of God, court order, public utility electrical failure, acts or war, terrorism, riots, civil disorders, rebellions or revolutions in any country or any similar cause beyond the reasonable control of such party and without the fault or negligence of such party (each a "Force Majeure Event"). The occurrence of a Force Majeure Event does not limit or otherwise affect Company's obligation to provide normal recovery procedures or any disaster recovery services to the extent practicable in the circumstances.   Nothing contained in this section shall be construed as entitling Company to any delay

Version: MSA 10/27/06

resulting from labor disputes involving its own employees or employees of its contractors and/or subcontractors, agents, or representatives. The party affected by a Force Majeure event will advise the other party in reasonable detail of the event as promptly as practicable (including the estimated duration of the event) and keep the other party reasonably apprised of progress in resolving the event. Any warranty period affected by a Force Majeure event shall be extended for a period equal to the duration of such Force Majeure event.

18. **Subcontracts and Assignment:**

   18.1. Company shall not assign, in whole or part, any of its obligations under this Agreement without Client's written consent. Company shall not subcontract any portion of its performance obligations under this Agreement without Client's prior written approval. Client's approval with respect to any subcontracting shall not relieve Company of its responsibility for the performance of its obligations under the Agreement.

   18.2. In the case of any subcontract for which Client has issued its written consent, each subcontract entered into by Company shall be in such form and substance as will not create any relationship, contractual or otherwise, between the subcontractor and Client, and will not permit subcontract to pass through to Client, as agent for subcontractor or otherwise, any claims of subcontractor. Company shall be solely responsible for the job performance, payment, actions, and omissions of the subcontractor's employees through completion of the subcontractor's performance of any such services.

   18.3. Company shall include in each subcontract terms and conditions consistent with the intent of the Agreement, including all special performance requirements hereunder. Additionally, Company shall include in each such subcontract, a provision giving Client the right to audit and inspect the subcontractor's facilities and procedures in accordance with the "Audit" requirements of the Agreement.

19. **Governing Law:** This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflicts of law rules.

20. **Disaster Recovery Plan:** Company shall provide disaster recovery and back up capabilities and facilities through which Company will be able to render the Services to Client with minimal disruptions or delays. Company shall provide to Client copies of the written plan or plans for disaster recovery and back up arrangements prior to or upon execution of this Agreement.

21. **Miscellaneous:**

   21.1. **Remedies:** No remedy herein conferred is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise.

   21.2. **No Waiver:** No delay or omission by either party to exercise any right or power it has under this Agreement shall impair or be construed as a waiver of such right or power. A waiver by any party of any breach or covenant shall not be construed to be a waiver of any succeeding breach or any other covenant. All waivers must be signed by the party waiving the rights.

   21.3. **Amendments/Modifications:** No amendment to, or change, waiver or discharge of, any provision of this Agreement shall be valid unless in writing and signed by an authorized representative of each of the parties.

   21.4. **Headings:** The headings in this Agreement are for convenience of reference only and in no way define or limit any of the provisions hereof or otherwise affect their construction or effect.

   21.5. **Survival:** Termination or expiration of this Agreement shall not release either party from their respective obligations hereunder with regard to (a) confidentiality, (b) indemnification, and (c) Services already delivered or performed, including, without limitation, obligations of payment, warranty, and representations.

   21.6. **Severability:** If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, then the remaining provisions of this Agreement, if capable of substantial performance, shall remain in full force and effect.

   21.7. **Use of Name:** Company shall not use Client's or its affiliates name, trademarks and/or logos for

01/24/2007 13:12 FAX 17278940107 @011/013

12-12020-mg    Doc 8531-4    Filed 04/27/15    Entered 04/27/15 16:52:56    Cunningham
                            Decl. Exhibit A    Pg 12 of 38

advertising or any other similar purpose including, but not limited to, brochures, advertisements, press releases, testimonials, websites, customer reference lists or other implied or expressed endorsements, without the prior written approval of Client, which can be withheld and withdrawn in its sole discretion. Company shall not represent directly or indirectly that the Services or Deliverables provided by Company to Client have been approved by or endorsed by Client. Company acknowledges that this Section 21.7 is a material provision to Client and further acknowledges that remedies at law may be inadequate to protect Client against breach of this provision. Company hereby agrees in advance that Client will be entitled to the granting of injunctive relief in its favor without proof of actual damages in the event of breach of this provision by Company. Such remedy shall not be deemed to be the exclusive remedy for any breach of this Agreement, but shall be in addition to all other remedies at law or in equity available to Client.

21.8. **California Personal Information Statute:** Company acknowledges that Client Confidential Information may include personal information pertaining to California residents. Company shall ensure that its system and/or the networks comply with the requirements of California Civil Code §1798.82 et. seq.; or any similar federal or state statute that may enacted (the "California Statute"), including the encryption of all personally-identifiable Client Confidential Information. If Company believes that personally-identifiable Client Confidential Information has been accessed without proper authorization, or there has been an unsuccessful attempt to access such Confidential Information, Company shall provide written notice to Client within twenty-four (24) hours. If Client determines that actions must be taken to comply with the California Statute, Company shall fully cooperate with Client to achieve such compliance. Nothing contained herein shall be deemed to release Company from its indemnification obligations as set forth in the Agreement.

21.9. **Representation of Counsel; Mutual Negotiation:** Each party acknowledges that it has had an opportunity to be represented by counsel of its choice in negotiating this Agreement. This Agreement will therefore be deemed to have been negotiated and prepared at the joint request, direction, and construction of the parties, at arm's length, with the advice and participation of counsel, and will be interpreted in accordance with its terms without favor to either party.

21.10. **Notices:** Any notices required or permitted hereunder will be in writing and sent to a party at the address on the signature page of this agreement (or to such other address of which either party may notify the other in a notice that complies with the provision of this section). Notices shall be effective upon receipt and shall be sent (i) by private carrier or reputable overnight carrier with package tracing capability; or (ii) by personal service; or (iii) by registered or certified mail, postage prepaid, return receipt requested.

21.11. **Order of Precedence; Exclusion of Other Terms and Conditions:** This Agreement constitutes the entire and exclusive statement of the agreement between the parties and supersedes all prior representations, understandings or agreements between the parties with respect to such subject matter. The documents referred to herein and attached hereto ("Attachments") shall be read together with this Agreement to determine the parties' intent. If there is a conflict between or among such documents, this Agreement shall be the final expression of the parties' intent and shall prevail over any inconsistent terms set forth in any Attachments. Any other terms or conditions included in any click-wrap license agreements, shrink wrap license agreements, quotes, invoices, acknowledgements, purchase orders, bills of lading or other forms utilized or exchanged by the parties shall not be incorporated in this Agreement or be binding upon the parties unless the parties expressly agree in writing or unless otherwise provided in this Agreement.

# END OF TERMS AND CONDITIONS

Version: MSA 10/27/06

## Exhibit A
### To Master Services Agreement: LAW-04018

### Confidentiality, Non-Disclosure and Security Requirements

The Gramm-Leach-Bliley Act of 1999 (Public Law 106-102, 113 Stat. 1138), as amended from time to time (the "GLB Act") and the regulations promulgated thereunder impose certain obligations on financial institutions with respect to the confidentiality and security of the customer data of such financial institutions. This Exhibit A to the Master Services Agreement sets forth the Confidentiality, Non-Disclosure and Security requirements for confidential information related to customers, including without limitation any "nonpublic personal information" as defined under the GLB Act and regulations promulgated thereunder.

1. **Confidential Information.**

    1.1.  For the purpose of this Agreement, the "Discloser" is the party disclosing its Confidential Information and the "Recipient" is the party receiving and/or accessing Confidential Information.

    1.2.  For the purposes of this Agreement, "Confidential Information" shall mean all information related to customers, including without limitation any "nonpublic personal information" as defined under the GLB Act and regulations promulgated thereunder in oral, demonstrative, written, graphic or machine-readable form, whether or not owned or developed by the Discloser.

2. **Disclosure and Protection of Confidential Information.**

    2.1.  Discloser warrants that their disclosure of Confidential Information to Recipient is in accordance with applicable state and federal laws and the Discloser's own privacy policy.

    2.2.  Recipient agrees not to use Confidential Information for any purpose other than the fulfillment of Recipient's obligations to the Discloser. Recipient shall not disclose, publish, release, transfer or otherwise make available Confidential Information in any form to, or for the use or benefit of, any third party without Discloser's prior written consent. Recipient shall, however, be permitted to disclose relevant aspects of the Confidential Information to its employees, agents and subcontractors to the extent that such disclosure is reasonably necessary for the performance of its functions and/or contractual duties and provided that such disclosure is not prohibited by the GLB Act, and the regulations promulgated thereunder or other applicable law. Recipient agrees that it will not use non-public personal information about Client's customers in any manner prohibited by the GLB Act. Recipient agrees that it shall remain fully responsible for any disclosure as set forth in the preceding sentence. Recipient further agrees to advise Discloser promptly in writing of any misappropriation, or unauthorized disclosure or use of Confidential Information which may come to the attention of Recipient, and to take all steps reasonably requested by Discloser to limit, stop or otherwise remedy such misappropriation, or unauthorized disclosure or use. If the GLB Act or other applicable law now or hereafter in effect imposes a higher standard of confidentiality and/or protection to the Confidential Information, then such standard shall take precedence over the provisions of this Section.

    2.3.  Recipient will make no more copies of the Confidential Information than is necessary for Recipient's use. All copies made, in any medium whatsoever, shall be covered by the terms and conditions of this Agreement.

    2.4.  Each party shall develop, implement and maintain a comprehensive information security program (the "Security Program") to protect Confidential Information that includes administrative, technical and/or physical safeguards appropriate to such party's size and complexity and the nature and scope of its activities in compliance with the GLB Act and regulations promulgated thereunder. The objective of each such Security Program shall be to (i) insure the security and confidentiality of Confidential Information, (ii) protect against any anticipated threats or hazards to the security or integrity of Confidential Information that could result in substantial harm or inconvenience to any customer, and (iii) have a program to respond to a security breach and to notify its customers affected by the breach where required by law or regulation.

    2.5.  Recipient will ensure that any third party to whom it transfers Confidential Information enters into an agreement to protect the confidentiality and security of Confidential Information in a manner no less stringent than required by this Agreement.

Version: MSA 10/27/06

2.6. Upon request, a party shall provide to the other party information such as audits or summaries of test results demonstrating the effectiveness of its Security Program.

3. **Return of Materials.**

3.1. All Confidential Information, including copies thereof, shall be promptly returned to Discloser upon request, except that copies may be retained, if required, for legal or financial compliance purposes.

3.2. Upon termination or expiration of the business relationship and/or Contract, all Confidential Information, including copies thereof, shall be promptly returned to such party or destroyed, except that copies may be retained, if required, for legal or financial compliance purposes and the terms and conditions of this Exhibit shall continue to apply for the period such information is retained, notwithstanding any termination or expiration of the Agreement.

3.3. Recipient shall implement and monitor procedures to comply with Fair and Accurate Credit Transactions Act of 2003 (Public Law 108-159, 111 Stat. 1952), as amended from time to time (the "FACTA") and implementing regulations concerning the safeguarding and disposal of Confidential Information. Such policies and procedures shall include, but are not limited to, destroying records and files containing Confidential Information. All such paper records will be shredded and all electronic or digital records and files will be erased or otherwise rendered unreadable in a way that prevents records and files from being practically read or reconstructed. Recipient will provide Discloser with all information that Discloser reasonably requests regarding the disposal of records and files containing Confidential Information including, but not limited to, relevant portions of Discloser's information security policies and procedures.

Version: MSA 10/27/06

04/02/2007 11:53 FAX 17278940107

12-12020-mg    Doc 8531-4    Filed 04/27/15    Entered 04/27/15 16:52:56    Cunningham 001/001
Decl. Exhibit A    Pg 15 of 38

**Amendment Number 1**
**to the**
**Master Service Agreement**

As of the 21st day of March, 2007, this Amendment Number 1 (the "Amendment") is hereby incorporated into the Master Service Agreement between **GMAC Mortgage Group, LLC** ("Client") and Law Firm of David J. Stern ("Company") dated January 12, 2007 (the "Agreement").

**WHEREAS**, Client and Company entered into the Agreement so that Company would provide certain direct sourcing for foreclosure and bankruptcy services to Client;

**WHEREAS**, Client and Company desire to amend the Agreement upon the terms and conditions noted below;

**NOW THEREFORE**, in consideration of the mutual covenants, agreements, warranties, and representations made and contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereby agree as follows:

**Amended Terms**

1.    All references to GMAC Mortgage Group, LLC are hereby deleted from the Agreement and replaced with GMAC Mortgage, LLC.

2.    Except as set forth herein, all other terms and conditions of the Agreement shall remaining full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first written above.

| GMAC Mortgage,, LLC | Law Office of David J. Stern |
|---|---|
| By: _William J. Morgan_ | By: _(signature)_ |
| | David J. Stern |
| Printed Name **William J. Maguire** **Senior Vice President** | Printed Name |
| | President |
| Title | Title |

Address for legal notice:
GMAC Mortgage, LLC
100 Witmer Road
Horsham, PA 19044
Attention: General Counsel

Law Office of David J. Stern
801 S. University Drive
Suite 500
Plantation, FL 33324
Attention: David Stern

1

## STATEMENT OF WORK
## FOR DIRECT SOURCING OF FORECLOSURE AND BANKRUPTCY
## FEBRUARY 2007

### I. INTRODUCTION

This Statement of Work (SOW) is issued pursuant to and in accordance with the terms and conditions set forth in the Master Service Agreement (Agreement) dated as of February 8th, 2007 between (Company) and GMAC Mortgage, LLC (Client). This SOW reflects the final pricing and requirements for Services, except as may be subsequently modified by the parties upon mutual written agreement. All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. Any services not specifically defined and/or detailed in this SOW will be provided as no additional cost to Client upon mutual agreement.

Any changes to or modifications of this SOW will be completed through execution of a change order in a similar form to Attachment A (Change order form) as attached hereto which will then be incorporated into the SOW.

### II. DESCRIPTION OF SERVICES

Company will receive direct referrals for foreclosure and bankruptcy actions through New Trak. Company will be responsible for paying to Fidelity all fees associated with New Trak usage. Company will be responsible for all required actions in order to protect the interest of Client.

### III. BUSINESS REQUIREMENTS

#### Foreclosure

- Prioritize all new foreclosure referrals by obtaining all relevant and required information and documentation for completing the first legal action and the foreclosure process.
- Adhere to all investor timeframes by completing each step in the foreclosure process within established industry standards. Make Client whole when Client has been assessed a penalty for failure to adhere to established standards.
- Update New Trak and Client's system of Record (MortgageServ "MS") with all applicable events in the foreclosure process and update comments with the ongoing status of specific matters. All delays in the foreclosure process must be updated in MS with reasonable explanations. All pending foreclosure matters must be updated at least monthly with a current status of the applicable matter.

1

02/15/2007 10:45 FAX 17278940107                                                    ☑002/008

12-12020-mg   Doc 8531-4   Filed 04/27/15   Entered 04/27/15 16:52:56   Cunningham
                           Decl. Exhibit A   Pg 17 of 38

- Pull all information from MS that is needed to effectuate the foreclosure process. This information includes, but is not limited to, obtaining judgment figures, payoff quotes, reinstatement quotes, payment histories, etc.
- Prepare foreclosure bids in accordance with Client or investor specifications that may be updated from time to time.
- Report all completed foreclosure sales to Client on the day of the sale so that the sale results can be reported to the investor timely. Client may give Company the ability to report sale results directly to the investor. Company will be responsible for any penalties imposed by investor for failure to report timely. Failure to report timely means either (1) no reporting sale results on the day of the sale to Client or (2) not reporting sale results directly to investor timely.

Bankruptcy

- Immediately prioritize all new referrals by obtaining all relevant required information and documentation to the matter. That would include reviewing all notices, debtor schedules, court docket notices, pleadings, and loan history to identify matters for immediate action, including but not limited to dismissal, stay relief, and abusive filing.
- Immediately file a notice of appearance so that law firm receives all future notices and pleadings relevant to the matter.
- Prepare the file and proof of claim in accordance with local rules and practices.
- Send out all ARM and escrow change letters to the trustee and debtor's attorney.
- Analyze filed bankruptcy plans and recommend an appropriate action or automatically take appropriate action, based on Client authorization, to ensure that the interest of Client is protected.
- File dismissals, stay relief, bankruptcy plan objections, or any other relevant proceeding in a timely matter.
- For all chapter 11, 12 and 13 bankruptcy matters that are reflecting as 60 days or greater post petition delinquent in MS and have not been referred for dismissal or a motion for relief, Company must update MS comments on a monthly basis with an explanation as to why the loan has not been referred.
- Perform ongoing analysis of the legal action and review all relevant court notices, pleadings, correspondence, docket review, etc.
- Update MS will all applicable events associated with the bankruptcy and document comments with the ongoing status of the particular case.
- Review the bankruptcy cases for ongoing payment compliance and take appropriate actions when payments are not being received. This includes following up with the bankruptcy trustee to ensure the timely receipt of trustee funds and also includes

2

02/15/2007 10:48 FAX 17278940107                                                    ☑003/008

12-12020-mg    Doc 8531-4    Filed 04/27/15    Entered 04/27/15 16:52:56    Cunningham
                             Decl. Exhibit A    Pg 18 of 38

timely initiations of dismissals, motions for relief and/or timely filings of default in the
event the borrower fails to comply with the terms of an agreed order.

- Perform a complete audit on every Chapter 13 (C-13) case approaching discharge (90
  days prior to scheduled discharge) to ensure that all amounts owing are accounted for
  and determine if any amounts can be changed back to the mortgagor or need to be
  written off.
- Respond to and assist Client on all routine inquires in a timely manner
- Reimburse Client for any documented errors by the law firm such as Proof of Claim
  (POC) errors resulting in shortages, agreed order errors resulting in shortages, etc.

IV.  PROCESS FLOW

- Client will notify Company when a new foreclosure referral or bankruptcy filing
  received from the Company's referral database or from its third party service provider,
  currently BANKO.
- Client will update all the MS information required for a new filing
- Client will provide the Company with a monthly report detailing the ARM and escrow
  change letters needed.
- Client reserves the right to add additional states and Service levels through a change
  order request-Attachment A.
- Company will follow all of the detailed policies and procedures provided by the Client.

V.  MANAGEMENT REPORTS

Company will provide Client with the reports identified below by the 3rd calendar day of
each month for the prior month's activity.

- Report #1 - % of notices of appearances sent to the court within 10 business days of
  the bankruptcy filing.
- Report #2 - % of C-13 plans reviewed 10 calendar days prior to confirmation hearing
- Report #3 - % of POC filed with 15 calendar days of the notice of bankruptcy
- Report #4 - % of Motion for Relief (MFR) filed within 60 calendar days of the post
  petition due date
- Report #5 - % of Notice of Default (NOD) requested before the 60th calendar day of
  delinquency
- Report #6 - % of completed bankruptcies where Client was notified within 10 calendar
  days of release date
- Report #7 – % of First Legal actions completed.  Company will establish state by state
  standards for timeliness of filing the first legal to be referenced as Attachment B.
- Report #8 – % Completed foreclosure sales.  These would be in accordance with the
  shortest available investor time standard.  Attorney would be permitted to carve out
  bankruptcy and loss mitigation delays from the time standard

- Report #9 – Report listing all reinstated and paid off loans from prior month. Attorney would be responsible for validating that funds were posted to each account by Client.

## VI. SERVICE LEVEL AGREEMENT

| SLA | MEETS | NEEDS IMPROVEMENT | BREACH |
|---|---|---|---|
| % of notices of appearance sent to the court within 10 calendar days o f bankruptcy filing notification | 96%-100% | 90%-95.5% | <90% |
| % of C-13 plans reviewed 10 calendar days prior to confirmation hearing | 96%-100% | 90%-95.5% | <90% |
| % of POCs filed within 15 calendar days of the notice of BK | 96%-100% | 90%-95.5% | <90% |
| % of MFRs filed within 60 calendar days of the post petition due date | 96%-100% | 90%-95.5% | <90% |
| % of NODs requested before 60th calendar day of delinquency | 96%-100% | 90%-95.5% | <90% |
| % of completed bankruptcies where Client was notified within 10 calendar business days of release date | 96%-100% | 90%-95.5% | <90% |
| % of First Legal actions completed. Company will establish state by state standards for timeliness of filing the first legal to be referenced as Attachment B. | 96%-100% | 90%-95.5% | <90% |
| % Completed foreclosure sales. These would be in accordance with the shortest available investor time standard. Attorney would be permitted to carve out bankruptcy and loss mitigation delays from the time standard | 96%-100% | 90%-95.5% | <90% |
| Report listing all reinstated and paid off loans from prior month. Attorney would be responsible for validating that funds were posted to each account by Client. | 96%-100% | 90%-95.5% | <90% |

| SCORING LEGEND | |
|---|---|
| MEETS/EXCEEDS STANDARD | 96%-100% |
| NEEDS IMPROVEMENT | 90%-95.5% |
| BREACH | <90% |

## VII. PRICING

- Company will bill Client in accordance with investor allowable and normal industry claimable items that are mutually agreed upon by the parties.
- Any charges that are over the allowable amount of the investor reimbursement will be billed back to Company. Reimbursement of such bill back amounts shall be sent to Client within 10 days of demand.
- Invoices will be delivered to Client's third party invoice clearinghouse within 3 days of the conclusion of an action.
- Company will be responsible for the cost of the communication T1 line installation as well as the monthly and other associated charges.

4

02/15/2007 10:46 FAX 17278940107                                    ☑005/008

12-12020-mg    Doc 8531-4    Filed 04/27/15    Entered 04/27/15 16:52:56    Cunningham
                             Decl. Exhibit A    Pg 20 of 38

- Client reserves the right to transfer to Company foreclosure and bankruptcy matters already in process with another firm at the sole discretion of Client. Company agrees to handle these matters in accordance with investor requirements and to do so without charging a "transfer fee" and to complete the process by charging the remaining investor allowable fee that has not been paid to the prior firm.

## VIII.  INVOICING

For purposed of this SOW only and notwithstanding anything to the contrary in Section VII "Pricing", Company shall submit all invoices to Client using the electronic invoicing system Client presently uses. Client shall not be responsible for paying any invoices submitted by Company which have not been submitted using electronic invoicing unless mutually agreed to in writing in advance by the parties.

Invoices are to be submitted 3 business days after the conclusion of an action identified steps in the foreclosure process, specifically, (1) filing of the complaint, (2) writ of execution and (3) final statement.

.

## IX.  FAILURE TO MEET SERVICE LEVELS

Company will perform the required Services in a manner that meets the SLAs herein or attached. If Company fails to meet any of the committed SLAs, Client will take the following actions:

- Provide Client with a single point of contact for the prompt resolution of all SLA failures
- Report a failure to Client within 48 hours
- Promptly initiate an investigation to identify the root cause of the failure
- Notify Client of the plan to resolve the problem within five (5) business days
- Correct the problem or provide capability to work around the problem depending on the severity of the problem
- Advise Client of the status of corrective efforts being undertaken with respect to solving this type of problem. Begin meeting the committed service levels with ten (10) business days

*The remainder of this page is intentionally left blank.*

5

02/15/2007 10:47 FAX 17278940107

12-12020-mg    Doc 8531-4    Filed 04/27/15    Entered 04/27/15 16:52:56    Cunningham
Decl. Exhibit A    Pg 21 of 38

☑006/008

IN WITNESS WHEREOF, the parties hereto have executed this Statement of Work as of the date
first written above.

For Client:                                                    For Company:

GMAC Mortgage, LLC                        Law Offices of David J. Stern, P.A.
                                                                COMPANY NAME

BY: _____              BY: _____

William J. Maguire                                David J. Stern
PRINTED NAME                                      PRINTED NAME

Senior Vice President                             President
Title                                                             Title

6

## Attachment A- Change Order Form

| Change Request Approved by: | |
|---|---|
| (Name): | |
| (Phone#): | |
| (E-Mail): | |
| (Signature & Date): | |
| Consultant Change Request #: | |

## EXHIBIT B
## FIRST LEGAL TIMELINE SCHEDULE

| STATE | # OF DAYS |
|-------|-----------|
| AK | 15 CALENDAR DAYS |
| AL | 15 CALENDAR DAYS |
| CA | 10 CALENDAR DAYS |
| DC | 20 CALENDAR DAYS |
| DE | 15 CALENDAR DAYS |
| FL | 15 CALENDAR DAYS |
| GA | 15 CALENDAR DAYS |
| HI | 15 CALENDAR DAYS |
| KS | 15 CALENDAR DAYS |
| KY | 15 CALENDAR DAYS |
| MA | 15 CALENDAR DAYS |
| MD | 20 CALENDAR DAYS |
| MI | 10 CALENDAR DAYS |
| MO | 15 CALENDAR DAYS |
| MS | 15 CALENDAR DAYS |
| NC | 15 CALENDAR DAYS |
| NH | 15 CALENDAR DAYS |
| NJ | 10 CALENDAR DAYS |
| NY | 10 CALENDAR DAYS |
| OH | 15 CALENDAR DAYS |
| PA | 10 CALENDAR DAYS |
| RI | 15 CALENDAR DAYS |
| SC | 15 CALENDAR DAYS |
| TN | 15 CALENDAR DAYS |
| TX | 15 CALENDAR DAYS |
| UT | 15 CALENDAR DAYS |
| VA | 20 CALENDAR DAYS |
| WV | 20 CALENDAR DAYS |
|  |  |

8

04/27/2007 11:23 FAX 17278940107           ☑001/002
12-12020-mg · Doc 8531-4    Filed 04/27/15    Entered 04/27/15 16:52:56    Cunningham
Decl. Exhibit A    Pg 24 of 38

**Change Order- Number 1 dated April 18, 2007**

To

**Statement of Work For Law Firm of David J. Stern dated February 8, 2007**

| | | |
|---|---|---|
| | 4/18/07 | 1 |
| | Linda Walton | |
| | Linda.walton@gmacm.com | |
| | | To establish incident escalation and notification guidelines for breaches in security of consumer data. |

For this change order Client and Company agree as follows:

1.  The following is added as a new section to the Statement of Work:

    Incident Escalation and Notification Guidelines- Company has implemented the following information security Incident escalation and notification process with regard to Client:

    ✓ Notification of any Incident that Impacts the confidentiality of Client information will be made no later than 24 hours after the identification of the incident.
    ✓ Whenever there is an incident that impacts the confidentiality of Client Information the following procedures will be followed:

         o A representative of Company will notify the Client security contact Becky Stoffel (952-979-4706 Becky.Stoffel@gmacrfc ) and relationship manager Linda Walton (215-682-1827 Linda.walton@gmacm.com ) by phone and email within 24 hours of the Incident being Identified. Client may upon written notice to Company change either the Client security contact or relationship manager as necessary.

    ✓ Client requires that prior to distribution to Client customers, all notifications must be reviewed and approved by Client.

In the event of a conflict between this Change Order and the Statement of Work with respect to the Services provided under this Change Order, this Change Order shall control.

Except as set forth herein, all other terms and conditions of the Statement of Work shall remain in full force and effect.

Change Request Approved by:

04/27/2007 11:24 FAX 17278940107

12-12020-mg    Doc 8531-4    Filed 04/27/15    Entered 04/27/15 16:52:56    Cunningham
Decl. Exhibit A    Pg 25 of 38

☑ 002/002

| (Name): | |
| (Phone#): | |
| (E-Mail): | |
| (Signature & Date): | |
| Company Change Request #: | |

IN WITNESS WHEREOF, the parties hereto have executed this Change Order as of the day and year first written above.

| GMAC Mortgage, LLC | Law Firm of David J. Stern |
| By: _William J. Maguire_ | By: _David J. Stern_ |
| William J. Maguire | David J. Stern |
| Printed Name | Printed Name |
| | Pres |
| Senior Vice President | |
| Title | Title |

13-Dec-2007 09:10 AM GMAC Mortgage 215-734-8848

12-12020-mg    Doc 8531-4    Filed 04/27/15    Entered 04/27/15 16:52:56    Cunningham
Decl. Exhibit A    Pg 26 of 38

1/1



# GMAC Mortgage

## Change Order Number 02 dated December 3, 2007

## To

## Statement of Work for Direct Sourcing of Foreclosure & Bankruptcy for Law Firm of David L. Stern

| Change Order Form | |
|---|---|
| Date Submitted: 12/3/07 | Number: 02 |
| Requested By: Linda Walton | |
| (E-mail): Linda.Walton@gmacm.com | |
| Brief Description/Need: Addition to Section III BUSINESS REQUIREMENT | |

**Information/Work Requirements**

For this change order 02 Client and Company agree as follows:

Add to Section III, Business Requirements under the Bankruptcy this will be added as the 6th bullet point:
- "Determine debtors intention of the property and properly update the company servicing system. Take appropriate actions, based on client authorization, to ensure the interest of the client is protected."

In the event of a conflict between this Change Order and the Statement of Work with respect to the Services provided under this Change Order, this change shall control.

The capitalized terms used herein, unless otherwise defined, shall have the meaning set forth in the Agreement.

Except as set forth, all other terms and conditions of the Statement of Work shall remain in full force and effect.

| Change Request Approved by: |
|---|
| (Name): |
| (Phone#): |
| (E-Mail): |
| (Signature & Date): |

Consultant Change Request #:

**Change Proposal Assessment (for Consultant use only)**

IN WITNESS WHEREOF, the parties hereto have executed this Change Order as of the day and year first written above.

| GMAC Mortgage, LLC | Law Firm of David L. Stern |
|---|---|
| By: _[signature]_ | By: _[signature]_ |
| William J. Maguire | DaViD J. STERN |
| Printed Name | Printed Name |
| Senior Vice President | PreSiDeNt |
| Title | Title |

07-Apr-2008 07:53 AM GMAC Mortgage 215-734-8848                                                                                                                1/1

12-12020-mg     Doc 8531-4     Filed 04/27/15     Entered 04/27/15 16:52:56     Cunningham
Decl. Exhibit A     Pg 27 of 38



**Change Order Number 03 dated March 20, 2008**

**To**

**Statement of Work for Direct Sourcing of Foreclosure & Bankruptcy for the Law firm of David L. Stern**

| Change Order Form | | | |
|---|---|---|---|
| Date Submitted: | 3/20/08 | Number: | 03 |
| Requester: | Linda Walton | | |
| (E-Mail) | Linda.walton@gmacm.com | | |
| Brief Description of Need(s): | Change to Reports and Service Levels | | |

| Formal Statement of Requirements: | | | |
|---|---|---|---|
| For this change order 03 Client and Company agree as follows:  See attached *"Change Order Terms"*.<br><br>In the event of a conflict between this Change Order and the Statement of Work with respect to the Service provided under this Change Order, this change order shall control.<br>The capitalized terms used herein, unless otherwise defined, shall have the meaning set forth in the Agreement.<br>Except as set forth, all other terms and conditions of the Statement of Work shall remain in full force and effect. | | | |

IN WITNESS WHEREOF, the parties hereto have executed this Change Order as of the day and year first written above.

| GMAC Mortgage, LLC | Company |
|---|---|
| By: _William J. Maguire_ | By: _David J. Stern_ |
| **William J. Maguire** | **David J. Stern** |
| **Printed Name** | **Printed Name** |
| **Senior Vice President** | **President** |
| **Title** | **Title** |

STATEMENT OF WORK (LAW-15696)
TO
MASTER SERVICES AGREEMENT (LAW-04018)
FOR DIRECT SOURCING OF FORECLOSURE AND BANKRUPTCY
EFFECTIVE January 31, 2010

## I.  INTRODUCTION

This Statement of Work (SOW) is issued pursuant to and in accordance with the terms and conditions set forth in the Master Service Agreement LAW-04018 (Agreement) dated as of 1/17/2007 between Law Firm of David Stern, (Supplier) and GMAC Mortgage, LLC (GMAC).  This SOW reflects the final pricing and requirements for Services, except as may be subsequently modified by the parties upon mutual written agreement.  All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement.  Any services not specifically defined and/or detailed in this SOW will be provided at no additional cost to GMAC upon mutual agreement.  Any changes to or modifications of this SOW will be completed through execution of a change order form in a similar form to Exhibit A (Change Order Form) as attached hereto which will then be incorporated into the SOW.

This Statement of Work supersedes the prior Statement of Work for Direct Sourcing of Foreclosure and Bankruptcy dated 2/8/2007 and all subsequent change orders between the Parties related to the Services described herein.  Further, the Agreement is only the effective Master Service Agreement in place between the parties related to the services described herein.

## II.  DESCRIPTION OF SERVICES

Supplier will receive direct referrals for foreclosure and bankruptcy actions through Process Management ("PM") or any other applicable system.  Supplier will be responsible for paying to LPS all fees associated with PM usage.  Supplier will be responsible for all required actions in order to protect the interest of GMAC.

## III.  INCIDENT ESCALATION AND NOTIFICATION

- Incident Escalation and Notification Guidelines- Supplier will implement the following information security incident escalation and notification process with regard to GMAC:
- Supplier must notify GMAC of any incident that affects the confidentiality of GMAC information no later than 24 hours after the Supplier identifies an incident may have occurred.
- Whenever there is an incident that may impact the confidentiality or security of GMAC information Supplier must notify the GMAC security contact Privacy.Office@gmacm.com and relationship manager Linda Walton (215-734-5074 Linda.walton@gmacm.com) by phone and email within 24 hours of the identification of the potential incident.  GMAC may upon written notice to Supplier change either the GMAC security contact or relationship manager as necessary.
- In the event Supplier suffers a security breach notification event involving GMAC data, Supplier must coordinate its response to such incident with GMAC.  Supplier will not distribute security breach notices to GMAC's customers without GMAC's prior written consent.

## IV.  PRIVACY STATEMENT

- Supplier affirms its commitment to treat any and all information pertaining to the borrowers, including but not limited to their name, address, phone number, loan number, principal balance, monthly payments, default status, Social Security number, employment information or any other information provided to it under this SOW as non-public, confidential and private information, and comply with all applicable laws pertaining thereto.
- Supplier will not use such information for any purpose other than the specific business purpose for which it is furnished to Supplier.
- Information will be released to third parties, independent agents, or independent sub-contractors, only to the extent necessary for the performance of the services requested hereunder.
- Supplier will monitor the handling of documents, data and reports to assure they remain secure and safeguarded against anticipated threats or hazards to the security of such information.

## V.  PRIVACY TRAINING

- During the term of this Statement of work and annually, Supplier will be responsible for Privacy training each year beginning 2010.  Completion of the privacy training must be done annually and acknowledgement form, Exhibit C returned to Linda Walton, Relationship Manager, linda.walton@gmacm.com by October 31st of each year.  Non compliance will be considered a breach in security and could result in termination.

## VI.  DELIVERABLES

- Supplier is required to install hard drive and email encryption on machines/computing equipment which will be used to fulfill GMAC RFG contractual obligations.  All emails sent to GMAC with any personal/confidential information on a borrower.

- Supplier is required to respond to all intercoms, emails, phone calls, and status requests within 2 business days of receipt.
- All items deemed non recoverable must be itemized as such within Invoice Management and the appropriate issue must be immediately raised in Process Management.

## FORECLOSURE

- Prioritize all new referrals by obtaining all relevant and required information and documentation for completing the first legal action and the foreclosure process.
- Adhere to all investor timeframes by completing each step in the foreclosure process within established industry standards.  Make GMAC whole when GMAC has been assessed a penalty for failure to adhere to established standards.
- Update PM including servicer steps listed in Exhibit F and GMAC's system of record (FiServe "FS") with all applicable events in the foreclosure process and update comments with the ongoing status of specific matters.  All delays in the foreclosure process must be updated in PM or FS with reasonable explanations. All pending foreclosure matters must be updated at least monthly with a current status of the applicable matter.
- Monitor, complete and reply when necessary to CITs found in individual and general FiServe queues within the timeframe specified in Exhibit E.
- Pull all information from FS that is needed to effectuate the foreclosure process.  This information includes but is not limited to, obtaining judgment figures, payoff quotes, reinstatement quotes, payment histories, etc.
- Prepare foreclosure bids in accordance with GMAC/Investor specifications that may be updated from time to time.
- Report all completed foreclosure sale to GMAC no later than 12:00PM Eastern Standard time (EST) on the business day following the sale so that the sale results can be reported to the investor timely.  GMAC may give Supplier the ability to report sale results directly to the investor.  Supplier will be responsible for penalties imposed by investor if the failure to meet the timeline was within their control.  Failure to report timely means either (1) not reporting sale results to GMAC by 12:00pm EST on the business day following the sale, or (2) not reporting sale results directly to investor timely.

## BANKRUPTCY

- Immediately prioritize all new referrals by obtaining all relevant required information and documentation to the matter.  That would include reviewing all notices, debtor schedules, court docket notices, pleadings, and loan history to identify matters for immediate action, including but not limited to dismissal, stay relief, and abusive filing.
- If supplier learns of a new BK filing they must open CIT895.
- GMAC relies on the expertise of Supplier to appropriately manage and handle all bankruptcies. Supplier should always proceed in the most economical manner and with GMAC's best interest in mind.
- Adhere to all investor timeframes by referring and completing each step in the bankruptcy process within established industry standards. Ensure all POC, stay relief, bankruptcy plan objections, or other relevant pleadings are filed in a timely manner.  Make GMAC whole when GMAC has been assessed a penalty for failure to adhere to established standards.
- Update PM including servicer steps listed in Exhibit F and GMAC's system of record (FiServ "FS") with all applicable events in the bankruptcy process and update comments with the ongoing status of specific matters.  All delays in the bankruptcy process must be updated in FS with reasonable explanations.
- Monitor, complete and reply when necessary to CITs found in individual and general FiServ queues within the timeframe specified in Exhibit E.
- Pull all information from FS that is needed to effectuate the bankruptcy process.  This information includes but is not limited to, POC/MFR figures, payoff quotes, reinstatement quotes, payment histories, etc.
- Review the bankruptcy cases for ongoing payment compliance and take appropriate actions when payments are not being received.  This includes following up with the bankruptcy trustee to ensure the timely receipt of trustee funds and also includes timely initiations of dismissals, motions for relief and/or timely filings of default in the event the borrower fails to comply with the terms of the agreed order. Refer out Motion for Relief in accordance with GMAC/Investor specifications including the timelines in Exhibit B.
- Timely review all bankruptcy plans and if appropriate refer out the Proof of Claim.  Ensure the Proof of claim is accurately and timely filed within the SLA timeframe.
- Complete reconciliation within 45 business days when the Poc (including amended Pocs) is filed, the plan is confirmed, or an agreed order is filed with the Court.  This reconciliation includes ensuring that all documents filed with the Court are accurate and FS is appropriately updated including all system figures.
- Complete all closings within the SLA timeframe ensuring that prior to closing out the loan the final bill has been paid and all fees and costs have been reconciled and all non-recoverable amounts removed from the loan prior to close out.
- When Supplier is notified of a Chapter 13 discharge they are to ensure that the account is contractually current, that there is $350 or less in fees and costs, and escrow does not have a shortage.  If there are fees of $350.00 or less open a 'BK Non Recoverable Fee – Closing" issue and wait for the fees to be properly removed.  If these conditions are not met, Supplier is to complete a full audit of the loan.  The loan must remain in active status with the delinquent counselor code updated to BKD and the audit must

2

be completed within **45 business days** from the date of discharge.  Supplier must document the Global Notes in FiServ as to their initial research and all continued research throughout the reconciliation process, including full notating any delays or extenuating circumstances that cause the loan to exceed the 45 business day timeframe.   A report will be run daily to review loans that exceed the timeline and Supplier will need to provide an update to the extenuating circumstances.

- Perform ongoing analysis of the legal actions and review all relevant court notices, pleadings, correspondence, docket review, etc.
- Update PM servicer steps  and FS with all appropriate events associated with the bankruptcy and document comments with the ongoing status of the particular case.
- Perform a complete audit on every Chapter 13 (C-13) case approaching discharge (90 days prior to scheduled discharge) to ensure that all amounts owing are accounted for and determine if any amounts can be charged back to the mortgagor or need to be written off.
- Respond to and assist GMAC on all routine inquiries in a timely manner.
- Supplier must immediately notify the appropriate GMAC litigation representative of all litigation (excluding objections to POC) including but not limited to adversaries, motions for sanctions, Title issues, discovery requests, QWRs, lien strips, cram downs, evidentiary hearings, etc upon receipt
- Reimburse GMAC for any documented errors by the laws firm such as Proof of Claim (POC) errors resulting in shortages, agreed order errors resulting in shortages, etc.

VII.  CLIENT RESPONSIBILITIES
- GMAC will notify Supplier when a new foreclosure referral or bankruptcy filing is received from the Supplier's referral database or from its third party service provider, currently BANKO.
- GMAC will update all the FS information required for a new filing
- GMAC will notify the Supplier of all ARM and escrow change letters on active bankruptcies.
- GMAC reserves the right to add additional states and Service levels through a change order request, Exhibit A.
- Supplier is to follow the P&P manual and attorney expectation document as reference for operational procedures and responsibilities.

VIII.  PROJECT ORGANIZATION

| Brett Larson | VM Analyst – BK | Brett.larson@gmacmc.com | 215-734-5156 |
| Geoff Hynes | VM Analyst – FCL | Geoff.larson@gmacm.com | 215-734-5317 |
| Will Watson | Team Lead | Will.watson@gmacm.com | 215-734-5316 |
| Linda Walton | Manager | Linda.walton@gmacm.com | 215-734-5074 |
| Pat Ford | Director | patricia.ford@gmacm.com | 215-734-5258 |

IX.  MANAGEMENT REPORTS
GMAC will provide supplier with the reports identified below by the 1st business day of each month for the prior month's activity.  Supplier will return the reports with any exceptions by 12pm (noon) of the 3rd business day of each month.
- Report #1 - % of C-13 plans reviewed 10 business days of the notice of bankruptcy.
- Report #2 - % of POC filed within 45 calendar days of the notice of bankruptcy
- Report #3 - % of Motion for Relief (MFR) referred within timelines given in Exhibit D
- Report #4 - % of Motion for Relief (MFR) filed within 30 calendar days of referral
- Report #5 - % of Notice of Default (NOD) requested before the 60th calendar day of delinquency
- Report #6 - % of closed bankruptcies within 10 calendar days of notification date
- Report #7 - % of Discharge Not Current (DNC) bankruptcies released within 45 business days of discharge
- Report #8 - % of first legal actions completed within state by state timelines given in Exhibit B
- Report #9 - % of bids completed 10 calendar days prior to sale
- Report #10 - % foreclosure sales completed within state by state timelines given in Exhibit B.
- Report #11 – Delinquent Direct Source steps in PM as a % of BK and FCL inventory in Exhibit F
- Report #12 – Delinquent Direct Source CITs as a % of open BK and FCL inventory in Exhibit E

Supplier will provide GMAC with the reports identified below by the 3rd calendar day of each month for the prior month's activity.
- Report # 1 – Report listing all reinstated and paid off loans from the prior month.  Attorney would be responsible for validating that GMAC posted the funds to each account.

X.  SERVICE LEVEL AGREEMENT

| SLAs | EXCEEDS | MEETS | NEEDS IMPROVEMENT | BREACH |
|---|---|---|---|---|
| % of C-13 plans reviewed 10 business  days of the notice of bankruptcy. | >99% | 96% - 99% | 90% - 95.9% | <90% |
| % of POC filed within 45 calendar days of the notice of | >99% | 96% - 99% | 90% - 95.9% | <90% |

| | | | | |
|---|---|---|---|---|
| bankruptcy.  POCs must be filed with a complete breakdown of all fees and costs and have the loan documents attached | | | | |
| % of POC's and Amended POC's accurately reconciled on Fiserv within 45 business days of the POC's filing date with the court. | >99% | 96% - 99% | 90% - 95.9% | <90% |
| % of Motion for Relief (MFR) referred within timelines given in Exhibit D | >99% | 96% - 99% | 90% - 95.9% | <90% |
| % of Motion for Relief (MFR) filed within 30 days of referral | >99% | 96% - 99% | 90% - 95.9% | <90% |
| % of Notice of Default (NOD) requested before the 60th calendar day of delinquency | >99% | 96% - 99% | 90% - 95.9% | <90% |
| % of completed bankruptcies where FiServ and Process Management were closed within 10 calendar days of release date | >99% | 96% - 99% | 90% - 95.9% | <90% |
| % of Discharge Not Current (DNC) bankruptcies audited and released within 45 business days of discharge | >99% | 96% - 99% | 90% - 95.9% | <90% |
| % of first legal actions completed within state by state timelines given in Exhibit B | >99% | 96% - 99% | 90% - 95.9% | <90% |
| % of bids completed prior to 10 calendar days of sale. | >99% | 96% - 99% | 90% - 95.9% | <90% |
| % foreclosure sales completed within state by state timelines given in Exhibit B.  Attorney would be permitted to carve out bankruptcy and loss mitigation delays from the time standard. | >99% | 96% - 99% | 90% - 95.9% | <90% |
| Delinquent Direct Source steps (all vendor steps plus servicer steps listed in exhibit F) in PM as a % of BK and FCL inventory. | >99% | 96% - 99% | 90% - 95.9% | <90% |
| Delinquent CITs as a % of open BK and FCL inventory.  Firm must complete or reply to CITs (found in individual and general Fiserv queues) within timelines given in Exhibit E. | >99% | 96% - 99% | 90% - 95.9% | <90% |
| Report listing all reinstated and paid off loans from the prior month.  Attorney would be responsible for validating that funds posted to each account by GMAC. | >99% | 96% - 99% | 90% - 95.9% | <90% |

| SCORING LEGEND | |
|---|---|
| >99% | EXCEEDS |
| 96% - 99% | MEETS |
| 90% - 95.9% | NEEDS IMPROVEMENT |
| <90% | BREACH |

Quality Control

Quality control reviews will be conducted monthly on FC and BK related operational tasks (as outlined in the FC and BK policy and procedures guidelines and the attorney expectations, such as updating the system accurately, using accurate figures, appropriate follow up etc) as well as auditing the applicable legal filings to ensure they are accurate and comply with jurisdictional and GMAC requirements.  A sample testing will be reviewed and any monetary errors will result in an immediate action plan and non-monetary errors must be 96% or greater to achieve a Meets, 90%-95.9% to achieve a Needs Improvement, and below 90% will be a Breach and result in an action plan as set forth in XIII.

The official reporting on new SLAs  and credits as referenced below will not be charged until 60 days after "Go Live" or a mutually agreed upon new date furthermore, if the Supplier fails to satisfy a Breach for two consecutive months a service level credit will be imposed as described below.

Processing Errors- The Supplier will be responsible for any and all hard costs incurred by GMAC resulting from processing errors or omissions from the Supplier performing the services.  If GMAC suffers a hard cost loss, GMAC will request reimbursement and said reimbursement will be delivered to GMAC within ten (10) business days of request.

XI.    PRICING

- Supplier will bill GMAC in accordance with investor allowable and normal industry claimable items that are mutually agreed upon by all parties.  All billing must be prorated to reasonable relate to the work actually performed and the allowable should not be billed unless the action being billed has been completed.  All

4

actions requiring additional fees must be approved by GMAC Mortgage/Investor prior to the action commencing unless the action is required to urgently protect the client's interest. Those items determined non recoverable by state or federal statue will be taken as a cost of doing business to GMAC.

- Any charges that are over the allowable amount of the investor reimbursement, and do not have GMAC/investor approval, will be bill back to the Supplier. Reimbursement of such bill back amounts shall be sent to GMAC within 10 days of demand.
- GMAC reminds Supplier that fees charged to borrowers must be permitted under the terms of the note, security instrument, and applicable laws and be prorated to reasonably relate to the amount of work actually performed. If Supplier determines that fees are non-recoverable please ensure the appropriate issue in process management is opened at the time of bill submission.
- Supplier will be responsible for the cost of the communication T1 line installation as well as the monthly and other associated charges.
- GMAC reserves the right to transfer to Supplier foreclosures and bankruptcy matters already in process with another firm at the sole discretion of GMAC. Supplier agrees to handle these matters in accordance with investor requirements and to do so without charging a "transfer fee" and to complete the process by charging the remaining investor allowable fee that has not been paid to the prior firm.

XII.   INVOICING

- For purposes of this SOW only and notwithstanding anything to the contrary in Section VII "PRICING", Supplier shall submit all invoices to GMAC using the electronic invoicing system GMAC presently uses. GMAC shall not be responsible for paying any invoices submitted by Supplier which have not been submitted using electronic invoicing unless mutually agreed to in writing in advance by the parties.
- Invoices will be delivered to GMAC's third party invoice clearinghouse no later than:
  Bankruptcy Invoices – 5 days of Bankruptcy resolution (dismissal, discharge or relief)
  Foreclosure Invoices – 15 days of Foreclosure acquisition (FCL sale, end of redemption, ratification or confirmation)
  This supersedes all other instructions received for invoice submission.

XIII.   NON SOLICITATION OF EMPLOYEES

During the Term and for a period of one year following termination of this Statement of Work, neither Party shall, without the prior consent of the other Party, intentionally solicit for employment any personnel of the other Party. The phrase "intentionally solicit" shall not include consideration of responses to advertising or job postings directed at the general public or unsolicited resumes. The Parties agree to inform their personnel of the applicable terms of this policy.

XIV.   FAILURE TO MEET SERVICE AND QUALITY CONTROL LEVELS

Supplier will perform the required Services in a manner that meets the SLAs and quality control standards herein or attached. In the event the overall service level is 90% or lower for any two (2) consecutive months Supplier and GMAC will take the following action:

- During our SLA/Quality Call - Provide GMAC with a single point of contact for the prompt resolution of all SLA failures
- Following the SLA/Quality call - Promptly initiate an investigation to identify the root cause of the failure
- Notify GMAC in writing of the action plan to resolve the problem within five (5) business days from the SLA call.
- Correct the problem or provide capability to work around the problem depending on the severity of the problem
- Advise GMAC of the status of corrective efforts being undertaken with respect to solving this type of problem.
- By the end of the 2nd month of a service or quality control failure if all action plans have not been successful, Supplier will be penalized $7,500. Once demand is made the Supplier will tender penalty payment within ten (10) business days of demand.

IN WITNESS WHEREOF, the parties hereto have executed this Statement of Work as of the date first written above.

For GMAC:

GMAC Mortgage, LLC

BY: _____

_____
Brian Pierce
PRINTED NAME

For Supplier:

LAW FIRM OF DAVID STERN

BY: _____

_____
DAVID STERN
PRINTED NAME

_Sourcing Manager_

———————————————                              ———————————————
Title                                                        Title

## Exhibit A - Change Order Form

| Change Order Form | | |
|---|---|---|
| Date Submitted: | | Number: |
| Requester: | | |
| (E-Mail) | | |
| Brief Description of Need(s): | | |
| | | |
| Formal Statement of Requirements: | | |
| | | |
| | | |
| | | |

IN WITNESS WHEREOF, the parties hereto have executed this Change Order as of the day and year first written above.

| GMAC Mortgage, LLC | Supplier |
|---|---|
| By: | By: |
| Printed Name | Printed Name |
| Title | Title |

**Exhibit B - FIRST LEGAL AND SALE TIMELINE SCHEDULE**
(Note: Schedule is for GMAC internal use only and does not excuse your firm from meeting other applicable timelines)

|  | Referral to 1st Legal | Referral to Sale |
|---|---|---|
| Alabama | 30 | 90 |
| Alaska | 15 | 150 |
| Arizona | 15 | 125 |
| Arkansas | 15 | 130 |
| California | 10 | 150 |
| Colorado | 15 | 165 |
| Connecticut | 15 | 220 |
| District of Columbia | 20 | 120 |
| Delaware | 15 | 250 |
| Florida | 30 | 170 |
| Georgia | 40 | 80 |
| Guam | 15 | 120 |
| Hawaii | 15 | 150 |
| Idaho | 15 | 190 |
| Illinois | 15 | 275 |
| Indiana | 15 | 265 |
| Iowa | 15 | 315 |
| Kansas | 15 | 180 |
| Kentucky | 15 | 265 |
| Louisiana | 15 | 220 |
| Maine | 30 | 355 |
| Maryland | 75 | 150 |
| Massachusetts | 15 | 195 |
| Michigan | 35 | 100 |
| Minnesota | 30 | 110 |
| Mississippi | 15 | 130 |
| Missouri | 15 | 85 |
| Montana | 15 | 205 |
| Nebraska | 15 | 155 |
| Nevada | 15 | 155 |
| New Hampshire | 30 | 110 |
| New Jersey | 15 | 300 |
| New Mexico | 15 | 250 |
| New York | 15 | 280 |
| North Carolina | 15 | 120 |
| North Dakota | 15 | 190 |
| Ohio | 15 | 265 |
| Oklahoma | 15 | 250 |
| Oregon | 15 | 180 |
| Pennsylvania | 15 | 300 |
| Puerto Rico | 15 | 360 |
| Rhode Island | 60 | 90 |
| South Carolina | 15 | 215 |
| South Dakota | 30 | 150 |
| Tennessee | 15 | 90 |
| Texas | 40 | 90 |
| Utah | 15 | 165 |
| Vermont | 30 | 360 |
| Virgin Islands | 15 | 300 |
| Virginia | 30 | 60 |
| Washington | 15 | 160 |
| West Virginia | 30 | 150 |
| Wisconsin | 15 | 310 |
| Wyoming | 15 | 100 |

## EXHIBIT C
## PARTICIPANT ACKNOWLEDGEMENT FORM INDIVIDUAL

**20__ Information Protection Training
Acknowledgement Form**

By signing this form I acknowledge that I have completed the 20__ Information Protection Training.

| | |
|---|---|
| **Name:** | **Signature:** |
| **Organization:** | **Date:** |
| | |

**Please fax this form to Linda Walton at 866-340-2924 or email to Linda.walton@gmacm.com
Or
William Watson at William.watson@gmacm.com**

8

## EXHIBIT D

### MFR Referral Timelines

All days are business days

- All FHLMC MFRs must be referred out by the following timeframes:
    i.   Chapter 7 (not delinquent at BK filing) – referred no earlier than 30 days and no later than 44 days from contractual delinquency
    ii.  Chapter 7 (delinquent at BK filing) – referred no later than 3 business days from BK notification
    iii. Chapter 13 – referred no earlier than 45 days and no later than 59 days from post petition delinquency

- All FNMA MFRs must be referred out by the following timeframes:
    i.   Chapter 7 (<=60 days delinquent at BK filing) – referred no earlier than 60 days and no later than 74 days from contractual delinquency
    ii.  Chapter 7 (> 60 days delinquent or in FCL at BK filing) – referred no later than 7 days from BK notification
    iii. Chapter 13 – referred no earlier than 60 days and no later than 74 days from post petition delinquency

- All other investors' MFRs must be referred out by the following timeframes:
    i.   Chapter 7 – referred no earlier than 45 days and no later than 59 days from contractual delinquency
    ii.  Chapter 13 – referred no earlier than 45 days and no later than 59 days from post petition delinquency

## EXHIBIT E

## CIT Completion/Response Timelines

Firm will complete or reply to CITs found in individual processor queues and general queues located in FiServe. These CITs must be completed or replied to within the specified number of days from CIT origination.

CIT# 809 (Property preservation CIT, Individual Queues) - 2 days

CIT# 886 (Close Reo module CIT, Individual Queues) - 2 days

CITs 904,905,906,907,908,909 (Investor Reporting CIT, Individual Queues) - 5 days

CITs 648, 649 (Payment reversal CITs, Individual Queue) - 3 days

CIT# 733 (Permission to pay Taxes BK, General Queue – Sort by state) - 10 days

CIT# 770 (Urgent permission to pay Taxes BK, General Queue – Sort by state) - 5 days

CIT# 950 (CIT from property preservation, General Queue) - 21 days

CIT# 957 (Cash movement CIT, General Queue) - 5 days

CIT# 967 (BK analysis not processed CIT, Individual Queue) - 1 day

### EXHIBIT F Direct Source Servicer

| Steps | |
|---|---|
| Accounting Adjustment Complete | |
| Amended Proof of Claim Referred to Attorney | |
| Adequate Protection Referred to Attorney | |
| Agreed Order Default Cured, Client System Updated | |
| Agreed Order Default Referred to Attorney | |
| Agreed Order SetUp on Client System | |
| All Payments Received, AO Cured | |
| Amended Proof of Claim Referred to Attorney | |
| Attorney Notified to Close File | |
| Bid Approved | |
| Bid Calculation Completed | |
| Bidding Instructions To Attorney | |
| Chapter 13 Closing Reason | |
| Chapter 13 Closing Reason Effective Date | |
| Ch 13 Dishcarge Audit Requested | |
| Ch 13 Discharge Audit Completed | |
| Chapter 13 Discharge Review Complete | |
| Chapter 13 Processes Closed in NewTrak | |
| Chapter 13 Trustee Ledger Reconciled | |
| Chapter 7 Asset Review Complete | |
| Chapter 7 Closing Reason | |
| Chapter 7 Closing Reason Effective Date | |
| Chapter 7 Processes Closed in NewTrak | |
| Client Review for Workstation Closing | |
| Client System Closed | |
| Client System Updated | |
| Defense of Proof of Claim Referred to Attorney | |
| Escrow Analysis Completed | |
| Executed Document Received Sent to Attorney | |
| Fees and Costs Reconciled | |
| File Closing Complete | |
| Filed Agreed Order/APO Reconciled | |
| Filed Amended POC Reconciled | |
| Filed POC Reconciled | |
| Hearing Results Reviewed | |
| HUD Conveyance Extension Requested | |
| HUD Conveyance Extension Response Received | |
| Hud Extension Referral Sent to Attorney | |
| In rem Motion for Relief Referred to Attorney | |
| Judgment Figure Data Referred | |
| Motion for Relief Referred to Attorney | |
| Motion to Deem Current Referred to Attorney | |
| Motion to Dismiss Referred to Attorney | |
| Motion to Sell Referred to Attorney | |
| Motion to Sell Order Entered | |
| No Stay Order Referred to Attorney | |
| Objection to Motion to Extend Stay Referred to Attorney | |
| Objection to Motion to Impose Stary Referred to Attorney | |
| Payoff Quote Request Submitted | |
| Plan Review Referred to Attorney Step | |
| Plan Objection Referred | |
| Plan Objection Results | |
| Plan Objection Review Complete | |
| POC Screen Modified in Client System | |
| Post Redemption Codes Changed in Clients System | |
| Proof of Claim Referred to Attorney | |
| Proof of Claim Screen Set Up in Client System | |