# EXHIBIT E

# TO THE DECLARATION OF

# JOHN W. SMITH T

STATE OF FLORIDA

OFFICE OF THE ATTORNEY GENERAL

DEPARTMENT OF LEGAL AFFAIRS



---

ECONOMIC CRIMES

SUBPOENA FOR APPEARANCE FOR KELLY SCOTT

AG CASE NO.: L10-3-1145

---

IN THE INVESTIGATION OF: Law Offices of David J. Stern, P.A.

900 S. Pine Island Road

Suite 400

Plantation, Florida 33324

---

CORRECTED

SWORN STATEMENT

OF

KELLY SCOTT

Office of the Attorney General

110 S.E. 6th Street, 10th Floor

Fort Lauderdale, Florida 33301

October 4th, 2010

2:14 p.m. - 3:45 p.m.

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 3 of 76

Page 2

```
 1    APPEARANCES:

 2

 3    For the Plaintiff(s):

 4                    JUNE M. CLARKSON, ESQUIRE
                      THERESA B. EDWARDS, ESQUIRE

 5                    Office of the Attorney General

                      110 S.E. 6th Street, 9th Floor

 6                    Fort Lauderdale, Florida 33301

 7

      For the Defendant(s):

 8

                      (Appearing telephonically)

 9                    DOUGLAS S. LYONS, ESQUIRE

                      MARSHA L. LYONS, ESQUIRE

10                    Lyons & Farrar

                      325 N. Calhoun Street

11                    Tallahassee, Florida 32301

12    Also Present:

13                    CORY FRIEDMAN (Intern)

                      HAROLD REAGAN (Court Reporter)

14

15                              - - - - -

16

17

18

19

20

21

22

23

24

25
```

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 4 of 76

Page 3

1                        I N D E X

2

3        Witness                Direct   Cross   Redirect   Recross

4    KELLY SCOTT

         By Ms. Clarkson           3

5        By Ms. Edwards           30

6

7

                            EXHIBIT   INDEX

8

         Plaintiff's              Description              Page No.

9

            1          Subpoena                              4

10

            2          Exemplar of Cheryl Salmons's         23

11                     Signature

12          3          Assignment of Mortgage               23

13          4          Assignment of Mortgage and           26
                       three signatures

14

            5          Cheryl Salmons signature             27

15

         (Exhibits were retained by attorney.)

16

17

18

19

20

21

22

23

24

25

12-12020-mg   Doc 8531-20   Filed 04/27/15   Entered 04/27/15 16:52:56   Smith T
Decl. Exhibit E   Pg 5 of 76

Page 4

1    THEREUPON:

2                              KELLY SCOTT

3    a witness named in the notice heretofore filed, having been

4    first duly sworn, deposes and says as follows:

5                         DIRECT EXAMINATION

6    BY MS. CLARKSON:

7         Q.    Please state your name for the record, please?

8         A.    My name is Kelly Scott.

9         Q.    Do you sometimes go by another name?

10        A.    My middle name. But I hardly ever use it, which is

11   Noelia.

12        Q.    Okay.  Is that N-o-e-l-l?

13        A.    N-o-e-l-i-a.

14        Q.    I'm going to ask you to take a look at this and see

15   if you recognize it?

16        A.    Yes, I do.

17        Q.    Okay. Is that the Subpoena that brought you here

18   today?

19        A.    Yes.

20             MS. CLARKSON:  I'd like to have this marked as

21        Exhibit 1.

22        (Thereupon, the document was marked as Plaintiff's Exhibit

23   1 for identification.)

24             MS. CLARKSON:  Doug, did you get a copy of the

25        Subpoena?

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 6 of 76

Page 5

```
 1            MR. LYONS:  No, I did not.

 2            MS. CLARKSON:  If you want one I can have it sent to

 3       you.

 4            MR. LYONS:  Thank you.

 5            MS. CLARKSON:  You're welcome.

 6   BY MS. CLARKSON:

 7       Q.   Have you ever had your sworn statement taken before?

 8       A.   Yes.

 9       Q.   When was that?

10       A.   More than fifteen years ago.

11       Q.   For a case?

12       A.   Yes.

13       Q.   What kind of case?

14       A.   Child molestation.

15       Q.   Against?

16       A.   Against a minor.

17       Q.   Okay. Who was the defendant in that case?

18       A.   It was Rebecca Diaz.

19       Q.   And who was the plaintiff in that case?

20       A.   I can't remember.

21            MS. CLARKSON:  Since it's been a while, remember to

22       answer verbally because when you nod your head like that

23       she can't take it down. And if you say uh-huh, we don't

24       know if that's a yes or a no.  Okay?

25            THE WITNESS:  Okay.
```

1        MS. CLARKSON:  Perfect.  And if you need a break just

2    let me know.

3        If you don't understand a question that I ask, ask me

4    to repeat it because I want you to understand before you

5    answer.

6        THE WITNESS:  All right.

7        MS. CLARKSON:  Okay.

8    BY MS. CLARKSON:

9        Q.    This Subpoena was served on you and that's why you're

10   here today.  Correct?

11       A.    Correct.

12       Q.    Okay. This says it's in the investigation of the Law

13   Offices of David J. Stern, P.A.  Are you familiar with the Law

14   Offices of David J. Stern, P.A.?

15       A.    Yes.

16       Q.    How are you familiar with them?

17       A.    That was my previous employer.

18       Q.    When did you work there?

19       A.    In 2008.

20       Q.    For how long about?

21       A.    A year.

22       Q.    When in 2008?

23       A.    2008? January 24th and I left the firm some time in

24   February of 2009.

25       Q.    So a year, a year and a week and a month?

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 8 of 76

Page 7

1    **A.**    Uh-huh.

2    **Q.**    And what was your position at that office?

3    **A.**    I was the legal assistant to Cheryl Salmons

4    (phonetic).

5    **Q.**    Of you were her legal assistant?

6    **A.**    Yes.

7    **Q.**    Okay. Did she have any other legal assistants?

8    **A.**    At the time, yes.

9    **Q.**    Who else was her legal assistant?

10    **A.**    Marsha.  Not Marsha.  I can't remember. I'm trying to

11    remember her name. I just can't remember right now.

12    **Q.**    Okay.  If you do remember it let me know.

13    **A.**    Okay.

14          MS. CLARKSON:  Okay. Thank you.

15    (Thereupon, a discussion was held off the record.)

16    BY MS. CLARKSON:

17    **Q.**    Okay.  Go ahead. Do you recall?

18    **A.**    Yes, I recall.  The other assistant, when I came in

19    2008, her name was Marvis Brown.

20    **Q.**    M-a-r-v-i-s?

21    **A.**    Yes.

22    **Q.**    And were you the two assistants together?

23    **A.**    Yes.

24    **Q.**    Was there ever a time when you were just the

25    assistant by yourself?

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 9 of 76

Page 8

1    A.    Yes.

2    Q.    When was that, approximately?

3    A.    2008, Mother's Day.

4    Q.    In May?

5    A.    Yeah, it was in 2008.  Marvis quit the firm.

6    Q.    Do you know why she quit?

7    A.    No.

8    Q.    Okay.  Do you know if she went to work someplace

9    else?

10    A.    I have no idea.

11    Q.    So as the assistant to Cheryl Salmons, what were your

12    duties?

13    A.    Assisting Cheryl with her work, daily.

14    Q.    What was her work, daily?

15    A.    Her work, daily, was reviewing files, checking voice

16    mail, e-mails, assisting clients daily, requesting documents.

17    Q.    Requesting documents from who?

18    A.    From the client.

19    Q.    And the client would be, for instance?

20    A.    The banks.  Any type of banks.

21    Q.    Like a Wells Fargo?

22    A.    Wells Fargo, Countrywide, Citi.

23    Q.    Okay. And she would request documents from them?

24    A.    Yes.

25    Q.    Do you know what kind of documents?

Page 9

1    **A.**    Demand letters and original Notes.

2    **Q.**    Original Notes and Mortgages?

3    **A.**    Yes.

4    **Q.**    And this was for the purpose of what?

5    **A.**    For the purpose of obtaining hearings.  We need to,

6    you know, request documents before we can, you know, submit our

7    motions in the court.

8    **Q.**    And this is foreclosures?  Is that what you're

9    talking about?

10    **A.**    Yes.

11    **Q.**    What else did she do?

12    **A.**    Chronology.

13    **Q.**    Which is what?

14    **A.**    The foreclosure time line.

15    **Q.**    It had to be done within a certain amount of time?

16    **A.**    Correct.

17    **Q.**    Anything else? Did she sign documents?

18    **A.**    Yes.

19    **Q.**    Did she notarize documents?

20    **A.**    I don't recall.

21    **Q.**    Did she witness documents?

22    **A.**    No.

23    **Q.**    She basically executed them?

24    **A.**    Yes.

25    **Q.**    And what was her job title?

1    **A.**    Office Manager for the Foreclosure Department.

2    **Q.**    Did that include all departments in foreclosure?

3    **A.**    Yes.

4    **Q.**    Every single department, whether it was assignments

5 or the lawyers or the paralegals?  Was she like the Queen Bee?

6    **A.**    She was the Queen Bee for the Foreclosure Department

7 but not for the attorneys.

8    **Q.**    She didn't tell the attorneys what to do?

9    **A.**    No.

10    **Q.**    Who told the attorneys what to do?

11    **A.**    Miriam Mindietta and Beverly Macoma.

12    **Q.**    And are they lawyers?

13    **A.**    Yes.

14    **Q.**    Do you remember what they're positions were?

15    **A.**    They are the head managers for all of the attorneys

16 in the firm.

17    **Q.**    Okay. There were two of them?

18    **A.**    Yes.

19    **Q.**    And do you know, when you left there were they still

20 working there?

21    **A.**    Yes.

22    **Q.**    So describe Cheryl Salmons role in the firm, if you

23 would?

24    **A.**    Can you be a little bit more specific.

25    **Q.**    Well, was she -- Was it what she said went?

1    **A.**    Yes.

2    **Q.**    As far as staff was concerned?

3    **A.**    Yes, she controlled exactly what occurred and what

4    needed to occur to get a hearing granted.

5    **Q.**    In your opinion, did she do what David Stern told her

6    to do?

7    **A.**    Yes.

8    **Q.**    Okay. And why is that your opinion?

9    **A.**    Because I was there and saw it and I heard it.

10    **Q.**    Okay. Could you tell me what you saw and heard?

11    **A.**    We had rapid docket.

12    **Q.**    You had what?

13    **A.**    Rapid docket.

14    **Q.**    Rapid?

15    **A.**    Yes, rapid docket.  Which means that we can have a

16    certain of files per day; 200 to up to 500 and it would be a

17    five minutes hearing.  So we --

18    **Q.**    Five minutes for each?

19    **A.**    Five minutes for each.

20    **Q.**    Okay.

21    **A.**    And we would push out as many files as we can and get

22    all the pleadings entered and granted.

23    **Q.**    And that is -- Who told her that?  Who told her that

24    was what she was supposed to be doing?

25    **A.**    David Stern.

Page 12

1    Q.    Would you see him there often?

2    A.    Yes.

3    Q.    So he was hands on?

4    A.    Yes.

5    Q.    Do you know how many employees the Law Office of

6    David Stern had?

7    A.    At the time when I started it was 327 and when I

8    resigned it was 857.

9    Q.    That's a lot of growth.

10   A.    Yes.

11   Q.    As you're assistant to Cheryl Salmons, did you ever

12   sign any documents --

13   A.    No.

14   Q.    -- as witnesses?  As a witness?

15   A.    No.

16   Q.    As a notary?

17   A.    No.

18   Q.    As a person executing the document?

19   A.    No.

20   Q.    Have you seen the system that is used to -- in the

21   office, to witness, execute and have notarized documents?

22   A.    Yes.

23   Q.    Can you tell me how that system operated?

24   A.    How the system operated is that every paralegal in

25   the firm, they were all notaries.

Page 13

1      **Q.**    They were notaries?

2      **A.**    Yeah, they were notaries. They had their stamp. They

3    would prepare all of the motions.  The junior would prepare it.

4    They'd get all the pleadings, documents.

5          And once they were printed out and they received the

6    original docs from the file room, the senior paralegal, which

7    would be the team lead, would notarize the file, sign it.

8          Once they notarized and signed it, then they would take it

9    to each floor.

10          We had at that time, like, four floors. So it would be

11    laid on a table.

12      **Q.**    A long table?

13      **A.**    A long table.

14      **Q.**    Like this conference table?

15      **A.**    Yes.

16          MS. CLARKSON:  Okay.  Let it note that this

17        conference table look to be fifteen feet long and about

18        five feet wide.

19    BY MS. CLARKSON:

20      **Q.**    Go on.

21      **A.**    They would stacked amongst each other, side by side,

22    and Cheryl would come twice a day, in the morning and

23    mid-afternoon, around two or three o'clock and she would sign

24    all of them; every single one of them.

25      **Q.**    But they've already been notarized?

Page 14

1    **A.**    They've already been notarized.

2    **Q.**    And what about witnessed?

3    **A.**    There was no witness there.

4    **Q.**    There was no witness there at the time?

5    **A.**    None whatsoever.

6    **Q.**    So you don't -- Have you ever seen witnesses execute

7    the documents as witnesses?

8    **A.**    Yeah.

9    **Q.**    When it's already done?

10    **A.**    Yes.

11    **Q.**    Okay. How would that happen?  How would the

12    witnessing take place? Would they still stay on the table and

13    then witnesses come by?

14    **A.**    No.

15    **Q.**    Okay?

16    **A.**    Once the para of the team signs, notarizes it and

17    it's laid out for Cheryl to come and just sign, she doesn't

18    review them.  She just looks.  The paper is going to be in the

19    top folder.  So it's visible for her.  And she knows exactly

20    where she would have to put her signature.

21        Once she has signed all of the documents she would send a

22    massive e-mail, please come collect your files.

23    **Q.**    Okay?

24    **A.**    And then the paralegals would go and collect their

25    files.

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 16 of 76

Page 15

1      **Q.**    And then the paralegals would take care of getting

2    them witnessed?

3      **A.**    Yes.

4      **Q.**    How would they do that?  Do you know?

5      **A.**    They would get another notary to go ahead and sign

6    off.

7      **Q.**    So they'd swap?

8      **A.**    Yes.

9      **Q.**    So one notary/paralegal would pass hers to another

10    notary/paralegal and vice-a-versa?

11      **A.**    Yes.

12      **Q.**    And they were signing as witnesses, documents that

13    had already been notarized and executed?  Is that correct?

14      **A.**    Correct.

15      **Q.**    Do you know what happened to the documents at that

16    point?

17      **A.**    At that point, once everything was signed it was good

18    to go, to go to court. So they would, you know, send out the

19    second half.  You know, the package would be sent, submitted to

20    the court and we would wait for the hearing.

21      **Q.**    Are you aware of any of the documents before they go

22    into court going into the County Recorder's Office to be

23    recorded?

24      **A.**    No.

25      **Q.**    You're not aware of Assignments of Mortgage being

12-12020-mg   Doc 8531-20   Filed 04/27/15   Entered 04/27/15 16:52:56   Smith T
Decl. Exhibit E   Pg 17 of 76

Page 16

1   executed and filed with the County Recorder's Office and then

2   sent to court?

3       **A.**   No.

4       **Q.**   Okay.  That's fine.  Can you tell me anything else

5   that Cheryl Salmons was responsible for at the firm?

6       **A.**   She was responsible for lost Notes, which is the LNA.

7       **Q.**   The LNA?

8       **A.**   Yes, LNA.  It call a Lost Note Affidavit.

9       **Q.**   Okay?

10      **A.**   If we weren't able to locate it in the house or if it

11  was lost in transition to the firm, I would normally take the

12  file to Cheryl Salmons and she will make this affidavit appear.

13  She would sign it and notarize it and stamp it and it was good

14  to go. And the I was able to take it to the Title Department.

15      **Q.**   And that was an Affidavit of Lost Note?

16      **A.**   Yes.

17      **Q.**   When you say make it appear, is she asking someone

18  else for it?

19      **A.**   No, I would bring the file to her and let her know,

20  listen, we can't have an original Note. It's not here. The

21  client -- It's missing. So we need an LNA.

22      I would leave it in her office and within an hour she

23  would send me an e-mail come pick up the file or most of the

24  time she would just have her file clerk take the file, already,

25  to the Title Department and it would be good to go.

Page 17

1     **Q.**    When you say good to go that means she had her

2  affidavit executed?

3     **A.**    Executed, stamped by her.  Yes.

4     **Q.**    What else did she do?  Her role?

5     **A.**    Her role was to train.  To have her other departments

6  training new employees how to prepare motions, defaults,

7  requesting docs. And it was a work in progress, about ten hours

8  per day. So everyone was pumping out as many files as they can.

9     Freddie Mac was one of the majority one.  Freddie Mac, as

10  well.

11     **Q.**    You mean Fannie Mae and Freddie Mac?

12     **A.**    Yes.

13     **Q.**    Both of them?

14     **A.**    Yes.

15     **Q.**    As her personal assistant, were you ever aware that

16  Ms. Salmons would bring in her personal home bills, private

17  bills to be paid for by the firm?

18     **A.**    Yes.

19     **Q.**    Could you tell me about that?  Did she give them to

20  you or who did she give them to?

21     **A.**    She would never give them to me. They were always

22  given directly to Shamisa (phonetic).

23     **Q.**    Can you spell that?

24     **A.**    I recall can't spell it.

25     **Q.**    And what's the last name, if you know?

Page 18

1    A.    I don't know her last name.

2    Q.    Okay. What was her job there?

3    A.    She was the head accounting.

4    Q.    You say was, is she no longer there?

5    A.    No.

6    Q.    She's left?

7    A.    Yes.

8    Q.    Was she fired or quit?  Do you know?

9    A.    Terminated.

10    Q.    Do you know why?

11    A.    No.

12    Q.    Okay. Shamisa?

13    A.    Shamisa.

14    Q.    So she would -- Now how are you aware that these were

15    her personal bills?

16    A.    Because I was good friends with one of her

17    assistants.

18    Q.    The other assistant?

19    A.    Yes.

20    Q.    Okay. And what was her name?

21    A.    Erica.

22    Q.    Cheryl Salmons' assistant?

23    A.    No, Shamisa's assistant.

24    Q.    You were good friend with?

25    A.    Shamisa's assistant.

Page 19

1    Q.    Who was the head accounting person?

2    A.    Correct.

3    Q.    And what did this friend say?

4    A.    Just regular bills, car payments, cell phone, house,

5    electrical.

6    Q.    When you say house, do you mean mortgage?

7    A.    I'm assuming. I'm not sure. I never saw the bills.

8    Q.    Right.  What's the friend's name of Shamisa?

9    A.    Erica.

10   Q.    Erica who?

11   A.    I'm trying to remember her last name. I can't

12   remember right now.  And -- There's someone else. I just can't

13   remember right now.

14   Q.    Do you know how to spell Erica, E-r-i-c-a?

15   A.    It was E-r-i-c-k-a.

16   Q.    C-k-a?

17   A.    Yes.

18   Q.    Okay.  And she told you that Ericka would see Cheryl

19   Salmons bills being paid for by Shamisa?

20   A.    Yes.

21   Q.    Was this paid for out of the Law Offices of David

22   Stern account?

23   A.    Yes.

24   Q.    And Ericka saw this?

25   A.    Yes.

Page 20

1    **Q.**    Were they being paid on a monthly basis?

2    **A.**    Yes.

3    **Q.**    Were they being paid like that since -- How long did

4    you know about it?

5    **A.**    I knew about it from the beginning.

6    **Q.**    Right when you got in there?

7    **A.**    Yes.

8    **Q.**    And what was said about Cheryl's bills being paid for

9    the Law Offices of David Stern?

10    **A.**    That he's always done it.  David Stern has always

11    paid for Cheryl's expenses.

12    **Q.**    Personal expenses?

13    **A.**    Yes.

14    **Q.**    Do you know if he -- Well was there rumor -- Was

15    there talk, rather, that he paid -- that he bought her car?

16    **A.**    No, that's confirmed. He did buy her a car. I

17    acknowledge that.

18    **Q.**    He did buy her a car?

19    **A.**    Yes.

20    **Q.**    What kind of car did he buy her?

21    **A.**    It was a BMW SUV.

22    **Q.**    And how do you know that?

23    **A.**    Because he left her a voice message and since I was

24    Cheryl's assistant I had privileges of going and reviewing her

25    voice mail.  And that day in particular, he wanted to make sure

Page 21

1    that was satisfied with the car. If not they can return the car

2    and she could get a different car.

3        Q.    But he said, I bought you a car?

4        A.    Yes.

5        Q.    Did he say why he bought her the car?

6        A.    No.

7        Q.    Did you ever hear of him buying her a home?

8        A.    No.

9        Q.    Did you ever hear that he had bought cars or

10   automobiles for her before?

11       A.    Yes.

12       Q.    What did you hear about that?

13       A.    I've heard it before from Maggie Pena and she was

14   another assistant for Shamisa.  And --

15       Q.    That's in accounting?

16       A.    Yeah, in accounting.  And he's -- I think it's every

17   year that she always gets a new car.  They swap out the car and

18   she gets a new one, the new version for the SUV BMW.

19       Q.    Do you know of any other, for lack of a better word,

20   perks that Cheryl Salmons got?

21       A.    Not that I recall.

22       Q.    Are you aware of anyone other than Cheryl Salmons

23   signing Cheryl Salmons' name to documents?

24       A.    Yes.

25       Q.    Could you tell me about that, please?

Page 22

1      **A.**    Cheryl would give certain paralegals rights to sign

2    her name, because most of the time she was very tired, exhausted

3    from signing her name numerous times per day.  You had to

4    understand it was more than five hundred files that she's

5    signing morning and afternoon.

6      **Q.**    Five hundred in the morning and then another five

7    hundred in the afternoon?

8      **A.**    Yes.

9      **Q.**    So approximately a thousand a day?

10      **A.**    A thousand day.

11      **Q.**    Okay?

12      **A.**    So yes, she would -- you know, if they were very

13    close with Cheryl Salmons --

14      **Q.**    They who?  Could you give me their names?

15      **A.**    Shannon Smith, Elizabeth Davilla, Beth Cerni.

16      **Q.**    These people were allowed to sign her name?

17      **A.**    Yes.

18      **Q.**    Are you familiar in any way, shape or form at all

19    that they would learn how to sign like she did?

20      **A.**    Yes, she showed me herself how to sign her name.

21      **Q.**    She should you as well?

22      **A.**    Yes.

23      **Q.**    Did you learn?

24      **A.**    Yes.

25      **Q.**    Could you do it now?

Page 23

1    **A.**    Yes.

2    **Q.**    Okay.  Let me give you a piece of paper and ask you

3  to go ahead and do that for me?

4    **A.**    You have to give me some time. It's been a while.

5         MS. CLARKSON:  I'm going to have this marked.

6     (Thereupon, the document was marked as Plaintiff's Exhibit

7  2 for identification.)

8  BY MS. CLARKSON:

9    **Q.**    Did you ever sign for Cheryl Salmons?

10   **A.**    Yes.

11   **Q.**    What did you sign?

12   **A.**    PTO requests for employees.

13   **Q.**    What is that, please?

14   **A.**    Personal time off.

15   **Q.**    What else did you sign, if anything?

16   **A.**    That's it.

17   **Q.**    What is personal time off?

18   **A.**    Vacation requests.

19   **Q.**    You just granted their --

20   **A.**    Yes.

21        MS. CLARKSON:  Okay.  I'm going to ask you to look at

22   this document.  It's called an Assignment of Mortgage.  It

23   is executed by Cheryl Salmons from the Law Office of David

24   Stern.  I'm going to have it marked.

25     (Thereupon, the document was marked as Plaintiff's Exhibit

Page 24

1    3 for identification.)

2    BY MS. CLARKSON:

3        Q.    Do you recognize that signature?

4        A.    Yes.

5        Q.    Now can you tell if that's Cheryl's or Beth's or

6    whose?

7        A.    No, that's Cheryl's.

8        Q.    That's Cheryl's?

9        A.    Yes.

10        Q.    That's Cheryl Salmons'?

11        A.    Yes.

12        Q.    Can you tell the different between Cheryl's and

13    Beth's and anyone else that was able to sign?

14        A.    No.

15        Q.    You couldn't?

16        A.    No.

17        Q.    Now I'm going to show you three and two, and ask you

18    again, if that is the way you would sign?

19        A.    It would be exactly like this but with more of a

20    curve.

21        Q.    You would put more loops into it?

22        A.    Yes.

23        Q.    This is the first time you've signed this in how

24    long?

25        A.    Like two years and a half.

12-12020-mg   Doc 8531-20   Filed 04/27/15   Entered 04/27/15 16:52:56   Smith T
Decl. Exhibit E   Pg 26 of 76

Page 25

1    **Q.**   Do you know approximately how many documents you

2    signed in her name?

3    **A.**   Maybe fifty.

4    **Q.**   When you said that you could tell that this was

5    Cheryl's signature, how can you tell?

6    **A.**   Because of the shape of the C. She makes a big curve

7    and then she loops down and then she makes another swerve.   So

8    it's not a signature. It's like an initial of her --

9    **Q.**   All right. I'm going to ask you to look at all three

10   signatures on this after it gets marked as Exhibit 4.   This is

11   also an Assignment of Mortgage. It's from the Law Office of

12   David Stern, supposedly signed by Cheryl Salmons, witnessed by

13   Elizabeth Lee and notarized by Elizabeth Lee.

14   Do you know Elizabeth Lee?

15   **A.**   Yes.

16   **Q.**   Did anyone else have Elizabeth Lee's signature?

17   **A.**   No.

18   **Q.**   Did Elizabeth Lee sign for anyone else?

19   **A.**   For Cheryl.

20   **Q.**   She signed for Cheryl as well?

21   **A.**   Yes.

22   **Q.**   Now take a look at this document.   There are three

23   signatures there that all are squiggles.   Do you know who signed

24   those?

25   **A.**   No.

1        (Thereupon, the document was marked as Plaintiff's Exhibit

2    4 for identification.)

3    BY MS. CLARKSON:

4        Q.    Is that Cheryl's signature?

5        A.    No.

6        Q.    Is that Cheryl's signature or someone else's?

7        A.    Cheryl's.

8        Q.    Okay. And what about -- Are you familiar with

9    Elizabeth Lee's signature?

10       A.    No.

11       Q.    Not at all?

12       A.    Un-uh.

13       Q.    Okay. So tell me about Elizabeth Lee and the signing?

14       A.    She's a team lead for her group.  I don't remember

15   the group that she was in. But she was a head team lead.

16       Q.    And she also was taught to sign for Cheryl?

17       A.    Yes.

18       Q.    And if you saw Elizabeth's signature on a document

19   for Cheryl, could you tell the difference? Or could you tell the

20   difference with Beth's?

21       A.    Uhm --

22       Q.    Or you could you only tell the difference that it's

23   not her?

24       A.    I can only identify Cheryl's signature.

25       Q.    I'd like you take a look at this before I mark it and

1    ask you if that's Cheryl's signature?

2        A.    The top one, yes.

3        Q.    Right there?

4        A.    Yes.

5            MS. CLARKSON:  I'll mark it Exhibit 5.

6        (Thereupon, the document was marked as Plaintiff's Exhibit

7    5 for identification.)

8    BY MS. CLARKSON:

9        Q.    Take a look at this and I'm going to ask you if

10   that's a signature of Cheryl Salmons?

11       A.    No.

12       Q.    How do you know that it's not her signature?

13       A.    Because the C is not shaped correctly.

14       Q.    Where is the C?

15       A.    At the beginning of her signature.  If you look at

16   Exhibit 4, Cheryl, she forms like a C and it dips down into a

17   loop which then goes like into an L and then converts into an S.

18       Q.    Okay. And that's not her signature?

19       A.    No.

20       Q.    Do you recognize whose signature that is?

21       A.    No.

22       Q.    Okay.  Had you seen any individuals personally with

23   your own eyes sign Cheryl Salmons' name?

24       A.    No.

25       Q.    As part of your job did you ever speak with the

Page 28

1    public?  The people being foreclosed on?

2        **A.**    When they called in the office, if I picked up the

3    phone and it was a borrower, yes.

4        **Q.**    Okay. So you had spoken with the borrowers?

5        **A.**    No.

6        **Q.**    Did you ever hear any complaints from the borrowers?

7        **A.**    Yes.

8        **Q.**    Could you give me an idea of what kind of complaints

9    you heard?

10        **A.**    That they had an eviction in 24 hours and that they

11    were notified that they were going to be evicted.  And this

12    borrower, in particular, she just got out of the hospital.  And

13    she had just had a baby. So I put her on hold and I went to see

14    Cheryl to advise her of the situation because this lady had

15    nowhere to go.  And Cheryl instructed me that was not her

16    problem or her issue and to transfer her to Claudia Bunje

17    (phonetic) the re-instatement supervisor.

18        **Q.**    And what would the re-instatement supervisor do?

19        **A.**    I have no idea.

20        **Q.**    What was the Re-Instatement Department doing?

21        **A.**    They will sometimes request pay off figures and

22    re-instate the loan.

23        **Q.**    Okay.  Do you remember the woman's name?

24        **A.**    No.

25        **Q.**    How long did it take you to learn to sign like Cheryl

Page 29

1    Salmons?

2        A.    One day.

3        Q.    But you never signed legal documents?

4        A.    Never.

5        Q.    Are you familiar with the manner in which Summonses

6    were filled out or Service of Process?

7        A.    Can you rephrase that a little bit for me?

8        Q.    The Summonses that were attached to different

9    Complaints to be served on the defendants, are you aware of what

10    company was used for servicing those?

11        A.    Yes.

12        Q.    Could you tell me, please?

13        A.    Provest.

14        Q.    And you do you know who owns Provest?

15        A.    No.

16        Q.    Do you know who has any interest in Provest?

17        A.    Yes.

18        Q.    Could you tell me?

19        A.    David Stern.

20        Q.    How do you know this?

21        A.    Because they work with us in the building.

22        Q.    They work -- Provest works with David Stern in the

23    building?

24        A.    Yes.

25            MS. CLARKSON:  Do you know if Provest --  Go ahead.

Page 30

1    If you have a question?

2         MS. EDWARDS:  Since they worked in the building with

3    you, how is it that you know that David Stern has an

4    interest in Provest?

5         MS. CLARKSON:  Go ahead.

6         THE WITNESS:  Because Provest, at the time, when I

7    was working there, they were on the fourth floor.  So they

8    had one side of the building which it was a whole wing

9    that was only set for Provest.

10        So any file that needed proof of service, if we

11   didn't have the proof of service you would go directly to

12   Provest and request for a copy of proof of service that

13   was given to the borrower.

14   BY MS. CLARKSON:

15        Q.   Okay. But that doesn't explain how you know that

16   Mr. Stern had an interest in Provest?

17        A.   Well --

18        Q.   An ownership interest?

19        A.   Ownership interest?  I'm not aware of that.  But that

20   they worked closely with David Stern and that they had perks

21   with David Stern, yes.

22        Q.   Explain the perks, please?

23        A.   Perks were that they were allowed to work in the firm

24   with us as long as they were able to produce as many files for

25   service completed for David.

1       Q.      Have you ever heard that Affidavits of Proof of

2   Service were created when service actually was not perfected?

3       A.      Correct.

4       Q.      How did you hear that?

5       A.      In the office.  Everyone knew about it.

6       Q.      Tell me what everyone knew about?

7       A.      Sometimes the borrower wouldn't be served correctly.

8   It was back dated.

9       Q.      Anything else?

10      A.      Nope.

11      Q.      Have you ever heard of the term sewer service?

12      A.      I've heard of it before.

13      Q.      And where did you hear it?

14      A.      In the media.

15      Q.      In the media?

16      A.      Yes.

17      Q.      You didn't hear about it around David Stern's office

18  or Provest?

19      A.      No.

20      Q.      Was it general knowledge or common knowledge around

21  the law firm that David Stern had an ownership interest in

22  Provest?

23      A.      I really wouldn't know. I would just know the part of

24  getting the service completed and getting it back dated to have

25  proof to the court that the borrower was served at a certain

Page 32

1    time period.

2        We have to file our motions and our Complaint and it has

3    to be just by routine, that time period.

4        Q.    And is that at the direction of Fannie Mae or Freddie

5    Mac or the banks?

6        A.    The clients, yes.

7        Q.    Have you heard about any irregularities in the

8    billing of Provest?

9        A.    No.

10       Q.    Have you heard that Provest would serve or pretend to

11   serve or try to serve four individuals at one property and bill

12   four times, but only have one person actually living in the

13   house?

14       A.    Yes.

15       Q.    Can you tell me about that?  And what is it you know

16   about it?

17       A.    I've known about that part because I've overheard

18   Cheryl numerous times talking to different paralegals where

19   they've serviced three, four times and they've served at the

20   wrong address and Cheryl's instructions was to go ahead and move

21   on with the file.  That the Judge wouldn't notice it.

22       Q.    And the whole point of that was to keep the billing

23   with that file even though it was the wrong address?

24       A.    Correct.

25       Q.    And who paid the bill?

Page 33

1    A.    I wouldn't know. I'm sorry.

2    Q.    Okay. Have you ever seen Affidavits of Indebtedness?

3    A.    Yes.

4    Q.    Do you know what they are?

5    A.    Yes.

6    Q.    Could you explain to me what you believe they are?

7    A.    We call it more the -- It's the AOI. We get the

8    Judgment figure from the client and it's like an escrow

9    breakdown. Once we get all of the information from the client

10   we prepare the AOI. It's prepared.

11        Then it's uploaded into a client system so the client can

12   review it to make sure that everything is correct.

13        If everything is correct then they will sign the document

14   and we will receive it and then from there on we will have to,

15   you know, stamp it, date it, notarize it acknowledging this is

16   the correct AOI so it can be submitted with the Motion for

17   Summary Judgment.

18   Q.    Do you know what AOI stands for?

19   A.    Yes.

20   Q.    Affidavit of Indebtedness?

21   A.    Yes.

22   Q.    Okay. Also on this affidavit, would there be a space

23   for expenses to the office, like service of process, complaint

24   filing fee?

25   A.    There would be -- Not on the AOI, but it would

Page 34

 1    definitely the Affidavit of --

 2        Q.    Of attorney's fees?

 3        A.    Of attorney's fees. It would be included; filing

 4    fees, attorney's fees and processing fees.

 5        Q.    What about title company fees?

 6        A.    Sometimes they will be included. Sometimes it will

 7    automatically be included with the client. It just depends which

 8    client. Certain clients you can charge them $200.00.  Certain

 9    client it will be $325.00.  It just depended on which bank.

10        Q.    And how did you -- How do you know which bank to

11    charge $300.00 and which bank to charge $200.00?

12        A.    There was a spreadsheet that basically tells you, you

13    know, exactly what's the title fee for that bank.

14        Q.    Are you aware of any of these affidavits, attorney's

15    fees affidavits, being signed prior to the numbers being filled

16    in?

17    A.    No.

18          MS. EDWARDS:  Can I?

19          MS. CLARKSON:  Yeah. Go ahead.

20    BY MS. EDWARDS:

21        Q.    When you talked about the Affidavit of Indebtedness

22    that is filled out, I understood you to say that the figures are

23    put in by the law firm and then reviewed by the client. Is that

24    correct?

25        A.    Correct.

Page 35

1    **Q.**    Okay. Who signs the Affidavit of Indebtedness?

2    **A.**    That I wouldn't know. I really know who signs it.

3    **Q.**    Is it somebody on the client's end or in Stern's

4    office?

5    **A.**    I really wouldn't know. I know it's uploaded into the

6    client's system and then it's uploaded again for approval to

7    proceed.

8    So I really wouldn't know who would sign it, exactly.

9    **Q.**    Do you ever see the originals?

10   **A.**    No.

11   **Q.**    Is that one of the documents that's put on the table

12   for signature?

13   **A.**    I don't recall.

14   **Q.**    You describe back dated service of process?

15   **A.**    Yes.

16   **Q.**    Who would direct that they should be back dated?

17   **A.**    Cheryl Salmons.

18   **Q.**    And did she do that whenever it was done?  How did

19   the request get to her?

20   **A.**    The junior paralegal or the team lead would go into

21   Cheryl's office or send her an e-mail to let her know the

22   situation that the defendant wasn't served correctly.  And they

23   will have the discussion behind closed doors.

24   **Q.**    And then how do you know the discussion was to back

25   date it?

Page 36

1    **A.**    Because one time I walked into the conversation,

2    accidentally, and I overheard one of the juniors saying that

3    this defendant wasn't served correctly and they were serving it

4    at the wrong address and Cheryl said don't worry, just move on

5    with the file.  The Judge is not going to notice.

6    **Q.**    Okay. But that's not back dating.  When did you hear

7    about somebody saying there was going to be back dating on the

8    service of process?

9    **A.**    Back dating -- They were doing the -- which is called

10   the demand letter, which is the service.  If I couldn't receive

11   a demand letter and it wasn't in the client's system,

12   Vendorscape or New Track, I would have to go with that file to

13   Cheryl and then from there on the document will appear that the

14   client's were served.  Even though on my end I was requesting

15   it. The client system couldn't provide it for me.  So she will

16   make the document appear that the client's were served.

17   **Q.**    So when you would be looking at the same document

18   system that Cheryl Salmons had, you would look in the file.

19   There would not be a demand letter that needed to be provided

20   and served on the --

21   **A.**    Defendant.

22   **Q.**    -- on the homeowner.  And then you would bring it to

23   Cheryl's attention?

24   **A.**    Yes.

25   **Q.**    And then the document which was necessary to proceed

Page 37

1    would magically appear?

2        **A.**    Yes.

3        **Q.**    How do you know it was done by Cheryl?

4        **A.**    Because I gave her the file and in an hour or two

5    hours she would give it back to me, it was done.  Service was

6    already on the file.  It was printed out.

7        **Q.**    Oh, it was printed out or was it on the --

8        **A.**    It was printed out and attached to the file.

9        **Q.**    And how could that have happened?

10       **A.**    I would not know. I gave her the file.  So I really

11   wouldn't know how this document would appear, but it did appear.

12       **Q.**    And does it have an original signature or is it only

13   off of the computer?

14       **A.**    It's more like a computerized image. There's not a

15   signature.  It's just basically Provest serving, you know, the

16   borrower and then it's like an X marked served on such and such

17   a date.  So it's like more data entry, than a signature from

18   someone saying yes, I've acknowledged that I received the

19   service.

20       **Q.**    Okay. And could Cheryl Salmons make entries into the

21   computer that would result on those types of documents being

22   created?

23       **A.**    I wouldn't know.

24       **Q.**    Does she have the ability to create documents that

25   would show service of process on the computer?

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 39 of 76

Page 38

1    A.    I wouldn't know.

2    Q.    Could you?

3    A.    No, not me.  I didn't have that -- the knowledge or

4    the authorization to make any alterations to any documents.

5    Q.    So you could see what was on there but you could not

6    change it?

7    A.    Exactly.

8    Q.    But you don't know if Cheryl could see it and make

9    changes?

10    A.    Correct.

11    Q.    So you would give her something and you would receive

12    it back and it would have changes on it?

13    A.    Yes.

14    Q.    But it doesn't indicate there whether she made the

15    changes or someone else? There's no initials or anything like

16    that?

17    A.    No. None. None whatsoever.

18    Q.    Are you aware of any other improprieties in the

19    service of process by Provest?

20    A.    No, none.

21    Q.    Did you ever hear any other conversations with her or

22    David Stern on how the Provest service of process was being

23    handled?

24    A.    No.

25    Q.    Did she have meetings with David Stern, regularly?

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 40 of 76

Page 39

1    **A.**    Yes.

2    **Q.**    And were you ever privy to the meetings?

3    **A.**    No.

4    **Q.**    How often did she meet with him?

5    **A.**    Every time  the clients were going to come to visit

6    us which were the banks they would have a meeting prior to that

7    and then after the clients leave.

8    **Q.**    And did anything happen in preparation for those

9    meetings?

10    **A.**    They were discussing the files that were going to be

11    viewed and what needs to be done to these files before the

12    clients arrived into the office.

13    **Q.**    Was there anything that they did to make it look good

14    to the client that wasn't actually happening?

15    **A.**    Yes.

16    **Q.**    What was that?

17    **A.**    Changing client code. Changing the client code in the

18    file and hiding them from the client.

19    **Q.**    I'm not familiar with that. So could you tell me what

20    you mean when you say changing the client code and hiding them?

21    **A.**    If certain files weren't up dated correctly and there

22    was lack of process, they would change the client code in the

23    file by -- if it was Countrywide they would change it into a

24    different client name with a sticker and print it out and then

25    these files were transferred into a room where they would hide

Page 40

1    them and then keep them behind closed doors until the client

2    would leave.

3        Q.    And which clients would come?

4        A.    Fannie Mae and Freddie Mac.

5        Q.    Were those the only ones that came?

6        A.    They were the ones that came the most to the office.

7        Q.    How often would you say they came?

8        A.    They came within that year, 2008, they came there

9    more than seven or eight times.

10       Q.    Seven or eight times while you were there?

11       A.    Yes.

12       Q.    And what was the purpose of their trip?

13       A.    Reviewing the files, auditing, questions and concerns

14   about how they're moving their files, what they want from David

15   Stern, how to move their files.

16       Q.    Did you ever see any documentation or did you ever

17   hear any conversations about what the problems were and what the

18   concerns were and how they were resolved?

19       A.    Just on how to push the files into getting MSJ

20   hearings granted and to push them to sale date.

21       Q.    Okay. So was their main focus on getting the

22   foreclosures to final hearing?

23       A.    Yes.

24       Q.    Do you know why?

25       A.    No.

Page 41

1    Q.    Did you hear conversations about it?

2    A.    Only through voice mail that David would leave to

3    Cheryl Salmons.

4    Q.    Saying what?

5    A.    That the files from Freddie Mac and Fannie Mae, they

6    need to pump out as much as they can for the month so they can

7    meet the quota.  What was the quota?  I really wouldn't know.

8    He didn't specify it.  But that the clients weren't happy and

9    that we needed to pick up our files.

10   Q.    You mean to pick up the file or pick up the speed?

11   A.    Pick up the speed.

12   Q.    Okay. Was there anybody in particular that had

13   contact with David Stern there when Fannie Mae or Freddie Mac

14   visited?

15   A.    David Stern had a contact from Freddie Mac that would

16   advise him that they were coming to the office.

17   Q.    So they would have notice ahead of time?

18   A.    Yes.

19   Q.    And who was that?

20   A.    I wouldn't know.

21   Q.    Are you sure?

22   A.    Yes.

23   Q.    Is there any way you can find out?

24   A.    No.

25   Q.    So he had somebody in Freddie Mac that called to tell

Page 42

1    him they were coming?

2        A.    Yes.

3        Q.    And did they call -- Were they supposed to let him

4    know ahead of time?

5        A.    To my understanding, this was normal in the office.

6    But I don't know if it was nor not.  But yes, they would call.

7        Q.    Would they call and set up an appointment or did they

8    come unexpectedly?

9        A.    No, they would call and let David Stern know that the

10   following week they would be in the office for three or four

11   days or a week.  And David Stern would take care of their

12   expenses of bringing them into the office; hotel, food, rental

13   cars, whatever the client needed.

14       Q.    How do you know that?

15       A.    Because I heard the conversations through his voice

16   mail when he left it for Cheryl.  Plus I had to go out and cater

17   for the clients when they came.  So I had to purchase the drinks

18   and the food and the catering.

19       Q.    And then after they left what happened to the files

20   that had been hidden?

21       A.    They would leave the room and then we would have to

22   change them back again to the right client code.

23       Q.    And on how many occasions did you do that during the

24   year you were there?

25       A.    Like five, six, seven times.

Page 43

1    Q.    And how many files would you say you changed?

2    A.    More than five hundred.

3    Q.    And who else did that other than you?

4    A.    It was me, Glenn Lewis, Vanessa Rios. And that's it.

5    Q.    And were they -- Did they assist you changing those

6    files?

7    A.    Yes.

8    Q.    Putting on the stickers and moving them?

9    A.    Yes.

10    Q.    Did all of you do five hundred together or five

11    hundred each?

12    A.    I know I did five hundred.  I don't know what they

13    other two did. But I know I did five hundred.

14    Q.    Were they -- Were you in a room together or were you

15    all separated?

16    A.    No separated.

17    Q.    Okay.  So more than five hundred were changed by you

18    on each occasion?

19    A.    Yes.

20    Q.    Who selected the people to do those changes?

21    A.    Cheryl.

22    Q.    So she selected the three of you to do that?

23    A.    Yes.

24    Q.    And she told you that was the purpose of doing it?

25    A.    Yes.

Page 44

1    Q.    Was Stern aware of this?

2    A.    I don't know.

3    Q.    Because your only contact was with Cheryl?

4    A.    Yes.

5    Q.    Do you know whether there was a particular person at

6    Provest that was handling it when the service of process was

7    back dated?

8    A.    No.

9    Q.    Was there any particular person that dealt with David

10   Stern from Provest or with Cheryl?

11   A.    I wouldn't have that information.

12   Q.    What was Mr. Stern's relationship with the people

13   that worked in the office?

14   A.    Can you specify that a little bit?

15   Q.    Did he have -- Was he personal friends with anybody

16   that worked in the office, as well as being in the office with

17   them?

18   A.    Yes.

19   Q.    Who was that?

20   A.    David Vargas.

21   Q.    Anybody else?

22   A.    Claudia Bunje, Miriam Mindietta, Beverly Macoma,

23   Mr. Forester, Elizabeth Lee, Elizabeth Davilla, Vanessa Rios,

24   Glenn Lewis, Jason Bennett.  That's all I can remember right

25   now.

Page 45

1    **Q.**    What about Cheryl Salmons?

2    **A.**    Yes, with Cheryl Salmons, as well.

3    **Q.**    When you say that they were personal friends as well

4    as worked together, could you tell me the extent of that

5    friendship, if you know?

6    **A.**    I understand that with Cheryl they basically brought

7    the company from scratch. So they have a very close, tight

8    relationship as friends, more than colleagues.

9    With David Vargas, he was like -- They called him his

10   protege.  He started with the firm as a file clerk and then

11   upgraded into, I think it was, a supervisor position but I'm not

12   -- I can't remember the title.

13   **Q.**    Uh-huh?

14   **A.**    Miriam and Beverly, they were friends because Miriam

15   and Beverly they have part ownership for the firm, as well. They

16   invested.

17   **Q.**    Uh-huh?

18   **A.**    And Jason Bennett and Glenn Lewis are very close with

19   Stern in regards like chit-chatting.  Jason Bennett will

20   basically update our bible in our company. So David Stern would

21   constantly be talking to Jason if there were any new laws or

22   regulations being changed to have these perks updated in our

23   bible.

24   And Glenn Lewis, well, they know each other for more than,

25   I think it's six or seven years.  Don't really know the

Page 46

1   relationship with them.  But I know that he's very fond of Glenn

2   Lewis.

3        **Q.**    And did these people go out to dinner together?  Go

4   on vacations?  Anything like that?

5        **A.**    Only Cheryl and David Vargas will go on vacation with

6   David Stern, at certain times.

7        **Q.**    And would you say that David Stern was in the office

8   every day?

9        **A.**    Yes.

10       **Q.**    And he had his own office, I'm assuming?

11       **A.**    Yes.

12       **Q.**    Did he share it with anyone?   Did he have it to

13  himself?

14       **A.**    No, it was all to himself.

15       **Q.**    And whose offices or whose desk was right around his

16  office?

17       **A.**    Paula Beacham, which was his assistant.

18       **Q.**    Is she still?

19       **A.**    I don't know.

20       **Q.**    Okay?

21       **A.**    And Cheryl Salmons and my cubicle was right in front

22  of his office.

23       **Q.**    Was there ever any conflicts that came up over how

24  the foreclosures were being handled and what was supposed to be

25  done to make things move more quickly?

12-12020-mg   Doc 8531-20   Filed 04/27/15   Entered 04/27/15 16:52:56   Smith T
Decl. Exhibit E   Pg 48 of 76

Page 47

1      **A.**    The only thing that was an issue in the firm is that

2    if we had service releases for certain files -- When they're

3    service released from one client, which is one bank, into

4    another bank, those files automatically have to be updated

5    within twenty-four hours.

6         We have to make sure that we're merging all of the

7    information from the previous servicer into the new one so

8    everything can show up in our client system, up to date.

9         And those files, we need to basically make sure that we

10   did the Complaints correctly.  We have to make sure that our MSJ

11   was filed or if it wasn't filed we would have to prepare those

12   and what documents were missing.

13        So those were one of the majority, when they became a

14   service release, we had to make sure that those were basically

15   taken care of and Fannie Mae and Freddie Mac. Those were top

16   prior for David Stern.

17        The Freddie Mac and Fannie Mae were number one for his

18   firm.

19        **Q.**    And do you know why that was?

20        **A.**    Because David Stern had a very close relationship

21   with Freddie Mac and Fannie Mae.

22        **Q.**    How is that?

23        **A.**    They will call David Stern and, you know -- I don't

24   know exactly who will call David Stern from Freddie Mac.  I

25   would not be in that conversation. But I know that those were

12-12020-mg   Doc 8531-20   Filed 04/27/15   Entered 04/27/15 16:52:56   Smith T
Decl. Exhibit E   Pg 49 of 76

Page 48

1  considered his babies.  And the reason why I say his babies is

2  because he expressed it numerous times in the firm, that those

3  files cannot be played around with or not taken care of

4  correctly.  That those files need to be pushed as any other file

5  but with an extra push to it.

6      Q.   But these were the same files that were being hidden

7  from them when they came in?

8      A.   Yes.

9      Q.   Well how it would be if they were worked properly

10  that they would be hidden?

11      A.   Sometimes if we got too many files and they're

12  overlapping each other we pushed those files to the bottom of

13  the pit.  And the paralegal just wouldn't have enough time to

14  update all these files.  Some paralegals had up to five hundred,

15  up to eight hundred files. A case load just for that one

16  paralegal. So it was kind of hard to keep track of all of your

17  files.

18      So if you had too many files for one individual, some of

19  them are just going to pass by and you're not going to be able

20  to catch on unless the client comes and questions what's going

21  on with my files.  And then that's when we would have to pick up

22  that file from wherever it was hidden and push it and make sure

23  that those files were being worked on right away.

24      Q.   You mentioned before that Cheryl Salmons had a case

25  that was transferred over to the re-instatement section?

Page 49

1    **A.**    Yes.

2    **Q.**    Who decided if a foreclosure got moved over to

3    re-instatement?

4    **A.**    The client will send a fax saying that the case is

5    going to be re-instated for a loan modification or pay off

6    figures.

7         Sometimes if the file was being transferred to another

8    firm, we needed to have the pay off figures so we could bill the

9    client before it can get transferred to the other firm.

10   **Q.**    Did cases often get transferred away from Stern to

11   other foreclosure firms?

12   **A.**    Yes.

13   **Q.**    And what was the reason for that?

14   **A.**    I don't know.

15   **Q.**    And did you hear any conversations about that?

16   **A.**    No.

17   **Q.**    When they left his firm what firms would they be

18   transferred to?

19   **A.**    Numerous, different -- Ben Azrick (phonetic). I know

20   there was a lot of them from Ben Azrick.

21   **Q.**    To or from?

22   **A.**    No, going to Ben Azrick.  Because I would see the fax

23   from Ben Azrick.  I used to pick up the fax machine paper from

24   Cheryl's office and I would have to give all of those faxes from

25   Ben Azrick to Claudia Bunje, which she was the supervisor for

Page 50

1   the reinstatements.  So I can acknowledge Ben Azrick, yes. But I

2   can't remember the other firms that they were being transferred

3   to. But I know for Ben Azrick, yes, because I saw the documents.

4      Q.    If a property was sold by short sale during the

5   foreclosure, how would the information get to David Stern's

6   office so the foreclosure would be halted?

7      A.    Sometimes the client will send like an intercom or an

8   e-mail to let them know that this loan is going to be a short

9   sale.  But I wouldn't see them all the time. This is just

10  sometimes, occasionally, I would see something like that.

11     Q.    Was there ever an occasion when a case had been

12  closed by the court, when there a decision made to try to get a

13  summary judgment granted on it even though it had been closed by

14  the court?

15     A.    I don't have any record of that.

16     Q.    Other than Cheryl going around twice a day to sign

17  the documents that she was reading, was there anyone else that

18  did that, as well?

19     A.    Only Cheryl. And only when Cheryl was of town, that

20  she would go on vacation, there was someone else that would sign

21  on her behalf.  Who was it?  I really don't know.

22     Q.    But they signed Cheryl's name?

23     A.    Yes.

24     Q.    And when you said those were the papers that were up

25  on the long table on the four floors, what types of documents

Page 51

1    were those?

2        **A.**    Motions for Summary Judgment and Assignments of

3    Mortgage.

4        **Q.**    Would there ever be the AOIs?

5        **A.**    I never saw them. They could have been with the file

6    but I never saw those laying in the front.

7        **Q.**    But whatever was on those long tables, nobody was

8    reading?  They were just putting their names on them?

9        **A.**    Yes, they were just putting their names.

10       **Q.**    Yes, there was no one reading them?

11       **A.**    Yes, there was no reading them.

12       **Q.**    Was there ever a Lost Note Affidavit put up there, do

13   you know?

14       **A.**    I don't know.

15       **Q.**    And you said that the Lost Note Affidavits would just

16   appear?

17       **A.**    From Cheryl's office, yes.

18       **Q.**    And was this an original that was signed and

19   notarized?

20       **A.**    Yes.

21       **Q.**    And what signed by her?

22       **A.**    Yes.

23       **Q.**    How would she have known whether there was a lost

24   Note?

25       **A.**    Because I would go into client system, notify the

Page 52

1    client that I was unable to get the original doc and that we

2    were still waiting for them and it passed a month -- The time

3    line was a month to review the original docs.

4        If we didn't receive it in our Original Docs Department,

5    which I would send them an e-mail, then I would let Cheryl know

6    that we need an LNA.  I would bring the file. She would stay

7    with the file. And then I would get them back with an LNA and

8    stamp the notary.

9        Q.    Signed by her?

10       A.    Yes. And then I was instructed to go the Title

11   Department with the file so they could move on with the file.

12       Q.    So you would request the original Promissory Note?

13       A.    Uh-huh.

14       Q.    And if a month went by and it had not been received

15   they then created a Lost Note Affidavit?

16       A.    Yes.

17       Q.    Did it mean that the Note was lost or did it mean you

18   just hadn't gotten it?

19       A.    That the original Note was lost.

20       Q.    Who would have looked for it?

21       A.    Cheryl or me.

22       Q.    So why would you be sending an e-mail to the client

23   or customer asking for it if the original would be with you or

24   Cheryl?

25       A.    I will only request for the original Note, if the

Page 53

1   file is fresh, that the service demand was completed.  Then the

2   next step for me was to request the original Note for the

3   mortgage, for the loan.  If I didn't get a reply back from the

4   client saying that they have the Note, that the Note was sent to

5   us.  Then I would have to go ahead and give it to Cheryl and

6   then she would have to create the LNA, get the papers signed and

7   notarized for me so that I can bring it to the Title Department.

8       **Q.**   Okay.  When you got these files to work on had the

9   Complaint already been filed in them?

10      **A.**   Yes.

11      **Q.**   So when you received the files they already had a

12  Complaint filed and yet the original Promissory Note and

13  Mortgage was not in the possession of the law firm?

14      **A.**   No.

15      **Q.**   And it was not in the possession of the client?

16      **A.**   No.

17      **Q.**   Was the client the bank or the servicer?

18      **A.**   The servicer.  The servicer will contact the bank.

19  It just depended which client's system.  If it's New Track, it's

20  the servicer and then the servicer will contact the bank.  So it

21  was more like a client system.  It was like a third party and

22  they would communicate with the bank and the bank would

23  communicate with the servicer.  And then it will be relayed back

24  to us.

25      **Q.**   How did the cases come through for Freddie Mac and

Page 54

1    Fannie Mae?

2        **A.**    They would come through New Track or Vendorscape or

3    Land Star.  It just depended on what service they were using at

4    that time, what client system.

5        **Q.**    So the first way Stern's office would get the

6    information that they were being retained to handle the

7    foreclosure was over this system?

8        **A.**    Yes.

9        **Q.**    Was there any contract in place with Stern's office

10   and the firms that hired them?

11       **A.**    I wouldn't know that information.

12       **Q.**    Did you ever see the contracts?

13       **A.**    I never saw that.

14       **Q.**    Now you said that part of Cheryl's job in the office

15   was to train other people?

16       **A.**    Yes.

17       **Q.**    And what did she train them to do?

18       **A.**    Preparing motions and defaults.

19       **Q.**    How would she train people to prepare motions and

20   defaults when she wasn't a lawyer?

21       **A.**    She had team leads that trained the new coming

22   employees at junior paralegals. So she had her selected team

23   leads that would go ahead and train these people in a special

24   room and they would be training there for a month and a half to

25   two months and a half preparing motions and defaults.

Page 55

1    Q.    Did they do Motions for Summary Judgment?

2    A.    Yes.

3    Q.    Did any lawyers prepare any motions?

4    A.    Not to my knowledge.

5    Q.    So everything they did was done by the paralegals?

6    A.    Yes.

7    Q.    Was it reviewed by lawyers?

8    A.    Yes.

9    Q.    Was it signed by lawyers?

10    A.    Yes.

11    Q.    Were there ever changes made on any of the motions

12  prepared by the paralegals?

13    A.    If there were some errors in the mailing address or

14  errors in the verbiage, yes.

15    Q.    At what point after you received the file was the

16  original Note and Mortgage requested by you?

17    A.    I would always request the original Note once I had

18  my demand letter service completed. If I received from the file

19  room then it was good to go and I would take it to the fifth

20  floor where title was and I would give it to Stephanie Carrabayo

21  or I would give it to -- I mean, not Stephanie Carrabayo,

22  Stephanie Izquierda or Carol Whitlow and Carol Whitlow was the

23  manager for title.

24    Q.    Okay. Now you said if you received the original Note

25  and Mortgage from the file room?

Page 56

1      **A.**    Yes.  The file clerk would bring it to me. I would

2   send an e-mail to the Doc Department requesting that I needed

3   the original docs for this file.

4      **Q.**    Did they hold original docs there?

5      **A.**    Yes, if they had them.  Yes.

6      **Q.**    How would they get original docs if they hadn't been

7   aware that there was going to be a foreclosure?

8      **A.**    I don't know.

9      **Q.**    Did they create documents there?

10      **A.**    I don't know.

11      **Q.**    When the documents went to the Title Department what

12   happened then?

13      **A.**    I wouldn't be able to tell you. Once --

14      **Q.**    It was out of your hands?

15      **A.**    Yes, it's out of my hands. Once it leaves my hands,

16   that I requested the demand, the original Note, then it's off my

17   hands.

18      **Q.**    You described a little bit about the rapid docket

19   where two to five hundred cases were handled and that Salmons

20   arranged to have that many cases moving there?

21      **A.**    Yes.

22      **Q.**    Do you know who created the rapid docket?

23      **A.**    Honestly?

24      **Q.**    Yes?

25      **A.**    I know the rapid docket was approved by the court.

Page 57

1    Which court?  It just depended which court was approved for

2    rapid docket and which Judge was allowing five minutes hearings.

3        Once we had the okay from that Judge in that County, then

4    all of these files would start being prepared with the Motions

5    for Default so we could get the hearing.

6        **Q.**    Did you hear any conversations or were you privy to

7    anything about who's idea it was to start the rapid docket?

8        **A.**    No.

9        **Q.**    Do you know if there were meetings with David Stern

10   and anyone in the judicial system to get approval for the rapid

11   docket?

12       **A.**    No.

13       **Q.**    What about Cheryl Salmons?

14       **A.**    No.

15       **Q.**    How did you first find out about the rapid docket?

16       **A.**    Jason Bennett sent an e-mail out to the -- to all

17   employees to let them know that certain counties were, at that

18   time, allowing rapid docket five minute hearings and just to

19   make sure to get those files moving the quickest.

20       **Q.**    So who was responsible for getting that many files

21   moving?

22       **A.**    The paralegals and the juniors getting all of the

23   motions prepared before hearing.

24   BY MS. CLARKSON:

25       **Q.**    When you call it the rapid docket, do you mean rocket

12-12020-mg   Doc 8531-20   Filed 04/27/15   Entered 04/27/15 16:52:56   Smith T
Decl. Exhibit E   Pg 59 of 76

Page 58

1    docket?

2        **A.**    It's the same thing. But they call it the rapid

3    docket.

4        **Q.**    Okay. When you left the Law Office of David Stern,

5    did you leave on your own or were you fired?

6        **A.**    No, I left.

7        **Q.**    You left on your own?

8        **A.**    Yes, I left. I gave three weeks notice.

9        **Q.**    Why is that you wanted to leave there?

10       **A.**    It was just -- I was getting very sick, very ill.  So

11   I just didn't want to stay with the firm any more.

12       **Q.**    Physically ill?

13       **A.**    Yes.

14       **Q.**    Did you take anything when you left?

15       **A.**    Like what exactly?

16       **Q.**    Any documents, e-mails?

17       **A.**    No, none.

18       **Q.**    Nothing?

19       **A.**    No, just my resignation letter and the letter from

20   H.R.

21       **Q.**    Were you aware of any other improprieties going on or

22   what you considered to be improprieties that caused you concerns

23   at the Law Office of David Stern?

24       **A.**    Like?

25       **Q.**    Anything?

Page 59

1      A.      Can you just name me like a subject, so at least I

2    know exactly what direction?

3      Q.      Anything that --

4      A.      Is it like personal or business or --

5      Q.      Personal? Business? Anything at all?

6      A.      Personal?  The only thing that I was aware of that

7    took place there were the perks that certain employees received

8    from David Stern.  If they were either dating him or they were

9    good friends with him, that they would basically do certain

10   things for him for certain files, in the sense of like David

11   Vargas.  He would have certain perks from David Stern, like a

12   house, a car, cell phone paid all by David Stern.

13          And that's all I know.

14     Q.      Okay. So do you know of any other perks besides what

15   you said that Cheryl Salmons got?  A car you said, for sure.

16   And her personal bills paid.

17     A.      Yes. And cell phone.

18     Q.      And probably her mortgage?

19     A.      Yes.  And vacations and gifts, jewelry.

20     Q.      Who else would received gifts and jewelry or cars or

21   homes?

22     A.      His girlfriend and David Vargas.

23     Q.      Who's his girlfriend?

24     A.      At the time it was Christina Dell'Aguila

25     Q.      Could you spell that, the best you can?

Page 60

1     **A.**    D-e-l-l, apostrophe, A-q-u-i-l-a.

2     **Q.**    And what was her position in the firm?

3     **A.**    She was just a paralegal, a junior paralegal.

4     **Q.**    A junior paralegal?

5     **A.**    Yes.

6    BY MS. EDWARDS:

7     **Q.**    When you said that things were being done for files,

8    for specific files, what did you mean by that?

9     **A.**    I know and I was aware of David Vargas. He had

10    control over certain client systems that I had no control over;

11    Lend Star.  And there he would -- How can I explain to you?  He

12    would like fabricate certain documents and upload it into the

13    client's system like back dating them.

14     **Q.**    How do you know that?

15     **A.**    Because I was privileged to that information because

16    one of the girls that worked with him gave me that information

17    that he was changing documents for David Stern.  What type of

18    documents?  She never specified.  But that he was changing these

19    documents in Lend Star.

20     **Q.**    Okay.  I'm a little confused. He was doing it for

21    David Stern?

22     **A.**    Yes, on certain files. But she didn't know exactly

23    what documents were being changed.

24     **Q.**    What is her name?

25     **A.**    It was Gianna Rodriguez.

1    Q.    Is that G-i-a-n-n-a?

2    A.    Yes.

3    Q.    And does she still work there, as far as you know?

4    A.    No, she was fired.

5    Q.    Why was she fired?

6    A.    I have no idea.

7    Q.    Was there anything she was doing wrong that you know

8  of?

9    A.    Not to my knowledge.

10    Q.    Do you know where she lives?

11    A.    No.

12    Q.    How long did she work for David Vargas?

13    A.    I can't remember.

14    Q.    As long as you were there?

15    A.    Yes.

16    Q.    Did he fire her?

17    A.    Cheryl Salmons fired Gianna.

18    Q.    But you don't know why?

19    A.    No.

20    Q.    And Cheryl never said anything to you?

21    A.    No. No.

22    Q.    Do you know anybody else that Cheryl fired while you

23  were there?

24    A.    She fired a lot of people. It just depended.

25    Q.    Did she have authority to hire and fire?

Page 62

1    **A.**   Yes.

2    **Q.**   Any lawyers?

3    **A.**   The lawyers, they would be fired by Beverly and

4    Miriam.

5    **Q.**   Why would they fire lawyers?

6    **A.**   They don't give that information out.

7    **Q.**   But they did fire them?

8    **A.**   Yes, they would.

9    **Q.**   Did they hire them?

10   **A.**   Yes.

11   **Q.**   And did they do that with David Stern's approval or

12   did he give them authority or how did that work?

13   **A.**   With David's approval.

14   **Q.**   Did he know before or after it happened?

15   **A.**   He knew it before, before they got fired.

16   **Q.**   How do you know that?

17   **A.**   Because Beverly or Miriam, both of them would go into

18   David's office before an attorney would be fired behind closed

19   doors and then you know that they were being terminated.

20   **Q.**   Did you ever hear Mr. Stern or did you hear about

21   Mr. Stern expressing any concern about the investigation of

22   these foreclosure mills?

23   **A.**   Not to my knowledge when I worked there, no. Never.

24   **Q.**   And did you ever hear any conversations of Cheryl's

25   about the problems going on with the foreclosures?

Page 63

1      **A.**     No, not when I worked there. No.

2      **Q.**     Since then did you hear anything from them?

3      **A.**     From the office?

4      **Q.**     Or from anyone that you know that was there at the

5      office?

6      **A.**     From friends that I still have there, yes.  That

7      they're very worried, yes.

8      **Q.**     You have friends that still work at the office?

9      **A.**     Yes.

10     **Q.**     Doing what?

11     **A.**     Foreclosure paralegals, docket return clerks.

12     **Q.**     And what are they telling you?

13     **A.**     That they're very scared. That's it.

14     **Q.**     That your friends are scared?

15     **A.**     Yeah, that my friends are scared.

16     **Q.**     Did they say anything about what's going on with

17     Stern or Cheryl Salmons or anybody else?

18     **A.**     The only concern was that they were moving files out

19     of the office into a different office and that Eighteen Inch

20     Freight, I think, was picking them up.  Something like that.

21     Trailer freight, something like that.

22     **Q.**     Do you know where --

23            MS. CLARKSON:  Eighteen wheeler?

24            THE WITNESS:  Yeah, eighteen wheeler.

25     BY MS. EDWARDS:

Page 64

1     Q.   Do you know where they were moving them?

2     A.   Supposedly they were being moved to Orlando's office.

3     Q.   And do you know why they would do that?

4     A.   No.

5     Q.   Do you know how long ago this was going on?

6     A.   I think a month and a half ago.

7     Q.   What kind of office is Orlando?

8     A.   David Stern has another law office in Orlando,

9 Florida.

10    Q.   What office is that?

11    A.   I don't know.

12    Q.   And was it connected with the office here in Broward

13 County?

14    A.   Yes.

15    Q.   And do you know which -- what the office is there or

16 what the location is?

17    A.   No, I just know it's another law office for David

18 Stern that he's opened for foreclosures in Orlando.

19    Q.   And did he just open it a month and a half ago?

20    A.   No.  He opened it, I think it was either sometime at

21 the beginning of this year or the end of last year. I can't

22 remember.

23    Q.   2010?

24    A.   Yeah.

25    Q.   Or December 2009?

Page 65

1     **A.**    It could be around that time. I just can't remember.

2     **Q.**    Well do you know if these files were being moved out

3   over concern of the investigation?

4     **A.**    Oh, I don't know.

5     **Q.**    Or just because they were moving files?

6     **A.**    They were just moving a particular bunch of files to

7   that office to be reviewed. That's what -- You know, my friend

8   expressed that they were going to be reviewing them over there.

9     **Q.**    And do you know what files, what group of files it

10   was?

11     **A.**    No.  I don't know.

12     **Q.**    Do you know who was going to be reviewing it?

13     **A.**    No.

14     **Q.**    And did the eighteen wheeler come and pick them up

15   during the day time, do you know?

16     **A.**    Yes.

17     **Q.**    But you don't know when it was?

18     **A.**    Exactly. No.

19     **Q.**    Other than that did you hear -- Did your

20   acquaintances say anything else about what's been going on there

21   in the last six months?

22     **A.**    No.

23          MS. EDWARDS:  Okay. I don't have anything else.

24   BY MS. CLARKSON:

25     **Q.**    I'd just like to know if you recall the name of any

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 67 of 76

Page 66

1    lawyers that were fired?

2        **A.**    I can't remember. There were so many of them. I just

3    can't remember of all of them. And I'm not good with their last

4    names.

5        **Q.**    But if you do recall will you let me know, if you get

6    a chance?

7        **A.**    Sure.

8        MS. CLARKSON:  Okay. You have my card?

9        THE WITNESS:  Yes.

10       MS. CLARKSON:  Okay.

11       MS. EDWARDS:  I don't think we have any other

12    questions.  Do they have anything?

13       MS. CLARKSON:  Doug are you there?

14       MR. LYONS:  Yes.  I just had you on mute. So that was

15    the clicking that you heard.

16       MS. CLARKSON:  Yeah, we knew that. We're done.  Does

17    she want to waive or read?

18       MR. LYONS:  No, let her read.  That way we can make

19    sure that everything is accurate.

20    (Thereupon, the deposition was concluded.)

21

22

23

24

25

Page 67

1                          CERTIFICATE

2

3    THE STATE OF FLORIDA)

4    COUNTY OF BROWARD)

5

6          I, MARITZA MONROE, a Court Reporter, do hereby

7    certify that I was authorized to and did report the deposition

8    of KELLY SCOTT, a witness called in the above-styled cause, that

9    the witness was first duly sworn by me; that a review of the

10   transcript was requested; and that the transcript is a true and

11   complete record of my notes.

12         I further certify that I am not an attorney or

13   counsel for any of the parties, nor related to any of the

14   parties, nor financially interested in the action.

15

16         Dated this 13th day of October, 2010

17

18

19            MARITZA MONROE

     COURT REPORTER

20

21

22

23

24

25                                    NBR/IMG

Page 68

1            E R R A T A   S H E E T

2    RECORD CHANGES HERE - DO NOT WRITE ON THE TRANSCRIPT

3    Office of Attorney General v. Florida Default Law Group

4    PAGE/LINE            CHANGE            REASON

5    _____    _____    _____

6    _____    _____    _____

7    _____    _____    _____

8    _____    _____    _____

9    _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17   _____    _____    _____

18   _____    _____    _____

19   _____    _____    _____

20   _____    _____    _____

21   Under penalties of perjury, I declare that I have read my

     deposition and that it is true and correct subject to any

22   changes in form or substance entered here.

23

24   _____        _____

           Date                          KELLY SCOTT

25

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 70 of 76

Page 69

**A**

A-q-u-i-l-a (1) 60:1
ability (1) 37:24
able (6) 16:10,14
  24:13 30:24 48:19
  56:13
above-styled (1) 67:8
accidentally (1) 36:2
account (1) 19:22
accounting (4) 18:3
  19:1 21:15,16
accurate (1) 66:19
acknowledge (2)
  20:17 50:1
acknowledged (1)
  37:18
acknowledging (1)
  33:15
acquaintances (1)
  65:20
action (1) 67:14
address (4) 32:20,23
  36:4 55:13
advise (2) 28:14
  41:16
AFFAIRS (1) 1:2
affidavit (11) 16:8,12
  16:15 17:2 33:20
  33:22 34:1,21 35:1
  51:12 52:15
affidavits (5) 31:1
  33:2 34:14,15
  51:15
afternoon (2) 22:5,7
AG (1) 1:8
ago (4) 5:10 64:5,6,19
ahead (11) 7:17 15:5
  23:3 29:25 30:5
  32:20 34:19 41:17
  42:4 53:5 54:23
allowed (2) 22:16
  30:23
allowing (2) 57:2,18
alterations (1) 38:4
amount (1) 9:15
answer (2) 5:22 6:5
anybody (5) 41:12
  44:15,21 61:22
  63:17
AOI (5) 33:7,10,16
  33:18,25
AOIs (1) 51:4
apostrophe (1) 60:1
appear (8) 16:12,17
  36:13,16 37:1,11,11
  51:16
APPEARANCE (1)
  1:7
APPEARANCES (1)
  2:1
Appearing (1) 2:8
appointment (1) 42:7
approval (4) 35:6
  57:10 62:11,13

approved (2) 56:25
  57:1
approximately (3)
  8:2 22:9 25:1
arranged (1) 56:20
arrived (1) 39:12
asking (2) 16:17
  52:23
Assignment (4) 3:12
  3:13 23:22 25:11
assignments (3) 10:4
  15:25 51:2
assist (1) 43:5
assistant (15) 7:3,5,9
  7:18,25 8:11 12:11
  17:15 18:18,22,23
  18:25 20:24 21:14
  46:17
assistants (3) 7:7,22
  18:17
assisting (2) 8:13,16
assuming (1) 19:7
  46:10
attached (2) 29:8
  37:8
attention (1) 36:23
attorney (7) 1:1,20
  2:5 3:15 62:18
  67:12 68:3
attorney's (4) 34:2,3
  34:4,14
attorneys (4) 10:7,8
  10:10,15
auditing (1) 40:13
authority (2) 61:25
  62:12
authorization (1)
  38:4
authorized (1) 67:7
automatically (1)
  34:7 47:4
automobiles (1)
  21:10
aware (14) 15:21,25
  17:15 18:14 21:22
  29:9 30:19 34:14
  38:18 44:1 56:7
  58:21 59:6 60:9
Azrick (7) 49:19,20
  49:22,23,25 50:1,3

**B**

B (1) 2:4
babies (2) 48:1,1
baby (1) 28:13
back (16) 31:8,24
  35:14,16,24 36:6,7
  36:9 37:5 38:12
  42:22 44:7 52:7
  53:3,23 60:13
bank (11) 34:9,10,11
  34:13 47:3,4 53:17
  53:18,20,22,22
banks (4) 8:20,20

32:5 39:6
basically (8) 9:23
  34:12 37:15 45:6
  45:20 47:9,14 59:9
basis (1) 20:1
Beacham (1) 46:17
Bee (2) 10:5,6
beginning (3) 20:5
  27:15 64:21
behalf (1) 50:21
believe (1) 33:6
Ben (7) 49:19,20,22
  49:23,25 50:1,3
Bennett (4) 44:24
  45:18,19 57:16
best (1) 59:25
Beth (1) 22:15
Beth's (3) 24:5,13
  26:20
better (1) 21:19
Beverly (6) 10:11
  44:22 45:14,15
  62:3,17
bible (2) 45:20,23
big (1) 25:6
bill (3) 32:11,25 49:8
billing (2) 32:8,22
bills (8) 17:16,17
  18:15 19:4,7,19
  20:8 59:16
bit (4) 10:24 29:7
  44:14 56:18
BMW (2) 20:21
  21:18
borrower (6) 28:3,12
  30:13 31:7,25
  37:16
borrowers (2) 28:4,6
bottom (1) 48:12
bought (4) 20:15 21:3
  21:5,9
break (1) 6:1
breakdown (1) 33:9
bring (6) 16:19 17:16
  36:22 52:6 53:7
  56:1
bringing (1) 42:12
brought (2) 4:17 45:6
Broward (2) 64:12
  67:4
Brown (1) 7:19
building (4) 29:21,23
  30:2,8
bunch (1) 65:6
Bunje (3) 28:16 44:22
  49:25
business (2) 59:4,5
buy (3) 20:16,18,20
buying (1) 21:7

**C**

C (4) 25:6 27:13,14
  27:16
C-k-a (1) 19:16

Calhoun (1) 2:10
call (10) 16:8 33:7
  42:3,6,7,9 47:23,24
  57:25 58:2
called (6) 23:22 28:2
  36:9 41:25 45:9
  67:8
car (14) 19:4 20:15
  20:16,18,20 21:1,1
  21:2,3,5,17,17
  59:12,15
card (1) 66:8
care (4) 15:1 42:11
  47:15 48:3
Carol (2) 55:22,22
Carrabayo (2) 55:20
  55:21
cars (3) 21:9 42:13
  59:20
case (9) 1:8 5:11,13
  5:17,19 48:15,24
  49:4 50:11
cases (4) 49:10 53:25
  56:19,20
catch (1) 48:20
cater (1) 42:16
catering (1) 42:18
cause (1) 67:8
caused (1) 58:22
cell (3) 19:4 59:12,17
Cerni (1) 22:15
certain (17) 9:15
  11:16 22:1 31:25
  34:8,8 39:21 46:6
  47:2 57:17 59:7,9
  59:10,11 60:10,12
  60:22
CERTIFICATE (1)
  67:1
certify (2) 67:7,12
chance (1) 66:6
change (5) 38:6 39:22
  39:23 42:22 68:4
changed (4) 43:1,17
  45:22 60:23
changes (7) 38:9,12
  38:15 43:20 55:11
  68:2,22
changing (6) 39:17
  39:17,20 43:5
  60:17,18
charge (3) 34:8,11,11
checking (1) 8:15
Cheryl (64) 3:10,14
  7:3 8:11,13 10:22
  12:11 13:22 14:17
  16:5,12 18:22
  19:18 21:20,22,23
  22:1,13 23:9,23
  24:10 25:12,19,20
  26:16,19 27:10,16
  27:23 28:14,15,25
  32:18 35:17 36:4
  36:13,18 37:3,20

38:8 41:3 42:16
  43:21 44:3,10 45:1
  45:2,6 46:5,21
  48:24 50:16,19,19
  52:5,21,24 53:5
  57:13 59:15 61:17
  61:20,22 63:17
Cheryl's (21) 20:8,11
  20:24 24:5,7,8,12
  25:5 26:4,6,7,24
  27:1 32:20 35:21
  36:23 49:24 50:22
  51:17 54:14 62:24
Child (1) 51:4
chit-chatting (1)
  45:19
Christina (1) 59:24
Chronology (1) 9:12
Citi (1) 8:22
Clarkson (34) 2:4 3:4
  4:6,20,24 5:2,5,6,21
  6:1,7,8 7:14,16
  13:16,19 23:5,8,21
  24:2 26:3 27:5,8
  29:25 30:5,14
  34:19 57:24 63:23
  65:24 66:8,10,13,16
Claudia (3) 28:16
  44:22 49:25
clerk (3) 16:24 45:10
  56:1
clerks (1) 63:11
clicking (1) 66:15
client (37) 8:18,19
  16:21 33:8,9,11,11
  34:7,8,9,23 36:15
  39:14,17,17,18,20
  39:22,24 40:1
  42:13,22 47:3,8
  48:20 49:4,9 50:7
  51:25 52:1,22 53:4
  53:15,17,21 54:4
  60:10
client's (7) 35:3,6
  36:11,14,16 53:19
  60:13
clients (9) 8:16 32:6
  34:8 39:5,7,12 40:3
  41:8 42:17
close (4) 22:13 45:7
  45:18 47:20
closed (5) 35:23 40:1
  50:12,13 62:18
closely (1) 30:20
code (5) 39:17,17,20
  39:22 42:22
colleagues (1) 45:8
collect (2) 14:22,24
come (11) 13:22
  14:13,17,22 16:23
  39:5 40:3 42:8
  53:25 54:2 65:14
comes (1) 48:20
coming (3) 41:16

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 71 of 76

Page 70

42:1 54:21
**common (1)** 31:20
**communicate (2)**
53:22,23
**company (4)** 29:10
34:5 45:7,20
**complaint (4)** 32:2
33:23 53:9,12
**complaints (4)** 28:6,8
29:9 47:10
**complete (1)** 67:11
**completed (4)** 30:25
31:24 53:1 55:18
**computer (3)** 37:13
37:21,25
**computerized (1)**
37:14
**concern (3)** 62:21
63:18 65:3
**concerned (1)** 11:2
**concerns (3)** 40:13,18
58:22
**concluded (1)** 66:20
**conference (2)** 13:14
13:17
**confirmed (1)** 20:16
**conflicts (1)** 46:23
**confused (1)** 60:20
**connected (1)** 64:12
**considered (2)** 48:1
58:22
**constantly (1)** 45:21
**contact (5)** 41:13,15
44:3 53:18,20
**contract (1)** 54:9
**contracts (1)** 54:12
**control (2)** 60:10,10
**controlled (1)** 11:3
**conversation (2)** 36:1
47:25
**conversations (7)**
38:21 40:17 41:1
42:15 49:15 57:6
62:24
**converts (1)** 27:17
**copy (2)** 4:24 30:12
**correct (15)** 6:10,11
9:16 15:13,14 19:2
31:3 32:24 33:12
33:13,16 34:24,25
38:10 68:21
**CORRECTED (1)**
1:14
**correctly (7)** 27:13
31:7 35:22 36:3
39:21 47:10 48:4
**CORY (1)** 2:13
**counsel (1)** 67:13
**counties (1)** 57:17
**Countrywide (2)** 8:22
39:23
**County (5)** 15:22
16:1 57:3 64:13
67:4

**court (14)** 2:13 9:7
15:18,20,22 16:2
31:25 50:12,14
56:25 57:1,1 67:6
67:19
**create (3)** 37:24 53:6
56:9
**created (4)** 31:2
37:22 52:15 56:22
**CRIMES (1)** 1:7
**Cross (1)** 3:3
**cubicle (1)** 46:21
**curve (2)** 24:20 25:6
**customer (1)** 52:23

**D**

**D (1)** 3:1
**D-e-l-l (1)** 60:1
**daily (4)** 8:13,14,15
8:16
**data (1)** 37:17
**date (6)** 33:15 35:25
37:17 40:20 47:8
68:24
**dated (7)** 31:8,24
35:14,16 39:21
44:7 67:16
**dating (5)** 36:6,7,9
59:8 60:13
**David (54)** 1:10 6:13
6:14 11:5,25 12:6
19:21 20:9,10
23:23 25:12 29:19
29:22 30:3,20,21,25
31:17,21 38:22,25
40:14 41:2,13,15
42:9,11 44:9,20
45:9,20 46:5,6,7
47:16,20,23,24 50:5
57:9 58:4,23 59:8
59:10,11,12,22 60:9
60:17,21 61:12
62:11 64:8,17
**David's (2)** 62:13,18
**Davilla (2)** 22:15
44:23
**day (13)** 8:3 11:16
13:22 17:8 20:25
22:3,9,10 29:2 46:8
50:16 65:15 67:16
**days (1)** 42:11
**dealt (1)** 44:9
**December (1)** 64:25
**decided (1)** 49:2
**decision (1)** 50:12
**declare (1)** 67:8
**Default (2)** 57:5 68:3
**defaults (1)** 17:6
54:18,20,25
**defendant (4)** 5:17
35:22 36:3,21
**Defendant(s) (1)** 2:7
**defendants (1)** 29:9
**definitely (1)** 34:1

**Dell'Aguila (1)** 59:24
**demand (7)** 9:1 36:10
36:11,19 53:1
55:18 56:16
**department (12)** 1:2
10:1,4,6 16:14,25
28:20 52:4,11 53:7
56:2,11
**departments (2)** 10:2
17:5
**depended (5)** 34:9
53:19 54:3 57:1
61:24
**depends (1)** 34:7
**deposes (1)** 4:4
**deposition (3)** 66:20
67:7 68:21
**describe (2)** 10:22
35:14
**described (1)** 56:18
**Description (1)** 3:8
**desk (1)** 46:15
**Diaz (1)** 5:18
**difference (3)** 26:19
26:20,22
**different (7)** 21:2
24:12 29:8 32:18
39:24 49:19 63:19
**dinner (1)** 46:3
**dips (1)** 27:16
**direct (3)** 3:3 4:5
35:16
**direction (2)** 32:4
59:2
**directly (2)** 17:22
30:11
**discussing (1)** 39:10
**discussion (3)** 7:15
35:23,24
**doc (2)** 52:1 56:2
**docket (15)** 11:11,13
11:15 56:18,22,25
57:2,7,11,15,18,25
58:1,3 63:11
**docs (7)** 13:6 17:7
52:3,4 56:3,4,6
**document (15)** 4:22
12:18 23:6,22,25
25:22 26:1,18 27:6
33:13 36:13,16,17
36:25 37:11
**documentation (1)**
40:16
**documents (35)** 8:16
8:17,23,25 9:6,17
9:19,21 12:12,21
13:4 14:7,21 15:12
15:15,21 21:23
25:1 29:3 35:11
37:21,24 38:4
47:12 50:3,7,25
56:9,11 58:16
60:12,17,18,19,23
**doing (7)** 11:24 28:20

**36:9** 43:24 60:20
61:7 63:10
**doors (3)** 35:23 40:1
62:19
**Doug (2)** 4:24 66:13
**DOUGLAS (1)** 2:9
**drinks (1)** 42:17
**duly (2)** 4:4 67:9
**duties (1)** 8:12

**E**

**E (3)** 3:1 68:1,1,1
**e-mail (8)** 14:22
16:23 35:21 50:8
52:5,22 56:2 57:16
**e-mails (2)** 8:16 58:16
**E-r-i-c-a (1)** 19:14
**E-r-i-c-k-a (1)** 19:15
**ECONOMIC (1)** 1:7
**Edwards (9)** 2:4 3:5
30:2 34:18,20 60:6
63:25 65:23 66:11
**eight (3)** 40:9,10
48:15
**eighteen (4)** 63:19,23
63:24 65:14
**either (2)** 59:8 64:20
**electrical (1)** 19:1
**Elizabeth (10)** 22:15
25:13,13,14,16,18
26:9,13 44:23,23
**Elizabeth's (1)** 26:18
**else's (1)** 26:16
**employees (6)** 12:5
17:6 23:12 54:22
57:17 59:7
**employer (1)** 6:17
**entered (2)** 11:22
68:22
**entries (1)** 37:20
**entry (1)** 37:17
**Erica (4)** 18:21 19:9
19:10,14
**Ericka (2)** 19:18,24
**errors (2)** 55:13,14
**escrow (1)** 33:8
**ESQUIRE (4)** 2:4,4,9
2:9
**evicted (1)** 28:11
**eviction (1)** 28:10
**exactly (11)** 11:3
14:19 24:19 34:13
35:8 38:7 47:24
58:15 59:2 60:22
65:18
**EXAMINATION (1)**
4:5
**execute (2)** 12:21
14:6
**executed (6)** 9:23
15:13 16:1 17:2,3
23:23
**executing (1)** 12:18
**Exemplar (1)** 3:10

**exhausted (1)** 22:2
**Exhibit (10)** 3:7 4:21
4:22 23:6,25 25:10
26:1 27:5,6,16
**Exhibits (1)** 3:15
**expenses (4)** 20:11,12
33:23 42:12
**explain (4)** 30:15,22
33:6 60:11
**expressed (2)** 48:2
65:8
**expressing (1)** 62:21
**extent (1)** 45:4
**extra (1)** 48:5
**eyes (1)** 27:23

**F**

**fabricate (1)** 60:12
**familiar (6)** 6:13,16
22:18 26:8 29:5
39:19
**Fannie (9)** 17:11 32:4
40:4 41:5,13 47:15
47:17,21 54:1
**far (2)** 11:2 61:3
**Fargo (2)** 8:21,22
**Farrar (1)** 2:10
**fax (3)** 49:4,22,23
**faxes (1)** 49:24
**February (1)** 6:24
**fee (2)** 33:24 34:13
**fees (7)** 34:2,3,4,4,4,5
34:15
**feet (2)** 13:17,18
**fifteen (2)** 5:10 13:17
**fifth (1)** 55:19
**fifty (1)** 25:3
**figure (1)** 33:8
**figures (4)** 28:21
34:22 49:6,8
**file (36)** 13:6,7 16:12
16:19,23,24,24
30:10 32:2,21,23
36:5,12,18 37:4,6,8
37:10 39:18,23
41:10 45:10 48:4
46:9 49:7 51:5
52:6,7,11,11 53:1
55:15,18,25 56:1,3
**filed (6)** 4:3 16:1
47:11,11 53:9,12
**files (50)** 8:15 11:16
11:21 14:22,25
17:8 22:4 30:24
39:10,11,21,25
40:13,14,15,19 41:5
41:9 42:19 43:1,6
47:2,4,9 48:3,4,6,11
48:12,14,15,17,18
48:21,23 53:8,11
57:4,19,20 59:10
60:7,8,22 63:18
65:2,5,6,9,9
**filing (2)** 33:24 34:3

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 72 of 76

Page  71

**filled (3)** 29:6 34:15 34:22
**final (1)** 40:22
**financially (1)** 67:14
**find (2)** 41:23 57:15
**fine (1)** 16:4
**fire (4)** 61:16,25 62:5 62:7
**fired (11)** 18:8 58:5 61:4,5,17,22,24 62:3,15,18 66:1
**firm (22)** 6:23 8:5 10:16,22 12:25 16:5,11 17:17 30:23 31:21 34:23 45:10,15 47:1,18 48:2 49:8,9,17 53:13 58:11 60:2
**firms (4)** 49:11,17 50:2 54:10
**first (5)** 4:4 24:23 54:5 57:15 67:9
**five (18)** 11:17,18,19 13:18 22:4,6,6 42:25 43:2,10,10,12 43:13,17 48:14 56:19 57:2,18
**floor (5)** 1:20 2:5 13:9 30:7 55:20
**floors (2)** 13:10 50:25
**Florida (8)** 1:1,11,21 2:6,11 64:9 67:3 68:3
**focus (1)** 40:21
**folder (1)** 14:19
**following (1)** 42:10
**follows (1)** 4:4
**fond (1)** 46:1
**food (2)** 42:12,18
**foreclosed (1)** 28:1
**foreclosure (12)** 9:14 10:1,2,6 49:2,11 50:5,6 54:7 56:7 62:22 63:11
**foreclosures (5)** 9:8 40:22 46:24 62:25 64:18
**Forester (1)** 44:23
**form (2)** 22:18 68:22
**forms (1)** 27:16
**Fort (1)** 1:21 2:6
**four (6)** 13:10 32:11 32:12,19 42:10 50:25
**fourth (1)** 30:7
**Freddie (14)** 17:9,9 17:11 32:4 40:4 41:5,13,15,25 47:15 47:17,21,24 53:25
**freight (2)** 63:20,21
**fresh (1)** 53:1
**FRIEDMAN (1)** 2:13
**friend (3)** 18:24 19:3 65:7

**friend's (1)** 19:8
**friends (10)** 18:16 44:15 45:3,8,14 59:9 63:6,8,14,15
**friendship (1)** 45:5
**front (2)** 46:21 51:6
**further (1)** 67:12

**G**

**G-i-a-n-n-a (1)** 61:1
**general (5)** 1:1,20 2:5 31:20 68:3
**getting (8)** 15:1 31:24 31:24 40:19,21 57:20,22 58:10
**Gianna (2)** 60:25 61:17
**gifts (2)** 59:19,20
**girlfriend (2)** 59:22 59:23
**girls (1)** 60:16
**give (5)** 17:19,20,21 22:1,14 23:2,4 28:8 37:5 38:11 49:24 53:5 55:20,21 62:6 62:12
**given (2)** 17:22 30:13
**Glenn (5)** 43:4 44:24 45:18,24 46:1
**go (31)** 4:9 7:17 13:20 14:24 15:5,18,18,21 16:14,25 17:1 23:3 28:15 29:25 30:5 30:11 32:20 34:19 35:20 36:12 42:16 46:3,3,5 50:20 51:25 52:10 53:5 54:23 55:19 62:17
**goes (1)** 27:17
**going (30)** 4:14 14:18 15:22 20:24 23:5 23:21,24 24:17 25:9 27:9 28:11 36:5,7 39:5,10 48:19,19,20 49:5,22 50:8,16 56:7 58:21 62:25 63:16 64:5 65:8,12,20
**good (10)** 15:17 16:13 16:25 17:1 18:16 18:24 39:13 55:19 59:9 66:3
**gotten (1)** 52:18
**granted (5)** 11:4,22 23:19 40:20 50:13
**group (4)** 26:14,15 65:9 68:3
**growth (1)** 12:9

**H**

**H (1)** 68:1
**H.R (1)** 58:20
**half (6)** 15:19 24:25 54:24,25 64:6,19

**halted (1)** 50:6
**handle (1)** 54:6
**handled (3)** 38:23 46:24 56:19
**handling (1)** 44:6
**hands (5)** 12:3 56:14 56:15,15,17
**happen (2)** 14:11 39:8
**happened (5)** 15:15 37:9 42:19 56:12 62:14
**happening (1)** 39:14
**happy (1)** 41:8
**hard (1)** 48:16
**HAROLD (1)** 2:13
**head (5)** 5:22 10:15 18:3 19:1 26:15
**hear (18)** 21:7,9,12 28:6 31:4,13,17 36:6 38:21 40:17 41:1 49:15 57:6 62:20,20,24 63:2 65:19
**heard (11)** 11:9,10 21:13 28:9 31:1,11 31:12 32:7,10 42:15 66:15
**hearing (6)** 11:4,17 15:20 40:22 57:5 57:23
**hearings (4)** 9:5 40:20 57:2,18
**held (1)** 7:15
**heretofore (1)** 4:3
**hidden (4)** 42:20 48:6 48:10,22
**hide (1)** 39:25
**hiding (2)** 39:18,20
**hire (2)** 61:25 62:9
**hired (1)** 54:10
**hold (2)** 28:13 56:4
**home (2)** 17:16 21:7
**homeowner (1)** 36:22
**homes (1)** 59:21
**Honestly (1)** 56:23
**hospital (1)** 28:12
**hotel (1)** 42:12
**hour (2)** 16:22 37:4
**hours (4)** 17:7 28:10 37:5 47:5
**house (5)** 16:10 19:4 19:6 32:13 59:12
**hundred (12)** 22:4,6 22:7 43:2,10,11,12 43:13,17 48:14,15 56:19

**I**

**idea (5)** 8:10 28:8,19 57:7 61:6
**identification (5)** 4:23 23:7 24:1 26:2 27:7

**identify (1)** 26:24
**ill (2)** 58:10,12
**image (1)** 37:14
**improprieties (3)** 38:18 58:21,22
**Inch (1)** 63:19
**include (1)** 10:2
**included (3)** 34:3,6,7
**Indebtedness (4)** 33:2 33:20 34:21 35:1
**INDEX (1)** 3:7
**indicate (1)** 38:14
**individual (1)** 48:18
**individuals (2)** 27:22 32:11
**information (9)** 33:9 44:11 47:7 50:7 54:6,11 60:15,16 62:6
**initial (1)** 25:8
**initials (1)** 38:15
**instance (1)** 8:19
**instructed (2)** 28:15 52:10
**instructions (1)** 32:20
**intercom (1)** 50:7
**interest (6)** 29:16 30:4,16,18,19 31:21
**interested (1)** 67:14
**Intern (1)** 2:13
**invested (1)** 45:16
**investigation (4)** 1:10 6:12 62:21 65:3
**irregularities (1)** 32:7
**Island (1)** 1:10
**issue (2)** 28:16 47:1
**Izquierda (1)** 55:22

**J**

**J (3)** 1:10 6:13,14
**January (1)** 6:23
**Jason (5)** 44:24 45:18 45:19,21 57:16
**jewelry (1)** 59:19,20
**job (4)** 9:25 18:2 27:25 54:14
**Judge (4)** 32:21 36:5 57:2,3
**judgment (5)** 33:8,17 50:13 51:2 55:1
**judicial (1)** 57:10
**JUNE (1)** 2:4
**junior (5)** 13:3 35:20 54:22 60:3,4
**juniors (2)** 36:2 57:22

**K**

**keep (3)** 32:22 40:1 48:16
**Kelly (7)** 1:7,17 3:4 4:2,8 67:8 68:24
**kind (6)** 5:13 8:25 20:20 28:8 48:16 64:7

**knew (5)** 20:5 31:5,6 62:15 66:16
**know (126)** 5:24 6:2 7:12 8:6,8,25 9:6,6 10:19 12:5 15:4,15 15:18,19 16:19 17:25 18:1,8,10 19:14 20:4,14,22 21:19 22:12 25:1 25:14,23 27:12 29:14,16,20,25 30:3 30:15 31:23,23 32:15 33:1,4,15,18 34:10,13 35:2,2,5,5 35:8,21,24 37:3,10 37:11,15,23 38:1,8 40:24 41:7,20 42:4 42:6,9,14 43:12,12 43:13 44:2,5 45:5 45:24,25 46:1,19 47:19,23,24,25 49:14,19 50:3,8,21 51:13,14 52:5 54:11 56:8,10,22,25 57:9,17 59:2,13,14 60:9,14,22 61:3,7 61:10,18,22 62:14 63:5,8,10,24,24 64:1,3,5,11,15,17 65:2,4,7,9,11,12,15 65:17,25 66:5
**knowledge (6)** 31:20 34:20 38:3 55:4 61:9 62:23
**known (2)** 32:17 51:23
**knows (1)** 14:19

**L**

**L (2)** 2:9 27:17
**L10-3-1145 (1)** 1:8
**lack (2)** 21:19 39:22
**lady (1)** 28:14
**laid (2)** 13:11 14:17
**Land (1)** 54:3
**Lauderdale (2)** 1:21 2:6
**law (16)** 1:10 6:12,13 12:5 19:21 20:9 23:23 25:11 31:21 34:23 53:13 58:4 58:23 64:8,17 68:3
**laws (1)** 45:21
**lawyer (1)** 54:20
**lawyers (9)** 10:5,12 55:3,7,9 62:2,3,5 66:1
**laying (1)** 51:6
**lead (4)** 13:7 26:14,15 35:20
**leads (2)** 54:21,23
**learn (3)** 22:19,23 28:25
**leave (7)** 16:22 39:7

12-12020-mg   Doc 8531-20   Filed 04/27/15   Entered 04/27/15 16:52:56   Smith T
Decl. Exhibit E   Pg 73 of 76

Page 72

40:2 41:2 42:21 58:5,9
**leaves (1)** 56:15
**Lee (6)** 25:13,13,14 25:18 26:13 44:23
**Lee's (2)** 25:16 26:9
**left (12)** 6:23 10:19 18:6 20:23 42:16 42:19 49:17 58:4,6 58:7,8,14
**legal (6)** 1:2 7:3,5,7,9 29:3
**Lend (2)** 60:11,19
**letter (6)** 36:10,11,19 55:18 58:19,19
**letters (1)** 9:1
**Lewis (5)** 43:4 44:24 45:18,24 46:2
**line (2)** 9:14 52:3
**listen (1)** 16:20
**little (5)** 10:24 29:7 44:14 56:18 60:20
**lives (1)** 61:10
**living (1)** 32:12
**LNA (7)** 16:6,7,8,21 52:6,7 53:6
**load (1)** 48:15
**loan (4)** 28:22 49:5 50:8 53:3
**locate (1)** 16:10
**location (1)** 64:16
**long (13)** 6:20 13:12 13:13,17 20:3 24:24 28:25 30:24 50:25 51:7 61:12 61:14 64:5
**longer (1)** 18:4
**look (10)** 4:14 13:17 23:21 25:9,22 26:25 27:9,15 36:18 39:13
**looked (1)** 52:20
**looking (1)** 36:17
**looks (1)** 14:18
**loop (1)** 27:17
**loops (2)** 24:21 25:7
**lost (10)** 16:6,8,11,15 51:12,15,23 52:15 52:17,19
**lot (3)** 12:9 49:20 61:24
**Lyons (7)** 2:9,9,10 5:1,4 66:14,18

**M**
**M (1)** 2:4
**M-a-r-v-i-s (1)** 7:20
**Mac (14)** 17:9,9,11 32:5 40:4 41:5,13 41:15,25 47:15,17 47:21,24 53:25
**machine (1)** 49:23
**Macoma (2)** 10:11 44:22

**Mae (9)** 17:11 32:4 40:4 41:5,13 47:15 47:17,21 54:1
**Maggie (1)** 21:13
**magically (1)** 37:1
**mail (4)** 8:16 20:25 41:2 42:16
**mailing (1)** 55:13
**main (1)** 40:21
**majority (2)** 17:9 47:13
**manager (2)** 10:1 55:23
**managers (1)** 10:15
**manner (1)** 29:5
**MARITZA (2)** 67:6 67:19
**mark (2)** 26:25 27:5
**marked (10)** 4:20,22 23:5,6,24,25 25:10 26:1 27:6 37:16
**Marsha (2)** 2:9 7:10 7:10
**Marvis (2)** 7:19 8:5
**massive (1)** 14:22
**mean (9)** 17:11 19:6 39:20 41:10 52:17 52:17 55:21 57:25 60:8
**means (2)** 11:15 17:1
**media (2)** 31:14,15
**meet (2)** 39:4 41:7
**meeting (1)** 39:6
**meetings (4)** 38:25 39:2,9 57:9
**mentioned (1)** 48:24
**merging (1)** 47:6
**message (1)** 20:23
**mid-afternoon (1)** 13:23
**middle (1)** 4:10
**mills (1)** 62:2
**Mindietta (2)** 10:11 44:22
**minor (1)** 5:16
**minute (1)** 57:18
**minutes (4)** 11:17,18 11:19 57:2
**Miriam (6)** 10:11 44:22 45:14,14 62:4,17
**missing (2)** 16:21 47:12
**modification (1)** 49:5
**molestation (1)** 5:14
**MONROE (2)** 67:6 67:19
**month (8)** 6:25 41:6 52:2,3,14 54:24 64:6,19
**monthly (1)** 20:1
**months (2)** 54:25 65:21
**morning (3)** 13:22

22:5,6
**mortgage (12)** 3:12 3:13 15:25 19:6 23:22 25:11 51:3 53:3,13 55:16,25 59:18
**Mortgages (1)** 9:2
**Mother's (1)** 8:3
**Motion (1)** 33:16
**motions (13)** 9:7 13:3 17:6 32:2 51:2 54:18,19,25 55:1,3 55:11 57:4,23
**move (5)** 32:20 36:4 40:15 46:25 52:11
**moved (3)** 49:2 64:2 65:2
**moving (9)** 40:14 43:8 56:20 57:19 57:21 63:18 64:1 65:5,6
**MSJ (2)** 40:19 47:10
**mute (1)** 66:14

**N**
**N (2)** 2:10 3:1
**N-o-e-l-i-a (1)** 4:13
**N-o-e-l-l (1)** 4:12
**name (24)** 4:7,8,9,10 7:11,19 17:25 18:1 18:20 19:8,11 21:23 22:2,3,16,20 25:2 27:23 28:23 39:24 50:22 59:1 60:24 65:25
**named (1)** 4:3
**names (4)** 22:14 51:8 51:9 66:4
**NBR/IMG (1)** 67:25
**necessary (1)** 36:25
**need (7)** 6:1 9:5 16:21 41:6 47:9 48:4 52:6
**needed (7)** 11:4 30:10 36:19 41:9 42:13 49:8 56:2
**needs (1)** 39:11
**never (10)** 17:21 19:7 29:3,4 51:5,6 54:13 60:18 61:20 62:23
**new (10)** 17:6 21:17 21:18,18 36:12 45:21 47:7 53:19 54:2,21
**nod (1)** 5:22
**Noelia (1)** 4:11
**Nope (1)** 31:10
**normal (1)** 42:5
**normally (1)** 16:11
**notaries (3)** 12:25 13:1,2
**notarize (4)** 9:19 13:7 16:13 33:15
**notarized (8)** 12:21 13:8,25 14:1 15:13

25:13 51:19 53:7
**notarizes (1)** 14:16
**notary (3)** 12:16 15:5 52:8
**notary/paralegal (2)** 15:9,10
**note (20)** 13:16 16:8 16:15,20 51:12,15 51:24 52:12,15,17 52:19,25 53:2,4,4 53:12 55:16,17,24 56:6,7
**notes (4)** 9:1,2 16:6 67:11
**notice (5)** 4:3 32:21 36:5 41:17 58:8
**notified (1)** 28:11
**notify (1)** 51:25
**number (1)** 47:17
**numbers (1)** 34:15
**numerous (4)** 22:3 32:18 48:2 49:19

**O**
**o'clock (1)** 13:23
**obtaining (1)** 9:5
**occasion (2)** 43:18 50:11
**occasionally (1)** 50:10
**occasions (1)** 42:23
**occur (1)** 11:4
**occurred (1)** 11:3
**October (2)** 1:22 67:16
**office (54)** 1:1,20 2:5 7:2 10:1 12:5,21 15:22 16:1,22 23:23 25:11 28:2 31:5,17 33:23 35:4 35:21 39:12 40:6 41:16 42:5,10,12 44:13,16,16 46:7,10 46:16,22 49:24 50:6 51:17 54:5,9 54:14 58:4,23 62:18 63:3,5,8,11,19 63:19 64:2,7,8,10 64:12,15,17 65:7 68:3
**offices (6)** 1:10 6:13 6:14 19:21 20:9 46:15
**Oh (2)** 37:7 65:4
**okay (56)** 4:12,17 5:17,24,25 6:7,12 7:7,12,13,14,17 8:8 8:23 10:17 11:8,10 11:20 13:16 14:11 14:15,23 16:4,9 18:2,12,20 19:18 22:11 23:2,21 26:8 26:13 27:18,22 28:4,23 30:15 33:2

33:22 35:1 36:6 37:20 40:21 41:12 43:17 46:20 53:8 55:24 57:3 58:4 59:14 60:20 65:23 66:8,10
**once (10)** 13:5,8 14:16,21 15:17 33:9 55:17 56:13 56:15 57:3
**ones (2)** 40:5,6
**open (1)** 64:19
**opened (1)** 64:18,20
**operated (2)** 12:23,24
**opinion (1)** 11:5,8
**original (22)** 9:1,2 13:6 16:20 37:12 51:18 52:1,3,4,12 52:19,23,25 53:2,12 55:16,17,24 56:3,4 56:6,16
**originals (1)** 35:9
**Orlando (3)** 64:7,8,18
**Orlando's (1)** 64:2
**overheard (1)** 32:17 36:2
**overlapping (1)** 48:12
**ownership (4)** 30:18 30:19 31:21 45:15
**owns (1)** 29:14

**P**
**P.A (1)** 1:10 6:13,14
**p.m (2)** 1:22,22
**package (1)** 15:19
**Page (1)** 3:8
**PAGE/LINE (1)** 68:4
**paid (11)** 17:17 19:19 19:21 20:1,3,8,11 20:15 32:25 59:12 59:16
**paper (3)** 14:18 23:2 49:23
**papers (2)** 50:24 53:6
**para (1)** 14:16
**paralegal (8)** 12:24 13:6 35:20 48:13 48:16 60:3,3,4
**paralegals (1)** 10:5 14:24 15:1 22:1 32:18 48:14 54:22 55:5,12 57:22 63:11
**part (5)** 27:25 31:23 32:17 45:15 54:14
**particular (6)** 20:25 28:12 41:12 44:5,9 65:6
**parties (6)** 67:13,14
**party (1)** 53:21
**pass (2)** 15:9 48:19
**passed (1)** 52:2
**Paula (1)** 46:17
**pay (3)** 28:21 49:5,8

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 74 of 76

Page 73

payments (1) 19:4
Pena (1) 21:13
penalties (1) 68:21
people (9) 22:16 28:1
  43:20 44:12 46:3
  54:15,19,23 61:24
Perfect (1) 6:1
perfected (1) 31:2
period (2) 32:1,3
perjury (1) 68:21
perks (8) 21:20 30:20
  30:22,23 45:22
  59:7,11,14
person (5) 12:18 19:1
  32:12 44:5,9
personal (12) 17:15
  17:16 18:15 20:12
  23:14,17 44:15
  45:3 59:4,5,6,16
personally (1) 27:22
phone (5) 19:4 28:3
  59:12,17
phonetic (4) 7:4
  17:22 28:17 49:19
Physically (1) 58:12
pick (8) 16:23 41:9,10
  41:10,11 48:21
  49:23 65:14
picked (1) 28:2
picking (1) 63:20
piece (1) 23:2
Pine (1) 1:10
pit (1) 48:13
place (3) 14:12 54:9
  59:7
plaintiff (1) 5:19
Plaintiff's (6) 3:8
  4:22 23:6,25 26:1
  27:6
Plaintiff(s) (1) 2:3
Plantation (1) 1:11
played (1) 48:3
pleadings (2) 11:22
  13:4
please (7) 4:7,7 14:22
  21:25 23:13 29:12
  30:22
Plus (1) 42:16
point (4) 15:16,17
  32:22 55:15
position (3) 7:2 45:11
  60:2
positions (1) 10:14
possession (2) 53:13
  53:15
preparation (1) 39:8
prepare (7) 13:3,3
  17:6 33:10 47:11
  54:19 55:3
prepared (4) 33:10
  55:12 57:4,23
preparing (2) 54:18
  54:25
Present (1) 2:12

pretend (1) 32:10
previous (2) 6:17
  47:7
print (1) 39:24
printed (4) 13:5 37:6
  37:7,8
prior (3) 34:15 39:6
  47:16
private (1) 17:16
privileged (1) 60:15
privileges (1) 20:24
privy (2) 39:2 57:6
probably (1) 59:18
problem (1) 28:16
problems (2) 40:17
  62:25
proceed (2) 35:7
  36:25
process (9) 29:6
  33:23 35:14 36:8
  37:25 38:19,22
  39:22 44:6
processing (1) 34:4
produce (1) 30:24
progress (1) 17:7
Promissory (2) 52:12
  53:12
proof (5) 30:10,11,12
  31:1,25
properly (1) 48:9
property (2) 32:11
  50:4
protege (1) 45:10
Provest (19) 29:13,14
  29:16,22,25 30:4,6
  30:9,12,16 31:18,22
  32:8,10 37:15
  38:19,22 44:6,10
provide (1) 36:15
provided (1) 36:19
PTO (1) 23:12
public (1) 28:1
pump (1) 41:6
pumping (1) 17:8
purchase (1) 42:17
purpose (4) 9:4,5
  40:12 43:24
push (5) 11:21 40:19
  40:20 48:5,22
pushed (2) 48:4,12
put (6) 14:20 24:21
  28:13 34:23 35:11
  51:12
putting (3) 43:8 51:8
  51:9

Q

Queen (2) 10:5,6
question (2) 6:3 30:1
questions (3) 40:13
  48:20 66:12
quickest (1) 57:19
quickly (1) 46:25
quit (3) 8:5,6 18:8

quota (2) 41:7,7

R

R (2) 68:1,1
rapid (14) 11:11,13
  11:14,15 56:18,22
  56:25 57:2,7,10,15
  57:18,25 58:2
re-instate (1) 28:22
re-instated (1) 49:5
re-instatement (5)
  28:17,18,20 48:25
  49:3
read (3) 66:17,18
  68:21
reading (4) 50:17
  51:8,10,11
REAGAN (1) 2:13
really (8) 31:23 35:2
  35:5,8 37:10 41:7
  45:25 50:21
reason (3) 48:1 49:13
  68:4
Rebecca (1) 5:18
recall (8) 7:17,18
  9:20 17:24 21:21
  35:13 65:25 66:5
receive (4) 33:14
  36:10 38:11 52:4
received (9) 13:5
  37:18 52:14 53:11
  55:15,18,24 59:7,20
recognize (3) 4:15
  24:3 27:20
record (5) 4:7 7:15
  50:15 67:11 68:2
recorded (1) 15:23
Recorder's (2) 15:22
  16:1
Recross (1) 3:3
Redirect (1) 3:3
regards (1) 45:19
regular (1) 19:4
regularly (1) 38:25
regulations (1) 45:22
reinstatements (1)
  50:1
related (1) 67:13
relationship (4) 44:12
  45:8 46:1 47:20
relayed (1) 53:23
release (1) 47:14
released (1) 47:3
releases (1) 47:2
remember (20) 5:20
  5:21 7:10,11,11,12
  10:14 19:11,12,13
  26:14 28:23 44:24
  45:12 50:2 61:13
  64:22 65:1 66:2,3
rental (1) 42:12
repeat (1) 6:4
rephrase (1) 29:7
reply (1) 53:3

report (1) 67:7
Reporter (3) 2:13
  67:6,19
request (9) 8:23 9:6
  28:21 30:12 35:19
  52:12,25 53:2
  55:17
requested (3) 55:16
  56:16 67:10
requesting (5) 8:16
  8:17 17:7 36:14
  56:2
requests (2) 23:12,18
resignation (1) 58:19
resigned (1) 12:8
resolved (1) 40:18
responsible (3) 16:5,6
  57:20
result (1) 37:21
retained (2) 3:15 54:6
return (2) 21:1 63:11
review (4) 14:18
  33:12 52:3 67:9
reviewed (3) 34:23
  55:7 65:7
reviewing (5) 8:15
  20:24 40:13 65:8
  65:12
right (13) 6:6 7:11
  19:8,12,13 20:6
  25:9 27:3 42:22
  44:24 46:15,21
  48:23
rights (1) 22:1
Rios (2) 43:4 44:23
Road (1) 1:10
rocket (1) 57:25
Rodriguez (1) 60:25
role (3) 10:22 17:4,5
room (7) 13:6 39:25
  42:21 43:14 54:24
  55:19,25
routine (1) 32:3
rumor (1) 20:14

S

S (4) 1:10 2:9 27:17
  68:1
S.E (2) 1:20 2:5
sale (3) 40:20 50:4,9
Salmons (3) 3:14
  7:3 8:11 10:22
  12:11 16:5,12
  17:16 19:21 20:21
  21:22 22:13 23:9
  23:23 25:12 27:10
  29:1 35:17 36:18
  37:20 41:3 45:1,2
  46:21 48:24 56:19
  57:13 59:15 61:17
  63:17
Salmons' (4) 18:22
  21:23 24:10 27:23
Salmons's (1) 3:10

satisfied (1) 21:1
saw (9) 11:9,10 19:7
  19:24 26:18 50:3
  51:5,6 54:13
saying (6) 36:2,7
  37:18 41:4 49:4
  53:4
says (2) 4:4 6:12
scared (3) 63:13,14
  63:15
Scott (7) 1:7,17 3:4
  4:2,8 67:8 68:24
scratch (1) 45:7
second (1) 15:19
section (1) 48:25
see (12) 4:14 12:1
  19:18 28:13 35:9
  38:5,8 40:16 49:22
  50:9,10 54:12
seen (4) 12:20 14:6
  27:22 33:2
selected (3) 43:20,22
  54:22
send (8) 14:21 15:18
  16:23 35:21 49:4
  50:7 52:5 56:2
sending (1) 52:22
senior (1) 13:6
sense (1) 59:10
sent (5) 5:2 15:19
  16:2 53:4 57:16
separated (2) 43:15
  43:16
serve (3) 32:10,11,11
served (11) 6:9 29:9
  31:7,25 32:19
  35:22 36:3,14,16,20
  37:16
service (25) 29:6
  30:10,11,12,25 31:2
  31:2,11,24 33:23
  35:14 36:8,10 37:5
  37:19,25 38:19,22
  44:6 47:2,3,14 53:1
  54:3 55:18
serviced (1) 32:19
servicer (7) 47:7
  53:17,18,18,20,20
  53:23
servicing (1) 29:10
serving (2) 36:3
  37:15
set (2) 30:9 42:7
seven (4) 40:9,10
  42:25 45:25
sewer (1) 31:11
Shamisa (6) 17:22
  18:12,13 19:8,19
  21:14
Shamisa's (2) 18:23
  18:25
Shannon (1) 22:15
shape (2) 22:18 25:6
shaped (1) 27:13

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 75 of 76

Page 74

share (1) 46:12
short (2) 50:4,8
show (3) 24:17 37:25
  47:8
showed (1) 22:20
sick (1) 58:10
side (3) 13:21,21 30:8
sign (24) 9:17 12:12
  13:7,23 14:17 15:5
  16:13 22:1,16,19,20
  23:9,11,15 24:13,18
  25:18 26:16 27:23
  28:25 33:13 35:8
  50:16,20
signature (22) 3:11
  3:14 14:20 24:3
  25:5,8,16 26:4,6,9
  26:18,24 27:1,10,12
  27:15,18,20 35:12
  37:12,15,17
signatures (3) 3:13
  25:10,23
signed (16) 13:8
  14:21 15:17 24:23
  25:2,12,20,23 29:3
  34:15 50:22 51:18
  51:21 52:9 53:6
  55:9
signing (5) 15:12
  21:23 22:3,5 26:13
signs (3) 14:16 35:1,2
single (2) 10:4 13:24
situation (2) 28:14
  35:22
six (3) 42:25 45:25
  65:21
Smith (1) 22:15
sold (1) 50:4
somebody (3) 35:3
  36:7 41:25
someplace (1) 8:8
sorry (1) 33:1
space (1) 33:22
speak (1) 27:25
special (1) 54:23
specific (2) 10:24
  60:8
specified (1) 60:18
specify (2) 41:8 44:14
speed (2) 41:10,11
spell (4) 17:23,24
  19:14 59:25
spoken (1) 28:4
spreadsheet (1) 34:12
squiggles (1) 25:23
stacked (1) 13:21
staff (1) 11:2
stamp (4) 13:2 16:13
  33:15 52:8
stamped (1) 17:3
stands (1) 33:18
Star (3) 54:3 60:11,19
start (2) 57:4,7
started (2) 12:7 45:10

state (3) 1:1 4:7 67:3
statement (2) 1:15
  5:7
stay (3) 14:12 52:6
  58:11
step (1) 53:2
Stephanie (3) 55:20
  55:21,22
Stern (49) 1:10 6:13
  6:14 11:5,25 12:6
  19:22 20:9,10
  23:24 25:12 29:19
  29:22 30:3,16,20,21
  31:21 38:22,25
  40:15 41:13,15
  42:9,11 44:1,10
  45:19,20 46:6,7
  47:16,20,23,24
  49:10 57:9 58:4,23
  59:8,11,12 60:17,21
  62:20,21 63:17
  64:8,18
Stern's (7) 31:17 35:3
  44:12 50:5 54:5,9
  62:11
sticker (1) 39:24
stickers (1) 43:8
Street (3) 1:20 2:5,10
subject (2) 59:1 68:21
submit (1) 9:6
submitted (2) 15:19
  33:16
Subpoena (5) 1:7 3:9
  4:17,25 6:9
substance (1) 68:22
Suite (1) 1:11
summary (4) 33:17
  50:13 51:2 55:1
Summonses (2) 29:5
  29:8
supervisor (4) 28:17
  28:18 45:11 49:22
supposed (3) 11:24
  42:3 46:24
supposedly (2) 25:12
  64:2
sure (13) 19:7 20:25
  33:12 41:21 47:6,9
  47:10,14 48:22
  57:19 59:15 66:7
  66:19
SUV (2) 20:21 21:18
swap (2) 15:7 21:17
swerve (1) 25:7
sworn (4) 1:15 4:4
  5:7 67:9
system (16) 12:20,23
  12:24 33:11 35:6
  36:11,15,18 47:8
  51:25 53:19,21
  54:4,7 57:10 60:13
systems (1) 60:10

T

T (2) 68:1,1
table (8) 13:11,12,13
  13:14,17 14:12
  35:11 50:25
tables (1) 51:7
take (15) 4:14 5:23
  13:8 14:12 15:1
  16:11,14,24 25:22
  26:25 27:9 28:25
  42:11 55:19 58:6
taken (3) 5:7 47:15
  48:3
talk (1) 20:15
talked (1) 34:1
talking (3) 9:9 32:18
  45:21
Tallahassee (1) 2:11
taught (1) 26:16
team (7) 13:7 14:16
  26:14,15 35:20
  54:21,22
telephonically (1) 2:8
tell (22) 10:8 11:10
  12:23 16:4 17:19
  21:25 24:5,12 25:4
  25:5 26:13,19,19,22
  29:12,18 31:6
  32:15 39:19 41:25
  45:4 56:13
telling (1) 63:12
tells (1) 34:12
ten (1) 17:7
term (1) 31:11
terminated (2) 18:9
  62:19
Thank (2) 5:4 7:14
THERESA (1) 2:4
they'd (2) 13:4 15:7
thing (3) 47:1 58:2
  59:6
things (3) 46:25
  59:10 60:7
think (7) 21:16 45:11
  45:25 63:20 64:6
  64:20 66:11
third (1) 53:21
thousand (2) 22:9,10
three (9) 3:13 13:23
  24:17 25:9,22
  32:19 42:10 43:22
  58:8
tight (1) 45:7
time (29) 6:23 7:8,24
  9:14,15 12:7 13:10
  14:4 16:24 22:2
  23:4,14,17 24:23
  30:6 32:1,3 36:1
  39:5 41:17 42:4
  48:13 50:9 52:2
  54:4 57:18 59:24
  65:1,15
times (9) 22:3 32:12
  32:18,19 40:9,10
  42:25 46:6 48:2

tired (1) 22:2
title (11) 9:25 16:14
  16:25 34:5,13
  45:12 52:10 53:7
  55:20,23 56:11
today (2) 4:18 6:10
told (6) 10:10 11:5,23
  11:23 19:18 43:24
top (3) 14:19 27:2
  47:15
town (1) 50:19
track (4) 36:12 48:16
  53:19 54:2
Trailer (1) 63:21
train (5) 17:5 54:15
  54:17,19,23
trained (1) 54:21
training (2) 17:6
  54:24
transcript (3) 67:10
  67:10 68:2
transfer (1) 28:16
transferred (7) 39:25
  48:25 49:7,9,10,18
  50:2
transition (1) 16:11
trip (1) 40:12
true (2) 67:10 68:21
try (2) 32:11 50:12
trying (2) 7:10 19:11
twenty-four (1) 47:5
twice (2) 13:22 50:16
two (9) 7:22 10:17
  13:23 24:17,25
  37:4 43:13 54:25
  56:19
type (2) 8:20 60:17
types (2) 37:21 50:25

U

uh-huh (5) 5:23 7:1
  45:13,17 52:13
Uhm (1) 26:21
Un-uh (1) 26:12
unable (1) 52:1
understand (4) 6:3,4
  22:4 45:6
understanding (1)
  42:5
understood (1) 34:22
unexpectedly (2) 42:8
update (2) 45:20
  48:14
updated (2) 45:22
  47:4
upgraded (1) 45:11
upload (1) 60:12
uploaded (3) 33:11
  35:5,6
use (1) 4:10

V

v (1) 68:3
vacation (3) 23:18

46:5 50:20
vacations (2) 46:4
  59:19
Vanessa (2) 43:4
  44:23
Vargas (7) 44:20 45:9
  46:5 59:11,22 60:9
  61:12
Vendorscape (2)
  36:12 54:2
verbally (1) 5:22
verbiage (1) 55:14
version (1) 21:18
vice-a-versa (1) 15:10
viewed (1) 39:11
visible (1) 14:19
visit (1) 39:5
visited (1) 41:14
voice (5) 8:15 20:23
  20:25 41:2 42:15

W

wait (1) 15:20
waiting (1) 52:2
waive (1) 66:17
walked (1) 36:1
want (5) 5:2 6:4
  40:14 58:11 66:17
wanted (2) 20:25
  58:9
wasn't (6) 35:22 36:3
  36:11 39:14 47:11
  54:20
way (5) 22:18 24:18
  41:23 54:5 66:18
we're (2) 47:6 66:16
week (3) 6:25 42:10
  42:11
weeks (1) 58:8
welcome (1) 5:5
Wells (1) 8:21,22
went (5) 8:8 10:25
  28:13 52:14 56:11
weren't (3) 16:10
  39:21 41:8
whatsoever (1) 14:5
  38:17
wheeler (3) 63:23,24
  65:14
Whitlow (3) 55:22,22
wide (1) 13:18
wing (1) 30:8
witness (14) 3:3 4:3
  5:25 6:6 9:21 12:14
  12:21 14:3,4 30:6
  63:24 66:9 67:8,9
witnessed (3) 14:2
  15:2 25:12
witnesses (5) 12:14
  14:6,7,13 15:12
witnessing (1) 14:12
woman's (1) 28:23
word (1) 21:19
work (14) 6:18 8:8,13

12-12020-mg    Doc 8531-20    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit E    Pg 76 of 76

Page 75

8:14,15 17:7 29:21
29:22 30:23 53:8
61:3,12 62:12 63:8
**worked (10)** 30:2,20
44:13,16 45:4 48:9
48:23 60:16 62:23
63:1
**working (2)** 10:20
30:7
**works (1)** 29:22
**worried (1)** 63:7
**worry (1)** 36:4
**wouldn't (17)** 31:7,23
32:21 33:1 35:2,5,8
37:11,23 38:1 41:7
41:20 44:11 48:13
50:9 54:11 56:13
**WRITE (1)** 68:2
**wrong (4)** 32:20,23
36:4 61:7

—————————
**X**
—————————
**X (2)** 3:1 37:16

—————————
**Y**
—————————
**Yeah (9)** 8:5 13:2
14:8 21:16 34:19
63:15,24 64:24
66:16
**year (8)** 6:21,25,25
21:17 40:8 42:24
64:21,21
**years (3)** 5:10 24:25
45:25

—————————
**Z**
—————————

—————————
**0**
—————————

—————————
**1**
—————————
**1 (3)** 3:9 4:21,23
**10th (1)** 1:20
**110 (2)** 1:20 2:5
**13th (1)** 67:16

—————————
**2**
—————————
**2 (2)** 3:10 23:7
**2:14 (1)** 1:22
**200 (1)** 11:16
**200.00 (2)** 34:8,11
**2008 (7)** 6:19,22,23
7:19 8:3,5 40:8
**2009 (2)** 6:24 64:25
**2010 (3)** 1:22 64:23
67:16
**23 (2)** 3:10,12
**24 (1)** 28:10
**24th (1)** 6:23
**26 (1)** 3:13
**27 (1)** 3:14

—————————
**3**
—————————
**3 (3)** 3:4,12 24:1

**3:45 (1)** 1:22
**30 (1)** 3:5
**300.00 (1)** 34:11
**32301 (1)** 2:11
**325 (1)** 2:10
**325.00 (1)** 34:9
**327 (1)** 12:7
**33301 (2)** 1:21 2:6
**33324 (1)** 1:11

—————————
**4**
—————————
**4 (5)** 3:9,13 25:10
26:2 27:16
**400 (1)** 1:11
**4th (1)** 1:22

—————————
**5**
—————————
**5 (3)** 3:14 27:5,7
**500 (1)** 11:16

—————————
**6**
—————————
**6th (2)** 1:20 2:5

—————————
**7**
—————————

—————————
**8**
—————————
**857 (1)** 12:8

—————————
**9**
—————————
**900 (1)** 1:10
**9th (1)** 2:5