# EXHIBIT F

# TO THE DECLARATION OF

# JOHN W. SMITH T

---

Page 1

STATE OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LEGAL AFFAIRS
AG # L10-3-1145

IN RE:

INVESTIGATION OF LAW OFFICES
OF DAVID J. STERN, P.A.

_____/


DEPOSITION OF TAMMIE LOU KAPUSTA


12:11 p.m. - 1:58 p.m.
September 22, 2010
Office of the Attorney General
110 Southeast 6th Street, 10th Floor
Fort Lauderdale, Florida 33301


Reported By:

Kalandra Smith
Notary Public, State of Florida
Apex Reporting Group
Phone - 954.467.8204

APEX REPORTING GROUP

---

Page 2

1  APPEARANCES:
2  ON BEHALF OF THE STATE:
3  JUNE M. CLARKSON, ASSISTANT ATTORNEY GENERAL
   OFFICE OF THE ATTORNEY GENERAL
4  110 Southeast 6th Street, 9th Floor
   Fort Lauderdale, Florida 33301
5
   THERESA B. EDWARDS, ASSISTANT ATTORNEY GENERAL
6  OFFICE OF THE ATTORNEY GENERAL
   110 Southeast 6th Street, 9th Floor
7  Fort Lauderdale, Florida 33301
8  MARK R. BRIESMEISTER, FINANCIAL INVESTIGATOR
   OFFICE OF THE ATTORNEY GENERAL
9  110 Southeast 6th Street, 9th Floor
   Fort Lauderdale, Florida 33301
10
11 ON BEHALF OF MS. KAPUSTA:
12 DOUG LYONS, ESQUIRE  (TELEPHONIC)
   LYONS & FARRAR
   325 North Calhoun Street
13 Tallahassee, Florida 32301
14 MARSHA LYONS, ESQUIRE  (TELEPHONIC)
   LYONS & FARRAR
15 325 North Calhoun Street
   Tallahassee, Florida 32301
16
   HAROLD REGAN, ESQUIRE (TELEPHONIC)
17 241 John Knox Road, Suite 100
   Tallahassee, Florida 32303
18
19            I N D E X
20 Name      Direct    Cross    Redirect    Recross
21 Ms. Kapusta    3
22
23         E X H I B I T S
24 Item                                        Page
25 Copy of subpoena                               3

APEX REPORTING GROUP

---

Page 3

1           P R O C E E D I N G S
2                - - -
3       Deposition taken before Kalandra Smith, Court
4  Reporter and Notary Public in and for the State of
5  Florida at Large, in the above cause.
6                - - -
7  THEREUPON:
8             TAMMIE LOU KAPUSTA
9  having been first duly sworn or affirmed, was examined
10 and testified as follows:
11           DIRECT EXAMINATION
12 BY MS. CLARKSON:
13     Q    State your name for the record, please.
14     A    Tammie Kapusta.
15     Q    I'd like you to take a look at this.
16     MS. CLARKSON:  I'm handing the witness a copy
17 of the subpoena.
18 BY MS. CLARKSON:
19     Q    Is that a copy of the subpoena that you
20 received and are you here today due to that?
21     A    Yes.
22     MS. CLARKSON:  I'd like to mark this as A.
23 BY MS. CLARKSON:
24     Q    Have you ever had your statement taken before,
25 deposition or a sworn statement?

APEX REPORTING GROUP

---

Page 4

1     A    No.
2     Q    You just need to answer the questions verbally
3  so that the court reporter can take them down.  If you
4  need to use the restroom or want some water just let me
5  know.  If you don't understand a question ask me to
6  repeat it and I'll do the best I can so that you can
7  understand the question.  I'm not going to ask you to
8  guess.  Just answer it if you know.
9     A    Okay.
10    Q    What is your employment background for the
11 past two years?
12    A    I'm a paralegal.
13    Q    Where did you get your education at?
14    A    David Stern.
15    Q    You worked for David Stern; is that correct?
16    A    That's correct.
17    Q    You no longer work for him?
18    A    No.
19    Q    When did you start working for him?
20    A    '08.
21    Q    '08?
22    A    May, March of '08.
23    Q    Through when?
24    A    July of '09.
25    Q    What were your job titles at David Stern?

APEX REPORTING GROUP

Page 5

```
1      A    I was the senior paralegal.
2      Q    What were your duties there at the firm?
3      A    I was responsible for my team from initiation
4  to sale.
5      Q    What team?
6      A    I had Aurora Loan Services, Fannie Mae,
7  Freddie Mac, broken down into alphabetical --
8      Q    Aurora, Freddie, and --
9      A    TCFM, which is Citibank and any client A
10 through L.
11     Q    That was a lot of clients.
12     A    I had twelve thousand files.
13     Q    How many were on your team?
14     A    Twelve girls.
15     Q    All paralegals?
16     A    Juniors is what they were.
17     Q    What were your duties?
18     A    I was responsible for everything for the file
19 from beginning of initiation to --
20     Q    Explain to me what you did with the file.
21 Just walk me through a file from start to finish.
22     A    When we would get the files they would be
23 checked in by Cheryl Samons and her crew.  Then they
24 would come to us and we would have to file the motion
25 for summary judgement, all the affidavits required to
```

Page 6

```
1  file that, any contested issues I handed on the files,
2  all assignments of mortgages, anything pertaining to the
3  file itself to make sure that it was done in the correct
4  manner.
5      Q    Were lis pendens filed in the cases?
6      A    Yes.  Those were filed in a different
7  department.
8      Q    Who prepared those lis pendens, do you know?
9      A    At the time when I was there it was what they
10 called a casesum department.  There was a manager for
11 that department also.
12     Q    What department?
13     A    They call it casesum.
14     Q    Casesum?
15     A    Yeah.  Caseum is where it starts basically.
16     MS. LYONS:  I'm sorry.  What was that word?
17     THE WITNESS:  It's casesum, C-A-S-E-S-U-M.
18 It's their computer system.  Basically someone
19 plugs in all the information given to them by the
20 banks or the referral source.
21     MR. REGAN:  Can I get that spelling again,
22 please.
23     THE WITNESS:  C-A-S-E-S-U-M.
24     MR. REGAN:  C as in cat?
25     THE WITNESS:  Yes.
```

Page 7

```
1      MR. REGAN:  C-A-S-E-U-M?
2      THE WITNESS:  S-U-M.  Casesum.
3      MR. REGAN:  Okay.  C-A-S-U-M.  Okay.  Go
4  ahead.
5  BY MS. CLARKSON:
6      Q    So, somebody in the casesum department would
7  take care of the lis pendens?
8      A    Correct.  They would take the referral and it
9  would start with all the information, the borrower.
10 Everything is plugged into a system which is in the
11 casesum department, which created all of our documents
12 thereafter.
13     Q    Okay.  So the documents were created in the
14 Law Officers of David Stern?
15     A    Correct.
16     Q    Were any documents created outside that came
17 in for your signatures or came in completed?
18     A    Like?
19     Q    Affidavits from the lenders?
20     A    Not usually.  We prepared most of the
21 affidavits.
22     Q    And then you sent them out for signature?
23     A    Some of them.  Most of them were signed
24 in-house.
25     Q    In-house by whom?
```

Page 8

```
1      A    Cheryl Samons.
2      Q    How would she have authority to sign for a
3  lender?
4      A    According to what we were aware of she had
5  power of attorney to do that.
6      Q    Did you ever see the power of attorney?
7      A    No.
8      Q    How many companies or lenders did she have
9  power of attorney for that you could guess or know?
10     A    A good guess would be approximately fifteen or
11 maybe more.
12     Q    So, she signed as attorney in fact or power of
13 attorney?
14     A    Correct.
15     Q    Was she ever assistant secretary to any of the
16 --
17     A    Some of them stated that also.  It would
18 depend on I guess the bank that we were dealing with.
19     Q    So she would be assistant secretary to some
20 and attorney in fact for the others?
21     A    Correct.
22     Q    Did you have a supervisor?
23     A    Yes.
24     Q    Who was that?
25     A    Cheryl Samons was my director.  I took over
```

Page 9

1  her position at the company when she became COO.  We all
2  reported to her.
3      Q    Was she a lawyer?
4      A    No.
5      Q    Was she a paralegal?
6      A    I guess that's what you would call her.  We
7  were under the impression.
8      Q    When you say "we" who is that?
9      A    The staff.
10     Q    Speaking of the staff how many staff were
11 there?
12     A    When I started with the company there was
13 approximately two hundred and twenty-five.  When I left
14 the company there was over eleven hundred.
15     Q    Is that including attorneys?
16     A    It would be a good guess to put them in there,
17 yes.  That was just in our building though.
18     Q    You had another building?
19     A    Well, there was working being done offshore.
20     Q    I want to talk about that too.  Is that where
21 documents were prepared?
22     A    They were preparing the casesums offshore,
23 yes.
24     Q    Where offshore, do you know?
25     A    I believe it was Guam and I don't remember the

Page 10

1  other one.
2      Q    Somewhere in the Philippines?
3      A    The Philippines is where it was, yes.
4      Q    How do you know that documents were being
5  prepared offshore in Guam and the Philippines?
6      A    Because we had several conversations about it
7  in the firm.
8      Q    Generally?
9      A    Yes.
10     Q    With Mr. Stern?
11     A    With Cheryl Samons.
12     Q    Okay.  What were you told about these
13 companies that were offshore?
14     A    That they were preparing our casesums while we
15 were sleeping.
16     Q    Did they prepare anything else?
17     A    Not that I'm aware of.
18     Q    Did they provide documents?
19     A    Not that I'm aware of.
20     Q    So if they were preparing the casesums what
21 exactly were they doing?
22     A    They were inputting the information to create
23 the documents.  Casesum takes the referral from the
24 lender and creates a document in David Stern's office
25 with all of the information that the lender provided.

Page 11

1  In other words, like the UPBs.
2      Q    UPB?
3      A    Unpaid principal balance.  The lender's
4  information, last known address, and stuff like that
5  that the bank would have on file for that.
6      Q    Instead of having to do it here in his office
7  they would do it in Guam or the Philippines?
8      A    Correct.  Because our office was not putting
9  out enough work.
10     Q    Okay.  Do you know what the name of these
11 companies were?
12     A    No, I do not.
13     Q    Do you know if they were owned by David Stern
14 or just hired by David stern?
15     A    I don't know.
16     Q    Do you know when approximately the offshore
17 casesums were begun?
18     A    It would be so hard for me to say correctly
19 without looking back on my life at that time there.  It
20 was probably when we moved in the new building, which is
21 the building now located off of Pine Island, the 900.
22     Q    900?
23     A    Yeah.  Maybe six months after we moved in
24 there.
25     Q    When did you move in there?

Page 12

1      A    I want to say July or August.
2      Q    Of what?
3      A    Of '08.
4      Q    So towards the end of '08, beginning of '09 is
5  when you started hearing about the Guan and the
6  Philippines companies?
7      A    Yes.
8      Q    Did you use process servers?
9      A    Yes.
10     Q    Did you have process servers in-house or were
11 they hired out?
12     A    They were hired out.
13     Q    Do you know what company you used?
14     A    G&Z and ProVest.
15     Q    GNZ?
16     A    G and like the little --
17     Q    Ampersand?
18     A    Yeah.
19     Q    G&Z?
20     A    Correct.
21     Q    And what else?
22     A    ProVest.
23     Q    Did you have any ProVest or G&Z employees at
24 the Offices of David Stern?
25     A    I believe they were there but since we

Page 13

1 occupied so many floors and there were so many people

2 there there's a lot of things that a lot of us didn't

3 know.

4     Q    Right.

5     A    It was more or less what was being said.  I

6 believe now they occupy an entire floor of David Stern's

7 office.

8     Q    ProVest?

9     A    Yes.

10     Q    It's ProVest?

11     A    Yes.

12     Q    Are they hired by David Stern?  Are they paid

13 by David Stern or are they paid by ProVest?  I'm trying

14 to find out whose employees they are if you know.

15     A    I don't know.

16     Q    Are they not using G&Z anymore to the best of

17 your knowledge?

18     A    No, I believe they still are.

19     Q    So both?

20     A    Yes.

21     Q    Did you ever hear of any problems with service

22 of process, any complaints?

23     A    Those were daily phone calls.

24     Q    Could you tell me about them.

25     A    People were not served.

APEX REPORTING GROUP

Page 14

1     Q    How did they know they weren't served?

2     A    Well, some of them would go to do

3 modifications on loans or go to take out other things

4 and it would come up that they were in foreclosure and

5 they would end up finding out that way that they was no

6 actual service on them.  I had tenants that were served

7 saying that they were the property owners and they

8 weren't the property owners.  Service was a complete

9 mess.

10     Q    At whose direction was service perfected?

11     A    Cheryl Samons.

12     Q    Did Cheryl Samons to the best of your

13 knowledge tell the process servers just to serve

14 anybody?

15     A    I don't know that she told them that but when

16 we would get the phone calls it would be what she would

17 call a business decision on whether the service was

18 completed or not.  We were directed to do whatever she

19 said.

20     Q    Didn't the process server deliver a return of

21 service?

22     A    Yes.

23     Q    And would they say that it was served?

24     A    Yes.

25     Q    And oftentimes they weren't?  Is that what

APEX REPORTING GROUP

Page 15

1 you're saying?

2     A    Correct.

3     Q    Did you have times when service was attempted

4 numerous times or on people that did not live at the

5 property?

6     A    I don't understand.

7     Q    One property might have two owners; a husband

8 and a wife.

9     A    Correct.

10     Q    But then the law firm would send out a

11 subpoena for tenants A,B,C,D,E,F,G and get ten service

12 fees for only two people?

13     A    Oh yeah.  That was done regularly.

14     Q    Was that done intentionally to build up the

15 service fees?

16     A    I would assume so.  If you're serving the

17 defendant at the property you can't serve Jane and John

18 Doe if you've already served the defendant there,

19 correct?

20     Q    If you say so.  So they would send out

21 multiple services?

22     A    Correct.  There was always a Jane and John

23 Doe.  Sometimes there would be a spouse, unknown spouse,

24 spouse, unknown spouse.  In other words, if it was Mary

25 Jane it would be the unknown spouse of Mary Jane.  Then

APEX REPORTING GROUP

Page 16

1 if it was James it would be the unknown spouse of James.

2 They changed it periodically on how they did it.

3     Q    They'd also add tenants?

4     A    Correct.  There was a fee for everyone.

5     Q    Do you know what the fees were?

6     A    I believe it was forty-five dollars for

7 service at one attempt.  Obviously two attempts was the

8 ninety dollars.  Anything out of state was a hundred and

9 eighty dollars.  It was out-of-state notices of action.

10 They did skip tracing.  They charged an additional I

11 believe that was eighty.

12     Q    Did they do the skip tracing?

13     A    I can't guarantee that.  They said they did

14 it.

15     Q    Who was billed the forty-five dollars?  Let's

16 just say it was the one service.  Who was billed?

17     A    It goes back to the borrowers.

18     Q    Eventually?

19     A    Well, it goes into your Affidavit A's and it's

20 part of your service.

21     Q    Right.  Okay.  Before that.  Because the

22 homeowner or the borrower or the defaulted one might not

23 pay so the process server has to get paid.  Who pays

24 them?

25     A    I would imagine it comes from the banks where

APEX REPORTING GROUP

Page 17

1  it's being billed to.

2      Q    It's being billed to the banks?

3      A    Correct.

4      Q    It's not being billed to David Stern?

5      A    Well, David Stern pays the bills but in return

6  I would imagine he's getting paid by the banks from what

7  we know.  I don't know that for sure.

8      Q    Do you ever have any reason to believe that if

9  the process server served one forty-five dollar bill

10  that it went into the affidavit as two or three?

11      A    I'm not sure I understand.

12      Q    If the affidavits that were filled out by Law

13  Offices of David Stern reflected the actual bill that

14  was billed or did they bill the homeowner more?

15      A    There was always a fee for the Jane and John

16  Does in the bill.  The bills always consisted of the

17  defendant, an unknown spouse of the defendant if there

18  wasn't a spouse, and always a Jane and John Doe.

19      Q    So they were always billed for four of five?

20      A    Correct.

21      Q    So the bill came in to David Stern for four of

22  five?

23      A    Correct.

24      Q    Now, that bill was probably paid by David from

25  the bank's money or whatever?

Page 18

1      A    Correct.

2      Q    Now, this four of five is going to go on an

3  affidavit of indebtedness?

4      A    Correct.

5      Q    Was it always just four of five?  What I'm

6  trying to ask you is was the bill ever inflated for the

7  homeowner?

8      A    I would say it was inflated if they are

9  charging for a Jane and John Doe.  Did we change what

10  the actual bill said?

11      Q    Yes.

12      A    No, we didn't.  Not that I'm aware of on my

13  team.

14      Q    Okay.  About what percentage would you say of

15  the people that were served actually got service?

16      A    It became such a nuisance for me that I

17  actually would tell the people that claimed -- they were

18  serving people with the same names and they would call

19  and say I'm not this person.  So to protect, you know, I

20  basically said you need to send a letter to the firm

21  because it became such a nuisance.  Those were most of

22  my calls during a day.  Any given day I'd probably have

23  a hundred different calls and most of it was service.

24      Q    So fifty percent of the people?

25      A    Yeah, that's a good guess.

Page 19

1      Q    Let's go to the assignments of mortgage.  They

2  were prepared in-house?

3      A    Yeah.

4      Q    You're smiling.  You want to tell me about

5  them?

6      A    Assignments were done sometimes after the

7  final judgement was entered.

8      Q    Do you know why that is?

9      A    Because that's what we were directed to do by

10  Cheryl.

11      Q    So the lis pendens is filed and you don't have

12  an assignment in some cases?

13      A    Correct.

14      Q    When there was an assignment was it usually to

15  the plaintiff or could it have been to someone else

16  other than the plaintiff?

17      A    Someone else other.

18      Q    Other than the plaintiff?

19      A    Yeah.

20      Q    Other than the plaintiff institution that was

21  actually in the lawsuit and got the final judgement then

22  there would be an assignment to lender somebody else?

23      A    Well the lenders switched a lot in David's

24  firm.

25      Q    Meaning?

Page 20

1      A    Meaning that a lot of the times they were

2  changing.  Say Aurora had the file.  They transferred it

3  over to TCFM.

4      Q    Why would they do that, do you know?

5      A    I'm not aware of that, no.

6      Q    You're not aware --

7      A    I do not know why they did that.

8      Q    You're aware of it happening?

9      A    Oh yes.

10      Q    You're not aware of why?

11      A    Right.

12      Q    Would the change the plaintiff in the lawsuit

13  or would they just leave it alone?

14      A    No.  A lot of times we never did the

15  substitution of plaintiff.  Until almost to the time

16  that I was leaving there is when things started to get

17  ugly for them for the assignments.  We were starting to

18  have to do substitutions of plaintiff.  If Nation Star

19  had the file and they turned it over to Citibank we were

20  foreclosing in Nation Star and not Citibank and we would

21  need to do a substitution of plaintiff for that.

22      Q    Right.  Would those be ex parte for the most

23  part?

24      A    Yeah.

25      Q    They wouldn't dismiss the lawsuit and start

Page 21

1  over?
2      A    No.
3      Q    They just substituted?
4      A    Yeah.
5      Q    They made it a practice to give the defendant
6  notice?
7      A    I mean we would mail them to the defendant.
8      Q    The notice of substitution of party?
9      A    Yes.
10     Q    Would you file an assignment at that time?
11     A    Sometimes.  Sometimes they were already filed.
12  Sometimes we would have to change it.  It depended on
13  the file.  It depended on how long it had been with the
14  firm.  Those were business decisions that Cheryl made on
15  a regular basis.
16     Q    Do you know what her business decisions were
17  based on?
18     A    Nope.  Nobody questioned that.
19     Q    Can you tell me the execution of the
20  assignments, how it worked?
21     A    Assignments were prepared again from the
22  casesum.  All of our stuff comes from the casesum.  They
23  would be stamped and signed by a notary or not.  Per
24  floor we had a designated spot to place them and Cheryl
25  would come once a day and sign them.

APEX REPORTING GROUP

Page 22

1      Q    Sign them as what?
2      A    As --
3      Q    For the bank?
4      A    Correct.
5      Q    Or for MERS or whoever it was for?
6      A    Correct.
7      Q    Would these notaries be there watching her as
8  she signed?
9      A    No.
10     Q    She would just sit there and sign stacks of
11  them?
12     A    Correct.  As far as notaries go in the firm I
13  don't think any notary actually used their own notary
14  stamp.  The team used them.
15     Q    There were just stamps around?
16     A    Yes.
17     Q    And you actually saw that?
18     A    I was part of that.
19     Q    You did it?  Are you a notary?
20     A    No, I'm not.
21     Q    Did you sign as a witness?
22     A    I did not.  I signed as a witness on one
23  document and after that I decided that I didn't want to
24  put my name as a witness anymore.
25     Q    Tell me about the stamps.  You stamped them?

APEX REPORTING GROUP

Page 23

1      A    Yeah, I had stamps.  Each team had a notary on
2  them or notaries that I was aware of.  Whether they were
3  or weren't wasn't --
4      Q    You had stamps?
5      A    Correct.  We would stamp them and they would
6  get signed.
7      Q    Stamp them in blanks?
8      A    Yes.
9      Q    Who would sign them?
10     A    Other people on the team that could sign the
11  signature of the person or just a check on there or
12  whatever.
13     Q    Was that common practice?
14     A    Yes.
15     Q    Was that standard practice?
16     A    Pretty much.
17     Q    What about the witnesses?
18     A    Those would be signed by juniors who were --
19     Q    Standing there?
20     A    Here, sign this.  It has to go to Cheryl, sign
21  it.  Then it would go and sit at the desk where Cheryl
22  would sign everything.
23     Q    Out of view of the notary and out of view of
24  the witnesses?
25     A    Correct.

APEX REPORTING GROUP

Page 24

1      Q    Do you know who implemented this procedure?
2      A    Cheryl.
3      Q    Cheryl did?
4      A    Um-hum.
5      Q    Did anybody else sign with the firm for the
6  banks?
7      A    Yes.
8      Q    Who was that?
9      A    There were people that were responsible for
10  signing Cheryl's name.  Cheryl, Tammie Sweat, and Beth
11  Cerni.  Those were the only three people that could sign
12  Cheryl's name.  If you ever look at assignments you'll
13  see that they are not all the same.
14         MS. EDWARDS:  What are the names again?
15  Cheryl, Tammie?
16         THE WITNESS:  Tammie Sweat and Beth Cerni.
17         MS. EDWARDS:  Could you spell that.
18         MS. CLARKSON:  C-E-R-N-I.
19  BY MS. CLARKSON:
20     Q    Did they practice Cheryl's signature?
21     A    I would assume so.
22     Q    Did you ever see them?
23     A    Not practicing but I've seen them sign it.
24     Q    Did you see somebody sign Cheryl's name?
25     A    Yes.

APEX REPORTING GROUP

Page 25

1  Q  That wasn't Cheryl?

2  A  Yes.  All the time.

3  Q  Did Cheryl know about this?

4  A  Yes.

5  Q  Was it at her direction?

6  A  Yes.

7  Q  What was her position with the firm?

8  A  When I started she was David's paralegal and

9  had the team that I had.  When we transferred into the

10  new building she became this COO of the company.

11  Q  Was that going on when you transferred

12  buildings and when she was the COO?

13  A  She was always the COO.  She just never had

14  the title.

15  Q  But now she has the title?

16  A  Correct.

17  Q  Did the practice still continue?

18  A  Oh yes.

19  Q  With the signatures?

20  A  Correct.

21  Q  So even though she became the COO her job

22  description didn't change?

23  A  No.

24  Q  She continued to pretty much run the office?

25  A  Oh yes.

Page 26

1  Q  Was David Stern aware of this as far as you

2  know?

3  A  Yes.

4  Q  How do you know that he was?  What makes you

5  think that he was aware of this?

6  A  Because Cheryl and David had daily meetings.

7  David knew the practice that was going on.  David's

8  office happened to be right outside -- I sat right in

9  front of David's office.  I'm well aware of what

10  transpired.  Cheryl's office was here.  Around the

11  corner was David's office.  Everything was in the loop.

12  He was well aware of what was going on.  I mean, you

13  could hear the screaming conversations.  Nothing was

14  really a secret on the fourth floor because that's where

15  Cheryl is.

16  Q  Who was screaming at who?

17  A  They were screaming at each other.

18  Q  They were screaming at each other?

19  A  Yes.

20  Q  Do you know over what?

21  A  Files not moving fast enough.  Just stuff like

22  that.

23  Q  Business stuff?

24  A  Correct.

25  Q  Do you know when these assignments were

Page 27

1  executed if Cheryl one, two, or three ever read them?

2  A  No, they were never read.

3  Q  They were just signed?

4  A  Correct.

5  Q  How many a day do you think?

6  A  Oh goodness.  Each floor would probably

7  produce two, two-fifty a day.

8  Q  So somewhere between four and five hundred a

9  day easy?

10  A  There's eight floors I believe.

11  Q  And each floor did two to two-fifty?

12  A  Yes.  We all had our own spot.  There was a

13  table approximately this big.

14  Q  So you sat at a conference table?

15  A  No, we didn't sit at it.  We just piled our

16  files there.

17  MS. EDWARDS:  For the record, the table is

18  approximately ten feet long by three feet wide.

19  THE WITNESS:  Correct.

20  MS. EDWARDS:  Would be piled.

21  THE WITNESS:  Correct.

22  BY MS. CLARKSON:

23  Q  With files ready for assignment signatures and

24  notaries and witnesses?

25  A  Correct, yes.

Page 28

1  Q  Where would these files go then at that point?

2  A  Then we would get an email saying come get

3  your files, they've been signed by Cheryl.

4  Q  So this was an assignment signing table?

5  A  Correct.  Assignments or Affidavit A's that

6  she was signing.

7  Q  What's an Affidavit A?

8  A  The indebtedness affidavit.

9  Q  Okay.

10  A  I think that's all Cheryl signed for.  I think

11  Beth signed for the rest.  There's your Exhibit E's.  We

12  had different exhibits.  That's how they signed them.

13  When Cheryl was out of the office Tammie would sign them

14  or Beth would go sign them.

15  Q  Beth would sign but it would say Cheryl

16  Samons?

17  A  Correct.

18  Q  And Beth would be the signer?

19  A  Correct.

20  Q  Or Tammie Sweat?

21  A  Right.  They were located on different floors.

22  The GMAC team was on the fifth floor.  Beth Cerni would

23  sign for the entire GMAC.  If Cheryl had already gone to

24  the table and signed everything and you needed to sign

25  something to get it out you would go to one of them to

1 sign it immediately.

2     Q   Then these assignments would go where?

3     A   In the file.

4     Q   Would they ever be sent to the recorder's

5 office?

6     A   Yes.

7     Q   And they were recorded?

8     A   Yes.

9     Q   And when you got them back from the recorder's

10 office would they be filed in court?

11     A   They were supposed to be.  I wasn't in court

12 to know them.  We sent them out occasionally to be

13 recorded.  It became a more stiffer practice after I

14 guess there was a problem where the notary date didn't

15 match the date of the assignment being initiated.  There

16 were basically three dates on there.  The dates were all

17 different.

18     Q   Right.

19     A   So at that point there was a huge meeting in

20 the building by Beverly McComas and Miriam Mendieta who

21 were the controlling attorneys there.  Basically we were

22 told if anyone sent out an assignment with the dates not

23 being the same on them that they would be fired

24 immediately.

25     Q   Why would the dates on the other ones have

1 been three different dates?  What would cause that?

2     A   Poor practice, not paying attention, not

3 knowing that it was supposed to be that way from the

4 initiation.  Basically they didn't train us to do it.

5 You have people just typing in.  Their being honest and

6 tying in this date as the date as being assigned but it

7 was executed six months ago.  The dates would be

8 different for that.  The issue became then the notary

9 would sign it tomorrow and date it tomorrow.

10     Q   So those attorneys knew this was going on?

11     A   Yes.

12     Q   Can you give me the names of the attorneys

13 that knew?

14     A   Every attorney in the firm.

15     Q   What do you mean every attorney in the firm?

16     A   Well, Beverly McComas.

17     Q   Can you spell that, please.

18     A   M-C-C-O-M-A-S, I believe and Miriam Mendieta

19 were the controlling attorneys.

20     Q   They were the controlling attorneys?

21     A   Correct.  They controlled the attorneys and

22 Cheryl controlled the paralegals and anybody else.

23     Q   Okay.

24     A   So they would inform the attorneys what they

25 wanted.  They happened to be at the meeting for the

1 assignments.  They pulled us in by team since there were

2 so many of us and told us this is what it needs to be.

3 They got in trouble for it and this is what needs to be

4 happening now.  Make sure that the date that it was

5 supposed to be executed is the same date that you're

6 signing it even though it could have been six months ago

7 and Cheryl is signing it today.

8     Q   But make the dates match?

9     A   Correct.

10     Q   Regardless of the date it is today?

11     A   Correct.

12     Q   Okay.  And that's the same for the notary?

13     A   Correct.

14     Q   And the date printed on it?

15     A   Correct.

16     Q   And the date that's actually typed in?

17     A   Correct.

18     Q   Make sure they're all the same no matter what

19 day it is?

20     A   Correct.

21     Q   The two lead lawyers, what was their title?

22 Were they senior attorneys?

23     A   No.  They didn't really have a title.  Most

24 people were just afraid of them.

25     Q   Why is that?

1     A   Because they were mean and nasty.  They were

2 very mean.

3     Q   In what way?

4     A   They would demean you.  They would yell and

5 scream at you.

6     Q   Condescending?

7     A   Oh yeah.  They would make you look like an ass

8 in front of the entire firm.

9     Q   What about the other lawyers that they

10 controlled?

11     A   They were just there to get by on what they

12 were doing.

13     Q   The other lawyers?

14     A   Yes.  Most of the lawyers had issue with them

15 but it was their job.

16     Q   Did anyone quit as far as you know due to the

17 practices?

18     A   I'm sure but they wouldn't come right out and

19 say I quit because of the practices.  I know that people

20 had left because they were uncomfortable with the things

21 that they were being asked to do, as most of us were.

22 When it got really sticky there were a lot of us that

23 weren't here.

24     Q   What does really sticky mean?

25     A   They wanted us to start changing the documents

Page 33

1  and stuff and doing stuff that we weren't supposed to be

2  doing as far as service.

3      Q    What documents did they want you to change?

4      A    Manpower documents.  A lot of judges started

5  requiring, because of the Jane and John Doe issues,

6  required that you have a military search for all the

7  defendants.  If you named a Jane and John Doe as an NKA

8  you had to pull a military search on them.  Unless you

9  have somebody's social security number technically you

10 can't pull a military search supposedly.

11          The program that we used for the program that

12 we used, you could put in the main defendant's social

13 security and John or Jane Doe's name and it would give

14 us a military search saying that they were in the

15 military.

16     Q    You would get their social security number

17 because the bank documents contained it?

18     A    Correct.  The lenders, the referrals had the

19 socials.

20     Q    Did you put the social in on everybody to find

21 out their address for service?

22     A    Not everybody.  I personally did not do it

23 because I refused to do it.  I wasn't going to falsify a

24 military document.  I was told that that's fine,

25 somebody else on your team will do it.

Page 34

1      Q    What do you mean falsify a military document?

2      A    Well, I'm using the main defendant's social

3  security number on somebody else's name, not his name.

4  John Doe and the main defendant was James, I was taking

5  James' social security number and putting John Doe's

6  name in there.  I wasn't but that's what the practice

7  was.  The judges started saying we're not going to

8  consider service completed until --

9      Q    There's a miliary search?

10     A    Correct.

11     Q    So why wouldn't they use the right social

12 security number for the right person?

13     A    Because you don't have a social for an NKA or

14 unknown tenant.  They wouldn't enter a final judgement

15 unless the military doc was there.

16     Q    So you just used anybody's?

17     A    Correct.

18     Q    Did Stern know about that practice?

19     A    Do I know if he knew personally, no.  I can

20 tell you that Beverly and Miriam sent emails to the

21 attorneys telling them that that is what to be done and

22 if the paralegals would not do it then they are

23 responsible for doing it.  That wasn't an option.

24     Q    So there were emails directing --

25     A    Correct.  Of course I'm not privy to those but

Page 35

1  I was told by my own attorney because I told my attorney

2  I'm not doing this.  I'm not doing it.  I refused.

3      Q    When you say you told your own attorney are

4  you talking about the attorney at the firm?

5      A    No.  I'm talking about my attorney from my

6  team.

7      Q    That's what I mean.  At the firm.

8      A    Yes.

9      Q    Not your personal attorney?

10     A    No, no, no.

11     Q    The attorney you worked for?  What attorney

12 was that?

13     A    Stephanie Burke.

14     Q    B-U-R-K-E?

15     A    Yeah.  She got married and I don't know what

16 her married name is.  Stephanie Burke was my attorney at

17 that time.  That's who I had that conversation with.

18 She is the one who told me that there was an email sent

19 and she couldn't believe that they had actually sent an

20 email saying that.

21     Q    When the affidavits were created for

22 indebtedness who were they created by?

23     A    Us.

24     Q    Paralegals?

25     A    Paralegals, juniors, yes.

Page 36

1      Q    Where did you get your figures from?

2      A    We had sites we would get the information from

3  the lenders on.

4      Q    Okay.

5      A    They were just typed in by us based on the

6  information that they gave us.  If we couldn't figure

7  something out Cheryl would help us do it.

8      Q    What about your costs and attorneys fees?

9      A    Those were standing, except for if they had

10 what they considered a litigated file.

11     Q    A contested file?

12     A    Yes.  They would do a memorandum of law and

13 charge the litigation fees that were permitted.

14     Q    Do you know what those litigation fees were?

15     A    I believe it was $175 for two hours is what

16 they allowed.

17     Q    What about just a standard non-contested

18 foreclosure?

19     A    Originally the fees were twelve hundred and

20 then they went to thirteen.

21     Q    What about costs?

22     A    Costs were title searches.  All that stuff was

23 broke down.  Probably somewhere about $475.  At one

24 point we were putting postage in.  Until probably June

25 or July of last year postage was going in and we weren't

Page 37

1  supposed to be doing that either.  That was $1,650 I
2  think that we had to back out of most of -- you had your
3  title searches, your GAP.  That was on Exhibit B.  On A
4  the costs were there but everything was broke down on B.
5  That's what they'd put in there.
6      Q    Were these figures that they put in the
7  affidavits supported by documentation?
8      A    I didn't have an invoice for it.  It was
9  standard.  It was automatically plugged into our
10 documents.
11     Q    You didn't plug it in?
12     A    No.
13     Q    Who plugged it in?
14     A    It was just automatically there in our
15 program, yes.
16     Q    So what you would do is get on and find out
17 much the bank was owed?  Is that what you said you did?
18 You interfaced with the bank's computer or site?
19     A    Yes.  For the most part your UPB was put in at
20 casesum time.
21     Q    Okay.
22     A    As a paralegal it would be within our job to
23 make sure that the figures matched on the Affidavit A
24 and B before you actually typed out your MSJ, your
25 motion summary judgement.  They were already there.

Page 38

1  Everything just plugged in.
2      Q    But over time it changes.
3      A    Correct.
4      Q    So how did it get changed?
5      A    We would have got go in and change it but the
6  UPB never changes from the initiation of the -- in other
7  words when we get the referral from the lender, that
8  stays the same.  What changes are the other costs.
9      Q    What if a homeowner made payment?
10     A    That was never there.
11     Q    If that happened it was never reflected?
12     A    No.  There was instances where the UPB should
13 have been different than what it was, but again, that
14 was a business decision made by Cheryl based on where we
15 were at on the file.  If we were ready to get judgement
16 on it she would just --
17     Q    So there's instances that you're aware of
18 where the affidavit of indebtedness used to get the
19 foreclosure was incorrect?
20     A    Correct.
21     Q    And lawyers and/or COO of the firm knew this?
22     A    When Cheryl knew because as a
23 paralegal I would have to go to her and say we filed
24 this and it was this and this amount off and she would
25 just say just go with it.

Page 39

1      Q    So who is it that's signing these affidavits?
2      A    Cheryl.
3      Q    Did she sign them all?
4      A    Again, the same amount of companies, yeah.
5  Beth and Tammie signed.  Anybody who signed Cheryl's
6  name would be those three.
7      Q    All of these affidavits, were they like the
8  assignment table?
9      A    Yeah.  They all went together.  It was either
10 assignments or affidavits on the table.
11     Q    But these affidavits would be signed by Beth,
12 Tammie, or Cheryl?
13     A    Correct.
14     Q    All signing Cheryl's name?
15     A    Correct.
16     Q    Were they ever read or just signed?
17     A    They were just signed.
18     Q    Did you ever see them just being signed?
19     A    Yes.  Sometimes we would just go home with a
20 signature page because of the way we were told to do
21 things.  If you look at the Affidavit A's they are two
22 pages for a reason.  The signature page is on one and
23 the costs are on the other.
24     Q    And you just slap them together?
25     A    Correct.

Page 40

1      Q    You said sometimes we would go home with
2  stacks of them?  Is that because you signed?
3      A    No.
4      Q    So what did you mean?
5      A    What do you mean?
6      Q    Who would go home with stacks of them?
7      A    Files?
8      Q    Yeah.
9      A    Well, I worked from home.
10     Q    Okay.
11     A    So any paralegal who had the right to work
12 from home would obviously take --
13     Q    Take the files with you?
14     A    Well, not the whole file but the paperwork
15 that I needed to type my motion or whatever it was that
16 I was doing that I needed to have.  That practice
17 changed again before I left being another practice.
18     Q    What was that practice?
19     A    Well, I guess there was an instance where
20 Cheryl wasn't allowed to sign anymore for the
21 affidavits.
22     Q    Why is that?
23     A    I don't know that we were actually privy to
24 it.  We were just told I believe there was a court
25 hearing of some sort.  We were just told by Beverly and

Page 41

1  Miriam this is the way it's going to be done.  I think I
2  want to say March 19th just because that sticks in my
3  head.
4     Q    Of this year?
5     A    Of last year.  From that forward anything
6  signed by Cheryl was not usable because she got in
7  trouble or something.
8     Q    Okay.
9     A    So what we had to do from that point, again
10 the affidavits were still split in two pages, at that
11 point we were supposed to be sending them back to the
12 banks to be signed now.  The problem being that a lot of
13 times we wouldn't get them back or executed in time for
14 the hearings.  So we had what they called signature
15 pages that Tammie Sweat or someone else would have in
16 their possession.  If we couldn't get it back from the
17 bank executed in time we would just take a signature
18 page and put it on the affidavit.
19    Q    What was on the signature page?
20    A    The signature and notary from the bank.
21    Q    Were these documents photocopied or were they
22 original documents?
23    A    Some were photocopied.
24    Q    How would you get that many from a bank
25 original?  The bank supplied them to you.

Page 42

1     A    Well, what would happen would be like if I had
2  file A and that one didn't go to hearing because there
3  was something wrong with it and file B was going to
4  hearing but it was the same bank, I would take the
5  signature page from A and give it to B.
6     Q    Oh give it to another file?
7     A    And just re-execute this file.
8     Q    Okay.  That was common practice?
9     A    Yes, after Cheryl couldn't sign.
10    Q    Did Cheryl know?
11    A    Yes.
12    Q    Cheryl knew about all the practices because
13 she is the one who ran the office?
14    A    She was the one who implemented them.
15    Q    Were there any other activities or practices
16 over at David Stern's firm that made you feel
17 uncomfortable or that you were unwilling to do?
18    A    I don't know how to answer that question.
19 It's a loaded one.
20    Q    Take your time.
21    A    Yeah.  Some of the things that were done there
22 just were not on the up and up.
23    Q    Explain to me in as much detail as you can
24 what those things were.
25    A    I don't even know where to start with it.

Page 43

1  Personal vendetta, work, their practices weren't nice.
2     Q    I'm more concerned with their legal practice
3  than with their attitudes.
4     A    We had lost notes.  That was another common
5  practice.  That's our Exhibit E's.
6     Q    Explain to me about the lost notes, how that
7  worked?
8     A    Well, I believe Beth Cerni was the only one to
9  sign for those but I'm not a hundred percent sure on
10 that one either because they all signed for them.  The
11 lost note would be if we lost the note in-house it's an
12 affidavit that you type up saying that the note was
13 lost.
14    Q    Okay.  Tell me how those were generated?
15    A    The same way everything was generated in that
16 office.
17    Q    Were there a lot of lost note affidavits?
18    A    We had quite a few.  More than we probably
19 should have.
20    Q    Did you lose them in-house?
21    A    Yes.
22    Q    Did you ever find them again?
23    A    Not that I'm aware of.  The practice of the
24 documents like mortgages and notes was really very
25 disarray.

Page 44

1     Q    How so?
2     A    Well, there were a lot of young kids working
3  up there who really didn't pay attention to what they
4  were doing.  We had a lot of people that were hired in
5  the firm that were just hired as warm bodies to do work.
6  The training process was very stupid and ridiculous.
7  The girls would come out on the floor not knowing what
8  they were doing.  Mortgages would get placed in
9  different files.  They would get thrown out.  There was
10 just no real organization when it came to the original
11 documents.
12    Q    So if the original note was lost who would the
13 affidavit be executed by?
14    A    Beth Cerni.
15    Q    Beth Cerni did them all?
16    A    She signed them.  We executed them.  We typed
17 them up.
18    Q    You drafted them?
19    A    Correct.
20    Q    She executed them?
21    A    Correct.
22    Q    She signed them?
23    A    Correct.
24    Q    Did she sign them all?
25    A    As far as I know.

Page 45

1    Q    Did anybody have her signature as well?

2    A    I never took it to anybody but her.

3    Q    Did she sign them?

4    A    Yes, she did.

5    Q    Were they to be notarized?

6    A    I believe so.

7    Q    And if they were to be notarized how would

8    they get notarized?

9    A    The same way.

10    Q    The same way as the practice you spoke about

11    earlier, just stamped?

12    A    Correct.

13    Q    Not in front of the witness?  Not in front of

14    the signer?

15    A    Correct.

16    Q    These documents were then used as exhibits to

17    motions for summary judgement?

18    A    Correct.  The memorandum of law that we were

19    doing was also -- that says we're litigating the file

20    and the files never left the paralegal's desk.  It was

21    never actually litigated in any way, shape, or form on

22    most of them.

23    Q    Were most of the judgements default

24    judgements?

25    A    Default meaning?

Page 46

1    Q    That the homeowner just never fought it.  They

2    defaulted so you get your judgement?

3    A    Not a lot of defaults were entered, no.  They

4    responded.  The problem is that the practice was so

5    large that there was never actually -- I had actually

6    been yelled at for trying to talk to homeowners on the

7    phone.  You're giving them too much time.  Start

8    working.  I worked for hospice for twelve years before I

9    went to David Stern so I just thought that there might

10    be some kind of compassion.  I would try to deal with

11    what wasn't being done proper.

12    We were directed that that was not what our

13    job was to do.  Our job was to run the team and type the

14    MSJs, get them out the door.  Get the judgements

15    entered.  Everything was about getting the judgement

16    entered because we have to report back to the banks.  We

17    had to do chronological things that were sent to them

18    that were also obviously changed and fudged because the

19    banks, some of them, are very unaware of what the

20    process is believe it or not.

21    Q    What did you have changed?

22    A    It takes a hundred and twenty days for a

23    foreclosure from beginning to end is what their standard

24    practice is.  Some of their files were three and four

25    hundred days old because of the mishaps of going to

Page 47

1    court and not having the proper documentation, not

2    having the note, the mortgage.  The judge would kick it

3    back for militaries.  That's when those practices would

4    come in where it would just be do this regardless of

5    what was said.  Just do it.  Get it done.  Get the file

6    out of here.

7    Q    Like sign the affidavit.  Switch the page.

8    A    Correct.

9    Q    Have it notarized with somebody's stamp, we

10    don't care who.

11    A    Correct.  Cheryl's big thing was moving the

12    file.  She didn't care how it got moved.

13    Q    Do you know if attorneys got any bonuses for

14    the number of foreclosure final judgements it got?

15    A    Not that I'm aware of.

16    Q    Do you know if lawyers got paid more if they

17    worked on the weekends?

18    A    As far as I know.

19    Q    As far as you know yes?

20    A    Yes.

21    Q    Anything else at the firm, their practices

22    that made you feel uncomfortable legally speaking?

23    A    I was gonna say that's a loaded question

24    again.

25    Q    I'm not speaking of personality-wise.

Page 48

1    A    Not that I'm aware of.  Their practice in

2    doing things the way they did was just wrong in itself.

3    Q    This was on a daily basis?

4    A    Oh yes.  This was how we kept our jobs and

5    they were threatened if not.  It was just a warm body.

6    They would produce and produce and produce.  All they

7    cared about was getting the file out.

8    Q    Did you ever hear of any of the lawyers talk

9    about the practices and being in fear of being

10    disbarred?

11    A    Yes.

12    Q    What was said?

13    A    Just that they were in fear of what they were

14    doing and that they knew that they could get in trouble

15    for it.

16    Q    They acknowledged it?

17    A    Oh yeah.

18    Q    They acknowledged it to you or did you hear

19    them acknowledging it to each other?  Do you know who

20    these people are?  Could you give me a name or two of

21    someone that you actually know said that?

22    A    Do I have to?

23    Q    I would appreciate it, yes.

24    THE WITNESS:  Doug, do I have to?

25    MS. CLARKSON:  Yes.

Page 49

```
         THE WITNESS:  He's not even listening to me.
    A    I was friendly with a few of the attorneys.
There was an attorney that I was very close with.  Her
name is Cassandra.
BY MS. CLARKSON:
    Q    Cassandra what?
    A    Rigaud.
    Q    Spell it.
    A    R-I-G-A-U-D.
    Q    She knew and she was scared?
    A    Oh yeah.  Their jobs were threatened.  Their
jobs were threatened.  Like everybody else they have a
family.  There's a few.  Daphne is one.
    Q    Daphne who?
    A    Tako.
    Q    T-A-C-O?
    A    T-A-K-O.
         MR. REGAN:  What's the first name?  Was it
Daphne?
         THE WITNESS:  Yes.
         MR. REGAN:  Thank you.
BY MS. CLARKSON:
    Q    Go ahead.
    A    I guess the attorneys that left the firm left
for the nasty practices that were going on.
```

Page 50

```
    Q    Their jobs were threatened if they didn't do
it?
    A    Yeah.  They would basically say this is what
you're going to do or you can find another place to
work, which a lot of them did because the practices just
became overwhelming for everyone.  The responsibility
that they expected people to have was above and beyond
what a human could actually do as far as case loads.
    Q    Were they paid well?
    A    Not from what I hear, no.  I believe that they
were very underpaid.  I don't think there was an
attorney there that didn't complain about the salary.
Most of them would be what we would call newbies.  They
were just learning to stand in front of a judge, you
know, litigate.  That's why they stayed there.  They
would stay a year and they would just go because they
knew it wasn't safe practice.  They were newbies and
they were well aware of it.
    Q    And they were scared?
    A    Oh yeah.
    Q    And they were worried about the possibility of
maybe getting disbarred?
    A    Yes.
    Q    Did they as far as you know bring that to Mr.
Stern's attention?
```

Page 51

```
    A    I believe that everybody was well aware of it.
Miriam and Beverly were very stern and not nice.  The
people that were in power were very mean and nasty.
    Q    Did they ever think that they were going to
get disbarred?
    A    No.  They acted like they are above whatever.
Basically they could do whatever they wanted which was
the rule of thumb over there.
    Q    Regardless of what is required by the law?
    A    Correct.
    Q    Was there any reason for David Stern to shred
any documents?  Was there a shredder there?
    A    Yeah.
    Q    Did he use the shredder?
    A    Rumor has it that he used the shredder on
several occasions, yes.
    Q    Did rumor say what he shredded?
    A    Documents that weren't supposed to be in the
files or incorrect things that he was going.  There
would be other people privy to that.  I was just a
paralegal.
    Q    But when you say that you heard it who would
you hear it from or how would you hear of it?
    A    The grapevine is very long there.  When you
have eleven hundred people working at a building like
```

Page 52

```
that the grapevine is very long.  There's a lot of
things that are said or that are occurring in different
departments that get through the office.
    Q    Right.
    A    Since I work directly under Cheryl there was a
lot of people for some reason who thought that I was the
person to tell a lot of these things to.  I just
listened.  I don't really offer any information and
never did.  Yeah, there was practices where audits were
coming in and we had to quickly run and get this
straight or get that straight.  It was mostly on the
Fannie Mae files.
    Q    What would you do on the Fannie Mae files?
    A    I wouldn't do anything.
    Q    What was done to the Fannie Mae files?
    A    They were correcting the things that they were
doing wrong.
    Q    Such as?
    A    Well, any practice that I just told you about.
Obviously the chronological orders of things.  You can't
lie to Fannie Mae.  They'll find out, especially when
they are doing an audit.  There was a few instances
where they were in the office and there were audits
done.  People were working overnight in the building to
get them straight.
```

Page 53

1    Q    Did Fannie Mae ever find out problems with
2  files?
3    A    I am unaware of any of that.
4    Q    Where did you work before you worked at David
5  Stern?
6    A    I worked for a neurologist.  I did research
7  for the FDA.
8    Q    Did you work at any other place in between the
9  neurologist and David Stern?
10   A    Just mediocre jobs.  I helped my friend with
11  his business or something like that.  You mean have I
12  ever worked at another law firm?
13   Q    No.  I wasn't asking you that.
14   A    Okay.
15   Q    Did you work simultaneously at David Stern and
16  another job?
17   A    No.
18   Q    Okay.
19   A    That was impossible.  I worked a lot of hours.
20        MS. CLARKSON:  Can we take a break for a
21   minute.  Do you mind?
22        THE WITNESS:  No, not at all.
23        (Thereupon, a brief recess was held.)
24  BY MS. CLARKSON:  (DIRECT CONTINUED)
25   Q    Do you know Shannon Smith?

APEX REPORTING GROUP

Page 54

1    A    Yes.
2    Q    How do you know her?
3    A    She works at the firm or worked.  I'm not sure
4  if she's still there.  She did work at the firm.
5    Q    Do you know what her duties were?
6    A    She was a paralegal like me.
7    Q    Do you know what her duties were?
8    A    The same as mine.
9    Q    Was she a notary?
10   A    As far as I know.
11   Q    Did you ever see her use her notary at the
12  firm?
13   A    No.  We were on two different floors.
14   Q    Was Shannon Smith in your group?
15   A    No.  She was with Homecomings I believe.  She
16  would have been on the fifth floor.
17   Q    She admits in a deposition that she took that
18  she signed assignments.  Were you aware of that?
19   A    Yes.  I think the whole firm was aware of
20  that.
21   Q    How was it the whole firm be aware of that?
22   A    Everybody knew about the deposition where she
23  had changed the dates on the assignments I think three
24  or four times or so or the dates were different on it.
25  There was, again, the rumor mill.

APEX REPORTING GROUP

Page 55

1    Q    Did you ever hear of any rumors that Shannon
2  Smith was also signing as Cheryl Samons?
3    A    No.
4    Q    You did not know that she may have altered her
5  signature?
6    A    May have, yes, but I was not aware that she
7  was doing it.
8    Q    Did you hear it?
9    A    I heard it.  Anybody in the firm heard about
10  that whole instance.
11   Q    Why don't you explain it to me what you heard.
12   A    Because it's not my team, it's on a separate
13  floor, I really stayed to myself.  It was just gossip.
14   Q    What did you hear?
15   A    Just that there was a document that she turned
16  in that was changed a few different times in front of a
17  judge in Hillsborough County if I'm not mistaken, if my
18  memory recalls me correctly and that she signed
19  something.  I suppose they were saying she signed
20  Cheryl's name or Cheryl was saying she signed her name.
21  That was it really.  We were told not to discuss it.
22  Again, if we were caught discussing things like that you
23  would be terminated.
24   Q    Beth Cerni was a paralegal, correct?
25   A    I believe so.

APEX REPORTING GROUP

Page 56

1    Q    Did you see her practicing law?
2    A    She was the team lead.  She was a manager in
3  the building on the fifth floor.
4    Q    What else was on the fifth floor?
5    A    GMAC and Homecomings I believe were the only
6  ones that occupied the fifth floor if I'm not mistaking.
7  Beth Cerni was -- GMAC was her team when she started
8  with Stern many years ago.
9        MR. REGAN:  Are you saying GMAC like G-M-A-C?
10        THE WITNESS:  Yes.
11        MR. REGAN:  Like General Motors Acceptance
12   Corporation?
13        THE WITNESS:  Correct.
14        MR. REGAN:  Thank you.
15  BY MS. EDWARDS:
16   Q    Did you ever hear any conversations in the
17  firm about any particular judges or jurisdictions where
18  there were problems with getting the foreclosures?
19   A    Oh yeah.  We knew what judges were what.  We
20  had what they called a bible.  The bible contained every
21  bit of information about every judge and what they were
22  looking for.  It made our job twice as difficult because
23  you had to go by the bible.
24   Q    Was there any arrangements made with any
25  particular judges or jurisdictions on how the

APEX REPORTING GROUP

1   foreclosures would be handled by Stern's office?

2       A   I believe the only one that I'm well aware of

3   that is just a large cluster of something is Lee County

4   judges. They used to do what they call a rocket docket.

5   It was five hundred files from our firm every other

6   Friday.

7   BY MS. CLARKSON:

8       Q   Would be filed or heard?

9       A   Would be heard.

10  BY MS. EDWARDS:

11      Q   Who arranged that?

12      A   As far as I know Cheryl Samons and the county.

13      Q   Cheryl and who?

14      A   The county. I wasn't privy to that.

15      Q   So how would you find out that --

16      A   Because they would call them rocket dockets.

17  We had to have five hundred files from our firm prepared

18  for it. Originally we had an in-house counsel there or

19  local counsel there. Then it went to our attorneys.

20  Two attorneys from our firm or two attorneys per floor

21  would go over to Lee County and do the rocket docket.

22  We would load their files into the car.

23      Q   So that was coordinated with Cheryl with the

24  county?

25      A   As far as I know. They were put on the rocket

1   docket basically.

2       Q   What I'm trying to find out was is Cheryl

3   involved in the implementation of the rocket docket?

4       A   Oh yes. She was responsible for all

5   scheduling anywhere. Her Beverly McComas and Miriam

6   Mendieta.

7       Q   How was it that the rocket docket was created?

8       A   I am not sure. That's what they called it.

9   They were going to do a rocket docket. Lee County I

10  guess was our largest county for foreclosures at the

11  time.

12      Q   Were you aware of her having any meetings with

13  anyone there to implement or to come up with the idea to

14  come up with the rocket docket?

15      A   No, I'm not aware of any meetings?

16      Q   Do you know who did that?

17      A   My guess would be Miriam Mendieta and Beverly

18  McComas because they were the controlling attorneys.

19      Q   They would have been involved in the original

20  implementation of the rocket docket?

21      A   Correct. They are the one who assigned

22  attorneys. They're pretty much the ones that oversaw

23  the scheduling for that. There's a few counties that we

24  would just send over a sheet of paper that would have

25  your unpaid, who was defaulted, when it was defaulted,

1   and basic information. From what my understanding is

2   when you go over there, as long as there was no response

3   from anybody and it isn't contested the judges would

4   just sign off on them as far as I know.

5       Q   The final judgements?

6       A   Correct.

7       Q   So there would be a faxed over document with

8   the basic information about the foreclosure on it and if

9   nobody appeared in opposition the judges would sign the

10  final judgements?

11      A   Correct.

12      Q   This was in Lee County?

13      A   Yes. It wasn't faxed. The attorneys brought

14  them. So if the judge wanted to look at something the

15  files were there. That's my assumption. The files were

16  just loaded into these attorneys cars and they were

17  elected to drive over there. It wasn't a choice. They

18  picked which attorneys were going to go each week or

19  ever other week whenever they decided to do the rocket

20  docket.

21      Q   And they decided that it would be five hundred

22  that would be handled?

23      A   It was five hundred from our firm, yes.

24      Q   Was it also other firms?

25      A   As far as I know. I'm not privy to that

1   information. I didn't work with other firms.

2       Q   Were you aware of comparable practices to

3   those you have just described with any other law firms

4   in Florida?

5       A   No. It wasn't something I discussed about

6   other firms.

7       Q   Are you aware of any payments that were made

8   by David Stern's firm to any companies as a result of

9   receiving the referrals of the foreclosure cases?

10      A   Not that I'm aware of. I know that one

11  particular bank that we dealt with, which was Aurora

12  Leman Brothers, he had his own employees there in

13  Aurora.

14      Q   For that purpose?

15      A   That was not something we knew. There's four

16  employees that are there. I would have to look through

17  some documents for their names. They worked for Aurora

18  and were paid by David Stern if that makes sense. They

19  worked in Aurora's building, ALS, but they were paid by

20  David Stern to be there.

21      Q   But you don't know what they did?

22      A   It was to oversee the practice that was going

23  on. I could tell you that Aurora did not want them

24  there. The were not very nice to them. They constantly

25  had issues with them. It was more or less for us like

Page 61

1  if we needed assignments to get them like that; whatever
2  we needed to get them back immediately. Aurora was his
3  baby and always has been.
4       Q  Why is that?
5       A  I believe that's what started his company.
6       Q  So he had his own employees in Aurora?
7       A  He went over there and hired them. They lived
8  there. I think it's in Minneapolis. I'm not sure.
9       Q  So David Stern personally went there and hired
10 people to work in Aurora?
11      A  Yes.
12      Q  And you don't know what they did there but
13 they were paid by David?
14      A  Yes. They were paid by David. They had an
15 email address by David.
16      Q  So obviously knew exactly what they were
17 doing?
18      A  Oh yes.
19      Q  Mr. Stern?
20      A  Yes.
21      Q  If you needed to get assignments quickly
22 that's who you contacted?
23      A  Correct.
24      Q  What did they do?
25      A  I don't know what they did on their end. All

Page 62

1  I know is I would have it by the end of the day.
2       Q  An original?
3       A  No, because it would come from there. It
4  would be something that they would scan over to us or
5  send to us or get to us overnight.
6       Q  How would that have been done differently than
7  the assignment process that you just described to us?
8       A  I don't know how they did it. I just know if
9  we needed anything that had to do with Aurora we would
10 call there and speak to those people. Aurora was
11 probably our messiest client.
12      Q  Why?
13      A  Because it was never done right from the
14 beginning so the files were a mess.
15      Q  Why is that?
16      A  I have no idea. I don't know. I know that it
17 had changed hands a lot with paralegals and Cheryl and
18 David. It was very messy. As far as I know that's the
19 only company that I worked with.
20      Q  Do you know if those employees ever signed off
21 on assignments or any other documents that were needed
22 for foreclosures?
23      A  I don't recall.
24      Q  Do you know the names of those employees?
25      A  I can't recall their names at the moment. I'm

Page 63

1  trying to think of the manager's name. Its at the tip
2  of my tongue but I can't think of his name either.
3       Q  But there were people that actually lived
4  where Aurora is?
5       A  Yes, they lived there and they were hired by
6  David. They were actually brought to our office. Since
7  I was the team lead for Aurora I was introduced. They
8  shadowed me so they could see what the process was that
9  we had to go through.
10      Q  Then they then went back to Aurora and they
11 did whatever they were doing for David Stern?
12      A  Correct.
13      Q  Why would there be someone there if this whole
14 practice is down here?
15      A  I don't know. I couldn't answer that
16 question.
17      Q  Are you aware of any contacts that Mr. Stern
18 or anyone else had with Fannie Mae or Freddie Mac that
19 assisted him in getting his referrals?
20      A  No, I'm not aware of any of that.
21      Q  Are you aware of any payments that were made
22 by Stern or his office to Fannie Mae or Freddie Mac or
23 anyone that worked there?
24      A  No, I'm not aware of that either.
25      Q  You mentioned that there was some vindictive

Page 64

1  behavior that you observed while you were working there.
2  Was any of this having anything to do with any of the
3  litigation in the home foreclosures?
4       A  Meaning? Most of the meanness came from if we
5  didn't do their jobs what they would consider up to par.
6       Q  You're talking about the people that worked in
7  David Stern's office?
8       A  Yes.
9       Q  That there was vindictiveness by personnel to
10 other personnel?
11      A  Oh yes. And by Cheryl. Cheryl would scream
12 at the top of her lungs and embarrass you.
13      Q  Was she very close with David Stern?
14      A  Oh yes. Their families traveled together on
15 vacations. Their kids went to the same school.
16      Q  Would you say that any information that Sheryl
17 had would probably also be information that David Stern
18 had?
19      A  Oh yes.
20      Q  Do you think there's any way that David Stern
21 did not know the procedures you just described that
22 Cheryl Samons was involved in?
23      A  No, there's no way.
24      Q  Did anyone express any concern when you left
25 the office that you had observed things that were not

Page 65

1   proper going on there?

2       A    Yes.  When I left the office they came to my

3   desk to --

4       Q    Why who?

5       A    MR.  Alicia Rhonda who I believe was the one

6   partaking in changing files.  She's the HR manager

7   there.  She would come to your desk and go through every

8   single document that you were removing from your desk.

9   They wouldn't allow you to take anything.  Not even a

10  sticky if it had something to do with the firm on it.

11      Q    Did you have any documents that belonged to

12  the firm when you left?

13      A    I did.

14      Q    What sort of documents did you have?

15      A    I had numerous amounts of documents.

16      Q    What type of documents were they?

17      A    I didn't take them when I left.  I obviously

18  had already had them.  What we've spoke about and the

19  practice, emails, and stuff like that.

20      Q    So they were documents that essentially

21  documented what you've just described?

22      A    Correct.

23      Q    Do you have copies of those emails now?

24      A    No, I don't.

25      Q    Do you have them in your possession?

Page 66

1       A    No, I don't.

2       Q    Where are they?

3       A    They are with my attorney.

4       Q    Who are the emails from?

5       A    The majority of them are from Cheryl.  Some of

6   them are from a gentleman named David Vargas which is an

7   issue that I had.  He was one of the mean people.

8       Q    Were those emails sent to you or other people?

9       A    No, they were sent to me.  They all came from

10  my email address.

11      Q    What was the nature of those emails that you

12  felt were important enough that you felt that you should

13  keep them?

14      A    Just the practices that weren't fair.  The

15  things that they were doing that weren't -- the things

16  that were wrong.

17      Q    Are those the things you've described so far?

18      A    Yes.

19      Q    And those emails document that?

20      A    The emails pertain to different things:

21  Changing UPB balances more or less, the badgering and

22  stuff, hearing outcomes.  Every day there were emails

23  sent from each county on what the hearings were and

24  stuff like that.

25      Q    Why would you have saved those?

Page 67

1       A    It just happened to be something I had because

2   I worked from home.  There wee documents I would take to

3   go over my -- we had reports that we would run.  Since I

4   had such a large amount of files it was easier for me to

5   do it that way.  That's how I initially got them.  It

6   was part of my job.

7       Q    What about the documents that you have?  What

8   is the nature of those documents, other than the emails?

9       A    They were just what we discussed here today.

10      Q    Examples?

11      A    Yes.  Examples are actually from files.

12      Q    And so the documents you have are examples of

13  what you described to us?

14      A    Correct.  There's also one thing I remembered

15  that I'm going to tell you because I want to make sure

16  that I -- the Exhibit D's were our attorneys fees.

17  Those were pre-signed by the attorneys prior to us

18  getting them.

19      Q    Prior to you getting what?

20      A    In other words, prior to them going out on the

21  file.  The only thing we did was fill in the fee and

22  stamp it.

23      Q    So the attorneys were signing attorneys fee

24  affidavits without figures there?

25      A    Correct.

Page 68

1       Q    And after the attorneys signed the affidavits

2   were notarized without the attorneys being there?

3       A    Correct.

4       Q    And the fee amount was filled in?

5       A    Correct.

6       Q    Were there particular attorneys that were used

7   for those?

8       A    Richard Toledo I believe was one.  Suarez was

9   the other one.  I'm not sure of his first name.

10      Q    So there were two?

11      A    Yes.  One did hearings in one county and one

12  did hearings in the other county.  We couldn't use them

13  in the county they did hearings in.

14      Q    How much were they paid for those?

15      A    I have no idea.

16      Q    Were they paid for filling out attorney fee

17  affidavits?

18      A    I would imagine so.

19      Q    But you don't have any knowledge of that?

20      A    No.

21      Q    If I understood your testimony about Cheryl

22  Samons signing affidavits of indebtedness and other

23  affidavits, these were all left on a table for her and

24  she signed without even reading them?

25      A    Correct.

Page 69

1    Q    Was that basically the case in every single
2    situation?
3    A    Yes. Yeah.
4    Q    You described that there was offshore
5    preparation of the information that was put into the
6    software that created all of the documents in the
7    foreclosure action; is that right?
8    A    Correct.
9    Q    Did anyone review to make sure that the
10   information being inputted was accurate?
11   A    That I'm not aware of. I know that initially
12   there was a huge problem with it just because of the
13   education between the two places. Sometimes you would
14   be in Cheryl's office and hear a conversation about
15   them, which is how I happen to know about those. I
16   didn't work in the casesum department.
17   Q    Do you know who was hired to put the
18   information into the casesum software?
19   A    From overseas?
20   Q    Yes.
21   A    No. I don't know particularly who, no.
22   Q    Did David Stern know about this?
23   A    Oh yes. He actually went there. Everybody
24   was aware that he went there.
25   Q    He went where?

APEX REPORTING GROUP

Page 70

1    A    To the Philippines and to Guam. I believe
2    there's another place. I'm just not sure of the name.
3    Q    How do you know he went there?
4    A    Because we all knew that it was going to be
5    implemented; that our case loads were going to be
6    getting larger. In casesums Cheryl had a rule that you
7    had to have fifteen casesums out the door a day and if
8    you didn't she would fire you if it was two consecutive
9    days.
10   Q    And the casesum was where you were putting in
11   the information that would come from the lender?
12   A    Correct. We knew that our case loads were
13   going to get larger because they were going to be doing
14   this offshore.
15   Q    Do you know if Mr. Stern was responsible for
16   hiring those people?
17   A    As far as I know.
18   Q    Do you know anything about who was paying
19   them?
20   A    He was paying them as far as I know.
21   Q    Cheryl Samons worked there on a daily basis?
22   She was there all day?
23   A    Yes.
24   Q    How often was Mr. Stern there?
25   A    He was there every day unless he was

APEX REPORTING GROUP

Page 71

1    traveling.
2    Q    Did he travel for purposes having to do with
3    the law firm?
4    A    Oh yeah.
5    Q    For what?
6    A    To visit different banks or go offshore. Most
7    of his travels had to do with the office.
8    Q    Why would he be going to the banks?
9    A    I have no idea.
10   Q    He traveled to visit the banks regularly?
11   A    As far as I know, yes. That's what we were
12   told, that he was out of the office for this or that
13   meeting. A lot of times they would come to our office
14   too. There were quite a few meetings there.
15   Q    Of bank representatives?
16   A    Yes.
17   Q    Do you know anything about what the meetings
18   were about?
19   A    No. Those were behind closed doors.
20   Q    Whose closed doors?
21   A    David Stern's, Miriam, and Beverly.
22   Q    Were those the people that attended the
23   meetings?
24   A    Yes.
25   Q    Was there anyone else at the meetings that you

APEX REPORTING GROUP

Page 72

1    know of?
2    A    Not that I'm aware of, no. Cheryl was in and
3    out of them I know.
4    Q    Did anyone keep notes from the meetings?
5    A    I don't know.
6    Q    If someone of those people were at meetings
7    who would you expect to be taking notes or keeping track
8    of what was going on?
9    A    That would be Cheryl.
10   Q    You mentioned that there were business
11   decisions on whether or not they were going to be
12   changing the principal balances due. She said they were
13   business decisions?
14   A    Well, the email subject line used to be
15   business decision. I have to come to your office for
16   the file because we didn't do something we were supposed
17   to do according to her rules. So we would go there, she
18   would look through the file, and she would make a
19   business decision based on where we were at with the
20   file. We didn't question her on that. That was
21   something you just didn't do.
22   Q    So she would just tell you how it was going to
23   be?
24   A    Yup.
25   Q    Now, you said that in every foreclosure there

APEX REPORTING GROUP

Page 73

1  were summons sent out to a Jane and John Doe?
2      A    Correct.
3      Q    Now, are you saying that there was one sent
4  out whether there was even an issue of whether or not
5  there was a Jane and John Doe involved or whether or not
6  the people, the original mortgagors were actually living
7  in the home?
8      A    Correct.  A return of service would be turned
9  in to court saying -- if they served me at home and my
10 husband, they would turn in also for Jane and John Doe.
11     Q    So they would issue the Jane and John Doe
12 summons whether the homeowner was actually living in the
13 home and was going to be served?
14     A    Correct.
15     Q    So what you're saying, if I understand it, is
16 that this was basically padded on to the summons to give
17 them an extra person to serve?
18     A    Correct.
19     Q    Extra two people to serve?
20     A    Correct.  Every single file that ever left the
21 office had a Jane and John Doe on it.
22     Q    And so basically they were sending a bill for
23 another ninety dollars?
24     A    Correct.
25     Q    So the process servers got paid an extra

Page 74

1  ninety dollars for service of a Jane and John Doe
2  whether there was any legitimate reason to think there
3  should be one listed?
4      A    Correct.
5      Q    So, even when you knew the mortgagors were
6  living in the home there was a Jane and John Doe
7  summons?
8      A    Correct.
9      Q    Who paid them?
10     A    I would assume David.  I'm not sure who paid
11 or what account it came from.
12     Q    Was there always a Jane and John Doe no matter
13 which one of the servicers were used?
14     A    Correct.
15     Q    Was that amount included in the affidavit of
16 service?
17     A    Correct.  Except for if the bible stated it.
18 There were some judges who got wise to it and decided
19 that you can't charge for Jane and John Doe.  There were
20 other judges who would say I'm only going to allow you
21 twenty dollars for service.  So, as I said, the bible
22 was our bible.  We would go by that.  If Judge Smith
23 said I'm only allowing you twenty dollars for service,
24 no Jane and John Does at all, then that's what we would
25 put in there.  If a judge didn't complain and nobody

Page 75

1  questioned it then it was put in here.
2      Q    If there's properties were sold at a
3  foreclosure sale and they were purchased by the bank
4  would those amounts be billed to the bank?
5      A    Sale was something I never ever -- I had my
6  own sale girl, own sale department.
7      Q    Do you know if David Stern ever purchased any
8  properties at foreclosure sales?
9      A    I have heard of a few.
10     Q    How did you hear about it?
11     A    Because the paralegal screwed up on something
12 or another was what the word said.
13     Q    Why is he buying properties at foreclosure
14 sales?
15     A    I don't know.  I couldn't answer that.  I
16 don't know.
17     Q    Were there any arrangements that he had with
18 the banks that he could bit on some and not others?
19     A    I'm unaware of anything to do with sales.
20     Q    Why would assignments of mortgage been
21 recorded at Cheryl's direction after final judgements
22 were entered?
23     A    Again, I don't know.  After the initiation of
24 the file we would record them.  We would be sending them
25 in with the final judgements.  In other words, if there

Page 76

1  was a file that the assignment wasn't done properly some
2  of them we would send the motion for summary judgement
3  and the attorney would go to court with the assignment
4  in their hands.
5      Q    Okay.  Was there any discussion about the fact
6  that that was not the correct or legal way to do that?
7      A    Not to me.  I was just told to do it.  If an
8  assignment needed to be with the file it needed to be
9  with the file.
10     Q    Did anybody say that it's not going to be
11 recorded?
12     A    Not that I'm aware of.  I didn't learn until
13 actually the end of that that the Fannie Mae and Freddie
14 Mac guidelines state that an assignment of mortgage has
15 to be filed with the mortgage and the note.  I was
16 unaware of that because I didn't work on their teams
17 until the latter part of my employment there.  So at
18 that time when we were conveying to our client through
19 VendorScape or Landstar or whatever it was for the
20 files, when they would question why the lis pendens
21 hadn't been filed we would say because under Fannie Mae
22 guidelines you can't file unless you have the
23 assignments of mortgage and the note and the mortgage.
24 I was unaware of that until then.
25     Q    And that was at the end of the time that you

Page 77

```
 1   worked there?
 2       A    Yeah.  It was only the Fannie Mae files that
 3   we did it on.
 4       Q    So, Fannie Mae and Freddie Mac had guidelines
 5   that you could not record a lis pendens or an assignment
 6   of mortgage?
 7       A    You weren't supposed to be filing the lis
 8   pendens prior to having those documents.  I'm not saying
 9   that that's what happened because we know that they were
10   back-dated.  Technically that's when I learned you
11   weren't supposed to be doing that, even though we were
12   doing it and it was our practice.  I was unaware until
13   that point when I started working on that particular
14   team.
15       Q    Are you aware of whether anybody else knew
16   that that was not the way that the foreclosure should be
17   handled?
18       A    Oh yeah.  The team leads.  Tammie Sweat was
19   responsible for Fannie Mae.  Beth Cerni was responsible
20   for GMAC.  There was another manager Jason something or
21   another.  I don't know.  He was responsible for Country
22   Wide and stuff like that.  I was told by them.  That's
23   what they told me to put in Landstar or VendorScape.  My
24   assumption would be yes they knew.
25       Q    They told you to put what in?
```

APEX REPORTING GROUP

Page 78

```
 1       A    That the lis pendens had been filed because
 2   pursuant to Fannie Mae guidelines we have to have the
 3   note and mortgage and stuff.
 4       Q    And were the Fannie Mae guidelines that they
 5   could not file their complaints until they have the
 6   assignments of mortgage?
 7       A    Correct.
 8       Q    So Fannie Mae and Freddie Mac mortgages did
 9   not have complaints filed until the assignment of
10   mortgage had been filed to reflect the proper owner?
11       A    Well, that was what the guidelines were but
12   that's not what we did.  They would back-date them if
13   need be.  In other words the assignments would be
14   back-dated to say yes that's what it was.  They'd come
15   in and audit or we'd have to give them chronological on
16   VendorScape or Landstar so we're just typing in what
17   they want to see.  It's not necessarily what actually
18   occurred.  That's what we were told to do.
19       Q    At any point are you aware of Fannie Mae or
20   Freddie Mac becoming aware that what was being reported
21   to them was different than what was actually happening
22   in David Stern's firm?
23       A    I'm not privy to any of that information, no.
24       Q    So there was never any screaming or meetings
25   about those issues?
```

APEX REPORTING GROUP

Page 79

```
 1       A    Oh there was screaming and meetings.  What I
 2   actually knew was going on or not -- Fannie Mae came to
 3   the building often.  They were there because we would
 4   all have to be under strict dress code and emails would
 5   go out that Fannie Mae was in the office.
 6       Q    When you talked about the fact that there were
 7   ex-parte motions to substitute plaintiff filed in the
 8   foreclosure actions do you know whose decision it was on
 9   the cases to send in ex-parte motions to substitute
10   plaintiff?
11       A    It was Cheryl's decision on any of them.  Some
12   of them we got the whole theory of when I questioned why
13   we were foreclosing -- I've actually had tenants or
14   borrowers call me and say well my bank was this and it
15   turned over to this, why did you foreclose on this.  I
16   would ask Cheryl and she would say just tell them it
17   doesn't matter.  I would say well what is the case with
18   that and she would say well it doesn't matter because
19   the bank is buying it back and it's going back to Fannie
20   Mae anyways so who cares.  That was their theory on when
21   you didn't file a substitution of plaintiff on the file.
22           A lot of them happened to be GMAC and Nation
23   Star.  Why are they the ones, I'm not particularly sure.
24   If it got flipped from one company to the other, which
25   happened quite often, the substitution of plaintiffs
```

APEX REPORTING GROUP

Page 80

```
 1   were not done on all of them I should say.  If we had
 2   time and we had just gotten the file and we knew it was
 3   going to be changed  and I was on top of my game with my
 4   files I would get it done.  But if it wasn't done, it
 5   wasn't done
 6       Q    Who would tell you to send in the ex-parte
 7   motions and orders?
 8       A    Either Tammie or Cheryl.
 9       Q    What about if there was an attorney on the
10   other side?
11       A    Opposing counsel they didn't really care much
12   about.  I wouldn't get involved in that.  That would go
13   to my attorney.
14       Q    Were you aware of attorneys sending in
15   ex-parte motions and orders even if there was counsel on
16   the other side?
17       A    Again, I wouldn't know.  I couldn't definitely
18   say.
19       Q    Just to clarify, you said between two hundred
20   and two hundred and fifty affidavits and assignments
21   were signed by Cheryl a day times eight?
22       A    Well, I think there's about six floors.  One
23   were reinstatements so it probably was not on there and
24   then one was something else.  Yeah, at least that.
25       Q    So you're talking about fifteen thousand a
```

APEX REPORTING GROUP

Page 81

```
 1  day?
 2       A    Probably, yeah.
 3            MR. REGAN:  No, no, no.  Wait, wait, wait.
 4  Eight times two-fifty, that's not fifteen thousand.
 5  I'm sorry.  Two thousand.
 6            THE WITNESS:  Two thousand.
 7  BY MS. EDWARDS:
 8       Q    So you're saying around two thousand a day
 9  were being signed by Cheryl?
10       A    Yes.
11       Q    Or other people on Cheryl's behalf?
12       A    Correct.
13       Q    So Cheryl worked as David's paralegal before
14  he got into this foreclosure business?
15       A    I'm not sure how that goes.  One store here
16  and one store there.  I actually had a conversation with
17  Cheryl about it one day just out of curiosity.  She had
18  said that she started out as his file clerk and then the
19  two of them built the company together.
20       Q    Do you know whether or not Cheryl got any
21  bonuses based on the number of files closed?
22       A    I'm not personally aware of it but the
23  grapevine again says she did.  There were a few people
24  that got bonuses based on what they got done.
25       Q    Do you know who they were?
```

Page 82

```
 1       A    They were team leads, yeah.  For sales it
 2  would have been Vanessa Rijos.  For the firm Cheryl.  As
 3  far as I know Cheryl never paid a bill for anything.
 4  Her bills were brought to the firm and paid for by the
 5  firm.
 6       Q    You mean her personal bills?
 7       A    Yes.  I'm trying to think of the team leads.
 8  It's hard to remember without like a list of their names
 9  in front of me.  I know Vanessa was sales.  There was
10  Kadian Doir was training.  They're all in a clique so
11  it's just how they were.  David Vargas.  I mean they all
12  ended up with new cars all of a sudden and things like
13  that.
14       Q    Are any of these people personal friends with
15  David Stern?
16       A    Yes.
17       Q    All of them?
18       A    Not that I'm aware of with the girls but David
19  Vargas and Cheryl Samons are very close personal friends
20  with David Stern.
21  BY MS. CLARKSON:
22       Q    Are you aware of any other inflating billing
23  other than the process by David Stern?
24       A    In memorandum of laws there would be inflated
25  billing since the attorneys weren't reviewing it.
```

Page 83

```
 1  Technically that's inflating it.
 2       Q    They didn't review them?
 3       A    No.  I did it.
 4       Q    What about titles, abstract searches?
 5       A    Those were just a nightmare.  I didn't work in
 6  the title department.  GAPs were supposed to be done and
 7  sometimes they weren't done until after the properties
 8  were sold.  The title department is a complete mess
 9  there.  There's things that are overlooked or not seen.
10  If you had a problem with title you went to a gentleman
11  there.  Brad is his first name I believe.  I'm not sure
12  of his last name.  He was the title person.  There was
13  one other lady who worked there also who wasn't very
14  nice either.
15            Nobody really would go to any of the managers
16  like that because you would get screamed at.  It wasn't
17  even -- it would be what are you stupid?  Why are you
18  asking me this question?  You were told to do this and
19  that's what you do.  Okay.  That's pretty much how it
20  ended up.  With the title I know for sure was a screwy
21  thing sometimes.
22       Q    Sometimes it was not done but was it always
23  billed for?
24       A    Oh yes.  It was always billed.  That's
25  inputted automatically into their system unless again a
```

Page 84

```
 1  judge says you're only allowed for a title to charge
 2  this much, this much or this much, they would back it
 3  out.
 4       Q    And they would put that in the bible?
 5       A    Yes.
 6       Q    Do you know of any instances or many instances
 7  where title was charged but not completed?
 8       A    Oh yeah.
 9       Q    Many or any?
10       A    Any.  Probably many but in my own team, any.
11       Q    Okay.  Do you know who they got the casesums
12  back from Guam and the Philippines?
13       A    I believe everything was done electronically
14  but I'm not sure, no.
15       Q    Are you aware of who the bank servicers were?
16       A    Meaning?
17       Q    The servicers?  Who told the attorneys what to
18  do?
19       A    No.
20       Q    No?
21       A    No.
22       Q    Did you take any other documents from the
23  officer that you haven't told us about?
24       A    No.
25            MR. BRIESMEISTER:  Mark Briesmeister here.
```

Page 85

BY MR. BRIESMEISTER:

1  BY MR. BRIESMEISTER:

2      Q    Tammie, you indicated you worked there from

3  approximately March of '08 to July of '09, correct?

4      A    I believe that's what it was, yes.

5      Q    What's your employment history since July of

6  '09?

7      A    I've worked for a condo HOA attorney.  I'm

8  currently unemployed.  I've actually had such a

9  difficult time getting a job because I worked at David

10  Stern's office.

11      Q    So you've been unemployed since --

12      A    I was employed for approximately seven months

13  and I've been unemployed since, yes.  My employment

14  terminated there July 7th of '09.

15      Q    You also indicated that your work space was

16  directly outside the office of David Stern, correct?

17      A    Correct.

18      Q    Did you in the course of working there ever

19  hear any conversations, meetings, dialog between David

20  directly and either Cheryl or other employees that would

21  indicate to you improper conduct?

22      A    On a personal level or business?

23      Q    Business dealings.

24      A    No.

25      Q    With regard to emails and documents that you

Page 86

1  say you took from the business, are all of the emails

2  you got either originated by you or you are the

3  recipient?

4      A    Correct.  All of them.

5      Q    You have no emails that would have been

6  directed or the recipient other than you?

7      A    No.  They all came from my email account.

8      Q    Any emails with David Stern in the chain?

9      A    Stern was in most of them when it came to like

10  hearings and stuff like that.  If I'm not mistaking the

11  copies were David Stern, Beverly, and Miriam Mendieta.

12  As far as I know every email he got on his Blackberry

13  because he would respond sometimes outside the office

14  from his Blackberry.

15      Q    Email or documents related to business

16  practices in the firm?

17      A    Yes.

18      Q    And you indicated that all of the documents

19  and emails have been turned over to your attorney?

20      A    Yes.

21      Q    You have no others?

22      A    No.

23      Q    How large was the book that you called the

24  bible?

25      A    Oh good God.  There's sixty-seven counties in

Page 87

1  the state?  It was every county and every judge

2  pertaining to foreclosures.

3      Q    Did you make any copies of any or part of

4  that?

5      A    No.  That was encrypted actually.  Jason is

6  the person who controls the bible.  It was encrypted as

7  far as we knew.  I do know that they watched that and if

8  you ever got caught printing it you pretty much -- it

9  printed by accident sometimes but the documents would

10  get shredded because just of the way it was set up on

11  Word or whatever.

12      MR. BRIESMEISTER:  That's all for me.

13  BY MS. EDWARDS:

14      Q    Is there any reason that you would have to be

15  saying things that are not truthful here?

16      A    No.

17      Q    Is there any reason that you can think of for

18  anyone at David Stern's office would say that you would

19  say things that were not truthful about what went on

20  there?

21      A    They could say a lot of things about a lot of

22  people there and most of the people that would say that

23  were the ones that were being compensated.  But no.

24      Q    Were there any personal relationships that you

25  were aware of that might have caused problems within the

Page 88

1  firm?

2      A    As far as people in the firm?

3      Q    Yes.

4      A    Yes.

5      Q    Could you describe that to us.

6      A    Well, David Stern had quite a few little

7  girlfriends in the firm.  David Vargas and Cheryl Samons

8  were very involved.

9      Q    Are you talking about romantically involved?

10      A    Yeah.  I believe there were people actually

11  fired for questioning it.

12      Q    Who else was involved in those sort of

13  relationships?

14      A    There were boyfriends and girlfriends within

15  the firm.  The policy was that fraternizing wasn't

16  allowed.  If it happened you'd have to let HR know and

17  they would separate you in teams.  I mean you put that

18  many people in one building you're going to have

19  relationships.

20      Q    Did you also say that sort of thing was going

21  on with David Stern and other people that worked there?

22      A    Oh yeah.

23      Q    How do you know that?

24      A    Because those conversations I was privy to.

25      Q    Could you describe the nature of those and the

Page 89

```
 1   people involved.
 2       A    There was a few young girls that he was very
 3   generous with and purchased properties, cars, jewelry.
 4   They would go in and out of his office, get roses, be in
 5   there for two hours.  I would hear the conversations
 6   with him and David Vargas in reference to taking them on
 7   plane rides and he was going to get in trouble because
 8   he's married and things like that.
 9       Q    Who were those girls?
10       A    Christina was one of them.  I'm not sure of
11   her last name because there were a few of them.
12       Q    Which division did she work in?
13       A    There was another girl named Christina
14   Dispersio (ph).  The first Christina worked in I want to
15   say Countrywide side.  She was a very very young girl.
16   Very pretty girl.  She had a four-year old daughter if
17   I'm not mistaking.  The second that the firm was aware
18   of it because there were plenty of times when Cheryl
19   would go storming in his door and screaming at him about
20   the fraternizing going on and the whole firm knowns
21   about it.  Of course people talk, especially when your
22   boss is doing that.
23            They removed her from the company.  Just one
24   day you came in to work and she was gone.  There were
25   people that were there that were friends with her.  The
```

Page 90

```
 1   grapevine is long and it would come back.  Apparently I
 2   know his right hand Paula Beachman, which has changed
 3   now because she got married, had made a comment to me
 4   one time about I don't want to know anything, I don't
 5   want to hear anything because I've already been deposed
 6   one time before because of his sexual misconduct.
 7       Q    Was he involved in sexual misconduct there?
 8       A    As far as I know, yes.
 9       Q    Did it involve anyone other than the two women
10   that you've described?
11       A    I'm sure there were numerous of them but I was
12   only aware of that because it was on the fourth floor.
13       Q    That was right outside from where you worked?
14       A    Yes.  When that became a whole situation
15   because -- how it was was David's Stern office and there
16   was a cubby and then a cubby.  The first cubby was David
17   Vargas and I was the second cubby.  So I would hear
18   everything.  He would always lean over sometimes and say
19   you're not hearing any of this and I would just hear no
20   evil, see no evil, say no evil.  The conversations were
21   there.  We were there a couple months and then we got
22   moved up to the sixth floor, our whole team.  We
23   actually expanded and there was no more room in that
24   particular spot.  So after that I wasn't aware of
25   anything other than Stern coming up and hanging out with
```

Page 91

```
 1   Vargas.
 2       Q    So you would overhear conversations between
 3   him and Vargas?
 4       A    Oh yeah.
 5       Q    And this was the nature of the conversations
 6   you heard?
 7       A    Yes.
 8       Q    And that Vargas was involved with Cheryl
 9   Samons?
10       A    That was just something that was known and
11   never said.  Like I said, there was somebody who said it
12   and they got fired.
13       Q    But you never heard any actually conversations
14   where Vargas said that or Cheryl?
15       A    Well, he made a couple of innuendos that were
16   inappropriate.  Sometimes when I was trying to learn
17   stuff from Cheryl and I was still in the training she
18   would be bending over the desk and he would say
19   something that was inappropriate about her.  They would
20   spend three and four hours in the office together.  He
21   was the only paralegal in the entire building that would
22   sit there with the door closed.  He would throw anybody
23   out of the office and walk in there.  You're guess is as
24   good as mine about what's going on behind closed doors.
25   That's about as privy as I was and that was too much.
```

Page 92

```
 1            MS. EDWARDS:  I don't have any other questions
 2   to ask.
 3   BY MS. CLARKSON:
 4       Q    The only thing I'd like to know is how you
 5   left?  What terms you left on?
 6       A    They terminated my employment and said that it
 7   wasn't working out.  That was approximately two weeks
 8   after I refused to do the military documents.  I was one
 9   of those people that just didn't believe in the
10   practices.  If I thought something was wrong I would
11   question it.  I think that they don't like that.
12       Q    So you were fired?
13       A    Yes.
14       Q    Did you leave on a good note or a bad note?
15       A    Good note.  The HR girl was crying her eyes
16   out when I left.
17            MS. CLARKSON:  Okay.  Thank you for coming in.
18   I think I'm going to have this typed up.  Would you
19   like to read or waive?
20            MR. LYONS:  Read.
21            (Thereupon, the deposition was concluded at
22   1:58 p.m.)
23
24
25
```

Page 93

1  STATE OF FLORIDA  )
2  COUNTY OF BROWARD  )

4        I, the undersigned authority, certify that TAMMIE
5  KAPUSTA appeared before me and was duly sworn.

7        WITNESS my hand and official seal this 22nd day of
8  September, 2010.

10                          _Kadra Smith_
11
                          Kalandra Smith
12                        Notary Public - State of Florida
                          My Commission No.:  EE3599
13                        My Commission Expires:  06/23/14

APEX REPORTING GROUP

---

Page 94

1                    C E R T I F I C A T E
2
3  The State of Florida,  )
4  County of Broward      )
5
6        I, Kalandra Smith, Court Reporter and Notary Public
   in and for the State of Florida at Large, do hereby
7  certify that aforementioned witness was by me first duly
   sworn to testify the whole truth; that I was authorized
8  to and did report said deposition; and that the
   foregoing pages are a true and correct transcription of
9  my reporting of said deposition.
        I further certify that said deposition was taken at
10 the time and place herein above set forth and that the
   taking of said deposition was commenced and completed as
11 herein above set out.
        I further certify that I am not an attorney or
12 counsel of any of the parties, nor am I a relative or
   employee of any attorney or counsel of party connected
13 with the action, nor am I financially interested in the
   action.
14      The foregoing certification of this transcript does
   not apply to any reproduction of the same by any means
15 unless under the direct control and/or direction of the
   certifying reporter.
16      IN WITNESS WHEREOF, I have hereunto set my hand
   this 22nd day of September, 2010.
17
18
19                          _Kadra Smith_
20
                          Kalandra Smith
21                        Notary Public - State of Florida
                          My Commission No.:  EE3599
22                        My Commission Expires:  06/23/14
23
24
25

APEX REPORTING GROUP

---

Page 95

1                    READ AND SIGN
2
3
4
5        I have read the foregoing pages and except for
6  the corrections or amendments I have indicated on the
7  sheets attached for such purposes, I hereby subscribe to
8  the accuracy of this transcript.
9
10
11
12
13 _____
14 Signature of Deponent
15
16
17 _____
18 Date
19
20
21
22
23
24
25

APEX REPORTING GROUP

---

Page 96

1                    E R R A T A   S H E E T
2
3  IN RE:
   Deposition of:
   Date taken:
4
5  DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE
6
7  Page #   Line #      Change          Reason
8  -----------------------------------------------------
9  -----------------------------------------------------
10 -----------------------------------------------------
11 -----------------------------------------------------
12 -----------------------------------------------------
13 -----------------------------------------------------
14 -----------------------------------------------------
15 -----------------------------------------------------
16
17 Under penalty of perjury, I declare that I have read my
18 deposition and that it is true and correct subject to
19 any changes in form or substance entered here.
20
21 Date:
22
23 Signature of Deponent:
24
25

APEX REPORTING GROUP

**A**
A's (3) 16:19 28:5 39:21
A,B,C,D,E,F,G (1) 15:11
abstract (1) 83:4
Acceptance (1) 56:11
accident (1) 87:9
account (2) 74:11 86:7
accuracy (1) 95:8
accurate (1) 69:10
acknowledged (2) 48:16,18
acknowledging (1) 48:19
acted (1) 51:6
action (4) 16:9 69:7 94:13,13
actions (1) 79:8
activities (1) 42:15
actual (3) 14:6 17:13 18:10
add (1) 16:3
additional (1) 16:10
address (4) 11:4 33:21 61:15 66:10
admits (1) 54:17
AFFAIRS (1) 1:2
affidavit (14) 16:19 17:10 18:3 28:5,7,8 37:23 38:18 39:21 41:18 43:12 44:13 47:7 74:15
affidavits (19) 5:25 7:19,21 17:12 35:21 37:7 39:1,7 39:10,11 40:21 41:10 43:17 67:24 68:1,17,22,23 80:20
affirmed (1) 3:9
aforementioned (1) 94:7
afraid (1) 31:24
AG (1) 1:3
ago (3) 30:7 31:6 56:8
ahead (2) 7:4 49:23
Alicia (1) 65:5
allow (2) 65:9 74:20
allowed (4) 36:16 40:20 84:1 88:16
allowing (1) 74:23
alphabetical (1) 5:7
ALS (1) 60:19
altered (1) 55:4
amendments (1) 95:6
amount (5) 38:24 39:4 67:4 68:4 74:15
amounts (2) 65:15 75:4
Ampersand (1) 12:17
and/or (2) 38:21 94:15
answer (5) 4:2,8 42:18 63:15 75:15
anybody (11) 14:14 24:5 30:22 39:5 45:1,2 55:9 59:3 76:10 77:15 91:22
anybody's (1) 34:16
anymore (3) 13:16 22:24 40:20
anyways (1) 79:20
Apex (1) 1:24
Apparently (1) 90:1
APPEARANCES (1) 2:1
appeared (2) 59:9 93:5
apply (1) 94:14
appreciate (1) 48:23
approximately (8) 8:10 9:13 11:16 27:13,18 85:3,12 92:7
arranged (1) 57:11
arrangements (2) 56:24 75:17
asked (1) 32:21
asking (2) 53:13 83:18
ass (1) 32:7
assigned (2) 30:6 58:21
assignment (16) 19:12,14,22 21:10 27:23 28:4 29:15 29:22 39:8 62:7 76:1,3,8,14 77:5 78:9
assignments (22) 6:2 19:1,6 20:17 21:20 21:21 24:12 26:25 28:5 29:2 31:1 39:10 54:18,23 61:1,21 62:21 75:20 76:23 78:6 78:13 80:20
assistant (4) 2:3,5 8:15,19
assisted (1) 63:19
assume (3) 15:16 24:21 74:10
assumption (2) 59:15 77:24
attached (1) 95:7
attempt (1) 16:7
attempted (1) 15:3
attempts (1) 16:7
attended (1) 71:22
attention (3) 30:2 44:3 50:25
attitudes (1) 43:3
attorney (35) 1:1,17 2:3,3,5,6,8 8:5,6,9 8:12,13,20 30:14,15 35:1,1,3,4,5,9,11,11 35:16 49:3 50:12 66:3 68:16 76:3 80:9,13 85:7 86:19 94:11,12
attorneys (32) 9:15 29:21 30:10,12,19 30:20,21,24 31:22 34:21 36:8 47:13 49:2,24 57:19,20,20 58:18,22 59:13,16 59:18 67:16,17,23 67:23 68:1,2,6 80:14 82:25 84:17
audit (2) 52:22 78:15
audits (2) 52:9,23
August (1) 12:1
Aurora (15) 5:6,8 20:2 60:11,13,17,23 61:2,6,10 62:9,10 63:4,7,10
Aurora's (1) 60:19
authority (2) 8:2 93:4
authorized (1) 94:7
automatically (3) 37:9,14 83:25
aware (49) 8:4 10:17 10:19 18:12 20:5,6 20:8,10 23:2 26:1,5 26:9,12 38:17 43:23 47:15 48:1 50:18 51:1 54:18 54:19,21 55:6 57:2 58:12,15 60:2,7,10 63:17,20,21,24 69:11,24 72:2 76:12 77:15 78:19 78:20 80:14 81:22 82:18,22 84:15 87:25 89:17 90:12 90:24

**B**
B (7) 2:5,23 37:3,4,24 42:3,5
B-U-R-K-E (1) 35:14
baby (1) 61:3
back (16) 11:19 16:17 29:9 37:2 41:11,13 41:16 46:16 47:3 61:2 63:10 79:19 79:19 84:2,12 90:1
back-date (1) 78:12
back-dated (2) 77:10 78:14
background (1) 4:10
bad (1) 92:14
badgering (1) 66:21
balance (1) 11:3
balances (2) 66:21 72:12
bank (17) 8:18 11:5 22:3 33:17 37:17 41:17,20,24,25 42:4 60:11 71:15 75:3,4 79:14,19 84:15
bank's (2) 17:25 37:18
banks (12) 6:20 16:25 17:2,6 24:6 41:12 46:16,19 71:6,8,10 75:18
based (6) 21:17 36:5 38:14 72:19 81:21 81:24
basic (2) 59:1,8
basically (12) 6:15,18 18:20 29:16,21 30:4 50:3 51:7 58:1 69:1 73:16,22
basis (3) 21:15 48:3 70:21
Beachman (1) 90:2
becoming (1) 78:20
beginning (4) 5:19 12:4 46:23 62:14
begun (1) 11:17
behalf (3) 2:2,10 81:11
behavior (1) 64:1
believe (30) 9:25 12:25 13:6,18 16:6 16:11 17:8 27:10 30:18 35:19 36:15 40:24 43:8 45:6 46:20 50:10 51:1 54:15 55:25 56:5 57:2 61:5 65:5 68:8 70:1 83:11 84:13 85:4 88:10 92:9
belonged (1) 65:11
bending (1) 91:18
best (3) 4:6 13:16 14:12
Beth (15) 24:10,16 28:11,14,15,18,22 39:5,11 43:8 44:14 44:15 55:24 56:7 77:19
Beverly (9) 29:20 30:16 34:20 40:25 51:2 58:5,17 71:21 86:11
beyond (1) 50:7
bible (9) 56:20,20,23 74:17,21,22 84:4 86:24 87:6
big (2) 27:13 47:11
bill (10) 17:9,13,14 17:16,21,24 18:6,10 73:22 82:3
billed (10) 16:15,16 17:1,2,4,14,19 75:4 83:23,24
billing (2) 82:22,25
bills (4) 17:5,16 82:4 82:6
bit (2) 56:21 75:18
Blackberry (2) 86:12 86:14
blanks (1) 23:7
bodies (1) 44:5
body (1) 48:5
bonuses (3) 47:13 81:21,24
book (1) 86:23
borrower (2) 7:9 16:22
borrowers (2) 16:17 79:14
boss (1) 89:22
boyfriends (1) 88:14
Brad (1) 83:11
break (1) 53:20
brief (1) 53:23
Briesmeister (5) 2:8 84:25,25 85:1 87:12
bring (1) 50:24
broke (2) 36:23 37:4
broken (1) 5:7
Brothers (1) 60:12
brought (3) 59:13 63:6 82:4
Broward (2) 93:2 94:4
build (1) 15:14
building (13) 9:17,18 11:20,21 25:10 29:20 51:25 52:24 56:3 60:19 79:3 88:18 91:21
buildings (1) 25:12
built (1) 81:19
Burke (2) 35:13,16
business (15) 14:17 21:14,16 26:23 38:14 53:11 72:10 72:13,15,19 81:14 85:22,23 86:1,15
buying (2) 75:13 79:19

**C**
C (4) 3:1 6:24 94:1,1
C-A-S-E-S-U-M (2) 6:17,23
C-A-S-E-U-M (1) 7:1
C-A-S-U-M (1) 7:3
C-E-R-N-I (1) 24:18
Calhoun (2) 2:12,15
call (9) 6:13 9:6 14:17 18:18 50:13 57:4 57:16 62:10 79:14
called (5) 6:10 41:14 56:20 58:8 86:23
calls (4) 13:23 14:16 18:22,23
car (1) 57:22
care (4) 7:7 47:10,12 80:11
cared (1) 48:7
cares (1) 79:20

cars (3) 59:16 82:12 89:3
case (5) 50:8 69:1 70:5,12 79:17
cases (4) 6:5 19:12 60:9 79:9
casesum (14) 6:10,13 6:14,17 7:2,6,11 10:23 21:22,22 37:20 69:16,18 70:10
casesums (7) 9:22 10:14,20 11:17 70:6,7 84:11
Caseum (1) 6:15
Cassandra (2) 49:4,6
cat (1) 6:24
caught (2) 55:22 87:8
cause (2) 3:5 30:1
caused (1) 87:25
Cerni (9) 24:11,16 28:22 43:8 44:14 44:15 55:24 56:7 77:19
certification (1) 94:14
certify (4) 93:4 94:7,9 94:11
certifying (1) 94:15
chain (1) 86:8
change (7) 18:9 20:12 21:12 25:22 33:3 38:5 96:7
changed (10) 16:2 38:4 40:17 46:18 46:21 54:23 55:16 62:17 80:3 90:2
changes (5) 38:2,6,8 96:5,19
changing (5) 20:2 32:25 65:6 66:21 72:12
charge (3) 36:13 74:19 84:1
charged (2) 16:10 84:7
charging (1) 18:9
check (1) 23:11
checked (1) 5:23
Cheryl (70) 5:23 8:1 8:25 10:11 14:11 14:12 19:10 21:14 21:24 23:20,21 24:2,3,10,15 25:1,3 26:6,15 27:1 28:3 28:10,13,15,23 30:22 31:7 36:7 38:14,22 39:2,12 40:20 41:6 42:9,10 42:12 52:5 55:2,20 57:12,13,23 58:2 62:17 64:11,11,22 66:5 68:21 70:6,21 72:2,9 79:16 80:8 80:21 81:9,13,17,20 82:2,3,19 85:20 88:7 89:18 91:8,14 91:17
Cheryl's (13) 24:10 24:12,20,24 26:10 39:5,14 47:11 55:20 69:14 75:21 79:11 81:11
choice (1) 59:17
Christina (3) 89:10 89:13,14
chronological (3) 46:17 52:20 78:15
Citibank (3) 5:9 20:19,20
claimed (1) 18:17
clarify (1) 80:19
CLARKSON (19) 2:3 3:12,16,18,22 3:23 7:5 24:18,19 27:22 48:25 49:5 49:22 53:20,24 57:7 82:21 92:3,17
clerk (1) 81:18
client (3) 5:9 62:11 76:18
clients (1) 5:11
clique (1) 82:10
close (3) 49:3 64:13 82:19
closed (5) 71:19,20 81:21 91:22,24
cluster (1) 57:3
code (1) 79:4
come (16) 5:24 14:4 21:25 28:2 32:18 44:7 47:4 58:13,14 62:3 65:7 70:11 71:13 72:15 78:14 90:1
comes (2) 16:25 21:22
coming (3) 52:10 90:25 92:17
commenced (1) 94:10
comment (1) 90:3
Commission (4) 93:12,13 94:21,22
common (3) 23:13 42:8 43:4
companies (6) 8:8 10:13 11:11 12:6 39:4 60:8
company (10) 9:1,12 9:14 12:13 25:10 61:5 62:19 79:24 81:19 89:23
comparable (1) 60:2
compassion (1) 46:10
compensated (1) 87:23
complain (2) 50:12 74:25
complaints (3) 13:22 78:5,9
complete (2) 14:8 83:8
completed (5) 7:17 14:18 34:8 84:7 94:10
computer (2) 6:18 37:18
concern (1) 64:24
concerned (1) 43:2
concluded (1) 92:21
Condescending (1) 32:6
condo (1) 85:7
conduct (1) 85:21
conference (1) 27:14
connected (1) 94:12
consecutive (1) 70:8
consider (2) 34:8 64:5
considered (1) 36:10
consisted (1) 17:16
constantly (1) 60:24
contacted (1) 61:22
contacts (1) 63:17
contained (2) 33:17 56:20
contested (3) 6:1 36:11 59:3
continue (1) 25:17
continued (2) 25:24 53:24
control (1) 94:15
controlled (3) 30:21 30:22 32:10
controlling (4) 29:21 30:19,20 58:18
controls (1) 87:6
conversation (3) 35:17 69:14 81:16
conversations (10) 10:6 26:13 56:16 85:19 88:24 89:5 90:20 91:2,5,13
conveying (1) 76:18
COO (6) 9:1 25:10,12 25:13,21 38:21
coordinated (1) 57:23
copies (3) 65:23 86:11 87:3
copy (3) 2:25 3:16,19
corner (1) 26:11
Corporation (1) 56:12
correct (94) 4:15,16 6:3 7:8,15 8:14,21 11:8 12:20 15:2,9 15:19,22 16:4 17:3 17:20,23 18:1,4 19:13 22:4,6,12 23:5,25 25:16,20 26:24 27:4,19,21,25 28:5,17,19 30:21 31:9,11,13,15,17,20 33:18 34:10,17,25 38:3,20 39:13,15,25 44:19,21,23 45:12 45:15,18 47:8,11 51:10 55:24 56:13 58:21 59:6,11 61:23 63:12 65:22 67:14,25 68:3,5,25 69:8 70:12 73:2,8 73:14,18,20,24 74:4 74:8,14,17 76:6 78:7 81:12 85:3,16 85:17 86:4 94:8 96:18
correcting (1) 52:16
corrections (1) 95:6
correctly (2) 11:18 55:18
costs (6) 36:8,21,22 37:4 38:8 39:23
counsel (6) 57:18,19 80:11,15 94:12,12
counties (2) 58:23 86:25
Country (1) 77:21
Countrywide (1) 89:15
county (16) 55:17 57:3,12,14,21,24 58:9,10 59:12 66:23 68:11,12,13 87:1 93:2 94:4
couple (2) 90:21 91:15
course (3) 34:25 85:18 89:21
court (9) 3:3 4:3 29:10,11 40:24 47:1 73:9 76:3 94:6
create (1) 10:22
created (7) 7:11,13 7:16 35:21,22 58:7 69:6
creates (1) 10:24
crew (1) 5:23
Cross (1) 2:20
crying (1) 92:15
cubby (4) 90:16,16,16 90:17
curiosity (1) 81:17
currently (1) 85:8

**D**
D (2) 2:19 3:1
D's (1) 67:16
daily (4) 13:23 26:6 48:3 70:21
Daphne (3) 49:13,14 49:19
date (13) 29:14,15 30:6,6,9 31:4,5,10 31:14,16 95:18 96:3,21
dates (9) 29:16,16,22 29:25 30:1,7 31:8 54:23,24
daughter (1) 89:16
David (62) 1:6 4:14 4:15,25 7:14 10:24 11:13,14 12:24 13:6,12,13 17:4,5 17:13,21,24 26:1,6 26:7 42:16 46:9 51:11 53:4,9,15 60:8,18,20 61:9,13 61:14,15 62:18 63:6,11 64:7,13,17 64:20 66:6 69:22 71:21 74:10 75:7 78:22 82:11,15,18 82:20,23 85:9,16,19 86:8,11 87:18 88:6 88:7,21 89:6 90:16
David's (7) 19:23 25:8 26:7,9,11 81:13 90:15
day (19) 18:22,22 21:25 27:5,7,9 31:19 62:1 66:22 70:7,22,25 80:21 81:1,8,17 89:24 93:7 94:16
days (3) 46:22,25 70:9
deal (1) 46:10
dealing (1) 8:18
dealings (1) 85:23
dealt (1) 60:11
decided (4) 22:23 59:19,21 74:18
decision (6) 14:17 38:14 72:15,19 79:8,11
decisions (4) 21:14,16 72:11,13
declare (1) 96:17
default (2) 45:23,25
defaulted (4) 16:22 46:2 58:25,25
defaults (1) 46:3
defendant (7) 15:17 15:18 17:17,17 21:5,7 34:4
defendant's (2) 33:12 34:2
defendants (1) 33:7
definitely (1) 80:17
deliver (1) 14:20
demean (1) 32:4
department (11) 1:2 6:7,10,11,12 7:6,11 69:16 75:6 83:6,8
departments (1) 52:3
depend (1) 8:18
depended (2) 21:12 21:13
Deponent (2) 95:14 96:23

deposed (1) 90:5
deposition (12) 1:12 3:3,25 54:17,22 92:21 94:8,9,9,10 96:3,18
describe (2) 88:5,25
described (8) 60:3 62:7 64:21 65:21 66:17 67:13 69:4 90:10
description (1) 25:22
designated (1) 21:24
desk (6) 23:21 45:20 65:3,7,8 91:18
detail (1) 42:23
dialog (1) 85:19
different (16) 6:6 18:23 28:12,21 29:17 30:1,8 38:13 44:9 52:2 54:13,24 55:16 66:20 71:6 78:21
differently (1) 62:6
difficult (2) 56:22 85:9
direct (4) 2:20 3:11 53:24 94:15
directed (4) 14:18 19:9 46:12 86:6
directing (1) 34:24
direction (4) 14:10 25:5 75:21 94:15
directly (3) 52:5 85:16,20
director (1) 8:25
disarray (1) 43:25
disbarred (3) 48:10 50:22 51:5
discuss (1) 55:21
discussed (2) 60:5 67:9
discussing (1) 55:22
discussion (1) 76:5
dismiss (1) 20:25
Dispersio (1) 89:14
division (1) 89:12
doc (1) 34:15
docket (9) 57:4,21 58:1,3,7,9,14,20 59:20
dockets (1) 57:16
document (8) 10:24 22:23 33:24 34:1 55:15 59:7 65:8 66:19
documentation (2) 37:7 47:1
documented (1) 65:21
documents (38) 7:11 7:13,16 9:21 10:4 10:18,23 32:25 33:3,4,17 37:10 41:21,22 43:24 44:11 45:16 51:12 51:18 60:17 62:21 65:11,14,15,16,20 67:2,7,8,12 69:6 77:8 84:22 85:25 86:15,18 87:9 92:8
Doe (16) 15:18,23 17:18 18:9 33:5,7 34:4 73:1,5,10,11 73:21 74:1,6,12,19
Doe's (2) 33:13 34:5
doing (24) 10:21 32:12 33:1,2 34:23 35:2,2 37:1 40:16 44:4,8 45:19 48:2 48:14 52:17,22 55:7 61:17 63:11 66:15 70:13 77:11 77:12 89:22
Doir (1) 82:10
dollar (1) 17:9
dollars (8) 16:6,8,9 16:15 73:23 74:1 74:21,23
door (4) 46:14 70:7 89:19 91:22
doors (3) 71:19,20 91:24
Doug (2) 2:11 48:24
drafted (1) 44:18
dress (1) 79:4
drive (1) 59:17
due (3) 3:20 32:16 72:12
duly (3) 3:9 93:5 94:7
duties (4) 5:2,17 54:5 54:7

**E**
E (9) 2:19,23 3:1,1 94:1,1 96:1,1,1
E's (2) 28:11 43:5
earlier (1) 45:11
easier (1) 67:4
easy (1) 27:9
education (2) 4:13 69:13
EDWARDS (10) 2:5 24:14,17 27:17,20 56:15 57:10 81:7 87:13 92:1
EE3599 (2) 93:12 94:21
eight (3) 27:10 80:21 81:4
eighty (2) 16:9,11
either (9) 37:1 39:9 43:10 63:2,24 80:8 83:14 85:20 86:2
elected (1) 59:17
electronically (1) 84:13
eleven (2) 9:14 51:25
else's (1) 34:3
email (9) 28:2 35:18 35:20 61:15 66:10 72:14 86:7,12,15
emails (17) 34:20,24 65:19,23 66:4,8,11 66:19,20,22 67:8 79:4 85:25 86:1,5,8 86:19
embarrass (1) 64:12
employed (1) 85:12
employee (1) 94:12
employees (8) 12:23 13:14 60:12,16 61:6 62:20,24 85:20
employment (5) 4:10 76:17 85:5,13 92:6
encrypted (2) 87:5,6
ended (2) 82:12 83:20
enter (2) 34:14 96:5
entered (6) 19:7 46:3 46:15,16 75:22 96:19
entire (4) 13:6 28:23 32:8 91:21
especially (2) 52:21 89:21
ESQUIRE (3) 2:11 2:14,16
essentially (1) 65:20
Eventually (1) 16:18
everybody (6) 33:20 33:22 49:12 51:1 54:22 69:23
evil (3) 90:20,20,20
ex (1) 20:22
ex-parte (4) 79:7,9 80:6,15
exactly (2) 10:21 61:16
EXAMINATION (1) 3:11
examined (1) 3:9
examples (3) 67:10 67:11,12
executed (8) 27:1 30:7 31:5 41:13,17 44:13,16,20
execution (1) 21:19
Exhibit (4) 28:11 37:3 43:5 67:16
exhibits (2) 28:12 45:16
expanded (1) 90:23
expect (1) 72:7
expected (1) 50:7
Expires (2) 93:13 94:22
explain (4) 5:20 42:23 43:6 55:11
express (1) 64:24
extra (3) 73:17,19,25
eyes (1) 92:15

**F**
F (1) 94:1
fact (4) 8:12,20 76:5 79:6
fair (1) 66:14
falsify (2) 33:23 34:1
families (1) 64:14
family (1) 49:13
Fannie (20) 5:6 52:12 52:13,15,21 53:1 63:18,22 76:13,21 77:2,4,19 78:2,4,8 78:19 79:2,5,19
far (24) 22:12 26:1 32:16 33:2 44:25 47:18,19 50:8,24 54:10 57:12,25 59:4,25 62:18 66:17 70:17,20 71:11 82:3 86:12 87:7 88:2 90:8
FARRAR (2) 2:12,14
fast (1) 26:21
faxed (2) 59:7,13
FDA (1) 53:7
fear (2) 48:9,13
fee (6) 16:4 17:15 67:21,23 68:4,16
feel (2) 42:16 47:22
fees (8) 15:12,15 16:5 36:8,13,14,19 67:16
feet (2) 27:18,18
felt (2) 66:12,12
fifteen (4) 8:10 70:7 80:25 81:4
fifth (5) 28:22 54:16 56:3,4,6
fifty (2) 18:24 80:20
figure (1) 36:6
figures (4) 36:1 37:6 37:23 67:24
file (39) 5:18,20,21,24 6:1,3 11:5 20:2,19 21:10,13 29:3 36:10,11 38:15 40:14 42:2,3,6,7 45:19 47:5,12 48:7 67:21 72:16,18,20 73:20 75:24 76:1,8 76:9,22 78:5 79:21 79:21 80:2 81:18
filed (13) 6:5,6 19:11 21:11 29:10 38:23 57:8 76:15,21 78:1 78:9,10 79:7
files (31) 5:12,22 6:1 26:21 27:16,23 28:1,3 40:7,13 44:9 45:20 46:24 51:19 52:12,13,15 53:2 57:5,17,22 59:15,15 62:14 65:6 67:4,11 76:20 77:2 80:4 81:21
filing (1) 77:7
fill (1) 67:21
filled (2) 17:12 68:4
filling (1) 68:16
final (8) 19:7,21 34:14 47:14 59:5 59:10 75:21,25
FINANCIAL (1) 2:8
financially (1) 94:13
find (9) 13:14 33:20 37:16 43:22 50:4 52:21 53:1 57:15 58:2
finding (1) 14:5
fine (1) 33:24
finish (1) 5:21
fire (1) 70:8
fired (4) 29:23 88:11 91:12 92:12
firm (46) 5:2 10:7 15:10 18:20 19:24 21:14 22:12 24:5 25:7 30:14,15 32:8 35:4,7 38:21 42:16 44:5 47:21 49:24 53:12 54:3,4,12,19 54:21 55:9 56:17 57:5,17,20 59:23 60:8 65:10,12 71:3 78:22 82:2,4,5 86:16 88:1,2,7,15 89:17,20
firms (4) 59:24 60:1,3 60:6
first (7) 3:9 49:18 68:9 83:11 89:14 90:16 94:7
five (9) 17:19,22 18:2 18:5 27:8 57:5,17 59:21,23
flipped (1) 79:24
floor (19) 1:17 2:4,6,9 13:6 21:24 26:14 27:6,11 28:22 44:7 54:16 55:13 56:3,4 56:6 57:20 90:12 90:22
floors (5) 13:1 27:10 28:21 54:13 80:22
Florida (16) 1:1,18 1:24 2:4,7,9,13,15 2:17 3:5 60:4 93:1 93:12 94:3,6,21
follows (1) 3:10
foreclose (1) 79:15
foreclosing (2) 20:20 79:13
foreclosure (15) 14:4 36:18 38:19 46:23 47:14 59:8 60:9 69:7 72:25 75:3,8 75:13 77:16 79:8 81:14
foreclosures (6)

56:18 57:1 58:10 62:22 64:3 87:2
foregoing (3) 94:8,14 95:5
form (2) 45:21 96:19
Fort (4) 1:18 2:4,7,9
forth (1) 94:10
forty-five (3) 16:6,15 17:9
forward (1) 41:5
fought (1) 46:1
four (9) 17:19,21 18:2 18:5 27:8 46:24 54:24 60:15 91:20
four-year (1) 89:16
fourth (2) 26:14 90:12
fraternizing (2) 88:15 89:20
Freddie (8) 5:7,8 63:18,22 76:13 77:4 78:8,20
Friday (1) 57:6
friend (1) 53:10
friendly (1) 49:2
friends (3) 82:14,19 89:25
front (7) 26:9 32:8 45:13,13 50:14 55:16 82:9
fudged (1) 46:18
further (2) 94:9,11

**G**
G (2) 3:1 12:16
G-M-A-C (1) 56:9
G&Z (4) 12:14,19,23 13:16
game (1) 80:3
GAP (1) 37:3
GAPs (1) 83:6
General (8) 1:1,17 2:3,3,5,6,8 56:11
Generally (1) 10:8
generated (2) 43:14 43:15
generous (1) 89:3
gentleman (2) 66:6 83:10
getting (10) 17:6 46:15 48:7 50:22 56:18 63:19 67:18 67:19 70:6 85:9
girl (5) 75:6 89:13,15 89:16 92:15
girlfriends (2) 88:7 88:14
girls (5) 5:14 44:7 82:18 89:2,9
give (8) 21:5 30:12 33:13 42:5,6 48:20 73:16 78:15
given (2) 6:19 18:22
giving (1) 46:7
GMAC (7) 28:22,23 56:5,7,9 77:20 79:22
GNZ (1) 12:15
go (37) 7:3 14:2,3 18:2 19:1 22:12 23:20,21 28:1,14,25 29:2 38:5,23,25 39:19 40:1,6 42:2 49:23 50:16 56:23 57:21 59:2,18 63:9 65:7 67:3 71:6 72:17 74:22 76:3 79:5 80:12 83:15 89:4,19
God (1) 86:25
goes (3) 16:17,19 81:15
going (42) 4:7 18:2 25:11 26:7,12 30:10 33:23 34:7 36:25 41:1 42:3 46:25 49:25 50:4 51:4,19 58:9 59:18 60:22 65:1 67:15 67:20 70:4,5,13,13 71:8 72:8,11,22 73:13 74:20 76:10 79:2,19 80:3 88:18 88:20 89:7,20 91:24 92:18
gonna (1) 47:23
good (7) 8:10 9:16 18:25 86:25 91:24 92:14,15
goodness (1) 27:6
gossip (1) 55:13
gotten (1) 80:2
grapevine (4) 51:24 52:1 81:23 90:1
group (2) 1:24 54:14
Guam (5) 9:25 10:5 11:7 70:1 84:12
Guan (1) 12:5
guarantee (1) 16:13
guess (13) 4:8 8:9,10 8:18 9:6,16 18:25 29:14 40:19 49:24 58:10,17 91:23
guidelines (6) 76:14 76:22 77:4 78:2,4 78:11

**H**
H (2) 2:23 96:1
hand (3) 90:2 93:7 94:16
handed (1) 6:1
handing (1) 3:16
handled (3) 57:1 59:22 77:17
hands (2) 62:17 76:4
hanging (1) 90:25
happen (2) 42:1 69:15
happened (8) 26:8 30:25 38:11 67:1 77:9 79:22,25 88:16
happening (3) 20:8 31:4 78:21
hard (2) 11:18 82:8
HAROLD (1) 2:16
head (1) 41:3
hear (18) 13:21 26:13 48:8,18 50:10 51:23,23 55:1,8,14 56:16 69:14 75:10 85:19 89:5 90:5,17 90:19
heard (9) 51:22 55:9 55:9,11 57:8,9 75:9 91:6,13
hearing (6) 12:5 40:25 42:2,4 66:22 90:19
hearings (6) 41:14 66:23 68:11,12,13 86:10
held (1) 53:23
help (1) 36:7
helped (1) 53:10
hereunto (1) 94:16
Hillsborough (1) 55:17
hired (10) 11:14 12:11,12 13:12 44:4,5 61:7,9 63:5 69:17
hiring (1) 70:16
history (1) 85:5
HOA (1) 85:7
home (11) 39:19 40:1 40:6,9,12 64:3 67:2 73:7,9,13 74:6
Homecomings (2) 54:15 56:5
homeowner (6) 16:22 17:14 18:7 38:9 46:1 73:12
homeowners (1) 46:6
honest (1) 30:5
hospice (1) 46:8
hours (4) 36:15 53:19 89:5 91:20
HR (4) 65:5,6 88:16 92:15
huge (2) 29:19 69:12
human (1) 50:8
hundred (16) 9:13,14 16:8 18:23 27:8 36:19 43:9 46:22 46:25 51:25 57:5 57:17 59:21,23 80:19,20
husband (2) 15:7 73:10

**I**
idea (4) 58:13 62:16 68:15 71:9
imagine (3) 16:25 17:6 68:18
immediately (3) 29:1 29:24 61:2
implement (1) 58:13
implementation (2) 58:3,20
implemented (3) 24:1 42:14 70:5
important (1) 66:12
impossible (1) 53:19
impression (1) 9:7
improper (1) 85:21
in-house (7) 7:24,25 12:10 19:2 43:11 43:20 57:18
inappropriate (2) 91:16,19
included (1) 74:15
including (1) 9:15
incorrect (2) 38:19 51:19
indebtedness (5) 18:3 28:8 35:22 38:18 68:22
indicate (1) 85:21
indicated (4) 85:2,15 86:18 95:6
inflated (3) 18:6,8 82:24
inflating (2) 82:22 83:1
inform (1) 30:24
information (19) 6:19 7:9 10:22,25 11:4 36:2,6 52:8 56:21 59:1,8 60:1 64:16 64:17 69:5,10,18 70:11 78:23
initially (2) 67:5 69:11
initiated (1) 29:15
initiation (5) 5:3,19 30:4 38:6 75:23
innuendos (1) 91:15
inputted (2) 69:10 83:25
inputting (1) 10:22
instance (2) 40:19 55:10
instances (5) 38:12 38:17 52:22 84:6,6
institution (1) 19:20
intentionally (1) 15:14
interested (1) 94:13
interfaced (1) 37:18
introduced (1) 63:7
INVESTIGATION... 1:6
INVESTIGATOR ... 2:8
invoice (1) 37:8
involve (1) 90:9
involved (11) 58:3,19 64:22 73:5 80:12 88:8,9,12 89:1 90:7 91:8
Island (1) 11:21
issue (5) 30:8 32:14 66:7 73:4,11
issues (4) 6:1 33:5 60:25 78:25
Item (1) 2:24

**J**
J (1) 1:6
James (3) 16:1,1 34:4
James' (1) 34:5
Jane (20) 15:17,22,25 15:25 17:15,18 18:9 33:5,7,13 73:1 73:5,10,11,21 74:1 74:6,12,19,24
Jason (2) 77:20 87:5
jewelry (1) 89:3
job (10) 4:25 25:21 32:15 37:22 46:13 46:13 53:16 56:22 67:6 85:9
jobs (6) 48:4 49:11,12 50:1 53:10 64:5
John (21) 2:17 15:17 15:22 17:15,18 18:9 33:5,7,13 34:4 34:5 73:1,5,10,11 73:21 74:1,6,12,19 74:24
judge (9) 47:2 50:14 55:17 56:21 59:14 74:22,25 84:1 87:1
judgement (10) 5:25 19:7,21 34:14 37:25 38:15 45:17 46:2,15 76:2
judgements (8) 45:23 45:24 46:14 47:14 59:5,10 75:21,25
judges (10) 33:4 34:7 56:17,19,25 57:4 59:3,9 74:18,20
July (6) 4:24 12:1 36:25 85:3,5,14
June (2) 2:3 36:24
juniors (3) 5:16 23:18 35:25
jurisdictions (2) 56:17,25

**K**
Kadian (1) 82:10
Kalandra (5) 1:23 3:3 93:11 94:6,20
Kapusta (6) 1:12 2:10,21 3:8,14 93:5

Page 101

keeping (1) 7:21
kept (1) 48:4
kick (1) 47:2
kids (2) 44:2 64:15
kind (1) 46:19
knew (23) 26:7 30:10
30:13 34:19 38:21
38:22,22 39:1,1
42:3,9,10 46:12,17
46:18 49:10 50:17
54:22 56:19 60:13
61:16 70:6,12 74:5
77:15,24 79:1 80:3
87:7
know (33) 4:5,8 6:8
8:9 9:24 10:4 11:10
11:13,15,16 12:13
13:3,14,15 14:1,15
16:5 17:2,7 18:19
19:8 20:4,7 21:16
24:1 25:5 26:2,4,20
26:25 29:12 32:16
32:19 34:18,19
35:15 36:14 40:23
42:10,18,23 44:25
47:13,16,18,19
48:19,21 56:15,24
55:25 54:2,5,5 19
58:16 59:4,25
60:10,21 61:12,25
62:1,8,18,16,19,24
62:20,24 63:15
64:21 69:11,15,17
69:21,22 70:3,13,17
70:16,20 71:13,18
72:1,3,5 75:7,15,16
75:23 77:9,23 79:8
80:17 81:20,25
82:5,9 83:20 84:6
84:13 86:17,17
85:16,23 90:2,4,8
92:4
knowing (2) 30:3
44:7
knowledge (3) 13:17
14:13 68:19
known (2) 11:14 90:19
knows (2) 21:17 90:19
Knox (1) 2:17

L
L (1) 5:10
L10-3-1145 (1) 1:3
lady (1) 83:13
landfair (3) 76:19
77:23 78:16
large (6) 3:5 46:5
57:3 67:4 86:23
94:6
larger (2) 70:6,13
largest (1) 58:10
Lauderdale (4) 1:18
2:4,7,9
law (11) 16:7:14

15:10 17:12 36:12
45:18 51:9 53:12
56:1 60:3 71:3
84:12 89:11
lawsuit (2) 19:21
20:12,25
lawyer (1) 9:3
lawyers (7) 31:21
32:9,13,14 38:21
47:16 48:8
lead (3) 31:21 56:2
63:7
leads (3) 77:18 82:1,7
lean (1) 90:18
learn (2) 76:12 91:16
learned (1) 77:10
learning (1) 50:14
leave (2) 20:13 92:13
leaving (1) 20:16
Lee (4) 57:3,21 58:9
59:12
left (15) 9:13 32:20
40:17 45:20 49:24
49:24 64:24 65:2
65:12,17 68:23
72:20 92:5,5,16
legal (3) 12:2 41:2 79:6
legally (1) 47:22
legitimate (1) 74:2
Leman (1) 60:12
lender (4) 6:3 10:24
10:25 19:22 18:7
70:11
lender's (1) 11:3
lenders (5) 7:19 8:8
19:23 31:18 36:3
Let's (3) 16:15 19:1
letter (1) 18:20
level (1) 85:22
lie (1) 52:21
life (1) 11:19
line (2) 72:14 96:7
lis (8) 6:5 8:7 19 11:1
76:20 77:5,7 78:1
list (1) 82:8
listed (1) 74:3
listened (1) 52:3
listening (1) 49:1
litigate (1) 50:15
litigated (6) 36:14
64:3
little (2) 61:8 86:8
live (1) 15:4
lived (3) 43:7 63:3,5
living (3) 73:6,12
74:6
load (1) 57:22
loaded (3) 42:19
47:23 59:16
loads (3) 50:8 70:5,12
Loan (1) 1:6

loans (1) 14:3
local (1) 17:19
localized (1) 11:21
28:21
long (6) 21:13 27:18
51:24 52:1 59:2
90:1
longer (1) 4:17
look (7) 3:15 24:12
32:7 59:21 59:14
60:16 72:18
looking (2) 11:19
56:22
loop (1) 26:11
lose (1) 43:20
lost (7) 43:4,6,11,11
43:13,17 44:12
LOU (2) 1:12 3:8
lumps (1) 64:12
LVONS (6) 2:11,12
2:14,14,16 92:20

M
M (1) 2:3
M-C-C-O-M-A-S (1)
93:11
Mac (7) 5:7 63:18,22
52:13,15,21 53:1
63:18,22 76:13,21
77:2,4,10 78:2,8
78:19 79:2,5,20
mail (1) 21:7
main (3) 33:12 34:2,4
majority (1) 66:5
manager (4) 6:10
56:2 65:6 77:20
managers (4) 65:15
manager (1) 6:8
Manpower (1) 33:4
March (3) 4:22 41:2
84:25
married (4) 35:15,16
89:8 90:3
MARSHA (1) 2:14
Mary (2) 15:24,25
match (2) 29:15 31:8
matched (1) 37:23
matter (4) 31:18
74:12 79:7,17,18
McComas (4) 29:20
30:16 58:5,18
mean (16) 21:7 26:2,12

30:15 32:1,2,24
34:1 35:7 40:4,5
51:3 53:16 66:7
82:6,9 91:19 92:23
92:6 88:11,16
measure (1) 64:4
means (3) 94:14
medecre (1) 33:10
meeting (3) 29:19
30:25 71:13
meetings (2) 50:16
58:12,15 71:14,17
71:23,25 72:4,6
78:24 79:1 85:19
member (1) 54:19
membered (2) 63:12
43:8
MERN (1) 22:5
men (3) 14:9 62:14
83:8
meow (1) 62:11
messy (1) 62:11
met (19) 29:13 41:11
mile (1) 28:10
military (1) 34:9
militaries (1) 47:3
military (9) 33:6,8,10
33:14,15,24 34:1,15
62:8
mill (1) 54:23
mind (1) 53:2
mine (2) 54:5 91:24
Minneapolis (1) 61:8
minute (1) 53:23
Mirors (9) 29:20
30:18 34:20 41:1
51:6 66:11
misconduct (2) 90:6
90:9
mishope (1) 46:25
mistaken (1) 35:17
mistaking (3) 56:6
86:10 89:17
modifications (1)
14:3
moment (1) 62:25
money (1) 77:25
47:2 78:20 76:16,9
78:3,6,10
mortgages (4) 6:2
43:24 44:8 78:8
mortgages (2) 73:16
74:5

motion (3) 5:24 37:25
40:15 76:2
motions (3) 45:17
70:7,9 80:7,13
Mowtos (1) 6:10
move (1) 11:25
moved (1) 11:20,23
movement (1) 6:12
moving (2) 26:21
47:11
MSJ (1) 37:24
MSs (1) 46:14
multiple (1) 15:21

N
N (2) 2:19 3:1
name (26) 2:20 3:13
11:10 22:24 24:10
24:12,24 33:13
33:3,3,6 35:16 39:9
39:14 48:20 49:4
49:18 55:20,20
52:5 57:3 80:6,22
83:11,12 89:11
named (1) 33:7 66:13
89:13
names (7) 18:18
24:14 39:12 69:17
62:24 23 82:8
narry (3) 21:4 66:25
51:3
Nation (2) 30:18,20
79:22
nature (4) 6:11 67:8
88:25 91:5
necessarily (1) 78:17
need (5) 4:2,4 18:20
20:21 78:11
needed (9) 26:24
40:15,16 61:1,3,21
62:9,21 76:8,8
needs (3) 51:7 53:3
53:5
negativer (1) 56:5
net (3) 29:11 31:24
26:6,21 29:21,22
49:16 52:3,23 57:7
73:5 78:24 82:3
91:11,13
new (3) 11:20 25:10
82:12
newbie (2) 59:13,17
nice (4) 43:11 51:2
51:24 83:14
nickel (1) 71:3
night (1) 91:12
nights (1) 41:20
NKA (2) 33:7 34:13
non-contested (1)
36:17
None (2) 11:18
North (2) 2:12,15
notaries (4) 22:7,12
23:3 27:24

APEX REPORTING GROUP

Page 102

notarized (5) 45:5,7,8
47:9 68:2
notary (17) 1:24 3:4
22:23 23:1,13,19
23:1,23 29:14 30:8
31:12 41:20 54:9
54:11 93:12 94:6
94:21
note (12) 43:11,11,12
43:17 44:12 47:2
76:15,22 78:3
78:6,10
notes (9) 43:4,6,24
72:4,7
notice (2) 21:6,8
notices (1) 16:9
nuisance (2) 18:16,21
number (7) 33:9,16
34:2,5,12 47:14
81:21
numerous (3) 15:4
65:16 90:11

O
O (1) 3:1
observed (2) 64:1,25
obviously (6) 16:7
40:12 46:18 51:20
61:16 65:17
occasionally (1)
29:12
occasions (1) 51:16
occupied (1) 13:17
occupy (1) 13:15
occurred (1) 78:18
occurring (1) 52:2
offer (1) 52:8
office (41) 11,17 2:3
2:6,8 10:24 11:6,8
13:7 25:24 26:6,9
26:10,18 28:13
29:13 37:24 41:5
41:9 45:25 46:5,13
51:15,20 52:16,17
55:10 62:23 65:25
64:14 66:7 73:8
73:12 82:17 82:19
89:1 21,25 92:9
90:19 91:11,13
92:24,25 93:10,13
15:7

P (1) 3:1
P.A (1) 1:6
P.M (1) 92:16
padded (1) 73:16
page (8) 2:24 39:20
39:22 41:18,19
42:3 47:3 96:7
paid (2) 29:12 44:10

paperwork (1) 40:14
par (1) 64:5
paragraph (13) 42:2
5:1 9:12 23:8 37:22
38:22 40:11 51:21
54:6 55:24 75:11
81:13 91:21
paralegal (5) 45:22
paralegals (6) 5:11
30:22 34:22 35:24
35:25 62:17
part (7) 16:20 20:23
22:18 27:19 67:6
76:11 87:3
parts (2) 35:2 40:2
party (3) 6:6 34:3
70:17
particular (6) 56:17
56:25 60:11 68:6
77:13 90:24
particularly (2) 64:22
79:23
parties (1) 94:12
partly (2) 21:8 60:22
partially (3) 30:22
36:3
pawn (2) 30:6 32:12
party (1) 64:24
passed (2) 58:2 58:19
paying (3) 30:2 44:10
44:11
payment (1) 38:9
payments (2) 66:7
68:2 13
pays (2) 16:23 17:5
pendency (6) 6:5 8:7
19:11 76:20 77:5,8
78:1
people (46) 13:1,23
13:4,18 15:17,18
18:24 23:10 24:9
25:1,3,3 31:11,24
32:19 44:4 48:20
50:7 51:25,25
52:6,24 61:10
62:22 65:24 66:6
66:7,8 76:16 71:22
72:6 73:6 79:5,10
80:2,13,19,22
81:2,5 82:14 82:22
83:2 84:6,8 87:21
89:1,21,25 92:9
percent (2) 16:3 43:9
43:9
percentage (1) 18:14
perfected (1) 14:10
periodically (1) 29:12
perjury (3) 90:7
permitted (1) 36:13
person (7) 18:19
23:11 34:12 52:17
73:17 83:12 87:6
personal (5) 43:24

34:19 61:9 81:22
personnel (2) 64:9,10
pertain (1) 66:20
pertaining (2) 6:2
87:2
ph (1) 89:14
Philippines (7) 10:2,3
10:5 11:7 12:6 17:1
84:1
phone (4) 1:25 13:23
14:16 46:7
photocopied (2)
41:21,23
picked (1) 59:16
piled (2) 27:15,20
Pine (1) 11:20
place (5) 21:24 50:4
53:8 76:22 94:10
placed (1) 44:8
places (1) 69:13
plaintiff (15) 19:16,18,20,22
20:15,18,21 79:22,10
21:4 22:20 37:9 40:6
plan (1) 44:7
planet (1) 88:7
please (3) 4:22 32:20
planned (4) 8:12 63:2
89:2
pleaded (1) 62:12
pledged (4) 7:17,19
37:13 38:1
pledges (1) 16:25
plugged (4) 7:10 37:9
37:13 38:1
plugs (1) 6:19
point (7) 28:1 29:19
36:24 41:9,11
77:13 78:19
policy (1) 88:15
Poor (1) 30:2
position (2) 9:1 55:7
possession (2) 41:16
possessor (2) 4:8,18
possibility (1) 50:21
postage (2) 66:7,8
posted (1) 32:23
postures (2) 8:3,6,9,12
24:21,22 62:4
present (2) 3:7,8,14
presented (1) 66:5
pressuring (2) 24:23
pretend (1) 24:19
prevented (1) 67:4
previous (1) 38:2
previously (4) 33:22

prepare (1) 10:16
prepared (7) 6:8 7:20
9:21 10:5 19:2
21:21 57:17
preparing (3) 9:22
10:14,20
pretty (6) 23:16
25:24 35:22 83:10
87:8 89:16
principal (2) 11:7
72:12
printed (2) 33:7,11
printing (3) 87:8
prior (4) 67:17,19,20
77:8
privy (8) 24:25 40:23
51:20 55:14 59:24
36:1,3,4 47:11
privvision (2) 9:14
problem (5) 29:14
41:21 46:4 69:12
problems (4) 53:10
53:1 56:18 87:25
procedure (2) 16:14
procedures (1) 64:23
process (3) 13:5 28:10
65:23
produce (6) 27:5 48:6
48:6,6
program (3) 33:11,11
57:15
proper (3) 42:11 47:2
83:19 74:8
property (2) 76:17
82:18
properties (5) 75:2,8
75:13 82:10,93
propose (1) 74:9
propped (1) 74:8
15:5,7,17
protect (1) 18:19
ProVest (3) 12:14,22
12:23 13:8,10,13
provide (1) 10:16
provided (1) 10:25
provider (3) 12:14,24
12:23 13:8,10,13
pulled (1) 31:1
purchase (1) 75:2,7,8
99:3
purpose (1) 60:14
purposes (2) 71:2
95:7
pursuant (1) 78:2
put (17) 4:23 5:2 22:1
33:12,20 37:15,16

APEX REPORTING GROUP

Page 103

41:18 57:25 69:5
69:17 74:25 75:1
77:23,25 84:4
Q
question (9) 6:5,7
42:18 47:23 63:16
62:19 76:20 83:16
92:11
questions (1) 21:18
75:5 79:12
quick (3) 27:17,19,19
quickly (2) 52:10
61:21
quit (2) 42:16,19
quite (4) 43:18 71:14
74:25 88:6

R
R (5) 2:8 3:1 94:1
96:1,1
R-I-G-A-U-D (1)
49:9
ran (1) 42:13
re-execute (1) 42:7
reached (9) 5:19 8:16
33:25 57:6 59:21,5
96:17
readback (1) 22:14
ready (5) 27:21 51:3
31:23 32:22,24
reads (1) 42:10
real (1) 86:8
reality (1) 59:16
realize (1) 76:8
really (26) 12:14
31:23 32:22,24
46:14 50:19 52:14
54:25 55:5 61:14
63:15,17 65:5
73:18 78:6 87:13
87:14,17 96:7
realize (2) 41:24
86:13
reason (6) 46:5,7,17
58:13 65:12 73:25
recall (4) 31:12 38:3
45:25 90:19
receipt (1) 69:15
receive (2) 44:5 66:16
received (6) 44:3,7,11
44:12 66:7 68:2
receiving (1) 69:9
recently (1) 43:11
recess (1) 53:23
recipient (1) 69:9
reckon (2) 65:13 77:9
recognize (1) 37:9
record (11) 16:9 76:13
16:12 22:18 37:17
76:14 79:14,15,19
96:7
recorded (3) 22:15
76:1 76:3
recording (2) 22:14

32:17
recording's (1) 22:15
recreate (1) 41:24
red (1) 32:11
reduced (2) 94:14
redirect (1) 75:6
reestablish (2) 6:24
7:1
refer (1) 48:19
referred (2) 29:4,8
reflect (3) 16:9 78:10
80:9
reflected (1) 77:13
reflecting (1) 78:15

refused (3) 33:23
35:2 92:8
REGAN (11) 2:16
6:21,24 7:1,3 49:18
49:21 56:9,11,14
81:3
regard (3) 85:25
regardless (3) 31:10
47:4 51:9
regular (2) 21:15
regularly (1) 91:13
regulations (8) 83:22
83:23,25 84:2
related (1) 86:20
relationships (3)
87:6,24
relative (2) 94:9,12
relatively (1) 91:16
remember (2) 92:5
92:25
remembered (1)
67:14
removed (1) 89:23
removing (1) 65:8
repeat (2) 48:6,9
repeated (1) 41:18
reported (21) 1:22 94:3
94:6,15
reporter (4) 3:4 4:3
94:6 96:1,4,4
reporting (2) 1:24
94:7
reports (1) 67:3
representation (1)
71:15
reproduction (1)
94:14
request (4) 45:6,7,20
68:15
requested (1) 45:22
require (2) 85:4,5,11
48:1 90:17
required (4) 5:23
33:6 51:9
requiring (1) 33:3
research (2) 53:16
85:19
respond (1) 29:21
responded (1) 46:4
response (2) 47:22
responsibility (1)
50:6
responsible (5) 5:3,18
50:7 51:11
respossing (1) 69:9

R
secret (1) 26:14
secretary (1) 15:19
security (6) 33:9,16
33:16 34:5,5,12
see (10) 6:8 24:4 37:17
42:24 39:18 51:22
56:1 61:8 76:17
90:20
seeing (2) 64:23 89:23
seen (3) 39:13 85:10
87:7
self-serving (2)
13:21,13
send (3) 66:20 68:6
send (1) 66:15,18
sending (1) 41:20
sense (9) 26:13 61:7
61:14 77:6 76:7
76:8 89:11,16
sensitive (1) 68:8
sent (15) 45:6 68:2
66:18 68:7 76:20
77:6 68:6,8
sentence (3) 33:17
separate (1) 37:14
separated (1) 89:7
served (3) 19:24,25
14:6,23 15:18,19
serves (2) 14:20
16:10 18:15,23
16:14 46:1,7
service (22) 13:5,21
14:6,9,10,17,20
15:18,21 16:25
17:4,7,10,14
18:15,18,19,23
32:21 43:25 52:7
68:8
serving (2) 15:16
16:18
set (3) 67:10 94:10,11
sets (1) 17:2
settle (1) 56:9
several (2) 34:16 63:4
sexual (1) 90:6
shaded (3) 33:18
sheet (1) 55:24
sheets (1) 53:24
Sheryl (1) 64:16
shoved (1) 66:6
showing (1) 51:11
showed (1) 86:3,5
shredded (2) 51:17
34:10
shore (4) 62:2,15
51:18
Siders (1) 31:6
side (4) 15:10,16
67:16,22,25
sign (14) 25:2 21:23
22:11,10,25 24:16

23:20,20 24:5,7,11
24:23 26:18,24,25
28:13 21:24 25:4
23:15,22,23,24,25
29:16,18 30:13
31:11 36:23 31:5
44:18 45:8,22 46:3
46:6 59:6 60:15
54:6,9 68:5 65:16
68:13 90:17
signature (6) 7:12
19:21,22,24 20:20
22:20,25 23:2 24:3
24:21 37:6 45:25
46:1,7 68:11
signed (13) 5:13 7:3
7:3 19:2 45:1 45:4
56:6 90:19
signing (4) 31:18 37:5
signs (1) 23:1
similarly (1) 82:1
simple (1) 41:5
simultaneously (1)
53:15
single (2) 26:17
70:15
sir (2) 48:22
sit (1) 20:25
sitting (7) 20:20
48:10,13 13:18
74:4 85:11 86:17
situation (2) 69:13
90:14
size (1) 91:4
sized (3) 31:5 34:15
slab (1) 91:5
slides (1) 53:24
slipped (1) 67:5
small (1) 86:21
smooth (1) 50:13
solid (1) 83:10
somebody (8) 17:5
24:9 24:10,14,18
47:7 67:1 80:8
someone (5) 13:11
24:19,25 46:8
60:21
somewhat (5) 33:9
47:3
sorry (2) 4:16 83:15
sort (1) 90:15
sorted (1) 27:7
sound (2) 22:23
26:9,11 89:15
sounds (2) 26:11
89:16
source (1) 62:9
South (2) 1:17 2:11
South (1) 2:11
South-east (1) 2:11

APEX REPORTING GROUP

Page 104

source (1) 62:9
Southeast (1) 1:17
2:4,6,9
speaks (1) 65:13
spending (3) 9:9
47:16,18
speak (2) 62:10
speaking (3) 9:9
47:16,18
47:22,25
spelling (1) 6:23
spend (1) 9:9
splint (1) 42:10
spoke (2) 45:25 46:8
spot (3) 21:24 27:12
67:6
spots (1) 27:15
spread (2) 27:15,17
square (1) 58:16
stack (3) 27:10 31:11
31:24
staffs (1) 27:15
stamp (3) 22:14 23:5
23:7,19 67:22
stamped (1) 66:19
stand (1) 86:3
standing (1) 72:7
Standard (3) 3:5 84:2
84:3
start (2) 33:12 84:23
started (6) 4:25 42:19
53:14 60:11 76:16
79:1
starting (1) 33:12
state (7) 3:13 13:6
16:24 17:1 79:6
93:12 94:2
stated (1) 36:24
statement (2) 21:12
42:2
states (3) 9:18 62:15
83:17
station (1) 34:18
stationed (1) 34:18
statute (1) 85:22
stay (1) 30:16
stayed (1) 30:16
staying (1) 30:3
Stephanie (2) 35:15
35:16
steps (1) 85:4
stick (1) 67:25
sticking (1) 67:6
stipulate (1) 3:13
stipulated (2) 3:11
3:12
stole (2) 43:25 44:1
stone (1) 71:3
stood (1) 72:7
stop (1) 67:17
stopped (3) 53:14
76:16 79:1
store (1) 27:22
stored (1) 27:23
straight (4) 23:16
50:2 50:5 87:8
street (2) 11:20,22

Sweat (5) 24:10,16
28:20 41:15 77:19
Switch (1) 47:25
switched (3) 19:23
swore (6) 3:9 88:18,20
88:22,22 90:20
system (1) 6:11 7:9
93:17
T
T (5) 2:23 94:1,1 96:1
96:1
T-A-C-O (1) 49:16
T-A-K-O (1) 49:17
take (9) 3:25 4:2 17:2
17:14 37:3 53:25
54:1 91:12 92:13
taken (6) 22:15 24:9
91:12 94:4,5,13
takes (1) 91:16
taking (1) 3:23 44:2
talent (1) 91:7
talk (1) 79:12
talkative (1) 64:17
talked (13) 16:18
58:25 76:24 79:7,20
88:8 89:20
talking (20) 9:7 32:13
37:22 36:21,25
53:14 61:9 74:4
80:2 85:20 88:8
89:19 91:12
tallest (1) 71:3
tape (1) 44:16
tax (2) 44:5,6
taxes (3) 43:23 44:4
44:10
TCFM (2) 5:9 20:3
team (2) 5:3 65:14
techniques (1) 87:24
technology (1) 93:17
tell (16) 13:24 18:17
19:7 24:2 26:9
31:23 36:18 40:14
46:24 61:12 67:24
68:4 80:7 85:11
86:14 89:20
telling (4) 18:17,19
54:22 87:5
tells (1) 66:6
term (1) 92:15

testified (3) 3:10
77:22,25 79:21
testify (3) 49:7 93:1
testimony (4) 5:4,5
18:18 84:17,23
Thank (3) 49:21
56:11 92:15
Thanks (1) 92:20
THERESA (1) 2:5
they'd (2) 16:3 37:5
78:14
thing (6) 43:11 53:8
55:10,11 63:14
87:8
things (24) 13:2 14:9
42:11 50:2 53:16
60:16 62:20 63:9
63:20 64:22 66:6
66:12,16 83:3 87:5
88:9,13,14
think (26) 4:17 10:19
21:4 29:11 30:9
34:7 38:23,24 39:2
39:14 40:8 44:19
50:15 56:25 59:2
61:10 63:3 65:21
69:5 77:9,17 78:20
88:22 89:13 90:22
thinking (2) 61:9
85:23
third (3) 6:6 34:3
70:17
thought (7) 46:7 54:5
59:16 62:12 73:25
74:7 90:14
thousand (3) 58:16
91:5
three (8) 34:16 58:16
61:5,10 69:11 83:3
threshold (1) 62:6
throw (1) 67:17
thumb (1) 71:7
tie (1) 56:2
time (35) 4:19 11:18
12:24 14:4 18:2,12
24:11 27:19,21
28:9 30:10 36:15
40:7,10,20 41:20
41:25 42:1 48:4
48:19 51:19 53:22
53:23 58:2 59:5,6
69:5,6 71:4,4 77:4
84:16 92:16 94:5
time's (1) 53:23
timely (1) 71:7
times (5) 34:16 53:21
58:16 65:22 69:11
title (2) 43:24 74:2
titled (1) 6:1
today (4) 3:24 30:7
80:13 83:15
today's (2) 9:9 47:16
together (5) 15:11
37:14 67:10 89:25
told (19) 18:17 19:5

APEX REPORTING GROUP

53:3 75:19 76:16
76:24 77:12
uncomfortable (3)
32:20 42:17 47:22
underpaid (1) 50:11
undersigned (1) 93:4
undersigned (3) 4:5,7
15:6 17:11 73:15
understanding (1)
59:1
understood (1) 68:21
unemployed (3) 85:8
85:11,13
unknown (6) 15:23
15:24,25 16:1
17:17 34:14
unpaid (2) 11:3 58:25
unwilling (1) 42:17
UPB (5) 11:2 37:19
38:6,12 66:21
UPBs (1) 11:1
unable (1) 41:6
use (6) 4:4 12:8 34:11
51:14 54:11 68:12
usually (2) 7:20 19:14

**V**
vacations (1) 64:15
Vanesse (2) 82:2,9
Vargas (10) 66:6
82:11,19 88:7 89:6
90:17 91:1,3,8,14
vendetta (1) 43:1
VendorScape (3)
76:19 77:23 78:16
verbally (1) 4:2
view (3) 23:23,23
vindictive (1) 63:25
vindictiveness (1)
64:9
visit (3) 71:6,10

**W**
wait (3) 81:3,3,3
waive (1) 92:19
walk (3) 5:21 91:23
want (13) 4:4 9:20
12:1 19:4 22:23
33:3 41:2 60:23
67:15 78:17 89:14
90:4,5
wanted (4) 30:25
32:25 51:7 59:14
warm (2) 44:5 48:5
wasn't (23) 17:18
23:1 25:1 29:11
33:23 34:6,23
40:20 46:11 59:17
53:13 57:14 59:13
59:17 60:5 76:1
80:4,5 83:13,16
88:15 90:24 92:7
watched (1) 87:7
watching (1) 22:7

water (1) 4:4
way (16) 14:5 30:3
32:3 39:20 41:1
43:15 45:9,10,21
48:2 64:20,23 67:5
76:6 77:16 87:10
we're (3) 34:7 45:19
78:16
we've (1) 65:18
wee (1) 67:2
week (2) 59:18,19
weekends (1) 47:17
weeks (1) 92:7
went (15) 17:10 36:20
39:9 46:9 57:19
61:7,9 63:10 64:15
69:23,24,25 70:3
83:10 87:19
weren't (15) 14:1,8
14:25 23:3 32:23
33:1 36:25 43:1
51:18 66:14,15
77:7,11 82:25 83:7
WHEREOF (1)
94:16
wide (2) 27:18 77:22
wife (1) 15:8
wise (1) 74:18
witness (22) 3:16
4:17,25 5:7 6:3
22:21,22,24 24:16
27:19,21 45:13
48:24 49:1,20
53:22 56:10,13
81:6 93:7 94:7,16
witnesses (3) 23:17
23:24 27:24
women (1) 90:9
word (3) 6:16 75:12
87:11
words (6) 11:1 15:24
38:7 67:20 75:25
78:13
work (19) 4:17 11:9
40:11 43:1 44:5
50:5 52:5 53:4,8,15
54:4 60:1 61:10
69:16 76:16 83:5
85:15 89:12,24
worked (28) 4:15
21:20 35:11 40:9
43:7 46:8 47:17
53:4,6,12,19 54:3
60:17,19 62:19
63:23 64:6 67:2
70:21 77:1 81:13
83:13 85:2,7,9
88:21 89:14 90:13
working (10) 4:19
9:19 44:2 46:8
51:25 52:24 64:1
77:13 83:18 92:7
works (1) 54:3
worried (1) 50:21

wouldn't (9) 20:25
32:18 34:11,14
41:13 52:14 65:9
80:12,17
WRITE (1) 96:5
wrong (5) 42:3 48:2
52:17 66:16 92:10

**X**
X (1) 2:19,23

**Y**
yeah (34) 6:15 11:23
12:18 15:13 18:25
19:3,19 20:24 21:4
23:1 32:7 35:15
39:4,9 40:3 42:21
48:17 49:11 50:3
50:20 51:13 52:9
56:19 60:3 71:4
77:2,18 80:24 81:2
82:1 84:8 88:10,22
91:4
year (4) 36:25 41:4,5
50:16
years (3) 4:11 46:8
56:8
yell (1) 32:4
yelled (1) 46:6
young (3) 44:2 89:2
89:15
Yup (1) 72:24

**Z**

**0**
06/23/14 (2) 93:13
94:22
08 (6) 4:20,21,22 12:3
12:4 85:3
09 (5) 4:24 12:4 85:3
85:6,14

**1**
1,650 (1) 37:1
1:58 (2) 1:16 92:22
100 (1) 2:17
10th (1) 1:17
110 (4) 1:17 2:4,6,9
12:11 (1) 1:16
175 (1) 36:15
19th (1) 41:2

**2**
2010 (3) 1:16 93:8
94:16
22 (1) 1:16
22nd (2) 93:7 94:16
241 (1) 2:17

**3**
3 (2) 2:21,25
32301 (2) 2:13,15

32203 (1) 2:17
325 (2) 2:12,15
33301 (6) 1:18 2:4,7,9

**4**
475 (1) 36:23

**5**

**6**
6th (4) 1:17 2:4,6,9

**7**
7th (1) 85:14

**8**

**9**
900 (2) 11:21,22
954,467.8204 (1) 1:25
9th (3) 2:4,6,9