# EXHIBIT H

# TO THE DECLARATION OF

# JOHN W. SMITH T

IN THE SUPREME COURT OF FLORIDA
(Before a Referee)

THE FLORIDA BAR,

    Complainant,

v.

DAVID JAMES STERN,

    Respondent.

_____/

Supreme Court Case
No. SC13-643

The Florida Bar File Nos.
2010-51,725(17I); 2011-50,154(17I);
2011-50,213(17I); 2011-50,216(17I);
2011-50,511(17I); 2011-50,695(17I);
2011-50,850(17I); 2011-50,949(17I);
2011-51,192(17I); 2011-51,322(17I);
2011-51,329(17I); 2011-51,369(17I);
2011-51,433(17I); 2011-51,497(17I);
2011-51,696(17I); 2011-51,868(17I);
2012-50,144(17I).

## REPORT OF REFEREE

I.  SUMMARY OF PROCEEDINGS

Pursuant to the undersigned being duly appointed as referee on May 1, 2013 to conduct disciplinary proceedings herein according to Rule 3-7.6, Rules of Discipline, a final hearing was held from September 30 through October 4, 2013.

All items properly filed including pleadings, recorded testimony (if transcribed), exhibits in evidence, and the report of referee constitute the record in this case and are forwarded to the Supreme Court of Florida.

The following attorneys appeared as counsel for the parties:

On behalf of The Florida Bar:

> Randi Klayman Lazarus
> The Florida Bar
> Fort Lauderdale Branch Office
> 1300 Concord Terrace, Suite 130
> Sunrise, FL 33323

On behalf of the Respondent:

> Jeffrey Allen Tew
> Tew Cardenas, LLP
> 1441 Brickell Avenue, Floor 15
> Miami, FL 33131

## II.    FINDINGS OF FACT

The Florida Bar presented a compelling case of conduct that prejudices the administration of justice with the burden of proof being clear and convincing. Conduct prejudicial to the administration of justice is defined as conduct that prejudices our system as a whole. The Florida Bar v. Machin, 635 So.2d 938 (Fla. 1994).

The Florida Bar's seventeen-count Complaint can be broken down into three categories of alleged misconduct. First, the Complaint raises issues with associate attorney mistakes and/or misconduct in the handling of foreclosure matters. *See* Count I (relating to the alleged failure to supervise which the Florida Bar maintains led to the other specifically enumerated acts of negligence or misconduct); Count IV (independent experts failed in some instances to properly review files prior to

executing reasonableness attorneys' fees affidavits); Count V (failure of

"Plaintiff's attorney who is responsible for the file" to appear at a Case

Management Conference in person in 16 cases); Count VI (associate attorney had

ex parte communication with the Court, failed to adequately inform the Court of

legal requirement of verifying foreclosure complaints and of opposing counsel's

objection to a motion for leave to file an amended complaint, and failed to attend a

telephonic hearing); Count VII (associate attorney checked the wrong box in a

certificate of compliance, thus failing to indicate that mediation was mandated in

the foreclosure case); Count XII (associate attorney failed to correct an error in a

foreclosure case where the wrong individual was improperly served with process);

Count XV (associate attorney failed to properly indicate to the court that the

property was tenant-occupied); Count XVI (associate attorney communicated

directly with defendant, despite information that defendant was represented by

counsel, by providing a notice of sale and mediation directly to the defendant).

Second, the Complaint raises issues with non-attorney mistakes and/or

misconduct in the handling of foreclosure matters. *See* Count I (relating to the

alleged failure to supervise which the Florida Bar maintains led to the other

specifically enumerated acts of negligence or misconduct); Count II (relating to the

filing of documents which were improperly executed and/or notarized by Ms.

Samons and/or other staff of the Firm); Count III (improperly notarized assignment

of mortgage filed in public records); Count IV (independent experts were improperly notarizing reasonableness attorneys' fees affidavits); Count XIII (The failure to adhere to a term of settlement payment requiring that funds be held in escrow until a satisfaction of mortgage was provided to defendant); Count XIV (The staff failed to timely release a lis pendens and the same failure as to reinstatement of a mortgage).

Third, the Complaint raises issues with Mr. Stern's failure to tend to and/or withdraw in each of the pending foreclosure cases for which his office was counsel of record after termination. *See* Count VIII (foreclosure sale cancelled in February 2011 for failure to prosecute case or properly withdraw); Count IX (failure to appear at court ordered mediation or trial in sixteen cases during the month of December 2010); Count X (failure to withdraw in 100,000 pending cases); Count XI (failure to respond to order to show cause issued by Court of Appeal in January 2011).

This case aptly illustrates the manner in which one attorney, David Stern, either in his capacity as the sole managing partner of his firm or in his individual capacity, created chaos on the courts of the state of Florida, prejudicing the whole system as a whole. Six circuit court judges testified in these proceedings.[1]

---

[1] Former Chief Judge Martha Lott, now retired, intended to appear live but a family emergency prevented her appearance. Judge Lott appeared telephonically.

Respondent's position that "only" six judges complained is evidence of his inability to fully grasp the magnitude of his actions.

Judge Stanley Griffis, Circuit Court Judge of the Eighth Judicial Circuit of Florida, had extensive problems with the attorneys of the Stern law firm. Between July 2009 and December 2009, Judge Griffis dismissed 15 cases for the failure of counsel to appear at case management conferences. Each order referenced the prior dismissals. However, it took five months for Mr. Stern to contact Judge Griffis to arrange a meeting regarding the dismissed cases. No explanation was provided for the failure to appear. Mr. Stern's attempt to resolve the problem by assigning attorneys to the caseload does not absolve him of the responsibility for the commission of violations of the rules for these actions. He failed to determine, if any other administrative procedure, i.e. improper or no calendaring, needed adjusting. Judge Griffis testified that despite the accommodations i.e., telephone hearings and block settings, the competence level remained unacceptable forcing him to "train" Mr. Stern's associate attorneys. The assigned attorney failed to know about the case resulting in resets and delays. The pleadings were not correct. The affidavits were problematic i.e. lost notes. The problems continued resulting in dismissals with prejudice. This problem continued in other circuits as supported by Judges Cox, Davis, Kanarek, and Francis testimony.

Judge Brian Davis of the Fourth Judicial Circuit of Florida was confronted with unethical and incompetent representations by a Stern firm associate who misstated the status of the proceedings and failed to alert the Court of Defendant's objection to the motion.   The attorney failed to appear in court despite proper notice and authorized telephonic appearance.  Judge Davis awarded attorney's fees as a sanction because of the bad faith conduct.

Judge Paul Kanarek of the Nineteenth Judicial Circuit of Florida was confronted with a Stern attorney who provided incorrect information to the court and his adversary concerning the Florida Supreme Court's requirement of mediation.  Judge Kanarek's complaint is not a gripe about "checking the wrong box"; it was a symptom of a pattern of representation causing delays that served to impede the orderly administration of justice.

Judge Charles Francis, Chief Judge of the Second Judicial Circuit of Florida, testified that his concerns with Mr. Stern's firm began in 2007, causing him to issue multiple orders to show cause for failing to appear.   Despite repeated admonitions, the problems never ceased disrupting the process.  Judge Francis' problems culminated in his grievance to The Florida Bar in which he provided instances of 10 mediation cases in which the Stern firm attorneys failed to appear, as well as four cases set for trial in which Stern firm attorneys failed to appear. These cases resulted in dismissals.  Mr. Stern's explanation is that these multiple

failures are justified by withdrawal of his clients' business in November of 2010. However, the termination did not relieve the attorney of responsibility under the Code and he shouldn't have left the problem on the court system to address.

Judge Cynthia Cox of the Nineteenth Judicial Circuit of Florida experienced the same multiple failures to appear resulting in chaos in the sale process. The court and Clerk personnel were consumed with the effects of these failures. Additionally, the failure to appear resulted in loss of funding dollars in having retired judges unavailable for other work.

Former Chief Judge Martha Lott's (retired) complaint addressed the issue of "abandonment". David Stern's firm had a large portion of the statewide foreclosure docket. By his own admission, in The Florida Bar Exhibit 7, his income from 2006 to 2010 was substantial. In fact, his income increased by almost eight times between these years. The volume of business and its increase permitted him to reap this level of earnings. Notably the letter of termination by Freddie Mac to David Stern dated November 1, 2010 explains the downfall:

> The reasons for the termination include the much-publicized revelations, as a result of the investigation by the Florida Attorney General, concerning the improper and possibly unlawful practices engaged in by a number of employees of either, or both, the law firm or DJS Processing, LLC. The fact that certain grounds for termination are stated in this letter does not imply that additional grounds for termination or other action by Freddie Mac do not exist... You... continue to be responsible... pursuant to all applicable professional and ethical standards.

(The Florida Bar Exhibit 52)

The clients were now urgently needing to obtain new counsel for thousands upon thousands of files. When Mr. Stern's clients removed their files, the office had a computerized system "tracker" which enabled them to compile sufficient information to file proper motions to withdraw pursuant to the Rules of Judicial Administration. The clients' directive that no further actions be taken on their files did not prohibit the filing of motions to withdraw and requests for court hearings as required by the Rules of Judicial Administration. Further, the fact that there were difficulties obtaining substitutions of counsel from successor attorneys neither prevented nor excused Mr. Stern from seeking to properly withdraw pursuant to the Rules of Court.

With that backdrop, on March 4, 2011, Mr. Stern wrote to the Chief Judges throughout the state announcing his "intention" to take no further action on approximately 100,000 pending files due to a lack of financial resources and personnel. (The Florida Exhibits 6, 8). That stated intention was an abandonment. Judge Lott testified to a multitude of effects on the limited resources of the judicial system both in time, manpower and funds. Volume can be handled efficiently not left for the court system to handle thusly affecting everyone.

The contention that Mr. Stern did not have sufficient funds to file motions to withdraw and have them heard is belied by his professional obligation, his

financial resources, and his commitment that some bonuses be payable regardless

of the employees' status. (The Florida Bar Exhibits 7, 49). Mr. Stern's contention

that he did not have sufficient information to file motions to withdraw is belied by

the compilations attached to the two lawsuits he filed seeking attorneys' fees and

costs from lenders in March and June of 2011, the existence of his computerized

system, and the list provided to the Chief Judges (The Florida Bar Exhibits 6, 50,

51) as well as access to the court system.

The motions to withdraw filed in 2010- 2011 were filed without consents

and Orders and were not set for hearing. These actions were not diligent and were

examples of improperly handling. As the managing attorney, Mr. Stern is required

to supervise his subordinates and is responsible that cases are handled reasonably

regardless of caseload.

These actions affected the Administration of Justice. For the court system,

Judges, staff, and Clerk, there were extraordinary delays resulting in the waste of

resources due to inaccurate representations and/or failures to appear. For the

borrowers, whether in default or not, the attempt to obtain modifications or settle

was impossible. For the lenders, the aim to obtain the collateral was delayed or

lost because of the inaction or non-appearance resulting in dismissals. Thusly,

creating a denial of equal justice to all parties.

Mr. Stern's response that his training program sufficiently prepared the associates failed to account for the proper handling of the massive volume resulting in the failure to appear at hearings and/or mediations, and failure to submit the applicable documents. A diligent mentoring and supervision should have corrected the problems. High volume required an increased level of supervision to create consistency and monitoring of that supervision which failed to occur.

James Covey, Richard Taylor, Wendy Anderson, and Patrick Phancao, all longstanding members in good standing of The Florida Bar, attested to the extraordinary difficulties encountered with Mr. Stern's firm beginning as early as 2007. All testified to their inability to obtain results after communicating with members of the firm.

Mr. Covey sent pay off monies in the amount of $49,887.84 to the Stern firm in August of 2010 for a client with the condition that it not be disbursed until a satisfaction of mortgage was received. In contravention of that condition, the funds were released and a satisfaction was not received. Mr. Covey's client blamed and accused him of misconduct, and cast doubt on the legal system. It took the filing of a Bar grievance and six months for the satisfaction to be provided in February 2011. The inaction in this situation created a cloud in title and the delay resulted in decrease in sale price and additional costs.

Richard Taylor had a similarly disturbing experience with the Stern firm. After months of multiple requests for a reinstatement figure on behalf of his client, he received the figure. Mr. Taylor sent reinstatement monies in the amount of $41,457.20 to the Stern firm in April of 2008 for a client with the condition that it not be disbursed until a pending foreclosure action was dismissed with prejudice. Just as with Mr. Covey, and in contravention of that condition, the funds were released and the lawsuit was not dismissed. As with Mr. Covey, Mr. Taylor's client blamed and accused him of misconduct. Just like attorney Covey, the filing of a Bar complaint and eight months after payment for the dismissal of the foreclosure. A second foreclosure suit was filed due to the delay and failure to provide instructions for future payments and Mr. Taylor's client did not receive the benefit of the funds forwarded to reinstate the mortgage. Mr. Stern's claim that timely responses were provided to the inquiry were not received by Mr. Taylor. If received, Mr. Taylor would have taken action. Mr. Taylor testified he had to obtain the dismissal in court although it was certified as mailed to him.

Wendy Anderson's client also suffered due to the ineptitude of the Stern firm. Despite Ms. Anderson's office appearing in the case and multiple communications with personnel in the firm, her client was contacted directly and motions were set that had been reset by agreement. Ms. Anderson sought and obtained sanctions and attorneys' fees as a result. Despite a court order, Ms.

11

Anderson's client was again directly contacted to appear at mediation. The client appeared and was distressed by the absence of her attorney which was not coordinated with her office. The Stern attorney ignored the existence of a defense attorney, a Court Order and directive and failed to make arrangements for timely payment of the sanction.

Attorney Phancao's client, a reputable real estate broker, was served with a lawsuit in foreclosure in 2008 because he has the same name as the actual owner. Mr. Phancao attempted to undo this initial mistake with documentation to support his client was not the proper party. Despite promises and innumerable contacts, even with a letter directly sent to Mr. Stern, no resolution occurred. Ultimately, the intervention of a court order in October 2010 and award of attorney's fees cured the problem. Mr. Phancao's client blamed him for his inability to extricate him from the litigation. The client suffered extreme angst, was concerned of the effect on his credit and licensure even though he had no interest in the legal proceeding.

Judith Young, the closing supervisor for the Mackinac banks in Michigan, could not get the Stern firm to provide a Release of Lis Pendens on a property to get clear title between May 2010 and August 2011. Like many others, who could neither communicate with the firm nor resolve an issue, Ms. Young filed a grievance with the Bar. The filing of a grievance led to the release of the Lis

Pendens by the subsequent attorney. The delay threatened the loss of a repurchase transaction.

Mohammed Shaikh was a tenant that was the subject of a foreclosure action initiated by the Stern firm. He had multiple contacts with members of the firm including Mr. Stern himself. Despite that, a Stern firm attorney filed a certificate in court stating that the property was not believed to be tenant occupied. (The Florida Bar Exhibits 28, 29). Mr. Stern, although aware of the complaint, forwarded the information but failed to investigate or follow up to see if the problem was resolved.

It is clear that attorneys and members of the public should not be forced to use The Florida Bar for these purposes. The mishandling and inaction are on the Stern firm.

This testimony established that the root cause of the variety of problems encountered by the judiciary, attorneys, and members of the public with the Stern firm was the excessive volume of files taken in by the firm. The control of the volume was within the exclusive authority of its sole managing partner, David Stern. From 2006 until 2008, the total number of active files increased by 48.75%. In 2006, an attorney at the firm handled an average of 784.56 files. That number increased in 2007 to 1,166.64. It reached an apex of 1,645.86 in 2008. In 2009, the number was 1,281.87. (The Florida Bar Exhibit 46). Mr. Stern's contention

13

that each case was simple belies the mishandling. Most of the firm's foreclosure attorneys were newly admitted to The Florida Bar. Any training program completed could not, and did not, prevent them from improperly handling matters. Without the proper support, mentoring, and supervision, Brian Spector's description that these associates were being "set up for failure" is accurate. No training or skills could save them from the tsunami of work that they faced. The inordinate amount of cases resulted in failure to properly appear and/or handle court hearings and in the failure to properly handle other concerns outside of court.

In reality, it was the entire judicial system, as reflected by the testimony of Judges Griffis, Davis, Kanarek, and Cox, that suffered this failure. Both Miriam Mendieta and Beverly McComas, Mr. Stern's lead attorneys, repeatedly requested of Mr. Stern that the volume of cases be reduced. Mr. Stern failed to take action. (The Florida Bar Exhibit 42, page 84). Mr. Stern refused to listen to his supervisors. He claims to have delegated all supervisory and office duties; however, he failed to monitor if the supervisor and others were properly handling their obligation under the Rules of Professional Conduct.

Mr. Stern's goal was to increase business and the firm income, and the sale of his back office. That business deal began in 2007. David Stern told his most senior attorney employee, Miriam Mendieta, that the business transaction, upon which he received in excess of $58,000,000 in 2010, was in part contingent on the

14

volume of files the firm processed. (The Florida Bar Exhibit 49). David Stern had a motive to ignore the advice of his key personnel to reduce the onslaught of cases. His sole occupation, to which he admits, was to serve as a "rainmaker."

Another factor which contributed to the firm's failure was the time deadlines imposed by the lender clients and enforced by the office manager, Cheryl Samons. Mr. Stern directed his staff to move files quicker to satisfy clients which would increase the volume of business. (The Florida Bar Exhibit 42, page 53). The clients' desire to move their matters rapidly is common. This desire cannot be achieved at the expense of competence and ethics.

It is also my finding that the support staff was led by Mr. Stern's most trusted employee and office manager, Cheryl Samons. Miriam Mendieta, Kelly Scott, and Tammie Kapusta[2] all testified that Cheryl Samons only acted at the direction and with the knowledge of David Stern. (The Florida Bar Exhibit 41, page 26). Miriam Mendieta testified Cheryl Samons and David Stern both admitted that Cheryl Samons received direct instructions from him.

Beverly McComas[3] testified that Cheryl Samons was able to run the firm without interference. (The Florida Bar Exhibit 42, page 40). The problems

---

[2] Tammie Kapusta's sworn testimony to the Attorney General's office was admitted into evidence.

[3] Beverly McComas' sworn testimony to The Florida Bar was admitted into evidence.

encountered were exacerbated by the fact that Cheryl Samons completely supervised the non-legal staff. This conclusion was supported by the testimony of respondent's witness, attorney Michelle Mason and Miriam Mendieta. The Rules Regulating The Florida Bar require that lawyers must make certain that non lawyer assistants are in compliance with the Rules Regulating The Florida Bar. There was no evidence that these non lawyers were aware of the rules or that they abided by them. Rule 4-5.3 of the Rules Regulating The Florida Bar. In fact, it was evident as early as 1999 that the firm's non lawyer assistants were engaging in unethical activity.

Gail Trenk, now a resigned member[4] of The Florida Bar, had executed reasonableness attorneys' fees affidavits for the Stern firm while a member in good standing of The Florida Bar. Thereafter, when suspended, she offered to assist the firm by providing the services of another member of The Florida Bar, Alan Medof, who was in good standing, to execute these affidavits. In reality, that attorney never agreed to serve in that capacity, never reviewed files or executed affidavits, and never received payment tendered by the Stern firm. Gail Trenk forged that attorney's name and negotiated the funds. There were approximately 5,000 affidavits totaling $5,000 in payments. These forged and false affidavits were filed

---

[4] A disciplinary resignation is tantamount to disbarment. The Florida Bar v. Hale, 762 So.2d 515 (Fla. 2000).

by the Stern firm in court cases. It was revealed that Stern employees in 1999, which remained until 2010, had notarized these affidavits. Clearly, had they been properly notarizing in the presence of the person executing them, they would have known that Alan Medof was not actually signing these documents.

The only remedial action taken by Mr. Stern after this incident was to have the attorneys executing attorneys' fee affidavits review the files in the Stern firm library, and to warn the staff that they must only notarize a document in the presence of the executor. Although these actions seemed reasonable in 1999, these failed to ensure that the Rules Regulating The Florida Bar were followed in light of the problems discovered occurring between 2005-2009. Mr. Stern's action in walking by the library door without reviewing a single document or asking a single question, or monitoring that the previous procedure enacted in 1999 was followed was not sufficient.

This type of misconduct persisted and was again discovered in the spring of 2009. Assignments of mortgages were filed throughout the state which contained fraudulent notarizations. The Bar submitted 40 assignments into evidence which on their face were notarized by 11 different notaries and revealed that they were not notarized on the date reflected. Not only were the dates false, but the evidence established through the testimony of Kelly Scott that Cheryl Samons executed approximately 1,000 assignments per day, moving from floor to floor in the Stern

firm. Kelly Scott testified that there was never any witness or notary present when Ms. Samons executed the document. Tammie Kapusta testified to the same procedure. (The Florida Bar Exhibit 41, page 24). Also, notaries' stamps were freely exchanged between the notaries, according to Tammie Kapusta. (The Florida Bar Exhibit 41, page 23). Several paralegals actually signed Cheryl Samons' name, according to Kelly Scott on assignments, without any indication of the true signatory. Mr. Stern failed to present any evidence upon which I should disregard this sworn testimony. I find that the circumstances establish Mr. Stern was aware of these procedures as a result of his regular presence at the firm, his direct and imperviable relationship with Cheryl Samons, as well as the fact, as testified to by several witnesses, that he knew everything that occurred at his firm. His corrective action of additional instructions to the notary with the threat of termination did not resolve the problem as indicated by the Toledo and Suarez affidavits.

Mr. Stern testified about one notary, Terry Rice, who executed an assignment with a notary stamp that could not have been in existence on the date the document existed. He recounted Ms. Rice's explanation that although she was actually present when the document was signed and mistakenly notarized months later with her new notary stamp. Although plausible, the existence of the 40 assignments by 11 different notaries with the same defect reflects otherwise.

18

Further, these false notarizations, witnessing, and backdating are not innocuous. Attorney Michael Wasylik testified to the submission of a corrected assignment prepared by David Stern reflecting that it was filed "to correct the effective date". In fact, the date was not in error. (The Florida Bar Exhibits 16, 17). Rather, the corrected assignment was filed to cover the improper notarization of the original assignment. The "corrected" assignment was a subterfuge and/or fraud.

The preamble to Chapter 4 of the Rules Regulating The Florida Bar provides that actual knowledge can be inferred from the circumstances. Based on the evidence I find that Mr. Stern was aware of the misconduct of Cheryl Samons. She was rewarded by Mr. Stern for her work. In 2009, Cheryl Samons received a bonus which was payable even if terminated. (The Florida Bar Exhibit 37).

Additionally, not only did evidence of improper notarization and witnessing resurface in 2009, but fraudulent attorneys' fees affidavits were again filed with the court. The Florida Bar presented the affidavits of attorneys Richard Toledo and Jorge Suarez. (The Florida Bar Exhibits 35 and Exhibit 36). Mr. Toledo executed approximately 36,000 attorneys' fees affidavits from 2007 until 2011, earning $240,000. Mr. Suarez executed approximately 53,000 attorneys' fees affidavits from 1997 until 2007. Mr. Suarez also provided coverage work for the Stern firm. He earned in excess of $840,000. Both attorneys' affidavits submitted in this

proceeding reflect that they failed to review files despite so attesting in their attorneys' fees affidavits as well as allowing improper notarization by Stern staff. Despite the longevity of their employment and size of their remuneration, Mr. Stern never spoke with either of these attorneys. He did <u>nothing</u> to ensure that these two attorneys or his staff behaved in conformity with the Rules Regulating The Florida Bar. This failure to make substantial corrective efforts in supervision and/or monitoring is particularly telling after the problems with Gail Trenk.

Mr. Stern's response to each transgression is a claim of delegation to two senior attorneys, their two subordinates, and his office manager. Mr. Stern misinterpreted his obligation. He was the only partner. As the only partner and sole managing attorney, he has the ultimate responsibility for his firm. Rule 4-5.3(c) of the Rules Regulating The Florida Bar. There is no evidence that Mr. Stern reviewed or took any responsibility for the work product of the non attorneys or the process by which it was produced to ensure compliance with the Bar Rules. There is likewise no evidence that Mr. Stern, pursuant to his obligation of Rule 4-5.1(a) of the Rules Regulating The Florida Bar, made any efforts to ensure that his firm had any measures in place to assure that his attorney staff was in compliance with the Rules Regulating The Florida Bar. In fact, to the contrary, it was Mr. Stern himself, with his desire to bring in more business and to ensure the sale of his

back office, which served to push his staff to performing in a substandard manner in contravention of the Rules Regulating The Florida Bar.

Although Mr. Stern had a supervisory structure, had a training program, had technology and written manuals to assist attorneys in properly performing their duties, the problems persisted. His claim of training, although commendable, fails to address the handling of the volume and coverage of the numerous hearings throughout the state. The office system for calendaring, phone, email referral failed to avoid missed hearings and to correct the handling of cases. The supervisors acknowledged they were supervisors for issues presented to them only however, they disavowed any responsibility for monitoring. Due to the volume, monitoring was impossible and the supervisors received no training as to this responsibility.

Mr. Stern stated the failure to provide release of lien and failure to pay sanction etc were the responsibility of the lenders not the firm. This explanation does not justify Stern's obligation as the attorney for the lenders to notify his client of their obligation to arrange the release or payment.

The failure to take action when he became aware of a problem as reported by the supervisors Miriam Mendieta and Beverly McComas (who reported any serious problem to him) shows Mr. Stern was aware of the numerous problems and failed to take corrective action. Michelle Mason's comment that Mr. Stern was

aware of court imposed sanctions belies Mr. Stern's own claim he was unaware of the sanctions. Additionally, Mr. Stern himself admitted he was aware of dismissals and sanctions and took no action.

Mr. Stern was aware of the Judge's concerns as indicated by his meeting by Judge Griffis. Any problems with Judges were reported directly by Beverly McComas and Miriam Mendieta to David Stern as testified by Michelle Mason and David Stern himself, however he denies awareness of Judges Davis and Kanarek's concerns. Mr. Stern claims human error on Judges Francis and Cox complaints.

By the end of 2008-2009, David Stern was personally aware of the problems as testified by Miriam Mendieta. She discussed with him the specifics of the Show Cause Orders and the volume of cases. His response was to reject the suggestion regarding reduction in business because the sale of the back office would solve the problem. Thereafter, he stopped the contact with the Judiciary until he was terminated by his clients.

As to the obligation to reject cases when one cannot diligently and competently handle, David Stern was aware of the numerous problems and sanctions, therefore, he had knowledge of the problem. He was aware of missed hearings which resulted in sanctions as supported by Michelle Mason's testimony. His claim that 40 mistakes in affidavits out of 237,000 cases was minor is not

22

appropriate. Although Mr. Stern admitted asking for a reduction, he never refused cases. The attempted changes in 2010 to create another level of supervisor came too late. David Stern was reactive to problems rather than proactive with the monitoring of compliance with firm standards and the Bar Rules.

As to Mr. Stern's claim that supervisory structure may have been an attempt to provide that the paralegal's conduct was compatible with the professional obligations of the lawyer; Cheryl Sammons overrode that structure and was permitted to do so by Mr. Stern.

The evidence established that 42 assignments of mortgage filed in the public records were not properly notarized by notaries and attorneys' fees affidavits were not notarized contemporaneously with their execution by independent expert attorneys. The assignments of mortgage issue came to Mr. Stern's attention in early 2009, although the evidence shows the problem existed in 2005. Re-training of the Firm's notaries to emphasize the requirement of contemporaneous notarization with the execution failed to correct the problem.

In 2010, the improper notarization of attorneys' fees affidavits was discovered. As to whether Mr. Stern was aware of this issue prior to its occurrence, the evidence showed that Mr. Stern saw independent experts in the office purportedly executing affidavits of reasonable attorneys' fees. However, this does not address if the notary was present to properly notarize the affidavits.

Mr. Stern's efforts to ensure that the Firm had measures in place giving reasonable assurance that notaries' and non attorneys' conduct was compatible with the professional obligations of the lawyers was insufficient. By law, each notary had taken an oath as required by Chapter 117, Florida Statutes. Each non attorney/notary was "supervised"; however, the errors in procedure were not caught and corrected.

Mr. Stern failed to establish appropriate monitoring to determine if compliance was occurring after three different discoveries of non compliance with the notary obligation. Mr. Stern "had to know" about these improprieties because of his close working relationship with Cheryl Samons, his frequent presence in the Firm's office, and because any problems were reported to him by the supervisors. Therefore, this evidence is sufficient to carry the Florida Bar's burden of demonstrating a Rule violation by clear and convincing evidence.

With respect to the third category of alleged misconduct - Mr. Stern's failure to tend to and/or withdraw in the pending foreclosure cases, the evidence established that the Firm's clients terminated their relationship in November 2010. The clients withdrew their files, instructed no further action be taken on their behalf, and stated that they would be engaging successor counsel. Despite Mr. Stern's suggestions to complete the cases, the clients decided to remove their files forcing a significant reduction in workforce.

24

Continuances and motions to withdraw were filed. The Firm signed stipulations for the substitution of counsel when advised of the successor counsel. The Firm attempted to get the motions to withdraw placed on mass hearings in some jurisdictions. However, thousands of other cases remained in limbo and no action was taken because of lack of personnel and financial resources.

The Court finds that Mr. Stern violated the applicable Rule by virtue of his failure to continue handling of the withdrawals on pending foreclosure cases. The Court finds that the various manner of handling, including the attempts to set motions to withdraw for bulk hearings, were an attempt to be reasonable. [*See, e.g., Public Defender, Eleventh Judicial Circuit of Florida v. State*, 115 So. 3d 261, 274 (Fla. 2013)] However, he stopped these procedures in March 2011 leaving thousands of cases unattended which affected the court system and the parties involved.

Finally, Mr. Stern ignored the Fifth District Court of Appeals when he was ordered to file a response, ordered to show cause, and ordered to appear. All notices were sent to his record Bar address between December 2010 and February 2011 and received. Michelle Mason testified that the office was operating with limited staff. I find Mr. Stern's complete failure to address or acknowledge the authority of the appellate court not only constitutes a violation of the Rules Regulating the Florida Bar, but an affront to the court system.

25

I recommend that Respondent be found guilty of violating the following Rules Regulating The Florida Bar: 3-4.2 [Violation of the Rules of Professional Conduct as adopted by the rules governing The Florida Bar is a cause for discipline.]; 3-4.3 [The standards of professional conduct to be observed by members of the bar are not limited to the observance of rules and avoidance of prohibited acts, and the enumeration herein of certain categories of misconduct as constituting grounds for discipline shall not be deemed to be all-inclusive nor shall the failure to specify any particular act of misconduct be construed as tolerance. The commission by a lawyer of any act that is unlawful or contrary to honesty and justice, whether the act is committed in the course of the attorney's relations as an attorney or otherwise, whether committed within or outside the state of Florida, and whether or not the act is a felony or misdemeanor, may constitute a cause for discipline.]; 4-1.3 [A lawyer shall act with reasonable diligence and promptness in representing a client.]; 4-1.16(a)(3) [Except as stated in subdivision (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if the lawyer is discharged.]; 4-1.16(d) [Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interest, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled, and refunding any advance payment of

fee or expense that has not been earned or incurred. The lawyer may retain papers and other property relating to or belonging to the client to the extent permitted by law.]; 4-3.2 [A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.]; 4-3.4(c) [A lawyer shall not knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists.]; 4-5.1(a) [Duties Concerning Adherence to Rules of Professional Conduct. A partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers therein conform to the Rules of Professional Conduct.]; 4-5.1(b) [Supervisory Lawyer's Duties. Any lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.]; 4-5.1(c) [Responsibility for Rules Violations. A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if: (1) the lawyer orders the specific conduct or, with knowledge thereof, ratifies the conduct involved; or (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take

27

reasonable remedial action.]; 4-5.3(b) [Supervisory Responsibility. With respect to

a nonlawyer employed or retained by or associated with a lawyer or an authorized

business entity as defined elsewhere in these Rules Regulating The Florida Bar:

(1) a partner, and a lawyer who individually or together with other lawyers

possesses comparable managerial authority in a law firm, shall make reasonable

efforts to ensure that the firm has in effect measures giving reasonable assurance

that the person's conduct is compatible with the professional obligations of the

lawyer; (2) a lawyer having direct supervisory authority over the nonlawyer shall

make reasonable efforts to ensure that the person's conduct is compatible with the

professional obligations of the lawyer; and (3) a lawyer shall be responsible for

conduct of such a person that would be a violation of the Rules of Professional

Conduct if engaged in by a lawyer if:    (A) the lawyer orders or, with the

knowledge of the specific conduct, ratifies the conduct involved; or (B) the lawyer

is a partner or has comparable managerial authority in the law firm in which the

person is employed, or has direct supervisory authority over the person, and knows

of the conduct at a time when its consequences can be avoided or mitigated but

fails to take reasonable remedial action.]; 4-5.3(c) [Ultimate Responsibility of

Lawyer. Although paralegals or legal assistants may perform the duties delegated

to them by the lawyer without the presence or active involvement of the lawyer,

the lawyer shall review and be responsible for the work product of the paralegals

or legal assistants.]; 4-8.4(a) [A lawyer shall not violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another.]; 4-8.4(c) [A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation ....]; and 4-8.4(d) [A lawyer shall not engage in conduct in connection with the practice of law that is prejudicial to the administration of justice, including to knowingly, or through callous indifference, disparage, humiliate, or discriminate against litigants, jurors, witnesses, court personnel, or other lawyers on any basis, including, but not limited to, on account of race, ethnicity, gender, religion, national origin, disability, marital status, sexual orientation, age, socioeconomic status, employment, or physical characteristic.].

IV.    STANDARDS FOR IMPOSING LAWYER SANCTIONS

I considered the following Standards to be applicable:

Standard 4.41:  Disbarment is appropriate when: (a) a lawyer abandons the practice and causes serious or potentially serious injury to a client; or (b) a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; or (c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.

Standard 6.21:  Disbarment is appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another,

29

and causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding.

Standard 7.1:   Disbarment is appropriate when a lawyer intentionally engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.

V.   CASE LAW

Given the magnitude of the misconduct and its widespread impact on the judiciary and public, disbarment is the appropriate sanction.  Most recently the Supreme Court of Florida was confronted with a case in which an office manager of a firm misappropriated funds.  The Court addressed the responsibility of the firm's two partners, who they disbarred.

> As the referee stated, "Respondents cannot abdicate, by delegation to the bookkeeper, the ultimate responsibility for trust account maintenance...." Their failure to exercise care and discretion in managing the trust account resulted in a massive theft of client funds—approximately $4.38 million was stolen from the account. If Respondents had adhered to the minimum trust account requirements set forth in the Rules Regulating the Florida Bar, they could have safeguarded their clients from this enormous amount of theft. While recognizing Respondents argument that the funds had been stolen by Bookkeeper, the referee concluded that this argument might hold for an isolated and recent conversion of trust funds, but the sheer size of the $4.38 million deficit proves that Bookkeeper had been embezzling for many months, if not years. Respondents had tried to delegate their responsibilities to a non-lawyer employee in the firm, and did not effectively monitor the employee or the trust account. As the referee

noted, the ultimate responsibility for the trust account monies rests with Respondents. They are the lawyers.

The Florida Bar v. Rousso and Roth, 117 So.3dd 756 (Fla. 2013)

Mr. Stern is similarly situated. His failure to exercise care resulted in massive injury to the system. The incidents were not isolated, but rather a representation of the culture of the firm, as to the low level of competence and ethics. He is the lawyer. It was his firm. Mr. Stern is responsible.[5]

In The Florida Bar v. Riggs, 944 So.2d 167 (Fla. 2006), that attorney was suspended for three years when he assigned responsibilities to his paralegal and failed to supervise her. Here, the lack of supervision is massive.

In The Florida Bar v. Ribowsky-Cruz, 529 So.2d 1100 (Fla. 1988) the Supreme Court of Florida disbarred an attorney who abandoned her law practice. That is precisely what Mr. Stern did when he announced his intentions to the Chief Judges of this state in his letter dated March 4, 2011 and failed to take any action on the remaining cases in which no withdrawal occured.

---

[5] I note that the Supreme Court of Florida recently approved a 91-day suspension for attorney Marshall Watson. The Florida Bar v. Watson, 117 So.3d 413 (Fla. 2013). Although that case did involve lack of supervision in a large foreclosure firm causing problems in the legal system, there are vast differences. Mr. Watson expressed deep remorse and did agree to discipline, without the need for the Bar to proceed to trial. Mr. Watson also suffered consequences when he agreed to and paid a $2,000,000 penalty to the Attorney General's office. Also, Mr. Watson's case did not involve the intentional abandonment of files throughout the state.

31

Further, Mr. Stern was publicly reprimanded in 2002. The misconduct involved an affidavit that contained inaccurate information. The instant matter, in part, involves false information in affidavits and assignments in David Stern's office. The repetition of the same misconduct establishes that Mr. Stern has no regard for the requirements and responsibilities of the Rules Regulating The Florida Bar.

Additionally, Mr. Stern's letter of abandonment states that he did not have the financial resources to properly withdraw from his pending cases. Mr. Stern's declaration revealed his net worth and that he did in fact possess sufficient resources to properly withdraw from cases. I am not persuaded by his argument that his reference to lack of financial resources related to the firm's net worth only. David Stern and the firm are one entity. His statement was a misrepresentation. I find it to be an aggravating circumstance in these proceedings.

Mr. Stern has not expressed any remorse in these proceedings. He has taken no responsibility. The mistake or difficulties are the actions of others.

Lastly, Mr. Stern has not presented me with any evidence of mitigation. As such, I have no basis to recede from the Bar's recommendation of disbarment. It is the appropriate result.

## VI.  RECOMMENDATION AS TO DISCIPLINARY MEASURES TO BEAPPLIED

I recommend that respondent be found guilty of misconduct justifying disciplinary measures, and that respondent be disciplined by:

A.   Disbarment.

B.   Payment of The Florida Bar's costs in these proceedings.

VII.   <u>PERSONAL HISTORY, PAST DISCIPLINARY RECORD</u>

Prior to recommending discipline pursuant to Rule 3-7.6(k)(1), I considered the following:

A.   Personal History of Respondent:

Age:  53

Date admitted to the Bar:  November 27, 1991

B.   Aggravating Factors:

9.22(a)  prior discipline:  October 24, 2002 - public reprimand before the Board of Governors

9.22(b)  dishonest or selfish motive

9.22(c)  a pattern of misconduct

9.22(d)  multiple offenses

9.22(g)  refusal to acknowledge wrongful nature of conduct

9.22(h)  vulnerability of victim (court system)

9.22(i)  substantial experience in the practice of law (admitted 1991)

C.   Mitigating Factors:

None

VIII. **STATEMENT OF COSTS AND MANNER IN WHICH COSTS SHOULD BE TAXED**

I find the following costs were reasonably incurred by The Florida Bar:

| | |
|---|---:|
| Administrative Fee | $ 1,250.00 |
| Investigative Costs | 7,340.33 |
| Bar Counsel Costs | 8,374.26 |
| Court Reporters' Fees | 14,810.73 |
| Witness Expenses | 2,992.30 |
| Expert Witness Brian Spector | 15,000.00 |
| TOTAL | $49,767.62 |

It is recommended that such costs be charged to Respondent and that interest at the statutory rate shall accrue and be deemed delinquent 30 days after the judgment in this case becomes final unless paid in full or otherwise deferred by the Board of Governors of The Florida Bar.

Dated this __28th__ day of October, 2013.

Nancy Perez, Referee

<u>Original To:</u>

Clerk of the Supreme Court of Florida, Supreme Court Building, 500 South Duval Street, Tallahassee, Florida 32399-1927

<u>Conformed Copies to:</u>

Jeffrey Allen Tew, Respondent's Counsel, Tew Cardenas, LLP, 1441 Brickell Avenue, Floor 15, Miami, FL 33131-3429, jt@tewlaw.com

Randi Klayman Lazarus, Bar Counsel, The Florida Bar, Ft. Lauderdale Branch Office, Lake Shore Plaza II, 1300 Concord Terrace, Suite 130, Sunrise, Florida 33323, rlazarus@flabar.org

Staff Counsel, The Florida Bar, at his designated email address of kmarvin@flabar.org