# EXHIBIT L
# TO THE DECLARATION OF
# JOHN W. SMITH T

**The New York Times** Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.

September 4, 2010

# Florida's High-Speed Answer to a Foreclosure Mess

By GRETCHEN MORGENSON and GERALDINE FABRIKANT

TEN days from now, a four-bedroom house on a cul-de-sac in Middleburg, Fla., is scheduled to be auctioned off at the Clay County courthouse, 25 miles south of Jacksonville.

A judge who recently took over their foreclosure case has ordered Rodney Waters; his fiancée, Terri Reese; and their four children to leave the home they bought in 2006.

Mr. Waters, a supervisor at a local packaging company and the family's sole breadwinner, fell behind on his mortgage two years ago after his property taxes jumped unexpectedly. He now owes $264,000 on the house; a similar home down the street sold for $138,500 in February.

The predicament of the Waters-Reese family is common in Florida today. The state routinely sets new records for foreclosures — in the second quarter, 20.13 percent of its mortgages were delinquent or in foreclosure, a national high, according to the Mortgage Bankers Association. And with housing prices still in a free fall, almost half of all borrowers in Florida owe more on their mortgages than their properties are worth, says CoreLogic, a data firm.

While the Waters-Reese case may not be unusual in Florida, the coming auction of the home is still notable: it will be a result of the Florida Legislature's new effort to cut the number of foreclosures inching their way through the state's courts. Earlier this year, Florida earmarked $9.6 million to set up foreclosures-only courts across the state, staffed by retired judges. The goal of the program, which began in July, is to reduce the foreclosures backlog by 62 percent within a year.

No one disputes that foreclosures dominate Florida's dockets and that something needs to be done to streamline a complex and emotionally wrenching process. But lawyers representing troubled borrowers contend that many of the retired judges called in from the sidelines to oversee these matters are so focused on cutting the caseload that they are unfairly favoring financial institutions at the expense of homeowners.

Lawyers say judges are simply ignoring problematic or contradictory evidence and awarding the right to foreclose to institutions that have yet to prove they own the properties in question.

"Now you show up and you get whatever judge is on the schedule and they have not looked at the file — they don't even look at the motions," says April Charney, a lawyer who represents imperiled borrowers at Jacksonville Area Legal Aid. "You get a five-minute hearing. It's a factory."

But Victor Tobin, chief judge on the 17th Judicial Circuit, which includes Broward County, defended the effort. "There are more assets devoted to those three foreclosure divisions in Broward than to any other division in the building in terms of case managers and that sort of thing to help the general public," he said. "The people who come get fully, fully heard."

In any event, huge numbers of cases are being handled. In an article last week in The Florida Bar News, Belvin Perry Jr., chief judge for the state's Ninth Judicial Circuit, said that during July, 1,319 cases had been closed by three senior judges in the district's two counties, Orange and Osceola.

Florida's foreclosure mess is made murkier by what analysts and lawyers involved in the process say are questionable practices by some law firms that are representing banks. Such tactics, these people say, have drawn out the process significantly, making it extremely lucrative for the lawyers and more draining for troubled homeowners.

Doctored or dubious records presented in court as proof of a bank's ownership have become such a problem that Bill McCollum, the Florida attorney general, announced last month that his office was investigating the state's three largest foreclosure law firms representing lenders.

"Thousands of final judgments of foreclosure against Florida homeowners may have been the result of the allegedly improper actions of these law firms," said Mr. McCollum in an interview. "We've had so many complaints that I am confident there is a great deal of fraud here."

To be sure, adjudicating foreclosure cases is difficult, complicated by multiple transfers of mortgages and notes when a loan is sold, bewildering paperwork submitted by loan servicers and shoddy record-keeping by the many institutions that touched the mortgages during the byzantine securitization process that fueled the housing boom.

Nevertheless, Florida law requires that before a financial institution can foreclose on a borrower, it must prove to the court that it actually has the standing to do so. In other words, it has to show that it is truly the owner. And this is done by demonstrating ownership of the note underlying the mortgage.

The Waters case offers an example of how wrong things can go in complex foreclosure cases.

While AmTrust, a failed Ohio bank that is now a division of New York Community Bank, said it owned the note and could foreclose, Mr. Waters's lawyer produced documents showing that Fannie Mae, the taxpayer-owned mortgage finance giant, was really the owner.

In spite of the conflicting evidence, Aaron Bowden, the retired judge overseeing the case, made a summary judgment on Aug. 3, ruling that the property should go back to AmTrust.

Mr. Bowden did not return phone calls seeking comment.

Chip Parker, managing partner at Parker & DuFresne in Jacksonville, which represents Mr. Waters, said: "The threshold issue in any foreclosure case is who has the right to foreclose. We presented evidence to the judge that Fannie Mae owns the note and mortgage, and yet the judge ignored this crucial evidence."

Mr. Parker is concerned that some homeowners are victimized by the system. "What we are talking about is railroading homeowners through the rocket docket," he added.

When contacted by a reporter on Thursday, a spokeswoman for Fannie Mae confirmed that it owned the note.

David Tong, the lawyer representing AmTrust in the case, declined to comment on the matter. But on Friday, he did an about-face, filing papers with the court acknowledging that Fannie Mae owns the note.

**Clearing the Backlog**

Florida law requires that banks argue their cases before a judge if they want to recover property from borrowers in default, and 471,000 such cases were pending in Florida at the end of July, according to the Florida State Courts administration.

Setting up discrete foreclosure courts statewide was seen as a way to help deal with the issue; consumer law experts say they aren't aware of any other state that has set up a temporary court to work down such a backlog.

But it is paradoxical, say lawyers representing homeowners in the cases, that Florida's attorney general acknowledges problems in the cases while retired judges, intent on reducing caseloads, seem unconcerned about those same problems — like flaws in the banks' documentation of ownership.

"The most shocking thing of all is the A.G.'s office understands the problem and yet the court system turns a blind eye to the fact that mortgage servicers are the problem," says Margery Golant, a lawyer in South Florida and a former executive at Ocwen, a large mortgage servicing company. "In the meantime, neighborhoods are being destroyed, homeowners' associations are being destroyed, and the tax base is being clobbered."

Steven P. Combs, a lawyer at Combs, Greene, McLester, who formerly was general counsel to the Fourth Judicial Circuit as well as a family law magistrate, says the entire process may be unconstitutional.

The Florida Supreme Court has consistently recognized the need to hire retired judges on a temporary basis, Mr. Combs said, and has ruled that such a "temporary" use is constitutional.

But because the retired judges are being given foreclosure assignments "repeatedly and consecutively" to the point of usurping the elected judges' jurisdiction over all residential foreclosure cases, he said, their use may not qualify as temporary and could thus violate the Florida constitution.

The fact that these judges are being paid to reduce the court's case load creates a perception among homeowners that the judges have a financial interest in dispensing cases prematurely, Mr. Combs said, creating a potential bias against borrowers and possibly violating their right to due process.

He pointed to a recent case in Broward County in which a retired judge refused to postpone a borrower's foreclosure sale even though the bank had agreed to it. The judge stated that she was there to "dispose of cases."

"If you are an individual whose house is being foreclosed and you hear these judges are being paid to clean out the backlog, under a realistic appraisal of human tendencies, do you think that the average judge would be biased in favor of prematurely terminating your case to clean out the backlog?" Mr. Combs asked.

J. Thomas McGrady, chief judge in the Sixth Judicial Circuit, said in a press release announcing the program: "We have to clear these cases because of the negative impact they are having on other civil litigation. The real estate crisis has placed a tremendous burden on our judges, and people with other types of pending litigation are also entitled to their day in court."

## Who Owns the Notes?

A foreclosure crisis that has forced millions of delinquent borrowers from their homes across Florida and elsewhere has also created enormous profits for the law firms and foreclosure servicers that represent banks and financial services in these actions.

Among the busiest of these firms are the three under investigation by Florida's attorney general: the Law Offices of Marshall C. Watson; Shapiro & Fishman; and the Law Offices of David J. Stern.

"These law firms appear to be mills," says Mr. McCollum. "They submit false documents, fabricate the documents, or the documents actually don't exist. They wanted to speed the process up because the faster they get the foreclosures done the better."

But Mr. Stern said: "I can't speak for the other firms, but I can assure you there has not been submission of fraudulent documents. We feel a lot of it is politically motivated. We have done nothing wrong and are going to cooperate fully."

Lawyers for the other two firms also disputed the attorney general's contentions, maintaining that they work diligently on behalf of their clients.

Borrowers' lawyers say they confront dubious practices, often involving false documentation "proving" who owns the note on a given property.

Typically, they say, this involves questionable affidavits asserting ownership of a note because the actual document has been lost or cannot be produced. Because the affidavits are often signed by bank representatives who have a stake in the outcome, they should not be allowed as evidence, borrowers' lawyers say.

Yet they routinely are introduced as evidence; the Waters case involves such an affidavit signed by an AmTrust official.

The problem of who owns the note is a result of the process of bundling home loans into securities and selling them to investors — a common practice in the housing boom. This meant that notes documenting ownership on a property were repeatedly transferred, blurring the identity of exactly who controlled the note.

Documents showing that a note has been assigned to a foreclosing bank are often dated after a foreclosure, meaning that the bank bringing the case may not have the right to foreclose.

Other questions arise involving documents with improper notary stamps and wildly different signatures on legal papers supposedly prepared by the same person, borrowers' lawyers say.

In a case in May 2009, Thomas E. Ice, a defense lawyer at Ice Legal in Royal Palm Beach, Fla., took the deposition of Cheryl Samons, an operations manager at the David J. Stern law firm. He asked her about instances at the firm of backdating the assignment of mortgages to allow foreclosures to go forward.

Mr. Ice and his wife, Ariane, who works with him, had found problems with notary stamps on mortgage assignments. "Many assignments of mortgages were signed and notarized with a stamp that had not been issued at the time of the signing, reflecting that the assignment was backdated," Mr. Ice says.

In her court deposition with Mr. Ice, Ms. Samons testified that she was both an executive of the entity that handles the mortgage transfers and an officer at the Stern firm. Mr. Ice says that this creates a conflict of interest because clients of the Stern firm — most of the nation's major banks — benefit from the transfer.

The law firm helps its own clients by "creating an illusion that the signing took place before and it did not," says Mr. Ice.

Mr. Stern attributed any backdating to sloppiness on the part of paralegals and said that it had since been corrected.

As for Ms. Samons's dual roles at the mortgage transfer registry and the law firm, he responded that, "We believe it is a solid practice."

Ms. Samons did not return phone calls seeking comment.

Another popular practice that ties up courts' calendars occurs after a foreclosure is granted and the property is scheduled to be returned to the bank. As ownership shifts from borrower to bank, so do all the obligations associated with it, like payment of homeowners' association dues.

But few banks want to pay these bills, so firms representing them move to delay the final step in the process by canceling the sale of a foreclosed property at the last minute, court officials say. This does not require the banks to restart the foreclosure process, but it keeps the property in the hands of the borrower, who remains responsible for maintenance and association dues.

Earlier this year, Jennifer D. Bailey, administrative judge in Miami-Dade County, said such cancellations were occurring in 55 percent of cases in her district. In July, she instituted new rules to reduce last-minute cancellations, including a requirement that a judge hear the reason.

"There was huge volume to start with and then with this extra bogus stuff going on, the courts were cross-eyed from it," says Ms. Golant. "There is a certain amount of truth to the gridlock, but the reason for the gridlock is the foreclosure firms are practically running the courtrooms."

**One Firm, Many Cases**

The lawyer most closely identified with Florida's foreclosure morass is David J. Stern. He is something of a mystery man within the foreclosure world; it is impossible to reach him by phone since his name is not in the firm's voice-mail directory and, until recently, there were no publicly available photographs of him.

Several prominent borrowers' lawyers who have litigated against his firm say they have never met him.

Operating out of a gleaming eight-story office building in Plantation, Fla., Mr. Stern, 50, has come a long way from the South Texas College of Law, from which he graduated in 1986. He spent his early career as a quality-control lawyer for Gerald Shapiro, a lawyer who represented mortgage lenders. He opened his own firm in 1994; Fannie Mae voted him attorney of the year in 1998.

Mr. Stern's company, which now includes a law firm and ancillary foreclosure support businesses, employs more than 900 people. The firm filed 70,382 foreclosure cases last year.

Critics say the Stern firm has been able to handle this high volume because its lawyers frequently refuse to work with borrowers and are very aggressive about pushing cases through the courts even when there are questions about the documentation.

Mr. Stern sees it differently. "I refer to us as an efficient law firm with a specialization in mortgage lending,'" he responded. "Should I feel ashamed that I have built a successful practice?" he asked. "No one references how committed I am, how I built my firm and how I work 20 hours a day."

But some question the thoroughness of the firm's work. Bill Warner, a private investigator in Sarasota, said the Stern firm filed a foreclosure suit against him on behalf of Deutsche Bank Financial Trust in January 2009. But the bank did not own the property and the suit erred by including in its claims a federal tax lien on another person with the same name but a different Social Security number, Mr. Warner said.

Mr. Warner's mortgage was actually owned by Countrywide, which had sold it to Wells Fargo. "I fought them myself for a year and a half," he recalls. "In the meantime, we did a loan modification with Wells Fargo but Mr. Stern's firm pursued the foreclosure on the property anyway."

Last May, Mr. Warner filed a motion to dismiss the case, alleging submission of a fraudulent document because Deutsche Bank was not owner of the note. He filed another motion questioning the credibility of the Stern firm and the lawyer on the case, he said. On June 14, Deutsche Bank withdrew the case.

Earlier this year Mr. Stern, who has profited handsomely from the foreclosure trade, sold the part of his operation that provides support services for his firm's foreclosure work — DJS Processing — to a public company called the Chardan 2008 China Acquisition Corporation. The processing company and affiliates generated revenue of $260 million in 2009, financial filings show.

Brian Foley, a compensation consultant in White Plains, concluded that Mr. Stern made $17.8 million in 2008, including $12.64 million in compensation and nonrecurring benefits of $4.36 million. In the deal with Chardan, Mr. Stern and his affiliates were paid $93.5 million: $58.5 million in cash and $35 million after the transaction closed, according to government filings. In addition, Mr. Stern got a promissory note for $52.49 million to be paid out over the next couple of years.

In recent years, Mr. Stern and his wife, Jeanine, have bought nearly $60 million in real estate, mostly in Florida, property records show. Their Mediterranean-style home on Harborage Isle Drive, in a gated community in Fort Lauderdale, faces water on two sides and cost almost $14 million. Not far away, in Hillsboro Beach, the Sterns bought two waterfront properties for $17 million.

Mr. Stern also spent $6.8 million last year on a 9,273-square-foot apartment at the Castillo Grand Residences in Fort Lauderdale, part of a Ritz-Carlton complex. He and his wife own two homes in Beaver Creek, Colo.; one was purchased in 2001 for $4.975 million, and another bought in 2007 for $14.2 million.

His automobile collection may be worth $3 million, auto experts said; it includes a 2008 Bugatti, multiple Ferraris, Porsches and Mercedes and a Cadillac.

This being Florida, Mr. Stern also collects boats. A 108-foot Mangusta yacht, Lady J, is for sale at $5.9 million, Web postings show. It was replaced by a 130-foot yacht that cost about $20 million, according to an acquaintance who requested anonymity over concerns about Mr. Stern's influence in the community.

In a nod to his foreclosure work, according to the acquaintance, Mr. Stern mused about possibly naming the larger yacht Su Casa Es Mi Casa — "Your House Is My House." But his wife and others cautioned against it, according to this acquaintance, and Mr. Stern named the boat "Misunderstood." Mr. Stern denies that he considered the "Su Casa Es Mi Casa" name.

## Resigned to Moving

While Rodney Waters and Terri Reese are resigned to leaving their home and moving their family into a rental, they still face another problem.

Under Florida law, a lender may pursue Mr. Waters for the difference between what it says he owes on the house and what it will fetch in a sale. Thanks to foreclosure fees and other charges, he owes almost double the $138,500 received in February by the seller of a neighboring house.

Included in the amount that Mr. Waters owes is almost $10,000 in fees generated by AmTrust's lawyers in the case. Mr. Bowden, the retired judge overseeing the case, ordered Mr. Waters to pay the fees.

His lawyer, Mr. Parker, had hoped to persuade the owner of the note to offer a new loan to his client in a smaller amount to reflect the reduced value in the property. He argued that this would be a better outcome for the lender and the borrower, since a foreclosure usually ends up costing a lender far more than does a principal write-down that leaves the borrower in the home.

But with the judge ruling in favor of the lender, such a deal is unlikely. Mr. Parker filed an appeal late last week, but Mr. Waters may have to file for bankruptcy to stop the foreclosure sale.