# EXHIBIT N-1

# TO THE DECLARATION OF

# JOHN W. SMITH T

Tew Cardenas LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 · 305-536-1112

# Exhibit "A"

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

RENAE MOWAT, NIKKI MACK,
ARKLYNN RAHMING, and QUENNA
HUMPHREY individually
and on behalf of all other similarly situated
individuals,

    Plaintiffs,

    v.        CASE NO. 10-62302-CIV-UNGARO

DJSP ENTERPRISES, INC., a Florida Corporation, DJSP
ENTERPRISES, INC., a British Virgin Islands Company,
LAW OFFICES OF DAVID J. STERN, P.A.,
DAVID J. STERN, individually, DAL GROUP, LLC,
a Delaware LLC, DJS PROCESSING, LLC,
a Delaware LLC, PROFESSIONAL TITLE AND ABSTRACT
COMPANY OF FLORIDA, a Delaware LLC, and
DEFAULT SERVICING, LLC, a Delaware LLC,

    Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VOLUME I

DEPOSITION OF
DAVID J. STERN

TAKEN ON BEHALF OF THE PLAINTIFFS

APRIL 25, 2011
10:00 A.M. - 5:13 P.M.

REIF KING WELCH LEGAL SERVICES
888 EAST LAS OLAS BLVD.,
SUITE 508,
FORT LAUDERDALE, FLORIDA 33301

SAMANTHA HANSTEIN, Court Reporter

---

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs:

    FARMER, JAFFE, WEISSING, EDWARDS, FISTOS &
    LEHRMAN, PL
    STEVE JAFFE, ESQ.
    425 NORTH ANDREWS AVE.,
    SUITE 2,
    FORT LAUDERDALE, FLORIDA 33301
    (954)524-2820
    steve@pathtojustice.com

    RAPOPORT LAW GROUP
    DAWN M. RAPOPORT, ESQ.
    1314 EAST LAS OLAS BLVD.,
    SUITE 121,
    FORT LAUDERDALE, FLORIDA 33301
    (954)712-7457
    dawn@rapoprtlawgroup.com

    REAL ESTATE & INVESTMENT LAW
    CHANDRA PARKER DOUCETTE, ESQ.
    621 NORTHWEST 53RD ST.,
    SUITE 240,
    BOCA RATON, FLORIDA 33487
    (561)995-1490
    chandra@chandralaw.net

On behalf of the Defendants:

    TEW CARDENAS, LLP
    JEFFREY TEW, ESQ.
    FOUR SEASONS TOWER
    15TH FLOOR, 1441 BRICKELL AVE.,
    MIAMI, FLORIDA 33131
    (305)536-1112
    jt@tewlaw.com

    DJSP ENTERPRISES, INC.
    STEPHEN J. BERNSTEIN, ESQ.
    900 SOUTH PINE ISLAND RD.,
    SUITE 400,

---

    (954)233-8000 ext. 1001
    sbernstein@djsenterprises.com

    BERGER SINGERMAN
    FRANK SCRUGGS, ESQ.
    350 EAST LAS OLAS BLVD.,
    SUITE 1000,
    FORT LAUDERDALE, FLORIDA 33301
    (954)525-9900
    fscruggs@bergersingerman.com

---

Case 0:10-cv-62302-RNS   Document 115-1   Entered on FLSD Docket 12/21/2011   Page 5 of 277

4

```
 1                    INDEX OF EXAMINATION
 2
 3    WITNESS:  David J. Stern
 4
 5                                                   Page
 6    DIRECT EXAMINATION
 7    By Steve Jaffe, Esq.                              7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Case 0:10-cv-62302-RNS   Document 115-1   Entered on FLSD Docket 12/21/2011   Page 6 of 277

5

```
 1                    INDEX TO EXHIBITS
 2
 3
 4    Exhibit        Description                     Page
 5      1     Press release dated July 27th          151
 6      2     Press release that announces new       152
              investigations against Law Offices of
 7            Marshall Watson, Shapiro & Fishman, Law
              Office of David J. Stern
 8
 9      3     Press release sent out September 7th   158
10      4     Letter dated October 21st              181
11      5     November 4th, 2010 mass e-mail         197
12      6     Three-page letter                      208
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Case 0:10-cv-62302-RNS   Document 115-1   Entered on FLSD Docket 12/21/2011   Page 7 of 277

6

```
 1             DEPOSITION OF DAVID J. STERN
 2                    APRIL 25, 2011
 3          COURT REPORTER:  Okay.  We are now on the
 4    video record.  Today's date is April 25th, 2011.
 5    The time is 10:06 a.m.  This is the video deposition
 6    of David Stern taken in the matter of Mowat, Mack,
 7    Rahming & Humphrey v. DSJP Enterprises, Inc.  The
 8    case number is 10-62302-CIV-UNGARO.  We're located
 9    at Reif King Welch Legal Services, 888 East Las
10    Olas Boulevard, Fort Lauderdale, Florida 33301.
11    The digital reporter is Samantha Hanstein with the
12    firm of Reif King Welch.
13          Would counsel please introduce themselves for
14    the record.
15          MR. JAFFE:  Steven Jaffe on behalf of the
16    plaintiffs.
17          MS. DOUCETTE:  Chandra Parker Doucette on
18    behalf of the plaintiffs.
19          MS. RAPOPORT:  Dawn Michelle Rapoport on behalf
20    of the plaintiffs.
21          MR. SCRUGGS:  Frank Scruggs of Berger
22    Singerman for DSJP Enterprises, Inc. and other
23    corporate defendants.
24          MR. TEW:  Jeff Tew for David Stern from the
25    Law Offices of David Stern, P.A.
```

---

Case 0:10-cv-62302-RNS   Document 115-1   Entered on FLSD Docket 12/21/2011   Page 8 of 277

7

```
 1          MR. STERN:  I'm David Stern for David Stern.
 2          MR. JAFFE:  Good morning.  My name is
 3    Steven Jaffe.
 4          We met briefly this morning.  Thank you for
 5    coming in this morning.
 6
 7             DAVID J. STERN,
 8    having been first duly sworn, testified as follows:
 9             DIRECT EXAMINATION
10    BY MR. JAFFE:
11       Q   Mr. Stern, thanks for coming in this morning.
12    Like I just said, my name is Steven Jaffe.  I'll be
13    taking your deposition probably most of today.  Has your
14    deposition ever been taken before?
15       A   Yes, sir.
16       Q   All right.  And now, you are a practicing
17    attorney?
18       A   I am.
19       Q   And you've taken depositions before?
20       A   I am.
21       Q   So, you know all the deposition admonitions,
22    and there's really no need for me to go over right now;
23    is that correct?
24       A   I officially waive.
25       Q   Okay.  And if you need a break, just tell me.
```

8

```
 1      I'll be happy to break anytime.  I'd like to start off,
 2   just going over your background.  We could, you know.
 3   Where are you from?
 4      A    Born in Chicago, Illinois.
 5      Q    And when did you come to South Florida?
 6      A    When I was 30 years old.
 7      Q    Where did you go to undergrad?
 8      A    Appalachian State University in North
 9   Carolina.
10      Q    I couldn't decide if my daughter's finishing
11   up there.
12      A    Great school.
13      Q    What year did you graduate?
14      A    From?
15      Q    Appalachian State University.
16      A    Yes, sir.
17      Q    And then did you go into the workforce or did
18   you go into the law school?
19      A    I went straight into law school.
20      Q    And where?
21      A    South Texas College of Law in Houston, Texas.
22   I graduated 1986.
23      Q    And where did you go -- did you stay in Texas
24   to begin your career as a lawyer?
25      A    That's how Texas -- being that three-tier
```

9

```
 1   school -- four-tier school.  Not that I read any of
 2   these articles, but that one came across my desk.
 3   That was good.  I'm sorry.
 4      Q    Where did you begin your practice of law?
 5      A    I actually began my practice of law with the
 6   Law Offices of Gerald Shapiro with the acronym of LOGS.
 7      Q    What year?
 8      A    I went to work for them right out of law
 9   school before becoming a member of the bar; ultimately
10   became a member of the bar in 1991; didn't necessarily
11   practice with them.  I was a national operations
12   manager, so I officially started practicing January 1st,
13   1994.
14      Q    If I heard you correctly, you graduated from
15   South Texas College of Law in 1986; is that correct?
16      A    Yes, sir.
17      Q    When did you first sit for any bar exam?
18      A    1990.
19      Q    Which bar exam was that?
20      A    I'm sorry.  Scratch that.  I sat for the Texas
21   Bar right after graduation from law school while working
22   for my then-previous employer.
23      Q    Okay.
24      A    And then I sat for the Florida Bar while
25   working for my previous employer, which is LOGS.
```

10

```
 1      Q    What year did you sit for the Florida Bar?
 2   1990?
 3      A    1990.
 4      Q    Let's go back to Texas.  So, you sat for the
 5   Texas Bar in 1986; is that correct?
 6      A    I believe that's --
 7      Q    Maybe 1987?
 8      A    I believe the next one after I graduated and
 9   was eligible.
10      Q    Okay.  And did you pass that bar?
11      A    I did not.
12      Q    Did you ever take the Texas Bar again?
13      A    No.
14      Q    I believe you say you moved to Florida
15   thereafter.
16      A    I don't recall saying that.
17      Q    Fair enough.  Where did you move after Texas?
18   Graduated from law school, sitting for the bar?  Where
19   did you move next?
20      A    I moved to Tampa, Florida.
21      Q    Approximately in 1986, 1987?
22      A    1986.
23      Q    And if I repeat myself which I'm about to, I
24   apologize, but let's just go with it, with -- where was
25   your first employment in 1986 in Tampa?
```

11

```
 1      A    The Law Offices of Gerald Shapiro or, say, the
 2   LOGS group.
 3      Q    And what type of practice did you have?
 4      A    Mortgage and lender representation.
 5      Q    In what capacity were you employed there
 6   initially?
 7      A    An intern/law clerk.
 8      Q    Why did you not sit for the Florida Bar until
 9   1990?
10      A    Because I worked my tail off 24/7 for LOGS.
11   And --
12      Q    Just so the record is clear, LOGS, spell that.
13      A    LOGS, L-O-G-S, the acronym for the Law Offices
14   of Gerald Shapiro.
15      Q    Okay.
16      A    LOGS.  When I first started working for LOGS,
17   I worked for them in their Tampa office for three months.
18   After working for them for three months, I've recruited
19   to the national office in Chicago, Illinois.  And I was
20   made the quality control representative.  When I started
21   with them, I had 13 offices.  As I made a name for myself,
22   I ultimately was responsible for opening or restructuring
23   some 33 offices.  As a result, I was on the road pretty
24   much every day.  Literally, every day.  I still have my
25   platinum lifetime marquis for Marriott and my
```

```
 1    Continental elite for lifetime, so it was worth it.
 2        Q    Explain to me your job responsibilities as
 3    what you just termed the quality control rep for LOGS.
 4        A    When there was a distressed office, initially,
 5    I would go in and make a determination of what the
 6    issues were, make recommendations, report back to the
 7    national office together with the guy who's from the
 8    national office and the managing attorneys, implemented
 9    a plan to turn the office around.  The duties then
10    grow from dealing with distressed offices to opening up
11    brand new offices.  So, during the eight years I was
12    with LOGS, I either opened or dealt with some 33 offices
13    in, like, 27, 28 different states.
14        Q    So, obviously, during that time, too busy to
15    sit down take the Florida Bar, other things were
16    happening that were of interest to you?
17        A    Correct, yes.
18        Q    The three months that you were in Tampa before
19    being promoted to the Chicago quality control rep, is it
20    fair to say that you learned as much as you could
21    regarding mortgage lender representation in the Tampa
22    office?
23        A    The day I started in Tampa, it was a
24    distressed office unbeknownst to me, and my first day
25    there, the senior management from Chicago came in and
```

```
 1    read everyone the riot act.  My first day, I didn't
 2    know much of anything.  Certainly, I didn't know
 3    mortgage lender representation, but I kind of went for
 4    broke and asked them for the opportunity to dive right
 5    in it.  And long story short, they laughed at me, but
 6    at the end of the day, they gave me the opportunity.
 7    And during those three months, I worked 24/7, had this
 8    neat little SkyPager, because cellphones were so big.
 9    Dare I say my age.  1-800 SkyPage and No. 20632.  We
10    can publish it.  That's on there.
11        Q    How old are you?
12        A    I'm 50.
13        Q    What's your date of birth?
14        A    Did you tell him to ask that?
15              May 6th, 1960.  But don't ask me where the
16    time went.  So, after three months in the Tampa office, I
17    demonstrated, I would assume, qualities that were unique
18    and valued in the eyes of upper management.
19        Q    Were there lawyers in their office?
20        A    Yes, sir.
21        Q    How many?  Approximately.
22        A    I got -- that's like 1986.  20.
23        Q    And non-legal staff, approximately, how many?
24        A    60, 70, I guess.
25        Q    And you say you worked 24/7, can we be
```

```
 1    literal?  What hours did you keep?
 2        A    24/7.
 3        Q    So, you worked 24 hours a day, seven days a
 4    week?
 5        A    I slept for three to four hours.  Sometimes, I
 6    went to bed at 1:00; sometimes I went to bed at 9:00 and
 7    woke up at 1:00.  Pretty much the same work ethic I've
 8    kept when I went to law school.  I went to law school at
 9    night, can't afford Tier 4.
10        Q    Tier 4?
11        A    Tier 4.  Thank you.  And I worked two jobs
12    during the day.  I went to law school from 5:30 to
13    10:30, got home, study for a couple of hours and just
14    kind of develop a sleep pattern of three hours.
15        Q    What type of work did you do during law
16    school?  Does it have anything to do with the mortgage
17    industry?
18        A    No, no, sir.  Originally, I clerked for the
19    City of Houston, so between clerking and studying law
20    and going to law school.  The local high schools were
21    looking for soccer coaches, and I had soccer background.
22    So, I took a job as a soccer coach, which in order to
23    coach, you had to teach and --
24        Q    Of course.
25        A    -- and I didn't have teaching credentials, so
```

```
 1    they gave me emergency teaching permit based on some
 2    online courses.  So, I taught senior government and I
 3    coached soccer and cross-country.
 4        Q    Where did you go to high school?
 5        A    Miami Edison Senior High School.
 6        Q    Did you play soccer?
 7        A    I did.
 8        Q    Back then?
 9        A    Back then, yeah.
10        Q    Did you play soccer at Appalachian State?
11        A    I did.
12        Q    All four years.
13        A    Two years.
14        Q    Were you at Appalachian State all four years?
15        A    Yes, sir.
16        Q    At Appalachian State, what degree did you
17    obtain?
18        A    Bachelor of Science in Political Science and
19    Criminal Justice minor in Sociology.
20        Q    Double major?
21        A    Yes, sir.  I wanted to get most from my
22    tuition.
23        Q    Were you on scholarship?
24        A    Financial aid.
25        Q    So, not under a scholarship?
```

```
 1        A    No.
 2        Q    When you went to work at LOGS, I assume, just
 3   correct me if I'm wrong, you learned -- you began to
 4   learn the mortgage lender business.
 5        A    I was there for eight years, and that's where I
 6   learned it.
 7        Q    Both the non-legal elements of the business
 8   and I assume, just correct me, the legal elements of
 9   business?
10        A    Yes, sir.
11        Q    And what was LOGS -- or what was your
12   understanding of what a distressed office was?
13        A    In my mind, a distressed office was an office
14   where there was dissatisfaction from clients or failure
15   on behalf of the office to meet milestones for the full
16   time frames that are essential to the industry.  And, of
17   course, if you want to find that you're missing
18   milestones before the client does because that could be
19   relationship ending.
20        Q    What would you say the three most important
21   things you learned at LOGS were?
22        A    Well, I was single at that time, so there was
23   this secretary.  I would say understanding the process
24   from an operations standpoint, understanding the process
25   from the legal standpoint and probably most importantly,
```

```
 1   establishing relationships with clients.  All three, I
 2   believe, I have mastered and perhaps the basis for my
 3   success.
 4        Q    How long did it take you to learn or belief
 5   those were the three most critical things in the
 6   industry to be a success?
 7        A    I got to tell you, I probably didn't realize
 8   it until the first year into my own practice.
 9        Q    Okay.  Well, then, so, you're saying that in
10   retrospect, that's what you learned at LOGS?
11        A    I loved my job at LOGS.  I loved the
12   responsibility.  I loved the challenge.  I loved
13   something that was getting ready to be kicked under the
14   rug and stopped it from being kicked under the rug.
15   Took something that was a failure and made into a
16   success or started something that was just soil and
17   built it into a successful, profitable learning, if you
18   will.
19        Q    Would you agree with me that LOGS was a
20   generally successfully business at the time you went
21   into it?
22        A    They were a up-and-coming firm -- they had 13
23   offices.  When I left, they had 54 offices, of which 33
24   were my responsibility.
25        Q    Could you list some of your clients?
```

```
 1        A    Sure.  Bank of America, Chase, Wells Fargo,
 2   Countrywide, pretty much -- they were national firms and
 3   they represented pretty much everyone.  Some of that are
 4   still around.  Some of that had car wrecked -- Gold Dome.
 5   Once in a while, I see these names, and I said -- I
 6   remember that -- National Mortgage in Memphis, but pretty
 7   much everyone.
 8        Q    When you say that you learned the process from
 9   an operations standpoint, can you explain that?
10        A    From an operations standpoint, I became
11   familiar with the movement of a particular action
12   through a process when that required efficiency, yet
13   needed to be done economically.  So, from a foreclosure
14   standpoint, I had to move things from the title, area
15   where it starts, to the complaint, which is essential,
16   and a time-driven milestone, milestone being the key
17   component of the foreclosure; how to most efficiently
18   and effectively move through service process, to deal
19   with process servers; how to get judgment centered; how
20   to take property to sale and move things efficiently.
21   My responsibilities were not also limited to judicial
22   foreclosures, but we have power sales states, which are
23   simply -- know this requirements, which are the majority
24   of the states.  So, I learned that.  And then I learned
25   the bankruptcy processes and the closing processes and
```

```
 1   the eviction process.  That's the operations standpoint.
 2        Q    When you went into LOGS, they already had
 3   system, operation systems, correct?
 4        A    They did.
 5        Q    And did they have policy and procedure
 6   manuals?
 7        A    Very few.  I wrote some of them.  I chuckle
 8   because it goes back to the old computers, to the big,
 9   old screens.  And when I started my practice eight years
10   later, I hired a computers' consultant and we were
11   designing and had the mouse.  I had never seen a mouse.
12   So, I picked it up and I started playing with the ball.
13   And I looked at it, he said, what are you doing?  I go,
14   what the hell is this?  And he knew he was in trouble.
15   So, I was not the most technological and hopeful that my
16   testimony hasn't led you to believe that I was
17   technologically advanced.  Because right now, my
18   14-year-old daughter handles all the technology in the
19   house.
20        Q    But from a practical standpoint, you
21   understood quickly how to maximize operations?
22        A    Back then, I thought I did.  Back then, I
23   thought, you know, I had it going on.  When I started my
24   own practice, I thought I had it going on.  I thought
25   people that I had trained, we had it going on.  And --
```

20

```
1    Q    Were you involved in training staff members at
2  LOGS from an operations, non-legal operations,
3  standpoint?
4    A    Yes, sir.
5    Q    So, you developed some of the policy and
6  procedure manuals from an operations standpoint at LOGS?
7    A    Yes, sir.
8    Q    And then you actually implemented those policy
9  and procedures that you had refined or established?
10   A    Refined in some offices, those offices that I
11  created, certainly established, bringing over ideas from
12  other offices that were successful ideas and certainly
13  eliminating or actually those that were disastrous.
14   Q    Did you study other competitors' model?
15   A    I did.
16   Q    Who were some of the other competitors that
17  you studied?
18   A    I don't recall.  I -- I know as I created
19  pleadings or recommended forms of pleadings, I would go
20  to courthouses and I would gather up copies of, say, the
21  judicial state, complaints from the five largest guys
22  and, you know, kind of piece them together and worked
23  with the senior attorney to make sure that we were in
24  compliance with that particular jurisdictions, laws.
25   Q    At LOGS, did you have the same job title the
```

21

```
1  entire eight years you were there?
2    A    I don't remember. Job titles mean nothing
3  to me.
4    Q    So, if I would ask you what your job titles
5  were at LOGS, you would not remember them?
6    A    I wouldn't.
7    Q    Did your job responsibilities increase over
8  the eight years you were at LOGS?
9    A    Yes, sir.
10   Q    When you first went to Chicago -- and I
11  believe you told me that was within three months of
12  being employed with LOGS?
13   A    Yes, sir.
14   Q    Your job title was quality control rep or is
15  that just an acronym?
16   A    Quality control manager.
17   Q    Okay.  What were your job responsibilities at
18  that point?
19   A    When I went to Chicago?
20   Q    Yeah.
21   A    I was in Chicago, as I recall, about two days.
22  And the California operation became distressed and there
23  was a falling out between the partners.  One office was
24  in San Diego that handled foreclosures.  The other
25  office was in Westwood, California, right down the
```

22

```
1  street from UCLA and the partner that walked out walked
2  out from the Westlake office.  So, I was asked to go in
3  make an evaluation, see what staff was staying, what
4  staff was going, review the procedures, see why he
5  walked out, make recommendations to the national office.
6  And ultimately, that project entailed consolidating the
7  San Diego office and the Westwood office to Costa Mesa.
8    Q    So, it sounds like that you have a forte for
9  evaluating people within the mortgage industry,
10  employees, deciding who was maybe dead weight, who was a
11  keeper and how to best create a better functioning
12  environment?
13       MR. TEW:  Objection.
14       MR. SCRUGGS:  Objection to form.
15       MR. TEW:  Same objection.
16   A    Back at that time, I probably felt that I did,
17  keeping what I've learned and who has come into -- at
18  one time came into our world, I realized that I knew
19  very little.
20   Q    (By Mr. Jaffe) When you say "who's come into
21  your world," what do you mean?
22   A    Rick Powers, chief operational officer.
23  The amount of knowledge that he instilled into me in
24  the brief time that I was privileged enough to be with
25  him is just amazing.  And I looked back and I say,
```

23

```
1  yeah, I have a Political Science degree; I have a
2  Criminal Justice degree, minor in sociology and a law
3  degree.  But certainly, no degree from an operational
4  standpoint, managing by matrix and developing charts
5  and -- amazing.
6    Q    So, you had a gut.  You went with your gut,
7  and at that time frame, at least, it was successful?
8    A    I think it was.
9    Q    And you were rewarded appropriately from law,
10  just stayed with them eight years, you elevated, they
11  opened more offices?
12   A    Since we're on the record, I would say, I
13  don't believe that they rewarded me adequately.
14   Q    I understand.
15   A    Hence, my departure from them.  I worked 24/7
16  to make someone wealthy and profitable.  I decided that
17  I might as well do it for myself.  So, I --
18   Q    Okay.
19   A    Since my counsel didn't object, I object.
20  Listen, I don't regret it and it was an invaluable eight
21  years.
22   Q    Sure.
23   A    If I would have left after six years, who
24  would have known?  If I were to stay for nine or 10
25  years, someone else may have pioneered the industry.
```

24

```
 1        Q    So, you also learned the processes from a
 2   legal standpoint within the foreclosure business while
 3   at LOGS as well?
 4        A    I learned not as a practicing attorney.
 5        Q    Right.
 6        A    Or be an authorized practicing one.  But I did
 7   learn that as well.
 8        Q    I didn't say you cannot -- I'm certainly not
 9   representing to you that you practiced at that time, but
10   you certainly absorbed and understood the process, learn
11   the process, and from an intellectual standpoint, you
12   believe you were able to create your own systems that
13   would be more efficient for the client?
14        A    Correct, yes.
15        Q    And talk to me a little bit about the third
16   element, that is, that you believe that relationships
17   were one of the three most important things that you
18   learned there?
19        A    Perhaps the most important.  In my role as the
20   quality control guy, any time that a file had gone awry,
21   our office had gone awry, it was my watch.  I was the
22   captain of the ship.  And clients would reach out to me
23   and they would voice their frustrations or concern.  And
24   while I don't have the answers to everything, I have --
25   always had the will to find those answers.  And I
```

25

```
 1   believe that my ability to demonstrate that to the vast
 2   majority of the industry which LOGS represented allowed
 3   me to be of instant credibility the day I hung my
 4   shingle out on January 1st, 1994 where I could reach out
 5   to the clients with the results that were beyond my
 6   wildest dreams.
 7        Q    You just mentioned earlier that one of the
 8   important elements that you learned was using or
 9   creating milestones in the foreclosure process.  And
10   that is a very important element to the industry and
11   certainly to the client; is that correct?
12        A    Yes, sir.
13        Q    Please --
14        A    Not using or creating the milestones that were
15   existent already, a measuring tool that the industry had
16   established.  How long does it take you to get the
17   complaint filed, service completed, judgment entered,
18   sale held and sold for you.  So, using them or
19   establishing them, they were used as a tool.  So, I did
20   adopt that methodology.
21        Q    What milestones were in place at that time as
22   you just laid out?
23        A    Same.
24        Q    What dates?  What's the time frames?
25        A    It varies, depending upon the state.  You've
```

26

```
 1   got judicial foreclosures, you've got power sale
 2   foreclosures.  In Texas and Georgia, you can get a
 3   foreclosure done in 26 days -- Tuesday.  States like
 4   Maine, New York, different processes, different
 5   procedures, superior court versus circuit court.  Some
 6   states, you can file in Federal court.
 7        Q    Back in that time frame in Florida?
 8        A    I can answer that.  That time frame back then
 9   was about 270 days --
10        Q    From?
11        A    File received.
12        Q    Is that -- I've read that you've used the term
13   "cradle to the grave."
14        A    Well, don't believe everything you read, but,
15   yes.
16        Q    Is that a term you've used?
17        A    We do use "cradle to grave."
18        Q    All right.  Is "cradle to grave" a reference
19   to something like this, 270 days?
20        A    Yes, sir.
21        Q    All right.  Then we'll get to that later.  270
22   days from time a file was received into the office --
23        A    Yes, sir.
24        Q    -- to judgment?
25        A    Sale held.
```

27

```
 1        Q    Okay.  And so, my question, with regard to the
 2   Florida milestones -- back then, who sets it?  Do you
 3   set them?  Does the client set them?  Is the industry
 4   standard?  Please explain it.
 5        A    Fannie Mae and Freddie Mac.
 6        Q    Thank you.  Are they hard milestones?  Hard
 7   dates or goals?
 8        A    They are hard dates.
 9        Q    And what happens if you don't meet them?
10        A    If you have a excusable delay, like the
11   borrower's debt is problematic to post to tombstone, so
12   you have to -- that that would be an uncontrollable
13   delay.  Or if you've got a special in today's
14   environment where everything is litigious and class
15   action attorneys suing people, foreclosure attorneys
16   wiping people out.  Those are controllable delays, so we
17   would --
18        Q    Back then, it was --
19        A    It wasn't as litigious.  It was just a matter
20   of how people did things.  If there was a push and then
21   someone like me came on the scene and said, you don't
22   need 270 days you can do within.
23        Q    And so, did you create policy and procedure
24   manuals to reduce those milestones?
25        A    When I was at LOGS?
```

28

1   Q    I'm sorry, yes.

2   A    If the milestone was reduced by the investor,

3   then we would have to adjust the policies and procedures

4   to be consistent in that.

5   Q    So, the investor would attempt to control

6   milestones?

7   A    Yes, sir.

8   Q    Were there times where you, on behalf of LOGS,

9   would control the milestones?

10  A    No.

11  Q    Were there incentives for meeting or exceeding

12  milestones at that time?

13  A    I'm not sure I understand your question.

14  Incentives paid by whom?

15  Q    Were there bonuses to LOGS?  Were there

16  bonuses to LOGS if you met or exceeded milestones?

17  A    Not to the best of my knowledge.

18  Q    Were employees of LOGS given bonuses for

19  meeting or exceeding milestones?

20  A    Not to the best of my knowledge.

21  Q    Were there quotas, monthly quotas at LOGS?

22  A    Monthly quotas?  I'm not sure I understand the

23  question.

24  Q    If you would be kind enough, could you explain

25  to me the process while at LOGS, in a general sense,

29

1   client sends in a file to be foreclosed upon and how it

2   processes through the office.

3   MR. TEW:  You're talking about in --

4   Q    (By Mr. Jaffe) Fair enough.  Florida.

5   A    Florida?  Back in the LOGS days, it was set up

6   by stages.  So, if I would come in through the --

7   given to the type of department, they would have certain

8   period of time to move it to the next stage, which would

9   have been complaint stage.  Complaints that needed to go

10  over a certain period of time I don't recall what those

11  time frames were.  That was one of the separate set

12  of paralegals.  The file would then move, once the

13  complaint was filed to service, a different set of

14  paralegals because its stage concept.  Assembly line, if

15  you will.  Then it'd move to the next stage, judgment.

16  Then it moved to the sale stage.  And then it moved to

17  the post sale stage.

18  Q    Reviewing those stages, where would legal come

19  in?  Only at the judgment stage?

20  A    Yes, sir.

21  Q    Okay.  Because you mentioned paralegal on two

22  occasions.  I didn't hear the mention of lawyers

23  involved?

24  A    Well, they all involve lawyers because lawyers

25  have the obligation to supervise paralegals.  The

30

1   paralegals can't sign the complaint or review the

2   complaint, of course.

3   Q    Okay.

4   A    The service process is reviewed by an

5   attorney.

6   Q    Let's go back it up.  How about the title

7   department?

8   A    Back at LOGS?

9   Q    Yes, sir.

10  A    John Stupprich.  John Stupprich,

11  S-T-U-P-P-R-I-C-H, was the title mastermind esquire.

12  Title in the State of Florida is not the functionality

13  of attorneys --

14  Q    Absolutely.

15  A    -- practicing law, so it just depends how it's

16  set up and what resources you have.

17  Q    Okay.  At LOGS, was there title department?

18  A    John Stupprich was an attorney, but the

19  examiners, I don't recall who's examiner.

20  Q    And so, maybe I misunderstood.  Where was John

21  located?

22  A    Tampa, Florida.

23  Q    All right.  The complaints, those were

24  automated at this stage in the chronology --

25  A    Yes.

31

1   Q    -- of computers?

2   A    Yes.

3   Q    All right.  Paralegal would take certain data,

4   input it into their computer, complaint would be split

5   out for the review of a lawyer?

6   A    Yes, sir.

7   Q    Lawyer signs the complaint?

8   A    Or makes corrections.

9   Q    Makes corrections, complaints finalized, then

10  lawyer signs complaint?

11  A    Yes.

12  Q    All right.  And that's time to get service, so

13  paralegal drafts the necessary service papers?

14  A    Summons complaint unless picked and they'll

15  draft it together.

16  Q    Okay.  Packaged?

17  A    Trained, trailed -- Trained, trailed and

18  packaged and then filed together.

19  Q    Explain to me, if you will, if at LOGS, in

20  Florida, how many departments there within a given office?

21  A    Foreclosure, bankruptcy, eviction, deed and

22  lieu, title, litigation, it just depends that the top of

23  it the industry like today or a while back, loss

24  mitigation research, back in the LOGS days, I don't

25  recall the loss mitigation.

32

1    Q    Just for the record, kindly define what loss

2  mitigation means.

3    A    A review of a file to mitigate the loss with

4  some sort of remedy.  The remedy could either be whole

5  retention, modification, repayment, forbearance or

6  amount of retention, deed and lieu and short sale.

7    Q    Have those departments with the exception of

8  loss mitigation stayed consistent in the industry until

9  today?

10    A    In the State of Florida?

11    Q    Yes, I'm sorry.

12    A    Well, it depends.  There are firms out there

13  that do things other than just foreclosures.

14    Q    In foreclosure only offices, do you -- to the

15  best of your knowledge.

16    A    Yes, sir.

17    Q    And while at LOGS, you supervised and reviewed

18  each of those departments from a processes and systems

19  standpoint?

20    A    I had assistance.

21    Q    Of course, anyone.  I'm certainly not

22  recommending that you did that alone.  But although

23  24/7, you might have been able to.  And where you found

24  deficiencies, you were in a position to attempt to

25  remedy via creating new systems and policies and

33

1  procedures and then implementing?

2    A    In conjunction with the managing attorney

3  license in that state as well as the national office.

4    Q    So, it's fair to say at the end of eight

5  years, working 24/7 for somewhere else, making them lots

6  of money throughout this country, you knew the mortgage

7  foreclosure business at that point?  In your mind.

8    A    If it's based on where I am today or perhaps

9  where I was six months ago, I would say that I certainly

10  did.

11    Q    You sat for the bar while -- excuse me -- you

12  sat for the Florida Bar while employed at LOGS?

13    A    Yes, sir.

14    Q    Why?

15    A    Because when they hired me, they promised me

16  that 70 times, that I take Florida Bar, because I went

17  to Miami Edison, grew up in Florida, loved Florida, had

18  a condo on South Beach and I knew ultimately at the end

19  of the day that I wanted to get licensed and I wanted it

20  to be in Florida.  So, after a combination of them

21  sending me off on projects and me prioritizing projects,

22  we finally decided that I would no longer blow it off.

23    Q    And so, in 1990, you sat for the bar; in 1991,

24  passed the bar?

25    A    There are good memories in that post.  They

34

1  have promised me I could take it.  I signed up for it,

2  signed up for BARBRI, dare I say.  And various

3  things came up.  And they said, we need you.  And I

4  said, I'm going to quit unless you give me something in

5  writing that next time, you'll pay for three months, and

6  I would have to look in or see.  Since I was already

7  signed up for the bar, during this time period, they

8  said, why didn't you sit for it?  You've got nothing to

9  lose.  So, I sat for it.  I took the two-day cram

10  course.  Out of the essay questions, I eliminated the

11  ones I had test on the previous months, crammed the

12  other four essays in, sat for the multi-state, sat for

13  the essay.  I remember I finished the multi-state up

14  early.  And as I was sitting there, I drew A, B, C, D.

15  In an hour early, I'm spinning my pen.  The examiner

16  says, What are you doing?"  I said I'm double-checking

17  my answers.  And I passed.  That's it.

18    Q    Luck or genius?

19    A    They didn't know that part.  I did --

20        MR. TEW:  Put that in your online.

21    A    Yeah, yeah, my best-selling.  But we haven't

22  closed the chapter yet.  There's still a lot to be

23  written.

24        MR. TEW:  That's true.

25        MR. JAFFE:  That's true.

35

1    Q    (By Mr. Jaffe) So, you passed in 1991?

2    A    Yes, sir.

3    Q    Worked for LOGS for a few years?

4    A    Through 1993.

5    Q    At that point, now, you're a licensed attorney

6  in Florida, did you actually go to court?

7    A    Yes.

8    Q    The day you opened your office on January 1st,

9  1994, had you been in a courtroom as a lawyer?

10    A    I don't believe I had.  I know that I had

11  business cards.

12    Q    Are you married?

13    A    Yes, sir, 17 years in June 19.

14    Q    Congratulations.

15  Any kids?

16    A    Two.  Logan, 10.  Brianna, 14.

17    Q    That's a beautiful thing.

18    A    The best.

19    Q    When you resigned from -- did you resign from

20  LOGS?

21    A    I did, yes, sir.

22    Q    Okay.  You weren't fired?

23    A    No, sir, I wasn't fired.

24    Q    When was that?

25    A    I submitted in resignation July of 1993.  My

36

1   last day was December 31st, 1993.

2       Q       And January 1st, 1994, you opened your own

3   office.

4       A       Literally, on New Year's Day.

5       Q       Where?

6       A       2627 Northeast 203rd Street, North Miami

7   Beach, Florida, 800 square feet. Kind of like this,

8   pink walls, blue carpet, 2386 computers, rubber stamps,

9   copier we had to move by hand and an old-fashioned

10  checkbook with very little money in it. I love those

11  days.

12      Q       Single at that point?

13      A       Single. Janine, who was my girlfriend, now my

14  wife. I think we got married -- I know we got married.

15  I know we got married six months after that -- six

16  months after that, June 19.

17      Q       At LOGS, would you agree with me that LOGS at

18  that time in 1980s or in 1990s was representing

19  certainly the top 10 lenders in the United States?

20      A       In one state or another, but not in every

21  single state.

22      Q       And certainly --

23      A       I knew them all, sir.

24      Q       -- a vast majority of the top 20 lenders

25  actually in the country as well?

37

1       A       Yes.

2       Q       And since customer relations is one, if not

3   the most important elements to a successful business, in

4   general, I assume that they knew you were going to

5   leave?

6       A       I don't think they did. I don't think they

7   really thought that I would leave. At that point in

8   time, I was the third man --

9       Q       My mistake and I'm sorry for interrupting you.

10  But I don't like to waste your time.

11      A       Okay. Thank you.

12      Q       I was speaking about the clients, the lenders.

13  Did you contact them? Did you have some quiet

14  conversations with them, saying, fellas, it's time?

15      A       Before I left?

16      Q       Yes, sir.

17      A       No, sir.

18      Q       All right. So, we're clear. No contact with

19  any what was to be a hopeful client down the road before

20  you left, telling that you were going to leave?

21      A       None at that or in the top 20.

22      Q       Okay.

23      A       A friend of a friend said, go visit somebody

24  in Orlando. They may have some foreclosures for you.

25  And it's my trip down to turnpike where I got my first

38

1   business, it's hard to make, at the turnpike card

2   machine back then.

3       Q       All right. So, in January of 1994 in South

4   Florida, David Stern -- David J. Stern, PA is born?

5       A       I believe we incorporated in October of 1993.

6       Q       Okay.

7       A       But didn't pay no shingle, didn't have

8   anything. But I had already given my notice and decided

9   to move on. Because I wasn't sure what I was going to

10  do.

11      Q       All right. So, you gave notice in July,

12  incorporated in October-ish, and in January, pulled the

13  trigger, so to speak?

14      A       Yes, sir. Yes, I like it, pull the trigger.

15  Yes.

16      Q       January 1st, 1994, you had no employees. True

17  or false?

18      A       False.

19      Q       Who did you have as employee?

20      A       Cheryl Sammons.

21      Q       Anybody else?

22      A       Janine, but she painted her nails and wore a

23  baseball hat but wasn't paid.

24      Q       Careful, this is on.

25      A       I still have that picture of her.

39

1       Q       Good. Where did you first meet

2   Cheryl Sammons?

3       A       Charlotte, North Carolina, with the LOGS

4   offices, probably 1989.

5       Q       What was her job at that time in LOGS office

6   in Charlotte, North Carolina?

7       A       She's a legal assistant.

8       Q       How was it that you met? Just by you being in

9   that office?

10      A       Advertisement.

11      Q       Okay. Let's go back there for a second. Back

12  to LOGS. Were you responsible in any way in hiring

13  staff?

14      A       Every time I got to -- this is -- this is

15  pretty good. Hiring staff and --

16      Q       At the office?

17      A       Yes, I was.

18      Q       Your office?

19      A       Hiring, firing.

20      Q       Okay. And so, obviously, there came a time

21  when you were at the Charlotte area and you were

22  interviewing staff members and you met Cheryl Sammons?

23      A       Yes, sir.

24      Q       Okay. And I assume she was a fine-tuned act?

25      A       Yes, sir.

```
 1        Q    All right.  And at that time, was the
 2   Charlotte office open?  You were staffing it or you just
 3   have to getting staff to then open the office?
 4        A    I'll save us all some time.  There was a
 5   Shapiro and Davis law firm.  Shapiro and Ron Davis had a
 6   falling out.  Ron Davis wrote the clients saying, I want
 7   the files.  And Gerry wrote the clients saying I want
 8   the files.  And David Stern's job was to go in and find
 9   office space, find a managing attorney, hire staff and
10   get the clients comfortable that Gerry's lack of
11   physical presence would not be detrimental to the
12   client -- to the client's files.  That's where I put the
13   ad in the paper, and amongst others, I met Cheryl.
14        Q    How many offices did you establish like that?
15        A    20.
16        Q    So, obviously, you were already comfortable in
17   the basics of how to open a foreclosure law office?
18        A    I wouldn't say I was comfortable.  I would say
19   I was challenged each and every time.  And neurotic ego,
20   hyper-energetic and fearful of defeat or failure, so I
21   was anything but comfortable.
22        Q    But you knew how to do it?
23        A    I felt I did.  Yes, sir.
24        Q    And you did it repeatedly.
25        A    I did, yes, sir.
```

```
 1        Q    And the offices that you opened and staffed
 2   became profitable for the LOGS?
 3        A    Yes, sir, they did.
 4        Q    It's a good thing, though, that started you on
 5   your own.
 6        A    It did.  It did, no regrets.
 7        Q    So, on December 31st, 1993, you knew what you
 8   were in for.  You knew how to open your own office?
 9        A    Yes, sir.
10        Q    Obviously, there was a time in 1993, you spoke
11   to Cheryl Sammons and told her what you were going to
12   do?
13        A    I did, yes, sir.
14        Q    And can I assume that you encouraged her to
15   come and be part of it?
16        A    She looked at me like I was crazy.  She said,
17   you're the heir apparent of all these.  Why would you
18   ever leave?  And she goes, stop joking.  And I looked at
19   her and said, I'm not joking.  Come down to Florida,
20   you, Robbie, her husband, guys, in a nice, quiet office.
21   There won't be anymore 24/7.  We would have clients
22   yelling and screaming.  We'll get your house, we'll get
23   your little picket fence and live in a nice, new regular
24   law office practice, which lasted about four days.
25        Q    You didn't tell her you wanted to go big and
```

```
 1   have these big dreams and all that?
 2        A    I didn't have that idea.  I didn't have that
 3   thought.  I never ever imagined.
 4        Q    When you hired her in 1989 in Charlotte in
 5   this to be new office, how many people were staffed in
 6   that office in 1989?
 7        A    Well, I started the office from scratch.
 8        Q    Right.
 9        A    And there were three attorneys, probably a
10   staff of six.
11        Q    Can I assume she left in 1993?
12        A    She did leave in -- at the end of 1993, the
13   same time I left.
14        Q    Okay.  At that time, how many attorneys were
15   in the Charlotte office?
16        A    It's a pretty big office, about 20.
17        Q    Okay.  And how many staff?
18        A    45, 50 power sales, I would say.
19        Q    Between 1989 and 1993, how much contact did
20   you have with Cheryl Sammons?
21        A    I spoke to Cheryl -- Cheryl -- I spoke with
22   Cheryl on a -- almost daily basis.
23        Q    Why?
24        A    Because she left the Charlotte office,
25   probably six months after, her starting there, she was
```

```
 1   great at implementing.  She was good with people.  She
 2   was great with clients.  So, I asked her if she wanted to
 3   be on the national level and help me manage all the
 4   offices that I had and she accepted.
 5        Q    Let me make sure I understood you.  With
 6   regard to Cheryl Sammons' employment at LOGS, that
 7   lasted six months at the Charlotte office that you had
 8   just opened?
 9        A    That is correct.  Yes, sir.
10        Q    She resigned?
11        A    She went to the National Payroll and became a
12   national employee.
13        Q    So, you pulled her, so to speak, from the
14   single office.  You obviously saw something in her and
15   said she could be of asset to me clarity with the powers
16   to be, assuming, and you put her on to the national
17   seat.
18        A    She'd be an asset to the national
19   organization, and first and foremost, to allow me to
20   continue doing what I do.
21        Q    All right.  But during this entire time, 1989
22   to 1993, she stayed in Charlotte?
23        A    She maintained her residence there, to the
24   best of my knowledge.  I think so her husband lived
25   there, and she would be on the road either with me or
```

1  helping me do what needed to be done.
2      Q   What did she do?
3      A   She would go in and do some interviewing, some
4  review of reports.  She was key to me in reviewing
5  reports in terms of achieving milestones, how were these
6  offices moving.  Can't rely on the offices to
7  self-report, so we go in and do a spot check.
8      Q   National Auditors?
9      A   National Auditors.
10     Q   Since you --
11     A   But that was -- that wasn't her name.  I can't
12  repeat that.  But --
13     Q   Since you established the policies and
14  procedures, by this time implemented them, you
15  obviously -- I'll use the word "taught" her your
16  systems, and she was sharp enough to understand that and
17  then follow up LOGS' policies.
18     A   Accountability and visibility mean two key
19  components and accountability would be done through
20  reports, as basic as they were back then, vis-a-vis what
21  we're able to establish today, especially someone like
22  Rick Powers.  That was exactly what was assumed.
23         MR. SCRUGGS:  Can we take a break?
24         MR. JAFFE:  Sure.
25             (Thereupon, a short break was

1             taken.)
2         (Deposition resumed.)
3      Q   (By Mr. Jaffe) At time that you left LOGS and
4  Ms. Sammons left LOGS, how many attorneys were employed
5  with LOGS around the country?
6      A   I don't know.
7      Q   Ballpark?
8      A   I have no idea.
9      Q   More than a thousand?
10     A   I don't know.
11     Q   More than 500?
12     A   I'm sorry.  I don't know.  I don't recall.
13     Q   Okay.  We do know at least 33 offices at that
14  point, correct?
15     A   There were, yes, sir.
16     Q   Okay.  Do you have a recollection of the
17  average number of lawyers per office?
18     A   Yes, sir.
19     Q   How about the average number of staff per
20  office?
21     A   I don't recall.
22     Q   Okay.  So, is it fair to say that there were
23  at least a thousand staff members nationwide for LOGS at
24  that time?
25     A   For LOGS, I would -- I would say at least,

1  yes, sir.
2      Q   Okay.  At the time you left LOGS, what was
3  your job responsibility?
4      A   At the time I left LOGS, my job responsibility
5  was to oversee the offices that I had either
6  restructured or -- or in the process of restructuring.
7  The intent lies for me to have offices up and running
8  efficiently without my day-to-day interaction.
9      Q   Okay.  And what was Ms. Sammons' job
10  responsibility at that time?
11     A   To review reports, ensure that time frames
12  were being met, that operational guidelines, policies
13  and procedures were being followed.
14     Q   Both of you, at that time, "that time" being
15  1991, 1992, understood and had business in the state of
16  Florida on behalf of LOGS?
17     A   Yes, sir.
18     Q   The Tampa office had closed?
19     A   Yes, sir.  But that was not one of my offices.
20     Q   Okay.  Did Ms. Sammons -- prior to,
21  Ms. Sammons coming to South Florida to work with you,
22  did she have any training or experience in dealing with
23  state of Florida foreclosure process?
24     A   Not while -- not a while, working with me.
25     Q   At LOGS?

1      A   At LOGS.
2      Q   Okay.  Do you know if she had any prior
3  experience, in other words?
4      A   I don't know.
5      Q   All right.  And I believe you testified
6  earlier that you were in daily contact with Ms. Sammons
7  at that time?  "That time," again, being late or early
8  1990s up until the time you guys left LOGS.
9      A   Pretty much in that.
10     Q   Okay.  All right.  So, your referenced you
11  drove up to Orlando to get your first client in 1994.
12  Did I hear you accurately?
13     A   I believe it was either towards the end of
14  1993 or the beginning of 1994 after I had given my
15  notice to LOGS, but was uncertain what type of law I was
16  going to practice.
17     Q   Who is your first client?
18     A   My first client was three of them:
19  CitiMortgage, Chase and Bank of America, which was
20  Nation's Bank or NCMB, actually.
21     Q   And did you get retained during that trip up
22  to Orlando?
23     A   No, sir.
24     Q   All right.  So, you opened in January of 1994.
25  I believe you said within four months, that things

48

1    started moving, paraphrasing of course.

2        A    Certainly, things started moving fairly

3    quickly.

4        Q    At what point did you decide that you were

5    going to operate a foreclosure business, legal business?

6        A    I guess I always knew at some point that I

7    would do foreclosures, but I wanted to do other types of

8    law --

9        Q    Like what?

10       A    -- as well.  I like criminal law.  I like the

11   contract law.  When you become a solo practitioner, you

12   do whatever you need to do, as you know.  So, I didn't

13   have my sight set on anything, and I really was

14   uncertain, at the end of the day, how successful or

15   how -- how successful, I guess, I would be in taking

16   work for LOGS because we always have long-standing

17   relationships.  So, I really wasn't sure where I was

18   going to be.

19       Q    Okay.  What did you mean when you said within

20   four months, things changed?

21       A    Almost from Day 1 when I reached out to those

22   three clients, they all agreed to give me work.  So,

23   things changed certainly before four months.  And I

24   apologize, I don't remember alluding to four months.

25   But if I go back through the history, to the best of my

49

1    recollection, there was something happening positive and

2    not be on a weekly basis.  And we continue to grow and

3    grow and grow.

4        Q    So, you quickly learned that relationships you

5    had established over the last eight years at LOGS were

6    now paying off as it relates to your own personal law

7    office?

8        A    The relationships were paying off, that is

9    correct.

10       Q    They obviously recognized talent.

11       A    Or they appreciated me on my knees with no

12   direct deposit knee pads on.

13       Q    So, you begged for business?

14       A    I did, yes, sir.

15       Q    And they gave you the business?

16       A    They gave me an opportunity to earn it.

17       Q    Now, Ms. Sammons was your first employee; is

18   that fair?

19       A    She was.

20       Q    How quickly did you begin adding staff to the

21   Law Offices of David J. Stern, P.A.?

22       A    Probably two weeks.

23       Q    Okay.  And what type of staff:  Staff or

24   lawyers or both?

25       A    Yes, both.

50

1        Q    Do you recollect who your first legal hire

2    was?

3        A    Legal as in law -- lawyer?

4        Q    Yes.  I'm sorry.

5        A    There was an attorney by the name of

6    Michael Chase that was across the hall and he was

7    looking for extra work, so I hired him as a counsel and

8    paid him on a case-by-case basis.  As court appearance

9    were needed, telephonic hearings were needed.  His

10   wife, Barbara Chase, also an attorney, was my first

11   lawyer hire.

12       Q    Did you ever actively go to court as a lawyer

13   in Florida?

14       A    Yes, sir.

15       Q    Okay.  And how quickly into your own personal

16   practice did you appear in court?  Or was -- you opened

17   at January 1st, 1994.  Do you have a recollection of how

18   quickly you were in --

19       A    I believe 30 days on the motion to dismiss.

20       Q    Okay.

21       A    This is why it's totally different.  They are

22   LOGS', because I wasn't an attorney.  Now, I've become

23   an attorney -- or I became an attorney going in, arguing

24   cases, familiarity with case law, familiarity with the

25   rules of civil procedure.  Everything was done

51

1    differently from the LOGS.

2        Q    Because now, you're a practicing attorney?

3        A    Well, because I'm a practicing attorney and --

4    remember, everything I did at LOGS had to come with the

5    scrutiny of the national office.  In that one day when

6    Gerry didn't want me to do what I needed to be done or

7    felt needed to be done, it was a series of on-going

8    denials.  No, you can't do it this way; no, you can't do

9    it this way; no, you can't do it this way.  And then one

10   day, he said, "No, you can't do it this way.  If you

11   think you can do it better, then go out and do it."  And

12   that's exactly right.  I said goodbye and created things

13   that I wanted to do my way.

14       Q    Right.  Okay.  So, how quickly did you

15   institute the David J. Stern systems into your now new

16   law office?

17            MR. SCRUGGS:  Objection to form.  Vagueness.

18   Undefined terms.

19       A    What do you mean David J. Stern way of doing

20   things?

21       Q    (By Mr. Jaffe) Well, during the eight years

22   you're with LOGS, you've established policies and

23   procedures on how you believe to best run a foreclosure

24   practice, and you've instituted those policies and

25   procedures.  Did you take what you learned there and

52

```
 1   established at LOGS and instituted in your law office in
 2   January of 1994?
 3       A    No, sir.  Not for the most part because the
 4   states that I established policies and procedures were
 5   states different than Florida.
 6       Q    Okay.
 7       A    There were things that were the LOGS -- in way
 8   of the LOGS' philosophy, LOGS' budget constraints and
 9   lots of things that I wanted to do that I couldn't do.
10   And, of course, Florida was a -- a totally different
11   sort of state.  So, I was able to come up with different
12   ideas, different technology, different reports, and I
13   didn't have the accountability to the national office.
14   My accountability became direct to the client.  So,
15   processes -- the collar was taken off me, the rains were
16   gone and I was free to run as I felt, yes.
17       Q    Explain this to me though.  My only confusion
18   is when you first came into the LOGS Group, you were out
19   at the Tampa office which you turned into a distressed
20   office where you were with for three months.  And I
21   thought your job responsibility when you went nationally
22   was to clean up, for lack of a better word, distressed
23   offices.
24       A    When I started in Tampa, it was a distressed
25   office.  My primary focus there was -- it was distressed
```

53

```
 1   because there were issues in post-sale and evictions.
 2   So, I was able to go in, and in my mind, create systems.
 3   It wasn't, here's what I want to do and it's blast.  It
 4   was like David, you need to sit down.  Take a deep
 5   breath.  You need to understand that, A, you have no
 6   experience; B, you're not a lawyer and C, there are
 7   established guidelines that are uniform.  That's why
 8   clients used the LOGS Group because they have uniformity
 9   and guidelines were appropriate within the given states.
10       Q    So, when you opened up your Florida office in
11   January of 1994, did you put into place your idea of how
12   you wanted to run David J. Stern, P.A.?
13       A    I did, yes, sir.
14       Q    Okay.  And Ms. Sammons and yourself worked on
15   a daily basis to establish those guidelines and
16   protocols?
17       A    Yes, sir.
18       Q    And when was the first time you created a
19   policy and procedure manual for your law office?
20       A    I would say almost from Day 1.
21       Q    And was it -- when you first opened your
22   office, what title company did you use?
23       A    Attorney's title, abstract, attorney, the
24   fund.
25       Q    By the end of 1994, how many attorneys did you
```

54

```
 1   have working on, ballpark?
 2       A    I don't recall.
 3       Q    Two?
 4       A    Counting myself?
 5       Q    Sure.
 6       A    Who will be part of the team?  85.
 7       Q    In late -- end of 1994, how much staff did you
 8   have, non-legal staff, approximately?
 9       A    Thirty.
10       Q    Had you moved locations already?
11       A    Don't hold me to the time frame, but we
12   quickly moved from North Miami Beach to Hollywood.
13       Q    Where in Hollywood?
14       A    4600 Sheridan Street, Hollywood, Florida.
15       Q    From 800 square feet in North Miami to how
16   much in Hollywood?
17       A    North Miami, went from 800 to 1,600 --
18       Q    Okay.
19       A    -- to 2,400 to 3,200.  We then outgrew the
20   space.  We were hated because we took all the parking.
21   So, we moved to Hollywood where we took 6,000 square
22   feet.
23       Q    Was that in 1994?  Right when you moved into
24   1995-ish?
25       A    If I'm guessing, we moved into early 1995-ish.
```

55

```
 1       Q    Okay.  How long did you stay in Hollywood?
 2       A    I've -- I'm thinking about a year, and then we
 3   moved to Plantation, Florida, 801 South University
 4   Drive, Plantation, Florida 33324.  We --
 5       Q    I'm sorry.  When was that?
 6       A    That was 1990- -- I want to say 1995, 1996.
 7       Q    Oh, so, you only stayed in Hollywood a very
 8   short time?
 9       A    We outgrew the space.
10       Q    Okay.  How much square feet did you take at
11   your first Plantation office, the 801 space?
12       A    Either -- I think it's 32,000 square feet.
13   More than we needed, but space was like $7 per square
14   foot or it's $5 per square foot plus cam charge of $7.
15   It was owned by a Trust and the Trust wanted us to take
16   the whole thing.  It used to be a Stein Mart.  So, at
17   the end of the day, they ended up probably paying me
18   rent.
19       Q    Timing is everything.  When you moved to
20   Plantation, approximately how many lawyers did you have
21   work for you?
22       A    When I first moved there?
23       Q    Yes.
24       A    10, 12.  I -- I can't remember.
25       Q    And approximate staff?
```

```
 1        A    A hundred.
 2        Q    What was Ms. Sammons' job title at that point?
 3   I know you don't like job titles but just --
 4        A    No, she had one.  Everybody has to have one,
 5   you know.  She was the office manager.
 6        Q    More importantly, what were her job
 7   responsibilities?
 8        A    When we moved to Plantation?
 9        Q    Yes, sir.  Oh, actually, did they change from
10   at the time you moved in North Miami to Plantation?
11        A    Well, when we were in North Miami, she did
12   everything.  She did proofs of claims in bankruptcy, she
13   wrote checks, she helped me do closings.  She did it
14   all.  When we moved to Plantation, she was the office
15   manager in charge of hiring and firing in all areas.
16   She -- we developed a whole new set of tracking,
17   processes.  Everything had changed from the LOGS' days.
18   So, she would assist me as a liaison with -- speaking
19   with clients, which, in the past, would never have
20   happened.  And she did interviews --
21        Q    At this stage in her career, it sounds like
22   she could effectively do every aspect of the business
23   except appearing to court?
24             MR. SCRUGGS:  Objection to form.
25             MR. TEW:  Yeah, same objection.
```

```
 1        A    I disagree.
 2        Q    (By Mr. Jaffe)  Okay.  What couldn't she do
 3   effectively at this point in 1996?
 4        A    She didn't have relationships with client, she
 5   couldn't do client development.  She could speak to them
 6   to answer a status question but she couldn't go out and
 7   draw up a business.
 8        Q    Fair enough.  Let's carve out business
 9   development.
10        A    Okay.
11        Q    In-house back office stuff, she could
12   effectively run each element of the business of
13   David J. Stern, P.A.?
14        A    No, she couldn't do the accounting, she
15   couldn't do the evictions, she couldn't do the
16   bankruptcies, she couldn't do the contested cases, she
17   couldn't do the title, the searches or the exams, she
18   could, certainly, if I needed her to do a proof of
19   claim.  But at that point in time, things became
20   electronic-based or -- so, that wasn't her -- her job
21   description.  So, I have to disagree.
22        Q    Did you have somebody that would review titles
23   at that point?
24        A    I did, yes, sir.
25        Q    Who -- or how many?  Who?  Excuse me.
```

```
 1        A    What period of time.
 2        Q    Fair enough.  Early 1996, if you remember.
 3        A    Sam Silvergate, attorney with me almost from
 4   the beginning.  In my opinion, he's one of the leading
 5   authorities with title and helped established our title
 6   operation and maintained the relationship with
 7   attorney's title.
 8        Q    When did he become employed by David J. Stern,
 9   P.A.?
10        A    1994, early.
11        Q    Okay.  And Sam later headed up what was then
12   to be known as Professional Title & Abstract?
13        A    That is correct, yes, sir.
14        Q    And so, is it fair to say that you had daily
15   contact with Sam -- 1994 to, certainly, 1996, you had
16   daily contact with Sam?
17        A    No.
18        Q    And why is that?
19        A    Title -- title, there's no reason for me to be
20   involved or anything.
21        Q    Was he on your physical plant, Sam, at that
22   time frame?
23        A    In our facility?
24        Q    Yeah.
25        A    In our office?  Yes, sir.
```

```
 1        Q    Okay.  Sam was employed by you and paid by you
 2   at that time.
 3        A    I'm not sure if he was paid by the law
 4   offices.  I -- I -- I don't recall.  He was -- he was
 5   obviously paid, not by me individually or personally.
 6   He was either paid by the Law Offices of David J. Stern
 7   or Professional Title & Abstract.
 8        Q    When was Professional Title & Abstract
 9   incorporated?
10        A    1994.
11        Q    And who incorporated it?
12        A    I don't know.
13        Q    Who were its officers?
14        A    Myself.
15        Q    Who were its directors?
16        A    Myself.
17        Q    Was there anybody besides yourself on the
18   board?
19        A    I don't believe so.
20        Q    Okay.  Can you give me an idea of the volume
21   that David J. Stern was opening on a monthly basis in
22   1996 once you've moved to Plantation?
23        A    1996 -- I -- I can't.  I'm sorry.
24        Q    In 1996, when you moved into Plantation, can
25   you tell me what departments you had?  When I say "you,"
```

60

```
 1        I'm taking about David, the law office.
 2        A    Well, there was Professional Title & Abstract,
 3   there was foreclosure department, there was a bankruptcy
 4   department, there was an eviction department.  There
 5   would be essential departments that were necessary to
 6   provide full capacity record, mortgage lend direct
 7   presentation.
 8        Q    And at this point, you had instituted the
 9   systems with no-collar on your ability to create
10   systems, like you had a lot, you would get instituted
11   those systems within to -- into your law office.
12        A    With any practice, there is going to be
13   systems, processes and procedures.  I did not like the
14   way of LOGS, their methodology, their technology.  I
15   liked a very little from there.  So, as I've said, if
16   you said my reigns were removed and I was free to do
17   things consistent with my dream.
18        Q    And you did that?
19        A    And I did that, yes, sir.
20        Q    And Ms. Sammons instituted those systems as
21   adjunct to you?
22        A    What time period?
23        Q    1996.
24        A    She would not have instituted all of them.  It
25   would have been -- with LOGS, they've -- LOGS had
```

61

```
 1   central accounting, central HR.  We have our own
 2   accounting.  Cheryl couldn't do that.  HR, Cheryl
 3   couldn't do that.  Insurance, workman's comp, Cheryl
 4   couldn't do any of that.  Totally different, totally --
 5   totally different world.  Cheryl didn't have the
 6   expertise to implement requirements under the bankruptcy
 7   code or in litigation department, just things that she
 8   couldn't do.  They were more in the foreclosure area and
 9   perhaps working with HR, assisting in some hiring,
10   second interviews, whatever the case may be.
11        Q    With regard to the foreclosure department, she
12   was able to institute your systems in a foreclosure
13   department?
14        A    Correct.  Correct.
15        Q    And that had been her specialty with you
16   previously?
17        A    Well, it -- it had, but that was with the
18   Shapiro vision, not with my vision.  So, I had to say,
19   no, no, we're not going to do it that way.
20        Q    Right.
21        A    And she learned quickly before she went down
22   that road more than not.  We actually went the opposite
23   direction.
24        Q    Were you working 24/7 at this point?
25        A    Yes, sir.
```

62

```
 1        Q    You can't change.  And --
 2        A    I've been working 24/7 since I was 10 years
 3   old.
 4        Q    I assume Cheryl Sammons worked similar hours
 5   as you did?
 6        A    No, sir.  I don't require sleep or food.  She
 7   requires sleep and food.
 8        Q    Okay.  With respect to when she do work, there
 9   was a plenty of time for you to explain and express your
10   vision to her?
11        A    Yes, sir.
12        Q    Okay.  And now that the collar is off, you did
13   that and you established the systems that you wanted to
14   place within your law office?
15        A    Better procedures than LOGS had, more
16   effective, more efficient, all the way around.
17        Q    And taught into her or she'd learned and --
18        A    Taught into her, she learned, she threw in her
19   two cents.
20        Q    And then carried them out through staff?
21        A    The policies and procedures, sometimes without
22   her two cents and sometimes her two cents.
23        Q    Okay.  In 1998, did your business take a turn
24   for the better?
25        A    My business took a turn for the better every
```

63

```
 1   year.
 2        Q    Fannie Mae named you to the attorney network
 3   in 1998?
 4        A    I'm not sure which year.
 5        Q    Was that of any significance to your ability
 6   to grow your business?
 7        A    For Fannie Mae?
 8        Q    Yes.
 9        A    Certainly nice to have on your resume but when
10   we were selected as Fannie Mae attorney, there was no
11   requirement that the services use Fannie Mae attorney
12   network.  I believe at that point in time, we had
13   established very solid client base.  And had we not been
14   selected under the -- the structure of the program back
15   then, we didn't feel that it would really hurt us
16   because relationships had been established.  It could
17   certainly help us as new services or potential new
18   clients go into the Fannie Mae service or approve.
19   Attorney Weston said, "Hey, if you're good enough
20   for Fannie, we'd use you."  So, if -- if your year
21   of 1998 is correct in that, and I don't recall if
22   it is, if we have just starting off that year, it would
23   have probably been a great thing.  But had we already
24   been established, again, under your timeline, four years
25   earlier, I don't think it made no difference.
```

Q    The fact that you were named attorney of the
year in 1998 and 1999 by Fannie Mae, did that have any
positive impact on your business?

A    I'm not certain if -- if it was those years,
but it was certainly something I believe that the
industry recognized.  It's something that I, again, put
on my resume.  I unfortunately, while in attendance at
the Mortgage Banker conferences, didn't have clients,
you know, like poodle on my legs saying, oh, my
God, you are the attorney of the year.  Come and get my
files.  But from a personal achievement and the
achievement of my folks and a part of success is sharing
it with the people that have gotten where they are.  And
I felt, I think, more proud for them in their
accomplishments necessarily than for me.

Q    When is the last time you handled a
foreclosure in a courthouse in person?

A    You guys are supposed to object.  What do you
mean "handle"?

Q    Went to the courthouse on behalf of a client.

A    Six, seven months ago.

Q    So, would you agree with me that you yourself
have maintained an active courtroom presence in the
South Florida market handling foreclosures on behalf of
clients?

A    I wouldn't -- .  Given the fact that we have
thousands and thousands and thousands and tens of
thousands of cases and the fact that I went seven months
ago, I would not say that I personally maintain activity
or really any hands -- just take hand -- hands-on
activity from an operations standpoint in -- in several
years.

Q    Let's see if I can put some brackets on these.
You went to court when you opened your own office in
1994?

A    Yes, sir.

Q    Did you maintain an active courtroom practice
for any period of time when you had your own office?

A    I'm going back, obviously, further than I care
to say, 17 years.  But in the beginning where it was
just myself and my chains of counsel, I did go to court
for a few months.  My focus at that point in time became
quite clear.  Do I go to court or do I take care of the
clients in the client relations?  I can hire people all
day long to go to court.  I could not nor did I have any
desire to try to hire any marketing folks.  That was
always been my forte.  So, it was very quickly that I
relinquished my court functionality.  It's nice to go
every once in a while.  It's actually or it was quite
flattering to go to court.

Q    When did you think you relinquished?
Approximately what year?  It was in the 1994?

A    From 1994 till seven months ago, I went to the
court with some frequency.  Maybe -- I went to court at
some point that maybe or it's just once every month,
once every three months.  In 1994, I was doing
telephonic hearings and I was appearing in the
tri-county.  If I go back, you know, two or three times
a week, certainly, in 1995, that was not what I -- I
did.

Q    How about 1996?  All I'm trying to get through
is the time frame in which you became, like you said,
less involved in the court system operations of your
business and more involved in client development and
overall running of the operation.

A    Certainly, 1996, 1997 --

Q    Okay.

A    -- simply because trying to keep up with case
law, trying to find time -- David, you're visiting a
city in St. Louis, you need to sign this pleadings.  At
the training, that is necessary -- necessary.  As local
rules change, judge requirements change.  So, it got to
a point where it was quite clear in my mind and the
minds of the trusted attorneys from the senior level
that I better not be the cook in the kitchen anymore.

Q    What was your best guess what year that was?

A    More so sooner than later.  I -- I would say
1996, 1997.

Q    Okay.  Who was your first managing attorney?

A    Well, when it was just Cheryl and I, it was
me.  It was Mary Mendieta.
Mary was hired in 1994.

Q    Okay.  So, Cheryl Sammons and Mary Mendieta
where with you since 1994.  I guess you just said that.

A    On full circle, I haven't.  Well, yes, sir,
that's correct.

Q    So, keeping good staff is an important part of
your business?

A    Keeping good, educated, hard working staff is
key to any business.  It doesn't matter if it's the
7-Eleven or Walmart or AutoNation.

Q    1998, your office was sued in a class action
and that class action resolved; is that correct?

A    In 1998, our offices -- my office was sued in
the Bryant class action as where two other big
competitor law firms, the Codilis Law Firm and the
Shebria Law Firm.

Q    And that case was resolved?

A    That case was resolved, yes, sir.

Q    Do you recollect, as you sit here today, what

```
 1    the allegation was in that case?  And I say the
 2    allegation.
 3        A    Allegations?
 4        Q    Fair enough.
 5        A    Overcharging for title, which in Codilis case,
 6    the Judge said 325 is fine.  Because that's what Fannie
 7    and Freddie said could be charged.  They alleged that we
 8    needed to keep time records, which in the Codilis --
 9    Beck v. Codilis the court said they will need to do.
10    The only issues that we had unresolved that never went
11    to hearing because they were settled or they did not
12    like the way that Professional Title & Abstract was
13    structured, they felt who was a shelf corporation
14    because it wasn't formalized.  Period of settlement, we
15    agreed to formalize it.  We also --
16        Q    When you say "formalized," what does that
17    mean?
18        A    They didn't like the way that it -- that
19    payroll was set up or the lack of payroll was set up.
20    They didn't like the way -- that it need the appearance
21    of a shelf corporation.  What they did conceive was the
22    amount that Professional Title and the law firm charged
23    for Title was reasonable and customary.
24        Q    You ultimately paid 2.2 million to settle that
25    case?
```

```
 1        A    Insurance company, yes, sir.
 2        Q    Unfortunately, in 2002, there was a bar
 3    grievance filed against you?
 4        A    Yes, sir.
 5        Q    In 2002, were you publicly reprimanded?
 6        A    Yes, sir.
 7        Q    And what was the basis of that, if you
 8    recollect?
 9        A    It was Professional Title & Abstract, the fact
10    that the court felt we were misleading by providing
11    invoices from Professional Title & Abstract when
12    Professional Title & Abstract appeared to be a shelf
13    corporation.  And again, the Florida bar, in terms of my
14    public reprimand, did recognize that the charges were
15    customary and reasonable.  They just didn't like the
16    fact that we said Professional Title bill the law firm
17    325 when they were an area of Professional Title but no
18    true Professional Title & Abstract employees.
19        Q    At what point did your law office begin using
20    a centralized computer system?  It seems like a stupid
21    question, but please answer it.
22        A    Well, Cheryl and I had two 386s hooked
23    together.  So, I would say January 1st, 1994.
24        Q    Okay.  And did your law office and each of its
25    developing departments over the years continue to use a
```

```
 1    centralized computer system?
 2             MR. SCRUGGS:  Objection to form.
 3        A    I'm not sure what your definition of
 4    "centralized" is, if one cord goes to the other cord.
 5    Yeah, but that's a -- a techie question.  And you would
 6    need Norman Gottschalk to help me.
 7        Q    (By Mr. Jaffe) All right.  Let's go there and
 8    get that out of the way.  Who would be the person with
 9    the most knowledge to answer IT-type questions of mine?
10        A    The chief information officer, Norman.
11        Q    Full name, please.
12        A    Norman Gottschalk.
13        Q    Spell the last name for the court reporter.
14        A    G-O-T-T-C-H --
15             MR. BERNSTEIN:  -- S-C-H-A-L-K.
16        A    -- A-L-K.  I'm lost without my Blackberry, the
17    piece of technology I do know.
18        Q    (By Mr. Jaffe) Okay.
19             MR. BERNSTEIN:  Just for clarification, he is
20        the chief information officer at DJSP Enterprises.
21        It's not a law firm.
22        Q    (By Mr. Jaffe) How long was he been employed
23    in your world?
24             MR. SCRUGGS:  Objection to form.
25             MR. TEW:  Same objection.
```

```
 1        A    He went public in January of 2010.  Created
 2    the back office 13 months, 12 months, something like
 3    that.
 4        Q    (By Mr. Jaffe) So, in the 2000 areas, 2001,
 5    2002, 2005, in that time frame, who ran your computer
 6    system?
 7        A    Vince Petrov.
 8        Q    Okay.  And what years did he work for the law
 9    office?
10        A    Vince worked for the law office, I'm guessing,
11    somewhere in 1986 -- 1996.  1996.  And then he became an
12    employee of DJSP on October -- on January 15th.
13             MS. DOUCETTE:  January 15th?
14        A    January 15th -- I'm sorry -- 2010.
15             MS. DOUCETTE:  I'm sorry, I didn't hear him.
16             MR. JAFFE:  It's okay.
17        Q    (By Mr. Jaffe) And you don't like job titles,
18    so I'm going to just ask it this way, he ran your
19    computers up until January 15th, 2010, your computer
20    systems?
21        A    Yes, yes.  I don't -- I don't know what his
22    title.
23        Q    That's why I didn't ask.  To the best of your
24    knowledge, is he still employed with DJSP?
25        A    He is not.
```

72

```
 1        Q    Do you know where he is?
 2        A    I do not.
 3        Q    Are you able to tell me on an annual basis
 4   what type of caseload your law office maintained in the
 5   mid-2000s, for example, 2005, 2006?
 6        A    As I sit here today, no.
 7        Q    Okay.  If I were to say to you that I've read
 8   somewhere -- and again, that's why I'm asking, I've read
 9   somewhere that you've handled approximately 15,000
10   foreclosures, you, your office in 2006 throughout the
11   State of Florida, does that sound accurate?
12        A    I'm sorry, all the years all run together.
13        Q    Okay.  Did there come a time after 2006 where
14   your business took a dramatic increase?
15        A    Yes.
16        Q    And when would that have occurred?
17        A    We've been in our existing space, 900 South
18   Pine Island Road, Plantation, Florida 33324 for three or
19   four years.  So, that's when the business had dramatic
20   growth.  So, doing some math, I would say 2007, 2008.
21        Q    All right.  Let me back up a little bit.  I'm
22   sorry for not doing that earlier.  You moved into, I
23   believe, 801 space in Plantation in 1996, correct?
24        A    Well, let's see, we have a 10-year lease
25   there.  Simply, we stayed there until 1996, 2006 but
```

REIF KING WELCH LEGAL SERVICES
www.reifkingwelch.com  (877) 291-DEPO (3376)

73

```
 1   then we had somewhere near about that years -- or a
 2   couple of years.
 3        Q    Okay.  All right.  Now, then you moved into
 4   the 900 South Pine Island Road space?
 5        A    Yes, sir.
 6        Q    Okay.  In approximately 2006, 2007?
 7        A    2007, 2008.
 8        Q    Okay.  Did you vacate the 801 space completely
 9   at that point?
10        A    Yes, sir.
11        Q    Did you have any other space in Plantation at
12   that point other than the 900 space?
13        A    For what?
14        Q    Anything.
15        A    Yes, sir.
16        Q    What would that have been?
17        A    I had default servicing in Louisville,
18   Kentucky.
19        Q    Okay.
20        A    This is when I moved in, 2008.  A couple of
21   storage areas, that's all Arena Default Servicing.
22   Professional Title and the law offices -- Professional
23   Title was with the law offices at that time.
24        Q    Okay.  Default servicing, what was that?  In
25   this time frame?  2007?
```

REIF KING WELCH LEGAL SERVICES
www.reifkingwelch.com  (877) 291-DEPO (3376)

74

```
 1        A    It was a company that I created that
 2   specialized in real estate owned liquidation on behalf
 3   of lenders.
 4        Q    You created it when?
 5        A    1999 -- 1998, 1999.
 6        Q    Who were the officers and directors?
 7        A    Myself.
 8        Q    And were you the managing member?
 9        A    I believe, yeah.
10        Q    In --
11             MR. SCRUGGS:  Okay.  Managing member, I think
12   default services of the corporation.
13             MR. JAFFE:  Right.  That's what I know.
14             MR. SCRUGGS:  All right.  So, it wouldn't be
15   managing --
16             MR. JAFFE:  Correct.  That's why I didn't
17   follow up on it.
18        Q    (By Mr. Jaffe) Would you agree with me that
19   between 2006 and 2009, your staff triples from
20   approximately 400 to approximately 1200?
21             MR. SCRUGGS:  Object to the form of the
22   question.
23        A    What were the dates again?
24        Q    (By Mr. Jaffe) 2006 to 2009.
25        A    There's huge increase.  I don't -- I don't
```

REIF KING WELCH LEGAL SERVICES
www.reifkingwelch.com  (877) 291-DEPO (3376)

75

```
 1   know if it tripled.  I have to check with HR on that.
 2        Q    Let's talk about HR for a second.  Who was
 3   your first director of HR?  Cheryl Sammons, 1994?
 4        A    Or me.
 5        Q    Or you?
 6        A    Gosh.  There were a couple of people.  I -- I
 7   cannot remember their names.  And then Shameeza Ishahak.
 8        Q    Please try to spell that for the court
 9   reporter.
10        A    I should know how to spell all these names,
11   but Shameeza's been gone for a while.  I don't want
12   to -- I don't want to butcher it.  Okay.
13   S-H-A-M-E-E-Z-A then I-S-H-A-H-A-K.
14             MR. JAFFE:  Ladies and gentlemen, it's 12:05.
15   I think we should break for lunch.  At this point,
16   certainly, I have lots more to cover, but I think
17   we should probably grab some lunch.  And I'd like
18   to be back 1:00.  Is that doable?
19             MR. SCRUGGS:  Yeah.
20             MR. JAFFE:  All right.
21             (Thereupon, a short break was
22             taken.)
23             (Deposition resumed.)
24        Q    (By Mr. Jaffe) All right.  We're back on the
25   record for our afternoon session.  I'm going to pick up
```

REIF KING WELCH LEGAL SERVICES
www.reifkingwelch.com  (877) 291-DEPO (3376)

76

```
 1    with your move into the 900 South Pine Island Road
 2    location.  Okay?
 3        A    Yes, sir.
 4        Q    All right.  And just for time frame purposes,
 5    that's some time between 2007, 2008, correct?
 6        A    Yes, sir.
 7        Q    All right.  At that time -- and that is the
 8    space that up to about recently or maybe even now is
 9    currently occupied with the Stern operations; is that
10    correct?
11        MR. SCRUGGS:  Objection to form.
12        A    When you say "Stern operations," what
13    operations?
14        (By Mr. Jaffe) You know what, let's leave that
15    alone.  We'll get through to that in its natural course.
16    When you moved into the 900 space, the law office and
17    Professional Title and Abstract moved into that space,
18    correct?
19        A    Yes, sir.
20        Q    And how many floors did you occupy initially?
21        A    Initially, one floor.
22        Q    And did there come a time where you occupied
23    more than one floor in the 900 space?
24        A    Yes, sir.
25        Q    And how many floors ultimately did you occupy
```

77

```
 1    at its height?
 2        A    When you say "floors," you're talking about
 3    four floors or portion of it?
 4        Q    Fair enough.  Let's just keep it globally and
 5    then I'll narrow it down.  Any portion of any floor.
 6        A    Five.
 7        Q    Okay.  So, any reports that you occupied eight
 8    floors or any portion of eight floors is grossly
 9    exaggerated?
10        A    We -- we did not occupy, in any way, shape or
11    form, eight full floors.
12        Q    How about eight partial floors?
13        A    I'm sorry.  Everything to do with this is --
14    is -- is grossly magnified and outstretched.  But having
15    said that, we occupied all of four, all of five, all of
16    six and all of seven and just a very small portion of
17    two.
18        Q    All right.  Floor two?
19        A    Yes, sir.
20        Q    All right.  So, all of four, all of five, all
21    of six, all of seven, and to, to use your word, small
22    portion of Floor No. 2?
23        A    Yeah.  But, you know what, I think ultimately
24    we did make it to floor number eight.
25        MR. TEW:  Now we're talking Pine Island in
```

78

```
 1        2006?
 2        A    Pine Island, uh-huh, 900.  No, he said at any
 3    point in time.
 4        MR. TEW:  Well, then let's differentiate --
 5        MR. JAFFE:  At its height.
 6        MR. TEW:  All right.
 7        MR. JAFFE:  We're okay?  All right.
 8        A    At its height, we would have occupied a small
 9    portion of --
10        MR. TEW:  And you're talking about the law
11    firm, not the --
12        A    I was saying Stern --
13        MR. JAFFE:  -- operations.
14        MR. TEW:  Well, I object to that.  There is no
15    such thing as Stern operations.
16        MR. JAFFE:  All right.
17        MR. TEW:  It was a law firm until 2010, then
18    there was DJSP Enterprises and subsidiaries and
19    there was a law firm.
20        MR. JAFFE:  I'll rephrase.
21        Q    (By Mr. Jaffe) Up until December 31st, 2009,
22    how many floors did the Stern Law Office and
23    Professional Title and Abstract occupy?
24        MR. BERNSTEIN:  Can I just clarify that you're
25    asking in the 900 South Pine Island Road address
```

79

```
 1    only?
 2        MR. JAFFE:  Sure.
 3        A    In December 31st, 2009, so that would have
 4    been 10.  To the best of my recollection, we occupied
 5    four, five, part of six and all of seven.
 6        Q    (By Mr. Jaffe) And nothing on floor number two
 7    at that point?
 8        A    I do not believe so.
 9        Q    Okay.  As of December 31st, 2009, did you have
10    leases on any other space other than the 900 space, in
11    different building?
12        A    The Law Offices of David J. Stern?
13        Q    Yes.
14        A    We may have had some month-to-month leases in
15    the building next door on a small scale.
16        Q    What would that have been?  What address would
17    that have been?
18        A    1000 Pine Island.
19        Q    As of December 31st, 2009, Default Servicing
20    was still in Kentucky?
21        A    Yes, sir, I believe.
22        Q    Okay.  How many employees did the law office
23    have in December 31st, 2009 to the best of your
24    recollection?
25        A    I don't recall.
```

```
 1        Q    How many lawyers?
 2        A    I don't recall.
 3        Q    Who is your managing attorney or attorneys in
 4   2009 -- December 2009?
 5        A    Miriam Mendieta and Beverly McComas.
 6        Q    When did Ms. McComas become employed by you,
 7   approximately?
 8        A    2000.
 9        Q    How often would you meet with Cheryl Sammons
10   in the Year 2009?
11        A    For what purpose?
12        Q    Any.
13        A    Which can typify any of the agreements in a
14   while, once a month maybe.
15        Q    At that point in 2009 -- during the period of
16   2009, did she have the authority to hire and fire?
17        A    She did have the authority to hire and fire,
18   yes.
19        Q    Both lawyers and non-lawyers?
20        A    Not lawyers.
21        Q    Who had the authority to hire and fire
22   lawyers?
23        A    Miriam Mendieta and Beverly McComas.
24        Q    Okay.  Is it your testimony that you did not
25   meet with Cheryl Sammons on a daily basis in 2009?
```

```
 1        A    Absolutely, 100 percent, my testimony.
 2        Q    Let me clarify my question a little bit.  Is
 3   it a fair statement to say that any day you were in the
 4   office you would at least have a meeting with Cheryl
 5   Sammons?
 6        A    Inaccurate statement.
 7        Q    All right.  Did you, as part of Cheryl
 8   Sammons' compensation, buy her a new BMW on an annual
 9   basis?
10        A    I did not.
11        Q    Did you buy her -- did you lease her a BMW on
12   an annual basis?
13        A    Short term.  Short term.  She didn't want it.
14   After she got it, she didn't want it.
15        Q    Okay.  Have you ever leased Cheryl Sammons a
16   car?
17        A    Yes.
18        MR. TEW:  "You" meaning who, the law firm?
19        Q    (By Mr. Jaffe) "You" being you, personally?
20        A    No, I did not.
21        Q    "You" being the law office?
22        A    Yes, sir.
23        Q    How many times?
24        A    Three times, four times.
25        Q    Approximate years?
```

```
 1        A    I don't recall.
 2        Q    Late 2000s?
 3        A    Sure.
 4        Q    Did you commonly pay her bills including her
 5   mortgage?
 6        MR. TEW:  When you say "you" --
 7        Q    (By Mr. Jaffe) You, personally.
 8        MR. TEW:  Okay.
 9        A    No, sir.
10        Q    (By Mr. Jaffe) The law office?
11        A    Pay which -- what bills?
12        Q    Any of her bills.
13        A    No, sir.
14        Q    Did you, on a regular basis, take her on
15   business trips with you?
16        A    How do you define regular basis?
17        Q    At least twice a year.
18        A    Twice a year, yes, sir.
19        Q    Would you describe your relationship with
20   Cheryl Sammons in 2009 as one wherein that you would
21   often be found yelling at each other within your office
22   or her office?
23        A    No, sir.
24        Q    In 2009, how would you describe her role
25   within your law office?
```

```
 1        A    In 2009, she was the operations manager.  She
 2   have responsibility for the foreclosure side in
 3   conjunction with HR and worked on a day-to-day basis
 4   with Miriam and Bev to run the firm.  It was her watch,
 5   Miriam's and Bev's watch.
 6        Q    You were no longer the captain of the ship at
 7   that point, in your mind?
 8        A    I would like to say I'm the admiral and then
 9   turned the command over.
10        Q    You earlier said that ultimately you are the
11   captain of ship with regard to the logs operation.  Were
12   you always the captain of the ship with regard to your
13   law office?
14        A    Based on what I just said, no.
15        Q    And you gave up being the captain of the ship
16   in your mind when?
17        MR. TEW:  Let me get a definition of "captain
18   of the ship."
19        MR. JAFFE:  It's his term.
20        Q    (By Mr. Jaffe) What is your definition of
21   "captain of the ship" when you used it referencing the
22   logs operations?
23        A    Who -- who's on watch, who's got the
24   day-to-day control, who makes the business decisions.
25        Q    Okay.
```

```
 1        A    When we moved into the 900 South Pine Island,
 2   when volumes increased dramatically -- you said three
 3   times and I said dramatically, I don't know what
 4   amount -- at that point in time, if not, prior, but
 5   certainly at that point in time, the day-to-day
 6   operations were turned over to Miriam and Bev, under
 7   their structure of supervision, there are other
 8   attorneys.  And the operations, non-legal side, were
 9   turned over to Cheryl and her host of assistant
10   managers.
11        Q    In any one time in 2009, Ms. Sammons would
12   have up to 60 people reporting to her?  Does that sound
13   correct?
14        A    How do you define "reporting to her"?
15        Q    Supervisors, managers.
16        A    I don't -- I -- I -- it wasn't my day-to-day
17   involvement at that point in time, so I have no idea.
18        Q    All right.  And so I'm clear, it's your
19   testimony that as far as your day-to-day involvement
20   with the running of your law office, you had turned that
21   over to Ms. McComas and Ms. Mendiendez at the time
22   you --
23        A    Mendieta.
24        Q    -- Mendieta at the time you moved into your
25   900 South Pine Island space?
```

```
 1        A    I believe it was some time prior.  I don't
 2   know exactly when, but it was about that time.
 3        Q    Why did you do that?
 4        A    Because I was busy drumming up the business,
 5   in your words, that huge increase, again, not three
 6   times.  And that's a full-time role, going out, wining,
 7   dining, clients, putting on the seminars, speaking,
 8   taking care of the clients, being there, being present,
 9   accountable.  And that's what I do.
10        Q    And from the operation side of the business,
11   Ms. Sammons is running the office; is that correct?
12        A    The non-legal -- non-legal matters.
13        Q    From the legal operation standpoint of the
14   business, your two managing attorneys whose names are --
15        A    -- Miriam Mendieta and Beverly McComas --
16        Q    -- were running the operation at that point?
17        A    The legal side?
18        Q    Yes.
19        A    Yes, sir.
20        Q    And you would agree with me that, ultimately,
21   you're responsible for all three of those people's
22   actions and behaviors?
23        A    Ultimately, I am responsible to ensure that
24   there's adequate supervision.  If they go out and kill
25   somebody, I'm not responsible for that.
```

```
 1        Q    Within the context of running your office --
 2   your law office?
 3        MR. TEW:  Object to the form of the question.
 4   Calls for a legal conclusion.
 5        A    Yeah.  You lost me on that one.  I'm sorry.
 6        Q    (By Mr. Jaffe) Who was your -- who was the
 7   manager or person in charge of Professional Title and
 8   Abstract when you moved into the 900 South Pine Island
 9   Road?
10        A    From the attorney standpoint, Sam Silverglate.
11   From the non-attorney standpoint, Carol Whitlow.
12        Q    And that stayed consistent up until 2009 --
13   late 2009?
14        A    It did stay consistent.
15        Q    Okay.  Who supervised them?
16        A    They were supervisors, they were managers,
17   they were over their own department, they were over
18   Professional Title and Abstract.  To the degree that
19   foreclosure overlapped or meshed with or had to work
20   with, Cheryl Sammons work with Carol Whitlow to
21   smooth -- to ensure smooth transition of the work, Sam
22   Silverglate work with Miriam Mendieta and Beverly
23   McComas.  So, if there were problems, Sam would go to
24   Miriam or Bev, or if things weren't getting done.  It
25   was a combination then of Sam, Carol, Cheryl Sammons,
```

```
 1   Miriam and Bev.
 2        Q    With regard to your meetings with your two
 3   managing -- co-managing attorneys in 2009, how often did
 4   you meet with them in person or by telephone to discuss
 5   the operations of your law office?
 6        A    Once a month, with certainty and as needed
 7   with any manager.  If a client called and said, "I'm
 8   going to pull the work if this doesn't happen," blah,
 9   blah, blah, blah, they had to come to me with that.
10        Q    And how often do that happen, approximately?
11        A    Maybe once a month, twice a month, where they
12   felt the need to bring it to me.  It may have happened
13   more, but where it got elevated to me, thankfully, we
14   have very solid relationships with the clients.  And if
15   the clients had issues, they would reach out to me
16   really at the end of the day because I'm the one that
17   cultivated and maintained the relationships.
18        Q    Did Ms. Sammons expressed to you difficulties
19   in properly staffing the law office once you move to 900
20   Pine Island?
21        A    Cheryl stressed to me that if I was going to
22   continue to bring in additional volumes it would require
23   additional staff.  And with additional staff comes
24   additional space, hence, the growth that we outlined and
25   eight, nine, 10.
```

1    Q    Did she express to you the inability to find

2    staff with any experience?

3    A    I don't recall.

4    Q    Or said another way, was she complaining to

5    you that the staff that she was hiring was

6    inexperienced?

7    A    I don't recall.

8    Q    Did she express to you that it was just too

9    much work for the staff to properly be able to manage?

10    A    No -- ah, let me take that back.  She did.  In

11    2008, I want to say, she did come to me and said -- it

12    was October, I believe, October 2008, maybe on October

13    2007 -- and said, "David, the paralegals have too much

14    work."  And I go, "Which paralegals?"  She told me what

15    teams, because we were broken in by teams.  And that was

16    the result of -- in -- in January, I think it's 2008, I

17    brought on three new clients that were supposed to be

18    relatively small in numbers.

19    Q    Who?

20    A    Who?

21    Q    Yes.  Who, the clients?

22    A    The three clients, Saxon, Wachovia and Homac.

23    Each month, so what she did was she assigned those

24    clients to an existing team that handled other clients'

25    files.  In October, she came to me and the

1    paralegals are flipping out, the clients are blank,

2    blank and blank, the three I just told you, Wachovia,

3    Homac and Saxon.  And I pulled up my volume report and

4    I'm like -- I'm not surprised.  Where they started off

5    giving us 100, ultimately, it turned into 500 or 600 a

6    month.  So, the paralegals were overwhelmed.  I picked

7    up the phone and I contacted all three of the clients

8    and asked them to stop sending us referrals.  At this

9    point in time, we cannot handle and I did not want to

10    disappoint or fail them.  They were originally taken

11    back, because I'm the guy that comes in with knee pads

12    and begs for more.  At the end of the day, they praised

13    me and said, "When you're ready to take the work back,

14    let me know."  We assured them that we would finish of

15    what we had and did so.  And the volumes just continue

16    to grow.  With Fannie Mae and Freddie Mac, we wanted to

17    make sure that we kept those teams solid.  And those

18    teams were the beneficiaries of those three new clients.

19    So, when Cheryl brought to me attention that her group

20    of paralegals were overwhelmed, I did the right thing

21    and contacted the client and told them we can't do it

22    anymore.

23    Q    Did Cheryl ever express to you that the new

24    staff was receiving little to no training?

25    A    No, she did not.  As a matter of fact, we had

1    groups of people that were in to do training.  There

2    were -- on -- on both the attorney side and on the

3    non-attorney side, there were groups of trainers whose

4    sole purpose was to do training.

5    Q    And that training was established -- those

6    protocols for training were established both at the

7    lawyer and the non-lawyer levels by you?

8    A    When you say "protocol," we wanted to make

9    certain that we maintained our reputation as best in

10    class and the best in the industry.  And as bodies were

11    brought on, we wanted to make certain that there was

12    nothing lost in the -- in translation.  So, I instructed

13    Cheryl to designate three or four people of her

14    choosing -- as I sit here today, I -- I -- I'm not sure

15    who it is.  I told Miriam Mendieta and Beverly McComas

16    on the attorney side that on the volumes, based on

17    the number of attorneys, based on the case load, we

18    needed attorneys to -- experienced attorneys to handle

19    training of the new attorneys, just like I did with

20    Cheryl.  Both the attorney side and the non-attorney

21    side, as I understand it, selected their trainers.  And

22    the attorneys, for a fact, before they were released to

23    go to court, went through, I believe, a 60 or 90-day

24    training period with Billi Pollack and Maria Solomon,

25    two most senior attorneys being used to train.

1    Q    And who trained them?

2    A    Miriam and Bev.  And they have been --

3    Q    And who trained them?

4    A    Trained -- who trained Miriam and Bev?  Gosh,

5    they kind of learned it on their own.  I mean, in the

6    beginning, there's foreclosures.

7    Q    Well, Miriam started with you in 1994, so I

8    assume that you would have been the one to train her

9    since she -- since you were the one who was establishing

10    the protocols since your collar was unleashed to do

11    things the way David J. Stern wanted them done within

12    his law office?

13    MR. BERNSTEIN:  Argumentative.

14    A    I -- I -- I agree.  Miriam role versus --

15    Miriam role -- Miriam's role is to go to court.  My

16    collar was never on in terms of court because I wasn't a

17    practicing attorney.  Miriam was a practicing attorney.

18    And while I did it in its infancy I was smart enough to

19    realize two things, that my opportunity for success

20    would be greater if I focused on client relations and

21    the other thing that went off is I'm not an attorney.

22    I'm not into case law.  I'm not into sitting down and

23    reading briefs.  So, in the infancy, Miriam got a very

24    solid handle on the way practice should be done.  And as

25    the industry evolved and case law became greater and

1    circumstances changed, Miriam got that really from the
2    beginning.
3    Q    (By Mr. Jaffe) Did you ever object to anything
4    she ever did as a practicing lawyer under your watch?
5    A    I don't recall.
6    Q    You don't recall objection?
7    A    I don't recall if there's nothing that she's
8    done.  I -- I don't recall anything.
9    Q    Oh, okay.  So, no?
10    A    Well --
11    Q    Nothing to your recollection?
12    A    At what point in time?
13    Q    Sure.  Up until -- from 1994 up until 2008.
14    A    The answer would be "no."  Because if that was
15    the case, she would have been gone.
16    Q    Were your clients requiring foreclosures to be
17    complete within six months for sending you the file?
18    A    No, sir.  At what point?  Let me ask you that.
19    Q    Between the period of 2006 and 2009.
20    A    At some point in time, Fannie Mae and Freddie
21    Mac lowered the foreclosure processing -- processing
22    time for uncontested/controllable foreclosures from 180
23    days to 150 days.  So, based on the custom and practice,
24    it was necessary for the law office to complete the
25    foreclosure within the insurer/investor time frame

1    absent any uncontrollable matter, which would include
2    litigation or delays that are beyond the law firm's
3    control.
4    Q    Between the time you moved into the 900 South
5    Pine Island Road location in December of 2009, would you
6    agree with me that the only entities -- the only David
7    J. Stern entities was the law office and the Title and
8    Abstract company?
9    MR. TEW:  Objection to form.
10    A    Would I agree with you that those were the
11    only entities?
12    Q    (By Mr. Jaffe) Yes.  I'll rephrase.  When you
13    first moved into 900 Pine Island Road, the two entities
14    that went with you, "you" being the Law Offices of David
15    J. Stern, was this office and Professional Title and
16    Abstract; is that correct?
17    A    No, sir.
18    Q    Okay.  What other entities went with you at
19    that point?
20    A    Stern and McSurdy.
21    Q    Okay.  What is that?
22    A    That's another law firm that I have for
23    commercial foreclosures.
24    Q    Spell the last name, please.
25    A    M-C-S-U-R-D-Y.

1    Q    Their role was what?
2    A    Commercial foreclosures and appellate work.
3    Q    Okay.
4    A    Default Servicing had a couple of employees
5    located in Plantation as an extension to Louisville for
6    check processing, accounting.
7    Q    What address?
8    A    900.
9    Q    Okay.  All right.
10    A    That's -- that's it.
11    Q    Okay.  As of December 31st, 2009, those four
12    entities still occupy the space that you originally
13    moved into except maybe expanded; is that fair?
14    A    Yes, sir.
15    Q    Okay.  And I apologize, I have not been out
16    there, okay, believe it or not, I've seen pictures.  How
17    many entrances and exits are there in the building?  I
18    don't mean emergency exits.
19    A    Just one.  One with four elevators -- no, wait
20    a minute, no.  I take that back.  You got two emergency
21    exits and you got a delivery.
22    Q    Let me help.  Excluding emergency, excluding
23    delivery, just for common -- for the workers and
24    clients.
25    A    Yeah.  One -- one entrance, four elevators,

1    slow elevators, junky, people always get stuck, should
2    be the next class action.
3    Q    We'll talk later.
4    A    I just wanted to get frank to laugh.  That's all,
5    I'm finished, we're -- we're done.  Okay.
6    Q    Was the -- was Professional Title and Abstract
7    on a particular floor in 2009?
8    A    Yes, sir.
9    Q    What floor?
10    A    I believe five.  Don't hold me to it, but I --
11    I think that was it.  Again, I was not day to day.  And
12    when I was in the office, I usually stay put, but I
13    think they're on five.
14    Q    What floor are you on?
15    A    Four.
16    Q    Was the entire law office on four?
17    A    Well, prior to December 30th, there was the
18    law office and it would have been on whatever floors we
19    had.  Professional Title, I can't tell you if they --
20    because of growth got spread to a second floor.  Stern
21    and McSurdy were on -- on one floor.  And Default
22    Servicing, he was on one floor, they -- I think there's
23    a couple of people.
24    Q    Is that as clear as you can be?  What I mean
25    is, what floor was Default Servicing even if there's

```
 1   only two officers?
 2        A    I -- I -- I don't remember.  I -- that just
 3   wasn't what I did.
 4        Q    Sure.  Who would know that, Cheryl Sammons?
 5        A    I would go -- I would have gone to Cheryl to
 6   ask her where are the Default Servicing people, but that
 7   was granular.  So, as, you know, the owner of a 14,000
 8   or 12,000-person law firm, I didn't deal with the two
 9   Default Servicing people that were on to deal with
10   checks.
11        Q    I know and I appreciate that.  And I
12   definitely understand how busy you are and how big the
13   company you got.  If -- I just want to know who I would
14   ask, the right person, to get the right answer.
15        A    Well, I guess you could ask them.  You could
16   ask the Default Servicing people.
17        Q    Name them, please?
18        A    David Obata.
19        Q    Spell his last name.
20        A    O-B-A-T-A.  And I don't even know who the
21   second person was.  And you may want to know that David
22   Obata is deceased.
23        Q    It's tough to ask him.
24        Q    You guys are good at what you do, so --
25        Q    I appreciate that.  Who did they report to?
```

```
 1        A    They would have reported to Jenny Johnson,
 2   who is the Default Servicing manager in Louisville,
 3   Kentucky.
 4        Q    And who did she report to?
 5        A    She would report to me.
 6        Q    So, ultimately, you were responsible for the
 7   actions of Default Servicing?
 8             MR. TEW:  Object to the form of the question.
 9   Calls for a legal conclusion.
10        A    I would be responsible for putting procedures
11   in place and expect that to be implemented.  If Jenny
12   didn't get her tickets to Kentucky Derby and killed
13   someone, I would not be responsible.
14        Q    (By Mr. Jaffe) Fair enough.  Were you also
15   responsible for putting policies and procedures in place
16   for Professional Title and Abstract?
17        A    That would have been Carol and Sam.
18        Q    And who would they report to?
19        A    Sam reported to Miriam.  And Carol reported to
20   Cheryl.
21        Q    The law office appears to have had space on
22   all of the floor number four as of 2009?
23        A    Yes, sir.
24        Q    All of floor number four and all of floor
25   number six; is that correct?
```

```
 1        A    There was one floor that they had only half.
 2   So, I think all the four, all the five, half of six,
 3   maybe half of seven.  I -- I can't recall.
 4        Q    And the other half of seven would have been
 5   Default Servicing?
 6        A    Default Servicing only have two people, so
 7   they were stuck God knows where but they wouldn't have
 8   had a floor.
 9        Q    All right.  Now, you just said that the law
10   office had all the five.  How much of five was
11   Professional Title and Abstract?
12        A    I don't know.  I just believe that
13   professional Title and Abstract was located on the fifth
14   floor.  To what degree it was split between the two, I
15   don't know.
16        Q    Are you able to tell me how many employees
17   were employed by Professional Title and Abstract in
18   2009, approximately?
19        A    60, 80.
20        Q    Okay.  Would you agree with me that the law
21   office and Professional Title and Abstract shared the
22   same file system in 2006 to 2009?
23        A    I'm not sure what you mean, "file system."
24        Q    The actual file itself.
25        A    Okay.  They did to some degree but not fully
```

```
 1   because Professional Title and Abstract had been the
 2   first to become paperless.  So, there would not have
 3   been a file to a large degree.
 4        Q    Would the law firm be able to access
 5   Professional Title and Abstract electronically?
 6        A    Access what?
 7        Q    Their file.
 8        A    Yes, sir.
 9        Q    As of December 31st, 2009, there was one
10   e-mail system being used; is that correct?
11        A    For which entities?
12        Q    All.
13        A    No, sir.
14        Q    Okay.  How many e-mail systems were being
15   used, to the best of your knowledge, in December of
16   2009?
17        A    I believe two.
18        Q    Okay.  One would have been the person's
19   name@sternlaw.com?
20        A    Dstern -- dstern.com.
21        Q    Okay.  What would the other have been?
22        A    It was a separate e-mail for Default Servicing
23   and I don't recall.
24        Q    Okay.  So, Professional Title and Abstract and
25   the law office use the same e-mail system as of December
```

1  of 2009?

2      A    Actually, I don't know.

3      Q    To the best of your recollection.

4      A    Yeah.  To the best of my recollection, yes,

5  but I -- I don't know.  When I -- I don't look at e-mail

6  addresses because I'm sure none of us really do.  If

7  it's in our Blackberry, it's in our Blackberry.  So --

8      Q    Who did the HR department report to?

9          MR. TEW:  You're talking about up to 2009?

10         MR. JAFFE:  Fair enough.  Fair enough.  Fair

11 enough.

12     Q    (By Mr. Jaffe)  As of December -- from 2009

13 going backwards, who did the HR department director

14 report to?

15     A    They would have reported to Cheryl and to

16 Miriam and Beverly.

17     Q    Depending if it was a lawyer or a non-lawyer;

18 is that fair?

19     A    It depends what the issue was.  They perhaps

20 would go to everybody and say, "What do you think about

21 this?"

22     Q    Okay.  As of December 2009, there was one HR

23 department for the law office, and Professional Title

24 and Abstract, and Default Services; is that correct?

25     A    Yes, sir, that is correct.

1      Q    And there were common policies and procedures

2  that the HR department used and applied to those three

3  entities as of December 2009?

4      A    Where the law would provide it.  There may

5  have been some differences because Default Servicing

6  was -- was in Kentucky and we would have to go by what

7  Kentucky required.

8      Q    But executed out of that one HR department?

9      A    Yes, sir.

10     Q    One HR department for hiring and firing,

11 again, of those three entities; the law office,

12 Professional Title and Abstract, and Default Services?

13     A    No, sir.

14     Q    Same question.  Same HR department for hiring

15 and firing for law offices and Professional Title and

16 Abstract?

17     A    No, sir.

18     Q    All right.  Explain that, please.

19     A    Going by your question, HR may not have always

20 done the firing.  They may have processed the paperwork

21 to do the firing, but the -- the firing may have been

22 done by Miriam or Beverly or Jenny Johnson or Cheryl

23 Sammons.

24     Q    Same HR department would have processed the

25 paperwork for those three entities?

1      A    They could have done the termination or they

2  could have processed the paperwork amongst other

3  responsibilities.

4      Q    Who did your IT department report to?  Let me

5  ask a predicate question.  Did you have an IT department

6  as of 2009?

7      A    Yes, sir.  As we indicated, Vince Petrov head

8  up -- headed up that department.

9      Q    How many people were employed in that

10 department working with him?

11     A    I don't know.

12     Q    Ballpark, more than two?

13     A    Yes, sir.

14     Q    Okay.  Who would have the IT department have

15 reported to?

16     A    Miriam, Beverly McComas and Cheryl Sammons.

17     Q    HR department that we have previously

18 discussed would have been responsible for that

19 department as well?

20     A    Yes, sir.  Well, when you say "responsible,"

21 they would have made sure they're paid, they would have

22 given adjustments, they would have taken care of

23 insurance, workmans' comp, et cetera.

24     Q    And if there were terminations, they would

25 have either handled the termination and/or handled the

1  paperwork associated with termination?

2      A    Yes, sir.

3      Q    Did Stern, P.A. have a 401(k)?

4      A    Yes, sir.

5      Q    Was -- were all the departments we previously

6  talked about allowed to participate in the Stern, P.A.

7  401(k)?

8      A    Departments, like foreclosure, bankruptcy and

9  IT, yes, sir.

10     Q    Who would not -- what department would not

11 have been able to?

12     A    I'm not sure I understand -- I -- I don't

13 believe that any department within the Law Offices of

14 David J. Stern would not have been allowed to

15 participate.

16     Q    And would Professional Title and Abstract be

17 allowed to participate?

18     A    I don't know if they had their separate plan

19 or not.  I -- I don't -- don't know.  Sorry.

20     Q    Would Default Services been able to

21 participate?

22     A    I don't know.

23     Q    IT would have been able to participate,

24 correct?

25     A    Right.

```
 1        Q   You don't know about the 401(k) with regard to
 2   what you just testified to.  Who would?
 3        A   Don't ask me about the 401(k).  Back in
 4   2009?
 5        Q   Correct.
 6        A   The HR director.
 7        Q   And at that point, who would that have been?
 8        A   Ali Rhonda, R -- R-H-O-N-D-A.
 9        Q   Okay.  Let me ask you a couple of more
10   questions about the HR department as it relates to --
11   excuse me -- the 401(k).
12        A   I don't know what floor they were on.
13        Q   Okay.  Fair enough.
14        A   Sorry.
15        Q   I don't think the 401(k) had a floor.  Where
16   was the HR department located?
17        A   I -- I don't know, no, seriously.  The good
18   thing is never got called to HR for --
19        Q   You were never recommended by HR?
20        A   Well, that's not true.  I did see a sexual
21   harassment videotape in the fourth floor conference
22   room.
23        Q   You actually were sued for sexual harassment,
24   right?
25        A   Years ago.  We won.
```

```
 1        Q   Good.  Congratulations.  As of September
 2   2009 -- okay?  Time frame-wise, are okay with that?
 3        A   Go ahead.
 4        Q   -- DJSP, P.A. existed, correct?
 5        A   The Law Offices of David J. Stern, P.A.
 6   existed.
 7        Q   Okay.  Did DJS Processing, LLC exist?
 8        A   No, it did not.
 9        Q   When did that -- when did DJSP Processing,
10   LLC -- DJS Processing, LLC, when was that born?
11        A   I believe January 15th, 2010.
12        Q   All right.  So, if I found some documents that
13   appeared to register DJS Processing, LLC on
14   September 15th, 2009 in Delaware, would that refresh
15   your recollection?
16        A   I -- you know what, when it comes to that, Tom
17   Vaughn of Dykema handled pretty much everything, so I
18   would defer to Tom.  Logic would have it that you don't
19   close a transaction on January 15th and all the
20   paperwork be done on January 15th.  As far as the dates
21   that the work was done, I have no idea, recollection,
22   knowledge.
23        Q   All right.  I agree that the documents speak
24   for themselves.  I'm just trying to understand your
25   understanding.  And you've clearly expressed --
```

```
 1        A   Yeah, yeah, yeah.  That's -- that's Tom
 2   Vaughn.
 3        Q   Just so the record is clear, Tom Vaughn of --
 4        A   -- Dykema out of Detroit, Michigan --
 5        Q   -- suggest that -- Dykema Law Office or
 6   Dykema Gossett, what's the name of the law firm?
 7        A   Dykema Gossett.  I can give you its hourly
 8   rate.
 9        Q   Okay.  I'm sure you're -- are you aware that
10   you are the managing member of DJS Processing, LLC as of
11   September 2009?
12        A   I would have to defer to Tom.
13        Q   Are you aware that you are the registered
14   agent of DJS Processing, LLC as of September 2009?
15        A   I am not.
16        Q   Are you aware that DJS Processing, LLC's
17   principal place of business as of 2009 in September was
18   900 South Pine Island Road, Plantation, Florida?
19        A   I was not aware.
20        Q   Why -- do you know why DJS Processing, LLC was
21   formed?
22        A   DJSP Processing --
23        Q   Let me rephrase.  DJS Processing, LLC, do you
24   know why it was formed?
25        A   It was formed because I was interested in
```

```
 1   doing the transaction.  And under our Florida Code of
 2   Ethics, a transaction which involve the law firm,
 3   vis-à-vis Default Servicing or Professional Title, a law
 4   firm cannot be sold to non-attorneys.  So, the way
 5   similar transactions were able to occur was the creation
 6   of a back office dealing with the non-legal aspect of
 7   the particular business.  So, DJS Processing was created
 8   in order to allow for a transaction to occur consisting
 9   with the Florida Ethics guidelines, rules and
10   regulations.
11        Q   Please define what the transaction that you
12   wanted to accomplish was.
13        A   I wanted an opportunity to expand beyond the
14   borders of Florida and get into additional businesses,
15   both typical and perhaps, unrelated.  And probably
16   three years before the transaction, I was approached by
17   some financial advisors from a whole host of companies.
18   They came in by the rushes.  Before I -- originally, I
19   said, "No, I don't want to do it," like what I've got
20   going.  Then, reached out to a gentleman by the name of
21   David Trott, the law firm of Trott & Trott out of
22   Detroit, Michigan, who I'm fairly good friends with.
23   And I said, "All right.  David, you've done a
24   transaction.  Why?  What's the ups, what's the downs,
25   where are the land mines and, you know, who should I
```

```
 1   use?  Because I'm getting phone calls from everybody,"
 2   at least for exploration purposes.  So, he told me the
 3   pluses, he told me the minuses, he told me why he did
 4   it.  And he said, "David, you should go with my deal
 5   makers, my financial advisors because they've already
 6   done the deal, they've already done the documents, they
 7   know where the lands mines are," et cetera.  So, I
 8   contacted Plante Moran out of Detroit.  I contacted them
 9   although they had called me a few times.  And I said,
10   "Look, I'm interested in meeting with you.  Tell me how
11   it works.  Tell me what it's about.  Give me some idea
12   dollar-wise.  How do we structure the deal?  How we
13   don't structure the deal?"  And it became, as you can
14   imagine, very labor-intensive in terms of picking the
15   right partner.  Do you go public?  Do you go private?
16   Do you go equity?  Do you go hedge?  What is the lesser
17   of the two evils?  What are the greater of everything?
18   At the end of the day, no matter what sector we went,
19   there would be a requirement as was the case with the
20   previous six or seven law firms that have done what I
21   did, that a back office specializing in or creating a
22   non-legal entity.  And that would be the entity that
23   would be subject to the transaction.  In my case, we
24   created DJS Processing and, of course, Professional
25   Title and Abstract to Default Servicing were stand-alone
```

```
 1   companies where we didn't have to do any split-off from
 2   the law firm.
 3       Q   So, the record is clear, DJS Processing, LLC
 4   stands for David J. Stern Processing, LLC?
 5       A   Sure.  Yes.
 6       Q   Professional Title and Abstract Company of
 7   Florida, LLC was formed in September of 2009 in
 8   Delaware.  Are you aware of that?
 9       A   I am not.
10       Q   Are you aware that it was registered in
11   Florida on September 2009?
12       A   I am not.  Just like Processing and the same
13   thing for Default Servicing.
14       Q   Are you aware that you were the sole director
15   of Professional Title and Abstract Company of Florida,
16   LLC in September of 2009?
17       A   I am not.
18       Q   Are you aware that you were the managing
19   member of Professional Title and Abstract Company of
20   Florida, LLC in September of 2009?
21       A   I am not.
22       Q   What is the Stern Holding Company?
23       A   I have to get the specifics from Tom Vaughn.
24       Q   Have you ever heard of the Stern Holding
25   Company?
```

```
 1       A   Yes, I have.
 2       Q   What is your understanding of it?
 3       A   It's a company that was established to put
 4   the -- what used to be the previous Default Servicing
 5   and Professional Title, Inc. into that holding company
 6   for purpose of -- of wind down is what I understand.
 7       Q   Default Servicing, LLC was formed in 2009 in
 8   Delaware -- or reformed in 2009 in Delaware.  Are you
 9   aware of that?
10       A   No, I'm not.
11       Q   And registered in September 2009 in Florida.
12   Are you aware of that?
13       A   I'm not.
14       Q   With DAL, D-A-L, as a managing member, are you
15   aware of that?
16       A   I'm not.
17       Q   As long as we're here.  Let's ask -- what is
18   DAL, D-A-L?
19       A   I don't recall.
20       Q   Just so I'm clear, DAL, D-A-L, Group, are you
21   familiar with what that is?
22       A   In the structure of the transaction, it is a
23   holding company that holds the newly formed operating
24   subsidiaries; Professional Title and Abstract, DJS
25   Processing, Default Servicing.  Professional and
```

```
 1   Default, yeah.
 2       Q   I'll ask it.  If you don't know or you know
 3   the answer, I'll ask it anyway.  Why was DAL the
 4   managing member of Default Servicing in September of
 5   2009?
 6       A   I don't know.
 7       Q   Who would know?
 8       A   Thomas Vaughn.
 9       Q   Up to 2009 -- December 2009, just so I
10   understand this, your two managing attorneys could hire
11   and fire attorneys without consulting you?
12       A   Yes, sir.
13       Q   Did they have salary parameters on hiring?
14       A   They did not have salary parameters unless it
15   was going to cost some astronomical amount.  Because in
16   my day-to-day functionality, I have no idea how much
17   associates made really at any level.
18       Q   The same question with regard to non-lawyer,
19   Ms. Sammons have the ability to hire staff --
20       A   Yes, sir, she did.
21       Q   -- without consulting you?
22       A   That is correct, part of her day-to-day
23   operation.
24       Q   Did you place upon Ms. Sammons or the
25   co-managing attorneys any limitation on staffing?
```

```
 1        A    No.
 2        Q    Certainly, the inherent limitation would have
 3   been space available; is that fair?
 4        A    I didn't put that limitation.  That was an
 5   obvious one.
 6        Q    Okay.  Did they ever come to you and ask
 7   permission to hire a particular lawyer or a particular
 8   staff member?
 9        A    Not that I recall.
10        Q    Did you have a management team?
11        A    How do you define "management team"?
12        Q    Key employees that have been with you more
13   than a decade.
14        A    That would be Miriam and Cheryl and Beverly.
15   And depending upon what they were looking to do, it may
16   include Sam.  It could -- it could have included Maria
17   Solomon.  It could have included Billi Pollack.  It
18   would depend upon what they were looking to do.  If it
19   was something general, then they would bring all the
20   managers in.
21        Q    And how often do that happen?
22        A    I don't know.  You have to ask them.
23        Q    And who established your budget prior to
24   December 2009?
25        A    We never had a budget.
```

```
 1        Q    So, as we sit here today, you're telling me
 2   you never had budget meetings with any of your key
 3   staff?
 4        A    That's correct.  Whatever it took to get the
 5   job done, they have carte blanche.  That presumes that
 6   question is December 31st, 2009.
 7        Q    Absolutely.  Mr. Stern, I apologize in advance
 8   for the next question.  I believe I asked it but I want
 9   to make sure that I covered it.  The system in place in
10   your law office to take a foreclosed -- foreclosure case
11   from cradle to grave was created by you?
12        A    I specifically said in my answer that cradle
13   to grave concept was not a word that was used to take
14   the foreclosure from the beginning to the end.  So, the
15   answer to your question is "no."
16        Q    Define "cradle to grave" in the context you
17   said it -- meant it when you said it.
18        A    When I speak of cradle to grave, that would be
19   that we provide services that may become necessary on a
20   default of loan on behalf of the client, so it generally
21   come in as a foreclosure.  If the foreclosure is
22   interrupted by a bankruptcy, we will handle that
23   bankruptcy.  Once the bankruptcy has been concluded and
24   we're free -- sorry -- from the automatic stay, we would
25   then continue on with the foreclosure.  Once the
```

```
 1   foreclosure is complete and title invest in the
 2   servicer, we would then handle any evictions where
 3   necessary.  Once the eviction is complete and it becomes
 4   a real estate-owned property, we would then open the
 5   title work and handle the closing on behalf of the
 6   grantor, the bank as the seller, to the grantee.
 7        Q    And those systems that were used by the Law
 8   Offices of David J. Stern, P.A., you developed?
 9        A    I -- the day one, I developed them; day two,
10   they continued to be expanded and improved upon by
11   people that were smarter than I was in those particular
12   areas.
13        Q    Okay.  But would you agree with me certainly
14   until 2006, you were the captain of the ship with regard
15   to your office and how it ran and the systems that were
16   to be used?
17        A    I would agree that I was the captain of the
18   ship.  I would strongly disagree that processes were put
19   in -- that were put in were put in by me.  The
20   development, better practices, things like that, Miriam,
21   Sam, Beverly, when she joined, and Cheryl, did a lot of
22   that.  So, there was -- in 2000 -- even in 2000, there
23   were procedures and policies put in place that they were
24   comfortable in doing and realized that I would have no
25   objection.  If I had to deal with every granular change
```

```
 1   that results from Fannie or Freddie guidelines or a
 2   local rule or a judge making some sort of requirement,
 3   that by definition would be an impossibility.  Hence,
 4   development expanding processes and procedures very
 5   quickly fell on Miriam, Beverly and -- and -- and
 6   Cheryl.  I was there for the day-to-day probably up
 7   until 2006.  He had my nose and things, but it didn't
 8   take long to realize that.  Sometimes you can't be the
 9   rainmaker and be involved in procedure because very
10   quickly, I did not know or have knowledge as to the
11   capabilities of the staff that was in place.
12        Q    Did you ever object to any of the policies or
13   procedures that were put in place by others beside
14   yourself.
15        A    I don't -- I don't recall.  Apparently, not
16   very long or hard or I'll stay with them in there.
17        Q    Effective January 15th, 2010, you went public;
18   is that correct?
19             MR. SCRUGGS:  Objection.  Form.
20             MR. TEW:  Yes.  Same objection.
21        A    We created a processing company, new
22   Professional Title, new Default Servicing that was part
23   of DJSP Enterprises.  DJSP Enterprises went public.
24        Q    (By Mr. Jaffe) In January -- actually, let's
25   backup, okay?  Tell me what Chardan 2008 China
```

1  Acquisition Corporation is or was?
2      A    It's traced in the NASDAQ as CACA.  I'm sorry.
3  It's true.  It's true.  For the record, it's true.  I'm
4  sorry.  I -- I love that part.  Anyway, Chardan Capital
5  was a -- a -- a company that, I guess, went public.
6  Through Chardan, it was their sixth or seventh spec
7  where they raised money looking for opportunities.  My
8  understanding, the previous facts all went to
9  China-based opportunities.  When my transaction was made
10 known to the Chardan folks, they fell in love with the
11 opportunity.  And we ended up getting together and
12 negotiating a deal.  Chardan then changed its name to
13 DJSP Enterprises.
14     Q    Personal place of business as of January 15th,
15 2010?
16     A    No.  I -- I believe Enterprises is a -- is a
17 Bridge, Virgin Islands company.  DAL would be, I think,
18 Florida-based.  And then you've got Default Servicing
19 and all the other companies.  I think they're Delaware
20 corporations but we obviously do business in Louisville,
21 Kentucky and Plantation, Florida.
22     Q    You also have an operation in Puerto Rico or
23 did?
24          MR. SCRUGGS:  Excuse me.  Objection.  You said
25     you --

1      Q    (By Mr. Jaffe) Was there any -- to the best of
2  your knowledge, was there any operation of any kind in
3  dealing with DJSP Enterprises in Puerto Rico?
4      A    Can you read that back, please?
5          (Thereupon, the record was played
6          back.)
7      A    I didn't know you were playing that back.  I
8  thought he was like -- that's pretty good, you know.  It
9  didn't seem --
10     Q    (By Mr. Jaffe) Well, that's the technology of
11 today.
12     A    And I lost you over there.
13     Q    As of January 15th, 2010, you were the sole
14 owner of David J. Stern, P.A. -- Law Offices of David J.
15 Stern, P.A.?
16     A    Yes, sir.
17     Q    And its registered agent?
18     A    I believe that is the case.  Yes, sir.
19     Q    As of January 15th, 2010, you were DJS
20 Processing managing member?
21     A    I -- between all of that, DJSP, the
22 Enterprises, the Processing, the -- I -- I -- I have to
23 ask Tom before we get to the total chart and what to
24 what.  I can't keep up with my role as officer or
25 director or just -- way too much.

1      Q    Indulge me then while I go through them and
2  you gave that same answer then.
3      A    Okay.
4      Q    As of January 15th, 2010, you were the
5  president, registered agent and managing member of DJS
6  Processing Enterprises, Florida?
7          MR. SCRUGGS:  Objection.  Form.
8      A    I'm sorry.  With everything that there is out
9  there between DJSP, Default Servicing, Professional
10 Title, Enterprises, it's more than I know.  I have to
11 defer to Tom Vaughn and look to some sort of chart for
12 guidance because I can't keep up --
13     Q    (By Mr. Jaffe) Do you know if the chart
14 exists?
15     A    No.
16     Q    As of January 15th, 2010, you are aware that
17 DJS Processing Enterprises BBI was created?
18          MR. SCRUGGS:  Objection.  Form.
19          MR. TEW:  Same objection.
20     A    I'm not sure.  I'd have to defer to Tom Vaughn
21 because --
22     Q    (By Mr. Jaffe) Okay.  But you know it existed
23 at that point; is that fair?
24     A    Yes.
25     Q    And are you aware that you were the president

1  and CEO of DJS Processing Enterprises BBI from
2  January 15th, 2010 until approximately November of 2010?
3          MR. SCRUGGS:  Form.
4          MR. TEW:  Same objection.
5      A    I'm not sure about the dates.
6      Q    (By Mr. Jaffe) As of January 15th, 2010, are
7  you aware you were the managing member of Professional
8  Title and Abstract?
9      A    I'm sorry.  I'd have to defer to Tom Vaughn.
10     Q    As of January 15th, 2010, are you aware you
11 were the chairman of the board and president of the DAL
12 group?
13          MR. TEW:  Form.
14     A    I'm not sure of the dates but I think so, yes,
15 sir.
16     Q    (By Mr. Jaffe) Are you aware whether or not
17 you were the registered agent for the following
18 companies, DJSP Enterprises, Florida?
19     A    I do not know.  I'd have to defer to
20 Tom Vaughn.
21     Q    DJSP Enterprises BBI?
22     A    I do not know.  I'd have to defer to
23 Tom Vaughn.
24     Q    DJSP -- DJS, P.A.?
25     A    The Law Offices of David J. Stern?

120

```
 1      Q    Yes.
 2      A    As of what time period?
 3      Q    January 15th, 2010.
 4      A    I was.
 5      Q    The DAL Group, LLC?
 6      A    I'd have to defer to Tom Vaughn.  I'm sorry.
 7      Q    DJS Processing?
 8      A    I'd have to defer to Tom Vaughn.
 9      Q    Professional Title and Abstract?
10      A    Registered agent.  And I'm -- I'm sorry.  I'd
11 have to defer to Tom Vaughn.
12      Q    Default Servicing?
13      A    I'd have to defer to Tom Vaughn.  I was a busy
14 guy.
15      Q    Who has possession of the corporate books and
16 records for the entities I've just asked you about?
17      A    The Law Offices of David J. Stern, they've
18 been in our office in Plantation 900.  Everything else,
19 I'd have to ask Tom Vaughn.
20      Q    So, you are not aware where the corporate
21 books and records are for DJSP Enterprises BBI?
22      A    No, sir, I'm not.
23      Q    Are you aware that DJSP Enterprises BBI
24 acquired 71 percent of the DAL Group on January 15th,
25 2010?
```

121

```
 1      A    I'm sorry, I'm not.
 2      Q    Do you know whether or not you were a member
 3 of the board of directors of DJSP Enterprises BBI?
 4      A    I believe I was a member of the board and
 5 chairman of the board.
 6      Q    Until when?
 7      A    I don't recall.
 8      Q    Why were -- were you removed?
 9      A    At the advice of legal counsel, we felt --
10 they felt it would be better for me to step down.
11 Inconsistent with counsel's direction, I voluntarily
12 stepped down.  I was not removed.
13      Q    Would you agree with me that as of July 1st,
14 2010, The Law Offices of David J. Stern, P.A. was the
15 sole client of DJSP Enterprises BBI?
16      MR. SCRUGGS:  Objection.
17      A    DJS, with the Law Offices of David J.
18 Stern, the sole client of Enterprises, I would disagree.
19      Q    (By Mr. Jaffe) Who were the other clients at
20 that time?
21      A    Part of DJSP Enterprises would include
22 Professional Title and Abstract.  And it would include
23 at someday Timeos and it would include Default
24 Servicing.  Each of those entities had their own
25 separate clients.  For example, Default Servicing on its
```

122

```
 1 own, independent of The Law Offices of David J. Stern,
 2 represented PNC Mortgage and two or three other smaller
 3 companies.  Timeos represented a significant number of
 4 clients.
 5      Q    When did -- when was Timeos acquired?
 6      A    I don't recall the close date.
 7      Q    Would it refresh your recollection if I told
 8 you August of 2010?
 9      A    Sounds about right.  There's -- I'm not
10 certain because there's some variables before the actual
11 transaction closed.
12      Q    So, let's go back to my question.  Would you
13 agree with me that as of July 1st, 2010, The Law Offices
14 of David J. Stern, P.A., Professional Title and Abstract
15 and Default Services were the sole clients of DJSP
16 Enterprises BBI?
17      MR. SCRUGGS:  Objection.  Form.
18      MR. TEW:  Same objection.
19      A    No, I would not.
20      Q    (By Mr. Jaffe) At that time, July 1st, 2010,
21 what other clients did DJSP Enterprises BBI have besides
22 those I just named?
23      A    Professional Title and Timeos and Default
24 Servicing were not clients of DJSP Enterprises.  They
25 were dropping down through DAL and were holding on the
```

123

```
 1 subsidiaries.  Within those holding on subsidiaries,
 2 they had their own client base.  For example, Default
 3 Servicing had relationships for our real liquidation
 4 with PNC and -- and a few others.  Timeos had 20, 30
 5 different relationships.  So, I would disagree that the
 6 sole clients of DJSP Enterprises were Professional
 7 Title, DJS Processing and Default Servicing because
 8 they -- they are not, in any way, shape or form,
 9 clients.
10      Q    Would you agree with me that as of
11 January 2010, you owned 33.15 percent of DJSP
12 Enterprises BBI?
13      A    When in January?
14      Q    After the 15th.
15      A    I don't know.  You'd have to ask Tom Vaughn.
16      Q    How about February of 2010, did you own
17 33.15 percent?
18      A    I'm not sure.  I'm not sure what the
19 percentage is or what my ownership was, if it dropped
20 through to another company.  I'd have to ask Tom Vaughn.
21      Q    DAL was a holding company for DJSP, Florida;
22 DJS Processing; Professional Title and Abstract and
23 Default Services; is that correct?
24      A    At what point?
25      Q    After January 15th, 2010.
```

```
 1        A    What were the -- the operating subsidiaries
 2   that you mentioned?
 3        Q    DJSP Florida, DJS Processing, Professional
 4   Title and Abstract and Default Services.
 5        A    I'm not familiar with DJSP, Florida.  Of
 6   course, it's DJSP Processing, because I don't know what
 7   DJSP, Florida is.
 8        Q    All right.  How about the others?
 9        A    DJSP Processing, Default Servicing and
10   Professional Title and Abstract.  As of January 15th,
11   DAL was a holding company for those three entities, yes.
12        Q    You received $58.5 million in cash and another
13   $88 million in notes in exchange for the DAL Group
14   obtaining the Stern businesses that we just referenced;
15   is that correct?
16        A    Can you repeat that, please?
17        Q    The DAL Group became the holding company for
18   DJS Processing, Professional Title and Abstract and
19   Default Servicing in January 15th, 2010; is that
20   correct?
21        A    Yes.
22        Q    And in exchange for that, you received
23   $58.5 million in cash?
24        A    I'd have to double check on that amount.
25        Q    What do you believe the amount to be?
```

```
 1        A    I don't recall.
 2        Q    In excess of $55 million?
 3        A    Yes, sir.
 4        Q    And in addition, an $88 million in notes?
 5        A    I'd have to look back in paperwork and see how
 6   that translates out in terms of notes.
 7        Q    Greater than $80 million, would you agree with
 8   that?
 9        A    I guess we could say there weren't a note and
10   then the note that I took back, that's correct.  Yes,
11   sir.
12        Q    I would like to take a bathroom break at this
13   point.
14             (Thereupon, a short break was
15             taken.)
16             (Deposition resumed.)
17        Q    (By Mr. Jaffe) Explain to me please what DJS
18   Processing once it was established and born in January
19   of 2010 did?  What was its role?  What did it do?
20        A    It did non-legal services on behalf of the Law
21   Offices of David J. Stern.
22        Q    How did those services differ on January 16th,
23   2010 than December 31st, 2009?
24        A    How did they differ?
25        Q    Uh-huh.  Differ.  How the services differ?
```

```
 1        A    On December 30th, 19- -- or 2010, the services
 2   were rendered by --
 3        Q    2009.
 4        A    2009, thank you. -- by employees of the Law
 5   Offices of David J. Stern, the attorneys.
 6        Q    And they would do what, for example?
 7        A    They would do the non-legal work.  They would
 8   prepare complaints.  They would do proofs of claims.
 9   They would do eviction pleadings.  Once the transaction
10   occurred, DJS Processing was governed by a services
11   agreement.  Services agreement, of course, was a
12   negotiated document that defines services, compensation,
13   facility agreement amongst other things.  And it clearly
14   indicated that the way it used to be done by a single
15   entity was no longer the case, there was no longer one
16   entity.  There were -- it was not a one entity
17   enterprise.  There were two entities with a definition
18   of what Processing was to do and what the law firm was
19   to do.  In essence, became a vendor/client relationship
20   with the vendor being DJS Processing and the client, of
21   course, being the Law Offices of David J. Stern.
22        Q    Fine.  Now, would you agree with me that the
23   actual day-to-day physical work that the employees did
24   was the same?
25        A    It cannot do that.  It was not --
```

```
 1        Q    Why?
 2        A    Because when Processing was born, a whole new
 3   concept was brought it.  Norman was brought in, Rick
 4   Powers was brought in.  The process --
 5        Q    Rick Powers was brought in on July of 2010.
 6        A    Well, there was interim CEOs or interim COOs
 7   that came in, a gentleman by the name of Phil Cobb.
 8   So, Phil began to guide Processing to do things that
 9   were, in essence, fabulous, unprecedented, in terms
10   of measuring by the matrix, better training, those
11   sort of things.
12        Q    They still drafted complaints?
13        A    Yes, sir.  But with greater efficiency.
14        Q    They still dealt with service process?
15        A    With greater efficiency.
16        Q    They still dealt with obtaining judgment?
17        A    With tremendously greater efficiency.  Up
18   four-fold.
19        Q    Still dealt with sales?
20        A    With greater efficiency.
21        Q    And post sales?
22        A    With greater efficiency.
23        Q    And the same people that were previously
24   employed by the law office?
25        A    And some others.
```

1    Q    And, in fact, they worked the same desks?
2    A    And some others were too.
3    Q    And on the same floors?
4    A    Correct.
5    Q    And using the same phones?
6    A    Pursuant to a facilities management agreement,
7    yes, sir.
8    Q    And using the same e-mail?
9    A    Pursuant to a facilities services agreement.
10    Q    And directed by the same HR department?
11    A    HR was a functionality of DJS Processing.  And
12    pursuant to the terms in the services agreement, the HR
13    functionality was outsourced from the law firm to DJS
14    Processing, correct, yes.
15    Q    Same people?
16    A    Absolutely.
17    Q    Same director?
18    A    No, sir.
19    Q    Chris Simmons?
20    A    Chris Simmons was not there prior to
21    January 15th.
22    Q    Okay.
23    A    So, not the same people.  Different people.
24    Q    A vast majority of the same people?
25        MR. SCRUGGS:  Objection to form.

1    Q    (By Mr. Jaffe) With regard to HR?  That was a
2    bad question.
3    A    I disagree.
4    Q    Okay.
5    A    I totally disagree.
6    Q    All right.  Professional Title and Abstract.
7    A    Okay.
8    Q    Same people employed in a leadership role.
9    Sam, right?  He was employed before January 15th, 2010
10    with Professional Abstract and Title.
11    A    Sam Silverglate, correct.
12    Q    And was employed with them in the same
13    capacity after January 15th, 2010?
14    A    Sam was employed with the law firm, not DJS
15    Processing.
16    Q    Okay.
17    A    You've lost me on that one.
18    Q    It's okay.
19    A    So, I disagree.
20    Q    Okay.  I've tried to lose you a couple of
21    times, not intentionally.  Was there a finance
22    department in the law office prior to January of 2010?
23    A    How would you define finance?
24    Q    Right.  An accounting department, same
25    difference.  I'm trying to --

1    A    There was an accounting department.
2    Q    Okay.  Did that include finance?
3    A    I don't know what finance means.  I mean, we
4    didn't finance anything.
5    Q    It's a bad question.
6    A    The law firm --
7    Q    What did the accounting department do?
8    A    The accounting department had multiple
9    functionality.
10    Q    Accounts payable?
11    A    Accounts payable.
12    Q    Accounts receivable?
13    A    Accounts receivable, collections.  Statement
14    balancing in all the accounts.  It was for both the law
15    firm and for Processing and for Professional Title and
16    for Default Servicing.
17    Q    Okay.  And those payrolls -- payroll was
18    outsourced, right, to -- was payroll outsourced?
19    A    Payroll was outsourced to ADP.
20    Q    The people in accounting who were employed by
21    the law firm in December of 2009 were still employed in
22    the same building and in the same space at their same
23    desks in January of 2010?
24    A    Some were, some weren't.
25    Q    Do you know where the IT department physically

1    was within the building?
2    A    The servers were on the fourth floor and some
3    of the people, the IT folks, were on the fourth floor.
4    But for efficiency, my understanding was that there were
5    a couple of technicians on each floor for quick
6    response.
7    Q    The employees of the IT department remained
8    employees of the IT department after January 15th, 2010?
9        MR. SCRUGGS:  Object to the form.
10    A    Some did, some didn't.
11    Norman, a CIO, highly compensated employee was
12    brought in.  Several people were let go, just like the
13    accounting department, a CFO, Kumar Gushani, was brought
14    in.  Esther was brought in to replace Shameeza.  So,
15    there were lots of changes.
16    Q    (By Mr. Jaffe) How about a guy named Vince?
17    A    Vince Petrov is or was the head of the IT,
18    without a title, prior to the January 15th, 2010 date.
19    Q    And he remained employed in the IT capacity
20    after --
21    A    Reporting to Norman Gottschalk.
22    Q    Did he change desks?
23    A    I don't know.
24    Q    Changed phones?
25    A    No -- I have no idea.

132

1    Q    Came in the same door downstairs?

2    A    I'm sure he came into the same door.

3    Q    How about Jack Brookshaw?

4    A    Jack Brookshaw was a member of the IT team.
5    Vince did more programming and Jack did more hardware.

6    Q    And Jack was employed in 2009 and 2010 as
7    well?

8    A    Prior to January 15th, 2010, Jack Brookshaw
9    was employed by the Law Offices of David J. Stern as
10   senior person that did soft -- that did the hardware.
11   On or about January 15th, he became an employee of DJS
12   Processing in a non-managerial, non-supervisory role.
13   And given the changes, reported to Norman and Norman's
14   group.

15   Q    After January 15th, 2010, who supervised DJS
16   Processing?

17        MR. SCRUGGS:  Objection.  Form.

18        MR. TEW:  Same objection.

19   A    DJSP Processing was supervised by a whole host
20   of areas, or a whole host of individuals depending upon
21   the nature of the department, certainly consisted with
22   the services agreement that existed between the Law
23   Offices of David J. Stern and DJS Processing.

24   Q    (By Mr. Jaffe) What was Cheryl Sammons' title
25   on January 16th, 2010?

133

1    A    January 16th, 2010, as the transaction
2    evolved, it was originally my plan for Cheryl to be the
3    operations manager over enterprise, over everything.
4    And as time evolved and more and more developed, and I
5    became educated into new matters or new -- new ways to
6    manage, greater technology, measuring by the matrix,
7    stronger -- stronger management skills that Phil Cobb,
8    who came in as an initial COO, certainly as Rick Powers
9    came in as the C -- as a subsequent COO.  It became
10   abundantly clear that neither Cheryl or even me on my
11   best day could ever be an operations manager over all of
12   those entities, quite simply because Cheryl didn't have
13   the pay grade, expertise, knowledge, education, I'm not
14   saying she couldn't learn it.  So, while originally she
15   was the operations manager over enterprises, she
16   subsequently became the operations manager over DJS
17   Processing.  For the non-legal side, obviously, which
18   was Processing by its definition and for the purposes of
19   the services agreement.  I don't know what date the
20   enterprise was taken off the table for her and the
21   Processing placed as her pretty much sole responsibility
22   with no oversight or intervention into Professional
23   Title, Default Servicing or at the right date for
24   Timcos.

25   Q    After January 15th, 2010, how often would you

134

1    meet with Cheryl Sammons on property unplanned?

2    A    Scheduled meetings, once a month.  If she
3    needed something in which she popped her head in, then
4    obviously I would meet with her.  But for the most part,
5    Cheryl worked with the heads of the other departments
6    within DJS Processing and together they managed the
7    day-to-day operation.  And where there is overlap with
8    the Law Offices of David J. Stern pursuant to that
9    services agreement, Miriam Mendieta and Beverly McComas
10   would come in.  Without violating the terms in the
11   services agreement, they work together to orchestrate
12   the initially smooth running operation.

13   Q    I asked you how often you would meet with
14   Cheryl Sammons.  Now, I'm going to ask you how often you
15   would speak to Cheryl Sammons after January 15th, 2010?

16   A    If I spoke with her, it would have been a
17   meeting with her.  She came in and if she had a
18   question, what about this client or David are you aware
19   that, you know, these circumstances took place, I just
20   want to let you know in case you get a call from ABC
21   Bank, that was our forte.  The rules were that if there
22   was a problem, a severe problem, I want to get to the
23   client before the client got to me.  Fortunately, early
24   on that did not happen all that much.  So there were
25   times where I didn't speak to Cheryl for two weeks,

135

1    three weeks because I was on the road, she had a
2    different schedule, I had a different schedule, I had
3    meetings.  Of course, after January 15th, we did a lot
4    of investor presentations, so I was gone pretty much
5    non -- nonstop or I was visiting my clients.

6    Q    Would you talk to her on the cell?

7    A    If there's a problem, yes, sir.

8    Q    How frequently?

9    A    Infrequently.

10   Q    With regard -- I'm jumping back for a second.
11   With regard to the 401(k) issue and contributions, after
12   January 15th, 2010, are you aware whether or not the DJS
13   Processing employees were able to participate in the Law
14   Offices of David J. Stern, P.A. 401(k)?

15   A    I have absolutely no idea how that worked out.

16   Q    Are you aware whether or not there was shared
17   administrative costs between the DJS Processing,
18   Professional Title and Abstract and Default Services
19   with regard to their participation in the 401(k)?

20   A    I'm sorry.  I have no idea.

21   Q    In 2009 prior to going public, obviously --
22   prior to going public -- going public in January 2010,
23   would you agree with me that the volume of new business
24   continued to rise?

25   A    I would -- I would not agree with you.

```
 1        Q    So, you would agree then that in 2009, the
 2   volume of new business began to drop?
 3        A    Business began to drop despite our
 4   expectations in 2010.
 5        Q    I said 2009.
 6        A    Business was greater in 2009 than it was in
 7   2010.
 8        Q    Did business increase in 2009?
 9        A    Over 2008?
10        Q    Yes.
11        A    Yes, sir.
12        Q    Do you remember being told that there were
13   hundreds of phone calls from people that your law office
14   was foreclosing upon complaining that they had never
15   been served their foreclosure notice?
16        A    Told by whom?
17        Q    Cheryl Sammons.
18        A    No.  I remember that --
19             MR. TEW:  There's no pending question.
20        A    Okay.
21        Q    (By Mr. Jaffe) Who is Tammy -- and I'll spell
22   it instead of butchering the pronunciation of them after
23   the -- K-A-P-U-S-T-A?
24        A    I believe that's Tammy Kaposta who I do not
25   know.
```

```
 1        Q    You are aware though that she worked at -- as
 2   a paralegal?
 3        A    I'm aware that she worked at my office.  I
 4   don't know her functionality.
 5        Q    Nor any of her responsibilities, roles while
 6   she was there?
 7        A    I only know that she was escorted out by the
 8   police and she lost her only child to her blind husband.
 9        Q    So, it's your inference that she wouldn't tell
10   the truth?
11        A    My inference is that she has no credibility
12   based on what I understand or understood her to say.  As
13   I sit here today, my testimony is that I did not read
14   her deposition.  As I glanced at it, to me, it was just
15   a blog because it was such garbage.  I went to Cheryl
16   because I knew clients would call, and Cheryl said
17   David, she's a fruitcake, she got fired, she was
18   escorted out by the police and to say how bad she is,
19   she, in a custody, lost her child to her blind husband.
20        Q    Did you read Cheryl Sammons' deposition?
21        A    Which deposition?
22        Q    How about the one in May of 2009?
23        A    You have to tell me what it was.  What case it
24   was.
25        Q    No, I don't -- it could be any of her
```

```
 1   depositions.
 2        A    No.
 3        Q    Are you familiar with what case on this?
 4        A    Yes, sir.
 5        Q    Did you, in any way, developed it?
 6        A    With Shapiro or with my office?
 7        Q    Good question.  Your office.
 8        A    With my office, we created a case summary,
 9   "we" being Cheryl and I, that listed from the referral
10   any bits of information that would be necessary to
11   create a merged document.  Client, client address,
12   borrower, borrower's address, loan number, UPB, anything
13   that would merge into any pleading.  That case sum
14   document saved us a lot of time, tremendously efficient.
15   From the time that Cheryl and I created it, probably was
16   two months, three months as Miriam started that I never
17   really looked at a case sum again, and I'm sure that it
18   got expanded a hundred times over without my sign-off
19   because I don't need to sign off on the cases.
20        Q    What is UPB?
21        A    Well, in my profession, it's unpaid principal
22   balance.  I guess, if you're playing basketball or
23   sports.  Unpaid principal balance.
24        Q    Well, I know what it means in sports.
25        A    Yeah.  I mean, it's true it's out there for
```

```
 1   something.
 2        Q    Would you agree with me that there was
 3   pressure put on Cheryl Sammons by you to get judgments
 4   entered so that the reports in the bank showed completed
 5   transactions?
 6             MR. TEW:  Object to the form.
 7        A    No, I wouldn't.  If Cheryl had issues, she
 8   would come to me as she had done in the past and I would
 9   rectify the situation by getting rid of clients or
10   calling clients to tell them you can turn off the
11   volume.  Cheryl knew if there was a problem, she could
12   come to me.  And that's why they had pretty much carte
13   blanche, no restrictions on salary, no restrictions on
14   hiring, take whatever space you need to take, no budget.
15   They had -- they had the best of all worlds.
16        Q    (By Mr. Jaffe) It sounds like a great place to
17   work.  During 2008, 2009, would Fannie Mae auditors come
18   on property?
19        A    In 2008, Fannie Mae created a new designated
20   counsel program or network.  They came on property to
21   interview each of the firms and to review our operation,
22   kick the tires if you will.  I am not aware of any other
23   Fannie Mae visit or on site, until probably June or July
24   of 2010 when --
25             MR. TEW:  Wait a minute.  You've answered the
```

```
 1    question.
 2        A    -- when Fannie Mae came in to visit law firms.
 3        Q    (By Mr. Jaffe) Did Fannie Mae come on property
 4    in 2008, Fannie Mae auditors?
 5        A    Fannie Mae auditors did not come out.  I do
 6    not believe Fannie Mae auditors came on property.  I
 7    believe their audit was a mail away audit.
 8        Q    Okay.  Did Fannie Mae auditors come on
 9    property in 2009?
10        A    I'm not -- let me -- let me go back.  I don't
11    think they came on in 2008.  I think they came --
12    they -- I'm sorry.  They never came on, to the best of
13    my knowledge.  I am not aware of an audit of any sort on
14    property or mail away in 2008.  I believe it was 2009
15    that they did an audit but it was a mail away audit.
16        Q    When Fannie Mae -- and I'm sorry, I was
17    interrupted so I lost the answer to the question that I
18    wanted to hear the answer to.  2009, did Fannie Mae come
19    on property?
20        A    For what purpose?
21        Q    Any.
22        A    Yes, sir.
23        Q    And did they let you know before they were
24    coming on property that they were coming?
25        A    They came on property they let us know for
```

```
 1    training and loss mitigation initiatives.
 2        Q    Okay.  So, you knew they were coming?
 3        A    Yes, sir.
 4        Q    Okay.  Did you instruct Cheryl or any staff
 5    members to extend hours in order to -- did you instruct
 6    staff to extend hours in anticipation of their meeting?
 7        A    That -- that's not what I did.  That would be
 8    a day-to-day operation or decision.  To the best of my
 9    knowledge, I wouldn't have any reason to do that and I
10    would not do that.  That would be Cheryl.
11        Q    Okay.  So, if it happened --
12        A    I'm not saying it didn't, but I'm telling you
13    I did not.
14        Q    Sure.  But I'm acknowledging that and say, if,
15    in fact, it happened, that would have -- Cheryl would
16    have been the person at the top that would have
17    authorized that behavior?
18        A    It depends if you're talking about
19    Processing --
20        Q    Yes.
21        A    -- or you're talking about one of the other
22    entities.
23        Q    Processing.
24        A    It would have been Cheryl.
25        Q    Do you have any knowledge with regard to the
```

```
 1    instruction of staff members to rip stickers and client
 2    codes off the Fannie Mae files replacing them with those
 3    of a different lender?
 4        A    I do not.
 5        Q    Have you ever heard that accusation?
 6        A    Ripping the sticker off and replace it with a
 7    different client, no, I haven't.  The files are $3 and
 8    80-some odd cents, I -- it's been so long I know the
 9    price of them.  But once the files were done because
10    they're so expensive, the items would be documented, it
11    would be put into a manila folder and we would re-use
12    the folder again for a brand new case.
13        Q    So, that's no?
14        A    That's -- the answer to your question is no.
15        Q    Are you aware that staff was instructed to
16    remove the Fannie Mae files and put them into a remote
17    back room?
18        MR. TEW:  Object to the form.
19        A    No, I'm not.
20        Q    (By Mr. Jaffe) When Fannie Mae did come on
21    property, what was your role?  Did you meet with them?
22        A    Fannie came for loss mitigation, they
23    asked that I be there simply to share best practices on
24    what I see in other states with other law firms and give
25    them benefit of my knowledge of what I understand to
```

```
 1    work or not work.  So, from a loss mitigation
 2    standpoint, I would have been in attendance at that
 3    meeting, but that, again, was not an audit meeting.
 4    There was a meeting where the higher ups at Fannie Mae
 5    came in and ask me to be in attendance as they were
 6    going by to see all of their large Florida firms.  And
 7    wanted to impress upon us the need to stay fully
 8    staffed, anticipations of huge, huge shadow inventory.
 9    Inventory that was in default but had not yet been
10    referred for various reasons.  And also to get my take
11    on what the issues may be for backup, if any, of files;
12    HEF, HOFA, all Obama initiatives that slowed down the
13    process.  So --
14        Q    Why did they want you there?
15        A    Because I'm the guy that knows what's going on
16    with other states.  I'm the guy that goes to these
17    seminars.  I'm the guy that probably more so than anyone
18    is in touch with the largest 10 lenders in the country,
19    and they were picking my brain to say hey, do you know
20    of any problems that the servicers are having, David, do
21    you know if they are, you know, getting you what you
22    need.  I can't tell you if they're getting us what
23    we need unless, you know, Cheryl would say Client ABC
24    would sent 10 affidavits and we haven't gotten them
25    back.
```

```
 1        Q    Would Cheryl be in those meetings?
 2        A    Cheryl would be in those meetings, yes.  As
 3   would Miriam, as would Beth.  All good meetings, all
 4   positive meetings, all exciting meetings for growth and
 5   anticipation of volume.  Huge numbers of shadow
 6   inventory.
 7        Q    On site, on the physical plant, 900 South Pine
 8   Island --
 9        A    900 South Island, fourth floor conference
10   room.
11        Q    Big conference room?
12        A    Big conference room.
13        Q    You're aware that, periodically, Cheryl
14   Sammons was deposed?
15        A    I am, yes, sir.
16        Q    Again, you've already testified that you never
17   read her depositions, is that accurate?
18        A    That is accurate, yes.
19        Q    When was the last time you spoke to Cheryl?
20        A    Latter part of -- probably, the latter part of
21   November 2010.
22        Q    Why?
23        A    Because as the wheels came off, it came off
24   under her watch and based on my testimony it's very
25   apparent that I had tremendous trust and confidence in
```

```
 1   her and let her run the show.  Not knowing that anything
 2   was wrong, I watched my world unravel.  And as items
 3   came up, I was not aware of certain things and they may
 4   or may not have been the reason for Fannie and Freddie
 5   pulling the plug at the end of the day.  I think it's a
 6   major reaction and political.  But at that point in
 7   time, I terminated her.
 8        Q    When was that?  Ballpark, November?
 9        A    End of November, yes.  And Miriam as well.
10        Q    Did you ever discuss with Cheryl her
11   deposition testimony in about the time in which they
12   were occurring?
13        A    I would deal with Jeff too and in-house
14   counsel for Forest McSurdy --
15        Q    Don't tell me anything you've talked to those
16   guys about.
17        A    No, I'm not.  I'm not.  -- to determine if
18   there were any issues or what needed to be taken if
19   there's going to be any surprises.  And Jeff, if
20   anything needed to be fixed, he fixed it.  And they
21   educated me on the fix.  And that was that.
22        Q    So, that's a yes?
23        A    Did I talk to Cheryl about her depo?  Not
24   specifics.  How did it go.  That's about it.
25        Q    Well, was it about how was it kind of go?
```

```
 1        A    Yeah, how did it go.  But again, it wasn't a
 2   big deal for me because Jeff would have been present in
 3   those depos.  And Jeff would have come if there were
 4   problems and said these are the problems, or these are
 5   going forward with would be our best practices.  So, I
 6   had it from him, I didn't need to go see Cheryl.
 7        Q    So, whatever occurred during the Sammons
 8   depositions, you were made aware of?
 9        A    If they were problematic, I would be made
10   aware of them and what measures to take to -- to fix the
11   issue, I would be made aware of.  Nothing that I sat
12   down and said oh, my God, I'm going to read this
13   deposition myself because I have Jeff.
14        Q    Just for the record, Jeff is Jeffery Tew --
15        A    Jeffrey Tew.
16        Q    -- sitting next to you?
17        A    Jeffrey Tew, Tew Cardenas, attorney
18   extraordinaire.  And from those depositions and
19   depositions of others, Jeff would come and say
20   everything good but I have some recommendations for best
21   practices due to changing environments.  And for the
22   most part, we always win.
23        Q    Would you -- were you told that with regard to
24   the Sammons depo in Deutsche Bank v. B-E-L-O-U-R-D-E-S,
25   P-I-E-R-R-A that Sammons testified that there were at
```

```
 1   times the wrong party of interest in certain documents?
 2        MR. TEW:  If any of your lawyers told you
 3   that, you shouldn't answer.  That's privileged.
 4        A    I don't know even know which case you're
 5   talking about.  I'm sorry.
 6        Q    (By Mr. Jaffe) Is it your testimony that at
 7   Cheryl Sammons' depositions, Jeffrey Tew of Tew Cardenas
 8   was her lawyer?
 9        A    I don't think in every single one.  There may
10   have been Forest McSurdy from our firm or Michelle Mason
11   or Donna Glaick, I'm not sure.  That wasn't a
12   day-to-day thing that I was involved in.  I would
13   venture to say that Jeff was brought in at the request
14   of Forest -- Jeff Tew was brought in at the request of
15   Forest McSurdy depending upon the nature of the -- of
16   the deposition or the nature of the case.
17        Q    Do you know whether or not Jeff Tew was in
18   attendance at the Sammons deposition taken on May 20th,
19   2009?
20        A    I don't.
21        Q    Do you know if Jeff Tew was in attendance in
22   the Sammons deposition that was taken on April 29th,
23   2010?
24        A    I do not.
25        Q    Were you made aware from Ms. Sammons that she
```

1    testified in April of 2010 that her signature does not
2    mean the contents of the document she signed was
3    accurate and truthful?
4         A    I'm sorry?  Would you read that back.
5              (Thereupon, the record was played
6              back.)
7              (Deposition resumed.)
8         A    I don't even understand the question.
9         Q    (By Mr. Jaffe) Was one of Ms. Sammons' roles
10   in 2008, 2009 to sign certain documents?
11        A    Certain types of documents, yes.  Not all of
12   2009 and only for certain clients.
13        Q    What type of documents?
14        A    Assignments of mortgage for MERS, mortgage
15   electronic registration, and -- and that, of course, was
16   executed pursuant to a MERS corporate resolution
17   empowering Cheryl and others to sign.
18        Q    Okay.
19        A    Cheryl also -- Cheryl and others, pursuant to
20   power of attorneys from various clients, would have
21   executed affidavits of indebtedness after their review
22   of the contents of the affidavits pursuant to power of
23   attorney that were, of course, set out under the
24   signature line.
25        Q    Okay.  And are you aware -- did Ms. Sammons

1    ever tell you that she testified that my signature on
2    certain documents doesn't mean that the contents of the
3    documents are either accurate or truthful?
4         MR. TEW:  Object to the form of the question.
5    Misstates the testimony.
6         A    I -- she actually never told me that.
7         Q    (By Mr. Jaffe) Okay.  When the stock -- when
8    you went public and the stock was issued, what was the
9    trade price, approximate trade price?
10        A    $8.81.
11        Q    10 -- $10?
12        A    I think it was $8.81.  I don't recall.  I
13   mean, it went to $10, it went to $12.50, it went to $15.
14        Q    All right.  Would you agree with me that by
15   February of 2010 it was trading at half that?
16        A    February of 2010?
17        Q    Yes.
18        A    It was trading at --
19        Q    $5-ish.
20        A    I don't -- I don't believe so.
21        Q    By April 15th, 2010, it was down by almost 88
22   percent?
23        A    I don't recall that, no.
24        Q    July 20th, 2010, you were sued in an investor
25   class action security suit?

1         A    When you say "you," who's who?
2         Q    Fair enough.  Stern -- Law Offices of David J.
3    Stern, P.A.  Question?
4         A    No.
5         Q    DJSP Enterprise, BBI?
6         A    I have to look back and sign up a complaint.
7         Q    But you are aware that there was a securities
8    case filed?
9         A    I am, yes, sir.
10        Q    Also in July 2010, there was a RICO class
11   action filed against you?
12        A    Who's you?
13        Q    Fair enough.  There was a RICO class action
14   filed against certain -- Stern, P.A., DJSP and others?
15        A    So, not me.  The 23 MERS members, yes, sir.
16   Which the court dismissed.
17        Q    Are you aware that July 27th, 2010 DJSP
18   Enterprises, BBI announced through a press release that
19   new referrals had decreased?
20        A    I'd have to see the press release of the time.
21   I understand there was a press release made, but I don't
22   know if it's July 27th.  If you say there's one done,
23   then we can stipulate to that.
24        Q    I'll get it if you want to.
25        A    Okay.

1         MR. JAFFE:  Frank, you want a copy?
2         MR. SCRUGGS:  Yes, please.  Thank you.
3         Q    (By Mr. Jaffe) Thought we're going to get
4    through without it because it looks --
5         A    No.  No.  We -- we --
6         Q    Plaintiff's 1.
7              (Thereupon, Exhibit 1 was entered
8              into the record.)
9         A    I don't mind.  You said guys, I'm good, in
10   there.
11        MR. BERNSTEIN:  You already made the copies,
12   so might as well hand them out.
13        Q    (By Mr. Jaffe) All right.  I just handed you
14   what's been marked as Plaintiff's Exhibit 1 for
15   identification purposes.  Take a look at it and then I
16   will ask a question.  I would direct your attention to
17   the second paragraph -- oh, the first paragraph where it
18   has a date and then the second paragraph.
19        A    Okay.  Yes, we did send out that press release
20   dated July 27th.
21        Q    All right.  So, back to my question.  Let's
22   just be clear on the record.  As of July 27th, 2010,
23   DJSP Enterprises, BBI announced that new referral
24   business had decreased?
25        A    Yes.

```
 1          Q     Okay.  Are you aware that August 10th, 2010
 2    the attorney general of the State of Florida began
 3    investigating your law office?
 4          A     I'm sorry.
 5                (Thereupon, Exhibit 2 was entered
 6                into the record.)
 7          Q     (By Mr. Jaffe) I'm going to show you what's
 8    now been marked as Plaintiff's 2 for identification
 9    purposes.  And ask you if you recognize that.
10          A     This is a press release that announces
11    investigate -- new investigations against Law Offices of
12    Marshall Watson, Shapiro & Fishman, Law Office of David
13    J. Stern.
14          Q     So, does that refresh your recollection that
15    on August 10th, 2010 the attorney general of the State
16    of Florida began an investigation?
17          A     No, sir, it does not.
18          Q     Okay.
19          A     I don't know if I have personal knowledge when
20    they started it, I just know when the release came out.
21          Q     Okay.  In August of 2010, were you made aware
22    by anybody that the AG was investing you, "you" being
23    the law office?
24          A     I don't know if it was on the 11th or the 12th
25    or the 13th.
```

```
 1          Q     So, you were made aware?
 2          A     I was made aware but I don't know if it was
 3    August 10th.
 4          Q     Okay.  All right.  So, sometime in August you
 5    were made aware that the attorney general's office had
 6    begun an investigation of your law office?
 7          A     Based on this press release that would -- I
 8    would know, somewhere around there, yes, definitely in
 9    the month of August.
10          Q     So, then you had a conference call with
11    investors on September 8th, 2010, correct?
12          A     Sorry?
13          Q     Okay.  If we could go back to Plaintiff's 1.
14    Specifically referring to paragraph five that begins
15    with "Rick Powers".  Let me know when you're ready.
16          A     Okay.
17          Q     Would you agree with me that in a July 27th,
18    2010 press release, DJSP Enterprises announced that
19    there would be no immediate plans for significant
20    staffing changes?
21                MR. SCRUGGS:  Object to the form.
22                MR. TEW:  Object to the form.
23          A     Rick was quoted as saying, "We have no
24    immediate plan for significant staffing changes that
25    would reduce our response time or our ability to handle
```

```
 1    the volume."
 2          Q     (By Mr. Jaffe) Do you understand what he means
 3    when he says, "We must also focus on our legacy
 4    population"?
 5          A     Yes.
 6                MR. TEW:  Object to the form.
 7          Q     (By Mr. Jaffe) You can answer.
 8          A     Yes.
 9          Q     What does he mean?
10          A     He means that there are files that had been in
11    the office that our legacy files, meaning they've been
12    around for a while.  Generally, on -- on hold for HEF
13    and HOFA.  And Fannie and Freddie were pushing servicers
14    to get these files off hold.  So, we're seeing huge
15    numbers of files by the -- by the thousands coming off
16    hold with proceeds.  Hence, he saying that while we have
17    no immediate plans for staff changes, we're going to use
18    that existing staff to handle those files that had come
19    off of hold from HEF and HOFA and get those moving
20    through the system.
21          Q     And let's move back to a question I asked you
22    previously.  And I'll ask a better question.
23          A     Okay.
24          Q     Would you agree with me that the Law Offices
25    of David J. Stern, P.A. was the principal customer of
```

```
 1    DJSP Enterprises, BBI?
 2                MR. SCRUGGS:  Object to the form.
 3                MR. TEW:  Same objection.  Form.
 4          A     No.
 5          Q     (By Mr. Jaffe) No?  All right.  Let me direct
 6    your attention down to the bottom of this press release,
 7    last paragraph.
 8          A     Okay.
 9          Q     And if you could read to me, beginning with
10    the word "the company's principal customer is."
11          A     "The company's principal customer is the Law
12    Office of David J. Stern whose clients include all of
13    the top 10 and 17th of the top 20 mortgage servicers in
14    the United States many which have been" -- I'm sorry --
15    "customers of the law firm for more than 10 years.  The
16    company has approximately a thousand employees and is
17    headquartered in."
18          Q     Does that refresh your recollection that the
19    Law Office of David J. Stern, P.A. was a principal
20    customer of DJSP Enterprises?
21          A     It is the principal customer of DJS
22    Processing.
23          Q     So, this is inaccurate?
24          A     It's not inaccurate.  It's DJS Processing is
25    then part of DJSP Enterprises.  But DJSP Enterprises has
```

156

1    other clients.

2        Q    So, it's less than complete?

3        A    I think it's complete.  I understand it.

4        Q    Okay.  With investors?

5        A    Other clients.

6        Q    Investors in the stock?

7            MR. TEW:  Object to the form.

8        A    I'm sorry.  One, I can't speak for the

9    investors.

10       Q    (By Mr. Jaffe) All right.  Have you ever been

11   become made aware of the attorney general of the State

12   of Florida's investigation into your law firm as to what

13   they're investigating?

14       A    I have.

15       Q    Are you aware that one of the things their

16   investigating is the creation of false legal documents?

17       A    False legal documents.  What's a false legal

18   document?

19       Q    Documents containing false information.

20       A    I -- I'm -- I'm not aware of that.  And they

21   may be investigating it but I'm not aware if -- if

22   that's one of their obligations in the business.

23       Q    Right.  That's all I'm asking you, of what

24   you're aware of, whether or not they're investigating

25   your law firm regarding inflated fees.

157

1        A    I had heard that on -- on -- on a list of one

2    of the items, that's correct.

3        Q    The AG is investigating your law office for

4    referring business to companies that the law firm owns

5    or has a financial interest in?

6        A    I haven't heard that one.

7        Q    Filing foreclosures without proving the bank

8    owns the loan?

9        A    I've heard that they're investigate -- they

10   were investigating that.

11       Q    Investigating the allegations that there were

12   false mortgage assignments?

13       A    False mortgage assignments, I have not heard

14   that.  I don't know what a false mortgage assignment is.

15       Q    A mortgage assignment containing false

16   information.

17       A    I -- they're maybe investigating.  I'm not

18   aware of that.

19       Q    Investigating false or fraudulent signatures?

20       A    I'm aware of that.

21       Q    Falsifying notarizations?

22       A    I wouldn't say falsifying but questioning

23   notarizations in the notary's presence while the party

24   is signing it.

25       Q    Are you aware that the attorney general's

158

1    office is investigating foreclosures on people without

2    verifying their identities?

3        A    I don't know how you do that, I'm not aware of

4    that.  But the AG wouldn't surprise me.

5        Q    Are you aware that the attorney general is

6    investigating the law office for foreclosing on people

7    without verifying the amount that is owed?

8        A    I guess that would be part of the review of

9    the affidavits.  So, yes.

10       Q    Are you aware that the attorney general's

11   investigating the law office or you, individually, for

12   paying kickbacks to banks?

13       A    I did hear that one.

14       Q    Let's move on to September 8th, 2010.  Do you

15   have a recollection of having a conference call with

16   investors?

17            MR. SCRUGGS:  Asked and answered.

18       A    I'm not sure what day but let's look at the

19   press release.

20            (Thereupon, Exhibit 3 was entered

21            into the record.)

22       Q    (By Mr. Jaffe) Let me show you what has now

23   been marked as Plaintiff's Exhibit 3 for identification

24   purposes.  Take a look at that.

25       A    Do you want me to read the whole thing?

159

1        Q    No.  No.  No.  No.

2        A    Okay.

3        Q    Let me direct your attention to page four of

4    this document, entitled "conference call information."

5    Please read that paragraph to yourself.

6        A    Okay.

7        Q    Does that refresh your recollection that there

8    was an investor conference call on September 8th, 2010?

9        A    It does.

10       Q    Do you recollect where you were, when you

11   participated in that conference call?

12       A    I don't.  I don't.

13       Q    Can I refresh your recollection by suggesting

14   to you that you're on your boat?

15       A    Absolutely not.

16       Q    Do you have a recollection of being live on

17   the premises or on the plant facility at 900 South Pine

18   Island Road?

19       A    I don't know if we were on the road.  I would

20   think, given the sensitivity -- I don't recall, but I

21   can say I was not on my boat.

22       Q    Let me ask you some questions.  Do you have an

23   independent recollection of the content of that call,

24   what you said?

25       A    I believe I said very little.  Rick Powers

1    handled that call to the best of my recollection.

2        Q    Okay.  And certainly, the tape recording of

3    the contents of that call speak for themselves and with

4    regard to who spoke and how much they spoke, correct?

5        A    Correct.

6        Q    Okay.  Do you have a recollection of saying

7    that DJSP Enterprises had 20 percent of the market share

8    in Florida?

9        MR. TEW:  Object to the form.

10       A    I don't recall saying that ever, or at what

11   point in time -- are you saying I said that on this

12   call?

13       Q    (By Mr. Jaffe) I'm asking you if you did.

14       A    I don't believe I -- I don't recall.

15       Q    Do you recall saying that there was 1,200

16   employees in DJSP Enterprises?

17       A    I don't recall what I said on that particular

18   call.

19       Q    Do you believe -- do you have a recollection

20   of whether or not you said that DJSP Enterprises was the

21   largest provider of processed services to the mortgage

22   lending industry in the State of Florida?

23       MR. TEW:  Object to the form.

24       A    I don't recall what I said.

25       Q    (By Mr. Jaffe) Do you have a recollection

---

1    whether or not you said DJSP Enterprises is believed to

2    be the largest in the country in terms of judicial

3    foreclosures?

4        MR. TEW:  Object to the form.

5        A    I don't recall what I said on that call.

6        Q    (By Mr. Jaffe) Would you agree with me that

7    Wells Fargo, GMAC and Goldman Sachs were some of your

8    top clients as of September 2010?

9        A    No.

10       Q    Would you agree with me that BOA, Citigroup

11   and HSBC were some of your top clients as of September

12   2010?

13       A    No.

14       Q    Would you agree with me that PNC, Freddie Mac

15   and Fannie Mae were some of your top clients as of

16   September 2010?

17       A    How -- define "some of your top clients."

18       Q    Were you doing work for any of those lenders?

19       A    Okay.  That doesn't -- yes, I was doing work

20   for -- well, the answer to your question is no.

21       Q    As of September 2010, you weren't doing any

22   work for any of those lenders?

23       A    Fannie Mae and Freddie Mac are not lenders.

24   And you put the three of them together, therefore the

25   answer is no.

---

1        Q    Were you doing any work for Wells Fargo?

2        A    Yes, sir.

3        Q    Were you doing any work for GMAC?

4        A    Yes, sir.

5        Q    Were you doing any work for Goldman Sachs?

6        A    Not that I know of.

7        Q    Bank of America?

8        A    Yes, sir.

9        MR. TEW:  These are referring to the law firm

10   of David Stern, right?

11       MR. JAFFE:  This --

12       MR. TEW:  Then I'm going to object to all

13   these questions you -- unless it means the Law

14   Offices of David Stern.

15       MR. JAFFE:  I didn't mean him, individually.

16       MR. TEW:  Well, there's no other law firm that

17   could be rendering services.  I'll object to all of

18   those questions, unless you mean the Law Office of

19   David J. Stern.

20       MR. SCRUGGS:  You know, I'll join.  I'll move

21   to strike the answers on the basis that -- of the

22   questions.

23       Q    (By Mr. Jaffe) Would you agree with me that

24   the following clients had been your clients, yours being

25   the Law Office of David J. Stern since 1994, Bank of

---

1    America?

2        A    No, sir.

3        Q    When did they become a client of your law

4    firm?

5        A    I'd have to look and see when Bank of America

6    came on the scene.  There's NCNB and there's

7    NationsBank.  In 1994, Bank of America, I don't think

8    they existed.  They certainly weren't our client.

9        Q    Okay.  Citigroup?

10       A    Citigroup?

11       Q    When did they come out --

12       A    As a client of the Law Offices of David J.

13   Stern?

14       Q    Yes, sir.

15       A    1994.

16       Q    HSBC?

17       A    There may be referrals that come from clients

18   where HSBC is a plaintiff, but a direct relationship

19   with HSBC, I don't recall.  Not in 1994 though.

20       Q    Is it fair to say though on that conference

21   call of September 2010, you held yourself out to

22   represent all of the top 10 lenders?

23       A    I don't recall what I said on that call.

24       MR. TEW:  Yeah.  Same objection as you.

25       Q    (By Mr. Jaffe) You, as it relates to a

164

1  conference call, were you speaking is what my reference
2  is to you, that you said that the law office or DJSP
3  enterprises represents all the top 10 lenders?
4      MR. TEW:  Same objection.
5      A  I don't recall what I, David J. Stern, said on
6  that call.
7      Q  (By Mr. Jaffe)  Okay.  Do you recollect saying
8  on that call that you expected growth to be at
9  historical heights between 2012 and 2017?
10      A  I, David J. Stern, do not recall anything that
11  I said or that call.  I may have said hi, this is David
12  Stern.
13      Q  I think you might have said a little more than
14  that.
15              (Thereupon, a short discussion was
16              had off record.)
17              (Deposition resumed.)
18      Q  (By Mr. Jaffe) Now that we have been speaking
19  about the conference call on September 8th, 2010, do you
20  recollect if you were reading from script?
21      A  I do not.
22      Q  Do you recollect if what documents, if any,
23  you were referring to and looking at while you were
24  speaking?
25      A  I don't.  I'm sorry.

165

1      Q  Is there anything that would refresh your
2  recollection as to what you were looking at and
3  referencing during that call?
4      A  I assume that if we read off the script, then
5  we could find the script.
6      Q  Is that something that was done on
7  investor-cost, that is, reading off the script at times?
8      A  At times.
9      Q  Assuming you said we have direct source for
10  Wells Fargo and for GMAC, what does that mean?
11      A  Assuming I said it?  Direct source is a
12  relationship whereby services have retained law firms to
13  handle both law firm functionality as well as servicer
14  functionality.  It results in increased volume, better
15  control over the files, closer relationships with the
16  clients and it avoids payment of any outsourcing fees.
17      Q  What does GSE mean to you?
18      A  Government-sponsored entity, Fannie Mae,
19  Freddie Mac.
20      Q  Do you recollect telling people on the other
21  end of the phone call, the conference call, that one of
22  the GSEs that was with us the other day in our office,
23  they actually were there to kick the tires.  Do you
24  remember making that statement?
25      A  I don't remember anything I said on that call.

166

1      Q  Do you remember GSE being in your office a few
2  days prior to September 8th, 2010?
3      A  I would have to look back at my calendar and
4  see which GSE and what it was.  As I -- yeah, that's
5  all.
6      Q  What are lien searches?
7      A  Lien searches are searches that people may
8  have against themselves, generally attaches to the
9  property.  So, if you want to give somebody a credit
10  card, you're going to want to do a lien search to see if
11  these people have any judgments or liens against them.
12      Q  Is that a business that DJSP Enterprises was
13  looking to get into?
14      A  Yes, sir.
15      Q  Do you remember telling the investors that
16  that would create a $100 to $150 a pop?
17      A  I don't recall.  "At what point in time,"
18  would be my first question, "What investors were?"
19  and --
20      Q  The September --
21      A  I can't tell you.  I don't recall what I said
22  on that call.
23      Q  I'm still -- I'm only talking about the
24  September 2000 --
25      A  I don't have any recollection of what was said

167

1  on that particular call.
2      Q  Generally speaking, do you believe you gave a
3  positive forecast for the future of DJSP Enterprises on
4  that September 8, 2010 phone call?
5      A  I don't recall what I said on that particular
6  day in terms of anything.
7      Q  On September 8th, 2010, the date of that
8  conference call, were you aware that two weeks later,
9  approximately, Ms. Kapusta's deposition was being taken
10  by the attorney general?
11      A  Was I aware at that time of this call, that
12  two weeks after, they were going to take her deposition?
13      Q  Sure.
14      A  Sorry.  My crystal ball was broken that day.
15      Q  But generally, there's some notice given?
16      A  No, there's not.  There's no notice.  There's
17  no right for us to cross-examine.  There's no right for
18  us to be there.  There's no nothing.  So, the answer is
19  no.
20      Q  I appreciate you clearing that up.
21      A  Keep asking your questions.
22      Q  Do you recollect -- referring to Plaintiff's
23  Exhibit No. 3 for identification purposes.  A press
24  release sent out, September 7th, a day before the
25  investor conference call by DJSP Enterprises.  I'm

168

```
 1    directing your attention to page three under "Operation
 2    Discussions".
 3         A    Okay.  I'm sorry.  What was your question?
 4         Q    I haven't asked you yet.
 5         A    Okay.  All right.
 6         Q    Is it fair to say that you were telling your
 7    investors by this press release that DJSP Enterprises
 8    believed file volume would increase over the third
 9    quarter?
10              MR. TEW:  Object to the form of the question.
11         That's an incomplete sentence or part of a
12         sentence.
13         Q    (By Mr. Jaffe) All right.  Based on the
14    objection, I'll torture you, and then ask you to read,
15    please, for the record, beginning with "As of" -- or "As
16    a."
17         A    "As a result of management's discussion with
18    our largest clients" -- "client, the law office of
19    David J. Stern PA, and with the major lenders and
20    servicers for whom DJSP process foreclosure files, we
21    believed file volume would increase in the third quarter
22    and we previously decided to maintain current staffing
23    levels; however, file volumes continued to be delayed
24    and existing staffing levels are not sustainable
25    indefinitely."
```

REIF KING WELCH LEGAL SERVICES
www.reifkingwelch.com  (877) 291-DEPO (3376)

169

```
 1         Q    So, here, explain to me, if you can, the
 2    purpose of that paragraph.
 3         A    It was the belief that volume would increase
 4    in the third quarter.  And DJS Processing had decided to
 5    maintain current levels.  At this point in time, the
 6    volume hasn't come back or they continued to be delayed.
 7    And as such, the existing staff levels are not
 8    sustainable indefinitely.
 9         Q    Were you involved in any way in disseminating
10    any of that information to anyone?
11         A    I don't recall what I said on the conference
12    call.  I didn't put these in envelopes and mail them out
13    to anybody.
14         Q    What I mean by this is, this is obviously
15    produced on September 7th and sent out, okay?
16         A    Yes.
17         Q    Right?
18         A    Yes, sir.
19         Q    Okay.  And the information contained within
20    this press release was obviously obtained before
21    September 7th.  Could have been the day before?
22         A    Yes, sir.
23         Q    Okay.  My question was, did -- were you part
24    of creating the data in any way that is contained in
25    this September 7th press release?
```

REIF KING WELCH LEGAL SERVICES
www.reifkingwelch.com  (877) 291-DEPO (3376)

170

```
 1         A    I don't recall.
 2         Q    Is it fair to say, paraphrasing, that the
 3    existing staffing levels may not be sustainable
 4    indefinitely, is what part of this message is?
 5         A    That is correct.
 6         Q    Is it also fair to say, looking at the next
 7    paragraph, Mr. Powers is commenting and saying,
 8    "We're prepared to create efficiencies and make
 9    cuts where appropriate over the next three to six
10    months"?
11         A    That's what he said, yes, sir.
12         Q    Okay.  When you say, "make cuts", what does
13    that mean to you?
14         A    Reduce staff.  Cut expenses.  Overhead would
15    include staff or could include office space or could
16    include copiers or could include lack of efficiency.
17         Q    In September -- as of September 7th, 2010, did
18    you inform any of your staff of impending cuts?
19         A    I did not.  I, David J. Stern, did not advise
20    my staff of any impending cuts.
21         Q    Did HR?
22         A    I have to ask HR.  I'm not aware of it.
23         Q    You're not aware of whether HR did or didn't?
24         A    Correct.  Everybody got this press release.
25         Q    Everybody?  What's that mean?
```

REIF KING WELCH LEGAL SERVICES
www.reifkingwelch.com  (877) 291-DEPO (3376)

171

```
 1         A    Whoever wanted to go look at the press release
 2    would have gotten knowledge, but I didn't send the press
 3    release out.
 4         Q    Where was it sent?
 5         A    I'm sorry?
 6         Q    You said everyone got this press release.  I'm
 7    not sure what that means.  I didn't get it.
 8         A    Whoever wanted it could get it.  I guess,
 9    they'd go on the SEC website where press releases are
10    released too, and it's there.
11         Q    Do you know if any of your staff who -- even
12    knew the existence of an SEC site -- website?
13         A    You have to ask folks that or the
14    informational officer.  I know at the time Chris Simmons
15    kept everybody abreast of where to go and what was
16    going on and commonly-asked-questions.  So, that was
17    a Chris Simmons, not a David Stern.
18         Q    And is it your testimony that Chris Simmons
19    would send out either e-mail or post HR disseminating
20    notes that, "A new press release has been made available
21    and here's a copy of it, if you want?
22         A    I do not know if that was the way the
23    mechanics work.  But I do know that Chris made himself
24    available to all staff if they had questions through a
25    particular e-mail box.
```

REIF KING WELCH LEGAL SERVICES
www.reifkingwelch.com  (877) 291-DEPO (3376)

1        Q    This press release, who is it intended for,
2   this type of a press release?
3        A    No idea.  Investors.  Disclosure to the world,
4   to the SEC.  You've got to make the world aware of
5   everything.  So, anyone in this world, it's intended
6   for.
7        Q    Including investors?
8        A    They're for everybody, including Hugh
9   Bernstein.
10        Q    Would you agree with me that on
11   September 29th, Chase suspended referrals to the Law
12   Office of Javid Day Stern.  Javid?
13        A    I got you.
14        Q    David J. Stern.
15        A    On September 29th?
16        Q    Yes, sir.
17        A    I am not aware of any client suspending
18   referrals in September.  As I sit here today, I have no
19   idea.
20        Q    Are you aware that on October 8th, 2010,
21   25 percent of Professional Title and Abstract employees
22   were fired?
23        MR. TEW:  Object to the form.
24        A    I am aware of somewhere during that time
25   period, given the acquisition of Timeos for efficiency

1   purposes, a lot of the previous Professional Title and
2   Abstract work was sent to the Timeos folks out in
3   California to gain efficiencies, better training, better
4   technologies, et cetera.
5        Q    (By Mr. Jaffe) Would you agree with me that on
6   October 8th, 2010, Freddie Mac told Morgan Services to
7   stop sending work to Stern PA?
8        A    Not aware of that.  On October 8th?  Not aware
9   of that.
10        Q    Are you aware that on October 11th, 2010,
11   Fannie Mae and Citigroup suspended new referrals to
12   Stern PA?
13        A    I'm not aware of that.
14        Q    Are you aware that on October 14th, 2010, DJSP
15   Enterprises announced a 10 percent reduction in file
16   volume?
17        A    Via what?
18        Q    A press release.
19        A    I'd have to see that, you know.  At that point
20   in time, everything, you know, cuts coming every which
21   way.
22        Q    So, you're not saying it didn't happen, you're
23   just not aware of it?  You don't recollect?
24        A    I mean, I don't recollect.
25        (Thereupon, a short discussion was

1               had off record.)
2               (Deposition resumed.)
3        Q    (By Mr. Jaffe) Let me rephrase.  Are you aware
4   on October 14th, 2010, staffing levels had been reduced
5   by 10 percent?
6        A    I certainly don't know the dates specific.  I
7   can tell you that that's before, at least to my
8   knowledge, that Fannie and Freddie pulled the files.
9   And I can tell you that staff reductions were
10   contemplated due to a whole host of things, from
11   uncontrollable events, government intervention,
12   robo-signing on behalf of pretty much every major bank
13   out there.
14        MR. TEW:  David, he just asked, "Were you
15   aware of that?"
16        A    I was not aware of the date, but I was aware
17   of the imminent staff reduction.
18        Q    (By Mr. Jaffe) Do you have a recollection when
19   the first time staff reduction issues were brought up in
20   a meeting?
21        A    I don't.  That would have been Rick Powers and
22   Cheryl Sammons and Chris Simmons.  I do not.
23        Q    You were not in any of those meetings?
24        A    To discuss staff reductions or to decide who
25   stays?

1        Q    To discuss the issue of staff reductions.
2        A    At what point in time?
3        Q    Any.
4        A    I've been at meeting where they discuss staff
5   reductions, absolutely.
6        Q    2010?
7        A    Yes.
8        Q    How early?
9        A    First, second week of November 2010.
10        Q    That's -- so, your best recollection is that
11   would be the first time you were animating where a
12   discussion was had regarding staff reductions?
13        A    No.  I would say I was in meetings for staff
14   reductions -- given the key words "staff reductions" --
15   from the day Phil Cobb came on to the day Rick Powers
16   succeeded him.
17        Q    Phil Cobb came on when?
18        A    I don't recall.  Sometime, I think, just as
19   the transaction kicked off on January 2010.
20        Q    Were you ever made aware by anyone after
21   January 15th, 2010 that based on industry events, you
22   might want to consider reducing staff?
23        A    Was I made aware at any time after
24   January 15th, 2010 that I might want to consider
25   reducing staff?  Anytime after January 10th?  Yes.

1    Q    And before November 2010?

2    A    Yes.

3    Q    What's your first recollection of when that

4    would have been and by who?

5    A    It would have been by Rick Powers in

6    September -- August, September.

7    Q    Under what circumstances was that discussion?

8    A    He presented me with updates on management

9    tools; better training, measuring by the metrics and

10   tremendous technology where efficiency's increased

11   tremendously.  And we would continue with staff to

12   handle legacy problems, issues, "volumes" being the

13   keyword.  But on a positive, given the technology and

14   the better training and holding people accountable, he

15   was confident that we could reduce staff at some point

16   in time.

17    Q    Was it Rick Powers' idea to outsource

18   backoffice labor to the Philippines?

19    A    No.

20    Q    Do you recollect espousing that one of the

21   keys to success on an ongoing basis would be to

22   outsource labor for backoffice to the Philippines at

23   one-half the salary of full-time Plantation employees?

24    A    I don't know if I said one-half, but at

25   substantial savings from a Plantation or US-based

1    employee, absolutely.

2    Q    And when is your recollection of the first

3    time you would have espoused that type of process?

4    A    I have no idea.

5    Q    2009?

6    A    No, I think it would have to have been after

7    the transaction, January 15th, 2010.

8    Q    It was in the first half of 2010?

9    A    I don't recall.

10    Q    Did you, in fact, outsource labor to the

11   Philippines?

12    A    We were doing that in 2008, 2007.

13    Q    Did you increase outsourcing of staff,

14   backoffice staff, in the first quarter of 2010?

15    A    Sure.  As volumes increased, we had to

16   increase volume there.

17    Q    Did you increase your staff in the Philippines

18   because -- or in a reaction to increased file volume or

19   to reduce expenses?

20    A    I only know that additional bodies were

21   necessary.  That would be Cheryl Sammons, that was her

22   role.  That wasn't my role.  So, I can't tell you.  I

23   don't know.  That's a day-to-day process that she was

24   involved in, and I can't even tell you who works in the

25   Philippines or who's who or what's what.  I can only

1    tell you from a dollar-and-cents, it's been efficient.

2    Q    You also said at some point that Professional

3    Title and Abstract was the first entity to go paperless?

4    A    I did, yes, sir.

5    Q    Okay.  Do you remember when that was?

6    A    No, sir.

7    Q    And did you also recollect saying in reaction

8    to going paperless, We won't need -- there'll be no need

9    for the 90-or-so file clerks running around.

10    A    Did I say that in my testimony today?

11    Q    No.

12    A    Oh, because if I say, "no" --

13    Q    No.

14    A    I don't recall saying that.  Yeah, I don't.

15    Q    Are you aware in October 21st and October 22nd

16   of 2010, DJSP Enterprises terminated 190 employees?

17    MR. TEW:  Object to the form.

18    A    I know DJSP Enterprises terminated employees.

19   I don't know exactly what dates or how many.

20    Q    (By Mr. Jaffe) Were you involved?  You've

21   already told me your first recollection of being in a

22   meeting with regard to terminations was in November.

23   So, obviously, my question's dealing with an October

24   date.  Is it fair to say you have no recollection being

25   in a meeting to discuss the terminations I've just

1    mentioned?

2    A    In October?

3    Q    Yes, sir.  Or earlier for that matter.

4    A    You know, I may have been in a meeting, but

5    Cheryl would have been there at that point in time.  So,

6    Cheryl would have headed up that meeting or worked

7    hand-in-hand with Chris Simmons and Rick Powers, quite

8    simply because I would not know who's who, who needs to

9    stay, who needs to go.  Was I in the meeting?  I don't

10   know.  Do I know the people?  Absolutely not.

11    Q    Would you agree with me that even as late as

12   November 2010, the HR department was still operating off

13   of one e-mail assistant?

14    MR. TEW:  Objection.

15    A    I wouldn't know that.

16    (Thereupon, a short discussion was

17   had off record.)

18    (Deposition resumed.)

19    Q    (By Mr. Jaffe) Are you aware that the

20   terminations I just referenced -- the 198 that were

21   conducted or carried out in October 21st, October 22nd,

22   2010 -- were just carried out by group meetings and

23   employees being given a letter?

24    MR. TEW:  Object to the form.

25    A    I remember knowing that cuts that took place

1    on or about that time or as a result of efficiencies
2    gained in the day-to-day operation.  I remember
3    expressing concern as to how do you go about terminating
4    whatever number it was.  I don't know what the number
5    was, but it wasn't feasible to bring a person in and
6    say, "Look, I'm sorry, blah, blah, blah".  And I
7    remember Rick Powers or Chris Simmons reaching out to an
8    outside firm for some guidance on how to best terminate
9    a number of people, a number of people where you can't
10   bring them all in one room and say, "I'm sorry, but the
11   firm's gained efficiencies.  It's time to have some
12   cuts, and unfortunately, you're the cuts".  So, how it
13   ultimately got done, I understand.  I do remember there
14   was letter of notification.  That's really about all
15   that I know.
16        Q    (By Mr. Jaffe) Did you sign that letter?
17        MR. SCRUGGS:  Objection to form.
18        MR. TEW:  Same objection.
19        A    I don't recall.
20        Q    (By Mr. Jaffe) But your name's on the bottom of
21   the list?
22        A    Show me the letter.  I can let you know.  I
23   don't recall.
24        Q    I show what's been marked Plaintiff's Exhibit
25   No. 4 for identification purposes.

REIF KING WELCH LEGAL SERVICES
www.reifkingwelch.com  (877) 291-DEPO (3376)

1              (Thereupon, Exhibit 4 was entered
2              into the record.)
3         Q    (By Mr. Jaffe) Actually, take a look.
4    Actually, after you're done looking at it, if you
5    recognize it?
6         A    I do recollect the letter and that is my
7    signature.
8         Q    Okay.  And you signed this letter dated
9    October 21st, yes?
10        A    I did sign it, yes, sir.
11        Q    And you signed it as CEO of DJSP Enterprises?
12        A    Yes, sir.
13        Q    And what was the reason that you gave the
14   affected employees for their termination?
15        A    What was the reason?
16        Q    Yes, please read paragraph number one.
17        A    "The referral of new businesses decreased by
18   over 75 percent in the last six months.  While we're
19   doing everything possible to guide the company
20   successfully through these difficult times, it's unclear
21   what the business will look like in the near future.
22   So, due to loss of business, we regret to inform you
23   that we are laying off a substantial amount".
24        Q    Now, is it your testimony that between
25   September 8th, 2010, which is the conference call date

REIF KING WELCH LEGAL SERVICES
www.reifkingwelch.com  (877) 291-DEPO (3376)

1    with investors, to October 21st, 2010, the 75 percent of
2    your referral business have gone away already?
3         MR. TEW:  Object to the form of the question.
4         A    If that's what's in the letter, then that's
5    what occurred.  I don't know if 70 percent went away two
6    days before and 5 percent went away June, July, August.
7         Q    (By Mr. Jaffe) Right.  Because you actually
8    referenced six months earlier.
9         A    Right.
10        Q    So, business had apparently begun to take a
11   downturn six months prior to October 21st, 2010?
12        A    Correct.  When Bank of America had technology
13   changed, volume began to drop off.  We, of course, were
14   hopeful that given the promises from clients that
15   volumes would pick up, Fannie Mae coming in the office
16   and saying, "Be prepared for the shadow inventory", that
17   that volume would come back.  And we were confident that
18   we could use the existing staff to work on the legacy
19   files.  Then --
20        Q    And the BOA business dropped off?  This began
21   when?
22        A    They had a technology change when Bank of
23   America and Countrywide merged or Bank of America
24   acquired Countrywide, they changed their system.  And as
25   a result of that system conversion, half of our

REIF KING WELCH LEGAL SERVICES
www.reifkingwelch.com  (877) 291-DEPO (3376)

1    referrals from them.
2         Q    When?
3         A    I'm thinking -- I got to look at the volume.
4    I got to look at the volume.  I'm thinking second
5    quarter.
6         Q    Define that for us, not in your world.
7         A    Oh, no, I'm not in that world neither.  Let's
8    see, January, February, March -- so, April, May, June.
9         Q    Okay.  Are you aware that on October 22nd,
10   2010, DJSP Enterprises sends out a press release
11   announcing that as of October 22nd, the total number of
12   layoffs were now approximately 300?
13        MR. TEW:  Object to the form of the question.
14        Q    (By Mr. Jaffe) Are you aware of that?
15        A    I don't recall.
16        Q    Any reason to question?  Are you saying, "I
17   don't agree" or are you saying "I have no knowledge."
18        A    I have no knowledge.  I don't know what the
19   number was.  I don't know the date.  I simply know that
20   great efficiencies were realized and volume hadn't
21   bounced back.
22        Q    On October 25th, 2010, Mark Harmon resigns off
23   the board of directors, is that true?  I mean, is that
24   your recollection?
25        A    I don't know the date, but Mark Harmon did

REIF KING WELCH LEGAL SERVICES
www.reifkingwelch.com  (877) 291-DEPO (3376)

184

```
 1    resign off the board of directors.
 2        Q    Do you know why?
 3        A    I don't.
 4        Q    How many people did you place on the board of
 5    directors?
 6        A    Four.
 7        Q    Who were they?
 8        A    Mark Harmon, Matthew Katon, myself and
 9    Kumar Gushani.
10        Q    Was there a reason, other than yourself, why
11    you named those other people to the board?
12        A    Well, Matthew's a longtime trusted friend
13    that -- about the only one -- I'm sorry, Jeff -- that I
14    trust. Mark does what I do or did in Massachusetts,
15    Rhode Island, New Hampshire, so he has tremendous inside
16    expertise. He kind of gets it, he understands. Kumar
17    was a natural fit at the time because we didn't have a
18    COO, so we brought the CFO in to be a director.
19        Q    How long have you known him?
20        A    Kumar? Six months.
21        Q    How'd you meet him?
22        A    He took the job as the COO.
23        Q    Did you interview him?
24        A    I did.
25        Q    Two days later, October 27th, 2010, the
```

185

```
 1    accounting firm resigned. Are you aware of that?
 2        A    Not aware of the date, but I do know that
 3    McGladrey resigned.
 4        Q    Do you know why?
 5        A    I do not.
 6        Q    Four days later, November 1st, 2010, DJSP
 7    Enterprise and your law office default on the lease at
 8    900 Southpine Island Road; is that correct?
 9        A    Yes, sir.
10        Q    Did either of those entities default on the
11    lease on November 1st, 2010?
12        A    I don't know at what point in time Processing,
13    who held the list, was in default.
14        Q    So, it's possible that DAL Group may have held
15    that lease; is that true?
16        MR. TEW:  Anything is possible. You're talking
17    about a document. I object to the form of the question.
18        Q    (By Mr. Jaffe) Are you aware that DJS
19    Processing defaulted on the list on November 1st, 2010?
20        A    I'm not sure if the list was with Processing
21    or Enterprise. I know at some point in time, there was
22    a default on the lease through one of the entities of
23    the public company.
24        Q    You're just not sure what date it was?
25        A    I'm not sure what date it was.
```

186

```
 1        Q    Does November 1st sound accurate?
 2        A    It doesn't.
 3        Q    Does not?
 4        A    It does not.
 5        Q    At this point, have you had -- at this point,
 6    being November 1st time frame, do you have a
 7    recollection of having any other meetings regarding
 8    further staff reductions and the necessity for that?
 9        A    I don't recall the time frames. Obviously, as
10    the unexpected catastrophic event occurred, there was a
11    need to have a meeting, but I don't recall at what point
12    in time that was.
13        Q    What "unexpected catastrophic event" did you
14    just reference?
15        A    Fannie Mae, Freddie Mac coming in and
16    terminating the relationships. And then the rest of --
17    substantial portion of the remainder of the industry
18    following suit.
19        Q    What's your recollection of the date that
20    Fannie and Freddie pulled?
21        A    I want to say November 4th, November 5th.
22        Q    Okay. What's your recollection of the other
23    entities that pulled following Fannie and Freddie?
24        A    Within two weeks, everything was pretty much
25    gone.
```

187

```
 1        Q    Do you have a recollection of -- I'll come
 2    back to that question. Just had a flashback regarding
 3    the conference call with investors, where periodically
 4    there were scripts that were used to have that type of
 5    conference call. My question there is, who drafted the
 6    scripts?
 7        A    Chris Simmons, director of investor relations,
 8    together with input from Kumar, Rick Powers. In many
 9    instances, myself, if they didn't know what was going or
10    if they needed a question answered.
11        Q    So, at this time frame, when you're giving
12    investor calls, you still know what's happening with the
13    business?
14        A    I don't understand your question.
15        Q    You're aware of -- you're reading reports.
16    You're seeing volume. You're seeing new file intakes.
17    You're seeing how fast they're closing. And you're
18    seeing the cash flow in and out of the company.
19        A    Okay.
20        Q    And so, you have -- in 2010, you have a handle
21    on what's happening with the business?
22        A    As the numbers are reported in the quarterly
23    earning calls and the investors or the world, whoever
24    elects to participate in that call is made aware of the
25    day-to-day happenings.
```

188

```
 1        Q    Right.  But you have that information, that
 2   institutional knowledge of your own business far in
 3   advance of those calls and reports for that matter.
 4        A    Sure.  When Fannie Mae comes in and sits down
 5   and says, "David, we have 600,000 shadow inventory
 6   loans", we say, "You mean, 60,000"?  And they go, "No.
 7   We mean, 600,000".  And I say, "Oh, that's nationwide"?
 8   And they go, "No, 600,000 shadow inventory in the State
 9   of Florida".  Sure, I know.  Yeah, it's exciting.
10        Q    November 4th, 2010, do you recollect being
11   involved in a mass layoff via e-mail?
12        A    Do I recall being involved?
13        Q    Yes, sir.
14        A    I do not recall what particular date.  I do
15   know, as a result of this unforeseeable catastrophic
16   event, that there obviously had to be significant lay
17   offs because there's nothing left.  It's all gone.
18   Pulled.  Whoever thought?  Certainly, the industry
19   didn't.  If you look at where we are.  Six months later,
20   files are still sitting in boxes.
21        MR. SUGGS:  Could you read back the prior
22   question?
23                    (Thereupon, a short discussion was
24                    had off record.)
25                    (End of Volume I)
```

```
 1   DATE:  April 29, 2011
 2   TO:    David J. Stern
 3          C/O
          Tew Cardenas, LLP
 4          Jeffrey Tew, Esq.
          Four Seasons Tower
 5          15th Floor, 1441 Brickell Ave.,
          Miami, Florida 33131
 6   IN RE:  Renae Mowat, Nikki Mack, Arklynn Rahming, and
 7           Quenna Humphrey individually and on behalf of
          all other similarly situated individuals v. DJSP
 8           Enterprises, Inc., a Florida Corporation, DJSP
          Enterprises, Inc., a British Virgin Islands
 9           Company, Law Offices of David J. Stern, P.A.,
          David J. Stern, individually, DAL Group, LLC, a
10          Delaware LLC, DJS Processing, LLC, a Delaware
          LLC, Professional Title and Abstract Company of
11          Florida, a Delaware LLC, and Default Servicing,
          LLC, a Delaware LLC
12          10-62302-CIV-UNGARO
13   Dear Mr. Stern:
14          Please take notice that on April 25, 2011, you
     gave your deposition in the above-referred matter.  At
15   that time, you did not waive signature.  It is now
     necessary that you sign your deposition.
16          You may do so by contacting your own attorney
     or the attorney who took your deposition and make an
17   appointment to do so at their office.  You may also
     contact our office at the below number, Monday - Friday,
18   9:00 AM - 5:00 PM, for further information and
     assistance.
19          If you do not read and sign the deposition
     within thirty (30) days, the original, which has already
20   been forwarded to the ordering attorney, may be filed
     with the Clerk of the Court.  If you wish to waive your
21   signature, sign your name in the blank at the bottom of
     this letter and return it to us.
22          Very truly yours,
23          SAMANTHA HANSTEIN
          Reif King Welch Legal Services
24          954-712-2600
25   I do hereby waive my signature.
```

```
 1   --------------------
 2   David J. Stern
 3   Cc: via transcript:      Steve Jaffe, Esq.
                            Jeffrey Tew, Esq.
 4                            Frank Scruggs, Esq.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    ERRATA SHEET
 2   PAGE NO.   LINE NO.
 3   _____    _____    _____
 4   _____    _____    _____
 5   _____    _____    _____
 6   _____    _____    _____
 7   _____    _____    _____
 8   _____    _____    _____
 9   _____    _____    _____
10   _____    _____    _____
11   _____    _____    _____
12   _____    _____    _____
13   _____    _____    _____
14   _____    _____    _____
15   _____    _____    _____
16   _____    _____    _____
17   _____    _____    _____
18   _____    _____    _____
19   _____    _____    _____
20   _____    _____    _____
21   _____    _____    _____
22   _____    _____    _____
23   _____    _____    _____
24   --------------------     -----------------
25   SIGNATURE                 DATE
```

```
 1              CERTIFICATE OF REPORTER

 2

 3    STATE OF FLORIDA
      SOUTHERN DISTRICT
 4

 5         I, SAMANTHA HANSTEIN, do hereby certify that

 6    the foregoing testimony was taken before me; that the

 7    witness was duly sworn by me; and that the foregoing

 8    pages constitute a true record of the testimony given by

 9    said witness.

10         I further certify that I am not a relative or

11    employee or attorney or counsel of any of the parties,

12    or a relative or employee of such attorney or counsel,

13    nor financially interested in the action.

14         Under penalties of perjury, I declare that I

15    have read the foregoing certificate and that the facts

16    stated herein are true.

17         Signed this 25th day of April, 2011.

18

19              Samantha Hanstein

20              SAMANTHA HANSTEIN

21

22

23

24

25
```

```
 1               CERTIFICATE OF OATH

 2

 3

 4    STATE OF FLORIDA
      SOUTHERN DISTRICT
 5

 6         I, the undersigned authority, certify that

 7    DAVID J. STERN personally appeared before me and was

 8    duly sworn.

 9

10         Witness my hand and official seal this 25th

11    day of April, 2011.

12

13

14    Samantha Hanstein, Court Reporter
      Notary Public, State of Florida
15    Commission No.: EE 070089
      Commission Expiration: 03/03/2015
16

17

18

19

20

21

22

23

24

25
```

**WORD INDEX**

1

**A**
ABC 134:20
143:23
ability 25:1 60:9
63:5 111:19
153:25
able 24:12 32:23
44:21 52:11
53:2 61:12
72:3 88:9
98:16 99:4
103:11,20,23
107:5 135:13
above-referred
189:14
abreast 171:15
absent 93:1
absolutely 30:14
81:1 113:7
128:16 135:15
159:15 175:5
177:1 179:10
absorbed 24:10
abstract 1:12
53:23 58:12
59:7,8 60:2
68:12 69:9,11
69:12,18 76:17
78:23 86:8,18
93:8,16 95:6
97:16 98:11,13
98:17,21 99:1
99:5,24 100:24
101:12,16
103:16 108:25
109:6,15,19
110:24 119:8
120:9 121:22
122:14 123:22
124:4,10,18
129:6,10
135:18 172:21
173:2 178:3
189:10
abundantly
133:10
accepted 43:4

access 99:4,6
accomplish
107:12
accomplishme...
64:15
accounding
131:13
accountability
44:18,19 52:13
52:14
accountable
85:9 176:14
accounting
57:14 61:1,2
94:6 129:24
130:1,7,8,20
185:1
accounts 130:10
130:11,12,13
130:14
accurate 72:11
144:17,18
148:3 149:3
186:1
accurately 47:12
accusation 142:5
achievement
64:11,12
achieving 44:5
acknowledging
141:14
acquired 120:24
122:5 182:24
acquisition
116:1 172:25
acronym 9:6
11:13 31:15
act 131 39:24
action 18:11
27:15 67:17,18
67:20 79:2
149:25 150:11
150:13 192:13
actions 85:22
97:7
active 64:23
65:12

actively 50:12
activity 65:4,6
actual 98:24
122:10 126:23
ad 40:13
adding 49:20
addition 125:4
additional 87:22
87:23,23,24
107:14 177:20
address 78:25
79:16 94:7
138:11,12
addresses 100:6
adequate 85:24
adequately
23:13
adjunct 60:21
adjust 28:3
adjustments
102:22
administrative
135:17
admiral 83:8
admonitions
7:21
adopt 25:20
ADP 130:19
advance 113:7
advanced 19:17
Advertisement
39:10
advice 121:9
advise 170:19
advisors 107:17
108:5
affidavits
143:24 148:21
148:22 158:9
afford 14:9
afternoon 75:25
AG 152:22
157:3 158:4
age 13:9
agent 106:14
117:17 118:5

119:17 120:10
ago 33:9 64:21
65:4 66:3
104:25
agree 17:19
36:17 64:22
74:18 85:20
91:14 93:6,10
98:20 105:23
114:13,17
121:13 122:13
123:10 125:7
126:22 135:23
135:25 136:1
139:2 149:14
153:17 154:24
161:6,10,14
162:23 172:10
173:5 179:11
183:17
agreed 48:22
68:15
agreement
126:11,11,13
128:6,9,12
132:22 133:19
134:9,11
141:23 154:7
161:20,25
167:18
answered
139:25 158:17
187:10
answers 24:24
24:25 34:17
162:21
anticipation
141:6 144:5
anticipations
143:8
anybody 38:21
59:17 152:22
anymore 41:21
66:25 89:22
anytime 8:1
175:25
anyway 111:3

182:12,23,23
amount 22:23
32:6 68:22
84:4 111:15
124:24,25
158:7 181:23
ANDREWS 2:5
and/or 102:25
animating
175:11
announced
150:18 151:23
153:18 173:15
announces 5:6
152:10
announcing
181:11
annual 72:3 81:8
81:12
answer 26:8
57:6 69:21
70:9 92:14
96:14 111:3
113:12,15
118:2 140:17
140:18 142:14
147:3 154:7
161:20,25
167:18
allegation 68:1,2
allegations 68:3
157:11
alleged 68:7
allow 43:19
107:8
allowed 25:2
103:6,14,17
alluding 48:24
amazing 22:25
23:5
America 18:1
47:19 162:7
163:1,5,7

| | | | | |
|---|---|---|---|---|
| 116:4 | April 1:19 6:2,4 | 39:24 41:14 | attorney's 53:23 | 156:24 157:18 |
| apologize 10:24 | 147:22 148:1 | 42:11 62:4 | 58:7 | 157:20,25 |
| 48:24 94:15 | 149:21 183:8 | 91:8 165:4 | audit 140:7,7,13 | 158:3,5,10 |
| 113:7 | 189:1,13 | assumed 44:22 | 140:15,15 | 167:8,11 |
| Appalachian 8:8 | 192:17 193:11 | assuming 43:16 | 143:3 | 170:22,23 |
| 8:15 15:10,14 | area 18:14 39:21 | 165:9,11 | auditors 44:8,9 | 172:4,17,20,24 |
| 15:16 | 61:8 69:17 | assured 89:14 | 139:17 140:4,5 | 173:8,10,13 |
| apparent 41:17 | areas 56:15 71:4 | astronomical | 140:6,8 | 173:14,23 |
| 144:25 | 73:21 114:12 | 101:6,13 | August 122:8 | 174:3,15,16,16 |
| apparently | 113:1 | attaches 166:8 | 152:1,15,21 | 175:20,23 |
| 115:15 182:10 | Arena 73:21 | attempt 28:5 | 153:3,4,9 | 176:25 178:5 |
| appear 50:16 | arguing 50:23 | 32:24 | 176:6 182:6 | 178:15 179:19 |
| appearance 50:8 | Argumentative | attendance 64:7 | authorities 58:3 | 183:9,14 185:1 |
| 68:20 | 91:13 | 143:2,5 147:18 | authority 80:16 | 185:2,18 |
| APPEARANC... | Arklynn 1:3 | 147:21 | 80:17,21 193:6 | 187:15,24 |
| 2:1 | 189:6 | attention 89:19 | authorized 24:6 | awry 24:20,21 |
| appeared 69:12 | articles 9:2 | 151:16 155:6 | 141:17 | A-L-K 70:16 |
| 105:13 193:7 | asked 13:4 22:2 | 159:3 168:1 | automated | a.m 1:20 6:5 |
| appearing 56:23 | 43:2 89:8 | automated | 30:24 | |
| 66:7 | 113:8 120:16 | 30:24 | automatic | **B** |
| appears 97:21 | 134:13 142:23 | automatic | 113:24 | B 34:14 13:6 |
| appellate 94:2 | 154:21 155:17 | 113:24 | AutoNation | Bachelor 15:18 |
| applied 101:2 | 168:4 174:14 | AutoNation | 67:16 | back 10:4 12:6 |
| appointment | asking 72:8 | 67:16 | available 112:3 | 15:8,9 19:8,22 |
| 189:16 | 78:25 156:23 | available 112:3 | 171:20,24 | 19:22 22:16,25 |
| appreciate 96:11 | 160:13 167:21 | 171:20,24 | Ave 2:5,20 189:4 | 26:7,8 27:2,18 |
| 96:25 167:20 | aspect 56:22 | Ave 2:5,20 189:4 | average 45:17 | 29:5 30:6,8 |
| appreciated | 107:6 | average 45:17 | 45:19 | 31:23,24 38:2 |
| 49:11 | Assembly 29:14 | 45:19 | avoids 165:16 | 39:11,11 44:20 |
| approached | asset 43:15,18 | avoids 165:16 | aware 106:9,13 | 48:25 57:11 |
| 107:16 | assigned 88:23 | aware 106:9,13 | 106:16,19 | 63:14 65:14 |
| appropriate | assignment | 106:16,19 | 109:8,10,14,18 | 66:8 71:2 |
| 53:9 170:9 | 157:14,15 | 109:8,10,14,18 | 110:9,12,15 | big 13:8 19:8 |
| appropriately | assignments | 110:9,12,15 | 118:16,25 | 44:25 42:1,16 |
| 23:9 | 148:14 157:12 | 118:16,25 | 119:7,10,16 | 67:20 96:12 |
| approve 63:18 | 157:13 | 119:7,10,16 | 120:20,23 | 144:11,12 |
| approximate | assist 56:18 | 120:20,23 | 134:18 135:12 | 146:2 |
| 55:25 81:25 | assistance 122:20 | 134:18 135:12 | 135:16 137:1,3 | bill 69:16 |
| 149:9 | 188:18 | 135:16 137:1,3 | 139:22 140:13 | bounced 183:21 |
| approximately | assistant 39:7 | 139:22 140:13 | 142:15 144:13 | box 114:17,18 |
| 10:21 13:21,23 | 84:9 179:13 | 142:15 144:13 | 143:25 148:4,6 | boxes 188:20 |
| 54:8 55:20 | assisting 61:9 | 143:25 148:4,6 | 146:11 147:25 | brackets 65:8 |
| 66:2 72:9 73:6 | associated 103:1 | 146:11 147:25 | 148:25 150:7 | brain 163:19 |
| 74:20,20 80:7 | associates | 148:25 150:7 | 150:17 152:1 | brand 12:11 |
| 87:10 98:18 | 111:17 | 150:17 152:1 | 152:21 153:1,2 | 142:12 |
| 119:2 155:16 | assume 13:17 | 152:21 153:1,2 | 153:13 154:21 | Brandt 7:8,15 |
| 167:9 183:12 | 162:8 37:4 | 126:5 148:20 | 156:15,20,21 | 44:23,23 75:15 |

| | | | | |
|---|---|---|---|---|
| backoffice | 90:17 92:23 | 6:19 16:15 | 90:10 99:15 | blanche 113:5 |
| 176:18,22 | 137:12 144:24 | 28:8 46:16 | 100:3,4 117:1 | 139:13 |
| 177:1 | 153:2 168:13 | 64:20,24 74:2 | 133:11 139:15 | blank 89:1,2,2 |
| backup 115:25 | 172:21 | 113:20 114:5 | 140:12 141:8 | 189:20 |
| 143:11 | basic 44:20 | 125:20 174:12 | 142:23 146:5 | blast 53:3 |
| backwards | basis 17:2 42:22 | 143:6 | 146:20 160:1 | blind 137:8,19 |
| 106:3 | 49:2 50:8 | behavior 141:17 | 175:10 183:8 | blog 137:15 |
| bad 129:2 130:5 | 53:15 59:21 | behaviors 85:22 | best-selling | blow 33:22 |
| 137:18 | 69:7 72:3 | belied 17:4 169:3 | 139:8 | blue 36:6 |
| balance 138:22 | 80:25 81:9,12 | 17:2 19:16 | Beth 144:3 | BLVD 1:22 2:10 |
| 138:23 | 82:14,16 83:3 | better 22:11 | better 22:11 | 2:4 |
| balancing | 102:21 176:21 | 24:12,16 25:1 | 51:11 52:22 | BMW 81:8,11 |
| 130:14 | 167:1 | 26:14 35:10 | 62:15,24,25 | BOA 161:10 |
| ball 19:12 | basketball | 38:5 47:5,5,13 | 66:25 134:24 | 182:20 |
| 167:14 | 130:17 | 47:25 50:19 | 170:17 178:25 | board 59:18 |
| ballpark 45:7 | bathroom | 51:23 59:19 | 173:3,3 176:9 | 119:11 121:3,4 |
| 54:1 102:12 | 125:12 | 61:23 64:5 | 176:14 | 121:5 183:23 |
| 145:8 | BBI 118:17 | 72:23 74:9 | Bev 83:4 84:6 | 144:1,1 |
| bank 18:1 47:19 | 119:1,21 | 79:8,21 85:1 | 86:24 87:1 | bost 159:14,21 |
| 47:20 114:6 | 120:21,23 | 88:12 90:23 | 91:2,4 | BOCA 2:21,5 |
| 134:21 139:4 | 121:5,15 | 94:16 95:10 | Beverly 80:5,23 | bodies 90:10 |
| 162:7,25 163:5 | 123:12 150:5 | 98:12 99:17 | 85:15 86:22 | 177:20 |
| 163:7 174:12 | 150:18 151:23 | 103:13 105:11 | 90:15 100:16 | bonuses 28:15 |
| 182:12,22,23 | 151:24 | 113:8 116:16 | 101:22 102:16 | 28:16,18 |
| Banker 64:8 | Bankof 133:8 | 117:18 121:14 | 112:14 114:21 | bonus 34:9 |
| bankruptcies | 36:7 54:12 | 124:25 135:24 | 115:5 134:9 | born 8:4 38:4 |
| 174:16 | 160:1 80:6,19 | 126:14 127:1 | Bev's 83:5 | 105:10 125:18 |
| bankruptcy | Beck 68:9 | 149:20 151:9,19 | beyond 25:5 | 127:2 |
| 18:25 31:21 | becoming 9:9 | 160:14,19 | 22:2 | borrower |
| 56:12 60:3 | bed 14:6,6 | 167:1 | big 13:8 19:8 | 118:3,22 |
| 61:6 103:8 | began 9:5 16:3 | believed 161:1 | 41:25 42:16 | borrower's |
| 113:22,23,23 | 128:7 136:2,3 | 168:8,21 | 67:20 96:12 | 27:11 138:12 |
| banks 158:12 | 152:2,16 | beneficiaries | 144:11,12 | bottom 155:6 |
| bar 9:9,10,17,19 | 182:13,20 | 89:18 | 146:2 | 180:20 189:20 |
| 9:21,24 10:1,5 | begged 49:13 | benefit 142:25 | bill 69:16 | Boulevard 6:10 |
| 10:10,12,18 | beginning 47:14 | Berger 3:3 6:21 | BillI 90:24 | bounced 183:21 |
| 11:8 12:15 | 58:4 65:15 | Bernstein 2:24 | 112:17 | bound 188:2 |
| 33:11,12,16,23 | 91:6 92:2 | 70:15,19 78:24 | bills 82:4,11,12 | boxes 188:20 |
| 33:24 34:7 | 113:14 115:1 | 91:13 151:11 | birth 134:13 | brackets 65:8 |
| 69:2,13 | 168:5 18:17 | 172:9 | bit 24:15 72:21 | brain 163:19 |
| Barbara 100:10 | begins 153:14 | best 22:11 18:17 | 82:6 | brand 12:11 |
| BARBRI 34:2 | begs 89:12 | 28:20 32:15 | bits 138:10 | 142:12 |
| base 63:13 123:2 | begun 35:23 | 35:6 45:8,14 | Blackberry | Brandt 7:8,15 |
| baseball 38:23 | 182:10 | 48:25 51:23 | 70:16 100:7,7 | 44:23,23 75:15 |
| based 15:1 33:8 | behalf 1:4,18 2:3 | 67:1 71:23 | 70:16 100:7,7 | 75:21 125:12 |
| 83:14 90:16,16 | 2:18 6:15,18 | 79:4,23 90:9 | 180:6,6,6 | 126:14 |

| | | | | |
|---|---|---|---|---|
| breath 53:5 | 107:7 116:16 | 188:3 | 57:16 65:3 | CFO 131:13 |
| Brianna 35:16 | 116:20 155:23 | csm 55:14 | 138:19 | 184:18 |
| Brickell 2:20 | 136:2,3,6,8 | capabilities | case-by-case | chains 65:16 |
| 189:4 | 156:1,8 | 115:1 | 50:8 | chairman |
| Bridge 116:17 | 157:4 166:12 | capacity 11:5 | cash 124:12,23 | 119:11 121:5 |
| brief 22:24 | 181:21,22 | 60:6 129:13 | 187:18 | challenge 17:12 |
| briefly 7:4 | 182:2,10,20 | 131:19 | catastrophic | challenged |
| briefs 91:23 | 187:13,21 | Capital 116:4 | 186:10,13 | 40:19 |
| bring 87:12,22 | 188:2 | captain 24:22 | 188:15 | Chandra 2:14 |
| 112:19 180:5 | businesses | 83:6,11,12,15 | Ce 190:2 | 6:17 |
| 180:10 | 10:14 124:14 | 83:17,21 | cell 135:6 | chandra@cha... |
| bringing 20:11 | 181:17 | 114:14,17 | cellphones 13:8 | 2:16 |
| British 1:10 | busy 12:14 85:4 | car 18:4 81:16 | centered 18:19 | change 56:9 |
| 189:8 | 96:12 120:13 | card 38:1 166:10 | central 61:7 | 62:1 66:22,22 |
| broke 13:4 | butcher 75:12 | Cardenas 2:19 | centralized | 134:23 121:22 |
| broken 88:15 | butchering | 146:17 147:7 | 114:23 131:22 | 182:2 |
| 167:14 | 136:22 | 146:9 | 69:20 70:1,4 | changed 48:20 |
| Brookahaw | buy 81:8,11 | 187:2 | cents 62:19,22 | 48:23 56:17 |
| 132:3,4,8 | 146:24 | cards 35:11 | 62:22 142:8 | 70:19 |
| brought 88:17 | B-E-L-O-U-R... | cars 65:14,18 | CEO 119:1 | 92:1 116:12 |
| 89:19 90:11 | 146:24 | 85:8 102:22 | 181:11 | 181:24 123:20 |
| 127:3,3,4,5 | | career 8:24 | CEOs 127:6 | 182:24 |
| 131:12,13,14 | **C** | 56:21 | certain 29:7,10 | changes 131:15 |
| 147:13,14 | C 34:14 53:6 | Careful 38:24 | 31:3 64:4 90:9 | 132:13 133:20 |
| 174:19 184:18 | 133:9 | Carol 86:11,20 | 90:11 122:10 | 153:24 154:17 |
| Bryant 67:20 | CACA 116:2 | 86:25 97:17,19 | 145:3 147:1 | changing 146:21 |
| budget 52:8 | calendar 166:3 | Carollas 8:9 | 148:10,11,12 | chapter 34:22 |
| 112:23,25 | California 21:22 | 39:3,6 | 149:2 150:14 | 56:16 63:13 |
| 112:23 139:14 | 21:25 173:3 | carpet 36:8 | certainly 13:2 | 116:4,6,10,12 |
| building 79:11 | call 134:20 | carried 62:20 | 20:11,12 23:3 | 116:13 117:3 |
| 79:15 94:17 | 137:16 153:10 | 29:2 | 24:8,10 25:11 | 117:5,8,9,10 |
| 130:22 131:1 | 158:15 159:4,8 | carte 113:5 | 32:21 33:9 | 187:18 187:18 |
| built 17:17 | 159:11,23 | 139:2 | 36:19,22 48:2 | chargeback |
| business 16:4,7 | 160:1,3,12,18 | carve 57:8 | 48:23 57:18 | 132:13,14 |
| 16:9 17:20 | 161:5 163:21 | case 1:8 6:8 | 58:15 63:9,17 | chargeoff 114:7 |
| 24:2 33:7 | 164:8,11,19 | 50:24 61:10 | 139:17 148:12 | chargeons |
| 35:11 37:3 | 165:3,21,21,25 | 61:18 62:18,23 | 75:16 84:17 | Charlotte 39:3,6 |
| 38:1 46:15 | 166:22 167:1,4 | 66:18 67:23,24 | 149:5 156:1 | 39:21 40:2 |
| 48:5,8 49:15 | 168:1,1,1 | 68:1,5,25 | certificate 190:2 | 42:4,24 |
| 49:15 56:22 | 187:4 | 75:16 84:17 | certify 192:5,15 | 42:25 |
| 57:7,8,12 | called 87:7 | 134:20 137:23 | cetera 102:23 | chart 117:23 |
| 62:23,25 63:6 | 104:18 108:9 | 138:3,8,11,17 | 103:6 | 118:11,13 |
| 64:3 66:14 | calling 139:10 | 142:12 147:4 | | 118:21 |
| 67:13,15 72:14 | calls 86:4 97:9 | 147:16 150:8 | check 44:7 75:1 | Chase 18:1 |
| 72:19 82:15 | | 150:11,14 | 94:6 124:24 | 47:19 50:6,10 |
| 83:24 85:4,10 | 108:1 136:13 | caseload 72:4 | 124:24 | 50:15 162:16 |
| 85:14 106:17 | 187:12,21 | cases 50:24 | 108:7 173:4 | checks 56:13 |

| | | | | |
|---|---|---|---|---|
| 96:10 | 30:24 | 47:11,17,18 | conched 15:3 | 93:23 94:2 |
| Cheryl 38:20 | chuckle 19:7 | 52:14 57:4,5 | coaches 14:21 | Commission |
| 39:2,22 40:13 | CIO 131:11 | 63:13 64:20 | Cobb 127:7 | 193:15,15 |
| 41:11 42:20,21 | circle 67:10 | 65:19 66:14 | 133:7 175:15 | common 94:23 |
| 42:21,22 43:6 | circuit 26:5 | 87:7 89:21 | 133:7 175:15 | 101:1 |
| 61:2,2,3,5 62:4 | circumstances | 91:20 113:20 | code 61:7 107:1 | commonly 52:14 |
| 67:5,8 69:22 | 92:1 134:19 | 123:2 126:20 | codes 142:2 | commonly-ask... |
| 75:3 80:9,25 | 176:7 | 176:7 | Coditio 67:21 | 171:16 |
| 81:4,7,15 | Citigroup | 134:18,23,23 | 171:16 | comp 61:3 |
| 82:20 84:9 | 161:10 163:9 | 138:11,11 | 68:5,8,9 | 92:23 |
| 86:20,25 87:21 | 163:10 173:11 | 142:1,7 143:23 | collar 52:15 | companies |
| 89:19,23 90:13 | CitiMortgage | 163:3,8,12 | 62:12 91:10,16 | 107:17 109:1 |
| 90:20 96:4,5 | 47:10 | 168:18 172:17 | collection | 116:19 119:18 |
| 97:21 100:15 | city 14:19 66:20 | clients 16:14 | 130:13 | 122:3 157:4 |
| 101:22 102:16 | civil 50:25 | 17:1,25 24:22 | College 8:21 | company 1:10 |
| 112:14 114:21 | claim 57:19 | 25:5 37:12 | 9:15 | 1:13 53:22 |
| 114:25 115:13 | claims 56:12 | 40:6,7,10 | combination | 69:1 74:1 93:8 |
| 133:2,10,14 | 41:21 43:2 | 41:23 42:9 | 33:20 86:25 | 96:13 109:6,15 |
| 134:1,5,14,15 | clarification | 42:22 50:6,19 | 94:11,19 51:4 | 109:25 110:8,25 |
| 134:25 136:17 | 70:19 | 56:19 63:18 | 41:15,19 | 110:3,5,23 |
| 137:15,16,20 | clarify 78:24 | 64:8,25 65:19 | 52:11 64:10 | 115:21 116:5 |
| 138:9,15 139:3 | 81:3 | 85:7,8 87:14 | 72:11 94:10 | 116:17 123:20 |
| 139:7,11 141:4 | clarity 43:15 | 87:15 88:17,21 | 133:14 148:24 | 123:24 124:11 |
| 141:10,15,24 | class 27:14 | 88:22,24,24 | 134:19 154:16 | 124:11 125:17 |
| 143:23 144:1,2 | 67:17,18,20 | 89:1,7,18 | 139:10 148:12 | 148:19 156:19 |
| 144:13,19 | 69:17,24,24 | 134:10 139:8 | 161:11 | 187:1 |
| 145:10,23 | 77:8 150:6 | 139:12,17 | 169:6 182:17 | compassion |
| 146:6 147:7 | 150:13 | 122:4,15,21,24 | 181:1 | 83:18 126:12 |
| 148:17,19,19 | class 22:2 53:1 | 123:4,15 124:5 | 146:19 147:8 | 176:1 |
| 174:22 177:21 | clear 11:12 | 124:6,9 128:7 | 133:15 154:19 | competitor |
| 179:5,6 | 37:18 65:18 | 129:18 133:14 | 163:11,17 | 62:1 |
| Chicago 8:4 | 66:23 84:18 | 139:10 148:12 | 169:6 182:17 | computation |
| 11:19 12:19,25 | 95:24 124:12 | 154:16 161:11 | 181:1 | 83:8 126:12 |
| 21:10,19,21 | 109:3 110:20 | 161:11,13,17 | 1884 | competitors |
| chief 22:22 | 133:10 151:22 | 162:24,24 | comes 87:23 | 20:14,16 |
| 70:10,20 | clearing 167:20 | 163:17 168:16 | 89:11 105:16 | complaining |
| child 137:8,19 | clearly 105:25 | 168:18 182:14 | 188:4 | 184:8 |
| China 115:25 | 123:8 | client's 40:12 | comfortable | complaint 18:15 |
| China-based | clerk 11:7 | close 105:19 | 40:10,16,18,21 | 18:16,17 |
| 116:9 | clerked 14:18 | 122:6 | 120:16 | complaints 14:7 |
| choosing 90:14 | Chris 128:19,20 | cloned 34:22 | 168:18 182:14 | 30:12,24 34:7 |
| Chris 128:19,20 | clerking 14:19 | 46:18 122:11 | client's 40:12 | complete 32:21 |
| 177:14,17,18 | clerks 178:9 | closer 165:15 | 123:8 | 30:12,24 34:7 |
| 171:23 174:22 | client 161:18 | closing 18:25 | commanded | completion |
| 179:7 180:7 | clients 25:23 | 118:5 187:17 | 170:7 | 20:21 29:9 |
| 187:7 | clarify 27:3 20:1 | 114:5 187:17 | complaint | 30:23 31:9 |
| chronology | | 27:3 20:1 | commenting | 30:23 31:9 |

| | | | |
|---|---|---|---|
| complete 92:17 94:24 114:1,3 156:2,3 | conjunction 33:2 83:3 | contract 48:11 | 105:20 103:24 104:5 105:4 |
| completed 25:17 139:4 | consider 175:22 175:24 | contributions | 111:22 113:4 115:18 123:23 |
| completely 73:8 | consisted 132:21 | control 11:20 12:3,19 21:14 21:16 | 124:15,20 125:10 128:4 128:14 129:11 |
| compliance 20:24 | consistent 28:4 32:8 60:17 86:12,14 | 24:20 28:5,9 93:4 28:14 29:11 | 153:11 157:2 160:4,5 170:5 |
| component 18:17 | consisting 107:8 | controllable 27:16 | 170:24 182:12 185:8 |
| compounds 44:19 | consolidating 22:6 | conversations 37:14 | corrections 31:8 |
| computer 31:4 69:20 70:1 71:5,19 | constitute 192:8 | conversion 182:25 | correctly 9:14 |
| computers 19:8 19:10 31:11 36:8 71:19 | constraints 52:8 | COO 133:8,9 | cost 111:15 |
| conceive 68:21 | consultant 19:10 | cook 66:25 | Costa 22:7 |
| concept 29:14 113:13 127:3 | consulting 111:11,21 | COOs 127:6 | costs 135:17 |
| concern 24:23 180:3 | contact 37:13,18 42:19 47:6 58:15,16 60:25 | copier 36:9 | counsel 2:1 6:13 |
| concluded 113:23 | contacted 89:7 89:21 108:8,8 | copiers 170:16 | 23:19 50:7 |
| conclusion 86:4 97:9 | contacting 189:15 | copies 20:20 | 65:16 121:9 |
| condo 33:18 | containing | 151:11 | 139:20 145:14 |
| conducted 179:21 | contained 169:19,24 | copy 151:1 171:21 | 192:11,12 |
| conference 104:21 144:9 144:11,12 153:10 158:15 159:4,8,11 163:20 164:1 164:19 165:21 167:8,25 169:11 181:25 187:3,5 | containing 156:19 157:15 | cord 70:4,4 | counsel's 121:11 |
| conferences 64:8 | contemplated 174:10 | core 165:4 | Counting 34:4 |
| confidence 144:25 | contents 148:2 148:22 149:2 | corporate 6:23 120:15,20 | country 33:6 |
| confident 176:15 182:17 | context 86:1 | 148:16 | 36:25 45:5 |
| confusion 52:17 | Continental 12:1 | corporation 1:10 68:13,21 69:13 74:12 | 143:18 161:2 |
| Congratulations | continue 43:20 49:2 69:25 82:22 89:15 | 116:20 | Countrywide 182:18 23:23,24 |
| | continued 114:10 135:24 | correct 7:23 9:15 10:5 12:17 16:3,8 19:24 25:11 26:4,20:11 | couple 14:13 73:2,20 75:6 94:4 95:23 |
| | | | 104:9 129:20 131:5 |
| | | | course 14:24 16:17 30:2 32:21 34:10 48:1 52:10 76:15 108:24 124:6 126:11 |
| | | | 126:21 133:3 148:15,23 |
| | | | Courthouse 64:17,20 |
| | | | courtroom 35:3 64:23 65:12 |
| | | | cover 75:16 |
| | | | covered 113:9 |
| | | | co-managing 87:3 111:25 |
| | | | cradle 26:13,17 |
| | | | crash 34:9 |
| | | | crammed 34:11 |
| | | | crazy 41:16 |
| | | | create 22:11 24:12 27:23 53:2 60:9 |
| | | | 138:11 166:16 170:8 |
| | | | created 20:11,18 67:6 51:12 33:18 71:1 74:1,4 107:7 108:24 113:11 115:21 118:17 183:8 138:15 139:19 |
| | | | creating 25:9,14 122:23 169:3 |
| | | | creation 107:5 |
| | | | credentials 175:1 |
| | | | credibility 25:3 171:1 |
| | | | credit 166:9 |
| | | | criminal 15:19 |

| | | | |
|---|---|---|---|
| 23:2 48:10 | 181:25 183:19 | 189:2,8,9 | 46:22 107:6 | 121:23,25 |
| critical 17:5 | 183:25 185:2 | 190:1 193:7 | 117:3 178:23 | 122:1,5,23 |
| cross-country 15:3 | 184:22 185:6 | Davis 40:5,5,6 | debt 12:12 | 123:2,7,23 |
| cross-examine 167:17 | 186:19 188:14 | Dawn 2:9 6:19 | 127:14,16,19 | 124:4,8,19 |
| crystal 167:14 | 189:1 191:25 | dawn@rapop... | Dear 189:12 | 130:16 133:23 |
| cultivated 87:17 | dated 5:5,9 | 2:12 | debt 27:11 | 135:18 143:9 |
| current 168:22 | 29:24 11:23 | day 11:24,24 | decade 112:13 | 185:7,10,13,22 |
| 169:5 | 105:20 119:15 | 12:23,24 13:1 | deceased 96:22 | 189:10 190:14 |
| currently 76:9 | 119:14 174:6 | 13:6 14:3,12 | December 36:1 | defaulted |
| custody 137:19 | 178:19 | 25:3 33:19 | 41:7 78:21 | 165:3,19 |
| custom 92:23 | daughter 19:18 | 35:8 36:1,4 | 79:3,9,19,23 | defeat 46:20 |
| customary 68:23 | straighter's 8:10 | 48:14,21 51:5 | 80:4 93:5 | defendants 1:14 |
| 69:15 | David 1:11,11 | 51:10 83:20 | 94:11 95:17 | 2:18 6:23 |
| customer 37:2 | 1:17 4:3 5;7 | 81:3 87:16 | 99:9,15,25 | defer 105:18 |
| 154:25 155:10 | 6:1,6,24,25 7:1 | 100:12,22 | 100:12 | 106:12 118:11 |
| 155:11,20,21 | 7:1,7 8:8,4,9 | 101:3 111:9 | 103:21,24 | 118:20 119:9 |
| customers | 133:11 145:5 | 108:18 112:9 | 112:24 113:6 | 119:13 120:6,8,11,13 |
| 155:15 | 158:18 165:22 | 133:11 145:5 | 126:3 160:23 | deficiencies |
| Cut 170:14 | 32:24 | 162:23 166:12 | 189:24 | 32:24 |
| cuts 170:9,12,18 | 53:12 57:13 | 169:21 172:12 | 174:24 | define 32:1 |
| 170:20 173:20 | 58:8 59:6,21 | 175:15,15 | decided 23:16 | 82:16 84:14 |
| 179:25 180:12 | 60:7,25 61:13 | 192:17 193:11 | 33:22 38:8 | 117:11 112:11 |
| 180:12 | 79:12 88:13 | days 14:3 21:21 | 168:22 169:4 | 113:16 129:23 |
| C/O 189:2 | 96:18,21 | 26:3,9,19,22 | deciding 22:10 | 161:17 183:6 |
| | 103:14 105:5 | 27:22 29:5 | 168:16 | definitely 96:12 |
| | 107:21,23 | 31:24 36:11 | decline 21:21 | 153:8 |
| D 34:14 | 108:4 109:4 | 41:24 50:19 | 160:16 | definition 70:3 |
| daily 42:22 47:6 | 114:8 117:14 | 159:19 151:24 | 181:7 | 83:17,20 115:3 |
| 53:15 58:14,16 | 118:19 | 184:25 185:6 | deed 31:21 32:6 | 126:17 133:18 |
| 80:25 | 120:17 121:14 | 181:17 | deep 53:4 | degree 15:16 |
| DAL 1:11 | 121:17 122:1 | day-to-day 46:8 | default 1:13 | 23:1,2,3,3 |
| 110:14,18,20 | 122:14 125:21 | 83:3,24 84:5 | 73:17,21,24 | 86:18 98:14,25 |
| 111:3 116:17 | 126:5,21 132:9 | 84:16,19 | 74:12 79:19 | 90:1 |
| 119:1 120:5 | 132:16 134:8 | 111:16,22 | 94:4 95:21,25 | Delaware 1:12 |
| 120:24 122:25 | 134:18 135:14 | 115:6 126:23 | 132:24 96:16 | 1:12,13,13 |
| 123:21 124:11 | 137:14 140:20 | 134:7 141:8 | 96:6,9,16 97:2 | 165:14 169:8 |
| 124:13,17 | 145:2 145:7,12 | 147:12 177:23 | 97:7 98:5,6 | 108:8,8 116:19 |
| 135:14 189:9 | 145:25 155:12 | 180:2 187:25 | 99:22 100:24 | 189:9,9,10,11 |
| daren 13:9 34:2 | 155:19 162:10 | dead 22:10 | 101:5,12 | deny 27:10,12 |
| data 31:3 169:24 | 162:14,19,25 | deal 18:18 96:8 | 103:20 107:3 | delayed 168:23 |
| date 6:4 13:13 | 163:12 164:5 | 96:9 108:4,6 | 108:25 109:13 | 169:6 |
| 122:6 131:18 | 164:10,11 | 108:25 110:5 | 110:4,7,25 | design 27:19 |
| 131:19,23 | 168:19 170:19 | 110:12 114:25 | 111:1,4 113:20 | 93:2 |
| 151:18 167:7 | 171:17 172:14 | 114:25 116:2 | 113:22 116:18 | delivery 94:21 |
| 174:16 178:24 | 174:14 178:24 | 116:11 118:19 | 148:9 120:12 | 94:23 |

| | | | |
|---|---|---|---|
| demonstrate 25:1 | 179:18 189:14 189:15,16,18 | 50:21 52:5,10 52:11,12,12 | 173:25 175:12 176:7 179:16 | 117:3,21 118:9 119:18,21,24 |
| demonstrated 13:17 | depositions 7:19 | 61:4,5 79:11 | 188:23 | 120:21,23 |
| denials 51:8 | 138:1 144:17 146:8,18,19 | 123:5 128:23 135:2,2 142:3 | Discussions 168:1 | 121:3,15,21 122:15,21,24 |
| department 29:7 30:7,17 60:3,4 60:4 61:7,11 | 147:7 | 142:7 | dismiss 50:19 | 123:6,11,21 |
| 61:13 86:17 | Derby 97:12 | differentiate 78:4 | dismissed 16:14 | 124:3,5,6,7,9 |
| 100:8,13,23 | describe 82:19 | differently 51:1 | disseminating | 125:9,10 |
| 101:2,8,10,14 | 87:24 | difficult 181:20 | 169:9 171:19 | 150:14,17 |
| 101:24 102:4,5 | description 5:3 | difficulties | distressed 12:4 | 151:2,20,25 |
| 102:8,10,14,17 | 57:21 | 87:18 | 12:10,24 16:12 | 160:7,16,20 |
| 102:19 103:10 | designate 90:13 | digital 6:11 | 16:13 21:22 | 161:1 164:2 |
| 104:16 128:10 | designated | dining 85:7 | 52:19,22,24,25 | 167:25 168:7 |
| 129:22,24 | 139:19 | direct 4:6 7:9 | DISTRICT 1:1 | 168:20 173:14 |
| 130:1,7,8,25 | designing 19:11 | 49:12 52:14 | 1:1 192:3 | 178:16,18 |
| 131:7,8,13 | desire 65:21 | 60:6 151:16 | diva 13:4 | 181:11 183:10 |
| 132:21 179:12 | desk 9:2 | 155:5 159:3 | DJS 1:12 105:7 | 185:6 189:7,7 |
| departments | desks 128:1 | 163:18 165:9 | document | dive 13:4 |
| 31:20 32:7,18 | despite 136:3 | 165:11 | 126:12 138:11 | documented |
| 59:25 60:5 | determination | 155:5 159:3 | 138:14 148:2 | 142:10 |
| 69:25 103:5,8 | 12:5 | dive 13:4 | 156:18 159:4 | documents |
| 134:5 | determine | direction 61:23 | 185:17 | 105:12,23 |
| departure 23:15 | 40:11 | 21:1 | dollar-and-ce... | 108:6 147:1 |
| depend 112:18 | Detroit 106:4 | director 75:3 | 2:23 6:22 | 148:6,14 |
| depending 25:25 | 107:22 108:8 | 100:13 104:6 | 70:20 71:12,24 | 149:2,3,5,15 |
| 100:17 112:15 | Deutsche 146:24 | 109:14 117:25 | 178:1 | 149:20,21 |
| 132:20 147:15 | develop 14:14 | 118:17 119:11 | dollar-wise | 156:2,16 |
| depends 30:15 | developed 20:5 | 118:17 119:1 | 178:18 | 162:4,21 |
| 31:22 32:12 | 56:16 114:8,9 | 124:18 125:17 | Dome 18:4 | doing 19:13 |
| 100:19 141:18 | 133:4 138:5 | disagree 57:1,21 | | 34:16 43:20 |
| depo 145:23 | developing 23:4 | 126:10,20 | | 51:19 66:6 |
| 146:24 | 60:25 | 128:11,13 | | 72:20,22 107:1 |
| depo 146:3 | development | 129:14 132:1,1 | | 116:16 173:3 |
| deposed 144:14 | 57:5,9 66:14 | 132:15,23 | | doing 19:13 |
| deposit 49:12 | 114:20 115:4 | 133:16 134:6 | | 34:16 43:20 |
| deposition 1:17 | Diego 21:24 22:7 | 135:12,17 | | done 3:15 12:7 |
| 6:1,5 7:13,14 | differ 125:22,24 | 151:21,24 | | 51:19 66:6 |
| 7:21 45:2 | 125:25,25 | 169:4 185:18 | | 72:20,22 107:1 |
| 75:23 125:16 | difference 63:25 | discuss 87:4 | | 116:16 173:3 |
| 137:14,20,21 | 129:25 | DJSP 1:10,10 | | |
| 145:11 146:13 | differences | 2:23 6:22 | | |
| 147:16,18,22 | 102:18 | 70:20 71:12,24 | | |
| 148:7 164:17 | discussion | 178:1 | | |
| 167:9,12 174:2 | 26:4,4 29:13 | 166:22 115:23 | | |

| | | | |
|---|---|---|---|
| Donna 147:11 | D-A-L 110:14 | eight 12:11 16:5 | 192:11,12 | 151:23 153:18 |
| door 79:15 | 110:18,20 | 19:9 21:1,8 | employees 22:10 | 155:1,20,25,25 |
| 132:1,2 | | 23:10,20 33:4 | 28:18 38:16 | 160:7,16,20 |
| double 15:20 | E | 49:5 53:1 | 69:18 79:22 | 160:7,16,20 |
| 124:24 | earlier 25:7 47:6 | 77:7,8,11,12 | 90:4 95:16 | 161:1 164:2 |
| double-check... | 63:25 72:22 | 77:21,24 87:25 | 112:12 126:4 | 167:25 168:7 |
| 34:16 | 83:10 179:3 | either 12:12 | 126:23 131:7,8 | 168:20 173:14 |
| Deucette 2:14 | 182:8 | 32:4 43:25 | 135:13 155:16 | 178:16,18 |
| 6:17,17 71:13 | early 34:14,15 | 46:5 47:13 | 160:16 172:21 | 181:11 183:10 |
| 71:15 | 47:7 54:25 | 55:12 59:6 | 178:9 181:19 | 185:6 189:7,7 |
| downs 107:24 | 58:2,10 134:23 | 102:25 149:9 | 183:10 189:7,8 | entire 21:1 |
| downstairs | 175:8 | 171:19 185:10 | 181:14 | entities 9:18 |
| 132:1 | earn 49:16 | electronic | employer 9:22 | 93:11,13,18 |
| downturn | earning 187:23 | 148:15 | 9:25 | 94:12 99:11 |
| 182:11 | East 1:22 2:10 | electronically | employment | 101:3,11,25 |
| draft 31:15 | 3:4 6:9 | 99:5 | 149:17 | 120:16 121:24 |
| drafted 127:12 | economically | electronic-based | empowering | 133:12 141:22 |
| 187:5 | 18:13 | 72:10 | 148:17 | 182:22 |
| drafts 31:8 | Edison 15:5 | elects 187:24 | encouraged | entitled 55:17 |
| drafts 31:13 | 33:17 | elected 61:14 | 45:14 | entity 108:22,22 |
| dramatically | educated 67:14 | 25:10 57:12 | ended 55:17 | 120:15,16,16 |
| 84:2,3 | 133:5 145:21 | elements 16:7,8 | 116:11 | 165:18 178:3 |
| draw 55:7 | education | 25:8 37:3 | ensure 46:11 | entrance 94:25 |
| dream 60:17 | 133:13 | elevated 23:10 | 85:23 86:21 | entrances 94:17 |
| dreams 25:6 | elevated 23:10 | 87:13 | entailed 22:6 | envelopes |
| 42:1 | EDWARDS 2:4 | elevator 16:16 | entered 25:17 | 169:12 |
| drew 34:14 | EE 193:15 | 94:25 99:1 | 26:9 25:17 | environment |
| Drive 55:4 | effective 62:16 | eligible 109:9 | 132:5 158:20 | 22:12 27:14 |
| drop 156:2,3 | 115:17 | eliminated 34:10 | 181:1 | environments |
| 182:13 | effectively 18:18 | 20:13 | enterprise | 146:21 |
| dropped 123:19 | 56:22 57:3,17 | elite 12:1 | 126:17 133:3 | escorted 137:7 |
| 182:20 | 180:1,11 | employ 12:11 | 133:20 150:5 | ERRATA 191:1 |
| dropping 122:25 | 182:20 | 21:13 33:12 | 185:7,21 | essay 34:10,13 |
| drove 47:11 | efficiency 18:12 | 6:22 70:20 | enterprises 1:10 | essays 34:12 |
| drumming 85:4 | 127:15,15,17 | 178:18 | 1:10 2:23 6:7 | |
| DSJP 6:7 | 127:20,22 | electronic 148:5 | 6:22 70:20 | |
| Dstern 99:20 | 45:4 121:2 | elite 12:1 | 71:12,24 | |
| dstern.com | 127:4 170:16 | employed 11:5 | establishing | |
| 99:20 | 172:25 | 11:13 12:12 | 176:10 | |
| due 146:21 | efficiently 18:17 | 12:8,9,12,14 | 178:8,10,17 | Esq 2:5,9,14,19 |
| 174:10 181:22 | 43:12 49:17 | 43:14 22:12 | 131:18,23 | 2:24 3:4 4:4 |
| 192:17 192:17 | 71:12 131:11 | 120:12 131:23 | 126:16 180:18 | esquire 30:11 |
| 193:8 | 131:18 162:14 | 123:6,12 | 133:13 190:2,3 | 190:3 |
| duties 12:9 | 18:20 46:8 | 73:12 131:11 | 190:3 | esquire 30:11 |
| Dykema 105:17 | 43:12 49:17 | 12:10 | | 151:10 153:18 |
| 106:4,5,6,7 | ego 40:19 | | | |

---

## Page 205 (10)

essence 126:19 127:9
essential 16:16 18:15 60:5
establish 40:14 44:21 53:15
established 20:9 20:11 25:16 44:13 49:5 51:22 52:1,4 53:7 58:3 62:13 63:13,16 63:24 90:5,6 110:3 112:23 125:18
establishing 17:1 25:19 91:9
estate 2:13 74:2
estate-owned 114:4
Esther 131:14
et 102:23 108:7 174:4
ethic 14:7
Ethics 107:2,9
evaluating 22:9
evaluation 22:3
event 186:10,13 188:16
events 174:11 175:21
everybody 56:4 100:20 108:1 170:24,25 171:15 172:8
eviction 19:1 31:21 60:4 114:2 126:9
evictions 53:1 57:15 114:2
evils 108:17
evolved 91:25 133:2,4
exactly 44:22 51:12 85:2 178:19

exaggerated 77:9
exsm 9:17,19
EXAMINATI... 4:1,6 7:9
examiner 30:19 34:15
examiners 30:19
example 72:5 121:25 123:2 126:6
exams 57:17
exceeded 28:16
exceeding 28:11 28:19
exception 32:7
excess 125:2
exchange 124:13 124:22
exciting 144:4 188:9
excluding 94:22 94:22
excusable 27:10
excuse 33:11 57:25 104:11 116:24
executed 101:8 148:16,21
Exhibit 5:3 151:7,14 152:5 158:20,23 167:23 180:24 181:1
EXHIBITS 1:21
exist 105:7
existed 105:4,6 118:22 132:22 163:8
existence 171:12
existent 25:15
exiting 72:17 88:24 154:18 168:24 169:7 170:3 182:18
exists 118:14
exits 94:17,18,21

expand 107:13
expanded 94:13 114:10 138:18
expanding 115:4
expect 97:11
expectations 136:4
expected 164:8
expenses 170:14 177:19
expensive 142:10
experience 46:22 47:3 53:6 88:2
experienced 90:18
expertise 61:6 133:13 184:16
Expiration 193:15
explain 12:2 58:2 274:19 28:24 31:19 52:17 62:9 101:18 125:17 169:1
exploration 102:2
express 62:9 88:1,8 89:23
expressed 87:18 105:25
expressing 180:3
ext 3:1
extend 141:5,6
extension 94:5
extra 50:7
extraordinaire 146:18
eyes 13:18
e-mail 5:10 99:10,14,22,25 100:5 128:8 121:19,25 179:13 188:11

**F**
fabulous 127:9
facilities 128:6,9
facility 58:23 126:13 159:17
fact 64:1 651,3 69:9,16 89:25 90:22 128:1 141:15 177:10
facts 116:8 192:15
fail 89:10
failure 16:14 17:15 40:20
fair 10:17 12:20 29:4 33:4 45:22 49:18 57:8 58:2,14 68:4 77:4 81:3 94:13 97:14 100:10,10,10 100:18 104:13 112:3 118:23 150:2,13 163:20 168:6 170:2,6 178:24
fairly 48:2 107:22
falling 21:23 40:6
false 38:17,18 156:16,17,17 156:19 157:12 157:13,14,15 157:19
falsifying 157:21 157:22
familiar 18:11 110:21 124:5 138:3
familiarity 50:24,24
Fannie 37:5 63:2 63:7,10,11,18 63:20 64:2 68:6 89:16 92:20 115:1

139:17,19,23 140:2,3,4,5,6,8 140:16,18 142:2,16,20,22 143:4 145:4 154:13 161:15 162:13 165:18 173:11 174:8 182:15 186:15 186:20 188:4 188:4
far 84:19 105:20 188:2
Fargo 18:1 161:7 162:1 165:10
FARMER 2:4
fast 187:17
fearful 40:20
feasible 180:5
February 123:16 149:15 149:16 183:8
Federal 26:6
feel 63:15
fees 156:25 165:16
feet 36:7 54:15 54:22 55:10,12
fell 113:5 116:10
fellas 37:14
felt 22:16 40:23 51:7 52:16 64:14 68:13 69:10 87:12 121:9,10
fence 41:23
fifth 98:13
file 24:20 26:6 26:11,22 29:1 29:12 32:3 41:9 50:22 48:5 51:23 60:3 61:8,11 61:12 64:17 76:9 92:16,22 93:23 94:2 157:7 158:1
filed 25:17 29:13

---

## Page 206 (11)

31:18 69:3 150:8,11,14 189:19
files 40:7,8,12 64:11 88:25 142:2,7,9,16 143:11 154:10 154:11,14,15 154:18 165:15 160:20 174:8 182:19 184:8 182:19 188:20
Filing 157:7
finalized 31:9
finally 33:22
finance 129:21 129:22 130:23 130:4
financial 15:24 107:18 107:8 157:5
financially 192:13
find 16:7 24:25 40:8,9 66:19 88:1 165:5
fine 68:6 126:22
fine-tuned 39:24
finish 89:14
finished 34:13 36:5
finishing 8:10
fire 80:16,17,21 111:11
fired 35:22,23 137:17 172:22
firing 39:19 56:15 101:10 101:15,20,21 101:21
firm 6:12 17:22 40:5 67:21,22 68:22 69:16 70:21 78:11,17 78:19 81:8 83:4 93:22 96:8 99:4 106:6 107:2,4

107:21 109:2 76:23 77:5,18 129:14 130:6 130:15,21 137:5 169:6 150:20 155:12 156:12,25 157:4 162:9,16 163:4 165:13 180:8 185:1 181:22 190:12 67:21 108:20 129:21 140:2 142:24 143:6 150:14 155:9 186:13
finer 76:20,25 180:11
first 7:8 9:17 10:25 11:16 12:24 13:1 17:8 21:10 25:17 26:7,9 28:24 29:7 31:20 32:10 33:12,16,17,17 33:20 35:6 36:7 38:7,4 41:19 46:16,21 46:23 50:13 52:25 57:6,4 55:11 60:9 57:21 58:8 63:1 63:8,11 64:24 69:13 72:11,18 106:18 107:1,9 107:14 109:7 109:11,15,20 110:11 116:21 118:6 119:18 122:3,24,25 124:7 143:6 152:2,16 160:8 185:9,11 186:8 189:5,7,11 190:2

floor 2:20 76:21 76:23 77:5,18 77:22,24 79:6 95:7,9,14,20 95:21,22,25 97:22,24,24 81:8,14 104:12,15,21 131:2,3,5 144:9 189:4
floors 76:20,25 77:2,3,8,8,11 77:12,17 78:7 162:24 186:18 186:23
Florida 1:1,12 1:13,23 2:6,11 2:15,21 3:5 6:10 8:5 9:24 11:2,10,10 11:8 12:15
Florida's 156:12
flashback 187:2
flattering 65:25
flipping 89:1

focus 52:25 65:17 154:3
focused 91:20
folder 142:11,12
folks 64:12 65:21 116:10 131:3 171:13 173:2
follow 44:17 74:17
followed 46:13
following 119:17 119:18 186:13 186:23
follows 7:8 107:1 162:24
forbearance 52:5
forecast 167:3
foreclosed 29:1 113:10
forcelosing 136:14 158:6
foreclosure 18:13,17 24:2 25:9 26:3 27:15 31:21 32:14 33:7 40:17 46:23 48:5 51:23 60:3 61:8,11 61:12 64:17 76:9 92:16,22 93:23 94:2 157:7 158:1

161:3
foregoing 192:6 192:7,15
foremost 43:19
Forest 145:14 147:10,14,15
forever 43:1
forgot 24:9
forgotten 4:3
form 33:8
forman 51:24
Fort 189:18
forthright 81:21
formalize 68:15
formalized 68:14,16
format 100:6 106:24,25 109:7 110:7,23
Part 1:23 2:6,11 3:5 6:10
forte 22:8 65:22 141:24,25
Fortunately 134:23
forward 146:5
forwarded 189:17
found 32:23 82:21 105:12 120:20 50:14 15:12,16 41:24 47:25 48:20,23,24

---

## Page 207 (12)

63:24 72:19 77:3,15,20 79:5 81:24 90:13 94:11,19 94:25 95:15,16 97:22,24 98:2 159:3 184:6 185:6 189:4
fourth 104:21 131:2,3 144:9
four-fold 127:18
four-tier 9:1
frame 23:7 26:7 26:8 54:11 75:15 84:14 71:5 73:25 76:4 92:25 186:6 187:11
frames 16:16 25:24 29:11 46:11 186:9
frame-wise 105:2
frank 3:5 6:21 95:4 151:11 190:3
fraudulent 157:19
Freddie 37:5 68:7 89:16 92:20 115:1 154:5 154:13 161:14,23 165:19 176:6 174:8 186:15 186:20,23
free 52:16 60:16 113:24
frequency 66:4
frequently 133:8
Friday 189:17
friend 37:23,23 184:12
friends 107:22
fruitcake 137:17
frustrations 24:23

fscruggs@ber... 3:6
full 16:15 60:6 67:10 70:11 69:23
fully 98:25 143:7
full-time 85:6 136:9
functionality 30:12 65:23 111:16 128:11 128:13 130:9 137:4 165:13 165:14
functioning 22:11
fund 53:24
further 65:14 186:8 189:17 192:10
future 167:3 181:21

**G**
gain 173:3
gained 180:2,11
garbage 137:15
gather 20:20
general 28:25 37:4 112:19 152:2,15 156:11 158:5 167:10
generally 17:20 113:20 154:12 166:3 167:2,15
general's 153:5 157:25 158:10
genius 34:18
gentleman 107:20 127:7
gentlemen 75:14
Georgia 26:2
Gerald 9:6 11:1 11:14
Gerry 40:7 51:6
Gerry's 40:10

getting 17:13 40:3 86:24 108:1 116:11 139:9 143:21 162:1
gingko 144:22
give 34:4 48:22 59:20 106:7 108:11 142:24 166:9
given 28:18 29:6 31:20 38:8 47:14 53:9 53:11 102:22 132:13 139:20 167:15 172:25 175:14 176:13 179:23 182:14 192:8
Glaick 147:11
glanced 137:14
globally 77:4
GMAC 161:7 162:3 165:10
go 7:22 8:7,17 8:18,23 10:4 10:24 12:5 11:4 19:13 20:19 22:2 29:9 30:6 35:6 37:23 39:11 40:8 41:25 44:3,7 48:25 50:12 51:11 53:2 57:6 63:18 65:16,18 65:20,23,25 66:8 70:7 85:24 86:23 88:14 90:23 91:15 96:5
goodbye 51:12
Gosh 75:6 91:4
Gossett 106:6,7
gotten 64:13

131:12 140:10 145:24,25 146:1,6 133:13 171:1,9,15 176:3 188:6,23
goals 27:7
God 64:10 98:7 165:18
goes 19:8 41:18 70:4 143:16
going 8:2 14:20 19:23,24,25 22:4 34:4 37:4 37:20 38:9 41:11 47:16 48:5,18 50:23 60:12 61:19 65:14 71:18 75:25 85:6 87:5,21 100:13 101:19 107:20 111:15 134:14 121:3 123:15 126:10 167:15 174:2 188:2
grandfather 9:14 10:8,18
graduation 9:21
grantee 114:6
grantor 114:6
granular 96:7 114:25
grave 26:13,17 26:18 113:11 113:13,16,18
great 8:12 43:1,2 63:23 139:16 183:20
greater 91:20,25 108:17 125:7 127:13,15,17 137:22 168:6 133:6 136:6 137:19 182:14 184:9 186:6
hard 27:6,6,8 38:1 67:14

143:24 171:2
Gotschalk 70:6 70:12 131:21
governed 126:10
government 15:2 174:11
Government-r... 165:18
grab 75:17
grade 133:13
graduate 8:13
graduated 8:22 9:14 10:8,18
group 1:11 2:9 11:2 32:18 53:8 89:19 110:20 119:12 120:5,24 124:13,17 125:8 126:14 137:24 139:15 140:6,10,16,18 146:14 149:24 166:16 169:6 171:19 179:12 182:16 186:9 187:1
growth 72:20

---

## Page 208 (13)

GSE 165:17 166:1,4
GSEs 165:22
guess 13:2 44:8,8 48:15 67:1,9 96:15 116:5 125:9 138:22 158:8 171:8
guessing 54:25 71:10
guidance 118:12 180:8
guide 127:8 181:19
guidelines 46:12 53:7,9,15 107:9 115:1
Gushani 131:13 184:9
gut 23:6,6
guy 12:7 34:20 89:11 120:14 131:16 143:15 143:16,17
guys 20:21 41:20 47:8 64:18 96:24 145:16 151:9

**H**
half 98:1,2,3,4 149:15 177:8 182:25
hall 50:8
Hampshire 184:15
hand 36:9 65:5 151:12 193:10
handed 131:13
handle 64:19 89:9 90:18 91:24 113:22 144:2,5 153:25 154:18 165:13
hands 134:5
hang 29:24 47:12

handled 21:24 64:16 72:9 88:24 102:25 102:25 105:17 124:7 154:19 153:3 165:24 169:1 171:3,16
handles 19:18
handling 64:24
hands 65:5
hedge 108:16
HEF 143:12 179:7
Hanstein 1:25 6:11 189:23 192:5,20
happen 87:8,10 112:21 134:24 137:22 182:14
happened 56:20 87:12 141:11 141:15
happening 143:16,17
happenings 187:24
happy 8:1
harassment 104:21,23
hard 27:6,6,8 38:1 67:14 115:16
hardware 132:5 132:10
Harmon 183:22 183:23 184:8 184:13

71:15 140:18 158:13
heard 9:14 109:24 142:5 157:1,6,9,13
holding 109:22 109:24 110:5
holds 122:2 133:19
Hollywood 54:12,13,14,16 54:21 55:1,7 55:9
Homas 88:22 89:3
home 18:16 124:11,14,17 176:14
hook 84:9
hooked 69:22
hopeful 19:15 37:19 182:14
host 84:9 107:17 70:6 94:22
hour 34:15
hourly 106:7
hours 14:1,3,5 14:13,14 62:6 141:5,6
house 19:19
41:22
Houston 8:21 84:19 184:21
H8 61:1,2,9 75:1,2,3 83:3 100:8,13,22 101:13,18,19 104:10,16,18 128:11,12 129:1 170:21 170:22,23 171:19 179:12
historical 164:9
HOFA 143:11 163:16,18,19

huge 74:25 85:5 143:8,8 144:5 154:14
Hugh 172:8
Humphrey 1:6 6:7 189:6
hundred 56:1 138:8
hung 25:3
hunt 63:15
husband 41:20 43:24 137:8,19
hyper-energetic 40:20

**I**
idea 42:4 5:8 53:11 59:20 54:17 105:1 108:11 111:11 111:16 113:25 125:2 127:12 129:12 172:19 176:17 179:24
identification 151:15 152:8 158:23
identities 116:2
Illinois 84:11 11:19
imagine 108:14
imagined 42:3
immediate 153:19,24
immediately 174:17
impact 64:3
impending 170:18,20
implement 64:6
implemented 12:8 20:8

**14**

| | | | |
|---|---|---|---|
| 44:14 97:11 | 168:25 169:8 | 143:12 | interview 56:20 | in-house 57:11 |
| implementing | 170:4 | input 31:4 187:8 | 16:16 | 154:11 |
| 33:1 43:1 | **Independent** | inside 134:15 | introduce 6:13 | Ishahak 75:7 |
| important 16:20 | 122:1 159:23 | instances 187:9 | invaluable 23:20 | Island 2:24 |
| 24:17,19 25:8 | **INDEX** 4:1 5:1 | instant 25:3 | inventory 143:8 | 72:18 73:4 |
| 25:10 37:3 | indicated 102:7 | instilled 22:23 | 143:9 144:6 | 76:1 77:25 |
| 67:12 | 126:14 | institute 51:15 | 182:16 188:5,8 | 78:2,25 79:18 |
| importantly | individually 1:4 | 61:12 | invest 114:1 | 84:1,25 86:8 |
| 16:25 56:6 | 1:11 59:5 | instituted 51:24 | investigate | 87:20 93:5,13 |
| impossibility | institute 51:15 | 52:1 60:8,10 | 152:8 169:12 | 106:18 144:8 |
| 11:5:3 | individuals 1:5 | 60:20,24 | investigating | 159:18 184:15 |
| inpress 143:17 | 132:20 189:7 | institutional | 152:3 156:13 | 185:8 |
| improved | Indulge 118:1 | 182:8 | 156:16,21,24 | Islands 1:10 |
| 114:10 | industry 14:17 | instruct 141:4,5 | 157:3,10,11,17 | 116:17 189:8 |
| inability 88:1 | 16:16 17:6 | instructed 90:12 | 157:19 158:1,6 | issue 100:19 |
| inaccurate 81:6 | 142:15 | 142:15 | 158:11 | 135:11 146:11 |
| 155:23,24 | 22:9 23:25 | instruction | investigation | 175:1 |
| incentives 28:11 | 25:2,10,15 | 142:1 | 152:16 153:6 | issued 149:8 |
| 28:14 | 27:3 31:23 | insurance 61:13 | 156:12 | issues 12:6 53:1 |
| include 93:1 | 32:8 64:6 | 69:1 102:23 | investigations | 68:18 87:15 |
| 112:16 121:21 | 90:10 91:25 | insurer/investor | 156:16 152:25 | 139:7 143:11 |
| 121:22,23 | 102:20 175:21 | 92:25 | investing 152:22 | 145:18 174:19 |
| 130:2 155:12 | 186:17 188:18 | intakes 187:16 | INVESTMENT | 176:12 |
| 170:15,16 | 187:6 | intellectual | 2:13 | items 142:10 |
| 170:16 | **inexperienced** | 24:11 | investor 28:2,5 | 145:2 157:2 |
| included 112:16 | 88:6 | intended 172:1,5 | 135:4 149:24 | |
| 112:17 | infancy 91:18,23 | intent 46:7 | 159:8 167:25 | it'd 29:15 |
| including 82:4 | inference 137:9 | intentionally | 187:7,12 | IT-type 70:9 |
| 172:7,8 | 137:11 | 129:1 | investors 153:11 | I-S-H-A-H-A-K |
| incomplete | inflated 156:25 | 129:21 | 155:4,6,9 | 75:13 |
| 168:11 | inform 170:18 | interaction 46:8 | 158:16 166:15 | |
| Inconsistent | 181:22 | interest 12:16 | 168:18 168:7 | **J** |
| 121:11 | information | 147:1 157:5 | 183:6 168:7 | J:11,11,11,17 |
| incorporated | 70:10,20 | interested | 172:3,7 182:1 | 2:24 4:3 5:7 |
| 85:9 169:19 | 138:10 156:19 | 100:25 108:10 | 187:3,23 | 6:1 7:7 38:4 |
| 59:11 | 157:16 159:4 | 162:13 | investor-cost | 71:11 131:5,18 |
| increase 21:7 | 169:10,19 | interim 127:6,6 | 165:7 | 18:13,22 |
| 72:14 74:25 | 181:18? 189:17 | inter/inter/law 11:7 | invoices 69:11 | 119:19,22 |
| 85:5 136:8 | **informational** | interrupted | 99:9 107:2 | 121:2 123:15 |
| 168:8,21 169:3 | 171:14 | 133:22 140:17 | 107:2 | 124:25 130:7,9 |
| 177:13,16,17 | Infrequently | interrupting | involved 20:1 | 131:13 133:10 |
| increased 84:2 | 135:9 | 37:9 | 29:23 58:20 | 134:1 138:24 |
| 163:14 176:10 | inherent 112:2 | intervention | 66:13,14 115:9 | 138:24 139:15 |
| 177:15,18 | initial 133:8 | 133:22 174:11 | 147:12 169:9 | 140:14 141:6 |
| indebtedness | initially 11:6 | interview 139:21 | 177:24 178:20 | 121:17 122:1 |
| 148:21 | 124 76:20,21 | 134:22 | 188:11,12 | 122:14 125:21 |
| indefinitely | 134:2 | interviewing | involvement | 126:5,21 132:9 |
| | initiatives 141:1 | 39:22 44:3 | 24:17 66:6 | 132:23 134:8 |

**15**

| | | | | |
|---|---|---|---|---|
| 135:14 150:2 | 164:18 168:13 | 147:7 189:3 | 20:24 | knew 19:14 |
| 152:13 154:25 | 173:5 174:3,18 | 190:3 | Justice 15:19 | 22:18 33:6,18 |
| 155:12,19 | 178:20 179:19 | Jenny 97:1,11 | 23:2 | 36:23 37:14 |
| 162:19,25 | 180:16,20 | 189:22 | | 40:22 41:7,8 |
| 163:12 164:5 | 181:3 182:7 | job 12:2 14:22 | **K** | 48:6 137:16 |
| 164:10 168:19 | 183:14 185:18 | 17:11 20:25 | Kapusta 136:24 | 139:11 141:2 |
| 170:19 172:14 | 190:2 | 21:2,4,7,14,17 | Kapusta's 167:9 | 171:12 |
| 189:2,8,9 | Janine 36:13 | 39:5 40:8 46:3 | Katon 184:8 | know 7:21 8:2 |
| 190:1 193:7 | 38:22 | 46:4,9 52:21 | keep 14:1 66:18 | 13:2,2 18:23 |
| Jack 132:3,4,5,6 | January 9:12 | 58:18 62:21,22 | 68:8 77:4 | 19:23 20:18,22 |
| 136:8 | 25:4 35:8 36:2 | 71:17 113:5 | 117:24 118:12 | 34:19 35:10 |
| Jaffe 2:4,5 4:6 | 38:3,12,16 | 184:22 | 167:21 | 36:14,15 45:6 |
| 6:15,15 7:2,3 | 47:24 50:17 | john 14:11 | keeper 22:17 | 45:10,12,13 |
| 7:10,12 22:20 | 52:2 53:11 | John 30:10,10 | keeping 22:17 | 47:2,4 48:12 |
| 29:4 34:25 | 69:23 71:1,12 | 30:18,20 | 67:12,14 | 56:3,5 59:12 |
| 35:1 44:24 | 71:13,14,19 | Johnson 97:1 | Kentucky 73:18 | 64:9 66:8 |
| 45:3 51:21 | 88:16 105:11 | 101:22 | 79:20 97:3,12 | 70:17 71:21 |
| 57:2 70:7,18 | 105:19,20 | join 162:20 | 101:6,7 116:21 | 72:1 74:13 |
| 70:22 71:4,16 | 115:17,24 | joined 114:21 | kept 14:8 89:17 | 75:1,10 76:14 |
| 71:17 74:13,16 | 116:14 117:13 | Joking 41:18,19 | 171:15 | 77:23 84:7 |
| 74:18,24 75:14 | 117:19 118:4 | 118:16 191:8 | key 18:16 44:4 | 85:2 89:14 |
| 75:20,24 76:14 | 118:16 119:2,6 | 2:22 | 44:18 67:15 | 96:4,7,11,13 |
| 78:5,7,13,16 | 119:10 120:3 | judge 66:22 68:6 | 112:12 113:2 | 96:20,21 98:12 |
| 78:20,21 79:2 | 120:24 123:11 | 115:2 | 175:14 | 98:21 105:12 |
| 79:6 81:19 | 122:3 125:21 | judgment 18:19 | keys 176:21 | 102:11 103:18 |
| 82:7,10 83:19 | 124:16 129:9 | 25:17 26:24 | keyword 176:13 | 109:20 121:22 |
| 83:20 86:6 | 125:18,22 | 29:15,19 | kick 139:22 | 104:1,12,17 |
| 92:3 93:12 | 127:18 129:9 | 127:16 | 165:23 | 105:16 106:20 |
| 97:14 100:10 | 129:3,23 | judgments 139:3 | kickbacks | 106:24 107:25 |
| 100:12 115:24 | 130:23 131:8 | 166:11 | 158:12 | 108:7 111:2,2 |
| 117:1,10 | 131:18 132:8 | Judicial 18:22 | kicked 17:13,14 | 111:6,7 112:22 |
| 118:13,22 | 132:11,15,25 | 20:21 26:1 | 175:19 | 117:6 117:7,8 |
| 119:6,16 | 133:1,25 | 150:12 | kidding 87:12 | 118:10,13,22 |
| 121:19 122:20 | 134:15 135:3 | July 5:5 35:25 | kind 13:3 14:14 | 119:19,22 |
| 125:17 129:1 | 135:22,23 | 38:11 121:13 | 20:22 28:24 | 121:2 123:15 |
| 131:16 132:24 | 175:9,21,24 | 122:13,20 | 36:7 91:5 | 124:6 130:3,25 |
| 136:22 140:10 | 175:25 177:7 | 129:24 150:10 | 117:2 145:25 | 136:21 137:4,7 |
| 147:6 149:9 | 177:22 178:23 | 152:21 | 184:16 | kindly 3:1 |
| 149:7 151:1,3 | Jeff 6:24 145:13 | 145:19 146:2,3 | King 1:21 6:9,12 | 143:8,21 |
| 151:13 152:7 | 145:19 146:9,13 | 146:13,14,19 | 189:23 | 143:23 147:4,4 |
| 154:6,7 155:5 | 146:13,14,19 | 147:13,14,17 | kitchen 65:25 | 147:7 151:21 |
| 156:10 158:22 | 147:13,14,17 | 24:1 146:9 | knee 90:3 | 150:22 152:19 |
| 160:13,25 | 147:21 184:13 | June 35:13 | knee 49:11 | 152:20,24 |
| 161:6 162:11 | Jeffery 146:14 | 36:16 139:23 | knees 49:11 | 153:22,23 |
| 162:15,23 | Jeffrey 2:19 | junky 95:1 | | 153:2,8,15 |
| 163:25 164:7 | 146:15,17 | juries 9:7 | jurisdictions | |

**16**

| | | | | |
|---|---|---|---|---|
| 157:14 158:3 | lack 40:10 52:22 | 92:24 93:2,7 | lay 188:16 | lenders 36:19,24 |
| 159:19 162:6 | 68:19 170:16 | 93:14,22 95:16 | laying 181:23 | 37:12 74:3 |
| 162:20 171:11 | Ladies 75:14 | 95:18 96:8 | layoff 188:11 | 143:18 161:18 |
| 171:14,22,23 | laid 25:22 | 97:21 98:9,20 | layoffs 183:12 | 161:22,23 |
| 173:19,20 | land 107:25 | 99:4,25 100:23 | leadership 129:8 | 163:22 164:3 |
| 174:6 176:24 | lands 108:7 | 101:4,11,15 | leading 59:4 | 168:19 |
| 177:20,23 | large 99:3 143:6 | 103:13 105:5 | learn 16:4 17:4 | lending 160:22 |
| 178:18,19 | largest 20:21 | 106:5,6 107:2 | 24:7,10 133:14 | lesser 108:16 |
| 179:4,8,10,10 | 143:18 160:21 | 107:3,21 | learned 12:20 | letter 5:9,11 |
| 179:15 180:4 | 161:2 168:18 | 108:20 109:2 | 16:3,6,21 | 179:23 180:14 |
| 180:15,22 | Las 1:22 2:10 | 113:10 114:7 | 17:10 18:8,24 | 180:16,22 |
| 182:5 183:18 | 3:4 6:9 | 117:14 119:25 | 18:24 22:17 | 181:6,8 182:4 |
| 183:19,19,25 | lasted 41:24 | 120:17 121:14 | 24:1,4,18 25:8 | 189:21 |
| 184:2 185:2,4 | 43:7 | 121:17 122:1 | 49:4 51:25 | let's 14:24 30:6 |
| 185:12,21 | late 47:7 54:7 | 122:13 125:20 | 61:21 62:17,18 | 39:11 57:8 |
| 187:9,12 188:9 | 82:2 86:13 | 126:4,18,21 | 91:5 | 60:24 117:25 |
| 188:15 | 179:11 | 127:24 128:13 | learning 17:17 | 72:24 75:2 |
| knowing 145:1 | Lauderdale 1:23 | 129:14,22 | lease 72:24 | 74:14 77:4 |
| 179:25 | 2:6,11 3:5 6:10 | 130:6,14,21 | 81:11 185:7,11 | 78:4 110:17 |
| knowledge | laugh 95:4 | 132:9,22 134:8 | 185:15,22 | 115:24 122:12 |
| 22:23 28:17,20 | laughed 13:5 | 135:13 136:13 | leases 79:10,14 | 158:14,18 |
| 32:15 43:24 | law 1:11 2:9,13 | 140:2 142:24 | leave 37:5,20,21 | 183:7 |
| 70:9 71:24 | 5:6,7 6:25 8:18 | 150:2 152:3,11 | leaves 37:7,20 | level 43:3 66:24 |
| 99:15 105:22 | 8:19,21 9:4,5,6 | 152:22 160:2 | 41:18 42:12 | 111:17 |
| 115:10 117:2 | 9:8,15,21 | 153:6 154:24 | 76:14 | levels 90:7 |
| 133:13 140:13 | 10:18 11:1,13 | 155:11,15,19 | led 19:16 | 168:23,24 |
| 141:9,25 | 14:8,8,12,15 | 156:12,25 | left 23:23 188:23 | 169:5,7 170:3 |
| 142:25 152:19 | 14:19 20:23 | 157:3,18 158:11 | 37:1,5,20,42:11 | 174:4 |
| 171:2 174:8 | 23:9 30:15 | 159:15 | 42:13,24 45:3 | liaison 56:18 |
| 183:17,18 | 40:5,17 41:24 | 162:13,16,12 | 45:4 46:2,4 | license 33:3 |
| 188:2 | 47:15 48:9,10 | 162:25 163:3 | 47:8 188:17 | licensed 33:19 |
| known 23:24 | 48:11 49:6,21 | 162:12 164:2 | legacy 154:3,11 | 33:5 |
| 58:12 116:10 | 50:3,24 51:16 | 165:12,13 | 156:12 182:18 | lien 36:7,10 |
| 184:19 | 52:1 53:19 | 168:18 172:11 | legal 1:21 6:9 | 166:11 |
| knows 98:7 | 59:3,6 60:1,11 | 185:7 189:8 | 189:23 | lies 46:7 |
| 143:15 | 62:14 66:19 | laws 20:24 | 29:18 39:7 | lieu 81:22 32:6 |
| Kumar 131:13 | 67:21,21,22 | lawyer 8:24 31:5 | 48:5 50:1,3 | lifetime 11:25 |
| 184:9,16,20 | 68:22 69:16,19 | 31:7,10 35:9 | 85:13,17 86:4 | 12:1 |
| 187:8 | 69:24 70:21 | 50:3,11,12 | 97:9 121:9 | liked 65:10 |
| K-A-P-U-S-T-A | 71:8,10 72:4 | 53:6 90:7 92:4 | 156:16,17,17 | limitation |
| 136:23 | 73:22,23 76:16 | 100:17 112:17 | 189:23 | 111:25 112:2,4 |
| | 78:10,17,19,22 | 147:8 | behind 132:21 | 118:8 132:1,13 |
| **L** | 79:12,22 81:18 | lawyers 13:19 | LEHRMAN 2:4 | 133:15,16 |
| labor 176:18,22 | 81:21 82:10,25 | 29:22,24,24 | lead 60:6 | limited 13:21 |
| 177:10 | 83:13 84:20 | 45:17 49:24 | lender 11:4 | line 29:14 |
| labor-intensive | 86:7 87:5,19 | 55:20 80:1,19 | 12:21 13:3 | 148:24 191:2 |
| 108:14 | 91:12,22,25 | 80:20,22 147:2 | 133:23 147:2 | 123:5 |

**17**

| | | | | |
|---|---|---|---|---|
| list 17:25 157:1 | 11:10,12,13,16 | looking 14:21 | 140:2,3,4,5,6,8 | 23:4 33:2 40:9 |
| 180:21 185:13 | 11:16 123:3,12 | 50:7 112:15,18 | 140:16,18 | 67:4 74:8,11 |
| 185:19,20 | 162,11,21 | 116:7 164:23 | 142:2,16,20 | 85:14 87:3 |
| listed 139:9 | 17:10,11,19 | 162:2 164:24 | 143:4 161:15 | 100:10 107:18 |
| Listen 22:20 | 192:20 2,6,25 | 170:6 181:4 | 161:23 165:18 | 110:14 111:4 |
| literal 14:1 | 21:5,8,12 24:3 | looks 151:4 | 173:11 182:15 | 111:10 117:20 |
| Literally 11:24 | 25:2 27:25 | lose 34:9 129:20 | 187:4 188:1,13 | 118:5 119:7 |
| 36:4 | 28:8,15,16,18 | loss 31:23,25 | magnified 77:14 | mamba 142:11 |
| litigation 31:22 | 28:21,25 29:5 | 32:1,3,8 141:1 | mail 140:7,14,15 | manual 53:19 |
| 61:7 93:2 | 30:8,17 31:19 | 141:22 143:1 | 169:12 | manus 76:6 |
| litigious 27:14 | 31:24 32:17 | 142:22 183:15 | Maine 26:4 | manuscript 76:6 |
| 27:19 | 33:12 35:3,20 | 143:8 34:18 | maintain 65:4 | 20:6 27:24 |
| little 13:8 22:19 | 36:17,17 39:1 | 90:12 117:12 | 65:12 168:22 | March 183:8 |
| 24:15 36:10 | 39:5,12 41:2 | 129:17 137:8 | 169:5 | Maria 90:24 |
| 41:23 60:15 | 43:6 44:2,7 | 137:19 140:17 | maintained | 112:16 |
| 72:21 81:2 | 45:3,4,5,23,25 | 140:20 | 43:23 58:6 | Mark 183:22,25 |
| 89:22 96:1 | 46:2,4,16,25 | lot 34:22 60:10 | 64:23 72:4 | 184:18 |
| 156:14,18,22 | 47:1,8,15 | 71:6 91:15 | 87:17 90:9 | marked 151:14 |
| 156:19,20 | 48:16 49:5 | lots 33:5 52:9 | major 15:20 | 180:24 |
| lived 43:24 | 50:22 51:1,4 | Louie 66:20 | 189:16 | most? |
| LLC 1:11,12,12 | 52:8,18 53:8 | Louisville 73:17 | majority 18:23 | marketing 65:21 |
| 1:12,13,13,13 | 53:17 60:14,15 | 94:5 97:2 | 25:2 34:24 | margins 11:25 |
| 105:7,10,10,13 | 60:25 62:1,15 | 116:20 | 128:24 | married 35:12 |
| 106:10,14,20 | 63:11,13,18,20 | live 36:10 116:4 | maker 168:8 | 36:14,14,15 |
| 109:7,16,20 | 62:18 64:5,21 | 116:10 | making 33:5 | Marriott 1:17,25 |
| 110:7 110:25 | 66:21 67:1,2,6 | Lived 43:25 | 153:2 168:25 | Marshall 5:7 |
| 189:9,9,10 | 68:2 110:7 | lives 41:14 | 169:4,5 | 152:12 |
| 189:10,11,11 | 115:16 142:28 | 108:14 189:22 | manage 43:3 | Mars 155:16 |
| LLC's 106:16 | 116:19 | lives 54:16 | 64:23 34:18 | Mary 67:6,7,8 |
| LLP 2:19 189:3 | longer 33:22 | living 39:5 | managed 134:6 | Mason 147:10 |
| load 90:17 | 83:6 126:15,15 | | management | 148:1 |
| loan 113:20 | longtime 184:12 | **M** | 12:25 13:18 | Massachusetts |
| 138:12 157:8 | long-standing | M 2:9 | 15:1 17:3,12 | 188:1 |
| 138:6,23 | 181:6 | Mac 77:25 89:16 | 17:18 18:25 | material 42:7 |
| loans 188:6 | look 34:6 100:15 | 92:21 161:14 | 19:6,8 121:10 | mastermind |
| local 14:20 | 108:10 118:11 | 161:23 165:19 | management | 20:3,4 |
| 66:21 115:2 | 118:16,23 43:5 | machine 38:2 | 168:17 | mastermind |
| located 8:6 | 118:5,18 143:6 | Mac 1:3 6:6 | management | 160:7 |
| 30:21 94:5 | 148:24 163:5 | 6:14 | 189:12 | math 72:20 |
| 98:13 104:16 | 151:24 158:7 | Mack 13:6 6:6 | 154:13 172:10 | matrix 23:14 |
| location 76:2 | 169:3 | 89:15 | 189:12,13,14 | 127:10 133:6 |
| 95:5 | 180:6 181:3,21 | Mae 27:5 65:2,7 | 173:13,22 | matter 6:6 27:19 |
| locations 54:10 | 183:5,4 188:19 | 63:10,11,18 | 133:15,16 | 67:15 89:25 |
| Logan 35:16 | looked 19:13 | 92:20,21 189:2 | 80:22 | 93:1 108:18 |
| Logic 105:18 | 22:25 41:16,18 | 93:17 139:22 | 11:25 189:22 | 179:3 188:3 |
| logo 9:6,25 111:2 | 42:7 41:13 | 139:19,23 | 189:13 189:13 | 189:14 |

---

## Page 213 (18)

matters 85:12
133:5
Matthew 184:8
Matthew's 184:12
maximize 199:21
McComas 80:5 80:6,23 84:21 85:15 86:23 90:15 102:16 134:9
McGladrey 185:3
McSurdy 93:20 95:21 145:14 147:10,15
mean 212:22,21 44:18 48:19 51:19 64:19 68:17 91:5 94:18 95:24 98:23 130:3 138:25 148:2 149:2,13 154:9 162:15,18 165:10,17 169:14 170:13 170:25 173:24 183:23 188:6,7
meaning 81:18 154:11
means 32:2 130:3 138:24 154:2,10 162:13 171:7
meant 113:17
measures 146:10
measuring 25:15 127:10 133:6 176:9
mechanics 171:23
meet 16:15 27:9 39:1 80:9,25 87:4 134:1,4 134:13 142:21 184:21

meeting 28:11 29:18 81:4 108:10 134:17 141:6 143:3,3 143:4 174:20 143:21 179:6 179:9 186:11
meetings 87:2 113:2 134:2 133:3 144:1,2 144:3,4,4 174:23 175:13 179:22 186:7
member 9:9,10 74:8,11 106:10 109:19 110:14 111:14 112:8 117:20 118:5 119:7 121:2,4 132:4
members 20:1 39:22 45:23 141:15 142:1 150:15
memories 33:25
Memphis 18:6
Mendienedez 84:21
Mendieta 67:6,8 80:5,23 84:23 84:24 85:15 86:22 90:15 134:9
mention 29:22
mentioned 25:7 29:21 124:2 179:1
merge 138:13
merged 138:11 182:23
MERS 148:14 148:16 150:15
Mesa 22:17
meshed 86:19
message 170:4
met 7:4 28:16

39:8,22 40:13 46:12
methodology 25:20 60:14
metrics 176:9
Miami 2:21 15:5 33:17 36:6 54:12,15,17 56:10,11 189:5
Michael 50:6
Michelle 6:19 147:10
Michigan 106:4 107:22
mid-2000s 72:5
milestone 18:16 18:16 28:2
milestones 16:13 16:18 25:9,14 25:21 27:2,6 27:24 28:6,9 44:5
million 68:24 124:12,13,23 125:2,4,7
mind 16:13 33:7 53:2 66:23 83:7,16 151:9
minds 66:24
mine 70:9
mines 107:25 108:7
minor 15:19 23:2
minuses 108:3
minute 94:20 139:5
Miriam 80:5,23 83:4 84:6 85:15 86:22,24 87:1 90:15 91:2,4,7,14,15 91:17,23 92:1 97:19 100:16 102:22 112:16 112:14 114:20

115:5 134:9 138:16 144:3 46:12
Miriam's 83:5 91:15
misleading 69:10
missing 16:17
Misstates 149:5
mistake 37:9
misunderstood 30:20
mitigate 32:3
mitigation 31:24 31:25 32:2,8 141:1 142:22 143:1
model 20:14
modification 32:5
Monday 189:17
money 33:16 36:10 116:7
month 66:5 80:14 87:6,11 87:11 88:23 89:6 134:2 93:6,19
monthly 28:21 28:22 59:21
months 11:17,18 12:18 13:7,16 21:11 33:9 34:5,11 36:15 36:16 42:25 43:7 47:25 48:2,20,23,24 52:20 64:21 65:3,17 66:3,6 76:12,17 77:7 136:16,16 170:10 181:18 184:21

Morgan 173:6
morning 7:2,4,5 7:11
mortgage 11:4 12:21 13:3 14:16 16:4 18:6 22:9 33:6 60:6 64:8 82:5 122:2 148:14 148:14 155:13 157:12,13,14 157:15 160:21
motion 50:19
mouse 19:11,11
move 10:17,19 18:14,18,20 29:8,12,15 36:9 38:9 76:1 87:19 154:21 158:14 162:20
moved 10:14,20 29:16,16 54:10 54:12,21,23,25 55:3,19,22 56:8,10,14 59:22,24 72:22 73:3,20 76:16 76:17 84:1,24 86:8 93:4,13 94:13
movement 18:11
moving 44:6 48:1,3 154:19
Mowat 1:3 6:6 109:6
multiple 130:8
multi-state 34:12,13
M-C-S-U-R-D... 93:25

### N

nails 38:22
name 7:2,22 11:21 44:11 50:5 70:11,13 79:14 93:24 96:17,19

---

## Page 214 (19)

106:6 107:20 116:12 127:7 189:20
named 63:2 64:1 122:22 131:16 184:11
names 18:5 75:7 75:10 85:14
name's 180:20
nama@cnrnla... 99:19
narrow 77:5
NASDAQ 116:2
national 9:11 11:19 12:7,8 18:22 62:5 33:3 43:3,11 43:12,16,18 44:8,9 51:5 52:13
nationally 62:12 139:20
NationalBank 163:7
nationwide 45:23 188:7
Nation's 47:20
natural 76:15 184:1
nature 132:21 147:15,16
NCMB 47:20
NCNB 163:6
near 73:1 181:21
neat 13:8
necessarily 9:10 64:15
necessary 31:13 60:5 66:21,21 92:24 113:19 114:3 138:10 177:21 189:15
necessity 186:8
need 7:22,25 27:22 34:3 48:12 53:4,5 66:20 68:9,20 76:9 87:12

138:19 139:14 143:7,22,23 146:6 178:8,8 186:11
needed 18:13 29:9 44:1 50:9 50:9 51:6,7 55:13 57:18 68:8 87:6 90:18 134:3 145:18,22 180:18 187:9
needs 17:18 75:7
negotiate 42:19
negotiating 116:12
neither 133:10 183:7
network 63:2,12 139:20
never 19:11 42:3 56:19 68:10 91:16 104:18 104:19 112:25 113:2 136:14 136:2 139:19 147:18 149:6 182:13
new 5:6 12:11 26:14 32:25 36:4,23 45:2 42:5 51:15 56:16 63:17,17 81:8 88:17 89:18,23 90:19 115:21,22 127:2 133:5,5 135:3 135:23 136:2 139:19 141:21,22 142:12 150:17 151:23 152:11 155:17 158:6 181:24,15 187:16 195:1,3

63:9 65:23
night 14:9
Nikki 11:3 189:6
nine 23:24 87:25
non 135:5
non-attorney 86:11 90:3,20
non-attorneys 107:4
non-lawyer 90:7 107:4
non-lawyers 18:18
no-collar 60:9
non-legal 13:23 16:7 20:2 54:8 84:8 85:12,12 107:6 108:22 125:20 125:17
non-managerial 132:12
non-supervisory 132:12
Norman 5:10
Norman's 132:13
North 2:5 8:8 36:6 39:3,8 54:12,15,17 56:10,11
Northeast 36:6
NORTHWEST 2:14
notarial 151:7
notarizations 157:21,23
Notary 193:14
notary's 157:23
note 125:9 151:7
notes 124:13
157:11 184:15
notice 38:8,17 47:15 136:15

167:15,16 189:13
notification 180:14
November 5:10 119:2 144:21 145:8,9 175:9 176:1 178:22 179:12 185:6 183:11,19 186:11 181:6,21,21 186:10 187:18 180:17,18 number 6:8 45:17,19 77:24 79:6 90:17 97:22,24,25 122:3 138:12 138:6 147:5 numbers 18:8 143:19 189:17 187:22

### O

OATH 193:1
Obama 149:12
Obama's 149:12
object 23:19,19 64:18 74:21 78:14 86:3 92:3 97:8 115:12 131:9 139:6 142:18 149:4 153:21 153:23 154:6 155:2 156:7 160:9,23 161:4 162:12,17 168:10 172:23 178:17 179:24 182:3 183:13 185:17
objection 22:13 22:14,15 51:17 56:24,25 70:2

70:24,25 76:11 92:6 93:9 114:25 115:19 115:20 116:24 118:7,18,19 119:4 121:16 122:17,18 128:25 132:17 132:18 155:3 163:24 164:4 168:14 179:14 180:17,18

observations 29:22
occupied 76:9 76:22 77:7,15 78:8 79:4
occupy 76:20,25 77:10 78:23
occur 107:5,8
occurred 72:16 126:10 146:17
occurring 145:12
October 5:9 38:5 71:12 88:12,12,12,25 77:20 173:6,8

---

## Page 215 (20)

173:10,14 174:4 178:15 178:15,23 179:2,21,21 181:9 182:1,11 183:9,11,22 184:25
October-ish 38:12
odd 142:8
office 5:17 11:17 11:19 12:4,7,8 12:9,22,24 13:16,19 16:12 16:13,13,15 21:23,25 22:2 22:5,7,7 24:21 26:22 29:2 31:20 33:3 35:8 36:3 39:5 39:9,16,18 40:2,3,9,17 41:8,20,24 42:5,6,7,15,16 42:24 43:7,14 45:17,20 46:18 49:7 51:5,16 52:1,13,19,20 52:25 53:10,19 53:22 55:11 56:5,14 57:11 58:25 60:1,11 62:14 63:9,13 67:17,19 69:19 69:24 71:2,9 71:10 72:4,10 76:16 78:22 79:22 81:4,21 82:10,21,22,25 83:13 84:20 85:11 86:1,2 87:5,19 91:12 92:24 93:7,15 95:12,16,18 97:21 98:10,21 99:25 100:23 101:11 106:5

107:6 108:21 113:10 114:15 120:18 127:24 129:22 136:13 137:3 138:6,7 138:8 152:3,12 152:23 153:5,6 154:11 155:12 155:19 157:3 158:1,6,11 162:18,25 166:1 168:18 170:15 172:12 182:15 185:7 189:16,17
officer 22:22 70:10,20 117:24 171:14
officers 59:13 74:5 95:1
offices 1:11 5:6 6:25 9:6 11:1 11:13,21,23 12:10,11,12 12:25 23:22 34:13 37:1 55:11 57:6 57:10 58:11 59:1,20 62:8 62:11,23 66:17 67:4,8 69:24 70:18 71:8,16 72:7,13 73:3,6 73:8,19,24 74:11 75:12 76:2 77:7 78:7 78:9,22 80:24 81:15 82:8 85:15 86:1,6 89:25 90:8,23 95:21 100:23 101:11 106:5

official 193:10
officially 7:24 9:12
offs 188:17
oh 55:7 56:9 64:9 92:9
okay 6:3 7:25 9:23 10:10 11:15 17:9 21:17 23:18 27:1 29:2 30:3,17 31:16 32:25 37:11,22 47:18 53:1 55:1,10 57:2 57:10 58:11 59:1,20 62:8 60:2,21 66:17 67:4,8 69:24 70:18,21,21 72:7,13 73:3,6 73:8,19,24 74:1 75:12 76:2 77:7 78:7 78:9 82:18 89:6 89:20 86:1,6 89:25 90:8,23 95:21 100:23 101:11 106:5

opening 1:22 12:10 59:21
operate 48:5
operating 110:23 124:1 179:12
operation 19:3 21:22 58:6 66:15 83:1 85:10,13,16 111:23 116:22 117:2 134:7,12 139:21 141:8 168:1 180:2
operational 22:22 23:3 170:12 178:5 46:12
operations 9:11 16:24 18:9,10 20:6 65:6 66:13 76:9,12 76:13 78:11,15 83:1,22 84:6,8 87:5 133:3,11 133:15,16
opinion 58:4 opportunities 116:7,9
opportunity 13:6,6 49:16 91:9 107:13
opposite 61:22
orchestrate 134:1
order 14:22 107:8 141:5 ordering 189:19
organization 43:10
original 189:19 originally 14:18 89:10 94:12 107:18 133:2 47:24 50:16 133:4 53:10,21 65:9 Orlando 37:24

---

## Page 216 (21)

47:11,22
outgrew 54:19 55:9
outlined 87:24
outside 180:8
outsource 78:12,22 177:10
outsourced 128:13 130:18 130:18,19
outsourcing 165:16 177:13
outstretched 77:14
overall 66:15
Overcharging 68:5
Overhead 170:14
overlap 134:7
overlapped 86:19
overseas 46:5
oversight 133:22
overwhelmed 89:6,20
owed 158:7
owes 54:15 74:2 123:11
owner 96:7 117:14
overnight 123:19
owns 157:6,8
O-B-A-T-A 96:1

### P

PA 38:4 168:19 173:7,12
packaged 31:16 31:18
pads 49:12 89:11
page 4:5 5:3 159:3 168:1

191:2
page 192:8
paid 28:14 38:23 50:8 59:1,3,5,6
palm 48:13
painted 38:22
paper 40:13 20:24 95:7
paperless 99:2 178:3,8
papers 31:13 130:18,19
paperwork 101:20,25 102:2 103:1
paragraph 15:11,17,18 153:14 155:7 191:20
parallel 25:11 20:14,15,17 29:14,25 30:1 88:13,14 89:1 89:6,20
parameters 111:13,14
paraphrasing 48:1 170:2
Parker 2:14 6:17
parking 54:20 part 34:19 41:15 52:3 54:6 64:12 67:12 79:5 81:7 11:1,22 115:22 100:22 102:14 140:20 146:22 155:23,24 98:20,25 99:14 99:18,21,24 100:4,8 166:3 105:2,7 106:9 112:6 114:13 115:23 118:3

187:24
participated 159:11
participation 18:11 20:24 95:7 107:7 112:7,7 114:11 160:17 113:17 149:22 188:14
particular 18:11 20:24 95:7 107:7 112:7,7 114:11 160:17 113:17 148:14
particularly 45:22 61:18
parties 192:11
partner 22:1
party 147:1 157:23
passed 33:24
pattern 14:14
pay 34:5 38:7 82:4,11 133:13
payable 130:10
paydays 49:6,8 55:17 158:12
payment 165:16
payroll 130:17 pays 54:15
penalties 192:14
pending 136:19 136:20,25
people 22:9,22 23:2,5 27:20 27:20 42:5 43:1 43:7,16,19 55:9 59:9,15,16 66:3,23 83:2 96:16 98:6 97:21 125:4,5,17

131:3,12 136:13 158:1,6 165:20 166:7 166:11 176:14 179:10 180:9,9 184:4,11
people's 45:21
percent 83:1
person 112:11 120:24 123:11 123:17 149:22 160:7 165:22 173:15 174:5 181:18 182:1,5 182:6 183:8
percentage 123:19
period 29:8,10 34:7 58:1 60:22 65:13 69:22 88:21 90:24 92:19 120:2 172:25
periodically 144:13 187:3
perjury 192:14
permission 112:7
permit 15:1
person 6:4 171:7 70:8 86:7 87:4 96:14,21 177:4 193:14
personal 49:6 50:15 64:11 116:24 152:19 165:8,9,10,15
personally 59:5 65:4 81:19
Peter 71:7,7
Petrov 71:7
Phil 127:3,8
plaintiff 163:18
plaintiffs 1:6,18 2:8,8 6:16,20 20:12
Plaintiff's 151:6

177:11,17,25
philosophy 52:8
phone 89:7
Picken 128:13 163:13
piece 18:13 165:21 167:4
phones 128:5 132:1
physical 40:11 58:21 126:23 144:7
physically 136:15
pick 75:25 182:15
picked 19:12 31:14 89:6
picking 108:14 143:19
picture 38:25 picture 14:17 pictures 94:16 piece 20:22 70:17
Pine 62:24 72:18 73:4 76:1 77:5 78:22,25 79:18 84:1 84:12 83:20 86:8 87:20 86:25 935,13 106:18 141:16 143:19 147:1 145:1
pink 36:8
pioneered 23:25
PL 2:4
place 25:21 53:11 62:14 97:11,15 106:17 11:24 113:9 114:23 116:14 143:1 116:14 163:1
Plaintiff 163:21
Plaintiff's 151:6

22

| | | |
|---|---|---|
| 151:14 152:8 | 37:7 45:14 | **possession** |
| 153:13 158:23 | 48:4,6 56:2 | 120:15 |
| 167:22 180:24 | 57:3,19,23 | **possible** 181:19 |
| **plan** 12:9 103:18 | 60:8 61:24 | 185:14,16 |
| 133:2 153:24 | 63:12 65:17 | **post** 27:11 29:17 |
| **plans** 153:19 | 66:5,23 69:19 | 33:25 127:21 |
| 154:17 | 73:9,12 75:15 | 171:19 |
| **plant** 58:21 | 78:9 79:7 | **post-sale** 53:1 |
| 144:7 159:17 | 80:15 83:7 | **potential** 63:17 |
| **Plantation** 55:5 | 84:4,5,17 | **power** 18:22 |
| 55:4,11,20 | 85:16 89:9 | 26:1 42:18 |
| 56:8,10,14 | 92:12,18,20 | 148:20,22 |
| 59:23,24 72:18 | 93:19 104:7 | **powers** 22:22 |
| 72:23 73:11 | 118:23 123:24 | 43:15 44:22 |
| 94:5 106:18 | 125:13 145:6 | 127:4,5 133:8 |
| 116:21 120:18 | 160:11 166:17 | 153:15 159:25 |
| 176:23,25 | 169:5 173:19 | 170:7 174:21 |
| **Plantic** 108:8 | 175:2 176:15 | 175:15 176:5 |
| **platinum** 11:25 | 178:2 179:5 | 176:17 179:7 |
| **play** 155,10 | 183:12,21 | 180:7 187:8 |
| **played** 117:5 | 186:5,5,11 | **practical** 19:20 |
| 148:5 | **police** 137:8,18 | **practice** 9:4,5,11 |
| **playing** 19:12 | **policies** 28:3 | 11:3 17:8 19:9 |
| 117:7 138:22 | 32:25 44:13,17 | 19:24 41:24 |
| **pleading** 138:13 | 46:12 51:22,24 | 47:16 50:16 |
| **pleadings** 20:19 | 52:4 62:21 | 51:24 66:12 |
| 20:19 66:20 | 97:15 101:1 | 65:12 91:24 |
| 126:9 | 114:23 115:12 | 92:23 |
| **please** 6:13 | **policy** 19:5 20:5 | **practiced** 24:9 |
| 25:13 27:4 | 20:8 27:23 | **practices** 114:20 |
| 69:21 70:11 | 53:19 | 142:23 146:5 |
| 75:8 19:24 | **political** 15:18 | 146:21 |
| 96:17 101:18 | 23:1 145:6 | **practicing** 7:16 |
| 107:11 117:4 | **Pollack** 90:24 | 9:12 24:5,6 |
| 124:16 125:17 | 112:17 | 30:15 51:2,3 |
| 151:2 159:5 | **poodle** 64:9 | 91:17,17 92:4 |
| 168:15 181:16 | **pop** 166:16 | **practitioner** |
| 189:3 | **popped** 134:3 | 48:11 |
| **plenty** 62:9 | **population** | **praised** 89:12 |
| **plug** 145:5 | 154:4 | **predicate** 102:15 |
| **plus** 55:14 | **portion** 77:3,5,8 | **premises** 159:17 |
| **pluses** 108:3 | 77:16,22 78:9 | **prepare** 126:8 |
| **PM** 189:17 | 186:17 | **prepared** 170:8 |
| **PNC** 122:2 | **position** 32:24 | 182:16 |
| 123:4 161:14 | **positive** 49:1 | **presence** 40:11 |
| **point** 21:18 33:7 | 64:3 144:4 | 64:23 157:23 |
| 35:5 36:12 | 167:3 176:13 | 187:5 85:8 |

| | | |
|---|---|---|
| **146:2** | 153:21,22 |  |
| **presentation** | 166:2 182:11 |  |
| 60:7 | 188:21 |  |
| **presentations** | **prioritizing** |  |
| 60:1,16 | 33:21 |  |
| **present** 176:8 | **private** 108:15 |  |
| **president** 118:5 | **privileged** 22:24 |  |
| 118:25 119:11 | 147:3 |  |
| **press** 5:5,6,8 | **probably** 7:13 |  |
| 150:18,20,21 | 16:25 17:7 |  |
| 151:19 152:10 | 22:16 39:4 |  |
| 153:7,18 155:6 | 42:9,25 49:22 |  |
| 158:19 167:23 | 55:17 63:23 |  |
| 168:7 169:20 | 75:17 107:15 |  |
| 169:25 170:24 | 115:18 116:6 |  |
| 171:1,2,6,9,20 | 139:23 143:17 |  |
| 172:1,2 173:18 | 148:24 |  |
| 183:10 | **problem** 134:22 |  |
| **pressure** 139:3 | 134:22 135:7 |  |
| **presume** 113:5 | 139:11 |  |
| **pretty** 11:23 | **problematic** |  |
| 14:7 18:2,3,6 | 27:11 146:9 |  |
| 39:15 42:16 | **problems** 86:23 |  |
| 47:9 106:17 | 143:20 146:4,4 |  |
| 117:8 133:21 | 176:12 |  |
| 135:4 139:12 | **procedure** 19:5 |  |
| 174:12 186:24 | 20:6 27:23 |  |
| **previous** 9:25 | 50:25 53:19 |  |
| 34:11 108:20 | 115:9 |  |
| 110:4 116:8 | **procedures** 20:9 |  |
| 173:1 | 22:4 26:5 28:3 |  |
| **previously** 61:16 | 33:1 44:14 |  |
| 102:17 103:5 | 46:13 51:23,25 |  |
| 127:23 154:22 | 52:4 60:13 |  |
| 168:22 | 62:15,21 97:10 |  |
| **price** 142:9 | 97:15 101:1 |  |
| 149:9,9 | 114:23 115:4 |  |
| **primary** 52:25 | 115:13 |  |
| **principal** 106:17 | **proceeds** 154:16 |  |
| 138:21,23 | 154:25 156:3,24 |  |
| 154:25 155:10 | 18:8,12,18,19 |  |
| 155:11,19,21 | 19:1 24:10,11 |  |
| **prior** 42:4,7,22 | 25:9 28:25 |  |
| 84:4 85:1 | 30:4 46:6,23 |  |
| 95:17 112:23 | 127:4,14 |  |
| 128:20 129:20 | 143:13 168:20 |  |
| 131:18 182:8 | 177:3,23 |  |

23

| | | |
|---|---|---|
| **processed** | 98:11,13,17,21 | **P-I-E-R-A** |
| 101:20,24 | 99:1,5,24 | 146:25 |
| 102:2 160:21 | 100:23 101:12 | **P.A** 1:11 6:25 |
| **processes** 18:25 | 101:15 103:16 | 49:21 53:12 |
| 24:6 29:2 | 107:3 108:24 | 57:13 58:9 |
| 56:17 60:13 | 109:6,15,19 | 103:3,6 105:4 |
| 114:18 115:4 | 110:5,24,25 | 150:6 151:16 |
| **processing** 1:12 | 115:22 118:9 | 171:14,15 |
| 92:21,21 94:6 | 119:7 120:9 | 119:24 121:14 |
| 105:7,9,10,13 | 122:23 123:6 | 122:14 135:14 |
| 106:10,14,16 | 128:22,25 | 150:3,14 |
| 106:20,22,23 | 149:8 185:23 | 154:25 155:19 |
| 107:7 108:24 | 150:1 187:19 | 189:8 |
| 109:3,4,12 | 155:18 175:2 | **P.M** 1:20 |
| 110:25 121:9 | 173:1 178:22 | |
| 117:22 139:1 | 189:10 | **O** |
| **profitable** 17:17 | | **qualities** 131:17 |
| 23:16 41:2 | | **quality** 11:20 |
| **program** 63:14 | | 12:3,19 21:14 |
| 139:20 | | 21:16 24:20 |
| **programming** | | 147:20 148:2 |
| 132:5 | | 168:21 169:4 |
| **project** 22:6 | | 177:14 178:5 |
| 26:19 68:20 | | 182:3 |
| **projects** 132:21 | | **quarter** 168:9 |
| 33:21 | | **quarterly** |
| **promised** 33:15 | | 187:22 |
| 34:1 | | **Quenna** 1:3 |
| **promises** 182:14 | | 189:6 |
| **promoted** 12:19 | | **question** 27:11 |
| 173:1 180:25 | | 28:13,23 57:6 |
| **pursuant** 128:6 | | 69:21 70:9 |
| 128:9,12 134:8 | | 74:22 81:2 |
| 148:16,19,22 | | 86:3 97:8 |
| **push** 15:21 | | 100:14,19 |
| **pushing** 154:13 | | 102:5 111:18 |
| **put** 34:20 40:12 | | 113:6,8,13 |
| 43:16 53:11 | | 122:12 129:2 |
| 64:6 65:8 | | 130:5 134:18 |
| 95:12 110:3 | | 136:19 138:7 |
| 112:4 114:18 | | 140:17 |
| 114:19,19,23 | | 142:14 148:8 |
| 116:9 138:9 | | 149:4 150:3 |
| 115:13 139:3 | | 151:16,21 |
| 143:21 166:9 | | 154:21,22 |
| 133:6 169:25 | | 161:20 166:18 |
| 148:22 85:7 | | 168:3,10 |
| 97:10,15 | | 169:23 182:3 |
| | | 183:15 |

24

| | | |
|---|---|---|
| **reaching** 180:7 | 115:15 121:7 | 183:24 186:7 |
| **reaction** 145:6 | 122:6 125:1 | 186:19,22 |
| 177:18 178:7 | 149:12,23 | 187:1 |
| **read** 9:11 13:1 | 159:20 160:10 | **recommendati...** |
| 26:12,14 72:7 | 160:14,15,17 | 12:6 22:5 |
| 72:8 117:4 | 160:24 161:5 | **recommend** |
| 137:13,20 | 163:23 | 20:19 104:19 |
| 144:17 146:12 | 164:5,10 | **recommending** |
| 148:4 155:9 | 166:17,21 | 172:11,18 |
| 158:25 159:5 | 167:5 169:11 | 173:11 183:1 |
| 165:4 168:14 | 170:1 175:18 | **referring** 133:14 |
| 181:16 188:21 | 177:9 178:14 | **referred** 143:10 |
| 189:18 192:15 | 180:19,23 | **reflected** 31:21 |
| **reading** 91:23 | 183:15 186:9 | **reformed** 110:8 |
| 164:20 165:7 | 186:11 188:12 | **refresh** 105:14 |
| 187:15 | 188:14 | **refund** 122:7 |
| **ready** 17:13 | **receivable** | 155:18 159:7 |
| 89:13 153:15 | 130:12,13 | 159:13 165:1 |
| **real** 2:13 74:2 | **received** 26:11 | **regard** 27:1 43:6 |
| 114:4 123:3 | 26:22 124:12 | 61:11 83:11,12 |
| **realize** 17:7 | 124:22 | 87:2 104:1 |
| 91:19 115:8 | **receiving** 89:24 | 118:1 182:4 |
| **realized** 22:18 | **recognize** 69:14 | 192:8 |
| 114:24 183:20 | 152:9 181:5 | **recording** 160:2 |
| **really** 7:22 37:7 | **recognized** | **records** 68:8 |
| 48:13,17 63:15 | 49:10 64:16 | 120:16,21 |
| 65:5 87:16 | **recollect** 50:1 | **recruited** 11:18 |
| 92:1 160:6 | 67:25 69:8 | **rectify** 139:9 |
| 111:17 138:17 | 159:10 164:7 | **reduce** 27:24 |
| 180:14 | 164:20,22 | 155:25 170:14 |
| **reason** 58:19 | 165:20 167:22 | 186:7 187:2 |
| 141:9 145:4 | 173:23,24 | **register** 105:13 |
| 181:13,15 | 176:20 178:7 | **registered** |
| 183:16 184:10 | 181:6 188:10 | 106:13 100:10 |
| **reasonable** | **recollection** | 110:11 117:17 |
| 68:23 69:15 | 45:16 49:1 | 118:5,15 119:7 |
| **reasons** 143:10 | 50:17 79:4,24 | 120:10 |
| **recall** 10:16 | 92:11 103:3,4 | **regulation** |
| 20:18 21:21 | 105:15,21 | 148:11 |
| 29:10 30:19 | 122:7 152:14 | **regret** 23:20 |
| 31:25 45:12,21 | 155:18,18,15 | 181:22 |
| 54:2 59:4 | 156:2 80:8 | **regrets** 41:6 |
| 63:21 79:25 | 160:1,6,19,25 | **regular** 41:23 |
| 80:2 82:1 88:3 | 162:4 166:25 | 82:14,16 |
| 88:9 92:5,6,7,8 | 174:18 175:10 | **regulations** |
| 98:3 99:23 | 176:3 177:2 | 10:10 |
| 110:19 116:10 | 179:20 182:8 | **Reiff** 1:21 6:9,12 |

| | | |
|---|---|---|
| **relates** 49:6 |  |  |
| 104:10 163:25 |  |  |
| **relation** 37:2 |  |  |
| 65:19 91:20 |  |  |
| 187:7 |  |  |
| **relationship** |  |  |
| 16:19 58:6 |  |  |
| 82:19 126:19 |  |  |
| 163:18 165:12 |  |  |
| **relationships** |  |  |
| 17:1 24:16 |  |  |
| 48:17 49:4,8 |  |  |
| 57:4 63:16 |  |  |
| **relative** 192:10 |  |  |
| 192:12 |  |  |
| **relatively** 88:18 |  |  |
| **release** 5:5,6,8 |  |  |
| 150:18,20,21 |  |  |
| 151:19 152:10 |  |  |
| 153:7,18 155:6 |  |  |
| 158:19 167:24 |  |  |
| 168:7 169:20 |  |  |
| 172:1 173:18 |  |  |
| **relevant** 90:22 |  |  |
| 171:10 |  |  |
| **reliability** |  |  |
| 188:10 |  |  |
| **reliable** 188:13 |  |  |
| **remainder** |  |  |
| 186:17 |  |  |
| **remained** 131:7 |  |  |
| **remember** 32:4,4 |  |  |
| 32:25 |  |  |
| **remember** 18:6 |  |  |
| 21:2,5 34:13 |  |  |
| 48:24 51:4 |  |  |

25

| | | |
|---|---|---|
| 136:12,18 | **representation** | **responsibilities** |
| 165:24,25 | 114:22 121:11 | 12:2 18:21 |
| 166:1,5 178:5 | 13:3 | 21:7,17 56:7 |
| 179:25 180:2,7 | **representative** | 92:3 137:5 |
| 180:13 | 11:20 | **responsibility** |
| **remove** 142:16 | **represented** | 17:11,24 46:5 |
| **remove** 142:16 | 18:3 25:2 | 46:4,10 52:21 |
| **removed** 60:16 | 122:2,3 | 133:3 155:15 |
| 121:8,12 | **representing** | 174:21 175:15 |
| **Renae** 1:3 189:6 | 24:9 36:18 | 176:5,17 179:7 |
| **rendered** 126:2 | **represents** 164:3 | 180:7 187:8 |
| **rendering** | **reprimand** | **Rice** 116:22 |
| 162:17 | 69:14 | 117:3 150:10 |
| **rent** 55:18 | **reprimanded** | 189:8 |
| **rep** 12:3,19 | 69:5 | **restrictions** |
| 21:14 | **reputation** 90:9 | 139:13 |
| **repayment** 32:5 | **request** 147:13 | **restructured** |
| **repeat** 102:3 | 147:14 | 19:17 21:25 |
| 44:12 124:16 | **requested** 67:6 | 24:5 26:18,21 |
| **repeatedly** 40:24 | 87:22 | 30:23 31:3,12 |
| **rephrase** 78:20 | **required** 18:12 | 37:18 38:3,11 |
| 93:12 106:23 | 19:7 | 40:1 42:8 |
| 174:3 | **requirement** | 43:21 47:5,10 |
| **replace** 131:14 | 63:11 108:19 | 47:24 51:12,14 |
| 142:6 | **requirements** | **rests** 80:6 |
| **replacing** 142:2 | 18:23 61:6 | **reviewing** 162:1 |
| **report** 12:6 89:3 | 156:25 175:12 | 168:5,13 |
| 96:25 97:4,5 | **requires** 62:7 | **resumed** 45:2 |
| 97:18 100:8,14 | **requiring** 92:16 | 75:23 125:16 |
| 102:12 | **research** 31:24 | 148:7 164:17 |
| **reported** 97:1,19 | **residence** 43:23 | 94:9 96:14,14 |
| 97:19 100:15 | **resign** 35:19 | 186:19 187:23 |
| 102:13 132:13 | 41:6 165:12 | 105:25 |
| 187:22 | 184:1 | **resignation** 32:5,6 |
| **reporter** 1:25 | **resignation** | 105:12,23 |
| 6:3,11 70:13 | 35:25 | 107:23 108:15 |
| 193:1 | **resigned** 35:19 | 122:19 |
| **reporting** 84:12 | 43:10 185:1,3 | **reprimand** 47:20 |
| 84:14 131:21 | **resigns** 183:22 | 129:6,9,24 |
| **represent** 44:5 | 185:1 | 140:18 148:22 |
| 44:20 46:11 | **resolved** 67:18 | 149:14 151:13 |
| 52:12 77:17 | 67:23,24 | 151:14,21 |
| 139:4 187:15 | **resource** 39:16 | 154:23 161:11 |
| 188:3 | **respect** 62:8 | 163:19 164:16 |
| **represent** | **response** 131:6 | 169:17 182:7,9 |
| 163:22 | 44:4 | 104:8 |

---

**S**
Sachs 161:7
162:5
salary 111:13,14
139:13 176:23
sale 18:20 25:18
26:1,25 29:16
29:17 32:6
sales 18:22
42:18 127:19
127:21
Sam 38:3,11,15
58:16,21 59:1
86:10,21,23,25
97:17,19
112:16 114:21
129:9,11,14
Samantha 1:25
6:11 189:23
192:5,20
193:14
Sammons 38:20
39:2,22 41:11
42:20 43:6
45:4 46:9,20
46:21 47:6
49:17 53:14
56:2 60:20
62:4 67:8 75:3
80:9,25 81:5,8
81:15 82:20
84:11 85:11
86:20,25 87:18
96:4 101:23
102:16 111:19
111:24 132:24
134:1,14,15
136:17 137:20
139:3 144:14
146:7,24,25
147:7,18,22,25
148:9,25
174:22 177:21
San 21:24 22:7
54:9,20,12,12

146:11
save 40:4
saved 138:14
savings 176:25
saw 43:14
Saxon 88:22
89:3
saying 10:16
17:9 37:14
40:6,7 64:9
78:12 133:14
141:12 153:23
154:16 160:6
160:10,11,15
164:7 170:7
173:22 178:7
178:14 182:16
183:16,17
says 34:16 154:3
188:5
sbernstein@dj...
3:1
scale 79:15
scene 27:21
163:6
schedule 135:2,2
Scheduled 134:2
scholarship
15:23,25
school 8:12,18
8:19 9:1,9,21
10:18 14:8,8
14:12,16,20
154:5
schools 14:20
Science 15:18,18
23:1
scratch 9:20
41:4
screaming 41:22
screens 19:9
script 164:20
165:4,5,7
scripts 187:4,6
Scruggs 3:3 6:21
6:21 22:14
44:23 51:17

56:24 70:2,24
74:11,14,21
75:19 76:11
78:12,16 118:24
118:7,18 119:5
121:16 122:17
128:25 131:9
132:17 151:2
153:21 155:2
158:17 162:20
160:17 190:3
scrutiny 51:5
scal 193:10
search 166:10
searches 57:17
Season 2:20
189:4
seat 43:17
SEC 171:9,12
second 39:11
91:16 95:12
95:20 96:21
105:1,14
106:11,14,17
109:7,11,16,20
110:11 111:4
113:11 138:14
159:8 161:8,11
161:16,21
163:21 164:19
166:2,20,24
167:4,7,24
169:15,21,25
170:17,17
172:11,15,18
176:6,6 181:25
series 51:7
seriously 104:17
served 136:15
servers 18:19
131:2
service 18:18
25:17 29:13
30:4 31:12,13

seminars 85:7
143:17
send 151:19
171:2,19
sending 33:21
89:8 92:17
173:7
senior 12:25
100:24 101:12
103:20 113:19
122:15 123:23
124:4 125:20
125:22,25
126:1,10,11,12
128:9,12
132:22 133:19
134:9,11
135:18 160:21
162:17 165:12
173:6 180:23
187:13 188:13
servicing 1:13
73:17,21,24
79:19 94:4
95:22,25 96:6
96:9,16 97:2,7
98:5,6 99:22
101:5 107:3
108:25 109:13
110:4,7,25
111:4 115:22
116:18 118:9
120:12 121:24
121:25 122:24
123:3,7 124:9
124:19 130:16
133:23 189:10
session 75:25
set 27:3,3 29:5
settle 68:24
settled 68:11
settlement 68:14
seven 14:3 64:21

63:18 127:14
servicer 114:2
165:13
servicers 143:20
154:13 155:13
168:20
servers 1:21 6:9
63:11,17 74:12
14:22 15:3,6
179:3 181:10
181:12 185:9
188:13
89:17 10:1
11:8 12:15
34:8 53:4
67:25 72:6
90:14 113:1
137:13 172:18
181 139:23 144:7
173:4 233:21
solid 63:13
87:14 89:17
91:24
solicitors 112:17
solidate 96:14
Solomon 90:24
112:17
somebody 37:23
57:22 85:25
166:9
someday 121:23
sooner 67:2
sorry 9:3,20
28:1 32:11
37:9 45:12
50:4 55:5
59:23 71:14,15
72:12,22 77:13
86:5 103:19
104:14 113:24
116:2,4 118:8
119:9 120:6,10
140:12,16
147:5 148:4
152:4 153:12
155:14 156:8
156:25 167:14
168:3 171:5
180:6,10
183:1 193:4
start 32:4 52:11

---

65:3 66:3
77:16,21 79:5
98:3,4 108:20
seventh 116:6
severe 134:22
sexual 104:20,23
shadow 143:8
144:5 182:16
188:5,8
Shameeza 75:7
131:14
Shameeza's
75:11
shape 77:10
123:8
Shapiro 5:7 9:6
11:1,14 40:5,5
61:18 138:6
112:2
share 142:23
160:7
shared 88:21
135:16
sharing 64:12
sharp 44:16
Shebela 67:22
SHEET 191:1
shelf 68:13,21
69:12
Sheridan 56:14
she'd 43:18
62:17
shingle 25:4
38:7
ship 24:22 83:6
83:11,12,15,18
83:21 114:14
114:18
short 13:5 32:6
44:25 55:8
75:21 81:13,13
125:14 164:15
173:25 179:16
188:23
show 145:1
152:7 158:22
180:22,24

showed 139:4
side 83:2 84:8
85:10,17 90:2
90:3,16,20,21
131:7
sight 48:13
sign 30:1 66:20
138:19 148:10
148:17 150:6
180:16 181:10
189:15,18,20
182:9 29:10
30:9 31:6
32:16 33:13
35:2,13,21,23
36:23 37:16,17
38:14 39:23,25
40:23,25 41:3
41:9,13 43:9
45:15,18 46:1
46:17,19 47:23
49:14 50:14
52:3 53:13,17
56:9 57:24
58:13,25 60:19
61:25 62:6,11
65:11 67:10,24
69:1,4,6 73:5
73:10,15 76:5
76:6,19,24
77:19 79:21
81:22 82:9,13
82:18,23 85:19
92:18 93:17
94:14 95:2,3,8
97:23 99:8,13
100:3 100:9
101:1,3,17
102:7,13,20
102:24,9
111:12,20
117:16,18
119:15 122:22
123:3,11 125:3
127:13 128:7
128:18 135:7
136:11 138:4
140:22 141:3
144:15 150:9

single 16:22
36:12,13,21
43:14 126:14
147:9
sir 7:15 9:16
13:20 14:18
16:25 16:18
20:4,7 21:9,13
25:12 26:20,23
28:7 29:20
30:9 31:6
32:16 33:13
35:2,13,21,23
36:23 37:16,17
38:14 39:23,25
40:23,25 41:3
41:9,13 43:9
45:15,18 46:1
46:17,19 47:23
49:14 50:14
52:3 53:13,17
56:9 57:24
58:13,25 60:19
61:25 62:6,11
65:11 67:10,24
69:1,4,6 73:5
73:10,15 76:5
76:6,19,24
77:19 79:21
81:22 82:9,13
82:18,23 85:19
92:18 93:17
94:14 95:2,3,8
97:23 99:8,13
100:3 100:9
101:1,3,17
102:7,13,20
102:24,9
111:12,20
117:16,18
119:15 122:22
123:3,11 125:3
127:13 128:7
128:18 135:7
136:11 138:4
140:22 141:3
144:15 150:9

150:15 152:17
162:2,4,8
163:2,14
166:14 169:18
169:22 170:11
172:16 178:4,6
179:3 181:10
181:12 185:9
188:13
smart 91:18
smarter 114:11
smooth 86:21,21
134:12
soccer 14:21,21
14:22 15:3,6
sold 132:12:10
sold 17:16
sold 25:18 107:4
sole 50:4 109:14
117:13 121:15
121:18 122:15
123:6 183:21
solid 63:13
87:14 89:17
91:24
solicitors 112:17
solidate 96:14
Solomon 90:24
112:17
somebody 37:23
57:22 85:25
166:9
someday 121:23
sooner 67:2
sorry 9:3,20
situation 139:9
six 23:23 33:9
36:15,15 42:10
42:25 43:7
64:21 77:16,21
79:5 92:17
97:25 98:2
100:18 107:9
181:18 182:8
182:11 184:21
182:11 184:20
184:21 186:1
skills 133:7
SkyPage 13:9
SkyPage 13:8
sleep 14:14 62:6
slight 122:8
slowed 143:12
small 77:16,21
76:6,19,24
77:19 79:21
81:22 82:9,13

sitting 10:18
situated 1:4
196:7
situation 139:9
six 23:23 33:9
42:25 43:7
45:1
skills 133:7
SkyPage 13:9
SkyPage 13:8
sleep 14:14 62:6
slight 122:8
slowed 143:12
small 77:16,21
167:8 167:14
168:3 171:5
180:6,10
183:1 193:4
smaller 122:2

start 32:4 52:11

---

115:2 118:11
127:11 140:15
sound 72:11
84:12 186:1
sounds 22:8
56:21 122:9
139:16
source 165:9,11
South 2:24 8:5
8:21 9:15
33:18 38:3
46:21 55:3
64:24 72:17
73:4 76:1
78:25 84:1,25
86:8 93:4
106:18 144:7,9
159:17
SOUTHERN
1:1 192:3
193:4
Southpine 185:8
space 40:9 54:20
55:9,11,13
72:17,23 73:4
73:8,11,12
76:8,16,17,23
79:10,16 84:25
87:24 94:12
97:21 112:3
130:22 139:14
170:15
speak 38:13
45:13 57:5
105:23 113:18
134:15,25
156:8 160:3
speaking 37:12
56:18 85:7
164:1,18,24
167:2
spec 116:6
special 27:13
specialized 74:2
specializing
108:21
specialty 61:15

specific 174:6
specifically
113:12 153:14
specifics 109:23
145:24
spell 111:12 70:13
75:8,10 93:24
96:19 136:21
spinning 34:15
split 31:4 98:14
split-off 109:1
spoke 41:10
42:21,21
134:16 144:19
160:4,4
sports 138:23,24
spot 44:7
spread 95:20
square 36:7
54:15,21 55:10
55:12,13,14
St 21:4 66:20
staff 13:23 20:1
24:24 57:8
spall 11:12 70:13
75:8,10 93:24
96:19 136:21
30:24 56:21
stamps 29:6,18
29:15,16,17,19
30:24 56:21
stand 57:8
stand-alone
108:25
start 8:1
started 9:12
11:16,20 12:23
17:16 19:9,12
19:23 41:4
42:7 48:1,2
52:24 89:4
91:7 138:16
152:20

143:8
staffing 40:2
87:19 111:25
153:20,24
162:4,8
26:6 36:19
52:4,5 53:9
142:24 143:16
155:14
status 57:6
stay 8:23 23:24
55:1 86:14
95:12 113:24
119:3 130:13
179:9
stayed 23:10
32:8 43:22
55:7 72:25
86:12
staying 22:3
stays 174:25
Stein 55:16
step 121:10
STEPHEN 2:24
stepped 121:12
Stern 1:11,11,17
4:5 5:7 61:6
173:7
story 13:5
straight 8:19
street 22:1 36:6
stress 54:1
stressed 87:21
strike 162:21
stronger 133:7,7
strongly 114:18
structure 63:14
structured 68:13
stuck 95:1 98:7
studied 20:17
study 14:13
20:14
studying 14:19
stuff 57:11
stupid 69:20

130:13 165:24
states 1:1 12:13
18:22,24 26:3
26:6 36:19
52:4,5 53:9
142:24 143:16
155:14
status 57:6
stay 8:23 23:24
55:1 86:14
95:12 113:24
119:3 130:13
179:9
stayed 23:10
32:8 43:22
55:7 72:25
86:12
staying 22:3
stays 174:25
Stein 55:16
step 121:10
STEPHEN 2:24
stepped 121:12
Stern 1:11,11,17
4:5 5:7 61:6
173:7
story 13:5
straight 8:19
street 22:1 36:6
stress 54:1
stressed 87:21
strike 162:21
stronger 133:7,7
strongly 114:18
structure 63:14
structured 68:13
stuck 95:1 98:7
studied 20:17
study 14:13
20:14
studying 14:19
stuff 57:11
stupid 69:20

154:25 155:12
155:19 162:10
162:15 163:16
30:22 46:18
52:19,24
tape 160:2
taught 15:2
44:15 62:17,18
teach 14:23
teaching 14:25
15:1
team 54:6 68:24
112:10,11
132:4
teams 88:15,15,15
89:17,18
techie 70:5
technicians
18:24
technological
19:15
technologically
19:15
technology
108:14 125:6
127:6
test 34:11
testified 7:8 47:5
104:2 144:16
146:6
testimony 19:16
80:24 81:1
84:19 137:13
144:5 147:16
147:6 149:5
171:18 178:10
181:24 192:6,8
Tew 2:19,19
6:24,24 22:13
22:15 29:3
30:25 76:24,24
76:25 78:15
87:18 115:2
107:3 110:24
111:12,12
testimony 19:16
85:4 87:11
100:9 115:20
telling 37:20

---

30:10,18
subject 108:23
submitted 35:25
subsequent
133:16
subsequently
133:16
subsidiaries
78:18 110:24
123:1,1 124:1
substantial
176:25 181:23
186:17
succeeded
175:16
success 17:3,6
17:16 64:12
91:19 176:21
successful 117:17
20:12 23:7
37:3 48:14,15
successfully
17:20 181:20
sued 67:17,19
104:23 149:24
suggest 106:5
suggesting
159:13
SUGGS 188:21
suing 67:18,25
suit 107:2 170:3
186:18
SUITE 1:22 2:6
2:10,15,25 3:4
sum 138:13,17
summary 138:8
Summons 31:14
superior 26:5
supervise 29:25
supervised 42:24
supervisor
52:17 86:15
132:15,19
supervision 84:7
85:24
supervisors
84:15 86:16
supposed 64:18

88:17
sure 18:1 20:23
23:22 28:13,22
38:9 43:5
44:24 48:17
75:13
S-C-H-A-L-K
70:15
S-H-A-M-E-E...
75:13
S-T-U-P-P-R-...
30:11

_____T_____
table 133:20
tail 11:10
take 10:12 12:15
17:4 18:20
23:6 31:3
33:16 34:1
44:23 51:25
61:18 76:6,16
94:5 102:19
135:2 144:17
147:22 167:14
168:17 177:16
173:19 177:12
taken 1:18 6:6
7:14,19 45:1
52:15 75:22
89:10 102:22
125:15 133:20
148:11 148:18
147:22 167:9
192:6
talk 24:15 75:2
95:3 135:6
145:23
talked 103:6
143:2 146:15
143:10
Tammy 136:21

114:7,15
141:19,24
165:20 166:15
168:6
Tampa 10:20,25
11:17 12:18,21
12:23 13:16
30:22 46:18
52:19,24
tape 160:2
taught 15:2
44:15 62:17,18
teach 14:23
teaching 14:25
15:1
team 54:6 68:24
112:10,11
132:4
teams 88:15,15,15
89:17,18
techie 70:5
technicians
18:24
technological
19:15
technologically
19:15
technology
108:14 125:6
127:6
test 34:11
testified 7:8 47:5
104:2 144:16
146:6
testimony 19:16
80:24 81:1
84:19 137:13
144:5 147:16
147:6 149:5
171:18 178:10
181:24 192:6,8
Tew 2:19,19
6:24,24 22:13
22:15 29:3
telephone 87:4
telephonic 94:5
66:7
ten 171:25 172:6
171:25 175:9
167:6 172:10
95:19 98:16
108:10,11
115:23 126:9
143:22 145:15
149:3 166:5,22
174:5 177:22
182:6,22 183:7
182:22 183:8
863:93 99:9:8
100:9 115:20
telling 37:20

118:19 119:4
119:13 122:18
132:18 136:19
139:6,25
142:18 146:14
146:15,17,17
147:2,7,7,14
147:17,21
149:4 153:22
154:6 155:3
156:7 160:9,23
161:4 162:9,12
162:16 163:24
164:4 168:10
172:23 174:14
178:17 179:14
179:24 180:18
182:3 183:13
185:16 189:3,3
190:3
Texas 8:21,21,23
8:25 9:15,20
10:4,5,12,17
26:2
thank 7:4 14:11
27:6 37:11
126:4 131:2
thankfully 87:13
thanks 7:11
thas-previous
9:22
they'd 171:9
thing 15:17 41:4
55:16 63:23
78:15 89:20
91:21 104:18
109:13 147:12
158:25
things 12:15
16:21 17:5
18:14,20 24:17
27:20 32:13
34:3 47:25
48:2,20,23
51:12,20 52:7
52:9 57:19
60:17 61:7

86:24 91:11
114:20 115:7
126:13 127:8
127:11 145:3
156:15 174:10
think 23:8 36:14
37:6,6 43:24
51:11 55:12
63:25 64:14
66:1 74:11
75:15,16 77:23
88:16 95:11,13
95:22 98:2
100:10 104:15
116:17,19
119:14 140:11
140:11 145:5
147:9 149:12
156:3 159:20
163:7 164:13
175:18 177:6
thinking 55:2
thinks 45:3
third 24:15 37:8
168:8,21 169:4
thirty 54:9
189:19
Thomas 111:8
though 19:22
19:23,24,24
46:14,14 47:7
47:7,8 53:18
54:11 55:8
56:10 57:19
58:1,22 59:2
60:22 62:9
63:12 64:16
65:13,17 66:12
66:19 68:8
71:5 72:13
73:23,25 76:4
76:5,7,22 78:3
84:4,5,11,17
84:21,24 85:1
85:2 89:9
92:12,20,22,25
93:4 105:2

85:5,21 88:17
88:22 89:2,7
89:18 90:13
101:2,11,25
107:16 122:2
124:11 135:1
138:16 161:24
168:1 170:9
Three-pages 5:11
three-tier 8:25
threw 62:18
tickets 97:12
Tier 14:9,10,11
till 66:3
time 6:5 12:14
13:16 16:16,22
17:20 18:15
18:21 186:6,9
22:24 23:7
24:9,20 25:21
25:24 26:7,8
26:22 28:12
29:8,10,11
31:12 34:5,7
36:18 37:8,10
37:14 39:5,14
39:20 40:1,4
40:19 41:19
42:13,14 43:21
44:14 45:5,24
46:2,4,10,11
46:14,14 47:7
Timing 55:19
tires 139:22
165:23
title 1:12 18:14
20:25 21:14
30:6,11,12,17
58:19 59:7,8
60:2 68:5,12
68:22,23 69:9
93:9 84:6,9,20

120:2 121:20
122:20 133:4
131:4,15 145:9
144:19 145:7
145:11 150:20
153:25 160:11
166:17 167:11
169:5 171:14
172:24 173:20
174:19 175:2
175:11,23
176:16 177:3
179:5 180:1,11
184:17 185:12
185:21 186:6,9
186:12 187:11
189:16
timeline 63:24
times 121:23
122:3,5,23
123:4 133:24
172:25 173:2
times 28:8 33:16
66:8 81:23,24
81:24 84:3
85:6 108:9
129:21 134:25
138:18 147:1
165:7,8 181:20
173:10
today's 6:4
27:13
told 21:11 41:11
88:14 89:2,21
90:15 108:2,3
108:3 122:7
136:12,16
146:23 147:2
149:6 173:6
178:2
Tom 105:16,18
106:1,3,11
109:23 117:23
118:1,20
119:9,20,23
120:6,8,11,13
120:19 123:15

93:7,15 95:6
95:19 97:16
98:11,13,17,21
99:1,5,24
100:23 101:12
101:15 103:16
107:3 108:25
109:6,15,19
110:5,24 114:1
114:5 115:22
118:10 119:8
120:9 121:22
121:24 123:23
124:10,18
136:6,10
130:15 131:18
132:14 132:14
132:14 133:18
135:18 172:21
173:1 173:3

---

123:20
tombstone 27:11
tool 25:15,19
tools 176:9
top 31:22 36:19
36:24 37:21
141:16 155:13
155:13 161:8
161:11,15,17
163:22 164:3
torture 168:14
total 177:23
173:6 tower
183:11
totally 50:21
52:10 61:4,4,5
129:5
touch 143:18
tough 96:23
Tower 22:10
189:4
traced 116:2
tracking 56:16
trade 149:9,9
trading 149:15
149:18
trailed 31:17,17
train 90:25 91:8
trained 19:25
31:17,17 91:1
91:3,4,4
trainers 90:3,21
training 30:3
46:22 66:21
89:24 90:1,4,5
92:1,24,24
127:10 141:1
173:3 176:9,14
transaction
105:19 107:1,2
107:8,11,16,24
108:23 110:22
116:9 122:11
126:9 133:1
175:19 177:7
transactions
107:5 139:5
transcript 190:2

transition 86:21
translates 125:6
translation
90:12
trap 31:22 36:19
36:24 37:21
141:16 155:13
155:13 161:8
tremendously
127:17 138:14
tremendous
144:25 176:10
184:15
tremendously
127:17 138:14
194:3
trial 129:20
trigger 38:13,14
trip 37:25 47:21
tripled 75:1
triples 74:19
trips 82:15
tri-county 66:8
Trott 107:21,21
107:21
trouble 19:14
194:3 19:14
true 34:24,25
38:16 69:18
104:20 116:3,3
116:3 138:25
183:23 185:15
185:15,24
186:17 187:3,8
188:20 189:2
187:4 188:6
trust 55:15,15
144:25 184:14
typify 80:13

twice 82:17,18
87:11
twe-14:11 15:13
21:21 20:21
35:16 44:18
49:22 54:3
62:19,22,22
66:8 67:20
69:22 77:17,18
186:6,6
two-day 34:9
type 11:3 14:15
29:7 47:15
49:23 72:4
148:13 172:2
173:3 187:4
types 48:7
148:11
typically 107:10
typify 80:13

U
UCLA 22:1
uh-huh 78:2
125:25
ultimately 9:9
11:22 22:6
33:18 68:24
76:25 77:23
83:10 85:20,23
89:5 97:6
180:13
unbeknownst
12:24
uncertain 47:15
48:14
unclear 181:20

uncontested/c...
92:22
uncontrollable
27:12 93:1
174:11
Undefined 51:18
undergrad 8:7
undersigned
193:6
understand
23:14 28:13,22
44:16 53:5
92:0 96:12
103:12 105:24
110:6 111:10
137:12 142:25
148:8 150:21
154:2 156:3
180:13 187:14
understanding
16:12,23,24
155:25 160:12
116:9 171:6
172:18 188:4
understands
184:16
understood
19:21 24:10
43:5 46:15
137:12
unexpected
186:10,13
unforeseeable
188:15
unfortunately
64:7 69:2
180:12
uniform 53:7
uniformity 53:8
unique 137:17
United 1:1 36:19
155:14
University 8:8
8:15 55:3
unleashed 91:10
unpaid 138:21
138:23
unplanned

134:1
unprecedented
127:9
unravel 145:2
unrelated
107:15
unresolved
68:10
UPB 138:12,20
updates 176:8
upper 33:18
ups 107:24
143:4
up-and-coming
11:21
up-to-date
112:12 108:17
137:12 142:25
148:8 55:22,3
137:13 187:14
versus 26:5
91:14
video 6:4,5
videotape
104:21
Vince 71:7,10
102:7 131:16
131:17 132:5
violating 134:10
Virgin 1:10
116:17 189:8
visibility 44:18
visions 61:18,18
62:10
visit 37:23
139:23 140:2
visiting 66:19
135:15
vis-à-vis 107:3
vis-a-vis 44:20
voice 24:23
volume 1:16
59:20 89:3
135:23 136:2
139:11 144:5
154:1 165:14
168:8,21 169:3
176:5 179:7
176:5
US-based
176:25

V
v 1:8 6:7 68:9
146:24 189:7
vacate 73:8
Vagueness 51:17
valued 13:18
variables 122:10
varies 25:23
various 34:2
143:10 148:20
164:25 25:24
128:24
Vaughn 105:17
106:2,3 109:23
111:8 118:11
118:20 120:3
120:6,8,11,13
120:19 123:15

---

venture 147:13
verifying 158:2
158:7
versus 26:5
91:14
video 6:4,5
videotape
104:21
Vince 71:7,10
102:7 131:16
131:17 132:5
violating 134:10
Virgin 1:10
116:17 189:8
visibility 44:18
visions 61:18,18
62:10
visit 37:23
139:23 140:2
visiting 66:19
135:15
vis-à-vis 107:3
vis-a-vis 44:20
voice 24:23
volume 1:16
59:20 89:3
135:23 136:2
139:11 144:5
154:1 165:14
168:8,21 169:3
176:5 179:7
176:5
voluntarily
121:11

W
Wachovia 88:22
89:2
wait 94:19

139:25
waive 7:24
189:14,20,25
walls 36:8
walked 22:1,1,5
Walmart 67:16
79:20 137:14
40:7 51:6 53:3
55:6 75:11,12
81:13,14 88:11
89:9 96:13,21
107:9 113:8
134:20,22
143:14 150:24
151:1 158:25
166:9,10
171:21 175:22
167:8,12
168:6,12
186:24
weight 22:10
WEISSING 2:4
Welch 1:21 6:9
6:12 189:23
Wells 18:1 161:7
162:1 165:10
want 8:19 9:8
13:3,16 14:6,6
14:8,12 16:2
17:20 19:2
21:10,19 23:6
25:21 54:17
54:22 77:21
113:13 155:10
words 47:5 83:5
65:3,9 66:3,4
67:16 70:1
work 9:8 14:7
14:15 16:2
46:21 48:16,22
50:7 55:21
62:8 7:18
85:19,20,21,22
87:8 88:9,14
141:1,11 161:18

Weston 63:19
Westwood 21:25
22:7
we'll 26:21
we're 6:8 23:12
37:18 44:21
61:19 75:24
77:25 78:7
95:5,5 110:17
113:24 131:3
134:14,17
170:8 181:18
We've 72:17
wheels 144:23
Whitlow 86:11
86:20
wide 36:14 50:10
wildest 25:6
win 146:22
wind 110:6
wining 85:6
wiping 27:16
wish 189:20
witness 4:3
192:7,9 193:10
193:16 194:1,9
we 104:20
word 44:15
52:22 77:21
113:13 155:10
wouldn't 21:6
40:18 65:1
74:14 98:7
137:9 139:7
141:9 139:22
158:4 179:15
wrecked 18:4
writing 34:5
written 34:23
wrong 16:3
145:2 147:1
wrote 19:7 40:6
40:7 56:13

161:19,22
162:1,3,5
171:23 173:2,7
182:18
worked 11:10,17
13:7,25 14:3
14:11 20:22
26:5 64:18
33:14 62:4
71:10 83:3
128:1 134:5
155:1,8 135:7
154:23,25
174:2 138:17
23:14 28:13,22
workers 94:23
workforce 8:17
working 9:21,23
11:16,18 33:5
47:24 54:1
61:9,24 62:2
67:14 102:10
workmans 102:23
workman's 61:3
works 108:11
wax 104:25
115:14 128:23
131:18 133:11
134:2 162:4
162:22,23
135:12,16
135:22 136:4,5
163:13 181:22
181:1 162:25
134:11 139:17
141:11 161:18

Y
yeah 15:9 21:20
23:1 34:21,21
56:25 58:24
70:5 74:9
75:19 77:23
86:5 94:25
100:4 106:1,1
106:1 111:1
138:25 146:1
163:24 166:4
178:14 188:9
year 8:13 9:7
10:1 17:8 55:2
63:1,4,20,22
64:2,10 66:2
67:1 80:10
82:17,18
148:24 150:8
152:7 153:14
153:16 155:2
153:16 165:7
10th 152:1,15
153:3 175:25
10-year 72:24
10-62302-CIV-...
1:8 6:8 189:11
189:25 190:1
100:6 6:5
10:30 14:13
108:11 89:5
1000:3,4 79:18
1001 3:1
11th 152:24
111:1,1,11 72:23

---

$8.81 149:10,12
$80 125:7
$88 124:13
125:4

0
03/03/2015
193:15
070089 193:15

1
1 5:5 48:21
53:20 151:6,7
151:14 153:13
149:9,12 23:4
35:8 36:2
38:16 50:1?
69:23 121:13
122:13,20
185:6,11,19
186:1,6
1,200 160:15
1,600 54:17
1-800 13:9
1:00 14:6,7
75:18
10 23:24 35:16
36:19 55:24
104:25 107:16
135:7 148:16
124:19 128:21
129:9,13 131:8
131:18 132:8
132:11,15
163:22 164:3
173:15 174:5
135:5,12
10th 152:1,15
153:3 175:25
10-year 72:24
10-62302-CIV-...
1:8 6:8 189:11
189:25 190:1
100:6 6:5
100 166:16
120 14:9 35:16
101:8 111:11
100:3,4 79:18
1001 3:1
11th 152:24
111:1,11 72:23

12 55:24 71:2
12th 152:24
12,000-person
96:8
12:05 75:14
1200 74:20
121 2:10
121:21 172:2
71:2
13th 152:25
134:2 149:10
143:16
14th 173:14
174:4
14,000 96:7
14-year-old
10:18
1441 2:10 189:4
15th 2:20 71:12
71:13,14,19
105:11,14,19
105:20 115:17
116:14 117:13
118:19 119:8,9
120:10 120:3
125:22 124:10
125:25 124:10
124:19 128:21
129:9,13 131:8
131:18 132:8
132:11,15
163:22 164:3
173:15 174:5
135:5,12
16 39:19
160:15
161:13 49:12
16:5 19:9 21:1
21:18 23:10,23
23:23,25 24:25
25:3,13 49:5
62:13 75:8
87:25 98:17
88:16 47:11,14
47:24 50:7
125:23 124:10
134:11 139:17
141:11 161:18

181 5:9
153:33 136:16
126:1
190 178:16
1960 151:8
197 5:10
198 179:20
1980s 36:18
1982 8:16
1986 8:22 9:15
105:21,22,25
137:13,16
1987 10:7,21
1989 39:4 42:4,6
42:19 43:21
1990 9:18 10:2,3
11:9 132:3
1990s 36:18 47:8
1991 9:30 33:23
35:1 46:13,15
1992 46:15
1993 35:4,25
36:1 38:5 41:7
42:10 42:11,12
42:19 43:22
1994 9:13 25:14
35:9 36:2 38:3
38:16 47:11,14
47:24 50:7
47:25 54:7,23
52:2 53:11,25
54:7,23 58:10
58:15 59:10
65:10 66:2,3,6
72:23 74:5
79:12,13 80:4
80:4,10,15,16
80:25 82:20,24
83:1 84:11

72:25
1997 66:16 67:3
1998 62:23 63:3
63:21 64:2
67:17,19 74:5
1999 64:2 74:5,5

2
2 2:6 5:6 72:22
152:5,8
2,400 54:19
2.2 68:24
20 13:22 36:24
37:21 40:15
42:16 123:5,4
135:13 160:7
131:8
20th 147:18
149:24
2000 71:4 80:8
114:22,22
166:24
2000s 82:2
2001 71:4
2002 69:2,5 71:5
2003 71:5 72:25
2005 72:5 73:25
2006 72:5,10,13
72:23 73:6
73:7,25 74:9,17
114:14 116:17
2007 40:20 73:6
73:7,25 76:5
88:11,12,16,25
114:1
2008 80:25 82:8
82:15 83:25
84:4,10,15,16
84:16 86:20,24
83:1 84:11

---

34

| | | | |
|---|---|---|---|
| 86:12,13 87:3 | 158:14 159:8 | 150:22 151:20 | 104:1,3,11,15 | 164:19 166:2 |
| 92:19 93:5 | 161:8,12,16,21 | 151:22 153:17 | 115:11,14,19 | 167:7 172:20 |
| 94:11 95:7 | 163:21 164:19 | 184:25 | 425:2:5 | 173:6,8 181:25 |
| 97:22 98:18,22 | 166:2 167:4,7 | 270 26:9,19,21 | 45 42:18 | 189:19 |
| 99:9,16 100:1 | 170:17 172:20 | 27:22 | 4600 54:14 | 88-some 142:8 |
| 100:9,12,22 | 173:6,10,14 | 28 12:13 | | 880 36:7 54:15 |
| 101:3 102:6 | 174:4 175:6,9 | 29 189:1 | 5 | 54:17 |
| 104:4 105:2,14 | 175:19,21,24 | 29th 147:22 | 5 5:10 182:6 | 881 55:3,11 |
| 106:11,14,17 | 176:1 177:7,8 | 172:11,15 | 5th 186:21 | 72:23 73:8 |
| 109:7,11,16,20 | 177:14 178:16 | | 5:00 189:17 | 85 54:6 |
| 110:7,8,11 | 179:12,22 | 3 | 5:13 1:20 | 88 149:21 |
| 111:5,9,9 | 181:25 182:1 | 3:5:8 158:20,23 | 5:30 14:12 | 888 1:22 6:9 |
| 112:24 113:6 | 182:11 183:10 | 167:23 | 50 13:12 42:18 | |
| 125:23 126:3,4 | 183:22 184:25 | 3,200 54:19 | 500 45:11 89:5 | 9 |
| 130:21 132:6 | 185:6,11,19 | 30 8:6 50:19 | 508 1:22 | 9:00 14:6 189:17 |
| 135:21 136:1,5 | 187:20 188:10 | 123:4 189:19 | 53RD 2:14 | 90-day 90:23 |
| 136:6,8 137:22 | 2011:19 6:2,4 | 30th 95:17 126:1 | 54 17:23 | 90-or-ao 178:9 |
| 139:17 140:9 | 189:1,13 | 300 183:12 | 561 995-1490 | 900 2:24 72:17 |
| 141:6 148:4 | 189:24 190:6 | 305 636-1112 | 2:16 | 73:4,12 76:1 |
| 147:19 148:10 | 2012 164:9 | 2:21 | | 76:16,23 78:2 |
| 148:12 177:5 | 2017 164:9 | 31st 36:1 41:7 | 6 | 78:25 79:10 |
| 2010 5:10 71:1 | 203rd 36:6 | 79:7,9,21 | 6 5:11 | 84:1,25 86:8 |
| 71:14,19 78:17 | 20632 13:9 | 99:9 113:6 | 6th 13:15 | 87:19 93:4,13 |
| 105:11 115:17 | 208 5:11 | 125:23 | 6,000 54:21 | 94:8 106:18 |
| 116:15 117:13 | 21st 5:9 178:15 | 32,000 55:12 | 601 13:24 84:12 | 120:18 144:7 |
| 117:19 118:4 | 179:21 181:9 | 325 68:6 69:17 | 603:20 88:19 | 159:17 185:8 |
| 118:16 119:2,2 | 182:1,11 | 331 1:23 121:2 | 60,000 188:6 | 189:24 |
| 119:6,10 120:3 | 22nd 178:15 | 17:23 45:13 | 600 89:5 | |
| 120:25 121:14 | 179:21 183:9 | 33:15 123:11,17 | 600,000 188:5,7 | 954 233-8000 |
| 122:8,13,20 | 183:11 | 33131 2:21 | 188:8 | 2:7 |
| 123:11,16,25 | 2386 36:8 | 189:5 | 621 2:14 | 954 524-2820 |
| 125:23 126:1 | 24 14:3 | 33301 1:23 2:6 | | 3:5 |
| 127:5 129:9,13 | 24/7 11:10 13:7 | 2:11 3:5 6:10 | 7 | 954 712-7457 |
| 129:22 130:23 | 13:25 14:2 | 33324 55:4 | 7 4:6 | 2:11 |
| 131:8,18 132:6 | 23:15 32:23 | 72:18 | 7th 5:8 167:24 | 954-712-2600 |
| 132:8,15,25 | 33:5 41:21 | 334 87 2:15 | 169:15,21,25 | 189:24 |
| 133:1,25 | 61:24 62:2 | 33873 2:4 | 170:17 | |
| 134:15 135:12 | 240 2:15 | 3866 69:22 | 7-Eleven 67:16 | |
| 135:22 136:4,7 | 25 1:19 6:2 | | 70 13:24 33:16 | |
| 139:24 144:21 | 172:21 189:13 | 4 | 13:25 | |
| 147:23 148:1 | 25th 6:4 183:22 | 4 5:9 14:9,10,11 | 71 120:24 | |
| 149:15,16,21 | 192:17 193:10 | 180:25 181:1 | 75 181:18 182:1 | |
| 149:24 150:10 | 26 26:3 | 4th 5:10 186:21 | | |
| 150:17 151:22 | 2627 36:6 | 188:10 | 8 | |
| 152:1,15,21 | 27 12:13 | 400 2:25 74:20 | 8 167:4 | |
| 153:11,18 | 27th 5:5 150:17 | 401(k) 103:3,7 | 8th 153:11 | |
| | | | 158:14 159:8 | |

---



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

COPY

RENAE MOWAT, NIKKI MACK,
ARKLYNN RAEMING, and QUENNA
HUMPHREY individually
and on behalf of all other similarly situated
individuals,

    Plaintiffs,

v.    CASE No. 10-62302-CIV-UNGARO

DJSP ENTERPRISES, INC., a Florida Corporation, DJSP
ENTERPRISES, INC., a British Virgin Islands Company,
LAW OFFICES OF DAVID J. STERN, P.A.,
DAVID J. STERN, individually, DAL GROUP, LLC,
a Delaware LLC, DJS PROCESSING, LLC,
a Delaware LLC, PROFESSIONAL TITLE AND ABSTRACT
COMPANY OF FLORIDA, a Delaware LLC, and
DEFAULT SERVICING, LLC, a Delaware LLC,

    Defendants.
_____

VOLUME II

DEPOSITION OF

DAVID J. STERN

TAKEN ON BEHALF OF THE PLAINTIFFS

APRIL 25, 2011
10:00 A.M. - 5:13 P.M.

REIF KING WELCH LEGAL SERVICES
888 EAST LAS OLAS BLVD.,
SUITE 508,
FORT LAUDERDALE, FLORIDA 33301

SAMANTHA HANSTEIN, Court Reporter

---

33324

```
 1                    APPEARANCES OF COUNSEL
 2
 3       On behalf of the Plaintiffs:
 4            FARMER, JAFFE, WEISSING, EDWARDS, FISTOS &
              LEHRMAN, PL
 5            STEVE JAFFE, ESQ.
              425 NORTH ANDREWS AVE.,
 6            SUITE 2,
              FORT LAUDERDALE, FLORIDA 33301
 7            (954) 524-2820
              steve@pathtojustice.com
 8
 9            RAPOPORT LAW GROUP
              DAWN M. RAPOPORT, ESQ.
10            1314 EAST LAS OLAS BLVD.,
              SUITE 121,
11            FORT LAUDERDALE, FLORIDA 33301
              (954) 712-7457
12            dawn@rapoprtlawgroup.com
13
              REAL ESTATE & INVESTMENT LAW
14            CHANDRA PARKER DOUCETTE, ESQ.
              621 NORTHWEST 53RD ST.,
15            SUITE 240,
              BOCA RATON, FLORIDA 33487
16            (561) 995-1490
              chandra@chandralaw.net
17
18       On behalf of the Defendants:
19            TEW CARDENAS, LLP
              JEFFREY TEW, ESQ.
20            FOUR SEASONS TOWER
              15TH FLOOR, 1441 BRICKELL AVE.,
21            MIAMI, FLORIDA 33131
              (305) 536-1112
22            jt8tewlaw.com
23
              DJSP ENTERPRISES, INC.
24            STEPHEN J. BERNSTEIN, ESQ.
              900 SOUTH PINE ISLAND RD.,
25            SUITE 400,
```

---

33325

```
 1            (954) 233-8000 ext. 1001
              sbernstein@djsenterprises.com
 2
 3            BERGER SINGERMAN
              FRANK SCRUGGS, ESQ.
 4            350 EAST LAS OLAS BLVD.,
              SUITE 1000,
 5            FORT LAUDERDALE, FLORIDA 33301
              (954) 525-9900
 6            fscruggs@bergersingerman.com
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    INDEX OF EXAMINATION
 2
 3    WITNESS:  David J. Stern
 4
 5                                                    Page
 6    DIRECT EXAMINATION
      By Steve Jaffe, Esq.                              7
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    INDEX TO EXHIBITS
 2
 3    Exhibit         Description                    Page
 4
 5      1    Press release dated July 27th           151
 6      2    Press release that announces new        152
           investigations against Law Offices of
 7         Marshall Watson, Shapiro & Fishman, Law
           Office of David J. Stern
 8
 9      3    Press release sent out September 7th    158
10      4    Letter dated October 21st               181
11      5    November 4th, 2010 mass e-mail          197
12      6    Three-page letter                       208
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1    did before you gave us the job.  Today, most of us have
 2    families, most of us have homes.  You've given us good
 3    paychecks and you've given us insurance more than anyone
 4    would normally give us specially in law firms".  And I
 5    remember Steven Bernastein got two seats down saying,
 6    David, I think I'm going to cry as I was wiping tears
 7    away.  Anytime someone wanted to see me, I made myself
 8    accessible.  As far as giving termination notice,
 9    however, it went for me.  Doing it personally is
10    impossible.  And there was others --
11         Q    I'm sure.
12         A    -- that have come in and gave those sort of
13    accolades.
14         Q    I'm sure.  You seem like a very nice guy.  At
15    the time of these mass layoffs, is it fair to say that
16    DJSP Enterprises had accounts receivable in excess of
17    $50 million?
18         A    How do you define "accounts receivable"?
19         Q    Money that's owed to them to DJSP Enterprises
20    that hasn't been paid yet.
21         A    But not yet billed?
22         Q    Billed and out on the street waiting for the
23    money to come.
24         A    I don't -- I don't know if it was $50 million.
25    I don't recall.
```

```
 1         Q    There was a certain amount of accounts
 2    receivable out at that time?
 3         A    Yes, of course.
 4         Q    And obviously, there was the unbilled yet to
 5    go out earned, but the bill yet to be sent, accounts
 6    receivable also?
 7         A    That is correct.
 8         Q    And those numbers combined were in the
 9    millions?
10         A    Those numbers combined were in the millions,
11    yes.
12         Q    And the law firm also had accounts receivable?
13         MR. TEW:  I'm going to object.  We're not
14    going to get into financials.  I don't see how
15    that's relevant.
16         MR. JAFFE:  I wasn't going any further than --
17         MR. TEW:  You're asking financial discoveries.
18    It's not appropriate at this stage, the law firms
19    finances.
20         Q    (By Mr. Jaffe)  When the unforeseen
21    catastrophic event that you had talked about occurred,
22    you gave a couple of examples when I asked you what you
23    meant and you said robo-signings.  What do you mean by
24    that?
25         A    Robo-signings in July, August, September
```

```
 1    depositions of clients began to get released.  And the
 2    gist of what kicked off robo-signing was a GMAC case in
 3    Maine, the State of Maine, where the GMAC employee that
 4    was responsible for executing affidavits was deposed by
 5    borrower's attorney.  And the gist of the depo that
 6    created this robo-signing concept was borrower's counsel
 7    asked Jeff Stephens -- well, according to your
 8    affidavit, you say you have actual knowledge you
 9    reviewed it, and he came back and said, well, no, I
10    didn't.  The attorney was a little bit dumbfounded while
11    you, under oath, said that you did review it.  And then
12    a whole new line of questioning ensued, how many of
13    these do you do?  How could you possibly do them?
14    Hence, in my mind, the term "robo" was the notary there
15    at the time and the answer was no, no, no, no.  Then
16    Bank of America had the issue and then PNC had the issue
17    and a whole host.  And as a result, they put a freeze on
18    the referral process until the clients made certain that
19    there was no robo-signing.  Now, keep in mind that
20    Florida is a verified complaints state, which would
21    require that the client review the complaint and execute
22    it; and if it needs to be notarized, notarize it in the
23    presence of a notary.  So, it caused every lender to
24    stop the wheels.
25         Q    And you are aware that robo-signing occurred
```

```
 1    in your office?
 2         A    It depends which element of robo-signing
 3    you're speaking of.
 4         Q    But nonetheless, it occurred?
 5         MR. TEW:  Form of the question.
 6         A    It -- there's a -- robo-signing encompasses a
 7    variety of things, not every variety of the occurrence
 8    occurred in my office.
 9         Q    (By Mr. Jaffe) Which variety occurred in your
10    office?
11         A    My understanding is that notaries were not
12    present in front of the attorney as the attorney's pen
13    hit the paper.
14         Q    Is that the only element of robo-signing
15    you're aware of have occurred in your office?
16         A    The same robo-signing concept also, not just
17    affidavits, but assignments.
18         Q    And those were -- some were executed by
19    Cheryl Sammons?
20         A    I don't know if Cheryl was present in front of
21    a notary or not.  I only know that there are allegations
22    that that occurred.
23         Q    Are you aware that there are allegations that
24    other paralegals were signing Cheryl Sammons' name?
25         A    I am aware of that.  But according to Cheryl,
```

```
 1    she said that's absolutely false or without her
 2    knowledge.  So, I guess, you'd have to ask those other
 3    paralegals that may have signed her name.
 4         Q    Are you aware of any paralegals that alleged
 5    to have signed her name -- Cheryl Sammons' name?  I'm
 6    sorry.
 7         A    Of course not.
 8         Q    Are you aware also that there's been
 9    allegations that Cheryl Sammons was signing between 400
10    and 1,000 affidavits a day at certain times?
11         MR. TEW:  Object to the form.
12         A    I'm not aware of that number.
13         Q    (By Mr. Jaffe) Are you aware that she would
14    designate two hours a day to sign affidavits?
15         MR. TEW:  Object to the form.
16         A    I don't reach her in the office.  I find your
17    blogs to be false.
18         Q    (By Mr. Jaffe) Are you aware that there's been
19    sworn testimony that files would be piled up on given
20    floors and given conference rooms and she would
21    periodically stop in to make the signatures at that
22    point?
23         MR. TEW:  Object to the form of the question.
24         A    I am not aware that it actually occurred, I
25    was not involved in the day-to-day operations.  I was
```

```
 1    not present in those particular areas.  So, whatever
 2    allegations are made, I look at them as allegations; and
 3    as I sit here today, they are unproven.
 4         Q    (By Mr. Jaffe) And you're telling us under
 5    oath that Cheryl never came to you to express
 6    frustration about these acts if in fact they were
 7    occurring?
 8         MR. TEW:  Object to the form of the question.
 9         A    Which acts?
10         Q    (By Mr. Jaffe) Signing 400 to 1,000 affidavits
11    a day, working unbelievable hours and so busy that she
12    had other people sign her name.
13         MR. TEW:  Object to the form of the question.
14         A    I'm not -- I'm not aware of that.
15         Q    (By Mr. Jaffe) Okay.
16         A    Of course not.  Cheryl would not come to me or
17    never came to me and said, I've had these people signing
18    the names or my name.  Absolutely not.
19         Q    Did she ever complain to you that there was so
20    much at work for her to sign that there was no way she
21    could actually read and verify what she was signing?
22         MR. TEW:  Object to the form of the question.
23         A    No.  There was more than one signer.  Cheryl
24    wasn't just the only signer.
25         Q    (By Mr. Jaffe) I agree.  I'm just talking
```

```
 1   about Cheryl.
 2       A    Okay.
 3       Q    No?
 4       A    No.
 5       Q    All right.  Let's go back to the November 4,
 6   2010 mass e-mail.  Have you ever seen it in print?
 7       A    I have to see it.  I don't -- I don't know.
 8       Q    So, as you sit here, you have no recollection
 9   of seeing that?
10       A    I don't have any recollection of seeing it.
11   I -- I -- if I see it, then I will recognize it or I
12   won't recognize it.
13       Q    Sure.  And --
14       A    And again, that was done at that level below
15   mine.
16       Q    That was my next question.  You did not author
17   the content of that e-mail?
18       A    I'd have to look at it and see if I recall
19   giving any of my input.
20       Q    Okay.
21       A    I don't recall and I don't know if it's --
22       Q    It's okay.  I think we're at 5.
23       A    Yes, sir.
24                (Thereupon, Exhibit 5 was entered
25                 into the record.)
```

```
 1       Q    (By Mr. Jaffe) Let me show you what's now
 2   marked as Plaintiffs' Exhibit 5 for identification
 3   purposes.  Ask you take a look at that and see if you
 4   recognize it.
 5       A    (Looking through papers/files.)
 6       Q    Ready?
 7       A    Ready.
 8       MR. JAFFE:  Mr. Scruggs.
 9       Q    (By Mr. Jaffe) You've had an opportunity to
10   look at Plaintiffs' Exhibit 5, which I represent to you
11   to be a November 4th, 2010 mass e-mail.  Do you
12   recognize it?
13       A    I do.
14       Q    This e-mail came from an e-mail address of HR
15   department mailbox, correct, that's from?
16       A    Yes, sir.
17       Q    Okay.  And would you agree with me that it was
18   sent to many, many people at one time?
19       A    Yes, sir.
20       Q    I had the pleasure of counting them.  I'm
21   representing to you it's over 430 people.  Did you work
22   with anyone to create a list of people that was subject
23   to this termination?
24       A    Did I work with anyone?  Again, I'm up here
25   trying to save the business and I've got Steven, I've
```

```
 1   got Rick, I've got Chris, I've got Cheryl who are
 2   familiar with these people, and of them, I would not be
 3   familiar with.  As this unfortunate unforeseeable
 4   catastrophic event occurred, given the ramifications,
 5   Cheryl was unable to help make selections.
 6       Q    Because?
 7       A    Because from a physical standpoint, she was
 8   in -- she was in denial.  She just didn't think it was
 9   going to happen.
10       Q    In fact, she's on the list.
11       A    She is on the list, but she went from
12   Processing, she also was employed by the law firm.  So,
13   she was terminated from Processing with the intent that
14   she be terminated from the law firm shortly thereafter
15   once we had the benefit of her knowledge on who should
16   stay.
17       Q    So, Cheryl Sammons was employed both by the
18   law firm and by DJSP Enterprises?
19       A    Yes, sir.
20       Q    What was her role with the law firm?
21       A    With the law firm, she assisted me in whatever
22   I needed, she assisted Miriam, she assisted Bev.  So, at
23   the time, we contemplated the transaction and put
24   together the services agreement.  We decided that we
25   would make her an employee of both the law firm and
```

```
 1   Processing.
 2       Q    She received two checks?
 3       A    Yes, sir.
 4       Q    How did you distinguish her roles and
 5   responsibilities?
 6       A    She did that, Miriam did that.  I was not
 7   involved in distinguishing her roles between the two.
 8       Q    Would you agree with me that prior to going
 9   public, you're more involved in the day-to-day
10   operations of your law firm than you were the day after
11   you went public?
12       MR. SCRUGGS:  Objection to form.
13       MR. TEW:  Same objection.
14       A    No.  I went --
15       Q    (By Mr. Jaffe) Because your day-to-day
16   involvement ceased a number of years earlier?
17       A    Correct.
18       Q    It seems like you put a lot of trust in
19   Ms. Sammons and Ms. Mandieta.
20       A    Blind faith, blind trust.
21       Q    Tell me what time this e-mail was sent.
22       A    Well, it says sent Thursday, November 4th at
23   10:30 a.m.
24       Q    Tell me what time the employees', all 435 of
25   them, security badges were deactivated.
```

```
 1        A    If it's not in the letter, I don't know.
 2        Q    You will.  Keep looking.  Page -- the last
 3   page.
 4        A    Security badges will be deactivated at
 5   11:30 a.m.
 6        Q    So, is it fair to say that you have now
 7   terminated 435 people --
 8        A    Who is "you"?
 9        Q    All right.  Let's back up.  Who signed the
10   e-mail?
11        A    I did.
12        Q    Okay.  That is you.
13        A    Well, that's me as whatever capacity I was in.
14        Q    Does it say that?
15        A    No, it doesn't.
16        Q    Okay.  So, my question is, you fired 435
17   people via e-mail at 10:30 and told them that your
18   badges were deactivated in an hour?
19        A    HR did.  HR sent that.  From -- see the top
20   line, from?
21        Q    From HR --
22        A    From HR.
23        Q    -- from you, the CEO of DJSP Enterprises and
24   president of the law firm.
25        A    I'm sorry.  Say that again.
```

```
 1        Q    You were the CEO of DJSP Enterprises at the
 2   time?
 3        A    Correct.
 4        Q    President and sole owner of the law firm at
 5   the time?
 6        A    Correct.  But this doesn't involve the law
 7   firm.
 8        Q    Okay.  But the point is, you signed an
 9   e-mail --
10        A    Okay.
11        Q    -- that HR sent.
12        A    Okay.
13        Q    So, my question --
14        A    So, HR and DJSP Enterprises terminated
15   whatever number of people due to a catastrophic
16   unforeseeable event, that's correct.
17        Q    And you gave them an hour to get out of the
18   building?
19        A    According to what's here, yes.  Did that
20   happen in reality?  I don't know.
21        MR. BERNSTEIN:  I would like to add a
22   clarifying note that --
23        MR. JAFFE:  Yeah, you're not being deposed
24   right now.
25        MR. BERNSTEIN:  Okay.  Fair point.
```

```
 1        Q    (By Mr. Jaffe) In the e-mail, it says in the
 2   first sentence that -- actually, why don't you read the
 3   second sentence.
 4        A    "It is with heavy heart that I must announce
 5   that due to the lawsuit" --
 6        Q    I'm sorry.  Second sentence, not second
 7   paragraph.
 8        A    In --
 9        Q    Paragraph one, "The referral".
10        A    "The referral of new business has decreased by
11   over 90 percent in the last six months".
12        Q    Okay.  So, my question is this, this is an
13   e-mail sent November 4th.  In October 22nd letter,
14   75 percent of referral business has been reduced over
15   the last six months.  And now by November 4th, it's up
16   to 90 percent; is that accurate?
17        A    I have to go back and look at the volume
18   reports to confirm that.
19        Q    Based upon your review of the e-mail, the
20   contents of the e-mail, did you have any input in
21   creating the content?
22        A    I asked to see the letter once it was drafted,
23   and I recall making a couple of changes in particular.
24   I don't remember what I changed, but I did see it and I
25   did give a couple of comments.  Once I gave those
```

```
 1   comments, it circulated back to Rick Powers, I assume,
 2   and Steve and Chris and I essentially was done.
 3        Q    You said to me that this e-mail did not deal
 4   with any of the law office employees.  Did I understand
 5   that correctly?
 6        A    I'd have to look through.  That was my
 7   understanding, but let me look and see.  As I sit here
 8   today, I don't know if this included the law firm, DJSP,
 9   DJS Processing or DJSP, what would have been DJSP, or
10   other DJSP Enterprises such as Default Servicing and
11   Professional Title and Timeos.
12        Q    Right.
13        A    So --
14        Q    So, the different way, the e-mail doesn't
15   distinguish employee by what department they worked in?
16        A    That is correct.
17        Q    Or what corporation they worked in or what LLC
18   they worked in or whether it was a law firm employee?
19        A    That's correct.
20        Q    Whose idea was it to have an HR person on
21   every floor collecting all employees' paperwork, company
22   computers -- excuse me -- cell phones, firm files, law
23   firm records?
24        A    It was not mine.
25        Q    Whose idea was it to have them all out of the
```

```
 1    building within an hour?
 2         A    It was not mine.  I don't know.
 3         Q    The e-mail also contains the name of
 4    Miriam Mendieta.
 5         A    Okay.
 6         Q    So, she was terminated in mass with
 7    Ms. Sammons on this November 4th, 2010 e-mail?
 8         A    I don't recall if that -- if the fact that if
 9    she is in there, if that actually meant she was
10    terminated, she may have been also Processing as well as
11    the law firm.
12         Q    So, as you sit here today, Miriam Mendieta may
13    have been receiving two checks as well, one from the law
14    firm and one from DJS Processing?
15         A    That is correct.
16         Q    What role did she have in Processing?
17         A    She would work with certain staff, be there to
18    answer any questions.  We felt that her salary -- and
19    I'm not sure if it panned out that way, but the original
20    process was that part of her process should be bourn by
21    Processing if she is going to be working with
22    Processing, giving them direct oversight or whatever the
23    case may be.
24         Q    So, she supervised Processing?
25         A    Well --
```

```
 1         Q    Certain aspects of Processing?
 2         A    She did, yes.  Of course.
 3         Q    And Sammons served -- supervised certain
 4    aspects of Processing?
 5         A    Right.
 6         Q    Sammons also supervised certain aspects of the
 7    law firm?
 8         A    As to non-legal work.
 9         Q    And obviously, Ms. Mendieta supervised aspects
10    of the law firm?
11         A    Yes.
12         Q    All aspects of the law firm actually.
13         A    Absolutely.
14         Q    Who else was dual employed by DJS Processing
15    and the law firm at this time?
16         A    Well, certainly, Cheryl was.  I'm thinking
17    Miriam was, but I'm not positive.  I was.  And I'm not
18    sure if Sam because Sam did law firm, and of course, he
19    worked with Professional Title.  Beyond that, I think
20    that would be -- that would be a -- Tom from Dykema.
21         Q    Was Sam employed -- based on what you just
22    said, I think I heard you say Sam was employed both by
23    the law firm and by Professional Title and Abstract at
24    the same time.
25         A    I'm not sure.
```

```
 1         Q    But it's possible?
 2         A    It's possible.
 3         Q    And that's what you think?
 4         A    I don't know -- I don't recall.  At the end of
 5    the day, given the magnitude of the transaction, if Sam
 6    at -- ultimately came over or not, that's -- you know,
 7    certainly, he sent over an interrogatory and Jeff can
 8    get it answered.
 9         Q    What is your understanding on the basis of our
10    lawsuit?
11         A    My understanding on the basis of this lawsuit
12    is that you feel that Processing, DJSP Enterprises
13    wrongfully terminated its employees in violation of WARN
14    and that I'm the mastermind that created it, and I said
15    at this public company to defraud the world and you want
16    to get into my deep pockets as well as the law firm.
17    That's my understanding of this lawsuit.
18         Q    Okay.
19         A    Is it one of the --
20         MR. TEW:  You answered the question.
21         A    Well -- but it's too good, Jeff.
22         MR. TEW:  No.
23         A    Okay.  I did get this long.  I can make it
24    another two hours.
25         Q    (By Mr. Jaffe) Now, you are aware that on
```

```
 1    November 3rd, 2010, Chris Simmons authored a letter to
 2    Gene Rhodes at the REACT Program in Tallahassee?
 3         MR. TEW:  Object to the form.
 4         A    I am not aware of that.
 5         Q    (By Mr. Jaffe) Okay.  This would be quicker
 6    then.  Are you telling me that you're not aware of
 7    whether or not anybody on behalf of DJSP Enterprises
 8    sent a WARN notice to Tallahassee in November?
 9         A    I don't know what date it was sent.  I don't
10    recall what date it was sent.
11         MR. JAFFE:  All right.  Please.
12         Q    (By Mr. Jaffe) Let's -- while she looks for
13    the copies -- you are aware a letter was sent, you're
14    just not aware what date it was; is that correct?
15         A    That's correct.
16         Q    Okay.  Were you privy to the development of
17    the contents of the letter prior to it being sent?
18         A    I'd have to look at it to refresh my memory.
19         Q    Okay.  Now, let me show you what we've now
20    marked Plaintiffs' Exhibit 6 for identification
21    purposes.
22              (Thereupon, Exhibit 6 was entered
23              into the record.)
24         Q    (By Mr. Jaffe) I would represent to you
25    it's -- one, two -- three pages.  Tell me if you
```

1   recognize it.

2       A   Yes, sir, I do.

3       Q   Were you involved in the development of the

4   content of these three pages?

5       A   No, sir, I was not.

6       Q   Did you review this letter -- one-page letter

7   and two-page memo, I'm going to call it, before it was

8   sent out to Tallahassee?

9       A   I did not.

10      Q   When is the first time you saw this

11  Exhibit 7 -- or Exhibit 6?  Excuse me.

12      A   A few days after it had gone out, just in my

13  stack of my monstrosity of reading.

14      Q   Do you have any knowledge as to how the laying

15  off of 38 law office employees was decided, which 38?

16      A   I'm sorry.  Can you repeat the question?

17      Q   Bad question.

18      A   Yeah.

19      Q   Will you agree with me that contained within

20  this letter, there was law office layoffs?

21      A   Yes, sir.

22      Q   And specifically, 38 people were laid off, at

23  least that's what the reporting is about.

24      A   Okay.

25      Q   Do you know how that 38 people were selected?

1       A   Miriam and Beverly would have selected those

2   individuals independent of me.

3       Q   You saved the next question, but I get to ask

4   anyway.  Without consulting with you, correct?

5       A   Correct.

6       Q   With regard to the 356 employees that were

7   terminated by DJS Processing, who would have selected

8   those people?

9       A   Well, Cheryl and Rick were supposed to select

10  them, and then we had some issues with Cheryl making

11  those selections.  So, they brought it, really, to me

12  and asked how I could help.  And I said, it's not what I

13  do.  I don't know any of these people.  I know very few

14  of these people, and the people that I do know may not

15  be the people that need to be kept.  So, I suggested

16  that perhaps they go to Cheryl's managers and have

17  Cheryl's managers help make the decisions because at the

18  end of the day, Cheryl was going to be gone and it would

19  be the managers that would have to -- Cheryl's managers

20  that would have to choose the right people.  So, that's

21  how the DJS Processing selections were made.

22      Q   So, back to the law office, though, Miriam

23  fired herself?

24      A   No.  I terminated Miriam, but Miriam or --

25  and/or Beverly -- because Beverly stayed through

1   whatever, March, I have something like that, and they --

2   I didn't know any of the attorneys or very few of the

3   attorneys, so I wouldn't have the -- where at all to

4   know who should stay or who shouldn't stay.  And that's

5   sort of what Miriam's last day was, but the need to cut

6   was not pushed back with Miriam or -- and/or Bev as it

7   was with Cheryl.

8       Q   At its height, how many lawyers did you have

9   employed at the law office?

10      A   I believe 150, give or take.

11      Q   How many of them did you know?

12      A   Maybe 20.  I wasn't there day to day, so I

13  didn't know.  I knew the ones that were there in 2005,

14  2006, but anyone that came after that, I just -- it

15  wasn't what I did.

16      Q   Is it fair to say that after 2005, 2006, the

17  number of staff -- I think your word was "dramatically

18  increased"?

19      A   2007 when we moved to Plantation, to 900 South

20  Pine Island.

21      Q   When the mass e-mail went out terminating

22  Cheryl as well, was -- I thought that I understood you

23  used to say that she stayed on on behalf of the law

24  firm.

25      A   The decision was that Cheryl and Miriam needed

1   to go and they needed to go immediately.  The -- the

2   reality was that with -- at the end of the day, all that

3   would fall back on me.  And because I was not involved

4   in the day-to-day, I couldn't possibly under any

5   circumstances do it.  As I recall, the intent was to get

6   them off Processing of the public company ASAP, make

7   them aware of that.  They would then be -- continue to

8   receive law firm payroll.  And after a week, they need

9   to be totally out.  And that's kind of how it went down

10  and I -- yeah, couldn't get them out fast enough.  But

11  unfortunately, they have the knowledge that -- a lot of

12  them we didn't get, as Steven said, but you're able to

13  do it without them.  David and Cheryl had some managers

14  under her and Bev was a godsend.

15      Q   Do you know if it was income-based, the cuts,

16  or was it you start with these most expensive people and

17  work down?

18      A   No, we definitely did not.

19      Q   The first in, first out?

20      A   No.  It just who we needed that could do

21  the best job given the relatively small staff that would

22  be left for an uncertain period of time.

23      Q   You would agree with me that the Exhibit 6

24  does not identify whether it was sent on behalf of DJSP

25  Enterprises, Florida or DJSP Enterprises, BVI; is that

```
 1    correct?
 2        A    Well, the employees that were being laid off
 3    worked for DJS Processing, they worked for the Law
 4    Offices of David J. Stern and they worked for Timeos
 5    because Professional Title had been pushed over to
 6    Timeos.
 7        Q    Sure.  But my question wasn't that.  My
 8    question was, the letter does not identify that it's
 9    being sent by either DJSP Enterprises, Florida or DJSP
10    Enterprises, BVI, correct?
11        A    It simply shows that it's being sent by DJSP
12    Enterprises, notifying the administrator that three
13    entities --
14        Q    I understand.  But my question is very
15    elementary.
16        A    I'm sorry.  I'm missing that.
17        Q    Let's go back up.  See the title, "DJSP
18    Enterprises"?
19        A    I do.
20        Q    Okay.  I understand there to be a DJSP
21    Enterprises, BVI.
22        A    Okay.
23        Q    And I understand there to be a DJSP
24    Enterprises, Florida.
25        A    I'm not aware of the DJSP Enterprises of
```

```
 1    Florida.  I only know BVI.
 2        Q    You already testified to that.  So, my
 3    question was, would you agree with me that it does not
 4    identify DJSP Enterprises, Florida or DJSP Enterprises,
 5    BVI?
 6            MR. SCRUGGS:  Objection.  Form.  Speaks for
 7    itself.
 8        A    I would say that -- first off, who in the heck
 9    is DJSP Enterprises, Florida?  And if it does exist,
10    what's their address?
11        Q    (By Mr. Jaffe) Ask your counsel.
12        A    Because clearly, DJSP Enterprises does -- does
13    exist at 900 South Pine Island.
14        Q    Okay.  I'll take that as a yes.  You would
15    agree with me that Chris Simmons, the director of HR,
16    signed this letter?
17        A    I believe that's his signature.
18        Q    Okay.  Are you aware that Chris Simmons was a
19    director -- at this time, a director of HR of DJSP
20    Enterprises, BVI?
21        A    Yes.
22        Q    And at this time in November, that's the -- an
23    entity that you owned 33 percent of?
24        A    I'm not sure, as I previously testified, what
25    percentage of it that I owned.
```

```
 1        Q    Was the November 4th, 2010 the last mass
 2    layoff?
 3        A    I don't recall.  How do you define "mass"?
 4        Q    More than 50.
 5        A    I don't know recall.  I don't know.  Maybe
 6    Chris Simmons, Stephen or Steve, two people down to my
 7    right.
 8        Q    And you removed of stepped down shortly after
 9    that e-mail, right?
10        A    Stepped down from?
11        Q    Chairman of DJSP Enterprises.
12        A    Somewhere thereabout, yes, sir.
13        Q    November 19th, I think.
14        A    I don't recall.  It's not like an anniversary.
15    It's not a date you want to remember.
16        Q    I thought just the opposite.  This is your
17    baby that you created, I would expect you to remember
18    the date that it ended.
19        A    No.  Sorry.
20        Q    It's okay.  Do you still go to the office?
21        A    I do.
22        Q    How often?
23        A    Maybe twice a week for two or three hours.
24        Q    Is there any business left?
25        A    There is.
```

```
 1        Q    What are your plans with the office?
 2        A    I'm shutting it down.
 3        Q    How soon?
 4        A    Not soon enough.
 5        Q    Why do you say it like that?
 6        A    It's done, it's over.  I have no desire to do
 7    this anymore.  It's a backstabbing business.  A guy
 8    finds a way to make success and people get thrills of
 9    seeing them come crashing down, not the American dream,
10    not the way I am.  June 30th is a -- is a -- is the --
11    existing files we have, we're substituting out or
12    getting clients to get new counsel to substitute out.
13    So, June 30th, we're done.  We had advised the clients
14    as of March 31st that we'd no longer be working with
15    them, and then that's it.
16        Q    Are you still employed by DJSP Enterprises?
17        A    No.
18        Q    When did that stop?
19        A    I want to say while I was employed by them, I
20    didn't take a salary since.
21            MR. TEW:  It's going beyond the question.
22        A    Am I still employed by DJSP?  No.
23        Q    (By Mr. Jaffe) When did that stop?
24        A    I don't recall.
25        Q    About the same time you stepped down as --
```

```
 1          A    I don't recall.
 2          Q    Are there any employees at DJSP Enterprises
 3   today?
 4          A    Are there any employees at D- -- yes, there
 5   are.
 6          Q    Have you had contact with any of them?
 7          A    I see them every day that I'm in the office.
 8          MR. JAFFE:  I believe that we're done, but I
 9   do want to take a break and make sure that we're
10   done before I officially say that.  Thanks for your
11   time, but give me a couple of seconds.
12          A    Okay.
13               (Thereupon, a short break was
14               taken.)
15               (Deposition resumed.)
16          MR. JAFFE:  We're done.  No further questions.
17   Thank you for your time.  Sorry for taking your
18   day.
19          MS. DOUCETTE:  No problem.  It's okay.
20          MR. JAFFE:  Good luck to you in the future.
21          A    Thank you.
22          THE COURT REPORTER:  Are you all going to
23   order?
24          MR. TEW:  We'll read.
25          THE COURT REPORTER:  You'll read?
```

```
 1          MR. TEW:  But I do want a copy.  Send me
 2   my copy.  I'll give it to the witness.  Then
 3   we'll read it, and then we'll sign.
 4          THE COURT REPORTER:  Okay.
 5          MR. JAFFE:  I want mine, but e-mail.
 6          THE COURT REPORTER:  By e-trans?
 7          MR. JAFFE:  Yeah, that's all I want.  I don't
 8   want paper.
 9          THE COURT REPORTER:  You don't want paper.
10   And standard delivery, would that be all right?
11          MR. JAFFE:  Yeah.
12          THE COURT REPORTER:  Seven days?
13          MR. JAFFE:  Yes.
14          MR. SCRUGGS:  Can you send mine that way,
15   e-trans as well?  The text only.
16          THE COURT REPORTER:  Sure.
17               (Deposition concluded at 5:13 p.m.)
18               (Reading and signing of the
19               deposition by the witness has been
20               reserved.)
21
22
23
24
25
```

```
 1   DATE:  April 29, 2011
 2   TO:   David J. Stern
 3         C/O
         Tew Cardenas, LLP
 4         Jeffrey Tew, Esq.
         Four Seasons Tower
 5         15th Floor, 1441 Brickell Ave.,
         Miami, Florida 33131
 6   IN RE:  Renae Mowat, Nikki Mack, Arklynn Rahming, and
 7           Quenna Humphrey individually and on behalf of
           all other similarly situated individuals v. DJSP
 8           Enterprises, Inc., a Florida Corporation, DJSP
           Enterprises, Inc., a British Virgin Islands
 9           Company, Law Offices of David J. Stern, P.A.,
           David J. Stern, individually, DAL Group, LLC, a
10           Delaware LLC, DJS Processing, LLC, a Delaware
           LLC, Professional Title and Abstract Company of
11           Florida, a Delaware LLC, and Default Servicing,
           LLC, a Delaware LLC
12           10-62302-CIV-UNGARO
13   Dear Mr. Stern,
14        Please take notice that on April 25, 2011, you
     gave your deposition in the above-referred matter.  At
15   that time, you did not waive signature.  It is now
     necessary that you sign your deposition.
16        You may do so by contacting your own attorney
     or the attorney who took your deposition and make an
17   appointment to do so at their office.  You may also
     contact our office at the below number, Monday - Friday,
18   9:00 AM - 5:00 PM, for further information and
     assistance.
19        If you do not read and sign the deposition
     within thirty (30) days, the original, which has already
20   been forwarded to the ordering attorney, may be filed
     with the Clerk of the Court.  If you wish to waive your
21   signature, sign your name in the blank at the bottom of
     this letter and return it to us.
22        Very truly yours,
23        SAMANTHA HANSTEIN
          Reif King Welch Legal Services
24        954-712-2600
25   I do hereby waive my signature.
```



```
 1   ---------------------
     David J. Stern
 2
     Cc: via transcript:      Steve Jaffe, Esq.
 3                            Jeffrey Tew, Esq.
                              Frank Scruggs, Esq.
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2   PAGE NO.   LINE NO.      ERRATA SHEET
 3   _____   _____   _____
 4   _____   _____   _____
 5   _____   _____   _____
 6   _____   _____   _____
 7   _____   _____   _____
 8   _____   _____   _____
 9   _____   _____   _____
10   _____   _____   _____
11   _____   _____   _____
12   _____   _____   _____
13   _____   _____   _____
14   _____   _____   _____
15   _____   _____   _____
16   _____   _____   _____
17   _____   _____   _____
18   _____   _____   _____
19   _____   _____   _____
20   _____   _____   _____
21   _____   _____   _____
22   _____   _____   _____
23   _____   _____   _____
24   ----------------      ------------------
25   SIGNATURE               DATE
```

```
 1                    CERTIFICATE OF REPORTER
 2
 3   STATE OF FLORIDA
     SOUTHERN DISTRICT
 4
 5       I, SAMANTHA HANSTEIN, do hereby certify that
 6   the foregoing testimony was taken before me; that the
 7   witness was duly sworn by me; and that the foregoing
 8   pages constitute a true record of the testimony given by
 9   said witness.
10       I further certify that I am not a relative or
11   employee or attorney or counsel of any of the parties,
12   or a relative or employee of such attorney or counsel,
13   nor financially interested in the action.
14       Under penalties of perjury, I declare that I
15   have read the foregoing certificate and that the facts
16   stated herein are true.
17       Signed this 25th day of April, 2011.
18
19            _____
20                 SAMANTHA HANSTEIN
21
22
23
24
25
```

```
 1                    CERTIFICATE OF OATH
 2
 3
 4   STATE OF FLORIDA
     SOUTHERN DISTRICT
 5
 6       I, the undersigned authority, certify that
 7   DAVID J. STERN personally appeared before me and was
 8   duly sworn.
 9
10       Witness my hand and official seal this 25th
11   day of April, 2011.
12
13   _____
14   Samantha Hanstein, Court Reporter
15   Notary Public, State of Florida
     Commission No.: EE 070089
16   Commission Expiration: 03/03/2015
17
18
19
20
21
22
23
24
25
```

WORD INDEX

1

**A**

able 212:12
above-referred 219:14
absolutely 195:1 196:18 206:13
Abstract 33323:12
206:23 219:10
accessible 191:18
accolades 191:13
accounts 191:16
191:18 192:1,5
192:12
accurate 203:16
action 222:13
acts 196:6,9
actual 193:18
add 202:21
address 198:14
214:10
administrator 213:12
advised 216:13
affidavit 193:8
affidavits 193:4
194:17 195:10
195:14 196:10
agree 196:25
198:17 200:8
209:19 212:23
214:3,15
agreement 192:24
allegations 194:21,23
195:9 196:2,2
alleged 195:4
America 193:16
American 216:9
amount 192:1
ANDREWS 33324:5
and/or 210:25
211:6
anniversary

215:14
announce 203:4
announces 33327:6
answer 193:15
205:18
answered 205:8
220:20
anybody 208:7
anymore 216:7
Anytime 191:7
anyway 210:4
APPEARANC-
33324:1
appeared 223:7
appointment 219:16
appropriate 192:18
April 33323:20
219:1,13
222:17 223:11
areas 196:1
Arklyun
33323:3 219:6
ASAP 212:6
asked 192:22
193:7 203:22
210:12
asking 192:17
aspects 206:1,4
206:9,9,12
assignments 194:17
assistance 219:18
assisted 199:21
199:22,23
assume 204:1
attorney 193:5
193:10 194:12
219:15,16,19
222:11,12
attorneys 211:2
211:3
attorney's
194:12

August 192:25
author 197:16
authored 208:1
authority 223:6
Ave 33324:5,20
219:4
aware 193:25
194:15,23,25
195:4,8,12,13
195:18,24
196:14 207:25
208:4,6,13,14
212:7 213:25
a.m 33323:20
200:23 201:5

**B**

baby 215:17
back 193:9
197:5 201:9
203:17 204:1
210:22 211:6
212:3 213:17
backstabbing
216:7
Bad 209:17
badges 200:25
201:4,18
Bank 193:16
based 203:19
205:1
bash 207:9,11
began 193:1
behalf 33323:4
33323:19
33324:3,18
208:7 211:23
212:24 219:6
believe 211:10
214:17 217:8
benefit 199:15
BERGER 33325:3
Bernstein 33324:24
191:5 202:21

202:25
best 212:21
Bev 199:22
211:6 212:14
Beverly 210:1
210:25,25
beyond 206:19
216:21
billed 191:21,22
bit 193:10
blank 219:20
blind 220:20,20
blogs 195:17
BLVD 33323:22
33324:10
33325:4
BOCA 33324:15
borrower's
193:5,6
bottom 219:20
bourn 205:20
break 217:9,13
Brickell 33324:10
219:4
British 33323:10
219:8
brought 210:11
building 202:18
205:1
business 198:25
203:10,14
215:24 216:7
busy 196:11
BVI 212:25
213:10,21
214:1,5,20

**C**

call 209:7
capacity 201:13
Cardenas 33324:20
219:3
case 33323:8
193:2 205:23

catastrophic
192:21 199:4
202:13,15
caused 193:23
Cc 220:2
ceased 206:16
cell 204:22
CEO 201:23
202:1
certain 192:1
193:18 195:10
200:25 217:20,1
205:6
certainly 206:16
207:6
certificate 222:1
222:15 223:1
certify 222:5,10
222:23
Chairman
215:11
CHANDRA 33324:14
chandra@cha...
219:5
changed 203:24
changes 203:23
checks 201:22
199:1 199:5,15
Cheryl 194:19
194:20,24,25
195:5,9 196:5
196:16,23
197:1 199:1,5
197:1 199:1,5
210:9,10,18
211:7,22,25
212:13
Cheryl's 210:16
210:17,19
checks 201:22
204:2 208:1
214:15,18
circulated 221:1
circumstances

**REIF KING WELCH LEGAL SERVICES**
**www.reifkingwelch.com   (877) 291-DEPO (3376)**

2

212:5
clarifying 202:22
clearly 214:12
Clerk 219:20
client 193:21
client 193:1,18
216:12,13
corporation 33323:10
collecting 204:21
combined 192:8
192:10
come 191:12,23
196:16 216:9
comments 203:25 204:1
Commission 223:15,15
company 33323:10,13
204:21 207:15
212:6 222:21
212:12,13
complain 196:19
complaint 219:24
193:21
complaints 193:20
concept 204:22
concerns 204:22
concept 193:6
194:16 198:4
cond 216:5
concluded 218:17
conference 195:20
confirm 203:18
constitute 222:8
consulting 210:4
contact 217:6
219:17
contacting 219:15
contained 209:19
contains 205:3
contemplated 199:23

content 197:17
contents 203:20
208:17
continue 212:7
copies 208:13
copy 218:1,2
corporation 33323:10
204:17 219:7
correct 192:7
192:13 193:1
202:3,4,16
204:16,19
205:15 208:14
208:15 210:4,5
213:1,10
corr 194:3
correctly 204:5
counsel 33324:1
193:6 214:11
216:12 222:11
212:6 217:18
days 209:12,8
day-to-day
declarations 216:9
date 209:9,10,14
215:15,18
216:6,8
David 33323:11
33323:11,18
219:8 210:6
delivery 218:10
delay 207:8
definitely 212:18
defraud 207:15
Delaware 33323:12,12
33323:13,13
219:11,19,10
death 33325:5
DAWN 33324:9
dawn@rapop...
33324:12
day 195:10,14

215:3
definitely 212:18
defraud 207:15
Delaware 33323:12,12
33323:13,13
219:11,19,10
definitely 212:18
deliberate 33323:22
delivery 218:10
delay 207:8
denial 199:8
department 198:15 204:15
depends 194:2
depo 193:5
deposed 193:4
202:23
deposition 33323:17
217:15 218:17
218:19 219:14
219:15,16,18
depositions 193:1
Description 212:2
designate 195:14
desire 216:16
development 208:16 209:3
different 204:14
direct 33326:6
205:22
director 214:15
215:2
discoveries 192:17
dislodging 200:4 204:15
distinguishing 222:23
DISTRICT 33323:1,1
222:3 223:4
DJS 33323:12
204:9 205:14
elementary 213:13
employed

219:9
DJSP 33323:10
33323:10
33324:23
191:16,19
202:1,14 204:8
204:9,9,10
204:20,22
212:24,25
213:9,9,11,17
214:4,4,9,12
214:19 215:11
215:15,16,18
222:12 217:2
Doing 191:9
DOUCETTE 33323:11
218:19 219:14
219:15,16,18
dramatically 211:17
drafted 203:22
dream 216:9
duel 206:11
duly 222:7 223:8
dumbfounded 193:10
Dykema 206:20

**E**

earlier 203:16
earned 192:5
EAST 33323:22
33324:11
EDWARDS
EE 223:15
either 213:9
element 194:14
elementary 213:13
employed

**REIF KING WELCH LEGAL SERVICES**
**www.reifkingwelch.com   (877) 291-DEPO (3376)**

3

206:14,21,22
211:9 216:16
216:19,22
employee 193:3
199:25 204:15
204:18 222:11
222:17
employees 200:24 204:4
204:21 207:13
209:15 210:6
213:8 217:2,4
encompasses 209:6
ended 215:18
ensued 193:12
entered 197:24
208:22
Enterprises 33323:10,10
33324:23
191:16,19
199:18 201:23
202:1,14
employment 204:10
208:7 212:25
212:23 213:9
213:10,12,18
213:21,24,25
214:4,20,21
214:20 216:11
216:16 217:7
217:7,8
entities 213:13
entity 214:23
ERRATA 221:9
Esq 33324:5,9
33324:14,19
33324:24
33325:3
essentially 204:2
ESTATE 33324:13
191:20 196:10
194:4 202:16

EXAMINATI...
33328:1,6
examples 192:22
excess 191:16
excuse 204:22
214:24
explore 193:21
214:10
executed 194:18
executing 193:4
Exhibit 33327:3
197:24 198:2
198:10 208:20
208:22 209:11
209:11 212:23
EXHIBITS 33327:1
exist 214:9,13
existing 216:11
expect 215:17
expensive 212:16
Expiration 223:15
195:25 202:23
202:1,14
e-mail 33327:10
197:6,17
198:11,14,14
200:21 201:10
212:23 213:9
213:10,12,18
213:21,24,25
216:16,21
2043,14 205:3
205:7 211:23
218:6,8,15
207:16 211:24
212:8
firm 191:4
first 203:2
209:10 212:19
Fishman 33327:7
FISTOS 33324:4
floor 33324:20
204:17 219:4
floors 195:20
Florida 33323:1
33323:23
33323:23
33324:6,11,15
33324:21

families 191:2
far 191:8
FARMER 33324:4
fast 212:10
feel 207:12
felt 205:18
filed 219:19
files 195:19
form 194:5
195:11,15,23
196:8,13,22
200:12 208:3
214:6
FORT 33323:23
33324:6,11
33324:15
33324:9 219:9
guess 195:2
guy 191:14
216:7

**H**

hand 223:10
Hanstein 33323:25
219:7 219:25
Friday 219:17
front 194:12,20
frustration 196:6
function 213:8
 fscruggs@ber...
33325:6
further 192:16
217:16 219:17
222:10
 future 217:20

**G**

Gene 208:21
getting 216:12
gist 193:2,5
give 191:4
203:25 211:10
217:11 218:2
given 191:2,5
195:19,20
199:4 207:5
212:21 222:8

217:19 205:22
GMAC 193:2,3
go 192:5 197:5
201:17 216:16
going 191:6
192:13,14,16
199:9 200:8
205:21 209:7
209:20 210:9
215:7,20 216:6
get 199:15
good 191:2
207:16,21
Group 33323:11
Group 33324:4
33323:4 219:9
guess 195:2
guy 191:14

**H**

hand 223:10
Hanstein 33323:25
219:7
happen 199:9
202:20
heard 206:22
heart 203:4
heavy 203:4
hel 199:6
help 199:5
210:12,17
he's 194:19
homes 191:2
hope 191:17
hour 201:18
hour 201:18
hours 195:14
196:11 207:24
215:23
hmm 202:12
201:19,21
201:22 202:11

4

202:14 204:20
214:15,19
Humphrey 33323:4 219:6

**I**

idea 204:20,25
identification 198:2 208:20
212:24 214:24
Il 33323:16
immediately 212:1
impossible 191:10
included 204:8
income-based 212:15
increased 211:18
INDEX 33326:1
33327:1
individually 33323:4,11
219:6,9
individuals 33323:5 210:2
219:7
information 219:17
input 197:19
203:20
Insurance 191:3
intent 199:13
212:5
interested 222:13
interrogatory 33324:22
investigations 33327:6
INVESTMENT 33324:13
Involve 202:6

involved 195:25
200:7,9 209:3
212:9
Involvement 200:16
Island 33324:24
211:20 214:13
Islande 33323:10
219:8
issue 191:16,16
issues 210:10

**J**

J 33323:11,11,18
33324:24
J 191:4
219:3 226:9
210:13,13,14
211:2,4,11,13
212:15 214:1
215:5
knowledge 193:8 195:2
206:22 222:7

**K**

keep 193:19

211:9,23 212:8
213:3 219:8
213:7 213:9
King 33323:22
219:23
knew 211:13
kept 210:15
kicked 193:2
kind 212:9
219:8
knew 211:13
know 194:20
214:14
lawsuit 203:5
lawyers 211:8
laying 209:14
layoff 215:2
layoffs 191:15
204:21
left 212:22
legal 33323:17
219:20
LEHRMAN 33324:4
lender 191:23
letter 33327:9
33327:11
201:1 203:13
203:22 208:21
208:13,17
209:6,6,20
212:8,14,16
219:21
Let's 197:5
201:9 206:12
213:17
level 197:14
199:12 202:20
211:22
life 198:22
199:10,11
little 193:10
LLC 33323:11
33323:11,12
33323:12,13
33324:11,13

219:3 222:8
213:3 213:9
Mack 33323:3
219:6
magnitude 207:5
mailbox 198:15
making 191:11
203:19 204:5
making 203:23
manager 210:16,17,19
manipulated 207:14
Marshall 33327:7
mass 33327:10
197:16,17
198:15 200:21
218:11 221:1,3
mastermind 207:14
matter 219:14
mean 192:23
meant 192:23
200:5
messages 207:9
memory 208:18
Mendieta 200:19 205:4
205:12 206:9
Miami 33324:21
219:5
million 191:17
millions 192:9

5

192:10
mind 193:14,19
mine 197:15
204:24 205:2
218:5,14
Miriam 199:22
200:6 205:4,12
206:17 210:1
210:22,24,24
211:6,25
Miriam's 211:5
missing 213:16
Monday 219:17
money 191:19
191:23
monstrosity
209:13
months 203:11
203:15
moved 211:19
Mowat 33323:3
219:6

**N**

name 194:24
195:3,5,5
196:12,18
203:3 219:20
names 196:18
necessity
219:15
need 210:15
211:5 212:8
needed 199:22
211:25 212:1
212:20
needs 199:22
never 196:5,17
new 33327:6
193:12 203:10
216:12
nice 191:14
Nikki 33323:3
219:6
non-legal 206:8
normally 191:4
NORTH

33324:5
NORTHWEST
33324:14
notarize 194:11
notarize 193:22
notarized
193:22
notary 193:14
193:23 194:21
223:14
note 202:22
notice 191:8
208:3 219:13
notifying 213:12
November
33327:10
197:5 198:11
200:22 203:13
203:15 205:7
208:1,8 214:22
215:1,13
number 195:12
200:16 202:15
211:17 219:17
numbers 192:8
192:10

**O**

oath 193:11
196:5 223:1
object 192:13
195:11,15,23
196:8,13,22
198:6 211:13
one-page 209:6
operations
195:25 200:10
opportunity
198:9
opposite 215:16
order 217:23
ordering 219:19
original 205:19
219:19
oversight 205:22
owed 191:19
owned 214:23
214:25

office 33327:7
195:11,16,18
195:16 204:4
209:15,20
33327:5 201:22
215:20 216:1
217:7 219:16
219:17
Offices
33323:11
33327:6 213:14
219:8
official 223:10
officially 217:10
okay 196:15
197:2,20,22
198:17 202:12
200:10,12,25
203:12 205:5
208:5,16,19
209:24 213:20
213:22 214:14
214:18 215:20
217:12,19
218:4
OLAS 33323:22
33324:10
33325:4
once 199:15
203:22,25
ones 211:13
one-page 209:6
operations
195:25 200:10
opportunity
198:9
opposite 215:16
order 217:23
ordering 219:19
original 205:19
219:19
oversight 205:22
owed 191:19
owned 214:23
214:25

owner 202:4

**P**

page 33326:5
33327:3 201:22
2013 221:2
pages 208:25
209:4 222:8
paid 191:20
panned 205:19
paper 194:13
218:8,9
papers/files
198:5
paperwork
204:21
paragraph
205:7,9
paralegals
194:24 195:3,4
PARKER
33324:14
part 205:20
particular 196:1
203:23
parties 222:11
paychecks 191:3
payroll 212:8
pen 194:12
penalties 222:14
people 196:12
196:17 198:18
198:21,22
199:2 209:17,17
199:8 200:21
210:13,14,14
210:15,20
212:16 215:6
216:8
percent 203:11
203:14,16
218:4
percentage
214:25
period 212:21
periodically

perjury 222:14
person 204:20
personally 191:9
223:7
phones 204:22
physical 199:7
piled 195:19
Plan 33324:24
211:20 214:13
PL 33324:4
Plaintiffs
33323:6,19
33324:3 198:2
198:10 208:20
plans 216:1
Plantation
211:19
please 208:11
219:13
pleasure 198:20
PM 219:17
PNC 193:16
pockets 207:16
point 195:22
202:8,25
positive 205:17
possible 207:1,2
possibly 193:13
212:4
Powers 204:1
presence 193:23
present 194:12
194:20 196:1
195:14 196:1
president 201:24
202:4
previously
214:20
print 197:6
prior 200:8
202:13
problem 217:19
problem 215:4
process 193:18
205:20,20

**Q**

quicker 208:5

**R**

Rahmdng
33323:3 219:6
ramifications
199:4
RAPPORT
33324:9,9
RATON
33324:15
RD 33324:24
reach 195:16
REACT 208:2
read 196:21
203:2 217:24
217:25 218:3
219:18 222:15
reading 209:13
218:18
Ready 198:6,7
REAL 33324:13
reality 202:20
212:2
really 210:11
recall 191:25
197:18,21
203:23 205:8
207:4 208:10
212:5 215:5,5
215:14 216:24
217:1
receivable
196:11
require 193:21
reserved 218:20
responsibilities
200:5
responsible
193:4
result 193:17
resumed 217:15
region 197:21
review 193:11
193:21 203:19
208:8
rich 210:9

refresh 208:18
regard 210:6
Reif 33323:22
219:23
reiterate 222:10
222:12
relatively 212:21
release 33327:5
33327:6,8
released 193:11
relevant 192:15
remember 191:8
203:24 215:15
215:17
removed 215:8
Rense 33323:3
219:6

**S**

salary 205:18
216:20
Sam 206:18,18
206:22,22
207:5
Samantha
33323:25
219:23 222:5
222:20 223:14
reporting
209:23
reports 203:18
represent
198:10 208:24
representing
218:7
S
save 198:25
saved 210:3
saw 209:10
saying 191:5
says 200:22
203:1
sbernstein@dj...
33325:1
Scruggs 33323:5
198:8 200:12
214:6 218:14
220:3
seal 223:10
Seasons
33324:20
219:4

seats 191:5
search 203:3,6,6
seconds 217:11
security 200:25
201:4
see 191:7 192:14
197:7,11,18
198:3 201:19
204:7 213:17
212:23
seeing 197:9,10
216:6
seen 197:6
select 210:9
selected 209:25
210:1,7
seminars 195:9
210:11,21
sent 218:1,14
208:7 210:18
192:5 198:18
200:21,22
201:19 202:11
203:13 207:7
208:8,9,10,13
208:19 210:8
212:14 213:9
217:4 213:13
213:11
sentence 203:2,3
206:5,6
September
33327:8
33324:8
192:25
served 206:3
services
33323:22
199:24 219:23
Servicing
33323:3
204:10 219:10
Seven 218:12
Sharpie 33327:7
SHEET 221:21
short 217:13
shortly 199:14
215:8

6

Processing
33323:12
199:12,13
200:1 204:9
205:10,14,16
205:21,22,24
206:1,4,14
206:17 210:7
210:22 213:19
211:13 219:10
212:14 213:9
Professional
33323:12
204:11 206:19
206:23 213:5
210:11
Program 208:2
public 200:9,11
215:17 216:16
223:14
purposes 198:2
208:21
pushed 211:6
213:5
really 210:11
197:18 209:23
P.A 33323:11
33326:9
pn 33323:20
218:17

**Q**

Quenna 33323:3
219:6
question 194:5
195:23 196:8
196:13,22
197:16 201:16
200:13 203:12
207:20 209:16
217:20 218:13
217:25 218:3
recollection
197:8,10
recollect 197:23
213:7,8,14
214:3 216:21
204:22 212:4
recordkeeping
219:3,2
records 204:23
reduced 203:14
referral 193:18
203:9,10,14

**R**

Rahmdng
33323:3 219:6
ramifications
199:4
RAPPORT
33324:9,9
RATON
33324:15
RD 33324:24
reach 195:16
REACT 208:2
read 196:21
203:2 217:24
217:25 218:3
219:18 222:15
reading 209:13
218:18
Ready 198:6,7
REAL 33324:13
reality 202:20
212:2
really 210:11
197:18 209:23
recall 191:25
197:18,21
203:23 205:8
207:4 208:10
receivable
196:11
receive 212:6
received 200:8
receiving 205:19
recognize
197:11,12
198:4,12 200:1
202:10 207:10
207:20 209:16
208:2 210:18
213:7,8,14
214:3 216:21
214:3 216:25
receipt 197:25
208:23 222:8
records 204:23
reduced 203:14
referral 193:18
203:9,10,14

refresh 208:18
regard 210:6
Reif 33323:22
219:23
reiterate 222:10
222:12
relatively 212:21
release 33327:5
33327:6,8
released 193:11
relevant 192:15
remember 191:8
203:24 215:15
215:17
removed 215:8
Rense 33323:3
219:6
Reporter
33323:25
217:22,25
218:4,6,9,12
218:16 222:1
reporting
209:23
reports 203:18
represent
198:10 208:24
representing
218:7
require 193:21
reserved 218:20
responsibilities
200:5
responsible
193:4
result 193:17
resumed 217:15
recollection
197:8,10
recollect 197:23
retirement
197:8,10
reviewer 193:11
193:21 203:19
Rhodes 208:2
Rick 199:11
203:9,10,14

right 197:5
201:9 202:24
204:12 206:5
208:11 210:20
robo 193:14
robo-signing
193:2,6,19,25
194:2,6,14,16
robo-signings
192:23,25
194:2,4 203:24
207:18 218:7
role 199:20
205:16
roles 200:4,7
rooms 195:20

**S**

salary 205:18
216:20
Sam 206:18,18
206:22,22
207:5
Samantha
33323:25
219:23 222:5
222:20 223:14
Sammons
194:19,24
195:5,9 199:17
200:19 205:7
206:5,6
save 198:25
saved 210:3
saw 209:10
saying 191:5
says 200:22
203:1
sbernstein@dj...
33325:1
Scruggs 33323:5
198:8 200:12
214:6 218:14
220:3
seal 223:10
Seasons
33324:20
219:4

seats 191:5
search 203:3,6,6
seconds 217:11
security 200:25
201:4
see 191:7 192:14
197:7,11,18
198:3 201:19
204:7 213:17
212:23
seeing 197:9,10
216:6
seen 197:6
select 210:9
selected 209:25
210:1,7
seminars 195:9
210:11,21
sent 218:1,14
208:7 210:18
192:5 198:18
200:21,22
201:19 202:11
203:13 207:7
208:8,9,10,13
208:19 210:8
212:14 213:9
217:4 213:13
213:11
sentence 203:2,3
206:5,6
September
33327:8
33324:8
192:25
served 206:3
services
33323:22
199:24 219:23
Servicing
33323:3
204:10 219:10
Seven 218:12
Sharpie 33327:7
SHEET 221:21
short 217:13
shortly 199:14
215:8

7

show 198:1
208:19
shows 213:11
shutting 216:2
sign 195:14
196:12,20
213:18 219:15
219:18,20
signature 214:17
219:14,20,25
221:25
signatures
195:25
signed 195:3,5
201:9 202:8
214:16 222:17
signer 196:23,24
signing 194:24
195:9 196:10
196:17,21
218:18
similarly
33324:22 219:7
Simmons 208:2
214:15,18
215:16
simply 213:11
SINGERMAN
33323:5
219:22
198:16,19
199:19 200:3
200:22 200:3,
215:12
sit 196:3 197:8
204:7 205:12
situated 33323:4
219:7
six 203:11,15
small 212:21
sole 202:4
soon 216:3,4
sorry 195:6
201:25 203:6
209:16 213:16
215:19 217:17
sort 191:12

**S**

211:5
South 33324:24
211:19 214:13
street 191:22
subject 198:22
substitute
216:12
substituting
216:11
success 216:8
suggested
210:15
SUITE
33323:23
33324:10,15
33324:25
supervised
205:24 206:3,6
206:9
supposed 210:9
sure 191:11,14
197:13 205:19
206:18,25
213:7 214:24
217:9 218:16
218:1 219:3,23
218:7
stay 199:16
211:4,4
stayed 210:25
211:23
Stephen
33324:24
215:6
Stephens 193:7
stepped 215:8
215:10 216:25
Stern 33323:11
33323:11,18
33326:3
33327:7 213:4
219:2,8,9,12
208:2,8 209:8
teams 191:6
Tell 200:21,24
208:25
telling 196:4
208:6
term 193:14

**T**

33324:7
stop 193:24
195:21 216:18
216:3
street 191:22
subject 198:22
substitute
216:12
substituting
216:11
success 216:8
suggested
210:15
SUITE
33323:23
33324:10,15
33324:25
supervised
205:24 206:3,6
206:9
supposed 210:9
sure 191:11,14
197:13 205:19
206:18,25
213:7 214:24
217:9 218:16
takes 198:3
take 198:3
211:10 214:14
216:20 217:9
217:13
talked 192:21
talking 196:23
Tallahassee
208:2,8 209:8
teams 191:6
Tell 200:21,24
208:25
telling 196:4
208:6
term 193:14

terminated
199:13,14
202:17 202:14
205:6,10
207:13 210:7
210:24 216:15
terminating
211:21
termination
191:8 198:22
192:15 222:6
216:21 218:14
214:24
testimony
195:19 222:6,8
Tew 33324:19
33324:19
192:13,17
193:16 195:15
199:13 216:14
200:13 207:20
207:22 208:3
216:21 217:24
tell 218:1,3
text 218:15
Thank 217:17
217:21
Thanks 217:10
thereabout
215:12
things 194:7
think 191:6
197:22 199:8
206:19,22
207:3 211:17
215:13
thinking 206:16
thirty 219:19
thought 211:22
215:16
three 208:25
209:4 213:12
213:23
Three-page
33327:11
thrilled 215:8

Thursday
200:22
time 191:15
192:19 193:15
198:18 199:23
200:21,24
205:2,2 206:15
205:14 206:20
212:22 214:19
214:22 216:25
217:11 218:18
210:14,14
192:6,13,22
213:18 217:16
193:20 203:19
213:20 219:5
times 195:10
200:5,14,20
time 191:15
195:15,23
196:18,23,25
today 191:1
196:3 194:20
194:20 205:3
top 201:19
totally 212:9
Tower 33324:20
217:21
transaction
199:23 207:5
transcript 220:2
transcript 222:8,16
true 222:13
trust 200:18,20
trying 198:25
twice 215:23
two 191:5
195:14 200:2,7
205:13 207:24
208:25 215:6
215:8 216:13
197 33327:10 *
two-page 209:7

**U**

ultimately 207:6
unable 199:5
unbelievable

8

196:11
unbilled 192:4
uncertain
212:22
undersigned
223:6
underrated
204:4 213:14
213:20,23
understanding
194:11 204:7
207:9,11,17
understood
211:22
unforeseen
192:20
unfortunate
199:3
unfortunately
212:1
UNITED
33323:1
unproven 196:3

**V**

v 33323:8 219:7
variety 194:7,7,9
verified 193:20
verify 196:21
violation 207:13
Virgin 33323:10
219:8
volume
33323:16
203:17

**W**

waiting 191:22
walk 212:16,22
212:24,24
219:25
want 207:15
215:15 216:19
218:7,18,9
217:16 208:25
wanted 191:7

WARN 207:13
208:8
wasn't 192:16
196:24 211:12
211:15 213:7
Watson 33327:7
way 196:20
204:14 205:19
213:20,23
week 212:8
weeks 212:6
215:23
WEISSING
33324:5
Welch 33323:22
219:23
wife 191:5
199:11 200:11
207:12 211:12
212:9
we'll 217:24
218:3,3
we're 192:13
197:22 216:11
216:13 217:8,9
203:03 2015
221:25
07:00:09 225:15
133327:5 *
1,000 195:10
196:10
we've 193:15
192:22 216:11
we've 196:10
wheels 193:24
wiping 191:6
witness 33326:3
193:13 222:2
222:9 223:10
word 211:17
work 191:10
193:4,19 211:4
195:5 196:10
worked 204:15
204:17,18
206:19 213:3,3
working 196:11
205:21 216:14
217:20,24
world 207:13
wouldn't 211:3
wrongfully

207:13
**Y**

yeah 202:23
209:18 212:10
218:7,11
years 200:16

**$**

$50 191:17,24

**0**

07:00:09 225:15

**1**

1 33327:5
1,000 195:10
196:10
10:00-CIV-...
33323:9
197:22 216:11
10:30 200:23
201:17
1000 33325:4
1001 195:10
11:30 201:5
123 33324:10
124 33324:10
1441 33324:20
144 219:4
15th 33324:20
145 197:21,23
152 33327:5
153 33327:6
154 197:6
161 33327:5
162 33323:7
181 33327:6
19 220:15 *

**2**

2 33327:6
33327:6
2011 217:2,23 *
2005 211:13,16

2006 211:14,16
2007 211:19
2010 33327:10
197:6 198:11
205:7 208:1
208:7,11
2011 33323:20
219:1,13
222:17 223:1
22nd 203:13
240 33324:15
25 33323:20
2530 33324:14
254,500 219:1
221:25 *
2700 33324:10
291-DEPO
33325:6
27th 33327:5
29 219:1 *

**3**

3 33327:8
209:11
3rd 208:1
30 219:19
305 530 33325:5
320 33324:21
33301 33325:5
33316 33323:24
33323:24
33323:11
33323:24 *
33 214:23
33401 33324:10
33406 33324:15

**4**

4 33327:9 *
98 203:11,16
900 33324:14
900 33324:21 *
33325:1
954 33324:15

400 33324:25
195:9 196:10
425 33324:5
430 33324:10
435 200:24
201:7,16

**5**

5 33327:10
197:22,24
198:2,10
5:00 219:17
5:13 33323:20
218:17
50 215:4
50:30 33324:14
53RD 33324:14
561 995-1490
33324:16

**6**

6 33327:1 *
208:20,22
209:11 212:23
621 33324:14

**7**

7 33324:6
7th 33327:8
75 203:14

**8**

8 33327:5
888 33323:22

**9**

9:00 219:17
90 33324:14
900 33324:21 *
954233-9
33323:2
954234-8100
33325:1
954254-2820
33325:2
954 995-9900
33325:3
954711-7457
33324:15
954-712-2600

9

219:24

**REIF KING WELCH LEGAL SERVICES**
www.reifkingwelch.com    (877) 291-DEPO (3376)