# EXHIBIT N-2

# TO THE DECLARATION OF

# JOHN W. SMITH T

12-12020-mg    Doc 8531-30    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit N-2    Pg 2 of 7

Case 1:11-cv-21349-FAM  Document 132-1  Entered on FLSD Docket 10/22/2012  Page 1 of 21

# EXHIBIT A

Case 1:11-cv-21349-FAM  Document 132-1  Entered on FLSD Docket 10/22/2012  Page 2 of 21

```
                                                              Page 1
 1           UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
 2
             CASE NO:  11-21349-CIV-MORENO
 3
 4  THE LAW OFFICES OF DAVID J. STERN, P.A.,
 5           Plaintiff,
 6  vs.
 7  BANK OF AMERICA CORPORATION, and
    BANK OF AMERICA, N.A.,
 8
             Defendants/Counter-Plaintiffs.
 9  _____/
10  BANK OF AMERICA CORPORATION, and
    BANK OF AMERICA, N.A.,
11
             Third-Party Plaintiffs,
12  vs.
13  DAVID J. STERN, individually,
14           Third-Party Defendant.
    _____/
15
16                   Suite 15th Floor
                     1441 Brickell Avenue
17                   Miami, Florida 33131
                     Thursday, 9:42 a.m.
18                   August 16, 2012
19
20       VIDEOTAPED DEPOSITION OF DAVID STERN
21
22       Taken on behalf of Bank of America before
23  Debbie L. Oates, RPR, Notary Public in and for the
24  State of Florida at Large, pursuant to Amended Notice
25  of Taking Deposition in the above cause.
```

Veritext Florida Reporting Co.
800-726-7007                                       305-376-8800

---

Case 1:11-cv-21349-FAM  Document 132-1  Entered on FLSD Docket 10/22/2012  Page 3 of 21

Page 51

```
 1  them.
 2      Q.  As a result of some of the publicity that
 3  your law firm was receiving and the AG investigation
 4  in September and October 2010, did some of your
 5  clients start pulling back their foreclosure work
 6  with your firm?
 7      A.  Yes, sir.
 8      Q.  During that time period, September or
 9  October of 2010, who were the largest, say, five
10  clients of The Law Offices of David J. Stern?
11      A.  The largest five clients.  Freddie Mac.
12  I'm not giving you the order.  I'm just giving you
13  the five.
14      Q.  That's fine.
15      A.  Freddie Mac, Fannie Mae, Bank of America,
16  Citi, Wells Fargo.
17      Q.  Was Freddie the largest?
18      A.  No, Bank of America was.
19      Q.  And was that in terms of total number of
20  cases or files that you were handling for the bank?
21      A.  Yes, sir.
22      Q.  At some point in time in October of 2010
23  as a result of the Florida AG investigation and the
24  publicity regarding your law firm, did Freddie Mac
25  and Fannie Mae suspend referrals of new cases to your
```

Veritext Florida Reporting Co.
800-726-7007                                       305-376-8800

---

Case 1:11-cv-21349-FAM  Document 132-1  Entered on FLSD Docket 10/22/2012  Page 4 of 21

Page 52

```
 1  firm?
 2      A.  No one at Freddie Mac ever told me why
 3  they were doing it.  I believe I saw a letter from --
 4  I'm not sure if it came from Fannie or Freddie, but
 5  it said as a result of the Attorney General's ongoing
 6  investigation, Fannie -- Freddie suspended the firm
 7  and took their files.
 8      Q.  Was that in the October, early November of
 9  2010 time frame?
10      A.  Yes, sir.
11      Q.  And do you recall representatives of
12  Fannie and Freddie coming to The Law Offices of David
13  J. Stern in the October 2010 time frame to review the
14  status of their cases and files?
15      A.  I recall Fannie bringing an individual in
16  to review the practices of the law firm.  Fannie had
17  been in there months before in an effort to
18  coordinate the movement of a backlog of files from
19  all of its servicers as a result of the government
20  intervention through various loss mitigation
21  requirements that the Obama administration put in.
22          When the AG article came out, the Fannie
23  representative changed her focus from -- her efforts
24  were to assist us in getting things from servicers,
25  to what allegations, if any, in this AG investigation
```

Veritext Florida Reporting Co.
800-726-7007                                       305-376-8800

Page 66

1  A.  My understanding is that the proceeds
2  themselves, the dollars, were assigned to Processing
3  by The Law Offices of David J. Stern.
4  Q.  Now, this agreement references that you
5  conveyed it to assignees which is collectively
6  defined above as both DJS Processing and DAL Group,
7  LLC; is that correct?
8  A.  The proceeds themselves were assigned to
9  those entities, yes, sir.
10  Q.  And the net proceeds are defined in here
11  as all amounts -- essentially all amounts you
12  obtained, proceeds from the collection cases minus
13  attorneys' fees and costs and a consulting fee to you
14  equal to 10 percent of the gross proceeds; is that
15  correct?
16  A.  Yes, sir.
17  Q.  So hypothetically if you recover a million
18  dollars in one of your collection cases, if the law
19  firm collects a million dollars in one of the
20  collection cases, they would net out the fees and
21  costs they've incurred prosecuting the collection
22  action, plus they would net out 10 percent of that
23  gross to you, and the remainder would be the net
24  proceeds going to DJS Processing and DAL Holdings; is
25  that correct?  Or DAL Group.

Veritext Florida Reporting Co.
800-726-7007                                    305-376-8800

Page 72

1  BY MR. BILIK:
2  Q.  So, Mr. Stern, once the lender, BA Note,
3  is paid off, the net proceeds will all be disbursed
4  to DJS Processing, correct?
5  A.  If you look at the Exhibit Number 2, 3.3,
6  Settlement of Collection Cases, I'll point to the
7  last sentence in that particular paragraph which
8  says, "Once the indebtedness has been paid in full to
9  the lender, DJS Processing shall retain the exclusive
10  right to settle any collection case."
11  Q.  Okay.  But with respect to the flow of
12  funds under the assignment and Exhibit 3, once the
13  lender, BA Note, is out of the picture, all of the
14  proceeds from the collection cases, net of Mr. Tew's
15  fees and costs and net your 10 percent consulting
16  fee, the remainder goes to DJS Processing?
17  A.  Yes, sir, it does.
18  Q.  Nothing comes back to the law firm?
19       MR. TEW:  Until that debt is paid.
20  BY MR. BILIK:
21  Q.  Correct.
22  A.  Right.  Nothing goes back to the law firm
23  until the indebtedness of the law firm is paid to
24  DJSP.
25  Q.  The second paragraph of the Assignment,

Veritext Florida Reporting Co.
800-726-7007                                    305-376-8800

Page 95

1  nothing I can do.
2  BY MR. BILIK:
3  Q.  With respect to this friends and family
4  plan that you referred to, you said Citi and SunTrust
5  both availed themselves of that plan?
6  A.  Citi, Wells, SunTrust.  Again, it wasn't a
7  Brad Quick that came down, it was people higher up
8  that I knew that were -- were sympathetic.
9  Q.  And you've -- you've sued both Citi and
10  SunTrust, correct?
11  A.  We have sued Citi and SunTrust, that is
12  correct.
13  Q.  You didn't -- did you sue Wells Fargo?
14  A.  No.  They paid everything, every single
15  penny that was due and owing.
16  Q.  And prior to the termination and prior to
17  this lawsuit, Bank of America and its predecessors
18  had paid your law firm millions of dollars; is that
19  fair?
20  A.  Sure.  Yes.  And we provided millions of
21  dollars worth of legal services.
22  Q.  In the 2010 time period -- well, strike
23  that.
24       At the time Mr. Quick showed up at the law
25  firm's offices in November 2010, had Citibank, Wells

Veritext Florida Reporting Co.
800-726-7007                                    305-376-8800

Page 184

1  concluded, from your perspective?
2  A.  A year ago.  It's been a long time.
3  Q.  Sometime in 2011?
4  A.  I believe so, yes, sir.
5  Q.  At the time that Bank of America
6  terminated The Law Offices of David J. Stern, the
7  Florida Attorney General investigation was ongoing,
8  correct?
9  A.  Yes, sir.
10  Q.  Did Fannie Mae or Freddie Mac or any of
11  your other clients give you a reason for why they
12  were pulling the files and terminating their
13  relationship with your law firm?
14  A.  My understanding from the discovery was
15  attributed to the attorney general investigation.
16  Q.  Did Fannie and Freddie also come in and --
17  and -- we talked about this a little bit.  I thought
18  they came in and audited or reviewed your files in
19  October 2010 before they actually pulled the files?
20  A.  Yes, sir.
21  Q.  And were there findings from their
22  inspection or audit that they informed you gave them
23  reason for concern and caused them to pull the files?
24  A.  Nothing that they shared with me.
25  Q.  With respect to the Mother Jones article

Veritext Florida Reporting Co.
800-726-7007                                    305-376-8800

Page 186

1  terms of their foreclosure practices?
2     A.    Yes, sir.
3     Q.    And that's -- this press release is
4  Exhibit 12, this -- when we've been referring to the
5  Florida Attorney General investigation today, is that
6  what you're referring to, this -- what this press
7  release announced?
8     A.    Yes, sir.
9     Q.    Was there ever a finding or conclusion in
10 the Florida AG's investigation that you had not
11 engaged in wrongdoing or was there a determination
12 that the AG's office lacked jurisdiction?
13    A.    There was a determination that the
14 attorney general's office lacked jurisdiction and
15 caused an unauthorized -- without authority
16 investigation to be made.
17    Q.    I'll mark as Exhibit 13 to your
18 deposition, Mr. Stern, a letter to Michael Williams,
19 the president and chief executive of Fannie Mae,
20 dated September 24th, 2010.
21          Ask you if you've seen that letter before.
22          (Thereupon, Deposition Exhibit 13 was
23 marked for identification.)
24          THE WITNESS:  I have not seen this letter
25 before.

Veritext Florida Reporting Co.
800-726-7007                                    305-376-8800

Page 197

1  provide The Law Offices of David Stern with a scanned
2  copy of the loan paper files that Bank of America was
3  removing from your offices.
4     A.    It does.
5     Q.    And does that refresh your recollection
6  that that was -- was done at your request or your
7  lawyer's request?
8     A.    It does.
9     Q.    Thank you.
10          Were you --
11          MR. TEW:  Go ahead.
12 BY MR. BILIK:
13    Q.    Were you involved, Mr. Stern, in the back
14 and forth in sort of the November/December 2010 time
15 frame with the exchange of information and a
16 spreadsheet that was prepared of all activity that
17 was coming up on any Bank of America files between
18 November and the end of December 2010?
19    A.    As I testified earlier this morning, I
20 believe we went above and beyond to assist with a
21 smooth transition of the files despite, you know,
22 give us 20 -- I see it's 18.  I think it's 20.  I see
23 28.  Whatever the number of files are.  My testimony
24 was that we assisted them, we created a portal, we
25 gave them spreadsheet of upcoming events, we

Veritext Florida Reporting Co.
800-726-7007                                    305-376-8800

Page 198

1  continued to notify Mr. Crenshaw of anything that we
2  learned of relative to the -- the files.
3     Q.    When -- this portal that you've referenced
4  several times today, when was that completed and
5  operational?
6     A.    That would have been completed within a
7  week or two after our termination.
8     Q.    So sometime in mid to late November 2010.
9           What would -- tell me what the
10 functionality was of the portal that you contend your
11 law firm --
12    A.    When we received --
13    Q.    -- put in place.
14    A.    -- mail relative to a file, it would be
15 uploaded into the portal and sent over to
16 Mr. Crenshaw.
17    Q.    So he would have access electronically to
18 the mail and incoming activity on the cases?
19    A.    They came and took the files, they told us
20 not to work them.  They had not substituted in as
21 counsel at that point in time.  They didn't have
22 time.
23          And we wanted to make certain that we
24 continued to keep them apprised of any pleadings that
25 we got.  So there was pleadings sent over

Veritext Florida Reporting Co.
800-726-7007                                    305-376-8800

Page 200

1     Q.    Do you recall in the early December time
2  frame there being concerns raised by Bank of
3  America's counsel that there were foreclosure sales
4  that had not been identified on the spreadsheet
5  provided by the Stern firm?
6     A.    I don't recall.
7     Q.    You don't have any recollection of there
8  being issues with an incomplete spreadsheet being
9  provided where activity was occurring in cases where
10 Akerman and Bank of America had not been advised?
11    A.    I do not -- do not recall.
12          What I do recall is they came in, they
13 took the files, and they left us pretty much
14 inoperative.
15          So I'm not aware of -- I'm aware of
16 spreadsheets going over.  I'm not aware of
17 deficiencies in those spreadsheets.  Again, Michelle
18 was the -- the liaison.
19          I certainly am aware of Bill's comment on
20 11/24, "Unfortunately the process is taking longer
21 than anticipated."
22    Q.    To scan the files?
23    A.    Scan the files and to substitute in.
24    Q.    Well, the -- the e-mail that Mr. Crenshaw
25 is responding to that you're quoting is in response

Veritext Florida Reporting Co.
800-726-7007                                    305-376-8800

Page 218

1  of the year. She was kind enough that -- she was
2  not, by any means, terminated. She knew that -- she
3  asked me what my plans were, and I told her, "I'm
4  done," so she moved on.
5       Q.   Was Ms. Mendieta terminated in connection
6  with her performance as an attorney manager for the
7  law firm?
8       A.   Yes, sir.
9       Q.   And what was the nature or the reason for
10 the termination?
11      A.   Her inability to manage the expert
12 attorneys properly and to insure that her attorneys
13 would adhere to the notary guidelines and the
14 attorneys signing things outside of the presence of
15 the notary.
16           MR. TEW:  You talking about the expert
17      attorney?
18           THE WITNESS:  I'm talking about the
19      expert attorneys, yeah.
20           MR. TEW:  Okay.
21 BY MR. BILIK:
22      Q.   And when you say "expert attorneys," what
23 are you referring to?
24      A.   There is an affidavit that is utilized as
25 to the reasonableness of attorney's fees and some of

Page 219

1  the experts, as I learned, were not complying with
2  the notary requirements, as dictated by the statute.
3           Miriam had told me that there was a
4  process in place for the experts to utilize. And I
5  found out that that process had been put into place
6  about a month earlier as opposed to the process that
7  was in place at the time I controlled that area and
8  that -- that went back to 2003, 2004.
9           And I asked her if there were any issues,
10 and she told me there wasn't.
11          And then I had learned through an
12 independent investigation conducted by Greenberg
13 Traurig, at the request of the public company's audit
14 company, that several or a couple at least of the
15 expert attorneys were not doing things properly. So
16 I confronted Miriam with it and I told her to leave.
17      Q.   So Greenberg Traurig performed an
18 independent audit at -- on behalf of DJSP
19 Enterprises, Inc.?
20      A.   Yes, sir.
21      Q.   Was that audit limited to issues related
22 to notaries or was there a broader purpose?
23      A.   Broader purpose.
24      Q.   What was the broader purpose?
25      A.   I don't have the full scope of it because

Page 220

1  it was something done by the audit committee. I was
2  just given the findings that they wanted to disclose
3  to me. There was not a written report; therefore,
4  the issues that were brought to my attention involved
5  the expert affidavit defects.
6       Q.   Was that prompted by the Florida Attorney
7  General's investigation or another -- do you know
8  what prompted the audit performed by Greenberg
9  Traurig?
10      A.   I believe it was prompted by the AG
11 investigation and the allegations in the deposition
12 of Tammie Kapusta.
13      Q.   Did you advise Bank of America or any of
14 your other bank clients of the results of the audit?
15      A.   Yes. I did.
16      Q.   In what manner did you advise them?
17      A.   Well, remember the audit -- all that
18 happened as clients were pulling files. So it was
19 too late. I mean when clients came in to review or
20 talk, I told them everything that I knew.
21          And my agreement with Fannie Mae was
22 anything that I learned or anything that I, A, know
23 of I would disclose to them.
24          And, of course, anything that I knew of
25 would have been information that when it was brought

Page 228

1  Exhibit 1, it's the topics of inquiry. Look at topic
2  10 at the bottom of the page and it continues onto
3  the next page.
4       A.   Okay.
5       Q.   And the question I have for you,
6  Mr. Stern, is whether as the head of the law firm it
7  would have been brought to your attention if
8  sanctions were awarded or entered against Bank of
9  America or one of your other bank clients as a result
10 of your law firm doing or not doing something?
11          MR. TEW:  Can we have a time frame?
12 BY MR. BILIK:
13      Q.   2010. Before the termination.
14      A.   It would absolutely 100 percent be -- my
15 requirement has always been my requirement -- that if
16 there is sanction, award of attorney's fees, default
17 entered that shouldn't be entered, case is dismissed,
18 that that be brought to my attention immediately so I
19 can reach out to the client so they hear it from me
20 and they not find out from one of my associates or by
21 a letter. That was kind of our forte.
22          And certainly with the volume we handled
23 there were mistakes made. When you look at the
24 number of files versus the mistakes, the mistakes
25 were -- were less than 1 percent. And clients are

Page 242

1  out. Really wasn't worried about it because I had
2  felt that we had not done anything wrong.
3           I did have a conversation with Bonnie
4  Dunn, vendor manager, about the attorney general
5  investigation, and I told her that my position was
6  that it was unfounded, we were cooperating with them
7  and that if anything came out of it, that I would let
8  her know.
9           And I had that conversation with many of
10 my -- with all of my large clients and some of the
11 smaller clients. I wanted them to hear it from me
12 because that's just the way I always did business.
13      Q.   Well, except with respect to the Greenberg
14 Traurig investigation and audit findings, you didn't
15 think it was the way you should do business with Bank
16 of America?
17      A.   I didn't have time, as I previously
18 testified. I never said I didn't think I didn't -- I
19 didn't think that I shouldn't tell them. I had
20 previously testified, and will continue to testify,
21 that I did not have an opportunity to disclose that
22 to them, and by the time I had the opportunity, it
23 didn't make any difference.
24      Q.   And I understand your testimony,
25 Mr. Stern, that it was your belief that the Florida

Page 248

1  BY MR. BILIK:
2       Q.   How many clients had terminated your law
3  firm as of November 10th?
4       A.   I -- I'm not sure of the exact date but
5  certainly by the end of November 75 percent of the
6  clients had terminated us.
7       Q.   At some point in time, you made the
8  decision, based on the terminations resulting from or
9  as an outflow from the Florida AG investigation, that
10 you were not going to be able to continue providing
11 foreclosure services?
12      A.   No, sir. I made the decision that I did
13 not want to provide foreclosure services. I believe
14 my previous testimony was I really thought Bank of
15 America was going to hang in there with us. They
16 understood because they had the issue with
17 affidavits.
18           Had Bank of America not pulled, and said,
19 "David, keep the work," I would probably be at the
20 office right now working their files.
21      Q.   Which -- which of your clients wanted you
22 to continue providing legal services as of
23 December 1st, 2010?
24      A.   I don't recall.
25      Q.   You said there were 25 percent of your

Page 259

1  BY MR. BILIK:
2       Q.   Second sentence.
3       A.   Okay. The indemnification provisions in
4  this agreement shall survive.
5            Yes, sir.
6       Q.   And then it does go on -- this is where
7  you were reading ahead. In the event of termination,
8  the firm -- that would be your law firm -- will
9  forward to Countrywide as soon as possible, and not
10 later than five days of receipt of such notice, a
11 current and updated status report on each loan
12 together with substitutions of counsel for all active
13 handle -- or all active files being handled by the
14 firm.
15           And with respect to the termination in
16 November 2010, that did not occur?
17      A.   My understanding is that reports did go
18 out. My understanding is that Norman set up a portal
19 which kept Mr. Crenshaw updated of pleadings that
20 came through. That was my previous testimony.
21      Q.   Okay. Is it your testimony that this --
22 this report or list and portal were set up within
23 five business days of the termination?
24      A.   I don't know when the status was done.
25 And I'm not certain if Norman got it done within five

Page 260

1  days or if it took ten days.
2       Q.   You don't know when -- you don't know when
3  it was completed?
4       A.   No, sir, I don't.
5       Q.   But it's your testimony that you believe
6  that a portal was actually completed that Bank of
7  America could access electronically?
8       A.   I know for a fact that the portal was
9  established and that the documents were transmitted
10 to Mr. Crenshaw through that portal. I know that for
11 a fact. I also know for a fact that we provided
12 reports to Mr. Crenshaw.
13      Q.   Were those reports and that information
14 provided through BAC Connect, the existing Bank of
15 America system for communications with outside
16 foreclosure counsel?
17      A.   They were provided to Mr. Crenshaw
18 electronically.
19      Q.   Okay. My question was: Was that provided
20 through BAC Connect, which is an existing system that
21 the bank had in place for communicating with its
22 outside law firms?
23      A.   No, we'd been --
24           MR. TEW:  You mean after termination?
25

12-12020-mg    Doc 8531-30    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit N-2    Pg 7 of 7

Case 1:11-cv-21349-FAM   Document 132-1   Entered on FLSD Docket 10/22/2012   Page 21 of 21

```
                                                        Page 279
 1   of America promissory notes?
 2        A.   Well, if we look at Exhibit 17, it
 3   concerns that -- it confirms that my client, meaning
 4   me, would turn over to BA all files.  Let's see, I've
 5   reviewed the agreement and consulted with my client.
 6   This will confirm that my client intends to turn over
 7   the BA files as soon as possible and not withhold
 8   them.
 9             Are we talking files or are we talking
10   original notes?
11        Q.   Mr. Stern, you're aware that when the Bank
12   of America representatives and the Akerman lawyers
13   were all on site in your offices in November 2010,
14   they were collecting, packaging up, and carrying away
15   original notes?
16        A.   I thought they were.  That was my
17   testimony.  So, yeah, I thought they were.  And as I
18   read this document request, I'm asking myself what I
19   thought was that incorrect or is this incorrect.  So
20   I obviously have testified that I believe they got
21   everything.  I think there's enough e-mail here that
22   clearly got -- they got the files because it was
23   taking them longer than anticipated to get them
24   copied.  I believe that they got everything, notes
25   and files.  So I am questioning my recollection of
```