# EXHIBIT Q

# TO THE DECLARATION OF

# JOHN W. SMITH T

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No.: 11-60623-CIV-SEITZ/SIMONTON**

THE LAW OFFICES OF DAVID J.
STERN, P.A.,

                                    **DEFENDANT/COUNTER-
PLAINTIFF DEMANDS
TRIAL BY JURY**

        Plaintiff/Counter-Defendant,

           vs.

FEDERAL HOME LOAN MORTGAGE CORP.,

        Defendant/Counter-Plaintiff,

------------------------------------------------------------------/

**FEDERAL HOME LOAN MORTGAGE CORPORATION'S
ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED
COMPLAINT AND DEFENDANT/COUNTER PLAINTIFF'S COUNTERCLAIM**

        Defendant, Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its

undersigned attorneys, files its Answer, Affirmative Defenses, and Counterclaim to the

Amended Complaint docketed by Plaintiff The Law Offices of David J. Stern, P.A. ("the

Stern law firm"), on March 21, 2012 at docket entry no. 62 (the "Amended Complaint"),

and Freddie Mac hereby states the following:

<u>**Jurisdiction and Venue**</u>

        1.      Paragraph 1 of the Amended Complaint states a legal conclusion to which

no response is required, but to the extent a response may be required, Freddie Mac admits

that this Court has jurisdiction over the controversy pursuant to 12 U.S.C. § 1452(f).

        2.      Freddie Mac admits the allegations contained in paragraph 2 of the

Amended Complaint.

                                          1

3.      Freddie Mac admits the allegations contained in paragraph 3 of the Amended Complaint.

4.      Paragraph 4 of the Amended Complaint states a legal conclusion to which no response is required, but to the extent a response may be required, Freddie Mac admits that venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

5.      Paragraph 6 of the Amended Complaint states a legal conclusion to which no response is required, but to the extent a response may be required, Freddie Mac denies the allegations contained in paragraph 5.

## Count I. Breach of Contract

6.      With respect to the allegations contained in paragraph 6 of the Amended Complaint, Freddie Mac realleges paragraphs 1 through 5 of this Answer as though set forth at length herein.

7.      Freddie Mac admits the allegations contained in paragraph 7 of the Amended Complaint, except respectfully refers the Court to the contract that is attached as Exhibit A to the original Complaint, which speaks for itself.

8.      Freddie Mac denies the allegations contained in paragraph 8 of the Amended Complaint.

9.      Freddie Mac denies the allegations contained in paragraph 9 of the Amended Complaint.

## Count II Open Account

10.      With respect to the allegations contained in paragraph 10 of the Amended Complaint, Freddie Mac realleges paragraphs 1 through 9 of this Answer as though set forth at length herein.

11.    Freddie Mac denies the allegations contained in paragraph 11 of the Amended Complaint.

## AFFIRMATIVE DEFENSES

### First Defense

15.    The Stern law firm is not entitled to recover on its open account claim as the open items identified concern services allegedly provided to Freddie Mac directly and services allegedly provided to certain financial institutions that serviced loans owned by Freddie Mac (the "Freddie Mac Servicers"), that are subject to and governed by express terms and conditions contained in written contracts between Freddie Mac and the Stern law firm and/or between each of the Freddie Mac Servicers and the Stern law firm. Those written contracts are the subject of the Stern law firm's own breach of contract claim asserted against Freddie Mac in this action and the Stern law firm's breach of contract claim asserted against each of the Freddie Mac Servicers in numerous other federal and state court actions commenced by the Stern law firm.

### Second Defense

16.    Insofar as the Stern law firm's open account claim is an equitable claim, the Stern law firm is barred from recovery based on the doctrine of unclean hands due to the Stern law firm's unconscionable conduct related to the services for which it seeks recovery. This defense is based on the Stern law firm's unconscionable conduct as described in factual allegations and legal claims contained in Freddie Mac's Counterclaim against the Stern law firm and Freddie Mac anticipates developing additional facts during the course of discovery and/or through further investigation.

### Third Defense

15.    If and to the extent that the Stern law firm is otherwise entitled to any recovery on its claims, which Freddie Mac denies, Freddie Mac is entitled to a set-off with respect to any and all transactions between the Stern law firm and Freddie Mac that are extrinsic to the transactions that are the subject of the Stern law firm's claims against Freddie Mac in its Amended Complaint. Freddie Mac's right to a set-off regarding any such extrinsic transactions is based on factual allegations and legal claims contained in Freddie Mac's Counterclaim against the Stern law firm and Freddie Mac anticipates developing additional facts during the course of discovery and/or through further investigation.

### Fourth Defense

16.    If and to the extent that the Stern law firm is otherwise entitled to any recovery on its claims, which Freddie Mac denies, Freddie Mac is entitled to a right of recoupment with respect to any and all transactions that arise out of the same transactions that are the subject of the Stern law firm's claims against Freddie Mac in its Amended Complaint. The right of recoupment is based on factual allegations and legal claims contained in Freddie Mac's Counterclaim against the Stern law firm and Freddie Mac anticipates developing additional facts during the course of discovery and/or through further investigation.

### Fifth Defense

17.    If and to the extent that the Stern law firm is otherwise entitled to any recovery on its claims, which Freddie Mac denies, the Stern law firm's recovery should be barred based on public policy grounds. This defense is based on factual allegations

contained in Freddie Mac's Counterclaim against the Stern law firm as well additional facts Freddie Mac anticipates developing during the course of discovery and/or through further investigation.

### Sixth Defense

18.    The Stern law firm's claims are barred to the extent that its damages were caused, in whole or in part, by the Stern law firm's own breach of the contract or contracts upon which it bases its breach of contract claim in the Amended Complaint against Freddie Mac. This defense is supported by factual allegations contained in Freddie Mac's Counterclaim against the Stern law firm, which show the Stern firm's own breach of its contract with Freddie Mac, and Freddie Mac anticipates developing additional facts during the course of discovery and/or through further investigation.

### Seventh Defense

20.    Freddie Mac respectfully reserves the right to raise such other and additional affirmative defenses as may be appropriate upon further investigation and discovery in this matter.

### COUNTERCLAIM BY FREDDIE MAC

For its Counterclaim against Plaintiff/Counter-Defendant, Defendant/Counter-Plaintiff Freddie Mac, by its attorneys, hereby states the following:

1.    Defendant/Counter-Plaintiff Freddie Mac asserts this Counterclaim for compensatory damages, including pre- and post-judgment interest, to redress the breach of contract and wrongful acts and omissions committed by Plaintiff/Counter-Defendant, The Law Offices of David J. Stern, P.A. The Plaintiff/Counter-Defendant law firm was retained by and on behalf of Freddie Mac to provide "high quality" legal services that are

532419

"always in the best interests of Freddie Mac" in a manner that would "strictly avoid any conflicts or apparent conflicts of interest with Freddie Mac" with respect to tens of thousands of Freddie Mac mortgage loans in default and warranting or necessitating proceedings in foreclosure. The Plaintiff/Counter-Defendant law firm instead provided legal services to and/or on behalf of Freddie Mac that fell below the minimum standard of professional care owing to Freddie Mac, resulting in substantial damage to Freddie Mac.

2.  The Court has original jurisdiction over Defendant's Counterclaim pursuant to 12 U.S.C. § 1452(c) and 28 U.S.C. § 1331.

### Background and Freddie Mac's Attorney-Client Relationship with the Stern Law Firm

3.  Defendant/Counter-Plaintiff Freddie Mac is a corporate instrumentality of the United States of America pursuant to the Federal Home Loan Mortgage Corporation Act, Title III of the Emergency Home Finance Act of 1970, 12 U.S.C. §§ 1451-1459 and has its principal place of business in McLean, Virginia. Freddie Mac was placed in conservatorship under the Federal Housing Finance Agency on September 8, 2008, pursuant to 12 U.S.C. § 4617(a).

4.  Freddie Mac was created by Congress in 1970 to develop a secondary mortgage market for conventional residential loans. To achieve this congressionally mandated purpose, Freddie Mac, in relevant part, has been engaged in the business of purchasing conventional mortgage loans (the "Freddie Mac mortgage loans"), from mortgage sellers who have been approved by Freddie Mac.

5.  At all relevant times, Freddie Mac mortgage loans have been serviced by mortgage servicers that are approved by Freddie Mac (hereinafter, "Servicer" or

"Servicers"). The servicing of these Freddie Mac mortgage loans are performed pursuant to the terms and conditions contained in certain purchase documents consisting of in relevant part, a purchase contact, Freddie Mac's Single-Family Seller/Servicer Guide (the "Guide") and Guide Bulletins that are periodically issued by Freddie Mac to its Sellers and Servicers which supplement the agreement of the parties.

6.    At all relevant times, Plaintiff/Counter-Defendant The Law Offices of David J. Stern, P.A. (the "Stern law firm" or the "law firm") has been a professional association formed under the laws of the State of Florida, consisting of one or more persons licensed to practice law in the State and maintaining its principal place of business at 900 S. Pine Island Road, Plantation, Florida 33324.

7.    At all relevant times, the Stern law firm specialized in handling residential mortgage foreclosures, bankruptcy, evictions, the sale of real estate owned ("REO") properties by foreclosing lenders, and foreclosure-related complex litigation *inter alia,* in the State of Florida.

8.    At all relevant times, David J. Stern ("Stern") has been an attorney duly licensed to practice law in the State of Florida and the principal or owner of the Stern law firm.

9.    In or about 1997, Freddie Mac established in Florida a Designated Counsel Program (the "Program") and, following a competitive selection process, retained a number of Florida law firms for the Program.

10.    The Stern law firm was selected as a Program firm and executed a Freddie Mac Retention Agreement with Freddie Mac, which was amended and modified from time-to-time through 2007. Each Retention Agreement executed, amended, and/or

modified by and between Freddie Mae and the Stern law firm was signed, on behalf of the Stern law firm, by Stern.

11.    At all relevant times, when there was a default under a Freddie Mac mortgage loan necessitating or warranting commencement of a foreclosure proceeding to recover mortgaged property located in the State of Florida, as required by the Guide, Servicers could choose to select legal counsel to provide legal representation in the foreclosure proceeding by drawing from the list of attorneys participating in Freddie Mac's Program.

12.    At all relevant times, fees, costs, and disbursements charged by Program participants providing legal representation pursuant to a Freddie Mac Retention Agreement with respect to Freddie Mac mortgage loans were submitted to and paid, in the first instance, by the Servicers. At the conclusion of the foreclosure proceedings, the law firm would submit an invoice to the Servicer and a Form 104DC to both Freddie Mac and the Servicer, at which time Freddie Mac would reimburse the Servicer for said costs. In each Form 104DC, the law firm set forth the legal counsel's fees and charges for its legal services and certified that the information contained in the 104DC was true to the best of the law firm preparer's knowledge and belief.

13.    On or about April 4, 2007, Freddie Mac and the Stern law firm, acting through Stern, as owner or principal of the Stern law firm, entered into an amended and revised Retention Agreement under which the Stern law firm continued to be retained to participate in the Florida Designated Counsel Program of Freddie Mac (the "Stern Retention Agreement"). A true copy of the Stern Retention Agreement as executed on or about April 4, 2007 by Stern, acting on behalf of the Stern law firm, together with a cost

limitations modification agreed to in or about August 2007 and a supplemental agreement entered into on or about December 3, 2008, are attached hereto collectively as Exhibit A.

14.    The Stern Retention Agreement set forth the parties' understanding, set forth in the provision identified as "1. General Provisions," that, among other things, Freddie Mac expected the Stern law firm to be "high quality," that the Stern law firm would "conduct itself so that the services rendered on Program Loans" are "always in the best interests of Freddie Mac," and that the Stern law firm would "strictly avoid any conflicts or apparent conflicts of interest with Freddie Mac."

15.    The Stern Retention Agreement specified in the provision identified as "1. General Provisions" that it would be working with the Servicers but that the Stern law firm would have its "primary client relationship . . . with and obligation . . . to Freddie Mac." The Stern Retention Agreement specified in the provision identified as "3. Freddie Mac/Servicer/Designated Counsel Attorney-Client Relationship" that an "attorney-client relationship exists between Designated Counsel [the Stern law firm], Freddie Mac and its Servicers." The Stern Retention Agreement specified in the provision identified as "4. Contacts" that Freddie Mac expect[ed] you [the Stern law firm] to provide a high level of client service to [Freddie Mac's] Servicers."

16.    During the period from in or about April 2007, when the Stern Retention Agreement was executed, until in or about November 2010, the Stern law firm performed legal work on behalf of Freddie Mac and the Servicers pursuant to the terms and conditions of the Stern Retention Agreement regarding foreclosure and related proceedings involving tens of thousands of Freddie Mac mortgaged properties located in the State of Florida, including evictions and REO closings. At relevant times, non-legal

support services for this legal work was performed by one or more separately incorporated entities in which David Stern held a substantial interest and/or over which David Stern maintained substantial control.

17.    During the period January 2009 until in or about October 2010, Freddie Mac, through its Servicers, paid the Stern law firm more than $6.6 million in judicial foreclosure fees alone, as well as substantial additional fees for legal services regarding Freddie Mac's REO properties.

### Disclosures Regarding Practices of the Stern Law Firm That Were Improper, Unprofessional and Failed to Meet Minimum Standards of Care

18.    On or about August 4, 2010, Mother Jones, a non-profit news organization that styles itself as specializing in investigative, political and social justice reporting, published an article written by Andy Kroll entitled "Fannie and Freddie's Foreclosure Barons." The Mother Jones article was highly critical of the Stern law firm's practices in handling mortgage foreclosures in Florida and reported on allegations that the Stern law firm was backdating assignment of mortgage documents in foreclosure cases and allegedly "lying to the court."

19.    The Mother Jones article quoted a written ruling by a Pasco County judge, who, "upon discovering that [the Stern law] firm had fudged an assignment of mortgage in a case before her court. . . dismissed the case with prejudice" in March 2010, stating in her written ruling that '"[t]he execution date and notorial date" on the document "were fraudulently backdated, in a purposeful, intentional effort to mislead the defendant and this court."

20.     The Mother Jones article described a deposition under oath, taken by a foreclosure defense firm on May 20, 2009 of Cheryl Samons, whom the article described as the Stern law firm's "top deputy." According to the article, Ms. Samons was allegedly confronted during this deposition with a number of "backdated documents," which "looked like a pattern," but which the witness allegedly described as "just a mistake."

21.     Since in or about 1994, Cheryl Samons has been employed by the Stern law firm as operations manager, reporting directly to Stern. Ms. Samons has also served as operations manager during relevant periods for the Stern law firm's processing division and/or for DJS Processing, LLC, a corporate entity created by the Stern law firm, and/or Stern to provide non-legal services required to process foreclosure files and ancillary services for the Stern law firm.

22.     On or about August 10, 2010, following the Mother Jones article, Florida Attorney General, Bill McCollum, announced that his office had launched an investigation into allegations of unfair and deceptive actions by the Stern law firm regarding its handling of foreclosure cases in the State of Florida. This investigation is believed to be still pending.

23.     On or about September 4, 2010, the New York Times published a comprehensive article on the unprecedented number of home mortgage delinquencies and foreclosures being handled in the State of Florida. It reported that according to "analysts and lawyers involved in the process," some law firms representing banks were engaged in "questionable practices" and specifically referenced the Stern law firm and the fact that it was being investigated by the Florida Attorney General.

24.    The New York Times article cited accusations by "critics" that the Stern law firm lawyers were "very aggressive about pushing cases through the courts even when there are questions about the documentation."

25.    Public reports emerged during this same time frame of additional deposition testimony that had been elicited from current or former employees of the Stern law firm, witnesses that were questioned under oath by foreclosure defense attorneys or by the Florida Attorney General's office as part of its investigation. This deposition testimony raised additional concerns about the foreclosure-related practices engaged in by the Stern law firm.

26.    Transcripts became publicly-available of the deposition testimony taken under oath of certain present or former employees of the Stern law firm, specifically: witness Cheryl Samons, who was deposed again on April 29, 2010; witness Tammie Lou Kapusta, deposed on September 22, 2010; and witness Kelly Scott, deposed on October 4, 2010. In these depositions, the witnesses described foreclosure-related practices by Stern and/or the Stern law firm, which, as described, involved acts of professional malpractice and/or breaches of professional duties owed by attorneys subject to the Rules for Professional Conduct for Florida Lawyers.

27.    The sworn deposition testimony of these witnesses contained accusations against the Stern law firm and/or Stern that included, among other accusations, the following:

(i) Causing and/or permitting the Stern law firm's employees to execute, witness and/or notarize assignments of mortgage that were back-dated;

(ii) Causing and/or permitting the Stern law firm's employees to witness and/or notarize assignments of mortgages, affidavits of indebtedness, and/or other affidavits on a daily basis prior to and without actually witnessing execution of

the document by the person whose signature was to be witnessed and/or notarized;

(iii) Causing and/or permitting the Stern law firm's employees to prepare and execute affidavits of indebtedness for submission to the foreclosure court that failed to follow appropriate professional practices and procedures;

(iv) Causing and/or permitting the Stern law firm's employees to sign the name of another person on foreclosure-related documents without any indication of that fact on the documents; and

(v) Charging Freddie Mac, through its Servicers, substantial fees and costs for legal services that the Stern law firm knew or should have known were not in accordance with the terms and conditions of the Stern Retention Agreement and fell below the minimum standard of professional care owed by the Stern law firm to Freddie Mac and its Servicers.

## Freddie Mac's Response to Disclosures About the Stern Law Firm's Practices

28.    In early August 2010, after becoming aware of the August 4, 2010 Mother Jones article, Freddie Mac communicated with the Stern law firm about the article's accusations. On August 10, 2010, Stern represented to Freddie Mac that the allegations of "back-dated documents" described in the Mother Jones article were the result of an inadvertent one-time error made by a single notary employed by the law firm, who neglected to timely notarize 21 assignments of mortgage after personally witnessing them being signed.  Stern assured Freddie Mac that the practice that led to this one-time error by the law firm employee had not been repeated again.

29.    When the Florida Attorney General's office opened its investigation into the practices of the Stern law firm on or about August 10, 2010, and served a subpoena on the law firm for production of documents, Stern and Forrest McSurdy, general counsel for the Stern law firm, communicated with Freddie Mac, indicating that they were "fully cooperating" and, Stern, again denied any wrongdoing.

30.    On or about October 7, 2010, Freddie Mac became aware of the deposition testimony of former Stern law firm employee Tammie Lou Kapusta, and Freddie Mac spoke with Stern on or about October 8, 2010 about the Kapusta deposition and related matters.

31.    Stern told Freddie Mac on or about October 8, 2010, that Ms. Kapusta's allegations concerning the law firm's misconduct or improprieties were fabrications being made by a disgruntled former employee of the Stern law firm.

32.    Also on or about October 8, 2010, Freddie Mac, in light of the on-going investigations by the Florida Attorney General, as well as other events and information, instructed Stern that, effective immediately, the Stern law firm was, among other things, to "take no further action to prosecute any foreclosure or bankruptcy cases" relative to Freddie Mac's files.

33.    On or about Friday, October 15, 2010, Freddie Mac notified the Stern law firm of its intent to conduct an on-site review of Freddie Mac files maintained by the law firm (the "On-Site Review"). A team of Freddie Mac representatives arrived at the Stern law firm on or about Monday, October 18, 2010 to begin the On-Site Review and the On-Site Review continued thereafter until the end of the month.

34.    Freddie Mac's On-Site Review included, without limit, a review of mortgage loan files randomly selected by Freddie Mac, interviews with Stern and other individuals employed by or representing the Stern law firm, the review of certain practices and procedures of the Stern law firm, and observations of the Stern law firm operations.

35.    Because of the Stern law firm's scope and size, Freddie Mac was assisted in its On-Site Review by the U.S. audit, tax and advisory services firm of KPMG, LLP.

36.    On or about October 18, 2010 through October 20, 2010, in various meetings, Stern and the Stern law firm's representatives, including Cheryl Samons, insisted to Freddie Mac's representatives that allegations concerning law firm misconduct or improprieties were attributable to fabrications by disgruntled former employees of the law firm.

37.    On or about October 20, 2010, however, Stern admitted to Freddie Mac's representatives that allegations made by others about the law firm's improper procedures were true and stated that he "may have to make a very large donation."

38.    Freddie Mac's representatives met again with Stern on or about Friday, October 28, 2010.  By this time, Stern was admitting to Freddie Mac's representatives that all of the allegations made by others against the Stern law firm were true, although Stern denied having had any prior personal knowledge of the improprieties alleged.

39.    On Monday, November 1, 2010, Freddie Mac hand-delivered to the Stern law firm a letter terminating the Stern Retention Agreement effective 6:30 p.m. that evening, as a result of which the law firm was no longer part of Freddie Mac's Florida Designated Counsel Program (the "Termination Letter").  A true copy of the Termination Letter is attached hereto as Exhibit B.

40.    Freddie Mac's termination was for cause based upon many factors, including the admissions made by, among others, Stern and other employees and/or representatives of the Stern law firm, Freddie Mac's On-Site Review of the Stern law firm, the ongoing investigation by the Florida Attorney General into the law firms'

532419                                           15

practices, and the publicized reports and deposition testimony about Stern and the Stern law firm's unprofessional practices.

41.     Beginning November 1, 2010 and continuing until November 3, 2010, Freddie Mac pulled and recovered from the Stern law firm approximately 22,512 Freddie Mac mortgage loan foreclosure files that had been maintained and handled by the Stern law firm, including electronic and hard-copy files, Freddie Mac's mortgage notes and foreclosure-related files (the "recovered Freddie Mac foreclosure files"), and also pulled and recovered roughly 2,500 additional Freddie Mac REO files that had been maintained by the Stern law firm (the "recovered REO files").

42.     Freddie Mac thereafter reassigned and delivered the 22,512 recovered Freddie Mac foreclosure files and the roughly 2,500 recovered REO files to 13 different law firms in the State of Florida.    Because of its concern over the allegations and evidence of unprofessional practices followed by the Stern law firm, Freddie Mac directed these newly-assigned law firms to review the recovered Freddie Mac foreclosure files and to re-initiate the foreclosure proceedings, in whole or part, as appropriate, due to concerns over the documents previously filed with the foreclosure court by the Stern law firm.

43.     By reason of the foregoing, Freddie Mac has incurred, and may continue to incur in the future, substantial costs attributable to the following: (i) costs associated with conducting its On-Site Review of the Stern law firm's files, policies and practices with the assistance of KPMG, LLP; (ii) costs associated with the need to seize approximately 22,512 recovered Freddie Mac foreclosure files and roughly 2,500 recovered REO files previously maintained and handled by the Stern law firm; and (iii)

costs associated with having the 13 newly-assigned law firms conduct a review of the recovered Freddie Mac foreclosure files seized from the Stern law firm and re-initiate foreclosure proceedings, as appropriate, based upon concerns raised over the documents previously filed with the courts by the Stern law firm.

44.    By reason of the foregoing, Freddie Mac has also incurred, and may continue to incur in the future, substantial additional costs attributable to the following: (i) the cost of paying duplicative legal fees and court costs to the newly-assigned law firms for handling the approximately 22,512 recovered Freddie Mac foreclosure files; (ii) the time value cost of money lost due to additional delays in prosecuting the approximately 22,512 recovered Freddie Mac foreclosure files; and (iii) the cost of foreclosure-related fees and costs previously incurred and paid on the recovered Freddie Mac foreclosure files when handled by the Stern law firm.

## COUNT I
### (Legal Malpractice)

45.    Freddie Mac repeats and realleges the allegations of paragraphs 1-44 of this Counterclaim as if fully set forth herein.

46.    During the period in or about April 2007, until at least in or about November 2010, an attorney-client relationship existed between and among the Stern law firm, its attorneys, including Stern, and Freddie Mac with respect to legal services provided by the Stern law firm to and/or on behalf of Freddie Mac pursuant to and in accordance with the Stern Retention Agreement.

47.    Under the Stern Retention Agreement, the Stern law firm understood and agreed, among other things: (i) to provide work to and/or on behalf of Freddie Mac that was of "high quality," to take "appropriate actions" to comply with Freddie Mac's

foreclosure requirements, to "conduct [itself] so that the services rendered on Program Loans" were "always in the best interests of Freddie Mac," and to "strictly avoid any conflicts or apparent conflicts of interest with Freddie Mac" (Agreement, provision 1. General Provisions); (ii) that the law firm's "primary client relationship" was with and its primary obligation was to Freddie Mac (Agreement, provision 1. General Provisions); (iii) that there was an attorney-client relationship between the Stern law firm and Freddie Mac and its Servicers (Agreement, Provision 3. Freddie Mac/Servicer/Designated Counsel Attorney-Client Relationship); and (iv) that Freddie Mac expected the law firm to "provide a high level of service to [Freddie Mac's] Servicers" (Agreement, provision 4. Contacts).

48.    The Stern law firm and its attorneys, including Stern, owed a duty of professional care to Freddie Mac with respect to the legal services provided by the Stern law firm pursuant to and in accordance with the Stern Retention Agreement, including, without limit, the duty to employ the legal knowledge and skill required under the circumstances in the performance of their legal services to and/or on behalf of Freddie Mac, the duty to act in the interest of and for the benefit of Freddie Mac, and the duty to comply with all applicable Rules Regulating the Florida Bar, including the Rules for Professional Conduct for Florida Lawyers.

49.    In performing their legal services to and/or on behalf of Freddie Mac, the Stern law firm, including Stern, owed Freddie Mac, more specifically, the following professional duties of care, among others: (1) the duty to control the law firm's workload so that each matter can be handled for the client adequately and within the accepted standard of professional care for a law firm in the State of Florida in accordance with

Florida Bar Rule 4-1.3; (2) the duty to take reasonable measures to ensure that non-lawyer conduct is compatible with professional obligations of the lawyer in accordance with Florida Bar Rule 4-5.3; (3) the duty to comply with a client's reasonable requests for information and to explain a matter to the client to the extent reasonably necessary for the client to make informed decisions about the lawyer's professional handling of the client's matters in accordance with Florida Bar Rule 4-1.4; (4) the duty to deal honestly with third parties when acting on behalf of the client in accordance with Florida Bar Rule 4-4.1; and (5) the duty not to engage in conduct otherwise involving dishonesty or misrepresentation in accordance with Florida Bar Rule 4-8.4.

50.    The Stern law firm negligently breached its professional duties owing to Freddie Mac by, among other things:

(i) Causing and/or permitting the Stern law firm's employees to execute, witness and/or notarize assignments of mortgage that were back-dated;

(ii) Causing and/or permitting the Stern law firm's employees to witness and/or notarize assignments of mortgages, affidavits of indebtedness and/or other affidavits on a daily basis prior to and without actually witnessing execution of the document by the person whose signature was to be witnessed and/or notarized;

(iii) Causing and/or permitting the Stern law firm's employees to prepare and execute affidavits of indebtedness for submission to the foreclosure court that failed to follow appropriate professional practices and procedures;

(iv) Causing and/or permitting the Stern law firm's employees to sign the name of another person on various foreclosure-related documents without any indication of that fact on the documents; and

(v) Charging Freddie Mac directly, and through its Servicers, substantial fees and costs for legal services that the Stern law firm knew or should have known was not in accordance with the terms and conditions of the Stern Retention Agreement and fell below the minimum standard of professional care owed by the Stern law firm to Freddie Mac and its Servicers.

51.     As a result of the Stern law firm's breach of its professional duties to Freddie Mac, Defendant Freddie Mac has suffered, and may continue to suffer in the future, substantial damages in an amount to be determined, but believed to be well in excess of $10 million.

## COUNT II
### (Breach of Contract)

52.     Freddie Mac repeats and realleges the allegations of paragraphs 1-51 of this Counterclaim as if fully set forth herein.

53.     By reason of the Stern Retention Agreement, a valid contract existed between and among the Stern law firm and Defendant Freddie Mac.

54.     The Stern law firm breached its material contractual obligations owed to Freddie Mac, including, without limit, the provisions set forth in paragraphs 14, 15 and 47 of this Counterclaim, by, among other things:

(i) Causing and/or permitting the Stern law firm's employees to execute, witness and/or notarize assignments of mortgage that were back-dated;

(ii) Causing and/or permitting the Stern law firm's employees to witness and/or notarize assignments of mortgages, affidavits of indebtedness and/or other affidavits on a daily basis prior to and without actually witnessing execution of the document by the person whose signature was to be witnessed and/or notarized;

(iii) Causing and/or permitting the Stern law firm's employees to prepare and execute affidavits of indebtedness for submission to the foreclosure court that failed to follow appropriate professional practices and procedures;

(iv) Causing and/or permitting the Stern law firm's employees to sign the name of another person on various foreclosure-related documents without any indication of that fact on the documents; and

(v) Charging Freddie Mac, through its Servicers, substantial fees and costs for legal services that the Stern law firm knew or should have known was not in accordance with the terms and conditions of the Stern Retention Agreement and

fell below the minimum standard of professional care owed by the Stern law firm to Freddie Mac and its Servicers.

55.    As a result of the Stern law firm's breach of its material contractual obligations to Freddie Mac under the Stern Retention Agreement, Freddie Mac has suffered, and may in the future continue to suffer, substantial damages in an amount to be determined, but believed to be well in excess of $10 million.

### COUNT III
### (Breach of Fiduciary Duty)

56.    Freddie Mac repeats and realleges the allegations of paragraphs 1-55 of this Counterclaim as if fully set forth herein.

57.    From in or about April 2007 until at least in or about November 2010, a fiduciary duty existed between and among the Stern law firm, its attorneys, including Stern, on the one hand, and Freddie Mac, on the other hand, under which the Stern law firm owed Freddie Mac a fiduciary duty to act in the interest of and for the benefit of Freddie Mac.

58. The Stern law firm breached its fiduciary duty to Freddie Mac by, among other things:

(i) Causing and/or permitting the Stern law firm's employees to execute, witness and/or notarize assignments of mortgage that were back-dated;

(ii) Causing and/or permitting the Stern law firm's employees to witness and/or notarize assignments of mortgages, affidavits of indebtedness and/or other affidavits on a daily basis prior to and without actually witnessing execution of the document by the person whose signature was to be witnessed and/or notarized;

(iii) Causing and/or permitting the Stern law firm's employees to prepare and execute affidavits of indebtedness for submission to the foreclosure court that failed to follow appropriate professional practices and procedures;

(iv) Causing and/or permitting the Stern law firm's employees to sign the name of another person on various foreclosure-related documents without any indication of that fact on the documents; and

(v) Charging Freddie Mac, through its Servicers, substantial fees and costs for legal services that the Stern law firm knew or should have known were not in accordance with the terms and conditions of the Stern Retention Agreement and fell below the minimum standard of professional care owed by the Stern law firm to Freddie Mac and its Servicers.

59.     As a result of the Stern law firm's breach of its fiduciary duty to Freddie Mac, Freddie Mac has suffered, and may continue to suffer in the future, substantial damages in an amount to be determined, but believed to be well in excess of $10 million.

## COUNT IV
### (Negligent Misrepresentation)

60.     Freddie Mac repeats and realleges the allegations of paragraphs 1-59 of this Counterclaim as if fully set forth herein.

61.     Between in or about April 2007 through in or about October 2010, the Stern law firm submitted to Freddie Mac and its Servicers completed and signed Forms 104DC, which purported to accurately state the Stern law firm's legal fees and expenses incurred to complete the foreclosure and foreclosure-related proceedings in a competent, professional manner. In these completed and signed Form 104DC, the Stern law firm certified that the information contained therein was true to the best of their knowledge and belief.

62.     The Stern law firm submitted the completed and signed Forms 104DC to the Servicer and Freddie Mac with the knowledge and expectation that Freddie Mac would reimburse the Servicer for the legal fees and expenses set forth by the Stern law firm in the completed and signed Form 104DC.

63.    The Stern law firm certified to Freddie Mac and the Servicer in the signed and submitted Forms 104DC that the Stern law firm was entitled to recover legal fees and recoverable costs for services that the law firm had rendered pursuant to and in accordance with the terms and conditions of the Stern Retention Agreement, which representations were false.

64.    The Stern law firm was negligent in making the representations contained in these signed and submitted Forms 104DC because it knew or should have known that the representations were false.

65.    The Stern law firm made the representations contained in these Forms 104DC intending that the Servicer and Freddie Mac would rely upon the representations that were false.

66.    Freddie Mac justifiably relied upon the false representations contained in these Forms 104DC signed and submitted by the Stern law firm to Freddie Mac.

67.    In addition to the foregoing negligent representations made by the Stern law firm in their signed and submitted Forms 104DC, the Stern law firm also made the following statements of fact to Freddie Mac, each of which were false when made:

(i)    On August 10, 2010, in an email, David Stern stated to representatives of Freddie Mac that the allegations of "back-dated documents" described in the Mother Jones article was the result of "inadvertence" and was a onetime error made by a single notary employed by the law firm, who neglected to timely notarize 21 assignments of mortgage after personally witnessing them being signed.

(ii)    Between on or about August 4, 2010 and on or about August 10, 2010, during a telephone conversation, Stern also falsely stated during a conversation with Freddie Mac representatives that this one-time error was limited to the one law firm employee;

(iii)    On or about October 8, 2010, during a telephone conversation, Stern stated to representatives of Freddie Mac that the deposition testimony of Tammie Lou

Kapusta on September 22, 2010 concerning the Stern law firm's misconduct or improprieties were fabrications being made by a disgruntled former employee of the Stern law firm; and

(iv) On one or more occasions between on or about October 18, 2010 through October 28, 2010, during meetings in the Stern law firm's offices in Florida, Stern, and the Stern law firm's Cheryl Samons, falsely represented to representatives of Freddie Mac that allegations concerning the Stern law firm's misconduct or improprieties were attributable to fabrications by disgruntled former employees of the law firm.

68.    The Stern law firm was negligent in making the false statements set forth in paragraphs 67(i) through (iv) above because the Stern law firm knew or should have known that the statements were false.

69.    The Stern law firm made the statements set forth in paragraphs 67(i) through (iv) above intending that Freddie Mac would rely upon the statements that were false.

70.    Freddie Mac justifiably relied upon the false statements set forth in paragraphs 67(i) through (iv) above.

71.    As a direct result of the Stern law firm's negligent misrepresentations and negligent misstatements as set forth above, Freddie Mac has suffered and/or will suffer substantial damages in an amount to be determined, but believed to be well in excess of $10 million.

## COUNT V
### (Fraud and Intentional Misrepresentation)

72.    Plaintiff repeats and realleges the allegations of paragraphs 1-71 of the Counterclaim as if fully set forth herein.

73.    Between in or about April 2007 through in or about October 2010, the Stern law firm charged Freddie Mac directly, and through its Servicers, substantial fees

and costs for legal services that the Stern law firm knew were not in accordance with the terms and conditions of the Stern Retention Agreement and fell below the minimum standard of professional care owed by the Stern law firm to Freddie Mac and its Servicers.

74.    The Stern law firm did so by submitting Forms 104DC to Servicers and Freddie Mac during the aforesaid time period containing factual statements which the Stern law firm knew to be false but which the Stern law firm falsely certified were true.

75.    The Stern law firm's false statements were made to induce Freddie Mac and its Servicers to pay Plaintiff substantial fees and costs for legal services that the Stern law firm knew were not in accordance with the terms and conditions of the Stern Retention Agreement and fell below the minimum standard of professional care owed by the Stern law firm to Freddie Mac and its Servicers.

76.    In making these false statements in the Forms 104DC, the Stern law firm intended to induce Freddie Mac to rely upon the false statements contained therein and Freddie Mac did reasonably rely upon each of those statements.

77.    As a result thereof, Freddie Mac has suffered damages in an amount to be determined.

**WHEREFORE,** Defendant/Counter-Plaintiff Freddie Mac respectfully requests the following relief:

(1)    With respect to the Stern law firm's Amended Complaint, judgment in Freddie Mac's favor dismissing the Amended Complaint in its entirety, together with an award of Freddie Mac's costs and disbursements:

(2)     With respect to Freddie Mac's Counterclaim, a judgment awarding compensatory damages in favor of Freddie Mac and against the Stern law firm, on each of Freddie Mac's Counts I, II, III, IV, and V, together with such pre-judgment and post-judgment interest as may be awarded to Freddie Mac according to law, as well as an award of Freddie Mac's costs and disbursements; and

(3)     Such further relief that this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendant/Counter-Plaintiff Freddie Mac hereby demands a trial by jury of all triable issues relating to Plaintiff/Counter-Defendant's Stern law firm's Amended Complaint and to Defendant/Counter-Plaintiff Freddie Mac's Counterclaim.

Dated this 30th day of March, 2012.

/s/ Rory Eric Jurman
_____
Rory Eric Jurman, Esq.
Florida Bar No. 194646
Email: rjurman@fowler-white.com
Avery A. Dial, Esq.
Florida Bar No. 732036
Email: adial@fowler-white.com
FOWLER WHITE BURNETT, P.A.
One Financial Plaza, Suite 2100
100 Southeast Third Avenue
Fort Lauderdale, Florida 33394
Telephone: *(954)* 377-8100
Facsimile: *(954)* 377-8101

William G. Ballaine, Esq.
Mark S. Landman, Esq.
*(Each admitted Pro Hac Vice)*
Landman Corsi Ballaine & Ford, P.C.
120 Broadway  27th Floor
New York, New York 10271
(212) 238-4800 (main)
(212) 238-4848 (fax)
wballaine@lcbf.com
MLandman@lcbf.com

Chante Bowser, Esq.
*(Admitted Pro Hac Vice)*
Associate General Counsel
Federal Home Loan Mortgage Corporation
Litigation-Single Family Distressed & Fraud
Legal Division
8200 Jones Branch Drive
McLean, Virginia 22312
(703) 903-2473 (direct)
(703) 903-3691 (fax)
Chante bowser@freddiemac.com

*Counsel for Defendant Federal Home Loan*
*Mortgage Corporation*

## CERTIFICATE OF SERVICES

I hereby certify that on March 30, 2012, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ Avery A. Dial
Rory Eric Jurman, Esq.
Florida Bar No.: 194646
Avery A. Dial
Florida Bar No.: 732036
FOWLER WHITE BURNETT, P.A.
One Financial Plaza
100 Southeast, 3rd Avenue, 21st Floor
Fort Lauderdale, FL 33394
(954) 377-8100 (main)
(954) 377-8105 (direct)

## SERVICE LIST

### THE LAW OFFICES OF DAVID J. STERN, P.A. v. FEDERAL HOME LOAN MORTGAGE CORPORATION
### CASE NO.: 0:11-CV-60623 – PAS

Chante Bowser
Federal Home Loan Mortgage Corporation
Litigation – Single Family Distressed & Fraud
Legal Division
8200 Jones Branch Drive
McLean, Virginia 22312
Chante_bowser@freddiemac.com
Associate General Counsel – Federal Home Loan Mortgage Corporation
Pending Pro Hac Vice Admission

Mark S. Landman
Landman Corsi Ballaine & Ford, P.C.
120 Broadway
New York, NY 10271
mlandman@lcbf.com
Counsel for Defendant Federal Home Loan Mortgage Corporation
Pending Pro Hac Vice Admission

William G. Ballaine
Landman Corsi Ballaine & Ford, P.C.
120 Broadway
New York, NY 10271
wballaine@lcbf.com
Counsel for Defendant Federal Home Loan Mortgage Corporation
Pending Pro Hac Vice Admission

Jeffrey Tew
Tew Cardenas, LLP
1441 Brickell Ave. 15th Floor
Miami, FL 33131
jt@tewlaw.com
Counsel for Plaintiff The Law Offices of David J. Stern, P.A.

Matias Dorta
Tew Cardenas, LLP
1441 Brickell Ave. 15th Floor
Miami, FL 33131
mrd@tewlaw.com
Counsel for Plaintiff The Law Offices of David J. Stern, P.A.

W:\82487\DocsNY-532419-v1-Stern Freddie Mac's Answer to Amended Complaint Counterclaim.doc

# EXHIBIT B


Freddie Mac

5200 James Branch Drive
McLean, VA 22102-3110

We make home possible

November 1, 2010

David J. Stern, Esq.
The Law Offices of David J. Stern, P.A.
900 South Pine Island Road
Suite 400
Plantation, Florida 33324

Re: Termination of Retention Agreement and Recovery of Files

Dear Mr. Stern:

Pursuant to paragraph 2 of the Retention Agreement, Billing Policy and Fee Agreement ("Retention Agreement") entered into on April 4, 2007 by and between Federal Home Loan Mortgage Corporation ("Freddie Mac") and The Law Offices of David J. Stern, P.A., I hereby give notice that the Retention Agreement is terminated effective at 6:30pm, November 1, 2010. As a result of the termination, The Law Offices of David J. Stern, P.A. are no longer part of Freddie Mac's Designated Counsel Program ("Program").

The reasons for the termination include the much-publicized revelations, as a result of the investigation by the Florida Attorney General, concerning the improper and possibly unlawful practices engaged in by a number of employees of either, or both, the law firm or DJS Processing, LLC. The fact that certain grounds for termination are stated in this letter does not imply that additional grounds for termination or other action by Freddie Mac do not exist.

As we discussed this morning, because of circumstances that have developed over the course of the past several weeks, you believe in any event that you are no longer in a position to continue to manage our files and you have agreed to cooperate fully in the prompt delivery of those files to our employees and contractors. We plan to distribute the files to other law firms. We appreciate your continuing cooperation as we work with you and your staff to locate and take possession of those files, and to assist us and these law firms with such matters as substituting counsel and alerting us to any important events or occurrences with respect to individual cases.

David J. Stern, Esq.
November 1, 2010
Page 2


The termination of the Retention Agreement should not be considered to be a waiver or relinquishment of any rights that Freddie Mac may have, and Freddie Mac reserves whatever rights it may have with respect to The Law Offices of David J. Stern, P.A. You, and the other attorneys of your law firm, continue to be responsible to Freddie Mac and our Servicers pursuant to all applicable professional and ethical standards. Please contact me if you have any questions.

Yours sincerely,

Graham H. Kidner
Managing Associate General Counsel
(703) 903-2492


cc:    Hyacinth G. Kucik
       Senior Vice President and Principal Deputy General Counsel