# EXHIBIT X

# TO THE DECLARATION OF

# JOHN W. SMITH T

```
 1        IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT
               IN AND FOR COLLIER COUNTY, FLORIDA
 2               GENERAL JURISDICTION DIVISION

 3                              CASE NO. 09-7336 CA

 4
        DEUTSCHE BANK TRUST COMPANY     )
 5      AMERICAS AS TRUSTEE FOR RALI    )
        2007QS3,                        )
 6                                      )
            Plaintiff,                  )
 7                                      )
        vs.                             )
 8                                      )
        BARRY F. MACK A/K/A BARRY FRITZ )
 9      MACK A/K/A BERRY FRITZ MACK,    )
        et al.,                         )
10                                      )
            Defendants.                 )
11      --------------------------------X

12

13

14

15

16        VIDEOTAPED DEPOSITION OF FORREST G. McSURDY

17

18      taken before Cindy Hart, Court Reporter and

19      Notary Public in and for the State of Florida at

20      Large, at Suite 1500, 1441 Brickell Avenue,

21      Miami, Florida, on Tuesday, April 17, 2012,

22      commencing at 11:05 a.m., pursuant to Defendants

23      Mack's Notice of Taking Videotaped Deposition of

24      Corporate Representative of Law Offices of David J.

25      Stern, P.A.
```

Page 2

```
 1  APPEARANCES:
 2    BRADLEY, ARANT, BOULT, CUMMINGS, LLP.
      (BY MR. JOHN W. SMITH T)
 3    One Federal Place
      1819 Fifth Avenue North,
 4    Birmingham, Alabama 35203-2104
      On behalf of the Plaintiff.
 5
      GARBER, HOOLEY & HOLLOWAY, LLP.
 6    (BY MR. DAVID F. GARBER)
      Suite 202
 7    700 Eleventh Street South,
      Naples, Florida 34102
 8    On behalf of the Defendants.
 9    TEW CARDENAS, LLP.
      (BY MR. JEFFREY TEW)
10    Suite 1500
      1441 Brickell Avenue
11    Miami, Florida 33131
      On behalf of the Deponent.
12
      ALSO PRESENT:
13
      MR. SYLVANUS HOLLEY, Videographer.
14
15            I-N-D-E-X
16  WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
17  FORREST G. McSURDY
18
19  BY MR. GARBER     5          121
20  BY MR. SMITH T            --        --
21  BY MR. TEW        120       --
22
23
24
25
```

Page 3

```
 1          E-X-H-I-B-I-T-S
 2  DEFENDANT'S FOR IDENTIFICATION       PAGE
 3  A - Master Services Agreement      7
 4  B - Complaint            28
 5  C - Answer and Counterclaims of Defendant   30
 6  D - Answer and Affirmative Defenses To   32
        Counterclaim
 7
    E - Deutsche 000979 - Deutsche 001068   48
 8
    F - Response of Law Offices of David J.   48
 9      Stern, P.A. To Defendants' Subpoena
        Duces Tecum Without Deposition
10
    G - Deutsche 001176 - Deutsche 001355   69
11
    No. 2 - New Trak notes history     93
12
    H - Two pages e-mails dated August 25, 2009  107
13      and August 18, 2010
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1       VIDEOGRAPHER:  We're here today April
 2  17th, year 2012.  Time is approximately 11:05 a.m.
 3  We're here for the videotaped deposition of Forrest
 4  G. McSurdy in the matter of Deutsche Bank Trust
 5  Company versus Barry F. Mack, et al.
 6       Court reporter today is Cindy Hart from
 7  Porter, Walker & Associates.  Videographer is
 8  Sylvanus Holley with Legal Video Services, Inc.
 9       Would counsel please announce their
10  appearance for the record.
11       MR. GARBER:  David Garber on behalf of the
12  Defendants, Mr. and Mrs. Mack.
13       MR. TEW:  Jeffrey Tew on behalf of the
14  witness.
15       MR. SMITH T:  My name is John Smith T.
16  I'm here on behalf of the Plaintiff, as well as GMAC
17  Mortgage.
18       Just let me say for the record that this
19  deposition is being made subject to the detective
20  order which was approved by the parties and is being
21  entered by the Court.
22       And as a result of the hearing on April
23  11th before Judge Manalich, the deposition also is
24  subject to certain limitations as to scope.  Thank
25  you.
```

Page 5

```
 1  Thereupon:
 2       FORREST G. McSURDY,
 3  after having been first duly sworn, was examined
 4  and testified as follows:
 5       DIRECT EXAMINATION
 6  BY MR. GARBER:
 7    Q.  Would you please tell us your full name,
 8  sir.
 9    A.  Forrest, middle initial G. McSurdy.
10    Q.  And what year were you born?
11    A.  1956.
12    Q.  Where do you live?
13    A.  I live in Miami.
14    Q.  Are you an attorney?
15    A.  Yes.
16    Q.  When did you become licensed to practice
17  law?
18    A.  1981.
19    Q.  Where did you go to law school?
20    A.  University of Miami Law School.
21    Q.  What firm are you employed with now?
22    A.  Law Offices of David J. Stern, P.A.
23    Q.  How long have you been with David Stern?
24    A.  Since December of 1995.
25    Q.  What types of duties have you undertaken
```

2 (Pages 2 to 5)

Page 6

1   while working at the Offices of David Stern?
2       A.   Initially I was hired as a litigation
3   attorney to handle contested foreclosure matters.
4   The firm was approximately five attorneys at that
5   point and maybe 10 paralegals.
6           As the firm grew, I became the head of the
7   litigation department and eventually I also took on
8   duties of general counsel and doing appellate work.
9       Q.   Were you working there in the summer of
10  2009?
11      A.   Yes.
12      Q.   And you were head of the litigation
13  department at that time?
14      A.   Yes.  Well, mostly general counsel but
15  also head of the litigation department.
16      Q.   How many people were employed there at
17  that time?
18      A.   What time is that again?
19      Q.   In the summer of 2009.
20      A.   Oh, I would say about between 1,000 and
21  1200.
22      Q.   That worked at the Offices of David Stern?
23      A.   Yes.
24      Q.   How many were lawyers?
25      A.   125, 130.

Page 7

1       Q.   The rest were support personnel?
2       A.   Yes, of some fashion, paralegals, clerks,
3   accounting.
4       Q.   We are involved in a lawsuit in which
5   Deutsche Bank is the Plaintiff and my clients,
6   Mr. and Mrs. Mack, are the Defendants.  Deutsche
7   Bank's interests have been handled by General Motors
8   Acceptance Corporation mortgage division.
9           Did you handle any cases for General
10  Motors, GMAC, in the summer of 2009?
11      A.   If I did, it would have been an appeal.
12  It would not have been a litigation matter.  That is
13  litigation, but I wouldn't have been involved in the
14  actual litigation of the case.
15      Q.   Have you ever seen the contract that the
16  Offices of David Stern entered into with GMAC?
17      A.   Yes, I have seen it.
18      MR. GARBER:  I have a couple of copies
19  here, and I would ask the court reporter if she would
20  be so kind as to mark this as Exhibit A to our
21  deposition, and a copy for you Mr. Smith T.
22          (Thereupon, Master Services Agreement
23      was marked as Defendant's Exhibit A, for
24      Identification.)
25      Q.   (BY MR. GARBER)  Please take a minute to

Page 8

1   review this and I'll ask you a few questions.
2       A.   Okay.
3       Q.   Have you ever seen this contract before?
4       A.   I have.
5       Q.   This is a contract that was produced to us
6   by Deutsche Bank and it's numbered on the bottom
7   right hand corners double 01069 through double 01104.
8           On the first page, which is 1069, is that
9   the signature of David Stern?
10      A.   It looks like his signature, yes.
11      Q.   If you'd be so kind as to turn to page
12  1071.  Was it the understanding that either party can
13  terminate the agreement by default of the other party
14  which remains uncured for 30 days after being
15  notified in writing of the default?
16      A.   Are you asking me is that what the
17  agreement says?
18      Q.   That's what it says.  Is that the practice
19  that you understood would be employed?
20      A.   I didn't have an understanding with
21  respect to that.
22      Q.   At the bottom of that page, paragraph 6.1,
23  it says that "Company represents and warrants that
24  the Services will be performed in a diligent and
25  workmanlike manner" by David Stern's law office.  Do

Page 9

1   you see that?
2       A.   Yes.
3       Q.   And you would agree with me that you
4   performed your work in a diligent and workmanlike
5   manner as the attorney for GMAC?
6       MR. SMITH T:  Object to form.
7       THE WITNESS:  You mean in all matters that
8   were handled by the ---
9       Q.   (BY MR. GARBER)  Yes, that was your
10  practice?
11      A.   That was the attempt, yes, to do that.
12      Q.   Was that your practice?
13      A.   The practice?
14      Q.   Yes.
15      A.   I believe it was.  We obviously are human
16  and make mistakes, but that was the attempt to
17  practice.
18      Q.   Okay.  Please turn to the next page, 1072.
19  Under 6.4 it says, "Company," that's David Stern,
20  "represents and warrants that Company's actions and
21  performance of the Services are and will be in full
22  compliance with all the applicable federal, state,
23  and local requirements, the state laws and
24  regulations; any valid and effective order, verdict,
25  judgment, consent decree or agreement."

3 (Pages 6 to 9)

Page 10

1     Was that the general practice also of
2  David Stern to uphold that paragraph 6.4 with respect
3  to GMAC cases?
4     A.  Yes, that was the goal.
5     Q.  In paragraph number seven on that same
6  page, it says, "When Company is performing Services
7  on Client's premises," clients is GMAC.  Did the
8  company ever perform services on client's premises?
9     A.  The company did have at least one person
10  that I know of on site at the client's premises.
11     Q.  And where was that?
12     A.  Pardon me?
13     Q.  Where was that?
14     A.  I don't know which of the main GMAC field
15  offices that was at.  It might have been Horsham, PA
16  or it might have been in Iowa.  They had many
17  different ---
18     Q.  Were you aware there's a litigation
19  department responsible for foreclosures in Fort
20  Washington, Pennsylvania?
21     A.  Fort Washington, that's near Horsham, yes,
22  that's the same area.  I grew up in Philadelphia.
23     Q.  Okay.  Do you know if that's where David
24  Stern maintained its client or its employee?
25     A.  No, I'm sorry.

Page 11

1     MR. SMITH T:  Object to form.  Asked and
2  answered.
3     Q.  (BY MR. GARBER)  Do you know the name of
4  that employee?
5     A.  Kevin Crecco I believe was his name,
6  C-r-e-c-c-o.
7     Q.  Do you know when they first maintained him
8  as an employee in Pennsylvania?
9     A.  No, I'm sorry, I don't.
10     Q.  So he was working for the Law Office of
11  David Stern, but he was situated on site with GMAC;
12  is that correct?
13     A.  Which period of time are you speaking of?
14     Q.  Well, the summer of 2009.
15     A.  I don't know.  Initially he -- to my
16  knowledge, he started out as an employee of GMAC and
17  at some point he became an employee of the Law
18  Offices of David Stern, on site.
19     Q.  Okay.  When he became an employee of David
20  Stern, did he move down to Fort Lauderdale or Miami?
21     A.  I don't believe so, but I don't know.
22     Q.  He just stayed up in wherever he was?
23     A.  My understanding, he was physically at the
24  GMAC facility.
25     Q.  Okay.  What were his functions as an

Page 12

1  employee of David Stern?
2     A.  He was to facilitate the movement of
3  foreclosure cases.  For example, if the law firm --
4  if it were a contested case, a litigated case and the
5  law firm had asked for documents to comply with
6  production requests and the law firm had not gotten
7  them in a timely manner, he would get involved to try
8  to get GMAC to comply with the requests.
9     Q.  Who was his immediate supervisor when he
10  worked for David Stern?
11     A.  I don't know.  Other than David Stern, he
12  probably came under the jurisdiction of the office
13  manager, Cheryl Sammons.
14     Q.  Where is Ms. Sammons now?
15     A.  I have no idea.
16     Q.  She was the office manager?
17     A.  Yes.
18     Q.  For how long?
19     A.  She was office manager when I started in
20  '95 and I believe she was -- her employment stopped
21  sometime in September of 2010.
22     Q.  When did Kevin Crecco stop being an
23  employee of David Stern?
24     A.  I don't know.
25     Q.  Now, under this paragraph seven of the

Page 13

1  contract, it says that the Company will maintain a
2  log of the names of personnel and times when they
3  have possession of such keys or access devices.
4     Do you know if the company did maintain
5  such a log, the company being David Stern?
6     A.  No, I don't.  Cheryl Sammons probably
7  would have noted that.
8     Q.  Under paragraph eight under "Place of
9  Performance," it says that the services shall take
10  place in any of the 50 states of the United States.
11     Did David Stern represent GMAC in any
12  other state other than Florida?
13     A.  I do not believe so.
14     Q.  On page 1073 it says, "Company," that's
15  David Stern, "shall provide assurance satisfactory to
16  Client that Company's personnel meet the rules,
17  regulations of Client pertaining to work history and
18  qualifications."  That's at the top under paragraph
19  looks like 8.3.  Do you see that?
20     A.  Yes.
21     Q.  Did David Stern provide assurances to GMAC
22  concerning the personnel that worked at David Stern?
23     A.  I have no knowledge of that, sorry.
24     MR. SMITH T:  I'll just say for the record
25  that Mr. McSurdy was not tendered today to interpret

4 (Pages 10 to 13)

Page 14

1  this document. I'm not objecting to his answering
2  questions that may be within his personal knowledge,
3  but I do want that on the record.
4      Q.  (BY MR. GARBER) Under paragraph 8.4,
5  "Company shall provide Client with the name of each
6  person assigned to work on Client's premises, and
7  shall immediately update such information whenever
8  changes occur."
9          Outside of Mr. Crecco, there was no other
10 personnel that worked on client's premises, correct?
11     A.  I know of no one else, but that doesn't
12 mean that there was not someone before him or after
13 him. Again, Cheryl Sammons would know that. I do
14 not know that.
15     Q.  If you would be so kind as to turn to page
16 1074, paragraph 13.1. "Company shall, at its own
17 expense, defend, indemnify, and hold harmless GMAC
18 and its employees." Do you see that paragraph?
19     A.  Yes.
20     Q.  Are you aware that a judgment was entered
21 against GMAC in the case of Deutsche -- or against
22 Deutsche Bank in the case of Deutsche Bank versus
23 Mack, which is the case I'm representing the Macks on
24 here?
25     A.  Yes.

Page 15

1      Q.  Are you aware that that judgment was
2  entered while David Stern was still the attorney of
3  record in the case?
4      A.  Yes.
5      Q.  Has David Stern done anything to indemnify
6  GMAC with respect to the entry of that judgment?
7          MR. TEW: I'm gonna object and instruct
8  him not to answer. It's beyond the scope of this
9  deposition, it has nothing to do with the case at
10 hand, and it would go into privileged and work
11 product.
12         MR. GARBER: So you're objecting on the
13 basis of attorney-client privilege?
14         MR. TEW: And work product.
15         MR. GARBER: And work product.
16         MR. TEW: And it's well outside the scope
17 of the Mack case.
18         MR. GARBER: Okay. I'll be asking several
19 questions in that area, so please make your
20 objections.
21         MR. TEW: Okay.
22     Q.  (BY MR. GARBER) Has David Stern made any
23 efforts to settle claims that Deutsche Bank or GMAC
24 may have with respect to the Macks?
25         MR. TEW: Same instruction not to answer.

Page 16

1  Work product and attorney-client privilege.
2          I point out that there is pending
3  litigation between GMAC and the law firm, the Stern
4  law firm pending here in the Southern District of
5  Florida.
6          MR. GARBER: I have a series of questions
7  about indemnification and agreements, and can we just
8  agree that you will make a continuing objection to
9  all those and I won't have to ask him?
10         MR. TEW: Yes.
11         MR. GARBER: Okay, thank you, sir.
12     Q.  (BY MR. GARBER) Please turn to page 1081,
13 paragraph 3.1. It says that "All Confidential
14 Information, including copies thereof, shall be
15 promptly returned to Discloser upon request."
16         Do you know if any confidential materials
17 were returned to GMAC at the termination or during
18 the pending Mack case with Deutsche Bank?
19         MR. SMITH T: Object to form.
20         THE WITNESS: No.
21     Q.  (BY MR. GARBER) You don't know?
22     A.  I do not know.
23     Q.  Please turn to the next page, which is
24 1082. This is a Change Order to the contract. It's
25 dated April 18, 2007 and on the next page, which is

Page 17

1  1083, it appears to be signed by David Stern. Is
2  that his signature?
3      A.  That appears to be his signature, yes.
4      Q.  Under the middle portion of the first
5  paragraph on page 1082, the first indentation says
6  that with regard to the client, "Notification of any
7  incident that impacts the confidentiality of Client
8  Information will be made no later than 24 hours after
9  the identification of the incident." Do you see
10 that, sir?
11     A.  Yes, I do.
12     Q.  Was GMAC notified of any matter that
13 impacted the confidentiality of GMAC with respect to
14 the Mack case at any time during its conduct by
15 Stern?
16     A.  I did not see any notification of that
17 type.
18     Q.  Further down in the same paragraph it
19 says, "A representative of the Company will notify
20 the Client security contact Becky Stoffel and
21 relationship manager Linda Walton by phone and e-mail
22 within 24 hours" of an incident.
23         Do you know if any phone calls were made
24 to either of those employees of GMAC?
25     A.  No, I do not know.

5 (Pages 14 to 17)

Page 18

1    Q.   Do you know if any e-mails went to them?
2       MR. SMITH T:   You're limiting it to the
3 Mack case I'm assuming?
4       MR. GARBER:   Yes.
5       MR. SMITH T:   I don't think that was clear
6 from your question, but I assumed that. Just wanted
7 to be clear.
8       MR. GARBER:   Yes, I mean, with respect to
9 the Mack case.
10       THE WITNESS:   I think he may have said
11 that, too.
12       No, I do not. In my review of the file,
13 the records involving the Mack case, I did not see
14 any e-mails, so I have no knowledge of any e-mails.
15    Q.   (BY MR. GARBER) What did you review prior
16 to your deposition here today?
17    A.   At what time?
18    Q.   Within the last week or two.
19    A.   I reviewed all of the documents that have
20 been produced to the Macks pursuant to the subpoena
21 that was issued.
22    Q.   Anything else?
23    A.   I reviewed the law firm litigation file
24 with respect to the ongoing collection action.
25    Q.   That's the lawsuit against GMAC?

Page 19

1    A.   The lawsuit against GMAC, yes. That would
2 be it.
3    Q.   Did you talk to any employees of David
4 Stern in preparation for today?
5    A.   There's only one other employee, and yes,
6 I spoke with her yesterday to let her know I'd be in
7 deposition all day, my assistant.
8    Q.   Did she tell you anything about this that
9 would help you in this deposition?
10    A.   No. She's my office administrator. She
11 used to run the title department, so she really is
12 not familiar with this case.
13    Q.   What is her name?
14    A.   Carol Whitlow, W-h-i-t-l-o.
15    Q.   W-h-i-t ---
16    A.   L-o-w, sorry. Whitlow, l-o-w.
17    Q.   So you and Ms. Whitlow are the only
18 employees of Stern, except for Mr. Stern, right now?
19    A.   Mr. Stern is not an employee anymore.
20    Q.   He's not?
21    A.   No. He's the sole shareholder, but he is
22 not employed.
23    Q.   Do you know where he lives right now?
24    A.   I do.
25    Q.   Where?

Page 20

1    A.   Fort Lauderdale.
2    Q.   Do you know his address?
3       MR. TEW:   I'm gonna instruct him not to
4 answer. I don't see any relevance to that.
5       MR. GARBER:   Well, it's possible we may
6 want to take his deposition.
7       MR. TEW:   Well, then you can contact me
8 and if you have an appropriate request to have his --
9 I'll certainly accommodate it, but I don't want his
10 address on the record for obvious reasons.
11       MR. GARBER:   I understand.
12    Q.   (BY MR. GARBER) Okay, would you be so
13 kind as to turn to page 1086. And at the bottom of
14 the page, paragraph number III, it talks about the
15 business requirements for foreclosures. Do you see
16 that, sir?
17    A.   Yes.
18    Q.   And was it the practice of the Offices of
19 David Stern to obtain all relevant and required
20 information and documentation for completing the
21 first legal action in the foreclosure process with
22 respect to the Mack case?
23    A.   Yes.
24    Q.   Was it also the practice of David Stern
25 and did they follow that practice with respect to the

Page 21

1 Mack case at the bottom of the page where it says to
2 "Update New Trak and Client's system of record
3 (MortgageServ 'MS') with all applicable events"?
4       MR. SMITH T:   Object to form.
5       THE WITNESS:   Again, are we talking about
6 the Mack case or are we talking in general?
7    Q.   (BY MR. GARBER) The Mack case.
8    A.   My review in the file is that it was
9 not appropriately -- the New Trak was not
10 appropriately updated.
11    Q.   It was not appropriately made?
12    A.   No.
13    Q.   At the bottom of the page, the last
14 sentence, it says, "All pending foreclosure matters
15 must be updated at least monthly with a current
16 status of the applicable matter."
17       Did the Offices of David Stern do that
18 with respect to the Mack case?
19    A.   Yes, up until the time the loan was -- the
20 office was notified that the loan was current.
21    Q.   Okay, on page 1088 if you'd be so kind as
22 to turn to that. Under paragraph V, about the fifth
23 item down, "Report #5," it says, "Notice of Default
24 requested before the 60th calendar day of
25 delinquency." Can you tell us what that was

6 (Pages 18 to 21)

Page 22

1  referring to.
2      A.  I believe they are referring to the Notice
3  of Default with respect to a pre condition to
4  bringing the foreclosure action under the terms of
5  the mortgage.
6      Q.  I see.  Do you know if there was a Notice
7  of Default that was sent out in the Mack case?
8      A.  I don't remember seeing one in our file,
9  but that doesn't mean that it was not sent out.
10  Sometimes the lenders, GMAC was one of them, would
11  send it out without our office being given copies.
12      Q.  Would you turn now to page 1090, paragraph
13  number VIII, "Invoicing."  "Company," that's David
14  Stern, "shall submit all invoices to Client using the
15  electronic invoicing system Client presently uses."
16      Do you know what that invoicing system
17  was?
18      A.  No, I don't know which one was their
19  use -- which was the one that they used.
20      Q.  Did David Stern send an invoice to GMAC
21  for handling the Mack case?
22      A.  I did see an invoice in the file, yes.
23      Q.  Do you know when that was sent out?
24      A.  No, I don't recall off the top of my head.
25      Q.  Was there only one invoice sent out?

Page 23

1      A.  I believe there were at least two sent.
2      Q.  Would they have been sent by regular mail?
3      A.  This was in 2009.  No, I believe it would
4  have been sent electronically.
5      Q.  What system would be used to send it
6  electronically?
7      A.  Again, there were several systems that
8  different clients required us to use.  One was called
9  New Invoice, one was called I think, I want to say
10  iClear, but I just got an iPhone and it might not be
11  the right term, so I'm not sure which one GMAC
12  required, but whatever the electronic system was, we
13  would have used it.
14      Q.  Would that be different than the New Trak
15  system that was referred to earlier in the contract?
16      A.  Yes, that's separate.
17      Q.  Would it also be different than the MS
18  system that was referred to earlier in the contract?
19      A.  I am not familiar with the MS system.  If
20  it goes by another name, I may know it, but MS,
21  Microsoft that means to me.
22      Q.  Towards the bottom of the page, paragraph
23  number IX, if you'd look at that, please.
24      A.  Okay.
25      Q.  In the last sentence of the first

Page 24

1  paragraph under IX, "If Company fails to meet any of
2  the committed SLAs, Client will take the following
3  actions."  Can you tell us what an SLA is.
4      A.  I'd have to look back in the agreement to
5  see where it was defined.
6      Q.  Now, it says, the "Client will take the
7  following actions," but when you read them, it seems
8  that it's actually company that takes the following
9  actions.  Do you know if that's a typo, who was
10  supposed to take those actions?
11      A.  I do not know.
12      Q.  Okay.  Well, let's look at the second one,
13  "Report of failure to Client within 48 hours."  Was
14  it the agreement of David Stern to report a failure
15  to GMAC within 48 hours?
16      A.  In the Mack case?
17      Q.  Yes.
18      A.  I do not see any such reports.
19      Q.  Was it the practice of David Stern, and
20  did they follow that practice, with respect to the
21  Mack case, to promptly initiate an investigation to
22  identify the root cause of the failure?
23      A.  My review of the file did not indicate
24  that there was any problem at the time it was being
25  handled.

Page 25

1      Q.  So at no time while the Offices of David
2  Stern was handling the Mack case were they aware of
3  any problem with the case; is that true?
4      A.  That's true.
5      Q.  Okay.  So none of these actions would have
6  been taken?
7      A.  Not that I had saw in the file.
8      Q.  If you'd be so kind as to turn to page
9  1094.  Please look at the bottom of the page, number
10  VI, "Supplier is required to install a hard drive and
11  e-mail encryption on machines, computing equipment
12  which will be used to fulfill GMAC RFG contractual
13  obligations."  Now, I believe "Supplier" in this case
14  is David Stern.
15      Did David Stern supply encryption and hard
16  drives on their machines in order to communicate with
17  GMAC?
18      A.  I don't know.  I never had conversations
19  with our IT people regarding that.  I don't know.
20      Q.  The last -- it's not a sentence but it's a
21  phrase on that page, it says, "All e-mails sent to
22  GMAC with any personal/confidential information on a
23  borrower."
24      Do you know if David Stern sent any
25  personal/confidential information on a borrower to

Page 26

1    GMAC with respect to the Macks?
2        A.   I didn't see anything in the file in that
3    regard.
4        Q.   Page number 1098, if you'd be so kind as
5    to turn to that, paragraph number XIII. It says,
6    "Neither Party shall, without the prior consent of
7    the other Party, intentionally solicit for employment
8    any personnel of the other Party." Do you see that,
9    sir?
10       A.   Yes.
11       Q.   Did David Stern solicit Kevin Crecco to
12   work for them without the permission of GMAC?
13       A.   I don't know how he came to the employ of
14   David Stern with respect to this sort of agreement.
15       Q.   When he was an employee of David Stern,
16   was he paid solely and directly by David Stern, by
17   the Office of David Stern?
18       A.   I don't know if he was paid solely and
19   directly by David Stern's office.
20       Q.   His principal duties, though, remained at
21   the GMAC site that he had previously worked?
22       MR. SMITH T:  Object to form.
23       THE WITNESS:  Yes, he did not work in the
24   Law Offices of David Stern physical building.
25       Q.   (BY MR. GARBER)  Do you know if anybody

Page 27

1    contacted him regarding the Mack case from David
2    Stern's office?
3        A.   No, I do not know.
4        Q.   Do you know if Cheryl Sammons had any
5    knowledge of the Mack case?
6        A.   I did not see her involvement in the case
7    at all.
8        Q.   Do you know any employees that have any
9    knowledge of the Mack case that worked for David
10   Stern?
11       A.   The attorney of record, Elsa Shum, would
12   have had knowledge.  And my review of the New Trak
13   notes and the comment case history indicated a few
14   dozen employees were involved in the file, clerks,
15   paralegals.  So at some point they had some sort of
16   knowledge.
17       Q.   Now, as a result of the representation of
18   GMAC Mortgage by the Law Offices of David Stern, a
19   bill accrued that has not yet been paid, didn't it?
20       A.   I don't understand the question.
21       Q.   GMAC owed money to David Stern sometime in
22   2011, didn't they?
23       A.   With respect to the Mack case?
24       Q.   No, with respect to many cases.
25       A.   Oh, you're talking about many cases.  Yes,

Page 28

1    there was an outstanding accounts receivable.
2        MR. GARBER:  I have a copy of a Complaint
3    here and if I could have the court reporter to please
4    mark this copy of the Complaint as Exhibit A.
5        MR. TEW:  Wouldn't this be B?
6        MR. GARBER:  Yes, B, you're right.
7        (Thereupon, Complaint was marked as
8    Defendant's Exhibit B, for Identification.)
9        Q.   (BY MR. GARBER)  Have you ever seen this
10   Complaint before?
11       A.   Yes.
12       Q.   Now, I believe there was an attachment to
13   it, which was the accounting.
14       A.   I've also seen that.
15       Q.   And according to this suit, $6,161,483.70
16   was due from GMAC since February 11, 2011.  That's
17   found on the last page and also the second page.
18       A.   Yes, I see that.
19       Q.   To the best of your knowledge, was that
20   the amount of money that GMAC owed to the Office of
21   David Stern for handling foreclosures as of the time
22   that date was given, which was February 11, 2011?
23       A.   I believe that amount also represented --
24   the law office represented evictions, bankruptcies,
25   foreclosures, it was regarding legal services and

Page 29

1    costs advanced based on the records in the firm as of
2    this date.
3        Q.   And I have reviewed those exhibits.  Would
4    it be fair to say that there were approximately
5    16,000 separate accounts on those exhibits?
6        A.   I know it's in excess of 10,000, so I
7    would not be surprised if it were 16,000.
8        Q.   Do you know how many cases David Stern was
9    handling for GMAC in the summer of 2009?
10       A.   I do not know the exact number, no.
11       Q.   Do you know an approximate number?
12       A.   No, I never have seen a report on that
13   number.
14       Q.   To the best of your knowledge, all of the
15   allegations that are contained in this Complaint are
16   true and correct?
17       A.   Today?
18       Q.   Well, when they were filed.
19       A.   When they were filed I believe it was
20   based on the firm's records as to what was owed, yes.
21       Q.   Were you the only attorney for David Stern
22   at the time this was filed?
23       A.   No.  This was filed, it looks like in July
24   of 2011.  Oh, yes, the last attorney was let go June
25   30 of 2011 other than myself, so yes, I was the only

Page 30

1  attorney left.
2      Q.  So you were aware of this Complaint when
3  it was filed?
4      A.  Yes.
5      Q.  Now, in response to that Complaint, there
6  was an Answer filed and I'm going to hand you a copy
7  of that and ask if you can identify that, and we'll
8  call that Exhibit C.
9          (Thereupon, Answer and Counterclaims of
10         Defendant was marked as Defendant's Exhibit
11         C, for Identification.)
12     Q.  (BY MR. GARBER)  Please take a look at
13 Exhibit C.  Have you ever seen Exhibit C before?
14     A.  Yes.
15     Q.  One of the allegations in this Complaint
16 is found in the Counterclaim by Defendant GMAC,
17 paragraph number 25.  Do you see that, sir?
18     A.  Yes.
19     Q.  I'm going to read it.  It says, "GMACM has
20 since learned that DJSPA --" that's David Stern's
21 offices, right?
22     A.  Yes, that's the --
23     Q.  (Continuing) -- "committed gross
24 malpractice in handling the GMACM matters.  For
25 example, in one foreclosure matter assigned to DJSPA

Page 31

1  for handling, DJSPA failed to communicate to GMAC
2  that counterclaims had been brought.  Indeed, DJSPA
3  neglected to put forward any defense to such
4  counterclaims, with the result that a default
5  judgment was entered on or about May 5, 2011 for over
6  $450,000.  DJSPA's conduct in this and other
7  instances has been wanton and reckless."
8          With respect to the Mack case in which a
9  judgment was entered on May 5, 2011 for over
10 $450,000, is that paragraph true?
11     MR. TEW:  Let me object.  He can answer
12 any factual allegation about the Mack case, but he is
13 not to answer as to any of the legal conclusions
14 contained in that paragraph because he's here as a
15 fact witness, not as a legal expert.
16         So, for example, I'm not going to permit
17 him to answer as to whether there was a, quote,
18 "malpractice."  And you can ask him about the Mack
19 case if you'd like factually, but he's not going to
20 respond to the conclusions in that Counterclaim.
21     MR. GARBER:  Okay, I will get into that in
22 detail in a few minutes.
23         I have also a copy of the Answer to the
24 Counterclaim which I would like to have marked as our
25 next numbered exhibit.  I guess that would be Exhibit

Page 32

1  D.
2          (Thereupon, Answer and Affirmative
3          Defenses To Counterclaim was marked as
4          Defendant's Exhibit D, for Identification.)
5      Q.  (BY MR. GARBER)  Could you please review
6  that when it's ready.
7      A.  Did you mean to give me a highlighted
8  copy?
9      Q.  No.  Actually I meant to keep it for
10 myself.
11         This particular Answer was filed in answer
12 to the Counterclaims of GMAC and in this Answer many
13 allegations are admitted and denied.  I would like if
14 you would be so kind as to turn to the second page in
15 paragraph number 18 where GMAC said in their
16 paragraph 18, the sworn deposition testimony of
17 witnesses contained accusations against David Stern
18 that included, among other things, the following,
19 causing and permitting David Stern's employees to
20 execute, witness, or notarize assignments of
21 mortgage.
22         Do you know if David Stern's office did
23 that?
24     MR. TEW:  I'm going to instruct him not to
25 answer.  We're here as a fact witness on the Mack

Page 33

1  case.  I have not heard anything in the Mack case on
2  that subject, so I'm gonna instruct him not to
3  answer.  He's not subpoenaed as to those issues and
4  they're totally irrelevant.  It's abusive.
5      MR. GARBER:  I don't believe that it's
6  irrelevant, I don't think it's abusive, and ---
7      MR. TEW:  Where is it in the Mack case?
8  Where is that fact at issue in the Mack case?
9      MR. GARBER:  I don't know that this
10 witness has a right to object to relevancy in the
11 Mack case.
12     MR. TEW:  Well, I have a right to object.
13 You've called him here to testify.  Your subpoena
14 requires him to testify about the Mack case.  So,
15 anything that isn't involved in the Mack case I don't
16 think is covered by your subpoena.
17     MR. GARBER:  Okay, I think that he can
18 answer he doesn't know if he doesn't know.
19     MR. TEW:  I'm not gonna permit him to
20 answer.  This is abusive and has nothing to do with
21 the Mack case.  It's a fishing expedition, and it's
22 not covered by your subpoena.
23     Q.  (BY MR. GARBER)  With respect to paragraph
24 18 (i), did David Stern execute any notarized
25 statements or assignments of mortgage that were

9 (Pages 30 to 33)

Page 34

1  backdated on the Mack case?
2      MR. TEW:  Same instruction on the grounds
3  previously stated.
4      MR. GARBER:  I'm asking on the Mack case.
5      MR. TEW:  Oh, well, he can testify as to
6  the record.
7      THE WITNESS:  David Stern did not, my
8  review of the file, did not sign any documents in the
9  Mack case.
10     Q.  (BY MR. GARBER)  Okay.  And paragraph
11  number two with respect to the Mack case, David
12  Stern's office did not witness or notarize any other
13  documents without having an actual person witnessing
14  the signature, did they?
15     A.  I did not see any example of that in the
16  Mack case.
17     Q.  Did David Stern's office, with respect to
18  the Mack case, cause or permit their employees to
19  prepare and execute any affidavits of indebtedness?
20     A.  In the Mack case, no, the case did not
21  proceed to that extent.  It didn't get to the point
22  where an affidavit would have been prepared or
23  executed.
24     Q.  So at least with respect to the Mack case
25  then, you would say that that paragraph should be

Page 35

1  denied?
2      A.  Yes.
3      Q.  Paragraph number 21, it says that on or
4  about November 16th GMAC terminated its relationship
5  with David Stern and sought to recover its files from
6  David Stern.  Do you see that, sir?
7      A.  Yes, I do.
8      Q.  Is that a true statement?
9      A.  To the best of my knowledge, that's about
10  the date that they terminated their relationship.  I
11  don't know exactly the date, but that's what I
12  recall.
13     Q.  It says that with respect to the
14  relationship that's admitted in your Answer but the
15  remainder of the allegations of 21 are denied, so I
16  guess that would refer to that GMAC sought to recover
17  its files from David Stern on or about November 16th.
18     A.  Or possibly the date is not correct.  It's
19  admitted in the Answer that it was terminated, so the
20  date may not be technically correct.
21     Q.  Do you know if GMAC sought to recover the
22  Mack file from David Stern?
23     A.  I did not -- in my review of the file did
24  not indicate that GMAC ever asked to review the Mack
25  file.

Page 36

1      Q.  They never sent a subpoena over to you for
2  recovery of that file?
3      A.  No, not to my knowledge.  I never received
4  a subpoena.  I was the records custodian.
5      MR. SMITH T:  David, let me make sure
6  we're all clear on what you're asking because there's
7  been subpoenas obviously served recently that I've
8  been involved in and Mr. Tew's been involved in.  Is
9  that what you're asking about, or are you asking
10  about previous to all that?  Forrest may be confused
11  and I'm kind of confused.
12     THE WITNESS:  Previous, right.
13     Q.  (BY MR. GARBER)  We sent out a subpoena
14  perhaps a month ago asking for the records.  I'm not
15  asking about that.
16     A.  Right, I received that.
17     Q.  Okay.  But in 2010, did GMAC ask for a
18  return of its records with respect to the Mack case?
19     A.  Not that I'm aware of and my review of the
20  file did not indicate that they did.
21     Q.  Okay.  And that's also true of 2011, GMAC
22  did not ask for a return of the file in 2011; is that
23  correct?
24     MR. SMITH T:  Well, I'm gonna object to
25  the form because that does get into the period of

Page 37

1  time when I was in discussions with Mr. Tew about
2  obtaining documents relating to this case, and
3  Mr. McSurdy may or may not be aware of all that.  I
4  don't know, but anyway, I just want that on the
5  record.
6      Q.  (BY MR. GARBER)  But do you have any
7  knowledge whether GMAC asked for a return of their
8  file in 2011?
9      A.  For the actual return, no.  As Mr. Smith
10  has said, they requested certain documents during
11  2011, but the actual file was requested sometime, but
12  I don't know if it was 2011 or 2012.  I don't know
13  the time frame.
14     Q.  Do you know what documents they requested
15  in 2011 from David Stern?
16     A.  They would have been file documents.
17     Q.  Did David Stern maintain a file on the
18  Mack case?
19     A.  Yes.
20     Q.  Was that a paper file?
21     A.  It was a paper file and it was an
22  electronic file.
23     Q.  Was it duplicative?
24     A.  No, it was not necessarily.
25     Q.  Is there a particular program the

10 (Pages 34 to 37)

Page 38

1  electronic file was maintained in?
2      A.  The system is called Case Management
3  System.  It's a tracking system for files.  CMS for
4  abbreviation.
5      Q.  Did David Stern keep track of any
6  telephone calls that they made to GMAC concerning the
7  Mack case?
8      A.  Not specifically.  There were notes made
9  in this CMS system in the comment history regarding
10  conversations that were held between GMAC and the law
11  firm, and also New Trak indicated communications back
12  and forth.
13      Q.  With respect to telephone calls, did you
14  just identify a program that there were telephone
15  calls with GMAC on the Mack case?
16      A.  My review of the comment history indicates
17  that there must -- I believe there must have been
18  telephone conversations because of the notes that
19  were written in the comment history.
20      Q.  Would that have been with the foreclosure
21  division of GMAC?
22      A.  I have no idea.  It doesn't indicate.
23      Q.  Do you know who David Stern would have
24  dealt with at GMAC, which division?
25          MR. TEW:  Are you talking about the law

Page 39

1  firm?
2          MR. GARBER:  Pardon?
3          MR. TEW:  When you say "David Stern,"
4  you're talking about the law firm?
5          MR. GARBER:  Yes, I am, I am talking about
6  the law firm.
7          THE WITNESS:  I'm sorry.  What was the
8  question again?
9      Q.  (BY MR. GARBER)  Do you know what division
10  the office would have been dealing with; would that
11  have been the foreclosure division?
12      A.  Right, or the default servicing division,
13  whatever they called it.
14      Q.  Is the default servicing division
15  different from the foreclosure division?
16      A.  I don't know.  Each client was different.
17  They called it -- each client called it different
18  things.
19      Q.  Would there have been a record of any of
20  those telephone calls?
21      A.  If there were, it would have been in the
22  original file.  There would have either been
23  handwritten notes in the original file produced or,
24  as I said, in the comment history there would have
25  been an indication.  A note would be made that the

Page 40

1  status of the case was, for example, the loan was
2  current and the only reason the person at the law
3  firm would know that is if they spoke to someone at
4  GMAC.
5      Q.  So would it be fair to say that not all
6  communications were done by typing in, I would call
7  them e-mails into the New Trak system?
8      A.  Mostly that's how the communication
9  occurred, but there were sporadic instances of -- it
10  looks to me as if there were a few conversations.
11      Q.  I have a copy of a document that was
12  submitted to me.  I received it today.  It's a
13  response to our subpoena which asks for a copy of all
14  the communications with David Stern or between David
15  Stern and GMAC.  Have you ever seen this document
16  before?
17      A.  I can't see it from here.
18      Q.  Okay.  I only have the one copy.
19          MR. SMITH T:  David, here's another copy.
20          THE WITNESS:  I did see the draft of this
21  response, yes.
22      Q.  (BY MR. GARBER)  Did you participate in
23  preparing this?
24      A.  To the extent of what's attached, I was
25  the one who retrieved it from the system.

Page 41

1      Q.  Is this a list of all communications
2  between the Office of David Stern and GMAC with
3  respect to the Mack case?
4      A.  Again, I don't know because I haven't
5  looked at the hard file, but if there were other
6  conversations, our practice had been on a sheet of
7  paper it would have been noted the date and the
8  initials of the person who spoke to whomever and
9  there would be hand notes.  I don't recall seeing
10  that in this case.
11          Also, New Trak would have, in addition to
12  this, these two go together, New Trak and this report
13  go together to indicate the history of the case.
14      Q.  Can you please tell us why they have these
15  different dates and entries on this response.  What
16  does this mean?
17      A.  This, again, is from our Case Management
18  System called Tracker System and it has different
19  dates because any time -- our policy was any time a
20  person of the firm, paralegals, to the less extent
21  attorneys, should have gone into this computer system
22  and entered why they were in possession of the file,
23  what the status of the file was.
24          So at any time if I wanted a file or David
25  Stern wanted a file, he could go into the computer

Page 42

1  and he could see the latest date and see where the
2  file was and what was happening.
3      Q.  So any time anybody took possession of the
4  Mack file, they would have made an entry that would
5  appear on this piece of paper?
6      A.  That was how it was supposed to work, yes.
7      Q.  Did it work that way in this case, the
8  Mack case?
9      A.  To my knowledge, it seems to have worked
10  that way, but again, I don't -- I wasn't involved in
11  it, so I don't know.
12      Q.  Let's please turn to Deutsche double
13  01366, which is the last page, but it has the
14  earliest dates.  Do you have the last page, that page
15  1366?
16      A.  Yes.
17      Q.  The first entry is one from 7-29-2009.  Do
18  you see that, sir?
19      A.  Yes.
20      Q.  It says, "File received 7-24-2009."  Do
21  you know what that means?
22      A.  Yes.
23      Q.  What does that mean?
24      A.  That means that Glen -- I don't know how
25  to pronounce his last name.  I always called him

Page 43

1  Glen.  (Continuing) -- Glen Lewin on the 29th of July
2  entered that comment that the file had been received.
3  He was in the new files department, so he would have
4  opened the file on the 24th and five days later
5  posted to our tracking system that comment.
6      Q.  Now, when he received the file, would that
7  be an electronic transmission?
8      A.  In this case it was.
9      Q.  And was a copy kept of everything that was
10  received on that electronic transmission?
11      A.  No.  Unfortunately, I did not see a copy
12  of the electronic transmission.
13      Q.  Would it have been the ordinary procedure
14  that, in fact, a copy of those documents would be
15  scanned into your system or placed into your system
16  electronically?
17      A.  No.  It was kept in the hard copy in the
18  file.  It was printed by -- printed by Glen and put
19  in the new file and then moved on to the next
20  department.
21      Q.  Did you look to see if there was a
22  printing of what was received on the 24th?
23      A.  I did look and I couldn't find anything.
24      Q.  Does that mean it's missing from the file?
25      A.  That would be my assumption.

Page 44

1      Q.  Did it go missing at a time that it was in
2  the custody and possession of David Stern?
3      MR. SMITH T:  Object to form.
4      THE WITNESS:  That would be my assumption,
5  yes, it would have been misplaced.
6      Q.  (BY MR. GARBER)  And you would agree with
7  me that David Stern, as the lawyer, was responsible
8  for maintaining the files of his clients?
9      A.  David Stern -- the Law Offices of David
10  Stern is responsible for maintaining the file, yes.
11      Q.  Now, if we wanted to find out what was
12  sent electronically on that date, is there any way to
13  recover that now?
14      A.  Possibly from GMAC.
15      Q.  Only from GMAC?
16      A.  To my knowledge, yes.
17      Q.  No way that you can think of that it could
18  be recovered through the Law Office of David Stern?
19      A.  You could look at the Complaint terms, you
20  could look at the Title Information Sheet, and those
21  two documents were a compilation of what would have
22  been on the referral.
23      Q.  Do you know if a copy of the note was sent
24  on July 24, 2009, the Mack note?
25      A.  My review of the file indicated the title

Page 45

1  examiner said that they did not have a copy of the
2  note at the time they examined title a few days
3  later.
4      Q.  Was it normal practice that when the file
5  was sent out by GMAC, it would include a copy of the
6  note?
7      A.  Sometimes it did; sometimes it didn't.
8      Q.  Do you know why a note was not here?
9      A.  No, I don't.
10      Q.  Would somebody at David Stern, in the
11  ordinary course of events, have contacted GMAC about
12  getting a copy of the note?
13      A.  Yes, if the original wasn't delivered a
14  few days later, yeah, someone would have followed up
15  to get a copy.
16      Q.  Okay.  So when they got the electronic
17  download of the documents and it didn't have the
18  note, ordinarily David Stern would not follow up with
19  a question at that time?
20      A.  No, not at that point.
21      Q.  It says on the 29th a title search was
22  ordered?
23      A.  Yes.
24      Q.  That was a title search ordered by the
25  Office of David Stern?

12 (Pages 42 to 45)

Page 46

1    A.    Yes.
2    Q.    On the 10th of August there's a note. I
3  guess Brittany Patullo, is that who entered that
4  note?
5    A.    Yes.
6    Q.    And it says "7/29 awaiting plaintiff info
7  via NT," is that New Trak?
8    A.    Yes.
9    Q.    Do you know what that means?
10    A.    Yes.
11    Q.    What does it mean?
12    A.    It means that Brittany was waiting on July
13  29th to hear from GMAC as to the party that should be
14  the appropriate plaintiff.
15    Q.    Why was she waiting from 7-29 if Glen
16  Lewin was the one that made the note on 7-29-2009?
17    A.    Glen was in the new files department. He
18  simply opened the file.
19    Q.    What did Brittany Patullo do?
20    A.    I don't know. I assume from the note that
21  she was in the title department because they could
22  not complete the title report without knowing who the
23  client wanted the plaintiff to be.
24    Q.    The next entry is entered by Oral Walters.
25  Do you see that?

Page 47

1    A.    Uh-huh.
2    Q.    And that was on 8-10-2009?
3    A.    Yes.
4    Q.    It says, "File to cases UM;" is that
5  correct?
6    A.    Case Um.
7    Q.    What's that?
8    A.    Case Um is a department where all the data
9  from the referral and from the title information
10  sheet would be entered into a mergible document to
11  create the Complaint, the lis pendens, and the
12  summonses.
13    Q.    And that was done in this case?
14    A.    Yes.
15    Q.    And is that maintained electronically
16  somewhere?
17    A.    Once it's merged, it becomes the
18  Complaint, the lis pendens, and the summons. There
19  would be a copy of the Case Um where the attorney
20  would review and there would be checkmarks in the
21  hard copy of the file.
22        MR. GARBER: I have a copy of documents
23  that we received from Deutsche Bank and it came
24  purportedly from the Office of David Stern. I'd like
25  to mark this as the next numbered exhibit which would

Page 48

1  be -- or the next lettered exhibit which would be E,
2  and show it to you.
3        THE WITNESS: What do you want me to do
4  with what we were looking at, this Response? Is that
5  an exhibit or not?
6        MR. GARBER: Oh, yes, that should be an
7  exhibit, too. We'll mark that ---
8        MR. SMITH T: I don't think we marked
9  that.
10        MR. GARBER: Let's mark that Exhibit F.
11        (Thereupon, Deutsche 000979 - Deutsche
12        001068 and Response of Law Offices of David J.
13        Stern, P.A. To Defendants' Subpoena Duces Tecum
14        Without Deposition, were marked as Defendant's
15        Exhibits E and F, respectively, for
16        Identification.)
17    Q.    (BY MR. GARBER) I'd like to refer your
18  attention to the first two pages of Exhibit E.
19    A.    Before you say that, I need to retract my
20  testimony. I see the referral in this package of
21  documents that was printed out. I did not see it
22  yesterday when I was reviewing the hard copy of the
23  file.
24    Q.    You see a referral?
25    A.    The referral that was printed from New

Page 49

1  Trak.
2    Q.    From 7-29?
3    A.    Yes.
4    Q.    And where is that located in here?
5    A.    It is Deutsche number 1050. It starts
6  there.
7    Q.    That is the electronic ---
8    A.    That's what would have been pulled from
9  the New Trak system, the referral, and printed for
10  the new file to be opened in the office.
11    Q.    This was what came in on 7-24-09? Because
12  at the top of 1050 it says, Received from New Trak
13  7-24-09.
14    A.    Yes, and the date is also printed on the
15  document. At the very bottom right hand side you
16  can -- it's hard to see, but it is the 24th of July.
17    Q.    Can you look at this document that looks
18  like it's Deutsche 1050 through 1055 and tell me if a
19  copy of the note was sent out?
20        MR. SMITH T: You mean on that day?
21        MR. GARBER: Yes.
22        THE WITNESS: No, I can't tell from --
23  whether there was an attachment of a copy of the
24  note, in other words, what was printed by Glen on the
25  day that he printed the referral.

13 (Pages 46 to 49)

Page 50

1  Q. (BY MR. GARBER) So you can't tell if any
2  documents were uploaded into New Trak and then
3  downloaded by David Stern on the 24th?
4  A. No, I can't tell from this printout.
5  Q. Would there ordinarily be an electronic
6  way of keeping a record of what documents were
7  downloaded?
8  A. I did not have access to New Trak, so I
9  don't know if once you downloaded something you could
10  go back in and see what was downloaded. I don't
11  know.
12  Q. Turning to the first page of Exhibit E,
13  paragraph number five, it says, "Plaintiff owns and
14  holds the Note and Mortgage." Do you see that, sir?
15  A. Yes.
16  Q. However, in paragraph number four it says,
17  "A copy of the Mortgage AND NOTE ARE attached hereto
18  as 'Exhibit A.'" Do you see that?
19  A. Yes.
20  Q. Now, when we look at the exhibit, Exhibit
21  A is only the mortgage. Do you see that, sir?
22  A. Yes, it only references the note on the
23  first page.
24  Q. So the first page says that the note is
25  attached, but the note was not attached to that

Page 51

1  Complaint?
2  A. Yes.
3  Q. That's true?
4  A. That's true, I do not see a copy of the
5  note attached.
6  Q. Okay. There is, however, an Exhibit B.
7  Do you see that?
8  A. Yes.
9  Q. Okay. Can you tell us what Exhibit B is?
10  A. Exhibit B is an outline of the relevant
11  terms of the subject note.
12  Q. Do you know who prepared Exhibit B?
13  A. Whoever did the Case Um report.
14  Q. Would that have been somebody at David
15  Stern?
16  A. Yes.
17  Q. So David Stern prepared this document?
18  A. Yes.
19  Q. Where would they have gotten this
20  information?
21  A. From the mortgage document and from the
22  referral.
23  Q. Okay. Would this be indicative of the
24  fact that David Stern did not have the note on the
25  date that this document was filed with the Court in

Page 52

1  Collier County?
2  A. I don't know about the day it was filed.
3  It would be indicative that the copy of the note was
4  not in the file the date the Case Um was drafted.
5  Q. The Complaint was filed in a program you
6  have that merged documents that you received from
7  GMAC to form a Complaint and the lis pendens,
8  correct?
9  A. Correct.
10  Q. And since this document refers to the note
11  and mortgage, was it the ordinary practice of David
12  Stern to include the note and mortgage when they
13  filed a Complaint of foreclosure?
14  A. Yes. If the mortgage were not in the
15  file, then the Complaint should have been revised,
16  but apparently the attorney who signed this did not
17  catch the fact that there was not a note attached.
18  Q. Was Exhibit B placed in substitution for
19  the note?
20  A. Exhibit B was commonly used when a lost
21  note count was a part of the Complaint, but in
22  reviewing this Complaint, when it was filed, there
23  was no lost note Count II, so at that point that
24  indicates to me that the law firm must have been in
25  possession -- someone must have seen before the

Page 53

1  Complaint was filed that the law firm had the note
2  because no lost note was filed, but whoever saw that
3  didn't take it a step further and get the original
4  note copy and attach it to the Complaint before it
5  was filed.
6  Q. Do you have any actual knowledge on which
7  you base that, or is that just your supposition?
8  A. Looking at the comment history report that
9  is attached to the subpoena response, it indicates
10  the original note came in with the law firm.
11  MR. TEW: No, that's not the right one.
12  THE WITNESS: This is it. The original
13  note and mortgage and original title policy received
14  by the law firm on August 10, 2009. The Case Um --
15  the Complaint looks like it was completed on August
16  11th, so what that indicates to me is the original
17  note and mortgage were delivered to the document
18  team, but the document team did not advise the Case
19  Um department that they had the original note and
20  mortgage so that the Case Um department drafted the
21  Complaint thinking that there was no copy of the note
22  available.
23  Q. (BY MR. GARBER) Case Um would be a
24  department at the Office of David Stern?
25  A. Yes.

14 (Pages 50 to 53)

Page 54

1    Q.   The program that produced the Complaint
2  and also the lis pendens, they would have produced
3  both those documents on the same date?
4    A.   Yes, they were a part of the same
5  document.
6    Q.   I believe we have a copy of the lis
7  pendens in here.  Let me see if I can find it.
8    A.   It's Deutsche number 1056.
9    Q.   Okay.  I have a copy at 1012.  Let me just
10 look and see if the 56 one is the same.
11         Could you please refer your attention to
12 1012.  1012 has a "Filed" stamp on Collier County
13 Circuit Court of August 20, 2009.  Do you see that,
14 sir?
15    A.   Yes.
16    Q.   But the one at 1056, it does not have a
17 "Filed" stamp.
18    A.   Yes, correct.
19    Q.   Do you know why they would be different in
20 that respect?
21    A.   The document lis pendens at 1012 is a copy
22 provided by Provest, the process server, after the
23 Complaint was filed with the Court case number on it.
24 The other document, 1056, is simply a copy that was
25 signed by the attorney before it was filed with the

Page 55

1  Court.
2    Q.   The lis pendens was -- it had the name of
3  Elsa Hernandez Shum as an attorney, but it was
4  actually signed by another attorney and that's the
5  page at 1013.  Could you please look at that.
6    A.   Yes, I see that.
7    Q.   It says it was signed on August 17, 2009.
8  What is the name of the attorney?
9    A.   Looks like Misty Barnes signed it.
10    Q.   Is that B-a-r-n-e-s?
11    A.   Yes, I believe so.
12    Q.   Who is Misty Barnes?
13    A.   She was an associate foreclosure attorney.
14    Q.   Was she a supervisor of Elsa Shum?
15    A.   No.
16    Q.   Why would she have signed it instead of
17 Ms. Shum?
18    A.   At that time a lot of Complaints were
19 being generated and there were more Complaints being
20 generated for review and signature than we had
21 necessarily attorneys on a particular team to sign.
22 Elsa was on the GMAC team, and for example, a batch
23 might have come in from GMAC where there were 200
24 Complaints to be filed, but she couldn't possibly
25 have reviewed them all, so she had help from other

Page 56

1  associate attorneys.
2    Q.   Now, at the time Misty Barnes signed this
3  Complaint -- and by the way, I see the number of 3100
4  it looks like beneath her name.  Do you know what
5  that is?
6    A.   I believe that's her Bar number.  I don't
7  think it's a complete number there.  It looks like
8  3100 and then another digit, which I can't tell what
9  it is.
10    Q.   At the time that Misty Barnes signed this,
11 would it have been her responsibility to review the
12 Complaint for completeness?
13    A.   She should have, yes.
14    Q.   And so if she signed it on August 17th but
15 the Office of David Stern had received the note by
16 August 10th, should she have caught that fact?
17    A.   She would have had to have gone into the
18 electronic computer system and seen that the note was
19 received, yes, but I don't know that associate
20 attorneys necessarily did that as a matter of course.
21    Q.   Would it have been her responsibility, if
22 she did know there was a note, to attach it as part
23 of Exhibit A as indicated in the Complaint?
24    A.   Absolutely.
25    Q.   Do you know how these documents that are

Page 57

1  Deutsche Bank 979 to 1068 came into the possession of
2  Deutsche Bank?
3    A.   Are these copies from the hard file?
4    Q.   I've been told they were copies of the
5  hard file.
6    A.   See, I've never seen the hard file.  The
7  hard file was taken from our storage facility, so.
8         MR. SMITH T:  I can represent that they
9  were.  This is the hard file.  I haven't looked at
10 the exhibits.
11         Excuse me, Forrest.  I'm sorry to
12 interrupt you.
13         I have not looked at this entire exhibit,
14 but as we said, as we said in the response to the
15 subpoena, Deutsche 979 through 1068 were obtained
16 from Iron Mountain by subpoena.
17         MR. GARBER:  And I appreciate that, but I
18 want to find out what the witness knows.
19         MR. SMITH T:  I understand.
20         THE WITNESS:  That's my knowledge, if it's
21 the hard file, it was obtained from Iron Mountain
22 storage facility.  The law firm did not have
23 possession of the hard file.
24    Q.   (BY MR. GARBER)  Was the Iron Mountain
25 storage facility the facility that was maintained by

15 (Pages 54 to 57)

Page 58

1    David Stern for its old files?
2        A.   It's a separate storage facility.  It's
3    not maintained by the Law Offices of David Stern.
4        Q.   Who pays for it?
5        A.   Nobody pays for it.  It's -- the law firm
6    can't afford to pay storage fees anymore.
7        Q.   Was anybody paying for it in 2009?
8        A.   Yes, the law firm was paying for storage
9    fees back then.
10       Q.   Who would have had access to that file
11   besides David Stern once it was placed in Iron
12   Mountain?
13       A.   No one, other than Iron Mountain
14   employees.
15       Q.   GMAC would not be able to get information
16   out of that?
17       A.   No.  It was our office file.  It was not
18   their file.
19       Q.   Do you have any knowledge of how it came
20   into the possession of GMAC?
21       A.   Just as was stated before, through a
22   subpoena to Iron Mountain, and Iron Mountain, it's my
23   understanding, produced the hard file.
24       Q.   To the best of your knowledge, is the
25   original file still in Iron Mountain?

Page 59

1        A.   I don't know where it is.
2        Q.   When you were preparing for this
3    deposition, did you review all the documents that are
4    contained in this Exhibit E?
5        A.   I reviewed them on the computer.  A copy
6    was sent by Attorney Smith to me to look at what was
7    produced.
8        Q.   Were they divided up into two parts, one
9    being this part that represents the hard copies from
10   Iron Mountain?
11       A.   Yes.
12       Q.   So you have reviewed all these in
13   preparation for this deposition?
14       A.   I quickly went through them.  Again, I
15   didn't spend much time on any of them.  I just looked
16   to see what they were.
17       Q.   Do you know if there was a problem with
18   the Mack referral when it was received by David
19   Stern?
20       A.   No, I didn't see anything regarding --
21   problem in transmission, is that what you mean?
22       Q.   Some problem with handling the file.
23       A.   The handling of the file?
24       Q.   Yes.
25       A.   No.

Page 60

1        Q.   If you would please turn to Deutsche Bank
2    1061.  Okay, this is a document that was prepared by
3    David Stern?
4        A.   No.
5        Q.   Who prepared this document?
6        A.   This was prepared by the title company.
7        Q.   The title company prepared this?
8        A.   Yes.
9        Q.   It says down at the bottom, "Note not
10   available" and the date is 8-8-09.
11       A.   Okay.
12       Q.   That would have been the title company
13   that would have put that down?
14       A.   Yes.
15       Q.   And again, on the next page, 1062, they
16   put "Note not available"?
17       A.   Is there a question?
18       Q.   Yes, that would have been true as of the
19   8th of August, 2009 that the note was not available?
20       MR. SMITH T:  Object to form.  Lack of
21   foundation.  Go ahead.
22       THE WITNESS:  I'm confused.  It looks like
23   the title examiner did not have a copy of the note on
24   the date that they did the title exam, which was
25   8-8-09.

Page 61

1        Q.   (BY MR. GARBER)  And looking at the
2    response to the subpoena that we have, it says that
3    the original note and mortgage and TP -- is that
4    title policy?
5        A.   Yes.
6        Q.   (Continuing) -- received on 8-10-2009,
7    correct?
8        A.   It's reflected received by the law firm.
9    This is the title examination report.  Two different
10   entities.
11       Q.   I see.  What was the name of this title
12   company?
13       A.   Professional Title & Abstract of Florida.
14       Q.   Who would have sent information to them to
15   prepare that?
16       A.   The law firm.
17       Q.   So they were a private contractor used by
18   David Stern to facilitate the foreclosure process?
19       A.   Yes.  And if you look at the comment
20   history, the title search was ordered on the 29th of
21   July which pre-dated the receipt of the note.  So
22   what the title company got probably was not
23   reflective of what the law firm had at the time the
24   exam was done.
25       Q.   The name of this company was Professional

16 (Pages 58 to 61)

Page 62

1  Title & Abstract; is that correct?
2      A.  Yes.
3      Q.  Do you know where they're located?
4      A.  I don't believe that they are doing
5  business any longer.
6      Q.  Where were they located?
7      A.  They were located at 900 South Pine Island
8  Road, I believe the fifth floor.
9      Q.  Is that the same building the Law Office
10  of David Stern was in?
11      A.  Yes.
12      Q.  Do you know if this was a business that
13  was affiliated with David Stern by cross boards of
14  directors or ownerships?
15      A.  Yes, I do know.
16      Q.  And it was an affiliated company?
17      A.  Yes.
18      Q.  Do you know when they went out of
19  business?
20      A.  No, I don't.  It eventually became a
21  public company and I don't know when they stopped
22  doing business.
23      MR. SMITH T:  David, can we take just a
24  short break --
25      MR. GARBER:  Sure.

Page 63

1      MR. SMITH T:  (Continuing) -- when you get
2  to a point?
3      MR. GARBER:  Can I just get to one point?
4      MR. SMITH T:  Yeah.
5      MR. GARBER:  On this title note there is a
6  portion that has been redacted on the last, 1065, and
7  Mr. Smith T has objected to that information being
8  given.  Would you also object to it here today, John?
9      MR. SMITH T:  Yes.  I mean, the Judge has
10  already ruled that it is not relevant, has nothing to
11  do with this case, so I don't understand even why you
12  would seek to revisit it at this time since the Judge
13  has already seen what's behind that and ruled on
14  this.
15      MR. GARBER:  I understand.
16      Okay, we can take a break.
17      VIDEOGRAPHER:  We're going off video
18  record.
19      (Thereupon, a brief recess was taken.)
20      VIDEOGRAPHER:  We're back on video record.
21      Q.  (BY MR. GARBER)  Mr. McSurdy, would you
22  please turn your attention to Exhibit D that we've
23  already introduced.
24      A.  Okay.
25      Q.  As far as you know, this Exhibit D, which

Page 64

1  is the response of David Stern to the Counterclaim of
2  GMAC, all of it's true and correct?
3      A.  Yes.
4      Q.  Did you participate in its preparation?
5      A.  Not specifically.
6      Q.  Did you provide information for it?
7      A.  I may have.  I don't specifically recall.
8      Q.  Do you know who did provide information
9  for it?
10      A.  I would be guessing.  Other than myself,
11  possibly David Stern.
12      Q.  Paragraph number two of the Affirmative
13  Defenses, that's found on page five of Exhibit D, in
14  paragraph number two the Office of David Stern is
15  saying GMAC is not entitled to relief because it
16  breached the contract by, among other things, failing
17  to promptly obtain replacement counsel.
18      Do you know if GMAC made attempts to
19  promptly obtain replacement counsel with respect to
20  the Mack case?
21      A.  That was really not relevant because the
22  case was closed on our system.
23      Q.  So from David Stern's point of view, when
24  they were terminated in November of 2011, David Stern
25  didn't feel that replacement counsel was needed with

Page 65

1  respect to the Mack case?
2      A.  That's correct.
3      Q.  In paragraph number three it says that
4  GMAC's claims are barred because of GMAC's own
5  negligence caused all or part of its purported
6  damages.  Part of those damages the judgment that
7  they illuded to in their Complaint of $450,000 in the
8  Mack case.
9      Can you tell us if GMAC was guilty of any
10  negligence in that case?
11      A.  In the Mack case?
12      Q.  Yes.
13      MR. TEW:  I'm gonna instruct him not to
14  answer as to legal conclusion.  He's here as a fact
15  witness, not to make a legal conclusion.
16      Q.  (BY MR. GARBER)  Did GMAC breach any
17  duties in the Mack case?
18      MR. TEW:  Same instruction.
19      Q.  (BY MR. GARBER)  Did GMAC do anything
20  wrong in the Mack case?
21      MR. TEW:  Same instruction.  In addition
22  to everything else, there's nothing in the subpoena
23  relating to this and it's calling on the witness to
24  make conclusions of law.  He's here as a fact witness
25  to testify about the Mack case in detail but not

17 (Pages 62 to 65)

Page 66

1  conclusions as to GMAC's conduct.
2      MR. GARBER:  And it is my understanding
3  that the subpoena that was sent out for a corporate
4  representative notifies the corporate representative
5  of those things specifically that he should try to be
6  prepared on, but it does not preclude that other
7  questions can be asked.
8      MR. TEW:  I know, but it doesn't turn him
9  into an expert witness who can make a legal
10 conclusion from facts.  For one thing, you haven't
11 asked him any hypotheticals.  I wouldn't let him
12 answer those anyway, but you're saying, did GMAC do
13 something wrong?  Those are all conclusions of fact
14 and law, and he's not here as that type of witness.
15 It's inappropriate to ask him.
16     MR. GARBER:  Okay.  That might be
17 important to our case.  Most things I can let go, but
18 that might be important to the case.
19     MR. TEW:  Well, that's for the Judge to
20 decide, not for Forrest.  He can't look at the facts
21 and make conclusions.
22     Q.  (BY MR. GARBER) With respect to paragraph
23 number nine, David Stern was saying that GMAC's
24 claim should be barred by the doctrine of unclean
25 hands for failure to retain replacement counsel.

Page 67

1      I've already asked you about that with
2  respect to the Mack case, and you said that's not an
3  issue, correct?
4      A.  That was not -- replacement counsel was
5  not an issue in either GMAC nor the Law Office of --
6  to my knowledge, the Law Offices of David Stern did
7  not tell GMAC that replacement counsel was necessary
8  because the file was closed in our system.
9      Q.  It goes on to cite -- citing inaccurate
10 affidavits.  There were no inaccurate affidavits,
11 were there, that was signed by GMAC on the Mack case?
12     A.  I don't know about inaccurate.  I didn't
13 see any affidavits in the Mack case at all, so I
14 don't think that would be pertinent.
15     Q.  Not confirming whether loan and mortgage
16 documents were properly endorsed.  Was that true in
17 the Mack case, that GMAC failed to see if loan and
18 mortgage documents were properly endorsed?
19     A.  Could you repeat the question?  I don't
20 really understand what you're asking.
21     Q.  Okay.  I'm asking, with respect to the
22 Mack case, do you know whether or not any loan or
23 mortgage documents that GMAC provided to the office
24 of David Stern were not properly endorsed or assigned
25 or in the possession of the appropriate party?

Page 68

1      A.  My review of the file did not indicate
2  that there was any inappropriate endorsement or loan
3  documentation in the file.
4      Q.  Was there any problem with GMAC having the
5  note?  We saw earlier on the Title Sheet that they
6  did not have the note as of the 8th of August.  Was
7  there some problem in getting the note from GMAC?
8      A.  I don't believe that it indicated GMAC
9  didn't have the note as of the 8th of August.  It
10 indicated our law firm did not have the note until
11 the 8th of August.
12     Q.  Right.
13     A.  Right.
14     Q.  But there was no problem in getting that
15 note from GMAC?
16     A.  No.  Actually, that was a quick delivery
17 of an original note based on my experience with
18 foreclosure cases.
19     Q.  This paragraph cites an order that was
20 entered by the Board of Governors in the Federal
21 Reserve System on April 13, 2011, which identified
22 misconduct on behalf of GMAC.  Do you have any
23 knowledge of that order?
24     A.  I've never read that order.  I've heard of
25 it, but that's the extent of my knowledge.

Page 69

1      Q.  So would it be fair to say that you also
2  don't have any knowledge of any misconduct by GMAC
3  with respect to the Mack case?
4      A.  Yes, I have no knowledge of that.
5      Q.  And by saying you have no knowledge,
6  you're not denying misconduct, but you have no
7  knowledge one way or the other?
8      MR. SMITH T:  I object to that.  The
9  witness can answer the question.
10     Q.  (BY MR. GARBER)  Is that a fair statement?
11     MR. GARBER:  Well, I just want to make
12 sure it's not mischaracterized later on.
13     MR. TEW:  Well, his answer is crystal
14 clear, he doesn't know.
15     THE WITNESS:  I don't know.
16     MR. GARBER:  Okay, I have some other
17 documents that I would like to go over with you, and
18 these are the second half of the Stern file that was
19 provided to us by Deutsche Bank.
20     Can we please have them marked as our next
21 numbered exhibit.
22     (Thereupon, Deutsche 001176 - Deutsche
23 001355 were marked as Defendant's Exhibit
24 G, for Identification.)
25     Q.  (BY MR. GARBER)  By the way, Mr. McSurdy,

18 (Pages 66 to 69)

Page 70

1    I note that it's 20 minutes to 1:00.  Are you okay
2  to just go through lunch?
3     A.  Sure.
4     Q.  Okay, thank you.
5     Do you have a copy of Exhibit G in front
6  of you?
7     A.  Yes.
8     Q.  The first one is a letter from my office
9  to Ms. Shum dated February 2, 2011.  Do you see this?
10    A.  I do.
11    Q.  Did David Stern receive this letter?
12    MR. TEW:  You mean the law firm?
13    THE WITNESS:  The law firm.
14    MR. GARBER:  Right.
15    THE WITNESS:  If this was one of the
16  documents that was produced by GMAC, yes.  I
17  personally pulled these documents from the system, so
18  if they -- if GMAC produces them, yes, it was
19  received by the law firm.
20    Q.  (BY MR. GARBER)  So in the second
21  production by Deutsche Bank, based on a production
22  request from my office, all those documents that
23  Deutsche Bank sent to us or GMAC sent to us were
24  ones you pulled from the system, correct?
25    A.  Yes, yes.

Page 71

1    Q.  So I see there's a bar coding down here on
2  the bottom right hand corner of the February 2nd
3  letter.
4    A.  Yes.
5    Q.  Was that put on there by David Stern's
6  office?
7    A.  Yes, that's when the mail room would have
8  processed the letter.
9    Q.  So whatever mail comes in, the mail room
10  would get it and put on the bar code?
11    A.  Yes.
12    Q.  And then what would they do with it?
13    A.  Well, what was supposed to happen was it
14  was supposed to be scanned into the system for the
15  particular file.  They would look up what the file
16  pertained to and then the hard copy should have been
17  given to the paralegal handling the case and
18  eventually an attorney would review the letter or the
19  pleading.
20    Q.  This letter was addressed to Ms. Shum.
21  Was she a lawyer at the Office of David Stern on
22  February 2, 2011?
23    A.  Yes.
24    Q.  It would not have ordinarily gone to her?
25    A.  Yes, it would have.  It would have made

Page 72

1  its way.  The process would have been mail room would
2  have scanned it first into the system, the hard copy
3  of the letter given to her paralegal on this
4  particular file, and then the paralegal would have
5  given that with other documents received that day to
6  Ms. Shum for her review and instructions as to what
7  to do.
8    Q.  Now, in this particular case David Stern
9  filed a foreclosure against the Macks in August of
10  2009, correct?
11    A.  Yes.
12    Q.  And there was a Counterclaim that was
13  filed on this in September of 2009, wasn't there?
14    A.  My review of the file indicates that there
15  was a Counterclaim filed, yes.
16    Q.  Would it have been the responsibility of
17  David Stern to notify GMAC when they received the
18  Counterclaim?
19    A.  Yes.  What should have happened was when
20  it came into the mail room, it should have been
21  scanned -- the same process, it should have been
22  scanned by the mail room, and then the hard copy
23  given to the paralegal, the paralegal should have
24  given it to the attorney handling the file, Ms. Shum.
25  She then would have reviewed it.  Because it was a

Page 73

1  contested pleading, she would have given it to a
2  managing attorney with the file, who would -- the
3  managing attorney would then have assigned it to a
4  litigator in the litigation department and from that
5  point, the litigator would have sent a copy to the
6  client, GMAC in this case, along with a proposed
7  budget how to defend that particular pleading.
8    Q.  That's what should have happened --
9    A.  That's what should have happened.
10    Q.  (Continuing) -- when the Counterclaim came
11  in?
12    A.  Yes, in September of --
13    Q.  2009?
14    A.  (Continuing) -- 2009.  I believe it
15  actually wasn't posted to Tracker until October of
16  2009.
17    Q.  So the Counterclaim then was posted to
18  Tracker in October of 2009?
19    A.  Yes.  The mail room was receiving
20  approximately 10,000 pieces of mail a day and they
21  were backlogged.
22    Q.  So was it assigned to a litigation
23  attorney?
24    A.  No, it never was.
25    Q.  Was there any understanding that David

Page 74

1  Stern had with GMAC that they would only handle the
2  foreclosure case and not handle a Counterclaim that
3  was filed?
4       A.  No, there was no such understanding.
5       Q.  So it was the duty of David Stern to
6  notify GMAC when they got the Counterclaim?
7       A.  That was the normal practice, yes.
8       Q.  And that was their duty?
9       A.  Yes, that was what was expected of them by
10  GMAC.
11       Q.  Was it also the duty of David Stern to
12  have filed an appropriate Answer to the Counterclaim
13  in the suit of foreclosure they brought in the Mack
14  case?
15       A.  Not necessarily.  It would have depended
16  on the response gotten -- received from GMAC after
17  the copy of the pleading had been sent to them with
18  the proposed budget.
19           Sometimes GMAC or another client would
20  say, "We would prefer another firm to handle the
21  defense of the Counterclaim, please transfer the file
22  to this firm."
23       Q.  Would it be fair to say then that when
24  Counterclaims were filed on foreclosure suits, they
25  were handled on a case-by-case basis, depending on

Page 75

1  the wishes of GMAC?
2       A.  Yes.
3       Q.  Did David Stern submit a budget to GMAC
4  about handling the Counterclaim?
5       A.  No.
6       Q.  Do you know if this letter of February 2,
7  2011 ever reached Ms. Shum?
8       A.  I do not know.  I can say what the
9  practice have been if I could tell if she had
10  received it.  What she should have done, our
11  attorneys are instructed to initial and date in the
12  lower corner of the letter if they had ever reviewed
13  the letter or the pleading.
14       Q.  And the fact that we don't see an initial
15  and a date in the bottom right hand corner, does that
16  indicate she did not?
17       A.  Indicates to me that she did not see the
18  letter.
19       Q.  Do you know who the paralegal was that
20  should have handed it to her?
21       A.  On this date, no.  There was much
22  turnover.
23       Q.  How many paralegals did you have
24  approximately that might have been assigned the Mack
25  responses?

Page 76

1       A.  The GMAC team had -- it could have been
2  one of 12.
3       Q.  Do you know the names of the people that
4  could have been doing it?
5       A.  No, I'm sorry.
6       Q.  Is there any record at David Stern of who
7  those people are?
8       A.  No longer, no.  There's nothing, at least
9  at this point.
10       Q.  Now, the Complaint itself was not signed
11  by Ms. Shum.  It was signed by Ms. Barnes, do you
12  remember that?
13       A.  Yes, I remember that.
14       Q.  Would this letter have been given to
15  Ms. Barnes because she was the one that actually
16  signed the Complaint?
17       A.  Again, I don't know.  I don't know what
18  happened to the letter.  From what I could tell, it
19  didn't make it out of the mail room.  The tracing of
20  it stopped with the mail being scanned into the
21  system.
22       Q.  Was Ms. Shum the individual attorney that
23  was assigned the Mack case?
24       A.  Yes.
25       Q.  Was it transferred over to Ms. Barnes

Page 77

1  because she signed the Complaint?
2           MR. SMITH T:  Let me object to the form.
3  I know we looked at the lis pendens which was signed
4  by Ms. Barnes.  I'm not sure we saw who signed the
5  Complaint, but go ahead.
6           MR. GARBER:  Actually, I don't know
7  either.  That's a good question.
8       Q.  (BY MR. GARBER)  Let's look at Exhibit E
9  and tell me, if you can, who signed it.
10       A.  I cannot tell who signed the Complaint.
11       Q.  Can you tell me who signed that Complaint,
12  the second page?
13       A.  It was not Misty Barnes, I can tell you
14  that.
15       Q.  Yeah, that's a good point.
16           What is that first thing, L/H?
17       A.  I can't make out anything.  A name, I
18  don't recognize a name, they didn't put their Bar
19  number.
20       Q.  It has a name of Miriam Mendieta.
21       A.  I know Miriam's signature and that's not
22  Miriam's signature.
23       Q.  Is there any way we can find out who
24  signed this Complaint?
25       A.  Not at this point.  I'm sorry.

20 (Pages 74 to 77)

Page 78

1    Q.   There are no records that David Stern has
2  that would show that?
3    A.   No, we don't have an HR department
4  anymore.  We don't have anything.
5    Q.   Okay.  Going beyond and in Exhibit G, the
6  first entry, Exhibit G was received by David Stern,
7  but as far as you can tell David Stern's office made
8  no action with respect to the February 2nd letter,
9  correct?
10    A.   Correct.
11    Q.   The next thing we have is a letter to the
12  clerk, it's also dated February 2, 2011, and it has
13  enclosures.  Motion to Compel Discovery.  Did the
14  Office of David Stern receive a copy of this letter
15  dated February 2, 2011 to the clerk?
16    A.   I can -- I can tell you that any documents
17  dated after the last date of the entry on the Tracker
18  comment history, the same -- my testimony would be
19  the same that if nothing is indicated after that
20  date, when the last date of the comment history, then
21  it indicates that nobody did anything with respect to
22  any documents that were received by the mail room.
23    Q.   Right, but I just want to make sure that I
24  have an acknowledgment that David Stern did receive a
25  copy of this letter of February 2, 2011.

Page 79

1    A.   I don't see the stamp on here from the
2  mail room, but I assume that it was also delivered as
3  part of the package that I sent to Mr. Smith, so yes,
4  if that's the case.
5    Q.   Okay.  It bears the Deutsche Bates stamp
6  of double 01177.
7    A.   Okay, then that would have been pulled
8  from our system electronically.
9    Q.   So as far as you know, that was received
10  by David Stern?
11    A.   Yes.
12    Q.   Okay.  And then there was a copy of the
13  Motion To Compel Discovery.  That was attached to it.
14  And that's also Deutsche Bates stamped.  That would
15  have been received as well?
16    A.   Yes.
17    Q.   And the next thing would be a copy of the
18  request for production of documents that's found at
19  Bates stamp 1180 and 1181 and 1182, correct?
20    A.   Yes.
21    Q.   And David Stern's office would have
22  received that as well?
23    A.   Yes.
24    MR. SMITH T:  David, are you intending to
25  go through each one of these?

Page 80

1    MR. GARBER:  Yeah, I just want to make
2  sure they were all received by them.
3    MR. SMITH T:  And I appreciate that.  I'm
4  not trying to prevent you from handling your
5  deposition, but I do want just to maybe save some
6  time and state that we have -- there has been
7  submitted in this response to the subpoena the
8  statement that says Defendant's documents labeled
9  Deutsche 1176 through 1355, these records were
10  electronically stored and contained documents that
11  had -- well, the rest of that doesn't matter.  But we
12  can say for the record that these are the documents
13  that Mr. McSurdy provided to me, which I then
14  produced in response to your document request.
15    MR. GARBER:  Okay.  And let me do this
16  since I want his knowledge on here to try and save
17  some time.
18    Q.   (BY MR. GARBER)  Can you look at the rest
19  of the packet and make sure these are the documents
20  that David Stern had in their possession and
21  provided to Deutsche -- to GMAC.
22    A.   Yes, these are all the documents that the
23  law firm received on the Mack file.
24    Q.   And do you have any reason to believe that
25  any of these documents, and they're numerous

Page 81

1  documents, that have dates on them were not received
2  by the Office of David Stern at or near the date of
3  the document?
4    MR. SMITH T:  Object to the form.  Let me
5  just say, I'm not preventing him from answering, but
6  again, we have made it known that some of the
7  documents have auto dating coding which change the
8  day when they were printed.  So the dates reflected
9  on some of the documents themselves won't reflect the
10  actual date or the contemporaneous receipt or
11  generation of that document.
12    Q.   (BY MR. GARBER)  Okay.  And the question
13  was:  Do you have any reason to believe that any of
14  these documents that bear a date on them as to when
15  they were made were not received by the Office of
16  David Stern at or about the time the document was
17  made?
18    MR. SMITH T:  Same objection.
19    THE WITNESS:  No, I have no reason to
20  believe that they were not received within a
21  reasonable time after the date shown, except in the
22  exception that he stated for auto dating.
23    Q.   (BY MR. GARBER)  Okay.  And just to take
24  an example, the first page of Exhibit G, that's a
25  letter dated February 2, 2011, to the best of your

Page 82

1  knowledge that was received by the Office of David
2  Stern a few days, within a few days of February 2,
3  2011, correct?
4      A.  Sometime between February 2nd and February
5  11th, yes.
6      Q.  And February 11th, okay.  And how do you
7  know February 11th?
8      A.  The mail stamp at the bottom there.
9      Q.  I see.  Okay.  Would you please turn to
10  Deutsche 1205.  This is an order setting the Deutsche
11  Bank versus Mack case for a docket sounding and it
12  bears the David Stern bar coding in the top right
13  hand corner.  Do you see that?
14      A.  Yes.
15      Q.  Looks like it has a date of February 17,
16  2011.
17      A.  Well, this is a proposed order.
18      Q.  Yes, but you're acknowledging that David
19  Stern received this, correct?
20      A.  Yes.
21      Q.  And would this not have attracted some
22  attention in the mail room that a trial was brewing
23  on this case?
24      A.  Would it not have?
25      Q.  Yeah.

Page 83

1      A.  Apparently it did not.
2      Q.  Would it be fair to say it should have?
3      A.  It should have been delivered to the
4  paralegal and paralegal should have given it to the
5  attorney handling the file.
6      Q.  Would you please turn to Deutsche Bates
7  stamp double 01239 and 1240.  Would you tell us what
8  1239 is.
9      A.  It is a copy of the Notice of Voluntary
10  Dismissal filed by the Law Offices of David Stern in
11  the Mack case, and it looks like it was filed on
12  December 8, 2009.
13      Q.  And who was -- who signed this Notice of
14  Voluntary Dismissal?
15      A.  It looks like Melissa Moros.
16      Q.  Okay.  Was it the practice of David Stern
17  to give a service list of everybody they give a copy
18  to?
19      A.  Yes.
20      Q.  Any reason to believe that David Stern
21  sent a copy of this Notice of Voluntary Dismissal to
22  the Macks' attorney, who was me, David Garber?
23      A.  No.  It looks like it went to the Macks.
24      Q.  Should it have gone to the Macks'
25  attorney?

Page 84

1      A.  Yes, it should have.  What should have
2  happened is the Case Um report should have been
3  updated to indicate that you had made an appearance
4  in the case and the system would have automatically
5  put you in there.
6      Q.  Okay.  Later on we're going to see some
7  New Trak notes and the New Trak notes indicate that
8  the Office of David Stern confirmed the file was
9  closed on September 3, 2009.
10      Do you know if the file, the Mack file was
11  closed on September 3, 2009?
12      A.  I have to look back at the comment
13  history --
14      Q.  Okay.
15      A.  (Continuing) -- which is Exhibit F
16  attached to the response to the subpoena.
17      The file was instructed to be closed by
18  GMAC on September 2nd and it was physically closed on
19  October 5, 2009.  There was an entry "File clicked
20  closed."
21      Q.  Okay.  Can you tell by looking at this
22  Exhibit F whether or not GMAC was notified that David
23  Stern's office had closed the file?
24      A.  From looking at Exhibit F, no.  They would
25  have known -- they would have received back the

Page 85

1  original note and mortgage.  There was a note there
2  on November 17, 2009 which is standard practice after
3  a file is closed to send back the original documents
4  to the client.  So that would have been their
5  indication the file was closed.
6      Q.  So based on Exhibit F, you believe that
7  David Stern closed the file on October 5, 2009?
8      A.  That's what is indicated, yes.
9      MR. SMITH T:  Object to form.
10      Q.  (BY MR. GARBER)  Okay.  Now, this
11  particular Notice of Voluntary Dismissal that we see
12  in Deutsche Bank 1239 was signed on December 2,
13  2009, correct?
14      A.  Correct.
15      Q.  Why would this have been generated if the
16  file had been closed in October?
17      A.  It was not a correct procedure.  The file
18  should not have been closed until the dismissal was
19  filed.
20      Q.  How did it come to be the file that was
21  closed and off the radar would suddenly be revived to
22  have work done on it?
23      A.  Are you asking me to speculate what
24  happened?
25      Q.  I'm asking if you know.

22 (Pages 82 to 85)

Page 86

1    A.   From the file I can't tell what caused the
2    dismissal to be filed.  In the normal course of the
3    practice of the firm, dismissals at that time were
4    being filed within six to nine months after a file
5    was closed.
6         Once the file was clicked closed, it would
7    be delivered to the dismissal department, and then we
8    had so many files that had to be dismissed at one
9    time in 2009 that it took six months to nine months
10   for that department to generate dismissals and get
11   them filed.
12        However, if during that period when the
13   file was closed but the physical file was in the
14   dismissal department to be dismissed, if an attorney
15   or a party needed a dismissal filed in order to sell
16   a piece of property or whatever reason they needed to
17   release the lis pendens, it would be pushed to the
18   head of the pile of dismissals.
19   Q.   Now, David Stern maintained an actual
20   paper file for a portion of the Mack case, correct?
21   A.   Yes.
22   Q.   When it was closed, as indicated on
23   October 5, 2009, would that paper file go somewhere?
24   A.   It would go -- in this case it would have
25   gone to the dismissal department to file the

Page 87

1    dismissal.
2    Q.   Okay.  So they would keep it there semi
3    active until they got the dismissal filed?
4    A.   Correct.  If you look at the comment
5    history -- oh, I take that back.  It looks like the
6    file was sent to storage before it went to the
7    dismissal department, which is not -- that's not the
8    normal case.  It should not have been sent to storage
9    until the dismissal was filed.
10   Q.   Okay.  So I see what you're looking at, on
11   9-22 "File to storage."
12   A.   Yes.
13   Q.   Is that what you're looking at?
14   A.   Yes.
15   Q.   And I see the dates are out of order
16   because they start at 9-15, they go up to 11-17 and
17   12-7 and then they go back to 9-22.  Do you know why
18   that's out of chronological order?
19   A.   No, I don't know why the system recorded
20   it that way.  Oh, oh, it's by year.  Look at the
21   year.  It's not out of chronological order.
22   Q.   Oh, I see.  Okay.
23        Well, let's look at the entry on Deutsche
24   Bank 1364, that's the third one down from the top,
25   and it says Heather Smith on 9-22-2010.  That's the

Page 88

1    person that made this entry?
2    A.   Yes.
3    Q.   Okay.  She sent a voluntary dismissal to
4    the court on 12-7-2009?
5    A.   Right.
6    Q.   Why did she make that notation a year
7    later or almost a year later?
8    A.   They were very backed up in what they had
9    to do.  That's what I was saying to you, six to nine
10   months.  That's almost -- that's 10 months later she
11   updated the system as to what had been done.
12   Q.   What would prompt her to update the system
13   after nine months after it had been closed?
14   A.   I have no idea.  It drove us crazy.  I
15   don't know.  We were constantly after them to do
16   better, and obviously in this case they didn't do
17   better.
18        VIDEOGRAPHER:  Excuse me for interrupting,
19   but we have a tape change in five minutes.
20   Q.   (BY MR. GARBER)  Okay.  The first entry
21   that's on this page 1364 is a Jennifer Bragonier.
22   That's an employee of David Stern?
23   A.   She was, yes.
24   Q.   And on 9-22 it says "Updated without
25   file."  What does that mean?

Page 89

1    A.   It means the file, as you see there, was
2    sent to storage it looks like the same day she
3    updated it but she didn't have the file.  She went
4    into the computer system without the file in front of
5    her.
6    Q.   And she updated the file?
7    A.   Updated without file, but it doesn't look
8    like she said anything.  She just updated without
9    file.
10   Q.   How would she update it?
11   A.   She also put comments lower there, "File
12   to storage, order recorded and scanned 9/22."
13   Q.   What order would she have been waiting?
14   A.   The dismissal order.
15   Q.   Where would there be a dismissal order?
16   A.   The voluntary dismissal back from the
17   Court.  She called it an order.  It really
18   technically wasn't an order.  It might have been in a
19   stack of papers that she had had there for six months
20   that she finally got to import in the system.  That's
21   how far back they were.
22   Q.   It says under this first entry by Jennifer
23   Bragonier on page 1364, it says, "Historical comments
24   (Secondary)."  What does secondary mean?
25   A.   I don't know the distinction in the

23 (Pages 86 to 89)

Page 90

1  computer software system there.
2       Q.  If you'd be so kind as to turn to page
3  1240 of Exhibit Number G.  That's the secondary
4  production of materials from the Office of David
5  Stern.
6       A.  Yes.
7       Q.  This is a document dated December 2, 2009?
8       A.  Yes.
9       Q.  And did it also go out with a Notice of
10 Voluntary Dismissal?
11      A.  It appears to have been filed at the same
12 time as the dismissal.
13      Q.  Do you recognize the name of the attorney?
14      A.  No, but the signature looks the same as
15 the -- almost the same as the person who signed the
16 Notice of Dismissal.
17      Q.  Okay.  And the first one, can you read
18 that.  Is that Melissa Moros?
19      A.  It looks like Moros.  I'm not familiar
20 with her last name.
21      Q.  But you do know a Melissa who was an
22 attorney then?
23      A.  I'm not familiar with her, no.  Again, we
24 had at that point 135 attorneys, or maybe even more
25 at that point.

Page 91

1       Q.  Well, her Bar number is legible, so I
2  guess we can look up who she is.
3       A.  Right.
4       Q.  She signed this "Prevailing Party."  Does
5  she believe -- I mean, would that indicate that she
6  believes she was the prevailing party?
7       MR. SMITH T:  Object to form.
8       THE WITNESS:  It's a form.  It's a
9  mergible form.
10      Q.  (BY MR. GARBER)  So she wasn't required to
11 check and see if they were or were not the
12 prevailing party?
13      A.  Well, if I were signing it, I would not
14 sign "Prevailing Party" if I were not the -- if the
15 plaintiff were not the prevailing party, but she just
16 signed it, it appears.
17      Q.  And I know this is somewhat redundant, but
18 the next pages that we have is 1241 through 1245.  Do
19 you see them?
20      A.  Yes.
21      Q.  Those are the Answers and the Counterclaim
22 that was filed in this case, right?
23      A.  That appears to be the case, yes.
24      Q.  And by including them in this stack of
25 documents, David Stern is acknowledging that they

Page 92

1  received this Counterclaim on or about the date that
2  it was sent, which would have been 9 September, 2009,
3  correct?
4       A.  I can't attest to that because when I
5  pulled them from the system, it didn't say the date
6  of receipt and there was no mail stamp on this one,
7  but it was at some point received by the law firm.
8       Q.  Okay.  You have no reason to doubt that it
9  was received about that time?
10      A.  Sometime after that date, yes.
11      Q.  Okay.
12      MR. GARBER:  Are we at the tape change
13 portion?  Do you want to do that now?  We'll take a
14 short break and I'll review my documents here.
15      VIDEOGRAPHER:  Time is 1:06 p.m.  End of
16 tape number one.
17      (Thereupon, a brief recess was taken.)
18      VIDEOGRAPHER:  Time is approximately 1:15.
19 This is tape two of the videotaped deposition of
20 Forrest G. McSurdy, Esquire.
21      MR. GARBER:  Mr. McSurdy, I'm going to
22 hand you a document that has previously been used in
23 discovery and we've been calling it Exhibit 2 because
24 it was the second exhibit to Mr. Gary's deposition.
25 He was an employee of GMAC.  I'd like to retain the

Page 93

1  Exhibit 2 on this so that we can correspond with the
2  other deposition.
3       So if the court reporter would please mark
4  this one as Exhibit 2.
5       (Thereupon, New Trak notes history was
6       marked as Defendant's Exhibit No. 2, for
7       Identification.)
8       Q.  (BY MR. GARBER)  This is a history of the
9  New Trak notes that were given to us by Deutsche
10 Bank, and it has been represented to be all of the
11 notes having to do that were put on New Trak by
12 either David Stern or by GMAC, and I would like, if
13 you would be so kind, as to compare this Exhibit 2
14 with your Exhibit F here today.
15      Turning to page 1364 of Exhibit F, I see
16 that there is three -- five entries on 9-22 at the
17 top, 9-22-2010.  Do you see that?
18      A.  Yes.
19      Q.  None of those entries are made on this
20 Exhibit 2 to Mr. Gary's deposition, that is the New
21 Trak notes provided by Deutsche Bank.  Do you know if
22 those entries on your Exhibit F were New Trak
23 entries?
24      A.  No, they were not.
25      Q.  Okay.  Was it the duty of David Stern to

24 (Pages 90 to 93)

Page 94

1  make annotations in the New Trak system every time
2  they touched the file or did something with the Mack
3  file?
4      A.  Not once the file was closed.  Again, this
5  was just the administerial act of dismissing the
6  case, these five entries represented on the history.
7      Q.  Okay.  When was the Mack case closed?
8          MR. SMITH T:  Object to form, asked and
9  answered.
10          THE WITNESS:  On our system it was clicked
11  closed on October 5, 2009.
12      Q.  (BY MR. GARBER)  Okay, but as a matter of
13  fact, you kept working on it after that date?
14      A.  After that it looked like the
15  dismissal occurred and the return of the original
16  documents to the client, yes, there was some work
17  done on the file.
18      Q.  Would it have been David Stern's duty to
19  put on the New Trak system that they closed the file
20  on October 5, 2009?
21      A.  I don't -- I don't understand the word
22  "duty."  In what sense?
23      Q.  Well, the contract that we looked at today
24  that was Exhibit A to the deposition says that any
25  time you doing something, you should put it in New

Page 95

1  Trak.
2          MR. SMITH T:  Object to the form.
3  Document speaks for itself.  Go ahead.
4      Q.  (BY MR. GARBER)  So would it have been the
5  duty of David Stern to make an entry every time they
6  did something with the Mack case?
7          MR. SMITH T:  Same objection.
8          THE WITNESS:  I don't know if it would
9  have been a duty.  Apparently it was not the practice
10  for that to occur once the file was closed.
11      Q.  (BY MR. GARBER)  Okay.  So is it fair to
12  say that David Stern did not follow the practice of
13  making an entry into New Trak every time they did
14  something on the Mack case?
15      A.  That appears to be the case, yes.
16      Q.  Now, New Trak is a system that is
17  maintained by GMAC, correct?
18      A.  I don't believe it's maintained by GMAC.
19  I believe they use it.
20      Q.  David Stern could make entries on that
21  system?
22      A.  Yes.
23      Q.  If David Stern made an entry, could they
24  then change that entry after they made it?
25      A.  I'm not familiar with the mechanics of the

Page 96

1  system.  I don't know if you could edit as you can
2  with an e-mail, pull it back after you've done it.  I
3  don't know.
4      Q.  GMAC could make entries on that system?
5      A.  Yes, they could.
6      Q.  Anybody else that could make entries on
7  that system?
8      A.  Well, many clients use that system, but
9  every client had different account.
10      Q.  Do you know who maintains the system?
11      A.  No, I'm sorry, I don't know the
12  particulars of that.
13      Q.  Is it some sort of computer program that's
14  maintained by a third party?
15      A.  I believe so, yes.
16      Q.  And by "third party," I mean not GMAC and
17  not David Stern.
18      A.  Yes, I believe both of them pay a user
19  fee.
20      Q.  Okay.  Now, I note that on 9-15 on the New
21  Trak notes, Exhibit 2, there is an entry from David
22  Stern's office, it's entry number three, that says
23  that they were awaiting docs from doc team as of the
24  15th of September, 2009.  Do you see that?
25      A.  I do.

Page 97

1      Q.  And I see a corresponding entry by a John
2  Metz on 9-15-2009 that says, "Awaiting docs from doc
3  team."  Do you see that?
4          MR. SMITH T:  Which entry is that?
5          MR. GARBER:  That's the third from the
6  bottom on the 1364.
7          MR. SMITH T:  Oh, I beg your pardon.
8  You're back on that.
9          THE WITNESS:  That's why I'm not following
10  either.
11      Q.  (BY MR. GARBER)  I was looking at
12  Exhibit --
13      A.  I follow what you're saying now.
14      Q.  (Continuing) -- F.  And we have an entry
15  from 9-15 by John Metz, "Awaiting docs from doc team"
16  and an entry on Exhibit 2 saying, "Awaiting docs from
17  doc team."
18      A.  Yes, I see that, both entries, uh-huh.
19      Q.  Are they the same entry, just recorded in
20  two different places?
21      A.  They're slightly different.
22      Q.  Okay.  Why would they be different?
23      A.  Because they don't say the same thing.
24      Q.  Right, but wouldn't this be what was
25  inputted in the system?

25 (Pages 94 to 97)

Page 98

1    A. In which system?
2    Q. Well, when they put it in the New Trak
3  system, wouldn't it automatically go over here?
4    A. Oh, no, no. You physically had to go to a
5  different part of the computer to enter New Trak and
6  to enter Tracker.
7    Q. I see. So Exhibit F may or may not
8  correspond with New Trak entries?
9    A. Correct. I can -- for example, I can
10  enter on comment history but I cannot enter New Trak.
11    Q. Okay. Looking up to an entry that was
12  made about the sixth from the bottom on Exhibit F by
13  Christina Pareja -- is that how you pronounce her
14  name?
15    A. Pareja, uh-huh, yes, I see it.
16    Q. It says, "Returned docs via UPS tracking
17  number." Would Ms. Pareja also put that into New
18  Trak?
19    A. Not necessarily.
20    Q. Wouldn't it be important that when
21  documents like originals of notes and so forth are
22  returned that the UPS tracking number be given to
23  GMAC?
24    A. Not necessarily. If they needed it -- if
25  for some reason the original note and mortgage did

Page 99

1  not get back to GMAC, they would communicate with the
2  law firm and ask for the tracking number.
3    Q. Okay. Later on, maybe two entries up,
4  Christina Pareja also made another entry on the 17th
5  of November on Exhibit F. It says, "File closed per
6  client - 9/2/2009." Does that mean the file was
7  closed on 9-2-2009?
8    A. I think she's referring to the 9-2-2009
9  New Trak comment.
10    Q. Oh, okay. That you were ---
11    A. Instructed to close the file.
12    Q. And then she has the word "reinstated."
13  Do you know what that means?
14    A. Yes, I know what "reinstated" means.
15    Q. What does it mean in this context?
16    A. In this context?
17    Q. Yes.
18    A. In particular with respect to the Mack
19  case?
20    Q. Yeah.
21    A. It means that the loan was current.
22    Q. Okay. So the loan was reinstated?
23    A. That was what I believe she mimicked from
24  the New Trak.
25    Q. Okay. So this could also be interpreted

Page 100

1  that the file was reinstated?
2    MR. SMITH T: Object to form.
3    THE WITNESS: I don't know how it could be
4  reinterpreted (sic). She may have looked at the New
5  Trak comment from 9-2-09 and simply written in the
6  same -- the reason it was closed is reinstated.
7  That's what GMAC inputted.
8    Q. (BY MR. GARBER) On the New Trak notes, if
9  you would be so kind, that's the Exhibit 2 that
10  we've just introduced, and turn to page 913, there
11  is an entry number 48 and it's entered by Nette
12  Diaz. Was she an employee of David Stern?
13    A. Yes.
14    Q. And it says ---
15    MR. SMITH T: David, not to quarrel, but I
16  think we decided that the number above the entry is
17  the corresponding number. Do you follow me?
18    MR. GARBER: Yeah. Isn't that what I
19  said?
20    MR. SMITH T: I thought you said 49. I'm
21  sorry. Go ahead.
22    MR. GARBER: Yes, I think we decided it
23  was the one above.
24    Q. (BY MR. GARBER) Okay. 48 is a note by
25  Nette Diaz. That's an employee of David Stern?

Page 101

1    A. Yes.
2    Q. But it doesn't appear on this Exhibit F,
3  correct?
4    A. What doesn't appear?
5    Q. The note of 7-28-2009 does not appear on
6  your Exhibit F.
7    A. Well, it says the file was received
8  7/24/09. First entry, "File received 7/24/09."
9    Q. Maybe I'm not looking at the right thing.
10  That's on Exhibit F you're looking at?
11    A. Yes, the first entry there, you see it's
12  dated 7-29-09?
13    Q. 7-24-09 file received. Oh, I see an entry
14  "Created/Mod Date." What is that "Created/Mod Date"?
15    A. I don't know where you're looking.
16    Q. Well, looking at Exhibit F, there's the
17  second column over and it has a date.
18    A. Oh, that's the date of the entry.
19    Q. The date of the entry?
20    A. Yes.
21    Q. So with looking at the last entry on page
22  1366, Glen Lewin made an entry on 7-29 telling the
23  system that he had received the file on 7-24,
24  correct?
25    A. Yes.

26 (Pages 98 to 101)

Page 102

1    Q.  Okay.  There was no mention of the New
2  Trak upload on 7-28.
3        MR. SMITH T:  Object to form.
4        THE WITNESS:  Why would there be?
5    Q.  (BY MR. GARBER)  Well, wouldn't this
6  document, Exhibit F, be a listing of all the
7  contacts that you had with David Stern regarding the
8  Mack case?
9        MR. SMITH T:  Object to form.
10        THE WITNESS:  No.
11    Q.  (BY MR. GARBER)  Well, what is this?
12    A.  This is a Tracker system.  This is when
13  someone handles the file, they were supposed to put
14  in comments as to why they had the file in order for
15  us to locate the file if we ever needed the file.
16  This is our internal tracking system.
17    Q.  I see.  So there may be other
18  communications other than our Complaint contained in
19  Exhibit F that Stern had with GMAC about the Mack
20  case?
21        MR. SMITH T:  Object to form.
22        THE WITNESS:  Other than reflected in the
23  New Trak?
24    Q.  (BY MR. GARBER)  Other than as reflected
25  in Exhibit F.

Page 103

1        MR. SMITH T:  Object to form.
2        THE WITNESS:  If the person didn't update
3  Tracker as to why they had the file, yes, there could
4  have been.
5    Q.  (BY MR. GARBER)  Okay.  So just to make
6  sure I'm clear, Exhibit F is not intended as a
7  complete summary of all the communications that
8  David Stern's office had with GMAC about the Mack
9  case, is it?
10    A.  No.  Remember I testified there's also --
11  there would have been a sheet where handwritten notes
12  would have been written in.
13    Q.  Right.
14    A.  That possibly would have reflected
15  communications also.
16    Q.  Which would have been in addition to all
17  these entries?
18    A.  Yes.
19    Q.  Okay.  But you didn't find any of those?
20    A.  I didn't see that, no.
21    Q.  But I believe when you were testifying
22  about that, you said something led you to believe
23  there were such notes at one time.
24        MR. SMITH T:  Object to form.
25        THE WITNESS:  No, I never saw any notes.

Page 104

1    Q.  (BY MR. GARBER)  Oh, okay.  Well, we were
2  talking about phone calls and you said you believed
3  there were some phone calls.
4    A.  From -- for example, if you look at
5  Exhibit F --
6    Q.  Right.
7    A.  (Continuing) -- Deutsche 1365.
8    Q.  Let me get to 1365.  Okay.
9    A.  Entry dated 8/25/09 by C. Erhmann.
10    Q.  Yes.
11    A.  He says "Account current."
12    Q.  Yes.
13    A.  He didn't just pull that out of the air.
14  He's a law firm employee.  He must have spoken with
15  someone, so I'm assuming that that reflects a
16  communication with GMAC.  Do you see what I'm saying?
17    Q.  Yeah.
18    A.  That's why I'm saying this reflects
19  possible communications.
20    Q.  Okay.  So let me go over to the New Trak
21  notes to see if there is an entry for corresponding
22  day 25.
23    A.  I would be surprised if there were.
24    Q.  Why?
25    A.  It didn't happen that quickly.  I think

Page 105

1  your next entry would have been the 9-2 where GMAC
2  said, "Reinstated Close File."  And also that was
3  around Labor Day.
4    Q.  Okay.  So, you believe that on or about
5  the 25th of August Mr. -- what was his name again,
6  Erhmann?
7    A.  Yes.
8    Q.  (Continuing) -- Erhmann called GMAC ---
9    A.  Or he might have received a call from
10  them.  I don't know.  It's not reflected.  All he
11  entered was "Account current."
12    Q.  Okay.  But it would have been on or about
13  August 25th?
14    A.  Right.  So if you look on the 24th of
15  August, there are several entries here by GMAC.  For
16  example, entry number 15, it says, "User has closed
17  the file.  Reason:  Open in error."
18        So maybe on the 24th someone called our
19  office and said, "The account's current, close the
20  file," but it wasn't reflected that the file was to
21  be closed until 9-2.
22    Q.  Okay.  And this is something that you
23  don't have any knowledge about, but you're trying to
24  come up with a reason?
25    A.  Piece it together, right, that's all I can

27 (Pages 102 to 105)

Page 106

1  do.
2      Q.  So an entry that would have been made on
3  Exhibit F might not correspond in date with the one
4  on New Trak?
5      A.  Correct.
6      Q.  Would New Trak have all the
7  communications, telephone and otherwise, that were
8  made between David Stern and GMAC?
9          MR. SMITH T:  Object to form, asked and
10  answered.
11         THE WITNESS:  I don't know.  It would
12  depend on whether every employee of GMAC imported New
13  Trak and whether every employee by ours did.
14         Not every employee in our firm had access
15  to New Trak, so I doubt that that would be a complete
16  compilation of communications.
17     Q.  (BY MR. GARBER)  Okay.  And still they
18  would be talking with GMAC if they did not have
19  access to New Trak?
20     A.  I believe so.  If you compare the names
21  that are in our comment history, they're probably not
22  all listed in New Trak.
23     Q.  Okay.  Okay, just to make sure that was
24  with respect to the Mack case because that's what I'm
25  here for.

Page 107

1      A.  Yes, exactly.
2      Q.  Thank you.
3          Mr. McSurdy, I have some other documents.
4  These are ones that I don't have copies of, but
5  they're Deutsche Bates stamp 1344 and 1345.
6          MR. GARBER:  Do you have copies of those,
7  John?
8          MR. SMITH T:  Can you show them to me.
9          MR. GARBER:  Yeah.
10         MR. SMITH T:  I'll see what I may be able
11  to dig out of my little pile of stuff.  Yeah.  Now,
12  those are in -- I think those are in the electronic
13  records, aren't they?
14         MR. GARBER:  I believe they came from the
15  electronic records.
16         MR. SMITH T:  Yeah, so that's part of
17  Exhibit G.
18         MR. GARBER:  I am going to hand you two
19  e-mails that I have from 1344 and 1345 on the
20  Deutsche Bates stamp, and if we can have them marked
21  as a composite exhibit which will be the next letter
22  to this deposition.
23         (Thereupon, Two pages e-mails dated
24  August 25, 2009 and August 18, 2010 were
25  marked as Defendant's Exhibit H, for

Page 108

1      Identification.)
2      Q.  (BY MR. GARBER)  Please take a minute and
3  look at them.
4      A.  Okay.
5      Q.  Have you ever seen those --
6      A.  Yes.
7      Q.  (Continuing) -- e-mails before?
8          And by the way, what is the Deutsche Bates
9  stamp on them?
10     A.  1344 and 1345.
11     Q.  Let's take the first one, which is 1344.
12  Was that e-mail written by an employee of David
13  Stern?
14     A.  Yes.
15     Q.  And what's the name of that employee?
16     A.  Ann Escobar.
17     Q.  And she wrote it to other employees of
18  David Stern?
19     A.  I'm not familiar with the name from the
20  content of the e-mail.  It looks like she wrote them
21  to GMAC.
22     Q.  And I don't have my copy in front of me.
23  Can I look at it?
24     A.  Sure.
25     Q.  You don't know who Linda Cronrath is?

Page 109

1      A.  No, I don't.
2      Q.  Please provide judgment figures good
3  through 9/24 with a breakdown.
4      A.  Yeah.
5      Q.  Would that e-mail have shown up as an
6  entry on New Trak?
7      A.  I don't know.  If I look, I could tell.
8      Q.  Okay.  Should it have shown up as an entry
9  on New Trak?
10         MR. SMITH T:  Object to form.
11         THE WITNESS:  Not necessarily.
12     Q.  (BY MR. GARBER)  Okay.  And you can look.
13  I don't remember that I saw it.
14     A.  25th of ---
15     Q.  When is it?
16     A.  25th of August it was sent at 3:36 a.m.
17  That doesn't make any sense.  On the 25th of August
18  there was someone who entered a comment, it's comment
19  number 13 on New Trak, "Await figures."
20     Q.  Yes.
21     A.  So that might have been Ann saying that
22  she had requested figures.
23     Q.  Okay.  Now, what is the name of that
24  e-mail?
25     A.  It says it was sent at 3:36 a.m.

Page 110

1   Q.   Did people work at David Stern at 3:36
2   a.m.?
3   A.   No, no, they didn't.
4   Q.   Would those times be incorrect?
5   A.   It might have been sent by the computer at
6   3:36 a.m. Sometimes our computer would send later
7   than what -- when the person -- it didn't go out of
8   the system until that time.
9   Q.   Okay. I know I used to have a VCR and it
10  always said it was 12 o'clock. Would these times
11  sometimes be in error?
12  A.   Only to the extent that if they weren't
13  sent out of the system, our system at like the time
14  that the person actually pushed the send button, it
15  may have been delayed a few hours.
16  Q.   Okay. You have a second e-mail there.
17  May I see that? It's a second part of the composite
18  exhibit. And this is one from Evan Kohn. Was he an
19  employee of David Stern?
20  A.   Yes.
21  Q.   And it was sent to Vegina?
22  A.   Well, I take that back. He was not an
23  employee of the law firm. He was an employee of --
24  at that point the law firm and the -- the law firm
25  had split into law firm and processing. He was a

Page 111

1   member of the processing company, the public company,
2   in 2010. You see that was 2010?
3   Q.   Okay. So he was not a member of the David
4   Stern law firm? Was that a subsidiary of David
5   Stern?
6   A.   No, it was a subsidiary of a public
7   company.
8   Q.   Any relationship from David Stern to that
9   subsidiary or to that company?
10  A.   David Stern owned some stock in the public
11  company.
12  Q.   Okay.
13  A.   And for awhile he was the CEO.
14  Q.   Okay. So this is the law firm from Evan
15  Kohn to, it looks like Vegina Hawkins, with a copy to
16  Elizabeth Davila; is that correct?
17  A.   Yes.
18  Q.   And who are Hawkins and Davila?
19  A.   Hawkins was an associate foreclosure
20  attorney with the law firm, and Elizabeth Davila was
21  a paralegal with the processing company.
22  Q.   Okay. And there was an attachment with
23  that e-mail?
24  A.   It references orders, yes.
25  Q.   Orders that are designated or coded on

Page 112

1   there, a number?
2   A.   By a scan reference. I can't tell just by
3   looking at the scan reference. She must have -- he
4   must have -- Evan must have scanned it and that was
5   the code number that was ---
6   Q.   Okay. Can I see, see if we can ---
7   A.   It's a PDF.
8   Q.   It says that it's orders 081610. Is that
9   the date?
10  A.   Yes, that's the date, and then following
11  that would be the PDF number from the scan document.
12  Q.   Okay. Now, Exhibit G contains all of the
13  documents that were not produced in the first
14  production from David Stern, that is, they didn't
15  come from Iron Mountain. They came from the
16  electronic scanning system of David Stern, correct?
17  A.   Yes.
18  Q.   Okay. Let's see if we can find those
19  documents that are referred to in here. And I think
20  we're going to see that they are orders having to do
21  with the scheduling of the trial, so they'd be around
22  August of 2010.
23  A.   I see an order dated August 2, 2010, Order
24  of Referral To General Magistrate.
25  Q.   Okay. And what's your Deutsche Bates

Page 113

1   stamp on it?
2   A.   1346. So it does follow directly the
3   e-mail, 1345.
4   Q.   And do you think that 1346 and 1347 is a
5   copy of the order that was sent in that e-mail?
6   A.   I believe that is correct.
7   Q.   Can you identify any other documents other
8   than Deutsche 1346 and 1347 that was sent in that
9   e-mail?
10  A.   It looks like a copy of the envelope to
11  Elsa Shum.
12  Q.   Okay. So those three things?
13  A.   Yes.
14  Q.   Why would it say "Orders," with a plural,
15  of 8-16-10? Does that mean there was more than one
16  order?
17  MR. SMITH T: Object to form, calls for
18  speculation. Go ahead.
19  THE WITNESS: It's been my experience that
20  even though only one order would be attached, that
21  that was the system's way of letting you know -- IT
22  broke the categorization down into orders, pleadings,
23  whatever it was, and the person that scanned it fit
24  it into that category that most likely fit that
25  attachment.

Page 114

1    Q.  (BY MR. GARBER) Okay.  Now, Evan Kohn has
2  a note here that says, "Please see attached."  Is he
3  asking for Ms. Hawkins to do something on this?
4        MR. SMITH T:  Object to form, calls for
5  speculation.  Go ahead.
6        THE WITNESS:  He was an assistant,
7  administrative assistant helping to disburse
8  pleadings and correspondence to attorneys and
9  paralegals.
10    Q.  (BY MR. GARBER) And this e-mail was sent
11  out on or about August 18, 2010, correct?
12    A.  Correct.
13    Q.  So that would have been long after the
14  file had been closed by David Stern?
15    A.  Yes.  He was doing the correct thing.
16  This was what should have been happening all along,
17  except he didn't send it to the right person.
18    Q.  How did he know to send it to Ms. Hawkins?
19    A.  I looked at the file.  I couldn't tell why
20  he sent it to her.  He should have sent it to Elsa
21  Shum.
22    Q.  Why would he send a copy to Elizabeth
23  Davila?
24    A.  She was the attorney who was assigned to
25  the file.

Page 115

1    Q.  Oh, she was an attorney, too?
2    A.  Not an attorney.  The paralegal, I'm
3  sorry.  Elsa was the attorney.
4    Q.  Okay.  And Vegina Hawkins was -- or
5  Vegina, whatever her name is ---
6    A.  It's Vegina.  It's Hispanic.
7    Q.  Vegina.  She is an attorney?
8    A.  Yes, she was an attorney with the firm.
9    Q.  As far as you know, did she have any
10  responsibility for this Mack case?
11    A.  No, I saw no indication she was
12  responsible at all for it.
13    Q.  Ms. Davila, was she a paralegal that was
14  assigned to it?
15    A.  I believe -- I read the deposition of Elsa
16  Shum, and I believe that she said she was working on
17  the file with her.
18    Q.  Okay.  You have no idea what happened
19  after Mr. Kohn sent this e-mail to these folks, do
20  you?
21    A.  No.
22    Q.  Was this the type of thing that David
23  Stern should have notified GMAC about?
24        MR. TEW:  The law firm when you say "David
25  Stern"?

Page 116

1        MR. GARBER:  Yeah, I mean the law firm.
2        THE WITNESS:  The order referring the case
3  to ---
4    Q.  (BY MR. GARBER) Case management, yes.
5    A.  Yes, I believe that it's appropriate for
6  when the firm gets that sort of an order that it
7  should have sent it on to the client.
8    Q.  (BY MR. GARBER) Would that have been in
9  New Trak where it would appear?
10    A.  If it had been sent, yes, it would have
11  been sent to New Trak or our comment history, one or
12  the other.
13    Q.  Now, the New Trak documents that I have,
14  the Exhibit 2, they actually only go up to 9-22-2009;
15  have you noticed that?
16    A.  Yes.
17    Q.  So these New Trak documents, if they were
18  only covering up to that period of time, they
19  wouldn't have covered the time of this e-mail, would
20  they?
21    A.  Right.
22    Q.  Have you been able to review New Trak to
23  see what's in there?
24        MR. SMITH T:  Object to form.
25        THE WITNESS:  Other than the document you

Page 117

1  gave me?
2    Q.  (BY MR. GARBER) Yeah.
3    A.  No, we don't have access to New Trak any
4  longer.
5    Q.  Okay.  We took the deposition of an
6  individual who was an employee of GMAC and his name
7  was Mr. Bennett.  We took it on or about March 13,
8  2012, and he was asked about what programs existed to
9  communicate between GMAC and David Stern, and I have
10  a copy of a portion of that.
11        On page 21 this question was asked, "And
12  if there was any other communication, you wouldn't
13  know anything about it?
14        Object to form.
15        Answer:  It's our business practice to --
16  if there ever is another form of communication with
17  an outside counsel or our homeowners, that it still
18  gets put in our daily system unless it's privileged,
19  and it gets put into our litigation software.  And
20  it's -- I have not reviewed any records like that."
21        Do you know if there was any privileged
22  litigation software that was involved with respect to
23  the Mack case?
24    A.  No, I do not know.
25    Q.  Okay.  Do you know anything about the

Page 118

1 privileged litigation software he referred to?
2  A.  No, not with respect to the law firm's.
3  Q.  With respect to David Stern?
4  A.  Right, we had no -- we had no dealings
5 with any sort of privileged litigation software.
6  Q.  Okay.  On any case?
7  A.  Not to my knowledge, no.
8  Q.  Okay.  So you don't know what the name of
9 that litigation software is?
10  A.  No.  It sounds like it's internal for
11 GMAC.
12  MR. GARBER:  Okay.  Okay.  Let me take a
13 few minutes.  We'll take a short break, I'll go over
14 my notes, and hopefully we can wind up and maybe you
15 can get a late lunch.
16  VIDEOGRAPHER:  Going off video record.
17  (Thereupon, a brief recess was taken.)
18  VIDEOGRAPHER:  We're back on video record.
19  Q.  (BY MR. GARBER)  Mr. McSurdy, I just want
20 to make sure, you don't -- did you review the note
21 that was actually sent to David Stern's office in
22 support of this foreclosure?
23  A.  Which note was that?
24  Q.  There was a note, a note for the mortgage,
25 the mortgage note of the Macks.

Page 119

1  A.  Oh, did I review -- I saw that it was in
2 the file when I was transmitting a copy per your
3 request to GMAC's counsel, but I did not actually
4 look at the terms of the note, no, I did not.
5  Q.  Was that note in the electronic file or in
6 the paper file?
7  A.  It was definitely in the electronic file.
8  Q.  So if it was in the electronic file, it
9 would have been found in Exhibit G to this
10 deposition, correct?
11  A.  Yes, unless I'm -- unless I'm getting
12 confused in having looked at -- I'm pretty sure that
13 it was a separate part in the electronic file that I
14 sent, but maybe I'm mistaken.  If you want me to look
15 through it again, I'd be glad to look through it.
16  Q.  I'll take a brief look.  You're probably
17 right.
18  A.  And the reason I say that, too, is the
19 practice is normally when the note's received, it's
20 scanned to Tracker.
21  Q.  So it would have been part of your
22 electronic system, wouldn't it be?
23  A.  It should have been, yes.
24  I found it.  1269.
25  Q.  1269?

Page 120

1  A.  Yes.
2  Q.  Okay, yes, I see it.
3  MR. GARBER:  Mr. McSurdy, I don't have any
4 further questions.  Thank you very much for your ---
5  MR. TEW:  Let me have one word with
6 Forrest before we -- I may have a question or have
7 him supplement an answer.
8  VIDEOGRAPHER:  Going off video record.
9  (Thereupon, a brief recess was taken.)
10  VIDEOGRAPHER:  We're back on video record.
11  CROSS EXAMINATION
12 BY MR. TEW:
13  Q.  Forrest, Plaintiff's counsel or actually
14 Defendants' counsel asked you about your knowledge of
15 any indemnification discussions or the
16 indemnification provision in the contract between
17 GMAC and the Law Firm of David J. Stern and I
18 instructed you not to answer, but so that we don't
19 spin our wheels here, I will let you talk about
20 anything you know, except what you may have discussed
21 with the law firm's counsel or what you may have
22 heard at any mediation --
23  A.  Okay.
24  Q.  (Continuing) -- on that subject.
25  A.  Okay.  My only involvement with the

Page 121

1 indemnification issue was receipt of a letter.  It
2 may have been -- it was from someone at Mr. Smith's
3 office following up the initial notification letter
4 that there was a problem in this file and that a
5 default judgment had been entered on the
6 Counterclaim.
7  A second letter was sent to my attention,
8 which I turned over to Mr. Tew, demanding
9 indemnification with respect to the Mack matter, and
10 that's the extent of my involvement.
11  REDIRECT EXAMINATION
12 BY MR. GARBER:
13  Q.  So as far as you know, there's been no
14 settlement with GMAC over the Mack case?
15  A.  To my knowledge, no, there's been no
16 settlement.
17  MR. GARBER:  Okay, I don't have any
18 further questions.
19  COURT REPORTER:  Does he want to read or
20 waive?
21  THE WITNESS:  I don't want to read.
22  VIDEOGRAPHER:  Time is 1:55.  This
23 concludes the deposition.
24
25

31 (Pages 118 to 121)

Page 122

```
 1          (Whereupon, reading, signing and Notice
 2     of Filing were waived, and the
 3     deposition was concluded at 1:55 p.m.)
 4
 5
 6
 7
 8
 9          CERTIFICATE OF OATH
10   STATE OF FLORIDA   )
11   COUNTY OF DADE     )
12          I, the undersigned authority,
13   certify that FORREST G. McSURDY personally appeared
14   before me and was duly sworn.
15          WITNESS my hand and official seal
16   this 20th day of April, 2012.
17
18          _____
                 CINDY HART
19               Court Reporter
20
21   My commission #EE 105726
     My commission expires:
22   June 23rd, 2015
23
24
25
```

Page 123

```
 1               CERTIFICATE
 2   STATE OF FLORIDA  )
                       )
 3   COUNTY OF DADE    )
 4          I, the undersigned authority, hereby
 5   certify that the foregoing transcript, pages 1 to 123
 6   is a true and correct transcript of the Videotaped
 7   Deposition of FORREST G. McSURDY, taken before me at
 8   the time and place stated in the caption thereof.
 9          I further certify that said witness was
10   duly sworn according to law.
11          I further certify that I am not of counsel
12   to either of the parties to said cause or otherwise
13   interested in the event thereof.
14          IN WITNESS WHEREOF I hereunto set my hand
15   and affix my official seal of office this 20th day
16   of April, 2012.
17
18          _____
                 Cindy Hart, Court Reporter,
19               Notary Public in and for the
                 State of Florida at Large.
20
21   My Commission #EE 105726
     My Commission expires:
22   June 23rd, 2015.
23
24
25
```

32 (Pages 122 to 123)

PORTER, WALKER & ASSOCIATES, INC.