# EXHIBIT Y

# TO THE DECLARATION OF

# JOHN W. SMITH T

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
IN AND FOR COLLIER COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION

DEUTSCHE BANK TRUST COMPANY
AMERICAS AS TRUSTEE FOR
RALI 2007QS3,

        Plaintiff,

v.

BARRY F. MACK a/k/a BARRY
FRITZ MACK a/k/a BERRY FRITZ
MACK, et al.,

        Defendant.

CASE: 09-7336-CA



EXCERPT OF TRANSCRIPT OF HEARING PROCEEDINGS
TESTIMONY OF FORREST McSURDY

DATE TAKEN:        Wednesday, May 16, 2012

TIME TAKEN:        4:06 p.m. to 5:41 p.m.

PLACE TAKEN:       Collier County Courthouse
                   3301 East Tamiami Trail
                   Naples, Florida  34112

BEFORE:            The Honorable Ramiro Manalich
                   Circuit Court Judge

REPORTED BY:       Sabrina C. Beauvais, CCR, FPR, CLR
                   Certified Court Reporter

 **Southwest Florida Reporting Services, Inc.**

Deposition Suites in Naples, Fort Myers, Punta Gorda, Port Charlotte, Sarasota and Tampa
Post Office Box 9161, Naples, Florida 34101
www.SouthwestFloridaReporting.com
*"Every word.  Every time."*
**(239) 774-2224**

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
IN AND FOR COLLIER COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION

DEUTSCHE BANK TRUST COMPANY
AMERICAS AS TRUSTEE FOR
RALI 2007QS3,

        Plaintiff,

v.                  CASE: 09-7336-CA

BARRY F. MACK a/k/a BARRY
FRITZ MACK a/k/a BERRY FRITZ
MACK, et al.,

        Defendant.

---

EXCERPT OF TRANSCRIPT OF HEARING PROCEEDINGS
TESTIMONY OF FORREST McSURDY

DATE TAKEN:    Wednesday, May 16, 2012

TIME TAKEN:    4:06 p.m. to 5:41 p.m.

PLACE TAKEN:   Collier County Courthouse
               3301 East Tamiami Trail
               Naples, Florida 34112

BEFORE:       The Honorable Ramiro Manalich
               Circuit Court Judge

REPORTED BY:   Sabrina C. Beauvais, CCR, FPR, CLR
               Certified Court Reporter

---

**Page 2**

A P P E A R A N C E S

For GMAC:        JOHN W. SMITH T, ESQUIRE
               Bradley, Arant, Boult and
               Cummings, L.L.P.
               One Federal Place
               1819 Fifth Avenue North
               Birmingham, Alabama 35203
               (205) 521-8000

For Deutsche Bank:  STANLEY A. BUNNER, JR., ESQUIRE
               Salvatori, Wood & Buckel, P.L.
               9132 Strada Place
               Fourth Floor
               Naples, Florida 34108
               (239) 552-4100

For Mr. and Mrs. Mack: DAVID F. GARBER, ESQUIRE
               Garber, Hooley & Holloway, L.L.P.
               700 Eleventh Street South
               Suite 202
               Naples, Florida 34102
               (239) 774-1400

Reported by:    SABRINA C. BEAUVAIS, CCR, FPR, CLR
               Southwest Florida Reporting
                  Services, Inc.
               Post Office Box 9161
               Naples, Florida 34101
               (239) 774-2224

Also present:   COLETTE J. KELLERHOUSE
               Paralegal for David F. Garber

               MARY MURPHY
               Paralegal for Stanley A. Bunner

               * * * * *

---

**Page 3**

I N D E X

                                                   PAGE

FORREST McSURDY

  Direct Examination by Mr. Bunner:        4

  Cross-Examination by Mr. Garber:       28

  Redirect Examination by Mr. Bunner:    90

  Recross-Examination by Mr. Garber:    93

Court Reporter's Certification:        95

               * * * * *

---

**Page 4**

            * * * * *

E X C E R P T   O F   P R O C E E D I N G S
            * * * * *

    (4:06 p.m.)

    THE CLERK: Do you solemnly swear or affirm that the testimony you are about to give shall be the truth, the whole truth and nothing but the truth?

    MR. McSURDY: Yes, I do.

    THE CLERK: Thank you.

THEREUPON,

    FORREST McSURDY,

called as a Witness, after having been first duly sworn, was examined and testified upon his oath as follows:

    DIRECT EXAMINATION

BY MR. BUNNER:

    Q.    Good afternoon, sir.

    A.    Hi.

    Q.    Would you please state your full name for the record?

    A.    Forrest McSurdy.

    Q.    And what, sir, is your occupation?

    A.    I am an attorney.

    Q.    And who is your employer?

    A.    Law offices of David J. Stern, P.A.

**Testimony of FORREST McSURDY on May 16, 2012**

Page 5

```
1    Q.      And how long have you worked at the Law
2  Offices of David J. Stern, P.A.?
3    A.      Since December of 1995.
4    Q.      Okay.  And just for speed's sake, if I refer
5  to the law offices of David J. Stern in the future simply
6  as "the firm," will we understand one another that I am
7  always referring to that firm?
8    A.      Yes.
9    Q.      All right.  And as an attorney at the firm,
10 what is your particular role?
11   A.      I am the general counsel and managing
12 attorney for the firm.
13   Q.      All right.  Have you ever had any other duty
14 positions with the firm while you have worked there?
15   A.      Yes.
16   Q.      And what were they?
17   A.      I was the head of the litigation department
18 from about 1996 until November of 2010.
19   Q.      Okay.  Who at the moment, if anyone, is the
20 records custodian for the firm?
21   A.      I am.
22   Q.      All right.  To your knowledge, was the firm
23 -- did the firm represent the Plaintiffs in the instant
24 action?
25   A.      Yes.  Did it represent the Plaintiffs?
```

Page 6

```
1    Q.      The Plaintiff.  I'm sorry.
2    A.      The Plaintiff, yes.
3    Q.      The Plaintiff.
4    A.      The lender bank, yes.
5    Q.      All right.  Thank you.  Sir, have you
6  reviewed the records of the firm as it pertains to the
7  firm's representation of the Plaintiff in the instant
8  action?
9    A.      Yes.
10   Q.      All right.  From the time you began working
11 there in 1995, did you notice any relative growth at the
12 firm?
13   A.      Yes.
14   Q.      All right.  And can you describe the growth
15 at the firm while you were working there?
16   A.      When I joined, I was about the third attorney
17 there, and we had about five or six paralegals in 1995.
18 Through the years, we grew to become a firm of about 150
19 to 160 attorneys in 2010, with a staff of 100 -- I'm
20 sorry -- with a staff of 1,400 people.
21   Q.      Okay.  And during that time frame, did you
22 notice any increase or decrease in the case load?
23   A.      Yes.
24   Q.      All right.  And what did you notice?
25   A.      The case load increased dramatically,
```

Page 7

```
1  especially the years after 2008.
2    Q.      All right.  Can you quantify that?  Back in
3  1995, approximately how many new cases might be opened in
4  any given month?
5    A.      Generally, we were referred anywhere -- per
6  month, anywhere between 500 and 1,000 foreclosures per
7  month in 1995 and 1996.
8    Q.      All right.
9    A.      And in 2009 and 2010, we were getting upwards
10 of sometimes 10,000 a month.
11   Q.      So 10,000 referrals a month --
12   A.      Referrals, yes, to initiate foreclosures.
13        THE COURT:  And in what time frame was that
14     latter one, sir?
15        THE WITNESS:  In 2010.
16           CONTINUED DIRECT EXAMINATION
17 BY MR. BUNNER:
18   Q.      Was there any increase or decrease in the
19 client base at the firm while you worked there?
20   A.      Yes.
21   Q.      Could you describe that, please?
22   A.      There was a significant increase from 1995 to
23 2010.  We went from representing initially just
24 Citibank®, who sent the first 100 files, to representing
25 every major lender -- or the top 20 lenders and probably
```

Page 8

```
1  90 out of the top 100 lenders in the country by 2010.
2    Q.      By, say, 2010, do you have any idea of how
3  many open cases the firm might have handled for any
4  individual clients?
5    A.      Yes, I do.
6    Q.      Okay.  What would be an example?
7    A.      The one in particular that I have knowledge
8  of is I was required to do an audit for Citibank®.  And
9  at the time I did the audit in 2010, the summer of 2010,
10 we were handling just over 11,000 files for Citibank®.
11   Q.      So 11,000 active files?
12   A.      Eleven thousand active files.
13   Q.      All right.  Did the firm have any process for
14 handling papers when it represented plaintiffs in
15 foreclosure actions?
16   A.      Yes.
17   Q.      Please describe that process.
18   A.      When mail or pleadings came in to the mail
19 room -- and, again, we are talking about the period of
20 2009 and 2010, we had set up a staff of mail personnel to
21 handle approximately 10,000 pieces of mail a day.
22        When that mail came in, one of a dozen people
23 would initially scan the letter on to our electronic case
24 management system under the file, where they determined
25 which file it should go into, and then they would
```

**Testimony of FORREST McSURDY on May 16, 2012**

Page 9

1 physically give the piece of mail or pleading to the
2 paralegal who was designated to handle that particular
3 file.
4      Q.     All right.  And how would the mail employees
5 know who was designated to handle a particular file?
6      A.     Our case management system computer was set
7 up so that they could -- once they determined what the
8 case was, they could see who was handling it based on who
9 had last touched the file.  We were required to keep a
10 running history of tracking the file, who had it.
11      Q.     Okay.  And what was the name of that system?
12      A.     We called it the tracker system, but it's
13 CMS, and that abbreviation was for Case Management
14 System.
15      Q.     Okay.  Sir, could you please turn to -- you
16 should have a big binder there in front of you.
17      A.     Here?
18      Q.     It's right there.  (Indicating.)
19      A.     Okay.
20      Q.     Could you please turn to Tab 22 in that large
21 binder?
22      A.     (Complies.)  Okay.
23      Q.     And I would ask you to review those documents
24 that are in Tab 22.
25      A.     Uh-huh.

Page 11

1      anything being on Page 3, at the bottom, and then
2      going backwards?
3           THE WITNESS:  Going up.  Right.
4           THE COURT:  Okay.  Thank you.
5               CONTINUED DIRECT EXAMINATION
6 BY MR. BUNNER:
7      Q.     So this appears to be in reverse
8 chronological order?
9      A.     Yes.  Because when you open the system, it
10 would show you where you presently were.
11      Q.     Okay.
12      A.     And then you would have to go to the back of
13 the system to see where everything was.
14      Q.     I understand.  And beginning with the last
15 page, do you recognize the name Glen Luen (phonetic
16 spelling)?
17      A.     I do recognize Glen Luen.
18      Q.     Who is Glen Luen?
19      A.     He was in the department that opened files.
20      Q.     Okay.  And that was a department at the firm?
21      A.     Yes.
22      Q.     All right.  And -- well, I will ask you,
23 could you look at the three pages of documents and tell
24 me -- do you recognize any names there who are not
25 employees of the firm?

Page 10

1      Q.     There appears to be three pages.
2      A.     Uh-huh.
3      Q.     And let me know when you've done that.
4      A.     Uh-huh.  (Reviewing documents.)  Okay.
5      Q.     All right, sir.  Do you recognize what you
6 have before you, what has been marked as Tab 22 in your
7 binder?
8      A.     I do recognize it.  It is not set up the way
9 our system prints it, but I do recognize it.
10      Q.     Okay.  And what do you recognize that to be?
11      A.     It is the case management history for a
12 particular file, 09-75969, which I have come to know to
13 be the Mack file.
14      Q.     Okay.  And what is reflected on these three
15 pages?
16      A.     Starting from the third page and going
17 forward, it starts with the referral being brought --
18 being received by the firm on July 24th, 2009.  And then,
19 through Page 3, it then goes through the history of how
20 our firm handled the file.
21           THE COURT:  For clarification now, sir, this
22      is then running backwards in terms of order.  Is
23      that correct?
24           THE WITNESS:  Yes, sir.
25           THE COURT:  So this is the first receipt of

Page 12

1      A.     I don't know all of the names, but I do --
2 the ones that I do know, they were members of the firm.
3      Q.     Okay.  And each of these individual entries,
4 what do they represent?
5      A.     When the person who was doing something on
6 the file made an entry with respect to the file.
7      Q.     Okay.  And these entries that are made, are
8 they made at or near the time of the occurrence by a
9 person with personal knowledge or with information
10 transmitted via a person with personal knowledge?
11      A.     They are supposed to be, yeah.  Occasionally,
12 there will be a -- sometimes there may be a few months'
13 delay, but ultimately the person will say when it was
14 that their action is referring to.  For example, there
15 may be an entry on January 1st referring back to October
16 31st.
17      Q.     Okay.  And are these entries kept in the
18 regular course of the regularly conducted business
19 activity of the firm?
20      A.     Yes.
21      Q.     And is it the regular practice of the firm to
22 make these entries?
23      A.     Well, was it?  Our firm no longer is in
24 business.  Yes, it was.
25      Q.     Okay.  But you still work there now.  Right?

**Testimony of FORREST McSURDY on May 16, 2012**

Page    13

1 You still ---

2    A.    I still --- I am the only one left, yes.

3    Q.    Correct.  So the firm is technically still in

4 business, is it not?

5    A.    It's winding down, yes.

6    Q.    Yes.

7    A.    But we don't do this anymore.

8    Q.    All right.  Well, let's say from the period

9 of July 29th, 2009, to the period of 9/22/2010, was it

10 the regular practice of the firm to make these records?

11    A.    Absolutely.

12    Q.    Okay.

13        MR. BUNNER:  Your Honor, at this time, we

14    would proffer the item marked as Tab 22, which is

15    Exhibit 22, into evidence.

16        THE COURT:  Any defense comment?

17        MR. GARBER:  Your Honor, I have no objection.

18        THE COURT:  All right.  Counsel, the only

19    question I have on this is, I am assuming you are

20    asking this be admitted as a business record.  Is

21    that correct?

22        MR. BUNNER:  Yes.

23        THE COURT:  And there was testimony about it,

24    that in some events there were several months'

25    delay.  Do you have any comment as to how that

Page    14

1    would still be appropriate to be admitted as a

2    business record?

3        MR. BUNNER:  Only that there has been no

4    objection to its admission, sir.

5        THE COURT:  Uh-huh.  Admitted as --- what

6    number is it?  Number 22?

7        MR. BUNNER:  Yes, sir.

8        THE COURT:  All right.

9        (Whereupon, GMAC Exhibit Number 22 was

10    admitted into evidence as of this date.)

11        CONTINUED DIRECT EXAMINATION

12 BY MR. BUNNER:

13    Q.    Mr. McSurdy, are you familiar with an entity

14 commonly referred to as GMAC?

15    A.    Yes.

16    Q.    What do you know GMAC to be?

17    A.    GMAC, from my perspective, was a mortgage

18 servicing company.

19    Q.    All right.  Do you know whether or not GMAC

20 was involved with this loan, the Mack loan?

21    A.    Yes.

22    Q.    All right.  And what was GMAC's involvement?

23    A.    It was the company that referred the

24 foreclosure to our office.

25    Q.    To your knowledge, did the firm communicate

Page    15

1 with GMAC regarding the handing of this foreclosure?

2    A.    Yes.

3    Q.    In what ways did the firm communicate with

4 GMAC?

5    A.    There were several ways.  There were e-mails.

6 There were telephone conversations.  And there were ---

7 there was an electronic communication system called New

8 Track.

9    Q.    Okay.

10        THE COURT:  So --- I'm sorry --- you said New

11    Track, e-mails, and what other method of

12    communication?

13        THE WITNESS:  Telephone.

14        THE COURT:  Oh.

15        THE WITNESS:  The usual method.

16        CONTINUED DIRECT EXAMINATION

17 BY MR. BUNNER:

18    Q.    And I believe, Mr. McSurdy, you stated that

19 you reviewed the records of the firm in this matter, did

20 you not?

21    A.    Extensively, yes.

22    Q.    Okay.  Could you please turn to Tab 25 of

23 your binder?

24    A.    (Complies.)

25    Q.    It is a rather lengthy document.  I would ask

Page    16

1 you to just look through it.

2    A.    (Complies.)  Uh-huh.  Okay.

3    Q.    Do you recognize the documents that are in

4 Tab 25?

5    A.    Yes.

6    Q.    What do you recognize those to be?

7    A.    These are documents that would have been in

8 the file, the foreclosure file, the main file.

9    Q.    And do you recognize these as documents you

10 reviewed as part of your preparation for testimony?

11    A.    Yes.

12    Q.    And Exhibit 26, I would ask you to look at

13 that.

14    A.    (Complies.)  These appear to be the documents

15 that I personally downloaded from the electronic system,

16 the case management system.

17    Q.    All right.  And --

18    Q.    Related to this file.

19    Q.    -- is it accurate to say that you reviewed

20 those documents in preparation for your testimony?

21    A.    Yes.

22    Q.    All right.  Mr. McSurdy, in the review of the

23 records that you have looked through here, as well as

24 Exhibit 22, did you find any indication whatsoever that

25 the firm ever notified GMAC that there was a counterclaim

**Testimony of FORREST McSURDY on May 16, 2012**

Page   17

1 filed in the Mack case?

2      A.      No.

3      Q.      All right.  Other than your review of

4 documents, did you conduct any other investigation with

5 regard to the Mack case?

6      A.      No.

7      Q.      Okay.  Foreclosures at the firm were handled

8 by what particular department?

9      A.      The foreclosure department.

10     Q.      All right.  Was it a policy of the

11 foreclosure department to make any written record when

12 there was a counterclaim pending in a case?

13     A.      Not a specific written record.  What the --

14 the procedure that was set up was the following:  If a --

15 again, just to reiterate what I said before, any pleading

16 that came in would be received by the mail room.  It

17 would be stamped, date stamped.

18            You can see several of the date stamps there

19 on the documents.  For example, the first document in Tab

20 Number 26 has a date stamp there as to -- showing that

21 our mail room received it.  And that also means that they

22 then scanned it into our electronic computer system from

23 each -- for the particular file.

24            Then the piece of mail or the pleading,

25 whichever it is, is supposed to have been given to the

Page   18

1 paralegal working on the file.  The paralegal would then,

2 in turn, make sure that the attorney saw what needed to

3 be seen in terms of pleadings or letters.  The attorney,

4 after they reviewed things, they were supposed to initial

5 the pleading and put it in the file, if no further action

6 was required.

7      Q.      With regard to the communications that you

8 described in that answer, in your review of the files did

9 you see any indication that there were any communications

10 pertaining to the counterclaim that was filed in the Mack

11 action?

12     A.      The counterclaim itself came in and it was

13 scanned.  I did see that it was scanned and it was saved

14 to the system in October of 2009, a few days after our

15 file was administratively closed due to the loan being

16 reinstated of record by GMAC telling us it was current.

17            At that point, nothing was done with the

18 counterclaim.  It was not -- as far as I can tell, it was

19 not delivered to the paralegal, it was not given to an

20 attorney to review.

21            Had it been given to the paralegal or to the

22 attorney, the attorney would have reviewed it and would

23 have turned the file over to the managing foreclosure

24 attorney to have a litigator assigned to it.  And the

25 litigator would have reviewed it and a budget would have

Page   19

1 been determined as to what would have been required to

2 defend the particular counterclaim.

3            The counterclaim then would have been

4 e-mailed or sent via this New Track system, and I'm not

5 completely sure how that occurs, but they would attach it

6 to a communication in the New Track system.

7            And then the client would be advised that

8 there was a counterclaim filed, and this would be the

9 amount of hours that it would take for us to -- were

10 anticipated to be necessary to be handling the defense of

11 the counterclaim.  The client would then advise us

12 whether we were to proceed or if they were would bring in

13 other counsel.

14     Q.      And that --

15            THE COURT:  Can you clarify, sir, then, on

16     your testimony what you answered is, does your view

17     indicate that the counterclaim reached one of your

18     attorneys or did not?  I wasn't clear --

19            THE WITNESS:  It --

20            THE COURT:  -- on that.

21            THE WITNESS:  It did not, Judge.  It -- from

22     what I could tell, it -- it stopped after being

23     scanned into the system and, from what I can

24     surmise, is the reason it wasn't given to a

25     paralegal or an attorney is because at that point

Page   20

1     the loan had been -- we were --

2            MR. GARBER:  Your Honor, I'm going to object.

3     It's speculation.  If he knows, but not if it's

4     speculation.

5            THE COURT:  Is this based on your review or

6     are you assuming these things happened?

7            THE WITNESS:  It's based on my review of --

8     of the chronology of the -- of the filing and past

9     history of similar circumstances, which we tried to

10     avoid happening.

11            THE COURT:  Okay.  So to clarify your answer

12     is that, based on your review, you -- you do not .

13     believe that the -- there's any indication that the

14     counterclaim reached the attorney or the paralegal?

15            THE WITNESS:  Correct.

16            THE COURT:  Thank you.  Please, continue.

17            MR. BUNNER:  Thank you, Your Honor.

18            CONTINUED DIRECT EXAMINATION

19 BY MR. BUNNER:

20     Q.      I believe you answered this as part of your

21 answer, but the -- did the litigation department have a

22 policy as to whether or not it would notify the client in

23 the event that a counterclaim was filed in a foreclosure

24 action?

25     A.      Yes, absolutely.  It was -- it was required.

Page  21

1    Q.    All right.  And did you review the files to
2 see if they had provided any indication that the firm
3 provided any indication to GMAC that a counterclaim was
4 filed?
5    A.    Not in this case.
6    Q.    Okay.  Is there any indication in the records
7 that the firm provided any indication to Deutsche Bank,
8 the Plaintiff itself?  And we use Deutsche Bank as a
9 shorthand.  I know it's a RALI Trust, but we'll call it
10 Deutsche Bank.
11    A.    No.  There was no communication at all
12 regarding the counterclaim to the -- to either Deutsche
13 Bank or GMAC.
14    Q.    Okay.  Another thing I believe you touched on
15 in your answer was that -- well, did the firm have a
16 policy with regard to whether or not it charged clients
17 extra money to defend counterclaims in a foreclosure
18 action?
19    A.    Yes.  That was with respect to the estimated
20 budget that would be transmitted with a copy of the
21 counterclaim.
22    Q.    And does your review of the records indicate
23 that there is any -- there was any budget prepared to
24 defend any counterclaim in this action?
25    A.    No.  There was no budget prepared.

Page  22

1    Q.    Was there any communications with GMAC, or
2 any other outside party outside the firm, regarding
3 payment to defend the counterclaim?
4    A.    No.
5    Q.    Okay.  And, again, both the -- both the
6 notification of the pending counterclaim, is that the
7 kind of -- of matter that would result in a record being
8 produced in the Stern file?
9    A.    Yes.  There would be some sort of record as
10 to the transmission to the client, either a -- an e-mail
11 saved to the system or a copy of a letter sent to the
12 client.
13    Q.    All right.  And -- and would that record be
14 regularly made and preserved in the regular course of
15 business at the firm?
16    A.    Yes.
17        MR. BUNNER:  All right.  And I guess I've
18    never done this, Your Honor, but that -- I would
19    proffer the absence of that entry of the record
20    under 806, Subsection 3, the absence of a record as
21    an exception to the hearsay rule.
22        THE COURT:  As to?
23        MR. BUNNER:  The absence --
24        THE COURT:  What's -- what's the request?
25    What are you asking the Court to admit or

Page  23

1    recognize?
2        MR. BUNNER:  Well, the absence of a record
3    technically could be arguably hearsay, but there is
4    an exception under our evidence code in the event
5    that -- that the testimony is there would be such a
6    record, that it would be regularly made and
7    preserved in the regular course of business and
8    that is admissible.  And so we're proffering the
9    absence of the indication that there was a
10    counterclaim as substantive evidence.
11        THE COURT:  Okay.  That's Sub 7 --
12        MR. BUNNER:  That's Sub 7, yes.
13        THE COURT:  All right.  Any objection?
14        MR. GARBER:  Your Honor, I would.  I'd wait
15    until I've had a chance to cross-examine this
16    person, that exception to the hearsay rule is 803,
17    Subsection 7, as the Court pointed out.
18        And I saw that Mr. Bunner brought his copy
19    of *Ehrhardt*, who is recognized by me and I think
20    most people, as a leading authority on it, and he
21    discusses this point exactly, and he said, as
22    Mr. Bunner did, that this is an exception to the
23    hearsay rule, but it should be construed much more
24    narrowly and much more vigilantly by a Court
25    because there's really no record.

Page  24

1        It's an absence of a record.  And so I'll
2    make that argument more when I've had a chance to
3    cross-examine him.
4        THE COURT:  All right.  I'll reserve.
5        CONTINUED DIRECT EXAMINATION
6 BY MR. BUNNER:
7    Q.    All right.  And I'd ask the same question
8 with regard to the absence of any paperwork pertaining to
9 a budget on the counterclaim.  Would that be something
10 that was regularly prepared?
11    A.    Yes.
12    Q.    Would it be regularly preserved in the
13 ordinary course of business?
14    A.    Yes, it would have been saved --
15        MR. BUNNER:  I would make the same proffer,
16    Your Honor, substantively.
17        THE COURT:  Okay.
18        CONTINUED DIRECT EXAMINATION
19 BY MR. BUNNER:
20    Q.    Mr. McSurdy, based on your review of the
21 documents in this case and as head of litigation and the
22 records custodian of this -- of the firm, have you been
23 able to determine why you believe the firm failed to
24 reply to any paper filed in this case after the firm
25 caused the notice of dismissal to be filed?

**Testimony of FORREST McSURDY on May 16, 2012**

Page 25

1   A.   Yes.

2   Q.   And what was your conclusion?

3   A.   My conclusion was based on the history of the
4   particular file. Please remind me, what number of the
5   tab was the comment history from our firm?

6   Q.   : Tab 22.

7       MR. SMITH T:   Tab 22.

8       THE WITNESS:   Twenty-two. (Reviewing
9   document.) The comment history from our firm on
10  the -- on the most recent page, which would be the
11  first page of the -- of the tab, shows on date
12  9/22 -- there is -- actually, there are several
13  entries:  9/15, 9/22. The person handling the
14  file, the paralegal entered, "The file is closed
15  per client," and it said, "The loan was reinstated
16  on 9/2/09."

17      Then on 10/5/2009, there's an entry by a
18  Kerry Cohen (phonetic spelling) in the middle of
19  the page that indicates the file was clicked
20  closed.

21          CONTINUED DIRECT EXAMINATION
22  BY MR. BUNNER:

23  Q.   What is the significance of the file clicked
24  closed?

25  A.   What that means is on our computer system,

Page 26

1   the file -- part of the initial screen when you brought
2   up the -- the file to look at a particular file, on the
3   top left corner it would tell you whether the file was
4   open or closed.

5       So when you brought up this particular file,
6   this file was administratively closed, so that when the
7   first person -- the first thing the person would see is
8   this file was closed, when they opened it, as of this
9   date, 10/5/2009.

10      And the reason it was clicked closed was
11  because we were advised by GMAC that the loan had
12  reinstated or it was brought current for -- and that we
13  were to dismiss the case.

14      Unfortunately, because of our enormous amount
15  of foreclosures that had to be dismissed during the
16  period of time, we were six to nine months behind in
17  dismissing cases. This particular case did not get
18  dismissed right away. You'll see, if you go to the top
19  of the comment history, that the dismissal for this
20  particular file only occurred -- it went to the Court.

21      There's an -- there's an entry, the third
22  entry from the top by Heather Smith. It went to the
23  Court in December of 2009, about three months after the
24  loan actually re -- we received notice of the loan
25  reinstatement.

Page 27

1       So the reason I'm telling you this is because
2   when I looked on the system, I saw when the counterclaim
3   was saved to the system. The counterclaim was saved on
4   the 7th of October, two days after the file was clicked
5   closed.

6       So anyone who looked at the -- the electronic
7   file system when the counterclaim came in, they would
8   have brought it up and it said, "Oh, this file's closed.
9   There's nothing we need to do with any further
10  pleadings," which was contrary to the system that I had
11  tried to set up with the foreclosure managers and the
12  paralegals and the mailroom whenever some kind of
13  pleading came in after a file was reinstated.

14  Q.   Okay. Was it accurate to say that what
15  happened with the papers in this case was not consistent
16  with the way the system was supposed to work?

17  A.   Yes. It was not consistent.

18  Q.   Once a file was closed, what physically was
19  done with the file?

20  A.   In this particular instance, the -- the file
21  physically went to the dismissal department to sit in a
22  pile of literally hundreds of files waiting to be
23  dismissed.

24  Q.   Okay. And were open files also kept with the
25  dismissed files in the dismissal department?

Page 28

1   A.   Well, technically they were still open until
2   they were dismissed with the Court.

3   Q.   Let me rephrase. Were -- were files that the
4   firm understood to still be open and active cases, were
5   they stored with files that the firm considered to be
6   closed?

7   A.   I don't -- I don't understand your question.

8   Q.   If one went to the firm and wanted to look at
9   a file that the firm believed was an open file, would
10  they go to the same office to look at it as they would to
11  go to a file that the firm believed was a closed file?

12  A.   No, no. They -- they would -- it would be in
13  a -- in a storage cabinet with open --- other open files.
14  It would not be in the dismissal department.

15      MR. BUNNER:   Okay. I have no further
16  questions.

17      THE COURT:   Cross-examination.

18      (4:33 p.m.)

19          CROSS-EXAMINATION
20  BY MR. GARBER:

21  Q.   Mr. McSurdy, good afternoon, sir.

22  A.   Hello.

23  Q.   Let me try to track the same order of
24  examination that you received your questions on direct,
25  and there was a copy of a complaint found in Tab 25 of

**Testimony of FORREST McSURDY on May 16, 2012**

Page   29

1 your -- of Plaintiff's notebook.  Correct?

2    A.    Yes.

3    Q.    Okay.  And that was a complaint prepared by

4 your office, wasn't it, sir?

5    A.    Yes.

6    Q.    And this complaint says that a copy of a note

7 and mortgage are attached as Exhibit A to the complaint.

8 Correct?

9    A.    Yes.

10    Q.    Found in par -- in Paragraph 4?

11    A.    Uh-huh.

12    Q.    And it says that there was a default for the

13 note and mortgage from August 1st, 2009 on.  Correct?

14    A.    Correct.

15    Q.    Was that information you got from GMAC?

16    A.    Yes.

17    Q.    You didn't attach a copy of the note to the

18 complaint, did you, sir?

19         MR. BUNNER:  Your Honor, objection,

20    relevance.

21         THE COURT:  Mr. Garber.

22         MR. GARBER:  Your Honor, I -- I think it's

23    relevant because we're trying to establish that

24    this law firm was guilty of gross negligence.  And

25    if it was guilty of gross negligence, then it's not

Page   30

1 excusable neglect.

2         THE COURT:  Any other argument?

3         MR. BUNNER:  Yes, Your Honor.  If the

4    excusable neglect is that of the client, not of the

5    lawyer, what he's asking about is whether or not

6    apparently there was a mistake made and the claim

7    that we established 60 minutes ago was voluntarily

8    dismissed.  It does not have anything to do with

9    the counterclaim or the three prongs in this

10    motion.

11         THE COURT:  The objection is overruled.

12         CONTINUED CROSS-EXAMINATION

13 BY MR. GARBER:

14    Q.    Okay.  So you did not have a copy of the note

15 with the complaint that you served?

16    A.    Did -- is the question, did the firm have a

17 copy of the note or was --

18    Q.    No.

19    A.    -- it attached?

20    Q.    You didn't attach a copy with the note, did

21 you, sir?

22    A.    The note was not attached.  It was --

23    Q.    Okay.

24    A.    A mistake was made, yes.

25    Q.    And you did have the note at that time,

Page   31

1 though, correct?

2    A.    According to the case history, yes, it looks

3 like the note was received by the firm.

4    Q.    Okay.  So would you say that was a mistake?

5    A.    The attorney who was reviewing the complaint

6 should have caught that and should have changed that,

7 yes.

8    Q.    Okay.  Now, this particular attorney who was

9 assigned this case was Elsa Shum, correct, sir?

10    A.    Yes.

11    Q.    And as a matter of fact, she didn't sign the

12 complaint, did she?

13    A.    No, she did not.

14    Q.    Okay.  Were you able, in reviewing these

15 records -- and we have literally many hundreds of pages

16 of records -- were you able to confirm that Elsa Shum

17 refer -- reviewed a single page of this file?

18    A.    I never considered the issue.  I'm sorry.

19    Q.    Okay.  So you have no information on that

20 point?

21    A.    No.

22    Q.    Okay.  And it's fair to say, you actually

23 have no personal knowledge of this entire case, do you,

24 sir?

25    A.    Other than reviewing the -- the records.  No.

Page   32

1    Q.    Right.  Okay.  So you reviewed the records

2 that have been submitted into evidence here today,

3 together with your -- what was called Exhibit F in your

4 deposition, but I think it was called another one here

5 for this --

6         MR. GARBER:  Do you know what the tab was?

7         MR. BUNNER:  I don't know what exhibit you're

8    talking about.

9         THE WITNESS:  Twenty-two.

10         THE CLERK:  Tab 22.

11         MR. GARBER:  Okay.  Thank you.

12         CONTINUED CROSS-EXAMINATION

13 BY MR. GARBER:

14    Q.    Tab 22 was what you downloaded from your

15 system.  Correct, sir?

16    A.    The comment history, yes.

17    Q.    Okay.  So you looked at Tab 22 and you looked

18 at the documents?

19    A.    Correct.

20    Q.    And that's the basis of your knowledge here

21 today?

22    A.    Yes.

23    Q.    Okay.  And also would it not be fair to say,

24 sir, before I get into some of these documents, actually,

25 that, in fact, you have sued GMAC yourself and are

**Testimony of FORREST McSURDY on May 16, 2012**

---

Page 33

1 involved in a suit with them?  Is that not true, sir?

2    A.    No, I'm not.

3    Q.    No.  I mean, David Stern.  The Office of

4 David Stern.

5    A.    Yes.  We -- we are in litigation with GMAC.

6    Q.    Okay.  You filed a complaint against them

7 because you want to get paid about $6 million --

8         MR. SMITH T:  Objection --

9         MR. GARBER:  For --

10        MR. SMITH T:  Judge, I'm here on behalf of

11 GMAC, and I don't understand the relevancy of this.

12        MR. GARBER:  Your Honor, it's relevant

13 because of bias of this witness.

14        MR. SMITH T:\ That, I think, goes in our

15 favor, but I sti -- I don't think that's sufficient

16 to admit that question.

17        THE COURT:  Objection is sustained.

18        MR. GARBER:  Well, the complaint itself was

19 signed --

20        THE COURT:  I will note, though, that

21 objection came after the answer previously that the

22 witness did admit there is litigation between GMAC

23 and David Stern.

24        MR. SMITH T:  Yes, sir.

25        MR. GARBER:  And, Your Honor, I want to say,

---

Page 34

1 also, so I can put the Court on notice, this case,

2 the Mack case, is a subject of that litigation and,

3 therefore --

4         THE COURT:  Is that either objected to or

5 admitted, Counsel?

6         MR. SMITH T:  Judge, that's -- that's a

7 matter of public record, that -- that there are

8 counterclaims going back against the Stern firm by

9 GMAC; yes, sir.

10        THE COURT:  All right.

11            CONTINUED CROSS-EXAMINATION

12 BY MR. GARBER:

13    Q.    So can you say -- do you know who did sign

14 this particular complaint from your office?

15    A.    I don't recognize the signature, no.

16    Q.    Okay.  There's a name of Miriam Mendieta?

17    A.    That -- I know Miriam's signature.  That's

18 not Miriam's signature.

19    Q.    Okay.  But some lawyer signed it and you

20 don't know their -- their name?

21    A.    Yes.

22    Q.    Right, sir?

23    A.    Correct.

24    Q.    Okay.  Now, there was a counterclaim that was

25 filed in this matter, wasn't there, sir?

---

Page 35

1    A.    Yes.

2    Q.    And the date of that counterclaim was

3 actually September the 9th.  Is -- I'm trying to look

4 through your records here to see if I can find a copy of

5 that counterclaim.  (Reviewing documents.)  Do you know

6 where it is -- or would you know it when you get there

7 if I is --

8    A.    It would have been in the second --- the one

9 that I copied from the electronic system.  It was not in

10 the physical file.

11    Q.    Okay.

12    A.    Tab 26 somewhere it should be.

13    Q.    In Tab 26 somewhere?

14    A.    (Nodding head.)

15    Q.    Okay.  You had two files, actually.  You had

16 an electronic file and a paper file.  Is that correct?

17    A.    Yes.

18    Q.    And 26 is your electronic file?

19    A.    Yes.

20    Q.    Okay.  Now, the complaint itself was filed --

21 has a stamp of September 11th, 2009.  Do you know when

22 your office received it?

23    A.    If we can find the --- the pleading, it --

24 that may answer it -- your question may be answered just

25 by the mailing stamp.

---

Page 36

1    Q.    Okay.

2    A.    When it was received.

3         MR. SMITH T:  Are you looking for the

4 counterclaim?

5         MR. GARBER:  Yes.

6         THE WITNESS:  Yes.

7         MR. SMITH T:  Go to Deutsche 1241.

8         THE COURT:  And what tab are you at, Counsel?

9         MR. SMITH T:  Twenty-six.

10        MR. BUNNER:  Tab 26, Your Honor.

11        THE COURT:  And what's the number?

12        MR. BUNNER:  It's 1241, your Honor.  That's

13 the answer to the complaint and the counterclaim.

14        MR. GARBER:  Okay.  Yes, 1241.

15        THE WITNESS:  (Complies.)  Uh-huh.

16        THE COURT:  And what was the question,

17 Mr. Garber?

18            CONTINUED CROSS-EXAMINATION

19 BY MR. GARBER:

20    Q.    Okay.  Do you know when you received a copy

21 of this counterclaim?

22    A.    I do not know when the mail room received a

23 copy of it.

24    Q.    Okay.  The date of the counterclaim was

25 September 9th, 2009.  Do you have any reason to believe

---

**Testimony of FORREST McSURDY on May 16, 2012**

Page 37

1 that this counterclaim was not received by your office
2 within a few days after that date?
3    A.    It -- no, I don't have any reason the mail
4 room wouldn't have received it.
5    Q.    Okay.  Now, the Office of David Stern filed
6 suit against the Macks and we've already looked at your
7 complaint.  You're not here to suggest that service or
8 sending this counterclaim to you was not proper service,
9 are you?
10    A.    No.  Not at all.
11    Q.    Okay.  And you being the attorney, that is
12 David Stern being the attorney, you had a duty to respond
13 to this counterclaim in a timely fashion, right, sir?
14    A.    Yes.
15    Q.    Okay.  As a matter of fact, you were notified
16 that there was a default that was requested in this
17 particular case; were you not, sir?
18    A.    When I reviewed the electronic file, I saw
19 that there was a default that the mail room had scanned
20 to the file, but no one seems to have reviewed it.
21    Q.    Okay.  Okay.  So to try and speed this up, I
22 want to go through the particular filings that your
23 office received.  I think I have a summary of them that
24 we can go through very quickly.
25    MR. SMITH T:  We're not -- we're not

Page 38

1    objecting that they were received, that they're in
2    here, Judge.  I don't know if that helps.
3    MR. GARBER:  Right.  They're in here, but
4    they're all in different order; whereas I have them
5    in chronological date.  And I'm just looking at my
6    complaint -- or my memorandum of law.
7    CONTINUED CROSS-EXAMINATION
8 BY MR. GARBER:
9    Q.    So you're admitting that you received the
10 answer and the complaint a few days of September 9th,
11 2009, right, sir?
12    A.    That's when it was served, yes.
13    Q.    Okay.  And you received a copy of the motion
14 for default within a few days of October 16th, 2009,
15 correct, sir?
16    A.    I have no knowledge when it was received.  I
17 can only tell, again, from when I look at the Tracker,
18 when it was posted to the file by the mail room and there
19 was -- in the case of the counterclaim, it was over a mo
20 -- it was about a month later that it was posted to the
21 file.
22    Q.    Okay.  But you have no reason to doubt that
23 these things were all timely sent on the days that they
24 say they were.  Right?
25    A.    No.  I have no reason to doubt that.

Page 39

1    Q.    Okay.  So in the documents that you reviewed,
2 you also got a copy of the motion for default dated
3 October 16th, 2009.  Correct?
4    A.    Again, I assume if it's in this package that
5 I sent you, yes.
6    Q.    It is.
7    A.    Okay.
8    Q.    And I'm just going through it.  And I want to
9 make sure the Court knows them all.  You got a copy of
10 the default that was entered on October 1st, 2009.
11 Correct?
12    A.    Yes.
13    Q.    Clerk's default.  You got a copy of
14 Defendant's first request for production on November 2nd,
15 2009.  Correct, sir?
16    A.    Yes.
17    Q.    You got a copy of the request for designation
18 of corporate representative.  That was November 2nd,
19 2009.  Correct?
20    A.    Yes.
21    MR. SMITH T:  Judge, again, --
22    THE WITNESS:  Again --
23    MR. SMITH T:  -- look, I -- I know Mr. Garber
24    wants to make this appear overwhelming, how much
25    paper was flowing into the Stern firm.  We're not

Page 40

1    contesting if it's in here that it was received --
2    THE COURT:  When you say "in here," you're
3    referring to --
4    MR. SMITH T:  The documents that have been
5    produced.  And he's asking Mr. McSurdy just blindly
6    to say did you get this, did you get this, did you
7    get this?  Now, he can go through and find it and
8    then confirm, yes, I got this; yes, we're on the
9    certificate of service; yes, the service dates say
10    what it is --
11    THE COURT:  Well, is there any way to
12    streamline, --
13    MR. GARBER:  That's what I'm --
14    THE COURT:  -- Mr. Garber, by stipulation as
15    to the litany of documents that would have been
16    received in relation to this case by the David
17    Stern firm?  I -- I believe that Plaintiff's
18    counsel is saying they are willing to stipulate
19    that -- I guess I'm trying to find --
20    MR. SMITH T:  Sure.  The documents that are
21    in Exhibits 25 and 26 were received by the Stern
22    firm.
23    MR. GARBER:  Okay.  And, Your Honor, I
24    thought I was streamlining it.  I can go through
25    Exhibit 26 and I can look at each document and do

**Testimony of FORREST McSURDY on May 16, 2012**

Page   41

1    it, but I thought just going through a list would
2    be much faster.
3          MR. SMITH T:  Well, this is even faster.
4          THE COURT:  Well, the --
5          MR. SMITH T:  I'm just saying --
6          THE COURT:  What the stipulation is, is that
7    the documents are in Plaintiff's Tabs 25 and 26?
8          MR. GARBER:  Yes, Your Honor.
9          THE COURT:  Does that cover all of the
10   documents you believe are at issue, Mr. Garber?
11         MR. GARBER:  I believe that they do.  I
12   really haven't confirmed that 26 is all of the
13   documents --
14         THE COURT:  And is --
15         MR. GARBER:  -- that we sent --
16         THE COURT:  -- Plaintiff is stipulating that
17   all of those documents that Mr. Garber can refer to
18   in Plaintiff's Tabs 25 and 26, that it would be the
19   witness' testimony that they were received
20   around -- shortly after or around the time when
21   they were sent?
22         MR. SMITH T:  Yes, sir.  Of course, there
23   are some documents in here that aren't service
24   papers, internal things, and those documents
25   speak for themselves.  But as to anything sent

Page   42

1    by Mr. Garber's office to Mr. Stern or the Stern
2    firm, if it's in here, we don't dispute that we
3    received it and we don't dispute that it came in
4    within a reasonable time after it was mailed.
5          THE COURT:  All right.  And, Mr. Garber, can
6    you just basically summarize the nature of those
7    documents, just read them off to see if there's any
8    issue as to whether Plaintiff's stipulation
9    includes them or any -- do you have a list of
10   those?
11         MR. GARBER:  Yes, Your Honor; I do have a
12   list of them.
13         THE COURT:  All right.  And if you can just
14   read that off and I can just clarify from Plaintiff
15   whether they dispute that -- whether there's any
16   questioning needed of the witness as to those being
17   received by David Stern around the time they were
18   sent.
19         MR. SMITH T:  Well, the problem is I don't --
20   I don't have committed to memory every single
21   pleading that he's probably going to read off if
22   it's in here.  I don't doubt that it is.
23         But he's asking, you know, second motion to
24   compel document requests, I presume it's in here,
25   but I haven't got that committed to memory.  I'm

Page   43

1    try -- what I'm trying to suggest is if -- if it's
2    in here, we received it, and we received it on or
3    about the time --
4          THE COURT:  Do you know, Mr. Garber, if there
5    are things not within those two tabs that you're
6    either seeking a stipulation or testimony about?
7          MR. GARBER:  Your Honor, I'm not sure.  I --
8    I hope they put everything in there, but I have not
9    compared that against my list.  I have compared it
10   against lists that they gave me.  I'm going through
11   documents that they gave me.  All of these are
12   marked with a Deutsche Bates stamp.
13         MR. SMITH T:  And that's a fair point.  I'm
14   not trying to sugg -- this -- these tabs should be
15   exactly what was produced.  And they're not, it's a
16   clerical mistake, but I have great confidence that
17   they are.
18         And we can re -- we can do it off the Bates
19   number.  That might be the easiest thing, just to
20   say we stipulate that documents labeled Deutsche
21   979 through 1068 and Deutsche 1176 through 1355
22   make up the Stern files and anything in that tho --
23   that range, those ranges, were -- if they were
24   pleadings from Mr. Garber, we do not dispute that
25   we received them.  We don't dispute that they were

Page   44

1    sent on or about the time of the certificate of
2    service.
3          THE COURT:  And those Bates Numbers that you
4    list are basically what constitute Plaintiff's Tabs
5    25 and 26?
6          MR. SMITH T:  It's exactly what it is.  And
7    it should line up with what Mr. Garber's got during
8    discovery.
9          MR. GARBER:  And it probably does, and I -- I
10   do want to streamline this, but these documents
11   actually fall into two parts.  One of them may have
12   been bar-coded by David Stern.
13         Somebody took and put a bar code on and then
14   followed up with the computer -- you know, whatever
15   the computer process that you do with bar codings.
16   And some of them were not bar-coded.  And the bar
17   codings have dates and they have certain numbers on
18   them.
19         MR. SMITH T:  I'm not -- I'm not saying that
20   you can't ask those questions.  I just thought we
21   were trying to get through were all these documents
22   actually received.  That's all.
23         MR. GARBER:  Okay.
24         THE COURT:  That would seem helpful and maybe
25   shorten things, but, you know, Mr. Garber, if you

**Testimony of FORREST McSURDY on May 16, 2012**

Page 45

```
1    need to ask additional questions regarding bar
2    coding or things, then obviously that's -- that's
3    still available to you.
4         MR. GARBER:  Okay.  Well, I'll try and do it
5    as rapidly as I can, Your Honor.
6         THE COURT:  Thank you.
7         CONTINUED CROSS-EXAMINATION
8  BY MR. GARBER:
9    Q.   Turning to the first page of Tab 26, that's
10  1176, letter to Elsa Shum.  That was bar-coded by your
11  office.  Correct?
12   A.   Correct.
13   Q.   Okay.  The next thing that was bar-coded --
14  and by the way, what does that mean when it is
15  bar-coded?
16   A.   It means that someone in the mail room
17  received it and scanned it to our system.
18   Q.   Okay.  There is an e-mail that was sent by
19  the Court to Deutsche Bank.  It's found at 1189.  This
20  was bar-coded by you, too?  I'm sorry.  Maybe that was an
21  e-mail sent by my office.  We were trying to set up a
22  five-minute hearing.  You bar-coded that?  Do you see in
23  the middle of the page?
24   A.   Yeah.  Yes.  That was bar-coded by us.
25   Q.   Okay.  And then the next one after that,
```

Page 46

```
1  January 31st, 2011, you bar-coded that.  Correct?
2    A.   Yes.  Uh-huh.
3    Q.   And, again, trying to speed up.  Anything
4  that has a bar code that looked like those bar codes that
5  I've just gone over, they indicated that they were
6  bar-coded by your system, not some other system.
7  Correct?
8    A.   Correct.
9    Q.   And scanned into your system?
10   A.   Yes.
11   Q.   And processed according to the way that your
12  bar coding is designated?
13   A.   Yes.
14   Q.   Okay.  Now, the --
15        MR. GARBER:  And, Your Honor, I'm not sure of
16   the Court's ruling.  I know the Court has discussed
17   this, but there is a lawsuit going on between David
18   Stern and GMAC.  And part of that lawsuit is that
19   GMAC says that you messed up the Mack case, and I
20   want to ask him about that.  Is -- is that within
21   your ruling?
22        THE COURT:  Counselor.
23        MR. SMITH T:  Well, yeah, we did object to
24   the nature and the particulars of that case because
25   it has no relevancy on the motion to set aside.
```

Page 47

```
1         And I think Mr. Bunner already pointed out,
2    it's the excusable neglect of the client that is at
3    issue, not the excusable neglect or the neglect or
4    lack of neglect on -- from the attorney.  I think
5    that was the argument.
6         MR. GARBER:  And, Your Honor, that is not the
7    law and I have given several cases to the Court;
8    that it is the client and the attorney's neglect
9    that is at issue, both of them.
10        THE COURT:  Mr. Smith T and Mr. Bunner, it
11   would seem as if -- if there's allegations specific
12   to the Mack case in this litigation between
13   Plaintiff and David J. Stern, it would seem that --
14   that might be relevant to the issue of excusable
15   neglect as to how this counterclaim was handled.
16   Why would it not be?
17        MR. SMITH T:  Well, Judge, maybe I can
18   short-circuit this.  I think I said earlier, there
19   is no disagreement that -- that there are
20   counterclaims and that part of the bases for those
21   counterclaims is that the Stern firm did not
22   adequately defend GMAC in connection with this
23   matter.  That is part of the case.
24        We're not making any secret that we're
25   disappointed that we weren't notified about the
```

Page 48

```
1    counterclaims.  That's the basis for our excusable
2    neglect.
3         And I think Mr. McSurdy has already testified
4    they didn't give notice and that that's something
5    that they normally would have done.  So I don't see
6    what point is served by further examination into
7    those areas.
8         THE COURT:  Mr. Garber.
9         MR. GARBER:  Your Honor, we have to establish
10   a record.  This may or may not be appealed.  And
11   although I -- the comments of Mr. Smith T are very
12   fair, they are not the record.
13        The record is the witness' testimony, and,
14   therefore, I think it is imperative to get it on
15   the record that they were involved in litigation,
16   each with the other, that that would show not only
17   prejudice, but bias, and I will bring that out as
18   exactly how that will show both of them.
19        MR. SMITH T:  I do believe the Court's
20   already ruled on bias.  It's not -- it's -- it's --
21   he -- he -- Your Honor sustained my objection on
22   that.  And on relevancy, I think Mr. McSurdy's
23   already testified.  As I said, I'm not trying to
24   testify, but I think Mr. McSurdy has, so I think
25   it's clear.  So I think we're going beyond the
```

Page 49

1   scope of what we're here about today.

2       MR. GARBER:  And, Your Honor, maybe I will

3   make it more clear what I am trying to do.  The

4   Stern law firm had a --

5       THE COURT:  Go ahead and ask your question

6   and then I'll --

7       MR. GARBER:  Okay.

8       THE COURT:  -- hear the objection.

9       MR. GARBER:  Okay.

10          CONTINUED CROSS-EXAMINATION

11  BY MR. GARBER:

12  Q.    Isn't it true, sir, that after you filed

13  suit, your company -- that is, the Stern office -- filed

14  suit against GMAC, that they responded to that and they

15  cited this particular case?  Isn't that true, sir?

16      MR. BUNNER:  Objection, Your Honor.  And I

17  would object on a number of bases, the first being

18  this witness is not competent to testify as to what

19  GMAC did.  He's not a GMAC witness.

20      Second of all, it violates the best evidence

21  rule.  I guess what Mr. Garber's asking about is

22  what is in pleadings in another case.  Those

23  pleadings are not in evidence.  We don't have

24  copies of them.  And so the witness may not testify

25  as to the substance of those pleadings without them

Page 50

1   being here in evidence.

2       MR. GARBER:  Your Honor, I have those

3   pleadings and I am prepared to introduce them into

4   evidence.

5       THE COURT:  Well, can you --

6       MR. BUNNER:  If counsel can --

7       THE COURT:  -- proffer to me, Mr. Garber --

8       MR. BUNNER:  -- authenticate them --

9       THE COURT:  -- or explain to me, Mr. Garber,

10  where are you going with this line of questioning?

11  What is it that you seek to establish as a proffer

12  on this?

13      MR. GARBER:  What I am going to be -- what I

14  proffer, Your Honor, is that these pleadings will

15  show that GMAC had a contract with David Stern to

16  represent them.  And as part of that contract, they

17  had an indemnity agreement; that if, in fact, there

18  was any third-party damage that would come out of

19  this, that David Stern would be the one that would

20  pay for that.

21      And these pleadings show that GMAC is

22  claiming damages of over $450,000.00 for this case,

23  this is the Mack case, that they want David Stern

24  to pay.  And my argument that I am going to make is

25  that if, in fact, this Court rules in favor of the

Page 51

1   motion to vacate, they are ruling in favor of David

2   Stern.

3       They will be rewarding David Stern for his

4   incompetence because they will not have to

5   indemnify GMAC $450,000.00 as they're now

6   litigating.

7       THE COURT:  What probative value do any of

8   these so far unproven allegations in this other

9   litigation have, Mr. Garber, as to whether there

10  was excusable neglect or failure of due diligence?

11      MR. GARBER:  Well, I think it -- it goes to

12  excusable neglect on what did -- did the Stern law

13  office, did they do anything -- were they excused

14  in their neglect?  The excusable neglect cases that

15  we have are ones that say a secretary miscalendered

16  something and the attorney didn't go there.

17      But we have a situation in which this was a

18  shower of pleadings that occurred.  And if this

19  Court rules in favor of GMAC, then Stern's law

20  office is going to be off the hook.  So they want

21  to come in here and testify in such a way that they

22  will win this motion to vacate, which I think

23  clearly shows bias on their part.

24      MR. BUNNER:  Your Honor, a couple of

25  different bases.  First of all, counsel will not be

Page 52

1   able to find any case where such a tangential

2   theory was ever deemed to be relevant to a motion

3   to vacate.

4       Second of all, the pleadings themselves --

5   let's assume even that these pleadings were between

6   these innocent parties.  Pleadings are not

7   evidence.  You can't take them as evidence.

8   They're allegations.

9       So, certainly, third-party pleadings in a

10  case that's not before the Court can't be

11  substantive evidence of anything.  They -- they're

12  of absolutely no probative value.  They -- they're

13  -- they're not even of probative value within a

14  case.

15      Evidence is a probative value, not pleadings.

16  Pleadings define what the material facts in

17  evidence -- what the material facts are so that

18  evidence can be provided.  So they're of no

19  probative value.  They're simply argumentative

20  value.

21      THE COURT:  Mr. Garber, any other argument on

22  that point --

23      MR. GARBER:  No, Your Honor.

24      THE COURT:  Well, I think if we were talking

25  about admissions of some type, that it might be

**Testimony of FORREST McSURDY on May 16, 2012**

Page   53

1   different, but these are allegations in a pending
2   case.
3         At this point, I -- I don't believe it is
4   relevant and it does have probative value. At this
5   point, the objection is sustained. And, I believe,
6   Mr. Garber, you've been allowed to make a proffer
7   for any appellate record, if necessary, of the
8   parameters of what you wanted to ask about. But I
9   am sustaining the objection on that line of
10  questioning.
11        MR. GARBER: Yes, Your Honor. And there is a
12  related question. I don't believe it's directly
13  under your ruling, but in this suit, GMAC has
14  included a copy of their contract with David Stern
15  and it has the indemniva [sic] -- indemnification
16  agreement. They have also provided me with a copy
17  of that contract, and I can introduce that entire
18  contract into evidence.
19        But I thought if I could just get to the
20  indemnification agreement, we could probably save a
21  great deal of time and -- and paper.
22        THE COURT: All right. Is there an objection
23  to Mr. Garber inquiring about an indemnification
24  agreement between Plaintiff and the firm?
25        MR. SMITH T: Judge, we did produce the

Page   54

1   contracts between the Stern firm and GMAC because
2   they asked. It's discovery.
3         We -- we will acknowledge the paper says what
4   it says. Mr. McSurdy's not here to interpret those
5   documents. But we will certainly -- if -- if -- if
6   -- if they are our contract, Judge, I'll look at
7   them and we will acknowledge that they are our
8   contract.
9         THE COURT: Okay. Are you agreeing to the
10  admission of the contract in evidence in this case?
11        MR. SMITH T: Judge, if I could have a minute
12  just to look at what he wants me to admit.
13        MR. GARBER: Well, it's going to be
14  this. (Indicating.) Let me show it to you.
15        THE COURT: While he's looking at that, Madam
16  Clerk, is your staff able to continue --
17        THE CLERK: Yes.
18        THE COURT: -- past five?
19        THE CLERK: Yes.
20        THE COURT: Until they finish with this
21  witness?
22        THE CLERK: Yes.
23        THE COURT: All right.
24        MR. GARBER: John, if you have no objection
25  to me admitting the contract with David Stern,

Page   55

1   we'll just do it that way and it can be brought up
2   in argument.
3         THE COURT: Well, Mr. Garber, I was not
4   intending to necessarily limit your ability to
5   question this witness if you did want to question
6   about some indemnification -- subject to some
7   objection, but just to save time as a -- kind of a
8   precursor to that, I wanted to know if the
9   Plaintiff had any objection to this contract being
10  admitted into evidence. Apparently they've been
11  shared and produced between the parties.
12        MR. GARBER: Yes, Your Honor, in discovery.
13        MR. BUNNER: Is it on your exhibit list?
14        MR. GARBER: All of the Deutsche Bank things
15  were not on the exhibit list.
16        MR. BUNNER: Again, on behalf of Deutsche
17  Bank, I would argue yet again that this is another
18  example where the exhibit list said all documents
19  of -- of GMAC or something or Deutsche Bank.
20  Again, this is surprise. We had no notice that
21  this was intended to be offered into evidence.
22        MR. SMITH T: Judge, it's not on their
23  exhibit list.
24        MR. GARBER: Can I see our exhibit list?
25  (Speaking to Colleen.)

Page   56

1         MR. SMITH T: So I object on that basis.
2         MR. GARBER: I have all documents produced in
3   discovery by Plaintiff, Deutsche Bank.
4         MR. SMITH T: Judge, that's not --
5         MR. GARBER: All documents produced in
6   discovery by GMAC Mortgage.
7         MR. SMITH T: -- no. Judge, we wrote
8   Mr. Garber after we received this and said that was
9   unfair. Please give us a more specific detailed
10  listing and we did not get an identification of
11  this document on the exhibit list, so I -- I don't
12  think that's within the letter or the spirit of
13  what you --
14        THE COURT: And again, Mr. Garber, how does
15  this indemnification contract or any questions
16  about that have probative value regarding the
17  motion to vacate?
18        MR. GARBER: Because it established bias on
19  this part of this witness. It is impeachment of
20  this witness.
21        THE COURT: Wouldn't it establish bias,
22  frankly, in -- in the reverse direction here,
23  that --
24        MR. GARBER: It could be argued both ways.
25  Yes, Your Honor. It could be. I hope that my

Page    57

1  argument would prevail, but it may not.

2          MR. BUNNER:  And -- and, Your Honor, it's not

3  technically actually impeachment because he didn't

4  offer any testimony to the contrary, and it seems

5  to me that under Mr. Garber's logic, with or

6  without this contract or with or without this

7  indemnification clause, the bias would be the same.

8          The -- a lawyer would always want to have the

9  judgment vacated, regardless of whether that

10  paragraph existed or not, so it -- I -- I just --

11  when you put all of these things together, the lack

12  of notice that it would be an exhibit, the

13  extremely, if any, tangential relevance of it, we

14  would, again, renew that objection.

15          THE COURT:  Any other comment, Mr. Garber?

16          MR. GARBER:  Your Honor, I intended to use it

17  as a cross-examination tool.  I did not intend to

18  produce this entire document as a thing of

19  evidence, so I saved it for cross-examination if

20  this issue came up, and it did come up, and,

21  therefore, I -- I think I've given them fair

22  notice.  They certainly have fair notice of their

23  own documents.

24          THE COURT:  Objection is sustained.

25          MR. GARBER:  Okay.  So where is our McSurdy


Page    58

1  file?

2          MS. KELLERHOUSE:  He has it.

3          MR. GARBER:  Oh, you have my file.

4          MR. GARBER:  I do.  That's it, I believe.

5  (Handing document to Mr. Garber.)  Sorry.

6          CONTINUED CROSS-EXAMINATION

7  BY MR. GARBER:

8      Q.    Mr. McSurdy, you actually had some e-mails

9  that went between your office concerning certain aspects

10  of this lawsuit, did you not?

11          MR. BUNNER:  Objection, Your Honor, vague.

12          MR. GARBER:  Okay.

13          THE COURT:  Sustained as to form.

14          CONTINUED CROSS-EXAMINATION

15  BY MR. GARBER:

16      Q.    Okay.  You have an individual named Evan

17  Cohen (phonetic spelling) that works in your office?

18      A.    He -- he did work in the law firm's office,

19  yes.

20      Q.    Okay.  And Evan Cohen sent a letter to Vagina

21  [sic] -- Vegina Hawkins on or about August 18th, 2010,

22  concerning this lawsuit, didn't he?

23      A.    Remind me of the Bates stamp number again?

24      Q.    Of the what?

25      A.    What's the Bates stamp number?  Which


Page    59

1  document you're referring to?

2      Q.    It's --

3      A.    And that individual, it's Vegina.  I keep

4  telling you, it's VA-heena.  Vegina.  She's Hispanic.

5      Q.    Oh, okay.  Vegina Hawkins.

6      A.    He has a hard time with her name.

7          THE COURT:  What's the last name?

8          THE WITNESS:  It's Hawkins.

9          THE COURT:  Then say Ms. Hawkins.  We'll

10  prefer to use that --

11          MR. GARBER:  Okay.

12          THE COURT:  -- reference.

13          MR. GARBER:  And, Your Honor, in my defense,

14  it's V-E-G-I-N-A.

15          MR. SMITH T:  We -- we don't -- we don't need

16  an explanation.

17          THE COURT:  Well, the -- the record captures

18  your spelling, it does not capture your

19  pronunciations, so we'll just refer to her as

20  Ms. Hawkins.

21          CONTINUED CROSS-EXAMINATION

22  BY MR. GARBER:

23      Q.    Okay.  So you had a -- did Ms. Hawkins work

24  for you?

25      A.    She was an attorney with the firm, yes.


Page    60

1          THE COURT:  I do think that it does remind me

2  of a scene in Austin Powers, if you ever saw that

3  movie.

4          (Laughter.)

5          MR. BUNNER:  Oh, my.

6          THE COURT:  All right.  It's late in the day,

7  but we'll refer to her as Ms. Hawkins.

8          MR. GARBER:  I have a copy of that e-mail in

9  front of me.  Do we have copies we can give to

10  everyone?

11          THE CLERK:  Yes, sir.

12          MR. SMITH T:  That's in Tab 26, Judge.

13          MR. BUNNER:  It's 1345.

14          CONTINUED CROSS-EXAMINATION

15  BY MR. GARBER:

16      Q.    And this is an e-mail from one of your

17  employees to another employee?

18      A.    Yes.

19      Q.    Correct?  Ms. Hawkins being the attorney?

20      A.    Correct.

21      Q.    And it had a copy of an order attached to it?

22      A.    Yes.

23      Q.    As far as you know, was that the order for

24  the case management conference regarding this case in

25  August of 2010?

Page    61

```
 1     A.     Yes.  This is an example showing you what
 2 should have happened from the beginning of when the
 3 complaint -- the -- the counterclaim was received.
 4          THE COURT:  Let me just ask:  Do we have the
 5 clerk switch at this time --
 6          THE CLERK:  Yes.
 7          THE COURT:  -- since it's after five.  If you
 8 want to go ahead and do that.
 9          THE CLERK:  Thank you.
10          THE COURT REPORTER:  Your Honor, could you
11 please get an idea of how late you think we're
12 going to go?
13          THE COURT:  Counsel, how long -- how long
14 would you estimate for this witness?
15          MR. GARBER:  I think this witness will go
16 another five or ten minutes and I'm going to
17 suggest, Your Honor, that we not do arguments
18 today, that we do them in writing or come back or
19 something like that.
20          THE COURT:  Well, I'll certainly try to
21 accommodate you in terms of finishing this case on
22 another date, in whatever format you can agree to,
23 whether it's some present, some on the phone or
24 everybody present on another date.  We can try to
25 work on that.
```

Page    62

```
 1          I do have -- I'm not supposed to go very late
 2 because of budgetary constraints.  I'm going to --
 3 I do want to finish with this witness, obviously.
 4 And after we finish with the witness, we can talk
 5 about the further scheduling.  So I would think we
 6 would be out of here tonight by no later than 6:00
 7 p.m.
 8          MR. GARBER:  Oh, yes, certainly, Your Honor.
 9          THE COURT:  All right.
10          MR. GARBER:  No objection from this side,
11 Your Honor.
12          MR. BUNNER:  No objection.
13          THE COURT:  All right.  Please continue.
14          CONTINUED CROSS-EXAMINATION
15 BY MR. GARBER:
16     Q.     Okay.  So this e-mail was referring to the
17 case management order that was -- that's attached to the
18 e-mail, correct, sir?
19     A.     Yes.
20     Q.     Okay.  If you would be so kind as to look at
21 another document that I have.
22          MR. GARBER:  This is a document produced in
23     discovery?
24          MS. KELLERHOUSE:  I believe it was produced
25     in deposition.
```

Page    63

```
 1          MR. GARBER:  Okay.
 2          THE COURT:  Are you seeking to admit any of
 3 these in evidence, Mr. Garber, or just show them to
 4 the witness?
 5          MR. GARBER:  Yeah.  I would like to introduce
 6 the other one in -- the one I just did into
 7 evidence.  That is the e-mail concerning the case
 8 management order, and that is -- it would be
 9 Exhibit 6 for identification?
10          MR. BUNNER:  No.  It's in evidence already.
11 It's part of -- it's part of Exhibit 26, which --
12          MR. GARBER:  Okay.  If it's in already,
13 then --
14          MR. BUNNER:  Yeah.  It's in evidence.
15          THE COURT:  Is there a page number on --
16          MR. BUNNER:  Yes, Your Honor.
17          THE COURT:  -- 26 --
18          MR. BUNNER:  1 -- 1345.
19          THE COURT:  Page 1345?
20          MR. BUNNER:  Deutsche Bank 1345 --
21          THE COURT:  All right.  So, --
22          MR. BUNNER:  -- of 26.
23          THE COURT:  -- Madam Clerk, you don't have to
24 concern yourself because it's already in evidence.
25 We're just identifying it for the record.
```

Page    64

```
 1          MR. GARBER:  Okay.  And can we get that to
 2 the witness?  Actually, give me that one and you'll
 3 get this.  (Indicating.)
 4          (Whereupon, Exhibit Number 6 was marked for
 5 identification as of this date.)
 6          CONTINUED CROSS-EXAMINATION
 7 BY MR. GARBER:
 8     Q.     Okay.  Have you ever seen a copy of what I
 9 have just handed to you, and I think I have marked it as
10 Exhibit Number 6?
11          MR. GARBER:  Is that right?  We've marked
12     that?
13          THE CLERK:  Yes.
14          MR. GARBER:  And it's Exhibit Number 6, for
15 identification.
16          THE COURT:  Mr. Garber, excuse me for
17 interrupting.  Before you continue on that,
18 Mr. McSurdy, back to that previous case management
19 conference e-mail.  If you could just clarify for
20 me if you know, that involved Ms. Hawkins and Evan
21 Cohen.  And --
22          THE WITNESS:  Yes.
23          THE COURT:  -- Hawkins is with your firm?
24          THE WITNESS:  Yes, she's -- she's an attorney
25 not on this case, but an attorney with the firm.
```

**Testimony of FORREST McSURDY on May 16, 2012**

Page 65

1   And Mr. Evan Cohen was an administrative assistant

2   in the mail room, who was responsible for

3   dispersing pleadings to paralegals and attorneys.

4   And you see the cc there was to Elizabeth Davia

5   (phonetic spelling).  She was the paralegal on this

6   file.

7       THE COURT:  Thank you for clarifying that.

8   All right.  Please continue, Mr. Garber.

9           CONTINUED CROSS-EXAMINATION

10  BY MR. GARBER:

11  Q.   I have just handed you a document for

12  identification, it is Defendant's Exhibit Number 6, and

13  ask if you can identify that?

14  A.   I can't tell what it is.  No.

15  Q.   Okay.  Was this a document that was sent to

16  you by GMAC, along with the foreclosure of the Macks?

17      MR. BUNNER:  Objection, Your Honor.  I

18  believe the testimony was, "I don't know what it

19  is."

20      THE COURT:  Objection is overruled.  You may

21  inquire --

22      THE WITNESS:  I -- I --

23      THE COURT:  -- further.

24      THE WITNESS:  I -- I don't recognize it.  I

25  am sorry.  I don't remember seeing this in our

Page 66

1   file.

2           CONTINUED CROSS-EXAMINATION

3   BY MR. GARBER:

4   Q.   Okay.  You see it's your name on the top

5   right-hand corner, David Stern?

6   A.   Well, I see somebody wrote David J. Stern at

7   the top there, but this is the first time I've seen this

8   document.

9   Q.   Okay.

10  A.   I'm sorry.  It looks like a transmittal of

11  the original note and mortgage is what it looks like to

12  me.

13  Q.   Okay.  But you don't have a copy of that in

14  your file?

15  A.   No.  I only have the note in our comment

16  history that says the original note and mortgage were

17  received.

18  Q.   Okay.  Would it surprise you if some

19  documents were missing from your file?

20  A.   This -- this is not even dated.  I don't

21  know -- I don't know what this is.  I don't know where it

22  came from, to whom it was --

23  Q.   Okay.  And my question was:  Would it be

24  surprising if some documents were missing?  Not directed

25  at that --

Page 67

1   A.   This --

2   Q.   -- one document, but --

3   A.   From -- between the electronic file and the

4   physical file, there sh -- you should have close to a

5   hundred percent of the file.

6   Q.   Okay.

7   A.   But, of course, you know, we're human.

8   Something might be missing.

9   Q.   The judgment --

10      THE COURT:  Mr. Garber, for housekeeping

11  purposes, are you seeking to admit this document?

12      MR. GARBER:  Not if he cannot identify it,

13  Your Honor.

14      THE COURT:  All right.

15      THE CLERK:  Is Number 5 admitted?

16      THE COURT:  The previous -- the one previous

17  to this one?

18      THE CLERK:  Yes.

19      THE COURT:  We did not need to ident -- have

20  anything entered by the clerk.  It's already

21  contained in a prior admitted exhibit.

22          CONTINUED CROSS-EXAMINATION

23  BY MR. GARBER:

24  Q.   Mr. McSurdy, this particular judgment that

25  we're here --

Page 68

1       THE COURT:  Excuse me, Mr. Garber.  I'm sorry

2   to interrupt again.  Just for housekeeping

3   purposes.

4       And I would like to ask the Plaintiff also,

5   and that is, it may be helpful if in the I'm sure

6   extremely unlikely event there would to be an

7   appeal of this matter by either side, do you wish

8   for this to be a court exhibit since the witness

9   was asked about it?  It would not be admitted.  It

10  would just simply be for purposes of any appellate

11  record and --

12      MR. SMITH T:  No, not from our standpoint,

13  Judge.

14      THE COURT:  Mr. Garber, do you want me -- it

15  to be kept as a separate court exhibit for the

16  record for any reason?

17      MR. GARBER:  I -- I think, yes, that would be

18  a good idea to keep it as --

19      THE COURT:  All right.  It's not admitted in

20  evidence, but it has been referred to.  And then if

21  it ever became an issue, the appellate court

22  wouldn't know what we were referring to.

23      MR. BUNNER:  No objection, Your Honor.

24      THE COURT:  This would be, I guess, Number 1,

25  Court's Exhibit Number 1, but it is not admitted

**Testimony of FORREST McSURDY on May 16, 2012**

Page 69

```
1     into evidence.
2            THE CLERK:  It's a court's exhibit.
3            THE COURT:  All right.
4            THE CLERK:  Uh-huh.
5            THE COURT:  But it's not ad -- admitted in
6     evidence.
7            THE CLERK:  Right.
8            CONTINUED CROSS-EXAMINATION
9  BY MR. GARBER:
10     Q.    Mr. McSurdy, David Stern was -- had not
11 withdrawn from the Mack case at the time that the
12 judgment was entered against Deutsche Bank on May 5th,
13 2011, had it?
14     A.    The loss -- the Law Firm of David Stern had
15 not withdrawn because the -- it had dismissed the
16 foreclosure case.  It saw no need to withdraw.  It
17 thought the case was closed.
18     Q.    Okay.
19     A.    Yes, we had not withdrawn.
20     Q.    You made no effort to withdraw from the case?
21     A.    No.  We just dismissed it.
22     Q.    Has the Office of David Stern done anything
23 to indemnify GMAC with respect to this judgment?
24            MR. BUNNER:  Objection, Your Honor,
25     relevance.
```

Page 71

```
1     there is an agreement.  And if there is no
2     agreement, if there have been discussions about an
3     agreement.  And --
4            THE COURT:  My understanding, Mr. Garber,
5     from the previous discussion was that there's
6     litigation ongoing, which would leave me at first
7     blush to assume that there is no indemnification
8     and no agreement at this time, but I'll overrule
9     the objection.  You can begin with the basic
10     question about whether there has been
11     indemnification.
12            CONTINUED CROSS-EXAMINATION
13 BY MR. GARBER:
14     Q.    Okay.  Has there been any indemnification of
15 GMAC by David Stern's office regarding the Mack case?
16     A.    No.
17     Q.    Okay.  And no agreement to do that.  Correct?
18     A.    No.
19     Q.    David Stern largely made the entries on the
20 New Track exhibit, that is Exhibit Number 7 to this
21 deposition?  You've looked at Exhibit 7?
22     A.    Not yet, no.
23     Q.    Okay.
24            THE COURT:  We're referring to Plaintiff's
25     Tab Number 7, Mr. Garber?
```

Page 70

```
1            THE COURT:  Mr. Garber, haven't we touched
2     upon this previously?
3            MR. GARBER:  No.  That was the agreement to
4     indemnify.  Now is the actual indemnification.  If
5     there is some agreement to settle this case between
6     them, I want to know about that because I think
7     that does show bias on behalf of the witness, and
8     -- and I think many appellate courts have ruled
9     that agreements between parties are admissible.
10            MR. BUNNER:  I think that's true, that there
11     are appellate cases that say agreements between
12     parties are admissible.  I don't think in this
13     context, and I haven't seen any case proffered by
14     counsel to support that idea.
15            (Whereupon, there was a brief discussion
16     between Mr. Bunner and Mr. Smith T out of hearing
17     of the court reporter.)
18            MR. GARBER:  Okay.  And I would give the
19     Court an example of a Mary Carter agreement or two
20     defendants enter into an agreement and one
21     defendant is --
22            THE COURT:  Are you asking to inquire about
23     the contents of any such agreement or just whether
24     or not there is an agreement?
25            THE WITNESS:  I'm going to ask about whether
```

Page 72

```
1            MR. GARBER:  Yes, Your Honor.
2            MR. SMITH T:  This is the one -- this is the
3     one that is reserved.
4            THE WITNESS:  Okay.  I'm sorry.  Your
5     question is have I seen this before?
6            CONTINUED CROSS-EXAMINATION
7  BY MR. GARBER:
8     Q.    Yes.
9     A.    I have seen this before at my deposition,
10 yes.
11     Q.    Okay.  And this exhibit is largely the
12 entries that are made by the Office of David Stern.
13 Correct?
14     A.    I didn't count --
15            MR. BUNNER:  Objection, Your Honor.
16            THE COURT:  Grounds?
17            MR. BUNNER:  Largely ambiguous.
18            MR. GARBER:  Your Honor, we can go through
19     this.  There are perhaps 35 notes, five of them are
20     GMAC and -- 30 of them are Stern, and I'm just
21     trying to shorten this up.  I could go over each
22     one.
23            MR. BUNNER:  Perhaps we could shorten it up.
24     I believe that the law of Florida is an agent of a
25     principal's acts taken on behalf of the principal
```

## Testimony of FORREST McSURDY on May 16, 2012

Page 73

1    are, as a matter of law, the acts of the principal,
2    and I think what counsel is trying to do here is
3    create some idea that this is not the principal's
4    record because the agent made some entries, and I
5    think, as a matter of law, the argument fails. But
6    if we want to go down this road, then -- you know,
7    that's my objection.
8         THE COURT: Objection is overruled. If you
9    would repeat the question, Mr. Garber.
10         CONTINUED CROSS-EXAMINATION
11 BY MR. GARBER:
12    Q.    Okay. This Tab 7 is largely notes that are
13 made by the Office of David Stern, correct, sir?
14    A.    Again, I would have to go through -- I -- I
15 don't know. I -- I'd have to look and see --
16    Q.    Okay.
17    A.    -- who wrote what.
18    Q.    Let's try and do it briefly. Deutsche 905.
19 That's the first page of Tab 7.
20    A.    Okay.
21    Q.    And the first one is 9/22/09, upload David
22 Stern. That's David Stern's entry. Right?
23    A.    Yes.
24    Q.    Next one, that's the -- I guess Note 2.
25 That's David Stern. Correct?

Page 74

1    A.    It's designated as Note 5, yes.
2    Q.    Okay. And as a matter of fact, looking at
3 all of Page 905, those are all David Stern's notes.
4 Correct?
5    A.    Yes. That's correct.
6    Q.    Okay. Let's turn the page. And notes -- it
7 looks like Notes 6, 7, 8 and 8 were all David Stern. Is
8 that correct?
9    A.    Six, 7 and 8, yes, were all David Stern.
10    Q.    Okay. And on 907, 12, 13, 14, 15, 16 and 17,
11 they were all David Stern. Correct?
12    A.    Yes.
13         MR. GARBER: And by the way, just as an
14 aside, Mr. Smith T and I have -- I think we've
15 reached an agreement that the numbers applied to
16 the note below it, but it looks to me, looking at
17 this, probably the numbers applied to the one above
18 it. What do you think, John?
19         MR. SMITH T: I thought -- no. I thought
20 they go down.
21         MR. GARBER: They go down?
22         MR. SMITH T: Yeah. That -- if you go to the
23 very first page, there's an entry above number 2.
24 That can't be --
25         MR. GARBER: Okay

Page 75

1         MR. SMITH T: That's my recollection, David,
2    but, you know, it's been a while since we've talked
3    about that.
4         MR. GARBER: Okay. Well, as long as we're
5    clear on it. That's all that I care about.
6         CONTINUED CROSS-EXAMINATION
7 BY MR. GARBER:
8    Q.    Go to the next page. This is Note 18, 19,
9 20, 21, 22 and 23. They're all David Stern. Correct?
10    A.    Yes.
11         MR. BUNNER: Your Honor, if I -- if I may
12    interject? Perhaps we could just stipulate that if
13    it -- if the written by line says David J. Stern,
14    Law Offices of, then that was entered by David J.
15    Stern and we could avoid going number by number by
16    number.
17         THE COURT: Mr. Garber, does that meet your
18    purposes?
19         MR. GARBER: Yes, Your Honor, that would meet
20    my purposes.
21         THE COURT: All right.
22         CONTINUED CROSS-EXAMINATION
23 BY MR. GARBER:
24    Q.    Now, David Stern, then, made a substantial
25 contribution to this Exhibit 7. Correct, sir?

Page 76

1    A.    Yes.
2    Q.    And could David Stern make alterations after
3 they made an entry?
4    A.    I don't believe so, but I don't -- I never
5 personally entered anything on the system, so I can't
6 tell you that I -- that it could or could not be done.
7    Q.    Okay. And do you know, sir, whether or not
8 David Stern could remove items from New Track?
9    A.    I -- again, same -- same answer. I don't
10 know.
11    Q.    Okay. So you don't know whether or not David
12 Stern could do it for their own entry. Could David Stern
13 do it for the entries by GMAC?
14    A.    If -- I would -- I don't know. I -- I would
15 guess not.
16    Q.    Okay.
17    A.    I -- if I had to guess.
18    Q.    Now, New Track was supposed to be updated
19 every time there was an event that occurred on the Mack
20 case, wasn't it?
21    A.    Theoretically, yes.
22    Q.    Okay. Now, in this particular case, the
23 Office of David Stern, not you, but the Office of David
24 Stern did not make appropriate entries to New Track, did
25 they, sir?

**Testimony of FORREST McSURDY on May 16, 2012**

Page   77

1    A.    No, they did not.

2    Q.    Okay.  You had several systems that you used

3 to communicate with GMAC concerning the Mack case.

4 Correct?

5    A.    That's correct.

6    Q.    And I believe on direct testimony you said

7 you used the telephone?

8    A.    Yes.

9    Q.    You used faxes?

10   A.    No.  I don't think faxes.

11   Q.    Did you use faxes?

12   A.    I -- I -- maybe.  I don't think so.  At this

13 point, it was mostly e-mails.

14   Q.    Okay.  E-mails, telephone.

15   A.    And New Track.

16   Q.    Was there another system other than New Track

17 that you would electronically communicate with GMAC?

18   A.    No.  Just New Track.

19   Q.    Okay.  And, sir, I'm going to refer you now

20 to your deposition.  You recall I took your deposition in

21 this case, do you not, about three weeks ago, I guess?

22   A.    Yes.

23   Q.    Okay.  And do you recall that was in your

24 office over in Miami?

25   A.    (Nodding head.)

Page   78

1    Q.    And I asked you the question on Page 23.  And

2 at Line 5 this was the question:  "What system would be

3 used to send it electronically?"

4         And your answer, sir:

5         "Again, there were several systems that

6 different clients required us to use.  One was called New

7 Invoice.  One was called, I think, I want to say iClear,

8 but I just got an iPhone and it might not be the right

9 term, so I'm not sure which one GMAC required, but

10 whatever the electronic system was, we would have used

11 it."

12        QUESTION:  "Would that be different than the

13 New Track system that was referred to earlier in the

14 contract?"

15        "Yes.  That's separate."

16        "Would it also be different than the MS

17 system that was referred to early in the contract?"

18        ANSWER:  "I'm not familiar with the MS

19 system."

20   A.    Yes.

21   Q.    That testimony is correct, sir?

22   A.    Yes.  Again, that testimony relates to

23 billing systems, the I -- the -- the I system, the New

24 Invoice, that's billing.

25   Q.    Right.

Page   79

1    A.    This is communications.  The New --

2    Q.    Right.

3    A.    -- Track, the VendorScape.  Two different

4 categories.

5    Q.    Right.

6    A.    Apples and oranges, yes.

7    Q.    Okay.  And I believe that you said that you

8 were -- how many cases were you handling for GMAC in

9 2009?

10   A.    I didn't say.

11   Q.    You didn't say?

12   A.    I don't believe so.

13   Q.    Well, how many do you think you were?

14   A.    I've -- (holding up hands).  I only know

15 Citibank® because that's the one where I actually did an

16 audit for them.

17   Q.    Okay.  Would it be fair to say that you were

18 handing a large number of cases for GMAC?

19   A.    Yes.  Several thousand.  Yes.

20   Q.    Many thousands?

21   A.    Many thousands.

22   Q.    Do you know if GMAC ever sought to recover

23 the Mack file from you?

24   A.    I do know.

25   Q.    And what is your answer, sir?  Did they?

Page   80

1    A.    They -- they did ask us for a copy of the

2 file and it was in storage, and I believe they obtained

3 it directly from our storage company.

4    Q.    Okay.  And do you recall, sir, I asked you

5 that question in your deposition?

6    A.    Yes.

7    Q.    Okay.  That was at Page 35 and Line 21.  My

8 question to you was this:  "Do you know if GMAC sought to

9 recover the Mack file from David Stern?"

10        And your answer:  "I did not -- in my review

11 of the file, did not indicate that GMAC ever asked to

12 review the Mack file."

13        I've got it here.  I'll show it to you if

14 you'd like.

15   A.    Well, when I reviewed the electronic file,

16 it -- that was different than them asking for the file

17 through this litigation.  Is that what -- is that what

18 you mean?

19   Q.    No.  My question was:  Did GMAC ever try to

20 recover the Mack file from David Stern's office?

21        MR. BUNNER:  Objection, Your Honor.  That

22        question is -- is vague, and I -- I believe counsel

23        should quantify the time period he's talking

24        about and --

25        THE COURT:  The objection is sustained as to

**Testimony of FORREST McSURDY on May 16, 2012**

Page 81

```
1     form.
2          MR. GARBER:  Okay.
3          THE COURT:  If you could be more precise,
4     Mr. Garber.
5          MR. GARBER:  Okay.
6               CONTINUED CROSS-EXAMINATION
7     BY MR. GARBER:
8     Q.     After January 1st -- well, let's make it
9     after September 2nd, 2009, did GMAC ask to review the
10    Mack file from your office?
11    A.     Yes.
12    Q.     Okay.  And do you recall the question was
13    asked of you:  "Do you know if GMAC sought to recover the
14    Mack file from David Stern?"
15           And your answer was:  "I did not -- in my
16    review of the file, did not indicate that GMAC ever asked
17    to review the Mack file."
18    A.     Yes.
19    Q.     Would you like to explain your discrepancy?
20    A.     Yes.  It was -- I -- I misunderstood your
21    question in the deposition.  I thought you were asking me
22    during the pendency of the foreclosure did they ask us to
23    give them a copy of the file.  They did not.  They only
24    asked us for a copy of the file after the litigation with
25    the Macks, when they moved to vacate the -- the
```

Page 82

```
1     counterclaim.
2     Q.     Okay.  And --
3     A.     I apologize that I was not clear in my
4     deposition.
5     Q.     No.  I understand.  Did they send a subpoena
6     over to you for recovery of the Mack file?
7     A.     Not to my recollection.  I believe it was
8     through our counsel.
9     Q.     Okay.  And you were the records custodian?
10    A.     I was, but I didn't have physical control of
11    the file at that point.  It was in a warehouse.
12    Q.     Right.  But you would have known if they sent
13    a subpoena to you.
14    A.     Do you know how many subpoenas I've gotten
15    since the downfall of the law firm?  I -- I really don't
16    remember specifically, so I don't want to go on the
17    record and say I did or didn't.  I don't remember.
18    Q.     Okay.  In 2010, did GMAC ask for a return of
19    its records with respect to the Mack case?
20    A.     Yes, I believe so.
21    Q.     Okay.  I'm going to refer you now to Page 36,
22    Line 17.  Question --
23    A.     Oh, I'm sorry.  I'm getting -- 2010.  It was
24    2011.  It was July 2011 I received a letter from them
25    notifying us of the -- of the problem.
```

Page 83

```
1     Q.     Okay.  But in 2010, GMAC did not ask for
2     those --
3     A.     No.
4     Q.     -- records?
5     A.     No, not to my review of the file.  I can't
6     remember what I watched on TV last night.  I'm sorry.  I
7     can't remember back that far.
8     Q.     Okay.  Now, with respect to 2011, do you have
9     any knowledge whether GMAC asked for a return of their
10    file in 2011?
11    A.     I believe that's when they did ask, yes.
12    Q.     Okay.  And do you recall I asked you that
13    question in the deposition?
14    A.     I wouldn't be surprised if you did.
15    Q.     Okay.  Page 37, Line 6.  Question:  "But do
16    you have any knowledge whether GMAC asked for a return of
17    their file in 2011?"
18           ANSWER:  "For the actual return, no.  As
19    Mr. Smith has said, they requested certain documents
20    during 2011, but the actual file was requested sometime,
21    but I don't know if it was in 2011 or 2012.  I don't know
22    the time frame."
23    A.     Okay.  I believe it was 2011, but --
24    Q.     Okay.
25    A.     -- that answer is still true.
```

Page 84

```
1     Q.     Did David Stern keep track of telephone calls
2     that were made to GMAC?
3     A.     In this particular file?
4     Q.     Yeah.
5     A.     I did not see evidence of any phone calls
6     being logged or -- in the file.
7     Q.     Okay.  And -- and my question was:  Did they
8     keep track of telephone calls?  Not if you saw them.
9     A.     The practice --
10           MR. BUNNER:  Objection, Your Honor.  That's
11           ambiguous.  If he's asking for was it -- was it the
12           policy to do it or is it in the file, and I think
13           that's the problem we're having here with a lot of
14           the questions.
15               CONTINUED CROSS-EXAMINATION
16    BY MR. GARBER:
17    Q.     Okay.  And -- and that -- my question is, did
18    they make a record of telephone calls?  Did they make a
19    record --
20           THE COURT:  Objection overruled.
21               CONTINUED CROSS-EXAMINATION
22    BY MR. GARBER:
23    Q.     Did they make a record of telephone calls to
24    GMAC?
25    A.     Was that the policy of the firm?
```

**Testimony of FORREST McSURDY on May 16, 2012**

Page 85

1    Q.    Yeah.

2    A.    Yes.  That was the policy of the firm.

3    Q.    Okay.  And did they do it in the Mack case?

4    A.    I did not see a record of a telephone log.

5    Q.    Okay.  Do you recall whether or not Stern's

6 office received an electronic transmission of the Mack

7 case in July of 2009 before the paper file was sent over?

8    A.    I don't know that a paper file was ever sent

9 over.  Usually referrals were received electronically in

10 2009.

11    Q.    Okay.  But you got a copy of the note, didn't

12 you?

13    A.    I believe we received the original note and

14 mortgage.

15    Q.    So that wouldn't be electronic?

16    A.    Right.  That would be a -- usually a Federal

17 Express or a UPS delivery.

18    Q.    Okay.  So did you get an electronic copy of

19 the note in 2009?

20    A.    I -- I couldn't -- I couldn't tell from my

21 examination of the file when the copy of the note was

22 received, other than what the comment history said.

23 Tab Number 22.

24    Q.    Okay.  Did you -- can you tell if any

25 documents were uploaded into New Track and then

Page 86

1 downloaded by David Stern on the 24th of July, 2009?

2    A.    I believe you asked me that in my deposition

3 and I don't --

4    Q.    Yes.

5    A.    -- remember being able to tell from New Track

6 whether there were any documents downloaded.

7    Q.    Okay.  So can I refer you to Page 50, Line 1

8 where I asked that question?

9    A.    Okay.

10    Q.    "So you can't tell if any documents were

11 uploaded in New Track and then downloaded by David Stern

12 on the 24th?"

13    "No, I can't tell from this printout."

14    QUESTION:  "Would there ordinarily be an

15 electronic way of keeping a record of what documents were

16 downloaded?"

17    ANSWER:  "I did not have access to New Track,

18 so I don't know if once you downloaded something you

19 could go back in and see what was downloaded.  I don't

20 know."

21    A.    Correct.

22    Q.    Was there any understanding that the Office

23 of David Stern had with GMAC that they would not handle a

24 counterclaim should one have been filed in a case such as

25 the Macks?

Page 87

1    A.    There was no such understanding.

2    Q.    Okay.  And it would be true, would it not,

3 that, in fact, you did handle counterclaims from time to

4 time for GMAC?

5    A.    Pursuant to the procedure I explained before,

6 yes.

7    Q.    Your office sent out a voluntary dismissal on

8 this case on December 7th, 2009.  Correct?

9    A.    Yes.

10    Q.    And in your notation that -- I want to make

11 sure I have the right one.  It was Exhibit F in your

12 deposition, and I can't recall what tab it was in.

13    THE CLERK:  Twenty-two.

14    MR. BUNNER:  Twenty-two.

15    MR. GARBER:  Twenty-two.  It's today.  Okay,

16    22.  Yeah.

17    CONTINUED CROSS-EXAMINATION

18 BY MR. GARBER:

19    Q.    Do you have in Tab 22 an entry as to the

20 dismissal that was prepared by your office and filed in

21 this case dismissing the claim in chief; that is, the

22 foreclosure claim?

23    A.    Yes.  There were -- yes, there was a --

24    Q.    And where on this Tab 22 is the entry that

25 you did that?

Page 88

1    A.    It's Page 1364, the third from the top on

2 that page, Heather Smith on the 22nd of September, 2010

3 entered voluntary dismissal to Court on 12/7/2009.

4    Q.    Okay.  So that -- that entry was made nine or

5 ten months after the fact that it was done.  Right?

6    A.    Correct.

7    Q.    Why, if you closed your file on October 5th,

8 as -- as your notes indicate, of 2009, why would you

9 suddenly file a voluntary dismissal on the 9th of

10 December of 2009?

11    A.    Suddenly?

12    Q.    Yeah.

13    A.    I would expect it to be done sooner and we

14 tried to accomplish that, but because of the thousands of

15 files that were being dismissed, it took six to nine

16 months from the dismissal department to dismiss a case.

17 In this case, it only took three months because somebody,

18 I suspect you, probably called and said, "This case has

19 not been dismissed yet," so it was pushed to the head of

20 the pack.

21    Q.    Okay.  So you think somebody called up to

22 trigger this event?

23    A.    Yes.  It was out of the norm of -- of -- of

24 the dismissals for that period of time.

25    Q.    Okay.  And you can't say whether it was my

Page   89

1  office or GMAC or anybody else?

2     A.    No, I -- I couldn't.  Somebody -- somebody --

3  the squeaky wheel gets attention.  I'm sure that's what

4  happened.

5     Q.    Okay.  Okay.  And I believe when you

6  falled -- filed the voluntary dismissal, the attorney

7  that signed that said that she was the prevailing party.

8  Do you recall that, sir?

9     A.    That's part of the form, yes.

10    Q.    Okay.  You -- and you are not trying to say

11  that GMAC was the prevailing party in that lawsuit, were

12  you?

13    A.    Technically that should have been deleted

14  from the file.

15    Q.    Okay.  Okay.  Was the New Track -- is that a

16  system that was maintained by GMAC?

17    A.    I do not believe so.

18    Q.    Okay.  Do you know who does maintain it?

19    A.    Not for certain.

20    Q.    Okay.  Okay.  Is -- is it maintained by a

21  third party, not GMAC and not David Stern?

22    A.    Yes, I believe so.

23        MR. GARBER:  Mr. McSurdy, I don't think I

24        have any further questions at this time.

25            Thank you very much and I'm sorry if I have

Page   90

1        been pointed about anything.

2        THE WITNESS:  I understand.

3        THE COURT:  Redirect?

4        MR. BUNNER:  Very briefly, Your Honor.

5        (5:36 p.m.)

6            REDIRECT EXAMINATION

7  BY MR. BUNNER:

8     Q.    Mr. McSurdy, I'd ask you to please turn again

9  to Exhibit 22.

10    A.    (Complies.)

11    Q.    And I'll ask you to direct your attention to

12  the entry on October 5, 2009, that you testified about

13  earlier regarding the file clicked closed.

14    A.    Okay.

15    Q.    And based on your understanding of the system

16  there at the firm and the processing -- receipt of papers

17  in an action and how they were processed, what would have

18  happened to any paper that would come in on a file after

19  it was clicked closed?

20    A.    Well, what should have happened is it should

21  have been given to the paralegal for the attorney to

22  review.  In this particular case, that did not happen.

23  The system did not work.

24    Q.    Okay.  And then, based on your review, what

25  do you believe happened to the documents that were

Page   91

1  received after the file was clicked closed on October 5th

2  of 2009?

3     A.    A lot of them were saved to the electronic

4  system for the file and except for one, which, again,

5  goes back to Tab 26, the Vegina Hawkins e-mail.

6     Q.    Right, 1345.

7     A.    1345.  That shows what should have happened

8  in the case.  The mail room properly routed -- now, this

9  was in 2010, so this was almost a year after the loan was

10  clicked closed.

11        It was routed to the -- what they thought was

12  the attorney of record, but they made a mistake there,

13  and also the paralegal, for them to review in case any

14  action was needed to send on to the client.

15    Q.    So based on your review, were there any other

16  papers that came in after the file was clicked closed

17  that were routed properly, ironically?

18    A.    No.  The majority were not routed properly.

19    Q.    So -- so even if -- so as far as you know,

20  even if there was something that could be categorized as

21  a cascade of papers received by the Stern firm, in fact,

22  only one of them was ever treated in a manner that the

23  system was designed to process the form.  Is that

24  accurate?

25    A.    That's correct.  Based on the -- the people

Page   92

1  looking at the screen that showed the file was closed,

2  they ignored the fact that the paper still had to be

3  looked at.

4     Q.    So your -- your -- based on your

5  understanding, your review, I believe, is it accurate you

6  just said that your belief is that the -- the employees

7  of the firm simply ignored any other papers that came in

8  after the file was clicked closed because they saw that

9  the file was clicked closed?

10    A.    Correct.

11    Q.    All right.  Now, so Ms. Hawkins -- was

12  Ms. Hawkins ever the attorney at the firm who was

13  responsible for this action?

14    A.    No, she was not.

15    Q.    Okay.  And yet --

16    A.    That does not excuse what -- excuse that she

17  didn't do anything, but she apparently did not take any

18  action.

19    Q.    Right.  Right.  But I'm just trying to

20  establish, was she the attorney responsible for this --

21    A.    No, she was not.

22    Q.    -- particular file?

23    A.    No.

24    Q.    All right.

25        MR. BUNNER:  I have nothing further, Your

Page    93

```
1        Honor.
2              THE COURT:  Anything else, Mr. Garber?
3              MR. GARBER:  Yes, just brief --- briefly.
4              THE COURT:  Okay.
5              (5:39 p.m.)
6                    RECROSS-EXAMINATION
7  BY MR. GARBER:
8      Q.    Mr. McSurdy, would it be fair to say that you
9  trusted your mail room clerks to make decisions about who
10 got mail?
11     A.    No.  A system was set up specifically.
12 You'll -- you'll see in the Bates -- in the stamps from
13 the mail room, categories were set up and we taught them
14 when mail would come in, it would be under certain
15 categories, and they would -- they would scan it to those
16 categories and it would be posted to the file and then
17 the hard copy would be given to the paralegal.
18     Q.    So in this particular case, the Mack case, we
19 have numerous letters directly to Ms. Shum.  She was a --
20 an attorney at your firm back then.  Correct?
21     A.    Correct.
22     Q.    Wasn't it the duty of your mail room people
23 to give Ms. Shum letters that were sent to her?
24     A.    The process was to go to her paralegal and
25 then her paralegal should have given it to her, yes.
```

Page    95

```
1              MR. SMITH T:  Thank you, Mr. McSurdy.
2              THE WITNESS:  Thank you.  Bye.
3              (Whereupon, Forrest McSurdy was excused at
4  5:41 p.m. and this excerpt concludes.)
5                    *  *  *  *  *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page    94

```
1  Somewhere along the line that didn't happen.
2      Q.    Okay.  And that happened numerous times; 40
3  or 50 times in the Mack case.  Correct?
4      A.    I -- I --
5              MR. BUNNER:  Objection, Your Honor --
6              THE WITNESS:  -- couldn't --
7              MR. BUNNER:  -- as to the number.
8         CONTINUED RECROSS-EXAMINATION
9  BY MR. GARBER:
10     Q.    Okay.  Whatever the number is, that's
11 complain --- contained in the --
12     A.    Whatever is in -- in the exhibits --
13     Q.    -- Exhibit 26 --
14     A.    -- except for that one order that did get
15 routed, yes.
16             MR. GARBER:  Okay.  Thank you.
17             THE WITNESS:  Uh-huh.
18             THE COURT:  All right.  Are we done with this
19 witness?
20             MR. BUNNER:  Yes.
21             THE COURT:  Is he excused to leave?
22             MR. BUNNER:  Yes.
23             THE COURT:  All right.  Thank you, sir.  Have
24 a good day.
25             THE WITNESS:  Thank you.
```

Page    96

```
1
2  STATE OF FLORIDA    )
3  COUNTY OF COLLIER   )
4
5        COURT REPORTER'S HEARING CERTIFICATION
6
7        I, Sabrina C. Beauvais, CCR, FPR, CLR,
8  Certified Court Reporter and Notary Public, in and for
9  the State of Florida, do hereby certify that I was
10 authorized to and did stenographically report the
11 foregoing proceedings and that this transcript is a true
12 and complete record of my stenographic notes of the
13 proceedings held.
14        I further certify that I am not a relative,
15 employee, attorney or counsel of any of the parties, nor
16 am I a relative or employee of any of the parties'
17 attorneys or counsel connected with this action, nor am I
18 financially interested in the action.
19        Dated this 22nd day of March, 2015.
20
21
22              Sabrina C. Beauvais, CCR, FPR, CLR
23              Certified Court Reporter
                Notary Public
24              State of Florida at Large
25
```

**Testimony of FORREST McSURDY on May 16, 2012**

$450,000.00 — aren't

---

## $

$450,000.00 [2] 50:22, 51:5
$6  33:7

## 0

09-7336-CA  1:7
09-75969  10:12

## 1

1 [4] 63:18, 68:24, 68:25, 86:7
1,000  7:6
1,400  6:20
10,000 [3] 7:10, 7:11, 8:21
10/5/2009 [2] 25:17, 26:9
100 [3] 6:19, 7:24, 8:1
1068  43:21
11,000 [2] 8:10, 8:11
1176 [2] 43:21, 45:10
1189  45:19
11th  35:21
12  74:10
12/7/2009  88:3
1241 [3] 36:7, 36:12, 36:14
13  74:10
1345 [6] 60:13, 63:18, 63:19, 63:20, 91:6, 91:7
1355  43:21
1364  88:1
14  74:10
15  74:10
150  6:18
16 [2] 1:15, 74:10
160  6:19
16th [2] 38:14, 39:3
17 [2] 74:10, 82:22
18  75:8
1819  2:6
18th  58:12
19  75:8
1995 [6] 5:3, 6:11, 6:17, 7:3, 7:7, 7:22
1996 [2] 5:18, 7:7
1st [4] 12:15, 29:13, 39:10, 81:8

## 2

2 [2] 73:24, 74:23
20 [2] 7:25, 75:9
2007QS3  1:5
2008  7:1
2009 [26] 7:9, 8:20, 10:18, 13:9, 18:14, 26:23, 29:13, 35:21, 36:25, 38:11, 38:14, 39:3, 39:10, 39:15, 39:19, 79:9, 81:9, 85:7, 85:10, 85:19, 86:1, 87:8, 88:8, 88:10, 90:12, 91:2
2010 [17] 5:18, 6:19, 7:9, 7:15, 7:23, 8:1, 8:2, 8:9, 8:9, 8:20, 58:21, 60:25, 82:18, 82:23, 83:1, 88:2, 91:9
2011 [10] 46:1, 69:13,

82:24, 82:24, 83:8, 83:10, 83:17, 83:20, 83:21, 83:23
2012 [2] 1:15, 83:21
2015  96:19
202  2:13
205  2:7
21 [2] 75:9, 80:7
22 [19] 9:20, 9:24, 10:6, 13:14, 13:15, 14:6, 14:9, 16:24, 25:6, 25:7, 32:10, 32:14, 32:17, 75:9, 85:23, 87:16, 87:19, 87:24, 90:9
22nd [2] 88:2, 96:19
23 [2] 75:9, 78:1
239 [3] 2:10, 2:14, 2:18
24th [3] 10:18, 86:1, 86:12
25 [7] 15:22, 16:4, 28:25, 40:21, 41:7, 41:18, 44:5
26 [19] 16:12, 17:20, 35:12, 35:13, 35:18, 36:10, 40:21, 40:25, 41:7, 41:12, 41:18, 44:5, 45:9, 60:12, 63:11, 63:17, 63:22, 91:5, 94:13
28  3:6
29th  13:9
2nd [3] 39:14, 39:18, 81:9

## 3

3 [3] 10:19, 11:1, 22:20
30  72:20
31st [2] 12:16, 46:1
3301  1:17
34101  2:18
34102  2:14
34108  2:10
34112  1:18
35 [2] 72:19, 80:7
35203  2:6
36  82:21
37  83:15

## 4

4 [2] 3:5, 29:10
40  94:2
4:06 [2] 1:16, 4:4
4:33  28:18

## 5

5 [4] 67:15, 74:1, 78:2, 90:12
50 [2] 86:7, 94:3
500  7:6
521-8000  2:7
552-4100  2:10
5:36  90:5
5:39  93:5
5:41 [2] 1:16, 95:4
5th [3] 69:12, 88:7, 91:1

## 6

6 [7] 63:9, 64:4, 64:10, 64:14, 65:12, 74:7,

60  30:7
6:00  62:6

## 7

7 [11] 23:11, 23:12, 23:17, 71:20, 71:21, 71:25, 73:12, 73:19, 74:7, 74:9, 75:25
700  2:13
774-1400  2:14
774-2224  2:18
7th [2] 27:4, 87:8

## 8

8 [3] 74:7, 74:7, 74:9
803  23:16
806  22:20

## 9

9/15  25:13
9/2/09  25:16
9/22 [2] 25:12, 25:13
9/22/09  73:21
9/22/2010  13:9
90 [2] 3:7, 8:1
905 [2] 73:18, 74:3
907  74:10
9132  2:9
9161  2:17
93  3:8
95  3:9
979  43:21
9th [4] 35:3, 36:25, 38:10, 88:9

## A

a/k/a [2] 1:8, 1:8
abbreviation  9:13
ability  55:4
able [6] 24:23, 31:14, 31:16, 52:1, 54:16, 86:5
absence [7] 22:19, 22:20, 22:23, 23:2, 23:9, 24:1, 24:8
absolutely [3] 13:11, 20:25, 52:12
access  86:17
accommodate  61:21
accomplish  88:14
according [2] 31:2, 46:11
accurate [4] 16:19, 27:14, 91:24, 92:5
acknowledge [2] 54:3, 54:7
action [14] 5:24, 6:8, 12:14, 18:5, 18:11, 20:24, 21:18, 21:24, 90:17, 91:14, 92:13, 92:18, 96:17, 96:18
actions  8:15
active [3] 8:11, 8:12, 28:4
activity  12:19
acts [2] 72:25, 73:1
actual [3] 70:4, 83:18, 83:20
ad  69:5
additional  45:1
adequately  47:22
administrative  65:1

administratively [2] 18:15, 26:6
admissible [3] 23:8, 70:9, 70:12
admission [2] 14:4, 54:10
admissions  52:25
admit [6] 22:25, 33:16, 33:22, 54:12, 63:2, 67:11
admitted [12] 13:20, 14:1, 14:5, 14:10, 34:5, 55:10, 67:15, 67:21, 68:9, 68:19, 68:25, 69:5
admitting [2] 38:9, 54:25
advise  19:11
advised [2] 19:7, 26:11
affirm  4:5
afternoon [2] 4:17, 28:21
against [7] 33:6, 34:8, 37:6, 43:9, 43:10, 49:14, 69:12
agent [2] 72:24, 73:4
agree  61:22
agreeing  54:9
agreement [16] 50:17, 53:16, 53:20, 53:24, 70:3, 70:5, 70:19, 70:20, 70:23, 70:24, 71:1, 71:2, 71:3, 71:8, 71:17, 74:15
agreements [2] 70:9, 70:11
ahead [2] 49:5, 61:8
al  1:9
Alabama  2:6
allegations [4] 47:11, 51:8, 52:8, 53:1
allowed  53:6
already [9] 37:6, 47:1, 48:3, 48:20, 48:23, 63:10, 63:12, 63:24, 67:20
alterations  76:2
although  48:11
ambiguous [2] 72:17, 84:11
AMERICAS  1:4
amount [2] 19:9, 26:14
answered [3] 19:16, 20:20, 35:24
anticipated  19:10
anymore  13:7
apologize  82:3
apparently [3] 30:6, 55:10, 92:17
appeal  68:7
appealed  48:10
appear [2] 16:14, 39:24
appears [2] 10:1, 11:7
appellate [5] 53:7, 68:10, 68:21, 70:8, 70:11
Apples  79:6
applied [2] 74:15, 74:17
appropriate [2] 14:1, 76:24
approximately [2] 7:3, 8:21
Arant  2:4
areas  48:7
aren't  41:23

arguably  23:3
argue  55:17
argued  56:24
argument [8]  24:2, 30:2, 47:5, 50:24, 52:21, 55:2, 57:1, 73:5
argumentative  52:19
arguments  61:17
aside [2]  46:25, 74:14
asking [10]  13:20, 22:25, 30:5, 40:5, 42:23, 49:21, 70:22, 80:16, 81:21, 84:11
aspects  58:9
assigned [2]  18:24, 31:9
assistant  65:1
assume [3]  39:4, 52:5, 71:7
assuming [2]  13:19, 20:6
attach [3]  19:5, 29:17, 30:20
attached [5]  29:7, 30:19, 30:22, 60:21, 62:17
attention [2]  89:3, 90:11
attorney [29]  4:23, 5:9, 5:12, 6:16, 18:2, 18:3, 18:20, 18:22, 18:22, 18:24, 19:25, 20:14, 31:5, 31:8, 37:11, 37:12, 47:4, 51:16, 59:25, 60:19, 64:24, 64:25, 89:6, 90:21, 91:12, 92:12, 92:20, 93:20, 96:15
attorney's  47:8
attorneys [4]  6:19, 19:18, 65:3, 96:17
audit [3]  8:8, 8:9, 79:16
August [3]  29:13, 58:21, 60:25
Austin  60:2
authenticate  50:8
authority  23:20
authorized  96:10
available  45:3
Avenue  2:6
avoid [2]  20:10, 75:15

**B**

backwards [2]  10:22, 11:2
bank [14]  1:4, 2:8, 6:4, 21:7, 21:8, 21:10, 21:13, 45:19, 55:14, 55:17, 55:19, 56:3, 63:20, 69:12
bar [7]  44:13, 44:15, 44:16, 45:1, 46:4, 46:4, 46:12
bar-coded [10]  44:12, 44:16, 45:10, 45:13, 45:15, 45:20, 45:22, 45:24, 46:1, 46:6
BARRY [2]  1:8, 1:8
base  7:19
bases [3]  47:20, 49:17, 51:25
basic  71:9
basically [2]  42:6, 44:4
Bates [6]  43:12, 43:18, 44:3, 58:23, 58:25,

93:12
Beauvais [4]  1:20, 2:16, 96:7, 96:22
became  68:21
become  6:18
begin  71:9
beginning [2]  11:14, 61:2
behalf [4]  33:10, 55:16, 70:7, 72:25
behind  26:16
belief  92:6
believed [2]  28:9, 28:11
BERRY  1:8
best  49:20
beyond  48:25
bias [8]  33:13, 48:17, 48:20, 51:23, 56:18, 56:21, 57:7, 70:7
billing [2]  78:23, 78:24
binder [4]  9:16, 9:21, 10:7, 15:23
Birmingham  2:6
blindly  40:5
blush  71:7
bottom  11:1
Boult  2:4
Box  2:17
Bradley  2:4
brief [2]  70:15, 93:3
briefly [3]  73:18, 90:4, 93:3
bring [2]  19:12, 48:17
brought [7]  10:17, 23:18, 26:1, 26:5, 26:12, 27:8, 55:1
Buckel  2:8
budget [5]  18:25, 21:20, 21:23, 21:25, 24:9
budgetary  62:2
Bunner [70]  2:8, 2:22, 3:5, 3:7, 4:16, 7:17, 11:6, 13:13, 13:22, 14:3, 14:7, 14:12, 15:17, 20:17, 20:19, 22:17, 22:23, 23:2, 23:12, 23:18, 23:22, 24:6, 24:15, 24:19, 25:22, 28:15, 29:19, 30:3, 32:7, 36:10, 36:12, 47:1, 47:10, 49:16, 50:6, 50:8, 51:24, 55:13, 55:16, 57:2, 58:4, 58:11, 60:5, 60:13, 62:12, 63:10, 63:14, 63:16, 63:18, 63:20, 63:22, 65:17, 68:23, 69:24, 70:10, 70:16, 72:15, 72:17, 72:23, 75:11, 80:21, 84:10, 87:14, 90:4, 90:7, 92:25, 94:5, 94:7, 94:20, 94:22
Bye  95:2

**C**

cabinet  28:13
can't [12]  44:20, 52:7, 52:10, 65:14, 74:24, 76:5, 83:5, 83:7, 86:10, 86:13, 87:12, 88:25
cannot  67:12

capture  59:18
captures  59:17
care  75:5
Carter  70:19
cascade  91:21
case [72]  1:7, 6:22, 6:25, 8:23, 9:6, 9:8, 9:13, 10:11, 16:16, 17:1, 17:5, 17:12, 21:5, 24:21, 24:24, 26:13, 26:17, 27:15, 31:2, 31:9, 31:23, 34:1, 34:2, 37:17, 38:19, 40:16, 46:19, 46:24, 47:12, 47:23, 49:15, 49:22, 50:22, 50:23, 52:1, 52:10, 52:14, 53:2, 54:10, 60:24, 60:24, 61:21, 62:17, 63:7, 64:18, 64:25, 69:11, 69:16, 69:17, 69:20, 70:5, 70:13, 71:15, 76:20, 76:22, 77:3, 77:21, 82:19, 85:3, 85:7, 86:24, 87:8, 87:21, 88:16, 88:17, 88:18, 90:22, 91:8, 91:13, 93:18, 93:18, 94:3
cases [9]  7:3, 8:3, 26:17, 28:4, 47:7, 51:14, 70:11, 79:8, 79:18
categories [4]  79:4, 93:13, 93:15, 93:16
categorized  91:20
caught  31:6
caused  24:25
cc  65:4
CCR [4]  1:20, 2:16, 96:7, 96:22
certain [5]  44:17, 58:9, 83:19, 89:19, 93:14
certainly [5]  52:9, 54:5, 57:22, 61:20, 62:8
certificate [2]  40:9, 44:1
Certification [2]  3:9, 96:5
Certified [3]  1:21, 96:8, 96:23
certify [2]  96:9, 96:14
chance [2]  23:15, 24:2
changed  31:6
charged  21:16
chief  87:21
chronological [2]  11:8, 38:5
chronology  20:8
Circuit [3]  1:1, 1:1, 1:19
circumstances  20:9
cited  49:15
Citibank<0174 [4]  7:24, 8:8, 8:10, 79:15
claim [3]  30:6, 87:21, 87:22
claiming  50:22
clarification  10:21
clarify [4]  19:15, 20:11, 42:14, 64:19
clarifying  65:7
clause  57:7
clear [5]  19:18, 48:25,

49:3, 75:5, 82:3
clearly  51:23
clerical  43:16
clerk [20]  4:5, 4:10, 32:10, 54:16, 54:17, 54:19, 54:22, 60:11, 61:5, 61:6, 61:9, 63:23, 64:13, 67:15, 67:18, 67:20, 69:2, 69:4, 69:7, 87:13
Clerk's  39:13
clerks  93:9
clicked [11]  25:19, 25:23, 26:10, 27:4, 90:13, 90:19, 91:1, 91:10, 91:16, 92:8, 92:9
client [11]  7:19, 19:7, 19:11, 20:22, 22:10, 22:12, 25:15, 30:4, 47:2, 47:8, 91:14
clients [3]  8:4, 21:16, 78:6
close  67:4
closed [23]  18:15, 25:14, 25:20, 25:24, 26:4, 26:6, 26:8, 26:10, 27:5, 27:8, 27:18, 28:6, 28:11, 69:17, 88:7, 90:13, 90:19, 91:1, 91:10, 91:16, 92:1, 92:8, 92:9
CLR [4]  1:20, 2:16, 96:7, 96:22
CMS  9:13
code [3]  23:4, 44:13, 46:4
codes  46:4
coding [2]  45:2, 46:12
codings [2]  44:15, 44:17
Cohen [5]  25:18, 58:17, 58:20, 64:21, 65:1
COLETTE  2:20
Colleen  55:25
Collier [3]  1:1, 1:17, 96:3
comment [9]  13:16, 13:25, 25:5, 25:9, 26:19, 32:16, 57:15, 66:15, 85:22
comments  48:11
committed [2]  42:20, 42:25
commonly  14:14
communicate [4]  14:25, 15:3, 77:3, 77:17
communication [4]  15:7, 15:12, 19:6, 21:11
communications [4]  18:7, 18:9, 22:1, 79:1
company [5]  1:4, 14:18, 14:23, 49:13, 80:3
compared [2]  43:9, 43:9
compel  42:24
competent  49:18
complain  94:11
complaint [17]  28:25, 29:3, 29:6, 29:7, 29:18, 30:15, 31:5, 31:12, 33:6, 33:18, 34:14, 35:20, 36:15, 37:7, 38:6, 38:10, 61:3
complete  96:12
completely  19:5
Complies [6]  9:22,

**Testimony of FORREST McSURDY on May 16, 2012** Complies - dismissed

15:24, 16:2, 16:14,
36:15, 90:10
computer [5] 9:6, 17:22,
25:25, 44:14, 44:15
concern 63:24
concerning [4] 58:9,
58:22, 63:7, 77:3
concludes 95:4
conclusion [2] 25:2,
25:3
conduct 17:4
conducted 12:18
conference [2] 60:24,
64:19
confidence 43:16
confirm [2] 31:16, 40:8
confirmed 41:12
connected 96:17
connection 47:22
considered [2] 28:5,
31:18
consistent [2] 27:15,
27:17
constitute 44:4
constraints 62:2
construed 23:23
contained [2] 67:21,
94:11
contents 70:23
contesting 40:1
context 70:13
continue [5] 20:16,
54:16, 62:13, 64:17,
65:8
CONTINUED [35] 7:16,
11:5, 14:11, 15:16,
20:18, 24:5, 24:18,
25:21, 30:12, 32:12,
34:11, 36:18, 38:7,
45:7, 49:10, 58:6,
58:14, 59:21, 60:14,
62:14, 64:6, 65:9,
66:2, 67:22, 69:8,
71:12, 72:6, 73:10,
75:6, 75:22, 81:6,
84:15, 84:21, 87:17,
94:8
contract [14] 50:15,
50:16, 53:14, 53:17,
53:18, 54:6, 54:8,
54:10, 54:25, 55:9,
56:15, 57:6, 78:14,
78:17
contracts 54:1
contrary [2] 27:10, 57:4
contribution 75:25
control 82:10
conversations 15:6
copied 35:9
copies [2] 49:24, 60:9
corner [2] 26:3, 66:5
corporate 39:18
correct [48] 10:23,
13:3, 13:21, 20:15,
29:1, 29:8, 29:13,
29:14, 31:1, 31:9,
32:15, 32:19, 34:23,
35:16, 38:15, 39:3,
39:11, 39:15, 39:19,
45:11, 45:12, 46:1,
46:7, 46:8, 60:19,
60:20, 62:18, 71:17,
72:13, 73:13, 73:25,
74:4, 74:5, 74:8,
74:11, 75:9, 75:25,

77:4, 77:5, 78:21,
86:21, 87:8, 88:6,
91:25, 92:10, 93:20,
93:21, 94:3
couldn't [4] 85:20,
85:20, 89:2, 94:6
counsel [15] 5:11,
13:18, 19:13, 34:5,
36:8, 40:18, 50:6,
51:25, 61:13, 70:14,
73:2, 80:22, 82:8,
96:15, 96:17
Counselor 46:22
count 72:14
counterclaim [39] 16:25,
17:12, 18:10, 18:12,
18:18, 19:2, 19:3,
19:8, 19:11, 19:17,
20:14, 20:23, 21:3,
21:12, 21:21, 21:24,
22:3, 22:6, 23:10,
24:9, 27:2, 27:3, 27:7,
30:9, 34:24, 35:2,
35:5, 36:4, 36:13,
36:21, 36:24, 37:1,
37:8, 37:13, 38:19,
47:15, 61:3, 82:1,
86:24
counterclaims [6] 21:17,
34:8, 47:20, 47:21,
48:1, 87:3
County [3] 1:1, 1:17,
96:3
couple 51:24
course [6] 12:18, 22:14,
23:7, 24:13, 41:22,
67:7
court [148] 1:1, 1:19,
1:21, 3:9, 7:13, 10:21,
10:25, 11:4, 13:16,
13:18, 13:23, 14:5,
14:8, 15:10, 15:14,
19:15, 19:20, 20:5,
20:11, 20:16, 22:22,
22:24, 22:25, 23:11,
23:13, 23:17, 23:24,
24:4, 24:17, 26:20,
26:23, 28:2, 28:17,
29:21, 30:2, 30:11,
33:17, 33:20, 34:1,
34:4, 34:10, 36:8,
36:11, 36:16, 39:9,
40:2, 40:11, 40:14,
41:4, 41:6, 41:9,
41:14, 41:16, 42:5,
42:13, 43:4, 44:3,
44:24, 45:6, 45:19,
46:16, 46:22, 47:7,
47:10, 48:8, 49:5,
49:8, 50:5, 50:7, 50:9,
50:25, 51:7, 51:19,
52:10, 52:21, 52:24,
53:22, 54:9, 54:15,
54:18, 54:20, 54:23,
55:3, 56:14, 56:21,
57:15, 57:24, 58:13,
59:7, 59:9, 59:12,
59:17, 60:1, 60:6,
61:4, 61:7, 61:10,
61:13, 61:20, 62:9,
62:13, 63:2, 63:15,
63:17, 63:19, 63:21,
63:23, 64:16, 64:23,
65:7, 65:20, 65:23,
67:10, 67:14, 67:16,

67:19, 68:1, 68:8,
68:14, 68:15, 68:19,
68:21, 68:24, 69:3,
69:5, 70:1, 70:17,
70:19, 70:22, 71:4,
71:24, 72:16, 73:8,
75:17, 75:21, 80:25,
81:3, 84:20, 88:3,
90:3, 93:2, 93:4,
94:18, 94:21, 94:23,
96:5, 96:8, 96:17
court's [4] 46:16,
48:19, 68:25, 69:2
Courthouse 1:17
courts 70:8
cover 41:9
create 73:3
cross-examinatio [31]
3:6, 28:17, 28:19,
30:12, 32:12, 34:11,
36:18, 38:7, 45:7,
49:10, 57:17, 57:19,
58:6, 58:14, 59:21,
60:14, 62:14, 64:6,
65:9, 66:2, 67:22,
69:8, 71:12, 72:6,
73:10, 75:6, 75:22,
81:6, 84:15, 84:21,
87:17
cross-examine [2] 23:15,
24:3
Cummings 2:5
current [2] 18:16, 26:12
custodian [3] 5:20,
24:22, 82:9

—— D ——

damage 50:18
damages 50:22
date [14] 1:15, 14:10,
17:17, 17:18, 17:20,
25:11, 26:9, 35:2,
36:24, 37:2, 38:5,
61:22, 61:24, 64:5
dated [3] 39:2, 66:20,
96:19
dates [2] 40:9, 44:17
Davia 65:4
David [57] 2:12, 2:20,
4:25, 5:2, 5:5, 33:3,
33:4, 33:23, 37:5,
37:12, 40:16, 42:17,
44:12, 46:17, 47:13,
50:15, 50:19, 50:23,
51:1, 51:3, 53:14,
54:25, 66:5, 66:6,
69:10, 69:14, 69:22,
71:15, 71:19, 72:12,
73:13, 73:21, 73:22,
73:25, 74:3, 74:7,
74:9, 74:11, 75:1,
75:9, 75:13, 75:14,
75:24, 76:2, 76:8,
76:11, 76:12, 76:23,
76:23, 80:9, 80:20,
81:14, 84:1, 86:1,
86:11, 86:23, 89:21
deal 53:21
December [4] 5:3, 26:23,
87:8, 88:10
decisions 93:9
decrease [2] 6:22, 7:18
deemed 52:2
default [7] 29:12,

37:16, 37:19, 38:14,
39:2, 39:10, 39:13
defend [5] 19:2, 21:17,
21:24, 22:3, 47:22
defendant [2] 1:10,
70:21
Defendant's [2] 39:14,
65:12
defendants 70:20
defense [3] 13:16,
19:10, 59:13
define 52:16
delay [2] 12:13, 13:25
deleted 89:13
delivered 18:19
delivery 85:17
department [11] 5:17,
11:19, 11:20, 17:8,
17:9, 17:11, 20:21,
27:21, 27:25, 28:14,
88:16
deposition [12] 32:4,
62:25, 71:21, 72:9,
77:20, 77:20, 80:5,
81:21, 82:4, 83:13,
86:2, 87:12
describe [3] 6:14, 7:21,
8:17
described 18:8
designated [4] 9:2, 9:5,
46:12, 74:1
designation 39:17
designed 91:23
detailed 56:9
determine 24:23
determined [3] 8:24,
9:7, 19:1
Deutsche [18] 1:4, 2:8,
21:7, 21:8, 21:10,
21:12, 36:7, 43:12,
43:20, 43:21, 43:19,
55:14, 55:16, 55:19,
56:3, 63:20, 69:12,
73:18
diligence 51:10
direct [13] 3:5, 4:15,
7:16, 11:5, 14:11,
15:16, 20:18, 24:5,
24:18, 25:21, 28:24,
77:6, 90:11
directed 66:24
direction 56:22
directly [3] 53:12,
80:3, 93:19
disagreement 47:19
disappointed 47:25
discovery [6] 44:8,
54:2, 55:12, 56:3,
56:6, 62:23
discrepancy 81:19
discussed 46:16
discusses 23:21
discussion [2] 70:15,
71:5
discussions 71:2
dismiss [2] 26:13, 88:16
dismissal [11] 24:25,
26:19, 27:21, 27:25,
28:14, 87:7, 87:20,
88:3, 88:9, 88:16, 89:6
dismissals 88:24
dismissed [10] 26:15,
26:18, 27:23, 27:25,
28:2, 30:8, 69:15,
69:21, 88:15, 88:19

**Testimony of FORREST McSURDY on May 16, 2012**

dismissing - FRITZ

dismissing [2] 26:17,
87:21
dispersing 65:3
dispute [5] 42:2, 42:3,
42:15, 43:24, 43:25
DIVISION 1:2
document [16] 15:25,
17:19, 25:9, 40:25,
42:24, 56:11, 57:18,
58:5, 59:1, 62:21,
62:22, 65:11, 65:15,
66:8, 67:2, 67:11
documents [42] 9:23,
10:4, 11:23, 16:3,
16:7, 16:9, 16:14,
16:20, 17:4, 17:19,
24:21, 32:18, 32:24,
35:5, 39:1, 40:4,
40:15, 40:20, 41:7,
41:10, 41:13, 41:17,
41:23, 41:24, 42:7,
43:11, 43:20, 44:10,
44:21, 54:5, 55:18,
56:2, 56:5, 57:23,
66:19, 66:24, 83:19,
85:25, 86:6, 86:10,
86:15, 90:25
doubt [3] 38:22, 38:25,
42:22
downfall 82:15
downloaded [8] 16:15,
32:14, 86:1, 86:6,
86:11, 86:16, 86:18,
86:19
dozen 8:22
dramatically 6:25
due [2] 18:15, 51:10
duly 4:13
duty [3] 5:13, 37:12,
93:22

## E

e-mail [10] 22:10,
45:18, 45:21, 60:8,
60:16, 62:16, 62:18,
63:7, 64:19, 91:5
e-mailed 19:4
e-mails [5] 15:5, 15:11,
58:8, 77:13, 77:14
earlier [3] 47:18,
78:13, 90:13
easiest 43:19
East 1:17
effort 69:20
Ehrhardt 23:19
either [5] 21:12, 22:10,
34:4, 43:6, 68:7
electronic [17] 8:23,
15:7, 16:15, 17:22,
27:6, 35:9, 35:16,
35:18, 37:18, 67:3,
78:10, 80:15, 85:6,
85:15, 85:18, 86:15,
91:3
electronically [3]
77:17, 78:3, 85:9
Eleven 8:12
Eleventh 2:13
Elizabeth 65:4
Elsa [3] 31:9, 31:16,
45:10
employee [3] 60:17,
96:15, 96:16
employees [4] 9:4,

11:25, 60:17, 92:6
employer 4:24
enormous 26:14
enter 70:20
entered [7] 25:14,
39:10, 67:20, 69:12,
75:14, 76:5, 88:3
entire [3] 31:23, 53:17,
57:18
entity 14:13
entries [10] 12:3, 12:7,
12:17, 12:22, 25:13,
71:19, 72:12, 73:4,
76:13, 76:24
entry [14] 12:6, 12:15,
22:19, 25:17, 26:21,
26:22, 73:22, 74:23,
76:3, 76:12, 87:19,
87:24, 88:4, 90:12
especially 7:1
ESQUIRE [3] 2:4, 2:8,
2:12
establish [5] 29:23,
48:9, 50:11, 56:21,
92:20
established [2] 30:7,
56:18
estimate 61:14
estimated 21:19
et 1:9
Evan [4] 58:16, 58:20,
64:20, 65:1
event [5] 20:23, 23:4,
68:6, 76:19, 88:22
events 13:24
everybody 61:24
everyone 60:10
everything [2] 11:13,
43:8
evidence [29] 13:15,
14:10, 23:4, 23:10,
32:2, 49:20, 49:23,
50:1, 50:4, 52:7, 52:7,
52:11, 52:15, 52:17,
52:18, 53:18, 54:10,
55:10, 55:21, 57:19,
63:3, 63:7, 63:10,
63:14, 63:24, 68:20,
69:1, 69:6, 84:5
exactly [4] 23:21,
43:15, 44:6, 48:18
examination [15] 3:5,
3:7, 4:15, 7:16, 11:5,
14:11, 15:16, 20:18,
24:5, 24:18, 25:21,
28:24, 48:6, 85:21,
90:6
examined 4:14
example [6] 8:6, 12:14,
17:19, 55:18, 61:1,
70:19
except [2] 91:4, 94:14
exception [4] 22:21,
23:4, 23:16, 23:22
excerpt [2] 1:13, 95:4
excusable [9] 30:1,
30:4, 47:2, 47:3,
47:14, 48:1, 51:10,
51:12, 51:14
excuse [4] 64:16, 68:1,
92:16, 92:16
excused [3] 51:13,
94:21, 95:3
exhibit [34] 13:15,
14:9, 16:12, 16:24,

11:25, 57:12, 32:7,
40:25, 55:13, 55:15,
55:18, 55:23, 55:24,
56:11, 57:12, 63:9,
63:11, 64:4, 64:10,
64:14, 65:12, 67:21,
68:8, 68:15, 68:25,
69:2, 71:20, 71:20,
71:21, 72:11, 75:25,
87:11, 90:9, 94:13
exhibits [2] 40:21,
94:12
existed 57:10
expect 88:13
explain [2] 50:9, 81:19
explained 87:5
explanation 59:16
Express 85:17
Extensively 15:21
extra 21:17
extremely [2] 57:13,
68:6

## F

facts [2] 52:16, 52:17
failed 24:23
fails 73:5
failure 51:10
fair [8] 31:22, 32:23,
43:13, 48:12, 57:21,
57:22, 79:17, 93:8
fall 44:11
falled 89:6
familiar [2] 14:13,
78:18
fashion 37:13
faster [2] 41:2, 41:3
favor [4] 33:15, 50:25,
51:1, 51:19
faxes [3] 77:9, 77:10,
77:11
Federal [2] 2:5, 85:16
Fifth 2:6
file [101] 8:24, 8:25,
9:3, 9:5, 9:9, 9:10,
10:12, 10:13, 10:20,
12:6, 12:6, 16:8, 16:8,
16:8, 16:18, 17:23,
18:1, 18:5, 18:15,
18:23, 22:8, 25:4,
25:14, 25:14, 25:19,
25:23, 26:1, 26:2,
26:2, 26:3, 26:5, 26:6,
26:8, 26:20, 27:4,
27:7, 27:13, 27:18,
27:19, 27:20, 28:9,
28:9, 28:11, 28:11,
31:17, 35:10, 35:16,
35:16, 35:18, 37:18,
37:20, 38:18, 38:21,
58:1, 58:3, 65:6, 66:1,
66:14, 66:19, 67:3,
67:4, 67:5, 79:23,
80:2, 80:9, 80:11,
80:12, 80:15, 80:16,
80:20, 81:10, 81:14,
81:16, 81:17, 81:23,
81:24, 82:6, 82:11,
83:5, 83:10, 83:17,
83:20, 84:3, 84:6,
84:12, 85:7, .85:8,
82:15, 88:7, 88:9,
89:14, 90:13, 90:18,
91:1, 91:4, 91:16,

92:1, 92:8, 92:9,
92:22, 93:16
file's 27:8
filed [16] 17:1, 18:10,
19:8, 20:23, 21:4,
24:24, 24:25, 33:6,
34:25, 35:20, 37:5,
49:12, 49:13, 86:24,
87:20, 89:6
files [16] 7:24, 8:10,
8:11, 8:12, 11:19,
18:8, 21:1, 27:22,
27:24, 27:25, 28:3,
28:5, 28:13, 35:15,
43:22, 88:15
filing 20:8
filings 37:22
financially 96:18
finish [3] 54:20, 62:3,
62:4
finishing 61:21
firm [69] 5:6, 5:7, 5:9,
5:12, 5:14, 5:20, 5:22,
5:23, 6:6, 6:12, 6:15,
6:18, 7:19, 8:3, 8:13,
10:18, 10:20, 11:20,
11:25, 12:2, 12:19,
12:21, 12:23, 13:3,
13:10, 14:25, 15:3,
15:19, 16:25, 17:7,
21:2, 21:7, 21:15,
22:2, 22:15, 24:22,
24:23, 24:24, 25:5,
25:9, 28:4, 28:5, 28:8,
28:9, 28:11, 29:24,
30:16, 31:3, 34:8,
39:25, 40:17, 40:22,
42:2, 47:21, 49:4,
53:24, 54:1, 59:25,
64:23, 64:25, 69:14,
82:15, 84:25, 85:2,
90:16, 91:21, 92:7,
92:12, 93:20
firm's [2] 6:7, 58:18
five [5] 6:17, 54:18,
61:7, 61:16, 72:19
five-minute 45:22
Floor 2:9
Florida [10] 1:1, 1:18,
2:10, 2:14, 2:16, 2:18,
72:24, 96:2, 96:9,
96:24
flowing 39:25
followed 44:14
follows 4:14
foreclosure [14] 8:15,
14:24, 15:1, 16:8,
17:9, 17:11, 18:23,
20:23, 21:17, 27:11,
65:16, 69:16, 81:22,
87:22
foreclosures [4] 7:6,
7:12, 17:7, 26:15
foregoing 96:11
format 61:22
Forrest [5] 1:13, 3:4,
4:12, 4:21, 95:3
forward 10:17
Fourth 2:9
FPR [4] 1:20, 2:16,
96:7, 96:22
frame [3] 6:21, 7:13,
83:22
frankly 56:22
FRITZ [2] 1:8, 1:8

**Testimony of FORREST McSURDY on May 16, 2012**

front [2] 9:16, 60:9
full 4:19
future 5:5

## G

Garber [146] 2:12, 2:12,
2:20, 3:6, 3:8, 13:17,
20:2, 23:14, 28:20,
29:21, 29:22, 30:13,
32:6, 32:11, 32:13,
33:9, 33:12, 33:18,
33:25, 34:12, 36:5,
36:14, 36:17, 36:19,
38:3, 38:8, 39:23,
40:13, 40:14, 40:23,
41:8, 41:10, 41:11,
41:15, 41:17, 42:5,
42:11, 43:4, 43:7,
43:24, 44:9, 44:23,
44:25, 45:4, 45:8,
46:15, 47:6, 48:8,
48:9, 49:2, 49:7, 49:9,
49:11, 50:2, 50:7,
50:9, 50:13, 51:9,
51:11, 52:21, 52:23,
53:6, 53:11, 53:23,
54:13, 54:24, 55:3,
55:12, 55:14, 55:24,
56:2, 56:5, 56:8,
56:14, 56:18, 56:24,
57:15, 57:16, 57:25,
58:3, 58:5, 58:7,
58:12, 58:15, 59:11,
59:13, 59:22, 60:8,
60:15, 61:15, 62:8,
62:10, 62:15, 62:22,
63:1, 63:3, 63:5,
63:12, 64:1, 64:7,
64:11, 64:14, 64:16,
65:8, 65:10, 66:3,
67:10, 67:12, 67:23,
68:1, 68:14, 68:17,
69:9, 70:1, 70:3,
70:18, 71:4, 71:13,
71:25, 72:1, 72:7,
72:18, 73:9, 73:11,
74:13, 74:21, 74:25,
75:4, 75:7, 75:17,
75:19, 75:23, 81:2,
81:4, 81:5, 81:7,
84:16, 84:22, 87:15,
87:18, 89:23, 93:2,
93:3, 93:7, 94:9, 94:16
Garber's [4] 42:1, 44:7,
49:21, 57:5
gave [2] 43:10, 43:11
general [2] 1:2, 5:11
Generally 7:5
gets 89:3
given [10] 7:4, 17:25,
18:19, 18:21, 19:24,
47:7, 57:21, 90:21,
93:17, 93:25
Glen [3] 11:15, 11:17,
11:18
GMAC [63] 2:4, 14:9,
14:14, 14:16, 14:17,
14:19, 15:1, 15:4,
16:25, 18:16, 21:3,
21:13, 22:1, 26:11,
29:15, 32:25, 33:5,
33:11, 33:22, 34:9,
34:18, 46:19, 47:22,
49:14, 49:19, 49:19,
50:15, 50:21, 51:5,
51:19, 53:13, 54:1,
55:19, 56:6, 65:16,
69:23, 71:15, 72:20,
76:13, 77:3, 77:17,
78:9, 79:8, 79:18,
79:22, 80:8, 80:11,
80:19, 81:9, 81:13,
81:16, 82:18, 83:1,
83:9, 83:16, 84:2,
84:24, 86:23, 87:4,
89:1, 89:11, 89:16,
89:21
GMAC's 14:22
goes [4] 10:19, 33:14,
51:11, 91:5
gone 46:5
gotten 82:14
grew 6:18
gross [2] 29:24, 29:25
Grounds 72:16
growth [2] 6:11, 6:14
guess [8] 22:17, 40:19,
49:21, 68:24, 73:24,
76:15, 76:17, 77:21
guilty [2] 29:24, 29:25

## H

handed [2] 64:9, 65:11
handing [3] 15:1, 58:5,
79:18
handle [5] 8:21, 9:2,
9:5, 86:23, 87:3
handled [4] 8:3, 10:20,
17:7, 47:15
handling [6] 8:10, 8:14,
9:8, 19:10, 25:13, 79:8
hands 79:14
happen [2] 90:22, 94:1
happened [9] 20:6,
27:15, 61:2, 89:4,
90:18, 90:20, 90:25,
91:7, 94:2
happening 20:10
haven't [4] 41:12,
42:25, 70:1, 70:13
having [2] 4:13, 84:13
Hawkins [13] 58:21,
59:5, 59:8, 59:9,
59:20, 59:23, 60:7,
60:19, 64:20, 64:23,
91:5, 92:11, 92:12
he's [8] 30:5, 40:5,
42:21, 42:23, 49:19,
54:15, 80:23, 84:11
hear 49:8
hearing [4] 1:13, 45:22,
70:16, 96:5
hearsay [4] 22:21, 23:3,
23:16, 23:23
Heather [2] 26:22, 88:2
held 96:13
Hello 28:22
helpful [2] 44:24, 68:5
helps 38:2
hereby 96:9
Hi 4:18
Hispanic 59:4
history [12] 9:10,
10:11, 10:19, 20:9,
25:3, 25:5, 25:9,
26:19, 31:2, 32:16,
66:16, 85:22
holding 79:14

Holloway 2:12
Honor [55] 13:13, 13:17,
20:2, 20:17, 22:18,
23:14, 24:16, 29:19,
29:22, 30:3, 33:12,
33:25, 36:10, 36:12,
40:23, 41:8, 42:11,
43:7, 45:5, 46:15,
47:6, 48:9, 48:21,
49:2, 49:16, 50:2,
50:14, 51:24, 52:23,
53:11, 55:12, 56:25,
57:2, 57:16, 58:11,
59:13, 61:10, 61:17,
62:8, 62:11, 63:16,
65:17, 67:13, 68:23,
69:24, 72:1, 72:15,
72:18, 75:11, 75:19,
80:21, 84:10, 90:4,
93:1, 94:5
Honorable 1:19
hook 51:20
Hooley 2:12
hope [2] 43:8, 56:25
hours 19:9
housekeeping [2] 67:10,
68:2
human 67:7
hundred 67:5
hundreds [2] 27:22,
31:15

## I

iClear 78:7
idea [5] 8:2, 61:11,
68:18, 70:14, 73:3
ident 67:19
identification [5]
56:10, 63:9, 64:5,
64:15, 65:12
identify [2] 65:13,
67:12
identifying 63:25
ignored [2] 92:2, 92:7
impeachment [2] 56:19,
57:3
imperative 48:14
included 53:14
includes 42:9
incompetence 51:4
increase [3] 6:22, 7:18,
7:22
increased 6:25
indemnification [10]
53:15, 53:20, 53:23,
55:6, 56:15, 57:7,
70:4, 71:7, 71:11,
71:14
indemnify [3] 51:5,
69:23, 70:4
indemnity 50:17
indemniva 51:16
indicate [5] 19:17,
21:22, 80:11, 81:16,
88:8
indicated 46:5
indicates 25:19
Indicating [3] 9:18,
54:14, 64:3
indication [8] 16:24,
18:9, 20:13, 21:2,
21:3, 21:6, 21:7, 23:9
individual [4] 8:4,
12:3, 58:16, 59:3

information [3] 12:9,
29:15, 31:19
initial [3] 18:4, 26:1
initially [2] 7:23, 8:23
initiate 7:12
innocent 52:6
inquire [2] 65:21, 70:22
inquiring 53:23
instance 27:20
instant [2] 5:23, 6:7
intend 57:17
intended [2] 55:21,
57:16
intending 55:4
interested 96:18
interject 75:12
internal 41:24
interpret 54:4
interrupt 68:2
interrupting 64:17
introduce [3] 50:3,
53:17, 63:5
investigation 17:4
Invoice [2] 78:7, 78:24
involved [4] 14:20,
33:1, 48:15, 64:20
involvement 14:22
iPhone 78:8
ironically 91:17
Isn't [2] 49:12, 49:15
issue [8] 31:18, 41:10,
42:8, 47:3, 47:9,
47:14, 57:20, 68:21
item 13:14
items 76:8
itself [4] 18:12, 21:8,
33:18, 35:20

## J

January [3] 12:15, 46:1,
81:8
John [3] 2:4, 54:24,
74:18
joined 6:16
JR 2:8
Judge [15] 1:19, 19:21,
33:10, 34:6, 38:2,
39:21, 47:17, 53:25,
54:6, 54:11, 55:22,
56:4, 56:7, 60:12,
68:13
judgment [5] 57:9, 67:9,
67:24, 69:12, 69:23
JUDICIAL 1:1
July [5] 10:18, 13:9,
82:24, 85:7, 86:1
JURISDICTION 1:2

## K

keeping 86:15
KELLERHOUSE [3] 2:20,
58:2, 62:24
kept [2] 12:17, 27:24,
68:15
Kerry 25:18
knowledge [10] 5:22,
8:7, 12:9, 12:10,
14:25, 31:23, 32:20,
38:16, 83:9, 83:16
known 82:12
knows [2] 20:3, 39:9

## L

L.L.P [2] 2:5, 2:12
labeled 43:20
lack [2] 47:4, 57:11
largely [4] 71:19,
72:11, 72:17, 73:12
later [2] 38:20, 62:6
latter 7:14
Laughter 60:4
law [16] 4:25, 5:1, 5:5,
29:24, 38:6, 47:7,
49:4, 51:12, 51:19,
58:18, 69:14, 72:24,
73:1, 73:5, 75:14,
82:15
lawsuit [5] 46:17,
46:18, 58:10, 58:22,
89:11
lawyer [3] 30:5, 34:19,
57:8
leading 23:20
leave [2] 71:6, 94:21
lender [2] 6:4, 7:25
lenders [2] 7:25, 8:1
lengthy 15:25
let's [5] 13:8, 52:5,
73:18, 74:6, 81:8
letter [6] 8:23, 22:11,
45:10, 56:12, 58:20,
82:24
letters [3] 18:3, 93:19,
93:23
limit 55:4
listing 56:10
lists 43:10
litany 40:15
literally [2] 27:22,
31:15
litigating 51:6
litigation [12] 5:17,
20:21, 24:21, 33:5,
33:22, 34:2, 47:12,
48:15, 51:9, 71:6,
80:17, 81:24
litigator [2] 18:24,
18:25
load [2] 6:22, 6:25
loan [9] 14:20, 14:20,
18:15, 20:1, 25:15,
26:11, 26:24, 26:24,
91:9
log 85:4
logged 84:6
logic 57:5
longer 12:23
looking [6] 36:3, 38:5,
54:15, 74:2, 74:16,
92:1
looks [5] 31:2, 66:10,
66:11, 74:7, 74:16
loss 69:14
Luen [3] 11:15, 11:17,
11:18

## M

Mack [30] 1:8, 1:8, 1:9,
2:12, 10:13, 14:20,
17:1, 17:5, 18:10,
34:2, 46:19, 47:12,
50:23, 69:11, 71:15,
76:19, 77:3, 79:23,
80:9, 80:12, 80:20,

81:10, 81:14, 81:17,
82:6, 82:19, 85:3,
85:6, 93:18, 94:3
Macks [4] 37:6, 65:16,
81:25, 86:25
Madam [2] 54:15, 63:23
mail [22] 8:18, 8:18,
8:20, 8:21, 8:22, 9:1,
9:4, 17:16, 17:21,
17:24, 36:22, 37:3,
37:19, 38:18, 45:16,
65:2, 91:8, 93:9,
93:10, 93:13, 93:14,
93:22
mailed 42:4
mailing 35:25
mailroom 27:12
main 16:8
maintain 89:18
maintained [2] 89:16,
89:20
major 7:25
majority 91:18
making 47:24
management [9] 8:24,
9:6, 9:13, 10:11,
16:16, 60:24, 62:17,
63:8, 64:18
managers 27:11
managing [2] 5:11, 18:23
Manalich 1:19
manner 91:22
March 96:19
marked [6] 10:6, 13:14,
43:12, 64:4, 64:9,
64:11
Mary [2] 2:22, 70:19
material [2] 52:16,
52:17
matter [11] 15:19, 22:7,
31:11, 34:7, 34:25,
37:15, 47:23, 68:7,
73:1, 73:5, 74:2
maybe [5] 44:24, 45:20,
47:17, 49:2, 77:12
McSurdy [23] 1:13, 3:4,
4:9, 4:12, 4:21, 14:13,
15:18, 16:22, 24:20,
28:21, 40:5, 48:3,
48:24, 57:25, 58:8,
64:18, 67:24, 69:10,
89:23, 90:8, 93:8,
95:1, 95:3
McSurdy's [2] 48:22,
54:4
means [3] 17:21, 25:25,
45:16
meet [2] 75:17, 75:19
members 12:2
memorandum 38:6
memory [2] 42:20, 42:25
Mendieta 34:16
messed 46:19
method [2] 15:11, 15:15
Miami 77:24
middle [2] 25:18, 45:23
million 33:7
minute 54:11
minutes [2] 30:7, 61:16
Miriam 34:16
Miriam's [2] 34:17,
34:18
miscalendered 51:15
missing [3] 66:19,
66:24, 67:8

mistake [5] 30:6, 30:24,
31:4, 43:16, 91:12
misunderstood 81:20
mo 38:19
moment 5:19
money 21:17
month [6] 7:4, 7:6, 7:7,
7:10, 7:11, 38:20
months [7] 12:12, 13:24,
26:16, 26:23, 88:5,
88:16, 88:17
mortgage [7] 14:17,
29:7, 29:13, 56:6,
66:11, 66:16, 85:14
mostly 77:13
motion [9] 30:10, 38:13,
39:2, 42:23, 46:25,
51:1, 51:22, 52:2,
56:17
moved 81:25
movie 60:3
MURPHY 2:22

## N

named 58:16
names [2] 11:24, 12:1
Naples [4] 1:18, 2:10,
2:14, 2:18
narrowly 23:24
nature [2] 42:6, 46:24
necessarily 55:4
necessary [2] 19:10,
53:7
needed [3] 18:2, 42:16,
91:14
neglect [13] 30:1, 30:4,
47:2, 47:3, 47:3, 47:4,
47:8, 47:15, 48:2,
51:10, 51:12, 51:14,
51:14
negligence [2] 29:24,
29:25
nine [3] 26:16, 88:4,
88:15
Nodding [2] 35:14, 77:25
nor [2] 96:15, 96:17
norm 88:23
normally 48:5
North 2:6
Notary [2] 96:8, 96:23
notation 87:10
note [21] 29:6, 29:13,
29:17, 30:14, 30:17,
30:20, 30:22, 30:25,
31:3, 33:20, 66:11,
66:15, 66:16, 73:24,
74:1, 74:16, 75:8,
85:11, 85:13, 85:19,
85:21
notebook 29:1
notes [7] 72:19, 73:12,
74:3, 74:6, 74:7, 88:8,
96:12
nothing [4] 4:7, 18:17,
27:9, 92:25
notice [11] 6:11, 6:22,
6:24, 24:25, 26:24,
34:1, 48:4, 55:20,
57:12, 57:22, 57:22
notification 22:6
notified [3] 16:25,
37:15, 47:25
notify 20:22
notifying 82:25

November [3] 5:18,
39:14, 39:18
numbers [12] 44:3, 44:17,
74:15, 74:17
numerous [2] 93:19, 94:2

## O

oath 4:14
object [4] 20:2, 46:23,
49:17, 56:1
objected 34:4
objecting 38:1
objection [35] 13:17,
14:4, 23:13, 29:19,
30:11, 33:8, 33:17,
33:21, 48:21, 49:8,
49:16, 53:5, 53:9,
53:22, 54:24, 55:7,
55:9, 57:14, 57:24,
58:11, 62:10, 62:12,
65:17, 65:20, 68:23,
69:24, 71:9, 72:15,
73:7, 73:8, 80:21,
80:25, 84:10, 84:20,
94:5
obtained 80:2
obviously [4] 45:2, 62:3
Occasionally 12:11
occupation 4:22
occurred [3] 26:20,
51:18, 76:19
occurrence 12:8
occurs 19:5
October [9] 12:15,
18:14, 27:4, 38:14,
39:3, 39:10, 88:7,
90:12, 91:1
offer 57:4
offered 55:21
office [33] 2:17, 14:24,
28:10, 29:4, 33:3,
34:14, 35:22, 37:1,
37:5, 37:23, 42:1,
45:11, 45:21, 49:13,
51:13, 51:20, 58:9,
58:17, 58:18, 69:22,
71:15, 72:12, 73:13,
76:23, 76:23, 77:24,
80:20, 81:10, 85:6,
86:22, 87:7, 87:20,
89:1
offices [4] 4:25, 5:2,
5:5, 75:14
ones [2] 12:2, 51:15
ongoing 71:6
open [9] 8:3, 11:9,
26:4, 27:24, 28:1,
28:4, 28:9, 28:13,
28:13
opened [3] 7:3, 11:19,
26:8
oranges 79:6
order [9] 10:22, 11:8,
28:23, 38:4, 60:21,
60:23, 62:17, 63:8,
94:14
ordinarily 86:14
ordinary 24:13
original [3] 66:11,
66:16, 85:13
outside [2] 22:2, 22:2
overrule 71:8
overruled [4] 30:11,
65:20, 73:8, 84:20

12-12020-mg    Doc 8531-41    Filed 04/27/15    Entered 04/27/15 16:52:56    Smith T
Decl. Exhibit Y    Pg 33 of 36

Page: 103
**Testimony of FORREST McSURDY on May 16, 2012**
overwhelming - relevance

overwhelming  39:24

**P**

P.A [2]  4:25, 5:2
P.L  2:8
p.m [8]  1:16, 1:16, 4:4, 28:18, 62:7, 90:5, 93:5, 95:4
pack  88:20
package  39:4
pages [4]  10:1, 10:15, 11:23, 31:15
paid  33:7
papers [7]  8:14, 27:15, 41:24, 90:16, 91:16, 91:21, 92:7
paperwork  24:8
par  29:10
paragraph [2]  29:10, 57:10
paralegal [16]  2:20, 2:22, 9:2, 18:1, 18:1, 18:19, 18:21, 19:25, 20:14, 25:14, 65:5, 90:21, 91:13, 93:17, 93:24, 93:25
paralegals [3]  6:17, 27:12, 65:3
parameters  53:8
particular [25]  5:10, 8:7, 9:2, 9:5, 10:12, 17:8, 17:23, 19:2, 25:4, 26:2, 26:5, 26:17, 26:20, 27:20, 31:8, 34:14, 37:17, 37:22, 49:15, 67:24, 76:22, 84:3, 90:22, 92:22, 93:18
particulars  46:24
parties [6]  52:6, 55:11, 70:9, 70:12, 96:15, 96:16
party [4]  22:2, 89:7, 89:11, 89:21
past [2]  20:8, 54:18
pay [2]  50:20, 50:24
payment  22:3
pendency  81:22
pending [3]  17:12, 22:6, 53:1
per [3]  7:5, 7:6, 25:15
percent  67:5
perhaps [3]  72:19, 72:23, 75:12
period [6]  8:19, 13:8, 13:9, 26:16, 80:23, 88:24
personal [3]  12:9, 12:10, 31:23
personally [2]  16:15, 76:5
personnel  8:20
perspective  14:17
pertaining [2]  18:10, 24:8
pertains  6:6
phonetic [4]  11:15, 25:18, 58:17, 65:5
physical [3]  35:10, 67:4, 82:10
physically [3]  9:1, 27:18, 27:21
piece [2]  9:1, 17:24
pieces  8:21

pile  27:22
Plaintiff [13]  1:6, 6:1, 6:2, 6:3, 6:7, 21:8, 41:16, 42:14, 47:13, 53:24, 55:9, 56:3, 68:4
Plaintiff's [7]  29:1, 40:17, 41:7, 41:18, 42:8, 44:4, 71:24
plaintiffs [3]  5:23, 5:25, 8:14
pleading [7]  9:1, 17:15, 17:24, 18:5, 27:13, 35:23, 42:21
pleadings [18]  8:18, 18:3, 27:10, 43:24, 49:22, 49:23, 49:25, 50:3, 50:14, 50:21, 51:18, 52:4, 52:5, 52:6, 52:9, 52:15, 52:16, 65:3
please [13]  4:19, 7:21, 8:17, 9:15, 9:20, 15:22, 20:16, 25:4, 56:9, 61:11, 62:13, 65:8, 90:8
point [11]  18:17, 19:25, 23:21, 31:20, 43:13, 48:6, 52:22, 53:3, 53:5, 77:13, 82:11
pointed [3]  23:17, 47:1, 90:1
policy [6]  17:10, 20:22, 21:16, 84:12, 84:25, 85:2
positions  5:14
Post  2:17
posted [3]  38:18, 38:20, 93:16
Powers  60:2
practice [3]  12:21, 13:10, 84:9
precise  81:3
precursor  55:8
prefer  59:10
prejudice  48:17
preparation [2]  16:10, 16:20
prepared [6]  21:23, 21:25, 24:10, 29:3, 50:3, 87:20
present [3]  2:20, 61:23, 61:24
presently  11:10
preserved [3]  22:14, 23:7, 24:12
presume  42:24
prevail  57:1
prevailing [2]  89:7, 89:11
previous [4]  64:18, 67:16, 67:16, 71:5
previously [3]  33:21, 70:2
principal [2]  72:25, 73:1
principal's [2]  72:25, 73:3
printout  86:13
prints  10:9
prior  67:21
probably [6]  7:25, 42:21, 44:9, 53:20, 74:17, 88:18
probative [7]  51:7, 52:12, 52:13, 52:15,

52:19, 53:4, 56:16
problem [3]  42:19, 82:25, 84:13
procedure [2]  17:14, 87:5
proceed  19:12
proceedings [3]  1:13, 96:11, 96:13
process [5]  8:13, 8:17, 44:15, 91:23, 93:24
processed [2]  46:11, 90:17
processing  90:16
produce [2]  53:25, 57:18
produced [8]  22:8, 40:5, 43:15, 55:11, 56:2, 56:5, 62:22, 62:24
production  39:14
proffer [7]  13:14, 22:19, 24:15, 50:7, 50:11, 50:14, 53:6
proffered  70:13
proffering  23:8
prongs  30:9
pronunciations  59:19
proper  37:8
properly [2]  91:8, 91:17, 91:18
provided [5]  21:2, 21:3, 21:7, 52:18, 53:16
public [3]  34:7, 96:8, 96:23
purposes [5]  67:11, 68:3, 68:10, 75:18, 75:20
Pursuant  87:5
pushed  88:19

**Q**

quantify [2]  7:2, 80:23
questioning [3]  42:16, 50:10, 53:10
quickly  37:24

**R**

RALI [2]  1:5, 21:9
Ramiro  1:19
range  43:23
ranges  43:23
rapidly  45:5
rather  15:25
re [2]  26:24, 43:18
reached [3]  19:17, 20:14, 74:15
really [3]  23:25, 41:12, 82:15
reason [8]  19:24, 26:10, 27:1, 36:25, 37:3, 38:22, 38:25, 68:16
reasonable  42:4
receipt [2]  10:25, 90:16
received [38]  10:18, 17:16, 17:21, 26:24, 28:24, 31:3, 35:22, 36:2, 36:20, 36:22, 37:1, 37:4, 37:23, 38:1, 38:9, 38:13, 38:16, 40:1, 40:16, 40:21, 41:19, 42:3, 42:17, 43:2, 43:2, 43:25, 44:22, 45:17, 56:8, 61:3, 66:17, 82:24, 85:6, 85:9,

85:13, 85:22, 91:1, 91:21
recent  25:10
recognize [13]  10:5, 10:8, 10:9, 10:10, 11:15, 11:17, 11:24, 16:3, 16:6, 16:9, 23:1, 34:15, 65:24
recognized  23:19
recollection [2]  75:1, 82:7
record [34]  4:20, 13:20, 14:2, 17:11, 17:13, 18:16, 22:7, 22:9, 22:13, 22:19, 22:20, 23:2, 23:6, 23:25, 24:1, 34:7, 48:10, 48:12, 48:13, 48:15, 53:7, 59:17, 63:25, 68:11, 68:16, 73:4, 82:17, 84:18, 84:19, 84:23, 85:4, 86:15, 91:12, 96:12
records [16]  5:20, 6:6, 13:10, 15:19, 16:23, 21:6, 21:22, 24:22, 31:15, 31:16, 31:25, 32:1, 35:4, 82:9, 82:19, 83:4
recover [4]  79:22, 80:9, 80:20, 81:13
recovery  82:6
Recross-examinat [3]  3:8, 93:6, 94:8
Redirect [3]  3:7, 90:3, 90:6
refer [8]  5:4, 31:17, 41:17, 59:19, 60:7, 77:19, 82:21, 86:7
reference  59:12
referral  10:17
referrals [3]  7:11, 7:12, 85:9
referred [6]  7:5, 14:14, 14:23, 68:20, 78:13, 78:17
referring [8]  5:7, 12:14, 12:15, 40:3, 59:1, 62:16, 68:22, 71:24
reflected  10:14
regard [4]  17:5, 18:7, 21:16, 24:8
regarding [8]  15:1, 21:12, 22:2, 45:1, 56:16, 60:24, 71:15, 90:13
regardless  57:9
regular [5]  12:18, 12:21, 13:10, 22:14, 23:7
regularly [5]  12:18, 22:14, 23:6, 24:10, 24:12
reinstated [4]  18:16, 25:15, 26:12, 27:13
reinstatement  26:25
reiterate  17:15
related [2]  16:18, 53:12
relates  78:22
relation  40:16
relative [3]  6:11, 96:14, 96:16
relevance [3]  29:20, 57:13, 69:25

relevancy [3] 33:11, 46:25, 48:22
relevant [5] 29:23, 33:12, 47:14, 52:2, 53:4
remind [3] 25:4, 58:23, 60:1
remove 76:8
renew 57:14
repeat 73:9
rephrase 28:3
reply 24:24
report 96:10
Reported [2] 1:20, 2:16
reporter [5] 1:21, 61:10, 70:17, 96:8, 96:23
Reporter's [2] 3:9, 96:5
Reporting 2:16
represent [4] 5:23, 5:25, 12:4, 50:16
representation 6:7
representative 39:18
represented 8:14
representing [2] 7:23, 7:24
request [3] 22:24, 39:14, 39:17
requested [3] 37:16, 83:19, 83:20
requests 42:24
required [7] 8:8, 9:9, 18:6, 19:1, 20:25, 78:6, 78:9
reserve 24:4
reserved 72:3
respect [5] 12:6, 21:19, 69:23, 82:19, 83:8
respond 37:12
responded 49:14
responsible [3] 65:2, 92:13, 92:20
result 22:7
return [4] 82:18, 83:9, 83:16, 83:18
reverse [2] 11:7, 56:22
review [22] 9:23, 16:22, 17:3, 18:8, 18:20, 20:5, 20:7, 20:12, 21:1, 21:22, 24:20, 80:10, 80:12, 81:9, 81:16, 81:17, 83:5, 90:22, 90:24, 91:13, 91:15, 92:5
reviewed [13] 6:6, 15:19, 16:10, 16:19, 18:4, 18:22, 18:25, 31:17, 32:1, 37:18, 37:20, 39:1, 80:15
reviewing [6] 10:4, 25:8, 31:5, 31:14, 31:25, 35:5
rewarding 51:3
right-hand 66:5
road 73:6
role 5:10
room [13] 8:19, 17:16, 17:21, 36:22, 37:4, 37:19, 38:18, 45:16, 65:2, 91:8, 93:9, 93:13, 93:22
routed [5] 91:8, 91:11, 91:17, 91:18, 94:15
rule [4] 22:21, 23:16, 23:23, 49:21
ruled [2] 48:20, 70:8
rules [2] 50:25, 51:19
ruling [4] 46:16, 46:21, 51:1, 53:13
running [2] 9:10, 10:22

**S**

Sabrina [4] 1:20, 2:16, 96:7, 96:22
sake 5:4
Salvatori 2:8
save [2] 53:20, 55:7
saved [7] 18:13, 22:11, 24:14, 27:3, 27:3, 57:19, 91:3
saying [3] 40:18, 41:5, 44:19
says [7] 29:6, 29:12, 46:19, 54:3, 54:4, 66:16, 75:13
scan [2] 8:23, 93:15
scanned [7] 17:22, 18:13, 18:13, 19:23, 37:19, 45:17, 46:9
scene 60:2
scheduling 62:5
scope 49:1
screen [2] 26:1, 92:1
secret 47:24
secretary 51:15
seeing 65:25
seek 50:11
seeking [3] 43:6, 63:2, 67:11
seem [3] 44:24, 47:11, 47:13
seems [2] 37:20, 57:4
send [3] 78:3, 82:5, 91:14
sending 37:8
sent [19] 7:24, 19:4, 22:11, 38:23, 39:5, 41:15, 41:21, 41:25, 42:18, 44:1, 45:18, 45:21, 58:20, 65:15, 82:12, 85:7, 85:8, 87:7, 93:23
separate [2] 68:15, 78:15
September [4] 35:3, 35:21, 36:25, 38:10, 81:9, 88:2
served [3] 30:15, 38:12, 48:6
service [6] 37:7, 37:8, 40:9, 40:9, 41:23, 44:2
Services 2:17
servicing 14:18
settle 70:5
several [8] 13:24, 15:5, 17:18, 25:12, 47:7, 77:2, 78:5, 79:19
sh 67:4
shall 4:6
shared 55:11
she's [3] 59:4, 64:24, 64:24
short-circuit 47:18
shorten [3] 44:25, 72:21, 72:23
shorthand 21:9
shortly 41:20
showed 92:1
shower 51:18
showing [2] 17:20, 61:1
shows [3] 25:11, 51:23, 45:10, 93:19, 93:23
Shum [5] 31:9, 31:16, 45:10, 93:19, 93:23
sic [2] 53:15, 58:21
sign [2] 31:11, 34:13
signature [3] 34:15, 34:17, 34:18
signed [3] 33:19, 34:19, 89:7
significance 25:23
significant 7:22
similar 20:9
simply [4] 5:5, 52:19, 68:10, 92:7
single [2] 31:17, 42:20
sit 27:21
situation 51:17
six [4] 6:17, 26:16, 74:9, 88:15
Smith [46] 2:4, 25:7, 26:22, 33:8, 33:10, 33:14, 33:24, 34:6, 36:3, 36:7, 36:9, 37:25, 39:21, 39:23, 40:4, 40:20, 41:3, 41:5, 41:22, 42:19, 43:13, 44:6, 44:19, 46:23, 47:10, 47:17, 48:11, 48:19, 53:25, 54:11, 55:22, 56:1, 56:4, 56:7, 59:15, 60:12, 68:12, 70:16, 72:2, 74:14, 74:19, 74:22, 75:1, 83:19, 88:2, 95:1
solemnly 4:5
somebody [6] 44:13, 66:6, 88:17, 88:21, 89:2, 89:2
someone 45:16
sometime 83:20
somewhere [3] 35:12, 35:13, 94:1
sooner 88:13
sorry [13] 6:1, 6:20, 15:10, 31:18, 45:20, 58:5, 65:25, 66:10, 68:1, 72:4, 82:23, 83:6, 89:25
sort 22:9
sought [3] 79:22, 80:8, 81:13
South 2:13
Southwest 2:16
speak 41:25
Speaking 55:25
specific [3] 17:13, 47:11, 56:9
specifically [2] 82:16, 93:11
speculation [2] 20:3, 20:4
speed [2] 37:21, 46:3
speed's 5:4
spelling [5] 11:16, 25:18, 58:17, 59:18, 65:5
spirit 56:12
squeaky 89:3
staff [4] 6:19, 6:20, 8:20, 54:16
stamp [6] 17:20, 35:21, 35:25, 43:12, 58:23, 58:25
stamped [2] 17:17, 17:17
stamps [2] 17:18, 93:12
standpoint 68:12
Stanley [2] 2:8, 2:22
Starting 10:16
starts 10:17
state [4] 4:19, 96:2, 96:9, 96:24
stated 15:18
stenographic 96:12
stenographically 96:10
Stern [64] 4:25, 5:2, 5:5, 22:8, 33:3, 33:4, 33:23, 34:8, 37:5, 37:12, 39:25, 40:17, 40:21, 42:1, 42:1, 42:17, 43:22, 44:12, 46:18, 47:13, 47:21, 49:4, 49:13, 50:15, 50:19, 50:23, 51:2, 51:3, 51:12, 53:14, 54:1, 54:25, 66:5, 66:6, 69:10, 69:14, 69:22, 71:19, 72:12, 72:20, 73:13, 73:22, 73:25, 74:7, 74:9, 74:11, 75:9, 75:13, 75:15, 75:24, 76:2, 76:8, 76:12, 76:12, 76:23, 76:24, 80:9, 81:14, 84:1, 86:1, 86:11, 86:23, 89:21, 91:21
Stern's [6] 51:19, 71:15, 73:22, 74:3, 80:20, 85:5
sti 33:15
stipulate [3] 40:18, 43:20, 75:12
stipulating 41:16
stipulation [4] 40:14, 41:6, 42:8, 43:6
stopped 19:22
storage [3] 28:13, 80:2, 80:3
stored 28:5
Strada 2:9
streamline [2] 40:12, 44:10
streamlining 40:24
Street 2:13
Sub [2] 23:11, 23:12
subject [2] 34:2, 55:6
submitted 32:2
subpoena [2] 82:5, 82:13
subpoenas 82:14
Subsection [2] 22:20, 23:17
substance 49:25
substantial 75:24
substantive [2] 23:10, 52:11
substantively 24:16
suddenly [2] 88:9, 88:11
sued 32:25
sufficient 33:15
sugg 43:14
suggest [2] 37:7, 43:1, 61:17
suit [5] 33:1, 37:6, 49:13, 49:14, 53:13
Suite 2:13
summarize 42:6
summary 37:23

12-12020-mg   Doc 8531-41   Filed 04/27/15   Entered 04/27/15 16:52:56   Smith T
Decl. Exhibit Y   Pg 35 of 36

Page: 105
summer - wrote

**Testimony of FORREST McSURDY on May 16, 2012**

summer 8:9
support 70:14
supposed [6] 12:11, 17:25, 18:4, 27:16, 62:1, 76:18
surmise 19:24
surprise [2] 55:20, 66:18
surprised 83:14
surprising 66:24
suspect 88:18
sustained [6] 33:17, 48:21, 53:5, 57:24, 58:13, 80:25
sustaining 53:9
swear 4:5
switch 61:5
sworn 4:13
system [43] 8:24, 9:6, 9:11, 9:12, 9:14, 10:9, 11:9, 11:13, 15:7, 16:15, 16:16, 17:22, 18:14, 19:4, 19:6, 19:23, 22:11, 25:25, 27:2, 27:3, 27:7, 27:10, 27:16, 32:15, 35:9, 45:17, 46:6, 46:6, 46:9, 76:5, 77:16, 78:2, 78:10, 78:13, 78:17, 78:19, 78:23, 89:16, 90:15, 90:23, 91:4, 91:23, 93:11
systems [3] 77:2, 78:5, 78:23

**T**

tab [30] 9:20, 9:24, 10:6, 13:14, 15:22, 16:4, 17:19, 25:5, 25:6, 25:7, 25:11, 28:25, 32:6, 32:10, 32:14, 32:17, 35:12, 35:13, 36:8, 36:10, 45:9, 60:12, 71:25, 73:12, 73:19, 85:23, 87:12, 87:19, 87:24, 91:5
tabs [5] 41:7, 41:18, 43:5, 43:14, 44:4
taken [4] 1:15, 1:16, 1:17, 72:25
Tamiami 1:17
tangential [2] 52:1, 57:13
taught 93:13
technically [5] 13:3, 23:3, 28:1, 57:3, 89:13
telephone [9] 15:6, 15:13, 77:7, 77:14, 84:1, 84:8, 84:18, 84:23, 85:4
telling [3] 18:16, 27:1, 59:4
ten [2] 61:16, 88:5
term 78:9
terms [3] 10:22, 18:3, 61:21
testified [4] 4:14, 48:3, 48:23, 90:12
testify [4] 48:24, 49:18, 49:24, 51:21
testimony [15] 1:13, 4:6, 13:23, 16:10,

16:20, 19:16, 23:5, 41:19, 43:6, 48:13, 57:4, 65:18, 77:6, 78:21, 78:22
Thank [15] 4:10, 6:5, 11:4, 20:16, 20:17, 32:11, 45:6, 61:9, 65:7, 89:25, 94:16, 94:23, 94:25, 95:1, 95:2
themselves [2] 41:25, 52:4
Theoretically 76:21
theory 52:2
there's [12] 20:13, 23:25, 25:17, 26:21, 26:21, 27:9, 34:16, 42:7, 42:15, 47:11, 71:5, 74:23
therefore [3] 34:3, 48:14, 57:21
THEREUPON 4:11
they're [12] 38:1, 38:3, 38:4, 43:15, 51:5, 52:8, 52:11, 52:12, 52:13, 52:18, 52:19, 75:9
they've 55:10
thing [5] 21:14, 26:7, 43:19, 45:13, 57:18
third [5] 6:16, 10:16, 26:21, 88:1, 89:21
third-party [2] 50:18, 52:9
tho 43:22
though [2] 31:1, 33:20
thousand [2] 8:12, 79:19
thousands [3] 79:20, 79:21, 88:14
timely [2] 37:13, 38:23
today [5] 32:2, 32:21, 49:1, 61:18, 87:15
tonight 62:6
tool 57:17
top [8] 7:25, 8:1, 26:3, 26:18, 26:22, 66:4, 66:7, 88:1
touched [3] 9:9, 21:14, 70:1
track [21] 15:8, 15:11, 19:4, 19:6, 28:23, 71:20, 76:8, 76:18, 76:24, 77:15, 77:16, 77:18, 78:13, 79:3, 84:1, 84:8, 85:25, 86:5, 86:11, 86:17, 89:15
tracker [2] 9:12, 38:17
tracking 9:10
Trail 1:17
transcript [2] 1:13, 96:11
transmission [2] 22:10, 85:6
transmittal 66:10
transmitted [2] 12:10, 21:20
treated 91:22
tried [3] 20:9, 27:11, 88:14
trigger 88:22
true [7] 33:1, 49:12, 49:15, 70:10, 83:25, 87:2, 96:11
Trust [2] 1:4, 21:9

trusted 93:9
TRUSTEE 1:4
truth [3] 4:7, 4:7, 4:8
turn [6] 9:15, 9:20, 15:22, 18:2, 74:6, 90:8
turned 18:23
Turning 45:9
TV 83:6
TWENTIETH 1:1
Twenty-six 36:9
Twenty-two [5] 25:8, 32:9, 87:13, 87:14, 87:15
type 52:25

**U**

Uh-huh [10] 9:25, 10:2, 10:4, 14:5, 16:2, 29:11, 36:15, 46:2, 69:4, 94:17
ultimately 12:13
understand [6] 5:6, 11:14, 28:7, 33:11, 82:5, 90:2
understanding [5] 71:4, 86:22, 87:1, 90:15, 92:5
understood 28:4
unfair 56:9
Unfortunately 26:14
unlikely 68:6
unproven 51:8
updated 76:18
upload 73:21
uploaded [2] 85:25, 86:11
upon [2] 4:14, 70:2
UPS 85:17
upwards 7:9
usual 15:15
usually [2] 85:9, 85:16

**V**

V-E-G-I-N-A 59:14
VA-heena 59:4
vacate [5] 51:1, 51:22, 52:3, 56:17, 81:25
vacated 57:9
Vagina 58:20
vague [8] 51:7, 52:12, 52:13, 52:15, 52:19, 52:20, 53:4, 56:16
Vegina [5] 58:21, 59:3, 59:4, 59:5, 91:5
Vendorscape 79:3
via [2] 12:10, 19:4
view 19:16
vigilantly 23:24
violates 49:20
voluntarily 30:7
voluntary [4] 87:7, 88:3, 88:9, 89:6

**W**

wait 23:14
waiting 27:22
wanted [3] 28:8, 53:8, 55:8
wants [2] 39:24, 54:12
warehouse 82:11
watched 83:6

ways [3] 15:3, 15:5, 56:24
we'll [5] 21:9, 55:1, 59:9, 59:19, 60:7
we're [17] 23:8, 29:23, 37:25, 37:25, 39:25, 40:8, 47:24, 47:24, 48:25, 49:1, 61:11, 63:25, 67:7, 67:25, 71:24, 75:4, 84:13
we've [4] 37:6, 64:11, 74:14, 75:2
Wednesday 1:15
weeks 77:21
weren't 47:25
what's [5] 22:24, 22:24, 36:11, 58:25, 59:7
whatever [5] 44:14, 61:22, 78:10, 94:10, 94:12
whatsoever 16:24
wheel 89:3
whenever 27:12
whereas 38:4
Whereupon [4] 14:9, 64:4, 70:15, 95:3
whether [22] 14:19, 19:12, 20:22, 21:16, 26:3, 30:5, 42:8, 42:15, 42:15, 51:9, 57:9, 61:23, 70:23, 70:25, 71:10, 76:7, 76:11, 83:9, 83:16, 85:5, 86:6, 88:25
whichever 17:25
whole 4:7
whom 66:22
willing 40:18
win 51:22
winding 13:5
wish 68:7
withdraw [2] 69:16, 69:20
withdrawn [3] 69:11, 69:15, 69:19
within [7] 37:2, 38:14, 42:4, 43:5, 46:20, 52:13, 56:12
witness [48] 4:13, 7:15, 10:24, 11:3, 15:13, 15:15, 19:19, 19:21, 20:7, 20:15, 25:8, 32:9, 33:13, 33:22, 36:6, 36:15, 39:22, 41:19, 42:16, 48:13, 49:18, 49:19, 49:24, 54:21, 55:5, 56:19, 56:20, 59:8, 61:14, 61:15, 62:3, 62:4, 63:4, 64:2, 64:22, 64:24, 65:22, 65:24, 68:8, 70:7, 70:25, 72:4, 90:2, 94:6, 94:17, 94:19, 94:25, 95:2
Wood 2:8
works 58:17
wouldn't [5] 37:4, 56:21, 68:22, 83:14, 85:15
writing 61:18
written [3] 17:11, 17:13, 75:13
wrote [3] 56:7, 66:6, 73:17

## Y

yeah [10] 12:11, 45:24,
 46:23, 63:5, 63:14,
 74:22, 84:4, 85:1,
 87:16, 88:12
yet [4] 55:17, 71:22,
 88:19, 92:15
you'd  80:14
you'll [4] 26:18, 64:2,
 93:12, 93:12
yourself [2] 32:25,
 63:24