1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 12-12020-mg

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    RESIDENTIAL CAPITAL, LLC, et al.,

9

10                Debtors.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14                United States Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                April 16, 2015

19                10:04 AM

20

21    B E F O R E:

22    HON. MARTIN GLENN

23    U.S. BANKRUPTCY JUDGE

24

25

1

2    Doc# 7092 Adjourned Hearing RE: Motion for Omnibus Objection to

3    Claim(s) / ResCap Liquidating Trusts Sixty-Eighth Omnibus

4    Objection to Claims.

5

6    (CC: Doc# 7188) Adjourned Hearing RE: Motion for Omnibus

7    Objection to Claim(s) / ResCap Borrower Claims Trusts Sixty-

8    Ninth Omnibus Objection to Claims (No Liability Borrower

9    Claims).  Hearing Going Forward solely as to claim Filed by

10   Maurice Sharpe.

11

12   (CC: Doc# 8042) Adjourned Hearing RE: ResCap Borrower Claims

13   Trusts Eighty-Second Omnibus Objection to Claims (No Liability

14   Borrower Claims).  Hearing going forward regarding the claim(s)

15   of Kenneth Dlin.

16

17   (CC: Doc# 8237) Motion for Objection to Claim(s) Number: 112,

18   114, 415, 417.

19

20

21

22

23

24

25

1

2   (CC: Doc# 8019, 8114) Evidentiary Hearing RE: Motion for

3   Objection to Claim(s) Number: 61 (Claim of Francine Silver).

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  David Rutt

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

4

1

2    A P P E A R A N C E S :

3    MORRISON & FOERSTER LLP

4          Attorneys for ResCap Borrower's Trust

5          250 West 55th Street

6          New York, NY 10019

7

8    BY:    JORDAN A. WISHNEW, ESQ.

9          NORMAN S. ROSENBAUM, ESQ.

10

11

12    PITE DUNCAN LLP

13          Attorneys for Borrower Claims Trust

14          4375 Jutland Drive

15          San Diego, CA 92117

16

17    BY:    LAUREL I. HANDLEY, ESQ.

18

19

20

21

22

23

24

25

1

2  LEWIS LAW, PLLC

3          Attorneys for Maurice Sharpe

4          120 Bloomingdale Road

5          Suite 100

6          White Plains, NY 10605

7

8  BY:   KENNETH M. LEWIS, ESQ.

9

10

11  DAVID J. WINTERTON & ASSOCIATES, LTD.

12          Attorneys for Maurice Sharpe

13          1140 North Town Center Drive

14          Suite 120

15          Las Vegas, NV 89144

16

17  BY:   DAVID J. WINTERTON, ESQ.

18

19

20  WEIL GOTSHAL & MANGES LLP

21          Attorneys for Ally Financial Inc.

22          767 Fifth Avenue

23          New York, NY 10153

24

25  BY:   CHRISTOPHER J. HOPKINS, ESQ.

6

1

2  KRAMER LEVIN NAFTALIS & FRANKEL LLP

3       Attorneys for the Liquidating Trust

4       1177 Avenue of the Americas

5       New York, NY 10036

6

7  BY:   DOUGLAS MANNAL, ESQ.

8

9

10  WILSON LAW OFFICE P.C.

11       Attorney for Kenneth Dlin

12       43 Bull Dogger Court

13       Bailey, CO 80421

14

15  BY:   BRIAN H. WILSON, ESQ.

16

17

18  ALSO PRESENT:

19  ERLINDA ANIEL - Pro per

20  DEANNA HORST - ResCap Liquidating Trust

21  KATHY PRIORE - ResCap Liquidating Trust

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                              7

1                    P R O C E E D I N G S

2            THE COURT:  All right.  Please be seated.  We're here

3   in Residential Capital, number 12-12020.

4            Mr. Wishnew.

5            MR. WISHNEW:  Good morning, Your Honor.  Jordan

6   Wishnew of Morrison and Foerster for the ResCap Liquidating

7   Trust.

8            Your Honor, the first matter going forward on today's

9   agenda is item number 1 under Roman numeral III, the ResCap

10  Liquidating Trust Sixty-Eighth Omnibus Objection to Claims.

11           THE COURT:  What page is that on?

12           MR. WISHNEW:  That is on page 8, Your Honor.

13           THE COURT:  Okay.

14           MR. WISHNEW:  Thank you, Your Honor.

15           This uncontested claims objection was filed and

16  documented at Doc #7092.  By the claims objection, the

17  liquidating trust seeks to disallow and expunge 113 proofs of

18  claim filed by the debtors' former officers, employees, and

19  directors, each of whom is a beneficiary of the third-party

20  release provided for in the plan and confirmation order.  Each

21  claimant voluntarily waived their indemnification claims

22  against the debtors in consideration for the third-party

23  release under the terms of the plan and confirmation order.

24           In support of their objection, the liquidating trust

25  submitted the declaration of Ms. Deanna Horst who is in the

RESIDENTIAL CAPITAL, LLC, ET AL.                                    8

1   court today and available to answer any questions the Court

2   might have.  The objection was served on all claimants, and to

3   date, no responses from any creditor, identified on Exhibit A

4   to the objection, have been received.

5            For the reasons set forth in the objection, Your

6   Honor, the liquidating trust -- the liquidating trust would

7   respectfully request the Court enter the proposed form of

8   order, docketed at 7092.

9            THE COURT:  So none of the claimants filed a response,

10  but AFI did.

11           MR. WISHNEW:  Yes, Your Honor.

12           THE COURT:  Is anybody here for AFI?

13           MR. HOPKINS:  Good morning, Your Honor.

14           THE COURT:  Come on up.

15           MR. HOPKINS:  Good morning, Your Honor.  Christopher

16  Hopkins from Weil Gotshal & Manges for AFI and its nondebtor

17  subsidiaries and affiliates.

18           THE COURT:  What gives AFI standing to file anything

19  with respect to this claim objection?

20           MR. HOPKINS:  Your Honor, we filed this claim

21  objection solely to clarify what AFI believed to be certain

22  matters for the record and to -- just to make sure the Court

23  was aware of the ongoing investigation by the DOJ.

24           THE COURT:  The issues raised by this objection, is

25  there a pecuniary interest that AFI has?

1        MR. HOPKINS:  Well, one of the statements made in the

2   objection relates to the indemnification claimants'

3   indemnification rights against Ally, and what we wanted to

4   clarify was just AFI does not believe that under the plan it

5   provided affirmative indemnification rights to each and every

6   indemnification claimant that we just wanted to clarify --

7        THE COURT:  But that's not before me today, right?

8        MR. HOPKINS:  Correct.

9        THE COURT:  Okay.

10        MR. HOPKINS:  Right.

11        THE COURT:  But you -- I'm not saying I'm ready to

12   sustain the objection.  I just want to understand that AFI has

13   no direct pecuniary interest in these indemnification claims

14   asserted against the debtors or the outcome of the trust's

15   objection; is that correct?

16        MR. HOPKINS:  That's correct.

17        THE COURT:  Okay.  Why don't you have to seat, but I

18   may still have some more questions for you.

19        MR. HOPKINS:  Okay.

20        THE COURT:  Here's what I want you to walk me through,

21   Mr. Wishnew.

22        MR. WISHNEW:  Sure, Your Honor.

23        THE COURT:  The AFI statement indicates that I guess

24   it's the U.S. Attorney's Office in Los Angeles is -- continues

25   to conduct an investigation about potential violations of

1   FIRREA.

2          MR. WISHNEW:  Correct, Your Honor.

3          THE COURT:  And you don't dispute that.

4          MR. WISHNEW:  No.

5          THE COURT:  Okay.  And the plan doesn't discharge,

6   bar, enjoin FIRREA claims against officers, directors or

7   employees; is that correct?

8          MR. WISHNEW:  That's correct, Your Honor.

9          THE COURT:  Those were -- it was expressly not

10  necessarily FIRREA, but it was expressly carved out

11  governmental claims against individuals.

12         MR. WISHNEW:  It was part of the limited carve-out,

13  and I believe it's section IX(E) of the claim, Your Honor.

14         THE COURT:  And the thirty-party releases that the

15  plan provides for the benefit of officers, directors, employees

16  doesn't serve to bar any DOJ claims under FIRREA against the

17  individuals, correct?

18         MR. WISHNEW:  Against the individuals, correct, Your

19  Honor, yes.

20         THE COURT:  Does the -- what language in the plan bars

21  indemnification claims by officers, directors or employees for

22  any liability -- I'm going to include within that defense

23  clause "et cetera" -- that they may incur in defending or

24  responding to DOJ claims under FIRREA?

25         MR. WISHNEW:  It would be the general injunction

1   provision, Your Honor, because it would be a continuation of a

2   pre-petition claim which they've voluntarily waived at this

3   point.

4            THE COURT:  Point me to the -- in other words,

5   I'm -- because -- I certainly understand -- I think I

6   understand that with respect to -- the plan included third-

7   party releases.  I've already had some -- written a bunch of

8   opinions insofar as

9   AFI as a beneficiary of the third-party release, what the

10  impact of that is, okay.  So if a borrower asserted a claim

11  against an officer or director arising out of their employment

12  with ResCap, one of the ResCap entities, the third-party

13  release would apply.  You would argue that, correct?  And what

14  precluded in the flip side of that is the officer, director or

15  employee released any claim that it might have against the

16  debtors, that makes perfect sense because you got an injunction

17  in their favor that third-party claims can't proceed.

18           Now we're dealing with a situation where potential DOJ

19  claims are not barred against the individuals.  And point me to

20  the precise language in the plan that would nevertheless

21  release, bar, discharge any indemnification claims that the

22  officers, directors or employees would have in connection with

23  responding to DOJ FIRREA claims.

24           MR. WISHNEW:  So, Your Honor, it would defer to -- one

25  moment.  So you have the plan injunction, Your Honor, which

1    provides --

2              THE COURT:  What paragraph are you reading from?

3              MR. WISHNEW:  That is Article IX(i).

4              THE COURT:  Okay, go ahead.

5              MR. WISHNEW:  It says, "All entities who have held or

6    may hold claims that constitute release claims are permanently

7    enjoined or precluded from the entity effective date" --

8              THE COURT:  Just a little slower, okay?

9              MR. WISHNEW:  Sure.  "All entities who have held or

10   may hold claims, equity interest, causes of action or

11   liabilities that constitute release claims are permanently

12   enjoined or precluded from and after the effective date from

13   commencing or continuing in any matter any other proceeding of

14   any kind against any released party either directly,

15   derivatively or otherwise on account of or in connection with

16   any of the released claims."

17             THE COURT:  Okay.  So what's a released claim?

18             MR. WISHNEW:  Well, the released claim is in turn

19   defined to include liabilities that --

20             THE COURT:  What paragraph are you looking at now?

21             MR. WISHNEW:  So "released claim" is defined by plan

22   Article I(A) subpart(242), to include liabilities that have

23   been released pursuant to the plan or subject to exculpation

24   pursuant to the plan.

25             THE COURT:  That doesn't help me a lot.

RESIDENTIAL CAPITAL, LLC, ET AL.                    13

1          MR. WISHNEW:  I mean, I would also add, Your Honor,

2     that to the extent that there's any inconsistency between the

3     plan and the confirmation order, the confirmation order does

4     govern, and in regards to finding of fact, conclusion of law QQ

5     in the confirmation order, it specifically contemplates the

6     affirmative waiver by these claimants of their claims against

7     the debtors.

8          THE COURT:  Point me to the paragraph -- none of them

9     filed an objection nor response to your objection, and I'm

10    certainly mindful of that, but as in all instances, I don't

11    sustain objections unless the objection has set forth a prima

12    facie basis for the relief that you've requested.

13         MR. WISHNEW:  Understood.

14         THE COURT:  AFI, which I sort of consider a stranger

15    to this specific objection, has filed this "statement".  I

16    think I would have had some of the same questions myself.  I

17    just want to be -- I need for you to walk me through -- and

18    this is what I didn't see in the papers, in the objection,

19    where you walk through and you point to Article I(A)(242) and

20    what the effect of that is, and if that doesn't do it but you

21    say the order -- the confirmation order does, fine.  I want you

22    to walk me through the precise language in the plan or the

23    confirmation order that would have the effect of having the

24    indemnification claimants release those claims even if they as

25    individuals may remain subject to FIRREA liability to DOJ.  I

1   mean, it's one thing to say that, well, we got them a third-

2   party -- we got a third-party release so nobody can proceed

3   against them as individuals and we dutifully enforce the

4   release and therefore it makes perfect sense for them to

5   release any indemnification claims against the debtor.  That's

6   one position.  But here, we're dealing with a circumstance

7   where the plan expressly carves out DOJ claims.

8                MR. WISHNEW:  Um-hum.

9                THE COURT:  But I'm focusing on FIRREA because they're

10  just -- you acknowledge there's a FIRREA investigation that

11  continues.

12               MR. WISHNEW:  Um-hum.

13               THE COURT:  What the result will be, I don't know.

14               MR. WISHNEW:  Um-hum.

15               THE COURT:  So the individuals are potentially

16  exposed.

17               MR. WISHNEW:  Agreed.

18               THE COURT:  And I want to be satisfied that the plan

19  or the confirmation order fairly read means that even though

20  you're still potentially exposed you -- the plan provides that

21  you have released, discharged your potential indemnification

22  claims against the debtors.

23               MR. WISHNEW:  To that point, Your Honor, let me

24  cite -- or let me read into the record confirmation order

25  paragraph QQ, and this is cited on page 10 of our objection.

1    "The individual officers and directors of Ally and its

2    subsidiaries (including the debtors, directors, officers, and

3    employees) covered by the defined term "third-party release"

4    have also made a substantial contribution to the plan by giving

5    up their rights to share in insurance that they would otherwise

6    have access to defend themselves against such potential

7    claims."

8           Goes on, "These parties will also forego their own

9    claims for indemnity and contribution from the estates.  By

10   giving up their insurance contractual indemnity claims, the

11   debtors, officers, and directors have provided substantial

12   consideration to the debtors' estates."

13          Paragraph SS continues, "There is an identity of

14   interest between the debtors and the beneficiaries of the

15   third-party releases.  The Ally released parties have the right

16   to seek indemnity, contribution or other reimbursement from the

17   debtors with respect to the debtors' activities.  The third-

18   party releases appropriately relieve the debtors from these

19   potential expenses."

20          So it's our position, Your Honor, that those

21   provisions, very unambiguously read, represent an affirmative

22   and knowing waiver by these claimants of their indemnification

23   rights against the debtors' estates, notwithstanding the fact

24   that they did have limited liability on an individual basis

25   arising from government investigations.

1        THE COURT:  SS, read it to me one more time because

2   it --

3        MR. WISHNEW:  Sure.

4        THE COURT:  That sounds like the situation where they

5   benefit from the third-party basis (ph.) and in return for

6   which they give up indemnification but --

7        MR. WISHNEW:  I think the --

8        THE COURT:  -- is it more broad.  Read SS to me.

9        MR. WISHNEW:  Sure.  "There is an identity of interest

10  between the debtors and the beneficiaries of the third-party

11  releases.  The Ally released parties" -- which is the defined

12  term -- "have the right to seek indemnity, contribution or

13  other reimbursement from the debtors with respect to the

14  debtors' activities.  The third-party releases appropriately

15  relieve the debtors from these potential expenses."

16        THE COURT:  How do the third-party releases release

17  the debtors from the expenses for FIRREA claims that are not

18  covered -- that are carved out in the plan.

19        MR. WISHNEW:  So to the extent that the third-party

20  release -- to extent the third-party release -- I guess the

21  fact of the matter is, Your Honor, with the knowing waiver of

22  claims by these individuals, they've essentially absolved the

23  debtors' estates of responsibility that could arise from the

24  FIRREA investigation.  I believe in part that is why, charting

25  back to the plan and Article IX(m), as in Mary, there is a

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

1  limited retention of the right to seek indemnity from Ally to

2  the extent that that indemnity right is -- does exist in that

3  claimant's favor.

4          THE COURT:  So I'm looking at your ResCap Liquidating

5  Trust's Sixty-Eighth Omnibus Objection to Claims, director,

6  officer, and employee indemnification claims.  It's in CF 7092.

7          So you quoted to me from confirmation order paragraph

8  SS, and it's in your motion papers at page 10, paragraph 1-3.

9  It says, "There is an identity of interest between the debtors

10 and the beneficiaries of the third-party releases.  The Ally

11 released parties have the right to seek indemnity contribution

12 or other reimbursement from the debtors with respect to

13 debtors' activities.  The third-party release is appropriate to

14 relieve the debtors from these potential expenses."

15         So you agree that third-party releases don't relieve

16 the debtors from potential expenses in connection with DOJ

17 FIRREA claims?

18         I see Mr. Mannal rising.  I don't know whether you

19 want to confer with him or -- do you want to speak to me, Mr.

20 Mannal?

21         MR. WISHNEW:  I would say, Your Honor, the debtors'

22 representatives are certainly beneficiaries of the third-party

23 releases.

24         THE COURT:  Third-party releases do absolutely no good

25 with respect to DOJ FIRREA claims.

1          MR. WISHNEW:  Understood.

2          THE COURT:  Correct?

3          MR. WISHNEW:  Agreed, Your Honor, yes.  I would simply

4    say to the extent that the debtors' estates are responsible in

5    any way related to the FIRREA investigation, it's to the extent

6    the DOJ has preserved that right through a proof of claim.

7          THE COURT:  Have they?

8          MR. WISHNEW:  I'm sorry?

9          THE COURT:  Have they?  Is there a DOJ proof of claim?

10         MR. WISHNEW:  There is a DOJ proof of claim, Your

11   Honor.  It's the liquidating trust position they have not

12   preserved their --

13         THE COURT:  Mr. Mannal, do you want to be heard?

14         MR. MANNAL:  Good morning, Your Honor.  Doug Mannal on

15   behalf of the liquidating trust.

16         Your Honor, just briefly, I think your first point was

17   absolutely correct, and I just -- AFI does not have any

18   standing to put in any objection or statement, however they

19   phrase it and --

20         THE COURT:  I think I would -- I had the

21   same -- before I read the AFI statement, I had the same issues

22   going through my mind, Mr. Mannal.

23         MR. MANNAL:  And I agree that the plan is not as clear

24   as it could have been on this issue.  But I think the -- if you

25   take a step back and look at what the confirmation order says

1    and what the agreements were and read the provisions together,

2    I think it's relatively clear.

3            If you look at QQ, the finding, it talks about

4    releasing -- the released parties releasing their claims

5    against the insurance.  And there's no suggestion that somehow

6    they're releasing their claims against the insurance other than

7    in connection with claims that the government may have under

8    FIRREA.
             And I think that's consistent with --

9            THE COURT:  The insurance is gone.  They can't look to

10   insurance whether --

11           MR. MANNAL:  Well, the insurance is gone as a result

12   of the global settlement.

13           THE COURT:  Yes, I understand.

14           MR. MANNAL:  Right.  And so what I'm suggesting is

15   they -- there's no suggestion that somehow that insurance was

16   preserved or what have you.

17           THE COURT:  Oh, I'm clear that the insurance is gone.

18           MR. MANNAL:  Right.  And the same paragraph then talks

19   about the fact that they would also forego their own claims for

20   indemnity and contribution from the estates.  What they're

21   saying is, because I'm benefiting from the third-party release,

22   whatever the third-party release provides it provides, but

23   because I'm benefiting from it, I'm waiving my indemnity claims

24   against the estates.  But in paragraph M of that same article,

25   the limitations, it makes clear, crystal clear, that any

RESIDENTIAL CAPITAL, LLC, ET AL.                    20

1  indemnity rights held by the debtors' representatives against

2  Ally arising from the claims are not released under this

3  Article IX.

4         And so the deal was, Your Honor -- and just to be

5  clear, and I agree that the language is not that crystal, but

6  when read together, I think it makes sense.  The deal was that

7  the indemnity claims against the estate would be released but

8  would be preserved against Ally with respect to things that

9  were carved out of the third-party release.

10         THE COURT:  Can somebody enlighten me whether -- do

11  you know whether Ally has paid for defense costs for any former

12  officers, directors, employees in connection with the DOJ

13  FIRREA investigation?

14         MR. MANNAL:  I don't know.  I know the liquidating

15  trust has not.

16         THE COURT:  So what remains filed against the estate

17  are unliquidated proofs of claim for indemnification, correct?

18         MR. WISHNEW:  Yes, Your Honor.

19         THE COURT:  Have any of the claimants, indemnification

20  claimants, forwarded any evidence of defense costs or anything

21  that they've incurred in connection with the FIRREA

22  investigation?

23         MR. WISHNEW:  No, Your Honor.

24         THE COURT:  Mr. Hopkins, has Ally reimbursed any

25  individual officers, directors or employees, present or former,

 1    for costs of defense in connection with the DOJ FIRREA

 2    investigation?

 3            MR. HOPKINS:  Your Honor, I don't know at this time.

 4    We haven't -- we haven't --

 5            THE COURT:  Since you decided to put your two cents in

 6    with a statement, I would like a letter filed on the docket by

 7    tomorrow at 5 o'clock specifically responding to my question

 8    whether AFI or any of its affiliates have paid or reimbursed

 9    any present or former officers, directors or employees for any

10    costs or expenses incurred in responding to a DOJ FIRREA

11    investigation.

12            MR. HOPKINS:  Thank you, Your Honor.

13            THE COURT:  And if so -- well, let's leave it -- I'll

14    leave it at that.  I'll decide after I get your response

15    whether I want more information or not.

16            Plan, Article IX(M) certainly contemplated that any

17    indemnity rights held by the debtors' representatives against

18    Ally arising from claims not released by this Article IX,

19    that's preserved.  And so I do want to know specifically, since

20    you -- Ally -- AFI took it on itself to file a statement, even

21    though it acknowledged it has no direct pecuniary interest,

22    what the actual facts are.

23            You know, I suppose it's one thing, Mr. Wishnew, if I

24    find that the plan language or confirmation order language is

25    clea and resolves this -- I'm not ruling on it.  If I were to

```
 1   find that the plan or confirmation order language is clear and
 2   unambiguous and clearly calls for the relief you're asking for,
 3   I would certainly grant it.  This is all abstract hypothetical
 4   because nobody's come forward, none of these indemnity
 5   claimants have come forward with a demand for reimbursement at
 6   this point.  So even if I rule, it still leaves open 502(j) as
 7   a basis for coming back at some later point and hashing this
 8   out.  I'm going to take this -- once I receive AFI's response,
 9   I'll decide whether I want to have a further hearing on it.  If
10   not, I will take it under advisement to see what to do with it.
11          MR. WISHNEW:  Understood, Your Honor.
12          THE COURT:  Okay.  All right.  Thanks.
13          MR. WISHNEW:  Your Honor, the next matter on today's
14   calendar is item 2 on page 9, the Borrower Claims Trust's
15   Sixty-Ninth Omnibus Objection to Claims, solely as it relates
16   to the claim of Maurice Sharpe.  I'm going to turn the podium
17   over to my colleague, Laurel Handley of Pite Duncan who will be
18   arguing this on behalf of the Borrower Claims Trust.  She has
19   been admitted pro hac vice for this matter.
20          THE COURT:  Okay.  Just bear with me since I'm
21   hunting.
22          MR. MANNAL:  Your Honor, may we be excused?
23          THE COURT:  Oh, absolutely, sure.
24          MR. MANNAL:  Good seeing your.
25          THE COURT:  Thanks.
```

RESIDENTIAL CAPITAL, LLC, ET AL.                    23

1          Just give me a second, okay?  Okay.

2          MS. HANDLEY:  Good morning, Your Honor.  My name is

3  Laurel Handley.  I'm with Pite --

4          THE COURT:  Just tell me your last name again.

5          MS. HANDLEY:  Handley, H-A-N-D-L-E-Y.  I'm with Pite

6  Duncan, and I'm here representing the ResCap Borrower Claims

7  Trust with regard to the sixty-ninth omnibus objection as it

8  relates to the claim of Maurice Sharp

9          MR. LEWIS:  Good morning, Your Honor.  Kenneth Lewis,

10  Lewis Law, PLLC, local counsel to Mr. Sharpe.  On the phone is

11  Mr. David Winterton who is Nevada counsel to Mr. Sharpe.

12          THE COURT:  Thank you.  Who's going to argue?

13          MR. LEWIS:  I am, Your Honor.

14          THE COURT:  Okay, Mr. Lewis.  Thank you.

15          Go ahead, Ms. Handley.

16          MS. HANDLEY:  Thank you, Your Honor.

17          Through the objection, the borrower trust seeks to

18  expunge the claim of Mr. Sharpe, and it's appropriate to do so

19  because the validity of Mr. Sharpe's claim can be determined as

20  a matter of law.  There are no factual issues that need to be

21  resolved with regard to the underlying Nevada state court

22  litigation.  The only issues relate to Nevada law.

23          Specifically, Mr. Sharpe has one claim remaining in

24  his Nevada state court litigation, that's a claim for wrongful

25  foreclosure.  However, the cause of action is not supported by

RESIDENTIAL CAPITAL, LLC, ET AL.                    24

1   Nevada law.  In Nevada, wrongful foreclosure is a very specific

2   claim.  The Nevada Supreme Court has laid out the required

3   elements to seek a wrongful-foreclosure claim.

4            THE COURT:  And what case are you referring to?

5            MS. HANDLEY:  It's Collins v. Union Federal Savings

6   and Loan Association.  The citation to the Pacific Reporter is

7   662 P.2nd 610.  It's a Supreme Court decision from 1983.  And

8   the Nevada Supreme Court has clearly stated that action from

9   the tort of wrongful foreclosure will lie if the borrower

10  establishes that they were not in default at the time of the

11  foreclosure.

12           THE COURT:  There's the nub.

13           MS. HANDLEY:  Yes, there --

14           THE COURT:  There is the nub, because doesn't this

15  turn on whether there is an enforceable note against Sharpe?

16           MS. HANDLEY:  That's what Mr. Sharpe is seeking to

17  expand the wrongful-foreclosure claim to --

18           THE COURT:  Why does that expand the -- I --

19           MS. HANDLEY:  Well, all of the cases that deal with

20  wrongful foreclosure presume the validity of the underlying

21  loan.

22           THE COURT:  Show me one case from Nevada or elsewhere

23  that deals with an allegedly forged note.

24           MS. HANDLEY:  There is none.

25           THE COURT:  Oh, so it's so clear --

RESIDENTIAL CAPITAL, LLC, ET AL.                    25

1          MS. HANDLEY:  For a wrongful-foreclosure claim.

2          THE COURT:  You're saying it's so clear under Nevada

3    law but you can't cite a single case that deals with an alleged

4    forged note?

5          MS. HANDLEY:  There is, not in the wrongful

6    foreclosure context.  There are cases that deal with forged

7    notes where the borrower seeks to quiet title or they seek

8    slander of title as Mr. Sharpe did in this case, or they seek

9    to invalidate the note and deed of trust.  Those causes of

10   action are separate causes of action.  And the wrongful

11   foreclosure case law doesn't deal with those separate

12   underlying claims --

13         THE COURT:  Doesn't --

14         MS. HANDLEY:  -- challenging the validity of the deed

15   of trust.

16         THE COURT:  -- a wrongful-foreclosure claim depend

17   upon the existence of an enforceable note?

18         MS. HANDLEY:  The Nevada case law doesn't make that

19   distinction.  I understand your point.

20         THE COURT:  Oh, it doesn't.  You haven't cited a

21   single -- nobody's cited a case --

22         MS. HANDLEY:  No.

23         THE COURT:  -- that deals with it.  But isn't it

24   obvious?  How can you -- let me ask you a hypothetical.  If

25   GMACM knew to a certainty that the note was a forgery, could it

RESIDENTIAL CAPITAL, LLC, ET AL.                    26

1   have proceeded with foreclosure?

2           MS. HANDLEY:  If it knew for a certainty --

3           THE COURT:  Yes.

4           MS. HANDLEY:  -- if there had been an adjudication,

5   likely not, but there --

6           THE COURT:  No, no, no, no.  Don't add facts to my

7   hypothetical, okay.  They know to a certainty that the note is

8   a forgery, may they proceed to foreclosure on the note -- on

9   the mortgage?  Yes or no?

10          MS. HANDLEY:  Likely not, but that's not a wrongful --

11          THE COURT:  I'm sorry.  Say that again.

12          MS. HANDLEY:  No, but I don't think that's a wrongful-

13  foreclosure claim.  That's a claim for negligence or slander of

14  title or quiet title.

15          THE COURT:  Well, why?  Why isn't that a

16  wrongful -- you're telling me it is not wrongful foreclosure in

17  the hypothetical that I posit if a loan servicer knows to a

18  certainty that a note is a forgery, it's not wrongful

19  foreclosure for them to foreclose on the mortgage?

20          MS. HANDLEY:  I don't think that under Nevada law it

21  supports that particular cause of action.

22          THE COURT:  Give me a case that says that.

23          MS. HANDLEY:  There isn't one.

24          THE COURT:  Give me a case that says it.

25          MS. HANDLEY:  There isn't one, and there isn't a case

1    that says that does support a claim for wrongful foreclosure.

2    There are cases that subject it supports other claims, and Mr.

3    Sharpe did pursue those other claims which were resolved, which

4    is --

5          THE COURT:  I can't figure out how anybody -- were you

6    the counsel for GMAC when this was resolved?

7          MS. HANDLEY:  My law firm was, yes.  The --

8          THE COURT:  How anybody could have -- let me stop.

9    The resolution through mediation expressly carved out the

10   wrongful-foreclosure claim, correct?

11         MS. HANDLEY:  Correct.

12         THE COURT:  And yet you're standing here today and

13   telling me that where a settlement was reached and expressly

14   carved out wrongful foreclosure, that Mr. Sharpe is precluded

15   from proceeding with a wrongful-foreclosure claim?

16         MS. HANDLEY:  Correct, based on claim preclusion and

17   also because the wrongful-foreclosure claim that he attempted

18   to carve out is not supported by Nevada law.  Yes, he did try

19   to carve out that cause of action, but the underlying facts

20   supporting that cause of action were resolved through his other

21   claims for fraud --

22         THE COURT:  Well, you say that, but show me an agreed

23   set of facts.  Show me a settlement agreement that resolves

24   those facts upon which he seeks to proceed with his wrongful-

25   foreclosure claim.  None exist to my knowledge.

1      MS. HANDLEY:  There is no settlement agreement or

2  findings of fact that resolve those issues of fact, correct,

3  but --

4      THE COURT:  And you say that in the absence of a

5  settlement agreement or an agreed statement of facts that

6  preclusion principles apply and prevent him from proceeding

7  with the cause of action that was expressly carved out from the

8  settlement.

9      MS. HANDLEY:  Correct, because there were four other

10  causes of action that were basically a reiteration of his

11  wrongful-foreclosure claim, or I should say the wrongful-

12  foreclosure claim is a reiteration of those other claims for

13  fraud and quiet title which were alleged in his original

14  claimant.  Those two causes of action were expressly dismissed

15  when he filed his amended complaint seeking negligence and

16  slander of title.  And in the negligence and slander of title

17  causes of action, Mr. Sharpe specifically alleges that GMAC

18  knew of the fraudulent nature of the underlying loan and

19  proceeded to foreclosure anyway.

20      THE COURT:  Yes, he alleges that, that's right.

21      MS. HANDLEY:  Right.  So those are the claims that

22  were previously resolved and dismissed or are subject to

23  dismissal.

24      THE COURT:  Well, that seems to be a major part of the

25  dispute is -- look, if a lawyer in your firm hadn't agreed to a

1  settlement that expressly carved out wrongful foreclosure, you

2  might have a better argument.

3         MS. HANDLEY:  The settlement was between Fidelity

4  National Title and Mr. Sharpe.  At that point, Fidelity

5  National Title was indemnifying GMAC as to those causes of

6  action and resolved the claims on behalf of GMAC.

7         THE COURT:  Let me ask this.  At the time of the

8  foreclosure, who owned the note?

9         MS. HANDLEY:  GMAC was is servicer for the loan.

10        THE COURT:  I know.  I asked who owned the note.

11        MS. HANDLEY:  I don't have that information off the

12  top of my head.  I believe at the foreclosure sale the entity

13  that took title was Federal National Mortgage Association,

14  Fannie Ma.  They were likely the investor at the time.

15        THE COURT:  Did GMAC have contractual indemnity from

16  Fannie Mae in connection with proceeding with the foreclosure?

17        MS. HANDLEY:  Not that I'm aware.

18        THE COURT:  Do you know?  I mean, do you know -- can

19  you represent affirmatively that there's nothing in a contract

20  with the loan servicer as to what rights of indemnity it

21  receives?

22        MS. HANDLEY:  It would be --

23        THE COURT:  It doesn't -- it's not foreclosing on its

24  own behalf.

25        MS. HANDLEY:  Right.

1      THE COURT:  It's foreclosing on behalf of whatever the

2  entity was that owned the note.

3      MS. HANDLEY:  Right.  Is servicing guide would cover

4  or govern the relationship.  There's not a contract between

5  GMAC on Fannie Mae when it services the loans.  There's a

6  servicing guide, and I think the servicing guide would require

7  if there was some inappropriate action on behalf -- on the part

8  of the servicer that they would repurchase the loan from Fannie

9  Mae.  I don't think there would be any indemnity claim on

10  behalf of Fannie Mae.  They would simply require the servicer

11  repurchase the loan.  But there has been no such claim for

12  repurchase in this case.  I believe Fannie Mae has already sold

13  the property to unrelated third parties.

14      And with regard to the carve-out, there is a

15  case -- actually a case that Mr. Sharpe cited that addresses

16  the carve-out and actually makes clear in that case a party

17  attempted to carve out their right to defend against a

18  complaint that was brought by a plumbing company that installed

19  plumbing in a hotel.  The defendant filed a cross-complaint and

20  resolved that cross-complaint.  They settled with regard to the

21  cross-complaint, dismissed the cross-complaint and reserved

22  their right to defend against the allegation in the underlying

23  complaint.  The court in that case -- and it's Alpha Mechanical

24  Heating and Air Conditioning v. Travelers.  The citation is 35

25  Cal.Rptr.3d 496.  In that case, the court held that the carve-

1    out attempted by the defendant was ineffective because it

2    didn't specify exactly what claims or defenses it could pursue

3    with regard to the complaint.  And the court actually noted

4    that the parties in these circumstances should be extremely

5    cautious about settling a part or piece of their litigation,

6    they must take great care to preserve key claims or defenses or

7    risk losing them.

8            THE COURT:  It was very crystal clear they preserved

9    the claim for wrongful foreclosure.

10           MS. HANDLEY:  But Mr. Sharpe did not preserve his

11   claim that the note and deed of trust was invalid.  And that's

12   what underlies his wrongful-foreclosure claim.  The

13   allegation --

14           THE COURT:  Well, you say he didn't --

15           MS. HANDLEY:  -- that the note and deed of trust --

16           THE COURT:  -- and his counsel say that he did.  To

17   the extent that it would have to be established in any

18   foreclosure action that there was a valid note, he's saying

19   that's preserved.

20           Look, if you had gotten a written order signed by the

21   court, which you don't have, you're trying to apply preclusion

22   to some document in mediation with no judicial incribitur

23   (ph.) -- let me switch subjects.  What's the statute of

24   limitations in Nevada for wrongful -- for a monetary damages

25   claim for wrongful foreclosure pursuant to Nevada revised

1  statute, Section 107.560?

2          MS. HANDLEY:  That section I believe is six months to

3  seek to set aside the deed of trust.

4          THE COURT:  That's --

5          MS. HANDLEY:  There's also a wrong --

6          THE COURT:  That's to set aside.

7          MS. HANDLEY:  Right.  Normal --

8          THE COURT:  Here, that's not happening, okay.  That

9  didn't happen.  And my question is, is there -- what is the

10 applicable --

11         MS. HANDLEY:  Yes.

12         THE COURT:  -- statute of limitations for a money

13 damages claim for wrongful foreclosure.

14         MS. HANDLEY:  One year for tort claims such as this.

15         THE COURT:  And when did he bring his action?

16         MS. HANDLEY:  In -- I believe it was April --

17         THE COURT:  How long after the foreclosure?

18         MS. HANDLEY:  -- April of 2009.

19         THE COURT:  How long after the foreclosure?

20         MS. HANDLEY:  It was within the one-year period.

21         THE COURT:  Okay.  So the statute of limitations for a

22 money damages claim for wrongful foreclosure, as you agree, has

23 not run.

24         MS. HANDLEY:  Well, he did not allege his wrongful

25 foreclosure cause of action in the original complaint.  The

1    original complaint was for fraud and quiet title.  In that

2    case, he was seeking to quiet title.  He amended the complaint

3    outside of the one-year period to allege the wrongful

4    foreclosure.

5            THE COURT:  Had foreclosure taken place at the time he

6    filed his complaint?

7            MS. HANDLEY:  No.

8            THE COURT:  Okay.  So he couldn't allege wrongful

9    foreclosure because it hadn't been foreclosed yet, right?

10           MS. HANDLEY:  Right.

11           THE COURT:  But he alleged the basic facts that gave

12   rise to his wrongful-foreclosure claim once GMAC went ahead and

13   foreclosed.

14           MS. HANDLEY:  He alleged the facts, yes, underlying

15   the fraud claim.  And it's our position that his fraud

16   allegations really are necessary to support his claim that he's

17   entitled wrongful foreclosure, but we don't believe that the

18   Nevada case law supports that as a claim for wrongful

19   foreclosure.  We do believe it supports a claim for fraud and

20   for other tort sounding -- like slander of title, which

21   is -- and negligence, which is exactly what he did pursue and

22   resolve.  It's simply the wrongful-foreclosure claim that's not

23   supported by Nevada law.  There are -- we agree that Mr. Sharpe

24   did have other causes of action.  It's just not under the

25   wrongful foreclosure heading.  And when he resolved those other

RESIDENTIAL CAPITAL, LLC, ET AL.                    34

 1   claims and carved out wrongful foreclosure, he essentially
 2   carved out a claim that does not exist under Nevada law.
 3              THE COURT:  You're not getting any traction with your
 4   argument.
 5              GMAC was aware, before it foreclosed, that Sharpe
 6   contended in an action he filed in state court that the
 7   promissory note was a forgery, correct?
 8              MS. HANDLEY:  Yes, they were aware of that contention.
 9   Your Honor, in Nevada there's no duty -- just because you're
10   aware that there's allegations that the note and deed of trust
11   are invalid, that doesn't create a duty to stop procedures in
12   foreclosure.
13              THE COURT:  Let's assume I accept that as true.
14              MS. HANDLEY:  Um-hum.
15              THE COURT:  But doesn't the loan servicer proceed at
16   its own risk when it goes ahead and forecloses?  Litigation can
17   then go forward on the damages claim --
18              MS. HANDLEY:  Correct.
19              THE COURT:  -- and, if it's not a fore -- if it's not
20   a forgery, you win.  If it is a forgery, you lose.
21              MS. HANDLEY:  Right.  And Mr. Sharpe did pursue those
22   damages claims in his negligence and slander-of-title causes of
23   action; it's those claims that we assert would --
24              THE COURT:  Is --
25              MS. HANDLEY:  -- now preclude the wrongful-foreclosure

RESIDENTIAL CAPITAL, LLC, ET AL.                    35

1  claim.

2          THE COURT:  In Nevada, are damages available on a

3  wrongful-foreclosure claim?

4          MS. HANDLEY:  Yes, but --

5          THE COURT:  I know you --

6          MS. HANDLEY:  -- let me preface that with --

7          THE COURT:  I heard your argument already why you

8  don't think --

9          MS. HANDLEY:  Yes, it's true; wrongful-foreclosure

10 claim, yes.  The borrower can either sue to set aside the

11 foreclosure or they can sue to seek damages.

12         THE COURT:  Okay.  And so, absent what you say is

13 preclusion that arises from a settlement that's not in

14 writing --

15         MS. HANDLEY:  There is a written settlement.

16         THE COURT:  Well, not that -- there's nothing within a

17 perimeter of a court that --

18         MS. HANDLEY:  Correct.

19         THE COURT:  -- determines anything with respect to

20 wrongful foreclosure.  So let's aside put aside case with no

21 settlement.  Okay?  Would you agree that a borrower -- let's

22 assume he gets an injunction but can't post the bond, okay, and

23 they go ahead and they foreclose, okay, and he goes ahead with

24 his damages claim.  If he establishes at trial the facts

25 alleged in his complaint, namely with the notes of forgery,

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1    can't he prevail on his wrongful-foreclosure claim?

2            MS. HANDLEY:  If that was the only claim presented in

3    his complaint --

4            THE COURT:  That's my hypothetical.

5            MS. HANDLEY:  -- I think so, yes.

6            THE COURT:  Okay.

7            MS. HANDLEY:  But that wasn't what happened in this

8    case.  He --

9            THE COURT:  Well, you say that.

10           MS. HANDLEY:  -- pursued other claims.

11           THE COURT:  You say -- if there were a clearer record

12   of what transpired in state court, what the effect of the

13   settlement was, you'd be on stronger ground.

14           Go ahead with your argument.

15           MS. HANDLEY:  Thank you.  I think I've made the points

16   that we made in our objection and the supplemental objection.

17   I think really, though, the main issue is we recognize -- or we

18   assert that this can be determined as a matter of law.  I don't

19   think there are any factual issues that need to be addressed at

20   the Nevada state court level.

21           THE COURT:  Are you willing to concede, for purposes

22   of your argument, that the note was a forgery?

23           MS. HANDLEY:  No.

24           One last point I would like to make in address --

25           THE COURT:  So if you're wrong about preclusion, would

RESIDENTIAL CAPITAL, LLC, ET AL.                    37

1    you agree that there's a disputed issue of fact whether the

2    note was a forgery?

3            MS. HANDLEY:  If I'm wrong about preclusion --

4            THE COURT:  Yes.

5            MS. HANDLEY:  -- and if I'm wrong about the wrongful-

6    foreclosure claim, then --

7            THE COURT:  Well, when you say --

8            MS. HANDLEY:  -- if it goes back to the trial court --

9            THE COURT:  You're basing --

10           MS. HANDLEY:  -- yes.

11           THE COURT:  You're basing your argument about wrongful

12   foreclosure based on preclusion from a settlement.

13           MS. HANDLEY:  In part.

14           THE COURT:  Well, what else?

15           MS. HANDLEY:  The wrongful-foreclosure cause of action

16   is simply not supported by Nevada law.  There's two -- there's

17   really two arguments; one, in Nevada, wrongful foreclosure

18   doesn't arise based on the facts of this case.  A wrongful-

19   foreclosure cause of action is one to be asserted when the

20   borrower's not in default.  That's simply not the case here.

21           THE COURT:  Ah.

22           MS. HANDLEY:  Other causes of action --

23           THE COURT:  For the borrower to be in default, it has

24   to be a valid note, doesn't it?

25           MS. HANDLEY:  Not under --

RESIDENTIAL CAPITAL, LLC, ET AL.                    38

1              THE COURT:  Doesn't it?

2              MS. HANDLEY:  -- the Nevada case law.  That's not --

3              THE COURT:  Really?

4              MS. HANDLEY:  -- a consideration --

5              THE COURT:  Show me a case that says that the borrower

6    is in default if he hasn't made payments on a forged note.

7              MS. HANDLEY:  There is a wrong in that case; it's just

8    not called --

9              THE COURT:  Show me a case --

10             MS. HANDLEY:  -- wrongful fore --

11             THE COURT:  -- that says that a borrower is in default

12   when it hasn't made payments on a note that it alleges is a

13   forgery.

14             MS. HANDLEY:  I am not aware of --

15             THE COURT:  Okay.

16             MS. HANDLEY:  -- any such case.

17             THE COURT:  So what supports your argument?  You keep

18   saying that Nevada law doesn't support it, but you don't have

19   any cases that say that.

20             MS. HANDLEY:  I have a case that --

21             THE COURT:  Collins doesn't say that.

22             MS. HANDLEY:  No, but it outlines the elements for

23   wrongful foreclosure, and every case --

24             THE COURT:  Collins was a case where the borrower was

25   in default, correct?

RESIDENTIAL CAPITAL, LLC, ET AL.                    39

1          MS. HANDLEY:  Corr -- correct.  He alleged he wasn't,
2    but, yes.
3          THE COURT:  Okay.  And here the borrower claims he
4    wasn't in default because the note was void because it was a
5    forgery, correct?  Yes --
6          MS. HANDLEY:  Not --
7          THE COURT:  -- or no?
8          MS. HANDLEY:  -- precisely.  Not exactly.
9          THE COURT:  Not precisely?
10         MS. HANDLEY:  No, he doesn't allege he wasn't in
11   default.  He alleges the note was -- the deed of trust was
12   invalid and GMAC proceeded with foreclosure anyway.
13         THE COURT:  Okay.
14         MS. HANDLEY:  There's not a single allegation, in the
15   complaint or the amended complaint, that says, I was not in
16   default.
17         THE COURT:  If his position is the note was a forgery,
18   how is it that you say he's in default?
19         MS. HANDLEY:  His pos -- if --
20         THE COURT:  Yeah, you tell me.
21         MS. HANDLEY:  -- it was a forgery --
22         THE COURT:  Hypothetically --
23         MS. HANDLEY:  -- then --
24         THE COURT:  -- if a note -- if you know --
25         MS. HANDLEY:  Right.

1          THE COURT:  -- if GMAC knew that the note was a

2     forgery -- didn't here; I'm asking a hypothetical --

3          MS. HANDLEY:  Um-hum.

4          THE COURT:  -- how could a borrower be in default of a

5     note that you know is a forgery?

6          MS. HANDLEY:  A borrower cannot be in default on a

7     note that's a forgery.

8          THE COURT:  All right.  And their contention is the

9     note's a forgery and you're saying Nevada law -- the cases say,

10    if there's a default -- there has to be a default for there to

11    be a wrongful fore --

12         MS. HANDLEY:  Um-hum.  All of the wrongful-foreclosure

13    case law deals with the fact scenario where there was a valid

14    loan, and they're challenging whether there's a default.

15         THE COURT:  So have you looked at --

16         MS. HANDLEY:  In --

17         THE COURT:  -- have you looked at Article 3 of the

18    UCC?  This is -- the note is a negotiable --

19         MS. HANDLEY:  Yes.

20         THE COURT:  -- instrument.

21         MS. HANDLEY:  Yes.

22         THE COURT:  And what does Article 3 of the UCC -- what

23    happens where there's -- and it talks about unauthorized

24    signature but --

25         MS. HANDLEY:  Um-hum.

RESIDENTIAL CAPITAL, LLC, ET AL.                    41

1          THE COURT:  -- defines an authorized signature as

2   including forgery.

3          MS. HANDLEY:  Um-hum.

4          THE COURT:  Have you looked at that?

5          MS. HANDLEY:  Not recently, but it would not be a

6   valid negotiable instrument.

7          THE COURT:  Okay.  Promissory note on a mortgage --

8          MS. HANDLEY:  Correct.

9          THE COURT:  -- in Nevada is a negotiable instrument --

10         MS. HANDLEY:  Correct.

11         THE COURT:  -- correct?  Okay.  So nobody has briefed

12  the issues under the UCC.  There is law on the UCC, about --

13         MS. HANDLEY:  Um-hum.

14         THE COURT:  -- unauthorized instruments, unauthorized

15  signatures --

16         MS. HANDLEY:  Correct.

17         THE COURT:  -- including -- and that's defined as

18  including forgery.

19         MS. HANDLEY:  Right, and in Mr. Sharpe's fraud and

20  quiet-title claims, he pursued those exact allegations.  We're

21  arguing that he's now precluded from --

22         THE COURT:  All right, I have your argument.

23         MS. HANDLEY:  -- seeking wrongful foreclosure just

24  because those other claim -- he could have pursued those other

25  causes of action; he did not.  I agree that there's a wrong

1    alleged; the issue is whether that wrong is properly carved out
2    under a wrongful-foreclosure claim.  We assert that it was not
3    because he resolved it with regard to the other claims where
4    those same allegations and the facts underlying fraud were --
5              THE COURT:  Were there --
6              MS. HANDLEY:  -- settled.
7              THE COURT:  -- other elements of those causes
8    of -- the causes of action that were resolved --
9              MS. HANDLEY:  Yes.
10             THE COURT:  Were there other elements of those causes
11   of action, other than forgery?
12             MS. HANDLEY:  No.  His -- if you look at the
13   allegations in his complaint, with regard to negligence he
14   alleges that the documents used to obtain the loan were a
15   for --
16             THE COURT:  Yes, but the negligence claim in
17   Nevada -- what are the elements of a cause of action for
18   negligence, in Nevada?
19             MS. HANDLEY:  A breach, a duty -- a duty, a breach and
20   damages.  I mean, it's essentially -- it's actually different
21   than the wrongful-foreclosure --
22             THE COURT:  That's right --
23             MS. HANDLEY:  -- claim for --
24             THE COURT:  -- it is.  It is.
25             MS. HANDLEY:  But the --

RESIDENTIAL CAPITAL, LLC, ET AL.                    43

1          THE COURT:  That's the point.

2          MS. HANDLEY:  -- underlying --

3          THE COURT:  No, that's the point.  Each of the causes

4   of action that he alleged and were resolved include elements of

5   those claims other than simply the note's a forgery.  Correct?

6          MS. HANDLEY:  Yes.  With regard to the slander-of-

7   title claim, I don't --

8          THE COURT:  GMAC didn't own -- I've dismissed a bunch

9   of quiet-title claims unless GMAC owned the loan -- owned the

10  mortgage, where it's only a loan servicer.  I've dismissed

11  quiet-title claims.  Under Nevada law, would a quiet-title

12  claim lie against the loan servicer?

13         MS. HANDLEY:  Yes, because the loan service -- at the

14  time, GMAC was the beneficiary of record under the deed of

15  trust, so it was the entity that held the record --

16         THE COURT:  Okay.

17         MS. HANDLEY:  -- beneficial interest under the deed of

18  trust.  So, yes, it would have.

19         THE COURT:  All right.  All right, let me hear from

20  Mr. Lewis.

21         MR. LEWIS:  Well, good morning, Your --

22         THE COURT:  Go ahead.  Why don't you go up to the

23  podium, Mr. Lewis.  You'll have to bend over.

24         MR. LEWIS:  Good morning, Your Honor.  Kenneth Lewis,

25  local counsel to Mr. Sharpe.  I believe Your Honor has already

1   hit most of the issues on the head; I do not, therefore, want

2   to burden the Court's time with getting into rehashing the same

3   arguments that are both in our papers and the very issues that

4   Your Honor has already --

5              THE COURT:  But tell me --

6              MR. LEWIS:  -- raised.

7              THE COURT:  -- tell me why in your view the settlement

8   of the claims that were settled doesn't -- why they don't

9   preclude Mr. Sharpe from proceeding with the wrongful-

10  foreclosure claim.

11             MR. LEWIS:  Two reasons, Your Honor; the first reason:

12  the parties, including GMAC, specifically carved out the

13  wrongful-foreclosure claim in the very -- in the settlement

14  agreement.  GMAC signed the settlement agreement.  If GMAC is

15  now telling us, well, the settlement agreement doesn't really

16  mean what it means, I mean, I think we've got much more serious

17  issues with GMAC than res judicata and collateral estoppel.  I

18  mean, that claim was specifically preserved.

19             With respect to the res judicata and collateral

20  estoppel issues that they then raise arising from agreeing to

21  dismiss those claims for relief, you don't need those other

22  claims.  Each and every allegation that is required in order to

23  allege a valid claim for wrongful foreclosure is still alive in

24  that complaint.  That claim for relief for wrongful foreclosure

25  specifically incorporates each and every allegation that is

RESIDENTIAL CAPITAL, LLC, ET AL.                    45

1    required.

2           The only thing that the parties did, in essence, was

3    agree to narrow the issues for trial.  We were no longer saying

4    we're going to seek a --

5           THE COURT:  You weren't trying to unwind the --

6           MR. LEWIS:  -- a negligence claim.

7           THE COURT:  -- foreclosure anymore.

8           MR. LEWIS:  I'm sorry, Your Honor?

9           THE COURT:  You weren't trying to unwind a

10   foreclosure.

11          MR. LEWIS:  Right.  It's too late.  There's no longer

12   a slander-of-title claim.  GMAC already foreclosed on the

13   property, and the property was already sold.  It's moot.  It's

14   too late to do that.  Likewise, negligence didn't apply.  What

15   did apply is wrongful foreclosure.

16          And to the extent -- to say that some claims were then

17   resolved under res judicata and collateral estoppel, just makes

18   no sense.  Every res-judicata and collateral-estoppel case

19   stands for the proposition -- this is first-year civil

20   procedure; it's based on a subsequent action.  The parties were

21   merely narrowing the issues for trial.  And if they're talking

22   about judicial -- the promotion of judicial economy, taking

23   their argument to their reasonable conclusion, no party would

24   ever agree to waive any claims for a trial and they would go

25   forward with ten or twenty claims that would require each and

1    every party to prosecute and defend, and would require every

2    judge to have to decide each and every issue in each and every

3    claim in a complaint, if the parties didn't properly narrow

4    claims for trial.  That's all that happened here.

5              So as I said, it's a real problem that GMAC is now

6    telling us that that's -- that they're trying to now sneak in

7    res judicata and collateral estoppel when they specifically

8    agreed to the --

9              THE COURT:  So what's your view about --

10             MR. LEWIS:  -- to the preservation of that claim.

11             THE COURT:  -- the Nevada Supreme Court ruling in

12   Collins?  What's the impact of Collins --

13             MR. LEWIS:  Impact of Collins.

14             THE COURT:  -- in this case?

15             MR. LEWIS:  Collins, they looked at -- it's

16   interesting because the trusts -- they like to say one or two

17   sentences from all of these decisions and say that that's what

18   they stand for.  What's interesting is every decision I cited,

19   but one, were the very decisions that the trusts cited in their

20   initial set of papers.  All I did was talk about what those

21   cases really stood for.

22             THE COURT:  So tell me what you think Collins really

23   stands for.

24             MR. LEWIS:  What Collins says is you have to look at

25   the underlying obligation itself, to see if there is a concern

1    or a -- to see if there's an underlying defect with respect to

2    the note.  It's not whether or not there's a default.  Of

3    course if there's a default or not default -- that's sort of

4    just the one sentence they say.  But in Collins, to the extent

5    that the loan was usurious, of course there was no obligation

6    to pay on a usurious note.  Likewise, in the California case

7    which we cited, where tender was accused -- and they go on to

8    say, well, tender doesn't apply because it's California law.

9    In their first set --

10            THE COURT:  No --

11            MR. LEWIS:  -- of papers, they tell us that California

12   law applies to Nevada; and in fact, Mr. Winterton can confirm

13   that.  In Nevada they follow both Nevada law and --

14            THE COURT:  Except the tender rule.

15            MR. LEWIS:  -- California law.  Well, because it

16   doesn't go to their advantage.  But tender -- I mean, it's just

17   a word.  I mean, whether it's performance or tender, I mean,

18   there's no obligation to pay on a note if the note doesn't

19   exist or if the note is defective or if there is an underlying

20   issue otherwise, as Your Honor pointed out in the first five

21   minutes of argument.  It's obvious.  I mean, obviously it is --

22            THE COURT:  What are Mr. Sharpe's narratives?

23            MR. LEWIS:  Well, in the state court there is

24   a -- other parties did default and the court did have --

25            THE COURT:  Well, he only gets to recover when

1  recovery -- so --

2          MR. LEWIS:  Right.  There's --

3          THE COURT:  -- what has he received so far?

4          MR. LEWIS:  There's -- so far he settled with

5  Fidelity, and I believe that settlement was 60,000 dollars; the

6  parties --

7          THE COURT:  What --

8          MR. LEWIS:  -- can correct me.

9          THE COURT:  What do you believe his

10  damages -- remaining damages --

11          MR. LEWIS:  Well, in the prove-up damage trial that

12  they had with respect to the defaulting parties, I believe the

13  claim was approximately 1.2 million.

14          THE COURT:  Forget that.  You try to argue that

15  somehow I'm bound by what happened as to other parties on

16  default; that's not -- no preclusive effect here whatsoever.

17  You don't really believe that I'm precluded --

18          MR. LEWIS:  No.

19          THE COURT:  -- that they're precluded by the damages

20  award, based on a default judgment against other parties, do

21  you?

22          MR. LEWIS:  My understanding is, at this juncture,

23  Your Honor, in essence it's not a factual determination as to

24  what the -- one, whether or not there is a fraud, a fraudulent

25  note and, two, if there was --

1           THE COURT:  Has he ever --

2           MR. LEWIS:  -- what the damages are.

3           THE COURT:  -- found Tracy?

4           MR. LEWIS:  I'm sorry?

5           THE COURT:  Has he ever found Tracy?

6           MR. LEWIS:  I don't know, Your Honor.  I don't know.

7    But to get to your point, though, with respect to damages, that

8    would be a factual determination.  I can certainly -- the

9    parties --

10          THE COURT:  What do you contend his damages are?

11   They're not a million dollars, Mr. Lewis.

12          MR. LEWIS:  It would be -- it would be the value of

13   the home at the time of the foreclosure.

14          THE COURT:  And what do you believe the value -- and

15   Nevada counsel is on the phone.  What do you believe -- what is

16   your good-faith belief as to what Mr. Sharpe's damages are in

17   the event he prevails in establishing wrongful foreclosure?

18          MR. LEWIS:  And I can step -- because I worked with

19   counsel --

20          THE COURT:  Okay.

21          MR. LEWIS:  -- on this --

22          THE COURT:  So what's the answer --

23          MR. LEWIS:  -- when we attempted to resolve it.

24          THE COURT:  -- to that question?

25          MR. LEWIS:  I believe that we obtained an appraisal

1    for the property as of the time of the foreclosure.

2              THE COURT:  Yes.

3              MR. LEWIS:  And we had retained that appraiser with

4    the consent of the trust; this way we wouldn't have --

5              THE COURT:  Sure.

6              MR. LEWIS:  -- fighting --

7              THE COURT:  Okay.

8              MR. LEWIS:  -- fights over --

9              THE COURT:  And what's the appraiser's --

10             MR. LEWIS:  And I believe -- I don't have it in front

11   of me; Mr. Winterton may.  I believe it was five-and-change,

12   five -- I have to get --

13             THE COURT:  Mr. Winterton, are you able to tell me

14   what the appraisal showed for the value of the property?

15             MS. HANDLEY:  I believe it was 580,000 dollars, Your

16   Honor.

17             THE COURT:  And, Ms. Handley, did the parties agree on

18   identifying the appraiser so you wouldn't get into a fight

19   about --

20             MS. HANDLEY:  Initially --

21             THE COURT:  -- competing --

22             MS. HANDLEY:  Yeah --

23             THE COURT:  -- battle of experts on appraisal?

24             MS. HANDLEY:  We do not dispute their appraiser.  We

25   initially agreed to find a mutually acceptable appraiser.

RESIDENTIAL CAPITAL, LLC, ET AL.                           51

1   Mr. Winterton obtained an appraisal and notified me after the

2   fact.  I did not thereafter object to his appraiser.  So we

3   didn't agree beforehand but we don't object to the appraisal.

4             THE COURT:  Okay, so the appraisal, you think, was

5   580,000?

6             MS. HANDLEY:  Correct.

7             THE COURT:  Okay.

8             MR. LEWIS:  And then subtracting from that what the

9   amount of the first mortgage was -- or should have been at the

10  time of the foreclosure -- and again, because I

11  don't -- actually, it may be in my initial set of papers; if I

12  can have a moment, I can --

13            THE COURT:  Sure.

14            MR. LEWIS:  -- get those.

15            THE COURT:  Go ahead.

16      (Pause)

17            MR. LEWIS:  I would also ask, if Mr. Winterton is on

18  the phone, if he can --

19            THE COURT:  Sure.  That's fine.  Either one of you.

20            MR. LEWIS:  -- check his file.

21            THE COURT:  Yeah.

22            MR. LEWIS:  I may not have it in the papers.

23            THE COURT:  So the original loan was 191,000; that's

24  what got refinanced?

25            MR. LEWIS:  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    52

1        THE COURT:  Is that -- am I -- Mr. Winterton, is that

2   right?  HomeTown Lending --

3        MR. WINTERTON:  Yeah, that's correct.

4        MR. LEWIS:  Yeah.

5        THE COURT:  -- 191,000.

6        MR. WINTERTON:  I thought it had been reduced to about

7   159- at the time of the sale.

8        THE COURT:  When you say "reduced to 159-", you're

9   saying that, had it not been refinanced, the first loan had

10  been reduced to 159,000?

11       MR. WINTERTON:  That's my recollection.  I can check

12  my note.

13     (Pause)

14       THE COURT:  Mr. Winterton, did they ever find Tracy?

15       MR. WINTERTON:  Yes, we have.

16       THE COURT:  Have you ever collected any money from

17  her?

18       MR. WINTERTON:  No, we have not.

19       THE COURT:  Did you collect any of the default

20  judgment from -- any portion of the default judgment from any

21  other parties?

22       MR. WINTERTON:  Just from the settlement with

23  GMA -- or, I mean, settlement with Fidelity.  The other

24  parties -- the mortgage company went belly-up.  There is a

25  criminal investigation with those parties and, last we traced

1   them, they had gone to Mexico and we have not been able to find

2   them there.

3             THE COURT:  Yeah.  Okay.

4             MS. HANDLEY:  Your Honor, if I might speak with regard

5   to the damages that you're inquiring about?

6             THE COURT:  Sure, go ahead, Ms. Handley.

7             MS. HANDLEY:  I believe --

8             THE COURT:  I'm not deciding anything.  I'm just

9   trying to get a sense --

10            MS. HANDLEY:  Right.

11            THE COURT:  -- for what this -- what's really going on

12  here.

13            MS. HANDLEY:  Understood.  I think Mr. Winterton is

14  correct that at the time of the refinance, the original loan

15  was about 159, 160.

16            But in addition from the proceeds of the loan at

17  issue, Mr. Sharpe's credit cards were paid.  They were Mr.

18  Sharpe's, in his name only -- the credit cards.  A large

19  portion of the loan proceeds -- 202,000 dollars -- was

20  deposited in a joint checking account held by Mr. Sharpe and

21  Tracy Sharpe, who was his girlfriend at the time.

22            THE COURT:  Yes.

23            MS. HANDLEY:  There were also some other taxes that

24  were paid, so any calculation of damages should be reduced by

25  amounts that Mr. Sharpe --

RESIDENTIAL CAPITAL, LLC, ET AL.                    54

1          THE COURT:  I just --

2          MS. HANDLEY:  -- benefitted from.

3          THE COURT:  You know, in very, very limited -- looking

4     at the White and Summers Treatise on the UCC, in the section

5     dealing with unauthorized signatures which, as I say, the UCC

6     defines as including forgery, these cases sometimes involve so-

7     called ratification and accepting the benefits of the forgery.

8          So it got refinanced.  It says it was a forgery.  Let

9     me assume that that's true.  It resulted in excess proceeds

10    from the refinancing, and the issue is where'd the money go?

11    And you're telling me, Ms. Handley, that Mr. Sharpe benefitted

12    to some amount from it because it was used to pay his debts or

13    some portion of his debts.

14         My quick glance, which is far from any -- I'm not

15    suggesting what I'm saying is authoritative -- in some cases,

16    it's tough luck.  It may have been an authorized forgery, but

17    if you, for some period of time, accept the benefits from it,

18    well, you can't later disavow it.

19         How and when Mr. Sharpe learned that there was a

20    forgery and that money that was received was gone, what did he

21    think when his -- the money was coming from when his bills were

22    paid, whether it's taxes or credit cards?

23         I'm just envisioning a fairly messy -- if -- and I'm

24    not ruling yet, but if the Court were to conclude that he has a

25    wrongful foreclosure claim that he can assert, it could well be

RESIDENTIAL CAPITAL, LLC, ET AL.                    55

1    that the crucial factual issues, was it a forgery, I think he'd

2    have the burden of establishing that it's a forgery.

3            Yes, I understand -- Mr. Lewis, you say, you know, the

4    photo ID that the mortgagee had showed a Hispanic and Mr.

5    Sharpe is a black man, and you know -- I mean, you'd recount

6    some of those facts.  You know, you could wind up with an

7    expensive litigation about just this issue of -- I'm using the

8    term loosely -- ratification, because there's a whole bunch of

9    stuff that follows from that.

10           MR. LEWIS:  Your Honor, I --

11           THE COURT:  Let me just -- this last thought out.  All

12   of that for an unsecured claim that's going to be paid in very,

13   very diluted dollars.  You all better think about is this the

14   road you want to head down.  But you'll decide.

15           Go ahead, Mr. Lewis.

16           MR. LEWIS:  Your Honor, and that was my point in the

17   context of the discussions that I did have with Mr.

18   Wishnew -- and again, I'm not running the foul of 408 at all.

19           THE COURT:  No.

20           MR. LEWIS:  I mean, we --

21           THE COURT:  I don't want to know what you --

22           MR. LEWIS:  We were discussing the very issue about,

23   you know, what of those proceeds benefitted him and didn't

24   benefit him.  And, you know, our position, of course, is he

25   didn't even know the proceeds went in there.  But of course, if

1    something paid his debt, we were deducting that.  But I mean,

2    that's really where we were.  But unfortunately, we were unable

3    to resolve this issue.  But we do understand the Court's issue,

4    which is the very issue that we were trying to resolve.  And so

5    we didn't have three sets of papers and someone flying from

6    California to address an unsecured claim because we are --

7                THE COURT:  Did you fly from California or Nevada?

8                MS. HANDLEY:  Well, I practice in Nevada.  I live in

9    California.

10               THE COURT:  Oh, okay.

11               MR. LEWIS:  So we are very aware of those issues and,

12   in fact, tried to resolve it along the lines that Your Honor is

13   suggesting.  Unfortunately, we weren't anywhere near there with

14   respect to what Your Honor is suggesting.

15               THE COURT:  It's about the nicest weather we've had in

16   New York in quite some time, so enjoy yourself --

17               MS. HANDLEY:  I was actually very surprised.

18               THE COURT:  -- while you're here.

19               MS. HANDLEY:  Yes.  Very pleasant.

20               MR. WISHNEW:  Ms. Handley brought it with her.

21               THE COURT:  I'm sorry?

22               MR. WISHNEW:  Ms. Handley brought it with her.

23               THE COURT:  Good.

24               MS. HANDLEY:  If I might mention, too, Your Honor,

25   you're exactly correct about the underlying claim and whether

RESIDENTIAL CAPITAL, LLC, ET AL.                    57

1    there was a ratification.  Those are the defenses that were

2    assertive the Nevada state court action.  We obviously didn't

3    bring that up here in these papers because we're --

4            THE COURT:  It's not relevant for the --

5            MS. HANDLEY:  It's not relevant, exactly.

6            THE COURT:  This is --

7            MS. HANDLEY:  That's the --

8            THE COURT:  The standard here is really, you know,

9    failure to state a claim.  This is -- that's what we're really

10   dealing with on a claim objection.  This is, as a matter of

11   law, does this claim fail to state a claim for relief.

12           All right, I'm going to it under submission.  Thank

13   you.

14           MS. HANDLEY:  Thank you, Your Honor.

15           THE COURT:  Is there anything -- Mr. Lewis, there

16   wasn't anything you wanted to add that might --

17           MR. LEWIS:  No, I think we've covered everything.

18   Thank you.

19           THE COURT:  Ms. Handley, is there anything you wanted

20   to add?

21           MS. HANDLEY:  No, Your Honor.  Thank you very much.

22           MR. LEWIS:  Thank you very much, Your Honor.

23           THE COURT:  Okay.  Thank you.  Okay.

24           MS. HANDLEY:  Your Honor, may I be excused?

25           THE COURT:  You certainly can.  Enjoy New York before

RESIDENTIAL CAPITAL, LLC, ET AL.                    58

1   you go home.

2            MS. HANDLEY:  Thank you.

3            THE COURT:  Where in California do you live?

4            MS. HANDLEY:  San Diego.

5            THE COURT:  That's a long way from Nevada.

6            MS. HANDLEY:  Yes.  Yes, it is.

7            THE COURT:  Okay.

8            MR. LEWIS:  May I also be excused, Your Honor?

9            THE COURT:  You can.

10           MR. LEWIS:  Thank you, Your Honor.

11           THE COURT:  Thanks, Mr. Lewis.

12           MR. WISHNEW:  Your Honor, Jordan Wishnew, Morrison

13  Foerster, for the Rescap Borrower Claims Trust.  The next

14  matter on today's agenda is item 3 on page 10, the Rescap

15  Borrower Claims Trust Eighty-Second Omnibus Objection to Claims

16  solely as it relates to the claim filed by Kenneth Dlin.

17           I'm not sure if anyone on Mr. Dlin's behalf is on the

18  phone.

19           THE COURT:  Mr. Dlin, are you or anybody on your

20  behalf on the phone?

21           MR. WILSON:  Good morning, Your Honor.  Brian Wilson

22  on behalf of Mr. Kenneth Dlin as creditor's representative.

23           THE COURT:  Are you a lawyer, Mr. Wilson?

24           MR. WILSON:  Yes, I am, Your Honor.

25           THE COURT:  And -- okay, where is your office?

RESIDENTIAL CAPITAL, LLC, ET AL.                    59

1              MR. WILSON:  In Bailey, Colorado.

2              THE COURT:  Okay, all right.  You're a member of the

3       Colorado Bar?

4              MR. WILSON:  I am.

5              THE COURT:  Okay.  Thank you, Mr. Wilson.

6              Mr. Wishnew?

7              MR. WISHNEW:  Thank you, Your Honor.  Your Honor,

8       through the eighty-second omnibus claims objection, the

9       Borrower's Trust seeks to expunge Mr. Dlin's proof of claim

10      because it does not represent a valid pre-petition claim

11      against GMAC Mortgage.  So it's the Borrower's Trust position

12      that Mr. Dlin has not proven, by a preponderance of the

13      evidence, any specific wrongdoing by the debtors.

14             In support of the objection and the reply, the

15      Borrower Trust submitted a supplemental declaration by Kathy

16      Priore, associate counsel to the Rescap Liquidating Trust.

17             Ms. Priore is on the phone today and available to

18      answer any questions the Court might have for her.

19             GMAC Mortgage's purported liability appears to stem

20      from Mr. Dlin's belief that GMAC told him he could not be

21      considered for a loan modification when he was current on his

22      loan and that the modification was offered to him increased his

23      monthly payments.

24             THE COURT:  Let me sort of cut to the chase.

25             MR. WISHNEW:  Of course, Your Honor.

1           THE COURT:  Okay.  Where are the investor guidelines?

2           MR. WISHNEW:  Where are the investor guidelines?

3           THE COURT:  Yes.  You have -- there -- we've looked

4    and we don't seem to have those.

5           MR. WISHNEW:  That's -- Your Honor, the investor

6    guidelines are what, at this point, is represented in Ms.

7    Priore's declaration --

8           THE COURT:  That's hearsay.

9           MR. WISHNEW:  -- embodied in the servicing notes.

10          THE COURT:  That's hearsay.  Okay, your arguments all

11   seem to -- you've focused on what is permitted or required by

12   the investor guidelines.

13          MR. WISHNEW:  Correct, Your Honor.

14          THE COURT:  I'm right in that?

15          MR. WISHNEW:  Yes, Your Honor.

16          THE COURT:  Okay.  But I don't have the investor

17   guidelines.  I have hearsay declaration about what the investor

18   guidelines provided.  So --

19          MR. WISHNEW:  Well, to --

20          THE COURT:  -- according -- you know --

21          MR. WISHNEW:  What you have, Your Honor, in the

22   servicing notes is a contemporaneous recording of --

23          THE COURT:  Who was the investor?

24          MR. WISHNEW:  The investor on this loan -- one minute,

25   Your Honor.  The investor on the loan, Your Honor, is

1    GreenPoint Mortgage Funding, Inc.

2            THE COURT:  Did they remain -- they were the -- they

3    didn't hold the note?

4            MR. WISHNEW:  I'm sorry.  I'm sorry.  It eventually

5    got --

6            THE COURT:  That was the originator?

7            MR. WISHNEW:  That was the original (sic), I

8    apologize.  They were the originator.  It eventually got placed

9    into a securitization.  HSBC Bank was the trustee.

10           THE COURT:  Okay.  So, you what?  You argue that Mr.

11   Dlin essentially raises three causes of action premised on two

12   alleged misrepresentations by Jeannette (ph.)?

13           MR. WISHNEW:  That's correct, Your Honor.

14           THE COURT:  One, that Dlin needed to be in default in

15   order to qualify for a loan modification and that somebody from

16   GMAC instructed him to do so?  That's one allegation?

17           MR. WISHNEW:  Yes, Your Honor.

18           THE COURT:  And second allegation that if he defaulted

19   the loan modification you offered, and you dispute both of

20   those assertions of fact?

21           MR. WISHNEW:  That's correct, Your Honor.

22           THE COURT:  Okay.

23           MR. WISHNEW:  And in support of our argument, we cite

24   to servicing notes which represent contemporaneous record of

25   conversations between the loan servicing representative for

1    GMAC Mortgage and Mr. Dlin --

2            THE COURT:  But do you believe -- are the loan

3    servicing notes competent and relevant material evidence that

4    could be admitted at a hearing in this Court to estab -- you're

5    relying on the investor guidelines.  And what you set forth are

6    representations in Ms. Priore's declaration about what the

7    investor guidelines were.

8            MR. WISHNEW:  Um-hum.

9            THE COURT:  That's hearsay.  Isn't it?  Yes or no?

10           MR. WISHNEW:  I -- well, to the extent that Ms. Priore

11   can testify, based upon her knowledge and the knowledge she

12   acquired as part of her job, and her familiarity with the loan

13   file, I don't know that it would be hearsay, Your Honor.

14           THE COURT:  Who's the investor?  Whose guidelines

15   would be up -- HSBC?  They were the trustee?

16           MR. WISHNEW:  Yes, Your Honor.

17           THE COURT:  Okay.  Do you think HSBC has a written

18   document applicable for the period at issue that sets forth

19   what their investor guidelines are?  Otherwise, it's just left

20   to -- is it just left to the loan servicer to say whatever it

21   feels like saying about well the investor guidelines here are

22   no modifications unless sixty days in default?

23           MR. WISHNEW:  No.  I mean, obviously the servicer is

24   acting for the benefit of and at the direction of the loan

25   investor, and can only take action authorized by the loan

RESIDENTIAL CAPITAL, LLC, ET AL.                    63

1    investor.

2              THE COURT:  Is there something in the servicing notes

3    that's specific -- not what somebody told Dlin, but sets forth

4    the HSBC investor guidelines for this loan or loans of this

5    type or category, or included within trusts as to which HSBC is

6    the servicer?

7              MR. WISHNEW:  I don't believe there would be a

8    specific iteration of, or essentially a copy and paste, of the

9    investor guidelines into the servicing notes.  Rather, the

10   servicing notes represent a contemporaneous record of

11   conversations between the loan service representative and the

12   borrower on inquiries related to an activity concerning the

13   underlying loan.

14             THE COURT:  But doesn't your position depend upon the

15   truth?  Let's assume that the trust's representations of what

16   was told to Mr. Dlin -- that the Court would define those to be

17   that's what was said.

18             MR. WISHNEW:  Right.

19             THE COURT:  Doesn't the outcome on this objection

20   hinge on whether that was an accurate -- that the GMAC

21   representative accurately stated what the investor guidelines

22   were?  I mean, your -- the trust's position is that a debtor

23   representative told Dlin that investor guidelines don't permit

24   a modification unless Lynn (sic) is in default.  There's one

25   place where it suggests it has to be 60 days in default.  Let's

RESIDENTIAL CAPITAL, LLC, ET AL.                    64

1  assume that.

2            MR. WISHNEW:  Correct, Your Honor.  Yes, the

3  representation was that if a borrower is current on his or her

4  mortgage, then a loan modification option is not available to

5  them.  Only if they are in default is -- can they first be

6  considered for the possibility of a loan modification.

7            THE COURT:  Okay.  And how do I know that that is an

8  accurate statement?  Why would that be admissible evidence?

9  Doesn't the outcome on this claim depend, in the first

10 instance, on that being an accurate statement of the investor

11 guidelines?

12           MR. WISHNEW:  Yes, Your Honor.

13           THE COURT:  Dlin also said that the GMAC

14 representative told him that a loan modification -- if he

15 defaulted, a loan modification would be offered to him.  The

16 trust disputes, based on what's in the servicing notes, that

17 that's what was said, correct?

18           MR. WISHNEW:  True, Your Honor.  Yes.

19           THE COURT:  Isn't that a factual dispute?

20           MR. WISHNEW:  I guess to your point, Your Honor, I

21 mean, simply saying that's not the case, I don't know that that

22 necessarily meets Mr. --

23           THE COURT:  And Mr. Dlin makes very express

24 representations about what was told to him by a GMAC

25 representative.  It may be accurate.  It may not.  He said if

1    I'm in default, they'll approve a loan modification.  The

2    trust's position is that's not what was said to him.  Isn't

3    that a factual dispute?

4              MR. WISHNEW:  To the extent the Court accepts

5    the -- find the requisite specificity to sustain a factual

6    issue, yes, Your Honor.

7              THE COURT:  Is there anything lacking in the

8    specificity of what Mr. Dlin says he was told by GMAC?

9              MR. WISHNEW:  I guess the way the trust sees it, Your

10   Honor, is he simply says that's not the case.  And I think

11   making the arg --

12             THE COURT:  No, he -- that's not.  He doesn't just say

13   that's not the case.  He's quite explicit about -- in his

14   reply, certainly -- or this is your reply, but he -- isn't Dlin

15   specific about what was said to him by a GMAC representative?

16             MR. WISHNEW:  Yes, Your Honor.

17             THE COURT:  Okay.  He says this and you dispute it.

18   Your evidence in support is the servicing notes.

19             MR. WISHNEW:  Yes, Your Honor.

20             THE COURT:  To the extent -- you know, the servicing

21   notes have come into evidence in other proceedings and

22   contemporaneous -- assuming you've established that they're

23   business records, they're contemporaneous notes, et cetera.

24             MR. WISHNEW:  Yes.

25             THE COURT:  In other proceedings before the Court,

RESIDENTIAL CAPITAL, LLC, ET AL.                    66

1    servicing notes have been admitted.

2              MR. WISHNEW:  Yep.

3              THE COURT:  Let me move to a different sheet.  Just

4    searching through my notes.

5                        (Pause)

6              THE COURT:  So Mr. Dlin's claim essentially proceeds

7    on three theories:  the coerced default theory.  You told him

8    he had to default.  The short-sale theory and then the standing

9    theory.
               So with respect to the short-sale theory --

10             MR. WISHNEW:   Yes, Your Honor?

11             THE COURT:  -- tell me why you believe the objection

12   to the claim on the short sale theory should be sustained.

13             MR. WISHNEW:  With regards to the short sale theory,

14   the evidence that's put forth by the borrower trust suggests

15   that Mr. Dlin's representative was told there were two

16   conditions to having the short sale approved, which is that it

17   had to yield eighty five percent of the market -- on a net

18   basis, yield eighty five percent of the market value to the

19   investor.  And secondly, it required the approval of a second

20   lien holder.

21             THE COURT:  And that was Bank of America?

22             MR. WISHNEW:  Correct, Your Honor.

23             It's the second prong that was never satisfied here.

24   And we put in -- we submit correspondence with Ms. Lloyd, Mr.

25   Dlin's representative, in which we advise her that she needs to

1  let us know before, I think it's June 28th, whether the second
2  lien lender has signed off on the short sale and that the
3  foreclosure was going forward -- it was not going to be
4  adjourned -- and we needed to know whether the approval was
5  received.
6          Our records reflect it was never -- we were never
7  advised, prior to the scheduled foreclosure sale, that the BofA
8  signed off on the short sale offer.  So that's why we believe
9  it was appropriate -- the short sale was appropriate and was
10 not improper in --
11         THE COURT:  Okay.
12         The third theory, the standing theory --
13         MR. WISHNEW:  Yes, Your Honor.
14         THE COURT:  -- if I understand your argument
15 correctly, it's basically that the Colorado State District
16 Court, in authorizing the sale, found that GMAC had standing to
17 foreclose, and that precludes Mr. Dlin from challenging the
18 sale by alleging that GMACM lacks standing.
19         MR. WISHNEW:  That's correct, Your Honor.
20         THE COURT:  So Colorado Rule of Civil Procedure,
21 Section 120(d) -- D as in David -- reads, "Neither the granting
22 nor the denial of the motion under this rule shall constitute
23 an appealable order or judgment.  The granting of any such
24 motion shall be without prejudice to the right of any person
25 aggrieved to seek injunctive or other relief in any court of

1  competent jurisdiction, and the denial of any such motion shall

2  be without prejudice to any right or remedy of the moving

3  party."

4        Doesn't Rule 120(d) establish the lack of merit in

5  your argument that -- it seems to -- it's not a -- it's clearly

6  not a final order; it's not appealable, and the rule expressly

7  states that it's "without prejudice to the right of any person

8  aggrieved to seek injunctive or other relief."  Well, now he's

9  seeking damages relief.  So what's the basis for your argument

10 that he's precluded from challenging GMAC's standing?

11       MR. WISHNEW:  Well, I think, Your Honor, it's the fact

12 of -- from a preclusion standpoint, I understand your

13 points -- Your Honor's points.

14       THE COURT:  You agree with my point?

15       MR. WISHNEW:  Well, based upon the plain reading of

16 120(d) -- well, it --

17       THE COURT:  This doesn't go to the issue of whether

18 GMAC actually had standing or didn't.  The issue is, is Dlin

19 precluded now from challenging GMAC's standing to foreclose?

20       MR. WISHNEW:  I think, Your Honor, that the statute

21 certainly gives him the right to seek it.  But at the same

22 time, it doesn't preclude us from making the argument that it's

23 a matter that's already been --

24       THE COURT:  Oh, really?  Come on.

25       MR. WISHNEW:  If nothing else, Your Honor, I believe

1    that it's certainly persuasive for this Court to consider, in

2    evaluating the same argument, and simply seeing this as a

3    reiteration of what's already been reviewed by another court.

4            THE COURT:  So what -- tell me -- what's the language

5    in the order that -- because there's no decision; there's no

6    order that was entered.  You have the language of the order in

7    which the Colorado District Court permitted the foreclosure to

8    go forward?  Isn't it to the effect -- I don't have it in front

9    of me but -- GMAC represented that it had standing?  I didn't

10   see any language where it expressly -- whether it would be

11   preclusive or not, there's nothing in the order that suggests

12   that the Court found, as a fact, that GMAC had standing.

13   Rather, he recites that GMAC represented certain facts.

14           You have the order?

15           MR. WISHNEW:  One of my many arms is looking through

16   the exhibits.

17       (Pause)

18           MR. WISHNEW:  So Your Honor, if you look at Exhibit

19   R --

20           THE COURT:  Okay, let me turn to it.  Hang on.

21           MR. WISHNEW:  This is at docket number 8485-19.

22           THE COURT:  Yes, I have it.

23           MR. WISHNEW:  Okay.

24           The second to last paragraph -- or third to last

25   paragraph starts, "The Court finds".  "The Court finds that

RESIDENTIAL CAPITAL, LLC, ET AL.                          70

1   there is a reasonable probability that a default exists, as

2   alleged in the motion, in order to invoke the power of sale in

3   said deed of trust; that the provisions of CRCP, Rule 120 and

4   the Service Members Civil Relief Act, as amended, have been

5   complied with; that the venue in this action is proper.  The

6   order authorizing this sale should be granted."

7            And then, it goes on to authorize the sale of the

8   property by the public trustee.

9            THE COURT:  A reasonable probability is not the

10  finding of a fact, is it?

11           MR. WISHNEW:  Well, I think, "The Court" -- I mean,

12  the paragraph specifically starts, "The Court finds".  So --

13           THE COURT:  That there's a reasonable probability,

14  not --

15           MR. WISHNEW:  Well, it could mean -- the fact of the

16  matter is that it's --

17           THE COURT:  And that's all he had to find under

18  Colorado law so the foreclosure could go forward.

19           All right, I have your point.

20           MR. WISHNEW:  Okay.

21           THE COURT:  Let me hear from Mr. Wilson.

22           MR. WILSON:  Good morning, Your Honor.  Brian Wilson,

23  in Bailey, Colorado, on behalf of Kenneth Dlin.

24           THE COURT:  Go ahead.

25           MR. WILSON:  Your Honor, the concern that we have is

RESIDENTIAL CAPITAL, LLC, ET AL.                     71

 1   that we never really did see any guidelines even though we'd

 2   asked for it previously when the District Court case here in

 3   Colorado was still in full force and effect.  We did get

 4   through to partial discovery and, in fact, even had a trial set

 5   in front of a jury before this was removed to your court, Your

 6   Honor.  We never saw any such guidelines.  We were basically

 7   told that they didn't exist or that they couldn't get them.

 8          So that was first concern that we have about coerced

 9   default was that we were never able to see those guidelines.

10   If that's something that could be produced, it would certainly

11   be interesting to us.

12          Secondly, Your Honor, as far as the short sale theory,

13   we do believe that there is a factual dispute on whether or not

14   Mr. Dlin was told by agents of GMAC, at that point in time,

15   that he would be given some kind of a short sale deal and

16   whether or not the parties that were involved informed the GMAC

17   representatives that, in fact, they were actively seeking a

18   Bank of America waiver, or at least some kind of a payout.

19   There's no doubt that that exists, and that's something that we

20   do dispute as far as the factual record.

21          THE COURT:  Let me ask this, Mr. Wilson.

22          MR. WILSON:  Yes, Your Honor.

23          THE COURT:  Did Bank --

24          MR. WISHNEW:  And then lastly, Your Honor --

25          THE COURT:  No, stop.

RESIDENTIAL CAPITAL, LLC, ET AL.                    72

1           MR. WILSON:  -- as far --

2           THE COURT:  Let me ask my question.

3           MR. WILSON:  Oh, yes, please, go ahead.

4           THE COURT:  Did Bank of America give its consent to a

5    short sale?

6           MR. WILSON:  The interesting thing is, they did, but

7    it was belated.

8           THE COURT:  When did Bank of America consent to a

9    short sale?

10          MR. WILSON:  One week later, Your Honor.

11          THE COURT:  One week after the foreclosure?

12          MR. WILSON:  Yes.

13          THE COURT:  Let's -- let me make a note.

14          MR. WILSON:  That is my understanding.  And Your

15   Honor, again, we're dealing with large banks making decisions,

16   and so it's difficult that it would take much longer for Bank

17   of America to come back and to make some kind of a

18   determination.  That's exactly what transpired here.  And just

19   a note of correction, Your Honor, it was actually July 28th,

20   not June 28th, when that occurred, where Mr. Dlin was seeking

21   to have Bank of America accept a payout on a short sale offer.

22          MR. WISHNEW:  My apologies.

23          THE COURT:  Okay.

24          Had you taken any discovery from BofA?

25          MR. WILSON:  Your Honor, at this point, we've only

RESIDENTIAL CAPITAL, LLC, ET AL.                    73

1  been able to get limited discovery from any of the parties.
2  Part of the reason is that when we were in negotiations -- as I
3  mentioned in our response to the objection, we were in
4  negotiations, at that point in time, with then GMAC, and we
5  believed that we had a settlement that was in the offing.
6          THE COURT:  I don't know -- I don't want to know what
7  the terms of the proposed the settlement were.
8          MR. WILSON:  Understood, Your Honor.  And not to give
9  you the terms, but rather just to put you on notice that that
10 was going forward, we believed that there was no need for any
11 further discovery at that point.  So there was no talk of
12 further discovery.
13         THE COURT:  Mr. Wilson, I'm not asking why you didn't
14 get discovery.  I'm asking, did you get discovery from BofA
15 about its consent to a short sale?
16         MR. WILSON:  No.
17         THE COURT:  Okay.
18         What discovery did -- was taken in the Colorado court?
19         MR. WILSON:  Your Honor, we propounded a series of
20 interrogatories, requests for production of documents that
21 local counsel here provided to us.  This would be approximately
22 three years ago.  And none of the information that is included
23 in the answer from ResCap was included in any of that
24 discovery.
25         THE COURT:  Explain to me why you believe that GMAC

1   didn't have standing to foreclose.

2          MR. WILSON:  Your Honor, the argument that we made to

3   the District Court -- and I believe that it is Exhibit B, as in

4   Boy, that was entered by ResCap, goes through the complaint

5   that was filed against GMAC.  And Your Honor, I would just draw

6   the Court's attention to that document.  It's twenty-five

7   pages.

8          THE COURT:  Okay.  I've got it open.

9          MR. WILSON:  Okay.  Your Honor, akin to the --

10          THE COURT:  But summarize for me why you believe that

11   GMAC didn't have standing.

12          MR. WILSON:  Your Honor, we believe that -- hold on,

13   if I can refer to my notes here for a second, Your Honor.

14          THE COURT:  Sure, go ahead.

15      (Pause)

16          MR. WILSON:  Your Honor, we believe that the issue

17   stems from the fraudulent conduct on the part of GMAC

18   in -- that's stated in the first claim for relief, the breach

19   of express contract.

20          THE COURT:  Tell me -- that isn't answering my

21   question.

22          MR. WILSON:  Okay.

23          THE COURT:  Tell me, in understandable words, why you

24   believe GMAC did not have standing to foreclose.

25          MR. WILSON:  In the most simple words, it's that GMAC

1   promoted the situation that created the foreclosure in the

2   first place, because Mr. Dlin was current on all of his

3   payments and sought to have some kind of a modification to the

4   loan to reduce his payments and followed the direction of GMAC

5   to the letter, exactly what GMAC said they should do.  And

6   then, GMAC increased those payments, creating a situation that

7   was not tenable for Mr. Dlin.

8          THE COURT:  Look, I've had, in other claim objections,

9   in other adversary proceedings, there have been lots of

10  arguments come up about GMAC's standing to foreclose.  And

11  you're not disputing that it had -- I know you say that their

12  conduct -- the result of their -- as a result of their conduct,

13  they should not have proceeded with foreclosure.  I

14  take -- you're not disputing that, through notes, assignments,

15  mortgage or deed of trust, GMAC had -- could satisfy the

16  elements of standing to foreclose under Colorado law.  Am I

17  correct about that?

18         MR. WILSON:  We have not made that argument.

19         THE COURT:  Okay, so what this -- and I asked this of

20  Mr. Wishnew; let me ask it of you.  I know you have a variety

21  of causes of actions that you've alleged.  But it does seem to

22  me that there are three main theories that underlie all of your

23  claims, what I refer to -- I think it's in the paper -- the

24  coerced default theory, the short sale theory and the standing

25  theory.  Do you agree with that?

RESIDENTIAL CAPITAL, LLC, ET AL.                    76

1           MR. WILSON:  I do.  I do agree with that.

2           THE COURT:  Okay.  And you heard my questions of Mr.

3    Wishnew with respect to the investor guidelines.  I, obviously,

4    wasn't aware of whether you had requested them, had not

5    requested them.  But since their argument is largely premised

6    on what the investor guidelines here provided -- let me ask

7    you:  Would you agree that if there was a set of written

8    guidelines from HSBC, the HomeEq Service -- GMAC serviced the

9    loan that said, in express terms, no loan modifications unless

10   a loan is in default for at least sixty days, that you would

11   have no cause of actions against GMAC based on the coerced

12   default theory?

13          MR. WILSON:  I would agree a hundred percent with

14   that.

15          THE COURT:  Okay.

16          MR. WILSON:  If they had produced that to my client or

17   even to us during the District Court action, then we would have

18   withdrawn that portion because it would have been clear.

19          THE COURT:  Okay.

20          MR. WILSON:  I agree with you.

21          THE COURT:  I'm trying to understand -- I raise my

22   questions about what's a factual dispute, what's not a factual

23   dispute.  But I want to understand what really is at issue

24   here.  That's why -- so it's helpful to me.  If there are, in

25   fact -- there are -- that those are the investor

RESIDENTIAL CAPITAL, LLC, ET AL.                    77

1  guidelines -- you're acknowledging if they accurately reported

2  to your client what the investor guidelines were and they

3  followed it, that theory is out, correct?

4              MR. WILSON:  Yes.

5              THE COURT:  Okay.

6              MR. WILSON:  Yeah, I would agree with that.  The

7  question is if are those producible.  We haven't seen them.

8  Even though we requested that information, we haven't seen

9  them.

10             THE COURT:  Okay.

11             MR. WILSON:  But if that were, in fact, the case,

12 then, as Your Honor stated, yes, I believe that it would take

13 the emphasis out of that.  Agreed.

14             THE COURT:  Okay.  So let's focus on the short-sale

15 theory.  So does -- are you disputing your client -- is your

16 client disputing that the second lienholders' consent was

17 required before a short sale could take place?

18             MR. WILSON:  We couldn't make that dispute, because we

19 don't have enough information from GMAC at that point, either

20 through the investor guidelines or from any other source, to

21 prove that that's the case.  But if we operate on the

22 assumption that that is the case -- and just from a personal

23 point of view, Your Honor, I know that generally to be the

24 case, because there's a second lienholder that's in there.

25             THE COURT:  Yeah, people aren't going to modify a loan

1    if there's a second lienholder behind them.  I mean, I

2    just -- I see that all the time.

3            MR. WILSON:  Right.  Correct.  And the only point that

4    I would add is that in my practice, Your Honor, we routinely

5    were receiving those kinds of waivers and release of liens from

6    Bank of America.  They did that routinely.  It wasn't something

7    that was a rarity.

8            THE COURT:  What do you believe you would be able to

9    prove at -- because, look, if I understand the facts correctly

10   here, your client came forward, used a realtor or a

11   representative to try and arrange a short sale.  There were a

12   series of proposed sales, and GMAC's response was:  not enough.

13   It has to be eighty-five percent of the market value -- the

14   gist.  I'm not quoting from --

15           But am I correct that there had been a number of

16   short-sale offers that GMAC rejected as being insufficient in

17   response?

18           MR. WILSON:  That's absolutely correct.  There were a

19   number of offers that were tendered.  And of course, the last

20   offer that was well above their eighty-five-percent threshold,

21   we believe would have been the one that took hold, and that's

22   the one just prior to the foreclosure sale.

23           THE COURT:  Right.  And so as to -- Mr. Wishnew, do

24   you dispute that the last offer was above the eighty-five-

25   percent threshold?

RESIDENTIAL CAPITAL, LLC, ET AL.                    79

1          MR. WILSON:  That is absolutely correct.

2          THE COURT:  No, I'm asking Mr. Wishnew his --

3          MR. WILSON:  Oh, I'm sorry.  Apologies, Your Honor.

4          THE COURT:  I'm trying to understand what the disputes

5    are here.

6          MR. WISHNEW:  It is my understanding that the last

7    offer would have satisfied the monetary threshold.

8          THE COURT:  Okay.  So the issue as to the last offer

9    was BofA consent?

10         MR. WISHNEW:  Correct, Your Honor.

11         THE COURT:  Do you agree with that, Mr. Wilson?

12         MR. WILSON:  I do.

13         THE COURT:  Okay.  Let me just move to the standing

14   theory.  I mean -- and I'm not trying to -- I understand your

15   arguments about why you think that GMAC's conduct was bad and

16   because it was bad they couldn't foreclose.  But the standing

17   argument that I usually focus on, and I think I've looked at

18   Colorado law of what's required for a loan servicer to go ahead

19   and foreclose.

20         Putting aside the issue of whether there's some

21   inequitable conduct or something that would prevent them from

22   doing it -- I think I understand that -- you're not contesting

23   that absent inequitable conduct or wrongful conduct, GMAC had

24   standing to foreclose, correct?

25         MR. WILSON:  That is correct.  We are not making that

RESIDENTIAL CAPITAL, LLC, ET AL.                    80

1  argument.  You pointed out very eloquently, Your Honor, under

2  Rule 120(d), we've afforded ourselves of the right to bring an

3  action against GMAC in the district court, and that's the sole

4  remedy, that's the only remedy that Mr. Dlin had.

5          THE COURT:  All right.  Is there anything else you

6  want to add, Mr. Wilson?  You've answered my questions.

7          MR. WILSON:  No.  Nothing further, Your Honor.

8          THE COURT:  Mr. Wishnew?

9          MR. WISHNEW:  One matter of process.  Contemporaneous

10 or --

11         THE COURT:  Just pull the microphone slightly to you.

12         MR. WISHNEW:  Oh, I'm sorry.

13         THE COURT:  Okay, go ahead.

14         MR. WISHNEW:  Mr. Dlin also had filed a motion for

15 relief from the automatic stay to continue the --

16         THE COURT:  This is not going back to Colorado.

17         MR. WISHNEW:  Okay.  I just want --

18         THE COURT:  I'm just telling you.

19         MR. WISHNEW:  -- I just want the record to be clear in

20 that regard.

21         THE COURT:  It's not -- Mr. Wilson, if this goes

22 forward, it's going forward in my court, it's not going back to

23 Colorado.

24         MR. WILSON:  Totally understood, Your Honor.

25         THE COURT:  Okay.

1          MR. WILSON:  Thank you for clarifying that.

2          THE COURT:  Okay.

3          MR. WISHNEW:  That's it.

4          THE COURT:  I think -- look, I'm going to issue an

5    opinion or an order dealing with this.  Look, Mr. Wishnew, you

6    and Mr. Wilson ought to start talking about this now.  There

7    are disputed issues of fact here.  And I'm going to permit some

8    discovery, not blunderbuss wide-open discovery.  You ought to

9    start talking about it now.  Don't even wait for me to issue an

10   order.  This is going forward.

11         It does seem to me -- and I think this last colloquy

12   with Mr. Wilson has really been helpful to me, because the

13   standing theory isn't the traditional standing theory that --

14         MR. WISHNEW:  Right, it's not Chen and Tyler (ph.) or

15   anything like that, Your Honor.

16         THE COURT:  No, it's not.  So there's really -- really

17   there are two theories on which --

18         MR. WISHNEW:  Short --

19         THE COURT:  -- this is going forward.

20         MR. WISHNEW:  -- short sale and coercion.

21         THE COURT:  The coerced default theory and the short-

22   sale theory.

23         MR. WISHNEW:  Yeah.

24         THE COURT:  Mr. Wilson, do you agree with that?

25         MR. WILSON:  I do.  I do agree with that, a hundred

RESIDENTIAL CAPITAL, LLC, ET AL.                                        82

1   percent, Your Honor.

2            THE COURT:  So look, the two of you ought to talk.

3   I'm going to issue an order, but let's get this moving along.

4   Either settle it or figure out -- you've got to start talking

5   about what discovery should be taken.  What I'm going to wind

6   up doing is after I issue an order, I'm going to schedule a

7   telephone conference with the two of you.  Let's get this

8   ironed out about what discovery's going to take place, how much

9   time is it going to take to do it, and -- you know.

10            I should tell you, Mr. Wilson, I try as best I can to

11   schedule any evidentiary hearings pretty quickly.  So this is

12   not going to linger.  Okay?

13            MR. WILSON:  Very good.

14            THE COURT:  All right.  Thanks very much, Mr. Wilson.

15            MR. WILSON:  Thank you, Your Honor.

16            THE COURT:  Okay.  All right.

17            MR. WILSON:  Bye-bye.

18            THE COURT:  One more to go, right?

19            MR. WISHNEW:  Your Honor, the last matter on this

20   morning's calendar is item 4 on page 11, the ResCap Liquidating

21   Trust and the ResCap Borrower Claims Trust's objection to claim

22   numbers 112, 114, 416, and 417, filed by Erlinda Abibas Aniel,

23   Fermin Solis Aniel, and Marc Jason Aniel.

24            THE COURT:  All right, is anybody appearing for the

25   Aniels?  Anybody on the telephone?

1           MR. WISHNEW:  I thought I heard Erlinda Aniel
2    register.
3           THE COURT:  Yeah, Erlinda Aniel, are you on the phone?
4    She checked in.  I had the sign-up list.
5           MR. WISHNEW:  Yeah, and I was pretty sure she checked
6    in before the hearing as well, Your Honor.
7           THE COURT:  Ms. Aniel are you on the telephone?
8           MS. ANIEL:  Yes, Your Honor.  Yes, I'm here.
9           THE COURT:  All right.  Mr. Wishnew will argue first,
10   and then I will give you an opportunity to respond.
11          Go ahead, Mr. Wishnew.
12          MR. WISHNEW:  Thank you, Your Honor.
13          Your Honor, as noted, the Aniels filed four general
14   unsecured claims.  They filed claims 112 and 114 asserting a
15   10,000-dollar general unsecured claim and a 1,075,000-dollar
16   secured claim against debtors Executive Trustee Services, and
17   GMAC Mortgage, respectively.
18          Claim numbers 416 and 417 were filed on August 20th,
19   2012, asserting unliquidated claims against ETS and GMAC
20   respectively.
21          The asserted basis for liability in these claims is
22   pending lawsuit.  The claims represent the claimants' attempt
23   to further litigate their pre-petition court actions currently
24   stayed in California.  Claims 112 and 114 relate to foreclosure
25   on property owned by Raoul and Corazon Estiva that the

1  claimants assert a one-percent interest in, although they've

2  never been borrow --

3          THE COURT:  I thought they claimed a fifty-percent

4  interest.  One percent --

5          MR. WISHNEW:  I'm sorry.

6          THE COURT:  -- originally and then a fifty percent?

7          MR. WISHNEW:  Your Honor, is correct, yes.  Yes.

8          Even though they've never been borrowers under the

9  loan that's being enforced by the debtors.

10         The California Superior Court previously issued a

11 decision in that case determining the claimants lacked

12 standings to contest the foreclosure, because they were not

13 borrowers under the loan secured by the property.  The

14 claimants appealed the decision.  The appeal is stayed.  Even

15 though res judicata does not apply here, Your Honor, the Court

16 can still dismiss these claims because the Aniels lack --

17         THE COURT:  The trial court's decision may be

18 persuasive as to lack of standing, even if it isn't binding on

19 me?

20         MR. WISHNEW:  Exactly, Your Honor; exactly.

21         Claims number 416 and 417 are premised on the lawsuit

22 filed in the United States District Court for the Northern

23 District of California, also stayed due to the debtors'

24 bankruptcy.

25         This lawsuit is an attempt to stop the foreclosure

RESIDENTIAL CAPITAL, LLC, ET AL.                    85

1    sale of the property securing the Aniels' two-million-dollar

2    loan which is serviced by the debtors, even though the Aniels

3    have not made a payment on the loan since June 2008.

4              The Aniels' attempted to obtain a temporary

5    restraining order to halt the foreclosure sale.  The district

6    court in California denied that application on the grounds the

7    Aniels' lawsuit was unlikely to succeed on the merits.

8              In that decision -- again, this is persuasive not

9    binding -- the court addressed many of the same issues

10    addressed in the Trust's objection to these claims.

11             Notwithstanding this decision, the foreclosure sale

12    has not been completed on this property, and it is the

13    Borrowers' Trust's understanding that the claimants remain in

14    the home and the loan is currently being serviced by Ocwen.

15             THE COURT:  Why wasn't the foreclosure sale completed?

16             MR. WISHNEW:  I believe that there were interceding

17    bankruptcies by Mr. and Mrs. Aniel.  And so in terms of

18    starting, stopping, restarting.

19             Notwithstanding the Aniels' ability to stave off a

20    foreclosure sale for the reasons stated in the Trust's

21    objection in reply, their claims against GMAC Mortgage and ETS

22    Are entirely without merit and devoid of supporting evidence.

23    The causes of action are premised on the mistaken belief the

24    loans at issue were transferred to the securitization trust

25    after the closing date of the trust, and as a result, the two

1    million dollars of debt has been canceled.

2              THE COURT:  So go through the facts with respect to

3    transfers of the loan, recording the notices of default, et

4    cetera.

5              MR. WISHNEW:  Okay.  This is -- and I'm referencing

6    factual statements made in the objection filed at docket number

7    8237 starting on page 11.  On September 29, 2008, ETS,

8    Executive Trustee Services, recorded a substitution of trustee

9    in the San Mateo County Recorder's Office.

10             THE COURT:  Hold on just a second.

11             Ms. Aniel, can you put your phone on mute?  I'm

12   picking up a lot of background noise.

13             MS. ANIEL:  Okay.

14             THE COURT:  Do you have it on the speaker?

15             MS. ANIEL:  Yeah.

16             THE COURT:  Is your phone on a speaker phone?

17             MS. ANIEL:  Okay, I turn off the speaker phone.  Thank

18   you very much.

19             THE COURT:  Go ahead, Mr. Wishnew.

20             MR. WISHNEW:  Thank you, Your Honor.  September 29th

21   the ETS recorded a substitution of trustee in the San Mateo

22   County Recorder's Office.  A copy of the substitution of

23   trustee is attached to the priori declaration as Exhibit X as

24   in X-ray.  On September 29, 2008, after the substitution of

25   trustee was recorded, ETS records a notice of default as the

1    claimants were -- had not made a payment since June 17th, 2008.

2    At that point in time, the claimants -- I'm sorry -- the

3    debtors received inbound calls from the claimants'

4    representative requesting a work out package for a possible

5    loan modification.

6           Discussions continue, Your Honor.  The claimants filed

7    a Chapter 11 bankruptcy February 25th, 2009, that was converted

8    to a Chapter 7 proceed --

9           THE COURT:  All right, let me just interrupt please.

10   I've been through the --

11          MR. WISHNEW:  Yeah.

12          THE COURT:  -- convoluted history and my question

13   focuses specifically on the steps in assignments, notices,

14   timing of those such that GMAC had standing to proceed with the

15   foreclosure.

16          MR. WISHNEW:  Okay.  I guess putting aside the

17   arguments from Gomez and those cases concerning the ability of

18   the Aniels to challenge the standing to foreclose, with regards

19   to --

20          THE COURT:  Part of -- I mean, part of my -- as I view

21   all these, this proof of claim, the challenge is standing,

22   among other things.  You came forward and you've put in

23   evidence.  The issue in my mind is, has the evidence that you

24   have put in shifted the burden to the Aniels to come forward

25   with evidence equal to or that would overcome your showing?

RESIDENTIAL CAPITAL, LLC, ET AL.                              88

1          MR. WISHNEW:  Correct, Your Honor.

2          THE COURT:  And so my question really focuses on what

3    have you -- what evidence have you put in to establish that

4    GMAC had standing to foreclose?

5          MR. WISHNEW:  So with regards to the standing --

6          THE COURT:  I understand with respect to the Esteva

7    (ph.) property --

8          MR. WISHNEW:  Um-hum.

9          THE COURT:  -- the California court's decision and

10   your argument here is they didn't sign the note; they didn't

11   have interest in the mortgage; they don't have standing to

12   contest it.  I'm --

13         MR. WISHNEW:  That's right, Your Honor.  The argument

14   with regards to the Aniel loan is more -- in the first

15   instance, it's really a legal argument, Your Honor, which is

16   that in California with a nontraditional foreclosure scheme,

17   that a borrower who is not a party to the securization trust

18   does not have challenge to --

19         THE COURT:  Doesn't actually have a challenge.

20         MR. WISHNEW:  Exactly, Your Honor.  So I understand

21   Your Honor's point, but I think that in terms of their ability

22   to challenge the standing in the first instance, it's a

23   nonstarter from a legal standpoint.

24         THE COURT:  Well, let's assume that I find that they

25   can challenge it, I want you to go through and tell me on the

1    merits why you believe the trust has put forward evidence to

2    shift the burden back to the Aniels.

3            MR. WISHNEW:  Sure, Your Honor.  So we would

4    reference, Your Honor, paragraph 27 of the objection at docket

5    number 8237, starting there, where we talk about the loan being

6    transferred to HSBC Bank USA as trustee for the securization

7    trust titled DALT2007-A05.  The assignment of the Aniel deed of

8    trust was recorded -- was subsequently recorded.  And then

9    pursuant to the pooling and servicing agreements which are

10   probably available, though not specifically in evidence today,

11   the GMAC Mortgage was given the authority to subservice the

12   Aniel loan from the point it was originated until servicing

13   transferred to Ocwen on February 16th, 2013.

14           THE COURT:  Okay.

15           MR. WISHNEW:  So the positive act -- so putting -- so

16   you got the point of Gomez and numerous cases in California

17   that follow Gomez in terms of the ability to challenge

18   standing.  The claimants fail to demonstrate by a preponderance

19   of the evidence that the debtor -- the debtors acted improperly

20   in servicing their loan or the alleged wrongdoing damaged them

21   in any way.

22           What should not be forgotten, as initially mentioned,

23   is that this loan is past due going back to June 2008, the

24   claimants remain in their home and that the foreclosure is

25   presently on hold.  As we understand it, they are presently

RESIDENTIAL CAPITAL, LLC, ET AL.                    90

1    Chapter 7 debtors.

2            THE COURT:  Doesn't that open a Chapter 7 case?

3            MR. WISHNEW:  That is my understanding, Your Honor.

4    So without going -- without repeating all of our arguments, we

5    believe that for reasons discussed in the objection, the Priore

6    declaration, and the reply, the relief sought should be granted

7    and there sh -- and these claims should be disallowed and

8    expunged.

9            THE COURT:  When did the Chapter 7 case open?

10           MR. WISHNEW:  I don't know, Your Honor.  We just --

11           THE COURT:  Why did the Aniels have standing to pursue

12   a claim at all if there's a Chapter 7?  Doesn't the Chapter 7

13   trustee -- is this -- is this --

14           MR. WISHNEW:  Yeah, that's a --

15           THE COURT:  Let me finish my question.  Did the claims

16   they're seeking to assert here arise before the Chapter 7 case

17   was filed?

18           MR. WISHNEW:  Absolutely, Your Honor.  I would just

19   say that with regards to the Chapter 7 -- the information of

20   the Chapter 7 is something that I learned for the first time

21   today because we made the inquiry.  We haven't dealt with this

22   loan in a few years.  We just made an inquiry of Ocwen as to

23   the current status, and I was -- I was informed fifteen minutes

24   before court today as to the current status.  So that's why I

25   bring it to the Court's attention.

1     THE COURT:  Okay.  Has anybody looked at the schedules

2   in the Chapter 7 case to see whether the Aniels scheduled any

3   of these asserted claims in their Chapter 7 petition or

4   schedules?

5     MR. WISHNEW:  We have not, Your Honor, but we can do

6   that when we get back to the office today.

7     THE COURT:  As you well know, I have ruled in a number

8   of ResCap matters that estoppel applies -- judicial estoppel

9   applies to a Chapter 7 debtor pursuing any pre-petition claims

10  that they failed to -- not only did they failed to schedule,

11  it's this Chapter 7 trustee who want to be the one, not the

12  Aniels.

13     Anything else you wanted to raise today?

14     MR. WISHNEW:  No.  Thank you, Your Honor.

15     THE COURT:  All right, Ms. Aniel, do you want

16  to -- can you tell me, Ms. Aniel, when did you file the Chapter

17  7 bankruptcy?

18     MS. ANIEL:  Your Honor, I would like -- I would like

19  to clarify because the data is (indiscernible).  He just left

20  off all the -- the objection.  But I want --

21     THE COURT:  I asked --

22     MS. ANIEL:  -- to clarify --

23     THE COURT:  Ms. Aniel?

24     MS. ANIEL:  -- you know, because I have proof -- proof

25  of claim.

1          THE COURT:  Ms. Aniel -- Ms. Aniel --

2          MS. ANIEL:  Yes.

3          THE COURT:  Stop.  I would appreciate it if you would

4    answer my question.  Do you have a pending Chapter 7 case?

5          MS. ANIEL:  No, because already been dismissed -- not

6    dismissed, discharge.  I'm sorry.

7          THE COURT:  All right.  When did you file your Chapter

8    7 case?

9          MS. ANIEL:  It was converted from 11 -- it was

10   converted to Chapter 7, that was in August 2010.

11         THE COURT:  It was converted to a Chapter 7 in August

12   2010?

13         MS. ANIEL:  Yes.

14         THE COURT:  And what you're saying is you received a

15   discharge in that case --

16         MS. ANIEL:  On December -- yeah.  I think the

17   discharge on Chapter 7 on December 10, 2010.

18         THE COURT:  I'm sorry, 2000 what?

19         MS. ANIEL:  2010.

20         THE COURT:  Mr. Wishnew, in February 2009, the Aniels

21   filed a Chapter 11 case in the bankruptcy court in the Northern

22   District of California.  In their amended schedules in that

23   case, they listed a fifty percent interest in the Esteva

24   property.

25         MR. WISHNEW:  Um-hum.

1           THE COURT:  It was converted to a Chapter 7 case on

2    August 4th 2010.

3           MR. WISHNEW:  Yes, Your Honor.

4           THE COURT:  And it received a discharge on December 2,

5    2010.

6           MR. WISHNEW:  Um-hum.

7           THE COURT:  I don't know whether any claims relating

8    to either of the transactions matters involved here were

9    scheduled.  It may be that many of the events that they're

10   complaining about here occur in 2011/2012.  So it may be that

11   this charge doesn't affect them at all.

12          MR. WISHNEW:  Your Honor, we put the Exhibit K, docket

13   number 8237-15, is the Chapter 11 petition filed by Furman

14   (ph.), Solace (ph.), Aniel and Perlinda Deevus Aniel (ph.).

15          THE COURT:  Yes.

16          MR. WISHNEW:  I just as -- as we're

17   standing -- standing here right now, I'm just trying to confirm

18   whether there's a claim represented on Exhibit B that might --

19          MS. ANIEL:  Your Honor, the State goes in

20   February -- I think February 2011.

21          THE COURT:  Okay.

22          MS. ANIEL:  That's when the trustee closed the estate,

23   no distribution.

24          THE COURT:  Okay.  All right.  Go ahead with your

25   argument, Ms. Aniel.  Explain to me why you think your claims

1    should not be expunged.

2         MS. ANIEL:  Your Honor, during my bankruptcy Chapter

3    11, it was already determined by the bankruptcy court here in

4    Northern California that that property belonged to my estate,

5    that I have fifty percent interested in that property.  I

6    claimed that in my insurance, when I filed my insurance, we

7    were not paid the mortgage.  I wanted to take care of

8    everything.  And since the beginning of when we purchased the

9    property, I was already part of the ownership of that property.

10        So the bankruptcy court allowed that to be part of my

11   estate.  And then at the time the judge told me, you know, I'm

12   going to file a law suit outside the bankruptcy, I have to file

13   a motion to abandon the property at the time because there was

14   no value in that property.  That's what I did before -- before

15   the judge told me to come back with the Chapter 7, because

16   there is no distribution -- more -- by that time the property

17   are no consequence of value.

18        So at the time I was -- I had -- you know, I had

19   ownership -- a present ownership.  And then after I was up

20   there, the estate was close, I have -- I was given -- granted

21   one percent that it is a charge.  The reason for that, Your

22   Honor, is because we went -- when we bought the property, here

23   in California you have to pay transfer tax.  And you pay, like,

24   almost several thousand on that property tax just to buy that

25   house.  Okay, and then they told me that this was one percent

1    so that you just pay that because you cannot -- you don't pay

2    twice on the tax here in California.  That's why was Stephan

3    just give me that one percent because Stephan knew that I

4    already disclosed that, that I have to keep up my interest on

5    the property.  And then --

6              THE COURT:  You didn't have any writing that

7    established a fifty percent.  The only -- anything in writing

8    was a one percent.  You asserted a fifty percent interest, but

9    you don't have any documents to support it, correct?

10             MS. ANIEL:  No, but it supports on my 1014 -- 40

11   income tax since we bought the property, because these are my

12   IRS.

13             THE COURT:  Yeah, but there's no --

14             MS. ANIEL:  No, we -- we --

15             THE COURT:  There's no bill of sale or -- or document

16   sub -- you know, transferred sub -- the owner of the property

17   transferring fifty percent to you, is there?

18             MS. ANIEL:  I guess not, no, Your Honor.  Just like

19   because it's a friend, we just, you know, talked -- we just,

20   you know, agreed upon.  And unfortunately, Mr. Esteva is

21   already deceased.

22             THE COURT:  I see.  And -- you think --

23             MS. ANIEL:  Yeah.

24             THE COURT:  You think under California law you can

25   transfer fifty percent interest in property without anything in

1   writing?

2           MS. ANIEL:  At the time, I -- I -- I really -- I don't

3   anticipate that.  But I -- you know, it's all about disclosure.

4   When I filed my Chapter 11, it was disclosed that I have the

5   fifty percent interest on the property and Esteva didn't

6   contest that.

7           THE COURT:  Why did somebody have to contest it?  You

8   don't have a piece of paper that says that somebody transferred

9   at fifty percent interest in this property to you.  You assert

10  it, but you don't have anything to back it up.

11          MS. ANIEL:  No, only the taxes that I -- that I paid.

12  Only the taxes, only the mortgage payment that I used my, you

13  know, account number to pay.

14          THE COURT:  Okay.

15          MS. ANIEL:  The monthly mortgage, the taxes, the

16  insurance.  That's how our arrangement was at the time without,

17  you know -- just all about the trust, we just trust each other.

18          THE COURT:  Okay, anything else you wanted to add?

19          MS. ANIEL:  And we agreed upon -- before buying the

20  property, we agreed that it -- we would share fifty percent,

21  that I made also a down payment for that.

22          THE COURT:  You didn't make any mortgage payments

23  though, did you?

24          MS. ANIEL:  I did, Your Honor, I did.  I did, I was

25  making all these mortgage payments.  I was the one collecting

1  the rent, I was the one everything.  If there was repairs in

2  the house I was -- the tenant would call me and then, you know,

3  I would do the repair.

4          THE COURT:  When did you stop paying the mortgage?

5          MS. ANIEL:  When?  I don't -- I don't -- I don't

6  remember at the time because there was -- at the time they

7  would always tell you, you know, you cannot -- you cannot offer

8  loan modification if you are not in the front.  You have to be

9  in front for ninety days in order for -- for them to -- I have

10 to create timesheet in order for them to -- to modify the loan.

11         THE COURT:  This was an income property, not a

12 residential property, correct?

13         MS. ANIEL:  No, no, no.  It's an income property, yes.

14         THE COURT:  All right, anything else you want to add?

15         MS. ANIEL:  This is what I did for the property.  I

16 think -- oh, this (indiscernible) was dismissed by the lower

17 court here in San Mateo, and I filed an appeal --

18         THE COURT:  Yes.

19         MS. ANIEL:  -- standing in California Court of Appeal

20 because of the debtor's bankruptcy.

21         THE COURT:  Yes, I understand that.  Okay, anything

22 else?

23         MS. ANIEL:  Anything else?  Regarding the assignment,

24 we did that was done (indiscernible).  I -- I disputed that

25 because, based on the assignment that we did I -- you know, I

1    accuse -- there's an allegation that (indiscernible), I'm not

2    the signer.  We (indiscernible) that he only sign it without

3    his personal knowledge.  He said that.

4              THE COURT:  Did he ever say that he --

5              MS. ANIEL:  (Indiscernible).

6              THE COURT:  Do you have some evidence that he said

7    that the assignment in your case is somehow fraudulent?

8              MS. ANIEL:  There was the deposition -- there was the

9    deposition of Jeffrey Stephan that I attached --

10             THE COURT:  Yes, I know, but that --

11             MS. ANIEL:  -- to my proof of claim.

12             THE COURT:  -- doesn't involve your case.  That

13   doesn't involve -- he acknowledged that he signed certain other

14   documents, not yours.

15             MS. ANIEL:  Yeah, but he -- he admitted that he signed

16   10,000 every month, so I assumed that one of those assignments

17   was our -- was -- was on the property at (indiscernible).  And

18   also, the notary -- notary said, you know, it was notarized in

19   Pennsylvania, but it was under penalty of perjury under the

20   State of California.  So how would -- how would they justify

21   that?  Why is it it was notarized in Pennsylvania and then it

22   was under penalty -- it was signed under penalty by Calif -- in

23   the State of California?

24             THE COURT:  All right.

25             MS. ANIEL:  So if we have to assume that,

1  that's -- that assignment is void.  And also that the time when

2  it was transferred, I was already in bankruptcy, that is a

3  violation of automatic stay.

4           THE COURT:  All right, thank you.

5           MS. ANIEL:  And it's unreliable documents, Your Honor.

6  And can we discuss, also, on the property on -- how do you call

7  that -- 416, 417 proof of claim, Your Honor, if you are done

8  with proof 112 and 114?

9           THE COURT:  Go ahead.  I'm going to give you a -- I --

10          MS. ANIEL:  Oh, okay, okay, okay, okay, okay.  And I

11  also -- I -- on my allegation, in my complaint, I said I have

12  no debt on this property, and if you -- I will give the -- I

13  call the attention of the -- of the Court, and especially,

14  Judge, that's Exhibit A that they submitted in the court, I

15  want you to make that as a judicial notice, and it says power

16  of attorney, that they were given power of attorney by HSB

17  (sic) Bank.  It's not true, not like an agent as trustee.

18          We just signed affidavit that was done, dated June 11,

19  2013, and we attached on that affidavit a limited power of

20  attorney, and least of all, the trustee.  But unfortunately,

21  the trustee, HSB, as trustee for .200708-3 and 08-5, is not

22  listed on this -- on this -- how do you call that -- limited

23  power of attorney.  It was not listed.  This is -- this is

24  the -- you know, if they just read it, because Kathy Priore

25  says on her declaration -- supplemental declaration that she

RESIDENTIAL CAPITAL, LLC, ET AL.                    100

1  reads the books and the records of the debtor, but it

2  doesn't -- it contradicts the records of the -- the books and

3  records of the debtor.  It doesn't say here that the trustee,

4  that they would give him limited power of attorney to sign in

5  the (indiscernible).  And also, it was dated June 11, 2013.

6  This is prior of giving the authority to -- dedicated the date,

7  and there was no (indiscernible) to hear that they were -- that

8  they were given an authority, so an assignment of deed is void,

9  Your Honor.

10        And then, if we go on Exhibit B, go page 3 of 264,

11  this is based on the declaration of Ms. Kathy Priore under

12  penalty of perjury, it says that I don't owe any money.  It

13  says there that there are three accounts that have been listed

14  here.  It says, carried balance, principal, zero; escrow, zero;

15  and applied balance, zero; buy-down, zero.  And it says it's

16  part of a collections property, it says, paid off.  My loan has

17  been already paid off since the beginning of my -- of my -- of

18  my case, Your Honor, but they still -- you know, they offered

19  my note, they sold it to -- and it says an investor,

20  (indiscernible) was (indiscernible).

21        THE COURT:  All right, Ms. Aniel --

22        MS. ANIEL:  As it searched --

23        THE COURT:  Ms. Aniel, thank you.

24        MS. ANIEL:  Doesn't say HSB --

25        THE COURT:  Ms. Aniel --

1          MS. ANIEL:  -- as trustee for (indiscernible) -- yes.

2          THE COURT:  Writing off the balance on a defaulted

3     note is not the same thing as having paid it off.

4          Let me ask -- I have some questions for Mr. Wishnew.

5          Mr. Wishnew --

6          MS. ANIEL:  Your Honor, I received --

7          THE COURT:  No.  Stop.

8          MS. ANIEL:  -- 1098 --

9          THE COURT:  Ms. Aniel --

10          MS. ANIEL:  -- interest mortgage payment that it was

11     already paid off --

12          THE COURT:  Ms. Aniel --

13          MS. ANIEL:  -- on 2013, Your Honor.

14          THE COURT:  Ms. Aniel --

15          MS. ANIEL:  That's --

16          THE COURT:  -- stop now.

17          MS. ANIEL:  Yes.

18          THE COURT:  Stop.

19          MS. ANIEL:  Yes, yes.

20          THE COURT:  No more.

21          MS. ANIEL:  Yes.

22          THE COURT:  Mr. Wishnew, is there a limited power of

23     attorney executed prior to the time that the assignment was

24     executed?  What Ms. Aniel has pointed to is a discrepancy in

25     the date, that the limited power of attorney included in the

RESIDENTIAL CAPITAL, LLC, ET AL.                                102

1    record from 2013 well post-dates the time when the assignment

2    that's at issue here was executed.

3              MR. WISHNEW:  I just -- I'd like to look this

4    doc -- what specific exhibits is she referring to, Your Honor?

5              THE COURT:  She referred to a limited power of

6    attorney dated in 2013, and what was the authority for

7    the -- if it wasn't executed -- if the limited power of

8    attorney wasn't granted until 2013, what was the authority to

9    execute assignments prior to that time?

10             MR. WISHNEW:  One moment, Your Honor.

11         (Pause)

12             MR. WISHNEW:  Your Honor, just what's giving me pause

13   here is the date, here.  June 11th, 2013 was after our

14   servicing platform sale to Ocwen, so --

15             THE COURT:  Yes?  That's the point.

16             MR. WISHNEW:  I understand, Your Honor.  I understand.

17   To the extent that it was -- to the extent Ocwen was servicing

18   this loan and it was not taken out of -- and continuing to

19   service in GMAC Mortgage's name and was not taken out of GMAC

20   Mortgage's name --

21             THE COURT:  What I'm really interested in is, was

22   there authority to execute the assignment at the time that it

23   was originally done?

24             MR. WISHNEW:  At the time it was originally done, it

25   would have been done pursuant to the pooling and servicing

1  agreement into which the loan was deposited.

2          THE COURT:  And you say that gave the specific

3  authority to do that?

4          MR. WISHNEW:  Typically, yes, Your Honor.

5          THE COURT:  All right, I'm going to take the matter

6  under submission.

7          MR. WISHNEW:  Thank you, Your Honor.

8          THE COURT:  All right, does that conclude the agenda?

9          MR. WISHNEW:  That concludes this morning's agenda.

10          THE COURT:  All right. We're in recess.

11          Thank you, Ms. Aniel.

12          MS. ANIEL:  Thank you, Your Honor.  I hope you, you

13  know --

14          THE COURT:  Yeah, I'm going to --

15          MS. ANIEL:  -- be fair, because even -- may I say

16  something?

17          THE COURT:  No, we got --

18          MS. ANIEL:  You just look at the --

19          THE COURT:  Ms. Aniel, I was just thanking you.

20          MS. ANIEL:  Yes.

21          THE COURT:  We're not -- no further argument, okay?

22          MS. ANIEL:  Okay.  Thank you very much, Your Honor.

23          THE COURT:  All right, okay.

24          MS. ANIEL:  Have a nice day.  Thank you.  Bye-bye.

25          THE COURT:  You're going to be back at 2 o'clock?  Is

RESIDENTIAL CAPITAL, LLC, ET AL.                    104

1    that --

2            MR. WISHNEW:  Yes, Your Honor.

3            THE COURT:  Did you --

4            MR. WISHNEW:  We'll be short, very short.

5            THE COURT:  Okay.

6        (Whereupon, the proceedings were concluded at 12:32 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                       C E R T I F I C A T I O N

3

4    I, David Rutt, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9

10   _____

11   DAVID RUTT

12   AAERT Certified Electronic Transcriber CET**D 635

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  April 16, 2015

19

20

21

22

23

24

25