1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 12-12020-mg

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    RESIDENTIAL CAPITAL, LLC, ET AL.,

9

10                   Debtors.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14                   United States Bankruptcy Court

15                   One Bowling Green

16                   New York, New York

17

18                   April 16, 2015

19                   2:00 PM

20

21    B E F O R E:

22    HON. MARTIN GLENN

23    U.S. BANKRUPTCY JUDGE

24

25

1

2   Evidentiary Hearing re: Motion for Objection to Claim(s) Number

3   61 (Claim of Francine Silver)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Dena Page

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4          Attorneys for ResCap Borrower's Trust

5          250 West 55th Street

6          New York, NY 10019

7

8  BY:    JORDAN A. WISHNEW, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.  All right we're here in

3    Residential Capital number 12-12020 in connection with an

4    evidentiary hearing in connection with the Trust's objection to

5    claim number 16 -- 61 excuse me -- claim number 61 of Francine

6    Silver.

7            Before -- well, go ahead and make your appearance, Mr.

8    Wishnew.

9            MR. WISHNEW:  Thank you, Your Honor.  Jordan Wishnew

10   of Morrison Foerster for the Residential Capital Borrower

11   Claims Trust.

12           THE COURT:  All right.

13           MR. WISHNEW:  Your Honor, if I may I can hand to you

14   the exhibits we will ask Ms. Keeley to review.

15           THE COURT:  Sure.  I want to put some other -- you can

16   come on up and give it to me.  I want to put some other things

17   on the record.

18           Thank you.

19           All right.  We're here in connection with a limited

20   evidentiary hearing on the objection of the ResCap Borrower

21   Claims Trust to proof of claim number 61 filed by Francine

22   Silver.  Notice of the hearing appears at ECF docket 8319 filed

23   on March 17, 2015.  The operative portion of the notice

24   provides that, for this limited evidentiary hearing, "during

25   which time Jacqueline Keeley will be examined on the record

1  concerning her execution of the assignment documents at issue

2  in the Trust's claim objection."

3         The objection to the Silver claim came on for hearing

4  on February 25, 2015.  The transcript of that hearing can be

5  found at ECF docket number 8368 filed on March 26, 2015.

6  Again, it relates to the hearing on February 25, 2015.  Ms.

7  Silver did not appear in person or by telephone during the

8  February 25, 2015, hearing.  The order that was entered --

9  excuse me, the notice that was entered for the hearing today

10  provided in the last paragraph, "Please take further notice

11  that if Francine Silver wishes to examine the Trust declarant,

12  then Ms. Silver must appear in person for the scheduled

13  hearing."

14         Yesterday, the Court was provided with a copy of a

15  letter addressed to me but not filed on ECF that chambers

16  received I believe from Morrison Foerster.  It's a letter dated

17  Monday, April 13, 2015, addressed to me, regarding 4/15/2015

18  hearing.  In the letter, Ms. Silver states in the first

19  paragraph, "I am recovering from a broken rib recently

20  sustained in a fall and will be physically unable to attain the

21  limited evidentiary hearing on April 16, 2015.

22         "I did not participate telephonically in the February

23  25th hearing because I only received notice that I could

24  participant telephonically on the evening of February 24th, and

25  CourtCall requires at least three days' notice."

1      I should say that Ms. Silver didn't contact chambers
2  seeking permission to appear by CourtCall for the February 25th
3  hearing.  I certainly would have accommodated her, even if it
4  was less than three days' notice.

5      I won't go into the rest of what's in the April 13th,
6  2015 later from Ms. Silver.  She did not file with this Court,
7  a letter or a motion seeking to delay or adjourn this hearing.
8  And again, she didn't appear on February 25th at the hearing.

9      So we're going forward with the hearing.  I should
10  make clear that this letter does not -- that I've just referred
11  to the April 13th letter doesn't request a continuance.  It
12  explains her reason for not appearing.

13      The trustee filed an objection to Silver's claim.
14  That appears as ECF docket number 8019.  Silver filed an
15  opposition to the objection and that appears as ECF docket
16  number 8114.  The Trust filed a reply, which appears as ECF
17  docket number 8165.

18      I won't review the objection or her opposition or the
19  reply in detail on the record; they speak for themselves.  But
20  Ms. Silver asserted a wrongful foreclosure claim under
21  California law.  The property at issue is located at 8613
22  Franklin Avenue in Los Angeles 90069 in connection with that
23  property.

24      Ms. Silver, on March 15, 2006, obtained a loan from
25  Nationwide Lending Group to refinance an existing mortgage on

1  the property.  The Nationwide Lending Group note is in the

2  amount of 1,300,000 dollars.  It was secured with a deed of

3  trust with initially LandAmerica Commonwealth as trustee.

4  MERS, as the beneficiary, "solely as nominee for lender and

5  lender's successors and assigns and the successors and assigns

6  of MERS."

7          In support of her claim in an opposition to the

8  objection, Ms. Silver asserted -- she challenged the validity

9  of the GMACM assignment and ETS substitution.

10         The GMACM assignment refers to a July 5th, 2011,

11  assignment from MERS to GMACM all beneficial interests into the

12  deed of trust pursuant to the GMACM assignment which was

13  recorded on July 13, 2011.  GMACM executed a substitution,

14  substituting ETS and that was -- as the trustee, and that was

15  signed on July 6th, 2011.  The ETS substitution was recorded on

16  July 22, 2011 concurrently with the recording of a notice of

17  default.

18         Ms. Keeley (sic) asserted in her opposition to the

19  objection that discrepancies between Ms. Keeley's signature on

20  two documents, casting doubt as to their authenticity.

21         A declaration by Ms. Keeley was filed in support of

22  the claim objection.  It appears as ECF docket number 8019-12,

23  styled "Declaration of Jacqueline Keeley in support of the

24  objection of the ResCap Borrower's Claim Trust to proof of

25  claim filed by Francine Silver (Claim number 61)."

1          That declaration by Ms. Keeley asserts under penalty

2   of perjury that in July 2011 she was an authorized signatory of

3   MERS to execute assignments and deeds of trust and substitution

4   of trustee on behalf of MERS, and she was an authorized

5   signatory of GMACM to execute substitutions of trustees on

6   behalf of GMACM, and that she signed the GMACM assignment and

7   ETS substitution.  That appears in the Keeley declaration at

8   ECF 8019-12 in paragraphs 6, 7, 9 and 10 and also, we'll refer

9   to it in -- referring to Exhibits 4(A) and Exhibits 4(B).

10          In Ms. Silver's California bankruptcy proceeding and

11  in a superior court action that she filed, the judges in those

12  two matters -- neither of whom had a declaration from Ms.

13  Keeley before the court -- both courts found that there were

14  what appeared to be discrepancies in the signatures on the

15  GMACM assignment and ECS substitution that cast doubt on their

16  authenticity.

17          In one of those, the judge said, "So I think there's

18  sufficient doubt about the veracity of the documents, and I

19  would have to conclude that either somebody was forging

20  signatures or this is a blatant example of robosigning."

21  That's an excerpt of the transcript of the hearing on GMACM's

22  lift stay motion in Silver's Chapter 7 -- it appears as

23  declaration, Exhibit 5(C).

24          And the second ruling was an order granting a

25  preliminary injunction.  This is the state court:  "The matter

1    having been argued and evidence having been presented to the

2    Court by both parties, the Court finds that there is

3    substantial evidence that one or more documents on which the

4    defendant's rely for their claims are fraudulent or contained

5    fraudulent signatures."  Like I said, it's not clear to the

6    Court that either court had Ms. Keely's testimony either in

7    declaration or oral form before making those comments.

8           In the transcript from the February 25th, 2014 (sic),

9    hearing at page 51 of the transcript, the court stated, "With

10   respect to the issue of the validity of the assignments of the

11   deed of trust as I understand it, that issue focuses on whether

12   Ms. Keeley was authorized to and did execute the assignments.

13   Is that a fair statement?"  And Mr. Wishnew responded, "Yes,

14   Your Honor."  I went on, then, "And I further understand the

15   two different judges, the bankruptcy judge in Ms. Silver's

16   bankruptcy case and the state court judge in the action pending

17   in Los Angeles Superior Court, and both raised the issue

18   whether the assignment includes a forgery.  Is that a fair

19   statement?"  Mr. Wishnew responded, "Yes, Your Honor."  Now, at

20   page -- that's at page 51 of the transcript.

21          At page 52 of the transcript, I said the following:

22   "All right.  In light of the decisions of the two judges, the

23   bankruptcy judge and the superior court judge, raising what

24   they believed were substantial questions about whether the

25   assignments included forgery, I'm going to schedule a limited

1  evidentiary hearing on the issue of the validity of the

2  assignments.  And because I would like Ms. Keeley here to

3  testify about -- you provided the declaration.  We're not going

4  to go through a deposition.  If Ms. Silver wants to show up and

5  cross-examine she can."

6          A little further in the transcript, page 54, lines 1

7  through 3, I said, "I want to hear the testimony about the

8  execution of the assignments.  Obviously, two judges comparing

9  signatures on a number of documents thought that they weren't

10  the same."

11          So that's -- what I recited into the record sets the

12  backdrop for why we're holding this hearing.

13  And Mr. Wishnew, you can call your witness.

14          MR. WISHNEW:  Thank you, Your Honor.  I would like to

15  call Ms. Jacqueline Keeley to the stand.

16          THE COURT:  If you would raise your right hand and be

17  sworn.

18      (Witness sworn)

19          THE COURT:  All right.  Please have a seat.  Thank you

20  very much.

21  DIRECT EXAMINATION

22  BY MR. WISHNEW:

23  Q.   Good afternoon, Ms. Keeley.

24  A.   Good afternoon.

25          THE COURT:  Keep your voice up if you can, okay?

```
 1              MR. WISHNEW:  Absolutely, Your Honor.
 2   BY MR. WISHNEW:
 3   Q.   Ms. Keeley, could you please state your full name for the
 4   record?
 5   A.   Jacqueline Ann Keeley (ph.).
 6   Q.   Ms. Keeley, please describe your educational background.
 7   A.   I am a paralegal with a paralegal degree.
 8              THE COURT:  Just -- you have to face the microphone a
 9   little bit.
10              THE WITNESS:  Near the microphone?  Okay.
11              THE COURT:  Okay.
12              THE WITNESS:  Is that better?
13              THE COURT:  Yeah, that's better.  Thank you.
14              THE WITNESS:  Okay.
15   A.   I'm a paralegal.  I obtained my degree at Community
16   College of Philadelphia.
17   Q.   Thank you.  Let's briefly go through your employment
18   history.  When did you first start working?
19   A.   In the field?
20   Q.   In the field, yes.
21   A.   2001.
22   Q.   Thank you.  And where was that at?
23   A.   It was at a law firm in Center City of Philadelphia.
24   Q.   Okay.  And how long did you work at that law firm?
25   A.   About a year.
```

RESIDENTIAL CAPITAL, LLC, ET AL.                    12

1    Q.    Okay.  And after leaving that firm, what was your next
2    job?
3    A.    At GMAC Mortgage.
4    Q.    Okay.  And what was your job at that point at GMACM
5    Mortgage?
6    A.    I was a foreclosure specialist.
7    Q.    Okay.  And what were your responsibilities as a
8    foreclosure specialist?
9    A.    I managed a portfolio of loans in the foreclosure area,
10   handled them from basically soup to nuts and was a liaison
11   between myself and default counsel.
12   Q.    Thank you.  And how long were you a foreclosure
13   specialist?
14   A.    Five years.
15   Q.    Okay.  And did you hold other positions with GMAC Mortgage
16   after that?
17   A.    Yes, I did.
18   Q.    And what were those positions?
19   A.    I worked in construction lending and I came back after
20   that and was in second lien mortgages?
21   Q.    Okay.  And when you say second lien mortgages, what does
22   that mean?
23   A.    We basically would -- we would bid at senior sales to see
24   if we had enough equity to sustain the mortgages that we were
25   holding.

RESIDENTIAL CAPITAL, LLC, ET AL.                          13

1    Q.    Okay.

2    A.    After that I worked in litigation, and I was pulled onto

3    the affidavits team.

4    Q.    And when were you pulled onto the affidavits team?

5    A.    In 2000 -- the end of 2010.

6    Q.    Okay.  What was the role of affidavits team?

7    A.    We were to review the affidavits and make sure they

8    were -- they were valid to be re-signed.

9    Q.    And when you say affidavits, are there specific types of

10   affidavits?

11   A.    Judgment affidavits.

12   Q.    Okay.  Foreclosure --

13          THE COURT:  I -- I'm sorry.  I didn't hear you.

14   A.    Yes, foreclosure judgement affidavits.

15   Q.    Okay.  Are you familiar with the acronym MERS, M-E-R-S?

16   A.    Yes.

17   Q.    And can you explain what MERS stands for?

18   A.    Mortgage Electronic Registration System.

19   Q.    Thank you.  And to the best of your knowledge what role

20   does MERS play in the recording of mortgages?

21   A.    They record some electronically.

22   Q.    Okay.  Are you familiar with the term "authorized

23   signatory"?

24   A.    I am.

25   Q.    And what is your understanding of that term?

RESIDENTIAL CAPITAL, LLC, ET AL.                          14

1   A.    It means I'm authorized to sign on behalf of the company.

2   Q.    Okay.  As part of your job, were you authorized to sign

3   document on behalf of GMAC Mortgage?

4   A.    Yes, I was.

5   Q.    All right.  Excuse me.  Let me rephrase that question for

6   the record.  When you were part of the affidavits team, were

7   you authorized to sign documents on behalf of GMAC Mortgage?

8   A.    Yes.

9   Q.    Okay.  Thank you.  As part of your job with the affidavits

10  team, did you sign documents on behalf of any other entity

11  other than GMAC Mortgage?

12  A.    Yes, I did.

13  Q.    And what entity or entities?

14  A.    For MERS, I signed.

15  Q.    Okay.  And when did you first become an authorized

16  signatory for MERS?

17  A.    20-, the end of 2010.

18  Q.    Okay.  And how long were you an authorized signatory for

19  MERS?

20  A.    About two years.

21  Q.    Okay.  And did you have to -- was there a process to

22  become an authorized signatory for MERS?

23  A.    Yes, we -- we needed to be tested --

24  Q.    Okay.

25  A.    -- prior to obtaining the signing.

RESIDENTIAL CAPITAL, LLC, ET AL.                    15

1    Q.    And was that test given on a regular or a periodic basis?

2    A.    Periodic basis.

3    Q.    Okay.  Was that every couple months, every year?

4    A.    Once a year.

5    Q.    Okay.  So you needed to renew your qualifications on an

6    annual basis?

7    A.    Yes.

8    Q.    Okay.  Now, what documents were you authorized to sign on

9    behalf of MERS?

10   A.    Assignments and SOTs.

11   Q.    And when you say "SOT", what does that mean?

12   A.    Substitute of trustee.

13   Q.    Substitution of trustee?

14   A.    Yes, sorry.

15   Q.    Okay.  In 2011, to the best of your knowledge,

16   approximately how many documents did you sign for GMAC Mortgage

17   on average in a given day in connection with the debtors'

18   administration and enforcement of defaulted loans?

19   A.    I would say about 20.

20   Q.    Okay, and when signing documents, such as assignments, did

21   you use a stamp or was each document hand-signed?

22   A.    A stamp and hand-signed.

23   Q.    So was your signature hand-signed?

24   A.    Yes, my signature was hand-signed.

25   Q.    And what was stamped?

1   A.   The stamp was the -- goes underneath my signature.

2   Q.   Okay, and the stamp gave your title and your position?

3   A.   Yes, my title.

4   Q.   Okay.

5   A.   Um-hum.

6   Q.   While you were on the affidavits team, did you ever ask

7   anyone to sign your name to a document on your behalf?

8   A.   No.

9   Q.   Okay.  Given your servicing and foreclosure experience,

10  what would be the consequences for you, personally, if an

11  assignment or such other document was deemed invalid because

12  your signature was deemed to be forged?

13  A.   We would -- we would be terminated.

14  Q.   Okay.  As Judge Glenn mentioned at the outset, we're here

15  to discuss certain documents executed in connection with Ms.

16  Silver's loan.  Are you familiar with this loan?

17  A.   Yes.

18  Q.   Okay.  Are you aware that Ms. Silver is involved in

19  litigation against certain parties, including GMAC Mortgage?

20  A.   Yes.

21  Q.   Thank you.  Are you aware Ms. Silver filed a proof of

22  claim against GMAC Mortgage in these bankruptcy cases?

23  A.   Yes.

24  Q.   Okay.  And are you also aware that the ResCap Borrower

25  Claims Trust filed an objection against Ms. Silver's proof of

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

1  claim in these cases?

2  A.    Yes.

3  Q.    Okay.  Were you asked to execute any declarations in

4  connection with the claims objection?

5  A.    Yes, I was.

6  Q.    Okay.  There's an exhibit before you which has a yellow

7  stamp marked 4, Exhibit 4.  Do you mind just taking a moment to

8  look at that?

9  A.    Um-hum.  Okay.

10  Q.    Have you seen that before today?

11  A.    I have.

12  Q.    Okay, and what is this document?

13  A.    This is a declaration that I signed in regards to the

14  case.

15  Q.    Okay.  And are you familiar with the contents of this

16  declaration?

17  A.    Yes, I am.

18  Q.    Okay.  Would you describe, generally, the statements that

19  you made in this declaration?

20  A.    I just stated that I signed both documents.

21  Q.    Okay.  And when you say "both documents", what documents

22  are you referring to?

23  A.    The assignment of mortgage and substitution of trustee.

24  Q.    Okay.  At the time you attested to the statements in the

25  declaration, did you believe them to be true and accurate?

RESIDENTIAL CAPITAL, LLC, ET AL.                    18

1    A.   I did.

2    Q.   Okay.  And did you sign the declaration attesting to its

3    truth?

4    A.   Yes.

5    Q.   Okay.  Before you is an exhibit marked 4(i).

6    A.   Okay.

7    Q.   Okay, you see that document?

8    A.   Yes, I do.

9    Q.   Okay.  And what is that document?

10   A.   The declaration.

11   Q.   Okay.

12   A.   Yeah.

13   Q.   And does it include your actual signature on it?

14   A.   It does.

15   Q.   Okay.  So that is your signature on the bottom of it?

16   A.   Yes, it is.

17   Q.   Okay.  Did you participate telephonically at the February

18   25th hearing?

19   A.   Yes, I did.

20   Q.   Okay.  And did you swear under oath that the information

21   contained in your declaration in support of Borrower's Trust

22   objection to Ms. Silver's proof of claim is true and correct?

23   A.   Yes.

24   Q.   Okay.  And do you still believe the information in that

25   declaration to be true and correct today?

1    A.    I do.

2    Q.    Okay.

3          MR. WISHNEW:  Your Honor, I'd like to offer into

4    evidence the Keeley declaration, which is Exhibit 4 of the

5    Borrower's Trust objection.

6          I'd also like to offer into evidence the hand-signed

7    copy of Ms. Keeley's declaration marked today as Exhibit 4(i).

8          THE COURT:  All right, hearing no one -- no one here

9    to object, both Exhibit 4 and 4(i) are admitted into evidence.

10   (Keeley declaration was hereby received into evidence as

11   Debtor's Exhibit 4, as of this date.)

12   (Hand-signed copy of Ms. Keeley's declaration was hereby

13   received into evidence as Debtor's Exhibit 4(i), as of this

14   date.)

15         MR. WISHNEW:  Thanks very much, Your Honor.

16   Q.    Ms. Keeley, when you were employed with GMAC Mortgage,

17   what was GMAC Mortgage's connection to the loan held by Ms.

18   Silver?

19   A.    We were servicing the loan.

20   Q.    Okay.  Were you involved in preparing or executing any

21   assignments related to Ms. Silver's loan documents?

22   A.    I executed them.

23   Q.    Okay.

24   A.    Or, I didn't prepare them.

25   Q.    Okay.  And what documents did you execute?

RESIDENTIAL CAPITAL, LLC, ET AL.                          20

1   A.   The assignment of mortgage and substitution of trustee.

2   Q.   Okay.  There are two other documents before you.  Let's

3   take a look at the first one marked Exhibit 4(A).

4   A.   Okay.

5   Q.   Do you recognize this document?

6   A.   I do.

7   Q.   Okay, and -- okay.  And have you seen it before today?

8   A.   Yes.

9   Q.   Okay, and what is this document?

10  A.   Assignment of deed of trust.

11  Q.   And that is your signature under the MERS signature block?

12  A.   Yes, it is.

13  Q.   Okay.  To the best of your ability, can you explain why

14  the rights associated with Ms. Silver's deed of trust and note

15  needed to be assigned to GMAC Mortgage?

16  A.   So we could service the loan.

17  Q.   Okay.  And to the best of your knowledge, who made the

18  request to you to execute the assignment?

19  A.   Default counsel.

20  Q.   And when you say "default counsel", what does that mean?

21  A.   That's the foreclosure -- local counsel that was handling

22  the actual foreclosure.

23  Q.   Okay.  Would you mind briefly discussing the steps you

24  took before you executed this document?

25  A.   What I would do first is see that they needed the

RESIDENTIAL CAPITAL, LLC, ET AL.                     21

1    assignment executed, and I would go into a system called LPS

2    which is like a housing system.

3              THE COURT:  I'm sorry, it's a what system?

4              THE WITNESS:  It's a housing system for these legal

5    documents to be reviewed.

6    A.    It also houses the borrower's loan documents, mortgage,

7    note, payment histories, things like that.  And I would print

8    out the assignment or substitution of trustee, review it,

9    assign the actual documents, review them, make sure everything

10   is accurate, and then I could execute.  So it was a review

11   period before assign.

12   Q.    And for the assignment of the deed of trust, did you

13   prepare the document yourself or was it prepared by someone

14   else and you ex --

15   A.    It was prepared by default counsel.

16   Q.    Okay, and you executed the finalized document after

17   reviewing -- after going through the steps you just laid out?

18   A.    Correct.

19   Q.    Okay.  And when was the assignment dated?

20   A.    July 5th, 2011.

21   Q.    Okay.  And do you recognize -- you're going to -- went

22   past it already.  Do you recognize the second signature on this

23   document?

24   A.    Yes, I do.

25   Q.    And whose signature is that?

RESIDENTIAL CAPITAL, LLC, ET AL.                    22

1  A.    It's my signature.

2  Q.    And was this assignment assigned on the same day it was

3  dated?

4  A.    Yes.

5  Q.    Okay, and was it your practice to date documents the same

6  day you assign them?

7  A.    Yes.

8  Q.    Okay, were you authorized by MERS to execute this

9  assignment?

10  A.    Yes, I was.

11  Q.    When you executed the assignment, did you believe the

12  information included in the assignment to be true and accurate?

13  A.    Yes, I did.

14  Q.    Okay.

15        MR. WISHNEW:  Your Honor, I'd like to introduce the

16  assignment of deed of trust into evidence attached to Ms.

17  Keeley's declaration as Exhibit 4(A).

18        THE COURT:  Could you -- before I rule, could you

19  inquire about the notarization?

20        MR. WISHNEW:  Of course, Your Honor.

21  Q.    Okay.  Ms. Keeley, if you look at the bottom half of the

22  assignment of deed of trust, this document is notarized.  Can

23  you tell me who it's notarized by?

24  A.    By Mary Lynch.

25  Q.    And do you happen to know who Mary Lynch is?

1   A.    I do.

2   Q.    Was she a GMAC Mortgage employee?

3   A.    Yes, she worked there.

4   Q.    Was she part of the affidavits team --

5   A.    Yes.

6   Q.    -- you worked with?

7   A.    Um-hum.

8   Q.    Okay, and was Ms. Lynch someone you typically would ask to

9   notarize a document?

10  A.    Yes.

11  Q.    Okay, and so you sign document before her and then she

12  affixed her notary?

13  A.    Yes.

14  Q.    Okay.

15          MR. WISHNEW:  Your Honor --

16          THE COURT:  Were you working -- where was your office?

17          THE WITNESS:  In Fort Washington, Pennsylvania.

18          THE COURT:  And both you and Ms. Lynch were in the

19  same location?

20          THE WITNESS:  Yes.

21          THE COURT:  All right, Exhibit 4(A) is admitted into

22  evidence.

23  (Assignment of Deed of Trust was hereby received into evidence

24  as Debtors' Exhibit 4(A), as of this date.)

25          MR. WISHNEW:  Thank you very much, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                    24

1   Q.   Okay, Ms. Keeley, to the best of your recollection, were

2   there other documents you executed on behalf of MERS or GMAC

3   Mortgage relating to Ms. Silver's loan?

4   A.   Yes, the substitution of trustee.

5   Q.   Okay.  Would you mind taking a look at the Exhibit marked

6   4(B)?  Do you recognize this document?

7   A.   I do.

8   Q.   Have you seen it before today?

9   A.   Yes, I have.

10  Q.   Would you mind describing this document?

11  A.   It's a document that -- sorry -- that we would sign to

12  make sure that we could substitute the trustee from -- from

13  LandAmerica Commonwealth to ETS.

14  Q.   Okay.

15  A.   Sorry about that.

16  Q.   That's okay.  That's okay.  Excuse me.

17       And what is the purpose of the substitution?

18  A.   So we could service the loan.

19  Q.   Okay.  And to the best of your recollection, who made that

20  request to you to execute the substitution?

21  A.   Our default counsel.

22  Q.   Okay.  And similar to what you did previously, can you

23  discuss the steps you took before executing the substitution of

24  trustee?

25  A.   Yes, I reviewed the document in comparison to the actual

RESIDENTIAL CAPITAL, LLC, ET AL.                    25

1  note, mortgage, payment history, and other relevant documents,

2  confirm them to be true, and executed the document.

3  Q.   Okay.  Did you prepare the substitution yourself, or were

4  they prepared by somebody else and you executed the finalized

5  document?

6  A.   They were -- they were prepared by default counsel and I

7  executed the final.

8  Q.   Okay, so you did your review of the documents first --

9  A.   Yes.

10  Q.   -- and then signed it?  Okay.  And when is this document

11  dated?

12  A.   7/6/2011.

13  Q.   So July 6th, 2011?

14  A.   Yes.

15  Q.   Okay.  Do you recognize the signature on the bottom?

16  A.   Yes.

17  Q.   And is that your signature?

18  A.   It is.

19  Q.   Okay.  Who authorized you to execute this substitution of

20  trustee?

21  A.   GMAC Mortgage.

22  Q.   Okay.  And was the substitution of trustee signed on the

23  day it was dated?

24  A.   Yes, it was.

25  Q.   Okay, and is it -- why is this document dated a day after

1  the assignment of deed of trust?

2  A.   All the substitution of trustees needed to be signed a day

3  after the assignments.  It was California law.

4  Q.   Okay.  And why is -- well, before I get there, now, who is

5  Nicole Shelton (ph.)?

6  A.   Nicole Shelton is another notary that was working in Fort

7  Washington.

8  Q.   Okay, and she was working in -- Nicole is a woman?

9  A.   Yes.

10  Q.   Okay, and Nicole was part of the affidavits team?

11  A.   Yes, she was.

12  Q.   Okay, and so the affidavits team had more than one

13  eligible notary to witness documents in the regular course?

14  A.   Yes, we did.

15  Q.   Okay.  And so when you signed this document, you signed it

16  in the presence of Ms. Shelton?

17  A.   I did.

18  Q.   Okay.  Why was the substitution of trustee signed for GMAC

19  Mortgage and the assignment of the deed of trust signed for

20  MERS?

21  A.   Because that was what we were assigning it to.

22  Q.   Okay.  And when you executed the substitution, did you

23  believe the information included to be true and accurate?

24  A.   Yes, I did.

25  Q.   And do you still believe the information contained in the

1    document to be true and accurate?

2    A.    I do.

3    Q.    Okay.

4          MR. WISHNEW:  Your Honor, I'd like to introduce into

5    evidence Exhibit 4(B).

6          THE COURT:  Exhibit 4(B) is in evidence.

7    (Substitution of trustee document was hereby received into

8    evidence as Debtors' Exhibit 4(B), as of this date.)

9          MR. WISHNEW:  Thank you very much, Your Honor.

10   Q.    Ms. Keeley, can you look at -- if you wouldn't mind

11   putting side-by-side, 4(A) -- or the signature block on 4(A),

12   the signature block on 4(B) and the signature block on 4(i)?

13   A.    Um-hum.  Okay.

14   Q.    Okay.  Even though you've already testified to -- that is

15   your signature on each of those documents?

16   A.    Yes, it is.

17   Q.    Okay.  When you sign documents, are your signatures always

18   identical from --

19   A.    No, they're --

20   Q.    -- one document to the next?

21   A.    Not all the time.

22   Q.    Okay.  Would it be fair to say that each of the signatures

23   on each of the exhibits is a little different from one another?

24   A.    Yes.

25   Q.    Okay.  Would it also be fair to say that just because the

RESIDENTIAL CAPITAL, LLC, ET AL.                                    28

1   signatures are different does not mean you did not sign the

2   document?

3   A.    Correct.

4   Q.    Okay.  Do you have any doubts, sitting here today, that

5   each of these is your signature?

6   A.    Not at all.

7   Q.    Okay.  Just a few more questions.  When did you become

8   aware that the authenticity of your signatures was being

9   contested in Ms. Silver's litigation?

10  A.    Last October.

11  Q.    Okay, and who -- how did you come to learn that?

12  A.    I was contacted by an attorney within our company.

13  Q.    Okay, and before today, have you testified before another

14  court concerning the authenticity of your signatures?

15  A.    I did the telephonic hearing, but I never testified in

16  person.

17  Q.    Okay.

18           THE COURT:  May I ask what telephonic hearing?  The

19  one here?

20           MR. WISHNEW:  Yes.

21           THE WITNESS:  Oh, yes.  Sorry.

22  Q.    Since you began your career, have you ever been accused of

23  having your signatures forged?

24  A.    No.

25  Q.    Aside from Ms. Silver, has anyone ever challenged the

1    authenticity of your signatures while you worked for GMAC

2    Mortgage?

3    A.    No.

4    Q.    Okay.  During your career at GMAC Mortgage, have you ever

5    had any disciplinary action taken against you for improperly

6    performing your work duties?

7    A.    No.

8    Q.    Okay.

9           MR. WISHNEW:  One moment, Your Honor.

10          THE COURT:  While you're doing that, Exhibit 4(A) and

11   4(B), the first page of each of those exhibits is a recording

12   document from the recorder's office in Los Angeles.  Can you

13   tell me, when you sign the assignment of deed of trust and the

14   substitution of trustee, what do you do with the documents?

15          THE WITNESS:  After we sign them, we mail them back to

16   default counsel, and they have them record it.

17          THE COURT:  Do you know who default counsel was in

18   this instance?

19          THE WITNESS:  In this instance, it's -- I believe it

20   was ETS.  They were -- well, actually, they were -- they were

21   the attorney -- they weren't technically an attorney, but they

22   were the ones that handled files for us in California.

23          THE COURT:  All right, so you sent them to ETS?

24          THE WITNESS:  ETS, yes.

25          THE COURT:  Go ahead, Mr. Wishnew.

RESIDENTIAL CAPITAL, LLC, ET AL.                    30

1          Thank you.

2          THE WITNESS:  Um-hum.

3          MR. WISHNEW:  Your Honor, at this point, I have no

4    further questions for Ms. Keeley.

5          THE COURT:  You're excused.

6          THE WITNESS:  Okay.  Thank you.

7          THE COURT:  Thank you very much for your testimony.

8          THE WITNESS:  Thank you.

9          THE COURT:  All right, you don't have any other

10   witnesses, I take it, Mr. Wishnew?

11         MR. WISHNEW:  No, Your Honor.

12         THE COURT:  Or any other exhibits?

13         MR. WISHNEW:  No, Your Honor.

14         THE COURT:  All right.  With that, I'm going to take

15   under submission the Trust's objection to claim 61 of Francine

16   Silver, and in due course, I will enter an opinion or order

17   with respect to that objection.  All right?

18         MR. WISHNEW:  Very good.

19         THE COURT:  Thank you.

20         MR. WISHNEW:  Thank you.

21         THE COURT:  Okay.  We're off the record.

22      (Whereupon these proceedings were concluded at 2:37 PM)

23

24

25

```
 1

 2                              I N D E X

 3

 4   WITNESS                 EXAMINATION BY        PAGE

 5   Jacqueline Keeley    Mr. Wishnew          10

 6

 7                              EXHIBITS

 8   DEBTOR'S               DESCRIPTION         PAGE

 9   4                     Keeley declaration  19

10   4(i)                  Hand-signed copy    19

11                         of Ms. Keeley's

12                         declaration

13   4(A)                  Deed of Trust       23

14   4(B)                  Substitution of     27

15                         trustee document

16

17

18

19

20

21

22

23

24

25
```

1

2                     C E R T I F I C A T I O N

3

4   I, Dena Page, certify that the foregoing transcript is a true

5   and accurate record of the proceedings.

6

7

8

9

10

11   _____

12   DENA PAGE, AAERT CET**D-629

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  April 17, 2015

19

20

21

22

23

24

25