## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

**IN RE: RESIDENTIAL CAPITAL, LLC., et al,**          **Case No. 12-12020**

**Debtors.**                                          **Chapter 11**

### DECLARATION OF INMER CAMPOS CARRANZA

I, Inmer Campos Carranza, am the age of majority, of sound mind, capable of making this declaration, and I have personal knowledge of the facts herein. I would testify to these facts if called upon to do so in a court of law. Therefore, under penalty of perjury pursuant to the laws of the United States, 18 U.S.C § 1621, I declare:

1.    I have filed a proof of claim in the above-captioned case In re: Residential Capital LLC, et al., Case No. 12-12020.

2.    I have valid claims against the trust because I had filed a lawsuit against GMAC in the Eastern District of Virginia for actions GMAC took against me in wrongfully foreclosing on my home.

3.    In the lawsuit, I alleged breach of contract for breach of the deed of trust, breach of contract for breach of the implied covenant of good faith and fair dealing, and demanded Declaratory Judgment, damages, rescission and equitable relief.

4.    Shortly after I filed my federal lawsuit, GMAC declared bankruptcy and my lawsuit against GMAC was automatically stayed.

5.    At the time the case was stayed, my lawyers had not conducted any discovery.

6.    I purchased a home located at 3207 Berkley Lane, Woodbridge, VA 22193, as a place for my family of six to call home.

7.    In May of 2007, I refinanced my home loan for a principal sum of $237,000.00. (Ex. 1). The note is secured by a Deed of Trust dated May 9, 2007, which was recorded in the Circuit Court Clerk's Office.

8.    The Note and Deed of Trust obligated me to make my mortgage payments to Reliance Lending, Inc.

9.    At some point after refinancing, Freddie Mac purchased the note and made GMAC servicer. (Ex. 2, "Yes! Our records show that Freddie Mac is owner of your mortgage.")

10.    I came to learn that GMAC was supposed to collect payments from me, communicate with me, provide loss mitigation alternatives, and respond to default, if any. I understand that GMAC's servicing responsibility was governed by Freddie Mac's Single Family Seller/Servicer Guide ("the Guide"). (Ex. 3).

11.    I understand that GMAC was required by its contract with Freddie Mac to follow the Freddie Mac instructions for servicing my loan.

12.    I made my mortgage payments timely until my wife and I began to experience a financial hardship due to my wife's medical condition requiring immediate surgery in 2011.

13.    My wife is a non-salaried cleaner at a hotel. We rely on her income. When she was ill, she missed three months of work without pay.

14.    Both the loss of my wife's income and the costs associated with her treatment caused a financial burden on our ability to pay the mortgage.

2

15.    We fell behind in the mortgage. I sought assistance from GMAC to see whether there were any repayment plans we could enter to cure any arrearage. However, GMAC refused to consider any request to work with us in order to bring our mortgage current under any kind of work out or plan.

16.    I intended and was attempting to cure the default and communicated this to GMAC.

17.    On about October 12, 2011, we were behind in the mortgage and GMAC sent us a default notice demanding payment of $2,210.76, which included the September and October 2011 mortgage payments, $311.46 for "fees, costs, and other accrued to date." (Ex. 4).

18.    Paragraph 6 of the Note provides that the servicer is allowed to send me a written notice of default "telling [me] that if [I] do not pay the overdue amount by a certain date, the Note Holder may require [me] to pay immediately the full amount of Principal which has not been paid an all the interest that [I] owe on that amount." (Ex. 1, ¶ 6(C)).

19.    Paragraph 6 also provides "if the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law." (Ex. 1, ¶ 6(E)).

20.    At the time GMAC sent me the October 12, 2011, default notice, I had on October 12, 2011, already paid $1621.82. Even assuming GMAC's notice of default provided the correct amount of overdue charges that it was entitled to collect from me, I was only in arrears by $588.94 pursuant to the October 2011 notice.

21.    In early November 2011, I contacted GMAC to pay the $588.94 balance as well as the November 2011 mortgage payment. GMAC refused to accept any payment that I tendered. Instead, GMAC told me that I was now required to pay approximately $3000.00 to cure the default. This amount demanded by GMAC supposed included the November 2011 payment and other costs that were not permitted under the terms of the Note.

22.    GMAC refused to accept my payments to cure default. They kept making up new amounts that they said I owed, which I knew to be incorrect.

23.    In January 2012, I contacted GMAC about loss mitigation alternatives, including whether I would qualify to participate in the Home Affordable Modification Program, "HAMP."

24.    On January 30, 2012, I submitted to GMAC a completed HAMP loan modification application.

25.    By way of letter dated January 23, 2012, Shapiro Brown & Alt, a foreclosure mill, sent me a letter that stated it was instructed to initiate legal action based on GMAC's claim that I was in default and that I owed $243,947.72.

26.    I did not owe that amount of money on January 23, 2012, when Shapiro Brown & Alt wrote that letter.

27.    I now know that Shapiro Brown & Alt did not request or have the original note, copies of the deed of trust and copies of the breach/acceleration letter within two days of the date my loan was referred for foreclosure. Shapiro Brown & Alt should have had the original note, deed of trust and letter no later than January 25, 2012.

28.    If Shapiro Brown & Alt had those required documents, it could see that I didn't owe the amount of money in the letter and that Freddie Mac was the investor, noteholder and beneficiary of the deed of trust.

29.    Also, I now know that GMAC was required to send the foreclosure mill attorneys at Shapiro Brown & Alt a written certification at least seven, but no more than 15 days prior to a foreclosure sale date that there is no payment arrangement pending or pending alternative to foreclosure.

30.    The payments I had tendered in order to cure as well as the loan modification application I completed and submitted to GMAC were such a "pending alternative to foreclosure."

31.    GMAC didn't provide written certification required by Freddie Mac.

32.    On the loan modification application itself there is an Acknowledgment and Agreement that I had to sign, and which states "the Servicer will not refer the account to foreclosure or conduct the foreclosure sale if already referred, while it is being reviewed for the Making Home Affordable program unless required by your investor. " I relied on this representation to my detriment.

33.    On or about February 27, 2012, Shapiro Brown & Alt sent me a foreclosure notice that my home was to be sole on March 20, 2102.  At the time I received that foreclosure notice, I was still being considered for the loan modification, which I believed I would get since the investor was Freddie Mac.

34.    Sometime after the March 20, 2012, foreclosure sale, I received a letter dated March 14, 2012, from GMAC stating that the investor did not give them authority to modify the loan.

35.    At that time, I did not know that GMAC was lying about the investor refusing to give authority. I later learned that Freddie Mac had expressly given GMAC authority to modify its mortgages.

36.    Even though I had made payments to cure the default, GMAC refused them. Even though I had submitted a completed application for a HAMP loan modification, GMAC turned me down based on what I now know was a lie. Even though the loan modification application expressly stated that GMAC would not foreclose, it foreclosed anyway on March 20, 2012, and sold my home to a third party investor for only $147,500.00.

37.    At the time GMAC illegally foreclosed, I believe my home was worth at least $198,954.00 that the GMAC broker valued the home (Kathy Priore Decl. ¶ 19)(Doc. 8143-3). At a minimum, it was probably worth more than its tax-assessed value of $153,000.00.

| Year | Property taxes | Change | Tax assessment | Change |
|------|------|------|------|------|
| 2014 | $2,380 | +20.2% | $186,000 | +18.0% |
| 2013 | $1,980 | -5.0% | $157,600 | +2.5% |
| 2012 | $2,084 | +38.3% | $153,800 | +1.1% |
| 2011 | $1,507 | -- | $152,100 | +32.7% |
| 2010 | $1,507 | -2.5% | $114,600 | -4.4% |
| 2009 | $1,546 | -36.1% | $119,900 | -49.0% |
| 2008 | $2,420 | -5.8% | $235,000 | -20.3% |
| 2007 | $2,568 | +4.7% | $295,000 | +1.0% |
| 2006 | $2,454 | -- | $292,100 | -- |
| 2005 | $2,454 | +25.3% | $292,100 | +70.0% |
| 2004 | $1,959 | -- | $171,800 | -- |

http://www.zillow.com/homes/3207-berkely-lane-woodbridge-va-_rb/

6

38.   I believe that my home was actually worth closer to $215,000.00, which is the amount that it sold for on May 23, 2013, approximately one year following the wrongful foreclosure.

## Price History

| Date | Event | Price | $/sqft | Source |
|------|-------|-------|--------|--------|
| 05/23/13 | Sold | $215,000+45.8% | $279 | Public Record |
| 05/02/12 | Sold: Foreclosure Auction | $147,500+9.3% | $192 | Public Record |
| 03/06/02 | Sold | $135,000 | $175 | Public Record |

http://www.zillow.com/homes/3207-berkely-lane-woodbridge-va-_rb/

39.   The Claims Trust apparently values my home at $233,364.00 today. (Priore Decl. ¶ 21).

38.   In addition to the lost value of my home, I have had to incur direct expenses of moving, finding other living arrangements, coming up with a security deposit and rent advance, and switching over all the utilities. I estimate the amount I spent in this regard was approximately $4,100.00. I also now pay rent instead of building equity in my home and my rent is more $400 more a month than my previous mortgage payment. I could also be potentially liable for any alleged deficiency due to the wrongful foreclosure sale. Lastly, my credit has been damaged and notated as if I did not make payments when I attempted to do so and it is listed as a foreclosure sale, despite GMAC's promises to me.

40.   I have suffered other serious and ongoing non-economic damages related to the foreclosure such as humiliation, stress, inconvenience, and emotional distress.

7

41.   On January 27, 2014, I received a letter from the Independent Foreclosure Review regarding GMAC's enforcement action related to its deficient mortgage practices. (Ex. 5).

42.   The Declaration of Kathy Priore contains many factually misleading statements. For instance, in paragraph 13, she states that "Debtors' books and records do not reflect any attempt by the Claimant to make any payment during the thirty days following the October Default Letter, or during November 2011."

43.   While GMAC may have failed to note that I not only attempted to make the payments, I did in fact make a payment of $1621.82 on October 12, 2011, which was reflected in my bank statement on October 14, 2011. (Ex. 6). Additionally, I was in fear of losing my home, I was in frequent communication with GMAC by phone, including to try to straighten out the amounts that they claim I owed, to dispute the incursion of involuntary fees I should not be required to pay such as property inspection.

44.   In their denial letter of March 14, 2012, GMAC expressly stated that "We service your loan on behalf of an investor or group of investors that has not given us authority to modify your loan." It also says that they will continue to work with me, but in fact they planned to foreclose no matter what because they refused to accept payment to cure any default as well.

45.   I did everything I could to avoid losing my home to foreclosure by communicating with GMAC, making payments, and attempting to cure the default that I had incurred. GMAC promised me in a written agreement that it wouldn't foreclose while a decision was pending.

46.    GMAC made numerous representations to me, including in writing in the loan modification application that they would not foreclose while an application was pending. I relied on their representation that they would not foreclose while a decision was pending. Had I known that they were intending all along to deny me a loan modification so that they could foreclose, I would have taken a different position on applying for and waiting for the loan modification decisions. I could have retained counsel earlier, attempted a short sale, or borrowed money from other sources. As a result of relying on GMAC's written misrepresentation, I did not take other steps to avoid foreclosure or to protect myself and my property. This has caused me an my family great emotional harm in additional to losing our home, having to move, having to pay rent, having to find a lawyer, file a lawsuit, and experience the indignity of wrongful foreclosure.

Made this __5__ day of May, 2015.         ......................................
                                                              INMER CAMPOS-CARRANZA

Exhibit 1

MIN: 100361300000039797           **NOTE**      Loan Number: ████9512

MAY 9, 2007                    ANNANDALE                VIRGINIA
[Date]                         [City]                   [State]

3207 BERKLEY LN, WOODBRIDGE, VIRGINIA 22193
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $237,000.00          (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is RELIANCE LENDING, INC., A VIRGINIA CORPORATION (CPL # MLB-954)
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   6.500    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the  1st  day of each month beginning on JULY 1
2007 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JUNE 1, 2037           , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 7700 LITTLE RIVER TURNPIKE STE. 201, ANNANDALE, VIRGINIA 22003

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ 1,498.00

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

VA3247.not

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000   % of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

VIRGINIA FIXED RATE NOTE–Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3247 1/01

Page 2 of 4

DocMagic ɛɛʀʌʑ9 800-949-1361
www.docmagic.com

Va3247.aat

## 9.   WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor and waive the benefit of the homestead exemption as to the Property described in the Security Instrument (as defined below). "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
INMER E CAMPOS CARRANZA    -Borrower                              -Borrower


_____ (Seal)          _____ (Seal)
                           -Borrower                              -Borrower


_____ (Seal)          _____ (Seal)
                           -Borrower                              -Borrower



[Sign Original Only]

This is to certify that this is the Note described in and secured by a Deed of Trust dated MAY 9
2007          , on the Property located in    PRINCE WILLIAM          , Virginia.
                                              WOODBRIDGE

My Commission Expires:  June 39 2009


_____
         Notary Public

VIRGINIA FIXED RATE NOTE—Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3247 1/01          Page 4 of 4

DocMagic EFRoms 800-649-1362
www.docmagic.com

*Exhibit "2"*

*UNIVERSAL TITLE*
*7611 Little River Turnpike, Suite 201W*
*Annandale, Virginia 22003*

*Tax Map ID: 8291-37-1345*
*Case#: 36264-CA/SL*

*Prepared By Lender*

This instrument prepared by:

After Recording Return To:
RELIANCE LENDING, INC.
7700 LITTLE RIVER TURNPIKE STE. 201
ANNANDALE, VIRGINIA 22003
Loan Number: ██████9512

Tax Map Reference No.:

PIN:

------------------------ [Space Above This Line For Recording Data] ------------------------

# DEED OF TRUST

MIN: 100361300000039797

The following information, as further defined below, is provided in accordance with Virginia law:

This Deed of Trust is given by   INMER E CAMPOS-CARRANZA

as Borrower (trustor), to   ARUN SAFRA

as Trustee, for the benefit of Mortgage Electronic Registration Systems, Inc., as beneficiary.

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)   "Security Instrument" means this document, which is dated   MAY 9, 2007              , together with all Riders to this document.

(B)   "Borrower" is   INMER E CAMPOS-CARRANZA

Borrower is the trustor under this Security Instrument.

(C)   "Lender" is   RELIANCE LENDING, INC.

Lender is a   A VIRGINIA CORPORATION                                          organized and existing under the laws of   VIRGINIA
Lender's address is   7700 LITTLE RIVER TURNPIKE STE. 201, ANNANDALE, VIRGINIA 22003

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01                                        Page 1 of 15

DocMagic *eForms* 800-649-1362
www.docmagic.com

12-12020-mg    Doc 8580-1    Filed 05/06/15    Entered 05/06/15 16:53:26    Exhibit Ex.

Case 4:12-cv-00094-MSD-TEM    Document 17-2    Filed 06/14/12    Page 3 of 16 PageID# 28

(D)  "Trustee" is  ARUN SAPRA

Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered corporation whose principal office is located in Virginia.  Trustee's address is   7700 LITTLE RIVER TURNPIKE STE 201, ANNANDALE, VIRGINIA 22003

(E)  "MERS" is  Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the beneficiary under this Security Instrument.  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F)  "Note" means the promissory note signed by Borrower and dated   MAY 9, 2007
The Note states that Borrower owes Lender   TWO HUNDRED THIRTY-SEVEN THOUSAND AND 00/100                                    Dollars (U.S. $  237,000.00     ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JUNE 1, 2037       .

(G)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)  "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider        ☐ Planned Unit Development Rider
☐ Balloon Rider                ☐ Biweekly Payment Rider
☐ 1-4 Family Rider             ☐ Second Home Rider
☐ Condominium Rider            ☐ Other(s) [specify]


(J)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)  "Escrow Items" mean those items that are described in Section 3.

(N)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01                                                    Page 2 of 15                                    DocMagic ℰℱℴℛℳℴ 800-649-1362
                                                                                                                 www.docmagic.com

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                              of               PRINCE WILLIAM                    :
[Type of Recording Jurisdiction]                              [Name of Recording Jurisdiction]
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS
EXHIBIT "A".

which currently has the address of                    3207 BERKLEY LN
                                                                          [Street]

              WOODBRIDGE                          , Virginia     22193        ("Property Address"):
                 [City]                                                  [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01                              Page 3 of 15                              DocMagic €Forms  800-649-1362
                                                                          www.docmagic.com

V43047.mzf

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver,

VIRGINIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT • MERS
Form 3047 1/01                                          Page 4 of 16

DocMagic ℗Forms 800-649-1362
www.docmagic.com

Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards

Va3047.mzd

including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

VIRGINIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01                                                          Page 6 of 15
DocMagic eForms 800-649-1362
www.docmagic.com

Va3047.mzd

6.   Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to; (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.   Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the

VaJ047.zml

12-12020-mg    Doc 8580-1    Filed 05/06/15    Entered 05/06/15 16:53:26    Exhibit Ex.

Case 4:12-cv-00094-MSD-TEM   Document 9-2   Filed 06/14/12   Page 9 of 16 PageID# 34

Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage Insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01            Page 8 of 15            DocMagic   800-649-1362
                                                                www.docmagic.com

Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01                Page 9 of 16                DocMagic eForms 800-649-1362 www.docmagic.com

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01                                  Page 10 of 15

DocMagic 800-549-1362
www.docmagic.com

Vul04I.cmd

12-12020-mg    Doc 8580-1    Filed 05/06/15    Entered 05/06/15 16:53:26    Exhibit Ex.

Case 4:12-cv-00094-MSD-TEM    Document 1-2    Pg 26 of 55    Filed 06/14/12    Page 12 of 16 PageID# 37

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19.  Borrower's Right to Reinstate After Acceleration.  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.  Hazardous Substances.  As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances:

V63047.mzd

gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.

Va3047.mzd

Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any liens of record inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

23.  Release. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24.  Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01                                   Page 13 of 18

DocMagic EForms 800-649-1362
www.docmagic.com

NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____(Seal)                    _____(Seal)
INMER F/CAMPOS/CARRANZA -Borrower                                          -Borrower


_____(Seal)                    _____(Seal)
                      -Borrower                                          -Borrower


_____(Seal)                    _____(Seal)
                      -Borrower                                          -Borrower


Witness:                                          Witness:

_____                           _____


VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS        Docitagio @Partiza 800-649-1362
Form 3047 1/01                               Page 14 of 15                          www.docmagic.com

——————————— [Space Below This Line For Acknowledgment] ———————————

State of Virginia

County of __FAIRFAX__

The foregoing instrument was acknowledged before me this __9th__ __day__ __of__ __May__ __2007__

by __INMER E CAMPOS-CARRANZA__

He/She/They is/are personally known to me or has/have produced _____

as identification.

Signature of Person Taking Acknowledgement

Title or Rank

Serial Number, if any

My commission expires the _____ day of

(Seal)

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01                                              Page 16 of 16

DocMagic @PSRUMs 800-649-1362
www.docmagic.com

*Exhibit "3"*

Exhibit 2

Go straight to content.

- Home |
- Terms and Conditions |
- Privacy Policy



Freddie Mac
How to Get Help with Your Mortgage

# Yes. Our records show that Freddie Mac is the owner of your mortgage.

En Español

## What to Do Next

1. **For help with your mortgage, contact your lender and let them know you would like to pursue assistance through the federal Making Home Affordable program.**

   (Your lender is the company to which you make your mortgage payments, and may also be referred to as a mortgage servicer.) Your lender can help you determine if you are eligible for the Making Home Affordable Program. Also, you can explore your eligibility for Making Home Affordable programs by visiting MHA's Web site and answering a series of questions that will help you determine your next step.

   a. **Through the Making Home Affordable program**, there are several options available to you.

      - If you are current on your mortgage payments, but have been unable to refinance due to declining property values, a Home Affordable Refinance (HARP) may better position you for long-term homeownership success. *Freddie Mac is working with our Sellers and Servicers to implement the new enhancements to HARP as announced by the Federal Housing Finance Agency on October 24, 2011; however, these enhancements will not be available immediately.*

      - If you are behind in making your mortgage payments or believe you may be soon, a **Home Affordable Modification** may help you obtain more affordable mortgage payments.

      - If it is not realistic for you to keep your home, a **short sale** or **"deed-in-lieu of foreclosure"** may help you transition to more affordable housing.

   Freddie Mac is working with our mortgage servicers (your lenders) to offer these solutions to eligible borrowers with Freddie Mac-owned mortgages. *Because*

Yes! Our records show that Freddie Mac is the owner of your mortgage. - Freddie Mac

*Freddie Mac does not work directly with consumers, you will need to work with your lender to determine your best foreclosure prevention option.*

b. **If you are not eligible for the Making Home Affordable program,** don't give up! Ask your lender about other options to make your payments more affordable or to avoid foreclosure. There are other options available for homeowners with Freddie Mac-owned mortgages that are available through your lender.

2. **If you are unable to reach your lender, call a U.S. Department of Housing & Urban Development (HUD)-certified housing counselor at 1-800-569-4287 or <u>visit the web site</u> to find a housing counselor in your area.**

Housing counselors can help you contact and work with your lender to get help with your mortgage – free of charge

**Support Information:**

**What to Expect**

**Be patient and diligent.** Lenders are working hard to get to every call and sometimes it takes longer than you expect.

**Be prepared.** Before you call your lender, here's what you'll need for <u>your conversation</u>.

Learn more about the federal <u>Making Home Affordable program</u> and the options available to you.

Thank you for contacting Freddie Mac. One of our top priorities is making sure homeowners with Freddie Mac-owned mortgages are able to get proper help and understand all options available to them during this difficult time.

© Freddie Mac

Select borrower type and enter borrower information to see Investor for MIN 1003613-0000003979-7.

◉ Investor for Individual Borrower

     Your entries may be either upper or lower case.
     Fields markedare required.
     ✱ Last Name: Campos-Carranza
✱ SSN: 612 - 38 - 0156

✱ ☐ By checking this box, the borrower or borrower's authorized representative is attesting to the fact that he or she is in fact the borrower or borrower's authorized representative for the loan in question. Additionally, borrowers wishing to learn the identity of their loan's investor must confirm their identity by entering their last name or corporation name as well as their SSN or TIN. If this information does not match the information contained in the MERS® System for the borrower of the loan, the investor information will not be displayed. Borrowers should verify the results with their loan servicer.
✱

[Submit]

○ Investor for Corporation/Non-Person Entity Borrower

     Your entries may be either upper or lower case.
     Fields markedare required.
     ✱ Corporation/Non-Person Entity Name:
✱ Taxpayer Identification Number:

✱ ☐ By checking this box, the borrower or borrower's authorized representative is attesting to the fact that he or she is in fact the borrower or borrower's authorized representative for the loan in question. Additionally, borrowers wishing to learn the identity of their loan's investor must confirm their identity by entering their last name or corporation name as well as their SSN or TIN. If this information does not match the information contained in the MERS® System for the borrower of the loan, the investor information will not be displayed. Borrowers should verify the results with their loan servicer.
✱

[Submit]

Servicer:   GMAC Mortgage, LLC                         Phone:  (800) 766-4622
               Waterloo, IA

Investor:   Federal Home Loan Mortgage Corporation

[Close Window]

Exhibit 3

## Designated Counsel/Trustee

### Virginia

*Last Updated May 22, 2012*

**Designated Counsel/Trustee**
**Virginia Foreclosures**
**and Bankruptcies**

Samuel I. White, P.C.
Attn: Wm. Adam White, Esq.
5040 Corporate Woods Drive
Suite 120
Virginia Beach, VA 23462

Tel: (757) 490-9284
Fax: (757) 467-2802

E-mail: WwhIte@siwpc.com

McCabe, Weisberg & Conway, LLC
Attn: Laura H.G. O'Sullivan, Esq.
8101 Sandy Spring Road, Suite 100
Laurel, MD 20707

Tel: (301) 490-1196
Fax: (301) 490-1568

E-mail: losullivan@mwc-law.com

Rosenberg & Associates, LLC
Attn: Diane Rosenberg, Esq.
7910 Woodmont Avenue, Suite 750
Bethesda, MD 20814

Tel: (301) 907-8000
Fax: (301) 907-8101

E-mail: diane@rosenberg-assoc.com

Shapiro Brown & Alt, LLP
Attn: Ray Mueller
236 Clearfield Avenue
Suite 215
Virginia Beach, VA 23462

Tel: (757) 687-1670
Fax: (847) 493-7224

E-mail: rmueller@logs.com

**Documents That Must be Received**
**by Counsel/Trustee**
**Within 2 Business Days of Referral**

- Copy of the original title policy
- Original note, copies of the deed of trust, intervening assignments and endorsements, non-military affidavits and any loan modifications
- Executed substitution of trustee
- References in collection notes as to borrower's current address and occupants of property
- Copies of the breach/acceleration/demand letter(s)
- 1–4 Unit Property Inspection Report (Form 1013)
- Full debt and reinstatement figures as of the referral date
- Name of mortgage insurance ("MI") company and MI certificate number (only required for loans with primary mortgage insurance)

Print out the complete Designated Counsel/Trustee list (PDF) or view another state:

| Select State |

© 2012 Freddie Mac



**Freddie Mac**

We make home possible®

**Freddie Mac Single Family**

◄ Back  |  Forward ►                                          |  Print  |  Contact Us

[ Table of Contents ]  [ Advanced Search ]

⊟ Freddie Mac Single Family
    Library Home
  ⊞ Bulletins and Industry Letters
  ⊞ Single-Family Seller/Servicer Guide, Volume 1
  ⊟ Single-Family Seller/Servicer Guide, Volume 2
       Copyright and Disclaimer
       Text Color Coding
    ⊞ Chapter 50: Introduction
    ⊞ Chapter A50: Requirements for Servicing Mortgages Using the Freddie Mac Service Loans Application
    ⊞ Chs. 51–57: General Freddie Mac Policies
    ⊞ Chs. 58–63: Servicing Performing Mortgages
    ⊟ Chs. 64–69: Servicing Nonperforming Mortgages
       ⊞ Chapter 64: Delinquencies
       ⊞ Chapter 65: Loss Mitigation
       ⊞ Chapter A65: Reinstatements and Relief Options
       ⊞ Chapter B65: Workout Options
       ⊞ Chapter C65: Home Affordable Modification Program
       ⊞ Chapter D65: Home Affordable Foreclosure Alternatives
       ⊟ Chapter 66: Foreclosure
            66.1: Introduction (10/01/11)
            66.2: Foreclosure process (10/01/11)
            66.3: Foreclosure process (10/01/11)
            66.4: General requirements (01/14/11)
            66.5: Freddie Mac's rights (06/30/11)
            66.6: Beginning the foreclosure process (10/01/11)
            66.7: Beginning the foreclosure contents (10/01/11)
            66.8: Initiation of foreclosure (01/14/11)
            66.9: Pre-referral account review (10/01/11)
            66.9.1: When to initiate foreclosure on a First-Lien or a Second Mortgage/Home Improvement Loan (H
            66.9.2: Solicitation during the foreclosure process (10/26/11)
            66.10: When to initiate foreclosure on a Second Mortgage/Home Improvement Loan (HIL) (10/01/11)
            66.11: Delaying initiation of foreclosure (10/01/11)
            66.12: Approving initiation of foreclosure on a First-Lien Mortgage or Second Mortgage/Home Improv
            66.12.1: Approving initiation of foreclosure on Mortgaged Premises owned by Borrowers in active mili
            66.13: Approving initiation of foreclosure on a Second Mortgage/Home Improvement Loan (HIL) (05/3
            66.14: Tenant-occupied properties built before 1978 (06/30/11)
            66.15: How to select foreclosure counsel or trustee (10/01/11)
            66.15.1: Compensatory fee for failure to use designated counsel or trustee when required (06/30/11)
            66.15.2: Foreclosure counsel and trustee fees (10/01/11)
            66.16: Initiating foreclosure (10/01/11)
            66.16.1: Initiating foreclosure on a Mortgage secured by a Manufactured Home (06/30/11)
            66.17: Foreclosing in the Servicer's name (04/01/11)
            66.18: What is the first legal action? (12/16/02)
            66.18.1: Choosing a judicial or nonjudicial foreclosure process (01/14/11)
            66.19: What is appropriate foreclosure documentation? (01/14/11)
            66.20: Obtaining the original Note (01/14/11)
            66.21: Reporting requirements (06/30/11)
            66.22: Managing the foreclosure process (10/01/11)
            66.23: Managing the foreclosure process (10/01/11)
            66.24: Servicer's responsibility to work with foreclosure counsel or trustee (10/01/11)
            66.25: Providing information to the foreclosure counsel or trustee; Servicer use of connectivity and in
            66.25.1: Monthly foreclosure reporting (06/30/11)
            66.26: Responding to and reporting Borrower defenses (06/30/11)
            66.27: Reimbursement of expenses for responding to Borrower defenses (05/17/11)
            66.28: Reporting lead-based paint violations (01/14/11)
            66.29: Expenses that may become First Liens on the property (01/14/11)
            66.30: State foreclosure time lines (10/01/11)
            66.30.1: Reporting the scheduled foreclosure sale date (06/30/11)
            66.31: Foreclosure time lines (10/01/11)

You are viewing: 66.41.1: Reviews and certifications prior to foreclosure sale (10/01/11)

◄ Previous | Next ►    View Full Screen

[ Reference ]

Single-Family
Seller/Servicer Guide,
Volume 2
  Chs. 64-69: Servicing
  Nonperforming Mortgages

**66.41.1: Reviews and certifications prior to foreclosure sale (10/01/11)**

**(a)**
**Pre-sale account review by the Servicer**

The Servicer must have written policies and procedures requiring a review of the Mortgage at least 30 days prior to the scheduled foreclosure sale date.

The Servicer must review the account history to verify compliance with all required Borrower outreach and solicitation requirements specified in Chapter 64 and that there is no approved payment arrangement or pending alternative to foreclosure offer for which the Borrower response period has not expired. The Servicer must document the results of their review in the Mortgage file or

POWERED BY ALLREGS                    © 2012 FREDDIE MAC. All Rights Reserved.



> **Freddie Mac Single Family / Single-Family Seller/Servicer Guide, Volume 2 / Chs. 64-69: Servicing Nonperforming Mortgages / Chapter 66: Foreclosure / 66.9.1: When to initiate foreclosure on a First-Lien or a Second Mortgage/Home Improvement Loan (HIL) (10/01/11)**

## 66.9.1: When to initiate foreclosure on a First-Lien or a Second Mortgage/Home Improvement Loan (HIL) (10/01/11)

The Servicer must initiate foreclosure on a First-Lien Mortgage no later than 150 days from the Due Date of Last Paid Installment (DDLPI) (120th day of Delinquency) when the pre-referral account review indicates that there is not an approved payment arrangement or a pending alternative to foreclosure offer.

However, a Mortgage must not be referred to foreclosure if:

- A complete Borrower Response Package is received and the Servicer is still within the 30-day evaluation time period for evaluating the package as prescribed in Section 64.6(d); or
- The Servicer has extended an offer for an alternative to foreclosure, and the period for the Borrower's response has not expired; or
- The Borrower is approved for mortgage assistance under the Hardest Hit Funds initiative as set forth in Bulletin 2010-25 or the Emergency Homeowners' Loan Program as set forth in Bulletin 2011-12
- The Borrower has accepted an offer for an alternative to foreclosure and is performing in accordance with its terms

A Servicer may postpone referral to foreclosure up to 10 days to provide additional time for the Borrower to submit a complete package if it has received a Borrower Response Package that is only missing the hardship documentation ("substantially complete Borrower Response Package"). If the Borrower submits the hardship documentation within this 10-day period, the Servicer must postpone referral to foreclosure to complete its evaluation of the Borrower Response Package, such postponement not to exceed 30 days.

Solely for the purpose of postponing referral to foreclosure, a Borrower's notification to the Servicer that he or she intends to accept an offer may be demonstrated as follows:

- Verbal notification
- Written notification
- Remittance of a payment due under an alternative to foreclosure offer that requires payment (i.e., forbearance, repayment or Trial Period Plan)

If the Borrower communicates an intent to accept the alternative to foreclosure within 14 days from the date of the Borrower Evaluation Notice offer as described above, the Servicer must postpone referral to foreclosure. Additionally, in cases where a payment is required under the terms of an alternative to foreclosure offer, and the Borrower communicates a verbal or written intent to accept an alternative to foreclosure offer, the Servicer must postpone referral to foreclosure until the last day of the month that the first payment is due under the terms of the alternative to foreclosure offer. If the Servicer receives the first payment timely in accordance with the terms of a Trial Period Plan, the Servicer must delay the next legal action in the foreclosure process until the first month following the end of the Trial Period Plan. If the Servicer receives the first payment timely in accordance with the terms of a repayment plan or forbearance plan, the Servicer must delay the next legal action unless the Borrower breaches the plan.

On a Second Mortgage/HIL the Servicer must submit a recommendation to Freddie Mac to initiate foreclosure no later than 150 days from the Due Date of Last Paid Installment

(DDLPI) (120th day of Delinquency). See Section 66.13 for details on submitting the recommendation to Freddie Mac.

Additionally, unless Freddie Mac requires the Servicer to obtain Freddie Mac's approval prior to initiating foreclosure (refer to Section 66.12 for instances where Freddie Mac must approve the referral of the Mortgage to foreclosure), if the Borrower has abandoned the property, then the Servicer may initiate foreclosure as soon as it is legally possible to do so.

The Servicer must comply with the foreclosure referral requirements of the FHA, VA, Rural Housing Service (RHS) or MI, if applicable.



> Freddie Mac Single Family / Single-Family Seller/Servicer Guide, Volume 2 / Chs. 64-69: Servicing Nonperforming Mortgages / Chapter 66: Foreclosure / 66.41.1: Reviews and certifications prior to foreclosure sale (10/01/11)

## 66.41.1: Reviews and certifications prior to foreclosure sale (10/01/11)

### (a) Pre-sale account review by the Servicer

The Servicer must have written policies and procedures requiring a review of the Mortgage at least 30 days prior to the scheduled foreclosure sale date.

The Servicer must review the account history to verify compliance with all required Borrower outreach and solicitation requirements specified in Chapter 64 and that there is no approved payment arrangement or pending alternative to foreclosure offer for which the Borrower response period has not expired. The Servicer must document the results of their review in its Mortgage file or servicing system.

### (b) Certification to Foreclosure Attorney/Trustee

At least seven, but no more than 15 days prior to foreclosure sale, the Servicer must review the account and send written certification to the attorney/trustee indicating that the foreclosure sale must continue unless:

- The account review reveals that all Borrower outreach and solicitation requirements have not been achieved, or
- There is an approved payment arrangement or pending alternative to foreclosure offer for which the Borrower response period has not expired, or
- The Servicer exercised its discretion to postpone the foreclosure sale to facilitate resolution of an escalated case. (Refer to Section 51.5.1 regarding escalated cases.)

If any of the above exceptions apply, then the Servicer must not provide the certification and must make every effort to stop a scheduled foreclosure sale.

The Servicer must document the results of its review in its Mortgage file or servicing system.

The Servicer must work with the attorney/trustee to develop a process for receipt of the foreclosure certification to prevent unnecessary delays. If the attorney/trustee cancels the foreclosure sale due to the Servicer's failure to provide the foreclosure certification timely, the Servicer will be subject to compensatory fees for delays resulting from such a cancellation.

Freddie Mac Single Family / Single-Family Seller/Servicer Guide, Volume 2 / Chs. 64-69: Servicing Nonperforming Mortgages / Chapter 66: Foreclosure / 66.54: Vesting the title and avoiding transfer taxes (04/01/11)

## 66.54: Vesting the title and avoiding transfer taxes (04/01/11)

After the foreclosure sale the Servicer must ensure that the title to the property is vested to the appropriate party.

### (a) Conventional Mortgages

The Servicer must ensure that its foreclosure counsel or trustee conducts the foreclosure in the Servicer's name and that title to the property is vested in Freddie Mac's name (if the property is not purchased by a third party). This must be done in a manner that does not result in an obligation to pay transfer taxes. Freddie Mac will not reimburse the Servicer for any transfer taxes.

If the foreclosure involves a Manufactured Home in a certificate of title State, the Servicer must conduct the replevin or other legal action necessary to repossess the home in the Servicer's name and have the new certificate of title issued in Freddie Mac's name.

### (b) FHA, Section 502 GRH or VA Mortgages

The Servicer must follow FHA, Rural Housing Service (RHS) or VA guidelines for conveying title to the foreclosed property to the applicable agency.



---

> **Freddie Mac Single Family / Single-Family Seller/Servicer Guide, Volume 2 / Chs. 64-69: Servicing Nonperforming Mortgages / Chapter 66: Foreclosure / 66.9.1: When to initiate foreclosure on a First-Lien or a Second Mortgage/Home Improvement Loan (HIL) (10/01/11)**

## 66.9.1: When to initiate foreclosure on a First-Lien or a Second Mortgage/Home Improvement Loan (HIL) (10/01/11)

The Servicer must initiate foreclosure on a First-Lien Mortgage no later than 150 days from the Due Date of Last Paid Installment (DDLPI) (120th day of Delinquency) when the pre-referral account review indicates that there is not an approved payment arrangement or a pending alternative to foreclosure offer.

However, a Mortgage must not be referred to foreclosure if:

- A complete Borrower Response Package is received and the Servicer is still within the 30-day evaluation time period for evaluating the package as prescribed in Section 64.6(d); or

- The Servicer has extended an offer for an alternative to foreclosure, and the period for the Borrower's response has not expired; or

- The Borrower is approved for mortgage assistance under the Hardest Hit Funds Initiative as set forth in Bulletin 2010-25 or the Emergency Homeowners' Loan Program as set forth in Bulletin 2011-12

- The Borrower has accepted an offer for an alternative to foreclosure and is performing in accordance with its terms

A Servicer may postpone referral to foreclosure up to 10 days to provide additional time for the Borrower to submit a complete package if it has received a Borrower Response Package that is only missing the hardship documentation ("substantially complete Borrower Response Package"). If the Borrower submits the hardship documentation within this 10-day period, the Servicer must postpone referral to foreclosure to complete its evaluation of the Borrower Response Package, such postponement not to exceed 30 days.

Solely for the purpose of postponing referral to foreclosure, a Borrower's notification to the Servicer that he or she intends to accept an offer may be demonstrated as follows:

- Verbal notification

- Written notification

- Remittance of a payment due under an alternative to foreclosure offer that requires payment (i.e., forbearance, repayment or Trial Period Plan)

If the Borrower communicates an intent to accept the alternative to foreclosure within 14 days from the date of the Borrower Evaluation Notice offer as described above, the Servicer must postpone referral to foreclosure. Additionally, in cases where a payment is required under the terms of an alternative to foreclosure offer, and the Borrower communicates a verbal or written intent to accept an alternative to foreclosure offer, the Servicer must postpone referral to foreclosure until the last day of the month that the first payment is due under the terms of the alternative to foreclosure offer. If the Servicer receives the first payment timely in accordance with the terms of a Trial Period Plan, the Servicer must delay the next legal action in the foreclosure process until the first month following the end of the Trial Period Plan. If the Servicer receives the first payment timely in accordance with the terms of a repayment plan or forbearance plan, the Servicer must delay the next legal action unless the Borrower breaches the plan.

On a Second Mortgage/HIL the Servicer must submit a recommendation to Freddie Mac to initiate foreclosure no later than 150 days from the Due Date of Last Paid Installment

(DDLPI) (120th day of Delinquency). See Section 66.13 for details on submitting the recommendation to Freddie Mac.

Additionally, unless Freddie Mac requires the Servicer to obtain Freddie Mac's approval prior to initiating foreclosure (refer to Section 66.12 for instances where Freddie Mac must approve the referral of the Mortgage to foreclosure), if the Borrower has abandoned the property, then the Servicer may initiate foreclosure as soon as it is legally possible to do so.

The Servicer must comply with the foreclosure referral requirements of the FHA, VA, Rural Housing Service (RHS) or MI, if applicable.

Exhibit 4

GMAC Mortgage
3451 Hammond Ave
PO Box 780
Waterloo, IA 50704-0780

**GMAC Mortgage**

October 12, 2011

INMER  E  CAMPOS-CARRANZA
3207  BERKLEY  LN
WOODBRIDGE VA   22193-1305



RE:    Account Number        ████9512
       Property Address      3207 BERKLEY LN
                             WOODBRIDGE VA 22193

Dear INMER E CAMPOS-CARRANZA:

We have not received your mortgage payments for the months of 09/01/11 through 10/01/11. This means your account is now in default. This is a demand for payment of the total amount due as of October 12, 2011:

| Payments | $ | 2301.58 |
|---|---|---|
| Late charges | $ | 230.68 |
| Fees, costs, and other accrued to date | $ | 311.46 |
| Suspense | $ - | 632.96 |
| | | |
| Total Amount Due | $ | 2210.76 |

To avoid foreclosure, you need to pay this amount no later than 30 days from the date of this notice. You also need to pay for all additional payments and fees that accumulate during this period.

Unless we receive full payment of all past-due amounts within 30 days from the date of this notice, we will require immediate payment of your entire loan and begin foreclosure proceedings. This could result in the loss of your home. You may have the right to bring a court action to challenge the default, or assert other defenses to immediate payment and sale that may be available in your mortgage documents or under state law.

If your payment is not accepted for any reason or your payment is for less than the total amount due (which we may accept without waiving any of our rights), this matter will not be resolved.

(Continued on next page)



12-12020-mg   Doc 8580-1   Filed 05/06/15   Entered 05/06/15 16:53:26   Exhibit Ex.

Case 4:12-cv-00094-MSD-TEM   Document 9-8 of 5 Filed 06/14/12   Page 3 of 3 PageID# 44

October 12, 2011
Account Number ▓▓▓▓9512
Page Two

Once in foreclosure, you have the right to reinstate your account up to five days before the foreclosure sale of your home if: 1) you pay the total amount due plus any fees, costs, and other amounts that accumulate through the reinstatement date, and 2) you take any other action reasonably required by us to assure the security of the property. Your obligations under the loan documents will still apply during this time.

Your credit rating may be negatively affected if you do not resolve this matter. We may visit your property from time to time to determine its condition and occupancy status. You will be responsible for the costs of these inspections.

HUD-approved counseling is available on FHA guaranteed loans by calling 1-800-569-4287. If you would like to discuss this letter, we encourage you to contact our loan counselors immediately at 800-850-4622 (weekdays, 8:00 a.m. - 11:00 p.m. CT; Saturday, 8:00 a.m. - 12:00 p.m.).

Sincerely,

Collection Department
Loan Servicing

Please Note:
This is an attempt to collect a debt and any information obtained will be used for that purpose.

If you have filed for bankruptcy and your case is still active or if you have received an order of discharge, please be advised that this is not an attempt to collect a pre-petition or discharged debt. Any action taken by us is for the sole purpose of protecting our lien interest in your property and is not to recover any amounts from you personally. If you have surrendered your property during your bankruptcy case, please disregard this notice.

If you are currently in bankruptcy under Chapter 13, you should continue to make payments in accordance with your Chapter 13 Plan and disregard this notice.

5020

Exhibit 5



Paying Agent – Rust Consulting, Inc.
P.O. Box 3036
Faribault, MN 55021-2636

**Independent Foreclosure Review**

**IMPORTANT PAYMENT AGREEMENT INFORMATION ENCLOSED**

January 27, 2014



Your payment is enclosed.

**SNGLP
INMER E CAMPOS-CARRANZA
14302 JEFFRIES RD APT 1103
WOODBRIDGE, VA 22191

Reference Number: 1001478218
Property Address:
3207 BERKLEY LN
WOODBRIDGE VA 22193

*Si usted habla español, tenemos representantes que
pueden asistirle en su idioma.*



Dear Inmer E Campos-Carranza,

You were recently sent a notice that you are eligible to receive a payment as a result of an agreement between federal banking regulators and GMAC Mortgage, LLC in connection with an enforcement action related to deficient mortgage servicing and foreclosure processes.

This letter includes your check. It also explains the amount of the payment, why you are receiving a payment, how to cash the check, and other important information and disclosures.

## Your payment is: $5,000.00.

### Why you are receiving a payment

In July of 2013, GMAC Mortgage, LLC entered into an agreement with the Board of Governors of the Federal Reserve System. This agreement resolved the Independent Foreclosure Review required by the Board of Governors. Additional information about this agreement can be found at www.federalreserve.gov.

Regulators determined your payment amount based on the stage of your foreclosure process and other considerations related to your foreclosure.

### How to cash the check

You must cash or deposit the check within 90 days, or the check will be void. All borrowers listed on the check must sign it to cash it.

> ## The payment amount is final.
> ## There is no process to appeal the payment.

*Continued on reverse side*

| Important Information |
| --- |

- By cashing or depositing the check, you do not waive any legal claims you may have against your servicer.

- Cashing or depositing the check may affect your taxes or public assistance benefits. Neither the paying agent —Rust Consulting, Inc., nor the regulators can advise you on tax liability or any effect on public assistance. If you have questions, you may consult a tax advisor or qualified individual or organization. You may also visit www.independentforeclosurereview.com/taxinfo for information about potentially taxable components of your payment. If required, tax documentation, such as a Form 1099, will be sent to you in January 2015.

- If you need additional help with foreclosure prevention, please contact the Homeowner's HOPE Hotline at 1-888-995-HOPE (4673) (or at www.makinghomeaffordable.gov) and they can put you in touch with a U.S. Department of Housing and Urban Development approved nonprofit organization that can provide **free assistance.**

- Please refer this letter to your attorney or authorized representative, if you are represented by an attorney or other authorized third-party representative regarding a foreclosure, bankruptcy case involving this mortgage loan, or the Independent Foreclosure Review.

- This payment does not mean that you necessarily suffered financial injury or harm.

| Other disclosures |
| --- |

This letter is not an attempt to collect a debt or to impose personal liability for any obligation, including, without limitation, any obligation that was discharged, or is subject to an automatic stay in bankruptcy under Title 11 of the United States Code.

Information you provided as part of the Independent Foreclosure Review may not be used for any other purpose.

If you have any questions, please call the paying agent—Rust Consulting, Inc.—at 1-888-952-9105, Monday through Friday, 8 a.m. - 10 p.m. ET or Saturday, 8 a.m. - 5 p.m. ET.

Si tiene preguntas, puede llamar al número de teléfono 1-888-952-9105 para hablar con un representante.

Assistance is also available from the toll-free number in more than 200 languages, including Chinese, Korean, Vietnamese, Tagalog, Hmong, and Russian.

Sincerely,

Paying Agent—Rust Consulting, Inc.

A 1LCN 000041326

Fund 09 Independent Foreclosure Review Payment QSF
Loan Servicer: GMAC Mortgage, LLC
P.O. Box 5016
Faribault, MN 55021-2836

The Huntington National Bank

Check No. 7716595

| DATE | CLAIM NUMBER | AMOUNT |
|---|---|---|
| January 27, 2014 | 10134743?0 | $5,000.00 |

Financial institutions may call
1-855-484-1829 to verify this check.

VOID AFTER NINETY DAYS
NOT VALID FOR AMOUNT OTHER THAN $5,000.00
All Payee's signatures required on back if more than one endorsement is required

PAY   FIVE THOUSAND DOLLARS AND NO CENTS
TO THE ORDER OF   MARI REGMROS CARRANZA

Paul Vine

Authorized Signature

⑈⑅7716595⑈⑅ ⑆044115126⑆ 01892665322⑈



**POSITIVE I.D. REQUIRED**

Financial Institutions may call
1-855-460-1528 to verify this check.

Exhibit 6

Account number: **1010191852321** ■ September 27, 2011 - October 26, 2011 ■ Page 3 of 5

WELLS
FARGO

## Transaction history (continued)

| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|---|---|---|---|---|---|
| 10/11 | | Check Crd Purchase 10/08 Wawa 662 0000 Woodbridge VA 482857xxxxxx3018 001281773651152 ?McC=5542 | | 20.00 | |
| 10/11 | | POS Purchase - 10/09 Mach ID 000000 Costco Whse #06 Woodbridge VA 3018 00381282681226143 ?McC=5300 | | 100.98 | |
| 10/11 | | POS Purchase - 10/11 Mach ID 000000 Costco Gas #062 Woodbridge VA 3018 00301284405615566 ?McC=5542 | | 25.05 | |
| 10/11 | | Save As You Go Transfer Debit | | 3.00 | 1,596.74 |
| 10/12 | | Check Crd Purchase 10/11 Gastroenterology & Alexandria VA 482857xxxxxx3018 001284452854980 ?McC=801 1 | | 50.00 | |
| 10/12 | | Save As You Go Transfer Debit | | 1.00 | 1,545.74 |
| 10/14 | | Federal Express Hourly 111014 0000745700 Campos,Inmer E. | 197.33 | | |
| 10/14 | | Loanservicing Phone Pay 111013 0000002639B2621 Inmer E Campos | | 1,621.82 | |
| 10/14 | | Save As You Go Transfer Debit | | 1.00 | 120.25 |
| 10/17 | | Deposit Made In A Branch/Store | 110.00 | | |
| 10/17 | | Deposit Made In A Branch/Store | 100.00 | | |
| 10/17 | | POS Purchase - 10/14 Mach ID 000000 Wal-Mart #1852 Woodbridge VA 3018 00581288169999019 ?McC=5310 | | 28.03 | |
| 10/17 | | Check Crd Purchase 10/14 Sunoco 0808923700 Woodbridge VA 482857xxxxxx3018 161287479173636 ?McC=5542 | | 20.00 | |
| 10/17 | | ATM Withdrawal - 10/15 Mach ID 0803O 2876 Dale Blvd. Hwy Woodbridge VA 3018 0009619 | | 60.00 | |
| 10/17 | | Save As You Go Transfer Debit | | 2.00 | 220.22 |
| 10/18 | | Check Crd Purchase 10/17 Labcorp Cash Vap58 Woodbridge VA 482857xxxxxx3018 001290441475396 ?McC=8071 | | 8.68 | |
| 10/18 | | Save As You Go Transfer Debit | | 1.00 | 210.54 |
| 10/19 | | Check Crd Purchase 10/17 Exxonmobil 4785 Alexandria VA 482857xxxxxx3018 161290621179592 ?McC=5542 | | 20.01 | |
| 10/19 | | POS Purchase - 10/19 Mach ID 000000 Costco Gas #062 Woodbridge VA 3018 00581292422550894 ?McC=5542 | | 30.03 | |
| 10/19 | | Alpha Vision Pre Cash Trans 11-45-003072571 Campos, Inmer | | 81.78 | |
| 10/19 | | Save As You Go Transfer Debit | | 3.00 | 75.22 |
| 10/20 | | POS Purchase - 10/19 Mach ID 000000 Wal-Mart #1852 Woodbridge VA 3018 00381293103499149 ?McC=5310 | | 28.04 | |
| 10/20 | | Save As You Go Transfer Debit | | 1.00 | 46.68 |
| 10/21 | | Federal Express Hourly 111021 0000745700 Campos,Inmer E. | 223.51 | | |
| 10/21 | | Check Crd Purchase 10/20 McDonald's F11719 Woodbridge VA 482857xxxxxx3018 161293406613171 ?McC=5814 | | 12.57 | |
| 10/21 | | Save As You Go Transfer Debit | | 1.00 | 256.62 |
| 10/24 | | Check Crd Purchase 10/21 Shell Oil 57543602 Alexandria VA 482857xxxxxx3018 161294653170104 ?McC=5542 | | 20.01 | |
| 10/24 | | Check Crd Purchase 10/21 Sunoco 0808923700 Woodbridge VA 482857xxxxxx3018 08129512589569 1 ?McC=5542 | | 20.07 | |
| 10/24 | | POS Purchase - 10/23 Mach ID 000000 Costco Gas #062 Woodbridge VA 3018 00461296726541549 ?McC=5542 | | 30.01 | |
| 10/24 | | POS Purchase - 10/23 Mach ID 000000 Costco Whse #06 Woodbridge VA 3018 00301296747878162 ?McC=5300 | | 125.40 | |
| 10/24 | | Save As You Go Transfer Debit | | 4.00 | 57.13 |
| 10/25 | | Deposit Made In A Branch/Store | 150.00 | | 207.13 |
| 10/26 | | Deposit Made In A Branch/Store | 100.00 | | |
| 10/26 | | Check Crd Purchase 10/24 Wal-Mart #1852 Woodbridge VA 473703xxxxxx9667 299140003892085 ?McC=5310 90 | | 10.16 | |
| 10/26 | | Save As You Go Transfer Debit | | 1.00 | |
| 10/26 | | Monthly Check Return/Image Stmt Fee | | 2.00 | 293.97 |
| **Ending balance on 10/26** | | | | | 293.97 |
| **Totals** | | | **$2,070.33** | **$3,001.69** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*