THOMAS P. BEKO, ESQ.  (SBN  01250)
ERICKSON, THORPE & SWAINSTON, LTD.
99 W. Arroyo Street
Post Office Box 3559
Reno, NV 89505
Ph:  (775) 786-3930; Fax: (775) 786-4160
*Attorneys for Claimants Pamela D. Longoni,*
*Lacey Longoni and Jean M. Gagnon*

# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |
| _____/ | |

## RESPONSE TO OBJECTION OF THE RESCAP BORROWER CLAIMS TRUST TO PROOF OF CLAIM FILED BY PAMELA D. LONGONI AND JEAN GAGNON CLAIM NOS. 2291, 2294, 2295 AND 2357

COME NOW, PAMELA D. LONGONI, individually and as the Guardian Ad Litem for LACEY LONGONI, and JEAN M. GAGNON, by and through their attorneys, ERICKSON, THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and hereby submit the following response to the Objection to the Proof of Claims filed by Pamela D. Longoni and Jean Gagnon.

DATED this 15th day of April, 2015.

ERICKSON, THORPE & SWAINSTON, LTD.


By   /s/ Thomas P. Beko
     THOMAS P. BEKO, ESQ.
     *Attorneys for Claimants*
     *Pamela D. Longoni, Lacey Longoni*
     *and Jean M. Gagnon*

Erickson, Thorpe & Swainston, Ltd.
P.O. Box 3559
Reno, Nevada 89505
Tel. (775) 786-3930 Fax (775) 786-4160

# TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

I. Summary of the Claims and the Debtors' Objection  . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  The Plaintiffs' Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. The Debtors' Objection  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.  Procedural Authority  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.     The Debtors Have Failed to Establish That They Had Any Legal Right to
       Commence a Non-Judicial Foreclosure Upon the Plaintiffs' Property.
       Therefore, They Cannot Negate an Essential Allegation of Any of the
       Claimants' Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    The Debtors Failed to Comply with Nevada's Statutory Requirements
       for Non-Judicial.  For These Additional Reasons, the Foreclosure was
       Unlawful  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.  The Plaintiffs' Claims.  Because GMACM accepted further payments
       from the plaintiffs after the foreclosure process was stopped, they were
       thereafter required to restart the process which would have necessarily
       occurred after July 1, 2009, making Nevada's Mandatory Foreclosure
       Mediation process applicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.    The Plaintiffs' Fraud, Misrepresentation and Promissory Estoppel Claims
       are Entirely Valid as there is Irrefutable Evidence that Multiple GMACM
       Representatives Informed the Claimants That GMACM's Proposed Loan
       Modifications Were, in Fact, Fully Approved. The Evidence Is Also Irrefutable
       That GMACM Repeatedly Informed Longoni That All Foreclosure Actions
       Were on Hold . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V.     The Claimants' Breach of Contract and Fraud and Misrepresentation
       Claims are Valid  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

VI.    The Claimants' Fraud and Misrepresentation Claims Are Valid  . . . . . . . . . . . . . . . . 28

    A.  Negligent misrepresentation is also properly stated  . . . . . . . . . . . . . . . . . . . . . 29

    B.  Even assuming a "no duty" rule applicable to lenders, an exception
       to such "no duty" rule is stated by the complaint's averment  . . . . . . . . . . . . . . . . 30

    C.  A claim for negligent infliction of emotional distress is also stated  . . . . . . . . . . . 31

VII.   The Plaintiffs' Breach of Contract and Promissory Estoppel Claims
       Are Entirely Valid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    A.  The claimants' Promissory Estoppel Claim is also fully
       established by the record in this matter  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

VIII.   Longoni's Intentional Infliction of Emotional Distress Claim has Already
        Been Determined to be Valid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

IX.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

iii

<u>**TABLE OF AUTHORITIES**</u>
<u>**Cases**</u>

<u>Adelson v. Hananel</u>
    2009 WL 2835119, *3 (D. Nev.)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

<u>Anderson v. Baltrusaitis</u>
    113 Nev. 963, 965, 944 P.2d 797, 799 (1997)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

<u>Barmettler v. Reno Air, Inc.</u>
     114 Nev. 441, 449, 956 P.2d. 1382, 1387 (1998),
     *quoting* Rest. 2d of Torts, § 552(1)(1976)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>Betsinger v. D.R. Horton, Inc.</u>
     232 P.3d at 436  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

<u>Bronner v. Park Place Entm't Corp.</u>
    137 F. Supp. 2d 306, 312 (S.D.N.Y.2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

<u>Cervantes v. Countrywide Home Loans, Inc.</u>
    656 F. 3d 1034, 1039, (9th Cir. 2011)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

<u>Collins v. Union Federal Sav. & Loan Ass'n</u>
    99 Nev. 284, 304, 662 P.2d 610, 623 (1983)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>Dynalectric Co. V. Clark & Sullivan Constructors, Inc.</u>
    127 Nev. Adv. Op. No. 41, 255 P. 3d 286, 288 (2011),
    *quoting* Restatement (Second) of Contracts, sec. 90(1)(1981)  . . . . . . . . . . . . . . . . . . . 33

<u>Edelstein v. Bank of New York Mellon</u>
    128 Nev. Adv. Op. 48, 286 P.3d 249, *7, 254, (Sept. 27, 2012)  . . . . . . . . . . 5, 6, 7, 10

<u>Fidelity Mortgage Trustee Service, Inc. v. Ridgegate East Homeowners Assoc.</u>
    27 Cal. App. 4th 503, 506, 32 Cal. Rptr. 2d. 521, 523 (1994)  . . . . . . . . . . . . . . . . . . . 30

<u>Franchise Tax Board v. Hyatt</u>
    130 Nev. Adv. Op. 71, 335 P.3d 125 (2014)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

<u>Ghervescu v. Wells Fargo Home Mortgage Co.</u>
    2008 WL 660248, **1-3, 6 (Cal. App. 4th) (unpublished)  . . . . . . . . . . . . . . . . . . . . . 29

<u>Gordon v. Beck & Gregg Hardware Co.</u>
    40 S.E.2d 428, 432 (Ga. App. 1946)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

<u>Gunsul v. Countrywide Home Loans, Inc.</u>
    2006 WL 3586091, **2-6 (Wash.App.)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>In re: Metex Mfg. Corp.</u>
    510 B.R. 735, 740 ( Bankr.S.D.N.Y. June 13, 2014)  . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>In re Residential Capital, LLC</u>
    2014 WL 1414136, *5 (Bankr. S.D.N.Y. April 10, 2014)  . . . . . . . . . . . . . . . . . . . . . . 5

iv

1

In re Residential Capital, LLC
   524 B.R. 465 (Bankr. S.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

2

Lenett v. World Sav. Bank, FSB
   2008 WL 2009757, *2 (Cal. App. 2d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

3

4

Leyva v. National Default Servicing Corp.
   127 Nev. Op. 40, 255 P.3d 1275, 1279 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5

Longoni v. GMAC Mortg.
   2010 WL 5186091, at *4, *6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 34

6

7

Nieto v. Litton Loan Servicing LP
   2011 WL 797496, * 3 (D. Nev. Feb. 23, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

8

Pasillas v. HSBC Bank USA
   127 Nev. Adv. Op. 39, 255 P.3d 1281 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

9

10

Rodriguez v. Prima Donna Co., LLC
   216 P.3d. 793, 799 (Nev. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0

11

Sattari v. Wash. Mut.
   2010 WL 3896146, *4 (D. Nev.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

12

13

Simon v. B of A, 2010 WL 2609436, *12 (D.Nev.)
   citing, Betsinger v. D.R. Horton, Inc.
   126 Nev. 17, 232 P.3d 43, 436 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

14

15

T & Beer, Inc., v. Wine Source Selections, LLC
   2012 WL 360286, *3 (N.J.Super. A.D. (Unpublished opinion) . . . . . . . . . . . . . . . . 31

16

Tene v. BAC Home Loan Servicing, LP
   2012 WL 222920, *2 (D. Nev. Jan. 25, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

17

18

Weingartner v. Chase Home Finance, LLC
   702  F. Supp. 2d 1276, 1290, 1291 (D.Nev 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 21

19

Wiseman v.  Hallham
   113 Nev. 1266, 1270, 945 P.2d. 945, 947-48 (1997) . . . . . . . . . . . . . . . . . . . . . . . 28

20

21                                    **Statutes/Rules**

22   11 U.S.C.  502(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

23   Nevada Revised Statute §11.220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

24   Nevada Revised Statute §107.080  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 28

25   Nevada Revised Statute  §107.085 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 28

26   Nevada Revised Statute   §107.086 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 28

27   Nevada Revised Statute   §107.087 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 28

28   Nevada Revised Statute   §107.089 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

v

Nevada Revised Statute §107.090 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

NRS 107.080 through NRS 107.100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Nevada Revised Statute §111.220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Nevada Revised Statute §719.100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Nevada Revised Statute §719.240 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Restatement (Second) of Contracts §90 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Restatement (Second) of Torts § 323 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

vi

**RESPONSE TO OBJECTION OF THE RESCAP BORROWER CLAIMS TRUST TO**
**PROOF OF CLAIMS FILED BY PAMELA D. LONGONI AND JEAN GAGNON**
**CLAIM NOS. 2291, 2294, 2295 AND 2357**

1.     The Claimants, Pamela D. Longoni and Jean Gagnon, hereby submit the following Response to the Objection to their Claims filed by debtors GMAC Mortgage, LLC ("GMACM"), and Executive Trustee Service, LLC ("ETS") on April 24, 2015.[1]  For the reasons set forth herein, the debtors' Objection should be denied in its entirety.

2.     First, and foremost, the debtors cannot defeat the plaintiffs' claims because they cannot prove, under Nevada law, that they had *any* legal right to commence any foreclosure proceedings upon plaintiffs' home.  Second, the justification which is now being proffered by the debtors for commencing the foreclosure is entirely false and fabricated.  Proof of this fact will be demonstrated herein through a recently obtained declaration of the actual former GMACM employee who was responsible for handling the plaintiffs' request for a permanent loan modification.  Finally, the plaintiffs will prove, through wholly undisputed evidence, that (1)  they were promised that all attempts at foreclosure were on hold while they continued to pursue a permanent loan modification, and (2) that GMACM had actually approved their requested loan modification.

I. <u>Summary of the Claims and the Debtors' Objection.</u>

3.     In a nutshell, this case is a prime example of a foreclosure sale which occurred when the right hand did not knowing what the left hand was doing. In this case, on August 14, 2009, Executive Trustee Services, LLC ("ETS") caused the sale of the plaintiffs' 14-year home in Reno, Nevada.  They did so purportedly at the direction of GMAC Mortgage, LLC ("GMACM").  It is the plaintiffs' position that ETS conducted the foreclosure sale not knowing that GMACM had placed the foreclosure on hold while they sought to change the plaintiffs' previously approved loan modification plan from a "Traditional" GMACM loan modification to a newly implemented "Obama Plan" (also known as "HAMP") modification.  And, as soon as GMACM discovered that ETS had sold the plaintiffs' home, GMACM's counsel contacted the plaintiff Longoni and admitted their error.  Thereafter, GMACM attempted to recover the plaintiffs' home back from the third party

---

[1] The claimant Pamela D. Longoni asserted claims on behalf of her minor daughter, Lacey Longoni as well.  Thus, all arguments set forth herein apply to her as well.

1

purchaser. However, the new purchaser refused to return to the home (because GMACM offered them only $4,000.00 to unwind that sale). GMACM then took steps to mitigate the plaintiffs' damages, but refused to complete even that process when the plaintiffs refused to provide them a full release. This litigation ensued.

4.    As will be demonstrated herein, in an effort to convince this Court to dismiss the plaintiffs' bankruptcy claims, the debtors have proffered an entirely *ex post facto* justification for the foreclosure, namely that the plaintiffs had breached a repayment plan (the "Repayment Agreement") that they entered into with GMACM. In this regard, the debtors now argue that the plaintiffs entered into a Repayment Plan with GMACM which required them to make three temporary payments of $1,600.00 which were to be followed by a balloon payment, specified only in an amount "in excess of $19,000.00." The debtors claim that because the plaintiffs failed to make this required balloon payment, GMACM was authorized to complete the previously commenced foreclosure proceeding.

5.    To support this claimed defense, the debtors have not provided this Court with a single affidavit from any witness who would testify that GMACM completed the foreclosure *because* the plaintiffs breached this Repayment Agreement. Instead, the debtors' defense is supported entirely upon their counsel's interpretation of obscure GMACM diary notes. As will be shown herein, their interpretation is entirely incorrect.

6.    As is reflected in the Declaration of GMACM's own Loss Mitigation Specialist (Mr. Jonathan "Nate" Stephenson), although he had initially proposed a Repayment Agreement (which had been sent to the plaintiffs), he immediately abandoned that plan when it became obvious that the plaintiffs would never be able to meet its requirements. *See, Declaration of Jonathan "Nate" Stephenson, attached hereto as Exhibit 1, ¶ ¶ 4-9.* He thereafter embarked upon the process to qualify the plaintiffs for a permanent loan modification. That process began with the plaintiffs making temporary payments in the amount of $1,600.00. During that this time period GMACM placed all foreclosure activities on hold while they evaluated the plaintiffs' request. According to Mr. Stephenson, there never was a Repayment Agreement, and because there was no such plan there was no required balloon payment. And because there was no balloon payment, the plaintiffs were, at all times, in full compliance with all requirements GMACM had imposed upon them as part of

2

1  their application for a permanent loan  Thus, according to Mr. Stephenson, the plaintiffs were never

2  in breach of any obligation imposed by GMACM.  *Id. at ¶ ¶ 6, 10.*

3  7.  In addition to this Declaration (which completely refutes the arguments now being

4  proffered by the debtors' current counsel), the plaintiffs have also attached a previously obtained

5  Affidavit from Mr. Stephenson wherein he provided that he actually received an email which

6  indicated that the plaintiffs' request for a permanent loan modification had, in fact, been approved

7  by GMACM's higher management.  *See, Affidavit of Jonathan "Nate" Stephenson, also attached*

8  *hereto as Exhibit 1.* Thus, the plaintiffs have evidence directly from GMACM's own agent which

9  completely obliterates every argument proffered by the debtors in their current Objection.  In light

10  of this evidence, this Court should summarily reject all of the debtors' arguments which are not

11  based upon actual evidence, but rather, strained extrapolations from vague log notes.[2]

12  **A.  The Plaintiffs' Claims.**

13  8.  As the debtors have aptly noted, the claims of Pamela Longoni and Jean Gagnon arise

14  as a result of the sale of their home following a nonjudicial foreclosure that the claimants allege was

15  wrongfully undertaken by the debtors GMACM and ETS.  That foreclosure process began in

16  February of 2009, and resulted in the sale of the claimants' home on August 14, 2009. The claimants

17  brought suit alleging various claims based upon the substantive law of the State of Nevada.

18  Generally speaking, the plaintiffs have asserted three claims.

19  9.  First, the plaintiffs alleged that the foreclosure caused by GMACM and conducted

20  by ETS was unlawful under Nevada law because neither GMACM nor ETS had the legal rights to

21  both the plaintiffs' promissory note and their deed of trust.  Because Nevada law explicitly requires

22  that the foreclosing party possess both of these legal instruments, and because neither GMACM nor

23  ETS were possessed of those rights, the foreclosure was unlawful *ab initio.* Therefore, regardless of

24  ───────────────

25  [2] The debtors' Objection is filled with such unsupported arguments.  Some of the most
outlandish are the claims of a breach of an obligation to make a $19,000+ balloon payment,

26  claims that the plaintiffs did not make timely temporary payments, claims of repeated telephone
calls to the plaintiffs demanding they provide further documentation to GMACM as part of their

27  request for a loan modification, and claims the plaintiffs failed to return requested documentation
when GMACM sought to qualify them under the HAMP program.  The plaintiffs submit that the
debtors are forced to rely upon such unsupported (and inadmissible) evidence, because they do

28  not have a single witness who could proffer testimony to support their arguments.

1   whether ETS followed Nevada's statutory rules on non-judicial foreclosure, the foreclosure was

2   unlawful.

3          10.    Next, the claimants alleged that when ETS conducted the foreclosure, they violated

4   various provisions of Nevada statutory law, including provisions which required (1) a specific type

5   of notice be personally served upon the plaintiffs, and (2) the debtors to participate in a mandatory

6   mediation program before proceeding forward with the foreclosure.  Because the debtors failed to

7   comply with these statutory requirements, the foreclosure was again unlawful.  Finally, the claimants

8   alleged that they quite reasonably relied, to their great detriment, upon the representations made by

9   GMACM's representatives Stephenson and Casas, that all foreclosure efforts were on hold while the

10  plaintiffs pursued a permanent loan modification.  These representations became actionable under

11  theories of fraud, misrepresentation (including negligent misrepresentation) and/or promissory

12  estoppel.

13               **B.  The Debtor's Objection.**

14         11.    In their current Objection the debtors assert four basic arguments.  First, they argue

15  that regardless of anything that GMACM's representatives may have said or done during the loan

16  mitigation process, the foreclosure was proper since the claimants had breached both their original

17  loan agreement as well as the "Repayment Agreement."  Second, they assert that they complied with

18  all *then-applicable* non-judicial foreclosure statutes which existed in the State of Nevada.  Third,

19  the debtors argue that the plaintiffs could not legally rely upon Nate Stephenson's written

20  representations (that their request for a permanent loan modification was approved or that the

21  foreclosure process was on hold) because the representations were too vague or because Mr.

22  Stephenson no longer had any authority to speak on behalf of GMACM (as he had been assigned to

23  a new team at the time).  Finally, the debtors claim that Nevada's Statute of Frauds renders any

24  promises made by the debtors unenforceable.

25               **C.  Procedural Authority.**

26         12.    "Courts in the Second Circuit apply a burden shifting framework for claims

27  objections."  *In re: Metex Mfg. Corp.*, 510 B.R. 735, 740 ( Bankr.S.D.N.Y. June 13, 2014).

28               A properly filed proof of claim constitutes *prima facie* evidence of

4

1
2
3
4

> the claim's amount and validity.    When a valid proof of claim is properly filed, the party in interest objecting to the claim carries the burden of putting forth evidence sufficient to refute the validity of the claim.  After the objector does so, the burden shifts to the claimant to establish the validity and amount of its claim by a preponderance of the evidence.

5 Id., 510 B.R. at 740.  (Internal citations omitted.)

6        13.    Under this shifting burden analysis, a properly filed claim is deemed allowed unless

7 a party in interest objects. 11 U.S.C. 502(a).  "If an objection refuting at least one of the claim's

8 essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.

9 *In re Residential Capital, LLC*, 2014 WL 1414136, *5 (Bankr. S.D.N.Y. April 10, 2014).  However,

10 if the objector does *not* introduce evidence as to the invalidity of the claim, the claimant need offer

11 no further proof on the merits of the claim. *In re Residential Capital, LLC.,* 524 B.R. 465 (Bankr.

12 S.D.N.Y. 2015).

13        14.    As noted above, in this case the objectors have failed to establish a fundamental

14 predicate to their right to engage in *any* foreclosure activity.  Because they cannot prove that they

15 had the legal right to commence a nonjudicial foreclosure, as a matter of legal necessity they cannot

16 defeat any of the claims asserted.  Because the debtors cannot make this predicate showing, the

17 burden should never shift to the claimants to prove the validity of their claims (or show that the

18 debtors' objections are not sustainable).  However, in this Response, the claimants will prove not

19 only that the foreclosures were unlawful, they will also prove their claims are entirely valid.

20
21

**II.**  **The Debtors Have Failed to Establish That They Had Any Legal Right to Commence a Non-judicial Foreclosure Upon the Plaintiffs' Property.  Therefore, They Cannot Negate an Essential Allegation of Any of the Claimants' Claims**.

22        15.    To justify the relief requested, the debtors must necessarily prove to this Court that

23 the foreclosure upon the plaintiffs' home was lawful.  For reasons which will soon be quite obvious,

24 the debtors simply cannot make that showing.  Under Nevada law, it is clear that before any party

25 can lawfully commence a non-judicial foreclosure, that party must possess the legal rights to both

26 the promissory note and the deed of trust.  In *Edelstein v. Bank of New York Mellon*, 128 Nev. Adv.

27 Op. 48, 286 P.3d 249 (Sept. 27, 2012), the Nevada Supreme made it clear that when MERS is

28 designated as the original beneficiary on a deed of trust (which, of course, they were in this case, *see,*

*Exhibit 2*), the note and deed of trust are split making nonjudicial foreclosure by either party improper. *Id. at \*7.* In reaching this decision, the Nevada Court found that such a division was not irreparable, however, the Court concluded that before a lawful nonjudicial foreclosure could be commenced, the promissory note and deed of trust had to be reunited in the same party. Because that never occurred in this case, the August 14, 2009 foreclosure sale was entirely unlawful.

16.    Relying on the frequently cited decision of *Cervantes v. Countrywide Home Loans, Inc.,* 656 F. 3d 1034, 1039 (9th Cir. 2011), the Nevada Supreme Court explained that "[t]he deed and note must be held together because the holder of the note is only entitled to repayment, and does not have the right under the deed to use the property as a means of satisfying repayment." *Edelstein*, 286 P.3d at 254. "Conversely, the holder of the deed alone does not have a right to repayment and, thus, does not have an interest in foreclosing on the property to satisfy repayment." *Id. See, also, Leyva v. National Default Servicing Corp.,* 127 Nev. Adv. Op. 40, 255 P.3d 1275, 1279 (2011) (recognizing note and deed of trust must be held by same person to foreclose). As will be demonstrated below, not only did the debtors never prove that either GMACM or ETS possessed the rights to both the promissory note and the deed of trust, they were never even able to identify who actually held these legal instruments at the time that ETS commenced foreclosure proceedings.

17.    As the debtors noted, there were multiple amendments to the plaintiffs' original complaint. These amendments became necessary because the defendants could never identify who owned or held the note or the deed of trust. The plaintiffs will review the evidence surrounding this issue, but before they do it is important for this Court to first review the debtors' Objection to see how they attempted to cause this Court to quickly skip over this critical fundamental prerequisite. In two paragraphs, the debtors provide an intentionally vague history of the loan in an effort to convince this Court that they somehow had standing to pursue foreclosure upon the plaintiffs' home. First, in paragraph 7, they properly note that on September 29, 2005, Longoni executed a promissory note and deed of trust on certain real property located at 5540 Twin Creeks Drive, Reno, Nevada (the "Property"). *See, attached Exhibit 2.*[3] Debtors declare that this deed of trust was "in favor" of

---

[3]The promissory note and deed of trust were also signed by the plaintiff Gagnon.

6

1   Equifirst Corporation.  However, as the Court can see, while the Lender on the promissory note is

2   identified as EquiFirst Corporation, the beneficiary of the deed of trust is not Equifirst Corporation,

3   but rather, it is Mortgage Electronic Registration System, Inc. ("MERS").  *See, Deed of Trust p. 2.*

4   Under the Nevada law set forth above, this act caused an immediate separation of the promissory

5   note away from the deed of trust. *See, Edelstein v. Bank of New York Mellon*, 128 Nev. Adv. Op. 48,

6   286 P.3d 249 (Sept. 27, 2012).  Under Nevada law, unless those two legal instruments were later

7   reunited in the same party, no party could lawfully pursue foreclosure.

8       18.    Next, debtors claim that in December of 2005, the "loan" was placed into a

9   securitized trust under which Residential Funding Corporation acted as the master servicer.[4]  They

10  then claim that Homecomings Financial LLC, and later, GMACM, acted as the sub-servicer on the

11  loan from 2005 to 2013.  They of course offer absolutely no evidence to support any of these legal

12  conclusions. From here, the debtors argue that Longoni defaulted on this "modified" loan in

13  December of 2008, and as a result GMACM declared the loan in default and sent a notice of default

14  on January 2, 2009.  They claim that Longoni failed to cure the default, so on February 26, 2009,

15  ETS formally recorded a Notice of Breach and Default.  They claim that ETS sent notice of this

16  filing to the plaintiffs on March 4, 2009.[5]

17      19.    Again, the debtors failed to explain what they meant by the word "modified" loan.

18  What they intentionally kept from this Court was the fact that on November 15, **2007**, Homecomings

19  Financial, LLC entered into a previous loan modification agreement with the plaintiffs. *See, attached*

20  *Exhibit 3, Adjustable Rate Loan Modification Agreement.*  Contrary to the debtors' current assertion,

21  Homecomings Financial, LLC was not identified in that agreement as a  "sub servicer" of the loan,

22  but rather,  Homecomings Financial, LLC was specifically identified as the "Lender."  **More**

23  **importantly, the Adjustable Rate Loan Modification Agreement specifically provided that the**

24  **"Lender" [Homecomings Financial, LLC] was the "legal holder and the owner of the Note and**

25

26      [4] The use of the word "loan" was not just sloppy lawyering, it was an intentional
    misnomer designed to obfuscate the fact that the promissory note and the deed of trust had been
27  severed from one another.

28      [5] As will be shown below, this Notice came back to ETS as "undeliverable."

7

**Security Instrument . . ."**

20.    After GMACM and ETS finally filed an Answer in the underlying litigation, the plaintiffs served them with their first set of interrogatories which asked the defendants to identify each individual or entity that has or has had, or who has claimed to have had, possession and/or an ownership interest in the Note and Deed of Trust. *See, attached Exhibit 4.* On December 2, 2010, GMACM provided the following response:

**Response No. 1:**

| | | |
|---|---|---|
| 9/29/05 | Equifirst Corp | Origination |
| 10/17/05 | Loan registered with MERS | Loan originated with MERS as nominee |
| 1/05/06 | Residential Funding Co, LLC as Trustees | Transfer of beneficial rights from EC |
| 10/08/06 | Residential Funding Co, LLC | Transfer of servicing rights from EC |

Quite notably, Homecomings Financial LLC is never identified as either a holder or owner of the Note and/or the Deed of Trust.  Moreover, there is no mention whatsoever of some "securitized trust" or any master or sub-servicer of the loan.  Nevertheless, based upon this rather evasive response, the undersigned sought leave to amend the complaint to add claims against Residential Funding. The Court granted the motion and Residential Funding was then added as a defendant.

21.    On July 29, 2011, the parties appeared before the United States Magistrate Judge on an unrelated matter.  During the course of that hearing, the debtors' counsel informed the court that he had received information from his clients that the owner of the Note was not Residential Funding, but rather it was owned by a company called Residential Asset Mortgage Products, Inc. *See, Minute Order, Doc. #80, Exhibit 5.*  Shortly thereafter on August 5, 2011, GMACM served the plaintiffs with its Amended Response to Plaintiffs' First Set of Interrogatories. *See, attached Exhibit 6.*  In these responses, GMACM gave a completely different response.  They stated:

On September 29, 2005, Equifirst Corporation originated the Note and Deed of Trust in the amount of $432,000.00; said Deed of Trust was recorded on October 7, 2005.  MERS was listed as "Nominee" on the Deed of Trust.  Residential Funding Corporation, LLC ("RFC") purchased the Loan from Equifirst in November, 2005. On December 1, 2005, the Pooling and Servicing Agreement between Residential Asset Mortgage Products, Inc., (RFC), and U.S. Bank ("the PSA") was executed.  The closing date of the PSA was December 28, 2005, and that is the date all of the Loans became securitized.  Also on December 28, 2005, the Assignment and Assumption Agreement between RFC and Residential Asset

8

Mortgage Products, Inc. was generated. That document has been previously produced as part of documents labeled RFC-002. That Assignment and Assumption Agreement provided for a transfer of ownership of the loans from RFC to Residential Asset Mortgage Products, Inc., and then an automatic transfer of ownership to the Trust of the loans for a stated period of time. Pursuant to the Assignment and Assumption Agreement, ownership of the loan at issue transferred to the Trust on that date – December 28, 2005. GMAC Mortgage, LLC obtained the right to service the loan on behalf of RFC on May 1, 2007. The investor on the loan currently is the Trust, RAMP 2205-EFC7, RFC is the Master Servicer, and GMAC is the second tier servicer.

22.    Again, there was no reference to Homecomings Financial, LLC, who was identified in the November 15, 2007, Adjustable Rate Loan Modification Agreement as both the holder *and* owner of the Note and the deed of trust. That agreement was executed almost two years *after* the debtors claimed that the Residential Funding Corporation, LLC purchased the "Loan" from EquiFirst Corporation and transferred it into the securitized trust. Nevertheless, because of this amended discovery response, the plaintiffs again amended their complaint to add these entities. [6]

23.    The undersigned then took the depositions of the individuals identified as the Persons Most Knowledgeable ("PMK") for GMACM and ETS. GMACM identified Mr. Juan Aguirre as its PMK.[7] In his deposition, Mr. Aguirre could never identify who actually owned the plaintiffs' promissory note. *See, Exhibit 7, at pp. 62-66, 72-73, 103-105.* He testified that despite numerous transfers, GMACM's computer system showed that Residential Funding Corporation was the custodian of the plaintiffs' note. *Id. at p. 94.* He admitted that he had never seen the note, nor did he know where it was at that time of the foreclosure proceedings. *Id. at p. 87.*

24.    ETS's PMK, Mr. Myron Ravelo, testified that he had no knowledge of any transfer

---

[6] The undersigned asserted bankruptcy claims against those entities as well, however, this Court previously dismissed those claims apparently because they were not involved in the foreclosure process. *See, Supplemental Order, Doc. No. 6258.* While it appears clear that these entities were not actually involved in the foreclosure process, under Nevada law, to legally commence foreclosure proceedings said entities would have had to have been the party which was foreclosing upon the property, assuming, of course that one of the parties was possessed of both the promissory note and the deed of trust.

[7] The individual identified as the Person Most Knowledgeable for GMACM also claimed that he was the PMK for Residential Funding Corporation. *Exhibit 7 at p. 8.*

9

of the claimants' promissory note to ETS from either the trust (RAMP 2005EFC), Residential Asset

Mortgage Products, Inc., Residential Funding Company, LLC, Residential Funding Corporation,

GMACM or Homecomings Financial.  *See, Exhibit 8, pp. 21-22.*  He further acknowledged that he

had no idea who owned or held the claimants' promissory note when ETS got the foreclosure

assignment from GMACM.  He was not aware of anyone even inquiring into the issue.  *Id. at pp.*

*62-63.*  Notably, Mr. Ravelo also admitted that after October of 2010, ETS would *not* foreclose upon

property (or even file a Notice of Default) until it had received a formal assignment of the deed of

trust from MERS. *Id. at pp. 83-85.*  No such assignment occurred prior to the plaintiffs' foreclosure.

25.    Under Nevada law, as the foreclosing party, ETS was legally required to possess both

the promissory note and deed of trust.  The did not, and therefore the foreclosure was unlawful.

### III.  The debtors failed to comply with Nevada's statutory requirements for non-judicial foreclosures.  For these additional reasons, the foreclosure was unlawful.

26.    Even if the debtors had legal standing to pursue foreclosure proceedings against the

plaintiffs' home, the foreclosure would still be unlawful because the debtors failed to comply with

Nevada's non-judicial foreclosure statutes. The only defense offered by the debtors against these

claims was that said statutes were not applicable because the charged statutes  did not become

applicable until July 1, 2009.  For the following reasons, these arguments are erroneous.

27.    The plaintiffs' first claims for relief were founded upon the defendants' alleged failure

to comply with certain provisions of the Nevada Revised Statutes, namely sections 107.080, 107.085,

107.086, 107.087 and 107.090.   In 2009, Nevada adopted what is known as its mandatory

Foreclosure Mediation Program.   The essential terms of this program were codified through

amendments to certain sections of the Nevada Revised Statutes, primarily NRS §107.080, §107.085,

and §107.090.  More significantly, Nevada added two key statutes which related primarily to the

foreclosure mediation program, namely NRS §107.086 and §107.087.  As was explained by the

Nevada Supreme Court in *Edelstein v. Bank of New York Mellon*, 128 Nev. Adv. Op. 48, 286 P.3d

249 (Sept. 27, 2012), the legislative changes increased the owner's redemption period and created

the Foreclosure Mediation Program which required the foreclosing trustee to participate in a

mediation program *before* proceeding forward with a foreclosure.  To lawfully commence a

foreclosure action, the trustee was first required to obtain a certification establishing that it he/she had participated in the program in good faith. *See, also, Pasillas v. HSBC Bank USA,* 127 Nev. Adv. Op. 39, 255 P.3d 1281 (2011).

28. The debtors claim these statutes only became effective as of July 1, 2009, and since their Notice of Default was Recorded on February 29, 2009, the statues simply did not apply. This argument fails for two reasons. First, certain parts of N.R.S. §107.085 (which required personal service of a specialized notice to owner-occupied property) were in effect since 2003, and the debtors completely failed to comply with those provision. Second, as was readily acknowledged by ETS's PMK, because GMACM engaged in a loan modification plan pursuant to which it accepted further payments from the plaintiffs, ETS was thereafter obligated to restart that foreclosure process. Had ETS done so that process would have started after July 1, 2009, and therefore, the debtors would have been required to comply with the statutes. Admittedly they did not.

29. Additionally, while it is true that some of the amendments to the charging statutes did not become effective until July 1, 2009, one statute, namely NRS §107.085, had been in full force and effect since 2003.[8] Because the debtors failed to comply with this statute, the foreclosure action was entirely unlawful. Pursuant to NRS § 107.085(2), certain property owners (owner-occupied) were entitled to an additional notice. Under this statutory section, no later than 60 days before the date of the sale (in this case June 14, 2009) the debtors were required to personally serve the plaintiffs with a notice **(along with a copy of the promissory note)** which contained the following information:

NOTICE
YOU ARE IN DANGER OF LOSING YOUR HOME

Your home loan is being foreclosed. In 60 days your home will be sold and you will be forced to move. For help, call:
Consumer Credit Counseling _____
The Attorney General _____
The Division of Financial Institutions _____
Legal Services _____
Your Lender _____
Nevada Fair Housing _____

---

[8] For the convenience of this Court the claimants have attached a copy of the pre-2009 version of NRS §107.085. *See, attached Exhibit 10.*

11

In this case, the debtors failed to comply with this statutory requirement.  For this wholly independent reason, the foreclosure was unlawful and the plaintiffs' claims are valid.

30.     In addition, pursuant to NRS §107.080(4)(a) (which had also been in effect for several years before 2009), the debtors were obligated to provide the claimants with notice of the proposed trustee's sale either by certified or registered mail.  In this case, the debtors claim that on July 23, 2009, they filed a Notice of Trustee sale in Washoe County and posted a copy in three public places.  *See, Objection ¶ 16.*  They further claim that they published the notice in the Sparks Tribune (a city sister to Reno, Nevada).  *Id.*  However, the debtors made no showing that such notice was served upon the plaintiffs by registered or certified mail.[9]  For this reason, the foreclosure was unlawful.

**A.  Because GMACM accepted further payments from the plaintiffs after the foreclosure process was stopped, they were thereafter required to restart the process which would have necessarily occurred after July 1, 2009, making Nevada's Mandatory Foreclosure Mediation process applicable.**

31.     It is undisputed that in March of 2009, GMACM began working with the claimants on a loan modification program.  It is also undisputed that as part of that process, the claimants made, and GMACM accepted, three separate payments of $1,600.00.  Those funds were never returned to the claimants.  *See, attached Affidavit of Pamela D. Longoni, ¶ 33, Exhibit 9.*  In his deposition, ETS's PMK admitted that once GMACM received and applied these funds to the plaintiffs' loan, the default amount would change and therefore the foreclosure process should have been started anew and he had no idea why that did not occur.  *See, Ravelo Depo, Exhibit 8, pp. 122-123, 127, 137.  See also, Aguirre deposition, Exhibit 7, p. 140.*  Had the debtors done what ETS's PMK testified they should have done, the foreclosure process would have been within Nevada's

---

[9] To support their claim of compliance with these statutory sections, the debtors did nothing more than direct this Court to the generalized affidavit attached to the Trustee's Deed Upon Sale wherein an ETS employee generally claims that "All requirements of Nevada Statutes" (including "personal delivery") have been complied with.  This declaration proves nothing.  In fact, as noted above, it is clear that the debtors did not comply with N.R.S. 107.085 by personally serving the plaintiffs with the notice (or a copy of the promissory note) as required by that statute.  It is this false declaration which formed a basis for the plaintiffs' fraud claim.  The representations are simply untrue.

1    mandatory Foreclosure Mediation Program. [10]

2    **IV.  The Plaintiffs' Fraud, Misrepresentation and Promissory Estoppel Claims are**
3    **Entirely Valid as there is Irrefutable Evidence that Multiple GMACM**
     **Representatives Informed the Claimants That GMACM's Proposed Loan**
     **Modifications Were, in Fact, Fully Approved. The Evidence Is Also Irrefutable That**
4    **GMACM Repeatedly Informed Longoni That All Foreclosure Actions Were on Hold.**

5        32.    Up to this point, the plaintiffs have demonstrated why the foreclosure was legally

6    deficient under Nevada's foreclosure laws.  The plaintiffs will now show why the actions of

7    GMACM's employees would have rendered the foreclosure unlawful, (or otherwise resulted in a

8    breach of an enforceable agreement).  The plaintiffs allege that in response to their application for

9    a loan modification, they were told to make monthly payments of $1,600 while GMACM considered

10   their request for a permanent modification to their loan.  They admittedly made those payments, and

11   during that time they were repeatedly told that the foreclosure process was on hold.  They claim that

12   on June 30, 2012, Ms. Longoni was told by Mr. Stephenson that the request had been approved.  The

13   plaintiffs will now review the truly uncontroverted evidence which supports these factual allegations.

14   This evidence consists of the Affidavit and Declaration from Loss Mitigation Specialist, Nate

15   Stephenson, the debtors' own internal log notes (or diary), GMACM's correspondence, as well as

16   email communications between Ms. Longoni and Mr. Stephenson.

17       33.    The entire process began with an inquiry Ms. Longoni made when she and her

18   partner, Mr. Gagnon suffered financial difficulties when he was transferred from Reno to Las Vegas.

19   When Ms. Longoni inquired about a modification to their existing loan, she was told that before they

20   could be considered for a loan modification, they had to be in default.  Because she had received this

21   information, the plaintiffs did not make their December 2008 payment.  *See, Longoni  deposition*

22   *Exhibit 23,  pp. 52-54.*

23       34.    On or about January 15, 2009, Ms. Longoni sent a request for a loan modification to

24   Homecomings Financial as she believed that was the lender on their loan.  *See, Longoni Affidavit,*

25

26       [10] The debtors have attempted to avoid the implications of these facts by arguing that the
     claim would be barred by reason of certain provisions which were contained within the
27   Foreclosure Repayment Agreement that Nate Stephenson originally proposed.  *See, Objection, ¶*
     *11.*  However, the debtors fully admit that the claimants never executed this agreement.  *See,*
28   *Objection ¶ 10.*  Thus, this argument is entirely specious.

*¶6, attached Exhibit 9, and letter of January 15, 2009, attached Exhibit 11.*  On February 18, 2009, GMACM's notes reflect that a "workout package" was sent to the claimants.  *See, attached Exhibit 12, bates page GMAC-01-0065.*  The very next day (February 19, 2009), GMACM referred the matter to ETS to commence foreclosure proceedings.  *Id.  See, also, Ravelo deposition, Ex. 8, p. 63.*  On March 5, 2009, GMACM received the claimants' completed financial package.  *See, Exhibit 12, bates page GMAC-01-0067.*  And on March 10, 2009, GMACM approved the matter for their loss mitigation program.  *See, Exhibit 12, bates page GMAC-01-0068.*  That same day, GMACM instructed ETS to place all foreclosure actions on hold until directed otherwise by GMACM.  *See, attached Exhibit 13, bates page ETS-01-000005.*

35.    Before proceeding forward, the claimants believe it is important for this Court to gain an understanding of what GMACM did as part of its Loss Mitigation practices.  To assist its Loss Mitigation Specialists, GMACM adopted internal guidelines which they refer to as Servicer Guide.  *See, attached Exhibit 14.  See, also, Deposition testimony of Aguirre, pp. 158-159, Exhibit 7.*  This guide identified the various options which were available for loss mitigation specialists.  The options included "Temporary Indulgence," "Repayment Plan," "Special Forbearance Relief Agreement," "Deed-In-Lieu of Foreclosure," "Write Offs," "Bankruptcy" and, of course, "Foreclosure."  Each had their own terms and conditions.  GMACM's "Repayment Plan" simply allowed a borrower to increase his/her payments over time to make up for a deficiency.  Under a repayment plan, the loan would *not* be modified and there would be no write off or debt forgiveness.  *See, Exhibit 14, bates p. RFC-001-000300, 369.*

36.    In contrast, a "Loan Modification" entailed a formal change in one or more terms of the original mortgage note.  Such changes could include a change to the interest rate, payment amount, maturity date, or the principal balance of the loan.  *See, Exhibit 14, bates p. RFC-001-000378.*  Loan modifications could be done under several plans such as "Traditional," "HAMP," "Second Lien Bulk" or "Framework (Bush)."  *See, Exhibit 14, bates GMAC-02-000193.*  According to Mr. Aguirre, loan modifications start as "trial" modifications and then they are changed to "permanent" modifications.  *See, Aguirre Deposition, pp. 185-186, Exhibit 7.*  HAMP modifications (which are synonymous with "Obama" modifications) came into effect in March of 2009, but

1    GMACM did not start to use them until May of 2009. *Id. at 164-165. 194.* GMACM Loan

2    Specialists could utilize either Traditional plans or HAMP plans depending upon which option

3    worked best for the borrower. *Id. at* 165. According to Aguirre, the specialist would look first to the

4    Traditional modification, however, when the HAMP program was enacted, it was used as the terms

5    were more liberal for the borrower (i.e., reduced interest rates, extended terms, etc.). *Id. at 188-189.*

6    This, of course, is precisely what occurred in this case. The only difference is that GMACM had

7    actually approved the plaintiffs' request before GMACM decided to change it to a HAMP loan.

8        37.    Confirming Mr. Stephenson's Declaration (Exhibit 1, ¶ 3), GMACM's March 10,

9    2009 notes reflect that they were first going to pursue a Repayment Plan. *See, Exhibit 12, bates page*

10   *GMAC-01-0068.* This plan consisted of 3 monthly payments of $2,270.00, followed by a balloon

11   payment of $19,421.76 *Id.* Attached hereto as *Exhibit 15* is the *proposed* Foreclosure Repayment

12   Agreement. The addendum describes the payment schedule, including the balloon. When Ms.

13   Longoni received this proposed plan, she contacted Mr. Stephenson and informed him that they

14   could not afford the monthly payment of $2,270.00, and they would never be able to make any type

15   of a balloon payment. *See, Longoni affidavit, Exhibit 9, ¶ 10.* Mr. Stephenson's Declaration fully

16   confirms this fact. *Exhibit 1, ¶ 4.* In response, Mr. Stephenson concluded that a Repayment

17   Agreement was not a viable option for the plaintiffs, and as a result he made the decision to forego

18   all attempts at a repayment plan and instead he pursued a permanent loan modification. *See,*

19   *Stephenson Declaration, Exhibit 1, ¶ 4.* GMACM's log notes from March 19, 2009, fully confirm

20   that change. *See, Exhibit 12, bates page GMAC-01-0072.* This log note reads as follows:

21              The borrower does not have enough savings to reinstate the loan and
              their financials do not support a repayment plan.
22

23   On the following page (*GMAC-01-0072*), GMACM's notes reflect Mr. Stephenson's Declaration

24   that a "trial" loan modification was then being proposed. That note reads as follows:

25              Proposed Solution: GMAC Mortgage proposes a **3 month trial
              modification** consisting of a down payment of $1600 and a monthly
26              contribution of $1600. Upon successful completion of the trial the
              estimated mod terms will be: Mod Type; Cap: Interest Rate Type:
27              ARM to ARM; Interest Rate: 3.25; Index Rate 3.9; Margin: -0.65;
              Arm Freeze: 5 year Freeze; NPV $10,737.80. (Emphasis added)
28

                                    15

38.    According to Mr. Stephenson, the loan modification plan that he proposed would included a three-month trial payment period during which time GMACM would decide whether to make the modification permanent.  It would also afford GMACM an opportunity to see if the borrowers could meet the agreed upon monthly payment.  *Id. at ¶ ¶ 4-6.*  As he confirms, because this was *not* a Repayment Agreement (Plan), there was no scheduled balloon payment.  And because this was not part of a Repayment Agreement, no new written Foreclosure Repayment Agreement was ever sent to Ms. Longoni.  *Id. at ¶ 6.*  Mr. Stephenson further confirmed that he never indicated to Ms. Longoni that they would be required to make any type of a balloon payment.  *Id.*  This is fully confirmed by Ms. Longoni.  *See, Longoni affidavit, Exhibit 9, ¶ 10.*  Again, Mr. Stephenson states that the plaintiffs were never in breach of any Repayment Agreement. *Id at ¶ 10.*

39.    GMACM's note of March 30, 2009, further confirms Mr. Stephenson's Declaration that the plan to allow $1,600.00 payments was *not* part of a Repayment Plan, but rather, was the first step in a loan modification plan. That note confirms Mr. Stephenson's statement that he had requested a debt forgiveness of $186,000.00, which was sent for approval.  *Exhibit 12, bates page GMAC-01-0073.*  As GMACM's internal guidelines clearly state, Repayment Agreements do not entail any debt forgiveness.  The proposed agreement also indicated that the interest rate would be frozen for five years.[11]   The plan was set to commence on March 30, 2009.

40.    The debtors' claim that the plaintiffs were in breach of the Repayment Agreement is further belied by the amount of the claimed balloon payment.  As this Court will recall, the debtor's claim that the plaintiffs were in breach because they failed to pay the $19,421.76 balloon payment which was required as part of the Repayment Plan that Mr. Stephenson had initially proposed.  However, as the debtors readily admit, that plan was never signed.  *See, Objection ¶10.*  As Mr. Stephenson noted in his Declaration, if his revised plan were a Repayment Plan with reduced payments of $1,600.00, the balloon payment would have been far in excess of the payment called for in his initially proposed  Repayment Agreement.  *See, Exhibit 1,Stephenson Declaration, ¶ 9.*

41.    The debtors claim that the plaintiffs were in breach of the revised plan because they

---

[11] As this Court likely noticed, according to GMACM's own Servicer Guide, Repayment Plans were for a maximum of 18 months.  *See, Exhibit 14.*

failed to make timely $1,600.00 payments is also belied by both Mr. Stephenson's Declaration and GMACM's diary notes. Those notes reflects that on March 27, 2009, Longoni contacted GMACM and requested a couple more days to make the first payment. *See, Exhibit 12, GMAC-01-0073.* The notes reflect that Mr. Stephenson granted Longoni an extension until April 3, 2009, and Longoni made her payment within that time. Subsequent notes (and Mr. Stephenson's Declaration) further reflect that any delay in receipt of those payments was fully authorized by Mr. Stephenson. Thus, the debtors' arguments that the plaintiffs breached the new agreement are entirely false.

42.    From this point forward, the communications between Stephenson and Longoni are confirmed by email communications. These actual email communications are attached hereto in *Exhibit 16*. For the ease of this Court, the critical communications have been placed into a table which appears on the first page of the exhibit. The communications between Longoni and Stephenson begin on April 2, 2009, after Longoni had made the claimants first $1,600.00 payment. She described the process she went through to make the payment. She then asked Mr. Stephenson when her next payment was due. He told her it was due on April 30, 2009. He followed that with the following remark:

> All that I am awaiting on in order to make this a permanent change (next 5 yrs) is approval from the Vice President of the Bank. I should know the outcome in the next month (ish).

43.    Beginning on April 20, 2009, Longoni had another exchange with Mr. Stephenson about fees that she noted had been added back into her account. Mr. Stephenson explained the fees as an escrow shortage which he indicated would be added back into the loan. On April 28, 2009, Mr. Stephenson further stated:

> " I just took a look at the notes on your loan and it looks as if one manager looked at it and agreed that it was a win win situation, but because it is $186K that we are trying to write off, it has to go a little higher."

44.    On May 1, 2009, Longoni attempted to make her second payment to GMACM. *See, Longoni Affidavit, Exhibit 9, ¶ 17.* She had made the first payment via an on-line payment system, however, she was unable to do so when she tried to make the second payment. She also attempted to make the payment by directly contacting a phone representative, however, that request was

1   refused.  Because of these difficulties, Ms. Longoni again contacted Mr. Stephenson who explained

2   to her that someone had put a "Certified Funds Flag" on her account which meant that all payments

3   had to be certified.  He told her that he had removed that flag.  Four days later on May 5, 2009, Mr.

4   Stephenson sent the following message to Ms. Longoni:

5           According to what I see we rcv'd $1600 yesterday.  You're good to
        go!!!  It doesn't look like our VP has had a chance to look at this yet.
6           (We are swamped!!!!!!!!!)  The notes that I saw are good though
        (indicating that it makes sense to do the Modification).  **We still have**
7           **2 months before I would have to set up a plan.  So everything is
        still sort of on hold.**  (Emphasis added)

8

9           45.     According to PMK Aguirre, GMACM started to implement the HAMP program in

10  May of 2009.  *See, Aguirre Deposition, p. 165, Exhibit 7.*  GMACM's Log Notes of May 22, 2009,

11  confirms this testimony through the following notation "Home Affordable Modification program

12  sent to borrower." *Exhibit 12, bates page GMAC-01-0076.*  By May 26, 2009, the claimants had still

13  received no documentation from GMACM regarding the modification.  Therefore, Longoni sent a

14  follow up email asking if they should continue to make the $1,600 payment.  *See, Exhibit 16.*  Mr.

15  Stephenson sent a response advising that she should continue to make the payment.  He added that

16  he expected an update soon and once a decision was made then "paperwork will be sent out with the

17  new terms."  And, while it is true that Mr. Stephenson indicated that he was going to be moving to

18  a new team the following week, he never indicated that he would have no authority to speak on

19  behalf of GMACM.

20          46.     In accordance with Mr. Stephenson's instructions, Longoni made their third payment

21  on June 1, 2009.  Still she heard nothing.  *See, Longoni Affidavit, Exhibit 9, ¶ 18.*  The debtors now

22  claim that the plaintiffs breached the Repayment Agreement when they failed to make the required

23  balloon payment which would have been due on June 30, 2009.  However, GMACM's notes prove

24  otherwise.  While a note dated March 30, 2009 (bates page GMAC-01-0073), reflects the entry

25  "Promise Broken 03/30/09," it is followed by a note dated 4/10/09 which states "Foreclosure

26  Started." (Bates p. GMAC-01-0074).  A note of 4/30/09 also states "Promise Broken 04/30/09" and

27  is followed by a note of 5/8/09 stating "Foreclosure Started."  Finally, a note dated 6/1/09 once again

28  states "Promise Broken" and is followed by a note dated 6/12/09 which states "Foreclosure Started."

From this it is clear, that GMACM's system was automatically populating these entries when the payments they were receiving were less than the $2,270 payments which were called for in Mr. Stephenson's original Repayment Agreement. Clearly, the plaintiffs were not in breach of that plan as it was abandoned. *See, Stephenson Declaration, Exhibit 1.*

47.    In direct contrast to the notes set forth above, the debtors claim that the foreclosure process was only restarted *after* the plaintiffs failed to make the required June 30, 2009. That claim is belied by the three previous notes which reflect that the Foreclosure was started after GMACM received each of the $1,600.00 payments. The argument is further belied by a log note dated July 2, 2009, from LHUCK ( Landon Huck) which states the following: "CALLED HOME LEFT MESSAGE. WILL NEED NEW HMP IN ORDER TO REVIEW FOR MOD. PLS HAVE BWR FAX TO 866-709-4744.*"  Exhibit 12, bates page GMAC-01-0077.* If GMACM had declared the plaintiffs in breach of their Repayment Plan, why was Mr. Huck asking them to submit a HAMP work-up? His following note indicated that he requested that a new HAMP workout be mailed to the claimants mailing address. *See, Exhibit 12, bates page* GMAC-01-0077.

48.    During the later part of June, Longoni had made several attempts to speak to a new Loan Specialist, however, she could never contact anyone who knew the status of their request. Therefore, she again reached out to Mr. Stephenson. The following email exchange occurred.

| 6/29/09 | Pam to Nate | Nate, I can't seem to get a hold of anyone who knows anything about the modification you were working on. Homecomings sent me information indicating that my payment was as it was before, and the balance was the same. Please help!!!! |
| 6/30/09 | Nate to Pam | Hi Pam, I e-mailed my old dept yesterday and they responded that the file has been sent for final management approval. The person handling the file is Landon Huck. I hope that this helps you. Good luck. |
| 6/30/09 | Pam to Nate | Hi Nate, do you have any contact information for Landon? Thank you for still helping us. Hope you are having a nice summer. Pam |
| 6/30/09 | Nate to Pam | Hi Pam, I am sorry I am not able to give you the contact info. **I did, however, rcv an e-mail stating that the MOD had been approved yesterday, but that is all I know.** You may want to call in and see if you can get some more details. Thanks, Nate |

19

| 6/30/09 | Pam to Nate | Nate, when I call the regular Homecomings 800 number, no one knows any information.  Do you have a suggestion as to what department I could start with?  So it was approved?  Does that mean the $1600 payment and the principal reduction?  Wow! |
| 6/30/09 | Nate to Pam | You might be able to try 1 800 799 9250 |
| 6/30/09 | Pam to Nate | So "approved" means $1600 a month and the principal reduction? |
| 6/30/09 | Nate to Pam | That is the way that I had it set up, however, I am not sure if that was how it was approved or not.  Thanks, Nate |

49.    The debtors now argue that these statements are too vague to support either a modification of the plaintiffs' existing loan, a new contract, or even promissory estoppel.  They further argue that this email does not prove that the approval related to the plan that Mr. Stephenson had originally proposed.  This argument, however, is once again disproven by GMACM's own employees.  In this regard, PMK Aguirre acknowledged that there was only one loan modification plan that was ever proposed by Mr. Stephenson, and that was the one which Stephenson had described to Longoni, namely $1600 payments, with a $186,000.00 write down.  *See, Aguirre Deposition pp. 264-266, attached Exhibit 7.*  Thus, there is no doubt but that the approval related to the plan Mr. Stephenson described in detail to Ms. Longoni and which was clearly identified in the GMACM's log note of March 19, 2009.   *See, Exhibit 12,* (*GMAC-01-0072*)

50.    Beginning on July 1, 2009, Longoni attempted to make her next payment of $1,600.00.  However, the system would not accept that payment.  *See, Longoni Affidavit, Exhibit 9, ¶ 21.*  On July 9, she was finally able to make contact with a representative of GMACM.  The individual she spoke with was named Henry.  *Id.*  During that call, she asked Henry about the status of her loan modification as she had been told on June 30, 2009, that it had, in fact, been approved.  Much to her shock and amazement, Henry told her that it was *not* approved, that she owed approximately $19,000.00 and that if she did not pay it, they would sell their home.  She attempted to make the next payment of $1,600.00, however, he refused to accept it.  He told her that it was only set up for three months.  As both Ms. Longoni and Mr. Stephenson acknowledged, no one had ever told the plaintiffs that the payment plan was only for three months, nor was she ever told that there

1    would be a balloon payment. *Id.*

2        51.    Even though Henry told Longoni that she needed to pay $19,000.00 or her home

3    would be sold, Henry nevertheless advised her to submit a new workout package as per the Obama

4    Modification plan. *See, Longoni Affidavit, Exhibit 9, ¶ 21.* He told her that they had 60 days to

5    continue to pursue a loan modification through this new federal program. <u>Critically, he specifically</u>

6    <u>told Ms. Longoni that the foreclosure would be on hold through this process.</u> *Id.* According to

7    Longoni, she believed that under the worst case scenario, they had until at least until September 9,

8    2009, to qualify for the new federal modification program. Ms. Longoni's claim is fully confirmed

9    in GMACM's log note of July 9, 2009, which reads as follows:

10            TTB1 [talked to borrower] VAI [verified account information] CI BC
              WANTED TO INQ MOD THAT WAS APPROVED RECENTLY.
11            ADV NT TRUE. ADV PREV REPAY PLAN IS COMPLETED.
              ADV TO RETURN WOUT PCK ASAP, TAT IS 60 DAYS, NO
12            GUARANTEED. I TRIED TO UPDATE DTI CALC BUT B DID
              NT KNOW HER GROSS INCOME. SD SHE WOULD CB TOMO
13            SHE HAD TO GO TO WORK.

14                            *    *    *
              PAYCUT START: 9/2008 ONGOING. M/I; 1800 A MONTH.
15            **ADV F/C SALE DT ON HOLD**, L/C AND C/R CONT. HCASAS.

16    *See, Exhibit 12, bates page GMAC-01-0078.*[12] Longoni's claim is further confirmed in an email

17    which she sent to Mr. Stephenson that same day, to which he responded as follows:

18
              Pam, It looks like they are trying to put you onto an Obama Modification. **Your**
19            **Foreclosure is on Hold. GMAC does not want to take your house.** When we last
              talked I said that from the information that I could gather from my old dept. this was
20            waiting to be approved by management. I am not sure what happened with that, but
              when I had originally set you up it was a traditional GMAC Mod. We are now trying
21            to put everyone into the Obama plan.

22    See, Exhibit 16.

23        52.    Based upon Stephenson's email communication and GMACM's diary notes, it is

24    undisputable that as of July 9, 2009, both Henry Casas *and* Nate Stephenson advised Ms. Longoni

25    that the foreclosure was on hold. There is absolutely no evidence that anyone ever told the claimants

26    anything different. The irrefutable evidence proves that GMACM had, in fact, approved the

27

28        [12] GMACM's PMK, Aguirre confirmed that this was a note written by Henry Casas. *See,*
      *Aguirre Deposition, Exhibit 7, pp. 247-248.*

                                            21

1    permanent loan modification which had been proposed by Mr. Stephenson, however, subsequent to

2    that time GMACM decided to try and place the plaintiffs into a HAMP modification. What they did

3    not do was tell ETS to stop the foreclosure process while they proceeded through that process.

4    GMACM's actions to continue to have the claimants *requalified* for the HAMP program are

5    confirmed through another entry in GMACM's diary. In a note dated July 13, 2009, yet another

6    GMACM representative telephoned Longoni and left a message saying that they needed a completed

7    Obama package back to review the account for a possible loan modification. *See, Exhibit 12, bates*

8    *page GMAC-01-0079.* At the same time that these GMACM's representatives were telling Longoni

9    to continue efforts to qualify for the HAMP program, GMACM sent the plaintiffs an automated letter

10    dated July 17, 2009, which stated that, "[T]he repayment plan we previously established at your

11    request has been cancelled for one or more of the following reasons:"

12
13                           [[x]] The payment was not received by the payment date *as specified
                           in the signed repayment agreement*. (Emphasis added)

14    *See, attached Exhibit 24.* It is wholly undisputed that there never was a signed repayment plan and

15    thus it is obvious that this automated letter was sent in error. The debtors' attempt to now rely upon

16    it as a justification for their actions shows just how desperate they have become to avoid accepting

17    responsibility for their mistake. This Court should ask them to produce this *signed agreement.*

18           53.    Despite their current claim that GMACM made the decision on July 15, 2009, to

19    complete the previously started foreclosure because the plaintiffs breached the repayment plan (and

20    their non-responsiveness to the company's outreach efforts,[13] *see, Objection ¶ 15),* GMACM

21    continued to mislead the claimants into believing that a permanent loan modification was available.

22    On July 29, 2009, GMACM directed the sending of a letter with yet another Financial Analysis

23    Form. *See, Exhibit 12, bates page GMAC-01-0081.* GMACM's log note of that day contains the

24    following entry: "obama workout package provided in today 30 days to sale (no contact) letter."

25    The letter referenced in this log entry (which is dated July 20, 2009) is attached hereto as *Exhibit 17.*

26
27           [13] Again, the debtors have not offered this Court an affidavit from any witness who states
      that the foreclosure was restarted for these reasons. In fact, the debtors have never shown this
      Court that the recommencement was the result of anything other than an automated action of
28    their computer system.

1    As the Court will note, that letter specifically contained a note which reiterates the "30 days to sale"

2    notation that was referenced in the GMACM log notes. Undisputedly, GMACM never gave the

3    plaintiffs that 30 days as ETS sold their home on August 14, 2009.

4    54.    Having heard nothing further from GMACM, on August 3, 2009, Longoni sent

5    another email to Nate Stephenson explaining how she was getting no assistance from GMAC and

6    that she had gotten some notice in her mail from some place called ETS saying that her house was

7    going to be sold at auction on the 18th.[14] Again, Mr. Stephenson responded telling her that she

8    needed to send the workout back to GMACM. Notably, Mr. Stephenson did *not* tell her that it was

9    true that her home was going to be sold. The following day (August 4, 2009) Longoni received a

10    package from Fed Ex Express. *See, Longoni Affidavit, Exhibit 9, ¶ 27.* Attached *Exhibit 18* is a

11    confirmation from Fed Ex showing that this package was received by Ms. Longoni on August 4,

12    2009. This Financial Analysis Form, was accompanied by GMACM's July 30, 2009 log note.

13    Longoni returned the package on August 10, 2009.[15] *See, Exhibits 9, ¶¶ 27-28, and Exhibit 19.*

14    55.    Not knowing that her home had been sold on August 14, 2009, on August 24, 2009,

15    Longoni telephoned GMACM to inquire about the status of her loan modification request. *See,*

16    *Longoni Affidavit, Exhibit 9, ¶ 29.* She advised the representative that she had received an email

17    from Nate Stephenson on July 9, 2009, stating that the foreclosure was on hold and that she believed

18    GMACM was trying to get them qualified under HAMP program. The representative told her that

19    her home had been sold at foreclosure on August 14, 2009. Longoni told her that she wanted her

20    home back, but was told that she would need to speak with the representative's supervisor who was

21    gone for the day. *Id.* Again, GMACM's log notes fully confirm Longoni's testimony. *See, Exhibit*

22    *12, bates pages GMAC-01-0086-87.* In pertinent part, this note reads as follows:

---

[14] According to Longoni, she believed this was junk mail that had been sent in error as she had received notice that their request for a permanent modification had been approved.

[15] In their Objection, the debtor's counsel declares to this Court that GMACM's records do not reflect receipt of this package. Obviously, GMACM's counsel would not have personal knowledge of this fact. She also states that Longoni never referenced having returned this package, however, Longoni's August 24, 2009, email clearly reflects the fact that she "promptly returned" the workout package to GMAC.

"... B1 [borrower 1] SAID THAT SHE RCVD AN EMAIL FROM A L/M RP ON 7/9 STATING THAT THE FCL WAS ON HOLD AND WE WERE TRYING TO GET THEM MODIFIED UNDER THE HMP PROGRAM.  THE PROPERTY WENT TO FCL ON 8/14.  TURNED ACCOUNT OVER TO SUPER FTOLBERT."

This diary note is critical for several reasons.  First it shows that Longoni did not know her home had been sold at foreclosure.  It also shows that Longoni specifically referenced the July 9, 2009 email that she undisputedly received from Nate Stephenson on that day.  The note also confirmed that this representative had turned the matter over to a supervisor identified as FTOLBERT.

56.    At two points in their instant Objection, the debtors quite recklessly claim that Longoni fraudulently fabricated an email which purported to prove that on August 3, 2009, Stephenson had sent her an email which purportedly stated, "Don't worry your foreclosure is on hold."  *See, Objection paragraph 28  (wherein the debtor's counsel actually quotes the alleged fraudulent representations, as well as paragraph 65).*  To support this outlandish allegation, the debtor's counsel attaches (as Exhibit 38) the email which she claims came from Pamela Longoni on August 3, 2009.  However, a review of this purported email clearly reveals that GMACM's representations are false.  The only reference to an email is one dated August 24, 2009, which is a *forwarded* email (See, FW in Subject line) of Longoni's previous August 3, 2009 email to Nate Stephenson.  This email most certainly does not contain the phrase quoted by GMACM's counsel (i.e., Don't worry your foreclosure is on hold").  Longoni did not "materially alter evidence," "forge a key document" or "falsify an August 3, 2009 email with Nate Stephenson" as the debtors now suggest.  Longoni did nothing more than *forward* her exact email communications with Nate Stephenson between July 9, 2009 and August 3, 2009.    At no point in time has Longoni ever alleged that anyone told her *on August 3, 2009*, that foreclosure activities were on hold.  *See, Plaintiff's Third Amended Complaint,  paragraphs 37 through 46, and esp. paragraph 46.*

57.    Although GMACM's Exhibit 38 does not prove any misrepresentation by Longoni, it does provide great evidence of GMACM's fault in this matter.  Further on down this chain, the Court will see an August 26, 2009 email that GMACM employee Logan Gill sent to Benjamin Willis.  In that email, Mr. Gill stated the following:

Hopefully you can help me out with this.  Basically the long and

1    skinny is that Nate told this lady the foreclosure was on hold when it
     is not and it went to 3rd party sale.  He now knows not to email
2    borrowers/3rd parties and will definitely be held responsible for his
     actions, but would this fall under the mod teams cost center as far as
3    the rescind process is concerned?  I am willing to do the leg work on
     it if I need to but I just need to figure out where this would fall.
4    Thanks in advance for all your help.

5    58.    Ms. Longoni account of the facts in this matter are entirely confirmed by Mr.

6    Stephenson's sworn affidavit .  *See, Exhibit 1*.  In his affidavit, Mr. Stephenson confirmed that on

7    June 30, 2009, he did, in fact, send an email to his former department inquiring into the status of

8    Longoni's loan modification request.  *Id at  ¶ 7*.  He further confirmed that he received a responsive

9    email stating that the Ms. Longoni's final loan modification had, in fact, been approved.  *Id. at ¶ 8*.

10   He further confirmed that he placed the foreclosure on hold.  GMACM's conduct after the August

11   14, 2009, foreclosure also proves its admission of liability.  As set forth in Ms. Longoni's attached

12   Affidavit, on September 9, 2009, she received an unsolicited telephone call from GMACM's counsel

13   Michael Knapp, Esq., who told her in no uncertain terms that GMACM made a terrible mistake.  He

14   told her that they were attempting to recover her home and that she would not have to move out.

15   *See, Longoni Affidavit, Exhibit 9, ¶ 35, and Exhibit 25, a copy of her Verizon telephone bill*

16   *reflecting the 8 minute call.*

17   59.    In this litigation, the debtors initially denied the allegation that after the trustee sale

18   they tried to recover the plaintiffs' home.  However, both Messrs. Aguirre and Ravelo testified that

19   they were fully aware that such actions had been undertaken.  *See, Aguirre deposition, pp. 255-56,*

20   *Exhibit 7 and  Ravelo deposition, pp. 127-129, Exhibit 8.*    Moreover, during the course of

21   discovery, the plaintiffs recovered further evidence of the debtors' efforts to recover the plaintiffs'

22   home after the foreclosure sale.  In this regard, they located a proposed Settlement Agreement

23   pursuant to which GMACM sought to buy back the plaintiffs' home.  *See, attached Exhibit 20.[16]*

24   When efforts to recover the plaintiffs' home failed, GMACM undertook efforts to minimize the

25   plaintiffs' damages.  First, they took steps to completely remove from the claimants' credit records

26   all negative references, both as to any default in their loan as well as the foreclosure.  Attached hereto

27

28   [16] Apparently, the purchaser wanted more than the $4,000.00 that GMACM was willing
     to pay for the return of the home.

1  as *Exhibit 21* are letters and emails sent by GMACM's counsel relative to this process. *See, also,*

2  *Longoni Affidavit, Exhibit 9, ¶ 37.* [17]

3      60.    Based upon the foregoing, several things are irrefutable.  First, the claimants never

4  defaulted upon any Repayment Plan by failing to make a balloon payment.  The proposed Repayment

5  Plan was abandoned in March of 2009, in favor of a Loan Modification.  Second, the claimants made

6  each of the $1,600 payments called for under the "Trial" modification plan and as of June 29, 2009,

7  GMACM had approved their request for a permanent loan modification, and on June 30, 2009, Mr.

8  Stephenson communicated that approval to the plaintiffs *in writing*.  Third, after June 29, 2009,

9  GMACM, and only GMACM decided to change the claimants' loan modification plan from the

10  Traditional plan (which GMACM had already approved) to a HAMP modification.  Fourth, during

11  this process, Nate Stephenson and Henry Casas both informed Ms. Longoni that all foreclosure

12  efforts were on hold and the claimants were never told otherwise.[18]  And finally, after GMACM

13  discovered that ETS had sold the plaintiffs' home, their counsel admitted to Longoni that the debtors

14  had made a terrible error.  These undisputed facts prove the validity of each of the plaintiff's claims.

15
16  **V.  The Claimants' Breach of Contract and Fraud and Misrepresentation Claims
      are Valid.**

17      61.    The debtors made the very same challenge to the plaintiffs' Fraud and

18  Misrepresentation claims before the Nevada District Court, and the court expressly found that the

19  claims stated a valid claim for relief.  *See, Longoni v. GMAC Mortg., 2010 WL 5186091, at \*4.*  The

20  debtors now seek to reargue the law of the case, claiming that the only false statement of fact that

21  the claimants can remotely point to is Mr. Stephenson's June 30, 2009 statement that he had received

22

23      [17] These actions on the part of GMACM are not inadmissible settlement negotiations –
      they are clear, unequivocal admissions that the debtors' actions toward the claimants were
24      wrongful.  Attorney Knapp fully admitted that GMACM had made errors and in accordance
      therewith he sought to recover the plaintiffs' home.
25
26      [18] While Longoni acknowledged in her August 3, 2009 email to Stephenson that she had
      received some notice from "ETS" that her home was going to be sold on August 19, 2009, she
      believed that such notice had to be in error as GMACM had told her that her modification was
27      approved and they were still working to get them approved for a HAMP modification.  *See,
      Longoni Affidavit, ¶ 29.*  It is also undisputed that the formal Notice of Trustee's Sale came back
28      to ETS as undelivered.  *See, attached Exhibit 22.*

1  an email stating that their modification had been approved the prior day.  The debtors claim that he

2  corrected his error that same day.  *See, Objection, ¶ 45.*  This is simply untrue.

3      62.    After Mr. Stephenson told Longoni that the request for a permanent modification had

4  been approved, all he did was tell her that he was not certain of the exact terms of the modification.

5  He did say that was how he had it set up. And as GMACM's PMK admitted, this was the only loan

6  modification plan that GMACM had ever proposed.  Thus, Mr. Stephenson's subsequent statement

7  is not a retraction of his previous statement.  From the inception, the plaintiffs sought relief from

8  their existing loan.  GMACM proposed a permanent loan modification pursuant to which the

9  plaintiffs were required to make monthly payments of $1,600.00 (which they admittedly did).  The

10  moment that Mr. Stephenson advised Ms. Longoni that their loan modification had been approved,

11  an enforceable agreement was created.  As will be addressed below, contrary to the debtors' current

12  arguments, that agreement was not in violation of the statute of frauds as it is clearly proven through

13  writings, including Mr. Stephenson's June 30, 2009 email communication and GMACM's own diary

14  notes.

15      63.    GMACM now seeks to deny the existence of this agreement by claiming that nine

16  days after Mr. Stephenson told Longoni that their request for a permanent loan modification had

17  been approved, Henry Casas told Ms. Longoni that there was no such approval.  The argument is

18  fatally flawed.  As stated above, a fully enforceable agreement was formed on June 30, 2009, when

19  Mr. Stephenson advised the claimants that their loan modification request was finally approved.

20  What Mr. Casas did on July 9, 2009, was simply repudiate that agreement.  When GMACM failed

21  to perform their promise, the fraud had been completed.

22      64.    Additionally, GMACM's representation that the claimants are asserting only one false

23  promise as the basis for their fraud claim is also quite erroneous.  As was aptly noted by the Nevada

24  District Court (when it denied the debtors' first motion to dismiss), the plaintiffs' fraud claim was

25  based upon **two** alleged false representations.  The first related to the promise that the loan

26  modification had been approved. There was a second false promise and that was that the foreclosure

27  was on hold.  As the Nevada Court properly concluded, the plaintiffs relied upon these statements

28  in making the $1,600.00 payments *and* by making no preparations to leave their home, thereby

27

1  incurring additional moving costs and rental expenses.  Moreover, as is set forth in Longoni's

2  attached Affidavit, had she known that the promises of a stayed foreclosure were false, she would

3  have pursued other means by which to bring the home out of foreclosure.  *See, Longoni Affidavit,*

4  *Exhibit 9, ¶ 43.*  She quite reasonably relied upon the representations of both Messrs Stephenson and

5  Casas.  As such, the fraud and misrepresentations claims are clearly valid.

6           **VI.    The Plaintiffs' Negligent Misrepresentation Claims Are Entirely Valid.**

7           65.    Debtors claim that the Plaintiffs' fourth claim for relief entitled "Negligence  and

8  Negligent Misrepresentation" fails to state a viable claim because the debtors owed the plaintiffs no

9  duty of due care.  However, the specific roles of the parties within this action illustrate both a duty,

10 and a myriad of viable negligence claims.  As the debtors argue, a lender generally owes no duty of

11 care to its borrower.  However, "this is only true in a lender's conventional role as a mere lender of

12 money.  It does not indicate that lenders (or others such as ETS who had no lender-borrower

13 relationship with the plaintiffs) have no duty of care in foreclosure proceedings."  *Weingartner v.*

14 *Chase Home Finance, LLC*, 702  F. Supp. 2d 1276, 1290 (D.Nev 2010).  The duty of care applicable

15 to foreclosures is, at a minimum, defined by Nevada's foreclosure statutes found at NRS 107.080

16 through NRS 107.100.  "These statutes set the floor of the duty of care for a foreclosing entity."

17 *Weingartner*, *Id*. at 1291.

18         66.    The standards of negligence *per se*  are well established at Nevada law.  "A violation

19 of statute establishes the duty and breach element of negligence only if the injured party belongs to

20 the *class* of persons that the statute was intended to protect, and the injury is of the *type* against

21 which the statute was intended to protect."  *Anderson v. Baltrusaitis*, 113 Nev. 963, 965, 944 P.2d

22 797, 799 (1997)  The amended complaint reflects violations of various sections of the foreclosure

23 code,  NRS 107.080, *et seq*., which establish negligence *per se* type claims.  (*See*, #32, ¶¶ 27-34;

24 ¶¶64-66.)  This alleged violation of statutory duties in and of itself is sufficient to state a negligence

25 claim.  "Although sometimes pled as such, negligence per se is not a separate cause of action, but

26 a doctrine whereby the floor of the duty of care is set as a matter of law, removing from the fact-

27 finder the 'reasonable person' determination and leaving to the fact-finder only a determination of

28 causation and damages. . ." *Weingartner,* 702 F.Supp. at 1290.

67.    Moreover, claims for negligent foreclosure have been allowed to proceed to trial before a jury. *See, Gunsul v. Countywide Home Loans, Inc.*, 2006 WL 3586091, **2-6 (Wash.App.) (negligent foreclosure claim allowed to proceed due to material issue of fact as to whether a lender failed to timely provide exact pay off information required to stop foreclosure); *Lenett v. World Sav. Bank*, FSB, 2008 WL 2009757, *2 (Cal. App. 2d) (case submitted to trial against lender on claim of negligent foreclosure). On a related note, "wrongful foreclosure" also potentially involves an element of negligence, and probable negligence per se when statutory violations are involved. This cause of action is recognized under Nevada law. "An action for the tort of wrongful foreclosure will lie if the trustor or mortgagor can establish that at the time the power of sale was exercised or the foreclosure occurred, no breach of condition or failure of performance existed on the mortgagor's or trustor's part which would have authorized the foreclosure or exercise of the power of sale." *Collins v. Union Federal Sav. & Loan Ass'n*, 99 Nev. 284, 304, 662 P.2d 610, 623 (1983).

### A.    Negligent misrepresentation is also properly stated.

68.    Negligent misrepresentation in Nevada is defined as follows:

> One who, in the course of his business, profession, or employment, or in any other action in which he or she has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he or she fails to exercise reasonable care or competence in obtaining or communicating the information.

*Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 449, 956 P.2d 1382, 1387 (1998), *quoting* Rest. 2d of Torts, § 552(1)(1976). Elements toward satisfying these requirements of negligent misrepresentation may be found within the Third Amended Complaint. Very similar factual circumstances to those alleged herein have been found to state viable causes of action for negligent misrepresentation. For example, in *Ghervescu v. Wells Fargo Home Mortgage Co.*, 2008 WL 660248 (Cal. App. 4th) (unpublished), a property owner was given misinformation about a notice of default. He was in the process of applying for a forbearance agreement, and was never told that the application had been denied. He was further told that he would have ample time to "make arrangements" to cure any default and reinstate the loan since any trustee sale could not be held earlier than a certain fixed date. *Id.*, **1-2. Instead, and approximately five weeks prior to that fixed date, the property owner, when

29

following up regarding his pending application, was told that the Trustee Sale had already been held. *Id.*, *2. The California court applied a negligent misrepresentation standard all but identical with Nevada's. *Id.*, *3. With an eye toward these allegations, that court allowed the plaintiff's negligent misrepresentation claim to proceed for the lower court's consideration. Id., *6. *See also*, *of similar effect*, *Fidelity Mortgage Trustee Service, Inc. v. Ridgegate East Homeowners Assoc.*, 27 Cal. App. 4th 503, 506, 32 Cal. Rptr. 2d. 521, 523 (1994) (claim as to whether mortgage trustee had negligently misrepresented that foreclosure proceedings would be delayed allowed to proceed to the jury).

69. Based upon the foregoing, the plaintiffs have clearly stated a viable claim for negligent misrepresentation. The evidence unequivocally demonstrates that the debtors made false statements of fact which were relied upon by the claimants to their great detriment. Thus, the claims are valid.

## B.    Even assuming a "no duty" rule applicable to lenders, an exception to such "no duty" rule is stated by the complaint's averment.

70. Moreover, based on the same misrepresentations, and purported efforts towards loan modification reflected within the Third Amended Complaint, said averments fall within an exception to any purported "no duty" rule.  For example, within *Wiseman v.  Hallham*, 113 Nev. 1266, 1270, 945 P.2d. 945, 947-48 (1997) the Nevada Supreme Court adopted the Restatement (Second) of Torts § 323 (1965), which appears equally applicable here. That section provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other persons or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:
>
> (a)    the failure to exercise such care increases the risk of such harm; or
>
> (b)    the harm is suffered because of the other's reliance upon the undertaking.

*Id.* This theory of negligence liability is pled at in paragraphs  ¶¶ 113-114.

71. Here, when GMACM undertook efforts at loan modification, which were relied upon by the plaintiff, GMACM fell within the parameters of the above-referenced exception to the "no duty" rule.  Reliance may be shown by tendering loan payments in compliance with the

30

1    understanding of the loan modification plan.

2    ## C.    A claim for negligent infliction of emotional distress is also stated.

3    72.    To state a claim for NIED within the wrongful foreclosure context, the plaintiffs

4    "must establish, at the very least, the traditional elements of negligence, and allege verifiable

5    physical manifestations of emotional distress." *Simon v. B of A*, 2010 WL 2609436, *12 (D.Nev.),

6    *citing, Betsinger v. D.R. Horton, Inc*., 126 Nev. 17, 232 P.3d 433 (2010).  The plaintiffs have pled

7    all such elements, and as is set forth below, they have shown the requisite physical manifestations

8    necessary for an award of damages under a negligent inflliction of emotional distress claim. *See also,*

9    *Betsinger v. D.R. Horton, Inc*., 232 P.3d at 436 (putative mortgagor's jury award against mortgagee

10   reversed, since putative mortgagor had failed to present any evidence that he had suffered physical

11   manifestation of emotional distress).[19]  Furthermore, plaintiffs have averred a legally sufficient claim

12   that the underlying foreclosure was wrongful, which also establishes a properly pled claim. *See*, e.g.,

13   *Sattari v. Wash. Mut*., 2010 WL 3896146, *4 (D. Nev.)(summary judgment on NIED claim granted

14   where defendant acted improperly in foreclosure process).

15
16   ## VII.    The Claimants' Breach of Contract and Promissory Estoppel Claims are entirely valid.

17   73.    As the debtors have properly noted, to prove the breach of contract claim they need

18   only show the existence of a valid agreement or contract between the parties, a breach of contractual

19   terms by the defendant, and damages. *Tene v. BAC Home Loan Servicing, LP,* 2012 WL 222920*,*

20   *2 (D. Nev. Jan. 25, 2012).  In this case, the evidence set forth above clearly proves there was an

21   agreement to modify the claimants' mortgage loan.  However, the debtors erroneously claim that this

22   agreement is unenforceable under Nevada's applicable statute of frauds, namely NRS §111.220(1)

23   since it would be an agreement which by its terms cannot be performed within one year from its

24

25   [19] The mere allegations reflected within the complaint, wherein the plaintiffs' home was wrongfully sold from underneath their feet, constitutes extreme and outrageous behavior.
26   Notably the *Betsinger* case made no contention that "extreme and outrageous" behavior was not shown within context of the failed real estate transaction.  It reflects that the Nevada Supreme
27   Court will recognize  emotional distress claims within the mortgagor/mortgagee context, and this federal court, as one sitting in diversity jurisdiction, must apply the substantive law of the forum
28   state in which it resides. *Adelson v. Hananel*, 2009 WL 2835119, *3 (D. Nev.).

execution.    Again, these arguments are erroneous.    *See, Pinnacle Fitness and Recreation Management v. Jerry and Vickie Moyes Family Trust,* 2013 WL 1932888.

74.    First, the agreement which the plaintiff's claim was breached was the agreement to enter into a loan modification.  That agreement could, and would have been performed within one year.   Had GMACM fulfilled its promise, that agreement would have be fully performed immediately.  Moreover, even the modified loan could have been performed within one year.   The claimants could have immediately sold the home to another or refinanced the loan through another lender.  Thus, it simply cannot be said that the agreement could not be performed within one year.

75.    Secondly, the debtors have erroneously argued that the agreement itself had to be in writing and signed by the party to be charged.  However, this is incorrect.  Writings which satisfy the statute of frauds do not necessarily equate with common notions of what does, or does not, constitute a contract or written agreement.  First, NRS 11.220 itself references merely "notes or memorandums" of the agreement being in writing. The exchange of a series of email correspondence between GMACM and Longoni satisfies all elements of contract formation and all essential elements of the contract.   The emails reflect terms, dates sent, identity of the drafters, and signatures.

76.    Under Nevada law, this exchange of electronic communications is sufficient for contract formation.  *See*, NRS 719.240(3)("If a law requires a record to be in writing, an electronic record satisfies the law."); NRS 719.100 ("'Electronic signature' means an electronic sound, symbol or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record.")   This concept is not unique to Nevada.  *See, Bronner v. Park Place Entm't Corp.*, 137 F. Supp. 2d 306, 312 (S.D.N.Y.2001)(a series of correspondence and memoranda may constitute an agreement that satisfies the Statute of Frauds);  *Gordon v. Beck & Gregg Hardware Co.*, 40 S.E.2d 428, 432 (Ga. App. 1946)(statute of frauds may be satisfied by series of writings internally connected and intelligible without parol aid and showing an agreement coextensive with the stipulations of the alleged contract).

77.    Indeed, to whatever extent the former mortgage requires that modification be in writing, these subsequent exchanges also comply with the terms of the initial mortgage.  *See*, *T & Beer, Inc., v. Wine Source Selections*, LLC 2012 WL 360286, *3 (N.J.Super. A.D. (Unpublished

32

opinion)(series of e-mails satisfied requirement that modification of terms of agreement must be in

wringing and signed by the parties). More importantly, GMACM's own agent admits the agreement

existed. Thus, the issue is entirely moot. Based upon the foregoing, it is clear that an enforceable

contract was formed between the claimants and GMACM.

### A.  The claimants' Promissory Estoppel Claim is also fully established by the record in this matter.

78.    Even if this court feels that the writing requirement is not met, promissory estoppel

renders the promises made by GMACM fully enforceable. As the debtors have fully acknowledged,

promissory estoppel may serve as an exception to the statute of frauds in very particular

circumstances. *Nieto v. Litton Loan Servicing*, LP, 2011 WL 797496, * 3 (D. Nev. Feb. 23, 2011).

Nevada follows the doctrine of promissory estoppel articulated in the Restatement (Second) of

Contracts §90 which provides as follows:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Dynalectric Co. V. Clark & Sullivan Constructors, Inc.,* 127 Nev. Adv. Op. No. 41, 255 P. 3d 286,

288 (2011), *quoting* Restatement (Second) of Contracts, sec. 90(1)(1981).

79.    In this case, there can be no doubt but that GMACM's employees made multiple

promises to the claimants. From the inception Mr. Stephenson told the plaintiffs that the foreclosure

was on hold, but clearly, it was. Next, Mr. Stephenson promised the claimants that GMACM had

approved their loan modification request. Third, even after Mr. Casas (Henry) told Ms. Longoni that

Mr. Stephenson's previous statement about approval was not correct, both he and Mr. Stephenson

told Ms. Longoni that efforts to foreclose were on hold. Without question, the plaintiffs relied upon

these statements.[20]    Moreover, these statements *are* contained in writings, both in email

---

[20] The debtors claim that the claimants Gagnon and Lacey Longoni cannot prevail upon their claims for promissory estoppel because they had no contact with GMACM. Not surprisingly, GMACM cites no authority for this ridiculous proposition. Once GMACM made the promises to Longoni, she and Gagnon relied upon those representations. Lacey Longoni was merely a minor child who would be a third party beneficiary of those representations.

33

1  communications (from Mr. Stephenson) and in GMACM's own diary notes (regarding Mr. Casas).

2  Thus, the statute of frauds provides no defense for the plaintiffs.

3      80.    GMACM also contends that the plaintiffs' promissory estoppel claim is barred

4  because the alleged statements surrounding loan modification were too vague and ambiguous to be

5  enforceable.  This again, is ridiculous.  Mr. Stephenson's email communications, and especially his

6  April 28, 2009 email communications clearly identify the modified loan terms.  The monthly

7  payments would be $1,600.00 per month with a principal reduction of $186,000.  After five years

8  the interest rate would increase by no more than 1% per year, never to exceed $13.875.  Additionally,

9  the repeated promises that the foreclosure process was on hold is eminently clear.

10     81.    Finally, the debtors seek this Court's blessing for them to ignore their promises by

11  arguing that no injustice would be suffered by not forcing the debtors to honor their word because

12  of Longoni's fraud upon GMACM through her alleged falsified or altered emails.  This issue was

13  discussed in detail above and needs no further comment.

14

15  **VIII.  Longoni's Intentional Infliction of Emotional Distress Claim Has Already Been Determined to Be Valid.**

16     82.    Finally, the debtors challenge Longoni's intentional infliction of emotional distress

17  claim, claiming that the conduct alleged cannot be deemed outrageous as a matter of law.  Once

18  again, the Nevada District Court has already rejected this argument.  *See, Longoni v. GMAC Mortg.,*

19  *2010 WL 5186091, at *6.*  In this regard, the Nevada court stated as follows:

20         [t]he court finds that under the facts alleged in the complaint, namely
           that defendants requested plaintiffs apply for a different loan
21         modification and assured plaintiffs that the foreclosure was on hold
           during this new application process, plaintiffs have alleged extreme
22         and outrageous conduct sufficient to state a claim for intentional
           infliction of emotional distress by the subsequent trustee's sale less
23         than a month later.

24  Based upon this previous ruling, this issue has been adversely determined against the debtors.

25     83.    Next, the debtors allege that there is noting in the factual record put forth by Longoni

26  indicating that she manifested any physical symptoms from the debtors' conduct.  This is clearly

27  incorrect.  During her deposition, and in her attached Affidavit, Longoni has testified that following

28  her eviction from her home of 14 years, she suffered an almost immediate loss of 13 pounds.  *See,*

34

*Longoni Affidavit, Exhibit 9, paragraphs 38-42, and Excerpts of her Deposition, at Exhibit 23.* She was forced to take prescription medications for her anxiety. On one occasion when she discovered that some of her property had been stolen, she actually vomited upon the discovery.

84. Longoni further described how devastating this was to her 13-year-old daughter who had been in the home her entire life. On August 25, 2009, an unknown man came to her home with a 5-day eviction notice. As is typical with GMACM, their callous attitude toward this obviously devastating event is manifest. Had this matter proceeded before a jury, they would have had little trouble accepting the fact that this event was utterly devastating to the claimants. As the Nevada Supreme Court has recently held, a sliding scale approach should be employed in testing a plaintiff's IIED claim. *See, Franchise Tax Board v. Hyatt,* 130 Nev. Adv. Op. 71, 335 P.3d 125 (2014). Under this standard, a plaintiff need only set forth "objective verifiable indicia" to establish that the plaintiffs "actually suffered extreme or severe emotional distress." Under this sliding scale approach, the more extreme the severity of the conduct, the less the Court will require in the way of proof that emotional distress was suffered.

85. While the debtors and their counsel suggest that the claimants should have suffered no distress when they were torn from their 14-year home on 5-days' notice, this Court must conclude otherwise. Any rational person would be thoroughly devastated by the events underlying this action. The claimants were not some money-hungry investor who made multiple purchases hoping to profit off the ever increasing real estate bubble, nor were they individuals who had recklessly purchased a property for which they could never qualify. They were ordinary citizens who lost their home of 14 years after making years of payments on the loan.

### IX. <u>Conclusion.</u>

86. Based upon the foregoing, this Court should find that the debtors have completely failed in their obligation to prove the invalidity of the plaintiffs' claims. The facts of this case cry out for relief. The actions of the debtors to manufacture a fabricated defense would be highly offensive to a jury which would have rendered a verdict far, far in excess of the highly conservative $600,000.00 value the claimants placed upon their claims. This Court should summarily deny the current motion and find, as a matter of law, that the claims are valid as stated.

DATED this 18th day of May, 2015.     ERICKSON, THORPE & SWAINSTON, LTD.

By   /s/ Thomas P. Beko

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:                                          Case No. 12-12020 (MG)

RESIDENTIAL CAPITAL, LLC, et al.,               Chapter 11

        Debtors.                            Jointly Administered
_____/

**EXHIBITS TO**

**RESPONSE TO OBJECTION OF THE RESCAP BORROWER CLAIMS TO PROOF OF
CLAIM FILED BY PAMELA D. LONGONI AND JEAN GAGNON
CLAIM NOS. 2291, 2294, 2295 AND 2357**
**Exhibit Index**

1.   Declaration of Nate Stephenson, May 12, 2015, and Affidavit of  Nate Stephenson, May 15, 2012

2.   Promissory Note and Deed of Trust re: 5540 Twin Creeks Drive, Reno, Nevada, dated September 29, 2005

3.   Adjustable Rate Loan Modification Agreement

4.   GMACM Response to Plaintiffs' First Set of Interrogatories

5.   Minute Order, Doc. No. 80, July 29, 2011

6.   GMACM Amended Response to Interrogatories

7.   Excerpts, Deposition of Juan Aguirre, September 1, 2011
     8, 62-66, 72-73, 87, 94, 103-105, 140, 158-159, 164-165,
     185-186, 188-189, 194, 247-248, 255-256. 264-266

8.   Excerpts, deposition of Myron Ravelo, September 8, 2011
     21-22, 62-63, 83-85, 122-123, 127-129, 137

9.   Affidavit of Pamela Longoni

10.  Pre-2009 version of N.R.S. §107.085

11.   January 15, 2009, letter from claimants to Homecomings Financial

12.  GMACM Log Notes (Diary) GMACM automated letter to claimants, July 16, 2009

13.  ETS Log Notes (Diary), ETS-01-00005

14.  GMACM Servicer Guide

15.  Proposed Foreclosure Repayment Agreement

16.  Emails between Longoni and Stephenson

17.    GMACM Letter, July 30, 2009

18.    Federal Express confirmation

19.    Financial Analysis Form

20.    Proposed Settlement Agreement with National Real Estate Services

21.    Letters and emails sent by GMACM's counsel

22.    Undelivered Notice of Trustee Sale

23.    Excerpts, Deposition of Pamela Longoni, November 10, 2011

24.     GMACM automated letter to claimants, July 16, 2009

25.    Verizon Billing Records

37