# EXHIBIT 7

# EXHIBIT 7

SUNSHINE
LITIGATION
SERVICES
Discovery + Depositions + Decisions

Las Vegas

Reno

Carson City

CERTIFIED
COPY

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA - RENO DIVISION

-oOo-

PAMELA D. LONGONI, individually,
and as Guardian Ad Litem for LACEY
LONGONI, and JEAN M. GAGNON,

Case No.
3:10-CV-00297-LRH-(VPC)

          Plaintiffs,

   vs.

GMAC MORTGAGE, LLC, a Delaware
Limitied Liability Company, et al.,

       Defendants.

DEPOSITION OF

MOST KNOWLEDGEABLE WITNESS ON
BEHALF OF GMAC MORTGAGE, LLC

JUAN AGUIRRE

September 1, 2011

Reno, Nevada

REPORTED BY: DEBORA L. CECERE NV CCR, #324, RPR

JOB NO.  143998

JUAN AGUIRRE - 9/1/2011

Page 8

1    Number 1 for identification to this deposition.

2                 (Exhibit Number 1 was marked for

3                 identification.)

4    BY MR. BEKO:

5         Q    And ask you whether or not you recognize that,

6    what's depicted in that document.

7         A    I haven't seen the notice itself.

8         Q    You haven't seen that before?

9         A    Not the notice, no.

10        Q    Okay.  We'll come back to it in a little bit.

11             Is it your understanding, sir, that you are here

12   today as a, a designated appointee under the Federal Rules

1    as the person most knowledgeable with regard to General

14   Motors or GMAC Mortgage, LLC?

15        A    Yes.

16        Q    All right.  Now, my understanding from your

17   counsel is that you also occupy that same position and

18   title with regard to the additional defendant in this case,

19   Residential Funding Company, LLC.

20             Is that your understanding as well?

21        A    Yes.

22        Q    Okay.  We'll come back to that exhibit here in a

23   little bit.

24             What's your current address, sir?

25        A    My work address?

JUAN AGUIRRE – 9/1/2011

Page 62

1    Residential Funding Corporation?

2         A     To my knowledge, yes.

3         Q     All right.   What is it?

4         A     Residential Funding Corporation -- I don't know

5    how exactly to explain it.   All I know is that at one point

6    they owned loans and were the investor of loans.   That's

7    all I know --

8         Q     All right.

9         A     -- regarding that.

10        Q     Do you know, is it a corporation?

11        A     I don't know if it's a corporation or what it

12   is.  No, I do not.

13        Q     Do you know where it's located?

14        A     The last time I remember seeing an address was

15   in Minnesota.

16        Q     Now, there's also a name that's frequently used

17   that I've seen in lots of documents called Residential

18   Funding Company, LLC.

19        A     Okay.

20        Q     Do you know -- what do you know about that

21   company?

22        A     I don't know about Residential Funding Company.

23        Q     Do you know what the difference is between

24   Residential Funding Corporation and Residential Funding

25   Company, LLC?

1    A    No.

2    Q    Do you -- you don't even know whether they're

3    two different companies or if they're in any way related or

4    anything at all; is that correct?

5    A    Correct.  I don't know if they're related at

6    all, no.

7    Q    Okay.  All you know, I guess, as I understand

8    it, is that what you believe to be Residential Funding is

9    located somewhere in Minnesota and that they own certain

10   loans?

11   A    Correct.

12   Q    Do you know about a company -- well, let me ask

13   you first.

14        As far as Residential Funding Corporation, do

15   you know what its relationship to GMAC is?

16   A    Yes.

17   Q    What is its relationship to GMAC?

18   A    Relationship -- regarding this loan, is what I'm

19   answering to.  Is that what you mean?

20   Q    No.  No.  What is its -- is it in any way

21   related to General Motors -- GMAC Mortgage, LLC?

22        In other words, is it owned -- does one of these

23   companies own the other company, does one of the companies

24   have some interest in it?

25        Do you know anything at all about the

JUAN AGUIRRE - 9/1/2011

1    same page here.

2        A    Okay.

3        Q    When you say Residential Funding, you don't know

4    if you're really referring to Residential Funding Company,

5    LLC, or Residential Funding Corporation, correct?

6        A    I'm referring to Residential Funding Corporation

7    when I'm talking about RFC.

8        Q    Okay.  All right.  And to your knowledge,

9    Residential Funding Corporation still is in existence

10   today?

11       A    That is my understanding.

12       Q    All right.  You started to explain to me what

13   you thought Residential Funding -- and I'm just going to

14   say -- call it RFC from this point forward.

15       A    Okay.

16       Q    And you're always going to be talking about

17   Residential Funding Corporation, correct?

18       A    Correct.

19       Q    Okay.  What is RFC's relationship to GMAC as far

20   as this loan is concerned?

21       A    Regarding this loan, we are the subservicer.  We

22   service on their behalf.  They are the master servicer to

23   this loan, and we have been designated as the subservicer

24   to service the loan for them.

25       Q    Okay.  Let me see if I am following you.  GMAC

JUAN AGUIRRE - 9/1/2011

Page 66

1   is a subservicer for this loan, and the actual servicer was

2   RFC?

3              MR. BASHFORD:  Objection.

4              THE WITNESS:  The master servicer is RFC.

5   BY MR. BEKO:

6        Q    Right.

7        A    And we, meaning GMAC, are the subservicers to

8   this loan, correct.

9        Q    Okay.  So, you recall the testimony before about

10  GMAC not actually owning any of the loans, instead it was

11  simply contracting with the owner to provide servicing

12  services for that loan.

1            Do you recall that testimony?

14       A    Yes.

15       Q    Okay.  If I understand what you're saying to me

16  now, is, is that GMAC did not contract directly with the

17  owner of the loan, but instead GMAC has a contractual

18  arrangement with RFC that it's going to perform RFC's

19  servicing obligations on behalf of RFC, and RFC had some

20  kind of agreement with the owner that it was supposed to be

21  the servicer.  Is that right?

22       A    My understanding is, yes, we do have an

23  agreement with -- I think it's in the exhibits -- the

24  Servicer Guide to service the loans for RFC, who is the

25  master servicer for the owner, or the investor, as they

JUAN AGUIRRE - 9/1/2011

Page 72

1    that's how I have to the best of my knowledge.

2         Q    In your information, all the information you

3    have as to who held and who owned this note and the

4    mortgage came from this paralegal Rosemary?

5         A    Correct.

6         Q    And upon belief in the accuracy of what she told

7    you, you then verified these answers?

8         A    Correct.

9         Q    Okay.  So as we look here, we see something

10   happening, apparently -- if one were to read the accuracy,

11   read this accurately, 1/5 of '06, Residential Funding

12   Company, LLC, as trustee, gets beneficial rights from EC on

13   1/5/06.  And then on 10/8 of '06 Residential Funding Co.,

14   LLC, but not as trustee, gets transfer of servicing rights

15   from EC.

16              Do you see that?

17        A    I do.

18        Q    Do you have any idea, sir, what the difference

19   is between Residential Funding Company, LLC, as trustee,

20   and Residential Funding Co. as LLC?

21        A    Not right now, no.

22        Q    All right.  Do you have any idea what

23   "beneficial rights" mean?

24        A    My understanding at that point was that the

25   rights to the loans were transferred from EquiFirst over to

1    RFC.

2        Q        Okay.   Loan, meaning the promissory note?

3        A        The promissory note and the whole loan itself

4    was transferred over to RFC.

5        Q        Okay.   And what, what -- would you define for me

6    what you mean as "the whole loan itself"?

7                What does that encompass?

8        A        Well, the rights to the note itself.   The rights

9    to owning the note at that point.   They're the new

10   beneficiary or the new owner of the note, yes.

11       Q        Okay.   Do you understand -- is there any

12   difference in your mind, sir, between the owner of the note

13   and the beneficiary of the note?

14               MR. BASHFORD:   Objection.

15               THE WITNESS:   No.   To me, the beneficiary and

16   the owner of the note, to me, it means that they own the

17   note, that they hold the note, yes.

18   BY MR. BEKO:

19       Q        Okay.   Do you understand there to be any legal

20   significance of the word "holder" of a note?

21               MR. BASHFORD:   Objection.

22   BY MR. BEKO:

23       Q        Do you have any knowledge of the legal

24   significance of the word "holder" of the note?

25       A        I'm not an attorney, legal language.   Yeah.

JUAN AGUIRRE - 9/1/2011

1     A     Correct.

2     Q     Have you seen, at any time in your career with

3     these companies, the original promissory note?

4     A     No.

5     Q     Do you have any idea where that original

6     promissory note is today?

7     A     Nope.  Sorry.  No.

8     Q     That's okay.  Thank you.

9           Have you ever seen a copy of that promissory

10    note?

11    A     The one that we had a copy of or what's out

12    there today?

13    Q     Let's talk about -- if there's something

14    different, let's talk about -- it's a good answer.

15          Let's talk first about the one you say "we had."

16    And when you say "we," who is "we"?

17    A     Well, a copy of it, as you stated.  I mean, we,

18    GMAC, had a copy imaged in our system of the promissory

19    note.  That's in the Looking Glass, as I stated earlier.

20    Q     Okay.

21          MR. BEKO:  And I'm going to go ahead and mark as

22    an exhibit this document.

23          (Exhibit Number 8 was marked for

24          identification.)

25    ///

JUAN AGUIRRE - 9/1/2011

Page 94

1        A       I don't know if it's the back side. Again, I

2   think we discussed that earlier, that to me the images are

3   just showing, you know, in my imaging system as one page.

4        Q       Okay.  But so we're clear --

5        A       Okay.

6        Q       -- when you see this document in your imaging

7   system, it's the only place that you know that you can go

8   to, to find this document, correct?

9        A       Yes.

10       Q       You couldn't walk down the hall, open the door

11  and go out and pull it out and look at the actual hard

12  copy.

1            You don't know that that document exists

14  anywhere where you can go do that, correct?

15       A       Not in my office.  I think we discussed earlier

16  that it's kept with the custodian in, in their office or

17  wherever they keep it.

18       Q       And who is the custodian?

19       A       I think we discussed it was RFC.

20       Q       Okay.  So you think that it's possible that you

21  could go to RFC's office -- and that's in Minnesota, right?

22       A       Correct.

23       Q       And you think you could go to their office and

24  you think you could find this note, the original note, in

25  their office?

JUAN AGUIRRE - 9/1/2011

1      A    If there's more to it, I don't know.

2      Q    All right.  Let's take a moment, sir, and talk

3  for a second about this apparent company, Residential Asset

4  Mortgage Products, Inc.

5          What do you know about that company?

6      A    All I know is that they purchased the loans,

7  which happened to be also the Longoni loan along with it,

8  and they purchased the pool of loans.  That's my

9  understanding.

10     Q    Okay.

11     A    They assumed the loans, I guess.

12     Q    Do you know what Residential Asset Management

13  Products, Inc. is from the standpoint of a business entity?

14  For instance, is it a corporation, is it an LLC?

15     A    Well, my understanding, per the document, it's a

16  Delaware corporation.

17     Q    Okay. And do you know when it was created?

18     A    No, I do not.

19     Q    Do you know where its business -- where its

20  principal place of business is?

21     A    No, I do not.

22     Q    Have you ever been there, to any offices of

23  Residential Asset Management Products, Inc.?

24     A    No, I have not.

25     Q    To your knowledge, does it even have a business

JUAN AGUIRRE - 9/1/2011

Page 104

1    address anywhere?

2        A    I do not know.

3        Q    Do you know how many employees it has?

4        A    I do not.

5        Q    Have you ever heard, sir, of, of a trust known

6    as RAMPI 2005 EFC7?

7        A    Yes.

8        Q    What is that?

9        A    My understanding is when RAMPI, or Residential

10   Asset Mortgage Products, took the loans, they put it into a

11   trust, and they are what we call the investor now.  That's

12   my understanding.

13       Q    So it's your understanding -- let me just ask

14   you this basic question.

15       A    Sure.

16       Q    Do you understand what a trust is?

17            MR. BASHFORD:  Objection.

18            THE WITNESS:  A trust is, to my understanding,

19   is -- and this we learned in the mortgage.  There's loans

20   and there's investors, individuals who invest in those

21   loans.  And -- I guess I'm going back to what a trust and a

22   trustee is with regular individuals, and U.S. Bank being

23   the trustee that oversees that trust and what's going on

24   with the loan.

25   ///

JUAN AGUIRRE - 9/1/2011

1    BY MR. BEKO:

2        Q    In a legal sense, a trust is a separate legal

3    entity, like a corporation or a limited liability company.

4    It's created as a separate legal entity.  And then

5    sometimes people talk about putting money or something in a

6    trust fund, which is just like an account.  It doesn't

7    create a separate legal entity.

8            Do you know whether or not this RAMPI that's

9    described as a trust, or, excuse me, RAMPI 2005 EFC7, is

10    actually a separate legal entity?

11            MR. BASHFORD:  Objection.

12            THE WITNESS:  My understanding is it's a

13    separate entity from the Residential Asset -- sorry,

14    Mortgage Products, RAMPI.  It's a totally different entity.

15    That is my understanding.  Yes.

16    BY MR. BEKO:

17        Q    And when was that trust formed?

18        A    I don't know the exact date that I recall.

19        Q    But, but that trust, to your knowledge, as the

20    person most knowledgeable with GMAC, is the owner of the,

21    of the note, the promissory note, the Longoni promissory

22    note.  Is that your understanding?

23        A    That's my understanding.

24        Q    If you look, sir, at Exhibit Number 10 --

25        A    Okay.

JUAN AGUIRRE - 9/1/2011

Page 140

1    started out.

2        Q    It makes good sense to me.

3        A    It used to be like that in the olden days.

4        Q    Seems to me if they had that in this case we

5    wouldn't be here.

6        A    Let me see.  That's all I can think of.

7        Q    Okay.

8        A    I'm sure there's more departments out there.

9        Q    What is the -- what's the mediations department?

10   What do those people do?

11       A    Those individuals are -- work with the

12   foreclosure department, and foreclosure loans, loans that

1    are on foreclosure that are going to be mediated prior to

14   maybe going into foreclosure, see if they can work with

15   them.  They try to work some sort of modification or some

16   sort of repayment plan at the mediation itself.

17       Q    Are those typically court-ordered mediations or

18   are they --

19       A    My understanding, certain states are court

20   ordered and some states are voluntary.

21       Q    Okay.  In this case, this never went through a

22   mediation here in Nevada, did it?

23       A    Not that I'm aware of.

24       Q    Do you know why not?

25       A    No, I do not.

SUNSHINE REPORTING - 775-323-3411

JUAN AGUIRRE - 9/1/2011

Page 158

1      A      As stated earlier, in the Servicer Guide over

2    here, which I'm -- it's part of the production.

3         Q      Okay.  Let's kind of go through that.

4         A      Okay.

5         Q      I'm going to show you a document that's marked

6    as Exhibit Number 15.

7         A      Okay.

8                (Exhibit Number 15 was marked for

9                identification.)

10              MR. BEKO:  And just for the record, that is

11   Bates numbers RFC 1293 through RFC 571, although I think

12   there are some -- it's hard to tell with the Bates, but I

1    think there are some omissions.

14   BY MR. BEKO:

15        Q      Do you recognize this document?

16        A      Yes.

17        Q      All right.  Now, your testimony is that at some

18   point in time during this loan modification request from

19   the Longonis, this document, Exhibit Number 15, was what

20   was followed by loss mitigation employees of GMAC when

21   requested to modify the Longoni loan?

22        A      This is a, what, the guide, yes, to working a, a

23   modification.  We would follow the rules from here,

24   correct.

25        Q      All right.  Now, this Servicer Guide says -- it

JUAN AGUIRRE - 9/1/2011

1    has on here "GMAC-RFC."

2              Do you see that?

3    A    Yes, I do.

4    Q    Do you know why -- I mean, who actually prepared

5    this?

6    A    The document itself?

7    Q    Yeah.

8    A    I don't know the person who prepared it, but

9    just by reading the document at the bottom, it's a 2008

10   Residential Funding Corporation, all rights reserved.

11   So --

12   Q    And I certainly see that.

13   A    Um-hum.

14   Q    But it -- what I understand was that RFC was the

15   master servicer; it was the one that was calling the shots

16   as far as the servicing was concerned.   Correct?

17   A    They delegated the authority to us to service

18   the loan and work the loans if modifications needed to be

19   done.

20   Q    Right.

21   A    Again, like I stated earlier, if there was a

22   certain level above the authority, then of course, you

23   know, we had to work up.

24   Q    Right.  And I think I understand what you're

25   saying.

JUAN AGUIRRE - 9/1/2011

Page 164

1      Q      Gagnon?

2      A      -- Mr. Gagnon maybe were qualified for a

3   different type of modification.

4      Q      All right.  And that's kind of what my question

5   is.

6      A      Okay.

7      Q      Was there some point -- let me ask you this.

8          Exhibit 15 was what we started with in 2009 as

9   far as loan modifications were concerned.  That's what

10  governed the decision-making process of GMAC employees when

11  2009 started, correct?

12     A      Right, when 2009 started.  This started in 2008.

1   Correct.

14     Q      Okay.  Was this Servicer Guide, these rules,

15  guidelines, whatever, were they discontinued when HMP came

16  into place, or were they simply supplemented by HMP, being

17  an additional method or means by which to review loan

18  modification?

19     A      HMP was a different method, totally different

20  modification, different guidelines that we would have to

21  follow for a different type of modification.  But these

22  were not discontinued.  They were still in effect.

23     Q      Okay.  So is it your understanding that the

24  employees of GMAC who were dealing with loan modification

25  could consider it under either the original GMAC-RFC

JUAN AGUIRRE - 9/1/2011

1    Servicer Guide, Exhibit 15, or they could do it under HMP

2    as well?

3         A    Yes.  We would look at both options to see what

4    would be best for the borrower.

5         Q    Okay.

6              MR. BEKO:  You know what?  I'm sorry.  I never

7    gave you the copy.  And part of it is on yellow because of

8    copy machine failure.

9    BY MR. BEKO:

10        Q    Do you know who -- strike that.

11             Was a decision ever made, to your knowledge,

12   that the Longonis -- or Pam Longoni could not qualify under

13   the GMAC guidelines?

14        A    My understanding is that they were reviewing her

15   loan for a modification when she called in and informed us

16   of her financial difficulties.  But they were reviewing.

17   That was, that's my understanding at that point.

18             And then at a certain point then they stated

19   that they were going to maybe look at a HMP modification.

20        Q    And when does HMP come into play?  When does it

21   take effect, the new guidelines that they --

22        A    I remember HMP coming in, actually, in the world

23   back in March of 2009.  And I think it was sometime in May

24   of 2009, is when we started working with the HMP

25   modifications, is what I recall.

1    employees how to handle loan modifications, et cetera,

2    under the Servicer Guide, Exhibit 15.

3        A    Correct.

4        Q    Okay.  Exhibit 21 is a training tool to instruct

5    employees how to handle home modification under the HMP

6    program, correct?

7        A    Correct.

8        Q    Is there a document that describes the HMP

9    program that is similar to Exhibit Number 15?

10        A    I know there's another document regarding the

11    HMP program, which is also with the documents in discovery,

12    which I saw when I was reviewing.  Not that thick as the

13    servicer guidelines, but there is another document.

14            (Exhibit Number 22 was marked for

15            identification.)

16    BY MR. BEKO:

17        Q    Showing you what's marked as Exhibit Number 22

18    for identification.

19            MR. BEKO:  Counsel, again, this is GMAC 02-193

20    through 236.

21    BY MR. BEKO:

22        Q    What, what is Exhibit Number 22?

23        A    Exhibit 22 is -- it's actually a, a set of

24    checklists on how to go about doing certain modifications.

25    Like we have a, a trial modification, permanent

JUAN AGUIRRE - 9/1/2011

Page 186

1    modification approval.  It's a checklist on how to go into

2    our system and what needs to be requested, a step-by-step

3    checklist for the individuals working the modifications.

4         Q    So this would apply to the, both the, I guess,

5    the GMAC type refinance as reflected in Exhibit 15 as well

6    as the HMP as well?  Is that right?

7         A    Not refinance, but loan modification.

8         Q    Loan modification.

9         A    Yes.  And the HMP.  Also there's a checklist

10   here for the HMP as well included.

11        Q    Right.  Okay.  So tell me how, how do these two

12   interplay with one another, Exhibit 22 and 15?

13        A    Well, this is the checklist.  This is how we go

14   into our system and how to go into screens and see if they

15   qualify for certain programs.  It's part of the servicing

16   of the loan, which would fall into part of the servicing

17   guides and how we should service loans.

18        Q    Okay.  That is not a description of the HMP

19   program like Exhibit 15 is for the GMAC traditional?

20        A    No, no.  This is just a checklist on how to

21   conduct certain modifications.  There's several different

22   checklists in here.  There's not one checklist.  There's

23   actually several, like you have the trial permanent

24   modification checklist, and if you keep going, special

25   servicing checklist.

JUAN AGUIRRE - 9/1/2011

Page 188

1      A      Yes.  That would be a non-HMP modification,

2    which would be traditional.  Irregular modification on a

3    loan, correct.

4      Q      Was there anything other than traditional

5    modification that was being used by GMAC before HMP came

6    along?

7      A      In terms of modifications, it was a -- we had

8    what was called a trial modification, which was kind of

9    sort of like a repayment plan where there was maybe three

10   payments to see if the borrower can afford something while

11   we looked at the traditional modification.  But not --

12   until HMP came along, then we started doing HMP

13   modifications.

14     Q      Along with the traditional one, correct?

15     A      We were also doing -- at the same time, yes.

16     Q      Okay.  And there was nothing, as far as you

17   know, that required any of your employees to choose one

18   plan over the other?

19     A      Well, what we do is we look at the finances, the

20   hardship, what the borrower can afford.  If they don't fall

21   within a traditional modification, of course, at that point

22   when HMP came around it was a little bit more -- what's the

23   word I'm trying to use -- be aggressive, or we can change

24   more.

25     Q      More liberal?

JUAN AGUIRRE - 9/1/2011

1        A       More liberal.  We can reduce the interest more,

2    maybe extend the terms a little bit more.

3        Q       All right.

4        A       So if they couldn't afford it in the

5    traditional, we would then, by all means, try and see if

6    they would fit into a HMP modification.

7        Q       All right.  And was there some benefit to GMAC

8    financially if they modified or agreed to a modification

9    for a homeowner?

10               In other words, did GMAC ever receive any kind

11   of compensation, federal or otherwise, for putting people

12   into these programs?

13       A       From reading my documents, yes, there were

14   incentives to the servicer when they were -- when there was

15   a successful completed modification, both in a traditional

16   and on the HMP as well.

17       Q       All right.  And how about compensation from the

18   federal government?  Did, did, did GMAC or the investor, to

19   your knowledge, ever receive any type of federal funds in

20   response to any -- and especially with regard to the

21   Longoni loan -- did they ever receive any kind of

22   compensation, payment, anything?

23       A       From the government?

24       Q       Um-hum.

25       A       I wouldn't know.  Not that I'm aware of.  But

JUAN AGUIRRE - 9/1/2011

Page 194

```
1    says, you know:
2                    Understand the background of the
3                    Making Home Affordable Program, Obama
4                    Mod HMP.
5              Is it your understanding the Obama Mod and HMP
6    is the same thing?
7         A    Yes.
8         Q    Okay.  Now, this shows that it has a date on it
9    of 3/8 of '10.
10        A    Correct.
11        Q    Is this a training material didn't come about
12   until March of '10?
13        A    Yes, because that's when the program was
14   starting to -- well, I'm sorry.  That's 2010.
15             March of 2009 is when the program started
16   rolling out.  So I don't know if this was a revised copy or
17   not.  It doesn't say revised.
18             MR. BASHFORD:  I'll make a copy now.
19             (Whereupon a recess was taken.)
20             MR. BEKO:  Back on the record.
21             (Exhibit Number 26 was marked for
22             identification.)
23   BY MR. BEKO:
24        Q    Showing you what's marked as Exhibit Number 26
25   for identification.
```

JUAN AGUIRRE - 9/1/2011

```
 1              60 days.  No guarantees.  I tried to

 2              update DTI calculator but borrower

 3              did not know her gross income.  Said

 4              she would call back tomorrow because

 5              she had to go to work.

 6      Q       All right.  Apparently something else is going

 7   on down there.  I don't know if it's a further extension.

 8   We see a 1025 -- 10:25:

 9              Do you know what those numbers relate to?

10      A       No.  I'm not going to guess.  No, I don't.

11      Q       All right.  Do you see this?  It says:

12              Pay cuts start 9/28.  Ongoing.

13              Tell me what that note means to you.

14      A       That's a continuation from the one above it,

15   where it says reason for default.  SPS.  I don't know what

16   the SPS means.  Had to get another job and took a pay cut.

17   Start on 9/2008 ongoing.

18              I don't know what the MI stands for, but:

19              $1800 a month.  Advised foreclosure

20              sale date on hold.  Late charges and

21              credit reporting continues.

22              H. Casas.

23              I don't know who that is.

24      Q       Let's see if we can figure that out.

25      A       Okay.
```

JUAN AGUIRRE - 9/1/2011

Page 248

1       Q       Henry Casas?

2       A       Correct.

3       Q       Okay.   The following day you go down and it --

4   on 7/10/09?

5       A       Um-hum.

6       Q       2928.   It says:

7                   Repay plan cancelled automatic.

8       A       Okay.

9       Q       And explain to me what that is.

10      A       There was four payment plans to that repayment

11  plan, the $1600, March 30th, April 30th, June 30th -- wait.

12  Sorry.  March, April, May, June 30th was that balloon

1   payment that we talked about.  That payment was not made so

14  instead of manually like the last one we saw where someone

15  manually cancelled it, the system automatically cancelled

16  it when we don't receive that full amount.

17      Q       Okay.   So that would have actually been -- that

18  would have been effective as of June 1st.

19      A       Which one?

20      Q       The failure to make the payment would have been

21  on June 1st?

22      A       March 30th.  April, May, June 30th was when her

23  final payment was due.  So July 1st would have been

24  considered late.  So the payment plan was cancelled after

25  that payment wasn't received, the June 30th balloon payment

JUAN AGUIRRE - 9/1/2011

```
 1                     Obama Workout Package provided to

 2                date.  30 days to sale.  No contact

 3                letter.

 4        A     I see that it says 30 days to sale.  But I don't

 5   see it in the body of the letter.

 6        Q     You can see it at the bottom?

 7        A     I see it at the bottom.  30 days to sale.

 8        Q     Okay.

 9        A     Exactly.

10        Q     Were you involved -- strike that.

11              Did you ever know that there was an effort made

12   to try to get this property back after the sale?

13        A     There was an understanding -- I have an

14   understanding that they were trying to get the property

15   back, yes.

16        Q     Why?

17        A     I don't know.  All I know is that they were

18   trying to get the property back at one point.

19        Q     Were you at involved in the negotiation process

20   with the purchaser where GMAC was trying to get the

21   property back?

22        A     No.

23        Q     Did anybody ever tell you that GMAC made a

24   mistake with regard to foreclosing on this property?

25              MR. BASHFORD:  Objection to the extent it calls
```

JUAN AGUIRRE - 9/1/2011

Page 256

1    for privileged information.

2    BY MR. ADAMS:

3        Q      Did anybody ever -- other than an attorney --

4    tell you that GMAC made a mistake in foreclosing on this

5    property?

6        A      No.

7        Q      Who did you talk with about this attempt to get

8    the property back?

9        A      I wasn't talking -- it was just in conversation.

10   Ms. DeSilva mentioned something at one time.  And --

11            MR. BASHFORD:  Objection.

12   BY MR. BEKO:

1        Q      Okay.  She's an attorney, right?

14       A      Yes.

15       Q      I don't know want you to tell me about what an

16   attorney for GMAC told you.  If you had a discussion with

17   anyone other than an attorney about the attempt to get the

18   property back, that's what I'm looking for.

19       A      Rosemary Meeker.  She's not an attorney.

20       Q      Okay.  What did Rosemary Meeker tell you?

21            MR. BASHFORD:  Objection.

22            THE WITNESS:  That at one point that they were

23   trying to get the property back.  That's what I was

24   informed.

25   ///

JUAN AGUIRRE - 9/1/2011

Page 264

1    The 2270 and the 1600 were repayment plans that were

2    discussed.

3        Q    Okay.  If in fact there had been a reduction in

4    the principal amount of the loan by the $186,000, would

5    that be deemed to be a modification?

6        A    If we were going to modify the whole loan and

7    reduce the amount by the 186 that was proposed, yes, we're

8    modifying the loan.  So that would be deemed a modification

9    if it was approved.

10       Q    So really, in reality, the only modification

11   that was ever discussed was the modification that included

12   the $1600 payment, the write-down, and the change in the

13   interest rate, correct?

14       A    According to what we were reading, Nate had

15   discussed that with her.  That was the second modification.

16   We had one back in 2007, but this is the second

17   modification that was discussed with Nate, but it was

18   submitted for, as a proposal.

19       Q    And I understand -- what I'm trying to get at is

20   you told me that the first discussion of the, of the

21   repayment plan, that's not a modification, correct?

22       A    Correct.  A repayment plan is not a

23   modification.

24       Q    So the only modification that was ever discussed

25   that you know of between GMAC and, and the borrowers, was,

JUAN AGUIRRE - 9/1/2011

Page 265

1    was the modification that Nate was referring to, $1600,

2    write-down 186,000, and just for reference, the -- let me

3    just read to you --

4         A    Correct.

5         Q    -- his e-mail.  On 4/28/09 he says:

6                   Hi.  It has to go to higher

7                   management due to the amount.  The

8                   balance I am showing is 439177.63  If

9                   we get this mod approved your balance

10                  will drop to 269677 for five years.

11        A    Okay.

12        Q    He responds back later and says:

13                  The 186 K includes 15,000 in

14                  interest.  So the actual principal is

15                  written off as around $169,000.

16                  After five years your interest rate

17                  will increase by no more than one

18                  percent a year.  The highest it can

19                  go is 13.875.  The principal will be

20                  gone forever.

21                  That's the only modification that you know of

22   that was ever being discussed between GMAC and the

23   borrowers, correct?

24        A    Nate's modification, that's the only one I know

25   of, yes.

JUAN AGUIRRE - 9/1/2011

1    Q    Okay.  So the only modification that Nate could

2    be referring to as being approved in the e-mail that he

3    sent had to be that one, right?

4         MR. BASHFORD:  Objection.

5         THE WITNESS:  I don't know what Nate was

6    thinking when he said that.

7    BY MR. BEKO:

8    Q    Can you identify for me any other modification

9    that was being discussed between GMAC and the borrowers

10   other than the one that I just read to you by Nate?

11   A    That's the only modification that I am aware of.

12   Q    Okay.

13        (Exhibit Number 31 was marked for

14        identification.)

15   BY MR. BEKO:

16   Q    Showing you what's been marked as Exhibit

17   Number 31 for identification.

18   A    Okay.

19   Q    Do you recognize this document?

20   A    Yes.

21   Q    You've seen it before?

22   A    I have seen it, yes.

23   Q    All right.  What do you know about GMAC Mortgage

24   removing all reference to the loan, the entire loan and

25   default and all that from the borrowers' credit?

```
1     STATE OF NEVADA     )
                          )  ss.
2     WASHOE COUNTY       )

3         I, DEBORA L. CECERE, a Certified Court Reporter, State

4     of Nevada, do hereby certify:

5         That on Thursday, the 1st day of September, 2011, at

6     the hour of 8:57 A.M. Of said day, at 99 West Arroyo

7     Street, Reno, Nevada, personally appeared JUAN AGUIRRE, who

8     was duly sworn by me to testify the truth, the whole truth,

9     and nothing but the truth, and thereupon was deposed in the

10    matter entitled herein;

11        That I am not a relative, employee or independent

12    contractor of counsel to any of the parties; or a relative,

13    employee or independent contractor of the parties involved

14    in the proceeding, or a person financially interested in

15    the proceeding;

16        That said deposition was taken in verbatim stenotype

17    notes by me, a Certified Court Reporter, and thereafter

18    transcribed into typewriting as herein appears;

19        That the foregoing transcript, consisting of pages 1

20    through 277 is a full, true and correct transcription of my

21    stenotype notes of said deposition.

22        DATED:  At Reno, Nevada this 12th day of September,

23    2011.

24    DEBORA L. CECERE, NV CCR #324, CA CSR #8821

25
```