# EXHIBIT 8

# EXHIBIT 8

SUNSHINE
ligation
SERVICES
Discovery + Depositions + Decisions

Las Vegas

Reno

Carson City

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA ~ RENO DIVISION

-oOo-

PAMELA D. LONGONI,                         Case No. 3:10-CV-00297-LRH-(VPC)
individually and as Guardian
Ad Litem for LACEY LONGONI,
and JEAN M. GAGNON,

          Plaintiffs,

vs.

GMAC MORTGAGE, LLC, a Delaware
Limited Liability Company, et
al.,

          Defendants.

_____/

DEPOSITION OF

MYRON RAVELO

SEPTEMBER 8, 2011

RENO, NEVADA

REPORTED BY:   CORRIE L. WOLDEN, NV CSR #194, RPR, CP

JOB NO. 144002

t  775.323.3411
f  775.323.2749

www.litigationservices.com

151 Country Estates Circle
Reno, Nevada 89511

MYRON RAVELO - 9/8/2011

1   Products, Inc.?

2      A   Not that I'm aware of.

3      Q   Do you know whether or not ETS has any contractual

4   relationship with Residential Funding Corporation?

5      A   No.

6      Q   Do you know whether ETS has any contractual

7   relationship with Residential Funding Company, LLC?

8      A   No.

9      Q   Do you know whether Executive Trustee Services has

10   any contractual relationship with a company known as MERS?

11      A   No.

12      Q   Do you know whether or not Executive Trustee

13   Services has any contractual relationship with a trust known

14   as RAMP 205EFC?

15      A   No.

16      Q   And, I'm sorry, that was RAMP 2005, like the year

17   2005.

18      A   No.

19      Q   Okay.  Are you aware of any assignment of rights

20   that Executive Trustee Services has received from this trust

21   RAMP 2005EFC?

22      A   No.

23      Q   Are you aware of any assignment of rights from

24   Residential Asset Mortgage Products, Inc. to Executive

25   Trustee Services?

MYRON RAVELO — 9/8/2011

Page 22

1       A    No.

2       Q    Are you aware of any assignment of rights between

3    Residential Funding Company, LLC and Executive Trustee

4    Services?

5       A    No.

6       Q    Are you aware of any assignment of rights from

7    Residential Funding Corporation to Executive Trustee

8    Services?

9       A    No.

10      Q    And are you aware of any assignment of rights from

11   GMAC Mortgage, LLC to Executive Trustee Services?

12      A    No.

1       Q    Are you aware of any assignment of rights between

14   Homecomings Financial, LLC and ETS?

15      A    No.

16      Q    You had indicated before that there were other

17   vendors that ETS uses, I guess, to perform its services.

18   Before we go there, I want to just have you describe for me

19   what you believe ETS does as a business.

20      A    ETS prepares and processes the foreclosure file

21   for our clients.

22      Q    All right.  And so preparing and processing the

23   foreclosure file, does that include actually engaging in the

24   process of foreclosing upon a piece of property?

25      A    Physically, no, but the documentation, yes.

MYRON RAVELO - 9/8/2011

Page 62

```
 1      the right to get the collateral back if the loan is not

 2      paid, correct?

 3                  MR. BASHFORD:  Objection.

 4                  THE WITNESS:  Yes.

 5      BY MR. BEKO:

 6           Q    Do you know who owned the Promissory Note when

 7      this assignment came to ETS?

 8                  MR. BASHFORD:  Objection.

 9                  THE WITNESS:  No.

10      BY MR. BEKO:

11           Q    Do you have any idea who held -- Do you know what

12      a holder is of a Promissory Note?

13                  MR. BASHFORD:  Objection.

14                  THE WITNESS:  Just from what I understand, it is

15      who has the actual physical note, original.

16      BY MR. BEKO:

17           Q    Okay.  Good.  Do you know who held the Promissory

18      Note when this assignment came to GMAC, or to ETS?

19                  MR. BASHFORD:  Objection.

20                  THE WITNESS:  No.

21      BY MR. BEKO:

22           Q    To your knowledge did anyone ever attempt to make

23      any inquiry as to who actually held the Promissory Note at

24      the time that the foreclosure was started?

25                  MR. BASHFORD:  Objection.
```

MYRON RAVELO - 9/8/2011

1                  THE WITNESS:  No.

2                  MR. BEKO:  Well, can you be more specific,

3       Counsel?

4                  MR. BASHFORD:  It is a legal question about the

5       definition of what the holder of the note is.

6                  MR. BEKO:  Okay.

7                  MR. BASHFORD:  He is not a legal expert.

8       BY MR. BEKO:

9           Q    Do you know, sir, at the time -- This foreclosure

10      was started on or about the 20th of February of 2009,

11      correct?

12          A    Correct.

13          Q    Does ETS have any idea who was in possession of

14      the Promissory Note?

15          A    No.

16          Q    Does ETS have any idea who was in possession of

17      the Deed of Trust?

18          A    Not physical, but no.

19          Q    How about anything other than physical?  Who was

20      in possession of it, if it is not physical?

21          A    ETS would assume GMAC would have it.

22          Q    Okay.  Do you know who MERS is?

23          A    I know, yes.

24          Q    What is MERS?

25          A    From what my understanding is, it is a company

MYRON RAVELO - 9/8/2011

Page 84

1    Deed of Trust is to whoever GMAC is notifying us to

2    foreclose under.

3        Q    I see.  So because they are saying to you do it in

4    MERS' name, you don't have to go get any assignment of the

5    Deed of Trust?

6        A    From what we know now.

7        Q    From what you know now?

8        A    No, from what we know, we don't have to.  We did

9    not have to at that time.

10       Q    Has that changed now?

11       A    Yes.

12       Q    What is different about that now?

1        A    Everything is assigned out.

14       Q    Right.  Meaning when you now do foreclosures, you

15   get an assignment from the original lender of the Deed of

16   Trust, correct?

17       A    That's correct.

18       Q    When did that change?

19       A    I believe the exact date was October 19, 2009.

20   I'm sorry, 2010.

21       Q    October 19th, 2010?

22       A    That's correct.

23       Q    And what happened to prompt that change?

24       A    I'm not exactly 100 percent sure what exactly

25   happened.

1      Q    So after 2010, whoever is listed as the lender on

2    the Deed of Trust then has to give an assignment to ETS

3    before you begin the foreclosure process?

4      A    That's correct.

5      Q    Okay.  And how do you know this date of October

6    19th?

7      A    There was a communiqué, a memo, a company memo.

8    It is either October 19th or 18th.

9      Q    Okay.

10      A    It is around that time frame.

11      Q    All right.  So now when ETS does a foreclosure,

12    they will get an assignment of the Deed of Trust, and will

13    they still do the Substitution of Trustee?

14      A    Yes.

15      Q    And then they will do the Notice of Default?

16      A    Correct.

17      Q    Okay.  All right.  And you don't remember anybody

18    telling you why it was that they were changing this

19    procedure by which to complete foreclosures?

20      A    No, not -- no.

21      Q    You don't have any idea?

22      A    I personally do, just from what I read and

23    reviewed, but not --

24      Q    Okay.  Tell me what your understanding is as to

25    why this change was made.

MYRON RAVELO - 9/8/2011

Page 122

1          A     I don't think it is a fair statement to say we

2     never have to, but we are obtaining, we would obtain that

3     information from the Revised Statutes of Nevada.

4          Q     Okay.  So you think that there is something in the

5     Revised Statutes of Nevada that says that ETS did not have

6     to go back and do another Notice of Default after additional

7     monies were paid by the borrower, loss mitigation had been

8     gone through, your understanding is that the statutes of

9     Nevada say that you don't have to issue another Notice of

10    Default?

11              MR. BASHFORD:  Objection.

12              THE WITNESS:  My understanding of that statute is

1     that if we file our Notice of Default and our statutory

14    mailings are completed at that portion of the foreclosure,

15    and as long as the default amounts do not change, we do not

16    have to send or record a new Notice of Default.

17    BY MR. BEKO:

18         Q     Okay.  And when you say as long as the default

19    amounts don't change, if GMAC on behalf of the lender

20    receives additional funds, would the default amount change?

21         A     If the payment, if the monies were applied, yes,

22    it would change.

23         Q     Well, if they received them, whether they apply

24    them or not, the amount in default would change, correct?

25         A     I can't make that statement.

MYRON RAVELO - 9/8/2011

1        Q      Why not?

2        A      If they don't apply to the loan and return it to

3   the borrower the next day, then it doesn't --

4        Q      Oh, sure, I totally understand that, sure.  If

5   GMAC receives money from the borrower and keeps the money,

6   doesn't give it back to the borrower, then the default

7   amount would change, correct?

8        A      That would be a fair assumption, yes.

9        Q      All right.  And in that situation, you believe

10  that ETS would need to go back and issue a new Notice of

11  Default, is that correct?

12       A      Yes.

13       Q      And was that ever done in this case?

14       A      Which portion, I'm sorry?

15       Q      Was there ever a new Notice of Default issued in

16  this case?

17       A      Not that I can recall, no.

18       Q      And do you know why not?

19       A      From my understanding, the amounts, the defaulted

20  amounts did not change.

21       Q      Okay.  Do you know whether or not GMAC actually

22  received additional funds from the borrowers, Ms. Longoni

23  and Mr. Gagnon?

24       A      No, we were not aware of that.

25       Q      If that happens, if after a Notice of Default is

MYRON RAVELO - 9/8/2011

Page 127.

1              Okay.  If, in fact, GMAC has received funds, but

2     not enough to cure the default, then under that situation

3     you then start the process over with a new Notice of Default

4     providing those new numbers and continuing forward from

5     there, is that right?

6          A    We would have to get, we would have to get

7     approval from GMAC, because if it changes the payment

8     amounts, it technically isn't a valid foreclosure, period,

9     regardless of what it is, so we would then have to refer it

10    back to GMAC and they would have to refer it back to us.

11    That is what I'm trying to --

12         Q    Right.  That makes sense to me.  If you started

13    the process and there was a certain amount owed and the

14    lender gets some money back from the borrower, then you have

15    got to start anew, right?

16         A    From my understanding, yes.

17         Q    Okay.  Do you have any explanation, I will submit

18    to you that there were payments that were received by GMAC

19    in this case from Ms. Longoni and Mr. Gagnon and the money

20    was kept.  It was never returned to them.  Do you know why

21    the foreclosure process wasn't started anew?

22         A    No.

23         Q    Do you know, sir, that after this foreclosure sale

24    went through that GMAC attempted to get the property back

25    from Ms. Gagnon, Mr. Gagnon and Ms. Longoni?

MYRON RAVELO - 9/8/2011

Page 128

1    A    I'm sorry, could you explain?

2    Q    Sure.  Did you know after the sale, the

3  foreclosure sale went through in this case, that GMAC

4  attempted to purchase back the property from the new buyer?

5    A    I'm not sure if it is a purchase, but, yeah, I

6  believe there was some sort of occurrence like that, yes.

7    Q    Why did that happen, do you know?

8    A    I could only assume.

9    Q    Was it because they had received those funds and

10  they didn't restart the foreclosure process over again?

11    MR. BASHFORD:  Objection to the extent it calls

12  for any privileged information.

1    THE WITNESS:  I don't know if that is the truth, I

14  mean, if that is the case or not, I'm sorry.

15  BY MR. BEKO:

16    Q    What is your understanding, what is your belief as

17  to why they went back and did that?

18    MR. BASHFORD:  Objection; don't answer that to the

19  extent you believe it is based on what you were told by

20  Counsel or any legal representation for GMAC or ETS.

21  BY MR. BEKO:

22    Q    Can you answer that question?

23    A    Based on what he said, I can't.

24    Q    So you don't have any information as to why they

25  tried to get the property back except for what some attorney

MYRON RAVELO - 9/8/2011

Page 129

1    told you, is that correct?

2         A    That's correct.

3         Q    Okay.  Mr. Ravelo --

4         A    Yes, sir.

5         Q    I don't know why I have a hard time remembering

6    your name, I'm sorry.  If, in fact, GMAC had received monies

7    and applied them from the borrowers, would there be some

8    kind of notation either in Exhibit 38 or Exhibit 4 where

9    they would be telling you that information?

10        A    Possibly.  It is possible.

11        Q    How else would ETS get that information if it

12   didn't come through either of these two electronic systems?

13        A    We would have to review GMAC's MortgageServ

14   system.

15        Q    Okay.  Let's talk about that for a second.  Would

16   you look, sir, at Exhibit 5 for identification?

17        A    Yes, sir.

18        Q    This is the system that you are talking about if,

19   in fact, GMAC had received funds that they would notify ETS

20   through this system?

21        A    No.  My explanation was if we don't get it on

22   notification through our system --

23        Q    Which is Exhibit 38?

24        A    Exhibit 38, I'm sorry, and Exhibit 4.

25        Q    Okay.

MYRON RAVELO - 9/8/2011

1    Default part.

2          Q      What has changed since the Longoni matter?

3          A      The MERS assignments.

4          Q      Okay.

5          A      For Nevada, the mediation requirements.

6          Q      There was no attempt to mediate this case in

7    Nevada at all, correct?

8          A      No.

9          Q      None of the notices that were required -- Are you

10   familiar with the notices that now have to go out in Nevada

11   as far as things that have to be done?

12         A      I know the general definitions of them.  I don't

13   know the exact verbiage and the exact pages of them, but I

14   do know the general definitions of them, yes.

15         Q      And none of that was complied with in this case,

16   correct?

17         A      Not at that time, no.

18         Q      Do you know why not?

19         A      I believe it was date of effect.

20         Q      Date of effect of what?

21         A      Of that mediation law, statute.

22         Q      Based upon the records that you have seen here to

23   date and the records that you think that you have seen that

24   are not here to date, it appears that all of the notices of

25   default that were sent to Longoni-Gagnon came back

MYRON RAVELO - 9/8/2011

Page 166

```
1    STATE OF NEVADA    )
                        )  Ss.
2    WASHOE COUNTY      )

3            I, CORRIE L. WOLDEN, a Certified Shorthand

4    Reporter in and for the County of Washoe, State of Nevada,

5    do hereby certify; That on THURSDAY, SEPTEMBER 8, 2011, at

6    the hour of 9:02 a.m. of said day, at 99 W. Arroyo Street,

7    Reno, Nevada, personally appeared MYRON RAVELO, who was duly

8    sworn by me to testify the truth, the whole truth and

9    nothing but the truth, and thereupon was deposed in the

10   matter entitled herein;

11           That I am not a relative, employee or independent

12   contractor of counsel to any of the parties; or a relative,

1    employee or independent contractor of the parties involved

14   in the proceeding, or a person financially interested in the

15   proceeding;

16           That said deposition was taken in verbatim

17   stenotype notes by me, and thereafter transcribed into

18   typewriting as herein appears; That the foregoing

19   transcript, consisting of pages 1 through 166, is a full,

20   true and correct transcription of my stenotype notes of said

21   deposition.

22           DATED:  At Reno, Nevada, this 16th day of

23   September, 2011.

24                   Corrie L. Wolden
                     _____
25                   CORRIE L. WOLDEN, CSR #194, RPR, CP
```

SUNSHINE REPORTING - 775-323-3411