12-12020-mg    Doc 8631-9    Filed 05/18/15    Entered 05/18/15 17:52:36    Exhibit
Exhibit 9    Pg 1 of 10

# EXHIBIT 9

# EXHIBIT 9

THOMAS P. BEKO, ESQ. (SBN 01250)
ERICKSON, THORPE & SWAINSTON, LTD.
99 W. Arroyo Street
Post Office Box 3559
Reno, NV 89505
Ph: (775) 786-3930; Fax: (775) 786-4160
*Attorneys for Claimants Pamela D. Longoni,
Lacey Longoni and Jean M. Gagnon*

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

STATE OF NEVADA     )
                    ) ss.
COUNTY OF WASHOE    )

### AFFIDAVIT OF PAMELA D. LONGONI

### NKA PAMELA D. SIMON

1. I am over the age of eighteen years, and a resident of the County of Washoe, State of Nevada, and I am competent to testify to the matters set forth herein.

2. I purchased the property located at 5540 Twin Creeks Drive, Reno, Nevada, on or about April 1, 1996. I was married at the time and had just given birth to my second daughter, Lacey Ann Longoni. This home was our family home and the house that both of my children were raised in.

3. In the latter part of 2002, I was divorced. In mid 2003, I was in a relationship with a man named Jean (pronounced John) Gagnon. In 2005, we sought to refinance the current mortgage on the property and we pulled out approximately $65,000 in equity.

4. In 2008, Mr. Gagnon was relocated back to Las Vegas, Nevada, which resulted in our finances being forced to be doubled to provide living expenses for two houses; one in Reno for myself and my children, and one in Las Vegas for Mr. Gagnon.

5. At that time, we began to contact Homecomings Financial to inquire into a loan modification as the mortgage payments were too much for our finances to handle. At that time, we were current on our mortgage payments, however, finances were becoming increasingly difficult with the duplication of our financial payments.

6. During my discussions with Homecomings Financial I was told that we would only qualify for a modification to our loan if we were in default. Thus, we were instructed to default on our payments. I believe the first missed payment occurred in December of 2008. Pursuant to their directives, on January 15, 2009, I sent a letter to Homecomings Financial asking for a modification of our existing loan. A true, accurate and correct copy of our letter of that date is attached as Exhibit 11 to our Response.

7. In the first few months of 2009, I contacted Homecomings Financial on a regular basis so as to begin the process of a loan modification. I began working with a Loan Specialist named Jonathan "Nate" Stephenson. He began to work with me to what I understood was a loan modification package.

8. I began working with my financial obligations to decrease whatever debts I had, and make different financial arrangements to decrease the current household debt. After reviewing the financial obligations, I determined that a mortgage payment of $1,600 would be financially feasible, and I contacted Nate Stephenson and discussed the same.

9. Over the course of the next several weeks, Nate and I worked together to complete all the modification documents. I provided him with all the necessary and required documents and information for him to complete the process.

10. In response to the information we produced, I received a proposed Foreclosure Repayment Agreement which called for payments in the amount of $2,270. A true, accurate and correct copy of that proposed agreement is attached to our Response as Exhibit 15. We never signed any such agreement. Nate and I discussed this and I expressed that $2,270 a month was not affordable and that we would never be able make any type of a balloon payment. Mr. Stephenson then advised me that he was going to propose a loan modification which included a payment reduction to $1600. He indicated he would forward me a new

2

agreement. He never did so. There was never any discussion about a balloon payment, nor did he say that the modification would be a temporary. In fact, in our subsequent discussions, he always told me that if approved, the modification would be permanent.

11. I never did receive new documentation regarding the proposed plan despite my numerous requests for the documents.

12. On or about March 19, 2009, I was informed that a trial modification was approved and to commence modification payments in the amount of $1,600. I requested and was granted the right to make the first payment by April 3, 2009. I made that first payment, as instructed, via the electronic payment portal from Homecomings Financial. I provided Mr. Stephenson the confirmation number.

13. Mr. Stephenson confirmed receipt of the first payment. I was advised that he was awaiting approval from the Vice President of the bank to make the modification a permanent change to our loan.

14. Mr. Stephenson further advised me that while our trial modification had been approved, he was attempting to write off $186,000 from the principal. He indicated he was "fairly confident it would get approved for a permanent modification," as per his email.

15. On or about April 20, 2009, I again contacted Mr. Stephenson and advised him that I was still waiting for the documentation to sign regarding the modification. He advised that things were backed up due to the current state of the housing market, and was still waiting for approval from the VP.

16. On or about April 28, 2009, I received an email from Mr. Stephenson and he indicated that after reviewing my file notes, one manager looked at it, and agreed that it was a win-win situation. He also indicates that the balance of the loan will drop to $269,776.03 for five years, which included the principle reduction, and the principle will be gone <u>forever</u>.

17. On May 1, 2009, I attempted to make the second modification payment on line as I did the first time. I could not do so. So I telephone Homecomings Financial and a representative would not accept the payment over the phone. I contacted Mr. Stephenson who indicated there was a "certified funds flag" put on the account, and he would have to

1  remove the flag for me to make the payment. Even though the certified funds flag was
2  apparently removed, the system would still not accept my payment. I then traveled to my
3  bank and withdraw cash, then traveled to Western Union and made the payment through
4  them. Four days later, a representative from However, Homecomings called and indicated
5  the payment had not been received. I contacted Mr. Stephenson who was able to verify the
6  payment had been made on time.

7    18.    On or about June 1, 2009, I was successful in making the third payment of
8  $1,600. However, as of that date, I still had not received or signed any documents relative
9  to the request.

10   19.    In the interim, Mr. Stephenson had been transferred to another department, and
11 no longer was working on my file. However, on June 30, 2009, he emailed me and indicated
12 that the file had been sent to management for final approval. He also indicated he received
13 an email stating the **modification had been approved.**

14   20.    On or about July 1, 2009, I attempted to make the fourth modification payment
15 of $1,600. The system continued to tell me the payment would not be accepted. I tried for
16 several days to make the payment.

17   21.    Finally, on July 9, 2009, I finally was able to reach financial services for
18 Homecomings Financial and I spoke to an individual who identified himself as Henry. I
19 asked Henry what the status was of my loan modification as I had been advised on June 30th
20 that it had been approved. To my shock and amazement, Henry then told me that the
21 modification was *not* approved. He advised me that I owed approximately $19,000 and that
22 if I didn't immediately pay it, they would sell our home. He refused my $1,600.00 and told
23 me that it was only set up for 3 months. No one had ever told me that before. Moreover, no
24 one had ever told me that there would be any balloon payment. I was lead to believe that any
25 deficiency would be written off.

26   22.    Henry then advised me to submit a new workout package as per the Obama
27 Modification plan. He told me that we had 60 days to pursue a loan modification through
28 this new federal program. He specifically told me that the foreclosure was on hold. Worst

4

case scenario, I thought I had at least until September 9, 2009, to qualify for new federal modification program.

23. I immediately emailed Mr. Stephenson with this information and he confirmed what Henry had told me; that the foreclosure is on hold. He further told me that GMACM did not want to take my house. He further confirmed that GMACM was trying to put the loan into an Obama Modification and that I should download the financial information and fill out the appropriate documents and send them in immediately.

24. Had I been informed at any time that the modification was not going to be approved, I would have sought financial assistance from perhaps family members, or other means, to attempt to keep my home. I certainly would have done so had I known that I was going to lose my house in a foreclosure sale.

25. In addition, had I had been informed that the modification was not going to be approved, I would have taken the time to find an appropriate rental home for my daughter and I, instead of the frantic search for a home five days before school started. This resulted in me having to rent a home which was far beyond my financial means.

26. When I could get no answers from GMACM on our loan modification request, on August 3, 2009, I sent another email to Nate Stephenson. In response, Stephenson wrote back to her telling me that we still needed to send in the Obama workout package.

27. The following day (August 4, 2009), a package from GMACM was delivered to my house via Federal Express. A true, accurate and correct copy of the Fed Ex Express confirmation is attached to the Response as Exhibit 18. This package included a letter dated July 30, 2009 which directed me to return a Financial Analysis Form. The letter contained a notation which indicated "30 days to sale." A true and accurate copy of that letter is attached to our Response as Exhibit 17.

28. The July 30, 2009, letter confirmed what Henry had indicated to me that there would be no sale until September of 2009. I filled out the Financial Analysis Form on August 9, 2009, returned it to GMACM on August 10, 2009. A true and accurate copy of that modification package is attached as to our Response as Exhibit 19.

5

29. I acknowledged that on August 3, 2009, I sent an email to Stephenson indicating that I had received some notice from "ETS" that our home was going to be sold on August 18, 2009, however, that such notice had to be in error as GMACM had told me our request for modification had, in fact, been approved. Moreover, they were still working to get us approved for a HAMP modification.

29. On August 24, 2009, I called GMACM to inquire as to the status of the modification documents that I had returned on August 10, 2009. I advised the representative that I had received an email from Nate Stephenson on July 9, 2009, stating that the foreclosure was on hold and that we believed GMACM was trying to get us qualified under HAMP program. At that time, the representative told me that my home had been sold at foreclosure on August 14, 2009. I told her I wanted my home back. In response, I was told that I would need to speak with the representative's supervisor who was gone for the day.

30. On August 25, 2009, my 13 year old daughter was served with the 5-day Notice to Tenant to Terminate Tenancy at Will.

31. I was then contacted by Brett Nelson regarding the purchase of my home. He indicated that I had five (5) days to vacate the premises or my personal belongings would be locked up and I would not be able to retrieve them.

32. He also indicated that he would provide me a check for "cash for keys." He did provide us with a check, however, that check was later dishonored by the bank for "non sufficient funds." This caused further emotional and financial distress.

33. When in spoke with the GMACM representative, I inquired about the three months of payments previously made to GMACM, which totaled $4,800. Those funds were never returned to me.

34. At this time, I had lived in the house for approximately 14 years. My children were raised in that home. School was set to start in a matter of days, and I had my daughter to think about. I frantically searched for a house to rent which was located in the same school district so that she would not be forced to entirely leave her friends, and the classmates she had known all her life. I was finally successful in locating a house and signed

1  a lease agreement.

2  35.    On September 4, 2009, I received an unsolicited telephone call from attorney
3  Michael Knapp who indicated that he was GMACM's counsel. He told me that GMACM
4  had made a very big mistake and that I would not have to move out of my home. He advised
5  me that GMACM was making efforts to recover the home from the buyer, and hopefully
6  return my home to me. Mr. Knapp wanted to make sure I had his personal cell phone number
7  so that I could contact him to discuss the matter further, as he was headed to the beach with
8  his family for the Labor Day holiday weekend. My Verizon phone call records identify this
9  8 minute call. A true, accurate and correct copy of this billing is attached to our Response
10 as Exhibit 24.

11 36.    The following week, I was contacted by GMACM counsel, Ms. Hancock. I
12 informed her that we wanted all negative references in our credit history removed, including
13 the foreclosure. She promised to do so.

14 37.    Ms. Hancock also offered to pay for our moving expenses as well as all
15 reimburse us for expenses we incurred for various home improvements to the property, as
16 well as receipts for moving expenses. Later she demanded that we execute a full release in
17 exchange for such payment. We refused and they never tendered the promised funds. A
18 true and accurate copy of these emails and a letter from GMACM's counsel is attached to our
19 Response as Exhibit 21.

20 38.    I expressed to all GMACM representatives that losing my home was such an
21 emotional and life changing event. My children grew up in that home. I had improved that
22 home greatly, and I was comfortable in my neighborhood. My daughter, Lacey, who was 13
23 at the time this foreclosure took place, suffered tremendously. She was forced out of her
24 neighborhood and left the kids she grew up with. She was forced to ride a new school bus
25 from our new rental house, and did not know any kids on the bus. She didn't have anyone
26 to walk home with as there were no kids in our new neighborhood.

27 39.    We relied tremendously on the neighbors across the street on Twin Creeks.
28 She was a stay at home mom, and me, being a single mom, relied greatly on her to assist with

7

Lacey after school. Our daughters were very close friends. Their friendship involved sleepovers, holiday events, and extracurricular activities together. We often attended summertime BBQ's and holiday events together. We shared activities as families and helped each other with transportation for our kids.

40.  It was devastating to lose my house. It caused a great deal of emotional distress. I had never planned on living anywhere else. However, since this time, I have lived in 4 other places, which has caused a lot of financial and continued emotional distress, as nothing has felt quite like "home."

41.  After I learned of the foreclosure, I lost 13 pounds in a less than two weeks. I was forced to take prescription medications just to stop the emotional breakdowns. I was embarrassed and humiliated that this had taken place. I had a hard time concentrating at work. I cried all the time. I felt so guilty for my daughter, Lacey, who had been displaced from her childhood home. I remember, while attempting to pack all of 15 years of belongings, and I was just exhausted, and I was wrapping up the day of packing. I had left several belongings in my driveway and after sheer exhaustion from the day, I covered those items with a tarp and believed they would be safe, as I knew my neighbors and neighborhood.

42.  The following morning, I went out to get my things and continue packing. I realized that sometime during the night, my belongings had been picked through, and several items were missing. I ran to the side of the house, and vomited.

43.  During this entire process, I relied upon the representations of Mr. Casas and Mr. Stephenson that the foreclosure had been placed on hold. Had I known that their representations were not truthful, I would have made efforts to prevent the foreclosure from moving forward by getting funds from family members or my retirement account. I had family and friends that I believe would have lent me the funds need to prevent the foreclosure. I would have availed myself of all my available resources.

44.  At no time did I ever fabricate or alter any email communications. I forwarded GMACM an exact copy of my emails with Mr. Stephenson.

8

1         FURTHER AFFIANT SAYETH NAUGHT.

2    DATED this 15 day of April, 2015.

                                 */s/ Pamela D. Simon/*

                                 PAMELA D. LONGONI, fka
                                 PAMELA D. SIMON

7 SUBSCRIBED and SWORN TO before me

8 this 15 day of April, 2015.

    */s/ Joy T. Porto/*

Notary Public

        JOY T. PORTO
    Notary Public - State of Nevada
   Appointment Recorded in Washoe County
    No: 92-1092-2 - Expires May 21, 2016

9