THOMAS P. BEKO, ESQ.  (SBN  01250)
ERICKSON, THORPE & SWAINSTON, LTD.
99 W. Arroyo Street
Post Office Box 3559
Reno, NV 89505
Ph:  (775) 786-3930; Fax: (775) 786-4160
*Attorneys for Claimants Pamela D. Longoni,*
*Lacey Longoni and Jean M. Gagnon*

# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF NEW YORK

In re:

RESIDENTIAL CAPITAL, LLC, et al.,

          Debtors.

_____/

Case No. 12-12020 (MG)

Chapter 11

Jointly Administered

## RESPONSE TO OBJECTION OF THE RESCAP BORROWER CLAIMS TRUST TO PROOF OF CLAIM FILED BY PAMELA D. LONGONI AND JEAN GAGNON CLAIM NOS. 2291, 2294, 2295 AND 2357

COME NOW, PAMELA D. LONGONI, individually and as the Guardian Ad Litem for

LACEY LONGONI, and JEAN M. GAGNON, by and through their attorneys, ERICKSON,

THORPE & SWAINSTON, LTD., and Thomas P. Beko, Esq., and hereby submit the following

response to the Objection to the Proof of Claims filed by Pamela D. Longoni and Jean Gagnon.

DATED this 22nd day of May, 2015.

ERICKSON, THORPE & SWAINSTON, LTD.


By____/s/ Thomas P. Beko_____
      THOMAS P. BEKO, ESQ.
      *Attorneys for Claimants*
      *Pamela D. Longoni, Lacey Longoni*
      *and Jean M. Gagnon*

Erickson, Thorpe & Swainston, Ltd.
P.O. Box 3559
Reno, Nevada 89505
Tel. (775) 786-3930 Fax (775) 786-4160

# TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I. Summary of the Claims and the Debtors' Objection  . . . . . . . . . . . . . . . . . . . . 1

    A. The Plaintiffs' Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. The Debtors' Objection  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.  Procedural Authority  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.    The Debtors Have Failed to Establish That They Had Any Legal Right to
Commence a Non-Judicial Foreclosure Upon the Plaintiffs' Property.
Therefore, They Cannot Negate an Essential Allegation of Any of the
Claimants' Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.   The Debtors Failed to Comply with Nevada's Statutory Requirements
for Non-Judicial.  For These Additional Reasons, the Foreclosure was
Unlawful  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A. Because GMACM accepted further payments  from the plaintiffs after
      the foreclosure process was stopped, they were thereafter required
      to restart the process which would have necessarily occurred after
      July 1, 2009, making Nevada's Mandatory Foreclosure Mediation
      process applicable  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.   The Plaintiffs' Fraud, Misrepresentation and Promissory Estoppel Claims
are Entirely Valid as there is Irrefutable Evidence that Multiple GMACM
Representatives Informed the Claimants That GMACM's Proposed Loan
Modifications Were, in Fact, Fully Approved. The Evidence Is Also Irrefutable
That GMACM Repeatedly Informed Longoni That All Foreclosure Actions
Were on Hold . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.    The Claimants' Breach of Contract and Fraud and Misrepresentation
Claims are Valid  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VI.   The Claimants' Fraud and Misrepresentation Claims Are Valid  . . . . . . . . . . . . . 24

    A.  Negligent misrepresentation is also properly stated  . . . . . . . . . . . . . . . . . 25

    B.  Even assuming a "no duty" rule applicable to lenders, an exception
    to such "no duty" rule is stated by the complaint's averment  . . . . . . . . . . . . . . 26

    C.  A claim for negligent infliction of emotional distress is also stated  . . . . . . . . . . 27

VII.  The Plaintiffs' Breach of Contract and Promissory Estoppel Claims
Are Entirely Valid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    A. The claimants' Promissory Estoppel Claim is also fully
      established by the record in this matter  . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1

VIII.    Longoni's Intentional Infliction of Emotional Distress Claim has Already
Been Determined to be Valid ........................................... 30

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>**TABLE OF AUTHORITIES**</u>
<u>**Cases**</u>

2

3

<u>Adelson v. Hananel</u>
    2009 WL 2835119, *3 (D. Nev.)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

4

<u>Anderson v. Baltrusaitis</u>
    113 Nev. 963, 965, 944 P.2d 797, 799 (1997)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

5

<u>Barmettler v. Reno Air, Inc.</u>
    114 Nev. 441, 449, 956 P.2d. 1382, 1387 (1998),
    *quoting* Rest. 2d of Torts, § 552(1)(1976)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

6

7

<u>Betsinger v. D.R. Horton, Inc.</u>
    232 P.3d at 436  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

8

9

<u>Bronner v. Park Place Entm't Corp.</u>
    137 F. Supp. 2d 306, 312 (S.D.N.Y.2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

10

<u>Cervantes v. Countrywide Home Loans, Inc.</u>
    656 F. 3d 1034, 1039, (9th Cir. 2011)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

11

12

<u>Collins v. Union Federal Sav. & Loan Ass'n</u>
    99 Nev. 284, 304, 662 P.2d 610, 623 (1983)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

13

<u>Dynalectric Co. V. Clark & Sullivan Constructors, Inc.</u>
    127 Nev. Adv. Op. No. 41, 255 P. 3d 286, 288 (2011),
    *quoting* Restatement (Second) of Contracts, sec. 90(1)(1981)  . . . . . . . . . . . . . . . . . . . 29

14

15

<u>Edelstein v. Bank of New York Mellon</u>
    128 Nev. Adv. Op. 48, 286 P.3d 249, *7, 254, (Sept. 27, 2012)  . . . . . . . . . . . . . . 5, 6, 9

16

17

<u>Fidelity Mortgage Trustee Service, Inc. v. Ridgegate East Homeowners Assoc.</u>
    27 Cal. App. 4th 503, 506, 32 Cal. Rptr. 2d. 521, 523 (1994)  . . . . . . . . . . . . . . . . . . . 26

18

<u>Franchise Tax Board v. Hyatt</u>
    130 Nev. Adv. Op. 71, 335 P.3d 125 (2014)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

19

20

<u>Ghervescu v. Wells Fargo Home Mortgage Co.</u>
    2008 WL 660248, **1-3, 6 (Cal. App. 4th) (unpublished)  . . . . . . . . . . . . . . . . . . . . . . 25

21

<u>Gordon v. Beck & Gregg Hardware Co.</u>
    40 S.E.2d 428, 432 (Ga. App. 1946)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

22

23

<u>Gunsul v. Countywide Home Loans, Inc.</u>
    2006 WL 3586091, **2-6 (Wash.App.)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

24

<u>In re: Metex Mfg. Corp.</u>
    510 B.R. 735, 740 ( Bankr.S.D.N.Y. June 13, 2014)  . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25

26

<u>In re Residential Capital, LLC</u>
    2014 WL 1414136, *5 (Bankr. S.D.N.Y. April 10, 2014)  . . . . . . . . . . . . . . . . . . . . . . 4

27

<u>In re Residential Capital, LLC</u>
    524 B.R. 465 (Bankr. S.D.N.Y. 2015)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28

Lenett v. World Sav. Bank, FSB
    2008 WL 2009757, *2 (Cal. App. 2d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Leyva v. National Default Servicing Corp.
    127 Nev. Op. 40, 255 P.3d 1275, 1279 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Longoni v. GMAC Mortg.
    2010 WL 5186091, at *4, *6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 30

Nieto v. Litton Loan Servicing LP
    2011 WL 797496, * 3 (D. Nev. Feb. 23, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Pasillas v. HSBC Bank USA
    127 Nev. Adv. Op. 39, 255 P.3d 1281 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Pinnacle Fitness and Recreation Management v. Jerry and
Vickie Moyes Family Trust, 2013 WL 1932888 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Sattari v. Wash. Mut.
    2010 WL 3896146, *4 (D. Nev.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Simon v. B of A, 2010 WL 2609436, *12 (D.Nev.)
    citing, Betsinger v. D.R. Horton, Inc.
    126 Nev. 17, 232 P.3d 43, 436 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

T & Beer, Inc., v. Wine Source Selections, LLC
    2012 WL 360286, *3 (N.J.Super. A.D. (Unpublished opinion) . . . . . . . . . . . . . . . . . 28

Tene v. BAC Home Loan Servicing, LP
    2012 WL 222920, *2 (D. Nev. Jan. 25, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Weingartner v. Chase Home Finance, LLC
    702  F. Supp. 2d 1276, 1290, 1291 (D.Nev 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Wiseman v.  Hallham
    113 Nev. 1266, 1270, 945 P.2d. 945, 947-48 (1997) . . . . . . . . . . . . . . . . . . . . . . . . 26

### Statutes/Rules

11 U.S.C.  502(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Nevada Revised Statute  §11.220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Nevada Revised Statute §107.080  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Nevada Revised Statute  §107.085 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Nevada Revised Statute   §107.086 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Nevada Revised Statute   §107.087 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Nevada Revised Statute  §107.090 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Nevada Revised Statute 107.080 through 107.100 . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1    Nevada Revised Statute §111.220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2    Nevada Revised Statute §719.100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

3    Nevada Revised Statute §719.240 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

4    Restatement (Second) of Contracts §90 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

5    Restatement (Second) of Torts § 323 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

**RESPONSE TO OBJECTION OF THE RESCAP BORROWER CLAIMS TRUST TO
PROOF OF CLAIMS FILED BY PAMELA D. LONGONI AND JEAN GAGNON
CLAIM NOS. 2291, 2294, 2295 AND 2357**

3      1.      The Claimants, Pamela D. Longoni and Jean Gagnon, hereby submit the following

4  Response to the Objection to their Claims filed by debtors GMAC Mortgage, LLC ("GMACM"),

5  and Executive Trustee Service, LLC ("ETS") on April 24, 2015.[1]  For the reasons set forth herein,

6  the debtors' Objection should be denied in its entirety.

7      2.      First, and foremost, the debtors cannot defeat the plaintiffs' claims because they

8  cannot prove, under Nevada law, that they had *any* legal right to commence any foreclosure

9  proceedings upon plaintiffs' home.  Second, the justification which is now being proffered by the

10 debtors for commencing the foreclosure is entirely false and fabricated.  Proof of this fact will be

11 demonstrated herein through a recently obtained declaration of the actual former GMACM employee

12 who was responsible for handling the plaintiffs' request for a permanent loan modification.  Finally,

13 the plaintiffs will prove, through wholly undisputed evidence, that (1)  they were promised that all

14 attempts at foreclosure were on hold while they continued to pursue a permanent loan modification,

15 and (2) that GMACM had actually approved their requested loan modification.

16      **I.  Summary of the Claims and the Debtors' Objection.**

17      3.      In a nutshell, this case is a prime example of a foreclosure sale which occurred when

18 the right hand did not knowing what the left hand was doing. In this case, on August 14, 2009,

19 Executive Trustee Services, LLC ("ETS") caused the sale of the plaintiffs' 14-year home in Reno,

20 Nevada.  They did so purportedly at the direction of GMAC Mortgage, LLC ("GMACM").  It is the

21 plaintiffs' position that ETS conducted the foreclosure sale not knowing that GMACM had placed

22 the foreclosure on hold while they sought to change the plaintiffs' previously approved loan

23 modification plan from a "Traditional" GMACM loan modification to a newly implemented "Obama

24 Plan" (also known as "HAMP") modification.  And, as soon as GMACM discovered that ETS had

25 sold the plaintiffs' home, GMACM's counsel contacted the plaintiff Longoni and admitted their

26 error.  Thereafter, GMACM attempted to recover the plaintiffs' home back from the third party

27
28
---
[1] The claimant Pamela D. Longoni asserted claims on behalf of her minor daughter,
Lacey Longoni, as well.  Thus, all arguments set forth herein also apply to her.

1

purchaser. However, the new purchaser refused to return to the home (because GMACM offered them only $4,000.00 to unwind that sale). GMACM then took steps to mitigate the plaintiffs' damages, but refused to complete even that process when the plaintiffs refused to provide them a full release. This litigation ensued.

4.    As will be demonstrated herein, in an effort to convince this Court to dismiss the plaintiffs' bankruptcy claims, the debtors have proffered an entirely *ex post facto* justification for the foreclosure, namely that the plaintiffs had breached a repayment plan (the "Repayment Agreement") that they entered into with GMACM. In this regard, the debtors now argue that the plaintiffs entered into a Repayment Plan with GMACM requiring them to make three temporary payments of $1,600.00 which were to be followed by a balloon payment, specified only in an amount "in excess of $19,000.00." The debtors claim that because the plaintiffs failed to make this required balloon payment, GMACM was authorized to complete the previously commenced foreclosure proceeding.

5.    To support this claimed defense, the debtors have not provided this Court with a single affidavit from any witness who would testify that GMACM completed the foreclosure *because* the plaintiffs breached this Repayment Agreement. Instead, the debtors' defense is supported entirely upon their counsel's interpretation of obscure GMACM diary notes. As will be shown herein, their interpretation is entirely incorrect.

6.    As is reflected in the Declaration of GMACM's own Loss Mitigation Specialist (Mr. Jonathan "Nate" Stephenson), although he had initially proposed a Repayment Agreement (which had been sent to the plaintiffs), he immediately abandoned that plan when it became obvious that the plaintiffs would never be able to meet its requirements. *See, Declaration of Jonathan "Nate" Stephenson, attached hereto as Exhibit 1, ¶ ¶ 4-9.* He thereafter embarked upon the process to qualify the plaintiffs for a permanent loan modification. That process began with the plaintiffs making temporary payments in the amount of $1,600.00. During this time period GMACM placed all foreclosure activities on hold while they evaluated the plaintiffs' request. According to Mr. Stephenson, there never was a Repayment Agreement, and because there was no such plan there was no required balloon payment. And because there was no balloon payment, the plaintiffs were, at all times, in full compliance with all requirements GMACM had imposed upon them as part of their

2

1    application for a permanent loan  Thus, according to Mr. Stephenson, the plaintiffs were never in

2    breach of any obligation imposed by GMACM.  *Id. at ¶ ¶ 6, 10.*

3          7.    In addition to this Declaration (which completely refutes the arguments now being

4    proffered by the debtors' current counsel), the plaintiffs have also attached a previously obtained

5    Affidavit from Mr. Stephenson wherein he provided that he actually received an email which

6    indicated that the plaintiffs' request for a permanent loan modification had, in fact, been approved

7    by GMACM's higher management.  *See, Affidavit of Jonathan "Nate" Stephenson, also attached*

8    *hereto as Exhibit 1.*  Thus, the plaintiffs have evidence directly from GMACM's own agent which

9    completely obliterates every argument proffered by the debtors in their current Objection.  In light

10    of this evidence, this Court should summarily reject all of the debtors' arguments which are not

11    based upon actual evidence, but rather, strained extrapolations from vague log notes.[2]

12                      **A.  The Plaintiffs' Claims.**

13          8.    As the debtors have aptly noted, the claims of Pamela Longoni and Jean Gagnon arise

14    as a result of the sale of their home following a nonjudicial foreclosure that the claimants allege was

15    wrongfully undertaken by the debtors GMACM and ETS.  That foreclosure process began in

16    February of 2009, and resulted in the sale of the claimants' home on August 14, 2009. The claimants

17    brought suit alleging various claims based upon the substantive law of the State of Nevada.

18    Generally speaking, the plaintiffs have asserted three claims.

19          9.    First, the plaintiffs alleged that the foreclosure caused by GMACM and conducted

20    by ETS was unlawful under Nevada law because neither GMACM nor ETS had the legal rights to

21    both the plaintiffs' promissory note and their deed of trust.  Because Nevada law explicitly requires

22    that the foreclosing party possess both of these legal instruments, and because neither GMACM nor

23

24        [2] The debtors' Objection is filled with such unsupported arguments.  Some of the most
outlandish are the claims of a breach of an obligation to make a $19,000+ balloon payment,

25    claims that the plaintiffs did not make timely temporary payments, claims of repeated telephone
calls to the plaintiffs demanding they provide further documentation to GMACM as part of their

26    request for a loan modification, and claims the plaintiffs failed to return requested documentation
when GMACM sought to qualify them under the HAMP program.  The plaintiffs submit that the

27    debtors are forced to rely upon such unsupported (and inadmissible) evidence, because they do
not have a single witness who could proffer testimony to support their arguments.  This Court

28    should summarily reject any argument not supported by competent, admissible evidence.

1    ETS were possessed of those rights, the foreclosure was unlawful *ab initio.* Therefore, regardless of

2    whether ETS followed Nevada's statutory rules on foreclosure, the foreclosure was still unlawful.

3        10.    Next, the claimants alleged that when ETS conducted the foreclosure, they violated

4    various provisions of Nevada statutory law, including provisions which required (1) a specific type

5    of notice be personally served upon the plaintiffs, and (2) the debtors to participate in a mandatory

6    mediation program before proceeding forward with the foreclosure. Because the debtors failed to

7    comply with these statutory requirements, the foreclosure was again unlawful. Finally, the claimants

8    alleged that they quite reasonably relied, to their great detriment, upon the representations made by

9    GMACM's representatives Stephenson and Casas, that all foreclosure efforts were on hold while the

10   plaintiffs pursued a permanent loan modification.

11                      **B.  The Debtor's Objection.**

12       11.    In their current Objection the debtors assert four basic arguments. First, they argue

13   that regardless of anything that GMACM's representatives may have said or done during the loan

14   mitigation process, the foreclosure was proper since the claimants had breached both their original

15   loan agreement as well as the "Repayment Agreement." Second, they assert that they complied with

16   all the *then-applicable* non-judicial foreclosure statutes which existed in the State of Nevada. Third,

17   the debtors argue that the plaintiffs could not legally rely upon Nate Stephenson's written

18   representations (that their request for a permanent loan modification was approved or that the

19   foreclosure process was on hold) because the representations were too vague or because Mr.

20   Stephenson no longer had any authority to speak on behalf of GMACM (as he had been assigned to

21   a new team at the time). Finally, the debtors claim that Nevada's Statute of Frauds renders any

22   promises made by the debtors unenforceable.

23                      **C.  Procedural Authority.**

24       12.    "Courts in the Second Circuit apply a burden shifting framework for claims

25   objections." *In re: Metex Mfg. Corp.*, 510 B.R. 735, 740 ( Bankr.S.D.N.Y. June 13, 2014). Under

26   this shifting burden analysis, a properly filed claim is deemed allowed unless a party in interest

27   objects. 11 U.S.C. 502(a). *In re Residential Capital, LLC*, 2014 WL 1414136, *5 (Bankr.

28   S.D.N.Y. April 10, 2014). However, if the objector does *not* introduce evidence as to the invalidity

4

1   of the claim, the claimant need offer no further proof on the merits of the claim. *In re Residential*

2   *Capital, LLC.,* 524 B.R. 465 (Bankr. S.D.N.Y. 2015). As noted above, in this case the objectors

3   have failed to establish a fundamental predicate to their right to engage in *any* foreclosure activity.

4   Because the debtors cannot make this predicate showing, the burden should never shift to the

5   claimants to prove the validity of their claims (or show that the debtors' objections are not

6   sustainable). However, in this Response, the claimants will prove both.

7        **II.**  **The Debtors Have Failed to Establish That They Had Any Legal Right to**
           **Commence a Non-judicial Foreclosure Upon the Plaintiffs' Property. Therefore,**

8           **They Cannot Negate an Essential Allegation of Any of the Claimants' Claims**.

9        13.     To justify the relief requested, the debtors must necessarily prove to this Court that

10   the foreclosure upon the plaintiffs' home was lawful. In this case, the debtors cannot. Under Nevada

11   law, it is clear that before any party can lawfully commence a non-judicial foreclosure, that party

12   must possess the legal rights to both the promissory note and the deed of trust. In *Edelstein v. Bank*

13   *of New York Mellon*, 128 Nev. Adv. Op. 48, 286 P.3d 249 (Sept. 27, 2012), the Nevada Supreme

14   made it clear that when MERS is designated as the original beneficiary on a deed of trust (which,

15   of course, they were in this case, *see, Exhibit 2*), the note and deed of trust are split making

16   nonjudicial foreclosure by either party improper. *Id. at *7.* In reaching this decision, the Nevada

17   Court found that such a division was not irreparable, however, the Court concluded that before a

18   lawful nonjudicial foreclosure could be commenced, the promissory note and deed of trust had to

19   be reunited in the same party.

20        14.     Relying on the frequently cited decision of *Cervantes v. Countrywide Home Loans,*

21   *Inc.,* 656 F. 3d 1034, 1039 (9th Cir. 2011), the Nevada Supreme Court explained that "[t]he deed and

22   note must be held together because the holder of the note is only entitled to repayment, and does not

23   have the right under the deed to use the property as a means of satisfying repayment." *Edelstein*, 286

24   P.3d at 254. "Conversely, the holder of the deed alone does not have a right to repayment and, thus,

25   does not have an interest in foreclosing on the property to satisfy repayment." *Id. See, also, Leyva*

26   *v. National Default Servicing Corp.,* 127 Nev. Adv. Op. 40, 255 P.3d 1275, 1279 (2011)

27   (recognizing note and deed of trust must be held by same person to foreclose). In this case, the

28   debtors have never proven that either GMACM or ETS possessed the rights to both the promissory

1    note and the deed of trust.  Because of this fact, the foreclosure was unlawful.

2        15.    As the debtors noted, there were multiple amendments to the plaintiffs' original

3    complaint.  These amendments became necessary because the defendants could never identify who

4    owned or held the note or the deed of trust.  The plaintiffs will review the evidence surrounding this

5    issue, but before they do it is important for this Court to first review the debtors' Objection to see

6    how they attempted to cause this Court to quickly skip over this critical fundamental prerequisite.

7    In two paragraphs, the debtors provide an intentionally vague history of the loan in an effort to

8    convince this Court that they somehow had standing to pursue foreclosure upon the plaintiffs' home.

9    First, in paragraph 7, they properly note that on September 29, 2005, Longoni executed a promissory

10   note and deed of trust on certain real property located at 5540 Twin Creeks Drive, Reno, Nevada (the

11   "Property").   *See, attached Exhibit 2.[3]*   Debtors declare that this deed of trust was "in favor" of

12   Equifirst Corporation.  However, as the Court can see, while the Lender on the promissory note is

13   identified as EquiFirst Corporation, the beneficiary of the deed of trust is not Equifirst Corporation,

14   but rather, it is Mortgage Electronic Registration System, Inc. ("MERS").  *See, Deed of Trust p. 2.*

15   Under the Nevada law set forth above, by naming MERS as the beneficiary, there was an immediate

16   separation of the promissory note away from the deed of trust. *See, Edelstein v. Bank of New York*

17   *Mellon*, 128 Nev. Adv. Op. 48, 286 P.3d 249 (Sept. 27, 2012).  Under Nevada law, unless those two

18   legal instruments were later reunited in the same party, no party could lawfully pursue foreclosure.

19       16.    Next, debtors claim that in December of 2005, the "loan" was placed into a

20   securitized trust under which Residential Funding Corporation acted as the master servicer.[4]  They

21   then claim that Homecomings Financial LLC, and later, GMACM, acted as the sub-servicer on the

22   loan from 2005 to 2013.  They of course offer absolutely no evidence to support any of these legal

23   conclusions. From here, the debtors argue that Longoni defaulted on this "modified" loan in

24   December of 2008, and as a result GMACM declared the loan in default and sent a notice of default

25

26              [3]The promissory note and deed of trust were also signed by the plaintiff Gagnon.

27              [4] The use of the word "loan" was not just sloppy lawyering, it was an intentional
     misnomer designed to obfuscate the fact that the promissory note and the deed of trust had been
28   severed from one another.

1   on January 2, 2009.  They claim that Longoni failed to cure the default, so on February 26, 2009,

2   ETS formally recorded a Notice of Breach and Default.  They claim that ETS sent notice of this

3   filing to the plaintiffs on March 4, 2009.[5]

4          17.    Again, the debtors failed to explain what they meant by the word "modified" loan.

5   What they intentionally kept from this Court was the fact that on November 15, **2007**, Homecomings

6   Financial, LLC entered into a previous loan modification agreement with the plaintiffs. *See, attached*

7   *Exhibit 3, Adjustable Rate Loan Modification Agreement.*  Contrary to the debtors' current assertion,

8   Homecomings Financial, LLC was not identified in that agreement as a "sub servicer" of the loan,

9   but rather,  Homecomings Financial, LLC was specifically identified as the "Lender."  **More**

10  **importantly, the Adjustable Rate Loan Modification Agreement specifically provided that the**

11  **"Lender" [Homecomings Financial, LLC] was the "legal holder and the owner of the Note and**

12  **Security Instrument . . ."**

13         18.    After GMACM and ETS finally filed an Answer in the underlying litigation, the

14  plaintiffs served them with their first set of interrogatories which asked the defendants to identify

15  each individual or entity that has or has had, or who has claimed to have had, possession and/or an

16  ownership interest in the Note and Deed of Trust. *See, attached Exhibit 4.*  On December 2, 2010,

17  GMACM provided the following response:

18         **Response No. 1:**

19  9/29/05   Equifirst Corp                          Origination
    10/17/05  Loan registered with MERS              Loan originated with MERS as nominee
20  1/05/06   Residential Funding Co, LLC as Trustees  Transfer of beneficial rights from EC
    10/08/06  Residential Funding Co, LLC            Transfer of servicing rights from EC
21

22  Quite notably, Homecomings Financial LLC is never identified as either a holder or owner of the

23  Note and/or the Deed of Trust.  Moreover, there is no mention whatsoever of some "securitized

24  trust" or any master or sub-servicer of the loan.  Nevertheless, based upon this rather evasive

25  response, the undersigned sought leave to amend the complaint to add claims against Residential

26  Funding. The Court granted the motion and Residential Funding was then added as a defendant.

27  _____

28         [5] As will be shown below, this Notice came back to ETS as "undeliverable."

7

19.    On July 29, 2011, the parties appeared before the United States Magistrate Judge on an unrelated matter.  During the course of that hearing, the debtors' counsel informed the court that he had received information from his clients that the owner of the Note was not Residential Funding, but rather it was owned by a company called Residential Asset Mortgage Products, Inc.  *See, Minute Order, Doc. #80, Exhibit 5.*  Shortly thereafter on August 5, 2011, GMACM served the plaintiffs with its Amended Response to Plaintiffs' First Set of Interrogatories.  *See, Response to Interrogatory 1, attached Exhibit 6.*  In these responses, GMACM gave a completely different response.  This time they stated that Residential Funding Corporation, LLC ("RFC") purchased the Loan from Equifirst in November, 2005, but pursuant to an subsequent Pooling and Servicing Agreement which transferred ownership of the loans from RFC to Residential Asset Mortgage Products, Inc.

20.    Again, there was no reference to Homecomings Financial, LLC, who was identified in the November 15, 2007, Adjustable Rate Loan Modification Agreement as both the holder *and* owner of the Note and the deed of trust.  That agreement was executed almost two years *after* the debtors claimed that the Residential Funding Corporation, LLC purchased the "Loan" from EquiFirst Corporation and transferred it into the securitized trust.  Nevertheless, because of this amended discovery response, the plaintiffs again amended their complaint to add these entities.

21.    The undersigned then took the depositions of the individuals identified as the Persons Most Knowledgeable ("PMK") for GMACM and ETS.  GMACM identified Mr. Juan Aguirre as its PMK.[6]  ETS identified Mr. Myron Ravelo as its PMK.  Neither could identify who actually owned the plaintiffs' promissory note or deed of trust at the time of the foreclosure.  *See, Aguirre Deposition, Exhibit 7, at pp. 62-66, 72-73, 87, 103-105.  See, also, Ravelo Deposition, Exhibit 8, pp. 21-22, 62-63, 83-85.*    Under Nevada law, as the foreclosing party, ETS was legally required to possess both the promissory note and deed of trust.  Clearly, they did not.

### III.  The Debtors Failed to Comply with Nevada's Statutory Requirements for Non-Judicial Foreclosures.  For these Additional Reasons, the Foreclosure was Unlawful.

22.    Even if the debtors had legal standing to pursue foreclosure proceedings against the

---

[6] The individual identified as the Person Most Knowledgeable for GMACM also claimed that he was the PMK for Residential Funding Corporation.  *Exhibit 7 at p. 8.*

1    plaintiffs' home, the foreclosure would still be unlawful because the debtors failed to comply with

2    Nevada's non-judicial foreclosure statutes. The only defense offered by the debtors against these

3    claims was that said statutes were not applicable because the charged statutes did not become

4    applicable until July 1, 2009, long after the Notice of Default was filed in February, 2009.

5        23.    The plaintiffs' first claims for relief were founded upon the defendants' alleged failure

6    to comply with certain provisions of the Nevada Revised Statutes, namely sections 107.080, 107.085,

7    107.086, 107.087 and 107.090.  In 2009, Nevada adopted what is known as its mandatory

8    Foreclosure Mediation Program.  The essential terms of this program were codified through

9    amendments to certain sections of the Nevada Revised Statutes, primarily NRS §107.080, §107.085,

10   and §107.090.  More significantly, Nevada added two key statutes which related primarily to the

11   foreclosure mediation program, namely NRS §107.086 and §107.087.  Pursuant to these statutes, to

12   lawfully commence a foreclosure action, the trustee was first required to obtain a certification

13   establishing that it he/she had participated in the program in good faith.  *See, Edelstein v. Bank of*

14   *New York Mellon*, 128 Nev. Adv. Op. 48, 286 P.3d 249 (Sept. 27, 2012), *see also, Pasillas v. HSBC*

15   *Bank USA,* 127 Nev. Adv. Op. 39, 255 P.3d 1281 (2011).

16       24.    The debtors' argument that these statutes did not apply fails for two reasons.  First,

17   certain parts of N.R.S. §107.085 (which required personal service of a specialized notice to owner-

18   occupied property) were in effect since 2003, and the debtors completely failed to comply with those

19   provisions.  Second, as was readily acknowledged by ETS's PMK, because GMACM engaged in a

20   loan modification plan pursuant to which it accepted further payments from the plaintiffs, ETS was

21   thereafter obligated to restart that foreclosure process.  Had ETS done so that process would have

22   started after July 1, 2009, and the new statutes would have applied.

23       25.    Contrary to the debtors' arguments, NRS §107.085, had been in full force and effect

24   since 2003.[7]  Under this statutory section, no later than 60 days before the date of the sale (in this

25   case June 14, 2009) the debtors were required to personally serve the plaintiffs with a notice **(along**

26   **with a copy of the promissory note)** which contained very detailed information.  *See, Exhibit 10.*

27   ───────────────

28       [7] For the convenience of this Court the claimants have attached a copy of the pre-2009
     version of NRS §107.085.  *See, attached Exhibit 10.*

9

1    Because the debtors failed to comply with this statute, the foreclosure action was entirely unlawful.

2    In addition, pursuant to NRS §107.080(4)(a) (which had also been in effect for several years before

3    2009), the debtors were also obligated to provide the claimants with notice of the proposed trustee's

4    sale either by certified or registered mail.  In this case, the debtors claim that on July 23, 2009, they

5    filed a Notice of Trustee sale in Washoe County and posted a copy in three public places.  *See,*

6    *Objection ¶ 16.*  They further claim that they published the notice in the Sparks Tribune (a city sister

7    to Reno, Nevada).  *Id.*  However, the debtors made no showing that such notice was served upon the

8    plaintiffs by registered or certified mail.[8]  For these reasons, the foreclosure was also unlawful.

9        **A.  Because GMACM accepted further payments from the plaintiffs after the**
     **foreclosure process was stopped, they were thereafter required to restart the process which**
10   **would have necessarily occurred after July 1, 2009, making Nevada's Mandatory Foreclosure**
     **Mediation process applicable.**

11

12       26.    It is undisputed that in March of 2009, GMACM began working with the claimants

13   on a loan modification program.  It is also undisputed that as part of that process, the claimants

14   made, and GMACM accepted, three separate payments of $1,600.00.  Those funds were never

15   returned to the claimants.  *See, attached Affidavit of Pamela D. Longoni, ¶ 33, Exhibit 9.*  In his

16   deposition, ETS's PMK admitted that once GMACM received and applied these funds to the

17   plaintiffs' loan, the default amount would change and therefore the foreclosure process should have

18   been started anew and he had no idea why that did not occur.  *See, Ravelo Depo, Exhibit 8, pp. 122-*

19   *123, 127, 137.  See also, Aguirre deposition, Exhibit 7, p. 140.* Had the debtors done what ETS's

20   PMK testified they should have done, the debtors would have been required to participate in

21   Nevada's mandatory Foreclosure Mediation Program.[9]  Admittedly, they did not.

22

23       [8] To support their claim of compliance with these statutory sections, the debtors did
     nothing more than direct this Court to the generalized affidavit attached to the Trustee's Deed
24   Upon Sale wherein an ETS employee generally claims that "All requirements of Nevada
     Statutes" (including "personal delivery")  have been complied with.  This declaration proves
25   nothing. In fact, as noted above, it is clear that the debtors did not comply with N.R.S. 107.085
     by personally serving the plaintiffs with the notice (or a copy of the promissory note) as required
26   by that statute.  It is this false declaration which formed a basis for the plaintiffs' fraud claim.
     The representations are simply untrue.

27       [9] The debtors have attempted to avoid the implications of these facts by arguing that the
     claim would be barred by reason of certain provisions which were contained within the
28   Foreclosure Repayment Agreement that Nate Stephenson originally proposed.  *See, Objection, ¶*

**IV. The Plaintiffs' Fraud, Misrepresentation and Promissory Estoppel Claims are Entirely Valid as there is Irrefutable Evidence that Multiple GMACM Representatives Informed the Claimants That GMACM's Proposed Loan Modifications Were, in Fact, Fully Approved. The Evidence Is Also Irrefutable That GMACM Repeatedly Informed Longoni That All Foreclosure Actions Were on Hold.**

27.    In this case, the plaintiffs allege that in response to their application for a loan modification, they were told to make monthly payments of $1,600 while GMACM considered their request for a permanent modification to their loan. They admittedly made those payments, and during that time they were repeatedly told that the foreclosure process was on hold. They further claim that on June 30, 2012, Ms. Longoni was told by Mr. Stephenson that their request had been approved. The plaintiffs will now review the truly uncontroverted evidence which supports these factual allegations. This evidence consists of the Affidavit and Declaration from Loss Mitigation Specialist, Nate Stephenson, the debtors' own internal log notes (or diary), GMACM's correspondence, as well as email communications between Ms. Longoni and Mr. Stephenson.

28.    The entire process began with an inquiry Ms. Longoni made when she and her partner, Mr. Gagnon, suffered financial difficulties when he was transferred from Reno to Las Vegas. When Ms. Longoni inquired about a modification to their existing loan, she was told that before they could be considered for a loan modification, they had to be in default. Because she had received this information, the plaintiffs did not make their December 2008 payment. *See, Longoni deposition, Exhibit 23, pp. 52-54.* On or about January 15, 2009, Ms. Longoni sent a request for a loan modification to Homecomings Financial as she believed that was the lender on their loan. *See, Longoni Affidavit, ¶6, attached Exhibit 9, and letter of January 15, 2009, attached Exhibit 11.* On February 18, 2009, GMACM's notes reflect that a "workout package" was sent to the claimants. *See, attached Exhibit 12, bates page GMAC-01-0065.* The very next day (February 19, 2009), GMACM referred the matter to ETS to commence foreclosure proceedings. *Id. See, also, Ravelo deposition, Ex. 8, p. 63.* On March 5, 2009, GMACM received the claimants' completed financial package. *See, Exhibit 12, bates page GMAC-01-0067.* And on March 10, 2009, GMACM approved the matter for their loss mitigation program. *See, Exhibit 12, bates page GMAC-01-0068.* That same

---

*11.* However, the debtors fully admit that the claimants never executed this agreement. *See, Objection, ¶ 10.* Thus, this argument is entirely specious.

11

1    day, GMACM instructed ETS to place all foreclosure actions on hold until directed otherwise by

2    GMACM.  *See, attached Exhibit 13, bates page ETS-01-000005.*

3         29.     To assist its Loss Mitigation Specialists, GMACM adopted internal guidelines which

4    they referred to as their Servicer Guide.  *See, attached Exhibit 14, and Aguirre depo, pp. 158-159,*

5    *Exhibit 7.*  This guide identified the various options which were available for loss mitigation

6    specialists. The options included "Temporary Indulgence," "Repayment Plan," "Special Forbearance

7    Relief Agreement," "Deed-In-Lieu of Foreclosure," "Write Offs," "Bankruptcy" and, of course,

8    "Foreclosure."   Each had their own terms and conditions.   As the Court can see, GMACM's

9    "Repayment Plan" simply allowed a borrower to increase his/her payments over time to make up for

10   a deficiency, however, under a repayment plan, the loan would *not* be modified and there would be

11   no write off or debt forgiveness.  *See, Exhibit 14, bates p. RFC-001-000300, 369.*  In contrast, a

12   "Loan Modification" entailed a formal change in one or more terms of the original mortgage note.

13   Such changes could include a change to the interest rate, payment amount, maturity date, or the

14   principal balance of the loan.  *See, Exhibit 14, bates p. RFC-001-000378.*  Loan modifications could

15   be done under several plans such as "Traditional," "HAMP," "Second Lien Bulk" or "Framework

16   (Bush)."  *See, Exhibit 14, bates GMAC-02-000193.*  According to Mr. Aguirre, loan modifications

17   start as "trial" modifications and then they are changed to "permanent" modifications.  *See, Aguirre*

18   *Deposition, pp. 185-186, Exhibit 7.*  HAMP modifications (which are synonymous with "Obama"

19   modifications) came into effect in March of 2009, but GMACM did not start to use them until May

20   of 2009.  *Id. at 164-165,194.*  GMACM Loan Specialists could utilize either Traditional plans or

21   HAMP plans depending upon which option worked best for the borrower.  *Id. at* 165. According to

22   Aguirre, the specialist would look first to the Traditional modification, however, when the HAMP

23   program was enacted, it was used as the terms were more liberal for the borrower (i.e., reduced

24   interest rates, extended terms, etc.).  *Id. at 188-189.* This is precisely what occurred in this case.

25        30.     Confirming Mr. Stephenson's Declaration that all efforts at a Repayment Agreement

26   were abandoned in lieu of a permanent loan modification, (*Exhibit 1, ¶ 3*), GMACM's March 10,

27   2009 notes confirms that they were first going to pursue a Repayment Plan.  *See, Exhibit 12, bates*

28   *page GMAC-01-0068.*  This plan consisted of 3 monthly payments of $2,270.00, followed by a

balloon payment of $19,421.76  *Id.* Attached hereto as *Exhibit 15* is the *proposed* Foreclosure Repayment Agreement.  The addendum describes the payment schedule, including the balloon. When Ms. Longoni received this proposed plan, she contacted Mr. Stephenson and informed him that they could not afford the monthly payment of $2,270.00, and they would never be able to make any type of a balloon payment.  *S0ee, Longoni affidavit, Exhibit 9, ¶ 10.*  Mr. Stephenson's Declaration fully confirms this fact.  *Exhibit 1, ¶ 4.*  In response, Mr. Stephenson concluded that a Repayment Agreement was not a viable option for the plaintiffs, and as a result he made the decision to forego all attempts at a repayment plan and instead he pursued a permanent loan modification. *See, Stephenson Declaration, Exhibit 1, ¶ 4.*  GMACM's log notes from March 19, 2009, fully confirm that change.  *See, Exhibit 12, bates page GMAC-01-0072.*  This log note reads as follows:

> The borrower does not have enough savings to reinstate the loan and
> their financials do not support a repayment plan.

On the following page (*GMAC-01-0072*), GMACM's notes reflect Mr. Stephenson's Declaration that a "trial" loan modification was then being proposed.   That note reads as follows:

> Proposed Solution: GMAC Mortgage proposes a **3 month trial modification** consisting of a down payment of $1600 and a monthly contribution of $1600.  Upon successful completion of the trial the estimated mod terms will be: Mod Type; Cap: Interest Rate Type: ARM to ARM; Interest Rate: 3.25; Index Rate 3.9; Margin: -0.65; Arm Freeze: 5 year Freeze; NPV $10,737.80.  (Emphasis added)

31.    According to Mr. Stephenson, the loan modification plan that he proposed would included a three-month trial payment period during which time GMACM would decide whether to make the modification permanent.  It would also afford GMACM an opportunity to see if the borrowers could meet the agreed upon monthly payment.  *Id. at ¶ ¶ 4-6.*  As he confirms, because this was *not* a Repayment Agreement (Plan), there was no scheduled balloon payment.  And because this was not part of a Repayment Agreement, no new written Foreclosure Repayment Agreement was ever sent to Ms. Longoni.  *Id. at ¶ 6.*  Mr. Stephenson further confirmed that he never indicated to Ms. Longoni that they would be required to make any type of a balloon payment, thus they were never in breach of any such obligation.  *Id at ¶ 10. See, also, Longoni affidavit, Exhibit 9, ¶ 10.*

32.    GMACM's note of March 30, 2009, which confirms a debt forgiveness of $186,000.00 further confirms Mr. Stephenson's Declaration that his plan was *not* a Repayment Plan,

1   but rather, was the first step in a permanent loan modification plan as GMACM's internal guidelines

2   clearly state, Repayment Agreements do not entail any debt forgiveness. *Exhibit 12, bates page*

3   *GMAC-01-0073.* The proposed agreement also indicated that the interest rate would be frozen for

4   five years.[10]   The plan was set to commence on March 30, 2009.

5        33.   The debtors' claim that the plaintiffs were in breach of the Repayment Agreement is

6   further belied by the amount of the claimed balloon payment.  The debtors now claim that the

7   plaintiffs were in breach because they failed to pay the $19,421.76 balloon payment which was

8   required as part of the Repayment Plan that Mr. Stephenson had initially proposed. However, as the

9   debtors readily admit, that plan was never signed. *See, Objection ¶10.*  As Mr. Stephenson noted

10  in his Declaration, if his revised plan were a Repayment Plan with reduced payments of $1,600.00,

11  the balloon payment would have been far in excess of the payment called for in his initially proposed

12  Repayment Agreement. *See, Exhibit 1,Stephenson Declaration, ¶ 9.*

13       34.   The debtors' claim that the plaintiffs were in breach of the revised plan because they

14  failed to make timely $1,600.00 payments is also belied by both Mr. Stephenson's Declaration and

15  GMACM's diary notes.  Those notes reflect that on March 27, 2009, Longoni contacted GMACM

16  and requested a couple more days to make the first payment. *See, Exhibit 12, GMAC-01-0073.*  The

17  notes reflect that Mr. Stephenson granted Longoni an extension until April 3, 2009, and Longoni

18  made her payment within that time.  Subsequent notes (and Mr. Stephenson's Declaration) prove that

19  any delay in receipt of those payments was fully authorized by Mr. Stephenson (and GMACM).

20       35.   From this point forward, the communications between Stephenson and Longoni are

21  confirmed by email communications.  These actual email communications are attached hereto in

22  *Exhibit 16*.  For the ease of this Court, the critical communications have been placed into a table

23  which appears on the first page of the exhibit.  The communications between Longoni and

24  Stephenson begin on April 2, 2009, after Longoni had made the claimants first $1,600.00 payment.

25  She described the process she went through to make the payment.  She then asked Mr. Stephenson

26  when her next payment was due.  He told her it was due on April 30, 2009.  He followed that with

27

28        [10] As this Court likely noticed, according to GMACM's own Servicer Guide, Repayment
     Plans were for a maximum of 18 months.  *See, Exhibit 14.*

1    the following remark:

2                All that I am awaiting on in order to make this a permanent change
                (next 5 yrs) is approval from the Vice President of the Bank. I should
3                know the outcome in the next month (ish).

4    On April 28, 2009, Mr. Stephenson further stated:

5                " I just took a look at the notes on your loan and it looks as if one
                manager looked at it and agreed that it was a win win situation, but
6                because it is $186K that we are trying to write off, it has to go a little
                higher."
7

8        36.        On May 1, 2009, Longoni attempted to make her second payment to GMACM. *See,*

9    *Longoni Affidavit, Exhibit 9, ¶ 17.* She had made the first payment via an on-line payment system,

10   however, she was unable to do so when she tried to make the second payment. She also attempted

11   to make the payment by directly contacting a phone representative, however, that request was

12   refused. Because of these difficulties, Ms. Longoni again contacted Mr. Stephenson who explained

13   to her that someone had put a "Certified Funds Flag" on her account which meant that all payments

14   had to be certified. He told her that he had removed that flag. Four days later on May 5, 2009, Mr.

15   Stephenson sent the following message to Ms. Longoni:

16               According to what I see we rcv'd $1600 yesterday. You're good to
                go!!! It doesn't look like our VP has had a chance to look at this yet.
17               (We are swamped!!!!!!!!!) The notes that I saw are good though
                (indicating that it makes sense to do the Modification). **We still have
18               2 months before I would have to set up a plan. So everything is
                still sort of on hold.** (Emphasis added)

19       37.        According to PMK Aguirre, GMACM started to implement the HAMP program in

20   May of 2009. *See, Aguirre Depo, p. 165, Exhibit 7.* GMACM's Log Notes of May 22, 2009,

21   confirms this testimony through the following notation "Home Affordable Modification program

22   sent to borrower." *Exhibit 12, GMAC-01-0076.* By May 26, 2009, the claimants had still received

23   no documentation from GMACM regarding the modification. Therefore, Longoni sent a follow up

24   email asking if they should continue to make the $1,600 payment. *See, Exhibit 16.* Mr. Stephenson

25   sent a response advising "yes," and he added that he expected an update soon and once a decision

26   was made then "paperwork will be sent out with the new terms." And, while it is true that Mr.

27   Stephenson indicated that he was going to be moving to a new team *the following week*, he never

28   indicated that he would have no authority to speak on behalf of GMACM. In accordance with Mr.

15

1    Stephenson's instructions, Longoni made their third payment on June 1, 2009. Still she heard

2    nothing. *See, Longoni Affidavit, Exhibit 9, ¶ 18.*

3        38.    The debtors now claim that the plaintiffs breached the Repayment Agreement when

4    they failed to make the required balloon payment which would have been due on June 30, 2009.

5    They further claim that the foreclosure process was only restarted *after* the claimants failed to pay

6    the balloon payment. However, GMACM's notes prove otherwise. In this regard, a note dated

7    March 30, 2009 (bates page GMAC-01-0073), reflects the entry "Promise Broken 03/30/09," and

8    it is followed by a note dated 4/10/09 which states "Foreclosure Started." (Bates p. GMAC-01-0074).

9    A note of 4/30/09 also states "Promise Broken 04/30/09" and is followed by a note of 5/8/09 stating

10   "Foreclosure Started." Finally, a note dated 6/1/09 once again states "Promise Broken" and is

11   followed by a note dated 6/12/09 which states "Foreclosure Started." GMACM's notes clearly

12   disprove the debtors' current claim that the foreclosure occurred only because of the plaintiffs'

13   failure to pay a balloon payment. Accepting as true GMACM's log notes, the plaintiffs were in

14   breach from the very moment they didn't make the first $2,270.00 payment. Nevertheless, GMACM

15   continued to accept their $1,600.00 payments, telling them they were "good to go."

16       39.    The debtor's current argument that foreclosure was restarted after the failure to make

17   the June 30, 2009 balloon payment is further belied by a log note dated July 2, 2009, from LHUCK

18   ( Landon Huck) which states the following: "CALLED HOME LEFT MESSAGE. WILL NEED

19   NEW HMP IN ORDER TO REVIEW FOR MOD. PLS HAVE BWR FAX TO 866-709-4744.*"

20   Exhibit 12, bates page GMAC-01-0077.* If GMACM had declared the plaintiffs in breach of their

21   Repayment Plan, (and had decided to pursue foreclosure) why was Mr. Huck asking them to submit

22   a HAMP work-up? The following note confirms his request to mail out such a package. *Id.*

23       40.    During the later part of June, Longoni had made several attempts to speak to a new

24   Loan Specialist, however, she could never contact anyone who knew the status of their request.

25   Therefore, she again reached out to Mr. Stephenson. The following email exchange occurred.

| 6/29/09 | Pam to Nate | Nate, I can't seem to get a hold of anyone who knows anything about the modification you were working on. Homecomings sent me information indicating that my payment was as it was before, and the balance was the same. Please help!!!! |
|---------|-------------|---|

16

| 6/30/09 | Nate to Pam | Hi Pam, I e-mailed my old dept yesterday and they responded that the file has been sent for final management approval. The person handling the file is Landon Huck. I hope that this helps you. Good luck. |
|---|---|---|
| 6/30/09 | Pam to Nate | Hi Nate, do you have any contact information for Landon? Thank you for still helping us. Hope you are having a nice summer. Pam |
| 6/30/09 | Nate to Pam | Hi Pam, I am sorry I am not able to give you the contact info. **I did, however, rcv an e-mail stating that the MOD had been approved yesterday, but that is all I know.** You may want to call in and see if you can get some more details. Thanks, Nate |
| 6/30/09 | Pam to Nate | Nate, when I call the regular Homecomings 800 number, no one knows any information. Do you have a suggestion as to what department I could start with? So it was approved? Does that mean the $1600 payment and the principal reduction? Wow! |
| 6/30/09 | Nate to Pam | You might be able to try 1 800 799 9250 |
| 6/30/09 | Pam to Nate | So "approved" means $1600 a month and the principal reduction? |
| 6/30/09 | Nate to Pam | That is the way that I had it set up, however, I am not sure if that was how it was approved or not. Thanks, Nate |

41.     The debtors now argue that these statements are too vague to support either a modification of the plaintiffs' existing loan, a new contract, or even promissory estoppel as this email does not prove that the approval Stephenson described related to the plan that he had originally proposed. This disingenuous argument, however, is once again disproven by GMACM's own employees. In this regard, PMK Aguirre fully acknowledged that there was only one loan modification plan that was ever proposed by Mr. Stephenson, and that was the one which Stephenson had described to Longoni, namely $1600 payments, with a $186,000.00 write down. *See, Aguirre Deposition pp. 264-266, attached Exhibit 7. See also, Exhibit 12,* (*GMAC-01-0072*)

42.     Beginning on July 1, 2009, Longoni attempted to make her next payment of $1,600.00, however, the system would not accept that payment. *See, Longoni Affidavit, Exhibit 9, ¶ 21.* On July 9, she was finally able to make contact with a representative of GMACM. The individual she spoke with was named Henry. *Id.* During that call, she asked Henry about the status of her loan modification as she had been told on June 30, 2009, that it had, in fact, been approved. Much to her shock and amazement, Henry told her that it was *not* approved, that she owed

17

1  approximately $19,000.00 and that if she did not pay it, they would sell their home.  She attempted

2  to make the next payment of $1,600.00, however, he refused to accept it.  He told her that it was only

3  set up for three months.  As both Ms. Longoni and Mr. Stephenson acknowledged, no one had ever

4  told the plaintiffs that the payment plan was only for three months, or that there was a balloon.

5       43.    Moreover, even though Henry told Ms. Longoni that she needed to pay $19,000.00

6  (or her home would be sold), Henry nevertheless advised her to submit a new workout package as

7  per the Obama Modification plan.  *See, Longoni Affidavit, Exhibit 9, ¶ 21.*  He told her that they had

8  60 days to continue to pursue a loan modification through this new federal program.  Critically, he

9  specifically told Ms. Longoni that the foreclosure would be on hold through this process.  *Id.*  Thus,

10 according to Longoni, she believed that under the worst case scenario, they had until at least until

11 September 9, 2009, to qualify for the new federal modification program.   Ms. Longoni's claim is

12 fully confirmed in GMACM's log note of July 9, 2009, which reads as follows:

13      TTB1 [talked to borrower] VAI [verified account information] CI BC
        WANTED TO INQ MOD THAT WAS APPROVED RECENTLY.
14      ADV NT TRUE.  ADV PREV REPAY PLAN IS COMPLETED.
        ADV TO RETURN WOUT PCK ASAP, TAT IS 60 DAYS, NO
15      GUARANTEED.  I TRIED TO UPDATE DTI CALC BUT B DID
        NT KNOW HER GROSS INCOME. SD SHE WOULD CB TOMO
16      SHE HAD TO GO TO WORK.

17                    *    *    *
        PAYCUT START: 9/2008 ONGOING.  M/I; 1800 A MONTH.
18      **ADV F/C SALE DT ON HOLD**, L/C AND C/R CONT. HCASAS.

19 *See, Exhibit 12, bates page GMAC-01-0078 (emphasis added).[11]*  This note fully confirms Longoni's

20 claim that Henry also told her that the foreclosure was only hold.  Henry's representations were

21 further confirmed by Mr. Stephenson in an email which read as follows:

22      Pam, It looks like they are trying to put you onto an Obama Modification. **Your
        Foreclosure is on Hold.  GMAC does not want to take your house.** When we last
23      talked I said that from the information that I could gather from my old dept. this was
        waiting to be approved by management.  I am not sure what happened with that, but
24      when I had originally set you up it was a traditional GMAC Mod.  We are now trying
        to put everyone into the Obama plan.
25
26 See, Exhibit 16.

27  _____

28      [11] GMACM's PMK, Aguirre confirmed that this was a note written by Henry Casas.  *See,
        Aguirre Deposition, Exhibit 7, pp. 247-248.*

                                18

44.    There is absolutely no evidence that anyone from GMACM or ETS ever told the plaintiffs that foreclosure efforts were not on hold.  The debtors' current claim that the plaintiffs should not have relied upon these representations is truly offensive.  This irrefutable evidence proves that GMACM had, in fact, approved the permanent loan modification which had been proposed by Mr. Stephenson, however, subsequent to that time GMACM decided to try and place the plaintiffs into a HAMP modification.  GMACM's actions to continue to have the claimants *requalified* for the HAMP program are confirmed through another entry in GMACM's diary.  In a note dated July 13, 2009, yet another GMACM representative telephoned Longoni and left a message saying that they needed a completed Obama package back to review the account for a possible loan modification. *See, Exhibit 12, GMAC-01-0079.*  At the same time that GMACM was telling Longoni to continue efforts to qualify for the HAMP program, GMACM sent the plaintiffs an automated letter dated July 17, 2009, which stated that, "[T]he repayment plan we previously established at your request has been cancelled for one or more of the following reasons:"

> [[x]] The payment was not received by the payment date *as specified in the signed repayment agreement*. (Emphasis added)

*See, attached Exhibit 24.*  It is wholly undisputed that there never was a signed repayment plan and thus it is obvious that there was a huge disconnect between GMACM's employees.

45.    Despite the debtors' current claim that GMACM made the decision on July 15, 2009, to complete the previously started foreclosure (because the plaintiffs breached the repayment plan and their non-responsiveness to the company's outreach efforts,[12] *see, Objection ¶ 15),* GMACM continued to mislead the claimants into believing that a permanent loan modification was available.  On July 29, 2009, GMACM directed the sending of a letter with yet another Financial Analysis Form. *See, Exhibit 12, GMAC-01-0081.*  GMACM's log note of that day contains the following entry:  "obama workout package provided in today 30 days to sale (no contact) letter."  The letter referenced in this log entry (which is dated July 30, 2009) is attached hereto as *17.*  As the Court will

---

[12] Again, the debtors have not offered this Court an affidavit from any witness who states that the foreclosure was restarted for these reasons.  In fact, the debtors have never shown this Court that the recommencement was the result of anything other than an automated action of their computer system.

19

note, that letter specifically contained a note which reiterates the "30 days to sale" notation that was referenced in the GMACM log notes.  The plaintiffs were not given 30 days.

46.    Having heard nothing further from GMACM, on August 3, 2009, Longoni sent another email to Nate Stephenson explaining how she was getting no assistance from GMAC and that she had gotten some notice in her mail from some place called ETS saying that her house was going to be sold at auction on the 18th.[13]  Again, Mr. Stephenson responded telling her that she needed to send the workout back to GMACM.  The following day (August 4, 2009) Longoni received a package from Fed Ex Express.  *See, Longoni Affidavit, Exhibit 9, ¶ 27.*[14]  Longoni returned the package on August 10, 2009.[15]  *See, Exhibits 9, ¶¶ 27-28, and Exhibit 19.*

47.    Not knowing that her home had been sold on August 14, 2009, on August 24, 2009, Longoni telephoned GMACM to inquire about the status of her newly-submitted loan modification request. *See, Longoni Affidavit, Exhibit 9, ¶ 29.*  She advised the representative that she had received an email from Nate Stephenson on July 9, 2009, stating that the foreclosure was on hold and that she believed GMACM was trying to get them qualified under HAMP program.  The representative told her that her home had been sold at foreclosure on August 14, 2009.  Longoni told her that she wanted her home back, but  was told that she would need to speak with the representative's supervisor who was gone for the day.  *Id.*  Again, GMACM's log notes fully confirm Longoni's testimony.  *See, Exhibit 12, bates pages GMAC-01-0086-87.*  This diary note is critical for several reasons.  First it shows that Longoni did not know her home had been sold at foreclosure.  It also shows that Longoni specifically referenced the **July 9, 2009** email that she undisputedly received from Mr. Stephenson.

48.    At two points in their instant Objection, the debtors quite recklessly claim that

---

[13]  According to Longoni, she believed this was junk mail that had been sent in error as she had received notice that their request for a permanent modification had been approved.

[14]  Attached *Exhibit 18* is a confirmation from Fed Ex showing that this package was received by Ms. Longoni on August 4, 2009.

[15]  In their Objection, the debtor's counsel declares to this Court that GMACM's records do not reflect receipt of this package.  Obviously, GMACM's counsel would not have personal knowledge of this fact.  She also states that Longoni never referenced having returned this package, however, Longoni's August 24, 2009 email clearly reflects the fact that she "promptly returned" the workout package to GMAC.

1    Longoni fraudulently fabricated an email which purported to prove that on August 3, 2009,

2    Stephenson had sent her an email which purportedly stated, "Don't worry your foreclosure is on

3    hold." *See, Objection paragraph 28  (wherein the debtor's counsel actually quotes the alleged*

4    *fraudulent representations, as well as paragraph 65).*  To support this allegation, the debtors'

5    counsel attached (as Exhibit 38) the email which she claims came from Pamela Longoni on August

6    3, 2009.  However, a review of this purported email clearly reveals that GMACM's representations

7    are false.  The only reference to an email is one dated August 24, 2009, which is a *forwarded* email

8    (See, FW in Subject line) of Longoni's previous August 3, 2009 email to Nate Stephenson.  This

9    email most certainly does not contain the phrase quoted by GMACM's counsel (i.e., Don't worry

10   your foreclosure is on hold").  Longoni did not "materially alter evidence," "forge a key document"

11   or "falsify an August 3, 2009 email with Nate Stephenson."  Longoni did nothing more than *forward*

12   her exact email communications with Nate Stephenson between July 9, 2009 and August 3, 2009.

13        49.     Although GMACM's Exhibit 38 does not prove any misrepresentation by Longoni,

14   it does provide great evidence of GMACM's acknowledgment of fault in this matter.   Further on

15   down this email chain, the Court will see an August 26, 2009 email that GMACM employee Logan

16   Gill sent to Benjamin Willis.  In that email, Mr. Gill stated the following:

17            Hopefully you can help me out with this.  Basically the long and
              skinny is that Nate told this lady the foreclosure was on hold when it
18            is not and it went to 3rd party sale.  He now knows not to email
              borrowers/3rd parties and will definitely be held responsible for his
19            actions, but would this fall under the mod teams cost center as far as
              the rescind process is concerned?  I am willing to do the leg work on
20            it if I need to but I just need to figure out where this would fall.
              Thanks in advance for all your help.
21

22        50.     The Claimants' account of the facts in this case are entirely confirmed by Mr.

23   Stephenson's sworn affidavit and declaration.  *See, Exhibit 1.* Moreover, GMACM's conduct after

24   the August 14, 2009 foreclosure further proves the error which is reflected in Mr. Gill's email quoted

25   above.  As set forth in Ms. Longoni's attached Affidavit, on September 9, 2009, she received an

26   unsolicited telephone call from GMACM's counsel Michael Knapp, Esq., who told her in no

27   uncertain terms that GMACM made a terrible mistake.  He told her that they were attempting to

28   recover her home and that she would not have to move out. *See, Longoni Affidavit, Exhibit 9, ¶ 35,*

21

*and Exhibit 25, a copy of her Verizon telephone bill reflecting the 8 minute call.*  Although the debtors initially denied admitting the error or taking actions to recover the plaintiffs' home from the new purchaser, both Messrs. Aguirre and Ravelo testified that they were fully aware that such actions had been undertaken.  *See, Aguirre deposition, pp. 255-56, Exhibit 7, and Ravelo deposition, pp. 127-129, Exhibit 8.*  Moreover, during the course of discovery, the plaintiffs recovered a proposed Settlement Agreement pursuant to which GMACM sought to buy back the plaintiffs' home.  *See, attached Exhibit 20.*[16]  After the sale, GMACM also undertook took steps to completely remove from the claimants' credit records all negative references, both as to any default in their loan as well as the foreclosure.  Attached hereto as *Exhibit 21* are letters and emails sent by GMACM's counsel relative to this process.  *See, also, Longoni Affidavit, Exhibit 9, ¶ 37.*

51.    Based upon the foregoing, several things are irrefutable.  First, the claimants never defaulted upon any Repayment Plan by failing to make a balloon payment.  The proposed Repayment Plan was abandoned in March of 2009, in favor of a Loan Modification.  Second, the claimants made each of the $1,600 payments called for under the "Trial" modification plan and as of June 29, 2009, GMACM approved their request for a permanent loan modification.  Third, On June 30, 2009, Mr. Stephenson communicated that approval to the plaintiffs *in writing*.  Fourth, after June 29, 2009, GMACM decided to change the claimants' loan modification plan from the Traditional plan to a HAMP modification.  Fifth, during this process, Nate Stephenson and Henry Casas both informed Ms. Longoni that all foreclosure efforts were on hold and the claimants were never told otherwise.[17]  And finally, GMACM fully admitted their errors after the August 14, 2009 sale.

**V. The Claimants' Breach of Contract and Fraud and Misrepresentation Claims are Valid.**

---

[16] Apparently, the purchaser wanted more than the $4,000.00 that GMACM was willing to pay for the return of the home.

[17] While Longoni acknowledged in her August 3, 2009 email to Stephenson that she had received some notice from "ETS" that her home was going to be sold on August 19, 2009, she believed that such notice had to be in error as GMACM had told her that her modification was approved and they were still working to get them approved for a HAMP modification.  *See, Longoni Affidavit, ¶ 29.*  It is also undisputed that the formal Notice of Trustee's Sale came back to ETS as undelivered.  *See, attached Exhibit 22.*

52.    The debtors made the very same challenge to the plaintiffs' Fraud and Misrepresentation claims before the Nevada District Court, however, that court expressly found that the claims stated valid claims for relief. *See, Longoni v. GMAC Mortg., 2010 WL 5186091, at *4.* The debtors now seek to reargue the law of the case, claiming that the only false statement of fact that the claimants can remotely point to is Mr. Stephenson's June 30, 2009 statement that he had received an email stating that their modification had been approved the prior day (which the debtors claim he corrected that same day). *See, Objection, ¶ 45.* This is simply untrue. After Mr. Stephenson told Longoni that the request for a permanent modification had been approved, he did not tell her that modification was not approved, all he did was tell her that he was not certain of the exact terms of the modification. He did say that was how he had it set up. Thus, Mr. Stephenson's subsequent statement was not a retraction of his previous statement. The moment that Mr. Stephenson advised Ms. Longoni that their loan modification had been approved, an enforceable agreement was created. The plaintiffs sought a modification, made payments toward that application, and they were told it was approved. [18]

53.    GMACM now seeks to deny the existence of this agreement by claiming that nine days after Mr. Stephenson told Longoni that their request for a permanent loan modification had been approved, Henry Casas told Ms. Longoni that there was no such approval. The argument is fatally flawed. Mr. Casas' statements to Ms. Longoni on July 9, 2009, did not vitiate the agreement, he simply repudiated the agreement which has been fully confirmed by Mr. Stephenson. This Court should take very special note of the fact that the debtors have not offered this Court any admissible evidence that GMACM did not, in fact, approve the plaintiffs' initial loan modification request. [19]

54.    Additionally, GMACM's representation that the claimants are asserting only one false promise as the basis for their fraud claim is also quite erroneous. As was aptly noted by the Nevada

---

[18] As will be addressed below, contrary to the debtors' current arguments, that agreement was not in violation of the statute of frauds as it is clearly proven through writings, including Mr. Stephenson's June 30, 2009 email communication and GMACM's own diary notes.

[19] The debtors claim they could not find the email Mr. Stephenson referred to in his email of June 30, 2009, however, their PMK admitted that they never even looked for it. *See, Aguirre deposition, pp. 170-171, 176-177.*

23

1   federal district court (when it denied the debtors' first motion to dismiss), the plaintiffs' fraud claim

2   was based upon **two** alleged false representations.  The first related to the promise that the loan

3   modification had been approved.  The second false promise was that the foreclosure was on hold.

4   As the Nevada Court properly concluded, the plaintiffs relied upon these statements in making the

5   $1,600.00 payments *and* by making no preparations to leave their home, thereby incurring additional

6   moving costs and rental expenses.  Moreover, as is set forth in Longoni's attached Affidavit, had she

7   known that the promises of a stayed foreclosure were false, she would have pursued other means by

8   which to bring the home out of foreclosure.  *See, Longoni Affidavit, Exhibit 9, ¶ 43.*  She quite

9   reasonably relied upon the representations of both Messrs Stephenson and Casas.  As such, the fraud

10  and misrepresentations claims are clearly valid.

11          **VI.    The Plaintiffs' Negligent Misrepresentation Claims Are Entirely Valid.**

12          55.      Debtors claim that the Plaintiffs' fourth claim for relief entitled "Negligence and

13  Negligent Misrepresentation" fails to state a viable claim because the debtors owed the plaintiffs no

14  duty of due care.  However, the specific roles of the parties within this action illustrate both a duty,

15  and a myriad of viable negligence claims.  As the debtors argue, a lender generally owes no duty of

16  care to its borrower.  However, "this is only true in a lender's conventional role as a mere lender of

17  money. It does not indicate that lenders (or others such as ETS who had no lender-borrower

18  relationship with the plaintiffs) have no duty of care in foreclosure proceedings." *Weingartner v.*

19  *Chase Home Finance, LLC*, 702  F. Supp. 2d 1276, 1290 (D.Nev 2010).  The duty of care applicable

20  to foreclosures is, at a minimum, defined by Nevada's foreclosure statutes.  "These statutes set the

21  floor of the duty of care for a foreclosing entity." *Weingartner, Id*. at 1291.

22          56.      The standards of negligence *per se*  are well established at Nevada law.  "A violation

23  of statute establishes the duty and breach element of negligence only if the injured party belongs to

24  the *class* of persons that the statute was intended to protect, and the injury is of the *type* against

25  which the statute was intended to protect." *Anderson v. Baltrusaitis*, 113 Nev. 963, 965, 944 P.2d

26  797, 799 (1997)  The amended complaint reflects violations of various sections of the foreclosure

27  code,  NRS 107.080, *et seq*., which establish negligence *per se* type claims. (*See*, #32, ¶¶ 27-34;

28  ¶¶64-66.)  This alleged violation of statutory duties in and of itself is sufficient to state a negligence

1  claim. *Weingartner,* 702 F.Supp. at 1290.

2      57.    Moreover, claims for negligent foreclosure have been allowed to proceed to trial

3  before a jury. *See, Gunsul v. Countywide Home Loans, Inc.*, 2006 WL 3586091, **2-6 (Wash.App.)

4  (negligent foreclosure claim allowed to proceed due to material issue of fact as to whether a lender

5  failed to timely provide exact pay off information required to stop foreclosure); *Lenett v. World Sav.*

6  *Bank*, FSB, 2008 WL 2009757, *2 (Cal. App. 2d) (case submitted to trial against lender on claim

7  of negligent foreclosure).  On a related note, "wrongful foreclosure" clearly involves an element of

8  negligence, and probable negligence per se when statutory violations are involved.   This cause of

9  action is recognized under Nevada law.   "An action for the tort of wrongful foreclosure will lie if

10  the trustor or mortgagor can establish that at the time the power of sale was exercised or the

11  foreclosure occurred, no breach of condition or failure of performance existed on the mortgagor's

12  or trustor's part which would have authorized the foreclosure or exercise of the power of sale."

13  *Collins v. Union Federal Sav. & Loan Ass'n*, 99 Nev. 284, 304, 662 P.2d 610, 623 (1983).

14        **A.    Negligent misrepresentation is also properly stated.**

15      58.    Negligent misrepresentation in Nevada is defined as follows:

16        One who, in the course of his business, profession, or employment,
        or in any other action in which he or she has a pecuniary interest,
17        supplies false information for the guidance of others in their business
        transactions, is subject to liability for pecuniary loss caused to them
18        by their justifiable reliance upon the information, if he or she fails to
        exercise  reasonable  care  or  competence  in  obtaining  or
19        communicating the information.

20  *Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 449, 956 P.2d 1382, 1387 (1998), *quoting* Rest. 2d of

21  Torts, § 552(1)(1976). Elements toward satisfying these requirements of negligent misrepresentation

22  may be found within the Third Amended Complaint.  Very similar factual circumstances to those

23  alleged herein have been found to state viable causes of action for negligent misrepresentation.  For

24  example, in *Ghervescu v. Wells Fargo Home Mortgage Co.*, 2008 WL 660248 (Cal. App. 4th)

25  (unpublished), a property owner was given misinformation about a notice of default.  He was in the

26  process of applying for a forbearance agreement, and was never told that the application had been

27  denied.  He was further told that he would have ample time to "make arrangements" to cure any

28  default and reinstate the loan since any trustee sale could not be held earlier than a certain fixed date.

25

*Id.*, \*\*1-2.  Instead, and approximately five weeks prior to that fixed date, the property owner, when

following up regarding his pending application, was told that the Trustee Sale had already been held.

*Id.*, \*2.  The California court applied a negligent misrepresentation standard all but identical with

Nevada's. *Id.*, \*3.  With an eye toward these allegations, that court allowed the plaintiff's negligent

misrepresentation claim to proceed for the lower court's consideration. Id., \*6.  *See also*, *of similar*

*effect*, *Fidelity Mortgage Trustee Service, Inc. v. Ridgegate East Homeowners Assoc.*, 27 Cal. App.

4th 503, 506, 32 Cal. Rptr. 2d. 521, 523 (1994) (claim as to whether mortgage trustee had negligently

misrepresented that foreclosure proceedings would be delayed allowed to proceed to the jury).  Based

upon the foregoing, the plaintiffs have clearly stated a viable claim for negligent misrepresentation.

The evidence unequivocally demonstrates that the debtors made false statements of fact which were

quite reasonably relied upon by the claimants to their great detriment.  Thus, the claims are valid.

**B.      Even assuming a "no duty" rule applicable to lenders, an exception to
such "no duty" rule is stated by the complaint's averment.**

59.    Moreover, based on the same misrepresentations, and purported efforts towards loan

modification reflected within the Third Amended Complaint, said averments fall within an exception

to any purported "no duty" rule.  For example, within *Wiseman v. Hallham*, 113 Nev. 1266, 1270,

945 P.2d. 945, 947-48 (1997) the Nevada Supreme Court adopted the Restatement (Second) of Torts

§ 323 (1965), which appears equally applicable here. That section provides:

> One who undertakes, gratuitously or for consideration, to render
> services to another which he should recognize as necessary for the
> protection of the other persons or things, is subject to liability to the
> other for physical harm resulting from his failure to exercise
> reasonable care to perform his undertaking, if: (a)the failure to
> exercise such care increases the risk of such harm; or (b) the harm is
> suffered because of the other's reliance upon the undertaking.

60.    Here, once GMACM undertook efforts at loan modification GMACM fell within the

parameters of the above-referenced exception to the "no duty" rule.  Although they may have had

no legal obligation to engage in loan modification discussions with the plaintiffs, once they did so,

they needed to act in a non-negligent fashion.  Telling the plaintiffs their application for a loan

modification had been approved, or even just telling them the foreclosure was on hold when it was

not (as was admitted by Mr. Gill), GMACM assumed a legal duty and then breached it.

**C.    A claim for negligent infliction of emotional distress is also stated.**

61.    To state a claim for NIED within the wrongful foreclosure context, the plaintiffs "must establish, at the very least, the traditional elements of negligence, and allege verifiable physical manifestations of emotional distress." *Simon v. B of A*, 2010 WL 2609436, *12 (D.Nev.), *citing, Betsinger v. D.R. Horton, Inc*., 126 Nev. 17, 232 P.3d 433 (2010).  The plaintiffs have pled all such elements, and as is set forth below, they have shown the requisite physical manifestations necessary for an award of damages under a negligent infliction of emotional distress claim.  *See also, Betsinger v. D.R. Horton, Inc*., 232 P.3d at 436 (putative mortgagor's jury award against mortgagee reversed, since putative mortgagor had failed to present any evidence that he had suffered physical manifestation of emotional distress).[20]  Furthermore, plaintiffs have averred a legally sufficient claim that the underlying foreclosure was wrongful, which also establishes a properly pled claim.  *See*, e.g., *Sattari v. Wash. Mut*., 2010 WL 3896146, *4 (D. Nev.)(summary judgment on NIED claim granted where defendant acted improperly in foreclosure process).

**VII.  The Claimants' Breach of Contract and Promissory Estoppel Claims are entirely valid.**

62.    As the debtors have properly noted, to prove the breach of contract claim they need only show the existence of a valid agreement or contract between the parties, a breach of contractual terms by the defendant, and damages.  *Tene v. BAC Home Loan Servicing, LP,* 2012 WL 222920*, *2 (D. Nev. Jan. 25, 2012).  In this case, the evidence set forth above clearly proves there was an agreement to modify the claimants' mortgage loan.  The plaintiffs were told to make payments as part of their application for a loan modification, they were told what the new terms would be if approved, and after they made the required payments they were told their request was approved.  A contract was formed at that point.  The debtors erroneously claim that this agreement is unenforceable under Nevada's applicable statute of frauds, namely NRS §111.220(1) since it would

---

[20] The mere allegations reflected within the complaint, wherein the plaintiffs' home was wrongfully sold from underneath their feet, constitutes extreme and outrageous behavior.  Notably the *Betsinger* case made no contention that "extreme and outrageous" behavior was not shown within context of the failed real estate transaction.  It reflects that the Nevada Supreme Court will recognize  emotional distress claims within the mortgagor/mortgagee context, and this federal court, as one sitting in diversity jurisdiction, must apply the substantive law of the forum state in which it resides. *Adelson v. Hananel*, 2009 WL 2835119, *3 (D. Nev.).

27

1    be an agreement which by its terms cannot be performed within one year from its execution.  Again,

2    these arguments are erroneous.  As set forth in *Pinnacle Fitness and Recreation Management v.*

3    *Jerry and Vickie Moyes Family Trust,* 2013 WL 1932888, the contract could be fully performed in

4    one year.  The claimants could have immediately sold the home to another or refinanced the loan

5    through another lender. Thus, the statute of frauds does not even apply.

6        63.    Secondly, the debtors have erroneously argued that the agreement itself had to be in

7    writing and signed by the party to be charged.  However, this is incorrect.  Writings which satisfy

8    the statute of frauds do not necessarily equate with common notions of what does, or does not,

9    constitute a contract or written agreement.  First, NRS 11.220 itself references merely "notes or

10   memorandums" of the agreement being in writing. The exchange of a series of email correspondence

11   between GMACM and Longoni satisfies all elements of contract formation and all essential elements

12   of the contract.  The emails reflect terms, dates sent, identity of the drafters, and signatures.  Under

13   Nevada law, this exchange of electronic communications is sufficient for contract formation.  *See,*

14   NRS 719.240(3)("If a law requires a record to be in writing, an electronic record satisfies the law.");

15   NRS 719.100 ("'Electronic signature' means an electronic sound, symbol or process attached to or

16   logically associated with a record and executed or adopted by a person with the intent to sign the

17   record.")  This concept is not unique to Nevada.  *See, Bronner v. Park Place Entm't Corp.*, 137 F.

18   Supp. 2d 306, 312 (S.D.N.Y.2001)(a series of correspondence and memoranda may constitute an

19   agreement that satisfies the Statute of Frauds);  *Gordon v. Beck & Gregg Hardware Co.*, 40 S.E.2d

20   428, 432 (Ga. App. 1946)(statute of frauds may be satisfied by series of writings internally connected

21   and intelligible without parol aid and showing an agreement coextensive with the stipulations of the

22   alleged contract).  *See, also, Pinnacle Fitness and Recreation Management v. Jerry and Vickie*

23   *Moyes Family Trust,* 2013 WL 1932888 * 4 (email exchange between parties sufficient to establish

24   an enforceable agreement).

25       64.    To whatever extent the former mortgage requires that modification be in writing,

26   these subsequent exchanges also comply with the terms of the initial mortgage.  *See*, *T & Beer, Inc.,*

27   *v. Wine Source Selections*, LLC 2012 WL 360286, *3 (N.J.Super. A.D. (Unpublished opinion)(series

28   of e-mails satisfied requirement that modification of terms of agreement must be in wringing and

28

signed by the parties).   More importantly, GMACM's own agent admits the agreement existed.

Thus, the issue is entirely moot.

### A.  The claimants' Promissory Estoppel Claim is also fully established by the record in this matter.

65.    Even if this court feels that the writing requirement is not met, promissory estoppel renders the promises made by GMACM fully enforceable. As the debtors have fully acknowledged, promissory estoppel may serve as an exception to the statute of frauds in very particular circumstances.  *Nieto v. Litton Loan Servicing*, LP, 2011 WL 797496, * 3 (D. Nev. Feb. 23, 2011). Nevada follows the doctrine of promissory estoppel articulated in the Restatement (Second) of Contracts §90 which provides as follows:

> A promise which the promisor should reasonably expect to induce
> action or forbearance on the part of the promisee or a third person and
> which does induce such action or forbearance is binding if injustice
> can be avoided only by enforcement of the promise.  The remedy
> granted for breach may be limited as justice requires.

*Dynalectric Co. V. Clark & Sullivan Constructors, Inc.,* 127 Nev. Adv. Op. No. 41, 255 P. 3d 286, 288 (2011), *quoting* Restatement (Second) of Contracts, sec. 90(1)(1981).  In this case, there can be no doubt but that GMACM's employees made multiple promises to the claimants that they relied upon. From the inception Mr. Stephenson told the plaintiffs that the foreclosure was on hold.  Next, Mr. Stephenson promised the claimants that GMACM had approved their loan modification request. Third, even after Mr. Casas (Henry) told Ms. Longoni that Mr. Stephenson's previous statement about approval was not correct, both he and Mr. Stephenson still told Ms. Longoni that efforts to foreclose were on hold. [21]   Moreover, these statements *are* contained in writings, both in email communications (from Mr. Stephenson) and in GMACM's own diary notes (regarding Mr. Casas).

66.    The debtors' arguments that their promises were too vague and ambiguous to be enforceable is ridiculous.  Mr. Stephenson's email communications, and especially his April 28,

---

[21] The debtors claim that the claimants Gagnon and Lacey Longoni cannot prevail upon their claims for promissory estoppel because they had no contact with GMACM.  Not surprisingly, GMACM cites no authority for this ridiculous proposition.  Once GMACM made the promises to Longoni, she and Gagnon relied upon those representations.  Lacey Longoni was merely a minor child who would be a third party beneficiary of those representations.

29

1   2009 email communications clearly identify the modified loan terms.[22]  Additionally, the repeated

2   promises that the foreclosure process was on hold were eminently clear.  Finally, the debtors seek

3   this Court's blessing for them to ignore their promises by arguing that no injustice would be suffered

4   by not forcing the debtors to honor their word because of Longoni's fraud upon GMACM through

5   her alleged falsified emails.  This issue was discussed in detail above and needs no further comment.

**VIII.  Longoni's Intentional Infliction of Emotional Distress Claim Has Already Been Determined to Be Valid.**

67.    Finally, the debtors challenge Longoni's intentional infliction of emotional distress

claim, claiming that the conduct alleged cannot be deemed outrageous as a matter of law.  Once

again, the Nevada District Court has already rejected this argument.  *See, Longoni v. GMAC Mortg.,*

*2010 WL 5186091, at \*6.*  In this regard, the Nevada court stated as follows:

> [t]he court finds that under the facts alleged in the complaint, namely that defendants requested plaintiffs apply for a different loan modification and assured plaintiffs that the foreclosure was on hold during this new application process, plaintiffs have alleged extreme and outrageous conduct sufficient to state a claim for intentional infliction of emotional distress by the subsequent trustee's sale less than a month later.

68.    Next, the debtors allege that there is nothing in the factual record put forth by Longoni

indicating that she manifested any physical symptoms from the debtors' conduct.  This is clearly

incorrect.  During her deposition, and in her attached Affidavit, Longoni provided detailed accounts

of the effects of the debtors' action on both her and her daughter. *See, Longoni Affidavit, Exhibit 9,*

*paragraphs 38-42, and Excerpts of her Deposition, at Exhibit 23. See, Franchise Tax Board v. Hyatt,*

130 Nev. Adv. Op. 71, 335 P.3d 125 (2014).   Based upon the foregoing, this Court should find that

the debtors have completely failed in their obligation to prove the invalidity of the plaintiffs' claims.

The facts of this case cry out for relief.   The claims are valid and worth far more than $600,000.00

DATED this 22nd  day of May, 2015.      ERICKSON, THORPE & SWAINSTON, LTD.

By   /s/ Thomas P. Beko

---

[22] The monthly payments would be $1,600.00 per month with a principal reduction of $186,000.  After five years the interest rate would increase by no more than 1% per year, never to exceed $13.875.

30

1

2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

3

In re:                                                    Case No. 12-12020 (MG)

4

RESIDENTIAL CAPITAL, LLC, et al.,                         Chapter 11

5

           Debtors.                                  Jointly Administered

_____/

6

**EXHIBITS TO**

7

**RESPONSE TO OBJECTION OF THE RESCAP BORROWER CLAIMS TO PROOF OF**
**CLAIM FILED BY PAMELA D. LONGONI AND JEAN GAGNON**

8

**CLAIM NOS. 2291, 2294, 2295 AND 2357**
**Exhibit Index**

9

10

1.    Declaration of Nate Stephenson, May 12, 2015, and Affidavit of Nate Stephenson, May 15, 2012

11

12

2.    Promissory Note and Deed of Trust re: 5540 Twin Creeks Drive, Reno, Nevada, dated September 29, 2005

13

3.    Adjustable Rate Loan Modification Agreement

14

4.    GMACM Response to Plaintiffs' First Set of Interrogatories

15

5.    Minute Order, Doc. No. 80, July 29, 2011

16

6.    GMACM Amended Response to Interrogatories

17

7.    Excerpts, Deposition of Juan Aguirre, September 1, 2011
      8, 62-66, 72-73, 87, 94, 103-105, 140, 158-159, 164-165,

18

      170-171, 176-177, 185-186, 188-189, 194, 247-248, 255-256
      264-266

19

8.    Excerpts, deposition of Myron Ravelo, September 8, 2011

20

      21-22, 62-63, 83-85, 122-123, 127-129, 137

21

22

9.    Affidavit of Pamela Longoni

23

10.   Pre-2009 version of N.R.S. §107.085

24

11.    January 15, 2009, letter from claimants to Homecomings Financial

25

12.   GMACM Log Notes (Diary) GMACM automated letter to claimants, July 16, 2009

26

13.   ETS Log Notes (Diary), ETS-01-00005

27

14.   GMACM Servicer Guide

28

15.   Proposed Foreclosure Repayment Agreement

16.   Emails between Longoni and Stephenson

17.    GMACM Letter, July 30, 2009

18.    Federal Express confirmation

19.    Financial Analysis Form

20.    Proposed Settlement Agreement with National Real Estate Services

21.    Letters and emails sent by GMACM's counsel

22.    Undelivered Notice of Trustee Sale

23.    Excerpts, Deposition of Pamela Longoni, November 10, 2011

24.     GMACM automated letter to claimants, July 16, 2009

25.    Verizon Billing Records

32