# EXHIBIT 1

# EXHIBIT 1

THOMAS P. BEKO, ESQ. (#002653)
PAUL M. BERTONE, ESQ. (#004533)
ERICKSON, THORPE & SWAINSTON
99 West Arroyo Street
P.O. Box 3559
Reno, Nevada 89505
Telephone: (775) 786-3930
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA - RENO DIVISION

PAMELA D. LONGONI, individually and as Guardian Ad Litem for LACEY LONGONI, and JEAN M. GAGNON,

Plaintiffs,

vs.

GMAC MORTGAGE, LLC., a Delaware Limited Liability Company, EXECUTIVE TRUSTEE SERVICES, LLC., a Delaware Limited Liability Company, ILLEANNA PETERSON, KATHLEEN GOWEN, individuals, DOES 1-10; BLACK AND WHITE CORPORATIONS 1-10, corporations; ABLE & BAKER COMPANIES 1-10, co-partnerships and or limited liability companies,

Defendants.

Case No.: 3:10-CV-00297-LRH-(VPC)

## DECLARATION OF JONATHAN "NATE" STEPHENSON

1. I am over the age of eighteen years, and a resident of the County of Dallas, State of Texas.

2. I was employed with GMAC Mortgage, LLC, from approximately January or February of 2009, until late in 2009, as a Loss Mitigation Specialist. I am providing this Declaration in supplement to the previous affidavit that I signed on May 15, 2012.

1    3. That as part of my duties as a Loss Mitigation Specialist, I was assigned the task
2    of reviewing a request by Pamela Longoni and Jean Gagnon for loan modification which was
3    prompted by a financial hardship that they had encountered. After receiving their request for
4    assistance and a completed workout package, I began to consider various loss mitigation
5    plans which were utilized by GMAC Mortgage. The first option that I considered was a
6    Repayment Plan pursuant to which a borrower is given an opportunity to make temporary
7    reduced payments which is later followed by a balloon payment which would include
8    payment of all incurred arrearages. A proposed plan was sent to Ms. Longoni for her
9    approval.

10    4. Shortly thereafter, I received a call from Ms. Longoni wherein she indicated that
11    she and Mr. Gagnon lacked sufficient funds to pay any balloon, and because of their existing
12    financial condition, they would not be able to even pay the monthly payments. At that point,
13    I made the decision to forego all attempts at a repayment plan and instead sought to gain
14    approval for a permanent loan modification. After reviewing the borrowers' financial
15    records, we concluded that they would be able to meet a monthly payment of $1,600.00. I
16    set up a proposed permanent loan modification plan which would include monthly payments
17    of $1,600.00. To achieve these payments, the loan modification would entail a forgiveness
18    of $187,000.00 from the principal of the loan.

19    5. Because of the amount of loan forgiveness, I did not have the authority to authorize
20    a permanent modification of the Longoni/Gagnon loan. Thus, on or about March 19, 2009,
21    I submitted my request for approval of the proposed permanent loan modification. Over the
22    next 90 days I reviewed the internal GMACM log notes which appeared to indicate that their
23    request was going to be approved.

24    6. As part of the loan modification plan, the borrowers (Longoni and Gagnon) were
25    required to make monthly payments in the amount of $1,600.00. This payments were
26    initially scheduled to be made for a three month trial period during which time GMACM
27    would decide whether to make the modification permanent. It would also give GMACM an
28    opportunity to see if the borrowers were able to meet the modified loan requirements.

2

Because this was not a Repayment Plan, there was no scheduled balloon payment. For this same reason, no written Foreclosure Repayment Agreement was ever sent to Ms. Longoni and I never indicated to her that they would be required to make any such payment in order to gain approval of the permanent loan modification. Thus Ms. Longoni and Mr. Gagnon were never in breach of any repayment agreement as such agreement simply did not exist.

7. In May of 2009, I advised Ms. Longoni that I had at least 2 months before I was required to set up her permanent plan. As noted in my previous affidavit, in late June of 2009, I was informed via email that the borrowers' request for a permanent loan modification had been approved and I informed Ms. Longoni of that fact on June 30, 2009. I expected that a confirming agreement would have been sent by GMACM to Longoni/Gagnon.

8. On July 9, 2009, I learned that GMACM had made a decision to try and place the borrowers into an Obama Modification plan as opposed to the Traditional plan that I had initially proposed. On that day, I informed Ms. Longoni that foreclosure efforts were still on hold while they applied for that modification plan. In my experience, foreclosure proceedings were always placed on hold while the borrowers were actively pursing a permanent loan modification. It was only when all efforts to qualify the applicant for such a modification had been exhausted would foreclosure proceedings be reinstated, and then only after clear notice was sent to the borrowers that such process would be restarted.

9. I was very surprised to learn that ETS had proceeded forward with the foreclosure sale on August 14, 2009. I believe that had to be the result of an internal error either from GMACM or ETS. I have since learned that GMACM has taken the position that Longoni and Gagnon breached a Repayment Agreement that I had set up. This simply is not true. There was no such plan. Although I had initially proposed a repayment plan that would have included a balloon payment in excess of $19,000.00, that plan was abandoned when I learned the borrowers would never be capable of satisfying the plan. I never again proposed or set up any repayment plan. Had there been a new repayment plan, because the monthly payments were less than the $2,270.00 initially established, the balloon payment would have been significantly greater than $19,000.00.

3

10. Longoni and Gagnon made each of their payments within the time period that I scheduled. As far as I am aware, they satisfied every requirement that GMACM had imposed upon them as part of their application for a permanent loan modification.

I hereby state under penalty of perjury that the foregoing is true and correct.

DATED this 17 day of May, 2015.

JONATHAN "NATE" STEPHENSON

4

THOMAS P. BEKO, ESQ. (#002653)
PAUL M. BERTONE, ESQ. (#004533)
ERICKSON, THORPE & SWAINSTON
99 West Arroyo Street
P.O. Box 3559
Reno, Nevada 89505
Telephone: (775) 786-3930
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA - RENO DIVISION

| | |
|---|---|
| PAMELA D. LONGONI, individually and as Guardian Ad Litem for LACEY LONGONI, and JEAN M. GAGNON, <br><br> Plaintiffs, <br><br> vs. <br><br> GMAC MORTGAGE, LLC., a Delaware Limited Liability Company, EXECUTIVE TRUSTEE SERVICES, LLC., a Delaware Limited Liability Company, ILLEANNA PETERSON, KATHLEEN GOWEN, individuals, DOES 1-10; BLACK AND WHITE CORPORATIONS 1-10, corporations; ABLE & BAKER COMPANIES 1-10, co-partnerships and or limited liability companies, <br><br> Defendants. | Case No.: 3:10-CV-00297-LRH-(VPC) |

STATE OF TEXAS        )
                     ) ss.
COUNTY OF DALLAS     )

## AFFIDAVIT OF JONATHAN "NATE" STEPHENSON

1. I am over the age of eighteen years, and a resident of the County of Dallas, State of Texas.

2. I was employed with GMAC Mortgage, LLC, a Delaware Limited Liability Company, from approximately January or February of 2009, until late in 2009, as a loss

mitigation specialist. My duties in that position included working with borrowers to achieve a loan modification which was within the basic parameters established by GMAC Mortgage, LLC, (and/or its investors) and acceptable to the borrower. GMAC policies and procedures required that each time an employee communicated with a borrower or otherwise worked on a borrower file, that employee was required to prepare notes and updates in GMAC's internal electronic file.

3. Pamela Longoni and Jean Gagnon were borrowers that I was working with while employed with GMAC Mortgage, LLC. During the loan modification process, I frequently communicated with Pamela Longoni on her application. Each time I communicated with the borrowers, or otherwise worked on the borrowers' file, I entered a note in the file system describing the work or communication. In compliance with my requests, Ms. Longoni and Mr. Gagnon (the "Borrowers") submitted detailed financial information. Upon receipt of their information, I analyzed under the lender's loan modification guidelines. Based upon the information they submitted, Ms. Longoni and Mr. Gagnon qualified for a loan modification under the lender's existing guidelines. Based thereon, I submitted the loan modification package for approval to my general manager.

4. Although GMAC had instituted foreclosure proceedings against Ms. Longoni and Mr. Gagnon, when they commenced the loan modification process, that foreclosure was placed on hold. I informed Ms. Longoni of that fact both orally and by email communication.

5. On or about April 2, 2009, GMAC approved a trial modification, however, because I was seeking to write off approximately $176,000.00 of the principal of the loan, approval for the final loan modification required approval from our Vice President. Based upon my review of Ms. Longoni's file, I felt the approval would be given and I informed Ms. Longoni of that fact by way of email communication.

6. On May 5, 2009, I was again contacted by Ms. Longoni requesting a status on the loan modification request. I checked the electronic file and determined that our Vice President had not yet reviewed the request, however, my review of the notes suggested that the modification was in line for approval. I informed Ms. Longoni of this fact by way of

email communication. I again informed her that any foreclosure was on hold.

7. In June of 2009, I was transferred to a new team, however, on June 29, 2009, I received an email communication from Ms. Longoni wherein she indicated that she was having difficulty locating the officer who was going to complete work on her loan modification. In response, I sent an email to my previous department inquiring into the status of her loan modification request. On June 30, 2009, I received a responsive email informing me that Ms. Longoni's file had been sent for final management approval. I also learned that an officer by the name of Landon Huck was now handling the file. I passed this information on to Ms. Longoni by way of email communication.

8. Later that same day, I reviewed Ms. Longoni's GMAC's internal file, and I received another email from my former department which indicated that Ms. Longoni's final loan modification had, in fact, been approved. I informed Ms. Longoni of that fact by way of email communication.

9. At no time during this process did anyone advised me that Ms. Longoni's loan modification was not approved, nor did her internal GMAC file reflect that fact. During the course or her application and trial loan modification process, the borrowers were generally in compliance with the repayment plan.

10. Shortly after my June, 2009, communications with Ms. Longoni, I learned that GMAC had proceeded forward with the foreclosure upon the borrowers' property. I was surprised by this fact, not only because I understood that GMAC had approved their permanent loan modification, but also, because GMAC would normally restart the foreclosure process anew once additional payments were received from a borrower under any loan modification plan.

11. After learing of these events, I was specifically advised by GMAC Mortgage management that I was no longer allowed to correspond via e-mail with borrowers. I was subsequently terminated by GMAC Mortgage for the purported reason that my production numbers were low, however, the numbers GMAC presented to me were not accurate.

12. Because I had met my production quota during my employment with GMAC, it

3

1  is my belief that GMAC modified the production data in order to justify my termination. I
2  believe the true reason behind my termination was because of the information from GMAC's
3  internal file which I disclosed to Ms. Longoni in email communications.
4      DATED this 15 day of May, 2012.

                                                    _____
                                                    JONATHAN "NATE" STEPHENSON

8  SUBSCRIBED and SWORN TO before me
9  this 15th day of May, 2012.

   _____
11 Notary Public

[Notary seal: MIN H. KANG, NOTARY PUBLIC, STATE OF TEXAS, EXPIRES 10-18-2013]