# EXHIBIT 8

# EXHIBIT 8

SUNSHINE Litigation SERVICES
Discovery + Depositions + Decisions

CERTIFIED COPY

Las Vegas
Reno
Carson City

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA - RENO DIVISION

-oOo-

| | |
|---|---|
| PAMELA D. LONGONI, individually and as Guardian Ad Litem for LACEY LONGONI, and JEAN M. GAGNON,  Plaintiffs,  vs.  GMAC MORTGAGE, LLC, a Delaware Limited Liability Company, et al.,  Defendants. | Case No. 3:10-CV-00297-LRH-(VPC) |

DEPOSITION OF

MYRON RAVELO

SEPTEMBER 8, 2011

RENO, NEVADA

REPORTED BY:  CORRIE L. WOLDEN, NV CSR #194, RPR, CP

JOB NO. 144002

t 775.323.3411
f 775.323.2749

www.litigationservices.com

151 Country Estates Circle
Reno, Nevada 89511

1  Products, Inc.?

2      A    Not that I'm aware of.

3      Q    Do you know whether or not ETS has any contractual
4  relationship with Residential Funding Corporation?

5      A    No.

6      Q    Do you know whether ETS has any contractual
7  relationship with Residential Funding Company, LLC?

8      A    No.

9      Q    Do you know whether Executive Trustee Services has
10 any contractual relationship with a company known as MERS?

11     A    No.

12     Q    Do you know whether or not Executive Trustee
13 Services has any contractual relationship with a trust known
14 as RAMP 205EFC?

15     A    No.

16     Q    And, I'm sorry, that was RAMP 2005, like the year
17 2005.

18     A    No.

19     Q    Okay. Are you aware of any assignment of rights
20 that Executive Trustee Services has received from this trust
21 RAMP 2005EFC?

22     A    No.

23     Q    Are you aware of any assignment of rights from
24 Residential Asset Mortgage Products, Inc. to Executive
25 Trustee Services?

1       A    No.

2       Q    Are you aware of any assignment of rights between
3  Residential Funding Company, LLC and Executive Trustee
4  Services?

5       A    No.

6       Q    Are you aware of any assignment of rights from
7  Residential Funding Corporation to Executive Trustee
8  Services?

9       A    No.

10      Q    And are you aware of any assignment of rights from
11 GMAC Mortgage, LLC to Executive Trustee Services?

12      A    No.

1       Q    Are you aware of any assignment of rights between
14 Homecomings Financial, LLC and ETS?

15      A    No.

16      Q    You had indicated before that there were other
17 vendors that ETS uses, I guess, to perform its services.
18 Before we go there, I want to just have you describe for me
19 what you believe ETS does as a business.

20      A    ETS prepares and processes the foreclosure file
21 for our clients.

22      Q    All right. And so preparing and processing the
23 foreclosure file, does that include actually engaging in the
24 process of foreclosing upon a piece of property?

25      A    Physically, no, but the documentation, yes.

```
 1   the right to get the collateral back if the loan is not
 2   paid, correct?
 3           MR. BASHFORD:  Objection.
 4           THE WITNESS:  Yes.
 5   BY MR. BEKO:
 6       Q   Do you know who owned the Promissory Note when
 7   this assignment came to ETS?
 8           MR. BASHFORD:  Objection.
 9           THE WITNESS:  No.
10   BY MR. BEKO:
11       Q   Do you have any idea who held -- Do you know what
12   a holder is of a Promissory Note?
13           MR. BASHFORD:  Objection.
14           THE WITNESS:  Just from what I understand, it is
15   who has the actual physical note, original.
16   BY MR. BEKO:
17       Q   Okay.  Good.  Do you know who held the Promissory
18   Note when this assignment came to GMAC, or to ETS?
19           MR. BASHFORD:  Objection.
20           THE WITNESS:  No.
21   BY MR. BEKO:
22       Q   To your knowledge did anyone ever attempt to make
23   any inquiry as to who actually held the Promissory Note at
24   the time that the foreclosure was started?
25           MR. BASHFORD:  Objection.
```

```
 1              THE WITNESS:  No.
 2              MR. BEKO:  Well, can you be more specific,
 3     Counsel?
 4              MR. BASHFORD:  It is a legal question about the
 5     definition of what the holder of the note is.
 6              MR. BEKO:  Okay.
 7              MR. BASHFORD:  He is not a legal expert.
 8     BY MR. BEKO:
 9         Q    Do you know, sir, at the time -- This foreclosure
10     was started on or about the 20th of February of 2009,
11     correct?
12         A    Correct.
13         Q    Does ETS have any idea who was in possession of
14     the Promissory Note?
15         A    No.
16         Q    Does ETS have any idea who was in possession of
17     the Deed of Trust?
18         A    Not physical, but no.
19         Q    How about anything other than physical?  Who was
20     in possession of it, if it is not physical?
21         A    ETS would assume GMAC would have it.
22         Q    Okay.  Do you know who MERS is?
23         A    I know, yes.
24         Q    What is MERS?
25         A    From what my understanding is, it is a company
```

```
 1    Deed of Trust is to whoever GMAC is notifying us to
 2    foreclose under.
 3         Q    I see.  So because they are saying to you do it in
 4    MERS' name, you don't have to go get any assignment of the
 5    Deed of Trust?
 6         A    From what we know now.
 7         Q    From what you know now?
 8         A    No, from what we know, we don't have to.  We did
 9    not have to at that time.
10         Q    Has that changed now?
11         A    Yes.
12         Q    What is different about that now?
13         A    Everything is assigned out.
14         Q    Right.  Meaning when you now do foreclosures, you
15    get an assignment from the original lender of the Deed of
16    Trust, correct?
17         A    That's correct.
18         Q    When did that change?
19         A    I believe the exact date was October 19, 2009.
20    I'm sorry, 2010.
21         Q    October 19th, 2010?
22         A    That's correct.
23         Q    And what happened to prompt that change?
24         A    I'm not exactly 100 percent sure what exactly
25    happened.
```

1    Q    So after 2010, whoever is listed as the lender on
2    the Deed of Trust then has to give an assignment to ETS
3    before you begin the foreclosure process?
4    A    That's correct.
5    Q    Okay. And how do you know this date of October
6    19th?
7    A    There was a communiqué, a memo, a company memo.
8    It is either October 19th or 18th.
9    Q    Okay.
10   A    It is around that time frame.
11   Q    All right. So now when ETS does a foreclosure,
12   they will get an assignment of the Deed of Trust, and will
13   they still do the Substitution of Trustee?
14   A    Yes.
15   Q    And then they will do the Notice of Default?
16   A    Correct.
17   Q    Okay. All right. And you don't remember anybody
18   telling you why it was that they were changing this
19   procedure by which to complete foreclosures?
20   A    No, not -- no.
21   Q    You don't have any idea?
22   A    I personally do, just from what I read and
23   reviewed, but not --
24   Q    Okay. Tell me what your understanding is as to
25   why this change was made.

1    A    I don't think it is a fair statement to say we
2 never have to, but we are obtaining, we would obtain that
3 information from the Revised Statutes of Nevada.
4    Q    Okay. So you think that there is something in the
5 Revised Statutes of Nevada that says that ETS did not have
6 to go back and do another Notice of Default after additional
7 monies were paid by the borrower, loss mitigation had been
8 gone through, your understanding is that the statutes of
9 Nevada say that you don't have to issue another Notice of
10 Default?
11    MR. BASHFORD:  Objection.
12    THE WITNESS:  My understanding of that statute is
13 that if we file our Notice of Default and our statutory
14 mailings are completed at that portion of the foreclosure,
15 and as long as the default amounts do not change, we do not
16 have to send or record a new Notice of Default.
17 BY MR. BEKO:
18    Q    Okay. And when you say as long as the default
19 amounts don't change, if GMAC on behalf of the lender
20 receives additional funds, would the default amount change?
21    A    If the payment, if the monies were applied, yes,
22 it would change.
23    Q    Well, if they received them, whether they apply
24 them or not, the amount in default would change, correct?
25    A    I can't make that statement.

1   Q   Why not?

2   A   If they don't apply to the loan and return it to
3   the borrower the next day, then it doesn't --

4   Q   Oh, sure, I totally understand that, sure.  If
5   GMAC receives money from the borrower and keeps the money,
6   doesn't give it back to the borrower, then the default
7   amount would change, correct?

8   A   That would be a fair assumption, yes.

9   Q   All right.  And in that situation, you believe
10  that ETS would need to go back and issue a new Notice of
11  Default, is that correct?

12  A   Yes.

13  Q   And was that ever done in this case?

14  A   Which portion, I'm sorry?

15  Q   Was there ever a new Notice of Default issued in
16  this case?

17  A   Not that I can recall, no.

18  Q   And do you know why not?

19  A   From my understanding, the amounts, the defaulted
20  amounts did not change.

21  Q   Okay.  Do you know whether or not GMAC actually
22  received additional funds from the borrowers, Ms. Longoni
23  and Mr. Gagnon?

24  A   No, we were not aware of that.

25  Q   If that happens, if after a Notice of Default is

1    Okay. If, in fact, GMAC has received funds, but
2    not enough to cure the default, then under that situation
3    you then start the process over with a new Notice of Default
4    providing those new numbers and continuing forward from
5    there, is that right?
6        A    We would have to get, we would have to get
7    approval from GMAC, because if it changes the payment
8    amounts, it technically isn't a valid foreclosure, period,
9    regardless of what it is, so we would then have to refer it
10   back to GMAC and they would have to refer it back to us.
11   That is what I'm trying to --
12       Q    Right. That makes sense to me. If you started
13   the process and there was a certain amount owed and the
14   lender gets some money back from the borrower, then you have
15   got to start anew, right?
16       A    From my understanding, yes.
17       Q    Okay. Do you have any explanation, I will submit
18   to you that there were payments that were received by GMAC
19   in this case from Ms. Longoni and Mr. Gagnon and the money
20   was kept. It was never returned to them. Do you know why
21   the foreclosure process wasn't started anew?
22       A    No.
23       Q    Do you know, sir, that after this foreclosure sale
24   went through that GMAC attempted to get the property back
25   from Ms. Gagnon, Mr. Gagnon and Ms. Longoni?

1    A    I'm sorry, could you explain?

2    Q    Sure. Did you know after the sale, the

3    foreclosure sale went through in this case, that GMAC

4    attempted to purchase back the property from the new buyer?

5    A    I'm not sure if it is a purchase, but, yeah, I

6    believe there was some sort of occurrence like that, yes.

7    Q    Why did that happen, do you know?

8    A    I could only assume.

9    Q    Was it because they had received those funds and

10    they didn't restart the foreclosure process over again?

11    MR. BASHFORD: Objection to the extent it calls

12    for any privileged information.

1    THE WITNESS: I don't know if that is the truth, I

14    mean, if that is the case or not, I'm sorry.

15    BY MR. BEKO:

16    Q    What is your understanding, what is your belief as

17    to why they went back and did that?

18    MR. BASHFORD: Objection; don't answer that to the

19    extent you believe it is based on what you were told by

20    Counsel or any legal representation for GMAC or ETS.

21    BY MR. BEKO:

22    Q    Can you answer that question?

23    A    Based on what he said, I can't.

24    Q    So you don't have any information as to why they

25    tried to get the property back except for what some attorney

1    told you, is that correct?
2    A    That's correct.
3    Q    Okay. Mr. Ravelo --
4    A    Yes, sir.
5    Q    I don't know why I have a hard time remembering
6    your name, I'm sorry. If, in fact, GMAC had received monies
7    and applied them from the borrowers, would there be some
8    kind of notation either in Exhibit 38 or Exhibit 4 where
9    they would be telling you that information?
10   A    Possibly. It is possible.
11   Q    How else would ETS get that information if it
12   didn't come through either of these two electronic systems?
13   A    We would have to review GMAC's MortgageServ
14   system.
15   Q    Okay. Let's talk about that for a second. Would
16   you look, sir, at Exhibit 5 for identification?
17   A    Yes, sir.
18   Q    This is the system that you are talking about if,
19   in fact, GMAC had received funds that they would notify ETS
20   through this system?
21   A    No. My explanation was if we don't get it on
22   notification through our system --
23   Q    Which is Exhibit 38?
24   A    Exhibit 38, I'm sorry, and Exhibit 4.
25   Q    Okay.

1  Default part.
2  Q   What has changed since the Longoni matter?
3  A   The MERS assignments.
4  Q   Okay.
5  A   For Nevada, the mediation requirements.
6  Q   There was no attempt to mediate this case in
7  Nevada at all, correct?
8  A   No.
9  Q   None of the notices that were required -- Are you
10 familiar with the notices that now have to go out in Nevada
11 as far as things that have to be done?
12 A   I know the general definitions of them.  I don't
13 know the exact verbiage and the exact pages of them, but I
14 do know the general definitions of them, yes.
15 Q   And none of that was complied with in this case,
16 correct?
17 A   Not at that time, no.
18 Q   Do you know why not?
19 A   I believe it was date of effect.
20 Q   Date of effect of what?
21 A   Of that mediation law, statute.
22 Q   Based upon the records that you have seen here to
23 date and the records that you think that you have seen that
24 are not here to date, it appears that all of the notices of
25 default that were sent to Longoni-Gagnon came back

MYRON RAVELO - 9/8/2011

Page 166

```
1    STATE OF NEVADA     )
                         ) Ss.
2    WASHOE COUNTY       )

3           I, CORRIE L. WOLDEN, a Certified Shorthand
4    Reporter in and for the County of Washoe, State of Nevada,
5    do hereby certify; That on THURSDAY, SEPTEMBER 8, 2011, at
6    the hour of 9:02 a.m. of said day, at 99 W. Arroyo Street,
7    Reno, Nevada, personally appeared MYRON RAVELO, who was duly
8    sworn by me to testify the truth, the whole truth and
9    nothing but the truth, and thereupon was deposed in the
10   matter entitled herein;
11          That I am not a relative, employee or independent
12   contractor of counsel to any of the parties; or a relative,
13   employee or independent contractor of the parties involved
14   in the proceeding, or a person financially interested in the
15   proceeding;
16          That said deposition was taken in verbatim
17   stenotype notes by me, and thereafter transcribed into
18   typewriting as herein appears; That the foregoing
19   transcript, consisting of pages 1 through 166, is a full,
20   true and correct transcription of my stenotype notes of said
21   deposition.
22          DATED: At Reno, Nevada, this 16th day of
23   September, 2011.
24                       _____
25                       CORRIE L. WOLDEN, CSR #194, RPR, CP
```

SUNSHINE REPORTING - 775-323-3411