**Hearing Date: June 10, 2015 at 10:00 a .m. (Prevailing Eastern Time)**

MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone:     (212) 468-8000
Facsimile:     (212) 468-7900
Norman S. Rosenbaum
Adam A. Lewis
Kristin A. Hiensch

*Counsel for the ResCap Borrower Claims Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------ ) | | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------ ) | | |

**RESCAP BORROWER CLAIMS TRUST'S PRETRIAL MEMORANDUM**
**BRIEF IN SUPPORT OF THE TRUST'S OBJECTION TO PROOF**
**OF CLAIM NO. 386 FILED BY BARRY AND CHERYL MACK**

## TABLE OF CONTENTS

**Page**

SHORT PREVIEW OF THE ESSENTIALS OF THE CASE.......................................................1

SHORT FACTUAL BACKGROUND ................................................................................3

THE PRELUDE:  CIRCUMSTANCES PREDATING THE FORECLOSURE.........................3

THE FORECLOSURE AND ITS AFTERMATH.........................................................6

THE CLOSING CHAPTERS.................................................................................12

ANALYSIS OF THE LAW AND FACTS ................................................................13

THE LETTER CANNOT BE A QWR BECAUSE IT WAS NOT SENT TO THE
    DESIGNATED ADDRESS...........................................................................13

THE CLAIMANTS ARE BARRED BY RES JUDICATA .......................................14

GMACM CANNOT BE LIABLE FOR ANY INJURIES TO THE MACKS PRIOR TO
    DECEMBER 26, 2009 ..............................................................................15

CONCLUSION ...................................................................................................19

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Berneike v. CitiMortgage Inc.*,
  708 F.3d 1141 (10th Cir. 2013) ........................................................................ 13

*Bonadio v. PHH Mortgage Corp.*,
  No.12 CV 3421 (VB), 2014 WL 522784 (S.D.N.Y. Jan. 31, 2014) ...................... 18

*Cezair v. JPMorgan Chase Bank, N.A.*,
  No. 13-2928, 2014 WL 4295048 (D. Md. Aug. 29, 2014) .............................. 16, 17

*Gorbaty v. Wells Fargo Bank, N.A.*,
  Nos. 10-CV-3291 (NGG)(SMG) & 10-CV-3354 (NGG)(SMG), 2012 WL 1372260
  (E.D.N.Y. April 18, 2012) .................................................................................. 18

*Harris v. Am. Gen. Fin., Inc.*,
  No. 02-1395-MLB, 2005 U.S. Dist. LEXIS 33260 (D. Kan. July 6, 2005), *aff'd*, 259
  Fed. Appx. 107 (10th Cir. 2007) ........................................................................ 16

*Henderson v. Wells Fargo Bank, N.A.*,
  974 F. Supp. 2d 993 (N.D. Texas 2013) ............................................................ 17

*Hilao v. Estate of Marcos*,
  393 F.3d 987 (9th Cir. 2004) .............................................................................. 14

*In re George Love Farming, LC*,
  366 B.R. 170 (Bankr. D. Utah 2007) .................................................................. 14

*Justice v. Ocwen Loan Servicing*,
  No. 2:13-CV-165, 2015 WL 235738 (S.D. Ohio January 16, 2015) .................... 17

*Kliesch v. Fifth Third Mortg. Co.*,
  No. 3:10-0600, 2010 U.S. Dist. LEXIS 125686 (M.D. Tenn. November 29, 2010) .............. 16

*Marais v. Chase Home Fin., LLC*,
  24 F. Supp.3d 712 (S.D. Ohio 2014) .............................................................. 17, 18

*Marais v. Chase Home Fin., LLC*,
  736 F.3d 711 (6th Cir. 2013) .............................................................................. 17

*McMillen v. Resurgent Capital Servs., L.P.*,
  No. 2:13-CV-00738, 2014 WL 3341337 (S.D. Ohio July 8, 2014) ...................... 17

*Payne v. Mortg. Elec. Registration Sys., Inc. (In re Payne)*,
  387 B.R. 614 (Bankr. D. Kan. 2008) .................................................................. 16

*Peralta v. Vasquez,*
        467 F.3d 98 (2d Cir. 2006) ................................................................ 14

*Pinchot v. Bank of Am., N.A.,*
        No. 12-cv-12994, 2012 U.S. Dist. LEXIS 178415 (E.D. Mich. Dec. 28, 2012) ..................... 16

*Roth v. CitiMortgage Inc.,*
        756 F.3d 178 (2d Cir. 2014) ................................................................ 13

*Rubio v. U.S. Bank N.A.,*
        No. C 13-05752 LB, 2014 WL 2602330 (N.D. Cal. June 10, 2014) ..................... 18

*Russell v. Nationstar Mortg., LLC,*
        No. 14-61977-CIV, 2015 WL 541893 (S.D. Fla. Feb. 10, 2015) ..................... 17

*Stahl v. Simon (In re Adamson Apparel, Inc.),*
        No. 12-57059, 2015 WL 2081575 (9th Cir. May 6, 2015) ..................... 14

*Steele v. Quantum Servicing Corp.,*
        No. 3:12-CV-2897-L, 2013 WL 3196544 (N.D. Tex. June 25, 2013) ..................... 16, 17

*U.S. v. McKeon,*
        738 F.2d 26 (2d Cir. 1984) ................................................................ 14

*U.S. v. McKeon,*
        738 F.3d 26 (2d Cir. 1984) ................................................................ 14

*Uzdavines v. Weeks Marine, Inc.,*
        418 F.3d 138 (2d Cir. 2005) ................................................................ 14

*Williamson v. Recon Trust Co., N.A.,*
        No. 2:CV 10-613-BLW, 2011 U.S. Dist. LEXIS 23876 (D. Idaho March 8, 2011) ..................... 16

*Zemer v. Am. Home Mortg. Serv., Inc.,*
        No. 11-15364, 2013 U.S. Dist. LEXIS 27488 (E.D. Mich. Feb. 28, 2013) ..................... 16

STATUTES

12 U.S.C.
        § 2605 ................................................................ 1
        § 2605(c) ................................................................ 8
        § 2605(e) ................................................................ passim
        § 2605(f)(1) ................................................................ 1, 17, 18
        §§ 2601-2617 ................................................................ 1

OTHER AUTHORITIES

24 C.F.R. § 3500.21(e) ................................................................ 8, 13

24 C.F.R. § 3500.21(e)(1)................................................................................................8, 13

Fed. R. Bankr. P. 9023 and 9024.............................................................................................2

Restatement (Second) of Agency § 219 (1958) .........................................................................15

Restatement (Third) of Torts § 13 (2000) ................................................................................15

sf-3520637

**TO THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

In accordance with the Court's Order Establishing Procedures for Evidentiary Hearing

Regarding Claim No. 386 Filed by Barry Mack [Dkt. No. 8362], the ResCap Borrower Claims

Trust (the "Trust") hereby files this pretrial memorandum in support of the ResCap Borrower

Claims Trust's Objection to Claim No. 386 Filed by Barry and Cheryl Mack [Dkt. 6763-4] (the

"Objection").

<u>**SHORT PREVIEW OF THE ESSENTIALS OF THE CASE**</u>

1.      On August 8, 2012, Barry and Cheryl Mack (the "Macks") filed Claim

No. 386  (the "Claim") seeking recovery for alleged injuries arising from the mistaken

foreclosure filed by debtor GMAC Mortgage, LLC ("GMACM") as servicer on behalf of

Deutsche Bank Trust Company Americas as Trustee for RALI 2007QS3 ("DB") in 2009.  The

Claim was substantially narrowed and deemed amended by the Memorandum Opinion

Sustaining in Part and Overruling in Part Objection to Proof of Claim 386 [Dkt. 7297] (the

"Memorandum Opinion").  In light of the Claimants' having previously sued GMACM in

Florida state court over the foreclosure, this Court reduced the scope of the Claimants' case to a

claim that in the aftermath of the commencement of the foreclosure GMACM failed to respond

to a "qualified written request" (a "QWR") in violation of 12 U.S.C. § 2605(e), entitling them to

damages, including damages for emotional distress, under 12 U.S.C. § 2605(f)(1).[1]*See*

Memorandum Opinion 21-31.  The Court made quite clear that the Claimants could not recover

for the consequences of the foreclosure proceedings, but only for damages traceable specifically

to GMACM's alleged failure to respond to the QWR.  Memorandum Opinion 30.  Nevertheless,

given the documents and evidence upon which the Claimants evidently intend to rely, it is clear

---

[1] 12 U.S.C. § 2605 is a section of 12 U.S.C. §§ 2601-2617, the Real Estate Settlement Procedures Act, or "RESPA".

sf-3520637

that they intend to try to achieve a second recovery for the consequences of the foreclosure, not

merely for the any injury specifically attributable to GMACM's alleged failure to respond to a

QWR.

      2.    The Trust will show that the Claimants, who have the burden of proof, are

not entitled to any recovery:

- Under applicable law controlling in this District, the October 26, 2009 letter that allegedly is a QWR (the "Letter") cannot serve as a QWR under § 2605(e) because it was sent to the wrong address.

- In the alternative, on grounds of both judicial estoppel and an admission, the Letter is not a QWR because, as the Claimants' counsel argued to this Court, the Macks meant it as a "general inquiry" rather than a QWR and therefore sent it to the address for general inquiries.

- Even if the Letter is a QWR, the Claimants are barred from seeking recovery under § 2605(e) by *res judicata* because they specifically but unsuccessfully sought such recovery in the Florida state court action against DB, which this Court has found to have a master/servant relationship with GMACM at the relevant time (*see* Memorandum Opinion 20), so that as with the other claims the Claimants asserted in the Florida proceeding, the Claimants could have tried to hold DB vicariously liable for the exclusive conduct of GMACM, and the claim clearly arises out of the same nucleus of events (indeed, it is specifically tied to the foreclosure proceedings).[2]

- Even if the Letter serves as a QWR, the Claimants cannot meet their burden of proof to show that it was received by GMACM.

- Even if the Letter qualifies as a QWR, the Claimants cannot claim any damages from a failure to respond by GMACM since the response was not due until *after* the Claimants knew that the foreclosure proceedings had been terminated, with any claim under § 2605(e) accruing only upon the failure to respond by the statutory deadline.

- Even if the Letter is a QWR, the Claimants cannot trace specific damages or injury to a failure by GMACM to respond to it for a number of reasons, or at best can make out only minimal damages , because, among other things.

---

[2] GMACM is well aware that the Court ruled against it on this and the next two bullet points in the Memorandum Opinion. GMACM is asking that the Court reconsider its rulings. Note that this request is not constrained by the provisions of Fed. R. Bankr. P. 9023 and 9024 because the Court has not yet entered a judgment.

2

- Mr. Mack admitted testified in April of 2012 that he only recently had begun to be bothered by GMACM's prior conduct (*see* Depo B. Mack 4/4/12 34:11-35:14.), and thus he was awarded no damages for emotional distress in the Florida action in May of 2011, 1 ½ years after the foreclosure fiasco; Mrs. Mack was awarded only $150,000 in the Florida action in May of 2011 for the *entire* foreclosure experience, whereas in this proceeding, only the narrow QWR is at issue.

- Mrs. Mack told her psychiatrist in December of 2009 that the pressure was off because the Macks had entered a contract to sell the property that month (which, as noted below, was their only alternative to suffering a foreclosure eventually), where as in this proceeding, only the alleged QWR is at issue.[3]

- Mrs. Mack suffered from profound physical and emotional distress that long antedated the foreclosure proceedings and the Letter; in fact, by the time the foreclosure proceeding began, she suffered from years of profound marital discord, long-term alcoholism, acute renal failure and congestive heart failure (the latter two conditions being cited as the immediate cause of her 2013 death on her death certificate).

- The centerpiece of the Claimants' damage claim, Mrs. Mack's early November 2009 suicide attempt, even if attributable to the foreclosure issue could not be due to GMACM's alleged failure to respond to the Letter because the attempt occurred just days after they mailed the letter; indeed, they did not even expect any response for "a week or two," and in any event occurred well before GMACM's response was due.

- So far as GMACM knows, there is no evidence connecting the QWR issue to any specific injury or damage.

## SHORT FACTUAL BACKGROUND

### The Prelude:  Circumstances Predating the Foreclosure

3.      The Macks bought the residence at 237 Egret, Naples, Florida (the "Property") in 2003 for $1.080 million, using a $990,000 mortgage.  (C. Mack depo, 11/16/11 12:10-12; 16:12-22; C. Mack afternoon depo, 4/4/12 11:4-7.).  The Property is a luxurious home on a canal, with two large verandas, a deck, a swimming pool, five bedrooms, 3 \1/2 baths and an

---

[3] The Florida court later vacated those damages because they were tied to alleged RESPA violations that it eventually found the Macks could not establish as a matter of law.

sf-3520637

electric winch to lower and retrieve their boat from a the canal.  (C. Mack afternoon depo, 4/4/12 28:7-16.)

4.      At that time, both were retired, living on their social security income and savings.

5.      In 2006, the Macks refinanced their $998,000 mortgage, with GMACM becoming their loan servicer and DB the trustee/owner.  At that time, their monthly payments on the mortgage were about $5,800.

6.      By March of 2008, the Macks put the Property on the market because they simply could not afford to keep it.  Indeed, by mid-2009 they were trying to get their mortgage obligations modified.  As they wrote to GMACM on August 10, 2009:

> We have tried to live with this payment amount, but we have exhausted all of our financial resources.  The money that we have gone through was all that we saved through the years of working, so that we could have something for our retirement years.  Well, unfortunately, those years are upon us now and we have nothing left.
>
> Our costs to maintain our current home have increased by leaps and bounds, while our income had not increased at all.  The current costs of insurance and real estate taxes and monthly living expenses, home maintenance, electric, water, sewerage and food more than drained us financially.

7.      Mrs. Mack testified in April of 2012 that the Macks had spent over $250,000 of their savings trying to keep the Property.  Moreover, the Macks' financial information submitted to GMACM in connection with their request for a modification of the mortgage in 2009 showed *gross* income of about $6,700 monthly to pay the mortgage of about $5,900 monthly *and* all their other basic living expenses (e.g., taxes, property taxes, food, clothing, insurance, medical insurance, and so on), not to mention any discretionary expenses such as recreation, entertainment, vacations, travel, furniture, and the like.  They were living well

4

beyond their means.  It is no wonder that they were at their financial wits' end. Clearly their only

choices were to get an accommodation on the mortgage or sell the house.  At that time, they were

trying to do both.   Just as clearly, the latter would be their *only* option absent a voluntary

accommodation on the mortgage.

8.    In November 4, 2009, GMACM advised the Macks that they did not

qualify for an accommodation on their mortgage because their financial information indicated

that they could not afford a mortgage modified in the range acceptable to GMACM.

9.    In the months leading up to these events, Mrs. Mack's physical and mental

health already were poor and deteriorating.  She attempted suicide in 2005, the first of three such

attempts.  She was so dissatisfied with her marriage that she had a year-long affair ended by her

partner in 2005, a denouement that "devastated her."  She repeatedly remarked that she was

happier when Mr. Mack was away.  And in May of 2011 she told a medical provider that Mr.

Mack been abusive both physically and mentally during their marriage.

10.    From 2006 to early 2010, she had regular visits with a psychiatrist, Dr.

Lichi.  Dr. Lichi repeatedly diagnosed her as having major depression and being an alcoholic.

Other providers also diagnosed her as being an alcoholic.  In May of 2011, she told a medical

provider that she had lied in 2002 to the medical staff at the Mayo Clinic when she told them did

she not use alcohol because she was afraid they would otherwise turn her down for the liver

transplant that she eventually had that year; she added that in fact she was an alcoholic before the

transplant and after, discontinuing her use of alcohol only for a six-month period after the

transplant.

11.    By mid-August of 2009, before the foreclosure proceedings began, she

was diagnosed as having "acute renal failure" due to the effects of the immunosuppressant she

sf-3520637

had been taking since her transplant (and continued to insist on taking despite its morbid effect).

On February 3, 2010, she told Dr. Lichi that she probably had congestive heart failure ("CHF").

12.    In short, it was not the foreclosure proceedings alone that lead her to try to

commit suicide in early November of 2009; far from it. Mrs. Mack was a congenitally unhappy

alcoholic trapped in an unhappy marriage suffering from debilitating illnesses when she made

the attempt.  Nor was that event the sole cause of the physical ailments that eventually caused her

death; many of them predated the attempt and were advanced even before November of 2009.

Furthermore, Mrs. Mack attempted suicide yet once more, in 2011, further contributing to her

ailments.[4]

### The Foreclosure and Its Aftermath

13.    On July 23, 2009, a GMACM's employee evidently mistakenly entered a

code in the computer system that authorized commencement of a foreclosure while she was

making a proper entry on that same screen opening the "loss mitigation" process pursuant to

which the Macks requested and accommodation from GMACM on their mortgage.  The

evidence will show that the person who made that entry was not authorized to enter foreclosure

codes.  The result of that mistaken entry was referral of the matter to the Law Offices of David

Stern ("Stern") for commencement of foreclosure through a computer system that GMACM

shared with Stern.

14.    The very next day, a person authorized to input codes in the foreclosure

field terminated the foreclosure, having evidently gotten a signal overnight from the internal

GMACM computer system that the foreclosure referral was a mistake because the loan was

current.  However, it appears that person did not place an appropriate entry in the computer

---

[4] The point here is not that Mrs. Mack was a weak or undeserving personality who was easily tipped over by the
slightest concern.  Rather, the point is one of the Letter's roles in causation of the suicide and extracting the
consequences of that event from those caused by Mrs. Mack's other, pre-existing afflictions and demons.

sf-3520637

system through which GMACM communicated with Stern. Thus, the foreclosure proceeded. Stern filed the foreclosure action in DB's name on August 20, 2009. The summons was served on the Macks in due course.

15.    Around August 26, 2009, GMACM discovered that the foreclosure was proceeding, and on September 2, 2009 directed Stern through the shared computer system to dismiss the foreclosure action. Again through the shared computer system, Stern the same day acknowledged the instruction and advised GMACM it had dismissed the foreclosure action and had closed the file the same day. However, for reasons unknown, in fact the Stern firm did not file a dismissal of the action until December 8, although it served a copy of the dismissal on the Macks on December 3. The Macks had a copy of the dismissal in their possession and turned it over to their counsel in 2012, who then turned it over to counsel for DB. That the Macks provided the dismissal to their counsel raises the inference that they got it soon after it was served on them on December 3 and that, as well, they knew by early December of 2009 that the foreclosure action had been dismissed.

16.    In the meantime, the Macks filed an answer and counterclaims against DB on September 11, 2009, serving Stern. Stern never advised DB or GMACM of this filing or subsequent proceedings on the counterclaim. Those two entities learned of the proceedings only after judgment had been entered for the Macks on the counterclaims and served on DB in May of 2011.

17.    The answer denied liability. The counterclaims alleged that GMACM had wrongfully commenced the foreclosure. It alleged liability for slander of title and under RESPA section 2605(c) because DB failed to notify them of the transfer of the loan from the prior owner to DB. It sought actual damages on both counts.

sf-3520637

18.    The Macks wrote the Letter to GMACM inquiring about the foreclosure in late October 2009 and claim to have mailed it on October 26, 2009.  The Letter is addressed to "GMAC Mortgage, Attn: Customer Care, P.O. Box 4622, Waterloo, IA 50574-4622".  Mr. Mack testified that it was the Macks' bookkeeper who selected the address.  However, GMACM's monthly invoices to the Macks at that time (and to other borrowers whose loans it serviced) contained information on the reverse side prominently set forth in boxes that instructs recipients where to communicate with GMACM for various purposes.  The Macks were thereby instructed to send QWRs to "GMAC Mortgage, Attn:  Customer Care, PO Box 1330, Waterloo, IA 50705-1330".  This clearly is a different address than the address to which the Macks allegedly mailed the Letter.  That latter address is the address for "General Inquiries" set forth in the same disclosure area of the back of the mortgage statement.  Such instructions to send QWRs to a specific address were permitted by the implementing regulations for RESPA.  24 C.F.R. § 3500.21(e)(1); 24 C.F.R. § 3500.21(e).  GMACM has no record of receiving a letter in the weeks immediately after October 26 even though its servicing notes normally record every communication with a borrower.  Not surprisingly, it therefore has no record of responding to it.

19.    Moreover, the Claimants' counsel in this proceeding told the Court in January of 2015 that the Macks specifically selected the Waterloo P.O. Box 4622 address from among those they saw on the back of the monthly mortgage statement because thought that they were sending a "general inquiry," not a QWR.  (*See* Transcript of 1/12/15 hearing 21:16-22:2.) This statement establishes two vital facts.  First, the Macks and their bookkeeper were paying attention to the instructions on the monthly mortgage statements and *deliberately* sent the Letter to the Waterloo address for *general inquiries*, consciously *rejecting* the address for QWRs.  This counsel did, not incidentally, in order to successfully induce the Court to deny the Trust's motion

for summary judgment on the QWR address issue facing the Trust's Second Circuit case that ruled that a purported QWR not sent to the address designated by the servicers for QWRs does not even qualify as a QWR.  (*See id.*, 22:13-22.)  Second, it means that the Macks were making a *general inquiry*, *not* sending a QWR.

20.    Of great importance is that there is *no* recorded testimony from Mrs. Mack about the Letter other than her having authenticated it, having written it out of "frustration" and (allegedly) mailed it.  (C. Mack depo 11/16/11 87:11-88:9;C. Mack afternoon depo., 4/4/12 40:16-43:6.)

21.    In the first week of November of 2009, Mrs. Mack attempted to commit suicide by a combination of alcohol and pills.  Her concern over the still-pending DB foreclosure was part of the reason for her act.  This date was just shortly after the Macks sent the Letter if indeed they mailed it on October 26.  Mr. Mack testified that he did not even expect a response to the Letter for "a week or two."   And, of course, GMACM's response was not even due until later December.  This was Mrs. Mack's second attempt a suicide.   She made a third attempt in 2011.

22.    With DB having made no appearance on the Macks' counterclaims in the Florida litigation, the Macks obtained a default.  Thereafter, on May 5, 2011, they put on their prima facie case, with Mrs. Mack being one of their testimonial witnesses.  Not knowing of the proceedings, neither DB nor GMACM appeared at the hearing.

23.    The Florida court entered its "Final Judgment" the same day.  It granted the Macks relief on both of their claims.  Among other things, the court awarded Mrs. Mack $150,00 in damages for emotional distress for the alleged RESPA claims, having found:

> Defendant, CHERYL M. MACK, experienced great mental
> distress, pain and suffering, including physical symptoms,

sf-3520637

including hospitalization, resulting therefrom as a result of the
stress during the foreclosure action wrongfully filed against
Defendants MACK.

(Final Judgment ¶ 11.)

24.    Particularly notable about this award  is that it came 21 months after the

commencement of the foreclosure, 19 months after Mrs. Mack's early November 2009 suicide

attempt, about 18 months after dismissal of the foreclosure and after the Macks sold their home

under a contract that closed early in 2010.  Thus, the $150,000 emotional distress award

encompassed *all* of the consequences of the foreclosure, of which the Letter was at most a sub

plot; the book was closed by that time.  In addition, there was no award whatsoever for Mr.

Mack since he was not then troubled by the foreclosure events.

25.    While the Final Judgment was not a final judgment for res judicata

*purposes*, it does place some common sense limits on the emotional distress and other (such as

medical expenses) damages that the Claimants now claim arose from the Letter alone, rather than

the larger foreclosure events of which the Letter was at most a subplot.

26.    Directly served with a copy of the Final Judgment around May 11, 2011,

DB then engaged counsel, who moved the Florida court to vacate the Final Judgment based upon

excusable neglect.  DB also argued that the RESPA award had to be set aside because nothing in

RESPA required a lender to report to the borrower a transfer of the loan to itself.   An evidentiary

hearing ensued in 2012, with post-trial briefing.

27.    In the post-trial briefing, the Macks, seeing that DB had a good argument

on the RESPA issues raised by DB, *expressly* argued in the alternative based on the Letter that

DB had violated § 2605(e), so the Final Judgment should stand on RESPA grounds.

Specifically, the Macks argued in Defendants Mack's [sic] Response to Objection and Motion

for Rehearing of Plaintiff Deutsche Bank and Motion for Reconsideration (dated December 5,

10

2012) (the "Reconsideration Brief") that, "The Counterclaim [of the Macks to the DB

foreclosure complaint] equated Plaintiff DEUTSCHE BANK as having the same legal status as

GMAC Mortgage, LLC . . . ."  (Reconsideration Brief 6.)  Thereafter, they wrote,

> Finally, the evidence produced in the Fla. R. Civ. P. 1.540(b)
> motion showed that Defendants MACK sent a written request to
> GMAC on October 26, 2009 asking for an explanation and relief
> from the foreclosure that Plaintiff DEUTSCHE BANK had filed.
> GMAC never answered despite the fact that this was a qualified
> written request under 12 U.S.C. § 2605(e) and a written response
> was required within 20 days.[5]

(Reconsideration Brief 7.)  They added, "Defendants MACK'S [sic] letter of October 26,

2009 . . . was a qualified written request under RESPA . . .which [was not] responded to."  (*Id.*)

The February 26, 2013 Final Order on Plaintiff's Motion to Set Aside Final Judgment and Set

New Trial, which sustained DB's argument about the RESPA notice issue, granted no relief to

the Macks under § 2605(e).

       28.     On February 26, 2013, the Florida court issued its Final Order on

Plaintiff's Motion to Set Aside Final Judgment and Set New Trial (the "Final Order").   Among

other things, the Florida court found that GMACM was DB's agent (¶ 2.a.i), that due to Stern's

misconduct, neither DB nor GMACM knew about the proceedings on the counterclaim until

after delivery of the judgment on May 11, 2011 (¶¶ 2.a.i, 2.b) that there was no excusable neglect

since Stern, counsel to DB, knew of the proceedings (¶ 2.b), that DB was correct that the RESPA

claim as originally plead had to be set aside, and that the damages previously awarded in the

Final Judgment were confirmed with some adjustments (including pre- and post-judgment

attorneys fees and interest), except that the award of $150,000 for emotional distress for violation

of § 2605(e) was vacated (¶¶ 1-4 of the SO ORDERED provisions).  The Final Order *did not*

---

[5] Actually, the deadline at that time was 60 days.

include any relief under § 2605(e) despite the Macks' *expressly* having attempted to recover under it.

29.    It also did not include any relief for any of the other theories that the Macks could have plead, along with the potentially sweeping damage claims they might entail. These included such claims as personal injury, malicious prosecution, and intentional infliction of emotional distress.  It also did not include any award for wrongful death because the Macks did not await Mrs. Mack's death to obtain a final judgment.  Thus, this Court has ruled that the Macks cannot recover for such claims even though they were pleaded in Claim No. 386 because they are barred by *res judicata*.  (Memorandum Opinion 21.)

## The Closing Chapters

30.    The Macks had decided in 2008 to sell their house because they could not afford to keep it and to move back to New Jersey to be with their relatives, who could also assist with Mrs. Mack's grave and worsening physical condition.

31.    They listed the Property for sale originally at $1.969 million (C. Mack afternoon depo, 4/4/12 27:11-13), dropping the price five times before the foreclosure began (and once afterwards).  (C. Mack depo, 11/16/11 31:4-20.)  They entered into a contract to sell the Property on December 9, 2010.  On December 22, 2009, Dr. Lichi recorded the following in his notes of an appointment with Ms. Mack:  "Sold the house!  Great pressure off."  The sale, for $1.275 million, closed on February 1, 2010.

32.    Later in 2010, they moved back to New Jersey.  There, they bought a house owned by Mrs. Mack's sister, Jewel DeMore for $345,000, resulting in mortgage payments far below those they had been making on the Property.  At that time, the financial

sf-3520637

information they submitted to take out a mortgage showed that their gross income still was only about $6,700 a month.

33.    In May of 2011, Mrs. Mack attempted yet again to commit suicide, her third such attempt, following those in 2005 and 2009.

34.    Mrs. Mack died on October 25, 2013.  The death certificate recites as the immediate causes of her death renal failure, congestive heart failure, cirrhosis of the liver and neuropathy.  As noted above, of these conditions, she suffered from at least the first two already even *before* GMACM commenced the foreclosure; and it is unsurprising that she also had cirrhosis in light of her long-time alcoholism.

## ANALYSIS OF THE LAW AND FACTS

### The Letter Cannot Be a QWR Because It Was Not Sent to the Designated Address

35.    Since 1994, the regulations adopted in connection with RESPA have allowed a servicer to designate a specific address to which a QWR must be sent provided that the borrower is given notice of the address in notice of transfer of servicing or by first class mail.  24 C.F.R. § 3500.21(e)(1); 24 C.F.R. § 3500.21(e).  If such a notice is given to the borrower, a letter cannot be a QWR if it is not sent to that specified address.  *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 182 (2d Cir. 2014) (citing *Berneike v. CitiMortgage Inc.*, 708 F.3d 1141, 1148-49 (10th Cir. 2013).  *Roth* is controlling in the Second Circuit, in which the Claimants' § 2605(e) claim is pending.  Per *Roth*, the Letter simply does not qualify as a QWR because it was sent to the address for general inquiries rather than the specified address for QWRs.

36.    Alternatively, as noted earlier, in trying to evade the application of *Roth* on January 12, 2015, counsel for the Claimants told the Court that the Macks intended the Letter as a *general inquiry*.  If it was intended by the Macks as a general inquiry properly addressed to

13

the Waterloo address for general inquiries, it was *not* a QWR.  And whatever the Claimants may

otherwise have argued, they cannot now change their story.  A party is bound by concessions he

made at oral argument.  *U.S. v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984); *Stahl v. Simon (In re

Adamson Apparel, Inc.)*, No. 12-57059, 2015 WL 2081575, at *8 (9th Cir. May 6, 2015);

*Hilao v. Estate of Marcos*, 393 F.3d 987, 993 (9th Cir. 2004).[6]

37.    Moreover, the Claimants equally are barred from doing so by judicial

estoppel.  *E.g., Peralta v. Vasquez*, 467 F.3d 98, 205 (2d Cir. 2006) (citations omitted) ("(1) the

party against whom . . .[judicial estoppel] is asserted must have advanced inconsistent positions

in a prior proceeding, and (2) the consistent position must have been adopted by the court in

some matter.").  The doctrine's purpose is to protect judicial integrity, *see, e.g., Uzdavines v.

Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005).  A party should not be permitted to make

a claim that suits it at the particular moment in order to obtain a favorable ruling without being

obliged to live with that claim even when it later becomes inconvenient because it is inconsistent

with a contrary claim the party later wishes to make.  Here the inconsistency between whether

the Letter was intended as a QWR or as a general inquiry is patent, as is the reliance of this Court

on the allegation that Letter was a general inquiry to deny the Trust's summary judgment motion.

Moreover, the Claimants' counsel made the above statements to successfully induce this Court to

deny a grant of summary judgment to the Trust on this issue.  (*See id.* 22:13-24.)

### The Claimants Are Barred by Res Judicata

38.    In ruling on the Objection, the Court rejected the Trust's argument that the

section 2605(e) claim was barred by res judicata for two reasons.  First the Court found that

because DB was a lender rather than a servicer, it could not have violate section 2605(e)

---

[6] Parties also are bound by the admissions and statements of their counsel.  *E.g., U.S. v. McKeon*, 738 F.3d 26, 30 (2d Cir. 1984); *In re George Love Farming, LC*, 366 B.R. 170, 181 (Bankr. D. Utah 2007).

sf-3520637

(Memorandum Opinion 22-23); second, it found that there was an insufficient nexus between the

section 2605(e) claim and the other claims entertained in the Florida action  The Trust

respectfully urges this Court to reconsider that ruling (*Id..*).

39.     As described above, the Macks expressly sought to have DB held liable

for a violation of section 2605(e).  (Reconsideration Brief 8.)  Although DB could not itself have

directly violated section 2605(e), there is no reason by it could not have been held vicariously

liable for the conduct of its agent, GMACM.  For example, neither the Restatement (Third) of

Torts § 13 (2000) (Vicarious Liability) nor the Restatement (Second) of Agency § 219) (1958)

(When Master is Liable for Torts of His Servants) require that a principal or master be capable of

violating the subject duty in order to be held liable for such a transgression by the servant or

agent.  Indeed, the Florida court found DB vicariously liable for the conduct of GMACM, it

agent, on the other claims it considered in the Florida action.

40.     Moreover, in allowing the Claimants to amend the Claim to include the

section 2605(e) theory, the Court expressly found that the section 2605(e) claim arose from the

same general course of conduct as the Claimants alleged in the original Claim as filed

(Memorandum Opinion 25) even though a lack of such a connection as the Court's basis for

overruling the Trust's arguments against amendment.  Thus, contrary to the Court's ruling on the

res judicata issue, the Court found that there *was* such a connection.

41.     The Trust therefore respectfully submits that it is proper for the Court to

reverse its res judicata ruling in the Memorandum Opinion.

## GMACM Cannot Be Liable for any Injuries to the Macks
## Prior to December 26, 2009

42.     Under section 2605(e) as then written, GMACM had 60 days in which to

respond to the Letter even if it were a QWR.  For obvious reasons, the cases hold that there can

be no violation of or claim under section 2605(e) until that time period has expired. *Zemer v. Am. Home Mortg. Serv., Inc.*, No. 11-15364, 2013 U.S. Dist. LEXIS 27488, *4-5 (E.D. Mich. Feb. 28, 2013); *Pinchot v. Bank of Am., N.A.*, No. 12-cv-12994, 2012 U.S. Dist. LEXIS 178415, *33-34 (E.D. Mich. Dec. 28, 2012); *Williamson v. Recon Trust Co., N.A.*, No. 2:CV 10-613-BLW, 2011 U.S. Dist. LEXIS 23876, *4-5 (D. Idaho March 8, 2011); *Kliesch v. Fifth Third Mortg. Co.*, No. 3:10-0600, 2010 U.S. Dist. LEXIS 125686, *7-8 (M.D. Tenn. November 29, 2010); *Harris v. Am. Gen. Fin., Inc.*, No. 02-1395-MLB, 2005 U.S. Dist. LEXIS 33260, *13 (D. Kan. July 6, 2005), aff'd, 259 Fed. Appx. 107 (10th Cir. 2007); *Payne v. Mortg. Elec. Registration Sys., Inc. (In re Payne)*, 387 B.R. 614, 635-36 (Bankr. D. Kan. 2008).

43.     It has been suggested in this case that a violation could have occurred sooner than the expiration of the statutory response period if, for example, the information at issue was readily available.  But that theory not only conflicts with the above cases, but with the plain language of the statute.  Section 2605(e) says that a response is due within 60 days.  It does not say, for example, that a response is due within a reasonable amount in light of the circumstances but no in event later than 60 days.  Moreover, Congress clearly knew how to accelerate the response time, for it later shortened it to 20 days.  *E.g., Cezair v. JPMorgan Chase Bank, N.A.*, No. 13-2928, 2014 WL 4295048 *7 n, 8 (D. Md. Aug. 29, 2014); *Steele v. Quantum Servicing Corp.*, No. 3:12-CV-2897-L, 2013 WL 3196544, *6 (N.D. Tex. June 25, 2013); *Henderson v. Wells Fargo Bank, N.A.*, 974 F. Supp.2d 993, 1017 (N.D. Texas 2013).  Thus, to attribute an unexpressed Congressional intent to require a response before the 60 days then in the statute not only conflicts with cases and the plain language of the statute, but also with the legislative record.

16

44.    It has also been suggested that compensable injuries may precede a

violation. *Justice v. Ocwen Loan Servicing*, No. 2:13-CV-165, 2015 WL 235738, *19 (S.D.

Ohio January 16, 2015) (costs of preparing QWR); *Marais v. Chase Home Fin., LLC*, 24 F.

Supp.3d 712, 726-28 (S.D. Ohio 2014) (costs of preparing QWR); *McMillen v. Resurgent

Capital Servs., L.P.*, No. 2:13-CV-00738, 2014 WL 3341337, *2-3 (S.D. Ohio July 8, 2014).

These three decisions, all by the same judge, rely on a hint for that result in *Marais v. Chase

Home Fin., LLC*, 736 F.3d 711, 721 (6th Cir. 2013) (remanding to district court to consider

plaintiff's arguments that such damages are recoverable under section 2605(e).  Indeed, the

district court decision in *Marais* is the Sixth Circuit case on remand.

45.    The Trust has not been able to find any other cases reaching the same

conclusion.  But it has found cases to the contrary, holding that only injuries that succeed a

violation are compensable. *Russell v. Nationstar Mortg., LLC*, No. 14-61977-CIV, 2015 WL

541893, *2 (S.D. Fla. Feb. 10, 2015); *Steele*, 2013 WL 3196544, at *8; *Cezair*, 2014 WL

4295048, at *8.  Indeed, as the district court noted in *Marais*, until the Sixth Circuit decision in

*Marais*, even itself and the other district courts in the Sixth Circuit thought that there could be no

recovery for pre-violation events under sections 2605(e) and 2605(f)(1). *Marais*, 24 F. Supp.3d

at 726-27.  And that conclusion is based not only on common sense, but again on the plain

language of the statute.  Section 2605(f)(1) provides for recovery of "actual damages to the

borrower *as a result of* the failure" of the servicer to respond within the statutory time period.

(Emphasis added.)  It is a matter of the English language that something that *precedes* something

else cannot *result from* it.

46.    Indeed, though reaching the result that it thought the Sixth Circuit's

decision in *Marais* envisioned, the district court recognized the force of these points. *Marais*,

sf-3520637

24 F. Supp.3d at 728.  The district court tried to reassure itself by arguing that when a contractor

takes money to build a project and then fails to do so, it is the pre-breach payment of money that

becomes the damages.  But this example misconstrues the situation.  The payment is the *measure*

of the damages that only arise when the loss occurs, that is, when the contractor breaches the

contract.  In sum, only injuries that occur *after* a section 2605(e) violation can be compensable

actual damages under section 2605(f)(1).

47.      But the story does not end there.  As the Court wrote in the Memorandum

Opinion, the Claimants must specifically trace any alleged compensable injury to GMACM's

alleged unlawful failure to respond to the Letter, as is reflected by the cases setting forth the

standard for pleading section 2605(f)(1) damages.  *E.g., Bonadio v. PHH Mortgage Corp.*, No.12

CV 3421 (VB), 2014 WL 522784, *6 (S.D.N.Y. Jan. 31, 2014) (must allege damages

proximately caused by violation and specifically how they resulted from the violation);

*Gorbaty v. Wells Fargo Bank, N.A.*, Nos. 10-CV-3291 (NGG)(SMG) & 10-CV-3354

(NGG)(SMG), 2012 WL 1372260 (E.D.N.Y. April 18, 2012), *5 (same); *Rubio v. U.S. Bank

N.A.*, No. C 13-05752 LB, 2014 WL 2602330, *10 (N.D. Cal. June 10, 2014) (injury must be

result of failure to comply with statute; must allege specific facts to show causation of actual

damages as a result of failure to comply with RESPA).[7]

48.      Given the preceding contours of damage doctrine under RESPA, the Trust

submits that the Macks *cannot* have suffered any damages even if the Letter was a QWR.  That

is because the evidence shows that they knew about the dismissal by Stern *before* GMACM's

response to the Letter (if it were a QWR) was due.  At the latest, they had the dismissal in hand

"towards the [Christmas] holidays."  But the response would not have been due until

---

[7] These cases also reinforce the concept that only injuries post-dating the violation are compensable.

18

December 26.  Thus, by the time the response would have been due, they knew there no longer was any foreclosure pending to trouble them.  By the same token, as noted above the Macks entered into a contract to sell the Property on December 9, 2009 and Mrs. Mack expressed great relief regarding the situation.  Once again, the crisis was over before GMACM's response was due; the foreclosure issue, and therefore the Letter, therefore, were moot.

49.     Finally, the Trust reiterates that by both applicable case law and the Memorandum Opinion, the Claimants will have to trace each alleged element of damages specifically to the alleged failure to respond.  The Claimants will have to show how that alleged failure resulted in each compensable injury.  It will not be enough, for example, to produce Mrs. Mack's post-violation medical records in bulk.  The Trust believes that the Claimants will have a hard time meeting that standard.[8]

**CONCLUSION**

50.     The Claim must be overruled.  The Letter cannot have served as a QWR because it was mis-addressed or because it was meant not as a QWR but as a general inquiry.  Moreover, the Claim is barred by res judicata.  In addition, the Macks cannot have suffered any damages because by the time GMACM's response period had expired, they already knew that the foreclosure had been dismissed and had inked a deal to sell the Property in any case.  Finally, the Trust believes that the Claimants will be unable to link specific alleged injuries to the QWR issue.

---

[8] Indeed, the Trust notes that Mr. Mack testified in April of 2012 that he had only recently begun to be troubled by the foreclosure scenario generally, over two years after the foreclosure played out.  (B. Mack depo, 4/4/12 34:11-35.)

19

sf-3520637

Dated:  May 27, 2015

/s/ Norman S. Rosenbaum
Norman S. Rosenbaum
Adam A. Lewis
Kristin A. Hiensch
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

*Counsel for the ResCap Borrower Claims Trust*

sf-3520637