**Hearing Date: June 10, 2015 at 10:00 a .m. (Prevailing Eastern Time)**

MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Norman S. Rosenbaum
Adam A. Lewis
Kristin A. Hiensch

*Counsel for the ResCap Borrower Claims Trust*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**NOTICE OF FILING OF PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW REGARDING PROOF OF CLAIM
NO. 386 FILED BY BARRY AND CHERYL MACK**

**PLEASE TAKE NOTICE** that in accordance with the *Court's Order Establishing Procedures for Evidentiary Hearing Regarding Claim No. 386 Filed by Barry Mack* [Docket No. 8362], the undersigned hereby files the attached *Proposed Findings of Fact and Conclusions of Law Regarding Proof of Claim No. 386 Filed by Barry and Cheryl Mack*.

- 1 -

ny-1189641

12-12020-mg    Doc 8658    Filed 05/27/15    Entered 05/27/15 14:24:25    Main Document
    Pg 2 of 14

- 2 -

Dated: May 27, 2015

/s/ Norman S. Rosenbaum
Norman S. Rosenbaum
Adam A. Lewis
Kristin A. Hiensch
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the ResCap Borrower Claims Trust*

ny-1189641

MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
Norman S. Rosenbaum
Adam A. Lewis
Kristin A. Hiensch

*Counsel for the ResCap Borrower Claims Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PROOF OF CLAIM NO. 386 FILED BY BARRY AND CHERYL MACK**

In accordance with the Court's Order Establishing Procedures for Evidentiary Hearing Regarding Claim No. 386 Filed by Barry Mack [Dkt. No. 8362], the ResCap Borrower Claims Trust (the "Trust") hereby files these proposed findings of fact and conclusions of law in advance of the trial regarding ResCap Borrower Claims Trust's Objection to Claim No. 386 Filed by Barry and Cheryl Mack [Dkt. 6763-4] (the "Objection").

## FINDINGS OF FACT

1. On August 8, 2012, Barry and Cheryl Mack (the "Macks" or "Claimants") filed Claim No. 386 (the "Claim") seeking recovery for alleged injuries arising from the mistaken foreclosure filed by debtor GMAC Mortgage, LLC ("GMACM") as servicer on behalf of Deutsche Bank Trust Company Americas as Trustee for RALI 2007QS3 ("DB") in 2009.

2. The Claim was substantially narrowed and deemed amended by the Memorandum Opinion Sustaining in Part and Overruling in Part Objection to Proof of Claim 386 [Dkt. 7297] (the "Memorandum Opinion").

3. In light of the Claimants' having previously sued GMACM in Florida state court over the foreclosure, this Court reduced the scope of the Claimants' case to a claim that in the aftermath of the commencement of the foreclosure GMACM failed to respond to a "qualified written request" (a "QWR") in violation of 12 U.S.C. § 2605(e), entitling them to damages, including damages for emotional distress, under 12 U.S.C. § 2605(f)(1).[1] *See* Memorandum Opinion 21-31.

### History Predating the Foreclosure

4. Claimants purchased the residence at 237 Egret Road, Naples, Florida (the "Property") in 2003 for $1.080 million, using a $990,000 mortgage. The Property is on a canal, has 4 bedrooms, 3.5 baths, two verandas, a swimming pool and a winch to place the Claimants' boat in the canal. In October of 2006, Claimants refinanced the Property with a loan, made by Primary Residential Funding, LLC (the "Loan"). Ownership of the Loan eventually was transferred to DB. GMACM was the servicer for the Loan at all times after November 1, 2006.

---

[1] 12 U.S.C. § 2605 is a section of 12 U.S.C. §§ 2601-2617, the Real Estate Settlement Procedures Act, or "RESPA".
sf-3538890

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

5.  The Claimants' monthly payments on the Loan were about $5,900 for the first 120 months and $7,700 thereafter. The Claimants had other expenses such as income and property taxes, food, clothing, maintenance of the Property and utilities. In order to make their monthly payments on the Loan, the Claimants had to invade their life savings and investments. Ultimately, they depleted their life savings and investments by more than $250,000. By March 28, 2008, the Claimants listed the Property for sale because they could no longer afford to reduce their savings.

6.  April of 2009, the Claimants were seeking a modification of the Loan from DB through GMACM, writing to GMACM on August 10, 2009 that they had exhausted their life savings and could not afford the mortgage any longer. The financial information they submitted in connection with the application showed a gross income of about $6,700. By 2009, Claimants had dropped the price of their Property five times.

7.  GMACM ultimately declined the Claimants' modification request on November 4, 2009, after reviewing financial and other submissions by the Claimants because, among other things, the Claimants lacked sufficient gross income to fund the proposed modification of the Loan.

### The Foreclosure and Its Aftermath

8.  Due to an error, on July 23, 2009, a GMACM employee entered a code in GMACM's internal computer system that designated the Loan for foreclosure. Even though GMACM promptly caught and corrected this error on the internal GMACM computer system, the erroneous entry triggered a foreclosure process in an external computer system used to communicate with outside counsel. As a result, local counsel filed the Complaint to Foreclose Mortgage on behalf of DB on August 20, 2009, thereby commencing the foreclosure action, even

though the Claimants were not in default on the Loan. GMACM discovered this mistake and notified local counsel on September 2, 2009 to dismiss the foreclosure action. Local counsel responded to the instruction on September 2, 2009 by confirming it had closed the file. In fact, local counsel did not file a dismissal of the foreclosure action until December 8, 2009.

9. In response to the foreclosure action, on September 11, 2009, the Claimants, through counsel David F. Garber, filed their Answer to Complaint for Foreclosure Mortgage, Affirmative Defenses and Counterclaim (the "Responsive Pleading") that contained the counterclaims seeking damages for alleged violations of 12 U.S.C. sections 2601 et. seq. and slander of title. DB did not answer or otherwise appear in response to the counterclaim until after the Claimants got a judgment against it. The Florida Court entered DB's default. On May 5, 2011, the Florida Court conducted an evidentiary hearing at which the Claimants put on their prima facie case. DB was not present at that proceeding. On May 5, 2011, the Florida Court entered its Final Judgment (the "Initial Florida Judgment") for the Claimants against DB awarding the Claimants a total of $469.470.27 plus attorneys' fees and costs on the counterclaims. The Initial Florida Judgment contained a $150,000 award to Mrs. Mack for emotional distress, but no award for Mr. Mack, who testified in April of 2012 that he had only then just begun to be bothered by the events of 2009-2010. There also was no award for any medical or related costs.

10. Upon being personally served with the Initial Florida Judgment on May 11, 2011, on July 14, 2011, DB filed Plaintiff's Motion to Set Aside Final Judgment and Set New Trial in the foreclosure action seeking to vacate the Initial Florida Judgment and set a new trial on the counterclaims (the "Motion to Vacate"). Among the arguments that DB made in the

Motion to Vacate was that the RESPA claims that the Claimants had made, for which the Florida Court had granted them judgment, could not as a matter of law be made against DB as the lender.

11. In opposing the Motion to Vacate, in their Defendant Mack's [sic] Response to Objection and Motion for Rehearing of Plaintiff Deutsche Bank and Motion for Reconsideration (dated November 5, 2012) (the "Motion to Vacate Opposition") the Claimants argued for a violation of RESPA section 2605(e) based on the Letter as an alternative RESPA theory to the ones that DB was attacking.

12. After an evidentiary hearing confined to whether DB had notice of the counterclaim and if not, whether its neglect was excusable, February 26, 2013, the State Court entered its Final Order on Plaintiffs' Motion to Set Aside Final Judgment and Set New Trial (the "Final Florida Judgment"), awarding the Claimants $321.970.77, plus attorneys' fees and costs, having reduced the award because it agreed with DB that, as matter of law, DB could not be held liable under the RESPA theories originally advanced by the Claimants. The Claimants recovered the amount of the judgment from a bond posted by DB, filing their Acknowledgment of Payment, and Partial Release and Assignment in the foreclosure action on or about March 20, 2013.

### The Letter

13. Shortly after the foreclosure action commenced, on October 26, 2009, the Claimants sent a letter (the "Letter") to GMACM, using an address other than the one specified for QWRs on the monthly mortgage statements GMACM sent to the Claimants. Indeed, evidence at trial included a copy of a monthly mortgage statement sent to Claimants, which plainly set forth a specific address for "general inquiries" and a separate address for QWRs. At his deposition, Mr. Mack testified that the Claimants' bookkeeper supplied the address. Later,

Claimants' counsel in this proceeding told the Court in January of 2015 that the Macks specifically selected the "general inquiries" address from among those they saw on the back of the monthly mortgage statement because thought that they were sending a "general inquiry," not a QWR. (See Transcript of 1/12/15 hearing 21:16-22:2.)

14. Under RESPA section 2605(e) at that time, GMACM had 60 days to respond to the Letter if it was a QWR. In 2012, that time period was reduced by amendment to a speedier 30 days. There is no direct evidence that GMACM received the Letter and no evidence that, if it did, it ever responded to it.

### Property Sold and "Great Pressure Off"

15. The Claimants entered into a contract to sell the Property on December 9, 2009. On December 22, 2009, Mrs. Mack told her psychiatrist, Dr. Eduardo Lichi, that as a result of the sale of the Property, there was "[g]reat pressure off." The sale of the Property closed on February 1, 2010. Thereafter they rented a home in Naples, Florida until they moved back to New Jersey in 2010 to be near their relatives, in part as a way of easing the consequences of Mrs. Mack's deteriorating physical condition.

16. After they moved to New Jersey, on or about October 29, 2010, they bought a house owned by Mrs. Mack's sister, Jewel DeMore, for $345,000. At that time, the financial information they submitted to the original lender, Gateway Funding Diversified Mortgage Services, L.P., which later sold the loan to GMACM, indicated that their gross income was about around $6,000 a month. Their monthly payments under this new loan were $1,528.35.

### Mrs. Mack's Health and The Closing Chapters

17. In 2002, Mrs. Mack had a liver transplant due to liver damage caused by genetic defect. Mrs. Mack was a chronic alcohol abuser prior to her liver transplant and, except for the six months following the operation, for the rest of her life. Mrs. Mack told the medical

providers for her transplant that she did not use alcohol.  At least one doctor suspected that Mrs. Mack's original liver problems resulted not only from her genetic defect, but also from her alcoholism.

18.    Mrs. Mack was chronically depressed from at least 2005, the year she began seeing Dr. Lichi, who diagnosed her as having "major depression," to the end of her life.  One cause of Mrs. Mack's depression was that Mrs. Mack's marriage to Mr. Mack was not a happy one.  She also told a provider in May of 2011 that Mr. Mack had long been both physically and emotionally abusive.  Another cause of her depression was the further strain on their marriage of their disagreement over whether to move back to New Jersey.  By 2007-08, Mr. Mack was pressing for them to move back to New Jersey to be near relatives, to ease the burden of her care and staunch the depletion of their savings.  Mrs. Mack did not want to move; she preferred to remain in the Property in Florida.

19.    Mrs. Mack attempted to commit suicide three times by a combination of sleeping pills and alcohol:  once in 2005, once in early November of 2009, and once more in May of 2011.  Apart from any damage caused by her suicide attempts, Mrs. Mack's physical health deteriorated steadily prior to as well as after her 2009 suicide attempt.  After her liver transplant, Mrs. Mack began taking an immunosuppressant, Prograf, to reduce the risk of rejection of the new organ by her body's immune defenses.  On August 17, 2009, Mrs. Mack was diagnosed suffering from "acute renal failure."  This diagnosis preceded her November 2009 suicide attempt and the commencement of the foreclosure action.  Mrs. Mack also suffered from "aortic insufficiency," essentially a faulty heart value that interfered with proper circulation of oxygenated blood.

20. Mrs. Mack entered hospice care in New Jersey on February 1, 2012. Mrs. Mack died on October 25, 2013. The death certificate recited that the immediate causes include cirrhosis of the liver, renal failure, congestive heart failure, and neuropathy.

## CONCLUSIONS OF LAW

Considering the stipulated facts and the evidence presented at trial, I conclude as follows:

21. **The Letter is not a QWR.** Since 1994, the regulations adopted in connection with RESPA have allowed a servicer to designate a specific address to which a QWR must be sent, provided that the borrower is given notice of the address in notice of transfer of servicing or by first class mail. 24 C.F.R. § 3500.21(e)(1); 24 C.F.R. § 3500.21(e). If such a notice is given to the borrower, a letter cannot be a QWR if it is not sent to that specified address. *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 182 (2d Cir. 2014) (citing *Berneike v. CitiMortgage Inc.*, 708 F.3d 1141, 1148-49 (10th Cir. 2013).

22. *Roth* is controlling in this Circuit. Per *Roth*, the Letter simply does not qualify as a QWR because it was sent to the address for general inquiries rather than the specified address for QWRs. Claimants were in fact given notice of the proper address for QWRs and the Letter was nevertheless sent to a different address.

23. Similarly, the Letter is not a QWR for the additional reason that, in trying to evade the application of Roth on January 12, 2015, counsel for the Claimants told the Court that the Macks intended the Letter as a general inquiry. If it was intended by the Macks as a general inquiry properly addressed to the address for general inquiries, it was not a QWR. And whatever the Claimants may otherwise have argued, they cannot now change their story. Claimants are therefore bound by their attorney's concession that the Macks intended the Letter as a general inquiry. A party is bound by concessions he made at oral argument. *U.S. v.*

sf-3538890

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

*McKeon*, 738 F.2d 26, 30 (2d Cir. 1984); *Stahl v. Simon (In re Adamson Apparel, Inc.)*, No. 12-57059, 2015 WL 2081575, at *8 (9th Cir. May 6, 2015); *Hilao v. Estate of Marcos*, 393 F.3d 987, 993 (9th Cir. 2004).[2]

24.     Moreover, the Letter is not a QWR for the additional reason that the Claimants are bound by judicial estoppel. *E.g., Peralta v. Vasquez*, 467 F.3d 98, 205 (2d Cir. 2006) (citations omitted) ("(1) the party against whom . . .[judicial estoppel] is asserted must have advanced inconsistent positions in a prior proceeding, and (2) the consistent position must have been adopted by the court in some matter."). The doctrine's purpose is to protect judicial integrity, *see, e.g., Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138 . 148 (2d Cir. 2005). A party should not be permitted to make a claim that suits it at the particular moment in order to obtain a favorable ruling without being obliged to live with that claim even when it later becomes inconvenient because it is inconsistent with a contrary claim the party later wishes to make. Here the inconsistency between whether the Letter was intended as a QWR or as a general inquiry is patent. Moreover, the Claimants' counsel made the above statements to successfully induce this Court to deny a grant of summary judgment to the Trust on this issue.

25.     **Claimants Are Barred From Recovery on the Claim Due to Res Judicata.** In ruling on the Objection initially, this Court rejected the Trust's argument that the section 2605(e) claim was barred by res judicata for two reasons. First, the Court found that because DB was a lender rather than a servicer, it could not have violated section 2605(e). Second, it found that there was an insufficient nexus between the section 2605(e) claim and the other claims entertained in the Florida action. In response to the Trust's request for reconsideration, and in reliance on the record at trial, this Court now reverses that ruling.

---

[2] Parties also are bound by the admissions and statements of their counsel. *E.g., U.S. v. McKeon*, 738 F.3d 26, 30 (2d Cir. 1984); *In re George Love Farming, LC*, 366 B.R. 170, 181 (Bankr. D. Utah 2007).

sf-3538890

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

26. As noted, the Macks expressly sought to have DB held liable for a violation of section 2605(e). Although DB could not itself have directly violated section 2605(e), it could have been held vicariously liable for the conduct of its agent, GMACM. For example, neither the Restatement (Third) of Torts § 13 (2000) (Vicarious Liability) nor the Restatement (Second) of Agency § 219) (1958) (When Master is Liable for Torts of His Servants) require that a principal or master be capable of violating the subject duty in order to be held liable for such a transgression by the servant or agent. Indeed, the Florida court found DB vicariously liable for the conduct of GMACM, its agent, on the other claims it considered in the Florida action.

27. The section 2605(e) claim arose from the same general course of conduct as the Claimants alleged in the original Claim as filed; Claimants are accordingly barred from recovery on the section 2605(e) claim under the doctrine of res judicata.

28. **GMACM Is Not Liable for any Injuries to the Macks Prior to December 26, 2009.** Under section 2605(e) as then written, GMACM had 60 days in which to respond to the Letter even if it were a QWR. For obvious reasons, there can be no violation of or claim under section 2605(e) until that time period has expired. Several cases so hold. *Zemer v. Am. Home Mortg. Serv., Inc.*, No. 11-15364, 2013 U.S. Dist. LEXIS 27488, *4-5 (E.D. Mich. Feb. 28, 2013); *Pinchot v. Bank of Am., N.A.*, No. 12-cv-12994, 2012 U.S. Dist. LEXIS 178415, *33-34 (E.D. Mich. December 28, 2012); *Williamson v. Recon Trust Co., N.A.*, No. 2:CV 10-613-BLW, 2011 U.S. Dist. LEXIS 23876, *4-5 (D. Idaho March 8, 2011); *Kliesch v. Fifth Third Mortg. Co.*, No. 3:10-0600, 2010 U.S. Dist. LEXIS 125686, *7-8 (M.D. Tenn. November 29, 2010); *Harris v. Am. Gen. Fin., Inc.*, No. 02-1395-MLB, 2005 U.S. Dist. LEXIS

33260, *13 (D. Kan. July 6, 2005), aff'd 259 Fed. Appx. 107 (10th Cir. 2007); *Payne v. Mortg. Elec. Registration Sys., Inc. (In re Payne)*, 387 B.R. 614, 635-36 (Bankr. D. Kan. 2008).

29.     This Court rejects Claimants' argument that a violation could have occurred sooner than the expiration of the statutory response period. Such a theory conflicts with the above cases and with the plain language of the statute. Section 2605(e) says that a response is due within 60 days. It does not say, for example, that a response is due within a reasonable amount of time in light of the circumstances but no in event later than 60 days. Moreover, Congress clearly knew how to accelerate the response time, for it later shortened it to 20 days. *E.g., Cezair v. JPMorgan Chase Bank, N.A.*, No. 13-2928, 2014 WL 4295048 *7 n, 8 (D. Md. Aug. 29, 2014); *Steele v. Quantum Servicing Corp.*, No. 3:12-CV-2897-L, 2013 WL 3196544, *6 (N.D. Tex. June 25, 2013); *Henderson v. Wells Fargo Bank, N.A.*, 974 F. Supp.2d 993, 1017 (N.D. Texas 2013). Thus, to attribute an unexpressed Congressional intent to require a response before the 60 days then in the statute not only conflicts with cases and the plain language of the statute, but also with the legislative record.

30.     This Court also rejects Claimants' argument that compensable injuries may precede a violation. Only injuries that succeed a violation are compensable. Only injuries that occur *after* a section 2605(e) violation can be compensable actual damages under section 2605(f)(1); no such injuries exist here.

31.     The Macks did not suffer any compensable damages even if the Letter was a QWR. The evidence shows that Claimants knew about the dismissal by Stern *before* GMACM's response to the Letter (if it were a QWR) was due. At the latest, they had the dismissal in hand "towards the [Christmas] holidays." But the response would not have been due until December 26. Thus, by the time the response would have been due, they knew there no

longer was any foreclosure pending to trouble them. By the same token, the Macks entered into a contract to sell the Property on December 9, 2009 and Mrs. Mack expressed great relief regarding the situation. Once again, the crisis was over before GMACM's response was due; the foreclosure issue, and the Letter, therefore, were moot.

32. Furthermore, the Claimants were unable to trace any compensable injury to GMACM's alleged unlawful failure to respond to the Letter, and accordingly Claimants failed to meet the standard for establishing section 2605(f)(1) damages as set out in the relevant case law on pleading such damages and in the Court' Memorandum Opinion in this matter. *E.g., Bonadio v. PHH Mortgage Corp.*, No.12 CV 3421 (VB), 2014 WL 522784, *6 (S.D.N.Y. Jan. 31, 2014) (must allege damages proximately caused by violation and specifically how they resulted from the violation); *Gorbaty v. Wells Fargo Bank, N.A.*, Nos. 10-CV-3291 (NGG)(SMG) & 10-CV-3354 (NGG)(SMG), 2012 WL 1372260 (E.D.N.Y. April 18, 2012), *5 (same); *Rubio v. U.S. Bank N.A.*, No. C 13-05752 LB, 2014 WL 2602330, *10 (N.D. Cal. June 10, 2014) (injury must be result of failure to comply with statute; must allege specific facts to show causation of actual damages as a result of failure to comply with RESPA). Indeed, Mr. Mack's April 2012 testimony indicates that he in particular suffered no injury whatsoever.

## CONCLUSION

33. For the reasons set forth above, the Objection is **SUSTAINED** in its entirety and the Claim is **DISALLOWED** and **EXPUNGED**.

**IT IS SO ORDERED**

Dated: June [__], 2015
      New York, New York

 

_____
MARTIN GLENN
United States Bankruptcy Judge

sf-3538890

**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**