1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg   Adv. Proc. No. 14-02388-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matters of:

7  RESIDENTIAL CAPITAL, LLC, et al.,

8             Debtors.

9  - - - - - - - - - - - - - - - - - - - -x

10  OCWEN LOAN SERVICING, LLC,

11             Plaintiff,

12          - against -

13  THE RESCAP LIQUIDATING TRUST,

14             Defendant.

15  - - - - - - - - - - - - - - - - - - - -x

16

17             United States Bankruptcy Court

18             One Bowling Green

19             New York, New York

20

21             May 14, 2015

22             4:16 PM

23  B E F O R E:

24  HON. MARTIN GLENN

25  U.S. BANKRUPTCY JUDGE

1

2    (Doc. No. 6297, 6926, 8129) Status Conference RE: ResCap

3    Liquidating Trust's Objection to Ocwen Loan Servicing, LLC's

4    Administrative Expense Claims.

5

6    Adversary proceeding: 14-02388-mg Ocwen Loan Servicing, LLC v.

7    The ResCap Liquidating Trust, a Delaware Statutory Trust

8    Status Conference

9

10   (CC: Doc# 7552, 7904) Status Conference RE:  ResCap Borrower

11   Claims Trust's Seventy-Fifth Omnibus Objection to Claims (No

12   Liability Borrower Claims) solely as to Claim of Rhonda

13   Gosselin, Hearing Going Forward solely as to Claim of Rhonda

14   Gosselin (Claim No. No. 3862)

15

16   (CC: Doc# 8072) Status Conference RE:  Motion for Objection to

17   Claim(s) Number: 2385, 2386, 2387, 2388, 2389 Filed by Duncan

18   Robertson

19

20

21

22

23

24

25

1

2  (CC: Doc# 8380) ResCap Borrower Claims Trust's Eighty-Fifth

3  Omnibus Objection to Claims ((I) No Liability Borrower Claims,

4  (II) Redundant Borrower Claims and (III) Misclassified Borrower

5  Claims).  The hearing on this matter, solely as it relates to

6  the claim filed by Phenon Walker (Claim No. 4966) and the claim

7  filed by Thomas G. Cooper (Claim No. 6272) has been adjourned

8  to June 4, 2015

9  Hearing as to other claimants will go forward.

10

11  (CC: Doc# 8452) Hearing RE: Motion for Objection to Claim(s)

12  Number: 5610, 5612.

13

14  (CC: Doc# 8459) Hearing RE:  ResCap Borrower Claims Trust's

15  Objection to Proofs of Claim Nos. 2769 and 2772.

16

17

18

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

4

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4       Attorneys for Residential Capital Liquidating Trust

5       and Residential Capital Borrower Claims Trust

6       250 West 55th Street

7       New York, NY 10019

8

9  BY:   JORDAN A. WISHNEW, ESQ.

10       ERICA J. RICHARDS, ESQ.

11       JAMES A. NEWTON, ESQ.

12       JAMIE A. LEVITT, ESQ.

13       TODD M. GOREN, ESQ.

14

15

16  CLIFFORD CHANCE US LLP

17       Attorneys for Ocwen Loan Servicing LLC

18       31 West 52nd Street

19       New York, NY 10019

20

21  BY:   JENNIFER C. DEMARCO, ESQ.

22

23

24

25

1

2    HUNTON & WILLIAMS LLP

3          Attorneys for Ocwen Loan Servicing LLC

4          200 Park Avenue

5          New York, NY 10166

6

7    BY:    PATRICK L. ROBSON, ESQ.

8          JOSEPH J. SALTARELLI, ESQ.

9

10

11    LAW OFFICE OF LAIRD HEAL

12          Attorneys for Gosselin Creditor

13          3 Clinton Road

14          Sterling, MA 01564

15

16    BY:    LAIRD J. HEAL, ESQ. (TELEPHONICALLY)

17

18

19    RICHARD RODE

20          Creditor Pro Se

21

22

23    DUNCAN K. ROBERTSON (TELEPHONICALLY)

24          Creditor Pro Se

25

1

2   ALSO PRESENT: (TELEPHONICALLY)

3         DAVID CUNNINGHAM, ResCap Liquidating Trust

4         CARL PALERMO, ServiceLink Agency Sales and Posting

5         ROD WALZ, Walz Group LLC

6         KATHY PRIORE, ResCap Liquidating Trust

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                    7

1                        P R O C E E D I N G S

2              THE COURT:  Sorry for the late start.

3              MR. GOREN:  No problem, Your Honor.  Todd Goren,

4     Morrison & Foerster, on behalf of the Res Cap Liquidating

5     Trust.

6              THE COURT:  Thanks, Mr. Goren.

7              MR. GOREN:  Good afternoon.  The first item on the

8     agenda is the status conference regarding Ocwen matters.

9              THE COURT:  Yes.

10             MR. GOREN:  There's two separate but related matters:

11    one an administrative claim objection and another records

12    management adversary proceeding.

13             THE COURT:  Let me just see -- who's appearing on

14    behalf of Ocwen?  Anyone?  Just make your appearance.

15             MS. DEMARCO:  Hi, Jennifer DeMarco for Clifford --

16             THE COURT:  Say it again, I'm sorry.

17             MS. DEMARCO:  I'm sorry.  Jennifer DeMarco from

18    Clifford Chance for Ocwen Loan Servicing on the administrative

19    claim matter.

20             THE COURT:  Go ahead.

21             MR. ROBSON:  Patrick Robson, and my colleague Joe

22    Saltarelli from Hunton & Williams, in connection with the

23    adversary proceeding.

24             THE COURT:  All right, thanks very much.

25             Okay, go ahead, Mr. Goren.

RESIDENTIAL CAPITAL, LLC, ET AL.                    8

1        MR. GOREN:  I'll cover briefly the adminis -- where we

2    stand on the administrative claim.

3        THE COURT:  Okay.

4        MR. GOREN:  And Ms. Levitt will cover the record

5    management adversary.

6        THE COURT:  Okay.

7        MR. GOREN:  On the administrative claim, prior to the

8    filing of our claim objection, we managed to winnow down the

9    universe of claims substantially, so that there was only a

10   handful left at that time.  By the time we got to our reply, we

11   were down to two claims:  one a secure access claim related to

12   indemnification from an alleged patent infringement; and

13   another claim that certain of the servicing advances we sent

14   them were faulty.

15       Subsequent to the filing of our reply, Ocwen sent us a

16   revised claim notice under the APA, in which they withdrew the

17   secure access claim and purported to amend the servicing

18   advance claim from about a two-million-dollar claim to about a

19   twelve-million-dollar claim.

20       THE COURT:  I bet you were really happy when you saw

21   that.

22       MR. GOREN:  Well, I was happy to see the secure access

23   claim go away.

24       THE COURT:  I'm sure you were.

25       MR. GOREN:  So now the only remaining issues are the

1  servicing advance claim the records management adversary.

2  There are really sort of two issues with the servicing advance

3  claim.  One, Ocwen has raised the objection that the servicing

4  advance claim isn't part of the administrative claim process

5  and shouldn't be litigated as part of that process.  And the

6  second is just whether the revised claim notice is valid at

7  all.

8           On the first issue, we've consulted with Ocwen, and

9  we're working on a stipulation, sort of taking a page out of

10 the playbook you suggested on the adversary proceeding, to put

11 that issue aside.  It's really, I think, largely irrelevant.

12 We both agree that this is -- we have a dispute on this issue,

13 and it's a dispute that needs to be litigated.

14           THE COURT:  When you say put it aside, the procedural

15 issue --

16           MR. GOREN:  Yes.

17           THE COURT:  -- of how to deal with it.  Let's get it

18 teed up and deal with it?

19           MR. GOREN:  Exactly.  Parties will reserve --

20           THE COURT:  Makes good sense.

21           MR. GOREN:  -- will reserve their rights and we'll set

22 it up so that we can have whatever argument --

23           THE COURT:  Yes.

24           MR. GOREN:  On the second question about whether it's

25 valid, what we've discussed and what we think make sense is to

1  stage that litigation so that the first question would be

2  whether they're entitled to amend the claim notice in the

3  manner they did.  Importantly, the ResCap Trust has done a

4  preliminary analysis, and we think that there's only about a

5  dozen loans that were in the initial claim notice that are in

6  the subsequent claim notice.  And those dozen loans, based on

7  our preliminary analysis -- and we're still going through it,

8  because it hasn't been long -- there's only about 60,000-

9  dollars'-worth of advances.  So if we're correct that they're

10  not entitled to amend the claim notice, then we think we have a

11  relatively small issue that could hopefully be resolved very

12  quickly.

13          If we're incorrect, then it's a much more cumbersome

14  and different issue to litigate, we have to go advance-by-

15  advance -- there's literally thousands of advances -- and

16  determine whether each advance breached a representation and

17  warranty in the APA, very difficult evidentiary issue.  So --

18          THE COURT:  Just educate me about what is your

19  argument as to why they can't amend the claim to bring in these

20  additional advances?

21          MR. GOREN:  Sure.  Essentially, the APA had a limited

22  set of core representations that survived for one year after

23  the closing of the sale.  And after that year passed, we had no

24  obligations for indemnification to them with respect to any

25  assets that they didn't claim in the initial notice.  So our

1    argument is --

2              THE COURT:  So you're saying the year passed, and now

3    they want to add additional --

4              MR. GOREN:  They want to add, what we believe, are new

5    assets.

6              THE COURT:  Okay.

7              MR. GOREN:  So that's essentially where the argument

8    is.  I think it's a fairly confined legal issue.  We're going

9    to work on a set of stipulated facts to govern that very

10   confined issue.  And our hope is that we can get that set of

11   stipulated facts done, and assuming we get that done, we could

12   brief it in the next forty-five days or so and tee it up for a

13   hearing sometime in July.

14             THE COURT:  I'm only shaking my head, because as I'm

15   sure you and your colleagues well know, ResCap is the case that

16   keeps giving and giving.  I must issue three opinions a week in

17   one aspect of ResCap or another.  There doesn't seem to be an

18   end in sight.

19             MR. GOREN:  I feel the same way.

20             So that's where we are on the servicing and advance

21   issue.  I don't know if Ms. --

22             THE COURT:  Let me ask this, Mr. Goren -- Ms. DeMarco,

23   are you the one who's dealing with this one?

24             MS. DEMARCO:  I am.

25             THE COURT:  Okay.  So are you and Mr. Goren in

RESIDENTIAL CAPITAL, LLC, ET AL.                        12

 1    agreement about procedurally how to try and deal with these

 2    issues?

 3              MS. DEMARCO:  Basically, Your Honor, we are.  We take

 4    the position that under the APA our rights under the APA are

 5    for a breach of contract.  But it does make this sense -- there

 6    is this indemnity escrow letter, and there's this dispute as to

 7    our demand under the indemnity escrow letter that will have to

 8    come before you at some point in time.

 9              They've taken an issue with the revised letter.  We

10    believe we had every right under the APA to revise it in the

11    matter we did, which --

12              THE COURT:  You believe New York's six-year statute of

13    limitations for breach of contract is the applicable provision?

14    Does New York law apply?

15              MS. DEMARCO:  We don't need to -- we don't even need

16    to go there --

17              THE COURT:  Yeah?

18              MS. DEMARCO:  -- we believe.  We describe the claims

19    in detail in the claim notice and --

20              THE COURT:  Okay.

21              MS. DEMARCO:  -- the schedule has changed.

22              So what we have decided on is how to tee up that issue

23    in the interim, because of their belief that we don't have the

24    ability to revise the notice.  And this way we'll either have

25    to go down the route of going through every loan, loan-by-loan,

1   which is how we discovered that the -- the estate had asked us

2   for additional backup on a loan-by-loan basis with respect to

3   the servicing advance claims, and the claims were basically

4   that the servicing advances under the APA that we purchased,

5   actually weren't entitled to be reimbursed at all, because they

6   were maintained on the books, even though they weren't

7   reimbursable, because they weren't within the guidelines -- the

8   servicing guidelines.

9         So they -- whether it was knowing or not, is left to

10  be seen.  But we -- it was going through on a loan-by-loan

11  basis that led us to the fact that these demands were -- or

12  these breaches were much larger -- sixfold -- than what we

13  thought they were initially.

14        THE COURT:  May I ask you, do you both agree that the

15  issue of whether the one-year limit is the applicable

16  provision, can that be resolved as a matter of law -- or if

17  not -- you think you can stipulate to the relevant facts, and

18  that no evidentiary hearing would be required?

19        MS. DEMARCO:  Well, the procedure that we've put in

20  place is to see if we can come up with stipulated facts.  And

21  in our initial discussions, we think we may be able to do that.

22        THE COURT:  Okay.

23        MS. DEMARCO:  If we can't, then we'll be back before

24  you with different procedures.

25        MR. GOREN:  But I think, yes, if we can agree on

 1  stipulated facts, and we've discussed generally what those

 2  stipulated facts should be, I think it's something you can

 3  resolve sort of akin to a summary judgment motion that -- based

 4  on the stipulated facts and the briefing.

 5          THE COURT:  What's a reasonable period of time for you

 6  to try and work out an applicable set of procedures for

 7  resolving the dispute and trying to reach stipulated facts?

 8          MR. GOREN:  I sent Ms. DeMarco a draft yesterday.  She

 9  came back this morning with a few conceptual comments.  I would

10  think within the next week --

11          THE COURT:  Okay.

12          MR. GOREN:  -- we could finalize that discussion.

13          THE COURT:  I'm going to be away for two weeks

14  starting Monday, so --

15          MR. GOREN:  Well, we hope to not bother you while

16  you're aware.

17          THE COURT:  You won't be bothering me while I'm away,

18  because you won't be able to reach me.

19          MS. DEMARCO:  Yeah, I don't think we'd be raising that

20  then.

21          THE COURT:  No, I'm just thinking, what might well

22  make sense is if you're able to reach an agreement -- I would

23  suggest, rather than getting into status letters and

24  everything, arrange a call, talk to Deanna, get a date for a

25  call, do it off the record, particularly if you have an

1    agreement as to how to proceed.  Schedule a call for an

2    afternoon.  Deanna will give you a date and time, we can do it

3    by telephone.  And you can sort of lay out for me how you're

4    proposing to proceed.  Does that make sense?

5              MS. DEMARCO:  That make sense.

6              MR. GOREN:  Sure.

7              THE COURT:  Okay.

8              MR. GOREN:  Okay.  So --

9              THE COURT:  So now you're going to deal with the

10   records management?

11             MR. GOREN:  Yes.

12             THE COURT:  Or Ms. Levitt's going to deal with the

13   records management.

14             MS. LEVITT:  Unless Todd wants to.

15             THE COURT:  And you're getting double-teamed on the

16   other side on this one.

17             MS. LEVITT:  Yeah, that's all right.  Good afternoon,

18   Your Honor.  So we are here on a status conference on the

19   adversary proceeding with respect to the records management

20   issues raised by Ocwen.

21             Your Honor, I don't think there's an enormous amount

22   to discuss on this.  We have fully briefed cross motions for

23   summary judgment.  We have a set of joint stipulated facts.

24   And we believe that this is ready for the Court to hear.  I

25   think we're really here for scheduling purposes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    16

1          THE COURT:  All the briefs are in already?

2          MS. LEVITT:  Yes.  You have six of them.  They're not

3    that long.

4          THE COURT:  Won't be in the next two weeks.

5          MS. LEVITT:  All right.  And I apologize, Your Honor,

6    but because it's the summer, I have a series of dates that

7    won't work.  So maybe we can put our heads together with the

8    Court and with Ocwen's counsel.

9          THE COURT:  Here's what I would suggest.  Why don't

10   you talk to my law clerks --

11         MS. LEVITT:  Okay.

12         THE COURT:  -- and you can do it when we -- either now

13   or by phone or whatever, and see whether -- so I get back June

14   1st.  And but I haven't look at a piece of paper in this.

15         MS. LEVITT:  Right.

16         THE COURT:  How voluminous are the briefs?

17         MS. LEVITT:  They're not voluminous -- they're not

18   voluminous at all.

19         THE COURT:  Okay.

20         MS. LEVITT:  So the opening briefs are

21   approximately --

22         THE COURT:  No, that's fine.  Somebody just --

23         MS. LEVITT:  -- fifteen pages, and they're --

24         THE COURT:  Yeah.

25         MS. LEVITT:  -- and they've relatively similar to one

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

1   another, just with the cross side -- I would really say you

2   have three briefs.

3              THE COURT:  Okay.

4              MS. LEVITT:  We're arguing the flip side of each

5   other's coins.

6              THE COURT:  Did you all confer about what would be a

7   mutually convenient date, for sort of mid-June?

8              MR. ROBSON:  I think we had proposed some dates when

9   we spoke with your clerk --

10             THE COURT:  Yeah, I didn't get --

11             MR. ROBSON:  -- for early June.

12             THE COURT:  -- don't blame them.  They probably tried

13  to give them to me and I ignored them.

14             MR. ROBSON:  I mean, we're available when the Court is

15  available.  And how is --

16             MS. LEVITT:  Yeah, I mean, there are dates in June and

17  July that work for us, and I'm happy to work with your clerks.

18             THE COURT:  All right, let me talk with my law clerks.

19  If you've given them the dates -- have you given them the dates

20  that work for both of you?

21             MS. LEVITT:  I don't really know.  Let me ask.

22             THE COURT:  Jamie, just talk to my clerks after --

23             MS. LEVITT:  Okay.

24             THE COURT:  -- and we'll come up with it.

25             MS. LEVITT:  Okay, great.

1           THE COURT:  Okay?

2           MS. LEVITT:  Thank you, Your Honor.

3           THE COURT:  All right.  Do you have anything you want

4    to add?

5           MR. ROBSON:  Nothing to add, Your Honor.  Thank you.

6           THE COURT:  Okay.  Can you just describe the issues

7    for me on this --

8           MS. LEVITT:  Yes, it's --

9           THE COURT:  -- dispute.

10          MS. LEVITT:  -- a -- I think it's pretty simple.  When

11   Ocwen took over servicing, there was a question of the storage

12   and the costs of all the loan files and servicing documents.

13   And the core dispute is whether we have an obligation --

14   ResCap -- to transfer the files to Ocwen or whether we have an

15   obligation to do something more.  And Ocwen's position is we

16   have an obligation to segregate and perhaps deliver those

17   files.  There's many millions of dollars of difference.

18          We believe we've done what is required and that the

19   agreement set this all out.  I don't want to get into a lot of

20   detail.

21          THE COURT:  No.  So this is basically -- it's a

22   contract dispute --

23          MS. LEVITT:  Contract dispute.

24          THE COURT:  -- about what the contract required in

25   terms of delivering or making available --

RESIDENTIAL CAPITAL, LLC, ET AL.                        19

1          MS. LEVITT:  Correct.

2          THE COURT:  -- the loan records.

3          MS. LEVITT:  Right.  And there's two contracts at

4    issue, the servicing transfer agreement and the transition

5    servicing agreement.  Just to make it easy, it's the STA and

6    the TSA.

7          THE COURT:  Okay.

8          MS. LEVITT:  And they have somewhat different

9    provisions.  We say one trumps.  They say they both exist and

10   they have different meanings.

11          THE COURT:  Okay.

12          MS. LEVITT:  It's a contract.  But I think the

13   language speaks for itself.

14          THE COURT:  All right.  Thanks very much.

15          Anybody who needs to be excused can be excused.

16          MS. LEVITT:  Thank you, Your Honor.

17          IN UNISON:  Thank you, Your Honor.

18      (Pause)

19          THE COURT:  Go ahead, Mr. Wishnew.

20          MR. WISHNEW:  Thank you, Your Honor.  Jordan Wishnew,

21   Morrison & Foerster, for the ResCap Borrower Claims Trust.

22   Next on today's agenda is the status conferences regarding

23   claims matters under Roman numeral III.  I'll be addressing

24   item number 1, and my colleague, Erica Richards, will be

25   addressing item number 2.

1        Item number 1 deals with the Rhonda Gosselin claim,

2    which is a part of the seventy-fifth omnibus objection.  Your

3    Honor, entered an order on April 21st, sustaining in part and

4    overruling in part our Claims Trust objection.

5        THE COURT:  Wait.  Is Ms. Gosselin --

6        MR. WISHNEW:  I think her counsel, Laird Heal is on

7    the phone.

8        MR. HEAL:  Yes, Your Honor, Laird Heal --

9        THE COURT:  Okay.

10       MR. HEAL:  -- for Ms. Gosselin, although today, she

11   told me she was going to get a different attorney.

12       THE COURT:  In for a dime, in for a dollar.  Until

13   you're relieved, you're in.

14       MR. HEAL:  Thank you, Your Honor.

15       THE COURT:  Okay.

16       MR. WISHNEW:  So Your Honor, the Court issued its

17   order on April 21st.  Promptly upon issuing the order, we spoke

18   with Mr. -- or we corresponded with Mr. Heal.  We invited him

19   to bring us what his client believed her damages were relating

20   to the claims that survived the objection.  We followed up on a

21   few occasions since then.

22       We were informed by Mr. Heal today that he's been

23   reaching out to his client.  He first got hold of her either

24   yesterday or today.  As you just heard, he -- she may be

25   seeking new counsel.  And at this point, she has not yet given

1   him really, any itemization of damages.  It's difficult for us

2   to -- "us" being the Borrower Claims Trust -- to engage in a

3   meaningful settlement discussion if we can't quite frame what

4   the claimant believes their claim might be, based upon the

5   Court's ruling.  At the same time, Your Honor, as you may know,

6   we also filed a motion for partial reconsideration of Your

7   Honor's decision based in part on the wrongful foreclosure

8   dispute.  So that would also potentially narrow the scope of

9   damages that Ms. Gosselin may be entitled to.

10          So in terms of a status, we'd like to move forward,

11  we're eager to move forward, but we do need some information --

12  some material information from Mr. Heal and his client, in

13  order to have some sort of discussion, figure out if this can

14  be resolved consensually, or move towards an evidentiary

15  hearing.

16          THE COURT:  Mr. Heal?

17          MR. HEAL:  Thank you, Your Honor.  Laird Heal.  I can

18  refer to -- we made an itemization of damages in the prior case

19  that was dismissed.  And then other than that, I can see if my

20  client thinks -- has a -- I should explain.  I had a stroke a

21  year ago, and sometimes I have trouble picking the right words

22  out.

23          But I will see if she has a change of mind, of idea.

24  I'm sorry -- that she will -- you know, if changed her mind.

25  And then if not, we've been associated for about five years,

1  and she hasn't been so far as to say I don't want to use you

2  for an attorney, but it's sometimes difficult to get her

3  attention.

4          THE COURT:  May I ask you this, Mr. Heal?  Where are

5  you geographically located and where is Ms. Gosselin?

6          MR. HEAL:  About an hour apart.  She's near

7  Springfield, and I'm near Worcester.

8          THE COURT:  Okay.

9          MR. HEAL:  But it's a -- I've gone to her house dozens

10 of times.

11         THE COURT:  Mr. Wishnew, does it make sense for you or

12 one of your colleagues, whoever the appropriate person is, to

13 try and arrange a face-to-face meeting with Mr. Heal and Ms.

14 Gosselin, to actually sit in a room to see whether you can --

15 in an effort to try and resolve things?

16         It sometimes helps to get everybody in the same room,

17 because you can have a dialog rather than Mr. Heal

18 communicating some information to you and then you getting back

19 to them.  You may have to have someone from the Trust present

20 for it.  But does that make sense at all, Mr. Wishnew?

21         MR. WISHNEW:  I mean, so we're talking about --

22         THE COURT:  Look, if you have to go forward with a

23 trial --

24         MR. WISHNEW:  Um-hum.

25         THE COURT:  -- it's going to cost the Trust more money

1   than taking a crack at sitting down with -- and I think -- my

2   suggestion is it be at Mr. Heal's office or Ms. Gosselin's

3   home; somebody goes up there.  And see if you can negotiate

4   something face-to-face.  If it doesn't work, it doesn't work.

5        MR. WISHNEW:  I mean, I'm certainly willing to try

6   anything to bring this to an expeditious resolution.  Perhaps

7   what might also help is if we can agree within three to four

8   weeks, Ms. Gosselin comes to the table and actually produces

9   some numbers, then we might save ourselves the trip.  But in

10  the first instance, we need the information to actually have a

11  fruitful discussion.

12        So I guess whether that -- whether that occurs in

13  Boston, in New York, over the phone --

14        THE COURT:  Mr. Heal, what's your view about it?

15        MR. HEAL:  Ms. Gosselin, in the past, has been very

16  effective talking to directly to an attorney.  In the

17  deposition she was very sharp.  And I think that would be good

18  for her.  A meeting in Springfield, might -- it's not a problem

19  for our side.  I'm not sure about for the Trust.

20        THE COURT:  Springfield isn't that far.  Springfield

21  isn't that far.  I just -- go ahead, Mr. Heal.  I'm sorry, I

22  cut you off.

23        MR. HEAL:  Thank you, Your Honor.  And as far as

24  putting a settlement or an offer, I will put that to Ms.

25  Gosselin and we'll see what she says.  I -- as I said, not only

1    I can decide.  I've contacted the only other attorney that I

2    know she's worked with and haven't heard back on that matter.

3    It may just have been that she was a little upset.

4            THE COURT:  Okay.

5            MR. HEAL:  It seems like if we make an offer, which is

6    what the Trust -- trustee wants -- then we can do some

7    negotiation.

8            THE COURT:  Mr. Heal, how long do you think it would

9    take for you to be able to get a demand from Ms. Gosselin?

10           MR. HEAL:  Thank you, Your Honor.  It would be perhaps

11   a couple of weeks.  I will try to reach her in the mail and see

12   if she responds.  And --

13           THE COURT:  Does she answer your phone calls?

14           MR. HEAL:  The problem, Your Honor, is that she hasn't

15   this past couple of weeks.  Ever since your decision, when I

16   tried to call her and had no answer.  In the past she would

17   call fairly quickly.

18           THE COURT:  If her demand is simply a number, it needs

19   to be supported by some rationale for how she gets there, not

20   just putting out a number unsupported by an explanation and

21   some support for it.  I really think that -- I'm willing to

22   show some limited patience to try and move this forward if --

23   I'm going to be away for two weeks.  If within two weeks, Mr.

24   Heal, you can communicate to Mr. Wishnew or his colleagues a

25   demand with an explanation, I'm prepared to order that the

RESIDENTIAL CAPITAL, LLC, ET AL.                    25

1   Trust's counsel and a representative of the Trust, if
2   necessary, go to Springfield and meet with you and Ms. Gosselin
3   in an effort -- for a face-to-face meeting, in an effort to try
4   and resolve this dispute.

5        If it doesn't get resolved, I'm just going to set down
6   a schedule.  I have not read Mr. Wishnew's motion for
7   reconsideration or partial reconsideration.  It's hit the stack
8   of other motions for reconsideration, usually coming from the
9   other side.  But it will get done in due course.  But I don't
10  force anybody to settle.  That's not my role.  I think
11  frequently settlement is the best course of action for the
12  parties -- both sides.  And usually the best settlement is one
13  that neither side is entirely happy with.

14       But so Mr. Wishnew, I'd ask for a status letter within
15  two weeks whether you've gotten a demand with an explanation of
16  the rationale for it from Ms. Gosselin.  And if you have, I
17  would urge you not to make me enter an order requiring you all
18  to travel to Springfield, work out the dates, put that in a
19  status letter as to what the status of it is.  And if
20  necessary, I'll schedule another telephone conference during
21  one of the omnibus hearings, and we'll move this forward.

22       I'm willing to give this a couple of weeks to see
23  whether it can be moved forward for a consensual resolution.
24  If not, it's going to move forward for a nonconsensual
25  resolution.

1           MR. WISHNEW:  Understood, Your Honor.

2           THE COURT:  Okay?  Mr. Heal, are we on the same page

3    on this?

4           MR. HEAL:  Yes, thank you, Your Honor.

5           THE COURT:  Okay, Mr. Heal, thank you very much.

6           MR. WISHNEW:  Thank you, Your Honor.  I'll turn the

7    podium over to my colleague, Ms. Richards.

8           THE COURT:  Okay.  And Mr. Heal, you're excused if you

9    want to hang up.  That's fine.  You can stay on if you want.

10          MR. HEAL:  Thank you, Your Honor.

11          THE COURT:  Okay.

12          MS. RICHARDS:  Hello, Your Honor.  Erica Richards of

13   Morrison & Foerster on behalf of the ResCap Liquidating Claims

14   Trust.  And I'm appearing in connection with item number 2 on

15   the status conferences regarding claim matters.  And that's the

16   status conference regarding the Liquidating Trust's objection

17   to the claims of Duncan Robertson.

18          THE COURT:  Is anybody on the phone for Mr. Robertson?

19          MR. ROBERTSON:  Yes, Duncan Robertson, pro se on the

20   phone.

21          THE COURT:  Good afternoon, Mr. Robertson.

22          MR. ROBERTSON:  Good afternoon, Your Honor.

23          THE COURT:  Go ahead, Ms. Richards.

24          MS. RICHARDS:  So in the order Your Honor entered

25   granting in part and overruling in part the Trust's objection

1    to Mr. Robertson's claims, you directed us to meet and confer

2    within fourteen days of entry of the order regarding the

3    possible settlement and also scheduling going forward.

4                We filed a letter at docket number 8602 indicating

5    that we did have a meet-and-confer on May 12th.  And the

6    Liquidating Trust requested some information from Mr. Robertson

7    regarding the amount of the surviving claims to help us frame

8    settlement discussions.  He indicated that he would provide

9    those materials, but that it would take him some time to pull

10   that together.

11               THE COURT:  Okay.

12               MS. RICHARDS:  So we agreed to continue settlement

13   discussions for forty-five days, and if we're unable to resolve

14   the matter within that time, we'll work to settle a joint

15   scheduling order and come back to the Court.

16               THE COURT:  Mr. Robertson, do you want to add

17   something?

18               MR. ROBERTSON:  Yes.  That's essentially what we came

19   up with.  What -- I do want to say that your comments on the

20   last case were actually very, very helpful, because what I was

21   looking at here is assembling seven years of business and

22   financial records, all the original copies.  And so I'm

23   scanning all that together with all the declarations and

24   supporting evidence and so on, on legal grounds, to submit for

25   this thing.  And it sounds like, for the proposes of

1  settlement, if I can produce what I have -- in other words a

2  description about what I have -- rather than shipping the whole

3  shebang to these folks.  That may be permissible.  That's why

4  the task seemed rather daunting when we were first talking

5  about it on the phone on Friday.

6          THE COURT:  Here's what I would urge, Mr. Robertson.

7  You and Ms. Richards should keep up -- should speak by

8  telephone, not now during the hearing, and you should try and

9  work out some understanding of what you can readily provide to

10  the Trust.  Hopefully that will be satisfactory.

11          I think the important thing is -- Mr. Robertson,

12  settlement works best when both sides are on a reasonably level

13  playing field about what the information is that is relevant to

14  your remaining claim.

15          MR. ROBERTSON:  I understand.

16          THE COURT:  I ruled -- obviously, I ruled as I did.

17  Some of your claims survived some didn't.  I'm glad to hear

18  that you and the Trust's counsel have agreed to try and

19  continue to pursue settlement.  I hope you're able to.  If not,

20  we'll move forward from there.

21          But what -- before you continue with your task at

22  producing seven years of records -- it may be that you'll have

23  to do that, certainly, if the case --

24          MR. ROBERTSON:  Yes.

25          THE COURT:  -- goes to trial -- but Ms. Richards, can

1   you talk with Mr. Robertson and see whether you can work out

2   what it is you need to see -- what information you need at this

3   point?

4          MS. RICHARDS:  Certainly, Your Honor.

5          THE COURT:  Okay, is that satisfactory for you, Mr.

6   Robertson?

7          MR. ROBERTSON:  Yes.

8          THE COURT:  Okay.  Do you have contact information,

9   Ms. Richards?

10          MS. RICHARDS:  We do, yes.

11          THE COURT:  Okay.  Ms. Richards will be in touch with

12   you, okay?

13          MR. ROBERTSON:  All right, and also I did --

14          THE COURT:  And let's see -- let's see where we get

15   to, okay?

16          MR. ROBERTSON:  All right.

17          THE COURT:  All right, thanks very much.

18          MR. ROBERTSON:  Thanks very much, Your Honor.

19          THE COURT:  Okay.

20          MS. RICHARDS:  With that, Your Honor, Jordan Wishnew

21   is back up.

22          THE COURT:  Okay.

23          MR. WISHNEW:  Good afternoon, Jordan Wishnew of

24   Morrison & Foerster for the ResCap Borrower Claims Trust.  We

25   move now to section IV of today's agenda, the claims

1  objections.  I'll address item number 1, the eighty-fifth

2  omnibus objection to claims.  This was filed at docket number

3  8380 on March 27th, 2015.

4         Your Honor, through the eighty-fifth omnibus

5  objection, the Borrower Trust seeks to expunge fifty-two proofs

6  of claim that do not represent valid pre-petition claims

7  against the debtors.  The objection contains multiple exhibits.

8  There are twenty-three claims reflected on Exhibit A to the

9  objection.  And the objection to those claims is based upon no

10  evidence of specific wrongdoing by the claimants against the

11  debtors.

12         The Borrower Trust thoroughly examined the debtors'

13  books and records in an effort to validate the accuracy of the

14  allegations made, and their responses on the claims at issue,

15  and determined the --

16         THE COURT:  May I ask you to hold a minute?  I left my

17  memo on the eighty-fifth on my desk.  I'm going to get it,

18  okay?  Everybody just stay seated.

19     (Pause)

20         THE COURT:  Okay, back on the record.  Go ahead, Mr.

21  Wishnew.

22         MR. WISHNEW:  Thank you, Your Honor.  So Exhibit A to

23  the proposed form of order deals with those claims where based

24  upon inspection of the debtors' books and records, we don't

25  believe a claim was validly asserted against the debtors.

1    Exhibit B deals with duplicative claims.  Exhibit C seeks to

2    reclassify certain claims from secured to unsecured, because on

3    the face of the claims, there's no stated valid basis for

4    secured status.

5            The Borrower Trust -- responses to the objection were

6    due on April 27th.  Due to certain issues with service, the

7    Borrower Trust adjourned the hearing on claim number 4966 filed

8    by Phenon Walker, and claim 6272 filed by Thomas and Catherine

9    Cooper, both of whose claims are on Exhibit A.  Those matters

10   will be taken up on June 4th in order to give those claimants

11   sufficient time to respond to the objection.

12           The Borrower Trust did receive a timely response to

13   the objection from Ms. Gale Gibbs.  This was filed at docket

14   number 8542.  And on Monday, we received a response to sixteen

15   claims filed by Robert D. Eberwein that was filed at docket

16   8597.  Those sixteen claims are found on Exhibit B.

17           THE COURT:  May I ask, is anybody appearing for Gale

18   Gibbs of Robert D. Eberwein?

19           No response.  Go ahead.

20           MR. WISHNEW:  Thank you, Your Honor.  The Borrower

21   Trust filed its reply in support of the objection at docket

22   number 8589, as it relates to the Gibbs objection.  In support

23   of the objection, in the reply, the Borrower Trust submitted

24   its supplemental declaration from Mr. David Cunningham,

25   director of the ResCap Liquidating Trust, who is on the phone

RESIDENTIAL CAPITAL, LLC, ET AL.                        32

1  today.

2          Putting aside the responses for one moment, Your

3  Honor, I respectfully request that the Court grant the eighty-

4  fifth omnibus claims objection as to the uncontested claims, on

5  the basis stated in the objection, as well as Exhibits A, B,

6  and C to the objection.

7          THE COURT:  All right.  It's granted as to the

8  unresponded to portions of the objection.

9          MR. WISHNEW:  Thank you.  Thank you very much, Your

10 Honor.

11         With regards to the Gibbs response, Your Honor, Ms.

12 Gibbs filed a claim designated as claim number 4701, asserting

13 a secured claim for $50,000 dollars, a general unsecured claim

14 for $33,000 -- $33,352.55, against GMAC Mortgage.

15         Her claim appears to be premised on the conclusory

16 allegation that all the loans originated by the debtors since

17 1986 are fraudulent.

18         THE COURT:  Let me stop you, since Ms. Gibbs has not

19 made an appearance.  The ResCap Borrowers Claims Trust's

20 eighty-fifth omnibus objection to claims is filed as ECF docket

21 8380.  Ms. Gibbs filed an opposition which is at 8542.  Ms.

22 Gibbs took out a 50,000-dollar home loan with the debtor

23 Homecomings Financial Network Inc., in August 2006, evidenced

24 by a note encumbering real property located in Arlington,

25 Texas.

1    Residential Funding Company purchased the loan from

2  Homecomings and transferred the loan to Deutsche Bank Trust

3  Company Americas, on September 28, 2006, when the loan was

4  securitized.  Homecomings serviced the loan from August 17,

5  2006 until July 1, 2009, when servicing rights were transferred

6  to debtor GMAC Mortgage, LLC.  GMAC Mortgage serviced the loan

7  from July 1, 2009, until transferring of servicing to nondebtor

8  Ocwen Loan Servicing on February 16, 2013.

9    Gibbs filed proof of claim 4701, asserting an

10 $83,352.55 general unsecured claim against GMACM for "fraud in

11 the factum and compensated conversion of promissory note."  The

12 claim amount is purportedly comprised of $50,000 for the note,

13 $2,000 for a down payment, $29,000 for estimated interest, and

14 $2,352.55 for current escrow.

15    The claim states, "If my limited comprehension of

16 derivative financial instruments is inaccurate, and this claim

17 is in error, a judgment may void this claim."  No other

18 document or explanation was provided in the proof of claim.

19    On June 21, 2013, the debtors mailed Gibbs a letter

20 requesting additional information and documentation in support.

21 On July 29, 2013, Gibbs responded by a letter stating that:

22 "Every loan contract since about 1986 is a fraud in the factum,

23 deceptive trade practice."  Gibbs asserts that she is generally

24 a victim of the defendant's alleged fraud and deceptive trade

25 practices.  She also asserts that, she "deserves at least

1    ninety percent of the profit gain from the sale of all of the

2    derivatives of which her trust is part of the trust that was

3    securitized and sold."

4            The Trust objected to the claim arguing that Gibbs

5    makes conclusory allegations and proffers no evidence

6    whatsoever showing how the debtors purportedly harmed her in

7    any way or that the debtors owe her any money.

8            Gibbs then filed an opposition objecting that the

9    Trust's objection was not timely filed and is therefore barred

10   by laches.  Additionally, she argues that her claim -- she has

11   a "perfected claim."  I won't go on.

12           The objection to the Gibbs claim is sustained.  Gibbs

13   fails to state a claim against the debtor.  She has offered

14   merely cryptic conclusory allegations of the debtors'

15   practices, without offering any evidence of plausible factual

16   allegations.  All of the events concerning an alleged agreement

17   entered into between Gibbs and the debtors are alleged to have

18   transpired after Ocwen began servicing the loan.

19   Additionally -- I'll stop there.

20           She also complains about the ballot in connection with

21   plan confirmation, arguing that under Bankruptcy Code Section

22   1126(f), the debtors conclusively presumed to have accepted the

23   plan and therefore I'm not entitled to vote on -- it makes no

24   sense.  The objection is sustained.

25           MR. WISHNEW:  Thank you, Your Honor.  That brings us

1   to the second response which we received this past Monday

2   dealing with the claims of Mr. Eberwein, E-B-E-R-W-E-I-N,

3   claims number 295 through 313.  These nineteen --

4           THE COURT:  Is Mr. Eberwein on the phone?  Is anyone

5   present in court for Mr. Eberwein?

6           Go ahead.

7           MR. WISHNEW:  Thank you, Your Honor.  The Borrower

8   Trust objects to the sixteen claims at issue because they are

9   substantially similar to other claims filed by the same

10  claimant.

11          In the response, Mr. Eberwein does not provide any

12  reason that these claims are not duplicative.  All the claims

13  were filed by the same entity, signed by the same individual,

14  and all assert an SEC servicing fee for four cents, but do not

15  assert the basis for any of the debtor's responsibility for

16  such fee.  Each claim is identical in its detail.  As a result,

17  we've determined that it be most fair, at this point, to keep

18  three surviving claims at each of the debtor groups, pending

19  further objections, provided that those claims are treated as

20  unsecured claims, because there's no valid basis stated for

21  secured status.  And in that regard, Your Honor, we'd ask that

22  the claims on Exhibit B be expunged, and those on Exhibit C be

23  reclassified, for now, to general unsecured claims.

24          THE COURT:  The objection is sustained.  Eberwein

25  appears to be associated with a number of redundant claims

RESIDENTIAL CAPITAL, LLC, ET AL.                          36

1  asserted by an entity named NDEX West LLC in the amount of four

2  cents.  The Eberwein application is incomprehensible and

3  consists solely of the following documents:  1) a letter from

4  the Clerk of the Court to Eberwein dated April 27, 2012

5  indicating several deficiencies with respect to a Chapter 11

6  case apparently filed with the court by Eberwein and a co-

7  debtor.  That is case number 12-11580-shl -- my colleague,

8  Judge Lane -- including nonpayment of the filing fee and other

9  deficiencies.  2) A cover page of a time schedule order entered

10 in a case before the Ninth Circuit styled Fedelina Roybal de

11 Aguero v. Wells Fargo, NA, case number 15-15638.  3) page 12 of

12 the affidavit of service.  And 4) claim number 312 filed by

13 NDEX listing Eberwein as a notice party.

14         The Trust does not address the Eberwein application in

15 its reply, however Exhibit B to the proposed order indicates

16 that each redundant claim filed by NDEX is substantially

17 identical to eighteen other claims filed by NDEX, and provides

18 the Trust -- and the Trust will address NDEX's surviving claim

19 in due course.  The objection is sustained.

20         MR. WISHNEW:  Thank you, Your Honor.  That brings us

21 to the second claim objection on today's calendar.  I will turn

22 the podium over to my colleague, Ms. Richards.

23         THE COURT:  Okay.

24         MS. RICHARDS:  Hello, again, Your Honor.  Erica

25 Richards of Morrison & Foerster, this time appearing on behalf

1  of the ResCap Borrower Claims Trust.  The next item on the

2  agenda is the Borrower Trust's objection to the proofs of claim

3  filed by Richard Rode.

4          THE COURT:  May I ask, who's present in court?

5          MR. RODE:  Richard Rode.

6          THE COURT:  Okay.  Otherwise we were going to jump

7  to -- I apologize, you've had to sit here through all of this.

8          MR. RODE:  It's absolutely no problem.

9          THE COURT:  All right.  Go ahead.

10          MR. RODE:  I've enjoyed it.

11          THE COURT:  Well, I'm -- that's a problem -- I'm not

12  sure I would use that term for it, but go ahead.

13          MS. RICHARDS:  Your Honor, I would also note that on

14  the line is Kathy Priore, who's in-house associate counsel for

15  the ResCap Liquidating Trust, and she's submitted a declaration

16  in support of the objection.

17          Mr. -- so the objection was filed at docket number

18  8452.  Mr. Rode filed a response to the objection which is at

19  docket 8561.  And the Borrower Trust filed a reply at docket

20  number 8603.

21          The objection concerns two proofs of claim filed by

22  Mr. Rode against Homecomings, which was claim number 5612; and

23  against GMAC Mortgage, claim number 5610.  I would note that

24  was initially filed against ResCap and was reclassified to be

25  against GMAC pursuant to the thirty-sixth omnibus claims

1    objection.

2              Each of the claims was filed in the face amount of

3    1,262,000 dollars, of which a portion is secured -- 339,000

4    dollars -- and the remainder is claimed as unsecured.

5              The Borrower Trust has objected to the proofs of claim

6    on the basis that they fail to state legally cognizable claims

7    against the debtors.  Additionally, as set forth in the reply,

8    the Borrower Trust is objecting to the claims that are

9    described in Mr. Rode's response on the basis that they're

10   brand new claims, based on new allegations raised for the first

11   time.  And as such, they don't relate back to the claims set

12   forth in his proofs of claim, and therefore Mr. Rode should be

13   precluded from asserting them now.

14             If it'll be helpful to Your Honor, before I turn to

15   the merits of Mr. Rode's claims, I could summarize the

16   background, as we understand it relating to the loan?

17             THE COURT:  Sure, go ahead.

18             MS. RICHARDS:  So Mr. Rode is a borrower under a loan

19   that was originated by Southtrust Mortgage Corporation in 2003.

20   The debtor, Residential Funding Corporation, purchased that

21   loan and transferred it to a securitization trust shortly after

22   origination.  Deutsche Bank was the trustee and Homecomings

23   serviced the loan from the time RFC purchased it through May

24   2007.  At that point, servicing was transferred to GMAC

25   Mortgage, who was servicer until the February 2013 sale to

1  Ocwen.

2          Mr. Rode applied to GMAC for a loan modification in

3  2008.  He was approved for a permanent modification in October

4  2008.  But due to various delays in finalizing the paperwork,

5  the modification had to be reset a number of times.

6          THE COURT:  May I -- look, I'll let you go on with the

7  chronology, but in reading the papers relating to your

8  objection to the Rode claim -- I want to be careful -- don't

9  misunderstand what I'm saying -- in some ways it was almost

10 like a comedy of errors, because you -- GMAC would agree on a

11 modification and send the documents, and at some point Mr. Rode

12 agreed, and then GMAC concludes, oh, we made a mistake in

13 computing the escrow, we've got to redo it, but they don't send

14 him the documents right away.  It's like it was ships

15 passing -- excuse me, I mean, I'm not -- this is not faulting

16 you in any respect, and I don't mean to make light of it by

17 talking about a comedy of errors --

18         MR. RODE:  You're right on.

19         THE COURT:  -- but I'm reading this chronology about

20 what happened.  Whether it's actionable or not is a different

21 issue.  GMAC didn't put its best foot forward in the way it

22 dealt with Mr. Rode and his loan modification.  And arrears

23 keep building up, and so the amount has to be adjusted.  You

24 basically acknowledged there were some errors made in -- with

25 the amounts in the escrow, correct?

RESIDENTIAL CAPITAL, LLC, ET AL.                    40

1      MS. RICHARDS:  With the amounts in the escrow?  No,

2  Your Honor, we don't agree that there were errors in the

3  escrow.

4      THE COURT:  Well, I thought there was an insurance

5  escrow that was set up, and then there was a refund and how

6  that was going to be dealt with.  Because you put force-placed

7  insurance.  I don't -- I'm not getting into the facts of

8  whether -- I don't know whether Mr. Rode contends that he had

9  insurance placed all along or whether it was just a question of

10 GMAC didn't have the information it needed to know; it needed

11 to be sure that the properties were properly insured.  That I

12 have no clue about.

13     MS. RICHARDS:  I believe I have responses to all of

14 that, Your Honor.

15     THE COURT:  Go ahead.

16     MS. RICHARDS:  And the first thing I would say is, I

17 don't disagree that the process for getting Mr. Rode a loan

18 modification was messy here.  That doesn't necessarily mean

19 that he has a legal claim.

20     THE COURT:  I agree with that.  I'm not saying one way

21 or -- that's not a ruling.  It doesn't follow from the fact

22 that the process was a mess that it does or doesn't give rise

23 to a claim or what the claim might be.

24     MS. RICHARDS:  Agreed, Your Honor.  So -- and I think

25 I'll be able to address some of your other questions or

1    statements in the course of my argument.

2           So again, there were -- he was initially approved for

3    a permanent modification in October 2008, and it was reset a

4    number of times after that.  And I believe -- it was some point

5    during this process that Mr. Rode retained counsel to assist

6    him with obtaining the loan modification and with disputes

7    regarding the handling of his escrow account.  In August --

8           THE COURT:  I was --

9           MS. RICHARDS:  Yes?

10          THE COURT:  -- much more focused on the August 2009 --

11          MS. RICHARDS:  Agreed.  And that's next --

12          THE COURT:  -- mess.  That's what it was.  It was a

13   mess, okay?

14          MS. RICHARDS:  Yes.  So in August 2009, GMAC approved

15   Mr. Rode for a new loan modification.

16          THE COURT:  And of course, you sent him the documents

17   and have him sign it, and then they countersigned it?

18          MS. RICHARDS:  GMAC countersigned it on the same day

19   that a 5,000-dollar insurance refund came in.

20          THE COURT:  Okay.

21          MS. RICHARDS:  And so --

22          THE COURT:  But you never sent him the countersigned

23   version?

24          MS. RICHARDS:  But GMAC did not send him the

25   countersigned agreement, because as soon as they started to

1  process the modification papers -- and at this point, more than

2  a month -- almost two months had elapsed since they'd initially

3  sent him the papers.  When they sent -- when they approved him

4  for the modification and they sent it to him, his escrow

5  account had a negative balance of almost 10,000 dollars.

6          THE COURT:  In then lo and behold a refund comes back

7  and it's no longer a negative balance or not as bit a balance.

8          MS. RICHARDS:  Well, the ref -- correct.  Not as big

9  of a negative balance.  So when it was 10,000 dollars in the

10  red, what GMAC agreed to do was capitalize 5,000 of the

11  negative balance and forgive 10,000 dollars.  So he would have

12  a -- at that point, a positive balance of 5,000 dollars.  And

13  the intent here was twofold:  one to make Mr. Rode's loan

14  payments manageable for him; and two, to make sure that GMAC

15  was no longer advancing payments on taxes and insurance out of

16  its own pocket.  Because that's what it does when the escrow is

17  negative.

18          THE COURT:  So can I ask this?  When GMAC received

19  this refund and didn't send the signed papers, did somebody

20  call Mr. Rode or his attorney to explain why?

21          MS. RICHARDS:  Your Honor, I know that Mr. Rode had

22  counsel.  I'm not sure --

23          THE COURT:  Well, what do your servicing notes -- do

24  the servicing notes show that GMAC responded and explained why

25  it wasn't returning the signed modification agreement?

 1          MS. RICHARDS:  The servicing notes don't reflect that

 2     the debtors contacted Mr. Rode or his counsel to explain.  They

 3     reflect that GMAC voided the mortgage and started to

 4     recalculate it.

 5          THE COURT:  And did they tell Mr. Rode or his attorney

 6     that that's what was happening?

 7          MS. RICHARDS:  I don't -- there's not evidence in the

 8     books and records of how it was communicated or whether it was

 9     communicated.

10          THE COURT:  Okay.

11          MR. RODE:  Your Honor, if I may?

12          THE COURT:  No, you'll get your chance.

13          MR. RODE:  All right.

14          THE COURT:  If you want to make a note that you want

15     to come to that point --

16          MR. RODE:  All right.

17          THE COURT:  -- okay, I'll be happy to listen to you

18     then.

19          Go ahead.

20          MS. RICHARDS:  But so when the refund came in and they

21     started to process the modification, they realized that the

22     amounts didn't work out and that GMAC's intent in entering into

23     the loan modification was being foiled, essentially, as a

24     result of the --

25          THE COURT:  Through no fault of --

RESIDENTIAL CAPITAL, LLC, ET AL.                    44

1          MS. RICHARDS:  -- escrow balances.

2          THE COURT:  -- Mr. Rodes.

3          MS. RICHARDS:  Through no fault of Mr. Rode's, but

4    also through no fault of GMAC's.

5          THE COURT:  You know, if somebody had sent a letter

6    explaining it or if there was some indication that they called

7    Mr. Rode or his attorney and explained what the situation

8    was -- that's where I'm drawing a complete blank.  It's like

9    a -- I see this black hole.

10         He thinks he's getting a modification, he's agreed to

11   a modification, he's waiting for it come back from GMAC; where

12   is it?

13         MS. RICHARDS:  Understood, Your Honor.  But the record

14   does show that he knew he hadn't received it, and he called --

15   he contacted GMAC to say I haven't received it.  The record

16   doesn't show what their response was.  But it's clear that he

17   wasn't relying on it waiting for it to come back, because he

18   knew, for whatever reason, it hadn't come back.  It hadn't been

19   finalized.  It hadn't been countersigned and sent to him.

20         THE COURT:  And I know that Mr. Rode's attorney sent a

21   letter to GMAC -- two letters, October 29 and October 30th,

22   2009, indicating that Mr. Rode did not intend to perform on the

23   terms of the August 2009 modification agreement, because he had

24   not received a countersigned copy of the agreement.  Agreed?

25         MS. RICHARDS:  Agreed, Your Honor.  And so I would

1   say, at this point, it's perhaps appropriate to address what

2   that means.  The modification wasn't approved -- or was

3   approved.  Either way, Mr. Rode still had an obligation under

4   the note to make his mortgage payments.  The question here was

5   how much those payments would be, whether they were in the

6   reduced modified amount --

7            THE COURT:  Well, do you think when you -- had

8   GMACM's -- I understand they didn't countersign -- or maybe

9   they countersigned, but they didn't send it back to him.  Had

10  he been told that he'd been approved for that modification?

11           MS. RICHARDS:  When the application is sent, I believe

12  the letter says you have been approved for a modification

13  subject to signing and -- you know -- whatever other closing

14  conditions there are.

15           THE COURT:  So does a borrower have any rights where

16  you tell him he's been approved; he's signed it; agrees to it;

17  and then he's met with radio silence from GMAC?  So you say

18  he -- it doesn't matter whether he was approved or not, his

19  obligation -- because it wasn't sent back to him, his

20  obligation under the note continued.  But here he's been -- let

21  me ask you.  Was he told that he'd been approved?

22           MS. RICHARDS:  He was told at the time the application

23  was sent to him that he had been approved.

24           THE COURT:  Okay, and does that give rise to any

25  duties on the part of the loan servicer?  Or can you just pull

RESIDENTIAL CAPITAL, LLC, ET AL.                    46

1  the rug out from under him and -- because here -- the loan, he

2  had been told it's been modified , his payments have been

3  altered.  And then it doesn't come, right?  How much had his

4  payments been reduced?

5          MS. RICHARDS:  I believe they were reduced from close

6  to 4,000 to a little over 3,000 -- so close to -- the reduction

7  was supposed to be approximately 900 dollars a month.  And Mr.

8  Rode can correct me if I'm wrong.

9          THE COURT:  Okay.  All right.  Let's assume those are

10 the numbers.  You say in the absence of his receiving it back

11 his obligations remain as they were specified in the note.

12         MS. RICHARDS:  That would be correct, Your Honor.

13         THE COURT:  Okay.

14         MS. RICHARDS:  And --

15         THE COURT:  But --

16         MS. RICHARDS:  -- the counter to that is --

17         THE COURT:  Yes, go ahead.

18         MS. RICHARDS:  -- if he believed there was an

19 agreement in place and that it should be enforceable, then he

20 either had to perform under it or be excused from performing

21 under it.

22         THE COURT:  Okay, I have your position.

23         MS. RICHARDS:  So Your Honor referenced the materials

24 that were attached indicating the correspondence from Mr. Rode

25 and his counsel --

1          THE COURT:  Right.

2          MS. RICHARDS:  -- demanding that GMAC return the

3     countersigned copy of the August 2009 agreement, and indicating

4     that Mr. Rode would not be making payments unless GMAC

5     honored -- agreed to honor the terms of that agreement --

6          THE COURT:  Is it -- go ahead.

7          MS. RICHARDS:  -- sorry -- and in February 2010, the

8     loan was referred to foreclosure.  At that point, the account

9     was owing for approximately sixteen months of payments.  The

10    foreclosure was put on hold while the account continued to be

11    reviewed for a modification.  GMAC approved Mr. Rode for

12    another modification on revised terms on August 2010.  That

13    modification was never completed.

14          In July 2011, Mr. Rode filed a petition in Texas State

15    Court against GMAC and Homecomings.  The petition was amended

16    in February 2012, and thereafter the case was removed to

17    district court in the Southern District of Texas.  The parties

18    had commenced discovery based on a scheduling order issued by

19    the district court, but those proceedings were stayed before

20    discovery was completed --

21          THE COURT:  Right.

22          MS. RICHARDS:  -- as a result of the debtors'

23    bankruptcy.  So that's essentially the background for the

24    client.

25          THE COURT:  I'm pretty familiar with the background.

1          MS. RICHARDS:  I assumed you would be.

2          THE COURT:  So tell me why he hasn't stated a claim.

3    So look, I clearly understand your arguments with respect to

4    the additional claims that have been asserted in Mr. Rode's

5    filings here.  And that's an untimely attempt at an amendment,

6    and they don't relate back -- they're new claims; they don't

7    relate back to the original claims.  And I understand your

8    arguments about why they shouldn't be permitted.  Okay?  And

9    I'm going to ask Mr. Rode about that.

10         Because Mr. Rode, I think, on that score, the Trust is

11   on pretty solid ground in its argument, but I'm going to --

12   I'll hear you on it.

13         But address the original claims that were in the

14   amended -- you would agree that the claims that he asserted in

15   his original petition and amended petition in the state court

16   in Texas, can properly be considered here as to whether he's

17   asserted -- properly stated a claim.  Would you agree with

18   that?

19         MS. RICHARDS:  Without question, Your Honor.  Yes.

20         THE COURT:  Okay, all right.  So address those claims

21   and why you believe they're not -- he hasn't stated a claim.

22         MS. RICHARDS:  I will do that.  So just addressing

23   each of the causes of the action --

24         THE COURT:  Um-hum.

25         MS. RICHARDS:  -- asserted in the amended complaint.

1    And -- we'll get to it in turn, Your Honor.  So the first cause

2    of action that Mr. Rode asserted was a claim for conversion.

3              THE COURT:  Right.

4              MS. RICHARDS:  And we understand that that was based

5    primarily on his allegations that GMAC had misapplied amounts

6    in his escrow account.

7              THE COURT:  So isn't -- say that again a little

8    slowly.

9              MS. RICHARDS:  Oh, sorry, that GMAC had been

10   misapplying amounts in his escrow accounts and disagreed with

11   the way it was being handled.

12             THE COURT:  Okay.

13             MS. RICHARDS:  And Texas state law sets forth the

14   elements for a claim for conversion.  And it requires that

15   money be delivered for safekeeping, intended to be kept

16   segregated, substantially in the form in which it is received,

17   or in an intact fund, and is not the subject of a title claim

18   by its keeper.

19             It's a little opaque.  But other Texas case law --

20             THE COURT:  Let me ask you this.

21             MS. RICHARDS:  Yes.

22             THE COURT:  Had Mr. Rode demanded a return -- well,

23   what is your position as to whether the Trust -- forget the

24   Trust -- what is your position with respect to GMAC, whether it

25   properly handled the amounts that were in the escrow?

1          MS. RICHARDS:  Your Honor, our position is that GMAC

2     properly handled the amounts that were in the escrow.  We set

3     forth an explanation in the objection setting forth all the

4     escrow transactions.  Again, a little difficult trying to piece

5     together from the correspondence we've seen from his counsel

6     and what happened.  I understand, based on the --

7          THE COURT:  See --

8          MS. RICHARDS:  -- correspondence that GMAC was sending

9     back that he was disputing the large part the lender-placed

10    insurance that it had placed on the property.

11         THE COURT:  Force-placed insurance.

12         MS. RICHARDS:  Correct.  And GMAC has letters, and

13    they were attached to Ms. Priore's declaration, showing that

14    when he submitted the evidence of coverage on the property,

15    that GMAC would then refund the amount for the policies.  And

16    there is a chart in the objection setting forth the back-and-

17    forth on that.

18         THE COURT:  Okay.

19         MS. RICHARDS:  They were -- so it requires that the

20    borrower provide proof of coverage.  If they haven't -- if the

21    borrower hasn't provided proof of coverage the lender --

22         THE COURT:  I'm familiar --

23         MS. RICHARDS:  -- places its own insurance --

24         THE COURT:  -- I'm familiar with force-placed

25    insurance.

RESIDENTIAL CAPITAL, LLC, ET AL.                    51

1        MS. RICHARDS:  You know how it works.  So the only

2   amounts that were not refunded were the amounts that Mr. Rode

3   had not provided coverage for.  It's our position that that's

4   what the transaction history shows, and that there was no

5   misapplication of funds.

6        THE COURT:  Okay.

7        MS. RICHARDS:  And that under Texas case law, keeping

8   of monies in an escrow account by a mortgage servicer doesn't

9   constitute conversion.  They're not given the money for

10  safekeeping, as in a traditional escrow account; it's for use

11  by the servicer in accordance with the servicing agreement, to

12  pay taxes and insurance as they come due.  And there's a Texas

13  case, Levels v. Merlino, 969 F.Supp. 2d 704 from the Northern

14  District of Texas in 2003 that states that a borrower can't

15  state a claim for conversion as a result of the lender's

16  exercised dominion over funds in an escrow account, even if

17  those funds were properly handled once received, because that

18  kind of escrow account is not the kind of account --

19       THE COURT:  You don't convert.  So if they -- if a

20  mortgagor is required to have an escrow, and there's a dispute

21  as to whether the amounts in the escrow are proper or not

22  proper, you overcharged, you owe me a refund, that may create

23  rights to receive the surplus, but it doesn't create a

24  conversion claim.  That would be your position.

25       MS. RICHARDS:  That is our position, Your Honor.

1          THE COURT:  Okay.

2          MS. RICHARDS:  Yes.  That brings me to the second

3    cause of action stated in Mr. Rode's amended complaint, and

4    that is for breach of fiduciary duty.

5          THE COURT:  Yes.

6          MS. RICHARDS:  And this perhaps is a little bit what

7    your prior question was getting at.  If a mortgage servicer has

8    agreed to give a party a loan modification and then it doesn't

9    perform, what does that mean?  A claim for breach of fiduciary

10   duty requires that there be a fiduciary relationship between

11   the plaintiff and the defendant.  And case law is very clear on

12   the fact that fiduciary duties do not arise between parties to

13   a mortgage agreement or between a borrower and a servicer in

14   its capacity as an escrow agent.

15         THE COURT:  Let me ask you this.  If a loan servicer

16   has orally agreed to grant the modification and with no change

17   in the facts regarding the borrower just doesn't go forward

18   with it, can the borrower assert a negligence claim or

19   negligent misrepresentation claim, if he's changed his position

20   in reliance upon it?

21         Because I had this recently in one of the other claim

22   objections, I don't remember which state law, because I've been

23   dealing with so many states' law.  I don't remember whether it

24   was Texas or not.  But so Mr. Rode has -- here's where I'm

25   going with this.  He's alleged facts.  The facts he's alleged

RESIDENTIAL CAPITAL, LLC, ET AL.                    53

1    may not support a fiduciary duty claim, but it may be the wrong

2    label attached to the same facts.  So rather than a fiduciary

3    duty claim, it might support a negligent -- those same facts

4    could support a negligent misrepresentation claim.

5         So the issue about a claim amendment -- I'm looking

6    for something in my notes.  In the Second Circuit, the

7    standard -- this is Integrated Resources v. Ameritrust, 157

8    B.R. 66, District Court -- (S.D.N.Y. 1993).  An "amendment to a

9    claim is freely allowed where the purpose is to cure a defect

10   in the claim as originally filed, to describe the claim with

11   greater particularity, or to plead a new theory of recovery on

12   the facts set forth in the original claim."

13        So it may be that -- and I'm not ruling -- that you're

14   correct that the facts alleged do not support a breach of

15   fiduciary duty claim; but my question to you is, do they

16   support a theory of liability for negligence or negligent

17   misrepresentation?  There's a serious issue about what damages

18   Mr. Rode seeks, but a claim objection is not a time for me to

19   resolve what the damages are.  Okay?

20        What I really do is decide whether the claim fails to

21   state a claim or not.  And I understand that he had an attorney

22   in Texas, but he's pro se here.  And so that's my question is

23   do these support a claim for negligent misrepresentation under

24   Texas law?

25        MS. RICHARDS:  Your Honor, so Mr. Rode's petition did

1   actually include in the causes of action a claim for negligent

2   misrepresentation.

3            THE COURT:  Okay.

4            MS. RICHARDS:  Which is addressed in our objection.

5   And the elements are set forth in a Texas case we cite, Larsen

6   v. Carlene Langford & Associates, 41 --

7            THE COURT:  You're voice drops off and I have a little

8   trouble --

9            MS. RICHARDS:  Apologies.  I'll be a little closer to

10  the mic.

11           THE COURT:  Okay.

12           MS. RICHARDS:  So we cited in our papers the Texas

13  case that sets forth the elements for negligent

14  misrepresentation.  And it requires -- not that different from

15  a fraud claim -- that the defendant provide information in the

16  course of business; that the information supplied would be

17  false; that the defendant did not exercise reasonable care or

18  competence in obtaining or communicating the information; that

19  the plaintiff justifiably relied on the information; and that

20  the plaintiff suffers damages proximately caused by his

21  reliance on the false information.

22           THE COURT:  Um-hum.

23           MS. RICHARDS:  So your question was does the fact that

24  GMAC Mortgage essentially promised Mr. Rode a loan modification

25  and didn't go through with it, give a cause to negligent

RESIDENTIAL CAPITAL, LLC, ET AL.                    55

1    misrepresentation?

2              THE COURT:  Right.

3              MS. RICHARDS:  And we cited to a case from the Fifth

4    Circuit, Your Honor, Thomas v. EMC Mortgage Corp., 499 F.

5    App'x, 337 (2012), stating that "representations containing

6    future" -- I'm sorry -- "regarding future loan modifications

7    and foreclosure constitute promises of future action rather

8    than representations of existing fact, and will not support a

9    claim for negligent misrepresentation."

10             THE COURT:  Okay, so is this a representation

11   regarding future loan modifications, or a representation of a

12   current loan modification?"  So you sometimes get -- and I know

13   it's an unpublished decision that you're referring to.

14             MS. RICHARDS:  It is, Your Honor.

15             THE COURT:  And it quotes from another unpublished

16   opinion from the Fifth Circuit, the DeFrancisci v. BAC Home

17   Loans Servicing, also another unpublished opinion.

18             MS. RICHARDS:  There are several Texas cases for this

19   proposition, and I believe they're all --

20             THE COURT:  Yeah, so --

21             MS. RICHARDS:  -- unpublished.

22             THE COURT:  BCY Water Supply Corp. v. Residential

23   Investment Inc., 170 S.W.3d 596 (Tex. App. 2005):  "A promise

24   to do or refrain from doing an act in the future is not

25   actionable, because it does not concern an existing fact."

1          But isn't Mr. Rode alleging not a promise to do

2   something in the future, but a promise to do something today:

3   modify his loan on specifically stated terms?  So I've had lots

4   of ResCap objections where the claim seems to be, oh, they said

5   they'd work out a loan modification, but it wasn't -- there

6   were no specific terms that were stated, it was just where a

7   borrower comes and said, well, they said don't worry about it,

8   we'll work out a loan modification.  That fits easily, I think,

9   into these Texas cases that you're referring to about a future

10  promise.

11          Mr. Rode alleges something different here.  He alleges

12  that there was a specific promise, on stated terms, which GMAC

13  reneged on.  Isn't that a fair statement of what he's alleging.

14          MS. RICHARDS:  That -- I leave it to him to say that,

15  if he's --

16          THE COURT:  No, I'm asking you.  Because I think the

17  consequences are different.  If you disagree, tell me.

18          MS. RICHARDS:  I disagree in that the agreement never

19  became legally binding, because GMAC -- under Texas law, you

20  have to execute the agreement and deliver it to the party.

21          THE COURT:  As a contract matter, it was not legally

22  binding.  You're telling me under Texas law they could promise

23  him anything they wanted to, and as long as they didn't sign on

24  the dotted line, it would not actionable.  That's your position

25  about Texas law?

RESIDENTIAL CAPITAL, LLC, ET AL.                    57

1              MS. RICHARDS:  It -- negligent misrepresentation also

2    requires reasonable reliance, and Mr. Rode clearly understood

3    that he had to receive the signed contract back, and he didn't.

4    So how would it be reasonable for him to rely on the

5    modification until he had the signed countercopy in his hand --

6    excuse me -- the countersigend copy in his hand.

7              THE COURT:  Did you call him and tell him we changed

8    our mind, we're not going to give it to you?

9              I mean, your position is, they could promise him

10   anything, but as long as they don't send it to him in writing,

11   tough luck.  That's your position, isn't it?

12             MS. RICHARDS:  That's what we believe the case law

13   provides, Your Honor.

14             THE COURT:  You think so?  Which case?

15             MS. RICHARDS:  I --

16             THE COURT:  You've cited cases that deal with promises

17   of future action.  And hasn't Mr. Rode fairly alleged -- close

18   question -- but hasn't he fairly alleged that they weren't just

19   promising future action, they promised now.  This modification,

20   these are the terms --

21             MS. RICHARDS:  Your Honor --

22             THE COURT:  -- and then you don't get back to him and

23   tell him oh, we're not going to go forward with it.

24             MS. RICHARDS:  What they -- what they prom -- what

25   they promised him was --

RESIDENTIAL CAPITAL, LLC, ET AL.                    58

1          THE COURT:  Did they promise him a modification on

2   specific terms?

3          MS. RICHARDS:  They said that he had been approved for

4   a modification on certain terms --

5          THE COURT:  On specific terms?

6          MS. RICHARDS:  -- on specific terms, subject to

7   finalizing the agreement.

8          THE COURT:  Okay, go ahead.

9          MS. RICHARDS:  Would it be helpful for Your Honor if I

10  returned to his causes of action as alleged in the complaint,

11  or I know we're running --

12         THE COURT:  No.  You --

13         MS. RICHARDS:  -- short on time --

14         THE COURT:  -- I actually -- you can see what's

15  bothering me.

16         MS. RICHARDS:  I do, Your Honor.  And being completely

17  candid we had the same struggle; and I can tell you, I did my

18  own review and thought about what cause of action is pled here,

19  and I just --

20         THE COURT:  Okay, let me hear from Mr. Rode, because

21  I'm keeping our ECRO operator late, and I didn't expect we'd be

22  going this late.

23         MS. RICHARDS:  Okay.

24         THE COURT:  You can do it from sitting down.  You

25  don't have to get up.  Okay?

1        MR. RODE:  Thank you, Your Honor.  It's a lot less

2   overwhelming from last time I was here for the Ally thing.

3        Yes, I do have a hard time with this, because not only

4   was it one modification, but they did it three times.  That's

5   why I have two claims.  Homecomings also offered a modification

6   because of the Hurricane Ike that hit in August of 2008.  And

7   that was the purpose of the modification, was not that I was

8   missing a payment, but that they were going to help me, and

9   that they sent me a package in 2008 to -- you know, to lower my

10  payments and the interest rate.

11       After sending all the paperwork in, they then stated

12  that I needed to send X amount of money in, which was more than

13  what my original payments were, because I had my own escrow

14  account -- or I didn't have an escrow account; they wanted to

15  put in an escrow account.  I took that money and said I don't

16  want this, and mailed the money to them, and that's what I'm

17  alleging -- I noticed that the document said that she had

18  looked at from March 2010 on, but all of the allegations and

19  all of the money that was taken out of my escrow account for --

20  under the note of corporate advisory, was done in 2007, 2008,

21  and 2009.

22       In 2000- -- at the end of 2010 or in the middle of

23  2010, they took the last 4,300 dollars out, and that money has

24  never been accounted for or told what it was used for, other

25  than my assumption is that they were charging me to modify a

1  loan and then said that I defaulted on it, for some reason,

2  mostly sixty-seven times asking for my wife's -- my ex-

3  wife's -- what she was taking home.

4         And I provided that, I don't know how many times, and

5  they just kept --

6         THE COURT:  I read about that.  And I'm not making

7  light of it.  I understand, this was the issue about being a

8  quitclaim from your ex-wife.

9         MR. RODE:  A quitclaim, yes.  And so --

10         THE COURT:  And you kept sending it.

11         MR. RODE:  And I kept sending it.  And the problem

12  that I have with this is, I was then forced to have to hire an

13  attorney, because I got -- I got a notice in 2008 that there

14  was a problem when a constable knocked on my door and they

15  tried to foreclose.  That's the first I had ever heard that

16  they weren't going to give a modification, even though I had

17  been making my payments.

18         When we didn't send -- I had my attorney send a letter

19  and we negotiated it.  That's when I -- what I don't understand

20  is, I had an attorney do it to make sure that I wasn't doing

21  anything wrong -- that made sure that I --

22         THE COURT:  Attorneys don't always get it right, but

23  that's a different --

24         MR. RODE:  I agree.

25         THE COURT:  I'm not saying your attorney didn't get it

1   right but --

2           MR. RODE:  Right.  But what we tried to do is, to

3   figure out what the problem was and go along with it.  When

4   they did not send -- I disagree.  In October -- or September

5   24th, we received a letter from them -- it was the last letter

6   we received -- we, in good faith, sent the 3,025 dollars as the

7   payment to be for the November 1st payment.  We sent a notice

8   September, October, and at the end of October, stating we have

9   held our end of the deal, where's the paperwork and

10  modification.  And as you know, again, I was knocked on the

11  door in --

12          THE COURT:  Did they cash your check?

13          MR. RODE:  Absolutely, same day.  In fact, in their

14  own records that we received when we finally decided that we

15  had to go to court --

16          THE COURT:  Did you send that check in reliance on

17  their statement that there was an agreement?

18          MR. RODE:  Did I what?

19          THE COURT:  Send you check in reliance on their

20  statement --

21          MR. RODE:  Correct.

22          THE COURT:  -- that you had an agreement?

23          MR. RODE:  Yes, we did.  In fact, we sent it early to

24  make sure.

25          Again, the first time we noticed is when a constable

1  knocked on the door and tried to foreclose again.

2       Upon discovery, we have found the notes that -- where

3  they said their overage was not because of the money that they

4  were going to have to put in, it's all the payments that they

5  were holding, and they didn't want to refund any of the money:

6  "we do not want to send him a refund, cancel, hold for three

7  months, and then refer to foreclosure."  That was in October of

8  2009.

9       And so to me, that was a definite -- not only did they

10  not contact me, but that was definitely showing fraud on their

11  part, that they purposely were doing that.

12       THE COURT:  Go ahead.  You don't have to go through

13  every -- I really have spent a lot of time on this.

14       MR. RODE:  I know you have, because I'm kind of blown

15  away.

16       The new charge I have are the reason I --

17       THE COURT:  That's what I -- I'm interrupting you now

18  because the hour is late.

19       MR. RODE:  I know.

20       THE COURT:  I am going to let you argue.  You've read

21  their papers.  There's a lot of law in this circuit, some from

22  me, about when can somebody amend a claim to assert new

23  grounds.  If it's -- when I asked Ms. Richards about whether --

24  when you express a new theory based on the same facts, that's

25  one thing.  Okay?  You don't always get to do it, but that's --

1  broader authority to do that.  But where you bring in new

2  facts, that's a new claim.  It doesn't relate back to the

3  original facts you've alleged.  And that's the problem I have

4  with the new theories --

5          MR. RODE:  And I do have --

6          THE COURT:  -- based on new facts that you're

7  asserting.

8          MR. RODE:  And I do have an answer for that.

9          THE COURT:  Okay, go ahead.

10          MR. RODE:  Because this was continuing, and we

11  obviously, because of the bankruptcy had not been able to get

12  as much discovery as we wanted to, because obviously we're

13  dragged -- we were led a long time, this is a case that I think

14  does relate back to the original facts, that there was fraud

15  and there were problems with this, and that they did not hold

16  their end of the deal, and then come to find out that the -- as

17  we found out, as this case was going on that this is just

18  another part of it, that they did not have a right to this

19  loan.  And that through the discovery it's a continuation of

20  that original lawsuit that we had.

21          THE COURT:  Okay.  I'm not ruling today.  I'm taking

22  it all under submission.  That part I have problems with.

23  Okay?

24          MR. RODE:  I understand.

25          THE COURT:  I just -- I'm not saying I don't have

RESIDENTIAL CAPITAL, LLC, ET AL.                    64

1    problems with some of your other arguments either, but I'm

2    troubled by their argument as well, because it does --

3           Sometimes things happen, Mr. Rode, that don't seem

4    quite right.  I put a lot of the things in your loan history in

5    that category.  That doesn't mean that everything that isn't

6    exactly right creates a cause of action for you to recover.

7    That's what I'm struggling with.  Okay?

8           The lawyers from Morrison & Foerster, they weren't

9    representing GMAC when all this --

10          MR. RODE:  Right.

11          THE COURT:  -- went on.  They take their client as

12   they find them.  The Trust is a fixed amount of money.  And

13   every additional dollar of claims that's allowed dilutes the

14   recovery of everybody else.  You want your share of it; I

15   understand.  But they're doing what they're supposed to be

16   doing.

17          MR. RODE:  Oh, I agree.  It's not personal, and I

18   don't take it that way.

19          THE COURT:  Yeah, so -- all right.  What else do you

20   want to say?

21          MR. RODE:  One other point was that last time I was

22   here, when the Ally thing was heard, is we did get to talk to

23   Ms. Richards upon your request to try to work something out.

24   And to be honest with you, that's what I thought had happened.

25   And in fact, I even included my attorney from Texas, gave them

RESIDENTIAL CAPITAL, LLC, ET AL.                    65

1    the number and to work it out.  Their argument for foreclosure
2    was the fact that I wasn't making payments.  Our argument is
3    that we made the payments and they misapplied them.
4            THE COURT:  Are you still in the property?
5            MR. RODE:  Yes.  Yes.
6            THE COURT:  And is Ocwen -- as I understand it,
7    they're not moving forward with foreclosure?
8            MR. RODE:  I don't know what Ocwen's doing.
9            THE COURT:  Well, you do know whether they're moving
10   forward -- have you gotten any notices about a foreclosure?
11           MR. RODE:  No, I've gotten a ton of notices for HAMP
12   program, on the average of four a week.  I'm not exaggerating.
13   But no, I haven't heard from anything else.
14           THE COURT:  All right.  Okay.  Go ahead.
15           MR. RODE:  As a background, I bought this land in
16   1996.  I waited till 2000 and I built the house myself.  This
17   is my home.  This is my homestead.  I bought it from a local
18   bank who then turned into Southtrust.  I was dealing with a
19   person that I talk to every day.  And how this got from there
20   to a New York court, I have no idea.
21           THE COURT:  Okay.  I'm going to take this under
22   submission.
23           When are you flying home?
24           MR. RODE:  I'm at your beck and call.
25           THE COURT:  No, it's not at my beck and call.

RESIDENTIAL CAPITAL, LLC, ET AL.                    66

1        MR. RODE:  I'm supposed to -- I'm supposed to fly out

2   tomorrow.

3        THE COURT:  Okay.  I really -- look, it's going to

4   take me some time to deal with this, if I have to deal with it

5   in resolving a lot of issues, a lot of causes of action.  I

6   don't know whether you got anywhere near close resolving the

7   claim with Mr. Rode.  Go out and buy a cup and coffee, first.

8   And you really ought to try and talk about this and see whether

9   you can come to a resolution of this.

10        If any of your claims survive, you're looking at a

11  long -- a tough fight to recover anything.  That's just the

12  reality of it.  That's not a threat.  It's --

13        MR. RODE:  I understand.

14        THE COURT:  -- it's just the reality of it.  Okay?

15        MR. RODE:  What is the opportunity of possibly being

16  able to take it back to Texas?

17        THE COURT:  Go have a cup of coffee.

18        MR. RODE:  Okay, thank you.

19        THE COURT:  Go talk about this.  See if you can make

20  any -- look, I don't expect you necessarily -- if you can reach

21  a resolution, that's great, today.  But if you can't, talk

22  about whether there's a process you can go through to see

23  whether you can try and find a consensual result.  If you can,

24  would you do this?  Send a letter to chambers advising me, so

25  we don't start working on an opinion.  I've got a bunch of them

1  stacked up.

2          MR. RODE:  Yes, sir.

3          THE COURT:  I think you ought to take a serious --

4  make a serious effort to see whether you can resolve this

5  claim.  There are a lot of causes of action.  It may be that

6  none of them state a claim.  I don't think GMAC dealt with Mr.

7  Rode and his mortgage issues in a particularly good fashion.

8  Let me put it that way.  That may not translate into a claim,

9  but I understand where Mr. Rode is coming from when I read this

10  story.

11         The number of times that you kept asking him for a

12  quitclaim and wouldn't move forward because his ex-wife was

13  still on the title, and he gives you a quitclaim, they don't

14  seem to find it, they keep asking for it over and over.  Okay.

15         MS. RICHARDS:  Your Honor, I would say, we've had

16  settlement discussions with Mr. Rode in the past.  We hear you.

17  I'm going to take him out to coffee or a beer, whatever he

18  prefers right now.

19         MR. RODE:  Beer.

20         THE COURT:  Beer sounds good to me too, but.

21         MS. RICHARDS:  We will have discussions and let you

22  know.

23         But I think your guidance has been constructive.  So

24  thank you.

25         THE COURT:  Okay.  All right.  So see what you can do.

RESIDENTIAL CAPITAL, LLC, ET AL.                    68

1   Okay?

2           And I'm going to be away for two weeks starting

3   Monday.  Within that time, send a status letter.  We're not

4   going to start working on this.  Send a status letter to the

5   court.  And if you've got some process, see if whether you can

6   come to a resolution, and that would be great.  Okay?

7           MS. RICHARDS:  We will do that, Your Honor.

8           THE COURT:  I apologize for keeping your late.

9           MS. RICHARDS:  Sorry, I think there's one more item on

10  the agenda, so --

11          THE COURT:  Oh, okay.  Yes.  Sorry.

12          MR. RODE:  Thank you, Your Honor.

13          THE COURT:  Thanks very much, Mr. Rode.

14          MR. NEWTON:  Good afternoon, Your Honor.  James

15  Newton, Morrison & Foerster.  The last item on the agenda --

16          THE COURT:  The LaBostries.

17          MR. NEWTON:  I'm sorry?

18          THE COURT:  The LaBostries?

19          THE COURT:  Is the LaBostries, claims number 2769 and

20  2772. Our objection is docket number 8459.

21          THE COURT:  Is anybody appearing for the LaBostries?

22  Before you start, Mr. Newton, I want to look through this

23  quickly.

24          Let me ask some specific questions.  So there were at

25  least two state court actions in California, right?  There was

1  an unlawful detainer proceeding --

2          MR. NEWTON:  That's correct.

3          THE COURT:  -- that your side won.

4          MR. NEWTON:  Correct.  Well, U.S. Bank, but --

5          THE COURT:  U.S. Bank -- well, that's why I'm saying

6  your -- I put them in the category of your side.

7          And there's an issue about what collateral estoppel

8  effect -- that was affirmed on appeal.

9          MR. NEWTON:  It was affirmed on appeal.

10         THE COURT:  And there's an issue about what collateral

11  estoppel effect flows from that judgment?

12         MR. NEWTON:  There is a -- there is a limited

13  collateral estoppel effect.  But there is certainly case law

14  from the Second Division of the --

15         THE COURT:  Second District.

16         MR. NEWTON:  -- Second District, I apologize, in which

17  Los Angeles.

18         THE COURT:  It's okay.  I just used to practice in

19  California, so.

20         MR. NEWTON:  Yes.  Concluding that there is preclusive

21  effect on a judgment in an 1161 -- which happens to be the

22  Civil Code provision -- the specific Civil Code provision under

23  which the unlawful detainer action proceeded.

24         There is preclusive effect in connection with issues

25  relating to the validity of the foreclosure --

1        THE COURT:  Let me ask you this.  Because -- and I'm

2    tired -- whether it was the LaBostries or Wayne Arnold, I'm not

3    sure which -- their son --

4        MR. NEWTON:  Um-hum.

5        THE COURT:  -- brought an action in superior court as

6    well.

7        MR. NEWTON:  The LaBostries did, correct.

8        THE COURT:  Okay, it was the LaBostries.

9        MR. NEWTON:  Yes.

10        THE COURT:  And the defendants demurred.

11        MR. NEWTON:  They did.

12        THE COURT:  And the demurrer was overruled.

13        MR. NEWTON:  That's correct.

14        THE COURT:  What's the chronology?  When was the

15    demurrer overruled?  Why wasn't the victory in the unlawful

16    detainer case preclusive in the action that the LaBostries

17    brought?

18        MR. NEWTON:  Your Honor, the chronology, I believe,

19    does tell the story.

20        THE COURT:  Okay.

21        MR. NEWTON:  My understanding is that there was no

22    collateral estoppel allegation in the demurrer.  And I believe

23    that is because --

24        THE COURT:  It wasn't final yet?

25        MR. NEWTON:  -- if you look at the date of the

1    appellate court's decision --

2              THE COURT:  Okay.

3              MR. NEWTON:  -- it was not quite final at that point.

4              THE COURT:  Okay.

5              MR. NEWTON:  There was a collateral estoppel argument

6    made in the summary judgment motion that was subsequently

7    filed, by the defendants.

8              THE COURT:  That hasn't been --

9              MR. NEWTON:  That was not decided at the time of the

10   bankruptcy case.

11             THE COURT:  Not decided.  Okay.  All right.

12             So what is covered by collateral estoppel, and what's

13   not?

14             MR. NEWTON:  Your Honor, the counts in the complaint,

15   which is the only thing that we had to go on --

16             THE COURT:  Sure.

17             MR. NEWTON:  -- that was referenced in the LaBostries'

18   proofs of claim, really relates to service -- that's the first

19   cause of action under California foreclosure law, and an Unfair

20   Business Practices Act.

21             Certainly, under the Malkoskie decision -- I believe

22   that the allegations that the notice wasn't effectuated

23   properly would be subject to a collateral estoppel defense.

24             Your Honor, from what I can tell, the real crux of the

25   Unfair Business Practices Act decision also relates to the

1    validity of those underlying documents.  Part of what the

2    unlawful detainer action court was required to decide, pursuant

3    to Malkoskie, is that U.S. Bank did, indeed, hold title to the

4    property pursuant to a lawfully performed trustee's sale.  So I

5    believe those as well would be -- would be subject to

6    collateral estoppel defense.

7            THE COURT:  So they make an allegation that the

8    notarization of documents was fraudulent, because the notary

9    was in Pennsylvania while the signatory was in California.  Am

10   I right on that?

11           MR. NEWTON:  I do know that there was an allegation as

12   to notarization, and perhaps a delay in the notarization.

13           THE COURT:  Well, could somebody in Pennsylvania

14   notarize the signature of somebody in California?  They

15   couldn't, could they?

16           MR. NEWTON:  Unless the person from California was

17   in -- in Pennsylvania --

18           THE COURT:  This is kind of a classic -- this is sort

19   of the classic problem that comes up in the lots of the

20   robosigning cases that you get people -- you'd have to agree

21   that a notary in Pennsylvania can't notarize the signature of a

22   person who's sitting in California when they sign, correct?

23           MR. NEWTON:  Somebody who's sitting in California?

24           THE COURT:  Yeah, in other words, they just didn't

25   happen to be in Pennsylvania at the time, walk into the

1   notary's office and sign it in front of them.  You're not

2   really contending that's what happened here?

3           MR. NEWTON:  Your Honor, I don't think I am contending

4   that.  Certainly, I think in -- I don't know what the rules are

5   in terms of video conferencing, but I get your point.  I take

6   your point.

7           THE COURT:  But what your position is, is that

8   collateral estoppel applies to prevent any examination of

9   whether the notarization was proper?

10          MR. NEWTON:  Correct.

11          THE COURT:  Would that be true under the Unfair and

12  Deceptive Trade Practices?

13          MR. NEWTON:  Well, Your Honor, the Unfair and

14  Deceptive Trade Practices Act claims in this particular case

15  are reliant -- they're derivative of the two allegations in the

16  complaint.  And those are allegations under the Penal Code and

17  under the Bankruptcy Code.

18          THE COURT:  Um-hum.

19          MR. NEWTON:  So it's not clear to me that those -- how

20  exactly those relate here, I suppose.

21          THE COURT:  Well, you also make the point that under

22  17200 and Business and Professions Code, they can only seek

23  injunctive relief or restitution and neither is available here.

24          MR. NEWTON:  Correct.

25          THE COURT:  All right, I'm going to take it under

1  submission.

2          MR. NEWTON:  All right.

3          THE COURT:  Let's not prolong it any further.  Okay?

4          MR. NEWTON:  All right, thank you, Your Honor.

5          THE COURT:  Thank you.

6      (Whereupon these proceedings were concluded at 5:46 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                      I N D E X

3

4                                      RULINGS

5                                                    PAGE        LINE

6    Borrower Trust's eighty-fifth omnibus        32           8

7    objection to claims is granted as to the

8    unresponded to portions of the objection.

9    The Trust's objection to Gale Gibbs' claim   34          12

10   is sustained.

11   The Trust's objection to the Eberwein claims 35          25

12   is sustained, and the remaining claims are

13   reclassified.

14

15

16

17

18

19

20

21

22

23

24

25

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

1

2                          C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9         _Penina Wolicki_

10

11   _____

12   PENINA WOLICKI

     AAERT Certified Electronic Transcriber CET**D-569

13

14

15   eScribers

     700 West 192nd Street, Suite #607

16

     New York, NY 10040

17

18

     Date:  May 18, 2015

19

20

21

22

23

24

25