**Hearing Date: June 4, 2015 at 10:00 a.m. (Prevailing Eastern Time)**

| | |
|---|---|
| MORRISON & FOERSTER LLP | BRADLEY ARANT BOULT CUMMINGS LLP |
| 250 West 55th Street | 100 N. Tryon Street |
| New York, New York 10019 | Suite 2690 |
| Telephone: (212) 468-8000 | Charlotte, North Carolina 28202 |
| Facsimile: (212) 468-7900 | Telephone: (704) 338-6000 |
| Norman S. Rosenbaum | Facsimile: (704) 332-8858 |
| Jordan A. Wishnew | Christian W. Hancock |
| Jessica J. Arett | Avery A. Simmons |
| | |
| *Counsel for the ResCap Borrower Claims Trust* | *Counsel for the ResCap Liquidating Trust* |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**REPLY BRIEF IN FURTHER SUPPORT OF THE OBJECTION OF THE RESCAP BORROWER CLAIMS TRUST TO PROOFS OF CLAIM FILED BY PAMELA D. LONGONI AND JEAN GAGNON (CLAIM NOS. 2291, 2294, 2295 AND 2357)**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

I.  GMACM and ETS complied with all requisite standing and statutory law in initiating the non-judicial foreclosure and Longoni's allegations based on these theories should be disallowed. ....................................................................................... 1

II. GMACM and ETS were correct in resuming the foreclosure after Longoni's failure to follow the terms of the workout plan. ............................................................. 6

III. GMACM never agreed to a permanent loan modification and any allegation of a permanent loan modification contract is barred by the Statute of Frauds. ....................... 8

IV. The statements contained in Nate Stephenson's declarations are inadmissible hearsay and should not be considered in ruling on Longoni's Claims. ............................ 10

CONCLUSION ............................................................................................................................ 11

# **TABLE OF AUTHORITIES**

**Cases**

Collins v. Burns,
　741 P.2d 819 (Nev. 1987) ............................................................................................. 7

Collins v. Union Fed. Sav. & Loan Ass'n,
　662 P.2d 610 (Nev.1983) .............................................................................................. 5

Correos v. Nat'l Default Servicing Corp.,
　2:12-CV-556, 2013 WL 2096407 (D. Nev. May 14, 2013) ......................................... 5

Edelstein v. Bank of N.Y. Mellon,
　286 P.3d 249 (Nev. 2012) ......................................................................................... 4, 5

Evans v. Aurora Loan Servicing, LLC,
　2:09-cv-02401, 2010 WL 2545639 (D. Nev. June 18, 2010) ....................................... 2

Ferris v. U.S.,
　501 F. Supp. 98 (D. Nev. 1980) .................................................................................. 10

Hakimi v. Bank of N.Y. Mellon,
　2:14-CV-2215, 2015 WL 2097872 (D. Nev. May 5, 2015) ......................................... 4

In re Spiewak,
　110 F.3d 70 (9th Cir. 1997) ........................................................................................ 10

Prince v. United States Bancorp,
　2:09-CV-01095, 2010 WL 3385396 (D. Nev. Aug. 25, 2010) ..................................... 8

Ray Motor Lodge, Inc. v. Shatz,
　390 P.2d 42 (Nev. 1964) ............................................................................................... 8

Turner v. Dewco Servs., Inc.,
　479 P.2d 462 (Nev. 1971) ............................................................................................. 3

**Statutes**

12 C.F.R. § 226.32 ................................................................................................................ 3

15 U.S.C. 1602(aa) ............................................................................................................... 3

Nev. Rev. Stat. § 107.080 ............................................................................................. 1, 2, 3

Nev. Rev. Stat. § 107.080(4)(a) ........................................................................................... 3

Nev. Rev. Stat. § 107.085 ............................................................................................ 1, 2, 3

**Other Authorities**

FED. R. EVID. 408 ...................................................................................................................9

FED. R. EVID. 801(c) ............................................................................................................10

The ResCap Borrower Claims Trust (the "Borrower Trust") respectfully files this reply brief in further support of its objection to the Claims filed by Longoni[1] on behalf of GMAC Mortgage, LLC ("GMACM") and Executive Trustee Services, LLC ("ETS"). In the response brief Longoni advances three main arguments, all of which fail. One, Longoni argues that the foreclosure on the Property was unlawful due to GMACM and ETS' failure to comply with relevant standing and statutory law. Two, Longoni argues that she was placed into a binding loan modification, not a repayment agreement, and that she complied with all applicable terms. Finally, Longoni alleges that GMACM contractually agreed to a permanent loan modification. As discussed below, the known facts reveal that all three of these arguments rest on faulty premises, have no legal merit, and fatally bar any recovery for Longoni under the Claims.

**I.    GMACM and ETS complied with all requisite standing and statutory law in initiating the non-judicial foreclosure and Longoni's allegations based on these theories should be disallowed.**

1.    In the Claims and response brief in further support thereof, Longoni incorrectly asserts that the foreclosure on the property was unlawful under Nevada statutory law governing foreclosure. She asserts two flawed premises in support of this allegation: (i) that GMACM and ETS failed to comply with the mediation, Notice of Sale and "Danger Notice" requirements detailed in Nev. Rev. Stat. §§ 107.080 and 107.085 (Doc. 8654, ¶¶ 22-25) ; and (ii) that GMACM and ETS lacked standing to initiate the underlying foreclosure (Id., ¶¶ 13-21).

2.    Regarding the mediation requirements of Nev. Rev. Stat. § 107.080, it is clear that the mediation requirements only applied to Notices of Default filed or recorded on or after July 1, 2009, which Longoni's was not. Longoni does not dispute this point, but attempts to apply the statute retroactively by arguing that GMACM's acceptance of the three $1600 payments post-default required GMACM and ETS to send a new notice of default, which would have been after

---

[1] All references to Longoni apply equally to arguments raised by Gagnon.

1

July 1, 2009, thereby triggering the mediation requirements. (Id., ¶ 26). However, Longoni points to absolutely <u>no law</u> to support this assertion,[2] and the applicable law actually supports the opposite conclusion.

3. In addressing a very similar fact pattern, the United States District Court for the District of Nevada expressly disallowed this argument, and upheld a motion to dismiss a borrower's wrongful foreclosure claim under Nev. Rev. Stat. § 107.080. <u>Evans v. Aurora Loan Servicing, LLC</u>, 2:09-cv-02401, 2010 WL 2545639 (D. Nev. June 18, 2010). In <u>Evans</u>, the borrower argued that because the loan servicer accepted payments from him after the notice of default was issued and recorded, a new notice of default was required, and the failure to send one was actionable under Nev. Rev. Stat. 107.080. <u>Id.</u> The court disagreed, noting that borrower's assertion "fails because NRS 107.080 does not require that a party seeking foreclosure file an updated notice of default." <u>Id.</u> at *3.

4. In addition, Longoni argues that the foreclosure did not comply with the relevant statutes due to GMACM and ETS' failure to provide the Danger Notice under Nev. Rev. Stat. § 107.085. (Doc. 8654, ¶ 25). What counsel fails to point out, however, is that Longoni does not assert, nor are there are any facts that demonstrate, that her loan was one which qualified for receipt of the Danger Notice as the statutory text existed in 2009. The relevant portion of the statute in 2009 provided:

> With regard to a transfer in trust of an estate in real property to secure the performance of an obligation or the payment of a debt, the provisions of this section ***apply to the exercise of a power of sale pursuant to NRS 107.080 only if***: … ***On the date the trust agreement is made, the trust agreement is subject to the provisions of the Home Ownership and Equity Protection Act of 1994, 15 U.S.C. § 1602(aa)***, and the regulations adopted by the Board of Governors of the

---

[2] The only support Longoni uses to support this point is the 30(b)(6) deposition testimony of Myron Ravelo and Juan Aguirre. However, neither Mr. Ravelo nor Mr. Gagnon are attorneys; as such, they are not qualified to opine on what the legal requirements for notices of default are.

2

> Federal Reserve System pursuant thereto, including without limitation, 12 C.F.R. § 226.32.

Nev. Rev. Stat. 107.085 (2009) (emphasis added). Section 1602(aa) of the Home Ownership and Equity Protection Act applies to high cost home loans—and there has been absolutely no showing throughout the six years that this case has been pending that Longoni's loan qualified as such. A review of the applicable definitions indicates that the loan is in fact not a high cost home loan. See 15 U.S.C. 1602(aa); 12 C.F.R. § 226.32. Accordingly, GMACM and ETS were not required to send the Danger Notice as required under § 107.085.

5. Finally, Longoni argues that there is no proof that the Notice of Sale was provided by registered or certified mail, as required under Nevada law. (Doc. 8654, ¶ 25). However, Longoni was provided with proof that the Notice of Sale was mailed to the property address via certified mail. Copies of same are attached hereto as Exhibit 1.[3] As Nev. Rev. Stat. § 107.080 does not require proof of receipt, but rather requires only that the notice be mailed by registered or certified mail, this is sufficient to establish compliance with the mailing requirements. Nev. Rev. Stat. § 107.080(4)(a); Turner v. Dewco Servs., Inc., 479 P.2d 462 (Nev. 1971).

6. In support of the argument that GMACM and ETS lacked standing to initiate the foreclosure action, Longoni argues that the note and deed of trust were "split" due to the designation of MERS as the beneficiary on the deed of trust, and that the documents were never reunited in the foreclosing entity. (Id., ¶¶ 14-15). Longoni relies on the Edelstein case, decided almost three years after the sale of her property. Edelstein provides that the foreclosing entity must be the holder of the note and the recipient of the beneficial interest under the deed of trust to participate in Nevada's non-judicial foreclosure *mediation* program. Edelstein v. Bank of N.Y.

---

[3] These mailing receipts were provided to counsel for Longoni via a letter dated January 11, 2010. Given the settlement posture, and therefore confidential nature, of the letter, the undersigned has just attached the proof of mailing provided. If necessary, undersigned counsel can provide the transmittal letter.

3

Mellon, 286 P.3d 249 (Nev. 2012). Under Nevada law, a foreclosing entity is not required to prove standing to initiate foreclose under Nevada's non-judicial scheme. See Hakimi v. Bank of N.Y. Mellon, 2:14-CV-2215, 2015 WL 2097872 (D. Nev. May 5, 2015) (dismissing claim for improper foreclosure based on lack of standing as a foreclosing entity need not prove standing to foreclose under the non-judicial scheme). Notably, since the non-judicial foreclosure mediation program was not even in effect for Longoni's loan at the time of sale—the Edelstein case is merely illustrative at best.

7.  There is no argument that there was confusion at the beginning of the Nevada Litigation concerning the identity of the "owner" of the Longoni's loan. However, all confusion was later cured, via both amended discovery responses and production of the relevant Assignment & Assumption Agreement, Pooling and Servicing Agreement ("PSA"), and servicer- and subservicer- guides. Contrary to counsel's assertion that no evidence was provided to support the relationship between the parties on this securitized loan, the documents produced clearly identify the relevant parties. See PSA, relevant portions attached hereto as Exhibit 2. In addition, the Assignment and Assumption Agreement provides for a transfer of the ownership of the loans from Residential Funding Corporation LLC to Residential Asset Mortgage Products, Inc., with a subsequent transfer to the trust entity. See Assignment and Assumption Agreement, attached hereto as Exhibit 3. Finally, servicing guides were produced during the course of the Nevada Litigation that identified GMACM as the sub-servicer on the loan. As such, U.S. Bank National Association, as Trustee for RAMP Mortgage Asset-Backed Pass Through Certificates Series 2005-EFC7 was the entity that oversaw the running of the trust, and GMACM was the authorized loan servicer. Consistent with Edelstein, U.S. Bank National Association, as Trustee for Mortgage Asset-Backed Pass Through Certificates Series 2005-EFC7 and GMACM would

have been the entities needing to demonstrate standing at any non-judicial foreclosure mediation process, had one been required to take place. See Edelstein, 286 P.3d at 253 (detailing that while Recon Trust was the appointed trustee, BNY Mellon and Bank of America were the entities that ultimately needed to demonstrate standing to participate in the mediation).

8. Consistent with the representation in the Assignment and Assumption Agreement and the PSA, the beneficial rights of the loan flowed from RFC to the Trust, of which U.S Bank was the trustee and GMACM the servicer. See Edelstein, 286 P.3d at 260 (noting that an assignment of beneficial instruments can be indicated by a signed writing). Accordingly, GMACM and U.S. Bank National Association, as Trustee for Mortgage Asset-Backed Pass Through Certificates Series 2005-EFC had standing to participate in the Nevada foreclosure mediation program. To the extent that this Court were to determine that these entities lacked standing to foreclose, it is a moot point.

9. In addition to the points above, to succeed on a claim for wrongful foreclosure under Nevada law, which this would fall under, Longoni must demonstrate that at the "time the power of sale was exercised, there was no breach of condition or failure of performance by plaintiffs that would have authorized the foreclosure." See Correos v. Nat'l Default Servicing Corp., 2:12-CV-556, 2013 WL 2096407 (D. Nev. May 14, 2013); see also Collins v. Union Fed. Sav. & Loan Ass'n, 662 P.2d 610, 623 (Nev.1983). As the undisputed facts indicate that Longoni was in default, and never cured the default prior to sale, Longoni cannot succeed on a claim for wrongful foreclosure.

10. Consistent with the arguments above, to the extent Longoni's Claims are based on Counts I (Violation of NRS 107.080, et seq.) and II (Violation of NRS 205.372), of the Third Amended Complaint, such claims should be disallowed. No facts put forth by Longoni support

5

any form of liability under the applicable foreclosure law here. Longoni also notes in Footnote 8 of the response that the fraud claim, listed at Count 3 in the Third Amended Complaint, is based on these statutory failures and ETS' recitation that they had been complied with; accordingly, as a matter of law, the fraud claim should fail as well.

**II.     GMACM and ETS were correct in resuming the foreclosure after Longoni's failure to follow the terms of the workout plan.**

11.     Longoni goes on to argue that the foreclosure was not legitimate to the extent it was based on her failure to meet the Foreclosure Repayment Agreement, as she was performing under the terms of an alleged loan modification and, therefore, foreclosure was not proper. (Doc. 8654, ¶¶ 27-34). However, this does not conform to the ***undisputed facts***.

12.     There is no dispute that Longoni defaulted under the terms of the note and deed of trust in December 2008. The undisputed facts go on to establish that:

(i)      Longoni was in default in the amount of $16,494.65 as of March 10, 2009 (Doc. 8654, Ex.15, ¶,3 );

(ii)     She was sent a Foreclosure Repayment Agreement in March 2009, requiring three monthly payments of $2,270/month with a fourth balloon payment of $19,421.76 (Doc. 8654, Ex. 15; Doc. 8654, ¶ 30);

(iii)    GMACM log notes show that Longoni did not make a $2,270 payment and the payments were changed to a trial loan modification, with three payments of $1,600/month because she couldn't afford the higher sum (Doc. 8654, ¶ 30);

(iv)    No documents, besides the Foreclosure Repayment Agreement, were ever created or executed by either side formalizing the trial loan modification agreement (Id., Ex. 9, ¶ 11; Doc. 8654, ¶¶ 33-34);

(v)     Longoni made three payments of $1,600 in April, May, and June, although she struggled to make them on the due dates (Doc. 8654, Ex. 9, ¶¶ 12, 17, 18);

(vi)    The HAMP program was rolled out in May 2009 (J.Aguirre Depo. 165:22-25);

(vii)   GMACM log notes indicate that in May 2009, a HAMP application was sent to Longoni (Doc 8654, Ex. 12, GMAC-0100076);

6

   (viii)    On June 30, 2009, Nate Stephenson told Longoni that he saw an email indicating that her permanent modification was approved, but that he did not know the terms (Doc. 8654, Ex. 16);

   (ix)    GMACM log notes indicate that on July 2, 2009, a call was placed to Longoni to advise her to submit a HAMP application (Doc 8654, Ex. 12, GMAC-01-0077);

   (x)    On July 9, 2009, Henry Casas told Longoni that her modification ***was not approved*** and that the $1,600 payment was only established for three months (Doc. 8654, Ex. 16);[4]

   (xi)    GMACM log notes indicate that GMACM called Longoni on July 13, August 4, 5, 6, and 7 to request a HAMP application (Doc. 8654, Ex 12, GMAC-01-0079, GMAC-01-0081, GMAC-01-0082); and

   (xii)    While Longoni claims that she returned a HAMP package, GMACM has no indication of receipt and Longoni has not been able to offer any proof of same (Doc. 8654, Ex. 12, GMAC-01-0082-83; Id., Ex. 9, ¶ 28).

13. GMACM was entitled to foreclose on Longoni's loan, as she never cured the underlying default. Whether or not she operated under the terms of a Foreclosure Repayment Agreement or a trial loan modification plan, the terms only provided relief for three, or potentially four months.[5] At the expiration of that time, Longoni needed to qualify for HAMP in order to avoid foreclosure, and there is no proof that she even applied for the program. Longoni last made payment on the loan in June 2009, and at the time of foreclosure, she was $11,694.65 in arrears. Any and all portions of the Claims based on allegations that the foreclosure was invalid for these reasons should be disallowed.

---

[4] As detailed in GMACM and ETS' original Objection, this statement vitiates any claim Longoni makes regarding her reliance on the promise of a loan modification. As a matter of law, any reliance must be reasonable, and the fact that Longoni was told on July 9 that her modification was not approved makes any further reliance unreasonable. Accordingly, any claims based on Longoni's reliance on promises of a loan modification (specifically Counts 3 and 9 in the Third Amended Complaint—for Fraud and Promissory Estoppel respectively) should be dismissed as a matter of law. See Collins v. Burns, 741 P.2d 819, 821 (Nev. 1987).

[5] As detailed below, the lack of any signed documents regarding the trial modification plan makes it impossible to know whether the balloon payment had been removed as a requirement.

**III.    GMACM never agreed to a permanent loan modification and any allegation of a permanent loan modification contract is barred by the Statute of Frauds.**

14.    Longoni argues that GMACM was required to honor the terms of a fictional permanent loan modification, with payments of $1,600/month, and that she is entitled to monetary damages for its failure to do so. (Doc. 8654, ¶ 51). In support of this, Longoni points to the email communications between her and Nate Stephenson as proof that a contract to permanently modify her loan had been established (id.); however, Nevada's Statute of Frauds applies to loan modification agreements and requires that any agreement to modify a loan be in writing. See Prince v. United States Bancorp, 2:09-CV-01095, 2010 WL 3385396 (D. Nev. Aug. 25, 2010). Contrary to the assertions in the response brief, the email communications between Longoni and Nate Stephenson are not sufficient to satisfy the writing requirement.

15.    In her response, Longoni argues that, through the course of emails, sufficient terms were established to overcome application of the bar of the Statute of Frauds. (Doc. 8654, ¶¶ 63-64). While Nevada law does allow that a contract can be cobbled together through a course of writings, the documents must contain all essential terms of the contract to be enforceable. See Ray Motor Lodge, Inc. v. Shatz, 390 P.2d 42 (Nev. 1964). While the emails here contain some terms regarding a loan modification, they omit critical terms such as the interest rate, term of the loan, or modified principal balance. Further, the most significant correspondence here is the email from June 30 from which Longoni relied on the language by Stephenson to establish a formal contract: "I did, however, rcv an email stating that the MOD had been approved yesterday, but that is all I know." Not only is the statement in the email inadmissible hearsay, but significantly, Longoni responds with a question on what the terms of the approval are—and Stephenson responds that he does not know "***if that was how it was approved or not***." There are absolutely no written terms stating what, if anything, was approved. Accordingly, there is no way

8

to define the terms of any permanent loan modification contract—and the emails cannot operate to satisfy the writing requirement under the Statute of Frauds. Accordingly, regardless of the facts alleged by Longoni, any claims based on the existence of a contract (most notably Count 5 in the Third Amended Complaint for Breach of Contract) fail as a matter of law.

16. Finally, Longoni makes much of the fact that GMACM, acting through counsel, engaged in settlement discussions with Longoni shortly after the foreclosure sale. (Doc. 8654, ¶¶ 48-49). Counsel asserts that these discussions were entered into because GMACM recognized that the sale on the Property was wrongful as Longoni was in a permanent modification and had been told that the foreclosure was on hold. (Id.). Not only are proof of settlement discussions not admissible for purposes of establishing liability, but the text of the August 3, 2009 altered e-mail is especially significant. See FED. RULE EVID. 408. As originally forwarded by Pam Longoni to Farrah Tolbert on August 24, the August 3 e-mail from Nate Stephenson to Longoni read:

> Hi Pam, Apparently we need you to send in the workout package that you can download from our website. Once we get that then they can work on it. The instructions are below. Hope that this helps. Also please include your acct number on everything that you send. ***Don't worry the foreclosure is on hold.*** Thanks

(Doc. 8530, Ex.3, Ex. 38). In fact, Longoni, in forwarding this email to Farrah Tolbert, states: "Ms. Newton, Another email dated August 3, 2009, ***indicating my foreclosure is on hold*** pending the workout package which I promptly returned to GMAC. Please help me!!!" (Id.). Ben Wills, in forwarding this email to his supervisor, noted that "Nate told this lady the foreclosure ***was on hold when it was not*** and it went to 3rd party sale." (Id.). Notably, in all other versions of this email produced by both GMACM and Longoni, the last statement "Don't worry the foreclosure is on hold." ***is not present***.

17. It is not disputed that the foreclosure hold was officially lifted on July 15, 2009—some 35 days prior to the above-described email. Based on the belief that Nate Stephenson had

9

told a borrower that her foreclosure was on hold *after the official hold was lifted*, GMACM entered into settlement discussions with Longoni. Use of the above described email text as a means of establishing liability is therefore misplaced.

**IV.    The statements contained in Nate Stephenson's declarations are inadmissible hearsay and should not be considered in ruling on Longoni's Claims.**

18.    To bolster the statements in the response brief, Longoni submits the affidavit and declaration of Nate Stephenson—however, several of the statements in these documents are inadmissible hearsay and should be ignored for purposes of reviewing the propriety of the Claims. Declarations submitted in support of bankruptcy proceedings should be based on personal knowledge and not contain inadmissible hearsay. In re Spiewak, 110 F.3d 70 (9th Cir. 1997). To the extent affidavits and declarations contain hearsay, they should not be admitted for evidentiary purposes. See Ferris v. U.S., 501 F. Supp. 98 (D. Nev. 1980); see also FED. R. EVID. 801(c).

19.    Here, paragraph 8 of Nate Stephenson's May 15, 2012 affidavit states: "… I received another email from my former department which indicated that Ms. Longoni's final loan modification had, in fact, been approved." (Doc. 8654, Ex. 1, ¶ 8). The statement is textbook hearsay, in that it is a statement from Nate Stephenson summarizing the contents of an email he allegedly saw, which contained a statement from unknown third parties. To the extent that Longoni and Gagnon attempt to use this statement as proof that Ms. Longoni's loan modification had been approved, the statement should be ignored.

20.    Nate Stephenson's May 12, 2015 declaration makes several other inadmissible statements—all of which qualify as inadmissible hearsay:

a. "Over the next 90 days I reviewed the internal GMAC log notes *which appeared to indicate that their request was going to be approved*." (Doc. 8654, Ex. 1, ¶ 5);

10

b. "[I]n late June of 2009, I was informed *via email that the borrowers' request for a permanent loan modification had been approved*…." (Id., ¶ 7); and

c. "As far as I am aware, *they satisfied every requirement that GMACM had imposed upon them as part of their application for a permanent loan modification.*" (Id., ¶ 10).

21.     To the extent that Longoni and Gagnon seek to use these statements to establish that a permanent loan modification was in fact, approved, all of these statements should be disallowed.

## CONCLUSION

WHEREFORE, the Borrower Trust respectfully requests that the Court grant the relief requested in the Objection by disallowing and expunging the Claims in their entirety.

Dated: June 2, 2015
     New York, New York

>By: /s/ Norman S. Rosenbaum
>Norman S. Rosenbaum
>Jordan A. Wishnew
>Jessica J. Arett
>MORRISON & FOERSTER LLP
>250 West 55th Street
>New York, NY 10019
>Telephone: (212) 468-8000
>Facsimile: (212) 468-7900
>
>*Counsel for the ResCap Borrower Claims Trust*
>
>          -and-
>
>BRADLEY ARANT BOULT CUMMINGS LLP
>Christian W. Hancock
>Avery A. Simmons
>100 N. Tryon Street
>Suite 2690
>Charlotte, North Carolina 28202
>Telephone: (704) 338-6000
>Facsimile: (704) 332-8858
>
>*Counsel for the ResCap Liquidating Trust*