**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

In re:                                          :
                                                :
                                                :
        RESIDENTIAL CAPITAL, LLC, *et al.*,     :        Chapter 11
                                                :
                                                :        Case No. 12-12020 (MG)
                        Debtors.                :
------------------------------------------------------------------x
                                                :
THE RESCAP BORROWER CLAIMS TRUST,               :
                                                :
                                                :
                        Objector,               :
                                                :
        - against -                             :
                                                :
BARRY AND CHERYL MACK,                          :
                                                :
                                                :
                        Defendant(s).           :
                                                :
------------------------------------------------------------------x

<u>**JOINT PRETRIAL ORDER**</u>

        The parties having conferred among themselves and with the Court pursuant to
Fed. R. Civ. P. 16, the following statements, directions and agreements are adopted as the
Pretrial Order herein.

I.        NATURE OF THE CASE

        In 2006, Claimants Barry Mack and Barry Mack as Executor of the Estate of Cheryl
Mack (the "Claimants") placed a mortgage (the "Mortgage") on their home (the
"Property") at 287 Egret Avenue, Naples, Florida to secure a loan (the "Loan") whose
ultimate owner was Deutsche Bank Trust Company Americas as Trustee for RALI
2007QS3 ("DB"). At all relevant times, GMAC Mortgage, LLC ("GMACM") was
the servicer of the Loan. GMACM mistakenly commenced a foreclosure action (the
"Foreclosure Action") on behalf of DB through local counsel in Florida against the
Claimants in Florida District Court (the "State Court") on August 20, 2009 even
though the Claimants were not in default on the Loan. By September 2, 2009,
GMACM had discovered its mistake, directed local counsel on September 2, 2009 to
dismiss the Foreclosure Action and gotten confirmation from counsel that same day
that the file had been closed. However, in fact, local counsel did not dismiss the

1

Foreclosure Action until December 8, 2009.  The Claimants filed a response that included counterclaims (the "Counterclaims") against DB on September 11, 2009. Later, on October 26, 2009, the Claimants claim to have sent a letter (the "Letter") that allegedly served as a Qualified Written Request (a "QWR") under 12 U.S.C. section 2605(e) to GMACM as servicer.  The QWR employed an address for GMACM that is different than the one the monthly statements from GMACM to the Claimants expressly directed them to use for QWRs.  Under the terms of section 2605(e) at the time, GMACM's response to the alleged QWR was due 60 days later. There is no evidence that GMACM received the Letter or, if it did, that it responded to it at any time.

Local counsel did not inform DB or GMACM of the Counterclaims or proceedings thereon.  The Claimants therefore got a default judgment against DB after putting on a prima facie case as to liability and damages.

After DB later learned of the judgment against it on the Counterclaims, it moved to vacate the decision.  The State Court denied the motion, but slightly amended the judgment on the Counterclaims, providing the Claimants with a money judgment of $327,000 plus fees and costs.  The Claimants subsequently recovered that sum via a bond that DB had posted.

The Claimants assert in Proof of Claim No. 386 that they suffered "actual damages" in the amount of $2.5 million, including emotional distress damages, as a result of GMACM's alleged failure to respond to their alleged QWR.

II.    BASIS FOR JURISDICTION, WHETHER THE CASE IS CORE OR NON-CORE, AND WHETHER THE BANKRUPTCY JUDGE MAY ENTER FINAL ORDERS OR JUDGMENT

This Court has core jurisdiction to hear and decide this matter under 28 U.S.C. sections 1334(a), 1334(b), 157(a), 157(a), 157(b)(2)(B), 157(c)(2) (if needed), by consent of the parties and the Amended Standing Order of Reference in Case No. 12 MISC 00032 (filed February 1, 2012, Dkt. No. 1).  *See also Erisksen v. Residential Capital, LLC*, United States District Court, Southern District of New York, No. 14-CV-7205 (filed December 18, 2014) (holding that the presence of a claim for emotional distress damages does not convert a matter into one governed by 28 U.S.C. section 157(b)(5).

III.    STIPULATED FACTS

1.    The Claimants moved from New Jersey to Florida in 2002.

2.    At that time, they were both retired.

3.    In 2003, they purchased the Property, taking out a mortgage to do so.

2

4. The Property was on a canal, had 4 bedrooms, 3.5 baths, two verandas, a swimming pool and a winch to place the Claimants' boat in the canal.

5. In October of 2006, they refinanced the Property with the Loan, made by Primary Residential Funding, LLC.

6. Ownership of the Loan eventually was transferred to DB.

7. GMACM was the servicer for the Loan at all times after November 1, 2006.

8. The Claimants' monthly payments on the Loan were about $5,800 for the first 120 months and $7,700 thereafter.

9. The Claimants had other expenses such as income and property taxes, food, clothing, maintenance of the Property and utilities.

10. In order to make their monthly payments on the Loan, the Claimants had to invade their life savings and investments.

11. Ultimately, they depleted their life savings and investments by more than $250,000.

12. By March 28, 2008, the Claimants listed the Property for sale because they could no longer afford to reduce their savings.

13. April of 2009, the Claimants were seeking a modification of the Loan from DB through GMACM, writing to GMACM on August 10, 2009 that they had exhausted their life savings and could not afford the mortgage any longer.

14. The financial information they submitted in connection with the application showed a gross income of about $5,400.

15. As of that time, they had dropped the price of their Property five times.

16. GMACM ultimately declined the Claimants' modification request November 4, 2009 after reviewing financial and other submissions by the Claimants because, among other things, the Claimants lacked sufficient gross income to fund the proposed modification of the Loan.

17. GMACM caused local counsel to file the Complaint to Foreclose Mortgage on behalf of DB on August 20, 2009, thereby commencing the Foreclosure Action, even though the Claimants were not in default on the Loan.

18. The Claimants dropped the price of their Property one more time thereafter.

19. GMACM discovered its mistake within days and notified local counsel on September 2, 2009 to dismiss the Foreclosure Action.

20. Local counsel responded to the instruction on September 2, 2009 by confirming it had closed the file.

21. In fact, local counsel did not file a dismissal of the Foreclosure Action until December 8, 2009.

22. The Claimants entered into a contract to sell the Property on December 9, 2009.

23. On December 22, 2009, Mrs. Mack told her psychiatrist, Dr. Eduardo Lichi, that the Claimants as a result of the sale of the Property, there was "[g]reat pressure off."

24. The sale of the Property closed on February 1, 2010.

25. In response to the Foreclosure Action, on September 11, 2009, the Claimants, through counsel David F. Garber, filed their Answer to Complaint for Foreclosure Mortgage, Affirmative Defenses and Counterclaim (the "Responsive Pleading") that contained the Counterclaims seeking damages for alleged violations of 12 U.S.C. sections 2601 et. seq. ("RESPA") and slander of title.

26. Shortly thereafter, on October 26, 2009, the Claimants sent the Letter using an address other than the one specified for QWRs on the monthly mortgage statements GMACM sent to the Claimants, as was on all monthly mortgage statements GMACM sent to borrowers.

27. Mr. Mack testified that the Claimants' bookkeeper supplied the address.

28. Under RESPA section 2605(e) at that time, GMACM had 60 days to respond to the Letter if it was a QWR.

29. In 2012, that time period was reduced by amendment to a speedier 30 days.

30. There is no direct evidence that GMACM received the Letter and no evidence that, if it did, it ever responded to it.

31. DB did not answer or otherwise appear in response to the Counterclaim until after the Claimants got a judgment against it.

32. The Florida Court entered DB's default.

33. On May 5, 2011, the Florida Court conducted an evidentiary hearing at which the Claimants put on their prima facie case.

34. DB was not present at that proceeding.

35. On May 5, 2011, the Florida Court entered its Final Judgment (the "Initial Florida Judgment") for the Claimants against DB awarding the Claimants a total of $469.470.27 plus attorneys' fees and costs on the Counterclaims.

4

36. Upon being personally served with the Initial Florida Judgment on May 11, 2011, on July 14, 2011, DB filed Plaintiff's Motion to Set Aside Final Judgment and Set New Trial in the Foreclosure Action seeking to vacate the Initial Florida Judgment and set a new trial on the Counterclaims (the "Motion to Vacate").

37. Among the arguments that DB made in the Motion to Vacate was that the RESPA claims that the Claimants had made for which the Florida Court had granted them judgment could not as a matter of law be made against DB as the lender.

38. In opposing the Motion to Vacate, in their Defendant Mack's [sic] Response to Objection and Motion for Rehearing of Plaintiff Deutsche Bank and Motion for Reconsideration (dated November 5, 2012) (the "Motion to Vacate Opposition") the Claimants argued for a violation of RESPA section 2605(e) based on the Letter as an alternative RESPA theory to the ones that DB was attacking.

39. After an evidentiary hearing in essence confined to whether DB had notice of the Counterclaim and if not, whether its neglect was excusable, February 26, 2013, the State Court entered its Final Order on Plaintiffs' Motion to Set Aside Final Judgment and Set New Trial (the "Final Florida Judgment"), awarding the Claimants $321.970.77, plus attorneys' fees and costs, having reduced the award because it agreed with DB that, as matter of law, DB could not be held liable under the RESPA theories originally advanced by the Claimants.

40. The Claimants recovered the amount of the judgment from a bond posted by DB, filing their Acknowledgment of Payment, and Partial Release and Assignment in the Foreclosure Action on or about March 20, 2013.

41. Thereafter they rented a home in Naples, Florida until they moved back to New Jersey in 2010 to be near their relatives, in part as a way of easing the consequences of Mrs. Mack's deteriorating physical condition.

42. After they moved to New Jersey, on or about October 29, 2010, they bought a house owned by Mrs. Mack's sister, Jewel DeMore, for $345,000.

43. At that time, the financial information they submitted to the original lender, Gateway Funding Diversified Mortgage Services, L.P., which later sold the Loan to GMACM, indicated that their gross income about around $6,000 a month.

44. Their monthly payments under this new Loan were $1,528.35.

45. In 2002, Mrs. Mack had a liver transplant due to liver damage caused by genetic defect.

46. Mrs. Mack was a chronic alcohol abuser prior to her liver transplant and, except for the six months following the operation, for the rest of her life.

47. Mrs. Mack told the medical providers for her transplant that she did not use alcohol.

5

48. At least one doctor suspected that Mrs. Mack's original liver problems resulted not only from her genetic defect, but also from her alcoholism.

49. Mrs. Mack was chronically depressed from at least 2005, the year she began seeing Dr. Lichi, who diagnosed her as having "major depression," to the end of her life.

50. One cause of Mrs. Mack's depression was that Mrs. Mack's marriage to Mr. Mack was not a happy one.

51. She also told a provider in May of 2011 that Mr. Mack had long been both physically and emotionally abusive.

52. Another cause of her depression was the further strain on their marriage of their disagreement over whether to move back to New Jersey.

53. By 2007-08, Mr. Mack was pressing for them to move back to New Jersey to be near relatives, ease the burden of her care and staunch the depletion of their savings. Mrs. Mack did not want to move; she preferred to remain in the Property in Florida.

54. Mrs. Mack attempted to commit suicide three times by a combination of sleeping pills and alcohol: once in 2005, once in early November of 2009 and once more in May of 2011.

55. Apart from any damage caused by her suicide attempts, Mrs. Mack's physical health deteriorated steadily prior to as well as after her 2009 suicide attempt.

56. After her liver transplant, Mrs. Mack began taking an immunosuppressant, Prograf, to reduce the risk of rejection of the new organ by her body's immune defenses.

57. On August 17, 2009, Mrs. Mack was diagnosed suffering from "acute renal failure."

58. This diagnosis preceded her November 2009 suicide attempt and the commencement of the Foreclosure Action.

59. Mrs. Mack also suffered from "aortic insufficiency," essentially a faulty heart value that interfered with proper circulation of oxygenated blood.

60. Partly in response to her distress over the Foreclosure Action, Mrs. Mack attempted suicide in November of 2009.

61. Mrs. Mack entered hospice care in New Jersey on February 1, 2012.

62. Mrs. Mack died on October 25, 2013. The death certificate recited that the immediate causes include cirrhosis of the liver, renal failure, congestive heart failure, and neuropathy.

## IV.    PARTIES' CONTENTIONS

The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties:

A.  Plaintiff's Contentions

1.   Claimants entered into a mortgage with Primary Residential Mortgage, Inc. on October 6, 2006 for $990,000.00, and for which debtor GMACM was the servicing agent, in Naples, Florida.

2.   The ownership of the note and mortgage was eventually claimed by DB.

3.   Claimants timely made all of their mortgage payments from the mortgage inception until its final payment in February 2010.

4.   On April 17, 2009, the Macks made an application for payment relief of their mortgage under provisions of the HAMP act.

5.   GMACM denied the HAMP request.

6.   On April 17, 2009, GMACM marked the Macks' Loan for foreclosure.

7.   In August 2009, GMACM caused a suit in foreclosure to be filed against the Macks with the plaintiff being DB.

8.   The Macks made numerous telephone calls to GMACM complaining of the foreclosure in August, September, October and November 2009, but the suit continued.

9.   On September 11, 2009, the Macks filed an answer and counterclaim for (1) slandering the title to their property, and (2) RESPA violations against Deutsche Bank for failing to notify the Macks of a transfer of ownership of the note and mortgage to a new party, Deutsche Bank, which resulted in their payments going to GMACM instead of the new note holder Deutsche Bank.

10. DB failed to respond to the counterclaim, provide discovery, or even acknowledge the claim.

11. On October 26, 2009, Claimants sent a letter which qualified as a QWR under 12 U.S.C. §2605 to GMACM at the address GMACM gave them for written inquires, asking for help in resolving the foreclosure filed by DB against them.

7

12. GMACM failed to respond to the QWR of October 26, 2009, and failed to resolve the wrongful foreclosure issue in favor of the Macks.

13. On December 9, 2009, the Macks entered into a contract to sell their house then in foreclosure at a greatly reduced price ($1,114,000.00), even though they had listed the property for sale at $1,969,000, in order to avoid losing the house through foreclosure sale.

14. On November 9, 2009, Claimant Cheryl Mack, ingested an overdose of 20 Ambien sleeping pills combined with alcohol.

15. Claimant Cheryl Mack was admitted to Naples Community Hospital on November 10, 2009 and involuntarily committed to hospitalization as a danger to herself as a result of her anxiety and depression over the foreclosure. She sustained permanent kidney damage as a result of her overdose.

16. On December 8, 2009, Deutsche Bank caused a dismissal of the foreclosure to be filed, claiming to be the prevailing party and demanding the Macks pay the attorney's fees and costs of the foreclosure. Deutsche Bank failed to address the counterclaims of the Macks, which continued to be pursued without response from Deutsche Bank.

17. The Macks did not become aware of the dismissal until after they signed a binding contract for sale dated December 9, 2009.

18. The court conducted a trial on May 5, 2011 after repeatedly notifying Deutsche Bank but it did not appear.

19. The court awarded Claimants (1) $296,920.05 on Count I – Slander of Title for loss of sale price of the home, and (2) $150,000 for the personal injuries of Cheryl Mack, and attorneys' fees under Count II – RESPA.

20. On July 14, 2011, under the threat of execution for the May 5, 2011 judgment, Deutsche Bank filed a motion for relief blaming the failure to respond to the counterclaim on their attorney.

21. On February 26, 2013, the Florida trial court granted partial relief to DB, on the grounds that Claimant had not alleged a legally recognized cause of action against DB under RESPA, and vacated all personal injury damages from the May 5, 2011 judgment against DB. The Court let stand the loss of property value on the slander count against DB.

22. In August 2009, GMACM was the servicer of the Loan. DB was not the servicer, but claimed to be the owner.

23. Claimants are now entitled to compensation under the provisions of RESPA for the personal injury to Cheryl and Barry Mack from the failure of GMACM to timely acknowledge the QWR of October 26, 2009, and further from their failure to immediately investigate the ongoing foreclosure against the Claimants which would have prevented Cheryl Mack's overdose on November 9, 2009 and her subsequent kidney damage.

24. 12 U.S.C. § 2605 which was then in effect gave GMACM 20 days to acknowledge the Mack's Qualified Written Request, and 60 days to notify Claimants of prompt corrective action, and required a reasonable investigation of the complaints within the 60-day time limit.

25. GMACM failed to acknowledge the Claimants Qualified Written Request of October 26, 2009.

26. GMACM failed to reasonably investigate Claimants' repeated telephone calls over the foreclosure instituted by them against the Macks, which calls occurred in August, September, October and November 2009.

27. GMACM failed to reasonably investigate and take appropriate action to terminate the foreclosure action after the October 26, 2009 QWR without adverse consequences to the Macks.

28. GMACM filed the foreclosure against the Macks through their attorney, Law Offices of David J. Stern, P.A., and were responsible for his actions and inactions.

29. The Law Offices of David J. Stern, P.A. was repeatedly notified by the attorney for the Macks of the baselessness of the foreclosure and their counterclaim.

30. GMACM failed to take prompt reasonable corrective action to dismiss the baseless foreclosure or address the issues raised by the counterclaim.

31. GMACM failed to timely notify Claimants of any corrective action.

32. On July 14, 2011, GMACM on behalf of DB filed a motion pursuant to Fla. R. Civ. P. 1.540 to vacate the judgment of the Court of May 5, 2011, which compensated Claimants for the wrongful foreclosure.

33. Claimants' anxiety and depression over the threat of losing their house, and its ultimate forced sale, continued until the partial ratification of their claims by the Court on February 26, 2013.  However, Cheryl Mack was admitted to Hospice care in February 2012 and died on October 25, 2013 from kidney failure and liver failure.

34. GMACM and DB, even though they acknowledged the wrongful foreclosure in their motion to vacate the final judgment of May 5, 2011, at all times subsequent continued to deny liability to the Macks for the wrongful foreclosure although they

9

did remit a reimbursement to the Macks of $3,712 in February 2013 for the fees and costs they had demanded from the foreclosure suit before they would allow the closing and sale under the contract of December 9, 2009 and release of the 2006 mortgage and note.

35. DB was not the prevailing party in the foreclosure suit of September 2009 despite GMACM's demands for payment after the dismissal of December 9, 2009.

36. Cheryl and Barry Mack both experienced great stress and anxiety over the period of time from before the October 26, 2009 QWR and at all times thereafter through the death of Cheryl Mack in October 2013, and resultant medical complications, extensive medical bills exceeding $250,000, permanent and serious injuries and after the death of Cheryl Mack, serious and permanent grieving of Barry Mack over the injury and death of his wife, which trauma would have been avoided if GMACM had promptly investigated and rectified the foreclosure suit before Cheryl Mack's suicide attempt of November 10, 2009, and before the Macks entered into a binding contract to sell their home at a distressed price.  Further, GMACM as servicer of the Loan exhibited a callous and either intentional or grossly negligent pattern in first filing the foreclosure while in negotiations to consider financial relief to the Macks, and then in a pattern of refusal to respond appropriately to numerous telephone complaints about the foreclosure in the months of August, September, October and November, 2009 and the insistence of GMACM to be compensated by the Macks for the baseless foreclosure before the release of the mortgage upon the January 31, 2010 closing of which the QWR of October 26, 2009 exemplifies, all of which Claimants pray that an award of $2.5 million and that they further be awarded, in addition to medical bills and pain and suffering in the sum of $1,000 pursuant to 12 U.S.C. § 2605 and their attorney's fees and costs herein expended.

37. The actual damages experienced by Barry and Cheryl Mack, including whether her hospitalization of November 11, 2009 could reasonably have been averted if GMACM would have taken prompt action to cause the foreclosure to be dismissed without harm to the Macks.

38. Cheryl Mack's kidney condition that ultimately contributed to her death was caused by the overdose of Ambien sleeping medication and alcohol secondary to her anxiety over the foreclosure, and aftermath rather than an aggravation of a preexisting condition.

B.  Defendant's Contentions

1.  The Claimants purchased the Property in 2003, placing a mortgage on the Property.

2.  At that time, they were retired, with their principal gross income being from Mr. Mack's pension plan and social security for each of them.

3.  The Macks refinanced the Property in 2006 pursuant to a mortgage placed with DB on which GMACM was the servicer.

4.  The monthly payment on the DB mortgage was about $5,800.

5.  The Claimants could not pay the mortgage and their other living expenses out of the gross income.

6.  The Claimants therefore had to invade their life savings.

7.  Ultimately, they depleted their life savings and investments by more than $250,000.

8.  By March of 2008, the burden of paying the mortgage led them to list the Property for sale.

9.  They dropped the list price on the Property five times before September of 2009 and once after.

10. By mid-2009, the Claimants began applying to GMACM for a modification of their mortgage because they were running out of funds.

11. At that time, their gross income was about $5,400.

12. The Claimants would have to dispose of the Property since they could no longer afford it.

13. GMACM mistakenly caused local counsel to file the Foreclosure Action on August 20, 2009 against the Claimants, who were not in default.

14. Within days, GMACM discovered its mistake.

15. On September 2, 2009, GMACM instructed local counsel to dismiss the Foreclosure Action and close the file.

16. On September 2, 2009, local counsel advised GMACM that it had dismissed the Foreclosure Action and closed the file per GMACM's instructions.

17. In fact, local counsel did not dismiss the Foreclosure Action until December 8, 2009.

18. On December 2, 2009, local counsel served the Claimants at the Property with the dismissal form that it later filed on December 8, 2009.

19. The Claimants received the dismissal served by local counsel on them within a few days.

20. Counsel for the Claimants received the dismissal not later than December 28, 2009.

11

21. On September 11, 2009, the Claimants filed the Responsive Pleading that contained the Counterclaims, which asserted causes of action under RESPA and slander of title.

22. Local counsel did not inform GMACM or DB about the Responsive Pleading and Counterclaims or proceedings thereon.

23. Because it did not know of the Counterclaims, DB did not appear with respect to them until after the Claimants Obtained the Final Judgment for about $470,000 after an evidentiary hearing at which the Claimants testified and at which DB was not present since it did not know about the Counterclaims.

24. DB and GMACM did not learn of the Initial Florida Judgment until May of 2011.

25. Upon learning of the Initial Florida Judgment, which was the first notice that DB and GMACM had to the Counterclaims proceedings, DB filed the Motion to Vacate, seeking to vacate the Final Judgment and set a new trial on the Counterclaims, and arguing in part that as a matter of law DB as the lender could not be liable on the RESPA claims that the Claimants had asserted.

26. In response, the Claimants filed the Motion to Vacate Opposition in which they argued, among other things, that RESPA section 2605(e) provided an alternative ground for recovery based upon the Letter.

27. After an evidentiary hearing confined to the issue of excusable neglect by DB, the State Court entered the Final Florida Judgment eliminating the original RESPA claims as a ground for recovery by the Claimants, eschewing any recovery under RESPA section 2605(e) and reducing the award to about $327,000, plus fees and costs.

28. The Claimants later were paid the amount of the Final Florida Judgment.

29. The Claimants entered into a contract to sell the Property on December 9, 2009.

30. On December 22, 2009, Mrs. Mack reported to her psychiatrist, Dr. Eduardo Lichi, that the sale contract meant "great pressure off."

31. The sale closed on January 28, 2010.

32. The Claimants moved to New Jersey in late 2010.

33. On moving to New Jersey, they bought a house owned by Jewel DeMore, Mrs. Mack's sister, for $345,000.

34. To buy the house, the Claimants took out a $301,000 mortgage from GMACM on which the monthly payments were $1,528.35.

35. At that time, their gross income was just about $6,000.

12

36. The monthly mortgage statements that GMACM sent to the Claimants for the 2006 mortgage to DB had a block on the back listing various addresses for various kinds of communications with DB.

37. On such address was specifically for QWRs under RESPA section 2605(e); another was specifically for "General Inquiries".

38. On October 26, 2009, the Claimants claim to have sent the letter to GMACM.

39. The Letter was addressed to the GMACM address for general inquiries, not to the address for QWRs.

40. Counsel for the Claimants has stated to the Court that the Claimants thought they were sending a general inquiry.

41. Mr. Mack has testified that it was the Claimants' bookkeeper who selected the address to which to send the Letter.

42. GMACM has no record of receiving or responding to the Letter.

43. By mid-August of 2009, before GMACM filed the Foreclosure Action, Mrs. Mack had a long history of deep depression, growing in part out of her unhappy marriage to Mr. Mack and their disagreement over whether to move back to New Jersey to be near relatives, as Mr. Mack wanted to do.

44. In 2005, Mrs. Mack attempted suicide.

45. Mrs. Mack had a long history of abuse of alcohol that was interrupted only for six months after her 2002 liver transplant and that continued until her death.

46. Mrs. Mack falsely told the professionals involved that she did not use alcohol in order to avoid being rejected for a transplant.

47. By mid-August of 2009, Mrs. Mack was seriously ill, having had a liver transplant in 2002, suffering from acute renal failure due to the effects of the immunosuppressant she had been taking ever since, congestive heart failure and aortic insufficiency, as well as possible damage to her liver from her continuing alcohol abuse.

48. In the first week of November of 2009, Mrs. Mack again attempted suicide, due in part to her distress over the Foreclosure Action.

49. By that time, she already was gravely ill with a number of conditions as noted above.

50. Mrs. Mack's health continued to deteriorate after her suicide attempt in November of 2009.

51. Mrs. Mack attempted suicide a third time in May of 2011.

52. On February 1, 2012, Mrs. Mack entered hospice care.

53. Mrs. Mack died on October 25, 2013.

54. The death certificate recited that the immediate causes of death included cirrhosis of the liver, renal failure, congestive heart failure, and neuropathy.

55. The Claimants' sole claim to be tried is their alleged RESPA section 2605(e) claim.

56. Since the Trust has provided sufficient evidence to contest the claim, thus necessitating this trial, the Claimants have the burden of proof to establish all elements of their alleged RESPA section 2605(e) claim. (*Feinberg v. Bank of New York*, 442 B.R. 220-21 (Bankr. S.D.N.Y. 2010); *In re St. Johnsbury Trucking Co., Inc.*, 206 B.R. 318, 323 (Bankr. S.D.N.Y. 1997) ("The claimant must prove the claim, not sit back while the objector attempts to disprove it.") (citation omitted), aff'd sub nom. *St. Johnsbury Trucking Co., Inc. v. Adams* (*In re St. Johnsbury Trucking Co., Inc.*), 221 B.R. 692 (S.D.N.Y. 1998), aff'd without op. 173 F.3d 846 (2d Cir. 1999). They must show that: (1) they sent the Letter; (2) to a proper address; (3) in content the letter was a QWR; (4) GMACM received the Letter; (5) GMACM did not respond to the Letter; and (5) GMAMC's lack of response to the Letter proximately caused them "actual damages" within the meaning of RESPA section 2605(f)(1)(A) that are separate and distinct from the damages arising from the Foreclosure Action.

57. The Court ruled that res judicata did not apply to the RESPA section 2605(e) claim because it did not involve the same nucleus of facts as the Counterclaims regarding the Foreclosure Action and because DB as a lender could not, as a matter of law, violate that statute. (Memorandum Opinion 21-23.) The ruling is not final since it did not dispose of all claims. The Trust respectfully asks the Court to reconsider the issue. The Letter was about the Foreclosure Action and was written because of it. Hence, it arose out of the same nucleus of facts. Moreover, the Court itself found that the RESPA section 2605(e) claim satisfied the "relation back" test for allowing amendments to proofs of claim. (Memorandum Opinion 25.) Next, while as a lender rather than a servicer DB could not be held directly liable for a violation of section 2605(e), it could be held liable as the principal of its agent, GMACM, as it was in connection with the Counterclaims even though it was innocent of any wrongful conduct itself. Finally, although the Claimants have asserted that they did not make a section 2605(e) claim in the Counterclaims proceedings (*see, e.g.*, Creditor Barry Mack's Response to ResCap Borrower Claims Trust's Objection to Proof of Claim No. 386 Filed by Barry and Cheryl Mack (Dkt. 6834) 16-17), the Claimants in fact unsuccessfully raised it in the Counterclaims proceeding.

14

58. The Claimants should be estopped from raising the section 2605(e) claim because they failed to include it in their Proof of Claim No. 386 when, as the Counterclaims proceedings reflect, they were well aware of it and could and should have expressly included it in the Proof of Claim.

59. The Court previously ruled that the Claimants could amend their Proof of Claim No. 386 to include the RESPA section 2605(e) claim. (Memorandum Opinion 24-26). The Court should reject the Claimants' attempt to amend their Proof of Claim to include the section 2605(e) claim because it is inequitable for them to raise it when it was not expressly raised in their proof of claim even though they raised other RESPA claims in it and they were fully aware of it, having raised it in the Counterclaims proceedings.

60. The Letter did not qualify as a QWR because the Claimants did not send it to the address specified by GMACM for QWRs.  24 C.F.R. § 3500.21(e)(1); 24 C.F.R. § 3500.21(e).  *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 182 (2nd Cir. 2014) *(citing Berneike v. CitiMortgage Inc.*, 708 F.3d 1141, 1148-49 (10th Cir. 2013). *Roth* is controlling in the Second Circuit, in which the RESPA Claim and Objection are pending.

61. The letter is not a QWR because the Claimants meant it as a "general inquiry," instead.

62. RESPA section 2605(f)(1)(A) provides for the recovery of "actual damages" for "failure to comply" with section 2605(e).

63. The Claimants cannot claim any damages even if the Letter was a QWR because before GMACM's response was due in late December of 2009, they knew that the local counsel for DB had dismissed the Foreclosure Action.  The issue of why the foreclosure was, therefore, moot.  Whatever may have been their expectations, the Claimants had no legally enforceable expectation of a response until then.  *Payne v. Mortgage Electronic Registration Sys., Inc. (In re Payne)*, 387 B.R. 614, 635-36 (Bankr. D. Kan. 2008) (no claim for relief accrues until response period exceeded).  Nothing in the statute indicates that a servicer must respond sooner if it can.  Congress could well have inserted appropriate language to compel a faster response, e.g., requiring a response "as soon as reasonably possible, but in no event later than 60 days."  It did not.  Indeed, Congress later expressed itself on the subject of a quicker response when it reduced the response time from 60 to 30 days in 2012.  Thus, the "failure to comply" with section 2605(e) for which the Claimants may claim actual damages did not occur until late December of 2009.

64. Even if the Letter was a QWR, any damages the Claimants suffered, particularly emotional distress damages, were at most minimal since Mrs. Mack reported to Dr. Lichi that that December 2009 sale contract for the Property meant that she felt "[g]reat pressure off."  This was at a time, moreover, when as just noted the Claimants had no legally enforceable expectation of receiving a response.

15

65. The Claimants may recover only damages that: (1) "result[] from the failure to respond to the QWR . . . [as contrasted with those] due to the foreclosure action." (Memorandum Opinion 30). "To receive any damages for the QWR Claim, Mack must demonstrate how the requested damages arise from GMACM's failure to respond to the QWR as opposed to its initiation of the Foreclosure Action." *Id.* In turn, the Claimants also cannot recover for any health issues arising prior to Mrs. Mack's November 2009 suicide attempt. These strictures apply to all damages claimed by the Claimants, including emotional distress damages even if they are recoverable under RESPA. Thus, among other things, the Claimants may not recover for any wrong or injury for which they did or could have recovered in the Foreclosure Action or which preexisted the Foreclosure Action or stemmed from other causes.

66. At the hearing on January 12, 2015, the Court granted the Trust partial summary judgment denying the punitive damage claim in Proof of Claim No. 386. (See Transcript of January 12, 2015 Hearing 20:4-20.)

## V.    ISSUES TO BE TRIED

1. Whether and when GMACM served pre-filing copy of the dismissal of the Foreclosure Action.

2. When the Macks first learned that the Foreclosure Action had been dismissed on December 8, 2009.

3. Whether local counsel informed GMACM or DB of the Counterclaims and proceedings thereon.

4. Whether DB or GMACM knew of the Counterclaims before DB was served with the Final Florida Judgment.

5. Whether counsel for the Claimants has stated to the Court that they thought they were making a general inquiry, for which the QWR address would not have been the correct one per the monthly mortgage statements.

6. Whether the State Court also granted the Claimants any relief under the RESPA section 2605(e) theory that the Claimants raised in connection with the Motion to Vacate.

7. Whether in 2006 Mrs. Mack told Dr. Lichi she had had an affair around 2004-05, but the other party later terminated the affair, further deepening her depression.

8. Whether Mrs. Mack told Dr. Lichi in February of 2009 that she probably had congestive heart failure.

9. Whether the Prograf progressively damaged her kidneys, as she knew, leading to her mid-August of 2009 diagnosis "acute renal failure."

16

10. Whether Mrs. Mack falsely told the medical providers involved in her transplant that she did not drink alcohol to avoid the risk of being rejected for the transplant.

11. When in November of 2009 Mrs. Mack tried to commit suicide.

12. Whether the Letter was a QWR despite being sent to the wrong address.

13. Whether the Claimants intended the Letter as a "general inquiry" so that it is not a QWR.

14. Whether res judicata bars the Claimants from recovering on their alleged RESPA section 2605(e) claim.

15. Whether the Claimants are barred from recovering on their alleged RESPA section 2605(e) claim.

16. Whether the Claimants should have been allowed to amend their claim to include the alleged RESPA section 2605(e) claim.

17. The extent of any actual damages, including emotional distress, other injuries and medical bills proximately caused the Claimants by GMACM's alleged failure to respond to the Letter if it was a QWR.

18. Whether the claimants are entitled to RESPA damages of $1,000 under 12 U.S.C. section 2605(f)(1)(B).

VI.    PLAINTIFF'S EXHIBITS

1.  Purged Loan Notes of GMACM.
2.  Doctor Lichi's records, his transcript of them and his accompanying glossary, and letter of December 1, 2009.
3.  All medical records of Cheryl Mack after the date of her hospitalization, including New Jersey records and Hospice.
4.  Depositions of Barry Mack and Cheryl Mack, including videos of the depositions; Depositions of Juan Antonio Aguirre and Renaldo Reyes.
5.  Notice of Dismissal.
7.  Copy of complaint, answer and counterclaim.
8.  Final Judgment of May 5, 2011.
9.  Copy of the order denying the RESPA count. February 26, 2013.
10. Copy of check in the amount of $3,712 for reimbursement of foreclosure attorney's fees and costs.
11. Deposition of Carol Conrad, LCSW.
12. Listing agreement of March 28, 2008.
13. Sale contract of December 9, 2009.
14. "Welcome letter" from GMAC Mortgage to Macks dated October 25, 2006.
15. Subpoena Duces Tecum In Aid of Execution to Deutsche Bank Trust Company Americas dated June 8, 2011.
16. Mitigation Request dated August 10, 2009.

17

17. Mortgage of Macks with Primary Residential Mortgage Inc. dated October 6, 2006 and Interest Only Period Fixed Rate Note dated October 6, 2006.

18. Servicing Disclosure Statement dated August 29, 2006.

19. Short Hand Definitions for GMACM account notes dated November 22, 2012.

20. Affidavit of Ronaldo Reyes in Support of Plaintiff's Motion to Set Aside Final Judgment and Set New Trial dated July 11, 2011.

21. January 14, 2010 letter to Barry and Cheryl Mack from GMACM Customer Care.

22. Subpoena Duces Tecum In Aid of Execution to GMAC Mortgage, LLC dated June 8, 2011.

23. Mortgage of Macks' Delran, New Jersey house dated October 29, 2010.

24. Notice of Lis Pendens dated March 26, 2008.

25. Release of lis pendens from 2009 foreclosure.

26. Copy of January 2010 closing statement.

27. All documents sent to Stern on Counterclaim from September 9, 2009 to May 5, 2011.

28. Satisfaction of 2006 mortgage.

29. MERS Milestones (MERS document 001 and 002).

30. Pooling and Servicing Agreement.

31. Prospectus for RALI 2007 QS3 Trust.

32. Payoff statement dated January 26, 2010.

33. DB's Objection to Entry of Final Order dated October 30, 2012.

34. Letter from Macks to GMACM dated October 7, 2009.

35. Master Servicing Agreement.

36. Contracts between DB and GMACM.

37. July 23, 2009 letter from GMACM to Claimants.

38. August 28, 2009 letter from GMACM to Claimants.

39. September 30, 2009 letter from GMACM to Claimants.

40. November 4, 2009 letter from GMACM to Claimants.

41. December 15, 2009 letter from GMACM to Claimants.

42. Medical bills after October 26, 2009.

## VII.    DEFENDANT'S EXHIBITS

A. Foreclosure Complaint in Florida Circuit Court litigation

B. Answer & Counterclaims in Florida Circuit Court litigation

C. Final Judgment in Florida Circuit Court litigation

D. DB Motion to Vacate in Florida Circuit Court litigation

E. Mack response to DB Motion to Vacate in Florida Circuit Court litigation

F. Final Order on Plaintiffs' Motion to Set Aside Final Judgment and Set New Trial

G. Purged Loan Notes

H. October 26 Letter from Claimants to GMACM

I. Notice of Dismissal in Florida Circuit Court litigation

J. January 4, 2012 Garber letter to John Smith T with enclosures

K. Docket Sheet from Florida Circuit Court litigation

L. Mack response to Trust's Objection No. 386

M. Memorandum Opinion (Dkt. No. 7297)

N. Transcript of 1/12/15 status conference
O. Mortgage Statement (Exhibit to B Mack depo in December 2014
P. Garber 11/81/14 Letter with Claimants' Answers to GMACM's 2nd Interrogatories
Q. Dr. Litchi notes
    a. 11/28/05
    b. 12/28/05
    c. 2/3/09
R. Dr. Wahe Reports
    a. 7/30/07
    b. 8/17/09
S. Purged Loan Notes 9/1/2009-5/31/11
T. Virtua Assessment Report 5/27-31/11
U. North Collier Hospital 11/12/09 History and Physical by R. Valenzuela
V. C. Mack deposition, 4/4/12, 76:8-77:15; 77:16-20.
W. B. Mack Deposition, 4/4/12, 34:11-35.

## VIII.   STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

Any objections not set forth herein will be considered waived absent good cause shown.  [The parties shall set forth any stipulations with respect to the authenticity and admissibility of exhibits and indicate all objections to exhibits and the grounds therefor.]

    A. Platinffs' Objections to Defendant's Exhibits.

    J. January 4, 2012 Garber letter to John Smith T with enclosures
     *Hearsay*

    P. Garber 11/81/14 Letter with Claimants' Answers to GMACM's 2nd
Interrogatories.
     *Hearsay.*

    B. Defendant's Objections to Plaintiffs' Exhibits

    1. Purged Loan Notes of GMACM.
     *Defendant reserves the right to object to specific entries on relevance grounds.*

    3. All medical records of Cheryl Mack after the date of her hospitalization, including New Jersey records and Hospice.
     *Defendant reserves the right to object to specific entries on relevance grounds.*

    4. Depositions of Barry Mack and Cheryl Mack, including videos of the depositions; Depositions of Juan Antonio Aguirre and Renaldo Reyes.
     *Hearsay.  Defendant reserves the right to object to specific entries on relevance grounds and form.*

11. Deposition of Carol Conrad, LCSW.
*Hearsay.  Defendant reserves the right to object to specific entries on relevance grounds and improper opinion testimony grounds, along with such objections as Defendant makes at the deposition if it is taken.*

15. Subpoena Duces Tecum In Aid of Execution to Deutsche Bank Trust Company Americas dated June 8, 2011.
*Relevance.*

20. Affidavit of Ronaldo Reyes in Support of Plaintiff's Motion to Set Aside Final Judgment and Set New Trial dated July 11, 2011.
*Relevance.*

22. Subpoena Duces Tecum In Aid of Execution to GMAC Mortgage, LLC dated June 8, 2011.
*Relevance.*

27. All documents sent to Stern on Counterclaim from September 9, 2009 to May 5, 2011.
*Relevance.*

30. Pooling and Servicing Agreement.
*Relevance.*

31. Prospectus for RALI 2007 QS3 Trust.
*Relevance.*

33. DB's Objection to Entry of Final Order dated October 30, 2012.
*Relevance.*

34. Letter from Macks to GMACM dated October 7, 2009
*Relevance*

35. Master Servicing Agreement
*Relevance.*

36. Contracts between DB and GMACM
*Relevance.*

37. July 23, 2009 letter from GMACM to Claimants.
*Relevance.*

38. August 28, 2009 letter from GMACM to Claimants.
*Relevance.*

sf-3500725

39. September 30, 2009 letter from GMACM to Claimants.
   *Relevance.*

40. November 4, 2009 letter from GMACM to Claimants.
   *Relevance.*

41. December 15, 2009 letter from GMACM to Claimants.
   *Relevance.*

IX.    PLAINTIFF'S WITNESS LIST

1. Barry Mack.
2. Jewel DeMore.
3. Carol Conrad, LCSW.

X.    DEFENDANT'S WITNESS LIST

David Cunningham  (Mr. Cunningham will testify on the meaning of certain of GMACM's "Purged Notes" regarding when the Foreclosure Action was commenced, when GMACM directed local counsel to dismiss it and when local counsel confirmed that it had done so.  Mr. Cunningham will also testify regarding when GMACM's records reflect that GMACM first learned of the Counterclaims and proceedings thereon.  Mr. Cunningham will also testify regarding GMACM's monthly mortgage statements it sent as servicer to borrowers, including to the Claimants.)

The witnesses listed may be called at trial.  No witness not identified herein shall be permitted to testify on either party's case in chief absent good cause shown.  Each party shall list the witnesses it intends to call on its case in chief and, if a witness's testimony will be offered by deposition, shall designate by page and line numbers the portions of the deposition transcript it intends to offer.  Each party shall set forth any objections it has to deposition testimony designated by the other and the basis therefor.

XI.    RELIEF SOUGHT

The plaintiff shall set forth the precise relief sought, including each element of damages.

Dated:  February 20, 2015

/s/ Norman S. Rosenbaum
Gary S. Lee
Norman S. Rosenbaum
Adam A. Lewis
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the ResCap Borrower Claims Trust*

/s/ David F. Garber
David F. Garber, Esq.
Florida Bar No. 0672386

DAVID F. GARBER, P.A.
700 Eleventh Street South, Suite 202
Naples, Florida 34102
Telephone: (239) 774-1400
Facsimile: (239) 774-6687
davidfgarberpa@gmail.com

*Counsel for Barry Individually and as Executor
of the Estate of Cheryl Mack*

**IT IS SO ORDERED.**

Dated: June 10, 2015
        New York, New York

        **/s/Martin Glenn**
        MARTIN GLENN
        United States Bankruptcy Judge

sf-3500725