1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10           Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14           United States Bankruptcy Court

15           One Bowling Green

16           New York, New York

17

18           June 4, 2015

19           10:03 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2  (CC: Doc. No. 8618) Motion to Further Extend the Date by Which

3  Objections to Claims Must be Filed, filed by Joseph A. Shifer

4  on behalf of ResCap Liquidating Trust.

5

6  (CC: Doc# 8380, 8542) ResCap Borrower Claims Trust's Eighty-

7  Fifth Omnibus Objection to Claims ((I) No Liability Borrower

8  Claims, (II) Redundant Borrower Claims and (III) Misclassified

9  Borrower Claims).Going Forward solely as it relates to the

10  claims filed by Phenon Walker (Claim No. 4966) and Thomas G.

11  Cooper (Claim No. 6272)

12

13  (CC: Doc# 8530) Hearing RE: Objection of the ResCap Borrower

14  Claims Trust to Proofs of Claim

15

16  (CC: Doc# 8529) Hearing RE: ResCap Borrower Claims Trust's

17  Objection to Claim No. 4418.

18

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4      Attorneys for ResCap Borrower Claims Trust

5      250 West 55th Street

6      New York, NY 10019

7

8  BY:  JORDAN A. WISHNEW, ESQ.

9

10

11  BRADLEY ARANT BOULT CUMMINGS LLP

12      Attorneys for ResCap Borrower Claims Trust

13      100 North Tryon Street

14      Suite 2690

15      Charlotte, NC 28202

16

17  BY:  AVERY ANN SIMMONS, ESQ.

18

19

20

21

22

23

24

25

1

2   KRAMER LEVIN NAFTALIS & FRANKEL LLP

3       Attorneys for ResCap Liquidating Trust

4       1177 Avenue of the Americas

5       New York, NY 10036

6

7   BY:   JOSEPH A. SHIFER, ESQ.

8         NATHANIEL ALLARD, ESQ.

9

10

11  ERICKSON, THORPE & SWAINSTON, LTD.

12      Attorneys for Claimant Gagnon et al.

13      99 West Arroyo Street

14      Reno, NV 89509

15

16  BY:   THOMAS P. BEKO, ESQ. (TELEPHONICALLY)

17

18

19  PHENON WALKER (TELEPHONICALLY)

20      Claimant Pro Se

21

22

23  ALSO PRESENT:  (TELEPHONICALLY)

24      DAVID CUNNINGHAM, ESQ., ResCap Liquidating Trust

25      DEANNA HORST, ESQ., ResCap Liquidating Trust

1                    P R O C E E D I N G S

2           THE COURT:  All right, please be seated.  We're here

3   in Residential Capital, number 12-12020

4           MR. SHIFER:  Good morning, Your Honor, Joseph Shifer

5   of Kramer Levin Naftalis & Frankel, for the ResCap Liquidating

6   trust.

7           THE COURT:  Just hang on.

8           All right, whoever is on the phone, the CourtCall

9   operator, whoever is on the phone where we're getting that

10  background noise, put your phones on mute unless you're

11  speaking.  If I continue to get the background noise, you're

12  going to get cut off from the call.

13          Go ahead, Mr. Shifer.

14          MR. SHIFER:  Your Honor, the first matter going

15  forward appears on page 2 of the agenda.  It's matter 1 under

16  contested matters.  It's the ResCap Liquidating Trust's motion

17  to further extend the date by which objections to claims must

18  be filed.  That's at docket number 8618.

19          Your Honor, in support of the motion, the Liquidating

20  Trust admitted the declaration of Deanna Horst, the Liquidating

21  Trust's chief claims officer.  Ms. Horst is on the phone if

22  Your Honor has any questions.

23          THE COURT:  Okay.

24          MR. SHIFER:  Just a note on service, Your Honor,

25  because this seems to come up each time we file these motions.

RESIDENTIAL CAPITAL, LLC, ET AL.                                        6

1    The motion was filed on the special service list, the general

2    service list, as well as all holders of disputed claim.  This

3    is out of an abundance of caution, even though the plan

4    provides that the deadline may be extended without notice to

5    any party.  KCC, our noticing agent, filed an affidavit of

6    service at docket number 8633 and a supplemental affidavit at

7    8671.

8            Your Honor, by the motion, the Liquidating Trust seeks

9    to extend the deadline to object to claims to March 15th, 2016,

10   which is a nine-month extension from the current deadline.  As

11   we stated in the motion, and I can quickly go through some of

12   the top-line numbers, this case involved quite a number of

13   claims.  There was a total of 7,487 claims filed.  To date,

14   3,897 claims have been expunged, with 2,933 claims withdrawn or

15   allowed.  And since filing the motion, in fact, 58 additional

16   claims were resolved.

17           So as of today, Your Honor, there are 599 total

18   unresolved claims.  This is down from the initial starting

19   point of 7,487.  So we've resolved more than ninety percent of

20   the total claims pool.  As of today, there are 280 nonborrower

21   claims with 319 borrower claims remaining.  And of course, Your

22   Honor, these numbers may actually increase, because sometimes

23   we do receive late-filed claims, even today.

24           Your Honor, since the last extension of the objection

25   deadline, the Trust resolved an additional 920 claims,

1  including 260 million -- over 260 million in general unsecured

2  claims, and 150 million in secured claims.  I think Your Honor

3  can take from those numbers, that the Trusts have been busy.

4  We certainly are --

5          THE COURT:  I can attest that the Trusts have been

6  busy, because I've been busy.

7          MR. SHIFER:  Sure.  And for every claim that comes to

8  the courtroom, of course, there are additional efforts outside

9  of the courtroom to resolve the claims and try to be efficient

10 with Your Honor's time.

11         So with that, Your Honor, the Liquidating Trust would

12 ask that you grant the motion.  There were four objection that

13 were filed.

14         THE COURT:  Yes, and let me hear -- I know -- I know

15 the Thompsons are going to be here this afternoon.  But one of

16 the objections is by Elda and Maria Thompson.  Are either of

17 you on the phone?

18         All right.  I've reviewed their objection.  The next

19 objection was by Julio Pichardo.  Mr. Pichardo, are you on the

20 phone?

21         The next objection is by Felix Abu, A-B-U.  Are you on

22 the phone, Mr. Abu?

23         And the last objection is by Michael E. Boyd.  Mr.

24 Boyd, are you on the phone?

25         All right, Mr. Shifer, I'm going to grant the motion.

1   I'm going to enter a written order to that effect.  I've

2   considered each of the objections that have been filed.  The

3   motion carefully lays out the total number of claims, the

4   number of claims remaining, some details about the claims

5   process.  And I can certainly understand that the remaining

6   claimants are sometimes frustrated by what they perceive as

7   delay.  But this has been an extremely complicated case.  The

8   claims resolution process is very time-consuming for the

9   debtors' counsel, or the two Trusts' counsel and for the Court.

10  Very substantial progress has been made.

11          This is obviously something I'm very closely aware of

12  what's been going on.  And I believe that the Trusts have been

13  proceeding diligently in the claims process.  More time is

14  clearly needed to resolve the remaining claims, so the motion

15  is granted.

16          MR. SHIFER:  Thank you, Your Honor.

17          Just a minor housekeeping matter.

18          THE COURT:  Yes.

19          MR. SHIFER:  Last night, there was an additional

20  filing on the docket; it's docket number 8710.  It's by

21  Christopher and Quandalyne Murphy.  On the docket, Your Honor,

22  it was linked as an objection to the motion, but on reviewing

23  this paper, it has nothing to do with it, and I just wanted to

24  note that on the record.

25          THE COURT:  Okay, thank you very much.

1           MR. SHIFER:  Thank you.  And may we be excused?

2           THE COURT:  Yes, you may.

3           MR. SHIFER:  Thank you, Your Honor.

4           THE COURT:  Thanks very much, Mr. Shifer.

5           THE COURT:  All right, Mr. Wishnew.

6           MR. WISHNEW:  Good morning, Your Honor.  Just let me

7     take a moment and --

8           THE COURT:  Sure.

9           MR. WISHNEW:  -- echo Mr. Shifer's comments and also

10    thank the Court and its staff for its continued diligence with

11    the claims process.

12          Your Honor, the next matter on the agenda is under

13    page 3, under Roman numeral III, claims objections, it's the

14    ResCap Borrower Claims Trust's eighty-fifth omnibus objection

15    to claims.  This is going forward as to two matters that were

16    carried from the last omnibus hearing.  Those are the claims by

17    Phenon Walker, claim number 4966, and Thomas Cooper, 6272.

18          I believe Ms. Walker is on the phone.

19          THE COURT:  I was advised that -- Ms. Walker, are you

20    on the phone?

21          MS. WALKER:  I am, yes, Your Honor.

22          THE COURT:  Okay.  Why don't you proceed, first, Mr.

23    Wishnew, and then we'll give Ms. Walker an opportunity to

24    respond, okay?

25          MR. WISHNEW:  Very good, Your Honor.  As Your Honor is

RESIDENTIAL CAPITAL, LLC, ET AL.                    10

1    aware the Court has already granted the eighty-fifth omnibus

2    objection as to all but two of the claims.  There were issues

3    concerning service on the two claimants whose claims are being

4    addressed today, and so we wanted to provide them with --

5            THE COURT:  The two claims are the Walker claim, which

6    is claim 4966 and the Cooper claim, 6272.

7            MR. WISHNEW:  That's correct, Your Honor.

8            THE COURT:  Okay.

9            MR. WISHNEW:  Thank you.  The Borrower Trust received

10   a response from Ms. Walker on May 8th, 2015, which is docketed

11   at 8599.  The Borrower Trust did not receive a response from

12   the Coopers.

13           With regards -- the Borrower Trust objected to claim

14   number 6272 filed by the Coopers because it was duplicative of

15   claim number 6270.  The only difference between the two claims

16   is that claim 6272 is asserted as a secured claim, whereas

17   claim 6270 is asserted as a general unsecured claim.

18           The Borrower Trust was alerted on April 22nd, 2015

19   that the objection was served on the incorrect e-mail address

20   on file for the Coopers, that copies that were mailed to the

21   Coopers were came back unclaimed.  The Borrower Trust promptly

22   re-served the Coopers at the correct e-mail address and

23   informed them they had until May 15th to respond and that a

24   hearing on their claim would be held on June 4th.

25           The stated basis of the Cooper's claim is home equity,

1   failure to account for payments.  The Coopers appear to be

2   asserting their claim based on GMAC Mortgage's purported

3   failure to provide them with an accounting of the payments made

4   to GMAC Mortgage under their home equity line of credit.

5           Nowhere in proof of claim 6270 or 6272, did the

6   Coopers provide a reason that their claim should be considered

7   secured.  Therefore, to avoid the possibility of multiple

8   recoveries for a single claim by the Coopers, the Borrower

9   Trust respectfully requests that the Court disallow and expunge

10   6272, and claim 6270 will remain on the claims register,

11   subject to further objections on any other basis.

12           THE COURT:  All right.  No one is appearing for the

13   Coopers.  The Court has reviewed the eighty-fifth omnibus

14   objection with respect to the claims of the Coopers, and the

15   objection is sustained.

16           MR. WISHNEW:  Thank you very much, Your Honor.

17           THE COURT:  Okay.  And include that in a separate

18   order, okay?

19           MR. WISHNEW:  Will do.  Will do, Your Honor.

20           THE COURT:  All right.  Okay.  So let's move on to --

21           MR. WISHNEW:  Moving on to Ms. Walker's claim.

22           THE COURT:  -- the Walker claim.

23           MR. WISHNEW:  The Borrower Trust filed a reply in

24   support of the objection solely as to Ms. Walker's claim.  That

25   was docketed at 8683.

1          In support of the objection, in the reply, the

2   Borrower Trust submitted declarations by David Cunningham,

3   director to the ResCap Liquidating Trust.  Mr. Cunningham is on

4   the phone today and available to answer any questions the Court

5   might have.

6          GMAC Mortgage's purported liability appears to stem

7   from Ms. Walker's belief that GMAC Mortgage did not transfer

8   all the insurance proceeds being held by GMAC Mortgage on her

9   behalf when it transferred servicing of her loan to Ocwen in

10  February of 2013.  As set forth in the Trust's filings, the

11  debtors' books and records show that at the time the servicing

12  was transferred to Ocwen, the entire balance of the insurance

13  proceeds that had been received by the debtors related to

14  claims filed by Ms. Walker were transferred to Ocwen.

15         THE COURT:  So that total that was transferred was,

16  what, 14,000 and --

17         MR. WISHNEW:  Roughly 14,000 dollars, Your Honor.

18  Give me one moment, I can try and --

19         THE COURT:  14,403.75.

20         MR. WISHNEW:  That's correct, Your Honor.  Yes.

21         Ms. Walker's only evidence that the proceeds were not

22  transferred is that her current servicer, SLS, who acquired

23  servicing from Ocwen, purportedly does not have the full amount

24  of proceeds.  However, the amount currently held by her

25  servicer, SLS, has no bearing on the amount that was

1    transferred by the debtors to Ocwen two years ago.

2            As a result, Ms. Walker has failed to prove that she

3    is owed any money by the debtors' estates, and we'd ask that

4    the claim be expunged.

5            THE COURT:  All right.  Ms. Walker, go ahead.

6            MS. WALKER:  Thank you very much, Your Honor.  What

7    we're attempting to prove or get the documentation from SLS,

8    the current servicer, is the amount that GMAC actually

9    transferred to Ocwen.  And they are providing me with -- well,

10   actually I received a letter just yesterday -- I believe

11   yesterday -- where they are still investigating the amount that

12   was transferred from GMAC to Ocwen.

13           There was no information presented in the debtors'

14   objection as to the transfer of the monies to Ocwen.  And I

15   haven't received a response back in regards to any proof.

16           And I'm kind of skeptical also, because of all my

17   historical information from GMAC, my loan documents all the way

18   to securitization paperwork, has just not been correct.

19           THE COURT:  May I ask you this --

20           MS. WALKER:  And so with that said, I am just wanting

21   verification of the amount.  So they are saying the escrow

22   amount was actually transferred, the 14,000.  And I have no

23   actual proof that that was actually done.  And again, the

24   current servicer, who received the funds from Ocwen, who

25   received funds from GMAC, that is what I'm trying to verify.

1          THE COURT:  May I ask you this, Ms. Walker?

2          MS. WALKER:  Yes.

3          THE COURT:  Because in reviewing the papers --

4          MS. WALKER:  Yes.

5          THE COURT:  -- the trust submitted the servicing

6    notes, and the servicing notes, at page 2 reflect that the

7    balance -- the unapplied balance that was transferred to Ocwen

8    was $14,403.75.  That's --

9          MS. WALKER:  Okay.

10         THE COURT:  -- that's the record -- that's the piece

11   of paper that was submitted in support of the objection that

12   appears to show the amount that was transferred to Ocwen.  Do

13   you have those servicing notes?  You should have been provided

14   with a copy of it.

15         MS. WALKER:  Yeah, and the --

16         THE COURT:  I know you're concerned.  Because the -- I

17   know you have -- you have the misfortune of having quite a few

18   insurance claims relating to your property, and what the record

19   before me would show is when GMAC received payments, they

20   deposited it in escrow -- they were less than the full amount

21   of your insurance claims -- and that the amounts remained in

22   escrow, and that as of August -- excuse me -- as of August

23   26th, 2013, the unapplied balance was this 14,403.75.  Let me

24   stop there.  Go ahead.

25         MS. WALKER:  That is correct, Your Honor.  That is the

1  amount that's left and the amount that I've been informed was

2  transferred from GMAC to Ocwen.  So what my attempt is to

3  verify that 14,403.75 was actually transferred from escrow of

4  GMAC to Ocwen, who subsequently transferred it to the current

5  servicer.  So that is what is in dispute, the amount

6  transferred, that 14,403.75.

7          THE COURT:  I guess let me ask this.  I mean --

8          MS. WALKER:  Yes.

9          THE COURT:  -- I understand your inquiry, but I'm

10 not -- your uncertainty doesn't create a dispute.  Okay?

11         They -- I'm playing devil's advocate here, but their

12 position is, we've put in the record that shows through the

13 servicing notes, what the amount was that was transferred to

14 Ocwen.  Whether Ocwen transferred the right amount to SLS, I

15 would have no knowledge.

16         MS. WALKER:  Correct, and but also to -- even though

17 the record that is showing 14,000 was transferred to Ocwen --

18         THE COURT:  Yes.

19         MS. WALKER:  -- there should be proof from Ocwen that

20 they were in receipt of those funds.  Isn't that correct?

21         THE COURT:  Well, you don't get to ask me the

22 questions.  So --

23         MS. WALKER:  I'm sorry.

24         THE COURT:  -- I'm not -- that wasn't intended as a

25 criticism.  I understand your question.  So Ocwen isn't in

1  front of me either.  But let me ask Mr. Wishnew, what are the

2  records that show the amount that was transferred to Ocwen?  Is

3  there anything other than the servicing note?

4          MR. WISHNEW:  Beyond the servicing notes, Your Honor,

5  no.  As Your Honor correctly noted, Ocwen is not before this

6  Court.  And to extent Ms. Walker's concerned about what Ocwen

7  received, that's information she can get from Ocwen.  It

8  doesn't amount to a claim allowable against GMAC Mortgage.

9          THE COURT:  Let me ask you this.  Ms. Walker, has SLS

10 told you how long it's going to take the -- it shouldn't be

11 that complicated an issue to investigate, but have they told

12 you how long it's going to take?

13         MS. WALKER:  They requested -- they sent a letter

14 requesting fifteen more days.  So -- and based upon what the

15 outcome was here, I was going to call and find out.  But

16 correct, I thought that this would be real easy, they could

17 just verify.  That's what they're in the process of doing.

18         THE COURT:  Okay.

19         MS. WALKER:  Verifying the amount that was actually in

20 escrow from GMAC, transferred to Ocwen, and then Ocwen in turn

21 will verify what was sent to them.  But the chain is what I'm

22 looking for.  And I have no other recourse, if the money was

23 not sent to Ocwen as stated.

24         THE COURT:  Well, I'm not ruling from the bench, but

25 let me just say that even if I were to sustain the objection,

1  there's a procedure under Section 502(j) where you could ask

2  for a reconsideration if the facts -- but here's what I'm going

3  to do.  I'm trying to log onto my computer.  So just bear with

4  me a second, okay?

5          MS. WALKER:  Thank you.

6       (Pause)

7          THE COURT:  May I ask you this, Ms. Walker?  Are you

8  disputing that the amount that GMAC was holding in escrow was

9  this $14,403.75?  To be clear, I just want to make sure I

10 understand exactly what the dispute it.  That -- in their

11 objection, GMAC -- the Trust has set out how much GMAC received

12 from the insurers for each of your claims and indicates it was

13 deposited in escrow.  And at the time that was transferring --

14 that the servicing was transferred to Ocwen, the balance in the

15 account was the $14,403.75.  Do you agree that that was the

16 amount that was being held in escrow by GMAC?

17         MS. WALKER:  You know, Your Honor, I -- the exact

18 amount, I'm going to -- I would have -- I'm so sorry; I don't

19 know the exact number right now.  I have to go right back in my

20 paperwork and total it up here.

21         THE COURT:  Look, here's what I'm going to do.

22         MS. WALKER:  However --

23         THE COURT:  Mr. Wishnew, do we have an omnibus date in

24 July?

25         MR. WISHNEW:  July 16th, Your Honor.

1          THE COURT:  Okay.  I'm going to adjourn this specific

2     objection to the July date.  What I would like you to do, Mr.

3     Wishnew, is communicate --

4          Ms. Walker, you don't have an attorney.  Am I correct?

5          MS. WALKER:  That's correct, Your Honor.

6          THE COURT:  Okay.  I ask that because Mr. Wishnew

7     couldn't talk to you directly if you had an attorney, but since

8     you don't have an attorney, he can -- he or one of his

9     colleagues.

10         I'd like you to follow up with Ms. Walker and see

11    whether you can get this resolved.  Perhaps, Mr. Wishnew you

12    get -- contact Ocwen and get a piece of paper from Ocwen that

13    shows what the amount that was transferred on what date, and

14    see whether this issue can be resolved consensually.  If not,

15    I'll put it back on the hearing in July.  You can appear by

16    telephone again, Ms. Walker, if you can't get it resolved, and

17    I'll rule at that time.  Okay?

18         MS. WALKER:  Thank you.  Thank you, Your Honor.

19         THE COURT:  All right.  Thanks very much, Ms. Walker.

20    And you're excused.  You're welcome to stay on the phone, or

21    you can hang up now, if you wish.

22         MS. WALKER:  Could I just ask, will someone contact

23    me, or should I contact them?  I couldn't exactly get the

24    person --

25         THE COURT:  Sure.

RESIDENTIAL CAPITAL, LLC, ET AL.                    19

1          MS. WALKER:  -- that you mentioned, the spelling of

2     his name or --

3          THE COURT:  Right.  Mr. Wishnew, will you or one of

4     your colleagues contact Ms. Walker?

5          MR. WISHNEW:  Yes, Your Honor.

6          THE COURT:  You're going to hear from one of the

7     Morrison & Foerster attorneys, okay?

8          MS. WALKER:  Got it.  Okay.  Thank you.

9          THE COURT:  Thanks very -- thanks very much --

10         MS. WALKER:  Have a good morning.  Thank you.

11         THE COURT:  Okay.

12         MS. WALKER:  Bye-bye.

13         THE COURT:  All right.  Go ahead, Mr. Wishnew.

14         MR. WISHNEW:  Thank you, Your Honor.  Your Honor, the

15    next matter on today's calendar is on the bottom of page 3,

16    item number 2, the ResCap Borrower Claims Trust's objection to

17    claim number 4418 filed by David Cruz, Jr.

18         Your Honor, this was filed at docket number 8529.  The

19    Borrowers Trust, to date, has not received any response from

20    Mr. Cruz on the objection.

21         Mr. Cruz filed a general unsecured claim designated as

22    claim number 4418 on November 9th, 2012, for 316,000 dollars

23    plus interest and accruals.  Through the claim, the claimant

24    attempts to further litigate the pre-petition court action that

25    is currently pending in the County Court for the 17th Judicial

 1   Circuit in and for Broward County Florida.  The claimant's

 2   second -- the claimant's complaint was filed on July 14th,

 3   2011, and amended in February 2012 to add GMAC Mortgage.  Its

 4   asserted causes of action relate to the debtors' origination of

 5   the loan on June 8th, 2007 and servicing of his loan, including

 6   alleged violations of the Fair Debt Collection Practices Act,

 7   the Florida Consumer Collection Practices Act, and the Florida

 8   Deceptive and Unfair Trade Practices Act.

 9           Your Honor, through this objection, the Borrower Trust

10   seeks to expunge the proof of claim filed by Mr. Cruz.  His

11   allegations are without merit, and each cause of action is

12   either barred by the statute of limitations or cannot be

13   supported by the debtors' alleged actions.  The --

14           THE COURT:  You believe that the statute of

15   limitations is a complete defense to each of the claims that's

16   been asserted?

17           MR. WISHNEW:  Yes, Your Honor.

18           THE COURT:  Okay.

19           MR. WISHNEW:  Yes.

20           THE COURT:  All right.  Since Mr. Cruz hasn't

21   appeared; I've reviewed the papers.  I'm going to take it under

22   submission.  We'll enter an appropriate order.  Okay?

23           MR. WISHNEW:  Thank you very much, Your Honor.

24           THE COURT:  All right.

25           MR. WISHNEW:  Your Honor, that brings us to the last

1    matter on today's calendar, which is being handled by Ms. Avery

2    Simmons, of Bradley Arant Boult & Cummings.  That is the

3    objection of the ResCap Borrower Claims Trust to proofs of

4    claim filed by Pamela Longoni and Jean Gagnon.

5            THE COURT:  Is anybody appearing for the claimants?

6            MR. BEKO:  I am, Your Honor.  Thomas Beko on behalf of

7    the claimants, Gagnon and Longoni.

8            THE COURT:  Okay.

9            MR. BEKO:  Thank you for allowing me to appear by

10   phone.

11           THE COURT:  Absolutely.

12           MS. SIMMONS:  Good morning, Your Honor.  Avery Simmons

13   on behalf of the ResCap Borrower Claims Trust, here appearing

14   for GMAC Mortgage and the ETS on behalf of their objection

15   filed to the proof of claim filed by Pamela Longoni and Jean

16   Gagnon.

17           Ms. Longoni and Mr. Gagnon's proof of claim is based

18   entirely on the allegations in the third amended complaint

19   filed in the United States District Court for the District of

20   Nevada.  Ms. Longoni and Mr. Gagnon assert eight claims in that

21   litigation.  The first for violation of certain Nevada statutes

22   related to Nevada's nonjudicial foreclosure scheme; the second

23   for violation of Nevada Statute 205.372; the third for fraud

24   and misrepresentation; the fourth for negligence and negligent

25   misrepresentation; five, for breach of contract; sixth for

1  intentional infliction of emotional distress, promissory

2  estoppel, and conspiracy.

3          It is the position of GMAC Mortgage and ETS that the

4  claim should be disallowed because all of the claims fail as a

5  matter of law.  As an initial matter, GMAC --

6          THE COURT:  Let me stop you there, because -- and I --

7  look, the papers are extensive and I've, at various points,

8  stricken both sides' papers as being over length.  The papers

9  are -- that I've finally reviewed, are quite helpful.  They're

10 extensive.  The Court has done a lot of its own research.  I've

11 also, as of yesterday, reviewed the docket from the district

12 court in Nevada.  So I've done quite a bit of work on this.

13         So Judge Hicks, in the district court in Nevada, had

14 entered an order on December 14th, 2010, dismissing certain

15 claims and overruling a motion to dismiss other claims --

16 denying the motion to dismiss other claims.  And while that

17 decision by Judge Hicks in 2010 -- there's no preclusive effect

18 on this Court, I'll be very clear that I don't intend to, at

19 this stage of the proceeding, to rule differently than Judge

20 Hicks did.

21         So it doesn't even resolve all of the claims, but

22 Judge Hicks went through and granted your motion to dismiss

23 certain of the claims and denied the motion to dismiss other

24 claims.  So I'll be blunt.  Save your breath.  Don't try to

25 convince me to do something different than what Judge Hicks

1    did.

2            That isn't to say -- all he did was conclude on

3    certain claims that the complaint was sufficient to state a

4    claim, not whether relief will ultimately be granted.  But he

5    denied the motion to dismiss as to certain of the claims --

6    granted it as to some, denied it as to others.  Okay?

7            MS. SIMMONS:  Yes, Your Honor.

8            THE COURT:  So focus -- let's deal with -- so assuming

9    that I'm going to find, at this stage of the proceeding, that

10   Judge Hicks' opinion is persuasive as to the claims as to which

11   he's denied the motion to dismiss, what do you want to tell me

12   now?

13           MS. SIMMONS:  Well, I think a couple of things.  I

14   think certain of the claims -- certain arguments weren't made

15   at the motion to dismiss stage.

16           THE COURT:  Yes, that's correct.

17           MS. SIMMONS:  So I think when you're looking at the

18   Nevada nonjudicial foreclosure statutes, we can dismiss those

19   as a matter of law in this court.  I think the violation of --

20   counsel has raised for Longoni that in the Nevada nonjudicial

21   foreclosure scheme, that GMAC and ETS violated 107.080,

22   107.085, and 107.086.

23           THE COURT:  And your argument is that those statutes

24   weren't effective at the time the notice of default was filed

25   here?

RESIDENTIAL CAPITAL, LLC, ET AL.                    24

1        MS. SIMMONS:  That's part of it, Your Honor.  So, yes.

2   So as concerning the mediation requirements of 107.086, that

3   only applied to notices of default recorded on or after July

4   1st, 2009.  Counsel has argued that we were required to send a

5   new notice of default, because we accepted payments from Ms.

6   Longoni.  However, the Evans case demonstrates that you're not

7   require to submit --

8        THE COURT:  And I read the case, and I understand your

9   argument on that.

10       MS. SIMMONS:  Okay.  And then moving on to the danger

11  notice requirements of 107.086, counsel contends that we were

12  required to send that.  That statute has been in effect since

13  2003.  However in 2003, continuing at the time this took place,

14  it was only required to be sent on loans that fit 15 U.S.C.

15  1602 Section (aa), which is the Home Ownership and Equity

16  Protection Act.  Section (aa), at that time, defined "high-cost

17  home loans".  There is no allegation nor has counsel ever

18  raised any allegation that Ms. Longoni's loan was a high-cost

19  home loan.  So in that regard, I think that claim can be

20  dismissed as a matter of law.

21       The notice of sale requirements under 107.085, counsel

22  for Longoni argues that it was required to be served on her via

23  certified or regular mail.  We've put forth proof numerous

24  times that it was served via certified and regular mail.  The

25  fact that Ms. Longoni didn't claim her mail doesn't mean we

1    violated the foreclosure statutes.

2            Additionally, 205.372, which counsel raises as the

3    second claim, there's actually just no private right of action

4    available to counsel for that claim.  So as a matter of law, it

5    should come out.

6            THE COURT:  Okay.  Anything else you want to say at

7    this point?

8            MS. SIMMONS:  I would argue that the statute of frauds

9    violates her breach of contract claim, and she can't sustain it

10   as a matter of law.

11           THE COURT:  Okay.  And Judge Hicks denied your motion

12   to dismiss the promissory estoppel claim.

13           MS. SIMMONS:  Yes.

14           THE COURT:  They argue that, well, even if the statute

15   of frauds would apply to the breach of contract claim, one of

16   the exceptions is promissory estoppel, effectively.

17           MS. SIMMONS:  Yes, Your Honor.  And in that regard,

18   there is a case from the Nevada courts which actually says --

19   it's the Nieto v. Liton Loan Servicing case -- and it actually

20   says that there's an extraordinary high burden that plaintiffs

21   have to prove to sustain a promissory estoppel claim.

22           THE COURT:  And that probably will be true, but we're

23   not at the proof stage.

24           MS. SIMMONS:  Yes, Your Honor.

25           THE COURT:  Okay.  I have some questions.  I'll come

1   back after Mr. Beko argues.  I have questions for both of you.

2   Go ahead, Mr. Beko.

3          MR. BEKO:  Thank you, Your Honor.  I'll try not to

4   review some of the -- all the information that was provided to

5   you before, because as you've noted, it is extensive.  I'm just

6   going to comment, I think, on a few points that were raised in

7   the reply brief.

8          One of our primary challenges in this case has always

9   been that the debtors in the case simply did not have the

10  standing to pursue the foreclosure, because they were not

11  possessed of the promissory note and the deed of trust.  And

12  the argument against that is just related to this Edelstein

13  case, which came down from the Nevada Supreme Court, which

14  very, very clearly indicated that all foreclosures in Nevada,

15  the foreclosing party must have standing.  And the argument

16  that was raised in the reply was, is that -- that that case

17  only applied to the question of whether or not the foreclosing

18  party had the right to participate in the mediation program.

19         If the Court looks at that Edelstein case, it's very,

20  very clear.  There's about six different places in that

21  decision in which the Nevada Supreme Court said that in order

22  to commence any foreclosure process, regardless of the

23  mediation statutes or not, the party that is pursuing the

24  foreclosure had to be possessed of both the promissory note and

25  the deed of trust.  That is a reiteration of another decision,

1  the Leyva decision that I quoted in my briefs, that came down

2  several years before that, in which the Nevada Supreme Court

3  made the very same point.

4          In this case, I went through all of the extensive

5  briefing that had -- and the events that had occurred in the

6  underlying litigation to point out that even as of the time of

7  the bankruptcy, GMAC and ETS could never identify who had --

8  who owned or who possessed the note or the deed of trust.

9  Their answers were entirely inconsistent.  And then they

10  finally came back with some amended responses, which they've

11  now again attempted to convince this Court that there was a

12  company by the name of -- I'll grab my notes here just for a

13  second -- just one moment, I'm sorry -- Residential Funding

14  Corp. LLC, which they are claiming owned the notes, and that

15  they transferred those notes then into Residential Asset

16  Mortgage Products, which in turn then put them into this trust

17  that was managed by the bank.

18          The problem is, is that the documents that they've

19  provided, which is the assignment and assumption agreement, as

20  well as this pooling and --

21          THE COURT:  Yes, the PSA, I mean, I think they're

22  relying on the pooling and servicing agreement as basically

23  it -- assuming that the note and the deed of trust were

24  separated, the effect of the PSA is effectively to reunite

25  them.  That's what I took to be their argument.

1          MS. SIMMONS:  That would be correct, Your Honor.

2          MR. BEKO:  The problem that you have with that -- and

3    I'm sorry, Your Honor.  I didn't mean to interrupt you if you

4    were not finished.

5          THE COURT:  No, go ahead.  I'm done.

6          MR. BEKO:  Is that those two documents were created in

7    2005, one on December 1st of 2005, the other on December 28th.

8    They've indicated that those documents resulted in the transfer

9    of the Longoni/Gagnon deed into that trust, but they've never

10   shown you that that was one of the -- one of the actual loans

11   that was transferred as part of that.

12         The real problem, however, occurs that two years after

13   that, the Longoni/Gagnon note was amended by a modified loan,

14   which was handled -- and the agreement is, I think, contained

15   in Exhibit 3 of our moving papers -- on November 2nd of 2007,

16   when Homecoming Financial LLC enters into this loan

17   modification with them, in which that document expressly

18   provides that Homecoming Financial is, in fact, the owner and

19   the possessor of both the note and the deed of trust.  Those

20   occurred two years after-the-fact.

21         So I mean, there's never been any explanation for how

22   it is that if these documents had actually gone into this

23   trust, why is it that two years later, Homecoming Financial,

24   LLC, who was never mentioned in any of the discovery responses

25   of having any ownership interest in the note or deed of trust,

1   is actually expressly listed in that loan agreement as the

2   lender -- as the holder of the note and the owner of the note.

3   And that was one of our challenges from the very inception.

4   And to this very day, they have never been able to explain how

5   it is that the actual note that they attempted to enforce

6   through the foreclosure process, is by someone that by all of

7   their own documents, they say had absolutely no interest

8   whatsoever in the note or the deed of trust.  And to this date,

9   even through their reply brief, they've never been able to

10  answer that question.

11          They also make these arguments that GMAC Mortgage was

12  authorized as the subservicer of these loans, yet none of the

13  documents that they provided to you, including the documents

14  that they attempted to clear this up with their reply, ever

15  mention GMAC Mortgage in any way, shape, or form.  And they

16  certainly don't mention ETS, which was the party that actually

17  was the one that filed the nonjudicial foreclosure documents,

18  as having any rights under those documents.

19          So I think, from the very inception, this claim cannot

20  be rejected at this stage, because they've never been able to

21  prove that they had the proper standing to commence the

22  foreclosure process.

23          So I think without being able to prove that key

24  element, none of the objections that they have filed should

25  defeat any of the claims that have been asserted, because they

RESIDENTIAL CAPITAL, LLC, ET AL.                    30

1   didn't have any right, under Nevada law, which is very clear

2   under both Edelstein or the Leyva case, that whomever it was,

3   the party that was foreclosing had to have the rights of both

4   of those two documents in order to proceed forward with the

5   foreclosure process.

6        I will note that in the reply brief, they referenced

7   another case from the Nevada District Court, Hakimi v. Bank of

8   New York Mellon.  And I want to comment briefly on that case,

9   to the extent that they are suggesting that that case said that

10   the foreclosing party did not have to establish standing.  If

11   the Court takes a moment to look at the history of that case, I

12   think the Court will see that the decision does not stand for

13   the proposition that they're presenting.  And that is,

14   because -- the Hakimi case was brought by a pro se claimant.

15   In January of 2012, the defendant in that case filed a motion

16   to dismiss.  Mr. Hakimi, although he filed an opposition to it,

17   all he did was put a cover sheet onto his complaint and called

18   that his opposition to the motion.

19        Nowhere in any of those briefings was the Edelstein or

20   the Leyva decision ever even addressed by the bank, and

21   certainly not by the plaintiff in that case.

22        THE COURT:  But in Hakimi, the court, quoting Birkland

23   v. Countrywide, said, "Parties initiating foreclosure

24   proceedings are not required to prove standing to foreclose in

25   a court of law before initiating the foreclosure process."

1    That's from 2015 WL 2097872 at *5.

2          MR. BEKO:  Correct, exactly.  The problem with the

3    decision, Your Honor, is that nobody mentioned the Nevada

4    Supreme Court decision either Edelstein or Leyva, in which the

5    Nevada Supreme Court very, very clearly said that those

6    elements were absolutely necessary.  And the problem with it

7    was, is that those briefs were filed -- in fact, there was only

8    really one brief.  The motion to dismiss was filed before the

9    Edelstein decision.  It didn't mention the Leyva decision.

10   There was really no opposition.  And those briefs sat for over

11   three years in which during the period of time, nobody ever

12   went back to the court and said, hey, by the way, the Nevada

13   Supreme Court has issued the decisions that are very clearly

14   contrary to what we had initially stated in our motion to

15   dismiss.

16         So I think the Hakimi decision, just is of no value,

17   because quite frankly, the defendant in that case never

18   presented to the Nevada District Court, the clear authority

19   from the Nevada Supreme Court, in the Edelstein or the Leyva

20   cases.  And so I just -- I mean without the court being

21   presented with those, and apparently not doing its own

22   research --

23         THE COURT:  But the Hakimi case also quotes from Villa

24   v. Silver State Financial Services, Inc.  And that quote is

25   that the law governing nonjudicial foreclosure "does not

1  require a lender to produce the original note or prove its

2  status as a real party in interest, holder in due course,

3  current holder of the note, nominee of the current holder of

4  the note, or any other synonymous status as a prerequisite to

5  nonjudicial foreclosure proceedings."  That's from Silver

6  State.

7          MR. BEKO:  And I understand that.  And I think --

8          THE COURT:  And that quotes Kwok v. Recontrust Co., it

9  cites Ritter v. --

10          MR. BEKO:  And again, I think, Your Honor --

11          THE COURT:  -- Countrywide.  So I mean, you're making

12  it sound like Hakimi just willy-nilly made some statement that

13  wasn't supported by any prior decisions.  But it seems to me

14  that the case relies and quotes from a number of other prior

15  federal court decisions in Nevada.

16          MR. BEKO:  And the problem with that, Your Honor, is

17  that none of them address Edelstein or Leyva, which is the

18  controlling law in Nevada.  The Nevada Supreme Court defined

19  what foreclosing parties must do.  And I just don't know how

20  you can ignore those two very clear decisions that have

21  described what the standing requirement entails.  And the --

22  none of those decisions that the Hakimi court relied upon ever

23  addressed those either.

24          And so I just don't think they're of any value,

25  because they don't recognize the very clear law that the Nevada

1  Supreme Court provided in those two decisions.

2          THE COURT:  And the Trust's response on this point is

3  that any split in the note and deed of trust were cured by the

4  PSA and the assignment and assumption agreement.

5          MR. BEKO:  And clearly those documents that they have

6  provided to you do not do that.  They don't --

7          THE COURT:  Well, we may have an issue of fact --

8  look, I've made clear that I'm not going to, at this stage,

9  disagree with Judge Hicks' ruling when he denied the motion to

10  dismiss certain of the claims.  It may well be that you're

11  raising what are disputed issues of fact that I'm not going to

12  resolve -- I mean, when I deal with a claim objection, Mr.

13  Beko, I essentially treat it as I would a motion to dismiss on

14  a complaint.  I look to see whether the claim fails to state a

15  claim as a matter of law.  And since your claims are largely

16  based on what was the complaint before the district court, and

17  the district court granted some motions and denied the rest of

18  the motion, that's kind of where things sit.

19          I realize there are arguments that are being raised in

20  these papers that weren't addressed -- weren't raised in the

21  motion before the district court, are raised for the first time

22  here now.  But --

23          MR. BEKO:  It --

24          THE COURT:  -- I'm not saying that you lose on your

25  standing argument.  What I'm saying is that to the extent that

1  the standing argument is going to depend on disputed issues of

2  fact, today is -- they're not getting resolved right now.

3          MR. BEKO:  Understood, Your Honor.  And I think this

4  is clearly one of the issues that GM -- that the debtors never

5  raised before Judge Hicks.  They never argued before Judge

6  Hicks anything relating to the standing issue.  And so this is

7  a completely new issue and --

8          THE COURT:  Okay.

9          MR. BEKO:  -- I think theoretically, if this Court

10 were to find that that were not a requirement, then I think the

11 Court could dispose of it.  But I think the Nevada Supreme

12 Court has said it clearly is an issue.  And I don't believe

13 that the documentation that they have attempted to provide to

14 you --

15         THE COURT:  I guess I --

16         MR. BEKO:  -- in any way, shape, or form --

17         THE COURT:  -- I guess I'd put it this way.  A number

18 of the district judges in Nevada seem to disagree with your

19 argument that it's a requirement under Nevada law.  I'm not

20 saying who is right and who is wrong.  Your argument is that

21 Edelstein -- that obviously on a state law issue, Nevada law is

22 what applies.  But there obviously seems to be a difference of

23 opinion about what Nevada law requires.

24         MR. BEKO:  And I think it's just a matter of timing,

25 Your Honor.  I think it's just the -- obviously the Hakimi

1  decision came down after that.  But it sat for three years.

2  And if you look at the briefing in it, the briefing was done

3  before those cases were decided.  So that --

4          THE COURT:  Okay.  I have your point on this, Mr.

5  Beko.

6          MR. BEKO:  Okay.  All right.

7          I guess beyond that, Your Honor --

8          THE COURT:  Let me raise this question with you.

9          MR. BEKO:  Certainly.

10          THE COURT:  And it's in all the extensive briefing and

11  Ms. Simmons raises it today.  And that relates to the specific

12  subsections of the Nevada law as to whether they apply here or

13  not.  It's the Trust's position that those subsequent

14  amendments to the Nevada statutes don't apply, that the

15  operative trigger is when the notice of default was filed.

16  Here it was before those changes to the statutes.  Do you want

17  to address that?

18          MR. BEKO:  Certainly.  To the extent that the argument

19  is that the 2009 amendments that amended some of these

20  provisions did not become effective until after the notice of

21  default was filed, that's -- that argument is correct.

22          Our argument as to the violation of these statutes is

23  twofold.  One, it's based upon an argument that this is not a

24  situation where payments were simply made pursuant to some

25  process.  This is -- in our case, our contention is that there

1    was, in fact, an application for a permanent loan modification.

2    There were certain conditions that were placed upon the

3    borrowers in order to pursue that, which was the payment of

4    1,600 dollars during the interim period, while the request was

5    being reviewed.  And they did, in fact, make those payments,

6    and they were told, without any question, that their loan

7    request had been approved.

8            That is what I think very much distinguishes this from

9    the Evans decision where, in that case, they were just making

10   payments.  There was never any agreement to modify the existing

11   loan.  And because there was, in fact, an agreement to modify

12   the existing loan, they simply were not making payments during

13   the course of the process, and that's why I think the Evans

14   decision does not apply.

15           THE COURT:  I think that the record is not quite as

16   strong as you describe it as to whether -- what your clients

17   were told about the approval and whether the person Stephenson,

18   who clearly made some statements about it -- you've put in a

19   declaration from Stevens (sic) about it -- whether he had

20   authority and whether it was quickly -- to the extent that it

21   was possibly misunderstood or -- and I know your position is

22   there's nothing ambiguous about it.  But there's a dispute

23   about it, that they basically told your clients that it's

24   looking good for a modification, but I don't have the authority

25   to approve it.  It's with higher-ups.  He may have --

1    Stephenson may have thought it was likely to get approved; it

2    ultimately didn't.

3            I think those are going to be disputes that ultimately

4    I'm going to have to hear and decide in the context of an

5    evidentiary hearing.

6            May I ask you his?  Was Stephenson -- I know you put

7    in a declaration.  Was he ever deposed?  I know there has been

8    some discovery.  I'm going to have some questions about that.

9    But was Stephenson ever deposed?

10           MR. BEKO:  He was not, Your Honor.

11           THE COURT:  Okay.

12           MR. BEKO:  What happened was, is that from the

13   inception we tried to get information regarding him, and GMAC

14   Mortgage and ETS said we don't have any information of where he

15   is.  We found him just the week prior to the notice of the

16   bankruptcy.

17           THE COURT:  Okay.

18           MR. BEKO:  And I had obtained his affidavit just a

19   couple of days prior.  The depositions were set to occur, of

20   all of these involved individuals, within the week after the

21   notice of bankruptcy was filed.  So we never had the

22   opportunity to depose him because of the automatic stay.  So

23   no, he was never deposed.

24           In fact, none of the individuals who were responsible

25   for -- who could have explained why it is that these people

1  were telling them that their request for a permanent loan

2  modification was approved or why they were telling her that her

3  foreclosure was on hold, we never had the opportunity to depose

4  any of those people.

5        Returning back to your other question.  As far as

6  those statutes being inapplicable, to the extent that they were

7  modified to include the foreclosure process, that is accurate.

8  However, as to one of those provisions, 107.085, which has

9  specific requirements as to notices that have to be given, that

10 statute was in effect since 2003.  And counsel has indicated

11 that we never alleged that there was -- that it was a high-cost

12 loan.  That's clearly in our complaint that that statute

13 applies.

14       And if you look at the sections of the act that it

15 relates to, the Home Ownership and Equity Protection Act, there

16 are several sections that clearly make this loan applicable to

17 those statutes.  And those are contained within 15 U.S.C. 1639.

18       There are provisions in there that make it applicable

19 if there is a pre-payment penalty.  In our case, there was a

20 pre-payment penalty, because the original loan had a

21 modification to it that was done -- when it was originally done

22 in 2005, which was never changed, that limited pre-payment.

23 There was also a provision that made it applicable in 15 U.S.C.

24 1639 if there was no -- if there was a negative amortization.

25 And in this case, there was a negative amortization, because

1   the original loan was for 432,000 dollars; that was in 2005.

2   It was an interest-only loan for a period of time.  However,

3   when it was modified in 2007, that loan amount, the principal

4   amount of the loan went from 432 to 439.  So that made it --

5   there was a negative amortization between that two-year period.

6          To the extent that GMAC wants to contend that it was

7   modified to include some type of a balloon payment, that would

8   also make that Home Ownership and Equity Protection Act

9   applicable as well.  All of those are contained within 15

10  U.S.C. 1639.

11          So the argument that the statute doesn't apply by tis

12  own terms, even in its 2003 version, is simply wrong, because

13  this loan was, in fact, subject to those provisions.  So under

14  107.085, GMAC Mortgage and ETS were required to give a very

15  specific notice, and they were required to produce and serve

16  upon them a copy of the promissory note.

17          Admittedly, they never did that.  Their only objection

18  to the application of that statute was, is that it did not

19  apply because it didn't go into effect until after the notice

20  and deed of -- after the notice of default was filed, which

21  again, in this case, that statute was in effect since 2003.

22          So clearly that statute was in effect.  Our

23  allegations have alleged that they didn't comply with it.  If

24  you look at the underlying statute that relates to the Home

25  Ownership and Equity Protection Act of 1994, this was, in fact,

1   what they have described as a high-cost loan.

2          Lastly, Your Honor, our argument is, is that because

3   the ETS person most knowledgeable readily admitted that because

4   of the sequence of events that occurred in this case, and

5   because they accepted payments, and because those loan amounts

6   changed, that they felt they were obligated to restart the

7   process.

8          Now, the only defense that's offered to that by GMAC

9   and ETS now is that those people are not attorneys, and that

10  the Nevada case that was referenced, the Evans case, shows that

11  they didn't have to do that.  But I think in this case, again,

12  the distinguishing factor is, these were not simply payments

13  that were made.  If you accept the e-mail communications from

14  GMAC's own agent, this was an approved process.  And so once

15  that loan modification was approved, then I believe it was

16  appropriate --

17          THE COURT:  You know, if you had gotten a piece -- if

18  your clients had gotten a piece of paper signed by someone at

19  GMAC reflecting the approval of the loan modification, I

20  think -- a) I don't think you'd be here at all; but we are

21  where we are.  I mean, that to me is the bar you're going to

22  have to jump over to show that there was, in fact, a binding --

23  an approval of a loan modification that's binding on GMAC.  I'm

24  not saying there was or wasn't, but I'm saying that's going to

25  be an issue.

 1          MR. BEKO:  And I agree that at a later stage, we may

 2    have to cross that bridge.  But at this point in time, I think

 3    you have to accept as true, not only the declaration of their

 4    own employee, but their own e-mail communications that are

 5    indicating to them that, in fact, their loan was approved.

 6    This really isn't about whether --

 7          THE COURT:  Look, put it this way.  Mr. Beko, without

 8    deciding anything, you've presented a strong record that this

 9    was not GMAC's best day, the way they handled this loan.  I

10    think that's a fair statement, without --

11          MR. BEKO:  Yeah, and I mean, I truly think that it's

12    just they just -- one part of this department didn't know what

13    the other part was doing.  And they attempted to correct it and

14    unfortunately couldn't.  But --

15          THE COURT:  Well, we'll see whether they could or not.

16    I mean, that's going to be an issue.

17          MR. BEKO:  Yeah, I think -- but the point is, in a lot

18    of this stuff, the borrowers in this case didn't know what was

19    going on internally.  All they were getting was one side of

20    this.  And to suggest that it was not appropriate for them to

21    rely upon these representations --

22          THE COURT:  Can I -- look, let me -- I don't mean

23    to -- I'm only interrupting you because save it for an opening

24    statement, okay?

25          MR. BEKO:  Understood, understood.  But --

1          THE COURT:  I've made clear, I'm not ruling from the

2     bench.  I mean, there are some portions that the district court

3     did not -- weren't raised in the district court that I've got

4     to consider.  Parts of this case are clearly surviving from

5     today; I made that clear from the start.  So there's going to

6     be another day.

7          You've got some strong arguments to make.  There'll be

8     an appropriate time to make them.  But spare me from it today,

9     okay?

10          MR. BEKO:  All right.  I guess lastly, Your Honor, I'm

11     just going to very just quickly, again, touch on this issue of

12     whether the statute of frauds applies.  They've cited you a

13     case; we've cited you a contrary one that dealt with all of the

14     applicable Nevada law, the Prince v. United States Bancorp

15     case, in which the court very clearly said even if the statute

16     of frauds might apply, it wouldn't in this case, because by the

17     terms of the loan agreement, it could have been -- it could, in

18     fact, have been fully performed within a one-year period, and

19     so --

20          THE COURT:  That -- I don't see how this could have

21     been fully performed within one year.  If you clients were

22     making 1,600 dollars a month payments, how it was possible that

23     this could be fully performed in one year, I don't see it.

24          MR. BEKO:  Well, but I think just the same way --

25          THE COURT:  I think the real issue is that the

1  terms -- assuming that your clients were told orally by Mr.

2  Stephenson that the loan modification was approved, all of the

3  terms of the modification were not set forth.  And I'm not

4  questioning whether your clients acted in appropriate reliance

5  on what they were told or not.  That's not today's issue

6  either.  But I have problems seeing your argument that this

7  could have been fully performed within one year.

8        MR. BEKO:  The only way that it could have been

9  performed in one year, would have been the same way that the

10  first note and deed of trust was fully performed when they

11  refinanced it with a new one.  I mean obviously they weren't

12  going to pay it off over the life of it, but they had the same

13  ability to refinance it in the same way that they had done

14  previously.

15        THE COURT:  Okay.  I understand your argument on it.

16        MR. BEKO:  Okay.

17        THE COURT:  I'm not ruling on it now one way or the

18  other, but I understand your arguments about the statute of

19  frauds.

20        MR. BEKO:  Understood.  Lastly, Your Honor, the

21  allegation was made in the reply brief that -- and I'm just

22  going to read it:  "While e-mails containing some terms

23  regarding loan modification, they omit critical terms such as

24  interest rate, term of the loan modification, modified

25  principal amount."

1          If you look at the e-mail communication that Mr.

2    Stephenson sent to Ms. Longoni on April 28th of 2009, he

3    specifically describes what the balance would be on the

4    principal, and he gives it to the penny:  269,000 --

5          THE COURT:  Yeah, but he also -- there's e-mail

6    communication from Mr. Stephenson where he says he doesn't have

7    the authority to approve any of this.  It's what maybe he was

8    recommending.  It had to be run up the chain of command.  It

9    required somebody's approval other than Stephenson.

10          I didn't see anything where he said your loan

11   modification on the following terms has been approved.  Am I

12   missing something?

13          MR. BEKO:  No.  What he says, Your Honor, is he

14   describes what the terms would be: 269,677.03, five-year

15   interest rate, that would not increase by more than one

16   percent, it would never exceed 13.85.  He gives those details.

17   And then he follows that up with numerous other e-mails saying

18   it looks like it should approve.  And then finally he says, it

19   is approved.

20          So if you piece all of those together, they did

21   describe to her precisely what those terms would be.  And when

22   I questioned -- I was able to take a couple of depositions, and

23   I asked the person most knowledgeable from GMAC Mortgage

24   whether there was any other loan modification proposal that was

25   on the table, he said no, this was the only one.  So for them

1    to now come back in after-the-fact and say well, those terms

2    were not specific enough, because when he sent his follow-up

3    e-mail he said I'm not certain if that was what was approved,

4    that's the way I had it put in, they want to ignore the fact

5    that they don't have any evidence that there was any other

6    terms.  This was the only one that had ever been presented.  If

7    it was approved or it wasn't approved, there could only be one

8    request.

9            THE COURT:  Okay.  Anything else you want to raise

10   now?

11           MR. BEKO:  If you could you give me just one moment --

12           THE COURT:  Sure.

13           MR. BEKO:  -- to just look through my notes, I would

14   appreciate it.

15           Your Honor, I think the remaining points, I think were

16   raised in our extensive opposition.

17           THE COURT:  Okay, Ms. Simmons go ahead.  And I do want

18   you to address Mr. Beko's argument that the 2003 Nevada statute

19   applies to the loan here because of the pre-payment provision,

20   because the negative amortization.

21           MS. SIMMONS:  Happy to, Your Honor.  In 107.085, Mr.

22   Beko attached to his response brief the statutory text as it

23   existed.  And the provision states:  "On the date the trust

24   agreement is made, the trust agreement is subject to the

25   provisions of Section 152 of the Home Ownership and Equity

RESIDENTIAL CAPITAL, LLC, ET AL.                46

1  Protection Act of 1994, 15 U.S.C. 1602(aa)."  There's no

2  mention of 1639, which is the provisions that Beko cites as

3  support for the fact that Ms. Longoni's notice -- or loan

4  qualifies for receipt of this danger notice.

5          And looking at 1602(aa) and 12 CFR, the Code of

6  Federal Regulations, there are specific definitions you have to

7  meet to qualify under Section (aa), as that statute existed in

8  2005.

9          THE COURT:  Wait.  Your position is you look to the

10  loan as originally granted.

11          MS. SIMMONS:  Yes.

12          THE COURT:  If there's a subsequent modification that

13  capitalizes unpaid interest and you wind up with a higher

14  principal balance, that doesn't make the statute applicable?

15          MS. SIMMONS:  Yeah, the statute says on "on the date

16  the trust agreement was made."

17          THE COURT:  Okay.  All right.

18          MR. BEKO:  Which Your Honor, it was the original note

19  in 2005.  That's the one that contained the no pre-payment.

20  That's the one that contained the interest only payments.  And

21  that's -- and as a result of those, those things did occur.

22          THE COURT:  Okay.  You want to just briefly -- Ms.

23  Simmons, you want to address that?

24          MS. SIMMONS:  Section (aa) specifies that high-cost

25  home loans are those where more than eight percent of the

RESIDENTIAL CAPITAL, LLC, ET AL.                47

 1  points and fees, as that term is defined under the Code of

 2  Federal Regulations, exceeds the total loan amount.  So you

 3  have to meet that definition under the Nevada statute to

 4  qualify for receipt of the danger notice.

 5           THE COURT:  Okay.  All right, let me -- I want to

 6  shift -- I don't want to hear any more about the claim

 7  objection.  So I looked at the district court docket.  I know

 8  you had a large number of case management conferences with

 9  Magistrate Judge Cooke, I think was the name; a number of

10  hearings and conferences with Judge Hicks.  Mr. Beko, what

11  discovery remains to be done?

12           MR. BEKO:  Well, Your Honor, we obviously would like

13  to take the depositions that we had noticed of those --

14           THE COURT:  How many had you noticed?

15           MR. BEKO:  I think there were about four, if I

16  remember correctly.  That has been several years now.  I think

17  there were four or five.

18           THE COURT:  Do you know where everybody is?  Obviously

19  nobody works for ResCap anymore.

20           MR. BEKO:  The only one that I know where it is, is

21  Mr. Stephenson.

22           THE COURT:  Okay.  Look, here -- I'm not suggest -- I

23  want to be very clear.  I'm not suggesting that it was taking

24  too long for this to move forward when it was in the district

25  court.  It's going to move forward quickly here.  Okay?

1    So obviously I need to get a decision out, because

2    there are -- I'm making it clear, this case is surviving.

3    Whether all the claims survive is a different issue.  But they

4    all arise out of the same facts.  So I don't think that it's

5    necessary to wait for my decision to get moving on discovery.

6    Okay.

7            What you need to do -- I'm addressing this to both

8    sides -- is meet and confer and discuss and come up with a

9    proposed discovery plan.  And you're going to have a hard time

10    convincing me why all of the remaining discovery can't be done

11    in no more than 120 days.  Okay.  Hopefully sooner than that.

12    Probably -- I would like to see you finish discovery within

13    ninety days.  Even that, I'm maybe being too generous.  But

14    there's no way I'm going to permit discovery beyond 120 days.

15            So the two of you are going to need to confer and come

16    up with a discovery plan.  If you get it done sooner, you'll

17    get a hearing sooner.  Okay?  I want to make it clear, okay.

18            We need to move forward.  So other than your -- and I

19    know you had served written discovery, Mr. Beko.  I saw there

20    were amendments to their responses and stuff like that.  Have

21    you gotten the documents, at this point?

22            MR. BEKO:  No.  They've given the me the documents --

23    at least they gave me the complete documents that they gave you

24    excerpts of, but those documents don't reference the loan.  So

25    there's nothing in there that talks about how it is that

1    Homecomings Financial supposedly is modifying a loan that it

2    didn't own two years after it went into this trust.  I mean,

3    they've given me no documentation that references that.

4            THE COURT:  All right.  So look, you need to move

5    forward expeditiously.  Get all the documents.  And if they

6    don't exist, they don't exist.  I want -- the first order of

7    business is get the documents produced.  Talk about it.  Figure

8    out what remains to be done.  I don't have a case management

9    order entered in this matter.  You can look at my -- the

10   court's website, if you look at the chambers rules, Mr. Beko,

11   you'll see I have a form.  It's usually in adversary

12   proceedings; this is a claim objection.  But I apply it in

13   claim objections as well.  It sets forth my procedures for

14   dealing with discovery disputes.  They're not complicated.

15           If you have a discovery dispute, the parties need

16   to -- counsel need to meet and confer in an effort to resolve

17   the dispute.  If you're unable to resolve it, the party needing

18   the assistance of the Court arranges for a telephone conference

19   with the Court.  I generally am able to hold those within a day

20   or two.  They're very quick.  I don't want to see -- I don't

21   even need to see letter briefs.  I just -- you'll describe for

22   me what the issues are, and I'm generally able to resolve the

23   issue on the telephone, very quickly.

24           If I feel I need some legal authority I'll ask for

25   short letter briefs.  I try -- I don't do -- I don't deal with

1   motions to compel.  We deal with it by these discovery

2   conferences on the phone.  You raise the issues.  If I want

3   letters, I'll tell you the letters, and we resolve it very

4   quickly.  I try to hold down, as much as possible, unnecessary

5   paperwork in motions and responses to motions and the time

6   that's consumed with that.

7           Discovery disputes are generally resolved within a day

8   or two of them being raised with me.  If there are privilege

9   issues, sometimes I'll ask for letter briefs with respect to

10  that.  But I try to move my docket along very quickly.

11          So by next week, the two of you should confer and I

12  would like you to -- if you could file a joint letter, that

13  would be helpful, setting out what your discovery plan is and

14  how you think it's going to take to accomplish.  And I've made

15  clear, hopefully it'll be done within 90 days, and it isn't

16  going to be longer than 120 days, I can assure you of that.

17  Okay.

18          MR. BEKO:  My only request, Your Honor, is I'm getting

19  ready to leave, and I'm going to be gone all of next week,

20  would the early part of the following week be acceptable to

21  you?

22          THE COURT:  Yes, it would.

23          MR. BEKO:  Thank you.

24          THE COURT:  It absolutely would.  Your office is in

25  Reno, is that -- do I understand correctly?

1          MR. BEKO:  That's correct, Your Honor.

2          THE COURT:  Okay.  Have you appeared before Judge Greg

3   Zive in the bankruptcy court?

4          MR. BEKO:  Many times.  Well, no.  Actually that is

5   not correct.  I don't do any bankruptcy --

6          THE COURT:  Okay.

7          MR. BEKO:  -- work at all, but I'm close friends with

8   Judge Zive.

9          THE COURT:  And he's a good friend of mine, too.  I

10  have the greatest respect for him.  He's a wonderful judge, and

11  a wonderful person.

12         MR. BEKO:  Yeah, he's one of the few truly amazing,

13  amazing legal minds I've ever seen in my life.

14         THE COURT:  Yeah.  All right, we'll put that aside.

15         All right, so when you get back from vacation the two

16  of you ought to speak and let's get this moving.

17         MR. BEKO:  Very well, Your Honor.

18         THE COURT:  Okay.  Now, one of the claims that Judge

19  Hicks denied the motion to dismiss, was the claim for

20  intentional infliction of emotional distress.  The two of you

21  need to confer, because 28 U.S.C. Section 157(b)(5) -- let me

22  find it in front of me here -- 157(b)(5) provides:  "The

23  district court shall order that personal injury tort and

24  wrongful death claims shall be tried in the district court in

25  which the bankruptcy case is pending or in the district court

1    in the district in which the claim arose, as determined by the

2    district court in which the bankruptcy case is pending."

3          My recollection is, there's a split in authority

4    whether a claim for intentional infliction of emotional

5    distress would be considered a personal injury tort.  The

6    legislative history is almost nonexistent on 157(b)(5).

7          In the Supreme Court's 2011 decision in Stern v.

8    Marshall, which deals with the authority of bankruptcy judges

9    to enter final orders of judgment, Chief Justice Roberts, in

10   the majority opinion, deals with an issue raised by J. (sic)

11   Pierce Marshall, with respect to 157(b)(5).  Marshall had filed

12   a defamation claim in the Chapter 7 bankruptcy of Anna Nicole

13   Smith.  She then counterclaimed for interference with an

14   expectancy from the estate of Pierce Marshall's father.

15         The main thrust of Stern v. Marshall dealt with

16   whether the bankruptcy court could enter a final order of

17   judgment on Anna Nicole -- the estate's claim against J. (sic)

18   Pierce Marshall.  That led to Stern v. Marshall, then in 2014,

19   the Arkison decision and a couple of weeks ago, the Wellness

20   decision from the Supreme Court.

21         But a somewhat little-noticed portion of Stern v.

22   Marshall was the chief justice's explanation that 157(b)(5) is

23   not jurisdictional, and in fact, in Stern v. Marshall, the

24   court concluded that Pierce Marshall consented to the

25   bankruptcy court resolving the defamation claim, therefore the

RESIDENTIAL CAPITAL, LLC, ET AL.                    53

1   Supreme Court didn't have to decide whether a defamation claim

2   fell within personal injury tort.

3           The two of you need to confer -- I actually have a

4   trial in one of the ResCap proceedings next week where the

5   parties have consented to the trial that -- I gave them the

6   choice, either consent or brief the issue in this upcoming

7   case, whether it was a personal injury tort or not.  They both

8   just agreed they'd try it here.

9           So the two of you need to confer with what your

10  position is with respect to whether intentional -- whether the

11  intentional infliction of emotional distress claim is a

12  personal injury tort within 157(b)(5).  And if you believe it

13  is -- if one side says yes and one side says no, you're going

14  to have to brief that issue.  So at least tell me right away

15  whether you agree or disagree.  And if both sides can avoid

16  having to brief the issue, if you agree, you'll simply just go

17  ahead and try it here.  I'm not putting pressure on anybody

18  about it, but I just want to -- I want to move this case along.

19  I don't want to get five months down the road and then find out

20  that there's this issue.  So I'm raising the issue with you

21  both today.

22          MR. BEKO:  Your Honor, if I might ask -- just showing

23  my ignorance.  Trying it here means trying it to the bench,

24  correct?

25          THE COURT:  That's correct.  It generally does.  There

1   is -- within 157(c) -- let me see if I can put my finger on the

2   specific subsection.

3            MR. WISHNEW:  157(e), Your Honor?

4            THE COURT:  Yeah, I want to see, 157 -- yes.

5   157(e) -- this is 28 U.S.C. 157(e):  "If the right to a jury

6   applies in a proceeding that may be heard under this section by

7   a bankruptcy judge, the bankruptcy judge may conduct the jury

8   trial if specially designated to exercise such jurisdiction by

9   the district court and with the express consent of all

10  parties."  When the district court has expressly consent -- the

11  district court has provided by rule that we can.  The parties

12  have to consent.

13           None of my colleagues -- I've been here eight-and-a-

14  half years.  My colleagues have been here much longer.  Nobody

15  can remember a jury trial in this court.  But there is that

16  provision in 157(e) that deals with it.

17           But you all need to address this.  The issue -- and I

18  must say, it's not clear whether intentional infliction of

19  emotional distress would or would not be considered a personal

20  injury tort.  And I won't elaborate on it further, at this

21  point.  You can all go and research it if you want.

22           MR. BEKO:  Very well.  Thank you, Your Honor.

23           THE COURT:  But I want to get this issue -- it's

24  important that the remaining claims that are involved in ResCap

25  be dealt with promptly by whatever court's going to do it.  So,

1    okay, let me stop there.

2            So the first thing to do is to confer about it, and

3    you'll let me know what the parties' views are.

4            MR. BEKO:  Thank you.

5            THE COURT:  Okay.  All right.  Anything else -- let me

6    ask you, Ms. Simmons, what discovery do you believe your client

7    wishes to take?

8            MS. SIMMONS:  I think at this point, Your Honor, the

9    only deposition we would want to take is the deposition of Nate

10   Stephenson.

11           THE COURT:  Okay.  Are you able to identify for me,

12   Mr. Beko, who are the other deponents that you want to take --

13           MR. BEKO:  If you could give me a couple of minutes,

14   Your Honor, I could probably pull that notice up that I had --

15           THE COURT:  I'll tell you what.  The two of you ought

16   to confer about it when you speak after your vacation.  Okay?

17   so let's avoid surprises.  Look, there's always odds and ends

18   that come up in discovery, but you --

19           MR. BEKO:  Sure.

20           THE COURT:  -- this case has been around long enough

21   that I think you both know what needs to be done.

22           MR. BEKO:  True.

23           THE COURT:  Okay?  All right.  Anything else either of

24   you want to say, at this point?

25           MS. SIMMONS:  No, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                    56

1          THE COURT:  All right.  So the Court will, in due

2     course, will enter a decision.  But I've already made clear, at

3     least as to those things that Judge Hicks denied the motion to

4     dismiss, they're going to survive.  Okay?

5          MS. SIMMONS:  Thank you, Your Honor.

6          MR. BEKO:  Very well.  Thank you, Your Honor.

7          THE COURT:  Thank you very much.  All right, we'll

8     adjourned.

9          Is there anything else, Mr. Wishnew?

10         MR. WISHNEW:  That's it.

11         THE COURT:  I think this is it, right?

12         MR. WISHNEW:  That's it.

13         THE COURT:  Okay, we're adjourned.  Thanks very much.

14      (Whereupon these proceedings were concluded at 11:16 AM)

15

16

17

18

19

20

21

22

23

24

25

1

2                                    I N D E X

3

4                                    RULINGS

5                                                      PAGE      LINE

6    ResCap Liquidating Trust's motion to extend    8        15

7    date to file objections to claims, granted.

8    Eighty-fifth omnibus objection is sustained   11        14

9    as to claim 6272 of the Coopers.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4   I, Penina Wolicki, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

9

10

11   _____

12   PENINA WOLICKI

13   AAERT Certified Electronic Transcriber CET**D-569

14

15   eScribers

16   700 West 192nd Street, Suite #607

17   New York, NY 10040

18   Date:  June 8, 2015

19

20

21

22

23

24

25