1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


             Debtors.


- - - - - - - - - - - - - - - - - - - -x

             United States Bankruptcy Court

             One Bowling Green

             New York, New York


             June 4, 2015

             2:03 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

1

2   Evidentiary hearing RE: Seventy-Sixth Omnibus Objection as it

3   Relates to Proof of Claim No. 1083 Filed by Elda and Maria

4   Thompson

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Sharona Shapiro

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER, LLP

4        Attorneys for ResCap Borrower Claims Trust

5        250 West 55th Street

6        New York, NY 10019

7

8   BY:   JORDAN A. WISHNEW, ESQ.

9        JESSICA J. ARETT, ESQ.

10

11   ELDA THOMPSON, PRO SE

12

13   MARIA THOMPSON, PRO SE

14

15

16

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                                    4

1                    P R O C E E D I N G S

2          THE COURT:  All right, please be seated.  We're here

3   in Residential Capital, number 12-12020.

4          Let me get the appearances, please.

5          MR. WISHNEW:  Good afternoon, Your Honor.  Jordan

6   Wishnew, Morrison & Foerster, for the ResCap Borrower Claims

7   Trust.  With me today is my colleague Jessica Arett.  Our

8   witness will be Lauren Graham Delehey for the ResCap

9   Liquidating Trust.

10          THE COURT:  All right.

11          Ms. Thompson?

12          MS. ELDA THOMPSON:  Elda Thompson.

13          THE COURT:  Thank you very much.

14          All right.  Before we begin, let me try and set the

15   stage for what I believe we will accomplish this afternoon.  On

16   November 10th, 2014, the ResCap Borrower Claims Trust filed its

17   Seventy-sixth omnibus objection to claims.  It appears as ECF

18   docket number 7736.  And it was supported by the declarations

19   of Kathy Priore, which is at ECF 7736-3, and Norman S.

20   Rosenbaum, which is at ECF 7736-4.

21          The objection addresses thirteen claims, one of which

22   is claim number 1083, filed by Maria M. and Elda Thompson.  The

23   claim originally asserted a secured claim in the amount of

24   $158,336.03, and a general unsecured claim in the amount of

25   500,000 dollars, against debtor Residential Capital, LLC.  The

1   claim was reclassified as a general unsecured claim for 658,336

2   dollars, against debtor GMAC Mortgage, LLC, on the Court's

3   entry of an order granting the trust's thirty-sixth omnibus

4   objection to claims.  The reclassification order may be found

5   at ECF docket number 5895.

6          The Thompsons filed an objection to the seventy-sixth

7   omnibus objection; they filed the objection on December 14th,

8   2014, and it appears at ECF docket number 7862.  And the trust

9   subsequently filed a reply, on January 9th, 2015, which is at

10  ECF docket number 7967.

11         The Court held a hearing on the objection on January

12  14, 2015.  At the hearing, it became apparent that the parties

13  disputed whether the Thompsons made certain monthly payments

14  and property tax payments.  The trust represented that the

15  Thompsons had attempted to submitted payments during 2007 and

16  2008, as well as during 2010 and 2011, that were rejected by

17  GMAC because either, one, the payments were only partial

18  payments of the total amount due for each month, or two, the

19  bank, presumably Wells Fargo, notified GMAC that the bank

20  account from which the funds were to be drawn, to make the

21  monthly loan payments, were insufficient.

22         By contrast, the Thompsons represented that they made

23  the payments and that no payments were returned due to

24  insufficient funds.  According to the Thompsons, they're in

25  possession of bank records from their bank, Wells Fargo,

1    evidencing that they made monthly loan payments in full and no

2    payments were returned, at least for the 2007 and 2008 period.

3            At the conclusion of the January 14, 2015 hearing, the

4    Court adjourned the objection to a date to be determined and

5    directed that the trust send a representative to the Thompsons'

6    home to review their documents and bank records that

7    purportedly evidenced the Thompsons' loan payments and to try

8    and resolve this matter.

9            After the parties reported to the Court that they were

10   having difficulty finding a mutually agreeable time to conduct

11   that meeting, the Court entered an order on March 9,

12   2009 -- excuse me, 2009 -- March 9, 2015, requiring the parties

13   to schedule the meeting before March 31, 2015.  That order is

14   at ECF docket number 8269.  The order directed that if the

15   parties were unable to meet before that date, the Court would

16   hold a hearing on March 31 regarding the payments issue.  The

17   parties were able to schedule the meeting prior to March 31,

18   but requested that the hearing conditionally scheduled for

19   March 31 go forward as a status conference, in light of the

20   parties' inability to resolve the outstanding issues.

21           On March 31, 2015, the Court held a status conference

22   on the objection.  The trust represented that counsel for the

23   trust met with the Thompsons at their home and reviewed the

24   Wells Fargo bank records.  The trust also represented, upon its

25   counsel's review of the documentation provided by the

1  Thompsons, the trust maintains that the Thompsons are unable to

2  prove that they made the requisite payments in 2007.  According

3  to the trust, the documents only demonstrate that payments were

4  made in the year 2008.  The Thompsons disputed the trust's

5  representations.

6          In light of the outstanding disputed issue of fact,

7  the Court scheduled an evidentiary hearing for April 20th,

8  2015.  The April 20th hearing did not go forward, however, due

9  to a requested adjournment from Elda Thompson because of health

10 reasons.  That's set forth in a letter from Ms. Thompson at ECF

11 8478.  The evidentiary hearing was scheduled for today, June

12 4th, 2015, at 2 p.m.

13         Before the parties begin, I want to make clear that

14 the only issue that the parties may address at this hearing is

15 whether the Thompsons made their monthly payments in 2007,

16 because I also have question, Mr. Wishnew, whether you believe

17 there's also an issue about the payment of the taxes as well as

18 the monthly payments?

19         MR. WISHNEW:  At this point, Your Honor, we're focused

20 on the principal payments for the months leading up to the

21 foreclosure.

22         THE COURT:  Okay.  Upon reviewing the parties'

23 exhibits, it became clear to me that one or both parties may be

24 seeking to introduce evidence or present arguments on other

25 issues relating to the claim and the objection.  However, this

1  evidentiary hearing will only go forward as to the payment

2  issue.

3          Also before we begin, I want to give some instructions

4  on how the hearing will proceed.  First, each party -- first

5  the trust and then Ms. Thomps -- the Thompsons, will be

6  permitted to make an opening statement.  In its opening

7  statement, each party will provide a brief recitation of their

8  argument with respect to the payment issue.

9          Then each party will be able to present evidence to

10  the Court by way of testimony from witnesses.  The trust will

11  call its witness first.  And Ms. Thompson, you'll have an

12  opportunity to cross-examine the trust's witness, if you wish.

13  After the trust is done presenting its evidence, Ms. Thompson,

14  you'll be allowed to present your evidence to the Court and the

15  trust will be allowed to cross-examine you or your witnesses.

16  After Ms. Thompson is finished presenting her evidence, the

17  trust, if it wants to, it will have an opportunity to present

18  rebuttal; I'm not sure that's going to be needed.  Once all the

19  evidence has been presented, each party can make brief closing

20  arguments, if it wishes to.

21          And with that said, does anyone have any questions

22  before we begin?

23          Mr. Wishnew?

24          MR. WISHNEW:  No, Your Honor.

25          THE COURT:  Either of the Thompsons?  Go ahead, Ms.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    9

1    Thompson.

2              MS. ELDA THOMPSON:  I have a question.  I don't have

3    additional evidence; what I have is what we argued about

4    the -- the dismissal of the foreclosure.  It's --

5              THE COURT:  The only thing that this hearing is about

6    today is at the prior hearings you represented to the Court and

7    argued that you had made all of the payments and that none of

8    them had been returned for insufficient funds or returned by

9    GMAC for any other reason.

10             MS. ELDA THOMPSON:  Right.

11             THE COURT:  That's a disputed issue.  The trust

12   asserts that you didn't make all the payments, or payments were

13   returned to you.  That's a disputed issue that the Court felt

14   it needed to hear evidence to be able to resolve.

15             With respect to the remaining arguments -- and you had

16   many arguments; I'm not -- I want to make clear to you that I'm

17   not rejecting your arguments, but in order for me to go ahead

18   and rule, I need to be able to resolve this disputed issue of

19   fact about whether you made the payments and whether they were

20   kept by GMAC.  So that's what this hearing is about.  It's

21   not -- you've had a chance, previously, and you did argue; you

22   appeared in court when the objection first came on, and you

23   made your arguments.  But because there was this disputed

24   issue, that's why we're going forward with the hearing today.

25   Okay?

1          MS. ELDA THOMPSON:  Okay.

2          THE COURT:  You understand that?

3          MS. ELDA THOMPSON:  So that will be heard on a

4     different date?

5          THE COURT:  No, I've heard the arguments.  I have all

6     the papers.  I've read all the papers.  But in order to resolve

7     all of the issues in the trust's objection --

8          MS. ELDA THOMPSON:  Right.

9          THE COURT:  -- and your opposition to it, I felt that

10    I needed to hear the evidence so that I could resolve the issue

11    whether you in fact made the payments or whether payments were

12    returned to you, either because they weren't full payments or

13    because there were insufficient funds in your account.

14          So I don't want to hear -- this is not -- the purpose

15    of this hearing is not to sort of go over again the arguments

16    that were previously made to the Court, but for each side to

17    have a chance to present its evidence and its arguments only on

18    the issue of whether the payments were made.  Okay?  You

19    understand?

20          MS. ELDA THOMPSON:  Yes.

21          THE COURT:  Okay.

22          MS. ELDA THOMPSON:  I read the witness, and what she

23    testified was actually what I had testified before.

24          THE COURT:  Well, let me hear -- I want to hear the

25    testimony.  I'm not sure.  I mean, you said you made the

1  payments and that they were accepted and never returned, and

2  that's not what I -- that's not what the trust's position is.

3  So let me hear -- let me hear the evidence.

4        MS. ELDA THOMPSON:  Okay.

5        THE COURT:  And -- but first, before we hear the

6  evidence, Mr. Wishnew, if you want to make a brief opening

7  statement, just lay out for me what you expect the evidence is

8  going to show.  Okay?

9        And then, Ms. Thompson, after Mr. Wishnew, I'll give

10  you a chance to do the same thing.  Okay?

11        MS. ELDA THOMPSON:  Okay.

12        THE COURT:  All right.  Go ahead, Mr. Wishnew.

13        MR. WISHNEW:  Thank you, Your Honor.  Jordan Wishnew

14  for Morrison & Foerster, for the ResCap Borrower Claims Trust.

15        Your Honor, we will offer the testimony of Ms. Lauren

16  Graham Delehey, an attorney with the ResCap liquidating trust,

17  who will walk through the company's or GMAC Mortgage's loan

18  payment history and servicing notes, and the related documents

19  referenced therein, concerning the nonpayment of certain

20  monthly mortgage payments preceding the commencement of a

21  foreclosure proceeding against Ms. Elda Thompson and Ms. Maria

22  Thompson in 2007.

23        She will then speak to the fact that, shortly after

24  the commencement of the foreclosure proceeding, a foreclosure

25  payment agreement was entered into by the parties, that a

1   repayment schedule was agreed to by the parties, and that the

2   repayment agreement was fully performed by the Thompsons,

3   thereby curing their default.  Ultimately, what was --

4           THE COURT:  Let me just interrupt.  That repayment

5   agreement and the payments, that -- as I understand your

6   position, that resolved the issue about any 2007 --

7           MR. WISHNEW:  Absolutely, Your Honor.

8           THE COURT:  -- 2008 payment defaults.

9           MR. WISHNEW:  Once they completed their payment

10  agreement, they were current at the time they completed.

11          THE COURT:  Until you get to 2010.

12          MR. WISHNEW:  That's correct, Your Honor.

13          THE COURT:  All right.  Go ahead.

14          MR. WISHNEW:  But we're only addressing 2007 here.

15          THE COURT:  Right.

16          MR. WISHNEW:  So that will be the sum and substance of

17  Ms. Delehey's testimony.  Like I said, she will go through the

18  payment history, the servicing notes, the related letters and

19  correspondence, as well as the satisfaction of the repayment

20  agreement.

21          THE COURT:  Okay.  Thank you very much.

22          All right.  Ms. Thompson, it's your chance to make an

23  opening statement, if you wish.

24          MS. ELDA THOMPSON:  No, I have the ones that GMAC has

25  sent us back in 2007 when the payments were in question --

1          THE COURT:  Yes.

2          MS. ELDA THOMPSON:  -- because the ones that they sent

3    me this year were all blacked out.  So I had to look for the

4    new ones.  I mean, I don't understand how am I supposed to read

5    what it says on there when everything is blacked out from my

6    actual history.  So what I did was look up the other ones,

7    because, as you can see, these are blacked out, these are not.

8    And this is what was actually sent by GMAC back in 2007,

9    showing that the payments were made.

10          THE COURT:  All right.  Well, we'll see what the

11   evidence is.

12          Mr. Wishnew, what's the redacted document?

13          MR. WISHNEW:  The loan servicing notes, Your Honor?

14          THE COURT:  Is that -- that's the loan servicing

15   notes?

16          MR. WISHNEW:  Yes, Your Honor.

17          THE COURT:  Okay.  All right.

18          Anything else you want to say before I get into the

19   evidence, Ms. Thompson?

20          MS. ELDA THOMPSON:  No.  Basically, it's they were

21   questioning whether we made payments --

22          THE COURT:  Right.

23          MS. ELDA THOMPSON:  -- in 2007?

24          THE COURT:  Yes.

25          MS. ELDA THOMPSON:  He saw the payments that we made

1   in 2008 and 2009, and here it shows that payments were applied

2   in 2007.

3          THE COURT:  All right.  Let me hear the evidence and

4   we'll see --

5          MS. ELDA THOMPSON:  Okay.

6          THE COURT:  -- what it shows.  Okay?  And so listen

7   carefully to this testimony, and you'll have a chance to cross-

8   examine, if you want to do that, okay?

9          All right, Mr. Wishnew, go ahead.

10          MR. WISHNEW:  Your Honor, I'd like to call Lauren

11   Graham Delehey to the stand, please.

12          THE COURT:  All right.  Ms. Delehey, come on up.

13          If you would raise your right hand and be sworn.

14      (Witness sworn)

15          THE COURT:  All right.  Please have a seat.

16          Go ahead, Mr. Wishnew.

17   DIRECT TESTIMONY

18   BY MR. WISHNEW:

19   Q.  Good afternoon, Ms. Delehey.

20   A.  Good afternoon.

21   Q.  My name is Jordan Wishnew.  I represent the Res --

22          THE COURT:  I think you've met.

23          MR. WISHNEW:  All right.  Okay.

24   Q.  Ms. Delehey, would you -- what is your current position?

25   A.  I am the chief counsel for litigation with the ResCap

1  liquidating trust.

2  Q.  Thank you.  And when did you begin your employment with

3  Residential Capital?

4  A.  In August of 2011.

5  Q.  And what city and state are the Residential Capital

6  offices located in?

7  A.  Fort Washington, Pennsylvania.

8  Q.  Okay.  And what is Residential Capital's relationship to

9  GMAC Mortgage, LLC?

10  A.  GMAC was a subsidiary of ResCap.

11  Q.  Okay.  And when you started in August 2001, what was your

12  job?

13          THE COURT:  2011.  Which --

14          THE WITNESS:  Yes, 2011.

15          THE COURT:  2011.

16          MR. WISHNEW:  2011, I'm sorry.

17          THE COURT:  Fix your notes.

18  Q.  You started in August of 2011; what was your job title at

19  Residential Capital?

20  A.  I was in-house litigation counsel.

21  Q.  And what were you responsibilities as in-house litigation

22  counsel?

23  A.  I managed litigation relating to the origination and

24  servicing and securitizations of residential mortgage loans.

25  Q.  And how long were you in the role of in-house litigation

1  counsel?

2  A.  I was in that role until the -- until ResCap filed for

3  bankruptcy protection in 2012.

4  Q.  Okay.  And then once Residential Capital and their

5  affiliates sought bankruptcy protection, what was your new

6  title?

7  A.  I became the chief counsel for litigation for ResCap.

8  Q.  Okay.  And so currently your current title is chief

9  litigation counsel for the ResCap liquidating trust?

10 A.  Yes.

11 Q.  And what's your responsibility in that position?

12 A.  I -- I assist both the borrower trust and the liquidating

13 trust in the resolution of claims, and I also manage litigation

14 for the liquidating trust, including litigation to recover

15 assets for the trust.

16 Q.  Thank you.  And as part of your employment with the

17 liquidating trust, do you have access to GMAC Mortgage's

18 business records?

19 A.  Yes, I do.

20 Q.  And what kind of records do you have access to?

21 A.  I'm able to see the GMAC Mortgage's servicing records on a

22 system called Fiserv or LoanServ.  We also have a system called

23 Looking Glass, where we have imaged the -- we keep imaged

24 records, and XNet, where we keep imaged records of -- of

25 communications that come in from the borrower.  We also have

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

1   access to the LPS system, which was the system on which GMAC

2   Mortgage communicated with their foreclosure counsel.

3   Q.  Okay.  And those records were maintained electronically by

4   the debtors?

5   A.  Yes.

6   Q.  Okay.  Generally, were documents entered or imaged into

7   GMAC Mortgage's servicing system at or near the time that the

8   information was transmitted by someone with knowledge of their

9   preparation or receipt?

10  A.  Yes.

11  Q.  Okay.  We're here to discuss -- as Judge Glenn mentioned,

12  we're here to discuss certain events concerning the Thompsons'

13  loan.  Are you familiar with this loan?

14  A.  Yes, I am.

15  Q.  Okay.  Are you aware that the Thompsons filed a claim

16  against GMAC Mortgage in the Residential Capital bankruptcy

17  cases?

18  A.  Yes.

19  Q.  Okay.  Are you also aware that there was an objection

20  filed to the allowance of this claim?

21  A.  Yes.

22  Q.  Okay.  And have you reviewed that objection?

23  A.  Yes.

24  Q.  And were you asked to execute any declarations in

25  connection with that claims objection?

1   A.  Yes, I was.

2   Q.  Okay.  There's an exhibit before you marked as BT-A; do

3   you recognize this document?

4   A.  Yes.

5   Q.  Have you seen it before today?

6   A.  Yes, I have; this is my declaration.

7   Q.  Okay.  And you're familiar with the contents of this

8   declaration?

9   A.  I am.

10  Q.  Would you generally describe the statements in the

11  declaration?

12  A.  Well, I go through my role and talk about the fact that I

13  have access to the records and reviewed the records.

14  And -- and I went through how we first responded to the

15  Thompsons' claims with letters requesting more information.

16  Q.  Okay.  Do you believe all the statements in the

17  declaration to be true and accurate?

18  A.  Yes, I do.

19  Q.  Okay.

20       MR. WISHNEW:  Your Honor, I'd like to move for the

21  admission of Exhibit BT-A into the record.

22       THE COURT:  Do you have any objection to the document?

23  Do you have the document, Ms. Thompson?

24       MS. ELDA THOMPSON:  I don't see it.

25       THE COURT:  Why don't you make sure she has it, Mr.

 1  Wishnew?

 2          MR. WISHNEW:  Yes, Your Honor.

 3          MS. ELDA THOMPSON:  Your Honor, this pages shows that

 4  she spoke to me --

 5          THE COURT:  No, I just want to be sure you have it,

 6  and then --

 7          MS. ELDA THOMPSON:  Yes, I have it.

 8          THE COURT:  -- Mr. Wishnew can go on from there.  Do

 9  you have it in front of you?

10          MS. ELDA THOMPSON:  Yes.

11          THE COURT:  Okay.  Exhibit BT-A is admitted into

12  evidence.

13  (Declaration of Lauren Delehey was hereby received into

14  evidence as Borrower Trust's Exhibit BT-A, as of this date.)

15          MR. WISHNEW:  Thank you, Your Honor.

16  Q.  Ms. Delehey, if you could look at the exhibit marked BT-1.

17  A.  I have it.

18  Q.  Do you recognize this document?

19  A.  Yes, these are the payment history notes and the loan

20  servicing notes for the Thompsons' loan.

21  Q.  Okay.  And have you seen it before today?

22  A.  Yes, I have.

23  Q.  Okay.  And can you ident -- okay.  What is the time period

24  that these servicing notes cover?

25  A.  They begin in -- I believe in October of 2005, when we

1  began servicing the loan, and they go through February of 2013,

2  which is when the loan was transferred to Ocwen.

3  Q.  Thank you.  And to the best of your knowledge, was this

4  document maintained in GMAC's business records?

5  A.  Yes.

6  Q.  Thank you.  What sorts of information are typically

7  maintained or included in the loan servicing notes?

8  A.  Well, the front part of -- of this exhibit is the loan

9  payment history, and that includes notations of when payments

10 come in and how those payments were treated throughout the time

11 of the servicing, and then towards the back of -- of the

12 document, beginning --

13         THE COURT:  There look to be page numbers in the

14 lower-right corner --

15         THE WITNESS:  Yeah.

16         THE COURT:  -- of each page.

17         THE WITNESS:  So beginning at page -- gosh, it's small

18 type.

19         THE COURT:  It is.

20         THE WITNESS:  53.

21         THE COURT:  I'm sorry; say it again, 53?

22         THE WITNESS:  Page 53 begins the servicing notes.

23         THE COURT:  Okay.  Mr. Wishnew, just make sure that

24 Ms. Thompson is able to follow where we are, okay?

25      (Pause)

RESIDENTIAL CAPITAL, LLC, ET AL.                    21

1          THE COURT:  Before you go on -- hold on.  Maybe I'm a

2     little lost, because in what I have, I'm looking at, it looks

3     like pages 1 of 162 through 16 of 162 appear to be the payment

4     history.

5          THE WITNESS:  That's right.

6          THE COURT:  And then beginning on page 17 of 162, that

7     looks like servicing notes.

8          THE WITNESS:  I see that that happens, and I think

9     that the reason -- I believe the reason for that is probably

10    because these end -- the servicing notes end when the loan is

11    service released.

12         THE COURT:  I'm just trying to make sure I understand.

13         THE WITNESS:  I'm not sure why it's --

14         THE COURT:  Am I correct that the payment history ends

15    on page 16?

16         THE WITNESS:  Yes.

17         MR. WISHNEW:  Yes, Your Honor.

18         THE COURT:  Okay.  And then what follows, you're

19    saying, are the servicing notes?

20         THE WITNESS:  That's right.

21         THE COURT:  Okay.  Go ahead, Mr. Wishnew.

22         THE WITNESS:  Thank you.

23    BY MR. WISHNEW:

24    Q.  Ms. Delehey, if GMAC Mortgage does not receive a payment,

25    would that be reflected in the payment history or servicing

RESIDENTIAL CAPITAL, LLC, ET AL.                        22

1  notes as a nonpayment?

2  A.  No, the -- the payment history shows just payments that

3  actually come in.

4  Q.  Okay.

5       MR. WISHNEW:  Your Honor, I'd like to introduce Ms.

6  Thompson's servicing notes and payment history into evidence as

7  Exhibit BT-1.

8       MS. ELDA THOMPSON:  We have to --

9       THE COURT:  I'm --

10       MS. ELDA THOMPSON:  We have to object to that.

11       THE COURT:  Why is that?

12       MS. ELDA THOMPSON:  Because there is no payment made.

13  We --

14       THE COURT:  You can sit down, it's okay.  You don't

15  have to get up.

16       MS. ELDA THOMPSON:  When this situation come up to our

17  knowledge --

18       THE COURT:  Yes.

19       MS. ELDA THOMPSON:  -- in October, first we

20  paid -- there was no prepay plan for payment.  There was no

21  plan for repayment; there was a foreclosure repayment.  And we

22  were -- we were paying what GMAC told us to pay because there

23  was a -- to stop a foreclosure that was never done.  There was

24  no foreclosure to stop to begin with.  We didn't know that at

25  that time.  This is 2007.  When we completed the payment

1    through the last part of 2007, and all of 2008, all the way to

2    February 2009, we just continued paying it.  And in October

3    2010, GMAC started doing the same situation that they did in

4    October of 2007.

5            When that happened, in October 2010, I called GMAC and

6    I was asking them to explain to us why the situation was coming

7    up again, when -- when that situation supposed to have been

8    completed and repaid and all of that.  We didn't know, at that

9    time, that they were not processing us any foreclosure.  We

10   didn't know that.  We learned in 2013 that that foreclosure of

11   2007 was cancelled, was closed.  It was closed -- it was never

12   accepted in 2007, so there was no processing of any foreclosure

13   for us to repay nothing.  We knew this in 2010.  We didn't know

14   that in 2007.  We just pay, pay, pay, pay.

15           Then in 20 -- when this happened in October of 2010,

16   we stopped payment.  We didn't pay.  We have not paid a cent

17   from 2010 -- from October 2010 to this day, because we were

18   told that we were not supposed to be paying anything because

19   there was no loan register with the county or with -- and then

20   we -- there was placed also escrow here.  The lady is saying

21   that there is a valid payment, they never received any payment

22   from us.  There's 2010 -- in October 2010, we stopped paying

23   them because we were told that we were not supposed to be

24   paying anything until this come to court.

25           No -- no court -- we tried immensely to hire an

1   attorney to -- to deal with this situation back in 2010, and no

2   one wanted to accept it because it was too complicated, they

3   felt.  So they -- what they told us was the same attorney was

4   just wait until the court -- wait until GMAC take us to court,

5   and there, at court, we will ask why the loan was never

6   registered.  And this is -- and that attorney told us not to

7   pay until we see the case in court.  There was no escrow.

8   Never was an escrow --

9           THE COURT:  Okay.  The only issue --

10          MS. ELDA THOMPSON:  -- for that account.

11          THE COURT:  Let me -- I'll give your chance to present

12   your evidence and your arguments.  The only issue now, Mr.

13   Wishnew has offered into evidence this business record.

14          MS. ELDA THOMPSON:  Okay.  So we have this business

15   record here.

16          THE COURT:  Yeah.

17          MS. ELDA THOMPSON:  We send a copy to you --

18          THE COURT:  Ms. Thompson, I'll give you a chance

19   to -- you'll be able to put your evidence in, okay?

20          But before I rule on the objection, Ms. Delehey, what

21   I'd like you to do -- I want to get a bit of understanding of

22   how things get recorded, okay?

23          THE WITNESS:  Um-hum.

24          THE COURT:  So let's start with the dates when -- from

25   reading the paper -- well, start with 2006.  This is on page 16

1    of 162.  And just run through and show me -- explain to me what

2    the exhibit shows --

3            THE WITNESS:  Okay.

4            THE COURT:  -- with respect to each month, when a

5    payment is received or when one wasn't received, okay?

6            THE WITNESS:  Okay.  So --

7            THE COURT:  You're on page 16?

8            THE WITNESS:  I'm on page 16.

9            THE COURT:  Okay.

10            THE WITNESS:  And I'll look for --

11            THE COURT:  Show me an entry where they made the

12    payment, how I'd --

13            THE WITNESS:  So the first payment in 2016 -- and if

14    you look at the --

15            THE COURT:  2006.

16            THE WITNESS:  I'm sorry, in 2006, came in on January

17    13th of 2006.  You can see that in the "Transaction added"

18    date.

19            THE COURT:  Yes.

20            THE WITNESS:  That column gives the date that the

21    payment came in.  The next column over, the "Date interest paid

22    current" column --

23            THE COURT:  Yes.

24            THE WITNESS:  -- shows the date of the payment for

25    which that payment was intended to pay.

1          THE COURT:  Okay.

2          THE WITNESS:  So it came in on --

3          THE COURT:  So the payment for January -- for the

4    month beginning January 1st, 2006, was received on January

5    13th?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.

8          THE WITNESS:  And in the "Transaction description"

9    column it says "Payment".

10         MS. ELDA THOMPSON:  Excuse me?

11         THE COURT:  No, you'll have your chance.  Please have

12   a seat.  Please have a seat.

13         Okay.  What's "Curtailment" mean?  Under "Payment",

14   there's a row that says "Curtailment".

15         THE WITNESS:  Curtailment is an accounting entry

16   that's just showing there an application of this one cent.  I

17   don't know if there was -- if another payment was one cent up

18   or down or something before.

19         THE COURT:  Okay.  Go on to the next column.

20         THE WITNESS:  So we're -- to the next column?

21         THE COURT:  Column, yeah.  I want to go across.  So

22   you picked the January 13th --

23         THE WITNESS:  Oh, I see.

24         THE COURT:  -- 2006.  I want you to just follow

25   through and explain to me what each entry in that row is.

1      THE WITNESS:  Okay.  So then the "Transaction type"

2  column, "AP" I know is applied payment.

3      THE COURT:  Okay.

4      THE WITNESS:  The teller ID number gives, I believe,

5  the person who entered --

6      THE COURT:  Okay.

7      THE WITNESS:  -- the information.

8      And then the columns on -- the remaining columns show

9  how --

10      THE COURT:  The total payment was $1,227.77?

11      THE WITNESS:  Right.

12      THE COURT:  That's the transaction amount?

13      THE WITNESS:  Right.

14      THE COURT:  And then it breaks it down into principal,

15  interest?

16      THE WITNESS:  Yes.

17      THE COURT:  So that's just dividing that $1,227.77

18  payment into its component -- what its component parts would

19  be?

20      THE WITNESS:  Correct.

21      THE COURT:  Okay.  So, if you could, work your way up

22  the page.  And I see for February 23rd, 2006 --

23      THE WITNESS:  Um-hum.  So if you go up to the line on

24  February 23rd, 2006, where the "Transaction type" indicates

25  "PR1" --

1          THE COURT:  Yes.

2          THE WITNESS:  -- that means that the payment was

3  returned for insufficient funds.

4          THE COURT:  How do you -- that's what the code PR1 --

5          THE WITNESS:  That's what PR -- PR means payment

6  returned.

7          THE COURT:  Okay.

8          THE WITNESS:  1 is a reason, and that reason is that.

9          THE COURT:  Insufficient?

10          THE WITNESS:  Um-hum.

11          THE COURT:  Okay.  What's below that?  There's the

12  "SR" transaction type.  It's the same date.  So there are --

13          THE WITNESS:  I --

14          THE COURT:  -- five entries for February 23rd, 2006.

15          THE WITNESS:  Right, and so -- so what happens is that

16  the payment comes in on the 23rd.  It's the payment -- I'm

17  sorry.  I'm sorry.  The payment comes in on the 13th, which is

18  the payment that is intended to pay January 1st of 2006.

19          THE COURT:  Right.

20          THE WITNESS:  Then if you go up until February 23rd,

21  you'll see the PR1 indication that shows that the payment was

22  returned, and then in the transaction amount the parentheses

23  indicate that it's --

24          THE COURT:  That's what -- they were supposed to make

25  a payment of $1,227.77 --

1          THE WITNESS:  No.

2          THE COURT:  No?

3          THE WITNESS:  This is an entry indicating that the

4    payment that was made earlier, the payment that came in on the

5    13th, was reversed on the 23rd.  So --

6          MS. ELDA THOMPSON:  I'm sorry; I'm confused.

7          THE COURT:  So am I, because there's a February 15th

8    entry --

9          THE WITNESS:  Oh, I -- yeah.  That's -- each

10   time -- each time a payment comes in or -- or is reversed, the

11   transaction description is going to say "payment".  So the

12   payment that came on the 23rd is -- is applied.

13         THE COURT:  I thought no payment came on the 23rd.

14         THE WITNESS:  I'm sorry.  I'm sorry.  The payment that

15   came on the 13th is applied.

16         THE COURT:  All right.  So going back down, there are

17   two entries for February 13th.

18         THE WITNESS:  Um-hum.

19         THE COURT:  The AP shows what?  The AP code, again, is

20   applied payment?

21         THE WITNESS:  Um-hum.

22         THE COURT:  $1,227.77.

23         THE WITNESS:  Correct.

24         THE COURT:  That's a payment that was actually

25   received on February 13th.

1          THE WITNESS:  Um-hum.

2          THE COURT:  You have to answer yes or no.

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  And that was -- the second column

5    "Date interest", "Date paid", February 1st, 2006.  So the

6    February 13th payment was in payment of the February 1st

7    payment?

8          THE WITNESS:  Yeah, and -- and the reason there are

9    multiple entries --

10         THE COURT:  Yes.

11         THE WITNESS:  -- on the -- when I -- when I look at

12   this, I tend to -- and I don't know if it's okay to draw a line

13   here.

14         THE COURT:  You can draw what you want on there; it's

15   not my copy.

16         THE WITNESS:  It helps me to -- it helps me to look,

17   because the entries on the thirt -- that are multiple

18   entries --

19         THE COURT:  Yes.

20         THE WITNESS:  -- on the 13th --

21         THE COURT:  Yes.

22         THE WITNESS:  -- are all addressing the same payment.

23         THE COURT:  Yes, okay.

24         THE WITNESS:  So it comes in, and they note that at

25   that point the account is paid through January 1st of 2006, in

1    the "Date interest paid current".  And then as you go up the

2    row to the --

3          THE COURT:  I thought it was paid through February

4    1st.

5          THE WITNESS:  Well, so these are accounting entries

6    that are showing that it was paid through the 1st, but now that

7    it's been received --

8          THE COURT:  Okay.

9          THE WITNESS:  -- two entries up, it shows that it's

10    paid now through February 1st rather than January 1st.

11          THE COURT:  Yes, okay.  All right.  So when's the

12    first missed payment?  That's the February -- a payment was

13    received on February 23rd?

14          THE WITNESS:  Well, okay, so a payment was received on

15    February 15th.

16          THE COURT:  Okay.

17          THE WITNESS:  And that was -- since it was already

18    paid through the 1st, I believe that that went for the -- I'm

19    sorry, for February 1st, that payment was applied to the March

20    1st.

21          THE COURT:  Okay.

22          THE WITNESS:  And then when you go up to the February

23    23rd numbers --

24          THE COURT:  That's what's confusing.

25          THE WITNESS:  -- that's -- right, okay.  So that is

1    noting -- these are -- that's noting that a payment that had

2    come in earlier was returned for insufficient funds.  So where

3    the account had previously, on February 15th, had come current

4    to be paid through March 1st, on March -- on February 23rd, a

5    payment was reversed, and so you'll see, in the "Date interest

6    paid current" column that it goes back to February 1st.

7            THE COURT:  So --

8            THE WITNESS:  So now they're only -- they're paid

9    through February 1st, not March 1st, because the previous

10   payment was reversed.

11           THE COURT:  Let me see if I understand.  On February

12   15th, 2006, GMAC received a payment in the amount $1,227.77.

13           THE WITNESS:  Correct.

14           THE COURT:  On February 23rd, that payment was

15   returned because of insufficient funds?

16           THE WITNESS:  That's correct.  The only thing I would

17   say is that I can't be sure from looking at this; I would have

18   to go back to the notes to see whether it was the -- which

19   payment was returned.

20           THE COURT:  Okay.

21           THE WITNESS:  So -- so but yes, one of the previous

22   payments was returned that day.  And the account was brought

23   back to current through February 1st, 2006.

24           THE COURT:  What's the code and transaction type

25   "SRA"?

1      THE WITNESS:  That means single -- it's an indication

2  that a payment was received.  I'm not sure exactly -- like

3  single payment applied -- it's maybe single payment received

4  and applied.  Something like that.

5      THE COURT:  Can I determine from looking at this

6  page -- let me withdraw that question.  Here's what I'm trying

7  to understand.  So you've explained to me where on February

8  23rd, a prior payment was reversed because of

9  insufficient -- because the payment that had been received

10  earlier was returned for insufficient funds.

11      THE WITNESS:  Correct.

12      THE COURT:  When I look up to like June 16th and then

13  September 1st, there are payments that are received and

14  entered.

15      THE WITNESS:  Um-hum.

16      THE COURT:  Is the account -- when you get to sort of

17  the top of this page, September 1st, is the account current, as

18  of then?  Can you tell?

19      THE WITNESS:  Well --

20      THE COURT:  Can I tell from looking at the page?

21      THE WITNESS:  The -- one -- let me get it right.  So

22  the -- on September 1st, a payment comes in --

23      THE COURT:  Well, on September 18th a payment comes

24  in, and it's applied to the September 1st --

25      THE WITNESS:  Okay.

1        THE COURT:  -- interest payment.

2        THE WITNESS:  Right.

3        THE COURT:  Am I right?

4        THE WITNESS:  That's correct.  So also, you see -- you

5   know that something's happening on a payment when it has in

6   capital letters "PAYMENT" in the transaction description

7   column.

8        THE COURT:  Yes.

9        THE WITNESS:  So, in fact, a payment came in on

10  September 1st, and that was applied to the August 1st payment.

11       THE COURT:  Okay.

12       THE WITNESS:  And then a payment came in on September

13  18th, and that was applied to the September 1st payment.

14       THE COURT:  Okay.

15       THE WITNESS:  You can -- the "Date interest paid

16  current" column shows you the payment that it was applied to.

17       THE COURT:  All right.  And --

18       I'm looking at the "Late charge" column, which is the

19  last column.

20       THE WITNESS:  Okay.

21       THE COURT:  When were late charges assessed?  Is that

22  an assessment of the late charges when it's in brackets, or is

23  that reversing a late charge?

24       THE WITNESS:  I believe that's assessing a late

25  charge.

1          THE COURT:  Okay.  Because there are entries in that

2    last column, some in parenthesis and some not.

3          THE WITNESS:  Oh, so I see.  So you're wondering

4    whether --

5          THE COURT:  I'm trying to understand what's --

6          THE WITNESS:  -- a late charge was returned?

7          THE COURT:  Yeah, reversed or something.  I'm trying

8    to understand what I'm looking at.  Okay?

9          THE WITNESS:  Um-hum.  I believe that the entry on the

10   first row is indicating that they're being refunded or -- the

11   late charge is being taken off.

12         THE COURT:  Okay.  Let me just ask this, and then I'll

13   let Mr. Wishnew ask some more questions.  As of September 1st,

14   2006 --

15         THE WITNESS:  Um-hum.

16         THE COURT:  -- can you tell me whether you can

17   determine, was the account current, as of that date?

18         THE WITNESS:  It was not.  It was current through

19   August 1st of 2006.  Then in -- on September of 18th of 2006,

20   it becomes current through September 1st of 2006.

21         THE COURT:  That's what I'm -- but when I look at this

22   page, 16 of 162 --

23         THE WITNESS:  Um-hum.

24         THE COURT:  -- as of the top of that page, the

25   Thompsons are current?

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.  So go back to page fif -- what I

3    want you to -- you show me, when do they fall behind?

4          THE WITNESS:  Okay.

5          THE COURT:  You told me what PR1 was, what's PR0?  I'm

6    looking at an entry for November 9, 2006.  The transaction type

7    is PR0.

8          THE WITNESS:  I don't know the -- that means payment

9    reversed.  I don't know the reason "zero".

10         THE COURT:  Okay.  All right.

11         THE WITNESS:  So -- okay, so there was a payment on

12   September 18th.  Now they're current through the September 1st

13   payment.  The next payment comes in on October 16th, which

14   makes them current through October 1st.

15         THE COURT:  Well, Mr. Wishnew, can -- I'd like you to

16   go through this schedule and show me where -- because the issue

17   we're dealing with is the 2007 payments?

18         MR. WISHNEW:  Yes, Your Honor.

19         THE COURT:  Okay.  So get me to there, so that I can

20   see --

21         MR. WISHNEW:  Sure.

22         THE COURT:  -- because you're -- as I understand from

23   your opening statement, you believe that payments were returned

24   in 2007.  Either there were insufficient funds or they weren't

25   brought current.

RESIDENTIAL CAPITAL, LLC, ET AL.                    37

1          MR. WISHNEW:  Um-hum.

2          THE COURT:  And I think I understand the schedule.

3    But so go ahead and get Ms. Delehey to explain to me and show

4    me where the defaults begin in 2007.

5          MR. WISHNEW:  Absolutely, Your Honor.

6          THE COURT:  You understand, Ms. Thompson, what I want

7    him to do?  Because they're talking about the 2007 payments,

8    and I want them to show me from their document --

9          MS. ELDA THOMPSON:  Right.

10         THE COURT:  -- where they say that that happens.

11         MS. ELDA THOMPSON:  This is what GMAC is.  So --

12         THE COURT:  Okay.  Well, you'll get your chance to

13   explain your part, okay?

14         Go ahead.

15         MR. WISHNEW:  Okay.

16   BY MR. WISHNEW:

17   Q.  Okay, so Ms. Delehey, okay --

18   A.  I think we could start where she's current through March

19   1st of 2007, which happens on --

20   Q.  Just for the ease of record and for everyone following

21   along, what page of -- what page of this loan history are you

22   on?

23   A.  Page 13.

24   Q.  Okay.  So at that point, there was a payment made March

25   23rd, which brought the Thompsons current through March 1st?

RESIDENTIAL CAPITAL, LLC, ET AL.                    38

1   A.   Correct.

2   Q.   Okay.  So the next payment that's reflected on page 13 is

3   where, Ms. Delehey?

4   A.   It's June 20th.

5   Q.   Okay.  So then between March 23rd and June 20th, were any

6   payments received from the Thompsons on this loan?

7   A.   No.  No payments came in for April or May.

8   Q.   Okay.

9   A.   So when the payment came in on June 20th, you can see that

10  it -- well, in fact, when the payment came in on June 20th, it

11  was returned, and I know that because SRO means that the

12  payment was returned.  And it --

13  Q.   What was the -- I'm sorry.  What was the amount of the

14  payment?

15  A.   The amount of the payment that came in was $1,227.78.

16  Q.   Okay.  And do you know why the payment would have been

17  returned at that point in time?

18  A.   I was returned because at that point, they were only paid

19  up through March 1st of 2007, so they owed three full payments,

20  at that point.  And it was only one payment that came in.  So

21  it was not a sufficient amount of money to bring the account

22  current.

23  Q.   Okay.

24        MR. WISHNEW:  Did you have a question, Your Honor?

25        THE COURT:  Go ahead.

1          MR. WISHNEW:  Okay.

2    Q.  Would there have been a communication from GMAC Mortgage

3    indicating that more than a single month's payment was required

4    at that point in time to bring the loan current?

5    A.  Yes, I believe there was.  And to see that, I would go

6    back to the servicing notes for the June 20th, 2007 time

7    period.  So --

8          THE COURT:  What page?

9    A.  -- and I have to get there.

10         THE COURT:  Okay.

11   A.  Okay, so on page 155 --

12   Q.  Um-hum.

13   A.  -- there's a note for June 21st --

14   Q.  So this is under the column "Transaction added date"?

15   A.  Correct.

16   Q.  Okay.

17   A.  That's the date.  And it indicates -- the second one up

18   says "Reversed, misapplied".

19   Q.  Okay.

20         THE COURT:  I'm sorry.  I'm at 155 now, and tell me

21   where to look.

22         THE WITNESS:  Okay.  It's -- if you go down the column

23   that says contract -- "Transaction added date" --

24         THE COURT:  Yes.

25         THE WITNESS:  -- to June 21st.

1          THE COURT:  Yes, I'm there.

2          THE WITNESS:  There are a number of entries for that

3    date.  It's indicating on the second one up, it says that the

4    payment was reversed, misapplied, and then one up from that it

5    says "returned."  And it states the reason that --

6          THE COURT:  One of three payments.

7          THE WITNESS:  -- it was only one of the three payments

8    due.

9          THE COURT:  All right.  May I ask, what was the policy

10   as to -- if they had paid two of the three, would it have been

11   deposited or not?

12         THE WITNESS:  I believe it they had paid two, it would

13   have been deposited.  I believe if they had paid one-and-a-half

14   it would have been deposited.

15         THE COURT:  Okay.

16         MR. WISHNEW:  Your Honor, I can actually go through

17   this.

18         THE COURT:  Go ahead.

19         MR. WISHNEW:   I had questions on that point.

20         THE COURT:  Sure, please, go ahead.

21         MR. WISHNEW:  Sure.

22   BY MR. WISHNEW:

23   Q.  So before commencing a foreclosure against a borrower in

24   New Jersey, would GMAC Mortgage send what's called an "options

25   to avoid foreclosure letter"?

1  A.  Yes.

2  Q.  And when would that letter be sent?

3  A.  When two payments were due.  So that would mean that one

4  payment was at least thirty days late.

5  Q.  Okay.  And would this letter state --

6          THE COURT:  Be --

7  Q.  I'm sorry, you know what --

8          THE COURT:  -- hold on.  Before you go on, Exhibit

9  BT-1 is admitted in evidence.  The objection is overruled.

10  (GMAC loan history was hereby received into evidence as

11  Borrower Trust's Exhibit BT-1, as of this date.)

12          MR. WISHNEW:  Thank you, Your Honor.

13  Q.  Ms. Delehey, if it would help, would you refer to or

14  please look to BT-2?

15  A.  Yes.  This is an options to avoid foreclosure letter --

16  Q.  Okay.

17  A.  -- addressed to --

18  Q.  And what does this letter generally state?

19  A.  It indicates that the Thompsons' account is in default

20  under the terms of the mortgage --

21  Q.  Um-hum.

22  A.  -- and that mortgage payments of $2,455.54 for the months

23  of April and May of 2007 are past due.

24  Q.  Okay.

25  A.  It tells them that they can basically contact the company

RESIDENTIAL CAPITAL, LLC, ET AL.                    42

1   to see if they could qualify for a loan modification or a

2   repayment plan.

3   Q.  Okay.  When was this letter dated?

4   A.  May 11th of 2007.

5   Q.  Okay.  And who is it addressed to?

6   A.  Maria and Elda Thompson.

7   Q.  And was this document maintained in GMAC's business

8   records?

9   A.  Yes.

10  Q.  Where would it be maintained?

11  A.  It would have been in our XNet system that keeps imaged

12  copies of documents that went to the borrowers.

13          MR. WISHNEW:  Okay.  Your Honor, I'd like to move into

14  evidence Exhibit BT-2.

15          THE COURT:  It's in evidence.

16  (Options to avoid foreclosure letter was hereby received into

17  evidence as Borrower Trust's Exhibit BT-2, as of this date.)

18          MR. WISHNEW:  Thank you, Your Honor.

19  Q.  So after an options to avoid foreclosure letter was sent,

20  would subsequent correspondence also be sent to a delinquent

21  borrower?

22  A.  Yes.  When -- if it's not resolved after that letter is

23  sent, we send what's called a notice of intent to foreclose, or

24  we also refer to that as a breach letter.

25  Q.  And can I direct your attention to Exhibit BT-3?

1    A.  Yes.

2    Q.  And would you describe -- or do you recognize this

3    document?

4    A.  Yes, I do.

5    Q.  And what is this document?

6    A.  This is a notice of intent to foreclose letter addressed

7    to Maria M. Thompson and Elda Thompson.

8    Q.  Okay.  And have you seen it before today?

9    A.  Yes, I have.

10   Q.  And when is this correspondence dated?

11   A.  June 4th of 2007.

12   Q.  Okay.  And how was this -- I'm sorry.  Was this

13   correspondence maintained in GMAC's business records?

14   A.  Yes, it would also have been imaged in our XNet system.

15   Q.  Okay.  And sorry if I already asked this question.  What

16   information is generally contained in this letter?

17   A.  In that letter, it again lets them know that the mortgage

18   payments are past due for April, and this time through June of

19   2007.  And then it lays out the amount of the payments due, the

20   late charges, other fees, gives them the total amount due.

21   Q.  Okay.  And is the mailing of this letter reflected in

22   GMAC's business records?

23   A.  Yes.

24   Q.  Okay.  And would that be in the servicing notes?

25   A.  Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    44

1   Q.   Would you mind just quickly directing the Court to where

2   it's identified in the servicing notes?

3   A.   Sure.  So since it says -- since it's dated June 4th, I

4   will scroll back to that time period.  And on page 155, again,

5   of the servicing records, if you go to the notes for

6   September -- I'm sorry -- for June 5th of 2007, there are

7   indications -- that says "Breach Maria M. Thompson, breach Elda

8   Thompson".  And that indicates that letters were sent out.  The

9   D19 is a batch letter indication that a letter went out to the

10  borrowers regarding the breach.

11  Q.   Okay.  And sorry, just -- at this point, how many months

12  delinquent was the loan?

13  A.   The indication on the breach letter is that payments were

14  past due for April, May, and June --

15  Q.   Okay.

16  A.   -- of 2007.

17  Q.   Okay.

18       MR. WISHNEW:  Your Honor, I'd like to introduce the

19  breach letter into evidence as Exhibit BT-3.

20       THE COURT:  All right, it's in evidence.

21  (Notice of intent to foreclose was hereby received into

22  evidence as Borrower Trust's Exhibit BT-3, as of this date.)

23       MR. WISHNEW:  Thank you, Your Honor.

24  Q.   Okay, so going back to the payment history --

25  A.   Um-hum.

1   Q.  -- did GMAC receive a payment from the Thompsons in June

2   2007?

3   A.  They did.  In -- on June 20th, a payment came in that

4   would have been intended for the March 1st, 2007 payment.  It

5   was returned -- oh, that's the one I think we might have

6   already talked about.

7   Q.  That's right.  I'm just going full circle.

8   A.  Right.  So it was returned.  And then soon after that, a

9   payment adjustment happened, because on June 26th, we see the

10  PR1 notation again --

11  Q.  Um-hum.

12  A.  -- with the payment amount in parenthesis showing that it

13  was taken off the account.  And what happened there was that,

14  in fact, the payment that had come in for -- I think it came

15  in -- I think it came in, in February -- was reversed.  And so

16  where we had previously shown that they were paid through March

17  1st of 2007, you can see that when this PR1 NSF return happens,

18  they're now paid only through February 1st of 2007, which means

19  that the March payment has now not been paid.

20  Q.  Okay.  If I could direct your attention to Exhibit BT-4?

21  A.  This is another letter that went out to the Thompsons

22  notifying them that their account is delinquent and may be

23  referred to foreclosure.

24  Q.  Okay.  And is this a document that is maintained in GMAC's

25  business records?

1  A.  Yes.  Again, this would have been imaged in our XNet

2  system.

3  Q.  Okay.  And similar to my earlier questions, is the mailing

4  of this letter to the Thompsons reflected in GMAC's servicing

5  notes?

6  A.  So I'll go back to the July 4th time frame.

7         THE COURT:  So you're going back to BT-1?

8         THE WITNESS:  I'm going back to BT-1, yes.

9  A.  And again, on July 5th, you see the D --

10         THE COURT:  What page are you on?

11         THE WITNESS:  Oh, I'm sorry.  On page 154.

12  A.  A little lower than the middle of the page, the July 5th

13  note that says, "Loss mit foreclosure referral", has that D19

14  transaction type that means that a batch letter went out to the

15  Thompsons.

16  Q.  Thank you.

17         MR. WISHNEW:  Your Honor, I'd like to introduce the

18  referral to foreclosure letter into evidence as BT-4.

19         THE COURT:  All right, it's in evidence.

20  (Referral to foreclosure letter was hereby received into

21  evidence as Borrower Trust's Exhibit BT-4, as of this date.)

22         MR. WISHNEW:  Thank you, Your Honor.

23  Q.  Ms. Delehey, what does it mean to refer an account to

24  foreclosure?

25  A.  It means to send the file over to foreclosure attorneys to

1    initiate a foreclosure action.

2    Q.  Okay.  And what was the method that GMAC Mortgage would

3    use to communicate with their foreclosure attorneys?

4    A.  We used a system called LPS.

5    Q.  Okay.  And so at the time that the loan was referred to

6    foreclosure, what was the account -- what payment was the

7    account owing for?

8    A.  So it was referred to foreclosure in July, and at that

9    point, it was paid through February 1st, which means that their

10   March 1st payment would have been due.

11   Q.  Thank you, okay.  If I could direct your attention to the

12   exhibit marked BT-5?

13   A.  Yes.

14   Q.  And do you recognize this document?

15   A.  This is a printout of the LPS notes, which is -- is just a

16   reflection of what was in the system commun -- the

17   communication system, LPS.

18   Q.  Okay.  And are these notes concerning the Thompson loan?

19   A.  Yes.

20   Q.  Okay.  And is it correct that the LPS system was a regular

21   business record of GMAC Mortgage?

22   A.  Yes.

23   Q.  Okay.

24       MR. WISHNEW:  Your Honor, I'd like to introduce

25   Exhibit BT-5 into evidence.

1          THE COURT:  Let me ask a couple questions.

2          THE WITNESS:  Um-hum.

3          THE COURT:  I just rather randomly opened to page 35

4  of 46, and I'm looking at entries 147, 148 and 149 --

5          THE WITNESS:  Okay.

6          THE COURT:  -- from May 1st, 2008.  Why are these

7  communications written by Ocwen?

8          THE WITNESS:  I don't -- don't know.

9          THE COURT:  I picked those at random.  Well, I turned

10  to page 36 and 37; there are multiple entries written by Tammy

11  Adams (ph.) at Ocwen Loan Servicing.

12          THE WITNESS:  I -- I don't know the answer to that,

13  and the only -- I mean --

14          THE COURT:  Don't speculate.  I --

15          THE WITNESS:  All right.

16          THE COURT:  I just -- I think you understand,

17  Mr. Wishnew, why I'm asking questions about it.

18          MR. WISHNEW:  I do, Your Honor.

19          THE WITNESS:  Well, I won't speculate, but one -- one

20  thing I can say --

21          THE COURT:  Okay.

22          THE WITNESS:  -- is that when the -- we pulled all of

23  the LPS notes, we, meaning ResCap --

24          THE COURT:  Yes.

25          THE WITNESS:  -- pulled all of the LPS notes from the

RESIDENTIAL CAPITAL, LLC, ET AL.                    49

1   LPS system, reflecting GMAC Mortgage loans, on -- in 2015.

2   So  -- because it was up with Ocwen.  So I don't know if that

3   has anything to do with it, but --

4              THE COURT:  Okay.

5              THE WITNESS:  -- that's the --

6              THE COURT:  Go ahead, Mr. Wishnew.

7              What's the relevance of BT-5?

8              MR. WISHNEW:  BT-5 is simply just -- okay.  Let me

9   backtrack, Your Honor.

10  BY MR. WISHNEW:

11  Q.  Okay, so, Ms. Delehey, if I could draw your attention to

12  what's been marked in the top right-hand corner of BT-5 as page

13  46 of 46.

14  A.  Yes.

15  Q.  And specifically entry number 202.

16  A.  That entry indicates that the -- the -- the file is

17  referred to the attorney on July 11th of 2007.

18  Q.  And who made the referral to the attorney?  Or what entity

19  would have made the referral to the attorney?

20  A.  My understanding is it would have been GMAC Mortgage.

21  Q.  Okay.  And the attorney in this case is what firm?

22  A.  Zucker Goldberg.

23  Q.  Okay.  And they were GMAC Mortgage's outside foreclosure

24  counsel?

25  A.  Correct.

RESIDENTIAL CAPITAL, LLC, ET AL.                    50

1  Q.  Okay.  And then if I can draw your

2  account -- sorry -- draw your attention to page 42 of 46 of BT-

3  5, entry 185.  Would you briefly describe what this

4  entry -- the meaning of this entry?

5  A.  That entry was put in by an attorney named Burt Hancock

6  (ph.) at Zucker Goldberg, and it indicates that a complaint was

7  filed on August 3rd of 2007; that would have been a foreclosure

8  complaint.

9  Q.  Okay.

10        MR. WISHNEW:  Your Honor, I'd like to move for the

11  admission of BT-5.

12        THE COURT:  All right, BT-5 is in evidence.

13  (Printout of LPS notes was hereby received into evidence as

14  Borrower Trust's Exhibit BT-5, as of this date.)

15  Q.  Ms. Delehey, if I can bring your attention to what's been

16  marked as BT-6.

17  A.  This -- what I have is -- this is the -- the first page of

18  the complaint --

19  Q.  Okay.

20  A.  -- for foreclosure.

21        MR. WISHNEW:  Your Honor, if I can approach?

22        THE COURT:  Sure.  Go ahead.

23        MR. WISHNEW:  Thank you.

24        THE COURT:  Just make sure that Ms. Thompson knows

25  what you're showing the witness, okay?

RESIDENTIAL CAPITAL, LLC, ET AL.                    51

1    Q.  Ms. Delehey, have you seen this -- can you just repeat

2    what this document is?

3    A.  This is a complaint for foreclosure against Maria M.

4    Thompson and her husband, and Elda Thompson.

5    Q.  Have you seen it before today?

6    A.  Yes.

7    Q.  Okay.  And was this a document -- and -- I'm sorry -- in

8    what court was this document filed?

9    A.  In the Superior Court of New Jersey, Essex County.

10   Q.  Okay.  If I could draw your attention to paragraph 6 of

11   the foreclosure complaint.  Would you mind reading what it

12   says?

13   A.  Sorry.  "The obligor has failed to make the installment

14   payment due on March 1st and all payments becoming due

15   thereafter.  Therefore, the loan has been in default since on

16   or about April 1st, 2007."

17   Q.  Now, is it your understanding this statement is accurate?

18   A.  Yes.

19   Q.  Okay.  If I could direct your attention to Exhibit BT-7.

20   Do you recognize this document?

21   A.  Yes.

22   Q.  Who is this document from?

23   A.  This is a document from the Thompsons.

24   Q.  Okay.  And when is it dated?

25   A.  It's dated August 31st, 2007.

RESIDENTIAL CAPITAL, LLC, ET AL.                    52

1   Q.  Okay.  And who is it addressed to?

2   A.  GMAC Mortgage.

3   Q.  Okay.  Is this a document that was maintained in the

4   debtors' books and records?

5   A.  Yes.  This --

6   Q.  Where would it have been maintained?

7   A.  This would have been imaged in our Looking Glass system.

8   Q.  Okay.  And is the receipt of this letter reflected in GMAC

9   Mortgage's records, specifically in its servicing notes?

10  A.  I believe it is, going back to the 2007 notes.

11      (Pause)

12  A.  Okay.  It's referencing the letter, in -- on page 144 --

13  Q.  Um-hum.

14  A.  -- it's referencing the letter in the entry of September

15  10th.

16  Q.  And that's the -- okay, so, gotcha.  So those are the line

17  entries, at the top of page 144?

18  A.  Correct.

19  Q.  Okay.

20  A.  Oh, wait a minute.

21      I believe that's right, yeah.

22  Q.  Okay.

23          MR. WISHNEW:  Your Honor, I'd like to introduce the

24  August 31st letter into evidence.

25          THE COURT:  It's BT-7?

RESIDENTIAL CAPITAL, LLC, ET AL.                    53

1          MR. WISHNEW:  Yes, Your Honor.

2          THE COURT:  All right, it's in evidence.

3   (8/31/07 document from the Thompsons to GMAC Mortgage was

4   hereby received into evidence as Borrower Trust's Exhibit BT-7,

5   as of this date.)

6   Q.  Ms. Delehey -- turning --

7          THE COURT:  Are you introducing BT-6, or -- you didn't

8   offer it; it's the foreclosure complaint.

9          MR. WISHNEW:  Not right now, Your Honor.

10         THE COURT:  Okay.  Go ahead.

11  Q.  With regards to -- going back to the payment history,

12  Ms. Delehey, did GMAC Mortgage receive any payments from the

13  Thompsons in September 2007?

14  A.  It appears a payment came in -- I'm looking at page 12 --

15  Q.  Um-hum.

16  A.  -- that a payment came in on September 13th, and the

17  payment was for $1,227.78.

18  Q.  Was that payment returned by GMAC Mortgage?

19  A.  It was.  The -- the indication on -- on September 14th,

20  the SRO transaction type and then the -- the payment amount in

21  parentheses indicated that the payment was returned; it would

22  be -- and I believe that's because it was insufficient to bring

23  the account current.

24  Q.  Okay.  Did GMAC Mortgage receive any other payments from

25  the Thompsons in September?

RESIDENTIAL CAPITAL, LLC, ET AL.                    54

1   A.   No.

2   Q.   Okay.  Did GMAC Mortgage receive any communications from

3   the Thompsons in September?

4   A.   Well, I believe that we received this -- this letter that

5   has been marked B -- BT-7 --

6   Q.   Um-hum.

7   A.   -- in September.

8   Q.   Okay.  Is there a record of receiving a workout package --

9   A.   Oh.

10  Q.   -- from the Thompsons in mid-September of late September

11  of 2007?

12        (Pause)

13  A.   Yes.  It -- these -- area ID that says "LMT", our loss-

14  mitigation group, is making those entries, and it appears that

15  they're being contacted by a third party, an authorized third

16  party.

17  Q.   Just if you can -- for the record, what pages of the

18  servicing notes are you on right now?

19  A.   143.

20  Q.   Okay.  And does that continue on earlier pages, 142, 141?

21  A.   Yes.

22  Q.   Okay.  Did GMAC Mortgage review the Thompsons' --

23            MR. WISHNEW:   Sorry.   Strike that.

24  Q.   Okay, if I could direct your attention to the October 12th

25  entries on page 141.

RESIDENTIAL CAPITAL, LLC, ET AL.                    55

1   A.   Um-hum.

2   Q.   Who was the third party that GMAC Mortgage spoke with?

3   A.   His name is Bob Thomas, and we were referring to him as an

4   authorized third party.

5   Q.   Okay.  And what loss-mitigation options were GMAC Mortgage

6   considering at that point?

7   A.   We had originally considered the Thompsons for a loan

8   modification but were not able to offer that, because it

9   appeared they had a 2,000-dollar surplus; and when you take

10  into account -- monthly surplus.  When you take into account

11  their monthly income and their -- and their mortgage payments,

12  that they had a surplus that made it -- them not qualify for a

13  modification.

14  Q.   Okay.  Notwithstanding that they weren't eligible for a

15  modification, were they considered for a repayment plan?

16  A.   Yes, they were.

17  Q.   Okay, and did GMAC approve them for a repayment plan?

18  A.   We did.

19  Q.   And can you just direct the Court to where the servicing

20  notes reflect that they were approved for -- was that on or

21  about October 25th?

22  A.   Yes.  It says -- it bears an entry that indicates

23  "approved for loss mitigation".

24  Q.   Okay, so we're on page 139 of 162?

25  A.   Correct.

RESIDENTIAL CAPITAL, LLC, ET AL.                    56

1   Q.   Okay.  And did GMAC Mortgage communicate this option to

2   Mr. Thomas?

3   A.   Yes.

4   Q.   Okay.  And what were the terms associated with the

5   repayment plan?  Was there a down payment that would be due?

6   A.   Yes.  There was a 4,000-dollar first payment.

7   Q.   Okay.  And would there be a monthly payment?

8   A.   Yes.

9   Q.   Okay, and how much was that monthly payment?

10  A.   $2,515.45.  I'm looking at page 139, entries 4 -- October

11  25th of 2007, and it indicates an initial down payment of

12  $4,000 to be posted by October 31st and monthly installments in

13  the amount of $2,515.45 until the plan completes.

14  Q.   Okay.  Now, just to clarify, is -- if you can look at the

15  last line on page 139; it says installments around 2,215.  I

16  just want to clarify if it's 2,215 or 2,515.

17  A.   Well, so that is an October 24th entry.

18  Q.   Um-hum.  Actually, you know what, better than that, if I

19  could turn your attention to Exhibit BT-8.

20  A.   Yes.

21  Q.   And specifically the last page of the repayment plan.

22  A.   Yeah, that's correct; it's 2,215 --

23  Q.   Okay.

24  A.   -- and 45 cents.

25  Q.   And so this --

RESIDENTIAL CAPITAL, LLC, ET AL.                    57

1          THE COURT:  Where do I find that?

2          THE WITNESS:  On the last page, the third page of this

3   repayment-plan document, BT-8, the repayment plan -- payment

4   schedule is -- is printed out there.

5          THE COURT:  Okay.

6   Q.  Okay, so this schedule reflects the agreed-upon repayment-

7   plan amounts, correct?

8   A.  Correct.

9   Q.  Okay.  And did the Thompsons agree to the repayment plan?

10  A.  Yes, they did.

11  Q.  Okay.  And to your knowledge, did they sign the repayment

12  plan?

13  A.  Yes.

14  Q.  Okay.  If I could direct your attention to BT-9.

15  A.  And this is the Thompsons' -- this -- the repayment plan

16  signature page signed by the Thompsons.

17  Q.  Right.

18          MR. WISHNEW:  Your Honor, I'd like to move into

19  evidence BT-8 and BT-9.

20          THE COURT:  All right, BT-8 and BT-9 are in evidence.

21  (Foreclosure repayment agreement was hereby received into

22  evidence as Borrower Trust's Exhibit BT-8, as of this date.)

23  (Repayment-plan signature page signed by Thompsons was hereby

24  received into evidence as Borrower Trust's Exhibit BT-9, as of

25  this date.)

RESIDENTIAL CAPITAL, LLC, ET AL.                    58

1       MR. WISHNEW:  Thank you, Your Honor.

2    (Pause)

3  Q.  Okay.  I'd just like to now take you through, Ms. Delehey,

4  the Thompsons' satisfaction of the repayment agreement.

5  A.  Um-hum.

6  Q.  Did GMAC Mortgage receive the 4,000-dollar down payment

7  from the Thompsons?  I guess it'd probably be easiest to go

8  back to the payment history.

9  A.  All right.  The --

10     Just slide it there.

11 Q.  If I could -- I think it's page -- if we could start on

12 page 12.

13 A.  So on page 12 you -- you can see, in the entry dated

14 October 30, 2007, in the Transaction Added date --

15 Q.  And if you go across to the transaction amount, that's

16 4,000 -- that's the 4,000-dollar down payment?

17 A.  Correct.

18 Q.  Okay.

19        THE COURT:  What's RP --

20 A.  Oh, actually, I --

21        THE WITNESS:  Repayment plan.

22        THE COURT:  Okay.

23 A.  So on October -- so this -- this entry reflects that on

24 October 30th of 2007 they recei -- we received the

25 payment -- the repayment-plan payment that was intended for

RESIDENTIAL CAPITAL, LLC, ET AL.                    59

1  October 31st, 2007; that's the date of the -- the due date

2  under the repayment plan.  And then as you go up the entries

3  for October 30, the -- the Date Interest Paid Current column

4  alters to show that we are now -- they're now current as of

5  February 1st, 2007.

6  Q.  Okay.  Did the Thompsons -- I'm sorry.  Did GMAC Mortgage

7  receive payments from the Thompsons in November 2007?

8  A.  Yes.  On No -- here we go.  On November 29th --

9  Q.  Um-hum.

10  A.  -- 2007 --

11  Q.  Um-hum.

12  A.  -- we received the repayment-plan payment for -- that was

13  due for November 30th of 2007.

14  Q.  Um-hum.

15  A.  It was in the correct amount, for 2,215.  And as you go up

16  the entries for the -- November 29th, you see that that payment

17  was applied to both the March 1st and April 1st payments.

18  Q.  Okay, so in other words, the first payment of 2,215 cured

19  past-due amounts from March and April?

20  A.  Correct.

21  Q.  Okay.  Did the -- okay.  Did GMAC Mortgage receive

22  payments from the Thompsons in December 2007?

23  A.  Yes, and the -- the easiest way for me to find those is

24  to -- to go up the Transaction Type column, to look for the RPL

25  notation, because that shows repayment-plan payments coming in.

RESIDENTIAL CAPITAL, LLC, ET AL.                    60

1   Q.  Um-hum.

2   A.  So you can see that on December 26, 2007 --

3   Q.  Um-hum.

4   A.  -- we received the payment -- the repayment-plan payment

5   that would -- would have been due on January 31st of 2008; they

6   made that payment --

7   Q.  Right.

8   A.  -- a little early.

9   Q.  And that is another payment, right above that, of

10  2,215.45?

11  A.  Um-hum.

12  Q.  Okay.

13  A.  Yes.

14          THE COURT:  You have to answer "yes".

15          THE WITNESS:  I'm sorry.

16  A.  Yes.

17  Q.  Okay.  So now we're on page 11 of BT-1.  And so the next

18  RPL payment --

19  A.  Well, let me just --

20  Q.  I'm sorry; I'll let you -- I'll let --

21  A.  Let me just indicate here that -- so that entry, as you

22  look at the -- all the entries for December 26 of 2007 --

23  Q.  Um-hum.

24  A.  -- in the -- in the Date Interest Paid Current column --

25  Q.  Right.

1    A.  -- shows that that payment brought them current for -- for

2    May, June and July --

3    Q.  Okay.

4    A.  -- of 2007.

5    Q.  Okay.  And then so the next payment looks to be February

6    1st, 2008?

7    A.  Right.

8    Q.  Okay.

9    A.  On February 1st, 2008, we received the payment that was

10   expected for January 31st of 2008.

11   Q.  Um-hum.

12   A.  And as you go up the -- the February 1st, 2008 entries,

13   you'll see that that brought them current for both August 1st

14   and September 1st payments for 2007.

15   Q.  Okay.  And then the next payment looks to be on February

16   28th?

17   A.  Correct.  On February 28th we received the repayment-plan

18   payment that was due -- would have been due on February 29th.

19   And as you go up the columns there, you'll see that

20   that -- that payment brought the Thompsons current for both

21   October and November of 2007.

22   Q.  Okay.  Moving now to page 10 of the payment history.

23   Looks like the next payment is March 10th, 2008 --

24   A.  Right.

25   Q.  -- the second line from the bottom.

RESIDENTIAL CAPITAL, LLC, ET AL.                    62

1    A.   That's right.  And on that date we received the payment

2    they were scheduled to send in for March 31st; and as you go up

3    the columns, the entries for March 10th, you'll see that that

4    brought them current for their December 1st, 2007 payment and

5    their January 1st, 2008 payment.

6    Q.   Okay.  And then what payment's received in April?

7    A.   Yes, April -- on April 10th, 2008 we received the

8    payment -- plan payment for April 30th of 2008, and the April

9    10th entries reflect that that brought them current for their

10   February 1st and March 1st, 2008 payments.

11   Q.   Okay.  Was a payment received in May of 2008?

12   A.   Yes.  On May 8th, 2008 --

13   Q.   Um-hum.

14   A.   -- we received the payment for May 31st, 2008, and then

15   the May 8th entries show that that brought them current for

16   their April 1st, 2008 payment.

17   Q.   Okay.  Were there payments received in June 2008?

18   A.   Yes.  On June 10th, 2008 we received their June 30th, 2008

19   repayment-plan payment, and the June 10th entries indicate that

20   that brought them current for their May and June 2008 payments.

21   Q.   Okay.  Did GMAC Mortgage receive any payments in July

22   2008?

23   A.   Yes.  On July 10th, 2008 we received the payment -- the

24   repayment-plan payment for July 31st, 2008, and that brought

25   them current for the July 1st of 2008 payment.

RESIDENTIAL CAPITAL, LLC, ET AL.                     63

1   Q.  Okay, was there a payment received in August 2008?

2   A.  Yes.  On August 14th, 2008 we received the repayment-plan

3   payment for August 31st of 2008.

4   Q.  Okay.  And was there a payment-plan -- was there a payment

5   made in September 2008?

6   A.  Yes.  On September 11th, 2008 we received the payment

7   for -- the repayment-plan payment for September 30th, 2008.

8   Q.  Okay.  And so through the repayment plan, was the

9   Thompsons' loan brought current?

10  A.  Yes.  The entries on September 11th of 2008 indicate that

11  they'd become current through September 1st of 2008.

12  Q.  Okay.

13          MR. WISHNEW:  Your Honor, at this point in time I

14  don't have any further questions for --

15          THE COURT:  Okay.

16          MR. WISHNEW:  -- Ms. Delehey.

17          THE COURT:  Thank you very much.

18          Do you want to cross-examine?

19          MS. ELDA THOMPSON:  Yeah.

20  CROSS-EXAMINATION

21  BY ELDA THOMPSON:

22  Q.  On the same year in October of 2008 and in November and

23  December 2008, were the payments --

24          THE COURT:  I'm sorry; just say that again.

25  Q.  The payments for 2008, October, November and December.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    64

1    A.  Are you asking --

2    Q.  Asking, yeah, the payments that were supposed to be made

3    that month, or no payments were supposed to be made?

4    A.  Well, the -- a payment came in, in October.

5            THE COURT:  When's that?

6            THE WITNESS:  October 7th, 2008.  That brought the

7    account current through the November 1st, 2008 payment.

8    Q.  No, for two and a half months, the next payment

9    that -- that I know that we sent was the 500 -- the 600-dollar

10   payment that was made in December.

11           MS. ELDA THOMPSON:  Maybe I'm confused.  I'm not sure

12   how to read these.  I'm in the wrong one.

13   Q.  When was the last payment of the payment arrangement?

14   A.  The last payment on the payment arrangement was made on

15   September 11th, 2008, and that brought the account current

16   through the September 2008 payment.

17   Q.  So then in October, what does UFU mean -- stand for?

18   A.  On -- on what --

19   Q.  In (sic) October 7th of 2008 --

20   A.  Um-hum.

21   Q.  -- on page 9 of 162, the UFU on Transaction Type, for

22   1 -- $1,228.98, what does the UFU mean or stand for?

23   A.  The UFU is a sus -- it -- it -- it's an indication that

24   funds were put into suspense.

25   Q.  Why were they put into suspense?

RESIDENTIAL CAPITAL, LLC, ET AL.                    65

1    A.  I don't know.  Maybe I can see something in the

2    servicing --

3             MR. WISHNEW:  Your Honor?

4             THE COURT:  No.

5             THE WITNESS:  Excuse me; let me --

6        (Pause)

7    A.  So --

8        (Pause)

9    Q.  Did you find the information?

10   A.  Well, I'm -- I'm --

11       (Pause)

12   A.  I don't -- I don't have -- I don't know what the

13   accounting entries are -- are saying, except that I can see

14   that the account was --

15   Q.  Are you speculating or are you -- do you, I guess --

16   A.  No, I'm not speculating.  I'm looking at the Date Interest

17   Paid Current and it's indicating --

18   Q.  Does it explain why it's suspended?

19   A.  No.  I don't know the answer.

20            THE COURT:  Is there anything in the servicing notes,

21   about it?

22            THE WITNESS:  It's -- indicates that there was

23   a -- that on September -- on October 7th, 2008 there was a

24   reversal because there -- because a payment was misapplied.

25   Q.  But there's four of them that's -- that are UFU.  So four

RESIDENTIAL CAPITAL, LLC, ET AL.                    66

1  payments were misapplied?

2  A.  All right, I don't -- what four are UFU?

3  Q.  Okay, I'm asking about the UFU payment -- UFU on September

4  1st; there's one for 3,000.  There's another one, UFU,

5  on -- not September 1st; September 22nd, there's a UFU for

6  3,000.  On October 7th there's one for $1,228.98.  There's

7  another one for the same amount in (sic) October 7th.  And then

8  there's one in November, for 650.  And then I missed one that

9  was in 12 -- on December 4th, for 650.  There's six of them,

10 actually.

11       THE COURT:  Are you able to explain those,

12 Ms. Delehey?

13       THE WITNESS:  I'm -- I'm not able to ex -- I -- I

14 don't -- I don't know specifically what these UFU things mean,

15 but I'm looking at the -- at the date that's brought current

16 and I'm seeing that it's -- it's current.  So -- yeah,

17 I -- I -- I'm sorry, I'm not able to explain the accounting

18 entries.

19 Q.  There's nothing on the notes?

20 A.  There's -- on -- on October 7th -- on October 6th, it

21 indicates that the borrower called in and wanted to know the

22 status of the account, was advised it's current, was advised

23 the month due, a work order was submitted for payment reversal.

24 Q.  Well, we didn't receive any payments back.  So does it

25 show where they reversed it to, or who they reversed it to?

RESIDENTIAL CAPITAL, LLC, ET AL.                    67

1   A.  It says, "Please apply October" -- "as October and

2   November payment.  The curtailment posted on September 22nd for

3   3,108.81" --

4   Q.  So what --

5   A.  -- "and the remaining amount, please put in U1 as per

6   borrower request."

7          THE COURT:  What's that mean?

8          THE WITNESS:  It means that --

9       (Pause)

10         THE WITNESS:  I don't know what each of these -- what

11  each of these accounting entries is -- is -- is doing, but what

12  I'm seeing is that the account is current; and so it's being

13  treated in a way that brings the account current by the end of

14  2008.

15  Q.  But that's not explaining what that is.

16  A.  Well, I can't explain exactly what the suspense -- what

17  happened in the suspense payments.  But if you're asking if you

18  should have received a return payment, I don't see any reason

19  that you would, because the payments --

20  Q.  Then what --

21  A.  -- are --

22         THE COURT:  That --

23  A.  -- being reflected as -- as coming current.  I -- I

24  don't --

25         THE COURT:  How do I know that?

RESIDENTIAL CAPITAL, LLC, ET AL.                    68

1          THE WITNESS:  Because --

2          THE COURT:  Show me the -- what line am I looking at?

3          THE WITNESS:  Because if you look at the first line on

4    page 9, it -- it shows that on December 31st of 2008 the -- the

5    account is current through the -- the 2008 payment.

6    Q.  Yeah, but that first line says, "UFU", and you said you

7    don't know what that stands for.

8    A.  Well --

9    Q.  So do you know or you don't know or you're not sure?

10   A.  It -- I -- I don't -- like I said --

11   Q.  It's six entries.

12   A.  Well, like I said, the -- it's -- the -- the UFU is an

13   internal account entry, but what I -- what I am able -- and I

14   don't know what kind of suspense fund that was put into or why,

15   but it was -- the -- the account was remaining current.

16         THE COURT:  What's the --

17   Q.  Okay.

18         THE COURT:  Looking at the first line on page 9, for

19   transaction dated December 31, 2008 --

20         THE WITNESS:  Um-hum.

21         THE COURT:  -- under Transaction Amount, in

22   parentheses the $650.85 --

23         THE WITNESS:  Um-hum.

24         THE COURT:  -- what's it for?  It's not applied to

25   anything; it just is -- it just appears as the negative number

RESIDENTIAL CAPITAL, LLC, ET AL.                    69

1    in Transaction Amount.

2         THE WITNESS:  I -- I don't know.  But I'm seeing it

3    coming in and going out, and coming in and coming out, and I

4    see the account not change from not -- become not current.

5    That's all I know; I'm sorry.

6    Q.  So it's my understanding that you don't know every

7    transaction initials on here, what they stand for?

8    A.  No, I don't have them memorized, no.

9         THE COURT:  It's not a question of memory.

10        THE WITNESS:  Well, no.

11        THE COURT:  It's --

12        THE WITNESS:  I don't know them.

13        THE COURT:  -- like an explanation too.  You're saying

14   that there're items shown in suspense.

15        THE WITNESS:  Um-hum.

16        THE COURT:  From where was that money derived?

17        THE WITNESS:  I -- I just -- I can't answer the

18   question.

19   Q.  Well, then I have a problem with --

20        THE COURT:  I don't want argument.  I just -- you can

21   ask questions.  You can make your argument after.

22        MS. ELDA THOMPSON:  Well -- okay.

23        THE COURT:  Do you have any other questions?

24        MS. ELDA THOMPSON:  Yes.

25   Q.  The --

RESIDENTIAL CAPITAL, LLC, ET AL.                    70

1          THE COURT:  Go ahead.

2    Q.  The letters that were sent, were they sent certified or

3    regular mail?  And if you sent them certified, did you have the

4    signed copies of the certified?

5          THE COURT:  Which letters are you talking about?

6          MS. ELDA THOMPSON:  The letters that they sent, B2-2

7    (sic), that they claimed that they sent, B2 --

8          THE COURT:  BT-2?

9          MS. ELDA THOMPSON:  BT-2, BT-3 and BT-4.

10   A.  I don't believe they were sent certified.  There's no

11   indication here that they were sent certified.

12   Q.  So you don't know if they were received or not?  Because

13   we never received them.

14   A.  Well, they were sent to the borrower's address and they

15   were not returned to us.

16   Q.  But you're sure that they were sent --

17   A.  Yes.

18   Q.  -- just from your -- but you're sure that they were

19   received?

20   A.  I have no way of knowing whether they were received.  I

21   know that they were sent to the borrower's address and that

22   they were not returned.

23   Q.  But we didn't receive --

24         THE COURT:  Ask your next question.  You can testify

25   when you're under oath.  Now you just ask questions.

RESIDENTIAL CAPITAL, LLC, ET AL.                    71

1           MS. ELDA THOMPSON:  Okay.

2    Q.  So they weren't sent certified?

3           MR. WISHNEW:  Asked and answered, Your Honor.

4           MS. ELDA THOMPSON:  Okay.  I'm just trying to verify

5    they were sent --

6           THE COURT:  Just ask your questions --

7           MS. ELDA THOMPSON:  -- certified --

8           THE COURT:  -- Ms. Thompson.  Just ask your questions.

9    Q.  Was it sent certified --

10           THE COURT:  She's already answered that question.

11           MS. ELDA THOMPSON:  I don't remember.

12           THE COURT:  She said no.

13           MS. ELDA THOMPSON:  Okay.

14           THE COURT:  Ask your next question.

15           MS. ELDA THOMPSON:  Okay.  Sorry.

16    Q.  In BT-5, in 1 -- on page 37 of 46, the 1 -- 157, that is

17    written by Ocwen Loan Servicing, were they involved in the

18    repayment plan?  Because we didn't know anything about their

19    involvement.  They were supposed to involve (sic) in 2013, not

20    in 2008.

21    A.  They were not.  What I believe is happening here is that

22    the -- the name is being autocorrected because Ocwen's taking

23    over the system.

24    Q.  So are you -- is it -- does it mean that the people worked

25    for GMAC and now they work for Ocwen and that's what is being

1   corrected?

2   A.   I believe so.

3           THE COURT:  Do you know who Trinita Dickson (ph.) is?

4           THE WITNESS:  I don't.

5           MS. MARIA THOMPSON:  May I ask a question?

6           THE COURT:  Go ahead.

7   CROSS-EXAMINATION

8   BY MARIA THOMPSON:

9   Q.   When you took -- when you named it repayment plan, when

10  did this occur, the repayment plan?  Like, we didn't pay seven

11  months and then we are repaying them in those seven months?

12  What that repayment plan means?  Because I don't remember

13  signing any repayment plan with GMAC, other than the

14  foreclosure repayment plan.

15  A.   That's the repayment plan.

16  Q.   The foreclosure repayment plan?

17  A.   Yeah, but --

18  Q.   They're two different thing (sic).

19  A.   No --

20          THE COURT:  Let's not get into --

21  A.   -- it's not --

22          THE COURT:  Let's not get into an argument.

23  Ask -- you can ask questions --

24          MS. MARIA THOMPSON:  Just questions.  Questions.

25          THE COURT:  If you look at BT --

RESIDENTIAL CAPITAL, LLC, ET AL.                    73

1          MS. MARIA THOMPSON:  But she says repayment plan, the

2     same thing as foreclosure repayment plan.

3          THE WITNESS:  Those are the same thing.

4     Q.  It's the same thing?

5     A.  Yes.

6     Q.  So we're going to call it repayment plan.  And if it only

7     were to repay June and -- May and June, why are we repaying in

8     the whole year of 2008?

9     A.  It's -- it's not --

10    Q.  Why were we repaying in 2008?  If we were to -- the

11    regular payment in 2008, in all 2008, was supposed to be 1,227.

12    We are we repaying 2,215?

13    A.  The repayment plan reflects the repayment -- the cure of

14    the full default that was on the account at the time of the

15    repayment plan, so it's dated October 26th.  The amount

16    necessary to cure the default on the account as of that time

17    was $14,189.33.

18    Q.  And that would cover what month?

19    A.  That --

20    Q.  May and June?

21    A.  That would cover February, March, April, May, June, July,

22    August, September, and October of 2007, and it would -- it

23    would -- the repayment plan would continue all the way through

24    September of 2008, so that when you completed the repayment

25    plan in September of 2008 you had not only cured all the

1   payments that had not been made in 2007 but had kept current

2   and caught up to the payments for 2008.  So when 2000 -- when

3   September of 2008 came along, you were current all the way up

4   through September, 2008.

5   Q.  But why at that time GMAC sent us this disclosure of the

6   payment I receive and it doesn't show any that says that it was

7   returned?

8   A.  I can't read that from here.

9   Q.  Well, I sent you a copy, and I sent him a copy.  I have

10  sent, like --

11            THE COURT:  Just ask questions.

12            MS. M. THOMPSON:  But --

13            THE COURT:  Just ask questions.

14            MS. M. THOMPSON:  I ask you questions.  But she said

15  that --

16            THE COURT:  Do you have a document that you want to

17  show Ms. Delehey?

18            MS. M. THOMPSON:  Yes.

19            THE COURT:  Okay.

20            Mr. Wishnew?

21            Why don't you stay there?

22            Mr. Wishnew, why don't you bring the document up to

23  Ms. Delehey?  Tell me, do you have any extra copy with you?  Is

24  that one of your exhibits?

25            MS. M. THOMPSON:  Oh, I sent a copy to everybody.

RESIDENTIAL CAPITAL, LLC, ET AL.                    75

1          THE COURT:  Yes, okay.

2          MS. M. THOMPSON:  They was have a copy.

3          THE COURT:  Fine.

4          MS. M. THOMPSON:  They have another copy.  You can

5   give this --

6          THE COURT:  Just stop.

7          MS. M. THOMPSON:  -- to the --

8          THE COURT:  Stop, stop.  Is it in the exhibit book,

9   Mr. Wishnew?

10         MR. WISHNEW:  Let me check, Your Honor.

11         THE COURT:  Okay.

12         MS. M. THOMPSON:  Yeah, I did.  I did put them.  At

13  the end.

14         MR. WISHNEW:  I believe -- one moment, Your Honor.

15         Your Honor, it's within what I think is marked as

16  Exhibit 2 of your binder.  Thompson Exhibit 2.  One, two,

17  three, four, five, six -- the eighth page, so the back of the

18  fourth double-sided page.

19         THE COURT:  All right.  Let me see.

20         All right.  Go ahead.  You can ask your question now,

21  Ms. Thompson.

22  BY MS. E. THOMPSON:

23  Q.  Why did we receive that copy and now it appears that

24  we -- the days that it says here that they received the payment

25  it doesn't show that it was received on your copy.

1    A.  Can you give me an example?

2    Q.  Okay.  For example, you said the payments started from

3    February, that we were paying from February down to December.

4    Well, in February of 2007, but in February the payment was

5    made.

6    Q.  And then it's June.

7    A.  Well, this -- this --

8           THE COURT:  Well, let me start with this.  Can you

9    tell me what this page is?  Is this from GMAC's records?

10   This --

11          THE WITNESS:  Yeah.

12          THE COURT:  We're looking at "2007 Detail by

13   Transaction", correct?

14          THE WITNESS:  It's not -- it's not a record that I

15   recognize.

16          THE COURT:  Well, I don't think they prepared it.

17   This looks like it had to have been prepared by --

18          THE WITNESS:  But I -- I mean -- I mean, I --

19          MS. E. THOMPSON:  This --

20          THE WITNESS:  I'm not challenging that -- I'm not

21   saying that it's not real.  I don't --

22          THE COURT:  Do you know what it is?

23          THE WITNESS:  -- personally recognize it.  It appears

24   to be a history statement of mortgage account.

25          THE COURT:  Ms. Thompson, what's the line entry that

1   you have your question about in this document?

2           MS. M. THOMPSON:  When year in -- we started in

3   January, '07, 1,227.38 --

4           THE COURT:  Right.

5           MS. M. THOMPSON:  And then the next line says we do

6   also.  And then another payment was in February, '07.  In

7   February, '07 was noted one, two, three, four payments, and

8   then it says principal paid 224, interest paid 1,003.  And the

9   next payment that they claim they wasn't paid for May, 1,227,

10  June, 1,227, and that was this -- their display to principal

11  paid and interest paid, and also in July, 1,227, and that was

12  the end of it.  That was when we asked for this, in July of '07

13  when GMAC claimed that it wasn't paid, so I asked for

14  the -- for their records, and -- and they stop in July, '07.

15          MR. WISHNEW:  Your Honor?

16          THE WITNESS:  I don't know how to an -- I mean --

17          MR. WISHNEW:  Your Honor, I think I might be able to

18  take Ms. Delehey through the payment history to correlate to

19  the entries that are on the page the Thompsons are questioning

20  her about.

21          THE COURT:  Well, after Ms. Thompson finishes

22  questioning you'll get your chance again.

23          THE WITNESS:  Well, I mean, I don't know how to -- and

24  that was, like, forty-seven questions.  I'm sorry.  I don't

25  mean -- I don't even know how to --

 1          THE COURT:  Well, it's not forty-seven questions.

 2          THE WITNESS:  What is the --

 3          THE COURT:  They put an exhibit in front of you, and

 4 they're asking for an explanation.  You say you're not familiar

 5 with the document.

 6          THE WITNESS:  Okay.

 7          THE COURT:  And okay.  So you're not familiar with the

 8 document.  I'd like to know where the document came from.  They

 9 didn't make it up.

10          THE WITNESS:  I --

11          MS. M. THOMPSON:  You did that.  We didn't.

12          THE WITNESS:  Well, let's see.

13          THE COURT:  Just stop for a second, okay.  Stop.  Not

14 yet.

15      (Pause)

16          THE COURT:  Go ahead, Ms. Delehey.  You wanted to say

17 something?

18          THE WITNESS:  The reversal indicated on January 25th

19 appears to correspond to the reversal in the notes that I

20 described.

21          THE COURT:  Well, I'm looking at the payment history,

22 page 11.

23          THE WITNESS:  Yes.  Oh.  11.  Okay.

24          THE COURT:  And I'm focusing on the last group of

25 entries on the exhibit that Ms. Thompson's handed up.  If I'm

1  understanding it correctly, on December 26, 2007 there were a

2  number of entries posted relating to earlier dates.

3        So, for example, the last two entries on her sheet,

4  payment 1,227.77 with a last paid date of July, 2007, post date

5  December 26th.  When I look at page 11 of the payment history

6  for December 26th, the numbers appear to correspond to the

7  payment and reversal.

8        THE WITNESS:  Um-hum.

9        THE COURT:  But I, you know, this isn't for me to

10  explain, but I'm trying to reconcile your numbers on -- GMAC's

11  numbers on two different schedules.

12        MS. E. THOMPSON:  And I just realized something.

13        THE COURT:  Go ahead.

14        MS. E. THOMPSON:  That the numbers in arrears add up

15  to the numbers that are on the UFU.  All six payment or credits

16  add up to the numbers that we owed in arrears.

17        THE COURT:  Do you have any more questions for Ms.

18  Delehey?

19        MS. E. THOMPSON:  No.  No.  Because --

20        THE COURT:  Okay.  And just -- I just want to be

21  clear.  Neither of you have any more questions for Ms. Delehey.

22        MS. E. THOMPSON:  I just have one more question.

23        THE COURT:  Go ahead.

24  BY MS. E. THOMPSON:

25  Q.  The ones on the UFU for the arrears, the ones that I was

1  asking about before, all six numbers add up to the 6,181 that

2  corresponds to what we owed mostly in arrears to the mortgage.

3  So if we paid up the mortgage that we owed that money, why was

4  it placed back into the -- into those months as a credit?  So

5  did we overpay, or we didn't owe and they found it later and

6  added it on?

7  A.  Well, if I understand your question correctly, I think that

8  the arrears are being brought current.

9  Q.  Yes, but the months under the UFU.

10  A.  Okay.  Can you -- I'm sorry.  I apologize --

11  Q.  Okay.

12  A.  -- but can you tell me what month?

13  Q.  Okay.  The October, 2007.  Okay.  On page 9 the December

14  31st unapplied 650.85, the 578, the 6 -- you know, all the

15  numbers together that are under the parentheses?  If you add

16  them up, they add up to the arrears.

17  A.  And I believe that that means that your arrears are being

18  brought current as a --

19  Q.  Yes, but the repayment --

20  A.  -- as a part of the re --

21      THE COURT:  Let her finish, and then you'll ask your

22  next question.

23      Go ahead, Ms. Delehey.

24  A.  So that the arrears are being brought current as part of

25  the payment plan, because the payment plan is designed not only

1  to -- it covers all of the arrears and the current payments,

2  and so it's -- those things are being addressed one by one and

3  brought current as the payments are coming in.

4        THE COURT:  Let me ask you.  On page 9 of 162 in the

5  loan payment history, the third entry on the page, transaction

6  dated December 4, 2008, what's PR-3?

7        THE WITNESS:  I don't know.  Sorry.  I just -- I -- I

8  don't know.  I've studied this in a way that I recognize that

9  the account's being brought current.  I have not studied it in

10  a way that I'm able to dissect these entries.  I would only be

11  able to do that -- I would be able to research further, but

12  I -- but I am clearly able to see that the account is current.

13        THE COURT:  So why, on that third entry in the column

14  for -- to unapplied funds amount, $650.85?  Why is that there?

15        THE WITNESS:  I'm -- I'm just -- I -- I'm sorry.  I'm

16  not able to --

17        THE COURT:  All right.  Any other questions for Ms.

18  Delehey?

19        MS. E. THOMPSON:  No.

20        THE COURT:  Mr. Wishnew, any further questions?

21        MR. WISHNEW:  Just a few, Your Honor.

22  REDIRECT EXAMINATION

23  BY MR. WISHNEW:

24  Q.  Ms. Delehey, if I could just have you look at two documents

25  simultaneously.  The first is a page of Exhibit 2 of the

RESIDENTIAL CAPITAL, LLC, ET AL.                    82

1   Thompson's exhibit, identified as "2007 Detail by Transaction".

2          THE COURT:  We're looking at Exhibit 2, Exhibit

3   Thompson Exhibit 2.

4          MR. WISHNEW:  Correct, Your Honor.

5          THE COURT:  Okay.

6   Q.  And then if we can go back to the payment history in BT-1.

7   Now, if you look at the Thompson's exhibit, the first line

8   reads "Post Date 9/13".

9   A.  What page of?

10  Q.  So I think it's the eighth page of Thompson's Exhibit 2,

11  the document entitled "2007 Detail by Transaction".

12  A.  Okay.

13  Q.  The fourth column is identified "Post Date"

14  A.  Okay.

15  Q.  Okay.  And the first line entry has a post date 9/13.

16  A.  Um-hum.

17  Q.  And then if you look --

18         THE COURT:  You have to answer yes or no.  You

19  can't --

20  A.  Yes.

21         THE COURT:  Can't do um-hum.

22  Q.  If you look to BT-1, page 12, is there a similar entry for

23  September 13th?

24  A.  Yes.

25  Q.  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                          83

1    A.  And it's indicating that on September 13th there was a

2    payment that brought the account current through January 1st of

3    2007.

4    Q.  Okay.  And then so would it be correct that turning back to

5    Thompson's Exhibit 2, the column "Last Paid" would correspond

6    to date interest paid current.

7    A.  Yes.

8    Q.  Okay.

9            THE COURT:  What's the code?  SRA?

10           THE WITNESS:  That means this -- it means the payment

11   was applied.

12           THE COURT:  What was it applied to?  All the other

13   columns are zeroes.

14           THE WITNESS:  I believe it was -- it was brought in,

15   and I believe what's --

16           THE COURT:  It's listed in the column to unapplied

17   funds.

18           THE WITNESS:  Oh, I see.  It's -- it was -- it was

19   brought in, but it was not -- it -- it was brought in, and that

20   line that says SRA shows it where it would apply, but

21   in -- it's put into a suspense and reversed on the line that

22   says SRO --

23           THE COURT:  Okay.

24           THE WITNESS:  -- because it was not sufficient to

25   bring the account current.

1           THE COURT:  Okay.

2    Q.  Okay.  So we'll take a second example.  If you look to the

3    fourth line of Thompson's Exhibit 2, it says "Post date,

4    October 30th".  Is there a corresponding line entry in the

5    payment history in BT-1?

6    A.  Yes.  It's October 30th payment of -- meant for the

7    February 1, 2007 due date.

8    Q.  Okay.  And if you go to the October -- I'm sorry.  Going

9    further down on Thompson's Exhibit 2, there's another payment

10   November 29th.  I'm sorry.  A post date of November 29th.  Is

11   there a corresponding payment on BT-1?

12   A.  Yes.

13   Q.  Okay.  And is there a corresponding payment -- I'm sorry.

14   If -- I apologize for the record for flip flopping, but going

15   back to Thompson's Exhibit 2, there's a second -- more entries

16   on November 29th.  This time the columns, it says "Last paid

17   04/07".  Is there a corresponding payment in the payment

18   history of ET-1 (sic)?

19   A.  Yes.  I -- I see what's happening is that there are

20   multiple entries in the transaction added column on ours that

21   are reflecting that the account is being brought current for

22   the March and April, 2007 payments.

23   Q.  Okay.  So --

24           THE COURT:  I don't understand, Mr. Wishnew.

25           THE WITNESS:  I'm sorry.  So I'm looking at page 12 of

RESIDENTIAL CAPITAL, LLC, ET AL.                               85

1   Exhibit BT-1, the first six entries that all have transaction

2   added date November 29th of 2007.  And then if you look in the

3   "Date Interest Paid Current" column, it's showing that

4   the -- we received the payment on 11/29, and it was the payment

5   we were expecting, the repayment plan payment we were expecting

6   for 11/30.  And then the 11/29 payment transaction added date

7   entries show how the account was brought current for the March

8   and April payments of -- from 2007.

9   Q.  So consistent with your earlier testimony, what Thompson's

10  Exhibit 2 shows is that a payment in September cured or brought

11  current a payment in January.  Or, I'm sorry, the January, 2007

12  payment.

13  A.  That's right.

14  Q.  And a payment in late October, 2007 -- specifically,

15  October 30th -- brought current the February, 2007 payment.

16  A.  Correct.

17  Q.  And a payment on November 29th, two payments on November

18  29th, brought current -- I'm sorry.  A payment on November 29th

19  brought current March and April, 2007 payments.

20  A.  Correct.

21  Q.  And going forward, a payment on March 26th brought current

22  the May --

23          THE COURT:  You need to close your phone off.

24          MS. E. THOMPSON:  She didn't know she brought it.

25          THE COURT:  I know.

1        MS. E. THOMPSON:  She thought she left it home, so --

2        THE COURT:  It's okay.  But you need to close it off.

3        MS. E. THOMPSON:  She can't even find it.  Sorry.

4        THE COURT:  Go ahead, Mr. Wishnew.

5        THE WITNESS:  Thank you.

6        THE COURT:  Wait until she finds her phone.

7        Go ahead, Mr. Wishnew.

8        MR. WISHNEW:  Thank you, Your Honor.

9   Q.  So then a payment --

10       MS. M. THOMPSON:  My apologies.

11   Q.   -- in December, December 26, 2007, brought current the

12   May, 2007 installment payment.

13   Q.   And the June, 2000 payment.

14   A.  And the July.

15   Q.  And the July.  So, really, what the 2000 -- the Exhibit 2

16   within Thompson's Exhibit 2, is simply another way of

17   presenting the same information that's reflected in BT-1, which

18   is the loan history maintained by GMAC Mortgage.

19   A.  Correct.

20   Q.  Okay.  And it's your testimony that the documents are

21   consistent in that they reflect payments being made pursuant to

22   the executed foreclosure of payment agreement, cured past due

23   amounts from earlier in the year.

24   A.  Correct.

25   Q.  Okay.  With regards to BT-5 --

RESIDENTIAL CAPITAL, LLC, ET AL.                    87

1        THE COURT:  Wait.  On Thompson Exhibit 2, just look at

2    the last four entries.  Why is a portion of it reversed on

3    December 26th?

4        THE WITNESS:  I believe that is bringing

5    current -- it -- I just -- I don't really -- I don't understand

6    the reversal entries.  What I'm understanding is that it's

7    taking care of everything from the June and -- the May, June,

8    and July.

9        I -- I'm --

10       THE COURT:  I'm going back to your Exhibit 1, the

11   payment history, page 11, and I'm looking at the December 26,

12   2007 transaction added date.  And it comes back to the same

13   question.  What's the SRO and what's the UFU?

14       THE WITNESS:  Oh.

15     (Pause)

16       THE WITNESS:  I -- now I'm -- I'm just -- I'm

17   not -- I'm not going to be able to answer that --

18       THE COURT:  Okay.

19       THE WITNESS:  -- fully.

20       THE COURT:  Any other questions, Mr. Wishnew?

21       MR. WISHNEW:  Yes, Your Honor.

22   Q.  Ms. Delehey, with regards to Borrower's Trust Exhibit 5,

23   the LPS notes.  In 2007 -- I'm sorry.  Was GMAC the only entity

24   that serviced the Thompson's loan up through February of 2013?

25   A.  From --

1  Q.  From -- from February --

2  A.    -- 2005 --

3  Q.  From February, 2005 through -- okay.

4  A.  Yes.

5  Q.  And so GMAC Mortgage would have been the only entity

6  communicating with foreclosure counsel through the LPS notes?

7  A.  Yes.

8  Q.  Okay.  And in February, 2013 did GMAC Mortgage convey

9  its -- or, I'm sorry -- sell its servicing platform to Ocwen

10  Loan Servicing?

11  A.  It did.

12  Q.  And did the loan servicing platform include its computer

13  systems, including LPS?

14  A.  Yes.

15  Q.  Okay.  And so is it possible that --

16          THE COURT:  I don't want to know what's possible.

17  That's speculation.

18  Q.  But to the best of your knowledge, no one at Ocwen would

19  have communicated with Zucker, Goldberg & Ackerman prior to the

20  transfer of loan servicing in February, 2013?  It would only be

21  GMAC Mortgage?

22  A.   Correct.

23  Q.  Okay.  And who were the individuals, or why types of

24  individuals would communicate with outside foreclosure counsel

25  through LPS?

1  A.  Foreclosure specialists within GMAC Mortgage.

2  Q.  Okay.

3       MR. WISHNEW:  That's all the questions I have, Your

4  Honor.

5       THE COURT:  All right.  You're excused, Ms. Delehey.

6       You have any other witnesses, Mr. Wishnew?

7       MR. WISHNEW:  I do not, Your Honor.

8       THE COURT:  Do you rest?

9       MR. WISHNEW:  I rest.

10       THE COURT:  All right.  We're going to take just a

11  ten-minute recess.

12       And then, Ms. Thompson, are one of you going to

13  testify?  One or both of you?

14       MS. E. THOMPSON:  Well --

15       MS. M. THOMPSON:  Testify about?

16       THE COURT:  I'm sorry.  I couldn't hear you.

17       MS. M. THOMPSON:  About what?

18       MS. E. THOMPSON:  What?  We --

19       MS. M. THOMPSON:  You want me to go --

20       THE COURT:  No.  No, wait, wait, wait.  Okay.  If you

21  want to offer any evidence, you have to be sworn in and

22  testify.  Since you don't have a lawyer, I'll permit

23  you -- it's what I refer to as testifying in the narrative

24  form.  No one has to ask you questions.  You can just explain

25  to me what it is that you want to testify about in evidence,

RESIDENTIAL CAPITAL, LLC, ET AL.                    90

1    and then Mr. Wishnew can cross-examine you if he wants.

2         MS. M. THOMPSON:  Well, the evidence that I have,

3    the -- the -- we have one history of payment, the same months

4    that they claim that it wasn't paid.

5         THE COURT:  Let me just --

6         MS. M. THOMPSON:  And we have another history of

7    payments.

8         THE COURT:  Here's what we'll do, okay?  We're going

9    to take a ten-minute recess.  And then if you want to offer any

10   exhibits in evidence you have to tell me which ones.

11        MS. M. THOMPSON:  Okay.  I can do that.

12        THE COURT:  And -- but --

13        MS. M. THOMPSON:  Yes, sir.

14        THE COURT:  And I'm going to ask that you be sworn as

15   a witness, and you can tell me what the exhibits are that you

16   want, and you'll tell me where you got them, okay?  So if you

17   got -- we've been talking about that "2007 Detail by

18   Transaction".  I gather you got that from GMAC.  Well, you'll

19   just tell me that, okay?  But you'll be under oath, and

20   that -- I'll give you a chance to tell me whatever it is you

21   want to say about your claim, okay?

22        MS. M. THOMPSON:  Okay.

23        THE COURT:  All right.  So we'll take a ten-minute

24   recess and then we'll do that.  Okay?

25        (Recess from 4:36 p.m. until 4:49 p.m.)

1        THE COURT:  All right.  Please be seated.

2        So, Ms. Thompson, you're going to testify now?

3        MS. M. THOMPSON:  Yes, sir.

4        THE COURT:  Okay.

5        MS. E. THOMPSON:  Yes, Your Honor.

6        THE COURT:  No, why don't you come on up?  You're

7    going to have to -- bring your papers with you.  Okay.  And

8    you'll raise your right hand.  You'll be sworn.  And then you

9    can sit down, and then you can explain to me what you want to

10   explain.  Okay?

11       All right.  Thank you very much.

12       She's going to administer the oath to you, okay?

13     (Witness sworn)

14       THE COURT:  Okay.  Please have a seat.  And let's

15   start by just repeating your full name for the record, okay?

16       THE WITNESS:  Now?

17       THE COURT:  Yes.

18       THE WITNESS:  Maria Mercedes Thompson.

19       THE COURT:  Okay, Ms. Thompson.

20       So, ordinarily there'd be a lawyer asking you

21   questions.  And I may have a few questions, but I want to give

22   you a chance to tell me whatever about this, the history of

23   this that you want to say.  Okay?

24       THE WITNESS:  Okay.

25       THE COURT:  Okay.  So just turn the microphone a

1    little bit, so we're making sure we're getting.  Go ahead.

2            THE WITNESS:  All right.  Well, with no question.  I'm

3    not asking you questions?

4            THE COURT:  No.  You're just going to tell me --

5            THE WITNESS:  Anybody --

6            THE COURT:  Tell me why you think you have a good

7    claim here.  Okay?

8            THE WITNESS:  Okay.

9    DIRECT EXAMINATION

10   BY PROFFER:

11           THE WITNESS:  Well, to begin with, is the -- this

12   document that shows that Zucker, Goldberg, Ackerman file a

13   foreclosure in 2007.

14           THE COURT:  What's the document you're looking at?

15           THE WITNESS:  Well, they had it as Exhibit BTE-6

16   (sic).

17           THE COURT:  What's the document you're looking at?

18           THE WITNESS:  Well, they had it as Exhibit --

19           MS. E. THOMPSON:  We have it.

20           THE WITNESS:  BT-6.

21           THE COURT:  Okay.  BT-6.  Okay.  Go ahead.

22           THE WITNESS:  And at the foreclosure, they made

23   a -- GMAC make us believe that there was a foreclosure on the

24   house.  And that's why we started all this dilemma.  And we

25   learned in 2011 that there was no foreclosure.  Never

1  had -- never had been, because it could not exist.

2          In 2013 -- we learn in 2014 that in 2013 was closed

3  because of lack of prosecution.  So there was never a

4  foreclosure.  And --

5          THE COURT:  Are you still living in the house?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.

8          THE WITNESS:  We never left.

9          THE COURT:  Sure.  Go ahead.

10          THE WITNESS:  And that's -- that -- that document, and

11  this is the document that they call it my Exhibit 2.

12          THE COURT:  Okay.  That's the one that's headed "2007

13  Detail by Transaction"?

14          THE WITNESS:  This says yes.  That's exactly correct.

15          THE COURT:  Okay.

16          THE WITNESS:  "2007 Detail by Transaction".

17          THE COURT:  Tell me where you got that.  Where'd you

18  get that?

19          MS. E. THOMPSON:  By mail.

20          THE COURT:  From GMAC?

21          THE WITNESS:  GMAC in July of -- that was when they

22  first questioning why you foreclosing the house, Elda, and I

23  said why can't you, and they said that she owes six months at

24  that time.  And I said what I need, a complete payment, because

25  I am not living in the -- I am not living in the house.  She

1    lives in the house.

2              THE COURT:  Okay.  The --

3              THE WITNESS:  I live in my own house.

4              THE COURT:  The she is Elda Thompson.

5              THE WITNESS:  Elda Thompson.

6              THE COURT:  Okay.

7              THE WITNESS:  Elda and her sons.

8              THE COURT:  Okay.

9              THE WITNESS:  Tony and Adam (ph.) They live in the

10   house.  They been living in the house since 1995 -- '98, 1998.

11   They have lived in the house, they both, since we came from

12   Puerto Rico in '79.  But in '7 -- in '97 the house got burned

13   down, and then we reconstructed the house, and when the house

14   was reconstructed I move to Willingboro and they stay in the

15   house.  So this from 1998.

16             THE COURT:  So may I ask this.  Do you want to offer

17   this page from your Exhibit 2 in evidence?

18             THE WITNESS:  Yes.

19             THE COURT:  Okay.  Any objection?

20             MR. WISHNEW:  No, Your Honor.

21             THE COURT:  All right.  So this one page of Exhibit 2,

22   which is headed "2007 Detail by Transaction", that was the

23   document that was the subject of some prior testimony, that's

24   in evidence.  Okay?

25   (2007 Detail by Transaction was hereby received into evidence

1   as Thompson's Exhibit 2, as of this date.)

2          THE WITNESS:  And then the -- you can add into my

3   evidence this foreclosure that start it all.

4          THE COURT:  It's already in.  That's in evidence.

5          THE WITNESS:  Already in.

6          THE COURT:  Okay.

7          THE WITNESS:  Okay.  So that goes with this, and this

8   goes with that together.  And then this one here, that is their

9   BT-7.

10          THE COURT:  Yes?

11          THE WITNESS:  They have several --

12          THE COURT:  That's in evidence already too.

13          THE WITNESS:  Regarding what?

14          THE COURT:  BT-7?

15          THE WITNESS:  Uh-huh.

16          THE COURT:  That's the letter from you and Elda

17   Thompson, right?

18          THE WITNESS:  No.  From them to us.  It says, "Newark,

19   New Jersey, August 31, 2007" here in the -- oh.

20          THE COURT:  No.  This is --

21          THE WITNESS:  From us to them.

22          THE COURT:  It's --

23          THE WITNESS:  From us to them.

24          THE COURT:  Yes.

25          THE WITNESS:  Right.  From us to them --

1        THE COURT:  Okay.

2        THE WITNESS:  -- that --

3        THE COURT:  All right.

4        THE WITNESS:  -- go way.

5        THE COURT:  So BT- --

6        THE WITNESS:  And the --

7        THE COURT:  That's in evidence already.

8        THE WITNESS:  Okay.  But this part here.

9        THE COURT:  You're looking at the second -- it's what?

10  The second page of the letter, the backside of the letter.

11        THE WITNESS:  Well, it is a -- I will

12  have -- I -- I'll send two pages, but they make a copy of it on

13  their special page.

14        THE COURT:  Yes.

15        THE WITNESS:  They made a copy of that.  And then it

16  says here that we sworn, we sign it before somebody, and we

17  didn't.  It say notary -- notary --

18        THE COURT:  Notary public.

19        THE WITNESS:  Notary public, that Maria M. Thompson

20  and Elda M. Thompson, known to me to be the person whose name

21  sign on this security document, and we never -- that never

22  happened.  I want to -- that's in front too.

23        THE COURT:  But what this letter says is that --

24        THE WITNESS:  Well, it is --

25        THE COURT:  But stop.  Stop, stop.

RESIDENTIAL CAPITAL, LLC, ET AL.                    97

1              THE WITNESS:  I didn't sign it for anyone.

2              THE COURT:  You're not disputing what's in --

3              THE WITNESS:  Yes, I dispute that.

4              THE COURT:  -- the content -- stop.  Stop.  Listen to

5    my question.

6         The letter basically says that Elda Thompson has

7    medical problems.

8              THE WITNESS:  Right.

9              THE COURT:  All right.  You don't dispute that?

10             THE WITNESS:  No.

11             THE COURT:  No.  Okay.

12             THE WITNESS:  But I wrote that letter.

13             THE COURT:  And is that your signature on --

14             THE WITNESS:  It is my signature.

15             THE COURT:  Okay.  And is that Elda Thompson's

16   signature?

17             THE WITNESS:  It is.

18             THE COURT:  Okay.  Go ahead.

19             THE WITNESS:  I sent this letter when the -- at the

20   beginning of the so-called closure that never existed to -- for

21   them to do some type of remedy before -- in closing up a

22   foreclosure without giving her time, because at that time she

23   was classified with all the -- her illness that now, at this

24   moment, has been worse than --

25             THE COURT:  Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    98

1       THE WITNESS:  -- because of this thing.  And but my

2   question is why would they go to that whole -- why did they

3   need that to be notarized, and not by us?  If they needed it to

4   be notarized, they could have sent it back to us and said

5   notarize and send it back.  But they made a duplicate copy in

6   the back, and then someone certified that that was our

7   signatures.  They didn't know that was our signature when they

8   certify that.

9       THE COURT:  May I ask you?  Is it your signature?

10      THE WITNESS:  Well, today I am telling you -- already

11  said it is my --

12      THE COURT:  Okay.  All right.  Okay.

13      THE WITNESS:  Well, if that wasn't important

14  where -- isn't that important for the Court to have the --

15      THE COURT:  Right.

16      THE WITNESS:  -- on it.

17      THE COURT:  Well, I have it.

18      THE WITNESS:  You have this?

19      THE COURT:  I have it.

20      THE WITNESS:  Oh, okay.  So you don't have this.  You

21  have --

22      THE COURT:  I do.  I do now.  It's in -- yes.

23      THE WITNESS:  Okay.

24      THE COURT:  So you gave Mr. Wishnew or his office the

25  exhibits that you wanted to be able to mark for the hearing,

1   and he put it in a binder and gave it to me.  Okay.  So I have

2   your exhibits.

3          THE WITNESS:  So is there.

4          THE COURT:  Yes.

5          THE WITNESS:  So everything I have here is there.

6          THE COURT:  Yes.

7          THE WITNESS:  And my testimony is just testimony to

8   why it was here.

9          THE COURT:  Let me ask you just a few questions, okay?

10         THE WITNESS:  Okay.

11         THE COURT:  So one of the exhibits that Mr. Wishnew

12  introduced into evidence is that foreclosure repayment

13  agreement.

14         THE WITNESS:  Um-hum.

15         THE COURT:  Okay.  And that was BT-8.  And then BT-9

16  was the signature page that -- you know what I'm referring to?

17         THE WITNESS:  Yes.

18         THE COURT:  So you and --

19         THE WITNESS:  Okay.

20         THE COURT:  Both you, Maria Thompson, and Elda

21  Thompson signed the signature page on that agreement.

22         THE WITNESS:  Right.  And the --

23         THE COURT:  Right.

24         THE WITNESS:  And the comment on that is that we never

25  heard from GMAC -- GMAC on that foreclosure agreement that we

1   made.  We did it through a third party, and they never -- they

2   never -- I -- when we learned -- really, when we learned about

3   the house was on foreclosure, it was because my other daughter

4   was going to refinance the other house that is in my name also,

5   and her realtor told her that it's going to be a problem

6   because Ellery house was in foreclosure.  We didn't know that.

7           THE COURT:  Okay.  But let me.  The repayment, the

8   foreclosure repayment plan set forth a series of twelve

9   payments that had to be made to bring the mortgage current.

10           THE WITNESS:  Not question.

11           THE COURT:  Okay.  And you made the payments, right?

12           THE WITNESS:  Yes.

13           THE COURT:  And they say you made the payments.

14           THE WITNESS:  Um-hum.

15           THE COURT:  They say that you brought the mortgage

16   current.  You agree with that?

17           THE WITNESS:  I agree with that.  My question is why

18   do we have to repay twelve months, when it was only two months

19   that they were complaining, and in that the two months were

20   already distributed to the principal and the interest in this

21   payment that they gave me in July of '07?  Why I have to repay

22   twelve months?

23           THE COURT:  I'm not going to -- I don't testify, so --

24           THE WITNESS:  But that's my question.

25           THE COURT:  What's in the agreement that you signed?

RESIDENTIAL CAPITAL, LLC, ET AL.                                    101

1          THE WITNESS:  I had to sign.  I didn't know that there

2     was a for -- they want -- they going to take Elda's house.

3          THE COURT:  I think what they would --

4          THE WITNESS:  I was forced to sign.

5          THE COURT:  I think what they would tell you, but it's

6     not for me to say, I think what they would tell you is there

7     were a series of payments that hadn't been made.

8          THE WITNESS:  Two.

9          THE COURT:  They say it was more, but okay.  And they

10    say that therefore there was a back, a balance that was due,

11    and they spread out those payments over twelve months, so that

12    in addition to the regular payment you paid an additional

13    amount, so that after the twelve months it was all caught up.

14    I mean, that's what I interpret this as saying.

15          THE WITNESS:  Well --

16          THE COURT:  Do you disagree with that?

17          THE WITNESS:  Sure I disagree with that.  Because so

18    the payment was 1,227 a month.  I pay my own taxes.  I pay my

19    own insurance.  And that was included in there.  And then when

20    they dropped/passed the loan, the so-called loan to Ocwen,

21    Ocwen added escrow.  That account -- that loan was never in

22    escrow.

23          THE COURT:  Well --

24          THE WITNESS:  I mean, for -- we are not going to

25    discuss this in this court.

1          THE COURT:  Okay.

2          THE WITNESS:  That's --

3          THE COURT:  Deal with Ocwen about that.

4          THE WITNESS:  That's right.

5          THE COURT:  Okay.

6          THE WITNESS:  We will -- we will with deal Ocwen about

7     that.

8          THE COURT:  Okay.  All right.

9          THE WITNESS:  Then there's -- that was a -- that

10    was -- that's a separate situation.  But what brought us here

11    was when all this happened, and then we learn in '11 that

12    according to GMAC someone there told us not to send any more

13    payment because the loan was not registered and they were not

14    supposed to collect money, some from the company, so we never

15    sent it back.  And then -- and I believe it was '13 when

16    there -- in there comes Ocwen, I own the loan.

17         Anyway, when we learn this, and we wrote a letter to

18    GMAC why is this happening, they send us a series of

19    mort -- registration -- several documents that you don't want

20    to be -- to hear it, because is not the situation -- excuse

21    me -- the situation to bring it out here, but they were all

22    altered.  Many alterations.  In one copy they did the whole

23    thing.  And when we make a -- look to what was really

24    registered in the County, it was only the transferring that I

25    did with Elda in 2005 when I sign -- when I just moved my

RESIDENTIAL CAPITAL, LLC, ET AL.                    103

1   ownership into her.  That was the only thing that was recorded

2   and the only document, beside the deed, that didn't have any

3   alteration on the paper.

4          When I send that to GMAC for an explanation, they

5   didn't -- they didn't answer to us.  Who answers us?  These

6   people.

7          THE COURT:  Who's these people?

8          THE WITNESS:  These people.

9          THE COURT:  You're talking about the lawyers?

10          THE WITNESS:  The bac -- the bac -- the bankruptcy --

11          THE COURT:  Lawyers.  Okay.

12          THE WITNESS:  These people --

13          THE COURT:  All right.

14          THE WITNESS:  Recap (sic).  They answer to us and says

15   that I didn't have any proof that this was happening.  So I

16   make a -- all copies of the documentation that GMAC has sent

17   us, and then they return us saying that okay, we are part of

18   the group, and that's how we get to --

19          THE COURT:  Okay.  Is there anything else that you

20   want to tell me?

21          THE WITNESS:  No.

22          THE COURT:  Okay.  Mr. Wishnew, do you want to cross-

23   examine?

24          MR. WISHNEW:  Thank you, Your Honor.

25   CROSS-EXAMINATION

RESIDENTIAL CAPITAL, LLC, ET AL.                    104

1   BY MR. WISHNEW:

2   Q.  Good afternoon, Ms. Thompson.

3   A.  Good afternoon.

4   Q.  Ms. Thompson, if you could look to the document --

5   A.  I don't have any.

6   Q.  -- 2007 Detail by --

7   A.  I don't have any.

8           THE COURT:  Yes, you have that in front of you.

9           MR. WISHNEW:  You have that.

10          THE WITNESS:  The one here?  This one?

11          THE COURT:  Yes.

12          MR. WISHNEW:  Yes.  Thank you.

13          THE WITNESS:  I have it.

14  Q.  It was your testimony a few minutes ago that you received

15  this in July, 2007.

16  A.  Um-hum.

17  Q.  Is there any reflection --

18          THE COURT:  You have to -- let me just.

19  A.  Yes.

20          THE COURT:  You have to answer yes and no.

21  A.  The --

22          THE COURT:  Okay?  Okay.

23          THE WITNESS:  Yes, Your Honor.

24  Q.  Is there any indication on this document that reflects it

25  was produced in July, 2007?

RESIDENTIAL CAPITAL, LLC, ET AL.                    105

1  A.  I have no idea when they produced it.  They -- I -- I

2  received it in July, '07, because that's when I asked them.

3  Q.  Okay.

4  A.  They send me this and records.

5  Q.  And --

6  A.  And history record that with no -- was not crossed out.  It

7  was completely open.

8  Q.  So -- okay.  So if it was produced in July, 2007 then how

9  are there post dates that relate to months after July, 2007?

10  A.  Well, it doesn't say the year there.  It says 12/26, and I

11  was just telling Your Honor that what means 12/26?  12/26/06,

12  because it cannot be 12/26/07, because they stop it at 7, at

13  July, '07.

14  Q.  Is it --

15  A.  See, they stop this reversal at July, '07, and then the

16  next number says 12/26.

17  Q.  Okay.  Did you --

18  A.  Post date.

19  Q.  Did you enter into a foreclosure repayment agreement with

20  GMAC Mortgage?

21  A.  Not with them.  With a third party.  Never talked to them.

22  I just sent them the money when they force us to send the money

23  to them.

24      They accepted our checks down payment, and that was it.

25          MR. WISHNEW:  Your Honor, if I can approach and --

1        THE COURT:  Yes, please.

2        MR. WISHNEW:  -- present BT-8?

3        THE COURT:  Sure.  Go ahead.

4   A.  Yeah, this was the one I will sign.

5   Q.  Okay.  So what you're referring to is the foreclosure

6   repayment agreement marked as BT-8, and on the first page it

7   says GMAC Mortgage in the top left-hand corner.

8   A.  Yes.

9   Q.  Okay.  So you --

10  A.  But we never spoke with them.

11  Q.  Okay.  But you executed a foreclosure repayment agreement

12  with GMAC Mortgage.

13  A.  Because they said there was a foreclosure.

14  Q.  Okay.  And as part of that repayment agreement you agreed

15  to repay past due amounts.  Is that correct?

16  A.  Whatever they say there.  I didn't want the house to be

17  taken from them.

18  Q.  On BT-8, paragraph 3, does it say the amount necessary to

19  cure the default is $14,189.33?

20  A.  Like I said, I accept whatever they said, because I didn't

21  want the house to be taken from them.

22  Q.  Okay.  And in paragraph 2, does the foreclosure repayment

23  agreement also state the account is presently in default for

24  nonpayment of -- to lender of the February 1, 2007 installment

25  payment?

1   A.   That's what they said.

2   Q.   Okay.  So then through the --

3   A.   They never talked to me and said this is what happening and

4   this is what happening.  They never.  Like, I just told

5   the -- Your Honor here, that I did whatever I needed to do to

6   hold the house, to halt the foreclosure.

7   Q.   I understand.

8   A.   Now, this foreclosure, they knew it was not foreclosure.

9   They didn't -- we didn't pass the clerk desk, but I didn't know

10  that.  I learned that in 2014, when I went to the other -- to

11  the other court, and the judge there says that he has no

12  jurisdiction, and he sent me to the American Bar Association,

13  and they refused to take my case.

14  Q.   Okay.

15  A.   Because it was too complicated.  And I says I signed

16  whatever I -- whatever I sign in 2007, in that date, I

17  didn't -- I didn't have time to double check what happened here

18  or look -- I didn't -- I didn't even -- it didn't pass my mind.

19  It didn't cross my mind that a company like GMAC would do

20  such -- such a thing.  So I didn't know.  I just whatever they

21  said we owe you, we're going to pay you.  And we did.

22  Q.   Okay.  So --

23       THE COURT:  Mr. Wishnew, the foreclosure complaint's

24  not in evidence.  You never moved into evidence.

25       MR. WISHNEW:  I'll move it in before we close the

1  record, Your Honor.

2          THE COURT:  Okay.

3  Q.  So the foreclosure complaint at BT-6 --

4  A.  I have it here.

5  Q.  Okay.

6  A.  Yes.

7  Q.  Okay.  And you are familiar with this foreclosure

8  complaint?

9  A.  No.  I learned to -- I learn about this in 2014 when we

10 receive all those documents.  I said look at that.  And it was

11 to -- even -- they even included Mr. Thompson and have him as

12 Elda's husband.  So that means that they didn't have the

13 information clear.

14 Q.  Ms. Thompson, have you put forth any evidence today to show

15 that a payment was made on the mortgage in March, 2007?

16 A.  This document that shows here.

17 Q.  I'm not referring to that document.  That document --

18 A.  I don't have it.  I don't have it.

19 Q.  Okay.  So there's --

20 A.  No closing statement.

21 Q.  There's no bank account statements in the record today to

22 show payment in March, 2007 on the loan.

23 A.  Well, that the same way you don't have any document that --

24         THE COURT:  Ms. Thompson?

25 A.  -- said I was --

RESIDENTIAL CAPITAL, LLC, ET AL.                    109

1          THE COURT:  Ms. Thompson?  That question just calls

2   for a yes or no answer.

3          THE WITNESS:  Okay.

4          THE COURT:  Do you have any document?

5          THE WITNESS:  I don't have it, no.

6          THE COURT:  Okay.

7   Q.  And do you have any documents in evidence today to show

8   payment in April, 2007 on the loan?

9   A.  Well, we will have to go back to the bank.

10  Q.  That's why we're here today, Ms. Thompson.

11  A.  Well, you don't have --

12         THE COURT:  Ms. Thompson.

13         THE WITNESS:  I don't have it today.

14         THE COURT:  Stop.  Stop.

15         THE WITNESS:  I don't have it today.

16         THE COURT:  Stop.  Stop.  We're here today because

17  many months ago you told me you had bank records that showed

18  you made the payments.  I sent Mr. Wishnew to your house to

19  look at your records, and after some difficulty scheduling the

20  meeting he came to your house.  Remember that?

21         THE WITNESS:  This is --

22         THE COURT:  Remember that?

23         THE WITNESS:  Yes.

24         THE COURT:  And you were going to show him the bank

25  records that showed you had made the payments.  And so he's

RESIDENTIAL CAPITAL, LLC, ET AL.                    110

1   asked you now do you have -- as you sit here now, do you have

2   any bank records that show you made these payments?

3           THE WITNESS:  I have.

4           THE COURT:  Well, that doesn't show payments --

5           MR. WISHNEW:  Okay.

6           THE COURT:  -- Ms. Thompson.

7           THE WITNESS:  Where it shows --

8   BY MR. WISHNEW:

9   Q.  Are there --

10          THE WITNESS:  -- that if it was received by the --

11          THE COURT:  Okay.  Ask your next question.

12          MR. WISHNEW:  Thank you, Your Honor.

13  A.  This has payment --

14          THE COURT:  Stop.

15          MR. WISHNEW:  Thank --

16          THE COURT:  Ask your next question.

17          THE WITNESS:  All right.

18  Q.  Ms. Thompson, are there any documents in evidence today to

19  show that a payment was made in May, 2007 on account of the

20  mortgage?

21  A.  Other than the one that they sent me, no.

22  Q.  Okay.  And is your testimony that you entered into a

23  foreclosure repayment agreement with GMAC Mortgage?

24  A.  We did.

25  Q.  In order to cure past due amounts?

1    A.  Yes, we did.

2    Q.  Okay.

3            MR. WISHNEW:  Your Honor, I'd like to move into

4    evidence BT-6.

5            THE COURT:  It's in evidence.  Anything else?

6    (Complaint for foreclosure against the Thompsons was hereby

7    received into evidence as Borrower Trust's Exhibit 6, as of

8    this date.)

9            MR. WISHNEW:  I have no further questions, Your Honor.

10           THE COURT:  All right.  You're excused as a witness.

11           THE WITNESS:  Thank you, Your Honor.

12           THE COURT:  I take it, Ms. Thompson, you don't have

13   any other witnesses you're calling.  You've put in whatever

14   evidence you want, right?

15           MS. M. THOMPSON:  No, we don't.

16           THE COURT:  Okay.  All right.  Any rebuttal, Mr.

17   Wishnew?

18           No, you can go ahead and sit down, Ms. Thompson.

19           Go ahead.

20           MS. M. THOMPSON:  Okay.

21           THE COURT:  Are you calling any rebuttal witness, Mr.

22   Wishnew?

23           MR. WISHNEW:  Nothing right -- no, Your Honor.

24           THE COURT:  Okay.  You rest?

25           MR. WISHNEW:  Yes, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                              112

1           THE COURT:  All right.  Both sides have rested.

2           The Court's going to take the matter under submission.

3    I've got the evidence, and in due course I'll enter a decision.

4    Okay?  All right.

5           MR. WISHNEW:  Thank you for your time, Your Honor.

6           THE COURT:  We're adjourned.  Thank you very much.

7       (Whereupon these proceedings were concluded at 5:14 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              **I N D E X**

3

4    WITNESS              EXAMINATION BY      PAGE

5    Lauren Delehey       Mr. Wishnew          14

6    Lauren Delehey       Elda Thompson        63

7    Lauren Delehey       Maria Thompson       72

8    Lauren Delehey       Mr. Wishnew          82

9    Maria Thompson       by Proffer           92

10   Maria Thompson       Mr. Wishnew         104

11

12                            EXHIBITS

13   BORROWER TRUST'S     DESCRIPTION        PAGE

14   BT-A                 Lauren Delehey's    19

15                        declaration

16   BT-1                 GMAC loan history   41

17   BT-2                 Options to avoid    42

18                        foreclosure letter

19   BT-3                 Notice of intent    43

20                        to foreclose

21   BT-4                 Referral to         46

22                        foreclosure letter

23   BT-5                 Printout of LPS     50

24                        notes

25

| | | |
|---|---|---|
| BT-7 | 8/31/07 document | 53 |
| | from the Thompsons | |
| | to GMAC Mortgage | |
| BT-8 | Foreclosure | 57 |
| | repayment | |
| | agreement | |
| BT-9 | Repayment-plan | 58 |
| | signature page | |
| | signed by | |
| | Thompsons | |
| BT-6 | Complaint for | 111 |
| | foreclosure | |
| | against the | |
| | Thompsons | |
| | | |
| THOMPSON'S | DESCRIPTION | PAGE |
| 2 | 2007 Detail by | 95 |
| | transaction | |

1

2                          C E R T I F I C A T I O N

3

4     I, Sharona Shapiro, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6

7     *Sharona Shapiro*

8

9     _____

10    SHARONA SHAPIRO

11    AAERT Certified Electronic Transcriber CET**D-492

12

13    eScribers

14    700 West 192nd Street, Suite #607

15    New York, NY 10040

16

17    Date:  June 8, 2015

18

19

20

21

22

23

24

25