1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


          Debtors.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          June 10, 2015

          10:02 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

1

2   Trial Regarding Claim No. 386 Filed by Barry Mack

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4        Attorneys for ResCap Borrower Claims Trust

5        425 Market Street

6        Suite 30

7        San Francisco, CA 94105

8

9  BY:   ADAM A. LEWIS, ESQ.

10        KRISTIN A. HIENSCH, ESQ.

11

12

13  DAVID F. GARBER, P.A.

14        Attorney for Claimant Barry Mack

15        2800 Davis Boulevard

16        Suite 211

17        Naples, FL 34104

18

19  BY:   DAVID F. GARBER, ESQ.

20

21

22

23

24

25

1                P R O C E E D I N G S

2           THE COURT:  All right, please be seated.  We're here

3    in Residential Capital, number 12-12020.  This is in connection

4    with the trial regarding the claim, claim 386 filed by Barry

5    and Cheryl Mack.  May I have the appearances, please,

6    plaintiff?

7           MR. GARBER:  Your Honor, David Garber on behalf of the

8    claimants, Barry and Cheryl Mack.

9           THE COURT:  Thank you.

10          MR. LEWIS:  Good morning, Your Honor.  Adam Lewis and

11   Kristin Hiensch, H-I-E-N-S-C-H, on behalf of the ResCap

12   Borrower Claims Trust.

13          THE COURT:  Thank you very much.  All right.

14          Let's just -- before we get started, let's just review

15   how we're going to proceed today and tomorrow.  I've reviewed

16   the pre-trial submissions.  I have the binders with the

17   evidence in front of me.  Obviously none of it is in evidence

18   until offered and admitted by the Court.

19          As I understand it, Mr. Lewis, your witness not

20   available today, but is tomorrow, correct?

21          MR. LEWIS:  Yes, Your Honor.  If the Court would like

22   details, I'm happy to give them to you.

23          THE COURT:  No, that's unnecessary.  I think you had

24   advised certainly the Court, I assume Mr. Garber as well, about

25   that.

RESIDENTIAL CAPITAL, LLC, ET AL.                    5

1          MR. LEWIS:  I did, yes.

2          THE COURT:  And I had set aside the two days.

3    Hopefully we won't need the two full days.  But Mr. Garber,

4    you're going to be calling two witnesses.  Is that correct?

5          MR. GARBER:  Yes, Your Honor.  Two witnesses:  Jewel

6    DeMore and Barry Mack.

7          THE COURT:  Okay.  All right.  So is there anything

8    either of you want to raise before we begin?

9          MR. LEWIS:  The only thing I can think of, Your Honor,

10   is -- I don't know if this is the right moment, but Mr. Garber,

11   in preparing for trial, went through his own files and found a

12   document that's of consequence --

13         THE COURT:  Just hang on.  Let me make -- go ahead.

14   Say it again.

15         MR. LEWIS:  Mr. --

16         THE COURT:  He found a document, yes.

17         MR. LEWIS:  -- of consequence, which he sent to me,

18   which I would like to have put in the record as well.  I have

19   it with me today.  It's a potentially very important document.

20   It's not on our current exhibit list because we didn't have it.

21         THE COURT:  That's fine.  I take it, Mr. Lewis, you're

22   not objecting to the document -- either you're going to offer

23   it or Mr. Garber's going to offer it.  The fact that it was

24   produced late, I mean, that's not uncommon to have --

25         MR. LEWIS:  I'm not complaining --

1      THE COURT:  -- a few odds and ends come up at -- my

2  biggest concern is when somebody tries to spring it on somebody

3  during the trial.  But you have the document, you want to be

4  able to use it.  You'll either offer it or Mr. Garber will

5  offer it, and if I hear objections, I'll rule on the

6  objections.

7      MR. LEWIS:  Okay.  It's just not on our exhibit list.

8  That's why I wanted --

9      THE COURT:  That's fine.

10      MR. LEWIS:  -- to raise now.

11      THE COURT:  Okay.

12      MR. LEWIS:  And Mr. Garber, I credit it with sending

13  it to me when he found it.

14      THE COURT:  That's fine.  Okay.

15      Mr. Garber, anything you want to raise before we

16  start?

17      MR. GARBER:  Your Honor, I have no objection.  I

18  unfortunately found this later than I would have liked --

19      THE COURT:  It's okay.  I don't hear Mr. Lewis

20  complaining about that aspect of -- both of you have proceeded

21  in a very straightforward and good-faith manner.  So I'm not

22  raising any issues about it.

23      So let me ask, do you wish to make an opening

24  statement?

25      MR. GARBER:  No, Your Honor.  I'll waive opening

1    statements.

2            THE COURT:  Okay.  Mr. Lewis?

3            MR. LEWIS:  I'll waive as well, Your Honor.

4            THE COURT:  Okay.  All right.  Mr. Garber, call your

5    first witness.

6            MR. GARBER:  Your Honor, if I could take a minute.

7    The manner in which I intend to proceed is I have a trial

8    notebook here --

9            THE COURT:  Okay.

10           MR. GARBER:  -- which has not all of the exhibits, but

11   excerpts from the exhibits.  So I will call my witnesses and I

12   will go over and identify those excerpts through my witness,

13   but the actual exhibits, of course, will already have been

14   submitted in the file.

15           THE COURT:  Okay.  Any problem with that, Mr. Lewis?

16           MR. LEWIS:  Not at all, Your Honor.

17           THE COURT:  Okay.

18           MR. LEWIS:  As long as we can find what he's talking

19   about, I'm fine with that.

20           THE COURT:  Okay.  And I think we probably -- I think

21   I filed some order that laid out my usual trial procedures, but

22   just let me briefly say that obviously, the witnesses testify

23   from the witness stand, they'll be sworn by the reporter.  If

24   at any time you wish to approach the witness to show him or her

25   a document or a portion of a document, you don't have to ask

RESIDENTIAL CAPITAL, LLC, ET AL.                                    8

1    for permission to approach the witness.

2              And Mr. Lewis, if you wish to be up there to see

3    what's being pointed at, you likewise can go there without --

4    you don't have to ask each time you want to approach a witness.

5    I assume neither of you are going to abuse that.  So I'd

6    just -- I don't enforce the rule about entering the well the

7    way some judges do that I was familiar with before.  So I try

8    to keep this, obviously, professional and moving forward.

9              I do prefer that when a witness is questioned, they're

10   questioned from the podium rather than from the table.  And

11   obviously if you need to go back to your table to find

12   documents or anything, you don't have to -- you can just go

13   ahead and do it.  Okay.

14             MR. GARBER:  Yes, Your Honor.

15             THE COURT:  So call your first witness.

16             MR. GARBER:  Your Honor, I would like to call to the

17   stand, Barry Mack.

18             THE COURT:  If you would just -- before you sit down,

19   Mr. Mack, if you would just raise your right hand, and you'll

20   be sworn, okay?

21        (Witness sworn)

22             THE COURT:  All right, please have a seat.  And I

23   believe there's a pitcher and some cups up there, so if you

24   want some water, feel free at any time.

25             THE WITNESS:  Thank you.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    9

1          THE COURT:  Okay?  All right, Mr. Garber.

2          MR. GARBER:  Your Honor, may I approach the witness

3    with the --

4          THE COURT:  Yes, absolutely.  Like I say, you don't

5    have to ask permission.

6          MR. GARBER:  I have provided the Court with two copies

7    of the trial notebook and Mr. Lewis with a copy, and I have a

8    copy.  And I'll be using that in my examination.

9          THE COURT:  Okay.

10   DIRECT EXAMINATION

11   BY MR. GARBER:

12   Q.   Mr. Mack, would you please state your full name for the

13   record?

14   A.   Barry Mack.

15   Q.   And how old are you, Mr. Mack?

16   A.   Seventy-three.

17   Q.   You were married to Cheryl Mack?

18   A.   Yes, I was.

19   Q.   When were you married to her?

20   A.   We were married for thirty years, exactly what year --

21   Q.   And she passed away in 2013?

22   A.   Yes, she did.

23   Q.   At which time you were still married to her?

24   A.   Yes.

25   Q.   And now you are the executor of her estate?

RESIDENTIAL CAPITAL, LLC, ET AL.                    10

1   A.   Yes.

2   Q.   Mr. Mack, what sort of educational background do you have?

3   A.   I graduated high school, military service, twenty-six

4   years in the police department.

5   Q.   Which police department?

6   A.   Edgewater Park Township, New Jersey.

7   Q.   And did there come a time -- you of course lived in New

8   Jersey during that time, correct?

9   A.   Yes, sir.

10  Q.   Did there come a time when you moved to the State of

11  Florida?

12  A.   It was after I -- we retired.

13  Q.   Do you recall the approximate year?

14  A.   Dates and times are spinning around my head.

15  Q.   Just do the best you can.

16  A.   Nineteen years --

17          THE COURT:  Are you able to help him out?

18          MR. GARBER:  I think it was about 2001 --

19          THE COURT:  Mr. Garber?

20          MR. GARBER:  -- but I'm not sure.

21          MR. LEWIS:  Your Honor, I was going to say if Mr.

22  Garber wants to lead his witness in some things like this, it's

23  fine with me.

24          THE COURT:  That's fine.

25  Q.   Was it about 2001?

RESIDENTIAL CAPITAL, LLC, ET AL.                    11

1   A.   Yes, sir.

2   Q.   And did you go down there and you bought a house to live,

3   didn't you?

4   A.   Yes, we did.

5   Q.   And then you sold that house and you bought another house?

6   A.   Yes, sir.

7   Q.   And then you sold that house and you bought a house on

8   Egret Avenue (ph.), is that true?

9   A.   Yes, it is.

10   Q.   And all those houses were owned with you and your wife,

11   Cheryl?

12   A.   Yes, of course.

13   Q.   Now, can you describe the house to us on Egret Avenue,

14   briefly.  How many bedrooms, what kind of location, that sort

15   of thing?

16   A.   It was four -- four-bedroom, two-story house, three-and-a-

17   half bathrooms.  It had a library, two-car garage, swimming

18   pool in the back yard with a hot tub in it, and a dock -- a

19   dock out back for a boat.

20   Q.   Okay.  When you bought the house, was it new?

21   A.   No, it was not.

22   Q.   Was it lightly used?

23   A.   Yes.

24   Q.   So it was in good condition?

25   A.   Yes, it was.

RESIDENTIAL CAPITAL, LLC, ET AL.                    12

1   Q.   Do you recall what you paid for the house?

2   A.   Approximately one-and-a-half million.

3   Q.   And you put down some cash on that house, didn't you?

4   A.   Yes, we did.

5   Q.   And you had to finance a portion of it?

6   A.   Yes.

7   Q.   Did you finance about a million dollars?

8   A.   Yes.

9   Q.   So you were able to put down several hundred thousand in

10  the down payment?

11  A.   Yes, we did.

12  Q.   You had savings that you could do that?

13  A.   Yes.

14  Q.   And what was your source of income after you moved into

15  that house?

16  A.   Well, retirement pay for myself; and my wife was

17  receiving -- what was it -- disability and Social Security.

18  Plus we had a lot of savings from inheritances.  We had money

19  invested in stocks and bonds.  We were slowly using the savings

20  and the stocks to keep the payments going.

21  Q.   We're not quite there yet.  I'll get there in a minute.

22       What was the nature of Mrs. Mack's disability?

23  A.   She began having problems and her kidneys were failing.

24  And she was -- had to be hospitalized.

25  Q.   Now, you said she was on Social Security disability.  Is

1   that correct?

2   A.   Yeah.

3   Q.   And she had been that way for some time when you came to

4   Florida, hadn't she?

5   A.   Yes.

6   Q.   And why was she on disability?

7   A.   She was on disability for a while.  She was unable to work

8   because of her kidneys weren't functioning right.  Just didn't

9   function right.

10  Q.   Was she receiving, when you were in Florida, about 1,335

11  dollars a month from Social Security disability?

12  A.   Yes.

13  Q.   And you were receiving a pension from the police

14  department in New Jersey?

15  A.   Yes, sir.

16  Q.   How much were you receiving?

17  A.   It was 2,500 dollars a month.

18  Q.   And you had other sources of income, you personally,

19  besides that?

20  A.   No.

21  Q.   Didn't you have Social Security?

22  A.   Oh, yes, I had Social Security.  But --

23  Q.   And how much was your Social Security when you started

24  receiving it?

25  A.   I have no idea.  I don't know.

RESIDENTIAL CAPITAL, LLC, ET AL.                    14

1  Q.    Did you start receiving it when you came to the age of

2  sixty-five?

3  A.    Yes, I did.

4  Q.    So you didn't take early Social Security retirement?

5  A.    No.

6  Q.    Was the only source of your income, then, your police

7  retirement and your Social Security?

8  A.    Yes.

9  Q.    You personally?

10  A.    Yes, sir.

11  Q.    Now, you made some money every time you sold a house down

12  in Florida, didn't you?

13  A.    Yes, we did.

14  Q.    And that added to your capital?

15  A.    Yes.

16  Q.    And that enabled you to buy this house on Egret and put

17  down money?

18  A.    Right.  Yes, sir.

19  Q.    How old was Mrs. Mack when she passed away?

20  A.    Sixty-two.

21  Q.    So she died in 2013.  Is that correct?

22  A.    That's correct.

23  Q.    And she was sixty-two at that time?

24        THE COURT:  You have to answer to that audibly, if you

25  can?

1    A.    Yes, she was.

2    Q.    What sort of educational background did she have?

3    A.    She graduated high school.  She went to a computer school

4    in Philadelphia and became a computer programmer-analyst for

5    Tyco Toys.  And after they moved then she moved for several

6    other companies after that.

7    Q.    Did there come a time when she started to have problems

8    with her liver?

9    A.    Yes.  Yes, sir.

10    Q.    And would that have been in the late 1900s (sic) and early

11    2000s?

12    A.    Yes.

13    Q.    Do you know what the problem was with her liver?

14    A.    At that time, we were in New Jersey, and she would -- she

15    had too much iron in her blood.  It was -- she had to get

16    rid -- they were drawing blood from her once a month to keep

17    the liver -- or keep the level of the iron in her blood a

18    little lower.  And she was told that she would need a --

19    probably need a liver transplant in the near future.

20    Q.    As you know, her liver problems were caused by this iron

21    excess that she had in her blood?

22    A.    That's how it started, yes.

23    Q.    Was that the basis of her Social Security disability?

24    A.    Yeah, I believe so.  Yes.

25    Q.    Did she have to have a liver transplant?

1   A.   Yes, she did.

2   Q.   And when did she have the liver transplant, to the best of

3   your memory?

4   A.   After we moved to Florida.  I'm not sure of the year.

5   Q.   But sometime in the early 2000s?

6   A.   Yes.

7   Q.   Was that at the Mayo Clinic in Florida?

8   A.   Yes, it was.

9   Q.   And did the liver transplant, did that improve her

10  condition, or did she still have an iron rich condition?

11  A.   No, she was -- that cured her condition.  She had no

12  problem after that.

13  Q.   Did they put her on immunosuppressant drugs?

14  A.   Yes.

15  Q.   Antirejection drugs?

16  A.   Yes.

17  Q.   Did she have to take those for the rest of her life?

18  A.   Yes.

19  Q.   Mr. Mack, you have a -- well, let me set the stage a

20  little bit more.  In the summer and fall of 2009, you were

21  making your payments on your mortgage?

22  A.   Yes, we were.

23  Q.   And that's on the house in Egret?

24  A.   Yes, it was.

25  Q.   Were you current on your mortgage at that time?

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

1    A.    Yes.

2    Q.    Do you recall who your mortgage was with?

3    A.    GM -- GMACM.

4    Q.    And sometime that summer, did you receive a notification

5    that your mortgage was being foreclosed?

6    A.    Yes, we did.

7    Q.    And at that point, you hired an attorney to defend you on

8    that?

9    A.    Yes, we did.

10   Q.    Do you recall the company that was foreclosing on your

11   house?

12   A.    It was Deutsche Bank.

13   Q.    Had you ever gotten a mortgage from Deutsche Bank?

14   A.    No.

15   Q.    Had you ever done business with Deutsche Bank?

16   A.    No, sir.

17   Q.    Were you ever informed that Deutsche Bank bought your

18   mortgage?

19   A.    No, I was not.

20   Q.    Were you ever informed that they had any rights to your

21   mortgage, or the servicing, or ownership rights at all?

22   A.    Nothing.  No.

23   Q.    So what did you do when you got your notice of foreclosure

24   besides hiring an attorney?

25   A.    We called GMAC Mortgage and asked them several times if

RESIDENTIAL CAPITAL, LLC, ET AL.                    18

1  they still had -- held our mortgage and asked if we were

2  delinquent, and they said no.  We were paid up.  There was no

3  problem.  And they did not have any idea of -- or couldn't tell

4  me anything about Deutsche Bank.

5  Q.    Nevertheless, did the foreclosure continue?

6  A.    Yes, it did.

7  Q.    When you first called GMACM to ask about why you were

8  getting foreclosed on, was that in August of 2009?

9  A.    Yes, it was.

10 Q.    And in September of 2009, your attorney filed an answer

11 denying that you were in default on your mortgage, correct?

12 A.    Yes.  Yes, sir.

13 Q.    Did you make calls to GM in September to ask why you were

14 under foreclosure?

15 A.    I believe so, yes.

16 Q.    And did you make calls in October of 2009 to inquire or

17 complain about the foreclosure?

18 A.    Yes, we did.

19 Q.    You did that to General Motors?

20 A.    Yes.

21 Q.    And how did you know what numbers to call?

22 A.    On -- the numbers were on statements and on the paperwork

23 that we had from GMAC.

24 Q.    Did you call and complain or inquire about the foreclosure

25 of General Motors in November of 2009?

RESIDENTIAL CAPITAL, LLC, ET AL.                    19

1  A.    Yes, sir.

2  Q.    Now, before you received the notice of foreclosure, had

3  you been in touch with General Motors to see if you qualified

4  for a mortgage relief on your payments under the Federal HAMP

5  Act?

6  A.    Yes.

7  Q.    Did you file an application with them?

8  A.    Yes, sir.

9  Q.    And did they require paperwork and supporting

10  documentation?

11  A.    Yes.

12  Q.    Did you send that to them?

13  A.    Yes, we did.

14  Q.    Did you do all that before the foreclosure was filed?

15  A.    Yes.

16  Q.    Did they give you an answer as to whether you qualified

17  for any mortgage relief in July of 2009?

18  A.    No, we never received an answer.

19  Q.    You never received an answer from them?

20  A.    No, I don't believe so.  No.

21  Q.    Okay.  So you didn't receive it in July.  You didn't

22  receive an answer in August on your mortgage application -- on

23  your reduction application.  Is that right?

24  A.    Right.

25  Q.    How about in September?  Did you receive any answer from

1  them on your payment reduction application?

2  A.    No.

3  Q.    Did you receive an answer from them in October?

4  A.    No.

5  Q.    Did you receive an answer from them in November?

6  A.    No.

7  Q.    How about in December?  Did you receive an answer from

8  them in December?

9  A.    No, sir.

10  Q.    Mr. Mack, you have in front of you what I have labeled

11  Creditor Barry Mack's Hearing Notebook, volume number 1.  And I

12  would ask if you would be so kind as to turn to tab 1?  Do you

13  see that, sir?  Do you have that in front of you?

14  A.    What was the --

15  Q.    Tab 1.  It's marked --

16  A.    Yes, sir.

17  Q.    -- as tab 1.

18  A.    I have that one.

19  Q.    There's a little tab sticking out of the notebook?

20  A.    Yes.

21  Q.    Okay.  And do you recognize that document?

22  A.    Yes, sir.

23  Q.    I would ask if you would be so kind as to turn to page 3

24  of that document.  And by the way, that document is labeled

25  under this tab, as Plaintiff's Exhibit number 17 to these

RESIDENTIAL CAPITAL, LLC, ET AL.                    21

1   proceedings today.  Do you see that in the bottom right-hand

2   corner of your document?

3   A.    Yes.

4   Q.    Okay.  So please turn to page 3.

5   A.    I have that.

6   Q.    Is that your signature?

7   A.    Yes, it is.

8   Q.    And is that Cheryl's, your wife's signature?

9   A.    Yes, it is.

10  Q.    And did you sign this document on or about the date that

11  is listed on the front page, which, if you'll look, is October

12  6th, 2006?

13  A.    Yes, sir.

14  Q.    Did you agree to pay an interest rate of seven-and-an-

15  eighth percent on your loan?  Down on the first page, paragraph

16  2.

17  A.    Yes, I did.

18  Q.    And you were going to pay all the payments to Primary

19  Residential Mortgage, Inc., is that true?

20  A.    That's correct.

21  Q.    Did you get this mortgage through a mortgage broker?

22  A.    Yes.

23  Q.    Do you recall the name of the mortgage broker?

24  A.    No, I don't.

25  Q.    Did you know when you signed this that you were agreeing

RESIDENTIAL CAPITAL, LLC, ET AL.                                    22

1   to make payments to Primary Residential of $5,878.13 a month?

2   A.    Yes.

3   Q.    And you were supposed to do that for 120 months?

4   A.    Yes.

5   Q.    And did you know that at the end of that ten-year period,

6   that your payments would go up to $7,749.92?

7   A.    Yes.

8   Q.    Do you recall your total income -- your income and your

9   wife Cheryl's income when you made this mortgage in October of

10  2006?

11  A.    No, I don't.

12  Q.    Was your income more than the payments which were 5,878?

13  A.    Yes, they were.

14  Q.    And was it 6- or 700 dollars more than that?

15  A.    Yes, sir.

16  Q.    So you had to live on -- after you made your mortgage

17  payment, you had to live on 6- or 700 dollars.  Is that true?

18  A.    Except from our savings and stock and stuff, yes.

19  Q.    So you had supplemental --

20  A.    Supplemental --

21  Q.    -- funds available to use?

22  A.    Yes.

23  Q.    Did you, on your mortgage, have to pay your own real

24  estate taxes?

25  A.    Yes, we did.

RESIDENTIAL CAPITAL, LLC, ET AL.                    23

1   Q.   Did you have to pay your own insurance?

2   A.   Yes.

3   Q.   And do you recall about how much you paid on your taxes

4   every year on that house?

5   A.   I can't recall right now, no.

6   Q.   Would it be fair to say that it was several thousands of

7   dollars --

8   A.   Yes.

9   Q.   -- 9- or 10,000 dollars?

10  A.   Yes, it was.  Yes, it was.

11  Q.   And do you recall what your insurance payments were for

12  the house?

13  A.   A couple thousand.

14  Q.   And you made all those payments?

15  A.   Yes, we did.

16  Q.   And you made them all on time?

17  A.   Yes, sir.

18  Q.   And you were able to do that by drawing from your savings?

19  A.   Yes.

20  Q.   You did that for a period of time from roughly October

21  2006 until in April of 2009, you and your wife realized that

22  your savings were going down?

23  A.   Yes, we did.

24  Q.   And is that the time that you called GM to see if you

25  might qualify for this federal HAMP program?

RESIDENTIAL CAPITAL, LLC, ET AL.                    24

1   A.    Yes.

2   Q.    Could you have continued to make the payments by drawing

3   on your savings, without the HAMP program?

4   A.    No.

5   Q.    Did you have any savings in April of 2009?

6   A.    Yes, we did.

7   Q.    So do you recall about how much you had in savings in

8   April of 2009?

9   A.    Let's see.  Roughly 50,000 dollars.

10  Q.    So you used your savings and you were able to pay for

11  April, May, June, and July of 2009 on your mortgage.  Is that

12  true?

13  A.    Yes.

14  Q.    And you were able to do that for August, September,

15  October, November and December of 2009?

16  A.    Yes.

17  Q.    Because you had enough savings to cover that?

18  A.    Right.  Yes, sir.

19  Q.    And you wound up signing a contract for the sale of your

20  house in December of 2009, didn't you?

21  A.    Yes, I did.

22  Q.    If you would not have sold your house in December of 2009,

23  could you have continued to make payments on your house and

24  live in your house?

25  A.    Not if they -- if they didn't cooperate on -- with us on

RESIDENTIAL CAPITAL, LLC, ET AL.                          25

1    lowering our mortgage payment, no, we could not have.

2    Q.    And did you realize, then, that because your living

3    payments and your house payments and your taxes and interest

4    were depreciating your savings, did you realize that it might

5    be financially wise to sell the house?

6    A.    Yes, sir.

7    Q.    So did you have the house listed for sale in the summer of

8    2009?

9    A.    Yes, we did.

10   Q.    Did you originally list it in March of 2008?

11   A.    Yes.

12   Q.    And do you recall the original listing price?

13   A.    I believe it was like 1.5 or -6 million -- 1.5.

14   Q.    Did you have to reduce the price?

15   A.    Yes, we did.

16   Q.    Do you recall how far you reduced it?

17   A.    To 1.3, I believe it was.

18   Q.    Okay.

19   A.    1.3.

20   Q.    Okay.  So tab number 1 is the note that you originally

21   signed, correct, that you had to make your mortgage payment?

22   A.    Yes.

23   Q.    Okay.  If you would be so kind as to turn to tab number 3.

24   And that has a sticker on it for the purposes of these

25   proceedings of Plaintiff's Exhibit number 14.  Would you please

RESIDENTIAL CAPITAL, LLC, ET AL.                    26

1   look at tab number 3?

2   A.   Yes, sir.

3   Q.   Is that a letter that General Motors Mortgage sent to you

4   when you originally got your mortgage with them?

5   A.   Yes, it is.

6   Q.   Okay.  Actually, you got your mortgage with Primary

7   Residential, to start with, didn't you?

8   A.   Yes, sir.

9   Q.   But you received this letter on October 14th, 2006, from

10  GMACM, and they told you in this letter that your loan was

11  transferred from Primary Residential to GMACM, effective

12  December 1st, 2006, didn't they?

13  A.   Yes, sir.

14  Q.   And if you'll look down to the bottom of the page -- or to

15  the two-thirds of the way down on the page, did this letter

16  tell you the address that you should use to write to GM if you

17  had any questions or concerns about your mortgage?

18  A.   Yes, it does.

19  Q.   Can you tell the Court what that address is that they gave

20  you?

21  A.   Post Office Box 622, Waterloo, Iowa.

22  Q.   Okay.  Is it possible that would be Post Office Box 4622?

23  A.   Yes, it is.

24  Q.   Okay.  And you wound up writing to General Motors about

25  the mortgage later on, especially in 2009, didn't you?

1   A.    Yes, sir.

2   Q.    And did you use this address?

3   A.    I believe so, yes.

4   Q.    Were you also given other addresses by General Motors to

5   write to?

6   A.    There were one or two others that they had on --

7   Q.    So when you were sending in your application for the HAMP

8   program, did you send some letters to those other addresses?

9   A.    I guess so.  Prob -- yes.

10  Q.    Now, if you would be so kind as to turn to tab number 4,

11  which is marked on the bottom right-hand corner as Plaintiff's

12  Exhibit in these proceeds, number 18.  Do you have that in

13  front of you, sir?

14  A.    Servicing disclosure?

15  Q.    Yes.

16  A.    Yes.

17  Q.    And was this a document that you received from Primary

18  Residential Mortgage at the time that you originally applied

19  for your mortgage and obtained it?

20  A.    Yes, sir.

21  Q.    And at that time, you read the document?

22  A.    Yes, we did.

23  Q.    And if you'd be so kind as to turn to the second page.

24  Does the document provide for you and your wife Cheryl to sign

25  the document?

RESIDENTIAL CAPITAL, LLC, ET AL.                    28

1   A.   Yes, it does.

2   Q.   And is that your signature and your wife's signature on

3   the bottom of that page?

4   A.   Yes, sir.

5   Q.   And the date is August 29th, 2006?

6   A.   Yes.

7   Q.   And you gave this document to your mortgage broker?

8   A.   Yes, sir.

9   Q.   But you kept this copy?

10   A.   Yes, we did.

11   Q.   And if you would be so kind as to turn to tab number 5?

12   And it's marked at the bottom right-hand corner as Plaintiff's

13   Exhibit 12 to these proceedings.

14   A.   Yes, sir.

15   Q.   Have you ever seen this document before?

16   A.   Yes, sir.

17   Q.   Okay.  If you would be so kind, please, to turn to the

18   second to the last page of tab number 5?  Is that your

19   signature, sir?

20   A.   The last page?

21   Q.   Second to the last page.

22   A.   Yes, it is.

23   Q.   And that's your wife Cheryl's signature as well?

24   A.   Yes, it is.

25   Q.   And I see at the bottom that it is signed by Ray Bowie

1  (ph.) Esq.  Do you see that, sir?

2  A.    Yes, sir.

3  Q.    And was he assisting you in handling this listing?

4  A.    Yes, he was.

5  Q.    And you also had another real estate agent that helped

6  you, too?

7  A.    Yes.

8  Q.    Do you recall her name?

9  A.    Right now, I can't remember her name.  I'll think of it.

10  Q.    Okay, we'll get to that later.

11       If you would now turn back to the front page or the first

12  page of this tab number 5, your listing agreement?

13  A.    Yes, sir.

14  Q.    This was to cover your house on Egret Avenue in Naples,

15  Florida?

16  A.    This is for Vanderbilt Avenue.

17  Q.    Okay.  Was that your house at 287 Egret Avenue?  Look at

18  the property address under subparagraph (c).

19  A.    Yes.  That --

20  Q.    And that was the last house that you owned in Florida,

21  right?

22  A.    Yes, it is.

23  Q.    Okay.  And the listing price was 1,969,000.  Is that

24  correct?

25  A.    Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    30

1   Q.   And was that the price that you had to lower progressively

2   as time went on and you weren't getting offers?

3   A.   Yes, we did lower the price.

4   Q.   If you would be so kind as to turn to the last page, now,

5   of this tab number 5?

6   A.   Yes, sir.

7   Q.   And you and your wife signed this brokerage relationship

8   disclosure form as well, in March 2008, didn't you?

9   A.   Yes, sir.

10  Q.   Would you please now turn to tab number 7?  Do you have

11  that in front of you?

12  A.   Yes, I do.

13  Q.   Tab number 7 bears a Plaintiff Exhibit number 37 for these

14  proceedings, in the bottom right-hand corner.  Have you ever

15  seen this letter before?

16  A.   Yes, sir.

17  Q.   Was this a letter that you received from GMAC Mortgage?

18  A.   Yes, it is.  Yes, it is.

19  Q.   And in the top left-hand corner, the address that they

20  gave you to write concerning these issues was PO Box 780

21  Waterloo, Iowa?  Is that right, sir?

22  A.   That's correct.

23  Q.   Do you know what the issues were that this letter

24  concerned?

25  A.   I don't remember what the issue was on this letter.

RESIDENTIAL CAPITAL, LLC, ET AL.                    31

1   Q.   Were the issues that this concerned was the HAMP payment

2   reduction that you'd applied for?

3   A.   Yes, it is.

4        (Pause)

5   Q.   Mr. Mack, was this letter about your HAMP application --

6             THE COURT:  I think he said yes.  He said it was.

7             MR. GARBER:  Oh, I'm sorry.  I didn't hear that.

8             THE COURT:  That's okay.

9   Q.   And I see that GMAC signed it, "Customer Care Loan

10  Servicing" at the bottom of the paper.  Do you see that?

11  A.   Yes, I do.

12  Q.   Okay.  If you would be so kind, now, as to turn to tab

13  number 8?  And you'll see it has Plaintiff's Exhibit number 38

14  for these proceedings on the bottom right-hand corner.  And

15  immediately above that, plaintiff's exhibit number -- somebody

16  has written in "SS Pension" -- and I can't read the other word.

17  "Realty" maybe?  Do you see that?

18  A.   Yes, I do.

19  Q.   Is that your wife's handwriting -- Cheryl Mack's?

20  A.   Yes.  Yes, it is.

21  Q.   So is this a document that you received on or about August

22  28th, 2009 from GMAC?

23  A.   Yes, sir.

24  Q.   And is this letter also concerning your application for

25  your HAMP loan?

RESIDENTIAL CAPITAL, LLC, ET AL.                    32

1   A.   Yes, it is.

2   Q.   If you would look to the bottom of the page, there's a

3   notice.  Do you see that notice?  Not quite the bottom of the

4   page, but two-thirds of the way down?  Do you see the notice in

5   italics?

6   A.   Yes, I do.

7   Q.   Okay.  When you got the letter, did you read the notice

8   that said it was an attempt to collect a debt?

9   A.   Yes, sir.

10  Q.   And the address that they gave you to write to concerning

11  any response to this letter is found at the bottom left-hand

12  corner of the page, and it's in Dallas, Texas, isn't it?

13  A.   Yes, it is.

14  Q.   If you would now turn to tab number 9.  Do you have that

15  in front of you?

16  A.   Yes, I do.

17  Q.   And that's listed as Plaintiff's Exhibit number 16 to

18  these proceedings.  Is this a letter that you signed?

19  A.   Yes, sir.

20  Q.   And that's your wife signature as well?

21  A.   Yes, it is.

22  Q.   And did you sign it on or about August 10th, 2009?

23  A.   Yes, we did.

24  Q.   Was this a letter that you sent to support your

25  application for mortgage payment relief under the HAMP program?

1  A.    Yes.

2  Q.    Do you know what address you sent it to?

3  A.    I'm not sure which address it was in this -- one of them

4  actually had already sent --

5  Q.    Okay.

6  A.    -- stuff to.

7  Q.    Would you be so kind, now, as to turn to tab 10?  And that

8  bears a sticker of Plaintiff's Exhibit number 39 for

9  identification to these proceedings.  Do you see that, sir?

10 A.    Yes, I do.

11 Q.    And this letter is dated September 30th, 2009?

12 A.    Yes, sir.

13 Q.    Did you receive this from GMAC Mortgage?

14 A.    Yes, we did.

15 Q.    And if you'll look towards the bottom of the page, you'll

16 see that same notice telling you that this is an attempt to

17 collect the debt.  Do you see that?

18 A.    Yes, it is.

19 Q.    Did you read this letter when you got it?

20 A.    Yes, sir.

21 Q.    And did you get it on September 30th, 2009 or soon

22 thereafter?

23 A.    Yes, sir.

24 Q.    Somebody has circled a telephone number that's about

25 halfway down.  Do you see that circle around the telephone

1   number?

2   A.    Yes.

3   Q.    Did your wife, Ms. Mack, do that?

4   A.    Yes, I believe so.

5   Q.    And is that a telephone number that you used in calling GM

6   about the issue that this document raised?

7   A.    Yes.

8   Q.    And was this document to ask you for further documentation

9   in support of your application for the HAMP program mitigation

10  request?

11  A.    Yes, it is.

12  Q.    At the bottom left-hand corner, they gave you the address

13  to write back as Dallas, Texas?

14  A.    Yes, it is.

15  Q.    If you would be so kind, now, as to turn to tab number 11?

16  And it's marked as Plaintiff's Exhibit 34 for identification

17  for these proceedings?

18  A.    Yes.

19  Q.    Mr. Mack, this letter is dated October 7th, 2009.  Did you

20  and your wife Cheryl write it on about that date?

21  A.    Yes, we did.

22  Q.    And I see it has an address on it that this is GMAC

23  Mortgage in Dallas, Texas?

24  A.    Yes.

25  Q.    Did you send that to Dallas, Texas because it was in

RESIDENTIAL CAPITAL, LLC, ET AL.                    35

1    response to the letters that you had received from General

2    Motors about your payment mitigation request?

3    A.   Yes.

4    Q.   Would you now turn to page number -- or tab number 12?

5    Are you there, sir?

6         Take a minute and get some water if you'd like.

7              THE COURT:  You don't have an exhibit number on this

8    one?  It's not on mine.

9              MR. GARBER:  Your Honor, I don't have an exhibit

10   number on mine, either.  I'm sure I can identify it later.

11             THE COURT:  Yeah, that's fine.  I just want to be sure

12   that if you're going -- you're going to have to mark it with an

13   exhibit number for the record.  But you don't have to do it

14   right now.

15             MR. GARBER:  I have a list of all my exhibits.  I'll

16   check.

17             THE COURT:  That's fine.

18   Q.   Mr. Mack, have you ever seen this letter before that's

19   found at tab number 12?

20   A.   Yes, I -- yes, I have.

21   Q.   That's your signature at the bottom of the page?

22   A.   Yes, sir.

23   Q.   And that's also your wife's signature?

24   A.   Yes, sir.

25   Q.   And did you send this letter to GMAC Mortgage?

RESIDENTIAL CAPITAL, LLC, ET AL.                                    36

1   A.   Yes, we did.

2   Q.   And the address you sent it to was PO Box 4622, Waterloo,

3   Iowa?

4   A.   Yes, sir.

5   Q.   Did you put a first-class stamp on your envelope?

6   A.   Yes.

7   Q.   Did you personally put it in the mailbox?

8   A.   Yes, I did.

9   Q.   And did you send it out on or about the date of this

10  letter, which is October 26th, 2009?

11  A.   Yes.

12  Q.   And did you use this address because General Motors had

13  told you to use this address when they first signed onto your

14  mortgage back in October of 2006?

15  A.   Yes, sir.

16  Q.   Actually, you had help in obtaining this address from a

17  bookkeeper that you had?

18  A.   Yes.

19  Q.   And that was somebody in the neighborhood that came by to

20  help you from time to time, with your financial affairs?

21  A.   Yes, sir.

22  Q.   Do you recall her name?

23  A.   I can't remember her now.

24  Q.   Okay.  Is this letter a letter that your wife, Cheryl

25  Mack, actually composed and typed?

1    A.    Yes.

2    Q.    And when you sent it to General Motors, you actually kept

3    a copy for your file?

4    A.    Yes, we did.

5    Q.    At the time that you sent this letter, was the foreclosure

6    still actively proceeding against you?

7    A.    Yes.

8    Q.    And you say in this letter that you believed that you were

9    not in arrears with General Motors Acceptance Corporation.  Is

10   that true?

11   A.    That's true, yes.

12   Q.    And even though you said GMAC, did you mean General Motors

13   Acceptance Corporation and Mortgage?

14   A.    Yes.

15   Q.    Because that's who you sent it to, isn't it?

16   A.    Yes, it is.

17   Q.    Did you receive a response to this letter?

18   A.    No, I don't think so.

19   Q.    You didn't receive a response in November, did you?

20   A.    No.

21   Q.    You didn't receive a response in December?

22   A.    No, sir.

23   Q.    You didn't receive one in January of 2010?

24   A.    No, sir.

25   Q.    Have you ever received a response to this letter?

RESIDENTIAL CAPITAL, LLC, ET AL.                    38

1   A.   No.

2   Q.   If you would be so kind as to turn to tab number 13.   And

3   we have this one labeled as Plaintiff's Exhibit number 40 for

4   identification in these proceedings.   Can you take a minute and

5   look at that?   Do you have that in front of you, sir?

6   A.   Yes, I do.

7   Q.   Okay.   That's a letter from GMAC Mortgage to you?

8   A.   Yes, sir.

9   Q.   And it has a date of November 4th, 2009.   Did you receive

10  it shortly thereafter?

11  A.   Yes, we did.

12  Q.   And this letter is about your application for your

13  mortgage payment reductions?

14  A.   Yes.

15  Q.   And it is not a response to your letter that we just

16  looked at asking about help from the foreclosure that had been

17  filed by Deutsche Bank?

18  A.   No.

19  Q.   The address that they wanted you to respond to was PO Box

20  780 Waterloo, Iowa, concerning this, now?

21  A.   Yes, it is.

22  Q.   We'd seen earlier that they had an address on your

23  mortgage mitigation request to use Dallas, Texas, but now they

24  say at Waterloo, Iowa on the mitigation request?

25  A.   Yes.

1   Q.   Would you be so kind as to turn to tab number 14, which

2   there is a sticker for identification to these proceedings, as

3   Plaintiff's Exhibit number 41.

4   A.   Yes, sir.

5   Q.   And this is a letter that you received from GMAC Mortgage

6   on or about December 15th, 2009?

7   A.   Yes, sir.

8   Q.   And they talk about an escrow for taxes and insurance on

9   your house, don't they?

10  A.   Yes.

11  Q.   Can you explain to the Court why you believe you received

12  this letter?

13  A.   I placed a telephone call to them and asked them why, and

14  they said that --

15  Q.   You asked them why what?

16  A.   They wanted -- they wanted to make sure that we had the

17  taxes paid and the insurance paid, and that they just wanted to

18  make sure it was paid.  I said we were paying it all along, why

19  did you have to raise it and take over the payments on it?  And

20  they said well, can't take a chance of you not being able to

21  pay your taxes and insurance bills.

22  Q.   And so did they try to raise your payment that you were

23  paying to them?  You were paying, at that time, 5,878 for

24  mortgage and principal, weren't you?

25  A.   Yes, we were.

RESIDENTIAL CAPITAL, LLC, ET AL.                    40

1  Q.   Were they trying to raise how much your payment would be?

2  A.   Yes, they did.

3  Q.   What did they want to raise it to?

4  A.   Approximately 12,000 -- 12,000 dollars.

5        MR. LEWIS:  Your Honor, I don't see the relevance of

6  this to the issue before the Court, which is the October

7  26th --

8        MR. GARBER:  Your Honor --

9        THE COURT:  Overruled.

10 Q.   So when you talked to the individual who had sent you this

11 letter and asked to raise your rate to 12,000 a month, did you

12 tell him how you were able to make your payments for your taxes

13 and insurance?

14       THE COURT:  Are you both misspeaking when you say

15 12,000 dollars a month?

16       MR. GARBER:  Pardon me?

17       THE COURT:  I think you said 12,000 dollars a month?

18       MR. GARBER:  Yes.  They raised his payment from 5,878

19 to 12,000 a month.

20       THE COURT:  Okay, go ahead.

21 Q.   Did you explain to him how you were able to pay your taxes

22 and insurance?

23 A.   Yes, I did.

24 Q.   And what did you tell him?

25 A.   I told him that we both retired, and we had saved for

RESIDENTIAL CAPITAL, LLC, ET AL.                              41

1  retirement.  We invested our money in a lot of company stock,

2  and just we inherited money from both our parents that passed

3  away.  And we just saved it and bought -- at least we had

4  bought two houses and made money on the two houses that we had

5  bought and sold before we bought Egret Avenue.

6  Q.   And did you tell him that you had been paying all your

7  taxes and insurance through the whole loan, yourself?

8  A.   Yes.

9  Q.   And did you told him that you could and would keep paying

10 those in the future?

11 A.   Yes.

12 Q.   Yourself?

13 A.   Yes.

14 Q.   And that you did not want and did not need an escrow?

15 A.   Yes.

16 Q.   Mr. Mack, if you would now be so kind as to turn to the

17 second volume of the documents that we would like to show to

18 the Court today.  And would you please look at that binder?

19 A.   Number 16?

20 Q.   Yes, but I want you to turn to tab number 17.

21 A.   Yes, sir.

22 Q.   And that was listed as Plaintiff's Exhibit number 13 for

23 identification in these proceedings in the bottom right-hand

24 corner.  Do you see that, sir?

25 A.   Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    42

1              MR. LEWIS:  Sorry, Mr. Garber, which are you on?

2              MR. GARBER:  Tab number 17.

3              MR. LEWIS:  Thank you.

4    Q.   Mr. Mack, is this a contract to sell your house that you

5    signed?

6    A.   Yes, it is.

7    Q.   And if you would be so kind as to turn to the third page

8    of this tab?

9    A.   Yes, sir.

10   Q.   Do you have that in front of you, sir?

11   A.   Yes.

12   Q.   Is that your signature?

13   A.   Yes, sir, it is.

14   Q.   And the date is December 9th, 2009.  Is that the date you

15   signed it?

16   A.   Yes, it is.

17   Q.   And your wife, Cheryl Mack, also signed it on that date?

18   A.   Yes, she did.

19   Q.   And Mr. Hogan, who wanted to buy your house at this price

20   was -- signed it before you signed it, on December 8th, 2009?

21   A.   Yes, sir.

22   Q.   Now, if you'll look down at the bottom, you'll see

23   beneath, Gulf Breeze Real Estate is the listing broker.  The

24   sales associate was Sue Myhelic.  Was that the name you were

25   trying to remember?

1  A.   Yes, it is.

2  Q.   Now, I would ask if you would be so kind as to turn to the

3  second page of this tab number 17.  And would you please read

4  into the record what -- under the additional terms and

5  conditions on paragraph 7, number 1 is?

6  A.   Number 1, it says, "Attached is an addendum to release of

7  pending foreclosure."

8  Q.   And now, if you would turn to that addendum, which is

9  found immediately after your signature page?  Do you have that

10  in front of you?

11  A.   Yes.

12  Q.   And this addendum was signed by you also on December 9th,

13  2009?

14  A.   Yes, it was.

15  Q.   And your wife, Cheryl?

16  A.   Yes.

17  Q.   And Mr. Hogan had signed it the day before?

18  A.   Yes, sir.

19  Q.   And if you would look to paragraph number 1 of the

20  addendum, would you please read the first sentence into the

21  record?

22  A.   Page number 1 of --

23  Q.   Paragraph number 1, the first sentence of that, on this

24  addendum?

25  A.   "Upon acceptance of this offer" --

 1   Q.   No, I think we're in the wrong place.

 2          THE COURT:  Why don't you read it, Mr. Garber so --

 3   Q.   Let me read it to you and you tell me if you agree:  "The

 4   parties acknowledge the existence of a pending foreclosure

 5   action pertaining to this property brought by Deutsche Bank

 6   Trust Companies America, as trustees for the RALI 2007 QS3,

 7   filed in Collier County Circuit Court, as case number

 8   097336-CA, therein the foreclosure action."

 9          That's in your copy, isn't it, sir?

10   A.   Yes, it is.

11   Q.   And the second sentence says, "Seller represents and

12   covenants to the buyer that this foreclosure is unfounded and

13   filed in error, and that seller is current on all payments and

14   not in arrears or default as to any obligation of seller's

15   mortgage."  Do you see that sir?

16   A.   Yes.

17   Q.   And then if you will look down at paragraph number 2 under

18   those covenants, you will see in the last sentence -- and I

19   will read it to you:  "As a result of this legal action, seller

20   anticipates that the foreclosure action will be dismissed prior

21   to the closing date of this transaction.  Do you see that, sir?

22   A.   Yes.

23   Q.   And was that because you thought the foreclosure was

24   unfounded?

25   A.   Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    45

1  Q.    And you thought that you would win the foreclosure by that

2  time?

3  A.    Yes.

4  Q.    And this language was put in there to warn the buyer that

5  in fact you had a title problem that you were attempting to

6  address?

7  A.    Yes, sir.

8  Q.    There were a number of other pages under a second

9  addendum.  Can you turn to them?  They're immediately past this

10  addendum.  Do you have that in front of you?

11  A.    No, I don't.

12  Q.    Let me show you where it is.

13        That is your signature, sir, at the bottom of the page?

14  A.    Yes, sir.

15  Q.    Bearing the date of December 9th, '09?

16  A.    Yes.

17  Q.    And Cheryl, your wife's, signature as well?

18  A.    Yes.

19  Q.    Signed by Mr. Hogan the day before?

20  A.    Yes.

21  Q.    And that was all part of the contract that you signed with

22  Mr. Hogan?

23  A.    Yes, sir.

24  Q.    And would you be so kind now as to turn to tab number 18?

25  And that is listed as Plaintiff's Exhibit number 24 to these

RESIDENTIAL CAPITAL, LLC, ET AL.                    46

1   proceedings.  Do you have that in front of you, sir?

2   A.   Yes, I do.

3   Q.   And you were originally sued for foreclosure by Deutsche

4   Bank.  Did they also serve this notice of lis pendens on you?

5   A.   Yes, they did.

6   Q.   And I see that this was filed in the court on August 20th,

7   2009.  Did you receive it when the sheriff came to your door,

8   some few days after that?

9   A.   Yes.

10  Q.   Do you recall the date in August you received this?

11  A.   No, I don't.

12  Q.   What was your understanding of the effect of this

13  document?

14  A.   I had no idea what -- I believe -- I had no idea what was

15  going on.  I -- I called them -- I called GMAC and asked them

16  if they had sold my mortgage, and they -- they told me no, we

17  did not sell your mortgage.  And I asked are we all -- are we

18  paid up, do we owe any more, were we ever late?  So they said

19  the payments are up to date.  I asked if they knew anything

20  about Deutsche.  They said that they didn't know anything about

21  Deutsche Bank foreclosing.

22  Q.   And you had that -- the gist of that same conversation

23  with GM, not only when you got this in August but also in

24  September?

25  A.   Yes, sir.

RESIDENTIAL CAPITAL, LLC, ET AL.                    47

1   Q.   And conversations in October?

2   A.   Yes.

3   Q.   And also in November --

4   A.   Yes.

5   Q.   -- of 2009?

6   A.   Yes.

7   Q.   Sometimes you called?  Sometimes you called GM?

8   A.   Yes, I did.

9   Q.   And sometimes Cheryl called GM?

10  A.   Yes.

11  Q.   Were you both present for most of those calls?

12  A.   Yes, we were.

13  Q.   Would you please be so kind as to turn to tab number 19?

14  Do you have that in front of you, sir?

15  A.   Yes, I do.

16  Q.   This is marked as Plaintiff's Exhibit number 5 to these

17  proceedings.  And to the best of your knowledge, did you

18  receive a copy of this notice of voluntary dismissal?

19  A.   No, I did not.

20  Q.   Okay.  Did you find out, sometime in December of 2009,

21  that, in fact, Deutsche Bank had cancelled the foreclosure

22  lawsuit against you?

23  A.   No, I did not.

24  Q.   Did you find out, before the closing date of the sale to

25  your house, with Mr. Hogan, that they had cancelled the

RESIDENTIAL CAPITAL, LLC, ET AL.                    48

1  foreclosure suit against you?

2  A.   No, I did not.

3  Q.   If you would be so kind as to turn to tab number 20,

4  Plaintiff's statement number -- Exhibit number 32 for

5  identification in these proceedings.  Would you please look at

6  the bottom?

7  A.   Yes, sir.

8  Q.   Is that your signature?

9  A.   Yes, it is.

10  Q.   And is that your wife, Cheryl Mack's signature?

11  A.   Yes, it is.

12  Q.   The date of this payoff statement is January 26th, 2010,

13  in the top right-hand corner.  Do you see that, sir?

14  A.   Yes.

15  Q.   Is that about the date that you saw this?

16  A.   Yes.

17  Q.   And you signed it on that date?

18  A.   Yes, sir.

19  Q.   And if you will please look down at the amount due, look

20  at item number 3.  Do you see where they are charging

21  $23,923.36 for escrow impound fees?

22  A.   Yes, sir.

23  Q.   Do you know what that was for?

24  A.   No, I do not.

25  Q.   And if you will look down to about the tenth item down,

RESIDENTIAL CAPITAL, LLC, ET AL.                49

1  where it says "other fees and costs", do you see that, sir?

2  A.    Yes.

3  Q.    And they were charging 3,712 dollars?

4  A.    Yes.

5  Q.    Do you recall what that was for?

6  A.    No, I do not.

7  Q.    But all those items were added to the principal balance

8  that you needed to pay?

9  A.    Yes.

10 Q.    And the total that GM required to be paid, before they

11 would release this mortgage, was one million-two hundred --

12          THE COURT:  It's $1,025,092.41.

13 Q.    -- 25,092, yes, correct?

14 A.    Yes, it is.

15 Q.    Okay.  And if you would be so kind now as to turn to tab

16 number 21.  And that bears Plaintiff's Exhibit number, for

17 identification, 26 for these proceedings.  Do you have that,

18 sir?

19 A.    Yes, I do.

20 Q.    Okay.  And if you would turn to the last page of this

21 exhibit.

22 A.    Yes.

23 Q.    Is that your signature on this settlement statement?

24 A.    Yes, it is.

25 Q.    And Mrs. Mack's as well?

RESIDENTIAL CAPITAL, LLC, ET AL.                    50

1    A.   Yes, it is.

2    Q.   And the Hogans signed this too?

3    A.   Yes, sir.

4    Q.   They weren't at the closing with you?

5    A.   No, they weren't.

6    Q.   You signed it on or about January 28th, 2010?

7    A.   Yes.

8    Q.   And if you would now turn to the first page, and please

9    look under "Seller" side -- it's a little hard to see, but it's

10   on the right-hand side.  Do you see the right-hand side?  It's

11   divided up into the buyer on the left and the seller on the

12   right?

13   A.   Yes.

14   Q.   Okay.  And they have, under item 504, "Payoff of the first

15   mortgage loan", do you see that, sir?

16   A.   What, please?

17   Q.   Item number 504, "Payoff of the first mortgage loan".

18   A.   Yes, sir

19   Q.   And they deducted out of the funds you were to receive

20   that day, the sum of $1,025,671.78?

21   A.   Yes.

22   Q.   And that was the amount that they told you you had to pay

23   to have your mortgage released, in their payoff statement that

24   was in tab number 20, wasn't it?

25   A.   Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    51

1  Q.    And you did pay that amount?

2  A.    Yes.

3  Q.    And you received out of this closing -- after paying all

4  the money that GM was demanding, and the cost of your sale, you

5  received the amount of $63,151.47?

6  A.    Yes.

7  Q.    Now, if you would be so kind to turn to tab number 22,

8  which bears Plaintiff's Exhibit number 21 for identification in

9  these proceedings.  Do you have that in front of you, sir?

10 A.    Yes.

11 Q.    And this was a letter dated January 14th, 2010, isn't it?

12 A.    Yes, sir.

13 Q.    Did you receive this from General Motors Acceptance

14 Corporation Mortgage?

15 A.    Yes, we did.

16 Q.    Had you contacted General Motors Acceptance Corporation

17 Mortgage, concerning the charge that you had on your mortgage

18 payoff statement of 3,712 dollars, to inquire as to what it

19 was?

20 A.    Did I inquire about it?

21 Q.    Yeah, did you ask GM why they were charging you 3,712

22 dollars?

23 A.    I believe we did, yes.

24 Q.    All right.  And was this the answer they gave you to

25 explain why they were charging that amount of money to you?

1    A.    Yes.

2    Q.    And did you know that this money would go to reimburse

3    them for their attorney costs when they filed, or costs when

4    Deutsche Bank caused the mortgage foreclosure to be filed

5    against you?

6    A.    No, I didn't know that.

7    Q.    Even after reading this letter, you didn't understand that

8    you had to reimburse them for the foreclosure they filed

9    against you?

10   A.    No.

11   Q.    Would you please turn back to tab number 19?  This was the

12   notice of voluntary dismissal, Plaintiff's Exhibit 5 to these

13   proceedings.  Do you have that in front of you, sir?  And I am

14   going to read into the record, and please tell me if I have it

15   wrong:  "Plaintiff, the prevailing party, by and through its

16   undersigned counsel, voluntarily dismisses its complaint for

17   foreclosure and other relief, without prejudice, and cancelled

18   the notice of lis pendens as to the property described as

19   follows".  Do you see that, sir?

20   A.    Yes, I do.

21   Q.    Would you be so kind now as to turn to tab number 23?  And

22   it's marked as Plaintiff's Exhibit number 28 for identification

23   in these proceedings.  Do you see that, sir?

24   A.    Yes, sir.

25   Q.    And this is a release of the mortgage that you paid GMACM

RESIDENTIAL CAPITAL, LLC, ET AL.                    53

1    for -- in your closing of late January of 2010, isn't it?

2    A.    Yes.

3    Q.    And it was filed in the clerk's office on February 17th,

4    2010?

5    A.    Yep.

6    Q.    It's dated by Mortgage Electronic Registration Systems on

7    February 11th, 2010.  Did you receive a copy of this?

8    A.    No, I don't think so.

9    Q.    Okay.  Mr. Mack, was your wife, Cheryl Mack, depressed and

10   upset when General Motors did not respond to your letter of

11   October 26th, 2009?

12   A.    Yes, she was, very depressed.

13   Q.    Now, I know she was -- she was concerned about the

14   foreclosure before that date, wasn't she?

15   A.    Yes, sir.

16   Q.    And you were too?

17   A.    Yes.

18   Q.    Did the fact that you did not get a response to that

19   letter, did that cause a problem with Cheryl?

20   A.    Yes, definitely.

21   Q.    And what happened to her in November of 2009?

22   A.    She -- in 2009, she went into the hospital.

23   Q.    I'm sorry, what?

24   A.    That's the date she went into the hospital, I believe.

25   Q.    Why did she go into the hospital in November?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    54

1  A.   She was very -- she couldn't -- I don't know how to

2  explain it.  She was very upset, just couldn't handle daily

3  living anymore and wanted to give up, and she just had -- she

4  had a drinking problem at the time, and we tried to get that

5  straightened out.  So she was in the hospital.

6  Q.   Did there come a time, in November of 2009, when she took

7  an overdose or an excessive amount of Ambien?

8  A.   Yes, there -- yes, she did.

9  Q.   Was that about November 9th, 2009?

10  A.   Yes.

11  Q.   And did she also mix that with alcohol?

12  A.   Yes.

13  Q.   Do you know how many Ambiens she took?

14  A.   No, I have no idea.

15  Q.   And forgive me, Mr. Mack, I know you may not be

16  comfortable with this; some people have described this as a

17  suicide attempt.  Do you think it was?

18  A.   Yes.

19  Q.   You do?

20  A.   Yes, sir.

21  Q.   How long was she in the hospital?

22  A.   For approximately a week.

23  Q.   When she got out of the hospital, was she better?

24  A.   Yes, a little bit; yes, she was.

25  Q.   Did she continue to show signs of depression after that

RESIDENTIAL CAPITAL, LLC, ET AL.                    55

1  date?

2  A.    Yes, she did.

3  Q.    And did she show depression in December of 2009?

4  A.    Yes, she did.

5  Q.    And in January of 2009?

6  A.    Yes, sir.

7  Q.    January of 2010, I should say?

8  A.    Yes.

9  Q.    You stayed in Naples, after you sold your house in late

10 January, for about another eight or nine months?

11 A.    Yes, we stayed there for one year.

12 Q.    Did she --

13 A.    We rented the house.

14 Q.    Did she continue to show signs of depression in that year

15 that you were down there, or nine months?

16 A.    Yes, she did.

17 Q.    And then you moved to New Jersey?

18 A.    Yes.

19 Q.    Why did you move to New Jersey?

20 A.    Well, she was -- she told me that she knew that she had a

21 kidney problem, and well, I knew that things -- I thought

22 things might be better if we were with family and where we had

23 lived before we did move to Florida, that it might help out her

24 depression, which it didn't.  And she just continued to get

25 worse because of the kidneys -- kidney problem.

RESIDENTIAL CAPITAL, LLC, ET AL.                    56

1  Q.   Now, she had a kidney problem before she went to the

2  hospital in November of 2009, didn't she?

3  A.   Yes, she did.

4  Q.   Did the problem get worse after that hospitalization?

5  A.   Yes.

6  Q.   And did there come to a point where she required dialysis

7  then?

8  A.   Well, she -- she used dialysis.

9  Q.   When did they recommend that she take dialysis?

10 A.   On that date when she left the hospital, they said she

11 would have -- it would be good for her to start dialysis.

12 Q.   And she did not want to do that?

13 A.   No, sir.

14 Q.   Had she ever taken dialysis before?

15 A.   No.

16 Q.   When you moved to New Jersey, did they also try to get her

17 to take dialysis?

18 A.   I tried to talk her into it, but she would not have

19 anything to do with it.

20 Q.   She died in October of 2013?

21 A.   Yes, she did.

22 Q.   Do you know what the cause of death was?

23 A.   Well, her kidneys.

24 Q.   And that whole time she never underwent dialysis?

25 A.   No, sir.

RESIDENTIAL CAPITAL, LLC, ET AL.                    57

1   Q.   And do you know why?

2   A.   I believe I do; I don't believe she wanted to live

3   anymore.

4   Q.   At the time that you signed the contract with Mr. Hogan to

5   sell your house in Florida, did you know that General Motors

6   had dismissed the suit against you?

7   A.   No, we did not.

8   Q.   Did Cheryl oppose moving to New Jersey after you sold your

9   house and moved out to Florida?

10  A.   She didn't want to leave Florida, no, but -- she didn't

11  want to leave Florida, and after we left Florida we had

12  problems, started to have problems as the kidneys got worse.

13  She kept saying, I want to go back home, I want to go back

14  home.  And we couldn't convince her that her home was here in

15  New Jersey.

16  Q.   And when she said I want to go back home, what was she

17  referring to?

18  A.   Florida.

19  Q.   Mr. Mack, what was your life like with Cheryl before your

20  October 26th, 2009 letter?

21  A.   We didn't have any problems.  I mean, we were --

22  everything was normal.

23  Q.   She had some depression problems before that time, didn't

24  she?

25  A.   Yes.

1   Q.   And she was seeing a psychiatrist for that?

2   A.   Yes, she was.

3   Q.   Do you recall the name of the psychiatrist?

4   A.   No, I do not -- I don't.

5   Q.   Was it Dr. Lichi?

6   A.   Yes, it is.

7   Q.   And were you aware that in 2005 she actually tried to

8   commit suicide?

9   A.   Yes.

10  Q.   After she began seeing Dr. Lichi, did she -- did her mood

11  and her depression that existed in 2005, did that get better?

12  A.   Yes, it did a little.  It got a little better.  She did a

13  little better.

14  Q.   You bought your house on Egret in 2 -- did you buy it in

15  2006?

16  A.   2006?

17  Q.   Yeah, that was when you got the loan with GM.  Was that

18  when you bought the house?

19  A.   Yes, sir.

20  Q.   To the best of your memory, was it a refinancing, with GM?

21  A.   Yeah.

22  Q.   The fact that you bought that nice house, did that improve

23  her attitude about life?

24  A.   Yes, she loved that house.  She thought that we were going

25  to be there until the end, but --

1   Q.   What did she like to do with the house?

2   A.   She was a decorator, she liked to decorate.

3   Q.   Did she do gardening?

4   A.   No.

5   Q.   Did you and Cheryl travel, did you enjoy traveling before

6   October of 2009?

7   A.   Yes, we did.

8   Q.   When was the last time you traveled before you wrote the

9   letter of October 26th, 2009?

10   A.   What was it?

11   Q.   When was the last time you traveled before you wrote the

12   letter of October 26th, 2009?

13   A.   Approx -- I would say about a year.

14   Q.   Before October of 2009, say September of 2009, was Cheryl

15   and were you physically able to travel if you wanted to?

16   A.   Yes, we were.

17   Q.   After her hospitalization of November of 2009, was Cheryl

18   physically able to travel?

19   A.   No, we did not travel after that.

20   Q.   Now, I noticed when you came in the courtroom today, you

21   were using the assistance of a walker to get to the witness

22   stand?

23   A.   Yes, sir.

24   Q.   And you need that now?

25   A.   Yes, I do.

RESIDENTIAL CAPITAL, LLC, ET AL.                         60

1  Q.   When did you first require the use of a walker to help

2  you?

3  A.   March of this year.

4  Q.   Is that because you broke your leg?

5  A.   Yes, I did.

6  Q.   And you, certainly, don't attribute your broken leg, or

7  your use of the walker, to anything that went on with General

8  Motors, do you?

9  A.   No, I don't.

10 Q.   So would it be fair to say that you might now be impeded

11 from traveling yourself, because you've broken your leg, and

12 you have a walker?

13 A.   I am impeded until I get the doctor's permission to put

14 more weight on my broken leg.

15 Q.   But before March of 2014 -- was it '14 or was it '15, that

16 you broke your leg?

17 A.   '15.

18 Q.   Okay.  Before that were you physically able, could you

19 have traveled if --

20 A.   Yes, sir.

21 Q.   -- Cheryl were here and she could go with you?

22 A.   Yes.

23 Q.   Did Cheryl's depression that came forth as a result of her

24 suicide attempt in November of 2009, did that stay with her as

25 a more significant depression than had ever existed before?

RESIDENTIAL CAPITAL, LLC, ET AL.                          61

1    A.    Yes, sir.

2    Q.    Did she again try to commit suicide in 2011?

3    A.    We were having problems, I don't remember.  She was taking

4    so many pills from -- that were prescribed, and I believe she

5    took an overdose of one pill for one -- one pill, but we caught

6    up with it.

7    Q.    Did your relationship with Cheryl, your personal

8    relationship with your wife, did that suffer in any way after

9    her hospitalization of November of 2009?

10   A.    Yes.

11   Q.    How?

12   A.    She was not a happy person, she did not want to -- she

13   didn't want to do anything.  She was a very good cook, she gave

14   up cooking, and so we had to -- I'm not a good cook, so we had

15   to eat out most of the time.  We didn't go anywhere or do

16   anything.  She was tired.

17   Q.    Did there come a time when she enrolled in hospice in New

18   Jersey?

19   A.    Yes, sir.

20   Q.    And did she have to carry oxygen with her?

21   A.    No, she never had oxy -- oxygen.

22   Q.    You lived in the house in New Jersey on Amber Drive?

23   A.    Amberfield Drive.

24   Q.    Amberfield Drive.  Did she have to have oxygen to walk

25   around the house?

1  A.   Yes, she did have oxygen.  Yes.

2  Q.   And was she required to use that before the time she

3  passed away in October of 2013?

4  A.   She was -- she was supposed to have it on, but she

5  wouldn't keep it on.  It was -- she had -- towards the end it

6  was a twenty-four hour a day, seven day a week job, to take

7  care of her, make sure she had her pills.  If she was having

8  problems with breathing, we would put the breathing tube on.

9  But --

10  Q.   Give me a minute, I just want to go over my notes, and

11  make sure I've covered everything with you.

12          MR. GARBER:  I don't have any further questions at

13  this time.  Thank you very much.

14          THE COURT:  Are you going to move your exhibits into

15  evidence?

16          MR. GARBER:  Yes, Your Honor, I would move all those

17  exhibits.

18          THE COURT:  Well, you need to identify specifically by

19  number.

20          MR. GARBER:  Yes.

21          THE COURT:  And I would -- just bear with me for a

22  second, okay.

23          MR. GARBER:  Mr. Mack --

24          THE COURT:  Hang on just a second, okay.

25          MR. GARBER:  -- you'll have to answer some questions

RESIDENTIAL CAPITAL, LLC, ET AL.                    63

1  from Mr. Lewis.

2          THE COURT:  Yes.  But before you do that, just hold

3  on.  Okay.

4          Okay.  You need to move your exhibits into evidence,

5  but I come back to the point that I think a document that's

6  important to you, the October 26th, 2009 letter, does not bear

7  an exhibit number.  And I -- it's tab 12, and I don't see it on

8  your exhibit list.  Easily fixed, but, I mean, no surprise

9  about that letter.

10          MR. GARBER:  Let me look at my exhibits.

11          THE COURT:  Look at your exhibit list and make sure.

12      (Pause)

13          MR. GARBER:  Your Honor, looking quickly at my exhibit

14  list that I have, I don't see the October 26th letter.

15          THE COURT:  All right.  Mr. Lewis, can we mark this as

16  PX-43?

17          MR. LEWIS:  Yes, Your Honor.

18          THE COURT:  All right.  And this letter is no surprise

19  to you, it's been a key letter throughout.

20          MR. LEWIS:   I was expecting it, Your Honor.

21          THE COURT:  Yes, okay.  So we're marking what's behind

22  tab 12 as PX-43, and it's the October 26th, 2009 letter from

23  the Macks to GMAC Mortgage.

24  (October 26th, 2009 letter from Mr. Mack was hereby marked for

25  identification as Plaintiff's Exhibit 43, as of this date.)

RESIDENTIAL CAPITAL, LLC, ET AL.                    64

1              THE COURT:  Hang on.  And one of my law clerks just

2    handed me a note, I think you have it marked, Mr. Lewis, as DX-

3    8?

4              MR. LEWIS:  We have -- we have it in our binder.

5    We're looking out for Mr. Garber.

6              THE COURT:  Yes.  All right.

7              MR. GARBER:  Thank you.

8              THE COURT:  But -- I'll tell you what we'll do.  Let's

9    take a short recess now.  Let's take a fifteen-minute recess,

10   and then you can begin your cross-examination.

11             MR. GARBER:  Your Honor, before we take the recess --

12             THE COURT:  Yes, go ahead.

13             MR. LEWIS:  -- I would like to approach the bench with

14   Mr. Garvey to discuss something that may affect how I do my

15   examination.

16             THE COURT:  Sure, please,  Come on up.

17             Just close off the recording.

18        (Recess from 11:34 a.m. until 11:38 a.m.)

19             THE COURT:  -- (starts mid-sentence) on the clock in

20   the courtroom, at which point Mr. Lewis can begin his cross-

21   examination.  I don't know how long that will last.  At around

22   12:30 I'll ask you how much further you have to go.  We'll

23   either take a lunch break then or not.  Okay.

24             Anything either of you want to raise?

25             MR. LEWIS:  No.

1          MR. GARBER:  Nothing.

2          THE COURT:  All right.  So we're going to take a

3   recess until five minutes to 12.  Thanks very much.

4      (Recess from 11:39 a.m. until 11:57 a.m.)

5          THE COURT:  All right.  Please be seated.

6          All right.  Before we begin with the cross-

7   examination, we had a brief off-the-record discussion before

8   the recess, regarding stipulated facts which were included in

9   the joint pre-trial conference order.

10          One of my clerks pointed out to me when -- during the

11   recess, that I had never actually signed, so-ordered, the joint

12   pre-trial order.

13          The joint pre-trial order submitted by counsel is

14   filed as ECF docket number 8162, it was filed on February 20th,

15   2015.

16          Unless I hear to the contrary, it's my intention later

17   today to just so order it and have it entered.  Just strike the

18   word "proposed", and have it entered.

19          And, obviously, the stipulated facts which are

20   contained, beginning on page 2 of the pre-trial order, they run

21   from page 2 through the top of page 6, any -- actually -- yeah,

22   2 through page 6.  Any of the facts that the parties have

23   stipulated, the Court will accept them as true, and apply them

24   to any decision the Court renders.

25          Mr. Garber --

RESIDENTIAL CAPITAL, LLC, ET AL.                    66

1          MR. GARBER:  Yes, Your Honor.  Your Honor, there was

2    an area of inquiry I forgot to ask.  And rather than do a

3    redirect, I would like the Court's permission to do that.

4          THE COURT:  Please go ahead.

5    RESUMED DIRECT EXAMINATION

6    BY MR. GARBER:

7    Q.   Mr. Mack, when your wife was hospitalized in November of

8    2009, do you know if there was a bill for that hospitalization

9    that you were aware of?

10   A.   An outstanding bill?

11   Q.   No.  What -- did her medical care cost anything?

12   A.   Yes, it did.

13   Q.   Now, you had Medicare that paid some of her bill?

14   A.   Yes, sir.

15   Q.   And you had your private insurance from your policeman's

16   retirement --

17   A.   Yes.

18   Q.   -- insurance, correct?

19   A.   Yes.

20   Q.   And the whole bill was paid?

21   A.   Yes, it was.

22   Q.   Do you recall about how much that bill was from her

23   hospitalization in November of 2009?

24   A.   I think it was about 30,000 -- 30,000 dollars.

25   Q.   Later on that year, while you were still in Naples, she

1   was, again, hospitalized.  I think that was in October of 2010,

2   do you recall that?

3   A.   Yes.

4   Q.   And, again, was that paid for by Medicare and your private

5   insurance through your policeman's --

6   A.   Yes.

7   Q.   -- retirement?

8   A.   Yes.

9   Q.   And do you recall about how much that bill was?

10  A.   About the same, maybe a little more.

11  Q.   Okay.

12  A.   40 -- 35, 40.

13          MR. GARBER:  I have no further questions.  Thank you.

14          THE COURT:  All right.  Mr. Lewis?

15          MR. LEWIS:  Your Honor, let me begin by reporting to

16  you an agreement that Mr. Garber and I have made regarding

17  exhibits.

18          THE COURT:  Yes.

19          MR. LEWIS:  That will save I think in the end a lot of

20  time.

21          We've agreed that each party's exhibits in the exhibit

22  books that were supplied to the Court, and were listed, will be

23  admitted.  And then we won't have to go through them one-by-

24  one-by-one.

25          THE COURT:  You may have a little bit of a problem

1   with me about that.  Let me explain.

2            MR. LEWIS:  Of course.

3            THE COURT:  I don't have a problem about any exhibit

4   that has been previously marked for identification, which is

5   raised during an examination, or specifically identified in

6   colloquy, is admitted in evidence.  What I always -- I don't --

7   you'll excuse my reference to it, but I don't allow exhibits to

8   simply be dumped in.  I don't know whether -- so there may be

9   exhibits in the exhibit books, yours, Mr. Lewis, or Mr.

10   Garber's, that are not referred to in any testimony or anything

11   else, and I will not admit them in evidence, unless they're

12   specifically identified on the record.  Okay.

13            I don't want to prolong the trial, but I don't want to

14   have to -- because anything that's in evidence, I will -- I'm

15   not going to rule from the bench during the trial.  I'll go

16   back and review again.  I've reviewed exhibits, but I don't

17   want to have to spend time carefully reading exhibits that

18   nobody ever refers to in the trial, because the two of you have

19   agreed they'll come into evidence.

20            I'm happy if one or both of you just identify the

21   exhibit numbers, what you're, you know, specifically going to

22   use, that's fine with me.  Am I understood about this?

23            MR. LEWIS:  I understand, Your Honor.  Here's our

24   thinking, and this involves a second supposition --

25            THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    69

1          MR. LEWIS:  -- that the Court may or may not concur

2     in.

3          Our second supposition is if the Court would be asking

4     for the post-trial briefing to knit all this together.  Just

5     because it's a partial live record, and a partial dead record,

6     that we would then in those briefs identify specific exhibits,

7     and specific excerpts from those exhibits, that we would like

8     to rely on in the Court's rendering a decision.  So the Court

9     wouldn't have to tour through everything trying to figure out

10    what counts and what doesn't count.

11         THE COURT:  When we get to the end of all of the

12    evidence, let's talk about whether I believe it's necessary to

13    have you both submit post-trial briefs.  I'm probably going to

14    be okay with that, but we'll cover that at the end.  All right.

15         We'll put off -- I understand the stipulation you both

16    reached with respect to the admissibility of the exhibits.

17    Let's just revisit it when all the evidence is in.

18         I think what you just suggested, Mr. Lewis, would

19    probably solve the problem that I have.  I just -- I hope you

20    understand that I just don't want to have to feel --

21         MR. LEWIS:  Sure.

22         THE COURT:  -- I've got to read every page of every

23    scrap of exhibit that nobody's ever referred to during trial,

24    because they came into evidence.  Okay.

25         MR. LEWIS:  We would like to relieve you of that

RESIDENTIAL CAPITAL, LLC, ET AL.                    70

1  spellbinding duty, Your Honor.

2          THE COURT:  Okay.  All right.  So let's proceed with

3  cross-examination.

4          MR. LEWIS:  Your Honor, to the extent that we need it,

5  we've put one of our exhibit books on the witness stand --

6          THE COURT:  Very good.

7          MR. LEWIS:  -- for Mr. Mack to refer to.  You have

8  one, I believe?

9          THE COURT:  I do.

10          MR. LEWIS:  Okay.

11  CROSS-EXAMINATION

12  BY MR. LEWIS:

13  Q.    Good morning, Mr. Mack.

14  A.    Good morning.

15  Q.    Are you aware that Dr. Lichi repeatedly diagnosed Mrs.

16  Mack as being -- suffering from major depression from 2005,

17  when he first began seeing her, all the way through the last

18  appointment with her in 2010?

19  A.    Well, it's why she was going to him.

20  Q.    She was depressed in 2005, wasn't she?

21  A.    Yeah, just not as bad as it became.

22  Q.    Now, are you aware that Mrs. Mack's kidney problems were

23  due to the interaction of her neosupressant Prograf with her

24  kidneys?

25  A.    Medications?

RESIDENTIAL CAPITAL, LLC, ET AL.                    71

1   Q.   Yeah.

2   A.   With the -- no, I was not.

3   Q.   Are you aware that she was diagnosed with acute renal

4   failure before the foreclosure process began?

5   A.   I knew she was having -- yes, she started to have them

6   before that.

7   Q.   And are you aware that after she took her overdose of

8   alcohol and drugs in 2009, November of 2009, she told the

9   medical providers there that she was both upset about the

10  foreclosure and about your financial situation?

11  A.   Yes.

12  Q.   So the foreclosure wasn't the only reason that she took

13  that overdose, was it?

14  A.   I believe it was.

15  Q.   That's not what she told the providers?

16  A.   Provider?

17  Q.   The people at the hospital, medical providers?

18  A.   I was never asked anything by those people.

19  Q.   You were not, but she was?

20  A.   She was, yes.

21  Q.   And that's what she told them, are you aware of that?

22  A.   Yes.

23  Q.   Okay.  Now, you wanted to move back to New Jersey

24  before -- before the foreclosure began, isn't that right?

25  A.   Before what?

RESIDENTIAL CAPITAL, LLC, ET AL.                                72

1    Q.    The foreclosure began?

2    A.    We didn't -- we hadn't thought about it.

3    Q.    Wasn't that a bone of contention between the two of you in

4    your marriage; you wanted to move to New Jersey to be with your

5    family, and she wanted to stay in Florida in her dream house?

6    A.    No, that's -- we would have stayed in Florida had we not

7    been involved in this going to bank and then back and forth

8    with Deutsche and GMAC.  We would have stayed there.  But as

9    things developed, got worse, we had to do -- had to do it.

10   Q.    You might have stayed in Florida, but you couldn't have

11   stayed in that house, could you, on Egret.

12   A.    If they didn't double my mortgage payment, and -- we could

13   have, yes.

14   Q.    Didn't they waive that requirement at some point?

15   A.    Not that I know of.  It was dropped the day before we made

16   settlement, nobody told us anything about it.

17   Q.    Are the exhibit books that Mr. Garber was using still up

18   there?

19   A.    Yes, sir.

20   Q.    Could you take volume 1 please?

21   A.    Yes, I have it.

22   Q.    And look at Exhibit 4 -- 14, I'm sorry?

23             THE COURT:  Are you saying tab 14?

24             MR. LEWIS:  Tab 14.  I'll get there, Your Honor.

25             THE COURT:  No, I just want to be sure I --

1         MR. LEWIS:  No, tab 14, Exhibit 41.

2  Q.    Do you remember testifying about this document, just

3  today?

4  A.    Document number 40?

5  Q.    No, tab 14, Exhibit 41.

6         MR. LEWIS:  May I, Your Honor.

7         THE COURT:  Yes, sure.  Go ahead.

8  Q.    So, Mr. Mack, are you now at tab 14, Exhibit 41?

9  A.    Yes.

10 Q.    And you remember testifying about that earlier today?

11 A.    Yes, sir.

12 Q.    Okay.  Can I get you to read the very first paragraph of

13 this letter?

14 A.    "In conjunction with your request for loan

15 modification" --

16        THE COURT:  Why don't you read it, and ask him to

17 follow along with you.

18        MR. LEWIS:  Sure, okay.

19        THE COURT:  We don't have to put Mr. Mack to that.

20        MR. LEWIS:  Okay.

21        THE COURT:  So just listen, he's going to read it, and

22 you follow along, okay.

23 Q.    Let me read this to you.  The first paragraph says, "In

24 conjunction with your request for loan modification" and that

25 would be your HAMP request, right?

 1   A.   Yes.

 2   Q.   "An escrow account or payment of tax and insurance was

 3   established as a requirement of the qualification system," do

 4   you see that?

 5            THE COURT:  Qualification process.

 6            MR. LEWIS:  Qualification process.

 7   A.   Yes.

 8   Q.   And that tells you that the escrow established -- was

 9   established because you applied for a loan modification, is

10   that right?

11   A.   Yes.

12   Q.   Okay.  Not just out of the clear blue?

13            THE COURT:  I have your point, Mr. Lewis.  Go ahead

14   and read the next sentence.

15   Q.   And the second sentence says, "As the loan did not qualify

16   for the requested modification, escrow for the above-referenced

17   items has been waived."  Do you see that sentence?

18   A.   Yes.

19   Q.   Does that remind you that contrary to your testimony

20   earlier this morning, GMAC did, in fact, make a decision about

21   your loan modification request, and denied it?

22   A.   And denied it, yes.

23   Q.   Yes.  But it did respond, it did make a decision?

24   A.   Right.

25   Q.   Do you recall testifying earlier this morning that it

RESIDENTIAL CAPITAL, LLC, ET AL.                    75

1   never made a decision, do you recall that testimony?

2   A.    That they -- they never gave me any --

3   Q.    Never made a decision on your loan modification request?

4   A.    I didn't know anything about them dropping -- dropping

5   payment or not granting it, I didn't know that.

6   Q.    This indicates that they denied it, doesn't it?

7   A.    They denied it, yes.

8   Q.    That's what this indicates.

9   A.    Yes.

10  Q.    So you knew, at least by December 9th, or December 15th or

11  so of 2009, that they had denied it, isn't that right?

12  A.    I don't remember reading anything about them denying it,

13  or that.

14  Q.    But you read this letter, you told us this morning?

15  A.    I read all the letters, I think.

16  Q.    Okay.  And this letter says they denied it, is that right?

17  A.    Yes.

18  Q.    Okay.  Now, isn't it true that regardless of whether the

19  foreclosure happened, you couldn't keep that house on Egret,

20  could you, because you couldn't afford it, is that true?

21  A.    We could have afforded it for a few more years.

22  Q.    I'd ask you to turn to tab 9 of this same booklet?

23  A.    9?

24  Q.    Yes.  This is another document you testified about this

25  morning.  Are you there?

RESIDENTIAL CAPITAL, LLC, ET AL.                    76

1  A.    Yes.

2  Q.    Okay.  And if you look at the second paragraph, the big

3  paragraph, the first paragraph, you explain why you applied for

4  the modification, right?

5  A.    Yes, sir.

6  Q.    And then you say in the next paragraph, "We have tried to

7  live with the payment -- this payment amount, but we've

8  exhausted all of our financial resources.  The money that we

9  have gone through was all that we saved from years of working,

10  so that we could have something for our retirement years.

11  Well, unfortunately, those years are upon us and we have

12  nothing left."  Do you see that?

13  A.    Yes, sir.

14  Q.    Is it still your testimony you could have afforded to keep

15  this house, having said this to GMAC in August of 2009?

16  A.    Well, we kept it for -- we were planning on staying there

17  until -- it was exhausted -- we don't know what's going to

18  happen.

19  Q.    Doesn't this say your savings were exhausted?

20  A.    It says that, but we had enough money to pay the bills

21  for, like I said, a few more years.

22  Q.    So you misled GMAC in this letter, isn't that right?  Is

23  that what you're telling me?

24  A.    Well, if they took it that way, I guess I did.

25  Q.    Did you intend them not to take what you said at face

RESIDENTIAL CAPITAL, LLC, ET AL.                    77

1  value?  You're saying here that your savings are gone.

2  A.   I'm just saying we had enough money to stay there for a

3  while.

4  Q.   Okay.  Your gross income in those days is about 6,700

5  dollars, right?

6  A.   Yes.

7  Q.   And you were paying 5,900 dollars a month on the mortgage?

8  A.   Yes.

9  Q.   That left you about 800 dollars a month for all your other

10 living expenses, is that right?

11 A.   Yes.

12 Q.   That wasn't nearly enough, was it?  Taxes, insurance --

13 A.   Not what we earned.

14 Q.   -- food, clothing, recreation, repairs, maintenance, that

15 house must have been pretty expensive to maintain, was it not?

16 The swimming pool and a dock?

17 A.   But we were -- we were paying bills, we had the money, we

18 were paying.

19 Q.   Could I get you to look at the second volume of Mr.

20 Garber's booklets, please?  And look at the document under tab

21 17.  Are you there?

22 A.   Yes.

23 Q.   And this is the contract that you entered into for the

24 sale of your house in December of 2009, right?

25 A.   Yes, sir.

1  Q.   Okay.  If I can get you to look at -- I have to do this

2  the hard way, I'm afraid -- the eighth page of this document.

3         THE COURT:  Perhaps you could just go up and help

4  him --

5         MR. LEWIS:  I'd be happy to do that, Your Honor.

6  Sure.

7         THE COURT:  -- because it's a long document, and

8  sometimes hard to find pages.

9         And then just tell us what's at the top of that page,

10  so that I'm at the same place you are.

11  Q.   This page is entitled "Number 2 Inspections," do you see

12  that?

13  A.   Yes, I do.

14  Q.   And do you see in 2(a) that the buyer has the right to

15  inspect the property for defects and repairs that might be

16  necessary?

17  A.   Yes.

18  Q.   Did the buyer do that?

19  A.   They had a company come around and inspect the house.

20  Q.   And did they find anything wrong?

21  A.   A couple of things they found wrong.

22  Q.   And did they ask you to make adjustments to the sale price

23  as a consequence?

24  A.   Yes.

25  Q.   And you made those adjustments?

RESIDENTIAL CAPITAL, LLC, ET AL.                    79

1  A.   Yes.

2  Q.   What would have happened if you had refused to make those

3  adjustments?

4  A.   I have no idea, they maybe would have said --

5       THE COURT:  You don't have to speculate.

6  Q.   But as your understanding of this contract, that you could

7  have backed out of the contract, right?

8  A.   If he said he didn't want to buy the house because I

9  didn't do the work that was needed.

10  Q.   He could have backed out of the contract, right?

11  A.   Yes.

12  Q.   Okay.  I'm going to hand you what will now be marked as

13  Defendant's Exhibit X.

14       MR. LEWIS:  Your Honor, this is the document that we

15  got last week.  If I may?

16       THE COURT:  Sure, please.

17       MR. LEWIS:  Giving you a tab and mark this for the

18  Court.

19       THE COURT:  Thank you.

20  Q.   Do you recognize this document?

21  A.   No, I don't.

22  Q.   Mr. Garber had you look at a copy of it earlier today, do

23  you recall that?

24  A.   No, I don't remember that.

25       THE COURT:  It's behind tab 19, it's PX-5

RESIDENTIAL CAPITAL, LLC, ET AL.                    80

1  Q.   Could you look behind tab 19.  We were -- this is Mr.

2  Garber's tab 19, are you there?

3  A.   Where is it at?

4  Q.   Let me --

5       (Pause)

6  Q.   This is tab 19 of Mr. Garber's volume II booklet, and it's

7  Exhibit 5, Plaintiff's Exhibit 5.  Do you remember seeing that

8  earlier today?  Mr. Garber asked if you'd ever seen it before,

9  and you said no?

10  A.   I don't believe I had seen it before.

11  Q.   Now, if you look at Exhibit X that I just handed you, the

12  one-page document?

13  A.   Yes.

14  Q.   This is the same document, isn't it, notice of voluntary

15  dismissal?

16  A.   Yes.

17  Q.   If you look at the top, the very top, do you see the

18  legend across the top that begins December 11th?  Do you see

19  that?  Would you like some help?

20  A.   Is the date December 11th?

21  Q.   You see that?

22  A.   Oh, okay, yes.

23  Q.   So do you see that legend at the top begins December 11th,

24  '09?

25  A.   Yes, sir.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    81

1   Q.   And it says 305P, as in 3:05 p.m., correct?

2   A.   Yes.

3   Q.   And then it says Sherry Mack, you see that?

4   A.   Yes, sir.

5   Q.   Mr. Garber had represented to me last week that Mrs. Mack

6   faxed this document to him on that day, December 11th, 2009.

7   That means that you and Mrs. Mack had this document at least by

8   December 11th, 2009, doesn't it?

9   A.   Probably, yes.

10  Q.   Okay.  And do you think if you got this document, and Mrs.

11  Mack opened it, she wouldn't share it with you?

12  A.   It doesn't say anything about the -- it being dropped in

13  this.

14  Q.   It says notice of voluntary dismissal, doesn't it?

15  A.   I --

16  Q.   So it says, "Plaintiff, the prevailing party," in the very

17  first paragraph, "by and through its undersigned counsel,

18  voluntarily dismisses its complaint for foreclosure and other

19  relief."  Do you see that?

20  A.   Yes, sir.

21  Q.   Okay.  So you knew -- you and  Mrs. Mack knew, at least by

22  December 11th of 2009, if not sooner, that Deutsche Bank had

23  dismissed the foreclosure action, isn't that correct?

24  A.   We did not know until after we made settlement that

25  anything was dropped.  That's all I can tell you.  All these

RESIDENTIAL CAPITAL, LLC, ET AL.                                     82

1  forms and everything, we knew nothing about.  And even if it

2  was dropped at that time, there was already a -- we were

3  already into selling the house and we couldn't back out of it

4  now, at that time.

5  Q.   You could have told Mr. Hogan that you weren't going to

6  agree to the repairs he wanted and seen if he backed out, could

7  you not?

8  A.   There was only two or three things that had to be taken

9  care of, and it was not a big thing.

10 Q.   I understand that.  But you could have told Mr. Hogan you

11 were not going to make those repairs and seen what he'd done.

12 Because if he'd backed out of the contract, you could have put

13 the house on the market again, is that right?

14 A.   We could have, I guess, yes.

15 Q.   Okay.

16         MR. LEWIS:  Your Honor, I don't have too much more.

17         THE COURT:  Fine.  We'll let you finish up then.

18         MR. LEWIS:  Thank you.

19 BY MR. LEWIS:

20 Q.   Now, Mr. Mack, the big exhibit book, the binder, would you

21 pick that up, please, and turn to the tab O.  May I help you?

22 A.   O?

23 Q.   Are you there at tab O?

24 A.   Yes, sir.

25 Q.   Okay.  And it says at the top, GMAC mortgage account

RESIDENTIAL CAPITAL, LLC, ET AL.                     83

1   statement, do you see that?

2   A.   Yes.

3   Q.   Do you remember this document?

4   A.   I can't say that I do.

5   Q.   Do you remember testifying about it?  Do you recall I took

6   your deposition in December of last year, the same day I took

7   Mrs. DeMore's deposition at your house?

8   A.   No, I don't.  He probably got it there, but I don't -- I

9   mean, there's so many documents, and so much paperwork --

10  Q.   Okay.

11  A.   -- I can't remember all this.

12  Q.   I'll come around to trying to help you remember it.  But

13  do you remember I took your deposition that day?

14  A.   Yes.

15  Q.   Okay.  And do you remember that in the course of the

16  deposition Mrs. DeMore volunteered that she had -- that there

17  was a copy of the monthly mortgage statement in your house, do

18  you recall that?

19  A.   Yes.

20  Q.   Okay.  And you recall she went upstairs and got it?

21  A.   Yes.

22  Q.   And brought it down.  And I put it in front of you and

23  asked you if this was the mortgage statement that you got from

24  GMACM, do you recall that?

25  A.   I think so, yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                     84

1  Q.   And this is the form and the statement you got from them

2  every month, right?

3  A.   Yes.

4  Q.   Okay.  And then I asked you to look at the back of this

5  statement, which is the second page of this exhibit.  And I

6  asked you to look at the box entitled account information or

7  questions, do you see that box about six-tenths of the way

8  down?  Do you see that box?

9  A.   Yes.

10  Q.   Okay.  And do you see a specific address for general

11  inquiries?

12  A.   Yes.

13  Q.   And would you read that address, please?  Let me read it

14  for you, and you just verify that's what it says.

15  A.   There's a line going through the --

16  Q.   Okay.

17  A.   It's Water -- Waterloo, Iowa.

18  Q.   Okay.  So general inquiry to GMAC Mortgage, Attention

19  Customer Care, PO Box 4622, Waterloo, Iowa 50704-4622.  Is that

20  what it says?

21  A.   Yes.

22  Q.   Okay.  And that's for general inquiries, right?

23  A.   Yes, sir.

24  Q.   And do you see there's another box below that that says

25  "Qualified written request."  Do you see that?

RESIDENTIAL CAPITAL, LLC, ET AL.                    85

1   A.   Yes.

2   Q.   And do you see that it instructs you to send qualified

3   written requests to a different address?

4   A.   Yes, sir.

5   Q.   And that address is GMAC Mortgage, Attention Customer

6   Care, PO Box 1330, Waterloo, Iowa 50704-1330.  Is that correct?

7   A.   Yes, sir.

8   Q.   And every mortgage statement you got had this information

9   on it?  Is that right?

10   A.   Yes.

11   Q.   Okay.  But when you sent the October 26th letter, you

12   didn't send it to that address, did you?

13   A.   No.

14   Q.   You sent it to the address for general inquiries, is that

15   correct?

16   A.   That's correct.

17   Q.   Okay.

18        MR. LEWIS:  I think I have nothing further, Your

19   Honor.

20        THE COURT:  Okay.  Mr. Garber, do you have any

21   redirect?

22        MR. GARBER:  Briefly, Your Honor.

23        THE COURT:  Okay.

24   REDIRECT EXAMINATION

25   BY MR. GARBER:

RESIDENTIAL CAPITAL, LLC, ET AL.                    86

1    Q.   Mr. Mack, you were asked some questions about repairs to

2    the house that you had to do, can you briefly recall what you

3    had to do for the sale to go through to Mr. Hogan?

4    A.   There was a piece of concrete missing out of the bulkhead

5    in the back of the house that had to be fixed, because it

6    belonged to the town, and they said that we had to repair it.

7    Q.   And how much was that?

8    A.   I don't even think it was repaired before we left.  I

9    don't know.  We agreed to pay for it.

10   Q.   Anything else?

11   A.   There was a problem with the deck on the back of the house

12   where water was accumulating.  And there was damage to the wood

13   underneath.  And it had to be -- that had to be repaired.

14   Q.   How much was that?

15   A.   Like I said, I believe we got an estimate, but it was not

16   repaired.  I don't remember how much it was, it was not much.

17   Q.   Was it your understanding that if you didn't make these

18   repairs that Mr. Hogan could either walk from the contract, get

19   out of it, or he could still go ahead with the contract at his

20   election?

21   A.   He wanted -- no, we had the contract, I agreed to either

22   pay for it or have it fixed.  And the man wanted the house, it

23   was a cash -- it was a cash deal.

24   Q.   Now, Mr. Lewis just asked you a minute ago did if you know

25   that these addresses were on each and every mortgage statement

1  that you got from GM, did you look at each and every mortgage

2  statement to see what addresses they had?

3  A.   No, I did not.

4  Q.   But you know this mortgage statement has it on it, the one

5  that he showed you, right?

6  A.   Yes.

7  Q.   Okay.  Are you able to testify about any other ones?

8  A.   No.

9  Q.   Okay.

10         MR. GARBER:  I have no further questions.

11         THE COURT:  Mr. Lewis?

12         MR. LEWIS:  Your Honor, I forgot one very small

13  area --

14         THE COURT:  Okay.

15         MR. LEWIS:  -- of material, it will only take a minute

16  or two.

17  RECROSS-EXAMINATION

18  BY MR. LEWIS:

19  Q.   Mr. Mack, you and Mrs. Mack went on a long trip to New

20  Zealand, is that right?

21  A.   Yes.

22  Q.   And do you recall when that was?

23  A.   What year, I --

24  Q.   Yeah.

25  A.   Two or three years before we started having these

1  problems, issues.

2  Q.   Does the year 2000 sound right, right after your

3  respective parents had died?

4  A.   Yes.

5  Q.   Okay.  So that was in 2000.  Have you taken any other

6  major trips like that ever since?

7  A.   No, that was the last one, we went to Australia and New

8  Zealand.

9  Q.   Okay.  So you stopped traveling after 2000?

10  A.   Yes.

11        MR. LEWIS:  No more questions, Your Honor.

12        THE COURT:  All right.  Mr. Garber, do you have

13  anything else?

14        MR. GARBER:  No further questions, Your Honor.

15        THE COURT:  All right, you're excused, Mr. Mack.

16        THE WITNESS:  Okay.  So --

17        THE COURT:  And we'll take our lunch recess until 2

18  o'clock, okay.

19        MR. GARBER:  Yes, Your Honor.

20        THE COURT:  All right.  Thanks very much.

21        MR. LEWIS:  Thank you, Your Honor.

22     (Recess from 12:40 p.m. until 2:02 p.m.)

23        THE COURT:  Please be seated.

24        All right.  Mr. Garber, are you ready to call your

25  next witness?

1          MR. GARBER:  Yes, Your Honor, I am.

2          THE COURT:  Okay.

3          MR. GARBER:  Your Honor, I would like to call to the

4    stand, Jewel DeMore.

5          THE COURT:  All right.  Please come on up to the

6    witness stand.  If you would raise your right hand and be

7    sworn.

8       (Witness sworn)

9          THE COURT:  All right.  Please have a seat.  There

10   should be cups there if you want water.

11         THE WITNESS:  Oh, okay.

12         THE COURT:  Okay.  All right, go ahead, Mr. Garber.

13   DIRECT EXAMINATION

14   BY MR. GARBER:

15   Q.   Ms. DeMore, would you please tell the Court your full

16   name?

17   A.   Jewel D. DeMore.

18   Q.   And where do you live Ms. DeMore?

19   A.   Delran, New Jersey.

20   Q.   How long have you lived there?

21   A.   In Delran about twenty-two years.  In my current place

22   four years.

23   Q.   What sort of educational background do you have?

24   A.   I have a bachelor's degree from Temple University.

25   Q.   In what?

RESIDENTIAL CAPITAL, LLC, ET AL.                    90

1   A.   Business education.

2   Q.   Have you ever taught that?

3   A.   Yes.

4   Q.   What sort of work experience do you have?

5   A.   I taught at Willingboro High School for thirty-four years.

6   Q.   How old are you?

7   A.   Sixty-seven.

8   Q.   Are you now retired?

9   A.   Yes, I am.

10   Q.   You are the sister of Cheryl Mack?

11   A.   Yes, I am.

12   Q.   Have you been close with Ms. Mack for a number of years?

13   A.   Yes, very close.

14   Q.   Did she die on October 9th of 2013?

15   A.   Yes, she did.

16   Q.   Okay.  She moved to Florida sometime in the early 2001

17   time frame, didn't she?

18   A.   Yes.

19   Q.   And you were in New Jersey at that time?

20   A.   Correct.

21   Q.   Did you maintain close contact with her?

22   A.   Yes.  And visited a number of times.  And spoke to her at

23   least weekly.

24   Q.   You came down to Florida?

25   A.   Oh, many times, yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    91

1   Q.    Did you ever see their house on Egret Avenue?

2   A.    Definitely.

3   Q.    And did she ever come to New Jersey?

4   A.    When her step-son was in an accident, she spent some time

5   up here, yes.  When Barry had gone back -- when Mr. Mack had

6   gone back to Florida after being up here, she came up to visit

7   him and stay with me.

8   Q.    Do you recall when that was?

9   A.    I'm not actually positive, I'd say maybe 2002, 2003.

10  Q.    Okay.  Can you -- I'm going to pick a date --

11  A.    Okay.

12  Q.    -- because it's relevant to these proceedings.  And that

13  is October 26th, 2009, can you tell me what the state of her

14  health was in the years before October 26th, 2009?

15  A.    Well, she had had liver problems, had a liver transplant.

16  She had some alcohol abuse, and went through some depressions.

17  But she seemed to be getting things back on track in the last

18  few years there.

19  Q.    Did she ever talk to you about her depression that existed

20  before October 26th of 2009?

21  A.    Yeah.  It was just a general type of depression.  It

22  was -- you know, she was drinking and nobody wanted her to

23  drink.  And she was just overall depressed.

24  Q.    Her medical records reveal that she was doing some

25  drinking after the liver transplant.  Did she ever tell you

RESIDENTIAL CAPITAL, LLC, ET AL.                    92

1  that she had been told not to drink --

2  A.   Yes.

3  Q.   -- after the liver transplant?

4  A.   Yes.

5  Q.   And she continued to do that?

6  A.   Yes.

7  Q.   Do you know about how much she drank a day after the liver

8  transplant?

9  A.   Well, right after the liver transplant, for maybe six

10 months, she didn't drink at all.  And then it was this sort of

11 a gradual thing that she would have maybe a couple glasses of

12 wine a day.  And then a few more after that.

13 Q.   One of the causes of death listed on her death certificate

14 was renal insufficiency?

15 A.   Yes.

16 Q.   Do you know anything about -- did she ever tell you about

17 any problems she was having with her kidneys before October

18 26th?

19 A.   Well, yeah.  The --

20         THE COURT:  You have to -- just let Mr. Garber finish

21 his question.  I want to be sure --

22         THE WITNESS:  Oh, I'm sorry.

23         THE COURT:  No, that's all right.  You know what he's

24 asking, and you starting to answer before he asks -- finished.

25 We have to get a clear record.  We don't have a stenographer.

RESIDENTIAL CAPITAL, LLC, ET AL.                    93

1  We have a voice recording that's made and a transcript can be

2  made from that.  So just pause a little bit, okay?

3          THE WITNESS:  Okay.

4          THE COURT:  Go ahead, Mr. Garber.

5  Q.   So did she ever discuss with you the state of her kidneys

6  before the date of October 26th, 2009?

7  A.   Yes, from the anti-rejection medication she was taking

8  that had an adverse effect on her kidneys, so they were going

9  down in function.  Her numbers were not as good as they were

10 before the transplant.

11 Q.   Do you know what those numbers were?

12 A.   The -- no.  I'm sorry; I don't.

13 Q.   Now, she had a problem in November of 2009.  Were you

14 aware that she was hospitalized?

15 A.   Yes.

16 Q.   Did she ever talk to you about that?

17 A.   Yes, she did.

18 Q.   And do you know why she was hospitalized?

19 A.   Yes, because she tried to commit suicide.

20 Q.   Okay, do you know how she tried to commit suicide?

21 A.   She took pills and drank -- pills and alcohol.

22 Q.   Did she ever tell you how many pills?

23 A.   No.  She said she took a lot of pills.

24 Q.   Do you know what kind of pills?

25 A.   I think it was the Ambien.

1   Q.   That's the sleeping medication?

2   A.   Yes.

3   Q.   Okay.  Do you know which date that occurred in November of

4   2009?

5   A.   It was either the 9th or the 10th of November.  I'm not

6   sure which.

7   Q.   And how did it come to be that she was hospitalized after

8   she took those pills?

9   A.   You know, I'm not really sure.  I don't know.

10  Q.   Did she take the pills at home?

11  A.   Yes.

12  Q.   And did she call you while she was in the hospital?

13  A.   I called her while she was in the hospital.

14  Q.   Several times?

15  A.   A few times.  I'd say two times.

16  Q.   Did you come down to see her?

17  A.   I did not.  She didn't want me to come down.

18  Q.   Did she tell you of the problems she was having with the

19  foreclosure on their house?

20  A.   Oh, definitely.

21          MR. LEWIS:  Your Honor, this is hearsay.

22          THE COURT:  Sustained.

23  Q.   Did --

24          MR. GARBER:  Your Honor, I am trying to ascertain the

25  state of mind of this person and it's not for the truth of the

1  matter.  And if it's not for the truth of the matter, I would

2  submit to the Court any state of mind that she may have

3  exhibited to her sister would not be hearsay, and I would ask

4  that I'd be granted the Court's indulgence to ask about the

5  state of mind.

6          THE COURT:  Mr. Lewis?

7          MR. LEWIS:  Your Honor, there is an exception for

8  present state of mind under 803.  That question was not about

9  the present state of mind.  That was about the foreclosure.

10 And I would add, Your Honor, my understanding of the rule, and

11 I don't pretend to be a treatise writer, is that you can ask

12 about the state of mind, but you can't ask about the cause.

13 Same thing with the present --

14         THE COURT:  Just give me a minute, okay?

15         MR. LEWIS:  Yeah.

16     (Pause)

17         THE COURT:  Mr. Garber, Rule 803(3), provides "A

18 statement of the declarant's then-existing state of mind (such

19 as motive, intent, or plan) or emotional, sensory, or physical

20 condition (such as mental feeling, pain, or bodily health), but

21 not including a statement of memory or belief to prove the fact

22 remembered or believed unless it relates to the validity or

23 terms of the declarant's will."  So those are excluded from the

24 hearsay rule, that statement of the then-existing state of

25 mind.  So the declarant you're asking about is Mrs. Mack.

1          MR. GARBER:  Yes, Your Honor.

2          THE COURT:  And so I'm going -- I would permit you to

3    inquire specifically about Mrs. Mack's statements of then-

4    existing state of mind.

5    BY MR. GARBER:

6    Q.   Ms. DeMore, did your sister, Ms. Mack, explain to you what

7    her state of mind was in her conversations with you in November

8    of 2009?

9    A.   She was extremely depressed.  She didn't feel that she had

10   much to live for.  She said, I, you know -- I don't know what's

11   going to happen.

12   Q.   And you found out from telephone conversations in November

13   of 2009?

14   A.   Yes, and thereafter.  I mean, I spoke with her, basically,

15   weekly and she was always depressed.

16   Q.   Did you have conversations with her on the telephone

17   before October 26th of 2009?

18   A.   Yes.

19   Q.   And did she appear to be depressed at that time?

20   A.   At that point, she was worried.

21   Q.   Did you find there to be a difference in talking to her

22   from her state of mind before October 26th, 2009 and after that

23   date?

24          MR. LEWIS:  Your Honor, that's a leading question.

25          THE COURT:  Sustained.

1  Q.   What did you find to be the difference in her state of

2  mind before that date and after that date?

3          MR. LEWIS:  Your Honor, it assumes facts not in

4  evidence.

5          THE COURT:  Overruled.

6          Go ahead, you can answer the question.

7          THE WITNESS:  I can?

8          THE COURT:  Yes.

9          THE WITNESS:  Okay.

10 A.   As I said, before that time, she was worried, but not

11 extremely depressed, because she felt that things were going to

12 get better.  After that time, she felt fatalistic, that things

13 were not getting better.

14 Q.   That was in November of 2009, right?

15 A.   Yes.

16 Q.   And how about after that, say, December of 2009?  Were you

17 talking with her then?

18 A.   Yes.

19 Q.   And what was her mood after that, in December?

20 A.   Still very depressed.

21 Q.   Now, she sold her house in Naples in late January of 2010.

22 Were you in communication with her in that time, too?

23 A.   Yes.

24 Q.   And they stayed in Naples until October of 2011, I

25 believe.  Were you in contact with her in that time?

RESIDENTIAL CAPITAL, LLC, ET AL.                    98

1    A.    Yes, I was.

2    Q.    How did you find her state of mind to be from the period

3    of time of December onward until she moved to New Jersey?

4    A.    Very depressed.  Even after she moved -- she moved to New

5    Jersey -- she was very depressed.  And that she loved Naples;

6    didn't want to leave, but felt that there was no other thing --

7    no other way to get out of their situation.

8    Q.    As a matter of fact at that time, you had a house that you

9    wanted to sell, didn't you?

10   A.    That's correct.

11   Q.    And did Mr. Mack and Mrs. Mack want to buy your house?

12   A.    Yes, yes, they did decide that they would like to buy my

13   house.

14   Q.    Did they buy it?

15   A.    Yes, they did.

16   Q.    Do you recall when that was?

17   A.    That was in November of 2010.

18   Q.    And did they --

19   A.    Actually October 30th of 2010.

20   Q.    Did they then move to New Jersey?

21   A.    Yes, they did.  They did not move to New Jersey until

22   January of 2011, when their lease was up.

23            THE COURT:  Can you just tell me, when did they buy

24   the house from you?  I just missed it.

25            THE WITNESS:  October 30th of 2010.

RESIDENTIAL CAPITAL, LLC, ET AL.                              99

1          THE COURT:  Okay.  Thank you.

2    Q.   When they moved back to New Jersey, did you then see Mr.

3    and Mrs. Mack on a continuing and frequent basis?

4    A.   Yes, very frequent.

5    Q.   How often?

6    A.   At least two, three times a week.

7    Q.   Did there come to be a time when Mrs. Mack needed to have

8    assistance or care?

9    A.   Yes.

10   Q.   Did you ever help out and try to provide some assistance

11   and care for her?

12   A.   Oh, very much so, yes.

13   Q.   What --

14   A.   I was there a lot.

15   Q.   What type of assistance and care did you provide for her?

16   A.   Well, I helped her with her medications.  I stayed with

17   her when Mr. Mack had to go out.  Moral support.  That's

18   basically it.  Well, I -- I cooked for them, because she -- she

19   didn't any cooking or cleaning.  They did have a cleaning lady.

20          THE COURT:  Was your sister older or younger than you?

21          THE WITNESS:  Younger.

22   Q.   What year were you born in?

23   A.   I?

24   Q.   Yeah.

25   A.   1947.

RESIDENTIAL CAPITAL, LLC, ET AL.                    100

1    Q.    And what year was she born in?

2    A.    1951.

3    Q.    Did her -- when did she die?

4    A.    October 25th, 2013.

5    Q.    Did you ever see from the time that she moved back to New

6    Jersey in 2010 until she passed away, did you ever see that

7    this depression ever lifted from her?

8    A.    She might have a couple of days where, you know, things

9    would be okay; then she would just fall back into the

10   depression.

11   Q.    Do you know if she ever took dialysis while she was in New

12   Jersey?

13   A.    She did not.

14   Q.    Did there come to be a time when she was enrolled in

15   hospice?

16   A.    Yes.

17   Q.    Do you know when that was?

18   A.    I think that was -- I think she started that in January of

19   2013.

20   Q.    Okay, and continued with that until she passed away?

21   A.    Yes.

22   Q.    Do you know what a qualified written request is?

23   A.    Not until you mentioned it yesterday.

24   Q.    Do you have any reason to believe that Mrs. Mack knew what

25   a qualified written request was?

1   A.   I would not have any reason to believe that, no.

2   Q.   And did you have any reason to believe that Mr. Mack, in

3   October of 2009, knew was a qualified written request was?

4   A.   No.

5   Q.   Do you know Mr. Mack very well?

6   A.   Yes.

7   Q.   Have you been in frequent and continued contact with him

8   over the marriage that he had with Mrs. Mack -- Cheryl Mack?

9   A.   Yes, yes, I have.

10  Q.   Do you think that his attitude or his health changed after

11  October of 2009?

12  A.   Well, I did not speak to him on the phone.  I spoke to my

13  sister most of the time, so I can't really say, until they came

14  up to New Jersey, about his attitude and state of mind.

15          MR. LEWIS:  Your Honor, that question called for an

16  opinion.

17          MR. GARBER:  Calls for what?

18          MR. LEWIS:  An opinion.

19          MR. GARBER:  Well, as to the mental state of the

20  person.

21          THE COURT:  Objection sustained.

22  Q.   Do you have any knowledge yourself of a letter that was

23  dated October 26th, 2009 that Mr. and Mrs. Mack sent to General

24  Motors Acceptance Corporation Mortgage?

25  A.   My sister told me about it.

RESIDENTIAL CAPITAL, LLC, ET AL.                    102

1   Q.    And that's the only knowledge you have?

2   A.    Yes.

3   Q.    Okay.  When did she tell you about it?

4   A.    She -- actually she told me she was going to write a

5   letter, and then she told me after she wrote it that they wrote

6   it and sent it.

7   Q.    Did she seem to you to be concerned that she didn't get a

8   response?

9               MR. LEWIS:  Your Honor?

10              THE COURT:  Sustained.

11              MR. LEWIS:  Thank you.

12  Q.    Ms. DeMore, I have no further questions; thank you.

13  A.    You're welcome.

14              THE COURT:  Cross-examination, Mr. Lewis?

15              MR. LEWIS:  Thank you, Your Honor.

16  CROSS-EXAMINATION

17  BY MR. LEWIS:

18  Q.    Ms. DeMore, are you aware that -- are you familiar with a

19  Dr. Lichi?

20  A.    Yes, I am.

21  Q.    And he was her psychiatrist, Mrs. Mack's, right?

22  A.    Yes.

23  Q.    From about 2005 on?

24  A.    Um-hum.

25  Q.    And are you aware that he diagnosed her from the first to

RESIDENTIAL CAPITAL, LLC, ET AL.                    103

1   the last as having major depression?

2   A.    Yes.  I was actually the one to take her to Dr. Lichi.

3   Q.    Okay.

4   A.    And, yes, she did.  I think --

5           THE COURT:  I think you've answered the question.

6   Wait for the next question.

7           MR. LEWIS:  Thank you, Your Honor.

8   Q.    Incidentally, 1947 was an excellent year for births.

9   A.    Oh, yours too?

10  Q.    Happens to be mine, yes.

11          THE COURT:  You're both youngsters.

12          MR. LEWIS:  Pardon me?  There may be those who

13  disagree that it was an excellent year for births, because of

14  me, but who knows.

15          THE COURT:  No, I -- my comment was you're both

16  youngsters.

17          MR. LEWIS:  Yes.

18          THE WITNESS:  Thank you.

19  Q.    In your testimony this morning, you said she was concerned

20  that things weren't getting better.  What things?

21  A.    In regard to the foreclosure or regard to her health?

22  Q.    I don't know.  It was your testimony.  You said she was

23  concerned that things weren't getting better.  That was your

24  phrase.  So my question is, what thing weren't getting better?

25  A.    I -- you know, I -- it's out of context.  I don't know

RESIDENTIAL CAPITAL, LLC, ET AL.                     104

1    what the question was before that, what I was answering to.

2    Q.    Mr. Garber asked you about her apparent state of mind.

3    A.    Okay.

4    Q.    And you said that she was concerned that things weren't

5    getting better.  And then my question is, what things?

6    A.    Okay, if I understand correctly, I think it is that, you

7    know, nothing was happening as far as being able to stay in

8    their house, which is what she wanted tremendously, to be able

9    to stay in her house, and that -- you know, she was still

10   depressed when they were in the rental house.

11   Q.    Were you aware that she couldn't afford to stay in that

12   house no matter what?

13   A.    I, you know -- when Mr. Mack was talking this morning, he

14   was talking about their savings.  There's a difference between

15   their savings and their investments.  And they did have a lot

16   of investments that they could still use.  I know that because

17   I do a lot with their books.  I keep Mr. Mack's books now.

18   Q.    Okay.  And you're not aware that they had decided they

19   couldn't afford to stay in that house?

20   A.    I knew they were having problems once the mortgage payment

21   went up to 12,000 dollars.

22   Q.    And that went back down, didn't it?

23   A.    That, I don't --

24   Q.    Okay.

25   A.    -- I was not aware of.

RESIDENTIAL CAPITAL, LLC, ET AL.                   105

1   Q.   Ms. DeMore, on the counter up there is a great big binder

2   like this.

3   A.   Um-hum.

4   Q.   Could I get you to turn to Exhibit O?

5   A.   O?

6   Q.   Yeah.

7   A.   Okay.  My goodness, okay.  Yes, the refinancing or

8   purchasing a new home?

9   Q.   No.

10          MR. LEWIS:  May I, Your Honor?

11          THE COURT:  Yeah.

12   A.   Wait a minute.  I turned two pages here.  This one?

13   Q.   This is it.  These two pages.

14   A.   Okay.

15   Q.   And you see that's a document captioned "GMAC Mortgage

16   account statement"?

17   A.   Yes.

18   Q.   Do you recognize that document?

19   A.   Actually, no, but --

20          THE COURT:  You've answered the question.

21          THE WITNESS:  Okay.

22   Q.   Do you remember at Mr. Mack's deposition last December

23   telling me that there -- you thought they had a mortgage

24   statement --

25   A.   Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    106

1   Q.   -- in the house?

2   A.   Yes.

3   Q.   Okay, and you retrieved that for me, right?

4   A.   I did.

5   Q.   Is this that document, do you know?

6   A.   I would imagine so.

7   Q.   Okay.

8   A.   I remember getting it.  I don't remember reading it.

9   Q.   Sure.  How did you know that they had a mortgage

10  statement?

11  A.   Because my sister kept very -- very good files.  And I

12  knew that there was a file for GMAC.  So I decided to go up and

13  look in that file to see if I could find the mortgage

14  statement.

15  Q.   And this is the only one you found?

16  A.   Yes.

17  Q.   Okay.  So you weren't involved in paying their mortgages

18  each month?

19  A.   No.

20  Q.   Okay.

21         MR. LEWIS:  All right.  I have no further questions,

22  Your Honor, thank you.

23         THE COURT:  All right.  Mr. Garber, redirect?

24         MR. GARBER:  No further direct, Your Honor.

25         THE COURT:  All right, you're excused.  Thank you very

1    much, Ms. DeMore.

2          All right.  Mr. Garber, do you have any other

3    witnesses you wish to call?

4          MR. GARBER:  No, I have no other witnesses, Your

5    Honor.

6          I am prepared to go through my exhibits, not all of

7    which have been referenced in testimony here, and explain to

8    the Court the excerpts that I think should warrant attention.

9    Mr. Lewis has suggested that maybe we could best do that in

10   argument, but whatever you want to do I'm comfortable with

11   doing.

12         THE COURT:  Well, let me just ask, Mr. Lewis, you have

13   one witness you're calling tomorrow?  Am I correct?

14         MR. LEWIS:  Yes, Your Honor, and probably two

15   exhibits, one of which has already been introduced.

16         THE COURT:  All right.  So it doesn't sound like we're

17   going to consume a great deal -- you'll obviously have cross-

18   examination, Mr. Garber -- but it doesn't sound like we'll

19   consume a great deal of time tomorrow.

20         So I think what would be best to do is, we'll defer

21   dealing with the exhibits until the close of the evidence

22   tomorrow.  And we'll see where things stand, because you both

23   inquired about post-trial briefing, and I really want to see

24   where we are at the end of the evidence as to what I think

25   would be helpful to the Court, okay.

1    So what I would ask, Mr. Garber, is subject to

2    resolving the issues regarding the admissibility of your

3    exhibits, do you rest?

4         MR. GARBER:  Yes, Your Honor, I do.

5         THE COURT:  Okay.

6         Mr. Lewis, is there anything that you want to cover

7    now?  Your -- it's your turn, your case.  I know you only have

8    one witness and that'll be tomorrow morning, but is there

9    anything you want to take any time to do now or do you want to

10   wait until the morning?

11        MR. LEWIS:  No, Your Honor, I think tomorrow morning

12   is all I have left.

13        THE COURT:  Okay.

14        MR. LEWIS:  And I appreciate the Court's indulgence

15   and I know Mr. Cunningham does.

16        THE COURT:  I set the two days aside.  You've both

17   been very efficient in preparing for the trial and organizing

18   your exhibits and evidence, and I always try to accommodate

19   scheduling issues that arise with witnesses and things like

20   that, and you certainly have notified me in advance, so I have

21   no problem about it.  Okay?

22        MR. LEWIS:  Very well, Your Honor.

23        THE COURT:  I'll see you both in the morning.

24        MR. LEWIS:  Thank you, Your Honor.

25        THE COURT:  We'll start at 10 and --

RESIDENTIAL CAPITAL, LLC, ET AL.                    109

1              MR. LEWIS:  I'll imagine we'll be done by noon.

2              THE COURT:  Okay.  Thanks very much.

3              MR. GARBER:  Thank you, Your Honor.

4              THE COURT:  And I will so order that pre-trial order.

5      It'll get entered on the docket.  You have it just without my

6      signature on it, so okay?

7              MR. LEWIS:  Thank you, Your Honor.

8              MR. GARBER:  Thank you, Your Honor.

9              Your Honor, before you --

10             THE COURT:  You can leave your stuff in the courtroom

11     if you wish.  You don't have to --

12             MR. GARBER:  Oh, okay.

13             THE COURT:  Go ahead, Mr. Garber.

14             MR. GARBER:  Before you sign the document, I wanted to

15     bring up one point to the Court's attention.

16             THE COURT:  Okay.

17             MR. GARBER:  I can do that tomorrow in the pre-trial

18     order.

19             THE COURT:  Well, you better tell me now --

20             MR. GARBER:  Okay.

21             THE COURT:  -- if it's in regard to the pre-trial

22     order.

23             MR. GARBER:  Here's the issue that I have.  There's a

24     statement of -- the pre-trial order has a statement that, in

25     fact, on all the mortgage statements that were sent through

RESIDENTIAL CAPITAL, LLC, ET AL.                110

1   GMAC they had this QWR address.  And the testimony that we have

2   had is that they don't know if they had any address on any of

3   the pre-trial orders.  I am -- I agreed to that.  I am happy to

4   stand with it.  But I want to make sure the Court and Mr. Lewis

5   knows that I intend to make an issue of that on cross-exam --

6   or on my argument.  And if he wants to bring in any other pre-

7   trial statements, I want to make sure he's aware that I'm --

8           THE COURT:  All right.  I'm aware of what you said.

9   Okay.  We'll see you tomorrow morning.

10          MR. GARBER:  Thank you.

11          MR. LEWIS:  Thank you, Your Honor.

12          THE COURT:  Thank you.  Again, you can leave anything

13  you want in the courtroom.  We're going to lock up the court --

14  there's nothing -- I don't have any other hearings today, so

15  we'll lock up the courtroom and --

16          MR. LEWIS:  And who would want to steal this?  What

17  about it?

18      (Whereupon these proceedings were concluded at 2:29 PM)

19

20

21

22

23

24

25

1

2                          I N D E X

3

4   WITNESS                EXAMINATION BY        PAGE

5   Barry Mack             Mr. Garber             9

6   Barry Mack             Mr. Lewis             70

7   Barry Mack             Mr. Garber            85

8   Barry Mack             Mr. Lewis             87

9   Jewel DeMore           Mr. Garber            89

10  Jewel DeMore           Mr. Lewis            102

11

12                          EXHIBITS

13  PLAINTIFF'S            DESCRIPTION           PAGE

14  43                     October 26th, 2009    63

15                         letter from Mr.

16                         Mack

17

18                          RULINGS

19                                         PAGE     LINE

20  Joint Pre-trial so ordered              109       2

21

22

23

24

25

1

2                        C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10

11   _____

     PENINA WOLICKI

12   AAERT Certified Electronic Transcriber CET**D-569

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  June 11, 2015

19

20

21

22

23

24

25