1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 12-12020-mg

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   RESIDENTIAL CAPITAL, LLC, et al.,

9

10            Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            June 11, 2015

19            10:05 AM

20

21   B E F O R E:

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25

1

2  Trial Regarding Claim No. 386 Filed by Barry Mack

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4       Attorneys for ResCap Borrower Claims Trust

5       425 Market Street

6       Suite 30

7       San Francisco, CA 94105

8

9  BY:   ADAM A. LEWIS, ESQ.

10       KRISTIN A. HIENSCH, ESQ.

11

12

13  DAVID F. GARBER, P.A.

14       Attorney for Claimant Barry Mack

15       2800 Davis Boulevard

16       Suite 211

17       Naples, FL 34104

18

19  BY:   DAVID F. GARBER, ESQ.

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE COURT:  All right, please be seated.  We're here

3    in Residential Capital, number 12-12020.  Mr. Lewis?

4          MR. LEWIS:  Yes, Your Honor.

5          THE COURT:  Well, let me ask first before we begin:

6    does anybody have anything they want to raise?

7          MR. LEWIS:  I have nothing, Your Honor.

8          MR. GARBER:  I have nothing at this time, Your Honor.

9          THE COURT:  Okay.  Call your first witness, Mr. Lewis.

10          MR. LEWIS:  Your Honor, I'd like to call David

11    Cunningham, please?

12          THE COURT:  Certainly.

13          Mr. Cunningham, if you would come on around, and if

14    you would raise right hand and be sworn.  Right there, yeah.

15      (Witness sworn)

16          THE COURT:  All right, please have a seat.  You should

17    have water and a cup there if you need it.

18          THE WITNESS:  Thank you.

19          THE COURT:  Okay, go ahead.

20          MR. LEWIS:  Thank you, Your Honor.

21    DIRECT EXAMINATION

22    BY MR. LEWIS:

23    Q.   Good morning, Mr. Cunningham.

24    A.   Good morning.

25    Q.   Would you state your full name, please?

RESIDENTIAL CAPITAL, LLC, ET AL.                          5

1   A.   David Cunningham.

2   Q.   And where do you reside?

3   A.   In Doylestown, Pennsylvania.

4   Q.   And what education do you have?

5   A.   Some college, one year.

6   Q.   And was there an emphasis in that one year?

7   A.   Business management.

8   Q.   All right.  Do you have any other formal training of any

9   kind?

10  A.   Since I've been employed with GMAC Mortgage, we've had

11  various training around leadership development, training on the

12  systems, and you know, training from outside counsel, who used

13  to come into the foreclosure department.

14  Q.   What's your current employment?

15  A.   I'm director of regulatory and compliance for ResCap

16  Liquidating Trust.

17  Q.   What does that position entail?

18  A.   I fulfill our remaining obligations under the settlements

19  entered into with the Department of Justice and the Federal

20  Reserve Board.

21  Q.   Okay.  And how long have you held that position?

22  A.   Since February of 2013.

23  Q.   All right.  And what was your previous employment?

24  A.   I was the director of the foreclosure operation for GMAC

25  Mortgage.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    6

1   Q.    And what did that entail?

2   A.    I was responsible for staffing, processes, and procedures

3   associated with foreclosures for GMAC Mortgage.

4   Q.    How long did you hold that position?

5   A.    From June of 2007 to February of 2013.

6   Q.    Okay.  And prior to that, what was your employment?

7   A.    I was manager of foreclosure operations for GMAC Mortgage.

8   Q.    How is the job as manager different from director?

9   A.    When I was manager, I was responsible for certain

10  investors, our subservice clients in the foreclosure operation.

11  Q.    So particular portfolios, for example?

12  A.    Yes.

13  Q.    Okay.  How long did you hold that position?

14  A.    Since 2003.

15  Q.    How long have you been employed by GMAC in one capacity or

16  another?

17  A.    Fourteen years.

18  Q.    In the course of your employment, have you become familiar

19  with what are generally known as servicing notes?

20  A.    Yes, I have.

21  Q.    Why don't you tell us, on a general level, what servicing

22  notes are?

23  A.    Servicing notes were -- reside in a system called LoanServ

24  that we used as our system of record to track servicing

25  activities for mortgage loans.

RESIDENTIAL CAPITAL, LLC, ET AL.                    7

1    Q.    Is that a program that you bought from some vendor?

2    A.    Yes.

3    Q.    And did you modify the program at all?

4    A.    Yes, we did.

5    Q.    Did you have a role in doing that?

6    A.    I did.

7    Q.    What was that role?

8    A.    We would enhance the system with various different what's

9    referred to as CITs, customer inquiry tracking codes and

10   different codes in the system to communicate --

11   Q.    What gets entered into --

12   A.    -- in our department.

13   Q.    -- LoanServ?

14   A.    Comments from communications with customers.  There's

15   payment history, tracking of payments from customers and going

16   out for taxes and insurance and other related activities, and

17   comments associated with the loan.

18   Q.    Do you know generally how to read LoanServ notes?

19   A.    Yes, I do.

20   Q.    It has various abbreviations that it uses, does it not?

21   A.    Yes.

22   Q.    Do you know some of them?

23   A.    I do.

24   Q.    Do you know them all?

25   A.    No, I don't.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    8

1   Q.    Okay.  Is there an index for the abbreviations?

2   A.    Yes, there is.

3   Q.    Okay.  So if you don't know an abbreviation, you go look

4   up the index, if you need to have that information?

5   A.    That's correct.

6   Q.    Okay.  Did you use LoanServ yourself, apart from having a

7   role in developing it?

8   A.    Yes, I did.

9   Q.    So you would enter information in it?

10  A.    Yes, I would view the application and enter comments and

11  information into the application.

12  Q.    And would you obtain information from it?

13  A.    Yes.

14  Q.    Okay.  And that was as both manager and director of the

15  mortgage foreclosure department?

16  A.    Yes.

17  Q.    Okay.  Now, on the counter up there somewhere, I think,

18  there's a big white binder that looks like this.  I'm going to

19  ask you to open it to Exhibit G.  Are you there?

20  A.    Yes.

21  Q.    Can you just thumb through it very quickly.  I'm going to

22  ask you if you recognize what it is?

23  A.    Okay.

24  Q.    Can you tell me what that is?

25  A.    These are LoanServ history notes, or servicing notes.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    9

1    Q.    And can you tell who the borrower is?

2    A.    Yes, Barry Fritz Mack.

3    Q.    Okay.  And does this cover the entire time that the Macks

4    were a borrower?

5    A.    Yes, it does.

6    Q.    How can you tell?

7    A.    On the first page you see a reference to a welcome letter,

8    eligible, which is the beginning of the loan.  And at the end

9    of the history you see liquidation activities, such as a

10   payoff.

11   Q.    Okay.  And after that, there would be no further notes,

12   absent some further development?

13   A.    Correct.

14   Q.    Okay.  Now, I've asked you to review these notes

15   generally, have I not?

16   A.    Yes.

17   Q.    Okay.  And you've done that?

18   A.    Yes, I have.

19   Q.    Okay.  You haven't memorized them, I take it?

20   A.    No, I haven't.

21   Q.    Okay.

22         THE COURT:  I see these notes appear to be redacted.

23   Could you explain that or have the witness explain it.  Are

24   they -- first of all, are they redacted?  I see large numbers

25   of entries with no transaction message.  I assume from prior

RESIDENTIAL CAPITAL, LLC, ET AL.                    10

1  matters where I've seen loan servicing notes that means they've

2  been redacted.  Maybe I'm wrong.

3  Q.   Do you know?

4  A.   I don't.

5          MR. LEWIS:  These were used in the deposition of Mr.

6  McGuire (ph.) that Mr. Garber took in the Florida litigation.

7  That's the tab --

8          THE COURT:  Well, just look at page 1, Exhibit G page

9  1 --

10          MR. LEWIS:  Yeah, no.  I --

11          THE COURT:  -- I mean there's large -- going through

12  it, leafing through it, there are large blanks, which appear to

13  me --

14          MR. LEWIS:  I understand --

15          THE COURT:  -- to be redactions.

16          MR. LEWIS:  My point, Your Honor, was that Mr.

17  Garber's more likely to know the answer to that question,

18  because he used them --

19          THE COURT:  Well, they're your client's notes.

20          MR. LEWIS:  I understand.  I can get you the answer,

21  but I don't know the answer, and Mr. Cunningham doesn't know

22  the answer.

23          THE COURT:  Okay.

24          UNIDENTIFIED SPEAKER:  We did not redact them as part

25  of this.

RESIDENTIAL CAPITAL, LLC, ET AL.                         11

1          THE COURT:  Okay.

2          MR. LEWIS:  We just took them as they came from the

3    deposition of Mr. McGuire.

4    BY MR. LEWIS:

5    Q.   Now, do the servicing notes usually include some reference

6    to any contact with the borrower, whether it's oral or written,

7    in person, telephone?

8    A.   Yes.

9    Q.   Okay.  And that was your practice, was it not?

10   A.   Yes, it was.

11   Q.   It was to enter some reference to any contact?

12   A.   Yes.

13   Q.   And so if you got a letter, you got a phone call from the

14   borrower, something normally would be entered --

15   A.   Yes.

16   Q.   -- that reflected that that had happened, and maybe

17   something about what it was?

18   A.   That's correct.

19   Q.   Can you say that a hundred percent of the time that

20   happened?

21   A.   No, I can't.

22   Q.   Okay.  But it was your goal that it did happen?

23   A.   Yes.

24   Q.   In fact, you trained your people to do that, did you not?

25   A.   That's correct.

1   Q.    Now, was there another computer program that you used

2   called LPS?

3   A.    Yes, there was.

4   Q.    What is LPS?

5   A.    LPS was the system that was used to communicate with

6   outside counsel on foreclosures and bankruptcy.

7   Q.    And was that also a vendor-supplied system?

8   A.    Yes, it was.

9   Q.    And it was modified after you obtained it.  Is that right?

10  A.    Yes.

11  Q.    Did you have any role in modifying that system?

12  A.    Yes, I did.

13  Q.    Okay.  Did you have any occasion to use that system?

14  A.    Yes, I did.

15  Q.    And that's because you would be communicating with

16  foreclosure counsel?

17  A.    Correct.

18  Q.    Do LPS entries typically get reflected in LoanServ?

19  A.    Yes, they do.

20  Q.    And so if you had a communication with foreclosure

21  counsel, for example, through LPS, that would also be entered

22  into LoanServ in some fashion?

23  A.    Yes, it would.

24  Q.    Okay.  And vice versa, if they communicated with you and

25  that was entered into LPS, that would also get entered into

RESIDENTIAL CAPITAL, LLC, ET AL.                    13

1   LoanServ in some fashion?

2   A.   Yes, it would.

3   Q.   Okay.  Can you say that happened a hundred percent of the

4   time?

5   A.   No, I can't.

6   Q.   Same testimony, essentially, right?  You aim for that, but

7   you can't verify personally that it happened a hundred percent

8   of the time?

9   A.   Correct.

10  Q.   Okay.  Now, if you started a foreclosure, would all of

11  your communications with counsel who was handling the

12  foreclosure be through LPS?

13  A.   Yes, it would.

14  Q.   So you'd make the referral through LPS, you'd supply the

15  documents through LPS, you'd check up on the progress through

16  LPS, they'd let you know what was going on through LPS, and so

17  on?

18  A.   Yes.

19  Q.   You would not normally have direct contact with local

20  counsel?

21  A.   Not outside of the LPS system, no.

22  Q.   Okay.  Now, you know that this case is about a foreclosure

23  that GMAC began against the Macks in 2009.  Is that correct?

24  A.   Yes.

25  Q.   Okay.  Can you look through the LoanServ notes and tell me

RESIDENTIAL CAPITAL, LLC, ET AL.                    14

1  where you first see any reference to that?

2  A.    On page 8, the entry on July 23rd of 2009, with a

3  transaction type of FOR, where it references "approved for

4  foreclosure, 7/23/09".

5  Q.    I'd like to go over these columns on the left to begin

6  with.  So "transaction added date", is that the date of the

7  entry?

8  A.    Yes, it is.

9  Q.    And the "transaction type", what does that refer to?

10  A.    That's the type of entry being entered into the LoanServ

11  application.

12  Q.    Okay.  And was there a special code for communications

13  with counsel?

14  A.    Yes, there was.

15  Q.    And what was that code?

16  A.    It would be under the transaction user ID 01122.

17  Q.    And the transaction user ID, that's the third column?

18  A.    That's correct.

19  Q.    And it -- what would go under this column besides 01122?

20  What other kinds of information would go under this column?

21  A.    The transaction user ID would identify the person within

22  servicing who is making the entry into the LoanServ

23  application.

24  Q.    Okay.  So 01122 treats counsel as a person?

25  A.    Yes, it does.

RESIDENTIAL CAPITAL, LLC, ET AL.                    15

1    Q.    A separate person?

2    A.    Yes.

3    Q.    Okay.  Now, you've identified the first indication of a

4    foreclosure as being on 7/23 and with a transaction type FOR.

5    If you look up a little bit higher, maybe four or five lines,

6    do you see a transaction code LMT?

7    A.    Yes.

8    Q.    It's also on 7/23?

9    A.    Yes.

10   Q.    And what does that refer to?

11   A.    Loss mitigation.

12   Q.    And what's that?

13   A.    Loss mitigation provides alternatives to homeowners.

14   Q.    So this --

15   A.    For --

16   Q.    -- is when you -- a homeowner applies, asks for some kind

17   of modification on his loan?

18   A.    A modification or a liquidation, such as a short sale or a

19   deed in lieu of foreclosure.

20   Q.    So this -- does this entry indicate, then, that on 7/23,

21   operator number 31938 opened a loss mitigation file for the

22   Macks?

23   A.    Yes.

24   Q.    Okay.  Now, does the same operator -- is it the same

25   operator who enters the foreclosure file -- who opens the

1  foreclosure file?

2  A.   Yes, it is.

3  Q.   Would that be normal?

4  A.   No, it wouldn't be.

5  Q.   Why is that?

6  A.   The loss mitigation associate is not authorized or not

7  allowed to update foreclosure codes.

8  Q.   Okay.  Can a loss mitigation associate stop a foreclosure?

9  A.   Yes, they can.

10  Q.   And why would that happen?

11  A.   With loss mitigation, when they provide alternatives to

12  homeowners and put a borrower into a plan, they go and close

13  out the file with counsel, you know, to make sure there's no

14  handoff issues between the different servicing units.  So loss

15  mitigation will reach out to counsel directly to close out

16  those files when they enter into an agreement with a customer.

17  Q.   Okay.  So it looks like the opening of the foreclosure

18  file here was a mistake by somebody not authorized to do that?

19          THE COURT:  Ask a nonleading question.

20          MR. LEWIS:  Okay.

21  Q.   Do you draw any conclusions about the --

22          THE COURT:  Let me ask you, do you have any personal

23  knowledge about what happened in the Mack file?  Do you have

24  any personal knowledge about how the foreclosure was initiated

25  or their efforts to obtain a loan modification?

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

1          THE WITNESS:  I know what's based on the servicing

2    notes.

3          THE COURT:  I can read them, too.  You'll interpret

4    them.  But my question to you is, do you have any personal

5    knowledge about what happened with respect to the Macks' loan

6    and the initiation of foreclosure, or consideration of loan

7    modification, other than what appears in the loan servicing

8    notes?

9          THE WITNESS:  No, I do not.

10         THE COURT:  Ask your next question.

11         MR. LEWIS:  Okay.

12   Q.   Now, I'd like to look a little bit further down the same

13   page.

14         THE COURT:  Do you know who 31938 is?

15         THE WITNESS:  I don't.

16         THE COURT:  Did you make any effort to find out who it

17   was?

18         THE WITNESS:  I did not.

19         THE COURT:  It's a person.  It was -- it was a person?

20         THE WITNESS:  It was a person.

21         THE COURT:  Do you know who it was, Mr. Lewis?

22         MR. LEWIS:  No, I don't, Your Honor.  And most of

23   those people are gone.

24         THE COURT:  Well, they may be gone, but I --

25   Q.   If you look further down the page, and you see another

RESIDENTIAL CAPITAL, LLC, ET AL.                    18

1    entry "FOR", do you see that, on 7/24?

2    A.    Yes, I do.

3    Q.    And what does that entry indicate?

4    A.    The entry indicates that the file was closed in the

5    LoanServ servicing system.

6    Q.    Now, when a foreclosure is terminated in LoanServ, does

7    someone also have to communicate with counsel --

8    A.    Yes.

9    Q.    -- to terminate the foreclosure through LPS?

10   A.    Yes, they do.

11   Q.    And that would normally show up in here, wouldn't it, if

12   that happened on the same day?

13   A.    Yes.

14         THE COURT:  Could you ask nonleading questions?

15         MR. LEWIS:  Okay.

16         THE COURT:  I really want to know about this.  I don't

17   want you leading the witness through it.  I want to know what

18   happened here.

19         MR. LEWIS:  Yes, Your Honor.

20   Q.    So if you thumb through these notes, when is the next

21   entry that you find --

22         THE COURT:  Do you know who 31578 is?

23         THE WITNESS:  I do not.

24         THE COURT:  It's a different person than 31938?

25         THE WITNESS:  Yes, it is.

RESIDENTIAL CAPITAL, LLC, ET AL.                    19

1  Q.    Are you familiar with what's called an "exception report"?

2  A.    Yes, I am.

3  Q.    What's an exception report?

4  A.    On a -- within the foreclosure operation on a daily basis,

5  we would -- a report would be auto-generated within my area to

6  identify loans that were coded as a foreclosure in the LoanServ

7  application but were contractually current.

8  Q.    Okay.  And that happened on a daily basis?

9  A.    Yes, it would.

10  Q.    Now, if you'd look through these notes, can you tell me

11  the next place you'd find any reference to the foreclosure

12  process?

13  A.    On 7/24, I show that the file was received on 7/24 of 2009

14  by David J. Stern (ph.).

15          THE COURT:  Where do you see that?

16          THE WITNESS:  On page 8 under -- on 7/24 with

17  transaction code 01122.

18          THE COURT:  That's Mr. Stern, 01122?

19          THE WITNESS:  That is the --

20          THE COURT:  Or his firm?

21          THE WITNESS:  -- LPS application -- it's notes from

22  the LPS application going into LoanServ.

23          THE COURT:  So how do you know it was Stern?

24          THE WITNESS:  Because when it references "to Law

25  Office of David J. Stern," down toward the bottom.

RESIDENTIAL CAPITAL, LLC, ET AL.                              20

1           THE COURT:  Let me --

2           THE WITNESS:  It's the ninth line up.

3           THE COURT:  Right.

4    Q.   And what does this entry indicate to you?

5    A.   That the foreclosure referral was received by David J.

6    Stern.

7    Q.   What's the next entry regarding the foreclosure process

8    that you find?

9    A.   On page 9 the third line --

10          THE COURT:  Could you come back to page 8 for a

11   minute?  The entry just immediately below "to Law Offices of

12   David J. Stern," what's PA at 7/24/2009?

13          THE WITNESS:  That's a continuation from the prior

14   line.  So it would be Law Offices of David J. Stern --

15          THE COURT:  Okay.

16          THE WITNESS:  -- PA.

17          THE COURT:  All right.  What's the entry two lines

18   further, just the date 7/24/08 (sic)?

19          THE WITNESS:  It would be a continuation of similar

20   activities.  It was received by the Law Offices of David J.

21   Stern on 7/24.

22          THE COURT:  So all those lines are the same -- are

23   really the same entry?

24          THE WITNESS:  They are.

25          THE COURT:  I just want to make sure I understand.

RESIDENTIAL CAPITAL, LLC, ET AL.                    21

1  The 01122, that's a person at GMAC?

2          THE WITNESS:  It was set up as a transaction user ID

3  for information from the LPS application to be put into

4  LoanServ.

5          THE COURT:  Okay.

6          THE WITNESS:  So it's not an actual person.  It's to

7  identify that that's where it came from.

8          THE COURT:  All right.  Go ahead.

9  BY MR. LEWIS:

10  Q.   What's the next reference you find to the foreclosure?

11  A.   On page 9 there's a -- on July 27th of 2009, there's

12  "upload comment title search".

13  Q.   I'd like you to turn over to page 14.  Turn to page 14.

14  Are you there?

15  A.   Yes, I am.

16  Q.   Okay.  And if you look down towards the bottom, there's a

17  whole series of FOR entries.  Do you see those?

18  A.   Yes, I do.

19  Q.   What do those entries tell you?

20  A.   That on September 2nd of 2009, the attorney was notified

21  to close and bill by Marina Sorona (ph.)

22  Q.   Okay.  And does it give you any other information?

23  A.   It also says that the attorney confirmed that the file was

24  closed on September 2nd of 2009.

25  Q.   You have no personal knowledge of why there was this

```
 1   hiatus between the time that the loan -- the foreclosure was
 2   closed in LoanServ and this information went to and came back
 3   from Stern's office in September.  Is that right?
 4   A.   That's correct.
 5          THE COURT:  May I ask you, Mr. Cunningham, at an
 6   evidentiary hearing last week -- it all kind of blends
 7   together -- or the week before, in a ResCap matter, the Trust's
 8   lawyers put in evidence, an exhibit from -- which I believe it
 9   was from the LPS system, but it also included payment history
10   with it.  Is the payment history part of the LPS system?
11          THE WITNESS:  No, it's not.
12          THE COURT:  Maybe I didn't mean LPS system.  Not LPS.
13   Is it part of the LoanServ history notes?  That's what --
14          THE WITNESS:  It's part of the LoanServ application,
15   yes.
16          THE COURT:  Do you have to print separate -- it was
17   presented in evidence as a single document before me that
18   included the payment history for the particular loan and all of
19   the notes associated with that loan.  Do you have to print
20   those separately?  It was presented as a single document to me.
21          And the reason I'm asking this is that I think the
22   record here indicates and certainly it's Mr. Mack's testimony
23   that he was always current in his payments.  And so that's why
24   I'm inquiring whether -- I've been given this exhibit with
25   notes but not the payment history.  Would they appear together?
```

RESIDENTIAL CAPITAL, LLC, ET AL.                                    23

1          THE WITNESS:  Not typically.  It depends on how you

2    pull the information.  I don't know what was provided to you

3    last week, but I know the payment history and the comment

4    history are typically separated because of how the LoanServ

5    application works.

6          MR. LEWIS:  Your Honor, if it helps at all, one of the

7    stipulated facts is that they were always current on the loan.

8          THE COURT:  That they were --

9          MR. LEWIS:  Always current on their loan.

10          THE COURT:  Oh, I know that.

11          MR. LEWIS:  There's no dispute about that.

12          THE COURT:  But what I'm -- I mean somebody triggered

13    a foreclosure here when they were current on their loan, and

14    I'm just -- I've been given loan service notes, but last week I

15    was given loan service notes that appeared in a single document

16    with the payment history.  And I would think that if somebody

17    had looked at the payment history, they wouldn't go ahead and

18    trigger a foreclosure if the borrower is current.

19          MR. LEWIS:  Your --

20          THE COURT:  The loan payment history for the loan last

21    week showed when the borrower missed payments.

22          MR. LEWIS:  Your Honor, I think I might be able to ask

23    a question that will help to clarify that a bit.

24          THE COURT:  Go ahead.

25    BY MR. LEWIS:

1  Q.   Mr. Cunningham, you've already testified that the same

2  person who entered the -- opened the loan mitigation file is

3  the person who also started the foreclosure.  Do you recall

4  that testimony?

5  A.   Yes.

6  Q.   On the computer screen, are those two fields on the same

7  screen?

8  A.   Yes, they were.

9          THE COURT:  The foreclosure and the loss mitigation

10  are in the same screen?  Is that what you're saying?

11         THE WITNESS:  Yes.

12         THE COURT:  Okay.  Go ahead.

13         MR. LEWIS:  And our surmise -- it's not evidence, but

14  our surmise is she wasn't authorized to do that but she --

15         THE COURT:  She did it.

16         MR. LEWIS:  -- accidentally did it -- entered

17  something in the wrong field.

18         THE COURT:  Okay.

19         MR. LEWIS:  But we don't know that.

20         THE COURT:  Okay.  Did you ever find out who these

21  people were?

22         MR. GARBER:  No, Your Honor, I didn't.

23         THE COURT:  Go ahead.

24         MR. LEWIS:  Thank you, Your Honor.

25  Q.   Mr. Cunningham, I asked you earlier whether I had asked

1  you to go through all these notes, and you said that you had

2  done so at my request.  Do you recall that?

3  A.    Yes, I did.

4  Q.    Now, looking at this file, the rest of these LoanServ

5  notes, do you find any further reference to the foreclosure

6  procedures or the litigation between the Macks and Deutsche

7  Bank?

8  A.    Can you clarify the question?

9  Q.    Yeah.  Is there any further evidence -- is there any

10  further reference in the LoanServ notes to litigation between

11  the Macks and Deutsche Bank?

12  A.    There is a comment on Feb -- I'm sorry, September 15th, of

13  2009 from David Stern on page 15 that references that the file

14  was sent to dismissals and file closed per client, 9/2/2009,

15  reinstated.

16             THE COURT:  Where do I find it?

17             THE WITNESS:  On page 15 in the -- just about the

18  middle of the page, under the transaction user 01122.

19       (Pause)

20             THE COURT:  Is that the file closed, per client?  Is

21  that what you referenced?

22             THE WITNESS:  That would have been an entry from David

23  Stern acknowledging that he closed the file at our request.

24             THE COURT:  What's "reinstated DIS"?

25             THE WITNESS:  That would have been the closing reason

RESIDENTIAL CAPITAL, LLC, ET AL.                    26

1    that he would have put when he closed the file out.

2              THE COURT:  I see a similar entry on 9/15 and on 9/23.

3              THE WITNESS:  It's a continuation of his comment from

4    9/15.

5              THE COURT:  How is it a continuation when it's a

6    different date?

7              THE WITNESS:  Well, the different date just references

8    that he is returning the original note and mortgage back to

9    GMAC.  So the 9/23 comment is referencing that he sent the file

10   to dismissals, but he's returning the original note and

11   mortgage.

12             THE COURT:  Okay.

13   Q.   Now, in the balance of the LoanServ notes, do you find any

14   further reference to the foreclosure action?

15   A.   No, I don't.

16   Q.   Okay.  Now, I also asked you specifically, did I not, to

17   look at the LoanServ notes from October 22nd, 2009 through

18   November 6th, 2009.  Do you recall that request?

19   A.   Yes.

20   Q.   And I asked you to look for any indication that the GMAC

21   had received a letter from the Macks, whether it's described as

22   a letter or some other form of communication.  Do you recall

23   that?

24   A.   Yes.

25   Q.   Did you find anything?

RESIDENTIAL CAPITAL, LLC, ET AL.                    27

1   A.    No, I didn't.

2   Q.    Okay.

3          MR. LEWIS:  Your Honor, I have no further questions of

4   the witness.

5          THE COURT:  Let me ask -- Mr. Garber is probably going

6   to cover this, but I just --

7          One of the issues here is over different addresses for

8   general inquires and for RESPA inquires.  If written inquiries

9   had been received for general inquires, should they be entered

10  into the loan servicing notes?

11         THE WITNESS:  Yes.

12         THE COURT:  And if a RESPA inquiry -- RESPA qualified

13  written request was received, should that be entered as well?

14         THE WITNESS:  I -- because I wasn't in that

15  department, I'm not sure exactly what their procedures were,

16  but generally, I would say yeah.

17         THE COURT:  You --

18         THE WITNESS:  I would say yes.

19         THE COURT:  -- you don't know?

20         THE WITNESS:  I don't know.

21         THE COURT:  Okay, go ahead, Mr. Garber.  You want to

22  cross?

23         MR. LEWIS:  Well, since you've asked that question, I

24  have another one --

25         THE COURT:  Yeah, go ahead.

RESIDENTIAL CAPITAL, LLC, ET AL.                    28

1          MR. LEWIS:  -- I want to ask him.

2          THE COURT:  Go ahead.

3  BY MR. LEWIS:

4  Q.   Mr. Cunningham, was there a particular department or group

5  that dealt with RESPA inquires, QWRs?

6  A.   Yes.

7  Q.   What was the name of that group?

8  A.   It was called Voice of the Customer in Customer Care.

9  Q.   That was their job?

10  A.   Yes.

11  Q.   And where were they located?

12  A.   In Waterloo, Iowa.

13  Q.   From when?

14  A.   I started in 2001, and Waterloo, Iowa was there when I

15  started.  So prior to me starting with GMAC Mortgage.

16          MR. LEWIS:  Okay.  I have no further questions now,

17  Your Honor.  Thank you.

18          THE COURT:  But what about -- customer care was

19  located in Waterloo, Iowa?

20          THE WITNESS:  It was, yes.

21          THE COURT:  Whether that's for general inquiries or

22  RESPA requests?  I mean, Mr. Lewis put in evidence yesterday a

23  monthly statement, and it had several addresses.  It had

24  something for general inquires, it had an address for RESPA

25  inquiries.  They were both in Waterloo, Iowa, they just were

1  different post office boxes.  So were -- and I think they were

2  both addressed "Customer Care", but they had different PO

3  boxes.  So was all of the customer care, whether it was RESPA

4  inquires or general inquires, in Waterloo, Iowa?

5            THE WITNESS:  The department was.

6            THE COURT:  Okay.

7  Q.   But to be clear, the subgroup that dealt with QWRs, that

8  was their job?

9  A.   Correct.

10 Q.   They didn't deal with other stuff?

11 A.   No, they didn't?

12 Q.   Okay.

13            THE COURT:  Just a minute.

14       (Pause)

15            THE COURT:  What's the code "NT"?  What does that

16 mean?

17            THE WITNESS:  I don't know off the top of my head.

18            THE COURT:  Look on page 23 of Exhibit G.  There are a

19 large number of entries with the code NT, can you tell from

20 looking at the entries what NT is?  Does that help you?

21            THE WITNESS:  It doesn't help me with what the code

22 means specifically, but I know what took place in this

23 transaction on page 23 for NT.

24            THE COURT:  What was the transaction?

25            THE WITNESS:  It was a payoff that would have been

1    faxed to Barry Fritz Mack.  The payoff quote would have been

2    good through February 25th of 2010.

3           THE COURT:  All right, let me wait for Mr. Garber to

4    do his cross-examination.  I may have some more questions.

5           Go ahead, Mr. Garber.

6           MR. LEWIS:  Thank you.

7           THE COURT:  Thank you, Mr. Lewis.

8           MR. GARBER:  Your Honor, I estimate my cross-

9    examination will be an hour-and-a-half to two hours.  Could I

10   ask the Court's indulgence to take a short break before --

11          THE COURT:  Absolutely.  Let's take a -- is a ten-

12   minute recess enough for you?

13          MR. GARBER:  That would be fine.

14          THE COURT:  Okay, we'll take a ten-minute recess.

15   Okay.  And when I come back in, everybody can stay in their

16   seats, okay?  You don't have to rise.

17       (Recess from 10:44 a.m. until 11:05 a.m.)

18          THE COURT:  Everybody stay seated.  Thanks, Mr.

19   Cunningham.

20          All right, cross-examination?

21          MR. LEWIS:  Your Honor, I've discussed with Mr. Garber

22   that I'd like to ask one or two more questions of the witness.

23          THE COURT:  Sure, go ahead.

24          MR. LEWIS:  Thank you, Your Honor.

25   BY MR. LEWIS:

RESIDENTIAL CAPITAL, LLC, ET AL.                    31

1   Q.   Mr. Cunningham, you understand you're still under oath?

2   A.   Yes.

3   Q.   Okay.  You testified earlier about exception reports.  Do

4   you recall that testimony generally?

5   A.   Yes, I do.

6   Q.   What's the purpose of an exception report?

7   A.   The exception report was to identify loans where they're

8   in foreclosure and shouldn't be.

9   Q.   Okay.  So it was a safeguard?

10  A.   It was, yes.

11  Q.   A nightly safeguard?

12  A.   It was autogenerated every day.

13  Q.   Okay.  Now, in the course of reading servicing notes in

14  LoanServ, did you ever see entries indicating that a qualified

15  written request had been received?

16  A.   I have, in the past, yes.

17  Q.   And have you seen entries that indicated that responses

18  have been sent to those qualified written requests?

19  A.   Yes.

20       MR. LEWIS:  Okay, I have no further questions, Your

21  Honor.

22       THE COURT:  Okay, cross-examination.

23       (Pause)

24  CROSS-EXAMINATION

25  BY MR. GARBER:

RESIDENTIAL CAPITAL, LLC, ET AL.                                    32

1   Q.   Good morning, Mr. Cunningham.

2   A.   Good morning.

3   Q.   I haven't had the pleasure of meeting you before today,

4   have I?

5   A.   No.

6   Q.   And I realize you made numerous answers on direct

7   examination.  To be honest with you, I wasn't sure I heard all

8   of them, so I'll try not to repeat any of them, but forgive me

9   if I do repeat one or two.

10  A.   Okay.

11  Q.   You now work for the ResCap Liquidating Trust?

12  A.   Yes.

13  Q.   And you have done so since February '13 to the present?

14  A.   February of 2013.

15  Q.   And before that you worked for GMAC Mortgage, correct?

16  A.   Yes.

17  Q.   From June '07 to February '13 when you began working for

18  ResCap, you were the director of the default operations?

19  A.   Director of foreclosure operations.

20  Q.   Okay, is there a difference between that and default

21  operations?

22  A.   Foreclosure operation was a part of default operations.

23  Q.   Okay.  And you were not director of default operations?

24  A.   I was director of the foreclosure operation.

25  Q.   Okay.  You managed over 65,000 foreclosures for various

RESIDENTIAL CAPITAL, LLC, ET AL.                    33

1  investors?

2  A.    Yes, I did.

3  Q.    And you led a team of 4 managers, 8 supervisors, 125

4  specialists?

5  A.    Yes, I did.

6  Q.    You provided ongoing oversight of performance?

7  A.    Yes, I did.

8  Q.    So would it be fair to say that the leadership and the

9  oversight of the entire foreclosure department in Fort

10  Washington, Pennsylvania for GMCAM was under your

11  responsibility?

12  A.    Yes, it was.

13  Q.    And you set up the guidelines and saw that they were

14  implemented, did you not?

15  A.    Well, there were a number of different parts of servicing:

16  audit, compliance, risk, in addition to just myself.  But I was

17  responsible for the foreclosure operation.

18  Q.    And your office in Fort Washington, did they handle all

19  the foreclosures for GMACM?

20  A.    Yes, they did.

21  Q.    So they would have handled them all over the country?

22  A.    Yeah.

23  Q.    Every -- all of the fifty states?

24  A.    Yes.

25  Q.    Including Florida?

RESIDENTIAL CAPITAL, LLC, ET AL.                    34

1   A.   Yes.

2   Q.   And your office was responsible for hiring contractors,

3   that is, attorneys, who would handle those foreclosures for

4   you?

5   A.   Yes, we were.

6   Q.   And one of the attorneys that you chose was a gentleman

7   named David Stern, was it not?

8   A.   It was -- he was a law firm within part of our attorney

9   network, yes.

10  Q.   And he was an attorney that was vetted by your office?

11  A.   He was an attorney that was in place with GMAC prior to me

12  starting in 2001, for GMAC.  But yes, he was one of our

13  attorneys.

14  Q.   Did you ever do any quality control checks on his work?

15  A.   That was not within the foreclosure operation.  There were

16  other business units that were responsible for oversight of

17  attorneys.

18  Q.   Prior to the 1st of January 2010, did you have any reason

19  to believe that he was performing at a substandard basis?

20  A.   No, I didn't.

21  Q.   You didn't have any complaints that came back?

22  A.   Again, attorney performance was managed within a group

23  that was called Vendor Management or Default Supplier

24  Relations.  So a lot of --

25          THE COURT:  I'm sorry, I missed the last part of your

RESIDENTIAL CAPITAL, LLC, ET AL.                    35

1   answer.

2   A.    It was managed within a group that was called Vendor

3   Management or Default Supplier Relations.

4           THE COURT:  Okay.  I just didn't hear the last --

5           THE WITNESS:  Sorry.

6   Q.    Forgive me.  I've forgotten some of the numbers, but it is

7   it true that in some months you sent many thousands of

8   foreclosures to David Stern to handle across the State of

9   Florida?

10  A.    I don't know the number specifically.

11  Q.    Would it be true that in total he handled over 60,000

12  foreclosures for General Motors in the State of Florida?

13  A.    I don't know.

14  Q.    You work primarily out of the Fort Washington office,

15  don't you?

16  A.    Yes, I do.

17  Q.    GM has a lot of different offices across the country?

18  A.    I don't know about General Motors, but GMAC --

19  Q.    GMACM?

20  A.    -- GMAC -- is there a certain time frame in question or --

21  Q.    Well, I'm primarily interested in 2008/2009?

22  A.    So GMAC was primarily based out of Dallas, Texas;

23  Waterloo, Iowa; and Fort Washington, Pennsylvania.

24  Q.    And each location handled a different type of interest for

25  GMACM, didn't it?

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1   A.    Different servicing operations, yes.

2   Q.    Fort Washington was the one that handled the foreclosures?

3   A.    Yes.

4   Q.    Dallas, Texas handled collections?

5   A.    There were a number of different servicing units down

6   there.

7   Q.    Did they handle collections?

8   A.    Some collections, yes.

9   Q.    And what's the difference between a collection and a

10   foreclosure?

11   A.    Collections was an operation that would collect payments

12   from delinquent customers.

13   Q.    Okay.  So that was pre-foreclosure?

14   A.    Yeah.

15   Q.    So if there was a problem with a loan, it would go first

16   to Dallas, who would try to collect on it, and then it would go

17   into foreclosure, if they were unsuccessful?

18   A.    Well, collections was based out of Dallas and out of

19   Waterloo, Iowa.  But yes.  Yes, the collections would be before

20   foreclosure.

21   Q.    And Waterloo, Iowa was the site at which GMACM maintained

22   its customer care, correct?

23   A.    That was one of the operations in Waterloo.

24   Q.    So if an individual were to call customer care, they would

25   be getting Waterloo, Iowa?

RESIDENTIAL CAPITAL, LLC, ET AL.                          37

1    A.    I don't know.

2    Q.    Okay.  I have a picture I would like to show you.

3              MR. GARBER:  May I approach, Your Honor?

4              And I only have the one picture.

5              THE COURT:  Is it marked for ID?

6    Q.    Do you recognize this picture?

7    A.    I don't know.

8    Q.    I'm sorry?

9              THE COURT:  You said you don't?

10              THE WITNESS:  It's hard to see.  I just see trees and

11   a bench.

12   Q.    So you don't recognize that particular site?

13   A.    I mean, I -- I don't see a site.  I see trees and a bench.

14   Q.    Okay.  Have you ever been out to the site at Waterloo,

15   Iowa?

16   A.    Yes, I was.

17   Q.    How often have you been there?

18   A.    I was there once.

19   Q.    When were you there?

20   A.    I don't recall.  It was a few years back.

21   Q.    Hmm?

22   A.    It was a few years back.  I don't recall a specific date.

23   Q.    When you say "a few years back", would it have been after

24   2009?

25   A.    Yes, it would have been after 2009.

RESIDENTIAL CAPITAL, LLC, ET AL.                    38

1    Q.    Okay.  So it would have been 2010 or 2011?

2    A.    Or thereafter.  But --

3    Q.    Okay.

4          MR. GARBER:  Can I have the picture back?

5          MR. LEWIS:  Your Honor, may I ask that the picture --

6    that you look at the picture as well, so that you can see what

7    he's seeing?

8          THE COURT:  Sure.

9          MR. LEWIS:  Thank you.

10          THE COURT:  You can have them back, Mr. Garber.  I see

11   a lot of trees and a road.

12          Mr. Lewis, do you want it marked for identification?

13          MR. LEWIS:  No, I --

14          THE COURT:  It doesn't seem to me we need to but --

15          MR. LEWIS:  -- I just wanted you to understand why he

16   had trouble identifying anything there.

17          THE COURT:  Yeah.

18   Q.    Now, the Waterloo, Iowa site is an office building that

19   has an address of 3451 Hammond Avenue, doesn't it?

20   A.    Yes.

21   Q.    Can you describe the building for us, at that site?

22   A.    I'm -- there's a cafeteria.  There's different -- there's

23   a lot of cubes.  There's different business units as you walk

24   down the aisles.  Some are property preservation.  And they're

25   segmented by function within the servicing operation.

RESIDENTIAL CAPITAL, LLC, ET AL.                39

1    Q.    How many people work there?

2    A.    I don't know.

3    Q.    More than a hundred?

4    A.    Yes.

5    Q.    How many separate offices are there there?

6    A.    I don't --

7              THE COURT:  Better use past tense, because --

8              MR. GARBER:  Oh, yes.

9    Q.    How many separate offices were there there in 2009?

10   A.    How many different sites can --

11   Q.    Yes.

12   A.    -- be identified?

13   Q.    Separate offices?

14   A.    I'm sorry can you rephrase the --

15   Q.    Okay.

16             THE COURT:  I don't understand the question either,

17   because he's talking about -- I think there were cubicles?

18             THE WITNESS:  Yes, Your Honor.

19   Q.    Okay, so you had cubicles, and a cubicle would maintain a

20   certain function from another cubicle.  Is that correct?

21   A.    A cubicle would hold one person who was part of an

22   operational unit.  So --

23   Q.    How many people worked for customer care?

24   A.    I don't know.

25   Q.    Did they have an office manual that they used?

RESIDENTIAL CAPITAL, LLC, ET AL.                    40

1              MR. LEWIS:  Objection; vague.

2              THE COURT:  Overruled.  If you know.

3   A.   I don't know.

4   Q.   Did they have a separate phone system that they used from

5   the other functions located at 3451 Hammond Avenue?

6   A.   I don't know.

7   Q.   Did they have different training manuals for each unit

8   that was located out at 3451 Hammond?

9   A.   I don't know.

10  Q.   Did they have separate office equipment for each unit that

11  was located at 3451 Hammond?

12  A.   Can you clarify that?

13  Q.   Copiers, telephones, intercoms, computers?

14  A.   I don't know.

15  Q.   Now, someplace, the mail was delivered at 3451 Hammond,

16  wasn't it?

17  A.   Yes.

18  Q.   Where was that?

19  A.   I don't know specifically.

20  Q.   Okay.  Do you know who picked up the mail?

21  A.   No, I don't.

22  Q.   Do you that if each unit that was assigned a duty out at

23  Hammond, in Waterloo, Iowa, if they had a separate person to go

24  pick up the mail?

25  A.   I don't know.

RESIDENTIAL CAPITAL, LLC, ET AL.                    41

1  Q.   Now, we have two addresses that are of great interest to

2  us here today.  One of them, I believe, is Post Office Box

3  1330.  Would that be a post office box that was located at a

4  central location on the 3451 Hammond Avenue address?

5  A.   I don't know.

6  Q.   And the other post office box that is of interest to us is

7  4622 -- Post Office Box 4622 of Waterloo, Iowa.  Do you know

8  who picked up that mail?

9  A.   No, I don't.

10  Q.   Do you know if that post office box was contiguous to

11  1330?

12  A.   I don't know that.

13  Q.   Do you even know if there was a separate post office box,

14  1330 from 4622?

15  A.   No.

16  Q.   Mr. Cunningham, in your duties for GMACM, and now for

17  Residential Capital, you were required to file affidavits?

18  A.   That was part of my team.

19  Q.   Okay.  How many affidavits a year do you think you filed

20  in 2009?

21        THE COURT:  Mr. Cunningham personally, or people in --

22        MR. GARBER:  No, Mr. Cunningham personally.

23  A.   Can you ask the question again.

24  Q.   In 2009, how many affidavits did you file?

25  A.   I don't know.

RESIDENTIAL CAPITAL, LLC, ET AL.                    42

1    Q.    Would it be fair to say it was over a hundred?

2    A.    Can you -- there were affidavits that were -- more than a

3    hundred, yes.

4    Q.    And did you make any court appearances in 2009 to testify

5    as a witness for GMACM?

6    A.    No, I did not.

7    Q.    And since that time, have you made court appearances to

8    testify in mortgage foreclosures?

9    A.    No.

10   Q.    You may not remember this, but you were called upon to

11   file affidavits in Mercer County in the State of New Jersey, in

12   2011.  Do you recall that?

13   A.    Can you ask the question again?

14   Q.    Pardon?

15   A.    Can you ask the question again?

16   Q.    I said you were called upon to file an affidavit in the

17   Chancery Division of the General Equity Part of the Superior

18   Court of New Jersey in Mercer County in August of 2011.  Do you

19   recall that?

20   A.    No, I don't.

21           MR. GARBER:  Okay.  Your Honor, may I approach?

22           THE COURT:  Yes.

23           UNIDENTIFIED SPEAKER:  Is this your only copy?

24           THE COURT:  Is the document marked for identification,

25   Mr. Garber?

RESIDENTIAL CAPITAL, LLC, ET AL.                    43

```
 1              MR. GARBER:  Pardon me?

 2              THE COURT:  Is the document marked for identification?

 3              MR. GARBER:  No, it's not, Your Honor.  It's a cross-

 4    examination document.  I don't think --

 5              THE COURT:  Well, in my court room, when you show a

 6    witness a document, in order to have a clear record, the

 7    document needs to be marked for identification.

 8              MR. GARBER:  Yes, Your Honor.  I think the last --

 9              THE COURT:  It has nothing to do with whether it gets

10    admitted into evidence, but you do not -- I mean, I let you

11    show the picture of trees, but you're showing him an affidavit.

12    And before you can show it to him, you should have multiple

13    copies, you should have it marked for identification.

14              Mark it for identification.  I gather that's the only

15    copy you have?

16              MR. GARBER:  Yes, Your Honor, that is.  The last

17    exhibit I had, I believe was 43.  Could I mark it as Exhibit 44

18    for identification?

19              THE COURT:  Yes you can.

20    (Affidavit of Mr. Cunningham was hereby marked for

21    identification as Plaintiff's Exhibit 44, as of this date.)

22    BY MR. GARBER:

23    Q.   Could you please take a look at this and see if that's an

24    affidavit you executed?

25         (Pause)
```

RESIDENTIAL CAPITAL, LLC, ET AL.                    44

1    A.    Okay.

2    Q.    Is that an affidavit your executed?

3    A.    Yes, it is.

4          THE COURT:  May I see it, please?

5          MR. GARBER:  Sure.

6      (Pause)

7          THE COURT:  All right.

8          MR. LEWIS:  Your Honor, unless Mr. Garber is going to

9    try to use this document to impeach the witness, I am having a

10   hard time seeing the relevance.

11         THE COURT:  I haven't heard his next question yet --

12         MR. LEWIS:  I understand.

13         THE COURT:  -- Mr. Lewis.  So your objection is

14   premature.

15   Q.    Now, according to this document you had an interface file

16   between LoanServ and LPS Desktop, is that correct?

17   A.    Yes.

18   Q.    And that was true in 2011?

19   A.    Yes.

20   Q.    And that was also true in 2009?

21   A.    Yes.

22   Q.    And we looked at the purged loan notes when you were on

23   direct examination.  And I'm going to get to those in a minute.

24   But some of those entries, I think you testified, were entered

25   by personnel by GMACM.  Is that correct?

1   A.   Can you rephrase the question?

2   Q.   I said some of the entries on the purged loan notes that

3   you went over on direct examination were made by personnel that

4   worked for GMACM.  Is that correct?

5   A.   Yes.

6   Q.   And many of the entries were made by independent outside

7   counsel, in this case, in our purged loan notes, David Stern's

8   office.  Is that correct?

9   A.   No.

10  Q.   He never made any entries into your purged loan notes?

11  A.   He made entries into LPS, which went into LoanServ --

12  Q.   Okay.

13  A.   -- through that interface.

14  Q.   So these purged loan notes that we went over, and I'm

15  going to go over them a little more detail shortly, they are

16  entries, some were made by General Motors employees -- GMACM

17  employees, and some were made by David Stern employees?

18          MR. LEWIS:  Your Honor, that mischaracterizes his

19  testimony.

20          THE COURT:  Overruled.

21  A.   No, the updates were made into the LPS application, by

22  outside counsel.

23  Q.   They're entries that appear in here, right?

24  A.   The entries are from LPS in LoanServ.

25  Q.   Now, in your affidavit you say that the interface file

RESIDENTIAL CAPITAL, LLC, ET AL.                    46

1   between LoanServ and LPS Desktop, provides the legal service

2   provider -- would that be, in this case with the Macks, David

3   Stern?

4   A.    Yes.

5   Q.    Okay.  With the date of the first missed payment.  Is that

6   correct?

7   A.    Yes.

8   Q.    Was that also true in 2009, when the Mack foreclosure was

9   going on?

10  A.    Yes.

11  Q.    Okay.  So automatically he would have been informed of the

12  date of the first missed payment.  Is that correct?

13  A.    Sorry, can you rephrase the question?

14  Q.    I said automatically, David Stern would have been informed

15  of the date of the first missed payment by the Macks?

16  A.    David Stern would have been provided the contractual due

17  date of the loan.

18  Q.    So he would not have been provided with the date of the

19  first missed payment from the Macks?

20  A.    No, he would be provided the contractual due date at the

21  time the referral was sent to David Stern's office.

22  Q.    The contractual due date of the outstanding principal

23  balance, which might have been twenty years in the future, or

24  the due date of the next payment?

25  A.    Due date of the next payment.

RESIDENTIAL CAPITAL, LLC, ET AL.                    47

1   Q.   Okay.  He would then been given the date of the default.

2   Is that correct?

3   A.   The contractual due date.  If it's --

4   Q.   And he would have been given the proper parties to the

5   foreclosure action, correct?

6   A.   He would have been provided images and documents from our

7   imaging system from origination.

8   Q.   That he could see who the proper parties to the

9   foreclosure action were?

10  A.   No.

11  Q.   So the three elements that you mentioned in your

12  affidavit, you're saying, do not apply to the Mack case?

13  A.    It does.  But in the Mack case David Stern requested

14  who -- from us, who the proper plaintiff should be in the case.

15  Q.   Okay.

16  A.    The servicing notes.

17  Q.   Which would you to lead you to believe, would it not, that

18  he did not know who the proper parties to the foreclosure

19  action were?

20  A.   Well, that was provided to David Stern --

21  Q.   Later on?

22  A.   -- through LPS.

23  Q.   And earlier in these proceedings we sent out

24  interrogatories to your counsel, and he provided answers to us,

25  and I would like to go over those with you now to see if you

RESIDENTIAL CAPITAL, LLC, ET AL.                    48

1   agree with those answers.

2           MR. GARBER:  These interrogatories are dated January

3   15th, 2015.  They were signed by Adam Lewis.  I won't show them

4   to the witness, but I will ask questions about them.

5   Q.   Question number 1:  What's the name, title, employer and

6   address of the employee of GMAC who made the first decision to

7   initiate foreclosure against the Macks?  And the answer was, no

8   natural person made the decision to commence the foreclosure.

9   Do you agree with that response?

10  A.   Is there something I can look at.

11          THE COURT:  It's just a question.

12  A.   Okay.  Can you reask the question?  I --

13  Q.   Okay.

14  A.   -- didn't get it.

15  Q.   The question that was asked was:  What is the name, title,

16  employer and address of the employee of GMACM who first decided

17  to initiate the foreclosure against the Macks.  And the answer

18  was:  No natural person made the decision to commence the

19  foreclosure.  Do you agree with that?

20  A.   Yes.

21  Q.   The next question was:  Was the decision to initiate the

22  foreclosure against the Macks by GMACM reviewed by any other

23  person?  If so, provide the name, title, employer, and address

24  of such person.  And in the response it states that the Trust

25  states that no natural person reviewed the automated decision

1    to initiate the foreclosure.  Do you agree with that answer?

2    A.    Yes.

3    Q.    Okay.  Question number 4 was:  Why did GMACM elect to

4    initiate a foreclosure against the Macks in 2009?  The response

5    was:  GMACM believes that the triggering of the automated

6    initiation of foreclosure was the result of the accidental

7    entry of certain incorrect information in the computer system.

8    Do you agree with that?

9    A.    Yes.

10   Q.    Do you have a copy of the purged loan notes in front of

11   you?

12   A.    Yes, I do.

13   Q.    Okay.  I would like to draw your attention --

14            MR. GARBER:  And Your Honor, the notes are also found

15   in my --

16            THE COURT:  I have Mr. Lewis' version open, the same

17   document, I take it?

18            MR. GARBER:  Yes.

19            THE COURT:  Go ahead.

20            MR. GARBER:  Same document, Your Honor.

21   Q.    Would you please look at the entry for 10/25/2006?

22            THE COURT:  So I'm looking at what Mr. Lewis marked as

23   Exhibit G.

24            MR. LEWIS:  Can you -- counsel, can you give us a

25   page?

RESIDENTIAL CAPITAL, LLC, ET AL.                    50

1          MR. GARBER:  Yeah, it's on the first page, 916.

2     Deutsche Bank Bates stamp 916.

3          THE COURT:  Okay.

4     Q.   Do you see that entry for 10/25/06?

5     A.   Yes.

6     Q.   A welcome letter eligible.  That means that GMAC was, at

7     that point, in a position to send a welcome letter to the

8     Macks?

9     A.   Yes.

10    Q.   And are you familiar with welcome letters?

11    A.   No.

12    Q.   I'm sorry, what was your response?

13    A.   No.

14    Q.   Okay.  If you would --

15         MR. GARBER:  Your Honor, may I approach the witness

16    and show him a copy of the welcome letter?

17         THE COURT:  Go ahead.

18         MR. GARBER:  Earlier, I had extra copies of these

19    logs, and the witnesses were able to use them.  Maybe they're

20    there in front of you.

21    Q.   So if you would be so kind as to turn to tab number 3?

22    And this has been marked Plaintiff's Exhibit for

23    identification, number 14.  Do you have that letter in front of

24    you, sir?

25    A.   Yes.

1  Q.   And the purpose of this letter was to tell the Macks that,

2  in fact, GMAC Mortgage would be the servicer on their account?

3  A.   Yes.

4  Q.   And it also gave them an address to write any

5  correspondence that they may have, didn't it?  If you'd look at

6  the bottom towards -- two-thirds of the way down, you'll see a

7  mailbox, and to the right of that, an address?

8  A.   Where it says "correspondence"?

9  Q.   Yes.

10 A.   Yes.

11 Q.   And that address, in fact, was PO Box 4622 Waterloo, Iowa?

12 A.   Yes.

13 Q.   Were any other addresses given to the Macks at that time,

14 to write to, if they had any concerns?

15 A.   I don't know.

16 Q.   If you would be so kind as to turn to tab number 4 on that

17 same book?  This is a servicing disclosure statement.  Are you

18 familiar with this?

19 A.   No, 'm not.

20 Q.   And it said the lender was Primary Residential Mortgage,

21 Inc.  Do you see that, sir?

22 A.   Yes.

23 Q.   Okay.  Was that one of the vendors that you handled as a

24 servicer?

25 A.   Not that I'm aware of.

RESIDENTIAL CAPITAL, LLC, ET AL.                    52

1   Q.   If you would now be so kind as to turn to the next page on

2   the purged loan notes which is Bates stamped at the bottom

3   Deutsche 000917?  I'll have a question on that page.

4   A.   Okay.

5   Q.   There's an entry at February 8, 2007, and it says the

6   transaction type is CBR.  Do you know what CBR is?

7   A.   I'm sorry, what was the date?

8          THE COURT:  I think you misstated the date.

9   Q.   2/9/2007.  It's at the top -- second one from the top?

10  A.   I don't know what CBR is.

11  Q.   To the right of that it's "purchased loan servicing date

12  10/24/06".  Do you see that, sir?

13  A.   Yes, I do.

14  Q.   Who is it that purchased the loan?

15  A.   I don't know.

16  Q.   Okay.  Did the person that purchased -- or the company

17  that purchased that loan, did they purchase it from Primary

18  Residential?

19  A.   I don't know.

20  Q.   Okay.  If you would be so kind as to turn to, on the loan

21  service -- or the purged loan notes, Deutsche Bates stamp 920

22  on the bottom right-hand corner?

23  A.   Okay.

24  Q.   And if you would go down to 4/17/2009, the second entry on

25  that date, it's an NT entry?

RESIDENTIAL CAPITAL, LLC, ET AL.                    53

1    A.    Yes.

2    Q.    Do you know what NT means?

3    A.    No, I don't.

4    Q.    And the description opposite that is "B2 seeking to lower

5    payments, no failed RPPs B2".  Do you know who B2 would be?

6    A.    That would have been a reference made by -- for borrower

7    2.

8    Q.    Okay.  Would that be Mrs. Mack?

9    A.    I'm not sure in this case.

10   Q.    It would be either Mrs. or Mr. Mack?

11   A.    Yes.

12   Q.    Okay.  What is a failed RPP?

13   A.    I believe it stands for repayment plans.

14   Q.    For what?

15   A.    Repayment plans.

16   Q.    Okay.  And do you know if she was calling about any

17   options she might have under the federal HAMP program, at that

18   point?

19   A.    No, I don't.

20   Q.    If you would be so kind as to look down to the last entry

21   on the page, also on April 17th, 2009.

22   A.    Okay.

23   Q.    And that says, "DFLT".  Do you know what DFLT is?

24   A.    I believe it stands for default.

25   Q.    Okay.  Default reason:  1 changed to other.  Can you tell

1  us what default that was?

2  A.    I don't know.

3  Q.    Now, there are numerous blank pages or blank spots on this

4  page and many other pages.  Maybe I need to ask you a little

5  bit about how the document is set up.  On the left-hand side we

6  have a date.  Is that correct?

7  A.    Yes.

8  Q.    Why is a date put there?

9  A.    A date's put for when the transaction takes place within

10  the LoanServ application.

11  Q.    Okay.  So some activity occurred on that date?

12  A.    Yes.

13  Q.    Okay.  To the right of that, we have a transaction type,

14  correct?

15  A.    Yes.

16  Q.    And that is a code that I presume you have a key for that

17  you can look at to see what those things are?

18  A.    Yes.

19  Q.    To the right of that we have a number.  It's a transaction

20  user ID.  Is that correct?

21  A.    Yes.

22  Q.    That's the number of the person or the entity that

23  actually makes that entry, correct?

24  A.    Correct.

25  Q.    Now, are those entries all put in automatically, or are

RESIDENTIAL CAPITAL, LLC, ET AL.                    55

1   they done every time a person or an entity has to make an entry

2   into the system?

3   A.    Can you say the question again?

4   Q.    Okay.  Are those entries put in automatically whenever

5   anybody signs on, or does the person or entity who signs on

6   have to type in the date, type in the code, and type in their

7   ID number?

8   A.    The person or entity performing the transaction has to

9   make a change within the application -- make a change or update

10  the application.

11  Q.    Now, we're looking still at page 920 and we see many blank

12  spaces, despite the fact that we have date entries, transaction

13  type entries and transaction user ID numbers.  Why are those

14  blank spaces there when somebody entered the system?

15  A.    I don't know.

16  Q.    Do you know who pulled this purged loan note from the

17  system?

18  A.    No, I don't.

19  Q.    If you would be so kind as to turn to page 922?

20  A.    Okay.

21  Q.    And do you see an entry about two-thirds of the way down;

22  it's dated July 22nd, 2009.  It's the third 7/22/2009 entry.

23  Do you see that, sir?

24  A.    Yes.

25  Q.    And user number two-thousand-and -- it looks like -- six.

RESIDENTIAL CAPITAL, LLC, ET AL.                      56

1   Do know who that person is?

2           THE COURT:  Actually, 20006, but -- you have another

3   digit.

4   A.   No, I don't know.

5   Q.   Okay, 20006.  But was that an employee of GM -- of GMACM?

6   A.   I don't know.

7   Q.   Okay.  Whoever it was then put in the following note that

8   appears to the right of it, correct?

9   A.   Can you say that again?

10  Q.   I said the person 20006, who made that entry, is the one

11  that typed in what is to the right, the transaction message,

12  correct?

13  A.   Yes, that's correct.

14  Q.   Okay.  And that is not necessarily a transcription of the

15  conversation that that individual, 20006, had with B2, is it?

16  A.   I don't understand the question.

17  Q.   It's not a direct transcription of what was actually said

18  by either party, is it?

19  A.   It would have been a summary of the discussion.

20  Q.   A summary of it.

21  A.   Yeah.

22  Q.   The summary that was made by 20006, correct?

23  A.   Yes.

24  Q.   In their own words?

25  A.   Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    57

1   Q.   Using abbreviations, correct?

2   A.   Yes.

3   Q.   And omitting parts that they did not feel were essential

4   or proper, correct?

5   A.   I don't know.

6   Q.   Well, you don't really believe that there was a telephone

7   call from B2 on that date where those words were said in that

8   way with no other words, do you?

9            THE COURT:  I think it's B1.  You said B2.

10  Q.   Okay, we'll, let's get into it.  Can you please read to me

11  what the message is that 2006 (sic) wanted to transcribe into

12  this purged loan note?

13  A.   That a new CIT 155, borrower 1 struggling to make

14  payments, stated been using savings, cannot refi.  He is on --

15  house on market, income is only 5,100 a month.

16  Q.   Okay.  It seemed like you left out a lot there.  New

17  financial with short sale requirement.  Do you see that, sir?

18  A.   Yes.

19  Q.   Okay.  Do you know what "WDOYLM" would be an abbreviation

20  for?

21  A.   No, I don't.

22  Q.   Okay.  So there was a new financial with short sale

23  requirement.  Was GMAC --

24            THE COURT:  Requirement or request?

25            MR. GARBER:  Pardon?

RESIDENTIAL CAPITAL, LLC, ET AL.                    58

1              THE COURT:  Requirement or request?  It's just "REQ".

2   Q.   Okay, well, is it request or requirement?

3   A.   I believe it would be request.

4   Q.   It would have been request.  Who made a request to have a

5   short sale?

6   A.   I don't know.

7   Q.   Okay.  So you're not able to say that B2 made a request

8   for a short sale, are you?

9   A.   It says B1 in the comment.

10  Q.   Okay, yes, B1.  You're not able to say that B1 made the

11  request for a short sale, are you?

12  A.   No, I'm not.

13  Q.   Can you say that the person who talked to B1 did not

14  request that B1 procure a short sale?

15  A.   I don't know.

16  Q.   Okay.  It goes on to say, "Account current".  Is my

17  translation of those abbreviations correct?

18  A.   I'm sorry?

19  Q.   ACC -- ACCT current?

20  A.   Yes.

21  Q.   Okay.  So would the operator 20006 have told B1 that the

22  account was current?

23  A.   For this comment specifically, it refers to -- I'm sorry,

24  yes.

25  Q.   So B1 would have been informed at that time, the account

1    was current, right?

2    A.    Yes.

3    Q.    And then after that, there's a slash mark -- "wanted to

4    know if CL" -- is something cut off there?

5    A.    I don't know.

6    Q.    When the purged loan notes were sought from the system to

7    produce this record, were many portions of the typed in

8    transcription and summary of the conversations cut out?

9    A.    I don't know.

10    Q.    Okay.  If you would be so kind as to turn to page 923?

11    And I'd like for you to look at the entry for July 22nd, 2009.

12    It's about five entries down from the top, and it is the fifth

13    entry for 7/22/2009.  The transaction type is DM.  Do you see

14    that, sir?

15    A.    Yes.

16    Q.    It says something about -- is that a continuation from two

17    lines up where it says "House been on the market for two

18    years"?

19    A.    Yes.

20    Q.    And then after the "two years", there's a slash:

21    "refusing to do SPO".  What is SPO?

22    A.    Short payoff.

23    Q.    Pardon?

24    A.    A short payoff.

25    Q.    What's a short payoff?

RESIDENTIAL CAPITAL, LLC, ET AL.                    60

1  A.    Similar to a short sale.

2  Q.    Okay.  So whoever this person was that was talking to the

3  General Motors employee -- GMACM employee -- that person was

4  refusing to do a short sale that the employee was requesting?

5  A.    I believe this implies that the customer may have been

6  suggesting that.

7  Q.    May have been what?

8  A.    Stating that they didn't want to do a short payoff.

9  Q.    Yes.  Why was the language used "refusing to do a SPO"?

10 A.    I don't know.

11 Q.    Would it be fair to say that in any case, this note

12 indicates that one of the Macks was talked to and that they did

13 not want a short sale on their property?

14 A.    At that time, yes.

15 Q.    If you will look down about the middle of the way down the

16 page --

17          THE COURT:  Before you go on, Mr. Garber, I just -- so

18 the same user ID entered the first six lines on this page,

19 Bates 923, but there are different transaction types

20 identified.  Can you just explain to me is that one continuous

21 entry?  It's the same operator who entered them, but some of

22 them seem to be continuations, but they're different

23 transaction codes.  Why would that be?

24          THE WITNESS:  I --

25          THE COURT:  So the first one is --

RESIDENTIAL CAPITAL, LLC, ET AL.                         61

1            THE WITNESS:  I think --

2            THE COURT:  -- NT, and then CIT, then DM, then NT,

3     then DM, then DM

4            THE WITNESS:  I think when comments were made in one

5     particular day, when the history comes back, it doesn't come in

6     order.  So I think you're seeing multiple different actions

7     taken by this one particular person, but when the history is

8     pulled, it comes back in different ways.  So it doesn't come in

9     order.

10           THE COURT:  Is this one continuous entry or separate

11    entries?  Can you tell?  Do you understand what I'm asking?

12           THE WITNESS:  Yes.

13           THE COURT:  The same user entered the information

14    that's on the first six lines, and I just want to understand

15    whether -- and there are different transaction types for each

16    line.  And would it have been entered in the single entry by

17    the user ID -- by the user?

18           THE WITNESS:  It would have been separate entries from

19    the user.  So it -- some of the comments are -- relate to the

20    discussion that took place, and other, such as CIT, which

21    stands for customer inquiry tracking, was used to send and --

22    send a request from that particular person.  So it was an

23    action taken from the discussion.

24           THE COURT:  Tell me, what does CIT mean?

25           THE WITNESS:  Customer inquiry tracking.

1           THE COURT:  What's that mean?

2           THE WITNESS:  It was used within the LoanServ

3    application to send a notification to a different business unit

4    or operation outside of that particular person's

5    responsibility.  So if another task needed to be done, you

6    would use a CIT.

7           THE COURT:  Go ahead, Mr. Garber.

8    BY MR. GARBER:

9    Q.   Mr. Cunningham, if you would be so kind now as to look

10   down about, oh, perhaps twelve entries, to an entry for July

11   23rd, 2009, and it bears the transaction type FOR.  It may be

12   the first one that we have in this purged loan notes.  Do you

13   see that, sir?

14   A.   Yes.

15   Q.   And this is transaction -- user number 31938.  I think

16   you've already been asked if you know who that is, and you

17   don't, do you?

18   A.   No, I don't.

19   Q.   To the right of that it says "approved for foreclosure,

20   7/23/09".  Do you see that, sir?

21   A.   Yes.

22   Q.   And is that what it means, that this loan, at that time,

23   on July 23rd, 2009, was approved by user number 31938 for

24   foreclosure, correct?

25   A.   That user populated a field that was called "approved for

RESIDENTIAL CAPITAL, LLC, ET AL.                              63

 1   foreclosure" on that date.

 2   Q.    Okay.  And that was one day after an employee of GMACM was

 3   in touch with the borrower and the borrower refused to do a

 4   short sale, correct?

 5   A.    Correct.

 6   Q.    And that was a few days after GM had -- GMACM had assured

 7   the borrower that their account was current, correct?

 8   A.    Correct.

 9   Q.    Now, when these users -- transaction users come on to the

10   computer, do they have the benefit of all this information in

11   front of them?

12   A.    Can you rephrase the question?

13   Q.    Okay.  When the user -- you have a transaction user that

14   comes onto the computer to make an entry on the computer

15   concerning the telephone call that they had with the customer,

16   do they have the benefit of all this information that we have

17   on the purged loan notes?

18   A.    When referring it to foreclosure?

19   Q.    No.  I'm talking about, let's say, Mr. Mack calls up,

20   wants to know if his loan is current, and so the operator that

21   he's talking to calls up on the computer, his account, to find

22   out if it's current and do they have the benefit of all this

23   history that we do on the purged loan notes?

24   A.    Yes, they will.

25   Q.    Okay.  If you'll look down on 7/24/2009, this is the first

1  transaction that is labeled an MFR.  Do you see that, sir?

2  A.    I'm sorry, what date?

3  Q.    It's on 7/24 of '09?

4  A.    Yes.

5  Q.    Okay.  The transaction type MFR, and the transaction user

6  ID is 00578.  Do you see that, sir?

7  A.    Yes.

8  Q.    And it says, "at that time, MERS was notified".  Is that

9  foreclosure?

10  A.    Yes, it is.

11  Q.    "Foreclosure reinstated on 7/24/09."  Had it been

12  instituted before and held up?

13  A.    I don't know.

14  Q.    Okay.  But on that date, it was reinstated, correct?

15  A.    Yes.

16  Q.    Okay.  And MERS was notified of that?

17  A.    Yes.

18  Q.    And MERS is -- well, tell us what MERS is?

19  A.    MERS refers to Mortgage Electronic Registration System.

20  Q.    Okay.  And they're an organization that keeps track of

21  notes and mortgages and ostensibly it's supposed to handle

22  those, correct?

23  A.    No.

24  Q.    What do they do?

25  A.    They're -- I believe, generally speaking, their

1  responsibility is to track or keep track of the mortgage and

2  any assignments that take place thereafter and maintain those

3  electronically.

4  Q.   Okay.  And a servicer such as GMACM will notify them

5  whenever there's a major event on that mortgage?

6  A.   I don't know.

7  Q.   Okay.  You never worked with MERS?

8  A.   Not within foreclosure or my operation, no.

9         THE COURT:  What's the code MFR?

10         THE WITNESS:  I don't know.

11  Q.   If you --

12         THE COURT:  What's "foreclosure reinstated" mean?

13         THE WITNESS:  I believe it's referring to the fact

14  that the foreclosure was closed out a few entries above, where

15  it says file closed 1000 completed --

16         THE COURT:  Yes.

17         THE WITNESS:  That that was the "MERS notified

18  foreclosure reinstated" is just evidencing that the foreclosure

19  is now closed in the LoanServ application.

20  Q.   If you would now look down at another entry that appears

21  on July 24th, 2009, and it is the fourth of the transaction

22  type FOR.  Do you see that, sir?

23  A.   Yes, I do.

24  Q.   Okay.  And to the right of it is user number 01122,

25  correct?

RESIDENTIAL CAPITAL, LLC, ET AL.                    66

 1  A.   Correct.

 2  Q.   That would have been David Stern's office?

 3  A.   That would have been the LPS process management system.

 4  Q.   Okay.  So that is -- in your affidavit you referred to an

 5  LPS system.  That's what you're referring to, correct?

 6  A.   Yes.

 7  Q.   Okay.  And it says, "User has updated the system for the

 8  following event:  file received by attorney, completed on July

 9  24th, 2009."  Do you see that, sir?

10  A.   Yes, I do.

11  Q.   So the causation of that entry was from David Stern's

12  office, and not from GMACM, correct?

13  A.   Correct.  That was David Stern acknowledging receipt of

14  the file that went to him in LPS.

15  Q.   What file went to him?

16  A.   It is an electronic file that was opened in the LPS system

17  from the approval for foreclosure that occurred in LoanServ.

18  Q.   Okay.  And would it have a copy of the mortgage?

19  A.   That would have been provided to David Stern at the time

20  it was referred.

21  Q.   At that time?

22  A.   Yes.

23  Q.   So when he received it, he would have had a copy of the

24  mortgage, right?

25  A.   Correct.  If it was available in our imaging system, yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    67

1   Q.   Okay.  It was your practice to send out copies of the

2   mortgage when you sent a file out to a service provider like

3   David Stern, for foreclosure, wasn't it?

4   A.   It was, yes.

5   Q.   And you would have sent out a copy of the note at that

6   time, would you not?

7   A.   If it was available in imaging, yes.

8   Q.   Okay.  And you would have sent out any other documentation

9   that you felt was necessary to institute this foreclosure,

10  correct?

11  A.   Yes.

12  Q.   Okay.  And these would have all been electronic images?

13  A.   Not in this particular case?

14  Q.   Oh, in this particular case you actually put it in the

15  mail and he received it?

16  A.   He was provided the original note and mortgage at -- after

17  the referral.

18  Q.   Okay.  So I'm talking about this entry.  This entry was --

19          THE COURT:  How do you know that?

20          THE WITNESS:  Just through the history notes.  Sorry.

21          If you refer to page 10 in Exhibit G --

22          THE COURT:  Yes.

23          THE WITNESS:  -- toward the bottom, it's probably

24  about the tenth entry from the bottom --

25          THE COURT:  Yes.

1    THE WITNESS:  -- it says, "User has updated the system

2    for the following event.  Original note sent to attorney.

3    Completed on 8/5/2009."

4    THE COURT:  Okay.

5    THE WITNESS:  And then further down, you see that

6    "sent original note, original recorded mortgage."

7    THE COURT:  All right, thank you.

8    THE WITNESS:  Thank you.

9    Q.   Okay.  So I want to be clear, on this entry that we find

10   on Deutsche Bank 923, this was an electronic transmission to

11   him, or this was a paper transmission?

12   A.   It was an electronic transmission.

13   Q.   Okay.  Okay.  Now, further down the page, we'll see an

14   entry also for 7/24, and it says -- it's by 01122 --

15   "foreclosure (NIE) ID number" -- gives a number -- "sent to the

16   Law Offices of David Stern at 7/24/2009, 1:52 p.m."  Do you see

17   that?

18   A.   Yes.

19   Q.   Okay, what does that number mean, NIE ID number?

20   A.   I don't know.

21   Q.   Is that a FedEx number?

22   A.   I don't know.

23   Q.   Okay.  Would that have been to differentiate it from the

24   electronic transmission?  Would that have been the paper, that

25   is, the actual note, the mortgage and any other documents that

RESIDENTIAL CAPITAL, LLC, ET AL.                    69

1  you needed to send, you would have sent on that date, to David

2  Stern?

3  A.    Can you ask the question again?

4  Q.    Okay.  My question was, this entry that we're looking at

5  now, for 7/24/2009, would that be evidence that, in fact, GMACM

6  sent the note and mortgage and other paper documentation to

7  David Stern?

8  A.    No.

9  Q.    Well, they had already sent the electronic transmission to

10 him earlier.  So why now do we have this entry?

11 A.    The electronic referral provided information, but LPS also

12 had an imaging system --

13 Q.    Yeah.

14 A.    -- that went with it, which was New Image Express.

15 Q.    Okay.

16 A.    And I believe this code reference images being provided to

17 them at the time of referral.

18 Q.    Why do you believe that?

19 A.    I believe the NIE refers to New Image Express.

20 Q.    Oh, okay.  Okay.  If you would now, please turn to page

21 924, the next page.  That's Deutsche 924.

22 A.    Okay.

23 Q.    And if you look about eight lines down from the top,

24 you'll see on July 27th, 2009, user -- transaction user number

25 01122 put in the following thing:  "Uploaded comment, file

1  received."  Do you see that, sir?

2  A.   Yes.

3  Q.   Now, does that mean that in fact, the electronic

4  transmission that we saw on the previous page, which you said

5  was the NIE number, does that mean that in fact, David Stern,

6  at that time, acknowledged receipt of that electronic

7  transmission?

8  A.   Yes.

9  Q.   Okay.  And just to be sure, that electronic transmission

10  would ordinarily had the mortgage and the note in it?

11  A.   It would have -- if the image was available in our imaging

12  system, it would have been the note, the mortgage, and the

13  title policy.

14  Q.   Okay.  And do you know whether those things were

15  available?

16  A.   I don't know if the images were available.

17  Q.   Well, shouldn't they have been available before you send

18  them out to an attorney?

19  A.   Yes.

20  Q.   Okay.  And do you have any reason to believe that they

21  were not sent, at that time, the image of the note and

22  mortgage?

23  A.   No.

24  Q.   Okay.  And as a matter of fact, that would have been the

25  usually process, wouldn't it?

RESIDENTIAL CAPITAL, LLC, ET AL.                    71

1  A.   Yes.

2  Q.   Okay.  Please look down about two-thirds of the way down,

3  there's an entry for July 29th on foreclosure, and it's by user

4  number 01122.  And it says "Off issue comments.  Please advise

5  as to what name we are to foreclose in, ASAP, status active."

6  Do you see that, sir?

7  A.   Yes.

8  Q.   Would that have been a note on your program with David

9  Stern, that in fact he wanted GM to tell him what name to

10  foreclose this loan in?

11  A.   Yes.

12  Q.   Okay.  And that's because David Stern apparently did not

13  know what name to close it in -- foreclose it in, did he?

14  A.   No.

15  Q.   Was that because he found a problem with the paperwork

16  that was sent to him?

17  A.   No, it was, at times, you know, customary to a certain

18  extent, for foreclosure counsel to reach out to us to ask that

19  specific question.

20  Q.   Well, how do you know that's what happened here as opposed

21  to there being a problem that he was aware of?

22  A.   Because I recall the process that we had in place in the

23  foreclosure operation.

24  Q.   But you don't know anything about this particular

25  foreclosure, do you?

RESIDENTIAL CAPITAL, LLC, ET AL.                              72

1   A.   Not this specific instance, no.

2   Q.   And your knowledge is the same that we would have by

3   looking at these notes, except that you know what the

4   abbreviations are, right?

5   A.   I know the processes and procedures we had in place within

6   the foreclosure operation to communicate with counsel.

7   Q.   Okay.  And so the processes and procedures stated that you

8   would ordinarily have sent the mortgage and the notes and all

9   the documents to him by electronic transmission?

10  A.   Yeah.

11  Q.   Correct?  Okay.  Now, go down about ten places from that

12  entry, and you'll see on July 29th, this entry:  "S foreclosed

13  Deutsche Bank Trust Company Americas as trustee for RALI 2007

14  QS3 Trust."  Do you see that, sir?

15  A.   Yes.

16  Q.   That is the notification by the GM employee -- GMACM

17  employee to David Stern that out of those papers that he got,

18  he should select the name of Deutsche Bank as the plaintiff in

19  the foreclosure suit, correct?

20  A.   No.

21  Q.   Okay.  So GM was not informing David Stern of the proper

22  name to bring the foreclosure suit in?

23  A.   Yes, they were.

24  Q.   They were.  Okay.  Now, was that an automated task that

25  the computer automatically picks a name to bring the

RESIDENTIAL CAPITAL, LLC, ET AL.                    73

1   foreclosure in?

2   A.    No.

3   Q.    So that was a person that made this entry, correct?

4   A.    Yes, it was.

5   Q.    Okay.  So that was a knowing, breathing, thinking person

6   who had access to this entire screen, and should have known the

7   history, and they made a conscious decision to tell David Stern

8   which name to use for the plaintiff?

9   A.    In the LPS application, yes.

10  Q.    Okay.  Now, what other name could the foreclosure have

11  been brought in, given the paperwork that you had?

12  A.    I don't know.

13  Q.    Okay.  Because -- do you know what the paperwork was that

14  you had at that time?

15  A.    Not for the Mack case, no.

16  Q.    Okay.  Okay, if you'll please to the next page, 925?  And

17  you'll see an entry at the top, third line down, 7/29/2009.  Do

18  you see that, sir?

19  A.    Yes.

20  Q.    And it's an entry again by 01122.  Would that have been

21  instigated by the Stern office?

22  A.    Yes.

23  Q.    Okay.  And the comment -- uploaded comment is this:  "7/29

24  AWT".  Is that "await"?

25  A.    Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    74

1   Q.   And then the next one is "PLNTF".  Is that plaintiff?

2   A.   Yes.

3   Q.   And then the line beneath that says "info".  That's

4   information, right?

5   A.   Yes.

6   Q.   Okay.  "via NT".  What is NT?

7   A.   NT is the prior name of the LPS application.  It used to

8   be known as New Track.

9   Q.   Okay.  And in parenthesis, they have "DIS" (sic).  What is

10  that?

11  A.   That refers to David J. Stern's office.

12  Q.   Okay.  So at the time that that entry was made, they were

13  still awaiting the information for which the plaintiff should

14  be in this foreclosure suit, correct?

15  A.   It all happened the same day --

16  Q.   Yes.

17  A.   -- so I don't know if that was done before or after.

18  Q.   Well --

19  A.   Chronologically.

20  Q.   -- when we have multiple entries on the same day, wouldn't

21  they appear chronologically as the dates appear

22  chronologically?

23  A.   Not in the LoanServ history notes here, no.

24  Q.   Okay.  Okay, if we go down about ten more lines, we'll see

25  an entry on the 7/30/2009, again by this user 01122, uploaded

1  comment: "Plaintiff info received DIS". Do you see that, sir?

2  A.   Yes, I do.

3  Q.   So is that David Stern acknowledging that now they know

4  who to file the suit in -- in whose name to file the suit,

5  correct?

6  A.   Yes.

7  Q.   Okay. And that's because somebody at GM looked over the

8  file and decided which is the proper name and communicated that

9  information with David Stern's office, correct?

10  A.   They looked at a document that would have provided them

11  the beneficiary information for this particular investor, and

12  provided that through LPS.

13  Q.   Okay. Now, if you'll please look down about another

14  twelve or fourteen lines, and here's an entry that appears on

15  August -- it looks like August 5th, 2009, with an FOR signature

16  by user number 01122. And to the right of it, it says, "User

17  has updated the system for the following event. Original note

18  sent to attorney completed on 8/5/2009." Do you see that, sir?

19  A.   Yes.

20  Q.   Okay, now was that David Stern saying that the note was

21  sent, or was that General Motors saying the note had been sent?

22  A.   General -- GMAC Mortgage.

23  Q.   Okay. So on that date, somebody at GMACM took the

24  original note, original mortgage, put it in an envelope, and

25  they sent it to David Stern, correct?

RESIDENTIAL CAPITAL, LLC, ET AL.                    76

 1  A.    Yes.

 2           MR. LEWIS:  Your Honor, the witness has been up a long

 3  time, I wonder if we could take a short break?

 4           THE COURT:  No, we'll go until 12:30 and take a lunch

 5  break then.

 6           MR. LEWIS:  Very well, Your Honor.

 7           THE COURT:  We had a recess earlier.

 8           MR. LEWIS:  Thanks.

 9  Q.    Okay.  And then if you go down about eight lines up from

10  the bottom, there's a note on 8/5/09 by 01122 that says, "Sent

11  original note, original recorded mortgage and original title to

12  David Stern, FedEx number," and then they give a number.

13  Correct?  Do you see that, sir?

14  A.    Yes.

15  Q.    So that's where that employee of GM would have actually

16  put it in an envelope and sent it out with a tracking number,

17  so they could make sure they don't lose their note and

18  mortgage, right?

19  A.    Yes.

20  Q.    Okay.  On the next page, this is Deutsche Bank 926, if you

21  will look about twelve lines down from the top, an entry on

22  8/10/2008 (sic), FOR, where it says "User has updated the

23  system for the following event:  Attorney received original

24  note, completed on 8/10/2008 (sic)".  Do you see that, sir?

25  A.    Yes.

1  Q.   That's the acknowledgement by Stern's office that they now

2  have the paperwork in their office, not an electronic image,

3  correct?

4  A.   Yes.

5  Q.   Okay.  Why do we have a similar entry about eight lines

6  down where it says, "User has updated the system for the

7  following event.  Attorney received original note.  User

8  changed."  Is that just to acknowledge separately the note as

9  opposed to the mortgage?

10 A.   Yes.

11 Q.   But the note and mortgage would have been sent together,

12 correct?

13 A.   Yes.

14 Q.   Would you please look down about three-quarters of the way

15 down, maybe ten entries up from the bottom, there's a note from

16 8/11/2009, CIT, user number 15732, and it says, "Fax received

17 hardship letter."  Do you see that, sir?

18 A.   Yes.

19 Q.   Do you know what letter that is?

20 A.   No, I don't.

21 Q.   Was that a letter where the Macks were trying to get some

22 help from GM to get their payments lowered so they wouldn't be

23 exhausting their savings?

24 A.   I don't know.

25 Q.   And would you please look to the second line up from the

RESIDENTIAL CAPITAL, LLC, ET AL.                        78

1  bottom on 8/11/2009, it's DM entry by number 15732, "Default

2  reason 3 changed to excessive obligations."  Do you see that,

3  sir?

4  A.   Yes, I do.

5  Q.   Do you know what the refers to?

6  A.   No, I don't.

7  Q.   Does that refer to the foreclosure?

8  A.   No.

9  Q.   What?

10  A.   No, it doesn't.

11  Q.   What does it refer to, then?

12  A.   I believe it refers to the loss mitigation activity.

13  Q.   And why would you say that?

14  A.   Because the CIT refers to -- above, that you referenced

15  earlier, refers to a financial statement, and those activities

16  are associated with loss mitigation activity.

17  Q.   Okay.  So when the time --

18       THE COURT:  Just hold on a second.

19  (Pause)

20       THE COURT:  I just need to make a note to myself.

21       Go ahead, Mr. Garber.

22  Q.   So on August 11th, 2009, GMACM knew that the Macks were

23  not going to qualify for a loan modification under the HAMP

24  program because they had excessive obligations, correct?

25  A.   I don't know.

1  Q.   Why would they put that in there if it weren't so?

2  A.   I don't know.

3  Q.   Okay.  Please turn to the next page, 927.  And we see an

4  entry about fifteen lines down from the top.  It's dated

5  8/13/2009, foreclosure, user number is 01122.  And to the right

6  of it it says, "uploaded comment, file to attorney."  Do you

7  see that, sir?

8  A.   Yes.

9  Q.   What file went to the attorney?

10  A.   I don't know.

11  Q.   Did GMACM make that entry?

12  A.   No.

13  Q.   Did David Stern's office make that entry?

14  A.   Yes.

15  Q.   So can you say -- is that an acknowledgement that they

16  received the file on that date?

17  A.   I don't know.

18  Q.   Okay.  If you go two-thirds of the way down, you'll see

19  many, many different entries, all bearing different transaction

20  user IDs with a blank space opposite.  Do you see that?

21  A.   Yes.

22  Q.   Why would those employees of GMACM come online, take the

23  trouble to put in a code, put in their transaction user ID

24  number, and then just go blank and put in nothing?

25  A.   I don't know.

RESIDENTIAL CAPITAL, LLC, ET AL.                    80

1   Q.   Okay.

2           THE COURT:  Mr. Lewis, I would appreciate it if you

3   would find out whether this document was redacted.

4           MR. LEWIS:  I will be happy to do that.  And the

5   reasons if it was --

6           THE COURT:  Yes.

7           MR. LEWIS:  -- and if it's not privileged information,

8   supply the information.

9           THE COURT:  Thank you.

10  Q.   Okay.  If you'll look up about ten from the bottom, on

11  August 17th, 2008 (sic), it says, foreclosure, again this

12  entity 01122 -- and by the way, that could be David Stern's

13  office or that could be GMACM using that same user ID number,

14  right?

15  A.   Yes.

16  Q.   Okay.  So this particular one says, "System updated for

17  the following event.  User has reprojected the step, complaint

18  filed to 8/25/2009."  Do you see that, sir?

19  A.   Yes.

20  Q.   Okay.  Why did they have to reprogram the date of filing

21  the complaint?

22          THE COURT:  It's reprojected.  It doesn't say

23  "reprogrammed".

24  Q.   Let's see.  Let me try to have -- oh.  I'm sorry, the word

25  was "reprojected".  I think -- did they project it before?

RESIDENTIAL CAPITAL, LLC, ET AL.                        81

1   A.    No, it's a set date at the time that the loan is referred.

2   Q.    Okay.  If you go down to the fourth entry up from the

3   bottom, on August 18th, 2009, uploaded comment -- that

4   indicates it came from David Stern's office, doesn't it?

5   A.    For what entry?  I'm sorry.

6   Q.    Fourth one up from the bottom, 8/18/2009 user number

7   01122?

8   A.    That, in connection with the next one, yes.  Uploaded

9   comment, correction completed, 8/17/09 DIS.

10  Q.    Okay.  Some correction was made at that point, correct?

11  A.    I don't know.

12  Q.    You don't know what the correction was?

13  A.    I do not.

14  Q.    Okay.  Was that a correction that David Stern had to make

15  in his foreclosure papers?

16  A.    I don't know.

17  Q.    If you'll please be so kind as to turn to the next page?

18  This is Deutsche Bank 928, bottom right-hand corner.  And if

19  you look at the entry about ten from the top, it's the DM

20  entry, the user number is 31243.  I believe it's the first one

21  on that page.  Do you see that entry, sir?

22  A.    Yes.

23  Q.    It has "TT".  What does "TT" mean?

24  A.    Talk to.

25  Q.    And then B2 -- that's borrower 2?

1    A.    Yes.

2    Q.    And then "VI".  What is "VI"?

3    A.    I don't know.

4    Q.    Is the next one, "advised that received foreclosure

5    notice"?

6    A.    Yes.

7    Q.    Comma, "and letter advising to get attorney."  Is that

8    correct?

9    A.    Yes.

10   Q.    "Advised not in foreclosure."  Is that what that means?

11   A.    Yes.

12   Q.    So somebody at GM was telling the Macks that they were not

13   in foreclosure, correct?

14   A.    Correct.

15   Q.    And then after they told the Macks that they were not in

16   foreclosure, there's this comment:  "But LPS shows FC moving."

17   Do you know if this operator told the Macks that LPS showed

18   foreclosure moving?

19   A.    Can you ask the question again?

20   Q.    Okay.  Do you know if this operator that was talking to

21   the Macks, B2, did they also advise them that LPS shows

22   foreclosure moving?

23   A.    The comment suggests that that was being told to the

24   Macks, yeah.

25   Q.    And how do you know that it wasn't just a comment that the

RESIDENTIAL CAPITAL, LLC, ET AL.                    83

1  operator put in so people at GM would know what the status is?

2  A.   I don't.  But the next entry that's associated with that

3  says, "Will e-mail Mod Rep to see if accurate".

4  Q.   Pardon?

5  A.   I said the next entry associated with that teller is that

6  they will e-mail Mod Rep to see if accurate.

7         THE COURT:  What's the Mod Rep?

8         THE WITNESS:  The modification associate in loss

9  mitigation.

10  Q.   Okay, so on 8/20 your operator at GM could look at this

11  screen and see that the corrections had been made to the file

12  by David Stern; that the complaint was sent for filing; knew

13  that it was sent for filing; and then that person would tell

14  the Macks that they're not in foreclosure, correct?

15  A.   No.

16  Q.   That's not what that note says?

17  A.   Not how you described it.

18  Q.   Okay.  Please look down about twelve lines from the

19  bottom.  There's an entry at 8/25/09, a foreclosure entry and

20  it's by this entity 01122.  Do you see that?

21  A.   Yes.

22  Q.   And opposite that it has, "Prepped docs in-house."  Do you

23  know who made that entry?  David Stern or GMACM?

24  A.   That would have been David Stern.

25  Q.   Okay.  Why would he say, David Stern, that he prepped docs

1  in-house?

2  A.   That goes along with the comment above where it says,

3  "Uploaded comment:  Awaiting FIGS ALM, prepped docs in-house."

4  Q.   What does that mean, "Awaiting FIGS ALM"?

5  A.   I believe it refers to awaiting figures for judgment --

6  judgment figures, so --

7  Q.   Okay.

8  A.   -- amount to include in the judgment.

9  Q.   What doc would David Stern have prepped?  He's already

10  sent the file out for foreclosure.  What documents would he be

11  prepping now?

12  A.   The affidavit.

13  Q.   The affidavit?

14  A.   Yes.

15  Q.   The affidavit of what?

16  A.   Judgment.

17  Q.   To justify how much the figures would be -- the principal

18  balance, the interest, and all that sort of thing?

19  A.   Yes.

20  Q.   Okay.  If you'd go down to the second line from the bottom

21  on 8/26, it's an entry by 11555.  That's a GMACM employee,

22  correct?

23  A.   Yes.

24  Q.   And TT, again, talked to B2-BI, and advised of DD 82 said

25  getting for noticed.  Do you know who advised what of DD 82 --

RESIDENTIAL CAPITAL, LLC, ET AL.                          85

 1 | or DD B2?

 2 | A.   I don't know.

 3 | Q.   Okay.  On the next page, 929, at 8/26/2009, transaction

 4 | user number at the top, 12700 says that B1 called re letter-fax

 5 | Cheryl Mack.  Does that mean that either Mr. Mack or Mrs. Mack

 6 | called GM with a question about a letter that was either faxed

 7 | to them or they faxed?

 8 | A.   I don't know.

 9 | Q.   You don't know what letter that refers to?

10 | A.   No.

11 | Q.   If you would look down about ten lines down, there's an

12 | entry on 8/26/2009, it's an NT entry, it's again by 12700, and

13 | says, "Letter 2:31".  Do you see that?

14 | A.   Yes, I do.

15 | Q.   What letter is being referred to as 2:31?

16 | A.   I don't know.

17 | Q.   So that you don't know if that was a letter the Macks were

18 | sending to GM or GM was sending to the Macks?

19 | A.   The comment refers to they could not be of assistance, she

20 | wanted a letter stating that the loan was current.

21 | Q.   Okay.  And --

22 | A.   And --

23 | Q.   -- if you look down about eight lines further from that,

24 | on 8/26/2009, NT operator number or user number said at -- at

25 | 12700 said, "Copy not mailed to customer."  Do you see that,

1  sir?

2  A.    Yes.

3  Q.    Was there supposed to be a letter that the Macks were

4  requesting that GM would notify them in writing that at that

5  time their account was not delinquent, it was current.  Was

6  that a letter they were asking for?

7  A.    Can you ask the question again?

8  Q.    Okay.  Do these messages mean that the Macks were

9  requesting that GMACM provide them with a letter in writing

10  that their account was not in default and it was, in fact,

11  current?

12  A.    Yes.

13  Q.    Okay.  Do you know -- and we see the letter was not mailed

14  to the Macks, correct?

15  A.    Well, it appears from the entry that the letter was faxed.

16  Q.    Okay, so a letter was faxed to them.  A letter was faxed

17  to them telling them -- somebody at GM prepared a letter saying

18  that your account is current, you are not in default, correct?

19  A.    I don't know.

20        THE COURT:  Where is that entry?  I'm just -- I've

21  lost you.  Sorry.

22        MR. GARBER:  I was -- Your Honor, I was looking at the

23  entry that followed 8/26/2009 by NT, that's 12700, "Letter

24  stating that the loan was current faxed."

25        THE COURT:  Which line -- I'm not even sure what part

1  of the page.

2          MR. GARBER:  Let me count them down.  It's about

3  thirteenth line from the top.

4          THE COURT:  Okay, thank you.  I've got it now.  Go

5  ahead.

6  Q.   Okay.  Another letter is referred to about ten lines down

7  further.  This is on 8/26/2009, transaction type NT, user code

8  12700, "B1 called re letter faxed."  Is that what those

9  abbreviations mean?

10  A.   Yes.

11  Q.   Okay.  "Cheryl Mack", and then a fax number was given.  Is

12  that the fax number of Cheryl Mack?

13  A.   I don't know.

14  Q.   Okay.  And then it goes on to say "Copy not mailed to

15  customer."  So do you believe from this there was a letter

16  prepared by GM saying that they were current, it was not mailed

17  to the Macks, but that it was faxed to them, and then Cheryl

18  Mack called back to discuss it?

19  A.   Can you ask the question one more time?

20  Q.   Okay.  Do you believe, from these transaction entries,

21  that in fact, either Mr. Mack or Mrs. Mack called up GMACM to

22  find out if they could get proof from GMACM that their account

23  was current and not delinquent, and that GMACM, in response to

24  that, prepared a letter saying that their account was current

25  and not delinquent, it was faxed to Mrs. Mack, and not sent?

RESIDENTIAL CAPITAL, LLC, ET AL.                          88

1  Is that what all that means?

2  A.   Yes.

3  Q.   Okay.  And then she called back to talk about the letter

4  that had been faxed to her or was supposed to be faxed to her,

5  correct?

6  A.   I don't know.

7  Q.   Okay.  If we go down about two-thirds of the way down,

8  we'll see an entry for 8/26/2009, and it bears the transaction

9  type of OL, and it's again this operator 12700.  Do you see

10 that, sir?

11 A.   Yes.

12 Q.   And it says WDYCUS (ph.) confirm account current."  Maybe

13 you told us before, I don't remember.  What does WDYCUS mean?

14 A.   I don't know.

15 Q.   Okay.  But in any case, the operator confirmed to somebody

16 that the account was current at that time, right?

17 A.   I don't know.

18 Q.   I just have to ask, if you have an operator that's

19 handling this account and they see that the account is in

20 foreclosure but the account is current and they're talking to

21 Cheryl Mack and telling her her account is current, we'll send

22 you a letter proving it, wouldn't that employee do something to

23 inquire and derail this foreclosure?

24 A.   I don't know.

25 Q.   You train them.  You supervise them.

RESIDENTIAL CAPITAL, LLC, ET AL.                                89

1  A.    The foreclosure operation.  But these comments come from

2  different areas within other business units.

3  Q.    Okay.  Okay, if we turn to --

4          THE COURT:  We're going to take our lunch break now.

5          MR. GARBER:  Okay, sure.

6          THE COURT:  All right, 2 o'clock.

7          Do you have an estimate of how much further -- more

8  cross-examination you have?

9          MR. GARBER:  I will try to curtail it, but it may be

10  as much as an hour.

11          THE COURT:  Okay.  See you all at 2.

12      (Recess from 12:31 p.m. until 2:04 p.m.)

13          THE COURT:  All right, please be seated.

14          All right, let's continue with cross-examination.

15  BY MR. GARBER:

16  Q.    Mr. Cunningham, I believe I was asking you some questions

17  from the purged loan notes.  I was last looking at Deutsche

18  Bank 930 at the bottom right-hand corner.

19      If you would please look at that page.  I don't think I've

20  asked you about this question, but there's an item about twelve

21  up from the bottom.  It's dated 9/23/09, with a transaction

22  type FOR and a transaction user ID 01122.  And then the

23  uploaded comment is, "Original note and mortgage TP returned

24  file to dismissals."  Do you see that, sir?

25  A.    Yes, I do.

RESIDENTIAL CAPITAL, LLC, ET AL.                    90

1  Q.   And did I read that right with the abbreviations spoken

2  out?

3  A.   It would be original note and mortgage and title policy.

4  Q.   And title policy?

5  A.   Correct.

6  Q.   Okay.  So that was a note that was entered by David Stern

7  on this document, correct?

8  A.   Yes.

9  Q.   And then if we go down to the third from the bottom on

10 10/5/2009, it's an NT note, and the handler or transaction user

11 is 22378.  Do you see that, sir?

12 A.   Yes.

13 Q.   Okay.  And it says, "B2" -- is that B2 called re the

14 3,629-dollar charge in the MSA, advised expense."  Did I read

15 that right?

16        THE COURT:  I don't think so.  I don't think it's MSA.

17 Q.   I'm sorry, can you read it to us and tell us what it says?

18 A.   Borrower 2 called in regarding the 3,629-dollar charge in

19 the mortgage account statement.  Advised expense."

20 Q.   Okay.  And what did you say the MAS meant?

21 A.   Mortgage account statement.

22 Q.   Mortgage account statement.  Okay.  So did, in fact, B2,

23 who was either Mrs. Mack or Mr. Mack, did B2 get charged 3,629

24 dollars?

25 A.   I don't know.

RESIDENTIAL CAPITAL, LLC, ET AL.                    91

1   Q.   Okay.  Do you know what that charge is for?

2   A.   I do not.

3   Q.   If you would now please turn to 931?  And if you will look

4   about --

5            THE COURT:  Just hang on a second.

6            Look at the last entry on the page -- on that same

7   page, Bates 930.  Could you read that entry?

8            THE WITNESS:  Borrower 2 called in, inquiring about

9   expense advance fee; transferred to loss.

10            THE COURT:  Does that relate to the line two lines

11   above?

12            THE WITNESS:  No, it's not.  It's a separate

13   transaction.  Both transactions are continued on the next page.

14            THE COURT:  All right.

15            THE WITNESS:  And it'll complete the thought for each

16   individual transaction.  So the first one was borrower 2 called

17   in regarding the 3,629-dollar charge in the MAS, advised

18   expense.  And then if you go to the top of page 000931, it's

19   "advances re the details advised transfer to loss mit."

20            THE COURT:  Okay, go ahead.

21   Q.   Okay.  So to make sense of this, she was complaining or

22   calling to question about a 3,600-dollar expense charge, and

23   she was referred over to loss mitigation who was handling her

24   HAMP application?

25   A.   Yes, she was transferred to loss mitigation.

RESIDENTIAL CAPITAL, LLC, ET AL.                    92

1   Q.   Okay.  Then if we look about twelve down from the top on

2   that 931, we'll see an entry that is dated October 6th, 2009.

3   It's called a DM entry, and the transaction ID number is 31123,

4   and it starts out with a number, and it's the same number.

5   It's 3,629.  And would you please tell us what that says?

6   A.   I'm sorry, which line are you referring to?

7   Q.   It's about twelve from the top, and it starts out with a

8   number in the transaction message --

9   A.   Okay.

10  Q.   -- and that number is 3,629.  It's the first --

11  A.   That's a continuation of a comment to above.

12  Q.   Okay.  Would you please read the whole thing so we don't

13  miss the sense of it?

14  A.   Talked to borrower 2.  Called in to check the amount for

15  her account -- for her 3,629 dollars.  Advised that this is the

16  expense and advised that it is foreclosure advance on company-

17  owned loan.

18  Q.   Okay.  Now, when it says "company owned loan", which

19  company is that?

20  A.   I don't know.

21  Q.   But do you believe that that 3,629 dollars was what the

22  company wanted Mrs. Mack to pay for the foreclosure that you

23  had brought against her and dismissed?

24  A.   I don't know.

25  Q.   Okay.  And to go on, she wanted to know some information

RESIDENTIAL CAPITAL, LLC, ET AL.                    93

1  about her loan modification.  Is that true?

2  A.    Yes.

3  Q.    And you advised her that you still need the proof of

4  income.  Is that correct?

5  A.    Correct.

6  Q.    And I'm curious about something I see down here.  It's a

7  continuation of the same message, and it says "Result CD

8  changed from LMDC to LMDC."  What does that mean?

9  A.    I don't know.

10  Q.    Okay.  If you would look down about ten up from the

11  bottom, there is an entry for October 20th, 2009.  It bears a

12  transaction type of LMT, and the transaction user ID is 20136.

13  And then the messages starts out with about eight zeros

14  following it with the word "task".  Do you see that, sir?

15  A.    Yes.

16  Q.    Okay.  What does that message mean?

17  A.    I don't know.

18  Q.    Okay.  Does it mean that the HAMP application was

19  rejected?

20  A.    I don't know.

21  Q.    Okay, if you'll turn over to 932, and about twelve lines

22  from the top, the entry date is October 20th, 2009.  It's a DM

23  entry, user code is 20136.  And it says -- it seems to say to

24  me, but I'd like for you to tell us what it means:  "Default

25  reason 1 changed to excessive obligations."  Do you see that,

1  sir?

2  A.    Yes.

3  Q.    Okay.  What default are they talking about?

4  A.    I don't know.

5  Q.    If you will go down about fifteen lines from that, there

6  is an entry on October 21st, 2009, and the transaction type is

7  CIT.  What is CIT, by the way?  I think you told us.

8  A.    Customer inquiry tracking.

9  Q.    Okay.  And the transaction user ID is 13413.  And then the

10  words -- looks to me like -- shortage amount $15,907.37.  Is

11  that what it says?

12  A.    Yes, it does.

13  Q.    Pardon me?

14  A.    Yes, it does.

15  Q.    Okay.  What shortage is that?

16  A.    I don't know.

17  Q.    Were the Macks current in their account, at that time?

18  A.    I don't know.

19  Q.    Okay.  Would you please turn over to page 933?  And look

20  about twenty up from the bottom.  This is an entry for November

21  3rd, 2009.  It's CIT, and the transaction user ID is 13304.  Do

22  you see that, sir?  It starts out with the words, or the

23  letters -- I'm sorry, the numbers 012?

24  A.    Yes.

25  Q.    Okay.  What does that message say?

RESIDENTIAL CAPITAL, LLC, ET AL.                    95

1   A.    Closing CIT 710, HAMP modification denied as -- and then

2   further down it says -- as loan does not meet pre-qualification

3   criteria.

4   Q.    Okay.  Does that mean that the modification that Mr. and

5   Mrs. Mack applied for were denied on that date?

6   A.    Yes.

7   Q.    And do you know if the Macks were notified that their

8   modification was denied?

9   A.    I don't.

10  Q.    If you look down about eight up from the bottom, you'll

11  see a note on November 4th, 2009.  This is a transaction type

12  NT, and the transaction user number is 13304.  It looks to me

13  it says "HAMP modification denied, mortgage is ineligible."  Is

14  that what it says?

15  A.    Yes.

16  Q.    Okay.  And why was the mortgage ineligible?

17  A.    I don't know.

18  Q.    If you will look down about four lines below that, and you

19  will see on November 4th, 2009, there is an OL entry, the

20  transaction user ID is 28831.  And it says "WDOYLM denial

21  letter."  Do you see that?

22  A.    Yes, I do.

23  Q.    Okay.  Is that where the Macks were notified that their

24  HAMP modification had been rejected, by that letter?

25  A.    I don't know.  That may have been the date the denial

1  letter was generated.

2  Q.   Okay.  And that was done on November 4th, 2009?  Is that

3  correct?

4  A.   That's the date the comment was put in, yes.

5  Q.   And if you would please look at page 934?  About fifteen

6  down from the top, there's an entry on November 6, 2006 (sic).

7  It's a DM entry.  The transaction user ID is 20305.  Do you see

8  that, sir?

9  A.   Yes.

10 Q.   Okay.  I don't want to take this out of context, but would

11 you tell us what that message says?

12 A.   It says, "Outbound call, called borrower 1 and advised mod

13 was denied."

14 Q.   Go on.

15 A.   To the next line under that transaction user?

16 Q.   Yeah.  That same transaction user.

17      THE COURT:  It's not.

18 A.   Further down, about five down with the same transaction

19 code, it says, "He will need to increase income or sell

20 property."

21 Q.   So would your transaction user 20305 have told Mr. Mack

22 that he's got one of two options, he's got to increase his

23 income or he's got to sell his property?

24 A.   I don't know.

25 Q.   Okay.  Would you look down about ten lines down below

1   that, the entry is November 6th, 2009.  It's an NT transaction

2   type, and the transaction user number is 11636.  And the

3   message starts out with "NDR".  Do you see that, sir?

4   A.    I -- yes, I see it now.

5   Q.    Okay.  I don't want to take it out of context, but would

6   you please tell us what that message says?

7        (Pause)

8   A.    There's multiple transactions for the same --

9   Q.    Okay, let's focus on the ones with that user, 11636, the

10  message from that --

11  A.    Okay.

12  Q.    -- entry.

13  A.    Starting from the top, about ten down, it's an NT

14  transaction 11636, starts with "B2".

15  Q.    Okay.

16  A.    It says "B2 called in, said she was previously denied for

17  mod, wanted to" -- and then you go down a few lines to the next

18  transaction for 11636 -- "wanted to know what else she could do

19  that may help.  Advised if" -- and then a few more lines down,

20  about five or six -- "nothing has changed and she didn't want

21  to do a refi."

22       Now a few more down, "Call transferred to collections to

23  see if there was any options" -- then two down -- "available

24  for her.  She also mentioned that she was" -- two down --

25  "never escrowed before, wanted to remove.  Advised her that

RESIDENTIAL CAPITAL, LLC, ET AL.                    98

1  in" -- two down -- "order to remove she will need to bring down

2  escrow account to a zero balance.  She said there is no way she

3  can make that.  Transferred to collections."

4  Q.    Okay.  If you will look four up from the bottom, there's

5  an entry on November 12th, 2009.  It's an NT entry, and the

6  transaction user number is 12031.  "B1 will call back to set up

7  a SS."  Do you see that, sir?

8  A.    Yes.

9  Q.    What is an SS?

10  A.    Short sale.

11  Q.    Okay.  B1 was Mr. Mack, right?

12  A.    I don't know.

13  Q.    Okay.  Do you know that his wife was in the hospital at

14  that time?

15  A.    I do not, no.

16  Q.    And this message has a name on it.  It looks like R.

17  Nerrimour (ph.).  Do you see that, sir?

18  A.    Yes, I do.

19  Q.    Is that an employee that worked for you at the Fort

20  Washington foreclosure facility?

21  A.    Not in my department, no.

22  Q.    Do you know where that employee worked?

23  A.    No, I don't.

24  Q.    Why did they have a user number of 2616 opposite the name?

25  A.    I don't know.

RESIDENTIAL CAPITAL, LLC, ET AL.                    99

1   Q.   We haven't seen many names opposite these messages, have

2   we?

3   A.   No.

4   Q.   Okay.  If you'll turn to the next page and please look

5   three down from the top.  There's a message from November 12th,

6   DM, the transaction user number is 12031.  Do you see that,

7   sir?

8   A.   Yes, I do.

9   Q.   And would you please tell us what that message is?

10   A.   If I could, the message actually starts on the prior page.

11   Q.   Okay.

12   A.   The second from the bottom.

13   Q.   Yes.

14   A.   "Talked to borrower 1, advised of mod denial and reviewed

15   for short sale.  Borrower 1" -- then if you continue to the

16   next page at the top -- "stated that his realtor suggested

17   doing a short sale but" -- two down -- "borrower 1 wanted to

18   know why his payment went to 12,000 dollars a" -- two down --

19   "month.  I advised him to call collections and call me back if

20   he decides to do a short sale.  R. Nerrimour, 2616."

21   Q.   Okay.  And that's this R. Nerrimour that is signing that

22   again, correct?

23   A.   Yes.

24   Q.   Okay.  Okay, and if you will look about five lines down

25   from that, an entry on November 27th, 2009, CIT, the user

RESIDENTIAL CAPITAL, LLC, ET AL.                    100

1  number is 17085.  Do you see that, sir?

2  A.   Yes, I do.

3  Q.   And it says "014 counseled to sell, worked twenty-plus

4  days, no contact."  Do you know what that means?

5  A.   No, I do not.

6  Q.   Okay.  Please turn over on the next page, which would be

7  Deutsche Bank 936, five down from the top.  There's an entry at

8  December 23rd, 2009, NT, and the transaction user number is

9  25041.  Do you see that, sir?

10  A.   Yes, I do.

11  Q.   It says, "PO unpaid fees, 3,722 dollars."  Do you know

12  what that is?

13  A.   No, I don't.

14  Q.   And beneath that, it says "PO escrow balance,

15  $28,028.21 -- or $98, I guess, and 21 cents.  Do you see that

16  sir?

17  A.   Yes.  Yes, I do.

18  Q.   Okay.  Okay.  If you'll look down fourth from the bottom,

19  you'll see an entry from January 6th, 2010.  Transaction type

20  is NT.  The transaction user number is 13567.  Do you see that?

21  A.   Yes, I do.

22  Q.   Can you put that together?  That's obviously a couple of

23  lines that go together for that.

24       (Pause)

25  Q.   If you could just read that line, then.  I want to make

1  sure we have it right.

2  A.   So it starts with NT and then 13567.  It starts with "B2".

3  Q.   Okay.

4  A.   "B2 called in inquiring call received GMAC could not

5  understand" -- and about five entries down -- "process of

6  making settlement.  Needs to know full" -- and if you go down a

7  few more, about five more -- "payoff calculated for 1/31,

8  1,025,000 amount.  Customer inquired why so high.  Advised

9  negative escrow balance needs to be" -- next page at the top --

10  "repaid.  Customer upset.  Pays quarterly, cannot pay" -- down

11  about five more -- "additional funds.  Transferred to tax.

12  Discussed disbursement."

13  Q.   Okay.  So would you look down to just past the middle of

14  the page, there's an entry on 1/14/2010.  It's the CIT

15  transaction type, user transaction number is 11283, and it

16  begins with the numbers 018.  Do you see that, sir?

17  A.   Yes, I do.

18  Q.   Okay.  Would you please read that to us?

19       (Pause)

20  A.   That line says "018 continued.  Closing CIT 127, total

21  billed 3712.".

22  Q.   Okay.  Well, keep going till you get to the part where it

23  starts out "018 closing".

24  A.   Oh, further below?  "018 closing CIT 127, mailed letter

25  advising there is a balance of liquidation preservation fees on

RESIDENTIAL CAPITAL, LLC, ET AL.                           102

1    our account in the amount of 3,712 dollars.  Fees were assessed

2    to your account due to foreclosure, EPO 883 dollars, 11/4/09

3    filing fee, 1,945, 9/10/9 foreclosure fee 1,170 9/1/09, process

4    service 180 dollars, 9/10/9 recording fees of 9 dollars; 9/1 of

5    '09 title costs of 150 dollars; 9/1 of '09 title search 175

6    dollars."

7    Q.   Okay.  Now where it said "foreclosure fee 1,170 dollars",

8    was that the amount that GMACM paid David Stern to file this

9    foreclosure?

10   A.   Yes.

11   Q.   Okay.  And you were demanding that the Macks pay you back

12   for that?

13   A.   That it was -- in the context of this response, that's

14   what the funds represented or what the expense represented, in

15   the system.

16   Q.   Okay.  So you were demanded that you be paid back for what

17   you had to pay David Stern for filing this foreclosure,

18   correct?

19   A.   It -- I don't know about demanded, but it was included in

20   the payoff statement --

21   Q.   Okay.

22   A.   -- that was issued.

23   Q.   And that payoff statement was what was required to pay off

24   the loan so -- because the Macks had a contract for sale of the

25   property -- you weren't going to release your mortgage until

RESIDENTIAL CAPITAL, LLC, ET AL.                        103

1    you got paid back your attorneys' fees, were you?

2    A.   I don't know.  I --

3    Q.   Okay.  Third line from the bottom, it's at January 15th,

4    2010, NT, the number is -- user number is 25041.  Do you see

5    that, sir?

6    A.   Yes, I do.

7    Q.   You were demanding an escrow balance to be paid at

8    $23,923.36, correct?

9    A.    Correct.

10         THE COURT:  Do you know whether there were any unpaid

11   property taxes on the property in January 2010?

12         THE WITNESS:  Well, as I recall correctly in the

13   history -- I'd have to look to find it, but I think there were

14   delinquent taxes that needed to be paid, and GMAC paid those

15   taxes and was recovering those through monthly payments and

16   through the final statement.  But they -- if I recall

17   correctly, if it was -- it did represent delinquent property

18   taxes.

19         THE COURT:  Could you show me where the delinquent

20   taxes are?

21         THE WITNESS:  If I can just get a minute.

22         MR. GARBER:  Your Honor, later on, I have a breakdown

23   of what GMAC says the charges are.

24         THE COURT:  No, I remember seeing the charges, but I

25   thought I also remembered a note that either borrower one or

RESIDENTIAL CAPITAL, LLC, ET AL.                    104

1  borrower two said they were paying their taxes quarterly.  I

2  looked and I didn't remember seeing anything about delinquent

3  taxes.

4            THE WITNESS:  But there was a reference to taxes being

5  delinquent for 36,000 or -- I remember -- just bear with me;

6  I'm sorry.

7       (Pause)

8            THE WITNESS:  I believe it is the -- I'm on page

9  000933.

10            THE COURT:  Yes.

11            THE WITNESS:  I think what I was referencing was the

12  escrow analysis advised 36,000 to pay -- advised borrower that

13  the amount of insurance and taxes will be spread across the

14  loan, and payment at this time is not determined, advise 36K is

15  not --

16            THE COURT:  Well, where does say that there's a

17  default.  What I had read the notes as saying, in prior

18  testimony yesterday, that when a loan is considered for a loan

19  modification, that GMAC's guidelines require putting the

20  borrower on tax and insurance escrow, and that's why it was set

21  up.  I don't remember hearing anything about any default, nor

22  does this entry that you're pointing to say there was a

23  default.  It's just that the taxes would be -- taxes and

24  insurance would be escrowed and would be spread across twelve

25  months.  Can you show me where it says there's a default?

RESIDENTIAL CAPITAL, LLC, ET AL.                    105

1          THE WITNESS:  No, that was just a misunderstanding on

2     my part, looking back at the --

3          THE COURT:  You're not finding anything that shows

4     there was a default, correct?

5          THE WITNESS:  No, I just misunderstood that.

6          THE COURT:  Was my understanding correct?

7          THE WITNESS:  Yes, it was.

8          THE COURT:  Go ahead.

9     BY MR. GARBER:

10    Q.    Mr. Cunningham, would you be so kind now to turn to the

11    book you have in front of you?  It's called "Creditor Burnett's

12    hearing notebook", volume number 1.  Do you have that, sir?

13    A.    Yes, I do.

14    Q.    Okay.  Please look at item number 3.  That's the GMAC

15    Mortgage welcome letter of October 24th, 2006.  Do you recall

16    testifying to that a little earlier in the day?

17    A.    Yes, I do.

18    Q.    Okay.  Now, I would ask you now, if you would be so kind,

19    to turn to the place in the purged loan notes where you find

20    that that letter was sent.

21    A.    Can you ask the question again?

22    Q.    Would you please tell us where in the purged loan notes do

23    you see an entry showing that that letter was sent?

24    A.    I see in the system that -- the date the letter was

25    generated.

RESIDENTIAL CAPITAL, LLC, ET AL.                     106

1   Q.   Where do you see that?

2   A.   That would be on the 10/25 date, just acknowledging

3   that -- that the letter was --

4   Q.   Are you talking about Deutsche Bank 916?  Is that --

5   bottom right-hand corner, that's the page you're looking at,

6   first page?

7   A.   Yes.

8   Q.   Okay.  And you're looking at the second entry on that

9   page?

10  A.   Yes.

11  Q.   Where it says "Welcome letter eligible"?

12  A.   Yes.

13  Q.   It doesn't say letter was generated, does it?

14  A.   No, it doesn't.

15  Q.   It doesn't say a letter was sent anywhere around there,

16  did it?

17  A.   No, it doesn't.

18  Q.   Okay.  Let's go to the next one, which is the letter from

19  GMAC to the Macks, dated July 23rd, 2009.  That's number 7 on

20  our trial log book.

21          THE COURT:  Plaintiff's Exhibit 37?

22          MR. GARBER:  Pardon me, sir?

23          THE COURT:  Plaintiff's Exhibit 37?

24          MR. GARBER:  Yes, it may be; let me look at it.  Yes,

25  you are correct, Your Honor, Exhibit number 37.

1  Q.    Would you please look at that, sir?

2  A.    Okay.

3  Q.    And can you tell us, does that appear in the purged loan
4  notes?

5  A.    There's a comment on 723 that a loss mitigation package
6  was sent.

7  Q.    Okay.  So it's 723 --

8  A.    MP01050, about seven lines down.

9  Q.    Okay.  And you think that package contained that letter?

10  A.    The second paragraph of the document, that letter, says
11  "enclosed is our financial analysis form".

12  Q.    Okay.  And let's go to the next letter.  And the next one
13  that I have is found in our tab 8, and let me get that exhibit
14  number.

15         THE COURT:  Exhibit 38?

16         MR. GARBER:  Exhibit 28, yes, Your Honor.

17  A.    Okay.

18  Q.    And can you find that letter in these purged loan notes?

19  A.    There's a note on 8/27 that references a ten-day doc
20  requesting proof of income.

21  Q.    Okay.  So you take this letter was the letter requesting
22  proof of income?

23  A.    Yes.

24  Q.    Now, let's take a minute and look at this letter.  It has
25  the notice at the bottom of it; can you see that notice?

1  A.   Notice?  I'm sorry.

2  Q.   Do you see a notice at the bottom of the body --

3  A.   Oh, yes, I do.

4  Q.   -- of the letter?

5  A.   Yes, I do.

6  Q.   This is an attempt to collect the debt.  Do you see that,

7  sir?

8  A.   Yes, I do.

9  Q.   Okay.  And that letter, was it generated from the Dallas

10  office?

11  A.   Yes, it was.

12  Q.   Okay.  And I think you told us earlier the Dallas office

13  was an office that handled collections, right?

14  A.   They did handle collections and loss mitigation.

15  Q.   They handled loss mitigation as well, okay.  If you would

16  please turn back to tab number 7, which is Plaintiff's Exhibit

17  37, and look at that.

18  A.   I'm sorry, which one?

19  Q.   It's tab 7 in our notebook, at Plaintiff's Exhibit 37.

20  A.   Okay.

21  Q.   And if you would look at who signed that; can you tell us

22  who signed that?

23  A.   Is this Plaintiff's Exhibit 37?

24  Q.   It's tab 7, but it's Plaintiff's Exhibit 37.  So look

25  under tab 7 of the notebook.

1   A.   Okay.  I don't see a signature.

2   Q.   Okay.  You see, though, an entry there saying who sent it,

3   don't you, typed entry?

4   A.   It refers to customer care.

5   Q.   At loan servicing, right?

6   A.   Yes, it does.

7   Q.   And if you look at the top, the address that it gives is

8   the GMAC Mortgage address at 3451 Hammond Avenue, which is

9   where customer care is, right?

10  A.   Yes.

11  Q.   And there's no notice to the Macks that they're attempting

12  to collect the debt on this letter, is there?

13  A.   I --

14       THE COURT:  There's nothing there.  Let's go on with

15  your questions.  Come on.

16       MR. GARBER:  Okay.

17  Q.   This is for loss mitigation; it came out of Waterloo,

18  Iowa, right?

19  A.   Yes.

20  Q.   And the next one is out of Dallas, Texas, and that's

21  Waterloo, Iowa.  The next one that I had --

22       THE COURT:  That didn't make sense what you just said.

23       MR. GARBER:  What did I say?

24       THE COURT:  Ask your question again.

25  Q.   Oh, okay.  The one on tab 7 was customer care from loss

RESIDENTIAL CAPITAL, LLC, ET AL.                    110

 1  mitigation, and it came out of Waterloo --

 2          THE COURT:  Customer care for loan servicing.

 3          MR. GARBER:  Pardon?

 4          THE COURT:  It says "Customer care loan servicing".

 5          MR. GARBER:  Yes, out of Waterloo, Iowa.

 6          THE COURT:  That's not what you said.

 7          MR. GARBER:  Customer care loan servicing.

 8          THE COURT:  You said loss mitigation.

 9          MR. GARBER:  Oh, yes.

10  Q.   But it was about loan mitigation, right, that letter?

11  A.   It's from loan servicing customer care.

12  Q.   But they were writing about loan mitigation?  They were

13  helping the Macks with their loan mitigation?

14  A.   They were providing the Macks a financial analysis form

15  for the purposes of loss mitigation.

16  Q.   Right, okay.  Okay.  And the next letter, which was

17  Plaintiff's 38, found at tab 8, that came from Dallas, Texas,

18  and that had the notice that they're collecting a debt.

19       Let's go to the next one, which is tab number 9.  Can you

20  see that, sir?  And it's Plaintiff's Exhibit number 16 that I'm

21  referring to.

22  A.   Okay.

23  Q.   And this is a letter from the Macks to General Motors

24  asking -- GMACM asking for help?

25  A.   Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    111

1   Q.   And the date by their signatures is August 10th, 2009.

2   Can I ask you if you can find that in the purged loan notes?

3   A.   On 8/11, about seven entries -- about the -- the

4   transaction type is CIT; trans user is 15732, "new CIT 835 fax

5   received hardship lawyer".

6   Q.   Okay.  I'm sorry.  I didn't see that.  How far up from the

7   bottom is that?  About ten up?  Yes, I do see it.  006, "new

8   CIT"; that's the one you're referring to?

9   A.   Yes.

10   Q.   Okay.  And that's the letter that you think this applies

11   to.  Okay.  If you would be so kind as to turn to our tab 10 on

12   the notebook, and look at Plaintiff's Exhibit number 39.  That

13   is a letter dated September 30th, 2009, from GM Mortgage to the

14   Macks.  Do you see that, sir?

15   A.   Yes, I do.

16   Q.   And it came from Dallas, Texas, right?

17   A.   Yes.

18   Q.   And it carried the warning that it was an attempt to

19   collect the debt, correct?

20   A.   Yes, it did.

21   Q.   And can you tell us, are you able to find that on the

22   purged loan notes, this letter?

23   A.   On September -- I'm on page 000930 --

24   Q.   Yes.

25   A.   -- the comment, September 29th, 2009, "NT transaction,

RESIDENTIAL CAPITAL, LLC, ET AL.                    112

1   user ID 25101WD" -- 0Y -- or "OYLM, ten-day doc requesting

2   proof of income".

3   Q.    And you think that letter applies to that entry?

4   A.    Yes.

5   Q.    Okay.  Would you please turn to tab number 11, Plaintiff's

6   Exhibit number 34, bearing date of October 7th, 2009, "Macks

7   are writing GMAC Mortgage"; do you see that, sir?

8   A.    Yes, I do.

9   Q.    Okay.  And they are writing to GMAC Mortgage in Dallas,

10  Texas because Dallas, Texas has been writing them, correct?

11  A.    Yes.

12  Q.    And can you find this letter on the purged loan notes?

13  A.    There's a comment on October 15th of 2009 at CIT, from

14  transaction user 13682, starting with 008, new CIT 601, which

15  indicates fax received for Social Security benefit.

16  Q.    Do you think that represents the receipt of this letter on

17  the 15th of October?

18  A.    I don't know.

19  Q.    Okay.  Now, this letter, which is Plaintiff's Exhibit

20  number 34, there's a Deutsche Bank stamp of 00074.  Do you see

21  that, sir?

22  A.    Yes, I do.

23  Q.    Okay.  That would indicate to you that this document

24  actually came from Deutsche, correct?

25  A.    I'm sorry; can you ask the question again?

1   Q.   This document was produced by Deutsche Bank, right?

2   A.   I don't know.

3   Q.   Did GM -- GMACM gives this to Deutsche Bank to produce?

4   A.   Not that I'm aware of; I don't know.

5   Q.   Okay.  If you would be so kind as to turn to tab number

6   12, and it contains Plaintiff's Exhibit number 43.

7   A.   Okay.

8   Q.   This is the letter from the Macks to GMAC Mortgage at

9   customer care, Waterloo, Iowa, correct?

10          MR. LEWIS:  Mr. Garber, I'm sorry; you said this is

11   Plaintiff's 43?

12          THE COURT:  Yes, this is the one that hadn't been --

13   didn't have a number on it --

14          MR. LEWIS:  Oh, okay.

15          THE COURT:  -- and it's behind tab 12.

16          MR. LEWIS:  Thank you, yes.

17   Q.   Plaintiff's Exhibit number 43, do you see that, sir?

18   A.   No.  It's in category 12?

19          THE COURT:  It's behind tab 12.

20          THE WITNESS:  Behind tab 12.

21   A.   It has "Staples" at the top?  I just want to make sure I'm

22   looking at the right.  Does it say "Staples" at the very top?

23   Q.   Yes, it does.

24   A.   Okay.  Yes -- yes, I have it.

25   Q.   Okay.  Now, you looked in the purged loan notes; you

RESIDENTIAL CAPITAL, LLC, ET AL.                    114

1    didn't see that, correct?

2    A.    No, I didn't.

3    Q.    Okay.  The next one is tab number 13, which contains

4    Plaintiff's Exhibit number 14, and would you please turn to

5    that?

6          MR. LEWIS:  I think it's Plaintiff's Exhibit 40, not

7    14.

8    Q.    Plaintiff's Exhibit 40, yes, tab 13.

9    A.    Okay.

10   Q.    Okay.  Can you find this one having been sent out on the

11   purged loan notes?

12   A.    There's a reference on -- at the bottom of page 933, with

13   a transaction type OL, from 28831WDOYLN, denial letter.

14   Q.    Okay.  So you think that was sent out -- that is, this

15   entry represents this letter?

16   A.    Yes.

17   Q.    Okay.  And please turn to tab number 14, Exhibit number

18   41 -- Plaintiff's Exhibit number 41.

19   A.    Okay.

20   Q.    Do you find that in here?

21   A.    There -- on 12/15/2009, there's a transaction OL2202 --

22   22062 for WDOYNOD, "waive escrow negative bal".

23   Q.    Okay.  I'm not following that.

24   A.    It's --

25   Q.    Oh, down under OL by 22062?

RESIDENTIAL CAPITAL, LLC, ET AL.                    115

1   A.   Correct.

2   Q.   And what does that say?

3   A.   "Waive escrow negative bal".

4   Q.   And you think that represents a letter?

5   A.   Yes.

6   Q.   Why do you think that?

7   A.   The -- the context of the letter in conjunction with the

8   comment, and the OL code stands for on-line letter.

9   Q.   Um-hum.  So --

10  A.   So it was a system-generated letter.

11  Q.   On-line letters?

12  A.   Which means it's from -- it's coming from a LoanServ

13  system.

14  Q.   Coming --

15  A.   It's generated from the LoanServ system, our system.

16  Q.   Okay.  Now, if you would be so kind as to turn to tab

17  number 2, please.

18  A.   Volume 2?  I'm sorry.

19  Q.   Tab number 2; that's Plaintiff's Exhibit number 29.  Do

20  you have that, sir?

21  A.   Yes, I do.

22  Q.   Turn to the second page.

23  A.   Okay.

24  Q.   And it says this is milestone for 1001464-0609002738-6 at

25  the top; do you see that, sir?

1  A.   Yes, I do.

2  Q.   Is that the Macks' account?

3  A.   I don't know.

4  Q.   Okay.  Please look from the bottom up, because it goes in

5  chronological order from the bottom up, to the left-hand side;

6  you'll see the first note, "Transfer of dental (sic) and

7  official rights" on October 29, 2006.  Do you see that, sir?

8  A.   On what date?  I'm sorry.

9  Q.   On October 29th, 2006.

10 A.   Yes, I do.

11 Q.   And if you look to the right you'll see the new investor

12 is 1000375 GMAC Mortgage, do you see that, sir?

13 A.   Yes.

14 Q.   Okay.  And then if you will now go up to the third entry

15 from the top, and it says, starting from the left-hand side,

16 "Transfer of 2/9/2007", you see that, sir?

17 A.   Yes.

18 Q.   And now it says the new investor is 1000440 Residential

19 Funding Company.  Do you see that, sir?

20 A.   Yes.

21 Q.   And the old investor is the one that --

22          THE COURT:  Where does it say "investor"?

23          MR. GARBER:  Pardon?

24          THE COURT:  Where does it say "investor"?

25          MR. GARBER:  "New investor and old investor", in the

1   comments on the right.

2           THE COURT:  Okay.

3   Q.   Okay.  And the "old investor" was 1000375 GMAC Mortgage,

4   correct, sir?

5   A.   Correct.

6   Q.   Okay.  And then if we look up to the second from the top,

7   which is described on the left as a transfer of beneficial

8   rights, on October 5th, 2007, do you see that, sir?

9   A.   Yes, I do.

10  Q.   And now the old investor is 1000440 Residential Funding,

11  which we just saw, and the new one is 100054 RC Trustee number

12  2.  Do you see that, sir?

13  A.   Yes, I do.

14  Q.   And is that a name for Deutsche Bank and the RALI trust

15  that is the possessor of the loan that is the subject of these

16  proceedings?

17  A.   I don't know.

18  Q.   You will agree with me, will you not, that it did not

19  go -- according to this document, this milestones document, it

20  did not go into the hands of the RFC trustee 02 until March

21  5th, 2007?

22  A.   Yes.

23  Q.   Okay.  Before I follow up on that, I want to do another

24  item.  We have a document that has been submitted as

25  Plaintiff's Exhibit number 7, and I don't have a copy for you,

RESIDENTIAL CAPITAL, LLC, ET AL.                    118

1   but I've supplied it to the Court, supplied it to opposing

2   counsel.

3           THE COURT:  I didn't see it.

4           MR. GARBER:  Plaintiff's Exhibit number 7?  It's the

5   complaint.  Actually, it may be here, but we can look at it in

6   the white notebook.  I believe that it is under tab B -- no,

7   tab A.  Okay, let's use this one.

8           THE COURT:  This is the trust's Exhibit A?

9           MR. GARBER:  In the Trust Exhibit A, yes.  Trust

10  Exhibit A, and I don't know what -- is that your Exhibit A

11  also?

12          THE COURT:  It's DX-A.

13          UNIDENTIFIED SPEAKER:  It looks like it was your

14  Exhibit 7.

15          MR. GARBER:  Yes, it's my Exhibit 7.

16  Q.   Do you have the white notebook in front of you, sir?

17  A.   I do, yes.

18  Q.   Okay.  And would you please tell us what you think this

19  is?

20  A.   It says "Complaint foreclosed mortgage".

21  Q.   Okay.  And if you would, would you please read paragraph

22  number 4?

23  A.   The mortgage was -- excuse me.  "The mortgage was recorded

24  on October 17th, 2006, on official record books 4123, at page

25  804 of the public record of Collier County, Florida, and

RESIDENTIAL CAPITAL, LLC, ET AL.                           119

1   mortgage of the property described in it, then owned by and

2   possessed by the mortgagors.  A copy of the mortgage and note

3   are attached hereto as an Exhibit A.  Said mortgage was

4   subsequently assigned to Deutsche Bank Trust Company Americas

5   as trustee for RALI 2007QS3 by virtue of an assignment to be

6   recorded".

7   Q.   Okay.  Now, would you please look back at the attachment,

8   which is Exhibit A?  Do you see that, sir?

9            THE COURT:  I don't.  Where is it?

10           MR. GARBER:  It's behind the mortgage foreclosure

11  complaint, about the third page down.

12           THE COURT:  In the lower right corner, what page

13  number?

14           MR. GARBER:  Yeah, and somebody has hand --

15           THE COURT:  In the lower right corner, what page

16  number?

17           MR. GARBER:  Oh, Exhibit A, page 3, is what says here.

18           THE COURT:  Okay.  I got it.

19  Q.   And somebody has handwritten in "Exhibit A" and put some

20  quotation marks.  Do you see that, sir?

21  A.   Yes.

22  Q.   Okay.  And you will agree with me that that, and the

23  subsequent twenty-three pages, are the mortgage, the Macks'

24  mortgage that is at issue here today, correct?

25  A.   Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    120

1  Q.   Okay.

2         MR. LEWIS:  Your Honor, I'm having trouble following

3  the relevance here.  This seems way out of bounds.

4         MR. GARBER:  Your Honor, I --

5         THE COURT:  I don't understand the relevance either,

6  but I'm going to let him go on.  Go ahead, let's get through

7  this.  Come on.

8         MR. GARBER:  Okay.

9  Q.   After the mortgage, sir, do you see another document, and

10  it's mentioned as Exhibit A, page 23?

11  A.   Yes, I do.

12  Q.   Okay.  What is that?

13  A.   I don't know.

14  Q.   Is this a document that was generated by your office?

15  A.   I don't know.

16  Q.   Do you see attached to that mortgage, in any place, a copy

17  of the note that is referred to in the paragraph that I asked

18  you to read, or said in Exhibit A there is a note attached?

19         THE COURT:  What's the relevance of this, Mr. Garber?

20  I'm running out of patience.

21         MR. GARBER:  Your Honor, the relevance is this.  I

22  think the Court may have two questions in its mind from all of

23  this.  Number one:  why did this start?  And why did it end?

24         THE COURT:  It started because they made a really

25  serious mistake.  And why it ended, I don't know.

RESIDENTIAL CAPITAL, LLC, ET AL.                    121

1          MR. GARBER:  And these answers will say why it ended,

2    I think.  They say it was a mistake; I think these answers may

3    show otherwise.

4          THE COURT:  Well, let's go --

5          MR. GARBER:  Okay.

6          THE COURT:  -- because you're not getting to the

7    point.

8    Q.   Okay.  So there is no note contained with this suit, is

9    there?

10   A.   Not in the documents here, no.

11   Q.   Okay.  Now, I would like to refer you to documents that

12   have been previously given to me.  Let me give a copy to you.

13         MR. GARBER:  Your Honor, I had copies made over lunch

14   hour, and --

15         THE COURT:  Why wasn't it pre-marked?

16         MR. GARBER:  Because --

17         THE COURT:  Is this an impeachment document?

18         MR. GARBER:  Yes, they're impeachment documents, and I

19   envision --

20         THE COURT:  Let me see what this is.  Bring it up.

21   I'm losing my patience, Mr. Garber.  I require that all

22   exhibits be pre-marked.  You've got a whole series of new

23   exhibits?

24         MR. GARBER:  There are four notes, four versions.

25         THE COURT:  Why weren't they marked --

1          MR. GARBER:  I --

2          THE COURT:  The promissory notes are hardly a mystery

3    or a surprise.  You have not pre-marked these.  Why should I

4    permit you to use them?  Why should I permit you to mark them

5    now?  I required that all exhibits be pre-marked and exchanged

6    ahead.

7          MR. GARBER:  I didn't envision them to be exhibits; I

8    envisioned them to be documents to use for cross-examination.

9          THE COURT:  Well, do you think you don't have to mark

10   documents that you wish to use for cross-examination?

11         MR. GARBER:  I didn't think that I did.

12         THE COURT:  Well, you do.  What's the point?  Tell

13   me -- make an offer of proof.

14         MR. GARBER:  Okay.

15         THE COURT:  Go back to the microphone.  Take your

16   documents with you.

17         MR. GARBER:  Here is what I intend to demonstrate,

18   Your Honor, that in fact when the mortgage was sent out to Mr.

19   Stern for foreclosure, that it did not contain the name of the

20   proper party to bring this suit in, which was Deutsche Bank;

21   that was the one they wanted to.  The copy of the mortgage was

22   sent and a copy of the note was sent.  Mr. Stern apparently

23   made some effort to prepare a document, to sue somebody by

24   somebody, and that was not satisfactory; he had to make a

25   correction on that.  Eventually, he had to sue Deutsche Bank

1    because GM wanted him to sue -- I'm sorry -- sue in the name of

2    Deutsche Bank.  He sued in the name of Deutsche Bank, but he

3    did not have a note that showed that Deutsche Bank had

4    possession of that property.  And therefore, a correction had

5    to be made and the notes had to be endorsed to reflect that.

6    However, GM could not, at that point, legally endorse those

7    notes to reflect that.  And the reason they couldn't do it was

8    because in 2007 they put this loan into a pass-through account.

9            THE COURT:  When did you get copies of the notes?

10           MR. GARBER:  I've had them for two years, Your Honor.

11           THE COURT:  Okay.  You didn't mark them.  They haven't

12   been pre-marked.  These are not impeachment documents.  They

13   don't relate to the RESPA claim.  I am barring you from using

14   those exhibits.

15           MR. GARBER:  Okay.

16           THE COURT:  You've been on notice for months about my

17   trial procedures.  You haven't followed them.  You are

18   precluded from marking those exhibits now.  Move on with your

19   questions and let's get over with this.

20           MR. GARBER:  Okay.  Your Honor, may I take a minute to

21   briefly review?  I think I'm about at the end.

22           THE COURT:  Yes.  Tell me how those notes bear on your

23   RESPA claim, which relates only to the October 26th, 2009

24   letter, if it's a QWR?  How do those notes bear on the RESPA

25   claim?

RESIDENTIAL CAPITAL, LLC, ET AL.                    124

1          MR. GARBER:  Well, because GM is using the purged loan

2    notes for evidence that they did not receive the letter from my

3    client, and they're saying they can be trusted, they're

4    accurate and so forth.  It doesn't have an entry there.  We've

5    seen several letters, or at least one letter that is not

6    mentioned on there.  We've seen --

7          THE COURT:  So far the only -- this witness has

8    identified -- every letter you've shown him, he has indicated

9    where he believes it is recorded in the purged loan notes.

10   Tell me how those promissory notes, which you did not mark, how

11   those bear on your RESPA claim.

12         MR. GARBER:  I think they would show that in fact

13   these purged loan notes had been doctored, they are not a true

14   account, and GM cannot have it come out that they did not have

15   this loan in this trust.

16         THE COURT:  Okay.  I reject that argument.  You're

17   prevented from marking those exhibits.  Let's finish up.

18         MR. GARBER:  Okay.  May I have a few minutes to look

19   over?

20         THE COURT:  Yes.

21         MR. GARBER:  Your Honor, I have no further questions.

22         THE COURT:  Okay.  Mr. Lewis, redirect.

23         MR. LEWIS:  I have just a very few questions, Your

24   Honor.

25   REDIRECT EXAMINATION

RESIDENTIAL CAPITAL, LLC, ET AL.                    125

1    BY MR. LEWIS:

2    Q.    First of all, Mr. Cunningham, looking at the loan notes,

3    can you tell why the escrow was set up in the first place?

4    A.    It appeared to be because of the request for a

5    modification.

6    Q.    And why would an escrow be set up in the case of a request

7    for a modification?

8    A.    To prevent future delinquency on taxes and insurance.

9    Q.    Okay.  So that's a standard procedure?

10   A.    Yes.

11   Q.    Okay.  And would that escrow require the payment of

12   anything in addition to taxes and insurance that are projected?

13   A.    No.

14   Q.    So the only difference it would make would be a party

15   who's going to have to fund the escrow might have to make

16   payments more frequently, but the total, in any particular

17   year, would be the same?

18   A.    Correct.

19   Q.    So they'd be paying the same amount of taxes, only through

20   GMAC, and the same amount of insurance, only through GMAC,

21   rather than directly, and maybe on a different schedule?

22   A.    That's correct.

23   Q.    Okay.  Now, if you would open to Exhibit G in our exhibit

24   book.  These are the purged loan notes.

25   A.    Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    126

1   Q.   And if you would look at Exhibit G, page 11.

2   A.   Okay.

3   Q.   And do you see the entry towards the bottom "default

4   reason 2" changed --

5   A.   Yes.

6   Q.   -- to "excessive obligations"?  Do you see that entry?

7   A.   Yes, I do.

8   Q.   And you recall being examined about that earlier today,

9   yes?

10  A.   Yes, I do.

11  Q.   Now, this default label, is it used only when a loan is in

12  default?

13  A.   No, it's used for purposes of loss mitigation activity.

14  Q.   And why is that?

15  A.   There's a particular screen, within the LoanServ

16  application, that's used for loan modifications and other type

17  of loss mitigation activity, and you know, primarily, those are

18  done when loans are delinquent.  So this system didn't

19  differentiate between the loan being contractually current for

20  purposes of this comment.

21  Q.   Thank you.

22         MR. LEWIS:  No questions, Your Honor.

23         THE COURT:  Any further questions?

24         MR. GARBER:  No further questions, Your Honor.

25         THE COURT:  All right.  Do you have any other

1  witnesses, Mr. Lewis?

2           MR. LEWIS:  I have none, Your Honor.  I --

3           THE COURT:  Does the trust -- go ahead.

4           MR. LEWIS:  I will get you a full set of the purged

5  loan notes, unless there's privileged information.

6           THE COURT:  All right.  Do you rest?

7           MR. LEWIS:  I do.

8           THE COURT:  All right.  You're excused.

9           THE WITNESS:  Thank you.

10          THE COURT:  All right.  I want to get this record

11 closed, so I want you each to go through and make your offer --

12 offer into evidence whatever exhibits I reserved -- I told you

13 yesterday I was going to reserve until the end.  I just --

14 there -- you used a fraction of what's in notebooks, and I want

15 to know today what the record consists of.  So do you want to

16 take a few minutes to collect your thoughts about that?

17          MR. GARBER:  Yes, Your Honor.

18          THE COURT:  Okay.  So --

19          MR. LEWIS:  Yes, Your Honor, although we did begin

20 that process today on the theory --

21          THE COURT:  Okay.

22          MR. LEWIS:  -- that you might reach this point.

23          THE COURT:  All right.  How much time -- I'm not

24 pressing you; how much time do you think you want to do that?

25 I'll take a break now and let you do that.

RESIDENTIAL CAPITAL, LLC, ET AL.                    128

1            MR. LEWIS:  I would think fifteen minutes.

2            MR. LEWIS:  I think twenty minutes, Your Honor.

3            THE COURT:  Let's -- let me ask a couple of questions

4    as well.  Yesterday you both raised the issue about post-trial

5    memoranda.  Is that your both -- is that what you want, or -- I

6    mean, we haven't had a lot of evidence.  I mean, I think I have

7    the evidence pretty much in mind, but --

8            MR. LEWIS:  We have a lot of evidence, if you combine

9    what you've heard today with what's in the stipulated facts.

10   And so I would like to have a chance to admit that together.

11   Obviously, the Court's decision, whether you want us to do

12   that.

13           THE COURT:  Mr. Garber, what's your view?

14           MR. GARBER:  I could go either way, Your Honor.  I'm

15   happy to do it today, or I could it later.

16           THE COURT:  So are you ordering a transcript?  What

17   are you --

18           MR. LEWIS:  We would order transcripts.  I'll order a

19   transcript anyhow, no matter what.

20           THE COURT:  How much time -- if I permit you both to

21   file post-trial memoranda, how much time do you want to be able

22   to do that?

23           MR. LEWIS:  On receipt of the transcript, I would need

24   thirty days, or such less time as the Court would give us.

25           THE COURT:  Well, I'm just --

RESIDENTIAL CAPITAL, LLC, ET AL.                    129

1          MR. LEWIS:  Your Honor, I've been working on this case

2     a long time.

3          THE COURT:  I know you have.  I know you have.

4          MR. LEWIS:  And I know the Court's been sitting on it

5     a long time.  We've both put a lot of effort into this,

6     although it's been a friendly piece of litigation.

7          THE COURT:  Right.

8          MR. LEWIS:  I want to put my best foot forward at the

9     end.  May I suggest, Your Honor, if you think about this a

10    little bit while we're in recess, and you can tell us what you

11    want to do?

12         THE COURT:  Okay.  All right.  So figure out what

13    exhibits; I want to get that part -- I want the record

14    closed --

15         MR. LEWIS:  Very well.

16         THE COURT:  -- as to what's in evidence.

17         MR. LEWIS:  Thank you, Your Honor.

18         THE COURT:  -- and what's not.  Okay.  Unless you

19    knock on my door, I'll be back at 3:30, okay?  And if you wish

20    to -- I know your client is from South Jersey, am I right about

21    that?

22         MR. LEWIS:  Yes, sir.

23         THE COURT:  So I leave it up to you and Mr. Garber --

24    traffic gets bad, and if you want to leave, I'm not going to be

25    offended if you don't stay, okay?  But I leave that to you and

1   Mr. Garber to work out, okay?  Don't think you're going to be

2   insulting the Court in any way if you decided that you want to

3   try and get a head start on traffic that only gets worse as the

4   time goes by.  Okay?  I'm going to leave that to you all to

5   decide, okay?

6            MR. GARBER:  Thank you.

7            MR. MACK:  Thank you.

8       (Recess from 3:11 p.m. until 3:36 p.m.)

9            THE COURT:  Okay.  Please be seated.

10           All right.  Mr. Garber, why don't you tell me which

11  exhibits you're going to move into evidence?

12           MR. GARBER:  Yes, Your Honor.  I would like to move

13  into evidence -- can I do it out of order, because I had it by

14  my notebook?

15           THE COURT:  Sure.

16           MR. GARBER:  Okay.  In volume 1, I want Exhibit 17 --

17           THE COURT:  And when you say exhibit, are we

18  looking -- or I guess we are.  Tell me what tab.

19           MR. GARBER:  Okay.

20           THE COURT:  Can you do that as well?

21           MR. GARBER:  Tab 1.

22           THE COURT:  Okay.

23           MR. GARBER:  Tab 2.

24           THE COURT:  Hang on.

25           MS. HIENSCH:  Could you also say the exhibit number?

1          THE COURT:  Yeah.

2          MR. GARBER:  Okay, yes.

3          THE COURT:  So first give the exhibit number and then

4   the tab, and I think we'll -- if you don't mind, okay?

5          MR. GARBER:  Yes, Your Honor.  It's Exhibit 17 at tab

6   1; Exhibit 29 at tab 2; Exhibit 14 at tab 3; Exhibit 18 at tab

7   4; Exhibit --

8          THE COURT:  Hang on.  Just let me catch up with you.

9          Okay, go ahead.

10          MR. GARBER:  Exhibit 12 at tab 5.

11          THE COURT:  Um-hum.

12          MR. GARBER:  Exhibit 1 at tab 6; Exhibit 37 at tab 7;

13   Exhibit 38 at tab 8; Exhibit 16 at tab 9; Exhibit 39 at tab 10.

14          THE COURT:  Okay.

15          MR. GARBER:  Exhibit 34 at tab 11; Exhibit 43 at tab

16   12; Exhibit 40 at tab 13; Exhibit 41 at tab 14; Exhibit 2 at

17   tab 15.

18          THE COURT:  Tell me what this is, because you didn't

19   use this.  Tell me what it is.

20          MR. GARBER:  Pardon me?

21          THE COURT:  Tell me what it is.  You didn't use this

22   during any of the examinations.

23          MR. GARBER:  Yes, Your Honor.  These are the medical

24   records on Exhibit -- tab -- Exhibit 2 at tab 15.  That's the

25   medical records of Dr. Lichi.

1              THE COURT:  Okay.

2              MR. GARBER:  Which is the psychiatric that she saw.

3              THE COURT:  Yes, I know who he is.

4              MR. GARBER:  And then going to --

5              THE COURT:  It's got a little doctor's handwriting.

6              MR. LEWIS:  That's a lot like my dad's.

7              MR. GARBER:  Going now to volume 2 of the trial

8    notebook.

9              THE COURT:  Okay.

10             MR. GARBER:  Exhibit 3 at tab 16, the medical records

11   of Naples Community Hospital.  And Your Honor, actually,

12   Exhibit 16 is quite long, and I have culled out, under tab 3,

13   the records that I think most pertinent to my case.  So the

14   Court wanted us to indicate if we could --

15             THE COURT:  Let me just -- say that again, because tab

16   3, there are some dividers in between.  When you say you've

17   "culled out", this is -- tab 3 -- everything that you have as

18   Exhibit 3 is a subset of medical records, is that what you're

19   telling me?

20             MR. GARBER:  Yes, Your Honor, it's all a subset.

21             THE COURT:  Okay.  All right.  Next.

22             MR. GARBER:  Exhibit 13 at tab 17; Exhibit 24 at tab

23   18.

24             MS. HIENSCH:  I'm sorry; you said 24?

25             MR. GARBER:  Exhibit 24 at tab 18.

RESIDENTIAL CAPITAL, LLC, ET AL.                    133

1          THE COURT:  Okay.

2          MR. GARBER:  Exhibit 5 at tab 19.

3          THE COURT:  Um-hum.

4          MR. GARBER:  Exhibit 32 at tab 20; Exhibit 26 at tab

5  21; Exhibit 21 at tab 22; Exhibit 28 at tab 23; Exhibit 8 at

6  tab 24; Exhibit 9 at tab 25; Exhibit 36 at tab 26; Exhibit --

7          THE COURT:  Wait, tell me what 36 is, because you

8  didn't use that.

9          MR. GARBER:  That is the client contract that sets up

10  the relationship of the duties between GMACM and RFC.

11          THE COURT:  Okay.  Next?

12          MR. GARBER:  Exhibit 4 at tab 27.

13          MR. LEWIS:  Your Honor, I object to the introduction

14  of the deposition of Barry Mack.  Counsel said he was not going

15  to use it, except for rebuttal, if at all.

16          THE COURT:  This is Cheryl Mack -- deposition of

17  Cheryl Mack.

18          MR. LEWIS:  Well, Barry -- this tab says Barry and

19  Cheryl Mack.

20          THE COURT:  Tab 27 is --

21          MR. GARBER:  I have Cheryl.

22          THE COURT:  Oh -- no, that's the deposition of Cheryl

23  Mack -- excerpts of the deposition of Cheryl Mack.

24          MS. HIENSCH:  On the back of that I think there's

25  Barry.

RESIDENTIAL CAPITAL, LLC, ET AL.                    134

1          MR. LEWIS:  Just as long as it's clear that Barry

2    Mack's deposition -- I think it's there, actually.

3          THE COURT:  Just tell me what's behind tab -- I only

4    see portions -- hold on.  Exhibit 4 says "Depositions of Barry

5    Macks and Cheryl Mack".

6          MR. LEWIS:  Well, in the book --

7          THE COURT:  Um-hum.

8          MR. LEWIS:  -- the only -- why don't you look at his

9    book?

10          THE COURT:  Well, are we naming exhibits or the stuff

11    in the book?  What's marked as Exhibit 4 -- it has an exhibit

12    tag on it -- are excerpts of the deposition of Cheryl Mack.

13          MR. LEWIS:  That's fine, Your Honor.

14          THE COURT:  Am I correct in that, Mr. Garber?

15          MR. GARBER:  Yes, Your Honor.

16          THE COURT:  Just excerpts of the deposition of Cheryl

17    Mack?

18          MR. GARBER:  That's in the book, but I believe that

19    Exhibit 27 has the entire deposition.

20          THE COURT:  Well, this is not Exhibit 27; we're

21    looking --

22          MR. GARBER:  Or Exhibit 4, rather, is the entire

23    deposition of Cheryl Mack.  It's a videotape deposition and a

24    transcript.

25          THE COURT:  So you're telling me you don't have the

RESIDENTIAL CAPITAL, LLC, ET AL.                    135

1  whole exhibit in your binder?

2          MR. GARBER:  No, Your Honor, I only have highlights

3  that I wanted to bring to the Court's attention.

4          THE COURT:  And what is it that you're offering?

5          MR. GARBER:  I'm offering the entire transcript.

6          THE COURT:  I'm not -- I don't -- I think I've made

7  clear to you before; I don't permit people to dump entire

8  deposition transcripts into the record.  You didn't follow my

9  directions previously.  I made clear that when you do

10 deposition designations, that's what you've got to do by page

11 and line number.  I don't permit entire depositions to be

12 dumped into evidence, which is what you appear to be attempting

13 to do.  You give me binders, you give me some smaller notebooks

14 that have excerpts of the Cheryl Mack deposition.  I don't

15 think I could have been any clearer in saying -- and I think

16 Mr. Lewis complained about this earlier, that you were supposed

17 to do, by page and line number, designations from any

18 depositions that you wish to offer in evidence.  And then Mr.

19 Lewis was going to have to object to the specific designations

20 that you were offering.  I never saw anything that you provided

21 with designations, okay?

22         MR. LEWIS:  Your Honor, what happened was I did

23 complain, but what you ended up deciding was that I should

24 write you a letter objecting to passages that I would object

25 to, which I did.

RESIDENTIAL CAPITAL, LLC, ET AL.                    136

1          THE COURT:  Yeah.

2          MR. LEWIS:  You didn't, at that time, require Mr.

3    Garber to do any further designations.

4          THE COURT:  What is your position, Mr. Lewis, with

5    respect to the deposition of Cheryl Mack?

6          MR. LEWIS:  Well, my position with respect to the

7    deposition of Cheryl Mack is if he's specified pages and

8    excerpts in his notebooks, that's good; I'm fine with that.

9    But if he's asking you to admit the entire deposition so that

10   he can refer to whatever passages he might in the end, I don't

11   think that's appropriate.

12         THE COURT:  How did you decide what to put in this

13   little binder you gave me, volume 2 of your trial notebook --

14   of your hearing notebook?

15         MR. GARBER:  They seemed to be the most salient

16   passages from her deposition.  Her deposition was taken at her

17   house and was videotaped, and it took about an hour and a half

18   or two hours; she was on oxygen and so forth.

19         THE COURT:  No, it didn't, because I did not watch the

20   entire video; I watched a portion of the video.  I think there

21   was, like, two hours in the morning and there was, sort of, two

22   hours in the afternoon.  And I must say, most of what I saw had

23   absolutely no bearing on a RESPA claim.

24         MR. LEWIS:  That was, incidentally, Your Honor, the

25   nature of most of my objections, that it wasn't relevant to

1    this case.

2            THE COURT:  See, that's why I require designations and

3    counter- designations, okay, because it allows me not to have

4    to go through three or four hours of -- particularly, you sent

5    me the DVDs; that was nice.  I wanted to see a little bit of

6    it; I did watch some of it.  And some of it I, kind of, readily

7    let it play on my desktop computer here, and didn't pay much

8    attention to it because it had no bearing, whatsoever, on a

9    RESPA claim.  It was taken in the case against Deutsche Bank,

10   okay?

11           What is it that you believe you need, beyond what's in

12   the excerpts you provided?

13           MR. GARBER:  Let me review it briefly; it's been some

14   time since I've looked at it.

15           She complains that she was not getting answers from

16   Deutsche Bank, that she was complaining about this, and

17   eventually she was led to write the letter, which she did not

18   get a response to.

19           THE COURT:  Hold on.  Let me understand.  That's in

20   the excerpts in the book?

21           MR. GARBER:  Yes, Your Honor, that's in the excerpt --

22           THE COURT:  Yeah.

23           MR. GARBER:  -- in the book.

24           THE COURT:  I'm prepared to admit that, okay, in

25   evidence.  I don't hear Mr. Lewis complaining about --

1    objecting to that, right?

2           MR. LEWIS:  No, Your Honor, except to the extent that

3    my relevance objections or other objections --

4           THE COURT:  I --

5           MR. LEWIS:  -- would apply to those passages.

6           THE COURT:  Okay.  Look --

7           MR. LEWIS:  These passages were not supplied to me in

8    advance.  I had to do my objections in the dark, and some of

9    them may relate to what's in the booklet; I don't know yet.

10          THE COURT:  That, I would -- look, my reaction is I'm

11   prepared to admit portions of the deposition as background,

12   okay?  I don't know that it needs to be tightly linked to

13   preci -- from what I watched, I mean, I got a sense about what

14   utter frustration Mrs. Mack felt expressed in the depo -- in

15   the portions of what I watched, which I can fully understand.

16   That doesn't necessarily mean there's a RESPA claim against

17   GMAC, but I've said this before and I'll say it now:  I don't

18   know that its' actionable, but it was pretty horrible the way

19   GMAC dealt with the Macks' account.  I mean, say what you want;

20   it just -- it was.  Well, I'm going to admit in evidence, for

21   such weight as it's entitled to, the excerpts of the deposition

22   of Cheryl Mack that are marked as Exhibit 4, and contained in

23   creditor Barry F. Mack's hearing notebook volume 2.  I am not

24   going to consider anything else because I was not provided with

25   page and line number designations, as I insist upon.  The

RESIDENTIAL CAPITAL, LLC, ET AL.                       139

1   relevance of some of what's even in here is questionable but

2   relevant background.  Let me put it that way.

3            What's next?

4            MR. GARBER:  Your Honor, in addition to that, I had

5   some other exhibits that I've submitted --

6            THE COURT:  Can I ask --

7            MR. GARBER:  -- that are not in the notebook.

8            THE COURT:  Yeah, I mean, 28 is not in the notebook.

9   29 is not in the notebook.  30 and 31, I have no idea what they

10  are.

11           MR. GARBER:  I'm sorry.  You referred to 28 and 29

12  aren't in the notebook?

13           THE COURT:  This -- that volume, your trial -- your

14  hearing notebook --

15           MR. GARBER:  Yes.

16           THE COURT:  -- it's blank behind the tabs for 28, 29,

17  30, 31, but nothing there.

18           MR. GARBER:  Yeah, I don't think there's anything --

19  supposed to be anything there; I don't know why that's there.

20           THE COURT:  Oh, okay.  So what else do you have?

21           MR. GARBER:  Your Honor, in addition, I would ask to

22  move into evidence Plaintiff's Exhibit number 7; it's a copy of

23  the complaint that was filed by Deutsche Bank.  I have as

24  Plaintiff's Exhibit number 7--

25           THE COURT:  That's the same thing, Mr. Lewis'

RESIDENTIAL CAPITAL, LLC, ET AL.                    140

1    exhibit --

2              MR. GARBER:  Yes, Your Honor.  He has the same --

3              THE COURT:  Which was it?  DX-A is the foreclosure

4    complaint.  That's what you're talking about?

5              MR. GARBER:  Yes, Your Honor.  And Your Honor, we did

6    not designate it in our -- that number in our hearing notebook,

7    but it was Exhibit 3, which was found at tab -- I'm sorry,

8    found at tab 12.  We didn't have a designation but that's what

9    we decided to --

10             THE COURT:  I'm sorry, which exhibit?

11             MS. HIENSCH:  Exhibit --

12             MR. GARBER:  That was Exhibit 43, found at tab 12.

13             THE COURT:  Right.  Right.  You listed that, I think.

14             MR. GARBER:  Yeah.

15             THE COURT:  You did; you already listed that.

16             MR. LEWIS:  Your Honor, that's not on the exhibit

17   list.  Which exhibit is that, please?

18             THE COURT:  It --

19             MR. GARBER:  It was Exhibit 43 at tab 12.

20             THE COURT:  It was in the binder.  It's the letter --

21   it's the October 26th, 2009 letter.

22             MR. LEWIS:  It's the letter, Your Honor.

23             THE COURT:  It's the letter.

24             MR. LEWIS:  Okay.

25             THE COURT:  It's the letter, yes.  You listed that

RESIDENTIAL CAPITAL, LLC, ET AL.                    141

1   when you went through, Mr. Garber.

2           MR. GARBER:  Okay.  And I think that's all the

3   exhibits.  Well, can I go -- just because I see the numbers

4   don't match up.  I have thirty-two -- no, it matches up.  I'm

5   sorry.  I didn't add them up right.

6           THE COURT:  All right.  Let me go back over one time,

7   and then -- Exhibit 17, tab 1; Exhibit 29, tab 2; Exhibit 14,

8   tab 3; Exhibit 18, tab 4; Exhibit 12, tab 5; Exhibit 1, tab 6;

9   Exhibit 37, tab 7; Exhibit 38, tab 8; Exhibit 16, tab 9;

10  Exhibit 39, tab 10; Exhibit 34, tab 11; Exhibit 43, the October

11  26th letter, tab 12; Exhibit 40, tab 13; Exhibit 41, tab 14;

12  Exhibit 2, tab 15; that's the Dr. Lichi notes; Exhibit 3, tab

13  16; Exhibit 13, tab 17; Exhibit 24, tab 18; Exhibit 5, tab 19;

14  Exhibit 32, tab 20; Exhibit 26, tab 21; Exhibit 21, tab 22;

15  Exhibit 28, tab 23; Exhibit 8, tab 24; Exhibit 9, tab 25,

16  Exhibit 36, tab 26; Exhibit 4, tab 27; Exhibit 7 is the same as

17  DX-A; it's the Deutsche Bank foreclosure complaint.  Okay.  And

18  with respect to Exhibit 4, that's tab 27, it's the excerpts,

19  portions of the deposition of Cheryl Mack.

20          Okay.  Do I have that right, Mr. Garber?

21          MR. GARBER:  Yes, Your Honor.

22          THE COURT:  Any objection, Mr. Lewis?

23          MR. LEWIS:  I'd like to ask, if I may, Your Honor,

24  whether Mr. Garber intends to introduce Dr. Lichi's notes

25  wholesale.  We specified specific entries in our exhibits, sort

RESIDENTIAL CAPITAL, LLC, ET AL.                    142

1   of like the issue with Mrs. Mack's transcript.  And the same is

2   true with medical records, specified specific excerpts.

3              THE COURT:  All right.  With the exception of Exhibit

4   2, behind tab 15, Dr. Lichi's notes, do you have any objection

5   to anything else?

6              MR. LEWIS:  None, Your Honor.

7              THE COURT:  All right.  So all of -- we'll get to Dr.

8   Lichi's notes, Exhibit 2, behind tab 15.  And I take it,

9   including Exhibit 7, the Deutsche Bank complaint -- foreclosure

10  complaint, you have no objection to those --

11             MR. LEWIS:  No.

12             THE COURT:  -- documents?  Okay.  All right.  So all

13  of those documents are admitted into evidence.

14  (Plaintiff's Exhibits 17, 29, 14, 18, 12, 1, 37, 38, 16, 39,

15  34, 43, 40, 41, 3, 13, 24, 5, 32, 26, 21, 28, 8, 9, 36, 4, and

16  7 were hereby received into evidence, as of this date.)

17             THE COURT:  With respect to Exhibit 4, behind tab 27,

18  the Court is only admitting the excerpts of the Cheryl Mack

19  deposition that are contained here in the notebook.

20             Okay.  We have to come back and deal with Dr. Lichi's

21  notes, Exhibit 2.  So we're going to hold on that a minute -- a

22  few minutes, at least.

23             Okay.  Mr. Lewis, tell me what exhibits you're

24  offering.

25             MR. LEWIS:  Yes, Your Honor.  I'm just going to go

RESIDENTIAL CAPITAL, LLC, ET AL.                    143

 1    straight down the list --

 2              THE COURT:  Okay.

 3              MR. LEWIS:  -- from A to Z, whatever we've got.

 4              THE COURT:  You're not really offering A through Z,

 5    are you?

 6              MR. LEWIS:  No.  I'm just telling you how I'm going to

 7    sequence it.

 8              THE COURT:  Okay.  All right.

 9              MR. LEWIS:  So the ones we would like admitted -- are

10    you at the index, Your Honor?

11              THE COURT:  Yes, I am.

12              MR. LEWIS:  Okay.  It would be B --

13              THE COURT:  So for the foreclosure complaint is -- you

14    want that in?  Both of you want --

15              MR. LEWIS:  That's the answer and counterclaims.  He's

16    got the foreclosure complaint in.

17              THE COURT:  Well, you have it marked as Exhibit A.

18              MR. LEWIS:  No, the foreclosure complaint is Exhibit

19    A.  Exhibit B is the answer and counterclaims --

20              THE COURT:  I know.  Are you offering the foreclosure?

21    I've heard it's already admitted.

22              MR. LEWIS:  No.

23              THE COURT:  You're not?

24              MR. LEWIS:  Yeah.  No.

25              THE COURT:  Okay.  All right.  It's in evidence

 1  already.

 2              MR. LEWIS:  Yeah.

 3              THE COURT:  Go ahead.

 4              MR. LEWIS:  Some of these may be duplicative --

 5              THE COURT:  Yes, okay.

 6              MR. LEWIS:  -- but I have --

 7              THE COURT:  Okay, go ahead.

 8              MR. LEWIS:  We would like to admit Exhibit C.

 9              THE COURT:  Did you say B, the answer --

10              MR. LEWIS:  C.

11              THE COURT:  Yeah, you're not offering B either?

12              MR. LEWIS:  We are offering B.

13              THE COURT:  You --

14              MR. LEWIS:  We are offering B.

15              THE COURT:  Okay.  All right.  All right, B, C --

16              MR. LEWIS:  C, D, E, F. G is the purged loan notes,

17  which have already been admitted.  It's up to the Court whether

18  it wants to make a separate note of this.

19              THE COURT:  Okay.  Go ahead.

20              MR. LEWIS:  H is the same; it's the October --

21              THE COURT:  Right.

22              MR. LEWIS:  -- it's the letter.

23              THE COURT:  Okay.

24              MR. LEWIS:  K, L -- let me ask you this question, Your

25  Honor.  Are pleadings automatically deemed part of the record

1  for purposes of the trial?

2          THE COURT:  No.

3          MR. LEWIS:  Okay.  So we would like to admit L and M.

4  We'd like to admit some of the other pleadings that are not on

5  this list.  They're --

6          THE COURT:  Well, you can ask me to take judicial

7  notice of pleadings, but the problem with not offering them

8  into evidence is they may well have lots of hearsay.  You can

9  ask me to take judicial notice of pleadings and I'll decide

10  what weight they're entitled.

11          MR. LEWIS:  Absolutely, yeah.

12          THE COURT:  But --

13          MR. LEWIS:  It's mostly for oral arguments that are in

14  them, not for the evidence in them.

15          THE COURT:  Well, let's go through your exhibits

16  first --

17          MR. LEWIS:  Okay.

18          THE COURT:  -- before you --

19          MR. LEWIS:  I'm up to M.

20          THE COURT:  Yep.

21          MR. LEWIS:  And then N.

22          THE COURT:  What's the relevance of a transcript

23  from --

24          MR. LEWIS:  That's the July 12th hearing on the motion

25  conference -- January 12th.

1          THE COURT:  All right.  Go ahead, N, go ahead.

2          MR. LEWIS:  O, and then from Q, Q(b) and Q(c) specific

3   excerpts from Dr. Lichi's notes.  From R, R(a) and R(b), T,

4   another specific excerpts from medical records, U, more

5   specific excerpts from medical records.  W, which is certain

6   excerpts from Mr. Mack's deposition.

7          THE COURT:  Okay.

8          MR. LEWIS:  And X, which is the fax dismissal that we

9   introduced yesterday.

10         THE COURT:  Okay.  Mr. Garber, do you have any

11  objection to those exhibits that Mr. Lewis has identified?

12         MR. GARBER:  Your Honor, I would object to N, which is

13  the transcript of the 1/12/15 status conference.  That was --

14  there was no evidence presented; there was argument of counsel

15  presented on how the matters would proceed.

16         MR. LEWIS:  That's not accurate, Your Honor.

17         THE COURT:  You're trying to -- you want to rely on --

18  tell me why -- what's your offer as to N?

19         MR. LEWIS:  Sure.  That status conference was also a

20  motion conference, because we'd asked for a motion conference

21  for a summary judgment motion.  One of the issues that I

22  raised, in arguing and describing the summary judgment motion,

23  on the issue of the address to which the letter was sent, was

24  that it was sent to the wrong address, the address for general

25  inquiries, instead of the address for QWRs.  Mr. Garber got up

1    and said, well, the Macks thought they were sending a general

2    inquiry; he said that.

3         THE COURT:  Okay.  You can ask me to take judicial

4    notice of the transcript of the hearing, and to the extent that

5    Mr. Garber made any statements that estop him from arguing

6    otherwise, you can argue about that.  But it's not evidence,

7    per se.  You can ask me -- I'll take judicial notice of the

8    transcript, and you can make your arguments about what effect

9    it had.  Let me deal with this right up front, okay?

10        And Mr. Garber, you started to say something

11   yesterday.  I think you said you would raise it today; this is

12   with respect to the pre-trial order, the stipulation in the

13   pre-trial order -- let me find the paragraph number.  Paragraph

14   26 of the stipulation contained in the joint pre-trial order,

15   which is, "Shortly thereafter, on October 26th, 2009, the

16   claimant sent the letter using an address other than the one

17   specified for QWRs on the monthly mortgage statements GMACM

18   sent to the claimants, as was on all monthly mortgage

19   statements GMACM sent to borrowers."

20        So I think you indicated yesterday you wanted to

21   address that.  Mr. Lewis, in his Exhibit O, was the monthly

22   mortgage statement for, I believe, November 2, 2009.  And I

23   believe you asked -- he asked Mr. Mack some questions, and then

24   on redirect, I think you asked a question, was it -- did he

25   know it was in the prior mortgage statements, and he said no.

1         So what's your position with respect to the

2    stipulation in paragraph 26 in the pre-trial order?

3         MR. GARBER:  Your Honor, I think it's only fair that I

4    should have admitted everything I believe to be true.  In this

5    particular case, I don't know what monthly mortgage statements

6    they may or may not have gotten.  I haven't seen of them.  It

7    is quite possible that is true, and I was hoping we might have

8    evidence today that would show that previous statements also

9    gave that address.  But since I don't think we've introduced

10   any of those, and since there is no evidence that there were

11   other monthly mortgage statements, then I don't believe that I

12   should be entering into a stipulation for something that I

13   don't know.

14        THE COURT:  Maybe you shouldn't, but you did.  This

15   was filed on the docket on February 20th, 2015.

16        So look, here's why this whole issue is, from the

17   Court's standpoint, somewhat murky.  Bear with me a second.

18   Reading from my opinion of July 24th, 2014 -- it's the

19   memorandum opinion and order sustaining, in part, and

20   overruling, in part, objection to proof of claim 386.  This is

21   not -- it is out of Westlaw, but I'm not referring -- I'm

22   referring to the copy that's ECF docket number 7297.

23        On page 11, the paragraph reads as follows.  It's

24   paragraph 2, "The QWR claim".  "Next, Mack argues that the

25   alleged RESPA liability here is based on GMACM's failure to

1  respond to Mrs. Mack's October 26, 2009 letter (the "QWR

2  Claim")."  I'm leaving out the citations within the opinion.

3  "The trust agrees that the letter qualified as a QWR" with a

4  citation to (May 15, 2014 Tr. at 59:10-14 (ECF Doc. # 6998).

5  "GMACM's failure to respond to the letter would be a violation

6  of RESPA.  Although the Macks alleged a RESPA violation in the

7  foreclosure action, that allegation did not involve a purported

8  failure to respond to a QWR and instead centered on a different

9  RESPA provision."  That's from my opinion.

10         So I went back -- and I didn't bring it out with me,

11 but I went back and looked at the transcript.  You may have it

12 with you; I don't know.  But I asked Mr. Lewis some questions,

13 and I asked -- the gist of which -- this is not a quote -- was

14 whether you agreed that the October 26th, 2009 letter qualified

15 as a QWR, and you said yes.  So that's from the May 15th, 2014

16 transcript, and that's in my opinion.

17         In the pre-trial order, Mr. Garber stipulates that --

18 in paragraph 26 -- I read it a few minutes ago; I won't read it

19 again; it says what it says.  And then in setting out the

20 parties' contentions, Mr. Lewis certainly made clear that the

21 defendant contends that it's not a QWR because it was sent to

22 the wrong address.  So the issue was clearly framed in the pre-

23 trial order.  There isn't -- from the Court's standpoint, as I

24 thought this through, this isn't a situation where Mr. Garber

25 can't argue that the issue -- you know, you didn't know this

1   was going to be an issue, okay?

2           So I've got Mr. Lewis' seeming admission in May, and

3   I've got your stipulation in the pre-trial order, okay?  So

4   when I thought it through, Mr. Garber, if I were in Mr. Lewis'

5   position, I'd say, well, I have the stipulation; I don't have

6   to offer -- I've put in Exhibit O, the November 2 -- clearly

7   it's, like, a week -- I don't know when it's mailed; it says

8   it's a statement for November 2; the letter's October 26th.

9   Then I start to say, well, do I have an earlier statement

10  before that has the QWR -- you know, that has the RESPA

11  address?  I don't.  The only exhibit is R; you pointed that

12  out.  But on the other hand, I say, Mr. Lewis, why should he --

13  he didn't have to come forward with an earlier statement

14  because he could rely on the stipulation.

15          So I've sort of been pondering this, okay?  We all

16  know the Second Circuit's Roth case.  Mr. Lewis relies on it a

17  lot.  You, in your brief, seek to distinguish Roth.  It is what

18  it is.  And I haven't made up my own mind about it.

19          So tell me, Mr. Lewis, if you can, have you looked for

20  prior statements?  I know you didn't offer any, but are there

21  prior loan -- you know, monthly mortgage statements?

22          MR. LEWIS:  Well, let me just first say I didn't

23  prepare that part of the case because I didn't think I had to.

24  I did ask some questions, and my understanding is, when I dug

25  this one out, at Mr. Mack's deposition, I then inquired whether

RESIDENTIAL CAPITAL, LLC, ET AL.                    151

1    they could generate others, and the answer was no, that the

2    system cannot recreate those, and that the images of those

3    would have been destroyed because the loan was closed and paid

4    off.  And so there was really no way, other than to sort of

5    survey the world to see whether there were other ones we might

6    come up with from somebody.

7              THE COURT:  Look, I mean, I --

8              MR. LEWIS:  And if I could just add, Your Honor, just

9    very quickly?

10             THE COURT:  Go ahead, yeah.

11             MR. LEWIS:  When you asked me -- for what this is

12   worth; I understand the Court will make evident its wishes

13   here.  When you asked me if I thought this was a QWR, I thought

14   you were asking about the content; that is, was this the kind

15   of thing that would qualify as a QWR because of what it asked

16   about.  And I --

17             THE COURT:  Well, the transcript was pretty -- I

18   think, when I went back and looked it, but what -- go ahead; I

19   interrupted you.

20             MR. LEWIS:  That's what I recall.

21             THE COURT:  Okay.  So look, Roth doesn't get decided

22   until June 24th, 2014.  And the hearing at which you made the

23   statement was May 15th, 2014.  I don't know whether you saw

24   Roth or not.  I hadn't seen it at the time, but that's beside

25   the -- I didn't bring that.  I had looked at the transcript

online. It was a pretty clear answer to what I thought was a fairly clear question. But when I say this is murky, look --

MR. LEWIS: You evidently were asking something different that I understood you were asking.

THE COURT: No, but when I say this is murky, I mean, on the one hand, Mr. Garber, you can say, well, Mr. Lewis admitted it qualifies as a QWR. And he can say, but he stipulated, in paragraph 26 of the joint pre-trial order, that the letter was sent using an address other than the one specified for QWRs on the monthly mortgage statement.

So you want to -- effectively, you want to be relieved from your stipulation, and that's what's murky about this whole thing. On the one hand, you could argue, well, Mr. Lewis conceded this issue on May 15th. And he can say, but I raised the issue -- and that wasn't -- it wasn't an evidentiary hearing. It wasn't -- you know. He subsequently asked for leave to file a summary judgment motion. I said no; I wanted to see what the evidence was.

I may be dragging this out more than -- let me ask you this, Mr. Lewis. Are you telling me that the trust can't generate -- I can't believe they had ten different forms they used, so maybe the Macks' loan got paid off when it did, but are there loan statements for other loans, or are there monthly statements for loans -- monthly statements predating October 26th, 2009?


MR. LEWIS: I don't know, Your Honor. I know there was one in Footrel (ph.), but I think that was later.

THE COURT: Okay.

MR. LEWIS: I think. It did have the same information on it, although I think there were other issues --

THE COURT: See, I don't think you ought to be -- I don't -- Mr. Garber, I can't relieve you -- in good -- in my view of this, I can't relieve you of the stipulation without giving -- and I'm not saying I'm going to relieve you of the stipulation, but I'd certainly -- it would be -- I think it would be error for me to relieve you from the consequences of the paragraph 26 stipulation without, at a minimum, providing Mr. Lewis an opportunity to show -- if it doesn't exist for the Mack loan, it may well exist for other loans.

MR. LEWIS: Your Honor, I'm sorry --

THE COURT: I'd be really surprised, Mr. Garber, whether it was changed on November 2nd from what it was on October 2nd, but let me just -- go ahead.

MR. LEWIS: If I could add, Your Honor, that stipulation was intensely negotiated. It went through a number of drafts by each side, and we each got some things we wanted and didn't get some things we wanted that we thought should have been agreed to. But we reached an agreement that we thought simplified the case for us and for the Court, and that was the agreement, and it was there right along.

RESIDENTIAL CAPITAL, LLC, ET AL.                    154

1      THE COURT:  I wouldn't have -- what's giving me some

2  pause, Mr. Lewis -- maybe I ought to look on the docket, okay,

3  and I'll find -- let me open up the transcript.  I will find

4  the transcript.

5      MR. LEWIS:  I do have the transcript; I just don't

6  have it with me.

7      THE COURT:  Okay.  No, I'll find it; that's okay.  Let

8  me look.

9      (Pause)

10      THE COURT:  Oh I have it.  My computer's slow and --

11  why don't you just go print out the page, or the page before

12  and the page after, or something like that, okay, because this

13  computer doesn't want to log on.

14      MR. LEWIS:  Your Honor, could I ask that an extra copy

15  be printed so I can follow along?

16      THE COURT:  Print up copies of the page --

17      MR. LEWIS:  Thank you.

18      THE COURT:  -- three copies.

19      Well, let's try to use this time while my law clerk

20  is -- my computer's still not booting up.  Let's just talk

21  about Dr. Lichi's notes, most of which I can't read.

22      MR. LEWIS:  Your Honor, there's -- I think there's

23  transcription of those notes.

24      THE COURT:  Is it?

25      MR. LEWIS:  Yeah, what happened, Your Honor, was we

1    subpoenaed Dr. Lichi -- it took us awhile -- in Florida.  He

2    was not anxious to appear.  He's a doctor, he's busy; I

3    understood that.  So we reached an agreement, which Mr. Garber

4    blessed in advance, that he would not have to appear.  Mr.

5    Garber agreed that his records would be business records.  And

6    I also required of Dr. Lichi, as a condition of that, that Dr.

7    Lichi transcribe his records --

8                THE COURT:  Okay.

9                MR. LEWIS:  -- so that we could read them.  And --

10               THE COURT:  Oh, that's behind it.  I see, okay.

11               MR. LEWIS:  Yes.

12               THE COURT:  All right.

13               MR. LEWIS:  Mr. Garber also went along with that and

14   was willing to treat those as business records too.  I actually

15   managed to read most of them and put them in proper order, but

16   it took some days.

17               THE COURT:  I bet it did.  So why are you objecting to

18   admitting all of those notes?

19               MR. LEWIS:  I'm not objecting to admitting all of the

20   notes, per se; I just want to know which ones he wants to refer

21   to and why.  It's just like Mrs. Macks' deposition.

22               THE COURT:  They're not -- but these, unlike Cheryl

23   Macks' deposition -- I'm looking at the transcription of the

24   notes; this is not that voluminous.  I mean --

25               MR. LEWIS:  No, it's not.

1          THE COURT:  I'm putting this issue to rest.  Exhibit 2

2    is admitted.  I'm admitting Exhibit 2 into evidence.

3    (Dr. Lichi's medical notes were hereby received into evidence

4    as Plaintiff's Exhibit 2, as of this date.)

5          MR. LEWIS:  Very well, Your Honor.

6          THE COURT:  Okay.  Look, you all can argue what you

7    want.  I mean, Mrs. Mack was a troubled person.  She was

8    troubled for a long time.  I appreciated that, when we had our

9    little bench conference off the record, that you didn't find it

10   necessary to cross-examine Mr. Mack about things about their

11   relationship and stuff like that.

12         MR. LEWIS:  Well, we stipulated facts on a number of

13   these issues, and that's one of the reasons I'm not using much

14   of Dr. Lichi's notes.

15         THE COURT:  Okay.  Let me let -- my law clerk

16   correctly raised -- what is that you're offering, Mr. Garber,

17   in Exhibit 3, the medical records?

18         MR. GARBER:  Your Honor, I think what I had referred

19   to in my tab 16 Exhibit 3, is the excerpts about her

20   hospitalization, the references to her suicide attempt, the

21   medical condition that she found herself in as a result of that

22   hospitalization, and the references to the foreclosure.  Let me

23   just look and -- yeah, I've only taken out those records from

24   the Naples Hospital that show that period of time, in my tab.

25   And I think those are the major portions of the medical records

1    that are relevant.

2           THE COURT:  So what I have in your trial notebook are

3    excerpts from more voluminous medical records?

4           MR. GARBER:  Yes, Your Honor.

5           THE COURT:  And are you objecting to those, Mr. Lewis?

6           MR. LEWIS:  No, Your Honor.

7           THE COURT:  All right.

8           MR. LEWIS:  I was objecting to the admission of all

9    the medical records.

10           THE COURT:  Okay.  But you don't have an objection to

11    what's in --

12           MR. LEWIS:  No.

13           THE COURT:  -- the hearing binder as --

14           MR. LEWIS:  No.

15           THE COURT:  -- Exhibit 3?  Okay.  So that's not an

16    issue.

17           All right.  So Mr. Pierce, my law clerk, has given me

18    the portions of that transcript from May 15th, 2014, and at

19    page 59, the Court says, "Okay, so let me ask you first, Mr.

20    Lewis, would you agree that Exhibit C, which is at ECF 6834-3,

21    which was filed on April 29th, 2014 here, that that letter

22    would satisfy the requirements of a qualified written request?"

23    Mr. Lewis: "Yes, I do, Your Honor."

24           MR. LEWIS:  Your Honor, I can only tell you what I

25    remember, and what I remember was I was thinking you were

RESIDENTIAL CAPITAL, LLC, ET AL.                    158

1   asking about the context, because most things don't come in

2   that say at the top "Qualified written request".  And a lot of

3   informal letters could be qualified written requests because

4   they have information requests in them that would make them,

5   conceptually, QWRs.  That's what I understood the Court to be

6   asking.  Perhaps I should have asked the Court to qualify -- to

7   clarify, but that --

8           THE COURT:  Have you seen the -- never mind; I won't

9   ask that question.  Bear with me a second.

10          MR. LEWIS:  Another point here, Your Honor, is that

11  when you asked me that question, the whole QWR had just come

12  up, the Court will recall, and I was at the beginning of my

13  process of trying to analyze what our defenses might be.

14          THE COURT:  Look, first let me say that I'm going to

15  ask Mr. Lewis to order an expedited copy of the transcript from

16  the trial so that this doesn't drag out forever.  I'm going to

17  permit both sides to submit simultaneous -- we're not going to

18  have back-and-forth briefs, one from each side, post-trial

19  memoranda from each side.

20          So in the timing -- I realize we don't know what date

21  you're going to get a transcript.  There's no question in my

22  mind that you can be working on post-trial briefs before you

23  get the transcripts.  I'm sure you both have notes and you know

24  what the exhibits -- we only had three witnesses.  It's

25  important to me that I get this matter decided before my law

1    clerks leave in early September.  Okay.  The three of us have a

2    lot of time invested in this case, and their assistance is

3    important to me.  So I only -- that's, in part, my

4    reluctance -- there are only three witnesses too.  I mean, just

5    it's not that complicated.

6           So find out, within the next day or so, how long it's

7    going to take you to get a transcript, and then you and Mr.

8    Garber try and agree on a date for submitting your post-trial

9    memoranda.

10          MR. LEWIS:  Does the Court have some sort of outside

11   objective date?  I mean, I'll live with -- we can live with

12   whatever --

13          THE COURT:  No, because I -- look, we've done a lot of

14   case on this case already; I want to make that clear.  And I've

15   taken notes and my law clerks have taken notes.  I have three

16   interns for the summer; they're taking notes as well.  And so

17   I'm not waiting until I get the post-trial to start.  I'm not

18   deciding the matter.  But find out when you're going to get a

19   transcript; that's number one.  So it's going to cost more, but

20   get an expedited transcript, okay?

21          Mr. Lewis, I'm not resolving today this issue of

22   relieving Mr. Garber of the paragraph 26 and the stipulation;

23   it says what it says.  And I know, Mr. Lewis, you're saying,

24   well, you didn't understand my question, on May 15th, the way I

25   think I ask it, but I'm not resolving that either.  I want to

RESIDENTIAL CAPITAL, LLC, ET AL.                    160

1    know -- you ought to be able to find out in the next week, by

2    the end of next -- I'm away next week anyway, okay?  By the end

3    of next week, you ought to be able to find out whether you can

4    get a copy of a GMAC monthly mortgage statement, the GMAC

5    Mortgage account statement for another borrower.  If it doesn't

6    exist for the Macks, has to have been a form.  And you can

7    redact it to take out the names and stuff.  What's really

8    important is the second page; that's where the -- the addresses

9    are here.

10            Not impossible, Mr. Garber, but I'd be really

11   surprised if the address for QW -- that the format or the

12   address changed in a month, and that's what we're really

13   talking about.

14            And in my view, I'm not sure I'm relieving you; the

15   stipulation is pretty clear to me, and effectively, I think

16   you're asking me to relieve you of the consequences of that

17   stipulation.  And but for the somewhat ambiguous transcript

18   from May 15th, I would probably just say no, if that's what's

19   before me, and that's the end of the subject.  But I would like

20   to see if there's a statement for a period, close in time,

21   before October 26th.

22            MR. LEWIS:  If I can find one, Your Honor, how would

23   you like me to submit it?

24            THE COURT:  With a declaration that authenticates it.

25            MR. LEWIS:  By filing?

1          THE COURT:  Yes.

2          MR. LEWIS:  Okay.

3          THE COURT:  And obviously, Mr. Garber will get it too.

4          MR. LEWIS:  Yes, also to Mr. Garber.

5          THE COURT:  And we'll see.

6          MR. LEWIS:  Okay.

7          THE COURT:  Let me raise -- let's assume that I

8    conclude the October 26th letter is a QWR.  You've put in some

9    evidence, Mr. Garber, and I haven't read the doctor's notes,

10   and I need to read that, about -- look, as I understand your

11   claim, at least what remains of the case, it's the RESPA

12   claim -- you're seeking emotional distress, noneconomic --

13   damages for noneconomic loss related to infliction of emotional

14   distress on Cheryl Mack.

15         MR. GARBER:  Yes, Your Honor.

16         THE COURT:  I listened carefully, and I didn't hear

17   Mr. Mack testify about anything that would come close to

18   establishing what's required to establish a claim, on his

19   behalf, for intentional infliction of emotional distress.  So

20   the issue is Mrs. Mack.  Do you agree with that?

21         MR. GARBER:  Yes, Your Honor.

22         THE COURT:  Okay.  And I've done some research, again,

23   on the assumption that the October 26th letter qualifies as a

24   QWR, on the issue of damages.  How do I determine damages?  I

25   mean, intentional infliction of emotional distress is not the

1    garden-variety case before a bankruptcy judge.  Okay.  And I've
2    been trying to focus on how am I supposed to determine --
3    assuming that I find GMAC culpable on that claim, how do I
4    determine the amount of damages?  And I want to focus -- I
5    mean, before I get to the damages point -- and it's also a
6    question for what period of time.  All right?
7              And so when you do your post-trial memoranda, let me
8    tell you some of the other things that are running through my
9    mind, okay?
10             Mr. Lewis, in your pre-trial brief, and in arguments
11    to the Court, you focused on the fact that GMAC didn't have to
12    respond to the QWR, assuming it's a QWR, until December 26th --
13             MR. LEWIS:  Yes, Your Honor.
14             THE COURT:  -- 2009.  That's not quite right.  The
15    statute, as it existed then, or the rules, as existed then,
16    required that GMAC acknowledge receipt of the QWR within twenty
17    days, and they didn't do that.  And 2605 -- I think 2605(e)(2),
18    in substance, provides that the servicer is liable for actual
19    damages to the borrower as a result of the "failure".  Well,
20    the failure includes, in my -- I think the -- I'm not deciding
21    it, but it looks to me that the failure includes failure to
22    acknowledge within twenty days, not just the sixty days.  Okay?
23    That's not addressed in your brief.  I'm not sure that you
24    addressed it either, Mr. Garber, but that's certainly
25    something --

RESIDENTIAL CAPITAL, LLC, ET AL.                    163

1          MR. LEWIS:  Never a claim that has been made in this

2    proceeding.

3          THE COURT:  Well, he claimed that GMAC violated --

4    committed a RESPA violation, and he's argued that damages can

5    go back to -- can wait until the date of response.  But I'm

6    telling you that, based on my reading of the law, the failure

7    to acknowledge is a violation; I mean, in twenty days, failure

8    to acknowledge a QWR is a violation, and the loan servicer can

9    be liable for that.  So this isn't a question -- at least the

10   way of my tentative thinking is, this isn't just a question of

11   whether they had until December 26th.  They had until -- I

12   don't know, you know, assuming it's a QWR, they had until about

13   November 20th, something like that.  Okay.

14         And then I listened to the evidence carefully, and

15   they enter into a contract to sell the property in early

16   December.  Would they have gone forward if there had been some

17   acknowledgement from GMAC?  I don't know.

18         And then I must say, one of the things -- whether it's

19   actionable, what's recoverable, Stern finally gets around to

20   dismissing the foreclosure action on what, December 8th?

21         MR. LEWIS:  It's filed on December 8th, served on

22   December 2nd.

23         THE COURT:  Okay.  No, it's entered on December 8th,

24   dismissed on December --

25         MR. LEWIS:  Correct.

RESIDENTIAL CAPITAL, LLC, ET AL.                    164

1           THE COURT:  Okay.  I thought, wow, did Stern finally

2    get the message that this was supposed to be dismissed?  All I

3    can say is the payoff statement -- and it's in the servicing

4    notes; Mr. Garber went through it with Mr. Cunningham today.  I

5    mean, they made Mr. Mack pay all of Stern's fees.  They made

6    him pay the filing fee for foreclosure.  It's clear --

7    obviously, I'm not blaming you, but GMAC -- they keep these

8    rolling notes, with everybody putting in their little piece,

9    and if somebody had actually looked at them, they would have

10   seen this foreclosure never should have happened.  The Macks

11   were current; the foreclosure was filed anyway.  They tell Mrs.

12   Mack, oh, it was a mistake; it's going to be dismissed.  It

13   doesn't get dismissed until much later.  It gets dismissed, but

14   they still exact a pound of flesh.  And it may be the economic

15   loss he recovered already, okay?  I'm not -- that's not the

16   point.  But if emotional distress damages are recoverable, it

17   didn't end in December.  My point is that it doesn't

18   necessarily end on December 8th because GMAC insisted on -- in

19   its payoff statement, they just wouldn't release the lien, you

20   know?  They don't get paid under the payoff statement, they

21   don't release the lien.

22           MR. LEWIS:  Well, Your Honor, first of all, we have no

23   testimony, of any kind, about such emotional distress after

24   that date --

25           THE COURT:  Well, I think we do.

RESIDENTIAL CAPITAL, LLC, ET AL.                    165

1              MR. LEWIS:  And then --

2              THE COURT:  I think we do.  I think we most certainly

3      do, in my view.

4              MR. LEWIS:  And the second thing is, just it's worth

5      keeping in mind that the suicide attempt, there's some

6      disagreement over when that happened.

7              THE COURT:  Well, I think November --

8              MR. LEWIS:  Well, we --

9              THE COURT:  -- 10th or 11th or something like that.

10             MR. LEWIS:  -- we think earlier, but --

11             THE COURT:  Okay.

12             MR. LEWIS:  And we have some evidence that we're

13     introducing for that.

14             THE COURT:  I think -- look, a fair statement that the

15     suicide attempt clearly occurred before an acknowledgement --

16             MR. LEWIS:  Exactly.

17             THE COURT:  -- of the QWR was due.  Okay.

18             So let's assume that Mr. Garber can't successfully tag

19     GMAC for her suicide attempt.  Let's assume that for now.

20             That may -- it certainly enters in my mind about

21     trying to figure out, if I were to award damages, what those

22     damages are to be.  So the restatement of tort (second) -- so

23     there is no separate cause of action for intentional

24     interference in connection with infliction of emotional

25     distress here.  The issue is whether, under a RESPA claim,

1   noneconomic damages are recoverable.  So when you -- when I

2   look at the law on intentional infliction of emotional

3   distress, the courts never state -- set a very high bar for any

4   recovery, because it's easy for people to claim they're

5   emotionally distressed because of something bad that happened

6   to them.

7         So restatement of tort (second), Section 46, is the

8   section that -- and the commentary deals with intentional

9   infliction of emotional distress.  It makes clear it can

10  also -- and I looked at cases from a number of states,

11  primarily New York, but I looked elsewhere.  New York follows

12  the restatement, Section 46.  Recklessness is enough, okay?  It

13  doesn't -- you don't have to have an evil intent; recklessness

14  is enough.  And you want to address whether GMAC was reckless

15  in how they handled this whole mess, okay?

16        The standard is a high bar:  extreme and outrageous

17  conduct is pretty much what the standard or the conduct has to

18  be.  That's not a measure of damages.  But in order to find

19  liability, it has to be extreme and outrageous conduct; I'm

20  sure it may need somewhat longer analysis.

21        So let's assume that Mr. Garber has established that,

22  just assume, for purposes of discussion.  The issue then

23  becomes how does one figure out damages, and there are a number

24  of -- I'm not finding the restatement in here.  I sent myself

25  an e-mail attaching them.  There it is.

RESIDENTIAL CAPITAL, LLC, ET AL.                    167

1          MR. LEWIS:  While you're looking at that, Your Honor,

2     I think it's important, at least as I understand what's at

3     issue here, that it's the conduct with respect to the QWR, if

4     there was one, not the conduct with respect to the foreclosure.

5          THE COURT:  Yes, I agree there.

6          MR. LEWIS:  Okay.

7          THE COURT:  I agree completely.  Okay.

8          MR. LEWIS:  I was just a little concerned when you

9     said "this whole mess".

10         THE COURT:  I agree; it has to relate to the QWR --

11    related to acknowledge or respond to the QWR.

12         So the point about whether it's acknowledge or

13    respond, neither of which they did, where they done or not, and

14    I realize it's disputed; whether it's a QWR, I realize it's

15    disputed.  But there has to be, my term, some proximate cause

16    between what happened.

17         So here's from a New York case, "Nonpecuniary damages,

18    the key component in the tort of intentional infliction of

19    emotional distress are, by their nature, not susceptible to

20    mathematical computation."  I'm going to leave the cites out.

21    "The plaintiff's subjective testimony of pain may be sufficient

22    to establish an injury for which he or she is entitled to some

23    compensation, but the proof must satisfactorily establish that

24    the injury is more than minimal.  Verdicts awarding

25    compensatory damages will be upheld unless they can be said

RESIDENTIAL CAPITAL, LLC, ET AL.                     168

1  that the reward 'deviates materially from what would be

2  reasonable compensation'".  That's from -- the name of the cite

3  of the case --

4            MR. LEWIS:  Your Honor, if it's from the restatement,

5  we can --

6            THE COURT:  -- but it's the case --

7            MR. LEWIS:  -- we can find it.

8            THE COURT:  It's Marie, and it's -- okay, 559 N.Y.S.2d

9  336.  It's a 1990 Appellate Division Second Department

10 decision.  And I read you a short blurb from a statement quoted

11 from the case.  But the restatement sections you ought to look

12 at are 46 -- these are all from the restatement (second), of

13 course -- 46, 905, 912, 910, and 917.

14           And I was also surprised by how little law I found on

15 figuring out what damages to award.  Most of the case law is

16 about how high the bar has to be for extreme and outrageous

17 conduct.  And most of them are on motions to dismiss, sometimes

18 they're motions to set aside a verdict, but very few when a

19 jury returns a verdict for damages.

20           I looked at some jury instructions; they didn't

21 provide much guidance either.  So I agree with you, Mr. Lewis,

22 that the issue is not whether Mrs. Mack was distressed --

23 severely distressed from the wrongful foreclosure.  Yes, the

24 issue was -- but the fact that she may have had a history of

25 mental health problems can't absolve --

1           MR. LEWIS:  I understand that part of the law, Your

2     Honor.

3           THE COURT:  And --

4           MR. LEWIS:  You take your victim as you find her.

5           THE COURT:  Yeah, you take your victim as you find

6     her.

7           MR. LEWIS:  I understand that.

8           THE COURT:  And boy, it sure isn't hard to say that

9     anybody, suddenly faced with the risk of losing their home,

10    when they believe they're current on their payments -- they're

11    stretching, but they're current.  And I know you're -- I heard

12    the evidence; I clearly have it in mind that they actually put

13    their house on the market considerably before this whole thing

14    happened.  I'm certainly mindful of that.  But I guess did they

15    sell the -- did they enter into the contract in early December

16    with a gun to their head because they thought they were facing

17    imminent foreclosure?  What kind of economic damages for -- I

18    guess you put in an appraisal.  And Mr. Garber, you showed that

19    the value of the house was 300,000 dollars roughly more than

20    what they entered into the contract sale for, and you've got to

21    be worried to do that, and that was damages.

22          So I'm rambling here, but I mean, I've spent a lot of

23    time thinking about this, not deciding it.  So it's a serious

24    issue whether it's QWR.  You could say it's hard medicine, but

25    I'm bound by it.

RESIDENTIAL CAPITAL, LLC, ET AL.                    170

1           So I will be away next week, but by a week from

2    tomorrow I do want some written communication as to whether

3    you've been able to get it, and if you get it, file it with a

4    declaration authenticating it.

5           MR. LEWIS:  Would you like for us to communicate to

6    chambers when the reporter thinks the expedited transcript --

7           THE COURT:  I do.

8           MR. LEWIS:  -- will be available?

9           THE COURT:  I would.

10          Let me see whether there's any other guidance I can

11   give you.  All right.  I think I've resolved all of the

12   evidence issue.  You know what the record is before you, right?

13          Maybe I didn't say this.  The defendant's exhibits

14   that Mr. Lewis has offered are admitted except for that one

15   transcript as to which the Court pled judicial notice.   That's

16   the one where you wanted to hold Mr. Garber to the statement he

17   made; I think he wants to hold you to the statement you made.

18   (Defendant's Exhibits B, C, D, E, F, G, H, K, L, M, N, O, Q(b),

19   Q(c), R(a), R(b), T, U, W, X were hereby received into

20   evidence, as of this date.)

21          THE COURT:  Any questions?

22          MS. HIENSCH:  I have a question, Your Honor.

23          THE COURT:  Yes, go ahead.  So will you be making your

24   decision as to whether or not to hold Mr. Garber to his

25   stipulated fact before or after --

RESIDENTIAL CAPITAL, LLC, ET AL.                    171

1          THE COURT:  No, I'm not -- I'm going to make -- I'm

2     only making one decision --

3          MS. HIENSCH:  Okay.

4          THE COURT:  -- one decision.  But I just --

5          MS. HIENSCH:  So we should be briefing both of those

6     issues?

7          THE COURT:  Yeah, and just so it's clear, Mr. Garber,

8     in my view, has asked to be relieved from the stipulation

9     contained in paragraph 6 of the joint pre-trial order.  And

10    what I've indicated, ordinarily, I wouldn't even consider, at

11    this stage of a case, doing that, but in light of what I've

12    already discussed about the May 15th transcript, I'm

13    considering it.  But I also believe it would be inappropriate

14    for me to relieve Mr. Garber of the consequences of paragraph

15    26 stipulation without giving Mr. Lewis the chance to try and

16    come forward with evidence to show that the QWR address, they

17    were on notice of what it was before the October 26th letter

18    was sent.  I'm not making a decision now; I'm asking Mr. Lewis

19    to see what he can find.

20         MR. LEWIS:  I will do that, Your Honor.

21         THE COURT:  Okay?  I appreciate the efforts of both

22    sides.  The case was well prepared.  It's a difficult case.

23    You really ought to try and settle this case.  I know I've said

24    that countless times before, but I'll say it one more time;

25    that's all.

1          Okay, thanks very much.

2          MR. LEWIS:  Thank you, Your Honor.

3          THE COURT:  You can -- don't wait for me to pick up my

4     stuff.

5          MR. LEWIS:  The affidavit?

6          UNIDENTIFIED SPEAKER:  Judge, you wanted a copy of the

7     affidavit?

8          THE COURT:  Yes, I do, that you cross-examined --

9          UNIDENTIFIED SPEAKER:  I need to give you --

10         THE COURT:  -- Mr. Cunningham's -- the affidavit you

11    filed in that other case.  I had you mark it for

12    identification.

13         UNIDENTIFIED SPEAKER:  We don't have a copy of it.

14         THE COURT:  And we don't have a copy, and we'll get

15    you a copy.

16      (Whereupon these proceedings were concluded at 4:53 PM)

17

18

19

20

21

22

23

24

25

1

2                          **I N D E X**

3

4  **WITNESS**              **EXAMINATION BY**        **PAGE**

5  David Cunningham       Mr. Lewis                4

6  David Cunningham       Mr. Garber               31

7  David Cunningham       Mr. Lewis                125

8

9                            **EXHIBITS**

10 **PLAINTIFF'S**          **DESCRIPTION**          **PAGE**

11 44                     Affidavit of Mr.         43

12                        Cunningham

13 17                     Mack Mortgage            142

14 29                     Document                 142

15 14                     Letter from GMAC         142

16 18                     Document from            142

17                        Primary Mortgage

18 12                     Listing Agreement        142

19 1                      Document                 142

20 37                     Letter from GMAC         142

21 38                     8/28/09 letter           142

22 16                     8/10/09 letter           142

23 39                     9/30/09 letter           142

24 34                     10/7/09 letter           142

25 43                     10/26/09 letter          142

| | PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | 40 | 11/4/09 letter | 142 |
| 3 | 41 | 12/15/09 letter | 142 |
| 4 | 3 | Medical records | 142 |
| 5 | 13 | House sale contract | 142 |
| 6 | 24 | Lis Pendens notice | 142 |
| 7 | 5 | Voluntary dismissal | 142 |
| 8 | | notice | |
| 9 | 32 | Payoff statement | 142 |
| 10 | 26 | Settlement | 142 |
| 11 | | statement | |
| 12 | 21 | 1/14/10 letter | 142 |
| 13 | 28 | Release of mortgage | 142 |
| 14 | 8, 9 | Documents | 142 |
| 15 | 36 | GMACM and RFC | 142 |
| 16 | | contract | |
| 17 | 4 | Cheryl Mack depo | 142 |
| 18 | | Excerpts | |
| 19 | 7 | Foreclosure | 142 |
| 20 | | Complaint | |
| 21 | 2 | Dr. Lichi's Notes | 156 |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

| | DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | B | Answer and | 170 |
| 3 | | counterclaims | 170 |
| 4 | C | Final judgment | 170 |
| 5 | D | Motion to vacate | 170 |
| 6 | E | Mack response to | 170 |
| 7 | | Motion to vacate | 170 |
| 8 | F | Final order | 170 |
| 9 | G | Purged loan notes | 170 |
| 10 | H | October 26th, 2009 | 170 |
| 11 | | letter | |
| 12 | K | Docket sheet | 170 |
| 13 | L | Response to | 170 |
| 14 | | Objection | |
| 15 | M | Memorandum opinion | 170 |
| 16 | N | Transcript | 170 |
| 17 | O | Mortgage statement | 170 |
| 18 | Q(b) and Q(c) | Excerpts | 170 |
| 19 | | from Dr. Lichi's | |
| 20 | | medical notes | |
| 21 | R(a) and R(b) | Excerpts | 170 |
| 22 | | from Dr. Lichi's | |
| 23 | | medical notes | |
| 24 | | | |
| 25 | | | |

| | DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | T | Excerpts | 170 |
| 3 | | from Dr. Lichi's | |
| 4 | | medical notes | |
| 5 | U | Excerpts | 170 |
| 6 | | from Dr. Lichi's | |
| 7 | | medical notes | |
| 8 | W | Excerpts | 170 |
| 9 | | from Mr. Mack's | |
| 10 | | deposition | |
| 11 | X | Fax dismissal | 170 |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

177

1

2                          C E R T I F I C A T I O N

3

4     I, Penina Wolicki, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6

7

8

9

10

11     _____

12     PENINA WOLICKI

13     AAERT Certified Electronic Transcriber CET**D-569

14

15     eScribers

16     700 West 192nd Street, Suite #607

17     New York, NY 10040

18

19     Date:  June 15, 2015

20

21

22

23

24

25