MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Todd M. Goren
Jamie A. Levitt
Meryl L. Rothchild

*Counsel to The ResCap Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ---------------------------------------------------------- ) | | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ---------------------------------------------------------- ) | | |

**THE RESCAP LIQUIDATING TRUST'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION TO OCWEN LOAN SERVICING, LLC'S REVISED CLAIM NOTICE <u>CONCERNING THE SERVICING ADVANCES CLAIM</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND .......................................................................................................................4

    A. The APA ..........................................................................................................................4

    B. The Plan and Confirmation Order............................................................................6

    C. Ocwen's Claims ............................................................................................................7

JURISDICTION ......................................................................................................................12

ARGUMENT ...........................................................................................................................12

I.     THE APA BARS OCWEN FROM ASSERTING INDEMNIFICATION
     CLAIMS FOR ALLEGED BREACHES OF CORE REPRESENTATIONS
     POST-TERMINATION DATE......................................................................................12

II.    OCWEN IMPROPERLY REVISED THE SERVICING ADVANCES CLAIM
     THROUGH THE REVISED CLAIM NOTICE ..........................................................15

    A.     Ocwen Fails to Meet the Second Circuit's Standards for Amending an
           Administrative Expense Claim.............................................................................15

         1.     Ocwen's New Servicing Advance Claims Do Not Relate Back to
               the Claims Included in the Initial Claim Notice ......................................17

         2.     The Trust Would Be Unduly Prejudiced if the Court Permits
               Ocwen's Untimely Amendment to the Servicing Advances Claim .........17

         3.     Equitable Factors Weigh Against Permitting Ocwen's Amendment
               to the Servicing Advances Claim ............................................................18

    B.     Ocwen's New Claims Are Barred by the Doctrine of Equitable Estoppel...........20

NOTICE ...................................................................................................................................22

CONCLUSION .......................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Babitt v. Citibank, N.A. (In re Vebeliunas)*,
   332 F.3d 85 (2d Cir. 2003) ................................................................................ 20

*Farricker v. Penson Dev., Inc.*,
   513 Fed. Appx. 46 (2d Cir. 2013) ..................................................................... 19

*In re Enron Creditors Recovery Corp.*,
   370 B.R. 90 (Bankr. S.D.N.Y. 2007) ................................................................ 18

*Integrated Res., Inc. v. Ameritrust Co. Nat'l Ass'n (In re Integrated Res., Inc.)*,
   157 B.R. 66 (S.D.N.Y. 1993) ............................................................................ 18

*Keady v. Nike, Inc.*,
   116 F. Supp. 2d 428 (S.D.N.Y. 2000), *aff'd in part, vacated in part and remanded on
   other grounds*, 23 Fed. Appx. 29 (2d Cir. 2001) .............................................. 19

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
   274 F.3d 706 (2d Cir. 2001) .............................................................................. 20

*LaBarbera v. Audax Constr. Corp.*,
   971 F. Supp. 2d 273 (E.D.N.Y. 2013) .............................................................. 19

*Mich. Funds Admin. v. DPH Holdings Corp. (In re DPH Holdings Corp.)*,
   494 Fed. Appx. 135 (2d Cir. 2012) ................................................................... 16

*Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.)*,
   419 F.3d 115 (2d Cir. 2005) ................................................................ 16, 17, 18

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The ResCap Liquidating Trust (the "Trust"), established pursuant to terms of the

Plan[1] confirmed in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), as successor

in interest to the Debtors, respectfully submits this memorandum of law (this "Memorandum")

and requests that the Court resolve this matter in its favor.  The Trust respectfully represents as

follows:

## PRELIMINARY STATEMENT

1.    Over 14 months **after** the deadline in the APA to bring claims and **after** briefing

had been completed on objections to Ocwen's Administrative Claims, Ocwen served a notice on

the Trust purporting to assert claims on an entirely new set of Servicing Advances.  Other than a

de minimis number of advances, these new advances had not been the subject of any prior notice

to, or communication with, the Trust.  Ocwen's attempt to bring new claims at this late stage is

improper under the APA, equity and other applicable law.

2.    The APA governing the Debtors' sale of assets includes a very specific and

limited defined set of "Core Representations" that would survive the closing of the Sale.[2]  *See*

APA § 1.1.  However, the APA correspondingly required Ocwen to bring any claim for breach

of these Core Representations within one year following the Closing Date (the "Termination

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms below or as set forth
in the APA, the Sale Order, the Plan, the Confirmation Order or the SoF, as applicable.

[2] "Core Representations" is a term defined in the APA as: (i) Section 4.4(a) (Financial Statements); (ii) Section 4.5
(Absence of Certain Changes or Events); (iii) Section 4.6 (Title to Assets); (iv) Section 4.7 (Purchased Assets Used
in the Business); (v) Section 4.8 (Real Property Leases), limited to the first sentence thereof and clause (ii) of the
third sentence thereof; (vi) Section 4.9(a)-(e) (Mortgage Servicing Portfolio; Servicing Agreements; the Business);
(vii) Section 4.10 (Material Contracts), limited to the first two sentences thereof; (viii) Section 4.14 (Litigation and
Claims), limited to clause (ii) thereof; (ix) Section 4.15 (Intellectual Property), limited to subsection (a) and, with
respect to any IP rights included with the Transferred IT Assets, subsection (c); and (x) Section 4.17 (Ginnie Mae
Loans).

Date"), and the representations and warranties expire with respect to any asset that was not subject to a claim by such date.

3.      Simply put, the APA bars Ocwen from revising the Servicing Advances Claim to include additional assets not previously identified by Ocwen on or before the Termination Date. Section 11.1(b) of the APA clearly and explicitly provides that no new indemnification claims relating to alleged breaches of "Core Representations" may be asserted after the Termination Date.  Section 11.1(b) also provides that the Sellers' indemnification obligations end on the Termination Date and shall continue beyond that date only as to any Loss Ocwen notified ResCap of on or prior to the Termination Date.   Because Ocwen only notified the Trust of Losses with respect to a specific, defined set of Servicing Advances in the Initial Claim Notice, Ocwen's attempt to expand that notice to include *new* Servicing Advances is barred by the APA.

4.      In addition to being barred by the APA, the revised Servicing Advances Claim also constitutes an improper amendment to Ocwen's Administrative Claim.  Ocwen's Administrative Claim Request clearly and explicitly asserted claims for breaches of the APA. Having chosen to file an Administrative Claim that covers alleged breaches of the APA like the Servicing Advances Claim, Ocwen waited until after briefing was complete on the Trust's objection to Ocwen's Administrative Claim Requests to amend the Servicing Advances Claim to bring claims on a brand new set of Servicing Advances.  As each Servicing Advance is a distinct asset, so, too, is the claim associated with such Servicing Advance; accordingly, the thousands of new claims asserted against the Debtors' estates do not relate back to the distinct Servicing Advance Claims originally listed as part of the Initial Claim Notice (save 12 loans with alleged Losses amounting to approximately $63,691.94 that were asserted in both the Initial Claim

-2-

Notice and the Revised Claim Notice).  As a result, Ocwen should be denied leave to amend the Servicing Advances Claim.

5.       Additionally, equitable considerations prevent Ocwen from revising the Servicing Advances Claim through the Revised Claim Notice at this late date.  Ocwen waited until *over 14 months* after both the Administrative Claim Bar Date and the Termination Date to submit the Revised Claim Notice containing the newly identified Servicing Advances that constitute the most current iteration of the Servicing Advances Claim.  Despite possessing all the loan information transferred to it as part of the Sale, Ocwen failed to identify in its Initial Claim Notice substantially all of the Servicing Advances it now claims are defective.  In fact, only *12 loans* listed on the Initial Claim Notice made their way onto the Revised Claim Notice; the remaining thousands of Servicing Advances listed on Exhibit A to the Revised Claim Notice are entirely new Servicing Advances brought to the Trust's attention not earlier than April 29, 2015.  Ocwen can find no reason to justify this delay when it held all the information.

6.       Moreover, permitting an amendment to Ocwen's Administrative Claim would, among other things, unduly prejudice the Debtors' estates.  Not only would it reset the litigation with respect to the Servicing Advances Claim back to "square one," such a result would require the Trust to expend considerable time and resources resolving the claim and cause a delay in the Trust's ability to distribute undisputed escrowed funds to creditors with Allowed Claims.  This result, too, would require the Court to expend its time and resources resolving this claim following a potentially lengthy evidentiary hearing.

7.       For the reasons stated in this Memorandum, and as demonstrated below, the Servicing Advances Claim asserted by Ocwen cannot be revised at this late date through the Revised Claim Notice, and the Trust has no obligation to indemnify Ocwen in connection

therewith.  Any claims with respect to new Servicing Advances incorporated therein should be
disallowed by the Court.

## BACKGROUND

8.     On May 14, 2012, each of the debtors in the Chapter 11 Cases (collectively, the
"<u>Debtors</u>") filed a voluntary petition in this Court for relief under chapter 11 of title 11 of the
United States Code.  (*Joint Statement of Stipulated and Undisputed Facts* [Docket No. 8762]
("<u>SoF</u>") ¶ 1.)  These Chapter 11 Cases are being jointly administered pursuant to Rule 1015(b) of
the Federal Rules of Bankruptcy Procedure.

### A.     <u>The APA</u>

9.     On November 2, 2012, Ocwen and the Debtors entered into the Asset Purchase
Agreement, as amended from time to time (the "<u>APA</u>")[3] pursuant to which certain of the Debtors
sold substantially all of their mortgage servicing assets, and corresponding rights and obligations,
to Ocwen (the "<u>Sale</u>").  (SoF ¶ 2.)  The Sale to Ocwen closed on February 15, 2013.  (*Id.*)

10.    The APA defines "Servicing Advances" to mean (emphasis added):

> ***[W]ith respect to each Agency Loan, Private Investor Loan or Other Serviced
> Loan***, the aggregate outstanding amount that, as of any date of determination, has
> been advanced directly by Sellers from their own funds or from funds advanced
> ***under any loan facility*** (but not with funds borrowed from any custodial or other
> accounts under a Servicing Agreement) in connection with servicing (including
> master servicing) of such Mortgage Loans in accordance with the applicable
> Servicing Agreements for which Sellers have a right of reimbursement under the
> applicable Servicing Agreement . . . .

11.    The APA includes as a "Core Representation" Section 4.9(c) (Mortgage Servicing
Portfolio; Servicing Agreements; the Business), which provides, in relevant part (emphasis
added):

---

[3] A copy of the APA is attached to the SoF as <u>Exhibit A</u>.

(c) Servicing Advances. . . . ***Each Servicing Advance*** is a valid and subsisting amount owing to a Seller, made in accordance with and payable at the times and in accordance with the provisions of the applicable Servicing Agreement, and is a legal, valid and binding reimbursement right, and is enforceable against such securitization trust or owner in accordance with its terms, and is not subject to any Claims, defenses or set-off arising from acts or omissions of the Sellers that could be asserted against Purchaser. ***Each Servicing Advance*** is entitled to be paid, has not been repaid in whole and has not been compromised, adjusted (except by partial payment), extended, satisfied, subordinated, rescinded, amended or modified. . . .

12.    The APA includes several key provisions, including Section 11.1 (Indemnification by Sellers), which provides for the Purchaser's sole remedy for a breach or inaccuracy of the Core Representations. This provision provides, in relevant part, that each Seller under the APA agrees to indemnify, among others, Ocwen from any and all Losses incurred by such party "in connection with or arising from any breach of any Core Representations or the inaccuracy of any Core Representations . . . ."  APA § 11.1(a).  (SoF ¶ 3.)

13.    Section 11.1(b) of the APA imposes a one-year time bar on the Sellers' indemnification obligations provided for in Section 11.1(a).  Specifically, such obligations:

> *. . . shall terminate on the earlier of one year after the Closing Date and the entry of a Final Order closing the Bankruptcy Case (the "*<u>*Termination Date*</u>*") (and no claims shall be made by any Purchaser Group Member under Section 11.1(a) after the Termination Date)*, except that the indemnification by Sellers shall continue as to any Loss of which any Purchaser Group Member has notified ResCap in accordance with the requirements of Section 11.2 on or prior to the Termination Date, as to which the obligation of Sellers shall continue until the liability of Sellers shall have been determined pursuant to this Article XI, and Sellers shall have reimbursed all Purchaser Group Members for the full amount of such Losses in accordance with this Article XI.

APA § 11.1(b) (emphasis added).  (SoF ¶ 4.)

14.    Section 11.2(a) of the APA provides that any party seeking indemnification under the section shall give to the relevant indemnifying parties "a notice (a "<u>Claim Notice</u>") describing ***in reasonable detail*** the facts giving rise to any claim for indemnification hereunder

and shall include in such Claim Notice (if then known) the amount or the method of computation

of the amount of such claim…." APA § 11.2(a) (emphasis added).  (SoF ¶ 5.)

15.    Section 11.6 (Survival) of the APA provides that all of the parties'

representations, warranties, and covenants, other than "Core Representations," expire on the

Closing Date, i.e., February 15, 2013.  APA § 11.6.  Section 11.6 further provides that the Core

Representations survive for one year past the Closing Date, as provided in Section 11.1(b).  *Id.*

16.    Section 11.7 of the APA (Exclusive Remedy) provides that, except in the case of

fraud:

> [T]he sole and exclusive remedy of any Purchaser Group Member in connection
> with any breach of any Core Representations . . . contained or referred to in this
> Agreement or in any certificate delivered by or on behalf of Sellers pursuant
> hereto, whether under this Agreement or arising under common law or any other
> Law, shall be provided in this Article XI.

### B.    The Plan and Confirmation Order

17.    On December 11, 2013, the Court entered the *Order Confirming Second Amended

Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of

Unsecured Creditors* approving the terms of the chapter 11 plan, as amended (the "Plan"), filed

in the Chapter 11 Cases [Docket No. 6065] (the "Confirmation Order").  (SoF ¶ 6.)  On

December 17, 2013, the effective date of the Plan occurred and, among other things, the Trust

was established [Docket No. 6137].  (*Id.*)

18.    The Confirmation Order required holders of purported Administrative Claims (as

such term is defined in the Plan, Art. I.A.4) to file their "requests for the payment of such

Administrative Claims not already Allowed by Final Order in accordance with the procedures

specified in the Confirmation Order, on or before the first Business Day that is thirty (30) days

following the Effective Date. . . ."  *See* Confirmation Order ¶ 50(f).  The Confirmation Order

provided that the APA "shall vest in the Liquidating Trust in accordance with the Plan and the

Sale Order" and that "[n]othing in the Plan Documents or this Confirmation Order shall, or shall

. . . alter . . . the terms and provisions of the Ocwen APA and Ocwen's, the Debtors', and the

Liquidating Trust's rights, as applicable, thereunder. . . ." *See id.* ¶ 31.  (SoF ¶ 8.)  In addition,

"Ocwen shall not be required to file an Administrative Claim to preserve its rights or Claims

arising after the Effective Date from or related to the Ocwen APA."  *See id.*

19.    In addition, on the Effective Date, in accordance with the Plan, the Debtors filed

the *Notice of Entry of the Confirmation Order Confirming the Second Amended Joint Chapter 11*

*Plan Proposed by the Residential Capital, LLC, et al. and the Official Committee of Unsecured*

*Creditors and Occurrence of the Effective Date* [Docket No. 6137], which set ***January 16, 2014***

as the deadline by which holders of Administrative Claims could file requests for payment of

such purported claims (the "<u>Administrative Claim Bar Date</u>").[4]  (*See* Plan, Art.V.A.1; *see also*

SoF ¶ 7.)  Thereafter, potential claimants and other parties in interest received the *Notice of*

*Deadline and Procedures for Filing Certain Administrative Claims* [Docket No. 6138], which

provided the procedures for filing Administrative Claims.

### C.    <u>Ocwen's Claims</u>

20.    On January 16, 2014, Ocwen filed requests for payment of administrative expense

claims [Docket Nos. 6296 and 6297] (collectively, the "<u>Administrative Claim Requests</u>").  (SoF

¶ 9.)  One Administrative Claim Request asserted a contingent unliquidated claim for any

breaches of the APA and reserved rights to enforce the APA, including for any breaches of

Section 4.9 (Mortgage Servicing Portfolio; Servicing Agreements; the Business) thereof, the

very section Ocwen relies on for its Servicing Advance Claim.  (*Id.*)

---

[4] The Confirmation Order provides that "holders of Administrative Claims that arose prior to the Effective Date (other than holders of Administrative Claims paid in the ordinary course of business . . .) must File and serve . . . requests for the payment of such Administrative Claims not already Allowed by Final Order . . . ."  Confirmation Order ¶ 50(f).

21.     On February 14, 2014, within the time period specified in Section 11.1(b) of the

APA, Ocwen sent a letter to the Trust providing notice of various asserted indemnification

claims (the "Initial Claim Notice"), relating to alleged breaches of the Core Representations,

including an alleged breach of Section 4.9 (Mortgage Servicing Portfolio; Servicing Agreements;

the Business) of the APA relating to certain Servicing Advances (each a "Servicing Advance

Claim" and, collectively, the "Servicing Advances Claim").  (*See* SoF ¶ 10; *see also* Initial Claim

Notice ¶ 2.)  This claim arises in connection with alleged Losses from certain Servicing

Advances conveyed to Ocwen pursuant to the APA.  In the Initial Claim Notice, Ocwen asserted

that it incurred "Losses currently estimated in the amount of at least $2,211,962.17 in connection

with ***certain*** Servicing Advances that were conveyed to Ocwen pursuant to the APA." (*Id.*

(emphasis added).)  The notice alleged that the representations in Section 4.9 of the APA were

breached because ***the applicable*** Servicing Advances (which were specifically listed in Exhibit A

to the Initial Claim Notice) were not valid and subsisting amounts and were not legal, valid and

binding reimbursement rights.  (*Id.*)  A copy of the Initial Claim Notice is attached to the SoF as

Exhibit B.

22.     Thus, the Initial Claim Notice, as was required by the APA, did not assert a claim

as to ***all*** Servicing Advances.  Rather, it asserted a claim as to "certain" Servicing Advances and

attached a list of the "applicable" Servicing Advances as to which Ocwen was asserting a claim.

23.     On May 21, 2014, the Trust emailed Ocwen, requesting additional information in

connection with the Servicing Advances Claim.  (SoF ¶ 11.)  A copy of this email is attached to

the SoF as Exhibit C.

24.     On June 4, 2014, Ocwen responded to the Trust's May 21, 2014 email to inform

the Trust that Ocwen was working on responses to the Trust's requests for information relating

to Ocwen's asserted indemnification claims and administrative expense claims, including, but

not limited to, the Servicing Advances Claim.  (SoF ¶ 12.)  A copy of this email is attached to the

SoF as Exhibit D.

25.      On August 20, 2014, the Trust emailed a letter to Ocwen setting forth the Trust's

positions on Ocwen's asserted claims, including Ocwen's claim related to the Debtors' alleged

breach of Section 4.9 (Mortgage Servicing Portfolio; Servicing Agreements; the Business) of the

APA as to the "certain" Servicing Advances identified by Ocwen in the Initial Claim Notice.

(SoF ¶ 13.)  The Trust requested additional detail regarding (i) why each advance had been

deemed uncollectible and (ii) how the purported uncollectibility rendered the Debtors in breach

of a specific Core Representation of the APA.  (*Id.*)

26.      The parties also exchanged various communications, by email and telephone,

relating to the Initial Claim Notice including regarding the Servicing Advances Claim.  (SoF

¶ 14.)  On or about February 11, 2015, Ocwen and the Trust participated in a conference call

regarding the Initial Claim Notice and the Administrative Claim Request at which time the Trust

again requested detail on a loan-by-loan basis of each alleged Servicing Advance Claim asserted

in the Initial Claim Notice.  (*Id.*)

27.      Ocwen committed to performing a review to provide additional detail on a

loan-by-loan basis as to why the certain Servicing Advances it brought claims on were alleged to

be not legal, valid and binding reimbursement rights.  (SoF ¶ 15.)

28.      On February 13, 2015, the Trust filed an objection to the Administrative Claim

Requests with respect to certain of the remaining claims not previously withdrawn by Ocwen

[Docket No. 8129] (the "Objection"), including the Servicing Advances Claim.  (SoF ¶ 16.)  The

Trust's Objection as related to the Servicing Advances Claim centered primarily on Ocwen's

complete failure to substantiate its claim.  On March 13, 2015, Ocwen filed a response to the

Objection [Docket No. 8301], pursuant to which Ocwen withdrew all of its remaining

Administrative Claims other than the claim referred to as the "Secure Axcess claim" and the

Servicing Advances Claim.  (*Id.*)  In its response, Ocwen also argued that the Servicing

Advances Claim, which was detailed in the Initial Claim Notice, was not included in or part of

its Administrative Claim Requests and not properly adjudicated pursuant to the administrative

claim process.  (*Id.*)  On April 3, 2015, the Trust filed its reply in support of its Objection

[Docket No. 8421] in which the Trust continued to argue that the Servicing Advances Claim had

not been substantiated, was properly before the Court and should therefore be disallowed.  (*Id.*)

29.    On March 25, 2015, the Trust emailed Ocwen a letter requesting the release of

undisputed funds from the Indemnity Escrow Account, which letter relied on Ocwen's then

asserted $2,211,962.17 Servicing Advances Claim.  (SoF ¶ 17.)  A copy of this letter is attached

to the SoF as Exhibit E.

30.    On April 29, 2015, *after* the parties had briefed their respective positions in

connection with the Administrative Expense Requests, Ocwen sent to the Trust a revised claim

notice (the "Revised Claim Notice") in which it withdrew the Secure Axcess claim and asserted

Losses in connection with Servicing Advances in the amount of $12,054,975.55 as set forth in

more detail in the Revised Claim Notice, including on Exhibit A to the Revised Claim Notice.[5]

(SoF ¶ 18.)  A copy of the Revised Claim Notice is attached to the SoF as Exhibit F.

---

[5] The Trust disputes whether amounts set forth on Exhibit A to the Initial Claim Notice and the Revised Claim Notice, respectively, are comprised solely of Servicing Advances as defined in the APA.  Nothing herein shall be deemed to constitute an admission that such amounts constitute Servicing Advances, and the Trust fully reserves its rights to address this issue and all related issues in any subsequently filed submissions to the Court.  (SoF n.4.)

31.     The vast majority of loans identified on the Revised Claim Notice were not
included in the Initial Claim Notice.  (*Compare* Ex. A of SoF <u>Exhibit B</u> *with* Ex. A of SoF
<u>Exhibit F</u>.)  Exhibit A to the Revised Claim Notice, which purported to list each Servicing
Advance Claim, only included ***12 loans*** that were included in Exhibit A to the Initial Claim
Notice; the remainder of the asserted Losses consists of Servicing Advances on newly identified
loans not identified on Exhibit A to the Initial Claim Notice.[6]  (SoF ¶ 19.)  The alleged Losses set
forth in the Revised Claim Notice with respect to the 12 loans were $63,691.94.  (*Id.*)  The
parties are continuing to reconcile the amount of alleged Servicing Advances with respect to
these 12 loans in the Initial Claim Notice.  (*Id.*)  A list of the 12 loans together with the total
amount of alleged Servicing Advances claimed in the Revised Claim Notice with respect to such
loans is attached to the SoF as <u>Exhibit G</u>.

32.     On June 1, 2015, subsequent to a status conference held on May 14, 2015 before
the Court concerning the issues raised in connection with the Revised Claim Notice, the Trust
and Ocwen submitted the *Stipulation and Order Between the ResCap Liquidating Trust and
Ocwen Loan Servicing, LLC Regarding the Servicing Advances Dispute* [Docket No. 8673] (the
"<u>Stipulation</u>") to set forth the parties' agreement as to how to litigate the Servicing Advances
dispute.  Pursuant to the Stipulation, the parties agreed to bifurcate the issues and to address the
revision to the Initial Claim Notice (i.e., whether Ocwen has the right to revise the Servicing
Advances Claim through the Revised Claim Notice) primarily.  Additionally, the parties reserved
all rights with respect to any briefing on related issues, including as to whether the Servicing
Advances Claim was part of Ocwen's Administrative Claim Requests.  *See* Stipulation at 3.  The

---

[6] Upon information and belief, the Trust believes that the balance of Servicing Advances asserted in the Initial Claim Notice, which were not also asserted in the Revised Claim Notice, were satisfied in the ordinary course of business.

Stipulation provided for a proposed briefing schedule in connection with the initial phase of the litigation.  *Id.* at 4.

33.    On June 16, 2015, pursuant to the Stipulation, the Trust and Ocwen submitted the SoF to the Court.

## JURISDICTION

34.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## ARGUMENT

### I.    THE APA BARS OCWEN FROM ASSERTING INDEMNIFICATION CLAIMS FOR ALLEGED BREACHES OF CORE REPRESENTATIONS POST-TERMINATION DATE.

35.    Ocwen's attempt to assert claims as to new Servicing Advances (not identified in the Initial Claim Notice) is not permitted by the APA.  Section 11.1(b) of the APA imposes a Termination Date—one year from the Closing Date of the Sale, i.e., February 15, 2014—by which Ocwen must assert any and all indemnification claims for alleged breaches of Core Representations under Section 11.1(a).  *See* APA § 11.1(b).  The APA expressly states that "no claims shall be made by [Ocwen] under Section 11.1(a) after the Termination Date."  *Id.*

36.    The indemnification obligations of the Debtors (or the Trust, as applicable) expire on the Termination Date and only extend as to those claims Ocwen provided notice to the Debtors (or the Trust) "***on or prior to the Termination Date***" until, and to the extent, the Debtors' potential liability is determined with respect to such claims.  *See* APA § 11.1(b) (emphasis added); *see also id.* § 11.6 (providing that Core Representations survive for one year past the Closing Date, as provided in Section 11.1(b)).  The Trust's indemnification obligations do not extend post-Termination Date as to any indemnification claims ***not raised*** by Ocwen by

the Termination Date.  While the APA permits Ocwen to determine its Losses as to previously

identified claims, it does not allow Ocwen to assert entirely new claims after the Termination

Date.

37.    Each Servicing Advance is an individual asset (SoF ¶¶ 6-7).  Specifically, the

APA defines Servicing Advances as "with respect to **each Agency Loan, Private Investor Loan**

**or Other Serviced Loan**, the aggregate amount that . . . has been advanced . . . under any loan

facility . . . ."  *See* APA § 1.1 (emphasis added).  Likewise, Section 4.9(c), describing the "Core

Representation" concerning Servicing Advances, defines and treats "Servicing Advances" on an

individual basis.  *See* APA § 4.9(c) (representing that Sellers delivered to Purchaser electronic

files "that set forth the amount of **each Servicing Advance**" where information is shown on a

loan-by-loan basis, and representing that "*[e]ach Servicing Advance* is a valid and subsisting

amount owning to a Seller, made in accordance with and payable at the times and in accordance

with the provisions of the applicable Servicing Agreement") (emphasis added).  Thus, the

Debtors' representation with respect to "each Servicing Advance" is a separate representation as

to the aggregate amount outstanding under **each applicable loan**.  As a result, to the extent

Ocwen asserts a breach of the representations concerning Servicing Advances, it must identify

each such Servicing Advance that it believes does not comply with the representations in the

APA (and why).

38.    Recognizing this fact, the Initial Claim Notice, as was required by the APA, did

not assert a claim as to **all** Servicing Advances in the aggregate.  Rather, it asserted a claim as to

the "certain" Servicing Advances that Ocwen believed did not comply with the APA, with an

Exhibit A attached that listed all of the "applicable" Servicing Advances as to which Ocwen was

asserting a claim.  *See* SoF Exhibit B at 2.  Given that the Debtors made representations to each

-13-

Servicing Advance transferred to Ocwen as part of the Sale, Ocwen had the right to include a list

of *all* individual Servicing Advances, if it had grounds to do so; however, Ocwen did not include

each and every Servicing Advance in its Initial Claim Notice.  Consequently, Ocwen's Servicing

Advances Claim—and the Trust's indemnification obligation with respect to each Servicing

Advance—is limited to only those Servicing Advances identified as of the Termination Date in

the Initial Claim Notice.

      39.     Further, the APA not only requires Ocwen to identify each Servicing Advance to

which it asserts a claim, Ocwen is required to also identify each claim "in reasonable detail."

*See* APA §§ 11.1(b), 11.2.  Ocwen, in only listing on Exhibit A to the Initial Claim Notice each

applicable Servicing Advance and the alleged Loss amount in connection with each, failed to

provide the requisite level of detail in the Initial Claim Notice or Exhibit A thereto by the

Termination Date, as required by the APA.[7]  *See* Ex. A to SoF Exhibit B.  Additionally, nowhere

in the Initial Claim Notice did Ocwen purport to notify the Trust that Ocwen may have Servicing

Advance Claims as to Servicing Advances beyond those "applicable" ones listed on Exhibit A.

For these reasons, any Servicing Advance Claim beyond those included in the Initial Claim

Notice is barred.

      40.     Finally, the purported Revised Claim Notice—*submitted over 14 months after*

*the Termination Date*—consisted of almost an entirely new set of Servicing Advances that

Ocwen sought to include as part of the Servicing Advances Claim.  *Only 12 loans included on*

*Exhibit A to the Initial Claim Notice were also included in Exhibit A to the Revised Claim*

*Notice*, which purported to list each Servicing Advance Claim against the Debtors' estates.  (SoF

---

[7] Nor did Ocwen subsequently provide this detail despite numerous requests for such information from the Debtors
and the Trust, respectively.  *See* SoF ¶¶ 13-17.

¶ 19.)  The alleged Losses set forth in the Revised Claim Notice with respect to those 12 loans

were $63,691.94.   Thus, in the Revised Claim Notice, Ocwen asserted nearly $12 million in

entirely new claims with respect to Servicing Advances that Ocwen had never identified as

defective until the Revised Claim Notice.  (*See id.*; *see also* SoF Exhibit G.)  Under the clear and

unambiguous terms of the APA, Ocwen's claim is therefore limited to at most the $63,691.94 in

Servicing Advances that relate to loans identified in the Initial Claim Notice.  The Trust has no

obligation to indemnify Ocwen for any new claims raised after February 15, 2014, which include

these newly identified Servicing Advances.  *See* APA §§ 11.1(b), 11.6.

## II.    OCWEN IMPROPERLY REVISED THE SERVICING ADVANCES CLAIM THROUGH THE REVISED CLAIM NOTICE.

41.    Even if Ocwen could arguably assert a new claim under the APA, which for the

reasons stated above it cannot, it should be barred under applicable law from amending its

Servicing Advances Claim at this late date for the reasons set forth below.

### A.    Ocwen Fails to Meet the Second Circuit's Standards for Amending an Administrative Expense Claim

42.     On January 16, 2014, Ocwen filed the Administrative Claim Requests, which

included requests for payment on account of asserted claims that purportedly arise under the

APA and the Sale Order, including a contingent, unliquidated claim for any breach of the APA.

*See* SoF ¶ 9.  The Administrative Claim Requests also included a reservation of rights with

respect to any breaches of the Core Representations related to Section 4.9 (Mortgage Servicing

Portfolio; Servicing Agreements; the Business) of the APA.  *See id.*  Although Ocwen made no

explicit reference to Servicing Advances in the Administrative Claim Requests, the Servicing

Advances Claim alleged in the Initial Claim Notice was clearly contemplated by the

Administrative Claim Requests (which predate the notice) as Ocwen asserted an Administrative

Claim for any breaches of the APA.  Accordingly, the Trust treated the Servicing Advances

-15-

Claim as incorporated in the Administrative Claim Requests to ensure the full and fair resolution

of Ocwen's claims against the Debtors' estates.  As Ocwen asserted its claims as part of the

Chapter 11 Cases' claims reconciliation process by filing the Administrative Claim Requests, the

Servicing Advances Claim is subject to the Second Circuit's rules that govern the amendment of

such claim.

43.     Ocwen's attempt to amend the Servicing Advances Claim does not meet the

standards that courts in the district apply when determining whether to allow post-bar date

amendments to administrative expense claims.  *See generally Mich. Funds Admin. v. DPH*

*Holdings Corp. (In re DPH Holdings Corp.)*, 494 Fed. Appx. 135 (2d Cir. 2012) (applying

Federal Rule of Bankruptcy Procedure 7015 and the Second Circuit's *Enron* test (described

below) to determine whether a post-bar date amendment to a claim for payment of administrative

expenses under section 503 is appropriate); *see also Midland Cogeneration Venture Ltd. P'ship*

*v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 133 (2d Cir. 2005) (describing a two-step

inquiry to consider allowing a post-bar date amendment: (i) whether the amendment "relates

back" to a timely filed claim; and (ii) whether allowing the amendment would, among other

things, unduly prejudice the opposing party).  The "relation back" inquiry considers whether the

purported amendment to a claim "1) corrects a defect of form in the original claim; 2) describes

the original claim with greater particularity; or 3) pleads a new theory of recovery on the facts set

forth in the original claim."  *Id.* (quoting *In re McLean Indus., Inc.*, 121 B.R. 704, 708 (Bankr.

S.D.N.Y. 1990)).

1.     *Ocwen's New Servicing Advance Claims Do Not Relate Back to the
Claims Included in the Initial Claim Notice*

44.     First, the Revised Claim Notice does not correct a defect of form in either the

Administrative Claim Requests or the Initial Claim Notice.  The Servicing Advances Claim was

raised at least as early as the Administrative Claim Bar Date in proper form, i.e., a request filed
with the Court pursuant to 11 U.S.C. § 503, and prior to the Termination Date set forth in the
APA, albeit missing supporting documentation and/or sufficient evidence to substantiate each
Servicing Advance Claim on a loan-by-loan basis, as was required by the APA.

45.     Second, the content of the revised Servicing Advances Claim, in substance, does
not describe the original claim[s] with greater particularity (*In re Enron Corp.*, 419 F.3d at 133).
Here, Ocwen's "amendment" of the Servicing Advances Claim is only an amendment with
respect to the 12 loans that appear on both Exhibit A to the Initial Claim Notice and the Revised
Claim Notice; the thousands of other claims included as part of the Revised Claim Notice are
***entirely new*** Servicing Advance Claims not previously raised to the Trust.  Accordingly, Exhibit
A to the Revised Claim Notice only describes with "greater particularity" those 12 loans.

46.     Third, the Revised Claim Notice does not adequately plead a new and valid theory
of recovery on the facts set forth in either the Administrative Claim Requests or the Initial Claim
Notice.  It maintains the same exact theory asserted in the Administrative Claim Requests and
the Initial Claim Notice:  that the Servicing Advances Claim is based on an alleged breach of
Section 4.9 of the APA.

2.     *The Trust Would Be Unduly Prejudiced if the Court Permits Ocwen's
Untimely Amendment to the Servicing Advances Claim*

47.     Permitting an amendment to Ocwen's Administrative Claim would also unduly
prejudice the Debtors' estates because it would set the litigation with respect to the Servicing
Advance Claim back to "square one" and require the Trust to expend considerable time and
resources resolving the Servicing Advances Claim.  Moreover, the entire $21 million escrow
from the Sale remains in the Indemnity Escrow Account, out of reach of the Trust, and
unavailable for distribution to creditors as a result of the Revised Claim Notice.  Were it not for

the Revised Claim Notice, there is little doubt that a substantial portion of the undisputed

escrowed funds could now be released.

       3.    *Equitable Factors Weigh Against Permitting Ocwen's Amendment to the
Servicing Advances Claim*

    48.    Courts consider the following five equitable factors in determining whether to

allow an amendment:

> (1) undue prejudice to opposing party; (2) bad faith or dilatory behavior on the
> part of the claimant; (3) whether other creditors would receive a windfall were the
> amendment not allowed; (4) whether other claimants might be harmed or
> prejudiced; and (5) the justification for the inability to file the amended claim at
> the time the original claim was filed.

*Integrated Res., Inc. v. Ameritrust Co. Nat'l Ass'n (In re Integrated Res., Inc.)*, 157 B.R. 66, 70

(S.D.N.Y. 1993) (citation omitted); *see also In re Enron Corp.*, 419 F.3d at 133. "The critical

consideration is whether the opposing party will be unduly prejudiced by the amendment."

*In re Integrated Res., Inc.*, 157 B.R. at 70 (citation omitted). The Trust "would be unduly

prejudiced due to the possibility of opening the floodgates for other similarly situated creditors

to come forward to amend their claims or file late claims . . . ," as the Trust would have no

repose and would need to divert time and resources away from winding down the estates to

litigating such untimely claims. *See In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 99

(Bankr. S.D.N.Y. 2007). Further, allowing Ocwen to assert these new claims would require

separate and considerable discovery and analysis with respect to the validity of each Servicing

Advance Claim listed on Exhibit A to the Revised Claim Notice, which would amount to a

review of thousands of newly identified loans, as opposed to a review of the 12 loans listed as

part of both the Initial Claim Notice and Revised Claim Notice. *See, e.g., LaBarbera v. Audax

Constr. Corp.*, 971 F. Supp. 2d 273, 285 (E.D.N.Y. 2013) (denying plaintiffs' amendment

where the new claims bore no relation whatsoever to plaintiffs' prior claims and where the

amendment would require separate and considerable discovery wholly unrelated to resolution of the claims included in plaintiffs' first amended complaint).  Finally, no other claimant would be harmed or prejudiced or receive a windfall were Ocwen's revised Servicing Advances Claim not allowed by the Court.

49.    In addition, Ocwen's attempt to revise the Servicing Advances Claim after the parties had fully briefed for the Court the issues raised in the Administrative Claim Requests and Initial Claim Notice is a significant equitable factor, which, by itself, warrants the denial of the revised claim.  *See Farricker v. Penson Dev., Inc.*, 513 Fed. Appx. 46, 49 (2d Cir. 2013) (affirming district court's denial of leave to amend complaint where "[plaintiff]'s request to amend the complaint came nine months after [defendant] filed its motion to dismiss, which has been fully briefed," and denial was based "on the undue prejudice that unexplained delay would have caused [defendant] in incurring additional time and expense to respond to a claim that should have been before the court in the initial complaint…."); *Keady v. Nike, Inc.*, 116 F. Supp. 2d 428, 441 (S.D.N.Y. 2000), *aff'd in part, vacated in part and remanded on other grounds*, 23 Fed. Appx. 29 (2d Cir. 2001) (finding that plaintiff's waiting until after the motions to dismiss were fully briefed in order to file his leave to amend was evidence of bad faith and demonstrated an intention to delay the litigation).  Further, Ocwen has not presented and cannot present any reasonable justification for its failure to file the contents of the amended Servicing Advances Claim—or at the very least, the complete list of alleged Servicing Advances—at the time the Initial Claim Notice was filed.  Accordingly, Ocwen's attempt to modify the Servicing Advances Claim at this late date is impermissible.

50.    For these reasons, the Court should disallow Ocwen's newly asserted Servicing

Advance Claim to the extent it does not relate to loans identified in the Initial Claim Notice, as

the proposed amendment fails the standards to amend administrative expense claims.

**B.    Ocwen's New Claims Are Barred by the Doctrine of Equitable Estoppel**

51.    Ocwen's attempt to assert new claims over a year after it submitted the Initial

Claim Notice and after briefing was fully completed on the Trust's objection to Ocwen's

Administrative Claim is likewise barred by the doctrine of equitable estoppel.

52.    "The doctrine of equitable estoppel is properly invoked where the enforcement of

the rights of one party would work an injustice upon the other party due to the latter's justifiable

reliance upon the former's words or conduct."  *Kosakow v. New Rochelle Radiology Assocs.,*

*P.C.*, 274 F.3d 706, 725 (2d Cir. 2001).  The Second Circuit instructs that:

> Under New York law, the elements of equitable estoppel are with respect to the
> party estopped: (1) conduct which amounts to a false representation or
> concealment of material facts; (2) intention that such conduct will be acted upon
> by the other party; and (3) knowledge of the real facts.  The parties asserting
> estoppel must show with respect to themselves: (1) lack of knowledge and of the
> means of knowledge of the true facts; (2) reliance upon the conduct of the party to
> be estopped; and (3) prejudicial changes in their positions.

*Babitt v. Citibank, N.A. (In re Vebeliunas)*, 332 F.3d 85, 93-94 (2d Cir. 2003) (citations omitted).

53.    Ocwen is estopped from asserting the Servicing Advances Claim as modified to

include thousands of newly identified Servicing Advance Claims as set forth in the Revised

Claim Notice.  Pursuant to Section 11.1 of the APA, Ocwen was obligated to notify the Debtors

or the Trust by the Termination Date of any indemnification claims and "describe in reasonable

detail" such claims.  *See* APA §§ 11.1(b), 11.2.  Ocwen's "silence" and failure to timely raise

any such claims until April 29, 2015 amounts to a misrepresentation.  *See Kosakow*, 274 F.3d at

725 (holding that silence may constitute an affirmative act for purposes of equitable estoppel

where there was a duty to speak).

-20-

54.    The Trust's actions since the passage of the Termination Date demonstrated to

Ocwen that the Trust was relying on Ocwen having asserted the entire universe of

indemnification claims pursuant to Section 11.1(a) of the APA as of the Termination Date:

(i) on numerous occasions following receipt of the Initial Claims Notice, the Debtors (or the

Trust, as applicable) sought additional loan-by-loan detail in connection with the Servicing

Advances Claim asserted in the Initial Claim Notice; (ii) on February 13, 2015, the Trust filed

the Objection to the claims raised in the Administrative Claim Requests and Initial Claims

Notice, which, as discussed below, the parties fully briefed and in no instance did Ocwen inform

the Court or the Trust that additional Servicing Advance Claims were being contemplated; and

(iii) on March 25, 2015, the Trust emailed Ocwen a letter requesting the release of undisputed

funds from the Indemnity Escrow Account, which accounted for the $2,211,962.17 amount of

Losses estimated from the Servicing Advances Claim listed in the Initial Claim Notice (*see* SoF

¶¶ 11-17).

55.    As to Ocwen's knowledge of the facts that could lend support to the Servicing

Advances Claim, since the Closing Date of the Sale, Ocwen had access to and the opportunity to

review the information transferred from the Debtors to Ocwen as part of the Sale in support of its

claims related to Servicing Advances.  There is no reasonable ground for Ocwen to have failed to

assert the full universe of the Servicing Advance Claims as of the Termination Date.

56.    The Trust, in turn, received no notification from Ocwen that Ocwen contemplated

adding an almost entirely new universe of alleged Servicing Advances separate and apart from

those asserted in the Initial Claim Notice after the Termination Date.  Nor was the Trust in a

position to learn the extent, if any, of Ocwen's potential Servicing Advance Claims after the

Debtors transferred their Books and Records and Mortgage Servicing Files, among other things,

as part of the Sale.  As evidenced from the Trust's briefing in connection with the Administrative Claim Requests and its continuation of wind-down efforts, the Trust relied on Ocwen's Servicing Advances Claim as set forth in the Initial Claim Notice and did not anticipate any new and untimely indemnification claims to be asserted against the estates more than ***two years following the Closing Date***, particularly where the APA imposed the one-year post-Closing Date limitation to bring such claims.

57.    If the Court permits Ocwen to modify the Servicing Advances Claim as set forth in the Revised Claim Notice, the Trust will be greatly prejudiced, as (i) the 12 alleged Servicing Advances reflected in both the Initial Claim Notice and the Revised Claim Notice amount to $63,691.94, which means that Ocwen is asserting $11,991,283.61 in entirely new claims against the estates, (ii) the Trust would have to expend time and resources in defending against these new and untimely claims rather than focus on winding down the Debtors' estates, and (iii) the Trust would be delayed in gaining access to and distributing undisputed escrowed funds currently in the Indemnity Escrow Account to creditors with Allowed Claims.

## NOTICE

58.    The Trust has served notice of this Memorandum in accordance with the Case Management Procedures [Docket No. 141] and the Confirmation Order.  The Trust submits that no other or further notice need be provided.

## CONCLUSION

WHEREFORE, the Trust respectfully requests that the Court enter an order granting the relief requested herein and granting such other relief as is just and proper.

Dated:  June 18, 2015
         New York, New York

                                        /s/ Todd M. Goren
                                        Todd M. Goren
                                        Jamie A. Levitt
                                        Meryl L. Rothchild
                                        **MORRISON & FOERSTER LLP**
                                        250 West 55th Street
                                        New York, New York 10019
                                        Telephone:  (212) 468-8000
                                        Facsimile:  (212) 468-7900

                                        *Counsel to The ResCap Liquidating Trust*