UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | **NOT FOR PUBLICATION** |
|  | ) |  |
|  | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) |  |
|  | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) |  |
|  | ) | Jointly Administered |

**MEMORANDUM OPINION AND ORDER SUSTAINING IN PART AND
OVERRULING IN PART THE RESCAP BORROWER CLAIMS TRUST'S
OBJECTION TO CLAIM NUMBERS 2291, 2294, 2295, AND 2357
FILED BY PAMELA D. LONGONI AND JEAN GAGNON**

*A P P E A R A N C E S :*

MORRISON & FOERSTER LLP
*Attorneys for ResCap Borrower Claims Trust*
250 West 55th Street
New York, New York 10019
By:    Norman S. Rosenbaum, Esq.
       Jordan A. Wishnew, Esq.
       Jessica J. Arett, Esq.

BRADLEY ARANT BOULT CUMMINGS LLP
*Attorneys for ResCap Liquidating Trust*
100 N. Tryon Street
Suite 2690
Charlotte, North Carolina 28202
By:    Christian W. Hancock, Esq.
       Avery Ann Simmons, Esq.

ERICKSON, THORPE & SWAINSTON, LTD.
*Attorneys for Pamela D. Longoni, Lacey
Longoni, and Jean M. Gagnon*
P.O. Box 3559
Reno, Nevada 89505
By:    Thomas P. Beko, Esq.

**MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the ResCap Borrower Claims Trust's (the "Trust") objection (the

"Objection," ECF Doc. # 8530) to Claim Numbers 2291, 2294, 2295, and 2357 (the "Claims")

filed by Pamela D. Longoni ("Longoni"), individually and on behalf of her daughter, Lacey

Longoni, as well as Longoni's former partner, Jean Gagnon ("Gagnon," and together with

Longoni and Lacey Longoni, the "Claimants").[1]  The Claimants filed an opposition (the

"Opposition," ECF Doc. # 8654) to the Objection.[2]  The Trust thereafter filed a reply (the

"Reply," ECF Doc. # 8682).  The Court held a hearing on the Objection on June 4, 2015 (the

"Hearing") and took the matter under submission.

Beginning in 2006 and continuing intermittently and then repetitively, the Claimants

encountered problems making their monthly mortgage loan payments.  The Claimants entered

into negotiations with Debtor GMAC Mortgage, LLC ("GMACM"), the servicer of their

mortgage loan, regarding potential loss mitigation options to cure their default.  The parties agree

that initially Longoni and GMACM pursued a repayment agreement path to cure the Claimants'

default on their loan obligations, which never fully came to fruition.  The parties disagree about

what happened subsequently.  On the one hand, the Trust argues that the parties agreed to a

three-month trial loan modification, that this trial modification was not ultimately approved as a

permanent modification, and that the foreclosure sale conducted on the Claimants' property was

conducted lawfully.  On the other hand, the Claimants assert that the parties agreed to a three-

month trial loan modification, that the trial modification was later approved by GMACM as a

---

[1]       The Objection is supported by the declaration of Avery Simmons (the "Simmons Decl.," Obj. Ex. 3), an
associate attorney with the law firm of Bradley Arant Boult Cummings, LLP.

[2]       The parties originally filed an objection and opposition supported by over length briefs, which the Court
struck with leave to re-file.  (*See* ECF Doc. ## 8532, 8505, 8513.)  The Trust re-filed the Objection supported by a
28 page brief; the Court granted the Trust permission to file the over length brief by telephone.  The Claimants re-
filed an opposition supported by a brief that was 35 pages in length.  (*See* ECF Doc. # 8631.)  The Court only
approved an over length brief of 30 pages in length by telephone prior to the Claimants' filing of this opposition.
Although the Claimants filed a motion for leave to file the over length brief (*see* ECF Doc. # 8640), the Claimants'
motion was denied, the brief was stricken, and the Court again granted the Claimants leave to re-file the opposition
supported by a brief of no more than 30 pages (*see* ECF Doc. # 8645).  The Claimants thereafter complied with the
Court's order and submitted the Opposition supported by a brief 30 pages in length.  The Trust also obtained
telephonic approval to submit an over length reply brief, 12 pages in length.

permanent modification, and that the foreclosure sale conducted on the Claimants' property was

conducted unlawfully because the default on their Loan account should have been deemed cured.

The breeding ground of the parties' dispute is a series of admittedly inconsistent letters, emails,

and phone conversations between Longoni and GMACM representatives in the summer of 2009

leading up to and continuing after the August foreclosure sale.

The Claims assert eight causes of action against GMACM and Debtor Executive Trustee

Services, LLC ("ETS"), previously asserted by the Claimants in a lawsuit they filed against these

two Debtors and other defendant entities and individuals in the United States District Court for

the District of Nevada (the "Nevada District Court"). These causes of action include: various

violations of Nevada statutory law, fraud, negligence, breach of contract, intentional infliction of

emotional distress, promissory estoppel, and concert of action. The Claimants also challenge

GMACM's standing to initiate the foreclosure proceedings.

Upon the Debtors' (and other defendants') motion to dismiss, the Nevada District Court

upheld the Claimants' fraud, intentional infliction of emotional distress, and promissory estoppel

claims, but did not address the remaining causes of action at issue before this Court. As set forth

below, the Court agrees with the Nevada District Court decision and therefore **OVERRULES**

the Objection without prejudice consistent with the prior ruling on the Debtors' motion to

dismiss. The Court also **SUSTAINS in part** and **OVERRULES in part** the remaining

arguments in the Objection to the Claims.

## I.    BACKGROUND

### A.    The Claimants' Loan History

On September 29, 2005, the Claimants executed a promissory note (the "Note") in favor

of Equifirst Corporation ("Equifirst") secured by a deed of trust (the "Deed of Trust," and

together with the Note, the "Loan") on real property located at 5540 Twin Creeks Drive, Reno, Nevada (the "Property"). (Obj. ¶ 7 (citing Simmons Decl. Ex. 1).) The Deed of Trust, though dated September 29, 2005, was executed and notarized on October 3, 2005. (*Id.* ¶ 7 n.6.) It indicates that Equifirst is the "Lender," Mortgage Electronic Registration Systems, Inc. ("MERS") is the "nominee" for the Lender and its successors and assigns as well as the "beneficiary," and First Centennial Title Company of Nevada is the "Trustee." (Simmons Decl. Ex. 1 at 1–2.) In December 2005, the Loan was placed into a securitization trust, with Debtor Residential Funding Corporation ("RFC") acting as the master servicer. (*Id.* ¶ 7; *see* Reply Ex. 2 (master servicing agreement).) The assignment and assumption agreement, dated December 28, 2005 (the "Assignment and Assumption Agreement," Reply Ex. 3), indicates that: (1) RFC was the master servicer, (2) Debtor Residential Asset Mortgage Products, Inc. ("RAMP") purchased the Loan among other mortgage loans pursuant to RFC's master servicing contracts, and (3) U.S. Bank National Association ("US Bank") was the trustee for the securitization trust into which RAMP deposited the purchased loans. (*Id.*) The pooling and servicing agreement (the "PSA", Reply Ex. 2) provided that the original Note, Deed of Trust (which is registered on the MERS system), and any relevant assignment and assumption agreement (presumably the Assignment and Assumption Agreement) were to be assigned by the "Depositor" (here, RAMP) to US Bank, as trustee for the underlying securitization trust (*id.*). Debtor Homecomings Financial, LLC ("Homecomings"), and later GMACM, acted as sub-servicer of the Loan beginning in 2005 and continuing until 2013. (Obj. ¶ 7.)

Longoni failed to make Loan payments in July 2006, April and November 2007, and lastly, in December 2008; in each instance, the Debtors mailed Longoni letters stating that the account was in default as a result of these missed Loan payments. (*Id.* ¶ 7, n.8 (citing Simmons

Decl. Exs. 2–5).)  According to the Claimants (and without specifying any dates), Longoni

inquired about loan modification options for the existing Loan when she and Gagnon were

having financial difficulties; in response to her inquiry, she was allegedly informed by GMACM

that before the Loan could be considered for a loan modification, the Loan had to be in default.

(Opp. ¶ 28 (citing the "Longoni Deposition," *id.* Ex. 23 at 52–54).)  Longoni alleges that as a

result of this advice, the Claimants did not make their December 2008 payment.  (*Id.*)

On January 2, 2009, ETS, as agent for the beneficiary of the Deed of Trust issued a notice

of default (the "Notice of Default," Simmons Decl. Ex. 6).  (Obj. ¶ 8.)  On January 15, 2009,

Longoni sent a request for a loan modification to Homecomings as she believed that

Homecomings was the lender on the Loan.  (Opp. ¶ 28 (citing the "Longoni Affidavit" or

"Longoni Aff.," *id.* Ex. 9 ¶ 6; Opp.Ex. 11, Letter dated January 15, 2009).)  On February 18,

2009, GMACM's servicing notes for the Loan reflect that a "workout package" was sent to the

Claimants.  (*Id.* ¶ 28 (citing *id.* Ex. 12).)  The next day, on February 19, 2009, GMACM referred

the matter to ETS to commence foreclosure proceedings.  (*Id.* (citing the "Ravelo Depo.," *id.* Ex.

8 at 63; Opp. Ex. 12).)

Longoni did not cure the default on the Loan and ETS formally recorded the Notice of

Default on February 26, 2009.[3]  (Obj. ¶ 8 (citing Simmons Ex. 6).)  ETS also prepared and

executed an affidavit of mailing indicating that the Notice of Default was sent to Longoni at the

Property address on March 4, 2009.  (*Id.* (citing Simmons Decl. Ex. 7).)

On March 5, 2009, Longoni again requested a loan modification from GMACM (*id.* ¶ 9

(citing Simmons Decl. Ex. 8)); the Claimants allege that on this date, GMACM received the

Claimants' completed financial package (presumably the completed workout package they

---

[3]        The date of recordation on the copy of the Notice of Default submitted by the Trust is illegible.

received from the Debtors) (Opp. ¶ 28 (citing *id.* Ex. 12)).  The Claimants also allege that on

March 10, 2009, GMACM approved the matter for a loss mitigation program and that GMACM

instructed ETS to place all foreclosure actions on hold until directed otherwise by GMACM.  (*Id.*

(citing *id.* Exs. 12–13).)  The Claimants further allege that GMACM's servicing notes indicate

that on this date, GMACM and Longoni were going to pursue a repayment plan, not a loan

modification.[4]  (*Id.* ¶ 30 (citing *id.* Ex. 12 at 68).)

On March 19, 2009, GMACM offered Longoni a three-month trial plan (the "Repayment

Agreement"), requiring three monthly payments of $2,270 and a balloon payment of $19,421.76

at the conclusion of the three-month period (March through June 2009).  (*Id.* (citing Simmons

Decl. Exs. 9, 25); *see also* Opp. Ex. 15.)  At the time the Repayment Agreement was offered, the

amount necessary to cure the prior defaults on the Loan was $16,494.65.  (Obj. ¶ 9 n.9.)  The

Repayment Agreement states in pertinent part:  (1) GMACM "agrees to suspend but not

terminate foreclosure activity on the default account," contingent on Longoni's compliance with

the terms contained in the Repayment Agreement; (2) "[i]n the event we do not receive timely

payment called for under this Agreement, Lender may, without further notice to Customer,

undertake or continue collection or foreclosure activities . . ."; and (3) "[a]cceptance of any

payment hereunder shall not constitute a cure nor be deemed a waiver of the existing default."

(*Id.* ¶ 11 (citing Simmons Ex. 10).)  The Trust concedes that Longoni did not execute the original

---

[4]      GMACM adopted internal guidelines, known as the Servicer Guide, which include definitions of certain
loss mitigation options.  (Opp. ¶ 29 (citing the "Aguirre Deposition" or "Aguirre Depo.," id. Ex. 7 at 158–59; Opp.
Ex. 14;).)  A "repayment plan" allowed a borrower to increase the loan payments over time to make up for a
deficiency, but the loan would not be modified and there would be no write off or debt forgiveness.  (*Id.* (citing *id.*
Ex. 14 at 369).)  A "loan modification" entailed a formal change in one or more terms of the original mortgage note,
including a change to the interest rate, monthly payment, maturity date, or the principal balance of the loan.  (*Id.*
(citing *id.* Ex. 14 at 378).)  Loan modifications start as "trials" and then are changed to "permanent" modifications;
they could take the form of "traditional," "HAMP," "second lien bulk," or "framework (Bush)," for example.  (*Id.*
(citing *id.* Ex. 14 at 193; Aguirre Depo. at 185–86).)

Repayment Agreement, but Longoni conceded in a deposition that she received a copy of the

Repayment Agreement and produced a copy of the document during litigation with the Debtors

(explained further below).  (*Id.* ¶ 12 (citing Simmons Decl. Ex. 10 at 100:15–22, Ex. 73).)

Based on the Debtors' servicing notes, Longoni advised the Debtors on March 19, 2009

that she could not afford to make the $2,270 monthly payments as proposed in the Repayment

Agreement; she therefore requested and received oral approval for the three-month trial plan

with a reduced monthly payment of $1,600.  (*Id.* ¶ 10 (citing Simmons Decl. Ex. 11).)  The

Claimants allege that Longoni also informed the Debtors that the Claimants would never be able

to afford to make any type of balloon payment.  (Opp. ¶ 30 (citing the "Stephenson Declaration"

or "Stephenson Decl.," *id.* Ex. 1 ¶ 4; Longoni Aff. ¶ 10).)  The Claimants further allege that in

response, the GMACM representative, Jonathan "Nate" Stephenson ("Stephenson"), concluded

that a repayment plan was not a viable option for the Claimants and made the decision to forego

all attempts at a repayment plan and instead pursue a permanent loan modification.  (*Id.* (citing

Stephenson Decl. ¶ 4).)  GMACM's servicing notes on March 19, 2009 state:

> Proposed Solution:  GMAC Mortgage proposes a 3 month trial modification consisting of a down payment of $1600 and a monthly contribution of $1600.  Upon successful completion of the trial the estimated mod terms will be: Mod Type; Cap: Interest Rate Type: ARM to ARM; Interest Rate: 3.25; Index Rate 3.9; Margin: -0.65; Arm Freeze: 5 year Freeze; NPV $10,737.80.
>
> . . . .
>
> The borrower does not have enough savings to reinstate the loan and their financials do not support a repayment plan.
>
> . . . .
>
> SHE SAID THAT THEY WOULD NOT BE ABLE TO . . . AFFORD $2270 PMT.  WENT OVER FIN'S WITH HER AND ADJUSTED SOME EXPENSES TO REPORT ACCURATELY.  $1600 IS THE NEW PMT STARTING 3/30/09.

. . . .

REPAY PLAN CANCELED MANUALLY

(*Id.* (quoting *id.* Ex. 12 at 72).)  This oral agreement was never memorialized in writing and the

servicing notes do not reflect whether the parties discussed a balloon payment due at the end of

the trial period.[5]  (*Id.*)

The first payment pursuant to the purported oral agreement was due on March 30, 2009.

(Obj. ¶ 12.)  On March 27, 2009, Longoni advised GMACM that she would need additional time

to make the first payment.  (*Id.* (citing Simmons Ex. 11).)  For March 30, 2009, GMACM's

servicing notes state the following:

> $186K debt forgive for approval
> Reqst to debt forgive $185,613.41.  Cannot capitalize arrearage
> because 2nd mod.  Using tot debt of $439,177.63 and IBPO value
> of 245000, LTV is 179%.  Based upon HEAT analytics, best-case
> liq

(Opp. Ex. 12 at 73.)  On April 3, 2009, after receiving permission from Stephenson to make the

payment late, Longoni made the first $1,600 payment.  (Obj. ¶ 12 (citing Simmons Ex. 11); Opp.

¶ 34 (citing *id.* Ex. 12 at 73).)  For the April 30 and May 30, 2009 payments, Longoni was also

late, but the Claimants allege that they received similar permission to pay late.  (*See* Obj. ¶ 12

(citing Simmons Ex. 11); *see also* Opp. ¶ 34).)  Longoni did not make any balloon payment in

June 2009.  (Obj. ¶ 12 (citing Simmons Ex. 12).)

---

[5]    The Stephenson Declaration indicates that the trial plan requiring $1,600 monthly payments was not a repayment plan, that there was no scheduled balloon payment, and that no new written Repayment Agreement was sent to Longoni as a result.  (Opp. ¶ 31 (citing Stephenson Decl. ¶¶ 4–6).)  The Stephenson Declaration further indicates that Stephenson never indicated to Longoni that the Claimants would be required to make any type of balloon payment.  (*Id.* (citing Stephenson Decl. ¶ 10; Longoni Aff. ¶ 10).)  Stephenson also declares that if the revised plan were a repayment plan with reduced monthly payments of $1,600, the balloon payment would have been far in excess of the payment called for in the initially proposed Repayment Agreement.  (*Id.* (Stephenson Decl. ¶ 9).)

During the three-month trial period, Longoni and Stephenson exchanged several emails:

- On April 2, 2009, Stephenson advised Longoni: "Your trial modification is approved, but since I am trying to write off $176K from your loan, I need to get approval from our Vice President. There is a chance that she may come back and say no." (*Id.* ¶ 21 (quoting Simmons Ex. 31).) Stephenson also wrote: "All that I am awaiting on in order to make this a permanent change (next 5 yrs) is approval from the Vice President of the Bank. I should know the outcome in the next month (ish). (Opp. ¶ 35 (quoting *id.* Ex. 16).)

- On April 21, 2009, Stephenson stated: "I am still waiting on approval from our VP." (Obj. ¶ 12 (quoting Simmons Decl. Ex. 32).)

- On April 28, 2009, Stephenson advised that the modification approval "has to go to higher management, due to the amount." (*Id.* (quoting Simmons Decl. Ex. 33).) Stephenson also wrote: "I just took a look at the notes on your loan and it looks as if one manager looked at it and agreed that it was a win win situation, but because it is $186K that we are trying to write off, it has to go a little higher." (Opp. ¶ 35 (quoting *id.* Ex. 16).)

- On May 1, 2009, after Longoni explained that she was unable to make the April 30, 2009 payment via the online payment system or over the phone Stephenson advised that someone had put a "Certified Funds Flag" on her account, meaning that all payments had to be certified; he advised that he removed the flag. (*Id.* ¶ 36 (citing *id.* Ex. 16).)

- On May 5, 2009, Stephenson wrote to Longoni: "According to what I see we rcv'd $1600 yesterday. You're good to go!!! It doesn't look like our VP has had a chance to look at this yet. (We are swamped!!!!!!!!!) The notes that I saw are good though (indicating that it makes sense to do the Modification). We still have 2 months before I would have to set up a plan. So everything is still sort of on hold." (*Id.*)

- On May 22, 2009, GMACM's servicing notes indicate that a HAMP application was sent to Longoni. (Opp. ¶ 37 (citing *id.* Ex. 12 at 76).) On May 26, 2009, Longoni had not received any documentation as of yet from the Debtors and sent an email to Stephenson asking if the Claimants should continue to make the $1600 payment on May, 30, 2009. (*Id.* (citing *id.* Ex. 16).) Stephenson responded "yes" and stated that he expected an update soon and once a decision was made the "paperwork will be sent out with the new terms." (*Id.*) He also wrote: "I don't have an update for you yet. You should continue to make the $1600 pymt." (Obj. ¶ 12 (quoting Simmons Decl. Ex. 34).) In the same email, Stephenson indicated that he would be moving to a new team the following week. (*Id.*)

Longoni made the third trial plan payment on June 1, 2009 (after the May 30th deadline) and did not hear anything from the Debtors. (*Id.* ¶ 37 (citing Longoni Aff. ¶ 18).) Throughout

9

the end of June 2009, Longoni made attempts to speak with a new loan specialist in light of

Stephenson's transfer to a new department, but she could not contact anyone who knew the

status of her Loan.  (Opp. ¶ 40.)  As a result, the following emails were exchanged between

Longoni and Stephenson:

- On June 29, 2009, Longoni wrote to Stephenson:  "Nate, I can't seem to get a hold of anyone who knows anything about the modification you were working on.  Homecomings sent me information indicating that my payment was as it was before, and the balance was the same.  Please help!!!!"  (*Id.* (quoting *id.* Ex. 16).)

- On June 30, 2009:

  o Stephenson wrote:  "Hi Pam, I e-mailed my old dept yesterday and they responded that the file has been sent for final management approval.  The person handling the file is Landon Huck.  I hope that this helps you.  Good luck.  (*Id.*)

  o Longoni responded:  "Hi Nate, do you have any contact information for Landon?  Thank you for still helping us.  Hope you are having a nice summer.  Pam[.]"  (*Id.*)

  o Stephenson stated:  "Hi Pam, I am sorry I am not able to give you the contact info.  I did, however, rcv an e-mail stating that the MOD had been approved yesterday, but that is all I know.  You may want to call in and see if you can get some more details.  Thanks, Nate[.]"  (*Id.*)

  o Longoni wrote:  "Nate, when I call the regular Homecomings 800 number, no one knows any information.  Do you have a suggestion as to what department I could start with?  So it was approved?  Does that mean the $1600 payment and the principal reduction?  Wow!"  (*Id.*)

  o Stephenson responded:  "You might be able to try 1 800 799 9250[.]"  (*Id.*)

  o Longoni then wrote:  "So 'approved' means $1600 a month and the principal reduction?"  (*Id.*)

  o Stephenson responded:  "That is the way that I had it set up, however, I am not sure if that was how it was approved or not.  Thanks, Nate[.]"  (*Id.*)

Beginning on July 1, 2009, Longoni attempted to make another $1,600 payment, but the

Debtors' system would not accept it.  (*Id.* ¶ 42 (citing Longoni Aff. ¶ 21).)  On July 2, 2009,

GMACM's servicing notes reflect that Landon Huck, the individual that took over the Loan

10

account after Stephenson was transferred, "CALLED HOME LEFT MESSAGE.  WILL NEED
NEW HMP IN ORDER TO REVIEW FOR MOD.  PLS HAVE BWR FAX TO 866-709-4744."
(*Id.* ¶ 39 (quoting *id.* Ex. 12 at 77).)  According to the Trust, Longoni attempted to make a
payment in the amount of $1,600 on July 3, 2009, but GMACM rejected this payment under the
terms of the Repayment Agreement because it was not the full amount ($19,421.76) of the
allegedly due June 30, 2009 balloon payment.  (Obj. ¶ 13 (citing Simmons Decl. Ex. 26).)

On July 9, 2009,[6] the Trust alleges that Stephenson advised Longoni that there was no
permanent modification, that she would have to apply for a new HAMP modification, and that
the foreclosure proceedings were on hold; more specifically, GMACM advised Longoni that she
needed to return a workout package for further review.  (*Id.* ¶ 23 (citing Simmons Decl. Ex. 20);
*see also id.* ¶ 26.)  According to the Claimants, on July 9, 2009, Longoni spoke to an individual
from GMACM named Henry and asked about the status of her loan modification as she had been
informed on June 30th that it was approved.  (Opp. ¶ 42.)  The Claimants allege that Henry
indicated that the loan modification was not approved, that she owed approximately $19,000 and
that if she did not pay it, GMACM would sell her home.  (*Id.*)  Although Longoni tried to make a
$1,600 payment, Henry refused to accept the payment and advised her that the $1,600 payments

---

[6]     GMACM's servicing notes for July 9, 2009 reads as follows:

> TTB1 [talked to borrower] VAI [verified account information] CI BC
> WANTED TO INQ MOD THAT WAS APPROVED RECENTLY.  ADV NT
> TRUE.  ADV PREV REPAY PLAN IS COMPLETED.  ADV TO RETURN
> WOUT PCK ASAP, TAT IS 60 DAYS, NO GUARANTEED.  I TRIED TO
> UPDATE DTI CALC BUT B DID NT KNOW HER GROSS INCOME.  SD
> SHE WOULD CB TOMO SHE HAD TO GO TO WORK.
>
> . . .
>
> PAYCUT STATE:  9/2008 ONGOING.  M/I; 1800 A MONTH.  ADV F/C
> SALE DT ON HOLD, L/C AND C/R CONT. HCASAS.

(*Id.* Ex. 16.)

were only set up for the initial three-month period.  (*Id.*)  Henry further advised her that she

should submit a new workout package under HAMP and that the Claimants had 60 days to

continue to pursue a loan modification through this new federal program; specifically Henry

advised her that the foreclosure would be on hold through this process.  (*Id.* ¶ 43 (citing Longoni

Aff. ¶ 21).)

Also on July 9, 2009, Longoni sent an email to Stephenson stating:  "[I] was told by some

guy named Henry that our modification was NOT APPROVED and we owe $19,000 some odd

dollars or they will sell our house!!!"  (*Id.* (quoting Simmons Decl. Ex. 26).)  Stephenson

responded to Longoni's email on the same day, stating that she needed to download a HAMP

application from GMACM's website and that "we will try to do everything we can before we

proceed with a foreclosure.  Unfortunately I can't do anything with this file myself because I am

no longer with this group."[7]  (*Id.*)  On July 10 and July 13, 2009, GMACM left unreturned voice

messages for Longoni regarding loan modification options.  (*Id.* ¶ 14 (citing Simmons Decl. Ex.

13).)  The July 13, 2009 message explicitly referred to a possible HAMP loan modification

option.  (*Id.*)

As a result of the loan modification review that was underway in 2009, the foreclosure

proceedings, commenced by the issuance of the Notice of Default, were stayed.  The stay of the

foreclosure proceedings was lifted, however, on July 15, 2009 due, according to the Trust, to

---

[7]     The email further stated:

> Pam, It looks like they are trying to put you onto an Obama Modification.  Your
> Foreclosure is on Hold.  GMAC does not want to take your house.  When we
> last talked I said that from the information that I could gather from my old dept.
> this was waiting to be approved by management.  I am not sure what happened
> with that, but when I had originally set you up it was a traditional GMAC Mod.
> We are now trying to put everyone into the Obama plan.

(*Id.* Ex. 16.)

Longoni's nonpayment of the alleged June balloon payment and her failure to respond to GMACM's outreach efforts. (*Id.* ¶ 15 (citing Simmons Decl. Ex. 13).)[8] On July 16, 2009, GMACM sent Longoni a letter advising her that the parties' proposed Repayment Agreement had been cancelled due to her nonpayment.[9] (*Id.* (citing Simmons Decl. Ex. 12).)

On July 23, 2009, ETS filed and recorded a notice of trustee's sale (the "Notice of Trustee's Sale," Simmons Decl. Ex. 14), scheduling the foreclosure sale for August 14, 2009. ETS posted a copy of the Notice of Trustee's Sale at the Reno Courthouse, City Hall and Public Library on July 24, 2009, and also published it in the *Sparks Tribune* from July 24, 2009 through August 7, 2009. (Obj. ¶ 16 (citing Simmons Decl. Exs. 15–16).) ETS executed an affidavit of mailing by registered and certified mail to Longoni on July 22, 2009.[10] (Reply Ex. 1.)

On July 30, 2009, GMACM sent Longoni a financial package, "urging" her to submit it along with a "signed letter explaining cause of default, two most recent paycheck stubs and copy of most recent federal tax return." (Obj. ¶ 17 (citing Simmons Decl. Ex. 17).) The letter specifically states "30 days to sale" and GMACM's servicing notes state: "[O]bama workout package provided in today 30 days to sale (no contact) letter." (Opp. ¶ 45 (citing *id.* Ex. 12 at 81; *id.* Ex. 17).) GMACM also tried calling Longoni on July 30 and 31 and August 4, 5, 6, 7, but was unable to reach her. (*Id.* (citing Simmons Decl. Ex. 18).)

---

[8]  The Claimants dispute whether this was the first or initial commencement of foreclosure against the Property. The Claimants point to three entries in the servicing notes indicating "Promise Broken" on March 30, April 30, and June 1, 2009. (Opp. ¶ 38 (citing *id.* Ex. 12).) Corresponding to these three entries are notes that "Foreclosure Started" on April 10, May 8, and June 12, 2009. (*Id.*)

[9]  More specifically, the letter states: "[T]he repayment plan we previously established at your request has been cancelled for one or more of the following reasons: [¶] [X] The payment was not received by the payment date as specified in the signed repayment agreement." (Opp. Ex. 24.)

[10]  Longoni alleges that she did not receive the Notice of Trustee's Sale, but the Trust alleges that documents she produced in the state court litigation reveal that she did in fact receive it (i.e., an August 3, 2009 email indicating that she was getting the notices from ETS scheduling the foreclosure sale discussed below). (Obj. ¶ 27 (citing Simmons Decl. Exs. 27, 29).)

On August 3, 2009, Longoni sent Stephenson an email stating that she was "getting

notices in [her] mail from some place called ETS saying [her] house is being sold at auction on

the 18th."[11]  (*Id.* ¶ 18 (citing Simmons Decl. Ex. 27).)  Stephenson responded by telling her to

complete the HAMP financial package GMACM had sent her.  (*Id.*)  Longoni alleges that she

received the package on August 4, 2009 and that she returned it on August 10, 2009, (*see* Opp.

¶ 46 (citing Longoni Aff. ¶ 27; Opp. Ex. 19)), but GMACM's records do not reflect receipt of

the financial package (Obj. ¶ 18 n.11).

The foreclosure sale went forward as scheduled on August 14, 2009 and the Property was

sold for $172,500 to National Real Estate Services.  (*Id.* ¶ 19 (citing Simmons Decl. Ex. 24).)  A

trustee's deed upon sale (the "Trustee's Deed Upon Sale," Simmons Decl. Ex. 19) was issued

and then recorded on August 26, 2009 (*id.*).  At the time the foreclosure sale was conducted, the

amount of unpaid debt owed by Longoni pursuant to the Loan was $467,815; the Property was

therefore sold at a loss.  (Obj. ¶ 19 (citing Simmons Ex. 24).)

Ten days after the sale was conducted, Longoni called GMACM to inquire about the

status of her newly submitted loan modification request.  (Opp. ¶ 47 (citing Longoni Aff. ¶ 29).)

Longoni told GMACM that she had received an email from Stephenson on July 9, 2009, stating

that the foreclosure was on hold and that she believed GMACM was trying to get the Claimants

qualified under HAMP.  (*Id.*)  The GMACM representative told Longoni that her home had been

sold at foreclosure on August 14, 2009.  (*Id.*)  Longoni stated that she wanted her home back, but

---

[11]        The Trust alleges that in initial conversations with GMACM shortly after the sale of the Property, Longoni
produced a copy of this August 3, 2009 email that stated "[d]on't worry your foreclosure is on hold," as a means to
prove there was an agreement to halt foreclosure efforts.  (*Id.* ¶ 28 (citing Simmons Decl. Ex. 38).  Counsel for
GMACM in the state court litigation requested discovery of electronic native format emails from Longoni's email
inbox and sent folders.  (*Id.* ¶ 28.)  After reviewing those emails in native format, counsel discovered that, contrary
to Longoni's statements to GMACM, on August 24, 2009, Stephenson did not tell Longoni her foreclosure was on
hold on August 3, 2009.  (*Id.*)  The Trust submits that Longoni doctored the email, intentionally altering material
evidence.  (*Id.*)  The Court makes no findings of fact on this issue.

she was advised that she would need to speak with the representative's supervisor who was gone

for the day. (*Id.*) GMACM's servicing notes appear to corroborate Longoni's account of the

telephone conversation. (*Id.* (citing *id.* Ex. 12 at 86–87).)

On August 26, 2009, Logan Gill of GMACM sent Benjamin Willis, also of GMACM, an

email stating:

> Hopefully you can help me out with this. Basically the long and
> skinny is that Nate told this lady the foreclosure was on hold when
> it is not and it went to 3rd party sale. He now knows not to email
> borrowers/3[rd] parties and will definitely be held responsible for his
> actions, but would this fall under the mod teams cost center as far
> as the rescind process is concerned? I am willing to do the leg
> work on it if I need to but I just need to figure out where this would
> fall. Thanks in advance for all your help.

(*Id.* ¶ 49 (citing *id.* Ex. 16).)

On September 9, 2009, Longoni received a telephone call from GMACM's counsel,

Michael Knapp, Esq., who told her that GMACM made a mistake, that it was attempting to

recover her home, and that she would not have to move out as a result. (*Id.* ¶ 50 (citing Longoni

Aff. ¶ 35; Opp. Ex. 25 (a copy of Longoni's Verizon phone bill reflecting the eight-minute call).)

Both Aguirre and Ravelo, representatives of the Debtors, testified in depositions that GMACM

took actions to recover the Property from the new purchaser. (*Id.* ¶ 50 (citing Aguirre Depo. at

255–56; Ravelo Depo. at 127–29).) Longoni also obtained, through discovery in the Claimants'

Nevada action explained below, a proposed settlement agreement pursuant to which GMACM

sought to buy back the Property. (*Id.* (citing *id.* Ex. 20).) After the sale, GMACM took steps to

remove negative references from the Claimants' credit records, including the default on the Loan

and the foreclosure. (*Id.* (citing *id.* Ex. 21 (letters from GMACM's counsel relating to this

process); Longoni Aff. ¶ 37).)

### B.       The Nevada Action and the Claims

On April 28, 2010, Longoni, Gagnon, and Longoni as guardian ad litem for Lacey

Longoni, Longoni's minor child, filed a complaint in the Second Judicial District Court of the

State of Nevada in Washoe County against GMACM, ETS, RFC, RAMP, Illeanna Peterson

("Peterson"), Kathleen Gowen ("Gowen"), and other unnamed entities and individuals (together,

the "Defendants").  (Obj. ¶ 5.)  The case (the "Nevada Action") was removed to the Nevada

District Court.  (*Id.*)  The original complaint pled causes of action for:  (1) violation of Nevada

Revised Statutes 107.080, 107.085, 107.086, 107.087, and 107.090 (the "First Cause of Action");

(2) violation of Nevada Revised Statutes 205.372 (the "Second Cause of Action"); (3) fraud and

misrepresentation (the "Third Cause of Action"); (4) negligence and negligent misrepresentation

(the "Fourth Cause of Action"); (5) breach of contract (the "Fifth Cause of Action"); (6) tortious

breach of the implied covenant of good faith and fair dealing; (7) breach of covenant of quiet

title; (8) intentional infliction of emotional distress (the "Sixth Cause of Action"); (9) promissory

estoppel (the "Seventh Cause of Action"); and (10) concert of actions (the "Eighth Cause of

Action").  (*Id.*)

On October 7, 2010, GMACM, ETS, Peterson, and Gowen moved to dismiss the fraud

and misrepresentation claim, the tortious breach of good faith and fair dealing claim, the breach

of covenant of quiet enjoyment claim, the intentional infliction of emotional distress claim, and

the promissory estoppel claim.  *See Longoni v. GMAC Mortg., LLC*, No. 3:10-CV-0297-LRH-

VPC, 2010 WL 5186091, at *2 (D. Nev. Dec. 14, 2010).  On December 14, 2010, the Nevada

District Court dismissed Longoni's breach of covenant of quiet title and tortious breach of the

implied covenant of good faith and fair dealing claims.  (*Id.*)  The other eight causes of action

alleged in the now operative third amended complaint (the "Complaint," Obj. Ex. 4) remain.  In

essence, Longoni alleges that GMACM wrongfully foreclosed on her home after agreeing to a permanent loan modification and that foreclosure efforts would be halted while the proposed modification was discussed. (*See id.*)

On May 17, 2012, GMACM, ETS, RFC, and RAMP filed a notice of bankruptcy and automatic stay. (*Id.*) The Nevada Action was stayed as to the Debtor Defendants on June 26, 2012 and administratively closed as to the remaining Defendants on September 24, 2013. (*Id.*)

The Claimants timely filed the Claims in the Debtors' bankruptcy proceedings, asserting general unsecured claims each in the amount of $600,000 against GMACM and ETS; Claim number 2291 was filed by Gagnon against GMACM; Claim Number 2294 was filed by Gagnon against ETS; Claim Number 2295 was filed by Longoni, individually and on behalf of Lacey Longoni, against ETS; and Claim Number 2357 was filed by Longoni, individually and on behalf of Lacey Longoni, against GMACM. (*See* Obj. Ex. 1.) All of the Claims are based on the Complaint filed in the Nevada Action and therefore rely on the Claimants' remaining eight causes of action. (*See id.*)

Through its Objection, the Trust seeks to disallow and expunge the Claims in their entirety, arguing that the Claims are without merit and fail to articulate a valid legal basis that would give rise to any liability on the part of GMACM or ETS.[12] (Obj. ¶ 1.)

## II.    DISCUSSION

### A.    Claims Objections

Bankruptcy Code section 502(b)(1) provides that claims may be disallowed if "unenforceable against the debtor and property of the debtor, under any agreement or applicable

---

[12] Due to the volume of the parties' briefing and the facts underlying the Claims and the Objection, the Court does not summarize the parties' arguments raised in each of the parties' memoranda of law. Rather, the Court assumes familiarity with such arguments and addresses the merits of the parties' arguments in the discussion below.

law." To determine whether a claim is allowable by law, bankruptcy courts look to "applicable

nonbankruptcy law."[13] *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006).

Federal pleading standards apply when assessing the validity of a proof of claim. *See,*

*e.g.*, *In re Residential Capital, LLC*, 518 B.R. 720, 731 (Bankr. S.D.N.Y. 2014); *In re DJK*

*Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party

has met their burden in connection with a proof of claim, bankruptcy courts have looked to the

pleading requirements set forth in the Federal Rules of Civil Procedure." (citations omitted)).

Accordingly, claimants must allege "enough facts to state a claim for relief that is plausible on its

face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009)). "Where a complaint pleads facts that are merely consistent

with a defendant's liability, it stops short of the line between possibility and plausibility of

entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).

Plausibility "is not akin to a probability requirement," but rather requires "more than a sheer

possibility that a defendant has acted unlawfully." *Id.* (citation and internal quotation marks

omitted). The court must accept all factual allegations as true, discounting legal conclusions

clothed in factual garb. *See, e.g.*, *id.* at 677–78; *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d

111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory

factual allegations in the complaint to be true" (citing *Iqbal*, 556 U.S. at 678)). The court must

---

[13]    Nevada law governs the Objection and the Claim. Nevada courts often look to precedent from other jurisdictions, particularly California, to fill in gaps in Nevada law, as Nevada did not have an appellate level court until January 2015. *See JPMorgan Chase Bank, N.A. v. KB Home*, 740 F. Supp. 2d 1192, 1198 (D. Nev. 2010) ("Nevada looks to 'the law of other jurisdictions, particularly California, for guidance.'" (citation omitted)); *see also* Katherine Henderson & Pamela G. Roberts, State Bar of Nevada, NEVADA CIVIL PRACTICE MANUAL § 1.03 (2012) ("California law has been a prominent source of Nevada law since the inception of statehood."). This Opinion therefore cites to Nevada law, as well as California and others states' laws.

then determine if these well-pleaded factual allegations state a "plausible claim for relief." *Iqbal*, 556 U.S. at 679 (citation omitted).

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted). A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). A claim that pleads only facts that are "merely consistent with a defendant's liability" does not meet the plausibility requirement. *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "The pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

To support claims grounded in fraud, Rule 9(b) of the Federal Rules of Civil Procedure require claimants to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). Federal Rule of Civil Procedure 9(b) is grounded in the purpose "to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties." *Silverman v. Arctrade Capital, Inc. (In re Arctrade Fin. Technologies Ltd.)*, 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2005) (internal quotation marks and citation omitted).

### B.    Standing

The Claimants argue that the Debtors have failed to establish standing under Nevada law to initiate foreclosure proceedings against the Property.  More specifically, the Claimants assert that the Note and Deed of Trust were split due to the designation of MERS as the nominee and beneficiary under the Deed of Trust and that the split was never cured by the reunion of the Note and Deed of Trust in the foreclosing entity prior to the initiation of the foreclosure proceedings against the Property.  (Opp. ¶¶ 14–15 (citing *Edelstein v. Bank of N.Y. Mellon*, 286 P.3d 249 (Nev. 2012)).)  The Trust responds that the Nevada case law the Claimants rely upon is limited to the context of Nevada's foreclosure mediation program, which is now a prerequisite to initiate foreclosure proceedings.  (Reply ¶¶ 6–8.)  According to the Trust, the foreclosure mediation program does not apply here because the Notice of Default was issued prior to the effectiveness of the Nevada statutes prescribing the program.  (*Id.*)  Additionally, the Trust argues that Nevada case law has made clear since the *Edelstein* opinion that a foreclosing entity is not required to prove standing to initiate foreclosure under Nevada's non-judicial scheme.  (*Id.* ¶ 6 (citing *Hakimi v. Bank of N.Y. Mellon*, No. 2:14-CV-2215, 2015 WL 2097872 (D. Nev. May 5, 2015)).)

Under the non-judicial foreclosure scheme in Nevada, "parties initiating foreclosure proceedings are not required to prove standing to foreclose in a court of law before initiating the foreclosure process." *Hakimi*, 2015 WL 2097872, at *5 (quoting *Birkland v. Countrywide Home Loans, Inc.*, No. 2:11-cv-00502-GMN, 2012 WL 83773, at *4 (D. Nev. Jan. 11, 2012)).  Further, Nevada Revised Statute section 107.080, the law governing non-judicial foreclosure, "does not require a lender to produce the original note or prove its status as a real party in interest, holder in due course, current holder of the note, nominee of the current holder of the note, or any other synonymous status as a prerequisite to non-judicial foreclosure proceedings." *Id.* (quoting *Villa*

*v. Silver State Fin. Servs., Inc.*, No. 2:10-cv-02024-LDG, 2011 WL 1979868, at *6 (D. Nev. May 20, 2011) (quoting *Kwok v. Recontrust Co., N.A.*, No. 2:09-cv-2298-RLH-LRL, 2010 WL 4810704, at *4 (D. Nev. Nov. 19, 2010))) (citing *Ritter v. Countrywide Home Loans, Inc.*, No. 2: 10-cv-00634-RLH-RJJ, 2010 WL 3829378, at *3 (D. Nev. Sept. 24, 2010) ("[T]he court has consistently held that NRS § 107.080 does not require MERS or any other similar entity to show it is the real party in interest to pursue non[-]judicial foreclosure actions.")).

Although the Nevada District Court appears to have held in favor of the Trust, the Claimants are correct that *Edelstein* holds that the designation of MERS as the nominee for the lender and as beneficiary under the Deed of Trust does split the Note and Deed of Trust under Nevada Law; and further, the split may only be cured by a written instrument establishing that the Note and Deed of Trust have been reunited. *See Edelstein*, 286 P.3d at 256–61. Whether the Trust is correct that the *Edelstein* opinion only applies in the context of prerequisites to the foreclosure mediation program in Nevada need not be addressed by the Court. Rather, based on the documents before the Court, any "split" in the Note and Deed of Trust was cured by the PSA and Assignment and Assumption Agreement such that the Note and Deed of Trust were reunited in the securitization Trust, with (i) US Bank as Trustee, (ii) RFC as master servicer, and (iii) GMACM as sub-servicer of the Loan. (*See* Reply Exs. 2–3.) Specifically, (1) the Assumption and Assignment Agreement assigns the Note and Deed of Trust pursuant to RFC's authority as master servicer to RAMP; and (2) the PSA states that the original Note, the Deed of Trust registered with MERS, and the Assignment and Assumption Agreement are to be assigned from RAMP to US Bank as Trustee for the Trust. Based on this reunification of the underlying instruments, the Court **SUSTAINS** the Objection to the extent the Claims are based on wrongful foreclosure for lack of standing.

C.        **First Cause of Action (Violations of Various Nevada Revised Statutes)**

In support of the First Cause of Action, the Claimants' Complaint asserts that the Debtors

violated Nevada Revised Statutes sections 107.080, 107.085, 107.086, 107.087, and 107.090.

(Compl. ¶¶ 67–76.)  According to the Claimants, these statutes "set time limits on when a non-

judicial foreclosure can be conducted, the manner in which the non-judicial foreclosure can be

conducted, and the notices which must be provided to those grantors or others with an interest in

the subject property before any sale can be conducted."  (*Id.* ¶ 68.)  The Claimants allege:  (1) the

Debtors failed to satisfy these statutory requirements; (2) GMACM proposed and agreed to a

loan modification of $1,600 per month that it failed to honor; and (3) GMACM represented that

the foreclosure sale was on hold.  (*Id.* ¶¶ 67–76.)  Addressing each of the cited statutory

provisions in turn, the Court concludes that not one of the statutory provisions provides a valid

basis for the Claims.

First, the 2003 version of section 107.085 requires the foreclosing party to:

> (a) . . . serve upon the grantor a notice in the form described in
> subsection 3 [no later than 60 days before the foreclosure sale
> date]; and (b) If an action is filed in a court of competent
> jurisdiction claiming an unfair lending practice in connection with
> the trust agreement, the date of the sale is not less than 30 days
> after the date the most recent such action is filed.

NEV. REV. STAT. § 107.085 (2003).  This version of the statute only applies to loans that were

subject to the Home Ownership Equity Protection Act of 1994, which the Claimants' Loan was

not.  *Id.*  As such, the Court **SUSTAINS** the Objection to the First Cause of Action to the extent

it is based on the 2003 version of section 107.085.

According to the Nevada statute, the following was required and effective during the

period of July 1, 2009 to June 30, 2011:

> 2.   The trustee shall not exercise a power of sale pursuant to NRS
> 107.080 unless:

22

> (a) In the manner required by subsection 3, not later than 60 days before the date of the sale, the trustee causes to be served upon the grantor or the person who holds the title of record a notice in the form described in subsection 3; and
>
> (b) If an action is filed in a court of competent jurisdiction claiming an unfair lending practice in connection with the trust agreement, the date of the sale is not less than 30 days after the date the most recent such action is filed.

NEV. REV. STAT. § 107.085 (2009). To the extent the Claimants rely on this version of the statute, the First Cause of Action fails. This version cannot apply to the Notice of Default because it was recorded prior to July 1, 2009. *See id.*; *see also Evans v. Aurora Loan Servs., LLC*, No. 2:09-cv-02401-RLH-LRL, 2010 WL 2545639, at \*3 (D. Nev. June 18, 2010). The Objection is therefore **SUSTAINED** on this ground.

Second, the parties agree that section 107.086 prescribes Nevada's foreclosure mediation program. *See* NEV. REV. STAT. § 107.086. Based on a review of the history and versions of this statutory provision, section 107.086 did not go into effect until July 1, 2009. *See id.* For the same reason the 2009 version of section 107.085 cannot apply in this case, section 107.086 cannot apply either. Consequently, the Court **SUSTAINS** the Objection to the extent the First Cause of Action is based on this provision.

Third, as to sections 107.080 and 107.087, the Trust shifted the burden in its Objection to the Claimants in arguing that there was no defect in the foreclosure notices that would constitute violations of these statutes. Further, the Trust argues that the Trustee's Deed Upon Sale attests to the fact that these requirements were met. (Obj. ¶ 37 (citing Simmons Decl. Ex. 19).) The First Cause of Action under these statutes, then, relies solely on the allegation that the Debtors did not properly serve the Notice of Trustee's Sale upon Longoni. The affidavit of mailing which

evidences the service of the Notice of Trustee's Sale upon Longoni directly contradicts the

Claimants allegation.  (*See* Reply Ex. 1.)  Thus, the Objection is **SUSTAINED** on this score.

Finally, as to section 107.090, which addresses the trustee's obligation to provide a notice

of default to a "person with an interest" who files a request in the office of county recorder, the

statute is inapplicable.  The Claimants do not establish that there was any "person with an

interest" who filed a notice in the county recorder's office that would trigger the effect of this

provision.  As such, the Objection is **SUSTAINED** to the extent the Claims are based on section

107.090 of the Nevada Revised Statutes.

### D.    Second Cause of Action (Violation of Nevada Revised Statute 205.372)

The Second Cause of Action alleges that the Debtors violated Nevada Revised Statutes

section 205.372, which sets forth the crime of mortgage lending fraud.  Specifically, the

Complaint alleges that:  (1) the Notice of Default incorrectly states that the Claimants were in

default on the Loan; (2) the Notice of Trustee's Sale incorrectly states that the Claimants were in

default under the Deed of Trust; and (3) the Trustee's Deed Upon Sale incorrectly states that all

applicable statutory requirements and all duties required by the Deed of Trust were performed.

(Compl. ¶¶ 80–82.)

Section 205.372 states in relevant part:

> 1.  A person who is a participant in a mortgage lending transaction and who:
>
>   (a)  Knowingly makes a false statement or misrepresentation concerning a material fact or knowingly conceals or fails to disclose a material fact;
>
>   (b)  Knowingly uses or facilitates the use of a false statement or misrepresentation made by another person concerning a material fact or knowingly uses or facilitates the use of another person's concealment or failure to disclose a material fact;

. . .

> Commits the offence of mortgage lending fraud which is a
> category C felony and, upon conviction, shall be punished by
> imprisonment in the state prison for a minimum term of not
> less than 1 year and a maximum term of not more than 10
> years, or by a fine of not more than $10,000, or by both fine
> and imprisonment.

NEV. REV. STAT. § 205.372. The statute also provides a private right of action. *Id.* The

Claimants, however, have failed to establish that they are entitled to bring this private right of

action. The Claimants focus on purportedly false statements in the Notice of Default and Notice

of Trustee's Sale that the Claimants were in default. Based on the record before the Court, the

Claimants were in default on the Loan as of December 2008 and the trial modification payments

Longoni made in March through June 2009 did not cure this default. The statements the

Claimants rely on are, therefore, true and cannot give rise to a viable claim under this statutory

provision. Accordingly, the Objection to the Claims is **SUSTAINED** to the extent they are

based on section 205.372 of the Nevada Revised Statutes.

### E.    Third Cause of Action (Fraud and Misrepresentation)

To adequately plead a cause of action for fraud under Nevada law, a plaintiff must allege:

"(1) that the defendant made a false representation of material fact which he knew to be false; (2)

that the defendant intended the plaintiff to rely on that statement; (3) that the plaintiff relied on

that misrepresentation to his detriment; and (4) damages resulting from the misrepresentation."

*Longoni*, 2010 WL 5186091, at *4 (citing *Chen v. Nev. State Gaming Control Bd.*, 994 P.2d

1151 (Nev. 2000)). Justifiable reliance on an alleged false representation is not sufficiently

alleged where "the recipient has information which would serve as a danger signal and a red light

to any normal person of his intelligence and experience." *Collins v. Burns*, 741 P.2d 819, 821

(Nev. 1987).

The Debtors' motion to dismiss filed in the Nevada Action argued that the fraud claim

fails because the Claimants did not plead detrimental reliance. *Longoni*, 2010 WL 5186091, at

*4. The Nevada District Court denied the Debtors' argument stating:

> [I]n their complaint, plaintiffs allege that GMAC[M] employee
> Stephenson had told them in June 2009, that they had received a
> permanent loan modification.  Further, plaintiffs allege that
> Stephenson assured them that foreclosure proceedings were on
> hold and no further action would be taken while the new
> GMAC[M] requested modification application was pending.
> Finally, plaintiffs allege that they relied upon these statements to
> their detriment by making the modified payments for three months
> and making no preparations to leave their home thereby incurring
> additional moving costs after the house was sold at the trustee's
> sale.  Accordingly, the court finds that these allegations are
> sufficient to state a claim for fraudulent misrepresentation.

*Id.* The Trust's arguments before this Court are essentially the same as the Debtors' arguments

raised in the Nevada Action and rest on the Claimants' purported failure to state a claim.  This

Court agrees with the Nevada District Court's holding that such arguments are insufficient to

dismiss this cause of action at this stage in the pleadings.

However, the Trust does raise the novel argument that Gagnon and Lacey Longoni lack

standing to assert a fraud claim against the Debtors because they did not have direct contact with

the Debtors, and therefore the misrepresentations upon which the claim is based were not made

to them.  The Claimants failed to address the standing argument in their Opposition, thereby

failing to meet their burden.  The Court concludes that Gagnon and Lacey Longoni do not have

standing to bring this Third Cause of Action. *See Volpicelli v. Edwards*, Case No. 56747, 2011

WL 2410299, at *1 (Nev. Sup. Ct. June 9, 2011).

In sum, the Objection to the Third Cause of Action is **OVERRULED** to the extent it is

asserted by Longoni, but it is **SUSTAINED** to the extent it is asserted by Gagnon and Lacey

Longoni.

### F.    Fourth Cause of Action (Negligence)

The Fourth Cause of Action calls on several different alleged duties and breaches on the

part of the Debtors.  First, the Complaint alleges that the Debtors owed a duty to the Claimants to

refrain from any conduct which unlawfully interfered with their rights to peaceful occupancy of

the Property and that the Debtors breached this duty by acting negligently, proximately causing

the unlawful foreclosure sale of the Property to a third party and ejection of the Claimants from

their home.  (Compl. ¶ 105.)  Second, the Complaint alleges that the Debtors had a duty of care

as prescribed by Nevada's foreclosure laws and that the Debtors breached this statutory duty by

foreclosing on the Property without proper standing and without honoring the Claimants'

purported cure of the default through the permanent loan modification, thereby giving rise to a

negligence per se claim.  (*Id.* ¶¶ 106–07, 109.)  Third, the Complaint alleges that the Debtors, in

the course of their business, profession, or employment, supplied false information for the

guidance of the Defendants in their business transactions and the Debtors failed to exercise

reasonable care or competence in obtaining and communicating such information.  (*Id.* ¶¶ 110–

11.)  Fourth, the Complaint alleges that the Debtors "are subject to liability to the [Claimants] for

the physical harm resulting from their failure to exercise reasonable care to perform this

undertaking – in particular, the represented loan modification – in that the defendants' failure to

exercise such care increased the risk of harm and foreclosure to the plaintiffs."  (*Id.* ¶ 114.)  The

Complaint also alleges that the Claimants suffered monetary damages as well as emotional

distress damages.  (*Id.* ¶¶ 117–18.)

27

The Trust's Objection characterizes the Fourth Cause of Action as being grounded on two legal theories: (1) negligence; and (2) negligent misrepresentation. (Obj. ¶¶ 49–52.) As to the negligence theory, the Trust argues that the Fourth Cause of Action fails because the Debtors did not owe a duty to the Claimants. (*Id.* ¶¶ 50–51.) According to the Trust, under Nevada law, financial institutions do not owe a duty of care to borrowers absent a special relationship. (*Id.*) The Trust asserts that the Claimants fail to allege any facts supporting a finding that a special relationship existed in this case. (*Id.*) As to the negligent misrepresentation theory, the Trust argues that Nevada law holds that "fraud" is an essential element of such a claim and the Fourth Cause of Action necessarily fails for the same reasons the fraud cause of action fails. (*Id.* ¶ 52.)

The Opposition characterizes the Fourth Cause of Action under more than just the two theories addressed by the Trust. First, the Opposition characterizes the Fourth Cause of Action as a pure negligence per se claim and argues that the Trust is incorrect that no duty is owed on the part of the Debtors. (*Id.* ¶¶ 55–56.) The Opposition reiterates the allegations in the Complaint, asserting that the Nevada statutes regarding foreclosure set the minimum duty of care that financial institutions owe to borrowers; the Debtors' violation of those statutes, the Claimants allege, constitutes a breach of their duty and gives rise to the negligence claim. (*Id.*) Alternatively, the Opposition asserts that the "no duty" rule should not apply in this context, because GMACM undertook efforts to modify the Loan and therefore assumed a duty of pursuing such efforts with reasonable care. (*Id.* ¶¶ 59–60.) Second, the Opposition classifies the Fourth Cause of Action as a negligent misrepresentation claim. (*Id.* ¶¶ 58.) The Claimants argue that the Debtors made false statements of fact with respect to the stay of the foreclosure sale and the approval of the permanent loan modification that are sufficient to give rise to this theory of relief. (*Id.*) Third, the Opposition classifies the Fourth Cause of Action as a claim for negligent

infliction of emotional distress.  (*Id.* ¶ 61.)  The Claimants assert that the alleged wrongful

foreclosure caused emotional distress with physical manifestations and this claim has been

adequately alleged in the Complaint.  (*Id.*)  The Claimants, however, only demonstrate that some

but not all four of these negligence based theories of relief constitute viable claims.

First, the negligence per se theory fails and the Objection on this score is **SUSTAINED**.

As indicated above, the Claimants do not adequately allege that the Debtors violated any Nevada

statutory provisions.  Without such violations, the Claimants cannot state a claim for negligence

per se.  *See, e.g.*, *Larson v. Homecomings Fin., LLC*, 680 F. Supp. 2d 1230, 1236 (D. Nev. 2009)

("To state a claim for negligence per se, a plaintiff must allege that (1) he belongs to a class of

persons that a statute was intended to protect; (2) defendant violated the relevant statue; (3)

plaintiff's injuries are the type against which the statue was intended to protect; (4) the violation

was the legal cause of plaintiff's injury; and (5) plaintiff suffered damages." (citing *Anderson v.

Baltrusaitis*, 944 P.2d 797, 799 (1997)).

Second, the Objection is **SUSTAINED** to the extent the Fourth Cause of Action is based

on the Claimants' assertion that the Debtors assumed a duty of care by entering into negotiations

with Longoni regarding modification options.  A duty owed by the defendant to the plaintiff is an

essential element of a negligence claim under Nevada law.  *See Hammerstein v. Jean Dev. W.*,

907 P.2d 975, 977 (Nev. 1995) (per curiam) (stating negligence claims consist of the following

elements:  "(1) that defendant owed him a duty of care; (2) that defendant breached this duty of

care; (3) that the breach was the legal cause of plaintiff's injury; and (4) that the complainant

suffered damages." (citing *Doud v. Las Vegas Hilton Corp.*, 864 P.2d 796, 798 (Nev. 1993))).  In

the mortgage lending context, the Nevada District Court has recognized that a "lender generally

owes no duty of care to its borrower[, b]ut this is only true in a lender's 'conventional role as a

mere lender of money.'"  *Weingartner v. Chase Home Fin., LLC*, 702 F. Supp. 2d 1276, 1290
(D. Nev. 2010) (citation omitted).  While Nevada law does recognize a duty on the part of a
financial institution if the plaintiff is able to sufficiently allege a "special relationship" exists
between the institution and the plaintiff, the allegations must "amount to more than an arm's
length transaction" to establish the requisite duty of care.  *See Larson*, 680 F. Supp. 2d at 1235–
36.  More specifically, the Nevada District Court has held that a "special relationship" based on
the financial institutions' advice on various loan options to the borrower and superior knowledge
the borrower trusted is insufficient to give rise to a duty upon which a viable negligence claim
may be based.  *Id.*

Here, the Claimants' reliance on the Debtors' engagement in loan modification
negotiations is inadequate.  Such negotiations are nothing more than "arm's length" negotiations
that Nevada courts would not recognize as giving rise to a duty.  *Id.*  In any event, the Complaint
fails to allege that the Debtors did not exercise reasonable care in the modification negotiations.
Rather, the only conduct at issue relates to whether the modification was ultimately approved
and abided by.  Whether or not the Debtors had a duty to negotiate with reasonable care, the
Claimants do not and cannot argue that the Debtors had a duty to approve the modification.

Third, the Court finds and concludes that the Claimants' negligent misrepresentation
theory survives in part.  Under Nevada law, a negligent misrepresentation claim must be pled
with particularity pursuant to Federal Rule of Civil Procedure 9(b), much like a typical fraud
claim.  *Padilla v. PNC Mortg.*, No. 3:11-cv-0326-LRH-VPC, 2011 WL 3585484, at *3 (D. Nev.
Aug. 15, 2011) (citing cases); *see also Scaffidi v. United Nissan*, 425 F. Supp. 2d 1159, 1169–70
(D. Nev. 2005) ("Although the word 'fraud' is not found anywhere in the Restatement
definition—nor is the intent requirement that normally must accompany an allegation of

common law fraud—fraud is still an 'essential element' of a negligent misrepresentation claim."

(citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003)).  Since the

Claimants' negligent misrepresentation theory is based on essentially the same allegations as the

Claimants' Third Cause of Action sounding in fraud, the Court **SUSTAINS** in part and

**OVERRULES** in part the Objection to the negligent misrepresentation theory in the same

manner.

Finally, the Court **OVERRULES** the Trust's Objection to the Fourth Cause of Action to

the extent it is based on negligent infliction of emotional distress.  The Trust did not challenge

this theory of relief in the Objection and therefore failed to shift the burden to the Claimants to

establish the viability of their claim.[14]

### G.    Fifth Cause of Action (Breach of Contract)

The Claimants' Fifth Cause of Action is based on two separate contracts.  First, the

Claimants point to the Loan, comprised of the original Note and Deed of Trust, asserting that

various provisions relating to the Debtors' obligation to abide by Nevada state and federal laws

were violated by the Debtors.  (Compl. ¶ 132.)  According to the Claimants, the statutes the

Debtors violated in breach of the Loan agreement are the same statutes upon which the

Claimants base their First and Second Causes of Action.  Similar to the unsuccessful First and

Second Causes of Action, the Claimants failed to plausibly allege that the Debtors violated the

Nevada statutes.  Without such violations, the Claimants cannot prove that the Debtors breached

the Loan and in turn fail to state a breach of contract claim.  *See Tene v. BAC Home Loan*

*Servicing LP*, No. 2:11-CV-01095-KDJ-PAL, 2012 WL 222920, at *2 (D. Nev. Jan. 25, 2012)

---

[14]    The Court also **OVERRULES** the Objection to this theory of relief in accordance with this Court's
disposition of the Claimant's Sixth Cause of Action grounded in the intentional infliction of emotional distress
addressed below.

(stating breach of contract claim must consist of the following elements:  "(1) the existence of a

valid contract, (2) that plaintiff performed or was excused from performance, (3) that the

defendant breached, and (4) that the plaintiff sustained damages." (citing *Calloway v. City of*

*Reno*, 1993 P.2d 1259, 1263 (Nev. 2000))).  As such, the Objection to this first breach of

contract theory is **SUSTAINED**.

Second, the Claimants allege that Longoni and GMACM entered into a binding loan

modification agreement that was established through oral representations and upon Stephenson's

June 30, 2009 email stating that a permanent modification was approved by GMACM.  (*Id.*

¶ 133.)  The Claimants allege that the enforceability of the contract is evidenced by Longoni's

payment of the three $1,600 monthly payments pursuant to the agreement's terms and

GMACM's acceptance of such payments.  (*Id.* ¶¶ 134–35.)  The Claimants further allege that the

Debtors breached the implied covenant of good faith and fair dealing in violating the Nevada

statutes and failing to abide by the loan modification approval.  (*Id.* ¶¶ 137–38.)  The Trust

objects, asserting that the alleged loan modification is unenforceable because it fails to comply

with the Statute of Frauds.  (Obj. ¶¶ 53–57.)  The Nevada District Court has held that deeds of

trust are subject to the Statute of Frauds, including oral agreements to modify deeds of trust.

*Davila v. BAC Home Loans Servicing, LP*, No. 2:10-cv-02252-ECR-GWF, 2011 WL 3159146,

at *2 (D. Nev. July 26, 2011) (citations omitted).  More specifically, courts have held that

purported oral loan modification agreements fall within the Statute of Frauds because they

cannot be performed within one year.  *See, e.g.*, *Corchado v. BAC Home Loans Servicing*, No.

2:10-CV-01860-KJD, 2011 WL 4573905, at *2 (D. Nev. Sept. 29, 2011); *Ctr. of Hope v. Wells*

*Fargo*, 781 F. Supp. 2d 1075, 1080 (D. Nev. 2011).  Although partial performance pursuant to

the terms of the alleged oral contract may be sufficient to overcome the bar of the Statute of

32

Frauds in certain contexts, *see Bronner v. Park Place Entm't Corp.*, 137 F. Supp. 2d 306, 312

(S.D.N.Y. 2001), at least one court has held that reduced mortgage payments paid by the

borrower and accepted by the financial institution for a period of five months were insufficient to

establish a valid loan modification contract, *Corchado*, 2011 WL 4573905, at *2.

        To the extent the Claimants base this breach of contract theory on oral representations,

the Statute of Frauds bars the enforceability of the oral modification and Longoni's three

monthly trial payments are insufficient evidence of partial performance.  *See id.*  To the extent

the Claimants rely on the emails between Stephenson and Longoni to establish a "writing"

satisfying the Statute of Frauds, the emails do not provide uncontroverted evidence that a

contract was formed between the parties memorializing a permanent modification on the exact

terms as negotiated between Longoni and Stephenson for the trial modification.  To the contrary,

Stephenson's emails on June 30, 2009, though they state that he believed the permanent loan

modification was approved, specifically indicate that he did not know what the exact terms of the

allegedly approved modification were and that Longoni would have to follow up with other

GMACM representatives to find out such terms.  The emails also illustrate that Longoni was

clearly on notice that the three-month trial modification plan was just that, a *trial*, and that she

was not guaranteed a permanent modification on those exact terms.  Moreover, shortly after

Stephenson told Longoni a modification was approved, GMACM employees informed her that

this was incorrect and that she would have to apply for a modification under HAMP.  On

balance, the Claimants fail to point to a valid and enforceable contract underlying this second

breach of contract theory.  The Court therefore **SUSTAINS** the Objection to this theory.

### H.    Sixth Cause of Action (Intentional Infliction of Emotional Distress)

The elements of an intentional infliction of emotional distress claim under Nevada law are: "(1) extreme or outrageous conduct on the part of the defendants; (2) intent to cause emotional distress or reckless disregard for causing emotional distress; (3) that the plaintiff actually suffered extreme or severe emotional distress; and (4) causation." *Franchise Tax Bd. of State of Cal. v. Hyatt*, 335 P.3d 125, 147 (Nev. 2014) (citation omitted).  As to the first element, extreme and outrageous conduct is that which is "'outside all possible bounds of decency' and is intolerable in civil life." *Longoni*, 2010 WL 5186091, at *5 (quoting *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 25 (Nev. 1998)).  To prove the third element, the plaintiff must set forth "objectively verifiable indicia." *Hyatt*, 335 P.3d at 147 (citation omitted).  Nevada courts apply a sliding scale approach such that "[t]he less extreme the outrage, the more appropriate it is to require evidence of physical injury or illness from the emotional distress." *Id.* at 148 (citation omitted).

The Nevada District Court upheld the Sixth Cause of Action in denying the Debtors' motion to dismiss, stating:

> [U]nder the facts alleged in the complaint, namely that defendants requested plaintiffs apply for a different loan modification and assured plaintiffs that the foreclosure was on hold during this new application process, [the Claimants] have alleged extreme and outrageous conduct sufficient to state claim for intentional infliction of emotional distress by the subsequent trustee's sale less than a month later.

*Id.* at *6.  The Court agrees with the Nevada District Court's holding and therefore **OVERRULES** the Objection to the Sixth Cause of Action on the same grounds.[15]

---

[15]    To the extent the Trust raises a novel argument that the Claimants fail to sufficiently allege the physical manifestations of their emotional distress in support of this cause of action (*see* Obj. ¶ 58), the Court disagrees.  At this stage of the pleadings, the Claimants provided sufficient allegations of such physical manifestations in their

(Footnote continues on next page.)

## I.      Seventh Cause of Action (Promissory Estoppel)

The Seventh Cause of Action is based on GMACM's alleged promises that the Claimants were approved for a permanent loan modification with $1,600 monthly payments and that the foreclosure was on hold.  (Compl. ¶¶ 179–85.)  The Nevada District Court previously upheld the Seventh Cause of Action against the Debtors' motion to dismiss, finding that the Debtors made the same failing arguments to dismiss this cause of action as they did to dismiss the fraud cause of action.  *Longoni*, 2010 WL 5186091, at *6.  Since this Court agrees with the Nevada District Court's holding as to the Claimant's fraud claim, the Court similarly agrees with the Nevada District Court's holding as to the Claimants' promissory estoppel claim.  Accordingly, the Objection to the Seventh Cause of Action is **OVERRULED**.[16]

## J.      Eighth Cause of Action (Concert of Actions)

In support of the Eighth Cause of Action, the Complaint alleges that  each of the Defendants:  (1) committed a tortious act in concert with one another or pursuant to a common design, plan, or scheme with one another, (2) knew that the others' conduct constituted a breach of duty and gave substantial assistance or encouragement to the other, or (3) gave substantial assistance to the other in accomplishing the tortious result and each of their own conduct, separately considered, constituted a breach of duty to the claims.  (*Id.* ¶¶ 189–91.)  The

---

(Footnote continued from previous page.)

Opposition, supported by Longoni's sworn affidavit to meet their burden.  (*See* Opp. ¶¶ 67–68 (citing Longoni Aff. ¶¶ 38–42).)

[16]      The Trust argues that Gagnon and Lacey Longoni do not have standing to assert the promissory estoppel claim against the Debtors because the promises upon which the claim is based were not made to them, but rather were only made to Longoni.  (Obj. ¶ 64.)  The Trust, however, fails to provide sufficient legal authority demonstrating that Nevada law requires that the promises be made directly to the plaintiff in order for such plaintiff to have the requisite standing.  *See Rippy v. Ravellette*, No. B154286, 2002 WL 31372056, at *3–5 (Cal. Ct. App. Oct. 22, 2002) (suggesting that standing to bring a promissory estoppel claim relates more to the injury rather than to whom the relevant promise was made).  As such, the Court **OVERRULES** the Objection on this score without prejudice.

Complaint also alleges that each Defendant conspired to create separate entities in order to shield and hide from public scrutiny their wrongful actions, and to attempt to avoid legal liability for conduct which they knew, or should have known, was unlawful or wrongful. (*Id.* ¶ 192.) As the Trust rightly points out, this cause of action is based on allegations that all of the Defendants worked in concert, while the Nevada Action, and this claim objection, only remains as against GMACM and ETS. (*See* Obj. ¶ 66.) In any event, the Claimants fail to establish that GMACM and ETS worked in concert with one another to harm the Claimants. To the contrary, the Claimants' allegations suggest that ETS and GMACM were anything but in concert with one another with respect to the hold of the foreclosure sale. The Claimants do not address the deficiency of their Eighth Cause of Action in their Opposition. The Objection to this cause of action is therefore **SUSTAINED**.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, the Court holds that the Objection to the Claims is:

1. **SUSTAINED with prejudice** as to the Claimants' standing challenge;

2. **SUSTAINED with prejudice** as to the First Cause of Action;

3. **SUSTAINED with prejudice** as to the Second Cause of Action;

4. **OVERRULED without prejudice** as to the Third Cause of Action to the extent it is asserted by Longoni, but is **SUSTAINED with prejudice** to the extent the Third Cause of Action is asserted by Gagnon and Lacey Longoni;

5. **SUSTAINED with prejudice** such that the Fourth Cause of Action premised on negligence per se and negligence arising out of a duty of care in entering into loan modification negotiations is dismissed; is partially **SUSTAINED with prejudice** and partially **OVERRULED without prejudice** as to the Fourth Cause of Action

to the extent it is premised on negligent misrepresentation, in accordance with the

Court's holding regarding the Third Cause of Action; and is **OVERRULED**

**without prejudice** such that the Fourth Cause of Action, to the extent it is

premised on negligent infliction of emotional distress, survives this stage of the

pleadings;

6. **SUSTAINED with prejudice** as to the Fifth Cause of Action;

7. **OVERRULED without prejudice** as to the Sixth Cause of Action;

8. **OVERRULED without prejudice** as to the Seventh Cause of Action; and

9. **SUSTAINED with prejudice** as to the Eighth Cause of Action.

The Trust shall confer with the Claimants' counsel within fourteen (14) days from the date

of this Opinion to discuss possible settlement of the Claims.  Additionally, as directed on the

record at the Hearing, counsel shall confer regarding the scheduling of any discovery and an

evidentiary hearing, as well as further briefing before trial.  Counsel shall thereafter promptly file

a status letter advising the Court of the proposed schedule.  The Trust's counsel shall set this

matter for a further status conference during the next available omnibus hearing date.  The

Claimants' Nevada counsel may participate by telephone.  The Court will enter a scheduling

order following that conference.

**IT IS SO ORDERED.**

Dated:    July 1, 2015
          New York, New York

_____*Martin Glenn*_____
          MARTIN GLENN
          United States Bankruptcy Judge