**Hearing Date and Time: July 30, 2015 at 10:00am (Prevailing Eastern Time)**

**RENNERT VOGEL MANDLER & RODRIGUEZ, P.A.**
Miami Tower
100 S.E. Second Street, Suite 2900
Miami, Florida 33131
Telephone: (305) 577-4177
Facsimile: (305) 533-8519

*Counsel for Claimant, Law Offices of David J. Stern, P.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ————————————— ) | | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| Residential Capital, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ————————————— ) | | |

**CLAIMANT LAW OFFICES OF DAVID J. STERN, P.A.'S**
**RESPONSE IN OPPOSITION TO RESCAP LIQUIDATING TRUST'S**
**OBJECTION TO PROOFS OF CLAIM NOS. 5275 AND 7464 FILED BY**
<u>**THE LAW OFFICES OF DAVID J. STERN, P.A. [D.E. 8531]**</u>

**[Hearing requested for contemporaneously filed *Motion for Permissive Abstention***
**(the "Abstention Motion") on a date prior to the July 30, 2015 Hearing on the**
**Debtor's Objection to the Claim of DJSPA [D.E. 8531] or, in the alternative,**
**for this Court to hear argument on the Abstention Motion on July 30, 2015**
<u>**prior to hearing argument on the Objection [D.E. 8531]].**</u>

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...................................................................1

PROCEDURAL AND FACTUAL BACKGROUND...............................................2

BURDEN OF PROOF ...............................................................................9

ARGUMENT ........................................................................................11

1.  **GMAC'S OBJECTION SHOULD BE DENIED BECAUSE IT DOES NOT PRESENT ANY COMPETENT EVIDENCE IN THIS ACTION TO SHIFT THE BURDEN BACK TO DJSPA**...........................11

    A.  David Cunningham's Declaration Does Not Shift GMAC's Burden Because it is Improperly Based on Hearsay, Opinion, and "Information and Belief". ....................................................11

    B.  John Smith T., Esq.'s Declaration Does Not Satisfy GMAC's Burden Because it is Based on Hearsay...................................13

    C.  GMAC Fails to Produce Any Evidence on the Dispositive Issues. ........13

2.  **EVEN IF THIS COURT WERE TO DECLINE TO STRIKE GMAC'S DECLARATIONS AND ACCEPT EVERYTHING IN THE IMPROPER DECLARATIONS AS TRUE, IT WOULD ONLY CREATE DISPUTED MATERIAL FACTUAL ISSUES THAT CANNOT BE RESOLVED AT THIS STAGE, ESPECIALLY WHERE DISCOVERY IS OUTSTANDING**................................14

3.  **THE FIRST MATERIAL BREACH DOCTRINE CANNOT BE APPLIED TO COMPLETELY ELIMINATE DJSPA'S RIGHT TO RECOVER LEGAL FEES AND COSTS FROM GMAC FOR THE SERVICES THAT DJSPA RENDERED AND THAT GMAC ACCEPTED**...............................................................15

    A.  The First Material Breach Doctrine. ....................................15

    B.  Recognized Exceptions to the First Material Breach Doctrine...............15

C. The First Material Breach Doctrine Does Not Apply to Legal Services That DJSPA Performed Under the MSA. ..............................18

D. The First Material Breach Doctrine Does Not Apply to Work That DJSPA Performed Under the Curative Agreement.. ............................19

E. The First Material Breach Doctrine Cannot Be Used to Strike DJSPA's Claim "in Toto" Because This Doctrine is Not Applicable to DJSPA's Alternatively Plead Theories of Recovery........21

4. **DJSPA ALREADY STATED A CLAIM IN THE DISTRICT COURT LAWSUIT.   SHOULD THIS COURT CONSIDER GMAC'S DEFENSES TO THAT SUIT IN CONNECTION IN THIS PROCEEDING, THEN DISPUTED FACTUAL ISSUES EXIST THAT CANNOT BE RESOLVED AT THIS STAGE**................................22

A. Who is responsible for the delays in completing GMAC's foreclosures? .......................................................................22

B. Is GMAC entitled to a setoff for "transfer fees" to shift the files from DJSPA to its replacement counsel?................................25

C. Was GMAC aware of DJSPA's offshore operations when GMAC entered into the Curative Agreement? ....................................27

D. Did DJSPA breach the MSA and/or Curative Agreement by Committing Malpractice? .......................................................27

5. **IF GMAC SEEKS AFFIRMATIVE RELIEF FROM DJSPA VIS-À-VIS COUNTERCLAIMS, THOSE CLAIMS SHOULD BE RESOLVED IN AN ADVERSARY PROCEEDING.** ...................................29

6. **THE ESCROW MONIES SHOULD NOT BE RELEASED TO THE ESTATE BECAUSE THEY ARE SUBJECT TO A RETAINING LIEN IMPOSED BY FLORIDA LAW.**...........................................29

NOTICE.......................................................................................................30

CONCLUSION.............................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Abdallah v. Caribbean Sec. Agency,*
    557 F.2d 61 (3d Cir. 1977)...........................................................................17

*Acosta v. Dist. Bd. of Trustees of Miami–Dade Comm. Coll.,*
    905 So. 2d 226 (Fla. 3d DCA 2005) ...........................................................18

*Alesayi Beverage Corp. v. Canada Dry Corp.,*
    947 F. Supp. 658 (S.D.N.Y. 1996)...............................................................18

*Andrew Hall and Associates v. Ghanem,*
    679 So. 2d 60 (Fla. 4th DCA 1996) .............................................................29

*Brandin v. Gottlieb,*
    2000 WL 1005954 (Del. Ch. July 13, 2000)................................................17

*Canadian Indus. Alcohol Co. v. Nelson,*
    188 A. 39 (Del. 1936) ..................................................................................29

*Chrysler Corp. v. Airtemp Corp.,*
    426 A.2d 845 (Del. Super. 1980) .................................................................15

*Conley v. Dan-Webforming Int'l A/S (Ltd.),*
    1992 WL 401628 (D. Del. Dec. 29, 1992)...................................................17

*Diaz v. Dr. Bertram P. Shapiro, P.A.,*
    605 So. 2d 966 (Fla. 3d DCA 1992) ............................................................17

*Eureka Res., LLC v. Range Res.-Appalachia, LLC,*
    62 A.3d 1233 (Del. Super. 2012)..................................................................29

*Hamilton v. Suntrust Mortgage Inc.,*
    6 F. Supp. 3d 1300 (S.D. Fla. 2014) ............................................................17

*In re Donato,*
    2011 WL 6057551 (N.D. Ohio Dec. 6, 2011) ..............................................29

*In re Heath*,
>331 B.R. 424 (B.A.P. 9th Cir. 2005)............................................................................10

*In re Monetary Grp.*,
>118 B.R. 114 (Bankr. M.D. Fla. 1990) ........................................................................17

*In re NextMedia Grp., Inc.*,
>440 B.R. 76 (Bankr. D. Del. 2010) ..............................................................................15

*In re: Residential Capital, LLC*,
>513 B.R. 446 (Bankr.S.D.N.Y.2014)..............................................................................9

*In re Residential Capital, LLC*,
>2015 WL 588359 (Bankr. S.D.N.Y. Feb. 11, 2015)......................................................10

*Kim v. Kum Gang, Inc.*,
>2014 WL 2081775 (S.D.N.Y. May 12, 2014) ..............................................................23

*Kiobel v. Royal Dutch Petroleum Co.*,
>621 F.3d 111 (2d Cir. 2010)..........................................................................................10

*Law Offices of David J. Stern, P.A. v. Bank of America Corp.*,
>2012 WL 112935 (S.D. Fla. Jan. 12, 2012) .................................................................21

*MDS (Canada) Inc. v. Rad Source Technologies, Inc.*,
>720 F.3d 833 (11th Cir. 2013) ......................................................................................18

*Medecon Off. Sys. V. Patterson, Zimmerman & Hodes*,
>166 A.D.2d 694 (N.Y. App. Div. 1990) .......................................................................17

*NAS Electronics, Inc. v. Transtech Electronics PTE Ltd.*,
>262 F. Supp. 2d 134 (S.D.N.Y. 2003)...........................................................................17

*Patterson v. County of Oneida, New York*,
>375 F. 3d 206 (2nd Cir. 2004)..........................................................................11, 12, 27

*Paul T. Freund Corp. v. Commonwealth Packing Co.*,
>288 F. Supp. 2d 357 (W.D.N.Y. 2003) ...................................................................11, 13

*Realty Growth Investors v. Council of Unit Owners*,
    453 A.2d 450 (Del. 1982) ............................................................................17

*Sellers v. M.C. Floor Crafters, Inc.*,
    842 F.2d 639 (2d Cir. 1988)....................................................................11, 12

*U.S. v. Bosurgi*,
    530 F.2d 1105 (2d. Cir. 1976)................................................................11, 13

*U.S. v. Thomas*,
    315 Fed. App'x. 828 (11th Cir. 2009) .........................................................23

*Vaughn v. Air Line Pilots Ass'n, Int'l*,
    604 F.3d 703 (2d Cir. 2010)........................................................................10

*Wintter v. Fabber*,
    618 So. 2d 375 (Fla. 4th DCA 1993) ..........................................................30

*Yale Mortgage Corp. v. Wells Fargo Bank*, N.A.,
    2012 WL 3597438 (S.D. Fla. Aug. 20, 2010).............................................26

## Other Authorities

    *Fed. R. Bankr. P.* 7001.................................................................................29

    *Fed. R. Civ. P.* 8 .........................................................................................21

    *Fed. R. Civ. P.* 56 .......................................................................................11

    *Fed. R. Evid.* 803........................................................................................23

    *Fed. R. Evid.* 1006......................................................................................23

    Restatement (Second) of Contracts § 237 (1981)................................15, 16, 20

    Restatement (Second) of Contracts § 240 (1981)......................................15-17

    14 Williston on Contracts § 43:12 (4th ed.)................................................18

**Exhibits**

Exhibit A        Declaration of David J. Stern

Exhibit B        Declaration of Jeffrey A. Tew, Esq.

Exhibit C        DJSPA's First Set of Interrogatories to GMAC

Exhibit D        DJSPA's First Request for Production to GMAC

Exhibit E        DJSPA's Proposed Order

**TO THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

Claimant, the Law Offices of David J. Stern, P.A. (hereinafter "DJSPA" or the "Law Firm"), by and through counsel, hereby responds to Debtor, Rescap Liquidating Trust's (hereinafter "Liquidating Trust" or "GMAC"), ***Objection to Proofs of Claim Nos. 5275 and 7464 Filed by The Law Offices of David J. Stern*** (the "Objection"). [D.E. 8531]  In support of this response, DJSPA submits the Declarations of David J. Stern (annexed hereto as Exhibit A) and Jeffrey A. Tew, Esq. (annexed hereto as Exhibit B), the written discovery requests it served on GMAC on June 29, 2015 (annexed hereto as Exhibits C and D), and DJSPA's proposed order (annexed hereto as Exhibit E), and respectfully represents as follows:

## PRELIMINARY STATEMENT

It is undisputed that (i) from about 1995 until 2011, the Law Offices of David J. Stern, P.A. ("DJSPA") represented GMAC Mortgage, LLC ("GMAC") in tens of thousands of residential foreclosure cases in Florida; (ii) for the overwhelming majority of that 16 year period, there was a productive and positive attorney-client relationship between the parties; (iii) GMAC benefitted greatly from DJSPA's legal services, having recovered GMAC's collateral in a substantial percentage of these foreclosure suits; and (iv) from 2007 through 2010, DJSPA rendered several million dollars-worth of legal services and out-of-pocket costs for GMAC's benefit.

Despite the foregoing, GMAC's Objection asks this Court to excuse it from paying DJSPA approximately $5.5 million in legal fees for services already rendered and out-of-pocket costs that DJSPA incurred.  GMAC argues that its entitlement to this windfall is predicated on the "first material breach" doctrine and affirmative defenses that were raised in a district court action before it was stayed when GMAC filed for bankruptcy.  Yet the only evidence GMAC

provides in support of these defenses are a pair of self-serving affidavits based on hearsay, opinion, and "information and belief," which, on GMAC's best day, create disputed issues of fact requiring a trial and, on their worst, fail to shift the burden back to DJSPA.

As detailed further below, half of the fees that DJSPA is seeking payment of are based on legal services GMAC requested—and DJSPA provided—to correct the record in thousands of foreclosure cases where GMAC executed fraudulent affidavits without informing DJSPA.  The remaining fees DJSPA seeks payment of are based on pre-2011 legal services it provided to GMAC on regular residential foreclosure matters.  DJSPA's suit to recover those unpaid fees and costs were being adjudicated in the aforementioned federal district court action pre-stay.  Since virtually all material issues of fact in that action were (and remain) disputed, this Court should not attempt to resolve them now based solely on affidavits, but should deny GMAC's Objection and permit discovery before conclusively resolving these issues at a trial.

## PROCEDURAL AND FACTUAL BACKGROUND

### The Master Services Agreement (the "MSA").

DJSPA is a Florida law firm that, until 2011, provided foreclosure-related legal services to banks and other financial institutions.  *See* Declaration of David J. Stern attached hereto as Exhibit A.  In or about 1995, DJSPA began representing GMAC in foreclosure suits in Florida. *Id.* at ¶ 3.  On or about January 17, 2007, DJSPA and GMAC entered into the "Master Services Agreement" and related Statements of Work (collectively the "MSA"),[1] which formalized the scope of legal services DJSPA would provide and DJSPA's attendant compensation.  *Id.* Specifically, paragraphs 2.1 and 2.3 of the MSA obligated GMAC to pay (i) DJSPA for all legal services and costs rendered and (ii) all DJSPA invoices that GMAC did not object to within 30

---

[1]        A true and correct copy of the MSA is attached as Exhibit 1 to Exhibit A.

2

days of receipt. *See* Exhibit 1 to Exhibit A. Paragraph 3.2 also entitled DJSPA to payment for ". . . work satisfactorily completed and not previously paid," even if DJSPA was terminated. *Id.*

## DJSPA Renders Legal Services to GMAC Under the MSA from 2007-2010.

After executing the MSA, DJSPA provided quality legal services to GMAC pursuant to the MSA in thousands of foreclosure related legal proceedings in Florida from 2007 through 2010, and in turn, GMAC continued to refer foreclosure matters to DJSPA. *See* Exhibit A at ¶ 3, 4. DJSPA worked on a flat-fee basis, generally varying from $1,300.00 to $1,450.00 depending on which institution owned the note and mortgage. *Id.* at ¶ 6. Those amounts, however, were billed in increments as per Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac") guidelines.[2] *Id.*

DJSPA's flat fee included all legal services rendered, exclusive of costs, from the time the file was referred by GMAC through the entry of a judgment. *Id.* The first invoice from DJSPA to GMAC would generally include: a) half of the flat-fee; b) filing fee (varied by county); c) service of process fees (generally $45.00 per defendant); d) title work costs. *Id.* Additional fees for bankruptcy cases, contested/litigated foreclosures, reinstatements, and publishing costs would be billed on a case-by-case basis as incurred. *Id.*

## GMAC Officer Jeffrey Stephan Fraudulently Executes Tens of Thousands of Affidavits.

In late 2009 and early 2010, depositions in Florida and Maine foreclosure lawsuits revealed that GMAC—through Jeffrey Stephan, one of its officers—had fraudulently executed tens of thousands of affidavits and caused them to be filed in GMAC foreclosure lawsuits throughout the country. *See* Exhibit A at ¶ 8 and Exhibit 2 thereto. Given the scope and

---

[2]    Although a relatively small portion of invoices were for "Fannie Mae" or "Freddie Mac" files, all non-Freddie Mac work was billed to GMAC at the Fannie Mae rate ($1,300) pursuant to the parties' oral contract.

3

severity of GMAC's misconduct (which quickly became public and created a media firestorm), GMAC asked its long-time Florida counsel, DJSPA, to assist in identifying the actual extent of the fraud.  *Id.*; *see also* ¶¶ 5-10 of Declaration of Jeffrey Tew, Esq., attached hereto as Exhibit B. Accordingly, representatives of DJSPA (including David J. Stern ("Mr. Stern")) had numerous conversations with high-level executives and legal counsel at GMAC (including but not limited to, David Cunningham, Linda Walton and Joseph A. Pensabene) concerning the problems caused by GMAC's fraudulent affidavits.  *See* Exhibit A at ¶ 9.  After DJSPA spent a great deal of time and resources analyzing the problem, it was determined that GMAC's fraudulent affidavits were filed in over 4,000 GMAC foreclosure lawsuits between June 2008 and July 2010.  *Id.* at ¶ 9.

In August 2010, the Florida Attorney General's Office announced that it had commenced an investigation of DJSPA and other foreclosure law firms in Florida regarding their handling of foreclosure cases.[3]  *Id.* at ¶ 10.  Various news articles critical of DJSPA were published in the late summer and early fall of 2010, including an article appearing in *Mother Jones* magazine.  *Id.*

During the late summer and early fall of 2010, Mr. Stern had a series of conversations with several high-level officers and legal counsel at GMAC (including but not limited to, David Cunningham, Linda Walton and Joseph A. Pensabene) regarding (i) the facts and circumstances surrounding the Attorney General investigation; (ii) the negative publicity surrounding DJSPA; (iii) the creation of DJSP Enterprises, Inc. (including its role in providing processing and non-legal services to DJSPA's clients, including GMAC, in early 2010); and (iv) how to deal with GMAC's fraudulent affidavits.  *Id.* at ¶ 11.

---

[3]     The investigation by the Florida Attorney General, which GMAC trumpets as seminal event in its relationship with DJSPA, consisted solely of the issuance of a subpoena on DJSPA by the Florida Attorney General, which was ultimately quashed by a Florida appellate court for lack of jurisdiction.  *See Law Offices of David J. Stern, P.A. v. State*, 83 So. 3d 847 (Fla. 4th DCA 2011).

**The Curative Agreement.**

In September 2010, Mr. Stern traveled to GMAC's headquarters in Pennsylvania to meet personally with Joseph Pensabene, GMAC ResCap's Executive Vice President and Chief Servicing Officer. *Id.* at ¶ 12. As a result of this meeting (and after a comprehensive discussion of all the material issues between the parties),[4] GMAC retained DJSPA to assist GMAC in preparing and filing corrected affidavits in the foreclosure lawsuits in which fraudulent affidavits had been previously supplied by GMAC (the "Curative Agreement").[5] *Id.* GMAC and DJSPA also agreed that their relationship would continue once DJSPA completed the work contemplated by the Curative Agreement, at which time GMAC would resume sending foreclosure cases to DJSPA at the customary volume that it had during previous years. *Id.*

The Curative Agreement was a separate and distinct contract from the MSA with different terms concerning scope of work and payment. *Id.* The legal fees contemplated under the Curative Agreement were divided into the following four "buckets," with each assigned a different flat-fee, depending on what stage of the foreclosure process each case was in:

1.  Judgment motion filed with affidavit executed prior to July 12, 2010 (the Monday following the date GMAC stopped the robo-signing of affidavits), but no hearing pending - $500.00.

---

[4]     Accordingly, GMAC entered into the Curative Agreement with full knowledge of: (i) the creation of DJSP Enterprises, Inc., in January 2010; (ii) that DJSP Enterprises, Inc., previously provided (and would continue to provide) processing and non-legal services to DJSPA in its handling of GMAC foreclosure cases; (iii) the Florida Attorney General had commenced an investigation into the foreclosure practices of DJSPA; and (iv) the existence of numerous news and magazine articles and reports criticizing the foreclosure practices of DJSPA. *See* Exhibit A at ¶ 13.

[5]     A true and correct copy of the correspondence subsequently memorializing the Curative Agreement is attached as Composite Exhibit 3 to Exhibit A.

2.    Judgment motion filed with affidavit executed prior to July 12, 2010 with hearing pending - $750.00.

3.    Judgment entered on or after July 1, 2009 and sale pending - $1,000.00.

4.    Judgment entered on or after July 1, 2009 and sale held - $1,200.00

Exhibit 3 to Exhibit A.

Once the Curative Agreement went into effect, DJSPA's personnel began working closely with GMAC and its personnel and counsel (*e.g.,* high-level executives such as Mr. Pensabene, David Cunningham and Linda Walton) to begin curing the thousands of fraudulent affidavits GMAC produced that had been filed in Florida.   *Id.* at ¶ 14.  In order to accommodate GMAC's presence at DJSPA's Florida offices, DJSPA (i) designated an entire section of its offices solely for the purpose of rendering the legal services contemplated under the Curative Agreement (*e.g.,* identifying, creating and preparing new affidavits) and (ii) devoted significant resources and personnel to this project.  *Id.*  From late September through mid-November 2010, DJSPA's personnel worked extensively with GMAC's representatives to prepare the revised, corrected affidavits.  *Id.*

**In November 2010, GMAC Terminates its Relationship with DJSPA; DJSPA Asserts a Retaining Lien on the Files; and GMAC Puts $3 Million in Escrow to Facilitate the Transfer of the Foreclosure Files from DJSPA to Successor Counsel.**

In November 2010, GMAC voluntarily terminated its relationship with DJSPA.  *Id.* at ¶ 15.  When GMAC terminated DJSPA on or about November 16, 2010, DJSPA had provided (i) over $2.9 million dollars in legal services to GMAC under the Curative Agreement and (ii) approximately $3.1 million dollars in legal services (and out-of-pocket expenses) to GMAC under the MSA.  *Id.*

With these fees and costs outstanding, DJSPA asserted a retaining lien on GMAC's foreclosure files pursuant to Florida law.  *See* Exhibit B at ¶ 10.  In order to convince DJSPA to

6

transfer the files to replacement counsel in light of its lien, GMAC placed $3,000,000.00 in

GMAC's counsel's (*i.e.*, Bradley Arant Boult Cummings, LLP ("BABC")) trust account

pursuant to an Escrow Agreement.  *See* Exhibit B at ¶ 10 and Exhibit 9 thereto.[6]  After DJSPA

transferred the foreclosure files to successor counsel, it sent GMAC a letter on or about February

25, 2011 demanding payment of $6,161,483.70 for the unpaid legal services rendered and out-of-

pocket costs incurred by DJSPA on GMAC's behalf.  *Id.*

**On June 2, 2011, DJSPA Sues GMAC in Florida State Court for Payment of the Legal Services it Already Rendered and Which GMAC Accepted the Benefits of.**

When DJSPA and GMAC could not reach an agreement concerning DJSPA's

outstanding balance, DJSPA was left with no recourse but to file suit.  *Id.* at ¶ 11.  Accordingly,

DJSPA sued GMAC on or about June 6, 2011 in the Seventeenth Judicial Circuit in and for

Broward County, Florida (*i.e.*, Florida state court).  *Id.; see also* Exhibit A at ¶ 16.  The style of

the lawsuit was *The Law Offices of David J. Stern, P.A. v. GMAC Mortgage, LLC,* and was

assigned case number 11-12801 CACE (05).  DJSPA's complaint sought $6,161,483.70 in

unpaid legal fees under the following three legal theories: (i) breach of contract; (ii) open

account; and (iii) account stated.  *See* Exhibit 4 of Exhibit A; *see also* Exhibit B at ¶ 12.

**On July 11, 2011, GMAC Removed the Suit to Federal Court.**

On July 11, 2011, GMAC removed the lawsuit to the federal District Court for the

Southern District of Florida (the "District Court Action"), which was assigned case number 11-

cv-61526-MGC.  *See* Exhibit B at ¶ 13.  A copy of DJSPA's Complaint in the District Court

Action (identical to the one filed in the state court action) is attached as Exhibit 4 to Exhibit A.

Rather than move to dismiss DJSPA's Complaint, GMAC filed an Answer and

Affirmative Defenses and Counterclaim on July 15, 2011 (hereinafter "GMAC Answer").  *See*

---

[6]      The $3 million dollars are still being held in escrow by BABC pursuant to the Escrow Agreement.

7

Exhibit B at ¶¶ 13, 14 and Exhibit 10 thereto.  In this pleading GMAC raised 11 affirmative

defenses (including breach of contract and set-off) and asserted claims against DJSPA, including

(i) legal malpractice, (ii) breach of contract, (iii) breach of fiduciary duty, (iv) a violation of

Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), and (v) misrepresentation.  *Id.*

On July 27, 2011, DJSPA filed its Answer and Affirmative Defenses to GMAC's Counterclaim

in the District Court Action.  *See* Exhibit B at ¶ 15 and Exhibit 11 thereto.

**Other Relevant Litigation While the District Court Action Was Pending, But Before
GMAC Filed for Bankruptcy.**

While the District Court Action was pending, DJSPA was also involved in litigation with

the Fannie Mae and Freddie Mac over their unpaid legal bills to DJSPA concerning foreclosure

lawsuits in which Fannie Mae and Freddie Mac owned the underlying note and mortgage.  *See*

Exhibit B at ¶ 16.[7]  The subject matter of that suit partially overlapped with the relief sought in

the District Court Action because DJSPA sought fees in both for legal services on loans

involving notes and mortgages owned by Fannie Mae and Freddie Mac.  *Id.*  Accordingly,

GMAC and DJSPA stipulated that DJSPA would seek its fees for (i) legal work on the

foreclosure of Fannie Mae and Freddie Mac loans in the respective suits against Fannie Mae and

Freddie Mac and (ii) curative services rendered in GMAC foreclosure cases involving loans

owned by Fannie Mae and Freddie Mac via the Curative Agreement would remain in the District

Court Action).[8]  *See* Exhibit B at ¶ 16 and Exhibit 12 thereto.

---

[7]    DJSPA subsequently entered into confidential settlement agreements with Fannie
Mae and Freddie Mac.

[8]    DJSPA stipulates that the Freddie Mac and Fannie Mae loans that were removed
from the District Court Action are not part of DJSPA's claim in this action, which reduces
DJSPA's total claim against GMAC in this action by $683,507.88 (*i.e.,* the combined value of
the legal services and costs provided by DJSPA on the Fannie Mae and Freddie Mac loans
severed and transferred from the District Court Action).  However, all other amounts, including

The process of identifying and severing the Fannie Mae and Freddie Mac loans from the District Court Action was lengthy and time consuming for the parties' counsel, and consequently, the parties engaged in a very limited amount of pre-trial discovery (*e.g.,* no depositions were taken) prior to the District Court Action being stayed on May 23, 2012 upon GMAC's filing a Suggestion of Bankruptcy. *See* Exhibit B at ¶ 18; *see also* Exhibit 14 of Exhibit B.

## GMAC Files for Bankruptcy on May 14, 2012.

The aforementioned Suggestion of Bankruptcy was predicated on GMAC filing a Chapter 11 petition for bankruptcy on May 14, 2012. [D.E. 8531 at ¶ 7] The automatic stay triggered by GMAC's bankruptcy forced DJSPA to seek its fees in GMAC's bankruptcy estate. *See* Exhibit B at ¶ 19. Accordingly, DJSPA filed Proof of Claim No. 5275 in this action on or about November 16, 2012 for $6,161,483.70. See Exhibit B at ¶ 19; *see also* Exhibit 15 of Exhibit B. This claim seeks the same relief DJSPA sought in the District Court Action and, therefore, is based on the claims it raised in its pleadings in that suit. *See* Exhibit B at ¶ 19. On May 12, 2014, Proof of Claim No. 7464 (collectively "Proof of Claim") was filed solely to update the contact information of undersigned counsel as DJSPA's authorized agent. *Id.* The Liquidating Trust filed its Objection to DJSPA's Proof of Claim on April 27, 2015. [D.E. 8531]. *See also* Exhibit B at ¶ 19.

## **BURDEN OF PROOF**

Claims objections have a shifting burden of proof. *In re: Residential Capital, LLC*, 513 B.R. 446 (Bankr.S.D.N.Y.2014). Specifically:

---

the Fannie Mae and Freddie Mac loans subject to the Curative Agreement, remain at issue in this case. *See* Exhibit B at ¶¶ 5-11, 19.

> Correctly filed proofs of claim "constitute prima facie evidence of the validity and amount of the claim.... To overcome this prima facie evidence, an objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir.B.A.P. 2000). By producing "evidence equal in force to the prima facie case," an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant to "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Creamer v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*, No. 12 Civ. 6074(RJS), 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted). If the objector does not "introduce[ ] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim."  4 Collier on Bankruptcy ¶ 502.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).

*In re Residential Capital, LLC*, No. 12-12020 (MG), 2015 WL 588359, at *7 (Bankr. S.D.N.Y. Feb. 11, 2015).

If GMAC can shift the burden back to DJSPA by producing the aforementioned evidence, then this Court is to assess the validity of DJSPA's proofs of claim based on Federal pleading standards. *Id.* Specifically, DJSPA must allege "enough facts to state a claim for relief that is plausible on its face." *Id. (citing Vaughn v. Air Line Pilots Ass'n, Int'l, 604 F.3d 703, 709 (2d Cir. 2010)).* In doing so, this Court must accept all of DJSPA's factual allegations as true. *Id.; Kiobel v. Royal Dutch Petroleum Co.,* 621 F.3d 111, 124 (2d Cir. 2010); *see also In re Heath*, 331 B.R. 424, 435 (B.A.P. 9th Cir. 2005) (deeming proofs of claim analogous to complaints and debtors' objections analogous to motions to dismiss).

DJSPA submits that GMAC's objection should be overruled because (i) it fails to produce the necessary evidence to shift the burden to DJSPA and, (ii) even if this Court finds that GMAC's objection satisfied its burden, DJSPA's response (*i.e.,* this memorandum) alleges enough facts—all of which this Court is obligated to accept as true—to state a claim for relief that is plausible on its face.

## ARGUMENT

**1. GMAC'S OBJECTION SHOULD BE DENIED BECAUSE IT DOES NOT PRESENT ANY COMPETENT EVIDENCE IN THIS ACTION TO SHIFT THE BURDEN BACK TO DJSPA.**

The only substantive "evidence" GMAC relies on to support its Objection are the declarations of David Cunningham (the "Cunningham Declaration") and John W. Smith T, Esq. (the "Smith Declaration).  [D.E. 8531-3, 8531-15]  Declarations or affidavits proffered in support of dispositive motions in federal court must be based on personal knowledge, not hearsay, opinion, or "information and belief."[9]  Since these declarations are based on hearsay, opinion, and "information and belief," they should be stricken, or alternatively, disregarded by this Court. Either way, GMAC fails to shift its burden and its Objection must be overruled.

### A. David Cunningham's Declaration Does Not Shift GMAC's Burden Because it is Improperly Based on Hearsay, Opinion, and "Information and Belief."

**Hearsay**—Right at the outset, the Cunningham Declaration warns that the testimony that follows is predicated on hearsay.  Specifically, the second paragraph clarifies that Mr. Cunningham's knowledge is derived from his ". . . discussions with other former members of

---

[9]        *See e.g.*, *Patterson v. County of Oneida, New York*, 375 F. 3d 206, 219 (2nd Cir. 2004) (holding affidavits submitted in support of or in opposition to the summary judgment motion must be made on personal knowledge); *Paul T. Freund Corp. v. Commonwealth Packing Co.*, 288 F. Supp. 2d 357, 369 (W.D.N.Y. 2003) (holding that conclusory allegations, opinions, argument, and legal conclusions are all prohibited from affidavits submitted in support of, or in opposition to, a motion under Federal Rule of Civil Procedure 56); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) (held that affidavit based upon information and belief insufficient for purposes of summary judgment under Rule 56, Fed. R. Civ. P.); *U.S. v. Bosurgi*, 530 F.2d 1105, 1111-1112 (2d. Cir. 1976) (holding lower court's acceptance of an attorney's affidavit with respect to facts not personally known to him did not entitle party seeking summary judgment in federal court to circumvent requirements of applicable rules in federal court proceeding).

[GMAC's] management or other former employees of [GMAC], the Liquidating Trust, its professionals and consultants." [D.E. 8531-3 at ¶ 2] Since this information—purportedly provided by various unnamed third parties—is hearsay, the Cunningham Declaration is not competent evidence that this Court can rely on to eliminate DJSPA's claim. *See Sellers*, 842 F.2d at 643.

**Information and Belief**—The Cunningham Declaration also includes a caveat that the following information is derived from Mr. Cunningham's "information and belief":

- Upon information and belief, GMACM never consented to allowing DJSPA to assign its obligations under the MSA to a third party; [10]

- Upon information and belief, GMACM was not informed of and did not approve – expressly or otherwise – this offshoring operation;

- Upon information and belief, among the invoices for which DJSPA seeks payment are ones in the collective amount of $1,158,885.04 that were submitted to GMACM before the petition date (and denied by GMACM before the Petition Date);

- … it is my understanding that but for DJSPA's action, GMACM would not have incurred such penalties.

[D.E. 8531-3 at ¶¶ 8, 19 and 21] Since this testimony is not based on Mr. Cunningham's personal knowledge, it cannot be relied on to shift GMAC's burden. *Patterson*, 375 F. 3d at 219.

**Opinion**—Mr. Cunningham also improperly attempts to use his declaration to interject his personal opinion into the matter in lieu of facts. Specifically, he testifies that DJSPA's legal services rendered pursuant to the parties' Curative Agreement were ". . . untimely and of a very low quality." [D.E. 8531-3 at ¶ 12] This opinion can be given no evidentiary value in

---

[10]    Mr. Cunningham's assertion that GMAC did not consent to DJSPA assigning its obligations under the MSA to third parties is directly contradicted by the Declaration of David J. Stern, which asserts that GMAC was fully aware that processing and non-legal services were being provided by subsidiaries of DJSP Enterprises, Inc., at the time GMAC entered into the Curative Agreement with DJSPA. *See* Exhibit A at ¶ 13.

determining whether GMAC's Objection shifted the burden back to DJSPA.[11]  *See Freund*, 288

F. Supp. 2d 357 at 369.

### B. John Smith T., Esq.'s Declaration Does Not Satisfy GMAC's Burden Because it is Based on Hearsay.

**Hearsay**—The Smith Declaration also warns at the outset that the testimony that follows

is predicated on hearsay.  Specifically, the fifth paragraph clarifies that Mr. Smith's knowledge is

derived from his ". . . discussions with persons in [his law] office who handled or are personally

familiar with matters identified below that were previously handled by DJSPA."  [D.E. 8531-15

at ¶ 5]   Since this information—purportedly provided by various unnamed third parties—is

hearsay, the Smith Declaration is also not competent evidence that this Court can rely on to

eliminate DJSPA's claim.  *Bosurgi*, 530 F.2d at 1111-12 (finding that affidavit of the attorney for

a party not based on personal knowledge insufficient for purposes of summary judgment).

### C.  GMAC Fails to Produce Any Evidence on the Dispositive Issues.

Neither the Cunningham nor the Smith Declaration (i) addresses the validity of each of

the invoices attached to DJSPA's Proofs of Claim (they were also attached as exhibits to

DJSPA's complaint in the District Court Lawsuit) or (ii) testifies that GMAC objected to any of

those invoices within 30 days of their being sent.  *See* Exhibit 4 of Exhibit A; *see also* Exhibit 15

of Exhibit B.  To the contrary, they concede under oath that DJSPA performed legal services and

incurred costs for GMAC.  [D.E. 8531-3 at ¶ 12]  This is critical because paragraphs 2.1 and 2.3

of the MSA obligated GMAC to pay DJSPA for all legal services and costs rendered and

invoiced if GMAC did not object within 30 days of receipt.  *See* Exhibit 1 of Exhibit A.  Since

---

[11]     To the contrary, his sworn admission that DJSPA did perform legal work for GMAC under the Curative Agreement [D.E. 8531-3 at ¶ 12] creates issues of fact concerning the quantity and quality of DJSPA's work that must be resolved at trial.  *See U.S. v. Bosurgi*, 530 F.2d at 1112. (appellate court affirmed district court denial of summary judgment due to existence of genuine issue of material fact between the parties).

GMAC provided no evidence concerning these dispositive issues, GMAC failed to shift its burden back to DJSPA.

**2.    EVEN IF THIS COURT WERE TO DECLINE TO STRIKE GMAC'S DECLARATIONS AND ACCEPT EVERYTHING IN THE IMPROPER DECLARATIONS AS TRUE, IT WOULD ONLY CREATE DISPUTED MATERIAL FACTUAL ISSUES THAT CANNOT BE RESOLVED AT THIS STAGE, ESPECIALLY WHERE DISCOVERY IS OUTSTANDING.**

Should this Court be willing to afford any evidentiary value to the Cunningham and/or Smith Declarations, then, on GMAC's best day, all those declarations do is create a variety of disputed material factual issues.  Some examples include:

(i)    Which party (if any) committed a material breach of the MSA and/or Curative Agreement?

    a.  *e.g.,* Did GMAC breach the MSA by submitting thousands of fraudulent affidavits?

    b.  *e.g.,* Did GMAC breach the MSA by failing to timely pay DJSPA invoices for legal services performed and costs incurred for which GMAC failed to timely object?

    c.  *e.g.,* Did DJSPA breach the MSA by committing malpractice?

(ii)    When did that breach (those breaches) occur?

(iii)    When did the non-breaching party obtain actual or constructive notice of the material breach(es)?

(iv)    Once the non-breaching party became aware of the material breach, did the non-breaching party conduct itself in a way that constituted a waiver of any rights it had to terminate the MSA and/or Curative Agreement?

    a.  *e.g.,* Did GMAC have actual or constructive knowledge of any DJSPA breaches of the MSA when GMAC entered into the Curative Agreement?

In order to flesh these (and other) issues out, on June 29, 2015, DJSPA propounded written discovery on GMAC.  *See* Exhibits "C" and "D."  GMAC's responses to these discovery requests are due less than a week after the July 30, 2015 hearing on GMAC's Objection.  This

Court should not summarily expunge DJSPA's $5.5 million claim without allowing DJSPA the opportunity to conduct sufficient discovery concerning GMAC's purported defenses, and to challenge GMAC's claims and defenses at trial.

3. **THE FIRST MATERIAL BREACH DOCTRINE CANNOT BE APPLIED TO COMPLETELY ELIMINATE DJSPA'S RIGHT TO RECOVER LEGAL FEES FROM GMAC FOR THE SERVICES THAT DJSPA RENDERED AND THAT GMAC ACCEPTED.**

### A. The First Material Breach Doctrine.

GMAC's objection to DJSPA's breach of contract claim is largely predicated on the "first material breach" doctrine.  [D.E. 8531 at pp.18-29]  This doctrine, which is derived from § 237 of the Restatement (Second) of Contracts—entitled "Effect on Other Party's Duties of a Failure to Render Performance"—simply states that, "except as stated in § 240," if one party materially breaches the contract, then the other party is under no obligation to perform its ***"remaining duties."*** *See* Restatement (Second) of Contracts § 237 (1981) (***emphasis added***).[12]  This doctrine "is based on the principle that where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his ***remaining duties*** of performance with respect to the expected exchange if there has already been an uncured material failure of performance by the other party."  *Id.* at cmt. b (***emphasis added***).

### B. Recognized Exceptions to the First Material Breach Doctrine.

<u>**Part Performance Exception**</u>—Since § 237 expressly mentions § 240 as an exception, an analysis of the former is incomplete without an analysis of the latter.  The effect of Section

---

[12]    The Delaware Supreme Court has relied on the Restatement (Second) of Contracts.  *See, e.g., Chrysler Corp. v. Airtemp Corp.*, 426 A.2d 845, 849 (Del. Super. 1980).  And the Delaware Bankruptcy Court has specifically relied on section 237 of that restatement, including the comments thereto.  *In re NextMedia Grp., Inc.*, 440 B.R. 76, 80 (Bankr. D. Del. 2010).  Accordingly, this Court should also rely on section 237 in its analysis of GMAC's "first material breach" defense.

240—entitled "Part Performances as Agreed Equivalents"—is that "[i]f there is an uncured material failure by either party, *he can claim compensation for any parts that he has already performed*, but he cannot enforce the contract with respect to any other pair of corresponding parts, including the part or parts that he has failed to perform." *See* Restatement (Second) of Contracts § 240 (1981) at cmt. b (*emphasis added*). Stated another way, § 240 "give[s] a party who has performed one of these parts the right to [the other party's performance of] its agreed equivalent[13] just as if the parties had made a separate contract with regard to that pair of corresponding parts." *Id.* at cmt. a.

With that in mind, the following illustration of this principle appears in the comments to § 240:

> 1. A contracts to sell and B to buy a quantity of dressed hogs and a quantity of live hogs at stated prices for each quantity. A is to deliver the dressed hogs first and the live hogs 15 days later, and B is to pay for each delivery within 30 days after it is made. A delivers the dressed hogs, but unjustifiably refuses to deliver the live ones. If a court finds that delivery of the dressed hogs and payment of the price stated for them are agreed equivalents, A can recover the stated price for the dressed hogs under the contract. B then has a claim against A for damages for his failure to deliver the live hogs.

*Id.* at cmt. b. This illustration is directly applicable to DJSPA's claim because the parties agreed in both the MSA and Curative Agreement that DJSPA would be paid an agreed-upon flat fee each time it rendered certain pre-defined legal services in any of GMAC's pending foreclosure lawsuits. Since the pre-defined legal services and the pre-assigned flat fees are "agreed equivalents," when DJSPA rendered those services (*e.g.,* the services detailed in section "1" of the Curative Agreement), GMAC became obligated to perform the "agreed equivalent" (*e.g.,*

---

[13] Corresponding pairs of partial performances are collectively referred to as "agreed equivalents." *See* Restatement (Second) of Contracts § 240 (1981).

paying DJSPA a flat fee of $500) regardless of whether DJSPA committed a separate material
breach of the overall agreement (*i.e.,* the MSA or Curative Agreement).

This result is consistent "with the policy favoring avoidance of unjust enrichment," and
empowers "courts [to] temper the application of [§ 237] in appropriate cases to avoid forfeiture."
*Id.* at cmt. a.  Since Delaware courts recognize, and cite to, section 240 of the Restatement
(Second) of Contracts, this Court should also rely on section 240 in its analysis of GMAC's "first
material breach" defense.[14]  This principle is equally applicable under New York[15] and Florida
law.[16]

**Waiver Exception**—Another recognized exception to the "first material breach" doctrine
is waiver.  Under Delaware law, "waiver" is defined as "the voluntary and intentional
relinquishment of a known right."  *Realty Growth Investors v. Council of Unit Owners*, 453 A.2d
450, 456 (Del. 1982).  Accordingly, "when [a material breach] becomes known to the opposite

---

[14]    *See, e.g., Brandin v. Gottlieb*, No. CIV. A. 14819, 2000 WL 1005954 at *21, n.53
(Del. Ch. July 13, 2000); *Conley v. Dan-Webforming Int'l A/S (Ltd.)*, No. CIV. A. 91-401 MMS,
1992 WL 401628 at *22 (D. Del. Dec. 29, 1992); *Abdallah v. Caribbean Sec. Agency*, 557 F.2d
61, 65, n.4 (3d Cir. 1977).

[15]    *See, e.g., NAS Electronics, Inc. v. Transtech Electronics PTE Ltd.*, 262 F. Supp.
2d 134, 145 (S.D.N.Y. 2003) (holding that plaintiff was entitled to payment for work already
performed under the parties' agreement prior to the plaintiffs' breach); *Medecon Off. Sys. V.
Patterson, Zimmerman & Hodes,* 166 A.D.2d 694, 695 (N.Y. App. Div. 1990) (holding that the
plaintiff, who breached a contract by prematurely ceasing his performance under his contract
with the defendant, was entitled to recover the contract price for all work, labor and services
performed up to the time of the breach).

[16]    *Diaz v. Dr. Bertram P. Shapiro, P.A.*, 605 So. 2d 966, 968 (Fla. 3d DCA 1992)
(expressly citing to restatement section 240); *see also Hamilton v. Suntrust Mortgage Inc.*, 6 F.
Supp. 3d 1300, 1309 (S.D. Fla. 2014) (holding that where one party breaches a contract, but the
other party nonetheless continues to perform under that contract, the party who continued to
perform may not rely on the prior breach as a defense); *In re Monetary Grp.*, 118 B.R. 114, 119
(Bankr. M.D. Fla. 1990) (holding "where benefits are divisible, a party may claim compensation
for that portion already performed").

party, he may in turn do some act that will operate as a waiver of the breach, which he cannot well do until he is aware of the breach." *See* 14 Williston on Contracts § 43:12 (4th ed.). GMAC is aware of this principle, having cited to Williston for this proposition in its objection. [D.E. 8531 at ¶ 44]  This principle is equally applicable under New York[17] and Florida law.[18]

### C. The First Material Breach Doctrine Does Not Apply to Legal Services That DJSPA Performed Under the MSA.

GMAC's objection correctly notes that DJSPA is seeking $2,498,475.82 for legal services it provided under the MSA.  [D.E. 8531 at ¶ 4]  In response, GMAC wants this Court to not only find that DJSPA committed the first material breach of the MSA (based solely on a couple of self-serving affidavits), but to also rule that GMAC is relieved from its obligation to pay for ***all legal services*** DJSPA ***performed*** prior to the breach and that GMAC received the benefits of.  [D.E. 8531 at ¶ 46]  Not surprisingly, even if the "first material breach" doctrine applied (it does not), it would not entitle GMAC to the windfall it seeks.

<u>**Complete (Or At Least Partial) Performance Under the MSA**</u>—Even if DJSPA eventually committed the first material breach of the MSA, by rendering legal services thereunder, DJSPA performed (at least partially) and thereby perfected its right to GMAC's

---

[17]     *See, e.g., Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F. Supp. 658, 667-68 (S.D.N.Y. 1996) ("If the non-breaching party elects to continue performance, it may not later choose to terminate the contract on account of the breach");

[18]     *MDS (Canada) Inc. v. Rad Source Technologies, Inc.*, 720 F.3d 833 (11th Cir. 2013) ("Under Florida law, a material breach excuses a party from performance of the contract, although the injured party may waive the breach.  Post breach actions evidencing that the contract is still subsisting, if sufficiently clear, can satisfy the requirement that, when inferring waiver from conduct, 'the conduct relied upon to do so must make out a clear case of waiver.'"); *Acosta v. Dist. Bd. of Trustees of Miami–Dade Comm. Coll.*, 905 So. 2d 226, 228-29 (Fla. 3d DCA 2005) ("Where a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement").

performance of its "agreed equivalent" (*i.e.,* paying the pre-assigned flat fee for the legal services

DJSPA actually performed). This is especially applicable where the MSA's "Statement of

Work" clearly and specifically assigned an exact dollar amount for the various legal services that

DJSPA actually performed and GMAC actually received the benefit of. *See* Exhibits 1 and 3 of

Exhibit A. To sustain GMAC's objection under these circumstances would expressly and

directly conflict with the preferred policy of avoiding forfeiture and unjust enrichment under

Delaware, New York and Florida law.[19]

**GMAC Waived its "First Material Breach" Defense By Executing the Curative**

**Agreement**—By entering into the Curative Agreement in September 2010, GMAC waived its

right to refuse to perform under the MSA based on the "first material breach" doctrine.

Specifically, GMAC's objection alleges that when "the Florida Attorney General launched an

investigation into DJSPA" August 2010, it had "no doubt" the "investigations were likely to

result in adverse decisions affecting DJSPA's ability to perform its obligations to" GMAC.

[D.E. 8531 at ¶¶ 48, 50] Yet despite possessing knowledge of these investigations and "no

doubt" as their inevitable result, GMAC nevertheless voluntarily entered into the Curative

Agreement with DJSPA for more legal work. *See* Exhibit A at ¶ 13. By doing so, GMAC chose

to continue to accept legal services from DJSPA under both the MSA and Corrective Agreement,

which resulted in a waiver of any right GMAC previously had to refuse to pay for legal services

DJSPA had already rendered under the MSA.[20]

    **D. The First Material Breach Doctrine Does Not Apply to Work That DJSPA**
        **Performed Under the Curative Agreement.**

---

[19]      *See* footnotes 14, 15 and 16.

[20]      *See* footnotes 17 and 18.

GMAC notes that DJSPA is also seeking $2,979,500.00 for legal services it performed for GMAC pursuant to the Curative Agreement.  [D.E. 8531 at ¶ 4]  GMAC's reliance on the "first material breach" doctrine in support of its objection to this portion of DJSPA's claim is misplaced for the reasons that follow:

**Breaches of the MSA Do Not Affect GMAC's Obligation to Pay for Legal Services Rendered Under the Curative Agreement**—Since the September 2010 Curative Agreement had a much different purpose, scope, and payment schedule from the January 2007 MSA (*e.g.,* attempting to cure the damage caused by the GMAC's robo-signed affidavits filed in GMAC's Florida foreclosure lawsuits), it cannot be disputed that the two agreements are separate and distinct.  *See* Exhibits 1 and 3 to Exhibit A.  Accordingly, any of DJSPA's alleged material breaches of the MSA do not extend to or otherwise affect GMAC's obligation to pay DJSPA for the legal services it rendered under the Curative Agreement:

> Under the rule stated in this Section, only duties with respect to the performances to be exchanged under the particular exchange of promises are affected by a failure of one of those performances. A duty under a separate contract is not affected.

*See* Restatement (Second) of Contracts § 237 at cmt. e.  Since GMAC has failed to carry its burden of presenting unrebutted, competent substantial evidence that DJSPA committed the first material breach of the Curative Agreement—not merely the MSA—DJSPA's claim for $2,979,500.00 for the curative work must survive GMAC's objection.

**Complete (Or At Least Partial) Performance Under the Curative Agreement**—Even if DJSPA eventually committed the first material breach of the Curative Agreement (which DJPSA denies), by rendering legal services thereunder, DJSPA performed (at least partially) and thereby perfected its right to GMAC's performance of its "agreed equivalent" (*i.e.,* paying the

pre-assigned flat fee for the legal services DJSPA actually performed).    This is especially

applicable where the Curative Agreement clearly and specifically assigned an exact dollar

amount for the various legal services that DJSPA actually performed and GMAC actually

received the benefit of (*e.g.,* flat fee of $500 for performing the services detailed in scenario one;

$750 for scenario two; etc.).    *See* Exhibits 1 and 3 to Exhibit A.    To sustain GMAC's objection

under these circumstances would expressly and directly conflict with the stated preferred policy

of avoiding forfeiture and unjust enrichment.[21]

### E. The First Material Breach Doctrine Cannot Be Used to Strike DJSPA's Claim "in Toto" Because This Doctrine is Not Applicable to DJSPA's Alternatively Plead Theories of Recovery.

DJSPA's claim seeks payment for legal services it performed for GMAC that GMAC

never paid for despite accepting the benefits thereof.    The various legal theories DJSPA asserted

in the District Court Action include "open account" and "account stated."    *See* Exhibit 4 to

Exhibit A.    These alternative theories of recovery should not be summarily dismissed in this

forum for three reasons.

First, another Federal court has already held that DJSPA's pleading in another lawsuit

containing virtually identical allegations sufficiently plead these causes of action.    *See Law

Offices of David J. Stern, P.A. v. Bank of America Corp.,* No. 11-21349-CIV, 2012 WL 112935

(S.D. Fla. Jan. 12, 2012).    Second, the rules of procedure expressly authorized DJSPA to plead

those claims "in the alternative" in the District Court Action.    *See Fed. R. Civ. P.* 8(a), (d).    And

third, since GMAC did not move to dismiss those claims in that forum, DJSPA has already

successfully stated a cognizable claim for open account and account stated, which should be

recognized in this forum.

---

[21]    *See* footnotes 14, 15 and 16.

Having said that, there is no authority that the "first material breach" doctrine can serve as a successful defense to these claims (or any claim other than "breach of contract"). Since DJSPA property raised these alternative claims in the District Court Action, GMAC's reliance on this doctrine alone cannot legally result in the complete elimination of DJSPA's entitlement to any recovery from GMAC—especially at this preliminary phase of the proceedings.

4. **DJSPA ALREADY STATED A CLAIM IN THE DISTRICT COURT LAWSUIT. SHOULD THIS COURT CONSIDER GMAC'S DEFENSES TO THAT SUIT IN CONNECTION IN THIS PROCEEDING, THEN DISPUTED FACTUAL ISSUES EXIST THAT CANNOT BE RESOLVED AT THIS STAGE.**

If the stated procedural standard is whether DJSPA can state a claim against GMAC, then this Court must resolve that question in the affirmative. This is because this Court is not faced with a hypothetical situation, but can look to GMAC's past actions: *e.g.,* when DJSPA previously sued GMAC (*i.e.,* the District Court Lawsuit), GMAC chose not to move for a dismissal on the ground that DJSPA failed to state a claim, but answered, raised affirmative defenses and counterclaims. *See* Exhibit 10 of Exhibit B.

The declarations attached to GMAC's Objection improperly attempt to back-door GMAC's affirmative defenses and counterclaim into this proceeding. Should this Court allow that to occur over DJSPA's objection, then this Court should not make a substantive ruling on GMAC's defenses and counterclaim based solely on GMAC's affidavits—especially where (i) DJSPA's discovery on GMAC is outstanding and (ii) DJSPA's sworn declarations create disputed material issues of fact, which should be resolved via trial once discovery is complete. Some of those issues include:

**A. Who is responsible for the delays in completing GMAC's foreclosures?**

GMAC uses the Cunningham Declaration to argue that DJSPA's claims should be barred, or setoff, by the amount of alleged timeline penalties GMAC paid to Freddie Mac and Fannie

Mae because, GMAC argues, DJSPA was responsible for the delays in completing GMAC's foreclosures:[22]

> GMACM was delayed in pursuing foreclosures proceedings against delinquent borrowers because i) appropriate procedures were not followed by DJSPA during the time such files were in possession and under its responsibility, which required other firms to perform new foreclosure services and initiate new actions or amend prior actions, and ii) the courts became backlogged due to a significant amount of new or amended actions having to be filed with the court in order to remedy DJPSA's mistakes.

[D.E. 8531-3 ¶ 20]

DJSPA's response to this argument when GMAC raised it via counterclaim in the District Court Action was that any delay and damages GMAC purportedly incurred as a result were caused by GMAC's own misconduct and/or negligence. *See* Exhibit 11 of Exhibit B. In support of this position, DJSPA relies on two pieces of evidence.

First, DJSPA relies on the over 4,000 fraudulent affidavits that GMAC's officer prepared and filed in foreclosure lawsuits in Florida and elsewhere that resulted in GMAC halting all

---

[22]    The spreadsheet attached as Exhibit I to the Cunningham Declaration provides virtually no substantive information as to support the assertion that DJSPA was the cause or reason for the alleged delays, or any other case specific information which would support the assertion that DJSPA was responsible for the purported delay. Similarly, the spreadsheets attached as Exhibits J and K to the Cunningham Declaration, and as Exhibit S to the Smith Declaration, are improper summaries prepared exclusively for litigation and otherwise fail to provide sufficient factual detail or information sufficient to support the assertion that DJSPA is responsible for the alleged categories of damages. Pursuant to Federal Rule of Bankruptcy 9017, the Federal Rules of Evidence apply in cases under the Bankruptcy Code, and consequently, these spreadsheets and summaries are inadmissible hearsay and should not be considered in support of GMAC's Objection. *See generally*, *U.S. v. Thomas*, 315 Fed. App'x. 828 (11th Cir. 2009) (finding that spreadsheets prepared for litigation were not admissible as data compilations under Rule 803(b), Fed. R. Evid.). Moreover, to the extent that GMAC attempts to argue that these records will be admissible summaries under Federal Rule of Evidence 1006, the documents should still be excluded because GMAC has failed to provide DJSPA with the underlying documentation as required under the rule. *See e.g.*, *Kim v. Kum Gang, Inc.*, No. 12-Civ-6344, 2014 WL 2081775 at * 4 (S.D.N.Y. May 12, 2014). Alternatively, at a minimum, DJSPA should be afforded the opportunity to conduct substantive discovery from GMAC on its alleged defenses and counterclaims for damages so that it may challenges such claims at trial.

foreclosures in 23 states across the country, including Florida.  *See* Exhibit A at ¶¶ 9, 12-14; Exhibit B at ¶ 5 and Exhibit 4 thereto.  In fact, in this action DJSPA seeks to recover legal fees for the work it conducted under the Curative Agreement, in which GMAC retained DJSPA to remedy the fallout resulting from GMAC's own fraudulent conduct.  *Id.*

Second, DJSPA relies on the following sworn deposition testimony of the former Managing Associate General Counsel of Freddie Mac in the case styled *Law Offices of David J. Stern, P.A. v. Federal Home Loan Mortgage Corp.*, Case No. 11-CV-60626, in the United States District Court for the Southern District of Florida:

> A:     … essentially **we told specific servicers that they could not proceed on foreclosures on Freddie Mac files until they had satisfied both themselves and us that they could proceed lawfully and relying on accurate and untainted documentation….**
>
> Q:     Why?
>
> A:     Because we didn't want servicers pursuing foreclosures against borrowers relying on improper documentation and other improprieties caused by servicers.
>
> Q:     Why did you provide the servicers the opportunity to correct affidavits that were filed robo signed affidavits?
>
> A:     I am not sure we provided the opportunity to correct necessarily. We recognized, I think, that foreclosures were necessary to do because borrowers had failed to pay their mortgages would have to proceed in any event. What we didn't want to have happen is that those would proceed relying on tainted documentation and other improprieties so we recognized the need no (sic) continue with foreclosure activity in those cases where that was the appropriate course of action, but we didn't want to have happen is that those foreclosure activities would continue to proceed relying on false inappropriate documentation and other improper practices…
>
> Q:     **Did you ever hear of any affidavits being executed by Jeffrey Stephan in connection with GMAC acting as its service (sic)?**
>
> A:     **Yes.**

Q:      What do you know about that?

A:      I know that there was some, that that was the GMAC employee. He was the first servicer that broke cover so to speak on the robo signing issue and we learned of that through – I don't recall exactly how we learned of it, but we learned of it- Oh, we learned of it from one of our designated counsel law firms.

Q:      Was there any direction given by Freddie Mac to GMAC with regard to those affidavits?

A:      There was a letter written to GMAC with regard to them proceeding on Freddie Mac files relying on improper and tainted documentation amongst other things. They didn't to my knowledge specifically reference Jeffrey Steffan (sic), but it referenced a series of allege improper activities that GMAC may have been relying on in order to prosecute foreclosure actions.

Q:      **Did Freddie Mac tell GMAC to correct those problems?**

A:      I am not sure that Freddie Mac exactly told them to correct the problem. Again, Freddie Mac told GMAC, and this is from memory **that they could not proceed to prosecute foreclosure action relying on any tainted documentation or improper practices…**

Exhibit B at ¶ 17 and Exhibit 13 thereto (**emphasis added**).

In light of the foregoing, GMAC's reliance on the biased Cunningham Declaration regarding timeline penalties is therefore not credible and the cause of any delays in GMAC foreclosure lawsuits (including the proximate cause of any alleged penalties associated with such delays) is a disputed issue of material fact.  *See* Exhibit B at ¶¶ 17, 21.

**B.  Is GMAC entitled to a setoff for "transfer fees" to shift the files from DJSPA to its replacement counsel?**

GMAC also uses the Cunningham Declaration to argue that DJSPA's claims should be set off by the amount of "transfer fees" GMAC had to pay other law firms to get thousands of foreclosure files from DJSPA's firm to replacement counsel on short notice after GMAC voluntarily terminated DJSPA.  [D.E. 8531-3 at ¶ 22]  DJSPA not only denied this argument when GMAC raised it via counterclaim in the District Court Action, but also raised a variety of

25

affirmative defenses in response (*e.g.,* failure to mitigation damages). *See* Exhibit B at ¶ 15 and Exhibit 11 thereto.

Additionally, whether "transfer fees" were foreseeable or a category of damages contemplated by the parties upon executing the MSA and/or Curative Agreement is—on GMAC's best day—a disputed issue of fact.[23]  GMAC's position is certainly not aided by (i) the fact that neither the MSA nor the Curative Agreement expressly list "transfer fees" as a measure of damages GMAC could recover from DJSPA upon DJSPA's termination (*see* Exhibits 1 and 3 to Exhibit A) or (ii) the language in section 3.4 of the MSA that expressly entitles DJSPA to compensation from GMAC should DJSPA assist GMAC in transferring files to successor counsel notwithstanding any dispute between the parties upon termination for any reason:

> In connection with the termination of this Agreement for any reason, and notwithstanding any dispute between the parties, Company (DJSPA) shall provide to Client (GMAC) such termination assistance as it may be reasonably request in order to provide an orderly transition from Company to another provider (the "Termination Services"). If any such Termination Services requires resources in addition to those being used by Company in performance of the Services, Client shall pay Company therefore on a mutually acceptable basis. Client shall continue to pay for all Termination Services requested by Client and performed by Company after the termination date, provided that if termination was by reason of a payment default by Client, Company shall be entitled to reasonable assurances acceptable to it prior to commencing such Termination Services that it will be fully compensated for such Termination Services.

*See* Exhibit 1 of Exhibit A.  At a minimum then, this disputed factual issue should be fleshed out in discovery and ultimately determined at trial.

---

[23]    Accordingly, "transfer fees" would be special damages, which GMAC cannot recover from DJSPA.  *See e.g., Yale Mortgage Corp. v. Wells Fargo Bank*, N.A., No. 11-22605-CIV, 2012 WL 3597438 at * 10-11 (S.D. Fla. Aug. 20, 2010) (district court upheld jury's finding that servicing fees were not recoverable because such fees were ". . . not general damages flowing naturally from the breach of contract but instead that such damages were special damages that were not foreseeable by the parties when the contract was made.").

**C. Was GMAC aware of DJSPA's offshore operations when GMAC entered into the Curative Agreement?**

GMAC also uses the Cunningham Declaration to argue that, "information and belief," GMAC was not aware of DJSPA's offshore operations when GMAC entered into the Curative Agreement. [D.E. 8531-3 ¶ 8] Again, on GMAC's best day[24] this is a disputed factual issue since Stern testified that GMAC did possess this knowledge. *See* Exhibit A at ¶ 13.

**D. Did DJSPA breach the MSA and/or Curative Agreement by Committing Malpractice?**

Finally, GMAC uses the Smith Declaration to argue that DJSPA breached the MSA and/or Curative Agreements by committing malpractice. [D.E. 8531-15 at ¶¶ 5, 14] Specifically, the Smith Declaration opines that of the tens of thousands of foreclosure cases that DJSPA competently handled for GMAC over a 16 year period, DJSPA committed an error or engaged in misconduct in nine lawsuits, which resulted in damages to GMAC and its successor entities. [D.E. 8531-15 at ¶ 14] Even taking the Smith Declaration on its face, this is a *de minimus* percentage of lawsuits. Yet upon closer inspection, it becomes clear that GMAC was responsible for adverse results in certain of these cases.

Specifically, one of the nine cases GMAC and Smith point to is styled *Deutsche Bank Trust Co. Americas as Trustee for RALI 2007QS3 v. Barry F. Mack, et al.*, Case No. 09-7336-CA, 20th Judicial Circuit in and for Collier County, Florida. [D.E. 8531 at ¶ 63; 8531-15 at ¶ 14(a)] Yet in that suit the trial court expressly found in the ***Final Order on Plaintiff's Motion to Set Aside Final Judgment and Set New Trial*** that GMAC's wrongful actions led to the adverse

---

[24]       A closer look at the Cunningham Declaration shows that this point is undisputed in DJSPA's favor. Specifically, the Cunningham Declaration never asserts that DJSPA ever serviced any ***GMAC foreclosure files*** offshore. It only cites to a deposition in in an unrelated lawsuit in which DJSPA's offshoring operations were discussed generally. [D.E. 8531-15 ¶ 8] This evidence is not sufficient to create a factual issue to shift GMAC's burden. *See e.g., Patterson v. County of Oneida*, 375 F.2d 206, 219 (2d Cir. 2004).

ruling against it (*i.e.,* GMAC conceded wrongfully initiating foreclosure proceedings against

borrowers who were not in default, thereby resulting in a $296,920.05 judgment against GMAC

slander of title):

> Defendants MACK did properly plead slander of title in that the publication of the
> lis pendens and the lawsuit alleging that they had failed to pay their mortgage in
> accordance with its terms led to third parties being reluctant to deal with them in
> their efforts to sell the property and pay off their loan, and significantly depressed
> its value. ***The foreclosure was not warranted because Defendants MACK in
> fact made their payments timely and servicer GMAC conceded that it
> mistakenly filed the foreclosure action without justification.***

Exhibit B at ¶ 22.  [D.E. 8531-15 at ¶ 14(a)(iv) and ¶¶ 3(ii), (iii) of Exhibit W thereto]

Another one of the nine cases GMAC and Smith point to is styled *GMAC Mortgage, LLC

v. Christopher Contreras*, Case No. 2010-2868-CA, in the Circuit Court of the Twelfth Judicial

Circuit in and for Sarasota County, Florida.  [D.E. 8531-15 at ¶ 14(i)]  However, as with the

aforementioned *Mack* suit, the counterclaims of the borrower in *Contreras* were based primarily

upon GMAC's misconduct, *e.g.,* GMAC's fraudulent assignment of mortgage and a fraudulent

affidavit in support of summary judgment executed by GMAC officer Jeffrey Stephan (*i.e.,* the

"master robo-signer").  *See* Exhibit B at ¶ 23 and Exhibit 16 thereto.[25]

As demonstrated above, even a cursory inspection into the *Mack* and *Contreras* cases

(*i.e.,* without the benefit of substantive pre-trial discovery) make clear that there are sufficient

factual issues as to whether DJSPA committed malpractice (*i.e.,* whether any purported damages

GMAC sustained from adverse foreclosure rulings are due to its own misconduct).

---

[25] On June 5, 2012, all claims against DJSPA in the *Contreras* case were dismissed
with prejudice.  *See* Exhibit 17 of Exhibit B.

5. **IF GMAC SEEKS AFFIRMATIVE RELIEF FROM DJSPA VIS-À-VIS COUNTERCLAIMS, THOSE CLAIMS SHOULD BE RESOLVED IN AN ADVERSARY PROCEEDING.**

As stated above, GMAC asserted counterclaims in the District Court Action.  *See* Exhibit 10 of Exhibit B.  GMAC improperly uses the Cunningham Declaration to insert those claims into this bankruptcy proceeding.  [D.E. 8531-3]  To the extent GMAC attempts to use its Objection not as a shield from DJSPA's proofs of claim, but as a sword to recover damages, GMAC's counterclaims must be resolved in a separate adversary proceeding.  *See Fed. R. Bankr. P.* 7001; *see also In re Donato*, No. 11-34418, 2011 WL 6057551, * 1 (N.D. Ohio Dec. 6, 2011).

6. **THE ESCROW MONIES SHOULD NOT BE RELEASED TO THE ESTATE BECAUSE THEY ARE SUBJECT TO A RETAINING LIEN IMPOSED BY FLORIDA LAW.**

Unlike the MSA, the Curative Agreement is governed by Florida law.[26]  This is because (i) both DJSPA and GMAC's obligations under that agreement were to be performed solely in Florida and (ii) the Curative Agreement does not expressly state that it should be governed by the law of another jurisdiction.[27]  GMAC placed monies in escrow to "bond off" DJSPA's retaining lien on the files GMAC's foreclosure files pursuant to Florida law.  *See* Exhibit B at ¶ 10; *Andrew Hall and Associates v. Ghanem*, 679 So. 2d 60 (Fla. 4th DCA 1996).  GMAC understood this and accordingly did not list the escrow monies as an asset in its bankruptcy

---

[26]    *Eureka Res., LLC v. Range Res.-Appalachia, LLC*, 62 A.3d 1233, 1237 (Del. Super. 2012); *see also Canadian Indus. Alcohol Co. v. Nelson*, 188 A. 39, 53 (Del. 1936) (holding "the obligation to pay damages for the non-performance of a contract is a matter of substantive right, imposed by the law as a substitute for performance, and should, therefore, be measured by the law of the place where such performance was promised").

[27]    DJSPA's obligations under the Curative Agreement were to perform legal work at its law offices (which are located only in *Florida*) for "Current GMAC Foreclosure Files [pending] in the State of *Florida*" and to file the result of that work (*i.e.,* the curative documents) in *Florida* courts.  *See* Exhibit A at ¶¶ 2, 12, 13 and Exhibit 3 thereto.  And GMAC's obligation under the Curative Agreement was to pay DJSPA for legal services it rendered in *Florida* by sending money to DJSPA in *Florida*.  *See id.*

schedules.  Since GMAC never would have obtained the benefit of DJSPA's foreclosure files

had it not placed this money in escrow, this money should remain outside the bankruptcy estate.

*Wintter v. Fabber*, 618 So. 2d 375 (Fla. 4th DCA 1993) ("The purpose of the lien is to assist the

attorney in preventing a client from refusing or failing to pay charges justly due. To permit a

client in arrears to obtain the use of the papers would rob the lien of its intended force").

## NOTICE

DJSPA has provided notice of this response in accordance with the Case Management

Procedures Order approved by this Court on May 23, 2012 [D.E. 141] and the Procedures Order.

## CONCLUSION

**WHEREFORE** DJSPA respectfully requests this Court **(i)** grant DJSPA's permissive

abstention motion filed contemporaneously with this response or, in the alternative, **(ii) (a)** deny

GMAC's Objection in its entirety [Docket No. 8531]; **(b)** allow DJSPA's Claims 5275 and 7464

to stand; **(c)** enter DJSPA's proposed order attached hereto as Exhibit E; and **(iii)** grant DJSPA

such other and further relief as the Court may deem just and proper.

RENNERT VOGEL MANDLER & RODRIGUEZ, P.A.
*Counsel for Claimant,*
*Law Offices of David J. Stern, P.A.*
Miami Tower
100 S.E. Second Street, Suite 2900
Miami, Florida 33131
Telephone: (305) 577-4177


By____/s/___Jeffrey A. Tew_____
    Jeffrey A. Tew, Esq.
    Florida Bar No. 121291
    Spencer A. Tew, Esq.
    Florida Bar No. 537071
    Thomas S. Ward, Esq.
    Florida Bar No. 028624

SALAZAR JACKSON, LLP
*Counsel for Claimant,*
*Law Offices of David J. Stern, P.A.*
2000 Ponce De Leon Boulevard
Penthouse
Coral Gables, Florida 33134
Telephone:  (305) 374-4848


By:___/s/__Linda Worton Jackson_____
    Linda Worton Jackson
    Florida Bar No. 843164
    *(Pro Hac Vice Motion to be filed)*
    Jesse R. Cloyd
    Florida Bar No. 58388