[House Hearing, 111 Congress]
[From the U.S. Government Printing Office]


FORECLOSED JUSTICE: CAUSES AND EFFECTS OF THE FORECLOSURE CRISIS
(PART I & II)

=======================================================================

HEARING

BEFORE THE

COMMITTEE ON THE JUDICIARY
HOUSE OF REPRESENTATIVES

ONE HUNDRED ELEVENTH CONGRESS

SECOND SESSION

----------

DECEMBER 2, 2010 AND DECEMBER 15, 2010

----------

Serial No. 111-158

----------

Printed for the use of the Committee on the Judiciary


Available via the World Wide Web: http://judiciary.house.govFOR
SPINE deg.


FORECLOSED JUSTICE: CAUSES AND EFFECTS OF
THE FORECLOSURE CRISIS (PART I & II)

FORECLOSED JUSTICE: CAUSES AND EFFECTS OF THE FORECLOSURE CRISIS (PART I & II)

=======================================================================

HEARING

BEFORE THE

COMMITTEE ON THE JUDICIARY
HOUSE OF REPRESENTATIVES

ONE HUNDRED ELEVENTH CONGRESS

SECOND SESSION

_____

DECEMBER 2, 2010 AND DECEMBER 15, 2010

_____

Serial No. 111-158

_____

Printed for the use of the Committee on the Judiciary

Available via the World Wide Web: http://judiciary.house.gov

----------
U.S. GOVERNMENT PRINTING OFFICE

62-935 PDF                    WASHINGTON : 2010

For sale by the Superintendent of Documents, U.S. Government Printing
Office Internet: bookstore.gpo.gov Phone: toll free (866) 512-1800;
DC area (202) 512-1800 Fax: (202) 512-2104 Mail: Stop IDCC,
Washington, DC 20402-0001

COMMITTEE ON THE JUDICIARY

JOHN CONYERS, Jr., Michigan, Chairman

HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C. ``BOBBY'' SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
WILLIAM D. DELAHUNT, Massachusetts
STEVE COHEN, Tennessee
HENRY C. ``HANK'' JOHNSON, Jr.,
  Georgia
PEDRO PIERLUISI, Puerto Rico
MIKE QUIGLEY, Illinois
JUDY CHU, California
TED DEUTCH, Florida
LUIS V. GUTIERREZ, Illinois
TAMMY BALDWIN, Wisconsin
CHARLES A. GONZALEZ, Texas
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
LINDA T. SANCHEZ, California
DANIEL MAFFEI, New York
JARED POLIS, Colorado

LAMAR SMITH, Texas
F. JAMES SENSENBRENNER, Jr.,
    Wisconsin
HOWARD COBLE, North Carolina
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
DANIEL E. LUNGREN, California
DARRELL E. ISSA, California
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio
TED POE, Texas
JASON CHAFFETZ, Utah
TOM ROONEY, Florida
GREGG HARPER, Mississippi

Perry Apelbaum, Majority Staff Director and Chief Counsel
Sean McLaughlin, Minority Chief of Staff and General Counsel

C O N T E N T S

----------

Page

HEARING DATES

Thursday, December 2, 2010
  Foreclosed Justice: Causes and Effects of the Foreclosure
    Crisis (Part I)............................................    1

Wednesday, December 15, 2010second date deg.
  Foreclosed Justice: Causes and Effects of the Foreclosure
    Crisis (Part II)...........................................  113

(PART I)
December 2, 2010first date deg.

OPENING STATEMENTS

The Honorable John Conyers, Jr., a Representative in Congress
  from the State of Michigan, and Chairman, Committee on the
  Judiciary....................................................    2
The Honorable Lamar Smith, a Representative in Congress from the
  State of Texas, and Ranking Member, Committee on the Judiciary.    4
The Honorable Steve Cohen, a Representative in Congress from the
  State of Tennessee, and Member, Committee on the Judiciary.....    5
The Honorable Darrell Issa, a Representative in Congress from the
  State of California, and Member, Committee on the Judiciary....    7
The Honorable Ted Deutch, a Representative in Congress from the
  State of Florida, and Member, Committee on the Judiciary.......    8
The Honorable Howard Coble, a Representative in Congress from the
  State of North Carolina, and Member, Committee on the Judiciary    9
The Honorable Mike Quigley, a Representative in Congress from the
  State of Illinois, and Member, Committee on the Judiciary......   10
The Honorable Bob Goodlatte, a Representative in Congress from
  the State of Virginia, and Member, Committee on the Judiciary..   10
The Honorable Louie Gohmert, a Representative in Congress from
  the State of Texas, and Member, Committee on the Judiciary.....   11

WITNESSES

Ms. Phyllis Caldwell, Chief, Homeownership Preservation Office,
  United States Department of the Treasury
    Oral Testimony.............................................   13
    Prepared Statement.........................................   15
Mr. Edward J. DeMarco, Acting Director, Federal Housing Finance
  Agency
    Oral Testimony.............................................   27
    Prepared Statement.........................................   29
Ms. Julie L. Williams, Chief Counsel, Office of the Comptroller
  of the Currency, United States Department of the Treasury
    Oral Testimony.............................................   42
    Prepared Statement.........................................   44
The Honorable F. Dana Winslow, Supreme Court Justice, New York
  State Supreme Court

Oral Testimony...................................................  61
Prepared Statement..............................................  63

(PART II)
December 15, 2010second date deg.

OPENING STATEMENTS

The Honorable Henry C. ``Hank'' Johnson, Jr., a Representative in
  Congress from the State of Georgia, and Member, Committee on
  the Judiciary..................................................  119
The Honorable Lamar Smith, a Representative in Congress from the
  State of Texas, and Ranking Member, Committee on the Judiciary.  120

WITNESSES

The Honorable Sheldon Whitehouse, a U.S. Senator from the State
  of Rhode Island
  Oral Testimony................................................  113
  Prepared Statement............................................  117
James A. Kowalski, Jr., Esquire, Law Offices of James A.
  Kowalski, Jr., PL, Jacksonville, FL
  Oral Testimony................................................  122
  Prepared Statement............................................  125
Thomas A. Cox, Esquire, Volunteer Program Coordinator, Maine
  Attorneys Saving Homes Project, Portland, ME
  Oral Testimony................................................  289
  Prepared Statement............................................  292
Ms. Sandra D. Hines, former homeowner, Detroit, MI
  Oral Testimony................................................  431
  Prepared Statement............................................  434
Vanessa Fluker, Vanessa G. Fluker, Esquire, PLLC, Detroit, MI
  Oral Testimony................................................  436
  Prepared Statement............................................  438
Mr. Tom Deutsch, Executive Director, American Securitization
  Forum, New York, NY
  Oral Testimony................................................  443
  Prepared Statement............................................  446
Mr. Christopher L. Peterson, Professor, S.J. Quinney College of
  Law, University of Utah, Salt Lake City, UT
  Oral Testimony................................................  499
  Prepared Statement............................................  501

APPENDIX
Material Submitted for the Hearing Record

Prepared Statement from Mortgage Electronic Registration Systems,
  Inc. (MERS)...................................................  544

FORECLOSED JUSTICE:
CAUSES AND EFFECTS OF THE
FORECLOSURE CRISIS (PART I)

----------

THURSDAY, DECEMBER 2, 2010

House of Representatives,
        Committee on the Judiciary,

7/7/2015    12-12020-mg  Doc 8862-18  FORCHRG-111hhrg62935 TS Entered 07/09/15 13:39:14  Exhibit
Exhibit 5 - Hearing H. Comm. on Judiciary, Pg 6 of 97
Washington, DC.

The Committee met, pursuant to notice, at 10:12 a.m., in room 2141, Rayburn House Office Building, the Honorable John Conyers, Jr. (Chairman of the Committee) presiding.

Present: Representatives Conyers, Boucher, Jackson Lee, Waters, Cohen, Quigley, Chu, Deutch, Gonzalez, Sanchez, Smith, Coble, Goodlatte, Issa, Forbes, Franks, Gohmert, and Chaffetz.

Staff Present: (Majority) Perry Apelbaum, Majority Staff Director and Chief Counsel; Susan Jensen, Counsel; James Park, Counsel; Reuben Goetzl, Clerk; and Zachary Somers, Minority Counsel.

Mr. Conyers. Good morning. The Committee will come to order. We are going to begin by thanking our three colleagues who will not be returning to Congress next year for their fine and outstanding contributions to the Committee. The first is Rick Boucher who has been with us since he arrived in 1983. Actually, the third most senior Member on the Committee, who has served on Energy and Commerce simultaneously for most of that time. And he has always been able to be counted on for bringing to us a thoughtful perspective to many of the sensitive issues that are dealt with on the House Judiciary Committee.

I have got a number of issues that he has championed: The Free Flow of Information Act, Satellite Home Viewers Act, he did a lot of work on the PATRIOT Act, and we have always been able to count on him for an honest evaluation of the many problems that we have dealt with. And his absence will be missed greatly. The next is Bill Delahunt from Massachusetts, a former prosecutor, who authored the Innocence Protection Act, has worked the last couple of congressional sessions on the Foreign Affairs Committee. He has championed equity state sales tax levies. And we remember him also for joining our other colleague, Mel Watt, who is not leaving, in creating the states rights caucus, and we had some interesting contributions there.

And finally, Dan Maffei, who was only with us for one term, but he took the lead in saving hundreds of dealerships at General Motors and Chrysler, and he helped strengthen legislation to protect employees and retirees caught up in bankruptcies. Dan has a great opportunity, and he has clearly enjoyed being with us. We hope he can return. And I will yield to my Ranking Member, Mr. Smith, Lamar, for any comments he may want to make about departing Members.

Mr. Smith. Thank you, Mr. Chairman. I really just want to echo your comments and sentiments, because I agree with you 100 percent. Mr. Delahunt is not here and Mr. Maffei is not here, so I won't dwell on them to the extent that I might have otherwise. But I do want to single out Rick Boucher as someone who has been a friend over many years, someone who has worked with me, and I with him, on any number of issues, particularly those issues involving the subject of high tech and patent reform and telecommunications as well.

He is an expert in many, many areas. And oftentimes to hear him speak about those issues is to hear an unwritten Ph.D thesis. And I often feel like it could be taken down and turned in as such. And we agree on so many issues. I won't mention the DMCA because there are so many other issues we agree on. But he will be missed as well, both his manner and his intelligence. But I do hope he stays in touch with this Committee and with you and me, Mr. Chairman, as well, because the friendship that we have with Mr. Boucher needs to continue and I am sure it

will. And I will yield back.

Mr. Conyers. Thank you very much, Lamar. Is there any other Member disposed to make a comment?

Mr. Forbes. Mr. Chairman.

Mr. Conyers. Yes, of course. The gentleman is recognized.

Mr. Forbes. Mr. Chairman, I would just like to echo what both of you said about Rick Boucher, and that is with no slight to the other Members, but I have enjoyed serving with Rick over the years in the Virginia delegation. And everything the Ranking Member said about his demeanor and his expertise has been so true. We have had a great working relationship and a great friendship. And Rick, we just appreciate your service, not only to the country, but to the Commonwealth of Virginia.

Mr. Conyers. Well, spoken like a true Virginian, Randy Forbes. If there are no other comments----

Mr. Gonzalez. Mr. Chairman.

Mr. Conyers. Yes, Judge Gonzalez, Texas.

Mr. Gonzalez. And I will be brief. But I have had the great privilege of knowing Rick now and serving with him both on Judiciary and Energy and Commerce. It has been an incredible experience. One, he is such a good friend. But to have a friend who is also a mentor is just the most incredible combination you can have, especially a Member of Congress. You are going to be missed, Rick.

But my sense is that hopefully we still will be in contact because we have so much to still learn from you on a continuing basis. Again, it has been great, and I just wish you were still coming back next year and standing with us as we all got sworn in, as we get sworn in in January. Thank you, Mr. Chairman. I yield back.

Mr. Conyers. Thank you very much, Mr. Gonzalez. Today's hearing is entitled Foreclosed Justice: Causes and Effects of the Foreclosure Crisis. And I and Lamar Smith want to begin with some observations. You know, reports began to surface about fraudulent foreclosure documentation issues several months ago. In The Washington Post, the comment was, The Nation's Overburdened Foreclosure System is Riddled With Faked Documents, Forged Signatures and Lenders Who Take Shortcuts Reviewing Borrowers Files. We learned about the robo-signers that mortgage servicers utilize who sign off on thousands of foreclosure documents a month without ever verifying the accuracy of the information contained in those statements. And there have been other reports. Servicers seeking to foreclose on properties when they lacked proof of title to do so. Affidavits notarized outside the presence of the signer. Notarizations by individuals who had no legal authority to do so. Affidavits asserting conflicting facts signed by the same individual. Unfortunately, this problem is really not news to us.

In 2007, the Commercial and Administrative Law Subcommittee of this Committee received testimony from one of the Nation's most respected consumer bankruptcy practitioners about the problems of mortgage lenders foreclosing without having documentation to support any entitlement to do so.

So we are here today not just about faulty paperwork problems, and about the need to stop the flood of unnecessary foreclosures that is ravaging across this Nation, our neighborhoods, communities, towns and cities.

And so we have three issues that are in the front of my mind as we proceed: What caused the current foreclosure problem? Initially, predatory lending practices and lax lending

standards played a major role. Some lenders specifically
targeted minority communities by pushing families into high
interest rate mortgages that they could obviously not afford, a
sort of form of reverse redlining.

And so this practice devastated communities of color across
the Nation and created a higher incidence of foreclosures. As a
matter of fact, many economists have attributed the subprime
mortgage practice as what triggered the whole bubble
collapsing. For example, one out of every eight Wells Fargo
loans in predominantly Black neighborhoods have gone into
foreclosure compared with one in 59 such loans in White
neighborhoods. As these subprime mortgages, of course with
escalating interest rates, matured, homeowners couldn't any
longer afford the mortgage payments and began to default. And
as more homes fell into foreclosure, the prices of homes in
surrounding areas obviously became more depressed.

And what exacerbated all of this was, in some places, the
massive loss of jobs. Take Detroit, for example, where with the
collapse of the automobile industry this exaggerated and
further emphasized home loss because a lot of people lost their
homes because they lost their jobs and foreclosure was
inevitable. But even prior to the recent recession, many
working families found it difficult to meet their housing
obligations. And after the latest recession, the bottom fell
out of the housing market, the value of home prices fell even
more precipitously in many areas of the U.S. Many families as a
result are now struggling to repay mortgages for homes that are
worth less than what they owe. They are under water. And the
crisis has been compounded by the lending industry's steadfast
refusal to modify home mortgages to save them from foreclosure.

Ironically, many of the beneficiaries of the stimulus and
TARP and bailout are still not lending money to small
homeowners. As of last year, 2\1/2\ million homes were lost to
foreclosure. Current projections estimate that by the time this
foreclosure crisis abates, as many as 13 million homes will
ultimately be lost to foreclosure. And yet on Wall Street,
mortgage lenders and servicers and Fannie Mae and Freddie Mac,
all of whom received taxpayer bailouts to the tune of billions
of dollars over the last 2 years, have, in many instances,
turned a blind eye toward homeowners in similar financial
distress.

Under every program established to date, homeowners must
rely on the willingness of lenders to modify mortgage terms to
save their homes. The HAMP, Home Affordable Mortgage--Home
Affordable Modification Program, a $75 billion incentive
program designed to encourage participating lenders to sign a
contract with the United States Treasury to modify mortgages,
has had few--well, I won't say they haven't had any result, but
it is so modest it is hardly worth talking about. Out of many
millions of homes lost or headed to foreclosure, half, less
than half a million mortgages have been successfully modified
under this program.

We hear report after report that homeowners are drowning in
bank bureaucracy with lost documents, unexplained rejections,
and some of them just closed down, period, and vanished. You
can't even get them on the phone, and they aren't even in their
business location any longer. And so many homes are rushed
through foreclosure without homeowners having a realistic
opportunity to restructure the mortgage.

Now, in light of these disclosures about inaccurate
foreclosure documents, we have to ask, do these institutions

legally have the right to foreclosure at all? And that has been
answered by at least one Federal judge who will testify about
the numerous documentation problems encountered at the trial
court level.

I will skip--let me conclude. The question that overrides
the hearing is about what can we do about the foreclosure problem and
the continuing problem of high unemployment. And I will put
some of those answers into the record. And thank you for your
indulgence. And now I would like to yield to Lamar Smith of
Texas, the Ranking Member of the House Judiciary Committee.

Mr. Smith. Thank you, Mr. Chairman. The past few years have
been a trying time for the U.S. housing market and American
homeowners. The foreclosure crisis has had a devastating impact
on the economy and regrettably has led to many Americans losing
their homes. The crisis has its roots in poorly underwritten
loans and unconventional mortgage products and has been
compounded by high unemployment. Over the past few months, a
new problem has emerged in the foreclosure crisis, the scandal
that has erupted around the widespread mismanagement of
foreclosure documents by lenders and mortgage servicers. The
corners they have cut to keep up with the large and growing
numbers of foreclosures are inexcusable.

For many Americans, a house will be the biggest purchase
they ever make and their single largest asset. Given the
importance of the purchase of a home, only strict compliance
with State foreclosure laws is acceptable. Accordingly,
regardless of whether borrowers have defaulted on their
obligations, they are entitled to due process in foreclosure.
This scandal is about more than sloppy and careless foreclosure
practices, it is about due process, private property rights and
the rule of law.

Fortunately, it appears the vast majority of defects and
foreclosure documents that have been uncovered are technical in
nature. The evidence indicates that despite the many
unacceptable technical errors that have been made by and large
foreclosures have only occurred in cases in which the
homeowners were in default. In many instances, foreclosures
take more than a year from start to finish giving the borrower
ample time to discover any flaws in the documents supporting
foreclosure. And in about one-third of all cases, borrowers
have already abandoned their homes before their foreclosure
process has even started. This does not minimize the
seriousness of the industry wide mismanagement of foreclosure
documents, but it does demonstrate that we must be careful in
our response to the scandal.

The housing market is showing some signs of recovery. We
need to avoid setting the recovery back by overreacting.
Foreclosure rules and requirements are determined under State
law. For this reason, attorneys general in all 50 States and
the District of Columbia have launched an investigation into
the foreclosure documentation problems. And I thank the State
AGs for their efforts. It appears that their investigations may
result in a settlement with mortgage servicers leading to a
nationwide fund to help any homeowners who did suffer wrongful
foreclosures.

However, the foreclosure document scandal has led some,
including some Members of this Congress, to call for a
nationwide moratorium on foreclosures. This approach, in my
judgment, would be a mistake. All indications are that a
nationwide moratorium would cause further harm to the already
depressed U.S. housing market. Lenders and servicers must be

held accountable for their mistakes, but we must also maintain
the stability of the housing market. A moratorium on
foreclosures will only serve to continue the significant
uncertainty that this controversy has raised for potential home
buyers and the housing market. At a time when purchases of
foreclosed homes account for 25 percent of all sales, halting
foreclosures could harm the economy and slow down the modest
recovery further worsening unemployment.

The current foreclosure crisis has been devastating. No one
wants to see these people lose their homes. Foreclosures not
only uproot families and cause hardship to borrowers, but they
also depress community property values and result in severe
losses for lenders and investors. But now is the not the time
for a quick fix approach like foreclosure moratoriums or
allowing modification of home mortgages in bankruptcy. These
so-called solutions will only cause more harm to the country's
economy, and, in fact, delay the recovery. We need to focus on
restoring the integrity of the foreclosure process in a manner
that protects homeowners and does not disrupt the functioning
of the housing market. Thank you, Mr. Chairman. I yield back.

Mr. Conyers. Thank you, Lamar Smith. Is there any Member
that is inclined toward just a brief observation? Let's see. I
will start off with Mr. Cohen of Memphis, Tennessee.

Mr. Cohen. Thank you, Mr. Chairman. First of all, I want to
say I appreciate your opening statement. And I concur on so
many of your remarks and you have well gone through the history
of the Committee and my Subcommittee, which I thank you for
appointing me the Chair of, Commercial and Administrative Law,
and the work we have done and we have looked at in this
Congress. And I want to thank you for what you have done. I
guess it is going to be the last Judiciary Committee for a
while where you are Chairman. And you have been a great
Chairman and shown great ability to work with both sides. And I
have learned from you in my opportunity to be a Subcommittee
Chair in doing that and trying to be fair to both sides and
maintain. And I always think about how would Chairman Conyers
handle this.

And I am sure that Ranking Member Smith has done the same
thing, and you prepared him well. With that said, the subject
matter is one that is so important to the American people. And
I think this subject matter is probably as much as anything
else what caused the change in the elections that took place.
The American public was angry that nobody worried about the
integrity of the lending practices or the integrity of the
bankers or the integrity of the Wall Street folks who bundled
all these mortgages and securitized them and made them so
complex that nobody knew where they originated and made the
problem of dealing with these foreclosures so difficult.

Rather than worry about the integrity of that process, we,
and I did it too, because it was the right thing to do, and
Chairman Frank said so appropriately, that it was what would be
considered collateral benefit, that sometimes you have to help
the people that caused the harm to help the whole system. And
the collateral benefit went to Wall Street. But we put 700 and
something billion dollars what was a bipartisan effort,
President Bush's idea, and Secretary Paulson's, and a goodly
number of Republicans and Democrats joined together to make a
very difficult vote, but one that was necessary, but one that
took care of keeping in place the people who perpetrated and
were responsible for the foreclosure crisis, the unemployment
situation in this country, and almost put this country and the

world's economies under water.

We took care of those people who got the major salaries and the major bonuses and are living just as well on Wall Street; we didn't put any of them in jail, none of them suffered in any way whatsoever for morally reprehensible conduct and who benefited financially, to a great extent, and whose lives are better than ever. And yet the homeowner and the unemployed who need unemployment insurance and who need help with their mortgages are considered to be detritus, they are considered to be collateral damage, and nobody has cared about them.

But the fact is the Democratic Congress, and there probably were a few Republican votes with us, but predominately, this democratic Congress has cared and tried to help. I think that the modifications in bankruptcy is the answer, and it is so important, because nothing else has worked. And there needs to be somebody with a lever to help the homeowner, and nobody does. These people are the forgotten victims of all of this economic fallout. They are the purple hearts of this economy, and they are being forgotten about in terms of help with their foreclosures. And, yes, we might have to do some things that are unusual, but they have been put in this position by people who made subprime loans, who made deals that maybe they were too good to be true, but they made those offers and they were wrong and got people into loans and obligations greater than they could afford; they have lost their monies, their homes and a lot of excess cost that they otherwise would not have incurred if they were not lured into it.

Many have lost their jobs. And now that they need unemployment benefits, there are people that don't want to give it to them. What you do onto the least of thee you do onto me, and for those who have given much, much is expected. And at this time when Christians and Jews and Muslims all should be thinking about what we are privileged to have and those that may not be privileged to have were not doing it. We are thinking about what this Congress has seen and this Administration has been seeing, wrongfully so, I believe, by the public, is caring about those that have much and taking care of those that caused the problem and keeping them in their high lofts in Wall Street, and not caring about the little fellow.

And that is what we need to do. And we need to have modifications to mortgages and we need to act. And if we err, we need to err on the side of the people who have been injured and harmed. With that, I yield back the remainder of my time. And thank you, Mr. Chairman.

Mr. Conyers. Thank you. Darrell Issa, would you care for a brief comment?

Mr. Issa. I would, Chairman. Seldom do I get the opportunity to say to a Chairman of the other party how much I have enjoyed my tenure under your leadership, but today is one of those days. You have been fair, you have been firm and I am not going to miss you because I know you will be right there just one over. And I look forward to serving with you in the next Congress. With that, I will correct you on one thing in your opening statement, Mr. Chairman. You used the word billions for bailout, when, in fact, it is trillions. Freddie and Fannie, we took full faith obligation for those entities.

So, in addition to the 140 or so billion that they have been handed permanently, we are on the hook for every penny, something that I hope in the legal terms here, in the financial terms that the Committee on Financial Services and on the

money, follow the money terms of the Government over-sight Committee, we can bring that to an end and never again put full faith behind somebody else's profit taking.

When we talk about Wall Street, let's remember Freddie and Fannie are Washington, D.C. Entities and not, in fact, Wall Street.

Mr. Chairman, the Home Affordability--Affordable Modification Program, or HAMP, must be ended. In its 20 months it has proven to delay the inevitable, it has proven to raise hopes only to be dashed, it has proven to be able to renegotiate only to have foreclosure return at every bit as high a rate. Mr. Chairman, in the 20 or so months that HAMP has been actively negotiating, they have--of the nearly 3 million opportunities that would have been granted, about 1\1/2\ million have begun; 1,395 trials have started; 719,000 or roughly half have been rejected; and 483,000 have been made permanent, of which nearly 10 percent have already redefaulted and expect that to rise three to fourfold.

During that period of time, the Obama administration, I believe in good faith, employed $22 billion in first time home buyer tax credits. Mr. Chairman, my Committee next door follows the money, this Committee follows the law. In this case, when you look at $22 billion in first time home buyer credits, without looking at what the true price of those homes should be, without those homes having reached their value, what we have done is had a new round of thousands or actually millions of new home buyers buy homes that are still sinking in value.

We must not complain about the number of foreclosures or sales, we must, in fact, look at HAMP and other programs and say, what are they doing to increase, dramatically increase the number of foreclosures if appropriate and legally reviewed, which is certainly something that has not yet been proven that the banks are willing to do accurately at 100 percent level, but also the number of short sales, voluntary abandonments and the like.

The truth is the sooner that a property is transferred to a new owner, able to make the payments, able to maintain the home, the sooner that the precipitous drop in value stops. Abandoned homes, homes in which a home has been rented to somebody who is no longer the owner and homes which are being stripped systemically because there is a profit taking even after the home is in foreclosure, all of this dramatically reduces the value of the home. Every neighborhood in my community in which a home is in foreclosure it can be seen from the outside that the maintenance has stopped, that the lawns have gone dry and the like.

This is what we as Committees of jurisdiction must work on. The swift, accurate and legal execution of those mechanisms now existing or which may be created that will allow for the proper value of a home to be assessed, a homeowner able to meet that value, able to remain through some mechanism and those not able to quickly able to move on to appropriate housing, and that house, home, apartment, condo or the like, able to be put back into current maintenance.

Mr. Chairman, the tragedy in America today are the homes that sit idle, abandoned or in foreclosure and in ruin. I hope that in the next Congress, we will continue to work on a bipartisan basis to recognize that is what is stopping America's value of homes from reaching bottom, reaching a point in which people can make sound investments and begin rising.

I look forward to this hearing and to the next Congress of

us working together to solve it. I thank the Chairman for his leadership, the Ranking Member for his leadership and yield back.

Mr. Conyers. Thank you, Darrell Issa. The gentleman from Florida, Ted Deutch.

Mr. Deutch. Thank you, Mr. Chairman. And Mr. Chairman, I would like to thank you first for the opportunity you have given me in the short time----

Mr. Conyers. Excuse me. Mr. Quigley, do you mind if he goes ahead of you?

Mr. Quigley. Yes.

Mr. Deutch. Another opportunity that you and Mr. Quigley have provided in the short time that I have been here. I would also like to take time to recognize your tireless efforts on this issue. In reforming the foreclosure process and ensuring that it treats homeowners fairly and justly, this hearing has particular significance from my State of Florida with the second highest number of foreclosures in the country and where half of all borrowers owe more than their properties are worth.

The collapse of our Nation's economy and the meltdown of the housing market have unveiled systemic problems in the mortgage foreclosure system. There is much blame to go around, but it is incumbent upon us to work on solutions so that foreclosures are processed in a fair and equitable manner. Railroading homeowners through foreclosure processes that are quickly cobbled together to relieve court dockets of mounting foreclosures can and, as we have seen, often do disregard due process rights of homeowners.

In Florida, the State legislature has created foreclosure only in courts, meant to reduce the mounting backlog of more than 300,000 foreclosure cases by the end of 2011. In an effort to quickly relieve court dockets, however, evidentiary hearings are rarely provided to examine whether documents are correct or fraudulent. Hearing times are sometimes as short as 15 seconds; do you live in the home? Are you behind in your payments? And lawyers representing the banks often do not appear in court.

In addition, while the foreclosure proceedings move forward a mediation process begins. The dual track system in Florida often confuses homeowners with court and mediation documents and creates confusion for the borrower, whether they need to have legal representation at the foreclosure process, in the mediation process or both. This is not limited to Florida, and I hope that we will have an opportunity to hear from the panelists today. This accelerated judicial review system is fraught with opportunities for fraud and for the due process rights of homeowners to be trampled.

In addition, the Federal Government's loan modification programs fail to provide necessary incentives for banks to engage in the scope of large scale modifications that are necessary to fix the broken mortgage system. And with waves of foreclosures continuing to inundate the court system, Mr. Chairman, more needs to be done to keep people in their homes, to root out fraud and to protect the due process rights of people going through foreclosure.

I think that is what we will have an opportunity to pursue here today. And I thank you for holding this hearing and giving me this opportunity, and I yield back. Thank you, Mr. Chairman.

Mr. Conyers. The Chair recognizes a senior Member of the Committee, the gentleman from North Carolina, Howard Coble, who is a Ranking Member on at least one of the Subcommittees.

Mr. Coble. Thank you, Mr. Chairman. And I will be very

brief. I want to associate myself with the comments of the
distinguished gentlemen from California when he used two four
letter ``F'' words to describe you, and those words were firm
and fair. And I reiterate what Darrell said about that. I also
want to associate myself with Darrell's comments. He is still
here. When he said----

   Mr. Issa. Keep talking.

   Mr. Coble. I am saying it favorably. When he said, Mr.
Chairman, one of the problems, and we all know this, is
abandoned or vacant houses. When houses lie vacant and/or
abandoned crime inevitably follows. So we need to be aware of
that. And I thank you again for your leadership, Mr. Chairman,
and yield back.

   Mr. Conyers. The gentleman from Illinois, Michael Quigley.

   Mr. Quigley. Thank you, Mr. Chairman. Much has been said
already, I won't add to that, except to, I guess, a message to
the financial institutions. In my view, this recent round of
mistakes only adds insult to injury. But like many Members, my
office in Chicago, our district offices, try to help our
constituents on a case-by-case basis, those who are dealing
with foreclosure. And there are many not-for-profit
organizations in my city of Chicago that try to help people as
well.

   To sum up, how they have been treated by the financial
institutions in their attempts to modify, they have been lied
to, their information has been delayed, their information they
received is inconsistent, incorrect and they have been abused a
second time. This is often because of the trust involved here
created an even worse situation for them because it has pushed
the time clock well past their ability to catch up.

   So what I would try to suggest to those institutions, and
they haven't even treated our staffs well, they haven't
returned phone calls. My colleague, Jan Schakowsky, and I had
to have a forced meeting in which we said to these banks you
need to return our phone calls, you need to respect our
constituents who are facing foreclosure. It has gotten that
bad.

   So with all due respect, I would suggest that they need
to--the respect that they get from the Members and the help
they get from Congress, at the very least, ask them to treat
our constituents, their clients, with that same respect. It has
not happened, and I suggest that its time has come. Thank you.

   Mr. Conyers. Thank you. The Chair is pleased to recognize
Bob Goodlatte, a senior Member of the Committee from Virginia.

   Mr. Goodlatte. Mr. Chairman, thank you very much, and thank
you for holding this hearing on the Effect of Foreclosure, Its
Causes and Effects in the Current Foreclosure Crisis.
Currently, Federal, State and local law enforcement agencies
are investigating the recently uncovered irregularities in the
foreclosure processes used by some banks. These irregularities
are very troubling and raise many questions about the validity
of some foreclosures, as well as the validity of other chain of
title transactions.

   Or it is important that we meticulously gather the actual
facts so that we can best solve the problems, broad accusations
not backed by the facts will do little to help those who have
been harmed by these errors.

   In addition, any solutions to this problem should be
tailored to the actual problem and not be so broad as to punish
banks, including smaller community banks that likely play by
the rules and completed the paperwork properly.

7/7/2015　　12-12020-mg　Doc 8862-18　FORECLOSURE: CAUSES AND REMEDIES | Exhibit Hearing H Comm on Judiciary &　Filed 07/09/15　Entered 07/09/15 13:39:14 | & Exhibit

Exhibit 5 - Hearing H Comm on Judiciary　Pg 15 of 97

And I would like to associate myself with the comments of the gentleman from North Carolina, Mr. Coble, who noted that there are ongoing problems. If we simply have this entire system break down, there are many related problems that occur in terms of vacant houses, in terms of disruption of our financial markets, in terms of other things, it is much more important that we get this focused on making sure that each individual who is the subject of a foreclosure is treated fairly than it is that we do something to put a halt, as has happened in some places, to the entire foreclosure process for any lengthy period of time. Because that is going to have a far-reaching impact, not just on the individuals directly affected, but by every homeowner in the country and everyone who desires to become a homeowner in the country.

So I look forward to hearing from our expert witnesses today on this very important issue. And again I thank you, Mr. Chairman.

Mr. Conyers. I thank you. We have with us on the panel, and we welcome them and commend them for their patience, Judge Winslow, Ms. Julie Williams, Mr. Ed DeMarco and Ms. Phyllis Caldwell, who is Chief of the Homeownership Preservation Office for the Department of Treasury. She is also a former president of the Washington area--the Washington Area Women's Foundation, President of Community Development Banking for Bank of America, and we welcome her as our first witness. And we would have--without objection, we will have all the statements entered into the record. And we will start off Ms. Caldwell with you.

Mr. Goodlatte. Mr. Chairman, I hate to interrupt, but it has been brought to my attention that your good friend and the gentleman from Texas, Louie Gohmert, wanted to say a few words.

Mr. Conyers. Judge Gohmert, excuse me, I didn't--I wasn't aware. The gentleman from Texas is welcome and recognized before we begin our witnesses. Please, forgive me.

Mr. Gohmert. Because of my warm feelings when I waved earlier, it may have been seen as a gesture of howdy. But also your recognizing what Darrell Issa had said, we have disagreed politically over many things, but you have never been anything but gracious as Chairman toward me personally, and I will always be grateful. Thank you, Chairman. I did want to address a couple of things. My friend from across the aisle, that, because there is more Democrats, actually sits right next to me on this side of the aisle, had commented about the Wall Street bailout. And I know that things were well intentioned, I know it was under the Bush administration and I know that President Bush was responding to the urgency pushed on him by Treasury Secretary Paulson as Paulson pushed for the Paulson poultice to solve his friends on Wall Street's problems, but what happens when this body steps in to interrupt the rules, to interrupt the laws and the system that has been put in place, it sends things spiraling.

So I disagree with my friend from Tennessee, it was not necessary to spend $700 billion for a major green poultice to be placed on the problem on Wall Street. It arose because of greed. There were people taking advantage of the situation that had come up with a ridiculous way in which to gamble legally by putting together mortgages so you couldn't review the individual mortgages, you bought a package. And then you would buy insurance called credit default swaps. But we wouldn't require that you put anything aside in reserve to pay the insurance in the event the insurable event occurred. Those were all big mistakes. But you don't rush in and completely redesign

the system by rewarding people's greed and say here is a green
poultice to put on your hurt, you make them go through the
system as it was set up called bankruptcy that was provided for
in the Constitution and which was actually set in place when
people realized the financier of the revolution, Mr. Morris,
was in debtor's prison. And he was let out of prison once the
bankruptcy laws were put in place.

AIG should have gone through, most of their departments
were making money, let them go through reorganize. Instead of
rewarding Goldman Sachs for their greed, they should have gone
through bankruptcy. We created a bigger problem when we rushed
in and rewarded the greed there.

Now, with foreclosure there are rules in place. And if
people have not followed the rules in foreclosing, there need
to be consequences that are set forth under the rules and in
the court system. But by playing by the rules and not changing
them after people have messed up, then we give certainty to the
system and the economy heals much quicker than if we interrupt.

And it brings me to what really drove me off the bench as a
district judge into wanting to legislate. And knowing that
legislating from the bench was improper, I left and ran for the
opportunity. But I found myself sentencing more and more women
who were single moms who were charged with felony welfare
fraud. And when you look to the heart of every case, it seemed
to arrive from the same thing, or derive from the same thing.
And that was that the great society legislation was so well
intentioned they saw single moms, deadbeat dads not
contributing, so let's help these single moms, let's give them
a check for these children they are having out of wedlock where
the deadbeat dad doesn't help.

What has happened over the last 45 years is we have lured
young women out of high school into having babies only to find
they can't live off that little check for one child, and then
they would have another and another, the ones that would come
before my court for welfare fraud. And they would finally
realize, I am never going to get out of this rut, so maybe if I
either sell drugs or if I get a job and don't tell the Federal
authorities, maybe I can climb out of this hole. And it just
seemed immoral that we, the well intentioned, as a Congress
provided incentives to lure these young women away from their
God-given potential into a rut from which there was no hope for
most of them for getting out.

We should not be satisfied with good intentions. We need to
look at the bigger picture, give incentives to reach potential,
not lure people into a rut of indentured servitude to this
Congress and to this Washington. The same thing with
unemployment. Given 99 weeks, my goodness, if you can't find a
job in 26 weeks in the area in which you are trained, then the
incentives ought to be to retrain for a place where there is
jobs, not let you sit home dreading the consequences for a year
and a half later where there is still no jobs. That seems
immoral to me.

And I am very concerned that we don't do something well
intentioned with regard to foreclosures that end up doing more
harm 40 years, 45 years from now, as I think we have done from
the great society. We need to incentivize proper conduct, we
need to enforce the fact that rules should be followed. And
whether you are a foreclosure company, a mortgage company or a
borrower, if you haven't played by the rules, then there is
consequences.

And close with this example. A stockbroker said, or a

stockbroker friend of his from California told him he needs the
government to step in because he is going to lose his home. He
has a $700,000 home and he can't make the payments. He said,
well, we make basically the same thing, how can you afford a
$700,000 home? He said, well, we had bought one before on a 12-
month note, interest only at the end of the 12 months, and we
could turn it and make a nice profit. So we did it with this
one and now we can't make the interest payments and we are
about to lose our home if the Federal Government doesn't step
in.

They should have bought a $300,000 or $400,000 home instead
of overstepping, and I don't think Congress should step in and
help this guy keep his $700,000 home. We need to buy within our
means, this Congress needs to act within its means and I think
the world will be a better place because of it. Thanks for
indulging me, Chairman.

Mr. Conyers. Ms. Caldwell, you are still the first witness
at this panel. And we are pleased that you will start off our
discussion.

TESTIMONY OF PHYLLIS CALDWELL, CHIEF, HOMEOWNERSHIP
PRESERVATION OFFICE, UNITED STATES DEPARTMENT OF THE TREASURY

Ms. Caldwell. Thank you, Chairman Conyers, and Members of
the Committee, again, as we discussed, the foreclosure problems
that have recently come to light underscore the continued
critical importance of the Making Home Affordable program
launched by Treasury of which HAMP is a part. Preventing
avoidable foreclosures through modifications and other
alternatives to foreclosure continues to be a critical
priority. Foreclosures dislocate families, disrupt the
community and destabilize local housing markets. Over the last
20 months, we have developed rules and procedures to facilitate
meaningful modifications and other foreclosure alternatives. We
have urged servicers to increase staffing and improve customer
service. We have developed specific guidelines and
certifications on how and when homeowners must be evaluated for
HAMP.

HAMP has strong compliance mechanisms in place to ensure
that servicers follow program guidelines. Treasury has built
procedural safeguards and appropriate communication standards
within HAMP to minimize those instances where borrowers are
dual-tracked, where they are being evaluated for HAMP at the
same time they are being put through the foreclosure process.

Specifically, program guidelines require participating
mortgage servicers of nonagency loans to evaluate homeowners
for HAMP modifications before referring those homeowners to
foreclosure; suspend any foreclosure sales against homeowners
who have applied for HAMP modifications while their
applications are pending; freeze all pending foreclosure
actions when a borrower makes the first payment on a fully
verified income trial plan; evaluate whether homeowners who do
not qualify for HAMP or who have fallen out of HAMP qualify for
alternative home retention or private modification programs;
evaluate whether homeowners may qualify for a short sale or
deed in lieu of foreclosure and provide a written explanation
to any homeowner who is not eligible for HAMP modification and
to delay the foreclosure sale for at least 30 days afterwards
to give the homeowner time to appeal.

Servicers may not proceed to foreclosure sale until they
have tried these alternatives. They must also issue a written

certification to their foreclosure attorney or trustee stating,
``All loss mitigation alternatives have been exhausted and a
nonforeclosure option could not be reached.''

    On October 6th, Treasury clearly reminded servicers of this
existing HAMP rule. And we have instructed our compliance team
to review the ten largest servicers, processes and procedures
for complying with these guidelines. If we find incidents of
noncompliance, Treasury will direct servicers to take
corrective action, which may include suspending those
foreclosure proceedings and reevaluating the affected
homeowners for HAMP.

    In terms of compliance, it is important to remember that
although Treasury administers HAMP, it does so through a
voluntary contract with the servicer versus regulatory or
enforcement agency authority. Thus, our compliance efforts are
focused on ensuring that servicers are following the
contractual requirements of their servicer participation
agreements. Compliance remedies have included reevaluating
loans for HAMP eligibility, resoliciting borrowers, enhancing
servicer processes and providing additional training to staff.

    To date, almost 1.4 million homeowners have started trial
modifications and 520,000 have started permanent modifications.
These homeowners have experienced a 36 percent median reduction
in their mortgage payments or more than $500 a month. Consider
that in the first quarter of 2009, nearly half mortgage
modifications increased borrowers monthly payments or left
payments unchanged. By the second quarter of 2010, 90 percent
of mortgage modifications for the borrower lowered monthly
payments. Homeowners today have access to more sustainable
foreclosure prevention solutions. And HAMP uses taxpayer
resources efficiently. Its pay-for-success design supports
borrowers who are committed to staying in their homes and
making monthly payments by paying out servicer, borrower and
investor incentives over 5 years when the loan remains current.
And the investor, not the taxpayer, retains the risk of
borrower payment.

    In conclusion, we believe the foreclosure problems
underscore the continued need for servicers to focus on
evaluating homeowners for all home retention options starting
with HAMP. We appreciate the efforts of both Members of this
Committee and our partners in the housing community in holding
servicers accountable and improving HAMP's design and
performance. I look forward to taking your questions. Thank
you.

    [The prepared statement of Ms. Caldwell follows:]
                Prepared Statement of Phyllis Caldwell


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]


                    _____


    Mr. Conyers. Mr. Edward DeMarco has been called one of the
50 most powerful men in real estate by Bloomberg BusinessWeek.
He appears today as the acting director of the Federal Housing
Finance Agency which is the conservator for both Fannie Mae and
Freddie Mac. He also established the agenda for the Home
Affordable Finance program. And we welcome you to this hearing
today, sir.

   TESTIMONY OF EDWARD J. DeMARCO, ACTING DIRECTOR, FEDERAL
                    HOUSING FINANCE AGENCY

Mr. DeMarco. Thank you, Mr. Chairman. Chairman Conyers, and
Members of the Committee, thank you for inviting me here today.
The recently identified deficiencies and the preparation and
handling of legal documents to carry out foreclosures----

Mr. Conyers. Could you pull your mic closer to you, we
can't hear.

Mr. DeMarco. Okay. Is this working? I will begin again. The
recently identified deficiencies and the preparation and
handling of legal documents to carry out foreclosures are
unacceptable. Those deficiencies undoubtedly reflect strains on
a system that is operating beyond capacity, but they also
represent a breakdown in corporate internal controls and
management oversight.

FHFA's goals in this matter are twofold, to ensure that
foreclosure processing is done in accordance with the servicer
contract and applicable laws and to protect taxpayers from
further losses on defaulted mortgages. Of course, before any
foreclosure is completed, we expect servicers to exhaust all
alternatives.

My prepared statement reviews the actions that FHFA has
taken to date, as well as those underway. It also provides
context for understanding the problems that have arisen,
including consideration of the role of servicers and a
description of the diverse range of foreclosure processing
requirements. As I have previously reported to Congress, the
enterprises, Fannie Mae and Freddie Mac, minimize losses on
delinquent mortgages by offering distressed borrowers loan
modifications, repayment plans or forbearance. These loss
mitigation tools reduce the enterprises losses on delinquent
mortgages and help homeowners retain their homes. Servicers of
enterprise mortgages know that these tools are the first
response to a homeowner who falls behind on their mortgage
payments. Yet for some delinquent borrowers, their mortgage
payments are simply not affordable due to unemployment or other
hardship, and a loan modification is not a workable solution.

For these cases the enterprises offer foreclosure
alternatives in the form of short sales and deeds in lieu of
foreclosure. Despite these options for a graceful exit from a
home, foreclosure remains the final and necessary option in
many cases. As we know, foreclosure process deficiencies have
emerged in several major servicers. Recently, FHFA provided the
enterprises and servicers a four-point policy framework for
handling these deficiencies. The four points are simply stated:
First, verify that the foreclosure process is working properly;
second, remediate any deficiencies identified in foreclosure
processes; third, refer suspicions of fraudulent activity; and
finally, avoid delay in processing foreclosures in the absence
of identified problems. Pursuant to that guidance, the
enterprises continue to gather information on the full nature
and extent of the servicers problems. Only a small number of
servicers have reported back to the enterprises has having some
problem with their foreclosure processing that needs to be
addressed. Still, these firms represent a sizable portion of
the enterprises combined books of business. The enterprises are
currently working directly with their servicers to ensure that
all loans are handled properly and corrections and refiling of
paperwork are completed where necessary and appropriate.

To be clear, FHFA does not regulate mortgage servicers and
the enterprises relationship with them is a contractual one. As
conservator of Fannie Mae and Freddie Mac, FHFA expects all

companies servicing enterprise mortgages to fulfill their
contractual responsibilities which include compliance with both
the enterprises' seller/servicer guides and applicable law.
Also, FHFA remains committed to ensuring borrowers are
presented with foreclosure alternatives.

Still, it is important to remember that FHFA has a legal
obligation as conservator to preserve and conserve enterprise
assets. This means minimizing losses on delinquent mortgages.
Clearly, foreclosure alternatives, including loan
modifications, can reduce losses relative to foreclosure. But
when these alternatives do not work timely and accurate
foreclosure processing is critical for minimizing taxpayer
losses.

To conclude, regulatory agencies including FHFA, are
carrying out important examination activities that will better
inform the issue. Thus, identification of further actions or
regulatory responses should await the results of these
examinations and evaluation of the information being developed.
Thank you.

Mr. Conyers. Thank you.

[The prepared statement of Mr. DeMarco follows:]

Prepared Statement of Edward J. DeMarco


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

_____


Mr. Conyers. Attorney Julie Williams is the Chief Counsel
of the Office of Comptroller of the Currency at the Department
of Treasury. OCC supervises all national banks and their
operating subsidiaries. Attorney Williams is the author of two
books and numerous articles on financial servicers, securities
and corporate law matters.

We welcome you to the hearing this morning.


TESTIMONY OF JULIE L. WILLIAMS, CHIEF COUNSEL, OFFICE OF THE
COMPTROLLER OF THE CURRENCY, UNITED STATES DEPARTMENT OF THE
TREASURY


Ms. Williams. Thank you.

Chairman Conyers and Members of the Committee, I appreciate
this opportunity to appear today to discuss recent events
concerning the mortgage foreclosure process and the actions
that the Office of the Comptroller of the Currency is taking in
response.

The occurrences of improperly executed documents and
attestations that have come to light raise concerns about the
overall integrity of the foreclosure process. Laws in each
State establish the requirements and process by which that
action may be taken. When that due process is not followed, it
is not a technicality, it goes to the propriety of the
foreclosure itself. The improprieties that have been identified
in the past several months are unacceptable practices that
warrant the thorough investigation that is now under way by the
OCC and other agencies and appropriate and vigorous responses.

The OCC supervises all national banks and their operating
subsidiaries, including their mortgage-servicing operation. In
recent years as problem loans surged, the OCC's primary focus
was to prevent avoidable foreclosures by directing national
banks to increase the volume and sustainability of loan
modifications. When we saw, using data from our mortgage

metrics system, that an inordinate number of modifications initiated in 2008 were redefaulting, we directed national bank mortgage servicers to take corrective action. Since then we have seen a sharp increase in modifications that lowered monthly payments and fewer defaults.

While these efforts are preventing foreclosures, many families are still struggling and face the prospect of losing their homes. In this regard questions have arisen about the practice of continuing foreclosure proceedings, even when a trial modification has been negotiated and is in force. We agree that this dual track is unnecessarily confusing for distressed homeowners and risks them receiving mixed or contradictory information.

HAMP requirements contain a model for suspending foreclosure proceedings when a borrower is successfully performing in a trial modification program; but most modifications today are not HAMP modifications. Therefore, yesterday, Acting Comptroller John Walsh announced that the OCC will direct national bank servicers to suspend foreclosure proceedings for borrowers in all types of successfully performing trial modifications where the servicer has the legal ability to do so. It is important to remember, however, that GSEs and private investors dictate the terms for non-HAMP modifications, so this flexibility may not always be available to the servicers.

The OCC, as part of its supervisory processes, reviews a national bank's foreclosure governance process to determine if it has appropriate policies, procedures and internal controls necessary to ensure the accuracy of information relied upon in the foreclosure process and compliance with Federal and State laws. We expect banks to test these processes through their internal audit and ongoing quality-control functions. Unfortunately, neither banks' internal quality control tests, internal audits, nor the OCC's own consumer complaint data suggested foreclosure document processing was an area of systemic concern. However, when problems were identified at Ally Bank, which is not a national bank, we immediately directed the eight largest national bank mortgage servicers to review their operations and take corrective actions.

In concert with other regulatory agencies, OCC examiners are now reviewing samples of individual loan files where foreclosures have either been initiated or completed to test the validity of banks' self-assessments and corrective actions; whether foreclosed borrowers were appropriately considered for loss-mitigation alternatives such as loan modification; and whether fees charged were appropriate, documents were accurate and appropriately reviewed, proper signatures were obtained, and documents necessary to support a legal foreclosure proceeding were provided.

We have likewise instructed examiners to be alert to and document any practices such as misapplied payments, padded fees and inappropriate application of forced-placed insurance as part of these file reviews. Where we find errors or deficiencies, we are directing national banks to take immediate corrective action, and we will not hesitate to take an enforcement action or impose civil money penalties, removals from banking, and make criminal referrals if warranted.

We expect to complete our examinations by mid to late December and to determine by the end of January what additional supervisory or enforcement actions are needed.

Thank you again for the opportunity to appear today. I

would be happy to answer your questions.

Mr. Conyers. Thank you.

[The prepared statement of Ms. Williams follows:]

Prepared Statement of Julie L. Williams

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

_____

Mr. Conyers. Our next witness is Judge Dana Winslow, who has served as the justice in the New York Supreme Court for the past 14 years. He has been at the trial level of more than 1,000 mortgage cases and has a wide experience of what actually happens during this foreclosure crisis.

We welcome you this morning.

TESTIMONY OF THE HONORABLE F. DANA WINSLOW, SUPREME COURT JUSTICE, NEW YORK STATE SUPREME COURT

Judge Winslow. I thank you very much and all of the members of the panel for affording me this opportunity.

I have decided, based upon the presentations made and the comments delivered already, that the level of sophistication is such that I can proceed to certain areas without the need for what seems to be repetition.

First, I do think that responsibility, not blame, has to be determined, and I think we will find that the responsibility lies with lenders, lenders' attorneys, the investment community including Wall Street, mortgage and real estate brokers, the business community, borrowers, and I say with no less the courts themselves, the judiciary, is responsible as well for this problem.

The court has accepted foreclosure applications without scrutiny. An environment of trust has prevailed rather than an examination of the submissions and a requirement to submit the required proof. Recently title companies have been expressing reluctance to ensure foreclosed properties because of questions about the status of title.

I am going to go basically to my conclusion so that I have sufficient time, and I think that it will also help to show why I am saying what I am about the particular problems within the industry.

I think the ultimate resolution rests in a paradigm chain which focuses upon the defendant owners' ability to pay rather than the plaintiff mortgagees' artificial requirements. For example, if the defendant homeowners are able to pay $2,000 per month, having a present obligation of $3,500 per month, a loan modification for a period of 2 or more years at $2,000 per month would avoid the plaintiff mortgagee's costs as well as the mortgagor's costs of foreclose and property maintenance, avoid the potential loss of principle arising out of a forced sale in a depressed market, and allow the defendant homeowners to remain in their home. This approach could ultimately reduce the cost to lenders, borrowers, stabilize the real estate market, and do what I think is most important: promote equitable predictability. We must have predictability, but it cannot be unfair.

Why this result? Because the examination has focused on the mortgagee all along. We look at what is wrong with the mortgagees' submissions, and we do not find that we are able to effect resolutions. All we are doing is forestalling or deferring the inevitable. If a prima facie case requirement to

entitlement remains with the mortgagee and after the acceptance
of such proof without refutation by the homeowner, then
justified dialogue can commence without regard to
considerations of possible deficiencies of the plaintiff
mortgagee.

What do we see on a regular basis? Well, what we see is
that many of the affidavits attesting loss of note--and I am
taking a step back--are inaccurate, clearly inaccurate on their
face. Take a step back because in New York and in many States,
a mortgage cannot be foreclosed without possession control of
the note.

We find gaps in the chain of title, and I refer you to my
attachment B in which there are multiplicity of names contained
within the caption; and to attachment A, which agonizingly, but
I am afraid accurately, demonstrates the course that both a
mortgage and note takes place in this mortgage climate.

Assignment documents are frequently notarized several
months after the assignment was purportedly effected and are
notarized in blank.

MERS, which needs to be mentioned, has, in fact, changed
drastically over the years. I have seen them starting in 2003
or 2004 and have received information from them.

I also notice my red light. And though from my perspective
I usually am not as aware of it as I am now, I will stop at
this point to say that the necessity for an examination of
precisely what MERS is allowed to do, whether MERS is permitted
the opportunity to foreclose, foreclose on behalf of an
assignee as opposed to the original lender.

And I do ask you all to in closing consider one issue that
wasn't mentioned, and that is that many people need to move
from one community to another for a job. They can't. They can't
move to get employment because they can't sell the house that
they are in and move to another area. So that is another issue
that I have not seen mentioned, and I ask for questions galore
if the panel is so inclined. Thank you.

Mr. Conyers. Thank you, Judge Winslow.
[The prepared statement of Judge Winslow follows:]
    Prepared Statement of the Honorable F. Dana Winslow


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]
                        _____


Mr. Conyers. There will be questions as soon as we return
from our obligation to cast votes on the floor. The Committee
will stand in recess. Members of both panels are invited to
join our staffs in the conference rooms, and the Committee will
stand in recess.

[Recess.]
Mr. Conyers. The Committee will come to order, please.

The question that I would like to pose to our distinguished
panel, and I appreciate your forbearance, and I understand your
schedules, is what can be done to reduce the number of
foreclosures? I am going to start with Judge Winslow.

Judge Winslow. All right. There are a number of things that
can be done. One is to assure that the servicer, who I am
afraid still is ill-defined, falling into various categories,
one of being a collection agency, another of acting as a
plaintiff in a foreclosure proceeding--to assure that the note
is available, the note is in the control of the mortgagee, and
that the entire package is complete and factually appropriate
in order for the commencement of discussions to take place.

Now, once they do, then it must go to the mortgagor. The
mortgagor homeowner must then--if there is no contest or
protestation of the prima facie case established by the
plaintiff mortgagee, the mortgagor then must come forward and
produce whatever response it has.

For instance--and I have never seen it, I had nothing to do
with the creation of this mortgage. A very good case in point
is one that I recently decided, and that was a case in which
the two homeowners, husband and wife, signed the mortgage. Only
the husband signed the note. I determined without further
explanation that that was insufficient for the case to proceed
on the basis that that did not comport with the requirements of
New York law.

In the event that there is no refutation, then the next
step must be justified negotiations between the mortgagee in
foreclosure, whoever it is that is commencing that foreclosure
action, has the authority and has the knowledge, with the
mortgagor with counsel, if possible. In New York we have
established under CPLR 3408(f) a process by which there will be
an appointment of counsel for a poor person. That must be
expanded.

There must be some kind of overseeing of the mortgagor's
rights, either through the courts or through counsel, and then
there must be an ability for that homeowner to communicate with
the lender or the lender's counsel. We have seen numerous
instances where the legal back contains an address in upstate
New York, the action is commenced in Nassau county, and the
only way that anyone, including the court, can get in touch
with that person in upstate New York, who shall remain nameless
for the moment, is by leaving messages, which are not ever
answered.

The person who developed the answering service should have
a coveted place in hell because it creates that barrier that
prohibits the necessary dialogue between the two, the
opportunity to engage in something that could lead to a loan
modification. And the loan modification can occur, and has in
my part, three times in the last month when there has been a
third party stepping forward with sufficient funds to address
the arrearage and sufficient income to address the income needs
going forward.

There is a 6-31 rule that is generally applicable with
several banks, including Immigrant, which is utilized. And that
6-31 rule means 6 percent interest, and there must be coverage
of 31 percent of the total income that would be used to pay the
mortgage on a monthly basis.

So if we incorporate those concepts, ideas and issues, I
think we have a much better chance to address the real problems
of the mortgage crisis. Thank you, sir.

Mr. Conyers. Thank you very much.

Attorney Williams.

Ms. Williams. Thank you, Mr. Chairman.

If I understood your question, it was how to avoid getting
into the foreclosure process, or how to produce a situation to
reduce the number of foreclosures.

I think there are three basic elements to improving what is
happening right now. First, is making sure that troubled
borrowers are effectively considered for loan modifications,
and that these programs servicersuse to identify and to
consider modifications for troubled borrowers are working.

Second, as part of that is a continuation of improving the
operations of the servicers so that they can deal effectively

and promptly with troubled borrowers to answer the kinds of
questions that the judge is referring to, ensuring that
theydeal effectively with the paperwork that is being provided
them, and that they are able to provide answers to those
borrowers in a prompt fashion.

And thirdly, I think the step that I talked about in my
oral statement, which is trying to eliminate some of the
confusion and potential mix-ups that may flow from this dual-
track process where you have a borrower that has been approved
to get into a trial modification program, but yet the borrower
is still getting notices or otherwise being treated as part of
the foreclosure legal process; to suspend that so that the
borrower has a clear path to work through the modification in
accordance with the terms of the mod.

We have evidence from our mortgage metrics system that when
the servicers provide affordable, sustainable modifications,
with payments that the borrowers can afford, it does
significantly reduce the redefault rates and keep those
borrowers out of foreclosure.

Mr. Conyers. But, Attorney Williams, in the vast number of
cases, that is not happening, the recommendations that you have
just elicited.

Ms. Williams. I think there are areas certainly to be
improved in connection with all of the three areas that I
noted, and the action that the OCC directed with respect to the
dual-tracking concern was something that the Comptroller
announced just yesterday. It is, unfortunately, a reality,
though, that there are going to be situations where we have
homeowners that cannot afford the homes that they are in. There
are options available for what has been referred to as a
graceful way to deal with that as well.

Mr. Conyers. Mr. DeMarco

Mr. DeMarco. Mr. Chairman, the most effective thing to
reduce foreclosures in this country would be jobs, getting
folks back to work. They don't have the income, or they have
had reduced income, they are not going to be able to keep up
with their mortgage. So the first thing and the biggest impact
that could be had is to get our economy moving again where it
needs to be and to be able to have enhanced employment
opportunities for folks. And there are plenty of folks that
still have jobs, but they have had reduced income as a result
of those jobs. That is far and away, in my mind, the first.

The other two are to continue to improve, as we have been
working hard to do, on two things. One is communication of the
opportunities that are being made available to troubled
homeowners. There is actually a great deal of public
information out there now, it continues to be developed and
improved, about what to do if you are having trouble with your
mortgage and that there are alternatives to foreclosure out
there.

I think continuing to make that clear to our citizens who
are having trouble with their mortgage would be helpful. That
is a responsibility we all share. Regulators share it, Members
of Congress share it, banks and mortgage servicers share it,
financial counselors share it. There are opportunities here,
and we just need to continue to make that clear and to improve
our communication.

And the third is I do believe that there are some large
mortgage servicers that have been very resource-strapped by
this unprecedented volume of troubled mortgages, and these
institutions need to continue to invest more of their

resources, their capital, into educating, training and
monitoring their employees and bringing in additional employees
who are needed to implement the various programs that have been
put in place over the last 2 years to give a wider range of
opportunities to people with troubled mortgages.

Mr. Conyers. Ms. Campbell--or Caldwell, excuse me.

Ms. Caldwell. Thank you.

Again, this may echo some of the statements by my fellow
panel members, but I think, you know, first and foremost we
have to expect servicers to follow the laws in the States in
which they do business and to adhere to the contracts with the
investors for whom they service. And the investors, including
whether it is investor guidelines from Fannie Mae and Freddie
Mac for the Federal housing agency, or even those that
participate in HAMP, all have protocols in place to consider
modifications before foreclosure, and we need to hold them
accountable for that.

The second is increased capacity across the servicing
industry. Even though, you know, there has certainly been a
tremendous addition of resources to modifications, loss
mitigations, still at this point there needs to be more
resources against this crisis. It is still huge in scale.

Third, continued support for counseling and--because one of
the things that we do know is that people do not go through a
mortgage process enough times in their life to ever get good at
it. And when you add to the stress of not being able to pay, we
continue to support, and educate, and train counselors as part
of our outreach.

And then finally, some standard set of guidelines and
protocols for servicing practices. And one of things that we
have worked very, very hard in the HAMP program and will
acknowledge has taken a long time to do is set up a system to
try and align incentives among groups of people that only had
aligned incentives when properties were rising forever. And as
they started to decline, where those incentives have not been
aligned, it becomes very apparent to us all. And we work very
hard in the HAMP program to try to align those incentives, and
when we have done it right, for those homeowners in permanent
modifications, they have seen their payments reduced by, you
know, 36 percent, $500 a month on average. The redefault rates
are lower than for historical modifications, and the payments
are affordable and sustainable and predictable for the
homeowner. So while it hasn't been the volumes that we would
have liked to have seen, for those who it has helped, it has
been an effective use of taxpayer funds and a change in
servicing practices.

So those would be my recommendations.

Mr. Conyers. Ms. Caldwell, in many, if not most, of the
instances that you recommended, we are not up to speed on them,
and I don't see how they are going to ever be utilized and
brought into fruition.

Ms. Caldwell. You know, again, this has taken a very long
time, it has been a very difficult process to implement. And I
think you have heard across this panel that there still needs
to be more attention to this matter, but I thought it might be
helpful just to share some statistics from our call center
complaints.

In October 2009, 18 percent of the complaints were they
have submitted documents and had not gotten a response from
their servicers. In October 2010, it is 5 percent. Now, 5
percent is still unacceptably high for losing documents or not

responding to homeowners, but it does show the effect of
resource investments.

You know, when we had servicers not participating in HAMP,
a year ago folks that called in to complain heard 10 percent of
the time they were not participating in HAMP. It is now down to
2 percent in 2010. We are seeing year-over-year improvement,
but it has been a very slow process to increase capacity given
the scale and the changing nature of this real estate crisis.

Mr. Conyers. Well, the projections that we have is that
there will be a total of 13 million foreclosures in the United
States of America before we come out of this downturn. So I
don't know how I can take any great encouragement at the
figures that more people are using HAMP that call you when the
number of foreclosures is going up. My question was how do we
reduce the extraordinary number of foreclosures?

Ms. Caldwell. You know, I think, as we have heard, we need
to continue to outreach to homeowners. You have heard from
other panel members. We still at this point in time have
homeowners for the first time they are having contact with
their servicer is when the foreclosure notice is filed.

And we recently launched a public service campaign to
educate homeowners that help is available. We have worked with
many of the nonprofits on stopping fraud and other scammers
that go after homeowners, but it is very, very difficult. And
one of the reasons why this program runs through 2012 is we are
not out of the crisis. We still have a lot of work to do.

Mr. Conyers. Well, does anyone here dispute the economic
prediction that there will be 13 million foreclosures before we
see any change?

Judge Winslow. Yes, I disagree with it. I think it is going
to be far more. Nassau County alone has now 40,000 foreclosures
that have either been commenced or are in danger of being
commenced.

Mr. Conyers. How many?

Judge Winslow. 3.12 percent actually commenced and another
7 percent in which the homeowner, borrower, is 90 days or more
in arrears. It is increasing; it is not decreasing, and it
cannot change unless the paradigm changes. Unless we see what
it is that the homeowner can do and, in doing so, allow the
equilibrium, which is now a disequilibrium, to return to the
real estate market because of surety regarding home sales, we
will not effect any substantial change in this process. It will
only get worse from this person's perspective.

Mr. DeMarco. Mr. Chairman, I am not familiar with the
particular study you are referring to. If you would like to
have your staff provide it, I will be happy to have my team
take a look and assess what are the underlying assumptions in a
forecast like that.

Mr. Conyers. Well, what do you have? What is your forecast?

Mr. DeMarco. I don't have a forecast, Mr. Chairman, but I
can give you a couple of numbers. Fannie Mae and Freddie Mac
currently own or guarantee about 30 million mortgages. That is
out of about 55 million mortgages in this country. So for the
first 8 months of this year, which, you know, one would expect
this year to be, you know, one of the high points in terms of
such action, the completed foreclosures on Fannie Mae and
Freddie Mac loans through the first 8 months was a little less
than 300,000. And I would add that for the 300,000
foreclosures, there were more than double that number completed
foreclosure-prevention actions.

So while there may be a great deal of filing of foreclosure, initiation of foreclosure processes, we are all still working very hard on these alternatives to foreclosure. And at least I can only speak to the enterprise book of business that I am responsible for, but we are working diligently through these various foreclosure alternatives, whether that means a loan modification, a repayment plan, or a short sale or deed in lieu of foreclosure. And our rate through the first 8 months of 2010, as I said, Mr. Chairman, a little less than 300,000 completed foreclosures and more than double that number of foreclosure alternatives having been finalized. So the modification, the modification is not a trial mod, it is a completed permanent mod.

Mr. Conyers. Are you telling me, Mr. DeMarco, that you have never heard of this prediction or projection of 13 million foreclosures before today?

Mr. DeMarco. Mr. Chairman, I am not familiar with what the assumptions are behind that, so I am not confident of what is in this projection, and I would be happy to take a closer look at it.

Mr. Conyers. All right. You have never heard of it before, or you don't know what--well, let me just get this straight. You have never heard of it before, or you have heard of it and you are not sure of its validity? Which?

Mr. DeMarco. Mr. Chairman, I can't recall whether I have heard that particular prediction or not.

Mr. Conyers. You can't.

Mr. DeMarco. I cannot, I am sorry, sir.

Mr. Conyers. Well, I am, too. But we are all sorry. But, you know, you have got a pretty big role in this, and to have never heard of this figure before. Now, maybe my staff pulled it up out of thin air, or maybe they have misunderstood it and I am not reporting it to you accurately. It would seem to me----

Mr. DeMarco. If----

Mr. Conyers. Wait a minute. It would seem to me that you would have some projection of your own if you don't accept or have never heard of this one.

Mr. DeMarco. With respect to doing projections, Mr. Chairman, as a conservator and regulator of Fannie Mae and Freddie Mac, that is the focus of my agency. And we have recently published on our Web site a series of loss projections with regard to future draws from the Treasury Department due to losses by Fannie Mae and Freddie Mac. And so we have made available that report on our Web site that takes various possible house price paths. We applied a stress-test-like scenario modeled after what the bank regulators did last year, and that information--I would be happy to provide copies of that report to the Committee.

Mr. Conyers. Well, would it help you, or will it have helped you, that you came before us today and you found out about the projection of 13 million foreclosures? Would that be of any assistance to your responsibility in the Federal Government?

Mr. DeMarco. Mr. Chairman, I view my responsibility is to minimize----

Mr. Conyers. Just answer the question. Would it or wouldn't it?

Mr. DeMarco. No, Mr. Chairman, it wouldn't.

Mr. Conyers. It would not.

Mr. DeMarco. Because I would not care whether the number

was 13 million or 5 million or 20 million. I am working like
the dickens to minimize----

    Mr. Conyers. Did you say that it would not affect you?
    Mr. DeMarco. Mr. Chairman, we are working to minimize that
number.
    Mr. Conyers. I just wanted to get your response, sir.
    Mr. DeMarco. Yes, sir.
    Mr. Conyers. Did you say it would not?
    Mr. DeMarco. No, I am misunderstood. It would be helpful to
know what that projection was and see if there is information
in that projection that could inform our decisionmaking. That
is why I would be happy to have that from your staff, sir, so I
could review the number and the basis behind it.
    Mr. Conyers. All right.
    Mr. DeMarco. If there is information in that sort of
projection that could be helpful to inform our work, I would be
most happy to have that.
    Mr. Conyers. Thank you. We will be happy to provide you
with the background for that statistic.

    And I want to thank Mr. Goodlatte, Bob Goodlatte, for his
forbearance here, because the only thing that I would like to
raise now is the fact that no one on this panel has raised the
question either for or against the temporary moratorium on
foreclosures, which is probably the most obvious remedy that
anybody in North America could come up with, especially in view
of the fact that it has been employed during the era of
Franklin Delano Roosevelt at not only the national level, but
at the State levels as well, and that there are Governors who
have resorted to this request at the State level. And I am now
about to dismiss all of you afterward, and there hasn't been
one solitary word mentioned about this procedure established in
the 1930's.
    Judge Winslow. Then let me, if I may, sir. The answer is
that a deferral or a moratorium may be appropriate if during
that time there is an honest, justified attempt at working out
the resolution that is only being forestalled.
    I would agree with a moratorium, but I don't believe that
we are going to see a sudden rise in house values, home values,
that is going to make a radical change in the way we approach
the real estate market and the foreclosure market, and that has
to happen over time. If we have--make it twofold for the
moratorium, I would think that that would be a very appropriate
consideration. Thank you, sir.
    Mr. DeMarco. Mr. Chairman, if I may, you are correct. I did
not raise this issue in my oral remarks, but I do deal with it
directly in my written statement submitted to the Committee.
And I submitted my view that I am not in favor of a nationwide
moratorium on foreclosures. I do not believe that that is
either appropriate or necessary at this point in time. And I
believe that the cost of such a moratorium would outweigh the
potential benefits, and I go through that in my written
statement, Mr. Chairman.
    Mr. Conyers. Well, do you still leave the door open
slightly, Mr. DeMarco, for the possibility that temporary State
foreclosure moratoriums could be, under circumstances,
appropriate?
    Mr. DeMarco. I wouldn't rule it out, Mr. Chairman, but I am
not aware of circumstances at this moment in which I would say
that that is appropriate.
    I would say that where we have servicers that have
identified problems in foreclosure processing that calls into

question the validity of paperwork being submitted to courts or
being submitted to State officials to effect a foreclosure, in
those cases where there was an identified problem with the
servicer, absolutely it would be dishonorable and it would be
illegal to be submitting such documents when there was a known
problem. I think in that case for the individual servicer where
there is a problem identified, that is how we ought to be
targeting stoppages of foreclosure actions until we are sure
that the law is being properly followed.

    Mr. Conyers. Attorney Williams, I notice you nodding your
head.

    Ms. Williams. I think we agree completely with the point
that Mr. DeMarco just made, where there have been identified
flaws and deficiencies in the foreclosure process or in the
documentation. If there are questions about the accuracy of the
information that is being relied on in connection with the
foreclosure, those need to be fixed before foreclosure resume.

    Ms. Caldwell. I would just say the same for those servicers
in those cases where their processes have showed they are not
sufficient to follow the laws, they need to stop the
foreclosures, fix the problems, and we supported those
moratoriums.

    I would also say within the Making Home Affordable program,
servicers are not permitted to file foreclosure until they have
tried to solicit homeowners that are 60 days delinquent, and we
set standards by how many times they have to attempt by mail
and by phone before they can file foreclosure.

    But in terms of a national moratorium, we have a lot of
concerns on neighborhoods and other things that can help folks
that are waiting to buy a house out of foreclosure.

    Mr. Conyers. Ranking Member Bob Goodlatte of Virginia.

    Mr. Goodlatte. Thank you, Mr. Chairman.

    Ms. Caldwell, when did the Treasury Department first learn
of the foreclosure document problems?

    Ms. Caldwell. Can you be more specific?

    Mr. Goodlatte. Well, you know, we have got this whole thing
that has burst on the scene here in the last few months about
problems with foreclosure documents not being properly
processed, not being properly signed and so on. You are
familiar with that, right?

    Ms. Caldwell. Correct.

    Mr. Goodlatte. When did the Department--when did the
Treasury Department first become aware of that?

    Ms. Caldwell. Again, I don't want to speak for everyone in
the Treasury Department, but certainly within our office we
became familiar with at the time that the first major servicer,
Ally, announced its foreclosure moratorium due to that
documentation problem.

    Mr. Goodlatte. So was it from press accounts, in other
words, that you first learned of this problem?

    Ms. Caldwell. From my office, yes.

    Mr. Goodlatte. With all the work that Treasury has done
with loan modifications, and working with lenders and servicers
through the Housing Affordable Modification Program, did the
Treasury Department have any indication that there were such
widespread documentation problems with foreclosures? Obviously
some of the people coming in for the modification process must
have reached a foreclosure stage of their circumstances.

    Ms. Caldwell. You know, I think it is important to keep in
mind that the Making Home Affordable Program is focused on
foreclosure prevention, doing everything to keep that homeowner

from getting to foreclosure. Certainly as it relates to documentation problems, we saw many of them. And we have had servicers go back, we solicit homeowners, we track them on collecting documentation, and in January of 2010, we instituted a temporary review period where we asked all servicers to go back and make sure they notified homeowners as to the status of their documentation or their payment and gave them a chance to appeal.

So we certainly saw documentation and capacity problems within modification, and we took steps to change behavior and correct that, but, again, HAMP is focused on foreclosure prevention, not the technical and State specifics on foreclosure.

Mr. Goodlatte. Let me ask Ms. Williams, when did the OCC become aware of the foreclosure documentation problem?

Ms. Williams. At the same time that Ms. Caldwell has mentioned.

Mr. Goodlatte. And was it from press reports?

Ms. Williams. It was from press reports in connection with the Ally matter.

Mr. Goodlatte. And can you explain how the OCC, which regulates the large banks that are at the center of this controversy, failed to detect that there were foreclosure documentation issues well before this turned into a crisis that we find has gummed up the entire works here and caused problems for families, problems for people who want to buy homes, and has really altered the entire real estate market of the country?

Ms. Williams. We were focusing our supervisory resources very intensively on the modification process, and directing the national bank servicers to make various improvements in their operations and in the structure of the modifications that they were offering. So our focus was on that aspect of their mortgage servicing operation. We were relying on internal audit and internal quality control procedures that these institutions had over what we regarded as sort of general business processes, how documents are signed, how documents are notarized.

The OCC, and I think bank regulatory agencies in general, in terms of what our examiners do, when you are
    talking about the general business processes of a bank, we rely to a large extent on the quality control and the audit by the institution to get those processes right. And we also look for warning signs, for example, consumer complaints from the OCC's Consumer Assistance Group. There were no warning signs from internal audit, quality control, or even complaints relating to the foreclosure documentation aspect of mortgage servicing triggering red lights for us.

In hindsight, as we think about the volume of transactions that were going through the process, we could have been more suspicious that the challenges that the servicers were encountering on the modification stages--which they had issues and they continue to have issues--that there may have been similar types of problems in handling the volume that were cropping up in the foreclosure stage. But that then raises a question. Does that mean that in order to oversee, you have to literally station bank examiners in the rooms where people are signing documents, to see if there is a notary sitting next to them?

I think there are some very legitimate questions about how to effectively supervise this type of activity going forward.

And one thing that I would note is the examinations that we have underway. We call them horizontal exams--across multiple banks and with the involvement of the other bank regulators and also the FHFA in certain respects, will produce not just findings particular to the individual banks to convey to those banks, but the regulators plan to do a public report of the basic problems that we find, sort of a lessons learned.

And I think that lessons learned can translate into two things that are very relevant to your question. One is there has been discussion about the development of standards for mortgage servicers so that there is a set of more uniform standards and expectations.

Mr. Goodlatte. Is that something the Federal Government should do or the State Government should do that?

Ms. Williams. Well, the Federal bank regulators certainly have the ability to do that, to set more precise standards across the depository institutions that we regulate. We also need to use our findings,as a lessons learned on our supervisory processes to illuminate ways in which we can more effectively supervise. And the idea of developing new standards and looking at supervisory techniques I think go hand in hand.

Mr. Goodlatte. Thank you. Mr. DeMarco, has the robo-signing scandal exposed the American taxpayers to any potential legal liability because of the Federal conservatorship of Freddie Mac and Fannie Mae?

Mr. DeMarco. Congressman, I am unaware of legal liability it would pose. It does pose a risk of additional losses to those taxpayers, which troubles me. But those losses would arise principally from additional delays in the actual processing of a foreclosure so that the loss on that particular property goes up. The longer the foreclosure takes, the more the American taxpayer is paying for that mortgage to be carried by Fannie Mae and Freddie Mac and the greater risk that the property value continues to decline. And those two things, sir, increase the loss to the taxpayer.

Mr. Goodlatte. What steps are Freddie Mac and Fannie Mae taking to ensure that foreclosure documentation scandals like this don't reoccur in the future?

Mr. DeMarco. Several things. With the major servicers, they are literally on site to look at how their mortgages are being serviced. We have been sending out a great deal of reminders and communications to servicers about their contractual responsibility. And I will speak for FHFA and say that we are certainly, you know, working in coordination with Federal banking regulators and awaiting their examination activity that Julie Williams spoke of a moment ago.

Mr. Goodlatte. Thank you. Justice Winslow, you are a State court judge and your testimony has detailed alleged abuses by servicers participating in State court foreclosure proceedings. Is your appeal to Congress for help today a suggestion that the New York State courts and Rules of Civil Procedure are not equipped to deal effectively with lawyers and parties who mislead the court?

Judge Winslow. It is addressed to both. I think that it can be a Federal matter as well as a State matter. Insofar as sanctions are concerned, insofar as consideration of the action taken against a particular mortgagee, that does lie within the purview of the State legislature and the State court judges. However, HAMP and HAFA have the ability to address certain minimum requirements. This is a due process issue in many respects, which can be addressed by Congress to assure that

each party is fairly treated, that the protections are
afforded.

Mr. Goodlatte. I agree with you that we can do that. But
let me ask you as a follow-up.

Judge Winslow. Certainly, please.

Mr. Goodlatte. The attorneys general of all 50 States and
the District of Columbia are investigating the foreclosure
documentation scandal. Given that foreclosure is a State law
issue, do you have any reason to believe that the State
attorneys general are not in the best position to resolve the
issue, at least initially?

Judge Winslow. I have no reason to believe otherwise. I
think that they are capable of addressing the particular issues
that they have. But that doesn't mean solution of the problem.
It means an examination, a reaction, rather than a proactive
approach which can come on the Federal level.

Mr. Goodlatte. It can come on the Federal level, but each
State concerned about both people who may be wrongly subjected
to foreclosure and to the fact that the delay in the
foreclosure, as Mr. DeMarco has pointed out, has serious
ramification beyond the individuals in that individual
transaction; they also have the ability to make sure that they
step in and see that attorneys and others who are responsible
for following the law are indeed following the law.

Judge Winslow. His comment is a very interesting one,
because at this point I think it is well recognized that the
mortgagee, the homeowner, who has had a foreclosure, and after
sale there is a deficiency, is unable to pay it. So the
mortgagee is the party that is most likely injured. That then
creates the environment or the atmosphere in which Federal
regulation can set certain minimum standards, as they have in
HAMP and HAFA. So I see very little enforcement through the
Federal Government standards now because they are not
compulsory, they are not mandatory, they allow for the
individual mortgagee to select.

Mr. Goodlatte. One last question. What interest has the
State bar association in ensuring that the attorneys who
conduct it regulates--I am sorry, the bar association regulates
the conduct of these attorneys, correct?

Judge Winslow. In a grievance fashion, absolutely, yes.

Mr. Goodlatte. Well, have there been in New York, to your
knowledge, any ethics proceedings brought with regard to
attorneys handling foreclosure cases?

Judge Winslow. As of this moment, not to my knowledge.

Mr. Goodlatte. Is that the bar association's failure to be
paying attention to what is going on here as well?

Judge Winslow. In many respects. But in deference to the
New York State bar association, they are not acting within
clearly defined rules. They are using the rules that they are
developing themselves through a Committee process.

Mr. Goodlatte. I mean, rules of ethical procedure regarding
improper signatures to documents don't exist right now under
the canons of ethics or the bar association in the State of New
York?

Judge Winslow. They clearly do. But the rules that would be
applied have come to light in the context of the violations
only within the last year. The association between the lender
and the lender's attorney is not something that was considered
in 2005 when virtually every single foreclosure, no matter how
improper the submission was, ended up in a resolution because
of the increasing value of real estate in the real estate

market.

Mr. Goodlatte. Well, you know, I understand----

Judge Winslow. Does that answer or not answer your question?

Mr. Goodlatte. I understand the desire on the part of many to have somebody wave a magic wand or come up with a silver bullet that will both cure all of the pending foreclosures that exist right now and prevent this kind of thing from happening in the future. I would argue that the silver bullet is to have people pay the penalty for not following the law as it exists right now. And I think you would see people clean up their act really quickly if that took place.

Judge Winslow. And just one very fast statistic. In the appellate division first department alone, there are over 3,500 grievances that have to be processed. Yes, there is underway a bar association committee investigation and approach to addressing your problem as you articulated it. It hasn't happened yet, it is on the horizon. And I don't think----

Mr. Goodlatte. Do you think the sooner everybody who is affected by it got about doing what they need to do, and if they are charged by the law or the canons of ethics or by the contractual obligations that they have got about doing it, the sooner we would clean this up and the sooner we wouldn't see repetition of it. And the longer we wait for Congress or somebody else on high to say that we have some magic solution, whether it is 13 million or 300,000 or whatever the number is, it is a good number, but to think that we can set up some new regime that is going to take care of this problem I think is a mistake. We need to get about the business of taking each one of these mortgages and doing them correctly.

And to the extent that Ms. Caldwell's Department can help people avoid foreclosure with a refinance intervention on their part, great, I am all for it. But it seems to me we are wasting a lot of time here saying we are not going to do anything because we have got so many of them, that we are just going to have a moratorium or a freeze or some other thing that delays justice occurring.

Judge Winslow. Yes, sir. And you heard what I said about a moratorium or a freeze.

The other aspect of this is the extent to which the lender participated in the lending process with the borrower. If in fact there is a conjunction of lender-borrower activity such that the lender directly or indirectly requested the borrower to place greater income on the financial statement is participation. Insofar as what the New York State Bar Association can do, they can do something, but it must be the grievance committee that is ultimately responsible for taking action against someone for suspension and a revocation of licensor.

Mr. Goodlatte. Thank you. I want to thank all the members of the panel. It has been very helpful. Mr. Chairman, thank you very much.

Mr. Conyers. Thank you very much, Mr. Goodlatte.

Mr. Goodlatte. I appreciate your forbearance as well.

Mr. Conyers. Well, I appreciate your steadfastness on this issue. I am now pleased to recognize the distinguished gentlelady from Los Angeles, California, Maxine Waters, a senior Member of the Committee.

Ms. Waters. Thank you very much, Mr. Chairman. I appreciate the opportunity to continue the work that I have been involved with on the Financial Services Committee relative to these

foreclosures and loan modifications. And I am familiar with
some of the witnesses that are here today, had an opportunity
to spend some time raising some questions, and if I may I want
to start again with Ms. Caldwell, who is the Chief of
Homeownership Preservation Office, Department of Treasury.

We heard from the Congressional Budget Office this week
that when all is said and done, the Treasurer will only spend
$12 billion of the $50 billion originally targeted under TARP
for homeowner assistance. Moreover, of the $12 billion only $4
billion is for HAMP and sent to payments for services to modify
loans. That is 8 percent of the total allocated to the program.

At my hearing on November 18th, Governor Elizabeth Duke
said we could expect more than 6 million more foreclosures
through 2012. I guess my question today, Ms. Caldwell, is $4
billion enough to deal with the scale of this problem?

Ms. Caldwell. Congresswoman, I am not familiar with all of
the assumptions behind the Congressional Budget Office
analysis. But what I do know is that as we sit here today, we
continue to have $45.6 billion allocated to the housing
programs that include close to $30 billion for HAMP, plus the
hardest hit--$7.6 billion for the hardest hit funds that
support the State housing finance agencies, including in
California, as well as the program we recently announced
through the FHA.

And what we--and I think it is important to remember that
these programs run through 2012, and we continue, we continue
to focus on outreach, because we don't think the crisis is
behind us, and we think there is more work to do on mortgage
modifications, and we are committed to doing that.

Ms. Waters. Ms. Caldwell, if I may, I am concerned that
with so much money left unspent--and you are describing that
the program is scheduled to go through 2012--that we are on
track to have $38 billion in HAMP funds remaining. Can the
Treasury Department do anything to change HAMP so that this $38
billion does not go unspent?

Ms. Caldwell. Again, Congresswoman, that is something that
we look at every day within the context of the programs that we
have. I think it is important to remember that the funding is
paid out over a period of 5 years as mortgages remain
successful. As the crisis is changed, we moved to the hardest
hit funds to get money out to the States. So we remain
committed to helping as many homeowners avoid foreclosure as
possible.

Ms. Waters. Well, I am being advised that the CBO report
takes all of that into account. And it looks as if the money is
not going to be spent, can't be spent.

Let me just get at why I think probably the moneys are not
being spent as they could be spent. What percentage of
borrowers are dropped from HAMP trial modifications simply
because they didn't submit the requisite paperwork, even when
they made all of their trial payments. I know this will be
different for every servicer, so you don't have to disaggregate
the information, just give me an average of what percentage of
these borrowers are being dropped because of paperwork
problems.

Ms. Caldwell. In terms of trial modifications, again, it is
hard to be very specific because there are some cases where
their documentation--there are some cases where they didn't
submit documentation and didn't make payment. But I would say
approximately in that population that went into a trial based
on their stated income, about 30 percent had a documentation

issue.

Ms. Waters. Well, the ones that I am referring to are the ones that made all of their trial payments and they wish to keep going, but they have not completed the paperwork. And a lot of times we are hearing that paperwork is lost, all kinds of problems with paperwork. So why are they dropped, why would they be dropped if they are up to date on their trial payments?

Ms. Caldwell. Again, you know, we have heard from your office and we have worked closely with a number of offices on resolving the paperwork. In January, as you know, we said the servicers could not decline anyone for lack of paperwork. They had to go back, they had to send a letter to that homeowner saying what paperwork was missing and give that homeowner a chance to resubmit it again. If they are declined for paperwork again, they have a 30-day appeal. And so while there continues to be an unacceptable level of lost paperwork, we have continued to keep people in trials for an extraordinarily long time to get the paperwork done.

Ms. Waters. Well, we believe that those persons who are in compliance, who have made all of their payments, should not be dropped because of paperwork problems. We don't know whether or not this problem is caused by the bank's failure to process paperwork, we don't know what is happening. But we believe that if these clients are keeping up with their payments that you should continue to keep them into the HAMP program in some way so that they can stay in their homes rather than facing foreclosure.

Now, having said that, you mentioned the Keep Your Home program. Other than Bank of America, the major servicers are not participating in California's 790 million principal reduction component of the Keep Your Home program which uses money from the hardest hit fund. Now, Treasury oversees this California program. Why can't you get more banks to participate than just one?

Ms. Caldwell. So let me just--I would like to address one more thing on the document issue, because you have

raised a very important concern, and I just want to make sure your office knows that if anyone has been declined from HAMP and has a reason code, they have been told that they did not submit their paperwork and they can produce and appeal it, we force the servicer to look at it. In some cases if they have decided that the paperwork doesn't work or they can't produce it, the servicer must consider them for an alternative modification. So I just want to make sure your office and others know that we take it----

Ms. Waters. Well, do all of the HUD counselors know this, all of those persons who are involved with assisting with loan modifications? Have you sent out any memorandum or notice to them that would explain this to them? Because they call us, and we are getting from the counselors in the HUD program that people are being dropped who are up to date on their payments in HAMP. So evidently they don't know. Has there been any communication with them?

Ms. Caldwell. You know, on November 3rd we actually issued guidance to servicers on handling the homeowner complaints and making sure that inquiries were independently reviewed and that servicers had to suspend any foreclosure sale until it has been resolved. Because again, the capacity issue has been something that we want to make sure gets addressed.

But again, I would like to answer your question on the hardest hit fund, and just say that in September we called in

all of the large servicers and representatives from all of the 18 housing finance agencies, along with representatives of Fannie Mae, Freddie Mac and FHFA, and talked to them about the importance of this program and putting together a model to get the servicers to work with all of the State FHFAs in this program.

Ms. Waters. I am reminded that at our Subcommittee hearing, the banks basically admitted to dropping participants because of paperwork problems. So I don't know what you can do to be more forceful in getting their cooperation or what you can do to communicate better to the counselors how to follow up when they get these complaints. But the fact of the matter is, I suppose all of this is voluntary; is that right?

Ms. Caldwell. Participation is voluntary, but once a servicer signs up, that servicer has to comply with the requirements of that contract, and we expect them to do so.

Ms. Waters. But they don't have to sign up?

Ms. Caldwell. Correct. Servicers do not have to participate. And in fact as of October 3rd, any servicer that is not in the program is not able to sign. So we have signed up the servicers that we have in there now.

Ms. Waters. Okay. And I want to get back to something that--questions that I have started, without badgering you, I don't want to badger you. But I do want to know this. Since HAMP is not working--and I think there is a consensus that it really is not working--it is a voluntary program, and since there have been no sanctions, no fines, no real enforcement, I want to know what is Treasury's program to redo all of this, to reconstruct it, to come back with something that is really going to deal with these foreclosures and loan modifications? What are you offering that is different?

Ms. Caldwell. Congresswoman, first let me just say it is not badgering. I really do appreciate the leadership you have provided on behalf of homeowners, not only in your State, but throughout the country. But while I will agree with you that HAMP has not helped as many people as we would have liked to have seen helped at this time last year, it has helped; it had tremendous growth when we started the year with 31,000 to 500,000. We need to focus and do more, and so I will agree with you on that.

But I think it is very important, we can't lose sight of the fact that those modifications done within HAMP are affordable and they are sustainable and they have changed the way the servicing industry has done business. So I just want to make sure that we follow that.

In terms of the programs, I also want to just remind you that it is contractual, it is voluntary, but that is the way the program was set up. And as part of the TARP legislation, those programs that we have in place are the programs that we have. And we continue to try to work and revise those programs to the extent we can within the legislation that we have based on feedback from homeowners, from investors, and from servicers to make sure it is performing better.

Ms. Waters. I appreciate what you are

Saying, Ms. Caldwell, but I would like to know, given you have all the money that you need to deal with these problems in the HAMP program in the hardest hit fund, the Keep Your Home program, how would you suggest that that money be used to speed up loan modifications and to facilitate loan modifications and do principal write-down? Do you have any--I mean, I know that you are saying that you have seen some progress. And I must be

very honest with you. Those of us who work very closely with
this just don't see the progress. We are still bombarded with
requests for help for these problems, for foreclosure problems
in our districts. And we really do need to see more aggressive
action. The more we hammer away at how to do it, we uncover
more and more problems that the regulatory agencies should be
uncovering, should be on top of, should know about. And it is
just blowing my mind that we have all of these problems with
the robo-signing and not having the notes, et cetera. So I mean
it is not that we can be comfortable that things are getting
better. How could you use this money to make it better?

Ms. Caldwell. Again, while the programs that we have
announced continue to be early, I just want to make sure on the
record that we have made so many changes to this program in
response to what we have heard. In fact, some would say that we
have made too many changes, that the system can't absorb them.
But within the first part of this year we announced the hardest
hit fund to five States, to have those States that were hardest
hit get money out the door. We got good response to that, that
we increased it in June to add an additional five States.

Ms. Waters. What banks are participating?

Ms. Caldwell. Again, as I mentioned----

Ms. Waters. In California we have one bank that is
participating, Bank of America. Why can't you get more to
participate?

Ms. Caldwell. As I mentioned, you know, the programs are
just continuing to be launched. The large servicers have said
they will participate. We have called them all in, including
the agencies, in September and more of them are participating
right now in the unemployment programs because that has been
faster to implement in a severe crisis to address, but we
remain focused on encouraging the use and the consideration of
principal reduction as much as possible, and we would like to
see more servicers engaged in the California program. I think
it is a good pilot for other FHFAs.

Ms. Waters. Well, as I see it, whether we talk about the
program that we funded for unemployed homeowners or whether we
talk about the TARP money that you have, we have basically done
everything possible to support keeping people in their homes.
And it is a little bit mind-boggling to recognize that you have
the money, you have the power, we have all of this so-called
oversight, and we still are looking at 6 million more
foreclosures through 2012.

I know, Ms. Caldwell, there are some people that would have
you believe that these are just irresponsible people who tried
to game the system. But I have said over and over again, I
don't believe that millions all of a sudden became bad people.
Something happened, and we know what it was. The subprime
crisis was created basically through predatory practices,
really; I mean that is what it amounts to. And nobody has gone
to jail, nobody has been fined, nobody has been penalized in
any way. And we just feel as if, given all of the resources
that we have made available to facilitate keeping people in
their homes, that we are just not doing a good job of it. You
are not doing a good job, our regulatory agencies are not
weighing in in ways that could help us keep people in their
homes.

And we think that when we find things, like in the HAMP
program, where people are up to date on their payments and they
have kept, you know, good faith with the contract, that they
should be assisted in staying in their home rather than being

dropped because the paperwork is not done. Sometimes it takes a
long time to get the paperwork done. We have people who call
us, the elderly, for example, who are asked for paperwork and
they have no assistance in trying to put that paperwork
together. And we finally get them with some counselors and the
counselors have to start from scratch in helping this 80-year
old person who has been in that house for 30 or 40 years who
got a refi through some slick loan initiator, and then we find
that this person has been in HAMP, they have paid, and they are
going to get kicked out of their home.

So it is very disturbing. And every time we hold these
hearings and we go over these questions and we bring this to
your attention, it gets even more frustrating.

Mr. Chairman, I yield back the balance of my time.

Mr. Conyers. Thank you very much. I am pleased now to call
Darrell Issa, recognize him and to thank him for his--he has
quite a schedule and he has fulfilled his commitment to return
back to the Committee for questions, and we yield to him at
this time.

Mr. Issa. Thank you, Mr. Chairman. And nothing could be
more important than American homeowners' ability to stay in
their home if they have the means to do so, and I appreciate
your leadership on this.

And for my colleague from California, as you may recall, we
have asked the special IG for an audit of the program you
mentioned earlier, and as soon as I get it back I will share it
with your office. I very much think you have a point, that this
is an example where we have got to get the numbers to figure
out whether in fact it needs to be shut down or revamped.

I will try to be brief, I know we have votes coming up and
we have a lot of Members still to ask questions. Mr. DeMarco, I
am going to only ask you one question, and I sort of view it
this way. In the news, rightfully so, there has been huge
indignation that loans are being not fully looked at and simply
stamped, the so-called robo signatures. But isn't it true that
Fannie and Freddie admitted that they didn't look at individual
loans, that they relied on third-party guarantees of large
packs of them when they took on trillions of dollars of
obligation effectively on behalf of the American people?

Mr. DeMarco. Congressman, Fannie Mae and Freddie Mac do not
service mortgages. They do guarantee mortgages that they
acquire or they securitize.

Mr. Issa. What I am getting to is they took mortgages
without looking at them, just as we are initiating HAMP events
today, based on, if you will, stated income, which is another
name for the beginning of a liar's loan if you don't change
along the process, right?

Mr. DeMarco. I see. Fannie Mae and Freddie Mac typically
purchase their loans that have been run through an automated
underwriting system of theirs so that it passes or doesn't pass
a screen that they have developed that defines their
underwriting----

Mr. Issa. Well, didn't their screen fail? Isn't it true
that they took crap in? They took in outright lies in which the
underwriting property was never worth what it was borrowed
against and the individual never had the income to repay it?
Isn't that true in many, many, many, many thousands of cases?

Mr. DeMarco. Congressman, they have drawn $151 billion from
the American taxpayer. They clearly bought loans that they
either did not adequately underwrite or they did not price the
risk adequately. And they certainly did not establish and build

up in their corporations sufficient capital to back the risk
they were taking.

Mr. Issa. I appreciate your honesty and candor. Because one
of the challenges that will not be met in this Congress, but we
will be dealing with in the next one, is what do we do going
forward, how do we unwind the history, and then if the Federal
Government is going to have participation through some form of
a GSE, how do we make sure this doesn't happen again and, more
importantly to me, make sure that executives don't get paid
millions simply because they took a lot of these on, and the
less they looked and the more they took on the higher their
bonuses were? And I think you would agree that that is part of
our undisputed history.

Ms. Caldwell, I appreciate your presence here. You have
been before both our Committees and you have always, you have
been gracious and patient for us to ask a lot of questions,
often the same. In this case I will try not to completely
retrace our steps on HAMP, but let me go through just a couple
of them that I think the record is not completely clear on
here.

Although you have made changes in the front end of HAMP
recently, I mean it is an evolving program, isn't it true that
basically people do not have an obligation to at least somewhat
substantiate their income at the very, very, very beginning of
an application, that they still come in with effectively I make
this much, give me 90 days to prove it?

Ms. Caldwell. Congressman, effective June homeowners coming
into HAMP verify their income before the trial modification
starts. We announced that change in January and had it take
effect in June. Certainly last year, when we were in the midst
of the crisis and servicers did not have capacity to verify
income up front, we did permit homeowners in under stated
income.

Mr. Issa. Which brings, the question is, in America,
particularly if you are a salaried employee, and most of the
people were, not all, but most, why was there ever an
expectation that the status quo, the lead-in of this thing
would be this is how much I make and I will prove it later?
Because the 90 days in fact stretched on in the beginning of
this process, didn't it?

Ms. Caldwell. That is correct. And I think we certainly,
both servicers, Treasury and participants in the program, would
all acknowledge that the capacity to collect the documentation,
which as you stated it seemed like it would be easy, presented
a very difficult challenge. And we struggled with the
documentation for, you know, a good period of time. And that is
why in January we did change the program to require
documentation up front, so that we wouldn't have the problems
that Congresswoman Waters discussed about lost paperwork and
not good treatment of homeowners or the one that you addressed
about the potential for people coming in and having the
mortgage reduced and then never providing income.

Mr. Issa. Now, just to make the record clear, as I
understand it, and correct me if I have misunderstood this all
along, but the participants, if they initiate and it goes along
anywhere except to a permanent modification, you don't
reimburse that, is that correct? In other words, the B of A or
any other bank or servicer, they are eating the front end of
the process if it completely fails, isn't that true?

Ms. Caldwell. Correct, yes. HAMP is a pay-for-success
program, so the servicers, the investors and the homeowners

only receive incentives if the mortgage is successful.

Mr. Issa. Let's try to quantify that. How much have you paid so far?

Ms. Caldwell. Again, I don't have the exact figures in front of me, but I would say approximately $700 million.

Mr. Issa. So you paid about half a billion, round number?

Ms. Caldwell. A little more than that, but that is fair.

Mr. Issa. And you have obligated $30 billion, round number?

Ms. Caldwell. For the HAMP program, correct.

Mr. Issa. So there is a lot of obligation and not much pay-for-success at this point, right?

Ms. Caldwell. And I think it is important that success is defined over 5 years. So the amount paid out to date just reflects the one time success payment when a modification converts and then there is payment that goes through 5 years for each year that the modification is successful.

Mr. Issa. And that is typically $1,000 at a crack times the number of loans and so on. They are relatively small payments per loan, right?

Ms. Caldwell. The payments to the servicer and the homeowner are fixed, but for the investor it is a cost share based on the mortgage reduction between 38 and 31 percent, so that could vary by a lot.

Mr. Issa. So this $30 billion program over 5 years that is serviced, if you will, on the front end of actually going to completion about half a million people, is going to cost us $30 billion over 5 years. And you are probably aware that in our hearings next door the companies, the servicers, the banks, told us that basically anybody who got into this 500 million, virtually all of them would have renegotiated without the HAMP, that in fact the ones who succeeded are the same who would have succeeded otherwise. Are you aware of those statements, I assume?

Ms. Caldwell. I am aware of those statements, yes.

Mr. Issa. Well, you know, Congresswoman Maxine Waters and all of us on the dais represent different constituencies, but we all have one thing in common, which is we know that money is fungible. So if all of the money you paid were obligated, half a billion paid out, $30 billion obligated and continuing to escalate, if all of it would have been, if these people would have gotten loan modifications anyway, they would have gotten to stay in their homes, assuming they applied, and it could have all been done with no Federal assistance, and they still would have gotten substantially the same deals, or at least they would have gotten their loans which they felt they could no longer afford modified so they could afford them, then shouldn't we take that $30 billion over 5 years and ask Congresswoman Waters and Congressman Conyers and others where we would like to spend $30 billion helping people in need instead?

It is not just a rhetorical question, it is based on the hearings next door and here. It is the greatest question I have going into the new year for HAMP, is why do we continue investing in something that takes a very long time, delays the disposition of land and our homes and we have had testimony from the banks participating and nonparticipating that it doesn't create any substantial amount of new modified loans, it simply reimburses for the most part for the people they would have done anyway.

Ms. Caldwell. I think one of the things that, again, is important to think about in HAMP is that it does pay for

success. And those same servicers have also testified that the existence of HAMP fundamentally changed the approach of modification in terms of payment reducing and other types of programs.

Mr. Issa. Ma'am, I have no doubt that in the midst of a crisis Republican and Democratic Presidents made decisions along with Treasury to try to find ways to change what was a free-fall. But Congress has an obligation to not live up to the worst of what Ronald Reagan always said, which is nothing had, I am paraphrasing, had greater immortality than a temporary government program. This program seems to have outlived its usefulness in that we are no longer in free-fall, we are in a period in which it appears as though loan modifications would occur anyway, and that if we began looking at the next tranche of $30 billion and said, well, can we target it only to those which would otherwise not have successfully been modified, can we modify the use of--I am not saying to stop spending money necessarily, but can we spend this money better in other ways than simply rewarding basically banks for doing what they would do anyway in their best interest?

Ms. Caldwell. And I think that is a very important consideration for Congress to have, but I also would just like to say that as we sit here today we have heard stories from many Members that modifications are not being done the way they need to be done, that the forecast for foreclosures continues to be high, we have heard multiple ranges of projections, but as we sit here today, you know, my office is charged with making sure modifications get done in accordance with program guidelines, and that goes to 2012.

Mr. Issa. And I appreciate your dedication. You know, the word ``bureaucrat'' is not always a pejorative. You are

Doing what is your task. Our challenge and Congresswoman Waters' challenge is can we take the next tranche of $30 billion and look at those who are failing in what we now call HAMP and say, well, wait a second, maybe what we should do is let loan modifications occur and only look at those who fail to get a modification through an ordinary way and then look at them on a different merit basis.

So I understand that your left and right barriers are your program, and I think you have been ingenious in trying to improve it over time. It started off as a terrible program; now it is only a program we are not sure does us any good. But that is a lot better than it was initially.

So Mr. Chairman, I respect that I have gone over my time. I appreciate it. I look forward to us continuing to figure out if there is a way to use these funds better. And I appreciate, and I particularly do, Phyllis, you have been great, you have done the best you can do, I think it has been very good of you to continue to try to take a program and make it work better than when it started. And I don't hold you accountable, but I do hope that we hold ourselves accountable to look at where the best place to put the dollars are.

I yield back.

Ms. Caldwell. Thank you.

Mr. Conyers. Thank you very much, Darrell Issa. I am pleased now to recognize a former Subcommittee Chairwoman, Sheila Jackson Lee of Houston, Texas.

Ms. Jackson Lee. Mr. Chairman, thank you, and I hope on your wisdom that we will continue this effort. I am delighted to listen to the questioning of Mr. Issa because he has confirmed of your genius that these hearings were long overdue.

7/7/2015 12-12020-mg Doc 8862-18 Filed 07/09/15 Entered 07/09/15 13:39:14 I & Exhibit FOR DISTRIBUTION TO PARTIES UNDER CONSIDERATION

Exhibit 5 - Hearing H. Comm. on Judiciary Pg 43 of 97

And I guess you will have to hear us pontificate for a little bit.

Let me, first of all, thank all the witnesses. And coming at it from the perspective of the Judiciary Committee, I know that we tried some months or more than a year ago to organize the concept of bankruptcy and foreclosure to allow the homeowners to work their own arrangement out. And it was interesting to hear the banking industry and mortgagors saying that we would have a calamity. And I frankly believe we have a calamity now, because we continue to see foreclosures, the tide has not stopped. And as I understand some of my colleague's questions, Congresswoman Waters raised a question of lost paperwork, I raise a question or the point of arrogance by banks: We don't have to worry about the paperwork, decisions are already made. And it is just perplexing, compounded by the fact that it is like pulling steak from a barracuda to try to get a loan from a bank today. And of course they threw it back on the regulators.

So I guess as we have listened to this series of questioning, and forgive me for not hearing the details of your testimony, I came in a little bit on Judge Winslow's remarks, but I still view where we are as a crisis, as a calamity. I don't see any progress having been made. I think the banks are culprits. We have made them richer and less sensitive to the intent of this body, which was to create greater access to credit, stabilize the marketplace. It is difficult for people to secure mortgages today, it is difficult for people to refinance, there is no relief on foreclosures, and the fat cats keep getting fatter.

And I think there is a valid point to the distinguished gentleman from California's comment about whether or not this program is working that you are in charge of, Ms. Caldwell, and whether or not there needs to be less of a boondoggle for the banks getting money to do good stuff and they don't do it.

So I would like to raise the question of what considerations is Treasury giving to totally modifying what you are responsible for? What kind of comfort level do you have with success on this remodification effort, and I have not listened to all that you have responsibility for. And what kind of vigorous give and take or oversight or hammer do you have on the banks? What is the punitive measure that can be utilized for banks that continuously ignore the homeowner? The homeowner is usually one person. They don't usually come in a class action, they don't usually organize the block and say let's 10 of us go in. It is usually one person at a time. That is an easy, easy prey to knock over. You don't have to even worry about that person. Because either by the time they are already out of their house, they are foreclosed on, either by the time they don't have the means to stay even in a foreclosed house because they can't pay for other things, maybe they are in that bad a shape, so they may go away quickly, particularly if they are not represented by counsel. And in this instance I think this was a process where they could handle this on their own.

But how deeply, I asked two questions, I hope you took note of them, how deeply does this program that you are involved in penetrate beyond the Beltway to provide a real comfort for these homeowners who are still going through foreclosures neighborhood by neighborhood, city by city, sometimes it is up, sometimes it is down, but it is still continuing?

Ms. Caldwell.

Ms. Caldwell. Thank you. Let me just first say that the stories that we hear about lost documentation, robo-signing and other practices are, you know, disturbing, inexcusable and, you know, servicers need to be held accountable in those cases where they are violating the laws in States which they do business. You know, the program that we operate, the Making Home Affordable Program, is a program authorized through TARP that is a contractual relationship, so it is governed by contract versus enforcement or regulatory agency. But when those servicers have signed the contracts we expect to hold them accountable.

Ms. Jackson Lee. In what way; what is the punitive measure?

Ms. Caldwell. Again, because it is contractual there is no civil money penalties or, you know, fines. We have remedies that we can withhold incentives on permanent modifications or we can claw back money that has already been paid. But our focus now is to get more modifications made.

Ms. Jackson Lee. And do the servicers include banks that you have contracted with?

Ms. Caldwell. The servicers, yes, bank servicers.

Ms. Jackson Lee. Include banks and others, forgive me for not understanding the distinction. Pardon me?

Ms. Caldwell. Yes.

Ms. Jackson Lee. All banks?

Ms. Caldwell. No, not all banks.

Ms. Jackson Lee. Right, but it does include some banks?

Ms. Caldwell. It does include banks, servicers that are part of banks.

Ms. Jackson Lee. And this was done administratively or when we passed TARP did we instruct Treasury to do this, meaning the Congress? Did we instruct or you have done this under the TARP funds administratively?

Ms. Caldwell. I am not sure I have the answer to that.

Ms. Jackson Lee. We passed TARP. That was a legislative action.

Ms. Caldwell. Correct.

Ms. Jackson Lee. Did we create and instruct you on this modification program that you are now speaking of, or did you create it administratively under TARP using TARP funds?

Ms. Caldwell. Again, I was not part of Treasury when TARP was created, but I understand that there was always a mortgage modification component to it. When I joined, the office had already been established. So I don't know all of the legislative detail behind the creation.

Ms. Jackson Lee. I will let you finish, but I think it is dastardly that we would have--I don't think there has any place in business where there is not a punitive measure for breaching contract. And for us to just pat people on the back or tap them on the knuckles, if you will, a tap-tap and say, oh, naughty, naughty, and they are literally killing people and throwing them out of their houses is a disgrace. And it may be that we need to remedy that. There needs to be some penalties where people feel the pain that they are creating for this whole market.

But finish, if you would. I just want to go to these other witnesses for questions. So you have got this modification program, it is contractual--and you can finish, go ahead. I think the question I want to hear from you is the fact that, you know, what is the punitive, what is the relief--as I understand it, that you have not implemented any of the remedies or claw backs, but what is it when this process fails

and the victims are the sufferers, what do you all do?

Ms. Caldwell. Again, you know, in those cases where laws have been violated we expect the servicers to be held accountable. In terms of the authority under our contracts, in those cases where servicers did not solicit homeowners for HAMP, we have required them to suspend those foreclosures and go back and reconsider those homeowners for modifications. In terms of those situations where homeowners have been inappropriately denied, we ask the servicers to reconsider those decisions.

So again, while we have not gone back and clawed back incentives at this point in time, remembering we are still, you know, less than 2 years into the program and, you know, may in some cases be building those steps necessary to impose fines, we have taken every step to change the behavior of the servicing industry and make sure that homeowners had an opportunity to be fairly considered for HAMP.

Ms. Jackson Lee. Let me move on to Mr. DeMarco very quickly and let Julie Williams contribute as it relates to how you fit into this process. But Mr. Chairman, I think it is a darn disgrace. And I am sitting next to a seasoned Member of the Financial Services Committee who has lived through this, Congresswoman Waters. And I imagine that they have crafted as much as they could craft a structure within the capitalistic system. All of us claim and have an affection for capitalism. No one here is waving the socialist flag or the Communist flag. But if there is ever a disgraceful debacle that has shown no positive relief on behalf of the United States Government for its people, its people who pay taxes, its people who are the basis of this country, it is mortgage foreclosure, because we have gone through it. And so I would simply say that the Judiciary Committee needs to look at this.

I frankly believe there should be punitive measures, jail time. Because it is absolutely absurd that people can be comfortable in their offices using our money to fool around, mess up and nothing happens to them at all. But the poor victim in the home, the home that is $1 million or $250,000 or $55,000, you know, is not only the victim, but also gets blamed because that is the dodo who got into a house that they couldn't afford. Fraud was limited; it existed, yes. But in many instances people were well intentioned by who led them to believe what they could handle. And then there was just the average Joe, hard working Joe, whose two-income family tried to get a brownstone in New York or tried to get a house in Detroit, you know the conditions there, or in Houston or in L.A. Or elsewhere.

So if anyone can answer. Judge Winslow, I didn't hear your testimony. I heard it but didn't hear it.

Judge Winslow. I am so sorry you didn't.

Ms. Jackson Lee. Yes, I know. I am going to be reading it though. Do you have any insight on this question of a lack of a punitive measure, or do you have any insight on why we failed to craft the bankruptcy process for holders of mortgages to protect themselves from foreclosure.

Judge Winslow. All right. If I could be sure that I understand your question so that I can answer it as accurately as I can. Why have not the trustee in bankruptcy and the bankruptcy court handle the process; is that the question.

Ms. Jackson Lee. We had legislation that failed to make the mark that we were going to include access to the bankruptcy courts for mortgage foreclosure, yes, so that all parties could

be protected. You must have heard that debate, it has been
going on for a number of years. So I just need yes or no. Do
you think that is a viable approach?

Judge Winslow. I do not.

Ms. Jackson Lee. Why not?

Judge Winslow. Because the trustee in bankruptcy and the
bankruptcy judge have an obligation to make a determination as
to what point all assets have been appropriately distributed
from the estate of the bankrupt and then there is a release.

We see, I see on numerous occasions, probably every 4 or 5
proceedings that appear before me, at least one and frequently
more than one bankruptcy which was ultimately released. It is
not a salvation. It is an----

Ms. Jackson Lee. Because my time is limited and the
Chairman has been very kind and I just have one more question,
let me say to you I am not convinced.

My final point is do you think there should be criminal or
punitive measures for a failed process, bankers, servicers and
others having a dereliction of duty that causes in a
potentially criminal way for viable homeowners and others to
lose their homes?

Judge Winslow. Yes.

Ms. Jackson Lee. All right. Thank you, sir. Let me move to
Ms. Williams and Mr. DeMarco. I will ask you collectively as
government representatives, what are you doing to stop the tide
of foreclosures realistically? And what are you doing to help
punish the deadbeats, who are servicers who are not doing their
job?

Just start with you, Ms. Williams.

Ms. Williams. Okay. Just by way of a little bit of
background, the Office of the Comptroller of the Currency, a
bank supervisory agency; we are responsible for national banks.
We have been--and I describe this in my written testimony in
some detail--very involved and very active in focusing on
causing national banks to improve their handling of the
modification process and to increase the volume of affordable
sustainable modifications that national banks are entering
into.

Ms. Jackson Lee. Do you keep records, can you tell me that
you have sizably increased that? Do you have punitive measures?
Do you have criminal measures? Do you have civil fines for
their inappropriate behavior?

Ms. Williams. Yes, we do. Let me break those down. We have
a substantial amount of data and----

Ms. Jackson Lee. How many, I would like to see that
submitted to the Committee.

Ms. Williams. We can provide for you information on
modifications by types that national banks have entered into,
the characteristics of the modifications, the extent to which
the mods resulted in reduced payments of 10 percent, 20
percent, more than 20 percent. We have a lot of data on that. I
am happy to share that with you.

Ms. Jackson Lee. I would appreciate it. Can you give me one
answer, do you have a list of those who have been civilly
fined, if you don't have criminal fines or punished for their
inactivity?

Ms. Williams. For their inactivity or----

Ms. Jackson Lee. Their improper, their, if you will, lack
of performance.

Ms. Williams. We are in the midst right now of a very
extensive multi-agency examination process that relates to the

foreclosure documentation and integrity issues. I describe this, there is more detail in my written statement.

Ms. Jackson Lee. Right.

Ms. Williams. It will be done by the end of December. In the weeks after that, we will be evaluating what enforcement and supervisory steps we want to take. All of the banking agencies are a part of this. We have very, very broaden enforcement remedies.

Ms. Jackson Lee. Well, the question is whether there has been any penalties, whether there has been any revocation of charters. And let me just say that I love our banks, we have community banks, we have large banks, and national banks as you have indicated. But there has to be an even playing field. There is not in this mortgage foreclosure.

I close on Mr. DeMarco. Do you have any teeth in what you are doing? This love of capitalism or this fear that the marketeers threaten Congress as they did a few hours before we passed this bailout that all would collapse, and we would never see America as it was ever again. We see that we are still in the midst of a quagmire. All of these threats I think have frozen the Federal Government into activity. Because you cannot possibly be doing anything if we go into our districts and find all these people that are in foreclosure, and they will say to you we tried to reach the bank, we tried modification and then we can't even get access to credit on another side of the coin.

Mr. DeMarco.

Mr. DeMarco. Congresswoman, since we put Fannie Mae and Freddie Mac into conservatorship those companies have completed about 1.2 million foreclosure alternative transactions. We report on that on a monthly basis to the Congress through what is called the Federal Property Managers Report. I would be glad to provide a copy of that to you.

With respect to penalties, Congresswoman, Fannie Mae and Freddie Mac's relationship with the mortgage servicers is a contractual one. And on the basis of contractual violations of representation and warranty, Fannie Mae and Freddie Mac have put back to mortgage servicers and originators billions of dollars worth of mortgages. I provided the actual data yesterday on the Senate side. I will be happy to provide the data on that to you. And there is still requests outstanding totaling in the billions of dollars. I also reported that. I would be pleased to provide that data to you as well.

And I would say with respect to Fannie Mae and Freddie Mac, while they are in some sense certainly victims of problems in the mortgage servicing thing, they also need to be held accountable for the problems that we have in the housing market, and obviously the Federal Government through FHFA, which was 6 weeks old at the time, placed Fannie Mae and Freddie Mac into conservatorship. The CEOs were dismissed from the job, the Boards of Directors, much of senior management has been replaced. And yes, in the past there have been civil money fines against certain management at those companies.

Ms. Jackson Lee. Well, thank you. It may be that we are the only ones who did anything, and certainly Fannie Mae and Freddie Mac were the ones that everyone wanted to put on the guillotine because it was easy to do. I think we need to look closely at criminal fines and other penalties, Mr. Chairman, for this foreclosure debacle. No one is getting it, people are still hurting. As long as we are fooling around with contractual relationships, there will be no action whatsoever. The banks will cry foul, they will talk about the system is

collapsing and the world is coming to an end, and we will stand
back and hold our hands up and all of America will be walking
past foreclosed properties.

Mr. Chairman, I thank you for this hearing and I hope the
Judiciary Committee can get its teeth into this process. I
yield back.

Mr. Conyers. Thank you, Sheila Jackson Lee.

I turn now to the Ranking Member of the Committee, the
gentleman from Arizona, Mr. Trent Franks.

Mr. Franks. Thank you for that advancement. I appreciate
the way that you advanced my position here. It is temporary?

Mr. Conyers. Yes.

Mr. Franks. He says it is temporary. Thank you, Mr.
Chairman.

Mr. DeMarco, if I could begin with you, sir. In your
written testimony you state that Freddie Mac and Fannie can
require a servicer to pay damages if the servicer does not
follow the servicer guidelines. And of course that seems very
appropriate to me. At the same time it perhaps introduces a
little more uncertainty into the current crisis which may
compound the problem, at least in the short-term.

But my first question is whether Freddie or Fannie have
actually sought any damages. It is a little related to Ms.
Jackson Lee's question, but as a result of the robo-signing
controversy, have you sought any damages from any of those
entities?

Mr. DeMarco. Servicers were reminded on October 1st by
Fannie and Freddie that robo-signing or those sorts of mistakes
were not following proper procedures and foreclosure process
and is a violation of the seller-servicer agreement. They have
been alerted that this makes them subject to penalty, and the
position at the moment, this is still fairly early, is we are
assessing what the damage has been, to know what sort of remedy
under the contracts to pursue, because we are still trying to
find out whose got the problem, what the scope of it is and
what has been the damage to Fannie Mae and Freddie Mac as a
result of that. There has not been an assessment made to date
that I am aware of, but they were alerted of this possibility
as set forth back in the contract back on October 1st.

Mr. Franks. Given the conservatorship, the question is sort
of a hard one to ask, I ask if Freddie on Fannie have done it
or if you have done it. Who is responsible for making the
decision on whether or not to seek damages in the first place
given the conservatorship in place at this time?

Mr. DeMarco. As we describe at the time the two companies
were placed into conservatorship, the day-to-day operations of
the company were delegated to the senior management, the
management team and the reconstituted boards of directors of
the company, so that there could be normal functioning
corporate governance. So day-to-day operations, including
executing and implementing and carrying out terms of contracts,
are the responsibility of management. But I can assure you,
Congressman, on this matter that has all of our attention, we
are paying close attention to what the companies are finding
with respect to added losses that they may be incurring as a
result of these matters. And I would expect that appropriately
remedies, fines, so forth, under the terms of the contract
would be pursued.

Mr. Franks. That makes sense. In other words, it is really
their responsibility at this point, but you are having some
very pointed discussions with them?

Mr. DeMarco. Yes. As conservator we are ultimately responsible. And the companies understand quite well and I am pleased with the support and activity of the senior management and the board. They fully understand that both of these companies are operating only as a consequence of the backstop provided by the American taxpayer, that they have a responsibility in operating these businesses, to do so in a way in which it minimizes losses on these troubled mortgages, because those losses are passing through to the American taxpayer.

Mr. Franks. I guess that probably tees me up for the next question. Given the conservatorship of Freddie Mac and Fannie Mae, how would an extended nationwide foreclosure moratorium potentially affect the taxpayers?

Mr. DeMarco. Congressman, I believe such an extended nationwide moratorium would add cost to the taxpayer. And I go into this a little bit in my written statement, but I would not support a nationwide moratorium. I don't see the grounds for it. At this point in time I think that absolutely where there are mortgage servicers that are not processing foreclosures properly, if they are in violation of State law, if they are not doing it according to contract, that that must be corrected, but I do not believe that we have the evidence to suggest that a nationwide foreclosure moratorium would on balance help this matter. I think that it would further harm neighborhoods and increase costs to the taxpayer.

Mr. Franks. I understand.

Mr. Chairman, some fairly learned voices have questioned the legality of the Mortgage Electronic Registration System, which is commonly known as the MERS system. And since about 60 percent of the Nation's residential mortgages are recorded in the name of MERS, Inc., the legality of this sort of obscure entity should either be established or addressed at least. And questions have been raised about MERS being both acting as an agent and as a principal in mortgage deals, and it just seems like the incoherence of the MERS legal position then becomes fairly challenging to sort out.

This may be something for Judge Winslow to look at here, but can you address those concerns? Judge, if it is all right with you, sir, I will start with you, but I think this will be something anybody can take a shot at because in property rights, protecting, you know, property rights it becomes obviously very critical to define precisely who owns what. And this seems to blur that line pretty dramatically in my mind.

Judge Winslow. I think the blurring started after 1997, and that is about the creation date of MERS Corp. and MERS. Through the years up to about 2004, MERS took a position they were a nominee only and did not act as a foreclosure agent. There then came a time up until approximately 2007 when MERS changed that position and stated that they would not any longer act as an agent to foreclose, particularly after the beginnings of the robo-signing recognition. It is still the case that MERS from time to time in the older cases, as well as in some of the newer cases where they, I understand it from the Web site, believe that they have the actual note in hand, that they will act as a mortgagee or in the capacity of a mortgagee in foreclosure as a plaintiff. I don't think that without having an equitable interest in the mortgage that the nominee in equity has the right to commence a foreclosure proceeding.

Mr. Franks. Well, judge----

Judge Winslow. Does that make sense?

Mr. Franks. You very eruditely defined why I asked the question.

Judge Winslow. Thank you.

Mr. Franks. I am impressed. But obviously you see the nexus of the question. And Ms. Williams, if you want to take a shot at it.

Ms. Williams. Okay. Let me add a couple of pieces here. There is a lot of confusion around because there is a lot of imprecise language that is used in some of the descriptions of the process.

Mr. Franks. Precisely, it's imprecise.

Ms. Williams. It takes you back to your real property classes in law school about the difference between the mortgage note and the mortgage. MERS doesn't hold the note; the note will go ultimately to a document custodian. What MERS is doing is acting as a nominee with respect to the mortgage. And it is the mortgage that gets recorded, not the note and there is confusion about that.

Issues about MERS's status are fundamentally issues under State property law. And that law is long-standing, our Acting Comptroller sometimes refers to these principles as going back to the days of Queen Elizabeth I, and some of that is probably quite right. So you are dealing with a situation where you have a modern type of electronic registry in the context of State property laws that have principles that are really rather quite old.

Separate from that, with respect to MERS I just want to add--and this is in my written testimony--that we are doing an examination of MERS and how MERS operates and the processes and procedures that it follows in order to do what it does. It is an interagency examination. The FHFA examiners are also part of this as well as examiners from the Fed and the FDIC. So looking operationally at MERS is also part of the examination work that we have underway right now.

Mr. Franks. I think Professor Peterson might have been inclined to ask some of those same questions.

I guess my last question is this, Mr. Chairman, and I address it to the group here to see who might best answer it, which entity created this MERS system? What was the fundamental reason for it? What was the rationale for it? And of course States feel like to some degree that their statutorial authority has been subordinated in this process and maybe they are right, maybe they are not, but those questions. And what is the answer? What would you do to address it?

Judge, you sound like you are ready to take it on.

Judge Winslow. I would be very pleased to. We have been in touch with MERS, my office has, since approximately 2004, speaking to general counsel, exchanging e-mails and trying to have an understanding of precisely what it is that they do. So at any particular moment in time their function was defined, but morphed into something else thereafter. Typically and from the beginning MERS Corp., which is owned substantially by banks, insurance companies like AIG and others, look to using companies such as MERS in order to facilitate the transfer of the mortgage. And it can do so in an inexpensive fashion and in a rapid fashion and sometimes so rapidly that the transfer takes place before the County Clerk has any notice, as a for instance, of the transfer. And that does become a problem even though in many States it is permissible to transfer a mortgage without making the change in the records of the County Clerk.

Mr. Franks. So would anyone want to suggest any way that it

should be addressed at this point? Is there anything that you
think is an important next step?

Mr. DeMarco.

Mr. DeMarco. Congressman, I would simply say that the
review that Julie Williams mentioned is underway and I would
like to see what comes out of that, but the basic premise here
that there be a way of adding liquidity to the mortgage and
mortgage servicing is something that developed in part in
response to the growing mortgage industry and the growing
transfer of mortgages, mortgage servicing, and the development
of securitization. And this utility, if you will, is something
that has been developed to contribute to facilitating
development of securitization, the development of
securitization, developed to be able to better access global
capital markets, to ultimately be able to reduce mortgage costs
for borrowers.

So while there are things, questions being raised about
MERS, they are being looked at and there should be, I think we
need to keep in mind here that this is part of, you know, as
has been mentioned, coming to grips with technology,
securitization and ways of facilitating financial transactions.

Mr. Franks. So you are really not saying that it was part
of catalyzing the bubble, it was just sort of one of the
accoutrements that went with it, it sounds like, and that
sounds reasonable.

Mr. Chairman, I yield back and thank you all for coming
here today.

Mr. Conyers. Thank you, Trent Franks. I am now pleased to
recognize the gentlelady from California from California, Dr.
Judy Chu.

Ms. Chu. Thank you, Mr. Chair. I would like to ask Justice
Winslow about the remedies available in court. According to the
Washington Post, some judges in New York are estimating that
they are dismissing 20 to 50 percent of the foreclosure cases
on the basis of sloppy or fraudulent paperwork that was filed
by lenders. In one case the court ruled in favor of a homeowner
in Long Island and cited that the mortgage company's paperwork
on her foreclosure case was flawed and that its behavior was
repugnant. The judge erased the family's $295,000 and gave the
house back for free.

Now while this may be an unusual result, it does illustrate
that there is the power of the court to remedy some of these
fundamental flaws in the system. I would certainly like that to
be available in California, but unfortunately we are a non
judicial State where the lender doesn't have to prove to a
judge that they have to foreclose on a homeowner.

The problem is how could you catch this kind of repugnant
paperwork in this kind of situation where you are a nonjudicial
State? And how could an average homeowner without high level
mortgage knowledge even know what to look for?

Judge Winslow. Thank you so much for the question. And I do
want everyone to realize that the case that you are referring
to, the Yano case, has in fact been reversed by the Appellate
Division Second Department with some admonition to Judge
Spinner that he exceeded his authority in revoking,
terminating, voiding the underlying mortgage obligation.

I believe that cases such as this on one side are positive
because they bring to the attention of the community the nature
of the problem that we have. On the other, I think they are not
positive because they lead to unpredictability, inability to
understand what is going to happen next. We have the tools

right now under 3408 of the C.P.L.R. And under the direction of
the administrative rules established by Jonathan Lippmann and
Ann Pfau, the Chief Administrators, State of New York, to do
two things. One is to require the certification of all
documents by the attorney representing the lender. And failing
to do that, there would be implications under what is called
Rule 130 of the Uniform Trial Rules. So there are significant
penalties available for failing to comply with that particular
rule.

The use of an extreme to address a particular problem may
not always be more than today's sound byte. And I am afraid
that in some cases that is what is happening and an improper
conclusion is being reached by the public that oh, I have a
chance now to wipe out my mortgage. That is not what is
happening in New York State.

New Jersey adopted the same rule literally 3 days ago about
requiring the note and mortgage to be together, and it is
growing into a State, common law State that has much of the
same rules as New York. And you know certainly about Florida.
So there are within our system right now penalties available
under Rule 130 which provide for $10,000 fines to both the
attorney and the principal in a case, plus all of the costs
associated with the defense of the case by the defendant or the
plaintiff who was wronged in the matter.

That is the answer that I think we should follow up on. If
we need more than that, then I think the trouble is going to be
of such a nature that the draconian method, if applied, is
going to ultimately find a way to raise its head and show that
it is not the answer.

Ms. Chu. Do you think it is true that the judges in New
York are estimating that they are dismissing 20 to 50 percent
of foreclosure cases due to sloppy paperwork?

Judge Winslow. I am sorry?

Ms. Chu. You said that the Yano case was reversed.

Judge Winslow. Yes.

Ms. Chu. But in terms of the other judges the Washington
Post said that they were dismissing 20 to 50 percent of the
foreclosures cases on the basis of sloppy or fraudulent
paperwork that was filed by lenders.

Judge Winslow. Yes. In those particular cases I will tell
you what I do and I don't think that it is substantially
different than many of the judges of this State do. There is
either a motion for a default judgment, the 3215, or a motion
for summary judgment, 3212, which is made by the plaintiff. If
in fact when I examine the submission it is faulty, dismiss the
submission and look at the underlying action. And if there is
no basis for the underlying action, dismiss that. That still
allows the lender the opportunity to remedy it, if the lender
can. So the matter doesn't end and we don't have a
circumstance, with rare occasions, where the lender is deprived
of any action or claim that it could maintain against the
borrower.

Ms. Chu. I am still thinking about any State over the next
2 years an additional 7,000 foreclosures are expected and an
almost 10 percent of these could be saved through a court
supervised modification.

Judge Winslow. Yes.

Ms. Chu. What concrete remedies do you think are available
in a State like mine?

Judge Winslow. I'm sorry, how did I get that information?

Ms. Chu. Well, I am just talking about California, which is

a nonjudicial state.

Judge Winslow. Okay, and?

Ms. Chu. What concrete remedies are available in our State?

Judge Winslow. What can we do about the 7,000?

Ms. Chu. Yeah.

Judge Winslow. What we can do about the 7,000 is to try a mediation, but that is the most. And I don't believe it is going to be effective. I have not seen mediation work as well as I would like or hope to see because both sides have the opportunity to say no. But since the 7,000 constitute notice only of a pending default matter which will result in a foreclosure, there is nothing that the State--that New York State can do other than to make the suggestion that there be a mediation.

Ms. Chu. Okay, thank you.

Judge Winslow. Thank you.

Mr. Conyers. Our final questioner for the day is the distinguished gentleman from Florida, Mr. Deutch. I want to commend him, he has been at the beginning of these hearings. He has been through much of the middle part of it, and now he will be the final Member to question the panel. The gentleman is recognized.

Mr. Deutch. Thank you, Mr. Chairman. Let the record show, Mr. Chair, that even as I was not sitting here I did watch the hearing as I was eating my sandwich. I appreciate the opportunity. I would like to go back to Judge Winslow for 1 second.

The certification process that you described with the $10,000 penalty, what happens if there is a false certification that is discovered only when it is too late? The fraud, the robo-signature, the notary example that you gave, some other violation, mortgage servicer, whatever it is, it appears too late and the homeowner has been foreclosed out.

Judge Winslow. As about as bad as it could possibly be, because you can set aside, you can set aside that whole transaction and require one of two things, either an enforcement proceeding, which would require that the property be returned to the original homeowner-borrower, or that damages equal to the actual loss be paid by the lender or the nominee who commenced the foreclosure action.

Mr. Deutch. Thank you. And Ms. Williams, given the late hour and the votes that were just called, I will say that I do have some serious concerns about the findings in the congressional oversight panel report from the 16th of November, particularly the securitization process. I will submit those to you as follow-up questions.

But I did want to return to something you said earlier in an exchange you had with Mr. Goodlatte. He had asked about why your office had not paid attention to this sooner; you talked about the focus being on modifications. The answer was there were no warning signs about foreclosure documentation that were triggering any red lights. There was an article in 2007 about some, I think it was Deutsche Bank where the foreclosure--2007 in fact where Deutsche Bank lacked standing to foreclosure in 14 cases because it couldn't produce the documents. That was followed by other cases around the country. I think it would be helpful to understand how it is that we might have missed those, and at this point what is in place to ensure that we don't miss something like that going forward?

Ms. Williams. A perfectly fair, appropriate question. What I was trying to explain is that we didn't have indicators of a

systemic programmatic problem with the foreclosure
documentation. I think that we would not argue that there have
been situations that have occurred over the course of the last
several years where a particular practice or particular
situation, a particular loan that involved a bank, a national
bank or otherwise, was not handled properly and that there have
been instances of litigation over that. But what we have
typically looked at in the examination process when we are
focusing on what I term general business processes, how you
sign the documents, doing the notarization properly, is the
bank's internal control processes, their quality assurance and
their audit to see that those issues are being identified and
they weren't. And the issues weren't surfacing in our own
consumer complaint system either.

Mr. Deutch. Excuse me, if I may, just to fast forward, you
have acknowledged earlier that this raises concerns about the
overall integrity of the foreclosure process. Certainly in my
State of Florida this is a devastating crisis and the integrity
of the entire process has absolutely been called into question.

So I would like to address what is going to be happening
through your office, through the OCC? The OCC's mission is to
regulate and supervise national banks. What will be happening?
You talked about the potential for civil money penalties, you
talked about the potential for criminal referrals if warranted.
Who is making that determination? Whose conducting the
investigation? How much staffing is there? How can we be
assured that this report that will be coming out in the next
few weeks will actually lead to the necessary actions we take
to restore some integrity to this process?

Ms. Williams. Right, right. First of all, what is being
done right now, and what we initiated a number of weeks ago
when the problem came to light as a result of the Allied Bank
situation is we immediately directed the major servicers that
we supervise to do a self-assessment and they did self-identify
that they had some of the same issues. That resulted in them
stopping foreclosures and correcting practices that were then
being conducted. So there is a corrective process that was
already initiated. This is essentially what I am trying to say.

At the same time we began the process and teed off a little
while later after it was organized with other agencies a very
comprehensive, horizontal, multi-servicer examination process
that we are in the midst of right now, and it will be as a
result of what we find when we conclude those examinations that
will be the basis for the decisions that at least the banking
agencies would make in terms of what type of supervisory or
enforcement actions we would take with respect to the
institutions that we supervise. We expect that we will be done
with the on-the-ground exam work by the end of this month. The
results will be beginning to be communicated to the
institutions shortly thereafter in the public report that the
agencies are envisioning in January hopefully.

Mr. Deutch. Right. And you said that there may be civil
money penalties or there may be criminal referrals.

Ms. Williams. I was describing the very broad range of
types of powers that the banking agencies have.

Mr. Deutch. Who will be making those determinations?

Ms. Williams. Each banking agency will make those
determinations with respect to the institutions that we have
jurisdiction over.

Mr. Deutch. And they will be making those determinations
based on what? Is there anything anecdotally that we have seen

in any of these accounts in the various newspapers around the
country, is there anything that stands out as the type of
activity that if confirmed might lead those sorts of penalties?

Ms. Williams. Well, there clearly have been breakdowns in
controls and oversight, but we need to get to the end of our
examination process to understand the dimensions of the
problems, if that was all, if there is more of what else needs
to be fixed before we can make any final decisions about what
the appropriate remedies and sanctions are.

Mr. Deutch. Okay. Finally, Mr. Chair, let me understand
then, there is a public report that will be coming out in
January?

Ms. Williams. Well, what the agencies have committed to do
is to come out with--the particular contours of this, I don't
think has been decided, but a form of public report on the
results of the horizontal exams. It would not, I would expect,
be bank specific, but it would talk about the types of issues
that were discovered, sort of lessons learned for the servicers
and also perhaps serve as a basis for the agencies to think
about developing some uniform standards for mortgage servicers
and also for the agencies to think about techniques to use
going forward for our own supervision.

Mr. Deutch. And I would respectfully suggest that uniform
standards going forward will be helpful. But there are hundreds
of thousands of foreclosure cases winding their way through the
courts in Florida through this rocket docket process where
separate foreclosure courts have been established. Those
hundreds, the hundreds of thousands of citizens in my State
aren't worried about uniform standards that will be applied
proactively. They want to be sure that the actions that have
been taken thus far to the extent that there is some evidence
of fraudulent activity or a pattern of fraud, whatever is
necessary for there to be penalties, that the law is upheld so
that there is some confidence brought back into this
foreclosure process and so that they know that the consumers of
my State and nationwide are actually receiving the just due
that they deserve. That is what I hope comes from this.

Ms. Williams. Yes, sir, we understand that.

Mr. Deutch. Thank you, Mr. Chair.

Mr. Conyers. Thank you, Mr. Deutch. Our gratitude to all of
the witnesses. We appreciate your bearing with us. There will
be an additional hearing in which the second panel will be
rescheduled and the bankers, of which there are approximately
six, that are also scheduled to testify on this matter.

And if Mr. Franks has any comment he can make it now.

Mr. Franks. Thank you all for being here.

Judge Winslow. Thank you, sir.

Mr. Conyers. And the hearing stands adjourned.

[Whereupon, at 2:50 p.m., the Committee was adjourned.]


                        FORECLOSED JUSTICE:
                   CAUSES AND EFFECTS OF THE
                   FORECLOSURE CRISIS (PART II)


                        ----------


                  WEDNESDAY, DECEMBER 15, 2010

                    House of Representatives,

7/7/2015          12-12020-mg   Doc 8862-18   Filed 07/09/15   Entered 07/09/15 18:39:14   &   Exhibit
Exhibit 5 - Hearing H. Comm. on Judiciary     Pg 56 of 97
Committee on the Judiciary,
Washington, DC.

The Committee met, pursuant to notice, at 10:15 a.m., in
room 2141, Rayburn House Office Building, the Honorable Henry
C. ``Hank'' Johnson, Jr. presiding.
    Present: Representatives Scott, Watt, Johnson, Chu, Deutch,
Schiff, Smith, Sensenbrenner, Coble, Gallegly, Goodlatte, King,
Franks, and Rooney.
    Staff Present: (Majority) Susan Jensen, Counsel; James
Park, Counsel; Reuben Goetzl, Clerk; and Zachary Somers,
Minority Counsel.
    Mr. Johnson. [Presiding.] The Committee will come to order.
Good morning, and before I recognize myself for a brief
statement, I do want to welcome Senator Sheldon Whitehouse from
the State of Rhode Island, who is with us today to testify
regarding the Home Affordable Modification Program. This is the
continuation of a hearing that started either last week or a
week before that, and we had to call it off due to votes, a
long series of votes. And so I appreciate the second panel
members for coming today.
    We will first hear from Senator Whitehouse. Senator
Whitehouse is very busy over in the Senate and doesn't have a
lot of time. So without any further adieu, I would like to
recognize him. He has for more than 20 years championed health
care reform, improving the environment, solving fiscal crises,
and investigating public corruption. As Chair of the Senate
Judiciary Committee's Subcommittee on Administrative Oversight
and the Courts, Senator Whitehouse has been a fearless consumer
advocate on various issues, particularly in the area of helping
homeowners save their homes from foreclosure.
    We very much look forward to his comments and appreciate
his contribution to today's hearing.
    Would you begin, Senator?

        TESTIMONY OF THE HONORABLE SHELDON WHITEHOUSE,
      A U.S. SENATOR FROM THE STATE OF RHODE ISLAND

    Senator Whitehouse. I will gladly do that, Representative
Johnson. I thank you for the opportunity to testify. Ranking
Member Smith, Members of the Committee.
    Sadly the foreclosure crisis remains unabated in my home
State of Rhode Island and many other parts of the country. And
I appreciate that you have convened this hearing in the final
days of the 111th Congress to inquire that this issue.
    Mr. Johnson. And Senator, will you pull that microphone up
just a little closer. Thank you.
    Senator Whitehouse. I look forward to working with this
Committee on legislation next year.
    In my capacity, like yours, Representative Johnson, as
Chairman of the Subcommittee on Administrative Oversight and
the Courts, I have chaired several hearings recently on the
foreclosure crisis, most recently in late October. At that
hearing a constituent of mine, Larry Britt from Riverside,
Rhode Island, told a story that is probably familiar to this
Committee.
    Larry had applied with his mortgage servicer for a mortgage
modification under the Obama administration's Home Affordable
Modification Program, which we call HAMP, and shepherding that
request had become for Larry a nearly full-time job. Time and
again over a 19-month period, the mortgage servicer asked Larry

to submit, and resubmit, and resubmit document after document.
Despite Larry having FedEx and facsimile records proving that
he had already submitted those documents, the bank consistently
alleged that Larry failed to send in the necessary paperwork
and he had to do it over and over again. When he tried to clear
up things over the phone he was punted from department to
department, never once during his 19 months of many calls
reaching anyone who appeared to have any authority to make a
decision.

    After 19 months of this bureaucratic nightmare, the bank
finally approved Larry for a mortgage modification. The
modification papers came to him via FedEx just 1 day after a
bank representative told him that he didn't qualify for a
modification. While he is cautiously optimistic with those
papers in hand, he still isn't certain that the bank won't
changes its mind again.

    Larry's story and thousands more like it get to a story of
bureaucracy run amok at the very heart of the foreclosure
crisis. Mortgage companies unwilling or unable to efficiently
evaluate modification requests, homeowners and mortgage
investors in limbo, suffering the consequences. When the
paperwork runaround leads to foreclosure, a family loses its
home, neighbors lose property value, communities lose tax
revenue. Investors who purchase the right to the mortgage
payments may lose out too. Often the foreclosure is not
necessary.

    I met with a group of Rhode Island realtors the other day
and every single one sitting around the table had the same
story. Each one of them had at least one short sale nailed down
with a buyer and a seller and had the experience of a
foreclosure notice appearing and interrupting the short sale.
Obviously that was the worst outcome for the homeowner. It was
also a worst outcome for the investors, because the result from
the foreclosure sale was worse than the outcome that had been
agreed to in the short sale.

    In the age of securitization the servicer merely serves as
a processing agent and may not work in the interest of the
people who actually own the mortgage. And in the age of
corporate bureaucracy, the left hand may not know what the
right hand is doing.

    While the program was well-intentioned, the poor
performance of the HAMP has demonstrated that cash incentives
alone won't get the banks to operate effectively and in good
faith. A different mechanism is needed to ensure compliance.

    In the past I had focused on proposals to give bankruptcy
court judges the power to reduce the principal on primary
residences mortgages, the same way they can for other mortgages
on vacation homes, on loans for cars and boats. While I have
long believed that this is the most efficient and least costly
way to keep families in their homes and many observers agree,
the large banks have fought against it with their full lobbying
might.

    Despite House passage of cram-down legislation in March of
2009, for which I thank and applaud you, we in the Senate have
been unable to overcome filibusters. Given these political
realities I decided to add to the focus of my Subcommittee a
different approach, already underway in several bankruptcy
courts. Under programs adopted in bankruptcy courts in Rhode
Island, New York, Florida, and Vermont, the court may order the
homeowner and the mortgage servicer to sit down and negotiate
in good faith, a settlement that is preferable to foreclosure

for all parties.

While judges have the ability under the programs to appoint a formal mediator if the informal talks don't work, in practice it has not been necessary in the vast majority of cases. For most homeowners the mere chance to speak directly with their mortgage company, with someone who has some authority is enough to lead to a mutually beneficial agreement.

Under the bankruptcy loss mitigation programs the power of the court to compel good faith talks breaks through the bureaucratic maze of the voluntary modification programs. The court of course does not have the power to force a settlement, but it can force the parties to talk to each other, and that can avoid a costly foreclosure that will benefit no one.

The programs in Rhode Island and the other States were designed with the input of creditors and homeowners and have been successful to date. I believe that the courts have appropriately implemented these programs under their section 105(d) authority to convene pretrial status conferences. Unfortunately, one servicer has challenged the authority of the bankruptcy court in Rhode Island to require it to come in and talk to the homeowner before it forecloses on their home. I have no doubt that the court's authority will be upheld eventually, but it could be years of litigation and appeal before the parties have a final answer. In the meantime other judges around the country may be reluctant to adopt a program facing such a challenge.

I proposed a simple legislative fix that would clarify that bankruptcy courts can run foreclosure loss mitigation programs, can make parties talk with each other before someone's home gets taken away. I hope that this Committee will help me pass it into law early next year. It seems plain and noncontroversial.

The American people are tired of taxpayer bailouts for banks, and we owe it to them to support a sensible program that comes with zero cost to the taxpayer. Bankruptcy will not be the answer for every homeowner, but the loss mitigation programs can help homeowners like Larry cut short a stalled application process and finally get an answer to their modification request. One could even imagine that the good sense of this could cause it to propagate outside of the bankruptcy process on a voluntary basis.

In Rhode Island bankruptcy court loss mitigation has already saved 100 homes and it has the potential to save thousands more across the country. I believe that makes it worth supporting.

Once again, thank you for the opportunity to take part in this hearing and I commend your good work. Thank you, Mr. Chairman.

[The prepared statement of Senator Whitehouse follows:]
          Prepared Statement of the Honorable Sheldon Whitehouse,
              a U.S. Senator from the State of Rhode Island


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

_____

Mr. Johnson. Thank you, Senator, and thank you for the legislation that you just mentioned. I think it is good in the judicial States, foreclosure judicial States, but there are about half the States almost that suffer from a nonjudicial foreclosure process, States like Georgia where I hail from, and

I am looking at some legislative solutions to that process,
some Federal legislative solutions to that process which should
measure up well with your efforts.

Senator Whitehouse. Mr. Chairman, in States like yours and
mine, which are both nonjudicial foreclosure States, the
ability of a homeowner to seek bankruptcy protection in order
to stop foreclosure and resolve all of their credit issues at
the same time is facilitated by this proposal. So it is
effective in Rhode Island and I think it would be effective in
Georgia as well, notwithstanding the nonjudicial nature of your
foreclosure process.

Mr. Johnson. Certainly. Thank you.

Senator Whitehouse. Thank you, Chairman. Thank you all for
your courtesy.

Mr. Johnson. Thank you for your appearance today.

And now we will call for the second panel. I will now
recognize myself for a brief statement.

These are challenging times in America, our economy is
struggling during an unprecedented housing crisis, a crisis
that is devastating American families and neighborhoods. Too
many constituents have contacted my district offices for
assistance because the banks and lenders are losing their
paperwork, failing to respond to their request for
modifications and failing to return their calls in a timely
manner. Their lives are disrupted and turned upside down by the
foreclosure process and by the shoddy procedures. The same
bankers who came to Congress with hat in hand demanding a
bailout, the same bankers who couldn't have survived without
welfare paid for by the American taxpayer, those same bankers
have no problem summarily throwing the American taxpayer out of
her home without due process, without accurate documents,
without regard for the human beings whose lives are being
affected.

So I submit to our friends from the financial industry that
our constituents, your borrowers, are living human beings. They
have blood flowing through their veins, they care about their
loved ones, they agonize over what will happen to their homes.
They need to be treated fairly during the foreclosure process.

One of the major causes of this foreclosure crisis was
greed. Banks and lending institutions, fueled by greed, put
everyday hardworking Americans into mortgages that they knew
that these Americans could not afford. In last week's
foreclosure hearing we had a chance to hear from a judge who
has presided over more than 1,000 mortgage cases. He testified
to the many problems he sees time and time again in his
courtroom, including situations where lawyers representing
mortgagors failed to know who they represented, or they lacked
the underlying note evidencing their entitlement to seek
foreclosure, or they failed to establish the legal chain of
title establishing the standing of their client mortgagors, and
they submitted to the court in some cases false affidavits
attesting to the ownership and the note of the mortgage.

Recent press reports indicate that lenders have executed
foreclosures recklessly and without adequate review of relevant
documents. The practice of robo-signing, where lenders sign
foreclosure documents with little or no knowledge of the
contents of the documents, calls into question the legitimacy
of hundreds of thousands of foreclosures. Other problems
rampant in the foreclosure process range from the imposition
and collection of improper fees, poor underwriting and improper
servicing, not to mention the pervasive predatory lending that

set the stage for the crisis in the first place.

These are serious issues that do not appear to be isolated incidents, but rather a systematic problem within the foreclosure industry.

Since 2007, Americans have lost nearly 6 million homes to this foreclosure crisis. This issue is of the utmost importance to me because my home State of Georgia ranks seventh in the Nation for foreclosures. Foreclosure and predatory lending issues have always been crucial issues to me. As a Dekalb County commissioner, I authored and passed Georgia's first approved ordinance against predatory lending which State legislators later used as a guide in passing a statewide law.

As foreclosures continued to surge, we must ask if mortgage servicers are doing all that they can to provide sustainable alternatives to foreclosure. How can we ensure that servicers have the training, personnel support, and judgment to properly service loans and interact with customers to avoid foreclosure? This is a time of economic and financial instability, and at the very least families should be able to go to sleep at night knowing that they have a place to lay their heads. Unfortunately, many Americans live under the shadow of imminent foreclosure and struggle against servicers who are often incompetent and disinterested.

I thank the Chairman for all of his hard work on this Committee during this Congress and for taking the time to hold this hearing. The Chairman had to depart for another very important meeting, and he asked me to chair this full Committee today.

I look forward to hearing from the witnesses today, and I yield back the balance of my time and will now recognize the Ranking Member of the Judiciary Committee and soon to be Chairman, my friend, Congressman Lamar Smith from Texas.

Mr. Smith. Thank you, Mr. Chairman. Mr. Chairman, I was interested in your opening statement because I didn't realize what you had done in the Georgia legislature to help address this problem and that is much appreciated, and I was glad to hear you say that a State law had been the result of your efforts.

Mr. Chairman, let me thank the witnesses from the second panel at our last hearing for their patience and for coming back to testify this week. I regret we were unable to hear from you the last time but appreciate your effort to be here today.

Errors in the foreclosure process are inexcusable and undermine the rule of law and the due process rights of borrowers. However, there does not appear to be any evidence of fraud or intent to mislead the courts. Rather, all indications are that the foreclosure documentation problems are limited to unacceptable, but curable documentation defects.

While the foreclosure documentation issues are troubling, and mortgage servicers undoubtedly will be held accountable for their mistakes, the larger problem is how to end the foreclosure crisis. We seem to be caught in an economic paradox between job creation and recovery of the housing sector.

As Peter Lawson of the American Enterprise Institute has observed, ``The housing industry, which amounts to almost one-sixth of the U.S. economy, has always been the economic sector that led the United States out of recessions.'' But at the same time it appears that jobs are what we need for the housing sector to recover. Analysts at Moody's have noted that without jobs fewer households are created and the existing households are unable to afford to buy a home.

Unemployment, coupled with a large number of borrowers who are under water on their mortgages and an overall lack of consumer confidence, is creating a drag on the housing sector. And by all indications a weak housing sector is constraining the broader economy. So while the mortgage documentation problems that are the genesis of this hearing are important, the more important question is how do we get the housing sector moving again?

At this point Obama administration programs like the Home Affordable Modification Program has succeeded in spending large sums of taxpayer money, but have had little success at stemming foreclosures. Hopefully as we move forward we can establish more effective policies for both job creation and recovery of the housing sector.

Mr. Chairman, I look forward to the witnesses' testimony and I yield back the balance of my time.

Mr. Johnson. Thank you, Congressman.

In the interest of proceeding to our witnesses and mindful of our busy schedules, I ask that other Members submit their statements for the record. Without objection, other Members' opening statements will be included in the record and without objection, all Members will have 5 legislative days to submit opening statements for inclusion in the record. Without objection, the Chair will be authorized to declare a recess of the hearing at any point.

I will now introduce our second panel. First is Mr. James Kowalski, Jr. He specializes in consumer protection litigation. Prior to entering private practice, Mr. Kowalski served as an assistant State attorney for Florida from 1989 to 1996, where he prosecuted public corruption, sex crimes, and homicides. He is a graduate of the University of California at Berkeley and the University of San Francisco School of Law. Mr. Kowalski also brings the perspective of having practiced in Florida, one of the States like my State of Georgia which has been hardest hit by the ongoing foreclosure crisis. He has also been on the forefront of the foreclosure documentation scandal. Welcome, sir.

Next is Mr. Thomas Cox. He has been a lawyer for more than 40 years and currently is a volunteer program coordinator at the Maine Attorneys Savings Homes Project. The project is jointly sponsored by the Pine Tree Legal Assistance and its affiliated Maine Volunteer Lawyers Project. Mr. Cox brings to this hearing a unique perspective. While he currently represents homeowners facing foreclosure, he used to represent lenders seeking to foreclose. I think his perspective will be particularly interesting on the foreclosure documentation issues that we are considering here today. Mr. Cox received his AB from Colby College and his JD from Boston University. Welcome, sir.

Our next witness, Ms. Sandra Hines, has been detained, a flight delay I believe, so she may or may not get here before we conclude this hearing.

Next I would like to welcome Vanessa Fluker. She is an attorney who practices in Detroit, which some consider to be one of the Nation's home foreclosure epicenters. Nearly every day she is in court helping those at risk losing their homes to foreclosure, and she is a leader of the Moratorium, now Coalition to Stop Foreclosures, Evictions and Utility Shut-offs.

Thank you for being here, ma'am. Over the years Ms. Fluker and Chairman Conyers have worked very hard to have the State of

Michigan institute a statewide foreclosure moratorium, and we
will want to hear her explain to us why such a moratorium is
needed. Ms. Fluker received her joint MA/JD degree in 2002 from
the WSU Law School and the Department of Political Science.

Our next witness is Tom Deutsch. Mr. Deutsch, excuse me,
sir, is the Executive Director of the American Securitization
Forum. Before obtaining that position he practiced law in the
capital markets department of Cadwalader, Wickersham & Taft. He
earned his BA from Washington University in St. Louis and his
JD from the University of Pennsylvania. Welcome, sir.

Our final witness is Mr. Christopher Peterson, who is an
Associate Dean for Academic Affairs and a professor of law at
the Quinney College of Law, University of Utah. He has lobbied
on consumer lending policy and testified on consumer finance
before the U.S. Senate Banking Committee and the White House.
He has a BS, an HBA, and a JD from the University of Utah. It
won't come as a surprise, but Professor Peterson has strongly
divergent views from Mr. Deutsch on the impact of
securitization on real property law. So we are looking forward
to an erudite discussion from both of these experts.

Now, Mr. Kowalski, would you please begin?


   TESTIMONY OF JAMES A. KOWALSKI, JR., ESQUIRE, LAW OFFICES OF
        JAMES A. KOWALSKI, JR., PL, JACKSONVILLE, FL


   Mr. Kowalski. Representative Johnson, Members of the
Committee, thank you for inviting us here today to testify on
issues relating to the foreclosure crisis facing our country. I
am an attorney practicing in Florida and a member of the
National Association of Consumer Advocates. I would like to
start my testimony by making a few clear points in follow up to
the regulators' testimony during your last hearing.

First, the manufacturer of significant documents for
submission to the courts is not a recent practice by the
servicing industry. It is widespread and longstanding. The use
of robo-signers, more accurately called robo perjurers, where
an individual submits testimony under oath in the form of an
affidavit, an affidavit relied upon as the primary evidence of
the court in evicting the homeowner, where the individual has
no personal knowledge whatsoever regarding the substance of
their testimony, is not a recent practice by the servicing
industry. These abuses of the judicial system are not the work
of a few individuals or a rogue, outsourced unit of the
servicer. The systemic use of manufactured documents and false
affidavits is a business model. It has been the business model
of the servicing industry for years.

I have been an attorney in Florida for 20 years, starting
as a assistant State attorney in the Fourth Judicial Circuit in
1989. I served as the division chief of the Public Corruption
Unit in the County Court, and as the senior trial attorney in
the Special Assault Unit in the Repeat Offender Court Unit. I
was also a member of the on-call homicide team, and I put three
men on Florida's death row.

After leaving the State attorney's office in 1996, I
entered civil practice and began representing individuals in
wrongful debt collections and wrongful mortgage foreclosure
cases in the early 2000's. I took my first robo signer or robo
perjurer deposition in 2003.

As a result of almost a decade of handling wrongful
foreclosure matters, I have reached five general conclusions.
First, the servicing industry as a business model is

irretrievably broken, and the application of servicing industry procedures to loan modifications or, to that matter, to any issues whatsoever with the foreclosure itself has been counterproductive. The clearest evidence of this is in the dual track process where a borrower who might not be behind at all, who calls his or her servicer to inquire about a loan modification or wrongly force placed coverage or a posting error by the servicer will often end up months down the road with one unit of the servicer continuing to deal with what by then is a horrific customers relations issue, while another unit of the same servicer proceeds blindly and mindlessly with foreclosure.

The various units of the servicer do not communicate, are not permitted to communicate, and do not even have access to each other's computer systems. At every turn the goal appears to be the pursuit, churning, and diverting of servicer fees. Examples of everything I will testify about are in the exhibits that I filed with my testimony.

Number two, affidavits and assignments of mortgage filed in mortgage foreclosure cases are for the most part worthless. The overwhelming evidence from Florida and around the country consists of proof that affidavits are completed by persons who not only do not read the file, they do not even have access to the critical portions of the file.

It is also now evident that assignments are created after the fact in an attempt to show a chain of ownership, and many critical facts in the assignment such as the date or the assertion of an equitable transfer are not based on any evidence at all. For example, the date often used by the assignment is the date the file was transferred to the law firm, not the date the servicer purportedly took ownership or the trust purportedly took ownership.

I listened to a Federal district judge last month describe affidavits as all surface and no anchor. I have never taken the deposition of an affiant or read or reviewed a deposition taken by another lawyer in more than 7 years of this practice where the affidavit itself was wholly truthful.

Number three, many of the mill law firms are overwhelmed by the internal structures and by demands placed on them by the industry, and as a practical effect have complied with whatever they have been asked to do. This includes law firm employees signing affidavits on behalf of their clients where a law firm employee had no personal knowledge and was acting outside the scope of whatever authority they might have.

Number four, Legal Aid groups and HUD counselors are an integral part of the solution and must be better funded to provide support at all levels.

Number five, local counsel unfortunately has no connection to these issues.

In conclusion, I would respectfully suggest that the major servicers should not be believed when they assert that borrowers are deadbeats and that speeding up the process and rubber-stamping MERS is the course we should follow. At some point we simply have to stop accepting the ever changing excuses offered by the servicing industry. If we are to restore trust in our institutions, we have to start at some point to reform the servicing industry. The dual track concept needs to end immediately. Fannie and Freddie need to be incentivized to be part of the solution. MERS needs to end. The servicers do not need a truth bailout to go along with a financial bailout we have given them as a reward for truly abysmal business

practices. And Legal Aid groups and HUD counselors have to be
properly funded.

Mr. Johnson. Mr. Kowalski, I am going to ask that you sum
up at this time. I neglected to mention to the witnesses that
each of you have 5 minutes, as indicated on the contraption in
front of you. There is a green, a red and a yellow light. The
green light cuts off after 4 minutes, it goes to yellow, and
then it goes to red. So if you would, sir, please.

Mr. Kowalski. Lawyers will always say I just have a few
more points, but I do just have a few more points. As members
of the National Association of Consumer Advocates, we would
appreciate the opportunity to form a bipartisan partnership to
confer as regularly as you want with the Members of this
Committee, with your staff, with OCC, with Treasury and with
others to work through the short and long-term solutions to
these issues. But at each step the interests of American
homeowners need to be considered first.

Thank you.
[The prepared statement of Mr. Kowalski follows:]
        Prepared Statement of James A. Kowalski, Jr.


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]
                    _____


Mr. Johnson. Thank you, sir.
Next we will have Mr. Cox give his statement. Thank you,
sir.

    TESTIMONY OF THOMAS A. COX, ESQUIRE, VOLUNTEER PROGRAM
COORDINATOR, MAINE ATTORNEYS SAVING HOMES PROJECT, PORTLAND, ME

Mr. Cox. Chairman Johnson, Members of the Committee, thank
you for this opportunity to be here today. I am retired from
the private practice of law in Maine, where for many years I
represented lenders as well as the FDIC in loan litigation
matters. For the past 2\1/2\ years I have been working full-
time as a volunteer with Pine Tree Legal Assistance of the
Maine Volunteer Lawyers Project. I have come to know the
foreclosure industry well from both sides of the street.

At the hearing conducted by this Committee on December 2,
2010, representatives from Treasury, the Federal Housing
Finance Agency, and the Office of the Comptroller of the
Currency each said that their agencies first learned of the
issues relating to dishonest foreclosure affidavits and other
foreclosure irregularities when the news broke in the press in
September of this year. Those were stunning admissions. These
issues have existed for years now and have been widely known to
those of us representing homeowners. There was a massive
failure in the regulators' oversight of these servicers. The
issues we are talking about today should have been immediately
apparent from any reasonably diligent examination of the
servicer's foreclosure operations.

Because the time allowed for me to speak is so brief I am
going to address my remarks solely to my dealings with GMAC
Mortgage over the last several months.

Problems with GMAC Mortgage were first exposed on the
public record by Attorney Kowalski in Florida back in 2006 when
he was dealing with a robo-signed affidavit from a GMAC limited
signing officer that was executed in 2004. So we know these
activities go back at least 6 years. The Florida court
sanctioned GMAC for that conduct in 2006, but GMAC rewarded its

employee who was the cause of those sanctions with a promotion. She became the supervisor of GMAC's document signing department where she is the supervisor of the GMAC's current robo signer, Jeffrey Stephan. It was his dishonest affidavit signing practices revealed in the deposition that I took of him on June 7th that forced GMAC to finally announce a halt in sales and evictions from foreclosed homes on September 17th of this year. Stephan, who signs between 8 to 10,000 documents a month, testified on June 7th that when his affidavits state he has personal knowledge of the facts stated in them, he doesn't. When his affidavits state that he has custody and control of loan documents at issue, he doesn't. When his affidavit states that he is attaching true and accurate copies of loan documents to his affidavits, he has no idea if that is true because it doesn't even look at them. And Stephan admitted that when his affidavits contained a sign attestation by a notary public that he personally appeared to be sworn, he doesn't even bother to do that. Furthermore, he testified that his practices are fully in accordance with GMAC Mortgage practices and procedures.

When GMAC Mortgage realized the damaging admissions made by Jeffrey Stephan in the deposition I took, rather than immediately moving to correct the problem, GMAC sought to cover it up. GMAC sought money sanctions against me personally for sharing that deposition transcript with other foreclosure defense lawyers around the country. They sought an order from the court that it be used in no other case and they sought an order from the court that it be retried from any lawyers who had received it from me.

In the end the Maine court denied the motion for sanctions that GMAC sought and imposed affirmative sanctions against GMAC for its bad faith affidavit signing practices and ordered GMAC to pay attorneys fees sanctions in that one case alone of $27,000.

Very recent actions of GMAC Mortgage prove that it is not prepared to cease its use and reliance upon these false affidavits. At the hearing conducted by the House Subcommittee on Housing and Community Opportunity on November 18th, 2010, Thomas Marano, the CEO of Ally Financial, the parent corporation of GMAC Mortgage, testified that GMAC is no longer proceeding with foreclosures based upon Stephan's affidavits without first going to the courts and seeking approval to use them. This fall we notice that GMAC Mortgage was doing exactly the opposite in Maine and was proceeding with foreclosure judgments based upon those false affidavits. We brought a Maine State court class action against GMAC seeking an injunction to stop it from continuing these offensive practices.

GMAC has vigorously opposed that effort to prevent the Maine State courts from even considering our request for injunctive relief. GMAC removed our case to the United States District Court in Maine, where the Anti-Injunction Act prohibits that court from enjoining any State court proceedings.

In light of these efforts by GMAC to avoid any judicial consideration of an injunction, the District Court ruled just this past Friday that even though we clearly had a right to a hearing on the merits in the State court, that court was powerless to grant any relief.

I submit to you that there has been abuse of our judicial systems by the foreclosure industry on an unprecedented and truly massive scale. Economic interests are driving this abuse. Until these perverse economic interests are addressed and until

the regulators truly start monitoring the loan servicers and
until the force of the criminal justice system is brought to
bear upon the dishonest conduct of the servicers, including
more than just the robo signers, those at higher levels who
clearly have been aware of and condoned and ordered this
conduct, there is not likely to be enduring change in this
industry.

I thank you for the opportunity to be here today, and I
welcome for questions.

[The prepared statement of Mr. Cox follows:]
              Prepared Statement of Thomas A. Cox


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]


                    _____


Mr. Johnson. Thank you, Mr. Cox. Next we will hear from
Sandra Hines. Is it Saundra or Sandra?

Ms. Hines. Sandra.

Mr. Johnson. Ms. Hines is a lifelong Detroit resident and a
social worker. She brings to this hearing her personal
experience of losing her family home of 37 years to foreclosure
and of being evicted from that home. Ms. Hines has turned those
painful experiences into valuable resources that she uses to
assist others facing foreclosure. She has been a tireless
advocate on other important issues of concern to the citizens
of Detroit.

We welcome you to the hearing, and we would like to hear
your testimony now if you would.

Ms. Hines. Thank you.

Mr. Johnson. Thank you.


TESTIMONY OF SANDRA D. HINES, FORMER HOMEOWNER, DETROIT, MI


Ms. Hines. I want to first thank the honorable men and
women here who can make a difference in our lives in America.

I lost my family home to foreclosure and eviction. And I
don't know if anybody here knows anyone or has had anyone in
they family lose they home, but it is an uprooting. We were
uprooted.

I still have a lump in my throat, hole in my chest every
time I think about it, because my mother and father worked real
hard to get that house. We moved into 16582 Lesure, Detroit,
Michigan in 1970. When we moved into that home we was the
second Black family on the block. My mother and them was
seeking a better way of life for us and a better environment.
We stayed--my mother put a roof on that home, she put in a new
furnace, she put in a hot water and cooler heater. She he had
the porch redone, she had awnings put around the house. She
also had before my father died central air conditioning added
to the home.

My mother--I mean my sister and my father was GM workers.
My father worked for GM almost to the day he died. He contacted
cancer from working for General Motors in those foundries that
was spitting out asbestos and lead and everything else.

I'm here to say that we believed in the American dream.
Most of the people who have bought homes in America believed in
the American dream. Now we are facing the American nightmare.
None of us in America would have thought that the government
would turn their back on the people and not allow the people to
have the kind of help that they need because the banks decided

they wanted to trick and rob people of they homes.

Now we can sit here all day. I am a little disappointed
that the room is not full, I don't know, maybe this is a
special committee and this is the only Committee that is
listening to people that's really trying to save their homes.
But I wish that every chair was filled in this room so that
they can understand the pain that is associated when you lose a
home of over 40 years.

We moved 40 years of memories in the cold, snow like a day
that we had in Detroit where it snowed all day, the ice was
covered over. They threw us out in conditions like that. They
took my mother's antique furniture and they threw it over in
the dumpster. The bailiff stood out there with his gun to let
us know that he would take us to jail and kill us if we tried
to stop him from coming into our house. It was the most
horrible and most pitiful experience I have ever had in my life
to lose a home that I lived in for 40 years.

Where do you go on Christmas now? Me and my sisters are
divided. We staying in apartments when we always had a home.
Where do you go on Easter when you don't have a home anymore?
What can you call--what can we call home now after all of years
that my father worked at General Motors and my mother worked
for a neighborhood service agency, helping people all her life
because she was an investigator for JDO.

And my mother--our house was paid for. The part that hurts
me so much, my mother told us, my mother said, don't remortgage
the home. If you remortgage the home, the bank is going to
steal it. She was telling my friends, my young friends who was
first-time buyers who was buying homes at that time that was
coming to my mother and didn't understand what was going on,
and I am talking about back in like 2004 and '3, they didn't
know this was the beginning of foreclosure and evictions. My
mother encouraged them and begged them, don't remortgage your
home. A couple of them didn't and they have their home today
because they didn't. The ones that did don't have they home,
they experienced foreclosure and eviction just like we did.

I just don't know why we have to come and beg people that
we put in office to work for us to work for us. What has
happened to America? I mean I don't get it. I don't get it why
you all sit here and make decisions over our lives and you all
can't see that if you throw us out of our homes we don't have a
life. Your life change. All of you got a home. You got money,
you got health care, you got the best insurance that anybody
can have, you probably have the best homes that anybody can
have. Don't you think other Americans want that, too? Isn't
that what America is supposed to be about? The land of the
brave and the home of the free? The people worked, the people,
the people have worked and built America what it used to be.
Because America ain't what it used to be no more.

My mother used to always say, they are going to turn
America into a third world country. Well, you just about to did
it. Come to Detroit and look at the neighborhoods, how they
have been ravaged by foreclosure and evictions. You ride down
the street 6 and 7 houses on one block out of maybe 20 houses,
10 on one side, 10 on the other side. Seven and 8 of them 10
have been shut down because of foreclosure. I don't know where
those people are at.

I came here to tell a story of the people. Maybe if the
people tell the story ya'll will get it. Because ain't none of
the rest of ya'll been able to respect the other ones. I have
seen the Congressmen that have argued on behalf of the people,

they get shut down. It is like they not saying anything that
anybody else is listening to. So we have to come now--and I am
going to tell you, I wasn't on the roster to come from Detroit.
Once I found out that you was having a hearing I asked my
relatives, I asked my friends to give me money to come here.
Just so happen it worked out. And on my way here I missed the
first plane, I broke my glasses while I was on the plane. That
is why I can't read my statement. But I'm here, because I am
supposed to be here representing the American people. And it is
not just Black people that is experiencing this, it is all
people, all of the people in America. America is a melting pot.
People come here because they want help, they want to be free.
They want to have what we said America was. And even the people
that was born here in America, those of us who claim to be
Americans, not only are you not helping those who have came,
now you are not helping us, the Americans. Why should people
have to come here and tell you this when you see us, the
millions and millions of people in foreclosure and evictions?
Don't you want to do something about it? Don't you want to
bring America back? It looks like a garbage dump now. Each city
from each city. Everything is falling down, it is because
people are stealing everything that ain't nailed down and not
doing what the people put them in office to do.
    Mr. Johnson. Ms. Hines, I want to thank you so much for
your statement.
    Ms. Hines. I am sorry if I appear to be angry, but I am. I
am mad at hell. And I thank you. I know my time is up. I
appreciate everybody listening to me, but the bottom line is,
and I'm going to close on this: Don't listen, do something
about it.
    [The prepared statement of Ms. Hines follows:]
             Prepared Statement of Sandra D. Hines


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]


                    _____


    Mr. Johnson. Thank you, Ms. Hines.
    Next we will hear from Ms. Fluker, is it Fluker?
    Ms. Fluker. Yes, it is.
    Mr. Johnson. And if you pull that microphone up and cut it
on.
    Ms. Fluker. The light is on.
    Mr. Johnson. I don't think it must be working.
    Ms. Fluker. Is it better now?
    Mr. Johnson. Perhaps if you would grab one of the other
microphones, that would be good.
    Ms. Fluker. Is this better?
    Mr. Johnson. Oh yeah, that is much better.

TESTIMONY OF VANESSA FLUKER, VANESSA G. FLUKER, ESQUIRE, PLLC,
                      DETROIT, MI


    Ms. Fluker. First of all, I would like to thank the
Committee for having this opportunity to come here today to
present testimony regarding this very important issue. I, too,
like Ms. Hines from the City of Detroit, Michigan, who is
ranked at the top of the list, we are almost at the very top,
in foreclosures leading to evictions because we are a
nonjudicial State.
    First, I would like to address the perspective of, the

media perception has been that for some reason we have all these massive foreclosures because you have this multitude of people who bit off more than they could chew, who went into homes that just were exorbitant and beyond their reach. This is not true. The majority of people in subprime mortgages are the working poor, minorities and senior citizens, and that is what constitutes and makes up the majority of my practice.

Unfortunately, the scenario is such that these subprime mortgages were marketed and pushed disparately on the working poor, minorities, and senior citizens. For instance to give a real life firsthand perspective, my client, Ms. Hart, works every day as a legal assistant, mother dying of cancer, she has been fighting for 2 years to get a modification with Bank of America, who by the way just got $7 billion additionally in January of this year to do that. No go. They are proceeding to evictions on that matter right now. The only reason an eviction hasn't occurred is because there may be some impropriety with the affidavits and documentation.

My client, a senior citizen, who was diagnosed with dementia in 2000, who was put in a pay-option ARM mortgage in 2007, who we are still fighting. Of course it is his family now, seeing as we have been fighting so long he died a week and a half ago.

My client who has a farm in Michigan, who was put in a subprime residential mortgage, interest only, but now he covers his house and his whole farm, and they are foreclosing and they are trying to take the whole farm.

Or even more egregious, my client who was in active duty in Iraq, serving his country, comes back, he is in foreclosure. They are like oh, well, too bad. We can't work with you, we can't modify your loan.

This is just a sampling of what I deal with every day, and it is voluminous.

And what makes this situation just in my opinion outrageous is because after, as we all know, it was the $700 billion bailout, approximately 75 percent of these subprime mortgages now are insured or underwritten by the government. Why does that become so significant? Because if in fact a mortgage is underwritten or guaranteed by Fannie Mae or Freddie Mac, when the banks and lenders throw these people out in the street they get paid the full mortgage value. That is why it is a bonanza in Michigan. Michigan property values have dropped in some areas up to 70 percent.

So for instance, I have a client whose fair market value is going between 12,500 and $15,000. Well, the mortgage balance on the home, being the adjustable rate predatory mortgage is close to $200,000. Guess what, if they are successful, in throwing that individual out of their home, they don't get the full market value, they get that full mortgage value. Therefore, why is there any incentive for any lender to work with anybody when they are being paid the full mortgage value?

Now this was really brought to light in the New York Times article on October 18th of this year. The article is about Bank of America, who is a perfect example, it is the same across the board. It talked about them resuming their foreclosures after the robo-signing issue. And what is significant about that article is because on page 2 it talks about of the 14 million mortgages that Bank of America holds, Fannie Mae and Freddie Mac underwrite one-half of them to the tune of $2.1 trillion. Layman's terms, if Bank of America forecloses on all of those underwritten loans by Fannie Mae and Freddie Mac, they would

make $2.1 trillion. Again that is why my clients who sent
paperwork in for modifications, 2, 3 4, 5, 6, 7 times, I turn
around as an attorney send it in 2, 3, 4, 5, 6, 7 times,
certified mail, green card receipt, we haven't received the
document and they are moving their house to foreclosure. That
is why that occurs, that is why. People who are going to trial
modifications, who have paid 3 months, 6 months, 9 months take
their money. All of a sudden say, oh, by the way, after paying
the trial modification for 9 months, you don't modify. Next
thing they know because we are nonjudicial they have a sheriff
sale tacked to their door and they are the host house for the
sheriff sale.

This is just getting outrageous, and I challenge this
Committee and Congress to do this, I believe this will be a
very telling statistical aspect--and I know my time is running
out.

Fannie Mae and Freddie Mac always talks about how many
houses they have sold, which is true, because in Detroit you
can get a beautiful house for 10, $15,000. Someone needs to
compare the numbers, how much money was paid to the banks for
those mortgages versus how much money was made from the sale of
those homes. And I can assure you for Michigan it will be an
outrage, because basically we are bailing out the banks in a
silent bailout with these guaranteed mortgages and there is no
incentive to work with the borrowers.

Thank you.

[The prepared statement of Ms. Fluker follows:]

                Prepared Statement of Vanessa Fluker


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]


                      _____


    Mr. Johnson. Mr. Deutsch?

    TESTIMONY OF TOM DEUTSCH, EXECUTIVE DIRECTOR, AMERICAN
          SECURITIZATION FORUM, NEW YORK, NY


    Mr. Deutsch. Representative Johnson, Members of the
Committee, my name is Tom Deutsch. And, as the executive
director of the American Securitization Forum, I appreciate the
opportunity to testify here today on behalf of the 330 ASF
member institutions who originate the collateral, structure the
transactions, serve as trustees, trade the bonds, service the
loans, and invest the capital in the preponderance of
residential mortgage-backed securities in the United States.

    In my prepared statement, I highlight some of the key
aspects of securitization as well as its critical importance to
the U.S. and global economy. Importantly for this hearing,
there are nearly 55 million first-lien mortgages in America
today that total approximately $9.75 trillion of outstanding
mortgage debt. Approximately three-quarters of this debt, or
about $7 trillion, resides in mortgage-backed securitization
trusts and are beneficially owned by institutional investors in
the United States and around the world, such as pension funds,
mutual funds, and insurance companies.

    But in my remarks today, I seek to address specifically the
concerns raised by a few commentators, that securitization
trusts may not actually own the $7 trillion of mortgages that
are contained within those trusts. For example, a recent
Congressional Oversight Panel report has even suggested that

these issues could create systemic risk to the banking sector
if loans weren't validly assigned to the securitization trusts.

But the concerns that have been raised have not been
supported by substantiation that there are, in fact, signs of
systematic fails in the process of assignments. Indeed, the
origin of these concerns is not clear. They are not the result
of a series of new court cases supporting the legal arguments
advanced, but instead appear to be largely the result of novel
academic theories. In fact, even the Congressional Oversight
Panel report states that, quote, ``The panel takes no position
on whether any of these arguments are valid or likely to
succeed,'' end quote.

So all of these dire consequences flow directly and solely
from a single mistaken core premise--that is, the trusts, and
ultimately the institutional investors such as pension funds
and mutual funds, don't actually own the $7 trillion of loans
in those trusts. As discussed in great detail in my written
testimony, this core premise is incorrect. And, therefore, the
dire consequences of this faulty premise will not follow.

Just last month, the ASF issued a white paper on this
subject that is part of our written testimony that puts to rest
many of the questions that have previously been raised by the
ownership of mortgage loans. In that white paper, ASF
exhaustively studied traditional legal principles and
processes, including the Uniform Commercial Code, or UCC, and
substantial case history throughout every one of the 50 U.S.
States and the District of Columbia and found that traditional
legal principles and processes are fully consistent with
today's complex holding, assignment, and transfer methods for
mortgage loans. In fact, 13 major U.S. law firms, listed in
Exhibit A to the ASF white paper, reviewed it and believe that
the executive summary contained therein represents a fair
summary of the legal principles presented.

Although the ASF white paper answered many of the concerns
that have previously been presented, some new concerns have
been raised since that white paper was published. For example,
one commentator has proposed that securitizers have not met the
contractual requirements for a complete or unbroken chain of
endorsement.

In our written testimony, we rebut this novel academic
theory in great detail, with analysis of key contractual
provisions, the intent of the contracting parties, industry
custom, independent third-party trustee acceptance, as well as
relevant caselaw and UCC applicability. In particular, this
argument overlooks the fact that each separate step in the
chain of transfers of ownership by each party, from the
originator to the securitization trust, is fully documented by
a separate contract.

The proposition itself, though--that securitization legal
professionals have uniformly opted out of the applicable laws,
such as the UCC, to set an even higher bar for transfers but
then subsequently and systematically ignored that higher bar--
appear on their face to be illogical assertions and,
ultimately, as a legal analysis in our written testimony
demonstrates, are patently false.

From time to time, though, mistakes will occur. And they
certainly do occur, particularly in a market where 55 million
mortgages are being serviced and in the worst housing crisis
that we have seen since the Great Depression. But those
mistakes do need to be addressed. But the contractual
provisions of the Pooling and Servicing Agreement and other

underlying documents allow for those mistakes to be corrected over time.

In conclusion, the ASF greatly appreciates the opportunity to appear before this Committee today. And I look forward to answering any questions the Committee Members may have. Thank you.

[The prepared statement of Mr. Deutsch follows:]
                    Prepared Statement of Tom Deutsch


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]
                    _____


    Mr. Johnson. Okay. Thank you, Mr. Deutsch.
    And if the panel will allow me just a couple of seconds to consult.
    Okay. Mr. Peterson, your testimony, please.

  TESTIMONY OF CHRISTOPHER L. PETERSON, PROFESSOR, S.J. QUINNEY
     COLLEGE OF LAW, UNIVERSITY OF UTAH, SALT LAKE CITY, UT

    Mr. Peterson. Mr. Chairman, Ranking Member Smith, other Members of the Committee, thank you for the opportunity to testify.
    If the long scope of history teaches us one single lesson, it is this: that, sooner or later, the powerful folks in society are going to come and try to take the land from the less powerful folks.That is an immutable lesson from history. And if you learn nothing else from it, that is the truth about the human species. And I think that that is what we are seeing today.
    One of the first things that the European colonists that came over from Europe did, before they set up the United States Constitution, before freedom of speech, before separation of church and state, before any of our constitutional principles, all 13 original colonies passed land title recording statutes that established real property records in the control and custody of democratically elected county recorders or county officials.
    So the people who got to decide who owned the land was the first thing that they set up. And they did that because, in Europe, there was an understanding that, sooner or later, the rich folks were going to come and try to take the land from the poor folks. And that legacy of certainty and real property ownership has been around in our country for a long time, and it is something that we have come to take for granted. We had that, and many other countries don't.
    But in the 1990's, the mid-1990's, the Mortgage Banking Association decided that they no longer wanted to pay the fees that were required since the beginning of the Republic to record documents with county officials. So they decided to create a shell company that would pretend to own all of the mortgages in the country. That way, they would never have to pay another fee for recording an assignment as those mortgages changed hands in the process of securitization. And, overall, this wasn't going to save that much money, but on any given loan maybe they would save $200, $250, plus the hassle of recording.
    And they did this without any permission from the State legislatures or without any authority from appellate courts that said that they could do that. This was a radical and fundamental change in the real property recording system.

The name of the company that does this is called MERS, or
the Mortgage Electronic Registration System. It is one of the
currents in the foreclosure crisis that really hasn't been
played out in the press and it hasn't been discussed in
Congress to the extent that I think it should. And my testimony
is going to focus on that particular company.

First, I believe that MERS is an anti-democratic
institution. It undermines not only the democratically elected
county recorders and circumvents the democratically adopted
State legislatures' land title statutes, but it also
circumvents the States' rights by creating a shadow company
that is owned by Wall Street banks and insiders and is operated
outside of Washington, D.C., without any oversight from the
Federal or State governments.

Second, I think that MERS is not only anti-democratic, it
is deceptive, and it doesn't work well. Because there is so
much legal uncertainty since they created a new legal system
without any cooperation from legislatures, it is not clear
whether or not their claims of owning mortgages are actually
valid or will be ratified over the long term as State appellate
courts look into it further.

Also, I would submit that the MERS system stymies
modification of mortgages. Families that are in the foreclosure
process oftentimes get a notice from this company called MERS
and don't understand who it is or whether or not they can
negotiate with that particular company. It makes it more
difficult and more confusing for borrowers at precisely the
time when they are most vulnerable, on the eve of foreclosure.

A couple of solutions that I would suggest for the
Committee to consider:

It seems to me that Fannie Mae and Freddie Mac, as well as
FHA and the VA and other Federal housing finance agencies,
ought to stop buying mortgages that are recorded through this
exotic and unprecedented system. We still have a legal system
that is safe and reliable. Why is the Federal Government still
buying mortgages that are recorded in untraditional ways? Not
only does it ratify the undemocratically motivated initiatives
of the financial services industry, but it also imposes risks
on the taxpayers because it is not certain how these legal
issues are going to be worked out.

I would also suggest to the Committee that we ought to
consider some new ideas in trying to incentivize modifications.
Here is one: Why don't we create a one-time emergency homestead
exemption of $15,000 that allows the first $15,000 in proceeds
of a foreclosure sale to go to the family as opposed to the
servicer. It is a little bit like a compromise between the
cram-down legislation that had been considered earlier, but it
is much more simple. It would be easy to administer.

The first $15,000 in proceeds goes to the homeowner. That
creates incentive for the homeowner to not drag their feet and
fight out long foreclosure battles because there is $15,000
that they can spend on getting a deposit on a new apartment and
the first month's rent and getting the kids in a new school.
Also, it creates some real incentives for servicers and the
investors to really get serious about modifying mortgages.

And, unlike the HAMP program, it doesn't cost taxpayers a
dime. Congress could do this with its Commerce Clause
authority, I believe. And it would be a real meaningful fuel
injector in the foreclosure system that might actually do some
good, whereas the current programs are not doing any good and
are failing.

Thanks for your time.

[The prepared statement of Mr. Peterson follows:]
    Prepared Statement of Christopher L. Peterson


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

_____


Mr. Johnson. Thank you, Mr. Peterson.

This hearing has released to the public some very spectacularly devastating information about the mortgage industry in this country as it works: Mr. Kowalski, having put three people on death row in Florida as a criminal prosecutor, who is now handling mortgage fraud, foreclosure fraud cases, discovered back in 2003 the robo-call, the robo-signing phenomenon that has been quietly permeating the foreclosure process for perhaps years prior to that time. No telling how long. And then Mr. Cox having uncovered from the master robo-signer--or the current master robo-signer--his practices, which are fully in keeping with GMAC mortgage practices, just devastating.

And then Ms. Hines, to put the human face on how this drama affects people, real human beings and real families. And Ms. Fluker coming forward with testimony about Fannie Mae and Freddie Mac and how the taxpayers ultimately are on the hook for the full value of these mortgages even though the collateral now is not worth the paper that it is written on, in some cases.

And then Mr. Deutsch having some expertise in how this system works. And Mr. Peterson then coming forward from the early annals of history of America about the importance of title to land to the settlers, how important that was, and bringing us up to date now on how the mortgage industry has sought to evade recording fees for documents, assignments of mortgages, and have put in place this concept of the Mortgage Electronic Registration System, Incorporated.

Can you tell us, Mr. Peterson, a little bit more that that entity?

Mr. Peterson. Sure. The company operates a database. Think of it as a big Microsoft Excel spreadsheet. And members of the system can enter information onto that database about the ownership of the loan or who owns the servicing rights of the loan.

But the tricky part that makes it legally problematic is that, in order to justify not recording those assignments, as the promissory note gets transferred to various companies on toward securitization, the mortgages list MERS as the mortgagee on the loan. The mortgagee, of course, historically, is the same person as the lender, and it is the one who owns the right to foreclose, owns the lien.

And it is very controversial, I think, from a legal perspective whether or not MERS can be a mortgagee because they don't actually invest in the asset, they don't make any loans. And now three State supreme courts--Maine, Arkansas, and Kansas--have all held that, in various contexts, MERS actually is not a mortgagee.

And it creates some real inconsistency with the position of the securitizing banks and the trustees that manage the pools of loans because they also claim to own the mortgage. They need to do that because otherwise their investors will be upset, as Mr. Deutsch pointed out----

Mr. Johnson. Let me stop you here.

Mr. Peterson. Yes, please, I apologize.

Mr. Johnson. Who owns--or who are the participants in MERS? Who are the owners of MERS? And does MERS have the ability to cut through the rigamarole that the attorneys, Mr. Kowalski, Mr. Cox, and Ms. Fluker, have to deal with in terms of establishing a chain of title, if you will? Does MERS have the ability to be of assistance in terms of running that title down?

And I would like to hear from each of the witnesses about that.

Mr. Peterson. Well, it is a great question. MERS is owned by Fannie Mae, Freddie Mac, and also all the big banks, Bank of America, Citi, et cetera. That is who owns it.

Can MERS cut through the rigamarole? My answer is no; MERS actually exacerbates the rigamarole. Why? Because MERS is just a shell company. They don't have many employees. So they have what are called--they have about 20,000 so-called ``vice presidents.'' And these vice presidents become vice presidents by getting a boilerplate corporate resolution--I am using air quotes, for the record--corporate resolution. I am not sure that it really is that.

But they get this corporate resolution off the Internet. And these are really customer service representatives, paralegals, workers for servicers that pretend to be vice presidents of MERS. And they are the same people, in many cases, that were the so-called ``robo-signers.'' So vice presidents of MERS are pretending to be--employees are pretending to be vice presidents of MERS when they go about doing this robo-signing nonsense.

So I don't think that MERS has helped clear up the system at all. It makes it more difficult for homeowners to understand what is going on. And it creates confusion and, I think, even deception in the system.

Mr. Johnson. All right. Thank you.

Mr. Kowalski?

Mr. Kowalski. If you look to--and I understand you wouldn't have it in front of you--but if you look to Exhibit 6 that I filed with the Committee, you will see a MERS assignment. It is an assignment that purports to have been signed on behalf of First Horizon Home Loan. It is actually signed by an office manager of the law firm that is foreclosing in this case.

And when I finally received, for example, the purported power of attorney that allowed the office manager to sign hundreds of these without knowing whether any true transfers took place at all because it is not part of her law firm office manager job description, I received a power of attorney that is also the next document in your Exhibit 6 that plainly makes clear that she doesn't even have authority to have signed the affidavit that she knows nothing about.

So, in short answer to your question of whether MERS helps make the process more transparent and solves issues, for the courts in particular, the answer is clearly no.

Mr. Johnson. Thank you.

Mr. Cox?

Mr. Cox. Representative Johnson, MERS has proven to be a significant problem for us in Maine. MERS claims that it has the right to foreclose mortgages in its own name. MERS has admitted that it does not own any loan; it never has owned a loan. MERS has no right to collect payments on any loan. It admits that. But yet it claims that it has the right to foreclose mortgages.

In Maine this summer, we went to the Maine Supreme Court, and we obtained a decision in the case of MERS v. Saunders, which explicitly held that MERS does not have the right to conduct foreclosures.

MERS seeks to get around that problem by a subterfuge. Jeffrey Stephan is a MERS vice president, in addition to being an employee of MERS. What MERS tells people like Mr. Stephan is that, when MERS wants to foreclose in its own name, Mr. Stephan should get out his MERS hat for a moment and put it on and call himself a MERS vice president. And in that moment, he should take possession of the promissory note that belongs to GMAC, perhaps, and hold it in his hand. And at that moment, MERS owns it, they claim. And because of that, MERS claims that, from there on out, it can go forward and foreclose.

This is a subterfuge on homeowners and lawyers all over the country, who don't even know who owns their mortgage and who they should deal with in trying to handle foreclosures and negotiate modifications.

Mr. Johnson. Thank you.

And I will be vacating this seat perhaps during Ms. Fluker's response to the question. And I would also ask you to respond, as well, Mr. Deutsch. And the reason why I will vacate the chair is because the Chairman is back.

Thank you.

Ms. Fluker. MERS is a problem in Michigan, as well. As stated earlier, Michigan is a foreclosure-by-advertisement State. That means it is done statutorily. In Michigan, in order to have a valid foreclosure on a property, you are supposed to be able to show that you have an ownership interest in the indebtedness. MERS cannot have an ownership interest in the indebtedness, because if you look at MERS's title on every mortgage, MERS is solely the nominee for the mortgagee.

However, because of the changing of hats, so to speak, of the affidavits that are submitted, it has become a split issue in Michigan. There are cases up on appeal right now. There are judges who say, ``Hey, this doesn't make sense. There is no ownership interest.'' There are others that have said, well, because of the contractual relationship with the mortgage document, that they could have some standing.

The bottom line is MERS is merely, as Mr. Peterson said, a shell corporation. If you look at their Web site, they strictly hold themselves out to be a recording agency. Caselaw from Nebraska and Kansas has indicated that they do not do any servicing on the loan, meaning they don't accept payments, they don't hold the mortgage. Therefore, it almost seems kind of commonsensical that they don't have an ownership interest in the loan. Yet they continue to foreclose independently without stating the actual lender or servicer, which has obviously exacerbated and complicated the foreclosure matter even worse than it already was.

Thank you.

Mr. Deutsch. In 2010, we have 55 million mortgages transferring through the system. In the 1600's, when our land title property records were created--I can't give any kind of significant detail to that, but I am guessing we were in the hundreds, maybe thousands of things being recorded.

Our complex financial system has expedited the speed at which mortgages move through the system, whether they are originated or they are transferred--certainly a much more complex system. That complex system, though, has enabled a massive increase in homeownership in America over the course of

the past 20, 30, 40 years. MERS has played a part of that, just
as the securitization process has played a critical part of
that, to allow additional access to credit.

MERS acts as a transfer of the title of the mortgage loan.
That is, as an originator originates the loan, they may sell it
to a subsequent purchaser, who then may sell it to another
purchaser, who then ultimately securitizes it. And by that
securitization process, you are able to link the process of
originating the loan with institutional investors, such as
pension funds and mutual funds, who are looking to invest money
to effectively lend, through the securitization process, money
from the mutual funds and pension funds directly to homeowners.

And MERS acts as a recording agent so that you are able to
track the ownership of that mortgage from ultimately the
originator to the ultimate investor who owns those loans. The
process of doing that allows for the additional creation of
credit.

Moreover, MERS does act on behalf of the trust. And in a
majority of jurisdictions throughout America, it has been found
that MERS does have the ability to foreclose in their own name.
But in many jurisdictions, or in those jurisdictions that have
been cited before, servicers are transferring the ownership
interest out of the MERS name and into the name of the trust,
who is the beneficial owner.

So this is a question of technicality as to who can
foreclose, not to whether foreclosure can occur.

Mr. Johnson. Thank you.

Mr. Conyers. [presiding.] Well, thank you very much, Mr.
Johnson, for stimulating all of the witnesses to the response.

I would like to now turn to the distinguished gentleman
from Arizona, Mr. Trent Franks.

Mr. Franks. Well, thank you, Mr. Chairman.

And I thank all of you being for being here.

Let me start by suggesting, Mr. Peterson, that your opening
statement was very compelling to me. You know, there is an old
Iroquois quote that says, the secret to the universe is in the
true naming of things. Sometimes clarity and specificity are
very, very important. And I think that that applies
fundamentally to property rights. And I want to ask you some
questions about that in the course of the moment here.

But I was also touched deeply, Ms. Hines, by your
testimony. And I want to be very careful how I respond to that,
because it seems to me that for 40 years your family did pretty
well until government came along and kind of messed things up.

And I would suggest that Ms. Fluker's comments were also
very compelling, in that we have created a system because of
government's involvement that now we have actually created a
disincentive for banks to work things out with the homeowner
because they, for understandable reasons--I mean, we have a lot
of major pension fund people that have contributed, or I should
say invested in these things and we are trying to hold the
system together.

But the end result, Ms. Fluker is correct; the end result
is that, because of government involvement here and the lack of
market discipline that comes with government involvement that
seems to hold the system together, we are in a situation now
where banks have an incentive oftentimes to foreclose rather
than to work things out with the homeowner. And I think there
is something desperately wrong with all of that.

It is ironic that, when this republic was first put
together, one of the comments of the Founding Fathers was

that--you know, when they were asked, what have you given us?
The response was, well, we have given you a republic if you can
keep it. And it seems like we forget that the Founding Fathers
knew that sometimes government had the power to waste the
substance of its people under the pretense of taking care of
them.

And I really believe that government here, and with all
good intentions, has caused a great deal of chaos and lack of
specificity and a lack of market discipline that has created a
lot of these problems. So, in a sense, I am afraid that
government is as much a part of the problem as it is any
possible solution.

With that, Mr. Peterson, if I could speak to some of your
comments related to MERS. In your testimony, you actually
question the legality of the Mortgage Electronic Registration
System--I am saying that so everybody understands what it is--
which, of course, is the MERS system that has been talked about
here quite a lot. And I think it is a very significantly
important subject since about 60 percent of the Nation's
residential mortgages are recorded in the name of MERS, Inc.
And the legality of this obscure entity should be either
established or addressed. It seems very clear that this is a
big issue.

You lay out MERS's dual and seemingly conflicting claims of
acting both as agent and principal in mortgage deals. And you
describe the incoherence of MERS's legal position as, quote,
``exacerbated by corporate structures that is so unorthodox as
to arguably be considered fraudulent.'' Well, I have to tell
you, I agree with you completely; there is no disagreement
here. Clarity here is lacking. And I understand that there was,
you know, an effort to do something good here, but the clarity
was lost in the process.

So can you elaborate any more? Is there anything else that
you want to say about that that you haven't already said?

Mr. Peterson. Well, thank you for the respectful comments.

Yeah, I think that I would like to add that, you know, MERS
is significantly depriving county governments of revenue, which
I think is another potential problem. Nobody likes taxes, I
don't like taxes, but, you know, if we are going to no longer
require or no longer facilitate recording assignments between
mortgagees down the chain into securitization, then it needs to
be the legislatures that decide that we are going to do that.

And also, speaking to the legality issues, you know, there
was no State legislature that adopted a statute that said that
they could do this. And what is more, they are going to drag up
some cases here and there from, you know, this era or that era
saying there is some nominal form of recording that is allowed
and you could still successfully perfect a mortgage. But, look,
there has never been a situation where the facts would arise
before an appellate court that replicate these facts. We never
tried to have one shell company try to own all the mortgage
loans in the country before, so they are not going to find any
case that says that that is legal that a Supreme Court can't
distinguish.

So the reality is that we are going to have some real
uncertainty about whether or not these loans are perfected and
even, potentially, whether or not mortgage loans are
enforceable. And that is something we are going to have to deal
with for the foreseeable future.

Mr. Franks. So you believe that it has kind of become an
anti-democratic institution and that it has fundamentally

weakened or diminished the clarity of property rights itself?

Mr. Peterson. Yes, I believe that. And, I think, increasingly, there are title insurance companies, especially the independent, smaller title insurance companies, that are starting to come to that recognition, as well. I believe it does decrease the certainty of property rights in our country.

Property rights are a function of law. Right? Law is what creates property rights. And if you have the new oracle, the new definer of who owns something be an institution that is created by an industry trade association, as opposed to a State legislature or an appellate court, in a country that purports to be a democratic republic, you have just introduced all sorts of uncertainty into the system. It is not clear whether or not the structure that they set up without permission is going to be recognized by the courts as legitimate.

And that is not just a bleeding-heart/professor/liberal comment; that is a decrease in an economic resource that industry and consumers alike have relied upon. There are a lot of countries out there where nobody knows who owns the land. And so it makes us less likely to invest in the land, it makes us less certain about whether or not we want to start businesses or build homes, because you can't be certain that, you know, 10 years down the road, some strong person might come and take that from you. We have lost some of that certainty by losing the effectiveness of our State and county real property records.

Mr. Franks. Thank you.

Mr. Chairman, if I could just ask Mr. Deutsch to respond to that, because I know that he had some potential dissent here, and I wanted to give you a chance to do that. Then I am prepared to yield back.

Mr. Deutsch. Thank you, Mr. Franks. And certainly, for the record, I do have strong dissent with Mr. Peterson's comments.

In I believe it is 46 States, the validity of MERS to effect a foreclosure has been upheld by the State judiciary. In a minority of States, in four States--I think all four of them have been mentioned--there has been some question as to whether MERS itself can initiate the foreclosure. But, in those instances, the mortgage loan could be transferred out of MERS's name and into the beneficial owner's name, whether that is a trust or another investor, to be able to initiate the foreclosure.

So there is very clear legal property right for MERS or any other system to be able to foreclose. There is no question as to the property rights.

To the second question and the second issue as to the recording fees, I think there is a very strong reason why we don't want to pay recording fees that don't do anyone any good. Particularly, as it pertains to Dodd-Frank, which was just passed, there is a specific provision that does provide the opportunity for any borrower to be able to find out who owns their loan. So that has been addressed in another means, in a Federal legislation.

But I think the critical component for MERS is to be able to allow the facilitation and transfer of mortgage loans in the secondary market system to help keep mortgage loan costs as low as possible.

Mr. Franks. Thank you, Mr. Chairman.

Mr. Conyers. Thank you, Trent Franks. An interesting line of questioning.

Did anyone, before I recognize Howard Coble, want to make

any comment about this discussion so far? Mr. Kowalski and Mr. Cox?

   Mr. Kowalski. One quick point, if I could, Mr. Chairman.
   With regard to the issue of whether or not MERS is transparent and tracks investors, I have a MERS screen print from the MERS servicer ID system that I printed off last week for another issue.

   And just as an example, when a HUD counselor is trying to do a loan mod, one of the things they are constantly being told is they need to know what the investor guidelines are--investor guidelines, investor guidelines. The actual reality is the servicers control everything, and the servicers, if they are interested in the loan mod, don't even talk to the investor.

   But this is a MERS servicer ID from last week. The servicer is GMAC Mortgage. Investor: Quote, ``This investor has chosen not to display their information. For assistance, please contact the servicer.'' So if you are trying to find out who owns your loan from the MERS system, you can't do it anymore.

   Mr. Cox. Mr. Chairman, with all due respect to Mr. Deutsch, I suggest that he is perpetuating a myth that MERS has been spreading about the country.

   Maine is one of the first State supreme courts to address the legitimacy of MERS's right to foreclose mortgages, and it did so this summer, and it said that they have no right to foreclose mortgages.

   Almost no other States and their supreme courts have addressed the issue. There have been a number of lower-level trial court decisions going both ways. But when Mr. Deutsch suggests that 46 States have blessed the concept of MERS foreclosing mortgages, I suggest that he is not being accurate.

   Mr. Conyers. Attorney Fluker, your silence isn't kidding me one bit.

   Ms. Fluker. Thank you, Chairman. I definitely would like to address the issue, as well.

   One thing that I think is very important is that the emphasis has been on MERS, recording, the assignments, things of that nature, but that is what the problem is. Even though, as Mr. Deutsch indicated, while MERS can assign it back to the servicer, who can then foreclose or assign it here or there, but all those assignments are not establishing who has the ownership interest in the debt, who actually owns this mortgage and this loan. And that is the problem.

   You can go all the way through litigation. I have a case right now. We have been to Federal court; we are back in State court. And at the end of the day, we found out when they foreclosed there wasn't even a deed. There was no chain of title for the ownership of the mortgage. And 6 months after the sheriff's sale, a, quote/unquote, ``affidavit of lost deed'' was filed, signed by the same person who has been the corporate resolution person for a zillion different other companies and MERS. So, I mean, you know, there is questionability as to the legitimacy of that.

   But that is one of the major problems with MERS, is you cannot determine strictly from a MERS assignment who has the ownership interest in the debt. And when you challenge it, there is no way to track back because MERS is solely a recording agency and is not a servicer or a lender.

   Mr. Conyers. The Chair now recognizes the distinguished Chairman of the Subcommittee on Crime and also a distinguished Member of the Budget Committee, Bobby Scott of Virginia.

   Mr. Scott. Thank you, Mr. Chairman.

Let me just follow up on that. If a person buys property at foreclosure, who do they buy it from?

Mr. Peterson?

Mr. Peterson. It is not clear. The title to the land is still--the fee simple ownership of the land is still deeded in the homeowner. But there is a lien on the land, and the lien is recorded in the name of MERS. Now MERS has to come and file a release of the lien. But it is never clear whether or not the person that is acting on behalf of MERS--remember, this is not a real employee of MERS; this is a vice president that is an employee of some other company--it is not clear whether or not that person is the appropriate individual to release the lien. So, basically, we just have to trust the----

Mr. Scott. Well, release the lien is one thing, but the fee simple title, who transfers title?

Mr. Peterson. MERS says that they are filing a release of the lien, and then the homeowner buys fee simple title from the previous homeowner.

Mr. Scott. Well, the homeowner is being foreclosed on. I mean, they don't sign anything. I mean, if you are doing a title search and you see a foreclosure in it, you see the owners bought the house, the mortgage is recorded. The next thing you know, somebody else owns the house. Who transferred the title?

Mr. Kowalski. In judicial foreclosure States, when there is a sale, the clerk's office transfers title to the bidder at the sale, which is almost always, unless there is equity in the property, is almost always the foreclosed entity.

A servicer in Florida--in Florida, typically we see servicers foreclosing in their own names. So when the title transfers, to make this issue even more confusion, instead of the investor trust transferring, you have the servicer purporting to transfer on behalf of the investor trust through the local clerk's office without any intervening assignments or true transfers being recorded as the headache for the title company down the road.

The perfect storm of that is in my Exhibit 1, which is where you have two securitized trusts, both alleging they both own the same note, foreclosing on the same house at the same time. So to add a further layer on it----

Mr. Scott. Two different buyers?

Mr. Kowalski. Well, it is an active foreclosure. So it is two different securitized trusts through two different servicers, both alleging in the paperwork they file with the court--and, in one case, swore to under Florida's recent civil procedure amendments--alleging they each own the same note and are foreclosing on the same house at the same time.

I have also cited a Florida appellate court decision where one of our appellate courts reversed on the same fact pattern, to add another layer to this issue of what exactly the clerk is transferring when a clerk in a judicial foreclosure State actually transfers the title.

Mr. Scott. Mr. Cox?

Mr. Cox. Representative Scott, a related problem--and, again, I have to address some of the testimony from Mr. Deutsch. He has described how, in some instances, MERS will assign a mortgage backout to a foreclosing party other than MERS. I would say, in 20 to 30 percent of the cases that I encounter, when MERS is doing that--and I can give a specific example.

We have a case in Maine where a mortgage was granted to

7/7/2015 12-12020-mg Doc 8862-18 FOR DISTRIBUTION Filed 07/09/15 CUSTOMERS Entered 07/09/15 13:39:14 18 C     Exhibit

Exhibit 5.- Hearing H. Comm. on Judiciary Pg 82 of 97

MERS as nominee for First National Bank of Arizona. Last year, MERS assigned that mortgage backout to another banking institution as nominee--purporting to act as nominee for First National Bank of Arizona. The OCC had closed that bank a year and a half earlier. MERS had no power to act for that bank at the time that it made that assignment. And it is leaving in its wake a massive title problem all across the country because of this.

Mr. Scott. I want to get to another issue, and quickly in the time I have left, and that is on the accounting principles, whether or not there is something in accounting principles that create disincentives for the banks to work with people.

I understand that if there is a short sale, the bank has to realize the loss right then and there. However, if there is a foreclosure, in which case they are going to end up with less money, they don't have to realize the loss, according to accounting principles, until much later. So if the bank is kind of on an edge and wants to keep their books as fat as possible, they are better off going into foreclosure because they don't have to realize the loss, rather than a short sale, which is in everybody's best interests--the homeowner, the new buyer, the bank actually.

Are there disincentives in accounting principles that we might want to address to encourage people to do what is in everybody's best interest, rather than allow the fraud of allowing banks to have on their books assets listed at values that are not realistic?

Ms. Fluker. I would like to take that question first, if it is okay.

One of the major problems, as I articulated somewhat but didn't go into detail in my testimony when I began, was that such a large percentage of the loans now are insured by the Federal Government--Fannie Mae and Freddie Mac.

Now, let me be clear. Under the Making Home Affordable program, there is a specific hierarchy of loss-mitigation procedures that should be followed. First, you should be looking at the borrower's loan to see if they are eligible for a modification using the formula articulated in their supplemental guidelines, looking at the 31 percent of the income, things of that nature.

If, for some reason, there is not the financial possibility or feasibility of modifying that loan, you are immediately to go to the next foreclosure alternatives, being short sale and deed in lieu. That, again, just like the modifications, are even less of a possibility from the mere fact--I know in Michigan you are looking at almost a 70 percent property decrease. And I would venture to say in other States, even though the property decrease may not be that significant, there is a decrease.

So there is every incentive to move forward with the foreclosure when you are getting paid the full mortgage debt plus the foreclosure fees, plus the costs, plus the attorney fees that the foreclosure attorneys charge to foreclose on these properties.

Mr. Scott. Wait a minute. On the short sale, the Federal guarantee of the loan does not kick in to make the loan whole?

Ms. Fluker. I don't believe it kicks in 100 percent. There are some incentives in place, but it is much more lucrative because you are getting the full mortgage debt at the foreclosure. At the short sale, the purpose of the short sale is that you are selling the property short of what the full

mortgage debt is. Therefore, there is not going to be the same level of profitability.

And, moreover, the way the structure is set up now, with the way the laws are set up, it is actually much more expedient to send someone out two modification letters, tell them you didn't receive their documents, shoot them to a sheriff's sale--which is very simple in Michigan because Michigan is a nonjudicial foreclosure. You don't have to go into court to foreclose on anybody in Michigan.

In fact, to show you how bad it is in Michigan and how disingenuous this process is, I have people I started representing at the eviction action still getting these form letters from their lender and servicer, saying, ``Hey, call us. We can help you. We can modify your loan.'' Why are they still getting those letters? It is because, under the supplemental guidelines of the Making Home Affordable program, they are mandated to reach out with solicitations to borrowers in order to remain eligible for those programs and receive those incentives.

So, in essence, there is an opportunity get one, two, three bites at the apple and then, at the end of the day, walk away with the whole basket because you get paid the full mortgage value on a property that is significantly less than that mortgage balance.

Mr. Scott. Mr. Cox?

Mr. Cox. Representative Scott, there are servicer fee incentives that really are at the fundamental base of this problem.

If you consider a situation--suppose a lender or a servicer is considering a short sale today versus carrying that property to a foreclosure 6 months from now. If the servicer approves a short sale today, its fee revenue for servicing that loan stops today. If they keep that on their books for 6 months, they earn fees for property inspection, broker opinions of value, forced placed insurance, and all of the other fees that continue to accrue until that house is finally sold at foreclosure.

When it sells at foreclosure for perhaps 50 percent of what the short-sale price would have been, the servicer suffers no consequence because it doesn't own the loan. The investor suffers the consequence. So the servicer incentives are to block short sales and to keep the property earning a fee revenue for them.

Ms. Hines. They created a whole new scheme in Michigan, where the thieves and the criminals go into the houses--as soon as the house is foreclosed on and the people are thrown out, they see the dumpster roll up, the next day the thieves go in, steal everything out of the home of any value, and so they leave the home a shell. And the banks still get money because the homes are insured.

And beautiful homes that were once appraised at $100,000-plus are reduced to being sold for $15,000 and $10,000 because the thieves went right in and stole everything that wasn't nailed down. So they created a whole criminal industry off of foreclosure and eviction.

Mr. Scott. Mr. Chairman, it seems to me that we ought to look into the financial incentives. And we have just heard how a foreclosure--people who are doing the foreclosure have an economic interest in getting less money at a foreclosure than they could have at a short sale. Everybody is disadvantaged.

And I think there are also some accounting principles where, when you realize the loss, it would give people an

incentive to just carry this phantom value on the books, creating another disincentive. And I think that is an area we need to look into.

Mr. Conyers. I would like Susan Jensen and Mr. Park to talk with you and me about the underlying problems, that we are actually encouraging the wrong thing to happen in this downturn that we are in. And I would like to explore that further with you, sir.

I would like to turn now to Howard Coble of North Carolina, but I don't know if he is Chairman-elect of a Committee again. He is a senior Member of the Committee. We are not sure what his future status will be after January 5, but I do know that he has been around here a long time, and we are proud to recognize him now.

Mr. Coble. Thank you, Mr. Chairman.

Mr. Chairman, I plead guilty to being a senior Member of the Committee. That is about all I know with certainty right now. But thank you for that. We will see. I will let you know. Stay tuned.

Thank you, Mr. Chairman.

Good to have the panelists with us.

Professor Peterson, let's visit MERS again. What role, if any, did Freddie Mac and Fannie Mae play in the creation of MERS? And what are these entities' current ownership stakes in MERS, if any?

Mr. Peterson. Well, they played a significant role. I think that the origin of MERS was at Mortgage Banking Trade Association meetings, where they cooked up the idea. Fannie Mae was a big part of that. I also think that Fannie Mae helped legitimize the agency--or this company. People saw Fannie Mae as being part of the government and saw that as, you know, a stamp of approval from the Federal Government.

Of course, you know, there are a lot of things about the GSEs that I really support and think worked well. Everybody disagrees about some of these points, but, you know, back in the 1950's and the 1960's, they really were helping create some homeownership, the GSEs were. But in the past 15 years, I think that they got out of hand and really became very profit-oriented businesses. And their support of Fannie Mae, in my mind, was because they were trying to shave a few dollars and cents off of their bottom line to help facilitate bigger commissions and bonuses for their management. That is what I think happened.

And so I think that Fannie Mae and Freddie Mac bear some responsibility in creating this MERS problem. And, at a minimum, we ought to get Fannie Mae and Freddie Mac to stop digging that hole deeper and, at least for the time being, not purchase any more MERS loans because of the risk that that is going to place on the United States Treasury.

And currently they still have an ownership stake in the--as far as I know, they have ownership stake in the MERS business.

Mr. Coble. Thank you, Professor.

Mr. Deutsch, several Members of Congress have proposed a nationwide foreclosure moratorium in response to the foreclosure documentation scandal. How would such a moratorium affect the housing market?

Mr. Deutsch. I think it would be catastrophic to the housing market. If you ultimately decline or disallow foreclosures to occur in situations where a modification doesn't work, a short sale doesn't work, ultimately the capital markets will freeze up. Mortgage funding will no longer flow to

new originations of mortgages. First-time homebuyers will not
be able to get mortgages. Because, simply put, the capital
markets will not put money into a mortgage process if a
borrower doesn't pay back that mortgage and they can't exercise
rights to the underlying collateral.

Mr. Coble. Thank you, sir.

Mr. Cox, Mr. Kowalski, or Ms. Fluker, either or all of the
three, you have testified regarding alleged abuses by servicers
in some cases. Courts, however, have procedural rules in place
to punish those who swear out false affidavits, mislead the
court in one way or another, or engage in other unethical
behavior.

Why are these mechanisms not sufficient?

Mr. Cox. Representative Coble, speaking for Maine, we have
a State judicial system that is in deep trouble. We have
judicial vacancies. We have vacancies in the courthouses.
Courthouse hours are being curtailed. The system is simply
being overwhelmed.

The problem we face is that the court system has enough
trouble dealing with its case flow and with a huge increase in
foreclosure cases that, so far, the States have been unable, at
the State level, to deal with this problem.

I would respectfully suggest there is a solution here in
Washington. Attorney General Holder last commented on this
issue back on October 6th when he talked about foreclosure
irregularities, and he has not been heard from since. And I
respectfully suggest that if criminal charges were considered
across the country, you would see a significant change across
the servicing industry in incentives for getting away with what
they have been getting away with.

So I suggest that a solution countrywide--because this is a
countrywide problem--exists here if somehow the Attorney
General's office can be led down this road. I met with the U.S.
Attorney in Portland, Maine, a month ago to discuss this. And I
sensed, from his feedback to me, he is waiting from word from
Washington.

Mr. Coble. Thank you.

Either of the other two want to be heard?

Thank you, Mr. Cox.

Ms. Fluker. Thank you for your question.

First and foremost, so much of this turns not only on just
there being the potentially fraudulent or faulty paperwork. I
am from Michigan. Michigan is a nonjudicial foreclosure State.
Therefore, technically, there is no paperwork until the person
gets to the eviction stage. You have a sheriff's sale. A
posting is put on an individual's house. The first time they
actually see any paperwork regarding that foreclosure is when
they get to eviction.

Eviction hearings in Michigan are handled by the State
district court. It is an expediting hearing. You get the
eviction notice; the hearing must be within 7 days of that
notice. So, literally, you are looking at documentation--if, in
fact, the borrower has representation, which 99.9 percent of
the time they don't. But if they do have documentation, it is
only at that point that you have the ability to review those
documents.

And, as Mr. Cox indicated, you have an overwhelming
scenario with the court system. Many times they are, you know,
unable or unwilling because of their caseloads to take the time
to--literally, you are going back and reviewing the whole chain
of title. So it puts borrowers at a disadvantage.

Mr. Coble. I thank you.

Mr. Chairman, I see my red light has illuminated. May I hear from Mr. Kowalski?

Mr. Kowalski?

Mr. Kowalski. In Florida, yes, to answer your question, the State bars are looking at this. Our State attorney general has not been active on this issue, although I understand there is a collection of 50 State attorney generals that are looking at it.

But part of the problem, in terms of the Federal Government's response, is this: The banks have always come here and said, we do not want to be regulated by the States; we do not want to face 50 different jurisdictions; we do not want the State attorneys general and individual State regulatory agencies to regulate us because we are national concerns.

They have come to Congress and said, make us immune, under the National Bank Act and other acts, make us immune from the meddling of individual States. And that is what has happened. So, as a result, these are national banks. They are regulated by the Federal Government agencies. And, in many cases, the need for transparency, which has been addressed over and over again today, is a Federal issue.

Mr. Coble. Thank you, sir.

I yield back, Mr. Chairman.

Mr. Conyers. We have only a few minutes before voting, and I want to divide that time between Mel Watt and Elton Gallegly.

Mel?

Mr. Watt. Do we know how much time we are dividing?

Mr. Conyers. Well----

Mr. Watt. I will just take my time, and you cut me off whenever you get ready.

Mr. Conyers. Ask the fellow to find out. He is on the phone right now.

Mr. Watt. Well, they haven't called votes, so we would have at least 15 minutes after they call votes. So I think we can get through in regular order here.

Let me thank my colleague from North Carolina, Howard Coble, for starting down a chain of questions that I wanted to try to pursue related to Fannie Mae and Freddie Mac's involvement with MERS.

I noticed that the former administrator of the Federal Housing Finance Agency is here in the room, and maybe he should be at the witness table.

But let me just ask Mr. Deutsch, what is your understanding of Fannie and Freddie's involvement with MERS?

Mr. Deutsch. I don't have a detailed understanding of the corporate governance relationship with MERS. They are some part owners of the MERS registration system. I don't know the percentage of that ownership, but they are part owners. And----

Mr. Watt. So how could a private registration service take the place of State laws that require establishment of a chain of liens and ownership through title transfer records?

Mr. Deutsch. I don't think MERS takes the place of the State laws. MERS operates within the State laws that have been held up in a majority of jurisdictions.

Mr. Watt. So when a mortgage comes to MERS, does it record that mortgage in the State registries?

Mr. Deutsch. When a mortgage is originated, let's just say at the very beginning of the process, it will be filed by MERS as an agent, as the owner of the mortgage in the State registry, so that then it can be transferred in the system.

7/7/2015    12-12020-mg  Doc 8862-18  FOR PUBLIC TORS Filed 07/09/15 SALE - OFFICIAL COMM Entered 07/09/15 13:39:14 EES & Exhibit I & Exhibit

Exhibit 5 - Hearing H. Comm. on Judiciary   Pg 87 of 97

Mr. Watt. How is MERS an owner of the mortgage at that point?

Mr. Deutsch. Well, they are acting as an agent for the beneficial owner.

Mr. Watt. An agent, but they are not the owner.

Mr. Deutsch. They are not the beneficial owner.

Mr. Watt. And when they transfer ownership, if my State requires that that be documented on the public records as to establish for everybody in the public--the owner and everybody else--the chain of title, what would happen when that transfers from MERS to somebody else?

Mr. Deutsch. Well, a transfer can be effected, and particularly in the capital markets, they are effectuated through----

Mr. Watt. I am not talking about in the capital markets. I am talking about on the State land registry titles.

Mr. Deutsch. Well, there is a critical relationship between how it is done in the legal system via contracts and how it is done----

Mr. Watt. All right. Well, let me--is the former Federal Housing Finance Agency administrator with you?

Mr. Deutsch. OFHEO Director Falcon?

Mr. Watt. Yes.

Mr. Deutsch. Or, former OFHEO Director Falcon?

Mr. Watt. Yes. Could you find out from him, while I go on to the next question, what Fannie and Freddie's formal relationship with--he is with you, right?

Mr. Deutsch. He is an advisor, a senior advisor.

Mr. Watt. Okay. Well, would you turn to him and find out from him, while I go on to another question, what Fannie and Freddie's involvement with MERS was at its origination, if he was involved in it at that time?

Mr. Deutsch. Sure.

Mr. Watt. Let me go to another question. This whole thing has been frustrating for me, in particular, because I serve not only on the Judiciary Committee but on the Financial Services Committee, which has jurisdiction over the GSEs and the preemption issues that get raised.

Ms. Fluker, there has been a lot of talk recently about standardizing these foreclosure procedures by having the Federal Government take them over. It seems to me that there are some substantial preemption issues involved with that, Federal preemption of State laws.

What is the State of Michigan's State legislature doing to--is it concerned about this whole process that you have described of nonjudicial foreclosures?

Ms. Fluker. First and foremost I think that it is important to note that specifically with respect to MERS issues, there are quite a few cases up on appeal because it is kind of split. We are a nonjudicial foreclosure State. There has not been any discussions as far as changing that structure into a judicial structure to my knowledge. However, I think it is very important that we realize that it is not an issue whether the foreclosure is judicial or nonjudicial.

Mr. Watt. Well, I understand that. But if a sheriff has to make a decision to go and tack something on a door in Michigan before a court even gets involved in it, that presents a serious problem for that State. It doesn't happen to be the process in North Carolina, and I don't know how the Federal Government can solve that. That is a State issue. So you know, I am just going to encourage you on some of this stuff you are

going to have push State legislators because if the Federal
Government standardizes it and preempts all foreclosure laws in
the State, I think you are going to be--a number of States are
going to see their foreclosure laws go down. In your State you
might see them go up, but I mean I just have some serious
reservations about federalizing foreclosure law, and I would
say that to all the attorneys on this panel.

My time is up. I would like to get an answer to this first
question about Fannie and Freddie's involvement now that I
notice Mr. Deutsch has consulted with his advisor.

Mr. Deutsch. For any information about MERS, the ownership
interest, you would have to direct those questions to MERS.
Neither one of us are aware of precise ownership interest of
Fannie and Freddie.

Mr. Watt. Well, you are here representing MERS, aren't you?

Mr. Deutsch. I don't represent MERS. They are not a member
of the American Securitization Forum.

Mr. Watt. So who are you here representing?

Mr. Deutsch. At the outset my testimony I indicated those
who originate the loans, those that service the loans, the
trustees of the loans, the investors in mortgage loans.

Mr. Watt. All right. Thank you. That perhaps my be the next
hearing that somebody has.

Mr. Conyers. Well, I would ask you to join with me and
Bobby Scott and our staff to think about the next hearing, Mel,
and I thank you very much.

I turn now to Elton Gallegly and recognize him, the
distinguished gentleman from California.

Mr. Gallegly. Thank you very much, Mr. Chairman. This issue
is of particular interest to me. In my former life I had a real
estate brokerage business, and I have held a broker's license
in the State of California for 43 years. And I can tell you in
the 20 some years that I was in business before I came to
Washington I had the good fortune of working with a lot of
wonderful people over the years. And to the best of my
knowledge, I never had a client or a customer that ever had
their home foreclosed on. I think a lot of that was due to the
fact that times were different, the economy was different,
property values were escalating, so even probably the least
focused salesmen and brokers could look like a hero because of
inflated values. That hasn't been the case in the last several
years, and there have been many reasons for that.

But I would like to get back to Ms. Hines and put the human
side on this and see how we get into these situations whether,
we are dealing with predatory lenders, whether we are dealing
with lack of good oversight of the process of brokers and
mortgage--real estate brokers, mortgage brokers and some
personal responsibility.

It is my understanding in your testimony, Ms. Hines, that
it was you and your sister that inherited the home from your
mother and father that had lived in the home for at least 30
years before they passed; is that correct?

Ms. Hines. Yes.

Mr. Gallegly. And when you inherited the home, was it free
and clear?

Ms. Hines. Yes, it was paid for.

Mr. Gallegly. Okay. So they had worked most of their adult
lives working their tails off to be able to pay their bills in
a responsible way and you inherited the home.

What year did you inherit the home?

Ms. Hines. In 2006.

Mr. Gallegly. 2006?

Ms. Hines. Uh-huh.

Mr. Gallegly. And how long was it after you inherited the home before you borrowed money?

Ms. Hines. I think it was 2005.

Mr. Gallegly. Okay.

Ms. Hines. It was 2 years, we went into foreclosure in 2007.

Mr. Gallegly. Okay, what year did you get the loan on the-- how long was it after you inherited before you borrowed money on the property?

Ms. Hines. About maybe 5--maybe about 4\1/2\ years before we borrowed.

Mr. Gallegly. But you said you inherited it in 2005?

Ms. Hines. We inherited it in 2005. Well, my mother died, she has been dead now for 8 years. So 8 years when she died, whatever the time frame.

Mr. Gallegly. So you inherited the property about 2002?

Ms. Hines. Yes.

Mr. Gallegly. And what year did you borrow money against the property?

Ms. Hines. In 2007.

Mr. Gallegly. So you lived there for 4 years----

Ms. Hines. My sister and her children lived there for 4 years.

Mr. Gallegly. And when did it go into foreclosure?

Ms. Hines. In 2007.

Mr. Gallegly. The same year that you borrowed the loan?

Ms. Hines. Well, yes--we borrowed--no, we borrowed the loan the year--I think we borrowed the loan--my sister borrowed the loan 2 years before the house went in foreclosure.

Mr. Gallegly. Okay. And----

Ms. Hines. Let me explain something because I don't want to confuse anybody. My sister was living in the home. I was living in an apartment. So all of the business, and she hid a lot of the mail that she received when the house started going into foreclosure from me and my other sister, who didn't live in the home.

Mr. Gallegly. You said you borrowed the money to do repairs on the property.

Ms. Hines. My sister came to us because the house was in dire need of repairs.

Mr. Gallegly. So the money that you borrowed probably enhanced the value of the property?

Ms. Hines. Yes, yes.

Mr. Gallegly. Okay. Was all the money used just for repairs?

Ms. Hines. Most of it, not all of it. Most of the money was used for repairs. My nephew got married that year and my sister took some of the money and helped with the wedding.

Mr. Gallegly. Okay. The reason I ask the questions is because it shows that you are fighting a declining market in value and you enhanced the value, yet you still ended up as we refer to upside down. Do you remember offhand what the value loan-to-value ratio was when you bought the property, meaning how much was it----

Ms. Hines. How much the house was appraised for?

Mr. Gallegly. Right.

Ms. Hines. The house was approved for $80,000?

Mr. Gallegly. And how much did you borrow?

Ms. Hines. We got 43,000?

Mr. Gallegly. So it was about 50 percent, plus or minus?

Ms. Hines. Yes. And I would say out of the 43,000 that we received, 40,000 went into the house, because we had to have----

Mr. Gallegly. So you spent almost all--so theoretically you might assume that it increased the value to over 100,000 if you put 40,000 in it?

Ms. Hines. Yeah, because we had to remove a tree. The basement kept flooding, every summer the basement would flood and it was because of a tree in the backyard. So we had to remove a tree with the money.

Mr. Gallegly. Pardon me, I see the time has expired. And I really didn't want to get off too far on this, I just wanted to show how you got into this situation. I assume there are a lot of people, your friends and neighbors, who are in similar situations.

Ms. Hines. Well, it ballooned once we took out the loan, the mortgage on the house then--my sister was paying 588 initially and then after a 3-period it ballooned to 988. My sister was on disability because she had worked at Cadillac, too, and she had incurred asthma and had had really attacks--a lot of attacks to where they put her on disability for General Motors.

Mr. Gallegly. And within 90 days they increased your mortgage almost 100 percent?

Ms. Hines. Yes.

Mr. Gallegly. And they didn't explain that to you when you purchased the property, that it was an adjustable after a period of time?

Ms. Hines. No, they did not.

Mr. Gallegly. This was not in the contract anywhere.

Ms. Hines. Yeah, it was under a contract. And they gave us a contract. The contract was like 125 pages that we had to read. And so I am just being honest, we did not--not being lawyers, not thinking that it was going to go from one amount to another amount, and because the house was practically--for the base of the house, we had to have the base of the house reinforced. They call it point and pay.

Mr. Gallegly. Well, I guess my point is, I really question how a mortgage could increase 100 percent in a period of 90 days without the borrower knowing about it. If this was not clearly explained to you and you didn't sign it somewhere, I think there may be another problem here. So you have got lots of lawyers.

Ms. Hines. Well, We got ripped off by a couple of lawyers. We went to a couple of lawyers to help us on the issue and they ripped us off, too. It has just been a nightmare ever since this thing happened. I am not a financial person, I am not a lawyer. I wasn't living in the house to actually give you moment-to-moment accounts of what money was spent.

Mr. Gallegly. No, I didn't mean that.

Ms. Hines. I know that you are not, I am just saying that we went through a lot and we are still going through a lot as a result of being evicted from that house.

Mr. Gallegly. Thank you, Mr. Chairman.

Mr. Johnson. [Presiding.] Thank you. Ms. Hines, do you have any idea what a yield spread premium is?

Ms. Hines. No, I do not and I don't think my sister does either.

Mr. Johnson. I will now recognize the gentlelady from California, Ms. Chu.

Ms. Chu. Thank you, Mr. Chair. Well, as we all know, HAMP fell far short of the expectations. It was supposed to help 3 to 4 million people from foreclosure but instead only helped 700 to 800,000. And the congressional oversight panel that was held in the House cited the Treasury's failure to require servicer participation, failure to hold servicers accountable, and the decision to outsource critical program functions to Fannie Mae and Freddie Mac. Moreover, these programs weren't designed to handle foreclosures due to unemployment.

I have a great concern because in California we indeed are facing far more foreclosures, in fact 1.5 million new foreclosures just in my State alone. And we have created another program called the Hardest Hit Funds Program, which is a TARP-funded program, and it is to be administered to low and moderate homeowners and to include principal reduction programs which several of you have mentioned as being very important, as well as programs to assist unemployed homeowners. But the problem is that not one bank has officially signed on to join this program in California. And so we are encountering the same problems.

I want to ask anybody on the panel how we could get banks to participate in these government run programs and give true foreclosure relief to hardworking families.

Ms. Fluker. Thank you. I think one of the major things that needs to be done, and it is in my written testimony, and people don't like this word, but it needs to be out there and it needs to be understood, there needs to be a moratorium on these foreclosures. People hear that word, they get scared, they are like, oh, my God, these borrowers are looking for a free house. That is not what a moratorium is. This is something that was done during the Great Depression in 25 States during the 1930's. It was upheld as constitutional by the U.S. Supreme Court in Home Building and Loan Association v. Blaisdell. That is 290 U.S. 398, 1934, for people who like to look up cases. And what actually happened was instead of going to court throwing people out in the street, people went to court and the judge determined a reasonable rent for these people to pay.

I think that is more than appropriate in this situation, not only because of our economic situation, but due to the fact we have so much underlying predatory and fraudulent conduct coming on. It would allow borrowers to still remain in their homes until all of this is sorted out. We can come down here week and week, month after month, but every day that goes by someone is being foreclosed and evicted and they are like Ms. Hines, who is not an isolated situation for people to sign these loans and not know if there were adjustable rates.

I have senior citizens that have owned their homes, 30, 40, 45 years, documents are brought to them, you are dealing with a broker who is a smooth talker, like I am taking care of you, look, everything is fine, that is why my paralyzed 80-year-old woman in a wheelchair is now facing eviction because she signed a loan for 331 and within a year it was over $1,400.

Ms. Chu. Okay. Well, I would like to hear from a variety of opinions. So Mr. Kowalski and then Mr. Peterson.

Mr. Kowalski. To start with, your question about hardest hit, I read this week for example that Treasury outsourced an opinion letter to a banking law firm to issue an opinion as to whether or not the hardest hit funds could go to Legal Aid groups and HUD counselors to assist with foreclosure prevention, and not surprisingly the banking law firm gave--I am not sure why the Treasury lawyers couldn't do this work, but

the banking law firm gave the opinion to Treasury that it couldn't. Of course it can. The only system that we have been able to develop in Florida at least is a cooperative agreement between the legal services groups, HUD counselors who are properly aware of what is going on with these loan modifications, and pro bono lawyers, working in cooperation with the judiciary. The Florida Supreme Court created the entire Judicial Mortgage Foreclosure Mediation Program, for example.

HAMP needs to be strengthened, not abandoned. Maybe some concepts need to be looked at, but it is not voluntary, it is tied to TARP. It was always tied to TARP, and the HUD regulations make it clear it is tied to TARP. At the end of the day the servicers are all regulated by the Federal Government. The servicers make all of the decisions, the servicers decide when loan mods work, when short sales work, when foreclosures are pushed through, and those are all federally regulated entities.

Ms. Chu. So you are saying it should be tied to the TARP funds?

Mr. Kowalski. It is tied to the TARP funds. You gave them the money and in return for handing them the money it was you have got to go out and work on HAMP.

Ms. Chu. Mr. Peterson.

Mr. Peterson. One of the problems I see with HAMP is that the incentive that it tries to create to promote modifications, one of the ways it does that is by giving some very modest compensation to the servicer, if they succeed, and that happens over the stage period of time. It is not very much money and it is not a sharp enough incentive to get them to actually do it.

So here is a different idea. Instead of having the taxpayers pay money to--a little bit of money to servicers to not foreclose, instead make the servicer or the investor through the trust pay an extra penalty if they actually do go forward with the foreclosure. So switch the incentive. And my advice would be peg it at 15,000, so the first is a national emergency homestead exemption. It is short of a moratorium, it is a reasonable compromise. So the first $15,000 in a proceeds of a foreclosure sale goes to the family to help them move on to the next location, get a deposit on the next apartment, pay that first month's rent, get the kids into school and that money has to be put on the table, cash on the table, if they are going to go forward with the foreclosure. It will give an incentive to borrowers that need that cash in order to move on, to stop fighting the foreclosure. It is a lot like the Cash for Keys programs that lots of servicers and lenders have done for generations where when you are foreclosing you give $1,000, 2000, $3,000 maybe to the homeowner if they turn over the keys and turn over the property in good condition without having the fixtures stripped out, that sort of thing. Only the difference is it is a little more money, and it is also clearly signaled to everybody up front, so everybody knows that that $15,000 is waiting for them. Lots of homeowners that are in foreclosure don't understand that Cash for Keys is a possibility. So I think that that would be--it is an innovative idea, but it is also much more simple. We don't have to have a big bureaucratic structure that enforces it, it just becomes a Federal law, it is a bright line rule. It is very simple and it would be effective.

Ms. Chu. Thank you.

Mr. Deutsch. Maybe I will address Professor Peterson's

proposal. Obviously I think that would create enormous
challenges for the pension funds of say a firefighters pension
fund or a police pension fund. Well, now you have incentive for
the borrower to default because to pay $15,000 to not actually
pay their mortgage, it seems that may cause an appreciable
increase in the number of foreclosures in America because it is
providing an incentive not to pay their mortgage. There are a
lot of Cash for Keys programs out there that do provide
relocation assistance where the servicers--when there is no
other alternative beside foreclosure the servicers does help
the borrower transition from their home to other places with 1,
2, $3,000. But to force that upon the owners of these
mortgages, to force them to pay $15,000 will have enormous
downstream effects on the future of mortgage lending in
America. In particular because Fannie Mae and Freddie Mac,
which is right now on the backs of the taxpayer, because those
institutions own such a significant amount of the mortgages in
America, it ultimately would be bigger than the American
taxpayer who is paying these $15,000.

    Ms. Chu. Well, I should cut it off here, because I far
exceeded my time. So I will yield back the balance of my time.

    Mr. Johnson. Thank you, Ms. Chu. Next we will--I have been
burning to ask this question all day. I think, Mr. Deutch from
Florida, you know what my question is, do you not?

    Mr. Deutch. Mr. Chair, I think both our witness and myself
go by Deutsch, if that's helpful.

    Mr. Johnson. And is there any other connection?

    Mr. Deutch. Other than having a last name that is often
butchered, I don't believe that we are in any other way
related.

    Mr. Johnson. All right. So at this time I will recognize
Congressman Deutch.

    Mr. Deutch. Thank you, Mr. Chair, but in an attempt to get
to know Mr. Deutsch better I do have some questions for you,
and we will see if these are questions that you are comfortable
answering. I wanted to talk a little bit about the
securitization process and specifically the securitization
through Real Estate Mortgage Investment Conduits. Can I
continue?

    Mr. Deutsch. Sure, I am familiar with REMIC.

    Mr. Deutch. Here are the concerns that I have. REMIC as I
understand received tax exempt status. Receiving the tax
benefits, also as I understand it, requires strict compliance
with the law, including the depositing of collateral within 90
days of the REMIC's formation, is my understanding correct?

    Mr. Deutsch. Correct.

    Mr. Deutch. And as I further understand it, the law does
not permit fixes to the transfer after that 90-day period. So
under this requirement the only assets that would receive tax
exempt treatment that are in a REMIC are those that are in the
REMIC on the startup date.

    Mr. Deutsch. Correct.

    Mr. Deutch. Now, further my understanding is that a failure
to comply with REMIC loss subjects the entity to 100 percent
taxation.

    Mr. Deutsch. If a securitization trust doesn't meet the
REMIC requirement, then the securitization trusts proceeds are
paid onto the investors would be taxed as a corporate entity
tax.

    Mr. Deutch. Right. And if they do meet the requirements
then they are exempt.

Mr. Deutsch. Correct, correct.

Mr. Deutch. Now, the oversight panel, the congressional oversight panel that issued its report recently talked about-- described documentation standards in the foreclosure process have helped shine a light on potential questions regarding the ownership of loans sold into securitization without the proper assignment of title to the trust that sponsors the mortgage securities. You had said earlier, Mr. Deutsch, that from time to time mistakes do occur.

Some of the issues then that I would like you to speak to include that if the millions of mortgage transfers during the boom or some number of them, small, large, there may be some dispute, but for those that were not properly completed, then under the REMIC rules, the REMICs may be empty entities that don't own anything; is that correct?

Mr. Deutsch. Well, I think the problem with that is that the premise that the trust don't actually own the loans is invalid. The trusts actually do own the loans, and they were validly transferred, and there are abilities for the trust to be able to cure the transfer of those loans once they are in there to perfect the ownership of the loans.

Mr. Deutch. I understand. They may perfect the ownership of the loans but they can't reclaim tax exempt REMIC status after that 90-day period.

Mr. Deutsch. Once the loans ares in a trust if a deficiency is observed you have a 90-day period to be able to cure that deficiency.

Mr. Deutch. The 90-day period----

Mr. Deutsch. From the time of the discovery of the deficiency.

Mr. Deutch. I would ask Mr. Peterson if that is your understanding as well of when the 90-day period starts to run.

Mr. Peterson. My understanding is that you can't put them back in after it is closed. After the 90-day window following closure of the REMIC has expired you can't insert new collateral to the trust, otherwise it destroys the tax exempt status.

Mr. Deutch. Okay. So there is a difference of opinion. The question then is if they are past this 90-day period, Mr. Peterson I will stick with you for a second. If they are passed the 90-day period and the tax exempt status is lost, can't be regained, then what about the next step of assessing liability? Would there be any liability to either the creators of the REMICs, would there be liability to the trustees or servicers at that point?

Mr. Peterson. Well, you have exceeded the boundary of the competence that I feel most comfortable with. I am not a tax lawyer, and I don't have an extensive practice of thinking through what happens when a REMIC status is destroyed. That is a big problem, and it is not something I have seen before or worked on. So I will be very cautious in answering.

Mr. Deutch. Let me just follow that up then. It is not something that you've seen because the issue hasn't been raised before; is that the reason?

Mr. Peterson. Well, that is part of it, yeah. These big securitization deals, there is a lot of money on the line and the IRS has not been aggressively trying to declare these trusts as no longer tax exempt, in part because I think the Treasury Department has been attempting to prop up some of the financial institutions that would have exposure to those taxes. But I have to--again, I have to qualify this, that I am not a

REMIC tax lawyers, so I don't want to--you pulled me off of my
core competence.

    Mr. Deutch. Well, I won't ask questions in great
specificity then. I will only ask again whether you have seen--
has the suggestion been made that the IRS ought to take a
closer look at the tax exempt status of REMICs?

    Mr. Peterson. Yes, that has definitely been made. And, you
know, who it is that decided not to do that is not clear to me.
I assume somebody high up in the Treasury Department made that
decision not to do that. My hunch, my intuition, respectfully,
is that there are some compelling arguments that the collateral
was not transferred consistent with the Uniform Commercial Code
and there is ambiguity in the State laws out there about how
that will get resolved.

    There is a credible argument that the tax exempt status has
been destroyed. There has not been case law confirming or
rejecting that proposition yet. It could go either way. And the
thing that is scary about it is it is a closer call than you
would think. Having plowed trillions of dollars into the
securitization structure, one would think we pretty much have
that locked down and certain. It is actually not that certain.
There are some decent arguments both ways. What the courts are
going to go do and what the IRS is going to do, no crystal ball
here on the desk from my perspective.

    Mr. Deutch. And then finally, Mr. Chair, Mr. Deutsch, have
you seen the suggestion made that some of these REMICs may have
lost their tax exempt status or certainly given that there is a
difference of opinion between you and Mr. Peterson that
difference of opinion I would imagine can be found on a larger
scale within the industry, have you seen the suggestion made
that it ought to be examined and is this something that the IRS
ought to do, if for no other reason than to clarify what the
correct position ought to be?

    Mr. Deutsch. I am aware of two academic commentators who
have proposed the idea. I think the IRS has a lot of work and
the Treasury Department has a lot of work to do on analyzing
and improving the HAMP processes.

    I think ultimately there is no merit to the argument or
suggestion that any REMIC violations have occurred in the 7
trillion--well, $1.5 trillion in private label mortgage
securities that are outstanding. I think to follow up on every
academic suggestion that something wasn't transferred validly
without any proof, and I address this directly in my testimony,
both in the written testimony as well as the white paper that
we put out just last month, that there is no valid reason to
believe that the mortgage loans weren't actually transferred
into the mortgage tray.

    Mr. Deutch. I understand. Mr. Chair, this is my last
question. I understand there may be no reason to believe that.
I guess the final question I have is if, however, there is an
example where the transfer was made outside of the 90 days,
even outside of the 90 days once discovered, which would call
into question the tax exempt status, in that case could you
imagine the IRS ruling that the tax exempt status would be
lost?

    Mr. Deutsch. I think what you are potentially postulating
is if any individual loan wasn't put into the trust, if there
was some mistake on an individual anecdotal loan, if that loan
wasn't into the trust, that loan would not be in the trust but
it doesn't destroy the REMIC status of the trust because of one
loan's violation.

Mr. Deutch. I am sorry that we are out of time, Mr. Chair, but I appreciate the time very much. Thank you.

Mr. Johnson. Thank you, Mr. Deutch. And I will say that this has been a very enlightening and frightening hearing to realize that it is a basic human instinct to want to control, and that control manifests itself in ownership of property. It is sobering to think how far we have gone down the line toward too big to fail entities having rigged up the property ownership process so as to be in a position to attain control of property here in America, land of the free, home of the brave, where a man or a woman's home is their castle. And all of this through private enterprise has been aided and abetted we are told by the United States Government, by United States Government policy or the lack thereof. And we sitting above you, you all sitting down there, we sitting up here have the power to take this complicated scenario and learn from it, turn it around and return power and control to the people.

And so I want to thank each and every one of you for your particular role in the fight, and I would ask you to not give up hope, to keep doing what you are doing. And I think collectively we will make a difference.

I would like to thank all of the witnesses for their testimony today. Without objection, Members will have 5 legislative days to submit any additional written questions which we will forward to the witnesses and ask that you answer as promptly as you can to be made part of the record. Without objection, the record will remain open for 5 legislative days for the submission of any other additional materials.

Again, I want to thank everyone for their time and patience. And I hope that, Ms. Hines, you are able to get you another pair of glasses pretty quickly and hope your trip back to Detroit is not as eventful as the one this morning coming here, and that goes for all of you all who are traveling. Again, I want to thank everyone for their time and patience. Merry Christmas, Happy New Year, Happy Chanukah, happy holidays and what not. This hearing of the Committee on the Judiciary is adjourned.

[Whereupon, at 12:48 p.m., the Committee was adjourned.]

A P P E N D I X

----------

Material Submitted for the Hearing Record

Prepared Statement from
Mortgage Electronic Registration Systems, Inc. (MERS)

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]