CLIFFORD CHANCE US LLP
31 West 52 Street
New York, New York 10019
Telephone:  (212) 878-8000
Facsimile:  (212) 878-8375
Jennifer C. DeMarco
Sarah N. Campbell

*Counsel for Ocwen Loan Servicing, LLC*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------
                                                                )
In re:                                                          )      Case No. 12-12020 (MG)
                                                                )
RESIDENTIAL CAPITAL, LLC, et al.                                )      Chapter 11
                                                                )
                                  Debtors.                      )      Jointly Administered
                                                                )
-----------------------------------------------------------------

**OCWEN LOAN SERVICING, LLC'S RESPONSE TO
THE RESCAP LIQUIDATING TRUST'S MEMORANDUM OF LAW IN SUPPORT OF
ITS OBJECTION TO OCWEN LOAN SERVICING, LLC'S
<u>REVISED CLAIM NOTICE CONCERNING THE SERVICING ADVANCES CLAIM</u>**

## **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ............................................................................................................................4

ARGUMENT ..................................................................................................................................9

I.     Ocwen Complied with the Terms of the APA and Nothing in the APA Prohibits Ocwen from Revising the Initial Claim Notice to Assert Additional Losses .......................9

II.    The Indemnity Demand Is Unrelated to Ocwen's Administrative Claim ..........................12

III.   The Trustee Has Not and Can Not Show Equitable Estoppel ...........................................13

CONCLUSION ..............................................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

CASES

*Babbit v. Citibank, N.A. (In re Vebeliunas)*,
    332 F. 3d 85 (2d Cir. 2003)……………………………………………………. 14

*Integrated Res., Inc. v. Ameritrust Co. Nat'l Ass'n (In re Integrated Res., Inc.)*,
    157 B.R. 66 (S.D.N.Y. 1993)……………………………………….………. 13

Ocwen Loan Servicing, LLC ("Ocwen"), by its undersigned counsel, files this response (the "Response") to the *ResCap Liquidating Trust's Memorandum of Law in Support of its Objection to Ocwen Loan Servicing, LLC's Revised Claim Notice Concerning the Servicing Advances Claim* [Docket No. 8771] (the "Objection") and in support of its demand for indemnification against the Indemnity Escrowed Funds for Losses[1] arising from Seller's breach of a Core Representation under the APA relating to Servicing Advances, and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.  The Purchase Price attributable to the Servicing Advances[2] conveyed to Ocwen pursuant to the APA and paid by Ocwen in connection with the closing of the Sale was calculated based upon the value of the Servicing Advances as of the Closing Date as maintained on the Sellers' books and records. *See*, APA Schedule 3.1(a). The Purchase Price for the Servicing Advances in general exceeded 90% of the stated value of the Servicing Advances. *Id*. In connection with the Servicing Advances, the Sellers represented to Ocwen, pursuant

---

[1] The parties agreed to bifurcate the issues raised by the Trust in connection with Ocwen's revised demand for indemnification arising from Seller's breach of its Core Representation pursuant to the APA from the ultimate dispute of the extent of the breach of such representation (i.e., the validity of each Servicing Advance on a loan by loan basis). *See*, Stipulation *and Order Between the ResCap Liquidating Trust and Ocwen Loan Servicing, LLC Regarding the Servicing Advances Dispute* [Docket No. 8673]. The parties also filed with the Court a *Joint Statement of Stipulated and Undisputed Facts* [Docket No. 8762] (hereinafter, the "SoF"). Capitalized terms not otherwise defined herein shall have the meanings ascribed in the APA (annexed as Exhibit A to the SoF) or the Statement of Facts, as applicable. The Statement of Facts also incorporates by reference any other pleading or document referenced therein and filed on the docket in the Chapter 11 Cases.

[2] "Servicing Advances" are defined in the APA to mean, with respect to each Agency Loan, Private Investor Loan or Other Serviced Loan, the aggregate outstanding amount that, as of any date of determination, has been advanced directly by Sellers from their own funds or from funds advanced under any loan facility (but not with funds borrowed from any custodial or other accounts under a Servicing Agreement) in connection with servicing (including master servicing) of such Mortgage Loans in accordance with the applicable Servicing Agreements for which Sellers have a right of reimbursement under the applicable Servicing Agreement, including with respect to principal, interest, Taxes, insurance premiums, corporate and other advances and all accrued but unpaid interest thereon as permitted by Applicable Requirements and the applicable Servicing Agreement, including in each case the right to reimbursement for, and enforce payment of, such Servicing Advances. For the avoidance of doubt, "Servicing Advances" shall not include any HELOC draws. APA at § 1.1 (pp. 25-26).

Section 4.9 of the APA, that the Servicing Advances to be transferred to Ocwen pursuant to the APA were *legal, valid and binding reimbursement rights*. Notwithstanding that representation, certain Servicing Advances transferred to Ocwen pursuant to the APA were carried by the Sellers on their books and records at values that exceeded the amounts that were entitled to be recovered under the relevant Servicing Agreements and therefore were not valid and subsisting amounts and were not legal, valid and binding reimbursement rights.[3] These overstated Servicing Advances resulted in Losses to Ocwen in the amount of $12,054,975.55.[4]

2. Pursuant to the APA, the Sellers agreed, on a joint and several basis, to indemnify and hold Ocwen harmless from and against any and all Losses, *inter alia*, incurred in connection with or arising from any breach or inaccuracy of the Core Representations of the Sellers and an indemnity escrow was established to backstop these indemnities. *See*, APA at §§11.1(b) and 2.17; SoF at ¶ 3. Section 4.9 of the APA relating to Servicing Advances was a Core Representation entitled to the benefit of the indemnity provisions of the APA.

3. On February 14, 2014, within the time period specified in the APA, Ocwen provided notice of its right to indemnification with respect to various breaches of Core Representations under the APA including the breach of the representation set forth at Section 4.9 of the APA relating to Servicing Advances (the "<u>Initial Claim Notice</u>"). *See*, SoF at ¶ 10. In the Initial Claim Notice, Ocwen asserted Losses then currently estimated in an amount of at least

---

[3] Pursuant to the agreed procedures, the validity of the underlying Servicing Advances is not before the Court at this time and each party reserves all rights with respect thereto.

[4] As the denominated Servicing Advances transferred to Ocwen did not consist of Servicing Advances as defined in the APA, Ocwen has additional claims against the Trust including claims for breach of contract and unjust enrichment against the Trust. While Ocwen believes it has a right to indemnification pursuant to the indemnification provisions of the APA relating to the breach of a Core Representation, to the extent Ocwen is not indemnified in connection therewith, it intends to pursue other claims it may have with respect to Servicing Advances.

$2,211,962.17 in connection with the breach of the Core Representation relating to certain Servicing Advances conveyed to Ocwen pursuant to the APA.  *Id.*

4. While, at the time, Ocwen attempted to identify the amount of its claim relating to the breach, Ocwen expressly reserved its right to amend or supplement its Initial Claim Notice at any time.  *See*, Initial Claim Notice at p. 4.  Following a later loan by loan analysis of the Servicing Advances, Ocwen determined that the quantum of Losses relating to the breach of the Core Representation relating to Servicing Advances was much greater than originally estimated and was in the amount of $12,054,975.55.  As a result, on April 29, 2015, Ocwen delivered to the Trust a Revised Claim Notice specifying the increase in Loss amount arising from the breach of the Core Representation related to Servicing Advances.  *See*, SoF at ¶ 18.

5. There is nothing in the APA or applicable contract law that prohibits the amendment of the Initial Claim Notice.  Ocwen put the Trust on notice pursuant to the Initial Claim Notice of the breach of the Core Representation in that certain Servicing Advances were not valid, binding reimbursement rights and that Ocwen incurred Losses in connection therewith.  Upon learning of the full quantum of Losses related thereto, Ocwen revised its demand for indemnification accordingly.

6. In an attempt to reap a windfall from the Sellers' misrepresentation relating to the Servicing Advances, the Trust seeks to nullify Ocwen's revision to its indemnification claim under the APA.  The Trust focuses on the universe of loans from which the quantum of Losses may be calculated as opposed to the actual breach of the Core Representation set forth in Section 4.9 of the APA: that certain Servicing Advances were not legal, valid and binding reimbursement rights.   The Trust also seeks to convert its contractual dispute regarding the indemnification demand under the APA to an objection to an administrative claim, presumably

to provide the Trust with some perceived procedural advantage. However, the Sale Order (defined herein) is explicit that Ocwen's rights under the APA, which include rights with respect to the indemnification and the Indemnity Escrowed Funds, are not subject to modification. Additionally, the demand for indemnification for Losses in connection with the breach of representation relating Servicing Advances was not included in the Ocwen's Administrative Claim Request and any objection to the claims set forth therein by the Trust is irrelevant to the indemnification demand under the APA.

7. The Trust also raises issues of equity to implore the court to deny Ocwen the right to assert a claim against the Indemnity Escrowed Funds for the increased Losses. However, principles of equity clearly favor Ocwen who has incurred extensive Losses from Sellers' misrepresentation relating to the validity of Servicing Advances. The Trust has failed to and cannot demonstrate any prejudice to the estate that might arise as a result of Ocwen's Revised Claim Notice (other than they would not benefit from the return of the full escrowed amounts) and the denial of Ocwen's full Losses under the indemnification provisions would result in significant prejudice to Ocwen and as set forth above a windfall to the estate.

## BACKGROUND

8. On May 14, 2012, the Debtors commenced the Chapter 11 Cases with the intention of implementing a reorganization through, among other things, the sale of certain of the Debtors' assets, including Debtors' mortgage servicing platform and other servicing-related assets.

9. Ocwen purchased the Debtors' mortgage servicing platform and other servicing-related assets pursuant to the terms of the APA. *See*, SoF at ¶2. The sale of the Debtors' assets to Ocwen pursuant to the APA as well as certain related relief was approved by the Court pursuant to that certain "Sale Order" dated November 21, 2012 [Docket No. 2246].

10.     The APA included certain representation concerning the assets to be purchased by and conveyed to Ocwen including with respect to Servicing Advances. Specifically, as the Purchase Price for Servicing Advances was to be calculated based upon the value of the Servicing Advances as maintained on the Sellers books and records, there is a representation at Section 4.9 of the APA that provides, in relevant part, that:

> [e]ach Servicing Advance is a valid and subsisting amount owing to Seller, made in accordance with and payable at the times and in accordance with the provisions of the applicable Servicing Agreement, and is a legal, valid and binding reimbursement right, and is enforceable against such securitization trust or owner in accordance with its terms, and is not subject to any Claims, defenses or set-off arising from acts or omissions of the Sellers that could be asserted against Purchaser. Each Servicing Advance is entitled to be paid, has not been repaid in whole and has not been compromised, adjusted (except by partial payment), extended, satisfied, subordinated, rescinded, amended or modified.

APA at §4.9(c); *see also*, APA Schedule 3.1(a).

11.     As described above, the Sellers agreed, on a joint and several basis, to indemnify and hold Ocwen harmless from and against any and all Losses, *inter alia*, incurred in connection with or arising from any breach or inaccuracy of the Core Representations of the Sellers including the representation set forth in Section 4.9 of the APA. *See*, APA at § 11.1(a);[5] SoF at ¶ 3. The APA also set forth the procedures for seeking indemnification as follows:

> Any Purchaser Group Member seeking indemnification hereunder shall give to each Seller obligated to provide indemnification to such Purchaser Group Member (the "Indemnitor") a notice (a

---

[5]     Section 11.1(a) provides in full as follows:

Each Seller agrees, on a joint and several basis, to indemnify and hold harmless each of Purchaser, Ocwen Financial Corporation ("Parent"), Parent's direct and indirect Subsidiaries, Parent's controlling shareholders and its and their respective directors, officers and employees (each a "Purchaser Group Member") from and against any and all Losses incurred by such Purchaser Group Member in connection with or arising from any breach of any Core Representations or the inaccuracy of any Core Representations of Sellers contained or referred to in this Agreement or in any certificate delivered by or on behalf of Sellers pursuant hereto; provided, that in no event shall the aggregate amount required to be paid by Sellers pursuant to this Section 11.1(a) exceed the Indemnity Escrow Amount.

>> "Claim Notice") describing in reasonable detail the facts giving rise to any claim for indemnification hereunder and shall include in such Claim Notice (if then known) the amount or the method of computation of the amount of such claim, and a reference to the provision of this Agreement or any other agreement, document or instrument executed hereunder or in connection herewith upon which such claim is based….

APA at § 11.2(a); *see also*, SoF at ¶ 5.

12. While the APA provides for a termination of the indemnification obligations set forth in Section 11.1(a) upon the Termination Date, the APA also specifically provides for the continuation of the indemnification by Sellers as to any Loss[6] of which Ocwen notified the Sellers in accordance with the provisions of Section 11.2 of the APA on or prior to the Termination Date until the liability of Sellers shall have been determined and Sellers shall have reimbursed Ocwen for the full amount of such Losses in accordance with this Article 11 of the APA. *See*, APA at § 11.1(b)[7] and at §11.6.

13. The sale to Ocwen closed on February 15, 2013. *See*, SoF at ¶2. At the Closing, an escrow in the amount of 1% of the Purchase Price ($21,639,805.95) was established in accordance with the APA, *inter alia*, to provide a source of funds for amounts owing under indemnification provisions of the APA. *See*, APA at § 2.17. Upon information and belief, as of the date hereof, the Indemnity Escrow Agent continues to hold these funds.

---

[6] The APA defines the term Loss broadly to mean "any and all damages, losses, actions, proceedings, causes of action, Liabilities, claims, Liens, penalties, fines, demands, Taxes, assessments, awards, judgments, settlements, costs and expenses…" APA at § 1.1 (p. 15).

[7] Section 11.1(b) provides in full as follows:

The indemnification provided for in Section 11.1(a) shall terminate on the earlier of one year after the Closing Date and the entry of a Final Order closing the Bankruptcy Case (the "Termination Date") (and no claims shall be made by any Purchaser Group Member under Section 11.1(a) after the Termination Date), except that the indemnification by Sellers shall continue as to any Loss of which any Purchaser Group Member has notified ResCap in accordance with the requirements of Section 11.2 on or prior to the Termination Date, as to which the obligation of Sellers shall continue until the liability of Sellers shall have been determined pursuant to this Article XI, and Sellers shall have reimbursed all Purchaser Group Members for the full amount of such Losses in accordance with this Article XI.

14. Subsequently, on December 11, 2013, the Confirmation Order was entered confirming the Plan. *See*, SoF at ¶ 6. The Confirmation Order explicitly provided that "[n]othing in the Plan Documents or this Confirmation Order shall, or shall be deemed or construed to, alter, change, modify or amend the terms and provisions of the Ocwen APA and Ocwen's, the Debtors', and the Liquidating Trust's rights as applicable, thereunder, which rights shall continue in full force and effect and be enforceable following the Effective Date in accordance with the terms thereof." Confirmation Order at ¶ 31; *see also*, SoF at ¶ 8.

15. The Plan set January 16, 2014 as the bar date by which administrative expense claims were required to be asserted against the estates and, on that date, Ocwen filed an Administrative Claim Request asserting a variety of claims against the estate. *See*, SoF at ¶¶ 7 and 9. The Administrative Claim Request did not include a demand for indemnification from the Indemnity Escrowed Funds pursuant to the APA relating to the breach of the representation concerning Servicing Advances. *See*, SoF at ¶ 9. The Administrative Claim Request and the claims set forth therein have been the subject of objection by the Trust and have been resolved or withdrawn prior to the date hereof.

16. In accordance with the indemnification provisions of the APA, on February 14, 2014, in advance of the Termination Date, Ocwen delivered that Initial Claim Notice notifying the Sellers of Ocwen's claim to indemnification with respect to Losses incurred in relation to the breach of the Core Representations including the breach of the Core Representation related to Servicing Advances as set forth at Section 4.9 of the APA. *See*, Initial Claim Notice at 2.b; SoF at ¶ 10. As set forth in the Initial Claim Notice, Ocwen also advised that it incurred Losses then "currently estimated in the amount of at least $2,211,962.17 in connection with certain Servicing Advances that were conveyed to Ocwen pursuant to the [APA]." Initial Claim Notice at 2.a. The

Initial Claim Notice further set out that "[t]he applicable Servicing Advances were not valid and subsisting amounts and were not legal, valid and binding reimbursement rights." *Id*.

17.     Ocwen also expressly reserved its right to amend or supplement the Initial Claim Notice at any time and reserved its rights under the APA:

> Ocwen (on behalf of itself and othe Purchaser Group Members) expressly reserves the right to amend or supplement this Claim Notice at any time. By delivery of this Claim Notice, Ocwen (on behalf of itself and othe Purchaser Group Members) does not waive any of its rights under the Asset Purchase Agreement, any Ancillary Agreement or any other agreements between any Purchaser Group member and any Seller, at law or in equity.

Initial Claim Notice at p. 4.

18.     After a period of time, subsequent to the Initial Claim Notice, Ocwen commenced a review of the Servicing Advances including in connection with various requests for additional back-up information received from the Trust. *See*, SoF at ¶¶ 11, 13, 14 and 15. Ocwen performed a review on a loan by loan basis as to the reasons that each Servicing Advance was not a legal, valid and binding reimbursement right. *See*, SoF at ¶ 15.

19.     On March 25, 2015, the Trust emailed Ocwen a letter requesting release of certain funds from the Indemnity Escrow Account. *See*, SoF at ¶ 17. Among other things, the letter requested prompt notification in the event that, *inter alia*, Ocwen believed that it was entitled to Indemnity Escrow Funds above the amount set forth in the letter.

20.     On April 29, 2015, after concluding its loan by loan review, Ocwen sent a Revised Claim Notice to the Trust quantifying the Losses in connection with the breach of the representation relating to Servicing Advances set forth at Section 4.9 of the APA. *See*, SoF at ¶ 18. The Revised Claim Notice states "Ocwen has now determined that the issues identified in the Initial Claims Notice related to Servicing Advances have resulted in Losses equal to

$12,054,975.55, plus legal fees and expenses" and that, such issues, constitute a breach of Section 4.9 of the APA. *See*, Revised Claim Notice at ¶¶ 2.a. and b.

## ARGUMENT

I. **OCWEN COMPLIED WITH THE TERMS OF THE APA AND NOTHING IN THE APA PROHIBITS OCWEN FROM REVISING THE INITIAL CLAIM NOTICE TO ASSERT ADDITIONAL LOSSES**

21.     Pursuant to the Initial Claim Notice, Ocwen asserted a right to indemnification from the Indemnity Escrowed Funds with respect to, and put Sellers on notice of, a breach of the Core Representation under Section 4.9 of the APA with respect to Servicing Advances and estimated Losses in connection therewith. Specifically, the Initial Claim Notice asserted that the Servicing Advances "were not valid and subsisting amounts and were not legal, valid and binding reimbursement rights." Initial Claim Notice at ¶ 2.a.

22.     Ocwen provided in its Initial Claim Notice Ocwen's then current estimate as to the minimum amount of its Losses arising from the breach in relation to the validity of certain Servicing Advances conveyed to Ocwen pursuant to the Asset Purchase Agreement in the amount of at least $2,211,962.17. *Id*.

23.     A loan by loan analysis of the underlying detail relating to the Servicing Advances reflected that the Losses attributable to the breach of the representation in Section 4.9 were much greater than estimated in the Initial Claim Notice. Therefore, Ocwen revised the Claim Notice to quantify its Losses arising from the breach identified in its Initial Claim Notice in the amount of $12,054,975.55, plus legal fees and expenses. *See*, Revised Claim Notice at ¶ 2.a. and b.

24.     Nothing in the APA or applicable contract law prohibits amendment to a Claim Notice. Moreover, in the Initial Claim Notice Ocwen expressly reserved its right to amend or supplement the Initial Claim Notice at any time and reserved its rights under the APA at law or

in equity. *See*, Initial Claim Notice at p.4. The parties rights under the APA have not been abridged or modified and such rights are not subject to any modification pursuant to the provisions of the Sale Order. *See,* Sale Order at ¶ 4. If the Trust believed that an amendment was prohibited, it never expressed this view in its communications with Ocwen notwithstanding the clear reservation in Ocwen's Initial Claim Notice.

25. The Trust has asserted that as the Initial Claim Notice did not include the universe of loans as to which the identified breach and Loss related, Ocwen did not identify prior to the Termination Date the breach of representation giving rise to the Losses set forth in the Revised Claim Notice. Not surprisingly, the Trust focuses on the specific loans identified in the Initial Claim Notice and not the notification of the breach of representation or notice of Loss itself. The Trust, attempts to parse the representation contained in Section 4.9(c) seeking to create individual representations as to each Servicing Advance in support of its argument that to preserve its rights, Ocwen was required to include all of the loan level detail for the Servicing Advances in its Initial Claim Notice. *See*, Objection at ¶ 38. However, the APA does not provide a separate representation as to each loan serviced. Instead, the APA at Section 4.9 contains a single representation that, "[e]ach Servicing Advance is a valid and subsisting amount owing to a Seller, made in accordance with and payable at all the times and in accordance with the provisions of the applicable Servicing Agreement, and is a legal, valid and binding reimbursement right…". APA at §4.9(c). This representation was in breach if it was false or inaccurate with respect to any of the Servicing Advances and would result in a Loss. It is the quantum of Losses that arise from the breach that would vary depending upon how many Servicing Advances are implicated and the nature and scope of the breach.

26. The Trust asserts that if the specific amount of Loss was not specified prior to the Termination Date, that the indemnification would not survive. However, that is not what the APA provides. The APA specifically provides that the indemnification obligations continue as to any Loss for which Ocwen has notified the Sellers in accordance with the requirements of Section 11.2 on or prior to the Termination Date. Section 11.2 specifically provides that the notice of indemnification should describe, among other items, the facts giving rise to the claim for indemnification and shall include *if then known* the amount of the claim. Here it is clear that Ocwen did not know the amount of the claim at the time of the Initial Claim Notice.

27. In focusing on the individual Servicing Advances, the Trust overlooks that it was provided a Claim Notice in advance of the Termination Date stating that there was a breach of the Sellers' Core Representation and estimating the amount of the claim in accordance with Section 11.2. The extent of the claim that derives from that breach was not then known. Ocwen notified the Trust that it suffered a Loss and provided in its Initial Claim Notice an estimate of the minimum amount of its Losses arising from that breach. It also expressly reserved its right to amend or supplement the Initial Claim Notice, which it did.

28. The Trust also has focused on the fact that only 12 individual loans were included in both the Initial Claim Notice and the Revised Claim Notice. That fact makes clear that while Ocwen discovered a breach of the Core Representation relating to the validity of Servicing Advances, the extent of the Losses and the amount of the claim was not then known. Ocwen determined the extent of the claim by reviewing the loan level detail for each Servicing Advance following which it delivered the Revised Claim Notice asserting the full amount of the claim.

29. The Trust also goes to great effort to stress the length of time between the Initial Claim Notice and the Revised Claim Notice (fourteen months). However, the length of time

between the notices is not relevant to the issue of whether Ocwen had the right to assert the full amount of the claim as set forth in the Revised Claim Notice.  The APA is clear that the indemnification as to any Loss of which the Trust was notified in accordance with the APA prior to the Termination Date would continue until adjudicated and paid.  The timing of the revision to assert the Loss is not relevant under the APA.  The length of time taken by Ocwen to determine the full extent of the Losses also resulted in no prejudice to the estate. [8]

30. The Trust has raised principles of equity in its papers to seek to deny Ocwen the right to assert the increased Loss amounts.  However, principles of equity strongly favor Ocwen in these circumstances.  It is Ocwen that relied upon the Sellers' Core Representations and paid a Purchase Price for the Servicing Advances that was calculated based upon the inflated values for Servicing Advances maintained in the Sellers' books and records.  Ocwen's Losses are related directly to the asserted inaccuracy of the representation with respect to the validity of the Servicing Advances and the estate would reap a windfall if Ocwen were prevented from asserting its full claim with respect to the Sellers' breach against the Indemnity Escrow Funds.

## II.   THE INDEMNITY DEMAND IS UNRELATED TO OCWEN'S ADMINISTRATIVE CLAIM

31. The Trust seeks improperly to modify Ocwen's right to indemnification for its Losses under the APA through the importation of the claims adjudication process and seeks to conflate Ocwen's indemnification demand under the APA with its separate Administrative Claim Requests.  Specifically, the Trust attempts to benefit from some procedural advantage by seeking to apply the Second Circuit's rules governing the amendment of claims to Ocwen's Revised Claim Notice.  Objection at ¶42.  However, Ocwen's right to indemnification under the APA is

---

[8] A general assertion of delay pending a disposition of the merits of the asserted breach and the fact that damages resulting from that breach would not be available to distributed to other creditors do not support the Trust's assertion that it is prejudiced.

unrelated to the administrative claims process and the standard for amending such claims is irrelevant to the contractual issues with respect to Ocwen's request for indemnification under the APA. The Sale Order is explicit that "[n]othing contained in any Chapter 11 plan confirmed in the Debtors' Chapter 11 cases or the order confirming any such Chapter 11 plan shall conflict with or derogate from the provisions of the Ocwen APA or this Order." *See* Sale Order at ¶ 4.[9]

32. The Trust also asserts various prejudice that would befall it if the litigation over the Servicing Advances and the Indemnity Escrow Funds were to proceed. However, the adjudication of issues properly before the court is not prejudice.[10] The Trust also suggests that the dispute with respect to Servicing Advances would be set back to "square one". Objection at ¶47. However, there has never been any litigation with respect to the demand for indemnity with respect to the Servicing Advances. The fact that the Trust chose to pursue the wrong procedure to seek to adjudicate the indemnification demand under the APA should not prejudice Ocwen's rights under the APA which are protected by the Sale Order and the Confirmation Order.[11]

### III.    THE TRUSTEE HAS NOT AND CANNOT SHOW EQUITABLE ESTOPPEL

33. The Trust also includes an argument that Ocwen should be equitably stopped from asserting the Losses as set forth in the Revised Claim Notice. However, the Statement of

---

[9] The Trust did object to the Initial Claim Notice as part of its objection to the Administrative Claim Requests in February 2015. *See*, Docket No. 8301; SoF at ¶ 16. However, the claims related to the Servicing Advances were not included in the Administrative Claims Request and Ocwen consistently has opposed the Trust's attempts to convert a contractual disptute with respect to the indemnification demand against the Indemnity Escrowed Funds pursuant to the APA to a claims resolution process for the unrelated Administrative Claim Requests. Simply, and as set forth in the Statement of Facts, "the Administrative Claim Request contained no reference to Servicing Advances but did assert a contingent unliquidated claim for any breaches of the APA and reserved rights to enforce the APA, including for breaches of Section 4.9 (Mortgage Servicing Portfolio; Servicing Agreements; the Business) thereof." *See*, SoF at ¶9.

[10] In *Integrated Resources*, a case cited by the Trust, the District Court cited to the severe prejudice which would arise from denial of the amendment to the claim at issue and dismissed an argument asserting prejudice arising from the amendment such as added expense, increased administration and litigation costs as insufficient, standing alone, to overcome the policy allowing amendment. 157 B.R. 66, 72-73 (S.D.N.Y. 1993).

[11] *See*, *The Trust's Objection to Ocwen's Request for Payment on Administrative Expense Claims* and *The Trust's Reply in Further Support of Objection to Ocwen's Request for Payment on Administrative Expense Claims* [Docket Nos. 8129 and 8421].

Facts does not support, and the Trust cannot establish, any element of the claim. As noted by the Trust, the elements of equitable estoppel are with respect to the party estopped: (i) conduct which amounts to a false representation or concealment of material facts; (ii) intention that such conduct will be acted upon by the other party; and (iii) knowledge of the real facts. The party asserting estoppel must show with respect to themselves: (i) lack of knowledge and of the means of knowledge of the true facts; (ii) reliance upon the conduct of the party to be estopped; and (iii) prejudicial changes in their positions. Objection at ¶ 52 citing *Babitt v. Citibank, N.A. (In re Vebeliunas)*, 332 F.3d 85 (2d Cir. 2003). There has been no representation let alone a false representation or concealment and no assertion of reliance or prejudicial change in position. Accordingly, this claim is unsupportable.

## CONCLUSION

34. For all of the foregoing reasons, Ocwen respectfully request that the Court deny the Objection to the Revised Claim Notice.

Dated: New York, New York
July 9, 2015

>                          Respectfully submitted,
>
>                          CLIFFORD CHANCE US LLP
>
>                          By: /s/ *Jennifer C. DeMarco*
>                               Jennifer C. DeMarco
>                               Sarah N. Campbell
>                               31 West 52 Street
>                               New York, New York 10019
>                               Telephone: (212) 878-8000
>                               Facsimile: (212) 878-8375
>
>                          *Counsel for Ocwen Loan Servicing, LLC*