**Hearing Dates: June 10-11, 2015 at 10:00 a .m. (Prevailing Eastern Time)**

MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Norman S. Rosenbaum
Adam A. Lewis
Kristin A. Hiensch

*Counsel for the ResCap Borrower Claims Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------ ) | | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------------ ) | | |

**RESCAP BORROWER CLAIMS TRUST'S POST-TRIAL**
**BRIEF IN SUPPORT OF THE TRUST'S OBJECTION TO PROOF**
**OF CLAIM NO. 386 FILED BY BARRY AND CHERYL MACK**

# TABLE OF CONTENTS

**Page**

SOME BASICS ................................................................................................................1

FACTUAL BACKGROUND ...........................................................................................2

THE PRELUDE:  CIRCUMSTANCES PREDATING THE FORECLOSURE .........................2

THE FORECLOSURE AND ITS AFTERMATH:.............................................................5

COMMENCMENT OF THE FORECLOSURE AND THE COUNTERCLAIMS ....................5

THE FORECLOSURE AND ITS AFTERMATH:  THE LETTER .............................................7

THE FORECLOSURE AND ITS AFTERMATH:.............................................................10

THE ATTEMPTED SUICIDE, ITS ANTECEDENTS AND ITS CONSEQUENCES .............10

THE FORECLOSURE AND ITS AFTERMATH:  THE BALANCE OF THE FLORIDA
LITIGATION .............................................................................................11

THE CLOSING CHAPTERS..........................................................................................14

ANALYSIS OF THE LAW AND FACTS .......................................................................15

GMACM DID NOT RECEIVE THE LETTER................................................................15

THE LETTER CANNOT BE A QWR BECAUSE IT WAS NOT SENT TO THE
DESIGNATED ADDRESS................................................................................16

THE CLAIMANTS ARE BARRED BY RES JUDICATA ........................................................18

GMACM CANNOT BE LIABLE FOR ANY INJURIES TO THE MACKS PRIOR TO
JANUARY 25, 2010 (OR NOVEMBER 23)...................................................19

THE CLAIMANTS CANNOT SATISFY THE RELEVANT STANDARDS FOR
PROOF OF DAMAGES ........................................................................22

CONCLUSION ............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Berneike v. CitiMortgage Inc.*,
708 F.3d 1141 (10th Cir. 2013) ...................................................................................... 16

*Bonadio v. PHH Mortgage Corp.*,
No.12 CV 3421 (VB), 2014 WL 522784, *6 (S.D.N.Y. Jan. 31, 2014) ............................... 21

*Cezair v. JPMorgan Chase Bank, N.A.*,
No. 13-2928, 2014 WL 4295048 (D. Md. Aug. 29, 2014)..................................................... 20

*Cowan v. City of Mt. Vernon*,
2015 U.S. Dist. LEXIS 39693 (S.D.N.Y. Mar. 27, 2015)...................................................... 24

*Gorbaty v. Wells Fargo Bank, N.A.*,
Nos. 10-CV-3291 (NGG)(SMG) & 10-CV-3354 (NGG)(SMG), 2012 WL 1372260
(E.D.N.Y. Apr. 18, 2012) .................................................................................................. 21

*Harris v. Am. Gen. Fin., Inc.*,
No. 02-1395-MLB, 2005 U.S. Dist. LEXIS 33260 (D. Kan. July 6, 2005), aff'd 259
Fed. Appx. 107 (10th Cir. 2007) ...................................................................................... 19

*Henderson v. Wells Fargo Bank, N.A.*,
974 F. Supp.2d 993 (N.D. Texas 2013)............................................................................... 20

*Hilao v. Estate of Marcos*,
393 F.3d 987 (9th Cir. 2004) ........................................................................................... 17

*In re Barquest Grp., Inc.*,
477 B.R. 454 (Bankr. S.D. N.Y. 2012) .............................................................................. 15

*In re George Love Farming, LC*,
366 B.R. 170 (Bankr. D. Utah 2007)................................................................................... 17

*Justice v. Ocwen Loan Servicing*,
No. 2:13-CV-165, 2015 WL 235738 (S.D. Ohio January 16, 2015) ..................................... 20

*Kliesch v. Fifth Third Mortg. Co.*,
No. 3:10-0600, 2010 U.S. Dist. LEXIS 125686 (M.D. Tenn. November 29, 2010)............... 19

*Laurie Marie M. v. Jeffrey T. M.*,
159 A.D.2d 52 (N.Y. App. Div. 2d Dep't 1990)................................................................... 24

*Marais v. Chase Home Fin., LLC*,
24 F. Supp.3d 712 (S.D. Ohio 2014)............................................................................20, 21

*Marais v. Chase Home Fin., LLC*,
    736 F.3d 711 (6th Cir. 2013) ..................................................................... 20

*McMillen v. Resurgent Capital Servs., L.P.*,
    No. 2:13-CV-00738, 2014 WL 3341337 (S.D. Ohio July 8, 2014) ....................................... 20

*Nordmann v. Nat'l Hotel Co.*,
    425 F.2d 1103 (5th Cir. 1970) ...................................................................... 1

*Payne v. Mortg. Elec. Registration Sys., Inc. (In re Payne)*,
    387 B.R. 614 (Bankr. D. Kan. 2008) .............................................................. 19

*Peralta v. Vasquez*,
    467 F.3d 98 (2d Cir. 2006) .......................................................................... 17

*Pinchot v. Bank of Am., N.A.*,
    No. 12-cv-12994, 2012 U.S. Dist. LEXIS 178415 (E.D. Mich. December 28, 2012) ........... 19

*Roth v. CitiMortgage Inc.*,
    756 F.3d 178 (2d Cir. 2014) ........................................................................ 16

*Rubio v. U.S. Bank N.A.*,
    No. C 13-05752 LB, 2014 WL 2602330 (N.D. Cal. June 10, 2014) ........................................ 21

*Russell v. Nationstar Mortg., LLC*,
    No. 14-61977-CIV, 2015 WL 541893 (S.D. Fla. Feb. 10, 2015) ......................................... 20

*Stahl v. Simon (In re Adamson Apparel, Inc.)*,
    No. 12-57059, 2015 WL 2081575 (9th Cir. May 6, 2015) ...................................................... 17

*Steele v. Quantum Servicing Corp.*,
    No. 3:12-CV-2897-L, 2013 WL 3196544 (N.D. Tex. June 25, 2013) ................................... 20

*Turley v. ISG Lackawanna, Inc.*,
    774 F.3d 140 (2d Cir. 2014) ........................................................................ 24

*U.S. v. Burke*,
    504 U.S. 229 (1992) .................................................................................... 1

*U.S. v. McKeon*,
    738 F.2d 26 (2d Cir. 1984) .......................................................................... 17

*Uzdavines v. Weeks Marine, Inc.*,
    418 F.3d 138 (2d Cir. 2005) ........................................................................ 17

*Williamson v. Recon Trust Co., N.A.*,
    No. 2:CV 10-613-BLW, 2011 U.S. Dist. LEXIS 23876 (D. Idaho March 8, 2011) .............. 19

*Zemer v. Am. Home Mortg. Serv., Inc.*,
No. 11-15364, 2013 U.S. Dist. LEXIS 27488 (E.D. Mich. Feb. 28, 2013) ..........................19

**STATUTES**

12 U.S.C.
§ 2605(c)............................................................................................................7, 13
§ 2605(e)........................................................1, 8, 12, 13, 16, 18, 19, 20, 21, 24, 25
§ 2605(f)(1) ...........................................................................................................21
§ 2605(f)(1)(A).....................................................................................................1, 9

**OTHER AUTHORITIES**

24 C.F.R. § 3500.21(e) .........................................................................................8, 16

24 C.F.R. § 3500.21(e)(1).....................................................................................8, 16

Restatement (Second) of Agency § 436 (1958) ........................................................24

Restatement (Second) of Torts § 46 (1958) .............................................................23

Restatement (Second) of Torts § 219 (1958) ...........................................................18

Restatement (Second) of Torts § 312 (1958) ...........................................................24

Restatement (Third) of Torts § 13 (2000) ................................................................18

Amanda Frost, *The Limits of Advocacy*, 59 DUKE L.J.447...........................................1

**TO THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

The ResCap Borrower Claims Trust (the "Trust") hereby files this post-trial brief in

support of the ResCap Borrower Claims Trust's Objection to Claim No. 386 Filed by Barry and

Cheryl Mack [Dkt. 6763-4] (the "Objection").[1]

## SOME BASICS

1.        This case is about – and *only* about – the claim of Barry Mack for himself

and as executor of the estate of his late wife, Cheryl Mack (the "Claimants") that GMAC

Mortgage, LLC ("GMACM") as servicer on behalf of Deutsche Bank Trust Company Americas

as Trustee for RALI 2007QS3 ("DB") is liable to them under 12 U.S.C. section 2605(f)(1)(A) for

"actual damages as a result of," and specifically traceable to, an alleged violation of 12 U.S.C.

section 2605(e) ("Section 2605(e)"), both provisions of the Real Estate Settlement Practices Act

("RESPA"), for failure to respond to an October 26, 2009 letter (the "Letter") as an alleged

"qualified written request" (a "QWR").  It is *not* about the mistaken foreclosure that GMACM

commenced against the Macks in 2009 and its general aftermath, the larger context in which the

Letter arose and for which they already have had their day in court.[2]  The Claimants have the

burden of proof on all the elements of the claim.[3]

---

[1] In this brief, the Trust will use the following evidentiary abbreviations:  "PLX" means Plaintiffs' Exhibit __; "DX" means Defendant's Exhibit __; "SF" means stipulated fact no. __ from Section III of the Parties' Joint Pretrial Order [Dkt. No. 8162, originally filed February 20, 2015) and approved by Dkt. No. 8743 (filed June 10, 2015)];  "TT1" means the trial transcript of June 10, 2015; "TT2" means the trial transcript of June 11, 2015.

[2] This differentiates them from most claimants in these cases, who are testing their claims for the first time; those who have taken a second bite have generally succumbed to such doctrines as *res judicata*.

[3] Moreover, the Claimants may not benefit from any arguments they failed to make for themselves.  *See e.g., United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring); *Nordmann v. Nat'l Hotel Co.*, 425 F.2d 1103, 1109 (5th Cir. 1970) (trial judge may not "take over the argument of one of the parties"); *see generally*, Amanda Frost, *The Limits of Advocacy*, 59 DUKE L.J.447, 455-61 (general rule inherent in American adversary system). There are some exceptions to this general rule, but none apply here.  *See generally*, Amanda Frost, *The Limits of Advocacy*, 59 DUKE L.J.447, 461-67 (listing and discussing general categories of exceptions to rule).

sf-3549047

## FACTUAL BACKGROUND

### The Prelude:  Circumstances Predating the Foreclosure

2.      The Macks moved from New Jersey to Florida in 2002.

3.      At that time, they were both retired.  Their financial resources included pension, social security and disability income, some retirement savings and some investments.

4.      They purchased and sold two houses serially, making a profit on each sale.

5.      The Macks then bought the residence at 237 Egret, Naples, Florida (the "Property") in 2003 using a $990,000 mortgage.  (SF 3.)  The Property is a luxurious home on a canal, with two large verandas, a deck, a swimming pool, four bedrooms, 3 ½ baths and an electric winch to lower and retrieve their boat from the canal.  (SF 4.)

6.      In 2006, the Macks refinanced their by-then $998,000 mortgage, with the new mortgage and note ultimately transferred to DB.  (SF 6.)  GMACM became loan servicer. (SF 7.)  At that time, their monthly payments on the mortgage were about $5,900.  Their *gross* income was only about $6,700 a month, income that had to cover not only their mortgage, but all their other expenses:  income tax, property taxes, insurance of various kinds, utilities, fuel, food, clothing, transportation, maintenance, recreation, and so on.  (SF 9.)

7.      By March of 2008, the Macks put the Property on the market because they simply could not afford to keep it (and because they planned to return to New Jersey[4]).  (SF 12; *see also* TT1 at 24:22-25:6.)[5]  Indeed, by mid-2009 they were trying to get their mortgage obligations modified.  As they wrote to GMACM on August 10, 2009:

---

[4] At trial, Mr. Mack denied that the Macks were planning to move back to New Jersey at the time.  (TT1 at 71:23-72:9.)  However, he said the opposite under oath in April of 2012.  (DX W at 34:11-35.)

[5] Mr. Mack's testimony at trial that they could have stayed in the Property for several more years is hard to explain. (TT1 at 72:10-13.)  His testimony that they could have stayed if GMACM had not "double[d]" his mortgage payment (TT1 72:3-13) not only conflicts with evidence just discussed, but also with the fact, brought out later by the Trust, that the Macks' total obligation for the mortgage, insurance and taxes did not change.  (TT2 125:2-25.)

2

> We have tried to live with this payment amount, but we have
> exhausted all of our financial resources.  The money that we have
> gone through was all that we saved through the years of working,
> so that we could have something for our retirement years.  Well,
> unfortunately, those years are upon us now and we have nothing
> left.
>
> Our costs to maintain our current home have increased by leaps
> and bounds, while our income had not increased at all.  The current
> costs of insurance and real estate taxes and monthly living
> expenses, home maintenance, electric, water, sewerage and food
> more than drained us financially.

(PLX 16.)[6]

8.      By the time of that letter, the Macks had spent over $250,000 of their

retirement savings and investments trying to service the mortgage.  (SF 11.)  In short, they were

living well beyond their means in a dream house they could not afford.  As the letter reflects,

they were at their financial wits' end.  Clearly their only choices were to get an accommodation

on the mortgage or sell the house.  At that time, they were trying to do both.  Just as clearly, the

latter would be their *only* option absent a voluntary accommodation on the mortgage.  Thus, the

subsequent commencement of the foreclosure did not create the prospect of losing the house for

the Macks in the first instance.

9.      In early November 2009, GMACM advised the Macks that they did not

qualify for an accommodation on their mortgage because their financial information indicated

that they simply could not afford a mortgage modified in the range acceptable to GMACM.  In

dramatically staged testimony progressing from month to month, Mr. Mack claimed that

GMACM *never* advised the Macks that their application had been denied.  (TT1 at 19:2-20:9.)

But that is directly contrary to a November 4, 2009 letter from GMACM to the Macks that Mr.

---

[6] In a display of evasiveness, Mr. Mack tried to dance around the plain meaning of this letter.  (TT1 75:18-77:3.)

3

sf-3549047

Mack specifically identified as having been received by the Macks about that date.  (TT1 at 38:2-11; PLX 13.)[7]

10.     By this time, Mrs. Mack's physical and mental health already were poor and deteriorating.  She attempted suicide in 2005, the first of three such attempts.  She was so dissatisfied with her marriage that she had a year-long affair ended by her partner in 2005, a denouement that "devastated her."  She repeatedly remarked that she was happier when Mr. Mack was away.  And in May of 2011 she told a medical provider that Mr. Mack had been abusive both physically and mentally during their marriage.[8]  (SF 50, 51; PLX 15 12/5/05, 12/19/05, 3/13/06, 7/17/06, 4/25/07, 11/26/08, 12/16/08.)  And, of course, she, along with Mr. Mack, was facing financial devastation.  The Macks were also fighting over whether to return to New Jersey; Mr. Mack wanted to do so, and Mrs. Mack did not.  (SF 52, 53.)

11.     From 2006 to early 2010, she had regular visits with a psychiatrist, Dr. Lichi.  Dr. Lichi repeatedly diagnosed her as having major depression[9] and being an alcoholic[10].  (SF 46, 49.)  Other providers also diagnosed her as being an alcoholic.  (*See, e.g.,* SF 48[11].)  In May of 2011, she told a medical provider that she had lied in 2002 to the medical staff at the Mayo Clinic when she told them did she not use alcohol because she was afraid they would

---

[7] It is unclear what relevance this issue has to the QWR claim that is the sole claim in this matter.  Likely, the point was to make GMACM look like a bad actor generically.  There were other such instances.  For example, Mr. Mack complained in his testimony that GMACM raised his monthly payments from $5,900 to about $12,000 by including funds for a property taxes and insurance escrow for no reason and implied that the Macks could have afforded the house had that not happened.  (TT1 at 72:10-13.)  However, the evidence showed later that:  (1) the increase in his monthly payments was a requirement of the loss mitigation process the Macks had initiated; and (2) all the requirement did was make the Macks pay their property taxes and insurance through GMACM instead of directly; their total for mortgage payments, property taxes and insurance, whether paid directly or through GMACM, did not change with the requirement.  (TT2 at 125:2-25; PLX 14.)

[8] At trial, Mr. Mack glibly asserted that the Macks' marriage as just fine.  (TT1 57:19-22.)  Mrs. Mack's statements tell a very different story.

[9] As the glossary prepared by Dr. Lichi and admitted into evidence as PLX 15, the abbreviation "md" stands for "major depression".

[10] PLX 15 indicates that the term "etohism" means "alcoholism" and "etoh" means "alcohol".

[11] Dr. Lichi's notes from 2005 on are replete with entries regarding her alcoholism.  (*See* PLX 15 *passim*.)

4

otherwise turn her down for the liver transplant that she eventually had that year.  (SF 47.)  In fact she was an alcoholic before the transplant and after, discontinuing her use of alcohol only for a six-month period after the transplant.  (SF 46.)[12]

12.    By mid-August of 2009, just before the foreclosure proceedings began, she was diagnosed as having "acute renal failure" due to the effects of the immunosuppressant she had been taking since her transplant  (SF 57; PLX 15 at 11/8/08.)  On February 3, 2009, she told Dr. Lichi that she probably had congestive heart failure ("CHF").  (PLX 15 at 2/3/09; *see also* SF 59.)

### The Foreclosure and Its Aftermath:
### Commencment of the Foreclosure and the Counterclaims

13.    For some years, GMACM had relied on two computer programs for the delivery of its servicing duties.  One was called LoanServ. [13]  GMACM personnel would enter into LoanServ codes and sometimes related comments for activities relating to the mortgages.  Included were notes relating to contacts with a borrower, whether by phone, letter or other means.  It was GMACM's goal and practice to enter all such contacts.  Mr. Cunningham also testified that over the years he has seen notations of QWRs in LoanServ notes (though he could not affirmatively say that the Voice of the Customer personnel, who handled QWRs, always entered them since he was not part of that group).  (TT2 27:5-20; 31:13-19.)  Foreclosures also were initiated through LoanServ, which then used the second program, LPS, to communicate with counsel who was to handle the foreclosure.  LPS entries were also reflected in LoanServ.  (TT2 6:18-8:16; 11:5-25; 12:1-13:9; 45:6-24.)

---

[12] Plaintiff's witness Jewel DeMore confirmed this lattermost fact in her trial testimony.  (TT1 91:24-92:13.)

[13] Testimony about LoanServ, LPS and notes relating to the Mack loan was given by Mr. David Cunningham.  Mr. Cunningham had a long history with GMACM, LoanServ and LPS.  (TT2 5:14-6:17.)  Mr. Cunningham identified the LoanServ notes for the Mack loan.  (DX G; TT2 8:17-9:13.)  In preparation for trial, Mr. Cunningham glanced through the LoanServ notes for the Mack loan generally and looked specifically at certain passages.  (TT2 9:14-20; 24:25-25:3; 26:16-24.)

5

14.     On July 23, 2009, a GMACM's employee improperly entered a code in LoanServ that authorized commencement of a foreclosure on the Macks while she was making a proper entry on that same screen opening the "loss mitigation" process pursuant to which the Macks requested an accommodation from GMACM on their mortgage.  (13:22-15:23; 24:1-11.) This occurred even though the Macks were current on their mortgage.  (SF 17.)

15.     Loss mitigation personnel were not authorized to commence foreclosures (only to stop them if a deal was made modifying the mortgage), but the foreclosure code field is on the same screen as the loss mitigation code.  (TT2 15:22-16:16.)  Thus, it appears that the foreclosure entry was an accident.  The result of that mistaken entry was referral of the matter through LPS to the Law Offices of David Stern ("Stern") for commencement of the foreclosure. (*E.g.,* 19:10-20:24.)

16.     At the time, GMACM had a safeguard in place to catch mistakes just such as occurred on July 23.  Overnight, the GMACM computer system produced an "exception report" that noted instances the previous day when a foreclosure was commenced even though the underlying mortgage was not in default.  (TT2 19:1-9; 31:3-12.)  Therefore, the very next day, an exception report for the Mack mortgage appeared, and that day – July 24 – a person authorized to input codes in the foreclosure field terminated the foreclosure.  (TT2 17:25-18:5.) However, it appears that person did not place an appropriate entry in LPS the same day as per GMACM's practice.  (TT2 18:6-12.)  Thus, the foreclosure proceeded.  Stern filed the foreclosure action in DB's name on August 20, 2009.  (SF 17.)  The summons was served on the Macks in due course.

17.     Around August 26, 2009, GMACM discovered that the foreclosure was proceeding, and on September 2, 2009 it directed Stern through LPS to dismiss the foreclosure

6

sf-3549047

action.  (TT2 21:13-25; SF 19.)  Again through LPS, Stern on the same day acknowledged the

instruction and advised GMACM it had dismissed the foreclosure action and had closed the file

the same day.  (TT2 25:4-26:11; SF 20.)  However, for reasons unknown (there are no further

entries regarding the foreclosure in LoanServ (TT2 26:13-15), in fact Stern did not file a

dismissal of the action until December 8, although it served a copy of the dismissal on the Macks

on December 2.  (SF 21; DX X, TT 79:12-82:4.)  The Macks had a copy of the dismissal in their

possession by at least December 11, 2009, when they faxed it to their counsel.  (TT 79:12-82:4.)

18.     In the meantime, the Macks filed an answer and counterclaims against DB

on September 11, 2009, serving Stern.  The LoanServ notes indicate that Stern never advised DB

or GMACM of this filing or subsequent proceedings on the counterclaim.  (TT2 26:13-15.)

Those two entities learned of the proceedings only after judgment had been entered for the

Macks on the counterclaims and served on DB in May of 2011.  (DX F ¶¶ 2ai, 2bi; DX K.)

19.     The answer denied liability.  The counterclaims alleged liability for

slander of title and under RESPA section 2605(c) because DB failed to notify them of the

transfer of the loan from the prior owner to DB.   It sought actual damages on both counts.  (DX

B.)

### The Foreclosure and Its Aftermath:  The Letter

20.     The Macks wrote the Letter to GMACM inquiring about the foreclosure.

(DX 12.).  It is dated October 26, 2009, and Mr. Mack claims, despite his otherwise often-faulty

memory, that he specifically remembers stamping and mailing it on that date.  (DX 12; TT1

35:18-36:21.)  The Letter is addressed to "GMAC Mortgage, Attn: Customer Care, P.O. Box

4622, Waterloo, IA 50574-4622".  (DX 12.)  Mr. Mack testified that it was the Macks'

bookkeeper who selected the address.  (SF 27.)

21.    However, GMACM's monthly invoices to the Macks at that time (and to
other borrowers whose loans it serviced) contained information on the reverse side prominently
set forth in boxes that instruct recipients where to communicate with GMACM for various
purposes.  The Macks were thereby instructed to send QWRs to "GMAC Mortgage, Attn:
Customer Care, PO Box 1330, Waterloo, IA 50705-1330".  (SF 26; DX O.)[14]  This clearly is a
different address than the address to which the Macks allegedly mailed the Letter.  That latter
address is the address for "General Inquiries" set forth in the same disclosure area of the back of
the mortgage statement.  (DX O.)  Such instructions to send QWRs to a specific address were
permitted by the implementing regulations for RESPA.  24 C.F.R. § 3500.21(e)(1); 24 C.F.R.
§ 3500.21(e).

22.    At that time, GMACM for some years had maintained a subgroup of its
customer service group called "Voice of the Customer" in Waterloo, Iowa whose sole
responsibility was dealing with QWRs.  At the time, GMACM had other groups and employees
in Waterloo (and in other locations such as Dallas and Ft. Washington).  (*See, e.g.,* TT2 35:21-
36:23.)  Having a separate post office box address for the Voice of the Customer/QWR group in
Waterloo was GMACM's way of ensuring that documents that were to be treated as (potential)
QWRs got to the right place.  That was important because Section 2605(e) required a servicer to
acknowledge receipt of the alleged QWR within twenty days (*excluding Saturdays, Sundays and
holidays*) and to provide substantive response within 60 days (again, excluding Saturdays,

---

[14] After the trial, the Claimants' counsel asked for relief from SF 26 on the grounds he could not verify its truth.
Counsel for the Trust objected, noting that the Joint Pretrial Order in which it appeared was heavily negotiated,
having gone through several drafts.  The Court also observed it had been filed by the  parties months earlier, on
February 20.  However, the Court did not rule on the request.  Instead, it asked the Trust to try to supply other,
earlier sample Mortgage Account Statements as a way of confirming that other Mortgage Account Statements were
just like SF 26.  (TT2 152:19-153:3; 159:25-160:9.)  This the Trust did on June 18, 2015.  (Dkt. No. 8765.)

8

Sundays and holidays) or face "actual damages" under Section 2605(f)(1)A).[15]  In this instance,

if it received the Letter at all, GMACM would have had to acknowledge receipt by no sooner

than November 23 and respond by no sooner than January 25th.  As GMACM will explain later,

these dates are important to a component of GMACM's defense.  Thus, the fact that GMACM

had different addresses for different purposes (e.g., loss mitigation) has no bearing on whether

the Claimants had to use the P.O. Box 1330 address for QWRs.

23.      In any case, in successfully trying to ward off GMACM's summary

judgment on the address issue, the Claimants' counsel in this proceeding told the Court

unequivocally on January 12, 2015 that the Macks specifically selected the Waterloo P.O. Box

4622 address from among those they saw on the back of the monthly mortgage statement

because they thought that they were sending a "general inquiry," not a QWR.  (*See* DX N 21:16-

22:2; 22:13-22.)

24.      This tactical statement establishes two vital facts.  First, the Macks and

their bookkeeper were paying attention to the instructions on the monthly mortgage statements

and deliberately sent the Letter to the Waterloo P.O. Box address for general inquiries,

consciously rejecting the address for QWRs.[16]  Between this fact and the Trust's evidence above

that QWRs had a separate address specifically for a special group to handle QWRs means that all

the Claimants' evidence that GMACM communicated on various other matters regarding the

mortgage (such as the mitigation request) from various other addresses and that Mr. Mack did

not know about the QWR address is unavailing for them.  Second, it means that the Macks were

making a *general inquiry*, not sending a QWR.

---

[15] In earlier briefing, the Trust had overlooked the exclusion of weekends and holidays by the statute.

[16] At trial the Claimants hinted that they used the P.O. Box 4622 address because that was the address that appeared on the so-called "Welcome Letter".  (TT1 25:23-27:3; PLX 14.)  But that cannot be.  The term "General Inquiries" appears nowhere on the Welcome Letter; but it does appear on the Mortgage Account Statements.

sf-3549047

25.      In any case, GMACM has no record of receiving a letter in the weeks

immediately after October 26 even though its servicing notes normally record every

communication with a borrower and even though they reflected every other communication with

the borrower that counsel for the Claimants presented to GMACM's witness at trial.  (TT2

105:10-115:15; 124:7-11.)  Not surprisingly, it therefore has no record of responding to it, either.

### The Foreclosure and Its Aftermath:
### The Attempted Suicide, Its Antecedents and Its Consequences

26.      Sometime in the first week of November 2009 Mrs. Mack tried to commit

suicide by a combination of pills and alcohol.  Although the Claimants have contended that

attempt was some time in the second week, the relevant medical records establish otherwise.

The records created upon her November 7, 2009 admission to the Emergency Room of Naples

Community Hospital recite that she told Dr. Valenzuela that "a few days ago she tried to OD and

took a large amount of Ambien and went to sleep."  The notes go on to say that she tried to

commit suicide in 2005 and this attempt "last week" was her second.[17]  (PLX 3, at page 1.)  A

look at a 2009 calendar demonstrates that the day she was admitted, November 7, was a

Saturday, so a "few days ago" would have been November 3 or 4.  That was just days after the

Letter allegedly was mailed, and about three weeks before even any acknowledgement was due,

and more than two months before any substantive response was required.[18]

27.      It is clear that the foreclosure, though one of the reasons she was

depressed, was not the only one.  (SF 60; PLX 3, 1st page "She admits it is very difficult because

they are having severe financial problems and also she has been drinking a large amount of

alcohol . . . ;" years of "major depression" and a decidedly unhappy marriage; *see also* TT1 71:7-

---

[17] The first was in 2005.  She tried a third time in 2011.

[18] The same notes reflect that she sought admission to the hospital because, drunk and depressed *after her suicide attempt*, she had just gone to see Dr. Lichi, who, fearing for her safety, recommended that she seek medical care.  *See also* PLX 15 at 11/10/09.)

sf-3549047

22.)  More importantly, since it is the QWR and not the foreclosure that is at issue in this matter,

it is even more clear that the lack of a response to the Letter, if it was a QWR that was delivered

to GMACM and at the right address, could not be responsible for the attempted suicide since the

acknowledgement would not have been due for another three weeks and the substantive response

for about another seven weeks after that. [19]

### The Foreclosure and Its Aftermath:  The Balance of the Florida Litigation

28.     With DB having made no appearance on the Macks' counterclaims in the

Florida litigation (*see* DX k), the Macks obtained a default (*id.*).  Thereafter, on May 5, 2011,

they put on their prima facie case, with Mrs. Mack being one of their testimonial witnesses.  (*See*

DX C prelude at 1.)  Not knowing of the proceedings, neither DB nor GMACM appeared at the

hearing.  (*See* DX K.)

29.     The Florida court entered its "Final Judgment" the same day.  It granted

the Macks relief on both of their claims.  Among other things, the court awarded Mrs. Mack

$150,000 in damages for emotional distress for the alleged RESPA claims, having found:

> Defendant, CHERYL M. MACK, experienced great mental
> distress, pain and suffering, including physical symptoms,
> including hospitalization, resulting therefrom as a result of the
> stress during the foreclosure action wrongfully filed against
> Defendants MACK.

(DX C ¶ 11.)  The Florida Court also awarded the Macks $296,920.05 on the slander of title

count for the diminished value of the Property due to the cloud on title the foreclosure

represented.[20]

---

[19] In another misstatement of the facts, Mr. Mack testified at first that life after the suicide attempt was different because the Macks could no longer enjoy traveling, as they had before.  (TT1 59:5-19.)  But under cross examination he admitted that the Macks' last meaningful trip was in *2000*.  (TT1 87:19-88:10.)

[20] Of course, since nobody was defending the counterclaims, the Florida Court did not know that GMACM had dismissed the foreclosure claim on December 8, 2009, before the sale of the Property closed.  But the Macks and their counsel knew that fact, the Macks having faxed the dismissal to counsel on December 11, yet they proceeded to judgment as though nothing had changed.

11

sf-3549047

30.    Particularly notable about this award  is that it came 21 months after the commencement of the foreclosure, 19 months after Mrs. Mack's early November 2009 suicide attempt, about 18 months after dismissal of the foreclosure, long after any acknowledgement of or response to the Letter would have been due, and after the Macks sold their home under a contract that closed early in 2010.  Thus, the $150,000 emotional distress award encompassed *all* of the consequences of the foreclosure, of which the Letter was at most an undifferentiated subplot; the book was closed by that time.  In addition, there was no award whatsoever for Mr. Mack since he was not then troubled by the foreclosure events.  There also was no award for any medical expenses.

31.    While the Final Judgment was not a final judgment for *res judicata* purposes, it does place some common sense limits on the emotional distress and other damages (such as medical expenses) that the Claimants now claim arose from the Letter alone, rather than the larger foreclosure events of which the Letter was at most a minor component.

32.    Directly served with a copy of the Final Judgment around May 11, 2011 (DX F at 1-2), DB first learned of the counterclaims and it then engaged counsel, who moved the Florida court to vacate the Final Judgment based upon excusable neglect.  (DX F ¶¶ 2ai, 2bi; DX K; DX D.)  DB also argued that the RESPA award had to be set aside because nothing in RESPA required a lender to report to the borrower a transfer of the loan to itself.  (DX D.)  An evidentiary hearing ensued in 2012 (DX F at 1), with post-trial briefing.

33.    In the post-trial briefing, the Macks, seeing that DB had a good argument on the RESPA issues raised by DB, *expressly* argued in the alternative based on the Letter that DB had violated § 2605(e), so the Final Judgment should stand on RESPA grounds. Specifically, the Macks argued that, "The Counterclaim [of the Macks to the DB foreclosure

sf-3549047

complaint] equated Plaintiff DEUTSCHE BANK as having the same legal status as GMAC

Mortgage, LLC . . . ." (DX E at 6.) Thereafter, they wrote,

> Finally, the evidence produced in the Fla. R. Civ. P. 1.540(b)
> motion showed that Defendants MACK sent a written request to
> GMAC on October 26, 2009 asking for an explanation and relief
> from the foreclosure that Plaintiff DEUTSCHE BANK had filed.
> GMAC never answered despite the fact that this was a qualified
> written request under 12 U.S.C. § 2605(e) and a written response
> was required within 20 days.[21]

(*Id.* at 7.) They added, "Defendants MACK'S [sic] letter of October 26, 2009 . . . was a qualified

written request under RESPA . . .which [was not] responded to." (*Id.*)

34.     On February 26, 2013, the Florida Court issued its Final Order on

Plaintiff's Motion to Set Aside Final Judgment and Set New Trial (the "Final Order"). (DX F.)

Among other things, the Florida court found that GMACM was DB's agent (¶ 2.a.i), that due to

Stern's misconduct, neither DB nor GMACM knew about the proceedings on the counterclaim

until after delivery of the judgment on May 11, 2011 (¶¶ 2.a.i, 2.b) that there was no excusable

neglect since Stern, counsel to DB, knew of the proceedings (¶ 2.b), that DB was correct that the

RESPA claim as originally plead had to be set aside, and that the damages previously awarded in

the Final Judgment were confirmed with some adjustments (including pre- and post-judgment

attorneys fees and interest), except that the award of $150,000 for emotional distress for violation

of § 2605(c) was vacated (¶¶ 1-4 of the SO ORDERED provisions). The Final Order *did not*

include any relief under § 2605(e) despite the Macks' *expressly* having attempted to recover

under it on the theory that DB could be liable for GMACM's conduct.

35.     It also did not include any relief for any of the other theories that the

Macks could have plead, along with the potentially sweeping damage claims they might have

entailed. These included such claims as personal injury, malicious prosecution, and intentional

---

[21] Actually, the deadline at that time was 60 days.

infliction of emotional distress. It also did not include any award for wrongful death. Thus, this

Court has ruled that the Macks cannot recover for such claims even though they were pleaded in

Claim No. 386 because they are barred by *res judicata*. (DX M at 21.) [22]

### **The Closing Chapters**

36.    The Macks had decided in 2008 to sell their house because they could not

afford to keep it, and to move back to New Jersey to be with their relatives, who could also assist

with Mrs. Mack's grave and worsening physical condition. (SF 12, 13; TT1 24:22-25:5.)

37.    They listed the Property for sale originally at $1.969 million, dropping the

price five times before the foreclosure began (and once afterwards). (TT1 29:23-30:3; SF 15,

18.) They entered into a contract to sell the Property on December 9, 2009. (SF 22; PLX 13;

TT1 41:22-42:6.) That contract allowed the buyer inspection rights and required the Macks to

correct any problems the buyer found and to back out if they refused. (PLX 13 at 7 of 10; TT1

77:19-78:17.) In fact, he did find some. (TT1 78:18-78:24.) By that time the Macks knew the

foreclosure had been dismissed. Yet, they did not test the buyer's determination to have those

issues addressed, for had they refused, the buyer might have exercised his right to cancel the

contract; the Macks would then have been free to re-market the Property without any cloud on

the title. (TT1 78:5-79:11.)

38.    On December 22, 2009, Dr. Lichi recorded the following in his notes of an

appointment with Ms. Mack: "Sold the house! Great pressure off." (PLX 15 12/22/09.) The

sale closed on February 1, 2010. (SF 24.)

39.    Later in 2010, the Macks moved back to New Jersey. (SF 42.) There,

they bought a house owned by Mrs. Mack's sister, Jewel DeMore for $345,000, resulting in

---

[22] DX M is the Memorandum Opinion Sustaining in Part and Overruling in Part Objection to Proof of Claim 386 [Dkt. 7297] (the "Memorandum Opinion"). The Trust asks the Court to take judicial notice of that document.

14

mortgage payments far below those they had been making on the Property.  (SF 42.)  At that time, the financial information they submitted to take out a mortgage showed that their gross income still was only about $6,700 a month.  (SF 43.)

40.    In May of 2011, Mrs. Mack attempted yet again to commit suicide, her third such attempt, following those in 2005 and 2009.  (SF 54.)

41.    Mrs. Mack died on October 25, 2013.  (SF 52.)  The death certificate recites as the immediate causes of her death renal failure, congestive heart failure, cirrhosis of the liver and neuropathy.  (SF 52.)  As noted above, of these conditions, she suffered from at least the first two already even *before* GMACM commenced the foreclosure; and it is unsurprising that she also had cirrhosis in light of her long-time alcoholism.

## ANALYSIS OF THE LAW AND FACTS

### GMACM Did Not Receive the Letter

42.    Although Mr. Mack claims to have an astonishingly vibrant memory of stamping and mailing the letter, the Trust's evidence of GMACM's practice of memorializing all communications with borrowers in LoanServ, including QWRs, confirmed by the cross examination of Trust witness David Cunningham by the Claimants in the case of series of letters between the Macks and GMACM, along with Mr. Cunningham's testimony that there was no indication of the Letter in LoanServ, means that the Claimants have failed to meet their burden of proof to establish that GMACM actually received the Letter.  To the extent that the so-called "mailbox rule" applies, the Trust has provided ample evidence to rebut the presumption that a duly-mailed letter not returned by the post office was received.  *See, e.g., In re Barquest Grp., Inc.*, 477 B.R. 454, 462 & n.7 (Bankr. S.D. N.Y. 2012) (presumption of delivery of service of process rebutted by evidence of alleged recipients' practices).

sf-3549047

## The Letter Cannot Be a QWR Because It Was Not Sent to the Designated Address

43.    Since 1994, the regulations adopted in connection with RESPA have allowed a servicer to designate a specific address to which a QWR must be sent provided that the borrower is given notice of the address in notice of transfer of servicing or by first class mail.  24 C.F.R. § 3500.21(e)(1); 24 C.F.R. § 3500.21(e).  If such a notice is given to the borrower, a letter cannot be a QWR if it is not sent to that specified address.  *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 182 (2d Cir. 2014) (citing *Berneike v. CitiMortgage Inc.*, 708 F.3d 1141, 1148-49 (10th Cir. 2013).  *Roth* is controlling in the Second Circuit, in which the Claimants' § 2605(e) claim is pending.  Per *Roth*, the Letter simply does not qualify as a QWR because it was sent to the address for general inquiries rather than the specified address for QWRs. [23]

44.    As noted above, at trial, the Claimants introduced evidence that there were several different addresses on communications from GMACM.  Evidently, this evidence was intended to support a claim that the Macks could not be held to using the QWR address.  But there are two things wrong with this theory, one minor and one dispositive.  The minor one is that none of the other addresses involved alleged QWR responses.  The dispositive one is that the regulation makes no exception to its rule when there are multiple addresses for different reasons.  Indeed, such an exception would make no sense.  The very reason for having a special address

---

[23] During the post-trial colloquy among the Court and parties, the Court suggested that GMACM may have waived the address issue at a hearing on May 14, 2014 by answering the Court's question whether the Letter was a QWR in the affirmative.  But a waiver must be knowing and intentional.  However, as counsel explained to the Court, the whole QWR issue was virtually brand new, the Trust had not yet really begun to investigate its merits (the issues at the hearing were whether the Section 2605(e) claim was barred by res judicata, whether it could amend Claim No. 386 and whether emotional distress damages were recoverable; they were not substantive), and counsel thought the Court was inquiring about whether the *substance* of the Letter served as a QWR.  Indeed, counsel for the Claimants must have seen things as the Trust did, for neither at the January 12, 2015 hearing on the Trust's summary judgment motion on the address issue (DX N 20:21-22:22) nor in their pretrial brief did the Claimants raise what occurred at the May 14 hearing.  Indeed, in an admission, counsel for the Claimants tried to evade the address issue by arguing on January 12 that the Letter was a general inquiry, for which Letter's address would have been the proper address. (DX N 21:24-22:2.)  In fact, contrary to the rule that a court should not raise for parties arguments they do not raise for themselves, the first time what the May 14 exchange meant came up was when the *Court* raised it post-trial. (*See generally* TT2 147:10-152:18; 153:6-154:17; 157:15-158:13; 160:14-21.)  Furthermore, as the Court itself noted, *Roth* had not yet been decided.  (TT2 151:21-24.)

16

for QWRs is that servicers may, indeed often do, have multiple addresses for multiple purposes; were that not so, there would be no reason for the regulation. By the same token, as noted above, it makes sense to allow for and enforce a special address for QWRs so that servicers can avoid the consequences of failing to timely respond to one because the letter comes into a designated address.

45.    Alternatively, as described earlier, in trying to evade the application of *Roth* on January 12, 2015, counsel for the Claimants told the Court that the Macks intended the Letter as a *general inquiry*. If it was intended by the Macks as a general inquiry properly addressed to the Waterloo address for general inquiries, it was *not* a QWR. And whatever the Claimants may otherwise have argued, they cannot now change their story. A party is bound by concessions he made at oral argument. *United States v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984); *Stahl v. Simon (In re Adamson Apparel, Inc.)*, No. 12-57059, 2015 WL 2081575, at *8 (9th Cir. May 6, 2015); *Hilao v. Estate of Marcos*, 393 F.3d 987, 993 (9th Cir. 2004).[24]

46.    Moreover, the Claimants equally are barred now from changing their tune by judicial estoppel. *E.g., Peralta v. Vasquez*, 467 F.3d 98, 205 (2d Cir. 2006) (citations omitted) ("(1) the party against whom . . .[judicial estoppel] is asserted must have advanced inconsistent positions in a prior proceeding, and (2) the consistent position must have been adopted by the court in some matter."). The doctrine's purpose is to protect judicial integrity, *see, e.g., Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005). A party should not be permitted to make a claim that suits it at the particular moment in order to obtain a favorable ruling without being obliged to live with that claim when it later becomes inconvenient to the party's case. Here the inconsistency between whether the Letter was intended as a QWR or as a

---

[24] Parties also are bound by the admissions and statements of their counsel. *E.g., United States v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984); *In re George Love Farming, LC*, 366 B.R. 170, 181 (Bankr. D. Utah 2007). For the May 14 hearing, however, the question is whether the address issue was in play when the Trust's counsel made his remark.

sf-3549047

general inquiry is patent, as is the partial reliance of this Court on the allegation that Letter was a general inquiry to deny the Trust's summary judgment motion.  (*See* DX N at 22:13-24.)

### The Claimants Are Barred by *Res Judicata*

47.    In ruling on the Objection, the Court rejected the Trust's argument that the Section 2605(e) claim was barred by *res judicata* for two reasons.  First, the Court found that because DB was a lender rather than a servicer, it could not have violate Section 2605(e) (DX M at 22-23); second, it found that there was an insufficient nexus between the Section 2605(e) claim and the other claims entertained in the Florida action (*id.*)  The Trust respectfully urges this Court to reconsider that ruling.

48.    As described above, the Macks expressly sought to have DB held liable for a violation of Section 2605(e) in the Florida action.  Although DB could not itself have directly violated Section 2605(e) since it only imposes duties on a servicer, there is no reason why it could not have been held vicariously liable for the conduct of its agent, GMACM.  For example, neither the Restatement (Third) of Torts § 13 (2000) (Vicarious Liability) nor the Restatement (Second) of Agency § 219 (1958) (When Master is Liable for Torts of His Servants) require that a principal or master be capable of directly violating the subject duty in order to be held liable for such a transgression by the servant or agent.  Indeed, the Florida court found DB vicariously liable for the conduct of GMACM, its agent, on the other claims it considered in the Florida action.

49.    Moreover, in allowing the Claimants to amend the Claim to include the Section 2605(e) theory, the Court expressly found that the Section 2605(e) claim arose from the same general course of conduct as the Claimants alleged in the original Claim as filed (DX M at 25) even though a lack of such a connection was the Court's very basis for overruling the Trust's arguments against amendment.  Thus, contrary to the Court's ruling on the *res judicata* issue in

18

the Memorandum Opinion, the Court found that there *was* such a connection in that very same

decision.

50.    The Trust therefore respectfully submits that it is proper and just for the

Court to reverse its res judicata ruling in the Memorandum Opinion.

### GMACM Cannot Be Liable for any Injuries to the Macks Prior to January 25, 2010 (or November 23)

51.    Under Section 2605(e) as then written and the accompanying regulation,

GMACM had 60 days excluding weekends and holidays in which to respond to the Letter even if

it were a QWR.[25]  For obvious reasons, the cases hold that there can be no violation of or claim

under section 2605(e) until that time period has expired.  *Zemer v. Am. Home Mortg. Serv., Inc.*,

No. 11-15364, 2013 U.S. Dist. LEXIS 27488, *4-5 (E.D. Mich. Feb. 28, 2013); *Pinchot v. Bank*

*of Am., N.A.*, No. 12-cv-12994, 2012 U.S. Dist. LEXIS 178415, *33-34 (E.D. Mich. Dec. 28,

2012); *Williamson v. Recon Trust Co., N.A.*, No. 2:CV 10-613-BLW, 2011 U.S. Dist. LEXIS

23876, *4-5 (D. Idaho March 8, 2011); *Kliesch v. Fifth Third Mortg. Co.*, No. 3:10-0600, 2010

U.S. Dist. LEXIS 125686, *7-8 (M.D. Tenn. November 29, 2010); *Harris v. Am. Gen. Fin., Inc.*,

No. 02-1395-MLB, 2005 U.S. Dist. LEXIS 33260, *13 (D. Kan. July 6, 2005), aff'd, 259 Fed.

Appx. 107 (10th Cir. 2007); *Payne v. Mortg. Elec. Registration Sys., Inc. (In re Payne)*, 387 B.R.

614, 635-36 (Bankr. D. Kan. 2008).

52.    It has been suggested in this case that a violation could have occurred

sooner than the expiration of the statutory response period if, for example, the information at

issue was readily available.  But that theory not only conflicts with the above cases, but with the

plain language of the statute.  Section 2605(e) says that an acknowledgement is due within 20

days (plus) a response is due within 60 days (plus).  It does not say, for example, that a response

---

[25] In previous briefing, GMACM overlooked the exclusion of weekends and holidays.

19

is due within a reasonable time in light of the circumstances but in no event later than 60 days.

Moreover, Congress clearly knew how to accelerate the response time, for it later shortened it to

20 days. *E.g., Cezair v. JPMorgan Chase Bank, N.A.*, No. 13-2928, 2014 WL 4295048 *7 n, 8

(D. Md. Aug. 29, 2014); *Steele v. Quantum Servicing Corp.*, No. 3:12-CV-2897-L, 2013 WL

3196544, *6 (N.D. Tex. June 25, 2013); *Henderson v. Wells Fargo Bank, N.A.*, 974 F. Supp.2d

993, 1017 (N.D. Texas 2013); (SF 29). Thus, to attribute an unexpressed Congressional intent to

require a response before the 60 days then in the statute not only conflicts with cases and the

plain language of the statute, but also with the legislative record.

53.     It has also been suggested that compensable injuries may precede a

violation. *Justice v. Ocwen Loan Servicing*, No. 2:13-CV-165, 2015 WL 235738, *19 (S.D.

Ohio January 16, 2015) (costs of preparing QWR); *Marais v. Chase Home Fin., LLC*, 24 F.

Supp.3d 712, 726-28 (S.D. Ohio 2014) (costs of preparing QWR); *McMillen v. Resurgent

Capital Servs., L.P.*, No. 2:13-CV-00738, 2014 WL 3341337, *2-3 (S.D. Ohio July 8, 2014).

These three decisions, all by the same judge, rely on a hint for that result in *Marais v. Chase

Home Fin. LLC*, 736 F.3d 711, 721 (6th Cir. 2013) (remanding to district court to consider

plaintiff's arguments that such damages are recoverable under Section 2605(e)). Indeed, the

district court decision in *Marais* is the Sixth Circuit case on remand.

54.     The Trust has not been able to find any other cases reaching the same

conclusion. But it has found cases to the contrary, holding that only injuries that succeed a

violation are compensable. *Russell v. Nationstar Mortg., LLC*, No. 14-61977-CIV, 2015 WL

541893, *2 (S.D. Fla. Feb. 10, 2015); *Steele*, 2013 WL 3196544, at *8; *Cezair*, 2014 WL

4295048, at *8. Indeed, as the district court noted in *Marais*, until the Sixth Circuit decision in

*Marais*, even itself and the other district courts in the Sixth Circuit thought that there could be no

20

recovery for pre-violation events under sections 2605(e) and 2605(f)(1). *Marais*, 24 F. Supp.3d

at 726-27. And that conclusion is based not only on common sense, but again on the plain

language of the statute. Section 2605(f)(1) provides for recovery of "actual damages to the

borrower *as a result of* the failure" of a violation. (Emphasis added.) It is a matter of logic and

the English language that something that *precedes* something else cannot *result from* it.

55.    Indeed, though reaching the result that it thought the Sixth Circuit's

decision in *Marais* envisioned, the district court recognized the force of these points. *Marais*,

24 F. Supp.3d at 728. The district court tried to reassure itself by arguing that when a contractor

takes money to build a project and then fails to do so, it is the pre-breach payment of money that

becomes the damages. But this example misconstrues the situation. The payment is the *measure*

of the damages that only arise when the loss occurs, that is, when the contract is breached.

56.    But the story on damages does not end there. As the Court wrote in the

Memorandum Opinion, the Claimants must specifically trace any alleged compensable injury to

GMACM's alleged unlawful failure to respond to the Letter (DX M at 30), as is reflected by the

cases setting forth the standard for pleading Section 2605(f)(1) damages. *E.g., Bonadio v. PHH

Mortg. Corp.*, No.12 CV 3421 (VB), 2014 WL 522784, *6 (S.D.N.Y. Jan. 31, 2014) (must allege

damages proximately caused by violation and specifically how they resulted from the violation);

*Gorbaty v. Wells Fargo Bank, N.A.*, Nos. 10-CV-3291 (NGG)(SMG) & 10-CV-3354

(NGG)(SMG), 2012 WL 1372260 (E.D.N.Y. Apr. 18, 2012), *5 (same); *Rubio v. U.S. Bank

N.A.*, No. C 13-05752 LB, 2014 WL 2602330, *10 (N.D. Cal. June 10, 2014) (injury must be

result of failure to comply with statute; must allege specific facts to show causation of actual

damages as a result of failure to comply with RESPA).[26]

---

[26] These cases also reinforce the concept that only injuries post-dating the violation are compensable.

sf-3549047

57.    Given the preceding contours of damage doctrine under RESPA, the Trust submits that the Macks *cannot* have suffered any damages even if the Letter was a QWR.  That is because the evidence shows that they knew about the dismissal by Stern *before* GMACM's response to the Letter (if it were a QWR) was due.  At the latest, they had the dismissal in hand by December 11.  But the response would not have been due until January 25.  Thus, by the time the response would have been due, they knew there no longer was any foreclosure pending to trouble them. [27]  By the same token, as noted above the Macks entered into a contract to sell the Property on December 9, 2009 and Mrs. Mack expressed great relief regarding the situation.  Once again, the crisis was over long before GMACM's response was due; the foreclosure issue, and therefore the Letter, were moot.

### The Claimants Cannot Satisfy the Relevant Standards for Proof of Damages

58.    There is virtually no testimony by either Mr. Mack or Ms. Mack in the record about her alleged emotional distress at failing to get the required response(s) to the Letter; the only testimony is Mr. Macks' that Mrs. Mack was "very depressed" when the Macks did not receive a response and that GMACM's silence "cause[d] a problem" with her.  (TT1 53:9-12; 53:18-20.)  But is it not clear whether this relates to acknowledgement or a substantive response.  Thus, the Claimants' evidence on emotional distress is both equivocal and lacking in any detail that would allow a trier of fact to evaluate it even before issues of the nature of the underlying conduct and whether it caused specific harm come into play.

---

[27] In the post-trial colloquy, the Court raised for the Claimants a second issue they raised only desultory fashion only in their response to the Objection (Dkt. No. 6834 at 17) and in the Contested Issues of the Joint Pretrial Order at page 9, paragraph 24.  The theory does not appear in the Claimants later pretrial brief or any other pleading or argument.  (Dkt. No. 8659.)  This was a claim that GMACM not only failed to supply a substantive response within the 60+ days the statute required, but failed to acknowledge receipt of the Letter within the 20+ days the statute prescribed.  But the acknowledgement requirement essentially gets the Claimants nowhere.  That is because 20 days exclusive of holidays and weekends made the acknowledgement due by November 23, long after Ms. Mack tried to commit suicide.  (*See* TT2 165:14-17; *see also* TT2 162:10-163:13.)

22

59.     In addition, the Trust reiterates that under both applicable case law and the
Memorandum Opinion, the Claimants must to trace each alleged element of damages *specifically
to the alleged failure(s) to respond*.  The Claimants have wholly failed to meet these standards.

60.     Mr. Mack put in no evidence regarding himself.  (TT2 161:16-22.)  And as
just described, there really is little evidence by or for Mrs. Mack, either.  And Mrs. Mack was
gravely ill both physically and mentally even before the foreclosure began, let alone before any
response(s) to the Letter were due.  In her case, the evidence shows at most that her suicide
attempt was due in part, but in part only, to the foreclosure.  But there is no evidence to allocate
any consequences among her pre-existing conditions (including her major depression,
alcoholism and acute renal failure), the Macks' financial stress, her sadness at *knowing they
could not keep the Property under any circumstances*, to the foreclosure, let alone specifically to
the Letter to which a substantive response was not due for almost another eight-plus weeks (and
any acknowledgement for about two weeks).

61.     The only evidence on economic loss is that there were some bills for Mrs.
Mack's hospitalization in 2009 after her suicide attempt and her later hospitalization in 2010.
But the evidence was that the 2009 bills were paid by insurance.  There also was no evidence
allocating the bills among the various contributing conditions just discussed, particularly the
Letter.  And finally, there is no evidence whatsoever linking her late 2010 hospitalization to
anything that can be even colorably laid at GMACM's feet.

62.     The standards for awarding emotional distress damages are exacting.   The
evidence failed to satisfy them.  After the trial concluded, the Court suggested that the
Restatement (Second) of Torts § 46 (1958) should guide the parties.  Comment d provides that
for emotional distress damages to be available, the underlying "conduct . . . [must be] so

23

sf-3549047

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Comment d cites to *Laurie Marie M. v. Jeffrey T. M.*, 159 A.D.2d 52, 56 (N.Y. App. Div. 2d Dep't 1990), which involved sexual molestation of a child.  *See also e.g., Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 157-58 (2d Cir. 2014).  At most, GMACM's conduct was incompetent; in any case, whatever it was did not rise to the level specified by the Restatement.[28]

63.    The other sections of the Restatement (Second) mentioned by the Court are equally inapplicable.  For example, Section 312 on intentional infliction of emotional distress requires intentional conduct.  But the Claimants have failed to carry their burden of proof, for they produced no evidence on that issue; indeed, there is doubt that GMACM even received the Letter had it been properly addressed.  Section 436 on bodily harm resulting from negligent infliction of emotional distress requires the presence of an unreasonable risk of bodily harm, but it is hard to foresee that not getting a response to a QWR concerning a foreclosure will lead to a suicide attempt.  In any case, these kinds of issues are ripe only if the Claimants have proved that the alleged failures to respond caused specific injury.  They have not done so.

64.    Moreover, matching the standards discussed above for linking damages to the GMACM's alleged violation of Section 2605(e), the Claimants faced a high burden of proof on the specific issue of causation emotional distress.  *E.g.,  See e.g., Cowan v. City of Mt. Vernon*, 2015 U.S. Dist. LEXIS 39693 (S.D.N.Y. Mar. 27, 2015) (recognizing "a causal connection between the conduct and the injury" as an element of intentional inflict of emotional distress claim); *see also Turley*, 774 F.3d at 157-158 (explaining that to prevail on intentional inflict of emotional distress claim "plaintiff must establish that there was 'extreme and

---

[28] In any event, there is no evidence that GMACM's conduct was intentional.

sf-3549047

outrageous conduct,' that the conduct was undertaken with 'intent to cause, or disregard of a substantial probability of causing, severe emotional distress,' and that the conduct *did in fact cause* severe emotional distress") (emphasis added).  There is no evidence in the record that specifically ties the alleged violation of the response date(s) to Ms. Mack's alleged emotional distress (as noted above, those dates both followed her suicide attempt, so that event and its aftermath could not have been caused by a Section 2605(e) violation).

### CONCLUSION

65.    The Letter cannot have served as a QWR because it was misaddressed or because it was meant not as a QWR but as a general inquiry.  Moreover, the Claim is barred by res judicata.  Finally, the Claimants failed to provide any meaningful evidence of injury and failed to trace any alleged injury specifically to the alleged violations of Section 2605(e).

Dated: July 13, 2015

/s/ Norman S. Rosenbaum
Norman S. Rosenbaum
Adam A. Lewis
Kristin A. Hiensch
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

*Counsel for the ResCap Borrower Claims Trust*

sf-3549047