David F. Garber, Esq.
Florida Bar No.: 0672386
DAVID F. GARBER, P.A.
2800 Davis Boulevard, Suite 211
Naples, Florida 34104
239.774.1400 Telephone
239.774.6687 Facsimile
davidfgarberpa@gmail.com
Attorney for Claimant, Barry Mack

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Case No.: 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al. | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) |  |

**CREDITOR BARRY MACK'S FINAL ARGUMENT**

# **TABLE OF CONTENTS**

**FINAL ARGUMENT**

I.    STATEMENT OF THE FACTS AND OF THE CASE          4-10

II.   CLAIMANTS MACKS' ARGUMENTS

    A.    RESPA CLAIM          10-15

    B.    DAMAGES          15-17

III.  GMACM'S DEFENSES

    A.    ADDRESS          17-21

    B.    RES JUDICATA          21-22

    C.    TIMING OF RESPONSE          22-23

IV.   CONCLUSION          23-24

# TABLE OF AUTHORITIES

## CASES

*Berneike v. Citimortgage, Inc.*                                        17, 79
    708 F.3d 1141(10th Cir. 2013)

*Catalan v. GMAC Mortgage Corp.*                                   11, 16, 19
    629 F.3d 676 (7th Cir. 2011)

*Hittle v. Residential Funding Corp.*                                  20, 22
    No. 2:13-cv-353 (S.D. Ohio Aug. 5, 2014)

*Justice v. Ocwen Loan Serv.*
    No. 2:13-CV-165 (S.D. Ohio January 16, 2015)        23

*McLean v. GMAC Mortg.*                                             12, 16
    595 F. Supp. 2d 1360 (S.D. Fla. 2009)

*Nash v. Green Tree Servicing, LLC*                                  21
    943 F. Supp.2d (E.D. Va. 2013)

*O'Toole v U.S. Secretary of Agric.*                                 11
    474 F. Supp.2d 1323, 1329 (Ct. Int'l Trade 2007)

*Pasillas v. Deutsche Bank National Trust. Co.*                      21
    5:12-CV-04123-LHK (N.D. Cal. 2014)

*Roth v. Citimortgage, Inc.*                                        17, 19, 21
    756 F.3d 178 (2d Cir. 2014)

*Whittaker v. Wells Fargo Bank, N.A.*                                10
    No. 12-CV-98-Orl-28GJK (M.D. Fla. Oct. 22, 2014)

## STATUTES

12 U.S.C. § 2605                                                     10

12 U.S.C. § 2605(e)                                           10, 11, 12, 19, 21, 22

## SECONDARY SOURCES

Restatement (Second) of Torts                                       15, 16, 17

## **FINAL ARGUMENT**

COMES NOW Creditor, BARRY MACK, by and through the undersigned counsel, and files his Final Argument pursuant to the Court's request after the evidentiary hearing on June 10 and 11, 2015 on Claim Number 386 filed by Barry and Cheryl Mack, as follows:

I.    STATEMENT OF THE FACTS AND OF THE CASE

In 2006, Barry and Cheryl Mack refinanced their house located at 287 Egret Avenue, Naples, Florida.  The house was a two-story, three and ½ bath house with a swimming pool and pool deck (Transcript of Record, Vol. I at 11, L16-19).  They refinanced it with Primary Residential Mortgage (P Ex. 18) for which the servicing was transferred to GMAC Mortgage, LLC (hereinafter "GMACM") on October 24, 2006 (P Ex. 14).  In the "welcome letter" that GMAC Mortgage sent to them, GMAC specified the address for all correspondence to GMACM as PO Box 4622, Waterloo, Iowa 50704-0422.  This letter was sent by Customer Care.  No specific address was given for any qualified written request that they might choose to send to GMACM.

Although their mortgage payments were $5,800 per month (Joint Pretrial Order at 3, ¶8), and their combined monthly income was about $6,500 (Transcript of Record, Vol. I at 22, L15), the Macks were able to make their payments on the mortgage and live in the house by drawing on savings and investments to assist them in their expenses (Transcript of Record, Vol. I at 23, L15).  The state of affairs remained static until the spring of 2009, at which time on April 17, 2009, they called GMACM to ask if they might be eligible for mortgage assistance through the government-sponsored HAMP program (Transcript of Record, Vol. I at 24, L1).  On the same day, GMACM marked their loan for default (P Ex. 1).

The Macks remained current on their mortgage at all times through the summer and fall of 2009, when a bank unknown to them, Deutsche Bank, filed a foreclosure suit against them saying they had defaulted on their payments as of August 1, 2009 (Transcript of Record, Vol. I at 16, L20-25). The Macks called GMACM, whom they had been dealing with, to inquire and complain about the foreclosure suit (Transcript of Record, Vol. I at 18, L13-25). The Macks made payments of principal and interest directly to GMACM, paid their own taxes and insurance, and did not have an escrow account (Transcript of Record, Vol. I at 22, L12-25; 23, L1-2).

Although the Macks called GMACM continuously throughout August, September, October and November 2009 to complain about the foreclosure suit brought by an entity unknown to them, Deutsche Bank, GMACM did not insure that the suit was dismissed. On December 9, the Macks, under threat of the foreclosure, signed a contract to sell their house at a greatly reduced rate so that the mortgage could be paid off and the foreclosure suit dismissed (Transcript of Record, Vol. I at 24, L19).

On October 26, 2009, Barry and Cheryl Mack sent a letter to GMACM addressed to Customer Care, PO Box 4622, Waterloo, Iowa 50704, to ask for help with the foreclosure suit then existing against them (Transcript of Record, Vol. I at 35, L18-24; P Ex. 43).

The Macks were anxious throughout the fall of 2009 about the application they had made for mortgage payment relief and called numerous times throughout that period, and they also remained anxious about the foreclosure pending against them by Deutsche Bank and continually complained to GMACM about the foreclosure (Transcript of Record, Vol. I at 46, L15-25; 47, L1-6). Each time they complained to GMACM, GMACM maintained their loan was current,

GMACM did not know who Deutsche Bank was, and GMACM did not know about the foreclosure suit.

Mrs. Mack, who had been suffering from depression for several years over a variety of factors, including challenges to her health from a liver transplant in 2002, which resulted in damage to her kidneys, drank frequently after the transplant. However, in 2008, and the majority of 2009, the notes from her doctor, Dr. Eduardo Lichi, of Naples, Florida indicated that her drinking had lessened and her mood had stabilized and improved. In 2005, for various reasons unrelated to the mortgage, Mrs. Mack attempted suicide. She continued to see Dr. Lichi sporadically over the next four years, but in the first half of 2009, her mood was stable.

In February 2009, she complained of sleeping too much, but indicated she was emotionally ok. In March of 2009, she told him she was drinking less and feeling and walking much better. In April 2009, she indicated she was feeling well, and her mood was stable. Again in April 2009, she was doing well. In August, September, and October of 2009, Mrs. Mack indicated concern and anxiety over the foreclosure which threatened them with the loss of their home. However, Dr. Lichi's notes do not seem to indicate the concerns were extreme (P Ex. 2). For instance, on August 25, 2009, he annotates in her file "no more booze", and states that she is looking and feeling good and is hopeful. On September 22, 2009, a month after receiving the foreclosure notice from Deutsche Bank, Dr. Lichi records that she is doing well and drinking only wine, no hard liquor. He indicates her mood as euthymic with a bright affect. On November 9, 2009, two weeks after Mr. and Mrs. Mack sent the October 26, 2009 letter to GMACM seeking help for the foreclosure filed against them by Deutsche Bank, Mrs. Mack attempted suicide by taking an overdose of Ambien and Alcohol. She was involuntarily hospitalized due to the suicide attempt on November 10, 2009. Dr. Lichi reports she said "I am

obsessed with suicide".  At the time he saw her she appeared heavily drunk, and had difficulty walking and slurred speech.  On that day, she was driven to Naples Community Hospital by one of his staff with the specific stipulation she was suicidal and intoxicated.  On December 1, 2009, Dr. Lichi records that she said "I am in the same position I was last time i.e. I will continue to drink and I hate life hence suicide is still on my mind although no active plan or intent".  He records her as having moderate to severe, yet no active suicidal thoughts.  He states that she admitted to feeling some hope that wasn't there before, but very difficult to deal with the foreclosure of her home.  On December 22, 2009, she indicated a great pressure was taken from her since they had sold the house.  Her alcohol abuse was noted and she indicated she was still drinking, but not to excess.  Dr. Lichi did not see her again until March 18 when she stated that there were lots of boxes everywhere in the house and that she missed her home. He notes continued alcohol abuse.  On May 25, 2010, she reported being in good spirits, but missing her home.  He notes continued alcohol abuse.  Dr. Lichi did not see her after that since she moved back to New Jersey with her husband after the loss of their home.

Barry Mack testified at the trial that he signed the letter of October 26, 2009 and mailed the letter with an address supplied by a bookkeeper, to GMACM by personally placing it in the mailbox with a first class stamp (Transcript of Record, Vol. I at 36, L2-11).  He further testified that they did not receive a response from that letter in October or November or December of 2009, and, in fact, never received a response to that letter (Transcript of Record, Vol. I at 27, L17-25).  He testified that he and his wife were calling GMACM continually during the fall of 2009 and complaining about the foreclosure that was pending against them until it was dismissed on December 8, 2009 (P Ex. 5). Instead of receiving help with the foreclosure, or help through the HAMP program, GMACM instead insisted on escrowing for taxes and insurance, which

raised their monthly payment from $5700 to $12,000 (Transcript of Record, Vol. I at 40, L3-4). Additionally, GMACM insisted that the Macks pay for the costs of the foreclosure suit that was brought against them, including the attorney's fees for a total amount of $3,712 (Transcript of Record, Vol. I at 49, L3-4).  He testified that during this time Cheryl appeared increasingly upset and depressed since they did not receive a response to their October 26, 2009 letter asking for help.

He testified that even after the house was sold and they moved into a rental house for nine months in Naples before moving back to New Jersey to be close to family, Cheryl continued to be depressed and continued to agonize over the loss of her house (Transcript of Record, Vol. I at 55).  Her health declined, and she was counseled to begin dialysis for her failing kidneys.  She refused dialysis (Transcript of Record, Vol. I at 56, L16-25) and ultimately died from kidney disease.  However, Barry Mack testified that he observed that she did not want to live anymore and could never get over having lost their house in Florida (Transcript of Record, Vol. I at 57, L2-3).  She never wanted to leave Florida (Transcript of Record, Vol. I at 57, 10-15).

Cheryl Mack's medical records from Naples Community Hospital from November 10, 2009 stemmed from a "combination of severe depression, suicidal ideation and alcohol abuse" The patient told the ER physician that she has been down and depressed, and has been drinking for the past several months.

During her evaluation, she reported that she had been going through a difficult time in her life over the last few weeks and admits it had been difficult because they are having severe financial problems, and also she has been drinking a large amount of alcohol and not telling much to her psychiatrist.  She admits to taking an overdose of Ambien and alcohol (P Ex. 3). Her diagnosis was "major depression – recurrent, severe".

In the hospital note of November 13, 2009, they state "the patient is noted with acute deterioration of renal functions". The assessment and plan for the report of the same date by Dr. Marilyn Wahe, indicates the number one problem was acute renal failure on chronic kidney disease. In the fall of 2010, Mrs. Mack was again hospitalized and in the history of her illness, it was reported that she "has been experiencing increasing falls, weakness and difficulty getting around, it sounds like it has been worsening over the past year or so." The hospitalization of May 2010, Dr. Manuel Patel states that "patient has had recurring episodes and has not stopped drinking for the last 6 months".

Barry Mack testified that his life with his wife was peaceful and satisfactory before her hospitalization in November of 2009 due to her suicide attempt. He indicates that they enjoyed traveling from time to time, not only out of the country, but also frequently to NJ to visit family and friends. However, they were unable to travel due to Cheryl Mack's health after November 2009 (Transcript of Record, Vol. I at 59, L5-19).

Her depression continued and she again tried to commit suicide in 2011 (Transcript of Record, Vol. I at 61). The approximate cost for the hospitalization in November 2009 was $30,000 (Transcript of Record, Vol. I at 66, L24), although it was paid for by Medicare and private insurance from Mr. Mack's police pension (Transcript of Record, Vol. I at 67). Cheryl Mack did not want to return to New Jersey, but was forced to because of the foreclosure (Transcript of Record, Vol. I at 72, L2-9). They could have continued to support the mortgage for a few more years even without any help from GMACM (Transcript of Record, Vol. I at 75, L18-21). Jewel DeMore, the sister of Cheryl Mack and sister-in-law of Barry Mack, testified that she spoke to her sister weekly, although Ms. DeMore was living in New Jersey and Mrs.

Mack was living in Florida (Transcript of Record, Vol. I at 90).  In the fall of 2009, Cheryl seemed worried in telephone conversations before October 26, 2009, but after that date became depressed (Transcript of Record, Vol. I at 96, L6-20).  Her depression continued even after returning to New Jersey in 2010, but she felt she had no choice (Transcript of Record, Vol. I at 98, L4-7).  Although Cheryl Mack told Ms. DeMore about the letter sent to October 26, 2009, neither she nor Barry ever indicated they knew what a qualified written request (QWR) was (Transcript of Record, Vol. I at 101, L1-4).  Ms. DeMore assisted the Macks with their finances and was aware from their financial information that they still had substantial investments although their savings were depleted, and they could have stayed in the house a while longer if they had not been foreclosed on (Transcript of Record, Vol. I at 104, L13-17).

## II.    CLAIMANTS MACKS' ARGUMENTS

### A.    RESPA CLAIM

Claimants MACK were required to show five elements to successfully pursue a 12 USC § 2605 (e) claim (RESPA) as enumerated in *Whittaker v. Wells Fargo Bank, N.A.*, No. 12-CV-98-Orl-28GJK (M.D. Fla. Oct. 22, 2014).  Those elements were shown either by proof at trial or stipulations entered prior to trial and are as follows:

i.    *The defendant was a servicer as defined by 12 U.S.C. §2605 (RESPA).* (Joint Pretrial Order at 3, ¶7.

ii.    *The defendant received a qualified written request from the plaintiff as defined in that statute.*  This requirement was shown by the testimony of Barry Mack, where he stated that he personally sent the QWR to GMACM at PO Box 4622, Waterloo, IA, by placing it in the mailbox with a first class envelope (P. Ex. 43).  Mr. Mack did this on or about the date of the letter of October 26, 2009 (Transcript of Record, Vol. I at 36, L2-11).  Pursuant to "the mailbox

rule", a letter, sent by first class mail, is presumed to have been received by the recipient. *O'Toole v U.S. Secretary of Agric.,* 474 F. Supp.2d 1323, 1329 (Ct. Int'l Trade 2007).

      iii.    *The qualified written request pertained to servicing of a loan*.  Whether the letter amounts to a qualified written request is found at 12 U.S.C. §2605(e), which requires that a letter be a communication other than a monthly bill, that it identify the name of the borrower, and that it identify the account number to which it pertains.  Further, it must inquire or complain of a subject matter regarding the handling of the loan.  *Catalan v. GMACM*, 629 F.3d 676 (7th Cir. 2011).  In this case, the Macks had been wrongfully sued by Deutsche Bank at the instigation of GMACM for a failure to make their monthly obligations on the mortgage when, in fact, they were never in default and for which the Macks were asking for help in resolving.  (Joint Pretrial Order at 3, ¶ 17; P Ex. 43).

      iv.    *The defendant failed to respond adequately to the qualified written request.*  Barry Mack testified that the Macks received no response to the October 26, 2009 letter (Transcript of Record, Vol. I at 37, L17-25; Joint Pretrial Order at 4, ¶30).  Instead, GMACM continued to put great pressure on the Macks to sell their house (see, P Ex. 6, November 4, 2009, November 5, 2009, November 12, 2009 and November 27, 2009 entries), despite the fact that GMACM "discovered its mistake within days and notified local counsel on September 2, 2009 to dismiss the foreclosure action." (Joint Pretrial Order at 3, ¶19).  GMACM also demanded payment for their foreclosure costs (P Ex. 6, December 23, 2009 entry; P Ex. 32 – payoff statement; P Ex. 21 – GMACM letter of January 14, 2010).  GMACM continued to deny any foreclosure mistake with the Macks even in their notice of dismissal without prejudice (P Ex. 5) where their attorney referred to Deutsche Bank, the plaintiff in that suit, as the "prevailing party".

v.    *The plaintiff is entitled to actual or statutory damages.*    The Macks are entitled to receive actual damages based upon the provisions of 12 U.S.C. § 2605(e) as interpreted by various federal courts across the United States.  *McLean v. GMAC Mortg.*, 595 F. Supp. 2d 1360 (S.D. Fla. 2009).  The damages from the failure to respond to the October 26, 2009 QWR are evident from Dr. Eduardo Lichi's letter of December 1, 2009, as well as his patient progress notes before the QWR of October 26, 2009 showing Cheryl Mack's stabilized moods on: February 3, 2009, March 17, 2009, April 14, 2009, April 29, 2009, June 9, 2009, August 25, 2009, and September 22, 2009 (P Ex. 2).

The first mention of severe emotional trauma to Cheryl Mack was recorded on November 10, 2009, two weeks after the QWR of October 26, 2009, and later on December 1, 2009.  This anxiety continued through the March 18, 2010 note, which was the last time Dr. Lichi consulted with Mrs. Mack.  These emotional damages are further evidenced from the medical records of Naples Community Hospital from November of 2009 (P Ex. 3).  Mrs. Mack's history and physical statement, dictated by Ranier Valenzuela on November 11, 2009, alluded to her severe depression and suicidal ideation.  Further, this depression was underscored by the emergency room note of Carolyn Walters dictated on November 10, 2009 finding severe depression and suicidal thinking.  Also, a note dictated on November 13, 2009 by Dr. Marilyn A. Wahe, states that "…the patient is noted with acute deterioration of renal functions."  The report describes it as acute renal failure on top of acute kidney disease.

Mrs. Mack began a course of conduct in which she completely gave up on her long-time fight against alcoholism after the date of her hospitalization in November 2009, and which was documented by Dr. Manuel Batlle in his history and physical dictated on April 29, 2010 (P Ex. 3).  He states that the patient had been drinking for at least 6-7 months.  Although Mrs. Mack

told her psychiatrist Dr. Lichi on December 22, 2009 that they had sold the house and a great pressure was off, she was still continuing to drink heavily and did so for the rest of her life after entering Hospice on February 1, 2012 (Joint Pretrial Order at 6, ¶61) until she died on October 25, 2013 of several causes listed in the death certificate, including renal failure.  (Joint Pretrial Order at 7, ¶62).  Undoubtedly, having the house sold did relieve pressure and although it was not mentioned in her note to Dr. Lichi, by this time (December 8, 2009) GMACM finally dismissed the foreclosure against the Macks.

This court has stated that damages from the foreclosure itself would not be recoverable, but only those damages that resulted from a failure to respond to the letter of October 26, 2009. It is evident from the notes of Dr. Lichi, as well as the testimony of Barry Mack and Jewel DeMore that the failure of GMACM to react to the October 26, 2009 was the last straw in a long series of foreclosure-induced assaults upon the emotional well-being of Cheryl Mack.  She finally collapsed under the pressure and attempted to commit suicide when she did not receive a response to the letter of October 26, 2009.  Each of the other actions that GMACM had engaged in with respect to the Macks, including the filing of the foreclosure suit; the continual assurances that they did not know who the plaintiff in the foreclosure suit was (Deutsche Bank, the trustee for RALI- QS3); that they were current on their loan; that there was no problem, and still the foreclosure continued; was undoubtedly frustrating and debilitating to someone in Mrs. Mack's condition with a prior history of depression, delicate health, and unwarranted alcohol consumption.  Just as a camel's back would not be broken save the last straw placed upon it, so too Mrs. Mack's collapse and suicide attempt resulted from the placement of the last straw – the failure of GMACM to respond to the October 26, 2009 letter.  The failure to answer the letter was reckless and outrageous in and of itself, but the repeated earlier denials of responsibility for

the foreclosure or even the existence of the foreclosure and the continual assurance that the mortgage was current, made their failure so much more difficult to understand. GMACM's witness, David Cunningham, stated that all of the operators that dealt with the Macks had at their disposal on the computer screen they were reviewing, all of the history of the case just as it appeared in Plaintiff's Exhibit 1, Purged Loan Notes (Transcript of Record, Vol. II at 63, L20-24). He was not able to give an answer as to why, if the operators did have the information, none of the subsequent operators in dealing with the Macks ever decided to look into the foreclosure (Transcript of Record, Vol. II at 88, L18-24). Nevertheless, it must be borne in mind that P Ex. 1 was selected from computer entries and prepared by GMACM for assistance in their motion to vacate the judgment existing against Deutsche Bank for a wrongful foreclosure on the grounds that they had no knowledge of the foreclosure after September 3, 2009. Barry Mack testified that both he and his wife repeatedly complained of the foreclosure in September, October, November and December, and yet in none of the telephone calls or entries in P Ex. 1 is there any mention of this. It is not surprising that the letter of October 26, 2009 also does not appear. If GMACM could not figure out which loans should be sued upon for default in foreclosure, especially when loans were reviewed daily by the computer to see if they were current (Transcript of Record, Vol. II at 19, L3-9), they certainly could not rely on the quality of their Purged Loan Notes (P Ex. 1) for the handling of their mortgages, nor can they now rely on them for completeness to show they did not receive P Ex. 43, the QWR. When the court inquired if a QWR would appear in the Purged Loan Notes, P Ex. 1, Cunningham acknowledged he did not know. (Transcript of Record, Vol. II at 27, L19-20). The failure to actually stop this foreclosure and be aware that David Stern was not following his instructions was not only willful and wanton, it is outrageous. P Ex. 1 may not qualify under the business records exception (FRE

802(6)) since entries were made by personnel (Law Offices of David Stern) who's business practices have been challenged by GMACM in the state suit (Transcript of Record, Vol. II at 45, L21-24).  P. Ex. 1 also is too untrustworthy to meet the requirements of FRE 802(7) regarding the absence of an entry in the record, given the blank spaces in the exhibit, GMACM's repeated failure to respond to the Macks' foreclosure complaints, and the insistence that they were the prevailing party in the foreclosure.  Cunningham's Supplemental Declaration of June 18, 2015 is unconvincing not only because it is an affidavit not subject to cross-examination, but also is speculation and his opinion based upon a review of the first (and unimportant) page (Cunningham Declaration at 2, Doc. 8769, Jun. 18, 2015).  However, P Ex. 1 does qualify for admission as a running statement against interest and was tendered by the Mack's as evidence because of that (FRE 801(d)(2)).

B.    DAMAGES

The Restatement (Second) of Torts § 46 recognizes liability against a tortfeasor for outrageous conduct causing severe emotional distress.  The Macks argue that GMACM's conduct was reckless or grossly negligent in that GMACM were repeatedly presented with opportunities to cure their wrongful foreclosure in August, September, and November of 2009, but failed to do so.  They should not be heard to argue that all of the preceding contacts do not affect the quality of their failure to respond to the QWR of October 26, 2009, since the history makes the failure after October 26, 2009 completely inexplicable.  Certainly, no argument can be made that Mrs. Mack's suicide attempt over the state of her foreclosure on November 10, 2009 did not demonstrate severe emotional trauma.  Even so, the comment to § 46 states that it might easily be added as a supplement to a suit where the gravamen is another tort or statutory violation.  In this case, the liability is established by GMACM's failure to respond to the QWR

of October 26, 2009.    RESPA is a consumer protection statute comparable to the FDCPA that does not require that the failure to respond be intentional, reckless or grossly negligent (*Catalan v. GMAC Mortgage Corp.*, 629 F.3d 676 (7th Cir. 2011)).    Under the FDCPA, a consumer protection statute, state law rulings on negligent or intentional infliction of emotional distress are not applicable.  *McLean v. GMACM,* 595 F.Supp2d 1360 (S.D. Fla. 2009).  RESPA sets a bright-line test that if there is a failure, there will be liability.  The liability for damages that has been found by a majority of courts in this country encompasses emotional harm.  There has been no requirement in any of the cases finding damages for emotional harm a valid under RESPA that it be severe, result in hospitalization, or that it result in disability.  However, all of these elements are present in the Macks' claim.

Restatement (Second) of Torts § 905 discusses humiliation as an element of damages when one has a cause of action for a tort (and presumably a statutory violation that allows mental suffering), as well as fear and anxiety.

While Mrs. Mack's reaction may have been more severe than the average homeowner, nevertheless even the average homeowner faced with the loss of his home, especially when he has fully met all of his obligations, at great personal sacrifice, and is powerless to protect it, would feel great fear and anxiety and even humiliation from being subjected to such a suit.  In Mrs. Mack's case, she had a history of delicate health and emotional troubles and was sent over the edge by the failure of GMACM to investigate this matter, dismiss the suit, and retract any claims for having brought the suit, including GMACM's attorney's fees, and otherwise make the Macks whole as should have been done.  This failure continued well after even the 60 days provided for by RESPA, including demands for attorney's fee reimbursement in their payoff figure.  It is difficult to know exactly what an appropriate dollar figure would be to compensate

16

for the pain and suffering that Mrs. Mack experienced, but certainly a fact to be considered is the length of time and the intensity of the distress (See Restatement (Second) of Torts § 905(i)), which, in Mrs. Mack's case, was the rest of her life until her death in October 25, 2013.

Under Restatement (Second) of Torts § 912, the Macks were required to present their claim with as much certainty as the nature of the action and the circumstances permit. There is no certain amount that will meet a formula to arrive at this, but, as comment A to Section 912 states, it is even more desirable that an injured person not be deprived of substantial compensation because they cannot prove their injuries with complete certainty. These matters must be left to the sound discretion of the judge. (See, Restatement (Second) of Torts § 912(e)).

In Restatement (Second) of Torts § 917(c), it states that the section does not apply to the creation of liability, but only to its extent. It applies to all situations, whether the conduct is intentional, negligent, or a matter of strict liability. Once it is determined that GMACM was under a duty to respond to the letter of October 26, 2009, and it failed to do so, liability would be established, and under Restatement (Second) of Torts § 910, the injured party is entitled to damages, past and future, caused by the tort or action establishing liability.


III.    GMACM'S DEFENSES

A.    ADDRESS

The primary defense that GMACM relies on to challenge the Macks' claim arises primarily from two cases, *Berneike v. Citimortgage, Inc.*, 708 F.3d 1141 (10th Cir. 2013) and *Roth v. Citimortgage, Inc.,* 756 F.3d 178 (2d Cir. 2014), which was an outgrowth of the *Berneike* ruling. In *Berneike*, the plaintiff sent over 100 letters to her mortgage servicer to addresses in Illinois and Nevada, but failed to send a single letter to the QWR designated address in

Maryland.  The court observed that HUD, the agency tasked with overseeing RESPA, formulated

a regulation in 24 C.F.R. § 3500.21 that allowed a servicer to designate a specific and exclusive

QWR address.  In that regulation, they stated that "a servicer may establish a separate and

exclusive office and address for the receipt and handling of qualified written requests."  A strict

reading of the rule requires then three things: (1) establishment by the servicer of a designated

QWR address (2) establishment of an office to handle the QWR, and (3) notice must be given to

the borrower of that address.  The Macks were initially given an address of Attn: Customer Care,

P.O. Box 4622, Waterloo, IA 50704-0422 (P. Ex. 14) when GMACM assumed the servicing of

their loan.  Later on, GMACM notified borrowers, including the Macks, that the address to

which QWRs should be sent was GMACM, Attn: Customer Care, P.O. Box 1330, Waterloo, IA

50704-1330 (D Ex. O).  While GMACM was not able to provide a copy of any earlier statements

to the Macks showing that this address changed, instead of the address they listed for all

correspondence in their 2006 Welcome Letter, nevertheless they were able to supplement the

trial record to show that the printed monthly billing statements for other customers in October

2009 reflected the new address.  GMACM therefore maintains it was likely that in fact the

Macks were notified of the new address on their monthly billing statement before their letter to

GMACM of October 26, 2009.  It should be noted that in the November billing statement,

GMACM retained the address of Customer Care, PO Box 4622, Waterloo, IA 50704-4622, just

as it had initially given the Macks in the Welcome Letter of October 1, 2006 for general

correspondence.  There was no evidence presented to show that the Macks had any knowledge as

to what a QWR was or whether they intended to send a QWR when they sent their letter of

October 26, 2009 to GMACM asking for help with the foreclosure that had been wrongfully filed

against them by Deutsche Bank.  However, there is no mention in 12 U.S.C. § 2605(e) that in

18

order to qualify for a QWR a borrower must intend that their communication be a QWR.  See, *Catalan v. GMAC Mortgage Corp.*, 629 F.3d 676 (7th Cir. 2011).  Instead, the only requirement is that it be on a statement other than the monthly printed billing forms, that it identify the name and account number of the borrower, and that it regard a matter affecting the servicing of their loan.  *Id*. at 676.  *Roth*, evolving from *Berneike*, was based on a case where the borrower's attorney sent letters to servicer Citimortgage indicating that the letters should be considered as QWRs under RESPA.  These letters were sent to addresses in Missouri and Des Moines, Iowa.  The attorney for Roth did not send any letters to Citimortgage at the QWR designated address in Gaithersburg, MD.  Thus, the *Roth* court found that since the letters there were not sent to the designated QWR address, they could not be considered as QWRs.

Both of these cases can be distinguished from the Mack case.  In *Berneike*, the borrower sent over 100 letters and was never able to use the properly designated address despite 100 tries.  In *Roth*, the borrower only made 3 tries, but those tries were made by an attorney familiar enough with RESPA to designate the letters as qualified written requests.  Further, *Roth* and *Berneike* were cases in which the borrower was in default on their loan, and complaining of relatively minor irregularities, such as service charges.  The Macks were complaining about a wrongful foreclosure when they had made all of their payments.  No evidence was presented at trial that the Macks were aware of 12 U.S.C. § 2605(e), or that they understood what a QWR was, and even if they had reviewed their billing statement they still might not know where to send the letter they sent to GMACM other than the address they were initially told to send all correspondence to when GMACM became the servicer in October 2006.  Further, neither the *Berneike* nor the *Roth* court address an important aspect of 24 C.F.R. § 3500.21, which is, that

the servicer must not only establish an address, he must establish an office in order to be availed of the QWR address defense.

This is a highly technical defense and for a remedial statute to be construed broadly *Hittle v. Residential Funding Corp*., No. 2:13-cv-353 (S.D. Ohio Aug. 5, 2014) would require great legal sophistication on behalf of any borrower complaining about the servicing of his loan in order to avoid the defense. If a court were to say in a blanket pronouncement that any inquiry made by a borrower otherwise qualifying as a QWR under the simple requirements Congress enumerated in RESPA, must fail if that borrower did not have the legal acumen to avoid the servicer oriented 24 C.F.R. § 3500.21 address trap, the consumer-oriented intent of RESPA would be completely vitiated.

In the Macks' case, David Cunningham was the witness for GMACM to establish their defenses. Cunningham had never been to GMACM's Waterloo site until after 2009. He was not able to describe how many people worked for customer care, he did not know if they had a particular training manual or phone system, he did not know if they had separate office equipment, and he did not know how the mail was picked up from the two different post office boxes at Waterloo, Iowa. In fact, the only clear difference between regular customer care and QWR customer care ("voice of the customer in customer care") (Transcript of Record, Vol. II at P28, L8), is the post office box number. Cunningham was not able to identify who picked up the mail (Transcript of Record, Vol. II at 40, L21). He did not know if there was a separate person to pick up the mail for each post office box (Transcript of Record, Vol. II at 40, L25). He did not know if both post office boxes were at a central location (Transcript of Record, Vol. II at 41, L5). He did not even know if there was a separate post office box for 1330 (the QWR address) and 4622 (the correspondence address). One can certainly understand the frustrations of the Second

20

Circuit in 2014 in the *Roth* case when they were considering a QWR claim by a borrower whose attorney was unaware of the address requirements, although he was aware of the implications of a QWR under RESPA, as well as the frustrations of the Tenth Circuit in 2013 when they were dealing with a seriously delinquent borrower who sent over 100 letters out which claimed to be QWRs but could never get a single letter to the correct address.

Whether or not an address is sufficient to comply with 24 C.F.R. § 3500.21 is a question of fact, not of law.  See, *Nash v. Green Tree Servicing, LLC*, 943 F. Supp.2d (E.D. Va. 2013). So too, the court in the Mack case must decide, based upon the evidence presented at trial, if GMACM truly established a separate address **and** office as required by 24 C.F.R. § 3500.21. Since RESPA is a consumer-oriented statute, defenses to RESPA should be strictly construed, and GMACM should be required to show strict compliance with the regulation to be availed of its defense.

B.    RES JUDICATA

This Court has already considered the arguments of both sides and has determined that the Macks' counterclaim in the state court against Deutsche Bank would not bar the Macks' bankruptcy claim against GMACM under the doctrine of res judicata.  In addition to the Court's decision already entered in this matter (Memorandum Opinion, Doc 7297, Jul 24, 2014), only a servicer can be liable under the terms of 12 U.S.C. § 2605.  See, *Pasillas v. Deutsche Bank National Trust Co.*, 5:12-CV-04123-LHK.    The Macks, in their state court action, filed a counterclaim alleging there was a failure to notify them of a change of ownership of the note that Deutsche Bank sued upon since the Macks knew they were current in their obligations with GMACM.  They continued to make all of their payments to GMACM, but unbeknownst to them, ownership of the note passed from GMACM to RFC Trustee (P Ex. 29) and presumably

Deutsche Bank.  The state court found that claim to be insufficient to establish a cause of action because only a servicer of a loan can be liable under RESPA and not the owner of the loan owner. That matter was not only not decided on the merits in Florida, but also the section of RESPA complained of was that of a failure to notice the borrower of a change in ownership, and not a failure to respond to a QWR, which forms the basis of this claim.  GMACM points to the fact that the letter of October 26, 2009 was argued in a subsequent memorandum to counter Deutsche Bank's motion to vacate the judgment, but, in fact, it was not a subject of the lawsuit itself, which could only have considered issues and facts within the four corners of the counterclaim.

C.    TIMING OF QWR RESPONSE

GMACM argues that even if the Macks sent a QWR on October 26, 2009, and even if the court decides that it was received within the meaning of the law by GMACM, nevertheless the Macks have no damages because a response was not required from GMACM until 60 days after the letter.  This argument ignores the plain meaning of the statute in which RESPA requires that a QWR be acknowledged within 20 days.  12 U.S.C. § 2605(e)(1)(A).  Further, pursuant 12 U.S.C. 2605(e)(2) a servicer is required, before taking any action with respect to the inquiry of the borrower, to conduct an investigation and make appropriate corrections.  The appropriateness of the response is dictated by common sense.  See, *Hittle v. Residential Funding Corp*., No. 2:13-cv-353 (S.D. Ohio Aug. 5, 2014).  GMACM can hardly make an argument that they conducted any reasonable inquiry or made any appropriate corrections, especially given that they failed to react when confronted with numerous telephone calls by the Macks concerning the wrongful foreclosure even when their own personnel acknowledged the account was current and further despite the fact that many of these calls were after October 26, 2009.  The foreclosure was

22

allowed to proceed, and no inquiry was made by GMACM of their attorney after September 2, 2009 to follow up and confirm if in fact he had ever actually dismissed the suit. The appropriate response would have been for GMACM to immediately call their attorney to see if he had dismissed the suit, or even gone to the court's website to see themselves, not to demand repayment for their foreclosure costs. *Id.* GMACM did not have unfettered discretion to pick any possible response.    In fact, one must wonder what happened between September 2, 2009 when GMACM claims they told attorney Stern to dismiss the suit and December 2, 2009 when the notice of dismissal was allegedly prepared, but filed December 8, 2009, that would have suddenly caused David Stern to take this action after he acknowledged this file was closed on September 15, 2009 (P Ex. 1 at 000930).  This argument further ignores the holding of *Justice v. Ocwen Loan Serv.*, No. 2:13-CV-165 (S.D. Ohio January 16, 2015), where the court stated that if a servicer fails to respond to a QWR, under the plain language of the statute, the servicer will be responsible for all damages that flow from the date of the QWR, not from the date that any response is due.

III.    CONCLUSION

The Macks were borrowers who were wrongfully sued in foreclosure by Deutsche Bank in the fall of 2009.  The Macks repeatedly complained about the foreclosure to their servicer, GMACM, since they were current on their loan and did not know who Deutsche Bank was. They were repeatedly reassured by GMACM that their loan was current, and that Deutsche Bank's interest was unknown to GMACM.  Despite all of these contacts, the lawsuit continued. While GMACM tries to place the blame on their attorney, David Stern, they were the entity that picked David Stern and set his actions in motion.  The evidence shows that Cheryl Mack was

23

upset over the foreclosure, but despite her previous history of depression was able to handle it for a period of a few months. However, a few weeks after she wrote to GMACM in October 2009 to ask for help with the suit brought against them by Deutsche Bank, she collapsed under the pressure and attempted to commit suicide. The net result of the foreclosure was a forced private sale of their house that Mrs. Mack never recovered from. When she was later presented with the option for dialysis for her failing kidneys, she refused the dialysis because she had no reason to live. Her death in 2013 may have resulted in part from that failure.

While a civil action in Florida compensated the Macks for the loss of the value of their home, they were not compensated for emotional harm to the Macks because personal injury damages were not available to them against Deutsche Bank, which was not a servicer of their loan. Their claim now before this Court seeks to redress that failure and that they be fully compensated for their loss now.

The equities must certainly be with the Macks. This court must decide whether the defenses of GMACM overcome those equities. The Macks pray that they be awarded a sum by the Court sufficient to compensate them for the anguish they felt over losing their home and the resultant destruction of Mrs. Mack's health.

DATED this 13th day of July, 2015.

/s/ David F. Garber
David F. Garber, Esq.
Florida Bar No.: 0672386

DAVID F. GARBER, P.A.
2800 Davis Boulevard, Suite 211
Naples, Florida 34104
239.774.1400 Telephone
239.774.6687 Facsimile
davidfgarberpa@gmail.com

24