UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ) | **NOT FOR PUBLICATION** |
| In re: ) | |
| ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, ) | |
| ) | Chapter 11 |
| Debtors. ) | |
| ) | Jointly Administered |

### MEMORANDUM OPINION AND ORDER SUSTAINING IN PART AND OVERRULING IN PART THE RESCAP BORROWER CLAIMS TRUST'S OBJECTION TO PROOF OF CLAIM NO. 2267 FILED BY WILLIAM J. FUTRELL

*A P P E A R A N C E S:*

**MORRISON & FOERSTER LLP**
*Attorneys for ResCap Borrower Claims Trust*
250 West 55th Street
New York, New York 10019
By:     Norman S. Rosenbaum, Esq.
        Jordan A. Wishnew, Esq.
        James A. Newton, Esq.

**THOMAS D. MARGOLIS, ESQ.**
*Attorney for William J. Futrell*
125 E. Charles Street
Suite 214
Muncie, Indiana 47305
By:     Thomas D. Margolis, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the ResCap Borrower Claims Trust's (the "Trust") objection

(the "Objection," ECF Doc. # 8315) to Claim Number 725 (the "Claim," ECF Doc. # 8528-2)

filed by William J. Futrell ("Futrell").[1]  Debtors Homecomings Financial, LLC

---

[1]     The Objection is supported by the declaration of Kathy Priore (the "Priore Decl.," ECF Doc. # 8315-3).  As explained below, the Debtors originally objected to Futrell's claim as part of the *Forty-Ninth Omnibus Objection to Claims (No Liability Borrower Claims – Books and Records)* (the "Prior Objection," ECF Doc. # 5161).  After Futrell filed a response (the "Prior Opposition," ECF Doc. # 5484) and a supplement (the "Prior Opp. Supp.," ECF
(Footnote continues on next page.)

("Homecomings"), and later Debtor GMAC Mortgage, LLC ("GMACM"), serviced Futrell's home mortgage loan for a number of years. Futrell's Claim arises from the Debtors' alleged mishandling of his loan servicing. Specifically, Futrell's Claim is premised on the following causes of action: (i) violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.*; (ii) violations of the Fair Debt Collections Practices Act (the "FDCPA"), 15 U.S.C. § 1692 *et seq.*; and (iii) common law fraud. As explained below, the Court concludes that Futrell fails to state a claim for most of these causes of action. However, factual issues preclude the resolution of Futrell's cause of action under section 6 of RESPA to the extent it is based on GMACM's alleged failure to respond to certain of Futrell's alleged qualified written requests. This Opinion therefore sustains in part and overrules in part the Trust's Objection to Futrell's Claim.

## I.    **BACKGROUND**

### A.    **Futrell's Loan History**

Futrell obtained a $76,500 home mortgage loan (the "Loan") from non-debtor Aegis Mortgage Corporation d/b/a UC Lending ("Aegis") in February 2001. (Obj. ¶ 12.) The Loan was evidenced by a note (the "Note," Priore Decl. Ex. A) secured by a mortgage (the "Mortgage," *id.* Ex. B) encumbering real property located in Bryant, Indiana (the "Property").

---

(Footnote continued from previous page.)

Doc. # 6023) providing further information and documentation in support of his Claim, the Trust withdrew the Prior Objection without prejudice as it related to Futrell's Claim. (*See* Obj. ¶ 45.)

After the Trust filed the current Objection, Futrell filed an opposition to the Objection (the "Opposition," ECF Doc. # 8413), and a supplemental opposition (the "Supplemental Opposition," ECF Doc. # 8548, and together with the Opposition, the "Oppositions"). The Trust filed a reply (the "Reply," ECF Doc. # 8528), and Futrell filed a surreply (the "Surreply," ECF Doc. # 8551). The Court held a hearing on the Objection on April 30, 2015 (the "Hearing") and took the matter under submission.

(Obj. ¶ 12.)  The Mortgage identified Mortgage Electronic Registration Systems, Inc. ("MERS")

as the mortgagee.  (*See* Priore Decl. Ex. B at 2.)  The Note was endorsed in blank and transferred

to Debtor Residential Funding Company, LLC ("RFC").  (Obj. ¶ 16; *see* Priore Decl. Ex. A at 5.)

The Note was subsequently negotiated from RFC to non-debtor Bank One National Association

("Bank One"), as trustee for the RASC 2001-KS1 securitization trust, in connection with the

March 2001 securitization of the Loan.  (*See* Obj. ¶ 16; Priore Decl. Ex. A at 5.)  Homecomings

serviced the Loan from March 9, 2001 until July 1, 2009, when servicing was transferred to

GMACM.  (*See* Obj. ¶¶ 13–14.)  GMACM serviced the Loan from July 1, 2009 until February

15, 2013, when servicing was transferred to non-debtor Ocwen Loan Servicing, LLC ("Ocwen").

(*See id.* ¶¶ 14, 18.)

The Loan went into default when Futrell failed to make the December 2007 monthly

payment.  (*Id.* ¶ 19.)  Futrell did not become current on the Loan until he received a permanent

loan modification in June 2010, as described below.  (*Id.*)  Because the allegations underlying

Futrell's Claim arise from interactions and communications between Futrell and the Debtors

during 2009 and 2010, the parties focus their discussion on that time period.  (*See id.*)

On January 23, 2009, Homecomings received a workout package for Futrell from a

"HOPE" representative.[2]  (*Id.* ¶ 20.)  On February 24, 2009, Homecomings spoke with Futrell

and offered him a repayment plan that would bring him current on the Loan (the "Special Plan"),

requiring Futrell to make equal payments of $657.25 on February 28, March 15, and March 28,

2009.  (*Id.*)  A letter memorializing the Special Plan was sent to Futrell on February 24.  (*Id.*)

---

[2]    "HOPE" is a third-party organization that assisted mortgage borrowers in completing paperwork associated
with loss mitigation efforts.  (*See id.* ¶ 20 n.6.)

The Special Plan was cancelled after Futrell failed to make the second required payment.  (*See id.* ¶ 21.)

On April 16, 2009, Futrell contacted Homecomings to request a loan modification; Futrell also indicated that he could not afford a repayment plan at the time.  (*Id.* ¶ 22.) Homecomings advised Futrell to obtain a workout package from the Debtors' website and submit it as soon as possible.  (*Id.*)  On June 2, 2009, Futrell contacted Homecomings regarding his account; as a result of this conversation, Homecomings set up a five-month special forbearance plan intended to provide Futrell with time to complete and return a workout package (the "Second Special Plan").  (*Id.* ¶ 23.)  The Second Special Plan required Futrell to make five monthly payments of $657.25.  (*Id.*)  On June 10, 2009, Homecomings received a workout package from Futrell via facsimile.  (*Id.*)  The same day, Homecomings contacted Futrell to advise him that the workout package was missing documentation, including an income tax return.  (*Id.*)  Homecomings subsequently received the requested documentation and commenced the loan modification review process.  (*See id.* ¶ 24.)

On June 10, 2009, Homecomings also sent Futrell a letter indicating that servicing of the Loan would be transferred from Homecomings to GMACM, effective July 1, 2009.  (*Id.* ¶ 14.) The letter informed Futrell that the "principal balance" of his Loan as of June 4, 2009 was $71,251.99, with an escrow balance of $0.00.  (*Id.*)  In connection with the transfer of servicing, GMACM sent Futrell a debt validation letter, dated June 10, 2009, informing him that GMACM would become his Loan's new servicer as of July 1, 2009.  (*Id.* ¶ 15.)  GMACM's letter indicated that the "total amount of the debt" outstanding as of June 4, 2009 was $73,341.47, which may include interest, late charges, legal costs and fees, and other charges.  (*Id.*)  Specifically, this aggregate amount of $73,341.47 included:  (i) a $71,251.99 principal balance; (ii) $591.48 in late

charges; (iii) $183.50 in charges incurred in connection with property inspections and a broker

price opinion; and (iv) $1,314.50 representing past due payments for May and June 2009.  (*Id.*)

On June 17, 2009, GMACM conducted an escrow analysis on the Loan.  (*See id.* ¶ 38.)

Due to an inadvertent typographical error, the escrow analysis projected a $1,352.53

disbursement from Futrell's escrow account in November 2009 to pay for fire insurance covering

the Property.  (*Id.*)  According to the Trust, the estimated November 2009 payment should have

been approximately $352.53, rather than $1,352.53.  (*See id.*)  As a result of GMACM's error,

the escrow analysis indicated that, beginning on August 1, 2009, the principal, interest, and

escrow portions of Futrell's monthly mortgage payment would increase from $657.25 to $886.36

if Futrell did not pay the anticipated $1,249.71 escrow deficiency in advance.  (*Id.*; *see* Prior

Opp. Ex. 4.)  GMACM sent Futrell a copy of the escrow analysis along with a notice indicating

that he could pay the anticipated escrow deficiency in advance, in which case his monthly

principal, interest, and escrow payment would only increase to $782.22, beginning August 1,

2009.  (*See* Obj. ¶ 38; Prior Opp. Ex. 4.)

Homecomings started the loan modification review process after receiving Futrell's

workout package in June 2009.  On June 19, 2009, Homecomings set up a three-month HAMP

loan modification trial plan (the "HAMP Trial Plan") that replaced the Second Special Plan.  (*Id.*

¶ 24.)  The HAMP Trial Plan required payments of $730.76 on the first of August, September,

and October 2009.  (*Id.*)  On July 2, 2009, Futrell's wife contacted GMACM to challenge the

June 2009 escrow analysis.  (*See id.* ¶ 39; Priore Decl. Ex. D at 116.)  GMACM informed her

that the loan modification review process had to be completed before a new escrow analysis

could be conducted.  (Obj. ¶ 39.)

Futrell made the required payments under the HAMP Trial Plan.  (*See id.* ¶ 25.)  On

October 8, 2009, GMACM approved Futrell for a permanent loan modification (the "Permanent

Plan"), with a first payment due on November 1, 2009.  (*Id.* ¶ 25.)  The Permanent Plan reduced

the Loan's interest rate from 9.75% to 7.75%, resulting in monthly payments in the amount of

$730.42 for principal, interest, taxes, and insurance.  (*Id.*)  GMACM sent Futrell a letter dated

October 14, 2009 advising that he had been approved for the Permanent Plan and directing him

to execute and return an enclosed agreement.[3]  (*Id.* ¶ 26; *see* Priore Decl. Ex. F.)

In response to further inquiries regarding his escrow account, GMACM sent Futrell a

letter dated December 3, 2009 advising that, due to restrictions imposed by the Loan's investor, a

new escrow analysis could not be completed until GMACM had completed its review of

Futrell's June 2009 loan modification request.  (*See* Obj. ¶ 39; Prior Opp. Ex. 22.)  On January 8,

2010, Futrell's wife spoke with GMACM and was again informed that an escrow analysis could

only be conducted once loan modification review was completed.  (*Id.*)  At that time, the

Permanent Plan documents were pending Futrell's execution and return.  (*Id.*)  By letter dated

January 12, 2010, GMACM also advised Futrell's counsel that an escrow analysis could not be

conducted until loan modification review had been completed.  (*Id.*)  On January 29, 2010, the

Permanent Plan was denied because Futrell had not signed and returned the applicable

agreement.  (*Id.* ¶ 26.)  GMACM informed Futrell that the Permanent Plan had been denied by

letter dated February 3, 2010.  (*Id.* ¶ 27.)

After denying the Permanent Plan, GMACM conducted a new escrow analysis on

February 3, 2010.  (*See id.* ¶ 40.)  Based on this second escrow analysis, Futrell's escrow

---

[3]        GMACM subsequently sent Futrell another letter reiterating that he had been approved for the Permanent
Plan.  (*See id.* ¶ 26.)

payment was reduced from $229.11 to $50.83, decreasing his total principal, interest, and escrow

payment from $886.367 to $708.08 each month.[4]  (*Id.*)

On February 12, 2010, GMACM received a new HAMP workout package from Futrell.

(*Id.* ¶ 28.)  On February 16, 2010, an employee in GMACM's customer advocacy group spoke

with Futrell's wife, informing her that Futrell would not qualify for a HAMP loan modification

at the time because he was deriving income from short term disability benefits.[5]  (*See id.*)  The

GMACM employee also informed Futrell's wife that GMACM could establish a temporary "stop

gap" plan (the "Stop Gap Plan") to suspend foreclosure while exploring a more long-term

solution.  (*See id.*)  On February 17, 2010, GMACM set up the Stop Gap Plan, which required a

$355.00 monthly payment to be made on the first of March, April, and May 2010 in order to

avoid foreclosure.  (*Id.* ¶ 29.)

On February 18, 2010, GMACM spoke with Futrell by telephone, advising him that his

Loan was being considered for a non-HAMP (i.e. traditional) loan modification.  (*Id.* ¶ 30.)  The

following day, Futrell was approved for a traditional loan modification trial plan (the "Trial

Traditional Plan"), which required a $704.23 monthly payment to be made on the first of April,

May, and June 2010.  (*Id.*)  In connection with the approval of the Trial Traditional Plan, the

Stop Gap Plan was cancelled.  (*Id.*)  GMACM unsuccessfully attempted to contact Futrell by

telephone on February 22 and 24, 2010.  (*Id.*)

On April 8, 2010, GMACM mistakenly cancelled the Trial Traditional Plan because it

believed it had not received the required loan modification paperwork.  (*Id.* ¶ 31.)  Futrell was

informed of this cancellation by letter dated April 14, 2010.  (*Id.*)  In fact, Futrell had executed

---

[4]      According to the Trust, escrow analyses were subsequently conducted on June 7, 2010 and approximately annually thereafter in accordance with GMACM's ordinary business practices.  (*Id.* ¶ 41.)

[5]      Futrell was also advised of the HAMP modification denial by letter dated February 17, 2010.  (*Id.* ¶ 29.)

and returned the required paperwork for the Trial Traditional Plan on March 30, 2010. (*Id.*)

Also on April 14, 2010, Futrell's authorized representative contacted an employee in GMACM's

customer advocacy group to inquire about the status of the Trial Traditional Plan. (*Id.* ¶ 32.)

Futrell's representative informed GMACM's employee that the first payment required under the

Trial Traditional Plan had been made and that the required loan modification documents had

been executed and returned. (*Id.*) In response, GMACM reinstated the Trial Traditional Plan for

the remaining two payments and informed Futrell's representative that Futrell should continue to

remit the Trial Traditional Plan payments on the first of May and June 2010. (*Id.*)

By letter dated May 20, 2010, Futrell was informed that, subject to certain conditions set

forth in the letter, he had been approved for a permanent, traditional loan modification (the

"Permanent Traditional Plan"). (*Id.* ¶ 33.) As set forth in this letter, Futrell was required to

execute and return an enclosed loan modification agreement and pay a $704.23 "contribution

amount" by June 1, 2010. (*Id.*) Subject to the conditions set forth in this letter, the Permanent

Traditional Plan would reduce the interest rate on the Loan to 8.50% and bring his account

current, resulting in a $705.53 monthly payment of principal, interest, and escrow.[6] (*Id.*) On

May 21, 2010, GMACM also informed Futrell by telephone that the Permanent Traditional Plan

had been approved and that the loan modification agreement and contribution amount were

required to be returned by June 1, 2010. (*See id.* ¶ 34.)

On June 3, 2010, GMACM received the executed loan modification for the Permanent

Traditional Plan and the required contribution amount. (*Id.* ¶ 35.) After Futrell entered into the

Permanent Traditional Plan, at various points in June 2010, Futrell submitted additional workout

---

[6]     As of May 20, 2010, Futrell's account was past due for the October 2009 through May 2010 Loan
payments. (*See id.*)

packages or loss mitigation requests, each of which were considered by GMACM.  (*Id.* ¶ 36.)

GMACM considered, but denied, loan modifications on several occasions during 2011 because,

among other reasons, Futrell did not have sufficient income to make the modified Loan

payments.  (*Id.*)  Additionally, Futrell was offered the opportunity to pay off the Loan for

approximately 35% of the Loan's principal balance, or $27,000.  (*Id.*)

Futrell was approved for subsequent trial loan modifications in April and November

2012; those modifications would have required monthly payments of $529.75 and $693.25,

respectively; in each case, however, the trial modification plan was cancelled after Futrell failed

to make the first required payment.  (*Id.* ¶ 37.)  According to the Trust, if Futrell had completed

these trial modification plans and obtained approval for a permanent loan modification, his

delinquencies would have been cured and all various outstanding fees and charges, including late

charges, would have been eliminated.  (*Id.*)

Pursuant to an assignment dated September 13, 2012 (the "Assignment," Priore Decl. Ex.

C), MERS assigned the Mortgage to The Bank of New York Mellon Trust Company, National

Association f/k/a The Bank of New York Trust Company, N.A. ("BONY"), as successor to

JPMorgan Chase Bank N.A. ("JPM"), successor by merger to Bank One.[7]  (Obj. ¶ 17; *see* Priore

Decl. Ex. C at 2.)  GMACM transferred servicing rights to the Loan to Ocwen on February 15,

2013.  (Obj. ¶ 18.)

---

[7]    The Assignment was recorded on September 19, 2012.  (*See id.*)

B.       **Procedural History**

Futrell timely filed the Claim on September 24, 2012, asserting an unliquidated general

unsecured claim against GMACM and Debtor Residential Capital, LLC ("ResCap").[8]  (*See*

Claim at 2.)  The asserted basis for the Claim is "mortgage servicing by GMAC/RESPA and

other bas[e]s . . . ."  (*Id.*)

On September 20, 2013, the Debtors filed the Prior Objection, seeking to disallow and

expunge the Claim and a number of other proofs of claim filed by other borrower claimants.

(Obj. ¶ 43.)  On October 22, 2013, Futrell filed the Prior Opposition, attaching new information

and documents regarding his Claim (Obj. ¶ 44), and setting forth that the Claim is asserted

against GMACM and Homecomings for their allegedly fraudulent conduct and their alleged

violations of certain sections of RESPA and the FDCPA.  (*See generally* Prior Opp.)

Futrell attached to his Prior Opposition seven purported qualified written requests

("QWRs") sent to the Debtors from October 31, 2009 through March 14, 2013.[9]  (*See* Prior Opp.

Exs. 14, 15A, 16A, 17A, 18, 19A, 20A.)  Specifically, these purported QWRS were dated:

October 23, 30, and 31, 2009; November 13, 2009; December 2009;[10] October 23, 2011; April

14, 2012; August 31, 2012; and March 14, 2013.  (Obj. Ex. 3; *see also* Prior Opp. Exs. 14–20.)

According to Futrell, the Debtors failed to respond to these QWRs in violation of RESPA.  (*See*

Prior Opp. at 2, 7–8.)  Futrell also asserts in his Prior Opposition that the Debtors violated the

provisions of RESPA relating to:  (i) good faith estimates (*id.* at 4); (ii) kick-backs and unearned

---

[8]       Because none of the allegations underlying the Claim appear to relate to ResCap, the Objection solely
addresses Futrell's purported claims against GMACM.  (*Id.* at 1 n.2.)

[9]       As explained below, section 6 of RESPA provides that a mortgage borrower may submit a QWR to his or
her loan servicer for certain information regarding their loan.  *See* 12 U.S.C. § 2605(e).

[10]      No specific date is provided for Futrell's purported QWR dated December 2009.  (*See* Obj. Ex. 3 n.28;
Prior Opp. Ex. 15.)

fees (*id.* at 5); (iii) escrow accounts and record keeping (*id.*); and (iv) shortages, surpluses, and

deficiency requirements (*id.* at 6). Futrell further asserts that the Debtors violated the FDCPA's

provisions regarding:  (1) communications (*id.* at 8); (2) harassment (*id.*); (3) misrepresentations

(*id.* at 9); (4) unfair practices (*id.*); and (5) debt validations (*id.*).  Finally, Futrell asserts that the

Debtors are liable for fraud for alleged misrepresentations regarding potential loan modifications

and escrow deficiencies.  (*See id.* at 10–11.)

On December 5, 2013, Futrell filed the Prior Opposition Supplement containing further

documents related to his Claim.  (Obj. ¶ 44.)  In order to consider the additional information

contained in these filings, the Trust withdrew the Prior Objection as it related to Futrell's Claim.

(*Id.* ¶ 45.)  The Trust subsequently filed the Objection seeking to disallow and expunge Futrell's

Claim.

### C.    The Objection

The Trust seeks to disallow and expunge the Claim in its entirety on the basis that:

(i) GMACM did not violate RESPA; (ii) GMACM did not violate the FDCPA; (iii) Futrell fails

to state a claim for fraud against GMACM; and (iv) Futrell has failed to quantify or otherwise

support any alleged damages.[11]

First, the Trust argues that Futrell fails to state a RESPA claim against GMACM for the

following five reasons:  (1) no private right of action exists under RESPA's provisions relating to

good faith estimates or escrow accounting (*see id.* ¶ 47–50); (2) nearly all of Futrell's allegations

regarding kickbacks and unearned fees are time-barred (*see id.* ¶ 51); (3) Futrell does not state a

claim for violating RESPA's escrow accounting provisions even if a private right of action exists

---

[11]    According to the Trust, "[a]lthough Homecomings previously serviced [Futrell]'s [L]oan, his allegations do
not relate to Homecomings and the Claim is not asserted against Homecomings."  (*Id.* at 15 n.9.)  The Objection
accordingly focuses on Futrell's allegations against GMACM.  (*Id.*)

(*see id.* ¶¶ 52–53); (4) RESPA' provisions relating to good faith estimates and kickbacks and unearned fees do not apply to post-origination activities of the kind alleged by Futrell (*see id.* ¶¶ 54–55); and (5) GMACM complied with RESPA by timely responding to Futrell's only QWR—a letter from Futrell's counsel to GMACM dated October 30, 2009 (the "QWR Letter," Prior Opp. Ex. 16) (*see* Obj. ¶¶ 56–59).

Second, the Trust argues that Futrell fails to state an FDCPA claim against GMACM for the following three reasons:  (a) Futrell's FDCPA claims are time-barred (*see id.* ¶¶ 61–63); (b) the FDCPA's provisions relating to debt collection communications and debt validations are facially inapplicable to any of Futrell's allegations against GMACM (*see id.* ¶¶ 64–67); and (c) Futrell's allegations of harassment, unfair practices, and misrepresentations are insufficient to state a claim under the FDCPA (*see id.* ¶¶ 68–75).

Finally, the Trust argues that Futrell's allegations sounding in fraud "do not remotely satisfy federal pleading standards" (*id.* ¶ 76); and, in any event, these allegations fail to state a claim against GMACM (*see id.* ¶¶ 76–80).  Additionally, the Trust argues that Futrell's fraud claim fails because he "fails to quantify or support any alleged damages."  (*Id.* ¶ 81.)

### D.    The Oppositions

Futrell generally argues that his RESPA claims are based on:  (i) the Debtors' inaccurate record-keeping with respect to his escrow account, (*see* Opp. at 8–9); (ii) the Debtors' failure to respond to his seven QWRs and address issues regarding inaccuracies with his escrow payments (*see id.* at 9–10, 12–13); and (iii) the Debtors' generation of numerous property inspection fees, in violation of RESPA's anti-kickback provisions (*see id.* at 10–11).  Futrell argues that his FDCPA claims are based on his allegations in the Prior Opposition and on the Debtors' misrepresentations of potential loan modification options, including the possibility of a short sale

of the Property.  (*See id.* at 14–15.)  Finally, Futrell asserts that his fraud claim is based on the

Debtors' misrepresentations concerning his escrow deficiency, their failure to respond to his

QWRs, and their acceptance of certain of his payments made under loan modification plans.

(*See id.* at 17.)  The Supplemental Opposition contains non sequitur assertions and generally

reiterates the arguments made in the Opposition.[12]  (*See generally* Supp. Opp.)

### E.    The Reply

The Trust first argues that Futrell, and not the Trust, ultimately bears the burden of

establishing his entitlement to an allowed claim, and Futrell has failed to meet his burden.

(Reply ¶ 3.)  According to the Trust, Futrell's Prior Opposition, but not his Claim, alleged

violations of sections 2604, 2605, and 2609 of RESPA and sections 1692c, 1692d, 1692e, 1692f,

and 1692g of the FDCPA.  (*Id.* ¶ 4 & nn.4–5.)  However, Futrell's Opposition apparently focuses

only on alleged violations of sections 2605, 2607, and 2609 of RESPA, section 1692e of the

FDCPA, and his purported fraud claim.  (*Id.* ¶ 4 & nn.6–10.)  The Trust contends that Futrell has

failed to state a claim under any of these statutory provisions.  (*See id.* ¶ 4.)

The Trust asserts that Futrell's failure to deliver a QWR to the designated QWR

addresses established by the Debtors does not trigger their duties under RESPA.  (*See id.* ¶ 5

(citing *Roth v. CitiMortgage*, 756 F.3d 178, 181–82 (2d Cir. 2014)).)  The fact that GMACM

responded to Futrell's August 31, 2012 inquiry does not change the law set forth by the Second

Circuit in *Roth* and convert Futrell's request to a QWR, and GMACM's response to this request

"was consistent with its obligations under RESPA to respond to QWRs."  (*Id.* ¶ 7.)  Moreover,

---

[12]    Futrell's unauthorized Surreply, like the Supplemental Opposition, generally reiterates arguments made in the Opposition.  (*See generally* Surreply.)

Futrell provides no legal support for his contention that GMACM's reference to this August 31,

2012 inquiry "somehow retroactively converted other inquiries into QWRs . . . ."  (*Id.* ¶ 8.)

The Trust argues that Futrell fails to establish that the Debtors violated RESPA's credit

reporting provisions by allegedly reporting adverse information to credit reporting agencies

within 60 days of receiving QWRs.  (*Id.* ¶ 9.)  First, the Debtors' alleged violation of RESPA's

credit reporting provisions is based solely on:  (i) an affidavit of Futrell's wife, which sets forth

that "[t]here was adverse credit reporting against the credit of the borrower from the servicer,

where USDA stated in their letter that there had been *11 mortgage delinquencies since 09/09*"

(Opp. Ex. 1, ¶ 59); (ii) the referenced letter from the USDA (*id.* Ex. 33); and (iii) Futrell's

argument that the "facts and reasonable conclusions from them" establish a violation of RESPA

(Opp. at 13).  (Reply ¶ 9.)  According to the Trust, these statements fail to establish that

GMACM made any adverse reports to credit agencies within 60 days of receiving any QWR.

(*Id.* ¶ 10.)  Moreover, "only [Futrell]'s October 30, 2009 letter constituted a QWR and, therefore,

the Debtors were not precluded by their receipt of any of the other letters from adversely

reporting to the credit agencies."  (*Id.* ¶ 10 n.17.)  The Trust admits that the Debtors reported

Futrell's account as delinquent to at least one credit agency on two occasions during the 60-day

period following the Debtors' receipt of Futrell's October 30, 2009 QWR (*id.* ¶ 11); however, the

Trust argues that even if the Court were "to conclude that the Debtors' [adverse] reporting in

November and December of 2009 constituted a violation of RESPA" (*id.* ¶ 12), Futrell has not

established he is entitled to any actual damages for such violation (*id.* (citing 12 U.S.C.

§ 2605(f)(1)(A))).

According to the Trust, RESPA's anti-kickback provisions do not relate to the post-

closing fees identified by Futrell, and none of those fees were improper in any event.  (*Id.* ¶ 13.)

Moreover, Futrell does not dispute that he did not pay the fees identified. (*Id.*) Accordingly, the Trust argues that Futrell fails to establish the Debtors' violation of RESPA's anti-kickback provisions. (*Id.*)

Finally, the Trust contends that Futrell does not state an FDCPA claim for GMACM's alleged contradictory statements regarding the possibility of a short sale. (*See id.* ¶¶ 14–15.) According to the Trust, Futrell asserts that a GMACM employee "suggested" to his wife that a short sale was a "possibility." (*Id.* ¶ 14 (citing Opp. at 14).) Futrell's wife then spoke to a second GMACM employee, who indicated that a short sale would not be possible (*id.* (citing Opp. at 14); less than a month later, Futrell received an offer for a short settlement (*id.* (citing Opp. at 15)). The Trust contends that these allegations do not suggest that GMACM engaged in any "false, misleading, or deceptive" acts. (*Id.* ¶ 15.) Rather, these allegations demonstrate that GMACM "considered the individual borrower for potentially available loss mitigation options and indeed offered an array of options, including a short settlement offer . . . ." (*Id.*) Furthermore, the Trust asserts that these allegations give rise to no damages because Futrell "admits that he received an offer for the very loss mitigation option he sought in short order after speaking with GMAC[M] employees." (*Id.* ¶ 15 n.19.)

## II.  <u>DISCUSSION</u>

### A.  **Claims Objections**

Correctly filed proofs of claim "constitute prima facie evidence of the validity and amount of the claim . . . . To overcome this prima facie evidence, an objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000). By producing "evidence equal in force to the prima facie case," an objector can negate a claim's

presumptive legal validity, thereby shifting the burden back to the claimant to "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Creamer v. Motors Liquidation Co. GUC Tr. (In re Motors Liquidation Co.)*, No. 12 Civ. 6074 (RJS), 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted). If the objector does not "introduce[] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim." 4 COLLIER ON BANKRUPTCY ¶ 502.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).

Bankruptcy Code section 502(b)(1) provides that claims may be disallowed if "unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1). To determine whether a claim is allowable by law, bankruptcy courts look to "applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006).

Federal pleading standards apply when assessing the validity of a proof of claim. *See, e.g.*, *In re Residential Capital, LLC*, 518 B.R. 720, 731 (Bankr. S.D.N.Y. 2014); *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure." (citations omitted)). Accordingly, a claimant must allege "enough facts to state a claim for relief that is plausible on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). Plausibility "is not akin to a probability requirement," but rather requires "more

than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation and internal

quotation marks omitted). The court must accept all factual allegations as true, discounting legal

conclusions clothed in factual garb. *See, e.g.*, *id.* at 677–78; *Kiobel v. Royal Dutch Petroleum

Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded,

nonconclusory factual allegations in the complaint to be true" (citing *Iqbal*, 556 U.S. at 678)).

The court must then determine if these well-pleaded factual allegations state a "plausible claim

for relief." *Iqbal*, 556 U.S. at 679 (citation omitted).

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

(citation omitted). A claim is plausible when the factual allegations permit "the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation

omitted). A claim that pleads only facts that are "merely consistent with a defendant's liability"

does not meet the plausibility requirement. *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 557 (2007)). "A pleading that offers labels and conclusions or a formulaic recitation of

the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal

quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice." *Id.* (citation omitted). "The pleadings must

create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l

Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

To support claims grounded in fraud, Federal Rule of Civil Procedure ("FRCP") 9(b)

requires the claimant to "state with particularity the circumstances constituting fraud or mistake."

Fed. R. Civ. P. 9(b). FRCP 9(b) is grounded in the purpose "to protect the defending party's

reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to

defending parties." *Silverman v. Arctrade Capital, Inc. (In re Arctrade Fin. Techs. Ltd.)*, 337

B.R. 791, 801 (Bankr. S.D.N.Y. 2005) (internal quotation marks and citation omitted).

Although "[claims] drafted by *pro se* [claimants] are to be construed liberally, [] they

must nonetheless be supported by specific and detailed factual allegations sufficient to provide

the court and the defendant with 'a fair understanding of what the [claimant] is complaining

about and . . . whether there is a legal basis for recovery.'" *Kimber v. GMAC Mortg., LLC (In re*

*Residential Capital, LLC)*, 489 B.R. 489, 494 (Bankr. S.D.N.Y. 2013) (ellipsis in original)

(quoting *Iwachiw v. N.Y.C. Bd. of Elections*, 126 F. App'x 27, 29 (2d Cir. 2005)).

## B.    RESPA

### 1.    Section 5(c) – Good Faith Estimates

"RESPA requires that borrowers receive certain disclosures explaining the costs

associated with settlement and describing lender services and escrow account practices." *Nelson*

*v. JPMorgan Chase Bank, N.A.*, 707 F. Supp. 2d 309, 315 (E.D.N.Y. 2009) (citations omitted).

Section 5(c) of RESPA requires lenders to also provide "a good faith estimate of the amount or

range of charges for specific settlement services the borrower is likely to incur in connection

with the settlement as prescribed by the Bureau [of Consumer Financial Protection]."  12 U.S.C.

§ 2604(c).

The Second Circuit has not addressed whether section 5 of RESPA provides a private

right of action.  *Johnson v. Wash. Mut. Bank, F.A.*, 216 F. App'x 64, 66 (2d Cir. 2007) (citations

omitted); *accord Mercado v. Playa Realty Corp.*, No. CV 03-3427 (JO), 2005 WL 1594306, at

*9 (E.D.N.Y. July 7, 2005) ("[Section 5 of RESPA] does not explicitly authorize a private right

of action, and the Second Circuit has not ruled on whether it creates an implied private right of

action.").  However, "[a]ll other courts that have considered this question have refused to find an

implied private right of action under the provision." *Mercado*, 2005 WL 1594306, at *9

(collecting cases); *accord Iannuzzi v. Wash. Mut. Bank*, No. 07-CV-964 (JFB)(WDW), 2008 WL

3978189, at *7 n.3 (E.D.N.Y. Aug. 21, 2008) ("[N]umerous courts have held that no private right

of action exists for a violation of [RESPA section 5]." (collecting cases)); *see also Collins v.

FMHA-USDA*, 105 F.3d 1366, 1368 (11th Cir. 1997) (holding that section 5 of RESPA does not

implicitly create a private right of action); *Nelson*, 707 F. Supp. 2d at 317 ("[E]ven assuming

Defendants' failure to make RESPA disclosures, RESPA itself provides no private right of action

for technical violations of its disclosure mandates." (collecting cases)).

     This Court follows the majority of courts and concludes that no private right of action

exists under section 5 of RESPA.  Section 5 does not explicitly provide for private rights of

action.  *See* 12 U.S.C. § 2604; *Mercado*, 2005 WL 1594306, at *9.  Additionally, the Eleventh

Circuit's reasoning in concluding that no implied private right action exists under RESPA

section 5 is persuasive.  *See Collins*, 105 F.3d at 1368 ("The present § 2604(c) replaced the prior

§ 2605, which had explicitly provided an action for damages for its violation.  That Congress

eliminated the provision when it amended the statute strongly suggests Congress intended that

there no longer be a private damages remedy for violation of § 2604(c)." (internal citations

omitted)).  Because the Court holds that section 5 of RESPA does not create a private right of

action, the Objection is **SUSTAINED** as to Futrell's claim under section 5 of RESPA.

> 2.    *Section 6 – Servicing of Mortgage Loans and Administration of Escrow Accounts*

     Section 6(e) of RESPA provides that a borrower may submit a QWR to its loan servicer

for "information relating to the servicing" of its loan.  12 U.S.C. § 2605(e)(1)(A).  The statute

defines a QWR as

> a written correspondence, other than notice on a payment coupon
> or other payment medium supplied by the servicer, that—(i)

19

> includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

*Id.* § 2605(e)(1)(B).  Upon receipt of a QWR "for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt . . . within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period."  *Id.* § 2605(e)(1)(A).  Additionally, the servicer has 30 days after receipt of a QWR (excluding legal public holidays, Saturdays, and Sundays) to correct any errors identified by the borrower or, after conducting an investigation, provide the borrower with a written response setting forth why the servicer believes that its determination regarding the borrower's account is correct or why the servicer cannot obtain the information requested by the borrower.  *Id.* § 2605(e)(2).  Failure to comply with any provision of section 6 subjects a servicer to liability for "actual damages to the borrower as a result of the failure" and "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000."  *Id.* § 2605(f)(1).

Futrell contends that he sent seven QWRs to the Debtors, beginning on October 23, 2009 and ending on March 4, 2013.  (*See* Opp. at 14.)  According to Futrell, several of these purported QWRs identified issues regarding escrow, fees, and loan modifications, and the Debtors failed to properly respond to these issues.  (*See id.* at 6.)  Additionally, Futrell contends that these requests constituted QWRs because certain of the Debtors' employees provided alternative contact information for inquiries (*see id.* at 9, 12), and the Debtors acknowledged and/or responded to many of these purported QWRs (*see id.* at 13).

The Trust argues that only one of Futrell's letters, the QWR Letter, constituted a QWR, and GMACM responded to the QWR Letter in compliance with section 6 of RESPA by letter dated November 13, 2009.  (*See* Obj. ¶ 59)  According to the Trust, none of Futrell's other letters constitute a QWR because they were not sent to GMACM's designated QWR address.  (*See id.* ¶ 58.)  The Trust asserts that GMACM's designated address for QWRs was prominently indicated on the reverse side of Futrell's monthly mortgage statements.  (*See id.*; Priore Decl. ¶ 33; *id.* Exs. M–Q.)  "In addition to being on the reverse side of [Futrell]'s monthly mortgage statement, [Futrell] was clearly aware of the proper QWR address, since [his] counsel directed one of his earliest inquires – dated October 30, 2009 – to the correct address."  (Obj. ¶ 58 (citations omitted).)

Since 1994, RESPA permits, but does not require, a loan servicer to establish a designated QWR address under implementing Regulation X.  *See* Regulation X, 59 Fed. Reg. 65442, 65446 (Dec. 19, 1994) (to be codified at 24 C.F.R. § 3500.21(e)(1)); 12 C.F.R. § 1024.36(b).  Futrell contends that he sent seven QWRs to the Debtors, beginning on October 23, 2009 and ending on March 4, 2013.  (*See* Opp. at 14.)  At all times relevant to Futrell's Claim, section 3500.21(e)(1) of Regulation X provided:

> By notice either included in the Notice of Transfer or separately delivered by first-class mail, postage prepaid, a servicer may establish a separate and exclusive office and address for the receipt and handling of [QWRs].

24 C.F.R. § 3500.21(e)(1).

In *Roth*, the Second Circuit held that a borrower's failure to send a request to the address designated by a servicer for QWRs does not trigger the servicer's duties under section 6 of RESPA.  756 F.3d at 181 (citing *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1148–49 (10th Cir. 2013) ("[I]f a servicer established a designated QWR address, 'then the borrower must

deliver its request to that office in order for the inquiry to be a qualified written request.'"
(quoting Regulation X, 59 Fed. Reg. at 65,446)). The circuit court affirmed the district court's
dismissal of a borrower's RESPA claims on the basis that she did not send a purported QWR to
her servicer's designated QWR address, holding that "[a]s long as a servicer complies with the
notice requirements of 24 C.F.R. § 3500.21 for designating a QWR address, a letter sent to a
different address is not a QWR, even if an employee at that address (who may not have training
in RESPA compliance) in fact responds to that letter." *Id.* at 182. In so ruling, the Second
Circuit found that the borrower was provided unambiguous notice of the designated QWR
address as a matter of law. *See id.* at 182–83.

In *Catalan v. RBC Mortgage Co.*, No. 05 C 6920, 2008 WL 2741159 (N.D. Ill. July 8,
2008), the District Court for the Northern District of Illinois also addressed whether a servicer's
letter to mortgage loan borrowers provided notice of a purported address designated for QWRs
as a matter of law. However, unlike in *Roth*, the *Catalan* court provisionally granted the
borrowers' motion *in limine* to exclude evidence that the servicer sent them notice of a
designated QWR address by letter, holding that no reasonable juror could conclude that the letter
at issue complied with section 3500.21(e)(1) of Regulation X. *Id.* at *7–8. The court observed
that section 3500.21(e)(1) of Regulation X requires that a servicer's notice of a designated QWR
address "must be 'separate' and must advise customers of a 'separate and exclusive address' that
they *must use* for the mailing of inquiries regarding the servicing of their mortgage loans." *Id.* at
*8. In reaching its conclusion that the letter at issue did not comply with Regulation X's notice
requirements for a designated QWR address, the court held that the letter did not unambiguously
designate a QWR address. *See id.* Noting that the letter's principal purpose was debt collection
and it directed communication "regarding th[e] notice" to be sent to the attention of one certain

individual, the court found it "just as likely that Plaintiffs would have read the letter as directing

them to send their correspondence to [the identified individual] at the address for payments,

rather than the other address listed for 'Mortgage Loan Services' that [the servicer] insist[ed] is

the separate and exclusive address for QWRs." *Id.* Moreover, the court observed that even if

"the letter should be construed to direct customers to send non-payment correspondence to the

[purported QWR] address, the letter in no way warns customers that [such] address is an

exclusive address–that is, that they *must* send their non-payment related correspondence to that

address and *only* that address on pain of losing any REPSA claim that they may have." *Id.*

In *Roth*, the Second Circuit considered but rejected the borrower's argument that her

servicer did not comply with Regulation X's notice requirements for designating a QWR address

by including such notice on the back of her mortgage statements, rather than "separate[]

deliver[y]," finding that section 3500.21(e)(1)'s specification that such notice may be separately

delivered "simply means that notice of the QWR address may be delivered separately from the

Notice of Transfer—not that it cannot be delivered along with other mortgage information."

*Roth*, 756 F.3d at 182. The court also rejected the borrower's argument that the notice was

insufficient because it was "buried in fine print," finding that the notice at issue clearly specified

the designated QWR address in capital letters. *Id.* at 182. Finally, the court held that the

borrower's reliance on *Catalan* was misplaced, finding that the district court properly

distinguished the notice at issue from the notice in *Catalan* and concluded that the *Roth*

borrower's notice "'contain[ed] none of the ambiguities that concerned the court in *Catalan*.'"

*Id.* at 183 (quoting *Roth v. CitiMortgage Inc.*, No. 12-CV-2446 (SJF), 2013 WL 5205775, at *6

(E.D.N.Y. Sept. 11, 2013)).

The Court concludes that the Trust has met its burden of establishing that GMACM

created a designated QWR address and communicated this address to Futrell no later than March

19, 2012.  (*See* Priore Decl. Ex. M at 2.)  The Trust submitted copies of Futrell's monthly

mortgage statements dated March 19, 2012 (*id.*), April 18, 2012 (*id.* Ex. N), July 18, 2012 (*id.*

Ex. O), and August 20, 2012 (*id.* Ex. P) (collectively, the "Mortgage Statements").  Each of the

Mortgage Statements clearly established the following address as a designated QWR address:

GMAC Mortgage, Attn: Customer Care, P.O. Box 780, Waterloo, IA 50704-0780 (the "QWR

Address").  (*See id.* Exs. M–P.)  The Mortgage Statements also provide the following

information under the subheading "Qualified Written Request":

> Under the Real Estate Settlement Procedures Act, a qualified
> written request is a written correspondence, other than notice on
> your payment coupon or other payment medium supplied by us,
> regarding the servicing of your loan which includes your name,
> account number, and your reasons for the request.  Any qualified
> written request you wish to submit must be sent to:  GMAC
> Mortgage, Attn: Customer Care, PO Box 1330, Waterloo, IA
> 50704-1330.

(*Id.* Ex. M at 3, Ex. N at 3, Ex. O at 3, Ex. P at 3.)  The Trust also indicates that Futrell "was

repeatedly informed of the designated address for QWRS on each of his monthly mortgage

statements" (Priore Decl. ¶ 33), and the servicing notes for Futrell's Loan reflect that the

Mortgage Statements were sent to Futrell (*see id.* Ex. D at 29, 31, 38, 40).  The record also

reflects that Futrell did not send any of his purported QWRs to the QWR Address, with the

exception of the October 30, 2009 QWR Letter.  (*See* Obj. Ex. 3; Prior Opp. Exs. 14–20.)

Because the Trust established that Futrell received notice of the designated QWR Address no

later than March 19, 2012, and Futrell did not send his purported QWRs dated April 14, 2012,

August 31, 2012, and March 14, 2013 to this address, the Objection to Futrell's RESPA section 6

claim is **SUSTAINED in part** to the extent it is premised on these purported QWRs.  However,

because the Trust did not submit evidence establishing that Futrell received notice of the QWR Address before March 19, 2012, the Court cannot conclude that Futrell's section 6 claim fails to the extent that his remaining purported QWRs were not sent to the QWR Address. Insofar as the Objection to Futrell's RESPA section 6 claim is based on the argument that these remaining purported QWRs were not sent to the QWR Address, it is **OVERRULED without prejudice**.

With respect to Futrell's October 30, 2009 QWR Letter, the Trust concedes that the QWR Letter was sent to the designated QWR Address. (*See* Obj. ¶ 59.) However, the Trust argues that GMACM properly responded to the QWR Letter in accordance with section 6 of RESPA. (*See id.*) According to the Trust, GMACM's letter in response to the QWR Letter is attached as Exhibit 21B to the Prior Opposition (the "QWR Response"). (*See id.* (citing Prior Opp. Ex. 21B).)

At the time the QWR Letter was drafted, section 6(e) provided that a servicer had 20 days to send a borrower written acknowledgement of its receipt of a QWR (unless the requested action is taken within such period) and 60 days to take responsive action with respect to the QWR. *See* Dodd-Frank Act, Pub. L. No. 111-203, § 1400(c), 124 Stat. 1376 (2010) (amending section 6(e) of RESPA). By the QWR Response, GMACM acknowledged receipt of a QWR and indicated it would respond to the QWR within 20 business days. (*See* Prior Opp. Ex. 21B.) While the QWR Response may evidence GMACM's compliance with section 6(e)(1) of RESPA, which requires a loan servicer to send a borrower a written acknowledgement of receipt of a QWR, *see* 12 U.S.C. § 2605(e)(1)(A), the Trust does not identify a particular document evidencing GMACM's substantive response to the QWR Letter, *see id.* § 2605(e)(2). The Objection to Futrell's RESPA section 6 claim is therefore **OVERRULED in part without prejudice** to the extent such claim is based on the October 30, 2009 QWR Letter.

Finally, the Trust asserts that GMACM responded to certain of Futrell's other purported QWRs to the extent that GMACM "could decipher the substance of the inquiries." (Obj. ¶ 59 n.15.) Specifically, the Trust cites to three documents allegedly constituting responses to Futrell's purported QWRs. (*Id.* (citing Prior Opp. Exs. 21A, 23; Priore Decl. Ex. R).) First, Exhibit 21A to the Prior Opposition is a letter from GMACM to Futrell, dated November 13, 2009, which conveys that it is sent in response to Futrell's October 23, 2009 QWR and provides an explanation of why GMACM believes Futrell's account is correct. (*See* Prior Opp. Ex. 21A.) Because this letter clearly responds to Futrell's October 23, 2009 QWR, and provides a substantive response to such QWR in accordance with section 6 of RESPA, the Objection to Futrell's section 6 claim is **SUSTAINED in part** to the extent such claim is based on the October 23, 2009 QWR. Second, Exhibit R to the Priore Declaration clearly responds to Futrell's August 31, 2012 QWR. (*See* Priore Decl. Ex. R.) As explained above, the Objection to Futrell's RESPA section 6 claim is **SUSTAINED in part** to the extent it is based on this purported QWR because it was not sent to GMACM's designated QWR Address. Third, Exhibit 23 to the Prior Opposition is a letter from GMACM to Futrell, dated January 12, 2010, which conveys that it is sent "in response to [Futrell's] loan modification and escrow inquiry on the . . . account." (Prior Opp. Ex. 23.) Presumably, this letter was sent in response to Futrell's purported QWR dated December 2009. (*See* Prior Opp. Ex. 15.) However, because it is not clear which purported QWR this letter is in response to, or when such purported QWR was received by GMACM, the Court cannot conclude that this letter establishes that GMACM complied with section 6 of RESPA as a matter of law.

To summarize, the Trust's Objection to Futrell's section 6 claim is **OVERRULED in part** and **SUSTAINED in part**. The Objection is **SUSTAINED** to the extent Futrell's section 6

claim is based on his purported QWRs dated October 23, 2009, April 14, 2012, August 31, 2012,

and March 14, 2013.  The Objection is **OVERRULED without prejudice** to the extent Futrell's

section 6 claim is based on his purported QWRs dated October 30, 2009, October 31, 2009,

November 13, 2009, December 2009, and October 23, 2011.

> 3.        *Section 8 – Prohibition Against Kickbacks and Unearned Fees*

Section 8(a) of RESPA prohibits the payment of "any fee, kickback, or thing of value

pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part

of a real estate settlement service involving a federally related mortgage loan shall be referred to

any person."  12 U.S.C. § 2607(a).  Section 8(b) provides that "[n]o person shall give and no

person shall accept any portion, split, or percentage of any charge made or received for the

rendering of a real estate settlement service in connection with a transaction involving a federally

related mortgage loan other than for services actually performed."  *Id.* § 2607(b).  Both

subsections of section 8 are limited to kickbacks and unearned fees paid in connection with real

estate settlement services.  *See id.* § 2607(a)–(b).  A "settlement service" is defined in relevant

part as "any service provided in connection with a prospective or actual settlement . . . ."  *Id.*

§ 2602(3).  "Settlement means the process of executing legally binding documents regarding a

lien on property that is subject to a federally related mortgage loan."  *Cohen v. J.P. Morgan

Chase & Co.*, 608 F. Supp. 2d 330, 345 (E.D.N.Y. 2009) (quoting 24 C.F.R. § 3500.2).

Section 8 of RESPA provides a private right of action, *see* 12 U.S.C. § 2607(d); however,

such action must be brought within one year from the alleged violation, *see id.* § 2614.  Because

the scope of section 8 is limited to the payment of prohibited referral or unearned fees in

connection with a prospective of actual settlement, "RESPA's one-year statute of

limitations . . . runs from the date of the alleged violation—*i.e.*, the payment of the illicit referral

or unearned fees at closing." *Gorbaty v. Wells Fargo Bank, N.A.*, No. 10-CV-3291

(NGG)(SMG), 2014 WL 4742509, at *10 (E.D.N.Y. Sept. 23, 2014) (citing 12 U.S.C. § 2614;

*Williams v. Aries Fin., LLC*, No. 09-CV-1816 (JG)(RML), 2009 WL 3851675, at *8–9

(E.D.N.Y. Nov. 18, 2009) ("It is well-settled that in closed-end transactions, such as mortgage

loans, the date of accrual for the statute of limitations is the date the plaintiff entered the loan

agreement.")); *see also Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 289 (S.D.N.Y.

2011) (holding that plaintiffs' claim for violations of section 8 of RESPA was time-barred

because it was brought more than one year after the closing date of their loan); *Cohen*, 608 F.

Supp. at 349 (holding that post-closing services are not settlement services within the meaning of

section 8 of RESPA).

Futrell's claim under section 8 of RESPA is time-barred because the applicable one year

statute of limitations expired on February 23, 2002, one year after the date on which his Loan

closed. Moreover, Futrell has not alleged facts establishing that equitable tolling applies to his

section 8 claim. "To determine whether to apply equitable tolling, the court 'must consider

whether the person seeking application of the equitable tolling doctrine (1) has acted with

reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the

circumstances are so extraordinary that the doctrine should apply.'" *Gorbaty*, 2014 WL

4742509, at *11 (quoting *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80 (2d Cir.

2003)). Futrell alleges that the Debtors "engaged in redundant and repetitive property

inspections . . . that generated fees for the servicer." (Opp. at 11.) These alleged property

inspection fees were generated as early as 2009 (*see id.* at 10), yet Futrell offers no justification

for failing to bring a section 8 claim against the Debtors until filing his Claim in 2012. Nor are

these alleged fees within the scope of section 8. To the contrary, Futrell alleges that these fees

were generated post-closing in connection with the Debtors' inspection of his Property.

Accordingly, the Objection is **SUSTAINED** with respect to Futrell's claim under section 8 of

RESPA.

> 4.     *Section 10 – Limitation on Requirement of Advance Deposits in Escrow Accounts*

Section 10(a) of RESPA provides, in relevant part, that a lender may not require a

borrower

> to deposit in any escrow account which may be established in connection with such loan for the purpose of assuring payment of taxes, insurance premiums, or other charges with respect to the property, in connection with the settlement, an aggregate sum (for such purpose) in excess of a sum that will be sufficient to pay such taxes, insurance premiums and other charges attributable to the period beginning on the last date on which each such charge would have been paid under the normal lending practice of the lender and local custom . . . .

12 U.S.C. § 2609(a)(1).  Additionally, section 10(b) requires the loan servicer to "notify the

borrower not less than annually of any shortage of funds in the escrow account."  *Id.* § 2609(b).

The Second Circuit has not addressed whether section 10 of RESPA provides a private

right of action.  *Johnson v*, 216 F. App'x at 66 (citations omitted).  However, the majority of

circuit courts to have considered the issue have held that no private right of action exists under

section 10.  *See Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1360 (11th Cir. 2006); *Clayton v.

Raleigh Fed. Sav. Bank*, No. 96-1696, 1997 WL 82624, at *1 (4th Cir. Feb. 27, 1997)

(unpublished table decision); *accord Louisiana v. Litton Mortg. Co.*, 50 F.3d 1298, 1301 (5th

Cir. 1995); *Allison v. Liberty Sav.*, 695 F.2d 1086, 1087–91 (7th Cir. 1982).  *But see Vega v.

First Fed. Sav. & Loan Ass'n of Detroit*, 622 F.2d 918, 925 n.8 (6th Cir. 1980) ("While the Act

does not expressly provide for [private] . . . causes of action, we believe, based on the legislative

history, that Congress intended to create a private remedy for violations of the Act." (citations

omitted)).  Additionally, the majority of lower courts in the Second Circuit that have addressed

the issue have likewise held that section 10 of RESPA provides no private right of action.  *See,

e.g.*, *Dolan v. Fairbanks Capital Corp.*, 930 F. Supp. 2d 396, 418 (E.D.N.Y. 2013) ("This

Court . . . agrees with the reasoning of other courts within this Circuit that have concluded that

there is no private right of action under [section 10 of RESPA]." (citations omitted)); *Johnson v.

Scala*, No. 05 Civ. 5529 (LTS)(KNF), 2007 WL 2852758, at *5 (S.D.N.Y. Oct. 1, 2007)

(concluding, without analysis, that private causes of action can be raised only under RESPA

sections 6, 7, and 9); *McAnaney v. Astoria Fin. Corp.*, 357 F. Supp. 2d 578, 591 (E.D.N.Y. 2005)

("In addition to the well-reasoned opinions of the Fifth and Seventh Circuits in *Litton* and

*Allison*, RESPA is clear on its face when it comes to private remedies.")*.  But see Heller v. First

Town Mortg. Corp.*, No. 97 Civ. 8575 (JSM), 1998 WL 614197, at *4 (S.D.N.Y. Sept. 14, 1998)

(holding that a private right of action exists under section 10(a) of RESPA "despite the

considerable case law to the contrary").  The Court concurs with the majority of courts holding

that no private right of action exists under section 10 of RESPA.  Thus, the Objection is

**SUSTAINED** as to Futrell's RESPA section 10 claim.

## C.    The FDCPA

Futrell argues that the Debtors violated the FDCPA by:  (i) periodically calling him and

his wife several times a day, and several days in a row (Prior Opp. at 8); (ii) demanding that he

make Loan payments on each telephone call (*id.*); (iii) making misrepresentations of fact,

including with respect to the terms of potential loan modifications, the prerequisites for obtaining

certain loan modifications, and Futrell's status as current on his account (*see id.* at 9);

(iv) threatening to foreclose (*see id.*); and (v) inaccurately calculating his escrow account (*see

id.*).  Futrell further asserts that a GMACM employee "suggested" to his wife that a short sale

was a "possibility." (Opp. at 14.) Futrell's wife then spoke to a second GMACM employee, who indicated that a short sale would not be possible (*id.*), but less than a month later he received an offer for a short settlement (*id.* at 15).

A one-year statute of limitations applies to claims brought under the FDCPA. 15 U.S.C. § 1692k(d). Because Futrell's FDCPA claims are untimely to the extent they accrued before May 14, 2011, one year before the Debtors filed their chapter 11 cases, the Objection is **SUSTAINED** as to Futrell's FDCPA claims accruing before May 14, 2011.

### 1.    *Section 805(a) – Communications*

Section 805(a) of the FDCPA prohibits a debt collector from communicating with a consumer in connection with the collection of any debt: (i) at an unusual time or place; or (ii) if the debt collector knows that the consumer is represented by counsel with respect to such debt. *See* 15 U.S.C. § 1692c(a). Futrell's claim under section 805(a) of the FDCPA is based on his allegations that the Debtors contacted him several times a day for several days in a row (*see* Prior Opp. at 8); however, section 805(a) does not limit the number of calls a debt collector can make to a consumer, *see* 15 U.S.C. § 1692c(a). While Futrell is now represented by counsel, he does not allege that the Debtors violated section 805(a) of the FDCPA by contacting him instead of his attorney. Accordingly, the Objection is **SUSTAINED** with respect to Futrell's claim under section 805(a) of the FDCPA.

### 2.    *Section 806 – Harassment or Abuse*

Section 806 of the FDCPA prohibits a debt collector from engaging "in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. Futrell's claim under section 806 also appears to be based on the frequency of the Debtors' alleged telephone calls to Futrell. Futrell states that the

31

Debtors "would call periodically, sometimes 2-3 times per day, and several days in a row."
(Prior Opp. at 8). These allegations are too conclusory to support a claim under section 806.
Additionally, Futrell acknowledges that these "periodic[]" calls occurred in the context of calls
he or his wife initiated (*see id.*), belying his allegation that the Debtors engaged in conduct, the
natural consequence of which is to harass. Therefore, the Objection is **SUSTAINED** as to
Futrell's claim under section 806 of the FDCPA.

### 3.    *Section 807 – False or Misleading Representations*

Section 807 of the FDCPA prohibits a debt collector from "us[ing] any false, deceptive,
or misleading representation or means in connection with the collection of any debt." 15 U.S.C.
§ 1692e. Futrell's claim under section 807 is premised on his allegations that the Debtors:
(i) "misstated the essential facts" related to a loan modification (*see* Prior Opp. at 9); (ii) stated
that Futrell was current on the Loan in October 2010 (*see id.*); (iii) stated that an "underwater
mortgage refinance program" was available for Futrell (*id.*); and (iv) failed to accept a refinance
request made by Futrell (*id.*). It appears that Futrell's claim under section 807 of the FDCPA is
premised entirely on actions occurring before May 14, 2011. As set forth above, Futrell's
section 807 claim is time-barred to the extent it arose before May 14, 2011. Accordingly, the
Objection to Futrell's claim under section 807 of the FDCPA is **SUSTAINED**.

### 4.    *Section 808 – Unfair Practices*

Section 808 of the FDCPA prohibits a debt collector from "us[ing] unfair or
unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. Among
other things, section 808 prohibits a debt collector from "[t]aking or threatening to take any
nonjudicial action to effect dispossession or disablement of property if -- (A) there is no present
right to possession of the property claimed as collateral through an enforceable security interest;

32

(B) there is no present intention to take possession of the property; or (C) the property is exempt

by law from such dispossession or disablement." *Id.* § 1692f(6).  Futrell's claim under section

808 is premised on his allegation that the Debtors threatened to foreclose on the Mortgage if his

account remained delinquent.  (*See* Prior Opp. at 9.)  However, Futrell provides no factual details

of when this "often repeated threat" was made.  (*See id.*)  Because this conclusory allegation is

not supported by any further factual allegations, the Court **SUSTAINS** the Objection to Futrell's

claim under section 808 of the FDCPA.

> ### D.    Fraud

The elements of a claim for common law fraud in Indiana are:  "(1) a material

misrepresentation of past or existing fact which[,] (2) was untrue, (3) was made with knowledge

of or in reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was

rightfully relied upon by the complaining party, and (6) which proximately caused the injury or

damage complained of."  *Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 335 (Ind. 2013)

(quoting *Lawyers Title Ins. Corp. v. Pokraka*, 595 N.E.2d 244, 249 (Ind. 1992)).  Futrell argues

that the Debtors are liable for fraud because:  (i) "th[e] material promise of a loan modification

was an illusory promise" (Prior Opp. at 10); (ii) the interest rates offered in the loan

modifications were in contrast with the lower rate set forth in an information sheet provided to

Futrell (*id.*); and (iii) the Debtors overcharged Futrell's escrow account (*id.*; Opp. at 17).  Futrell

asserts that he suffered harm to the extent he used proceeds of his 401K account to make

payments on the Loan in reliance on the Debtors' misrepresentations.  (*See* Prior Opp. at 9, 11.)

Futrell's claim fails because he has not alleged any injury that was proximately caused by

the Debtors' misrepresentations.  The Trust submitted servicing notes indicating that Futrell went

into default on the Loan by failing to make the December 2007 payment.  (*See* Priore Decl. Ex.

D at 152.)  To the extent Futrell suffered an injury by accessing his 401K account to make Loan

payments, it is not clear that this is the proximate consequence of any of the Debtors' actions,

particularly in light of his Loan account's continued delinquency.  Accordingly, the Objection to

Futrell's fraud claim is **SUSTAINED**.

### III.    CONCLUSION

For the reasons set forth above, the Objection is **SUSTAINED in part** and

**OVERRULED in part without prejudice**.  The Objection to Futrell's claim under section 6 of

RESPA is **OVERRULED without prejudice** to the extent such claim is based on his purported

QWRs dated October 30, 2009, October 31, 2009, November 13, 2009, December 2009, and

October 23, 2011.  The Objection is **SUSTAINED** as to all other causes of action.

The Trust's counsel shall confer with Futrell's counsel within fourteen (14) days from the

date of this Opinion to discuss possible settlement of the remaining issues in this dispute.  The

parties shall also confer regarding the scheduling of any discovery and an evidentiary hearing, as

well as further briefing before trial.  Following such conference, counsel shall promptly file a

status letter advising the Court of the proposed schedule.  The Trust's counsel shall also schedule

this matter for a further status conference during the next available omnibus hearing date;

Futrell's counsel may participate in the status conference by telephone.  The Court will enter a

scheduling order following that conference.

**IT IS SO ORDERED.**

Dated:    July 14, 2015
          New York, New York


                                    _Martin Glenn_____
                                    MARTIN GLENN
                                    United States Bankruptcy Judge