<u>**Exhibit 2**</u>

**Letter**

PRIVILEGED & CONFIDENTIAL
SUBJECT TO FRE 408


RESCAP

LIQUIDATING TRUST


August 20, 2014

Jennifer L. Scoliard
V.P., Assistant General Counsel
Ocwen Financial Corporation
Mail Code: 190-FTW-L95
1100 Virginia Drive
Fort Washington, Pennsylvania 19034

Re:  Ocwen Indemnification Claims and Administrative Expense Claims

Dear Jennifer:

This letter is in response to certain correspondence (collectively, the "Correspondence")[1] from
Ocwen Loan Servicing, LLC ("Ocwen") to the ResCap Liquidating Trust (the "Trust"), the most
recent being your email to me, dated July 11, 2014, in connection with Ocwen's asserted
indemnification claims and administrative expense claims in the Residential Capital, LLC, *et al.*
bankruptcy cases, Case No. 12-12020 (the "Chapter 11 Cases").  The Trust will address each
claim in turn below, and reserves all rights under the APA[2] and the Sale Order to assert
counterclaims and/or defenses in connection with the estates' purported liability for each.

*Framework for Discussion*

The framework for this discussion on liability for Ocwen's asserted claims is based on the fact
that the transaction between Ocwen and the Debtors (the "Sale") is an "As is, Where is"
transaction.[3]  Accordingly, Ocwen cannot assert claims for anything beyond alleged
indemnification claims for breaches of Core Representations raised within the one-year period
past the February 15, 2013 closing date of the Sale (the "Closing Date").  The only exception to
this general rule is administrative expense claims brought pursuant to Paragraph 35 of the Sale
Order for indemnification claims brought by RMBS Trustees[4] that are (i) paid by Ocwen, (ii)

---

[1]  The Correspondence includes: (i) December 16, 2013 Letter from Eric Spett (Ocwen) to Tammy Hamzehpour
(Trust); (ii) February 14, 2014 Letter from John Britti (Ocwen) to Tammy Hamzehpour (Trust); and (iii) July
11, 2014 Email from Jennifer Scoliard (Ocwen) to Tammy Hamzehpour (Trust).

[2]  The "APA" means the Asset Purchase Agreement, dated as of November 2, 2012 and as amended from time to
time, between Ocwen and certain of the Debtors pursuant to which the Debtors sold substantially all of their
mortgage servicing assets.  The APA was approved by order of the Court on November 21, 2012 [Docket No.
2246] (the "Sale Order").

[3]  *See* APA § 2.14.

[4]  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the APA or the
Sale Order.

**PRIVILEGED & CONFIDENTIAL
SUBJECT TO FRE 408**

which have not been reimbursed by the applicable RMBS Trust after Ocwen made a
reimbursement request, and (iii) which were asserted by Ocwen prior to the administrative claim
bar date (*i.e.* January 16, 2014).

In addition, while Ocwen arguably raised a number of claims within the one-year period past the
Closing Date,[5] Ocwen is not permitted to hold open indefinitely its ability to (i) bring claims for
breaches of Core Representations or provide evidence substantiating these claims, and (ii)
reserve its right to bring claims not yet discovered beyond this one-year period. Ocwen's
possession of such a right of open-ended duration was not the parties' intent when entering into
the APA, and would eviscerate the carefully negotiated deadlines in the APA and Sale Order for
asserting such claims. Thus, the Trust objects to Ocwen's attempt to assert contingent or
unliquidated claims not yet identified.

Lastly, after reviewing Ocwen's purported bases for asserting claims against the Debtors' estates,
the Trust fundamentally disagrees with Ocwen's application of the Sale Order's and APA's
respective "no successor liability" provisions. Specifically, in a number of instances, Ocwen
uses the "no successor liability" provisions to assert claims against the Trust for reimbursement
for payments made by Ocwen (or potential payments Ocwen *may* make) to claimant counter-
parties on account of certain obligations purportedly owed to said parties. If Ocwen chooses, for
its own purposes, to settle or otherwise subject itself to possible liability rather than extract itself
from the claim as it is entitled to do under the Sale Order, it must bear the consequences of that
decision. To do otherwise would effectively transform an otherwise unsecured claim against
Debtors by a plaintiff into a "full money" claim that can instead be made by Ocwen against the
Debtors' estates. This is neither supported by the APA's language nor the intent of the APA.
The intent behind the "no successor liability" provisions was to allow Ocwen to inform a
claimant counter-party that Ocwen is not liable for those claims and the counter-party can assert
claims, if at all, against the Debtors. Neither the Sale Order nor the APA provides a basis for
Ocwen to assert claims against the Trust if Ocwen chooses to pay obligations for which Ocwen
is not liable.

With this framework in mind, the Trust will first address claims that fall under the
"indemnification claim" category, and then the remaining claims that are asserted as
administrative expense claims.

***Indemnification Claims***

1. Secure Axcess

Ocwen notified the Trust of the lawsuit that Secure Axcess, LLC ("Secure Axcess") filed against
Ocwen on December 16, 2013 (the "Secure Axcess Lawsuit") for which Ocwen is seeking
indemnification from the Trust pursuant to Section 11.1 of the APA. All of Ocwen's

---

[5]  *See* APA § 11.6 (providing that all representations and warranties, other than "Core Representations," expire
on the Closing Date).

PRIVILEGED & CONFIDENTIAL
SUBJECT TO FRE 408

indemnification claims relating to the Secure Axcess Lawsuit, as set forth in the Correspondence,[6] are without merit.

In the Correspondence, Ocwen states that: (a) Ocwen acquired from Residential Capital, LLC ("ResCap") certain contracts, rights and licenses under the APA that relate to certain multi-factor authentication technology (the "MFA Technology") and used by the gmacmortgage.com site and certain private label sites; (b) Secure Axcess alleges in the complaint filed in the Secure Axcess Lawsuit (the "Complaint") that the MFA Technology infringes upon Secure Axcess' patent rights set forth in United States Patent Number 7,631,191 B2 (the "'191 Patent"); and (c) the Trust must indemnify Ocwen pursuant to the provisions of Section 11.1 of the APA because the Secure Axcess Lawsuit arises from ResCap's breach of its representations and warranties set forth in Sections 4.6, 4.7 and 4.15 of the APA.

First, the basic structure of the APA makes clear that there is no breach here. Specifically, Section 4.15 of the APA is the Core Representation that deals with the representations and warranties of the Debtors in connection with Transferred IP Assets, including, relevant to this dispute, that the Debtors have not received any notice of infringement. Notably, at no point did the Debtors represent that none of the Transferred IP Assets infringed on any patent. Ocwen's attempt to broaden the Debtors' representation relating to the Secure Axcess claim to other sections of the APA to shoehorn in IP claims was not contemplated by the parties, nor was it their intent, given that a separate provision was created to specifically deal with such IP-related issues. Accordingly, neither Section 4.6 nor Section 4.7 applies in this instance.

Moreover, none of the Correspondence sufficiently describes in reasonable detail, as required by Section 11.2 of the APA, how the representations and warranties in Sections 4.6, 4.7 and 4.15 of the APA were in fact breached. Regardless, consistent with the basic structure of the APA discussed above, the Trust will demonstrate why none of these representations and warranties has been breached.

- Section 4.6:  ResCap did not breach Section 4.6 of the APA because ResCap transferred good, valid and marketable title to the Purchased Assets. The MFA Technology was not a Purchased Asset. The MFA Technology was licensed to Ally Financial Inc. ("AFI") and ResCap did not have a separate license to use the MFA Technology. The Trust's understanding is that Ocwen obtained the right to use the MFA Technology via a separate agreement into which Ocwen entered with AFI.

- Section 4.7:  Pursuant to Section 4.7 of the APA, ResCap represented and warranted that, except for the Excluded Assets listed on Schedule Q of the APA and any services to be provided by Sellers under the Transition Services Agreement, and by AFI under the AFI

---

[6]   In the December 16, 2013 Letter, Ocwen asserted that ResCap is obligated to indemnify Ocwen for the Secure Axcess Lawsuit because Secure Axcess' claims arise from a breach of "a legal, valid and binding obligation of each Seller that is a party to a "Material Contract" and/or the APA's Schedule P of material contracts (including, but not limited to, contracts with RSA Security entitled "Master Software License Agreement" and/or "Professional Services Agreement") . . ." and such breach constitutes a breach of ResCap's representations and warranties set forth in Section 4.10 of the APA. Given that Ocwen didn't raise this allegation in the succeeding Correspondence, the Trust presumes that Ocwen realized that this allegation is meritless and abandoned it. If Ocwen decides to reassert this claim, the Trust reserves its right to dispute it.

PRIVILEGED & CONFIDENTIAL
SUBJECT TO FRE 408

Transition Services Agreement, the Purchased Assets comprise all of the assets, properties and rights used by ResCap as of the date of the APA (*i.e.* November 2, 2012) and necessary to conduct ResCap's business in the manner conducted as of that date. ResCap did not breach Section 4.7 of the APA because, as mentioned above, the Trust's understanding is that Ocwen did in fact obtain the right to use the MFA Technology via a separate agreement into which Ocwen entered with AFI and such right was the same right to use the MFA Technology that ResCap had as of the date of the APA (*i.e.* November 2, 2012). Section 4.7 does not require ResCap to obtain any assets, properties and/or rights that ResCap did not own or have the right to use as of November 2, 2012. Moreover, given that Ocwen discontinued using the MFA Technology shortly after the February 15, 2013 Closing Date, the MFA Technology likely is excluded from this representation and warranty for not being "necessary to conduct of the ResCap's business". In other words, if the MFA Technology was necessary to the conduct of ResCap's business, Ocwen wouldn't have discontinued its use shortly after the February 15, 2013 Closing Date.

- Section 4.15: ResCap did not breach Section 4.15 of the APA because not only did ResCap not receive any written notice of infringement from Secure Axcess, ResCap was unaware of any such patent infringement claim by Secure Axcess. While ResCap is not obligated to indemnify Ocwen for any third party intellectual property infringement claims arising from Ocwen's use of the MFA Technology, Ocwen should review its agreement with AFI to determine whether AFI and/or RSA, the security division of EMC Corporation from whom AFI licensed the MFA Technology, is/are obligated to indemnify Ocwen for such claims.

2. Trustee Reimbursement Claims

These claims, raised by Ocwen under Paragraph 35 of the Sale Order, relate to the following matters: (i) *People of California v. Deutsche Bank National Bank & Trust Co.*; (ii) US Bank, as RMBS Trustee, indemnification claim; and (iii) *King v. Bank of New York Mellon.* Pursuant to Paragraph 35, Ocwen is only entitled to assert RMBS Trustee claims against the Debtors' estates where Ocwen (i) has paid any amounts to the RMBS Trustees on account of these claims, <u>and</u> (ii) such amounts are not reimbursed to Ocwen by the applicable RMBS Trust under the applicable Servicing Agreements after seeking reimbursement therefor from the applicable RMBS Trusts.

In each of the aforementioned matters, it appears as though Ocwen has neither paid any amounts to the applicable RMBS Trustee, and accordingly, has not yet attempted to seek reimbursement by the applicable RMBS Trust for said payments. Moreover, we believe that all of the asserted amounts would be properly reimbursable through the RMBS Trusts. For these reasons, there is no basis to assert these claims at this time.

Notwithstanding this point, the Trust requests that within sixty (60) days following the receipt of this letter, Ocwen provides the Trust with notice of all amounts actually paid to the RMBS Trustee, if/when it has sought reimbursement for those amounts, and, if applicable, whether such reimbursement request was denied. In the event these claims are not resolved by the end of this 60-day period, the Trust believes Ocwen must seek estimation of these claims as required by Paragraph 35 of the Sale Order. Ocwen cannot hold these claims open indefinitely. There is no

**PRIVILEGED & CONFIDENTIAL**
**SUBJECT TO FRE 408**

basis to seek payment of contingent/unliquidated claims, particularly those that were not identified by the administrative claim bar date, under the Sale Order.

3. New Jersey Show Cause Matter

Ocwen claims that the Debtors breached Section 4.14 of the APA in connection with curing certain defective notice practices. New Jersey's Fair Foreclosure Act ("FFA") provides for certain requirements relating to notices of intention to foreclose ("NOI"), and subsequent court decisions found that a failure to identify a lender in an NOI renders the NOI defective. The court provided that a servicer could file an order to show cause ("OTSC") allowing it to cure all defective NOIs. The Trust disagrees that filing an OTSC and remediating loans to correct the NOI constitutes a breach of Section 4.14 of the APA. First, these matters do not qualify under 4.14(i) as an "action, suit, demand, inquiry, proceeding, claim, cease and desist letter, hearing or investigation by or before any Government Entity pending, . . . or threatened."[7] Even if the filing of the OTSC by the Debtors were to arguably fall under Section 4.14(i), it would have to "materially and adversely affect the ability of the Sellers to complete the transactions contemplated" by the APA to be a breach. The amounts in connection with this claim, approximately $66,684.41, are clearly not material in the context of this matter, and thus cannot possibly amount to a breach of Section 4.14(i).

With respect to Section 4.14(ii), until an Order is actually entered by a court of competent jurisdiction, a Purchased Asset is not subject to said Order. For this reason, the OTSC is not an Order that existed as of the date of the APA (*i.e.* November 2, 2012) or the Closing Date (*i.e.* February 15, 2013), as the New Jersey Supreme Court only issued it after the Closing Date (*i.e.* April of 2013). Accordingly, since no Purchased Asset was subject to the OTSC as of the Closing Date, the Debtors were also not in breach of Section 4.14(ii) of the APA.

4. REO Code Violation

It appears that Ocwen is asserting that the Debtors are liable to Ocwen for amounts Ocwen paid to remediate certain REO property code violations purportedly caused by the Debtors, and therefore owe Ocwen an indemnity. Here, Ocwen again misconstrues the meaning of "no successor liability," as this provision permits Ocwen to inform other claimant counter-parties that it is not liable for certain claims, whereby those parties could then turn to the Debtors' estates to seek relief.

Further, REO code violations do not fall within the parameters of Section 4.14 of the APA, as codes and code violations do not amount to an "action, suit, demand, inquiry, proceeding, claim, [and/or] cease and desist letter" as contemplated by this provision. Additionally, similar to the NJ NOI claim discussed above, even if code violations could apply to Section 4.14(i), these matters clearly do not "materially and adversely affect the ability of the Sellers to complete the transactions contemplated" by the APA. Moreover, with respect to Section 4.14(ii), there is no reference to a court Order, only a violation of certain codes. The Debtors did not include as part of their Core Representations a "compliance with codes" representation. Thus, there was no breach by the Debtors, and accordingly, this claim has no merit.

---

[7]    *See* APA § 4.14.

PRIVILEGED & CONFIDENTIAL
SUBJECT TO FRE 408

5. Servicing Advances

Ocwen claims that the Debtors have breached of Section 4.9(c) of the APA relating to certain Servicing Advances.  Section 4.9(c) provides that each Servicing Advance is a "valid and subsisting amount" owing to a Debtor, "and is a legal, valid and binding reimbursement right" entitled to be paid.  Yet, nowhere in this provision do the Debtors represent or provide a guarantee of the *collectability* of these Servicing Advances.

Since the Debtors did not provide a guarantee of collectability of Servicing Advances, Ocwen has not provided sufficient information to substantiate this claim.  Accordingly, as I requested on our last call on this claim, the Trust requests that Ocwen promptly provide the Trust with detail as to (i) why each Advance has been deemed uncollectible, and (ii) how the purported uncollectibility renders the Debtors in breach of a specific Core Representation of the APA.

6. Montgomery County (Taggart) Litigation

Ocwen contends that the Debtors should indemnify Ocwen for any amounts paid in connection with litigation involving Taggart before the Court of Common Pleas, Montgomery County, PA, Case No. 09-25338 (the "Taggart Litigation"), if the Taggart Litigation is decided in Taggart's favor.  Ocwen's description of this claim appears to come directly from the complaint filed by Kenneth Taggart ("Taggart").  As you are aware, as former counsel to the Debtors, the Debtors and the Trust as successor to the Debtors dispute these allegations.

At present, the Taggart Litigation is pending, but stayed due to the Chapter 11 Cases. Specifically, Ocwen has dismissed the foreclosure action, but Taggart's counterclaims are still pending.  Ocwen claims that the Trust would be liable for any amounts that need to be written off to correct Mr. Taggart's Ginnie Mae Loan account and bring his loan current, as well as the cost of repurchasing the loan, if necessary.  GMAC Mortgage, LLC ("GMACM") finds Taggart's allegations in the Taggart Litigation, which include purported wrongful force-placed insurance, accounting, and foreclosure errors (all of which allegedly occurred before the Closing Date) to be overstated and subject to numerous defenses.  The ResCap Borrower Claims Trust expects to file in the near term an objection to Taggart's claims in the Chapter 11 Cases.

Taggart's claims against the Debtors involve the 2008 refinancing of a mortgage note of one of Taggart's investment properties and a subsequent 2009 foreclosure proceeding.  Initiation of the foreclosure proceeding was proper under Pennsylvania law, and was the result of Taggart's failure to make his mortgage payments for extended periods of time.  In addition to Taggart's prolonged payment breaches that forced GMACM to properly initiate a foreclosure proceeding, Taggart fails to identify any contractual obligation that GMACM allegedly breached by putting lender-placed insurance on Taggart's investment property.  Even accepting Taggart's allegations (which amass to more than 60 claims for relief in several courts) as true, the Trust does not believe that the Debtors breached any Core Representations of the APA.

First, Ocwen's argument that the "no successor liability" provisions of the APA and Sale Order give rise to a claim is wrong.  In addition to the reasons noted above, the APA's definition of "Assumed Liabilities" includes, among other things, all Liabilities relating to MSRs for Agency

6

**PRIVILEGED & CONFIDENTIAL**
**SUBJECT TO FRE 408**

Loans guaranteed by Ginnie Mae, whether arising prior to or after the Closing."[8]  Thus, Ocwen
must identify a breach of a Core Representation to assert a claim with respect to the Taggart
Litigation.  For the reasons set forth below, none exist.

Contrary to Ocwen's contentions, the existence of this pending litigation does not constitute or
otherwise establish a breach of the representations and warranties set forth in Section 4.17(a), (f),
or (j) of the APA.  As an initial matter, none of these subsections of Section 4.17 presents a
guarantee that as of the Closing Date, there is no pending litigation involving (i) potential
deficiencies with respect to compliance with underwriting policies, (ii) potential setoff rights,
and/or (iii) instances where the repurchase of any such Ginnie Mae Loan may be required.  With
respect to Section 4.17(a), this provision states that all Ginnie Mae Loans comply in material
respects with the Debtors' underwriting requirements and that the origination, servicing, and sale
of such loans comply with certain applicable requirements in all material respects.  Here, the
Debtors materially complied with all applicable servicing requirements with respect to Taggart's
Ginnie Mae Loan.  The Debtors believe that should a court identify any non-compliance, such
non-compliance would be non-material, and thus, would not amount to a breach under Section
4.17(a) of the APA.

With respect to Section 4.17(f), which states that any Ginnie Mae Loan is not subject to
rescission, setoff, etc., for the reasons set forth in the objection to the Taggart proof of claim in
the Chapter 11 Cases, the Trust does not believe a right of rescission or offset will be available to
Taggart.  Nor does the Trust believe that Section 4.17(j) is implicated by the Taggart litigation.
Taggart makes many unfounded claims.  The Debtors had no basis to believe that repurchase or
indemnity would be required with respect to the Taggart loan as of the Closing Date, nor does
the Trust believe so today.

7. Mack Claim/DB Trust

Ocwen did not raise this claim in its email communications with the Trust, but previously
included it as part of its other Correspondence to the Trust.  Ocwen asserts an indemnification
claim in connection with a lawsuit, styled *Deutsche Bank Trust Company of the Americas as
Trustee for RALI 2007 QS3 v. Barry F. Mack*, before the Circuit Court for the Twentieth Judicial
District in and for Collier County, Florida (the "Florida Court").  In 2009, GMACM filed a
foreclosure action on behalf of Deutsche Bank against Mack.  On May 5, 2011, the Florida Court
entered a final judgment that dismissed the foreclosure action and found in favor of Mack
regarding Mack's counterclaims against Deutsche Bank.  On July 13, 2011, Deutsche Bank
moved to set aside the final judgment, but only received partial relief by the Florida Court's final
order.  On February 26, 2013, the Florida Court entered its final order, which reduced the amount
of the judgment entered in Mack's favor but kept the final judgment intact.  The parties cross-
appealed the final order, but on October 18, 2013, the final order was ultimately upheld by the
Florida appellate court.

Ocwen asserts a protective indemnification claim pursuant to Sections 4.14 and 11.1 of the APA,
as well as pursuant to Paragraph 35 of the Sale Order, for the amount of the judgment in favor of

---

[8]    *See* APA § 1.1.

PRIVILEGED & CONFIDENTIAL
SUBJECT TO FRE 408

Mack, as well as in the event the court determines Deutsche Bank is liable for Mack's attorney fees.

The Trust disagrees that Ocwen has any reason to assert this claim against the Debtors' estates. Importantly, Ocwen has not, and will not likely, suffer a loss in connection with this matter, as Mack has already been paid under a bond that was guaranteed by Ally. Thus, it does not appear that Deutsche Bank could suffer any losses in connection with this claim that would entitle it to indemnification. All that remains is a potential claim by Ally, which Ally will assert either against Ocwen or the Trust. Ally – not Ocwen – will pursue this claim, so there is no basis for Ocwen to assert a claim against the Debtors. To the extent Ally pursues a claim against Ocwen, Ocwen should be able to defend such a claim by pointing to the no successor liability language in Sale Order. Thus Ocwen does not appear to be at risk of loss with respect to the Mack Claim. Neither Paragraph 35 of the Sale Order nor any provision of the APA supports an indemnification claim here. Notwithstanding these points, the Trust requests that within sixty (60) days following the receipt of this letter, Ocwen provides the Trust with notice of all amounts actually paid on account of this matter, if/when it has sought reimbursement for those amounts, and, if applicable, whether such reimbursement request was denied.

8. Robinson Section 363(o) Claims

Ocwen did not raise this claim in recent email communications with the Trust, but previously included it as part of its other Correspondence to the Trust. The Trust understands that Ocwen has settled this matter with Simona Robinson ("Robinson"), and Robinson's loan modification and settlement documents have been executed. Further, Robinson's motion relating to such requested relief has been withdrawn from the Chapter 11 Cases. As this newly documented modification resolved all of Robinson's issues with both Ocwen and the Debtors, and since these documents contained standard release clauses, the Trust believes that there is no risk of any future claim to be asserted by Robinson.[9]

9. Records Management SOW / Iron Mountain

The parties have already had exhaustive communications laying out their positions on this issue, which need not be repeated in detail herein. Suffice it to say, the Trust believes that this claim for indemnification is without merit.

*Administrative Expense Claims*

While the Trust does not see any basis to assert administrative expense claims above and beyond the indemnification claims asserted under the APA or Sale Order discussed above (and believes it is too late to attempt to recast these claims as indemnification claims at this late stage, well past the deadline in the APA), the Trust will briefly respond substantively to such claims.

---

[9] Robinson did not file a proof of claim in the Chapter 11 Cases, which also bars her from now raising any claims against the Debtors' estates.

PRIVILEGED & CONFIDENTIAL
SUBJECT TO FRE 408

1. Kasork

In its latest Correspondence, Ocwen suggests that Kasork's vendor claim against Ocwen, which seeks fees incurred for pulled listings under a contract amendment, will be withdrawn. In the event that this matter is not resolved, the Trust maintains that it is not liable for this asserted administrative expense claim. Further, this claim does not appear to constitute a breach by the Debtors of an obligation under the APA that would give rise to a right to indemnity. As in other instances, Ocwen misinterprets the scope of the "no successor liability" clauses, and cannot use those provisions as a basis to assert this claim against the Debtors to seek reimbursement for any amounts Ocwen pays to Kasork.

2. SAS

This administrative expense claim is based on amounts Ocwen claims it erroneously paid to the Debtors in connection with the SAS Institute Inc.'s ("SAS") software license. Ocwen asserts that even though the SAS license was assumed and assigned to Ocwen pursuant to the APA and was Ocwen's property, ResCap wrongfully charged Ocwen for amounts owed in connection with the use of the license. According to Ocwen, this resulted in Ocwen's "double payment" for the use of the licensed software, as it made a payment to ResCap for its *pro rata* use of the software, and subsequently made a separate payment to SAS under a separate agreement for such use. SAS has apparently also asserted a claim against Ocwen in connection with purported unauthorized use of the SAS license by the Debtors, AFI, and ditech in connection with certain transition services agreements. Accordingly, Ocwen reserves its rights and seeks reimbursement from the Trust for the amounts paid to the Debtors by Ocwen on account of SAS's claim.

The Trust and Ocwen reached an understanding whereby the Debtors following the Closing Date would pay SAS for the cost of using the SAS software license for the benefit of Ocwen so long as Ocwen agreed to repay the Debtors. The SAS license agreement was properly assumed and assigned to Ocwen under the APA, and both Ocwen and SAS received notice of the assumption and assignment (*see* Docket No. 924, p. 63 of 81.); Schedule O to APA. Thus, we believe the amounts paid by Ocwen to the Trust were properly paid and consistent with the parties' understanding. If SAS incorrectly convinced Ocwen that it was required to enter into a new license or separately pay it for a license, that circumstance does not give rise to a claim against the Debtors.

*Conclusion*

While the Trust believes it has no liability on any of these claims, and therefore, the full amount set aside under the Indemnity Escrow Agreement should be released promptly to the Trust, the Trust believes the parties should meet to determine whether a comprehensive resolution of the Ocwen claims is possible. We propose that the parties work to schedule such a meeting for mid-September. The Trust believes such a meeting would be most productive if Ocwen provides the additional diligence requested herein (particularly with respect to the Advance Claims) in advance of the meeting.

**PRIVILEGED & CONFIDENTIAL**
**SUBJECT TO FRE 408**

We look forward to hearing from you on these matters.

Sincerely yours,

RESCAP LIQUIDATING TRUST

Tammy Hamzehpour
Chief Business Officer

Cc:    Jeffrey A. Brodsky
       Jill Horner
       John Ruckdaschel
       Lauren Delehey
       Todd Goren
       Meryl Rothchild