1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 Case No. 12-12020-mg

5 - - - - - - - - - - - - - - - - - - - - -x

6 In the Matter of:

7

8 RESIDENTIAL CAPITAL, LLC, ET AL.,

9

10             Debtors.

11

12 - - - - - - - - - - - - - - - - - - - - -x

13

14             United States Bankruptcy Court

15             One Bowling Green

16             New York, New York

17

18             July 15, 2015

19             10:12 AM

20

21 B E F O R E:

22 HON. MARTIN GLENN

23 U.S. BANKRUPTCY JUDGE

24

25

1

2   Evidentiary Hearing Re:   Todd Silber's claim

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Sharona Shapiro

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

1

2    A P P E A R A N C E S:

3    MORRISON & FOERSTER LLP

4         Attorneys for ResCap Borrower Claims Trust

5         250 West 55th Street

6         New York, NY 10019

7

8    BY:   JORDAN A. WISHNEW, ESQ.

9         JESSICA J. ARETT, ESQ.

10

11

12    ALSO PRESENT:

13    TODD SILBER, Party Pro Se

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  All right.  Please be seated.  We're here

3      on Residential Capital, number 12-12020.  We're here for a

4      trial in connection with the claim of Todd Silber; it's claim

5      number 4222.

6              Can I have the appearances, please?

7              Mr. Silber, do you want --

8              MR. SILBER:  I beg your pardon?

9              THE COURT:  State your appearance.

10             MR. SILBER:  Oh, Todd Silber.

11             THE COURT:  Okay.  Mr. Wishnew?

12             MR. WISHNEW:  Good morning, Your Honor.  Jordan

13     Wishnew.  I'm here with my colleague, Jessica Arett, Morrison &

14     Foerster, for the ResCap Borrower Claims Trust.

15             THE COURT:  Okay.  I apologize for being a little late

16     in taking the bench.  I had an early morning meeting and then

17     tried to get the last few things done before taking the bench.

18             All right.  So just so we're all on the same page, the

19     trust had objected to claim 4222 of Mr. Silber, and on March

20     9th, 2015, I issued an opinion, an order sustaining, in part,

21     and overruling, in part, the ResCap Borrower Claim Trust

22     objection to the claim.  There was then a motion for

23     reconsideration, and the Court denied the motion for

24     reconsideration but clarified a few issues on it.  So that's

25     where we are.  The opinion sustaining, in part, and denying, in

1    part -- overruling, in part, the claim objection, left some

2    issues to be decided, and that's what we're here for today.

3            So Mr. Silber, I know you don't have a lawyer; that's

4    quite all right.  It's always a little bit more of a challenge

5    for pro se parties.  I have to apply the rules, but the law

6    allows me -- I guess I would describe it as somewhat ease or

7    bend the rules to accommodate pro se parties, but nevertheless,

8    I've left open certain issues, and now's your

9    opportunity -- and when I say I left open, I concluded, in my

10   original opinion, that I couldn't resolve.  There were disputed

11   issues of fact that prevented me from resolving your claim,

12   particularly as it related to the Connecticut Housing financial

13   assistance program, and whether it's under a negligence

14   representation theory or another, that was the issue.  You had

15   contended that GMAC misrepresented to the Connecticut agency

16   what the amount owing on your loan was, and that was one of the

17   issues that I left open.  So I assume you reviewed the opinion

18   again?

19           MR. SILBER:  Yes, sir.

20           THE COURT:  Okay.  So are you going to call any

21   witnesses today?

22           MR. SILBER:  No, sir, nobody can --

23           THE COURT:  Well, you can testify and then --

24           MR. SILBER:  Well, I'll call myself then, yes, sir.

25           THE COURT:  Yeah.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    6

1          MR. SILBER:  I beg your pardon.

2          THE COURT:  No, and so when a pro se party, such as

3  yourself, a claimant without a lawyer, appears at an

4  evidentiary hearing, what I permit is for you to testify in the

5  narrative form.  And what I mean by that is that ordinarily, in

6  a trial, if there are lawyers, the lawyer who calls the witness

7  asks questions and the witness answers, and then the other side

8  has a chance to cross-examine.  Okay?  Well, I don't have you

9  say a question and then ask yourself the question, so when I

10 permit you to testify in the narrative form, what I'm saying is

11 you'll come up to the witness stand.  You can bring any

12 documents you want to refer to.  You'll be sworn by the

13 reporter.  Your testimony is under oath.  And I'll give you a

14 chance to basically provide your evidence that you want to

15 provide.  It's basically to explain whatever facts, and it has

16 to be -- you testify as to facts, not the legal arguments,

17 whatever facts you want to tell the Court that you believe I

18 should consider in deciding your claim.  Are we on the same

19 page about that?

20         MR. SILBER:  Yes, sir.

21         THE COURT:  Okay.  So why don't you come on up to the

22 witness stand.  The reporter will swear you.  Bring any

23 documents you want to refer to.

24         MR. SILBER:  Okay.

25         THE COURT:  Okay?

1          MR. SILBER:  And this is just related to the CHFA

2     DHLP, is that what we're doing right now?

3          THE COURT:  That's what I -- Mr. Wishnew, you tell me

4     what you believe, but that's what I believe remains.

5          MR. SILBER:  Was there something unclear?

6          THE COURT:  Hang on.  Mr. Wishnew, what's your view of

7     what we're doing here today?

8          MR. WISHNEW:  That was -- one minute, Your Honor.

9     Your Honor, I thought we were -- I wasn't sure if there

10    was -- basically, there's a common set of facts, and I wasn't

11    sure if breach of contract and breach of implied covenant of

12    good faith and fair dealing also apply, Your Honor.

13         THE COURT:  Well, it all related to the same --

14         MR. WISHNEW:  It all --

15         THE COURT:  -- part --

16         MR. WISHNEW:  Yeah, it all relates to the same

17    purported, I think, three loan modifications in 2009, I think,

18    and 2010, that Mr. Silber alleges we improperly denied.

19         THE COURT:  Okay.

20         MR. WISHNEW:  So to the extent there are causes of

21    action for breach of contract, breach of implied covenant of

22    good faith and fair dealing, negligent misrepresentation, or I

23    think it's CUTPA, all of those relate to that set of facts, and

24    so we were prepared to offer Mr. Cunningham to address those

25    facts.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    8

1          THE COURT:  Mr. Silber, if you look at pages 10

2    through 12 of the opinion, it says the objection is partially

3    overruled without prejudice and the remaining causes of action

4    of Silber's claim include:  1) breach of contract; 2) breach of

5    the implied covenant of good faith and fair dealing; 3)

6    negligent misrepresentation; and 4) a violation of CUTPA,

7    C-U-T-P-A; it's the Connecticut Unfair Trade Practices Act.

8          So the other claims I sustained, and with respect to

9    those four claims, what -- they all remain with regard to the

10   same facts, basically.  Your argument was that the note

11   includes the HUD guidelines, for example, and there was an

12   issue about what's supposed to happen as a result of that.  And

13   I concluded there were "several disputed issues of fact that

14   cannot properly be resolved based on the record before this

15   court without an evidentiary hearing.  For example, while the

16   HUD guidelines are incorporated into the terms of the note, it

17   is unclear, at this stage, what guidelines specifically require

18   of GMACM and whether GMACM did in fact comply with those

19   guidelines.  Moreover, is is unclear whether Silber's

20   modification applications provided sufficient documentation of

21   income, specifically unemployment income, pursuant to the

22   relevant guidelines, and in turn, whether GMACM properly

23   reviewed Silber's modification applications consistent with

24   relevant guidelines.  As a result of these factual issues,

25   Silber's negligent misrepresentation claim also cannot be

1   resolved at this time.  Although the documents before the Court

2   establish that Silber was told, before and after the December

3   2010 e-mail, that unemployment income could be considered in

4   the loan modification review process" -- I'll leave the cite

5   out -- "there remains a disputed issue of fact whether Silber

6   sufficiently establishes reliance on false representations in

7   that e-mail."

8           So I overruled the objection with respect to those

9   remaining causes of action without prejudice, and that's what

10  we're here to today is -- so just so we're clear, but they all

11  revolved around the same basic facts and legal theories.

12          Do you agree or disagree with that, Mr. Wishnew?

13          MR. WISHNEW:  I would agree, Your Honor.

14          THE COURT:  Okay.  So do you understand what we're

15  doing today, Mr. Silber?

16          MR. SILBER:  I do, sir.

17          THE COURT:  Okay.  So come on up.  Bring whatever

18  papers you believe you need with you.

19          MR. SILBER:  Okay.

20          THE COURT:  And --

21          MR. SILBER:  I believe I have everything.

22          THE COURT:  You'll go up there and stand, and you'll

23  be sworn, okay?

24          MR. SILBER:  Over here?

25          THE COURT:  Stand right there, and raise your right

1  hand, and then you'll sit down.

2          MR. SILBER:  Okay.

3      (Witness sworn)

4          THE COURT:  Okay.  Go ahead and have a seat.

5          THE WITNESS:  Thank you.

6          THE COURT:  So it's possible, as you explain the

7  facts, that Mr. Wishnew may have an objection.  He'll state it,

8  and I'll rule on the objection.  I think Mr. Wishnew recognizes

9  that you're not a lawyer, and I'll listen to the testimony and

10 give what weight I think it should be accorded to, but if he

11 objects he's entitled to do that, okay?

12         THE WITNESS:  Okay.

13         THE COURT:  So go ahead.  You're under oath.  And why

14 don't you tell me whatever facts you wanted me to consider in

15 resolving the remaining issues.  And if there are exhibits, if

16 there are documents that you want me to look at with

17 respect -- they have to be -- if they're documents you want me

18 to consider, you have to offer them into evidence.  So tell me

19 what the document is, describe it; hopefully I have a copy

20 here.  You will offer it into evidence.  Mr. Wishnew can

21 object, if he wants, and I'll rule -- what I base my ruling on

22 is whatever comes into evidence today has to -- I don't -- your

23 argument is one thing and the evidence is another, okay?

24         THE WITNESS:  Yes, sir.

25         THE COURT:  All right.  Go ahead.

 1  DIRECT EXAMINATION

 2  BY PROFFER:

 3          THE WITNESS:  Where do you want to start, from the

 4  breach of contract?  You had mentioned the DHLP and CHFA.  Is

 5  that what you want to --

 6          THE COURT:  Well --

 7          THE WITNESS:  -- start at, or --

 8          THE COURT:  One of your arguments, in your opposition

 9  to the objection, was related to the HUD guidelines, and for

10  purposes of the objection, Mr. Wishnew agreed that I could

11  consider those HUD guidelines incorporated into the promissory

12  note that you signed.

13          Is that a fair statement, Mr. Wishnew?

14          MR. WISHNEW:  Correct, Your Honor.

15          THE COURT:  Okay.  So I didn't have -- no one

16  offered -- I didn't have the HUD guidelines, so if you're

17  saying that the HUD guidelines required GMAC to do certain

18  things they didn't do, you need to point me -- you need to

19  offer evidence of the HUD guidelines.

20          THE WITNESS:  Okay.

21          THE COURT:  Okay?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  So I don't want to direct your testimony

24  precisely, but let's start there, okay?

25          THE WITNESS:  Okay.  Exhibit 43 is in a manila

1  envelope.

2          THE COURT:  Okay.  Let me find it.  Bear with me one

3  minute.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Okay.  I have what's been marked as

6  Exhibit 43.  Go ahead.

7          THE WITNESS:  That's the FHA HUD handbook, chapter 7,

8  section 4330.1, revision 5.

9          THE COURT:  Okay.

10          THE WITNESS:  In that handbook, it generally speaks of

11  doing everything to avoid foreclosures, foreclosures not in the

12  best interests of the parties.

13          There's also, on page 3, 7-4, the "Mortgagee

14  Collection Attitude" is pretty specific as far as what HUD

15  expects the mortgagees to do when revolving around a

16  HUD-insured note.  Would you like me to read the entry?

17          THE COURT:  Well, Mr. Wishnew, are you on?

18          MR. WISHNEW:  I am, Your Honor.

19          THE COURT:  Okay.  I'm on page -- you've marked page

20  numbers in the upper right-hand corner.

21          THE WITNESS:  I have, yes, sir.

22          THE COURT:  Okay.  And I'm looking at what's 3 in a

23  circle.  And on that page, you're pointing to paragraph 7-4,

24  "Mortgagee Collection Attitude"?

25          THE WITNESS:  Correct.

1      THE COURT:  And you don't have to read the whole

2  thing, but what is it that you believe that they didn't do that

3  that required them to do?

4      THE WITNESS:  When the mortgage made the decision to

5  make the mortgage loan -- "When the mortgagee made

6  the decision to make the mortgage loan, provided it was

7  insurable by HUD, or when they acquired the servicing" -- as

8  GMAC did -- "of the mortgage from another mortgagee, at that

9  time it committed itself to assume the added costs and effort

10  required to service those mortgages in accordance with HUD

11  guidelines should they become delinquent."

12      THE COURT:  Okay.

13      THE WITNESS:  So that's going to be -- it goes

14  hand -- that section of the handbook's going to go hand in hand

15  with the FHA mortgage letters, specifically Exhibit 44, which

16  is in a manila envelope also.

17      THE COURT:  All right.  Let me just -- so we're clear,

18  do you offer Exhibit 43 into evidence?

19      THE WITNESS:  I do.

20      THE COURT:  Any objection?

21      MR. WISHNEW:  Yes, Your Honor.  The reason for the

22  objection, Your Honor, is that this is -- it appears, based on

23  the first page -- and I apologize that I'm doing this on the

24  first exhibit, but this looks like to be from 1994.  If you

25  look at the lower left-hand corner, Your Honor, under the first

1  line across the page, it says 7-19\1994.  This suggests to me,

2  at least, that this is guidelines from 1994, and that there

3  would have been more recent applicable guidelines, that Mr.

4  Silber might be getting to in Exhibit 44, that are more

5  relevant to Mr. Silber's loan.  So I do have a concern about

6  the antiquity of this particular document.

7        THE COURT:  All right.  I'm going to --

8        THE WITNESS:  May I rebuttal?

9        THE COURT:  I -- well, I'm going to rule.  Okay.  I'm

10  going to overrule the objection.  I'm going to admit Exhibit 43

11  in evidence and give it such weight as I conclude it's entitled

12  to.  We'll see where we get to.  But go ahead.  What's the next

13  exhibit?

14  (FHA HUD handbook, chapter 7, section 4330.1, revision 5 was

15  hereby received into evidence as Silber's Exhibit 43, as of

16  this date.)

17        THE WITNESS:  So it was Exhibit 44, the FHA mortgage

18  letter, 0923.  It's in a manila envelope marked as Exhibit 44.

19        THE COURT:  Oh, I have it.

20        THE WITNESS:  Yes, sir.

21        THE COURT:  Okay.  And what is it that you're --

22        THE WITNESS:  May I grab my notes?

23        THE COURT:  Yes, please.

24        THE WITNESS:  I forgot my notes.

25        THE COURT:  Yes.

1              THE WITNESS:  Excuse me.  So this is being offered

2     into an exhibit based off of the guidelines in that letter.

3     That mortgage letter also references the HUD handbook, section

4     4330.1, revision 5.

5              THE COURT:  Where do I find that?

6              THE WITNESS:  I just had the page.  Forgive me; I can

7     look it right back up for you.

8              THE COURT:  That's okay.

9              THE WITNESS:  I just thought that would validate the

10    existence.  You've already overruled, but I'll point it out to

11    you, if you'd like.

12             THE COURT:  Well, I said -- I overruled the objection,

13    but I'll give it such weight as it's entitled to, so if you

14    have something -- it was 2009 --

15             THE WITNESS:  I do.  If you go to page 9.

16             THE COURT:  Okay.  These are the page numbers that you

17    wrote out?

18             THE WITNESS:  Yes, sir.

19             THE COURT:  Okay.  That's fine.

20             THE WITNESS:  Exhibit 44, page 9.

21             THE COURT:  Yes.

22             THE WITNESS:  If you go down to "Case Mortgage

23    Documentation".

24             THE COURT:  Yes.

25             THE WITNESS:  It just references "Servicing files must

RESIDENTIAL CAPITAL, LLC, ET AL.                    16

1  be retained for a minimum of the life of the mortgage plus

2  three years, per handbook 433.1, revision 5."  I think this

3  further validates that revision 5 was in effect at the time of

4  this mortgage letter which was issued in 2009.

5            THE COURT:  Okay.  All right.  Is there something in

6  Exhibit 43 -- other than this reference, is there something you

7  wanted me to look at in here?

8            THE WITNESS:  43 or 44 -- the mortgage letters.

9            THE COURT:  I'm sorry, in 44.

10           THE WITNESS:  Yes, sir.

11           THE COURT:  Okay.

12           THE WITNESS:  Yes, sir.  Page 12, up in the right-hand

13  corner, in Exhibit 44, number C, it mentions calculation of a

14  partial claim.  Partial claim can be used hand in hand in a

15  reduction of the loan as well as during a trial modification, a

16  loan modification, a forbearance plan, or it can be taken

17  advantage of to help reduce the overall balance of the loan.

18  And that partial claim gets put somewhere else, and it's not

19  used against you when they're underwriting the thirty-one

20  percent, as close to fifty-five percent, or whenever they're

21  using it, they can take a portion of the mortgage and make it

22  obsolete when calculating a modified application -- or a loss

23  mitigation application.  And I was never offered a partial

24  claim.

25           THE COURT:  Is there anything here that requires that

1  they do that?

2          THE WITNESS:  Yes, Your Honor, let me -- perhaps I

3  should start with that.  Okay.  If we go to -- page 15, that I

4  marked in the upper right-hand corner.

5          THE COURT:  I'm there.

6          THE WITNESS:  If you go down to 15, "Is this program

7  mandatory or required to solicit borrowers who qualify?"  "Yes,

8  the evaluation of borrowers for loss mitigation is mandatory.

9  The loss mitigation priority, as defined on page 3 of the

10 attachment to mortgage letter 0923, states that FHA-HAMP can be

11 utilized only if the mortgagor does not qualify for current

12 home retention.  But it speaks, once again, that utilizing the

13 programs that are available.  I believe that not exercising all

14 of the programs or all of the options that are available, Your

15 Honor, is impeding me from receiving the FHA benefits, which is

16 one of the major claims of breach of covenant to bargain in

17 good faith and fair dealings.

18         THE COURT:  Okay.

19         THE WITNESS:  If you're impeding me from receiving

20 benefits in any way --

21         THE COURT:  But is there something in here --

22         THE WITNESS:  There is.  I --

23         THE COURT:  -- that was -- here's -- my question is:

24 let's assume a loan servicer evaluates your modification

25 request.  Is there anything in here that says they have to give

1    a principal deduction or they have to capitalize mortgage

2    arrears?  I understand there are many options, but what I'm

3    focusing on, if you're able to provide any evidence that says

4    they have to do that, they have to do each of the available

5    options.

6         (Pause)

7         THE COURT:  Because -- let me just stop you there.

8    I'm on page 15.  You pointed to paragraph number 15:  "Is this

9    program mandatory?"  And "Are we required to solicit borrowers

10   who may qualify?"  And then in italics, "Yes, the evaluation of

11   FHA borrowers for loss mitigation is mandatory.  The loss

12   mitigation priority order, as defined on page 3 of the

13   attachment" -- et cetera -- "can be utilized only if the

14   mortgagor does not qualify for current home retention options."

15        So are you saying you don't believe they evaluated you

16   for loss mitigation?

17        THE WITNESS:  Correct, they didn't -- they didn't

18   evaluate for an FHA modification.  That's referring to -- FHA

19   can only be used if you don't qualify for current home

20   retention, which would be the HAMP program --

21        THE COURT:  Okay.

22        THE WITNESS:  -- which is more rigid, Your Honor --

23        THE COURT:  Okay.

24        THE WITNESS:  -- for FHA.

25        THE COURT:  All right.  Go ahead.

1          THE WITNESS:  I'm sorry.

2          THE COURT:  Do you offer Exhibit 44 into evidence?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Any objection?

5          THE WITNESS:  No objection.

6          THE COURT:  All right.  Exhibit 44 is in evidence.

7  (FHA mortgage letter was hereby received into evidence as

8  Silber's Exhibit 44, as of this date.)

9          THE WITNESS:  I am sorry.

10          THE COURT:  No, that's all right.  Just relax.

11          THE WITNESS:  I have that written at the top of all of

12  my documents.

13          So other supporting documentation would obviously be

14  the note -- I believe that the Trust and myself have a list of

15  exhibits that we were going -- that copy each other, that we

16  were going to admit.

17          THE COURT:  Mr. Wishnew?

18          THE WITNESS:  He's laughing because as of last night I

19  was still -- I didn't receive the documents until the day after

20  the due date, but let's let the documents speak for themselves.

21  I don't want to make an argument about that.

22          MR. WISHNEW:  Mr. Silber is correct.  If you were to

23  compare our list of documents against his list of documents,

24  there are some overlap.  We're willing to stipulate those

25  documents into evidence, Your Honor.  I'm happy to read

RESIDENTIAL CAPITAL, LLC, ET AL.                    20

1    through --

2            THE COURT:  Do you have a typed list or -- exhibit

3    list?

4            MR. WISHNEW:  One moment, Your Honor.

5            THE COURT:  Okay.

6            MR. WISHNEW:  If not, I can certainly read it into the

7    record.

8            THE WITNESS:  I did not have time to type one up.  I

9    actually spent the night in New York last night so to ensure

10   I'd be here on time, not waiting on trains.  I got the e-mail

11   last night, late last night.

12           THE COURT:  Well, we'll go on, and --

13           MR. WISHNEW:  Okay.

14           THE COURT:  -- if there's a list, that's fine.

15           So what's the next exhibit you want to --

16           THE WITNESS:  Okay.  So we have the bank note, which I

17   believe is on the exhibit list.

18           THE COURT:  Does it have one of your exhibit numbers

19   on it?

20           THE WITNESS:  It does, Exhibit 1.  And now we're going

21   to go to the folder, Your Honor, Exhibit 1.  Okay.  I think I

22   understand how this process is working now.

23           THE COURT:  All right.  So Exhibit 1 is the note.  All

24   right.  Are you offering it into evidence?

25           THE WITNESS:  Yes, sir.

1          THE COURT:  Okay.  No objection, Mr. Wishnew?

2          MR. WISHNEW:  No objection.

3          THE COURT:  All right.  Exhibit 1 is in evidence.

4    (Bank note was hereby received into evidence as Silber's

5    Exhibit 1, as of this date.)

6          MR. WISHNEW:  Your Honor, I can actually, if you'd

7    like, quickly address the documents that match.

8          THE COURT:  Sure.  Do you have a copy of the list for

9    me?  That might even --

10         MR. WISHNEW:  I, unfortunately, do not, Your Honor.

11   I'm sorry about that.

12         THE COURT:  We'll deal with at another time.  Okay.

13         Exhibit 1 is in evidence.  Go ahead.

14         MR. WISHNEW:  Exhibit 1 is in evidence.  That is

15   duplicative.

16         THE COURT:  All right.  Well, we'll deal with this --

17         MR. WISHNEW:  Okay.

18         THE COURT:  Let's just go on.

19         MR. WISHNEW:  Okay.

20         THE COURT:  Okay?

21         THE WITNESS:  Exhibit 2, Your Honor, is the --

22         THE COURT:  Is there something in 1 you wanted me to

23   look at?

24         THE WITNESS:  Just the provisions.  If you look at

25   page 1, if you go down to 6 "Borrower's failure to pay",

RESIDENTIAL CAPITAL, LLC, ET AL.                    22

1   paragraph B means that this note cannot be accelerated.  We're

2   limited by the -- I'm sorry, it says that the note does not

3   authorize acceleration when not permitted by HUD regulations.

4             THE COURT:  Oh, that's the issue of whether the HUD

5   regulations are incorporated into the note.

6             THE WITNESS:  Correct.

7             THE COURT:  And as to that, I find that you and Mr.

8   Wishnew, you agreed --

9             MR. WISHNEW:  Yes.

10             THE COURT:  -- that for purposes of this claim

11   objection, I can consider it incorporated.

12             MR. WISHNEW:  Correct, Your Honor.

13             THE COURT:  Okay.  Go ahead.

14             THE WITNESS:  Okay.  Number two is just the mortgage

15   itself to go hand in hand with the note.

16             THE COURT:  Is it --

17             THE WITNESS:  The mortgage in Exhibit 2; I beg your

18   pardon.

19             THE COURT:  Okay.  And you offer Exhibit 2?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  All right.  Any objection?

22             MR. WISHNEW:  No, objection.

23             THE COURT:  All right.  Exhibit 2 is in evidence.

24   (Mortgage was hereby received into evidence as Silber's Exhibit

25   2, as of this date.)

RESIDENTIAL CAPITAL, LLC, ET AL.                          23

1          THE WITNESS:  Exhibit 3 --

2          THE COURT:  Is there something in the mortgage you

3  want me to look at or --

4          THE WITNESS:  It just reiterates the same thing that

5  number 1 said, Your Honor.

6          THE COURT:  Okay.

7          THE WITNESS:  Exhibit 3 is an affidavit, federal loss

8  mitigation, that's required by the superior court.  It just

9  shows that the financial analysis that completed this report

10  for the federal court put in the reasons why I was being denied

11  certain modifications.  This document was filed with the court

12  on 4/30/2012.  This is the Hartford Superior Court.

13          THE COURT:  And is there something in this document

14  you want me to look at?

15          THE WITNESS:  I would just His Honor to take a note of

16  when the document was filed and what was written in by the

17  financial analysis of why I was being denied modifications.

18          THE COURT:  Where will I find it?

19          THE WITNESS:  Page 2 of 4 -- well, I'm sorry.  Page 1,

20  there's an X marked out at the bottom, "The loan is eligible

21  for review under both programs, but the borrower does not

22  qualify for the following reasons".

23          THE COURT:  All right.

24          THE WITNESS:  Page 2 of 4, 5(a)(1), specific to HAMP,

25  "current delinquency exceeds twelve months or current

RESIDENTIAL CAPITAL, LLC, ET AL.                    24

1    delinquency plus previous payment claim exceed twelve months

2    maximum".  I believe those are the only two I've -- oh, and

3    then -- I'm sorry, on page 3, at the top, there's checked in

4    the box that says "other", "Traditional modification denied due

5    to insufficient income", but on page 2, they're speaking of an

6    FHA modification.  The Court is looking for an FHA

7    modification, reason why FHA was denied, and the financial

8    analysis is speaking within a traditional modification.

9            THE COURT:  Who prepared Exhibit 3?  You're saying

10   that --

11           THE WITNESS:  It is Amber Pete (ph.), who was an

12   analasyst (sic) for GMAC.  If we go to page 1 of Exhibit 3, it

13   gives the name of who prepared it.  And number then 2 says, "I

14   am an analasyst (sic) of GMAC Mortgage."

15           THE COURT:  Okay.  All right.  So you're saying that

16   GMAC submitted Exhibit 3 to the court in Connecticut.

17           THE WITNESS:  Correct, on April 30th of 2012.

18           THE COURT:  And do you offer Exhibit 3?

19           THE WITNESS:  Yes, sir.

20           THE COURT:  Any objection?

21           MR. WISHNEW:  No objection.

22           THE COURT:  Exhibit 3 is in evidence.

23   (Federal loss mitigation affidavit filed 4/30/2012 was hereby

24   received into evidence as Silber's Exhibit 3, as of this date.)

25           THE WITNESS:  Okay.  I think Exhibit 4 is redundancy,

RESIDENTIAL CAPITAL, LLC, ET AL.                    25

1  as that form itself is added into a manila envelope.  So I'll

2  withdraw Exhibit 4 at this time.

3          THE COURT:  Well, I'll just -- I'm writing down what

4  you're offering, so --

5          THE WITNESS:  Okay.  All right.

6          THE COURT:  Okay?

7          THE WITNESS:  Exhibit 5, 2/11/2010; this is the letter

8  received by GMAC, and this --

9          THE COURT:  That -- let me just, before you do that,

10  let me come back to Exhibit 3.  You say that's a document

11  that --

12          THE WITNESS:  Yes, sir.

13          THE COURT:  -- a summary that GMAC prepared.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Is it your -- do you believe any of the

16  information contained in the form is not accurate?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Tell me what.

19          THE WITNESS:  Well, they're making a reference to it

20  being -- at the page 2 of 4, number 5, with respect to the

21  Federal Housing Administration, those are FHA loan, not a

22  traditional loan modification, and yet her reasoning is

23  "traditional modification due to insufficient income".

24          Also, as far as the specifics to HAMP, 2 of 4,

25  5(a)(1), the other box, "Current delinquency" exceeds twelve

1  months of current -- I'm sorry, "exceeds twelve months or

2  current delinquency plus previous payment claim exceeds twelve

3  months".  The date that this was filed, Your Honor, was on

4  4/30/2012.  I have another exhibit in this document which is

5  mandated from the Court that they must file this financial

6  analysis within thirty days.  And that was released by the

7  Court in 2010.  So of course if they wait until 2012 to file

8  this, then they can simply tell the Court, well, he's twelve

9  months past due.

10        THE COURT:  Let me -- what I'd like to know is this.

11  The document is dated April 30th, 2012.

12        THE WITNESS:  Yes, Your Honor.

13        THE COURT:  Did your delinquency exceed twelve months

14  as of April 30th, 2012?

15        THE WITNESS:  Yes, Your Honor.

16        THE COURT:  Okay.  So it's accurate.

17        THE WITNESS:  I understand it's accurate --

18        THE COURT:  I just meant --

19        THE WITNESS:  Okay.

20        THE COURT:  I'm not trying to --

21        THE WITNESS:  It's -- for the date that it was filed,

22  it's accurate, Your Honor.

23        THE COURT:  Okay.  That's what I'm trying to under --

24        THE WITNESS:  Yes, Your Honor.

25        THE COURT:  -- stand, whether -- because you point to

1  this exhibit, and for me to understand it in the context of

2  this hearing, I'm trying to understand whether there -- and it

3  was prepared by GMAC.

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  Is there anything in the exhibit, as of

6  the date it's prepared, that you believe was not accurate?

7          THE WITNESS:  No, it's accurate --

8          THE COURT:  Okay, fine.

9          THE WITNESS:  -- as per the date it was filed, Your

10  Honor.

11          THE COURT:  Okay, fine.  All right.  Continue.

12          THE WITNESS:  Okay.  Page 4, we can --

13          THE COURT:  Exhibit 4, you're saying that --

14          THE WITNESS:  That's just redundancy.  I apologize.

15          THE COURT:  No, that's fine.  All right.  What is

16  next?

17          THE WITNESS:  Exhibit 5, we have a copy -- we have a

18  letter from GMAC to myself that's explicitly explaining that

19  they require a copy of unemployment award letter providing the

20  original award beginning and the end date.

21          THE COURT:  Do you --

22          THE WITNESS:  So I --

23          THE COURT:  -- offer Exhibit 5?

24          THE WITNESS:  I offer this as an exhibit, yes, Your

25  Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                              28

1              THE COURT:  Okay.  Mr. Wishnew?

2              MR. WISHNEW:  No objection, Your Honor.

3              THE COURT:  All right.  Exhibit 5 is in evidence.

4   (Letter from GMAC to Todd Silber regarding requirement of

5   unemployment award letter was hereby received into evidence as

6   Silber's Exhibit 5, as of this date.)

7              THE WITNESS:  Thank you.

8              Exhibit 6 is an e-mail from Carmen Starr to Mr.

9   Chambers in regards to Mr. Chambers being the State Attorney

10  General's -- working for the Connecticut State Attorney

11  General's Office, Joseph Chambers.  I acquisitioned the

12  Attorney General's Office as an agent to act on my behalf, to

13  look into what was going on with my loan modification, and

14  Carmen Starr, who is out of the executive office, resolution

15  specialist, had provided inaccurate information which quelled

16  his investigation.  It says, paragraph 2, "Due to guideline

17  changes, unemployment income cannot be utilized when reviewing

18  an account for a loan modification," which is an inaccurate

19  statement.

20             THE COURT:  All right.  Are you offering Exhibit 6?

21             THE WITNESS:  Yes, sir.

22             THE COURT:  Mr. Wishnew?

23             MR. WISHNEW:  No objection, Your Honor.

24             THE COURT:  Okay.  Exhibit 6 is in evidence.

25  (E-mail from Carmen Starr to Mr. Chambers was hereby received

1  into evidence as Silber's Exhibit 6, as of this date.)

2          THE WITNESS:  Exhibit 7 -- it was just an exhibit that

3  I wanted to provide to show the acquisition of Joseph Chambers

4  to act on my behalf, that I was asking for the State Attorney

5  General's Office to step in.

6          THE COURT:  Okay.  Do you offer Exhibit 7?

7          THE WITNESS:  I do, Your Honor.

8          THE COURT:  Mr. Wishnew?

9          MR. WISHNEW:  No, objection, Your Honor.

10          THE COURT:  All right.  Exhibit 7 is in evidence.

11  (Document indicating acquisition of Joseph Chambers, AUSA, to

12  act on Todd Silber's behalf was hereby received into evidence

13  as Silber's Exhibit 7, as of this date.)

14          THE WITNESS:  Exhibit 8 shows that they did take on

15  that position to act on my behalf, and there's a public inquiry

16  number.  This was just all support to the e-mail, in case it

17  was said to be hearsay.

18          THE COURT:  And you're offering Exhibit 8?

19          THE WITNESS:  I am, yes, Your Honor.

20          THE COURT:  Mr. Wishnew?

21          MR. WISHNEW:  No objection, Your Honor.

22          THE COURT:  All right.  Exhibit 8 is in evidence.

23  (Document with public inquiry number indicating that the

24  Attorney General's Office agreed to act on behalf of Todd

25  Silber was hereby received into evidence as Silber's Exhibit 8,

1   as of this date.)

2          THE WITNESS:  Exhibit 9 is the original claims form

3   that was filed with the trust by the due date required.

4          THE COURT:  Any objection, Mr. Wishnew?

5          MR. WISHNEW:  No objection, Your Honor.

6          THE COURT:  All right.  Exhibit 9 is in evidence.

7   (Original claims form filed with trust was hereby received into

8   evidence as Silber's Exhibit 9, as of this date.)

9          THE WITNESS:   Exhibit 10 is the letter that they sent

10  to me requiring additional information.  They wanted me to

11  explain more what I was looking for as far as damages because I

12  really didn't have a dollar amount.  It just said "plus pending

13  lawsuit".

14         THE COURT:  Are you offering Exhibit 10?

15         THE WITNESS:  I am, yes, Your Honor.

16         THE COURT:  Mr. Wishnew?

17         MR. WISHNEW:  No objection, Your Honor.

18         THE COURT:  All right.  Exhibit 10 is in.

19  (Letter sent to Todd Silber was hereby received into evidence

20  as Silber's Exhibit 10, as of this date.)

21         THE WITNESS:  Exhibit 11 is what my original -- what I

22  was asking for originally in my federal lawsuit against GMAC

23  filed in the -- well, it was originally filed in the Hartford

24  superior court; it was then moved, by GMAC's attorneys, to a

25  federal court.

1          THE COURT:  This is, what, the last page of a

2    complaint?

3          THE WITNESS:  Yes, Your Honor.  It's just what I was

4    looking for, Your Honor, the damages that I was being sought.

5    I thought we already touched based on all the other.

6          THE COURT:  Mr. Wishnew?

7          MR. WISHNEW:  No objection, Your Honor.

8          THE COURT:  All right.  Exhibit 11 is in evidence.

9    (Document indicating damages Todd Silber requested in his

10   original lawsuit against GMAC was hereby received into evidence

11   as Silber's Exhibit 11, as of this date.)

12         THE WITNESS:  Exhibit 12 is the mortgage foreclosure

13   standing order federal loss mitigation programs.  It's issued

14   by the state superior court.  If we go down to number 4, it

15   just says, "In any mortgage foreclosure proceeding filed before

16   September 1st, 2010, that is pending in the superior court that

17   has not gone to judgment -- or has gone to judgment of

18   foreclosure by sale, in which the sale of the foreclosed

19   residential property has not been approved, the plaintiff shall

20   file a fully executed affidavit, Federal Loss Mitigation

21   Programs form, JDCL 114, no later than thirty days from this

22   effective date of this order."

23         The effective date of this order was September 1st,

24   2010.  And Exhibit 3 shows they waited two years to file it.

25         THE COURT:  All right.  Do you offer Exhibit 12?

RESIDENTIAL CAPITAL, LLC, ET AL.                                              32

1            THE WITNESS:  Yes, Your Honor.

2            THE COURT:  Mr. Wishnew?

3            MR. WISHNEW:  No objection, Your Honor.

4            THE COURT:  All right, Exhibit 12 is in evidence.

5    (Mortgage Foreclosure Standing Order Federal Loss Mitigation

6    Programs was hereby received into evidence as Silber's Exhibit

7    12, as of this date.)

8            THE WITNESS:  I offer Exhibit 13.  It is from the FHA

9    Web site itself.  And it just shows a variance -- it says "A

10   lender is required to submit Form HUD 90041, request for a

11   variance procedure on any loss mitigation option where all HUD

12   requirements have not been met.  These variances must be

13   submitted by the EVAR system."

14           And then it goes on to instruct that if there are

15   variances that need to be consi -- it goes on to say, "All

16   variances are considered on a case-by-case basis.  When

17   preparing a variance for special forbearance, loan

18   modification, or deed in lieu of foreclosure," and then it

19   instructs them how to file it.

20           THE COURT:  And what's the relevance of this document?

21           THE WITNESS:  The relevance is, is that there's never

22   been a variance filed with FHA for any of my loss mitigation

23   applications.

24           THE COURT:  Okay.  Are you offering Exhibit 13?

25           THE WITNESS:  Yes, Your Honor.

 1              THE COURT:  Mr. Wishnew?

 2              MR. WISHNEW:  No objection, Your Honor.

 3              THE COURT:  All right.

 4    (FHA Web site printout was hereby received into evidence as

 5    Silber's Exhibit 13, as of this date.)

 6              THE COURT:  Go ahead.

 7              THE WITNESS:  Exhibit 14 is a message from Jeffrey

 8    Knickerbocker, who is an attorney for Hunt Leibert, who was

 9    representing GMAC during the foreclosure.  It just flat-out

10    says to me in the second paragraph, "Also our position is that

11    you signed the note and mortgage, that required you to make

12    monthly payments, and you breached that agreement.  At that

13    point, our client did not have any obligation to negotiate

14    anything.  Further, our client was well within its rights to

15    commence a foreclosure action, and we are ready to litigate

16    that issue."

17              I'm just bringing that exhibit forward to show the

18    mentality of GMAC that they weren't required to do anything.

19    And that's the whole basis of my argument; they were required

20    to negotiate and explore loss mitigation options.

21              THE COURT:  This is an e-mail -- you say this is from

22    GMAC's lawyer to you?

23              THE WITNESS:  Yes, Your Honor.

24              THE COURT:  Okay.

25              THE WITNESS:  In the top left-hand corner:

1  Knickerbocker, Hunt & Leibert.

2          THE COURT:  You're offering Exhibit 14/

3          THE WITNESS:  Yes, Your Honor.

4          THE COURT:  Mr. Wishnew?

5          MR. WISHNEW:  Your Honor, I do have a concern about

6  this one.  The subject line --

7          THE COURT:  I know you have a concern.  Just tell me

8  what your objection is.

9          MR. WISHNEW:  Objection, Your Honor.  I believe this

10  looks like a settlement communication.  And to the extent that

11  the settlement communication is being offered for the truth,

12  there's an issue as to admissibility under Federal Rule of

13  Evidence 408.

14          THE COURT:  The objection is overruled.  I've heard

15  some euphemistic descriptions of what an e-mail such as this is

16  telling somebody.  I don't see anything about settlement.

17  Overruled, it's in evidence.

18  (Message from Mr. Knickerbocker was hereby received into

19  evidence as Silber's Exhibit 14, as of this date.)

20          MR. WISHNEW:  Your Honor, may I address one other

21  point?  I know you've ruled.

22          THE COURT:  Go ahead.

23          MR. WISHNEW:  But the subject line does say, Re:

24  settlement, reinstatement offer.

25          THE COURT:  It's overruled.  Go ahead.

RESIDENTIAL CAPITAL, LLC, ET AL.                    35

1            MR. WISHNEW:  Okay.

2            THE COURT:  Go ahead, Mr. Silber.

3            THE WITNESS:  Exhibit 15 is dated for Tuesday, May

4    31st, 2011.  It is a letter or an e-mail from attorney Jeffrey

5    Knickerbocker that shows that they agreed to waive late charges

6    and any inspection fees totaling 1,591.72.  But it just says

7    that they agree to waive late charges and inspection fees.  One

8    of the fees that GMAC put forward when telling EHLP, the CHFA

9    program, of what was past due, they added in inspection fees

10   that was promised to be waived.

11           THE COURT:  Mr. Wishnew?

12           MR. WISHNEW:  No objection, Your Honor.

13           THE COURT:  All right, it's in evidence.

14   (5/31/11 e-mail from Mr. Knickerbocker was hereby received into

15   evidence as Silber's Exhibit 15, as of this date.)

16           THE COURT:  This does look like it's a settlement

17   proposal, but it's in evidence.  Go ahead.

18           THE WITNESS:  I believe Exhibit 16 is redundant

19   information.

20           THE COURT:  All right.

21           THE WITNESS:  It just shows the partial claim, so we

22   can skip that one.

23           THE COURT:  Okay.

24           THE WITNESS:  If it pleases the Court.

25           Exhibit 17, I wish to admit into evidence.  September

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1   1st, 2011.  This shows the figures that was provided to CHFA in

2   regards to the EHLP program, in regards to the negligence and

3   misrepresentation.

4          THE COURT:  Just let me read this over, okay?

5      (Pause)

6          THE COURT:  What's the second page of the exhibit?

7          THE WITNESS:  The second page of that exhibit is the

8   documentation that shows what exactly was reported to CHFA.  I

9   apologize for all the writing on it.  I started -- I did some

10  calculations in the past on it.

11         THE COURT:  Is all the writing yours?

12         THE WITNESS:  All the handwriting except for the top

13  where it says "reinstatement figure from GMAC Mortgage."  That

14  was from the -- that was part of the original, when CHFA mailed

15  this exhibit to me.  That's not my handwriting.  I don't -- I

16  assume it's CHFA's, but I don't know whose handwriting it is at

17  the top.  The rest is all mine, yes, Your Honor.

18         THE COURT:  And how did you obtain a copy of Exhibit

19  17?

20         THE WITNESS:  Oh, that's what they sent to me.

21         THE COURT:  Okay.  CHFA?

22         THE WITNESS:  CHFA, yes, Your Honor.

23         THE COURT:  Okay.  You offer Exhibit 17?

24         THE WITNESS:  Yes, Your Honor.

25         THE COURT:  Mr. Wishnew?

1           MR. WISHNEW:  No objection, Your Honor.

2           THE COURT:  All right.  I'll obviously disregard the

3   handwriting that Mr. Silber identified as his.

4   (9/1/11 figures provided to CHFA re negligence and

5   misrepresentation was hereby received into evidence as Silber's

6   Exhibit 17, as of this date.)

7           THE WITNESS:  I'm sorry, Your Honor.

8           THE COURT:  No, that's okay.  Go ahead.

9           THE WITNESS:  Exhibit 18, Your Honor, also from CHFA.

10  It now shows that there's a denial for the EHLP based off that

11  they required them to be able to assist for six months of

12  payments.  So this is just a denial letter based off of the

13  figures that GMAC provided to E -- to CHFA.

14          THE COURT:  Well, let me -- so this denial letter is

15  dated September 23rd, 2011.

16          THE WITNESS:  Correct.

17          THE COURT:  So from the hearing on -- the prior

18  hearing on the objection, I understand that you assert that

19  GMAC misrepresented the total due, the $43,736.80,

20  because -- well, do you agree that that amount would be the

21  correct amount if the September 2011 payment was included in

22  the arrearage?

23          Let me ask it a different way.

24          THE WITNESS:  No, I understand what you're -- yes,

25  Your Honor.  That would be correct if they put the September

1   payment in.  Except for on page 2 of Exhibit 17, it has a

2   different spot for when they put the next-due payment in.

3           THE COURT:  Where would I find it?

4           THE WITNESS:  If you go halfway down, "Next due PITIA,

5   1,990.80," and it -- that's my mortgage payment.  So they were

6   asking for the next --

7           THE COURT:  Hang on.  This is on 2 of 3?

8           THE WITNESS:  Page -- Exhibit 17 --

9           THE COURT:  Oh, I'm sorry.  I'm in the --

10          THE WITNESS:  I'm sorry.

11          THE COURT:  No, it's okay.  I was on the wrong place.

12  Okay.  Show me again.

13          THE WITNESS:  Page 17 -- I'm sorry, Exhibit 17 page 2.

14          THE COURT:  Yes.

15          THE WITNESS:  Halfway down -- or a majority of the way

16  down.

17          THE COURT:  Yes.

18          THE WITNESS:  "Next due PITIA".  And then it says

19  1,990.80.  They were already calculating when the next payment

20  due date was.  The figures were asked for -- I guess the

21  argument is, is that the figures were asked for on August 18th

22  and August -- August 18th.  They were provided on August 26th.

23          THE COURT:  They -- I'll point you to what's confusing

24  me about it.  And it's an issue I had before we went through

25  the document.  You see the line for "reinstatement through

RESIDENTIAL CAPITAL, LLC, ET AL.                                39

1    date", September 25th, 2011?

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Okay.  And my question really goes to, as

4    of September 25th, 2011, what was the amount that was going to

5    be due to reinstate your loan?  And wouldn't that include the

6    September 2011 payment?

7              THE WITNESS:  If they gave them a thirty-day notice,

8    it would.  But that would just be the twenty-one payments of

9    what was past due.  But we also have unexplained fees such as

10   inspection fees.

11             THE COURT:  Oh, we'll cover the inspection fees.

12             THE WITNESS:  Oh, I'm sorry.

13             THE COURT:  Okay.

14             THE WITNESS:  I missed the program by 400 dollars.

15   That's why every little thing is going to come into effect.

16   Every little dollar amount that they told them is not sitting

17   right with me.

18             Furthermore, if I may, Your Honor, there's another

19   exhibit that shows what they told me on August 11th, what was

20   my reinstatement amount.  I think what the determination to

21   save my house, from what I've shown, and I hope it would be

22   aware that if I was aware that I was going to miss the program

23   by 450 dollars, I could have paid GMAC 450 dollars, which goes

24   into the suspense balance or the credit on the account.  And

25   then when they give the reinstatement figures to GMAC, I

1   qualify.  I'm underneath the 50,000-dollar loan limit.  I was

2   told one thing, and they were told something else.

3            THE COURT:  I take it, I'm correct, you didn't make

4   the September 2011 payment?

5            THE WITNESS:  No, Your Honor.

6            THE COURT:  Okay.  All right, well, go ahead.

7            THE WITNESS:  I'm sorry, where were we at?  Number 18,

8   the exhibit 18 --

9            THE COURT:  Yes.

10            THE WITNESS:  -- shows the denial, and I guess I wish

11   to admit that into evidence.

12            THE COURT:  Mr. Wishnew?

13            MR. WISHNEW:  No objection, Your Honor.

14            THE COURT:  All right.  Exhibit 18 is in evidence.

15   (EHLP denial from CHFA was hereby received into evidence as

16   Silber's Exhibit 18, as of this date.)

17            THE WITNESS:  Okay.  Exhibit 19, Your Honor, shows the

18   Federal Emergency Homeowners Program, the EHLP program.  It

19   just gives you some outlines of that program and the

20   eligibility for that program.  It is four pages, and I wish to

21   admit that into evidence.

22            THE COURT:  Mr. Wishnew?

23            MR. WISHNEW:  No objection, Your Honor.

24            THE COURT:  All right.  Exhibit 19 is in evidence.

25   (Federal Emergency Homeowners Program EHLP outline was hereby

RESIDENTIAL CAPITAL, LLC, ET AL.                    41

1    received into evidence as Silber's Exhibit 19, as of this

2    date.)

3            THE WITNESS:  Page 20, I believe this is one of the --

4            THE COURT:  Exhibit 20.

5            THE WITNESS:  Exhibit 20, I'm sorry.  I believe this

6    is one of the ones that are duplicate.

7            THE COURT:  Then let's pass it by.

8            THE WITNESS:  Attorney Wishnew?

9            THE COURT:  If you want to offer it, fine.

10           THE WITNESS:  I'd like to offer it as an exhibit but

11   I --

12           THE COURT:  Okay.

13           THE WITNESS:  Okay.

14           THE COURT:  Mr. Wishnew?

15           MR. WISHNEW:  No objection, Your Honor.

16           THE COURT:  All right, Exhibit 20 is in evidence.

17   (Document was hereby received into evidence as Silber's Exhibit

18   20, as of this date.)

19           THE WITNESS:  Okay.  Exhibit 21 is the figures that

20   GMAC informed me of on -- I'm sorry.  GMAC informed me as far

21   as the beginning of August what was due -- what my payoff was

22   going to be.

23           THE COURT:  All right.  This is part of another

24   document, right?

25           THE WITNESS:  This is just the figures that they told

RESIDENTIAL CAPITAL, LLC, ET AL.                    42

1    me in a separate date.

2              THE COURT:  I know.  But what you marked as Exhibit 21

3    shows at the bottom a page number 4.  I don't know what the

4    first three pages -- I don't know whether there was a page 5.

5    You see what I'm looking at?

6              THE WITNESS:  I do see what you're looking at.

7              THE COURT:  What is this taken from?

8              THE WITNESS:  This was sent to me from GMAC.

9              THE COURT:  Just this page or --

10             THE WITNESS:  It would indicate that there was more.

11   I honestly don't recall anything else.  I would have -- this

12   document is so important; if I'd seen anything else that it was

13   pertaining to, I would have included it.  I didn't even see

14   number 4 on the bottom.  But this is -- yeah, I guess it does

15   insinuate that there are other pages involved in this document.

16   But it was in response to a payoff request that I sent GMAC.

17             THE COURT:  Okay.  The handwriting on the document,

18   whose is it?

19             THE WITNESS:  That's all my complete mess.

20             THE COURT:  Okay.

21             THE WITNESS:  After cross-referencing the figures.

22             THE COURT:  Where does this Exhibit 21 show the amount

23   of your arrears?

24             THE WITNESS:  I had -- I guess I added it up, Your

25   Honor.  I add it up in some handwriting.  It just shows what's

1    past due, the expense advance, escrow, fees, previous owner

2    release charges, and then what the suspense balance was on the

3    account.

4          THE COURT:  Because the document itself doesn't show

5    the amount of the arrears, correct?  It shows --

6          THE WITNESS:  The amount that's past due?

7          THE COURT:  Yeah.

8          THE WITNESS:  Oh, it's not -- it's not totaled into a

9    line, I guess, no, Your Honor.

10         THE COURT:  So from the line "interest from December

11   1, 2009 to August 9, 2011", do you know when is this

12   document -- this is only a partial document, do you know when

13   it's from, when it was prepared?

14         THE WITNESS:  At the beginning of -- the beginning of

15   August, they were giving me a ten-day payoff from the beginning

16   of August, if I remember correctly.  Because they knew that I

17   was going to be applying for the EHLP program.  Or I assumed

18   that they knew.  I needed a payoff -- I didn't want to waste

19   time filling out any more documentation.  I was aware of the

20   rules and the proce -- and what was required to qualify for

21   EHLP.  So I just wanted my payoff, and then I did some

22   calculations to see if I could qualify before wasting -- before

23   investing the time in it.  And the numbers they gave me showed

24   that's what was the amount due.

25         THE COURT:  Does this -- as of what date would this be

RESIDENTIAL CAPITAL, LLC, ET AL.                    44

1   the payoff amount?

2           THE WITNESS:  August 9th, 2011.  This is the payoff

3   month of August 9th, 2011.  And then there's a per diem rate of

4   42.28 -- if you look at number 13.

5           THE COURT:  Okay.

6           THE WITNESS:  And the per diem rate, I put in the

7   calculation.  If you go 8/9/2011 to when they gave the

8   documents to CHFA, it would be 930 dollars in addition.  So I

9   did a -- I was doing a breakdown to try to see where all that

10  additional money came from.

11          THE COURT:  All right.  Do you offer Exhibit 21?

12          THE WITNESS:  Yes, Your Honor.

13          THE COURT:  Mr. Wishnew?

14          MR. WISHNEW:  No objection, Your Honor.

15          THE COURT:  All right, Exhibit 21 is in evidence.

16  (August 2011 payoff information from GMAC was hereby received

17  into evidence as Silber's Exhibit 21, as of this date.)

18          THE WITNESS:  Thank you.  I offer Exhibit number 22.

19  This is the variance form directly from the FHA Web site, Form

20  HUD 90041, and its effective date is June 2003.  The bottom

21  right-hand corner, Your Honor.  And it's also referenced in the

22  Handbook 4330.1, which is also --

23          THE COURT:  Okay.  Any objection, Mr. Wishnew?

24          MR. WISHNEW:  No objection, Your Honor.

25          THE COURT:  All right.  Exhibit 22 is in evidence.

RESIDENTIAL CAPITAL, LLC, ET AL.                    45

1  (Form HUD 90041 was hereby received into evidence as Silber's

2  Exhibit 22, as of this date.)

3          THE WITNESS:  Exhibit 23, I wish to admit into

4  evidence.  This is just a letter from employee Carmen Starr

5  from the executive offices to myself.  I believe this is one of

6  our joint exhibits.

7          THE COURT:  Mr. Wishnew?

8          THE WITNESS:  I don't have the list, so I'm not sure.

9          MR. WISHNEW:  It's not a joint exhibit Your Honor.

10  But --

11          THE COURT:  Okay.

12          MR. WISHNEW:  -- we have no objection.

13          THE COURT:  All right, it's in evidence.

14  (Letter from Carmen Starr of GMAC was hereby received into

15  evidence as Silber's Exhibit 23, as of this date.)

16          THE WITNESS:  Okay, thank you.

17          THE COURT:  What is it about the letter that you --

18          THE WITNESS:  Just me being misinformed, and some

19  inaccurate, incorrect information, and some bank --

20          THE COURT:  What's the inaccurate information?  It's a

21  two-page letter.

22          THE WITNESS:  Your Honor, there was never a

23  calculation of me being denied backend debt-to-income back in

24  my original modification application and then filed in December

25  and then updated at the beginning of January 2010.

1        THE COURT:  Where do I find that in the letter?

2        THE WITNESS:  Six paragraphs down, it says, "Based on

3   monthly gross income, your backend debt-to-income was," this.

4        THE COURT:  Was seventy-three percent?

5        THE WITNESS:  Yes, Your Honor.

6        THE COURT:  And you say that's inaccurate?

7        THE WITNESS:  I'm saying that nothing -- that they're

8   saying that they reviewed it at that time, and they didn't

9   review anything with backend debt-to-income at that time.

10       THE COURT:  I want to be clear about this.  It says,

11  "Based on a monthly gross income of $3,677.92, your backend DTI

12  was seventy-three percent, making you ineligible for FHA HAMP."

13  Do you say that that statement is accurate or inaccurate?

14       THE WITNESS:  I say that it's inaccurate.

15       THE COURT:  What's inaccurate about it?

16       THE WITNESS:  They never evaluated a backend.  They

17  auto-declined it based on front end.  They wouldn't use my

18  unemployment at the time.  And this letter is dated October

19  12th, 2010.  And I believe there's some backtracking.  There's

20  no record of ever there being a backend debt-to-income.

21       THE COURT:  Let me ask you this.

22       THE WITNESS:  For -- I'm sorry.

23       THE COURT:  Was you gross income $3,677.92?

24       THE WITNESS:  Yes, Your Honor.

25       THE COURT:  Okay.

1              THE WITNESS:  To the best of my knowledge at that

2     time, yes.  It's in one of the mortgage letters.

3              THE COURT:  So based on that gross income, what do you

4     believe your DTI was?

5              THE WITNESS:  I don't know, Your Honor.  I was never

6     told.  Furthermore, I believe there's an error in the

7     calculation of the DTI, as it's saying --

8              THE COURT:  That's what I wanted -- if you never --

9              THE WITNESS:  Oh.

10             THE COURT:  -- if you didn't calculate it, how do you

11    know this calculation is inaccurate?

12             THE WITNESS:  I was never told what my new mortgage

13    payment was going to be, my modified payment would be.  Right

14    above that paragraph at the -- the paragraph above it -- on top

15    of it, it says the backend debt-to-income is the current

16    mortgage payment with escrow plus revolving debt divided by

17    gross.  I believe they used the wrong formula to calculate

18    backend debt-to-income.

19             THE COURT:  Okay.

20             THE WITNESS:  And I have -- I'm sorry.

21             THE COURT:  But how do I know that?  I mean, I

22    just -- you're testifying about a calculation that you say GMAC

23    made.  I see this letter.  I see the reference to the seventy-

24    three percent.  You're telling me that's not accurate.  And I

25    want you to explain to me what establishes that it's not

1  accurate?  That's what I have to know.

2          THE WITNESS:  Well, in January I was never examined,

3  and there was no denial of a backend debt-to-income, and

4  there's no reason for a failure due to backend debt-to-income.

5  This was written in 2010.  I believe it's backtracking.

6          Also, I believe they're using the wrong formula to

7  calculate the backend debt-to-income.

8          THE COURT:  How --

9          THE WITNESS:  We all know I can't afford the --

10          THE COURT:  How do I know that?  That's where I'm

11  struggling.

12          THE WITNESS:  I feel like I'm giving away my case now,

13  Your Honor.  I don't know how much I'm supposed to say

14  without --

15          THE COURT:  Okay.

16          THE WITNESS:  Well, you know what --

17          THE COURT:  Well, look, Mr. Silber, you're telling me

18  that the statement in this letter is not accurate.

19          THE WITNESS:  I have supporting --

20          THE COURT:  But I need to understand why it's not

21  accurate.

22          THE WITNESS:  The mortgage letter, which was

23  Exhibit -- FHA mortgage letter 0923, Exhibit 44 --

24          THE COURT:  Yes.

25          THE WITNESS:  -- references what's supposed to be used

 1    in calculating a backend debt-to-income.

 2            THE COURT:  Okay.

 3            THE WITNESS:  That's why I believe it's inaccurate,

 4    the formula used.  Furthermore, I think the relevancy of that

 5    is that it's backtracking to cover why they originally denied

 6    me, and they're trying to say now that -- ten months later, oh,

 7    well, you failed backend debt-to-income anyway.

 8            THE COURT:  Applying what you believe is the correct

 9    formula, which you say is in Exhibit 44, have you calculated

10    what you believe the DTI was, at the time?

11            THE WITNESS:  No, Your Honor.  I would need to know

12    what the new modified payment would have been.

13            THE COURT:  Okay.  All right, go ahead.

14            THE WITNESS:  And there's never been any underwriting

15    or forms to show me what they were using.

16            THE COURT:  Here's what I'm -- I'm not saying your

17    testimony is inaccurate, is not correct or -- but when you tell

18    me something is inaccurate, you need to be able to explain to

19    me, to give me why it's inaccurate.  I understand you say they

20    didn't -- your testimony is they didn't make the calculation at

21    the time.  We'll see whether I hear evidence about it.  But the

22    letter makes the factual statement what your gross income

23    was -- monthly gross income.  You say that's a correct figure.

24            THE WITNESS:  It's --

25            THE COURT:  And somebody calculated your backend DTI

1   and said it was seventy-three percent.  You say that's not

2   accurate, but I don't know why you think it's inaccurate.

3        THE WITNESS:  Based off the formula they say they're

4   using in the paragraph above.  Backend DTI is the current

5   mortgage payment with escrow plus revolving debt divided by

6   gross income.  And I don't think they were --

7        THE COURT:  All right, go ahead.

8        THE WITNESS:  -- they're not supposed to use the

9   current mortgage payment.  And that's supported in documents

10  that have already been -- the mortgage letter, for instance,

11  Exhibit 44 references what they're supposed to use.

12       THE COURT:  But I don't see what they -- how they

13  calculated it.  I just see a number.  You say that's not

14  accurate, but I don't see -- if you showed me a piece of paper

15  that you've got that showed their calculation and you pointed

16  to me, that calculation is wrong because they used the wrong

17  assumptions or they took the wrong -- I'd understand.  What

18  you're pointing to is a letter that says based on your gross

19  income, which you say is the right figure, somebody calculated

20  your DTI.  You say that's incorrect; but I don't have -- I

21  don't want to argue with you about it, but that's what I'm

22  talking about.

23       THE WITNESS:  I know.  I just never received any

24  detailed --

25       THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    51

1           THE WITNESS:  -- denials.  I was kept in the dark.

2           THE COURT:  All right.

3           THE WITNESS:  And I wasn't told at the time --

4           THE COURT:  Go ahead with your testimony.

5           THE WITNESS:  Okay.  So are we on Exhibit 23, is that

6   admissible or no, Your Honor?

7           THE COURT:  It's in evidence.  We're up to 24.

8           THE WITNESS:  Oh, I beg your pardon.  Exhibit 24 I

9   wish to admit into evidence as on the second page --

10          THE COURT:  I take it the handwriting is yours?

11          THE WITNESS:  Yeah, I'm sorry.

12          THE COURT:  No, that's okay.  I just want to

13   understand it.

14          THE WITNESS:  I believe you have the originals.  This

15   should be all blue.  GMAC Mortgage up top.

16          THE COURT:  That's okay.

17          THE WITNESS:  The letters?

18          THE COURT:  That's fine, but go ahead.

19          THE WITNESS:  I just believe the entire statement

20   includes some misinformation.

21          THE COURT:  What's the --

22          THE WITNESS:  I'm sorry, the misinformation.

23          THE COURT:  What's the misinformation?

24          THE WITNESS:  The third paragraph down:  "As you have

25   an FHA loan, if the account is more than ninety days

RESIDENTIAL CAPITAL, LLC, ET AL.                    52

1   delinquent, the loss mitigation department will review the

2   account for a traditional modification first."  That's an

3   inaccurate statement.  That was changed.  You had to be one

4   payment behind, so thirty days, not ninety days.

5           THE COURT:  Okay.

6           THE WITNESS:  That's supported by the mortgage letter,

7   Exhibit 44.

8           They also go on to say in that same paragraph -- I

9   believe this is Carmen Starr, once again -- it is.  "With a

10  traditional modification based on the homeowner's monthly net

11  income, you cannot use unemployment income.  We attempted to

12  reach a payment that would create a monthly surplus of

13  approximately 300," which is not correct.  Again, they're not

14  using the unemployment, and we have an argument that they were

15  supposed to use unemployment.  That's the whole basis of this

16  entire claim.

17          THE COURT:  Now, I had understood from the claim

18  objection that GMAC believed that you had to have -- you had to

19  establish your right to unemployment insurance for twelve

20  months in order for them to consider unemployment, right?

21          THE WITNESS:  They repeatedly told me nine months,

22  Your Honor.

23          THE COURT:  Okay.  And I know at some point -- I know

24  that they had said twelve months and then it was changed to

25  nine months.  But what -- from reviewing the original objection

RESIDENTIAL CAPITAL, LLC, ET AL.                    53

1    to the claim, what I understood GMAC's position to be is that

2    you never provided evidence that you had committed unemployment

3    insurance for nine months.

4            THE WITNESS:  After the review of their exhibits of

5    that time, because I didn't have time to review the -- are

6    their servicing notes admitted as an exhibit?

7            THE COURT:  Not yet.  If you want it --

8            THE WITNESS:  Their servicing notes will confirm that

9    they made a call to Massachusetts Unemployment that showed my

10   unemployment lasted until October of 2010, and the unemployment

11   award letter that was given to them that shows that also shows

12   that the awards began in November of 2009; one full year of

13   modified payments, even though nine months were -- I'm sorry,

14   one full year of unemployment benefits.

15           Plus the mortgage letter requires -- the requirement

16   from the mortgage letter, and requirement from FHA, is explicit

17   where it says "reasonable assurance".  It says letters,

18   documents, or various other things from the provider.  And I do

19   believe that --

20           THE COURT:  Okay.  Is one of your exhibits the

21   document from Massachusetts that you say demonstrates that --

22           THE WITNESS:  Yes, Your Honor.

23           THE COURT:  -- you were getting -- they were committed

24   to pay you unemployment for your nine or twelve months?

25           THE WITNESS:  Yes, Your Honor.

1            THE COURT:  Okay.  Show me that.

2            THE WITNESS:  If we go to Exhibit 46, which is in a

3    manila envelope.

4            THE COURT:  Sure.

5            THE WITNESS:  January 2010, loss mitigation

6    application plus supporting documents.  If we go to the very

7    back, so page 20, 21, 22, and 23, it shows that it's from

8    Massachusetts.  Page 2 confirms who I am.  Page 3, which -- I'm

9    sorry, which is page 22; I beg your pardon.

10           THE COURT:  I have it.

11           THE WITNESS:  Page 22 in the bottom left-hand corner,

12   it shows the starting date being October 24th, 2009, and on the

13   final page in the top corner, I believe it's underlined in

14   everybody's -- they underline the original -- it says by

15   10/16/2010.  And that was the effective date of when it was

16   over.  I explained that to GMAC and they made -- they had

17   confirmed that that was the end date.

18      (Pause)

19           THE COURT:  Okay, go ahead.

20           THE WITNESS:  So --

21           THE COURT:  Are you offering Exhibit 46?

22           THE WITNESS:  Yes, Your Honor.

23           THE COURT:  Mr. Wishnew?

24       MR. WISHNEW:  No objection, Your Honor.

25           THE COURT:  All right, Exhibit 46 is in evidence.

RESIDENTIAL CAPITAL, LLC, ET AL.                    55

1  (1/2010 loss mitigation application plus supporting documents
2  was hereby received into evidence as Silber's Exhibit 46, as of
3  this date.)

4          THE WITNESS:  Which one were we on in the book, if you
5  could refresh my memory, please?  Were we on number 24?

6          THE COURT:  Yes.

7          THE WITNESS:  So I wish to put number 24 down as
8  evidence, Your Honor.

9          THE COURT:  Mr. Wishnew

10          MR. WISHNEW:  No objection, Your Honor.

11          THE COURT:  All right.  It's in evidence.
12  (Document from GMAC was hereby received into evidence as
13  Silber's Exhibit 24, as of this date.)

14          THE WITNESS:  Thank you.  Exhibit 5 (sic) seems to be
15  redundant information of what's already been said, except for
16  the relevance of it, it's a separate date.  It's August 13th,
17  2010, and the same information was being provided to me that
18  they could not use unemployment, and the backend debt-to-
19  income.  And it just confirms that the -- that it was
20  repeatedly said.

21          THE COURT:  Are you offering Exhibit 25?

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  Mr. Wishnew?

24          MR. WISHNEW:  No objection, Your Honor.

25          THE COURT:  It's in evidence.

RESIDENTIAL CAPITAL, LLC, ET AL.                    56

1  (Document from GMAC was hereby received into evidence as

2  Silber's Exhibit 25, as of this date.)

3          THE WITNESS:  Exhibit 26 is a letter from executive

4  office employee Carmen Starr to me, May 5, 2010.  And it

5  explains a six-month partial payment forbearance plan and then

6  outlines what that forbearance plan included.  And I wish to

7  offer that as evidence.

8          THE COURT:  Mr. Wishnew, Exhibit 26?

9          MR. WISHNEW:  No objection, Your Honor.

10          THE COURT:  It's in evidence.

11  (5/5/10 letter re forbearance plan was hereby received into

12  evidence as Silber's Exhibit 26, as of this date.)

13          THE WITNESS:  Exhibit number 27 is a denial letter for

14  the first modification attempt.  It was sent from GMAC to

15  myself.  There's two pages.  I wish to offer it as an exhibit.

16          THE COURT:  Mr. Wishnew?

17          MR. WISHNEW:  No objection, Your Honor.

18          THE COURT:  In evidence, Exhibit 27.

19  (Denial letter was hereby received into evidence as Silber's

20  Exhibit 27, as of this date.)

21          THE WITNESS:  Exhibit number 28 is two pages as well.

22  It was sent to me February 25th, 2010.  And it's a letter from

23  GMAC to myself, once again, of a denial for a modification,

24  with reasoning.

25          THE COURT:  Mr. Wishnew?

RESIDENTIAL CAPITAL, LLC, ET AL.                    57

1           MR. WISHNEW:  No object, Your Honor.

2           THE COURT:  Exhibit 28 is in evidence.

3  (2/25/10 denial letter was hereby received into evidence as

4  Silber's Exhibit 28, as of this date.)

5           THE WITNESS:  Exhibit number 29, March 15th, 2010,

6  another denial letter for loss mitigation from GMAC to myself.

7           THE COURT:  You're offering it?

8           THE WITNESS:  Yes, Your Honor.

9           THE COURT:  Mr. Wishnew?

10          MR. WISHNEW:  No objection, Your Honor.

11          THE COURT:  Exhibit 29 is in evidence.

12  (3/15/10 denial letter was hereby received into evidence as

13  Silber's Exhibit 29, as of this date.)

14          THE WITNESS:  Exhibit 30, three pages, another denial

15  letter from GMAC to myself, I wish to offer as evidence.

16          THE COURT:  Mr. Wishnew?

17          MR. WISHNEW:  No objection, Your Honor.

18          THE COURT:  Exhibit 30 is in evidence.

19  (Denial letter was hereby received into evidence as Silber's

20  Exhibit 30, as of this date.)

21          THE WITNESS:  Number 31 is another denial letter,

22  January 19th, 2011, from GMAC to myself.

23          THE COURT:  You're offering Exhibit 31?

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  Mr. Wishnew?

 1          MR. WISHNEW:  No objection, Your Honor.

 2          THE COURT:  31 is in evidence.

 3    (1/19/11 denial letter was hereby received into evidence as

 4    Silber's Exhibit 31, as of this date.)

 5          THE WITNESS:  Your Honor, Exhibit number 32 is a

 6    letter from myself responding to Carmen Starr.

 7          THE COURT:  It's an e-mail?

 8          THE WITNESS:  It's an e-mail, yes, Your Honor.  I beg

 9    your pardon.

10          THE COURT:  That's okay.

11          THE WITNESS:  It was in regards to a response to what

12    she had told Attorney General Joseph Chambers.  And the thing

13    in this is just what my position was at the time that the

14    forbearance plan was going on and what my intentions were to

15    move -- moving forward.

16          THE COURT:  All right.

17          THE WITNESS:  I wish to put it in as evidence.

18          THE COURT:  Mr. Wishnew?

19          MR. WISHNEW:  No objection, Your Honor.

20          THE COURT:  Exhibit 32 is in evidence.

21    (Claimant's letter to Carmen Starr was hereby received into

22    evidence as Silber's Exhibit 32, as of this date.)

23          THE WITNESS:  Exhibit number 33 is two pages, Your

24    Honor, and it's just more FAQs from FHA Web site, revolving

25    (sic) different things with loss mitigation.

RESIDENTIAL CAPITAL, LLC, ET AL.                    59

1          THE COURT:  Mr. Wishnew?

2          MR. WISHNEW:  No objection, Your Honor.

3          THE COURT:  Exhibit 33 is in evidence.

4   (FAQs from FHA Web site was hereby received into evidence as

5   Silber's Exhibit 33, as of this date.)

6          THE WITNESS:  Your Honor, are the documents that

7   are -- I saw the agenda for today and it says that there are

8   supporting documents 7979-3, which was the original objection.

9   Are those documents accessible today?

10          THE COURT:  You can offer it.

11          THE WITNESS:  Okay.  This is just a page from that

12  document, then, Your Honor.  I wish to put this forward as an

13  exhibit.  It just confirms the amount of what they told --

14          THE COURT:  What is it -- which paragraph number?

15          THE WITNESS:  I'm sorry.  Number 26, down at the

16  bottom.  It just confirms what they told -- what the Trust has

17  already said they said -- they told EHLP and CHFA regarding the

18  EHLP help program.

19          THE COURT:  You're offering as Exhibit 34 page 9 of 13

20  of docket number 7979-3.  Is that correct?

21          THE WITNESS:  Yes, Your Honor.

22          THE COURT:  Mr. Wishnew?

23          MR. WISHNEW:  No objection, Your Honor.

24          THE COURT:  All right, it's in evidence.

25  (Page 9 of 13 of docket number 7979-3 was hereby received into

 1  evidence as Silber's Exhibit 34, as of this date.)

 2          THE WITNESS:  I offer Exhibit --

 3          THE COURT:  Wait, wait, wait.

 4          THE WITNESS:  I'm sorry.

 5          THE COURT:  Can I ask you, do you have a copy of what

 6  GMAC sent to the CHFA?  This was the payoff amount, right?

 7          THE WITNESS:  Yes, Your Honor.  I believe -- well, I

 8  don't know.  The only thing that I have in regards to that is

 9  Exhibit 17, page 2, which shows the breakdown of what was to be

10  reinstated.

11          THE COURT:  Hold on.

12          THE WITNESS:  The document that has all my --

13          THE COURT:  Yeah.

14          THE WITNESS:  -- handwriting on it.

15          THE COURT:  I want to be very clear the reason I'm

16  asking especially.  If you look at Exhibit 34, paragraph 26 --

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  -- it indicates that on August 25th, 2011

19  the debtors provided its reinstatement -- and then the second

20  sentence:  "this included twenty past-due payments of $1,990.80

21  each, the payment due for September, September 1, 2011

22  ($1,990.80), inspection fees," et cetera.  I'll stop there, and

23  close quote.

24          This -- reading this, this says that GMAC told the

25  CHFA not only what your past due amount was, but what was due

1   on September 1st, 2011.  If they did that, what's wrong?

2   That's not -- it's not a mis -- I take it -- let me ask you

3   this.

4           You agree that you had -- in August of 2011, you had a

5   payment coming due on September 1st, 2011, of $1,990.80, right?

6           THE WITNESS:  Yes, Your Honor.

7           THE COURT:  Okay.  So if they tell -- if they told the

8   CHFA what's set forth in paragraph 26, namely:  twenty past-due

9   payments, one payment due on September 1st, what's inaccurate

10  about that?

11          THE WITNESS:  The inaccurate is, is if we go back to

12  page 2 of Exhibit 17, they're showing twenty-one payments past

13  due, and then they have the next payment due.  That

14  payment -- CHFA asked for past-due arrearages.  The payment for

15  September wasn't due on that day.  And it's not past-due until

16  thirty days later.

17          THE COURT:  Yeah, but when they tell you that -- I

18  apologize.  I don't want to get into an argument with you about

19  it.  But I -- it's -- I'm playing devil's advocate with you.

20          THE WITNESS:  I understand.

21          THE COURT:  Okay, because this is what's bothering me

22  when I go back to Exhibit 17, the second page.  They give a

23  quote for a reinstatement of now due, "reinstatement through

24  date, September 25th, 2011."  Okay?  By September 25th, 2011,

25  your September payment would have been due.  Okay.  That's what

1    I'm having trouble with is to see what's the misrepresentation.

2            THE WITNESS:  Be --

3            THE COURT:  If -- let me finish.  If they had given a

4    reinstatement amount as of August 9th -- you had something

5    showing what you now owe as of August 9th -- clearly the

6    September payment wouldn't have been due.  But when -- if the

7    reinstatement date through September -- the reinstatement

8    amount through September 25th would have included the September

9    payment.  That's why I'm struggling to see what you're --

10           THE WITNESS:  It's just that they put the next due

11   payment in also.  They put the September payment in twice, and

12   it's just unclear.  And they're also assuming that it's going

13   to take thirty days for CHFA to make a decision, when we know

14   we had an initial response from CHFA on September 1st.  That's

15   an exhibit that's been permitted.  CHFA was moving a little bit

16   faster.  And I guess the relevance --

17           THE COURT:  I understand.  Okay.  Go ahead.  So

18   we're -- and 34 is in evidence.

19           THE WITNESS:  Okay.

20           THE COURT:  Okay.

21           THE WITNESS:  Exhibit 35 is part of Exhibit C of the

22   Trust's document 8160, which was exhibits in their reply to my

23   reply to their objection.

24           THE COURT:  What is it you're going to admit.

25           THE WITNESS:  At this point, I just want to show the

RESIDENTIAL CAPITAL, LLC, ET AL.                     63

1   mentality.  Page 2, it shows a -- what I assume to be a

2   subordinate worker underneath the level of Carmen Starr, the

3   executive office resolution specialist, the same person that

4   I'm going to -- that I've declared has made false statements

5   throughout -- it shows that she's reach -- someone's reaching

6   out to Carmen Starr in the company on advice about something I

7   brought up.  And her mentality in that second paragraph is:

8   "Hello again.  OMG on this account, smiley face, smiley face,

9   smiley face."  And I don't think that's a very professional

10  diligence, let alone if someone beneath you from another

11  department is reaching up to a supervisor for help, and your

12  mentality revolving around me is "oh, my God, on this account,

13  smiley face, smiley face, smiley face," of course she's just

14  tried to make us bad.

15          THE COURT:  Look I --

16          THE WITNESS:  I'm sorry.

17          THE COURT:  I don't --

18          THE WITNESS:  I guess I'm trying to establish a

19  pattern of misconduct.

20          THE COURT:  The attitude may have been inappropriate.

21  I'm not going to get into that.  Is there something in the

22  document that you say is inaccurate?  I know you didn't

23  like -- you don't like her attitude.  But what I want to focus

24  on, is there something that's inaccurate?

25          THE WITNESS:  Not that I saw, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                    64

1      THE COURT:  Okay.  All right.  Let's go on to the next

2  one.  Do you want to offer Exhibit 35?

3      THE WITNESS:  Yes, Your Honor.

4      MR. WISHNEW:  No objection, Your Honor.

5      THE COURT:  Mr. Wishnew?

6      MR. WISHNEW:  No objection.

7      THE COURT:  It's in evidence.

8  (Part of Exhibit C of the Trust's document 8160 was hereby

9  received into evidence as Silber's Exhibit 35, as of this

10  date.)

11      THE WITNESS:  Exhibit 36 shows an additional program

12  from EHLP.  It's called the Connecticut Families First Program.

13  This explains what you needed to do in order to qualify for it.

14  And this, I feel is -- and why I offer it as an exhibit,

15  because this was going hand-in-hand with the EHLP program.

16      THE COURT:  Okay.  Mr. Wishnew?

17      MR. WISHNEW:  No objection, Your Honor.

18      THE COURT:  Exhibit 36 is in evidence.

19  (Connecticut Families First Program was hereby received into

20  evidence as Silber's Exhibit 36, as of this date.)

21      THE WITNESS:  Exhibit 37 is five pages.  The

22  fundaments of that is just to show you that the Connecticut

23  Families First Program was in existence at the time.

24      THE COURT:  All right.  Mr. Wishnew?

25      MR. WISHNEW:  No objection, Your Honor.  No objection.

1      THE COURT:  All right, Exhibit 37 is in evidence.

2  (Connecticut Families First Program was hereby received into

3  evidence as Silber's Exhibit 37, as of this date.)

4      THE WITNESS:  Exhibit 38 is part of the main document

5  of the Trust's Exhibit -- document 7979.

6      THE COURT:  What is it you want me to look at?

7      THE WITNESS:  The bottom paragraph in number 14

8  where -- because I don't -- where it just says, "The debtors

9  did enter into a voluntary commitment to the government to

10 modify loans that qualify for HAMP programs."

11     THE COURT:  Point me where?

12     THE WITNESS:  All the way at the bottom.  I believe is

13 that a Supra 14.

14     MR. WISHNEW:  Footnote 14, Your Honor.

15     THE WITNESS: Footnote 14.

16     THE COURT:  Okay.  All right.  Mr. Wishnew?

17     MR. WISHNEW:  Just one question, Your Honor.  Are

18 these Mr. Silber's markings on the document?

19     THE COURT:  Yeah, is that your handwriting?

20     THE WITNESS:  Yeah, I'm sorry.

21     THE COURT:  Don't be sorry.  I just want to know what

22 it is.  Mr. Wishnew?

23     MR. WISHNEW:  No objection, Your Honor.

24     THE COURT:  All right, Exhibit 38 is in evidence.

25 (Page from docket 7979 was hereby received into evidence as

1  Silber's Exhibit 38, as of this date.)

2          THE WITNESS:  Exhibit 39, Your Honor, is a declaration

3  from Kathy Priore dated February 20th, 2015.  That was part of

4  document 7979.  It just confirms what Jeffrey

5  Knickerbocker -- attorney Jeffrey Knickerbocker in the other

6  exhibit that you admitted, it just -- admitted into evidence.

7  The debtors advised that the late charges and inspection fees

8  totaling X amount could be waived if the claimant brought the

9  account current.

10          THE COURT:  And you believe that's inaccurate -- not

11 accurate?

12          THE WITNESS:  No, I believe that is accurate.

13          THE COURT:  Oh.

14          THE WITNESS:  That's an accurate statement.  And --

15          THE COURT:  You're offering Exhibit 39?

16          THE WITNESS:  Yes, Your Honor.

17          THE COURT:  Mr. Wishnew.

18          MR. WISHNEW:  No objection, Your Honor.

19          THE COURT:  All right, Exhibit 39 is in evidence.

20 (2/20/15 declaration of Kathy Priore was hereby received into

21 evidence as Silber's Exhibit 39, as of this date.)

22          THE WITNESS:  Exhibit 40 is just a judgment of

23 dismissal from the superior court on my foreclosure action

24 against me.

25          THE COURT:  Are you still in possession of the

RESIDENTIAL CAPITAL, LLC, ET AL.                    67

1    property?

2            THE WITNESS:  I am, Your Honor.

3            THE COURT:  Okay.

4            THE WITNESS:  As in residing there?

5            THE COURT:  Yeah.

6            THE WITNESS:  Yes, Your Honor.

7            THE COURT:  Is there a current foreclosure pending?

8            THE WITNESS:  No, I'm protected in the State of

9    Connecticut, Your Honor.  The federal lawsuit -- the federal

10   lawsuit where these claims are coming from, there was an order

11   saying that it was dismissed administratively until this was

12   over --

13           THE COURT:  Okay.

14           THE WITNESS:  -- or until I had to face another

15   foreclosure action.  I don't think it was fair that I had to

16   fight on two fronts for --

17           THE COURT:  All right, you're offering Exhibit 40?

18           THE WITNESS:  Yes, Your Honor.

19           THE COURT:  Mr. Wishnew?

20           MR. WISHNEW:  No objection, Your Honor.

21           THE COURT:  All right, Exhibit 40 is in evidence.

22   (Judgment of dismissal was hereby received into evidence as

23   Silber's Exhibit 40, as of this date.)

24           THE WITNESS:  Exhibit 41, Your Honor, this is the

25   ResCap's objection to the claim, the original objection to the

1    claim.  It was page 6.  This is -- I'm sorry -- this is the

2    reply to the claim.  It just says all the way at the bottom,

3    Your Honor, footnote number 3:  In the objection the Borrowers

4    Claims Trust mistakenly identified the rejected payment as the

5    first payment under the forbearance plan, when in fact, it was

6    the second payment."

7            THE COURT:  Is that an accurate statement?

8            THE WITNESS:  That's an accurate statement, Your

9    Honor.

10           THE COURT:  Okay.

11           THE WITNESS:  That was corrected back on that date.

12           THE COURT:  All right.  You're offering Exhibit 41?

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  Mr. Wishnew?

15           MR. WISHNEW:  No objection, Your Honor.  And just for

16   the record, to clarify, these are Mr. Silber's markings on the

17   document.

18           THE COURT:  Yes, it's your handwriting, right?

19           THE WITNESS:  It's all my handwriting.  Yes, Your

20   Honor.

21           THE COURT:  Okay, all right.

22   (Page 6 of ResCap's reply to claim was hereby received into

23   evidence as Silber's Exhibit 41, as of this date.)

24           THE COURT:  Okay, any other exhibits you want?

25           THE WITNESS:  Number 42 is various records that would

1   allow me to -- it's pages from the servicing notes and the

2   records.  I believe this would be redundant if their servicing

3   records are put forth as an exhibit.

4           THE COURT:  You're offering Exhibit 42?

5           THE WITNESS:  Yes, Your Honor.

6           THE COURT:  Mr. Wishnew?

7           MR. WISHNEW:  No objection, Your Honor.

8           THE COURT:  All right, Exhibit 42 is in evidence.

9   (Excerpts of servicing notes was hereby received into evidence

10  as Silber's Exhibit 42, as of this date.)

11          THE WITNESS:  We did 43 and 44 already, Your Honor?

12  The HUD Handbook and the FHA mortgage letter?

13          MR. WISHNEW:  That's correct, Your Honor.

14          THE WITNESS:  Thank you.

15          THE COURT:  Yes, they're in evidence.

16          THE WITNESS:  Exhibit 45 is a loss mitigation

17  application from December 2009 plus supporting documents.  It's

18  in a manila envelope.

19          THE COURT:  Yes.  You're offering Exhibit 45?

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  Mr. Wishnew?

22          MR. WISHNEW:  No objection, Your Honor.

23          THE COURT:  All right, Exhibit 45 is in evidence.

24  (12/2009 loss mitigation application plus supporting document

25  was hereby received into evidence as Silber's Exhibit 45, as of

1    this date.)

2            THE COURT:  Is there something in particular you want

3    me to look at?

4            THE WITNESS:  Well, we touched base on, I

5    believe -- no it just shows the documents of what I sent to

6    them at the time.  At this time, I don't think there's anything

7    specific to look at.

8            THE COURT:  All right.  Exhibit 45 is in evidence.

9            THE WITNESS:  Exhibit 46 shows the second loss

10   mitigation application, January 2010, plus additional

11   supporting documents that were faxed afterwards, but were

12   involved in that loss mitigation review, i.e., the unemployment

13   letter.

14           THE COURT:  Exhibit 46 is already in evidence.

15           THE WITNESS:  Oh, I'm sorry, I beg your pardon.

16           THE COURT:  No, that's okay.

17           THE WITNESS:  Exhibit 47, loss mitigation application

18   update, some new information was required.  This is just

19   additional information I had given them.

20           THE COURT:  The first page, that's a handwritten fax

21   sheet that you did?

22           THE WITNESS:  Yes, Your Honor.

23           THE COURT:  Okay.  Any objection to 47, Mr. Wishnew?

24           MR. WISHNEW:  No, objection, Your Honor.

25           THE COURT:  All right, Exhibit 47 is admitted.

RESIDENTIAL CAPITAL, LLC, ET AL.                    71

1   (Loss mitigation application update was hereby received into

2   evidence as Silber's Exhibit 47, as of this date.)

3          THE WITNESS:  Exhibit 8 (sic) is a loss mitigation

4   application plus supporting documents from December of 2010.

5          THE COURT:  Mr. Wishnew?

6          MR. WISHNEW:  No objection, Your Honor.

7          THE COURT:  All right, Exhibit 48 is in evidence.

8   (12/2010 loss mitigation application plus supporting documents

9   was hereby received into evidence as Silber's Exhibit 48, as of

10  this date.)

11         THE WITNESS:  Thank you, Your Honor.  I believe that's

12  all my exhibits, Your Honor.

13         THE COURT:  Okay, you can now tell me what you believe

14  this all goes to.

15         THE WITNESS:  I beg your pardon?

16         THE COURT:  Is there anything -- the exhibits are in

17  evidence, okay.  Is there anything you want to explain to me as

18  part of your testimony?

19         THE WITNESS:  In addition to what's been laid out in

20  the proposed order or the statements of facts and elements?  In

21  addition to this, or do you want me to go over this, Your

22  Honor?

23         THE COURT:  Well, this is the time when you're

24  testifying under oath.  The exhibits are now part of the

25  evidence, and I'll consider all of that.  I want to give you a

1  chance to tell me any facts that you want me to consider in

2  ruling on your claim.  Okay?  So this is the one and only

3  chance you get.  Then Mr. Wishnew will get to cross-examine

4  you, and you may get a chance to say something after that.  But

5  this is your chance to tell me why you think you should prevail

6  and what you think you're entitled to recover.  Okay?

7         You're trying to recover damages, so you need to tell

8  me what you're trying to recover, how much, and why, and what

9  supports it.  This is your chance to do that.

10         THE WITNESS:  I believe from the -- from the very

11  beginning, it was nothing but a hurdle.  They had a moral and

12  ethical obligation, once they offered me the opportunity to

13  modify my mortgage.  As soon as they directed me towards the

14  application process, they had a duty to follow all the

15  guidelines of HUD as well as my note back to me that they had

16  to follow the guidelines of HUD.

17         They must utilize every option.  They have to bargain

18  in good faith.  And the HUD Handbook revolves around not

19  foreclosing, doing everything you can to foreclose (sic).  They

20  skipped multiple steps.  They did not offer -- they did not

21  offer programs that are either mandatory by HUD or even

22  suggested by HUD.

23         I was not required to know the FHA HUD Handbook.  I

24  was not required to know any of the laws.  I put all my faith

25  into GMAC almost like my broker, to broker me a modification or

RESIDENTIAL CAPITAL, LLC, ET AL.                    73

1  a temporary plan on my home to help me.  They made it utterly

2  impossible.  They asked for inaccurate documentation.  After

3  they had documentation, they claimed they didn't have it and

4  sent me going to find that documentation again.

5        It was just a constant setup for failure with what I

6  call the dangling the carrot technique.

7        I've come to the realization that behind the scenes,

8  there were some additional facts that also hindered HUD or FHA

9  from even looking in to monitor.  Every program that's offered,

10  every temporary forbearance, special forbearance, repayment

11  plan, trial plan, needs to be reported to HUD and FHA.  All of

12  the guidelines from HUD and FHA says "as close to thirty-one

13  percent as possible", "as close to fifty-five percent as

14  possible", "twelve months of unemployment with reasonable

15  assurance."

16        We know that there's a variance compliance form that's

17  in existence, that they should have taken the advantage of to

18  modify the loan.  These programs weren't put in place for them

19  to give you a modification application, send you the wrong way

20  about doing things, wrongfully deny you, and then in the end

21  hide behind some excuse of well, we never had to modify your

22  mortgage.

23        I believe the agreement to receive HELP money from the

24  government explicitly states that they have to modify

25  mortgages.  HUD did not want to take on foreclosures.  HUD did

1  not want to have to pay out insurance benefits to mortgagors

2  when there were significant losses after a short sale of the

3  house.  And that's what GMAC rushed me to.  They kept me in the

4  dark, misinformed, uninformed.  And every hurdle they put in

5  front of me, I like to think I jumped over, and it should have

6  never came this far.

7        The fact is, if we go back to 2009, the original

8  application, right from the very beginning, when we're talking

9  about time-sensitive documentation, they hindered me and halted

10  me and severely crippled me from receiving any help from that

11  day forward.  Had a temporary modification just been granted

12  that day, just a chance, just an opportunity to make modified

13  payments -- I never even got an opportunity, a chance, a

14  temporary one, where it says in the mortgage letter that

15  temporary -- you know, temporary modifications is something

16  that should be offered before they get a permanent one.

17        We wouldn't be here.  I would either be paying those

18  temporary modification payments still, without people hovering

19  around and money accruing on this house that's getting out of

20  control.  And if I didn't pay those payments, I wouldn't be

21  right here because then I couldn't afford them.  Or I would be

22  here, and I wouldn't have much of an argument, because they

23  gave the opportunity and I failed at it.  I was never even

24  given the opportunity.

25        You know, there's so much I want to say and I

 1    just -- I'm getting -- it wasn't handled professionally; it

 2    wasn't handled diligently.  When I overcame one of their

 3    objectives to what -- when I say "they", I mean GMAC -- when I

 4    overcame one of the objectives GMAC set in front of me or

 5    stipulations, through time I started learning about the laws

 6    and I started pointing out how that stipulation is incorrect.

 7            I asked for help.  I -- there's records that I asked

 8    for them, can you please file a variance compliance.

 9            THE COURT:  And what'd they tell you?

10            THE WITNESS:  We will not explore any options unless

11    you have an unemployment letter that shows nine months of

12    benefits.  And by that time, they did.

13            THE COURT:  Let me ask you this question.  What are

14    the damages you're asking the Court to award and how did you

15    calculate them?

16            THE WITNESS:  The original thing that I asked for in

17    the federal court was just the opportunity to make modified

18    payments.  I've come to the realization now that the one --

19            THE COURT:  They can't do that.

20            THE WITNESS:  I understand that.  At the time, I guess

21    I thought -- this was before the transfer to Ocwen -- the

22    transfer to Ocwen.

23            THE COURT:  Servicing.

24            THE WITNESS:  I thought somehow that the court could

25    force them.  I realize now that I don't think the court can

1  force an entity into a legal binding contract.  I don't know if

2  that's true or not.  That's what I was told.

3          THE COURT:  Ocwen is not before the Court.  GMAC

4  doesn't service loans --

5          THE WITNESS:  At the time, Your Honor.

6          THE COURT:  -- anymore.

7          THE WITNESS:  Right.  Okay.  I'm just in an impossible

8  situation.

9          THE COURT:  Can I ask this:  when is the last mortgage

10  payment you made?

11          THE WITNESS:  It would be in the temporary forbearance

12  plan.  That was November of 2010, was the last mortgage

13  payment.

14          THE COURT:  Do you know what the current balance due

15  is?

16          THE WITNESS:  350,000 dollars -- $358,000.94.  I

17  believe I brought a statement with me from Ocwen, most recent

18  statement.  It's not as an exhibit, but it's just here to show

19  in case it came --

20          THE COURT:  Let me come back to the same question.

21  What is it you're asking for?  What are you asking the Court to

22  award you and why?  I understood the why.  Let's leave the why.

23  You've explained your -- the facts, but I don't think the

24  number is that in the air.

25          THE WITNESS:  They hindered me from receiving

 1    benefits.  They impeded me from receiving benefits, which is a

 2    breach of bar and of good faith, which is breach of contract.

 3    And breach of contract says they have to make me whole from

 4    what I missed out on.  So I was deferring to the Court.  And I

 5    don't have a frivolous lawsuit for a million dollars.  I don't

 6    want anything extra.  I just want what I missed out on.  And I

 7    defer to the Court's judgment.  And if it's determined that

 8    they were wrong, I would defer to their judgment, too, of what

 9    they think is the best way to make me whole from what I missed.

10           I mean, even if there was a past due amount exonerated

11    on the loan, which I don't think it happened, I'm still seventy

12    months past due.  There are no programs that you can

13    participate in when you're seventy months past due.  There's

14    nothing.  I'm in an impossible buried situation that has

15    stemmed and spiraled out of control since 2009, and I did

16    everything I was supposed to do.  I did everything GMAC asked

17    me for, except for one time I didn't comply with something they

18    said, but I made them aware that I wasn't going to comply, and

19    instead, I complied with their attorney.  But every time

20    they've asked me for something, I've provided it to them to the

21    best of my abilities.

22           I made countless phone calls, and in the end, I was

23    told no, no, no, all for the wrong reasons.  Nothing they're

24    saying's adding up.  There is no -- there is no underwriting

25    form -- Hunter FHA (ph.) can only get involved to make

1    stipulations to any requirement.  They can only -- they can

2    only waive certain requirements -- or he's at thirty-three

3    percent, it says as close to thirty-one percent as possible,

4    those are all decisions made by FHA that they can file a form

5    for.

6           It's a -- -- it was a -- it was a program that was

7    available in various compliance that was never taken advantage

8    of, and there's no underwriting, there's -- I was never allowed

9    to talk to anybody who did the underwriting on my modification

10   reviews.  Instead I was just misinformed and we have nothing

11   tangible to show anything was even done.  There's no forms,

12   there's no reporting to FHA or HUD.  There's, through

13   different -- different ways they can report it:  the EVAR (ph.)

14   system, I believe, the other one is the F -- SFDS (ph.) system.

15   There's nothing.

16          THE COURT:  Anything else you want to tell me?

17          THE WITNESS:  Just that not having HUD or FHA involved

18   to monitor impeded me from receiving benefits that I was

19   entitled to.

20          THE COURT:  Is there a second or third mortgage on the

21   property?

22          THE WITNESS:  No, Your Honor, --

23          THE COURT:  It's the --

24          THE WITNESS:  -- it's the only mortgage.

25          THE COURT:  -- only mortgage?  All right.  Before I

1   let Mr. Wishnew cross-examine, is there anything else you want

2   to tell me?

3           THE WITNESS:  I just don't think it was supposed to be

4   this hard.  I guess that's just an opinion --

5           THE COURT:  Let's take --

6           THE WITNESS:  -- and not a fact.

7           THE COURT:  -- a ten-minute recess, and then we'll

8   have cross-examination, okay?

9           THE WITNESS:  Okay.

10          THE COURT:  So you can go out, go to the bathroom,

11  take water, whatever you want.

12          THE WITNESS:  Okay, thank you.

13          THE COURT:  Come in in about ten minutes.  And then

14  just go ahead and -- you can leave everything there.

15          THE WITNESS:  Okay.

16          THE COURT:  You may need it.  Okay?

17          THE WITNESS:  All right.  All right.

18          THE COURT:  Thank you very much.

19          THE WITNESS:  Same to you.

20  (Recess from 11:46 a.m. until 12:11 p.m.)

21          THE COURT:  All right, please be seated.

22          THE WITNESS:  Your Honor, can I just add something

23  else?  I was able to calm down and --

24          THE COURT:  Sure.

25          THE WITNESS:  -- maybe I can clarify what was

1    involved.

2              THE COURT:  Yes.

3              THE WITNESS:  Okay.

4              THE COURT:  But take the stand, first.  You're still

5    under oath.

6              THE WITNESS:  You need me to swear in?

7              THE COURT:  No, no, no.  You're still under oath.

8              THE WITNESS:  I guess I would just like to add that

9    the property was eligible for programs per the loss mitigation

10   guidelines.  But this program for loss mitigation was initiated

11   with a purpose.  It wasn't just put out there for them to be

12   able to deny people.  It was applied to modify loans.  The

13   agreement with the government when they received the money was

14   to modify loans.  They had that agreement with HUD, as well,

15   which instituted that loss mitigation is mandatory.  It is

16   mandatory.

17             Now, what do they have to do during loss mitigation?

18   Well, that's going to fall to the implied covenant of good

19   faith rule.  Supreme Court axiomated (sic) that every contract

20   comes with the implied to bargain in good faith.  I made a note

21   of that in my orig -- in my document of proposed findings.

22             I would just like to add, if I could, Connecticut

23   Supreme Court standings -- standards for breach of covenant of

24   good faith complaint claim, it was axiomated (sic) that the

25   duty of good faith and fair dealing is a covenant implied into

1   a contract or contractual relationships.  In other words, every

2   contract carries the implied duty required that neither party

3   do anything that will injure the right of the other party to

4   receive benefits of the agreement.  The covenant of good faith

5   and fair dealings prepaces -- presupposes that the terms and

6   purpose of the contract are agreed upon by the parties and that

7   what is in dispute is the party's discretionary application of

8   or interpretation.

9         We do know that the bank note implies bound by HUD,

10  loss mitigation is mandatory.  To constitute a breach of

11  implied covenant of good faith and fair dealings, the act by

12  which a defendant allegedly impedes the plaintiffs' right to

13  receive benefits that he or she reasonably expected to receive

14  under the contract must have been taken in bad faith.  Bad

15  faith, in general, implies both actual or constructive fraud,

16  or a design to mislead or deceive another, or a neglect or

17  refusal to fill some sort of duty, some contractual obligation.

18        Connecticut civil declaration is every contract

19  contains an implied covenant of good faith and fair dealings to

20  require that neither party do anything that will injure the

21  right of the other party to receive the benefit of the

22  contract.  The definition of bad faith is acting the opposite

23  of good faith.

24        Good faith is exercising every option available.  Good

25  faith is following the laws and the guidelines set forth by FHA

RESIDENTIAL CAPITAL, LLC, ET AL.                    82

1   and HUD.  The mortgage lender that we've put into exhibit says

2   that HUD and FHA are going to monitor it, issue sanctions.  The

3   HUD handbook shows it's best to avoid foreclosure.  If they're

4   able to say there's no law that says they have to modify my

5   loan, (a) I disagree, and (b) then why put me through all of

6   this from the very beginning?  That's immoral and unethical.

7   That's an unfair -- and that falls underneath the CUTPA.

8           In my opinion, negligence of failing -- neglecting to

9   give me information that stops me from -- or impedes me from

10  receiving benefits is bargaining in bad faith which, in return,

11  is a breach of contract.

12          THE COURT:  Mr. Wishnew.

13          MR. WISHNEW:  Thank you, Your Honor.

14  CROSS-EXAMINATION

15  BY MR. WISHNEW:

16  Q.  Good afternoon, Mr. Silber.

17  A.  How you doing?

18  Q.  Good.  Just a few questions about the exhibits that were

19  put into evidence today.  First, if you could turn to your

20  Exhibit 6?  Second paragraph in this e-mail from Ms. Starr to

21  Mr. Chambers, was it your testimony that the second sentence

22  beginning -- I'm sorry, that reads "Due to guideline changes,

23  unemployment income cannot be utilized when reviewing an

24  account for a loan modification."  Is it your testimony that

25  that's a misrepresentation made by a GMAC employee?

RESIDENTIAL CAPITAL, LLC, ET AL.                    83

1   A.  Yes.

2   Q.  Okay.  And if you could then turn to Exhibit 48?

3   A.  That's a manila envelope, correct?  My Exhibit 48?

4   Q.  Yes, I believe it's --

5   A.  Okay.

6   Q.  -- one of your loan modification packages.

7   A.  Okay.  Yes, sir?

8   Q.  Okay.  And this is a loan modification package from

9   December, I think, 24th of 2010?

10  A.  Correct.

11  Q.  Okay, and so this was submitted after the communication I

12  referenced in Exhibit 6, correct?

13  A.  Yes.

14  Q.  Okay.  And in Exhibit 48, you submitted to GMAC Mortgage

15  unemployment information in connection with a loan

16  modification, is that correct?

17  A.  Correct.

18  Q.  Okay.  How, then, did you rely, to your detriment, on Ms.

19  Star's purported representation?

20  A.  Because it quelled the investigation of the Attorney

21  General's Office, who has the power to step in and do something

22  at the time.

23  Q.  Okay.  The --

24  A.  I'd been aware that unemployment could be used the whole

25  time.

RESIDENTIAL CAPITAL, LLC, ET AL.                    84

1   Q.  Okay.  But -- okay.  That's it.  If you could turn to your

2   Exhibit 12?

3   A.  Okay.

4   Q.  It was your testimony you took issue with the timing of

5   GMAC's submission of the affidavit.  Is that correct?

6   A.  Correct.

7   Q.  Okay.  And did the affidavit precede any motion for

8   default judgment?

9   A.  Could you repeat that, please?

10          THE COURT:  I don't understand the question.

11  Q.  So paragraph 5 --

12          MR. WISHNEW:  Let me start on -- let me rephrase.

13  Q.  Paragraph 5 on Exhibit 12 states, "If plaintiff does not

14  comply with our requirement to follow a fully executed

15  affidavit, federal loss mitigation programs, form JD-CL-114,

16  under this order, a motion for default or a motion for a

17  judgment filed by plaintiff may not be granted until the

18  affidavit is filed or upon order of the Court."  So was there a

19  motion for default or a motion for judgment filed by GMAC

20  Mortgage?

21  A.  Maybe I'm reading them -- can I ask you a question first?

22  I'm sorry.  I don't know --

23  Q.  Sure.

24  A.  -- if that's allowed.

25  Q.  Sure.

RESIDENTIAL CAPITAL, LLC, ET AL.                              85

1    A.  Number 5 is the penalty for not complying, correct?

2    That's the -- that's the penalty.  Is that what you're

3    referring to?

4    Q.  I would disagree with your characterization.

5    A.  Okay.  No, there was no form -- there was no judgment at

6    that point in time.  Before April -- before the date of the

7    other exhibit, is that what you're referring?  Before that

8    financial and that --

9    Q.  Right.

10   A.  -- analysis was -- was sent in.

11   Q.  Okay.  If I could turn to para -- Exhibit 15?  Mr.

12   Knickerbocker says, "We can waive late charges and any

13   inspection fees at this time, but that is it."

14        Now, if I could ask you to also look at Exhibit 39, Ms.

15   Priore's declaration.  Paragraph 10 states, "The debtors'

16   advised that late charges and inspection fees totaling

17   $1,591.72 could be waived if the claimant brought the account

18   current."  Did you bring the account current?

19   A.  I have to answer yes or no?  No.

20   Q.  Okay.  If I could ask you to look to Exhibit 44,

21   specifically page 12 of 18.

22   A.  Is that an envelope?

23   Q.  That is --

24   A.  Manila envelope, okay.

25   Q.  -- mortgagee letter 2009-23.

1  A.  Okay.

2  Q.  Okay, specifica -- so page 12 of 18 under the subheadings

3  Underwriting -- Monthly Gross Income.  Questions -- and the

4  last paragraph on the bottom --

5  A.  I'm -- I'm not there yet.  I'm sorry.

6  Q.  Sorry.

7  A.  Can you -- is it my page 12 or page 12 in the document?

8  Q.  Page 12 in the document, your page 22.

9  A.  Okay, thank you.  Okay, where at, now?

10  Q.  The last paragraph on that page that begins, "If the

11  borrower has other income, such as unemployment".

12  A.  Okay.

13  Q.  Okay.  And the document states, "Acceptable documentation

14  includes letters, exhibits, or benefit statements from the

15  provider that states the amount, frequency, and duration of the

16  benefit, correct?

17  A.  Correct.

18  Q.  Okay.  So would you agree with me that this document

19  states that the third party provider has to provide evidence of

20  unemployment income, as opposed to you, individually, providing

21  proof of unemployment income?

22  A.  I would disagree with your assession (sic) of that, of how

23  that's written.

24  Q.  Okay.  And -- okay, that's fine.  Turning to Exhibit 46,

25  your page -- you marked it page 21.

RESIDENTIAL CAPITAL, LLC, ET AL.                              87

1    A.   Okay?

2    Q.   Okay.  Now, it was your testimony that this document

3    provides for one year of benefits, correct?

4    A.   That's correct.

5    Q.   Okay.  If you could look at page 21, left-hand side,

6    there's a line item that says "potential duration: twenty-nine

7    weeks"?

8    A.   Correct.

9    Q.   Okay.  Doesn't that mean that the potential duration of

10   unemployment benefits from the Commonwealth of Massachusetts is

11   for twenty-nine weeks?

12   A.   That is to potential benefits of the original awardments

13   (sic), of what's originally awarded, meaning the first

14   extension of the benefits.

15   Q.   So how -- what representation do you have from the

16   Commonwealth of Massachusetts to substantiate that the term

17   "bye", B-Y-E, on page 23, represents the fact that the

18   potential duration lasts any longer than twenty-nine weeks?

19   A.   That was the same question that was asked that your

20   employee called to confirm, and you also put that declaration

21   in in your final proposal.  Your -- you have that, also.  The

22   proof is that you were aware of it.  You had to call to confirm

23   it, because it was -- they asked the same question, but you and

24   your empl -- GMAC employees at the time were aware of it.

25   Q.   And where is that document in evidence today?

RESIDENTIAL CAPITAL, LLC, ET AL.                                88

1  A.  I have to go over there and grab your proposal -- your

2  proposed statement of facts.  Can I walk over there and grab

3  it?

4  Q.  Sure.

5  A.  Okay.  I'll just bring all this stuff over, just to save

6  another trip.

7      (Pause)

8  A.  I know I have it with me, just bear with me, please.

9      (Pause)

10 A.  Your number 52 on your number 8828 document, ResCap

11 Borrowers Claims Trust proposed finding of fact and conclusion

12 of law, you declare "On April 7th, 2010, the claimant spoke

13 with the debtors over the phone, at which time the debtor

14 informed him that his unemployment income could not be used

15 because the documentation he provided showed him as ending in

16 October of 2010.  See page 258 of 286."  That's what you say.

17      I have my other notes.  I don't know if it's on 256.  I

18 can't confirm if it's on page 256, but -- 258, I beg your

19 pardon.  Let's take a look.  Well, that -- that's what you

20 said.  I have further confirmation if you require it.

21 It's -- I can keep looking at notes unless you wish to withdraw

22 that part.

23 Q.  I don't wish to withdraw anything.  So -- but your point

24 is that the unemployment let -- sorry.  The one year of

25 unemployment goes back to 2009, as opposed to being a measure

RESIDENTIAL CAPITAL, LLC, ET AL.                    89

1  of one year of unemployment from 2010, correct?

2  A.  Are you asking of its continuance dates?

3  Q.  Yes.

4  A.  Its continuance date on that doc -- on the unemployment I

5  provided to you was from Nove -- October of 2009 to October of

6  2010.

7  Q.  Okay.

8          THE COURT:  When did you send that information to

9  GMAC?

10         THE WITNESS:  After they -- the letter told me what

11 they required.

12         THE COURT:  Do you recall the date of the letter?

13         THE WITNESS:  Let me -- let me tell you the day I sent

14 it.  I am just buried over here, I'm sorry.

15         THE COURT:  That's okay.

16         THE WITNESS:  It wasn't in December, because they

17 didn't ask for it.  I believe that was sent on February 10th.

18 It was faxed --

19         THE COURT:  February 10th of what year?

20         THE WITNESS:  Of 2010.  It was in regard to the

21 January application, and at that time, it was showing, since it

22 was being used with the January application, nine months of

23 continued benefits.  If you go to Exhibit -- my Exhibits -- I

24 made a table of contents.  I'm going to use that.  I believe

25 it's my Exhibit 5?

1   Q.  Um-hum.

2   A.  It is Exhibit 5?

3   Q.  Um-hum.

4   A.  It shows a letter that they sent to me that just says "a

5   copy of unemployment award letter providing original award

6   beginning and end date."

7   Q.  Um-hum.  Okay.

8            THE COURT:  Go ahead, Mr. Wishnew.

9   Q.  So this was submitted in connection with a January 2010

10  loan modification package, correct?

11  A.  Correct.

12  Q.  Okay.  And these -- the admission -- the submission of

13  unemployment income lasted through October, 2010, less than

14  twelve months, correct?

15  A.  At the time that it was submitted to you?

16  Q.  Yes.

17  A.  Less than twelve months, correct.

18  Q.  Okay.  And if I can refer you back to Exhibit 44, your

19  page 22?

20  A.  Okay.

21  Q.  Would you agree -- I mean, am I -- looking at question 3

22  under section Y, it specifically states, unemployment income

23  must be documented assurance of its continuance for at least

24  twelve months, correct?

25  A.  That's what it says.

1    Q.   Okay.

2             MR. WISHNEW:  Your Honor, I have no further questions.

3             THE COURT:  Okay.

4             THE WITNESS:  Now, do I get to rebut for that?

5             THE COURT:  You do.

6             THE WITNESS:  Okay.  Just begin now?

7             THE COURT:  Yes.

8    REDIRECT EXAMINATION

9    BY MR. SILBER:

10            THE WITNESS:  Okay.  I was never asked to supply

11   twelve months of unemployment, ever.  The Trust never mentioned

12   anything about twelve months of unemployment until I brought it

13   up at our last hearing.  Everything they asked for was nine

14   months.  I am not required by law to know the mortgage letters,

15   they are.  Again, I put my faith in them.

16            I could have given them what they required, Your

17   Honor, and I can prove it to you.  The unemployment award

18   letter shows if you go to Exhibit -- let's go to Exhibit 46,

19   Your Honor, of my exhibits in the manila envelope.

20            THE COURT:  Okay.

21            THE WITNESS:  My page 13, it shows a remaining balance

22   on your unemployment insurance account -- that's the second

23   block down.

24            THE COURT:  Just give me a second.

25            THE WITNESS:  I'm sorry.

1              THE COURT:  All right, go on.

2              THE WITNESS:  It shows "the remaining balance on your

3       unemployment insurance account is 10,463 dollars.  It shows my

4       payments of 679 dollars.  This shows that the benefits for this

5       statement would end in -- on April of 2010.  This was

6       sufficient information to give to them, plus I gave them plenty

7       of letters showing all the extensions that were available that,

8       when I first gave it to them, I thought it was sufficient.

9       Then they required this document.

10             THE COURT:  But I --

11             THE WITNESS:  Yes, Your Honor?

12             THE COURT:  Is there a document that shows that they

13      asked you for nine months of unemployment rather than twelve

14      months?

15             THE WITNESS:  Every one of their loss mitigation

16      applications, and their entire servicing record notes.

17             THE COURT:  Is that the --

18             THE WITNESS:  I'm sorry, Your Honor.

19             THE COURT:  Which exhibit?

20             THE WITNESS:  Exhibit 46.

21             THE COURT:  Yes.

22             THE WITNESS:  Page 2.  I believe there's a little X

23      there where I -- where I had marked it beforehand.  It just

24      says, "such benefits must continue for at least nine months."

25      If we go to Exhibit 47 --

RESIDENTIAL CAPITAL, LLC, ET AL.                              93

1          THE COURT:  Hold on.

2          THE WITNESS:  I don't have their cover letter there.

3          THE COURT:  I see that.  Go ahead.

4          THE WITNESS:  Okay.  Sorry, 47, I forgot to put in the

5   cover letter for it.  If we go to Exhibit 48, once again there

6   are documents, where the check marks are, it shows nine months.

7          THE COURT:  All right.

8          THE WITNESS:  I'd like to further explain -- or, if I

9   could that there are ton -- there were plenty of extensions

10  benefits that I gave them in the note.  They didn't want to

11  verify the information, which is fine.  They required

12  additional documentation for unemployment and I

13  thought -- well, at the time, I thought it was enough.  They

14  were told that it wasn't.  Okay, it wasn't.  I see the mortgage

15  letters now, I agree that it was enough.

16         We're talking about time sensitive documentation.  I

17  showed that those award letters showed my first extension of

18  unemployment ended in April.  I got to say this without

19  hearsay.  Massachusetts unemployment was aware of what I

20  required, and preapproved me one of the extensions to show the

21  due date of nine months, as required by the defendants.

22         Every week, you have to apply for unemployment and

23  it's not guaranteed.  I have to make a call every Sunday, fill

24  out a -- take a survey.  There is no, you're guaranteed for

25  twenty-nine weeks, you're guaranteed for thirty-four weeks.

RESIDENTIAL CAPITAL, LLC, ET AL.                    94

1  There's no guarantee.  That's why the requirement is reasonable

2  assurance.  That's why the requirement from FHA is reasonable

3  assurance.  It goes back to, do not encase in a rigid system.

4          Furthermore, if it was only nine months, where's the

5  variance compliance request to say, Mr. Silber's only showing

6  eight months, seven months, three months, two months?  The

7  stipulation says whenever one of the requirements is not met,

8  you must file a variance compliance request.  That is

9  Exhibit -- Exhibit 13 and Exhibit 33.

10         THE COURT:  I just want to be sure I understand.

11  You're testimony is that pages 21 through 22 and 23 of Exhibit

12  46 is the document from Massachusetts that you believe shows

13  the continuation of unemployment for nine months?

14         THE WITNESS:  No, no, Your Honor.  I believe it shows

15  a continuance of nine months from the effective date of when

16  the loss mitigation application was in.  We're talking about

17  January 2010 to October 2010.

18         THE COURT:  All right.  I just wanted to check.

19         THE WITNESS:  Okay.

20         THE COURT:  Anything else you want say?

21         THE WITNESS:  Just, if you would look at Exhibit 13

22  with the variances, again, whether it's seven months, eight

23  months, nine months, two months, all -- a lender is required to

24  submit --

25         THE COURT:  I have your testimony.  I understand.

1          THE WITNESS:  Okay.  I beg your pardon, then.  I can

2    only give them what is required.  I can only put my faith in

3    them as my broker, but by not informing me accurately of what

4    was required in a timely fashion of what was required and not

5    filing a variance so HUD or FHA could make a case by case

6    scenario to weigh the stipulation, they once again impeded me

7    from receiving benefits.

8          THE COURT:  I'm only cutting you off, because I --

9          THE WITNESS:  I'm sorry.

10         THE COURT:  -- I believe you testified to this before.

11         THE WITNESS:  Okay.

12         THE COURT:  Is there anything --

13         THE WITNESS:  I'm a little new at this, I'm sorry.

14         THE COURT:  -- new you want to tell me?

15         THE WITNESS:  In regards to his questions?

16         THE COURT:  On -- you're essentially doing redirect.

17   It's supposed to be limited to addressing things that Mr.

18   Wishnew asked during cross-examination.

19         THE WITNESS:  Okay.

20         THE COURT:  Do you have anything else in response to

21   what he said?

22         THE WITNESS:  In response?

23         THE COURT:  Yes.  Uh-huh.

24         THE WITNESS:  No, Your Honor.

25         THE COURT:  Okay.

1          THE WITNESS:  Well, I do.  I do, actually.

2          THE COURT:  go ahead.

3          THE WITNESS:  In December of 2009, when I filled out

4   the first loss mitigation application, it now shows that I

5   could have given them that letter, had they required it.  They

6   never asked me for further unemployment information.  I gave

7   them a letter of benefits.  I gave them my handwritten thing of

8   extensions, saying here's all the extensions that were

9   available.  They turned around and said, you're missing your

10  tax returns.

11         Now, looking at their servicing notes, at that time

12  they told me the tax returns were missing, they also required

13  further unemployment information, and they never informed me.

14  So from the very beginning, you just -- you did not inform me

15  on time sensitive documentation.  At the time they thought it

16  was only nine months, I was able to provide a letter when it

17  was finally required that shows October of 2010.

18         THE COURT:  When did you cease -- when did you stop

19  receiving unemployment?

20         THE WITNESS:  Sheesh, not until 2011.  I brought those

21  bank statements last time, to the last hearing.

22         THE COURT:  Are you working finally?

23         THE WITNESS:  Yes, Your Honor.  I started my own

24  business.  Yes, Your Honor.

25         THE COURT:  Okay.  All right.  Mr. Wishnew, anything

RESIDENTIAL CAPITAL, LLC, ET AL.                              97

1   further?

2         MR. WISHNEW:  One more question.

3         THE COURT:  Go ahead.

4   RECROSS-EXAMINATION

5   BY MR. WISHNEW:

6   Q.  Mr. Silber, going back to your Exhibit 46, on page 1, it

7   says documents received January 27th, 2010, correct?

8   A.  Exhibit 46?

9   Q.  Yes.

10  A.  Page 1?  Correct.

11  Q.  Okay.  And then your testimony is that the -- on page 23

12  of that exhibit, it says that the employment benefits would

13  last until October 16th, 2010?

14  A.  Correct.

15  Q.  Okay.  Isn't that less than nine months?

16  A.  Then that would disqualify me from HAMP, yes.

17  Q.  Okay.

18        MR. WISHNEW:  Thank you, Your Honor.  That's it.

19  A.  But not FHA-HAMP.  I'm sorry.  Do I rebut that afterwards?

20        THE COURT:  Well, this is the only time you have.

21  So --

22  FURTHER REDIRECT EXAMINATION

23  BY MR. SILBER:

24  A.  Okay.  HAMP is in case, in a rigid system -- once again,

25  where it says nine months.  A normal HAMP program you need nine

1  months.  You're right, in January of 2010, when you required

2  those documents at the time I filled it out, it didn't show

3  nine months.  Had you required that in December of 2009, you

4  would have had it for nine months.  Hence, you impeded me from

5  receiving HAMP benefits.

6       Also, again, FHA says twelve months of reasonable

7  assurance.  That letter shows twelve months of reasonable

8  assurance.  I don't want to get into the nitty-gritty of, is it

9  twelve months from the time the repayment or the modification

10  starts?  I know HAMP says that.  FHA-HAMP does not say that, or

11  I haven't see it.  I beg your pardon, let me redact that.  I

12  haven't seen it anywhere.

13       Furthermore, you have the variance compliance.  So you're

14  right.  It disqualified me from HAMP in January of 2010.  If it

15  was asked for in December of '09, it would not have.

16            THE COURT:  Anything else?

17            MR. WISHNEW:  Nothing further, Your Honor.

18            THE COURT:  All right.  I'm going to take a lunch

19  recess.  How long do you anticipate you'll be?  You're calling

20  Mr. Cunningham?  Is that --

21            MR. WISHNEW:  Correct, Your Honor.

22            THE COURT:  How long do you think's your direct

23  examination of him?

24            MR. WISHNEW:  Forty-five minutes, Your Honor?

25            THE COURT:  Okay.  I'm going to shorten our lunch to

1  only an hour, so we're going to resume at 1:45.  Two judges are

2  being sworn in this afternoon, and I'm supposed to report

3  somewhere at 3:30.  So if this -- the meeting's at 4.  But we

4  have to end by 3:30.  So I apologize for shortening the lunch,

5  but 1:45, okay?

6          MR. SILBER:  Do I get to cross-examine --

7          THE COURT:  You do.

8          MR. SILBER:  -- the witness?

9          THE COURT:  You absolutely do.

10          MR. SILBER:  Thank you, Your Honor.

11          THE COURT:  You can take all of your document back.

12  You can leave everything in the courtroom, okay?  No one's

13  going to take a look in it.

14          MR. SILBER:  Okay.

15          THE COURT:  Just make sure you're back on time.

16          MR. SILBER:  One hour?

17          THE COURT:  Yes.

18          MR. SILBER:  Wow.

19          THE COURT:  Okay?

20          MR. SILBER:  Okay.

21          THE COURT:  There is something off the record.

22      (Recess from 12:41 p.m. until 1:48 p.m.)

23          THE COURT:  All right, please be seated.

24          Mr. Wishnew?

25          MR. WISHNEW:  Thank you, Your Honor.  Your Honor, I'd

1  like to call Mr. David Cunningham to the stand.

2         THE COURT:  Okay.  Come on up and be sworn.

3      (Witness sworn)

4         THE COURT:  Have a seat, please.

5  DIRECT EXAMINATION

6  BY MR. WISHNEW:

7  Q.  Good afternoon, Mr. Cunningham.

8  A.  Good afternoon.

9  Q.  Mr. Cunningham, we're here today in connection with a

10 claim objection the Borrower Trust filed against Mr. Todd

11 Silber, a former borrower of GMAC Mortgage.  Judge Glenn has

12 directed that there be an opportunity to ask you some questions

13 concerning GMAC Mortgage's records regarding Mr. Silber's loan.

14 I'd like to first start with some general background

15 information.  Would you briefly describe your educational

16 backgrounds?

17 A.  I had some college through Montgomery County Community

18 College.

19 Q.  Okay.  In terms of your employment history, when did you

20 begin your employment with Residential Capital LLC?

21 A.  It was August of 2001.

22 Q.  Okay.  And what is Residential Capital's relationship to

23 GMAC Mortgage LLC?

24 A.  GMAC Mortgage was a subsidiary of Residential Capital.

25 Q.  Okay, when you started in 2001, what was your job title at

RESIDENTIAL CAPITAL, LLC, ET AL.                    101

1 Residential Capital?

2 A.  Foreclosure specialist.

3 Q.  Okay and what were your responsibilities?

4 A.  I was responsible for handling foreclosures on individual

5 loans for some private investors.

6 Q.  Okay, and how long were you in that role?

7 A.  A year.

8 Q.  Okay.  Did you hold other positions at Residential Capital

9 or its affiliates?

10 A.  Yes.

11 Q.  And what were those positions?

12 A.  I was team leader of the foreclosure department, a manager

13 of the foreclosure department, and a director of the

14 foreclosure department.

15 Q.  Okay.  And are you currently employed by the ResCap

16 Liquidating Trust?

17 A.  Yes.

18 Q.  And what is your position with the Liquidating Trust?

19 A.  Director of regulatory and compliance.

20 Q.  Okay.  And so is it fair to say that during your time with

21 Residential Capital since 2001, and now with the Liquidating

22 Trust, you've dealt with loans in default?

23 A.  Yes.

24 Q.  Okay.  When the debtors had an active servicing operation

25 prior to the sale to Ocwen in 2013, were there different

RESIDENTIAL CAPITAL, LLC, ET AL.                    102

1   divisions within the default group?

2   A.  Yes.

3   Q.  Okay.  And is it accurate to say those divisions

4   were -- included foreclosure and loss mitigation?

5   A.  Yes.

6   Q.  Okay.  During your twelve years working for the debtors,

7   did you have exposure to the debtors' loss mitigation

8   operations?

9   A.  Yes.

10  Q.  Could you go into a little bit of detail about that?

11  A.  Yes, so while I was in the foreclosure operation, we

12  worked closely with the loss mitigation team, because loss

13  mitigation was working with borrowers on alternatives to

14  foreclosure, and would communicate directly with foreclosure

15  counsel when they entered into programs for loss mit.

16  Q.  Okay.  As part of your employment with the debtors, did

17  you have access to GMAC Mortgage's business records?

18  A.  Yes.

19  Q.  Okay, and what kind of records did you have access to?

20  A.  There were various systems.  One was called LoanServ,

21  which was our system of record.  There was an imaging system

22  referred to as Looking Glass.  There was other systems that

23  were used for retaining letters and other such documentation

24  called XNet.  And with regard to loans that were in foreclosure

25  or bankruptcy status, there was a system referred to as LPS.

RESIDENTIAL CAPITAL, LLC, ET AL.                    103

1   Q.  Okay.  And generally, were documents entered into GMAC

2   Mortgage's servicing system at or near the time that the

3   information was transmitted by the borrower to someone at the

4   company with knowledge of their preparation?

5   A.  Yes.

6   Q.  Okay.  As I mentioned at the outset, we're here to discuss

7   Mr. Silber's loan.  Are you familiar with this loan?

8   A.  Yes.

9   Q.  Okay, and are you also aware that Mr. Silber filed a claim

10  against GMAC Mortgage in these bankruptcy cases?

11  A.  Yes.

12  Q.  Okay.  And are you also aware that the Borrower Claims

13  Trust filed an objection to Mr. Silber's -- to the allowance of

14  Mr. Silber's proof of claim?

15  A.  Yes.

16  Q.  Okay, and have you reviewed that objection?

17  A.  Yes, I have.

18  Q.  Okay, and were you asked to execute any declarations in

19  connection with the declara -- in connection with the claims

20  objection.

21  A.  Yes.

22  Q.  Okay.  Did you review documents in the com -- in the

23  debtors' business records concerning this loan, including the

24  company's -- including the debtors' servicing loans?

25  A.  Yes, I did.

RESIDENTIAL CAPITAL, LLC, ET AL.                    104

1   Q.  Okay.  There's a document marked in front of you as

2   Exhibit S.  Do you recognize this document?  Look to the front

3   of that package.  To the beginning.

4   A.  Is it in another binder?

5            MR. SILBER:  No, no, no.  Not that.

6            THE COURT:  Where is Exhibit S?

7            MR. WISHNEW:  It should be -- it's Mr. Cunningham's

8   declaration.

9            THE COURT:  Oh.  Okay.

10  A.  Ah, got it.  I'm sorry.  It was right in front.

11  Q.  Mr. Cunningham, do you --

12           THE COURT:  Just hang on a second.

13           MR. WISHNEW:  Sure.

14           THE CLERK:  Judge?

15           THE COURT:  Yes?

16           THE CLERK:  Judge, it's going to fall over, I think.

17           THE COURT:  Bear with me, Mr. Cunningham.

18           MR. WISHNEW:  Apologies, Your Honor.

19           THE COURT:  Okay, I have it.

20           MR. WISHNEW:  Okay.

21           THE COURT:  Mr. Silber, do you have it, as well?

22           MR. SILBER:  I do, Your Honor.

23           THE COURT:  Go ahead.

24           MR. WISHNEW:  Okay.  Okay.

25  Q.  Mr. Cunningham, do you recognize this document?

RESIDENTIAL CAPITAL, LLC, ET AL.                    105

1    A.  Yes, I do.

2    Q.  And have you seen it before today?

3    A.  Yes.

4    Q.  Would you briefly describe this document?

5    A.  This is a declaration that I had in support of the ResCap

6    Borrower Claims Trust objection to claim number 4222.

7    Q.  Okay, and are you generally familiar with the content of

8    this declaration?

9    A.  Yes, I am.

10   Q.  Okay.

11          MR. SILBER:  I beg your pardon, I do not have it.  S?

12   Was it S?  Oh, I beg your pardon.  So his origin -- oh, so

13   that's the -- okay, I do have it.  What page are we on?  The

14   first one?

15          MR. WISHNEW:  We're just speaking generally about it.

16          MR. SILBER:  Sorry.

17   Q.  At the time you made the statements in this declaration,

18   did you believe them to be true and accurate?

19   A.  Yes.

20   Q.  Okay.  And did you sign this document attesting to its

21   truth?

22   A.  Yes.

23   Q.  Okay.  Your Honor, I'd like to offer into evidence Mr.

24   Cunningham's declaration at Exhibit S.

25          THE COURT:  Just the -- just the declaration?

1      MR. WISHNEW:  The declaration and its accompanying

2  exhibits incorporated therein.

3      THE COURT:  Well, you know, you haven't laid

4  any -- you got Exhibits A through W.

5      MR. WISHNEW:  Okay, I will go separately through

6  the --

7      THE COURT:  Uh.

8      MR. WISHNEW:  I'll only submit the declaration at this

9  point in time --

10     THE COURT:  All right, submit it --

11     MR. WISHNEW:  I will sub --

12     THE COURT:  The -- Mr. Cunningham's declaration, which

13  is part of Exhibit S, is admitted into evidence.

14  (Declaration of David Cunningham was hereby marked for

15  identification as part of Debtors' Exhibit S, as of this date.)

16     MR. WISHNEW:  Thank you, Your Honor.

17  Q.  Mr. Cunningham, I left a separate binder of documents in

18  front of you.  Should be at first tab, Exhibit A.  Okay.  Would

19  you briefly describe this document?

20  A.  In Exhibit A?

21  Q.  Yes.

22  A.  This is the note for borrower Todd Silber.

23  Q.  Okay, and is this an FHA-insured loan?

24  A.  Yes.

25  Q.  Okay.  And how do you know that?

RESIDENTIAL CAPITAL, LLC, ET AL.                    107

1   A.   On the top right corner, there's an FHA case number, and

2   down on the bottom left, it's a multi-state FHA note.

3   Q.   Okay.   How is an FHA-insured loan serviced differently

4   from a nonFHA-insured loan?

5   A.   Typically, on a nonFHA-insured loan, you would follow

6   investor guidelines, the investor who ultimately owns the loan.

7   Q.   Um-hum.

8   A.   Whereas, on an FHA-insured loan, since FHA is insuring the

9   loan on behalf of the investor, you are required to follow the

10  FHA guidelines.

11  Q.   Okay.   Your Honor, I'd like to introduce Exhibit A into

12  evidence, although I believe it's also been Exhibit -- sorry,

13  introduced through Mr. Silber, as well.

14        THE COURT:   All right, it's in evidence.

15  (Note for Todd Silber's loan was hereby received into evidence

16  as Debtors' Exhibit A, as of this date.)

17        MR. WISHNEW:   Okay.

18  Q.   Mr. Cunningham, if I could direct you to Exhibit C?

19  A.   Okay.

20  Q.   What is Exhibit C?

21  A.   Exhibit C is the payment and comment history from our

22  servicing system of record called LoanServ.

23  Q.   Okay, so this is what we've commonly referred to as the

24  loan servicing notes?

25  A.   Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    108

1  Q.  Okay.  And whose loan servicing notes -- I'm sorry.  To

2  which loan do these loan servicing notes pertain?

3  A.  Todd Silber.

4  Q.  Okay.  And was this document maintained in GMAC Mortgage's

5  system of business records?

6  A.  Yes.

7  Q.  Okay.  And to the best of your knowledge, as part of GMAC

8  Mortgage's regular business practices, what sorts of

9  information would be included in these servicing notes?

10 A.  It would be communications with the borrower,

11 communications -- or, you know, payments made by the borrower

12 or any advances made from the loan, and any communications that

13 took place between -- during the delinquency of a loan, either

14 with a borrower or outside counsel.

15 Q.  Okay.

16         MR. WISHNEW:  Your Honor, I'd like to introduce

17 Exhibit C into evidence.

18         THE COURT:  Any objections?

19         MR. SILBER:  Your Honor, I don't wish to object to any

20 of their exhibits, if that helps speed things up.

21         THE COURT:  All right, Exhibit C's in evidence.

22 (ResCap's LoanServ loan servicing notes was hereby received

23 into evidence as Debtors' Exhibit C, as of this date.)

24         MR. WISHNEW:  Thank you, Your Honor.

25         Thank you, Mr. Silber.

1    MR. SILBER:  You're welcome.

2  Q.  Mr. Cunningham, are you familiar with -- I'm sorry.  Are

3  you familiar with the term "loss mitigation"?

4  A.  Yes.

5  Q.  Okay.  In your own words, and based upon your experience

6  working with the debtor since 2001, would you explain your

7  understanding of the term "loss mitigation"?

8  A.  Loss mitigation is an area that works with homeowners to

9  provide alternatives on current or delinquent loans, either

10  through a retention strategy or through a liquidation strategy.

11  Q.  Okay.  As a servicer of mortgage loans, did GMAC Mortgage

12  engage in loss mitigation activities with borrowers?

13  A.  Yes.

14  Q.  Okay.  Were there specific sets of rules of guidelines

15  that GMAC Mortgage was required to follow in connection with

16  loss mitigation activities?

17  A.  Yes.

18  Q.  Okay, for a loan such as Mr. Silber's, what guidelines

19  define GMAC Mortgage's ability to engage in loss mitigation

20  activities?

21  A.  FHA.

22  Q.  Okay.  And if I could ask you to turn to Exhibit D, as in

23  dog?

24    THE COURT:  Since Mr. Silber said he's not going to

25  object to your exhibits, and you just want to -- let's get

RESIDENTIAL CAPITAL, LLC, ET AL.                    110

1   clear records, if you want to offer them my way, you can --

2           MR. WISHNEW:  Okay --

3           THE COURT:  -- you can do that.

4           MR. WISHNEW:  That's fine.  Your Honor, I'd like enter

5   Exhibit D into evidence.

6           THE COURT:  All right, it's in evidence.

7   (FHA-HAMP loan modification guidelines was hereby received into

8   evidence as Debtors' Exhibit D, as of this date.)

9           MR. WISHNEW:  Thank you, Your Honor.

10  Q.  Okay, I'd like to --

11          THE COURT:  This is an exhibit that Mr. Silber marked,

12  as well.  So --

13          MR. WISHNEW:  Yeah.

14  Q.  Mr. Cunningham, if you could just briefly describe what

15  Exhibit D is?

16  A.  Exhibit D is the FHA-HAMP program, which was communication

17  provided from FHA to servicers --

18  Q.  Um-hum.

19  A.  -- with guidelines around how to provide an FHA-HAMP

20  modification.

21  Q.  Okay, so for an FHA-insured loan, to the extent that

22  borrowers sought an FHA-HAMP loan modification, these would be

23  the governing guidelines?

24  A.  Yes.

25  Q.  Okay.  If I could ask to turn your attention to Exhibit R,

1   as in Robert?  Would you briefly identify for me this document?

2   A.  Yes, this was a mortgagee letter from HUD that outlines

3   the various programs that HUD allows for loss mitigation.

4   Q.  Okay.  And we just spoke about an FHA-HAMP modification.

5   Does this deal with a different type of modification from an

6   FHA-HAMP modification?

7   A.  Yes.

8   Q.  What does this deal with?

9   A.  This is for traditional modifications and other types of

10  programs, like forbearance plans, repayment plans, and other

11  types of loss mitigation strategies.

12  Q.  So if a loan servicer was to consider a traditional

13  modification for an FHA loan, this is -- this -- these would be

14  the governing guidelines?

15  A.  Yes.

16  Q.  Okay, thank you.

17        MR. WISHNEW:  Your Honor, I'd like to introduce

18  Exhibit R into evidence.

19        THE COURT:  All right, it's in evidence

20  (Mortgagee letter from HUD outlining various programs HUD

21  allows for loss mitigation was hereby received into evidence as

22  Debtors' Exhibit R, as of this date.)

23        MR. WISHNEW:  Okay.

24  Q.  Mr. Cunningham, when GMAC Mortgage reviewed an account for

25  an FHA-HAMP modification would it have also have reviewed the

RESIDENTIAL CAPITAL, LLC, ET AL.                    112

1   account for an FHA traditional modification?

2   A.  Yes.

3   Q.  Okay.  And how does an FHA-HAMP modification differ from

4   an FHA traditional modification?

5   A.  With regard to the Silber loan, it would be around

6   unemployment income and with regard to when someone is eligible

7   for a traditional mod.

8   Q.  Okay, so you mentioned unemployment income.  Is it

9   considered in one but not the other?

10  A.  Well, no --

11  Q.  So --

12       MR. WISHNEW:  Let me rephrase the question.

13  Q.  In an FHA-HAMP modification, is unemployment income

14  considered when assessing the viability of a possible

15  modification?

16  A.  Yes.

17  Q.  In an FHA traditional modification, is unemployment income

18  considered?

19  A.  No.

20       THE COURT:  I think you may -- I want to be sure I

21  understand.  It's considered for FH -- unemployment income is

22  considered for an FHA modification, is that correct?

23       THE WITNESS:  For an FHA-HAMP --

24       THE COURT:  FHA-HAMP --

25       THE WITNESS:  -- modification.

RESIDENTIAL CAPITAL, LLC, ET AL.                    113

1          THE COURT:  -- modification.  And what -- when is it

2    not considered?  What kind of modification would it not be

3    considered for?

4          THE WITNESS:  For an FHA traditional --

5          THE COURT:  Okay.

6          THE WITNESS:  -- modification.

7          THE COURT:  You asked that.  I missed the point, and I

8    got it now.

9          MR. WISHNEW:  Okay.

10         THE COURT:  Go ahead.

11         MR. WISHNEW:  Very good, Your Honor.  All right.

12   Q.  Mr. Cunningham if we you turn to Exhibit E, as in Edward?

13   A.  Okay.

14   Q.  Okay.  Do you recognize this document?

15   A.  Yes.

16   Q.  And what is this document?

17   A.  This is the workout package that was submitted by Mr.

18   Silber.

19   Q.  And approximately when was it submitted?

20   A.  Around December 18th.

21         THE COURT:  What year?

22   Q.  Okay.

23         THE WITNESS:  2009.

24   Q.  Thank you.  The -- okay.  In addition to the workout

25   package at Exhibit E, did Mr. Silber submit additional

RESIDENTIAL CAPITAL, LLC, ET AL.                    114

1    documentation in connection with his 2000 -- December 2009 loan

2    modification request?  Let me refer you to Exhibit F.  Are

3    you -- are you there?

4    A.  Yes, I am.

5    Q.  Okay.  Is this additional information that Mr. Silber

6    provided in connection with his December 2009 loan modification

7    request?

8    A.  Yes, it is.

9    Q.  Okay.

10           THE COURT:  Are you offering it into evidence?

11           MR. WISHNEW:  Yes, Your Honor.  I'd like to offer

12   Exhibits E and F into evidence

13           THE COURT:  All right.  In evidence.

14   (Mr. Silber's workout package was hereby received into evidence

15   as Debtors' Exhibit F, as of this date.)

16   (Additional information Mr. Silber provided in connection with

17   his December 2009 loan modification request was hereby received

18   into evidence as Debtors' Exhibit F, as of this date.)

19           MR. WISHNEW:  Thank you, Your Honor.  Okay.  Okay.

20   Q.  How were --

21           MR. WISHNEW:  That's okay, never mind.

22   Q.  When GMAC reviewed Mr. Silber's 2009 -- December 2009

23   workout package, what factors were considered?

24   A.  So it would have been eligible income or verifiable

25   income --

1    Q.   Um-hum.

2    A.   -- and expenses that were outlined within the financial

3    analysis form --

4    Q.   Okay, and that would --

5    A.   -- that's in the workout package.

6    Q.   That would determine his DTI, or his debt-to-income ratio?

7    A.   Yes.

8    Q.   Okay.  And did GMAC approve or deny the December 2009

9    workout package?

10   A.   It was denied.

11   Q.   Okay.  And do you know when it was denied?  Actually, do

12   you know what?  Let me -- let me refer you to page 275 of

13   Exhibit C, as in cat.

14          THE COURT:  You're looking at the page numbers in the

15   lower right-hand corner?

16          MR. WISHNEW:  Yes, Your Honor.  So it would be marked

17   page 275 of 286.

18   A.   At the bottom of the page, on January 13th of 2010, it was

19   denied.

20   Q.   Okay.  And why was it denied?

21   A.   Because the borrower cannot afford the property.

22   Q.   Okay.  And there's also a mention of fail DTI.  What does

23   that mean?

24   A.   When you take the gross monthly expenses --

25   Q.   Um-hum.

RESIDENTIAL CAPITAL, LLC, ET AL.                    116

1   A.  -- and you divide that by your -- the front-end DTI is

2   your gross monthly income --

3   Q.  Um-hum.

4   A.  -- divided by your mortgage payment, which your mortgage

5   payment would be your principal interest, taxes, and insurance.

6   Q.  Okay.  And is there a certain threshold that the borrower

7   must meet?

8   A.  Yes.  You -- within the guidelines, it requires you have a

9   thirty-one percent debt-to-income ratio.

10  Q.  Okay.  And so in the case, there would not have been that

11  requisite ratio?

12  A.  No.

13          THE COURT:  Is it -- is it calculated -- is the

14  calculation shown?  I see where your pointing to:  fail FE DTI.

15  But is there -- is there an actual calculation somewhere?

16          THE WITNESS:  No, not in the history.

17          MR. SILBER:  Your Honor, do I get to rebut each time

18  if we move too far ahead, or --

19          THE COURT:  No, when he finishes his examination, you

20  get to cross-examine.

21          MR. SILBER:  Out of all -- out of all --

22          THE COURT:  Yes.  Keep notes of what you want to ask

23  him about, okay?

24          MR. SILBER:  Okay, very well.

25  Q.  Okay.  Referring back, Mr. Cunningham, to Exhibits E and

RESIDENTIAL CAPITAL, LLC, ET AL.                    117

1   F, did Mr. Silber provide any documentation to GMAC Mortgage

2   concerning his unemployment income?

3   A.  Yes.

4   Q.  And how many months of unemployment income were

5   demonstrated in these documents?

6   A.  On the last page of Exhibit E, it would reflect twenty

7   weeks.

8   Q.  That --

9          THE COURT:  Can you --

10  Q.  That is the page marked --

11         THE COURT:  Can you point me to where that is?

12         MR. WISHNEW:  Yeah, that's where I was going, Your

13  Honor.

14         THE WITNESS:  Yes.  If you calculate the balance

15  divided by the net payment, it gets you to twenty weeks.  It's

16  13,600 and, I believe, it's 9 dollars.

17  Q.  Okay, so --

18  A.  Eight.

19  Q.  So in the table at the bottom of the page -- and we're

20  referring to the page that is marked page 13 on the top right-

21  hand corner, there's a balance of 13,608 dollars?

22  A.  Yes.

23  Q.  And in net payments of 679?

24  A.  Correct.

25  Q.  And so your suggestion is that dividing -- putting the

RESIDENTIAL CAPITAL, LLC, ET AL.                     118

1   balance in the numerator and the payment in the denominator

2   gets you to -- gets you to twenty weeks?

3   A.  Yes.

4   Q.  Okay.  After the December 2009 workout package, did Mr.

5   Silber submit another workout package to GMAC Mortgage for

6   another loan modification?

7   A.  Yes.

8   Q.  Okay, and when was that?  Oh, well, let me ask you now.

9   If you could refer to Exhibit I, as in ice?

10  A.  So yes, this was signed on January 23rd of 2010.

11  Q.  Okay.

12        MR. WISHNEW:  And so, Your Honor, I'd like to move

13  Exhibit I into evidence.

14        THE COURT:  All right, it's admitted into evidence.

15  (Documents were hereby received into evidence as Debtors'

16  Exhibit I, as of this date.)

17        MR. WISHNEW:  Thank you, Your Honor.

18  Q.  Have you seen this document before today?

19  A.  Yes.

20  Q.  Okay.  And in addition to this workout package, is

21  it -- to your knowledge, did Mr. Silber submit additional

22  documentation in connection with his loan modification request?

23  A.  Yes.

24  Q.  Okay, and if I could ask you to turn to Exhibit J?

25  A.  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    119

1  Q.  Is that the additional documentation submitted?

2  A.  Yes.

3  Q.  Okay.

4         MR. WISHNEW:  Your Honor, I believe Mr. Silber already

5  put this into evidence, but I'd like to exhibit -- put Exhibit

6  J into evidence.

7         THE COURT:  I think Exhibit J's in evidence.

8  (Additional information Mr. Silber provided in connection with

9  his January 2010 loan modification request was hereby received

10 into evidence as Debtors' Exhibit J, as of this date.)

11        MR. WISHNEW:  Okay.

12 Q.  When GMAC Mortgage reviewed Mr. Silber's 2010 -- January

13 2010 workout package, what factors were considered?

14 A.  Again, similar to before, it would be the monthly gross

15 income divided by either the mortgage payment, included

16 principal, interest, taxes, and insurance, or the back-end

17 ratio, which is the monthly gross income divided by the

18 household expenses.

19 Q.  Okay, and did Mr. -- I'm sorry.  Did GMAC Mortgage approve

20 or deny this workout package?

21 A.  Deny.

22 Q.  Okay, if I could take you back to Exhibit C, specifically

23 page 269 of 286?

24 A.  Okay.

25        THE COURT:  I'm not there yet.

RESIDENTIAL CAPITAL, LLC, ET AL.                    120

1              THE WITNESS:  Oh, that's fine.

2              THE COURT:  Go ahead, Mr. Wishnew.

3              MR. WISHNEW:  Thank you, Your Honor.

4    Q.  What was the reason for the denial of Mr. Silber's loan

5    modification package?

6    A.  It's due to no verifiable income.

7              THE COURT:  Where do I see that?

8              THE WITNESS:  In the middle of the page, dated 2/24,

9    the note transaction type is NT, so it's customer denied the

10   HAMP due to no verifiable income.

11             THE COURT:  Okay.  I see it.

12             MR. WISHNEW:  Okay.

13             THE COURT:  Can I ask this?  Look at Exhibit J.  Mr.

14   Wishnew just showed that to you.  So, this is a Massachusetts

15   form, is that correct?

16             THE WITNESS:  I believe so, Your Honor, yes.

17             THE COURT:  Have you ever seen one like this before?

18             THE WITNESS:  I have not, no.

19             THE COURT:  Mr. Silber testified that this

20   demonstrated that he was approved for nine months of

21   unemployment?  You're not familiar with the form?  Do you know

22   how to read the forms?

23             THE WITNESS:  To the extent that, for the potential

24   duration and --

25             THE COURT:  What do you understand the potential

RESIDENTIAL CAPITAL, LLC, ET AL.                    121

1  duration to be?

2          THE WITNESS:  The twenty-nine weeks on -- which would

3  be the --

4          THE COURT:  Mr. Silber --

5          THE WITNESS:  -- second page.

6          THE COURT:  -- pointed to, on the last page, the

7  BYB -- no.  No.  Yeah, the BYE date --

8          THE WITNESS:  Yeah.

9          THE COURT:  -- 10/16/10.  What do you understand that

10  to be?

11          THE WITNESS:  I don't know.

12          THE COURT:  Okay.  Go ahead, Mr. Wishnew.

13          MR. WISHNEW:  Thank you, Your Honor.

14  BY MR. WISHNEW:

15  Q.  Mr. Cunningham, when GMAC Mortgage considered proof of

16  unemployment income, a document such as this, did they

17  consider -- as of what date are the unemployment benefits

18  considered?

19  A.  As of the date the workout package is submitted.

20  Q.  Okay.

21          THE COURT:  And what date was that in this instance?

22  So I take --

23          THE WITNESS:  Is it January 20 --

24          THE COURT:  The workout package you're referring to is

25  Exhibit I?

1          THE WITNESS:  Yes, but it's the date received in the

2    history --

3          THE COURT:  Okay.

4          THE WITNESS:  -- which would have been on or around

5    January 23rd, but --

6    Q.  Mr. Cunningham, to the extent that it would help, you

7    might -- refer to page 273 of the servicing notes?

8    A.  January 29 --

9    Q.  And where --

10   A.  -- of 2010, sorry.

11   Q.  Where on the page does -- are you getting that?

12   A.  Just toward the bottom of the page.  Do you see

13   "Loss" -- "LMT Borrower Financial Receipt Added".

14   Q.  Okay, and that's next to the Transaction

15   Code -- "Transaction Type, HMP"?

16   A.  Yes.

17   Q.  Okay.

18          THE COURT:  Okay.

19   Q.  Mr. Cunningham, to your understanding, is a borrower's

20   representation about what benefits will be provided by a third

21   party, sufficient documentation under the FHA-HAMP guidelines

22   to provide -- to substantiate unemployment income?

23   A.  No.

24   Q.  Okay.  If I can direct your attention to Exhibit L, as in

25   lady?

1   A.  Okay.

2   Q.  What is this document?

3   A.  A workout package submitted by Mr. Silber.

4   Q.  Okay.  And I apologize for flip-flopping, but if I can

5   take you back to page 261 of 286 at Exhibit C?  Is this workout

6   package reflected in the loan history?

7   A.  Yes, on April 2nd, 2010.

8   Q.  Okay, can you just identify where on the page you are

9   looking?

10   A.  I'm sorry.  I see a note on -- what is that -- April

11   2nd --

12   Q.  Um-hum.

13   A.  -- in the middle of the page, "review for HAMP".

14   Q.  Okay.

15        THE COURT:  Look on that same page, the first CIT

16   transaction type.

17        THE WITNESS:  Yes.

18        THE COURT:  Actually, the one -- the line before that.

19   It is -- so "Advise he does not qualify under HAMP or

20   traditional with unemployment".  Can you explain that to me?

21        THE WITNESS:  Yes, so further down in the history

22   you'll see where it has an Area ID of INQ60.  It says,

23   "Unemployment income cannot be used for traditional workout

24   options; only HAMP review can use unemployment."

25        THE COURT:  Well, was he being considered for one or

1   the other type of modification type?

2          THE WITNESS:  He would have been looked at for both,

3   but because the traditional modification, you can't -- you

4   don't use unemployment income, that automatically goes to the

5   HAMP program -- the FHA-HAMP program which allows for it.  And

6   then the comment up above that you were referring to is -- we

7   were advising that he does not qualify under HAMP or

8   traditional with unemployment because of the duration on the

9   HAMP.

10          THE COURT:  So is what you're telling me that

11  unemployment insurance can be considered under the HAMP

12  modification but it has to be for what duration?

13          THE WITNESS:  For the FHA-HAMP guidelines, it's twelve

14  months.

15          THE COURT:  We saw earlier -- you were here -- that

16  Mr. Silber showed me a number of documents that he received

17  from GMAC that said nine months, not twelve.  Can you explain

18  that?

19          THE WITNESS:  The non-FHA-HAMP program allows for nine

20  months.

21          THE COURT:  But HAMP requires -- but -- FHA-HAMP --

22          THE WITNESS:  But FHA-HAMP requires twelve --

23          THE COURT:  -- requires twelve months.  And could Mr.

24  Silber's loan be considered for non-FHA-HAMP or only for FHA-

25  HAMP?

1           THE WITNESS:  Only for FHA-HAMP.

2           THE COURT:  Okay, go ahead.

3    BY MR. WISHNEW:

4    Q.  Mr. Cunningham, when GMAC Mortgage was reviewing Mr.

5    Silber's --

6           THE COURT:  Let me -- I do have another question.  On

7    this same page 286, if he had to have twelve months of

8    unemployment, why the entry on -- highlighted entry on April 2,

9    "Unemployment does not go nine months out"?  I thought you just

10   told me it had to be twelve months.

11          THE WITNESS:  The agent was referring to the non-FHA-

12   HAMP guidelines.

13          THE COURT:  Well, do you know why that an agent would

14   be referring to the non-FHA-HAMP guidelines if this had to be

15   considered under the HAMP -- under the FHA-HAMP?

16          THE WITNESS:  No, I don't.

17          THE COURT:  So I take it you agree that the

18   information that was input, namely "unemployment does not go

19   nine months out", would not be the appropriate entry for an

20   FHA-HAMP loan?

21          THE WITNESS:  Yes.

22          THE COURT:  Go ahead, Mr. Wishnew.

23          MR. WISHNEW:  Thank you, Your Honor.

24   Q.  Mr. Cunningham, when -- actually one follow-up question.

25   Recognizing that FHA-HAMP required twelve months, non-FHA-HAMP

RESIDENTIAL CAPITAL, LLC, ET AL.                                        126

1   required nine months, to your knowledge, did Mr. Silber ever

2   provide documentation of more than nine months or at least nine

3   months of unemployment income?

4   A.  No.

5   Q.  Okay.  When GMAC Mortgage reviewed Mr. Silber's April 2010

6   workout package, what factors were considered?

7   A.  Similar to before, it was the monthly income versus

8   expenses for the front-end debt-to-income ratio and the monthly

9   versus household expenses for the backend.

10  Q.  Okay.  And did GMAC Mortgage approve or deny the April

11  2010 workout package?

12  A.  Denied.

13  Q.  Okay.  If I could turn your attention to servicing notes

14  at page 266?  What was the reason for denying the April 2010

15  modification request?

16  A.  I'm sorry, 266 or --

17  Q.  If I have it wrong, I welcome you to correct me.  Oh, I'm

18  sorry, my apologies.  Sorry, if I could --

19  A.  On page 257 --

20  Q.  Yup.

21  A.  -- at the top.

22  Q.  Yes.

23  A.  I'll refer you to the third line down from the top.

24          MR. SILBER:  I'm sorry, what page?

25          THE WITNESS:  257 of 286.

RESIDENTIAL CAPITAL, LLC, ET AL.                    127

1          MR. SILBER:  Thank you.

2   A.   The Area ID is COL09.  It says "Failed traditional

3   decisioning.  Failed traditional options since borrower does

4   not show affordability for property."

5   Q.   Okay.

6          THE COURT:  What's required to show affordability for

7   property?

8          THE WITNESS:  Income that would allow for the borrower

9   to meet a thirty-one percent debt-to-income ratio on the front-

10  end and the fifty-five percent on the backend ratio.

11  Q.   Would rental income qualify as affordability?

12  A.   Yes, it would.

13  Q.   Okay.  And if I could turn your attention back to page

14  261/286, middle of the page.  Is there a reference to rental

15  income?

16  A.   Yes.

17  Q.   Okay.  And what specifically is described?

18  A.   In the middle of the page, on April 2nd, it refers to

19  "provided HAMP agent with 500-dollar rental income of which we

20  can only use seventy-five percent."

21  Q.   Okay.  Subsequent to the denial of this modification

22  package, did GMAC Mortgage provide Mr. Silber with an

23  opportunity to enter into a forbearance plan?

24  A.   Yes.

25  Q.   And how long was that forbearance plan?

1   A.  It was a six-month forbearance plan.

2   Q.  And do the debtors typically offer borrowers the

3   opportunity to enter into a forbearance plan even though a loan

4   modification was denied?

5   A.  Not typically.

6   Q.  So then why was Mr. Silber, in this circumstance, given

7   that opportunity?

8   A.  It was provided to Mr. Silber to allow a period of time

9   where we would accept half the regular contractual payment to

10  allow for him to improve his financial situation, and in turn,

11  at the end of the forbearance plan or during, if the financial

12  situation changed, resubmit a new modification request.

13  Q.  So this is just an example of a servicer, in this case

14  GMAC Mortgage, trying to work with a borrower, even though they

15  are unable to comply with the requisite guidelines for a loan

16  modification?

17  A.  Yes.

18  Q.  Okay.  If I could refer you to Exhibit G, as in guy, is

19  this the communication from GMAC Mortgage to Mr. Silber

20  offering him the opportunity to enter into that forbearance

21  plan?

22  A.  Yes.

23  Q.  Okay.

24       MR. WISHNEW:  Your Honor, I'd like to move Exhibit G

25  into evidence.

RESIDENTIAL CAPITAL, LLC, ET AL.                    129

1          THE COURT:  All right.  Exhibit G's in evidence.

2     (GMAC Mortgage letter offering forbearance plan was hereby

3     received into evidence as Debtors' Exhibit G, as of this date.)

4          MR. WISHNEW:  Okay.

5     Q.  And did Mr. Silber accept the forbearance plan?

6     A.  Yes, he did.

7     Q.  Okay, and what was his monthly payment during the term of

8     the forbearance plan?

9     A.  It was half his contractual payment, so it was $995.40.

10    Q.  Okay.  Did he complete the forbearance plan?

11    A.  Yes, he did.

12    Q.  Okay.  Are you familiar with Mr. Silber's allegations

13    regarding an e-mail from a representative of GMAC Mortgage to

14    the Assistant Attorney General of Connecticut dated December

15    8th, 2010?

16    A.  Yes.

17    Q.  Okay.  And after December 8th, 2010, did Mr. Silber submit

18    a workout package to GMAC Mortgage?

19    A.  Yes, he did.

20    Q.  Okay.  If I can refer you to Exhibit N, is this the

21    workout package submitted by Mr. Silber in January 2011?

22    A.  Yes, it is.

23    Q.  Okay.

24          MR. WISHNEW:  Your Honor, I'd like to move Exhibit N

25    into evidence.

RESIDENTIAL CAPITAL, LLC, ET AL.                    130

1           THE COURT:  All right, it's in evidence.

2    (Workout package submitted January 2011 was hereby received

3    into evidence as Debtors' Exhibit N, as of this date.)

4           MR. WISHNEW:  Okay.

5    Q.  When GMAC Mortgage considered this workout package, was

6    there -- what factors were considered?

7    A.  Similar to before, it would be the gross monthly income

8    and the expenses associated with the mortgage and any household

9    expenses.

10   Q.  Okay.  And was this loan modification request agreed to or

11   denied?

12   A.  It was denied.

13   Q.  Okay.  If I could refer you to pages 192 and 193 of

14   Exhibit C.

15       (Music playing)

16           THE COURT:  Do you have somebody from the Trust who's

17   on the phone?  Is that --

18           MR. WISHNEW:  I think people are listening in, yes.

19           THE COURT:  They're going to get cut off if we get

20   that again.

21           MR. WISHNEW:  Understood, Your Honor.

22           THE COURT:  Go ahead.  What pages were you referring

23   to?

24           MR. WISHNEW:  192 and 193, Your Honor.

25           THE COURT:  Okay.

1    Q.  And for this modification, was Mr. Silber considered for

2    both an FHA-HAMP modification and an FHA traditional

3    modification?

4    A.  Yes.

5    Q.  And was he denied on both counts?

6    A.  Yes.

7    Q.  And what was the reason for the denial?

8    A.  Denial for traditional mod was "insufficient income to

9    support the loan modification request", which is on page 193,

10   in the middle of the page.

11   Q.  That's at the entry --

12   A.  Dated --

13   Q.  -- dated --

14   A.  -- January 14th of 2011.

15   Q.  Right, and the Area ID is TIINC?

16   A.  Correct.

17   Q.  Okay.

18   A.  And then the denial for the FHA-HAMP modification was on

19   page 192 with an Area ID of COL09.

20   Q.  That's at the bottom quarter of the page?

21   A.  Bottom part of the page it says "cannot lower payment

22   enough to be approved for HAMP".

23          MR. SILBER:  What page is that?

24          MR. WISHNEW:  192 of 286.

25          THE WITNESS:  Page 192.

1          MR. SILBER:  Thank you.

2          THE COURT:  That's where you go through the iterative

3     steps reducing the payment, trying to get to that thirty-one

4     percent figure?

5          THE WITNESS:  It's the calculation of using the

6     verifiable income that's produced in the workout package versus

7     the expenses that are outlined in the workout package, and, you

8     know, again, that front-end that the income ratio is calculated

9     for the thirty-one percent, to get that gross income verified

10    and then compare that to the mortgage payment and see what that

11    percentage is.  And then you have to verify the backend which

12    includes their other household expenses that would typically be

13    referred to in their credit report, so auto, loans, you know,

14    utilities, et cetera, to meet that, you know, fifty-five

15    percent backend DTI ratio.

16         THE COURT:  The loan notes show the conclusion as to

17    why he's turned down.  Is there any document that's created

18    that actually shows the calculation?  In other words, earlier

19    today, Mr. Silber thought one of the letters contained a

20    misrepresentation when it calculated his DTI and it was

21    seventy-three percent.  But when I ask him, is there some

22    document, what did they use -- is there a document

23    within -- was there a document within GMAC's system that

24    actually shows the calculations, not just the conclusions as

25    to -- do you understand my question?

1          THE WITNESS:  I do and, I mean, there was a process to

2    calculate that, but not to store it for this unique situation,

3    because the verifiable income was either zero or it was only

4    375 dollars.  So if you have verifiable income, that's get you,

5    you know, closer around that thirty-one percent or fifty-five

6    percent, you would have more information, but when your

7    verifiable income is so low, it doesn't really go to that

8    second stage of going from what we refer to the front-end

9    triage group that collects all the docs and does that first

10   pass to then the underwriter who does that deeper dive and gets

11   all the supporting documentation.

12          THE COURT:  Go ahead, Mr. Wishnew.

13   BY MR. WISHNEW:

14   Q.  To follow up on the Court's question, with regards to the

15   data, the data that is used to calculate the DTI ratio is

16   simply taken from the information package, so everything

17   is -- the universe of applicable facts is drawn from the

18   modification package.  Is that correct?

19   A.  It is, which is -- yes.

20   Q.  Okay.

21          THE COURT:  Do you know what Mr. Silber's DTI would

22   have been if his unemployment payments had been included in the

23   calculation?

24          THE WITNESS:  I -- in the letter that Carmen Starr

25   provided to Mr. Silber, that letter mentioned that, you know,

RESIDENTIAL CAPITAL, LLC, ET AL.                    134

1   we didn't have verifiable income.  However, you know, we did

2   have Loss Mit do a calculation assuming we could use it.

3   Right?  And here's what the results were, and that's where I

4   think we refer to that seventy-three percent backend debt-to-

5   income ratio.  So, yes, they did -- though we didn't have

6   verifiable income -- they did make an assumption just for

7   purposes of communicating with Mr. Silber, that had we even

8   been able to use the ver -- use unemployment income, he would

9   have exceeded the allowable guidelines for FHA-HAMP.

10          THE COURT:  Thank you, go ahead.

11          MR. WISHNEW:  Thank you, Your Honor.

12  Q.  In connection with Mr. Silber's loan, are you familiar

13  with the acronym, EHLP?

14  A.  Yes.

15  Q.  And what does -- can you briefly describe what EHLP was?

16  A.  The Emergency Homeowners Loan Program was something that

17  Mr. Silber pursued, and the purpose was to provide him with a

18  loan that would, essentially, pay his arrearage, his

19  delinquency, but then assist him for a certain period of time

20  up to twenty-four months and up to 50,000 dollars for the loan

21  for a duration of up to twenty-four months after he was brought

22  current.

23  Q.  Okay.  And was GMAC -- EHLP, was that a program

24  administered by GMAC Mortgage?

25  A.  No.

RESIDENTIAL CAPITAL, LLC, ET AL.                    135

1   Q.  Do you know who it was administered by?

2   A.  I believe it was CHFA.

3   Q.  And CHFA --

4   A.  Connecticut Housing --

5   Q.  -- stands for the Connecticut Housing Finance Authority?

6   A.  Yeah.

7   Q.  Okay.  And did CHFA request information from GMAC Mortgage

8   in connection with Mr. Silber's EHLP application?

9   A.  Yes.

10  Q.  And what did they specifically request?

11  A.  A reinstatement quote.

12  Q.  Okay.  If I can turn -- refer you to page 97 of 286 at

13  Exhibit C?

14          MR. SILBER:  Page 297?

15          MR. WISHNEW:  97.

16          MR. SILBER:  97.

17  Q.  Is there a specific mention of a reinstatement request?

18  A.  Yes, on August 18th of 2011.

19  Q.  Okay.  And I think we're in the middle of the page.  If

20  you can just try and identify the line?

21  A.  Sorry, just need one second.  Actually on page 94 --

22  Q.  Okay.

23  A.  -- would have been the reinstatement quote.

24  Q.  Okay.

25  A.  At the bottom of the page, you'll first see it start at

1  the Area ID of COL26.

2  Q.  Um-hum.

3  A.  It refers to special programs, hold postpone for closure

4  for forty-five days and then the reinstatement quote good

5  through 9/23 of 2011.

6  Q.  Okay.  And if you could briefly describe the meaning of

7  each of the following lines?

8  A.  Should --

9  Q.  Sorry, look -- before I get there.  When CHFA requested a

10  reinstatement quote, did they define what elements were to be

11  included in the reinstatement quote?

12  A.  No.

13  Q.  And as a loan servicer, did GMAC Mortgage typically

14  provide reinstatement quotes to borrowers?

15  A.  Yes.

16  Q.  And what items are typically included in reinstatement

17  quotes?

18  A.  It would be payments due on the loan through the good-

19  through date of the reinstatement.  Any unapplied credits or

20  unapplied expense that would have been a credit to the loan

21  plus any delinquency related advances.

22  Q.  Okay.  So if we're looking -- the sixth line from the

23  bottom says "20PMT @ $1,990.80".  What is that line item?

24  A.  That would have been all payments due up to the point that

25  the quote was pulled together, so as of 8/25, those twenty

RESIDENTIAL CAPITAL, LLC, ET AL.                    137

1   payments were due.

2   Q.  Right.  And so that would include the September 1st

3   payment?

4   A.  The next line item would have added the payment for

5   September.

6   Q.  Understood.

7   A.  That's why it's separate.

8   Q.  Understood, thank you.  And the unapplied credit, as you

9   mentioned, and then inspections?

10  A.  Those are property inspections that were conducted on the

11  loan --

12  Q.  Okay.

13  A.  -- during delinquency.

14  Q.  And advances?

15  A.  Those were attorney fees and costs that were paid during

16  the foreclosure action, which was underway at this point.

17  Q.  Okay.  And then "outstanding FC advances"?

18  A.  Those are the foreclosure fees and costs that were quoted

19  by outside counsel that were due, but not paid by ResCap at

20  that time --

21  Q.  How did --

22  A.  -- were through the good-through date, I'm sorry.

23  Q.  And so then the total is that, am I correct, is reflected

24  on the third line of page 95 of 286?

25  A.  Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                      138

1   Q.  Okay.

2   A.  And it's under EHLP.  The total is $43,736.80.

3   Q.  Okay.  Now, Mr. Silber has made an allegation that we

4   provided him with -- GMAC Mortgage provided him with incorrect

5   information.  Is there a difference between a reinstatement

6   quote and a payoff quote?

7   A.  Yes.

8   Q.  And could you describe that?

9   A.  A reinstatement quote is intended to bring arrearage

10  current or bring delinquency current, whereas a payoff quote is

11  to either liquidate the loan or to pay off the loan in full.

12  Q.  Okay.  So -- give me one moment; I just want to pull Mr.

13  Silber's exhibits.  Do you have Mr. Silber's -- a binder of Mr.

14  Silber's exhibits?

15  A.  I don't.

16          MR. WISHNEW:  Your Honor, if I may approach?

17          THE COURT:  Go ahead.

18          MR. SILBER:  I have an extra copy.

19          THE COURT:  No, he's got it.  Just make sure that

20  Mr. -- no, go ahead.  But Mr. Silber -- tell Mr. Silber what

21  you're looking at --

22          MR. WISHNEW:  Yes, sir.

23          THE COURT:  -- so he can look at it as well.

24          MR. WISHNEW:  So Exhibit 21 in your --

25  Q.  So, Mr. Cunningham, is Exhibit 21 that I've placed before

1  you, is that a payoff statement or is that a reinstatement

2  quote?

3  A.  That's the payoff amount.

4  Q.  Okay.  And so that is different from a reinstatement

5  quote?

6  A.  Yes.

7  Q.  Okay.  And so when Mr. Silber requested a payoff quote

8  from GMAC Mortgage, this is what he got?

9  A.  No.

10 Q.  So okay.

11         THE COURT:  I don't understand that.

12         MR. WISHNEW:  Let me --

13 Q.  EHLP requested a reinstatement quote, correct?

14 A.  Correct.

15 Q.  Okay, and that was the information we just went through in

16 the servicing notes?

17 A.  Yes.

18 Q.  Okay.  And then -- but what we see before us at Exhibit 21

19 of Mr. Silber's exhibits is not a reinstatement quote; it's a

20 payoff quote?

21 A.  That's correct.

22 Q.  Okay, got it.

23         THE COURT:  Let me ask you this.  I haven't seen a

24 copy of what was submitted to Connecticut.  I asked Mr. Silber

25 about it.  I've seen the reinstatement amount, but in a

RESIDENTIAL CAPITAL, LLC, ET AL.                    140

1   declaration that's been marked -- part of a declaration marked

2   into evidence -- it breaks down the reinstatement amount into

3   twenty missed payments, the September payment.  Do you know in

4   what form the informa -- is there a copy of what actually was

5   submitted to Connecticut?

6          THE WITNESS:  I don't know.

7          THE COURT:  Do you know whether Connecticut was given

8   a breakdown or just 43,000 whatever?

9          THE WITNESS:  I -- when I looked at the exhibit Mr.

10  Silber produced that came from CHFA, it -- they appeared to

11  break it down the same way we did.

12         MR. SILBER:  What exhibit?

13         THE WITNESS:  It's Exhibit 17.

14         THE COURT:  Well, I -- I'm looking at Exhibit 17 --

15         THE WITNESS:  Oh, I'm sorry; you meant the breakdown.

16  I just meant the total.

17         THE COURT:  Yeah, it has to total.

18         THE WITNESS:  Match the amount, yes, I'm sorry.

19         THE COURT:  But -- and what I'm trying to understand

20  is whether they were given a breakdown of what went into the

21  total.  Part of the dispute is whether the figure they were

22  given was accurate, because it included the September payment,

23  okay.  And I'm trying to understand what was given to

24  Connecticut.

25         THE WITNESS:  And within my role in foreclosure, we

1    handle the reinstatement quote process.

2              THE COURT:  Um-hum.

3              THE WITNESS:  So typically what's done is it would

4    output into the servicing notes so we had a reflection of what

5    that looked like, and then it would have been either put into a

6    Word document or into an e-mail of some sort if somebody was

7    going to e-mail that to CHFA, but it would have been produced

8    in the same form that it was in the history.  That's the output

9    of the descrip --

10             THE COURT:  So I don't where that specific entry is.

11   I think I looked earlier and I saw that in the loan notes it

12   has the breakdown --

13             THE WITNESS:  It does.

14             THE COURT:  -- including the September --

15             THE WITNESS:  Yes.

16             THE COURT:  -- payment.

17             MR. WISHNEW:  Right.

18             THE WITNESS:  And it would have had a good-through

19   date on it as well.

20             THE COURT:  Yes.

21             MR. WISHNEW:  I think that's -- I forget what

22   page -- we went through that.

23             THE COURT:  Okay, go ahead, Mr. Wishnew.

24             MR. WISHNEW:  Okay.

25   BY MR. WISHNEW:

RESIDENTIAL CAPITAL, LLC, ET AL.                    142

1   Q.  Now, Mr. Silber has also suggested that GMAC Mortgage

2   should have sought a variance in connection with his loan

3   modifications.  Based on your experience, is GMAC Mortgage

4   required to submit a variance on a loan modification if the

5   loan modification is denied?

6   A.  No.

7   Q.  Okay.  Under what circumstances, to the best of your

8   knowledge, were variances sought?

9   A.  I mean, primarily if you look at the form itself, it's

10  intended for liquidation-type of strategy.  It's intended for a

11  short sale or something along those lines, because a lot of

12  what's in the variance form asks for value of the property and

13  those type of factors, right, which go into more of a

14  liquidation strategy as opposed to a retention strategy.  So if

15  a variance was to be used, you know, in a modification process,

16  it would have only been done with a very narrow margin of debt-

17  to-income ratio, or something along those lines, which didn't

18  really occur in this case.

19  Q.  And when you say a very narrow debt margin, what would you

20  characterize?

21  A.  Instead of thirty-one percent, it's at thirty-two.  You

22  know, instead of fifty-five on the backend, it's fifty-eight,

23  so --

24  Q.  Right.

25  A.  -- you know, HUD is -- you know, has their requirements

1    and you must follow them, otherwise HUD will remove their

2    insurance.  So you have to follow their guidelines strictly.

3    Q.  And if I were to refer to Mr. Silber's Exhibit 22?

4    A.  Okay.

5    Q.  It says "Pre-foreclosure sale procedure" in the top left-

6    hand corner.  Is that consistent with your statement that the

7    variances were sought in connection with liquidation

8    alternatives, as opposed to --

9    A.  Correct.  There's that commentary, plus in the middle of

10   the page you see, you know, approval from the subject

11   homeowners' participation and pre-foreclosure sale procedure,

12   you know, because of the as-is approved -- you know, as-is

13   appraised value of the property is less than the required

14   seventy percent of the outstanding principal balance.  So you

15   know, in a short sale situation, where the property is not

16   worth as much as what the delinquency is -- or I'm sorry, the

17   total debt, the payoff, you would go to them for a variance to,

18   you know, go below that seventy percent.

19   Q.  Right.  So this form doesn't contemplate a variance when

20   the borrower seeks to stay in the property?

21   A.  No.

22   Q.  Okay.

23        THE COURT:  You're almost done?

24        MR. WISHNEW:  Yes, I am, Your Honor.

25        Your Honor, just to -- I mean, if the Court wouldn't

RESIDENTIAL CAPITAL, LLC, ET AL.                    144

1   mind, I'd like to just move all exhibits that we've submitted

2   into evidence.

3           THE COURT:  I'm not going to admit everything that's

4   behind his declaration into evidence.  I just don't allow

5   people to just --

6           MR. WISHNEW:  That's fine, Your Honor.

7           THE COURT:  -- dump stuff in.

8           MR. WISHNEW:  Right.  No.  The separate binder of

9   Exhibits A through R --

10          THE COURT:  Okay.

11          MR. WISHNEW:  -- I'd want to submit into evidence,

12  Your Honor.

13          THE COURT:  All right.  Do you have any objection, Mr.

14  Silber?

15          MR. SILBER:  No, Your Honor.

16          THE COURT:  All right.

17          MR. WISHNEW:  Your Honor, I have no more questions for

18  this witness.

19          THE COURT:  All of the exhibits, A through R, many of

20  them have already been admitted -- are in evidence.

21          Okay.  Cross-examination.

22  (Various documents were hereby received into evidence as

23  Debtor's Exhibit A through R, as of this date.)

24          MR. SILBER:  Thank you.

25  CROSS-EXAMINATION

RESIDENTIAL CAPITAL, LLC, ET AL.                    145

1    BY MR. SILBER:

2    Q.  How are you doing?

3    A.  Good.  How are you?

4    Q.  Good.

5        During your time as employed by GMAC, was one of your main

6    functions to help save the company money through foreclosure

7    and loss mitigation processes?

8        I'm sorry:  Was the best interest to save the company

9    money.  So --

10   A.  No, it was to keep borrowers in their home.

11   Q.  So one of your positions there as director wasn't to save

12   money for that --

13            MR. WISHNEW:  Asked and answered, Your Honor.

14            THE WITNESS:  I'm sorry?

15            THE COURT:  Overruled.  Go ahead.  Go ahead, Mr.

16   Silber -- Mr. Cunningham.

17   A.  The goal is to keep borrowers in their home, but follow

18   investor and insurer guidelines when doing so.  And it's not in

19   the investor's best interest or the insurer's best interest to

20   have to go through a foreclosure.  So we follow their

21   guidelines to insure that we, number one, protect, you know,

22   the best interest of the borrower and the investor by following

23   their guidelines.

24   Q.  Okay.  Let's start with your declaration.  We've already

25   established your declaration and what you said.

 1   A.  Yes.

 2   Q.  Really quick.

 3          MR. SILBER:  I'm so overwhelmed; I'm sorry.  Let's

 4   start here.

 5   Q.  You spoke of a traditional modification, a FHA-HAMP

 6   modification.  There is a third modification called HAMP.

 7   Correct?

 8   A.  Yes.

 9   Q.  Okay.  HAMP is the requirement for nine months, is that

10   correct, for unemployment?

11   A.  For the non FHA-HAMP program, yes.

12   Q.  When I refer to FHA-HAMP, I'll say FHA-HAMP for

13   clearance -- so -- for clarity.

14       HAMP requires nine months of unemployment?

15   A.  Yes.

16   Q.  Okay.  At any point in time, did you tell me -- oh, I'm

17   sorry -- did GMAC tell me I needed to supply twelve months of

18   unemployment insurance?

19   A.  I don't know.

20   Q.  Your servicing records are right in front of you.  You put

21   it in as an exhibit.

22          THE COURT:  Just ask questions.

23          MR. SILBER:  I'm sorry.  Okay.

24   Q.  If we could go to your servicing notes, your Exhibit C,

25   and I'd like to start on page 267.

RESIDENTIAL CAPITAL, LLC, ET AL.                    147

1    A.  Okay.

2    Q.  And we've already touched base on this, said, failed

3    front-end debt-to-income.  In front of that, does that say

4    failed HAMP decision or failed FHA-HAMP decision?

5    A.  It says "failed HAMP decision."

6    Q.  Thank you.  Page number 261.

7    A.  Okay.

8    Q.  The same question.  Halfway down, where it says, "COL11".

9    Does it say review for HAMP or review for FHA-HAMP?

10   A.  It says, "Review for HAMP."

11   Q.  Thank you.  Page 193, please.

12   A.  Okay.

13   Q.  If you go to where we've already touched base on the

14   highlighted insufficient income to support the loan, if you go

15   about four or five up, dated 1/14/2011, it begins with "New

16   CIT, number 609, loan failed HAMP decisioning."  Does that say

17   FHA-HAMP or HAMP decisioning?

18   A.  It says, "HAMP."

19   Q.  Thank you.  And we've already clarified that I wasn't

20   eligible for HAMP because I couldn't show nine months of

21   unemployment?

22   A.  Sorry; ask that again?

23   Q.  The time that you finally got the unemployment letter, and

24   we've already established that there wasn't nine months left,

25   my question is if we already knew that I wasn't eligible for

RESIDENTIAL CAPITAL, LLC, ET AL.                    148

1    HAMP, why are all the modification applications put through

2    HAMP and not FHA-HAMP?

3    A.  You would have gone through the FHA-HAMP process --

4    Q.  You have --

5    A.  -- for approval.  You --

6    Q.  Okay.  Do you have any notes of anything, any

7    declarations, any supporting documents, any underwriting done,

8    any documentation you sent to FH -- that you sent to FHA or HUD

9    for approval, anything that shows -- anything tangible that

10   shows FHA-HAMP?

11   A.  You did not -- the loan did not have verifiable income to

12   go to the underwriter to review for the FHA-HAMP file.

13   Q.  Just yes or no, please.  Do you have anything for FHA-

14   HAMP?

15   A.  Not based on the notes that we just discussed.

16   Q.  Thank you.  You spoke of the temporary forbearance plan

17   was half the payments, you declared under oath; when did that

18   plan start?

19   A.  June 1st of 2010.

20   Q.  And if I completed six payments, as you declared, when did

21   that plan end?

22   A.  November 1st of 2010.

23   Q.  Okay.  Thank you.  If we could go to the December 2009

24   application; I believe it's Exhibit 44 in the manila envelope?

25   No, I beg your pardon; Exhibit 45.  I was close.

RESIDENTIAL CAPITAL, LLC, ET AL.                    149

1   A.   Okay.

2   Q.   When you received this documentation, you also received

3   additional documentation afterwards which was the tax returns.

4   Is that correct?  I'm sorry; let me rephrase that.

5        Two weeks after you rec -- approximately, two weeks after

6   you received the fax for the loan modification, you then

7   received the fax because you had requested the tax returns.

8   You said it was missing.  Is that correct?

9   A.   If you refer to -- I'm sorry to bounce around -- but

10  Exhibit C from our materials --

11            THE COURT:  Yes, go ahead.

12  A.   -- for the servicing notes, page 279 of the history --

13  Q.   Right.

14  A.   -- in the middle of the page it says, "Fax received;

15  hardship affidavit, hardship letter, financial statement Form

16  4506-T, bank statement, unemployment benefit.  Missing:  signed

17  income tax return, images workout."

18  Q.   Correct.  So do you dis -- is it yes or no that you

19  received those tax returns about two weeks later when I faxed

20  them over to you?

21  A.   Two weeks later, "Fax received; signed tax returns.

22  Missing unemployment award letter" --

23  Q.   I'm not asking that question, sir.  I'm just asking if you

24  received the tax returns two weeks later -- approximately two

25  weeks later?

1    A.   Yes.  We received them.

2    Q.   Okay.  In between 12/18 of 2008 in your servicing notes,

3    and the time when you received the tax returns, can you please

4    point out where you notified me that you required additional

5    unemployment information?  Your servicing records shows that

6    you're aware it was missing; but could you please point out

7    where you told me -- you informed me that it was missing?

8        I guess I could just ask the question:  Did they inform me

9    between those two dates that I was missing unemployment

10   information and specifically tell me what was required?

11   A.   On January 11th -- I'm sorry; bear with me.

12       (Pause)

13   A.   No, I don't see anything.

14   Q.   Okay.  So we could say that it was never informed to me

15   these time-sensitive documents were required at that time?

16            THE COURT:  Well, that's -- no, you can't --

17            MR. SILBER:  Oh, I'm sorry; is that --

18            THE COURT:  He can only tell you what he said.

19            MR. SILBER:  Okay.

20   Q.   Mr. Cunningham, I'd like to read number 21 of your

21   declaration to you, then, if I could.  "According to the books

22   and records, the debtors informed the claimant over the phone

23   that he would need to submit an award letter demonstrating his

24   unemployment income with last, at least, nine months.

25   Specifically, the debtor's informed the claimant of this

RESIDENTIAL CAPITAL, LLC, ET AL.                    151

1  requirement February 9th, March 1st, April 2nd, April 5th, and

2  April 7th."

3      Therefore, by your declaration, it was never said to me in

4  December or January.

5  A.  But my declaration is referring to February 9th, March

6  1st, April 2nd, April 5th, April 7th.

7  Q.  Sir, it says you told me specifically on these days.  The

8  servicing records shows that I was never informed.  Do you wish

9  to say that I was informed that I required the unemployment

10  letter --

11  A.  Can you re-ask the question?

12  Q.  -- that I was notified?

13        MR. SILBER:  Your Honor, can I just make a declaration

14  out of you, Your Honor?

15        THE COURT:  No, but I know what you're getting at.

16        MR. SILBER:  Okay.

17        THE COURT:  Let me ask the question.

18        So what Mr. Silber is pointing to in paragraph 21 of

19  your declaration, you indicate the dates in which Mr. Silber

20  was informed that he needed an award letter, and he went

21  through the servicing notes to show there's no entry showing

22  that he was told that he needed an award letter.  He wasn't

23  told that in December or January.  The first date you picked up

24  was the February 9th date.  Is that correct?

25        THE WITNESS:  Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    152

1          THE COURT:  Okay.  That's your point, isn't it, Mr.

2    Silber?

3          MR. SILBER:  Yes, Your Honor.  Thank you.

4    Q.  Also, I'd like to go to my Exhibit number 5, please.  Do

5    you have that in front of you?

6    A.  No.

7    Q.  I can get you one.

8    A.  Okay.  I have it.

9    Q.  You have it?

10   A.  Yes.

11   Q.  You see that top date there, "2/11/2010"?

12   A.  Yes.

13   Q.  And do you see where it says it's requiring a copy of

14   unemployment award letter providing original award beginning

15   and end date?

16   A.  Yes.

17   Q.  This is something you're requiring in February.  Do you

18   know of any time that you sent this letter to me prior?  Are

19   there any records of this being sent to me prior, that I was

20   notified?

21        (Pause)

22   A.  No, I don't.

23   Q.  Thank you.

24          MR. SILBER:  Can I only ask yes or no questions or can

25   I ask for clarification?

1           THE COURT:  No, you can ask questions.

2           MR. SILBER:  Okay.

3           THE COURT:  Just have to be questions.

4  Q.  So if I sent my -- if I gave you what was required, even

5  if it was the wrong information, and the wrong information that

6  I provided or information that was not significant enough, if

7  I'm not notified it's not significant enough, how can I

8  possibly correct it when we're talking about time-sensitive

9  documents?

10          THE COURT:  Let me ask -- ask --

11          MR. SILBER:  I'm sorry.

12          THE COURT:  -- I think, this point, in a slightly

13  different way.  Okay.

14          You received a modification application in, what,

15  December of 2010?

16          THE WITNESS:  December --

17          MR. SILBER:  2009, Your Honor.

18          THE COURT:  2009.

19          MR. SILBER:  This is 2009, the first one.

20          THE COURT:  And what's the process for reviewing an

21  application to see whether all of the required documentation is

22  provided?

23          THE WITNESS:  You first have to gather all the

24  documents that are required for the review.

25          THE COURT:  Hang on just a second.  Okay.

1          Mr. Wishnew, CourtCall was disconnected.  Do you need

2    your person back on the phone?

3          MR. WISHNEW:  I don't believe so, Your Honor.

4          THE COURT:  Okay.  I'm sorry.  Go ahead.

5          THE WITNESS:  So the first step in the process is to

6    obtain all the documentation that's required for the review.

7    So --

8          THE COURT:  So I regrettably know from a lot of prior

9    experience that the modifica -- this is not referring to the

10   Silber -- modification packages frequently don't have

11   everything that's required.  The loan servicer advises the

12   borrower of what's needed.

13         THE WITNESS:  Correct.

14         THE COURT:  Okay.  So when did GMAC first advise Mr.

15   Silber that he had not provided all of the information required

16   for consideration of a modification?

17         THE WITNESS:  It would have been after we had a

18   complete package to review.

19         THE COURT:  Well, you don't have the complete package,

20   right.  So, for example, if the tax returns aren't there, you

21   advised him that he needed to provide tax returns.

22         THE WITNESS:  Correct.

23         THE COURT:  Is that correct?  And if you're

24   requirement which is set in this Exhibit 5 that the following

25   information and/or documents are required:  copy of

1  unemployment award letter providing the original award

2  beginning and end date, somebody reviewed an application and

3  found that that wasn't there, I take it.  Right?

4          THE WITNESS:  Correct.  But in order to review all the

5  documents that are available for the package, you need a

6  complete package to do the review to determine if the document

7  provided meets the guidelines set by the investor -- insurer.

8          THE COURT:  So if Mr. Silber sends you a package that

9  doesn't have everything that's required, do you notify him of

10 what's missing?

11         THE WITNESS:  We -- yes, we do.

12         THE COURT:  Okay.  I think what he was trying to ask

13 about this, when did you first tell him that he needed to have

14 a copy of the unemployment award letter?

15         THE WITNESS:  It would have been February of 2010.

16         THE COURT:  Okay.  And when his package that was being

17 reviewed had been submitted when?

18         THE WITNESS:  Originally, it was December but it was

19 missing documents which -- I'm sorry.

20         THE COURT:  And before February had you not told him

21 about any other documents that were missing?

22         THE WITNESS:  Not -- no.

23         MR. SILBER:  Your Honor, they were aware that the

24 unemployment award letter was missing on 1/11 of 2010 according

25 to their service records, after the first document's received,

RESIDENTIAL CAPITAL, LLC, ET AL.                    156

1  prior to them telling me that they were missing the tax

2  returns.

3          THE COURT:  You agree with that?

4          THE WITNESS:  I have to look.

5          THE COURT:  Let him look.

6          MR. SILBER:  Page 277, right at the top, COL11, starts

7  on line 3.

8          THE COURT:  I see the fourth line in the entry, "Still

9  need copy of unemployment award."

10         MR. SILBER:  In the line above that, Your Honor, go to

11 "Express DTI."

12     (Pause)

13         THE COURT:  Mr. Silber, I have your point.

14 You're -- I ordinarily don't do this, but you're trying to make

15 the point that as of no later than January 11th, they knew you

16 were missing the award, and they didn't send you a letter

17 telling you that till February 10th?

18         MR. SILBER:  And prior to that, they were aware of it

19 also.

20         THE COURT:  Well, is there something in the notes to

21 show that they were aware of it?

22         MR. SILBER:  January of 2010, Your Honor.  Not,

23 January of 2011.

24         THE COURT:  Okay.

25         MR. SILBER:  Did I misunderstand what you said?

RESIDENTIAL CAPITAL, LLC, ET AL.                    157

1           THE COURT:  All right.  No, I understand it.

2           MR. SILBER:  All right.  It shows the records of

3    12/18, they received everything, and then the first mention of

4    them missing information --

5           THE COURT:  Okay.

6           MR. SILBER:  -- it --

7           THE COURT:  I follow you.

8           MR. SILBER:  All right.  Okay.  All right.  So you --

9    okay.

10           THE COURT:  Um-hum.

11           MR. SILBER:  All right.  So I guess --

12           THE COURT:  The witness has not pointed to any other

13    entries in the servicing notes to show that GMAC advised you

14    that you needed the award statement.  That's your point.

15    Right?

16           MR. SILBER:  Correct.

17           THE COURT:  Okay.  Go ahead.  You can continue.

18    BY MR. SILBER:

19    Q.  So if my unemployment was determined that it lasts until

20    October of 2010 prior to any extensions that were available,

21    and you asked me for those documents in December of 2009 when

22    you were first aware they were missing, would I have had nine

23    months left of unemployment?

24           THE COURT:  This is not the time for argument.  I

25    understand your question.

1          MR. SILBER:  I'm sorry; okay.  If you understand the

2     point.

3          THE COURT:  I understand.

4          MR. SILBER:  So just move off to the next section

5     here.

6          THE COURT:  Go onto the next.

7          MR. SILBER:  Okay.  I'm --

8          THE COURT:  It's okay.

9          MR. SILBER:  This is six years for me, Your Honor.

10          THE COURT:  I understand the point you're making.

11          MR. SILBER:  Okay.

12          THE COURT:  The witness has addressed the

13     issues -- the questions that you asked.

14          MR. SILBER:  Okay.  Okay.

15     BY MR. SILBER:

16     Q.  Now, the denial letter for that says that I failed debt-

17     to-income.  Is that correct?

18     A.  In January?

19     Q.  For the first modification.  Yes, sir.

20     A.  It says it was denied because "borrower cannot afford the

21     property."

22     Q.  If we go to Exhibit number 27, my exhibit, page 2.

23     A.  Okay.

24     Q.  It says, "Failed front-end debt-to-income."  Is that

25     correct?

RESIDENTIAL CAPITAL, LLC, ET AL.                          159

1    A.   Yes.

2    Q.   Because you weren't using my unemployment.  Is that

3    correct?

4    A.   Which of your exhibit was your first package that you

5    submitted?  I'm sorry.  I'm just trying to move things along a

6    little faster; if you have the exhibit number?

7    Q.   45.  45.

8    A.   I believe the document that was produced for the twenty

9    weeks would have been used for the front-end calculation, but

10   it was only twenty weeks.

11   Q.   So I was not eligible then?  You just said earlier, sir,

12   that you would not --

13   A.   For front-end DTI.

14   Q.   You just said earlier that you couldn't calculate the

15   payments, and I wasn't eligible for review if I didn't show the

16   nine months.

17   A.   But they did a calculation, I believe, on this one using

18   this --

19   Q.   Okay.

20   A.   -- for that first one.

21   Q.   What was the front-end debt-to-income?

22         THE COURT:  All right.  Do you understand that whether

23   he was eligible to use unemployment or not, they made the

24   calculation with it?

25         THE WITNESS:  And I think you'll see in the history

RESIDENTIAL CAPITAL, LLC, ET AL.                    160

1  that that was done because they would do a mock escrow analysis

2  each time.  But whether they put a zero, 375 dollars because it

3  was, you know, the rental income, or they would put in this,

4  you know, unemployment amount, it would have failed.

5          THE COURT:  It would have failed with all of that in?

6          THE WITNESS:  Correct.  Correct.

7  Q.  Do you have any evidence that shows what income you used

8  at the time of the failure of the front-end debt-to-income?

9  A.  No, I don't.

10  Q.  Okay.  If the front-end income fails, you've declared that

11  the requirement was thirty-one percent.  Is that correct?

12  A.  Correct.

13  Q.  Okay.  I'd like to go to the mortgage letter now.  Exhibit

14  44, please, page number 23, "Underwriting".

15  A.  Okay.

16  Q.  Does the target thirty-one percent debt-to-income pertain

17  to the payment calculation at the time the qualification for a

18  trial plan or the final calculation of the HAMP plan following

19  the accrued of additional past amounts?  But it says "The

20  lender should try to get as close to thirty-one percent debt-

21  to-income as possible"; as close to.

22  A.  Thirty-one percent, yes.

23  Q.  As close to thirty-one percent.  Would you say that

24  there's leeway there?

25  A.  Not much.  No.

1  Q.  Not much based on what evidence, sir?

2  A.  It's thirty-one percent.  I mean, that's the process of

3  what they require.

4        MR. SILBER:  Your Honor, the mortgage letter refers to

5  as close to thirty-one percent as possible.

6        THE COURT:  I read it.  Go ahead, Mr. Silber.  Ask

7  your --

8        MR. SILBER:  Okay.  That there is indeed some leeway.

9        THE COURT:  Mr. Silber -- Mr. Silber, ask your next

10  question.  Okay.

11        MR. SILBER:  Yes, sir.  Yes, sir.  Okay.

12  Q.  The forbearance plan, you said that it was for half the

13  payments of 995 dollars.  Is that correct?

14  A.  No.  I believe it was $995.40.

15  Q.  Okay.  $995.40; it was paid from June of 2010 till

16  November of 2010.  Is that correct?

17  A.  Correct.

18  Q.  So this was a temporary forbearance plan?

19  A.  Yes.

20  Q.  Was there any other additional plan included in that plan?

21  A.  I don't understand the question.

22  Q.  Was there an additional plan included:  a repayment plan,

23  a trial modification plan, any additional plan?

24  A.  You mean the forbearance was essentially offering you an

25  opportunity --

1   Q.  I understand, sir.

2   A.  -- to change your financial situation.

3          THE COURT:  Don't interrupt him --

4          MR. SILBER:  Sorry.

5          THE COURT:  -- while he's answering the question.

6          MR. SILBER:  Your Honor, the forbearance plan that was

7   offered was also a temporary --

8          THE COURT:  This is not the time to argue.  This is

9   the time that you question.

10          MR. SILBER:  Oh.

11          THE COURT:  So when you say Your Honor and you start

12   to give me an explanation --

13          MR. SILBER:  I'm sorry.  I'm sorry.

14          THE COURT:  -- this is the time for you to ask your

15   questions.

16   Q.  So there was not an additional plan.  It was just a

17   forbearance plan and that's it?

18   A.  It was -- yes, it was a forbearance plan.

19   Q.  Okay.

20          MR. SILBER:  I've just got to find my notes where it

21   is now.

22   A.  And I think, if you look at the letter just to refer you

23   to our Exhibit G on page 3, it says, in the last sentence,

24   "This plan will allow you time to increase your income or

25   decrease your expenses or to transition to another home if the

RESIDENTIAL CAPITAL, LLC, ET AL.                    163

1   need arises."

2   Q.  Correct.

3   A.  "It will" --

4   Q.  Well, there was an additional plan in it and I'm going to

5   point that out.  So just give me a second, please.

6        (Pause)

7          MR. SILBER:  You know, let's just move onto the next

8   question.

9   Q.  Was the forbearance plan reported to HUD or FHA for

10  monetary?

11  A.  I don't know.

12  Q.  Is there any record in that book of it being reported to

13  HUD or FHA for monetary?

14  A.  I don't know.

15  Q.  Is it required to be reported to HUD or FHA for monetary?

16  A.  I don't know.

17  Q.  If we could go back to Exhibit 44, the mortgage letter, my

18  exhibit?

19       (Pause)

20  A.  Okay.

21  Q.  Page 17, number 1.

22  A.  Okay.

23  Q.  "Will HUD have special coding for month-end delinquency

24  reporting for FHA-HAMP?  If not, should we use existing codes

25  for partial payments, modifications, and partial claims?"

1  A.  Okay.

2  Q.  It says, "Additional codes were announced."  I'm just

3  asking if you reported this repayment plan to HUD for monetary?

4  A.  I don't know.

5  Q.  Okay.

6      Sorry.

7          MR. SILBER:  I'm sorry for the delay.  I just -- I

8  have to look for it, Your Honor.  I'm sorry.

9          THE COURT:  I'm going to alert you all that we're

10 going to have to recess in about another five minutes.  We

11 will -- can you resume tomorrow, Mr. Silber at 11 o'clock?  I

12 have ResCap at 10 and I'm prepared to resume this at 11

13 o'clock.

14         You're entitled to your cross-examination.  I'm not

15 trying to cut you off.  I just have to go to the swearing in

16 and have to be in another courtroom, first, at 3:30.  So I'm

17 prepared to resume this evidentiary hearing tomorrow to

18 complete your examination and any redirect.  He's the only

19 witness.

20         MR. SILBER:  I'll be here at 11 tomorrow.  That's

21 fine --

22         THE COURT:  Okay.

23         MR. SILBER:  -- because I feel like I'm rushing right

24 now and I'm sorry.  I can't find anything and --

25         THE COURT:  Okay.  All right.  Let's break now.  Can

1   you be here tomorrow, Mr. Cunningham?

2           THE WITNESS:  I --

3           THE COURT:  I thought we would have been done; we're

4   not.

5           MR. SILBER:  Okay.  Can I -- I can make my last point

6   which I think I need Mr. Cunningham for, if you'd like.

7           THE COURT:  Go ahead.  I want to make clear, Mr.

8   Silber, I'm not trying to cut you off.

9           MR. SILBER:  Okay.  Could you -- can you be here

10  tomorrow or no?  I guess that's your question.

11          THE WITNESS:  I don't know if I can.

12          THE COURT:  Well, you can.

13          MR. SILBER:  I'm sorry?

14          THE COURT:  He will be here if I direct him to be

15  here.

16          What's your last point?  I don't want -- Mr. Silber,

17  I'm not trying to cut you off.

18          MR. SILBER:  Okay.

19          THE COURT:  Okay.  I think you're wandering a little

20  bit with some of your questions, statements.

21          MR. SILBER:  I think the point that I'm trying to get

22  to that the only way for me to expect HUD or FHA intervention

23  is if they file variances or there's reporting to HUD or FHA.

24  However, there are things that will auto-disqualify me that

25  will cease any investigation from HUD or FHA to help, really,

RESIDENTIAL CAPITAL, LLC, ET AL.                    166

1    try to push for a modification:  if I were to have failed at a

2    trial part repayment plan, if I am more than twelve months past

3    due.  So there's a few things that I'd like to point out and

4    there's some things said in Mr. Cunningham's declaration.

5            THE COURT:  It's up to you.  We can end in a few

6    minutes; if you want to resume tomorrow, we'll resume tomorrow

7    at 11 o'clock.  I'm not cutting you off.

8            MR. SILBER:  You have to leave in five minutes; I

9    don't think -- you know what, the way I'm rushing.  You know,

10   in five minutes, I don't think I can touch base --

11           THE COURT:  All right.  We'll resume tomorrow at 11

12   o'clock.

13           MR. SILBER:  Okay.  Sorry, Mr. Cunningham, if you're

14   stuck here another day.  So am I, for what it's worth.

15           THE COURT:  Well, if you're in Connecticut, you can't

16   take a train in in the morning?

17           MR. SILBER:  Your Honor, I'm not -- every time I take

18   the train -- oh, wait; tomorrow 11 o'clock?

19           THE COURT:  Yes.

20           MR. SILBER:  Oh, so I can.  Actually, yes.  So I don't

21   have to worry about being here by 10.

22           THE COURT:  Okay.  Fair enough.  Just think through

23   what you want to cover.

24           MR. SILBER:  Your Honor, I will, Your Honor.

25           THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                                167

1        MR. SILBER:  I will.  And I just want to thank

2    everybody for their patience.  I -- you know, this is

3    important.  I know it's important to everybody else.

4        THE COURT:  This is important to you; it's important

5    to me.  Okay.

6        MR. SILBER:  Thank you.  Thank you very much for

7    saying that.

8        THE COURT:  I don't want to cut you off but I

9    also -- this is the time you get to ask questions and -- okay.

10   See you all at 11 o'clock.

11       MR. SILBER:  Thank you.

12      (Whereupon these proceedings were concluded at 3:25 PM)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                  **I N D E X**

3

4  **WITNESS**              **EXAMINATION BY**      **PAGE**

5  Todd Silber            by Proffer            11

6  Todd Silber            Mr. Wishnew           82

7  Todd Silber            Mr. Silber            91

8  Todd Silber            Mr. Wishnew           97

9  Todd Silber            Mr. Silber            97

10  David Cunningham       Mr. Wishnew           100

11  David Cunningham       Mr. Silber            145

12

13                                  **EXHIBITS**

14  **SILBER'S**             **DESCRIPTION**            **PAGE**

15  43                     HUD handbook                14

16  44                     FHA mortgage                19

17                         letter

18  1                      Bank note                   20

19  2                      Mortgage                    22

20  3                      Federal loss                24

21                         mitigation

22                         affidavit

23                         filed 4/30/2012

24  5                      Letter from GMAC            28

25                         to Todd Silber

| | | | |
|---|---|---|---|
| 1 | 6 | E-mail from Carmen | 29 |
| 2 | | Starr to Mr. | |
| 3 | | Chambers | |
| 4 | 7 | Document | 29 |
| 5 | | indicating | |
| 6 | | acquisition of | |
| 7 | | Joseph Chambers, | |
| 8 | | AUSA, to act on | |
| 9 | | Todd Silber's | |
| 10 | | behalf | |
| 11 | 8 | Document with | 30 |
| 12 | | public inquiry | |
| 13 | | number re: | |
| 14 | | | |
| 15 | | Office | |
| 16 | 9 | Original claims | 30 |
| 17 | | form filed with | |
| 18 | | trust | |
| 19 | 10 | Letter sent to | 30 |
| 20 | | Todd Silber | |
| 21 | 11 | Document indicating | 31 |
| 22 | | damages Todd Silber | |
| 23 | | requested in his | |
| 24 | | original lawsuit | |
| 25 | | against GMAC | |

| 1 | 12 | Mortgage | 32 |
| 2 | | Foreclosure | |
| 3 | | Standing Order | |
| 4 | | Federal Loss | |
| 5 | | Mitigation | |
| 6 | | Programs | |
| 7 | 13 | FHA Web site | 33 |
| 8 | | printout | |
| 9 | 14 | Message from Mr. | 34 |
| 10 | | Knickerbocker | |
| 11 | 15 | 5/31/11 e-mail | 35 |
| 12 | | from Mr. | |
| 13 | | Knickerbocker | |
| 14 | 17 | 9/1/11 figures | 37 |
| 15 | | provided to CHFA | |
| 16 | | re negligence and | |
| 17 | | misrepresentation | |
| 18 | 18 | EHLP denial from | 40 |
| 19 | | CHFA | |
| 20 | 19 | Federal Emergency | 41 |
| 21 | | Homeowners Program | |
| 22 | | EHLP outline | |
| 23 | 20 | Document | 41 |
| 24 | 21 | August 2011 payoff | 44 |
| 25 | | information from | |

| | | | |
|---|---|---|---|
| 1 | | GMAC | |
| 2 | 22 | Form HUD 90041 | 45 |
| 3 | 23 | Letter from Carmen | 45 |
| 4 | | Starr of GMAC | |
| 5 | 46 | 1/2010 loss | 55 |
| 6 | | mitigation | |
| 7 | | application plus | |
| 8 | | supporting | |
| 9 | | documents | |
| 10 | 24 | Document from GMAC | 55 |
| 11 | 25 | Document from GMAC | 56 |
| 12 | 26 | 5/5/10 letter re | 56 |
| 13 | | forbearance plan | |
| 14 | 27 | Denial letter | 56 |
| 15 | 28 | 2/25/10 denial | 57 |
| 16 | | letter | |
| 17 | 29 | 3/15/10 denial | 57 |
| 18 | | letter | |
| 19 | 30 | Denial letter | 57 |
| 20 | 31 | 1/19/11 denial | 58 |
| 21 | | letter | |
| 22 | 32 | Claimant's letter | 58 |
| 23 | | to Carmen Starr | |
| 24 | 33 | FAQs from FHA Web | 59 |
| 25 | | site | |

| | | | |
|---|---|---|---|
| 1 | 34 | Page 9 of 13 of | 60 |
| 2 | | docket number | |
| 3 | | 7979-3 | |
| 4 | 35 | Part of Exhibit C | 64 |
| 5 | | of the Trust's | |
| 6 | | document 8160 | |
| 7 | 36 | Connecticut | 64 |
| 8 | | Families First | |
| 9 | | Program | |
| 10 | 37 | Connecticut | 65 |
| 11 | | Families First | |
| 12 | | Program | |
| 13 | 38 | Page from docket | 66 |
| 14 | | 7979 | |
| 15 | 39 | 2/20/15 | 66 |
| 16 | | declaration of | |
| 17 | | Kathy Priore | |
| 18 | 40 | Judgment of | 67 |
| 19 | | dismissal | |
| 20 | 41 | Page 6 of ResCap's | 68 |
| 21 | | reply to claim | |
| 22 | 42 | Excerpts of | 69 |
| 23 | | servicing notes | |
| 24 | | | |
| 25 | | | |

| | | |
|---|---|---|
| 1 | 45 | 12/2009 loss | 69 |
| 2 | | mitigation | |
| 3 | | application plus | |
| 4 | | supporting | |
| 5 | | document | |
| 6 | 47 | Loss mitigation | 71 |
| 7 | | application update | |
| 8 | 48 | 12/2010 loss | 71 |
| 9 | | mitigation | |
| 10 | | application plus | |
| 11 | | supporting | |
| 12 | | documents | |
| 13 | | | |
| 14 | DEBTORS' | DESCRIPTION | PAGE |
| 15 | part of S | Declaration of | 106 |
| 16 | | David Cunningham | |
| 17 | A | Note for Mr. | 107, 144 |
| 18 | | Silber's loan | |
| 19 | B | No description | 144 |
| 20 | C | LoanServ loan | 108, 144 |
| 21 | | Servicing notes | |
| 22 | D | FHA-HAMP loan | 110, 144 |
| 23 | | modification | |
| 24 | | guidelines | |
| 25 | E | Mr. Silber's workout | 144 |

| 1 |   | Package |   |
|---|---|---------|---|
| 2 | F | Mr. Silber's | 114 |
| 3 |   | workout package |   |
| 4 | F | Additional information | 114, 144 |
| 5 |   | for 12/2009 loan |   |
| 6 |   | modification request |   |
| 7 | G | GMAC letter offering | 128, 144 |
| 8 |   | Forbearance plan |   |
| 9 | H | No description |   |
| 10 | I | No description | 118, 144 |
| 11 | J | Additional | 119, 144 |
| 12 |   | information Mr. |   |
| 13 |   | Silber provided in |   |
| 14 |   | connection with |   |
| 15 |   | his January 2010 loan |   |
| 16 |   | modification request |   |
| 17 | K | No description | 144 |
| 18 | L | No description | 144 |
| 19 | M | No description | 144 |
| 20 | N | Workout package 1/2011 | 130, 144 |
| 21 | O | No description | 144 |
| 22 | P | No description | 144 |
| 23 | Q | No description | 144 |
| 24 | R | HUD loss | 111, 144 |
| 25 |   | mitigation information |   |

C E R T I F I C A T I O N

I, Sharona Shapiro, certify that the foregoing transcript is a
true and accurate record of the proceedings.


_____

SHARONA SHAPIRO

AAERT Certified Electronic Transcriber CET**D 492


eScribers

700 West 192nd Street, Suite #607

New York, NY 10040


Date:  July 16, 2015