1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


            Debtors.


- - - - - - - - - - - - - - - - - - - -x

            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            July 16, 2015

            10:03 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

1

2    (CC: Doc# 8676) Hearing RE: Objection of the ResCap Borrower

3    Claims Trust to Claim Number 452 Filed By Julio Pichardo

4

5    Status Conference RE: Objection of the ResCap Borrower Claims

6    Trust to Proofs of Claim Filed by Pamela D. Longoni and Jean

7    Gagnon (Claim Nos. 2291, 2294, 2295 and 2357). [Docket No.

8    8530]

9

10   Status Conference RE: ResCap Liquidating Trust and the ResCap

11   Borrower Claims Trust's Objection to Claim Nos. 112, 114, 416,

12   and 417 Filed by Erlinda Abibas Aniel, Fermin Solis Aniel, and

13   Marc Jason Aniel [Docket No. 8237]

14

15

16

17

18

19

20   Transcribed by:  Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4        Attorneys for ResCap Borrowers Claim Trust

5        250 West 55th Street

6        New York, NY 10019

7

8  BY:   JORDAN A. WISHNEW, ESQ.

9        ERICA J. RICHARDS, ESQ.

10        JESSICA J. ARETT, ESQ.

11

12

13  ERICKSON, THORPE & SWAINSTON, LTD.

14        Attorneys for Claimant Gagnon, et al.

15        99 West Arroyo Street

16        Reno, NV 89509

17

18  BY:   THOMAS P. BEKO, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25

1

2  SEVERSON & WERSON, APC

3          Attorneys for Residential Capital, LLC

4          19100 Von Karman Avenue

5          Suite 700

6          Irvine, CA 92612

7

8  BY:   YARON SHAHAM, ESQ. (TELEPHONICALLY)

9

10

11  BRADLEY ARANT BOULT CUMMINGS LLP

12          Attorneys for ResCap Borrower Claims Trust

13          100 North Tryon Street

14          Suite 2690

15          Charlotte, NC 28202

16

17  BY:   AVERY SIMMONS, ESQ. (TELEPHONICALLY)

18

19

20  ERLINDA ARIEL

21          Pro Se (TELEPHONICALLY)

22

23

24  JULIO PICHARDO

25          Pro Se (TELEPHONICALLY)

1

2  ALSO PRESENT:  (TELEPHONICALLY)

3        KATHY PRIORE, ESQ., ResCap Liquidating Trust

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.  All right, we're here

3    on Residential Capital, number 12-12020.  Good morning.

4            MS. RICHARDS:  Good morning, Your Honor.  Erica

5    Richards, Morrison & Foerster, appearing today on behalf of the

6    ResCap Borrower Claims Trust.  Your Honor, the first matter

7    going forward today is found on page 8 of the agenda, and that

8    is the objection of the Borrower Claims Trust to claim number

9    452 filed by Julio Pichardo, which is filed at docket number

10   8676.

11           THE COURT:  Okay.  Before we do that, is anyone

12   appearing with respect to the case management conference in

13   Longoni?

14           MR. WISHNEW:  Your Honor, there are two individuals on

15   the phone, Ms. Simmons from the Bradley Arant firm on behalf of

16   the Borrower Claims Trust, and Mr. Beko on behalf of the

17   claimants.

18           THE COURT:  All right, Mr. Wishnew.  I reviewed the

19   proposed case management and scheduling order, and it's in a

20   form and content satisfactory to me.  So does anybody else want

21   to be heard with respect to that?

22           MR. WISHNEW:  I'll defer to --

23           THE COURT:  We'll go ahead and enter that order.

24           MR. WISHNEW:  Okay.  I'll defer to counsel on the

25   phone.

1          THE COURT:  Anybody want to be heard on the phone

2     about it?

3          MR. BEKO:  Your Honor, this is Tom Beko.  I do not

4     need to be heard.

5          THE COURT:  Okay, thank you.

6          MS. SIMMONS:  No, Your Honor.

7          THE COURT:  All right.  So that's all we had to deal

8     with today on Longoni, right?

9          MR. WISHNEW:  Correct, Your Honor.

10         THE COURT:  Okay.  So that order will get entered

11    today, and certainly anybody on the phone for that conference

12    certainly can disconnect.

13         MR. WISHNEW:  Okay.

14         THE COURT:  Okay?  All right.  I'm sorry, go ahead,

15    Ms. Richards.

16         MR. BEKO:  Thank you, Your Honor.  And thank you again

17    for allowing me to appear by phone.

18         THE COURT:  Absolutely.  Sure.

19         Okay, go ahead.

20         MS. RICHARDS:  Sure, Your Honor.  So taking up, again,

21    the objection to Mr. Pichardo's claim.

22         THE COURT:  Okay.  Mr. Pichardo, you're on the phone.

23    Is that correct?

24         MR. PICHARDO:  I'm on the phone, Your Honor.  Good

25    morning.  And let me know when I should proceed, Your Honor,

1   presenting my claim.

2            THE COURT:  Okay.  I'll do that.

3            Go ahead, Ms. Richards.

4            MS. RICHARDS:  Your Honor, in support of the

5   objection, the Borrower Trust submitted declarations.  One was

6   by Kathy Priore, who's the in-house associate counsel for the

7   ResCap Liquidating Trust.  We also submitted a declaration by

8   Yaron Shaham, of Severson & Werson, who represents Ocwen in Mr.

9   Pichardo's state court litigation.  Both of those individuals

10  are also appearing telephonically today.

11           THE COURT:  Okay, go ahead.

12           MS. RICHARDS:  Mr. Pichardo filed a timely response to

13  the objection which was docketed at 8745.  He also filed a

14  supplemental response after the objection deadline which was

15  docketed at 8878, and a proof of service that included a

16  request for relief from the stay which was docketed at 8798.

17  The Borrower Trust filed a reply addressing all three of those

18  submissions, which was filed at docket number 8876.

19           The objection concerns proof of claim number 452,

20  which was filed by Mr. Pichardo against GMAC Mortgage in the

21  amount of 650,000 dollars.  The Borrower Trust has objected to

22  the claim on the basis that it fails to state any cognizable

23  claims against GMAC Mortgage.

24           Before I turn to the merits of those claims, I'll

25  first briefly summarize the relevant factual background.

1          THE COURT:  I've read everything.  So you don't need

2     to summarize the factual background.

3          MS. RICHARDS:  Okay.  Would Your Honor like me to just

4     proceed to our position on the merits of the claims?

5          THE COURT:  Yes, please.

6          MS. RICHARDS:  All right.  So the first point that I

7     would make is that Mr. Pichardo never amended his initial proof

8     of claim and he never submitted the first amended complaint in

9     support of his proof of claim.  So it's our position that that

10    first amended complaint is not actually part of his proof of

11    claim.

12         Out of an abundance of caution we addressed all of the

13    causes of action set forth in both his initial complaint and

14    the first amended complaint in the objection.

15         THE COURT:  When did Mr. Pichardo file his action in

16    the Orange County Superior Court?

17         MS. RICHARDS:  In July 2012, a month-and-a-half after

18    ResCap Filed for bankruptcy.

19         THE COURT:  Okay, go ahead.

20         MS. RICHARDS:  So the first cause of action raised in

21    Mr. Pichardo's initial complaint is a claim for violation of

22    the Fair Debt Collection Practices Act.  As set forth in the

23    objection, GMAC Mortgage began servicing Mr. Pichardo's loan

24    shortly after its inception.  Mr. Pichardo was current on the

25    loan at that time.  And as a result, under the FDCPA, GMAC

1    Mortgage is not the debt collector as defined under the

2    statute, and it's inapplicable here.

3              Mr. Pichardo's second cause of action raised in his

4    initial complaint is one for negligent misrepresentation.  That

5    claim is based on his allegation that statements were made by

6    agents and employees of GMAC Mortgage that his loan was in

7    default.  As Your Honor knows, the elements of a claim for

8    negligent misrepresentation require that a defendant made a

9    misrepresentation of a past or existing fact -- material fact

10   without reasonable grounds for believing it to be true, and

11   among other elements, damages.

12             Mr. Pichardo has not credibly alleged with any

13   specificity that GMAC Mortgage advised Mr. Pichardo of any

14   information that was false, nor has he pled reliance on any

15   statements by GMAC Mortgage regarding the status of his loan,

16   nor has he shown damages as a result of conduct by GMAC

17   Mortgage.

18             His primary claim for damages arises out of

19   allegations that he suffered personal injury, resulting from a

20   decline in his health due to stress caused by statements made

21   by GMAC employees.  However, the records he attached to the

22   proof of claim show that as of April 2009, he was already on

23   permanent disability; he said that he had a litany of health

24   problems.

25             THE COURT:  Well, but he -- the fact that someone may

1    have had a current medical condition doesn't preclude somebody

2    from asserting that improper conduct exacerbated his condition.

3    Do you agree with that?

4              MS. RICHARDS:  I agree with that, Your Honor.

5              THE COURT:  I mean, it's the eggshell head case.  You

6    take the plaintiff as you find them, and if you find them with

7    suffering from some medical or emotional condition, and the

8    alleged conduct, assuming that the conduct would be actionable,

9    exacerbates the condition, couldn't that give rise to a claim

10    including damages for emotional distress?

11             MS. RICHARDS:  I think that it could, Your Honor.  But

12    here, we also -- I think that would be a disputed matter of

13    fact that might be --

14             THE COURT:  You agree?

15             MS. RICHARDS:  -- appropriate for further hearing.

16    But we also think Mr. Pichardo has not plausibly alleged the

17    other elements of negligent misrepresentation.

18             THE COURT:  Here's what I have some difficulty with.

19    You attach to the papers in support of the objection the

20    payment history.

21             MS. RICHARDS:  Yes.

22             THE COURT:  And I've got to tell you, it's not easy to

23    decipher or understand, and there's no declaration explaining

24    it.  Let me focus -- because this is the concern I have.  The

25    facts that give rise to some concern on my part, and then if

1  those facts give rise to causes of action -- it may be more

2  than one cause of action, but it's the same basic facts that

3  cause me some concern.

4          And it relates to the breach -- the facts leading up

5  to the breach letter which is dated August 3, 2009, which

6  stated that Mr. Pichardo and his wife were in default of their

7  loan because he failed to make payments for June, July, and

8  August 2009.  The payment history, if I'm reading it correctly,

9  indicates Mr. Pichardo was current through April 2009, but

10  thereafter failed to make full monthly payments for May, June,

11  and July 2009.

12          Mr. Pichardo attaches return receipts showing that he

13  sent packages to GMAC on June 19th and July 9th, 2009.  And

14  there's a payment entry on the payment history on June 24th,

15  2009, with a payment amount of 832 dollars.  At that time, the

16  records would appear that a full payment had to be $1,584.50.

17          There's no payment entry for July 2009.  Mr.

18  Pichardo -- and I'm going to have questions for him -- alleges

19  that he made payments.

20          MR. PICHARDO:  Yes.

21          THE COURT:  And so that's what's -- I guess I have a

22  question.  Let me -- Mr. Pichardo, let me ask you now.  I'll

23  take you a little bit out of order.  I'll give you a chance to

24  make your full argument when we're done.

25          MR. PICHARDO:  Yes.

1      THE COURT:  Do you agree that the amount of the

2  payment you made in June 2009 was $832 rather than $1,584.50?

3      MR. PICHARDO:  Yes, Your Honor.  That was the amount

4  that the loss mitigation requested that I send, and it was two

5  checks of 832, as you can see in my evidence, that I sent,

6  docketed number 8878.  There is two checks for that same

7  amount.  And the payments were up-to-date, Your Honor.  There

8  was no missing payments.  And my main concern is that they

9  defaulted and foreclosed this loan due to the fact -- and I

10  have submitted those checks that shows two payments during that

11  time, requested by loss mitigation.  And those checks are proof

12  that it was up-to-date.  And that's what they requested.

13      As you can see, the proof of service to them shows

14  that it was directly to loss mitigation.  And that's the --

15  because they had initiated modification process by them.

16      THE COURT:  So when did you -- did you send the two

17  checks together or --

18      MR. PICHARDO:  Yes, Your Honor.

19      THE COURT:  -- one each month?  When did you --

20      MR. PICHARDO:  As you can see on docket number 8878.

21      THE COURT:  Yes.

22      MR. PICHARDO:  They're together.

23      THE COURT:  Okay.  And when did you send them?

24      MR. PICHARDO:  That's -- those were sent June 19th.

25      THE COURT:  Okay.  And what did you send on July 9th?

1          MR. PICHARDO:  On July 9th, I sent them the other

2    payment which was requested for August, because apparently they

3    were saying that they needed to send me the statements for

4    this -- for this loan would be principal reduction, rate

5    reduction, and the liens on the property included.  And I said,

6    okay, here goes.  And I sent it, forward it, and that current

7    receipt shows that they received it.

8          THE COURT:  I know.  How much did you send for the

9    August payment?

10         MR. PICHARDO:  The same amount.

11         THE COURT:  832.

12         MR. PICHARDO:  Be -- yes.  Because this is what they

13   designated for June, July, and August.

14         THE COURT:  All right.  Thank you.

15         MR. PICHARDO:  And then when the --

16         THE COURT:  Mr. Pichardo, I'll --

17         MR. PICHARDO:  I'm sorry.

18         THE COURT:  I'll come back and ask you -- that answers

19   my immediate questions.  But I'll give you a chance to make

20   your full argument, okay?

21         MR. PICHARDO:  Sure.

22         THE COURT:  All right.  So, Ms. Richards, so do you

23   agree that Mr. Pichardo made payments -- three payments in the

24   amount of 832 each, two of them sent on June 19th and one on

25   July 9th?

1          MS. RICHARDS:  I do, Your Honor.  I think I can

2   clarify the --

3          THE COURT:  No, no, I just want to make sure I --

4   there's no dispute about that?

5          MS. RICHARDS:  He did make those payments.

6          THE COURT:  Okay.

7          MS. RICHARDS:  Absolutely, Your Honor.

8          THE COURT:  And how were those payments -- so the

9   payment history shows a 832-dollar payment recorded on June

10  24th.  That partial payment, if I'm understanding the loan

11  history correctly, is that -- how is that reflected in the

12  payment history?

13         MS. RICHARDS:  So looking on page 4 of the payment

14  history --

15         THE COURT:  Yes.

16         MS. RICHARDS:  -- it's shown as a payment.  So I

17  believe Mr. Pichardo was making those payments under a

18  temporary loan modification agreement.

19         THE COURT:  Okay.

20         MS. RICHARDS:  So GMAC sent their standard default

21  letters, because it wasn't the full amount.  The default was

22  wiped out as soon as the loan modification became permanent.

23         THE COURT:  So but there's no -- I didn't see a

24  payment entry in July --

25         MR. PICHARDO:  Um-hum.

1    THE COURT:  -- that would match up to the -- Mr.

2  Pichardo indicates and he attaches the return receipt for July

3  9th, 2009, and he indicates with that he sent the August

4  payment for 832 payments.  And I don't see that payment

5  recorded.  I may have -- I'm having a hard time understanding

6  the payment history here.  I'm just trying to get to the basic

7  facts.  We'll see whether that gives rise to a claim or not,

8  but -- okay?

9    MS. RICHARDS:  Understood, Your Honor.  I also don't

10 see that payment in the payment history.  I'm not an expert at

11 reading these records either.

12   THE COURT:  Well, that didn't make life easy for me,

13 okay?

14   MS. RICHARDS:  Understood.

15   THE COURT:  So but you don't dispute he sent that

16 payment?

17   MS. RICHARDS:  He submitted evidence showing he sent

18 the payment.

19   THE COURT:  Okay.  So why isn't it there?  I mean --

20   MR. PICHARDO:  Um-hum.

21   THE COURT:  -- so he submitted evidence that he sent

22 the payment.

23   MS. RICHARDS:  Correct, Your Honor.

24   THE COURT:  Did it get deposited at some point, and

25 when, and how was it treated in the payment history?

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

1          MS. RICHARDS:  I can't speak to that at this moment,

2    Your Honor.

3          THE COURT:  That's what I'm concerned about.

4          MS. RICHARDS:  What I would say is that Mr. Pichardo

5    was granted a loan modification on very favorable terms.

6    There's no record of --

7          THE COURT:  We'll get -- we'll get --

8          MS. RICHARDS:  -- default after --

9          THE COURT:  -- we'll get to that --

10         MS. RICHARDS:  -- the modification.

11         THE COURT:  -- okay?  All right.  So when he was sent

12   the notice of default, there was a temporary modification in

13   place is your position, right?

14         MS. RICHARDS:  I believe that was the case, Your

15   Honor, yes.

16         THE COURT:  Okay.  And that doesn't -- shouldn't that

17   be reflected in the notice that's sent?  Because the notice of

18   default is that he hadn't paid May, June, or July?

19         MS. RICHARDS:  Your Honor, I am -- I was trying to

20   find it in the servicing notes, and I can't on the fly.  Mr.

21   Pichardo contacted the debtors when he received those

22   notices --

23         THE COURT:  Yes.

24         MS. RICHARDS:  -- and said I'm making payments under

25   the temporary loan modification, why did I get this notice.

1   And they informed him that it's an auto-generated letter; it

2   goes out.  He should disregard them; continue making payments

3   under the temporary modification, and when his modification was

4   final it wouldn't count against him.  And that is exactly what

5   happened.

6           THE COURT:  All right.  Mr. Pichardo, did --

7           MR. PICHARDO:  There was no notification saying, Your

8   Honor, canceling letter, like a problem -- or have a problem

9   sending notification.  The only notification I got, as you can

10  see --

11          THE COURT:  Wait, Mr. Pichardo, stop, stop, stop.

12          MR. PICHARDO:  Yes.

13          THE COURT:  What Ms. Richards has said is that you

14  contacted GMAC.  Did you have a telephone conversation with a

15  representative of GMAC raising the issue about why you got the

16  notice of default, and do you agree that they told you what Ms.

17  Richard said, that --

18          MR. PICHARDO:  No, no, Your Honor.  They did not tell

19  me that.  They asserted that they received the payment

20  according to their instruction of the three payment of 832

21  dollars, and during that time, that's when I received this

22  notice of default and foreclosure proceeding.

23          THE COURT:  Okay, but I --

24          MR. PICHARDO:  Which I called them about.

25          THE COURT:  -- I want to be clear.  Because Ms.

RESIDENTIAL CAPITAL, LLC, ET AL.                     19

1    Richards says that the loan notes reflect that you had a

2    conversation with someone from GMAC.  You called them to

3    inquire why you got the notice of default when you had made

4    payments pursuant to the temporary modification agreement.  And

5    Ms. Richards says you were told that once the modification is

6    finalized that would be reversed; that's the standard done.

7    And I just wanted to know --

8             MR. PICHARDO:  No, that's -- that's incorrect, Your

9    Honor.

10            THE COURT:  Okay.  All right.  So Ms. --

11            MR. PICHARDO:  The only assertion they gave me that

12   they had received the payment sent as required by them.

13            THE COURT:  Okay.  All right.  So Ms. Richards, isn't

14   that a disputed issue of fact?

15            MR. PICHARDO:  May I, Your Honor?

16            THE COURT:  No, hang -- just bear with me, okay?

17            MR. PICHARDO:  Okay.  Okay.

18       (Pause)

19            THE COURT:  The silence is because I'm looking at some

20   documents, Mr. Pichardo, so that's the pause.

21            MR. PICHARDO:  Yes.

22       (Pause)

23            THE COURT:  Okay, go ahead, Ms. Richards.

24            One of my law clerks has pointed out to me page --

25   this is Exhibit E to the Priore declaration, on page 45 at the

1  bottom of the page, there's an entry for an August 7, 2009 call

2  from the borrower.  Is that what you were referring to?

3            MS. RICHARDS:  It is, Your Honor.  That's where I was

4  going to direct your attention.

5            THE COURT:  Okay, go ahead.

6            MS. RICHARDS:  So, Your Honor --

7            THE COURT:  So isn't there a disputed issue of fact

8  between -- Mr. Pichardo wasn't told disregard the notice or if

9  a modification is finalized.  I see what's in your document.

10           MS. RICHARDS:  We have documentary evidence

11  contradicting his allegations.

12           THE COURT:  That's what's called a disputed issue of

13  fact.

14           MS. RICHARDS:  Understood, Your Honor.

15           What I would also say, though, is that his pleadings

16  are not specific about when he alleged GMAC was making the

17  threats about foreclosure.  It's unclear if it refers to the

18  time prior to modification.

19           THE COURT:  Oh, come on.  They sent him an August --

20  on August 3rd, they sent him a notice of default.  I mean --

21           MS. RICHARDS:  And then they granted him a loan

22  modification.

23           THE COURT:  Well, we'll deal with what that -- the

24  effect of that.  But you don't -- there's no dispute that GMAC

25  sent him a notice of default.

RESIDENTIAL CAPITAL, LLC, ET AL.                                21

1          MS. RICHARDS:  Agreed, Your Honor.  They sent him a

2    notice of default.  They never sent him a notice of

3    foreclosure.

4          THE COURT:  Okay.

5          MS. RICHARDS:  They never instituted foreclosure

6    proceedings against him.

7          THE COURT:  Okay.

8          MS. RICHARDS:  So his allegations in that respect are

9    incorrect.

10         THE COURT:  Well, he -- I'm not -- by my comment, I'm

11   not suggesting it was improper to send him the notice of

12   default.  But sending somebody a notice of default if they

13   shouldn't be getting one certainly can have adverse

14   consequences, correct, to a borrower?

15         MS. RICHARDS:  It could, Your Honor.  I would say,

16   again, I'm not an expert on how GMAC handled its accounts that

17   were in the process --

18         THE COURT:  Okay.

19         MS. RICHARDS:  -- of a temporary modification.  I

20   don't know that it's fair to say that they incorrectly sent him

21   the notice of default.

22         THE COURT:  Okay.  It still leaves the question in my

23   mind of what happened to the 832-dollar payment that he sent on

24   July 9th that doesn't get reflected in the payment history.

25   You acknowledge that he's provided evidence that he sent the

 1  payment.

 2          MS. RICHARDS:  He submitted evidence that he provided

 3  the payment, yes.

 4          THE COURT:  And it's indisputable that the payment's

 5  not recorded in the payment history, correct?

 6          MS. RICHARDS:  I don't see it in the payment history.

 7          THE COURT:  Okay, I don't either.  But so for present

 8  purposes, there seems to be a dispute about that payment,

 9  although -- we'll move on from there.

10          MS. RICHARDS:  Turning back to the causes of action --

11          THE COURT:  Yes.

12          MS. RICHARDS:  -- in the initial complaint.  Your

13  Honor, the next cause of action that Mr. Pichardo asserted in

14  the initial complaint was that GMAC violated California's

15  Unfair Competition Law.

16          THE COURT:  Okay.  So let's assume I agree with you

17  that injunctive relief isn't available.  So address the

18  restitution issue.

19          MS. RICHARDS:  So in the initial complaint, Mr.

20  Pichardo made no allegations that he had made any specific

21  payments to GMAC that they kept --

22          THE COURT:  Look, I'm not ruling on it at this point,

23  but you've known about that first amended complaint for a very

24  long time.

25          MS. RICHARDS:  We have, Your Honor.

1          THE COURT:  Okay.

2          MS. RICHARDS:  Which is why we addressed it.

3          THE COURT:  And with a pro se -- I read he had a

4    lawyer in California, right?

5          MS. RICHARDS:  He's had --

6          THE COURT:  Two.

7          MS. RICHARDS:  He's gone through two counsel, yes,

8    Your Honor.

9          THE COURT:  Okay.  But he filed this claim, pro se, by

10   himself, without a lawyer.

11         MS. RICHARDS:  He did.

12         THE COURT:  And I'm going to -- I'm taking this under

13   submission when we get to the end of the day, but you won't be

14   shocked if I decide that I need to consider the first amended

15   complaint as permitted, in essence, to amend his claim, to

16   assert those matters asserted in the first amended complaint.

17         So let's deal with it as if I had ruled, okay?

18         MS. RICHARDS:  Understood, Your Honor.  I will do

19   that.

20         So under the first amended complaint, Mr. Pichardo

21   alleged that he made irregular payments on account of

22   undisclosed fees and costs; not that he made payments that were

23   never credited to his account; not that GMAC pocketed funds.

24   He says that he made irregular payments.  And if you look at

25   the payment history, it does show that he made payments for

1   amounts after the modification that didn't quite track with his

2   required payment.

3          GMAC applied those amounts to reduce his principal

4   balance as a curtailment.  So there's no allegation and no

5   evidence that GMAC Mortgage retained any payments made by Mr.

6   Pichardo --

7          THE COURT:  Okay.

8          MS. RICHARDS:  -- for the loan --

9          THE COURT:  Your position is, anything he paid got

10  credited?

11         MS. RICHARDS:  Exactly, Your Honor.

12         THE COURT:  Okay.  So just to deal with the first --

13  the original complaint has this false advertising --

14         MS. RICHARDS:  It did, Your Honor.

15         THE COURT:  -- claim.  And your position -- and your

16  position with respect to that is what?

17         MS. RICHARDS:  Is that it's inapplicable.  There's no

18  allegation that GMAC Mortgage was soliciting services from Mr.

19  Pichardo through any advertising.

20         THE COURT:  Right.  This was -- this dispute focuses

21  on communications between Mr. Pichardo and GMAC and not

22  communications to the public, right?

23         MS. RICHARDS:  Yes, Your Honor.

24         THE COURT:  Okay.  All right.  So let's talk more

25  about the first amended complaint.

1          MS. RICHARDS:  Okay.  So the first cause of action

2     listed in the first amended complaint is Mr. Pichardo's claim

3     for breach of contract.

4          THE COURT:  Right.

5          MS. RICHARDS:  And this is based on his allegations

6     that GMAC Mortgage failed to honor the terms of the August

7     modification agreement.  I'm sure Your Honor is very familiar

8     with the elements required for breach of contract.

9          THE COURT:  I am.  Let me -- just to focus the

10    discussion very specifically.

11         MS. RICHARDS:  Yes.

12         THE COURT:  You argue that there was no contract,

13    because material terms were missing.

14         MS. RICHARDS:  That's correct, Your Honor.

15         THE COURT:  Okay.  That contract, on the face of it,

16    doesn't it specifically deal with all principal and interest

17    payments that Mr. Pichardo was required to make?  I mean, if

18    you look at the four corners of that August agreement, there

19    doesn't appear to be any principal unaccounted for.  You may

20    not like it; it may have been stupid for GMAC -- somebody at

21    GMAC to prepare and sign it, but it recites that it amends and

22    supplements the note.  The note was in the original principal

23    amount of 190,000 dollars.  And the contract sets forth that as

24    of the effective date, "the amount payable under the note is

25    $63,272.87."  And then "consisting of the amounts loaned to,"

1  Mr. Pichardo, "and any accrued but unpaid interest capitalized

2  to date."  And it also provides for the calculation of interest

3  in the amount of Mr. Pichardo's monthly payments of principal

4  and interest.

5          So I don't see -- reading the four corners of that

6  document, which also has an integration clause, saying that:

7  "This agreement and the note and security interest as amended

8  hereby sets forth the entire understanding between the parties,

9  there are no unwritten agreements between the parties," the

10  issue that I'm concerned about is whether -- under ordinary

11  rules, you can't use parol evidence to vary the terms of a

12  writing that appears to be complete on its face.  Address that.

13          MS. RICHARDS:  Your Honor, the modification agreement

14  clearly states that it amends and supplements the note.  The

15  note was for an amount much larger than 60,000 or 63,000

16  dollars.  The fact that the agreement is completely silent

17  about the 120,000 dollars --

18          THE COURT:  Well, it's --

19          MS. RICHARDS:  -- it doesn't say --

20          THE COURT:  -- not completely silent.  It says --

21          MS. RICHARDS:  -- it's reduced --

22          THE COURT:  -- the amount payable under this note

23  is -- it amends the note and it says the amount payable under

24  the note is $63,272.87.  What's ambiguous or unclear about

25  that?

1          MS. RICHARDS:  Nothing is ambiguous.

2          THE COURT:  Okay.

3          MS. RICHARDS:  It is omitting a material fact.

4          THE COURT:  How is it omitting.  A note has a

5    principal amount.  The August contract states that it amends

6    the note, and that the amount payable under the note at --

7    amount payable under the note from the August agreement, and it

8    has the $63,272.87.  And this is consisting of amounts loaned

9    and any accrued and unpaid interest.

10         It may have been a careless error on the part of the

11   scrivener at GMAC.  But the four corners of that agreement with

12   an integration clause, why isn't that an enforceable contract,

13   fully integrated, on which you cannot rely on parol evidence to

14   vary the terms?

15         MS. RICHARDS:  Your Honor, if you apply those same

16   arguments to the amended agreement, this agreement, even if it

17   was valid, was superseded by an agreement which Mr. Pichardo --

18         THE COURT:  We'll get to that.  We'll get to that.

19   Okay?  There is no question.  And Mr. Pichardo alleges --

20   whether it's sufficient to state a cause of action or not --

21   that he was -- he signed it under duress, whatever.

22         So it seems to me I've got a couple of questions I've

23   got to deal with.  First, was the original contract an

24   enforceable contract?  You argue it's not.  The other side of

25   it is -- and I'm not deciding it yet -- the other side of that

1   argument is that there's nothing uncertain or ambiguous.  It

2   says how much -- it amends the note, says how much is payable.

3           Look, principal reductions were not common, but

4   they're not unheard of.  When there's a principal reduction,

5   it'll say what the amount that has to be paid.  That's what Mr.

6   Pichardo argues is the case here, that there's nothing

7   uncertain -- and there's law about when you can vary the

8   terms -- when you're permitted to go to parol -- use parol

9   evidence.

10          MS. RICHARDS:  Your Honor, I would --

11          THE COURT:  Tell me why you think it's not an

12  enforceable agreement?

13          MS. RICHARDS:  As an initial matter, and the servicing

14  records that we attach to the objection show this, when Mr.

15  Pichardo first contacted GMAC and he said I would like a loan

16  modification, he asked for principal reduction, and they told

17  him that was unavailable.  It's scattered throughout the

18  servicing notes.

19          THE COURT:  So you're arguing it was a unilateral

20  mistake on the part of GMAC to enter into a written contract

21  with Mr. Pichardo that on the face of it appears to reduce the

22  principal amount of his obligation to 63,000 dollars?

23          MS. RICHARDS:  Correct, Your Honor.  GMAC --

24          THE COURT:  And why is it that you think a unilateral

25  mistake will vitiate this contract?  Have you established all

1  of the requirements to set aside a contract on the grounds of

2  unilateral mistake?

3          MS. RICHARDS:  We didn't brief that argument in our

4  papers, Your Honor.

5          THE COURT:  I know.

6          MS. RICHARDS:  We believe the contract was incomplete,

7  and it did not reflect the meeting of the minds as the parties

8  had agreed to it when the ran the loan modification.  GMAC told

9  Mr. Pichardo he would not be getting a principal reduction.

10          THE COURT:  Despite the language of this writing --

11          MS. RICHARDS:  The writing does not memorialize the

12  oral communications that the parties had had.

13          THE COURT:  I see.

14          MS. RICHARDS:  And it would be --

15          THE COURT:  And therefore --

16          MS. RICHARDS:  -- inequitable to allow Mr. Pichardo to

17  capitalize on an error in an agreement.

18          THE COURT:  And then therefore the integration clause

19  in all capital letters:  "This agreement and the note and

20  security instrument as amended hereby, sets forth the entire

21  understanding between the parties.  There are no unwritten

22  agreements between the parties."  That's in the contract, in

23  all capital letters.  And you think that just has no effect?

24          MS. RICHARDS:  I would say it doesn't say the contract

25  that's otherwise incomplete.

1          THE COURT:  Okay.  Let's go on to the next issue.

2          MS. RICHARDS:  So whether or not Your Honor believes

3     that the August agreement was a valid and binding contract, in

4     any event, it was superseded by the subsequently executed,

5     corrected agreement, which contains the same language

6     regarding --

7          THE COURT:  Right.

8          MS. RICHARDS:  -- complete agreement, amending and

9     superseding completely.  As you noted, Mr. Pichardo has alleged

10    that he signed that contract under duress.

11         THE COURT:  Right.

12         MS. RICHARDS:  Even if that's true, which GMAC

13    disputes, Mr. Pichardo ratified the agreement subsequently

14    through his conduct by continuing to accept performance under

15    the corrected agreement, for years --

16         THE COURT:  So let me --

17         MS. RICHARDS:  -- until the contract was transferred

18    to Ocwen.

19         THE COURT:  -- let's assume that I agree with you that

20    the amended -- the further amended contract is the operative

21    document and that he can't assert a breach of contract claim

22    based on the August -- earlier August agreement.  Why wouldn't

23    he have properly stated as to the first agreement a breach of

24    implied covenant of good faith and fair dealing claim, the

25    elements of which in California are parties entered into a

1   contract -- if we assume that contract was valid, they entered

2   into a contract; the plaintiff fulfilled his obligations under

3   the contract, he said I made the payments.  Any conditions

4   precedent to the defendant's performance occurred; the

5   defendants unfairly interfered with the plaintiff's rights to

6   receive the benefits of the contract; and the plaintiff was

7   harmed by the defendant's conduct.

8           So since the corrected contract added all that

9   principal back in, his argument that he's harmed by your --

10  let's assume he's satisfied that element; I think the sticking

11  point is, has the defendant unfairly interfered with the

12  plaintiff's right to receive the benefits of the contract.

13          So he basically -- he alleges that through threats and

14  duress, he was basically forced to sign the corrected

15  agreement.  Do you agree that's his allegation?

16          MS. RICHARDS:  I agree that is his allegation, Your

17  Honor.

18          THE COURT:  So why doesn't that state a claim for

19  breach of the implied covenant of good faith and fair dealing

20  with respect to the first contract?

21          MS. RICHARDS:  Your Honor, the cause of action

22  requires the existence of an implied duty to --

23          THE COURT:  Does it?  No.  I'm reading from Rosenfeld

24  v. JPMorgan Chase, 732 F.Supp 2d 952, 968 (N.D.Ca. 2010).  It

25  specifically -- I'll quote to you from it: "In California, the

1  factual elements necessary to establish a breach of the

2  covenant of good faith and fair dealing are:  (1) the parties

3  entered into a contract; (2) the plaintiff fulfilled his

4  obligations under the contract; (3) any conditions precedent to

5  the defendant's performance occurred; (4) the defendant

6  unfairly interfered with the plaintiff's right to receive the

7  benefits of the contract; and (5) the plaintiff was harmed by

8  the defendant's conduct."  That's a quote from the case.

9        And another case, Woods v. Google, Inc., 889 F.Supp.

10  2d 1882 (sic), 1194 (N.D.Ca. 2012):  "A plaintiff must show

11  that the conduct of the defendant, whether or not it also

12  constitutes a breach of a consensual contract term,

13  demonstrates a failure or refusal to discharge contractual

14  responsibilities."

15        So why hasn't Mr. Pichardo sufficiently pleaded a

16  cause of action for breach of the implied covenant of good

17  faith and fair dealing -- if I find that that first agreement

18  was an enforceable contract, why hasn't he sufficiently alleged

19  breach of the implied covenant of good faith and fair dealing?

20        MS. RICHARDS:  Your Honor, it's not a breach of an

21  agreement to request that a party amend that agreement.  He

22  cited no case law for that proposition.

23        THE COURT:  Well, he certainly -- you know, one

24  question I have is has he fairly alleged that the defendant

25  unfairly interfered with his rights to receive the benefits of

RESIDENTIAL CAPITAL, LLC, ET AL.                    33

1   the contract.

2           MS. RICHARDS:  But --

3           THE COURT:  When GMAC insisted that the contract be

4   amended -- further amended, he argues that GMAC unfairly

5   interfered with his right to receive the benefits of that

6   contract.  It may have been stupid.  It may have been a

7   terrible mistake for GMAC to sign a contract that on its face

8   would appear to include the substantial principal reduction,

9   but they did.

10          MS. RICHARDS:  Your Honor, I don't see what is unfair

11  in --

12          THE COURT:  You don't?

13          MS. RICHARDS:  -- GMAC contacting the plaintiff and

14  saying the agreement contained an error.  You know, because we

15  spoke, that you were never getting a principal reduction.

16          THE COURT:  So that sounds like a disputed issue of

17  fact about what the conversations were that caused Mr. Pichardo

18  to sign the corrected or amended agreement.  Right?  You say

19  that GMAC said you know, Mr. Pichardo, that that wasn't our

20  agreement.  Disputed issues of fact, agreed?

21          MS. RICHARDS:  Agreed, Your Honor.

22          THE COURT:  Okay.  Let's go on to the negligence

23  claim.

24          MS. RICHARDS:  The negligence claim is based on

25  allegations that GMAC failed to accurately calculate and credit

1  payments made by Mr. Pichardo, prepared and filed false

2  documents, and threatened foreclosure without having the legal

3  authority to do so.

4         As Your Honor is well aware, there's a plethora of

5  case law stating that lenders and their agents do not owe a

6  duty of care as a general matter to borrowers.  And Mr.

7  Pichardo has not identified any exception that would apply in

8  this case.

9         THE COURT:  Well, Lueras v. BAC Home Loan Servicing,

10  163 Cal. Rptr. 3d 804, 820, (CA Ct. App. 2013) would seem to

11  support your argument, were California law all that clear.

12  Segura v. Wells Fargo Bank, the existence of a duty of care

13  owed by financial institutions in the process of considering

14  borrowers for loan modification is an unsettled issue.  So

15  Lueras may well be the most persuasive authority, but would you

16  agree that the issue is not entirely resolved in California?

17         MS. RICHARDS:  Based on the citation you just read me,

18  California courts believe it's unsettled, it sounds like.

19         THE COURT:  Lueras is pretty strong authority, because

20  it says:  "Rights duties and obligations," I'll add some words,

21  offering, considering, or approving loan modifications and

22  exploring foreclosure alternatives are "set forth in the note

23  and deed of trust, the parties forbearance agreement, federal

24  and state statutes and regulations and the directives and

25  announcement of the United State Department of Treasury and

1   Fannie Mae."

2          So I mean, I think -- Lueras is strong support for

3   your position.  It's not entirely clear under California law,

4   but I -- is there anything you want to add to the argument?

5          MS. RICHARDS:  There is not, Your Honor.

6          THE COURT:  Okay.

7          MS. RICHARDS:  We've believe the weight of authority

8   is in favor of our position.

9          THE COURT:  Okay.  And let's talk about unjust

10  enrichment.  There is no private cause of action -- there is no

11  independent cause of action in California for unjust

12  enrichment.  That's your position?

13         MS. RICHARDS:  It is, Your Honor.

14         THE COURT:  Okay.  Among other cases, Melchior v. New

15  Lines Products, Inc., 131 Cal. Rptr. 347, 357 (CA Ct. App.

16  2003).

17         Okay.  Let's talk about the Unfair Competition Law,

18  the Business and Professions Code 17200.  Mr. Pichardo alleges

19  that he was coerced into executing the corrected agreement

20  under the pretense that GMAC would foreclose on his property at

21  the time when he was not in default.  Why isn't that if true --

22  if true, why wouldn't that constitute an unfair or fraudulent

23  business practice within the meaning of Business and

24  Professions Code 17200?

25         MS. RICHARDS:  Your Honor, my understanding of that

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1    statute is that it relates to competition.  So actions taken by

2    a company seeking to gain an advantage over a competitor.  I

3    don't see how those allegations would support an unfair

4    competition claim.

5         THE COURT:  Could you remind me, have -- I thought I

6    had -- I didn't look at this -- I didn't go back to look at

7    this.  I thought in prior ResCap borrower claims, I had

8    addressed the 17200 claim.  Can you remind me about that?

9         MS. RICHARDS:  Just give me a moment, Your Honor.

10        Your Honor, I apologize, I'm not familiar with your

11   prior decisions on that.

12        THE COURT:  I can't keep them -- keep track of them

13   all at this point either, because they're -- I've tried to -- I

14   have probably had to address the law in at least a dozen states

15   with respect to various borrower claims.  And so I have some

16   trouble keeping it straight in my own mind.

17        I'm pretty sure -- Mr. Wishnew, have I addressed the

18   17200 claims?

19        MR. WISHNEW:  I believe so, Your Honor.  I know that

20   in other California borrower cases, borrowers have definitely

21   pled 17200 --

22        THE COURT:  Tia Smith and Karen Rozier.

23        MR. WISHNEW:  That's exactly right, Your Honor.

24        THE COURT:  And what did I do in those?

25        MR. WISHNEW:  I believe -- look, Ms. Rozier's claim

1    was expunged in its entirety.  Ms. Smith's claim was also

2    expunged, I think substantially in its entirety, with one

3    element remaining.

4              THE COURT:  Let me check with my law clerks.

5              My law clerk advises me that with respect to Tia

6    Smith, I overruled the objection with respect to the unfair

7    competition law claim.

8              MR. WISHNEW:  I think Ms. --

9              THE COURT:  I have to go back and reread the opinion,

10   but --

11             MR. WISHNEW:  Right.  And I think Ms. Smith has

12   appealed that opinion now.

13             THE COURT:  Well, she may have appealed, but you lost

14   on this issue.

15             MR. WISHNEW:  That is true, Your Honor.  I think that

16   might be the only case we've lost on that particular California

17   Code section.

18             THE COURT:  I need to go back and look at it.

19             Ms. Richards, that -- Business and Professions Code

20   17200 existed for a long time.  It was -- I haven't practiced

21   law in California since 1985.  But from '72 to '85 I used to

22   have a fair number of cases under 17200, and they all -- they

23   were not all competition cases.  Okay, so, it's a frequently --

24   plaintiffs frequently attempt to rely on 17200.  I'll have to

25   go back and look at it.  I was pretty sure I've addressed it

1    before.  My clerks tell me I did with respect to Smith and

2    Rozier.  I'll have to go back and look at what I did.

3              MS. RICHARDS:  Good.

4              THE COURT:  Okay.  Let me see if I have other

5    questions for you.  I don't.  Is there anything else you want

6    to tell me now?

7              MS. RICHARDS:  Not at this time, Your Honor.

8              THE COURT:  Okay.  Mr. Pichardo, your turn.

9              MR. PICHARDO:  Yes.  Your Honor, this claim is based

10   on the default and foreclosure they initiated which immediately

11   caused an effect on me.  It sent me to the hospital, Your

12   Honor, because I was update on payments and following every

13   instruction.  There had never been any late payments.  All

14   payments had been made correctly, according to the servicer.

15             So when I see this, and I called them, and I said you

16   have sent me -- and I need to show this, Your Honor -- I

17   numbered my documents -- number document 11 shows that prior to

18   all of this, they sent the default and foreclosure.  Prior to

19   all of this.

20             THE COURT:  But when you say -- stop for a second.

21   When you say "prior to all of this", you acknowledge that for

22   June, July, and August 2009, you made payments of 832 dollars

23   for each of those months.  I'll go further, but at least that

24   part, you don't dispute, correct?

25             MR. PICHARDO:  That was the -- I don't dispute it,

1    because that was the amount indicated by loss mitigation to

2    make.

3            THE COURT:  Right.

4            MR. PICHARDO:  But if you look, Your Honor --

5            THE COURT:  Well, let me -- stop, stop, stop.  Let me

6    take it one step at a time.

7            MR. PICHARDO:  Okay, I'm sorry.

8            THE COURT:  I just want to be sure.  As to those

9    payments, that's the amount -- you agree that's the amount you

10   paid, and you made those pursuant to the temporary modification

11   that GMAC agreed upon with you.  Correct?

12           MR. PICHARDO:  The modification is -- was not a

13   temporary, Your Honor, because it was -- it was negotiated for

14   eight months.  So they did not send me any notification saying

15   this is a temporary -- nor did I have a conversation at any

16   time.  It was sent to me, signed.  I sent it back.  They

17   note -- they executed it.  There was never any notification.

18   The only notification I got was about the one I mentioned, Your

19   Honor, that prior to this loan modification, they sent me July

20   10th of '09 notification of default and foreclosure.  That's

21   prior to all of this.  And that's what sent me to the hospital.

22           And I said, but I haven't defaulted.  I have every

23   payment.  I have followed everything that I was instructed to.

24   And if you see -- if you look, Your Honor, I numerated document

25   number 11, which is dated 7/10 of '09.  That's prior to all of

RESIDENTIAL CAPITAL, LLC, ET AL.                    40

1  this.

2             THE COURT:  Mr. Pichardo, I thought that the breach

3  letter was dated August 3, 2009, not in July.

4             MR. PICHARDO:  No, Your Honor.  I sent you a copy,

5  document number 11, as I numerated it from 1 to 80.  And it's

6  dated July 10th, which they sent to me a foreclosure -- default

7  and foreclosure.

8             THE COURT:  Okay, go ahead.

9             MR. PICHARDO:  And I said to them -- that's when my

10  call was made to them.  I said why are you sending me a default

11  and foreclosure initiation when I have -- when I had been up to

12  date on every payment?  There has never been any kind of

13  rectification, cure, or anything to that effect.  So all they

14  said was, oh, we received it -- we received the payment.  But

15  nothing addressing -- nobody every addressed the default and

16  foreclosure in any way.

17             THE COURT:  All right.

18             MR. PICHARDO:  So here I am --

19             THE COURT:  Mr. Pichardo --

20             MR. PICHARDO:  -- in the hospital --

21             THE COURT:  -- the servicing notes show a phone call

22  with you on August 7th, 2009.  They -- what I thought was that

23  they sent you an August 3 default letter, and that you called

24  on August 7th.

25             MR. PICHARDO:  No, Your Honor.  I called prior to

RESIDENTIAL CAPITAL, LLC, ET AL.                    41

1 │ August --

2 │         THE COURT:  Okay.

3 │         MR. PICHARDO:  -- also --

4 │         THE COURT:  All right.

5 │         MR. PICHARDO:  -- which concerned the document I just

6 │ mentioned to you dated July 10th of '09.

7 │         THE COURT:  Okay.

8 │         MR. PICHARDO:  Enumerated number 11 in my document

9 │ submission.

10 │         THE COURT:  Okay.  All right, go ahead.

11 │         MR. PICHARDO:  And so here I am with this exacerbated

12 │ condition by all of this, and from the hospital I called them.

13 │ I said what is going on?  Why have you done this?  Why have you

14 │ not corrected this?  I have no notification that you've

15 │ corrected this default -- false default, unjustifiable

16 │ reference for foreclosure.  What is going on?  So that was the

17 │ end of the conversation.

18 │         There was never, never, Your Honor, a conversation

19 │ concerning anything other than the payments I made in the

20 │ default.

21 │         THE COURT:  Okay.

22 │         MR. PICHARDO:  So I come out the hospital.  When I

23 │ arrive, they're calling me, telling me, oh, you are going to

24 │ have to sign another agreement.  I said why?  I have an

25 │ agreement which was executed.  It was finalized.  It has terms

RESIDENTIAL CAPITAL, LLC, ET AL.                    42

1    that there's no other agreements to that; that this is the

2    entire agreement.  And I -- you have executed it and so did I.

3    And they go, no, you have to; if not, we're going to foreclose

4    on you.

5           And I said, again, so here I go again to the hospital,

6    Your Honor, with my condition.  I had never been hospitalized

7    like this except when GMAC and the servicer started all this.

8    And here I am in the hospital.  My wife brings over to me an

9    overnighted letter from them with a document.  And I said, the

10   prior one took eight months, and they're telling me overnight

11   this.  And I said I haven't even reviewed this.  Hope in the

12   Treasury Department and Senator Feinstein's office was

13   instrumental in obtaining the first operative agreement, which

14   is the operative agreement, period.

15          And there's no notification saying we're going to send

16   you another agreement.  We want you to look it over and if you

17   agree, sign it.  No.  They send it over with the threat of

18   foreclosure, which was still standing from their notifications.

19   And I go, I don't need another contract.  I already have a

20   contract and it's binding.  You have signed it.  And I

21   submitted, Your Honor, also a document numerated for your --

22   for you to see that I requested the statement showing the

23   principal reduction, showing the interest and all the letters

24   pertaining to this modification.

25          For a year-and-a-half, Your Honor, I received those

1   statements, which I submitted to you -- to this Court.  I

2   submitted those statements for a year-and-a-half that showed

3   that is the principal reduction on there.  And three years

4   after, when I'm filing a complaint with the Financial

5   Protection Bureau -- Consumer Financial Protection Bureau --

6   three years after, they send a note saying, oh, there was an

7   error.  By the way, there was an error.  And I said, wait a

8   minute, an error?  I have relied on the contract.  I have

9   relied on the statements for a year-and-a-half.  I have even

10  additional other documents which I submitted which shows from

11  the CEO -- GMAC's CEO -- stating that the principal amount on

12  the loan is exactly as per the operative agreement of this 5th

13  of '09.

14          And I put in the file all those documents that show

15  that they were admitting to that.  Not only that, but all my

16  payments had been made to that first agreement and they have

17  accepted it.  The issue that they want to imply that they're --

18  they want to introduce another agreement, Your Honor, that took

19  me another joke, and that's what got the condition that I have.

20          THE COURT:  Okay.  Let me ask you and then I want to

21  ask about something else.  I think -- and I'm not ruling from

22  the bench.  I understand the issues, and I'll go ahead and deal

23  with it in writing.  You have your lawsuit against Ocwen,

24  correct?

25          MR. PICHARDO:  Yes.

1          THE COURT:  What's the -- has a trial date been set?

2          MR. PICHARDO:  Not yet, Your Honor.  There -- the

3    issue with Ocwen is that when they obtained this loan, they --

4    as you remember -- they were a participant in acquiring this

5    loan from the previous servicer.  And I sent them notices

6    saying there are issues that you must address.  For two years

7    they didn't touch anything.  They didn't want to answer,

8    nothing.  When finally I filed, and included Ocwen as the

9    servicer with the duty to perform on this contract, they

10   entirely washed their hands of it.

11         THE COURT:  Yeah, no, I just want -- I'm just trying

12   to understand procedurally, because I know there was a hearing

13   on ADR, I think, on June 1st of 2015.

14         MR. PICHARDO:  Yeah, there was no results of that,

15   Your Honor.  I'm sorry.

16         THE COURT:  Okay.  And so what I'm trying --

17         MR. PICHARDO:  They -- they --

18         THE COURT:  I'm trying to find out whether this case

19   is going to go to trial in California or not and when.

20         MR. PICHARDO:  It's probably will, Your Honor.  The

21   judge had previously set for trial, but Ocwen requested ADR.

22   And I said, if you're not going to go by the operative

23   agreement, this is a waste of time.  So eight months went by --

24   seven, eight months went by.  And now they are requesting

25   summary judgment.

1          THE COURT:  Ms. Richards, do you know what the status

2   is?

3          MS. RICHARDS:  I -- Your Honor, I think the better

4   person to ask --

5          MR. PICHARDO:  There's a hearing coming up --

6          MS. RICHARDS:  -- is Mr. Shaham who's on the line.

7          MR. PICHARDO:  -- September 9th for the summary

8   judgment, Your Honor.

9          THE COURT:  I'm sorry, when?

10         MR. PICHARDO:  September 8th, I'm sorry.  September

11  8th.  That's for a summary judgment.

12         THE COURT:  And Ocwen's counsel is on the phone?  Is

13  that what you're saying?

14         MS. RICHARDS:  Yes, Your Honor.

15         THE COURT:  Can you just tell me your name again, sir?

16  For who?

17         MS. RICHARDS:  Mr. Shaham was on the line.

18         THE COURT:  Mr. Shaham, are you on the line?

19         MR. SHAHAM:  Yes, Your Honor, I'm on the line.  Yaron

20  Shaham on CourtCall for Ocwen Loan Servicing.

21         THE COURT:  All right.  Tell -- what's the --

22         MR. SHAHAM:  Thank you for allowing me to --

23         THE COURT:  -- what's the status?

24         MR. SHAHAM:  The status is, Your Honor, that there is

25  a second amended complaint before the Orange County Superior

1   Court here in Orange County, California.  We have filed a

2   motion for summary judgment that is set currently for September

3   8th of this year.  Recently Mr. Pichardo filed a motion for

4   leave to file a third amended complaint and add additional

5   causes of action.  That motion was denied by the court, and as

6   such, the only thing that is currently on calendar before the

7   court here in Orange County, California is our -- is Ocwen's

8   September 8th MSJ hearing.

9         THE COURT:  Okay, is that fully briefed yet?

10        MR. SHAHAM:  We have filed our motion and supporting

11  pleadings.  Mr. Pichardo has filed a response to our separate

12  statement of undisputed facts; and as such, that is currently

13  all that has been briefed at the present time.  The way it

14  works here in California, Your Honor, is fourteen days prior to

15  a hearing on a motion for summary judgment, opposition

16  pleadings are due; and then about -- I think it's five days --

17  yeah, five days, Your Honor, the reply papers are all due.  So

18  we still have a couple of weeks before everything has to get

19  in, Your Honor.

20        THE COURT:  Okay.  Thank you very much.

21        MR. SHAHAM:  You're welcome, Your Honor.

22        THE COURT:  All right.  I'm going to take the matter

23  under submission.  I have a, I think, a pretty complete

24  understanding of the legal issues on the objection to the

25  claim, and I will enter an appropriate decision.  Okay?

RESIDENTIAL CAPITAL, LLC, ET AL.                    47

1        MS. RICHARDS:  Thank you, Your Honor.

2        THE COURT:  Thank you very much, Mr. Pichardo.

3        MR. PICHARDO:  Thank you, Your Honor.

4        THE COURT:  All right.  We're going to take a --

5        MR. WISHNEW:  Your Honor, there's one last matter.

6        THE COURT:  Go ahead, Mr. Wishnew.

7        MR. WISHNEW:  Briefly, Your Honor.  The last matter on

8    today's calendar was a second status conference.  This is at

9    number 1 under V on page 8 of today's agenda.  This concerns

10   the claim objection of the Borrower Claims Trust to Erlinda

11   Abibas Aniel and Fermin Solis Aniel.  I believe Ms. Aniel is on

12   the phone.

13       THE COURT:  Ms. Aniel, are you on the phone?  Ms.

14   Aniel, are you on the phone?  I see you've checked in earlier.

15       MS. ANIEL:  Yes, good morning, Your Honor.

16       THE COURT:  Thank you.

17       MS. ANIEL:  Yeah, I'm here.

18       THE COURT:  Okay, go ahead, Mr. Wishnew.

19       MR. WISHNEW:  Your Honor, unfortunately, since Your

20   Honor issued the decision on June 30th, the Borrower Trust has

21   not had an opportunity to reach out to Ms. Aniel to try and

22   explore settlement.  However, in the interim, Ms. Aniel did

23   file a motion for reconsideration that I know the Court has at

24   this point in time.  We're willing to wait for the Court to

25   rule on the reconsideration motion and then try and briefly

1    explore settlement, and if not, then move forward towards an

2    evidentiary hearing on any --

3              THE COURT:  All right.  You shouldn't be waiting for

4    me to rule on the motion for reconsideration.

5              MR. WISHNEW:  Okay.

6              THE COURT:  You should reach out and --

7              MR. WISHNEW:  Okay.

8              THE COURT:  -- certainly begin discussion with Ms.

9    Aniel to see whether you can -- the matter can be resolved or

10   not.

11             MR. WISHNEW:  Okay.

12             THE COURT:  In due course, I'll rule on the motion for

13   reconsideration, but I don't have a ruling yet.

14             MR. WISHNEW:  Okay.

15             THE COURT:  So let's not wait.

16             MR. WISHNEW:  Very good.

17             THE COURT:  Ms. Aniel, is there anything you want to

18   say?

19             MS. ANIEL:  Pardon me, Your Honor?

20             THE COURT:  Yes?  So Mr. Wishnew or one of his

21   colleagues will be in touch with you to try and discuss whether

22   the matter can be resolved through settlement.  You have your

23   motion for reconsideration.  In due course, I'll rule on that.

24   If not, I'm going to expect that the scheduling order gets

25   set --

RESIDENTIAL CAPITAL, LLC, ET AL.                        49

1          MR. WISHNEW:  Yup.

2          THE COURT:  -- and we'll deal with that.

3          MR. WISHNEW:  Will do, Your Honor.

4          THE COURT:  So you want to likewise speak with Ms.

5   Aniel about -- assuming you can't get it resolved -- about a

6   scheduling order as well --

7          MR. WISHNEW:  Yes.

8          THE COURT:  -- with the appropriate schedule list.

9          MR. WISHNEW:  Yes.

10         THE COURT:  Okay?

11         MR. WISHNEW:  Very good.

12         THE COURT:  All right.  Thank you very much, Ms.

13   Aniel.

14         MS. ANIEL:  Okay, thank you very much, Your Honor.

15   Have a nice day, thank you, bye-bye.

16         THE COURT:  All right.  We're going to take a ten-

17   minute recess, and then we'll hopefully finish up reasonably

18   quickly.  Okay?

19         MR. WISHNEW:  Very good, Your Honor.

20         THE COURT:  Thanks very much.

21         MR. WISHNEW:  Thank you.

22      (Whereupon these proceedings were concluded at 11:07 AM)

23

24

25

1

2                                    **I N D E X**

3

4                              RULINGS

5                                              PAGE      LINE

6   Proposed case management and scheduling       6         24

7   order in Longoni and Gagnon claim matter is

8   approved.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          C E R T I F I C A T I O N

3

4      I, Penina Wolicki, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7

8

9

10     _____

11     PENINA WOLICKI

12     AAERT Certified Electronic Transcriber CET**D-569

13

14     eScribers

15     700 West 192nd Street, Suite #607

16     New York, NY 10040

17

18     Date:  July 17, 2015

19

20

21

22

23

24

25