1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, ET AL.,

9

10            Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            July 16, 2015

19            11:21 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2   Evidentiary Hearing Re:   Todd Silber's claim

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Ellen S. Kolman

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

1

2    A P P E A R A N C E S :

3    MORRISON & FOERSTER LLP

4         Attorneys for Debtors

5         250 West 55th Street

6         New York, NY 10019

7

8    BY:   JORDAN A. WISHNEW, ESQ.

9         ERICA J. RICHARDS, ESQ.

10        JESSICA J. ARETT, ESQ.

11

12

13   SEVERSON & WERSON

14        Attorneys for Debtors

15        19100 Von Karman Avenue

16        Suite 700

17        Irvine, CA 92612

18

19   BY:   YARON SHAHAM, ESQ. (TELEPHONICALLY)

20

21

22

23

24

25

1

2  RESCAP LIQUIDATING TRUST

3        P.O. Box 385220

4        Bloomington, MN 55438

5

6  BY:   KATHY PRIORE, ESQ. (TELEPHONICALLY)

7

8

9  BRADLEY ARANT BOULT CUMMINGS LLP

10        Attorneys for The ResCap Borrower Claims Trusts

11        100 North Tryon Street

12        Suite 2690

13        Charlotte, NC 28202

14

15  BY:   AVERY SIMMONS, ESQ. (TELEPHONICALLY)

16

17

18  ALSO PRESENT:

19        TODD SILBER, Party, Pro Se

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE COURT:  All right.  Please be seated.

3          We're here in Residential Capital, number 12-12020.

4    It's a continuation of the evidentiary hearing with respect to

5    the objection of claimant Todd Silber.

6          Mr. Silber?

7          MR. SILBER:  Good morning.

8          THE COURT:  Mr. Wishnew?  Mr. Cunningham.

9          MR. WISHNEW:   Should I reintroduce Mr. Cunningham

10   today?

11         THE COURT:  Yes.  Absolutely.

12         Come on up, Mr. Cunningham.

13         You're still under oath, Mr. Cunningham.  Why don't

14   you just have a seat?  Okay.

15         MR. CUNNINGHAM:  Thank you.

16         THE COURT:  First, I want to apologize to all of you.

17   I really had wanted to finish yesterday.  I thought we would

18   have been done.

19         Because all of our judges had to be up on a bench for

20   the public swearing in of two of the judges who, actually, were

21   sworn in informally a couple of months ago and have been

22   sitting, but I don't know where you live, Mr. Cunningham; I

23   know it wasn't convenient for you to have to stay and come back

24   and I apologize for that.

25         MR. CUNNINGHAM: Thank you.

 1          THE COURT:  Okay.  And to you, as well, Mr. Silber.

 2          MR. SILBER:  Thank you.

 3          THE COURT:  I hope you were able to go home and take

 4   the train in this morning.

 5          MR. SILBER:  A train and bus.  So maybe I'll take a

 6   boat home today to wrap up all three modes of transportation.

 7          THE COURT:  Okay.  All right.  So we're -- when we

 8   broke yesterday, we were in Mr. Silber's cross-examination of

 9   Mr. Cunningham.  So why don't you proceed.  Okay?

10          MR. SILBER:  Do you need me to state who I am again

11   for the record?

12          THE COURT:  Yes.  Why don't you go up to the --

13          MR. SILBER:  Okay.

14          THE COURT:  Bring your notes or whatever you need over

15   there.

16          MR. SILBER:  Very well.

17          THE COURT:  Okay.

18          MR. SILBER:  I'll start here.

19          THE COURT:  Do you have an estimate of how much time

20   you have?  I'm not --

21          MR. SILBER:  I have no idea, Your Honor.  I'm so

22   sorry.  I do not know.

23          THE COURT:  All right.  Let's proceed.

24          MR. SILBER:  I just have a lot to say.

25          THE COURT:  Well --

1          MR. SILBER:  But I will try to be --

2          THE COURT:  Okay.

3          MR. SILBER:  I recognize my error yesterday; I'll be

4    sure to correct it for today and moving a little bit further.

5          THE COURT:  You didn't -- it wasn't an error.  Look,

6    you're appearing without a lawyer.  You're doing just fine.

7    Okay

8          MR. SILBER:  Okay.  Thank you for saying that.

9          Good morning, Mr. Cunningham.

10          THE WITNESS:  Good morning.

11          MR. SILBER:  Todd Silber for the record.  Pro se

12   claimant 4222.

13       (Witness previously sworn)

14   CONTINUED CROSS-EXAMINATION

15   BY MR. SILBER:

16   Q.  So, if we could go back to the first modification attempt,

17   which is Exhibit 45, and establish that those documents were

18   sent, in fact, on December 18th of 2009.

19   A.  Correct.

20   Q.  Page 279 of the servicing records confirms that?

21   A.  Yes.

22   Q.  If you go to page 277, that date is nearly three weeks

23   later, and I understand there was Christmas and a holiday,

24   weekend, but that follow-up was, actually, just a routine

25   collection call, and I had to inquire about what was going on

 1 | with my loss mitigation.

 2 |      THE COURT:  You have to ask questions.

 3 |      MR. SILBER:  Oh, I'm sorry; I'm sorry.

 4 |      THE COURT:  You have to ask questions.  You're not

 5 | testifying.

 6 |      MR. SILBER:  I apologize.

 7 | Q.  Page 277, when I was first notified of missing the -- of

 8 | missing the document, which was the tax returns that were later

 9 | faxed, was that a routine call that was made or was it a

10 | follow-up call from GMAC about what was missing?

11 | A.  I'm sorry; which --

12 | Q.  I'm sorry.

13 | A.  -- are you referring to?  Which --

14 | Q.  Page 277.

15 | A.  I'm sorry; which line on 277?

16 | Q.  I'm sorry; if you go down to 1/11/2010 DM, and it shows

17 | there was a conversation there and them informing me about

18 | collection and fees.  I informed them that it's okay to receive

19 | notice.

20 |      THE COURT:  I don't see where you are.  So you --

21 |      MR. SILBER:  I'm sorry.

22 |      THE COURT:  -- either count down the number of lines

23 | from the top or up from the bottom.

24 |      MR. SILBER:  Okay.  It's going to start on number

25 | nine.

1          THE COURT:  Number nine from the top?

2          MR. SILBER:  Yes, sir.

3          THE COURT:  Okay.

4          MR. SILBER:  It's going to start on number ten; -- I

5    beg your pardon -- with the phone number there.

6          THE COURT:  All right.  Go ahead.  I see it now.

7    Q.  Does that phone number indicate that you were calling me

8    or was I calling you or do you not know?

9    A.  I don't know.

10         THE COURT:  You didn't -- hold on a second -- you

11   didn't make the -- this is not your contact -- the transaction

12   that's recorded was not you personally?

13         THE WITNESS:  No.  No, it wasn't.

14         THE COURT:  Okay.  I'm correct.

15         THE WITNESS:  Correct.

16         THE COURT:  Okay.

17         MR. SILBER:  I beg your pardon.

18   Q.  Based off of what's written underneath that number in your

19   notes, was that a routine call or was it a follow-up to my loss

20   mitigation application?

21   A.  I don't know.

22   Q.  Okay.  If you received documents on the 18th, why did it

23   take over two weeks to be notified there was missing documents?

24   A.  I don't know.

25   Q.  Is that customary for the loss mitigation to take that

1  much time?

2  A.  Each loan has its own circumstances for a review process.

3  Q.  I think yesterday you touched base on it, but could you

4  refresh my memory, what is the process when a loss mitigation

5  comes in through fax -- through a fax machine?

6  A.  A workout package, you mean?

7  Q.  Yes, sir.

8  A.  The workout package would be reviewed to ensure that the

9  documents provided are complete, and if the documentation is

10  not complete, reach out to the customer to obtain the

11  additional documentation is the first step.

12      Second step, once all documentation is received, it will

13  go through our first review with the triage team before we get

14  under -- submitted to the underwriting team for underwriting

15  the loan modification, if approved.

16  Q.  Okay.  And what is the review process?  I believe -- and

17  don't -- that yesterday, just to confirm, was it traditional

18  modification and then HAMP?  Is that how your review process is

19  handled for loss mitigation applications?

20  A.  It's -- I mentioned it's liquidation and retention

21  programs, liquidation programs being a deed in lieu of

22  foreclosure or a short sale, or retention programs which would

23  include traditional loan modifications for FHA, FHA-HAMP mods,

24  or other forbearance-type plans --

25  Q.  Okay.

1    A.  -- or repayment plans.

2    Q.  If we can go to Exhibit 46 in the manila envelope?

3    A.  Okay.

4    Q.  This was the second modification that you had -- is this

5    the second modification application you received from myself?

6    Oh, I'm sorry; that GMAC received from myself?

7    A.  Yes.

8    Q.  Okay.  And then I'd like to go to Exhibit 28, if I could,

9    please, in the binder.

10   A.  Okay.

11   Q.  This denial letter was sent on February 25th, 2010?

12   A.  Is that a question?

13   Q.  Is that correct?  Yes, I'm sorry.

14   A.  Yes.

15   Q.  Is this the denial letter for the January 10th

16   modification -- January 2010 modification application?

17   A.  Yes.

18   Q.  Okay.  Can you explain, in this letter that was sent to

19   me, why I was denied the modification?

20   A.  The letter says, "The financial information provided which

21   shows you have insufficient income to support your request."

22   Q.  And can you continue on with what that says, please?

23   A.  "We recommend you consider selling your property.  If the

24   value of your property has declined and would not result in a

25   full payoff of the mortgage, please contact our office when an

1  offer is received so we can review for a possible short sale."

2  Q.  Do you have any itemization or notes to help back that the

3  financial information provided show you have no insufficient

4  income -- or "you have insufficient income to support your

5  request"?

6  A.  Can you ask that question again?

7  Q.  I'm sorry.  Do you have any documentation to support "The

8  financial information provided shows you have insufficient

9  income to support your request"?  Any kind of underwriting,

10  documentation at all?

11  A.  It's the documentation provided in your workout package.

12  Q.  If we could go to Exhibit 27, right in front of the other

13  one, this letter is dated 1/13/2010.  Was this the letter of

14  denial for the December '09 modification attempt?

15  A.  Yes.

16  Q.  Okay.  If you go to page 2, there's a checkmark with an

17  additional reason of why I was denied.  So it kind of

18  explains -- the front -- does the front of that app -- the

19  front, page 1, say the same information as Exhibit 28, the

20  second denial letter:  "Financial information provided shows

21  you have insufficient income to support your home, or your

22  request.  We recommend you consider selling your property"?

23  A.  Yes, it does.

24  Q.  Okay.  Is there a particular rea -- now, you go on page 2

25  of Exhibit 27; you inform me I failed front-end debt-to-income.

1  Is that what fail -- FEDTI means?

2  A.  Yes.

3  Q.  Okay.  Is there a particular reason why, on Exhibit 28,

4  the second denial letter, there's no clarification of what the

5  insufficient income was?

6  A.  Can you ask that question again?  I'm sorry.

7  Q.  Can you explain why there's no additional reason for

8  denial on the second modification application, as in no front-

9  end debt-to-income, not back-end debt-to-income, anything other

10 than the first paragraph check; when it was done on the first

11 one?

12 A.  In the letter or in the servicing notes, because

13 there's --

14 Q.  In the letter that I would have received -- I'm

15 sorry -- in the exhibit that I received, what you sent me.

16 A.  There was no additional information other than the

17 financial information provided shows you have insufficient

18 income to support the request in the letter.

19 Q.  Is there a reason why there was no additional information

20 added to this one when there was in the first one?

21 A.  I mean, there's comments in the servicing notes, around

22 discussions that took place regarding that.

23 Q.  Are those discussions telling -- informing me?

24 A.  I'll refer you to the servicing notes, page 268, at the

25 bottom of the page, starts with "From Aaron Driscoll," the

1  transaction user name.  If you go halfway down, "Borrower

2  called in, verified info.  Advised credit letters and total

3  amount due.  Breach expiration.  Advise payments.  Borrower 1

4  stated he wants to know why he was denied for mod.  Advised due

5  to unemployment benefits doesn't show verifiable income for

6  nine months.  Advise if there was any other income in home.

7  Borrower 1 state his mother helps the needs" but I think that

8  was the relevant part of it.

9  Q.  So I called in to get clarification for this letter, then,

10  and six days later that's the conversation that was made to me?

11  A.  Yeah.

12  Q.  Okay.  Is there a particular reason why he's informing me

13  of nine months for unemployment?  I think, yesterday, we

14  established that wasn't a requirement of mine.  Twelve months

15  was the requirement -- well, reasonable assurance of twelve

16  months is the requirement.

17  A.  I believe he was stating the regular HAMP guidelines and

18  not the FHA-HAMP guidelines --

19  Q.  Okay.

20  A.  -- in front of him.

21  Q.  I'd like to go to the mortgage letter, Exhibit 44,

22  mortgage letter and FAQ, if I could, please.

23  A.  Okay.

24          THE COURT:  I'm sorry; which exhibit?

25          MR. SILBER:  Exhibit 44 in a manila envelope.

1        THE COURT:  Sure.  Okay.

2  Q.  Can you tell me what FHA's requirements of priority for an

3  FHA modification is -- for an FHA loan is?  What is the order

4  of priority for loss mitigation?

5  A.  Well, the requirement is for retention options first, and

6  then liquidation strategies after you exhaust your retention

7  options.

8  Q.  Yesterday, you spoke of triage, HAMP, and then a

9  traditional denial.  I'm not trying to hold you to that; I'm

10  just trying to refresh my memory.  What is GMAC's position on

11  how it's done?  Can you explain it specifically, please, again?

12  A.  Say that again.

13  Q.  What loss mitiga -- what loss mitigation or programs are

14  initiated and in what order are they initiated?

15  A.  I think I just mentioned that the retention options

16  are -- such as, the FHA-HAMP modification, traditional HAMP

17  modifications -- partial claims, forbearance, repays; those are

18  retention options.

19  Q.  That's your first?

20  A.  That's the first.

21  Q.  Okay.

22  A.  Liquidation strategies are second if you exhaust all

23  options for retention strategy.

24  Q.  Liquidation strategies being --

25  A.  Short sales and deed liens.

1  Q.  On page 3 of Exhibit 44, carried over from number 2 -- and

2  this is my upper right-hand corner -- "Requirements to use FHA-

3  HAMP.  FHA-HAMP can be utilized only if the mortgagor does not

4  qualify for current mitigation home retention options.

5  Priority order:  FHA special forbearance, loan modification,

6  and partial claim."

7      Was an FHA special forbearance ever explored for me as

8  soon as I sent a loss mitigation application to GMAC?

9  A.  It's part of the decisioning process for loss mitigation.

10  Q.  Does your decision -- does GMAC's decision supersede HUD

11  or FHA requirements in this mortgage letter?

12  A.  I don't understand the question.

13  Q.  The question is, does GMAC's -- does GMAC decide how to

14  process loss mitigation applications or must they follow FHA

15  guidelines on FHA loans?

16  A.  We follow FHA guidelines.

17  Q.  So the question is is -- is there any record of an FHA

18  special forbearance, the first option, explored?

19  A.  It's part of the loss mitigation process.

20  Q.  I think, yesterday, we touched base on the servicing

21  records that it's not in there at all.  So we can go --

22          THE COURT:  Ask your question.

23          MR. SILBER:  I'm sorry.

24  Q.  Is it in the servicing notes -- is it kept in the detailed

25  report anywhere that that was put in?

1   A.  The special forbearance?

2   Q.  The FHA special forbearance.

3   A.  Not that I've seen.  I don't recall.

4   Q.  Okay.  Are you required to keep a detailed report for HUD;

5   detailed records?

6   A.  Can you clarify with regard to what, specifically?

7   Q.  Does HUD and FHA require GMAC to keep detailed records of

8   all servicing notes and anything that's been said between

9   parties?

10  A.  I don't know.

11  Q.  Okay.  I'd like to go to Exhibit 43, if we could, the FHA

12  HUD handbook, Chapter 7.  It's in the manila envelope.

13      I believe it's going to be -- well, let me confirm.  It's

14  page 19 -- excuse me -- at the top.

15      "7/12, review before foreclosure decision:  Mortgagees

16  must assure that servicing files fully document that all

17  servicing requirements have been followed and steps have been

18  taken to save a mortgage prior to making a decision to

19  foreclosure."

20      So are there additional servicing files and servicing

21  notes to what you've provided as exhibits here today?

22  A.  There's other systems and applications, yes.

23  Q.  Okay.  With the servicing notes that you provided, would

24  you say that they're fully documenting all servicing

25  requirements?

1   A.  Well, I -- I think when -- I -- I had mentioned yesterday,

2   that in addition to servicing notes in the loan serve

3   application system record, there's other systems such as XNet,

4   Looking Glass, you know, there's other applications beyond just

5   the servicing notes that store information and data.

6   Q.  Okay.  Is -- do those notes have fully documented all the

7   loss mitigation programs that I was applied for, such as FHA

8   forbearance, then -- in accordance with HUD stipulations, do

9   other servicing notes somewhere have the detailed requirements

10  of exactly what steps you took during loss mitigation process?

11  A.  I don't know.

12  Q.  Would you say the servicing notes that we provided are

13  fully documented?  The servicing notes --

14  A.  I don't understand your question.

15  Q.  I'm sorry.  Would you say that Exhibit G, the servicing

16  notes that were provided, are fully documented?

17          THE COURT:  C, Exhibit C is the servicing note.

18          MR. SILBER:  Oh, I'm looking at his; I'm sorry.  I

19  forgot that they only put their --

20          THE COURT:  It's Exhibit C.

21          MR. SILBER:  Exhibit C, I beg your pardon.

22          THE COURT:  And what is your question?

23  Q.  My question is the servicing notes that I've been provided

24  in this exhibit, would you say that these are fully documenting

25  the information regarding loss mitigation applications of

1   myself?

2   A.   I -- I would say it's tracking the activities, but there

3   could be other information in some of those other systems that

4   I spoke to.

5   Q.   So just not in what you provided here today?

6   A.   Asking?  I'm sorry.

7   Q.   I think I got my answer.  I got my answer, thank you.  We

8   could move on, I'm sorry.

9        At any point could I have added someone who wasn't on the

10  current mortgage -- in an attempt for a loss mitigation, could

11  I have added a person to the mortgage to help me possibly push

12  through, using their income, their credit if it was required?

13  A.   Yes, the guidelines allow for you to use other household

14  income.

15  Q.   Okay.  I can add somebody to the loss mitigation

16  application who isn't already on there?

17  A.   Not somebody; other income within the household.

18  Q.   So I wouldn't be able to add another person, okay.  If we

19  could go back to --

20        THE COURT:  He hadn't finished his answer.

21  Q.   I'm sorry, go ahead.

22  A.   I was going to say to add a person to the loan would be an

23  assumption.

24  Q.   Okay.

25  A.   So no, you can't add a person.

1   Q.  If we can -- could I have added my fian --

2           THE COURT:  Stop, stop, stop.

3           MR. SILBER:  Sorry.

4           THE COURT:  Explain, when you say you could add

5   someone, what -- explain what you do?

6           THE WITNESS:  You can't add -- you cannot add someone

7   to the loss mitigation package, but you can add income from

8   someone within the household, as long as it's documented

9   through --

10          THE COURT:  Third party --

11          THE WITNESS:  -- a lease agreement, some type of, you

12  know -- income from that other party who's not on the note or

13  the mortgage can be used.

14          THE COURT:  Okay.

15          THE WITNESS:  As long as it's documented.

16  Q.  I'd like to go to Exhibit 44, then, page 5.  This is my

17  Exhibit 44, which is the FHA mortgage letter 0923.

18          MR. SILBER:  You know what exhibit it is of yours, Mr.

19  Wishnew?

20          MR. WISHNEW:  I'm looking at your exhibits.

21          MR. SILBER:  Okay.

22  A.  Okay.

23  Q.  "Eligibility for mortgagers", five paragraphs down, or

24  five statements down, "A new mortgager may be added to the HAMP

25  mortgage, provided at least one existing mortgager is

1  retained."  Does that say I could add a new mortgager as long

2  as -- to the HAMP mortgage?

3  A.  That's assuming you get a HAMP modified loan, that you can

4  go through an assumption process, through the modification,

5  because you're reunderwriting the loan, to add someone to that

6  modification.  Your question earlier related to --

7  Q.  Is that not what I just asked you earlier?

8          THE COURT:  Don't interrupt him.

9          MR. SILBER:  I'm sorry.

10 A.  Your question earlier related to income, can you use

11 income for purposes of the workout package.

12 Q.  I believe I just asked you if I could have added somebody

13 on a loss mitigation application; that was the question.

14 A.  And the answer is --

15 Q.  Could I have added somebody --

16 A.  -- no, you cannot.

17 Q.  -- to the --

18         THE COURT:  Stop.  Both of you stop.  You have to wait

19 until he finishes his question before you answer.  And then,

20 Mr. Silber (sic), wait until you finish your answer before he

21 asks his next question.  So let's start with Mr. Silber asking

22 a question, and you'll answer it, okay.

23         MR. SILBER:  Okay.  I guess I'd ask for the Court to

24 read --

25         THE COURT:  I can't read it back.

1        MR. SILBER:  Okay.

2    Q.  Did I not just ask you --

3        THE COURT:  Just ask a question --

4        MR. SILBER:  I'm sorry.

5        THE COURT:  -- not what you asked before.  Just ask a

6    question.

7    Q.  So this says a new mortgager could be added to the HAMP

8    mortgage.  So when I filed for a loss mitigation application, I

9    could have added a second person to help me, a second person to

10   be added to the mortgage?

11   A.  You could add their income to the workout package.  So,

12   yes, you could add their income to your workout package.

13   Q.  And page 5 says a new mortgager may be added to the HAMP

14   mortgage.  It doesn't say anything on income; it says you may

15   add a second person?

16   A.  To the -- I'm sorry, to the mortgage itself, the modified

17   mortgage.  It does not reference application.

18   Q.  Well, how else do we come --

19       THE COURT:  Ask another question.

20       MR. SILBER:  Okay, sorry.

21       THE COURT:  Let's move onto another topic, Mr. Silber.

22       MR. SILBER:  All right.

23   Q.  Is GMAC required to report loss mitigation applications

24   and information to FHA and HUD for monetary?

25   A.  Through the SFDMS system, yes.

1   Q.  And that's how you would -- that's how HUD would collect

2   data, you would say?  That's the data collection process?

3   A.  Yes.

4   Q.  Okay.  What does SFDMS stand for?

5   A.  SFDMS is single family default management system.

6   Q.  Okay.

7   A.  It's a FHA system.

8   Q.  So you are -- okay.  So we're required to report it?

9   A.  Yes.

10   Q.  Was it ever reported to HUD or FHA to monitor my loss

11   mitigation application?

12   A.  I -- I don't know.

13   Q.  In the servicing notes that you provided, is there any

14   record that it was ever reported to HUD or FHA?

15   A.  Not in the servicing notes.

16   Q.  Okay.  And what's the purpose for the data collection from

17   FHA-HUD?

18   A.  I -- I don't know.

19   Q.  Exhibit 44, the mortgage letter, page 10.  Up in the upper

20   right-hand corner, my mark.

21   A.  Okay.

22   Q.  "Mortgagees will continue to be required to collect and

23   transmit mortgager and property data in order to ensure

24   compliance with the program, as well as to measure its

25   effectiveness.  Data elements may include data needed to

1    perform underwriting analysis, mortgage terms, low-level data,

2    in order to establish loans for processing during the trial

3    period, to record modification details, and monthly loan

4    activity reports."

5    A.  Okay.

6    Q.  So do you think it's essential -- I can't ask that

7    question.  You don't have any record of it being reported,

8    okay.  We can move on.

9         If we go to Exhibit 47 --

10   A.  Okay.

11   Q.  -- the back page shows a --

12         MR. SILBER:  Are we all there?

13         THE COURT:  Go ahead.

14         MR. SILBER:  Okay.

15   Q.  The back page shows a tenant agreement between myself and

16   one Ms. Melinda Johnston.

17         THE COURT:  Mindy Johnston?

18         MR. SILBER:  Mindy Johnston.

19   Q.  And how much is that for?

20   A.  500 dollars a month.

21   Q.  And it was -- and when you used this as additional income,

22   the GMAC used all of the 500?

23   A.  No.

24   Q.  How much did they use of it?

25   A.  375.

1    Q.  Why was only seventy-five percent used?

2    A.  That's the HUD guideline, the FHA guideline.

3    Q.  Do you have any documentation to support that?  Or could

4    you explain where you're getting that from?

5    A.  Yeah, just give me one minute.

6        (Pause)

7    A.  Sorry, I'm trying to find the exhibit for the HAMP -- the

8    FHA-HAMP.  Okay, that's Exhibit 44.

9    Q.  I believe my exhibit is 44 for that; you might have a

10   different one, but I believe the document's identical.

11       (Pause)

12   A.  I'm sorry, it's here.  I'm just having a hard time finding

13   it.  Sorry.

14       (Pause)

15           MR. SILBER:  I believe counselor for the -- they found

16   it if you want to point it out.  I don't know if they're

17   allowed to point it out to him.

18           THE COURT:  They can.  It's in the documents; we just

19   want to get to the facts.

20           MR. WISHNEW:  Mr. Cunningham, if you could look to

21   Borrower Trust Exhibit M, as in Mary, page 8.

22           THE COURT:  Make sure it's the --

23           THE WITNESS:  I believe I know what document they're

24   referring to.

25   A.  So because the FHA-HAMP program was silent on -- with

1  regard to rental income, you relied on the regular HAMP

2  guidelines to provide --

3  Q.  So it says that --

4  A.  -- the seventy percent, the seventy-five percent.

5  Q.  So it says it in the HAMP guidelines --

6  A.  The regular HAMP.

7  Q.  -- it doesn't say it in the FHA-HAMP guidelines?

8  A.  It's silent in the FHA-HAMP guidelines.

9  Q.  Can you -- can you point out where you would --

10         THE COURT:  Let's not get into an argument.

11         MR. SILBER:  Okay, sorry.

12         THE COURT:  Okay.  Just ask your questions.  He's

13  answered your question.

14         MR. SILBER:  Okay.

15         THE COURT:  Ask your next question.

16         MR. SILBER:  Okay.  Can I point out something?  Page

17  11 of the Exhibit 44 --

18         THE COURT:  Okay.

19         MR. SILBER:  -- the mortgage letter, the FHA mortgage

20  letter, page 11 of Exhibit 44.

21  Q.  At the top it says, "Basic program guidelines".

22  A.  I'm sorry, where?

23  Q.  Are you on page 11 of my Exhibit 44?

24  A.  Your page 11, or the FAQ page 11?

25  Q.  Yeah, my page 11, in the top right-hand corner.  I'm

1    sorry.

2    A.   Yes, I'm there.

3    Q.   Okay.  "Basic program guidelines."

4    A.   Section A, yes.

5    Q.   "In general" -- if you go all the way down to number 4.

6    "In general, when an issue is not addressed can we follow HAMP

7    rules?"  You see where it asks that question?

8    A.   Um-hum.

9    Q.   And the next page, page 12, upper right-hand corner, it

10   says, "No, FHA-HAMP applies only to FHA-insured mortgages.

11   Consequently, when an issue is not specifically addressed in"

12   this mortgage letter ... "servicers to other mortgagee letters

13   for FHA modifications and FHA partial claim guidance".  So I

14   don't see where it says you default to HAMP.

15   A.   I was stating a business practice.

16   Q.   And does your business practice supersede FHA guidelines?

17   Can you overrule FHA and HUD guidelines?

18   A.   Well, it didn't overrule; it gave us a guideline to

19   utilize that was silent in the FHA modification program.

20   Q.   I think I've made my point on that, thank you.

21           THE COURT:  Just ask questions.

22           MR. SILBER:  Sorry.

23   Q.   At the time that that lease agreement was given to you in

24   the servicing records, was it being reviewed for a HAMP

25   modification, or an FHA-HAMP modification?

1  A.  Do you have a page or --

2  Q.  I'm sorry, I can look it up; I thought we touched based on

3  it yesterday.  I can just --

4  A.  Yeah, I think we did, also.

5       THE COURT:  Servicing notes only refer to HAMP, not

6  FHA-HAMP.

7       THE WITNESS:  Correct.

8       THE COURT:  We went through this yesterday.

9       MR. SILBER:  Okay.  So we made -- okay, we made the

10 point.

11      THE COURT:  I have it in mind.

12      MR. SILBER:  Thank you, I'm sorry.

13      THE COURT:  That's okay.  Let's move on.

14      Although, my recollection of his testimony yesterday,

15 Mr. Silber, is even though it said HAMP it was for an FHA-HAMP

16 modification that was being reviewed, but that was what I

17 remember the testimony to be.  I know --

18      MR. SILBER:  Okay.

19      THE COURT:  -- what the servicing notes say.

20      MR. SILBER:  Okay.  I guess I'll have to ask that

21 que -- I don't recall that.

22      THE COURT:  Go ahead, ask a question.

23 Q.  If it says HAMP inside the servicing notes, even though it

24 says HAMP, it was being reviewed for FHA-HAMP?

25 A.  Correct.

1    Q.   And do we have any documentation that supports that?  Loss

2    mitigation applications -- I'm sorry, underwriting, breakdowns,

3    servicing notes, records of any kind that supports it was being

4    reviewed for FHA?

5    A.   I'd have to go through the whole servicing history, so I

6    don't know.

7             THE COURT:  Go ahead.

8             MR. SILBER:  Okay.

9    Q.   If we can go to your servicing notes, page 259.

10            THE COURT:  This is Exhibit C.

11            MR. SILBER:  Exhibit C, I beg your pardon.

12            THE COURT:  No, I'll just add that to --

13            THE WITNESS:  Okay.

14   Q.   If you go thirteen up from the bottom, so above where Kay

15   Frey (ph.) is there and you enter the discussion with Aaron

16   Driscoll.

17       It says that, "You are unemployed and receiving benefits,

18   and advised if not showing nine months of guaranteed months, we

19   will not look into options"?

20   A.   Yes.

21   Q.   You see where it says that?

22   A.   Yes.

23   Q.   Did the nine months of guaranteed unemployment, was it a

24   requirement of mine, for other options?

25   A.   Yes.

RESIDENTIAL CAPITAL, LLC, ET AL                    30

1   Q.  Was the first requirement in the mortgage letter of loss

2   mitigation for a HAMP program or an FHA program?

3   A.  I'm sorry, say it again?

4   Q.  In the mortgage letter, we established earlier the order

5   of priority for loss mitigation on FHA applications.

6   A.  Okay.

7   Q.  Did it say the first priority was for HAMP or for FHA-

8   HAMP?  I'm sorry, did it say it was for HAMP or for an FHA

9   forbearance plan?

10   A.  It special forbearance.

11   Q.  FH -- okay.  Well, let's go back a minute, take a look.

12   So the first priority is an FHA special forbearance?

13   A.  If I can go back to the document, I believe that's what it

14   says.

15   Q.  Page 45.

16   A.  I think we concur.

17   Q.  Yet the conversation with Aaron says, "Nine months of

18   guaranteed or will not look into any other options."  When is

19   the nine months of unemployment guaranteed required?  What

20   program?

21   A.  Well, I think in these servicing notices you're referring

22   to after it was evaluated multiple times for the FHA programs.

23   So I --

24   Q.  Well, there's no FHA pro --

25        THE COURT:  Please stop.  Go ahead with your answer.

1   A.  His comment's alluding to "it's been reviewed for the FHA

2   programs" and I believe that comment to be that for retention

3   options you would need to provide that additional

4   documentation.

5   Q.  Can you point out where he's telling me it was already

6   reviewed for FHA-HAMP?

7   A.  It's in the history.  It's in the months prior leading up

8   to that discussion.  And as part of the process when a borrower

9   calls in here, discussing working -- you know, working with the

10  homeowner, you look at the history of the loan before you have

11  that discussion.  So it's inherent in the history.

12  Q.  That day when I spoke to him, that conversation alone,

13  does it reference anything about FHA, special forbearance --

14          THE COURT:  I can read it as well as anybody else.  If

15  you're asking what the document says, I see it.  Let's move on.

16          MR. SILBER:  Okay.  I'm sorry.  I --

17          THE COURT:  Okay.  You're fencing with the witness

18  about a conversation he didn't have, about what's written on a

19  piece of paper that is in front of me.  I've read it.  Ask your

20  next question.

21          MR. SILBER:  Okay, sorry.

22  Q.  Is FHA loss mitigation mandatory -- to be reviewed for FHA

23  loss mitigation, is it mandatory?

24  A.  It was -- we had it in place.  I mean, the

25  mandatory -- GMAC followed the FHA guidelines.

RESIDENTIAL CAPITAL, LLC, ET AL                    32

1    Q.  I guess yes or no, is it mandatory for you to follow to

2    participate in FHA loss mitigation?

3    A.  I don't know.

4    Q.  Can we go back to Exhibit 44, page 15, please?  My page

5    15, in the upper right-hand corner.

6    A.  Okay.

7    Q.  If we go down to number 15, the question is asked, "Is

8    this program mandatory or required to solicit buyers when they

9    qualify?"  "Yes, the evaluation of FHA borrowers for loss

10   mitigation is mandatory."  Do you see that?

11   A.  Yes.

12   Q.  Do you dispute that statement in any way?

13   A.  No.

14   Q.  Okay, I think we can move on.  If you can go to

15   Exhibit -- I guess that's an argument.  Sorry, beg your pardon.

16       Prior to the foreclosure, was I considered for all loss

17   mitigation programs according to FHA guidelines?

18   A.  Yes.

19   Q.  Are you incentivized by HUD or FHA to modify loans?  I'm

20   sorry, was GMAC incentivized by HUD, FHA to modify loans to

21   avoid foreclosures?

22   A.  Yeah.

23   Q.  I'd like to go to your declaration now, if we could:

24   notice of declaration of David Cunningham.

25       You spoke yesterday, briefly, and then we had to cut it

RESIDENTIAL CAPITAL, LLC, ET AL                           33

1  short, about the forbearance plan that was offered.  Did we

2  enter an agreement for a forbearance plan?

3  A.  Yes.

4  Q.  And the forbearance plan was for how much?

5  A.  It was half your contractual monthly payment.  You need

6  the exact dollar amount?

7  Q.  Please.

8          THE COURT:  Could you point him to the place, so we

9  can move along.

10          MR. SILBER:  Of where the dollar amount is?

11          THE COURT:  Yes.

12          MR. SILBER:  Well, the contractual monthly payment was

13  made --

14          THE COURT:  Is it in the declaration?

15          MR. SILBER:  No.  It's -- oh, it is, I'm sorry.

16          MR. WISHNEW:  Paragraph 22, Your Honor.

17          THE COURT:  Paragraph 22.

18          MR. SILBER:  Thank you, Mr. Wishnew.

19  A.  $995.40.

20  Q.  And did I make all six payments?

21  A.  Yes.

22          THE COURT:  We covered this yesterday.

23          MR. SILBER:  I didn't know where left off, Your Honor,

24  I'm sorry.

25          THE COURT:  You asked him about it, and he said you

RESIDENTIAL CAPITAL, LLC, ET AL                     34

1   made all the payments.

2           MR. SILBER:  Okay.

3   Q.  Was a payment ever refused, according to that plan?

4   A.  Yes.

5   Q.  Number 24 it says, "The debtors mistakenly returned the

6   claimant's first payment under the forbearance plan."  Number

7   24 of your declaration?

8   A.  Yes.

9           THE COURT:  It's paragraph 24 on page 9.  Go ahead.

10          THE WITNESS:  Yes.

11          MR. SILBER:  Page 9, I'm sorry.  Page 9.

12  Q.  So was the first payment refused underneath the

13  forbearance plan?

14  A.  Yes.

15  Q.  Okay.

16  A.  But shortly thereafter it was corrected, if you go to the

17  service agreement.

18  Q.  If we can go to my Exhibit 41 inside my three-ring binder.

19  A.  Okay.

20  Q.  I thought I had the document number up top of where that's

21  from.  I'm just looking it up, so I can tell you exactly what

22  that's from.

23      Okay.  That is from document 8160, the "ResCap Borrower

24  Claims Trust's Reply in Support of its Objection to Claim

25  Number 4222 Filed by Todd Silber".  That's just a page from it,

1  page 60, or my Exhibit 41 is a page from it.

2      At the bottom of that page, in the original objection, it

3  says, "The Borrower's Trust mistakenly identified the rejected

4  payment as the first payment on the forbearance plan, when, in

5  fact, it was the second payment."

6  A.  Okay.

7  Q.  In your declaration you're saying it's the first payment.

8  Could I just have some clarification?  Was it the first payment

9  or second payment?

10      (Pause)

11  A.  I'm sorry.  Just give me one minute.

12          MR. WISHNEW:  Your Honor, if I could ask a question to

13  try and move this along?

14          THE COURT:  No.

15          MR. WISHNEW:  Okay.

16      (Pause)

17  A.  I believe it was the second.

18          THE COURT:  What are you referring to?

19          THE WITNESS:  The servicing notes on page 243 and page

20  244.  On page 244 it alludes to on June 1st -- it says the

21  borrow -- I'm sorry. Middle of the page.  It says,

22          "The borrower signed a six month forbearance plan and

23  we have received the first payment and signed agreement."

24          And then, if you refer to page 243, it speaks to the

25  returned check.

1          THE COURT:  All right.  Ask your next question, Mr.

2    Silber.

3    Q.  If we can go to your declaration, page 5, number 11.  Well,

4    let's start at number 10.

5          "GMACM serviced the loan from the time it was originated on

6    November, 2008 until servicing of the loan was transferred to

7    Ocwen, February 16, 2013."  "Attached hereto as Exhibit G,

8    GMACM assigned the mortgage to Ocwen on April 18, 2014.  See

9    Ocwen Assignment, attached hereto."

10         Number 11 says:  "At the time servicing was transferred to

11   Ocwen, the claimant had not made a mortgage payment since July

12   30, 2010 and the loan was past due for the December 1, 2009

13   payment."

14   A.  Okay.

15   Q.  Mr. Cunningham, you just told the Court that we had a six-

16   month forbearance plan.  Yesterday it was from June of 2010

17   till November of 2010; that I made all six payments.  So I just

18   want to know where that information is coming from.

19   A.  If you refer to page 1 of the servicing note, the payment

20   history, it's actually -- it was not July 30th.  In the middle

21   of the page it says "Last Payment October 29th of 2010."

22   Q.  In what?  I'm sorry?

23   A.  October 29th of 2010.  It's in the middle of the page on

24   page 1 in servicing notes.

25   Q.  I know what it says in the servicing notes, Mr. Cunningham.

1    I'm just wondering where you're getting that statement from,

2    why that statement was made.

3    A.  I think that was just an error.

4    Q.  That's the -- July 30th was the second month of the

5    forbearance plan?

6    A.  It was the second month, yes.

7    Q.  July was the second month.

8    A.  Because it started in June.

9    Q.  And July was the month that you sent back the payment

10   in -- wrongfully refused my payment.

11   A.  Correct.

12   Q.  Correct?  Okay.  If HUD was monitoring and saw that I

13   failed at a repayment plan such as a forbearance plan, would it

14   terminate me from being eligible from further FHA benefits?

15   A.  I don't know.

16   Q.  You can go to the mortgage letter, if you don't mind.

17   Exhibit 44.

18       (Pause)

19   Q.  If we can go to page 20?  I apologize for the delay in

20   finding it.  Page 20 on Exhibit 44, my page 20 in the upper

21   right-hand corner, number 3 at the very, very bottom underneath

22   "Trial Modification":

23       "To clarify, no matter what circumstances that occurred, if

24   a borrower breaks the trial plan arrangements they are not

25   eligible for another HAMP?"

1          And if you go to page 21, it says "correct" as the answer.

2               MR. WISHNEW:  Is there a question, Your Honor?

3               THE COURT:  Not so far.

4               MR. SILBER:  I beg your pardon?

5               MR. WISHNEW:  You simply --

6               THE COURT:  Do you have a question?

7               MR. WISHNEW:  You simply stated something on the

8     record.

9               THE COURT:  You have to ask a question.

10              MR. WISHNEW:  What's the question to Mr. Cunningham?

11              THE COURT:  You've pointed out the --

12              MR. SILBER:  Oh, I asked a question.  He said he

13    didn't know.  I was pointing out the answer.  I'm sorry.  I'm

14    sorry.

15              THE COURT:  Well, you don't point out answers.

16              MR. SILBER:  I'm sorry.

17              THE COURT:  If you want to ask him about --

18              MR. SILBER:  Okay.

19              THE COURT:  Now, Mr. Silber, there comes a point in a

20    cross-examination where it begins to become diminishing

21    returns.  You're well past that point.

22              MR. SILBER:  I'm sorry.

23    Q.  If I were to move out of my house, if I abandon my

24    property, if I leave, I move out, I have a change in address,

25    does that disqualify me from participating in any FHA-HAMP

1  benefits?

2  A.  I don't know.

3         THE COURT:  Mr. Silber, what relevance does that have

4  to this dispute?

5         MR. SILBER:  Okay.  All right.

6         THE COURT:  You weren't rejected from a modification

7  because you moved out of the house.

8         MR. SILBER:  I'm sorry.

9         THE COURT:  You weren't rejected because you allegedly

10  missed a payment or didn't miss a payment.  So your cross-

11  examination has to be relevant to the dispute that's before me.

12  Not hypothetical about what might have happened to somebody

13  else under other circumstances.

14         I don't want to lecture you, okay?  But I want this to

15  conclude.

16         MR. SILBER:  Okay.

17         THE COURT:  You're entitled to cross-examine him on

18  matters that are relevant to your specific case.

19         MR. SILBER:  Okay.  Okay.

20  Q.  Did you report to HUD that I moved out of my home?  Or I

21  changed my address?

22  A.  I don't know.

23         MR. WISHNEW:  Object.

24         MR. SILBER:  It's relevant to my case for monetary.

25  I'm sorry.

1          THE COURT:  You ask him a question.  He answered the

2    question.

3          MR. SILBER:  Okay.

4          THE COURT:  Ask your next question.

5          MR. SILBER:  Okay.  I guess I'm done.

6          THE COURT:  All right.  Any redirect?

7          MR. SILBER:  I will rest with a question.

8          THE COURT:  All right.

9          MR. SILBER:  Let me just make sure.  I'm sorry.  Let

10   me --

11         I'm sorry.

12      (Pause)

13         MR. SILBER:  I guess there's no further questions to

14   Mr. Cunningham.

15         THE COURT:  All right.

16         MR. SILBER:  I am drawing a blank, and I'm --

17         THE COURT:  Mr. Wishnew, any redirect?

18         MR. WISHNEW:  Yes, Your Honor.

19         MR. SILBER:  I'm just upsetting everybody.

20   REDIRECT EXAMINATION

21   BY MR. WISHNEW:

22   Q.  Good afternoon, Mr. Cunningham.

23   A.  Good afternoon.

24   Q.  I'm going to take you through a couple of exhibits, just to

25   address some of the points that Mr. Silber raised on his cross.

1      I'd like to draw your attention first to Mr. Silber's

2  Exhibit 45.

3  A.  Okay.

4  Q.  In the table, where the right-hand column says

5  "documentation required", and five items down, what does it

6  provide is required for documentation related to unemployment

7  or public assistance?

8  A.  That says, "Copy of benefits statement or letter from the

9  provider that states the amount, frequency and duration of the

10  benefit.  Such benefit must continue for at least nine months

11  to be considered for qualifying income."

12  Q.  Okay.  Thank you.  If I could draw your attention to

13  Borrower's Trust Exhibit G, as in guy, specifically, when you

14  get there, if you could read the last paragraph on the first

15  page.

16  A.  "The Loss Mitigation Department completed their review on

17  January 13, 2010; however, they were unable to approve a loan

18  modification.  The account did not qualify for a traditional

19  modification as the only income was unemployment; therefore, it

20  was reviewed for the FHA-HAMP.  Based on a monthly gross income

21  of $3,677.92, your back-end DTI was 73 percent making you

22  ineligible for the FHA-HAMP."

23  Q.  Okay.  Thank you.  And then I'd like to also then draw your

24  attention to paragraph 18 of your declaration.

25  A.  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL                              42

1   Q.  And is it your understanding that it was GMAC Mortgage's

2   business practice to sometimes review an account based on a

3   borrower's unemployment income, even though the borrower had

4   not yet provided documentation demonstrating proof of the

5   duration of that unemployment income?

6   A.  Yes.

7   Q.  Okay.  And if I could now turn your attention to Exhibit M,

8   as in Mary.

9   A.  Okay.

10  Q.  And what is this document?

11  A.  I'm sorry.  I might be looking at the wrong one.

12      This is the regular HAMP program.

13          MR. SILBER:  What exhibit?

14          MR. WISHNEW:  M.

15          THE WITNESS:  M.

16          MR. SILBER:  M?

17  Q.  Is it the regular HAMP program or FHA's HAMP loss

18  mitigation?  They're going to --

19          MR. WISHNEW:  Okay.  Sorry.  My apologies.  Strike

20  that question, Your Honor.

21  Q.  If I could refer you to page 6?

22  A.  Okay.

23  Q.  And, specifically, the paragraph beginning the borrower's

24  "monthly gross income".

25  A.  Read that paragraph?

1    Q.  Well, what does -- if it says -- if I could refer you to

2    the last sentence of that paragraph, would you mind reading

3    that?

4    A.  "If only net income is available, the servicer must

5    multiply the net income amount by 1.25 to estimate the monthly

6    gross income."

7    Q.  Okay.  And if I could --

8           MR. SILBER:  What page?  I'm sorry.

9           MR. WISHNEW:  That was page 6 of Exhibit M.

10          MR. SILBER:  Page 6 of Exhibit M.  Thank you.

11   Q.  And if I could turn your attention back to Exhibit E, as in

12   Edward, once I --

13          MR. WISHNEW:  Strike that.

14   Q.  Let me turn your attention back to Silber Exhibit 45.

15   A.  Okay.

16          MR. WISHNEW:  Your Honor, may I approach the witness

17   with a calculator from my phone?

18          THE COURT:  Yes.

19          MR. WISHNEW:  Thank you.

20   Q.  Okay.  Looking at Silber 45, what was Mr. Silber's net

21   weekly unemployment payments?

22       If I could direct you to his, what's marked as page 9.

23   A.  679 dollars.

24   Q.  Okay.  And so using the calculator I've handed to you, how

25   would you calculate the net monthly income off of the net

RESIDENTIAL CAPITAL, LLC, ET AL                    44

 1  payment?

 2  A.  Multiply the weekly payment times four to get to the

 3  monthly.

 4  Q.  Well, since there's a little bit more than four weeks in

 5  each month, would it be more appropriate to multiple it by the

 6  fifty-two weeks in a year and then divide that by twelve?

 7  A.  Yes.

 8  Q.  Okay.  Can you, using the calculator I've given to you, do

 9  that calculation?  So 679 times 52 divided by 12.

10  A.  $2942.33.

11  Q.  Okay.  And in the guidelines that we were referring to

12  reference multiplying --

13          MR. SILBER:  Which exhibit?  I'm sorry.  In the

14  guidelines of which exhibit?

15          MR. WISHNEW:  That was Exhibit M, as in Mary.

16  Q.  Referenced when using unemployment multiplying it by 1.25

17  to get the monthly gross income.  Is that correct?

18  A.  Correct.

19  Q.  Okay.  Could you multiply the sum you had times 1.25?

20  A.  $3,677.92, I think.

21  Q.  Okay.  And if I could turn you back to Exhibit G.

22  A.  Okay.

23  Q.  What is the monthly gross income evaluate -- I'm

24  sorry -- the monthly gross income mentioned in the last

25  paragraph on the first page of Exhibit G?

1  A.  $3,677.92.

2  Q.  Okay.  If I could now ask you to look to the servicing

3  notes at Borrower's Trust Exhibit C, as in cat, page 277.

4  A.  Okay.

5  Q.  And, specifically, the third line from the top, where it

6  says, "007 Retarget Cit 854 to 26935 to go to Express DTI".

7      Does this suggest -- does this notation suggest that GMAC

8  Mortgage used the unemployment income provided by Mr. Silber to

9  determine whether he qualified for a loan modification?

10 A.  Yes.

11 Q.  Okay.  So they use the monthly income.  They valued it and

12 determined that it didn't fall within the applicable DTI ratio

13 required under FHA.

14 A.  Yes.

15 Q.  Okay.  Okay.  And so, again, going back to paragraph 18 of

16 your declaration, you stated that in March, 2010 Mr. Silber's

17 account was reviewed for a loan modification using the

18 unemployment information he provided even though he did not

19 demonstrate the length of that unemployment income.  Is that

20 correct?

21 A.  Yes.

22 Q.  Okay.  And then if I could take you back, and I apologize

23 for the back-and-forth, but if I could take you back to Exhibit

24 G.

25 A.  Okay.

1  Q.  Page 2.  Is this review -- is the review I just described

2  reflected in the letter?

3  A.  Yes.

4  Q.  Okay.  And is that in -- and is that -- let's see.

5      If I could take you then to Exhibit C, as in cat, page 268.

6  A.  Okay.

7  Q.  Is the reviewer just discussing the notified -- or, I'm

8  sorry, indicated on the -- in the servicing notes at -- on the

9  top half of the page?

10  A.   Yes.

11  Q.  Okay.  So the review that was conducted in March, 2010, is

12  it fair to say that review is similar to the review conducted

13  by GMAC Mortgage of Mr. Silber's unemployment income in

14  January, 2010, prior to the denial?

15  A.  Yeah.

16  Q.  Okay.  So then is it your testimony today that the denials,

17  the January denial, was not for a lack of documentation but for

18  a lack of income?

19  A.  Yes.

20  Q.  Okay.  Thank you.  Mr. Silber made note that -- or just

21  made -- was trying to make the point that the servicing notes

22  only say HAMP.  But even though the servicing notes say HAMP,

23  and this was an FHA-insured loan, does the indication of HAMP

24  in the notes equate to the loan being serviced or mean that the

25  loan was being serviced under FHA-HAMP guidelines?

1       THE COURT:  I'm sorry.  Can you ask that again?

2   A.  I don't understand your question.

3       MR. WISHNEW:  Let me strike that question and rephrase

4   it.

5   Q.  Mr. Silber had an FHA-insured loan, correct?

6   A.  Yes.

7   Q.  Okay.  And when he was considered for loan modification

8   options, he was considered under FHA-HAMP guidelines.

9   A.  Yeah.

10  Q.  And so even though the servicing notes might say HAMP and

11  not FHA-HAMP, that doesn't mean he was not considered under

12  FHA-HAMP.  Correct?

13  A.  Correct.

14  Q.  Okay.  Thank you.  You've mentioned the SFDMS system.  And

15  that was a reporting system for FHA HUD?

16  A.  Yes.

17  Q.  Okay.  And GMAC generally reported to -- yeah -- sorry.

18      Did GMAC service hundreds, thousands, hundreds or

19  many -- hundreds, thousands, or ten of thousands of FHA-insured

20  loans?

21  A.  Yes.

22  Q.  Okay.  And so Mr. Silber's was one of many of FHA-insured

23  loans that GMAC Mortgage serviced.

24  A.  Correct.

25  Q.  And GMAC Mortgage regularly reported to HUD or to FHA HUD

1  on those loans through the SFDMS system.

2  A.  Yes, they did.

3  Q.  Okay.  Mr. Silber also raised the point about the rental

4  income and the fact that 75 percent was used as opposed to,

5  say, the full 500 dollars.  If the full 500 dollars was used,

6  would the decision, at the end of the day, have been any

7  different?  Would he still have been denied, because of a lack

8  of affordability, for the loan modification?

9  A.  Yes.

10  Q.  Okay.

11       MR. WISHNEW:  Just one moment, Your Honor.

12  Q.  Now, well, if I could take you to Silber Exhibit 44?

13  Specifically, the page marked 5 in the top right-hand corner.

14  A.  Okay.

15  Q.  Mr. Silber was hollering that fourth line -- I'm

16  sorry-- the fifth line down saying,

17       "A new mortgagor may be added to the HAMP mortgage."

18       If you could look at the fourth line down, or the one

19  above, that says,

20       "The mortgagors must be an owner-occupant."  Did Mr. Silber

21  ever provide evidence of an owner-occupant that would make this

22  mortgagor eligible to be added for him?

23       MR. WISHNEW:  Strike that question.  Let me rephrase.

24  Q.  Mr. Silber provided rental, evidence of rental income in

25  connection with the loan modification application, correct?

1    A.  Yes.

2    Q.  Okay.  He never provided any evidence of an owner-occupant,

3    correct?

4    A.  Correct.

5    Q.  Okay.

6            THE COURT:  Are you done, Mr. Wishnew?

7            MR. WISHNEW:  Yes, Your Honor.  I have no more

8    questions.

9            THE COURT:  All right.  I'm going to take the matter

10   under submission.

11           MR. WISHNEW:  Okay.

12           THE COURT:  Do you rest, Mr. Wishnew?

13           MR. WISHNEW:  I do rest, Your Honor, unless you want

14   to hear closing statements.

15           THE COURT:  No, I don't.

16           MR. SILBER:  May I say one more thing?  I just have

17   two questions --

18           THE COURT:  Very quickly.

19           MR. SILBER:  -- two questions to ask.

20           THE COURT:  All right.  Go ahead.  Please.

21           UNIDENTIFIED SPEAKER:  I'm counting.

22   BY MR. SILBER:

23           MR. SILBER:  Okay.  Sorry.  Exhibit 33.

24   Q.  Okay.  It says number 2 -- it says "Variance.  A lender is

25   required to submit this form.  Any loss/mitigation applications

1   where all HUD requirements have not been met.  These variances

2   are submitted via EVAR system.  All variances are considered on

3   a case-by-case."

4           THE COURT:  Okay.  Examinations are supposed to go

5   like a pyramid, okay?  So you're entitled to ask about anything

6   Mr. Wishnew covered in his examination.

7           MR. SILBER:  Okay.

8           THE COURT:  This is not among them.

9           MR. SILBER:  Okay.  I'm sorry?

10          THE COURT:  You already covered variance.

11          MR. SILBER:  I beg your pardon?

12          THE COURT:  I'm not reopening the door to move

13  examination.

14          MR. SILBER:  Mr. Wishnew just touched based on your

15  requirements in the nine months of unemployment.

16  Q.   What is FHA's requirement for unemployment?

17          THE COURT:  You've covered that so many times.

18          MR. SILBER:  Oh, I'm sorry.

19          THE COURT:  But look, you know, that --

20          THE COURT:  Mr. Silber?

21          MR. SILBER:  Yes, sir?

22          THE COURT:  He probably told you six times that FHA-

23  HAMP is twelve months.  The servicing notes show repeatedly

24  that they told you nine months.

25          MR. SILBER:  Okay.  Scratch that up.

1        THE COURT:  But his testimony is even considering the

2   unemployment Okay?  But his testimony is, even considering the

3   unemployment income, you didn't qualify.  I'm not sure what

4   the -- how the nine versus twelve months make a difference as a

5   result.

6        MR. SILBER:  Okay.

7        THE COURT:  But you established in your cross-

8   examination of him, multiple times he told you FHA-HAMP is

9   twelve months.  You pointed out lots of places in the servicing

10  notes that keep telling you nine months.  Is there some

11  different point you're trying to make now?

12       MR. SILBER:  No, not on that.  I'm sorry.  Okay.

13  Q.  Can you calculate how back-end debt- to-income is done?  I

14  don't remember what you said yesterday.

15  A.  Okay.  The back-end debt-to-income is your monthly gross

16  income divided by your household expenses.

17  Q.  Can you --

18  A.  So it would be your mortgage payment, which would be

19  principal, interest, taxes, and insurance, plus, you know,

20  household expenses such as, you know, car loan, typically

21  things you would see on a credit report.  So car loans, credit

22  cards, utilities, things like that.  That would have been

23  listed in the application.

24  Q.  Okay.  I'd like to go to the mortgage letter, Exhibit 40 --

25       THE COURT:  You're asked your two questions.

1          MR. SILBER:  I'm sorry.

2          THE COURT:  You know?

3          MR. SILBER:  I'm sorry.

4          THE COURT:  What question are you trying to ask him

5     now?

6          MR. SILBER:  I guess that's the question, and he gave

7     his answer and his position.  We'll argue -- we'll have an

8     argument afterwards, or do I --

9          THE COURT:  We're not having argument.  I'm taking it

10    under submission.  I understand each side's positions.  There's

11    been lots of briefing.

12         MR. SILBER:  Okay.

13         THE COURT:  This was the evidentiary hearing.  I've

14    heard all the evidence.  I'm taking it under submission.  And

15    I'll render a decision.

16         All right.  We're adjourned.

17         MR. WISHNEW:  Thank you, Your Honor.

18         MR. SILBER:  I didn't speak on the EHLP.  Can I just

19    point out one thing?  Please?  I'll just point it out.  One

20    thing.

21         MR. WISHNEW:  Your Honor, that wasn't the subject of

22    redirect.

23         THE COURT:  It wasn't the subject of Mr. Wishnew's

24    examina -- look, Mr. Silber.

25         MR. SILBER:  I'm sorry.  You're right.

RESIDENTIAL CAPITAL, LLC, ET AL                    53

1          THE COURT:  I'm bending over backwards --

2          MR. SILBER:  I appreciate it.

3          THE COURT:  -- to allow you to ask, you know, you're

4    not a lawyer, although you do pretty well.  I got to tell you.

5    Okay?  But there are certain things that whether you're a

6    lawyer or not a lawyer, that are rules that apply.  Okay?  You

7    cross-examined them at length.  I gave you a lot off leeway.

8          Mr. Wishnew asked redirect.  You're entitled to ask

9    questions focused solely on what he covered in redirect.  What

10   you've been doing is going back over issues you covered the

11   first time around.  And that's not going to happen.

12         We're adjourned.

13         MR. WISHNEW:  Thank you, Your Honor.

14         THE WITNESS:  Thank you, Your Honor.

15     (Whereupon these proceedings were concluded at 12:43 PM)

16

17

18

19

20

21

22

23

24

25

1

2                            I N D E X

3

4  WITNESS                EXAMINATION BY      PAGE

5  David Cunningham    Mr. Silber            7

6  David Cunningham    Mr. Wishnew           40

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              C E R T I F I C A T I O N

3

4    I, Ellen S. Kolman, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _____

10   ELLEN S. KOLMAN

11   AAERT Certified Electronic Transcriber (CET**D-568)

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  July 17, 2015

18

19

20

21

22

23

24

25