UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | **NOT FOR PUBLICATION** |
|  | ) |  |
|  | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) |  |
|  | ) | Chapter 11 |
| Debtors. | ) |  |
|  | ) | Jointly Administered |

**MEMORANDUM OPINION AND ORDER SUSTAINING THE RESCAP
BORROWER CLAIMS TRUST'S OBJECTION TO CLAIM NUMBER 4222
FILED BY TODD SILBER**

*A P P E A R A N C E S :*

MORRISON & FOERSTER LLP
*Attorneys for ResCap Borrower Claims Trust*
250 West 55th Street
New York, New York 10019
By:    Norman S. Rosenbaum, Esq.
       Jordan A. Wishnew, Esq.
       Jessica J. Arett, Esq.

TODD SILBER
*Pro Se*
73 Farnham Road
South Windsor, Connecticut 06074
By:    Todd Silber

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Todd Silber ("Silber") filed Claim Number 4222 (the "Claim," Ex. 9) against Debtor

GMAC Mortgage, LLC ("GMACM").  GMACM serviced his mortgage loan from November

2008 through February 2013.  In 2009, Silber lost his job and encountered difficulty in making

his monthly mortgage payments.  Although he was receiving unemployment benefits, and at

certain later dates additional monthly rental income, time and time again for nearly two and half

years, Silber's loan modification applications were reviewed by GMACM and denied.  Silber

was extremely diligent in submitting several workout packages, providing supplemental

documentation supporting those workout packages, and following up via telephone to ensure that

his applications were complete and adequately reviewed.  Silber complains that his workout

packages were not properly reviewed by GMACM.  Silber's loan (an "FHA loan") was insured

by the Federal Housing Administration ("FHA").  The FHA required that review of Silber's loan

modification application follow FHA guidelines—guidelines that GMACM did not dutifully

follow.

The ResCap Borrower Claims Trust (the "Trust"), a successor in interest to the Debtors

in the above-captioned chapter 11 proceedings, filed an objection (the "Objection," ECF Doc.

# 7979) to Silber's Claim, asserting that the Claim failed to state a viable claim for relief.[1]  The

Court held a hearing on the Objection on February 25, 2015 (the "Objection Hearing"), and, on

March 9, 2015, issued a Memorandum Opinion and Order (the "Prior Opinion," ECF Doc.

# 8265) sustaining in part and overruling in part the Objection.  Four causes of action remained:

(1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing ("breach

of the implied covenant"); (3) negligent misrepresentation; and (4) violation of the Connecticut

Unfair Trade Practices Act ("CUTPA").[2]  (*See* Prior Opinion at 10.)  Familiarity with the Prior

Opinion is assumed.

After the parties were unable to resolve the remaining causes of action of Silber's Claim,

the Court scheduled and conducted an evidentiary hearing on July 15 and 16, 2015 (the

---

[1]     The Objection is supported by the declarations of Kathy Priore (ECF Doc. # 7979-3) and Norman S.
Rosenbaum (ECF Doc. # 7979-24).  Silber filed an opposition to the Objection (the "Opposition," ECF Doc. # 8064)
and the Trust filed a reply (the "Reply," ECF Doc. # 8160), supported by a supplemental declaration of Ms. Priore
(ECF Doc. 8160-2).

[2]     Silber filed a motion for reconsideration (the "Reconsideration Motion," ECF Doc. # 8353), which this
Court denied on March 26, 2015, except to the extent the Court clarified its prior Opinion (the "Reconsideration
Order," ECF Doc. # 8364).

"Evidentiary Hearing").[3]  Silber called one witness, himself, and the Trust called one witness,

David Cunningham ("Cunningham"), the Director of Regulatory Compliance for the Trust.  Each

party also submitted documentary evidence.

This Opinion includes the Court's findings of fact under Federal Rule of Civil Procedure

52, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 7052.

The Court finds that Silber failed to prove by a preponderance of the evidence that he is entitled

to recover under any of the four causes of action remaining in his Claim.  Silber was a credible

witness.  This case illustrates the frustrations a borrower in financial distress understandably

feels while seeking assistance from his loan servicer.   But such frustrations do not necessarily

give rise to a legally cognizable claim.  It is indisputable that Silber experienced aggravation and

disappointment throughout GMACM's loss mitigation reviews, but the Court ultimately

**SUSTAINS** the Trust's Objection to Silber's Claim and the Claim is hereby **DISALLOWED**

and **EXPUNGED**.

## I.    FACTUAL FINDINGS

### A.    Silber's Loan

Non-Debtor Norwich Commercial Group, Inc., d/b/a/ Norcom Mortgage ("Norcom")

originated a loan (the "Loan") to Silber on November 20, 2008.  Silber executed a note in the

amount of $236,823.00 (the "Note," Exs. 1, A), secured by a mortgage (the "Mortgage," Exs. 2,

B) on property located at 73 Farnham Road, South Windsor, Connecticut 06074 (the "Property").

---

[3]       The Court entered an order establishing procedures for the evidentiary hearing (the "Procedures Order,"
ECF Doc. # 8455), requiring, among other things, that the parties submit pre-trial memoranda of law and proposed
findings of fact and conclusions of law by July 2, 2015 (*see id.* at 1–2).  In accordance with the Procedures Order,
the Trust filed its pre-trial memorandum of law (the "Trust PT Br.," ECF Doc. # 8827) and a separate document
with its proposed findings of fact and conclusions of law (the "Trust FOF," ECF Doc. # 8828); Silber submitted a
combined pretrial memorandum of law, which includes his proposed findings of fact and conclusions of law (the
"Silber PT Br.," ECF Doc. # 8839).

The endorsements on the Note indicate that the Note was originally transferred from Norcom to

Wells Fargo Bank, N.A.; this endorsement was cancelled however.  (*See* Note.)  An allonge

attached to the Note (the "Allonge") evidences that Norcom transferred its interest in the Note to

Non-Debtor GMAC Bank.  (*Id.*)  GMAC Bank subsequently transferred its interest in the Note to

GMACM.  (*Id.*)  GMACM then endorsed the Note to blank and transferred its interest in the

Loan to Government National Mortgage Association, or Ginnie Mae.  (*See* Note; *see also* the

"Cunningham Declaration," Ex. S ¶ 9.)

GMACM serviced the loan from origination until servicing was transferred to Ocwen

Loan Servicing, LLC ("Ocwen") on February 16, 2013.  (Cunningham Decl. ¶ 10.)  On April 18,

2014, GMACM assigned the Mortgage to Ocwen.  (*Id.*)  On April 20, 2014, Ocwen assigned the

Mortgage to Everbank.  (*Id.*)  GMACM no longer retains an interest in the Loan.

### B.    Relevant Loss Mitigation Guidelines

Silber's Loan is an FHA loan and therefore is subject to the guidelines for the FHA's

Home Affordable Modification Program ("HAMP") (the "FHA HAMP Guidelines," Exs. 44, D),

a type of loan modification available for FHA borrowers.  "The evaluation of FHA borrowers for

loss mitigation is mandatory."  (*Id.* at 16.)  The FHA HAMP Guidelines, which were admitted in

evidence, provide that for purposes of reviewing a borrower's FHA HAMP loan modification

application, a borrower's monthly gross income may include unemployment income and rental

income.  (*Id.* at 8.)  "Unemployment income must be documented with reasonable assurance of

its continuance for at least 12 months" for it to qualify for consideration as part of the borrower's

monthly gross income.  (*Id.* at 23.)  "[A]cceptable documentation [of unemployment income]

includes letters, exhibits, or benefits statement from the provider that states the amount,

frequency and duration of the benefit.  The servicer must [also] obtain copies of signed federal

income tax returns, IRS W-2 forms, or copies of the two most recent bank statements." (*Id.* at 23–24.)

A loan servicer is supposed to consider two income ratios in determining eligibility for a FHA HAMP modification. First, the front end debt-to-income ratio, or the ratio of the borrower's total monthly mortgage payment for the modified mortgage divided by the borrower's gross monthly income, "must be as close as possible, but not less than, 31 percent." (*Id.* at 3.) Second, the back end debt-to-income ratio, or the total monthly mortgage payment plus all recurring monthly debt divided by the borrower's gross monthly income, "must not exceed 55 percent." (*Id.*) The Guidelines do not provide specific requirements for a borrower to support a loan modification application with rental income.

HAMP guidelines for modification of non-FHA loans are different. (*See* Non-FHA HAMP Guidelines," Ex. M). The Non-FHA HAMP Guidelines, similar to the FHA HAMP Guidelines, include unemployment income and rental income in the calculation of a borrower's monthly gross income. (*Id.* at 6.) To establish unemployment income, a borrower may submit "letters, exhibits or a benefits statement from the provider that states the amount, frequency, and duration of the benefit." (*Id.* at 8.) However, Non-FHA HAMP Guidelines only require that the "servicer . . . determine that the income will continue for at least nine months," as opposed to the FHA HAMP Guidelines' 12 months. (*Compare id.*, *with* FHA HAMP Guidelines at 23.) With regard to rental income, acceptable documentation under the Non-FHA HAMP Guidelines includes "[c]opies of all pages from the borrower's most recent two years of signed federal income tax returns and Schedule E – Supplemental Income and Loss." (Non-FHA HAMP Guidelines at 8.) According to the Non-FHA HAMP Guidelines, only 75 percent of the gross rent may be used for the monthly gross income calculation; the remaining 25 percent is

"considered vacancy loss and maintenance expense." (*Id.*)  For purposes of determining a borrower's eligibility under the Non-FHA HAMP Guidelines for a Non-FHA HAMP loan modification, a servicer must calculate the borrower's monthly mortgage payment ratio.  (*See id.* at 6.)  This ratio equals the borrower's current monthly mortgage payment divided by the borrower's monthly gross income and must not be greater than 31 percent for the borrower to qualify for Non-FHA HAMP.  (*Id.* at 6, 8.)

A servicer should not use the Non-FHA HAMP Guidelines in reviewing a FHA loan for a FHA HAMP loan modification, even if the FHA HAMP Guidelines are silent on a particular issue.  (*See* FHA HAMP Guidelines at 12–13.)

### C.    Silber's Loss Mitigation History

From the end of 2009 through the first quarter of 2012, Silber submitted several loss mitigation applications, or workout packages, to GMACM.  GMACM reviewed each of these workout packages for possible FHA loss mitigation options, Non-FHA loss mitigation options, or both FHA and Non-FHA loss mitigation options.  All of Silber's workout packages were denied due to insufficient income to support the requested loan modification.  Although Silber argues that GMACM is guilty of improperly reviewing his FHA Loan under Non-FHA guidelines, the Court concludes that the workout packages submitted by Silber demonstrate that he did not have qualify under either FHA HAMP or Non-FHA HAMP requirements.  The documentary evidence establishes that GMACM evaluated Silber's loan modification applications under the Non-FHA HAMP requirements.  But with respect to unemployment income, Silber had to present evidence *from the provider* showing that benefits would continue for 9 months under the Non-FHA HAMP Guidelines, or 12 months under the FHA HAMP

Guidelines. Silber did not provide evidence satisfying either requirement. Below is a summary of the Court's findings of fact with respect to Silber's loss mitigation history.

### 1.    *The December 2009 Workout Package*

Silber failed to make his monthly loan payments that were due on November 1 and December 1, 2009. (*See* the "Servicing Notes," Ex. C at 7.) Silber spoke to a GMACM representative about his Loan account on December 4, 2009. (*Id.* at 281.) After Silber indicated that he had access to the Internet, the GMACM representative referred Silber to the website where he could obtain a financial workout package (i.e., a loan modification application). (*Id.*) Silber submitted a workout package for loan modification review on December 18, 2009 (the "December 2009 Workout Package," Ex. E). Within the December 2009 Workout Package, Silber provided a letter from himself indicating that he was entitled to "20 more weeks" of unemployment income, but that he intended to apply for further extensions of the benefits. (*Id.* at 9.)

The Servicing Notes indicate that the December 2009 Workout Package was missing signed income tax returns. (Servicing Notes at 279.) On January 11, 2010, a GMACM representative advised Silber over the phone that he needed to submit signed income tax returns. (*Id.* at 277.) On the same date, the Servicing Notes indicate that Silber's December 2009 Workout Package was also missing a letter regarding his unemployment income, but there is no evidence that Silber was informed of this missing documentation. (*Id.* at 276–77.) Silber faxed GMACM the missing signed income tax returns on January 12, 2010 (the "December 2009 Supplemental Workout Documents," Ex. F). (Servicing Notes at 276.) Receipt of the income tax returns was noted in the Servicing Notes; but the Servicing Notes indicated that GMACM

was still missing appropriate documentation of Silber's unemployment income. (*Id.*) There is

no evidence that Silber was informed that such documentation was missing. (*Id.*)

On January 13, 2010, GMACM sent Silber a letter advising him that his December 2009

Workout Package was denied (the "January 13, 2010 Denial Letter," Exs. 27, H). The January

13, 2010 Denial Letter stated that GMACM reviewed his request for a "FHA Loan

Modification" and that the application was denied due to "insufficient income to support" the

modification request as a result of his failure to pass the front end debt-to-income ratio

calculation. (*Id.* at 1–2.)

On April 30, 2010, GMACM sent Silber a separate letter, which, in part, more

specifically discusses GMACM's denial of the December 2009 Workout Package (the "April 30,

2010 Letter," Exs. 24, G). The April 30, 2010 Letter stated that the December 2009 Workout

Package was first reviewed for a Non-FHA loan modification, but that Silber did not qualify

because he was only receiving unemployment income. (*Id.* at 1.) The letter also stated that the

December 2009 Workout Package was reviewed for a FHA HAMP loan modification, but that

"[b]ased on a monthly gross income of $3,677.92, [Silber's] back end [debt-to-income] was 73%

making [him] ineligible for the FHA HAMP." (*Id.*) At the Evidentiary Hearing, Cunningham

testified that based on these figures, GMACM considered Silber's unemployment income in their

calculation of his debt-to-income ratio despite the lack of appropriate documentation pursuant to

the FHA HAMP Guidelines. (*See* the "Jan. 16, 2015 Hrg. Tr.," ECF Doc. # 8941 at 41:12–

45:14.) The Court concludes that this testimony by Cunningham is credible.

### 2.    *The January 2010 Workout Package*

On January 19, 2010, Silber spoke to a GMACM representative about the denial of his

December 2009 Workout Package; Silber said he would re-apply for a loan modification.

(Servicing Notes at 275.)  On January 29, 2010, Silber submitted a second workout package for

loan modification review (the "January 2010 Workout Package," Exs. 46, I).  The January 2010

Workout Package included a printed statement of his unemployment benefits demonstrating that

he was eligible to receive benefits for 15 weeks.  (*See id.* at 12–14.)  Silber also submitted a letter

from him explaining the statement and asserting that he would receive a one-year extension of

benefits.  (*Id.* at 15–17.)

On February 5, 2010, the Servicing Notes indicate that the January 2010 Workout

Package was missing appropriate documentation of unemployment income that stated the

"ending date" of the benefits.  (Servicing Notes at 272.)  On February 8, 2010, a GMACM

representative told Silber over the phone that the January 2010 Workout Package did not contain

sufficient documentation of his unemployment benefits.  (*Id.* at 271.)  Silber responded that he

was told by the state of Massachusetts, from which he was receiving unemployment benefits,

that he could not get an award letter stating the end date; GMACM advised that he will need to

try again because, without it, GMACM may not be able to review his January 2010 Workout

Package for loss mitigation options.  (*Id.*)  The next day Silber spoke with another GMACM

representative and was again told that he needed to submit more documentation regarding his

unemployment income because the statement he provided was insufficient.  (*Id.*)  On February

10, 2010, Silber called GMACM to advise it that he would be getting the unemployment income

letter and would be sending it to GMACM; he requested that in the meantime, GMACM review

the documentation he already submitted which explains that he would be receiving

unemployment income through October 2010.  (*Id.*)  GMACM also sent a missing items letter to

Silber on February 11, 2010 requesting the unemployment income documentation.  (*See id.* at

270.)

On February 15, 2010, Silber submitted information to GMACM from the Massachusetts

Division of Unemployment (the "February 2010 Unemployment Information," Ex. J).  Silber

testified that the February 2010 Unemployment Information is appropriate documentation under

the FHA HAMP Guidelines, demonstrating that the benefits would continue through October 16,

2010.  (*See* the "Jan. 15, 2015 Hrg. Tr.," ECF Doc. # 8939 at 53:8–54:25; *see also* February

2010 Unemployment Information at 5 ("BYE: 10-16-10")).  Cunningham testified that GMACM

interpreted the February 2010 Unemployment Information to be appropriate documentation

under FHA HAMP Guidelines that only demonstrated unemployment benefits for 29 weeks; he

did not know what the "BYE: 10-16-10" entry in the documentation meant.  (Jan. 15, 2015 Hrg.

Tr. at 118:24–121:11.)  It is also unclear to the Court what "BYE: 10-16-10" means; no

explanation is provided on the form.  Silber may be reading it correctly, or maybe not.  However,

even if the documentation was sufficient to demonstrate that Silber's unemployment benefits

would continue through October 16, 2010, it does not demonstrate that Silber would receive

benefits for 12 months under the FHA HAMP Guidelines; nor does it demonstrate that Silber

would receive benefits for up to nine months under Non-FHA HAMP Guidelines.[4]

The Servicing Notes indicate that on February 24, 2010, the January 2010 Workout

Package was reviewed and deemed denied under "HMP due to no verifiable income."

(Servicing Notes at 269.)  The Servicing Notes further provide that Silber "has less than 9

months from the trial effective date to receive Unemployment so can NOT be used."  (*Id.*)  On

February 25, 2010, GMACM mailed Silber a letter advising him of the denial (the "February 25,

---

[4]        Silber submitted the January 2010 Workout Package on January 29, 2010.  To satisfy the Non-FHA HAMP
Guidelines, it would have to demonstrate that Silber would receive unemployment benefits through October 29,
2010—nine months after the date the application was submitted.  If Silber's interpretation of the February 2010
Unemployment Information is correct, Silber only provided documentation demonstrating that the benefits would
continue through October 16, 2010.

2010 Denial Letter," Ex. 28).  The February 25, 2010 Denial Letter advises that GMACM

reviewed his "request for a loan modification" and that the request was denied due to

"insufficient income to support" the requested loan modification.  (*Id.* at 1.)

The April 30, 2010 Letter provides slightly more detailed information regarding this

denial.  (*See* April 30, 2010 Letter at 2.)  This letter advises that in support of the January 2010

Workout Package, GMACM "did not receive the unemployment benefits statement showing the

benefits would continue for 9 months more."  (*Id.*)  The letter further provides that after

GMACM advised Silber of the insufficient unemployment income, Silber submitted the

February 2010 Unemployment Information, which also was insufficient because it "did not

confirm the unemployment payments were going to continue for 9 months from the effective

date of a trial modification."  (*Id.*)  The letter concluded that "[d]ue to this the account was

denied for a traditional modification . . . ."  (*Id.*)

The Servicing Notes and the letter sent to Silber regarding the denial of the January 2010

Workout Package indicate that this package was reviewed only for a Non-FHA HAMP loan

modification; there is no indication that GMACM reviewed this application for a FHA HAMP

loan modification.

### 3.    *The March 2010 Loss Mitigation Reviews*

On March 1, 2010, Silber called GMACM to ask why the loan modification was denied;

GMACM informed Silber that his unemployment income could not be considered because he did

not provide documentation that such income would last for the nine-month period.  (*See*

Servicing Notes at 268.)

On March 8, 2010, Silber called GMACM again, telling a representative that he received

an extension of 17 weeks for his unemployment income, followed by an additional twenty

weeks.  (*Id.*)  As a result, GMACM referred Silber's account for another loss mitigation review

(the "March 2010 Loan Modification Review").  (*Id.*)

On March 15, 2010, GMACM sent Silber a letter (the "March 15, 2010 Denial Letter,"

Exs. 29, K) advising him that they reviewed his "request for a FHA Loan Modification," but that

the request was denied due to "insufficient income to support" the requested modification, as his

debt-to-income ratio "exceed[ed] program limits" (*id.* at 1–2).  The April 30, 2010 Letter

provides that "[e]ven though [GMACM] did not receive confirmation of the unemployment

extension, the Loss Mitigation Department reviewed the account on March 15, 2010."  (April 30,

2010 Letter at 2.)  The April 30, 2010 Letter further stated that "[b]ased on unemployment

benefits of $3,542.50, the account was denied for a FHA HAMP as [Silber's] back end [debt-to-

income ratio] was 65%."  (*Id.*)

The Servicing Notes and letters indicate that the March 2010 Loan Modification Review

was one for a FHA HAMP loan modification.

On March 25 and 26, 2010, Silber spoke with GMACM representatives over the phone

regarding the denial of the March 2010 Loan Modification Review.  GMACM advised him of

the denial and referred him to the website from which he could obtain a financial workout

package.  (Servicing Notes at 264.)  On March 31, 2010, GMACM reportedly received an

incomplete workout package "through the HOPE Counselor Hotline."  (*Id.* at 262.)  This

package was reviewed by GMACM and denied because Silber did not qualify for "HMP" as his

unemployment would not extend for 9 months.  (*Id.*)  The GMACM representative who reviewed

the loan modification application sent it to another GMACM representative "to review for partial

claim and/or provide feedback on trad mod denial."  (*Id.*)  The Servicing Notes demonstrate that

this application was reviewed for a Non-FHA loan modification, rather than a FHA HAMP loan
modification.

### 4.  *The April 2010 Workout Package*

On April 1, 2015, Silber called GMACM and said he had a tenant moving in that would
provide $500 per month in rental income.  (*Id.* at 261.)  On April 2, 2010, Silber again spoke
with a GMCM representative who told Silber that he could submit a new financial workout
package with updated financials and the lease agreement; upon receipt, GMACM would again
review his Loan account for modification.  (*Id.*)  The GMACM representative further told him he
needed to provide documentation evidencing that his unemployment income would last at least
nine months.  (*Id.*)

On April 5, 2010, Silber submitted a workout package for modification review (the
"April 2010 Workout Package," Exs. 27, L).  The April 2010 Workout Package did not include
any documentation relating to unemployment income, but it did include a copy of the lease
agreement between Silber and his new tenant, demonstrating that Silber would receive $500 per
month in rental income.  (*Id.* at 8.)  The Servicing Notes indicate that on April 7, 2010 a
GMACM representative recorded that GMACM was not able to use Silber's unemployment
income in the loan modification review because the end date was in October 2010.  (Servicing
Notes at 258.)  On that same day, a different GMACM representative spoke with Silber by
phone; during this conversation, they discussed October 2010 as the purported end date of
Silber's unemployment benefits; the GMACM representative also told Silber that only 75% of
the documented rental income could be considered in the loan modification review.  (*Id.*)

Ultimately, on April 12, 2010, GMACM denied the loan modification.  (*Id.* at 257.)  The
Servicing Notes indicate that Silber "Failed Traditional Options as borrower does not show

affordability for property." (*Id.*)  The letter (the "April 12, 2010 Denial Letter," Ex. 30)

GMACM sent Silber advising him of the denial indicates that GMACM reviewed his "request

for a FHA Loan Modification" and that the request was denied due to "insufficient income to

support" the requested modification (*id.* at 1.)  According to the April 12, 2010 Denial Letter,

"Negative Amortization" was the more specific reason for the denial.  (*Id.* at 2; *see also*

Servicing Notes at 256 ("LOSS MIT DENIED OTHER [¶] Failed HMP Decision 2 – Failed Neg

Am").)

      The April 30, 2010 Letter clarifies that GMACM reviewed the Loan account with the

rental income on April 12, 2010, but the April 2010 Workout Package was denied "based on an

income of $375.00 ($500.00 x 75%)," which was insufficient "to approve a traditional

modification or a modification through the FHA HAMP."  (April 30, 2010 Letter at 2.)

      The Servicing Notes and letters demonstrate that GMACM reviewed the April 2010

Workout Package for a Non-FHA traditional loan modification as well as a FHA HAMP loan

modification.  However, in reviewing the April 2010 Workout Package for a FHA HAMP loan

modification, GMACM used only 75% of the rental income that Silber documented.

Cunningham testified that GMACM used 75% of the rental income in its calculation of Silber's

monthly gross income—the FHA HAMP Guidelines are silent about how to use rental income so

GMACM employed Non-FHA HAMP Guidelines, which dictate that only 75% of rental income

may be considered.  (July 16, 2015 Hrg. Tr. at 24:9–26:8.)  The FHA HAMP Guidelines provide,

however, that a servicer should not use Non-FHA guidelines in reviewing a FHA loan for a FHA

HAMP loan modification, even when FHA HAMP Guidelines are silent on a particular issue.

(*See* FHA HAMP Guidelines at 12–13; *see also* July 16, 2015 Tr. at 24:9–27:19.)  Despite this,

Cunningham testified that even if GMACM made its calculations with the full $500 in monthly

rental income, Silber's income would still be insufficient to support the approval of a FHA

HAMP loan modification.  (Jan. 16, 2015 Hrg. Tr. at 48:3–9.)

### 5.  The Forbearance Plan

Although the April 30, 2010 Letter provides an explanation of each denial of Silber's

prior work out packages, the main purpose of the letter was to advise Silber of an opportunity to

obtain a six month forbearance plan (the "Forbearance Plan") from June 1 through November 1,

2010 that would permit Silber to make payments of $995.40 each, half of his monthly mortgage

payment amount at that time.  (April 30 Letter at 2–3; *see also* Ex. 26.)  The purpose of the

Forbearance Plan was to "allow time for the new HAMP guidelines to be implemented" and to

allow Silber "time to increase [his] income or decrease [his] expenses or to transition to another

home if the need [arose]."  (April 30 Letter at 2–3.)

On May 10, 2010, Silber's Loan account was approved for the Forbearance Plan.

(Servicing Notes at 263.)  Silber made all of the monthly payments for the six months pursuant

to the terms of the Forbearance Plan.  (*Id.* at 5–7.)

### 6.  The January 2011 Workout Package

GMACM sent a new workout package to Silber on November 11, 2010, after the

Forbearance Plan came to its close.  (Servicing Notes at 217.)  Silber had multiple phone

conversations with GMACM representatives about the loan modification review process over the

course of the next month.  (*See id.* at 210–16.)

On December 7, 2010, Justin Chambers, Assistant Attorney General of the State of

Connecticut (the "AAG"), sent GMACM an email regarding a complaint his office received

from Silber that GMACM was not assisting him in his pursuit of a loan modification.  (Ex. 6.)

On December 8, 2010, GMACM responded to the AAG, incorrectly stating:  "Due to guidelines

changes, unemployment income cannot be utilized when reviewing an account for a loan
modification" (the "December 2010 Email," Ex. 6 at 1).  Despite this misstatement, Silber
testified at the Evidentiary Hearing that he was always aware (i.e., before and after the December
2010 Email was sent and received) that unemployment income could be used in his loan
modification applications.  (Jan. 15, 2015 Hrg. Tr. at 83:2–25 ("I'd been aware that
unemployment could be used the whole time.").)

On January 3, 2011, Silber submitted another workout package (the "January 2011
Workout Package," Ex. N).  This package did not include appropriate documentation of
unemployment benefits that would satisfy either the FHA HAMP Guidelines or the Non-FHA
HAMP Guidelines.  (*See id.*)  The January 2011 Workout Package only included a printout from
a website describing an unemployment benefit program (and bank statements showing receipt of
benefits) and a letter indicating that another individual would be contributing $600 per month to
the monthly mortgage payment.  (*See id.* at 19–26.)  Silber circled or underlined references to
unemployment income on two of the first three pages of this package.  (*Id.* at 2–3.)  The
Servicing Notes indicate that the January 2011 Workout Package was missing an unemployment
award letter as well as two recent bank statements and/or two cancelled checks for $600
demonstrating the contribution income.  (Servicing Notes at 197, 203.)

From January 14 to 19, 2011, GMACM reviewed the January 2011 Workout Package and
determined that Silber did not qualify for a "traditional" or "FHA" loan modification.  (*See id.* at
192–93.)  On January 19, 2011, GMACM sent Silber a letter (the "January 19, 2011 Denial
Letter," Exs. 31, O) advising Silber of the denial of his "request for a loan modification" (*id.* at
1).  The January 19, 2011 Denial Letter indicates that Silber was denied under the "HAMP
Program . . . due to insufficient income."  (*Id.* at 2.)

16

The Servicing Notes and letters indicate that the January 2011 Workout Package was reviewed for both a Non-FHA traditional loan modification and a FHA HAMP loan modification.

### 7.   Attempted Loan Reinstatement

On August 22, 2011, GMACM received authorization from the state of Connecticut for Silber's potential entry into the Connecticut Housing Finance Authority's (the "CHFA") Emergency Homeowners' Loan Program ("EHLP")[5] and thereafter, GMACM reviewed Silber's Loan account in order to provide the CHFA with a loan reinstatement quote.  (Servicing Notes at 96–97.)

On August 25, 2011, GMACM provided the CHFA with a reinstatement quote of $43,736.80 (the "Reinstatement Quote").  (*Id.* at 94–95.)  The Servicing Notes show that this Reinstatement Quote included 20 past due payments of $1,990.80 each, the payment due for September 1, 2011 (also $1990.80), inspection fees of $112.50, advances of $1,577.30, outstanding foreclosure advances of $1,991.00, and a deduction for an unapplied credit on the account of $1,750.80, totaling $43,736.80.  (*Id.* at 94.)  Silber argued that the Reinstatement Quote improperly included the payment due on September 1, 2011, since that payment was not yet due when the August 25, 2011 quote was sent.  The Court disagrees and finds that GMACM properly computed the Reinstatement Quote provided to the CHFA.  Initially, on September 1, 2011, the CHFA advised Silber by letter that he was eligible under the EHLP based on the $43,736.80 figure provided by GMACM with monthly assistance for up to five months (*see* the "CHFA Eligibility Letter," Ex. 17 at 1).  The CHFA Eligibility Letter clarifies that the

---

[5]       The EHLP provides federal funds for eligible homeowners to pay mortgage arrearages, delinquent taxes, homeowners insurance, condominium fees and foreclosure related legal fees, as well as assist with monthly mortgage payments for up to 24 months or $50,000 whichever comes first.  (*See* Ex. P at 1.)

Reinstatement Quote received from GMACM was good through September 25, 2011 (*see id.* at

2); the Court finds that the September 25 "good through" date means that GMACM properly

included the payment due on September 1 in computing the Reinstatement Quote—that payment

would be due well before the September 25 reinstatement deadline.

On September 22, 2011, Silber's application under EHLP was ultimately denied because:

> [t]he maximum loan amount available is insufficient to reinstate
> the current mortgage and provide the monthly assistance required
> for a minimum of six months.  The applicants' current aggregate
> household income is insufficient to cover the housing expense after
> reinstatement.

(*See* the "CHFA Denial Letter," Ex. 18 at 1–2.)

Silber purportedly received a different reinstatement quote from GMACM on or about

August 9, 2011.  (*See* Ex. 21.)  However, Silber failed to demonstrate that the figures in his

Exhibit 21 were in fact a reinstatement quote that would be comparable to the Reinstatement

Quote GMACM provided to the CHFA.  Rather, Silber testified that Exhibit 21 contains a "pay

off" statement, does not include his arrears, and mainly shows past due interest.  (Jan. 15, 2015

Hrg. Tr. at 41:19–44:17.)  Cunningham confirmed that Exhibit 21 is not a reinstatement quote,

but instead was a payoff amount.  (*Id.* at 134:12–139:22.)  Based on the parties' testimony and

review of Exhibit 21 and the Servicing Notes, the Court finds that Exhibit 21 is a payoff amount,

not a reinstatement quote, and therefore does not include figures that are comparable to the

Reinstatement Quote provided by GMACM to the CHFA.

### 8.  *The March 2012 Workout Project*

On February 23 and March 9, 2012, GMACM sent Silber letters informing him of loan

modification options.  (Servicing Notes at 65, 68.)  On March 9, 2012, GMACM mailed Silber a

letter offering a meeting with a HOPE representative to discuss possible workout options.  (*Id.*)

GMACM records do not show whether any meeting between a HOPE representative and Silber occurred.  (*See id.*)

Also on March 9, 2012, Silber submitted another workout package for review (the "March 2012 Workout Package," Ex. Q).  The Servicing Notes indicate that GMACM reviewed the March 2012 Workout Package on March 29, 2012 and determined that Silber was not eligible for a Non-FHA traditional modification due to "insufficient income."  (Servicing Notes at 58.)  On March 30, 2012, GMACM determined that the current delinquency on the account exceeded 12 months.  (*Id.*)  As a result, on April 2, 2012, GMACM determined that Silber was also not eligible for a FHA HAMP loan modification since he was delinquent for 28 months.  (*Id.*; *see also* Cunningham Decl. ¶ 33.)  GMACM sent Silber a letter advising him of the denial of the March 2012 Workout Package and later spoke with him on the phone about the denial on April 9, 2012.  (*See* Servicing Notes at 57–58.)

Based on the Servicing Notes, the March 2012 Workout Package was reviewed for a Non-FHA traditional modification as well as a FHA HAMP loan modification.

### D.    The Claim

Silber filed the Claim on November 9, 2012 against GMACM, asserting a secured and administrative priority claim in the amount of $30,616 plus "pending CASES Damages Awarded By the Courts Connecticut U.S. District 3:12-cv-01087."  (*See* Claim at 1.)  The asserted basis for the Claim in the proof of claim is "civil suit, District Courts.  Violation of Truth + Lending" and "Bank Fraud."  (*Id.*)  Silber also submitted a response to the Trust's letter requesting additional information and documentation in support of his claim (the "Diligence Response," Ex. 10), elaborating that:

> The Basis of Claim and Amount there of Are the Same as Asserted
> in my Lawsuit Against the Debtors.  Lawsuit is for the following

> violation of Truth + Lending Covenant to Bargain In Good Faith
> Bank Fraud Challenging the Right to service.
> The Suit is Asking For $30,616 For Violation of Truth + Lending
> Release of Lien on the property + Note termination and
> $231,120.00 + cost of Suit + Interest + Court Discretion.

(Diligence Response at 1.)  Silber's Claim incorporates an amended complaint he filed against

GMACM in the Superior Court of the Judicial District of Hartford Connecticut (the "Connecticut

State Court") on June 8, 2012, asserting five causes of action (the "Connecticut Action").[6]

As already mentioned, the Court's Prior Opinion sustained in part and overruled in part

the Trust's Objection, concluding that an evidentiary hearing was required on four narrow causes

of action:  (1) breach of contract; (2) breach of the implied covenant; (3) negligent

misrepresentation; and (4) a violation of CUTPA.  (*See* Prior Opinion at 10.)  The first three

causes of action are based on allegations that GMACM did not follow certain federally imposed

guidelines in reviewing Silber's Loan account for a potential loan modification.  The disputed

facts included (1) which loan modification guidelines GMACM was required to apply, (2)

whether GMACM applied those guidelines, and (3) whether Silber's loan modification

applications met the guidelines' requirements such that Silber would have qualified for a loan

modification had GMACM complied with the guidelines.  (*Id.* at 10–12.)  The Court further held

that the negligent misrepresentation claim survived because (1) the Trust failed to address this

cause of action and thereby failed to meet its burden, and (2) an disputed issue of fact remained

---

[6]     On March 19, 2010, Silber's Loan account was referred to foreclosure.  GMACM commenced a judicial foreclosure action in the Connecticut State Court on March 31, 2010, and an eventual judgment of strict foreclosure was entered by the Connecticut State Court on June 12, 2012.  (*See* Obj. ¶¶ 37–43.)  On June 8, 2012, Silber filed the Connecticut Action against GMACM, which removed it to the United States District Court for the District of Connecticut on July 26, 2012.  (*Id.* ¶ 44.)  The parties engaged in unsuccessful mediation in both proceedings.  (*Id.* ¶¶ 40, 44.)  The Connecticut Action was stayed due to the Debtors' bankruptcy filings in this Court.  (*Id.* ¶ 46.)  The foreclosure proceeding, Connecticut Action, and the mediations are not relevant to the current issues before the Court with respect to the Claim and Objection.

whether Silber sufficiently relied on the false representation made in the December 2010 Email. (*Id.* at 12.)

In response to Silber's Reconsideration Motion, the Court entered the Reconsideration Order denying the motion, but clarifying that certain of Silber's CHFA and EHLP-related allegations too survived the Prior Opinion. (*See* Reconsideration Order at 4–6.)

At the Evidentiary Hearing, the parties were only permitted to present evidence relevant to the four remaining causes of action. The Court therefore only reviews those causes of action in this Opinion.

## II.    DISCUSSION

### A.    Breach of Contract

To assert a breach of contract claim under Connecticut law, a plaintiff must plead the following elements: "formation of an agreement, performance by one party, breach of an agreement by the other party and damages." *Meadowbrook Ctr., Inc. v. Buchman*, 90 A.3d 219, 226 (Conn. App. Ct. 2014) (citing *Pelletier v. Galske*, 936 A.2d 689 (Conn. App. Ct. 2007), *cert. denied*, 943 A.2d 1100 (Conn. 2008)). Silber's surviving breach of contract claim is based on the Loan, comprised of the Note and Mortgage, and two alleged breaches on the part of GMACM. The claim raises the following issues:

(1) Did GMACM breach the Note by failing to comply with the FHA HAMP Guidelines when reviewing his applications for loan modifications and by wrongfully denying them?[7]

---

[7]    Silber also argues that GMACM breached the FHA HAMP Guidelines by failing to offer him other loss mitigation options for which he may have qualified.

> (2) Did GMACM breach the Note by providing an inflated
>
> Reinstatement Quote to the CHFA, thereby disqualifying Silber for
>
> the EHLP assistance?

The parties agree for purposes of this Claim Objection that the FHA HAMP Guidelines are incorporated into the terms of the Note and Mortgage.  As a result, any breach of the FHA HAMP Guidelines, in turn, constitutes a breach of the parties' Loan contract.    Based on the evidence presented at the Evidentiary Hearing, the Court finds that Silber established that GMACM breached the FHA HAMP Guidelines, and in turn, the parties' Loan contract, by failing to review some of Silber's workout packages using the FHA HAMP Guidelines.  For example, the evidence demonstrates that the January 2010 Workout Package and March 2010 Loss Mitigation Review were not reviewed for a FHA HAMP loan modification.  Additionally, in evaluating the April 2010 Workout Package under Non-FHA and FHA HAMP Guidelines, Cunningham testified that GMACM followed its "business practice" of only considering 75% of rental income in calculating a borrower's monthly gross income because FHA HAMP Guidelines were silent on this issue.  (July 16, 2015 Tr. at 24:9–27:19.)  However, FHA HAMP Guidelines provide that when they are silent on a particular issue, a servicer should not insert and follow Non-FHA guidelines.  (*Id.*; FHA HAMP Guidelines at 12–13.)  Moreover, GMACM representatives repeatedly informed Silber that he needed to submit appropriate documentation demonstrating that his unemployment income would continue for at least nine months; FHA HAMP Guidelines required documentation demonstrating a continuation of twelve months of unemployment benefits.  (See FHA HAMP Guidelines at 23.)

The Court further finds, however, that Silber failed to establish any damages, a required element of a breach of contract claim.  Silber failed to produce evidence demonstrating that he

would have qualified for a FHA HAMP loan modification under FHA HAMP Guidelines.  For

each workout package Silber submitted, the documentary evidence and testimony established

that the documentation of unemployment income and/or rental income, whether taken together or

separately, would not have been sufficient to obtain approval of a FHA HAMP loan modification

under FHA HAMP Guidelines.  Thus, whether or not FHA HAMP Guidelines were followed,

the result would have been the same; Silber's workout packages would have been denied.

Without evidence of a contrary result, Silber fails to prove he is entitled to recover breach of

contract damages and Silber's FHA HAMP-related breach of contract claim fails.[8]  *See, e.g.*,

*Meadowbrook Center, Inc. v. Buchman*, 90 A.3d 219, 226 (Conn. App. Ct. 2014) ("The general

rule in breach of contract cases is that the award of damages is designed to place the injured

party, so far as can be done by money, in the same position as that which he would have been in

had the contract been performed." (citation and internal quotation marks omitted)).

　　　　Silber also asserts that GMACM committed a breach of contract by submitting an

inflated Reinstatement Quote to the CHFA.  The Court finds that Silber failed to produce any

evidence demonstrating a breach on the part of GMACM.  First, Silber has not pointed to a

---

[8]　　　　To the extent Silber argues that GMACM breached the FHA HAMP Guidelines in failing to review his
Loan account for loss mitigation options other than a FHA HAMP loan modification, (1) the evidence before the
Court contradicts this argument, and (2) Silber did not provide any evidence that he would have qualified for those
other options.  Further, Silber's attempt to assert that GMACM should have requested a variance of the FHA HAMP
Guidelines on his behalf in order to approve him for a Non-FHA HAMP loan modification is unpersuasive.  To begin
with, this argument is essentially an admission that he would not have qualified under FHA HAMP Guidelines for a
FHA HAMP loan modification upon review of his workout packages.  Moreover, Cunningham's testimony
established that requests for "variances" were not mandatory and were typically used for other purposes (i.e.,
"liquidation type" options like short sales), not for HAMP loan modifications.  (Jan. 15, 2015 Hrg. Tr. at 142:1–
144:16.)  Cunningham further testified that although such variances were ordinarily not sought for loan modification
applications, if a variance were to be sought "it would have only been done with a very narrow margin of debt-to-
income ratio, . . . which didn't really occur in this case" in which Silber's ratios were at 73% and 65%; values that
are far from the 31% or 55% guideline figures.  (*Id.* at 142:7–24.)  Since Silber could not provide evidence
demonstrating that he would have qualified for a Non-FHA HAMP loan modification, which has less stringent
standards than the FHA HAMP Guidelines, the Court is not persuaded that Silber should have been entitled to a
variance to obtain a FHA HAMP loan modification.

single provision in the parties' Loan contract that GMACM breached by providing a purportedly

inflated Reinstatement Quote to a third-party, the CHFA.  Second, the only potential inaccuracy

in the Reinstatement Quote that Silber asserts is the addition of the September 1, 2011 payment

that was not due at the time GMACM sent the Reinstatement Quote to the CHFA.  The

Reinstatement Quote, however, was clearly valid through September 25, 2011.  (*See* CHFA

Eligibility Letter at 2.)  Therefore, because the September 1 payment was due before September

25, 2011, it was properly included in the Reinstatement Quote.  Moreover, the payoff amount

Silber submitted as purported evidence that GMACM submitted an inflated figure is not

evidence of that at all.  A payoff statement is different from a reinstatement quote; more

pointedly, "[a] reinstatement quote is intended to bring arrearage current or bring delinquency

current, whereas a payoff quote is to either liquidate the loan or pay off the loan in full."  (Jan.

15, 2015 Tr. at 138:3–11 (Cunningham).)  That the payoff statement amounted to a different

monetary figure than the Reinstatement Quote is therefore irrelevant to the accuracy of the

Reinstatement Quote GMACM provided to the CHFA.

Because (1) Silber failed to demonstrate that he is entitled to damages with respect to the

FHA HAMP Guidelines-related breach, and (2) Silber failed to prove that GMACM breached the

Loan in its provision of the Reinstatement Quote to the CHFA, Silber cannot recover under his

breach of contract cause of action.  The Trust's Objection to this claim is therefore

S**USTAINED**.

### B.    Breach of the Implied Covenant

Under Connecticut law, a plaintiff must prove the following elements:  "(1) the plaintiff

and the defendant were parties to a contract under which the plaintiff reasonably expected to

receive certain benefits; (2) that the defendant engaged in conduct that injured the plaintiff's

right to receive some or all of those benefits; and (3) that when committing the acts by which it injured the plaintiff's right to receive benefits he reasonably expected to receive under the contract, the defendant was acting in bad faith." *Rhodes v. Advance Prop. Mgmt.*, No. CV135015924, 2014 WL 5355430, at *2 (Conn. Super. Ct. Sept. 17, 2014) (citation omitted).

> A cause of action for breach of the implied covenant of good faith and fair dealing is not simply any breach of an express provision of a contract which is aggravated by dishonest purpose. The implied covenant imposes in all contracts a good faith duty to execute discretionary acts, the contours of which are not explicitly stated in the contract language, fairly so as not to deprive the other party to the agreement of the benefit of the contract. It is "a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." The implied covenant cannot be used to vary the expressed terms of the agreement
>
> The implied covenant is invoked when the contract language is imprecise or silent as to the specific actions or inactions which are required or disallowed in a given, discretionary circumstance. It is a breach of an unstated, contractual obligation implied by fair dealing and good faith among all the contracting parties in order to achieve the ends for which the agreement was created.

*Topolski v. Bank of Am.*, No. TTDCV135005789, 2014 WL 2853906, at *2 (Conn. Super. Ct. May 16, 2014) (internal citations omitted). To be actionable, the defendant's conduct must amount to acts "taken in bad faith[, which] . . . general[ly] implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or come contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive . . . ." *Rhodes*, 2014 WL 5355430, at *4. "Bad faith means more than mere negligence; it involves a dishonest purpose." *Id.*

Silber's breach of the implied covenant cause of action is premised on the same two breaches Silber alleges to support his breach of contract cause of action. Neither of these theories of breach passes muster.

Silber failed to provide evidence demonstrating that GMACM breached the FHA HAMP Guidelines by reviewing his workout packages under Non-FHA guidelines only or in conjunction with FHA HAMP Guidelines.  Nor did he prove that he was injured in his "right to receive some or all of [the] benefits [he was entitled to under the parties' Loan contract]." *Rhodes*, 2014 WL 5355430, at *2.  Since Silber would have been denied a FHA HAMP loan modification based on the workout packages he submitted, whether the packages were reviewed under FHA or Non-FHA guidelines, Silber cannot satisfy this element of a breach of implied covenant claim.  Additionally, Silber has not produced any evidence that GMACM was acting in bad faith.  While Cunningham testified that Silber was evaluated for both FHA HAMP and Non-FHA HAMP modifications, the documentary evidence in at least two instances shows only Non-FHA modification review.  While this shows that GMACM was not at all times following the FHA HAMP Guidelines, Silber suffered no prejudice—the Non-FHA HAMP Guidelines were more favorable to borrowers such as Silber, but he still did not qualify.  The FHA HAMP Guidelines require documentation from the provider of at least 12 months of unemployment income, whereas the Non-FHA HAMP Guidelines only require 9 months of unemployment income.  The evidence shows that even in the absence of the required documentation—evidence of provider documentation—GMACM evaluated Silber's loan modification packages including his unemployment income under both FHA HAMP and Non-FHA HAMP Guidelines.  The calculations of the front end and back end debt to income ratios were substantially above the acceptable thresholds.  GMACM's conduct in reviewing Silber's workout packages thus hardly amounts to bad faith.

Silber's breach of the implied covenant claim also fails because Silber has not demonstrated that GMACM acted wrongfully in providing the Reinstatement Quote, as

addressed above.  Further, Silber has not provided evidence that GMACM acted in bad faith in

providing the Reinstatement Quote to the CHFA.  Nothing in the record before the Court

indicates that the Reinstatement Quote was inaccurate or inflated.

Since Silber failed to prove by a preponderance of the evidence the required elements of

a breach of the implied covenant claim under either theory of breach, the Trust's Objection to

Silber's breach of the implied covenant claim is **SUSTAINED**.

### C.    Negligent Misrepresentation

To successfully assert a negligent misrepresentation claim, a plaintiff must establish:

"(1) that the defendant made a misrepresentation of fact, (2) that the defendant knew or should

have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and

(4) suffered pecuniary harm as a result."  *Rhodes*, 2014 WL 5355430, at *2; *see also Bukowski v.

Safeco Ins. Co. of Am.*, No. CV064008977, 2008 WL 4014222, at *10 (Conn. Super. Ct. July 9,

2008) ("In order to prove negligent misrepresentation, the plaintiffs must prove, by a

preponderance of the evidence, that the defendants (1) supplied false information; (2) failed to

exercise reasonable care in obtaining or communicating the information to the plaintiffs; (3)

supplied the information to induce the plaintiffs to act on it; and (4) that the plaintiffs justifiably

relied on the false information to their detriment.").  Silber premises his negligent

misrepresentation claim on two alleged misrepresentations:  (1) the December 2010 Email; and

(2) the payoff amount GMACM provided to him prior to GMACM's provision of the

Reinstatement Quote to the CHFA.

To the extent this cause of action is based on the December 2010 Email, Silber fails to

establish that he relied on the email.  While the parties agree that the statement in the email that

unemployment income could not be considered in a loan modification review was false, Silber

expressly testified that he knew at all times, before and after the December 2010 Email was sent and received, that the statement was not accurate.  (Jan. 15, 2015 Hrg. Tr. at 83:18–25 ("I'd been aware that unemployment could be used the whole time" (Silber)).)  Silber further demonstrated his lack of reliance through the submission of his January 2011 Workout Package, which includes documentation relating to his unemployment income and his handwritten notes circling and underlining references to the use of unemployment income in support of the application.  (*See* January 2011 Workout Package at 2–3, 20–25.)  When asked how he relied to his detriment on the December 2010 Email, Silber merely stated that the email "quelled" the AAG's investigation into his case.  (Jan. 15, 2015 Hrg. Tr. at 83:18–25 ("Because it quelled the investigation of the Attorney General's Office, who has the power to step in and do something at the time." (Silber).)  This testimony only demonstrates that the AAG may have relied on the December 2010 Email, but a negligent misrepresentation claim must be premised on the *plaintiff's* reliance.  *See Rhodes*, 2014 WL 5355430, at *2.

To the extent this cause of action is based on the payoff amount GMACM provided to Silber in August 2011, Silber fails to demonstrate (1) that the payoff amount was a "misrepresentation," or (2) that he "reasonably" relied on the representation.  First, Silber has not put forth any evidence demonstrating that the payoff amount he received in August 2011 was inaccurate or false.  The Court has already concluded that the Reinstatement Quote was an accurate figure.  The real issue is Silber's erroneous conflation of the payoff amount to the Reinstatement Quote.  At the Evidentiary Hearing, it was made clear that a payoff amount is different from a reinstatement quote; that the two figures were different in amount does not mean that Silber was provided an inaccurate payoff amount.  In any event, Silber hardly establishes that he "reasonably" relied on the payoff amount in formulating his own calculation of what

GMACM would potentially be providing to the CHFA for a reinstatement quote.  GMACM's calculation of the Reinstatement Quote was clearly accurate, and other than the addition of the amount for the payment due on September 1, 2011, Silber did not dispute the amount.  As already explained, adding the amount for the soon-to-be-due September payment was proper in light of the quote being valid through September 25, 2011.  The figures in the payoff amount are clearly different from those in a reinstatement quote; the document Silber provided with the payoff amount does not list any number in the ball park of the approximately $43,000 Reinstatement Quote; and the purported calculation that leads to a smaller figure than the Reinstatement Quote provided to the CHFA was a result of Silber's own calculations, not GMACM's.  There is no evidence before this Court establishing that GMACM provided Silber with a reinstatement quote that would be provided to the CHFA in support of his EHLP application; nor is there evidence before the Court establishing that Silber ever asked GMACM to provide him with that figure.  Lastly, even if Silber adequately established that GMACM misrepresented the figure and that he relied on that misrepresentation, Silber has not specified the damages he would be entitled to.

Silber's negligent misrepresentation claim therefore fails and the Trust's Objection to it is **SUSTAINED**.

### D.    Violation of CUTPA

CUTPA provides that:

> (a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act, or practice, prohibited by § 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business, or is doing business, to recover actual damages.

*Id.* Courts consider three factors in determining whether conduct or a practice violates the

statute:

> (1) whether the practice, without necessarily having been
> previously considered unlawful, offends public policy as it has
> been established by statutes, the common law, or otherwise-
> whether, in other words, it is within at least the penumbra of some
> common law, statutory, or other established concept of unfairness;
> (2) whether it is immoral, unethical, oppressive, or unscrupulous;
> (3) whether it causes substantial injury to consumers (or
> competitors or other businessmen).

*TD Bank, N.A. v. Anastacio*, No. CV 126014582S, 2014 WL 4746864, at *5 (Conn. Super. Ct.

Aug. 18, 2014).  All three of these criteria do not need to be satisfied to support a finding of

unfairness; "[a] practice may be unfair because of the degree to which it meets one of the criteria

or because to a lesser extent it meets all three."  *Id.* (internal quotation marks and citation

omitted).  The question whether a practice is unfair in violation of the statute is an issue of fact

and may be established through an allegation of an "actual deceptive practice . . . or a practice

amount[ing] to a violation of public policy."  *Id.* (citation and internal quotation marks omitted).

A CUTPA claim may be premised upon a breach of contract, *see Ulbrich v. Groth*, 78

A.3d 76, 100 (Conn. 2013), but not all breaches amount to a CUTPA violation, *see TD Bank*,

2014 WL 4746864, at *6.  Allegations of "aggravating unscrupulous conduct," rather than "mere

incompetence," or "allegations that show the defendant engaged in a pattern of bad faith

conduct," may support a determination that a defendant who breached a contract violated

CUTPA.  *TD Bank*, 2014 WL 4746864, at *6.  At least one court has held that "[a] financial

institution's failure to renegotiate [a mortgage contract] with defendants, and instead proceed to

foreclosure without a contractual duty to do otherwise does not represent a legally sufficient

claim under CUTPA."  *Chance v. Torrington Sav. Bank Mortg. Serv. Co.*, No.

WWMCV115005691S, 2013 WL 951266, at *4 (Conn. Super. Ct. Feb. 13, 2013).

A CUTPA claim may also be premised on negligent misrepresentation. *Precision Mech., Inc. v. Empyrean Hosp.*, No. CV075002281, 2007 WL 3011010, at *6 (Conn. Super. Ct. Sept. 26, 2007) ("[N]either knowledge of falsity nor intent to deceive, mislead or defraud need be proven to establish a violation of CUTPA.  Thus, a CUTPA claim may be based on allegations of negligent misrepresentation as well as intentional misrepresentation." (citations omitted)).

Here, with respect to the causes of action that remained after the Prior Opinion, Silber has failed to demonstrate that he is entitled to recover under breach of contract, breach of the implied covenant, or negligent misrepresentation.  Without the underlying wrongful conduct adequately established, Silber's CUTPA claim cannot survive.  Even considering Silber's arguments and evidence under the three-pronged CUTPA standard, Silber has not established that GMACM has engaged in conduct that would constitute a violation of CUTPA.  Thus, the Trust's Objection to the CUTPA claim is **SUSTAINED**.

### III.    CONCLUSION

For the foregoing reasons, following the trial of Silber's surviving causes of action, based on the findings of fact and conclusions of law contained in this Opinion, the Trust's Objection to Silber's Claim is **SUSTAINED** and the Claim is hereby **DISALLOWED** and **EXPUNGED**.

**IT IS SO ORDERED.**

Dated:    August 4, 2015
          New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge