**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | **NOT FOR PUBLICATION** |
| | ) | |
| | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |
| | ) | Jointly Administered |

**MEMORANDUM OPINION AND ORDER (I) SUSTAINING IN PART AND
OVERRULING IN PART THE RESCAP LIQUIDATING TRUST'S OBJECTION TO
CLAIM NUMBERS 5275 AND 7464 OF THE LAW OFFICES OF DAVID J. STERN,
P.A., AND (II) DENYING CLAIMANT'S MOTION FOR PERMISSIVE ABSTENTION**

*A P P E A R A N C E S :*

MORRISON & FOERSTER LLP
*Counsel for the ResCap Liquidating Trust*
250 West 55th Street
New York, New York 10019
By:     Norman S. Rosenbaum, Esq.
        Jordan A. Wishnew, Esq.

BRADLEY ARANT BOULT CUMMINGS LLP
*Co-Counsel for the ResCap Liquidating Trust*
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
By:     John W. Smith T, Esq.

RENNERT VOGEL MANDLER & RODRIGUEZ, P.A.
*Counsel for Law Offices of David J. Stern, P.A.*
Miami Tower
100 S.E. Second Street
Suite 2900
Miami, Florida 33131
By:     Jeffrey A. Tew, Esq.
        Spencer A. Tew, Esq.
        Thomas S. Ward, Esq.

SALAZAR JACKSON, LLP
*Co-Counsel for Law Offices of David J. Stern, P.A.*
2000 Ponce De Leon Boulevard
Penthouse
Coral Gables, Florida 33134
By:     Linda Worton Jackson, Esq.
        Jesse R. Cloyd, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the ResCap Liquidating Trust's (the "Trust") objection (the "Objection," ECF Doc. # 8531) to Claim Numbers 5275 and 7464 (the "Claims," Obj. Ex. 3) filed by the Law Offices of David J. Stern, P.A. ("DJSPA"). The Objection is supported by the declarations of David Cunningham (the "Cunningham Declaration," Obj. Ex. 2-A) and John W. Smith T (the "Smith T Declaration," Obj. Ex. 2-B). DJSPA filed an opposition to the Objection (the "Opposition," ECF Doc. # 8857), supported by the declarations of David J. Stern ("Stern") (the "Stern Declaration," ECF Doc. # 8860) and Jeffrey A. Tew ("Tew") (the "Tew Declaration," ECF Doc. # 8860-12). The Trust thereafter filed a reply (the "Reply," ECF Doc. # 8932) in support of its Objection.

Stern is a now-disbarred Florida lawyer who previously represented Debtor GMAC Mortgage, LLC ("GMACM") in thousands of mortgage foreclosure cases in Florida. He was disbarred in January 2014 following a lengthy investigation and disciplinary proceeding because of his misconduct in mortgage foreclosure cases. The two Claims filed by DJSPA, Stern's now-shuttered law firm, seek to recover more than $6 million in what DJSPA asserts are unpaid legal fees. The Trust asserts that no fees are due because of Stern's material breaches of the parties' contract, Stern's malpractice, and for other reasons as well.

DJSPA also filed a motion for permissive abstention (the "Abstention Motion," ECF

Doc. # 8856), supported by the same declarations of Stern and Tew.[1]  The Trust filed an

objection to the Abstention Motion (the "Abstention Objection," ECF Doc. # 8919).

Dealing first with the Abstention Motion, as explained below, the Abstention Motion is

**DENIED**.  DJSPA filed Claims for more than $6 million in these Chapter 11 cases and thereby

submitted to the Court's equitable jurisdiction to resolve its Claims as part of the claims-

allowance process.  Resolution of creditor claims filed against a debtor's estate is part of the core

jurisdiction of the bankruptcy court.  While DJSPA's Claims are based exclusively on (Delaware

and Florida) state law, there is nothing about the legal or factual issues surrounding those Claims

that would lead this Court to exercise its discretion to permissively abstain.  While the causes of

action underlying the Claims (and counterclaims by GMACM) were previously asserted in

Florida state court and removed to the federal district court, the litigation was at an early stage

when it was stayed as a result of the debtors' (the "Debtors") chapter 11 filings in May 2012.  It

is important that the Objection to the Claims be promptly resolved, something that this Court is

ready and willing to do.

With respect to the Trust's Objection to the Claims, the Objection is **SUSTAINED** in

part and **OVERRULED** in part.  Some of the issues raised by the parties can be resolved as a

matter of law and this Opinion does so.  To the extent the Objection is overruled, it is because

there are disputed issues of fact that cannot be resolved as a matter of law.

---

[1]  The Stern and Tew Declarations filed in support of the Abstention Motion, though identical to the
declarations filed in support of the Opposition, were filed separately.  (*See* ECF Doc. # 8862.)

## I. __BACKGROUND__

### A.    __Relationship Between DJSPA and the Debtors__

Stern was the principal of DJSPA, a Florida law firm that was engaged in handling residential mortgage foreclosures, bankruptcy, evictions, the sale of real estate owned properties by foreclosing lenders, and other foreclosure-related litigation in the state of Florida.  (Obj. ¶ 13.)  In 1995, DJSPA began representing GMACM in foreclosure suits in the state of Florida.  (Opp. at 2 (citing Stern Decl. ¶ 3).)  GMACM retained DJSPA, pursuant to the Master Services Agreement (the "MSA," Cunningham Decl. Ex. A), to provide legal services in connection with mortgage loans for Florida properties that GMACM was servicing on behalf of various financial institutions.  (Obj. ¶ 14.)  The MSA was executed on January 17, 2007, was amended from time to time, and provided that it was governed by Delaware law.  (*Id.* ¶¶ 14–15 (citing MSA ¶ 19).)

The parties also entered into statements of work (the "SOWs," Cunningham Decl. Ex. A).  (Obj. ¶ 14.)  Together, the MSA and SOWs obligated DJSPA to handle residential mortgage foreclosures, bankruptcy, evictions, and the sale of real estate owned properties in the state of Florida.  (*Id.* (citing Cunningham Decl. ¶ 6).)

Paragraphs 2.1 and 2.3 of the MSA provided that GMACM was obligated to pay DJSPA for all legal services and costs, and all DJSPA invoices to which GMACM did not object within 30 days of receipt.  (Opp. at 2 (citing MSA ¶¶ 2.1, 2.3).)  DJSPA was entitled to payment for "work satisfactorily completed and not previously paid," even if DJSPA was terminated.  (*Id.* (citing MSA ¶ 3.2).)  The parties agreement also incorporated GMACM's expectation guidelines (the "Guidelines" or "Attorney Expectation Document," Cunningham Decl. Ex. G), containing additional requirements that outside counsel were expected to meet in providing legal services on behalf of GMACM.  (Obj. ¶ 16 (citing SOW ¶ VII).)  The Guidelines were intended to ensure

4

that GMACM could obtain reimbursements from the investors of each loan for the cost of legal

services; the Guidelines described the services for which law firms could bill, how much could

be billed for particular services, and the time within which bills had to be submitted to GMACM,

as well as the consequences of failing to submit timely invoices.  (*See* Guidelines; *see also*

Cunningham Decl. ¶ 19.)  The Guidelines stated that charges by counsel over the amounts

allowed for investor reimbursement that did not have GMACM or investor approval would not

be paid by GMACM.  (*See* Guidelines; *see also* Cunningham Decl. ¶ 19.)  The Guidelines also

advised that GMACM reserved the right to decline payment of an invoice if it was not submitted

within the pre-determined timelines.  (*See* Guidelines; *see also* Cunningham Decl. ¶ 19.)

From 2007 through November 2010, DJSPA performed legal services on behalf of

GMACM relating to thousands of mortgage files serviced by GMACM.  (*Id.* ¶ 17.)  Certain

support services that were supposed to be provided by DJSPA were performed by one or more

separately-incorporated entities in which Stern held a substantial personal interest and over

which Stern maintained substantial control.  (*Id.*)  One of these entities was DJS Processing,

LLC; it provided non-legal services needed to process foreclosure files and ancillary services for

DJSPA.  (*Id.*)

**B.    Events Leading to the Termination of the Parties' Relationship**

In late 2009 and early 2010, depositions in Florida and Maine foreclosure lawsuits

revealed that GMACM's employee, Jeffrey Stephan ("Stephan"), had fraudulently executed

thousands of affidavits and caused them to be filed in GMACM foreclosure lawsuits across the

country.  (Opp. at 3 (citing Stern Decl. ¶ 8; *id.* Ex. 2).)  GMACM requested DJSPA's assistance

in identifying the extent of the fraud.  (*Id.* at 3–4 (citing Stern Decl. ¶ 8; *id.* Ex. 2; Tew Decl. ¶¶

5–10).)  According to Stern, DJSPA representatives had numerous conversations with high-level

5

executives and legal counsel at GMACM concerning problems caused by the Stephan affidavits.
(*Id.* at 4 (citing Stern Decl. ¶ 9).)  Also according to Stern, Stephan affidavits were filed in over
4,000 GMACM foreclosure lawsuits in which DJSPA was counsel of record in Florida between
June 2008 and July 2010.  (*See id.* (citing Stern Decl. ¶ 9).)

On August 10, 2010, the Florida Attorney General publicly announced an investigation
into allegations of unfair and deceptive actions by DJSPA in handling foreclosure cases in
Florida.  (Obj. ¶ 18 (citing Federal Home Loan Mortgage Corporation's Answer and Affirmative
Defenses to Plaintiff's Amended Complaint and Defendant/Counter Plaintiff's Counterclaim at
¶¶ 18–39, *Law Offices of David J. Stern, P.A. v. Federal Home Loan Mortgage Corp.*, No. 11-
CV-60623-RSR (S.D. Fla. Mar. 30, 2012) (ECF No. 63); Smith T Decl. ¶¶ 7–8, 12).)  Publicly
available documents, including sworn deposition testimony from employees of DJSPA, revealed
that DJSPA engaged in unethical foreclosure-related practices, such as widespread and improper
preparation, execution and submission of assignments, affidavits of indebtedness, and other
papers in mortgage cases that had been handled over the years by DJSPA in Florida.  (*Id.* ¶ 18
(citing Smith T Decl. ¶¶ 7, 9 (citing testimony of DJSPA employees Cheryl Sammons, Tammy
Lou Kapusta, and Kelly Scott)).)

In response to the disclosure of DJSPA's improper business practices, federal agencies,
including the Federal National Mortgage Association ("FNMA") and Federal Home Loan
Mortgage Corporation ("FHLMC"), and other mortgage service providers, terminated their
relationships with DJSPA.  (*Id.* ¶ 19.)  GMACM was advised that FNMA and FHLMC
terminated their relationships with DJSPA; and DJSPA was no longer authorized to provide legal
services for loans subject to their programs.  (*See id.* (citing Smith T Decl. ¶ 12 (citation
omitted); Cunningham Decl. ¶ 14).)  GMACM serviced, and DJSPA provided legal services for

6

GMACM, in connection with many FNMA or FHLMC loans. (*See id.* ¶ 14.) FNMA and

FHLMC required GMACM to transfer all such matters DJSPA was handling to other approved

law firms; they further required that such files be the first priority for file set-up and review at the

new firms. (*Id.* (citing Cunningham Decl. ¶ 14).)

During the late summer and early fall of 2010, Stern spoke with several high-level

officers and legal counsel at GMACM about the Attorney General's investigation, the negative

publicity surrounding DJSPA, the creation of DJSP Enterprises, Inc., including its role in

providing processing and non-legal services to DJSPA's clients such as GMACM in early 2010,

and how to deal with GMACM's Stephan affidavits. (Opp. at 4 (citing Stern Decl. ¶ 11).)

## C.    Remedial Efforts and the Beginnings of the Parties' Dispute

With respect to the Stephan affidavits, GMACM undertook remedial efforts, first by

sending attorneys and staff to meet with Stern at DJSPA's offices to discuss the potential defects

with affidavits of indebtedness (the "Affidavits") submitted in judicial foreclosure cases in

Florida.[2] (*Id.* ¶ 23.) GMACM then sought to remediate the problems by, among other things,

submitting corrected affidavits. (*Id.* (citing Cunningham Decl. ¶ 9).)

According to DJSPA, in September 2010, Stern met with Joseph Pensabene, GMACM's

then Executive Vice President and Chief Servicing Officer, and as a result of the meeting,

GMACM retained DJSPA to assist GMACM in preparing and filing corrected affidavits in the

foreclosure lawsuits in which fraudulent Affidavits had been filed. (Opp. at 5 (citing Stern Decl.

¶ 12).) DJSPA further alleges that GMACM and DJSPA also agreed that their relationship

would continue once DJSPA completed the work contemplated by this retention and GMACM

---

[2]     The Trust alleges that the fraudulent Affidavits were filed by DJSPA, but DJSPA alleges that the fraudulent
Affidavits were fraudulently executed by Stephan.

would resume sending foreclosure cases to DJSPA at the customary volume that it had during
previous years.  (*Id.*)

On September 27, 2010, Stern sent a letter to GMACM (the "September 27 Letter,"
Cunningham Decl. Ex. B), apparently memorializing the retention, and requesting a flat fee for
specific services for each population of foreclosure files that required affidavit remediation that
DJSPA would provide (*see id.*).  The September 27 Letter indicated that the scope of services
and fees charged would vary depending on the procedural status of the foreclosure file.  (*Id.*)  For
matters in which a motion for entry of a foreclosure judgment was filed but no hearing was
pending, DJSPA would prepare and file a notice as well as an amended affidavit containing
current judgment figures.  (*Id.*)  For matters in which a foreclosure judgment was entered and a
foreclosure sale was conducted, DJSPA would file a motion disclosing the defect in the Affidavit
and seeking to cancel the foreclosure sale.  (*Id.*)

On October 14, 2010, GMACM responded to the September 27 Letter, agreeing
generally to the proposed rates so long as DJSPA met specific timing requirements (the
"GMACM Letter," Cunningham Decl. Ex. C).  The GMACM Letter also indicated that DJSPA
was only authorized to provide services with respect to a portion of files requiring remediation.
(*Id.* (citing Cunningham Decl. ¶ 10).)

DJSPA alleges that the September 27 Letter was a separate and distinct contract from the
MSA with different terms concerning the scope of work and payment.  (Opp. at 5 (citing Stern
Decl. ¶ 12).)  The Trust alleges that the September 27 Letter was part of a single agreement
between GMACM and DJSPA, and subject to the MSA that was signed in January 2007.  (*See*
Reply ¶¶ 14–20.)  Whether the parties had a single agreement or multiple separate agreements

may impact the legal rules and consequences of an alleged breach by either party, and is addressed further below.

DJSPA also alleges that the legal fees under the September 27 Letter were divided into four groups, with each assigned a different flat-fee depending on the stage of the foreclosure process in each case:

1. A $500 fee would be paid for cases in which a judgment motion was filed with an Affidavit executed prior to July 12, 2010 (the Monday following the date GMACM stopped the robo-signing of Affidavits), but no hearing was pending;

2. A $750 fee would be paid for cases in which a judgment motion was filed with an Affidavit executed prior to July 12, 2010 with a hearing pending;

3. A $1,000 fee would be paid for cases in which a judgment was entered on or after July 1, 2009 and a foreclosure sale was pending; and

4. A $1,200 fee would be paid for cases in which a judgment was entered on or after July 1, 2009 and a foreclosure sale was held.

(*Id.* at 5–6 (citing Stern Decl. Ex. 3).)

DJSPA alleges that its staff worked extensively with GMACM's representatives to prepare the revised and corrected affidavits. (*Id.* at 6 (citing Stern Decl. ¶ 14).) The Trust alleges that, ultimately, GMACM's in-house personnel and outside counsel (other than DJSPA) prepared the necessary information because DJSPA's work was either incomplete and/or untimely. (Obj. ¶ 25.) GMACM eventually sent DJSPA a letter documenting the corrections made to each original Affidavit. (*Id.*) The Trust alleges that the only curative services DJSPA provided were limited to pulling files, providing original or copies of Affidavits and simply incorporating the changes needed to correct the Affidavits. (*Id.*) The Trust further alleges that

such services were significantly less than the scope of curative services DJSPA was supposed to

perform under their agreement. (*Id.*) The Trust also notes that because other firms were retained

to cover GMACM's loan files, including those that needed corrected Affidavits, not one of the

corrected affidavits drafted by DJSPA was used to remediate the foreclosure matters pursuant to

the September 27 Letter agreement. (*Id.* (citing Cunningham Decl. ¶ 12).)

### D.    The Termination of the Parties' Relationship

GMACM terminated its relationship with DJSPA in November 2010 after confirming

that the Florida Attorney General was conducting a formal investigation of DJSPA, and FNMA

and FHLMC terminated their relationships with Stern. (Obj. ¶ 20 (citing Cunningham Decl.

¶ 15).) To cut ties with DJSPA, GMACM sought to recover its files from DJSPA. (*Id.* ¶ 21.)

The Trust alleges that DJSPA refused to release any files to GMACM until GMACM placed

funds allegedly owed to DJSPA in escrow. (*Id.*) DJSPA alleges that at the time GMACM

terminated the relationship, on or about November 16, 2010, DJSPA had provided over $2.9

million in legal services to GMACM under the September 27 Letter and approximately $3.1

million in legal services and out-of-pocket expenses to GMACM under the MSA. (Opp. at 6

(citing Stern Decl. ¶ 15).) DJSPA asserted a retaining lien on GMACM's foreclosure files under

Florida law because of the allegedly outstanding fees. (*Id.* (citing Tew Decl. ¶ 10).)

On November 5, 2010, to expeditiously obtain its files and terminate the relationship,

GMACM entered into an escrow agreement with DJSPA (the "Escrow Agreement,"

Cunningham Decl. Ex. D) under which the law firm of Bradley Arant Boult Cummings LLP

("BABC"), another one of GMACM's outside counsel, served as the escrow agent, holding

$3 million in escrow until GMACM and DJSPA resolved their dispute over attorneys' fees and

expenses. (*Id.*) Section 2 of the Escrow Agreement provides in part that "[u]pon receipt and

approval of . . . any Court Order from a Court of competent jurisdiction, after appeals have been

exhausted, Escrow Agent shall remit the Attorney Fee & Expense Funds in accordance with any

agreement or Court Order." (*Id.*) The $3 million remains in escrow with BABC. (*Id.*)

After the Escrow Agreement was signed, GMACM obtained substantially all of its files

from DJSPA and subsequently transitioned the files to other law firms, directing the new firms to

review the recovered files and take appropriate steps to remedy any errors committed by DJSPA.

(*Id.* ¶¶ 21–22.) Based on the new firms' review, among other developments, GMACM

determined that DJSPA had committed malpractice in the handling of a number of GMACM

matters before GMACM terminated DJSPA's services. (*Id.* ¶ 22 (citing Smith T Decl. ¶ 14).)

The Trust alleges, among other things, that the malpractice involved the submission of invalid

documentation by DJSPA to Florida courts, loss of loan documents, failure to respond to

discovery propounded by adversaries, failure to respond to dispositive motions, and failure to

respond to counterclaims which, in several instances, resulted in default judgments being entered

as to loans owned or serviced by GMACM. (*Id.* ¶ 79 (citing Smith T Decl. Ex. S).) The Trust

further alleges that these allegedly wrongful acts committed by DJSPA resulted in approximately

$865,104.33 in damages. (*Id.*)

After transferring the foreclosure files to successor counsel, DJSPA sent GMACM a

letter dated February 25, 2011 (the "February 25 Letter"), demanding $6,161,483.70 in unpaid

legal fees and out-of-pocket expenses allegedly incurred on GMACM's behalf. (*Id.* ¶ 26 (citing

Cunningham Decl. ¶ 16); *see also* Opp. at 7 (citing Tew Decl. ¶ 10; *id.* Ex. 9).)

On March 4, 2011, DJSPA sent correspondence to the judges of the judicial circuits in

which it was the firm of record concerning thousands of mortgage-related cases pending

throughout Florida, stating that the "firm suffered a tremendous reduction of both clients and

personnel," requiring it to "withdraw from approximately 100,000 files statewide." (*Id.* ¶ 27

(citing Smith T Decl. ¶ 8 (citing the "Florida Bar Complaint," *id.* Ex. G)).)

### E.    Prepetition Litigation between the Parties

On June 2, 2011, DJSPA filed a complaint against GMACM in Florida state court (the

"Florida Lawsuit Complaint," Smith T Decl. Ex. O) alleging breach of contract, open account,

and account stated (the "Florida Lawsuit"). The Florida Lawsuit Complaint sought damages of

$6,161,483.70, broken down as follows: (1) $411,687.15 for FNMA matters; (2) $271,820.73

for FHLMC matters; (3) $2,979,500.00 for "Remediation Work"; and (4) $2,498,475.82 in

"Other FC Work". (Obj. ¶ 28 (citing Smith T Decl. ¶ 11); *see also* FL Compl.)

On July 11, 2011, GMACM removed the Florida Lawsuit to the United States District

Court for the Southern District of Florida (the "Florida District Court"). (Obj. ¶ 29.) GMACM

filed an answer with counterclaims (the "Answer," Smith T Decl. Ex. P) alleging legal

malpractice, breach of contract, breach of fiduciary duty, violations of Florida's Deceptive and

Unfair Trade Practices Act (the "FDUTPA"), and misrepresentation/suppression (*see id.*). The

breach of contract counterclaim and related defenses are based on the MSA and related SOWs.

GMACM asserted that DJSPA's material breaches of the MSA and SOW barred DJSPA's

recovery. (*Id.*; *see also* Obj. ¶ 29 (citing Smith T Decl. ¶ 11).)

In arguing that DJSPA committed negligence and breach of fiduciary duty, the Trust

alleges that in one foreclosure matter assigned to DJSPA in August 2009, DJSPA failed to

communicate to GMACM that counterclaims had been filed by the borrowers on September 11,

2009, failed to answer or defend against such counterclaims, and, as a result, a $469,470.27

default judgment was entered against the loan investor on October 21, 2009, which became final

on May 5, 2011. (*Id.* ¶ 30 (citing Smith T Decl. ¶ 14); *see also* Smith T Decl. Exs. T–Y.)

GMACM hired new counsel to seek to vacate the judgment, which was partially granted on

February 26, 2013; but a $321,970.77 was affirmed (the "Final Order," Smith T Decl. Ex. W).

The Final Order found "conclusively. . . that there was a complete breakdown of the system at

the Stern Firm" and that "the Stern Firm was guilty of gross negligence." (*Id.*)  The Trust alleges

that GMACM incurred substantial attorneys' fees and expenses due to DJSPA's malpractice and

DJSPA has at all times declined to defend or indemnify GMACM pursuant to its obligations

under the MSA.  (*Id.* (citing Smith T. Decl. Ex. S).)  A summary of additional matters DJSPA

allegedly failed to handle competently is provided in Exhibit S to the Smith T Declaration.  (*See*

Smith T Decl. Ex. S.)

While the Florida Lawsuit was pending, DJSPA was also involved in litigation with

FNMA and FHLMC over their unpaid legal bills concerning foreclosure lawsuits involving the

agencies' loans.  (*Id.* (citing Tew Decl. ¶ 16).)  DJSPA conceded that the subject matter of the

Florida Lawsuit and the litigation with FNMA and FHLMC overlapped.  (*Id.*)  As a result,

GMACM and DJSPA stipulated that DJSPA would seek its fees for legal work on the

foreclosure of the agency loans in the respective suits against FNMA and FHLMC; and fees for

curative services rendered in GMACM foreclosure cases involving loans owned by FNMA and

FHLMC via the September 27 Letter would remain in the Florida Lawsuit (the "Agency Loan

Stipulations," Smith T Decl. Ex. R).  (Opp. at 8 (citing Tew Decl. ¶ 16, Ex. 12).)  The Trust

argues that the Agency Loan Stipulations bar at least a portion of the Claims asserted in this

case; DJSPA's counsel agreed during the July 30, 2015 hearing, but the amount of the reduction

of DJSPA's Claims is unclear.

The Debtors filed their Chapter 11 cases on May 14, 2012 (the "Petition Date").  Before

the Petition Date, the parties engaged in initial written discovery and document production, but

no depositions or other discovery was conducted.  (Obj. ¶ 34.)  The Florida Lawsuit was stayed

on May 23, 2012 and remains stayed as a result of the Debtors' bankruptcy filings.  (*Id.* (citing

Smith T Decl. ¶ 11); Opp. at 9 (citing Tew Decl. ¶ 18; *id.* Ex. 14).)

### F.      The Florida Bar Proceedings Against Stern

On April 17, 2013, the Florida Bar filed a complaint against Stern (the "Florida Bar

Complaint," Smith T Decl. Ex. G), which eventually reached the Florida Supreme Court.  (Smith

T Decl. ¶ 8.)  In the Florida Supreme Court, a referee was appointed and filed a report (the

"Report of Referee," Smith T Decl. Ex. H), making several findings of fact of misconduct on the

part of Stern and DJSPA and recommending that Stern be disbarred (*see generally id.*).

In January and February 2014, Jorge Luis Suarez, a DJSPA associate, executed a

conditional guilty plea for consent judgment resolving the Florida State Bar disciplinary action

against Suarez (the "Suarez Consent Judgment," Smith T Decl. Ex. I).  The Suarez Consent

Judgment indicates that an unknown number of affidavits processed by Suarez while working for

DJSPA from 2007 through 2010 were not executed by him in the presence of a notary.  (*Id.*)

On January 7, 2014, the Supreme Court of Florida issued an order approving the Report

of Referee and disbarring Stern, effective thirty days after the order was entered (the

"Disbarment Order," Smith T Decl. Ex. J).

On February 10, 2014, the Florida Supreme Court entered an order approving a

conditional guilty plea and consent judgment against Miriam L. Mendieta, another attorney

employed by DJSPA (the "Mendieta Suspension Order," *id.* Ex. K).  The Mendieta Suspension

Order provided that Mendieta was suspended from practicing law for ninety days.  (*Id.*)

### G.      The Claims

DJSPA filed two Claims against GMACM in the Debtors' bankruptcy cases:

(1) Claim Number 5275 for $6,161,483.70 against GMACM, alleging breach of contract, open account, and account stated causes of action premised on the Florida Lawsuit Complaint, for amounts purportedly due and owing as of February 2011.  (*See* Claims.)  The Claim is comprised of (1) $2,979,500.00 in unpaid invoices for curative work GMACM requested in 2010; (2) $2,498,475.82 for services rendered before GMACM terminated the relationship; and (3) $683,507.88 related to FNMA and FHLMC matters.  (*Id.*)

(2) Claim Number 7464, amending Claim Number 5275.  (*Id.*)  The only change to the claim is new contact information for Jeffrey Tew, DJSPA's authorized agent.  (*Id.*; *see also* Opp. at 9 (citing Tew Decl. ¶ 19).)

### H.      The Abstention Motion and Abstention Objection

DJSPA argues that the Court should abstain from hearing the Objection pursuant to 28 U.S.C. § 1334(c)(1).  (Ab. Motion ¶ 15.)  According to DJSPA, six factors that Second Circuit courts generally consider support "abstain[ing] from exercising jurisdiction over this purely state law fee dispute case."  (*Id.* ¶ 19.)  First, the Florida District Court's resolution of the Florida Lawsuit would not negatively impact the efficient administration of the Debtors' estates or "amount to abdication of a critical role in the administration of the estate[s]."  (*Id.* ¶ 20 (quoting *In re CPW Acquisition Corp.*, Case No. 08-14623 (AJG), 2011 WL 830556, at *6 (Bankr. S.D.N.Y. Mar. 3, 2011)).)  Second, the claims and counterclaims asserted in the Florida Lawsuit are governed solely by Delaware and Florida law and involve specific Florida statutes and Florida Bar rules that should be adjudicated by a Florida court.  (*See id.* ¶¶ 23–25.)  Third, the Florida Lawsuit is currently pending in the Florida District Court and could be adjudicated there. (*See id.* ¶ 26.)  Fourth, the Florida Lawsuit is not a core proceeding but rather is, at most, related to a case under the Bankruptcy Code.  (*See id.* ¶¶ 27–28.)  Fifth, the Florida Lawsuit involves

15

"Delaware and Florida state law issues that are unrelated to these bankruptcy cases and are easily severable from these bankruptcy cases." (*Id.* ¶ 29.) Finally, sixth, "[a]bstention from this contested matter will relieve this Court's already busy docket." (*Id.* ¶ 30.)

The Trust argues that the Abstention Motion should be denied because the Court's adjudication of the Claims is a core proceeding and DJSPA cannot establish exceptional circumstances warranting permissive abstention. (Ab. Obj. ¶ 1.) According to the Trust, DJSPA filed its Claims and thereby voluntarily submitted itself to the Court's jurisdiction in order to receive any recovery on any such Claims, if allowed. (*Id.* ¶ 2.) Abstention would impair the ongoing claims reconciliation process as a consequence of delay and increased administrative costs. (*Id.* ¶ 1.) Moreover, DJSPA cannot establish that the factors commonly considered by courts in determining whether to abstain weigh in its favor. (*Id.*) The Claims do not raise any novel or complex state law issues that the Court cannot determine, and the Court regularly adjudicates state law issues in the context of claims objections. (*Id.*)

## I.    The Objection

The Trust seeks to disallow and expunge the Claims in their entirety pursuant to section 502(b) of the Bankruptcy Code. (Obj. ¶ 37.) The Trust also seeks the Court's order authorizing the release to the Trust of funds currently being held in escrow. (*Id.*)

First, the Trust argues that under Delaware's material breach doctrine, DJSPA is guilty of several material breaches of the parties' contract excusing GMACM's performance of any of its obligations under the parties' contract (i.e., payment for legal services rendered). (*Id.* ¶¶ 41–65.) According to the Trust, DJSPA materially breached the parties' agreement in the following ways: (1) it breached paragraph 6.8 of the MSA, which warrants and represents that DJSPA is not subject to investigations or suits that "if adversely decided, might adversely affect [DJSPA's]

ability to enter into" the MSA and perform its obligations, by engaging in improper business

practices leading to formal investigations into DJSPA by the Florida Attorney General (*id.*

¶¶ 47–50); (2) it breached paragraph 6.6 of the MSA, which warrants and represents that DJSPA

will maintain "all licenses, franchises, permits, authorizations and approvals materially necessary

for the lawful conduct of its business," by losing FNMA and FHLMC designations (*id.* ¶ 51); (3)

it breached paragraphs 6.1 and 6.4 of the MSA, which require DJSPA to provide services "in a

diligent and workmanlike manner in accordance with good industry practices, by individuals of

suitable training and skill" and that such work will be performed in compliance "with all

applicable federal, state and local requirements," by failing to abide by the Florida Rules of

Professional Conduct and the Rules Regulating the Florida Bar as well as failing to provide

competent legal services in accordance with good industry practices (*id.* ¶¶ 52–59; (4) it

breached paragraphs 6.1 and 8.8 of the MSA, which require DJSPA to employ "individuals of

suitable training and skill" and "to select, supervise and monitor the personnel performing" the

work for GMACM, by failing to provide adequate oversight and suitable training to its

employees (*id.* ¶¶ 60–63); (5) it breached paragraph 18.1 of the MSA, which provides that

DJSPA "shall not assign, in whole or part, any of its obligations under [the MSA] without

[GMACM's] written consent" nor subcontract any portion of its obligations, by assigning its

obligations under the MSA in 2009 without approval to several separate publicly-traded entities

Stern exclusively used from that point to assist in the foreclosure processing (*id.* ¶ 64); (6) it

breached paragraph 8.1 of the MSA, which states that DJSPA "may perform . . . Services outside

of the United States, . . . only if expressly agreed to by [GMACM] in the Statement of Work or

otherwise," by offshoring work on GMACM files to individuals working in the Philippines as

early as 2007 (*id.* ¶ 65).

17

The Trust further notes that, in related litigation, against a different mortgage service provider, CitiMortgage, Inc., DJSPA has been barred from recovery as a result of its material breaches of its agreement  (*Id.* ¶ 66.)[3]

The Trust also argues that the Claims are overstated and are subject to offsets.  (*Id.* ¶¶ 67–80.)  First, as to the amount demanded in connection with FNMA and FHLMC loans, the Trust argues that DJSPA is not entitled to recovery.  (*Id.* ¶¶ 67–68.)  While the Florida Lawsuit was pending, DJSPA also sued FNMA and FHLMC seeking unpaid legal fees.  (*Id.* ¶ 68 (citing Smith T Decl. ¶¶ 12–13 (citations omitted)).)  DJSPA and GMACM filed the Agency Loan Stipulations providing that the FHLMC and FNMA loans were transferred from the Florida Lawsuit to the FHLMC and FNMA lawsuit and arbitration, respectively, and were no longer part of the Florida Lawsuit.  (*Id.*)  These stipulations were filed prior to the Debtors' filing for bankruptcy; therefore, $683,507.90 allegedly owed to DJSPA for legal work on FNMA and FHLMC loans is not recoverable from GMACM.  (*Id.*)  DJSPA's counsel agreed at the July 30, 2015 hearing that the Agency Loan Stipulations remain effective in this case.

Second, with regard to the $2,498,475.82 in allegedly unpaid prepetition legal fees, the Trust argues that under GMACM's outside counsel fee guidelines, $1,158,885.04 of DJSPA invoices were previously submitted to and rejected by GMACM because either the invoice amounts were above the payment thresholds set by the applicable investors and/or the invoices were not submitted on a timely basis to GMACM.  (*Id.* ¶¶ 70.)  The Trust therefore argues that the prepetition legal fees claim should be reduced and should be no greater than $1,339,590.78. (*Id.*)

---

[3]    The filings were submitted under seal and the opinion is not publicly available.

Third, as to the $2,979,500.00 purportedly attributable to the curative work done pursuant to the September 27 Letter, the Trust argues that DJSPA did not provide such services and, therefore, it is not entitled to payment. (*Id.* ¶ 71.) The Trust alleges that the work DJSPA did was untimely and of low quality. (*Id.*) The Trust further alleges that the only potentially curative services DJSPA performed were limited to pulling files, providing original or copies of Affidavits, and making corrections to Affidavits; such work is much less than what was contemplated in the September 27 Letter. (*Id.*) The Trust also highlights that not one of the affidavits drafted by DJSPA was used by the new firms GMACM replaced DJSPA with to remediate the errors in the foreclosure actions. (*Id.*)

Fourth, the Trust argues that, under Delaware law, DJSPA's claim must be offset for damages GMACM suffered by reason of DSJPA's misconduct. (*Id.* ¶¶ 72–80.) The Trust alleges the following damages GMACM incurred as a result of DJSPA's conduct: (1) GMACM incurred timeline penalties of $1,220,865.96 (the "Timeline Penalties") enforced by FNMA and FHLMC as a result of having to reassign the agency loan files being managed by DJSPA and consequent delays in pursuing foreclosures (*id.* ¶ 77); (2) GMACM incurred $1,964,700 in costs relating to transferring the non-agency loans to new firms (the "Transfer Costs"), which are substantially comprised of a $300 flat fee GMACM paid to new law firms for each loan the new firm needed to familiarize itself with (*id.* ¶ 78); (3) GMACM suffered damages of at least $865,104.33 from DJSPA's negligence as summarized in Exhibit S to the Smith T Declaration (*id.* ¶ 79); and (4) GMACM incurred at least $57,139.98 in damages relating to DJSPA's failure to recover costs from borrowers that the servicer was rightly entitled to receive when it enforced its remedies against the borrower (*id.* ¶ 80).

According to the Trust, these damages would not have been incurred but for DJSPA's wrongful conduct and breaches of the parties' agreement and should be subtracted from any allowed amount of the Claims.

Lastly, the Trust argues that the open account and account stated claims DJSPA asserts are redundant or otherwise invalid. (*Id.* ¶¶ 81–83.) The Trust argues that the Florida Lawsuit Complaint does not demonstrate that these two causes of action are based on facts different than those alleged in support of the breach of contract claim. (*Id.* ¶ 81.) The Trust also argues that a claim for open account is unavailable because DJSPA cannot demonstrate that there was at least some expectation that the parties would work together again in the future—Stern was disbarred, DJSPA was dissolved, and the Debtors' liquidation plan was confirmed by the Court. (*Id.* ¶ 82.) Moreover, the Trust contends that DJSPA cannot assert a claim for account stated because the parties did not agree that a certain balance was correct and due, nor was there an express or implicit promise to pay this balance. (*Id.* ¶ 83.) Merely submitting the invoices DJSPA prepared is insufficient to support such a claim. (*Id.*)

### J.    The Opposition

DJSPA argues that the Trust's Objection should be overruled because it fails to produce the necessary evidence to shift the burden to DJSPA, and even if the evidence provided was sufficient, DJSPA's Opposition alleges enough facts to state a claim for relief that is plausible on its face. (Opp. at 10.)

In terms of failing to shift the burden, DJSPA argues that the only evidence the Trust relies on in support of its Objection are the Cunningham and Smith T Declarations, which should be stricken as they are based on hearsay, "upon information and belief," and proffer improper opinions. (*Id.* at 11–13.) Additionally, DJSPA argues that neither the Cunningham nor the

Smith T Declaration addresses the validity of each of the invoices attached to DJSPA's Claims or testifies that GMACM objected to any of those invoices within 30 days of their being sent. (*Id.* at 13–14.)

DJSPA then asserts that even if the Court accepted the declarations, there are disputed issues of material fact that cannot be resolved at this stage of the matter. (*Id.* at 14–15.) DJSPA submits that the following issues remain disputed and therefore preclude sustaining the Trust's Objection:

(1) Which party committed a material breach of the MSA and/or September 27 Letter?

(2) Did GMACM breach the MSA by submitting thousands of fraudulent Affidavits?

(3) Did GMACM breach the MSA by failing to timely pay DJSPA invoices for legal services performed and costs incurred for which GMACM failed to timely object?

(4) Did DJSPA breach the MSA by committing malpractice?

(5) If breaches of the parties' contracts occurred, when did those breaches occur?

(6) When did the non-breaching party obtain actual or constructive notice of the material breaches?

(7) Once the non-breaching party became aware of the material breach, did the non-breaching party conduct itself in a way that constituted a waiver of any rights it had to terminate the MSA and/or September 27 Letter?

(8) Did GMACM have actual or constructive knowledge of any DJSPA breaches of the MSA when GMACM entered into the Curative Agreement?

(*Id.*)

Turning to the merits of the Objection, DJSPA argues that the material breach doctrine does not preclude DJSPA's recovery of legal fees for the services it rendered and GMACM accepted. (*Id.* at 15–22.) With respect to the $2,498,475.82 of legal services DJSPA rendered under the MSA, DJSPA argues that the material breach doctrine does not relieve the Trust of its entire obligation to pay DJSPA. (*Id.* at 18–19.) According to DJSPA, even if DJSPA committed the first material breach of the MSA, the partial performance exception to the material breach doctrine applies; DJSPA allegedly partially performed and thereby perfected its right to GMACM's performance of its "agreed equivalent" (i.e., paying the pre-assigned flat fee for the legal services DJSPA actually performed under the SOWs). (*Id.*) DJSPA further argues that the Trust cannot fully reap the benefits of the material breach doctrine because the waiver exception to the doctrine applies. (*Id.* at 19.) DJSPA contends that by entering into the September 27 Letter, GMACM waived its right to refuse to perform under the MSA because the Trust alleges that when the Attorney General investigation was launched in August 2010, GMACM had "no doubt" the "investigations were likely to result in adverse decisions affecting DJSPA's ability to perform its obligations to" GMACM. (*Id.*) By voluntarily entering into the September 27 Letter with knowledge of the investigation, GMACM waived this argument of material breach. (*Id.*)

With respect to the $2,979,500 DJSPA seeks for legal services under the September 27 Letter, DJSPA first alleges that breaches of the MSA do not affect GMACM's obligation to pay for legal services under the September 27 Letter. (*Id.* at 20.) Second, DJSPA again refers to the partial performance exception to the material breach doctrine, arguing that even if DJSPA committed a material breach of the September 27 Letter, DJSPA at least partially performed and

thereby perfected its right to GMACM's performance of its "agreed equivalent" (i.e., paying the pre-assigned flat fee for the legal services DJSPA actually performed). (*Id.* at 20–21.)

DJSPA also asserts that the material breach doctrine cannot be used to strike DJSPA's claim "in toto" because the doctrine is not applicable to DJSPA's alternatively pleaded theories of recovery (i.e., open account and account stated). (*Id.* at 21–22.) First, DJSPA asserts that the Florida District Court has already held that DJSPA adequately pleaded such claims in a lawsuit containing "virtually identical allegations." (*Id.* at 21 (citing *Law Offices of David J. Stern, P.A. v. Bank of Am. Corp.*, No. 11-21349-CIV, 2012 WL 112935 (S.D. Fla. Jan. 12, 2012)).) Second, DJSPA asserts that the rules of procedures authorize DJSPA to plead those claims "in the alternative." (*Id.* (citing FED. R. CIV. P. 8(a), (d)).) Third, DJSPA asserts that since GMACM did not move to dismiss those claims in the Florida Lawsuit, DJSPA has already successfully stated a cognizable claim for open account and account stated, which should be recognized in this Court. (*Id.*)

With respect to the defenses GMACM raised in the Florida Lawsuit, to the extent this Court considers those defenses here, DJSPA asserts that there are disputed issues of facts that cannot be resolved at this stage. (*Id.* at 22–28.) According to DJSPA, the declarations submitted in support of the Objection improperly attempt to back-door GMACM's affirmative defenses and counterclaims into this proceeding. (*Id.* at 22.) If this Court considers those defenses and counterclaims over DJSPA's objection, the Court should not make a substantive ruling because discovery is outstanding and DJSPA's sworn declarations create disputed issues of fact. (*Id.*) DJSPA then addresses each of these defenses in turn.

First, with respect to the Timeline Penalties defense, DJSPA argues that any delay and damages GMACM purportedly incurred resulted from GMACM's own misconduct or

negligence as evidenced by (1) the over 4,000 fraudulent Affidavits that GMACM's officer

prepared and filed in foreclosure lawsuits that delayed foreclosure suits in 23 states that had to be

remediated, and (2) the deposition testimony relied upon by the Trust that does not necessarily

indicate that DJSPA was the proximate cause of alleged wrongdoing that resulted in penalties

and delays.  (*Id.* at 24–25.)  Second, as to the Transfer Fees defense, the DJSPA refers to its

denial of liability for these fees and affirmative defenses raised in the Florida Lawsuit, including

GMACM's failure to mitigate damages.  (*Id.* at 25–26.)  DJSPA further argues that whether such

Transfer Fees were foreseeable or a category of damages contemplated in the MSA or September

27 Letter is a disputed issue of fact.  (*Id.* at 26.)  Third, as to the offshoring of work defense,

DJSPA disputes through the Stern Declaration that GMACM did not have knowledge of the

offshore operations.  (*Id.* at 27.)  Fourth, as to the malpractice defense, DJSPA argues that there

are disputed issues of fact whether DJSPA actually committed malpractice in the cited instances

the Trust relies upon.  (*Id.* at 28.)

DJSPA then argues that if GMACM seeks affirmative relief from DJSPA through its

counterclaims, those claims should be resolved in an adversary proceeding rather than through

the claims allowance process.  (*Id.* at 29.)  Finally, DJSPA contends that the escrow funds should

not be released to the Debtors' estates because they are subject to a retaining lien imposed by

Florida law.  (*Id.* at 29–30.)

### K.    The Reply

The Trust argues in its Reply that DJSPA does not dispute that it breached the MSA.

(Reply ¶¶ 1–3.)  According to the Trust, DJSPA attempts to shift the Court's focus on the need to

correct the Stephan Affidavits, but that need has no effect on DJSPA's lack of performance and

failure to comply with the MSA.  (*Id.* ¶ 3.)  The Trust then argues that DJSPA does not dispute

that Delaware law recognizes the first material breach doctrine or that DJSPA's breaches of the MSA were in fact material.  (*Id.* ¶ 4.)

As to DJSPA's payment for its partial performance argument under section 240 of the Restatement (Second) of Contracts, the Trust argues that Delaware courts do not apply section 240 to material breach of contract cases.  (*Id.* ¶¶ 5–10.)  The Trust asserts that section 240 only pertains to contracts that are divisible or severable and Delaware case law holds that ongoing services contracts such as the MSA are not susceptible to divisibility.  (*Id.* ¶¶ 6–8.)  The Trust further argues that even if section 240 did apply to the MSA, DJSPA would need to prove that it provided the services on each divisible transaction and the reasonable value for each such service.  (*Id.* ¶ 9.)  The Trust also contends that DJSPA's breaches of the MSA are so egregious that they apply to all constituent projects and DJSPA should not receive any benefit for partial performance.  (*Id.* ¶ 10.)

The Trust asserts that GMACM never waived its rights to withhold its performance arising from DJSPA's material breaches.  (*Id.* ¶¶ 11–13.)  The MSA requires a written waiver for any party to waive its contractual rights.  (*Id.* ¶ 12–13.)  No such written waiver was provided here and, as a result, GMACM cannot be considered to have waived any of its rights under the MSA.  (*Id.*)

The Trust also addresses DJSPA's contention that the September 27 Letter was a separate and distinct contract from the MSA.  (*Id.* ¶¶ 14–20.)  The Trust argues that the MSA constitutes the parties' entire agreement and contemplates the parties' performance pursuant to "Projects" as defined by the MSA, memorialized in SOWs.  (*Id.* ¶ 16 (citing MSA ¶ 1).)  The Trust contends that the September 27 Letter is a "Project" or SOW and its terms comply with the MSA's prescription that SOWs are to be subsequent writings describing the work plan, pricing, process

for billing the work, and a schedule.  (*Id.*)  The Trust emphasizes that the Stephan Affidavits that

needed to be corrected under the September 27 Letter were all Affidavits that were filed in

actions DJSPA covered for GMACM.  (*Id.* ¶ 18.)  As a result, the Trust submits that the

September 27 Letter was an extension of services assigned under the MSA, which required

additional pricing, invoicing, and scheduling specifications.  (*Id.*)  Nevertheless, the Trust argues

that if the September 27 Letter is a separate contract, DJSPA is guilty of material breach of that

agreement because it failed to provide competent legal services (1) untainted by formal

investigation, and/or (2) with improperly trained and poorly supervised personnel; it also failed

to retain qualification for working on FHLMC and FNMA matters.  (*Id.* ¶ 20.)

The Trust asserts that the Cunningham Declaration can be properly considered by the

Court because the statements made therein are based on Cunningham's personal knowledge

gathered from a variety of sources he reviewed, and Cunningham is prepared to competently

testify based on his personal knowledge about the statements within his declaration.  (*Id.* ¶¶ 21–

22.)

With regard to the Transfer Fees the Trust seeks from DJSPA, the Trust argues that it is

disingenuous for DJSPA to argue that when it was fired by a client because of its malfeasance,

that it should not expect its client to incur the cost of transferring the files to a new law firm. (*Id.*

¶ 23.)  The Trust also argues that the MSA expressly required that the Transfer Fees were to be

borne DJSPA as a "Termination Service."  (*Id.*)

Lastly, the Trust acknowledges that while it may not obtain an affirmative recovery from

DJSPA based on the counterclaims previously asserted in the Florida action, the counterclaims

from that case are properly before the Court in this Objection because, if proven, they will reduce

the allowed amount of the claim and will be resolved more efficiently without an adversary

proceeding.  (*Id.* ¶ 24.)

## II.    DISCUSSION

### A.    Permissive Abstention

District courts have original jurisdiction over "civil proceedings arising under title 11, or

arising in or related to cases under title 11."  28 U.S.C. § 1334(b).  The "district court may

provide that any or all" such proceedings "shall be referred to the bankruptcy judges for the

district."  *Id.* § 157(a).  Section 157(b) of title 28 provides a bankruptcy judge with authority to

"hear and determine" core proceedings and enter final judgments in such proceedings.  *See* 28

U.S.C. § 157(b)(1).  Section 157(b)(2) provides a non-exhaustive list of core proceedings,

including "matters concerning the administration of the estate," 28 U.S.C. § 157(b)(2)(A), and

"allowance or disallowance of claims against the estate," *id.* § 157(b)(2).

The determination whether to allow or disallow the Claims is a statutory core proceeding.

*See* 28 U.S.C. § 157(b)(2)(B) (defining a core proceeding as the "allowance or disallowance of

claims against the estate"); *In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 706 (2d Cir. 1995)

(holding that bankruptcy court's disallowance of a creditor's proof of claim based on a

prepetition state law claim was a core proceeding under section 157(b)(2)(B)).  This Court also

has constitutional authority to enter final judgment on the Trust's Objection to the Claims

because the Objection arises "as part of the process of allowance and disallowance of claims,"

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58 (1989) (quoting *Katchen v. Landy*, 382 U.S.

323, 336 (1966)), which is "clearly within the traditional core jurisdiction of the bankruptcy

court," *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1390 (2d Cir. 1990) (citing *N.

Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 84 n.36 (1982); *Lesser v. A-Z*

*Assocs. (In re Lion Capital Grp.)*, 46 B.R. 850, 860 (Bankr. S.D.N.Y. 1985)). Additionally, by

filing the Claims against the Debtors' estates, DJSPA "submitted itself to the equitable power of

the bankruptcy court to disallow its claim[s]." *Manville*, 896 F.2d at 1389 (citing

*Granfinanciera*, 492 U.S. at 59 n.14); *see S.G. Phillips*, 45 F.3d at 706 (holding that bankruptcy

court had jurisdiction to disallow a claim filed in the debtor's bankruptcy case, finding that the

claimant "became involved in bankruptcy court proceedings by filing its proof of claim in

bankruptcy court and thereafter actively litigating in that court").

        Nothing about these conclusions about the bankruptcy court's authority in this matter is

altered by the decision in *Stern v. Marshall*, 564 U.S\_\_\_, 131 S. Ct. 2594 (2011), where the

Court held that a bankruptcy judge lacks constitutional authority to enter a final judgment on

claims designated as core that "exist[] without regard to any bankruptcy proceeding" and only

"seek 'to augment the bankruptcy estate,'" *id.* at 2618. Resolving issues raised by a creditor's

proof of claim are quintessentially a part of the claims allowance process. As the Court stated in

*Katchen v. Landy*, 382 U.S. at 333 n.9, "he who invokes the aid of the bankruptcy court by

offering a proof of claim and demanding its allowance must abide the consequences of that

procedure." *Katchen* remains good law after *Stern v. Marshall*. *See Stern*, 131 S. Ct. at 2616

(explaining *Katchen*). Indeed, during the hearing on the Abstention Motion and Objection,

DJSPA's counsel agreed that if the contested matter remains in this Court, the Trust can assert as

defenses to the Claims all of the issues raised in the counterclaims. Therefore, it is clear that this

Court has the authority to hear and determine (i.e.,. enter final orders or judgment) all of the

issues raised by DJSPA's Claims and the defenses asserted against them. Assuming the

authority to do so, however, the Court must determine whether permissive abstention is

nevertheless appropriate.

With certain limited exceptions, a bankruptcy court may abstain from hearing a particular

proceeding "in the interest of justice, or in the interest of comity with State courts or respect for

State law . . . ." 28 U.S.C. § 1334(c)(1).  "Courts must be sparing in their exercise of permissive

abstention, and may abstain only for a few extraordinary and narrow exceptions." *CCM*

*Pathfinder Pompano Bay, LLC v. Compass Fin. Partners LLC*, 396 B.R. 602, 607 (S.D.N.Y.

2008) (internal citations and quotation marks omitted); *accord In re Residential Capital, LLC*,

519 B.R. 890, 903 (Bankr. S.D.N.Y. 2014) ("A federal court must be 'sparing' in its exercise of

permissive abstention 'because [it] possess[es] a virtual unflagging obligation . . . to exercise the

jurisdiction given [to it].'" (quoting *Kirschner v. Grant Thorton LLP (In re Refco, Inc. Sec.*

*Litig.)*, 628 F. Supp. 2d 432, 446 (S.D.N.Y. 2008))).  In determining whether to abstain from

adjudicating a proceeding under section 1334(c)(1), courts in this district commonly consider the

following twelve factors:

> (1) the effect or lack thereof on the efficient administration of the
> estate if a Court recommends abstention, (2) the extent to which
> state law issues predominate over bankruptcy issues, (3) the
> difficulty or unsettled nature of the applicable state law, (4) the
> presence of a related proceeding commenced in[]state court or
> other nonbankruptcy court, (5) the jurisdictional basis, if any, other
> than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness
> of the proceeding to the main bankruptcy case, (7) the substance
> rather than form of an asserted "core" proceeding, (8) the
> feasibility of severing state law claims from core bankruptcy
> matters to allow judgments to be entered in state court with
> enforcement left to the bankruptcy court, (9) the burden [on] the
> court's docket, (10) the likelihood that the commencement of the
> proceeding in a bankruptcy court involves forum shopping by one
> of the parties, (11) the existence of a right to a jury trial, and (12)
> the presence in the proceeding of nondebtor parties.

*In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 332 (S.D.N.Y. 2003) (quoting *Masterwear Corp.*

*v. Rubin Baum Levin Constant & Friedman (In re Masterwear Corp.)*, 241 B.R. 511, 520

(Bankr. S.D.N.Y. 1999)).  "Not all of these factors need be applied, however, although the

balance should be heavily weighted in favor of the exercise of jurisdiction." *In re Portrait Corp. of Am., Inc.*, 406 B.R. 637, 642 (Bankr. S.D.N.Y. 2009) (internal citations and quotation marks omitted). The party moving for permissive abstention bears the burden of establishing that abstention is warranted. *In re Residential Capital, LLC*, 519 B.R. at 903 (citing *In re Residential Capital, LLC*, 488 B.R. 565, 577 (Bankr. S.D.N.Y. 2013)).

DJSPA has not established that the balance of the factors weigh in favor of abstention, "particularly in light of the narrow circumstances in which permissive abstention should be exercised." *Id.* at 903. First, abstention would detrimentally impact the claims reconciliation process. The resolution of DJSPA's Claims in the Florida Lawsuit would delay the claims reconciliation process and result in increased administrative expenses. (*See* Ab. Obj. ¶ 14.)

Second, although state law issues predominate, DJSPA has not demonstrated that any issues to be resolved are particularly complex or that the Florida District Court has any special expertise in interpreting the state law issues. (*See id.*) This Court regularly adjudicates state law issues in resolving claims objections and DJSPA has not identified any compelling reason why this Court is not able to do so in resolving the Objection to its Claims.

Third, resolution of the Objection is a core proceeding, contrary to DJSPA's assertion otherwise. (*See* Motion ¶¶ 27–28.) Finally, adjudicating the Trust's Objection would not overly burden the Court's docket. (*See id.* ¶ 30.) Therefore, the Abstention Motion is **DENIED**.

### B.    Claims Objections

Correctly filed proofs of claim "constitute prima facie evidence of the validity and amount of the claim . . . . To overcome this prima facie evidence, an objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000). By

producing "evidence equal in force to the prima facie case," an objector can negate a claim's

presumptive legal validity, thereby shifting the burden back to the claimant to "prove by a

preponderance of the evidence that under applicable law the claim should be allowed." *Creamer*

*v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*, No. 12 Civ. 6074 (RJS),

2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted).  If the

objector does not "introduce[] evidence as to the invalidity of the claim or the excessiveness of

its amount, the claimant need offer no further proof of the merits of the claim."  4-502 COLLIER

ON BANKRUPTCY ¶ 502.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).

Bankruptcy Code section 502(b)(1) provides that claims may be disallowed if

"unenforceable against the debtor and property of the debtor, under any agreement or applicable

law."  To determine whether a claim is allowable by law, bankruptcy courts look to "applicable

nonbankruptcy law."  *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006).

If a claim fails to comply with the documentation requirements of Bankruptcy Rule

3001(c), it is not entitled to *prima facie* validity.  *See Ashford v. Consol. Pioneer Mortg. (In re*

*Consol. Pioneer Mortg.),* 178 B.R. 222, 226 (9th Cir. B.A.P. 1995), *aff'd*, 91 F.3d 151 (9th Cir.

1996); *In re Minbatiwalla*, 424 B.R. 104, 112 (Bankr. S.D.N.Y. 2010).  Where creditors fail to

provide adequate documentation supporting the validity of their claims consistent with

Bankruptcy Rule 3001(c), courts in this Circuit have held that such claims can be disallowed.

*See Minbatiwalla*, 424 B.R. at 119 (determining that "in certain circumstances, claims can be

disallowed for failure to support the claim with sufficient evidence . . . because absent adequate

documentation, the proof of claim is not sufficient for the objector to concede the validity of a

claim.").

*1.     Breach of Contract*

DJSPA's first cause of action asserted against GMACM is for breach of contract.  The

Trust argues that the MSA and September 27 Letter should be considered as one agreement

between the parties, arguing that DJSPA materially breached the parties' agreement; and as a

result, DJSPA is not entitled to recover breach of contract damages under Delaware law.  DJSPA

argues that the breach of contract claim is based on two separate and distinct contracts (i.e., the

MSA and the September 27 Letter).  DJSPA emphasizes that the Trust only argues that DJSPA

materially breached the MSA; as a result, (1) to the extent this claim is based on the September

27 Letter, the Trust failed to shift the burden, and (2) to the extent this claim is based on the

MSA, there are disputed issues of fact precluding this Court from sustaining the Objection.

DJSPA further asserts that to the extent DJSPA materially breached the agreement, DJSPA is

nevertheless entitled to payment for its partial performance and GMACM waived its rights

relating to the material breaches by failing to timely object to the invoices forming the basis of

the Claims.

As an initial matter, the Court holds, as a matter of law, that the MSA and September 27

Letter constitute one single agreement between the parties that should be interpreted together.

"Under standard rules of contract interpretation, a court must determine the intent of the parties

from the language of the contract." *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014).  The

parties' intent "determine[s] whether two separately executed documents are in reality one

agreement." *Phillip Servs. Corp. v. Luntz (In re Phillip Servs. (Del.), Inc.)*, 284 B.R. 541, 546

(Bankr. Del. 2002), *aff'd*, 303 B.R. 574 (D. Del. 2003) (citations omitted).

The MSA provides in relevant part:

> It is the intention of the parties to establish this Agreement to
> govern the respective rights, duties and obligations of the parties.

. . .

Services shall be performed in accordance with the attached Terms and Conditions, Statement(s) of Work and all other documentation referred to herein and attached hereto.

. . .

1. **Project**:   During the Term (as defined herein),[4] Client or company may identify services that Company can provide to the Client ("Project(s)").   Each Project may include provisions of services ("services") and/or delivery of certain products or other items ("Deliverables").   Each Project will be described, along with any terms and conditions that are additional to the terms and conditions of this Agreement, in a Statement of Work, which may contain specifications, schedules, milestones, payments, or any other terms and conditions mutually agreed upon by the parties.   The terms and conditions of this Agreement shall be applicable to each Project and are incorporated by reference into each Statement of Work. . . .

. . .

21.11. **Order of Precedence; Exclusion of Other Terms and Conditions**:   This Agreement constitutes the entire and exclusive statement of the agreement between the parties and supersedes all prior representations understandings or agreements between the parties with respect to such subject matter.   The documents referred to herein and attached hereto ("Attachments") shall be read together with this Agreement to determine the parties' intent. If there is a conflict between or among such documents, this Agreement shall be the final expression of the parties' intent and shall prevail over any inconsistent terms set forth in any Attachments.   Any other terms or conditions included in any click-wrap license agreements, shrink wrap license agreements, quotes, invoices, acknowledgements, purchase orders, bills of lading or other forms utilized or exchanged by the parties shall not be incorporated in this Agreement or be binging upon the parties unless the parties expressly agree in writing or unless otherwise provided in this Agreement.

(MSA Preamble, ¶¶ 1, 21.11.)

---

[4]       The "Term" of the MSA "commence[d] on the Effective Date as stated [in the MSA] and [remained] in force [until the MSA was] terminated . . . ."  (*Id.* ¶ 3.1.)

The September 27 Letter states it is a "suggested course of action and billing schedule" that DJSPA proposed to GMACM.  (*See* September 27 Letter at 4.)  GMACM's response to the September 27 Letter indicates that it "confirm[s] and document[s] [the parties'] agreed upon plan of action for GMACM's ongoing remediation work at [DJSPA]."  (*See* GMACM Letter at 1.)

The "remediation work" referred to in the GMACM Letter and the September 27 Letter constitutes one of many types of "services" identified by the parties under section 1 of the MSA.  (*See* MSA ¶ 1.)  The letters also provide the "terms and conditions" with "specifications" as to how the work will be performed by DJSPA, "schedules" for completion of the work, and "payments" contemplated for the work.  (*See generally* September 27 Letter; GMACM Letter.)  Such specifications, schedules, and payments were "mutually agreed upon by the parties" via the letters and are "applicable to" the "remediation work" "Project."  (*See* MSA ¶ 1; September 27 Letter; GMACM Letter.)  The letters do not mention the MSA, but DJSPA indicates that the September 27 Letter "remediation work" was discussed along with the parties' "continued partnership"—an indirect reflection of the parties' ongoing relationship as defined by the MSA.  (*See* September 27 Letter at 1.)  Nothing in the letters indicates the "remediation work" would be treated as separate and apart from other contractual arrangements between the parties.  The MSA and September 27 Letter should be treated as a fully integrated single agreement, in conjunction with other SOWs agreed upon between the parties.

To adequately plead a breach of contract claim under Delaware law, a plaintiff must establish:

> the existence of an express or implied contract; (2) the breach of an obligation imposed by that contract; and (3) resulting damages to the plaintiff.  Furthermore, a plaintiff alleging breach of contract must demonstrate substantial compliance with all the provisions of his contract in order to recover damages for any breach.

*Edelstein v. Goldstein*, C.A. No. 09C-05-034 DCS, 2011 WL 721490, at *5 (Del. Super. Ct. Mar. 1, 2011). "A party is excused from performance under a contract if the other party is in material breach thereof. A slight breach by one party, while giving rise to an action for damages, will not necessarily terminate the obligations of the injured party to perform under the contract." *Biolife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 237 (1981) ("Except as stated in § 240, it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."). Put another way, "[a]s a general rule the party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to perform." *Brandin v. Gottlieb*, No. CIV.A. 14819, 2000 WL 1005954, at *21 (Del. Ch. July 13, 2000) (citation and internal quotation marks omitted); *Edelstein*, 2011 WL 721490, at *5 (citation omitted).

The question whether a breach of a contract is "material" "is a fact-sensitive analysis." *Commonwealth Constr. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, C.A. No. 04L-10-101 RRC, 2006 WL 2567916, at *19 (Del. Super. Ct. Aug. 31, 2006) (citation omitted). It is a question "of degree and is determined by weighing the consequences in the light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case." *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, C.A. No. 5886VCP, 2013 WL 3934992, at *11 (Del. Ch. July 24, 2013) (citation and internal quotation marks omitted). Delaware law explains that a "material breach" is

> a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract. In other words, for a breach of contract to be material, it must go to the root or essence of the agreement between the parties, or be one which touches the

> fundamental purpose of the contract and defeats the object of the
> parties in entering into the contract.

*Id.* (citation and internal quotation marks omitted).  To determine whether a breach is material,

Delaware courts have adopted section 241 of the Restatement (Second) of Contracts, *see, e.g.*,

*Biolife Solutions*, 838 A.2d at 278; *Commonwealth Constr. Co.*, 2006 WL 2567916, at *19,

which provides:

> In determining whether a failure to render or to offer performance
> is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the
> benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately
> compensated for the part of that benefit of which he will be
> deprived;
>
> (c) the extent to which the party failing to perform or to offer
> to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to
> perform will cure his failure, taking account of all the
> circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to
> perform or to offer to perform comports with standards of
> good faith and fair dealing.

RESTATEMENT (SECOND) OF CONTRACTS § 241.

Here, the Trust argues that DJSPA materially breached the parties' agreement by:

- being subject to the investigation into widespread improprieties and unethical
  practices at DJSPA by the Florida State Bar, resulting in the dissolution of DJSPA
  and disbarment and other sanctions against several of its attorneys, in violation of
  paragraph 6.8 of the MSA;

- being removed from the approved attorney network list of FHLMC and FNMA in
  violation of paragraph 6.6. of the MSA;

- failing to provide competent legal services and comply with good industry
  practices in violation of paragraph 6.1 of the MSA;

36

- failing to provide training and oversight to DJSPA personnel assigned to handle GMACM matters in violation of paragraphs 6.1 and 8.8 of the MSA;

- assigning obligations to non-DJSPA entities without GMACM"s "prior written approval," in violation of paragraph 18.1 of the MSA; and

- utilizing foreign-based entities to provide services that should have been performed by DJSPA in violation of paragraph 8.1 of the MSA.

(Obj. ¶¶ 47–65; Reply ¶ 2.)

The Trust further argues that DJSPA does not dispute that it materially breached the MSA. (Reply ¶¶ 2–3.) While DJSPA does not deny that it committed these alleged acts, that it was subject to a Florida State Bar investigation and was later dissolved, with some of its attorneys subject to sanctions or disbarment, DJSPA's Opposition and the Stern Declaration do dispute whether DJSPA materially breached the MSA. For example, DJSPA argues that there are disputed issues of fact, including whether DJSPA's conduct and alleged malpractice constitutes a material breach of the MSA. (*See* Opp. at 14–15.)

The issue whether DJSPA materially breached the MSA therefore involves disputed issues of fact that may not be resolved as a matter of law in deciding the Objection. Whether a breach is material is a fact-specific question; the Trust has not provided any case law dismissing a breach of contract claim at the motion to dismiss stage based on a finding that the plaintiff materially breached the contract. Each case the Trust relies upon in its material breach argument either reviewed a summary judgment determination or was decided after an evidentiary hearing. At this stage of this contested matter, the Objection to the breach of contract cause of action is **OVERRULED**, at least in part.

DJSPA also argues that even if it materially breached the contract, it is nevertheless entitled to recover damages for breach of contract based on partial performance. If the Trust

establishes a material breach by DJSPA, applicable Delaware law does not permit DJSPA to

recover damages based on partial performance in the circumstances present here and, to that

extent, the Trust's Objection is **SUSTAINED**.

When one party materially breaches the parties' contract, "[a] non-breaching party. . . is

not entitled to a windfall." *Preferred Inv. Servs.*, 2013 WL 3934992, at *21.  For example, the

materially breaching party's partial performance may entitle that party to compensation to the

extent he or she performed.  *See id.* ("[T]he party in breach is entitled to restitution for any

benefit that he has conferred by way of part performance." (citation and internal quotation marks

omitted)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 240 ("If the performance to be

exchanged under an exchange of promises can be apportioned into corresponding pairs of part

performances so that the parts of each pair are properly regarded as agreed equivalents, a party's

performance of his part of such a pair has the same effect on the other's duties to render

performance of the agreed equivalent as it would have if only that pair of performances had been

promised.").  However, a materially breaching party is only entitled to payment for its partial

performance if the contract consists of severable and divisible parts.  *See* RESTATEMENT

(SECOND) OF CONTRACTS § 240 cmt. b.  The Court concludes that the MSA, in conjunction with

the September 27 Letter, is not a severable and divisible contract.  Under Delaware law, a

contract for ongoing services, such as the MSA, is not susceptible to divisibility even though the

services themselves can be segregated into individual projects, when "the parties intend[] for the

agreement to be an entire contract . . . ." *See Lowe v. Bennett*, Civ. A. No. 94A-05-001, 1004

WL 750378, at *2 (Del. Sept. 22, 1994); *see also Orenstein v. Kahn*, 119 A. 444, 446 (Del.

1922) ("If there be a single assent to a whole transaction involving several things or several kinds

of property, a contract is always entire.  If, however, there be a separate assent to each of the

several things involved, it is always divisible."); *see also* MSA Preamble, ¶ 21.11.

DJSPA additionally asserts that GMACM waived its rights to the extent DJSPA is found

to have materially breached the MSA.  Under Delaware law, a party may waive its rights

pursuant to a particular contract through a "voluntary and intentional relinquishment of a known

right" with "knowledge of all material facts, and intent to waive."  *Realty Growth Investors v.

Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982).  For example, DJSPA argues that the

Florida Attorney General and Florida State Bar investigations were publicly known, disclosed

and discussed with representatives of GMACM *before* the terms of the September 27 Letter were

agreed upon.  The Court is unable to resolve the waiver argument as a matter of law because

disputed facts exist with respect to the Attorney General and Florida Bar investigations.  But the

Trust alleges other material breaches of the contract, unrelated to the two investigations; it may

well be that even if the waiver doctrine applies to the two investigations, waiver does not apply

to other alleged material breaches.  These issues concerning waiver cannot be resolved on the

current record.

The parties' agreement also governs waiver and requires an express waiver in writing.

More specifically, the MSA expressly provides:

> **21.2 No Waiver**:  No delay or omission by either party to exercise
> any right or power it has under this Agreement shall impair or be
> construed as a waiver of such right or power.  A waiver by any
> party of any breach or covenant shall not be construed to be a
> waiver of any succeeding breach or any other covenant.  All
> waivers must be signed by the party waiving the rights.

(MSA ¶ 21.2.)  While the September 27 Letter vaguely indicates that the parties discussed the

Florida Bar's investigation, the GMACM Letter, responding to the September 27 Letter, does not

mention any of the alleged material breaches on the part of DJSPA; the GMACM Letter only

refers to the "remediation work."  (*See generally* September 27 Letter; GMACM Letter.)

Neither the September 27 Letter (which was not signed by GMACM) nor the GMACM Letter

(which makes no mention of any breaches on the part of DJSPA), appear to satisfy the

requirements of paragraph 21.2 of the MSA.  The letters do not appear to provide the

"unequivocal" evidence of a waiver required by Delaware law.  *See Aeroglobal Capital Mgmt.,*

*LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) (indicating that the "standards for

proving waiver under Delaware law are quite exacting," as the "facts relied upon to prove waiver

must be unequivocal" (citation omitted)).  The Court reserves decision whether DJSPA can

prevail on its waiver theory.

2.    *Open Account*

The parties do not dispute that Florida law applies to DJSPA's open account cause of

action, but they dispute whether DJSPA has adequately pled the elements of this claim.  Under

Florida law, a cause of action for open account includes the following elements:  "(1) a contract

between creditor and debtor; (2) where the amount claimed by the creditor represents either an

agreed on sales price or the reasonable value of goods delivered; and (3) that goods were actually

delivered."  *Law Offices of David J. Stern, P.A. v. Bank of Am. Corp.*, No. 11-21349-CIV, 2012

WL 112935, at *4 (S.D. Fla. Jan. 12, 2012).  More generally, open account is "defined as an

unsettled debt arising from items of work and labor, goods sold and delivered, with the

expectation of further transactions subject to future settlement and adjustment."  *Id.* (citation

omitted); *see also Robert W. Gottfried, Inc. v. Cole*, 454 So. 2d 695, 696 (Fla. Dist. Ct. App.

1984).

The Trust argues that DJSPA fails to state a claim for open account because it is

redundant of the breach of contract claim and DJSPA cannot show that there is an expectation of

future transactions as between DJSPA and the Debtors.  (Obj. ¶ 82.)

40

DJSPA asserted a similar claim against Bank of America in another action in the Florida District Court. *See Law Offices of David J. Stern, P.A. v. Bank of Am. Corp.*, No. 11-21349-CIV, 2012 WL 112935, at *4 (S.D. Fla. Jan. 12, 2012).[5] The district court denied the defendants' motion to dismiss the open account claim, concluding that DJSPA adequately pled the claim and rejecting the defendants' argument that the open account claim was "materially indistinguishable from the breach of contract claims." *Id.* at *4. The court further found that the documents attached to the complaint, which listed "a bill number, an invoice date, a foreclosure matter code, a loan number and a client name" were sufficient to support the claim. *Id.* However, the court did not address the separate required element that there was an expectation of future transactions.

Here, there can be no expectation of future transactions between DJSPA and the Debtors. DJSPA has dissolved and Stern, DJSPA's former principal, has been disbarred from the practice of law. The Debtors here have confirmed a plan of liquidation. Therefore, the Objection to the portion of the Claims for open account is **SUSTAINED**.

### 3.    *Account Stated*

The parties similarly do not dispute that Florida state law applies to DJSPA's account stated claim. In Florida, "[a]n account stated is defined as an agreement between persons who have had previous transactions, fixing the amount due in respect to such transactions and promising payment." *Id.* (citation and internal quotation marks omitted). "For an account stated to exist as a matter of law, there must be an agreement between the parties that a certain balance is correct and due and an express or implicit promise to pay this balance." *Merril-Stevens Dry Dock Co. v. "Corniche Express"*, 400 So. 2d 1286, 1286 (Fla. Dist. Ct. App. 1981). A claim for

---

[5]    The Court was advised during the argument of the Motion and Objection that the Bank of America case has been settled.

account stated is "an action for a sum certain, . . . and where there is no such agreement between the parties, the plaintiff may not recover upon a theory of account stated . . . ." *Id.*

The Trust argues that DJSPA's account stated claim fails because it is redundant of the breach of contract claim and, as a matter of law, there was no agreement between the parties that the sum was due and that the Debtors expressly or implicitly promised to pay the balance DJSPA claims. (Obj. ¶ 83.) According to the Trust, attaching copies of the invoices prepared and compiled by DJSPA is insufficient to prove this claim as a matter of law. (*Id.*)

The Florida District Court addressed the defendants' similar argument in the Bank of America case that there was no meeting of the minds showing that the defendants agreed to pay the amounts shown in the account statements. *Law Offices of David J. Stern*, 2012 WL 112935, at *5. The court denied the motion to dismiss DJSPA's account stated claim, concluding that the operative complaint adequately alleged that the defendants "agreed to the balance and did not object to the statements." *Id.* Here, the Trust's conclusory argument states that GMACM never agreed to the amounts invoiced by DJSPA or that, "upon information and belief," GMACM rejected certain of the invoices. DJSPA has raised a disputed issue of fact whether there was a meeting of the minds by alleging that the MSA required GMACM to object to the invoices within a specified time period and that GMACM failed to do so. Consequently, a factual dispute exists whether GMACM agreed to the invoiced charges. Therefore, the Objection to the account stated portion of the Claims is **OVERRULED.**

### 4.    *Various Defenses Raised by the Trust*

The Trust requests that the Court find that the amount of the Claims should be reduced or offset for various reasons. DJSPA's Opposition asserts that these arguments should be considered counterclaims that are not properly before the Court and must be asserted in an adversary proceeding. The Trust would need to commence an adversary proceeding "to recover

money or property." FED. R. BANKR. P. 7001.  A claim objection may not be used as a means for

obtaining an affirmative award of damages from a creditor that files a proof of claim; an

adversary proceeding is required to do so.  *See In re MF Global Inc.*, 531 B.R. 424, 430–31

(Bankr. S.D.N.Y. 2015).

During the July 30 hearing, however, DJSPA's counsel acknowledged that the arguments

raised by the counterclaims asserted in the Florida action may be asserted as defenses or offsets

to any recovery by DJSPA here.  The Trust's counsel agreed that the Trust may not obtain any

affirmative damages recovery against DJSPA through the Objection.

Whether the Trust can succeed with its defenses cannot be determined at this stage of the

case, but a brief discussion of the defenses may hopefully shape future proceedings.  The Court

will address each argument in turn.

### a.    Reduction Related to FNMA and FHLMC Loan Invoices

The Trust asserts it is entitled to a reduction in the amount of DJSPA's Claims based on

legal fees that DJSPA asserts it is entitled to receive for legal services performed on FNMA and

FHLMC loans.  This portion of the Claims relates to sums allegedly owed pursuant to 2,468

invoices.  (Obj. ¶ 67.)  The parties agree that DJSPA and GMACM entered into the Agency Loan

Stipulations in the Florida District Court.  The Agency Loan Stipulations provide that (1) DJSPA

would seek its fees for legal work on the foreclosure of the agency loans in the respective suits

against FNMA and FHLMC, and (2) DJSPA's claimed fees for curative services rendered in

GMACM foreclosure cases involving loans owned by FNMA and FHLMC via the September 27

Letter would remain in the Florida Lawsuit.  (*See generally* Agency Loan Stipulations.)  During

the July 30 hearing both parties' counsel agreed that the Agency Loan Stipulations remain

operative and DJSPA' Claims must be reduced for those invoices that remained the subject of

DJSPA's claims against FNMA and FHLMC.  The Court is unclear on the appropriate amount of the reduction in the Claims.

                          b.       <u>Reduction Related to GMACM's Rejection of Certain of DJSPA's Invoices</u>

The Trust alleges that the amount of DJSPA's Claims, to the extent allowed, should be reduced by $1,158,855.04 because GMACM denied certain of DJSPA's invoices.  (Obj. ¶ 70.) The only evidence the Trust offers in support of this reduction is a statement in the Cunningham Declaration, made "upon information and belief," that such invoices were timely and properly rejected by GMACM within the terms of the parties' agreement.  Basing this argument "upon information and belief" is insufficient.  This defense must await future proceedings.

                          c.       <u>Reduction Relating to Inadequate Remediation Work Under the September 27 Letter</u>

The Trust seeks to reduce the Claims for services rendered under the September 27 Letter.  (Obj. ¶ 71.)  According to the Trust, DJSPA's work under this agreement was untimely, of very low quality, and was really limited to services much less in scope than that originally contemplated in the September 27 Letter.  (*Id.*)  DJSPA argues that it did provide the services contemplated under the September 27 Letter; namely, DJSPA prepared corrective affidavits; whether or not such affidavits were used by GMACM does not necessarily preclude DJSPA's recovery.  (Opp. at 20–21.)  Because the extent of DJSPA's services rendered under the September 27 Letter is disputed and because the parties have not agreed whether DJSPA timely and properly performed the work under the September 27 Letter, this defense raises disputed issues of fact that cannot be resolved on the current record before the Court.

                     5.      *Offsets Relating to Timeline Penalties*

The Trust argues that any breach of contract damages awarded to DJSPA should be offset by certain Timeline Penalties GMACM had to pay FNMA and FHLMC as a result of delays in

prosecuting foreclosures on agency loans. (Obj. ¶ 77.) According to the Trust, DJSPA did not

follow procedures and therefore new actions and/or amended actions needed to be filed. (*Id.*)

DJSPA argues that the Trust fails to establish that DJSPA was the "but for" and proximate cause

of the delays—for example, GMACM doesn't address delays caused by remediating the Stephan

Affidavits. (Opp. at 22–25.) There are disputed issues of fact about the cause of the delays and

the extent to which DJSPA should be held responsible for the Timeline Penalties.

### 6. *Offsets Relating to Transfer Costs*

The Trust seeks an offset to any breach of contract damages awarded to DJSPA on

account of Transfer Costs it incurred when it transferred its legal files from DJSPA to new law

firms. (*Id.* ¶ 78.) The Trust alleges that GMACM was damaged in the amount of $1,964,700 in

Transfer Costs after having paid $300 per loan file to cover the time the new firms would need to

familiarize themselves with the facts of each file. (*Id.*) DJSPA argues that GMACM failed to

mitigate those damages and the Trust fails to demonstrate that the Transfer Costs were

foreseeable under the MSA. (Opp. at 25–26.) The Trust has failed to sufficiently establish that it

is entitled to this offset because it failed to address GMACM's potential ability to mitigate the

amount of the Transfer Costs. Merely stating that GMACM unilaterally decided to pay the firms

$300 per new loan file is not sufficient to support this defense.

### 7. *Offsets Relating to DJSPA's Negligence*

The Trust requests an offset of any breach of contract damages awarded to DJSPA as a

result of DJSPA's poor management and mishandling of loan files, as summarized in Exhibit S

to the Smith T Declaration. (Obj. ¶¶ 79–80.) The Trust argues that GMACM was prejudiced by

DJSPA's errors, malpractice, and negligence, and the amount of damages presently known to

GMACM resulting from such conduct is at least $865,104.33. (*Id.* ¶ 79.) The Trust further

asserts that DJSPA failed to recover costs from borrowers that GMACM was rightly entitled to

receive when it enforced its remedies against the borrowers; the amount of damages presently

known and attributable to this conduct is $57,139.98.  (*Id.* ¶ 80.)  DJSPA addresses some of the

malpractice instances in Exhibit S arguing that GMACM failed to establish that DJSPA is the

"but for" cause entitling GMACM to damages.  (Opp. at 27–28.)  The validity or amount of

offset from this defense cannot be resolved without a full record.

### C.    Escrow Funds and Retaining Lien

DJSPA argues that the funds in the escrow account should not be released to the Trust

because they are subject to a valid retaining lien under Florida law.  "An attorney is entitled to a

lien on his client's papers, money, securities and other property coming into his possession in the

course of his professional employment which gives him the right to retain possession thereof as

security for payment of fees and cost."  *Wintter v. Fabber*, 618 So. 2d 375, 376 (Fla. Dist. Ct.

App. 1993).  "The lien may not be impaired by the client securing the right to inspect and copy

the papers or compelling their production by subpoena."  *Andrew Hall & Assocs. v. Ghanem*,

679 So. 2d 60, 61–62 (Fla. Dist. Ct. App. 1996).  "The purpose of the lien is to assist the attorney

in preventing a client from refusing or failing to pay charges justly due."  *Wintter*, 618 So. 2d at

376.  "If there is a dispute between the lawyer and client as to the fee owed, the trial court may

hold a hearing to liquidate the amount and determine the terms of an adequate security."

*Ghanem*, 679 So. 2d at 62.

Clearly there is a dispute between DJSPA and the Trust, as GMACM's successor in

interest, as to the amount of fees allegedly owed.  Because the Court is unable at this time to

resolve whether DJSPA's Claims should be allowed, and, if so, in what amount, the Court cannot

resolve the issues concerning whether or how much of the escrow should be released and to

which party.

**D.      Declarations**

DJSPA's objection to the Cunningham and Smith T Declarations are **OVERRULED**.

The objection is premature, as the Court has not decided any disputed issues of fact.

### III.      CONCLUSION

For the reasons explained above, the Objection to the Claims is **SUSTAINED** in part and

**OVERRULED** in part.  A separate order has been issued setting forth the schedule for fact and

expert discovery.  (*See* ECF Doc. # 8943.)  This contested matter will proceed expeditiously.

**IT IS SO ORDERED.**

Dated:      August 4, 2015
New York, New York

*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge