**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) **FOR PUBLICATION** |
| | ) |
| | ) Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) |
| | ) Chapter 11 |
| Debtors. | ) |
| | ) Jointly Administered |

**MEMORANDUM OPINION AND ORDER SUSTAINING THE
RESCAP BORROWER CLAIMS TRUST'S OBJECTION TO PROOF OF
CLAIM NO. 386 FILED BY BARRY AND CHERYL MACK**

*A P P E A R A N C E S:*

MORRISON & FOERSTER LLP
*Attorneys for ResCap Borrower Claims Trust*
250 West 55th Street
New York, New York 10019
By:   Norman S. Rosenbaum, Esq.
      Adam A. Lewis, Esq.
      Kristin Hiensch, Esq.

DAVID F. GARBER, P.A.
*Attorney for Barry Mack*
2800 Davis Boulevard
Suite 211
Naples, Florida 34104
By:   David F. Garber, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

On June 10 and 11, 2015, the Court conducted a trial of the one surviving portion of Barry and Cheryl Mack's (together, the "Macks") Claim Number 386 (the "Claim") filed against Debtor GMAC Mortgage, LLC ("GMACM")—a claim for violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, alleging that GMACM failed to acknowledge and then respond to the Macks' October 26, 2009 letter asking why GMACM was trying to foreclose on their home when they were current on their mortgage payments. The

ResCap Borrower Claims Trust (the "Trust") objects to the surviving claim. The Trust's objection to all other portions of the Macks' Claim was sustained in an Opinion and Order, dated July 24, 2014. *See In re Residential Capital, LLC*, 513 B.R. 446 (Bankr. S.D.N.Y. 2014). Familiarity with that Opinion is assumed. As explained below, the Trust's objection to the remaining RESPA claim must be sustained because controlling case law compels this result based on the facts established at trial.[1]

## I. BACKGROUND

GMACM's outrageous conduct that gave rise to the Claim unquestionably contributed to Cheryl Mack's death in October 2013, several years after she suffered renal failure from a large overdose of sleeping pills in November 2009, while GMACM—the loan servicer of the Macks' mortgage loan—pursued foreclosure of the Macks' Florida home even though there was no loan default.

The earlier Opinion concluded that all claims asserted by the Macks against GMACM, except the RESPA claim, are barred by Florida's res judicata principles since the Macks already recovered damages in a Florida state court action for the claims that were or could have been asserted against Deutsche Bank Trust Company Americas ("Deutsche Bank"), for whom GMACM serviced the Macks' mortgage loan, based on GMACM's conduct. *See id.* at 459–62.

The Macks had contacted GMACM to explore a possible mortgage loan modification; they were financially stretched and had to rely on money from Barry Mack's retirement account—he was a retired New Jersey policeman—to make what were probably unsustainable mortgage payments when combined with expenses for other life necessities. Rather than modify

---

[1] The following recitation of facts represents the Court's findings of fact pursuant to Federal Rule of Bankruptcy Procedure 7052 based on the evidence presented at trial.

the mortgage—which, for purposes of this Opinion, the Court concludes GMACM was not required to do—GMACM hired a now disbarred Florida lawyer, David Stern ("Stern"), to file a foreclosure action against the Macks. But the Macks had not missed a single mortgage payment.

Stern filed the foreclosure action in Florida state court in August 2009. The Trust admits that filing the foreclosure action was a mistake. The named plaintiff in the foreclosure action, started at the direction of GMACM, was Deutsche Bank, the trustee of the securitization trust that acquired the Macks' mortgage. GMACM was not a named party to the foreclosure action. When the Macks received the foreclosure complaint, they were, not surprisingly, dumbfounded. First, while it was financially difficult for them to do so, they continued to make all required mortgage payments. Second, the Macks had no idea what connection Deutsche Bank had to their mortgage; Primary Residential Mortgage Inc. ("Primary") was the original lender, and the Macks were unaware that the mortgage had been transferred to a securitization trust. Debtor Residential Funding Company ("RFC") was the master servicer of the loan, and GMACM was the subservicer, a role it had both before and after securitization of the mortgage.

After receiving the foreclosure complaint, the Macks promptly called GMACM (having already contacted GMACM about a possible loan modification). Surely, they thought, the foreclosure action was a terrible mistake; GMACM verbally acknowledged the mistake, telling them not to worry; the mistake would be corrected. Only it never was fully corrected. The Macks continued to contact GMACM by letter and by telephone, trying to stop the foreclosure action, but to no avail.

3

Stern continued to prosecute the Florida foreclosure action. He eventually dismissed the foreclosure action, but not until December 8, 2009,[2] after the Macks hired a lawyer who filed an answer and counterclaims against Deutsche Bank. While Deutsche Bank's foreclosure action was dismissed, the Macks' counterclaims remained. But the dismissal of the foreclosure action did not fully correct the continuing harm to the Macks. GMACM actually charged the Macks $3,712.00 for attorney's fees and expenses from the foreclosure action when the Macks sold their home in January 2010; this amount was included in GMACM's payoff demand in order to have the mortgage lien released upon the sale of their property. (*See* Pl.'s Ex. 32 (January 26, 2010 payoff statement).)

On or about November 9, 2009, while the foreclosure action was pending, Cheryl Mack, who had a long pre-existing history of serious health and emotional problems, and was now facing a foreclosure action, was hospitalized after taking a large overdose of sleeping pills. She suffered irreversible renal failure, eventually leading to her death on October 25, 2013.

The Macks' counterclaims against Deutsche Bank alleged violations of RESPA and slander of title, and sought damages for economic losses due to the decline in the value of their home (the Macks marketed the house for sale and had to reduce the price several times to arrange a sale to avoid foreclosure), as well as damages for emotional distress and pain and suffering relating to Cheryl Mack's overdose (she was still alive at the time).

Stern did not tell GMACM or Deutsche Bank about the counterclaims, and he did not file a response to the pleading. The Macks' lawyer obtained a default judgment against Deutsche Bank. The Florida trial court held an inquest and Stern did not appear. The court heard evidence

---

[2] The notice of voluntary dismissal falsely recited that "Plaintiff, the Prevailing Party, by and through its undersigned counsel, voluntarily dismissed its Complaint for Foreclosure and Other Relief, without prejudice, and cancel the Notice of Lis Pendens as to the property . . . ." (Pl.'s Ex. 5 (notice of voluntary dismissal).)

4

and entered a final judgment on May 5, 2011, awarding the Macks damages against Deutsche Bank. The judgment was originally $469,470.27 plus attorney's fees, including $150,000.00 for Cheryl Mack's emotional distress and pain and suffering; the emotional distress and pain and suffering damages were awarded as part of the RESPA claim, not the slander of title claim.

According to the Trust, Deutsche Bank and GMACM only learned of the counterclaims after the final judgment was entered. GMACM filed a notice of appearance on June 29, 2011. On July 13, 2011, Deutsche Bank moved to set aside the final judgment and vacate the judgment on the RESPA claim on the merits. Deutsche Bank argued that it could establish excusable neglect based on the "gross misconduct of its prior counsel." *Residential Capital, LLC*, 513 B.R. at 454. It also argued that it had meritorious defenses, including that Deutsche Bank never violated RESPA because RESPA only required notice to the Macks of a change in the servicer, and there was no change of servicer for the Macks' loan.

The Florida court heard evidence that Deutsche Bank first received notice of the final judgment on the counterclaims on May 11, 2011, and GMACM "as agent for [Deutsche Bank] had the responsibility to investigate the [f]inal [j]udgment and appropriately respond." *Id.* It was GMACM's misconduct as loan servicer and agent for Deutsche Bank that provided the basis for the judgment against Deutsche Bank—Deutsche Bank knew nothing about what had happened.

On February 26, 2013, the Florida court issued a final order on Deutsche Bank's motion. The court found that the Macks could not maintain a RESPA claim against Deutsche Bank, so the court vacated the RESPA damages, including the $150,000.00 in damages for Cheryl Mack's emotional distress and pain and suffering. The court confirmed the judgment as to the loss in value of the Macks' home resulting from slander of title and reduced the Macks' damages award

5

to $321,970.77. The Florida state appellate court affirmed the reduced judgment. On March 20, 2013, the Macks acknowledged receipt of $321,970.77 in satisfaction of the judgment.

While res judicata bars any recovery from GMACM based on the same facts for the claims that were or could have been asserted against Deutsche Bank, the one surviving RESPA claim against GMACM is different from the RESPA claim that had been asserted against Deutsche Bank in the Florida action; and the claim against GMACM was not and could not have been asserted against Deutsche Bank. *See Residential Capital*, 513 B.R. at 462–64.

The surviving RESPA claim focuses on an October 26, 2009 letter, drafted by Cheryl Mack, addressed to GMACM at the following address: GMAC Mortgage, Attn: Customer Care, P.O. Box 4622, Waterloo, IA 50704-4622. (*See* Pl.'s Ex. 43 (October 26, 2009 letter from Macks to GMACM).) The letter asked GMACM why the foreclosure was proceeding and stated that "[y]our company has reassured us that our mortgage is current and that we were not in any arrears with GMAC[M]." (*Id.*) Barry Mack ("Mack"), who has continued to pursue the Claim that he and Cheryl Mack filed together while she was still alive, contends that the October 26, 2009 letter was mailed to GMACM, and GMACM never acknowledged receipt or responded to the letter, as RESPA requires. It is undisputed that GMACM never acknowledged receipt or responded to the letter.

While the earlier Opinion recognized a split in authority, the Court concluded that non-economic damages can, under some circumstances, be recovered by a borrower since RESPA permits recovery of "actual damages to the borrower as a result of the failure" to acknowledge receipt or respond to a qualified written request ("QWR"). *See* 12 U.S.C. § 2605(f)(1)(A); *Residential Capital*, 513 B.R. at 464–66. Therefore, Mack seeks to recover damages for his wife's pain and suffering and emotional distress resulting from GMACM's alleged RESPA

6

violation. Of course, Mack must first establish that GMACM committed a RESPA violation by failing to acknowledge receipt or respond (these are separate requirements under RESPA) to a properly mailed QWR.

The outcome of this contested RESPA claim rests on the following issues:

(1) Does the October 26, 2009 letter satisfy the RESPA requirements to constitute a QWR—specifically, was the October 26, 2009 letter mailed to the required address for a QWR?

(2) Was the October 26, 2009 letter actually mailed (assuming it was properly addressed)?

The Trust agrees that the contents of the October 26, 2009 letter satisfy the requirements for a QWR. But, the Trust argues, the letter cannot qualify as a QWR because it was addressed to the wrong address (assuming it was in fact sent). RESPA and its implementing administrative regulations provide that if a servicer has properly identified a specific address to which a QWR must be sent, and a borrower does not send the communication to that address, the loan servicer's duty to acknowledge and respond to the request is not triggered. *See Roth v. CitiMortgage Inc.*, 756 F.3d 178, 182 (2d Cir. 2014) (stating that a "[f]ailure to send the [request] to the designated address . . . does not trigger the servicer's duties under RESPA" (quoting *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1148–49 (10th Cir. 2013))). If the Macks sent the QWR to GMACM, it was required to acknowledge receipt within 20 days and respond to the questions in the QWR within 60 days. *See* 12 U.S.C. § 2605(e) (2006 & Supp. III 2009), *amended by* 12 U.S.C. § 2605(e) (2006 & Supp. IV). It is undisputed that GMACM did not acknowledge receipt of the letter or respond to its contents.

The Trust offered evidence at trial of a specific address GMACM designated to send a QWR inquiry, and the October 26, 2009 letter was not addressed to that address, assuming it was

7

mailed. The language in the monthly mortgage statements sent to the Macks included bold language advising where a QWR must be sent. In *Roth v. CitiMortgage Inc.*, 756 F.3d at 182–83, the Second Circuit found that a substantially similar notice to a borrower that required a QWR be sent to a specific address, different from the one to which the borrower's lawyer sent a letter that would otherwise qualify as a QWR, did not trigger the loan servicer's duty to acknowledge and respond to the letter. *Id.* at 183.[3] Like the statement in *Roth*, the monthly statement to the Macks included several addresses, one to which a QWR should be sent and other addresses for other types of communications. The October 26, 2009 letter was not addressed to the designated QWR address.

The Trust also questions whether the letter was mailed; it offered evidence at trial that GMACM has no record of receiving it. Mack has the burden of proof on this issue. Evidence offered by GMACM, in the form of loan servicing notes, included entries for all other written communications from the Macks, but not for the October 26, 2009 letter. However, Mack testified that he personally mailed the letter on or about the date it was drafted, and it is thereby presumed to have been received by GMACM under the "mailbox rule," which provides that a letter shown to be properly addressed and mailed raises a "rebuttable presumption of receipt." *In re AMR Corp.*, 492 B.R. 660, 663 (Bankr. S.D.N.Y. 2013) (citing *R.H. Macy & Co.*, 161 B.R. 355, 359 (Bankr. S.D.N.Y. 1993)). The absence of a corresponding entry in the Macks' loan servicing notes is not sufficient to rebut the presumption of receipt because the Trust did not establish the reliability of such records.

---

[3] The *Roth* decision does not include a copy of the notice with the pertinent addresses, but the actual notice appears in the parties' joint appendix filed in the Second Circuit. *See* Joint Appendix at 82–85, *Roth v. CitiMortgage Inc.*, 756 F.3d 178 (2d Cir. 2014) (No. 13-3839), ECF Doc. # 28-2.

Assuming the letter qualifies as a QWR and was properly mailed, the Trust also contends that Mack failed to prove causation and damages for any alleged non-economic losses (emotional distress and pain and suffering).  Cheryl Mack had already overdosed on sleeping pills before GMACM was required to respond to the letter so, the Trust argues, the Trust cannot be liable for non-economic damages resulting from these unfortunate facts.

Because the Court concludes that the October 26, 2009 letter does not qualify as a QWR because it was improperly addressed, it is unnecessary to reach the issues relating to non-economic damages.

The Trust and Mack submitted a joint pretrial order before trial (the "Joint PTO," ECF Doc. # 8743), setting forth a summary of the case, stipulated facts, the parties' arguments, the issues to be tried, a list of exhibits and witnesses to be relied on, and objections to the admissibility of certain exhibits.[4]  (*See generally id.*)  Among other things, the parties agreed to the following stipulated facts in the Joint PTO:  (1) "on October 26, 2009, the [Macks] sent [GMACM] the [l]etter using an address other than the one specified for QWRs on the monthly mortgage statements GMACM sent to the [Macks], as was on all monthly mortgage statements GMACM sent to borrowers" (*id.* § III, ¶ 26); and (2) "[t]here is no direct evidence that GMACM received the [October 26, 2009] [l]etter and no evidence that, if it did, it ever responded to it" (*id.* ¶ 30).  The Court so ordered the Joint PTO on June 10, 2015.  (*See id.* at 22.)

At trial, Mack testified that GMACM sent the Macks a letter on October 14, 2006 (the "Notice of Transfer," Pl.'s Ex. 14), indicating that Primary transferred their loan to GMACM,

---

[4]     Prior to the trial, the Trust filed a pretrial memorandum of law (ECF Doc. # 8659) and proposed findings of fact and conclusions of law (ECF Doc. # 8658), and Mack filed a pretrial memorandum of law (ECF Doc. # 8659). The parties also submitted a joint status report (ECF Doc. # 8685), identifying no issues to be resolved before the Evidentiary Hearing, and indicating that settlement discussions did not bear fruit.

9

effective December 1, 2006. (*See id.*; June 10, 2015 Hr'g Tr. 26:9–13.) The Notice of Transfer provided that correspondence should be sent to the following address: PO Box 4622, Waterloo, IA 50704-0422. (Pl.'s Ex. 14.) However, the Trust submitted a mortgage account statement for the Macks' account, dated November 2, 2009 (the "November 2009 Mortgage Statement," Def.'s Ex. O), the second page of which contains a box titled "Account Information or Questions" (*id.* at 2; June 10, 2015 Hr'g Tr. 82:20–84:9.) Under the bold subheading titled "General Inquiries" is the following address: GMAC Mortgage, Attn: Customer Care, P.O. Box 4622, Waterloo, IA 50704-4622. (Def.'s Ex. O at 2.) Additionally, the following is provided under the bold subheading titled "Qualified Written Request:"

> Under the Real Estate Settlement Procedures Act, a qualified written request is a written correspondence, other than notice on your payment coupon or other payment medium supplied by us, regarding the servicing of your loan which includes your name, account number, and your reasons for the request. Any qualified written request you wish to submit must be sent to: GMAC Mortgage, Attn: Customer Care, PO Box 1330, Waterloo, IA 50704-1330.

(*Id.*) On cross-examination, Mack testified that the November 2009 Mortgage Statement reflected "the form and the statement" the Macks received from GMACM every month (June 10, 2015 Hr'g Tr. 84:1–3), and every mortgage statement he received had this information on it (*id.* at 85:8–10). However, on redirect, Mack testified that he did not look at every mortgage statement to see what addresses they had listed and acknowledged that he was unable to testify about the content of other mortgage statements. (*See id.* at 86:24–87:8.)

According to Mack, his wife drafted the October 26, 2009 letter to inquire why Deutsche Bank was foreclosing on their home in light of the fact that they were not in arrears with GMACM. (*See* June 10, 2015 Hr'g Tr. 36:24–14; Pl.'s Ex. 43.) Mack testified that he personally mailed the letter to GMACM by first-class mail on or about October 26, 2009. (*See*

10

June 10, 2015 Hr'g Tr. 36:5-11.)  He addressed the letter to PO Box 4622, Waterloo, Iowa because GMACM provided the Macks with this address in the October 2006 Notice of Transfer. (*See id.* at 36:12–15.)  Mack admitted he sent the October 26, 2009 letter to the address designated for general inquiries in the November 2009 Mortgage Statement, not the address designated for QWRs.  (*See id.* at 85:2–16.)  GMACM never responded to the Macks' October 26, 2009 letter.  (*Id.* at 37:17–38:1.)

At the conclusion of the trial, Mack's counsel attempted to argue that he could no longer stipulate that the Macks were provided notice of the designated QWR address in each monthly mortgage statement, as set forth in paragraph 26 of the Joint PTO.  (*See* June 11, 2015 Hr'g Tr. 148:3–13, ECF Doc. # 8757; Joint PTO ¶ 26.)  Other than the November 2009 Mortgage Statement, the Trust did not introduce evidence of any other mortgage statements indicating a designated QWR address; more specifically, the Trust failed to provide a mortgage statement for the Macks that pre-dated the October 26, 2009 letter.  (*See* June 11, 2015 Hr'g Tr. 148:3–13.)  Mack's counsel asserted that he did not see every monthly mortgage statement sent to the Macks and therefore could not agree that each statement identified a designated QWR address, notwithstanding the parties' stipulated facts.  (*See id.*)

The Court stated that the issue whether to relieve Mack's counsel of the stipulation made in section III, paragraph 26 of the Joint PTO was "somewhat murky."  (*Id.* at 148:16–17.)  On the one hand, at a May 15, 2014 hearing on the Trust's Objection to the Macks' Claim, the Trust's counsel agreed that the October 26, 2009 letter constituted a QWR (*id.* at 149:3–16), and therefore arguably conceded the issue whether the Macks were given notice of a designated QWR address (*id.* at 152:13–14).  However, the Trust's counsel subsequently "made clear that the [Trust] contends that it's not a QWR because it was sent to the wrong address" (*id.* at

11

149:20–22), thereby putting Mack's counsel on notice of the issue at the time the Joint PTO was drafted (*id.* at 149:23–150:1). Section IV.B. of the Joint PTO set forth the Trust's arguments, and paragraph 60 of that section stated: "The Letter did not qualify as a QWR because the [Macks] did not send it to the address specified by GMACM for QWRs." (Joint PTO, § IV.B., ¶ 60 (citing *Roth*, 756 F.3d at 182.).) Additionally, the Trust's counsel could argue that the Court raised the issue and the May 15, 2014 hearing was not an evidentiary hearing. (June 10, 2015 Hr'g Tr. at 152:14–16.) On the other hand, the Court observed that the Trust relied on the stipulation and potentially would have offered evidence of earlier monthly mortgage statements identifying a designated QWR address in the absence of such stipulated facts. (*See id.* at 150:2–14.) However, the Trust's counsel said that the November 2009 Mortgage Statement was the only mortgage statement for the Macks that the Trust could locate (*see id.* at 150:24–151:6), and the Trust lacked the capability of generating prior mortgage statements for the Macks' account because "the images of those [mortgage statements] would have been destroyed because the loan was closed and paid off" (*id.* at 150:24–151:4).

The Court did not resolve whether to relieve Mack's counsel of the stipulation made in section III, paragraph 26 of the Joint PTO. (*See id.* at 159:21–160:9.) Rather, the Court permitted the Trust to locate and submit, with an authenticating declaration, an account statement indicating the same designated address for another borrower for a period, close in time, but before October 26, 2009. (*Id.* at 159:25–160:24.) Additionally, the Court provided the parties time to submit simultaneous post-trial briefs. (*Id.* at 158:16–19.)

On June 18, 2015, the Trust filed the declaration of Adam A. Lewis (the "Lewis Declaration," ECF Doc. # 8765), attaching mortgage statements for another loan serviced by GMACM covering the months of September and October 2009, which included the same address

12

listings as the November 2009 Mortgage Statement sent to the Macks. (*See id.* Ex. A at 3, Ex. B at 3.) On July 13, 2015, post-trial briefs were filed by Mack (ECF Doc. # 8884) and the Trust (ECF Doc. # 8880).

## II. DISCUSSION

Section 6(e) of RESPA provides that a mortgage borrower may submit a QWR to his or her loan servicer for "information relating to the servicing" of his or her loan. 12 U.S.C. § 2605(e)(1)(A) (2012). The statute defines a QWR as:

> [A] written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that— (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

*Id.* § 2605(e)(1)(B). At the time the Macks drafted the October 26, 2009 letter, section 6(e) provided that a loan servicer who receives a QWR must "provide a written response acknowledging receipt . . . within 20 days . . . unless the action requested is taken within such period." 12 U.S.C. § 2605(e)(1)(A) (2006 & Supp. III 2009), *amended by* 12 U.S.C. § 2605(e)(1)(A) (2006 & Supp. IV 2010). The statute in effect at the time also provided a servicer 60 days after receiving a QWR to correct any errors identified by the borrower or, after conducting an investigation, provide the borrower with a written response setting forth why the servicer believes that its determination regarding the borrower's account is correct or why the servicer cannot obtain the information requested by the borrower. 12 U.S.C. § 2605(e)(2) (2006 & Supp. III 2009), *amended by* 12 U.S.C. § 2605(e)(2) (2006 & Supp. IV 2010). Failure to comply with any provision of section 6 subjects a servicer to liability for "actual damages to the borrower as a result of the failure." 12 U.S.C. § 2605(f)(1) (2012).

13

RESPA permits, but does not require, a loan servicer to establish a designated QWR address under implementing Regulation X. *See* 12 C.F.R. § 1024.36(b) (2015). At the time the Macks sent the October 26, 2009 letter to GMACM, the applicable section of Regulation X provided:

> By notice either included in the Notice of Transfer or separately delivered by first-class mail, postage prepaid, a servicer may establish a separate and exclusive office and address for the receipt and handling of [QWRs].

24 C.F.R. § 3500.21(e)(1) (2009).

In *Roth*, the Second Circuit held that a borrower's failure to send a QWR to the address designated by a servicer for QWRs does not trigger the servicer's duties under section 6(e) of RESPA. *Roth*, 756 F.3d at 181 (citing *Berneike*, 708 F.3d at 1148–49) ("[I]f a servicer established a designated QWR address, 'then the borrower must deliver its request to that office in order for the inquiry to be a qualified written request.'" (quoting 24 C.F.R. § 3500.21(e)(1) (2011))). The Second Circuit affirmed the district court's dismissal of a borrower's RESPA claims on the basis that her lawyer did not send a QWR to a specific address her servicer indicated QWRs must be sent to in her monthly mortgage statements, holding that "[a]s long as a servicer complies with the notice requirements of [Regulation X] for designating a QWR address, a letter sent to a different address is not a QWR, even if an employee at that address (who may not have training in RESPA compliance) in fact responds to that letter." *Id.* at 182. In so ruling, the court found that the borrower was provided unambiguous notice of the designated QWR address in her monthly mortgage statements. *See id.* at 182–83.

The court in *Catalan v. RBC Mortgage Company*, No. 05 C 6920 (RMD), 2008 WL 2741159 (N.D. Ill. July 8, 2008), also considered whether a certain letter the servicer sent to the borrowers provided sufficient notice of a designated QWR address. The court observed that

14

Regulation X provides that a servicer's notice of a designated QWR address "must be 'separate' and must advise customers of a 'separate and exclusive address' that they *must use* for the mailing of inquiries regarding the servicing of their mortgage loans." *Id.* at *8 (emphasis in original). However, unlike in *Roth*, the *Catalan* court found that the borrower was not unequivocally provided notice of a designated QWR address in the servicer's letter at issue and granted the borrowers' motion *in limine* to exclude the letter at issue, holding that no reasonable juror could conclude that the letter complied with the applicable section Regulation X. *Id.* at *7–8. According to the *Catalan* court, the letter at issue did not unambiguously designate a separate and exclusive QWR address. *See id.* Rather, the court concluded that the letter's principal purpose was debt collection and it directed communication "regarding th[e] notice" to be sent to the attention of one certain individual. *Id.* Therefore, it was "just as likely that Plaintiffs would have read the letter as directing them to send their correspondence to [the identified individual] at the address for payments, rather than the other address listed for 'Mortgage Loan Services' that [the servicer] insist[ed] [wa]s the separate and exclusive address for QWRs." *Id.* The court also found that the letter did not sufficiently mandate that QWRs must be sent to the designated address, stating:

> even if the Court were to accept for the sake of argument that the letter should be construed to direct customers to send non-payment correspondence to the [designated] address, the letter in no way warns customers that the [designated] address is an exclusive address-that is, that they *must* send their non-payment related correspondence to that address and *only* that address on pain of losing any REPSA claim that they may have.

*Id.* (emphasis in original).

In *Roth*, the Second Circuit considered but rejected the borrower's argument that her servicer did not comply with Regulation X's notice requirements for designating a QWR address

15

by including such notice on the back of her mortgage statements, rather than "separate[] deliver[y]." *Roth*, 756 F.3d at 182. According to the Second Circuit, Regulation X's specification that such notice may be separately delivered "simply means that notice of the QWR address may be delivered separately from the Notice of Transfer—not that it cannot be delivered along with other mortgage information." *Id.* The court also rejected the borrower's argument that the notice was insufficient because it was "buried in fine print," finding that the notice at issue clearly specified the designated QWR address in capital letters. *Id.* at 182. Finally, the court held that the borrower's reliance on *Catalan* was misplaced; the notice at issue in *Roth* "contain[ed] none of the ambiguities that concerned the court in *Catalan*." *Id.* at 183 (quoting *Roth v. CitiMortgage Inc.*, No. 12-CV-2446 (SJF), 2013 WL 5205775, at *6 (E.D.N.Y. Sept. 11, 2013)).

Based on the evidence at trial, the Court concludes that GMACM's duty to respond to the October 26, 2009 letter was not triggered because the letter was not sent to the address designated for QWRs in the Macks' monthly mortgage statements.

The evidence shows that GMACM clearly established the following address to which a QWR must be sent (the "QWR Address"): GMAC Mortgage, Attn: Customer Care, PO Box 1330, Waterloo, IA 50704-1330. (*See* Def.'s Ex. O at 2; *see also* Lewis Decl. Ex. A at 3; *id.* Ex. B at 3.) By contrast, the following separate address was designated as the address for general inquiries (the "General Inquiries Address"): GMAC Mortgage, Attn: Customer Care, PO Box 4622, Waterloo, IA 50704-4622. (*See* Def.'s Ex. O at 2; *see also* Lewis Decl. Ex. A at 3; *id.* Ex. B at 3.)

The November 2009 Mortgage Statement provides notice of the QWR Address at least as clearly as the mortgage statement at issue in *Roth*. Like the mortgage statements in *Roth*, the

16

QWR Address and the General Inquiries Address was provided on the second page of the November 2009 Mortgage Statement.  (Def.'s Ex. O at 2.)  *See* Joint Appendix at 83, 85, *Roth v. CitiMortgage Inc.*, 756 F.3d 178 (2d Cir. 2014) (No. 13-3839), ECF Doc. # 28-2.  Additionally, the November 2009 Mortgage Statement, like the *Roth* mortgage statement, clearly stated that a QWR "must be sent" to the QWR Address.  (Def.'s Ex. O at 2.)  *See Roth*, Joint Appendix at 83, 85.  While the *Roth* mortgage statement identified the designated QWR address in capital letters, *see id.*, the November 2009 Mortgage Statement does not (Def.'s Ex. O at 2).  However, the November 2009 Mortgage Statement clearly indicates each address under a bold subheading titled "General Inquiries" or "Qualified Written Request," respectively (*id.*), whereas the *Roth* mortgage statement did not identify the designated QWR address under a subheading clearly referencing QWRs or RESPA, *Roth*, Joint Appendix at 83, 85.

However, because the November 2009 Mortgage Statement is dated November 2, 2009—after the Macks sent GMACM the October 26, 2009 letter—the November 2009 Mortgage Statement does not alone establish that GMACM provided the Macks notice of the QWR Address.  Mack's counsel stipulated in the Joint PTO that the October 26, 2009 letter was mailed to "an address other than the one specified for QWRs on the monthly mortgage statements GMACM sent to the [Macks], *as was on all monthly mortgage statements GMACM sent to borrowers*" (Joint PTO § III, ¶ 26 (emphasis added)).  Mack's counsel sought to be relieved of this stipulation, but the Trust was entitled to rely on it in deciding what evidence to offer at trial.  With the Court's permission, the Trust subsequently submitted two virtually identical mortgage statements for another borrower's account:  (1) a mortgage statement dated September 1, 2009 (Lewis Decl. Ex. A); and (2) a mortgage statement dated October 1, 2009 (*id.* Ex. B).  With the exception of borrower-specific information, these mortgage statements are identical to the

17

November 2009 Mortgage Statement, including with respect to their identification of the QWR Address and the General Inquiries Address. (*See id.* Ex. A at 3, Ex. B at 3.) Because the September and October 2009 mortgage statements for a wholly different borrower are identical (with the exception of borrower-specific information) to the Macks' November 2009 Mortgage Statement, the Court finds that the same language was included in the monthly mortgage statements sent to other borrowers in September and October 2009. Based on this finding, the Court concludes that Mack's attorney should not be relieved of the consequences of the stipulation of facts that the QWR Address indicated on the November 2009 Mortgage Statement was on all monthly mortgage statements sent to the Macks. (*See* Joint PTO § III, ¶ 26.) Accordingly, the Court finds that the Macks received notice of the QWR Address before they drafted, addressed, and mailed the October 26, 2009 letter. (*See id.*; Def.'s Ex. O.)

Mack admitted that he did not address the October 26, 2009 letter to the QWR Address. (*See* June 10, 2015 Hr'g Tr. 85:2–16.) While the Court finds that GMACM is presumed to have received the October 26, 2009 letter under the "mailbox rule," *In re AMR Corp.*, 492 B.R. at 663, and that the Trust did not rebut the presumption of receipt,[5] GMACM's duty to acknowledge and then to respond to the letter under section 6(e) of RESPA was not triggered because the letter was not sent to GMACM's designated QWR Address, *see Roth*, 756 F.3d at 181. Consequently, GMACM did not violate section 6(e) of RESPA by failing to respond to the Macks' October 26, 2009 letter, and the Objection to the Macks' Claim is hereby **SUSTAINED**.

---

[5] The Trust's witness, David Cunningham, testified that the loan servicing notes for the Macks' account did not reflect GMACM's receipt of the October 26, 2009 letter. (*See* June 11, 2015 Hr'g Tr. 26:16–27:1.) However, the Court finds that the Trust did not establish that the loan servicing notes were sufficiently reliable. The Court resolves this disputed issue of fact in favor of Mack.

### III. CONCLUSION

GMACM unquestionably acted recklessly by commencing the foreclosure action against the Macks when they were not in default on their loan. The foreclosure action never should have been filed, and once filed in error, it should have been promptly dismissed. While the Macks have recovered some damages for the nightmare they endured in 2009, their suffering was very real. On the Macks' one surviving claim after the Court's prior ruling on the Trust's Objection—the RESPA claim—Mack may not recover damages for a RESPA violation by GMACM because their October 26, 2009 letter was sent to the wrong address. Applicable law in this Circuit with respect to the required address to mail a QWR necessarily leads the Court to sustain the Trust's Objection to the Claim. The Objection is **SUSTAINED** and the Claim is **EXPUNGED.**

**IT IS SO ORDERED.**

Dated:   August 4, 2015
         New York, New York

                                    ___*Martin Glenn*___
                                        MARTIN GLENN
                                    United States Bankruptcy Judge

19