**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ) | **NOT FOR PUBLICATION** |
| In re:                                  ) | |
| ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al*.,   ) | |
| ) | Chapter 11 |
| Debtors.   ) | |
| ) | Jointly Administered |

**MEMORANDUM OPINION AND ORDER SUSTAINING THE RESCAP**
**LIQUIDATING TRUST'S OBJECTION TO OCWEN LOAN SERVICING, LLC'S**
**REVISED CLAIM NOTICE CONCERNING THE SERVICING ADVANCES CLAIM**

*A P P E A R A N C E S:*

MORRISON & FOERSTER LLP
*Attorneys for ResCap Liquidating Trust*
250 West 55th Street
New York, New York 10019
By:     Todd M. Goren, Esq.
          Jamie A. Levitt, Esq.
          Meryl L. Rothchild, Esq.

CLIFFORD CHANCE US LLP
*Attorneys for Ocwen Loan Servicing, LLC*
31 West 52nd Street
New York, New York 10019
By:     Jennifer C. DeMarco, Esq.
          Sarah N. Campbell, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

A key to the debtors' (the "Debtors") successful confirmation of their chapter 11 plan of

liquidation was the sale to Ocwen Loan Servicing, LLC ("Ocwen") of the Debtors' mortgage

servicing platform and other servicing-related assets, including outstanding servicing advances.

Under the parties' Asset Purchase Agreement (the "APA," SUF Ex. A) governing the sale, the

Debtors' represented that the servicing advances were valid reimbursement rights.  To the extent

this "Core Representation" of the Debtors is breached, the APA provides that Ocwen is entitled

to indemnification from the Debtors' estates.  Most representations and warranties in the APA terminated upon the closing of the sale to Ocwen.  "Core Representations," however, expired one year after the sale closed.  To exercise its indemnification rights relating to the breach of "Core Representations," the APA required Ocwen to submit a claim notice to the Debtors within one year after the closing date, before such representations terminated.  Ocwen submitted a claim notice shortly before the one-year period expired, asserting that the representation about the validity of servicing advances was breached and estimating Ocwen's damages attributable to the breach at approximately $2 million.  An attachment to the claim notice specifically listed approximately 6,000 loans by loan number for which Ocwen asserted that the servicing advances were not valid and enforceable.  The claim notice also included a statement reserving Ocwen's right to amend its indemnification claim.

Fourteen months after the representation terminated, Ocwen submitted a revised claim notice asserting breach of the same representation for losses attributable to servicing advances for over 30,000 loans, with damages now estimated at approximately $12 million.  Only 12 loans with servicing advances with estimated losses to Ocwen of approximately $63,000 listed in the schedules to the revised claim notice were listed in the schedules to the original claim notice.

The parties seek a declaration from the Court whether Ocwen is limited to recovering indemnification for losses attributable to servicing advances from the loans specifically identified in the original claim notice, or whether Ocwen was permitted to amend its claim notice 14 months after the representation expired, seeking indemnification for more than 30,000 additional loans with losses over $12 million.  For the reasons explained below, the Court concludes as a matter of law that Ocwen is limited to seeking indemnification for the loans specifically listed in the schedules to the original claim notice.

# I.    BACKGROUND

## A.    Procedural Posture of the Dispute

The ResCap Liquidating Trust (the "Trust"), a successor in interest to the Debtors,

objects to Ocwen's attempted revision of its servicing advances indemnification claims (the

"Objection," ECF Doc. # 8771).  Ocwen filed an opposition to the Objection (the "Opposition,"

ECF Doc. # 8865) and the Trust filed a reply (the "Reply," ECF Doc. # 8923).  The parties also

submitted a joint statement of undisputed facts (the "SUF," ECF Doc. # 8762) regarding the

issues relevant to the Objection.  The Court held a hearing (the "Hearing") on the Objection on

July 30, 2015 and took the matter under submission.

The Trust's Objection treated the dispute as an objection to Ocwen's administrative

expense claim to be resolved as part of the claims allowance process.  Ocwen argued that the

claim notice is not a part of Ocwen's administrative expense claim and, therefore, not properly

part of the claims allowance process—Ocwen stated in its brief (but did not really press the

point) that the dispute would have to be resolved by an adversary proceeding.  It is clear,

however, that the both parties want a prompt resolution of the legal issues involved.  To avoid

the necessity of the Court resolving whether the dispute must be raised by an adversary

proceeding, the parties agreed, for procedural purposes, that the Court may treat this matter as if

an adversary proceeding was filed by one of the parties seeking a declaratory judgment about the

rights to indemnification relating to servicing advances.

As set forth below, the Court holds that:  (1) the terms of the parties' contract do not

permit Ocwen to base its servicing advances indemnification claims upon the newly identified

allegedly invalid servicing advances in its revised claim notice; and (2) Ocwen's revised claim

notice fails to satisfy Second Circuit standards governing the amendment of pleadings.  The

Trust also argued that equitable estoppel bars Ocwen's effort to amend its claim notice.  The

Court's ruling on the first two issues makes it unnecessary to address the Trust's equitable estoppel argument.

### B.    Stipulated Facts[1]

#### 1.    The Debtors' Bankruptcy and Ocwen's Purchase of Certain of the Debtors' Assets

On May 14, 2012 (the "Petition Date"), each of the Debtors in the above-captioned chapter 11 proceedings filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code. (SUF ¶ 1.) Ocwen purchased the Debtors' mortgage servicing platform and other servicing-related assets; the purchase and sale are memorialized in the APA, dated November 2, 2012, as amended from time to time. (SUF ¶ 2.) The sale to Ocwen closed on February 15, 2013. (*Id.*)

Article XI of the APA addresses indemnification. Section 11.1(a) provides that each seller under the APA agrees to indemnify, among others, Ocwen from any and all "Losses" incurred by such party "in connection with or arising from any breach of any Core Representations or the inaccuracy of any Core Representations . . . ."[2] (APA § 11.1(a).)[3]

---

[1]    The parties stipulated to bifurcate and resolve certain issues relating to Ocwen's indemnification claim arising out of the "Core Representation" about the validity of servicing advances transferred to Ocwen (*see* the "Scheduling Order," ECF Doc. # 8673 at 3). The parties agreed upon a briefing schedule and to provide the Court with a joint statement of undisputed facts. (*Id.* at 3–4.) The parties stipulated to the following facts.

[2]    "Core Representations" are defined through references to sections 4.4(a), 4.5, 4.6, 4.7, 4.8, 4.9(a)–(e), 4.10, 4.14, 4.15, and 4.17 of the APA. (*See* APA art. I.)

[3]    *See id.* ("Each Seller agrees, on a joint and several basis, to indemnify and hold harmless each of Purchaser, Ocwen Financial Corporation ("Parent"), Parent's direct and indirect Subsidiaries, Parent's controlling shareholders and its and their respective directors, officers and employees (each a "Purchaser Group Member") from and against any and all Losses incurred by such Purchaser Group Member in connection with or arising from any breach of any Core Representations or the inaccuracy of any Core Representations or the inaccuracy of any Core Representations of Sellers contained or referred to in this Agreement or in any certificate delivered by or on behalf of Sellers pursuant hereto; provided, that in no event shall the aggregate amount required to be paid by Sellers pursuant to this Section 11.1(a) exceed the Indemnity Escrow Amount.").

Section 11.1(b) provides:

> The indemnification provided for in <u>Section 11.1(a)</u> shall terminate on the earlier of one year after the Closing Date and the entry of a Final Order closing the Bankruptcy Case (the "<u>Termination Date</u>") (and no claims shall be made by any Purchaser Group Member under <u>Section 11.1(a)</u> after the Termination Date), except that the indemnification by Sellers shall continue as to any Loss of which any Purchaser Group Member has notified ResCap in accordance with the requirements of <u>Section 11.2</u> on or prior to the Termination Date, as to which the obligation of Sellers shall continue until liability of Sellers shall have been determined pursuant to this <u>Article XI</u>, and Sellers shall have reimbursed all Purchaser Group Members for the full amount of such Losses in accordance with this <u>Article XI</u>.

(*Id.* § 11.1(b).)

Any party seeking indemnification under Article XI must provide "a notice (a '<u>Claim Notice</u>') describing in reasonable detail the facts giving rise to any claim for indemnification hereunder and shall include in such Claim Notice (if then known) the amount or the method of computation of the amount of such claim . . . ." (*Id.* § 11.2(a).) All of the parties' representations, warranties, and covenants, other than Core Representations, expire on the Closing Date, or February 15, 2013, and the Core Representations survive for one year past the Closing Date. (*See id.* §§ 11.1(b), 11.6.) "[T]he sole and exclusive remedy of any Purchaser Group Member" with respect to breaches of the Core Representations, "whether under [the APA] or arising under common law or any other Law, shall be as provided in [APA] <u>Article XI</u>," except in the case of fraud. (*Id.* § 11.7.)

Section 4.9 of the APA, which addresses the mortgage servicing portfolio, servicing agreements,[4] and "the Business"[5] as defined in the APA, includes one of the Core Representations of the Debtors. (*Id.* art. I.) It provides in pertinent part:

---

[4]    "Servicing Agreements" are defined to include:

(Footnote continues on next page.)

Sellers have delivered to Purchaser Electronic Data Files dated as of August 31, 2012 that set forth the amount of each Servicing Advance (shown, (i) in the case of P+I Advances (as defined in the applicable Servicing Agreement) on an aggregate portfolio basis, net of any unscheduled principal and interest payments and (ii) in the case of T&I and Corporate Advances (as defined in the applicable Servicing Agreement) on a loan-level basis, gross of any unscheduled principal and interest payments) with the data fields identified in Schedule 4.9(c) (the "Servicing Advance Schedule," which term includes, except where the context requires otherwise, an updated version of such schedule to be prepared as of the close of business on the day immediately preceding the Cut-Off Date (the "Cut-Off Date Servicing Advance Schedule")), each to be delivered as provided in Article III. Each Servicing Advance is a valid and subsisting amount owing to a Seller, made in accordance with and payable at the times and in accordance with the provisions of the applicable Servicing Agreement, and is a legal, valid and binding reimbursement right, and is enforceable against such securitization trust or owner in accordance with its terms, and is not subject to any Claims, defenses or set-off arising from acts or omissions of the Sellers that could be asserted against Purchaser. Each Servicing Advance is entitled to be paid, has not been repaid in whole and has not been compromised, adjusted

_____

(Footnote continued from previous page.)

all Contracts pursuant to which any Seller provides servicing, including primary servicing or master servicing and related activities (including duties as a REMIC Administrator), and includes the Agency Contracts listed on Schedule F, and the Private Investor Servicing Agreements and Servicing Agreements for Other Serviced Loans, in each case as listed on Schedule E [to the APA].

(APA art. I.)

[5]    The "Business" is defined as:

[T]he business, directly or indirectly, engaged in by Sellers and Affiliate Sellers of (i) originating Mortgage Loans, including through Sellers' Consumer Lending Platform; (ii) owning the Other Purchased Assets; (iii) providing primary servicing, back-up servicing and related activities for Mortgage Loans and Other Serviced Loans; (iv) providing fee-based subservicing for Mortgage Loans; (v) providing master servicing for Private Investors in Private Investor Loans and investors in Other Serviced Loans; (vi) financing and reselling serviced Mortgage Loans and related capital markets transactions; (vii) other operations related to the foregoing and (viii) foreclosure trustee services and recovery services provided to ETS Customers. "Business" expressly excludes all activities, operations, products, transactions and services that are conducted under, or in connection with, any Excluded Assets.

(APA art. I.)

(except by partial payment), extended, satisfied, subordinated, rescinded, amended or modified.  No Servicing Advance has been sold, transferred, assigned or pledged (other than a pledge that has been released as of the Closing including pursuant to the DIP Financing Agreements) by the related Seller to any Person other than the Purchaser.  All of the Servicing Advances included in the Purchased Assets relate to Mortgage Loans that are being serviced by a Seller pursuant to a Servicing Agreement.  The information set forth in the Servicing Advance Loan Schedule is true, complete and correct in all material respects as of the date thereof and the information in the Cut-Off Date Servicing Advance Schedule to be prepared and delivered to Purchaser in accordance with Article III will be true, complete and correct in all material respects as of Cut-Off Date, in each case in accordance with the applicable Servicing Agreement.

(*Id.* § 4.9(c).)

Servicing advances (the "Servicing Advances") are defined in the APA as follows:

[W]ith respect to each Agency Loan, Private Investor Loan or Other Serviced Loan, the aggregate outstanding amount that, as of any date of determination, has been advanced directly by Sellers from their own funds or from funds advanced under any loan facility (but not with funds borrowed from any custodial or other accounts under a Servicing Agreement) in connection with servicing (including master servicing) of such Mortgage Loans in accordance with the applicable Servicing Agreements for which Sellers have a right of reimbursement under the applicable Servicing Agreement, including with respect to principal, interest, Taxes, insurance premiums, corporate and other advances and all accrued but unpaid interest thereon as permitted by Applicable Requirements and the applicable Servicing Agreement, including in each case the right to reimbursement for, and enforce payment of, such Servicing Advances.  For the avoidance of doubt, "Servicing Advances" shall not include any HELOC draws.

(APA art. I.)

After the sale to Ocwen was approved by the Court, the Debtors and the Official Committee of Unsecured Creditors filed the *Second Amended Joint Chapter 11 Plan by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* (the "Plan," ECF Doc. # 6030).  The Plan was confirmed on December 11, 2013 (the "Confirmation Order,"

ECF Doc. # 6065).  (SUF ¶ 6.)  The Plan became effective on December 17, 2013 and the Trust

was established as a successor in interest to the Debtors.  (SUF ¶ 6 (citing ECF Doc. # 6137).)

　　　　The Plan provides for the treatment of certain types of claims, including administrative

expense claims, setting January 16, 2014 as the bar date by which administrative claims were

required to be asserted against the Debtors' estates.[6]  (*Id.* ¶ 7 (citing Plan art. V.A.1).)

　　　　　　　*2.　　　Ocwen's Originally Asserted Claims*

　　　　On January 16, 2014, Ocwen filed requests for payment of administrative expense claims

in the Debtors' bankruptcy case (the "Administrative Claim Requests," ECF Doc. ## 6296,

6297).  (SUF ¶ 9.)  The Administrative Claim Requests did not reference the Servicing

Advances, but did assert a contingent unliquidated claim for any breaches of the APA and

reserved rights to enforce the APA, including for any breaches of section 4.9 of the APA.  (*Id.*)

　　　　On February 14, 2014, within the time period specified in section 11.1(b) of the APA,

Ocwen sent a letter to the Trust providing notice of various asserted indemnification claims (the

"Initial Claim Notice," SUF Ex. B).  In pertinent part, the Initial Claim Notice alleges "a breach

---

[6]　　　The Confirmation Order states in pertinent part:

> Notwithstanding anything to the contrary in the Plan, on the Effective Date, the
> Ocwen APA . . . shall vest in the Liquidating Trust in accordance with the Plan
> and the Ocwen Sale Order.  The Liquidating Trust shall assume and perform any
> and all rights, benefits, duties and obligations of the Debtors under the Ocwen
> APA and the Ocwen Sale Order in accordance with their terms, and such rights,
> benefits, duties and obligations shall not be deemed to have been released or
> discharged by the occurrence of the Effective Date, by any provisions of the
> Plan (including, but not limited to, the provisions of Article XI of the Plan), or
> otherwise.  Nothing in the Plan Documents or this Confirmation Order shall, or
> shall be deemed or construed to, alter, change, modify or amend the terms and
> provisions of the Ocwen APA and Ocwen's, the Debtors' and the Liquidating
> Trust's rights, as applicable, thereunder, which rights shall continue in full force
> and effect and be enforceable following the Effective Date in accordance with
> the terms thereof.  For the avoidance of doubt, Ocwen shall not be required to
> file an Administrative Claim to preserve its rights or Claims arising after the
> Effective Date from or related to the Ocwen APA.

(Confirmation Order ¶ 31.)

of" section 4.9 of the APA such that Ocwen incurred "Losses currently estimated in the amount

of at least $2,211,962.17 in connection with certain Servicing Advances that were conveyed to

Ocwen pursuant to the APA" (the "Servicing Advances Claim").  (SUF ¶ 10; *see also* Initial

Claim Notice.)  According to the Initial Claim Notice, the representations in section 4.9 were

breached because the applicable Servicing Advances were not valid and subsisting amounts and

were not legal, valid, and binding reimbursement rights.  (*Id.*)  Exhibit A to the Initial Claim

Notice identifies over 6,000 loans for which Ocwen alleges the Servicing Advances were invalid.

(*See* Initial Claim Notice Ex. A.)

> ### 3.    *The Parties' Communications Regarding the Originally Asserted Claims*

On May 21, 2014, the Trust emailed Ocwen, requesting additional information in

connection with the Servicing Advances Claim.  (SUF ¶ 11 (citing *id.* Ex. C).)  On June 4, 2014,

Ocwen responded, informing the Trust that Ocwen was working on responses to the Trust's

requests for information relating to Ocwen's asserted indemnification claims and administrative

expense claims, including but not limited to the Servicing Advances Claim.  (*Id.* (citing *id.* Ex.

D).)

On August 20, 2014, the Trust emailed Ocwen a letter setting forth the Trust's positions

on Ocwen's asserted indemnification claims and administrative expense claims, including

Ocwen's claims pursuant to section 4.9 as to certain Servicing Advances.  (SUF ¶ 13.)  The Trust

requested additional detail regarding (i) why each Servicing Advance had been deemed

uncollectible and (ii) how the purported inability to collect such Servicing Advance rendered the

Debtors in breach of a specific Core Representation of the APA.  (*Id.*)

The parties exchanged further communications by email and telephone relating to the

Initial Claim Notice, including the Servicing Advances Claim.  (*Id.* ¶ 14.)  On February 11,

2015, Ocwen and the Trust held a conference call regarding the Initial Claim Notice and the

Administrative Claim Requests.  (*Id.*)  During the call, the Trust again requested detail on a loan-

by-loan basis of each alleged Servicing Advances Claim asserted in the Initial Claim Notice.

(*Id.*)  Ocwen committed to perform a review to provide additional detail on a loan-by-loan basis

as to why the Servicing Advances were alleged to be illegal, invalid, and not binding

reimbursement rights.  (*Id.* ¶ 15.)

### 4.    *The Trust's Objection to the Administrative Claim Requests*

On February 13, 2015, the Trust filed an objection to the Administrative Claim Requests

with respect to certain of the remaining claims not previously withdrawn by Ocwen during the

parties' prior communications; one such claim was the Servicing Advances Claim.  (*See* ECF

Doc. # 8129).  Ocwen filed an opposition to the initial objection on March 13, 2015, in which

Ocwen withdrew all of its remaining administrative claims other than a claim referred to as the

"Secure Axcess claim."  (SUF ¶ 16 (citing ECF Doc. # 8301).)  Ocwen argued that the Servicing

Advances Claim, which was contained in the Initial Claim Notice under the APA, was not

included in or part of its Administrative Claim Requests and not properly adjudicated pursuant to

the administrative claims allowance process.[7]  (*Id.*)  The Trust later filed a reply in support of its

initial objection on April 3, 2015, continuing to assert that the Servicing Advances Claim was

properly before the Court.  (*Id.* ¶ 16 (citing ECF Doc. # 8421).)

### 5.    *Ocwen's Revised Servicing Advances Claim Notice*

On April 29, 2015, Ocwen sent the Trust a revised claim notice (the "Revised Claim

Notice," *id.* Ex. F), which withdrew the Secure Axcess claim and, as a result of an extensive

review of Servicing Advances on a loan-by-loan basis, asserted losses in connection with the

---

[7]      On March 25, 2015, approximately two weeks after Ocwen filed its opposition, the Trust emailed Ocwen a
letter requesting the release of undisputed funds from the Indemnity Escrow Account.  (*Id.* ¶ 17 (citing *id.* Ex. E).)

Servicing Advances Claim in the amount of $12,054,975.55.  (*Id.* ¶ 18 (citing Revised Claim

Notice).)  Exhibit A to the Revised Claim Notice identifies over 30,000 loans that form the

purported basis of the Revised Claim Notice.  (*See* Revised Claim Notice Ex. A.)  Only 12 of the

more than 30,000 loans identified in Exhibit A to the Revised Claim Notice are also identified in

Exhibit A to the Initial Claim Notice; the remainder of the asserted losses in Exhibit A to the

Revised Claim Notice for breach of the representation with respect to allegedly unrecoverable

Servicing Advances relate to loans not identified in Exhibit A to the Initial Claim Notice.  (SUF

¶ 19.)  The alleged losses set forth in the Revised Claim Notice with respect to the 12 loans that

were identified in both the Initial Claim Notice and Revised Claim Notice amount to $63,691.94.

(*Id.*)  However, the parties are continuing to reconcile the amount of alleged Servicing Advances

with respect to these 12 overlapping loans.  (*Id.*)

      **C.**      **The Objection**

      The Trust seeks the Court's declaration that Ocwen is not entitled to base its Servicing

Advances Claim on the Revised Claim Notice because it is not entitled to submit the revision

pursuant to the terms of the APA or pursuant to Second Circuit precedent.  The Objection begins

with an assertion that the APA bars Ocwen from asserting indemnification claims for alleged

breaches of Core Representations post-Termination Date and as a result, the Trust is only liable

for alleged breaches attributable to the 12 loans identified in the Initial Claim Notice (and the

Revised Claim Notice), as opposed to those 12 loans and the other tens of thousands of loans

identified in the Revised Claim Notice.  (Obj. ¶¶ 35–40.)  According to the Trust, the APA

precludes Ocwen from asserting indemnification claims for alleged breaches of Core

Representations under section 11.1(a) after one year from the Closing Date of the sale, or

February 15, 2014.  (*Id.* ¶ 35 (citing APA § 11.1(b)).)  The Trust asserts that the indemnification

obligations, consequently, expired on the Termination Date and only extend to those claims for

which Ocwen provided notice to the Debtors or the Trust "on or prior to the Termination Date."

(*Id.* ¶ 36 (citing APA § 11.1(b)).)  Put another way, the APA does not permit Ocwen to assert

entirely new clams after the Termination Date.  (*Id.*)

The Trust further argues that each Servicing Advance is an individual asset; and as a

result, the Debtors' representation with respect to each Servicing Advance is a separate

representation to the aggregate amount outstanding under each applicable loan.  (*Id.* ¶ 37 (citing

SUF ¶¶ 6–7, APA §§ 1.1, 4.9(c)).)  The Trust contends that to the extent Ocwen asserts a breach

of the representations concerning Servicing Advances, it must identify each Servicing Advance

that does not comply with the representations in the APA and why such Servicing Advance is

non-compliant.  (*Id.*)  According to the Trust, Ocwen concedes this point by implication because

its Initial Claim Notice did not assert a claim as to all Servicing Advances in the aggregate, but

rather asserted a claim as to the "certain" Servicing Advances that Ocwen believed did not

comply with the APA and attached a list of the "applicable" Servicing Advances as to which

Ocwen was asserting a claim.  (*Id.* ¶ 38 (citing SUF Ex. B at 2).)  The Trust asserts that its

indemnification obligation is limited to only those Servicing Advances identified as of the

Termination Date in the Initial Claim Notice.  (*Id.* ¶ 38.)  The Trust further asserts that its

indemnification obligations do not extend to any of the newly asserted loans in the Revised

Claim Notice because it was submitted over 14 months after the Termination Date and asserted

nearly $12 million in entirely new claims that Ocwen never identified as defective within the

APA's time frame.  (*Id.* ¶ 40 (citing Revised Claim Notice).)  As such, the Trust argues that it is

only liable for, at most, the $63,691.94 attributable to the 12 loans listed in the Revised Claim

Notice that were also listed in the Initial Claim Notice.  (*Id.*)

Alternatively, the Trust asserts that even if Ocwen could assert a new claim under the APA through the Revised Claim Notice, Ocwen should be barred from amending its Servicing Advances Claim because (1) Ocwen fails to meet the Second Circuit's standards for amending an administrative expense claim, and/or (2) Ocwen should be equitably estopped. (*Id.* ¶¶ 41–58.)

### D.      The Opposition

Ocwen argues that it complied with the terms of the APA and that the APA does not prohibit Ocwen from revising the Initial Claim Notice to assert its additional losses. (Opp. ¶¶ 21–30.) Ocwen explains that it followed the APA by submitting the Initial Claim Notice, (a) asserting that the Servicing Advances "were not valid and subsisting amounts and were not legal, valid and binding reimbursement rights" in breach of the Debtors' Core Representation under section 4.9 of the APA, and (b) providing Ocwen's then current estimate of the minimum amount of its losses arising from the breach in the amount of at least $2,211,962.11. (*Id.* ¶¶ 21–22.) Ocwen further explains that it then conducted a loan-by-loan analysis of the Servicing Advances, which revealed that the losses attributable to the breach of the representation in section 4.9 were $12,054,975.55, plus legal fees and expenses. (*Id.* ¶ 23 (citing Revised Claim Notice ¶ 2.a–b).) Ocwen argues that nothing in the APA or applicable contract law prohibits amending a Claim Notice under the APA, and the Initial Claim Notice expressly reserved Ocwen's right to amend or supplement the notice at any time. (*Id.* ¶ 24 (citing Initial Claim Notice at 4).)

Ocwen disagrees with the Trust's assertion that the Servicing Advances should be treated as individual representations for each applicable loan. (*Id.* ¶ 25.) According to Ocwen, the APA does not provide a separate representation for each loan serviced; section 4.9 contains a single representation and it is the quantum of losses that arise from the breach of that single

representation that would vary depending upon how many Servicing Advances are implicated in the nature and scope of the breach. (*Id.*) Ocwen also disagrees with the Trust's assertion that if the specific amount of loss was not specified prior to the Termination Date, then the indemnification would not survive. (*Id.* ¶ 26.) Ocwen argues that the APA provides that the indemnification obligations continue for any loss for which Ocwen has notified the Debtors of in accordance with section 11.2 on or prior to the Termination Date; the APA also provides that the notice should include the amount of the claim "if then known[.]" (*Id.*) Ocwen argues that Ocwen did not know the amount of the claim at the time of the Initial Claim Notice and therefore was still in compliance with the APA; the amount provided in the Initial Claim Notice was intended to be an estimated minimum amount of the losses arising from the breach. (*Id.* ¶¶ 26– 27.) As to the Trust's emphasis on the length of time between the submission of the Initial Claim Notice and Revised Claim Notice, Ocwen contends that the length of time is irrelevant to the issue whether Ocwen had the right to assert the full amount of the claim as set forth in the Revised Claim Notice and such length of time did not prejudice the Debtors' estates. (*Id.* ¶ 29.)

Ocwen further asserts that the principles of equity the Trust raises actually weigh in favor of Ocwen. (*Id.* ¶ 30.) According to Ocwen, it relied on the Debtors' Core Representations and paid a purchase price for the Servicing Advances that was calculated based upon the inflated values for Servicing Advances maintained in the Debtors' books and records; Ocwen's losses are related directly to the asserted inaccuracy of the Core Representation; and the Debtors' estates would reap a windfall if Ocwen were prevented from asserting its full claim with respect to the Sellers' breach against the Indemnity Escrow Funds. (*Id.*)

Ocwen lastly addresses the Trust's arguments that the Second Circuit standard for amending administrative claims and the doctrine of equitable estoppel preclude Ocwen from basing the Servicing Advances Claim on the Revised Claim Notice.  (*Id.* ¶¶ 31–33.)

### E.    The Reply

The Trust reiterates that the APA bars Ocwen from asserting claims for new Servicing Advances.  (Reply ¶¶ 7–14.)  First, the Trust argues that Ocwen was required to identify each Servicing Advance subject to a claim in the Initial Claim Notice; to the extent the Initial Claim Notice did not identify the individual loans, Ocwen cannot now recover for loans newly identified in the Revised Claim Notice.  (*Id.* ¶¶ 7–11.)  According to the Trust, Ocwen's interpretation of section 4.9 would render the provision's repetitive use of the word "each" and Article XI's one-year timing requirement for providing the Claim Notice superfluous.  (*Id.* ¶¶ 7–10.)  Second, the Trust argues that the APA does not permit Ocwen's amendment of the Initial Claim Notice.  (*Id.* ¶ 12.)  The Trust states that the APA contemplates that a permitted amendment may be to "the amount or the method of computation of the amount of such claim" if such amount or method of computation is not known as of the Termination Date.  (*Id.* (citing APA § 11.2(a)).)  The Trust argues that while amendment could result in the revision of alleged losses for claims specifically identified in a Claim Notice, such amendments are limited to losses already specified by the Termination Date.  (*Id.*)  Third, the Trust asserts that Ocwen's purported reservation of rights in the Initial Claim Notice cannot expand its rights under the APA.  (*Id.* ¶¶ 13–14.)

The Trust further argues that the Debtors' estates would not reap a windfall from disallowing the amendment; Ocwen agreed to limit its right to seek indemnification to only those claims it identified in reasonable detail by the Termination Date, which was factored into the

purchase price it paid and it is Ocwen's fault that it failed to comply with the terms of the APA.
(*Id.* ¶ 14.)  The Trust then addresses the Second Circuit precedent regarding claim amendments,
arguing that it bars Ocwen's amendment to the Initial Claim Notice.  (*Id.* ¶¶ 15–19.)

Lastly, the Trust reads Ocwen's Opposition to reserve the right to assert additional bases
to pursue claims related to the Servicing Advances Claim against the Trust, including under
theories based on breach of contract or unjust enrichment.  (*Id.* ¶ 20 (citing Opp. n.4).)  The Trust
argues that such a reservation is improper and prohibited by the APA.  (*Id.* ¶¶ 20–21.)

## II.    DISCUSSION

### A.    The Revised Claim Notice under the APA

"Under New York law, which governs [the APA], 'the initial interpretation of a contract
is a matter of law for the court to decide.'"  *Compania Financiera Ecuatoriana de Desarrollo,
S.A. v. Chase Manhattan Bank*, No. 97 Civ. 5724 (JGK), 1998 WL 74299, at *3 (S.D.N.Y. Feb.
19, 1998) (quoting *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.
1996) (quoting *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996)) (citing
*Curry Road Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir. 1990); *Metro. Life Ins. Co. v. RJR
Nabisco Inc.*, 906 F.2d 884, 889 (2d Cir. 1990)).  If the terms of the contract are "'complete,
clear and unambiguous on [their] face, [they] must be enforced according to the plain meaning of
[their] terms.'"  *Wurtsbaugh v. Banc of Am. Secs. LLC*, No. 05 CIV. 6220(DLC), 2006 WL
1683416, at *5 (S.D.N.Y. 2006).  Such a contract "has a definite and precise meaning,
unattended by danger of misconception in the purport of the [contract] itself, and concerning
which there is no reasonable basis for a difference of opinion."  *Compania Financiera de
Desarrollo*, 1998 WL 74299, at *3 (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt.
Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355
(1978)) (citing *United Nat'l Inc. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 109 (2d Cir.

1993); *Metro. Life Ins. Co.*, 906 F.2d at 889).  By contrast, contract language is ambiguous "if it

is reasonably susceptible to more than one meaning." *Id.* (citation omitted); *see also*

*Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51–52 (2d Cir. 1993) ("We

have described such an ambiguity as the absence of a definite and precise meaning, unattended

by danger of misconception in the purport of the contract itself, and concerning which there is no

reasonable basis for a difference of opinion." (citation omitted)).

Under New York law, a court interpreting a contract "is required to discern the intent of

the parties, to the extent that the parties memorialized what they intended, by what they wrote."

*In re Aerovias Nacionales de Colom., S.A. Avianca*, 323 B.R. 879, 887 (Bankr. S.D.N.Y. 2005)

(citation omitted).  When the language of the contract is clear, "the intent of the parties must be

gleaned from within the four corners of the instruments, and not from extrinsic evidence," *id.*

(citation omitted), and the contract "must be enforced according to the plain meaning of its

terms," *Fitzpatrick v. Animal Care Hosp., PLLC*, 104 A.D.3d 1078, 1080 (N.Y. App. Div. 2013)

(citation omitted).  It is also crucial that the contract "be read to give effect to all its provisions

and to render them consistent with each other." *In re Aerovia Nacionales de Colom.*, 323 B.R. at

888; *see also Painewebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) ("New York follows

the common law rule that, [i]n interpreting a contract, the intent of the parties governs, and

therefore [a] contract should be construed so as to give full meaning and effect to all of its

provisions." (citation omitted)); *Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS CBO II,*

*Ltd.*, 910 F. Supp. 2d 629, 648–49 (S.D.N.Y. 2012) ("In interpreting a contract under New York

law, words and phrases . . . should be given their plain meaning, and the contract should be

construed so as to give full meaning and effect to all of its provisions.  [A]n interpretation of a

contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not

preferred and will be avoided if possible." (citations omitted)); *Muzak Corp. v. Hotel Taft Corp.*,

1 N.Y.2d 42, 47 (1956) ("The rules of construction of contracts require us to adopt an

interpretation which gives meaning to every provision of a contract or, in the negative, no

provision of a contract should be left without force and effect."); *Givati v. Air Techniques, Inc.*,

104 A.D.3d 644, 646 (N.Y. App. Div. 2013) ("[A] court should seek an interpretation which

fulfills the parties' reasonable expectations and which gives all parts of the contract full force

and effect.").

The Trust argues that the APA is clear, section 4.9(c) provides a Core Representation as

to each Servicing Advance, and, in turn, Article XI allows for indemnification for breaches of

each of those representations on a loan-by-loan basis.  As a result, the Trust argues that Article

XI requires Ocwen to assert an indemnification claim for each individual Servicing Advance that

is purportedly invalid; to the extent the Revised Claim Notice asserts new Servicing Advances

that are invalid that were not identified in the Initial Claim Notice, Ocwen is not entitled to

indemnification.

Ocwen also argues that the APA is clear, but asserts that section 4.9(c) consists of only

one Core Representation—that "[e]ach Servicing Advance is a valid and subsisting amount

owing to a Seller, . . . and is a legal, valid and binding reimbursement right . . . ."  (APA § 4.9.)

Ocwen asserts that Article XI therefore permits indemnification for the breach of that one

representation, the Initial Claim Notice put the Trust on notice of the breach of that one

representation, and the Revised Claim Notice permissibly provides an amendment to the asserted

losses attributable to that breach.

The Court finds that the language of the APA is clear as a matter of law and concludes that Ocwen is not entitled to base its Servicing Advances Claim upon the newly identified loans in the Revised Claim Notice.

First, section 4.9(c) repeatedly uses the word "each" to modify the term Servicing Advances. (*See, e.g.*, APA § 4.9 ("*Each* Servicing Advance is a valid and subsisting amount owing to a Seller, . . . and is a legal, valid and binding reimbursement right . . . ." (emphasis added)).) Therefore, the Core Representation in section 4.9(c) should be read, as the Trust asserts, as a Core Representation about the validity of each individual Servicing Advance transferred to Ocwen. Ocwen's position—that section 4.9(c) only sets forth a single Core Representation—is in direct conflict with the express language of section 4.9(c) and would require this Court to hold that the word "each" actually means "any" or "all" of the Servicing Advances; but that is not what section 4.9(c) states. In accordance with the language of section 4.9(c), to the extent an individual Servicing Advance is invalid, the Debtors are liable for a separate breach, and Ocwen is entitled to an individual indemnification claim with respect to that specific breach.

Second, section 11.2(a) requires Ocwen to identify "each" Servicing Advance on a loan-by-loan basis in its Claim Notice. The identification of "each" Servicing Advance is necessary to "describ[e] in reasonable detail the facts giving rise to [Ocwen's] claim for indemnification . . . ." (*Id.* § 11.2(a).) Ocwen did this with respect to over 6,000 loans in its Initial Claim Notice. (*See* Initial Claim Notice Ex. A.) While Ocwen is correct that it was only required to provide an estimation of the monetary value of the losses it incurred in the Claim Notice it submitted (*see* APA § 11.2(a) (stating that the Claim Notice "shall include . . . (if then known) the amount or the method of computation of the amount of such claim . . .")), it is disingenuous of Ocwen to argue

that it was also entitled to estimate the number of Servicing Advances that were invalid (i.e., the number of Core Representations that were breached).[8] A "computation" of the amount of loss must be calculated for each individual Servicing Advance; this does not appear to be in dispute amongst the parties. If the Revised Claim Notice simply altered the "amount" of the loss for each of the allegedly invalid Servicing Advances on a loan-by-loan basis, the Revised Claim Notice may have been proper under section 11.2. The Revised Claim Notice, however, does more than that by also altering the identified loans underlying each of Ocwen's indemnification claims. Such an alteration constitutes the assertion of new claims, rather than a re-estimation of the claims already noticed in the Initial Claim Notice.

Third, while the parties agree that the Initial Claim Notice was timely under Article XI, it is clear that the Revised Claim Notice was not, as it was submitted to the Trust 14 months after the deadline imposed by the APA. Section 11.1(b) of the APA states that Ocwen's indemnifications rights "shall terminate on the earlier of one year after the Closing Date and the entry of a Final Order closing the Bankruptcy Case (the "Termination Date") (and no claims shall be made by any Purchaser Group Member under Section 11.1(a) after the Termination Date) . . . ." (*Id.* § 11.1(b).) The parties do not dispute that this provision dictates that Ocwen was required to notice its indemnification claims on or before February 15, 2014. The fact that Ocwen did not "then know[]" on or before this date each of the Servicing Advances that was invalid in breach of section 4.9(c) is not a risk to be borne by the Debtors' estates. The parties expressly negotiated over the survival of the representations and warranties in the APA up until this date. (*See id.*) Allowing Ocwen to base its Servicing Advances Claim upon the newly

---

[8]    Such an interpretation of the APA would allow Ocwen to initially assert an indemnification claim under section 4.9(c) upon discovering that one or two Servicing Advances were invalid and later come back to the Trust stating that tens of thousands of Servicing Advances are invalid—this simply cannot be correct.

identified loans in the Revised Claim Notice would render this bargained for expiration date

meaningless.  To the extent Ocwen did not identify individual Servicing Advances that are

invalid on or before that date, Ocwen is not entitled to assert those claims thereafter.

Lastly, Ocwen's purported reservation of rights to amend the Servicing Advances Claim

in the Initial Claim Notice does not allow Ocwen to circumvent the express terms of the APA.  A

party to a contract cannot reserve rights it does not have pursuant to that contract.  *See Winshall*

*v. Viacom Int'l Inc.*, C.A. No. 6074 (LES), 2012 WL 6200271, at *8 (Del. Ch. Dec. 12, 2012

(holding that attempted reservation of rights "constitute[d] a unilateral rewriting of the contract

and [was] impermissible").

Consequently, the Objection is **SUSTAINED** pursuant to the language of the APA.

**B.        Second Circuit Precedent**

The parties agreed at the Hearing on the Objection that the Court may treat the instant

matter as if one of the parties filed an adversary proceeding for a declaratory judgment.

Therefore, Second Circuit precedent discussing Federal Rule of Civil Procedure 15(c), which

governs the amendment of pleadings, is applicable.  Even though the parties' written

submissions to the Court focus on Second Circuit precedent regarding the standard for amending

proofs of claim in bankruptcy proceedings, their arguments, at least in part, are still relevant to

the Court's determination.

Courts analyzing a proposed amendment to a proof of claim apply a two part test.  *See,*

*e.g.*, *Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.)*, 419 F.3d

115, 133 (2d Cir. 2005) (citations omitted); *In re Enron Creditors Recovery Corp.*, 370 B.R. 90,

95 (Bankr. S.D.N.Y. 2007); *Integrated Res., Inc. v. Ameritrust Co. Nat'l Ass'n (In re Integrated*

*Res., Inc.)*, 157 B.R. 66, 70 (S.D.N.Y. 1993) (citations omitted); *In re McLean Indus., Inc.*, 121

B.R. 704, 707–709 (Bankr. S.D.N.Y. 1990) (citations omitted).  The first prong examines

"whether there was [a] timely assertion of a similar claim or demand evidencing an intention to

hold the estate liable."  *In re Enron Corp.*, 419 F.3d at 133 (citation omitted).  To satisfy this

prong, courts require that the proposed amendment:  "1) correct[] a defect of form in the original

claim; 2) describe[] the original claim with greater particularity; or 3) plead[] a new theory of

recovery on the facts set forth in the original claim."  *Id.* (citations omitted).  Applying this initial

prong, "courts have applied Rule 15(c) of the Federal Rules of Civil Procedure . . . pursuant to

[Federal Rules of Bankruptcy Procedure] 7015 and 9014(c)."  *In re Enron Creditors Recovery*

*Corp.*, 370 B.R. at 95.  The critical inquiry courts apply under Federal Rule of Civil Procedure

15(c) is whether the proposed amended claim "relates back" to the original claim.  *Id.* at 96.

"Ordinarily to be within the scope of a permissible amendment, the second claim should not only

be of the same nature as the first but also reasonably within the amount to which the first claim

provided notice."  *In re Integrated Res., Inc.*, 157 B.R. at 70–71 (citation omitted).  Overall,

Federal Rule of Civil Procedure 15 generally requires that "the original pleadings . . . give notice

of the transaction or occurrence giving rise to the plaintiff's cause of action in the amended

pleading and the amendment must not substantially prejudice the opposing party."  *Id.* (citation

omitted).

    If the claimant meets the first prong of the claim amendment standard, the second prong

asks whether it would be equitable to allow the amendment.  *Id.* at 95 (citation omitted).  In

balancing the equities, courts consider the following factors:

> undue prejudice to opposing party; (2) bad faith or dilatory
> behavior on part of the claimant; (3) whether other creditors would
> receive a windfall were the amendment not allowed; (4) whether
> other claimants might be harmed or prejudiced; and (5) the
> justification for the inability to file the amended claim at the time
> the original claim was filed.

*Id.* at 70 (citing *In re McLean Indus., Inc.*, 121 B.R. at 708 (Bankr. S.D.N.Y. 1990)).  This second

prong is where the standard for amending proofs of claim diverges from the standard for

amending pleadings under Federal Rule of Civil Procedure 15.  Here, the Court need not address

the second prong because Ocwen's Revised Claim Notice fails to satisfy the first prong, which

incorporates Federal Rule of Civil Procedure 15(c)'s applicable standard.

Each Servicing Advance corresponds with a particular loan.  An alleged breach of the

representation that any single Servicing Advance is a valid reimbursement right constitutes a

single claim, or put another way, a separate "transaction and occurrence."  *Id.* at 70–71 (citation

omitted).  Accordingly, to the extent the Revised Claim Notice identifies new and/or different

loans from those listed in the Initial Claim Notice, Ocwen is asserting new causes of action that

do not "relate back" to the Initial Claim Notice.  Moreover, allowing Ocwen to amend its

Servicing Advances Claim by way of the Revised Claim Notice would undoubtedly prejudice the

Trust and the Debtors' estates.  The Revised Claim Notice not only is not of the "same nature" as

the Initial Claim Notice in that it identifies wholly different loans (except for 12) and in turn

different indemnification claims, but the Revised Claim Notice is also not "reasonably within the

amount to which the [Initial Claim Notice] provided notice."  *Id.* at 70–71 (citation omitted).  An

original assertion of approximately 6,000 claims amounting to approximately $2 million in

damages hardly provides sufficient notice of a later assertion of over 30,000 claims amounting to

approximately $12 million in damages.

As such, the Objection is **SUSTAINED** pursuant to Second Circuit precedent.[9]

---

[9]    In light of the Court's holding under the terms of the APA and Second Circuit precedent regarding Federal
Rule of Civil Procedure 15, the Court need not address the Trust's additional argument under the doctrine of
equitable estoppel.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, the Objection is **SUSTAINED**.

**IT IS SO ORDERED.**

Dated:    August 5, 2015
       New York, New York

_Martin Glenn_
            MARTIN GLENN
    United States Bankruptcy Judge