Todd Silber. Pro- Se claimant. 73 Farnham rd. South Windsor Ct. 06074, 860-922-4156

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------x
In Re:                             : Chapter 11
                                   : Case NO 12-12020 (MG)
Residential Capital LLC, et,al.,   :
Debtors.                           :
------------------------------------------------- x



AUG 1 7 2015

U.S. BANKRUPTCY COURT
SO. DIST. OF NEW YORK

## MOTION FOR PARTIAL RECONSIDERATION AND REARGUE TO MEMORANDUM OPINION AND ORDER SUSTAINING THE RESCAP BORROWERS CLAIMS TRUST'S OBJECTION TO CLAIM NUMBER 4222 FILED BY TODD SILBER.

On August 4th, the courts entered a Decision sustaining the claims Trust objection to the 4 remaining claims, 4222, filed by Silber, doc 8962.

This Motion to reargue/reconsider is prepared by Todd Silber. This motion is not adding any new exhibits, only referring to factors, testimony, exhibits, and/or mandated requirements possibly not considered, or not considered to the severity they should be, from the evidentiary hearing and court documents on file prior to. As well as flawed methodology and inaccurate facts that contributed/lead to His Honors opinion and order.

** Silber is unaware if the exhibits provided for the evidentiary hearing can be referred to or need to be re-filed when cited in this document. Silber will provide the exhibits using the same numbers or letters as were used during the evidentiary hearing, and apologizes if this was not required.

**Breach of contract.**

**Silbers Loss mitigation history in regards to unemployment.**

The court finds that Silber did not provide evidence satisfying requirements of unemployment, 9 months for Non-fha hamp, and 12 months for FHA HAMP.

The Court finds Silber was not informed of further unemployment information required during first his unemployment application review , Dec 09. Silber was also never informed, through the entire loss mitigation review process, by GMAC that he was required to provide 12 months of unemployment benefits. Silber can only provide what is asked for, GMAC only ever asked for 9 months, even though FHA-HAMP was looking for 12 months. Silber ultimately provided an exhibit/letter from the Mass unemployment, determining his unemployment would end 10-16-10 (Exhibit 46, pages, 20-23). While this may not be a traditional award letter, Silber explained to GMAC at the time what that date meant. Silber gave the same testimony at the evidentiary hearing. The letter showed a pre approval of the first extension of benefits, determining they would end 10-16-10. Mr. Cunningham during the testimony, claimed GMAC read the Mass Unemployment exhibit, as appropriate/acceptable documentation though



claimed to have never seen an award letter as such before, his Honor had mentioned the same. Never the less, GMAC is once again confused or unaware of what is acceptable documentation. GMAC application, and non-fha-hamp requires a benefits statement or letter from the provider, showing amount, frequency, and duration. It goes on to say benefits must continue for 9 months. (See application cover sheets in exhibits 45 & 46. Dec 09 and Jan 2010.) While FHA-HAMP is not limited to accepting only "a benefit letter".

In either case the Mass unemployment Exhibits/letter was deemed appropriate, as it should of been and GMAC servicing notes as well as Counsel for the Trust both confirm GMAC verified/confirmed Silber's end date on the information provided by Mass Unemployment, was 10-16-10. (Rescap Claims trust proposed finding of facts and conclusion of Law. Doc 8828, page 7, number 52). GMAC would later use such income, despite their argument of still not being 9 months.

Silber at the time, was unaware that each modification application stood on its own, and any information provided would not be added or in reference to the first application date. When Silber provided the information above it was for the second set of paper work/modification attempt as Silber was not aware or informed prior that the information provided thus far was not being accepted. Silber acknowledges however, while 10-16-10 unemployment end date of the first extension of benefits falls a little short of the 9 months requirement in regards to the 2nd application, Jan 29th 2010. If the information was requested on or about December 18th 2009, in regards to the first modification application, when GMAC was aware and decided Silber needed to provide more unemployment information, but failed to do so, which the court concluded was in fact never requested. Silber would have met the 9 month requirement.

Furthermore while non-FHA HAMP may require 9 months from the time of the application. FHA-HAMP states 12 months, of reasonable assurance, of its continuance. (GMAC has defaulted to HAMP guidelines, when a FHA-HAMP guideline might not be specific, They are not allowed to do so as this court has also determined.) The same Letter/Exhibit showing the end date of 10-16-10, shows a start date of 10-24-09 (Exhibit 46, page 22). That is 52 weeks / 1 year of continued benefits. Silber also provided multiple letters showing the further extensions were available. The requirement from FHA as acceptable documentation states, "Acceptable documentation includes letters, exhibits, or benefits statements from the provider" and also "reasonable assurance of its continuance".  This is a much looser standards than what non-FHA HAMP or GMAC's applications request/require.

Silber provided letters of the extensions. Silber see's that the requirement provided could read as, "letters from the provider only". But argues it does not . In either case GMAC ignored such letters. Any clarification of what was to be required, or what would be accepted as "reasonable assurance" (IE, Letters)that could be used and ultimately any decision fell in the hands of FHA/HUD. GMAC was required to transfer any and all information to FHA/HUD for monitoring/underwriting, (Exhibit 44 FHA mortgage letter, page 10) and also in (Exhibit 43, Hud handbook , page 10, 7-8 Default reporting). There is no record of GMAC ever providing any data, information, loss mitigation, or request for guidance on reviews. There are no records of information transferred in GMAC's serving notes utilizing the "EVARS reporting/monitoring system ", in regards to Silber's modification applications.



\*\*Silber points out, that if he was timely informed of the proper 12 month of unemployment requirements, and if GMAC requested 12 months continuance from the time of the application, though this is not what FHA required. Silber could have taken action to obtain such information. Mass unemployment showed they were willing to grant/pre-approve extension and documentation of such. By GMAC not informing Silber, it contributes to Silber's failure at receiving a fair review and modification.

When GMAC failed to follow FHA/Hud requirements, by not keeping FHA/HUD informed, and by defaulting to HAMP guidelines, when they might of required clarification on protocols. GMAC guaranteed Silber's failure. Any decision on a FHA-HAMP modification is ultimately in the hands of FHA. FHA-HAMP has great flexibility, while non-FHA Hamp is rigid. GMAC was not to incase Silber's modification reviews in any rigid system what so ever. (Exhibit 43,Hud Handbook, page 4, "7-6 staffing", also page 8, section F, second paragraph)

**Silbers loss mitigation in regards to Debt to income failure.**

Silber has read and understands His Honors decision based off a debt to income not qualifying for FHA HAMP, had a FHA HAMP review been done. Silber still reargues no record in GMAC servicing notes shows a review failing for FHA HAMP, there is also no records of under writing done, and there is no record of FHA monitoring or being informed, which is part of an FHA-HAMP review. Silber has shown GMAC was required to report to FHA above. Silber also points out that GMAC was required to keep very detailed records and notes. (FHA mortgage letter, EXHBITIT 44, page 9, case/mortgage documentation). GMAC detailed records and notes provide no evidence a FHA-HAMP review was ever done in its entirety. The only evidence are generic denial letters, that are computer generated, without any names of any personal who determined the denials. GMAC was not to allowed to allow automated systems to make decisions. (Exhibit 43, Hud handbook, Page 4, 7-6 staffing)

*There is no substitute tor human judgment in servicing, and the function must not be delegated to automated systems or encased in a rigid system.*

Furthermore the decisions /opinions of the "73% and 65%" back end DTI not meeting the 55% requirement would have resulted in a FHA HAMP denial, Is based off of incorrect facts and flawed underwriting methodology and incorrect testimony.

The first source of information claiming BE DTI was 73% , is from a letter from Carmen Starr. (Exhibit 24, dated April 30th, 2010). In regards to the December 18th, 2009 modification application, 4 months prior. It says "Back end DTI is current mortgage payment (with escrow), plus revolving debt by gross."

The letter also state "based off monthly income of $3677.92, your back end DTI was 73 % making you ineligible for the FHA HAMP, a denial letter was mailed to you on Jan 13, 2010". That denial letter mailed Jan 13,2010 (Exhibit 27) Makes no mention of Back end Debt to income being the reason of the denial, in fact it says 'front end' Debt to income. As we know GMAC did not use Silber's unemployment income at the time of December 18th, 2009 review. GMAC would later go on to state the back end DTI was 65%.

However while non-FHA-HAMP may or may not use the current mortgage payment when determining debt to income ratios, the letter claims it was for an FHA-HAMP review, FHA does not make any mention in its underwriting of using the current mortgage payment. It makes no sense, we already know Silber cannot afford the current mortgage. Furthermore the FHA mortgage letter, speaks of using the new modified payment in regards to Debt to income underwriting. (EXHIBIT 44, page 23, Z "as close to 31% DTI as possible at both the trial modification period and final. Also Page 24, 3, "We would agree a back end ratio of 55% or greater does add risk to the sustainability of the modification"). Ultimately this may be unclear still, however GMAC defaulted to HAMP guidelines, when they should have been reporting to FHA, which would have added clarification and underwriting, and exceptions if needed.

Furthermore, Silber discredits the validity and credibility from Carmen Starr to the extent of the methodology used. Starr is a Advocacy Resolution Specialist, in the Executive offices. Starr provided a flat out misrepresentation of facts to Connecticut State AG, Joseph Chambers, after Silber requested assistance (Exhibit 6), when Starr quelled the investigation from the AG office, by saying Unemployment could not be used as verifiable income. His Honor has ruled the statement does not qualify as a negligent misrepresentation in regards to damages, but it still shows a flat out Lie from the Executive office of GMAC. Starr has also shown a lack of diligence and professionalism, upon a conversation between Starr and another GMAC employee. The employee was seeking information/assistance from Starr. Starr's initial reply starts off with "Hello again- OMG on this account" followed by 3 smiley faces. (Exhibit 35, page 2) If an Executive employee is not going to handle any of Silber's concerns with diligence or professionalism, how can I expect any kind of fairness, accuracy, or diligence from any other employee in a subordinate position.

At the evidentiary hearing Cunningham did give testimony which shows a flawed methodology in the underwriting process that not only cost Silber but countless others. When Cunningham was being examined/cross examined, under oath on 2 separate occasions, Cunningham was asked what sources of debt/methodology was used to determine the back end debt to income. Cunningham said, revolving Debt, utilities, food, and housing cost are used. While this may or may not be what is required with a non-Fha-hamp. FHA-HAMP specifically speaks of what is not to be used and what is to be excluded. (Exhibit 44, FHA mortgage letter & FAQ, page 23, AA underwriting - Back end Debt to income ratio)

> *1) When calculating the back end ratio, what does HUD consider incremental monthly obligations? Does this mean all monthly obligations including food and Housing costs?*
>
> *No, food, Housing, and utilities are excluded.*

When an FHA HAMP review was claimed to have been done, the reasons for failure were due to Back end Debt to income, (Trust Exhibit C page 128, approx middle of page), nothing else. We now know there was a flawed methodology being used by GMAC to determine the 73% and later, the 65% back end debt to income.

The facts however are. Silber was not at 73% back end debt to income nor 65%.

Exhibit 45, page 4 of the modification application from December of 2009 shows. Auto expenses, not the car payment, of $220-$260, Food/Household supplies $645-$750, and utilities of $545-600. That is $1410-$1630, that should NOT of been used to determine back end Debt to income underwriting.

Exhibit 46, page 4 of the modification application from January 2010 shows. Auto expense, not the payment, of $179. Food/housing of $400-$450. Utilities $190. Misc $100. This is $869-$919 of Debt that should NOT of been used.

Exhibit 47, page 3 of the modification application update, April 2010 shows. Auto expense (not payment) $180, food/housing $425, utilities $210. This is $815, of Debt that should NOT of been used.

Furthermore there is a significant reduction in credit card revolving Debt, The first application listed $500-$600 of credit card debt, while it was dropped to $30-$50 over the course of the next few modification applications. FHA mandates GMAC pull a credit report, the revolving Debt would still show the $500-$600. However FHA mandates GMAC must talk to Silber for verification and consideration . (Exhibit 44, page 7, final paragraph on page)

> *The mortgagee must validate monthly installment , revolving debt and secondary mortgage debt by pulling a credit report for each mortgagor or a joint report for a married couple. The mortgagee must also consider information obtained from the mortgagor orally or in writing concerning incremental monthly obligations.*

GMAC never contacted Silber in regards to monthly obligations. Silber was not aware of the protocols at the time GMAC was to take as far as underwriting. In Jan 2010 Silber contacted his credit card companies and informed them of his financial hard ships and some missed payments. Silber informed them that he could no longer pay, and was ashamed of this. Silber was made aware he was protected from monthly obligations due to financial hardship and becoming unemployed, while some cards where only 30 days, most were while he remained unemployed.

There is also a drop in food bills, utilities, and other debt. Silber and his family cut back, Silber's family had gotten rid of one of their cars reducing insurance and gas expenses. Also eliminated or cut back on some utilities, such as cable, not running the central air unit, and eliminating a better performing internet.

It is unclear what GMAC used for credit card debt/revolving debt, as there is no underwriting provided or done. The facts are, GMAC did not consult Silber on credit card debt. Silber could and would have provided explanation letters from Creditors if that is what it took as well as other information such as the cancelation of the Cable Bill and reduction in the internet cost.

Cunningham's testimony also states they used Utilities, Housing expenses, and Food cost, which FHA-HAMP explicitly states to exclude.

Again the importance of reporting to FHA and allowing a more competent source to be involved for determination and underwriting is invaluable. As pointed out earlier, it is also mandatory. And Silber



feels the importance and severity of this lack of reporting to FHA might is being over looked or not being viewed to the capacity of its importance from the Courts.

GMAC skipped critical guidelines, showed a flawed/incorrect methodology in underwriting and resorted to non-FHA-HAMP guidelines as they saw fit, and simply never truly did an FHA HAMP review, or not correctly, fairly, completely, or accurately at least.

The fact is Silber was not anywhere close to as High as 73% or 65%. As time went by Silber cut his debt significantly, as well as increased gross income by adding rental income. In addition the Housing, utilities, or food should not have been used, and these are factors that would bring Silber's debt to income much lower, closer to the 55% goal and probably below it, but definitely much farther away from the 65% or 73% declared by GMAC.

Cunningham gave testimony of how much of rental income should be used stating only 75% as per an FHA silent rule. Silber disputes FHA having any Silent rules in their mortgage letters, Silber also points out Cunningham's first gave testimony that it was in fact in the FHA Mortgage letter the trust provided as an exhibit (which is the same Exhibit provided by Silber, Exhibit 44), when it was determined it was not in there. Cunningham then pointed out/acknowledged, when a rule or guideline is not listed in FHA-HAMP guidelines, you default to non FHA-Hamp guidelines. When that was pointed out to be incorrect, Cunningham stated it was a "silent rule". For this, Silber ask the court to reconsider that statement as credible.

Silber states that 100% of the rental income brings Silber even closer or perhaps below the 55% requirement , but definitely brings Silber's back end debt to income further away from the statement of 73% or 65% provided by GMAC. The only way to determine how much rental income should/could of been used, would be if GMAC was reporting it to FHA.

Ultimately, we do not know what the new payment would have been due to no underwriting provided for an FHA -HAMP review. However, the Court ruled an FHA-HAMP review was done on a few occasions, but based off testimony it was not done accurately or correctly at the very least, and should be reconsidered.

**Partial Claim, program not utilized to ensure/assist in debt to income compliance.**

Furthermore, if an accurate review, using the correct underwriting did determine Silber was still over 55% Debt to income, which Silber Disputes. There is another program never utilized that was mandatory in the review process, and that is a partial claim. Partial Claim is 0% lien that would be assigned to FHA.(Exhibit 44, page 16, F) It is better known as a balloon payment that is sitting on the mortgage that is not due until fulfillment/maturity of the mortgage, sale of property or refinance (Exhibit 44, FHA mortgage letter, page 8, partial claim guidelines). The partial claim is an amount of up to 30% of the unpaid principle balance as of the date of default combined with a loan modification (Exhibit 44, page 1) As well as to utilize a principle reduction if need be. (Exhibit 44, page 2)



GMAC employee, Kay Frey, informed Silber he was not eligible for a partial claim due to him only being on unemployment. ( Trust Exhibit C, Servicing Notes, page 261. approx middle of page) That same employee in the same conversation states. "Unemployment income cannot be used for trad. work out option, only HMP review can use unemployment..." This statement is incorrect as well, it is proven Unemployment is not limited to HMP or non-FHA-HAMP.

Furthermore there is no such limitation in the mortgage letter, (Exhibit 44) That suggest partial claim cannot be used if mortgagor only has unemployment income, in fact the opposite. Exhibit 44 (page 1), is a FHA mortgage cover letter, it is announcing the FHA HAMP programs, as well as how to utilize partial claims on their own or in addition to modifications work out plans if a partial claim does not satisfy the default circumstances.

Silber asserts without this option being utilized, it ultimately guaranteed failure to Silber's attempt at modifications. In addition, had a correct and proper underwriting methodology used to determine debt to income still been over 55%, regardless of whether it is the current mortgage payment or new modified mortgage payment. A 30% reduction refinance, would definitely have brought Silber to at least 55%, and probably much lower, making eligibility for an FHA-HAMP easily obtainable. Silber points out there was no foreclosure action at the time of his first 2 modification applications, so a partial claim utilized would not have to pay any attorney Fee's or foreclosure fee's. Silber was only past due 1 payment at the time of the first modification attempt, and 2-3 payments during the time of the 2nd modification attempt. Silber also points out any late fees would be waived also. ( Exhibit 44, page 8.)

GMAC was required and mandated to review loans for FHA HAMP, they were required to utilize every option prior to foreclosure. (Exhibit 43 Hud handbook, page 19, 7-12.)

> *Review before foreclosure decision (24, CRF 203.606). Mortgagees must assure that servicing files fully document that all servicing requirements have been followed and steps have been taken to save a mortgage prior to making a decision to foreclose.*

2 paragraphs down it goes on to say.

*Note: If at "any time" (before or after foreclosure committee review) that there is a possibility that loan can be salvaged and an assignment or foreclosure avoided, then HUD **expects** mortgagees to continue to service the loan and to work with the mortgager.*

This institutes with doing it fairly and correctly. Instead GMAC made a negligent misrepresentation of the facts, and flat out misinformed Silber he was not eligible for a partial claim. The court has determined that it is mandatory for FHA borrowers to be evaluated for loss mitigation. But FHA has a strict order mandating the evaluation process, known as the 'waterfall'. (Exhibit 44, page 3. )

*Priority order; FHA special forbearance, loan modification, partial claim, then FHA-HAMP.*

There is no proof or tangible evidence, that this was ever done, there is no proof of any Partial claims underwriting done in conjunction to qualify for an FHA-HAMP in regards to Silber's first 3 modification attempts. While the court determined that sometimes GMAC did review for FHA-HAMP and at other



times they did not. It was mandated that a proper review process must be done for each application, which they did not do each time. Furthermore GMAC still did not do it in the priority order as referenced above, FHA HAMP only after the "waterfall", to take advantage of every step of the "waterfall" break down, in the end to determine what would be utilized, what option/s should be used, and does the option used required further assistance to obtain a work out plan. IE, how could they do a proper/fair FHA-HAMP review, if they did not utilize every option, such as a partial claim, to help Silber meet end result requirements?

**Silber points out, GMAC did attempt to utilize the partial claim in regards to a non-fha-Hamp approval. But it was not done until 1/19/2011, long after the first 3 applications, when Silber was 13 months past due + interest, and there was a foreclosure action and fees associated with such. Also after Silber was not eligible for FHA-HAMP any longer. (Trust Exhibit C, page 192) What this does show, is confirmation that a partial claim could be utilized in order to meet guidelines for a modification.

**Variance.**

Silber in no way admits he would not of qualified or met any requirement, but only points out that if he did not or would not have, there was other programs such as a variance. His Honor, states that Silber's argument on a variance is essentially an admission that he would not have qualified for an FHA-HAMP modification. Silber understands his Honors statement, but Silber never meant it as such.

Ultimately, any final decision is up to FHA/HUD. FHA has guidelines GMAC can utilize to determine if a person qualifies for an FHA-HAMP. This requires proper underwriting and review process, as well as keeping FHA/HUD informed with data, information, and applications provided by Silber.

If a guideline is initially not met, IE 55% back end debt to income or only X months of unemployment. There is a variance process that must be filed in order to allow FHA to make the final determination. His Honor has ruled, Silber did not prove he was entitled to any Variance, and for the following Silber wishes to reargue and ask his Honor to reconsider

Exhibits 13 and 33 page 2, are from the FHA website itself. Both touch base on FAQ's involving Variances. Both state,

> A lender is **required** to submit form Hud-90041, request for Variance procedure, on any loss mitigation option where all Hud requirements have not been met. These Variances are to be submitted via the Extension and variance automated request system (EVARS).

This is not an option GMAC may or may not chose to utilize, it says they are required to. Furthermore a variance is another tool that can be utilized if needed, and Hud mandates, as pointed out above, GMAC must utilize every option in hopes in attempts to avoid foreclosure. Furthermore Variances date back to at least 2003, as form Hud-90041 shows. (Exhibit 22, bottom right hand corner)

Exhibits 13 and 33, go on to declare.



*All variances are considered on a case-by-case basis. When preparing a variance for a special forbearance, loan modification, or deed-in lieu of foreclosure, Mortgagee is to select "other button"*

*When preparing a variance for a pre-foreclosure sale program (pfs) and a **FHA-HAMP option**, the lender is to utilize the drop down menu and select the appropriate choice.*

With all due respect, the Variance was mandatory despite Cunningham's testimony that variances request were not mandatory and were typically used for other purposes and not HAMP modifications. Silber's argument of a Variance is for FHA-Hamp modifications. Cunningham's declaration stating they are not mandatory for "HAMP" could be accurate however. Cunningham went on to say if a variance were sought "it would have only been with a narrow margin of debt to income." This confirms it is not limited to "typically used for other purposes and not modifications".

However this again, is a generalizing statement that is throwing Silber in with the masses. Silber's Exhibits 13 and 33, does show they were mandatory for FHA loans. They further state, each variance is considered on a case by case scenario. Regardless of what Cunningham has seen or GMAC employees have seen in the past. With all due respect, it was not his decision, nor any GMAC employees decisions to generalize Silber or determine what the outcome of any FHA variance, in regards to Silber's modifications would have been. It was FHA's decision. It was a requirement, and it was used in regards to loan modifications as well as FHA-HAMP modifications as (Exhibits 13 and 33 page 2 declare. )

In fact, regardless of how high the debt to income would have been on a loss mitigation application and even if there was only 1 day left on unemployment benefits. As absurd as it may seem, GMAC would still have had to file a variance in order to comply with FHA/Hud requirements, "Must file a variance when a HUD guideline is not meant", and "Handled on a case by case scenario". It shows FHA wanted to have the final say to any end result, were prepared to make any exception they saw fit, and make sure every option was being utilized to avoid a foreclosure. GMAC made the decision themselves to never file a variance, which ensured Silber's failure at receiving FHA/HUD benefits and/or a modification.

Silber has shown.

A) requirements skipped or ignored

B) an error in the debt to income under writing.

C) Silber did show 12 months of continued benefits from the provider.

D) While GMAC required a unemployment award letter, FHA accepted other documentation.

E) Silber provided letters, showing other extensions available if needed, with information that could of been verified, and ultimately determined to be "reasonable assurance" of further unemployment benefits"

F) GMAC did not utilize the proper options during the review/under writing process.



G) Silber has shown a variance was mandatory and a requirement as per Evidence from FHA itself, as well as a the Hud Handbook stating all program/options must be used prior to foreclosure, and GMAC never filed one.

These factors guaranteed Silber's failure during the review process, and also show Silber did meet the debt to income requirements, or at least was not at 73% or 65%, not even close, when housing, food, or utilities were to be excluded and a partial claim utilized. It also shows unemployment requirements for FHA-HAMP may have been met, and if those requirements were not met, in the end it was FHA/HUDs decision to grant any variance, by any amount or flexibility to any guidelines not met, since each Variance was handled on a case by case scenario and not based off of a mold or predetermined threshold, had a variance been required of course. With all due respect, no one can say what FHA would have determined in the end, in regards to Silber's applications, accept FHA themselves, and that opportunity was never given or granted, and that was an opportunity Silber was entitled to if it was needed. Silber ask His Honor to reconsider his opinion in regards to the Variance from FHA.

***Silber adds, the Back end debt to income requirement was extremely flexible, and as time went by FHA made the 55% guideline even higher and looser to assist servicers and lenders with faster approvals. Ultimately FHA removed that requirement all together in 2012. While Silber understands it was after his applications, it does show that the back end debt to income was not a deciding major factor for approvals. FHA/HUD did not want to foreclose and speaks over and over again about avoiding foreclosure at all cost and exercising flexibility and understanding to the individual.

Exhibit 43, Hud handbook, page 1, 7-1.

> *mortgagee staff should also review each loan in default to determine which available foreclosure avoidance strategy is appropriate.*

*Page 4, 7-6 staffing. A successful collection department is one that incorporates both understanding and flexibility into its operations.*

> *A. Qualifications. Collection personnel shall be qualified to evaluate delinquent accounts in relation to the circumstances of the mortgagor so that they can make sound decisions regarding the possibility of avoiding foreclosure.*

> *Page 8, F, 2nd paragraph. Mortgage provisions are to be applied with flexibility(not arbitrarily) based on the merits of the individual circumstances is they are to serve as an effective tool to decrease the probability of foreclosure.*

> *Page 17, 7-11, Foreclosure avoidance.*

> *page 18, Section A. Loss mitigation. Finding alternatives to foreclosure is a positive action which benefits both lenders and mortgagors, HUD expects lenders to utilize loss mitigation measures whenever appropriate.*



*page 19, 7-12 Review before foreclosure decision. Mortgagees must assure that servicing files fully document that all servicing requirements have been followed and steps have been taken to save a mortgage prior to making a decision to foreclose.*

Even mortgages/mortgagors that were already in foreclosure, where to be allowed time to apply for FHA-HAMP. (Exhibit 44, FHA mortgage letter, page 8)

*To ensure that a mortgagor currently in the process of a foreclosure has the opportunity to apply, Mortgagees shall not proceed with the foreclosure sale until the mortgagor has been evaluated for the program.*

**Conclusion:** Silber understands that an FHA-HAMP modification may require more attention, time, energy and possibly cost from the Servicer/mortgagee in order to conduct a complete, fair and accurate review for loss mitigation. But Silber had an FHA loan, and paid FHA/HUD insurance, and was entitled to every step and action mandated by FHA/HUD. Silber also adds GMAC was aware of the added energy, time, and cost when it took on the roll of servicer to Silber's FHA loan. (Exhibit 43, FHA/HUD handbook, page 3, 7-4 Mortgage collection attitude.)

*Mortgagee personnel must be aware of the psychological difference and varying life styles among mortgagors. Servicing practices that are effective with one mortgagor may not be effective with another. When a Mortgagee made the decision to make the mortgage loan, provided it was insurable by HUD or when acquiring the servicing of a mortgage from another mortgagee, at that time it committed itself to assume the added costs and effort required to service those mortgages in accordance with HUD guidelines should they become delinquent.*

To many steps where missed and/or ignored, and there was great flexibility and options that were required to be utilized, that would of lead to a loan modification. Instead GMAC impeded Silber, and Silber never got a fair and accurate review of his modification applications. Just excuses, lies, and hurdles.

The final decision on any guideline that might not of been determined to have been met, was up to FHA/HUD, and only they could have made it.

By GMAC breaching Silber's note and mortgage, by not following requirements, GMAC guaranteed Silber failure in attempts to modify his Home mortgage and save his home.

GMAC ignored nearly every part of the FHA mortgage letter (Exhibit 44). They continuously used HAMP guidelines in their evaluations, and even in their entire defenses and objection to Silber's claim (Doc 7979) and reply to support objection (Doc 8160) they continuously refer to HAMP guidelines not being met and mention nothing about FHA-HAMP.



His Honor has determined that GMAC did breech Silber's contract by not reviewing for FHA-HAMP each time, but ultimately Silber would have failed any FHA-HAMP review based off Debt to income requirements or Unemployment requirements. However for that re-argued above in this document thus far, Silber request the courts to reconsider their opinion and order sustaining the Trust objection to Silber's claim of Breach of contract and Violation of CUTPA to the extent of the Breech.

**CHFA, EHLP program/ Reinstatement.**

In regards to the EHLP program. Silber has read and understands his Honors decision and clarification in regards to the figures provided to Silber being a pay off, while the figures provided to CHFA were a 30 day reinstatement. However Silber points out that the reinstatement figures were $43,736.80. The figures included inspection fees of $112.50, advances of $1577.30, outstanding foreclosure advances of $1991.00. Cunningham gave testimony that the advances of $1577.30 and foreclosure advances of $1991.00 were Attorney fees. Those fees Including the $112.50 for inspection fees, for a total of $3680.80 of fee's. Silber reargues that the fees were never validated. No bills, or proof of Attorney fee's was ever provided, further more why would foreclosure advances be included if the loan was going to be reinstated? Never the less, The figure given to CHFA was to be total pass due, less fee's. (Exhibit 17, page 2, previously underlined.) Silber is embarrassed and ashamed he forgot to point this out during the hearing, especially since he originally underlined it. But would like to reargue it now since it was in the exhibits, if he is allowed. While the program from CHFA does mention fee's can be collected or added in. It is unknown if any other information was provided to CHFA, or CHFA determined/was aware, or speculated there were additional fee's since the mortgage was in a foreclosure, it is also unknown why CHFA required a pass due amount less fee's. Fact is, CHFA thought/was informed Silber's past due amount before any fee's was $43,736.80, when this was not accurate. This lead to Silber being ultimately denied. And while it goes on to say in the denial, "current aggregate household income is insufficient to cover the housing expenses after reinstatement". That is because the 6 months of assisted payment could not be utilized while Silber was made current and complete the EHLP program making him eligible for another program.

Explanation/Clarification; The EHLP program was the first program to make a borrower current, one of the requirements, was "Eligible homeowners must have a reasonable likelihood of being able to resume repayment of the first mortgage obligation and meet other housing expenses and debt to obligations within **2 years**. ( Exhibit 20, page 1, Ability to resume repayment). Exhibit 17 page 1, shows an initial approval, based off the figures provided by GMAC. It also shows they would assist with payments for 5 months, this met all the requirements to stay under the $50,000 loan amount. The reasonable likelihood to resume payments, was once Silber was current on the mortgage, There was another program called CT. Families First (EXHIBIT 36). It was a conventional refinance that even FHA home owners could utilize. It was taking homeowners who were struggling with these big lenders/banks on receiving help, and allowing them to refinance with local banks based off the program guidelines. The guidelines were set for people like Silber. It utilized no minimal fico score, a very low interest rate, and one of the banks participating was Webster bank. This has been Silber's bank for over 12 years, as well as Silber had a closed mortgage, paid in full with Webster bank in the past. However, the requirement was you needed



to be current on your mortgage. EHLP program would have brought Silber current, and assisted in current monthly payments while the approval for CT families was done and completed.

In either case, the figures provided were not the past due amount less fee's on the line that states they are, and this influenced the outcome and final underwriting by CHFA. Silber ask his Honor to reconsider these factors.

**EHLP negligent misrepresentation.**

His Honor has ruled in his opinion and order sustaining the trust objection in regards to the EHLP program. "GMACM'S calculation of the reinstatement quote was clearly accurate". While the quote including fee's may be accurate, for the reasons stated earlier that the figures were not represented accurately, Silber ask his Honor to reconsider this declaration. Furthermore Silber has specified/specifies, that the EHLP program would have saved his Home from foreclosure, paid off a past due amount, made him current, and allowed participation in further programs to take Silber away from GMAC, and refinance his home with a state approved Bank, lowering his payment and interest rate. IE, a new modified payment/refinance.

**Breech and implied in regards to Silber's Jan 2011 modification application.**

Silber takes some accountability for the information provided not being enough. Silber was foolish enough to put his faith in GMAC's attorney, Hunt and Liebert to assist him to make sure the application was complete. Silber informed GMAC attorneys he did not want to fill out another application and the applications filled out already should be used since GMAC missed steps. But ultimately filled out the application only if he could send it to GMAC's attorneys to review for completion and Silber's past applications would be taken into consideration since they were reviewed in error. Silber just needed to provide more tangible evidence of the extensions available. Silber provided extensions from the providers website, and sent the application package to Hunt and Liebert. Hunt and Liebert never informed Silber he was missing any documentation, and faxed it over to GMAC. (Trust Exhibit N) Shows application sent to Hunt and Liebert, and Hunt and Liebert sending it over to GMAC. As well as page 19 showing the extensions from the providers website. Silber again was misinformed, uninformed, and mislead this time from GMACS Attorneys. Who's position was GMAC was not obligated to help in anyway once Silber defaulted (Exhibit 14).

**Breech of Covenant to bargain in Good faith and Fair dealings/ Implied good faith.**

For the same re-arguments listed above under the Breach of Contract, Silber ask his Honor to reconsider his order sustaining the Trust objection to Implied good faith. His Honor points out a basis of his decision was due to GMAC reviewing Silber for FHA HAMP and non FHA HAMP. The Calculations for front end Debt to income and back end Debt to income ratios were substantially above the acceptable thresholds. Silber has shown earlier in this document that this was not the case, had a proper review, with proper under writing, utilizing proper programs, which was a requirement, had been conducted.

(13)

Furthermore, Silber feels the significance of all the tactics used by GMAC to dismay and frustrate Silber, in an attempt to get him to forfeit his home may be being over looked. And the questionable conversations in the servicing notes presented as exhibits at the evidentiary hearing shows errors, alternative motives, and a flat out deceptive moves that guaranteed Silber's failure and prevented any hope at all.

Please reconsider based on the following as well. An important factor is the lack of any FHA monitoring, because GMAC knew they were not doing enough, and FHA would step in. While GMAC has no record, and never kept FHA/HUD informed on Silber's loss mitigation applications. There is 1 record of HUD issuing some sort of Directive to GMAC. The time the Directive was issued, and the facts of what the Directive was, has been redacted, but servicing notes show employees (One being Carmen Starr) referring to some sort of HUD directive issued on "6/01". (trust Exhibit C, page 226, top of page) It also references to a died in lieu request to HUD that was not approved.

In the same month, June of 2010, GMAC and Silber began a temp forbearance plan, GMAC claims it was a plan to help Silber acquire time to find work. All documents supplied from the Trust thus far reference a 6 month plan for $995.40 monthly installments. Cunningham testifies to the same. The 6 payments were made and the plan was completed. However Kathy prior declarations (Doc 7979-3, page 7, line 20) , the claims Trust objection to claims (Doc 7979, page 11, line 27), and Cunningham's declaration's (Doc 8842, page 9, line 24) all stated the first payment of that plan was mistakenly refused. Silber has proven in his reply to the objection that it was in fact that it was the second payment of that plan refused (July 2010). This was confirmed by the Trust reply. (Doc 8160, page 9, notes at bottom '3'). The Courts have ruled earlier that the error in the refused payment was promptly fixed, and therefore not damaging. However Silber ask his Honor to reconsider, not that is was promptly fixed, but why GMAC has repeatedly attempted to draw attention away from July 2010 being the final payment, and instead attempted to say is was June 2010 payment.

Facts, The forbearance plan (though unclear if it was FHA to comply with Hud Directive or regular Hamp) was also an additional plan, a temp repay plan (Trust Exhibit C, page 208 bottom of page, "Forbearance, and repayment plan"). There was 2 plans/agreements determining, yet 1 payment determining Silber's fate. The payments for that plan was also not half the current mortgage payments as the Trust and Witnesses has continuously pointed out, as a regular forbearance would suggest. The payments were in fact $955.40 (Trust Exhibit C, pages 6 and 7).

** A FHA temp forbearance requires a trial period and trial payment to be close to what the modification payment would be. (Exhibit 44, FHA mortgage letter, page 6, Trial modification. And page 20, U, Trial modification)

Furthermore, Silber addressed the declaration from Kathy Priore (7979-3 page 4, #9), the Trust objection to the claims (Doc 7979, page 7, number 16), and Cunningham's declaration (Doc 8842-1, page 5, #11), while cross examining Cunningham Silber asked, why the declarations stated over and over, "At the time servicing was transferred to Ocwen, the claimant had not made a mortgage payment since July 30th, 2010 and the loan was past due for the Dec 1, 2009 payment".

Cunningham declared it was an error. But the significance of that date has not been realized Your Honor. Silber ask the Court to reconsider why GMAC, its Agents, or Witnesses continuously said July 30th 2010 was the final payment date, and attempted to claim it was a mistake. When it has been confirmed Silber's final payment to GMAC, was actually November 2010, the final payment of the plans.

Silber paid 6 payments of $955.40 June 10-Nov 10, these payments would be used to make the Nov 09 payment, as well as the Dec 09 payment, leaving a $1750.80 as a credit. The figures and explanation of past due installments given to CHFA, for the EHLP program confirm this. (6 x $955.40, less 2 mortgage payments applied for x 1990.80 = $1750.80 unapplied credit)

And while the servicing notes provided and exhibits shows this. There is some record, or notes GMAC has, that is showing July 30th 2010 being the final payment day, and Dec 09 payment being due still. Priore declaration is dated 1/12/2015, The Trust objection is dated 1/12/2015, and Cunningham's declaration is dated 7/6/2015. Years later, there are records of July 2010 being the last payment of any amount from Silber to GMAC. Those records show, Silber did not complete the trial forbearance/repay plans.

This is why GMAC/Trust attempted to draw attention away from the second payment of the forbearance plan being the one cancelled (July 2010 payment) in all of its previously filed documents, GMAC and its witness's and agents repeatedly said it was the June 2010, first payment. They have a record of Silber failing to complete the Temp repay plan/ forbearance plan, and Silber terminating that agreement in July of 2010. We do not know any other actions taken with that record, or if that record was given to any other source, such as HUD/FHA.

GMAC was issued a directive from HUD on 6/1/2010, though the reason that prompted the involvement is unclear, servicing notes suggest GMAC attempted to file for a Deed in Lieu, and Hud said and/or placed a hold on the request while issuing some sort of 'directive'.

GMAC/ Silber entered an agreement based on a combination/evaluation of 2 plans, for 6 monthly payments of $955.40. While GMAC and its witness's has continued to claim it was a Special plan for half the monthly mortgage payments of $990.40.

GMAC refused the second payment for July 2010, and reported the plan terminated

GMAC repeatedly attempted to claim it was the June 2010 payment, "mistakenly" refused.

GMAC servicing notes provided as Exhibits, show they fixed the problem and reinitiated the plan

GMAC has Records that are not provided, outside the servicing notes, that shows that the temp plans were terminated in July of 2010 and not reinstated, backed by Declarations and Objections filed years later in this case/claim.

(15)

**Furthermore GMAC made a report and is on record, that Silber had changed his address in July of 2010** (Trust exhibit C, servicing notes, page 243, 12th line, "Change in primary borrowers Address". The personal who entered that information has been redacted/altered...

There is no information of any follow up after July 2010, the same month the Temp. plans payment was refused, and a report was made of Silber moving out of his house, that shows any HUD/FHA involvement, monitoring, or further information on the "directive".

Your Honor please reconsider that there are 3 elements that would cease any involvement from FHA/HUD. 3 factors that auto disqualify a borrower s eligibility of an FHA-HAMP modification.

1) Being 12 months past due, which Silber was not at the time.

2) If the primary borrower does not occupy the address, (Exhibit 44, FHA mortgage letter, page 5, Eligibility-mortgagors and page 18, N, property Eligibility)

3) If a borrower fails any trial payment plan. (Exhibit 44, FHA mortgage letter, page 12, D; Requirements to use FHA-HAMP) please also See page 20 of the same Exhibit, Trial modification, 3, continued onto page 21)

There are flat out lies, that were used to deflect HUDs directive, as well as quell any further involvement from HUD or FHA, that cost Silber severely, these are sinister moves to the fullest extent of deceptive acts and practices.

For the above mentioned, Silber ask the court to Reconsider their Opinion and order sustaining the Trust objection to Silber Implied good faith claim, as well as any CUTPA violations related to.

**In regards to Negligent misrepresentation.**

**False representation of facts to the Connecticut Attorney General's office.**

Silber did declare that he was aware unemployment could be used prior and after he sought help from the CT. Ag's office. But Silber could only reached out to agents that could enforce or take action for GMAC not conducting themselves correctly. Even the AG office of the United States stepped in, issued sanctions, and has been involved in GMACs bankruptcy.

Silber humbly request clarification why this claim of Negligent Misrepresentation ultimately fails. At the hearing in Feb 2015 and in his Honors Memorandum and opinion Sustaining in part and over ruling in part the Trust Objection (Doc 8265). His Honor stated the false representation potentially fell in 3 categories: 1) Fraud, 2) Defamation, 3) negligent misrepresentation. His Honor determined the claim to fall under the Negligent Misrepresentation category.

There was a representation that was determined to be false.


16

The statement was made to an agent acting on behalf of Silber, and Silber retained the Connecticut AG office because GMAC was violating his contract and not conducting fair, contractually obligated, reviews of Silber's loss mitigation applications.

The AG office is an entity that can step in and issue sanctions or force correction of actions from GMAC.

GMAC lied to the AG office which quelled the AG office investigation.

Silber suffered for it.

Silber humbly request clarification, of why his Claim of False Representation of Fact, that was detrimental ultimately fails and does not fall into one of the 3 sub categories.

Silber thanks the Courts for their time and consideration.

**NOTICE,** I certify this document has been sent to the following parties via USPS.

Morrison & Foerster LLP, 250 West 55th Street | New York, NY 10019-9601

I swear this document to have been prepared in good faith, and all accounts to be accurate and true to the best of my knowledge.

Dated: August 13th, 2015.

_____ date 8/13/2015

Todd Silber, 73 Farnham Rd. South Windsor Ct. 06074