# Exhibit 3



**CORPORATION SERVICE COMPANY®**

NTP / ALL
Transmittal Number: 11959088
Date Processed: 12/17/2013

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Walter Wronka<br>PHH Mortgage Corporation<br>1 Mortgage Way<br>Floor 3 Mail Stop LGL<br>Mt. Laurel, NJ 08054 |
| **Copy of transmittal only provided to:** | Janet Goldstein |

| | |
|---|---|
| **Entity:** | PHH Mortgage Corporation<br>Entity ID Number  2131683 |
| **Entity Served:** | PHH Mortgage Corp. |
| **Title of Action:** | Residential Funding Company, LLC vs. PHH Mortgage Corp. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | U.S. District  Court, Minnesota |
| **Case/Reference No:** | 0:13-cv-03503-PAM-SER |
| **Jurisdiction Served:** | Minnesota |
| **Date Served on CSC:** | 12/16/2013 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Lee A. Lastovich<br>612-339-6321 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road  Wilmington, DE 19808  (888) 690-2882  |  sop@cscinfo.com

# Felhaber :: Larson

Donald G. Heeman
612-373-8524
Fax: 612-338-0535
E-mail: dheeman@felhaber.com
Reply to Minneapolis Office

December 14, 2013

**PERSONAL SERVICE**

PHH Mortgage Corp.
c/o Corporatioin Service Company
380 Jackson Street
Suite 700
St. Paul, MN 55101

RE:    **Residential Funding Company, LLC v. PHH Mortgage Corp.**
       **Our File No. 14757.1500**

Dear Sir or Madam:

　　　Enclosed and personally served upon you as registered agent, officer of the company or other agent authorized to receive service for PHH Mortgage Corp., please find the following:

1.     Summons;
2.     Complaint; and
3.     Civil Cover Sheet.

Sincerely,

Donald G. Heeman

DGH/gej
Enclosures

**Minneapolis**                              **St. Paul**
220 South Sixth Street, Suite 2200    ::    **felhaber.com**    ::    444 Cedar Street, Suite 2100
Minneapolis, MN 55402-4504                    St. Paul, MN 55101-2136
612 339 6321  ||  fax 612 338 0535            651 222 6321  ||  fax 651 222 8905

565124.1

AO 440 (Rev. 02/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Minnesota

Residential Funding Company, LLC,

          *Plaintiff,*

v.

                                            Case No. 0:13−cv−03503−PAM−SER

PHH Mortgage Corp.,

          *Defendant.*

## SUMMONS IN A CIVIL ACTION

To:  PHH Mortgage Corp.

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) - or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) - you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

          Lee A Lastovich
          220 S 6th St Ste 2200
          Mpls, MN
          55402−4504

If you fail to respond, judgment by default may be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*RICHARD D. SLETTEN, CLERK OF COURT*      By:

Signature of Clerk or Deputy Clerk

Katie Thompson

Date of Issuance:  December 16, 2013

AO 440 (Rev. 02/09) Summons in a Civil Action

## Summons and Complaint Return of Service

Case No. 0:13−cv−03503−PAM−SER

A copy of the Summons and Complaint has been served in the manner indicated below:

Name of Defendant Served:          PHH Mortgage Corp.

Date of Service: _____

## Method of Service

_____ Personally served at this address:

_____ Left copies at defendant's usual place of abode with (name of person):

_____ Other (specify):

_____ Returned unexecuted (reason):

**Service Fees:**    Travel $_____    Service $_____    Total $_____

## Declaration of Server

I declare under the penalty of perjury that the information contained in this Return of Service is true and correct.

Name of Server: _____

Signature of Server: _____

Date: _____

Server's Address: _____

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| RESIDENTIAL FUNDING COMPANY, LLC, | CASE NO. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| PHH MORTGAGE CORP., | |
| Defendant. | |

Plaintiff Residential Funding Company, LLC ("RFC" or "Plaintiff"), by and through its attorneys, alleges for its Complaint against defendant PHH Mortgage Corp. ("Defendant") as follows:

## NATURE OF ACTION

1.      Defendant sold mortgage loans to RFC pursuant to the Seller Contracts attached as Exhibit A (the "Contract").

2.      The Contract incorporates into its terms and conditions the RFC Client Guide, exemplary excerpts of which are attached as Exhibit B (the "Client Guide"). (The various applicable versions of the Client Guide are known to the parties and too voluminous to attach in their entirety.) The Contract and Client Guide collectively form the parties' Agreement.

3.      Pursuant to the Agreement, Defendant made a number of representations and warranties to RFC regarding, among other things, the quality of the mortgage loans it sold RFC; the manner in which the mortgage loans were originated and underwritten; and the compliance of the mortgage loans with applicable state and federal law.

4.     Defendant breached these representations and warranties by delivering loans that were not originated or underwritten in accordance with the requirements of the Agreement; did not meet the representations and warranties made as to those loans; and/or failed to comply with applicable state and federal law.

5.     Had RFC been aware of the defects in Defendant's loans, it would never have acquired them.

6.     As a direct result of these contractual breaches, RFC has suffered damages and losses for which it is entitled to damages pursuant to the Agreement.

7.     Pursuant to the Agreement, RFC is entitled to seek repurchase of the defective loans from Defendant or, where repurchase is not possible, contractual damages sufficient to make RFC whole and/or compensate it for its acquisition of the defective loans.

8.     As a further result of Defendant's breaches of representations and warranties, RFC has been forced to incur (and continues to incur) substantial losses in the form of damages paid to third parties, settlement payments, repurchases, lost value and lost profits stemming from non-performing or defective loans, increased servicing expenses (including foreclosure costs associated with non-performing and/or non-compliant loans), attorneys' fees, court costs, and other losses.

9.     Indeed, as discussed in further detail below, in May 2012, RFC was forced to file for bankruptcy protection pursuant to Chapter 11 of the United States Bankruptcy Code, in part because of the dozens of lawsuits and allegations relating to defective loans, including those sold to it by Defendant.

10.     Defendant agreed and is obligated to indemnify RFC, and to reimburse RFC for and against any and all losses, damages, penalties, fines, forfeitures, court costs and reasonable

2

attorneys' fees, judgments, and any other costs, fees and expenses resulting from Defendant's breaches and defaults.

11.    RFC therefore brings this action for breach of contract, and for indemnification for losses RFC has suffered due to Defendant's conduct.

## PARTIES

12.    Plaintiff Residential Funding Company, LLC, f/k/a Residential Funding Corporation, is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota. RFC is a wholly owned subsidiary of GMAC Residential Holding Company, LLC, a Delaware limited liability company. GMAC Residential Holding Company, LLC is a wholly owned subsidiary of Residential Capital, LLC, a Delaware limited liability company. Residential Capital, LLC is a wholly owned subsidiary of GMAC Mortgage Group LLC, a Delaware limited liability company. GMAC Mortgage Group LLC is a wholly owned subsidiary of Ally Financial, Inc., a Delaware corporation with its principal place of business in Michigan.

13.    Defendant PHH Mortgage Corp. f/k/a Cendant Mortgage Corp. is a New Jersey corporation with its principal place of business at 1 Mortgage Way, Mount Laurel, NJ 08054.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events and omissions giving rise to this Complaint occurred in Minnesota, and because the parties have contractually agreed that Minnesota is an appropriate venue.

## FACTUAL BACKGROUND

### The Agreement Between RFC and Defendant

16.     RFC was an aggregator of residential mortgage loans and an issuer of mortgage-backed securities.

17.     As such, RFC acquired mortgage loans from "correspondent lenders," including Defendant.  As a correspondent lender, Defendant had the initial responsibility for collecting information from the borrower, verifying its accuracy, and underwriting the loan.  Defendant had primary responsibility for all aspects of the underwriting of the loan, and it was understood between the parties that RFC would generally *not* be re-underwriting the loan.  It was the Defendant that actually closed the loans with the borrowers.

18.     Defendant contracted with RFC to sell already-closed loans to RFC pursuant to the requirements set forth in the Agreement.

19.     As Defendant was well aware, once the loans were sold to RFC, RFC pooled groups of loans with similar characteristics, and the pool of loans would be sold into a special-purpose securitization Trust.  The pool of loans formed the collateral underlying the Trust's mortgage-backed securities, which were in turn sold to investors.

20.     RFC also sold pools of loans to whole loan investors.

21.     Defendant knew of RFC's intention to securitize and/or sell the loans. Specifically, Defendant acknowledged, in the Client Guide, that it "recognize[d] that it is [RFC's] intent to securitize some or all of the Loans sold to [RFC]," and agreed to provide RFC with "all such information ... as may be reasonably requested by [RFC] for inclusion in a prospectus or private placement memorandum published in connection with such securitization," including all information necessary to comply with the disclosures required by Regulation AB

4

(governing asset-backed securities) and other applicable federal securities laws. (See Client Guide at A202(II); 206(D).)

22.    Over the course of the parties' relationship, RFC acquired more than $37 million worth of residential mortgage loans from Defendant pursuant to the Agreement.

23.    Pursuant to the Agreement, Defendant made a number of representations and warranties with respect to the loans, including, but not limited to, the following:

    a.  Defendant's "origination and servicing of the Loans have been legal, proper, prudent and customary and have conformed to the highest standards of the residential mortgage origination and servicing business." (Client Guide A201(K).)

    b.  Defendant "will comply with all provisions of this Client Guide and the Program Documents, and will promptly notify GMAC-RFC of any occurrence, act, or omission regarding [Defendant], the Loan, the Mortgaged Property or the Mortgagor of which [Defendant] has knowledge, which ... may materially affect [Defendant], the Loan, the Mortgaged Property or the Mortgagor." (Client Guide A201(M).)

    c.  "All information relating to each Loan delivered and sold to GMAC-RFC is true, complete and accurate and there are no omissions of material facts. All data provided by the Client to GMAC-RFC relating to any Loan, whether in electronic format, or otherwise, is true and complete and accurately reflects the information in the related Loan file." (Client Guide A202(A).)

    d.  "All Loan Documents, Funding Documents and Final Documents are genuine, have been completed, duly and properly executed, are in recordable form and delivered in the form and manner specified in this Client Guide," and "[a]ll originals and copies of such documents and all other documents, materials, and other information required to be submitted to GMAC-RFC have been so submitted, and are complete and accurate." (Client Guide A202(D).)

    e.  "All Loan Documents, Funding Documents and Final Documents and all other documents describing or otherwise relating thereto are in compliance with all local and State laws, regulations and orders." (Client Guide A202(D).)

    f.  "There is no default, breach, violation or event of acceleration existing under any Note or Security Instrument transferred to GMAC-RFC, and no event exists which, with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and no such default, breach, violation or event of acceleration has been waived by

[Defendant] or any other entity involved in originating or servicing the Loan."
(Client Guide A202(G).)

g.  "[E]ach Loan has been originated, closed, and transferred in compliance with
all applicable local, State and federal laws and regulations, including, but not
limited to, the Real Estate Settlement Procedures Act, the Fair Credit
Reporting Act, the Equal Credit Opportunity Act, the Truth-in-Lending Act,
the Fair Housing Act, and the National Flood Insurance Act. This warranty is
made by [Defendant] with respect to each GMAC-RFC Loan Application
taken and processed for each Loan and with respect to each Loan made by the
[Defendant] or any other entity." (Client Guide A202(I).)

h.  "No Loan is a ... loan considered a 'high-cost,' covered, 'high-risk,'
'predatory' or any other similar designation under any State or local law in
effect at the time of the closing of the loan if the law imposes greater
restrictions or additional legal liability for residential mortgage loans with
high interest rates, points and/or fees." (Client Guide A202(J)(1)(d).)

i.  "[N]o circumstances exist involving the Loan Documents, the Mortgaged
Premises or the Borrower's credit standing that could: (i) cause private
institutional investors to regard the Loan as an unacceptable investment, (ii)
cause the Loan to become delinquent, or (iii) adversely affect the Value or
marketability of the Mortgaged Premises or the Loan."    (Client Guide
A202(Q).)

j.  "The Loan is of investment quality, has been prudently originated and has
been underwritten in compliance with all requirements of this Client Guide."
(Client Guide A202(T).)

k.  "For each Loan for which an appraisal is required or obtained under this
Client Guide, the appraisal was made by an appraiser who meets the minimum
qualifications for appraisers as specified in this Client Guide." (Client Guide
A202(T).)

l.  "For each Loan, as of the Funding Date, the market Value of the Mortgaged
Premises is at least equal to the appraised value stated on the Loan appraisal,
or if an Automated Valuation Model (AVM) is permitted, the Value on the
AVM, except to the extent that the market Value of the Mortgaged Premises is
lower ... due to the effect of any toxic materials or other environmental
hazards of which neither the appraiser nor the [Defendant] has actual
knowledge or reasonable grounds to suspect." (Client Guide A202(T).)

m. "No fraud or misrepresentation by the Borrower or by the [Defendant],
broker, correspondent, appraiser or any independent contractor retained by the
[Defendant], broker, correspondent, appraiser or any employee of any of the
foregoing occurred with respect to or in connection with the origination or
underwriting of any Loan and all information and documents provided to

6

GMAC-RFC in connection with the Loan are complete and accurate." (Client Guide A202(KK).)

24.     RFC relied on these representations and warranties in acquiring the loans, and their presence was a material consideration in RFC's decision to acquire the mortgage loans from Defendant.

25.     Pursuant to the Client Guide, Defendant's failure to comply with its representations and warranties or any of the other requirements, terms or conditions of the Client Guide constitutes an "Event of Default," as does its failure to provide RFC with true, accurate and complete information in a timely manner. (See Client Guide A208.)

26.     Similarly, it is an "Event of Default" if a "[b]orrower or any other person or entity involved in the loan transaction or its underwriting or documentation (including any appraiser, broker, third-party originator, credit reporting agency, or other provider of underwriting information) has made any false representation and/or has failed to provide information that is true, complete and accurate in connection with" the loan transaction, regardless of whether Defendant knew of the misrepresentation or incorrect information. (See Client Guide A208.)

27.     The Client Guide further specified the remedies available to RFC in case of an Event of Default, including a breach of any loan-level representation or warranty. The available remedies included repurchase of the defective loan, substitution of another loan for the defective one, or indemnification against losses resulting from such breaches.

28.     The repurchase provision requires Defendant to compensate RFC for defective loans according to a formula specified in the Client Guide that is based on the original principal balance of the loan. Where repurchase is not feasible, Defendant is nonetheless contractually obligated to pay all losses, costs and expenses incurred by RFC and/or the loan's servicer as a result of an Event of Default. (Client Guide A210.) Moreover, Defendant expressly agreed that

7

RFC was permitted to exercise any remedy "allowed by law or in equity" in connection with

such Events of Default. (Client Guide A209.)

29.    Defendant also expressly agreed to broad indemnification provisions, which

provide as follows:

> [Defendant] shall indemnify GMAC-RFC from all losses, damages,
> penalties, fines, forfeitures, court costs and reasonable attorneys' fees,
> judgments, and any other costs, fees and expenses ... includ[ing], without
> limitation, liabilities arising from (i) any act or failure to act, (ii) any
> breach of warranty, obligation or representation contained in the Client
> Guide, (iii) any claim, demand, defense or assertion against or involving
> GMAC-RFC based on or resulting from such breach, (iv) any breach of
> any representation, warranty or obligation made by GMAC-RFC in
> reliance upon any warranty, obligation or representation made by
> [Defendant] contained in the Client Contract and (v) any untrue statement
> of a material fact, omission to state a material fact, or false or misleading
> information provided by the [Defendant] in information required under
> Regulation AB or any successor regulation.
>
> In addition, [Defendant] shall indemnify GMAC-RFC against any and all
> losses, damages, penalties, fines, forfeitures, judgments, and any other
> costs, fees and expenses (including court costs and reasonable attorneys'
> fees) incurred by GMAC-RFC in connection with any litigation or
> governmental proceeding that alleges any violation of local, State or
> federal law by [Defendant], or any of its agents, or any originator or
> broker in connection with the origination or servicing of a Loan.

(Client Guide A212.)  The Client Guide also entitles RFC to recover all court costs,

attorneys' fees and any other costs, fees and expenses incurred by RFC in enforcing the

Agreement or Client Guide.

## The Performance of Defendant's Loans and the Consequences for RFC

30.    RFC generally was not in the business of holding loans on its books.  The loans it

acquired from Defendant and other correspondent lenders were sold, either into residential

mortgage-backed securitization ("RMBS") trusts that issued certificates to outside investors, or

in "whole loan" portfolios to other mortgage companies and banks.

8

31.     The loans Defendant sold RFC were eventually included in more than 15 RMBS Trusts. When RFC sold the loans, it passed on a more limited set of representations and warranties to the Trusts, and, as required by SEC regulations, disclosed pertinent information about the loans to investors in its RMBS. In making those representations and warranties, RFC relied on information provided to it by Defendant and other correspondent lenders. That information in many cases violated Defendant's representations and warranties to RFC.

32.     Over time, many of the loans sold to RFC by Defendant defaulted or became seriously delinquent.

33.     Internal reviews conducted by RFC after the loans were acquired from Defendant determined that many of the loans sold to RFC by Defendant violated the Client Guide and/or other representations or warranties made by Defendant, resulting in an Event of Default under the Agreement. In fact, more than 45% of the loans reviewed were deemed to have some type of defect.

34.     Upon information and belief, the types of defects varied, but included owner occupancy fraud, appraisal fraud or inaccuracies, undisclosed debt, failure to comply with applicable state and federal laws, and missing or inaccurate documents, among others.

35.     Indeed, as part of its own analysis of the claims later asserted against it, RFC retained its own expert, who concluded that approximately 43.5% of the loans he reviewed were materially defective in one or more ways, and that the likely exposure to RFC and its affiliates from defective correspondent loans exceeded $7 billion.

36.     Beginning in 2008 and continuing until RFC filed for bankruptcy protection on May 14, 2012, RFC faced a growing number of claims and lawsuits stemming from the defective loans sold to it by Defendant and others.

37.   RFC had always received a certain number of repurchase demands, primarily from whole loan investors.

38.   However, in early 2008, MBIA Insurance Corp., a bond insurer that issued insurance policies guaranteeing the performance of certain mortgage-backed securities issued by RFC, began for the first time questioning the quality of large numbers of loans in the securitizations it had insured.

39.   MBIA hired a team to begin reviewing loan files, and in May 2008, based on the *less-stringent* representations and warranties RFC had made to MBIA, demanded that RFC repurchase over 2,000 allegedly defective loans.

40.   Although RFC aggressively defended the claims made by MBIA wherever possible, RFC was forced to concede that, even on the basis of representations and warranties that were less stringent than those Defendant made to RFC, RFC was obligated to repurchase at least 24% of the loans MBIA claimed were defective.  MBIA continued its review and continued to find thousands of defective loans, ultimately resulting in protracted and costly litigation, as described below.

41.   Similar repurchase demands were made by other bond insurers, including FGIC, FSA/Assured, Ambac and Syncora.

42.   In 2012, Deutsche Bank, a Trustee of numerous RMBS issued by RFC, for the first time made a repurchase demand to RFC.  Deutsche likewise alleged that the loans were defective in numerous ways.

43.   Beginning in October 2008, RFC was sued in literally dozens of lawsuits stemming from allegedly defective mortgage loans, including those sold to it by Defendant.

44.     The first of these lawsuits was filed by bond insurer MBIA in October 2008. The MBIA lawsuit covered five RFC second-lien securitizations that included thousands of mortgage loans. For the first time, RFC learned that MBIA's analysis had concluded that over 80% of the loans in the pools it insured were defective.

45.     The MBIA lawsuit was followed shortly by a class action suit filed by the New Jersey Carpenters pension funds.

46.     The New Jersey Carpenters' lawsuit purported to cover 59 mortgage-backed securities offerings issued through RFC's RALI shelf in 2006 and 2007, which consisted of first-lien Alt-A loans.

47.     The New Jersey Carpenters complaint alleged that 38% of the mortgage loans underlying the securitizations were in delinquency, default, foreclosure or repossession by the time New Jersey Carpenters filed their class action complaint, and that much of RFC's mortgage loan data "was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective underwriting" described throughout the Complaint. (NJ Carpenters First Am. Compl. at ¶¶ 9, 110.) Of course, that data was provided to RFC—and represented and warranted to be accurate—by Defendant and other correspondent lenders.

48.     Numerous other lawsuits followed on through RFC's bankruptcy filing in 2012, including over fifteen lawsuits brought by private investors in its RMBS securities, and more than a dozen lawsuits brought by monoline insurers.

49.     All of these lawsuits alleged that the loans RFC sold into RMBS securitizations were defective in a variety of ways, including because of borrower fraud, missing or inaccurate

documentation, fraudulent or inflated appraisals, misrepresentations concerning owner-occupancy, or failure to comply with applicable state and federal law.

50.     Collectively, these lawsuits involved more than a hundred RMBS securitizations, and a combined original principal balance of more than $100 billion.

51.     Across the dozens of securitizations involved in these lawsuits, Defendant was responsible for over a hundred of the loans.

52.     In May 2012, RFC filed for Chapter 11 bankruptcy protection in the Southern District of New York.

53.     In connection with the bankruptcy proceeding, literally hundreds of proofs of claim were filed by private securities investors, monoline insurers, whole loan purchasers, indenture trustees, and an array of co-defendants in the above-described loan-related litigation. These proofs of claim sought damages in the tens of billions of dollars, all stemming from allegedly defective mortgage loans, including those sold to RFC by Defendant.

54.     In addition, over time, RFC was forced to defend against, respond to, and in many instances accept repurchase demands made by purchasers of portfolios of whole loans from RFC. These whole loan purchasers included Countrywide, Wells Fargo, Indy Mac, Goldman Sachs and others, many of which also filed proofs of claim in the bankruptcy case seeking hundreds of thousands of dollars in recovery.

55.     These claims, lawsuits, and demands alleged, among other things, that the loans were defective, improperly underwritten, and breached representations and warranties made by RFC to investors, purchasers, and other contractual parties.   Those representations and warranties were, in most cases, identical to or less stringent than those received by RFC from

Defendant, and were based on RFC's reliance on Defendant's (and other correspondent lenders')
representations and warranties to RFC.

56.    After hard-fought negotiations and litigation, RFC and its affiliates ultimately
settled many of these claims and lawsuits in the bankruptcy proceeding for allowed claims
totaling billions of dollars. RFC continues to litigate other claims.

57.    Even given the fact that these creditors will only recover a small percentage of
their claims under the Plan of Reorganization, RFC and its affiliates will still ultimately pay out
hundreds of millions of dollars stemming from the defective loans.

58.    In addition to the bankruptcy settlements, before the bankruptcy, RFC had already
repurchased millions of dollars' worth of defective loans from its RMBS securitizations and
from whole loan purchasers, either at the request of a bond insurer or trustee, or because RFC
itself discovered a defect and affirmatively took steps to repurchase the loan.

59.    RFC continues to lose value on hundreds of loans still in its own portfolio.

60.    Finally, prior to and during the bankruptcy case, RFC paid millions of dollars in
attorneys' fees to defend against, negotiate, and ultimately settle claims relating to allegedly
defective loans.

61.    These losses and exposures stem in part from Defendant's breaches of the
representations and warranties, and RFC is entitled to recover from Defendant for those
breaches. RFC is also entitled to indemnification from Defendant pursuant to the Defendant's
express indemnification obligations.

## COUNT ONE
### (BREACH OF CONTRACT)

62.    RFC realleges each and every allegation set forth in Paragraphs 1 through 61,
above, as if fully rewritten herein.

13

63.    Defendant made representations and warranties to RFC regarding the quality and characteristics of the mortgage loans, which Defendant sold to RFC.

64.    Defendant breached its representations and warranties to RFC inasmuch as the mortgage loans did not comply with the representations and warranties.

65.    Defendant's breaches constitute Events of Default under the Agreement, resulting in damages to RFC.

66.    Accordingly, RFC is entitled to damages equivalent to the contractual repurchase price specified in the Client Guide, and/or damages sufficient to make RFC whole for its purchase of defective loans, in an amount to be proven at trial, which under either calculation exceeds $75,000, together with an award of attorneys' fees and costs.

## COUNT TWO
## (INDEMNIFICATION)

67.    RFC realleges each and every allegation set forth in Paragraphs 1 through 66, above, as if fully rewritten herein.

68.    RFC has incurred substantial losses and damages arising from and relating to the mortgage loans, which Defendant sold to RFC.

69.    Defendant expressly agreed to indemnify RFC for the losses and damages, including attorneys' fees and costs, which RFC has incurred.

70.    Accordingly, RFC is entitled to indemnification in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees and costs.

WHEREFORE, RFC demands judgment in its favor and against Defendant as follows:

(A)    On Count One (Breach of Contract), contractual repurchase and/or "make whole" damages in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees and costs; and

14

(B)     On Count Two (Indemnification), damages sufficient to reimburse RFC's losses,

costs and expenses caused by Defendant's actions in excess of $75,000 and in an amount to be

proven at trial, and an award of attorneys' fees and costs; and

(C)     All such further relief, as the Court deems necessary or proper.

Dated:  December 13, 2013

/s/ Lee A. Lastovich
Donald G. Heeman, #286023
Lee A. Lastovich, #239495
FELHABER LARSON
220 South 6th Street, Suite 2200
Minneapolis, MN  55402-4504
Telephone:  (612) 339-6321
Facsimile:  (612) 335-0535
DHeeman@felhaber.com
LLastovich@felhaber.com

*Attorneys for Plaintiff Residential Funding
Company, LLC*

*Of Counsel*
Gary S. Lee
Jamie A. Levitt
Kayvan B. Sadeghi
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
Suite 3900
New York, NY  10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
GLee@mofo.com
JLevitt@mofo.com
KSadeghi@mofo.com

Jeffrey A. Lipps
Jennifer A. L. Battle
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone:  (614) 365-4100
Facsimile:  (614) 365-9145

Lipps@CarpenterLipps.com
Battle@CarpenterLipps.com