# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| RESIDENTIAL FUNDING COMPANY, LLC,<br><br>       Plaintiff,<br><br>v.<br><br>SIERRA PACIFIC MORTGAGE COMPANY, INC.,<br><br>       Defendant. | Case No. 0:13-cv-03511-RHK-FLN<br><br>**DEFENDANT SIERRA PACIFIC MORTGAGE COMPANY, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT** |

## INTRODUCTION

When does a zealous effort to recover on behalf of bankruptcy creditors go one step too far?

The question is not theoretical – it is fundamentally the issue before the Court, and the answer is clear. The zealous advocate crosses the line when:

- The bankruptcy debtor mass-litigates breach of warranty claims by filing 75+ identical "cookie cutter" lawsuits against all of its former correspondent lenders that survived the economic meltdown;

- Every one of those complaints consists of conclusory allegations that cannot survive *Iqbal/Twombly* scrutiny;

- Just one month before filings those complaints, the debtor's counsel testified under oath in the bankruptcy proceeding that the evidence potentially supporting the claims alleged (specifically, loan files and loan-level electronic data for as many

as 190,000 mortgages) is almost entirely unsearchable and inaccessible; and

• Facing a hearing on the first Motion to Dismiss in a line of many, the debtor brings a motion for leave to file a proposed First Amended Complaint ("FAC") that (1) rectifies none of the shortcomings of the original Complaint; (2) remains obviously and admittedly without evidentiary support; and (3) injects new allegations that patently violate broad-spanning releases and covenants not to sue contained in a prior settlement agreement with the defendant – an agreement that, according to publicly-filed billing records, the debtor's counsel actually reviewed and discussed prior to filing suit.

### STATEMENT OF FACTS

Sierra Mortgage Company, Inc. ("Sierra") began doing business with plaintiff and debtor-in-liquidation Residential Funding Company, LLC ("RFC") in or around March 1997. (Complaint, Ex. A, p. 1.) RFC alleges that, from that time until RFC filed for Chapter 11 bankruptcy in May 2012 (the "Bankruptcy Action") (*Id.*, ¶ 52), Sierra sold RFC "thousands" of residential mortgage loans. (*Id.*, ¶ 51.) The FAC puts the number of loans Sierra sold to RFC at "over 9,000," and attaches a 195-page list of all the loans allegedly bought from Sierra from to 2000 to 2007 – but *does not identify any loans that RFC contends are "defective."* (FAC Redline, p. 7, ¶¶ 16, 18 and Ex. C [Dkt. Nos. 49-6 and 49-5]).

### The December 19, 2007 Settlement Agreement

Sierra occasionally repurchased certain mortgage loans from RFC; however, contrary to the allegations of the proposed FAC (at p. 3, ¶ 5 [Dkt. No. 49-6]), Sierra did

not "acknowledge" any "material defects" regarding such loans, and retains no continuing liability on them. In fact, Sierra and RFC executed written settlement agreements that (1) disclaimed any admission of wrongdoing by Sierra; (2) contained full releases and covenants not to sue with respect to the repurchased loans; and (3) obligated RFC to reimburse Sierra its costs and attorneys' fees in the event RFC – as it *expressly* does here – ever breached the covenant not to sue. (Declaration of James Coffrini ("Coffrini Dec."), Exs. 1-3.)

One such settlement agreement, effective December 19, 2007 (the "December 19, 2007 Settlement") – thus post-dating every loan listed in Exhibit C – provided Sierra with a broad-spanning retroactive release. (Coffrini Dec., Ex. 1.) In addition to an attached list of 29 "Subject Loans," the December 19 Settlement defined certain "Additional Loans" that

> were sold to GMAC-RFC on or before the effective date of this Agreement, which may be in breach of one or more Events of Default, as described in the Client Guide but which have not been identified as of the date of this Agreement…

(Coffrini Dec., Ex. 1, p. 1.) Section 2(b) stated that upon payment of the Settlement Amount:

> …GMAC-RFC for itself, its present and past representatives, heirs, executors, administrators, successors, assigns, family, partners, employees, agents, and attorneys *will fully and forever release and discharge Client… from all claims, demands, torts, damages, obligations, liabilities, costs, expenses, rights of action, or causes of action arising out of the Subject Loans, and arising out of the Additional Loans,* but only where **the Additional Loans involve a borrower who has made the first twelve consecutive payments due GMAC-RFC within the month mandated by the contract, _or_ (ii) where the overstatement of stated income by the borrower(s) is identified as the only Event of Default** of the GMAC-RFC

3

12-12020-mg Doc 9086-1 Filed 08/31/15 Entered 08/31/15 17:15:40 Exhibit EX 1
CASE 0:13-cv-03521-RHK-FLN Document 58 Filed 08/08/14 Page 4 of 22
- Sierra Opp to Mtn to Amend Pg 5 of 23

Client Guide ("Client Guide").

(*Id.*, p. 3 (emphasis added).) Sierra timely paid the full settlement amount. (Coffrini Dec., ¶ 3.) Section 3 contains a covenant not to sue: the parties promised not to "bring against the other party any other suits or actions, however denominated concerning any claim, demand, liability or cause of action that is the subject of this Agreement." (*Id.*, Ex. 1, p. 3.) Section 4 provides that neither party admitted fault or liability (*Id.*, pp. 3-4), and Section 6 awards prevailing party costs and attorneys' fees in the event of any dispute (*Id.*, p. 4).

RFC's purported FAC seeks to "pursue additional recoveries" (¶ 5) against Sierra based on all previously repurchased loans, including the 29 Subject Loans expressly resolved by the December 19, 2007 Settlement. This alone is a breach of the covenant not to sue, but RFC has also opened a much uglier can of worms: its covenant not to sue extends not just to the Subject Loans, but a defined subset of Additional Loans that consists of the following: *each and every loan that RFC contends is defective and purports to sue on in this action*, **unless** for any such loan, **either**:

1. The borrower did not make "the first twelve consecutive payments due GMAC-RFC within the month mandated by the contract"; *or*

2. RFC can identify some other "Event of Default" pursuant to the relevant Client Guide other than "the overstatement of stated income by the borrower(s)."

(Coffrini Dec., Ex. 1, p. 3.) As will shortly be discussed, RFC apparently lacks the ability to access the information necessary to make these determinations. Thus, allowing

12-12020-mg    Doc 9086-1    Filed 08/31/15    Entered 08/31/15 17:45:40    Exhibit EX 1
- Sierra Opp to Mtn to Amend    Pg 6 of 23
CASE 0:13-cv-00551-RHK-FLN   Document 58   Filed 08/08/14   Page 5 of 22

RFC to proceed with the proposed FAC would subject Sierra to undue prejudice, because the most effective weapon against breach of the covenant not to sue – a counter-claim for attorneys' fees – is not much of a deterrent against a bankrupt debtor with a proven track record of shooting first and asking questions *not at all*.

**The Other Settlement Agreements**

Given the broad retroactive effect of the December 19, 2007 Settlement, Sierra did not receive a significant number of repurchase demands from RFC following its execution. However, Sierra did subsequently enter into several similar settlement agreements with RFC, including two such agreements that completely extinguished any ostensible liability on the part of Sierra with respect to four of the "example" loans cited by the proposed FAC.

On March 10, 2008, the parties entered into a settlement (the "March 10, 2008 Settlement") resolving seven Subject Loans. (Coffrini Dec., Ex. 2.) Among the Subject Loans were three of the "example" loans cited in RFC's proposed FAC:

**11208459** (FAC, ¶ 42(k).)

**11208467** (*Id*., ¶ 42(l).)

**11301585** (*Id*., ¶ 42(n).)

(Coffrini Dec., Ex. 2, ¶ 1(a) and Exhibit A thereto.) The March 10, 2008 Settlement contained language virtually identical to that of the December 19, 2007 Settlement: including a release and covenant not to sue with respect to each Subject Loan. (*Id*.)

Similarly, on September 17, 2008, the parties entered into another settlement agreement (the "September 17, 2008 Settlement") releasing Sierra of liability with

12-12020-mg   Doc 9086-1   Filed 08/31/15   Entered 08/31/15 17:15:40   Exhibit EX 1
CASE 0:13-cv-00351-RHK-FLN   Document 58   Filed 03/08/14   Page 6 of 22
- Sierra Opp to Mtn to Amend   Pg 7 of 23

respect to three Subject Loans, one of which is an RFC "example" loan cited in the proposed FAC:

**11249329**  (FAC, ¶ 53(c).)

(Coffrini Dec., Ex. 3, and Exhibit A thereto.)   The September 17, 2008 Settlement contained the same provisions as the above-described settlement agreements.  (*Id.*)

RFC counsel apparently reviewed at least one of these settlement agreements prior to the filing of this action.  According to the billing records of Morrison Foerster LLP,[1] RFC's counsel in the Bankruptcy Action – which is listed in the original complaint in this action as "Of Counsel" to RFC (Dkt. No. 1, p. 15) – on November 1, 2013, one of RFC's lawyers billed for the following time entry: "[r]eview Sierra Pacific file documents, *including settlement agreement* (0.6); *discuss same* with [other attorney] (0.2)." (Declaration of Jonathan M. Jenkins ("Jenkins Dec."), Ex. A, p. 2) (emphasis added.) While it is unclear which of the settlement agreements was reviewed, *all* such agreements contain a release and covenant not to sue for the repurchased Subject Loans.  Thus, it is completely unclear why RFC's proposed FAC now attempts to violate that covenant not to sue by "pursu[ing] additional recoveries stemming from" each of the repurchased loans.  (Dkt. No. 49-6, ¶ 5.)

## The Genesis of This Lawsuit (And 75+ Others Like It)

Prior to filing for Chapter 11 bankruptcy in May 2012 along with numerous

---

[1] As explained in the Jenkins Dec. (at ¶¶ 2-3), Morrison Foerster LLP and Carpenter Lipps & Leland LLP (which is Special Litigation Counsel for RFC in the Bankruptcy Action, as well as counsel of record for RFC in this action) periodically file their billing and expense reports publicly in the Bankruptcy Action to receive compensation from the debtor estates.

12-12020-mg    Doc 9086-1    Filed 08/31/15    Entered 08/31/15 17:45:40    Exhibit EX 1
CASE 0:13-cv-03351-RHK-FLN    Document 58    Filed 03/08/14    Page 7 of 21
- Sierra Opp to Mtn to Amend    Pg 8 of 23

affiliates, RFC was a mortgage loan aggregator, in the business of acquiring loans from numerous "correspondent lenders" such as Sierra and pooling them into securitized mortgage trusts. (FAC, ¶¶ 1-2.)

On December 11, 2013, the bankruptcy court approved RFC's Chapter 11 Plan (the "Plan").[2] Over the next several days, RFC mass-filed virtually identical lawsuits against Sierra and other former loan correspondents – 67 separate lawsuits in this federal district alone.[3] (RFC also filed several similar lawsuits in Minnesota state court, as well as in New York federal and state courts). Yet, even more remarkable than the sheer volume of litigation RFC commenced is the swiftness with which it all came about.

Sometime after September 1, 2013,[4] the bankruptcy debtors asked the Carpenter firm to "examine potential claims against certain third parties related to their roles in the

---

[2] One aspect of the Plan was creation of a Liquidating Trust to prosecute certain "Liquidating Trust Causes of Action" (including the potential claims against Sierra and other loan originators). However, RFC was blocked from bringing such claims in the Bankruptcy Action because, *inter alia*, many of RFC's correspondent agreements contain a Minnesota choice of venue clause (Complaint, Ex. A, ¶ 13 [Dkt. No. 1-1, p. 8]). Such provisions are automatically upheld in any "non-core" proceeding (*e.g.* a state law breach of contract action against a non-debtor entity). *See, e.g. In Re Exide Technologies*, 544 F.3d 196, 206 (3rd Cir. 2008). Thus, Section 13.2 of the bankruptcy court-approved Liquidating Trust Agreement included a jurisdictional carve-out: "…notwithstanding… anything to the contrary set forth in the Plan, the Liquidating Trust Board shall have power to bring (or cause to be brought) any action *in any court of competent jurisdiction to prosecute any Liquidating Trust Cause of Action.*" (Jenkins Dec., Ex. D, p. 24) (emphasis added.) Therefore, RFC's contention in its recently-filed Motion to Transfer Venue to the U.S. Bankruptcy Court for the Southern District of New York (Dkt. No. 54) that the bankruptcy court retained "exclusive jurisdiction" over this action is incorrect.
[3] Exhibit D to Sierra's Request for Judicial Notice in Support of its Motion to Dismiss provides a list of the 67 cases RFC filed against former correspondent lenders in the U.S. District Court for the District of Minnesota.
[4] The caption to the cited "Summary of Fifth and Final Application of Carpenter Lipps & Leland LLP as Special Litigation for the Debtors for Compensation and Reimbursement of Expenses" explains that the "Fifth Compensation Period" (when the debtors made their request to the Carpenter firm) was from September 1, 2013 through December 17, 2013. (Jenkins Dec., Ex. B, p. 3.)

12-12020-mg    Doc 9086-1    Filed 08/31/15    Entered 08/31/15 17:15:40    Exhibit EX 1
CASE 0:13-cv-03351-RHK-FLN    Document 58    Filed 08/08/14    Page 8 of 22
- Sierra Opp to Mtn to Amend    Pg 9 of 23

Debtors' securitization to try and recover some of [sic] liabilities that were settled as part
of the Global [bankruptcy] Settlement" (Jenkins Dec., Ex. B, p. 5); and sometime
thereafter, the bankruptcy debtors "ultimately decided to pursue claims against certain of
the correspondent lenders who had sold [RFC] loans." (*Id.*)  The Carpenter firm's first
billing entry regarding these correspondent lender lawsuits appears to have occurred on
October 25, 2013 (*Id.*, p. 7) – just seven weeks prior to the "filing of more than 75 cases
in December 2013 asserting claims against these lenders based on defective loans they
had sold to RFC" (*Id.*, p. 5): "[r]eview various e-mails and related materials related to
purchase of loans (.20).  Conference with [other attorney] regarding potential affirmative
claims (0.5)." (*Id.*, p. 7.)

Evidently, the notion of suing numerous correspondent lenders using substantially
similar complaints advanced quickly.  Just a few days later, on November 1, 2013,
another attorney at the Carpenter firm had begun "work on draft correspondent lender
complaint." (Jenkins Dec., Ex. B, p. 9.)  Within several days, the Carpenter firm had
designated this complaint as the "form correspondent lender complaint" or, alternatively,
the "template complaint." (*Id.*, pp. 10-11.)  In terms of actual due diligence, however,
between October-December 2013, there appear to be only two specific references to
Sierra in the Carpenter firm's billing records, amounting to less than three hours' work:

> 11/13/2013    Review and analyze correspondent files regarding Sierra Pacific
> Mortgage (1.5)

> 11/14/2013    Review and analyze Sierra Pacific lender file. [1.8]

(*Id.*, p. 12.)

Contemporaneously, the Carpenter firm was working on the bankruptcy debtors' Plan confirmation.  The question of how much pre-filing diligence RFC performed – or *could* have performed – seems to be addressed at least in part by a declaration of attorney Jeffrey Lipps of the Carpenter firm, filed in the Bankruptcy Action on November 12, 2013 (the "Lipps Declaration" or "Lipps Dec.").  (Jenkins Dec., Ex. C.)   The Lipps Declaration urged the bankruptcy court to approve the proposed Plan in part because it resolved pending securities fraud lawsuits against RFC (and the other debtors) that would otherwise require extensive discovery, including the production of copious loan files and loan-level data – information quintessentially relevant to *this* action.  However, RFC *lacked the ability to access* large quantities of such information because, among other things, it had sold its entire loan servicing portfolio to Ocwen Loan Servicing, LLC ("Ocwen") for $3 billion in early 2013.

The Lipps Declaration provided several "illustrative examples" of the discovery burdens RFC and the other bankruptcy debtors potentially faced in multiple mortgage-backed securities actions, and used as one such example the action *Allstate Insurance Co., et al. v. GMAC Mortgage, LLC et al*., Hennepin County District Court Case No. 27-CV-11-3480:

> The *Allstate* plaintiffs bought over $553 million of RFC and GMAC RMBS certificates in twenty-five securitizations involving more than 190,000 mortgage loans between 2005 and 2007.

(Jenkins Dec., Ex. C, p. 18.)   The proposed FAC concedes that "a number [of the 25 securitizations at issue in *Allstate*] included Sierra Pacific loans."  (Dkt. No. 49-6,

¶ 72(c).)

12-12020-mg  Doc 9086-1  Filed 08/31/15  Entered 08/31/15 17:15:40  Exhibit EX 1
- Sierra Opp to Mtn to Amend    Pg 11 of 23
CASE 0:13-cv-03993-RHK-HB  Document 36  Filed 03/08/14  Page 10 of 22

The Lipps Declaration explained that if the *Allstate* litigation (which involved "all five of RFC's securitization shelves") were to continue, the discovery burdens would be severe:

> Many loan files exist entirely or partially in paper copy only… production of all 190,000 loan files would likely require production of tens of millions of pages. Moreover, *the personnel and systems needed to efficiently search for and copy loan files have all transferred to Ocwen, leaving the debtors with extremely limited practical ability to collect and produce those materials.*

(Jenkins Dec., Ex. C, pp. 19-20 (emphasis added).)  Thus, at the same time RFC was ramping up to file dozens of lawsuits against loan originators using its "template" complaint, it was simultaneously telling the bankruptcy court that it no longer had the ability to access critical evidence it would need to prosecute such claims (let alone conduct pre-filing diligence).

Moreover, to avoid violating the broad covenant not to sue in the December 19, 2007 Settlement with Sierra, RFC should have conducted pre-filing diligence using loan-level performance data, payment histories, and underwriting parameters for *each and every loan it is purportedly suing on* – to ensure that none of them were loans as to which: (1) the borrower had made 12 consecutive monthly payments; or (2) there was no Event of Default other than the borrower's overstatement of stated income.  However, the Lipps Declaration explained that RFC lacks access to this information as well:

> In addition, relevant loan-level data apart from origination files – *such as information about loan-level performance data, loan originators, underwriting parameters, due diligence, quality audit results, payment history, and other relevant metrics* – is housed in or was processed through a number of electronic systems.  *Some of these electronic systems are no longer operational, so it would require extensive IT work to access them.*

12-12020-mg   Doc 9086-1   Filed 08/31/15   Entered 08/31/15 17:15:40   Exhibit EX 1
CASE 0:13-cv-03039-RHK-FLN   Document 30   Filed 05/08/14   Page 11 of 22
- Sierra Opp to Mtn to Amend    Pg 12 of 23

(Jenkins Dec., Ex. C, p. 20 (emphasis added).)  This concession perhaps shows why, as late as December 5, 2013 – just one week before RFC launched 75+ loan originator complaints into the judicial system – an attorney at the Carpenter firm was still searching for some means of corroborating RFC's blanket allegations.  The billing entry reads:

> Investigation into *potential sources of quality control data to provide defect detail in complaints*.

(Jenkins Dec., Ex. B, p. 14 (emphasis added).)  Evidently, at the same time RFC's attorneys were preparing to storm courthouses, they were still struggling to find data to corroborate their "template" complaint.

## Differences Between the Proposed FAC and the Original Complaint

Sierra's Motion to Dismiss (Dkt. No. 10) attacked the Complaint on, *inter alia*, *Iqbal/ Twombly* grounds.  The Complaint, like the other 66 complaints RFC filed in this judicial district, was a generic "template" that could have been (and apparently was) filed against any former correspondent lender that managed to survive the housing-market meltdown and global financial crisis.  In 15 pages dotted with interchangeable references to "Defendant" and "other correspondent lenders," the Complaint offered:

• Lengthy and mostly irrelevant background regarding the Bankruptcy Action;

• Similarly irrelevant descriptions of securities fraud lawsuits brought against RFC on account of allegedly defective loans "including those sold to it by Defendant" (¶ 9);

• Generic allegations of contractual breach by "Defendant and other correspondent lenders" (¶ 31);

- An allegation that "*dozens* of the loans sold to RFC by Defendant violated the Client Guide and/or other representations or warranties made by Defendant" (¶ 33) (emphasis added); and

- *Zero* specific loans and *zero* particular representations and warranties allegedly breached by specific loans.

After bringing an unsuccessful motion for a six-week extension of time to "decide how to respond" to the Motion to Dismiss, RFC now asks for leave to file the proposed FAC which, in a nutshell:

- Changes "Defendant" to "Sierra Pacific" in most places;

- Conveniently and inexplicably raises the number of allegedly defective Sierra loans from "*dozens*" to "*hundreds*" (¶ 40);

- Provides even *more* irrelevant details regarding the Bankruptcy Action (¶¶ 71, 72(a)-(f), 75-76) and the securities fraud lawsuits against RFC (¶¶ 49, 60-61, 65);

- Violates covenants not to sue with Sierra (by, *inter alia*, seeking "additional recoveries" on all previously repurchased loans (¶ 5) and using as "examples" not less than four loans covered by prior settlement agreements (¶¶ 42(k),(l),(n) & 53(c)); and

- *Still* fails to identify *a single specific representation or warranty* allegedly breached with respect to *even one single Sierra loan*.

The proposed FAC makes three other notable additions.  First, RFC provides 17 "example" defective loans (¶¶ 42(a)-(n) and 53(a)-(c)).  However, *none* of these "examples" actually *identifies* a specific representation or warranty that the example loan

allegedly breached.   Tellingly, RFC goes on to allege that *"[u]pon information and belief*, many more of the loans sold to RFC by Sierra Pacific contained material defects" (¶ 43 (emphasis added)).  It would appear that RFC is just guessing.

Second, the proposed FAC attaches thick exhibits: fifteen versions of Client Guide "excerpts," and a list of 9,000+ loans purchased from Sierra.   However, this "informational deluge" merely underscores the critical information RFC does not offer and does not itself know: *which* loans allegedly breached *what* contractual obligations (as established by *what* version of the Client Guide) and *how*?  RFC never *connects the dots* – not even once.

Exhibits B-1 through B-15 (Dkt. Nos. 49-3 and 49-4) consist of hundreds of pages of "exemplary excerpts" from fifteen constantly-changing versions of the Client Guide. The sheer number of different versions demonstrates the difficulty in even figuring out the correct *source* of the contractual obligations applicable to any given loan – let alone the specific provisions allegedly breached.   RFC makes no attempt to sort things out, stating only that the various excerpts "set the standards to which Sierra Pacific's loans to RFC were expected to adhere" and leaving it undecipherably at that.  (Dkt. No. 49-6, ¶ 17.)[5]

Exhibit C (Dkt. No. 49-5) purports to be a 195-page list of the 9,000 loans RFC bought from Sierra (FAC, ¶ 18), with sale dates as early as 2000 (and thus far outside

---

[5] The proposed FAC contends that "[t]he complete versions of the Client Guide are known to the parties…" (¶ 17.)  Quite the opposite.  When it was in business, RFC made the Client Guides available primarily online.  The most recent Sierra loan sale listed in Exhibit C was dated September 2007, more than six years ago, and RFC is out of business and in liquidation.

Minnesota's 6-year statute of limitations for breach of contract claims). Nowhere does Exhibit C specify which of these loans RFC alleges to be defective – meaning that Sierra cannot even *attempt* the process matching specific loans to particular representations and warranties scattered throughout "excerpts" from fifteen versions of the Client Guide.

Third, RFC tries to spruce up its allegations that certain (unspecified) Sierra loans "materially" breached various representations and warranties (also unspecified) by repeating the contentions made by former litigation adversaries (or contained in bankruptcy proofs of claim "stemming from *allegedly* defective mortgage loans." (FAC, ¶¶ 49, 57, 60-61, 65.) For example, RFC alleges:

> …as part of the MBIA litigation, MBIA hired an expert to review again a sampling of loans… *MBIA's expert identified* 88 loans originated by Sierra Pacific that materially breached *the weaker representations that RFC had provided to MBIA.* Examples of the material breaches *MBIA asserted* were []…

(*Id.*, ¶ 61 (emphasis added).) What this section makes clear is that, for all of RFC's references to the mortgage securitization actions, those cases involved *completely different* sets of contractual obligations, notwithstanding RFC's conclusory assertion that the other representations and warranties were "weaker" or "more limited." (FAC, ¶ 36.)

In addition, RFC conspicuously avoids conceding that MBIA's (or any other plaintiff's) allegations were *accurate.* The proposed FAC tries to use the damaging assertions leveled against RFC in other actions as proof that Sierra breached representations and warranties in *this* case, but without conceding that RFC itself

12-12020-mg   13-cv-03899-RHK   Filed 08/31/15   Entered 08/31/15 17:15:40   Exhibit EX 1
Doc 9036-1   Document 36   Filed 03/08/14   Page 15 of 22
- Sierra Opp to Mtn to Amend    Pg 16 of 23

committed wrongful conduct or caused any damages.[6]

RFC cannot have it both ways.   Notably, RFC's Answer in the MBIA litigation (filed by the Carpenter firm) denied nine times "that RFC made any misrepresentations or breached any warranties" or that "there were undisclosed or misrepresented any risks related to loans in the collateral pools…"  (Jenkins Dec., Ex. F.)   RFC also asserted as an affirmative defense that "*general economic conditions and changes in the housing market*" were the superseding cause of MBIA's claimed mortgage securitization losses. (*Id*., p. 40 (emphasis added).)   RFC is bound to this position whether it likes it or not: its counsel in both this action and the Bankruptcy Action, Jeffrey Lipps of the Carpenter firm, also served as RFC's expert witness in the Bankruptcy Action; his expert report filed on October 3, 2012 opined on the merits of the bankruptcy debtors' *"Housing Crisis" Defense*:

> [t]here is ample evidence that the true cause of the losses to these Trusts was the massive economic downturn beginning in late 2007 and escalating through 2008 and into 2009… Debtors had developed extensive factual and expert support for this argument.

---

[6] Consistent with this new strategy, RFC elected to delete ¶ 35 of the Complaint from the proposed FAC (Dkt. No. 49-6, p. 18), which read:

> 35.    Indeed, as part of its own analysis of the claims later asserted against it, RFC retained its own expert, who concluded that approximately 43.5% of the loans he reviewed were materially defective in one or more ways, and that the likely exposure to RFC and its affiliates from defective correspondent loans exceeded $7 billion.

Apparently, as RFC attempts to convert this case into a "breach of warranty" action by citing breach of warranty caselaw (Motion, p. 3), it has become uncomfortable with the notion of conceding its own misconduct – perhaps out of concern that "breach of warranty" claims implicate a provision of Minnesota's comparative fault statute, *Minn. Stat.* § 604.01(1a).

(*Id.*, Ex. E, p. 38.)

## **STANDARD OF REVIEW**

RFC correctly notes that F.R.C.P. Rule 15(a)(2) obligates federal courts to "freely" grant leave to amend "when justice so requires." (Motion, p. 2.) RFC also appositely cites (at p. 2) the recent decision in *Streambend Properties III, LLC v. Sexton Lofts, LLC*, 2014 WL 316895 (D. Minn. Jan. 28, 2014), in which the district court denied plaintiff's Rule 15(a)(2) motion for leave to amend because, among other reasons, the proposed amendments were "futile" and infused with bad faith.[7]

*Streambend* explained that a proposed amendment is "futile" when it would not survive a Rule 12(b)(6) motion to dismiss. Thus, proposed amendments must survive *Twombly/Iqbal* scrutiny: "[a] claim that does not satisfy *Twombly* is futile under Rule 15(a)." *Id.* at *6. *See also Cornelia I. Crowell GST Trust v. Possis Medical, Inc.*, 519 F.3d 778, 781-83 (8th Cir. 2008) (upholding district court's denial of leave to amend on ground of futility). The Court may also properly deny leave to amend where the request is apparently made in "bad faith" or would cause "undue prejudice" to the opposing party. *Streambend*, 2014 WL 316895 at *6-8.

*Twombly* mandates that a viable complaint must set forth enough specific facts "to state a claim to relief that is plausible on its face." 550 U.S. at 570. "[L]abels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. In a breach of contract case, the mere assertion that the defendant breached a

---

[7] The district court in *Streambend* established that plaintiff's proposed amendments were time-barred by citing a county recorder document that evidenced plaintiff's constructive notice. 2014 WL 316895 at *6-8.

12-12020-mg Doc 9036-1 Filed 08/31/15 Entered 08/31/15 17:15:40 Exhibit EX 1
CASE 0:13-cv-03999-RHK-FLN Document 38 Filed 03/08/14 Page 17 of 22
- Sierra Opp to Mtn to Amend    Pg 18 of 23

contractual obligation is not enough; the plaintiff must specify *what* contractual
provisions are at issue, or it is "impossible to discern precisely how [the defendant]
allegedly has breached them." *Motley v. Homecomings Fin., LLC*, 557 F. Supp. 2d 1005,
1013 (D. Minn. 2008). *See also T.B. Allen & Assocs., Inc. v. Euro-Pro Operating LLC*,
2012 WL 2508021 at *2 (D. Minn. June 28, 2012) (dismissing breach of contract claim
when plaintiff did not sufficiently plead terms of contract).

F.R.C.P. Rule 8(a)(2)'s "short and plain" fair-notice pleading standard affords no
protection to complaints that are minimally pled because of insufficient pre-filing
diligence or a lack of evidentiary support:

> It is the plaintiffs' burden, under both Rule 8 and Rule 11, to
> reasonably investigate their claims, to research the relevant
> law, to plead only viable claims, and to plead those claims
> concisely and clearly, so that a defendant can readily respond
> to them and a court can readily resolve them.

*Gurman v. Metro Housing and Redevelopment Authority*, 842 F. Supp. 2d 1151, 1153 (D.
Minn. 2011). Accordingly, conclusory allegations that lack factual support and are based
on "information and belief" do not satisfy Rule 8. *See Vollmer v. Fed. Home Loan
Mortg. Corp.*, No. 13-2617, 2014 WL 642423, at *1 (8th Cir. Feb. 20, 2014).

## ARGUMENT

### 1. The Court Should Deny Leave to File the Proposed FAC Because It Is Futile, Smacks of Bad Faith, and Would Unduly Prejudice Sierra

On this Motion, issues of futility and bad faith run together: the proposed FAC,
like the original Complaint, does not pass muster under Rule 12(b)(6) and
*Twombly/Iqbal*. The proposed FAC throws up huge amounts of data (9,000 loans and 15

partial versions of a Client Guide) that only further convolutes RFC's claims – for instance, by purporting to make *clearly time-barred claims* based on loans that RFC purchased as far back as 2000.[8] The FAC seeks additional recovery on loans that Sierra already repurchased, violating a settlement agreement and covenant not to sue that RFC's own attorneys have read, according to their publicly-filed billing records. And RFC is bound to further violate the retroactive release and covenant not to sue contained in the December 19, 2007 Settlement,[9] because RFC apparently has no access to the electronic loan-level data (such as payment histories) necessary just to ascertain whether any given Sierra loan is subject to the settlement provisions.

Particularly concerning, however, is the question of *why* RFC now presents the Court with a *second* pleading asserting claims that lack evidentiary support. In the Lipps Declaration, RFC's own counsel (and expert witness) essentially admitted in open court – just one month before this action and 70+ other like it were filed – that plaintiff did not have the *ability* to adequately investigate and prosecute these claims. (Nonetheless, at the very same moment, RFC's attorneys were hurriedly churning out a "template" complaint in anticipation of mass litigation).

---

[8] "It is well-settled [under Minnesota law] that a cause of action for breach of contract accrues immediately on a breach, though actual damages resulting therefrom do not occur until afterwards." *Enervations, Inc. v. Minnesota Mining and Mfg. Co.*, 380 F.3d 1066, 1069 n2 (8th Cir. 2004) (citation omitted) (leave to amend properly denied where extrinsic settlement agreement revealed claim to be time-barred).

[9] While typically the Court does not look beyond the Complaint on a motion to dismiss, there is a recognized exception for "materials that are part of the public record… as well as materials that are necessarily embraced by the pleadings" – such as the December 19, 2007 Settlement. *Homeownership Preservation Foundation*, 2009 WL 6067018 at n3.

12-12020-mg Doc 9086-1 Filed 08/31/15 Entered 08/31/15 17:15:40 Exhibit EX 1
CASE 013-cv-03699-RHK-JJK Document 36 Filed 03/05/14 Page 19 of 22
- Sierra Opp to Mtn to Amend    Pg 20 of 23

RFC cites several cases for the proposition that plaintiffs in the "RMBS litigation space" (which this two-count breach of contract action does *not* occupy) do not have to "set forth in the complaint each and every breach for every one of the thousands of loans involved." (Motion, pp. 5-6.) This is an unavailing attempt to redirect the line of battle: RFC need concern itself with whether it must match specific contractual provisions to particular loans "thousands" of times when thus far it has failed to do so *even once*.

Federal courts in other jurisdictions have provided clear and persuasive authority regarding the application of *Twombly/Iqbal* to the breach of warranty claims that predominate in loan repurchase litigation. Those courts "have dismissed breach of representation and warranty claims, which fail to plead facts sufficient to put a defendant on notice of the nature and scope of the claims." *Torchlight Loan Servs., LLC v. Column Fin., Inc.*, 2012 WL 3065929, at *5 (S.D.N.Y. July 25, 2012) (dismissing portions of a complaint that merely recited the warranties and alleged breaches but provided no factual underpinnings of the purported breach); *see also Wells Fargo Bank, N.A. v. LaSalle Bank N.A.*, 2011 WL 4837493, at *3 (N.D. Ill. Oct. 11, 2011) (dismissing breach of warranty claim where plaintiff failed to allege "the ways" in which defendant breached its warranty).

In this case, the Complaint offered lots of detail about irrelevant matters such as the Bankruptcy Action and the dozens of securities fraud actions filed against RFC, and the proposed FAC provides more of the same. However, in marked comparison, RFC's operative allegations of contractual breach are strikingly threadbare – far more so than the complaints analyzed in *Torchlight* and *Wells Fargo*. In fact, both documents –

19

stripped of the irrelevant "filler" – are more similar to the skeletal complaint at issue in

*Bissessur v. Indiana University Board of Trustees*, 581 F.3d 599, 604 (7th Cir. 2009),

where the Court of Appeals affirmed dismissal of a student's breach of implied contract

claim against a university due to insufficient factual allegations in support of naked legal

conclusions.   The decision gave the plaintiff a scathing rebuke that seems equally

applicable to RFC's factually bankrupt claims against Sierra:

> Allowing this case to proceed absent factual allegations that match the bare-bones recitation of the claims' elements would sanction a fishing expedition costing both parties, and the court, valuable time and resources.

Such language calls to mind *Iqbal*'s cautionary admonition that F.R.C.P Rule 8

"does not unlock the doors of discovery for a plaintiff armed with nothing more than

conclusions."  556 U.S. at 678-79.  It logically follows that the "doors of discovery" also

remain barred for a plaintiff who – according to the recent testimony of its bankruptcy

counsel/litigation counsel/expert witness under penalty of perjury – cannot access

potential evidentiary support because it is located in untrackable loan files or on

inoperative computer systems.

Without a doubt, RFC and its counsel are attempting to zealously represent the

interests of bankruptcy creditors.  They may hold a firm belief that evidence supporting

RFC's allegations is somewhere out in the universe.  And they are clearly concerned

about a rapidly closing window on the statute of limitations.  Regardless, it is equally

clear that RFC is undeterred by the fact that its cookie-cutter claims against Sierra and

70+ other loan originators lack adequate evidentiary support.  And permitting RFC to go

on marching blindly into the night – while trampling on Sierra's rights in violation of

covenants not to sue – is not the appropriate result.  As this Court has previously noted, "[a] shot in the dark is a sanctionable event, even if it somehow hits the mark."  *Brown v. Ameriprise Financial Services, Inc.*, 276 F.R.D. 599, 605 (D. Minn. 2011), citing *Vista Mfg., Inc. v. Trac-4, Inc.*, 131 F.R.D. 134, 138 (N.D. Ind. 1990).

On these facts, denial of RFC's Motion is warranted on three grounds: futility, bad faith, and prejudice to Sierra.  *Streambend*, 2014 WL 316895 at *6-8.  The proposed FAC is facially defective, RFC does not have proper evidentiary support for the claims alleged, and the mere filing of the FAC would massively violate Sierra's rights under the retroactive release and covenant not to sue contained in the December 19, 2007 Settlement.  Denying RFC leave to file the FAC as proposed would not even be especially prejudicial (and certainly not the death knell this action deserves), as plaintiff's original Complaint is still pending.

Nonetheless, denial will send RFC and its counsel an overdue reminder (on behalf of Sierra and 66 other outraged mortgage originators recently hailed before this Court) that zealous advocacy has limits.  Some lines may never be crossed, whether by one step or ten, even in the name of bankrupt debtors that no longer bleed.

12-12020-mg   Doc 9036-1   Filed 08/31/15   Entered 08/31/15 17:15:40   Exhibit EX 1
- Sierra Opp to Mtn to Amend   Pg 23 of 23
CASE 0:13-cv-03093-RHK-FLN   Document 36   Filed 03/08/14   Page 22 of 22

## CONCLUSION

For the above-stated reasons, Sierra respectfully requests that the Court deny RFC's Motion.


Dated: March 7, 2014                          Respectfully Submitted,


                                              /s/ Jonathan M. Jenkins_____
                                              Jonathan M. Jenkins
                                              Admitted *pro hac vice*
                                              Lara Kayayan
                                              Admitted *pro hac vice*
                                              JENKINS LLP
                                              8075 West Third St., Suite 407
                                              Los Angeles, California 90048
                                              Telephone: (310) 984-6800
                                              Fax: (310) 984-6840
                                              jjenkins@jmjenkinslaw.com
                                              lkayayan@jmjenkinslaw.com


                                              Richard T. Thomson (#109538)
                                              Amy L. Schwartz (#0339350)
                                              Lapp, Libra, Thomson, Stoebner & Push,
                                                 Chartered
                                              120 South Sixth Street, Suite 2500
                                              Minneapolis, MN 55402
                                              Telephone: (612) 338-5815
                                              Fax: (612) 338-6651
                                              rthomson@lapplibra.com
                                              aschwartz@lapplibra.com

                                              Counsel for Defendant Sierra Pacific
                                              Mortgage Company, Inc.