**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) )  NOT FOR PUBLICATION |
|  | ) |
| RESIDENTIAL CAPITAL, LLC, *et al*., | )  Case No. 12-12020 (MG) |
|  | ) |
| Debtors. | )  Chapter 11 |
|  | ) |
|  | )  (Jointly Administered) |

**MEMORANDUM OPINION AND ORDER SUSTAINING IN PART AND
OVERRULING IN PART THE RESCAP BORROWER CLAIMS TRUST'S
OBJECTION TO
CLAIM NOS. 5610 AND 5612 FILED BY RICHARD D. RODE**

*A P P E A R A N C E S :*

MORRISON & FOERSTER LLP
*Attorneys for the ResCap Borrower Claims Trust*
250 West 55th Street
New York, New York 10019
By:    Norman S. Rosenbaum, Esq.
        Jordan A. Wishnew, Esq.
        Erica J. Richards, Esq.

RICHARD D. RODE
*Pro Se*
2301 West Lawther Lane
Deer Park, Texas 77536
By:    Richard D. Rode

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the ResCap Borrower Claims Trust's (the "Trust") objection

(the "Objection," ECF Doc. # 8452) to Claim Numbers 5610 and 5612 (the "Claims," *id.* Exs. 1-

A, 1-B) filed by Richard D. Rode ("Rode").[1]  Rode asserts that Debtors Homecomings Financial,

LLC ("Homecomings") and GMAC Mortgage, LLC ("GMACM") misapplied funds held in

---

[1]        The Objection is supported by the declaration of Kathy Priore (the "Priore Declaration," Obj. Ex. 2).

Rode's escrow account and failed to honor the terms of a loan modification agreement dated October 1, 2009 (the "October Agreement," Priore Decl. Ex. L). The Claims are based on a Texas state court action Rode filed against Homecomings and GMACM in July 2011. The Debtors removed the case to federal court. The case was stayed when the Debtors filed their bankruptcy cases in May 2012.

Rode alleges that the Debtors offered him a loan modification in August 2009 on terms set forth in the written October Agreement; Rode signed and returned the agreement as directed, along with a required initial payment of $3,025.00. Rode's next payment ($3,013.70) was due on November 1, 2009. Homecomings countersigned the loan modification agreement on October 7, 2009, but did not return the countersigned copy to Rode—GMACM alleged that it processed an insurance refund on October 7 that would have resulted in a surplus in Rode's escrow account. GMACM contended that its initial escrow analysis had likely been incorrect and it "backed off the modification," insisting that it needed to be modified, before delivering a countersigned copy to Rode. (Priore Decl. ¶ 22.) Rode's lawyer wrote two letters to GMACM in October 2009, stating that Rode was ready, willing, and able to make the November 1, 2009 payment, but would not do so until GMACM confirmed that the agreement had been finalized and the payments properly applied. The standoff persisted until late February 2010, when GMACM referred Rode's loan to foreclosure. Rode responded in July 2011 with his state court lawsuit; an amended complaint was later filed in February 2012. The amended complaint alleges a litany of state law causes of action against Homecomings and GMACM, each of which is discussed below. But the central issue in this contested matter is whether the October Agreement was binding on GMACM—Rode argues yes; GMACM argues no.

Rode filed an opposition to the Objection (the "Opposition," ECF Doc. # 8561), and the

Trust filed a reply (the "Reply," ECF Doc. # 8603).[2]  The Court held a hearing on the Objection

on May 14, 2015; Rode appeared at the hearing in person.  At the conclusion of the hearing, the

Court took the matter under submission.[3]

As set forth below, the Court holds that Rode has stated a breach of contract claim based

on the alleged October Agreement; but Rode fails to state a claim for any of the other causes of

action underlying his Claims.  Therefore, the Objection is **SUSTAINED in part** and

**OVERRULED in part**.

## I.    BACKGROUND

### A.    The Loan

Rode obtained a $265,175 residential mortgage loan (the "Loan") from non-debtor

Southtrust Mortgage Corporation ("Southtrust") in March 2003.  (Obj. ¶ 12.)  The Loan is

evidenced by a note (the "Note," Priore Decl. Ex. A) secured by a deed of trust (the "Deed of

Trust," *id.* Ex. B) encumbering real property located in Deer Park, Texas (the "Property").  (Obj.

¶ 12.)  The Deed of Trust named Mortgage Electronic Registration Systems, Inc. ("MERS") as

the beneficiary.[4]  (Deed of Trust at 2.)  Debtor Residential Funding Corporation ("RFC")

purchased the Loan from Southtrust and transferred the Loan to Deutsche Bank Trust Company

---

[2]      The Reply is supported by the supplemental declaration of Kathy Priore (the "Priore Supp.," ECF Doc.
# 8603-1).

[3]      The Court also directed the parties to meet and confer regarding a potential settlement of the Objection.  On
June 1, 2015, the Trust filed a letter indicating that the parties were still engaged in settlement discussions and
requesting that the Court delay issuing a decision on the Objection until the earlier of (i) June 30, 2015 or (ii) the
date the parties agreed that settlement discussions reached an impasse.  (*See* ECF Doc. # 8677.)  On July 13, 2015,
the Trust filed a subsequent letter indicating that the parties were still at an impasse and requesting that the Court
issue a ruling on the Objection.  (*See* ECF Doc. # 8885.)

[4]      The Deed of Trust indicates that MERS "is acting solely as a nominee for Lender and Lender's successors
and assigns."  (Deed of Trust at 2.)  The Deed of Trust was recorded on March 27, 2003.  (*See* Priore Decl. Ex. C at
2.)

Americas ("Deutsche Bank") on June 1, 2003 when the Loan was securitized.[5]  (*See* Obj. ¶ 12.)

On April 16, 2010, MERS, as nominee for Southtrust, assigned the Deed of Trust to Deutsche

Bank (the "DB Assignment," Priore Decl. Ex. C).[6]  (Obj. ¶ 12.)

According to the Trust, Homecomings serviced the Loan from April 2003 until it

transferred servicing to GMACM in May 2007; GMACM purportedly serviced the Loan from

May 2007 until it transferred servicing to non-debtor Ocwen Loan Servicing, LLC ("Ocwen") in

February 2013.[7]  (*Id.* ¶ 13.)  Rode's account was already delinquent when GMACM became

servicer in May 2007 and the account was never current thereafter.  (*Id.* ¶ 33.)

### B.    Loss Mitigation Efforts

Rode applied for a loan modification in 2008.  (*Id.* ¶ 20.)  He was approved for a non-

HAMP permanent loan modification on October 14, 2008; he had to submit signed documents to

the Debtors by November 10, 2008.  (*Id.*)  The loan modification documents required signatures

by Rode and his ex-wife (*id.*); she had signed the Deed of Trust but not the Note (*compare* Deed

of Trust at 14, *with* Note at 4).  Rode requested that GMACM issue new documents removing

her name.  (Obj. ¶ 20.)  GMACM informed Rode on two occasions that he needed to submit a

quitclaim deed from his ex-wife before GMACM would remove her name from the documents.

(*See id.*)  GMACM received a quitclaim deed on December 5, 2008.  (*Id.* ¶ 21.)  According to the

Trust, because of the delay in finalizing the loan modification documents, the original terms of

---

[5]    The Note was negotiated via endorsements from Southtrust to RFC, and from RFC to Deutsche Bank.  (*See* Note at 5.)

[6]    The DB Assignment was recorded on May 11, 2010.  (*See* DB Assignment at 3.)

[7]    While the Trust asserts that Homecomings serviced the Loan until May 2007, it is not entirely clear that this is accurate because Homecomings—not GMACM—countersigned the October Agreement in October 2009. (*See* October Agreement at 5.)

the non-HAMP permanent loan modification had to be reworked since the original terms would

not bring Rode's account current.  (*Id.* ¶ 22.)

Having provided GMACM with the quitclaim deed, as requested, Rode diligently

continued to pursue a loan modification during the first half of 2009.  GMACM insisted on a

new loan modification application from Rode, and again asked for a quitclaim deed from his ex-

wife, even though GMACM had already received it in December 2008.  (*See id.* ¶ 23.)  Rode's

frustration was palpable.  In early August 2009, Rode's attorney sent GMACM a letter

threatening a lawsuit unless GMACM offered Rode a loan modification.  (*Id.* ¶ 26.)  In late

August 2009, Homecomings approved Rode for a new loan modification, requiring Rode to

return an executed copy of the October Agreement and a payment by October 1, 2009.[8]  (*Id.* ¶¶

26, 27; *see* Priore Decl. Ex. K.)  Rode signed the October Agreement on October 1, 2009;

GMACM or Homecomings received the signed copy on October 5, 2009.[9]  (Obj. ¶ 28; *see*

October Agreement at 4.)  By October 2009, Rode owed twelve Loan payments (from November

2008 through October 2009).  (*See id.* ¶ 33.)  According to the Trust, Rode's escrow account had

a negative balance of $9,650.15, reflecting amounts that GMACM had already advanced as loan

servicer, attributed to (1) lender-placed insurance premiums for periods for which Rode had not

provided evidence of coverage, and (2) real estate taxes on the Property that had substantially

increased from prior years.  (*Id.*)

---

[8]       It is unexplained why the October Agreement identifies Homecomings rather than GMACM as a party—
GMACM purportedly succeeded Homecomings as servicer in May 2007 and Deutsche Bank, as trustee of a
securitization trust, owned the Loan.  Neither party raises an issue about this anomaly.

[9]       On October 25, 2009, GMACM resent Rode the October Agreement because his ex-wife's signature had
not been provided; however, on October 6, 2009, GMACM added a note to Rode's account indicating that, in light
of the quitclaim deed Rode had previously provided, his ex-wife's signature was not needed to process the
modification.  (Obj. ¶ 28 n.4.)

Homecomings countersigned the October Agreement on October 7, 2009. (Obj. ¶ 29; *see* Priore Decl. Ex. L at 5.) But on that same date, GMACM processed a $4,686.00 insurance refund, leaving a $4,964.15 negative escrow balance on Rode's account. (Obj. ¶ 29.) The terms of the October Agreement provided $10,000 in debt forgiveness to be posted to the escrow account; $5,189.91 in the overdrawn escrow amount was to be capitalized; together, this would result in an escrow surplus of $5,035.85. (*Id.*) GMACM concluded that its initial escrow analysis was incorrect, and that finalizing the October Agreement would result in a large surplus in Rode's escrow account. According to the Trust, consummating the loan modification would result in GMACM writing off the overdrawn escrow balance and refunding Rode for the escrow surplus out of its own pocket. (*See id.*) "GMACM backed off the modification and determined that it would be necessary to recalculate the terms of the modification taking into account all of the insurance refunds and escrow adjustments. . . . GMACM therefore voided the [October] 2009 Modification Agreement and did not return a copy of the fully executed agreement to Rode." (Priore Decl. ¶ 22.) Rode's attorney sent GMACM two letters, dated October 29 and 30, 2009, informing GMACM that Rode was ready, willing and able to make the November 1, 2009 payment, but he did not intend to perform under the terms of the October Agreement because he had not received a countersigned copy of the agreement. (*See* Obj. ¶ 29.)

### C.    Foreclosure Proceedings

GMACM referred the Loan to foreclosure in February 2010 (*id.* ¶ 34), but foreclosure was placed on hold while Rode's account was reviewed for a loan modification (*id.* ¶ 35). According to the Trust, GMACM ultimately approved Rode for a loan modification on revised terms in August 2010; however, that modification was never completed because Rode never submitted the required documents. (*See id.* ¶ 32.) The Trust also asserts on information and

6

belief that Rode has declined to pursue a loan modification with Ocwen, the current servicer of

the Loan.[10] (*Id.* ¶ 36.)

### D.    The Texas Action

On July 21, 2011, Rode filed a petition (the "Petition," Priore Decl. Ex. P) in Texas state

court against Homecomings and GMACM, seeking unspecified damages relating to the Debtors'

servicing of his Loan (the "Texas Action").  (*See* Obj. ¶¶ 37–38.)  The Petition asserted Texas

state law causes of action for:  (1) breach of contract; (2) fraud in the inducement; (3) fraud;

(4) negligent misrepresentation; and (5) violation of the Texas Deceptive Trade Practices Act

(the "TDCPA").  (*Id.* ¶ 38.)  The Debtors filed an answer to the Petition on August 11, 2011.

(*Id.* ¶ 39; *see* Priore Decl. Ex. Q.)  On February 6, 2012, Rode filed a first amended petition (the

"Amended Petition," Priore Decl. Ex. R at 6–60) asserting additional Texas state law causes of

action for:  (i) conversion; (ii) breach of fiduciary duty; (iii) common law and statutory fraud;

(iv) accounting; (v) violations of the Texas Finance Code; and (vi) violations of the Texas Theft

Liability Act (the "TTLA").  (Obj. ¶ 41.)

The defendants removed the Texas Action to federal court and filed an answer to the

Amended Petition.  (*Id.* ¶¶ 42, 43; *see* Priore Decl. Ex. T.)  The Texas Action was stayed when

the Debtors filed their chapter 11 cases.  (*Id.* ¶ 45.)  While still in its preliminary stages, the court

dismissed the Texas Action without prejudice on February 27, 2013 in light of the Debtors'

pending bankruptcy cases.  (*Id.*)

### E.    The Claims

Rode timely filed the Claims subject to the Objection:  (1) Claim Number 5610 ("Claim

No. 5610," *id.* Ex. 1-A) against Residential Capital, LLC ("ResCap") for $1,262,000 (comprised

---

[10]        According to the Trust, Ocwen ceased foreclosure on the Loan in November 2014.  (Priore Supp. ¶ 5.)

of a $339,000 secured claim and a $923,000 unsecured claim);[11] and (2) Claim Number 5612

("Claim No. 5612," *id.* Ex. 1-B) against Homecomings for $1,262,000 (comprised of a $339,000

secured claim and a $923,000 unsecured claim).[12]  (Obj. ¶¶ 49–50.)  The asserted basis for each

of the Claims is:  "Escrow Overage/Overpayments, Mortgage Fraud, Damages, Respa Violation,

Contingent."  (*See id.* Exs. 1-A, 1-B.)  The Claims attached no supporting documentation.  (Obj.

¶ 51.)  The Debtors requested additional information supporting the Claims, and Rode provided a

copy of the Amended Petition filed in the Texas Action.  (*See id.*)

### F.    The Objection

The Trust argues, among other things, that the Claims should be disallowed and

expunged because the Amended Petition fails to state any claims upon which relief can be

granted.  (*See* Obj. ¶¶ 56–109.)  The Trust also argues that the Debtors' non-performance under

the October Agreement did not excuse Rode from performing his obligations under the Note and

Deed of Trust.  (*Id.* ¶ 112.)  Even if the Court were to determine that Rode has a valid claim

against the Debtors for their non-performance under the October Agreement, the Trust asserts,

Rode's damages would be limited to economic damages directly attributed to the breach;

however, because Rode ceased making Loan payments altogether, he has no such damages.  (*Id.*

¶ 113.)

---

[11]      Pursuant to a stipulation and order (ECF Doc. # 5758), Claim No. 5610 was reclassified as a claim against GMACM.  (Obj. ¶ 49.)

[12]      Rode timely filed other claims that were previously expunged:  (1) Claim Number 2751 against ResCap and Claim Number 2678 against Homecomings were expunged by the *Order Granting Debtors' Twenty-Fifth Omnibus Objection to Claims (Amended and Superseded Borrower Claims)* (ECF Doc. # 5188); (2) Claim Number 2758 against GMACM was expunged by the *Amended Order Granting Debtors' Twenty-Sixth Omnibus Objection to Claims (Borrower Claims with Insufficient Documentation)* (ECF Doc. # 5221); and (3) Claim Number 5617 against GMAC-RFC Holding Company, LLC was expunged by the *Order Granting Debtors' Twenty-First Omnibus Objection to Claims (Borrower Claims with Insufficient Documentation)* (ECF Doc. # 4942).

The Trust further argues that Rode's Claims are not entitled to secured status. (*Id.* ¶ 114.) According to the Trust, Rode fails to provide any valid basis for treating any portion of the Claims as secured, and allowing them to be treated as secured would result in Rode receiving a disproportionately higher distribution than similarly situated borrower claimants. (*See id.* ¶ 115.) Finally, the Trust contends that any punitive damages sought by Rode should be equitably subordinated. (*Id.* ¶ 116.) According to the Trust, because "the Debtors are no longer conducting business, punitive damages will not have a deterrent effect on future conduct" (*id.*); rather, permitting Rode's claims for punitive damages to proceed would "have the inequitable result of requiring other similarly situated creditors to pay for a debtor's wrongdoing" (*id.*).

### G.    The Opposition

In his Opposition, Rode appears to assert—for the first time—additional claims sounding in wrongful foreclosure and violations of the Fair Debt Collection Practices Act (the "FDCPA"), the Texas Uniform Commercial Code (the "UCC"), certain of the pooling and servicing agreements ("PSAs") entered into by the Debtors, and the Securities Act of 1933 (the "Securities Act"). Rode asserts that the Debtors and their successors: (i) lack standing to foreclose on his Property; (ii) did not record a notice of assignment, as required; and (iii) manufactured and filed fraudulent documents evidencing their chain of title. (*See* Opp. at 2.) Rode contends the Debtors and their successors lack standing to foreclose because they are not the "[h]older in due course with rights to enforce [the Note]." (*Id.* at 5.) According to Rode, GMACM was represented to be the holder of the Note; however, the Note was made to Southtrust, and neither MERS nor GMACM can accelerate the obligations due under the Note. (*See id.*) Rode challenges the Loan's chain of title, indicating that "a fraudulent [a]llonge . . . disallows [RFC], or Deutsche Bank control of the Note or Deed of Trust." (*Id.*) Rode states that the appointment

of substitute trustee by MERS is fraudulent, since MERS has no rights in the Note (*id.* at 6), and

the DB Assignment is also fraudulent and unenforceable because it was not recorded before the

"cutoff date" for the applicable securitization trust (*id.* at 7–8). Accordingly, the alleged debt

obligation identified in the notice of substitute trustee's sale is "fraudulent, misleading, and

patently false" (*id.* at 7), and Rode denies owing any obligation to RFC or Deutsche Bank (*id.*).

 Rode also argues that the Debtors violated section 809 of the FDCPA. (*Id.* at 8.)

According to Rode, he requested to view the original Note with a complete chain of assignments

after receiving the Debtors' notice of acceleration; however, the Debtors failed to provide him

with the information requested in violation of section 809 of the FDCPA. (*Id.*) In support of his

FDCPA claim, Rode attaches a letter dated July 29, 2009 from his attorney to the Debtors. (*Id.*

Ex. B.)

 Finally, Rode asserts that the Debtors violated article 9 of the UCC by filing a fraudulent

financial statement (*see id.* at 3); this also purportedly violated the terms of the Debtors' PSAs

and the Securities Act (*see id.* at 3–4, 8).

### H. The Reply

 According to the Trust, the Objection set forth arguments rebutting at least one essential

element of each cause of action underlying the Claims; Rode failed to respond to these

arguments with countervailing evidence or additional allegations, and therefore each Claim

should be disallowed. (Reply ¶ 1.) Additionally, the Trust argues that Rode's Opposition

constitutes an untimely and improper amendment to his Claims to the extent he alleges new

causes of action for wrongful foreclosure and violations of the FDCPA, the UCC, the Securities

Act, and the Debtors' PSAs, and this amendment should not be permitted because it does not

"relate back" to his Claims and would unduly prejudice the Trust. (*See id.* ¶ 3.) The Trust

contends that Rode's allegations in the Opposition do not relate back to his Claims because: (1) the Debtors referred the Loan to foreclosure more than a year before Rode commenced the Texas Action and two and a half years before he filed the Claims; and (2) Rode did not make similar allegations of wrongful foreclosure in the Claims or in his response to the Debtors' requests for information in support of the Claims. (*Id.* ¶ 4.) Allowing Rode to raise new claims at this juncture would be unduly prejudicial, the Trust asserts, because: (i) the Debtors and the Trust spent a significant amount of time researching and analyzing the Claims; and (ii) Rode, and his counsel, "could have, or should have, become aware of these potential claims over five years ago, and Rode has been given ample opportunity to supplement his claims."[13] (*Id.* ¶ 5.) Because Rode inexplicably failed to put the Debtors on notice of these newly asserted claims, the Trust contends he should be barred from raising them now. (*Id.*)

## II.    DISCUSSION

### A.    Claims Objections

Correctly filed proofs of claim "constitute prima facie evidence of the validity and amount of the claim . . . . To overcome this prima facie evidence, an objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000). By producing "evidence equal in force to the prima facie case," an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant to "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Creamer*

---

[13]    The Trust notes that the Opposition indicates that Rode is appearing *pro se* in the Debtors' chapter 11 cases; however, Rode was represented by an attorney in his Texas action, and the Trust was copied on correspondence from that attorney to Ocwen on May 5, 2015, suggesting that this attorney is also advising Rode in connection with his Claims. (Reply ¶ 5 n.5 (citing *id.* Ex. 2).)

*v. Motors Liquidation Co. GUC Tr. (In re Motors Liquidation Co.)*, No. 12 Civ. 6074 (RJS),

2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013).  If the objector does not "introduce[]

evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need

offer no further proof of the merits of the claim."  4 COLLIER ON BANKRUPTCY ¶ 502.02 (Alan N.

Resnick & Henry J. Sommer eds., 16th ed. 2014).

Bankruptcy Code section 502(b)(1) provides that claims may be disallowed if

"unenforceable against the debtor and property of the debtor, under any agreement or applicable

law."  11 U.S.C. § 502(b)(1).  To determine whether a claim is allowable by law, bankruptcy

courts look to "applicable nonbankruptcy law."  *In re W.R. Grace & Co.*, 346 B.R. 672, 674

(Bankr. D. Del. 2006).

Federal pleading standards apply when assessing the validity of a proof of claim.  *See,

e.g.*, *In re Residential Capital, LLC*, 518 B.R. 720, 731 (Bankr. S.D.N.Y. 2014); *In re DJK

Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party

has met their burden in connection with a proof of claim, bankruptcy courts have looked to the

pleading requirements set forth in the Federal Rules of Civil Procedure." (citations omitted)).

Accordingly, a claimant must allege "enough facts to state a claim for relief that is plausible on

its face."  *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Where a complaint pleads facts that are merely

consistent with a defendant's liability, it stops short of the line between possibility and

plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 678 (citation omitted).  Plausibility "is

not akin to a probability requirement," but rather requires "more than a sheer possibility that a

defendant has acted unlawfully."  *Id.* (citation omitted).  The court must accept all factual

allegations as true, discounting legal conclusions clothed in factual garb.  *See, e.g.*, *id.* at 677–78;

*Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory factual allegations in the complaint to be true" (citing *Iqbal*, 556 U.S. at 678)). The court must then determine if these well-pleaded factual allegations state a "plausible claim for relief." *Iqbal*, 556 U.S. at 679 (citation omitted).

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted). A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). A claim that pleads only facts that are "merely consistent with a defendant's liability" does not meet the plausibility requirement. *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "The pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

To support claims grounded in fraud, Federal Rule of Civil Procedure ("FRCP") 9(b) requires the claimant to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). FRCP 9(b) is grounded in the purpose "to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties." *Silverman v. Arctrade Capital, Inc. (In re Arctrade Fin. Techs. Ltd.)*, 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2005) (citation omitted).

13

Although "[claims] drafted by *pro se* [claimants] are to be construed liberally, [] they must nonetheless be supported by specific and detailed factual allegations sufficient to provide the court and the defendant with 'a fair understanding of what the [claimant] is complaining about and . . . whether there is a legal basis for recovery.'" *Kimber v. GMAC Mortg., LLC (In re Residential Capital, LLC)*, 489 B.R. 489, 494 (Bankr. S.D.N.Y. 2013) (ellipsis in original) (quoting *Iwachiw v. New York City Bd. of Elections*, 126 F. App'x 27, 29 (2d Cir. 2005)).

### B.     Amendment of a Proof of Claim

The Trust argues that Rode should not be permitted to amend his Claims to include the newly asserted claims Rode alleges in his Opposition.  Federal Rule of Bankruptcy Procedure 3003(c)(3) directs bankruptcy courts "to establish a bar date beyond which proofs of claim are disallowed in a chapter 11 case." *In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 94 (Bankr. S.D.N.Y. 2007); *see* FED. R. BANKR. P. 3003(c)(3).  "The bar date is critically important to the administration of a successful chapter 11 case for it is intended to be a mechanism providing the debtor and its creditors with finality." *Id.* (citation omitted).  Where the bar date has passed and a creditor seeks to file an amended proof of claim, "the decision to allow the amendment of the claim is committed to the discretion of the bankruptcy judge." *In re Asia Global Crossing, Ltd.*, 324 B.R. 503, 507 (Bankr. S.D.N.Y. 2005) (citations omitted).

Amendment of a claim is "freely allowed where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim." *Integrated Res., Inc. v. Ameritrust Co. Nat'l Ass'n (In re Integrated Res., Inc.)*, 157 B.R. 66, 70 (S.D.N.Y. 1993) (citations omitted). "However, the court must subject post bar date amendments to careful scrutiny to assure that there was no attempt to file a new claim under the guise of amendment." *Id.* (citations omitted).

14

Courts in the Second Circuit apply a two-step inquiry when determining whether to allow post bar date amendments to proofs of claim. *See , e.g.*, *Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 133 (2d Cir. 2005); *In re Barquet Grp. Inc.*, 477 B.R. 454, 464 (Bankr. S.D.N.Y. 2012), *aff'd*, 486 B.R. 68 (S.D.N.Y. 2012). First, the court must decide "whether there was [a] timely assertion of a similar claim or demand evidencing an intention to hold the estate liable." *Midland Cogeneration*, 419 F.3d at 133 (alteration in original) (citation omitted). In other words, the amendment must relate back to the original proof of claim. An amendment satisfies this "relation back" inquiry if it: "1) corrects a defect of form in the original claim; 2) describes the original claim with greater particularity; or 3) pleads a new theory of recovery on the facts set forth in the original claim." *Id.* (quoting *In re McLean Indus., Inc.*, 121 B.R. 704, 708 (Bankr. S.D.N.Y. 1990)). In determining whether an amendment relates back to an earlier claim, "[t]he court must decide whether there is a sufficient commonality of facts between the allegations relating to the two causes of action to preclude the claim of unfair surprise." *Asia Global Crossing*, 324 B.R. at 508 (citing *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 23 (2d Cir. 1994)). "The court should also consider whether the defendant had notice of the claim now being asserted, and whether the plaintiff will rely on the same type of evidence to prove both claims." *Id.* (citations omitted).

If the initial "relation back" inquiry is satisfied, courts then examine whether it would be equitable to allow the amendment. *Id.* at 507; *Integrated Res.*, 157 B.R. at 70. Courts consider several factors when balancing the equities, including:

> (1) undue prejudice to opposing party; (2) bad faith or dilatory behavior on the part of the claimant; (3) whether other creditors would receive a windfall were the amendment not allowed; (4) whether other claimants might be harmed or prejudiced; and (5) the justification for the inability to file the amended claim at the time the original claim was filed.

*Integrated Res.*, 157 B.R. at 70 (citing *McLean*, 121 B.R. at 708); *accord Enron*, 419 F.3d at

133.  "The critical consideration is whether the opposing party will be unduly prejudiced by the

amendment."  *Integrated Res.*, 157 B.R. at 70 (citation omitted).

First, Rode's new causes of action asserted in his Opposition do not relate back to his

Claims.  The Claims, predicated on the allegations in the Amended Petition, concern the

Debtors' administration of Rode's escrow account and their actions taken in connection with loss

mitigation, including their representations made with respect to the October 2009 loan

modification.  (*See* Am. Pet. ¶¶ 5.01–5.10.)  While the Amended Petition makes occasional,

conclusory references to the Debtors' allegedly wrongful foreclosure (*see id.* ¶¶ 4.01, 5.09, 7.01),

the focus of the Amended Petition is the Debtors' actions taken before foreclosure was

commenced, including their alleged mishandling of Rode's escrow account and failure to

perform under the October Agreement.  (*See* Am. Pet. ¶¶ 6.01–6.10.)  Notably, Rode attached

the allegedly invalid foreclosure notices to the Amended Petition (*id.* Ex. G); however, the

Amended Petition does not raise issues concerning GMACM's standing to foreclose, challenge

the Loan's chain of title, or set forth that any foreclosure notices were fraudulent or deficient.

Nor does the Amended Petition reference the PSAs, the Securities Act, or the UCC.  Thus,

Rode's newly asserted claims do not correct defects in the allegations in the Amended Petition or

describe the Claims in greater detail.  Rather, Rode seeks to assert new theories of relief based on

a new, augmented scope of facts.

Even if Rode's newly alleged causes of action did relate back to his Claims, equitable

factors militate against allowing the amendment.  The Trust would be unduly prejudiced if

amendment were permitted because it has spent substantial time and resources analyzing the

merits of Rode's Claims and responding to his allegations.  Rode filed his Petition against the

Debtors in July 2011; he filed the Amended Petition asserting new causes of action in February

2012.  Rode does not explain why he did not assert the new causes of action alleged in his

Opposition when he filed his Claims in November 2012.  Nor does he offer any reason why he

did not assert these new theories of relief until approximately two and a half years later, when he

filed the Opposition.  There is no reason to expect that other creditors would receive a windfall

were the Court to refuse to allow Rode to amend his Claims.  By contrast, other creditors may be

prejudiced if amendment were permitted, as the Trust would likely spend significant time and

incur significant administrative expenses objecting to Rode's new claims, which could delay and

diminish distributions to other claimants.  Accordingly, the Objection is **SUSTAINED** as to

Rode's newly asserted claims for wrongful foreclosure and violations of the FDCPA, the UCC,

the Securities Act, and the Debtors' PSAs.

### C.    Conversion

Under Texas law, "[t]he elements of a conversion cause of action are:  (1) [the] plaintiff

owned, had legal possession of, or was entitled to possession of the property; (2) [the] defendant

assumed and exercised dominion and control over the property in an unlawful and unauthorized

manner, to the exclusion of and inconsistent with plaintiff's rights; (3) [the] plaintiff made a

demand for the property; and (4) [the] defendant refused to return the property."  *Fowler v. U.S.*

*Bank, Nat'l Ass'n*, 2 F. Supp. 3d 965, 982 (S.D. Tex. 2014) (citation omitted).  "[A]n action for

conversion of money arises only where the money can be identified as a specific chattel,

meaning it is '(1) delivered for safekeeping; (2) intended to be kept segregated; (3) substantially

in the form in which it is received or an intact fund; and (4) not the subject of a title claim by the

keeper.'"  *Entm't Merch. Tech., L.L.C. v. Houchin*, 720 F. Supp. 2d 792, 799 (N.D. Tex. 2010)

(quoting *Edge Petroleum Operating Co. v. GPR Holdings, L.L.C. (In re TXNB Internal Case)*,

17

483 F.3d 292, 308 (5th Cir. 2007)); *see Mitchell Energy Corp. v. Samson Res. Co.*, 80 F.3d 976,

984 (5th Cir. 1996) ("Where money is involved, it is subject to conversion only when it can be

described or identified as a specific chattel, but not where an indebtedness may be discharged by

the payment of money generally." (quoting *Crenshaw v. Swenson*, 611 S.W.2d 886, 891 (Tex.

Ct. App. 1980))); *Levels v. Merlino*, 969 F. Supp. 2d 704, 719 (N.D. Tex. 2013) ("[W]hen an

indebtedness can be discharged by payment of money, a conversion action is inappropriate."

(citations omitted)).

Because "[c]onversion involves a taking of property without the owner's consent," *Mack

v. Newton*, 737 F.2d 1343, 1354 (5th Cir. 1984) (citation omitted), a claim for conversion does

not lie where the owner of the subject property "has expressly or impliedly assented to the taking

or disposition of the property," *Taylor Pipeline Constr., Inc. v. Directional Rd. Boring, Inc.*, 438

F. Supp. 2d 696, 708 (E.D. Tex. 2006) (citations omitted) (dismissing plaintiff's conversion

claim where plaintiff assented to payment system that gave one defendant authority to pay funds

from project to second defendant who, in turn, would pay plaintiff); *see Levels*, 969 F. Supp. 2d

at 720 ("Plaintiffs agreed to a payment plan whereby they would give Defendants escrow funds,

and Plaintiffs did so with no other agreement related to those funds in place.  By consenting to

this payment method and participating in it, Plaintiffs are precluded from asserting that

Defendants' exercise of dominion over the money was wrongful.").

Rode argues that the Debtors are liable for conversion because they wrongfully charged

or debited fees, penalties, or costs to his escrow account without authorization.  (Am. Pet.

¶ 6.01.)  Rode alleges that the escrow account funds were designed to be held in his escrow

account "for safekeeping and segregated, and kept in such form, and only to be released upon

proper payment/debits of legitimate and agreed upon expenditures" (*id.*); however, the Debtors

wrongfully misappropriated such funds (*id.*), including by making "a $10,000.00

withdrawal/assessment out of escrow to 'other'" (*id.* ¶ 5.05). The Trust asserts that the escrow

account funds were not held by the Debtors for safekeeping but were instead applied by the

Debtors to certain escrow items as they became due. (*See* Obj. ¶ 58.) To the extent the escrow

account was incorrectly debited, the Trust contends that the Debtors could have remedied the

resulting indebtedness by crediting the escrow account.[14] (*See id.*) The Trust also argues that

Rode's conversion claim fails because he (1) expressly or impliedly assented to the Debtors'

disposition of his escrow account funds (*see id.* ¶ 59); and (2) has not identified any improper

charges to his escrow account (*id.* ¶ 60). Finally, the Trust asserts that Rode is barred from

seeking exemplary damages for conversion because he has not established by clear and

convincing evidence that the Debtors acted with fraud, malice, or gross negligence. (*See id.*

¶ 61.)

First, the Deed of Trust supports Rode's allegation that the escrow account funds were

specifically identifiable, segregated funds. Section 3 of the Deed of Trust, which governs the

establishment and administration of Rode's escrow account, provides that funds for the payment

of "Escrow Items" "shall be held in an institution whose deposits are insured by a federal

agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits

are so insured) or in any Federal Home Loan Bank." (Deed of Trust § 3.) Moreover, upon

---

[14]    Indeed, the only specific payment from the escrow account that Rode challenged was the premium for forced place insurance obtained by GMACM when it concluded that there was a gap in coverage. When Rode's lawyer provided GMACM with evidence that Rode had obtained insurance coverage, GMACM reversed the entry and credited the escrow with the amount of the premium. (*See* "Letter, Uzick to GMACM, dated Sept. 2, 2009," Am. Pet. Ex. B (enclosing declaration page of insurance policy and requesting "refund or apply the inappropriate charges to Mr. Rode's account for insurance coverage"); "Letter, GMACM to Uzick, dated Sept. 24, 2009," Priore Decl. Ex. F (stating that "insurance policy provided has been updated, the lapse from December 31, 2006 to September 21, 2007 has been canceled and a refund in the amount of $4,686.00 will be returned to escrow").

payment in full of all amounts secured by the Deed of Trust, the lender under the Deed of Trust

"shall promptly refund to [Rode] any Funds held by Lender."  (*Id.*)

Second, it is not clear that Rode expressly or implied assented to the Debtors' allegedly

improper debits to his escrow account.  Unlike in *Levels*, where the court held that the plaintiffs

were barred from pursuing a conversion claim against the defendants when the plaintiffs agreed

to give the defendants escrow funds "with no other agreement related to those funds in place,"

969 F. Supp. 2d at 720, the Deed of Trust sets forth limitations to the lender's use of the escrow

account funds.  For example, the escrow account funds are for payment of amounts due for

Escrow Items.  (*See* Deed of Trust § 3.)  The Deed of Trust further provides:

> If there is a surplus of Funds held in escrow, as defined under
> RESPA, Lender shall account to Borrower for the excess funds in
> accordance with RESPA.  If there is a shortage of Funds held in
> escrow, as defined under RESPA, Lender shall notify Borrower as
> required by RESPA, and Borrower shall pay to Lender the amount
> necessary to make up the shortage in accordance with RESPA, but
> in no more than 12 monthly payments.  If there is a deficiency of
> Funds held in escrow, as defined under RESPA, Lender shall
> notify Borrower as required by RESPA, and Borrower shall pay to
> Lender the amount necessary to make up the deficiency in
> accordance with RESPA, but in no more than 12 monthly
> payments.

(*Id.*)

Ultimately, however, Rode does not allege that he actually demanded return of allegedly

misappropriated escrow funds.  In his Amended Petition, he asserts that his attorney sent letters

to the Debtors on October 27 and 30, 2009, demanding an explanation of allegedly misapplied

escrow funds and an accounting (*see* Am. Pet. ¶¶ 5.05–5.06; *see also* Priore Decl. Exs. M–N),

but he does not allege that he demanded the return of such funds and the Debtors refused to

comply with his demand.  And, as already noted, when Rode provided evidence that the Property

was properly insured, GMACM credited the escrow account for the amount of the premium for

20

forced place insurance.  Given that Rode has not identified improper payments that the Debtors

failed to return, the Court concludes that Rode fails to state a claim for conversion.  Therefore,

the Objection to Rode's conversion cause of action is **SUSTAINED**.

### D.    Breach of Fiduciary Duty

To state a claim for breach of fiduciary duty under Texas law, the following elements

must be alleged:  "(1) a fiduciary relationship between the plaintiff and defendant; (2) the

defendant . . . breached his fiduciary duty to the plaintiff; and (3) the defendant's breach . . .

result[ed] in injury to the plaintiff or benefit to the defendant."  *Navigant Consulting, Inc. v.*

*Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (citation omitted).  However, "Texas law does not

recognize a fiduciary relationship between a borrower and a lender."  *Bittinger v. Wells Fargo*

*Bank NA*, 744 F. Supp. 2d 619, 626 (S.D. Tex. 2010); *accord Williams v. Countrywide Home*

*Loans, Inc.*, 504 F. Supp. 2d 176, 192–93 (S.D. Tex. 2007), *aff'd*, 269 F. App'x 523 (5th Cir.

2008) (per curiam) (unpublished decision).  "Similarly, a mortgage servicer owes no fiduciary

duty to its clients."  *Leal v. Bank of N.Y. Mellon*, No. C-12-265 (BLO), 2012 WL 5465978, at

*14 (S.D. Tex. Oct. 22, 2012) (citing *Townsend v. BAC Home Loans Servicing, L.P.*, 461 F.

App'x 367, 372 (5th Cir. 2011) (per curiam) (unpublished decision)); *accord Richardson v.*

*Ocwen Loan Servicing, LLC*, No. 3:13-CV-2578-O (ROC), 2014 WL 978512, at *6 (N.D. Tex.

Mar. 11, 2014) (explaining that a "mortgage servicer's duties are purely contractual").  However,

a mortgage loan servicer does have a duty to administer an escrow account as provided by the

applicable agreement between the parties in interest.  *White v. Mellon Mortg. Co.*, 995 S.W.2d

795, 801 (Tex. Ct. App. 1999) (citing *Watkins v. Williamson*, 869 S.W.2d 383, 387 (Tex. Ct.

App. 1993)).

One Texas Court of Appeals has offered the following description of case law addressing

whether an escrow agreement gives rise to a fiduciary relationship:

> Cases in which courts have described escrow agents as owing
> fiduciary duties to both parties to an escrow agreement have
> considered the issue in the context of *closings* on real property
> wherein the agent has a fiduciary duty to both sides in the
> transaction.  Other cases have explained that when the escrow
> agreement simply provides for the payment of funds by the
> mortgagor into an account for the mortgagee's use to meet tax,
> insurance, and other obligations—as appears to be the case here—
> no fiduciary relationship is created.

*Garcia v. Bank of Am. Corp.*, 375 S.W.3d 322, 333 (Tex. Ct. App. 2012) (emphasis in original)

(citations omitted).  According to the Fifth Circuit, "the courts of Texas have left no doubt that

the mere "[p]ayment of funds by the mortgagor into an escrow account for the mortgagee's use

to meet tax and insurance obligations on the property as they accrue does not create a trust or

fiduciary relationship under Texas law.'"  *Monumental Life Ins. Co. v. Hayes-Jenkins*, 403 F.3d

304, 318–19 (5th Cir. 2005) (alteration in original) (quoting *White*, 995 S.W.2d at 801).

Rode asserts that the Debtors owed him a fiduciary duty to correctly administer his

escrow account and to provide him with an accounting, upon request, of all expenditures, debits,

withdrawals, and payments with respect to his escrow account.  (Am. Pet. ¶ 6.02.)  Rode argues

that the Debtors breached this fiduciary duty by mishandling his escrow account and failing to

provide him with an accounting upon request.  (*Id.*)  According to the Trust, the Debtors, as

servicers of his Loan, did not owe him a fiduciary duty.  (Obj. ¶ 64.)  Even if the Debtors did

owe Rode a fiduciary duty, the Trust argues that Rode fails to allege that the Debtors breached

such a duty by identifying any specific improper charges made to his escrow account.  (*Id.* ¶ 65.)

Rode fails to state a claim for breach of fiduciary duty against the Debtors because the

Debtors owed Rode no fiduciary duty as servicers of his Loan, notwithstanding that they

administered the escrow account for the Loan.  *See Monumental Life*, 403 F.3d at 318–19;

*Garcia*, 375 S.W.3d at 333; *White*, 995 S.W.2d at 801.  Therefore, the Objection is

**SUSTAINED** as to Rode's breach of fiduciary duty cause of action.

### E.    Breach of Contract

Rode's breach of contract claim is two-fold: he relies on two separate contracts—the

Note and Deed of Trust, on the one hand, and the October Agreement, on the other.  As

explained below, the Court finds that Rode's breach of contract claim is viable to the extent it is

based on the October Agreement, but not as it relates to the Note and Deed of Trust.

"In Texas, '[t]he essential elements of a breach of contract claim are: (1) the existence of

a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the

contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'"

*Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (quoting *Aguiar v. Segal*, 167

S.W.3d 443, 450 (Tex. Ct. App. 2005)).  A contract is breached when a party "fail[s] to perform

an act that it expressly or impliedly promised to perform."  *Berry v. Fed. Nat'l Mortg. Ass'n*, No.

3:11-CV-1288-L (SAL), 2013 WL 1294008, at *4 (N.D. Tex. Mar. 29, 2013) (citing *Case Corp.

v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 769–70 (Tex. Ct. App. 2005)).  "It is a well

established rule that a party to a contract who is himself in default cannot maintain a suit for its

breach."  *Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990) (citations omitted); *accord Vera

v. Bank of Am., N.A.*, 569 F. App'x 349, 352 (5th Cir. 2014) (per curiam) (unpublished decision)

("Because Plaintiffs defaulted on their obligations under the Deed and their default was not

excused, they cannot maintain a breach of contract action against Defendants." (citing *Dobbins*,

785 S.W.2d at 378)).

While the Amended Petition does not specify which agreement forms the basis for

Rode's breach of contract claim, the claim appears to be based on the Debtors' non-performance

under the October Agreement as well as their alleged mishandling of his escrow account. (*See*

Am. Pet. ¶ 6.03.) Rode argues that the Debtors are the cause of his failure to make monthly

Loan payments because they never executed the October Agreement, as promised, or provided

any explanation of their debits to his escrow account. (*Id.*)

The Trust contends that Rode fails to state a claim for breach of contract based on the

Note and Deed of Trust or the October Agreement. With respect to the Note and Deed of Trust,

the Trust argues that Rode's breach of contract claim fails because the Debtors are not a party to

either of those Loan documents, and Rode himself breached such documents by failing to make

payments in accordance with their terms. (*See* Obj. ¶ 70.) The Trust also asserts that Rode's

breach of contract claim fails to the extent it arises out of the October Agreement because:

(1) the agreement did not constitute a meeting of the minds and was therefore not a legally

enforceable contract, since the terms offered were based on a flawed escrow analysis (*id.* ¶ 71);

(2) the doctrines of unilateral mistake and/or frustration of purpose excused GMACM from

performance even if the October Agreement were legally enforceable (*id.* ¶¶ 72–74); (3) Rode

did not perform under the October Agreement even if the agreement were legally enforceable

(*id.* ¶ 75); (4) the October Agreement did not contain any express or implied promises to Rode

regarding the management of his escrow account (*id.* ¶ 76); and (5) Rode has not established that

he suffered any damages that were the proximate result of any alleged breach of the October

Agreement (*id.* ¶ 77).

1.     <em>The Note and Deed of Trust</em>

According to the Trust, Rode fails to state a claim for breach of contract for the Debtors'

alleged breach of the Note and Deed of Trust because Rode breached these documents. (*See*

24

Obj. ¶ 70.)  Specifically, the Trust asserts that "Rode's account was already 30 days delinquent

when GMACM became servicer for the . . . Loan, and [the account] was never brought current."

(Priore Decl. ¶ 25 (citing *id.* Ex. G at 1).)  Additionally, the Trust states that "at the time Rode

returned the [October] . . . Agreement to GMACM on October 5, 2009, the account was owing

for twelve payments, from November 2008 through October 2009 . . . ."  (*Id.*)  In support, the

Trust submitted the servicing notes and payment history for Rode's Loan.  (*See id.* Exs. G, O.)

Rode does not allege that he performed his obligations under the Loan documents but asserts that

the Debtors "wrongfully applied sums paid by [him] totaling in excess of $24,000.00."  (Am.

Pet. ¶ 5.09.)  However, the Priore Declaration sets forth that the Trust reviewed the Debtors'

books and records and "found no indications that there were any improprieties related to the

handling of Rode's escrow account."  (Priore Decl. ¶ 8.)  The Trust provided Rode with the

details of the payments from the escrow account.  Rode has not identified any improper

payments.  As already discussed, the one specific item Rode complained about—the premium

for forced place insurance—was promptly credited to the escrow account when Rode provided

evidence the insurance coverage was in force.

       To the extent that Rode's breach of contract claim is based on the Debtors' alleged

breach of the Note and Deed of Trust, the Court concludes that the Trust rebutted the prima facie

validity of Rode's breach of contract claim.  The Trust submitted evidence of Rode's

nonperformance of his obligations under these Loan documents, and Rode failed to meet his

burden of establishing the validity of his claim by rebutting this evidence with countervailing

evidence.  Consequently, the Objection to Rode's breach of contract claim is **SUSTAINED** to

the extent it is based on alleged breaches of the Note and Deed of Trust.

2.    *The October Agreement*

The Trust argues that this breach of contract claim fails because the October Agreement is not a valid contract.  (*See* Obj. ¶ 71.)  Specifically, the Trust contends that "the [October] . . . Agreement did not constitute a meeting of the minds, since the terms offered were based upon an incorrect escrow analysis."  (*Id.*)  Moreover, the Trust asserts that the Debtors never delivered an executed copy of the agreement to Rode, which Rode admits.  (*Id.* (citing Am. Pet. ¶ 5.04).)  The issue here is whether Rode has sufficiently alleged that the October Agreement was binding on GMACM or Homecomings; the Court concludes that he has.

"The elements of a valid contract are (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and, in the case of a written contract, (5) execution and delivery of the contract with the intent that it be mutual and binding."  *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 17 (Tex. Ct. App. 2005) (citations omitted).  "[T]he determination of whether minds have met and whether a valid offer and acceptance have occurred is based on objective standards."  *Oliver v. Kroger Co.*, 872 F. Supp. 1545, 1550 (N.D. Tex. 1994) (citing *Fuqua v. Fuqua*, 750 S.W.2d 238, 245 (Tex. Ct. App. 1988)).  In resolving whether there was a meeting of the minds, courts look to "[t]he meaning reasonably conveyed by the parties' actions and words, rather than their uncommunicated subjective intentions . . . ."  *Id.* (citation omitted).

By letter dated August 26, 2009, the Debtors offered Rode the October 2009 loan modification.  (*See* Priore Decl. Ex. I.)  The letter instructed Rode to execute the October Agreement before a notary and return a contribution payment and the executed agreement to the Debtors by October 1, 2009.  (*See id.*)  The letter further indicates that "[t]he loan modification will not be complete until [the Debtors] receive all properly executed documents and the contribution amount."  (*Id.*)  Notably, the letter does not state that the October Agreement will

26

not be effective until GMACM executes the agreement and returns a copy to Rode.  The

Amended Petition attaches a letter from GMACM, dated September 24, 2009, acknowledging

receipt of Rode's contribution payment in connection with the October Agreement.  (Am. Pet.

Ex. C.)  Additionally, the Trust acknowledges that the Debtors received an executed version of

the October Agreement on October 5, 2009.[15]  Moreover, Homecomings countersigned the

October Agreement, only later determining that it believed the terms of the agreement were

based on an incorrect escrow analysis.  (*See* Obj. ¶¶ 29–30; Priore Decl. Ex. L.)

     The Trust's argument that the October Agreement does not reflect a "meeting of the

minds" appears unsupportable:  the four corners of the agreement appear clear and unambiguous.

To the extent the Trust asserts affirmative defenses of unilateral mistake and frustration of

purpose because of GMACM's faulty escrow analysis, such defenses raise questions of fact and

law that cannot be resolved on a claim objection.

     It is undisputed that Rode did not make the payments required under the October

Agreement.  Neither the November 1, 2009 payment nor subsequent payments were made.  The

letters Rode's attorney sent to GMACM on October 27 and 30, 2009 indicate that Rode would

not make the November 1, 2009 until Rode received confirmation that the October Agreement

had been finalized.  (*See* Priore Decl. Exs. M–N.)  It is unclear whether Rode's attorney sent

these letters because GMACM communicated that it did not intend to proceed with the October

Agreement.  The Trust argues that Rode was in default by not making the November 1, 2009

payment.  A party to a contract who is in default cannot maintain a breach of contract action.

*See Vera*, 569 F. App'x at 351–52 (citing *Dobbins*, 785 S.W.2d at 378)).  But a party's

---

[15]     While the October Agreement was not received by GMACM until October 5, 2009, the agreement was
signed by Rode on October 1, 2009, and the Trust does not challenge the validity of the agreement because it was
not timely received.

nonperformance under a contract is excused when the other party prevented his performance.

*Sgroe v. Wells Fargo Bank, N.A.*, 941 F. Supp. 2d 731, 746 (E.D. Tex. 2013) (citations omitted).

Whether Rode's performance under the agreement was excused by GMACM's breach remains

an open issue that cannot be resolved on the present record.  Consequently, the Trust's Objection

to the breach of contract claim as it relates to the October Agreement is **OVERRULED**.

However, even if Rode prevails on his breach of contract claim, it would result in an

allowed unsecured claim.  There is no basis for a secured claim or for punitive damages.  To the

extent Rode seeks such relief, the Objection is **SUSTAINED**.

### F.     Fraud in the Inducement

A claim for fraudulent inducement is a fraud claim related to the formation of a contract.

*GMAC Commercial Mortg. Corp. v. E. Texas Holdings, Inc.*, 441 F. Supp. 2d 801, 807 (E.D.

Tex. 2006) (citation omitted).  To state a claim for fraudulent inducement, the plaintiff must

allege:  "(1) the other party made a material representation, (2) the representation was false and

was either known to be false when made or made without knowledge of its truth, (3) the

representation was intended to be and was relied upon by the injured party, and (4) the injury

complained of was caused by the reliance."  *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 678

(Tex. 2009) (citation omitted).

Rode alleges that the Debtors are liable for fraudulent inducement because they made

knowingly false, material representations concerning their future performance of the October

Agreement with the intention that he rely on them.  (Am. Pet. ¶ 6.04.)  According to Rode, he did

in fact rely on these allegedly false representations.  (*Id.*)  The Trust argues that under Texas law,

a plaintiff cannot assert a fraudulent inducement claim in the absence of a contract, and the

October Agreement is not a legally enforceable contract.  (Obj. ¶ 81.)  Even if the October

Agreement were a legally enforceable contract, the Trust asserts that the agreement "contains an express acknowledgement that no representations, agreements or promises were made to Rode other than those set forth in the agreement itself." (*Id.* ¶ 82 (citing Priore Decl. Ex. K § 8).) Accordingly, the Trust argues that Rode's reliance on any alleged representations made while negotiating the October Agreement that are not contained in the agreement itself cannot form the basis for his fraudulent inducement claim. (*Id.*)

The terms of the October Agreement establish that GMACM, in entering into the agreement, did not intend Rode to rely on any representations not contained in the agreement. Specifically, the October Agreement contains the following provision:

> EACH OF THE BORROWER AND THE LENDER ACKNOWLEDGE THAT NO REPRESENTATIONS, AGREEMENTS OR PROMISES WERE MADE BY THE OTHER PARTY OR ANY OF ITS REPRESENTATIVES OTHER THAN THOSE REPRESENTATIONS, AGREEMENTS OR PROMISES SPECIFICALLY CONTAINED HEREIN. THIS AGREEMENT, AND THE NOTE AND SECURITY INSTRUMENT (AS AMENDED HEREBY) SETS FORTH THE ENTIRE UNDERSTANDING BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

(October Agreement ¶ 8.)  Additionally, because Rode does not allege that he performed under the October Agreement, he has not adequately pleaded reliance on any alleged misrepresentations made in the agreement itself.  Consequently, the Objection to Rode's fraudulent inducement claim is **SUSTAINED**.

### G.    Fraud

"The elements of common law fraud in Texas are:  (1) the defendant made a representation to the plaintiff; (2) the representation was material; (3) the representation was false; (4) when the defendant made the representation, the defendant knew it was false or made

the representation recklessly and without knowledge of its truth; (5) the defendant made the representation with the intent that the plaintiff act on it; (6) the plaintiff relied on the representation; and (7) the representation caused plaintiff injury." *Thompson v. Bank of Am., N.A.*, 13 F. Supp. 3d 636, 659 (N.D. Tex. 2014) (citing *Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1032–33 (5th Cir. 2010)).

Rode asserts a claim for common law and statutory fraud against the Debtors but does not identify any statutory provision in his Amended Petition.  (*See* Am. Pet. ¶ 6.05.)  Nevertheless, Rode's fraud claim, like his fraudulent inducement claim, is premised on his allegation that he relied on the Debtors' knowingly false, material misrepresentations made with the intent that he rely upon them.  (*See id.*)  Rode asserts that these misrepresentations include the Debtors' failure to:  (i) remove his ex-wife's name from loan modification documents as promised (*id.* ¶ 5.02); (ii) "zero out account balance/incurred charges and fees once the new loan documents were received and signed" (*id.*); and (iii) return a countersigned version of the October Agreement (*id.* ¶ 5.04).

According to the Trust, Rode's allegations that the Debtors knew that any of these representations were false at the time they were made are belied by the Debtors' books and records, which reflect that the Debtors concluded that they were not able to consummate the October Agreement only after it had been signed.  (Obj. ¶ 87.)  The Trust also argues that Rode cannot establish that these alleged misstatements were material.  (*See id.* ¶ 88.)  According to the Trust, the Debtors' failure to remove Rode's ex-wife's name from loan modification documents was not material because the loan modification was able to be processed upon receipt of the quitclaim deed, and the other alleged misstatements are not representations at all.  (*Id.*) Specifically, the Trust asserts that the expectation that GMACM would return a countersigned

version of the October Agreement was a condition to the agreement's effectiveness, not a

representation.  (*Id.*)  Additionally, revisions to Rode's loan status were terms of the loan

modification, contingent on GMACM's entry into the agreement, which GMACM denied.  (*Id.*)

The Trust further argues that Rode cannot establish that his reliance on these alleged

misstatements was reasonable, since GMACM never provided him an executed copy of the

October Agreement and Rode further indicated that he did not intend to perform his obligations

under the loan modification.  (*See id.* ¶ 89.)  Finally, the Trust contends that Rode cannot

establish that he suffered damages as a consequence of any alleged misrepresentation because

any damages he suffered are largely due to his own failure to satisfy his Loan obligations.  (*Id.*

¶ 90.)

Rode attempts to convert his breach of contract claim—which, for now, has survived in

part—into a fraud claim; on the facts alleged, the attempt fails.  Rode's alleges that GMACM

falsely represented that it would:  (i) "zero out the account balance/incurred charges and fees"

once it received the executed October Agreement (Am. Pet. ¶ 5.02); and (ii) return to Rode a

countersigned version of the October Agreement (*id.*¶ 5.07).  Rode cannot plausibly assert that

he relied on these alleged misrepresentations—he indicated that he did not intend to perform

under the October Agreement unless and until he received a countersigned version of the

agreement and assurances that his escrow account would be properly administered.  (*See id.*

¶ 5.06.)  Additionally, Rode does not state a fraud claim based on GMACM's alleged

misrepresentation that it would remove his ex-wife's name from the October Agreement because

he admits that GMACM informed him that the loan modification could proceed without her

signature.  (*See id.* ¶ 5.03.)  The Objection to Rode's fraud cause of action is therefore

**SUSTAINED**.

### H.    Accounting

Rode contends that the Debtors failed to properly justify their administration of his escrow account, even upon written demand.  (Am. Pet. ¶ 6.06.)  Accordingly, he "seeks an accounting of all expenditures, debits, credits, payments, fees, costs, penalties, and interest charged or withdrawn out of [his] escrow account at [the Debtors]' cost."  (*Id.*)  According to the Trust, Rode's accounting claim is moot because he "has already been provided with an accounting of his escrow account via discovery materials produce to him in connection with the [Texas action]."  (Obj. ¶ 91; *see* Priore Decl. ¶ 35.)

There is a split in authority whether an accounting is an equitable remedy or an independent cause of action under Texas law.  *Compare Watson v. Aurora Loan Servs. LLC*, No. 4:11-CV-301-BJ (JLC), 2012 WL 3594233, at *10 (N.D. Tex. Aug. 21, 2012) ("[A]n accounting is an equitable remedy that is not an independent cause of action." (citing *Henry v. CitiMortgage, Inc.*, No. 4:11-CV-83 (ALM), 2011 WL 2261166, at *8 (E.D. Tex. May 10, 2011))), *with Palmetto Lumber Co. v. Gibbs*, 80 S.W.2d 742, 626–27 (Tex. Comm'n App. 1935) (treating an accounting "as a proceeding in equity").  However, "[w]hether an accounting is only an equitable remedy or also an independent cause of action, it is appropriate only 'when the facts and accounts presented are so complex that adequate relief may not be obtained at law.'"  *Donnelly v. JP Morgan Chase, NA*, No. H-13-1376 (LHR), 2014 WL 429246, at *3 (quoting *Hutchings v. Chevron USA, Inc.*, 862 S.W.2d 752, 754 (Tex. Ct. App. 1993)).

Rode fails to state a claim for an accounting—the allegations in the Amended Petition do not support an inference that the facts are too complex for a legal remedy or that he cannot obtain the information he seeks through other means, particularly in light of the Trust's assertion that Rode was already provided an accounting of his escrow account.  *See McLaughlin v. Wells*

*Fargo Bank, N.A.*, No. 4:12-cv-02658 (MH), 2013 WL 5231486, at *6 (S.D. Tex. Sept. 13,

2013) (dismissing accounting cause of action for failure to state a claim where "there [we]re no

allegations that either the facts or the account at issue is complex, or that Plaintiff cannot obtain

the accounting information he seeks through discovery"); *accord Sauceda v. Wells Fargo Bank,*

*N.A.*, No. SA-12-CV-01094 (DAE), 2013 WL 690534, at *2 (W.D. Tex. Feb. 25, 2013).  For

these reasons, the Objection is **SUSTAINED** as to Rode's accounting cause of action.

## I.    Negligent Misrepresentation

The elements of a claim for negligent misrepresentation under Texas law are:  "(1) the

representation is made by a defendant in the course of his business, or in a transaction in which

he has a pecuniary interest; (2) the defendant supplies 'false information' for the guidance of

others in their business; (3) the defendant did not exercise reasonable care or competence in

obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by

justifiably relying on the representation."  *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442

(Tex. 1991).  "Significantly, the sort of false information contemplated in a negligent

misrepresentation case is a misstatement of existing fact, not a promise of future conduct."

*Baker v. Great N. Energy, Inc.*, 64 F. Supp. 3d 965, 978 (N.D. Tex. 2014) (citations omitted); *see*

*Thomas v. EMC Mortg. Corp.*, 499 F. App'x 337, 342 (5th Cir. 2012) (unpublished decision)

(affirming dismissal of negligent misrepresentation claim asserted against mortgage lenders

because "representations regarding future loan modifications and foreclosure constitute

'promises of future action rather than representations of existing fact'" (quoting *De Franceschi v.*

*BAC Home Loans Servicing, L.P.*, 477 F. App'x 200, 205 (5th Cir. 2012) (unpublished

decision))); *BCY Water Supply Corp. v. Residential Invs., Inc.*, 170 S.W.3d 596, 603 (Tex. Ct.

App. 2005) ("A promise to do or refrain from doing an act in the future is not actionable because it does not concern an existing fact." (citation omitted)).

Rode alleges that the Debtors are liable for negligent misrepresentation for their conduct relating to the October Agreement, including alleged misrepresentations that Rode's escrow account would be properly administered.  (*See* Am. Pet. ¶ 6.07; *see also id.* ¶¶ 6.01–6.06.) According to the Trust, these alleged misstatements cannot form the basis of a negligent misrepresentation claim because "Texas courts have consistently held that representations regarding future loan modifications and foreclosure constitute promises of future action rather than representations of existing fact and will not support a claim for negligent misrepresentation."  (Obj. ¶ 94 (citations omitted).)  Additionally, the Trust contends that Rode fails to state a claim for negligent misrepresentation because he cannot establish that:  (i) the information the Debtors provided with respect to his escrow account was false (*id.* ¶ 96); (ii) he justifiably relied on any information regarding his escrow account provided by the Debtors (*id.* ¶ 97); and (iii) he suffered any damages as a proximate result of the Debtors' alleged misrepresentations, rather than his own failure to comply with the terms of the Note and Deed of Trust (*id.* ¶ 98).

To the extent that Rode's negligent misrepresentation claim is premised on GMACM's alleged representations that it would enter into the October Agreement and "zero out [his] account balance" once it was executed (Am. Pet. ¶ 5.02), these allegations constitute promises of future action that are not actionable.  *See, e.g.*, *Carlisle v. JP Morgan Chase Bank, N.A.*, No. H-11-2849 (LHR), 2012 WL 912735, at *3 (S.D. Tex. Mar. 16, 2012) (collecting decisions holding that an alleged representation concerning future action is not cognizable as a negligent misrepresentation).  Additionally, Rode has not identified any specific misrepresentations the

Debtors allegedly made concerning his escrow account, or otherwise, on which he relied. Thus,

the Objection to Rode's negligent misrepresentation claim is **SUSTAINED**.

### J.    The TDTPA

According to Rode, the Debtors violated section 17.46 of the TDTPA by failing to

properly manage his escrow account, as they represented they would. (*See* Am. Pet. ¶ 6.08.)

Specifically, the Debtors failed to disclose certain specific actions they took with respect to his

escrow account and failed to provide him with information regarding his escrow account when

requested. (*See id.*) The Trust argues that Rode's TDTPA claim fails as a matter of law because

he is not a "consumer" within the meaning of the statute. (Obj. ¶ 99.) According to the Trust, a

necessary element to a well-pleaded TDTPA claim is that the plaintiff is a consumer as defined

by the statute. (*See id.* ¶ 100.)

The state a claim under the TDTPA, the plaintiff must allege: "(1) the plaintiff is a

consumer, (2) the defendant engaged in false, misleading, or deceptive acts, and (3) these acts

constituted a producing cause of the consumer's damages." *Doe v. Boys Clubs of Greater Dall.,

Inc.*, 907 S.W.2d 472, 478 (Tex. 1995) (citing TEX. BUS. & COM. CODE § 17.50(a)(1)). To

qualify as a consumer under the TDTPA, a plaintiff must establish that he is "an individual . . .

who seeks or acquires by purchase or lease, any goods or services . . . ." TEX. BUS & COM. CODE

ANN. § 17.45(4). In general, loans of money or extensions of credit are not considered goods or

services that can form the basis of a TDTPA claim. *Gomez v. Wells Fargo Bank, N.A.*, No. 3:10-

CV-0381-B (JJB), 2010 WL 2900351, at *3 (N.D. Tex. 2010) (concluding that mortgagor who

attempted to modify her home loan with mortgagee to avoid repossession of her home was not a

consumer under the TDTPA because she was attempting to borrow money and not purchase a

good or service); *see also Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 174 (Tex. 1980)

("[A]n attempt to borrow money is not an attempt to acquire either work or labor as contemplated in the [T]DTPA."); *Maginn v. Norwest Mortg., Inc.*, 919 S.W.2d 164, 167 (Tex. Ct. App. 1996) (holding that a party was not a consumer under the TDTPA where the purpose of the subject transaction was only to obtain a mortgage loan). It is true that a party who obtains a loan that is "inextricably intertwined" in the purchase or lease of a good or service may qualify as a consumer. *See Knight v. Int'l Harvester Credit Corp.*, 627 S.W.2d 382, 389 (Tex. 1982) (concluding that a bank customer qualified as a consumer because he sought financing to purchase a dump truck). However, "[t]he determining factor is whether the purchase or lease of a good or service was 'an objective of the transaction, not merely incidental to it.'" *Gomez*, 2010 WL 2900351, at *3 (quoting *F.D.I.C. v. Munn*, 804 F.2d 860, 865 (5th Cir. 1986)).

Rode used the Loan to purchase his home, which does not qualify as a "good" or "service" under the TDTPA. *See, e.g.*, *Brush v. Wells Fargo Bank, N.A.*, 911 F. Supp. 2d 445, 477 (S.D. Tex. 2012) ("Because the plaintiffs sought to modify their mortgage loan and not to acquire, by purchase or lease, a 'good' or 'service,' they do not have a viable [T]DTPA claim." (citations omitted)); *Fix v. Flagstar Bank, FSB*, 242 S.W.3d 147, 160 (Tex. Ct. App. 2007) (concluding that the refinance of a home equity loan did not qualify as a good or a service under the TDTPA); *Marketic v. U.S. Bank Nat'l Ass'n*, 436 F. Supp. 2d 842, 855 (N.D. Tex. 2006) (concluding that a home equity loan was not a "good" or a "service" under the TDTPA). Because Rode did not use the Loan to purchase a "good" or "service" within the meaning of the TDTPA, he is not a consumer as defined in the statute. Thus, Rode fails to state a claim under the TDPTA, and the Objection to his TDTPA is therefore **SUSTAINED**.

36

### K.      The Texas Finance Code

Rode asserts that the Debtors violated section 392.303(a)(2) of the Texas Finance Code by collecting or attempting to collect interest, charges, fees, or expenses incidental to his Loan that were not expressly authorized under the Note or Deed of Trust.  (*See* Am. Pet. ¶ 6.09.) Additionally, Rode contends that the Debtors violated section 392.304(a)(8) of the Texas Finance Code "by misrepresenting the character, extent, or amount of consumer debt, or misrepresenting the consumer's debt status in a judicial or government proceeding."  (*Id.*) According to the Trust, Rode's claim for violations of the Texas Finance Code fails because: (i) the Debtors' books and records reflect no improper management of Rode's escrow account, and Rode has not identified any specific improper charges to his escrow account (Obj. ¶ 103); and (ii) binding "Fifth Circuit authority holds that allegations regarding loan modification representations generally cannot state a debt collection practices claim under the Texas Finance Code" (*id.* ¶ 104 (citing *Chavez v. Wells Fargo Bank, N.A.*, 578 F. App'x 345, 348 (5th Cir. 2014) (per curiam) (unpublished decision)).)

Under section 392.303(a)(2) of the Texas Finance Code, "a debt collector may not use unfair or unconscionable means," including "collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer . . . ."  TEX. FIN. CODE. ANN. § 392.303(a)(2).  Rode asserts that the origin of the October 2009 loan modification was the Debtors' "misapplication of fees and wrongful charges of insurance."  (Am. Pet. ¶ 5.01.)  Additionally, he contests a "$10,000.00 withdrawal/assessment out of escrow to 'other'" (*id.* ¶ 5.05), and states that the Debtors "have wrongfully applied sums paid by [him] totaling in excess of $24,000.00" (*id.* ¶ 5.09).  The Trust

37

explains that the escrow transaction in the amount of $10,000 is attributed to the reversal of debt

forgiveness contemplated under the October 2009 loan modification.  (*See* Obj. ¶¶ 15, 29–30.)

Additionally, the Trust asserts that Rode has not identified any specific improper charges to his

account, notwithstanding that the Debtors provided him with a full explanation of the

transactions made to his escrow account.  (*See id.* ¶ 103.)

Section 392.304 of the Texas Finance Code provides that "in debt collection or obtaining

information concerning a consumer, a debt collector may not use a fraudulent, deceptive, or

misleading representation," including "misrepresenting the character, extent, or amount of a

consumer debt, or misrepresenting the consumer debt's status in a judicial or governmental

proceeding."  TEX. FIN. CODE. ANN. § 392.304(a)(8).  However, "[d]iscussions regarding loan

modification or a trial payment plan are not representations, or misrepresentations, of the amount

or character of [a] debt."  *Thomas*, 499 F. App'x at 343 (alteration in original) (quoting *Watson

v. Citimortgage, Inc.*, No. 4:10-CV-707 (RAS), 2012 WL 381205, at *7 (E.D. Tex. Feb. 3,

2012)).  Rode's claim for violations of section 392.304(a)(8) fails to the extent it is based on

discussions concerning the October 2009 loan modification.  Additionally, Rode does not

sufficiently allege facts supporting his claim for violation of section 394.304(a)(8) of the Texas

Finance Code.  Consequently, the Objection is **SUSTAINED** as to Rode's claim for violations of

the Texas Finance Code.

### L.    The TTLA

According to Rode, the Debtors' misappropriation of his escrow account funds

constitutes theft of property under the TTLA.  (*See* Am. Pet. ¶ 6.10.)  The Trust characterizes

Rode's TTLA claim as "the statutory corollary to Rode's conversion claim" and argue that it

fails for the same reasons that his conversion claim fails.  (*See* Obj. ¶¶ 106–08.)

38

The TTLA provides that "[a] person who commits theft is liable for the damages resulting from the theft." TEX. CIV. PRAC. & REM. CODE ANN. § 134.003(a). The TTLA further provides that a person who has sustained damages as a result of theft may recover actual damages, additional damages not to exceed $1,000.00, and court costs and reasonable and necessary attorney's fees if he prevails. *See id.* § 134.005.

"Theft" is defined under the TTLA as "unlawfully appropriating property or unlawfully obtaining services as described by [s]ection[s] 31.03, 31.04, 31.06, 31.07, 31.11, 31.12, 31.13, or 31.14 [of the] [Texas] Penal Code." *Id.* § 134.002(2). In turn, section 31.03 of the Texas Penal Code provides:

> (a) A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property.
>
> (b) Appropriation of property is unlawful if:
>
>> (1) it is without the owner's effective consent;
>>
>> (2) the property is stolen and the actor appropriates the property knowing it was stolen by another; or
>>
>> (3) property in the custody of any law enforcement agency was explicitly represented by any law enforcement agent to the actor as being stolen and the actor appropriates the property believing it was stolen by another.

TEX. PENAL CODE ANN. § 31.03(a)–(b). A person acts with the requisite intent to commit theft within the meaning of the TTLA when it is his "conscious desire or objective to deprive the [p]laintiff of property." *Montgomery v. SunTrust Mortg., Inc.*, No. 3:10-CV-733-F (RF), 2012 WL 1353087, at *8 (N.D. Tex. Apr. 19, 2012) (citations omitted); *accord Allison v. J.P. Morgan Chase Bank, N.A.*, No. 1:11-CV-342 (KFG), 2012 WL 4633177, at *15 (E.D. Tex. Oct. 2, 2012) (citations omitted). Rode alleges in conclusory fashion that the Debtors' misapplication of his escrow account funds "was made with the intent to deprive [him] of his property." (Am. Pet.

¶ 6.10.)  However, Rode does not allege additional facts that plausibly suggest that any alleged misapplication of escrow account funds was made with the intent to deprive him of his property. Accordingly, the Objection to Rode's TTLA claim is **SUSTAINED**.

### M.    RESPA

While Rode's Claims refer to RESPA violations, Rode does not allege a RESPA claim in the Amended Petition or in the Opposition.  The Trust argues that Rode's RESPA cause of action therefore "fail[s] to meet even the minimum pleading standard required to state a claim and [is] not supported by any documentary evidence."  (Obj. ¶ 109.)  The Court agrees.  Rode has not sufficiently alleged a RESPA claim, nor referenced any section of RESPA in his Amended Petition or Opposition.  As a result, the Objection to Rode's RESPA claim is **SUSTAINED**.

### III.    CONCLUSION

For the above reasons, the Objection is **SUSTAINED in part** and **OVERRULED in part**.  The Trust's counsel should schedule this matter for a case management conference at the next available omnibus hearing date.

**IT IS SO ORDERED.**

Dated:    September 2, 2015
          New York, New York

_Martin Glenn_
MARTIN GLENN
United States Bankruptcy Judge