## **Exhibit 2**

**Lathrop Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |

**DECLARATION OF SARA LATHROP IN SUPPORT OF THE RESCAP BORROWER CLAIMS TRUST'S OBJECTION TO CLAIM NOS. 3734 AND 3735 FILED BY JACQUELYN O. WIELAND, TTE OF MARSHALL O. CULTON REV. LIVING TRUST**

I, Sara Lathrop, hereby declare as follows:

1. I serve as Senior Claims Analyst for the ResCap Borrower Claims Trust (the "Borrower Trust"), established pursuant to the terms of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6030] confirmed in the above-captioned Chapter 11 Cases. During the Chapter 11 Cases, I served as Regulatory Compliance Manager and Loss Mitigation Manager in the loan servicing department of Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases (collectively, the "Debtors"). I began my association with ResCap in June 2006 working as an associate in the Default Division of the loan servicing operation of GMAC Mortgage, LLC ("GMACM"). In 2008, I became a Default Quality Control Specialist, a position that I held until I became a Supervisor in the Default Division in 2009. In 2011, I became a Supervisor in the Loss Mitigation Division of GMACM's loan servicing operation, and in February 2012, I became a Manager in that division. In this role, I oversaw GMACM associates in their efforts to provide borrowers with loss mitigation options and

1

assisted in the development of GMACM's loss mitigation policies. In January of 2013, I became the Regulatory Compliance Manager for ResCap. I became Senior Claims Analyst for ResCap in July 2013 and continued in this role when the ResCap Liquidating Trust (the "Liquidating Trust") was established in December 2013. In my current position as Senior Claims Analyst to the Borrower Trust, among my other duties, I continue to assist the Borrower Trust in connection with the claims reconciliation process.[1] I am authorized to submit this declaration (the "Declaration") in support of the *ResCap Borrower Claims Trust's Objection to Claim Nos. 3734 and 3735 Filed by Jacquelyn O. Wieland, TTE of Marshall O. Culton Rev. Living Trust* (the "Objection").[2]

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations, information learned from my review of relevant documents and information I have received through my discussions with other former members of the Debtors' management or other former employees of the Debtors, the Liquidating Trust, and the Borrower Trust's professionals and consultants. If I were called upon to testify, I could and would testify competently to the facts set forth in the Objection on that basis.

3. In my current and former capacities as Senior Claims Analyst and Loss Mitigation Manager to the Borrower Trust, the Liquidating Trust, and ResCap, I am intimately familiar with the Debtors' claims reconciliation process. Except as otherwise indicated, all statements in this Declaration are based upon my familiarity with the Debtors' Books and Records kept in the course of their regularly conduct business activities (the "Books and

---

[1] The ResCap Liquidating Trust and the ResCap Borrower Claims Trust are parties to an Access and Cooperation Agreement, dated as December 17, 2013, which, among other things, provides the Borrower Trust with access to the books and records held by the Liquidating Trust and Liquidating Trust's personnel to assist the Borrower Trust in performing its obligations.
[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Objection.

2

ny-1201447

Records"), as well as the Debtors' schedules of assets and liabilities and statements of financial affairs filed in these Chapter 11 Cases (collectively, the "Schedules"), my review and reconciliation of claims, and/or my review of relevant documents. I or Liquidating Trust personnel have reviewed and analyzed the proof of claim forms and supporting documentation filed by the Claimants. Since the Plan went effective and the Borrower Trust was established, I, along with members of the Liquidating Trust have consulted with the Borrower Trust to continue the claims reconciliation process, analyze claims, and determine the appropriate treatment of the same. In connection with such review and analysis, where applicable, I or Liquidating Trust personnel, together with professional advisors, have reviewed (i) information supplied or verified by former personnel in departments within the Debtors' various business units, (ii) the Books and Records, (iii) the Schedules, (iv) other filed proofs of claim, and/or (vi) the official claims register maintained in the Debtors' Chapter 11 Cases.

4. The Debtors have taken steps in these Chapter 11 Cases to afford Borrowers who have filed proofs of claim additional protections, as set forth in the Borrower Claim Procedures approved by the Procedures Order. A Request Letter was sent to the Claimant and the Borrower Trust received a response on July 22, 2013, which is attached hereto as Exhibit A.

5. On April 30, 2007, non-Debtor MortgageIT, Inc. ("MortgageIT") originated a loan (the "Loan") to Marshall O. Culton ("Culton"), evidenced by a note (the "Note") and secured by a deed of trust (the "Deed of Trust") on property located at 830 West Orange Grove Ave., Arcadia, CA 91006 (the "Property"). Copies of the Note and the Deed of Trust are attached hereto as Exhibit B and Exhibit C, respectively. On or around July 1, 2007, the Loan was transferred to HSBC Bank USA, National Association, as Trustee ("HSBC").

3

ny-1201447

6. GMACM subserviced the Loan for HSBC from May 11, 2007 until the foreclosure of the Property on January 29, 2010. On March 31, 2009, ETS recorded a Substitution of Trustee (the "Substitution of Trustee"). See Substitution of Trustee, attached hereto as Exhibit D.

7. Culton defaulted on the loan when she failed to make the September 2008 payment. See Servicing Notes, attached hereto as Exhibit E. The Property was referred to foreclosure on March 23, 2009 as the account was owing for the November 2008 through March 2009 payments. See id. On March 31, 2009, after the Substitution of Trustee was recorded, ETS recorded a Notice of Default and Election To Sell Under Deed of Trust (the "Notice of Default"). See Notice of Default, attached hereto as Exhibit F.

8. On July 2, 2009, the Debtors recorded a Notice of Trustee's Sale, setting the date of the foreclosure sale for July 27, 2009 (the "Notice of Sale" and with the Notice of Default, the "Notices"). See Notice of Sale, attached hereto as Exhibit G.

9. On July 10, 2009, Culton spoke with the Debtors via phone and discussed setting up a six month forbearance plan. See Servicing Notes at 30 of 53. On July 15, 2009, after confirming that Culton could afford the forbearance payments, the Debtors set up the six month forbearance plan (the "Forbearance Plan") on Culton's account. See id at 28. The monthly payment under the Forbearance plan was $3,353.89, compared to Culton's regular monthly payment of $3,605.43. See Forbearance Plan Agreement, attached hereto as Exhibit H.

10. On September 17, 2009, Culton spoke with the Debtors via phone and advised that she would like the Forbearance Plan to be converted to a HAMP Plan. See Servicing Notes at 23. The Debtors approved Culton for a HAMP Trial Plan (the "HAMP Trial Plan"), and Culton executed the related documents that same day. See HAMP Trial Plan,

attached hereto as <u>Exhibit I</u>. The HAMP Trial Plan stated that Culton would make payments of $3,353.89 by the 26th day of September, October, November, and December 2009. <u>See</u> <u>id</u>. The HAMP Trial Plan also stated that there is no grace period during the agreement. <u>See</u> <u>id</u>. Once the HAMP Trial Plan was completed, the Debtors would review the account for a permanent HAMP modification.[3]

11. The Debtors received payments pursuant to the HAMP Trial Plan on September 22, 2009, October 22, 2009, and November 24, 2009. <u>See</u> Servicing Notes at 2 of 53.

12. On December 10, 2009, the Debtors received a call from Robert Wieland who advised that Culton had passed away in November and that the Claimant was the executrix of her estate. <u>See</u> Servicing Notes at 21of 53. The Debtors advised Mr. Wieland that executorship documents and a death certificate needed to be sent to the Debtors' assumptions department.[4] <u>See</u> <u>id</u>.

13. On December 29, 2009, the Debtors received a death certificate but did not receive the executorship documents. <u>See</u> <u>id</u>.

14. On January 8, 2010, the HAMP Trial Plan was cancelled because the Debtors did not receive the payment due on December 26, 2009. <u>See</u> Servicing Notes at 20 of 53. As a result, the Debtors resumed the foreclosure process. <u>See</u> <u>id</u>.

15. On January 13, 2010, the Debtors spoke with Robert Wieland via phone, at which time the Debtors again advised Mr. Wieland that he needed to provide executorship

---

[3] Because the HAMP program was still new at this time, the Debtors' systems were not yet capable of setting up trial plans. As a result, the Debtors would provide borrowers with a plan that included a balloon payment, but the borrower would not have been expected to make the payment. Rather, once the four trial payments were completed, the account would be reviewed for a permanent modification.

[4] It was the Debtors' policy, in order to comply with federal privacy law, not to disclose information to unauthorized third parties unless the third party had authority to act on behalf of a borrower. This included requiring proof that a party was authorized to act on behalf of the estate of a deceased borrower. Thus, in accordance with their policy, the Debtors required proof that Mr. Wieland was an authorized party on the account before their representatives could have provided account information to him.

5

ny-1201447

papers identifying the person who was the authorized representative for the Culton estate, and that until such paperwork was received, the Debtors were not authorized to discuss the account with him. See id at 19 of 53.

16. On January 18, 2010, the Debtors again spoke to Mr. Wieland via phone, at which time Mr. Wieland stated he was trying to become authorized on the account. See Servicing Notes at 18 of 53. During the phone call, the Debtors once again advised Mr. Wieland that the Debtors required a proof of executorship or notarized will in order to authorize him on the Culton account. See id.

17. The Debtors spoke to Mr. Wieland via phone again on January 26, 2010, at which time Mr. Wieland asked about possible arrangements to stop the foreclosure sale. See Servicing Notes at 16 of 53. During that call, the Debtors again advised him that they could not discuss the account with him because he was not an authorized party on the account and that he would need to send in executorship papers. See id.

18. There is nothing in the Books and Records to indicate that a representative of the Debtors promised Mr. Wieland that foreclosure activity would be suspended. Furthermore, a representative of the Debtors could not have discussed such a topic with Mr. Wieland because he was not an authorized party on the account.

19. On January 28, 2010, the Property was sold in a foreclosure sale to a third party for $1,071,000. See Trustee's Deed Upon Sale, attached hereto as Exhibit J. At the time of the foreclosure sale, the account was owing for the February 2009 through January 2010 payments and the unpaid debt was $1,084,755.27.[5] A copy of the document prepared by the

---

[5] The total amount owed included a loan balance of $1,003,905.30, principal and interest advances of $49,218.32, an escrow balance of $28,516.92, and other fees and advances totaling $3,114.73. See Claims Balance.

Debtors and sent to the investor to show the amount still due on the account after the foreclosure is attached hereto as Exhibit K.

20. On January 29, February 2, and February 9, 2010, the Debtors received calls from Mr. Wieland, Diane Monzeta, and Jacqueline Wieland, respectively, each asking to discuss the account. See Servicing Notes at 8-12 of 53. On each occasion, the Debtors informed the person calling that executorship paperwork needed to be submitted before the Debtors could discuss the account. See id.

21. On June 11, 2010, the Debtors received a copy of Culton's will naming Jacqueline Wieland as Culton's special representative. See Servicing Notes at 6 of 53.

22. On December 7, 2011, the Claimant filed a complaint against GMACM and ETS and non-Debtor Mortgage Electronic Research Services ("MERS") in the State Court. See State Court Docket, attached hereto as Exhibit L. The Claimant filed an amended complaint on March 7, 2012.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 25, 2015

/s/ Sara Lathrop
Sara Lathrop
Senior Claims Analyst for ResCap
Borrower Claims Trust