## Claim No. 3735



Claim #3735  Date Filed: 11/8/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY **COURT FOR THE SOUTHERN DISTRICT OF NEW YORK** | | PROOF OF CLAIM |
|---|---|---|

Name of Debtor: RESIDENTIAL CAP/GMAC MORTGAGE LLC   Case Number: 12-12020 MG/12-12032(MG)/JOINT ADMIN.

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):   APRIL 28, 2005
JACQUELYN O. WIELAND, TTE. OF MARSHELL O. CULTON REV. LIVING TRUST
Name and address where notices should be sent:   NameID: 10855520
WILDISH & NIALIS
JACQUELINE O WIELAND, AS TRUSTEE OF THE MARSHELL O CULTON REVOCABLE LIVING
TRUST DATED APRIL 28, 2005 VS GMAC MRTG LLC ET AL
500 North State College Blvd., Suite 1200
Orange, CA 92868
Telephone number: 714 634-8001   email:

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number: _____ *(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):   ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

■ Date Stamped Copy Returned
☐ No self addressed stamped envelope
■ No copy to return

Telephone number:   email:

1. Amount of Claim as of Date Case Filed: $ SEE ATTACHED  $1,566,415.00
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
■ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: SEE ATTACHED
(See instruction #2)

3. Last four digits of any number by which creditor identifies debtor: _____   | 3a. Debtor may have scheduled account as: _____ (See instruction #3a) | 3b. Uniform Claim Identifier (optional): _____ (See instruction #3b) |

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.
Nature of property or right of setoff: ☐Real Estate ☐Motor Vehicle ☐Other
Describe:
Value of Property: $_____ Annual Interest Rate_____% ☐Fixed ☐Variable (when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $_____   Basis for perfection: _____
Amount of Secured Claim: $_____   Amount Unsecured: $_____

6. Claim Pursuant to 11 U.S.C. § 503(b)(9):
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____ (See instruction #6)

7. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. (See instruction #8, and the definition of "redacted".)
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

9. Signature: (See instruction #9) Check the appropriate box.
■ I am the creditor.   ☐ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)   ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)   ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: JACQUELYN O. WIELAND
Title: TTE OF MARSHELL O CULTON
Company: REV. LIVING TRUST
Address and telephone number (if different from notice address above):

Telephone number:   Email:

(Signature) *Jacquelyn O. Wieland*   (Date) 11-2-12

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

Amount entitled to priority:
$_____

\* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**RECEIVED**
NOV 0 8 2012
KURTZMAN CARSON CONSULTANTS
COURT USE ONLY

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

00:KC0002_51765-5_domestic_21/019330/15976      1212020120830175138257656

## SUMMARY OF CLAIM AND INTEREST CALCULATION

The Claimant has sued the debtor on a variety of causes of action in the Superior Court of the State of California, Los Angeles County,  in the case of **Jacquelyn Wieland, Trustee of the Marshell O. Culton Revocable Living Trust, dated April 28, 2005 v. GMAC Mortgage, LLC et al.** Case No.  GC048550.  Attached as documentary evidence of the claim is the Second Amended Complaint in this case, which constitutes a detailed  pleading of the facts underlying this claim, and further contains exhibits demonstrating the validity of the claim against the debtor.   The filing of the Chapter 11 petition herein has stopped the litigation as to the debtor, pursuant to 11 USC § 362 **et seq.**  This claim is filed in lieu of litigation as to the debtor.    Although multiple parties are listed in the lawsuit,  the debtor who is named herein as the subject of this claim is substantively liable for the entire amount of damages set forth below.  The amount of the claim is computed as follows:

Damages based on loss of the real property,
as of January 28 2010, wrongfully caused by debtor's acts
and omissions as plead in the  complaint, and which are
applicable as to all causes of action.

| | | |
|---|---|---|
| FMV Value of real property: | $2,000,000 | |
| Less Mortgage: | 1,078,000 | 922,000 |

Attorneys fees to May 14, 2012, Chapter 11 filing date
plead and recoverable  as per the complaint.                                   25,187

Interest from Jan. 28, 2010 to  May 14, 2012                                   119,228
Interest Calculation: 10% is the statutory legal interest rate in Calif. litigation,
from foreclosure date to date of Chapter 11 filing.  Property loss, less mortgage is
$922,000@10% simple interest= $92,200 per year,or $7683.33/month, or $252.60/day.

Punitive Damages, as plead  and recoverable in the complaint.            500,000

                                                     **TOTAL:    $1,566,415**

1

1   RONDINE E. MACADAEG, ESQ., SBN 263247
    MARK A. NIALIS, ESQ., SBN 89923
2   WILDISH & NIALIS
    500 North State College Boulevard, Suite 1200
3   Orange, California 92868
    Tel: (714) 634-8001 / Fax: (714) 634-3869
4   email: rmacadaeg@wildishandnialis.com
    email: mnialis@wildishandnialis.com
5
    Attorneys for Plaintiff
6   JACQUELINE O. WIELAND, as Trustee of
    THE MARSHELL O. CULTON REVOCABLE
7   LIVING TRUST DATED APRIL 28, 2005

8               SUPERIOR COURT OF THE STATE OF CALIFORNIA

9       COUNTY OF LOS ANGELES, NORTHEAST DISTRICT - PASADENA COURTHOUSE

10

11  JACQUELINE O. WIELAND, as Trustee of    ) Case No.: GC048550 [UNLIMITED CIVIL]
    THE MARSHELL O. CULTON REVOCABLE        )
12  LIVING TRUST DATED APRIL 28, 2005       ) Assigned to the Honorable Joseph F.
                                            ) DeVanon, Department S
13              Plaintiff,                  )
                                            ) PLAINTIFFS' SECOND AMENDED
14  vs.                                     ) COMPLAINT FOR:
                                            ) 1.  BREACH OF CONTRACT
15  GMAC MORTGAGE, LLC, a California limited ) 2.  FRAUD;
    liability company;                      ) 3.  INTENTIONAL
16  EXECUTIVE TRUSTEE SERVICES, LLC dba     )     MISREPRESENTATION;
    ETS SERVICES LLC, a Delaware limited    ) 4.  NEGLIGENT
17  liability corporation;                  )     MISREPRESENTATION; AND
    MORTGAGE ELECTRONIC REGISTRATION        ) 5.  WRONGFUL FORECLOSURE
18  SYSTEMS, INC., a Delaware corporation; and, )
    DOES 1 through 50, inclusive,           )
19                                          )
                Defendants.                 )
20  _____ )

21       Plaintiff JACQUELINE O. WIELAND, as the Trustee and Executor of the Marshell O.

22  Culton Estate, alleges as follows:

23                          COMMON ALLEGATIONS

24       1.      Plaintiff, JACQUELINE O. WIELAND, as the Successor Trustee of THE

25  MARSHELL O. CULTON REVOCABLE LIVING TRUST DATED APRIL 28, 2005 ("Plaintiff"

26  or "WIELAND"), is an individual residing in the City of Arcadia, County of Los Angeles, State of

27  California.

28       2.      Plaintiff is informed and believes and thereon alleges that Defendant,

                                    1
                          SECOND AMENDED COMPLAINT

MORTGAGEIT, INC. ("MORTGAGEIT"), is, and was at all times herein mentioned a foreign corporation organized and existing under the laws of the State of New York, duly licensed and authorized to do and doing business in the State of California.

3.      Plaintiff is informed and believes and thereon alleges that Defendant, DEUTSCHE BANK AG ("DEUTSCHE BANK"), is, and was at all times herein mentioned, a German business corporation authorized to and doing business in the State of California.

4.      Plaintiff is informed and believes and thereon alleges that Defendant, HSBC BANK USA, NATIONAL ASSOCIATION ("HSBC"), is, and was at all times herein mentioned, a national banking association organized and existing under the laws of the United states, duly licensed and authorized to do business in the State of California.

5.      Plaintiff is informed and believes and thereon alleges that Defendant, GMAC MORTGAGE (hereafter referred to as "GMAC") is, and at all times herein mentioned was, limited liability company organized and existing under the laws of the State of California, and doing business in California.

6.      Plaintiff is informed and believes and thereon alleges that Defendant, EXECUTIVE TRUSTEE SERVICES, LLC dba ETS SERVICES LLC (hereafter referred to as "ETS") is, and at all times herein mentioned was, a foreign corporation organized and existing under the laws of the State of Delaware, authorized to do and doing business in the State of California.

7.      Plaintiff is informed and believes and thereon alleges that Defendant, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (hereafter referred to as "MERS"), is, and at all times herein mentioned was, a foreign corporation organized and existing under the laws of the State of Delaware, authorized to do and doing business in the State of California.

8.      Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 50, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will amend the Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believe, and thereon allege, that each of the fictitiously named Defendants is negligently responsible in some manner for the occurrences herein alleged, and that Plaintiff's losses as herein alleged were proximately caused by such negligence.

9.    Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each Defendant was the agent and employee of each of the remaining Defendants and, in doing the things hereinafter alleged, was acting within the course and scope of such agency and employment.

10.    Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each Defendant acted in concert of action with each and every other Defendant in doing the things hereinafter alleged.

11.    Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, Defendants, and each of them, approved, authorized, directed and ratified the acts of each and every other Defendant in doing the things hereinafter alleged.

12.    On or about October 16, 2002, Marshell O. Culton ("CULTON"), mother of JACQUELINE O. WIELAND, purchased the real property located at <u>830 West Orange Grove Avenue, Arcadia, CA 91006</u> (the "Subject Property").

13.    On or about July 12, 2005, CULTON, as Trustee, transferred the Subject Property to THE MARSHELL O. CULTON REVOCABLE LIVING TRUST DATED APRIL 28, 2005, (hereinafter "Trust"), which was recorded with the Los Angeles County Recorder's Office as Instrument No. 051641340.

14.    Plaintiff is informed and believes and thereon alleges that MORTGAGEIT caused CULTON to take the Subject Property out of the Trust for purposes of refinancing by way of the Note. On or about May 8, 2007, CULTON recorded a Quitclaim Deed on the Subject Property to Marshell O. Culton, an unmarried woman, which was recorded with the Los Angeles County Recorder's Office as Instrument No. 20071113043. (A true and correct copy of which is attached hereto as Exhibit "A.")

15.    Notwithstanding, Plaintiff alleges that CULTON was the predecessor in interest of the Trust. It was always CULTON's intent that the Subject Property would remain in her trust after her refinance. Plaintiff alleges that CULTON entered into the Note with MORTGAGEIT in her own name, but it was always for the benefit of herself and the Subject Property and it inured to the benefit of the Trust when the Subject Property was deemed by the Probate Court to be part of the Trust.

CULTON was trustee of the Trust.  Plaintiff is now the successor trustee of the Trust. (A true and correct copy of the Probate Court order dated November 28, 2011 is attached hereto as Exhibit "B.")

16.    Plaintiff is informed and believes and thereon alleges CULTON encumbered the Subject Property with a Note secured by a First Deed of Trust in the amount of $970,000.00 (the "Subject First Deed of Trust") dated April 30, 2007, which was recorded in the Los Angeles County Recorder's Office on May 8, 2007 as Instrument No. 20071113044 which is in a first priority position. The Subject First Deed of Trust recites MORTGAGEIT as the Lender and further recites that MERS is a "nominee for the Lender and Lender's successors and assigns" and that MERS is the "beneficiary under this Security Instrument." (A true and correct copy of which is attached hereto as Exhibit "C.")

17.    Plaintiff is informed and believes and thereon alleges that, notwithstanding the Subject First Deed of Trust's recitals regarding MERS as nominee, MERS is also a beneficiary under the Subject First Deed of Trust because of MERS' economic interest and financial gain resulting from its financial interest under the Subject First Deed of Trust and the wrongful foreclosure against the Subject Property. Plaintiff is further informed and believes and thereon alleges that, MERS acted in concert of action with each and every other Defendant to financially gain from the Subjetc First Deed of Trust and from the wrongful foreclosure against the Subject Property.

18.    Plaintiff is informed and believes and thereon alleges that MORTGAGEIT may have transferred part of its beneficial interest under the Subject First Deed of Trust to DEUTSCHE BANK and HSBC. Plaintiff is further informed and believes and thereon alleges that DEUTSCHE BANK may have transferred part of its beneficial interest under the Subject First Deed of Trust to HSBC. Plaintiff is FURTHER informed and believes and thereon alleges that MORTGAGEIT, DEUTSCHE BANK and HSBC (collectively hereafter as "Lenders/Investors") are the true beneficiaries under the Subject First Deed of Trust because they are the lenders and investors of the Note secured by the Subject First Deed of Trust.

19.    Plaintiff alleges that MORTGAGEIT failed to record MORTGAGEIT's partial transfers and/or assignments of its beneficial interest under the Subject First Deed of Trust to either DEUTSCHE BANK or HSBC.  Plaintiff further alleges that DEUTSCHE BANK also failed to

1  record its partial transfer and/or assignments of its beneficial interest under the Subject First Deed

2  of Trust to HSBC. MORTGAGEIT is the Lender of record title under the Subject First Deed of

3  Trust. Plaintiff is ignorant of Defendants MORTGAGEIT, DEUTSCHE BANK, HSBC and MERS'

4  (collectively as "BENEFICIARIES") exact beneficial interest under the Subject First Deed of Trust

5  as they have failed to record the assignments and/or partial transfers.

6      20.    On or about March 31, 2009, a Notice of Default and Election to Sell Under Deed of

7  Trust (the "NOD") was recorded by Defendant ETS against the Subject Property indicating that as

8  of March 27, 2009, CULTON was in default in the amount of $25,886.23. The NOD was recorded

9  with the Los Angeles County Recorder's Office as Instrument No. 20090459490. (A true and correct

10  copy of which is attached hereto as Exhibit "D.")

11     21.    On or about July 2, 2009, an invalid Notice of Trustee's Sale (the "invalid NTS") was

12  recorded against the Subject Property. The invalid NTS was recorded with the Los Angeles County

13  Recorder's Office as Instrument No. 20090999746 in violation of the California Foreclosure

14  Prevention Act pursuant to Civil Code section 2923.52. (A true and correct copy of which is

15  attached hereto as Exhibit "E.")

16     22.    Plaintiff alleges that Defendants, and each of them, violated Civil Code section

17  2923.52 by failing to give the notice of sale until at least 90 days after the lapse of three months as

18  set forth in Civil Code section 2924(a)(2) because of the following

19          (1) the Subject First Deed of Trust was recorded during the period of January 1,

20          2003, to January 1, 2008, and is secured by the Subject Property;

21          (2) the loan at issue is a first deed of trust that the Subject Property secures;

22          (3) the Decedent/Borrower occupied the Subject Property as the Decedent/Borrower's

23          principal residence at the time the loan became delinquent; and

24          (4) the NOD was recorded on the Subject Property.

25     23.    Subsequent to the recordation of the NOD and invalid NTS, CULTON and Defendant

26  GMAC exchanged communications concerning a foreclosure repayment plan and agreement.

27     24.    On or about September 17, 2009, CULTON and Defendant GMAC agreed to a

28  "Foreclosure Repayment Agreement." (A true and correct copy of the Foreclosure Repayment

1   Agreement signed by CULTON is attached hereto as Exhibit "F.") Plaintiff is informed and believes

2   and thereon alleges that Defendant GMAC is in possession of the fully executed copy of the

3   Foreclosure Repayment Agreement.  Plaintiff is further informed and believes and thereon alleges

4   that GMAC, as loan servicer, was the agent and employee of each of the remaining Defendants.

5          25.    Plaintiff alleges that CULTON attempted to cure the default in the NOD and invalid

6   NTS under the Subject First Deed of Trust by making payments on the "Foreclosure Repayment

7   Agreement" with GMAC.  Payments were made pursuant to the Foreclosure Repayment Agreement

8   up to November 2009.  Plaintiff is informed and believes and thereon alleges that GMAC accepted

9   CULTON's payments on behalf of and for the benefit of the BENEFICIARIES under the Subject

10  First Deed of Trust.

11         26.    On or about November 5, 2009, CULTON passed away, leaving Plaintiff WIELAND

12  as the successor trustee of the Trust.  Plaintiff alleges that CULTON performed all conditions,

13  covenants, and promises required on her part to be performed in accordance with the terms and

14  conditions of the Foreclosure Repayment Agreement up to her date of death.

15         27.    Plaintiff alleges that on or about November 15, 2009, *after* CULTON passed away,

16  Plaintiff and her husband Robert Wieland remitted a payment pursuant to the Foreclosure Repayment

17  Agreement, which GMAC accepted on behalf of and for the benefit of the BENEFICIARIES under

18  the Subject First Deed of Trust.

19         28.    Plaintiff, as successor trustee, promptly notified Defendant GMAC of her mother's

20  death.  Plaintiff and her husband Robert Wieland called GMAC's Mortgage Loan Servicing

21  Customer Care Department at (866) 725-0782. Defendant GMAC, by and through its representative

22  whose identity is known to GMAC, orally directed Plaintiff and Robert Wieland not to make any

23  payments under the Foreclosure Repayment Agreement.  Further, Defendant GMAC, by and through

24  its representative whose identity is known to GMAC, promised Plaintiff that GMAC would suspend

25  all foreclosure activity concerning the Subject Property and that GMAC would continue to work with

26  Plaintiff and her husband while GMAC determined how to proceed after CULTON's death. (A true

27  and correct copy of Robert Wieland's phone records showing telephone calls made to GMAC

28  Mortgage Loan Servicing Customer Care Department at (866) 725-0782 on 12/10/09 and 1/13/11

is attached hereto as Exhibit "G.")

29.    Plaintiff did not make the monthly payment for December 2009 in reliance upon the statements of GMAC's Loan Servicing Customer Care representative whose identity is known to GMAC.

30.    On or about December 22, 2009, Robert Wieland thereafter provided Defendant GMAC with a copy of CULTON's death certificate, as requested by GMAC. (A true and correct copy of CULTON's death certificate is attached hereto as Exhibit "H.")

31.    Defendant GMAC failed to note in their records that CULTON had passed away and continued to direct communications to her, despite receiving a copy of Marshell O Culton's death certificate.

32.    On or about January 8, 2010, Defendant GMAC sent a letter to CULTON stating that the repayment plan previously established at her request was canceled because "the payment was not received by the payment date as specified in the **signed repayment agreement**." [Emphasis Added] This letter was sent over two months after CULTON passed away and over two weeks after Robert Wieland provided a copy of CULTON's death certificate, as requested by Defendant GMAC. (A true and correct copy of GMAC's letter dated 1/8/10 indirectly admitting the Foreclosure Repayment Agreement between GMAC and CULTON was executed and binding against GMAC is attached hereto as Exhibit "I" and incorporated by reference as though fully set forth herein.)

33.    Plaintiff is informed and believes and thereon alleges that on January 28, 2010, Defendant ETS, acting in concert of action with each and every Defendant, conducted a void Trustee Sale for an inadequate amount of approximately $1,078.000 against the Subject Property pursuant to the invalid Notice of Sale dated 7/2/09 and without any further notice to Plaintiff.

34.    On or about February 5, 2010, Defendant ETS recorded a Trustee's Deed Upon Sale from ETS to Grandana LLC/Lava rock Investments, LLC which was recorded with the Los Angeles County Recorder's Office as Instrument No. 20100170064.   (A true and correct copy of which is attached hereto as Exhibit "J.")

35.    Plaintiff is informed and believes and thereon alleges that twenty days later, on or about February 26, 2010, a Grant Deed was recorded from  Grandana LLC/Lava Rock Investments,

LLC to Grandana LLC, Lava Rock Investments, Mansour Meisami and Manzar Meisami, Husband

and Wife and E&A LLC, which was recorded with the Los Angeles County Recorder's Office as

Instrument No. 20100263451. (A true and correct copy of which is attached hereto as Exhibit "K.")

36.    Plaintiff is informed and believes and thereon alleges that on or about February 26,

2010, the Subject Property was quickly re-sold without improvements for approximately $1,500,000.

A Grant Deed was recorded from Grandana LLC, Lava Rock Investments, Mansour Meisami and

Manzar Meisami, Husband and Wife and E&A LLC to David Robert Kruse and Linda Faye Kruse

Co-Trustees of the David and Linda Kruse Community Property Trust, under trust dated 6/26/03,

which was recorded with the Los Angeles County Recorder's Office as Instrument No.

20100263451. (A true and correct copy of which is attached hereto as Exhibit "L.")

### FIRST CAUSE OF ACTION

### (Breach of Written Contract Against

### Defendants GMAC, MORTGAGEIT, DEUTSCHE BANK, HSBC and DOES 1 through

### 15, Inclusive)

37.    Plaintiff realleges and incorporates Paragraphs 1 through 36, inclusive, as though fully

set forth herein.

38.    Plaintiff is informed and believes and thereon alleges that at all times herein alleged,

Defendant GMAC, as loan servicer, was acting as an authorized agent and was acting within the

course and scope of such agency of Lenders/Investors MORTGAGEIT, DEUTSCHE BANK, and

HSBC under the Subject First Deed of Trust. Plaintiff is further informed and believes and thereon

alleges that Defendants GMAC financially benefitted as the loan servicer agent for Defendants

MORTGAGEIT, DEUTSCHE BANK, and HSBC and acted in concert of action with each and every

other Defendant in doing the things hereinafter alleged.

39.    On or about September 17, 2009, CULTON and Defendant GMAC agreed, on behalf

of itself and on behalf of and for the benefit of Defendants MORTGAGEIT, DEUTSCHE BANK,

and HSBC, to enter into a "Foreclosure Repayment Agreement." Plaintiff is informed and believes

and thereon alleges that Defendant GMAC is in possession of the fully executed copy of the

Foreclosure Repayment Agreement (*See* Exhibit "F" for the Foreclosure Repayment Agreement

1  executed by CULTON on 9/17/09.) Plaintiff is informed and believes and thereon alleges that the

2  Foreclosure Repayment Agreement was a modification of the Note secured by the Subject First Deed

3  of Trust.

4       40.     Plaintiff alleges that CULTON was the predecessor in interest of the Trust. It was

5  always CULTON's intent that the Subject Property would remain in her trust after entering into the

6  Foreclosure Repayment Agreement with GMAC. Plaintiff alleges that CULTON entered into the

7  Foreclosure Repayment Agreement with GMAC in her own name, but it was always for the benefit

8  of herself and the Subject Property and it inured to the benefit of the Trust when the Subject Property

9  was deemed by the Probate Court to be part of the Trust. CULTON was trustee of the Trust.

10  Plaintiff is now the successor trustee of the Trust. (Exhibit B.)

11       41.     Plaintiff alleges that CULTON performed all conditions, covenants, and promises

12  required on her part to be performed in accordance with the terms and conditions of the Foreclosure

13  Repayment Agreement up to her date of death on or about November 5, 2009.

14       42.     Plaintiff is informed and believes and thereon alleges that Defendant GMAC ratified

15  the partially executed Foreclosure Repayment Agreement by accepting CULTON's payments.

16  Plaintiff is informed and believes and thereon alleges that, on or about November 15, 2009,

17  Defendant GMAC further accepted the payment remitted by Plaintiff in her capacity as successor

18  trustee.

19       43.     Plaintiff, as successor trustee, promptly notified Defendant GMAC of her mother's

20  death. Plaintiff and her husband Robert Wieland called GMAC's Mortgage Loan Servicing

21  Customer Care Department at (866) 725-0782. Defendant GMAC, by and through its representative

22  whose identity is known to GMAC, orally directed Plaintiff and Robert Wieland not to make any

23  payments under the Foreclosure Repayment Agreement. Further, Defendant GMAC, by and through

24  its representative whose identity is known to GMAC, promised Plaintiff that GMAC would suspend

25  all foreclosure activity concerning the Subject Property and that GMAC would continue to work with

26  Plaintiff and her husband while GMAC determined how to proceed after CULTON's death. (A true

27  and correct copy of Robert Wieland's phone records showing telephone calls made to GMAC

28  Mortgage Loan Servicing Customer Care Department at (866) 725-0782 on 12/10/09 and 1/13/11

is attached hereto as Exhibit "G" and incorporated by reference herein as though fully set forth.)

44.    Plaintiff did not make the monthly payment for December 2009 in reliance upon the statements of GMAC's Loan Servicing Customer Care representative whose identity is known to GMAC.

45.    On or about January 8, 2010, Defendant GMAC sent a letter to CULTON stating that the repayment plan previously established at her request was canceled because "the payment was not received by the payment date as specified in the **signed repayment agreement**." [Emphasis Added] (Exhibit I.) Plaintiff is informed and believes and thereon alleges that GMAC's letter indirectly admitted to the validity and enforceability of the Foreclosure Repayment Agreement.

46.    Plaintiff alleges that on or about January 8, 2010, Defendant GMAC breached its contract by canceling the Foreclosure Repayment Agreement notwithstanding Defendant GMAC's agreement with Plaintiff, as successor trustee to the Trust, to suspend all foreclosure activity concerning the Subject Property and that GMAC would continue to work with Plaintiff and her husband while GMAC determined how to proceed after CULTON's death. Plaintiff is informed and believes and thereon alleges that at the time of GMAC's breach, GMAC was acting on behalf of itself and on behalf of and for the benefit of Defendants MORTGAGEIT, DEUTSCHE BANK, and HSBC.

47.    On or about January 28, 2010, GMAC, in concert of action with each and every remaining Defendant caused Defendant ETS to wrongfully foreclose against the Subject Property pursuant to the invalid Notice of Sale dated July 2, 2009. (Exhibits E and J.)

48.    As a direct and proximate result of Defendant GMAC's breach of the Foreclosure Repayment Agreement, Plaintiff has been damaged by the wrongful foreclosure against the Subject Property, in an amount according to proof at trial.

## SECOND CAUSE OF ACTION

### (Fraud - Promise Made Without Intention to Perform,

### Against Defendant GMAC and DOES 1 through 20, Inclusive)

49.    Plaintiff realleges and incorporates herein by reference Paragraph Nos. 1 through 48, inclusive, of this Complaint as though set forth in full herein.

50.     Plaintiff, as successor trustee, promptly notified Defendant GMAC of CULTON's death.   Plaintiff and her husband Robert Wieland called GMAC's Mortgage Loan Servicing Customer Care Department at (866) 725-0782. Defendant GMAC, by and through its representative whose identity is known to GMAC, orally directed Plaintiff and Robert Wieland not to make any payments under the Foreclosure Repayment Agreement. Further, Defendant GMAC, by and through its representative whose identity is known to GMAC, promised Plaintiff that GMAC would suspend all foreclosure activity concerning the Subject Property and that GMAC would continue to work with Plaintiff and her husband while GMAC determined how to proceed after CULTON's death. (See Exhibit "G" for telephone calls made to GMAC Mortgage Loan Servicing Customer Care Department at (866) 725-0782 on 12/10/09 and 1/13/11).

51.     At the time Defendant, GMAC made this promise, it had no intention of performing it.   On or about January 8, 2010, Defendant GMAC sent a letter to CULTON stating that the repayment plan previously established at her request was canceled because "the payment was not received by the payment date as specified in the signed repayment agreement." (Exhibit "I.")

52.     The promise was made by Defendant GMAC by and through it's Loan Servicing Customer Care representative whose identity is known to GMAC, with the intent to induce Plaintiff not to make the monthly payments under the Foreclosure Repayment Agreement so Defendant GMAC could proceed with wrongfully foreclosing against the Subject Property pursuant to the Subject First Deed of Trust. Defendant GMAC knew or should have known to stay the foreclosure proceedings against the Subject Property.

53.     Plaintiff, at the time this promise was made and at the time Plaintiff took the actions herein alleged, was ignorant of Defendant GMAC's secret intention not to perform. Plaintiff could not, in the exercise of reasonable diligence, have discovered Defendant GMAC's secret intention. In reliance on the promise of Defendant GMAC, Plaintiff did not make a payment pursuant to the Foreclosure Repayment Agreement while Plaintiff, as successor Trustee, was waiting for Defendant GMAC's response and direction on how to proceed with the trust property. If Plaintiff had known of the actual intention of Defendant GMAC, Plaintiff would have made the monthly payments pursuant to the Foreclosure Repayment Agreement to ensure the postponement of foreclosure

1  activity against the Subject Property.

2      54.    Defendant GMAC failed to abide by its promise to suspend all foreclosure activity

3  against the Subject Property while GMAC determined how to proceed after CULTON's death.

4  Instead, on or about January 28, 2010, GMAC, in concert of action with each and every remaining

5  Defendant caused Defendant ETS to wrongfully foreclose against the Subject Property pursuant to

6  the invalid Notice of Sale dated July 2, 2009. (Exhibits E & J.) But for the promises made by

7  Defendant GMAC, by and through its Loan Servicing Customer Care representative whose identity

8  is known to GMAC, Plaintiff would have made the monthly payments pursuant to the Foreclosure

9  Repayment Agreement.

10      55.    As a direct and proximate result of Defendant GMAC's promise made without

11  intention to perform, Plaintiff has been damaged by the wrongful foreclosure against the Subject

12  Property, in an amount according to proof at trial.

13                 **THIRD CAUSE OF ACTION**

14             **(Intentional Misrepresentation Against**

15       **Defendants GMAC and DOES 1 through 25, Inclusive)**

16      56.    Plaintiff realleges and incorporates Paragraphs Nos. 1 through 52, inclusive, as though

17  fully set forth herein.

18      57.    Plaintiff, as successor trustee, promptly notified Defendant GMAC of CULTON's

19  death. Plaintiff and her husband Robert Wieland called GMAC's Mortgage Loan Servicing

20  Customer Care Department at (866) 725-0782. Defendant GMAC, by and through its representative

21  whose identity is known to GMAC, orally directed Plaintiff and Robert Wieland not to make any

22  payments under the Foreclosure Repayment Agreement. Further, Defendant GMAC, by and through

23  its representative whose identity is known to GMAC, promised Plaintiff that GMAC would suspend

24  all foreclosure activity concerning the Subject Property and that GMAC would continue to work with

25  Plaintiff and her husband while GMAC determined how to proceed after CULTON's death. (See

26  Exhibit "G" for telephone calls made to GMAC Mortgage Loan Servicing Customer Care

27  Department at (866) 725-0782 on 12/10/09 and 1/13/11).

28      58.    The representations made by Defendant GMAC to suspend all foreclosure activity

concerning the Subject Property while it determined how to proceed after CULTON's death were in fact false. The true facts were that Defendants and each of them did not suspend foreclosure activities against the Subject Property. Instead, on or about January 28, 2010, GMAC, in concert of action with each and every remaining Defendant caused Defendant ETS to wrongfully foreclose against the Subject Property pursuant to the invalid Notice of Sale dated July 2, 2009. (Exhibits E & J.)

59. When Defendant GMAC made these representations to Plaintiff, GMAC knew them to be false and made these representations with the intention to deceive and defraud Plaintiff and to induce Plaintiff to act in reliance on these representations in the manner hereafter alleged, or with the expectation that Plaintiff would so act. Defendant GMAC knew or should have known to stay the foreclosure proceedings against the Subject Property.

60. Plaintiff, at the time said representations was made by Defendant GMAC and at the time Plaintiff took the actions herein alleged, was ignorant of the falsity of Defendant's representations and believed them to be true. In reliance on these representations, Plaintiff was induced to not, and did not, make the monthly payments pursuant to the Foreclosure Repayment Agreement. Had Plaintiff known the actual facts, Plaintiff would have made the payments pursuant to the Foreclosure Repayment Agreement to ensure the Subject Property was not foreclosed upon. Plaintiff's reliance on Defendant GMAC Loan Servicing Customer Care agent's representations was justified because Plaintiff had no reason to believe Defendant GMAC would wrongfully foreclose against the Subject Property while Plaintiff was ready, willing and able to make payments pursuant to the Foreclosure Repayment Agreement. While Plaintiff was having the above-described discussions with Defendant GMAC, Plaintiff was working on, and making alterations and improvements to, the Subject Property.

58. As a direct and proximate result of the fraudulent conduct of Defendants GMAC as herein alleged, Plaintiff was damaged in a sum according to proof at trial.

59. The aforementioned conduct of Defendant GMAC was an intentional misrepresentation, deceit, or concealment of a material fact known to the Defendant with the intention on the part of Defendant of thereby depriving Plaintiff of property or legal rights or

1  otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust

2  hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and

3  punitive damages.

4  ## FOURTH CAUSE OF ACTION

5  ### (Negligent Misrepresentation as Against

6  ### Defendants GMAC MORTGAGE and DOES 1 through 30, Inclusive)

7  60.    Plaintiff realleges and incorporates Paragraphs Nos. 1 through 59, inclusive, as though

8  fully set forth herein.

9  61.    Plaintiff, as successor trustee, promptly notified Defendant GMAC of CULTON's

10  death.  Plaintiff and her husband Robert Wieland called GMAC's Mortgage Loan Servicing

11  Customer Care Department at (866) 725-0782. Defendant GMAC, by and through its representative

12  whose identity is known to GMAC, orally directed Plaintiff and Robert Wieland not to make any

13  payments under the Foreclosure Repayment Agreement. Further, Defendant GMAC, by and through

14  its representative whose identity is known to GMAC, promised Plaintiff that GMAC would suspend

15  all foreclosure activity concerning the Subject Property and that GMAC would continue to work with

16  Plaintiff and her husband while GMAC determined how to proceed after CULTON's death. (See

17  Exhibit "G" for telephone calls made to GMAC Mortgage Loan Servicing Customer Care

18  Department at (866) 725-0782 on 12/10/09 and 1/13/11).

19  62.    The representations made by Defendant GMAC were in fact false.  The true facts

20  were that Defendant did not suspend all foreclosure activities against the Subject Property. Instead,

21  on or about January 28, 2010, GMAC, in concert of action with each and every remaining Defendant

22  caused Defendant ETS to wrongfully foreclose against the Subject Property pursuant to the invalid

23  Notice of Sale dated July 2, 2009. (Exhibits E & J.) Defendant GMAC knew or should have known

24  to stay the foreclosure proceedings against the Subject Property.

25  63.    Defendant GMAC made these representations with the intention of inducing Plaintiff

26  to act in reliance on these representations in the manner hereafter alleged, or with the expectation

27  that Plaintiff would so act.

28  64.    Plaintiff, at the time said representations were made by Defendant GMAC and at the

1   time Plaintiff took the actions herein alleged, was ignorant of the falsity of Defendant GMAC's

2   representations and believed them to be true. In reliance on these representations, Plaintiff was

3   induced to not, and did not, make the monthly payments pursuant to the Foreclosure Repayment

4   Program. Had Plaintiff known the actual facts, Plaintiff would have made the payments pursuant

5   to the Foreclosure Repayment Agreement to ensure the Subject Property was not foreclosed upon.

6   Plaintiff's reliance on Defendant GMAC's representations was justified because she had no reason

7   to believe Defendant GMAC would wrongfully foreclose against the Subject Property while Plaintiff

8   was ready, willing and able to make payments pursuant to the Foreclosure Repayment Program.

9   While Plaintiff was having the above-described discussions with Defendant GMAC, Plaintiff was

10  working on, and making alterations and improvements to, the Subject Property.

11      65.     As a direct and proximate result of the fraudulent conduct of Defendant GMAC as

12  herein alleged, Plaintiff was damaged in a sum according to proof at trial.

### FIFTH CAUSE OF ACTION

### (Wrongful Foreclosure as Against

### All Defendants and DOES 1 through 50, Inclusive)

16      66.     Plaintiff realleges and incorporates Paragraphs Nos. 1 through 65, inclusive, as though

17  fully set forth herein.

18      67.     Plaintiff is informed and believes, and thereupon alleges, that Defendants, GMAC,

19  ETS, MORTGAGEIT, DEUTSCHE BANK, HSBC, MERS, and Does 1-50, inclusive,

20  ("Defendants") conducted a void Trustee Sale against the Subject Property, on or about January 28,

21  2010, ostensibly to collect the unpaid balance on the Note secured by the Subject First Deed of Trust.

22  Plaintiff is further informed and believes and thereupon alleges that Defendants and each of them

23  acted in concert to wrongfully foreclose against the Subject Property with a material procedural

24  irregularity coupled with an inadequate sale price that injured Plaintiff.

25      68.     Plaintiff is informed and believes and thereupon alleges that Defendants and each of

26  them acted in concert to wrongfully foreclose against the Subject Property pursuant to an invalid

27  Notice of Sale (NTS) in violation of the California Foreclosure Prevention Act under *Civil Code* §

28  2923.52 which was in effect at all times herein alleged. (Exhibit E. ) *Civil Code* § 2923.52 was

effective from May 21, 2009 to December 31, 2010 and provides:

(a) Notwithstanding paragraph (3) of subdivision (a) of Section 2924, a mortgagee, trustee, or other person authorized to take sale shall not give notice of sale until at least 90 days after the lapse of three months as set forth in paragraph (2) of subdivision (a) of Section 2924, in order to allow the parties to pursue a loan modification to prevent foreclosure, if all of the following conditions exist:

(1) The loan was recorded during the period of January 1, 2003, to January 1, 2008, inclusive, and is secured by residential real property.

(2) The loan at issue is the first mortgage or deed of trust that the property secures.

(3) The borrower occupied the property as the borrower's principal residence at the time the loan became delinquent.

(4) The notice of default has been recorded on the property.

69.    Plaintiff is informed and believes and thereon alleges that Defendants, and each of them, violated Civil Code section 2923.52 because of the following:

(1) the Subject First Deed of Trust was recorded on May 8, 2007, and is secured by the Subject Property;

(2) the Note at issue is a first deed of trust that the Subject Property secures;

(3) the Decedent/Borrower CULTON occupied the Subject Property as her principal residence at the time the loan became delinquent; and

(4) the NOD was recorded on the Subject Property on March 31, 2009.

Plaintiff is informed and believes and thereon alleges that Defendants and each of them should not have given the notice of sale until at least 90 days after the lapse of three months as set forth in Civil Code Section 2924(2)(a). The earliest Notice of Sale should have been given on September 27, 2009. Instead, Defendants gave the Notice of Sale on July 2, 2009 in violation of *Civil Code* section 2923.52. ( Exhibit "E.") Plaintiff is informed and believes and thereon alleges that the Notice of Sale dated July 2, 2009 was invalid and that any subsequent trustee sale is also void and invalid.

70.    Plaintiff alleges that Plaintiff was ready, willing and able to make payments pursuant

to the Foreclosure Repayment Agreement and justifiably relied to her detriment on Defendant GMAC's broken promise to suspend all foreclosure activity concerning the Subject Property while it determined how to proceed after CULTON's death. Plaintiff further alleges that full tender under the invalid NTS would be inequitable in this instance.

71.    Plaintiff is informed and believes, and thereupon alleges, that Defendants and each of them acting in concert wrongfully foreclosed against the Subject Property in violation of *Civil Code* 2923.52 and proactively engaged in a pattern of utilizing the non-judicial foreclosure procedures of this State to foreclose on the Subject Property when they did not, in fact, have the right to do so.

72.    Plaintiff is informed and believes, and thereupon alleges, that in pursuing non-judicial foreclosure, Defendants, and each of them, represented that they had the right to foreclose pursuant to the invalid Notice of Sale.

73.    The true facts were that, Defendants proceeded to foreclose non-judicially without right under the law.   Defendants knew or should have known of the irregularity in pre-foreclosure notices against the Subject Property. Plaintiff is informed and believes and thereon alleges that Defendants' Trustee Sale on or about January 28, 2010 was void and invalid. (Exhibit J.)

74.    Plaintiff is informed and believes and thereupon alleges that in addition to Defendants' foreclosure irregularity by way of the invalid NTS, the Subject Property was also sold at the Trustee sale at an inadequate sale price. Plaintiff is further informed and believes and thereon alleges that the Subject Property was sold at the Trustee Sale on January 28, 2010 for approximately $1,078,000. (Exhibit "J.") Plaintiff is further informed and believes and thereon alleges that, twenty days later, the Subject Property was quickly re-sold for approximately $1,500,000 without any improvements. (Exhibits "J" to "L.")

75.    Plaintiff is informed and believes and thereon alleges that the Trustee sale is void because of the invalid NTS, the inadequate sale price, and unfairness which were all abundantly present at all times alleged herein.

76.    As a direct and proximate result thereof, Plaintiff has been damaged by Defendants' wrongful foreclosure against the Subject Property, in being required to hire attorneys in bringing this action, and has had to and will have to incur attorney fees to stop the wrongful acts of the Defendants,

1   and each of them, in a sum far exceeding $1,500,000, according to proof at trial.

2       WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as follows:

3   <u>On the First Cause of Action:</u>

4       1.    General and special damages in a sum to be determined according to proof.

5   <u>On the Second Cause of Action:</u>

6       1.    General and special damages in a sum to be determined according to proof.

7       2.    Punitive damages according to proof.

8   <u>On the Third Cause of Action:</u>

9       1.    General and special damages in a sum to be determined according to proof.

10      2.    Punitive damages according to proof.

11  //

12  <u>On the Fourth Cause of Action</u>

13      1.    General and special damages in a sum to be determined according to proof.

14  <u>On the Fifth Cause of Action:</u>

15      1.    General and special damages in a sum to be determined according to proof.

16      2.    Punitive damages according to proof.

17  <u>On All Causes of Action:</u>

18      1.    For costs of suit herein incurred.

19      3.    For attorneys' fees and costs as allowed by law and statute, according to proof.

20      4.    For prejudgment interest at the legal rate from the date first allowable by law.

21      5.    For such other and further relief as the Court deems just and proper.

22  Dated: July 5, 2012          WILDISH & NIALIS

23

24            By:_____

25            RONDINE E. MACADAEG
              MARK A. NIALIS

26            Attorneys for Plaintiff JACQUELINE O. WIELAND,
              as Trustee of THE MARSHELL O. CULTON

27            REVOCABLE LIVING TRUST DATED APRIL 28,
              2005

28  L:\5005 (3971)\Pld\Complaint 03 (SAC) [DRAFT].wpd

*Exhibit A*

Branch : ILA, User : AD16          Order: 0000000  Title Officer: 00  Comment:          Station Id : XT15



**This page is part of your document - DO NOT DISCARD**

 **20071113043**    Pages: 004



| | |
|---|---|
| Recorded/Filed in Official Records | Fee:  33.00 |
| Recorder's Office, Los Angeles County, California | Tax:  0.00 |
| | Other: 0.00 |
| **05/08/07 AT 08:00AM** | Total: 33.00 |

**Title Company**

## TITLE(S) :   DEED



L E A D    S H E E T

**Assessor's Identification Number (AIN)**
To be completed by Examiner OR Title Company in black ink.      Number of AIN's Shown



THIS FORM IS NOT TO BE DUPLICATED

Branch : ILA, User : AD16                Order: 0000000  Title Officer: 00  Comment:                        Station Id :XT15

**ORANGE COAST TITLE CO.**

RECORDING REQUESTED BY:
Orange Coast Title Company of the Inland Empire

AND WHEN RECORDED, MAIL TO
MARSHELL O. CULTON
830 W. ORANGE GROVE
ARCADIA, CA 91006

05/08/07

**20071113043**

*2*

---

THIS SPACE FOR RECORDER'S USE ONLY

# QUITCLAIM DEED

ASSESSOR'S PARCEL NO : 5769-015-007
TITLE ORDER NO · 100-867845-02
ESCROW NO · R20701-BW

†ra: 01887

The undersigned Grantor(s) declare that the DOCUMENT TRANSFER TAX IS: $ ∅
County City
___ computed on the full value of the interest of property conveyed, or
___ computed on the full value less the value of liens or encumbrances remaining
thereon at the time of sale
_X__ OR transfer is EXEMPT from tax for the following reason: TRANSFER OUT
OF TRUST

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, MARSHELL O. CULTON, TRUSTEE OF THE
MARSHELL O. CULTON REVOCABLE LIVING TRUST

hereby REMISES, RELEASES and QUITCLAIMS to MARSHELL O. CULTON, AN UMARRIED WOMAN

all that real property situated in the City of ARCADIA, County of LOS ANGELES, State of CA, described as: LOT 2 OF TRACT
948, IN THE CITY OF ARCADIA, AS PER MAP RECORDED IN BOOK 17 PAGE 21, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY.

SEE EXHIBIT "A" FOR COMPLETE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

Dated April 25, 2007

State of California
County of SACRAMENTO
On APR 30 2007 before me, F B JACOBS , a
notary public, personally appeared
MARSHELL O CULTON
personally known to me (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the
same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal

SIGNATURE

MARSHELL O. CULTON, TRUSTEE OF THE
MARSHELL O. CULTON REVOCABLE
LIVING TRUST

*Marshell O. Culton*
MARSHELL O. CULTON, TRUSTEE

F. B. JACOBS
COMM. # 1462922
NOTARY PUBLIC-CALIFORNIA
SACRAMENTO COUNTY
COMM. EXP. JAN. 15, 2008

(This area for official notary seal)

MAIL TAX STATEMENTS TO:
MARSHELL O. CULTON
830 W. ORANGE GROVE
ARCADIA, CA 91006

RECORDER'S MEMO:
LEGIBLE COPY ATTACHED HERETO

Branch :1LA,User :AD16          Order: 0000000  Title Officer: 00  Comment:          Station Id :XT15

## Exhibit "A"

3

That portion of Lot 2 of Tract 948, in the City of Arcadia, as per map recorded in Book 17, Page 21 of Maps, in the Office of the County Recorder of said County, described as follows:

Commencing at a point in the North Line of said Lot 2, said point being the Northwest Corner of the parcel of land conveyed to Norman Chandler, et ux., and described in Deed recorded in Book 15466, Page 274, Official Records; Thence South 88 degrees 53' 40" West along the North Line of said Lot 2, 165 feet to the true point of beginning; Thence South 88 degrees 53' 40" West along the North line of said Lot 2, 165 feet; to the true point of beginning; South 88 degrees 53' 40" West along the North line of said Lot 2; Thence South 1 degrees 06' 20" East, 260.66 feet; Thence North 88 degrees 53' 40" East 165 feet; Thence North 1 degrees 06' 20" West 269.66 feet to the true point of beginning.

Branch :ILA,User :AD16         Order: 0000000  Title Officer: 00  Comment:         Station Id :XT15

RECORDING REQUESTED BY
Orange Coast Title Company of the Inland Empire

AND WHEN RECORDED, MAIL TO
MARSHELL O CULTON
830 W ORANGE GROVE
ARCADIA, CA 91006

UNDER THE PROVISIONS OF GOVERNMENT DOE 27361.7 I
HEREBY CERTIFY UNDER THE PENALTY OF PERJURY THAT
THE FOLLOWING IS A TRUE COPY OF ILLEGIBLE WORDING
FOUND IN THE ATTACHED DOCUMENT.

X _____
MONIQUE FEMATT FOR ORANGE COAST TITLE COMPANY

THIS SPACE FOR RECORDER'S USE ONLY

# QUITCLAIM DEED

ASSESSOR'S PARCEL NO  5769-015-007
TITLE ORDER NO  100-867845-02
ESCROW NO  R20701-BW

The undersigned Grantor(s) declare that the DOCUMENT TRANSFER TAX IS:
County City
___ computed on the full value of the interest of property conveyed, or
___ computed on the full value less the value of liens or encumbrances remaining
     thereon at the time of sale
_X_ OR transfer is EXEMPT from tax for the following reason: TRANSFER OUT
     OF TRUST

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, MARSHELL O CULTON, TRUSTEE OF THE
MARSHELL O. CULTON REVOCABLE LIVING TRUST

hereby REMISES, RELEASES and QUITCLAIMS to MARSHELL O CULTON, AN UMARRIED WOMAN

all that real property situated in the City of ARCADIA, County of LOS ANGELES, State of CA, described as: LOT 2 OF TRACT
948, IN THE CITY OF ARCADIA, AS PER MAP RECORDED IN BOOK 17 PAGE 21, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY

SEE EXHIBIT "A" FOR COMPLETE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

Dated April 25, 2007

State of California
County of _____
On _____ before me, _____, a
notary public, personally appeared _____

personally known to me (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the
same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument

WITNESS my hand and official seal

_____
SIGNATURE

MAIL TAX STATEMENTS TO.
MARSHELL O. CULTON
830 W. ORANGE GROVE
ARCADIA, CA 91006

MARSHELL O. CULTON, TRUSTEE OF THE
MARSHELL O. CULTON REVOCABLE
LIVING TRUST

_____
MARSHELL O. CULTON

(This area for official notary seal)

*Exhibit B*



1  MARK A. NIALIS, ESQ., SBN 89923
   WILDISH & NIALIS
2  500 North State College Boulevard
   Suite 1200
3  Orange, California 92868
   Tel: (714) 634-8001 / Fax: (714) 634-3869
4  email: mnialis@wildishandnialis.com

5  Attorneys for Petitioner, JACQUELYN O. WIELAND

6

7

8

9            SUPERIOR COURT OF THE STATE OF CALIFORNIA

10       FOR THE COUNTY OF LOS ANGELES, NORTHEAST DISTRICT (PASADENA)

11

12  In re:                                  )  Case No.: GP016044
                                            )  Assigned for all Purposes to the Honorable
13  THE MARSHELL O. CULTON REVOCABLE        )  [PROPOSED] ORDER APPROVING
    LIVING TRUST DATED APRIL 28, 2005       )  PETITION TO CONFIRM TRANSFER
14                                          )  OF ASSETS TO REVOCABLE TRUST
                                            )
15                                          )  Hearing: Petition
                                            )  Date:    November 4, 2011
16                                          )  Time:    8:30 a.m.
                                            )  Dept:    A
17  ─────────────────────────────────────

18       The Petition to Confirm Transfer of Assets to Revocable Trust of Petitioner Jacqueline O.

19  Wieland came on for regularly scheduled hearing on November 4, 2011 at 8:30 a.m., the Honorable
    Stan Blumenfeld
    Mary Thornton presiding in Department A of the Los Angeles County Superior Court located at 300

20  East Walnut Street, Pasadena, California. Mark A. Nialis of the law firm of Wildish and Nialis

21  appeared on behalf of Petitioner. No other parties appeared.

22       Having reviewed the file and to the satisfaction of this Court, and good cause appearing

23  therefor:

24       IT IS HEREBY ORDERED that the Marshell O. Culton Revocable Living Trust Dated April

25  28, 2005 is valid; and

26       IT IS ORDERED that Petitioner, Jacqueline O. Wieland's Petition to Confirm Transfer of

27  Assets to the Marshell O. Culton Revocable Living Trust Dated April 28, 2005 is hereby

28
                                            1
            ORDER APPROVING PETITION TO CONFIRM TRANSFER OF ASSETS TO REVOCABLE TRUST

1    APPROVED as supplemented; and

2        IT IS ORDERED that the real property located at 830 W. Orange Grove, Arcadia, California

3    described as set forth below is deemed the property of the Marshell O. Culton Trust at the time of

4    Settlor's death.

5        That portion of Lot 2 of Tract 948, in the City of Arcadia, as per map recorded in Book 17,
     Page 21 of Maps, in the Office of the County Recorder of said County, described as

6    follows:

7    Commencing at a point in the North Line of said Lot 2, said point being the Northwest
     Corner of the parcel of land conveyed to Norman Chandler, et ux., and described in Deed

8    recorded in Book 15466, Page 274, Official Records; Thence South 88 degrees 53' 40"
     West along the North Line of said Lot 2, 165 feet to the true point of beginning; Thence

9    South 88 degrees 53' 40" West along the North line of said Lot 2 165 feet; to the true point
     of beginning; South 88 degrees 53' 40"West along the North line of said Lot 2; Thence

10   South 1 degrees 06' 20" East, 260.66 feet; Thence North 88 degrees 53' 40" East 165 feet;
     Thence North 1 degrees 06' 20" West 269.66 feet to the true point of beginning.

11

12        DATED this _____ day of    NOV 28 2011    , 2011.

13

14

15                        Stan Blumenfeld

16                        JUDGE OF THE SUPERIOR COURT

17

18

19

20

21

22

23

24

25

26

27

28

ORDER APPROVING PETITION TO CONFIRM TRANSFER OF ASSETS TO REVOCABLE TRUST

*Exhibit C*

Branch :ILA,User :AD16          Order: 0000000   Title Officer: 00   Comment:          Station Id :XT15

This page is part of your document - DO NOT DISCARD

 **20071113044**    Pages:
023

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

05/08/07 AT 08:00AM

Fee:  76.00
Tax:  0.00
Other: 0.00
Total: 76.00

Title Company

TITLE(S) :

L E A D    S H E E T

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.          Number of AIN's Shown

THIS FORM IS NOT TO BE DUPLICATED

LOS ANGELES,CA                    Page 1 of 23          Printed on 7/2/2012 10:31:43 AM
Document: TD 2007.1113044

2

05/09/07
20071113044

100-867845-02
**ORANGE COAST TITLE CO.**

Recording Requested By:
MORTGAGEIT

Return To:
MORTGAGEIT

1350 DEMING WAY, 3RD FLOOR
MIDDLETON, WI 53582
Prepared By:

301 NORTH LAKE AVENUE SUITE 400
PASADENA, CA 91101-

—————————— [Space Above This Line For Recording Data] ——————————

## DEED OF TRUST

LOAN NO.: ███████8133          MIN ███████08667
ESCROW NO.: R20701-BW          MERS Phone: 1-888-679-6377

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 18.

(A) "Security Instrument" means this document, which is dated          APRIL 30, 2007          ,
together with all Riders to this document.
(B) "Borrower" is
MARSHELL O CULTON, AN UNMARRIED WOMAN

Borrower's address is 830 WEST ORANGE GROVE AVENUE, ARCADIA, CA 91006-
Borrower is the trustor under this Security Instrument.
(C) "Lender" is
MORTGAGEIT, INC

Lender is a  CORPORATION
organized and existing under the laws of  NEW YORK

initials MOC
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS     Form 3005  1/01
V-6A(CA) (0707) 01                    Page 1 of 15     LENDER SUPPORT SYSTEMS, INC MERS6ACA.NEW (09/06)

APN: 5769-015-007

22

3

Lender's address is
33 MAIDEN LANE 6TH FLOOR, NEW YORK, NY 10038-

(D) "Trustee" is
ORANGE COAST TITLE ESCROW

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated          APRIL 30, 2007
The Note states that Borrower owes Lender

NINE HUNDRED SEVENTY THOUSAND AND NO/100 X X X X X X X X X X X X X X X X X X X X X X X
                                                                                                      Dollars

(U.S. $ 970,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    JUNE 01, 2037          .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "RIDERS" means all riders to this Security Instrument that are executed by Borrower. The following riders are to be executed by Borrower [check box as applicable]:

[XX] Adjustable Rate Rider     [ ] Condominium Rider              [ ] 1-4 Family Rider
[ ] Graduated Payment Rider    [ ] Planned Unit Development Rider  [ ] Biweekly Payment Rider
[ ] Balloon Rider              [ ] Rate Improvement Rider          [ ] Second Home Rider
[ ] Other(s) [specify]

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

V-6A(CA) (0701) 01                    Page 2 of 15                    Initials: [signature]
                                                                       Form 3005  1/01

Branch :1LA,User :AD16          Order: 0000000  Title Officer: 00  Comme          Station Id :XT15

4

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
          COUNTY                    of              LOS ANGELES                    :
        [Type of Recording Jurisdiction]                [Name of Recording Jurisdiction]

SEE COMPLETE LEGAL DESCRIPTION DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 5789-015-007                       which currently has the address of
                830 WEST ORANGE GROVE AVENUE                              [Street]
            ARCADIA              [City] , California      91006-      [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

V-6A(CA) (0707) 01                     Page 3 of 15                     Form 3005 1/01

Branch :11.A,User :AD16          Order: 0000000  Title Officer: 00  Comment:          Station Id :XT15



5

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

87
1113044

V-6A(CA) (0207) 01                    Page 4 of 16                    Initials: OC    Form 3005 1/01

Branch :ILA,User :AD16          Order: 0000000  Title Officer: 00  Comment:          Station Id :XT15

6

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

V-6IA(CA) (0207) 01                      Page 5 of 15                      Form 3005 1/01

Initials: MQC

Branch :ILA,User :AD16        Order: 0000000  Title Officer: 00  Comment:    Station Id :XT15

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

V-6A(CA) (0207) 01

Page 6 of 13

Initials: _M.O.C_
Form 3005  1/01

Branch :1L.A,User :AD16          Order: 0000000  Title Officer: 00  Comment:          Station Id :XTJ5



the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

V-6A(CA) (0202) 03                       Page 7 of 15                       Initials: _m a c_
                                                                            Form 3005  1/01

Branch :1LA,User :AD16                Order: 0000000  Title Officer: 00  Comment:        Station Id :XT15

9

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

87 1113044

V-6A(CA) (0207) 01        Page 8 of 15        Initials: _MQC_
                                               Form 3005  1/01

Branch :1LA,User :AD16          Order: 0000000  Title Officer: 00  Comment:                    Station Id :XT15

10

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

V-8A(CA) (0207) 01                          Page 9 of 15                          Form 3005  1/01

Branch :ILA,User :AD16        Order: 0000000  Title Officer: 00  Comment:        Station Id :XT15



to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

V-6A(CA) (0207) 01        Page 10 of 15        Initials: MOC
Form 3005  1/01

12

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word 'may' gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

V-6A(CA) (0207) 01                              Page 11 of 15                              Initials: _____
                                                                                          Form 3005 1/01

Branch :ILA,User :AD16          Order: 0000000  Title Officer: 00  Comment:          Station Id :XT15

13

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

V-8A(CA) (0207) 01                                   Page 12 of 15                              Initials: MC          Form 3005  1/01

Branch :1LA,User :AD16        Order: 0000000  Title Officer: 00  Comment:        Station Id :XT15

14

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

V-8A(CA) (0307) 01                  Page 13 of 15                  Form 3005  1/01

Branch :ILA,User :AD16     Order: 0000000  Title Officer: 00  Comment:    Station Id :XT15

]S

**BY SIGNING BELOW,** Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any RIDER executed by Borrower and recorded with it.

Witnesses:

_Armando Padilla_
NOTARY PUBLIC    -Witness

_____    -Witness

_Marshell O Culton_ _____(Seal)    _____(Seal)
MARSHELL O. CULTON    -Borrower    -Borrower

_____(Seal)    _____(Seal)
-Borrower    -Borrower

_____(Seal)    _____(Seal)
-Borrower    -Borrower

_____(Seal)    _____(Seal)
-Borrower    -Borrower

07 1113044

V-6A(CA) (0207) 01    Page 14 of 15    Form 3005  1/01

16

State of  CALIFORNIA
County of  *Los Angeles*                              } ss.

On  *04-30-2007*          before me, *ARMANDO  Padilla,  Notary Public*
                                                          personally appeared

MARSHELL O. CULTON

                                                    , ~~personally known to me~~
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that ~~he/she/they~~ executed the same in ~~his/her/their~~
authorized capacity(ies), and that by ~~his/her/their~~ signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

ARMANDO PADILLA
Commission # 1440622
Notary Public - California
Riverside County
My Comm. Expires Sep 21, 2007

_____ (Seal)

V-6A(CA) (0207) 01                    Page 15 of 16                      Initials _____
                                                                         Form 3005  1/01

Branch :ILA,User :AD16          Order: 0000000  Title Officer: 00  Comment:                    Station Id :XT15

Order No. 867845-02



17

## Exhibit "A"

That portion of Lot 2 of Tract 948, in the City of Arcadia, as per map recorded in Book 17, Page 21 of Maps, in the Office of the County Recorder of said County, described as follows:

Commencing at a point in the North Line of said Lot 2, said point being the Northwest Corner of the parcel of land conveyed to Norman Chandler, et ux , and described in Deed recorded in Book 15466, Page 274, Official Records, Thence South 88 degrees 53' 40" West along the North Line of said Lot 2, 165 feet to the true point of beginning; Thence South 88 degrees 53' 40" West along the North line of said Lot 2, 165 feet, to the true point of beginning, South 88 degrees 53' 40" West along the North line of said Lot 2; Thence South 1 degrees 06' 20" East, 260.66 feet, Thence North 88 degrees 53' 40" East 165 feet, Thence North 1 degrees 06' 20" West 269 66 feet to the true point of beginning

07 1113044

18

## ADJUSTABLE RATE RIDER
### (MTA-Twelve Month Average Index - Payment Caps)

LOAN NO.: [redacted]5133                        MIN [redacted]5557
                                                MERS Phone: 1-888-679-6377

THIS ADJUSTABLE RATE RIDER is made this 30th day of        APRIL, 2007      , and is
incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of
Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
MORTGAGEIT, INC.

("Lender") of the same date and covering the property described in the Security Instrument
and located at:

830 WEST ORANGE GROVE AVENUE, ARCADIA, CA 91006-

[Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND
THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE
MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO
REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT
NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agrees as follows:

A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

2. INTEREST
(A) Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been
paid. I will pay interest at a yearly rate of        1.000      %. The interest rate I will pay
may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of the Note.

(B) Interest Rate Change Dates
The interest rate I will pay may change on the   1st   day of      JULY, 2007        ,
and on that day every month thereafter. Each date on which my interest rate could change is

PayOption MTA ARM Rider                                        Initials: _MOC_
FE-5315  (0511)  Page 1 of 6   LENDER SUPPORT SYSTEMS, INC. COU-5315.COU (01/06)

07 1113044

Branch :ILA,User :AD16          Order: 0000000  Title Officer: 00  Comment:                    Station Id :XT15

*19*

called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

(C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding          TWO AND 800/1000THS          percentage point(s)    2.800    % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than     9.950    %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

3.  PAYMENTS

(A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the  1st   day of each month beginning on JULY, 2007          . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on     JUNE 01, 2037     , I still owe amounts under this Note. I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at GMAC MORTGAGE, LLC
PO BOX 780, WATERLOO, IA  50704-0780
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $      3,119.90      unless adjusted under Section 3(F).

PayOption MTA ARM Rider
FE-5315  (0511)                    Page 2 of 6                    Initials: *mOC*

Branch :ILA,User :AD16  Order: 0000000  Title Officer: 00  Comment:    Station Id :XT15

$\jmath^0$

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the 1st day of    JULY, 2008    , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

PayOption MTA ARM Rider
FE-6315  (0511)                    Page 3 of 6                    Initials _M O C_

07
1113044

Branch :ILA,User :AD16          Order: 0000000  Title Officer: 00  Comment:          Station Id :XT15

$2|$

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN AND 000/1000THS          percent ( 115.000 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G) Required Full Payment**
On the    fifth    Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)     Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)    Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii)   15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

**PayOption MTA ARM Rider**
**FE-5315  (0511)**              Page 4 of 6              Initials *MOC*

Branch :ILA,User :AD16          Order: 0000000  Title Officer: 00  Comment:          Station Id :XTJ5

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

PayOption MTA ARM Rider
FE-5315  (0511)                    Page 5 of 6                    Initials: _mOC_

07 1113044

Branch :ILA,User :AD16        Order: 0000000  Title Officer: 00  Comment:    Station Id :XT15

23

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Marshell O. Culton_ _____(Seal)    _____ (Seal)
MARSHELL O. CULTON              -Borrower                              -Borrower

_____ (Seal)    _____ (Seal)
                       -Borrower                              -Borrower

_____ (Seal)    _____ (Seal)
                       -Borrower                              -Borrower

_____ (Seal)    _____ (Seal)
                       -Borrower                              -Borrower


PayOption MTA ARM Rider
FE-5315  (0511)              Page 6 of 6

07 1113044

*Exhibit D*

Branch :1LA,User :AD16          Order: 0000000  Title Officer: 00  Comment:                    Station Id :XT15

**This page is part of your document - DO NOT DISCARD**




# 20090459490

Pages:
0003

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**03/31/09 AT 08:00AM**

| | |
|---|---|
| FEES : | 14.00 |
| TAXES : | 0.00 |
| OTHER : | 0.00 |
| PAID : | 14.00 |


LEADSHEET


200903310220012

00000280283


002036665

SEQ:
22

DAR - Title Company (Hard Copy)

**THIS FORM IS NOT TO BE DUPLICATED**            t35

LOS ANGELES,CA                    Page 1 of 3                    Printed on 7/2/2012 10:31:48 AM
Document: ND 2009.459490

Branch :ILA,User :AD16          Order: 0000000  Title Officer: 00  Comment:          Station Id :XTI5



03/31/2009

*20090459490*

**RECORDING REQUESTED BY:**

LSI TITLE COMPANY, INC.

**WHEN RECORDED MAIL TO:**
**ETS Services, LLC**
**2255 North Ontario Street, Suite 400**
**Burbank, California 91504-3120**

TS No.: GM-196566-C    Loan No.: ░░░░0846          SPACE ABOVE THIS LINE FOR RECORDER'S USE

# NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

## IMPORTANT NOTICE
### IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,
and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is **$25,886.23** as of **3/27/2009**, and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the three month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor. To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**
**C/O ETS Services, LLC**
**2255 North Ontario Street, Suite 400**
**Burbank, California 91504-3120**
**(818) 260-1600 phone**

22K

Branch :1LA,User :AD16          Order: 0000000  Title Officer: 00  Comment:                    Station Id :XT15

TS NO.: GM-196566-C          LOAN NO.: ████████846

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.
Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is
concluded prior to the conclusion of the foreclosure.

### Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN: That **Executive Trustee Services, LLC dba ETS Services, LLC** is
either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or
beneficiary under a Deed of Trust dated  4/30/2007 , executed by **MARSHELL O CULTON, AN
UNMARRIED WOMAN**, as Trustor, to secure certain obligations in favor of **MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC. ,** as beneficiary, recorded 5/8/2007, as Instrument
No. 20071113044, in Book , Page ,  of Official Records in the Office of the Recorder of **Los
Angeles** County, California describing land therein as:

AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

including **ONE NOTE FOR THE ORIGINAL** sum of **$970,000.00** ; that the beneficial interest under
such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a
breach of, and default in,  the obligations for which such Deed of Trust is security has occurred in
that payment has not been made of:

Installment of Principal and Interest plus impounds and/or advances which became due on 11/1/2008 plus late charges, and
all subsequent installments of principal, interest, balloon payments, plus impounds and/or advances and late charges that
become payable.

That by reason thereof, the present beneficiary under such deed of trust, has executed and
delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and
has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing
obligations secured thereby, and has declared and does hereby declare all sums secured thereby
immediately due and payable and has elected and does hereby elect to cause the trust property to
be sold to satisfy the obligations secured thereby.

The undersigned declares that the beneficiary or its authorized agent has declared that they have complied with
California Civil Code Section 2923.5 by making contact with the borrower or tried with due diligence to contact
the borrower as required by California Civil Code Section 2923.5.

Dated: 3/27/2009

ETS Services, LLC AS AGENT FOR
BENEFICIARY

BY:  _Maria DeBelen_

Maria DeBelen
TRUSTEE SALE OFFICER

*Exhibit E*

Branch :1LA,User :AD16          Order: 0000000  Title Officer: 00  Comment:          Station Id :XT15

This page is part of your document - DO NOT DISCARD

## 20090999746



Pages:
0003

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

07/02/09 AT 08:00AM

| FEES: | 15.00 |
|---|---|
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 15.00 |



LEADSHEET



200907020140005

00000802984

002185917

SEQ:
09

DAR - Title Company (Hard Copy)

THIS FORM IS NOT TO BE DUPLICATED          T35



Branch :1LA,User :AD16          Order: 0000000  Title Officer: 00  Comment:          Station Id :XTI5

2

RECORDING REQUESTED BY
ETS Services, LLC

AND WHEN RECORDED MAIL TO:
ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120

T.S. No. GM-196568-C          3002
Loan No.        0846

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 4/30/2007. UNLESS YOU TAKE
ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN
EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT
A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank,
check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan
association, or savings association, or savings bank specified in Section 5102 of the Financial Code and
authorized to do business in this state, will be held by the duly appointed trustee. The sale will be made,
but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to
satisfy the obligation secured by said Deed of Trust. The undersigned Trustee disclaims any liability for
any incorrectness of the property address or other common designation, if any, shown herein.

TRUSTOR:MARSHELL O CULTON, AN UNMARRIED WOMAN
Recorded 5/8/2007 as Instrument No. 20071113044 in Book , page  of
Official Records in the office of the Recorder of Los Angeles County, California,
Date of Sale:7/27/2009 at 10:30 AM
Place of Sale:    At the west side of the Los Angeles County Courthouse,  directly facing
                 Norwalk Blvd., 12720 Norwalk Blvd., Norwalk, California
Property Address is purported to be:    830 WEST ORANGE GROVE AVENUE
                                        ARCADIA, CA 91006

APN #:  5769-015-007

The total amount secured by said Instrument as of the time of initial publication of this notice is
$1,075,490.40, which includes the total amount of the unpaid balance (including accrued and unpaid
interest) and reasonable estimated costs, expenses, and advances at the time of initial publication of this
notice.

Pursuant to California Civil Code §2923.54 the undersigned, on behalf of the beneficiary, loan servicer or
authorized agent, declares as follows:

[ 1 ] The mortgage loan servicer has obtained from the commissioner a final or temporary order of
exemption pursuant to Section 2923.53 that is current and valid on the date the notice of sale is filed;
[ 2 ] The timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not
apply pursuant to Section 2923.52 or 2923.55.

Branch :1LA,User :AD16          Order: 0000000   Title Officer: 00   Comment:          Station Id :XT15

3

T.S. No. GM-196508-C
Loan No. ████████846

Date: 7/1/2009

ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120
Sale Line: 714-730-2727

Sunil Jayasinha, TRUSTEE SALE OFFICER

*Exhibit F*

09/17/09

## FORECLOSURE REPAYMENT AGREEMENT

MARSHELL O CULTON

254 ANGELO PL
ARCADIA        CA 91006-1501

RE:    Account Number        ████0846
       Property Address    830 WEST ORANGE GROVE AVENUE
                           ARCADIA        CA 91006-0000

MARSHELL O CULTON ("Customer") and GMAC Mortgage, LLC ("Lender"), in consideration for the mutual covenants set forth in this Foreclosure Repayment Agreement (the "Agreement"), hereby agree as follows:

1.    There is an outstanding debt to the Lender pursuant to a note and mortgage or deed of trust or equivalent security instrument (the "Mortgage") executed on 05/07/07, in the original principal amount of $970000.00.

2.    The account is presently in default for non-payment to Lender of the 01/01/09 installment and all subsequent monthly payments due on the Mortgage for principal, interest, escrows and charges.

3.    The amount necessary to cure the default is $57,870.80 plus such additional amounts that are presently due under the terms of the loan documents as of 09/17/09, and will increase until the default in the account is brought current.

4.    Lender has instituted foreclosure proceedings against the property securing the Mortgage indebtedness, which proceedings will continue until the default(s) described herein is/are brought current under the terms of the Mortgage, or otherwise cured as provided for in this Agreement.

5.    Notwithstanding the foregoing, Lender agrees to suspend but not terminate foreclosure activity on the default account, provided we receive the executed Agreement and we receive the initial installment in the amount of $2,790.00 no later than 09/26/09. This executed Agreement can be mailed or faxed to us at:

09/17/09
Account Number█████0846
Page Two

GMAC Mortgage, LLC
Attention: Default Payment Processor
3451 Hammond Avenue
Waterloo, IA 50702
Fax: 866-340-5043

6. Pursuant to your request you agree to pay the remainder of the default, $55,080.80, as indicated in the Payment Schedule enclosed and made a part hereof by reference. Customer understands that payments due under the Payment Schedule may include amounts due for real estate taxes and insurance, and the Payment Schedule amounts may, in such event, have to be increased, at the sole option of the Lender, if the items for such escrow purposes should increase during the duration of the Agreement.

7. All payments under this Agreement, including the regular monthly payments, shall be made in certified funds or cashier's check, shall include the account number on the Customer's check or on a written attachment to the check, and shall be sent to the following address:

GMAC Mortgage, LLC
Attention: Default Payment Processor
3451 Hammond Avenue
Waterloo, IA 50702

Additional methods of remitting payments under this agreement are:
- Money Gram using a Receive Code of 2365
- Western Union using a Code City and State of Home, IA

If payment is tendered in any other form, Lender may return the payment and invoke any remedies available under the loan documents and this Agreement.

8. In the event we do not receive timely payment called for under this Agreement, Lender may, without further notice to Customer, undertake or continue collection or foreclosure activities. In such event, any payments tendered under this Agreement shall be applied to the account in the manner specified in the Mortgage, and there will be no right to a refund of the tendered funds. In the event Lender chooses to accept any payment not in the full amount called for under this Agreement, such acceptance shall not be deemed a waiver of Lender's right to declare a default under this Agreement. Upon any default in meeting the terms of this Agreement, any such payments received under the terms of this Agreement shall be applied first against the default in the account, with the excess, if any, then applied according to the terms of the Mortgage. The parties expressly understand and agree time shall be of the essence as to the obligation under this Agreement.



SEP-17-2009  13:29  FROM:AF  REHLCHOICES              2148142191              TO:826331881T                  P: 6/24 6b6

09/17/09
Account Number [REDACTED] 0846
Page Three

9. Customer understands and agrees that all other provisions, covenants and agreements set forth in the Mortgage shall remain in force and effect during the duration of this Agreement and thereafter, and this Agreement shall not constitute a modification or extension of the Mortgage.

10. If a notice of a new or subsequent bankruptcy is received during the duration of this Agreement, the Agreement will automatically be voided.

11. Acceptance of any payment hereunder shall not constitute a cure nor be deemed a waiver of the existing default, and in no manner shall such acceptance prejudice any rights of Lender to proceed with the Trustee Sale Action noticed in the Notice of Default, and shall not constitute a violation of California Code of Civil Procedure Section 726.580(a), 580(d) (the One Form of Action Rule), and shall not invalidate the Notice of Default. Customer expressly relinquishes and waives any rights, claims and defenses Customer may have under any of the Code of Civil Procedure Sections or under the Loan with regard to any whole or partial payments, whether current, past or future.

12. If any additional amounts are added to the loan to be collected that have not been addressed in this agreement, those amounts will need to be paid at the conclusion of this agreement.

**Notice: This is an attempt to collect a debt, and any information obtained will be used for that purpose. If your debt has been discharged in bankruptcy, our rights are being exercised against the collateral for the above-referenced account, not as a personal liability.**

If you have any additional questions, please contact us at 800-850-4622, extension .

Loss Mitigation Department
Loan Servicing

Enclosure

SEP-17-2009 13:30 FROM:HF REALCHOICES       2148742197          TO:6263576617        P. 005/006

09/17/09
Account Number ████ 0846
Page Four

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*CERTIFIED FUNDS ONLY\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NOTE: There is no grace period during this Agreement. Pursuant to your request and in order to cure the default on this account, all payments must be received on or before the due date.

RECEIVED AND AGREED:

_Marshell O Culton_ _____ (Seal)          _SEPT, 17, 09_ _____
MARSHELL O CULTON                           Date
Customer

_____                _____
                                            Date
Customer

Upon receipt of the signed agreement, we as the Servicer will also execute to indicate our concurrence with this agreement.

_____
Servicer

5:15

## SIGN AND RETURN THIS PAGE ONLY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* FAX TO 866-340-5043 \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SEP-17-2009 13:30 FROM:HF REALCHOICES          2148742197          TO:6263576617          P. 006/006

GMAC Mortgage, LLC                                        PAGE      1
PO Box 780                                                DATE 09/17/09

Waterloo          IA 50704-0780
                                      REPAYMENT AGREEMENT-███████0866

-------------- MAIL -------------------- -------- PROPERTY ----------------

    MARSHELL O CULTON

    254 ANGELO PL                        830 WEST ORANGE GROVE AVENUE

    ARCADIA          CA 91006-1501 ARCADIA          CA 91006-0000

------ DATES ------      ---- CURRENT BALANCES -----      -------- UNCOLLECTED --------
PAID TO    12/01/08   PRINCIPAL        1006097.25   LATE CHARGES        1051.42
NEXT DUE   01/01/09   ESCROW           -25016.46    OPTIONAL INS           0.00
LAST PMT   08/13/09   UNAPPLIED FUNDS    3162.22    INTEREST               0.00
AUDIT DT   05/11/07   UNAPPLIED CODES         F     FEES                 170.50
  LAST ACTIVITY       BUYDOWN FUNDS         0.00    DFLT EXP PD         2849.58
    09/17/09          BUYDOWN CODE                  DFLT EXP UNPD          0.00

---------------------------------------------------------------------------------------
PMT  PLAN PMT   PLAN PMT    AMOUNT TO     AMT TO      UNAPPLIED    FIRST/LAST
NUM  DUE DATE   AMOUNT      REG PMT       LC/UNCOL    BALANCE      PMT APPLIED
---  --------   --------    ---------     --------    ---------    -----------
1    09/26/09   2790.00        0.00          0.00     5952.22
2    10/26/09   2790.00E    6249.82          0.00     2492.40     01/09
3    11/26/09   2790.00        0.00          0.00     5282.40
4    12/26/09   2790.00     6249.82          0.00     1822.58     02/09
5    01/26/10   66990.74*   64741.42      4071.90        0.00     03/09 01/10

PLAN TOTAL      78150.74

- ESCROW CHANGE  A - ALTERNATIVE LOAN P&I CHANGE  B - BUYDOWN SUBSIDY CHANGE

(WE) AGREE TO THE REPAYMENT SCHEDULE AS SET FORTH ABOVE.  THE AMOUNT OF EACH
PAYMENT IS SUBJECT TO CHANGE BASED ON SCHEDULED ALTERNATIVE MORTGAGE P&I, ESCROW
OR OTHER PAYMENT CHANGES.  ALL PROVISIONS OF THE NOTE AND MORTGAGE/DEED OF TRUST
REMAIN IN FULL FORCE AND EFFECT.

_____
MARSHELL O CULTON

_____

20 COL31038

*Exhibit G*



| Customer | Account Number | Bill Period | Bill Date | |
|---|---|---|---|---|
| Robert Wieland | ████ 6617 | Dec 01 - Dec 31 | Jan 04, 2010 | **A3 of 7** |

## Call details

### (626) 975-2810 (Continued)

| | Date | Time | Phone Number | Call Destination | Rate Type | Minutes Used | Total Charges |
|---|---|---|---|---|---|---|---|
| 97 | 12/09 | 03:14 PM | VoiceMail | ALHAMBRA,CA | PU | 1 | |
| 98 | 12/09 | 03:18 PM | VoiceMail | ALHAMBRA,CA | PU | 1 | |
| 99 | 12/09 | 03:19 PM | 323-350-7629 | LOSANGELES,CA | PU | 1 | |
| 100 | 12/09 | 03:48 PM | 323-350-7629 | Incoming | PU | 3 | |
| 101 | 12/09 | 04:08 PM | VoiceMail | ALHAMBRA,CA | PU | 1 | |
| 102 | 12/09 | 04:10 PM | 281-358-3188 | HMBL SOHML,TX | FC | 4 | |
| 103 | 12/09 | 05:01 PM | 519-293-3776 | Incoming | PU | 9 | |
| 104 | 12/09 | 05:14 PM | 414-281-5864 | MILWAUKEE,WI | PU | 2 | |
| 105 | 12/10 | 11:43 AM | VoiceMail | ALHAMBRA,CA | PU | 1 | |
| 106 | 12/10 | 11:44 AM | 626-353-5416 | ARCADIA,CA | PU | 2 | |
| 107 | 12/10 | 11:46 AM | 626-353-5416 | ARCADIA,CA | PU | 1 | |
| 108 | 12/10 | 11:47 AM | 519-293-3776 | Canada,ON | LD | 2 | $0.18 |
| 109 | 12/10 | 11:59 AM | 814-932-8193 | ALTOONA,PA | PU | 3 | |
| 110 | 12/10 | 12:19 PM | 323-350-7629 | LOSANGELES,CA | PU | 3 | |
| 111 | 12/10 | 01:21 PM | 909-598-6000 | Incoming | PU | 2 | |
| 112 | 12/10 | 02:05 PM | VoiceMail | ALHAMBRA,CA | PU | 1 | |
| 113 | 12/10 | 02:07 PM | 866-775-0282 | Toll Free Call | PU | 2 | * |
| 114 | 12/10 | 03:26 PM | 814-932-8193 | Incoming | PU | 2 | |
| 115 | 12/10 | 03:44 PM | 323-350-7629 | LOSANGELES,CA | PU | 2 | |
| 116 | 12/10 | 04:39 PM | 414-281-5864 | MILWAUKEE,WI | PU | 12 | |
| 117 | 12/10 | 05:19 PM | 323-350-7629 | LOSANGELES,CA | PU | 2 | |
| 118 | 12/10 | 09:30 PM | 831-869-8245 | MONTEREY,CA | NW/PU | 4 | |
| 119 | 12/11 | 09:25 AM | 519-293-3776 | Canada,ON | LD | 2 | $0.09 |
| 120 | 12/11 | 04:39 PM | 814-932-8193 | Incoming | PU | 2 | |
| 121 | 12/12 | 12:26 PM | 831-419-3181 | Incoming | NW/PU | 2 | |
| 122 | 12/12 | 09:39 PM | 626-793-7300 | PSDN MAIN,CA | NW/PU | 1 | |
| 123 | 12/13 | 01:42 PM | 213-680-0912 | LOSANGELES,CA | NW/PU | 2 | |
| 124 | 12/13 | 02:19 PM | 519-293-3776 | Incoming | NW/PU | 38 | |
| 125 | 12/13 | 03:27 PM | VoiceMail | ALHAMBRA,CA | NW/PU | 1 | |
| 126 | 12/14 | 12:51 PM | 310-993-1000 | BEVERLYHLS,CA | PU | 2 | |
| 127 | 12/14 | 01:54 PM | 519-293-3776 | Canada,ON | LD | 2 | $0.13 |
| 128 | 12/14 | 02:14 PM | 310-993-1000 | Incoming | PU | 1 | |
| 129 | 12/14 | 06:54 PM | 519-293-3776 | Incoming | PU | 15 | |
| 130 | 12/14 | 07:34 PM | 814-932-8193 | ALTOONA,PA | PU | 2 | |
| 131 | 12/15 | 10:13 AM | 909-829-5213 | Incoming | PU | 2 | |
| 132 | 12/15 | 10:52 AM | 562-846-0622 | Incoming | PU | 4 | |

| 133 | 12/15 | 11:15 AM | Unavailable | Incoming | AM/PU | 1 |
| 134 | 12/15 | 11:17 AM | Unavailable | Incoming | AM/PU | 1 |
| 135 | 12/15 | 11:17 AM | 814-932-8193 | ALTOONA,PA | AM/PU | 1 |
| 136 | 12/15 | 11:18 AM | 814-932-8193 | ALTOONA,PA | AM/PU | 8 |
| 137 | 12/15 | 11:39 AM | 856-498-5619 | Incoming | PU | 1 |
| 138 | 12/15 | 11:43 AM | 856-498-5619 | VINELAND,NJ | PU | 4 |
| 139 | 12/15 | 12:16 PM | 323-350-7629 | Incoming | PU | 2 |
| 140 | 12/15 | 01:06 PM | 519-293-3776 | Incoming | PU | 1 |
| 141 | 12/15 | 01:35 PM | 562-846-0421 | WHITTIER,CA | PU | 8 |
| 142 | 12/15 | 01:51 PM | VoiceMail | ALHAMBRA,CA | PU | 2 |
| 143 | 12/15 | 02:03 PM | 909-802-0121 | POMONA,CA | PU | 1 |

PU - Plan/Promotional Usage    FC - Free Call    LD - Long Distance Charges    NW - Night and Weekends
AM - Off Network - Included in America Plan

# Sprint 

| Customer | Account Number | Bill Period | Bill Date |
|---|---|---|---|
| Robert Wieland | ███5617 | Jan 01 - Jan 31 | Feb 04, 2010 |

## A3 of 9

## Call details

### (626) 975-2810 (Continued)

| | Date | Time | Phone Number | Call Destination | Rate Type | Minutes Used | Total Charges |
|---|---|---|---|---|---|---|---|
| 96 | 01/11 | 11:18 AM | 626-447-2155 | Incoming | PU | 1 | |
| 97 | 01/11 | 11:07 PM | 765-204-1980 | AIRLINE,TX | PU | 25 | |
| 98 | 01/11 | 12:29 PM | 818-481-7458 | VAN NUYS,CA | PU | 3 | |
| 99 | 01/11 | 12:41 PM | 714-832-2950 | SANTA ANA,CA | PU | 5 | |
| 100 | 01/11 | 12:56 PM | 714-832-2950 | SANTA ANA,CA | PU | 5 | |
| 101 | 01/11 | 01:00 PM | 818-481-7458 | Incoming | CWPU | | |
| 102 | 01/11 | 01:00 PM | 714-832-2950 | SANTA ANA,CA | PU | 1 | |
| 103 | 01/11 | 01:01 PM | 818-481-7458 | VAN NUYS,CA | PU | 2 | |
| 104 | 01/11 | 01:10 PM | 519-293-3776 | Canada,ON | LD | 2 | $0.18 |
| 105 | 01/11 | 01:47 PM | 832-473-1494 | BAMMEL,TX | PU | 4 | |
| 106 | 01/11 | 01:53 PM | 832-473-1494 | BAMMEL,TX | PU | 4 | |
| 107 | 01/11 | 01:57 PM | 713-832-2950 | Incoming | CWPU | | |
| 108 | 01/11 | 02:02 PM | 831-869-8245 | MONTEREY,CA | PU | 7 | |
| 109 | 01/11 | 02:29 PM | 847-509-5260 | ROSELLE,IL | PU | 5 | |
| 110 | 01/11 | 03:05 PM | 713-724-3600 | HOUSTON,TX | PU | 3 | |
| 111 | 01/11 | 03:11 PM | 570-815-1626 | SCRANTON,PA | PU | 2 | |
| 112 | 01/11 | 03:18 PM | 570-815-1626 | SCRANTON,PA | PU | 3 | |
| 113 | 01/11 | 03:56 PM | 800-848-9380 | Incoming | PU | | |
| 114 | 01/11 | 07:03 PM | 562-846-0622 | WHITTIER,CA | PU | 3 | |
| 115 | | | | | | | |
| 116 | 01/12 | 01:16 PM | 626-445-0271 | Incoming | PU | 2 | |
| 117 | 01/12 | 01:39 PM | 213-279-7135 | LOS ANGELES,CA | PU | 2 | |
| 118 | 01/12 | 01:41 PM | 814-932-8193 | ALTOONA,PA | PU | 2 | |
| 119 | 01/12 | 01:48 PM | 310-993-1000 | BEVERLYHLS,CA | PU | 2 | |
| 120 | 01/12 | 01:55 PM | 310-993-1000 | BEVERLYHLS,CA | PU | 1 | |
| 121 | 01/12 | 02:56 PM | 310-993-1000 | BEVERLYHLS,CA | PU | 2 | |
| 122 | 01/12 | 02:55 PM | 519-293-3776 | Incoming | PU | 2 | |
| 123 | 01/12 | 03:18 PM | 213-279-7135 | LOS ANGELES,CA | PU | 2 | |
| 124 | 01/12 | 03:21 PM | 760-217-0754 | VICTORVL,CA | PU | 2 | |
| 125 | 01/12 | 03:26 PM | 814-932-8193 | ALTOONA,PA | PU | 4 | |
| 126 | 01/12 | 03:31 PM | 814-932-8193 | Incoming | PU | 6 | |
| 127 | 01/12 | 03:54 PM | 909-802-0953 | Incoming | PU | 4 | |
| 128 | 01/12 | 04:03 PM | 814-932-8193 | ALTOONA,PA | PU | 4 | |
| 129 | 01/12 | 04:25 PM | 814-932-8193 | Incoming | PU | 5 | |
| 130 | 01/12 | 04:32 PM | 626-353-5416 | ARCADIA,CA | PU | 2 | |
| 131 | 01/12 | 05:07 PM | 814-932-8193 | ALTOONA,PA | PU | 4 | |
| 132 | 01/12 | 06:14 PM | 800-668-0107 | Incoming | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 132 | 01/17 | 06:44 PM | 800-6899-0102 | Incoming | | |
| 133 | 01/17 | 06:45 AM | 800-569-0102 | Toll Free Call | | 8 |
| 134 | 01/17 | 06:53 PM | 626-375-0355 | Incoming | PU | 10 |
| 135 | 01/12 | 08:23 PM | 323-252-1433 | LOS ANGELES,CA | PU | 5 |
| 136 | 01/12 | 09:21 PM | VoiceMail | ALHAMBRA,CA | NW/PU | 6 |
| 137 | 01/13 | 08:42 AM | 310-993-1800 | Incoming | PU | |
| 138 | 01/13 | 10:04 AM | 626-353-5416 | ARCADIA,CA | PU | 1 |
| 139 | 01/13 | 11:47 AM | 280-243-8473 | Incoming | PU | 8 |
| 140 | 01/13 | 12:39 PM | 909-994-7299 | ONTARIO,CA | PU | 12 |
| 141 | 01/13 | 12:50 PM | 626-353-5416 | ARCADIA,CA | PU | 2 |
| 142 | 01/13 | 01:31 PM | 814-932-9193 | Incoming | PU | 10 |
| 143 | 01/13 | 02:55 PM | 800-225-0782 | Toll Free Call | PU | 8 |

PU - Plan/Promotional Usage      CW - Call Waiting      LD - Long Distance Charges      NW - Night and Weekends

*Exhibit H*

# CERTIFICATION OF VITAL RECORD

## CITY OF HOUSTON, TEXAS, USA

**STATE OF TEXAS**  **CERTIFICATE OF DEATH**  **STATE FILE NUMBER**

1. LEGAL NAME OF DECEASED: **MARSHELL OLEAN CULTON**

CULTON

2. DATE OF DEATH: **11/05/2009**

3. SEX: **FEMALE**  4. DATE OF BIRTH: **08/00/1928**

5. BIRTHPLACE: **TULSA, OK**

9. RESIDENCE STREET ADDRESS: **2203 LUCAS**

CITY OR TOWN: **HOUSTON**

10a. COUNTY: **HARRIS**  STATE: **TEXAS**  ZIP CODE: **77026**

11. FATHER'S NAME: **JIM O. CULTON**

12. MOTHER'S NAME PRIOR TO FIRST MARRIAGE: **MABLE RHINEHART**

COUNTY OF DEATH: **HARRIS**  CITY/TOWN: **HOUSTON 77026**

FACILITY NAME: **2203 LUCAS**

INFORMANT'S NAME & RELATIONSHIP: **JACQUELYN WIELAND - DAUGHTER**

MAILING ADDRESS: **2 ANGELO PLACE ARCADIA, CA 91006**

SIGNATURE: **VICTORIA DIANNE WADE - BY ELECTRONIC SIGNATURE 11226**

PLACE OF DISPOSITION: **RANDOLPH CEMETERY**

LOCATION: **NORMANGEE TX**

NAME OF FUNERAL FACILITY: **SUNSET FUNERAL HOME - HOUSTON**

COMPLETE ADDRESS OF FUNERAL FACILITY: **4337 LIBERTY RD, HOUSTON, TX 77026**

TIME OF DEATH: **09:00 AM**

TITLE OF CERTIFIER: **M.D**

CAUSE OF DEATH: Cardiac Arrest / Cardiac Myxoma

REGISTRAR FILE NO.: **02-19440**  DATE RECEIVED BY LOCAL REGISTRAR: **Dec. 17, 2009**

DATE ISSUED: **DEC 1 8 2009**

This is to certify that this is a true and correct reproduction of
the original record as recorded in the office issued under
authority of Section 191.051, Health and Safety Code of Texas.
This copy not valid without engraved border displaying seal
and signature of the Registrar.

Lisa Akhikurane, Registrar
**BUREAU OF VITAL STATISTICS**

VS-112 REV 1/2008

1 0 1 9 8 0 9 3 3

*Exhibit I*



# GMAC Mortgage

3451 Hammond Ave
P.O. Box 780
Waterloo, IA 50704-0780

01/08/10

MARSHELL O CULTON

254 ANGELO PL
ARCADIA        CA 91006-1501

RE:    Account Number        ████0846
       Property Address      830 WEST ORANGE GROVE AVENUE
                             ARCADIA        CA 91006-0000

Dear    MARSHELL O CULTON

The repayment plan we previously established at your request has been canceled for one or
more of the following reasons:

   [[]]   The payment received does not represent the correct amount as specified in the
   signed repayment agreement.

   [[x]]   The payment was not received by the payment due date as specified in the
   signed repayment agreement.

   [[]]   The signed repayment agreement has not been received.

   [[]]   The required contribution has not been received.

Notice -- This is an attempt to collect a debt and any information obtained will be used for that
purpose. If your debt has been discharged in bankruptcy, our rights are being exercised against
the collateral for the above-referenced loan, not as a personal liability.

At this time, the default proceedings will resume. If you wish to discuss the status of your
account or the canceled payment plan, please contact the Loss Mitigation Department at
800-850-4622, extension .

Loss Mitigation Department
Loan Servicing

5:86

*Exhibit J*

Branch :ILA,User :AD16          Order: 0000000   Title Officer: 00   Comment:          Station Id :XT15

This page is part of your document - DO NOT DISCARD

## 20100170064





**Pages:**
**0004**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**02/05/10 AT 11:52AM**

| FEES: | 21.00 |
| TAXES: | NEPR |
| OTHER: | 0.00 |
| PAID: | NEPR |



LEADSHEET

201002050050040

00001894306

002528522

SEQ:
01

DAR - Counter (Hard Copy)



THIS FORM IS NOT TO BE DUPLICATED

Branch :1LA,User :AD16          Order: 0000000  Title Officer: 00  Comment:          Station Id :XT15

2

RECORDING REQUESTED BY:

AND WHEN RECORDED TO:
GRANDANA LLC/ LAVA ROCK INVESTMENTS LLC
13405 ARTESIA BLVD
CERRITOS, CA 90703

02/05/2010



*20100170064*

Forward Tax Statements to
the address given above

SPACE ABOVE LINE FOR RECORDER'S USE

TS # GM-196568-C
LOAN # ███████0846          INVESTOR #: 0000000000000
TITLE ORDER # 090223002-CA-MSI

## TRUSTEE'S DEED UPON SALE

APN 5769-015-007          TRANSFER TAX: $
The Grantee Herein Was Not The Foreclosing Beneficiary.
The Amount Of The Unpaid Debt was $1,078,874.88
The Amount Paid By The Grantee Was
Said Property Is In The City Of ARCADIA, County of Los Angeles

> TRANSFER TAX:
> NOT A PUBLIC RECORD

Executive Trustee Services, LLC dba ETS Services, LLC, as Trustee, (whereas so designated in the Deed of Trust hereunder
more particularly described or as duly appointed Trustee) does hereby GRANT and CONVEY to

## GRANDANA LLC/ LAVA ROCK INVESTMENTS LLC

(herein called Grantee) but without covenant or warranty, expressed or implied, all right, title and interest conveyed
to and now held by it as Trustee under the Deed of Trust in and to the property situated in the county of Los Angeles,
State of California, described as follows:

SEE EXHIBIT "A"

This conveyance is made in compliance with the terms and provisions of the Deed of Trust executed by MARSHELL O
CULTON, AN UNMARRIED WOMAN as Trustor, dated 4/30/2007 of the Official Records in the office of the Recorder of
Los Angeles, California under the authority and powers vested in the Trustee designated in the Deed of Trust or as the
duly appointed Trustee, default having occurred under the Deed of Trust pursuant to the Notice of Default and Election to
Sell under the Deed of Trust recorded on 5/8/2007, instrument number 20071113044 (or Book, Page )
of Official records. Trustee having complied with all applicable statutory requirements of the State of California and
performed all duties required by the Deed of Trust including sending a Notice of Default and Election to Sell within ten days
after its recording and a Notice of Sale at least twenty days prior to the Sale Date by certified mail, postage pre-paid to
each person entitled to notice in compliance with California Civil Code 2924b.

[Page 1 of 2]

LOS ANGELES,CA                    Page 2 of 4              Printed on 7/2/2012 10:31:53 AM
Document: DF 2010.170064

Branch :II.A,User :AD16                Order: 0000000   Title Officer: 00   Comment:                Station Id :XTI5

3

## TRUSTEE'S DEED UPON SALE

Trustee's Deed
T.S.# GM-196568-C
Loan #▇▇▇▇0846
Title Order # 090223002-CA-MSI

All requirements per California Statutes regarding the mailing, personal delivery and publication of copies
of Notice of Default and Election to Sell under Deed of Trust and Notice of Trustee's Sale, and the posting
of copies of Notice of Trustee's Sale have been complied with. Trustee, in compliance with said Notice of
Trustee's sale and in exercise of its powers under said Deed of Trust sold said real property at public auction
on 1/28/2010. Grantee, being the highest bidder at said sale became the purchaser of said property
for the amount bid, being                in lawful money of the United States, in pro per, receipt there
of is hereby acknowledged in full/partial satisfaction of the debt secured by said Deed of Trust.

In witness thereof,  **Executive Trustee Services, LLC dba ETS Services, LLC** , as Trustee, has this day, caused its
name
to be hereunto affixed by its officer thereunto duly authorized by its corporation by-laws

Date: 1/28/2010

                                        **Executive Trustee Services, LLC dba ETS Services,**

**LLC**

                                        By:_____
                                        Max A. Garcia, Limited Signing Officer

State of California        } S.S.
County of Los Angeles    }
On 2/3/2010 before me, **Gisela A. Clark**, Notary Public, personally appeared **Max A. Garcia** who proved to me on the
basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
            Gisela A. Clark

GISELA A. CLARK
Commission # 1802574
Notary Public - California
Los Angeles County
My Comm. Expires May 1, 2010

[Page 2 of 2]

Branch :1LA,User :AD16                Order: 0000000  Title Officer: 00  Comment:                    Station Id :XT15

4

EXHIBIT A

LEGAL DESCRIPTION

REF. NO. GM-196588-C

REAL PROPERTY IN THE CITY OF ARCADIA, COUNTY OF LOS ANGELES, STATE OF
CALIFORNIA, DESCRIBED AS FOLLOWS:

THAT PORTION OF LOT 2 OF TRACT 948, IN THE CITY OF ARCADIA, AS PER MAP
RECORDED IN BOOK 17 PAGE 21 OF MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTH LINE OF SAID LOT 2, SAID POINT BEING
THE NORTHWEST CORNER OF THAT PARCEL OF LAND CONVEYED TO NORMAN
CHANDLER ET UX., AND DESCRIBED IN DEED RECORDED IN BOOK 15466 PAGE 274,
OFFICIAL RECORDS; THENCE SOUTH 88 DEGREES 53' 40' WEST ALONG THE NORTH
LINE OF SAID LOT 2, 165 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH
88 DEGREES 53' 40' WEST ALONG THE NORTH LINE OF SAID LOT 2, 165 FEET; TO
THE TRUE POINT OF BEGINNING; SOUTH 88 DEGREES 53' 40' WEST ALONG THE
NORTH LINE OF SAID LOT 2, 165 FEET; THENCE SOUTH 1 DEGREES 06' 20" EAST,
269.66 FEET; THENCE NORTH 88 DEGREES 53' 40' EAST 165 FEET; THENCE NORTH 1
DEGREES 06' 20" WEST, 269.66 FEET TO THE TRUE POINT OF BEGINNING.

Exhibit K

Branch :ILA,User :AD16                Order: 0000000  Title Officer: 00  Comment:                Station Id :XT15

This page is part of your document - DO NOT DISCARD



# 20100263451



**Pages:
0003**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**02/26/10 AT 08:00AM**

| | |
|---|---|
| FEES: | 22.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 22.00 |



LEADSHEET



201002260190013

00001984451

002559086

SEQ:
20

DAR - Title Company (Hard Copy)



THIS FORM IS NOT TO BE DUPLICATED          t01

LOS ANGELES,CA
Document: D 2010.263451

Printed on 7/2/2012 10:32:13 AM

Branch :ILA,User :AD16    Order: 0000000    Title Officer: 00    Comment:    Station Id :XTI5

RECORDING REQUESTED BY:

Order No. 106015699-H07
Escrow No. 21107-CT
Parcel No.  5769-015-007

AND WHEN RECORDED MAIL TO:

GRANDANA LLC
12654 MISTY PLACE
CERRITOS, CA 90703



02/26/2010

*20100263451*

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S) THAT DOCUMENTARY TRANSFER TAX IS $-0- and CITY $-0-

☐   computed on full value of property conveyed, or
☐   computed on full value less liens or encumbrances remaining at the time of sale.
☐   unincorporated area:    ☒    Arcadia, and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
Grandana LLC / Lava Rock Investments LLC

hereby GRANT(S) to Grandana LLC, Lava Rock Investments LLC, Mansour Meisami and Manzar Meisami,
Husband and Wife and E&A LLC

the following described real property in the County of Los Angeles, State of California:

See Exhibit "A" attached hereto and made a part thereof.

*"This conveyance is to secure a debt, R & T 11921."*

Date    February 18, 2010

Grandana LLC                                    Lava Rock Investments LLC

By: Grace Hu, Members                           By: Derek Kam, Managing Member

STATE OF CALIFORNIA            )
                               )S.S.
COUNTY OF LOS ANGELES          )

On February 18th, 2010 _____, before me, **Young Eil Kim, Notary Public** _____
personally appeared **Grace Hu and Derek Kam** who proved to me on the basis of satisfactory evidence to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

Signature _____    (Seal)

YOUNG EIL KIM
Commission # 1762411
Notary Public - California
Los Angeles County
My Comm. Expires Sep 12, 2011

Mail Tax Statement to: SAME AS ABOVE or Address Noted Below

Branch :ILA,User :AD16                  Order: 0000000  Title Officer: 00  Comment:                  Station Id :XTI5

Order No: 106015699 · H07

## EXHIBIT "A"
## LEGAL DESCRIPTION

3

THAT PORTION OF LOT 2 OF TRACT NO. 948, IN THE CITY OF ARCADIA, COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 17 PAGE 21 OF MAPS, IN
THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

COMMENCING AT A POINT IN THE NORTH LINE OF SAID LOT 2, SAID POINT BEING THE
NORTHWEST CORNER OF THAT PARCEL OF LAND CONVEYED TO NORMAN CHANDLER ET UX., AND
DESCRIBED IN DEED RECORDED IN BOOK 15466 PAGE 274, OFFICIAL RECORDS; THENCE SOUTH
88 DEGREES 53' 40" WEST ALONG THE NORTH LINE OF SAID LOT 2, 165 FEET TO THE TRUE
POINT OF BEGINNING; THENCE SOUTH 88 DEGREES 53' 40" WEST ALONG THE NORTH LINE OF
SAID LOT 2, 165 FEET; THENCE SOUTH 1 DEGREES 06' 20" EAST, 269.66 FEET; THENCE
NORTH 88 DEGREES 53' 40" EAST 165 FEET; THENCE NORTH 1 DEGREES 06' 20" WEST,
269.66 FEET TO THE TRUE POINT OF BEGINNING.

LGLDESC1 · 04/11/89

LOS ANGELES,CA                          Page 3 of 3                          Printed on 7/2/2012 10:32:14 AM
Document: D 2010.263451

*Exhibit L*

Branch :1LA,User :AD16          Order: 0000000  Title Officer: 00  Comment:                    Station Id :XT15

This page is part of your document - DO NOT DISCARD




**20100263452**

Recorded/Filed In Official Records
Recorder's Office, Los Angeles County,
California

**02/26/10 AT 08:00AM**

Pages:
0005

| | |
|---|---|
| FEES: | 28.00 |
| TAXES: | 1,647.80 |
| OTHER: | 0.00 |
| PAID: | 1,675.80 |


**L E A D S H E E T**


201002260190013

00001984452


002559086

SEQ:
21

DAR - Title Company (Hard Copy)



THIS FORM IS NOT TO BE DUPLICATED          t01

LOS ANGELES,CA                          Page 1 of 5                    Printed on 7/2/2012 10:32:14 AM
Document: D 2010.263452

Branch :ILA, User :AD16                    Order: 0000000  Title Officer: 00  Comment:                    Station Id :XT15

RECORDED AT THE REQUEST OF
CHICAGO TITLE COMPANY

RECORDING REQUESTED BY:
Order No. 106015699-H07
Escrow No. 21107-CT
Parcel No.  5769-015-007

AND WHEN RECORDED MAIL TO:

**DAVID/KRUSE**
1205 RODEO
ARCADIA, CA 91006


02/26/2010
*20100263452*

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S) THAT DOCUMENTARY TRANSFER TAX IS $1,647.80 and CITY $-0-
[X]  computed on full value of property conveyed, or
[ ]  computed on full value less liens or encumbrances remaining at the time of sale.
[ ]  unincorporated area:    [X]  Arcadia, and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
Grandana LLC, Lava Rock Investments LLC, Mansour Meisami and Manzar Meisami, Husband and Wife
and E&A LLC

hereby GRANT(S) to    David Robert Kruse and Linda Faye Kruse Co-Trustees of the David and Linda Kruse
                       Community Property Trust, under trust dated 6/26/03

the following described real property in the County of Los Angeles, State of California:
See Exhibit "A" attached hereto and made a part thereof.

Date    February 18, 2010

Grandana LLC                                        E&A LLC

By: Grace Hu, Members                               By: Helen Lin

Lava Rock Investments LLC                           Mansour Meisami

By: Derek Kam, Managing Member                      Manzar Meisami

STATE OF CALIFORNIA          )
                             )S.S.
COUNTY OF LOS ANGELES        )

On **February 18th, 2010**              , before me, **Young Eil Kim, Notary Public**
personally appeared **Grace Hu and Derek Kam** who proved to me on the basis of satisfactory evidence to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

Signature _____  (Seal)

YOUNG EIL KIM
Commission # 1762411
Notary Public - California
Los Angeles County
My Comm. Expires Sep 12, 2011

Mail Tax Statement to: SAME AS ABOVE or Address Noted Below

Branch :ILA,User :AD16          Order: 0000000  Title Officer: 00  Comment:                          Station Id :XTJ5

# ACKNOWLEDGMENT

State of California

County of Los Angeles

On Feb 19th, 2010 before me, Young Eil Kim, Notary Public
(here insert name and title of the officer)

personally appeared Mansour Meisami and Manzer Meisami

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity on behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

```
YOUNG EIL KIM
Commission # 1762411
Notary Public - California
Los Angeles County
My Comm. Expires Sep 12, 2011
```

(Seal)

## OPTIONAL INFORMATION

Description or Title of the Attached Document: Grant Deed

Number of Pages: _____    Document Date: Feb 18, 2010

Capacity Claimed by Signer(s):
- ☐ Individual(s)
- ☐ Corporate Officer(s): _____
- ☐ Trustee(s)
- ☐ Attorney-in-Fact
- ☐ Partner(s)
- ☐ Other: _____

## ACKNOWLEDGMENT

4

State of California

County of ___Los Angeles_____

On __Feb 22, 2010__ before me, __Young Eil Kim, Notary Public_____
                                (here insert name and title of the officer)

personally appeared ___Helen Lin_____

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity on behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

Signature _____

```
YOUNG EIL KIM
Commission # 1762411
Notary Public - California
Los Angeles County
My Comm. Expires Sep 12, 2011
```

(Seal)

·······································································································

### OPTIONAL INFORMATION

Description or Title of the Attached Document:    Grant Deed

Number of Pages: _____    Document Date:  Feb 18, 2010

Capacity Claimed by Signer(s):
☐   Individual(s)
☐   Corporate Officer(s): _____
☐   Trustee(s)
☐   Attorney-in-Fact
☐   Partner(s)
☐   Other: _____

Branch :ILA,User :AD16          Order: 0000000  Title Officer: 00  Comment:          Station Id :XT15

Order No:  106015699 - H07

EXHIBIT "A"

## LEGAL DESCRIPTION

5

THAT PORTION OF LOT 2 OF TRACT NO. 942, IN THE CITY OF ARCADIA, COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 17 PAGE 21 OF MAPS, IN
THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

COMMENCING AT A POINT IN THE NORTH LINE OF SAID LOT 2, SAID POINT BEING THE
NORTHWEST CORNER OF THAT PARCEL OF LAND CONVEYED TO NORMAN CHANDLER ET UX., AND
DESCRIBED IN DEED RECORDED IN BOOK 15466 PAGE 274, OFFICIAL RECORDS; THENCE SOUTH
88 DEGREES 53' 40" WEST ALONG THE NORTH LINE OF SAID LOT 2, 165 FEET TO THE TRUE
POINT OF BEGINNING; THENCE SOUTH 88 DEGREES 53' 40" WEST ALONG THE NORTH LINE OF
SAID LOT 2, 165 FEET; THENCE SOUTH 1 DEGREES 06' 20" EAST, 269.66 FEET; THENCE
NORTH 88 DEGREES 53' 40" EAST 165 FEET; THENCE NORTH 1 DEGREES 06' 20" WEST,
269.66 FEET TO THE TRUE POINT OF BEGINNING.

LDI DRSC1 - 04/18/90

# PROOF OF SERVICE
(C.C.P §§ 1013, 1013a)

STATE OF CALIFORNIA, COUNTY OF ORANGE

At the time of service I was over 18 years of age and not a party to this action.

My [✓] Business    [＿＿] Residence address is:

Business:  500 North State College Boulevard, Suite 1200, Orange, CA 92868

On July 5, 2012                 I served the following documents:

PLAINTIFF'S SECOND AMENDED COMPLAINT

I served the documents on the persons below, as follows:

See attached Service List, incorporated here.

The documents were served by the following means:

[✓]  **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses listed above and

     [＿＿] deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

     [✓] placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

[＿＿]  **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

[＿＿]  **By fax.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed above. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

[＿＿]  **By e-mail.** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[＿＿]  **By personal service.** I personally delivered the documents to the persons at the addresses listed above. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of 8 a.m. and 6 p.m.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 5, 2012

PATTI MARTINEZ
   (NAME OF DECLARANT)

                                                  (SIGNATURE OF DECLARANT)

**PROOF OF SERVICE**
**Service List Attachment**

Attorneys for Defendants, GMAC MORGTGAGE, LLC; etc.
David M. Liu, Esq., SEVERSON & WERSON, P.C.
19100 Von Karman Avenue, Suite 700
Irvine, CA 92612

Attorneys for Defendants, GMAC MORGTGAGE, LLC; etc.
John B. Sullivan, Esq., SEVERSON & WERSON, P.C.
One Professional Corporation, One Embarcadero Center, Suite 2600
San Francisco, CA 94111

Attorney for Defendant, MORTGAGEIT, INC.
Erica Yen, Esq.; REED & SMITH, LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071

Defendant MORTGAGEIT
c/o C T Corporation System, Agent
818 West Seventh Street
Los Angeles, CA 90017

CalCourtForms POS11
[Rev. 5-15-2008]

**PROOF OF SERVICE**
**Service List Attachment**

www.CalCourtForms.com
California's Best Form Solution