**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DECLARATION OF SARA LATHROP IN SUPPORT OF RESCAP BORROWER CLAIMS TRUST'S OBJECTION TO CLAIM NO. 1083 FILED BY ELDA AND MARIA THOMPSON**

I, Sara Lathrop, hereby declare as follows:

1. I serve as Senior Claims Analyst for the ResCap Borrower Claims Trust (the "Borrower Trust"), established pursuant to the terms of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6030] confirmed in the above-captioned Chapter 11 Cases. During the Chapter 11 Cases, I served as Regulatory Compliance Manager and Loss Mitigation Manager in the loan servicing department of Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases (collectively, the "Debtors"). I began my association with ResCap in June 2006 working as an associate in the Default Division of the loan servicing operation of GMAC Mortgage, LLC ("GMACM"). In 2008, I became a Default Quality Control Specialist, a position that I held until I became a Supervisor in the Default Division in 2009. In 2011, I became a Supervisor in the Loss Mitigation Division of GMACM's loan servicing operation, and in February 2012, I became a Manager in that division. In this role, I oversaw GMACM associates in their efforts to provide borrowers with loss mitigation options and

1

ny-1205434

assisted in the development of GMACM's loss mitigation policies. In January of 2013, I became the Regulatory Compliance Manager for ResCap. I became Senior Claims Analyst for ResCap in July 2013 and continued in this role when the ResCap Liquidating Trust (the "Liquidating Trust") was established in December 2013. In my current position as Senior Claims Analyst to the Borrower Trust, among my other duties, I continue to assist the Borrower Trust in connection with the claims reconciliation process.[1] I am authorized to submit this declaration (the "Declaration") in support of the ResCap Borrower Claims Trust's Objection (the "Objection") to Proof of Claim No. 1083 Filed by Elda and Maria Thompson (the "Thompson Claim").

2.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations, information learned from my review of relevant documents and information I have received through my discussions with other former members of the Debtors' management or other former employees of the Debtors, the Liquidating Trust, and the Borrower Trust's professionals and consultants. If I were called upon to testify, I could and would testify competently to the facts set forth in the Objection and this Declaration on that basis.

3.  In my current and former capacities as Senior Claims Analyst and Loss Mitigation Manager to the Borrower Trust, the Liquidating Trust, and ResCap, I am intimately familiar with the Debtors' claims reconciliation process. Except as otherwise indicated, all statements in this Declaration are based upon my familiarity with the Debtors' Books and Records kept in the course of their regularly conduct business activities (the "Books and Records"), as well as the Debtors' schedules of assets and liabilities and statements of financial

---

[1] The ResCap Liquidating Trust and the ResCap Borrower Claims Trust are parties to an Access and Cooperation Agreement, dated as December 17, 2013, which, among other things, provides the Borrower Trust with access to the books and records held by the Liquidating Trust and Liquidating Trust's personnel to assist the Borrower Trust in performing its obligations.

2

ny-1205434

affairs filed in these Chapter 11 Cases (collectively, the "Schedules"), my review and reconciliation of claims, and/or my review of relevant documents. I or Liquidating Trust personnel have reviewed and analyzed the proof of claim forms and supporting documentation filed by the Claimants. Since the Plan went effective and the Borrower Trust was established, I, along with members of the Liquidating Trust have consulted with the Borrower Trust to continue the claims reconciliation process, analyze claims, and determine the appropriate treatment of the same. In connection with such review and analysis, where applicable, I or Liquidating Trust personnel, together with professional advisors, have reviewed (i) information supplied or verified by former personnel in departments within the Debtors' various business units, (ii) the Books and Records, (iii) the Schedules, (iv) other filed proofs of claim, and/or (vi) the official claims register maintained in the Debtors' Chapter 11 Cases.

4.    According to the Debtors' books and records, non-Debtor Ameriquest Mortgage Company ("Ameriquest") originated a loan to the Thompsons on June 25, 2005 (the "Thompson Loan"), secured by a mortgage on property located at 137 Ellery Ave., Newark, NJ 07106 (the "Thompson Property"). See Thompson Note, attached hereto as Exhibit A and Thompson Mortgage, attached hereto as Exhibit B. The Thompson Loan was securitized in 2005 where U.S. Bank N.A. was named as Trustee for Citigroup Mortgage Loan Trust Inc. series 2005-09. See Assignment of Mortgage, attached hereto as Exhibit C.

5.    GMACM serviced the Thompson Loan from October 20, 2005 until servicing was transferred to Ocwen Loan Servicing, LLC ("Ocwen") on February 16, 2013.

6.    Section 4 of the Thompson Note provides for a fixed interest of 5.99% from the date of origination through August 1, 2008. Beginning on August 1, 2008, the interest rate adjusts, and would continue to adjust, every six months on "Change Dates." See Thompson

3

Note. Beginning with the first Change Date, the interest rate under the terms of the Thompson Note was based on the average of the interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. See id. Before each Change Date, the new interest rate would be calculated by adding two and three-quarters percentage points (2.75%) to the LIBOR listed 45 days prior to the Change Date, and then rounding the result to the nearest one-eighth of one percent (.125%). See id. The Thompson Note further states that the interest rate will not be greater than 11.99% or less than 5.99% and will not be increased or decreased on any single Change Date by more than one percentage point from the rate of interest for the preceding six months. See id.

7.    Pursuant to the Thompson Note, the interest rate that was applied from the date of origination until August 1, 2008 was 5.99%, which the Borrower Trust confirmed amounted to a monthly payment of $1,227.76. See Thompson Note; see also Servicing Notes, attached hereto as Exhibit D.

8.    On June 24, 2008,[2] the Debtors sent the Thompsons a letter informing them that, pursuant to the Thompson Note, their interest rate would be changing on August 1, 2008 and would be effective with the September 1, 2008 payment (the "June 2008 Adjustment Letter"). See June 2008 Adjustment Letter, attached hereto as Exhibit F. The June 2008 Adjustment Letter explained that the LIBOR was 3.24%, and therefore, using the formula under Section 4 of the Thompson Note, the Thompson's new interest rate would be 6.00% (3.24% + 2.75% = 5.99%, rounded to the nearest .125% = 6.00%). See id. Thus, the Thompson's monthly payment for the six month period beginning September 1, 2008 through February 1, 2009 would

---

[2] Even though the letter was dated May 27, 2008, the Debtors' servicing notes reflect that the letter was actually mailed on June 24, 2008. See Servicing Notes at 135. The incorrect date is also demonstrated by the LIBOR in the letter, which is from June 17, 2008, 45 days prior to the August 1, 2008 Change Date. See Historic LIBOR indices 2008, attached hereto as Exhibit E.

be $1,228.98. See id. The Borrower Trust confirmed that the monthly payment reflects an interest rate of 6.00%.

9. On December 26, 2008, the Debtors sent the Thompsons a letter informing them that, pursuant to the Thompson Note, their interest rate would be changing on February 1, 2009 and would be effective with the March 1, 2009 payment (the "December 2008 Adjustment Letter"). See December 2008 Adjustment Letter, attached hereto as Exhibit G. The December 2008 Adjustment Letter explained that the LIBOR was 1.891%, and therefore, using the formula under Section 4 of the Thompson Note, the Thompson's new interest rate would be 5.99% (because the interest rate could not go below 5.99%). See id. Thus, the Thompson's monthly payment for the six month period beginning March 1, 2009 through August 1, 2009 would be $1,227.70. See id.

10. On June 24, 2009, the Debtors sent the Thompsons a letter informing them that, pursuant to the Thompson Note, their interest rate would be changing on August 1, 2009 and would be effective with the September 1, 2009 payment (the "June 2009 Adjustment Letter"). See June 2009 Adjustment Letter, attached hereto as Exhibit H. The June 2009 Adjustment Letter explained that the LIBOR was 1.163%, and therefore, using the formula under Section 4 of the Thompson Note, the Thompson's new interest rate would be 5.99% (because the interest rate could not go below 5.99%). See id. Thus, the Thompson's monthly payment for the six month period beginning September 1, 2009 through February 1, 2010 would be $1,227.70. See id.

11. On December 24, 2009, the Debtors sent the Thompsons a letter informing them that, pursuant to the Thompson Note, their interest rate would be changing on February 1, 2010 and would be effective with the March 1, 2010 payment (the "December 2009 Adjustment

ny-1205434

Letter"). See December 2009 Adjustment Letter, attached hereto as Exhibit I. The December 2009 Adjustment Letter explained that the LIBOR was 0.443%, and therefore, using the formula under Section 4 of the Thompson Note, the Thompson's new interest rate would be 5.99% (because the interest rate could not go below 5.99%). See id. Thus, the Thompson's monthly payment for the six month period beginning March 1, 2010 through August 1, 2010 would be $1,227.70. See id.

12. On June 23, 2010, the Debtors sent the Thompsons a letter informing them that, pursuant to the Thompson Note, their interest rate would be changing on August 1, 2010 and would be effective with the September 1, 2010 payment (the "June 2010 Adjustment Letter"). See June 2010 Adjustment Letter, attached hereto as Exhibit J. The June 2010 Adjustment Letter explained that the LIBOR was 0.754%, and therefore, using the formula under Section 4 of the Thompson Note, the Thompson's new interest rate would be 5.99% (because the interest rate could not go below 5.99%). See id. Thus, the Thompson's monthly payment for the six month period beginning September 1, 2010 through February 1, 2011 would be $1,227.70. See id.

13. On December 24, 2010, the Debtors sent the Thompsons a letter informing them that, pursuant to the Thompson Note, their interest rate would be changing on February 1, 2011 and would be effective with the March 1, 2011 payment (the "December 2010 Adjustment Letter"). See December 2010 Adjustment Letter, attached hereto as Exhibit K. The December 2010 Adjustment Letter explained that the LIBOR was 0.459%, and therefore, using the formula under Section 4 of the Thompson Note, the Thompson's new interest rate would be 5.99% (because the interest rate could not go below 5.99%). See id. Thus, the Thompson's monthly

6

payment for the six month period beginning March 1, 2011 through August 1, 2011 would be $1,227.70. See id.

14. On June 23, 2011, the Debtors sent the Thompsons a letter informing them that, pursuant to the Thompson Note, their interest rate would be changing on August 1, 2011 and would be effective with the September 1, 2011 payment (the "June 2011 Adjustment Letter"). See June 2011 Adjustment Letter, attached hereto as Exhibit L. The June 2011 Adjustment Letter explained that the LIBOR was 0.395%, and therefore, using the formula under Section 4 of the Thompson Note, the Thompson's new interest rate would be 5.99% (because the interest rate could not go below 5.99%). See id. Thus, the Thompson's monthly payment for the six month period beginning September 1, 2011 through February 1, 2012 would be $1,227.70. See id.

15. On December 26, 2011, the Debtors sent the Thompsons a letter informing them that, pursuant to the Thompson Note, their interest rate would be changing on February 1, 2012 and would be effective with the March 1, 2012 payment (the "December 2011 Adjustment Letter"). See December 2011 Adjustment Letter, attached hereto as Exhibit M. The December 2011 Adjustment Letter explained that the LIBOR was 0.783%, and therefore, using the formula under Section 4 of the Thompson Note, the Thompson's new interest rate would be 5.99% (because the interest rate could not go below 5.99%). See id. Thus, the Thompson's monthly payment for the six month period beginning March 1, 2012 through August 1, 2012 would be $1,227.70. See id.

16. On June 25, 2012, the Debtors sent the Thompsons a letter informing them that, pursuant to the Thompson Note, their interest rate would be changing on August 1, 2012 and would be effective with the September 1, 2012 payment (the "June 2012 Adjustment

ny-1205434

Letter"). See June 2012 Adjustment Letter, attached hereto as Exhibit N. The June 2012 Adjustment Letter explained that the LIBOR was 0.737%, and therefore, using the formula under Section 4 of the Thompson Note, the Thompson's new interest rate would be 5.99% (because the interest rate could not go below 5.99%). See id. Thus, the Thompson's monthly payment for the six month period beginning September 1, 2012 through February 1, 2013 would be $1,227.70. See id.

17.    On December 24, 2012, the Debtors sent the Thompsons a letter informing them that, pursuant to the Thompson Note, their interest rate would be changing on February 1, 2013 and would be effective with the March 1, 2013 payment (the "December 2012 Adjustment Letter"). See December 2011 Adjustment Letter, attached hereto as Exhibit O. The December 2012 Adjustment Letter explained that the LIBOR was 0.508%, and therefore, using the formula under Section 4 of the Thompson Note, the Thompson's new interest rate would be 5.99% (because the interest rate could not go below 5.99%). See id. Thus, the Thompson's monthly payment for the six month period beginning March 1, 2013 through August 1, 2013 would be $1,227.70. See id.

18.    In sum, during the time the Debtors serviced the Thompson Loan the Debtors properly calculated and changed the appropriate interest rate. At each Change Date, the Debtors calculated the rate consistent with the terms of the Thompson Note. As discussed above, except for the first Change Date, the applicable interest rate at all other times was the minimum rate provided for under section 4 of the Thompson Note.

8

ny-1205434

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 6, 2015

/s/ Sara Lathrop
Sara Lathrop
Senior Claims Analyst for ResCap Borrower Claims Trust