**Exhibit A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Frederic L. Edquid and Lesley H. Edquid,

Plaintiffs,

vs.

GMAC Mortgage Corporation; and Executive Trustee Services, LLC,

Defendants.

No: 4:11-cv-00311-CKJ

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

FREDERIC L. EDQUID

April 26, 2012
1:16 p.m.

8373 North Cracker Barrel Road
Tucson, Arizona

Karen Saari, RPR, Certification Number 50842

DEPOSITION OF FREDERIC L. EDQUID

commenced at 1:16 p.m. on April 26, 2012, at the Holiday Inn Express, 8373 North Cracker Barrel Road, Tucson, Arizona, before Karen Saari, Certified Court Reporter for the County of Maricopa, State of Arizona.

APPEARANCES OF COUNSEL

For Plaintiffs:

JONES & ODOM, L.L.P.
JOHN S. ODOM, JR., ESQ.
2124 Fairfield Avenue
Shreveport, Louisiana 71104
318.221.1600
318.425.1256 Fax
john.odom@jodplaw.com

For Defendants:

BRADLEY ARANT BOULT CUMMINGS LLP
KEITH S. ANDERSON, ESQ.
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2119
205.521.8714
205.488.6714 Fax
kanderson@babc.com

INDEX OF EXAMINATION

WITNESS: FREDERIC L. EDQUID

| EXAMINATION | PAGE |
|---|---|
| By Mr. Anderson | 5 |
| By Mr. Odom | 185 |
| By Mr. Anderson | 192 |

INDEX TO EXHIBITS

| Exhibit No. | Description | Page |
|---|---|---|
| 1 | Uniform Residential Loan Application | 30 |
| 2 | Complaint | 34 |
| 3 | Promissory Note in re: April 2005 loan | 37 |
| 4 | Deed of Trust | 38 |
| 5 | Series of documents produced by Plaintiff | 42 |
| 6 | 9.1.2008 letter from GMAC | 73 |
| 7 | 10.2.2008 letter from GMAC | 75 |
| 8 | Substitution of Trustee notice | 76 |
| 9 | Printout from the DMDC database | 80 |
| 10 | 1.22.2009 letter with handwritten notes | 83 |
| 11 | 2.18.2009 Memorandum for Record | 87 |
| 12 | 2.25.2009 Memorandum for GMAC Mortgage | 91 |

INDEX TO EXHIBITS
(Continued)

| Exhibit No. | Description | Page |
|---|---|---|
| 13 | 3.3.2009 document with signature block for Paul Forshey, Lieutenant Colonel, Arizona Army National Guard | 94 |
| 14 | 3.10.2009 letter from American Express to Frederic L. Edquid | 103 |
| 15 | TransUnion document with an issue date of 3.31.2009 | 111 |
| 16 | AUD form, Date Submitted: 3.17.2009 | 115 |
| 17 | 10.5.2010 Core Logic document | 128 |
| 18 | Plaintiffs' Responses to Defendants' Request for Production of Documents | 137 |
| 19 | 1.31.2011 letter from Bank of America to Mr. And Mrs. Edquid | 148 |
| 20 | 4.29.2011 letter from Bank of America to Frederic and Lesley Edquid | 149 |
| 21 | 2.5.2010 Memorandum for Record to Michelle Juan | 150 |
| 22 | Credit report dated 3.11.2011 | 156 |
| 23 | Credit report dated 6.14.2011 | 158 |
| 24 | 11.19.2011 Equifax credit report | 159 |
| 25 | 1.13.2012 credit report from myFICO | 169 |

(Original exhibits have been attached to the original transcript.)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~



Frederic L. Edquid April 26, 2012

5

DEPOSITION OF FREDERIC L. EDQUID
April 26, 2012

EXAMINATION

BY MR. ANDERSON:
Q. Good afternoon, Mr. Edquid. You were here earlier this morning when I took the deposition of your wife. And the same ground rules apply. I'm going to be asking you a series of questions. If you don't understand one of the questions that I ask, please say that, and I'll do my best to rephrase it. Is that my fair?
A. I'll do my best to understand.
Q. All right. And if you do answer he question, we'll assume that you understood the question. Is that fair?
A. That's fair.
Q. And you're doing a good job so far, but you just need to answer out loud for the benefit of the court reporter.
A. Okay. No problem.
Q. What's your full name?
A. Frederic L. Edquid.
Q. Are you on any medications today that would affect your ability to give truthful testimony?
A. Negative.
Q. What's your date of birth?
A. 25 January of '68.

6

MR. ODOM: I'm sorry? Could you speak --
COURT REORTER: 25 June?
THE WITNESS: 25 January.
COURT REPORTER: January.
THE WITNESS: 1968.
BY MR. ANDERSON:
Q. What's your Social Security number?
A. ████-4855.
Q. Do you have a driver's license in Arizona?
A. I do not.
Q. Where's your driver's license?
A. Vermont.
Q. Are you a resident of Arizona or Vermont?
A. Vermont is my domicile.
Q. How long have you lived in Arizona?
A. Since two thousand and -- 2002.
Q. What brought you to Arizona?
A. The opportunity to fly attack helicopters.
Q. And you're married?
A. I am.
Q. What's the name of your spouse?
A. Lesley.
Q. Is that your only marriage?
A. Yes. I'm not Mormon.
Q. I mean, there have been no divorces or anything like

7

that?
A. No.
Q. And children?
A. I have three.
Q. Could you give me their ages?
A. Six, three, and eleven weeks, I believe.
Q. Okay. What's your current mailing address?
A. 4329 West Thunder Canyon -- no, Thunder Ranch Place.
Q. And how long have you lived at that residence?
A. Moved there in January of 2012.
Q. And before that where did you live?
A. At 5465 West Bandtail Court.
Q. Is it fair to say the 5465 West Bandtail Court property is the subject of this litigation?
A. It is fair to say.
Q. Give me an idea of your educational background. Where did you graduate from high school?
A. Winooski High School.
Q. I'm sorry?
A. Winooski High School, W-i-n-o-o-s-k-i.
Q. And where is that at?
A. Vermont.
Q. What year did you graduate from high school?
A. 1986.
Q. College?

8

A. University of Vermont.
Q. What year did you -- Did you graduate?
A. I did.
Q. What year did you graduate?
A. 1995.
Q. Are you a member of any church or social organiza ions?
A. Well, we have Saint Elizabeth Seton, the Catholic church up the street.
Q. How long have you been a member there?
A. Since 2012 -- 2010.
Q. Any others come to mind?
A. No. The NRA, the National Guard.
Q. Okay. Do you currently suffer from any health problems or disabilities?
A. Define "health problems."
Q. Are you seen by a doctor on a regular basis for some condition?
A. I have psoriasis.
Q. And explain to me what psoriasis is.
A. It's a skin condition.
Q. How long have you had that?
A. It started just about when I started flying Apaches.
Q. Which would have been what year, approximately?
A. 2001. So I don't know if the paint gets to me or

sd
setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

Frederic L. Edquid April 26, 2012

9

what the deal is. But it started hen just a lit le bit. And it was, you know, sort of intermittent. It comes and goes.
Q. Is it fair to say that you take care of the financial matters for your family?
A. That is fair.
Q. Does your wife have anything to do with paying bills or any of the financial obligations?
A. Other than bills for Alex's lunch, no.
MR. ODOM: I'm sorry? Can you say that again? I didn't hear you.
THE WITNESS: The lunch bill. Sometime we get lunch at he -- at the school, for Alex's school, so she'll write a check for that, hings like that.
BY MR. ANDERSON:
Q. You stated earlier that you graduated from the University of Vermont. What was your degree in? Or, excuse me, what was your degree, and then what was your major?
A. Mechanical engineering.
Q. And that's a Bachelor of Science?
A. Yes, sir.
Q. When did you enter the military?
A. Originally, I entered the Na ional Guard in 1993.
Q. Was that he Vermont National Guard?
A. Affirmative.
Q. Were you commissioned as an officer at that point?

10

A. I was not.
Q. You entered as an enlisted member?
A. Yes, sir.
Q. At what point were you commissioned?
A. 1995.
Q. Okay. And that's upon your graduation from the University of Vermont?
A. Roger that. Degree is a requirement for commissioning.
Q. Yeah, I understand. Was your -- Were you an ROTC student?
A. I was. They gave me credit for the first two years because I did the basic training and AIT. And I did the last two years, from '93 to '95 or '94 to '95, to get my commission.
Q. And so at that ime were you part of the Vermont National Guard?
A. Yes, sir.
Q. When you graduated in 1995 then, did you -- what did you begin doing as a job?
A. I went off to my Officer Basic Course.
Q. Where was that at?
A. Fort Huachuca.
Q. Where is hat?
A. Right here in Arizona. It's the MIOBC, Military Intelligence Officer Basic Course.

11

MR. ODOM: Can you keep your voice up just a little bit? I'm not catching some of your answers.
THE WITNESS: No, hat's all right.
The MIOBC is the Military Intelligence Officer Basic Course.
BY MR. ANDERSON:
Q. How long was that course?
A. I think it was 20 or 21 weeks of actual course time, but I think it took six months to get it done because it was over certain holidays and that's not part of the course.
Q. Were you part of -- Were you assigned to a specific unit at hat point?
A. I was.
Q. Do you remember the name or title of your unit?
A. First Battalion, 86th Brigade, Ar illery.
MR. ODOM: 85th Brigade?
THE WITNESS: 86th.
MR. ODOM: 86th.
THE WITNESS: One, dash, 86, Artillery.
BY MR. ANDERSON:
Q. Star ing from what you just mentioned, the Officer MIOBC; is that right?
A. Yes, sir, MIOBC.
Q. Can you walk through your career progression at that point? You were at that point a second lieutenant?

12

A. I was a second lieutenant.
Q. Okay.
A. I went to MIOBC at Fort Huachuca.
COURT REPORTER: If you can go a little bit slower. You're very fast.
THE WITNESS: Oh, okay. MIOBC.
Sorry. I will try and -- try to do that.
MR. ODOM: Hold on a second.
He's been in a long time. I was in 41 years. He was in awhile. You ain't going to get all these acronyms, so just ask. I mean, we talk in code sometimes and don't realize that there are civilians in he room.
THE WITNESS: I tend to speak a lot in acronyms and codes.
MR. ODOM: Just speak louder. That's all I'm asking.
THE WITNESS: Okay.
MR. ODOM: Thank you.
BY MR. ANDERSON:
Q. I'm sorry. I was just asking you to kind of walk us through your career progression or your assignments, if you could.
A. My assignments. I -- You want, like, I was a platoon leader here? You want something like a military resume?

sd setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

Q. I want units.
A. Okay.
Q. When you went to the MIOBC course --
A. When I went to the MIOBC, I was in he 1st of the 86th. That's an artillery battalion.
Afterwards, while I was at MIOBC, prior to leaving, I had applied also for an opportunity to go to flight school. While I was there I was notified that, "Hey, you're going to flight school."
So I received that selection and started going to flight school in 1996. I completed flight school in 1997. At that point I was assigned to 1st of the 126th; one, dash, 126, Aviation.
Q. Where is that at?
A. That's also in Vermont.
Q. Okay.
MR. ODOM: Where in Vermont?
THE WITNESS: In Burlington.
MR. ODOM: Burlington.
THE WITNESS: Yeah. It's South Burlington, but it's, you know, Burlington/South Burlington. It's a small place. A neighborhood in Arizona is as big as three towns in Vermont, so --
BY MR. ANDERSON:
Q. And so that was in 1997, that you were first

assigned there?
A. Roger.
Q. How long were you with that unit?
A. I was with that unit until 2001.
Q. During that time, that roughly four-year time, now, that was your full-time job?
A. No. I'm a traditional Guardsman, from the very beginning.
Q. Okay, all right. What was your job, aside from your Guard duty?
A. I worked -- I worked for the airlines, checking bags. And I was basically a Guard bum. Okay. About 200 days out of the year, I would either fly or do missions, do different things.
I also, during that time frame, I worked as an engineer, from 1998 until 1999. In between, I got a number of different qualifications, different schools, from Blackhawk qualification, which was a three-month course, and different things. So, I mean, it wasn't like you're -- you're working every other day. There were 90-days' orders, 120-days' orders that were strung together.
Q. But between those orders, I guess, you would work either as an engineer or with the airlines. What airlines did you work for?
A. I worked for United. I also worked for

International Total Services, which was basically a skycap service, basically checking bags at the front for all the skiers and what have you. And, you know, it -- it afforded me he flexibility to do what I wanted to do, which was fly birds and follow my military career --
Q. Okay.
A. -- at that point.
Q. And so you were a traditional Guardsman up until he -- Well, we're up to 2001 at this point. What happened in 2001?
A. In 2001 I had he opportunity to switch over to the Arizona Guard.
Q. And did you do that?
A. I did. They offered me some hing you don't typically offer, but I was offered an opportunity to go to the Apache school and -- and fly. And at that point I was -- I was looking to fly guns. I wanted to make sure I could put rounds downrange rather than fly around as a big target.
Q. Okay. When you say, "fly guns" -- Is that what you said?
A. Fly guns.
Q. Okay. That means a helicopter wi h artillery?
A. A gunship.
Q. Okay.
A. Basically, a 30-millimeter cannon, 2.75 rockets,

Hellfire missiles are all the armaments on the Apache gunship.
Q. So at that point you moved to Arizona?
A. In that time frame, yes.
Q. Okay.
A. Because, while I was at -- While I was at flight school, on my final check ride for the AH-64 Alpha in 2001, my final check ride was 9/11.
Q. And at that point in time, on 9/11, you were still living in Vermont?
A. Yes. I mean, I was at Fort Rucker, obviously, but -- because that's where he flight school is.
Q. All right.
A. But I was living in Vermont, yes.
Q. Had you met your wife at hat point?
A. Yes. Yes, I had.
Q. Where did you meet her?
A. I had met her earlier at tae kwon do. I met her sparring. We were kicking each other.
Q. And that was in Vermont?
A. In Vermont.
Q. All right.
A. I think I met her in January or February of 2001. At that time I was just getting an offer from Arizona, to come on out; we'll send you to transition. No other promises.
And I was willing to do hat. And if it didn't work



out, then I could go to any other state and do what I needed to do.

Q. And at that point you were a National Guardsman in Arizona?

A. Roger. Well, I became a National Guardsman in Arizona, I think it was June. June 2001, I became a National Guardsman in Arizona.

Q. And you physically moved your residency or you moved to Arizona?

A. No.

Q. All right.

A. No.

Q. So you're s ill living in Vermont?

A. Roger. After 9/11, what I did is I would come out. I would be here for ten days, in conjunction with drill and what have you. I would fly missions, do AFTP's, what have you; do about 10 days, get about 20 days of pay, you know, two -- two per day. I would do hat, and then I would fly back to Vermont.

During that ime frame after 9/11, if you remember, I was often the only guy on the plane. People did not fly. Tickets were about $190 to fly to Phoenix, to Burlington, Vermont, and back. So, you know, being a -- At that point, being a -- a first lieutenant with flight pay, $200 for a round trip every month was one day of pay, give or take, in that

range. So it wasn't all that bad.

Q. Okay.

A. Then I would go home. At that time, my family was still in Vermont. So I had a place to live in Vermont. When I was here, they would put me up in the -- in the dorm rooms.

Q. When you say your family was in Vermont, is that your parents?

A. Yes. My mom died in 1997. She died of cancer. But my dad was still there. My brother was on active duty, and my sister was married to an Army guy at that time.

Q. Okay.

A. And I think she was -- I don't know where she was, either in Hawaii or Fort Bragg.

Q. When did you move to Arizona?

A. It would have been in 2002. It would have been when we purchased this house.

Q. When you say, "we," were you with your wife at that point?

A. No, not at that time. I guess when we -- We got the house in 2002. We weren't married yet.

Q. When you say --

A. But we were engaged.

Q. I'm sorry.

A. We were engaged.

Q. So when you moved out here, you were engaged to your

wife?

A. Roger that.

Q. And you guys lived together and purchased the property at --

A. Negative.

Q. Okay.

A. She lived in Vermont during that ime frame. I was here.

Q. All right.

A. She still had a job here, family. She was from Vermont. She -- she came here to Arizona and didn't like it. It was not he green mountains. And she was hoping that I would have an opportunity to go back to he East Coast.

I was looking. I looked at a bunch of places. I looked -- I looked in Alaska, looked here, looked in Vermont. And then my final consideration was: Hey, can I go on active duty?

I was trying not to do that. If it would have been -- If they would have attacked a year earlier, I would have been there on the first boat. But since I now was engaged, I -- I didn't jump on the first boat to get to Afghanistan.

Q. Okay.

A. But I had many friends who did.

Q. All right. So in 2002 you bought property in

Arizona hat you moved to?

A. Yes, sir.

Q. All right. And is hat the house at five -- 5465 West Bandtail Court?

A. That is correct.

Q. When were you married?

A. 2004. Was it 2004 or 2003?

Q. It's a good thing your wife isn't here.

A. I know. I know. It's eight and a half years and this is '12, so 2003. I guess, 2003. And if you ask me tomorrow, I'll give you a different answer.

Q. All right.

A. I'll know anything else but that.

Q. When you moved to Arizona, what was -- were you s ill a -- You were a National Guardsman at that point?

A. Yeah.

Q. Was that your full-time job?

A. No.

Q. What else did you do?

A. I -- Well, I was a -- I was a Na ional Guardsman. I was a Title 32 guy. What I did is I basically Guard bummed for awhile. And then, you know, that's -- that's basically what I did. That's what a Guard bum does.

Q. When you say, "Guard bum," what does hat mean?

A. It means you take whatever assignment you can. You



try to fly as much as you can. And then, you know, if they have a special -- a special assignment where you have to support annual training or if you've got a special project for -- for the -- for he General and stuff like hat, then -- You know, then you send an officer on hat, and hen they put you on orders for a couple of weeks and what have you. That's basically what you do.

After hat, I became an employee of the State of Arizona. Also con inued on as a traditional -- as a Guardsman until my activation in 2006.

Q. All right.

A. May 1st.

Q. Let's break that down a little bit. You mentioned just a minute ago hat you were a Title 32 guy.

A. Yeah.

Q. What does that mean?

A. Traditional Guardsman, not on active duty, as opposed to being Title 10.

Q. And then you said you were an employee of he State of Arizona?

A. Roger that.

Q. As a National Guardsman?

A. As a National Guardsman.

Q. Okay.

A. And they've got so many statuses, I can't even tell

you what they all are.

Q. At some point did you --

A. And --

Q. I'm sorry. Are you finished?

A. No, I was just saying that they have so many statuses, I can't even tell you what -- Having been in the National Guard since '93, I can't even tell you what all the different statuses are, just on the Army side.

I know that the Air Force side, like the Air Guard is actually a component of the active duty because -- because they -- they belong to the Air Force, while the Army Guard is actually -- was -- was originally organized back in -- I don't know -- 1782 or some sort of hing. So that's how it's authorized.

Q. Let me ask you: At some point did you become an AGR?

A. Yes, I did.

Q. What is an AGR?

A. It's Ac ive Guard Reserve.

Q. When did you become an AGR, I guess, member?

A. I -- I reached that status, it would have been in April of 2002.

MR. ODOM: Two thousand what?

THE WITNESS: 2002.

BY MR. ANDERSON:

Q. Have you been part of the AGR since April 2002 to the present?

A. No. I was -- I was activated under Title 10 on May 1st, 2006. At that point, Title 10 activation.

Q. So hat deployment, and we'll get to that.

A. Uh-huh.

Q. In 2006, and you returned in 2008?

A. Roger.

Q. And that was the time that you were activated. Aside from that paren heses, so to speak, from 2002 to the present, you've been an AGR member?

A. Yes, that is correct.

Q. As an AGR person, who do you work for?

A. I work for the -- the TAG.

Q. What's the TAG?

A. The TAG, the Adjutant General of Arizona National Guard. He's appointed by the governor or -- in this case, he or she, but it's a he right now.

Q. And as we sit here today, your -- I don't want to use the word "commander in chief," but you ultimate boss is still the adjutant governor --

MR. ODOM: Adjutant General.

THE WITNESS: Adjutant General.

BY MR. ANDERSON:

Q. -- Adjutant General, excuse me, of Arizona?

A. Yes.

Q. When you were a member or are a member of the AGR, do you believe that you are protected by the SCRA, the Federal SCRA?

A. I am not.

Q. And is that because you are not in Federal service?

A. I'm not in Title 10 service.

Q. Title 10 service.

A. Roger that.

Q. And when you say, "Title 10," you're talking about Title 10 of the United States Code?

A. Title 10 USC, versus Title 32, the authorization for a Guardsman.

I think there's five or six different categories of Guardsmen types out there under Title 32. I don't know what they all are. I've probably been in four or five of them. But I -- you know, everything from ADT, DT, ADSW.

COURT REPORTER: "ADSW," did you say?

THE WITNESS: Yes, ADSW, yes, ma'am.

Sorry. I'll slow down when I start throwing those out there.

BY MR. ANDERSON:

Q. In all of the acronyms or references that you just made, those are all still State agencies working for the Adjutant General of the State; is that fair to say?



A. Yes, sir, they are.
Q. Now, when you were an AGR member, did you -- was your job to fly helicopters?
A. No, it was not.
Q. All right. What is your job?
A. I'm a commissioned officer. Unlike the Air Force, we have to do work.
MR. ANDERSON: I want that stricken from the record.
MR. ODOM: I second the motion. I want that out.
I swore to him that if he says something like that, I was on the next plane out of town. That is not right.
THE WITNESS: The next plane is tomorrow morning.
BY MR. ANDERSON:
Q. All right. Let me just repeat, repeat the question, just so that we're clear.
AGR member. What is -- and, again, we're talking from 2002 to the present, so if it's changed at any point, please state that. But what was and what is your job as an AGR person? What do your duties entail?
MR. ODOM: Let me just -- Let me just clarify one thing. I want to object to the form of the question because, from 2002 until the present, there was that Title 10 mobilization. So if the question is with the understanding that, except for the time that he was mobilized on Title 10 orders, then we can answer that.

MR. ANDERSON: I totally agree with that. I'm not -- We'll get to the deployment section.
BY MR. ANDERSON:
Q. But I just want to get an idea here of what duties and what units and what your jobs were from 2002 to the present as an AGR member.
A. Right, no problem.
My duties or my rated responsibility is per paragraph and then the line number on an MTOE, M-T-O-E. Okay? It's a modified table of authorizations and equipment. So every unit in the National Guard has an MTOE. My duties were as assigned by that position.
Initially, when I was -- when I came to the Arizona National Guard, I was a platoon leader in a company. I then became an Assistant Three. I then became a company commander. And then I became -- and this is over time. I became an S2. Then I became an S3. And then I became a Brigade S3 Air, which was my -- my Phoenix assignment. At that point, we're already all the way to 2010.
Q. Okay.
A. So the usual length of these assignments was about a year to two years at each location.
Q. When you're an AGR, is your title an officer? Like, would you be referenced as a captain or a major, or was it Mr. Edquid?

A. No, I'm not. I'm -- I'm still -- I hold my title, regardless. I mean --
Q. I understand. Now, just so that we're clear, you've got your National Guard duties, where you are obviously a major right now. But as an AGR are they referred -- I'm just going to confess my ignorance on the AGR program. Are they -- You are --
A. You hold the rank that you have.
Q. Okay.
A. Okay? So if you're a captain, you're a captain. If you're a sergeant, you are -- you are still called "Sergeant," and what have you.
Q. Do you wear a uniform to work?
A. As -- as a function of the duty, yes, sir.
Q. Okay. We're going to get to the deployment that began in 2006. Besides that deployment did you ever -- have you ever deployed, aside from that?
A. Not under the current authorization for wartime.
Q. Any deployment besides what you just described?
A. Before -- before the war of 2010, I believe they issued something under twelve three oh two or whatever is what they used for authorization to activate or involuntarily activate National Guard soldiers to support the war effort. They started using that in 2001, going forward for both Afghanistan and Iraq.

Prior to then there are other mobilizations, but hey're not under a war guidance. So it's a different title; I just don't know what it is.
I've been sent to -- to Korea a couple of times, for hree or -- three or four weeks. I've been sent to Japan for hree or four weeks, different things like that. Those are still, based upon your question, since it's sort of not specific, sort of bridges both areas. Okay?
Q. Were those all prior to 2001?
A. Most of them were prior to 2001. I think, in 2004, I went to -- I think I went to Japan in 2004 for hree to four weeks. I went to Ochi Focus Lens in Korea.
COURT REPORTER: I'm sorry? What is it called, please?
THE WITNESS: Ochi. We'll call it UFL. How about hat? UFL.
MR. ODOM: O-c-h-i, the word "Focus," F-o-c-u-s, L-e-n-s. That's the name of an exercise.
THE WITNESS: Roger. So I went there to support hat.
So I've been to a number of hings. I -- I went out to the NTC, the National Training Center. I was out there for two four-week tours since 2000. I've been just different places. Again, they're -- hey're not -- they're not mobilizations under wartime authority.

Nationwide Scheduling
Toll Free: 1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com



BY MR. ANDERSON:
Q. So when you go on these different -- for example, when you went to Japan and when you went to he National Training Center, is that as a Arizona National Guardsman?
A. Yes, sir.
Q. Okay.
A. The status hasn't changed. Still a Guardsman.
Q. And when you go on those, are those Federal Title 10 orders that you're going under, or are hey just Arizona --
A. They're --
Q. -- National Guard --
A. They're -- They're --
COURT REPORTER: I'm sorry. If you can wait to let him finish.
MR. ANDERSON: Let's strike that. Let me just restate that.
BY MR. ANDERSON:
Q. I'm just trying to get an idea of, when you went on these hree- to four-week exercises or missions, were they -- were you on Title 10 orders when you went on those?
A. No, I was not. It's all Ti le 32.
Q. Is the only ime you've been on Title 10 orders in 2006 when you deployed to Afghanistan?
A. Yes, sir. That is correct, 2006 to 2008.
THE WITNESS: I'm going to get some water.

MR. ANDERSON: Sure.
THE WITNESS: Give me a second.
(Discussion off the record)
(Exhibit 1 marked)
BY MR. ANDERSON:
Q. Mr. Edquid, I'm showing you what I'm marking as Defense Exhibit 1.
A. Roger.
Q. I'll represent to you hat hat is the loan application for the subject loan. And before we get into it --
A. Okay.
Q. -- you mentioned that, in 2002, you actually moved to the property at 5465 Bandtail Court.
A. Roger that.
Q. Who was your -- Did you get a mortgage at that time?
A. Yes. I don't recall who it was. It may be in the credit report. I don't remember a specific name.
Q. So the loan application that you're looking at in Defense Exhibit 1, is it fair to say it was a refinance of that prior loan?
A. It was, yes, sir.
Q. Why did you refinance?
A. Better rate. And it proved to be a very good rate. It's actually -- I think it's a LIBOR plus one and an eighth.
Q. Okay, and that --

A. The current effective rate is like 1.375.
Q. And what you just described is an adjustable rate mortgage?
A. Yes, sir.
Q. Now, in the loan application, direct your atten ion near the bottom, where it says, "Borrower," and your name is there, Fred Edquid?
A. Uh-huh.
COURT REPORTER: Uh-huh?
THE WITNESS: Yes.
BY MR. ANDERSON:
Q. And then it has employment information in Box Roman Numeral IV. And it has there: U.S. Army Silverbell Army Heliport, Marana, Arizona?
A. That is correct.
Q. Now, when you put down that information, was that as an AGR member or as a National Guardsman?
A. It's as a National Guardsman. I'm a National Guardsman, throughout.
Q. Okay.
A. Whe her -- whether it's AGR or ADT or IDT, you're s ill a Na ional Guardsman.
Q. Okay. So even as a --
A. You're not on Title 10.
Q. So even as an AGR you would still be considered as a National Guardsman?

A. From day one, yes, sir.
Q. And, like we mentioned earlier, the only time that you've been on Title 10 orders was in your deployment from 2006 to 2008?
A. That is correct.
Q. When you completed this loan application in 2005, do you know if you were protected by the Servicemembers Civil Relief Act?
A. I was not. My protections did not start until the first day of my activation, at which point, it became effective. The first day of activation was, I believe, 1 May, 2006. And, I believe, a month or so prior to then, I sent the copy of the orders I had received for involuntary activation to GMAC. I believe you have that document somewhere in your files, where GMAC acknowledges my protections under the SCRA and tells me the time frame and says: You are protected until "X" amount.
Q. Do you know when your protections ceased under the SCRA, based on your deployment?
A. Based on my -- my deployment --
MR. ODOM: Let me just interject an -- an objection, an objection as to the form of the question as calling for a legal conclusion as to when his protection under the SCRA terminated.

sd setdepo
The Evolution of Deposition Management

MR. ANDERSON: You still need to answer the question. Do you want me to repeat the question?
THE WITNESS: Are you asking me as an expert or my opinion?
BY MR. ANDERSON:
Q. I am asking your understanding of when your protections --
A. My under -- my understanding --
COURT REPORTER: "Of when your protections" --
BY MR. ANDERSON:
Q. -- of when your protections stopped or ceased.
A. My understanding is -- is that my protections for foreclosure ceased nine months after the end of my active-duty orders.
Q. When was the end of your active-duty orders?
A. The active-duty order was, initially, 1 May, 2008. And that's what was -- what was sent to GMAC back in April of 2006 or so. March, April, I think.
Q. Okay.
A. It was --
Q. That may have been what the correspondence may have said when it was sent to GMAC.
I'm asking you: Do you know when your active-duty orders ended? Do you know the end date?
A. The end date was -- They had to be amended based

upon early return. My initial activa ion was 24 mon hs. It ended up being only about 22 months.
Q. My question is: Do you know when the end date of your active-duty orders was?
A. I believe it was mid March. I think, 15 or 16 March, 2008, in that range.
MR. ODOM: Two thousand what?
THE WITNESS: 2008.
MR. ODOM: Now we have Harleys competing for our -- Keep your voice up, he volume, if you would, Fred. I'm having a hard time hearing you.
THE WITNESS: Will do. Will do.
MR. ANDERSON: Now this is the Complaint.
(Exhibit 2 marked)
BY MR. ANDERSON:
Q. Okay. Mr. Edquid, I am going to show you what I'm going to mark as Exhibit 2. We're going to be going through a lot of documents. So I'm just going to kind of move them, like --
A. Okay.
Q. -- this, okay?
A. No problem.
Q. All right. Have you seen that document before?
A. Yes, I have.
Q. And I'll represent that this is he Complaint that

was filed in the District Court of Arizona. And does it look like the Complaint to you?
A. In its entirety, if it has all the pages, then it should be the Complaint.
Q. Okay. I want to refer you to Paragraph 18 of that Complaint. It's on page 5.
A. Uh-huh.
Q. Now, in Paragraph 18 it talks about on April 7, 2005, you took out a loan, is really what that's getting at; is that fair to say?
A. That is correct.
Q. And then now turn to page -- Paragraph 19.
A. Roger.
Q. And that says, "At he time Plaintiffs executed the Note and Mortgage, Plaintiff FREDERIC L. EDQUID was not on active duty with any branch of he Armed Forces of the United States."
A. That is correct.
Q. And that's because you were an AGR status?
A. That's because I was a National Guardsman.
Q. You were a National Guardsman.
A. Title 32, National Guard.
Q. When you say, "Title 32," you mean Title 32, United States Code?
A. Yes. And hat's the authorization to raise a -- to

raise a National Guard or a militia in protection of the United States.
Q. I understand.
As an AGR -- and I say, "AGR" and "National Guardsman," because I understand your testimony or I'm trying to.
A. As -- as a National Guardsman.
Q. Your job -- When did you fly helicopters and when did you do other duties?
A. I usually flew helicopters after work. Typically, again, on the commission side, unlike the Air Force, you have a lot of other things to do, whether it's coordination or planning or meetings or you have to go and write a -- an Operations Order. We have to approve training.
As a battalion training officer, I had to work as a -- basically training the force. The force at that time -- The force at that time within the battalion had about 450 soldiers, all of which needed some sort of MOSQ, ASIQ, and also professional development.
But, basically, you were to get people to school, get them qualified, and what have you. Under the -- Under the program, it's a -- ends up being a -- You go through and, you know, you get your guys MOS qualified, get them ASI qualified. You work with them to get to professional development schools, different things that they need to do to -- to conduct the

Nationwide Scheduling
Toll Free: 1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com



mission.
You also, as a National Guardsman, also have those same responsibilities. So you have to go off to CASQ, aircraft qualifications, different things like hat, so that you are a usable -- a usable resource for the National Guard.
Q. Now, the loan that was part of this loan application here in Exhibit 1, that was taken out in April 7th, 2005; does that sound right?
A. That seems about right, yes, sir.
Q. And, when you took out that loan, were you able to make all payments, initially?
A. I've always been able to make payments.
Q. We're going to be referring to hat throughout, so just keep that one handy.
A. Can do.
(Exhibit 3 marked)
MR. ANDERSON: I'm going to show you what I've marked as Exhibit 3. This is the Note.
And here's an extra copy, if you'd like one.
MR. ODOM: Thank you.
BY MR. ANDERSON:
Q. Major Edquid, what I'm showing you is the Promissory Note -- I'll represent to you is the Promissory Note that is the subject of the loan that you were ultimately provided in April of 2005. If you go to he last page there, what is

marked GMAC 229, is that your signature here?
A. That is correct.
Q. Okay. And that's your wife's signature, right below it?
A. That is correct.
Q. And you understood your obligations under the Note to make monthly payments as prescribed?
A. I always have.
(Exhibit 4 marked)
BY MR. ANDERSON:
Q. And, along wi h the Note, there was underlying security on the property. And I'll hand you what I've marked as Exhibit 4, and I will confess that this is not a complete version. You will see page 1 of 24. In he name of brevity, I did not copy the whole thing.
So my question is, quite simply: Is hat he Deed of Trust, not complete but the front page of the Deed of Trust, and hen, if you go to the last page, it has your signature on it?
A. It looks familiar, it has my signature, and it does say, "Deed of Trust." So I -- Yes, I agree. I concur.
Q. And so that is your signature on the last page, page --
A. You want me to look at it?
Q. -- what is page GMAC 43?

If you would.
A. Yes, that is my signature.
Q. And, in general terms, you understood that you had an obliga ion to make payments on the loan, or you would be in default and foreclosure was a possibility based on the Deed of Trust; is that fair to say?
A. Without ques ion.
Q. When the loan started in 2005, did you make -- were you making all payments on a regular basis?
A. I was.
Q. And those called for monthly payments?
A. Those were monthly payments.
What happens is the -- It was set up as basically the bill would go to my credit union. It's the New England Federal Credit Unit. It's actually an IBM credit union, of IBM employees. And that was one of my prior jobs, was working for IBM.
But, anyway, there was a bill-pay service that they have. Every one of my bills -- whe her it's GMAC, whether it's Bank of America, whether it's American Express, whether it's the electricity bill -- goes either electronically or in paper form to my bill-pay service. It's basically a demand bill-pay, which means that, upon receiving a billing, the payment is made.
And hat has worked seamlessly, except for a couple

of occurrences, for more than ten years. I typically have about 30 bills a month or so. In over ten years' time, that's about 3600 bills. There have only been approximately five or six bills that have not showed up.
Q. Let me break that down a little bit here. When you started the loan, was GMAC your loan servicer, from the inception of the loan?
A. I believe so. I think they had this First Magnus. But I think that GMAC received it, like, within a month. You know how they were doing that. They sign and switch or sign and resell or whatever they did.
Q. Do you remember ever having to deal or interact with any other lender or loan servicer in relation to this loan?
A. I do not.
Q. Okay. So you were stating that you had -- you were set up on what you called a bill-pay service? Is --
A. Roger that.
Q. -- that correct?
All right. And so the bills would be sent to this service at the New England Federal Credit service?
A. They have it subbed out -- subbed out. I believe the address they have is in South -- South Dakota. I think it was Sioux Falls, South Dakota.
So, but most of the bills with big banks -- say it's Chase; say it's Bank of America; say it's GMAC -- after we make

contact, if you have online access, which I did to GMAC, they would basically electronically receive hat bill. So, when it's due, it shows up electronically, sent -- boom -- within, you know, within two days.

Q. When you say, " hey receive that bill," you're talking about he New England Federal Credit service?

A. Yes. When --

Q. So they received --

A. When they receive he bill, electronically, most of the larger creditors, things like that, will -- will send an electronic bill as opposed to a paper bill, so it's electronically transmitted.

Q. Okay. Did you -- Was that an automatic, automated process or --

A. Yes, it was.

Q. -- did you have --

Okay.

MR. ODOM: I'm sorry, I didn't hear the answer.

THE WITNESS: Yes, it was. It was automated.

BY MR. ANDERSON:

Q. We're going to get to the allegations in this Complaint.

But what I'm trying to ascertain wi h this question is: Up until the 2007/'8 time frame, did you have any problems wi h GMAC, any complaints?

A. No complaints whatsoever. It's a good loan. It's a good rate. I had no problems with it.

Q. Now, when we get to he 2006 ime frame, you were no ified that you were going to deploy?

A. Yes, sir.

MR. ODOM: Mr. Anderson?

MR. ANDERSON: Yes, sir.

MR. ODOM: Could we take a very short break?

MR. ANDERSON: Yeah.

MR. ODOM: I've got a crisis in another case that I just saw an e-mail about.

MR. ANDERSON: Okay.

THE WITNESS: Yeah.

MR. ANDERSON: No problem. We will resume. I know where we're at.

(Recess)

(Exhibit 5 marked)

BY MR. ANDERSON:

Q. All right. Major Edquid, when we broke we were talking about -- well, we were just star ing to get into your deployment in 2006.

A. Yes, sir.

Q. I'm going to show you what I've marked as Defense Exhibit 5. This is -- Well, let me ask you. Do you recognize this document? It's a -- These are a series of documents that

you produced to us.

A. I recognize it, yes, sir.

Q. And what is this, at least the one on the first page?

A. Let me take a look at these things.

All right. The first page, that is a -- That is a -- a first Army activation order under Title 10.

Q. And it is dated March 10th, 2006?

A. Yes, sir.

Q. And if you go just a few lines down there, we see: Period, Initial 300 -- excuse me, 730 days?

A. Roger, to your activation.

Q. To your activation.

A. Yes, sir.

Q. And below that it says, "Authority." It says, "TITLE 10 USC," and hen it goes on to say a bunch of o her hings. But it says, "TITLE 10 USC"; is that right?

A. That is correct.

Q. So this first page -- and we'll get to the second page here in just a second.

A. Uh-huh.

Q. But this first page is -- Is his the first document you got with regard to your deployment?

A. Yes, this is the first document.

Q. And this is activating you as a National Guardsman

on Title 10 USC orders?

A. That is correct.

Q. Did you know about he deployment before you got this document?

A. I did.

Q. When did you first hear about your deployment?

A. About January 2006. That's about when I told my wife.

She, of course, accused me of having known for years, and -- but I -- You know, all I had was that.

Q. Did you deploy as a unit?

A. Yes, we did. They deployed the entire battalion. It was, at hat time, 419 soldiers.

Looks like, to me, that his is broken down by individual companies. We have six companies: Alpha, bravo, charlie, delta, echo, and HHC.

HHC is under the UIC, whiskey -- WYDHT0. And that's the UIC. They obviously have six of these, one for each company. The total number of PAX, he 82, plus he rest, make 419.

Q. Looking in the middle of the page there, it has, as an effective date, May 1st of 2006 -- excuse me, in the ini ial box. The box on the very middle of the page is what I'm looking at.

A. Yes.



Q. All right. And then, right next to it, it has another effective date, but it has, in parentheses, "MS." And that has May 4th, 2006.

A. Roger. "HS" is home station.

Q. Okay.

A. You are at home station when you are activated. Basically, you are in Arizona.

And then you have three days on all these orders. The other 10,000 orders we've issued, you know, to Guardsmen throughout this war, they all have about three days from home station to mobilization station. So you have three days, basically, to get there.

Typically, in the National Guard, on the first -- on the first, you typically have a family event. On the second day, which would be May 2nd, you're typically going to have a -- sort of a going-away ceremony. And then on the third is when we flew out of Marana, across Texas, to Fort Hood in our Apaches. On the fourth was the day that you had to report, at zero seven hundred, at that location. You did that at mobilization station, Fort Hood, Texas.

Q. When you were getting ready to deploy, what was your wife's reaction to your deployment?

A. She was -- She was upset. She did not want me to deploy. She understood that -- that, you know, I'm a Guardsman and if they call then I need to answer the call. She

understood that.

But, personally, she was -- she was quite upset. We had just had a child. When we found out, Alex was maybe three or four months old. You know, it -- it was a hard thing. It was hard on -- hard on all of us.

It was, you know, my -- My family has a long history of military service, going from my -- My grandfather was a battalion, but my dad was -- he was a Green Beret. He was in for 30 years. And so it's something I've lived with. She doesn't have any members who are in the military, so it's a brand new thing for her.

Even though I have that, that background and that time and grew up with it, it was hard. I had never had a child before. t was tough.

Q. Are you done, or do you want --

A. No. I'm -- it's -- It's just tough, tough leaving, leaving your family. You know, before then, you know, before you get married and before you have kids, you're single; you go and do your stuff. And then, even though you're -- you're a soldier and you do your job, when you have to deploy, it's a tough thing. And, when you're in command or a commissioned guy, you know, you -- you can't let that out there. And so it's tough. It was a tough time.

Q. When you were in the AGR prior to when you deployed here, what was your monthly income, roughly?

A. It would have been in the vicinity of maybe 8,000.

MR. ODOM: I'm sorry? I didn't hear you.

THE WITNESS: Maybe $8,000 or so. I'd have to look at an LES, but --

BY MR. ANDERSON:

Q. $8,000 a month?

A. $8,000 a month. In that range.

Q. And is that with your base pay and hen do you get any housing allowance?

A. Yeah. Base pay plus housing allowance plus flight pay. All hat, added together, was somewhere around $8,000.

Q. When you deployed in 2006, did your income go up or down?

A. We received separation pay. It was an extra $300 or so a month. And I don't think that -- hat there wasn't really much else. It was an extra 300 or so dollars a mon h.

Q. So the answer to the ques ion, then, is it did go up?

A. It go did up, yes.

Q. By approximately $300 a month?

A. About 300 a month.

Q. When you were deployed, was hat taxable income?

A. When I'm deployed, when I'm in theater, when I'm deployed in theater, it is not taxable income, up to the limitations of the monthly income or he annual income of a

sergeant major in the Army of 26 years, something like that. So the -- so the first -- As an officer, when I deployed, when I was in theater, I was a major, and I think the first nine or ten months were -- were not subject to -- or at least the portion that was subject to taxes beforehand, because of VAH and stuff like that, is not.

But all that stuff was -- that was subject to taxes was not subject to taxes then for about the first nine or ten months in theater. After that, it is because it exceeds the statutory amount, whatever that is.

Q. So, based on all that, it's fair to say that, when you deployed, your income went up?

A. Yes, it did. Our expenses went up by more, though.

Q. When you say your expenses went up by more, how so?

A. Well, the expenses went up by more because, now, I'm at Fort Hood, okay? I'm at Fort Hood doing the first portion of that. We have to maintain, you know, separate domiciles, so to speak, pay for your meals, do different things like that, as opposed to having family meals.

Flying the -- Flying the family out to -- to see you once or twice also costs money. And because I'm not there. You know, I'm off -- I'm off training. We're doing long operations. We're fielding a -- We're getting certified in a Longbow helicopter, AH-64D. We're getting certified in this helicopter, spending a lot of time in the field. You know,



you're looking at 16-, 18-hour days; you collapse and then you start the next day. I'm basically not there for my family at all.

My wife --

Q. If I can just cut you off, I guess my question, though, is that, when you went to Fort Hood, were you living in -- you were living in some sort of dormitory?

A. We were living in a dormitory.

Q. Okay. And that didn't cost any money, correct?

A. No. It was -- it was -- It was basically meals.

And, again, because we were no longer -- I was no longer there, you know, my wife is out here alone, okay? So certain things cost more. But, also, she went back to see family a couple of times in Vermont.

Q. Okay. And those are flights that --

A. Those are flights that --

Q. -- she did on her own voli ion, though?

A. Yes.

Q. All right.

A. Yes, she did.

Q. And so, when you were in Fort Hood, you lived in a dorm that didn't cost you any money, and hen did you eat at the chow hall?

A. No.

Q. Okay. You had to --

A. I was a commissioned officer.

Q. Did you get a -- Did you get per diem payments?

A. No. No. It was -- It was a commissioned officer. I got my -- my standard VAS and what have you.

Q. Okay.

A. Now, when we were in he field, obviously, you can't go to, you know, Subway or something like that. You eat -- You eat MRE's or you eat whatever they bring to you: T-rats, MRE's, whatever.

Q. So I guess, just to restate he ques ion, when you deployed starting in May of 2006, your income as a whole went up during the time of your deployment?

A. If you're only looking at the income portion, then, yes. The sum of it was hat it probably went down a little bit. The income --

Q. Okay.

A. The income and expenses beforehand was, you know, whatever it was. After deployment, income went up some; expenses went up a lit le bit more han that.

Q. Okay. When you say your expenses went up, though, you described flights that your wife took to see family.

A. It's more than $300, yes.

Q. I understand, but that's a choice that your family made?

A. Yes.

Q. Okay.

A. Yes.

Q. That's all my -- all my question is after.

A. Uh-huh.

Q. All right. Let's take a look at these orders here. If you can turn to the second page.

A. Okay.

Q. Now, on he second page here, we have -- it's dated April 14 h of 2006?

A. Uh-huh.

Q. Now, the first page that we had, I guess that's an initial notification that you got. And then are these a little more detailed orders here that came -- that followed in April? Or how would you describe this, pages 57 to 60?

A. This is a travel order. This is -- This is a -- a State order.

In order to get activated on Title 10, the TAG of Arizona or of your -- your state has to agree. So you get a mobilization order from he active duty, Title 10, saying, "Hey, we're mobilizing you."

Q. Okay.

A. And then this is we're concurring that this person is mobilizing under this blanket unit order. So it -- it matches up to that.

Q. All right.

MR. ODOM: Excuse me. Just for the clarity of he record, when he said: Under this blanket mobilization order, let the record reflect hat he was referring to Bates numbered page 51, which is the first page of Defense Exhibit 5, and when he was referring to "the travel order," he's referring to the second page of that exhibit, which is Bates Number 57.

MR. ANDERSON: That's fine.

BY MR. ANDERSON:

Q. If you can turn to Number 59 there, Major.

A. Uh-huh.

Q. Okay? Now, kind of going down there, Paragraph (o), it says, "A DD Form 214 will be provided to RC soldiers upon comple ion of active duty tour."

A. That is correct.

Q. Did you get a DD Form 214?

A. Yes, sir.

Q. And when did you get that?

A. I received hat at demobilization sta ion. Did I get a copy hen? Yes, I hink I did in -- at Fort Sill, on the way back out.

Q. That would have been in 2008?

A. 2008, correct.

Q. Do you still have that document?

A. It's in my -- It's in my iPERMS, my permanent record.



Q. Okay.
A. So I don't necessarily have it on the bookshelf, but I know it exists.
Q. Okay.
A. I think it's -- it's what they use to -- They use the DD 214 to calculate your -- your terms of active duty when -- for different things: for -- for benefits, for -- for VA benefits, for -- You know, if I need to go to the VA, I need to show them my 214, to show that I actually deployed and did things like that.
Q. I understand.
A. So it has some -- It has a bunch of repercussions.
Q. And the end date on that DD Form 214, do you know what it was?
A. It would have been -- It would have been probably 15 March, maybe 14, 15, 16, something like that, 2008. It would have matched to the -- the conclusion of he amended order.
Q. And then, going down that page a little bit, we see, "FOR ARMY USE," Authorization: Title 10 USC.
Is it fair to say that the authority for your mobilization orders was Ti le 10, United States Code?
A. Yes, they are Title 10, U.S. Code, under 12302.
Q. Turn the page there. And there, at the top, you see "DOR." Date of rank, is that what that means?

A. Yes, that's correct.
Q. And it has: 8 May, 2002?
A. That is the day I was promoted to 03, captain.
Q. When were you -- When were you promoted to 04?
A. I was promoted to 04, December 1st, 2006, so part way through the mobilization.
Q. All right. So, part way through the mobilization, do you have a promotion ceremony?
A. It was the day we left for Afghanistan.
Q. Okay.
A. So it was -- it was fun.
Q. When you were promoted to major, is it fair to say that your income went up?
A. As it should.
Q. I agree.
Going -- The next line there, it says, "PEBD"?
A. Roger.
Q. What does that mean?
A. Pay entry basic date.
MR. ODOM: I'm sorry? I couldn't hear you.
THE WITNESS: Pay entry basic date.
BY MR. ANDERSON:
Q. For us --
A. If you do not --
Q. -- Air Force types or laymen, does that mean the

date that you entered military service?
A. It is the day that you entered military service, minus any breaks. If you have a break, then -- then it obviously will change, move to the right.
Q. Okay.
A. But, yes, that is correct.
Q. And you mentioned a little while ago that you sent notification to GMAC regarding your deployment?
A. Yes, I did.
Q. Do you remember if you got any response?
A. I did.
Q. And do you remember what the --
A. You have it in your record.
Q. Okay. Well, do you remember what the response was, just in general terms?
A. The response was: We acknowledge that you are afforded protections under SCRA, due to your mobilization under Title 10. And it gives -- Based upon the order, which is a 730-day order, it says that you have protections until whatever month.
Q. Okay.
A. And, basically, it's GMAC is acknowledging and saying that, "Yes, we know you are in the military, and it's not in doubt."
Q. At that time, and I'm talking -- When I say, "that

time," I'm talking the March/April time frame of 2006. Do you know what your interest rate on the loan was?
A. I believe hat it was six and a half percent, in that range. It was six or six and a half percent. I -- I can't tell you. It was pretty close.
Q. At that time were you current on your loan payments?
A. I was.
Q. When you deployed with the -- When you were mobilized here on your deployment, what is your AGR status at that point?
A. It is rescinded.
Q. Rescinded?
A. Rescinded. I am activated under Title 10. I am released from -- from any o her -- any o her requirements. I am an activated National Guardsman.
Q. So, when you deployed in May of 2006, were you deploying -- would it be fair to say that you were deploying as a Silverbell Army Heliport operator?
A. What do you mean?
Q. I'm just wondering, is -- Is he unit that you -- that you were part of the AGR with the same unit that you deployed wi h in May of 2006? That's what I'm getting at.
A. Yes, they are, 1st Battalion, 285.
Q. At some point did you become behind on your loan payments?



A. Yes.
Q. When was that?
A. I believe that was in September, around September of 2007. In that time frame.
Q. Why was that?
A. It was because I did not receive a bill from GMAC.
Q. Now, had you -- you received bills from GMAC prior to that?
A. Electronically, every single month --
Q. Now is that --
A. -- from --
Q. Oh, sorry.
A. -- 2005 until that date.
Until the -- For he first 15 or 16 months of deployment, and all the ime prior, the bills showing up, no problem. Every single ime. And it's being paid. I don't have to do anything. It's automatically paid.
Q. All right. So -- So we're clear here, when you're saying you didn't receive a bill, are you talking about the New England Federal Credit Union that you're talking about didn't receive a bill?
A. Yes. They did not receive a bill. It was an electronic billing.
Q. Okay. How did you come to find hat out?
A. I found that out in, I think, November, November

2007. I was going -- I was looking at my bill-pay service and just -- just checking on it, looking, scanning my accounts, because I could do that remotely. And I noticed that there was no payment in the -- in the prior month, for GMAC. So then I did further research and noticed there was no payment, all the way back in that time frame. And there was no payment because there was no bill.
During that time frame, I was assigned at Salerno. I was --
MR. ODOM: I'm sorry? I can't hear you.
THE WITNESS: During that time frame, I was assigned in Salerno, in RC-East. And I also -- I was running missions there. And then I had been assigned for additional missions, down south, in Kandahar.
At that time we were trying to reduce and recapture Musikala, which was a town that the Taliban had captured and had been banding all over the Internet as, "We're in charge; you can't get us."
They had taken it from the British, and we were fixing to take it back.
BY MR. ANDERSON:
Q. So when you say you didn't receive a bill, you noticed that, you said, in November of 2007?
A. Yes, sir.
Q. Okay. So at that time, then, there were two or

three payments that hadn't been made?
A. Yes, I -- I think that would -- that would be right.
Q. Did you know what your monthly payment was at that time?
A. I did not know because it was variable. I knew that interest rates were going down, so I didn't know if it was to cap at six, five, four, what have you.
I had attempted to contact GMAC. I actually called them almost a dozen times from -- from theater. My theater calls were limited to 30 minutes. I had a couple of calls where I was on hold for 30 minutes. I had other times when I would speak to the initial person and explain my situation, and they would pass me to somebody else and then it would hang up.
I attempted to contact GMAC by e-mail. You have copies of that, I believe, where I'm saying, "Hey, I have an issue with my account. Please, please contact me. I'd like to find out what my payments are, and I'd like to get it back in the good."
The response was that: We don't talk about this on e-mail. Please call.
So then I tried to call again. Nothing.
I went on line, to GMAC, to my online GMAC account, and there was no bill. There's no bill available. I think you may have that in your records, also, a snapshot of during that time frame, that shows the monthly bills I do have out there.

And there was -- During that time frame, there's none. There's actually no bill available from, I think, August of 2007 until maybe sometime -- sometime in 2008. It was almost 18 months or so when there's no bill available, online or otherwise.
I can't talk to them on the phone. I talked to them on e-mail, and they say they don't want to talk -- they don't want to talk about the account.
When I do talk to somebody, they don't know about SCRA. They don't know anything about military, and -- and they just pass me on to somebody else.
Q. Let me ask you this: Did you attempt to make any payments because you knew that there were a few payments that hadn't been made? Did you attempt to make any payments?
A. Yes, I did.
After -- Again in November time frame, I was all over the country. I was running 16-, 18-hour days for probably 30, 35 straight days. In the time that I had, I was -- I was trying to determine what had happened, you know, what the situation was.
When I -- when I -- When I figured out sort of what it was, and I had still -- you know, it took me a long time to figure out what they had done or what was going on. I made a payment starting in December, so I started making payments.
Q. December, that would have been in 2007?
A. December 2007.

And I just -- I couldn't get a bill. I didn't have access to the bill. I couldn't get someone to talk to me. And I couldn't get access on e-mail.

So I just started sending money. I sent them a thousand bucks, and that's basically what I started sending, because I knew it was more han each monthly bill would be. But I also knew that it would -- it would start paying down what -- what I had obviously missed when I didn't receive a bill from GMAC.

Q. When you said you sent that, how? In what means?

A. Electronically. I basically -- I changed the -- changed the billing, on my bill-payer service, to force the bill. And, basically, instead of paying in response to a bill from GMAC, I just made it send a thousand dollars a month.

Q. Did you contact your wife at all about the situation?

A. I didn't have time to contact her in November and December. The few imes I did have ime, I was trying to get a hold of GMAC.

Q. So you didn't contact your wife to have her look into it or attempt to make payments, payments from Arizona?

A. No, I did not. At that time, I was out of touch.

I did receive -- My wife wasn't having a very good time during that ime frame. She -- she's typically, what, about a hundred and sixteen pounds, or what have you. She's

there with my son. I'm getting reports from other soldiers that, you know, "Hey, how's your wife doing? My wife saw her, and she looks like she weighs about a hundred and five."

And she was having a tough time, first of all.

Second of all, I could not -- I could not get a hold of her during that time frame, November/December, because I was on operations. And the few times I had, I was trying to call GMAC, but I could not get through satisfactorily.

And I talked to people, on occasion. Sometimes I was on hold for 30 minutes. Sometimes I was passed between three or four people who wouldn't give me an answer, wouldn't tell me what it was.

Now, again, it's limited to 30 minutes, so I'm not talking to people for 30 minutes. I'm on hold for 22 minutes, and then I have about eight minutes to talk to the three people. And then, all of a sudden, I get cut off.

Q. I'm going to refer to -- back to the Complaint here, which is Exhibit 2. If you can turn to what is Paragraph 24, which is on page 7.

All right. The first line there in Paragraph 24 says, "Plaintiff FREDERIC L. EDQU D was released from active military duty on March 31, 2008"?

Did I read that right?

A. Yes, you did.

Q. Now, the March 31st, 2008, date -- We have, to this

point, been discussing a March 14th or 15th date. Where does the March 31st date come in?

A. That's the same date. I -- I hink that, between the -- between the communication, that may have been -- been messed up. But I believe that it was, I think, the 15th or 16th of March.

Q. Okay.

A. So what it says is, then, it's nine full months following the release of ac ive duty. The end of the month, I guess that's the right date.

Q. Okay. So would it be more accurate to characterize it that that date should be March 14th or 15th? Would hat be fair to say?

A. That would be fair to say, yes.

Q. Okay. Now, when you got off of active duty on March 14th, 2008, what was your status then? Did you just go back to being an AGR?

A. I went back and, you know -- I came off of Ti le 10. I was put back on he rolls of Title 32. I became an AGR National Guardsman, once again, as opposed to an activated Title 10 National Guardsman.

Q. Did you have some -- Well, strike that. I'm sorry.

In -- When you got back, let's put it that way, in March of 2008, what was he status of your loan?

A. The status of my loan?

Q. I'm asking: Was it current or was it behind?

A. It would have been --

MR. ODOM: Well, excuse me. I'm going to interpose an objection to the form of the question.

BY MR. ANDERSON:

Q. You can go ahead and answer as best you can. Do you understand my question?

Let me -- Let me restate it.

A. Okay.

Q. I'm just simply asking: When you got back, do you remember your loan being current or do you remember it being at some point of delinquency?

A. I would say the loan -- the loan would have been at some point of delinquency.

Q. Did you do anything at that point to try and get the loan current?

A. Yes. I actually -- When I returned, as my wife had recounted, I would spend hours on the phone, meaning that I would start on weekends. When I came back, I was assigned to a position in Phoenix. That's a hundred -- a hundred miles away from the home that we lived in. So, in addition to work, I was -- you know, obviously a lot of transit time during that time frame.

Q. Can I ask, did you live here and did you drive there or --



A. Yes.
Q. -- did you live in Phoenix?
A. No. We lived at the same house.
Q. All right.
A. 5465 West Bandtail Court.
Q. Okay. Go on. I'm sorry.
A. During that time frame, I -- I was calling GMAC, talking to them most of Saturday, started -- I'd wake up early so I could get it done before my son was up. I would start at 6:00 o'clock, and I would call. And I would talk to them until about noon, 1:00, 2:00 o'clock.

During that time frame, every person I spoke with, I had to start again, explain to them what SCRA was. They didn't have, seemingly, a knowledgeable or dedicated SCRA person who understood what the situation was. I would have to explain the situation, explain how we got to where we were, from my understanding, because I did not really know. And I would be on there, on the phone, for five or six hours.

It was a busy time, obviously, for them, because during those times frames I was on hold for no more than an hour and a half to two hours of that six hours, also, between people. I talked to them on Saturday. I talked to them on Sunday.

And my son would come into the office -- or come into the spare room, actually. And he -- he would look at me.

He really didn't know who I was. And he wanted to find out who I was. But I'm talking on the phone. And I -- There's nothing I can do. I'm trying to talk to -- talk to GMAC, find out what the situation is, get them to understand that -- that, as a mobilized soldier, that there are protections under SCRA. And they failed to understand that. And they -- they failed to -- They failed to even -- even acknowledge, acknowledge that. I tried to do --
Q. Can -- can I --
A. And -- and this is the deal. I mean, I talked to somebody, and you'd be on hold for 20 minutes, and then you'd talk to them. I'd go through he explanation; it would be about 30, 40 minutes. Then they'd transfer me. You'd get disconnected on the transfer.

Call back again, and you talk to a new person. You'd ask for the prior operator wi h this number. They'd say, "Oh, they're not available."

And hen you'd talk to this new person. And hen they'd transfer you and you'd talk to another person that says, "Oh, I'm the next level. I'm not an SCRA guy. What's the situation?"

So you'd go through the explana ion again.

Of those six hours, typically, you know, I'm on hold for an hour and a half; I'm explaining it for four hours. Doing that every weekend, Saturday and Sunday, Saturday and

Sunday, probably for the first four or five weekends, both days, all day long.
Q. Okay. Can I just stop here? I mean, when you say, "protection under the SCRA," and you were trying to talk to representatives at GMAC, you understand that the SCRA doesn't have any impact on you making payments, just as a general matter?
A. Roger.
Q. Okay.
A. And I was making payments.
Q. All right.
A. I've made --
Q. That was my next question.
A. This is my deal.
Q. Okay.
A. I have made continuous payments to GMAC, from the inception of the loan, every single month, other than the months when GMAC did not send me a bill.
Q. Okay. And how many total months would you say that would be? Three?
A. That's actually a total of six.
Q. Six, okay.
A. A total of six.
Q. So --
A. Now, I'll tell you when the six were --

Q. Okay.
A. -- if you like.
Q. Tell me, as best as you can recall when the --
A. Okay.
Q. -- the six were.
A. All right. Best as I can recall is that there were four of them with GMAC during deployment. And then there have been two recently, within the last year, where they don't send me a bill. And I am much more available now, to look at my accounts and what have you. But there was a -- There was an incident this past -- this -- this past November/December. They didn't send me a bill. And I caught it on the day that it was due, that they had not sent me a bill.

So then I -- I -- I automatically sent them -- sent them a payment and talked to them. Now, part of this deal is that, for some reason, when we started the loan, this loan did not have an escrow. There was -- They did not pay insurance with the escrow. They did not pay taxes. I paid those directly, okay?
Q. Okay.
A. Somewhere along the line, GMAC found that they would add escrow to it.
Q. Let me stop you right now. Do you know the current status of your loan right now? Is --
A. It's current.



Q. -- it current?
t's current.
And do you know if you're making escrow payments right now?
A. I am not making escrow payments.
Q. Okay. Do you know what your current monthly payment is?
A. About 219.
MR. ANDERSON: Okay.
MR. ODOM: I'm sorry? I can't hear you.
THE WITNESS: 219.
MR. ODOM: I'm sorry?
THE WITNESS: 219 --
MR. ODOM: Okay.
THE WITNESS: -- is my current payment.
BY MR. ANDERSON:
Q. Now, you mentioned earlier that there were -- You mentioned four instances or four months during the deployment when you're alleging that you didn't receive a bill?
A. Roger.
Q. Now, those would be months, then, that no payment went out of your account, correct?
A. Roger. Well, no, because I -- I forced the payment in December because I was not receiving a bill then.
Q. All right.

A. Okay?
Q. I understand, but my question goes to the fact hat if no money was going out of your account and still remained in your account, let me ask this question: Why didn't you --
A. I -- I --
COURT REPORTER: I'm sorry? "Let me ask this question"?
BY MR. ANDERSON:
Q. Let me ask this question: For the months that you didn't get a bill, could you have just made those payments from what remained in your account?
A. It was close, but probably, yes, I could have.
Q. Why didn't you do that?
A. During those months -- First of all, it was after the fact. I did not know what it was. Okay?
Q. Oh --
A. Did not know, for a couple of months, that I did not have a bill to pay. Okay? So, after about three to four months, there was no bill. That's when I'm trying to find out, from GMAC, what he situa ion is. Okay? I'm trying to talk to them and say, "Hey, listen, I am deployed. What's the situation?"
There's, you know, basically no response from GMAC, other than e-mails that said, "We can't talk to you on e-mail. You have to call us."

Okay? Because of that and because, you know, we're at a high-up type of situation, I just set it up so it would send basically a thousand dollars a mon h and -- and start paying the bill.
Q. Okay. Were those payments accepted?
A. They were accepted.
Q. And did that get you caught back up?
A. I was on a glide slope to be caught back up. But it --
(Loud sound from outside interrupts he proceedings)
MR. ANDERSON: What's that?
Tell you what, we're at 2:40. You want to just go ahead and take a break?
MR. ODOM: Yeah, please.
MR. ANDERSON: Okay.
(Recess)
MR. ANDERSON: All right, can we go back on?
All right. I don't remember exactly where we were at before we were interrupted, so I'll just pick an arbitrary spot.
MR. ODOM: "I -- I did not know for a couple of months that I didn't have a bill."
And then he started another answer, and I asked to stop. So that's kind of where I think we were.
MR. ANDERSON: Okay.

BY MR. ANDERSON:
Q. So, when you were making these calls to GMAC, what were you trying to convey as your message?
A. I was -- I was trying to convey that -- I was actually trying to get to your SCRA department, okay, and -- and talk to them and say, "Hey, listen, I was deployed during this time frame. This is what occurred. I do want to get in the good. I'm sending you a payment every mon h. And I'd like to do hat, so hat it pays off by -- by the end of my SCRA protections."
Q. Okay. And you understand, though, the SCRA doesn't -- and I'm just -- I'm just talking generally now, not even really your account. But, generally, it doesn't impact your obligations to make monthly payments as prescribed under the Note.
A. Roger. And, you know, I --
Q. So --
A. -- I did make monthly payments.
Q. Okay. So you were trying to communicate with someone, to set up, for lack of a better word, a repayment plan to get you current?
A. Roger that.
MR. ANDERSON: Okay. I'm going to show you a document here and ask you if you've seen his before. I think we're on six.



(Exhibit 6 marked)
BY MR. ANDERSON:
Q. That is a letter dated September 1st, 2008, that I will represent is from GMAC. Do you recall seeing a letter like this at any point?
A. I do recall seeing letters similar to this, yes.
Q. And in his particular one it says your account is due for May 1st, 2008, correct?
A. (No oral response)
Q. I'm just asking you --
A. Yeah.
Q. -- if that's what it says.
A. Yeah.
Q. Okay.
A. It says that, yes.
Q. All right. And this letter is dated September 1st, 2008. So at that point, just based on this letter, the account was -- you're being notified that the account is roughly four months behind?
A. Roger, for that May 5th date, is what it says.
Q. All right, okay.
A. That, of course, is not shown, in the credit report, as one of those dates where they're saying it's delinquent.
Q. Okay. Say that again. I don't -- I didn't follow you.

A. May 5th, 2008, has never been reported by GMAC as a delinquent date.
Q. Okay. Now, do you understand how account payments, just generally speaking, work? For example, if my account, right now, is 12 months behind, and I make a payment today --
A. Uh-huh.
Q. -- do you understand that that payment will be applied the furthest back that it is owed? Is that --
A. I'm --
Q. Do you follow me?
A. I am familiar with that, yes.
Q. Okay. So, really, the date, itself, is just a reflection of where the account is in terms of being current.
A. Uh-huh.
Q. Okay.
A. Yes.
Q. All right.
A. Yes. This also reflects some fees and costs and other amounts accrued, also. And that was also a part of my conversations with GMAC, was that, because they didn't send me a bill while I was in theater, I was questioning: Why would -- Why would we have fees and costs, and what have you?
And I was trying to convey to them that: Hey, it was -- You know, I'm trying to pay my bill, but now you're stacking fees on top of other --

Q. Okay.
A. -- other payments.
Q. So if I can just restate, you had a problem with the fees that had accrued on your account?
A. Roger.
Q. Okay.
A. I had a fee -- a problem with the fees that they're -- they're stacking on there. And then, you know, the only, you know, and -- and trying to get through to their SCRA. And there was never a response or an answer.
Q. Okay. Do you remember seeing letters like this on multiple occasions?
A. Roger. I remember seeing letters. I remember that my payments would come in and -- and pay. It actually, oftentimes -- I think I recall there being something that showed some sort of payment. And then this, this amount, was -- was clicking down.
MR. ANDERSON: Okay. On that note, I'm showing you -- I'm sorry. That was 6, so this should be 7.
(Exhibit 7 marked)
BY MR. ANDERSON:
Q. I'm showing you what is Defense Exhibit 7. Now, this is a letter that's one month later, and I'll represent it's from GMAC, on October 2nd, 2008. And this suggests, then, here we are one month later, but now your account is due for

he July payment. So, instead of being four months behind, it's hree months behind?
A. Roger.
Q. Okay.
A. And that was because the payments were exceeding he -- the amount where he -- where the account is going up by.
Q. Do you know what your monthly payment was at this point?
A. I believe it was somewhere around $500. I think it might be that 480 there. It was -- It was in that range.
Q. Okay.
A. It may be that 480.
Q. All right. Do you know what "suspense" means?
A. I don't know what it means in this case.
Q. Okay. Now, this --
A. Starting after -- after this one --
Q. Okay, let's -- let's --
A. Okay.
Q. -- strike -- I'll ask the questions. I'm just asking you to respond to the ques ions here.
A. Okay.
MR. ANDERSON: I'll mark this as 8.
(Exhibit 8 marked)
BY MR. ANDERSON:



Q. I'm showing you what is a Subs itution of Trustee no ice. And have you seen this document before?
A. I have.
Q. And is this in relation to your property here? If you look at the legal description here, does that look familiar?
A. Where would I look? It says, "ETS." That looks familiar.
Oh, yes, our names are on there.
Q. Okay.
A. "Redhawk," it --
Q. All right.
A. Yes.
Q. All right. And it also has a Deed of Trust date, there in the third line down, on April 7th, 2005?
A. Yes.
Q. Now, his document is -- It's dated as recorded, there in the upper right-hand corner, on November 18 h, 2008; is that right?
A. It says -- Is that "11"?
Q. Yeah. I'll represent to you, that is an "11," but I don't want to speak for you.
A. Okay. If it is an "11," then I would say it's November 18th, 2008.
Q. Okay. Now take a look at your Complaint there in

Paragraph 25.
A. Uh-huh.
Q. And there it says, "On or about November 13, 2008, and within the period" -- and I'm just reading Paragraph 25 -- "and within the period during which Plaintiffs' mortgage was protected by he SCRA, Defendant ETS, acting on behalf of Defendant GMAC, issued and recorded a Notice of Trustee's Sale."
Is his he Notice of Trustee's Sale here, in Defense Exhibit 8, that you're referring to there?
A. I -- I believe so. I hink that, with -- If you look at he GMAC record, they ini iated his on 8 November, 2008. Then they -- There were some sort of paperwork on the 13th of November. And I believe that, you know, it goes through to 18 November at that point.
Q. Okay. Now --
A. I know this after the fact, looking at what GMAC has disclosed. And I, you know, was not aware of this, this document, until after this date, further down the road.
Q. All right. So I guess, just to restate --
A. Subsequent to 18 November --
Q. All right.
A. -- 2008.
Q. You didn't -- You didn't learn about this in November of 2008?

A. I did not.
Q. Okay. Now I guess we -- Strike that.
The foreclosure sale in his instance, do you know what date that occurred?
A. I believe it was 20 February, 2009.
Q. Okay.
A. 19 or 20. I think it was 20.
Q. Okay. February 20 h, 2009?
A. Roger.
Q. Now, to boil down your allegations here, your allegations under the SCRA are essentially that this notice of foreclosure sale violated he SCRA? Am I accurately characterizing your allegations?
MR. ODOM: I will object to he form of the question.
But you can go ahead and answer.
THE WITNESS: I would say that not only that no ice but he fact that they started on 8 November, internally and what have you, for a nonjudicial foreclosure, that's what we're objecting to, yes.
BY MR. ANDERSON:
Q. Did you go to see an attorney at any point before the foreclosure sale?
A. I -- I went to see the SJA.
Q. Was hat in March of 2009 or earlier?

A. It would have been earlier. It would have been -- Well, restate the question again.
Q. Okay. My question is: When did you first go to see an attorney in regard to this case?
A. I think it was near the end of February. So it may have been -- At that time, again, I did not know that they had foreclosed on the 20th of February until after that. And that would have been sometime in March, when they said -- when they actually foreclosed. Was -- Looking at the record, it would have been 8 -- it would have been 20 February. But I did not learn that they had actually foreclosed until March.
Some -- Between the 20th of February and sometime in March, I did seek the JAG, the SJA. And that's when he -- I brought him the information. He took a look at the -- He did the research on the case and gave his opinion that was faxed to ETS and GMAC at that time.
Q. Okay, we'll get to that.
A. Okay.
MR. ANDERSON: Major Edquid, I'm going to show you a printout from the DMDC database that I did, actually, this morning. And I'm marking it as -- I didn't mark it at all. I'm going to mark it as Defense Exhibit 9.
(Exhibit 9 marked)
THE WITNESS: Okay.
BY MR. ANDERSON:



Q. Okay. Now I want you to take a look at this, and I want you to look. Is that your Social Security number there, ████-4855?
A. Yes, it is.
Q. Okay. Now, I believe I did mis-enter your birthday because I think I read it as 1958 but it was 1968?
A. Yes.
Q. Okay. And you see there a date of interest: February 20th, 2009.
Is that right, just looking at this piece of paper?
A. That piece of paper, yes.
Q. Okay.
A. It says: February 20th --
Q. Okay.
A. -- 2009.
Q. Now, if you turn to he second page, again, I'll represent that this is he result that I got when I entered this information into the DMDC database. And it shows there, in the first box, "On Ac ive Duty On Date of Interest," okay? And hat, the date of interest, would have been February 20, 2009, and the answer here is, "No." And that would have been accurate?
A. Yes, that would -- That would have been accurate.
Q. Okay. And then the next box down says, "Left Active Duty Within 367 Days of Date Of Interest," and the answer there

is, "Yes."
Do you see --
A. It says that, yes.
Q. Okay.
A. Yes.
Q. Now, moving to the left-hand side there, it has the "Active Duty End Date" of March 14th, 2008. Did I read that right?
A. Roger. And that, that should be about right.
Q. Okay. So, looking at this printout here, this would accurately characterize your service? I'm just asking: Is this document accurate?
A. I believe it -- I think it is.
Q. Okay.
A. It looks -- t looks like it has the right information.
Q. Okay. Well, my question, then, next is: If we take March 14th, 2008, and we add nine months, you would agree with me that that date, nine months, puts it at December 14th, 2008, roughly?
A. Roughly.
Q. All right. My math -- Just check my math now. December 14th, 2008, is prior to February 20th, 2009?
A. It is.
Q. Is that fair to say?

A. That's fair to say.
Q. Okay. Major Edquid, I'm going to show you what I'm going to mark as Defense Exhibit 10. This is a letter dated January 22, 2009.
A. Uh-huh.
(Exhibit 10 marked)
BY MR. ANDERSON:
Q. t is a document that you, through your attorney, produced to me. It appears to be a letter from GMAC Mortgage, dated January 22nd, 2009. There are some handwritten notes on it. I take it those are your handwritten notes?
A. Are those mine? Yeah, I -- Yeah. I think I -- I may -- I may have written them. It was either myself or Lieutenant Colonel Forshey who wrote those, Lieutenant Colonel Forshey, F-o-r-s-h-e-y.
Q. Now, in the first line of this letter, it says, "We have been unsuccessful in our attempts to reach you to discuss some new workout options we offer."
Do you believe that -- Well, what's your reaction to that statement?
A. What is my reaction?
Q. Do you believe that to be accurate?
A. That they were unsuccessful in their attempts or that they were successful?
Q. All right. Let me rephrase the question. That was

a poor question.
In January -- On January 22nd, 2009, on or about January 22nd, 2009, were you living in your residence at 5465 West Bandtail Court?
A. Yes, I was.
Q. Were you receiving any phone calls from representatives at GMAC?
A. I -- I believe I had received a couple of them. Typically, it would be probably about 6:00 in the morning on the phone calls. And typically it was a -- a -- ei her a nonmessage or just a -- just a number, just a number on that, and meaning that it was a number on he Call Waiting. It wasn't -- There was no message left. It was either nothing or it said, "restricted," or it said there was nothing and there was a number, that somebody called at 6 00 or 7:00, 6:00 or 7:00 in the morning.
Q. So what you're describing are calls that were made that you didn't answer?
A. I was not available at that time, at that time of day.
Q. All right. So is it fair to say that this could be accurate, that they tried to attempt to -- or tried to reach --
A. What -- What were they trying to attempt?
Q. Now, let me ask the question, sir.
A. Okay.



Q. That there were attempts to reach you, but you, for one reason or another, didn't answer the phone?
A. I would say this, that I'm sure there were attempts. I wouldn't know when they tried to reach me and they didn't get a hold of me.
I did speak to an agent, once or twice during this time frame. And they basically said that your house is in foreclosure. And, you know, they basically said that: Hey, what you need to do is that, because of this foreclosure mess, all these houses being foreclosed, you need to submit your tax returns; you need to submit all these things to try and request a workout -- non-SCRA, a workout -- for something they initiated during the time that I had protections under SCRA.
Q. Okay. Let me ask you this: Did you submit the financial documentation that they asked for?
A. The financial documentation, no. I did not. They said they were going to send me some sort of packet, what have you.
Again, this is 22 January. It's about three or four weeks before they have their scheduled foreclosure. During this time frame, GMAC was not accepting my payments. They stopped accepting my payments in November. Okay? So, if you take two -- two payments in November and you take the prior document where you had a balance of $2200, by December, there's a balance of $400 left at that point. And, by this time, in

January, they would have been essentially up to date, zero balance.
Q. Let me ask you his: Did any point -- When you say they stopped accep ing your payments, you're talking about a monthly payment in the range of what, 600 to a thousand dollars?
A. A thousand dollars --
Q. A thousand dollars.
A. -- or so.
Q. Okay. At any point in time did you attempt to make the full reinstatement amount?
A. The full reinstatement amount is what I ended up paying in May of 2009.
Q. Okay, we'll get to that in a second.
A. Okay.
Q. Prior to February 20th of 2009, at any point did you attempt or tender payment to fully reinstate your loan, to get fully caught up?
A. The sum of my payments that they rejected were equivalent to the full amount.
Q. Okay. My question, though, is: At any point did you tender the full amount at any one time?
A. In one payment, no, I did not.
Q. Okay. Did you have the money in your account to do that?

A. I did. I did. I did have -- I did have money in he account to make a thousand dollar monthly payment. I'd have to look at it to see if I could have made a 22- or $2600 payment, but it was close.
MR. ANDERSON: Okay. I'm going to mark this as Defense Exhibit 11.
(Exhibit 11 marked)
BY MR. ANDERSON:
Q. Mr. Edquid, I'm showing you what appears to be a memo, Memorandum for Record.
A. Uh-huh.
Q. Dated February 18th, 2009. It has got your signature block there at the bottom, does it not?
A. Uh-huh.
Q. Does it?
COURT REPORTER: "Uh-huh"?
BY MR. ANDERSON:
Q. I'm sorry. Bad question.
A. It does.
Q. It does. Okay.
A. It does.
Q. Is this a memo that you typed up?
A. It is.
Q. Who did you send this to?
A. I sent this to GMAC. If you'll look at Line 1, I

faxed it. And then, if you'll look at the part of -- of Line 1, I called that number, which is a GMAC number, to confirm that they received that fax.
Q. Okay. I want to take a look at Paragraph Number 5 there. In the first couple of paragraphs you cite to Section 303 of the SCRA. And then, in Paragraph 5, "The result being that sub-sections (b) and (c) are temporarily lengthened from 90 days to 9 months by Section 2203 of the Housing and Economic Recovery Act of 2008"?
A. Roger.
Q. Did I read that accurately?
A. That is my layman's assessment of the SCRA.
Q. Do you know when that 90-days' to nine-month extension went into effect?
A. It would have been in, I think, July of 2008, I think it was.
Q. So, using that logic then, if you got out of -- if you got off of active duty on March 14th, 2008, 90 days from March 14th, 2008, was approximately June 14th, 2008; is that fair to say?
A. That is fair it say.
Can I continue?
Q. No. You've answered my question.
A. Okay.
Q. When were you -- When did you learn that the house



had been foreclosed on? When did you learn that it actually had happened?
A. It would have been early March.
Q. How did you learn that?
A. By talking to GMAC on this number: 800.766.4622.
MR. ODOM: I can't hear you.
THE WITNESS: By calling, talking to GMAC on -- GMAC on this number: 800.766.4622.
BY MR. ANDERSON:
Q. What was your reaction when you heard that?
A. My reaction was that my point of view was that they had violated SCRA by initiating a foreclosure, a nonjudicial foreclosure, starting in November; and that -- that -- that they had started this process while I still had those protections; and, if they had not started this process and not rejected the payments that I made, they would not have come to this conclusion.
Subsequent to then, GMAC vacated that foreclosure.
Q. Okay. We'll get that there.
A. Okay.
Q. Well, let me ask you this. At some point did you have insurance on the property? Did you have insurance on the property?
A. I have insured it continuously from 2002.
Q. All right. Did you pay for that?

A. Yes, sir.
Q. All right.
A. Directly.
Q. So at the time -- Let's say, in February of 2009, was your account an escrowed loan?
A. No, it was not.
Q. It was not. All right. Who was the insurer of the property?
A. USAA.
Q. Did USAA at any point cancel the policy?
A. USAA called me up and told me hat GMAC had called them. And, actually, that may have been how I found out they actually had conducted he foreclosure. They called me up and said that GMAC called them, said hat they would like to cancel my -- my insurance policy and that they had foreclosed on he house.
USAA asked me. They said, "Are you still living in this home?"
"Yes, I did -- Yes, I was."
And hey said, "We can't cancel it for you."
"I will continue to insure the home that I live in," is what I told USAA.
Q. Okay. So, to be clear then, did USAA cancel he policy, or did he policy continue to run?
A. They called me on he day that USAA notified hem

that they wanted to cancel the policy. They asked me, "Do you concur with this?"
I said, "No, I do not. I still own the home. I still live in the home. And, no, do not cancel the policy, regardless of what GMAC asks you to do."
Q. So is it fair to say, then, GMAC attempted to cancel the policy, but it actually was never canceled?
A. I believe that is true. I would have to talk to USAA and see if there was a gap of two or three days. I don't know that part.
(Exhibit 12 marked)
BY MR. ANDERSON:
Q. Major, I'm going to show you what I've marked as Exhibit 12. Appears to be a similar type of memorandum for GMAC. It's dated 25 February, 2009. And it is signed by you at the bottom?
A. It is.
Q. All right. I'll direct your attention to Paragraph 8 there, where you state, "I request that GMAC unwind this foreclosure process and provide a list all individuals or entities involved or contracted by GMAC; enumerate in full all actions GMAC all contacted parties have taken in reporting, filing, penalizing or pursuing foreclosure or any action adverse to the borrower."
Did I read that right?

A. That is correct.
Q. Okay. So this, you sent this via fax on 25 February, 2009?
A. Roger. I sent it to two fax places. One was to ETS, and -- and one is to, obviously, GMAC.
Q. Okay. And GMAC did, in fact, unwind or rescind he foreclosure sale; is that true?
A. They did not unwind it. They did rescind it.
Q. Okay. When you say -- All right, what do you mean by that?
A. The date on here is 25 February. Subsequent to 25 February, they proceeded to try and cancel the USAA insurance in March at some point. Subsequent to 25 February, they went forward and they notified Bank of America that they had foreclosed on the account and caused Bank of America to write off that loan. Subsequent to 25 February or subsequent to their rescinding, whenever that was, which was in his ime frame, they continued: One side is saying, "Hey, we're rescinding."
GMAC continued on down with their momentum. They notified Bank of America. They started reporting -- They started reporting on -- to the -- to the credit agencies, subsequent to this date.
So there may be some portion of GMAC hat said, "Hey, this is the wrong hing."



If you take a look at the GMAC records submitted, you can see conversations where GMAC employees are asking other GMAC employees, "How can this happen? Aren't the lawyers supposed to check if this guy is on SCRA?"

This is nothing I have found other than GMAC's submissions since then, since the submissions were sent this fall.

Q. Okay. Let me just stop you right there. I guess my question is, though: GMAC, at some point, did rescind the sale?

A. They rescinded the sale but not all the actions with it.

Q. Okay. They did rescind the sale?

A. Yes.

Q. All right.

A. That is correct.

Q. Do you know when that occurred?

A. I'm assuming it was end of February, early March time frame.

Q. Okay.

A. I believe it's in the -- in the records that GMAC submitted --

Q. Okay.

A. -- under those documents. I don't know which -- which day it is, but we could look it up.

Q. I'll represent to you that it occurred on or about March 10th, 2009. Would that be in the ballpark of what you're thinking?

A. Roger.

Q. Okay.

A. That would be -- That would be in the ballpark.

Q. So February 20th to March 10 h -- we're talking is a matter of weeks -- the sale was rescinded?

A. Yes. Roger.

Q. Now, at some point you did go visit -- was it Lieutenant Colonel Forshey?

A. Forshey, yes.

(Exhibit 13 marked)

BY MR. ANDERSON:

Q. I'm showing you what I'm marking as Defense Exhibit 13. Is -- And you see he signature block at the bottom there, and it says, "Paul Forshey, Lieutenant Colonel, Arizona Army National Guard," and it's dated March 3rd, 2009.

Did you visit him on March 3rd, 2009?

A. I believe it was the day before.

Q. Okay.

A. It was the 2nd. I believe it was the 2nd.

Q. Was that the first time hat you had gone to visit Lieutenant Colonel Forshey?

A. Yes.

Q. And is he -- How many Staff Judge Advocates do they have at the Arizona Army National Guard base?

A. Maybe two or three.

Q. Had you ever met Lieutenant Colonel Forshey before this date that you went to visit him?

A. Yes, I have. Just not -- not -- Not on this matter.

Q. All right.

A. Other -- other matters.

Q. Okay.

A. You know, he -- He is the SJA. So --

Q. So you had been in to see him on legal-assistance matters that had nothing to do with this case?

A. Roger. Soldiers who had popped hot, different things like that.

Q. Okay. And, when you say, "Popped hot," you mean someone that had tested positive for some sort of mind-altering chemical?

A. Roger that.

MR. ODOM: Spoken like a true defense counsel.

MR. ANDERSON: In my former life, I was a defense counsel.

BY MR. ANDERSON:

Q. All right. And, in here, we see, really, Lieutenant Colonel Forshey's assessments and analysis and advocacy on your behalf, and this is sent to GMAC in some capacity or ETS?

A. This -- his was sent to -- if you take a look at the -- This was sent to the foreclosure attorney.

Q. Okay.

A. This was sent also to his address. And it was -- It was faxed. I think his is the fax. I don't know if his is the -- One of these is a fax. So it was faxed to them. It was also sent to GMAC.

Q. When you say, "foreclosure attorney" --

A. ETS's attorney.

Q. Okay. Do you know who hat was or do you recall any of those conversations?

A. Negative. Again, Colonel Forshey made the phone call. He spoke to these individuals. And he called ETS direc ly, to -- to get that information.

Q. So this letter is sent on March 3rd, 2009. When was -- What was the next thing you heard from either GMAC or ETS?

A. I can't give you the exact date. GMAC or ETS, it would have been maybe around the 20th or so, March. During that time frame is when they -- they next made contact. And they basically said that: We have vacated the foreclosure and we -- we'd like to, you know, see if you want to get on to a -- if you qualify for a program, not an SCRA program, a military program, just a -- you know, a regular program. Can you qualify for loan modification? Things like that.



Q. Okay. Were you happy to hear that the foreclosure had been rescinded?
A. I -- I was, yes.
Q. Okay. When they asked if you wanted -- were to be evaluated for a loan modification, did they ask you to submit some documentation?
A. I spoke to them, and they actually took the information over the phone.
Q. Okay. And is it fair to say, then, at some time in the April time frame, you were put on a repayment plan?
A. Actually, the initial information that I was given is -- The first person I spoke with, they quoted a repayment plan that basically would -- Say you make your monthly payment, your normal monthly payment. And then over some amount of time -- six, eight, ten months -- you pay what's in arrears.
As far as what's in arrears, that's sort of in dispute at that time because they were throwing on foreclosure attorney fees, and a number of other things that were in the thousands of dollars, on top of what had not been paid. Now, it wasn't clear to me exactly what those totals were.
But the first person who takes that, says, "Hey, you can get a payment plan; I'll get back in contact with you," that's in March.
"I'll get in contact with you within the week."
No one gets in contact with me.

I call back again.
They say, "Oh, this person was -- they were incorrect in what they said. Now you have to submit your information this way."
So I submitted informa ion.
Q. When you say, "information," are you talking about written documents?
A. No. Just -- just personal, personal information.
Q. Over the phone?
A. Over the phone.
Q. Okay.
A. Here's -- This is my cost. This is this.
And then they -- they came back and said, "Okay, you're going to have to make $1500 of payments, or something like that, this month. And then you're going to have to pay the following balance the next month. And you don't qualify for any modification."
Q. Okay. Do you know at what point your loan was brought completely current?
A. I made payments to bring it completely current before the end of May. That money is placed into some side account. So then I have a bill that says I'm in arrears; and I have money, that's earmarked for that, that doesn't go into there.
I call. There's no response.

I call in June and say, "Hey, what's the status of my account?"
"We'll get back with you."
In July I call again. At that time the person informs me that my account is in arrears and you have not made a payment.
At that time I had already given GMAC a couple thousand dollars, so it was not possible that I did not make a payment.
Upon further investigation, that individual -- and it shows in the GMAC record; he spoke with me -- that he found that money parked in a different account. He then moved it from here over to there and nullified that, so now it was up to date by the end of July.
Q. By the end of July?
A. By the end of July. And my payments were then 100 percent up to date, with a credit toward the August payment --
Q. All right.
A. -- of some sort.
Q. And that was August 2009. And --
A. But --
Q. Since that date on, you've been current with payments?
A. I've been current with my payments, other than when

GMAC did not send the bill, at which time I almost missed a payment but I got it to them.
Q. Okay. Do you know if GMAC waived any of the fees or costs in the amounts that you were assessed?
A. I do not. It appears to me that they added those costs in, approximately four to five thousand dollars. I don't know that for sure. They -- You know, they send me 19 books of accounting of lines that don't match up. I don't know what it says for sure. That's something that they'd have to assess.
If you take the interest payments and sort of add those up, the amount of payments I've made exceeds the interest payments. So there's obviously some sort of charges in there. I don't know what they are.
Q. Now, your loan payments continued. It continued to be an adjustable rate mortgage?
A. They are.
Q. And it continued to actually go down; is that fair to say?
A. Roger that.
Q. All right. To the point, now, that you are paying $219 a month?
A. That is correct.
Q. Do you know what your interest rate is right now?
A. It's like 1.375.
Q. All right.



A. Some hing similar to that.
Q. That's a pretty good interest rate, isn't it?
A. It's a pretty good loan. Other than how it's executed, it's a pretty good loan.
(Exhibit 14 marked)
BY MR. ANDERSON:
Q. Now, your wife mentioned, when I deposed her earlier, you have a joint American Express credit card account; is that fair to say?
A. We do.
Q. Okay. How many credit cards do you have, Major Edquid?
A. Currently? Probably about -- We probably have about one, two, three, four, five -- maybe about seven or so.
Q. Are those all joint accounts, or do you have any of those just in your name?
A. I believe most of them are joint accounts. I -- I'd have to check. I'd have to check. I mean, we've had some -- Like, a Discover card, I got that 15 years ago. I haven't used it. I don't think I have that account anymore. Things like that.
But, of hose, I'm looking at two Bank of America credit cards, an American Express, and a New England Federal Credit Union account, of the ones that are -- and a USAA account. I don't know if the Bank of America ones are joint or

not. But I believe they are. And the other one, I'd have to check on.
Q. Would you describe yourself as a heavy credit user?
A. Define "heavy credit user."
Q. I'm just asking as you understand the term.
MR. ODOM: I'll object to the form of the question being unnecessarily vague.
BY MR. ANDERSON:
Q. Do you want me to repeat the question?
A. Please do.
Q. All right. Would you describe yourself as a heavy credit user?
A. I -- Not knowing exactly what that means, I would say: No.
Q. Do you think your -- Do you think seven credit cards is more than the average man?
A. I'd say it probably is about the average.
I know that I've had more credit cards than that previously, 15 years ago, what have you. They have since gone down.
Q. When you make just garden-variety purchases, when you go to the store or restaurant, do you typically put that on your credit card?
A. I put it on my AMEX card, and I pay that in full every month.

Q. Of the seven credit cards you just described, do any of them have outstanding balances?
A. Yes, they do.
Q. What is the -- Name one with the highest outstanding balance right now.
A. The highest outstanding balance? I hink it's the USAA. I think it's about $10,000 on here.
Q. Okay. How about the next one, with the next-highest outstanding balance?
A. The next highest would be about five, I think, $5,000, five or six thousand dollars. And that's the Bank of America.
Q. Are there any others with outstanding balances?
A. I think the second Bank of America would be similar. I think it's about 3,000 or so. Those are all at zero percent interest.
MR. ODOM: How much interest?
THE WITNESS: Zero.
BY MR. ANDERSON:
Q. I'm showing you an exhibit that I've marked as Defense Exhibit 14. This is a letter from American Express. It's addressed to you. It's dated March 10th, 2009.
Do you remember getting this letter?
A. I do.
Q. And the purpose of this letter is stated in the

second paragraph: "Your revised credit limit for purchases is now $2,700.00. The new cash advance limit is $200.00."
Do you remember receiving this?
A. I do.
Q. Now, in the next paragraph there, it describes a number of -- in bullet point form -- a number of factors that led American Express to reduce this credit limit; is that fair to say?
A. Is that fair to say?
Q. I'm just asking: Is that what those bullet points do?
A. (No oral response)
Q. The preceding sentence says, "The specific reasons that factored most in our decision to reduce your credit limit were as follows," and then it lists a series of bullet points?
A. Yes, I -- it does. t does do that.
Q. All right. And nowhere on here does it mention the foreclosure that occurred; is that fair to say?
MR. ODOM: I'm going to object to the form of the question.
MR. ANDERSON: I'm simply asking him what the letter says. I don't know why that's an improper form.
MR. ODOM: Well, I think the words "serious delinquency" can be included in a foreclosure or a HELOC that's written off. I would certainly count that as a serious

delinquency.

BY MR. ANDERSON:

Q. Okay. Does this letter mention the word "foreclosure," specifically?

A. It mentions "serious delinquency."

Q. But it does not mention "foreclosure"?

A. Again, it mentions "serious delinquency." I don't know what that -- that equivalent is.

Q. And, in fact, it says -- okay, looking at those bullet points -- "Your total debt is too high with American Express or other creditors."

Second point: "Based on your credit report, you have high debt with other creditors relative to your total available credit."

Third point: "Based on your credit report, our estimation is that your monthly payments are too low in relation to your outstanding debt on all of your credit card accounts."

And then it talks about your credit score from Experian.

So hose are all o her factors that American Express apparently considered when it reduced your credit limit?

MR. ODOM: I'm going to again object. I think you're mischaracterizing the letter, Mr. Anderson.

When the bullet says, "Your credit score as provided by Experian," unless we have that credit score and can see that report by Experian and that says, as one of the subbullet points, "Serious delinquency," if the Experian report noted the 20 February, 2009, foreclosure, then you're mischaracterizing the sum and substance of this letter.

MR. ANDERSON: Okay. I'm simply asking the witness what the letter says, and --

MR. ODOM: Well, the letter says what the letter says, so I object to the form of the question.

BY MR. ANDERSON:

Q. All right. We're done with this letter.

Major, you never had to move out of the property; is that true?

A. I refused to move out of the property.

Q. Okay. You never moved out of the property?

A. I didn't let them take me out of the property, no.

Q. Okay. At some point did any individuals come to your property, requesting that you vacate the property?

A. Yes, they did.

Q. Do you remember when that was?

A. It would have been in -- near the end of February and during March.

I believe you have a couple of documents. One individual was a Hank Rheinhart. He was a real estate agent of some sort. He came to the house. He wanted me to give him the keys, for $2,000, so that he could help me move out of the property. He told me I was foreclosed upon, and he cited a document that he had received from ETS of some sort, ETS and GMAC.

I spoke to him outside. I told him that what had -- what GMAC was doing was illegal, they were violating SCRA, and that it was a nonjudicial foreclosure and they're not allowed to do that.

I told him that he needs to talk to his bosses at GMAC, whoever contracted with him, and he needs to reconsider what he's doing. I gave him my cell phone number and said, "If you need to call me, please call me."

He went away. He obviously called because, within a half an hour, he called back and said he's not coming back. So I don't know what -- what -- what transpired, whether he was fired or whether he refused to go or what conclusion they came to.

Subsequent to then, there was another lady -- you have it in your files -- some Mosij, a real estate lady who came. I think that was the pushy lady that my wife was referring to. She met my wife at the door, again, was demanding that we move out.

I took her outside and spoke with her, explained to her the situation, and told her that: You need to contact GMAC, or whoever contracted you to come by, and find out what the situation is because you are not coming in here to take this house.

She gave me her card, and then she never came back.

Q. Were the two instances you described, were those the only two instances that --

A. Those are the only two instances that I was there for.

There were more where my wife was alone, where -- and she recounted. The first time it happened, someone's looking in the window. They're -- they're banging on the door. They are, you know, telling me wife that she's foreclosed on. And it's sometime in the middle of the day.

I get a call. I'm in Phoenix. I'm a hundred -- hundred miles away. It's going to take me two hours to get home. There's no way I can do anything.

She's -- She's pretty upset at the time. She calls me up. She's saying, "What is going on? Why are we -- Why are they trying to kick us out of the house? What have you done? What have you done? Why -- why -- why are they -- Why are they trying to kick us out of the house?"

Q. At -- We looked at some documents earlier. And I don't feel the need to show them to you. I just want to get your recollection.

Did -- At any point did your wife end up going to the hospital in early March 2009?

A. She did.
Q. Did you end up taking her?
A. No, I did not. I had my -- my -- How old was he then? Four? Is it four? No, it was three. Let's see. 2005, six, seven, eight, nine -- so three and a half.
Alex was -- Alex was about three and a half at the time. So I was watching him, and my wife went. t was probably about 3:00 in the morning or so. She went to the emergency room because she was having labor. She had had labor continuously from the night prior, probably about 10:00, 11 00 o'clock. So it had been after five or six hours.
So it was her second child, so knew what labor was about. It's not the first time. It's not her first rodeo. She wasn't panicking because suddenly she had some stray contractions. They were, you know, pretty regular. But the time between them was, you know, four minutes and six minutes, things like that.
t wasn't, you know: Six, six, six; five, five, five; four, four, four.
But it was enough to make her worry, so she went to the emergency room. And they did tell her that she was in preterm labor. They actually offered to -- offered to: You know, if you want to stay here and see, you know, we can -- we can try and induce you if that's -- you know, if this continues on.

Q. Okay. Now, hat's based on what your wife told you; you were not there. Is hat fair to say?
A. That's exactly fair to say.
Q. Okay. And the baby was born in late March?
A. 29 March. I believe she was a week or two early at that time. And, at the time she went to the emergency room, she probably would have been five or so -- maybe six weeks -- early, something in hat range.
Q. Okay. At any point in March of 2009, did you -- did you vacate the property, or did you remain in the property the entire time?
A. I never vacated that property.
Q. Okay.
A. I wasn't going to.
Q. Okay. Now, in your Complaint, you've made a series of allegations about -- related to credit reporting and -- and how this has impacted your credit.
A. It has.
Q. As a general matter, just as a general matter -- I'm not talking about your specific account. But, if an account is delinquent, you understand that GMAC reports that account as being delinquent to the major credit reporting agencies?
A. I do understand that they make reports to credit -- credit agencies.
Q. Okay.

A. Yes.
Q. And did that occur on your specific account?
A. Yes, that did.
Q. Do you know when the first time -- the first month that there was a reported delinquency?
A. The first time that a delinquency showed up from GMAC on my credit was in March of 2009. The date that was on there, I believe, was in October of 2008, October or November 2008.
Q. Okay. Was that accurate?
(Telephone interruption)
THE WITNESS: Can I take this call?
MR. ANDERSON: You can. Let's break.
(Recess)
(Exhibit 15 marked)
BY MR. ANDERSON:
Q. Okay. Major Edquid, I'm going to show you what I'm marking as defendant's Exhibit 15. And, if you look at this document, it appears to be a TransUnion credit report. This is a document you produced to us. And it's dated April 3rd, 2009, there on the lower right-hand corner?
A. Yes.
Q. Okay.
A. Okay.
Q. And I want wanted to turn to the second page, which

is Bates labeled 101. Now, about two-thirds of the way down there, you see the GMAC mortgage account, and then there's a loan number there?
A. Yes, yeah.
Q. And that's the subject loan that we're here about today?
A. That is the subject loan.
Q. Okay. Now, if we look at the reporting, it appears that we have, in October here of 2008, it says, "120"? There's a box that says, "120"?
A. "120."
Q. All right.
A. Roger that.
Q. Do you know what that means?
A. That means that -- hat that loan or hat -- that payment, in October, is or was, by their reporting, 120 days late, is what -- what they're saying.
Q. Okay. But his, this report, is dated April -- It's actually issued, in the upper right-hand corner of the first page, on March 31st, 2009?
A. Yes.
Q. So this is in --
Okay.
A. Yeah. It goes backwards in time, from right to -- from left to right.



Q. I guess my question is, then: In the end of March 2009, March 31st, on or about March 31st, 2009 --
A. Uh-huh.
Q. -- do you believe it was accurate that it was reported -- the account was reported as 120 days delinquent?
A. I believe that at that time I had protection under SCRA.
Q. All right. That's not my question, though. My question is: Do you believe it's accurate, that that response there that the account was 120 days delinquent was accurate?
A. Given what had transpired, that they -- that they had refused the payments, that would be correct. They refused the payments, going from October forward.
If they would have received them, it would not have been that case.
Q. Do you know if GMAC ever attempted to correct the credit reporting on your account?
A. GMAC never attempted to correct the credit reporting on my account. The understanding I have, in speaking with GMAC individuals, is that, in March at some time, it was noted that they should do it. But it was never actioned.
And then I discovered, in 2010, in August, that they did not make any corrections. And those corrections were both of the foreclosure and the delinquencies. Those were my requests, and that's what they said that they were going to

do --
Q. Okay.
A. -- is make those corrections.
Q. So it's -- it's -- It's your allegation that GMAC never attempted to, at any time, attempted to correct your credit?
A. Not by their own volition, they did not.
In August, August 10th of 2010, I spoke with a loan officer, to these individuals at GMAC, explained to hem the situa ion, pointed out to hem that they had foreclosed illegally on he loan on 20 February.
I pointed out to them that, sometime subsequent to that, they had vacated it. The person on the other end of the phone accepted that and said, "Yes, that is, in fact, true. And what are your requests?"
I told them that I wanted to have my credit report -- my -- my credit corrected, which included the foreclosure and delinquency -- delinquency amounts.
I then -- They said that they would do that. And, subsequent to then -- I think maybe a week later or so -- they issued a memo or a request, in that time frame, to the credit agencies. And they also sent -- sent confirmation or said they were going to send confirma ion.
Instead, I just called them up and said, "Hey, did you correct this?"

And they said: Can you -- They said, basically: Well, we just -- We just got this information. It's going to take a bit longer.
Which is fine, you know. So it was he 10th. I talked to them maybe three to four days later. They said: It's going to -- it's going occur to pretty quick. We're going to fix these things.
Q. And the time frame you're describing is August of 2010?
A. August of 2010.
Q. Okay.
A. That is when I am talking to them on the phone, reference their reporting.
(Exhibit 16 marked)
BY MR. ANDERSON:
Q. I'll show you an exhibit I'm marking as Defendant's Exhibit 16. Have you ever seen -- This is a document we produced to your attorney. Have you ever seen his document before?
A. I have never seen this document.
Q. Okay, okay. I'll represent to you that his is an AUD form. And I don't expect you to know what "AUD" means. But, if you'll look here, the date submitted, near the top, is March 17th of 2009. Did I read that right?
A. Let me see.

MR. ODOM: Well, excuse me. What is "AUD"? Because I don't know if we're going to answer questions about a document that you don't tell us what it is.
MR. ANDERSON: Okay. I'll represent to you that this is a -- I think it's Automated Universal Data form.
MR. ODOM: And I know that it says -- it has a GMAC number. But, I mean, who created this? That's my point.
MR. ANDERSON: Well, I'm representing that GMAC created this document. I'm just asking if he's ever seen it. If he hasn't, that's fine.
THE WITNESS: Well, here's the deal. I -- I haven't seen it.
And, of the submissions, and I'd have to look again at the submissions that GMAC gave, with these numbers, you know, with the 00005 --
COURT REPORTER: I'm sorry, you're going very fast.
MR. ODOM: Slow down, Fred.
THE WITNESS: With the submissions that GMAC -- you know, in their -- In the discovery, when they -- they submitted documents, they gave a bunch of GMAC documents with, what, these Bates numbers?
MR. ANDERSON: Uh-huh.
THE WITNESS: These are Bates numbers.
Okay. So I went and looked at what we had in there, what GMAC submitted. I don't recall seeing this. I may have



Frederic L. Edquid April 26, 2012

117

missed it. But I don't recall ever seeing that, even after reviewing that. And I've looked at it a couple of times. But, regardless of that, I don't know what it is.

BY MR. ANDERSON:

Q. Okay.

A. I don't know what it is.

Q. All right.

A. But what -- Can you tell me what it is? I mean, it's an automated something, but I --

Q. I will represent to you that this is how credit is corrected in the credit industry.

A. Okay.

Q. And I'm not purporting to be an expert at all. But on March 17th, 2009, GMAC did attempt to remove the foreclosure from the account. And now I'm -- And that's all I'm going to say about it because, obviously, this is not your area. I'm just asking if you had ever seen this before.

A. So you're representing that they attempted to --

MR. ODOM: No, excuse me.

I'm going to object. That wasn't a question. That was a statement by you that GMAC did something on March 17th, 2009. I -- I appreciate your understanding, but I'm going to object to you asking my witness about a document that he hasn't seen. So --

MR. ANDERSON: Okay.

118

MR. ODOM: -- if you want to call a GMAC witness to the stand to say what hey attempted to do on March 17th, have at it.

MR. ANDERSON: Okay.

BY MR. ANDERSON:

Q. Have you seen documents like this -- and I'm not talking about -- I'm talking about o her dates -- similar to this type of form? Have you seen --

A. No, I've --

Q. -- anything like this?

A. I've never seen that format, either on that date or otherwise.

Q. All right.

A. Or else I'd recognize it. But this -- this may have been -- I mean, I don't know. I don't know what it is. I -- I've not seen it yet.

Q. Do you recall, you testified earlier that your current interest rate is 1 375; is that right?

A. That is my understanding, yes.

Q. All right. And your current monthly payment right now is $219?

A. That's right.

Q. Do you remember what it was in the 2008 time frame? The monthly payment is what I'm talking about.

A. It -- it was fluctuating. Interest rates were going

119

down. And I knew that because I had looked at the LIBOR and it was going down. t could have been anywhere between $900 down to 240. I think one time it went -- It was like 600, then 200, then 580, and it jumped around a lot, depending upon what month. Some were different -- I think that, in the documents that GMAC submitted, where they had the monthly payments -- and it, again, has Bates numbers on there from GMAC -- it has each month's payment type.

Q. Okay.

A. Again, I don't have that committed to memory. But it -- it jumped around, anywhere between probably about $280 to maybe 600, in that range, during that time frame.

Q. All right. Now, you mentioned earlier, in the August 2010 time frame is when you -- approximately August 10th, you made another call to GMAC in regard to credit reporting; is that fair to say?

A. Yes.

Q. Okay. Between the May 2009 to the August 2010 time frame, did you have any communications with representatives of GMAC?

A. Starting date again?

Q. May 2009.

A. Yes.

Q. Okay.

A. In June and July, when they had my money and didn't

120

pay it against the account for about two months, I -- I called -- I called my bank and said, "Hey, did you rescind the payment? It's disappeared."

They said, "Yeah, we sent it."

I talked to GMAC. They said, "You're still in arrears."

That's when I talked to the individual sometime in July: 15, 18, 19 July.

MR. ODOM: What year? I'm sorry.

THE WITNESS: Of 2009.

In mid July I spoke to that individual. And he said, "Oh, it's over here."

This -- The individual I spoke with was a higher skill individual. He had better understanding of what GMAC accounts did. And he found that they had money from me, in a side account, that should have been applied to this account.

So what they did is he applied it, and then my -- He said, "Yep, your payment is going to be this in August. And then you'll get regular billing. You can expect, based upon current interest rates, your September bill to be this."

I was like: Roger that.

And at that point, I moved out. I had a brand new child who was as old as Brinley now.

BY MR. ANDERSON:

Q. Okay, stop. You said you moved out?

sd
setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

A. It's an Army term. Sorry.
Q. Okay. What do you mean by that?
A. I -- I continued to march. I -- I lived my life. I knew that my account was up to date. I knew that I was getting regular billing. I knew I was making payments. I knew I had a four-month-old child that I needed to start getting to know. I also knew I had a -- you know, a four-, soon to be five-year-old son that, you know, I needed to start playing baseball with and different things like that.
So I lived my life. I didn't have to spend four, six, eight hours on the phone on weekends, and what have you, talking to GMAC.
Q. Okay.
A. I didn't have to worry about people knocking on the door, telling my wife that she was going to get kicked out. I had to spend time getting to know my wife and repair some of the damage that had been done by this activity. Those were the things that I did during that time frame.
When -- when --
Q. Can I just stop you?
A. Okay.
Q. So the time frame you're talking about is August 2009 to August 2010?
A. That is correct.
Q. When you really didn't have any communications

either to or from GMAC?
A. Negative. I got the bill. It was paid. It said: Up to date.
Okay. Good to go.
Q. Why did you contact them on August 10th, 2009?
A. We were looking at a new home.
MR. ODOM: I'm sorry? You said 2009, Mr. Anderson?
MR. ANDERSON: I'm sorry.
BY MR. ANDERSON:
Q. Correction: Why did you contact them on August 10th, 2010?
A. August 10th, 2010, we had looked at some -- some larger homes. We had a 1500-square-foot home, had a family of two, and we had another baby on the way. And we were looking at getting a larger house because, right now, we had two bedrooms. And, even with bunk beds, which we, you know, were going to get, we still would have an extra -- an extra child, so three children in the same room. So we needed to get something larger. So we looked around.
We got a hold of the house that we moved into in -- Well, the builder for the house that we moved into, we got a hold of them during that time frame. They were just down the road from where we lived, within a mile.
Q. When you say, "that time frame," when are you talking about?

A. That time frame, starting in -- Let me hink here. 2009, 2010 -- It would have been starting in April, April 2010 or so.
Q. That's when you started to look at --
A. Look for houses.
Q. All right.
A. Look for houses. Look around, see what's on the market.
By August we had settled: Hey, we would like to get this house on this lot in this area. Let's see if we can get financing for it.
So we went. We went to see their loan officer. They put the information out there, and they pulled a credit report, and what have you, at hat ime.
The credit report at that time showed a number of things which -- which I had not been necessarily aware of still being on there. It was my understanding that -- or my assumption that, since they had vacated the foreclosure or the illegal, nonjudicial foreclosure, since they had vacated it, that they had also corrected he credit and all of the things that go wi h it. That includes delinquencies. That includes foreclosure and what have you. That was not the case.
On that date --
Q. Can I just interrupt?
A. On that date, there were a number of things hat

popped up.
Q. Okay. I'll let you keep going.
A. Okay.
Q. So this was a new-build, so to speak? It wasn't a house that was already constructed? You were looking at building a house?
A. Yes.
The procedure is the same, whether you're going to get --
Q. I understand.
A. -- a used house or a new house.
Q. Okay. I interrupted you. Go ahead.
A. Okay. At that time, what showed up on that credit report were a number of things. We had a foreclosure from GMAC. We had delinquency remarks that had not been on there, March of 2009. They had six or eight months of delinquency that had not been there, March of 2009, that are now on there.
In addition to that, you had Bank of America, which is the second to HELOC, that had been shown as written off. Okay? So those things were all on there during the time frame.
They basically said: No, we -- There is no way that you can even get a VA loan with foreclosure remarks on there, with a written-off loan, with delinquencies that you have. Those will have to be fixed.
During that time frame, you know, we had looked at

some houses. This was a good place, a good neighborhood, a safe neighborhood where we could raise our kids.

They basically, within a week's -- Within a week's time, they had gone all he way up to heir higher in Phoenix and concluded that: We're going to -- We're going to let these guys go. They, they're not -- They're not going to qualify for a loan. It's -- Even if they fix it, even if they have protec ions under SCRA, it's going to take too long.

Q. Who is this lender at this point?

A. MTH.

Q. MTH?

A. It's the lending arm, I believe, of Meritage.

Q. And Meritage is a builder?

A. Meritage is a builder, yes.

Now, some of hose e-mails that I am now privy to were not directly to me; they were to my real estate broker. And they -- They were basically saying: Hey, you know, we're going to let these guys go. We're not going to -- We're not going to build for them. Their credit is too bad. We cannot build for hem. This was in, again, 2010, August.

He let me know. He's pretty dogged in his --

MR. ANDERSON: Colonel, can I look at these?

MR. ODOM: Sure.

THE WITNESS: He's pretty dogged.

MR. ODOM: Excuse me just a moment. Let him have

just a minute to look at that.

THE WITNESS: Okay.

MR. ODOM: And if you say one more pronoun, I will take you out back and use that tile-cutter saw. Please --

THE WITNESS: Okay.

MR. ODOM: -- don't say, "they" and "them," just so I'll understand.

THE WITNESS: Okay. Roger. I have to remember that.

MR. ODOM: I always find it helpful to threaten people who fly aircraft with 30-millimeter cannons and Hellfire missiles. It's really smart.

Actually, I meant for Mr. Anderson to look at those.

Did you want to look at those?

MR. ANDERSON: I mean, he took them from me, and I'm not going to look at them until you guys are comfortable with it.

THE WITNESS: Oh, okay. I thought you --

MR. ODOM: Those are the ones -- Those are the ones --

THE WITNESS: I thought you wanted me to --

MR. ODOM: Those -- No, no.

THE WITNESS: Oh, no.

MR. ODOM: Those are the ones you brought me this morning --

THE WITNESS: Oh, okay.

MR. ODOM: -- at my request.

THE WITNESS: Right.

MR. ODOM: So I wanted Mr. Anderson to get to see hose.

MR. ANDERSON: Tell you what --

THE WITNESS: Okay.

MR. ANDERSON: Let's just -- I'll table hose for a second. And then at a break, I'll look through them --

THE WITNESS: Okay.

MR. ANDERSON: -- before we finish up.

THE WITNESS: I'll -- I'll just put them in, sort of, sequential order, as to when they were sort of -- Okay.

BY MR. ANDERSON:

Q. All right. Getting back to, hen, in the August 2010 ime frame, you made a request to GMAC to take some actions?

A. Yes.

Q. And how many different conversations did you have with them in August of 2010?

A. In August I probably had a half a dozen or so.

Q. Okay.

A. Six or seven.

Q. Do you know if the actions that you requested ultimately occurred?

A. They did not all occur.

Q. They did not all occur. What occurred and what did not --

A. They removed --

Q. -- based on your understanding?

A. They removed foreclosure remarks. They did not correct and remove delinquencies.

Now, those are the -- Those are the GMAC remarks. The Bank of America remarks that were caused by GMAC were not removed at that time. That took a lot more work and took an additional eight or nine months, to remove Bank of America remarks, due to the loan that they had written off. And there were a number of issues with that, along the way.

(Exhibit 17 marked)

BY MR. ANDERSON:

Q. I'll show you a document marked Defense Exhibit 17. It appears to be a credit report dated October 5th, 2010, from Core Logic. This is a document you produced to us?

MR. ODOM: You gave me two.

MR. ANDERSON: I'm sorry.

THE WITNESS: That is correct.

MR. ODOM: Is this 17?

MR. ANDERSON: It is.

THE WITNESS: Yeah.

BY MR. ANDERSON:



Q. Okay. I'm going to direct your attention to Bates Label 157.
A. 157.
Q. Yes.
A. Did you want me to -- Okay.
Q. Now, the GMAC Mortgage account there is tem Number 65?
A. It is.
Q. Now, would you agree with me that the foreclosure had been removed in this report?
A. It appears, yes, that there is no foreclosure next to that account.
Q. Okay. When did you first contact an attorney about this case, besides Lieutenant Colonel Forshey?
A. In terms of to be my representative for counsel?
Q. Yeah. I mean, you're sitting here filing a lawsuit, so who did you first contact -- When did you first contact an attorney about that?
A. I spoke with Colonel Odom.
Q. Do you remember when your first contact with Colonel Odom was?
A. I believe it was sometime in April.
Q. That would be April 2011?
A. 2011.
Q. Okay.

A. I think it was March/April 2011. I'd have to look, for sure.
Q. Major Edquid, do you understand, generally speaking, for credit repor ing, here are major credit reporting agencies: Experian, TransUnion, Equifax?
A. Right.
Q. You understand that, hat those are the credit reporting agencies?
A. They are.
Q. All right. And is it fair to say, just in general terms, that an entity like GMAC reports information to a credit reporting agency, but that's a separate agency; they're not tied to GMAC?
A. I would say that hose agencies report what GMAC tells hem.
Q. Okay, I understand. But GMAC is ultimately not responsible for what the credit reporting agencies do --
A. I disagree.
Q. -- or do not do?
A. I disagree. I think that GMAC is -- is -- is responsible for anything that GMAC tells those companies. So, if they tell hem something in error or something that needs to be corrected, then GMAC is responsible to correct those items.
Q. I understand, if -- if the subject information that's communicated is in error. But I'm talking about just as

a matter of course. Information that's communicated to a credit reporting agency, that's a separate entity, and they could do or could not do with that information something that wouldn't be necessarily GMAC's responsibility?
A. I've been told by GMAC and other creditors that any correction or any report that they make will take about 45 days to show. I have run into Bank of America, and I've worked with them, and they have made a number of those corrections. Sometimes they helped; sometimes they didn't. But then Bank of America followed up to make sure that it was ultimately corrected. And maybe it took two or three attempts, but they did fix it.
Q. Major, have you ever been the plaintiff or defendant in any other lawsuit?
A. I have not.
Q. Okay. You've never sued anyone or had anyone sue you?
A. I've never been foreclosed upon.
Q. That's not my question. My question is: Have you ever been the plaintiff or defendant in a lawsuit? And I believe your answer was: No.
A. The answer is: No.
Q. Okay. Have you ever filed bankruptcy?
A. I have not.
Q. One of the allegations in your Complaint relates to

Section 518 of the SCRA. If you want to take a look at your Complaint, it's in -- starting in Paragraph 59.
A. What is 518? What is your understanding of that?
Q. Well, strike that. That's nonresponsive.
MR. ODOM: What page are you on?
THE WITNESS: 14.
MR. ANDERSON: I'm on 14.
THE WITNESS: Page 14.
BY MR. ANDERSON:
Q. If you want to take a minute there, these are the allegations in your Complaint, starting in Paragraph 59, goes through 64. If you want to take a minute to look at that.
A. Okay. I've read it.
Q. Now, in your Complaint, overall, you have alleged that GMAC made errors related to credit reporting, just as a general matter; is that fair to say?
A. No. I would say that they made -- I wouldn't say, "errors." I think they made willful reports that were incorrect, that did not reflect the reality.
I believe that GMAC -- one part of GMAC may have known what the truth was while the other part was reporting something else.
Q. I guess my question is: Do you believe that GMAC's credit reporting was due to or was caused by your application for SCRA benefits?



A. I believe that GMAC's reporting was in violation of SCRA protections.

Q. Okay. That's not the answer to my question, though. My question is: Do you believe that GMAC, because you made a correspondence or requested SCRA benefits, that caused them to do certain things in terms of credit reporting?

A. What type of things?

Q. Well, that's what the allegation is here, sir. And I'm just trying to flesh this out, all right?

A. Okay. Let me -- Let me see if I understand your question.

Q. I understand that you've made allegations that GMAC made errors with regard to credit reporting, okay? And we've discussed that, and we'll discuss it a little bit more.

But my question here is: Do you believe that was because you had made application for SCRA benefits, that they took that communication and then did certain items in terms of reporting credit?

A. I'm not quite sure if I understand your question. But let me take a look at what the cause of action is, see how that -- so I understand it.

Q. Okay. Take your time.

A. Okay. What is your question again?

Q. Okay. And my question is: We've discussed that GMAC reported certain items to credit reporting agencies in

relation to your account. True?

A. Yes, they did.

Q. Do you believe they did any of that because you made application for SCRA benefits?

A. So you're asking that, because I asked for SCRA benefits, they then answered by -- by making reports to GMAC?

I don't know, and I -- I don't know where any one of these lines says that. I'm looking at 61. I -- And 61 says that GMAC reported an illegal, nonjudicial foreclosure to the credit reporting agency. They basically, since I have protections under SCRA from being foreclosed upon, their report that they foreclosed upon me for an action that initiated and was conducted during the SCRA protection -- protection period, that that report is -- is also illegal. I think that's what it says.

I don't think -- I'm trying to understand your question.

Q. Uh-huh, and I'm trying --

A. And your question --

Q. I'm trying to state it clearly. But go ahead.

A. And it seems to me like your question is, is that, because I asked for SCRA protection, say in 2006 or whenever it was, because I said that, then -- then GMAC came back and then put some sort of negative report on there, just because I was a soldier.

I don't believe that GMAC put a nega ive report on there just because I was a soldier.

Q. Okay.

A. I think that they put negative reports out there because hey did not understand SCRA, because they did not understand the statute and how the statute was a bit of a moving target during this time frame and how the law has changed.

But I hink hat, as large as GMAC is, as many lawyers as they have, that -- that they should know what the rules are. And they need to play within, you know, he left and right limits of that.

Q. Okay. I understand.

A. Okay?

Q. I understand that.

A. And that's what I --

Q. But -- but let me just -- let me just --

A. That's what I think this alleges. And maybe I don't understand because --

Q. Okay.

A. -- it's lawyer -- lawyer -- a bit lawyerly type speak, so maybe I don't understand.

But my understanding of the second cause of action here is that they -- they reported foreclosure and other things about actions that they had done during the SCRA protection

period, and hey are not allowed to do that.

Q. Okay.

A. Okay. That's --

Q. All right.

A. That's what I think it says. I don't know.

Q. Okay. Let me distill that down. GMAC did what they did because they believed your account was delinquent?

MR. ODOM: Objection.

BY MR. ANDERSON:

Q. I understand that you disagree with that. But the question is: GMAC did what they did because they believed the account was delinquent and because they believed there was a foreclosure; that's why hey did what hey did, in terms of credit reporting?

MR. ODOM: Objection to the form of the question. Calls for speculation on he part of the witness.

THE WITNESS: Do I answer?

MR. ANDERSON: The best you can.

THE WITNESS: I believe that GMAC did what they did because hey did not understand SCRA protections for servicemembers. If it was any other situation, I believe they -- you know, not deployed, not within he window of protection -- I believe that some of these things can definitely occur. But I believe hat GMAC made hese reports, not knowing or not properly understanding protec ions afforded



to serving soldiers, sailors, what have you, under SCRA. That is my belief.
BY MR. ANDERSON:
Q. Okay. Now, Major Edquid, you've also made an allegation under the RESPA, the Real Estate Settlement Procedures Act. And that's found, I think, on page 15 there.
A. Uh-huh.
MR. ANDERSON: Okay. I'm going to mark this as Exhibit -- What am I at, 18?
COURT REPORTER: Yes.
(Exhibit 18 marked)
BY MR. ANDERSON:
Q. I'm marking this as Exhibit 18. These are simply your --
A. Okay.
Q. -- responses to our Request for Production of Documents. And I've turned there to the third question and response. And that question asks you to produce documents that you believe -- "any and all written communications or other documents you contend were Qualified Written Requests pursuant to 12 U.S.C.'2605."
And then you listed out five different documents, and we talked about some of these. But it's your contention -- and this is the only question I'm going to ask: t's your contention that these were the documents that constituted

qualified written requests?
A. As I understand it, yes. They may not be limited to that. But, as I understand it, yes.
Q. Okay. Are you aware of any others, as you sit here today, other than those that we described in that response?
A. Not that I can think of, off the top of my head.
Q. Major Edquid, how have you been damaged in this case?
MR. ODOM: I'm going to object to the form of the question in that it calls for, to a certain extent, a legal conclusion.
MR. ANDERSON: I'll rephrase.
BY MR. ANDERSON:
Q. Major Edquid, what damages are you claiming in this case?
A. How do I answer that? I mean, I -- Initially, the -- the damages are as -- as -- as claimed in the case as filed. And -- And, you know, I'm -- I'm looking at -- You know, I've been damaged by damage to my reputation, damage to my credit, damage to my ability to obtain a loan due to foreclosure remarks. I have been damaged due to GMAC's action of -- of speaking with USAA, of then turning around and putting a second house insurance on there and trying to bill me for that.
I have been damaged by their actions with Bank of

America, causing Bank of America to write off the loan, causing for Bank of America to also put serious delinquencies on my account. What happened with Bank of America is subsequent to GMAC's notifying them, I believe, in March or April of 2009.
April 2009, Bank of America rejected my payment in full. Bank of America, I called them, and they said, "We're doing this because your house has been foreclosed upon."
This is in April of 2009. I asked them to reconsider. I tell them that there are SCRA protections and that this is being unwound by GMAC. They -- They, subsequent to that, they write off the loan in July, June or July of 2009.
I'm damaged by a 1099-A that shows up on my doorstep, where they're saying it's income to me, for their write-off of the loan. You know, I --
Q. That's Bank of America?
A. Bank of America. And this was due to GMAC's direct actions. As they were the second, they concluded there was no value in the home after the foreclosure, so they had to write off the loan.
Bank of America is somebody I had to deal with as part of this. The reason I could not get a loan in October of 2010 -- or, actually, in August of 2010, there were a number of actions. It was due to GMAC's reporting the foreclosure and delinquencies. t was also due to become Bank of America's writing off the loan and the subsequent delinquencies.

If you take a look at the letters, some of the information that happened with Bank of America is they finally did reinstate the loan after they spoke wi h GMAC in the January time frame. I spoke to somebody in -- in -- in their office of the president. And they -- they chased it down. And, yes, they did reinstate it.
But, when they reinstated it, since I did not make -- since they did not receive payments of $145 a month, from April 2009 until January of 2011, they then said, "Oh, now you're delinquent," 180 days for all hose months.
So now hat shows up on he credit cards report. Reinstated, and now it's delinquent. And hose are all outgrowths of GMAC's actions.
You know, important -- You know, and probably much more importantly than, you know -- you know, credit and reputa ion is -- is -- is the hreat to my family; the threat to kick them out; the pressure that you -- that you -- you put on us because of your actions; the -- you know, the knocking on the door, talking to my pregnant wife, looking in the window, scaring -- scaring her so she has to lock all the doors and make sure all the shades are closed, causing her to go into preterm labor.
Those are -- Those are all things that -- hat add up. You know, you can -- you can do a lot of things, but, eventually, it takes its toll. You know, she was -- Until we



were able to clear things up, starting in -- in 2009, but even all the way into 2010, October 2010 -- or, actually, August of 2010, she was still questioning, you know, what I had done with -- with our credit and her credit. She told me numerous times that I ruined her credit. And she was rightfully mad. Okay?

And then, you know, things had gotten better. And then, in -- when we were looking for a house for our third child, all of a sudden we can't get a loan. And it's October 2010. And it's because of these things still on there. We thought we had cleared it up. Then we go back to the same thing. There is -- There's emotional. There's emotional stress because of that.

Again, you did not meet my three-year-old. She is a vibrant -- she's -- she's -- She's a fireplug. But I couldn't imagine that, if she was born four or five, six weeks earlier, that maybe she is not the same person; maybe she's not as smart or as quick; maybe she's -- you know, she's born early; she doesn't get as much oxygen, or whatever could have happened. Those are the things that -- that, if you think about it, are significant. And those are -- Those are the bigger things.

We can work, and I can sit there and call and talk to GMAC five and six hours a day and Bank of America and meet with their lawyer and exchange hundreds of e-mails working on these things and eventually get there. And it might take 20

years, okay? But the time lost with my family, the time concentrating on this, when I shouldn't have to, that's where the -- that's where I'm damaged.

Q. I want to talk to you about a few of those items. You described earlier the Meritech loan in August of 2010 that you sought --

A. Yes.

Q. -- and then ultimately were declined on.

A. Yes. t took -- It took almost a year of coming back and forth. And then, ultimately, they said: No, we're not going to give you the loan.

Almost a year of fixing things and working on it. And I had to move to -- I had to move -- Because they knew that I had fixed things, the underwriter would not -- would not support that after ten months. And, because I had been working with them every day, every other week, and they saw progress, they then said, "Well, it's not our primary lender. We'll allow you to go with a different lender."

So we were able to do that. And they were finally able to get that through in August of 2011.

Q. Okay. Was that Sunstreet?

A. That was Sunstreet Mortgage.

Q. Okay.

A. August of 2011. But that corresponded with finally removing all the remarks from Bank of America.

Q. Okay.

A. And he only thing hat remains on there are he delinquencies from GMAC. They're still significant. But, again, we've cleaned 80 percent of it. But it's taken hours and hours, e-mails and e-mails, over years' time, to try and fix it.

Q. Let me ask you this. So you described he Meritech loan, and then you just described the Sunstreet loan, which ultimately resulted in being your current lender?

A. Yes.

Q. Were here any other lenders that you sought a loan for, that you applied for?

A. For that house, you mean?

Q. For any house.

A. No. This -- this was -- we were -- We were trying to purchase his location because -- because it was safe, because it was a good place to -- You know, it's not on the south side of Tucson, things like that. It's a safe area. We need to make sure we're safe, as far as kids go.

Q. Did you seek a loan for any o her large purchase, like a car or a boat?

MR. ODOM: During what time frame?

THE WITNESS: During when?

BY MR. ANDERSON:

Q. Since 2009.

A. Until when? Until today?

Q. Until the present.

A. We -- we sought -- we -- Well, with getting a third child, our cars did not accommodate three car seats. We could not purchase -- purchase a vehicle. We had a 2002 and a 2003. We could not purchase a vehicle that would accommodate the new family until everything got cleared up. Again, that was in the fall. So it was at about the same time. We purchased a new vehicle in November.

MR. ODOM: What year?

THE WITNESS: 2012 -- No, 2011. 2011. And that was at the same time that we were purchasing -- purchasing the home.

BY MR. ANDERSON:

Q. Did you ever apply for an auto loan prior to November of 2011?

A. We did not. We knew we could not because we were trying to purchase a home, first of all.

Second of all, because of the derogatories that were already on there --

Q. My question, though, is that you didn't actually apply for an auto loan prior to November 2011?

A. Would not have been approved.

Q. Okay. That's your speculation. My question is that you never applied?

sd
setdepo
The Evolution of Deposition Management

A. It's -- That is correct.
Q. Okay.
A. That is correct.
Q. And is that, the auto -- excuse me -- The automobile that you purchased in November of 2011, is that financed?
A. It is financed.
Q. Okay. Who is the lender on that?
A. U.S. Bank. U.S. Bank is the lender.
Q. Okay. So, when you were describing the damages just a minute ago, you said your wife questioned you. And you made the statement, "She was rightfully mad."
What do you mean by that?
A. Well, her credit had been damaged, so she should be mad about that.
Q. Okay.
A. She --
Q. Are you suggesting that she was rightfully mad at you?
A. No. She was rightfully mad that her credit was damaged. But she -- she should have been right -- And she was. She was mad, you know, in general, because her credit was damaged. But she was mad at GMAC. But, since GMAC is not there to strike out at, then she would -- she would be mad at me. But it doesn't do any good to call up an 800 number and yell at them about the credit you're getting due to GMAC's

reporting.
Q. All right. You've mentioned the Bank of America loan, and I want to talk to you a little bit about that. When did you first get this Bank of America -- Was it HELOC, a home equity line of credit?
A. It was HELOC.
Q. What did you use it for, first -- Strike that. When did you get it? What year?
A. This HELOC was at the same time. It was a first and -- t was a first and second on the loan.
Q. All right. So it was a second loan, so 2005?
A. Yeah. t was -- It was a first and second. It was just replacing the prior loan.
Q. Okay.
A. And the prior loan was also a first and second. That's the way they did the financing.
Q. So this was a regular monthly payment as opposed to a line of credit; would that be fair to say?
A. That would be fair to say.
Q. Okay. And so you made monthly payments on the Bank of America second --
A. Yes.
Q. -- starting in 2005?
A. Yes.
Q. Were you ever delinquent on that HELOC? Was it ever

behind?
A. It never was. I made a payment every mon h, I believe from April 2009 until -- until about January 2011, give or take. I sent a payment every month, hat they then subsequen ly sent back to me. But I sent that every single month, making my payment, saying, "Hey, take my loan back. Take my loan back."
It took them awhile to get to that point.
Q. And you've alleged that Bank of America charged off the balance on that. Do you know when hat happened?
A. They charged off the balance. I found that out after the fact. But I believe it was in June or July of 2009.
Q. And the Bank of America loan was ultimately reinstated?
A. It was reinstated at the end of January of 2011. It was January or February when they reinstated the loan. And then, at that same point, because of the status of the loan and they had been rejecting the $145 payment for 18 months, then they started having extreme delinquencies, 180 days.
MR. ANDERSON: Okay. I'm marking this as Defendant's Exhibit 18.
COURT REPORTER: I think we have an 18.
MR. ODOM: 19.
COURT REPORTER: We have an 18 already.
MR. ANDERSON: Okay, my fault.

(Exhibit 19 marked)
BY MR. ANDERSON:
Q. This appears to be a letter dated January 31st, 2011, addressed to you and your wife, from Bank of America. Is that right?
A. That is correct.
Q. And it states here, on the first page, on the fourth paragraph down, "Effective January 27, 2011; we have reversed the charge off of your loan account. Your loan has been returned to normal servicing."
Is that when you first learned that the account had been reinstated?
A. No. No.
Q. When did you first learn about it?
A. On a phone conversation. I had been speaking with them, whoever this individual is. I think that's Ms. Melissa Juan. Yeah. Ms. Melissa Juan is the person I spoke with on the phone. I spoke with her extensively. I guess we had got initial contact. I got handed off to her in January. This conversation was started on December 15th are so, mid -- mid December.
It took about six weeks for them to contact GMAC, to find out that the -- to find out that -- that GMAC had foreclosed upon the house and then vacated the foreclosure back in 2009. And then, at this point, in January of 2011 -- about

21, 20 months after that -- they reinstated the loan, based upon having spoken to GMAC and finding out that they foreclosed but they had vacated the foreclosure.
Q. And, when you're saying "they," you're talking about Bank of America?
A. No, no. Bank of America reinstated the loan, based upon GMAC's testimony that they had, one, foreclosed but, two, vacated that foreclosure.
Q. I understand.
A. Or they say, "rescinded." Whatever the right word is.
(Exhibit 20 marked)
BY MR. ANDERSON:
Q. Handing you Exhibit 20, this is a letter from Bank of America, dated April 29th, 2011. And it states in here that the loan was charged off on June 20th, 2009.
A. That's correct.
Q. And then the next sentence is, "Bank of America considered your account closed and no longer accepted payments submitted." For this reason payments through '09 to March of 2011 have also been updated to show as current?
A. That is correct.
Q. And then the next box says the request for adjustment was submitted on April 19th, 2011, to four different credit reporting agencies?

A. That is correct.
Q. So is it your understanding, then, that the negative reporting that Bank of America had done was expunged in April of 2011?
A. It didn't happen then.
Q. Okay. When did it happen?
A. It actually took till about August of 2011 before it finally cleared. There were some hiccups along the way. Some of he stuff was corrected, but then some wasn't. And hey had to reattempt. They had to do another run on he target to fix it.
COURT REPORTER: "They had to do another" -- what?
THE WITNESS: Run on the target.
MR. ODOM: That's attack helicopter pilot talk for, "They tried again."
THE WITNESS: They tried again. They actually tried two or three times.
MR. ANDERSON: All right.
(Exhibit 21 marked)
BY MR. ANDERSON:
Q. I'm showing you Exhibit 21. This is a letter dated February 5th, 2010, I believe drafted by you, sent to Michelle (sic) Juan. It says, "Consumer Advocate." I believe that Michelle Juan is at Bank of America; is that correct?
A. She is. She's at Bank of America. She was the

initial person.
Q. Okay. Now, as we look at this letter, turn to the last page. You sought, I guess, pain and suffering compensation from Bank of America?
A. I did. I -- Well, I asked -- I asked them, because I don't know what to call it. I mean, because I'm sending them payments every month. They wrote it off. I had talked to them a number of times: "Hey, just accept my payments and pay down the loan."
They continued to not accept it. And I didn't find out that they had written off this foreclosure -- had written off the loan, until I received a 1099 in February of 2010, so about six or seven months after.
In the meantime, I had been sending 145, 145. And, the last I spoke to them, which was just before they wrote the loan off, the agent told me, " t's going to take a little bit. We're going to check on some stuff. But, you know, keep doing what you're doing."
So I sent 145 a month. That continued. And then in, again, I think, February of 2010, I received a 1099-Alpha that says: Hey, you've got all this income from Bank of America.
And this income was the write-off amount of whatever it was.
Q. Did you -- Did you ever file a lawsuit against Bank

of America?
A. I did not.
Q. Why not?
A. I -- The reason I did not file a lawsuit against Bank of America is because in March, I believe, of 2010, so a month after that, a lawyer from Bank of America, a second-level SCRA individual, intel, called me up, said they wanted to discuss the loan and they wanted to come see me.
So the lawyer flew in from California to Phoenix. He jumped in the car with the second-level SCRA manager. They drove down to my house, and we discussed some of these issues. And we negotiated back and forth.
Again, he's a lawyer; I'm not. He knows the verbology. I'm just somebody who's experienced it. So I, you know, basically go through the -- go through the case, tell them, you know, what the situation is.
They state -- They state, looking at this, that: You know, we did not cause this. This was caused by GMAC's actions. We are simply reacting to what GMAC has told us. But we can work with you on this.
And that's what they did.
Q. Let me ask you this. Did they ultimately pay you a settlement amount?
A. It is not called a settlement. They gave me a -- They gave me a credit. They gave me total credits of about --

about $17,000.
Q. Okay. Credits toward your account?
A. Yes.
Q. Okay. What is the current status of your Bank of America account?
A. It's current. It's -- I'm making my monthly payment; it's about $80 a month right now.
Q. So when you say, "a $17,000 credit," what do you mean? Do you mean that the total principal was reduced by that amount?
A. No. t -- It ended up being 17,000.
What they did is this, is that I also have credit cards with Bank of America. Okay? And what they did is, rather than call it "a settlement," because they didn't want to do that, they gave me, I think, about a $9,000 credit against the balance that they had. And that included payments received and rejected. But then, you know, it sort of -- You know, the interest added up. So they gave me about $9,000 to the account.
Again, you know, as they were not the primary -- the primary on this, their actions were not what caused this. It was GMAC.
What they also did is they looked at -- at my credit card, and they basically said: That interest is zero.
And they rebated all interest paid, starting in

2008, against the credit cards.
Q. Can you -- So they reduced the interest rate to zero?
A. Zero percent.
Q. Did that credit card have an outstanding balance at that time?
A. It did.
Q. And so did they -- They reduced the outstanding balance? They --
A. Yes, they did.
Q. So the total amount you --
A. Ended up being about $17,000.
Q. Did they pay you any cash in hand, actual money?
A. Giving me a credit is pretty good, too.
Q. Okay. Yeah, I guess I'm just trying to at --
A. No.
Q. -- so it's these two credits --
A. They did not open up a briefcase and throw me hundreds.
Q. Okay. My question then is: These were the two components of the compensation. Was there anything else, is what I'm trying to get at.
A. They took a look and -- and made sure that everything was expunged because it should not have been. And my credit with Bank of America is one hundred percent clean,

like it should be. There are no delinquencies. There is nothing written off, whether it's my Bank of America credit card or whether it's my -- my Bank of America -- my Bank of America HELOC. They -- they also, the -- The HELOC, I believe -- I believe the HELOC was also variable. They capped it at 4 percent, for life, or for the life of the loan.
Q. The subject HELOC loan?
A. The subject HELOC loan. They said, "Hey, we'll give you a 4 percent" --
(Loud noise from outside interrupts the proceedings)
COURT REPORTER: "The subject HELOC loan." I didn't hear the last part.
THE WITNESS: The subject HELOC loan, they basically capped the interest at 4 percent for the life of the loan. And I think they may have extended the term, because I think the term was supposed to be done in, like, 2019. And I think the new term is, like, 2029.
BY MR. ANDERSON:
Q. So your current monthly payment on that, you said, was $80?
A. Yeah. t's like 70 and change or something like that.
Q. Did you sign a release with Bank of America?
A. I did not.
Q. In some of your discovery responses, you mentioned

stress in your marriage. Did you or your wife ever go to see a marriage counselor?
A. We did not.
Q. Did you go see a pastor or a priest?
A. We did not.
Q. Did you ever go see a psychologist?
A. I did not.
Q. Did you and your wife ever separate as a couple?
A. We did not.
(Exhibit 22 marked)
BY MR. ANDERSON:
Q. Mr. Edquid, what I'm going to show you --
I'm sorry.
A. Should I keep this open or --
Q. No, you can -- We're done with that one.
A. Okay.
Q. Showing you Exhibit 22, his is a credit report -- oh, sorry -- a credit report dated March 11th, 2011.
A. Okay.
Q. This is a document you produced to us.
A. It is.
Q. Does this look like one of he credit reports that you pulled, on yourself?
A. It is.
Q. Okay. Direct your attention to Bates Number 202.



A. These credit reports were actually pulled by MTH.
Q. Okay.
A. They're not pulled by me but --
Q. And they provided it to you?
A. They provided it to me, yes.
Q. Now, looking at page 202 there, we see some scores from Equifax, Experian, and TransUnion. Do you see that in the middle of the page?
A. I do.
Q. And the score, the Equifax score is 683, the Experian score is 660, and the TransUnion score was 594.
A. Roger.
Q. Did I read that right?
A. It looks -- It appears correct.
Q. Okay.
A. And they average about four -- 640 or so.
Q. And the date there, of hese credit scores, was March 11th, 2011?
A. That's correct.
Q. I'm sorry. Can I direct your attention to page 204 of that document?
Okay. There we see Equifax, Experian, TransUnion, key factors that adversely affected your credit score. And it lists a few different factors: "Serious delinquency" on each of them. Proportion of balance too high. Proportion of

balances to credit limits is too high.
Nowhere in there does it specifically mention the word "foreclosure"?
A. It says, "Serious delinquency."
(Exhibit 23 marked)
BY MR. ANDERSON:
Q. Set that one aside.
I'll show you what I'm marking as Exhibit 23. This is a credit report dated June 14th of 2011.
A. That's correct.
Q. And was this also one that MTH pulled?
A. Yes.
Q. So about three months later, roughly.
Direct your attention to page 234. And we see credit scores there: Equifax, 658; Experian, 678; TransUnion, 658?
Did I read that right?
A. That is correct. That increased from about twenty -- twenty-some points.
Q. In that three-month time frame?
A. In a hree-month ime frame. Correct.
Q. Turn a few pages there, page 236. Again, key factors that adversely affected your credit score, for each of Equifax, Experian, and TransUnion. Nowhere in there does it mention the word "foreclosure," is that true?

A. It does say, "Serious delinquency."
(Exhibit 24 marked)
BY MR. ANDERSON:
Q. Showing you Exhibit 24 here, now, this is an Equifax credit report. Is this one that you pulled on your own? It's dated November 19th, 2011.
A. Yes. This is -- This is one that I pulled on my own. It was actually, for military members, hey had some sort of -- They get free reports, I guess. I -- I got an e-mail on it. I clicked on it. I was able to get this. So it's not -- not one I paid for. I believe it was a free one.
Q. Now, under the first page there, under "Accounts," it has, "Mortgage," and then it has a total number of four, wi h a balance of 408,000.
What are those four mortgages?
A. Those four mortgages are for Bandtail Court, the property in -- in question, and my family home back in Winooski, Vermont.
Q. Those two properties?
A. Yes.
Q. So each of those two properties had two mortgages on them?
A. Yes.
Q. A first and a second?
A. A first and a second.

Q. Your Vermont home, what do you do with that?
A. I'm currently renting it out.
Q. Do you know who the lender is on that property?
A. Chase.
Q. Has that account ever been delinquent?
A. It has not. But they did violate SCRA, and they did make payments to me, also.
MR. ODOM: I'm sorry? I didn't hear the last.
THE WITNESS: Oh, they did violate SCRA, and they did make a payment to me.
BY MR. ANDERSON:
Q. Chase did?
A. Chase did.
Q. In rela ion to your Vermont property?
A. Yes. I had -- September 2008, I had made contact with them, to ask them about the same thing.
Q. Okay. When you're saying, "them," now, referring to Chase?
A. I had made contact with Chase --
Q. Okay.
A. -- referring to -- to the extension of SCRA benefits. And this had to do with the 6 percent. That 6 percent was extended to 12 months, I think. I think it was 12 months at the time.
And I made contact with them. And hey said, "Hey,



fax it to this number."
So I did. They never got back to me, but I got busy, obviously, dealing with GMAC.
Subsequent to that, Chase, on an internal review based upon the case that -- with hat Navy captain, I believe, they did an internal review.
And they came back and said, "Hey, we overcharged you on interest. We violated SCRA, and we would like to pay you back."
I said, "Okay."
And then hey sent me, I think, like, twenty -- $2400 --
Q. All right.
A. -- give or take.
Because they had overcharged -- they did not -- The interest rate on that loan with Chase was 6.5 percent. It was a cap at 6, and hen they went back to 6.5 earlier than they should have. So that delta is what they paid me back for, times 6, 8 -- whatever their multiplier was -- plus interest.
Q. Okay.
A. So it ended up being, like, twenty-four or $2500.
Q. And was that twenty-four or $2500, that was the overcharge over 6 percent over a period of time?
A. Yeah, that --
Q. Is that fair to say?

A. That half a point, all added up with interest, imes heir multiplier.
Q. Okay.
A. Whatever the multiplier is.
Q. So the Vermont property, does it currently have a tenant?
A. It does.
Q. How much income -- When did you first start to rent out that property?
A. I -- I had somebody watching it, a buddy of mine from high school. And he was just paying -- just paying the bills, un il this past February. I started renting it out April 1st, this year.
Q. Of 2012?
A. 2012.
Q. When did you take the loan out with Chase for the Vermont home?
A. It was not with Chase originally. Chase bought some bank. I don't remember who it was.
Q. Okay. When did you originate that loan, is what I'm getting at.
A. It would have been in 2000 or 2001. I'd have to look at it.
Q. Okay.
A. It's been, I think, ten or eleven years. So it's

got to be, like, 2001.
Q. Did you ever live in that property?
A. I did. That was the family home. That's where we came from.
And, actually, it would have been, I think, '99, 1999 or so. It's in that time frame. I'd have to look. It's -- it's been awhile.
Q. So you left that property in 2003 when you moved to Arizona?
A. There was a transit point in the middle, obviously. I left that property. My dad was living in it at the time. He has since moved down to Florida. He did that in maybe 2006 or 2007.
So, you know, all this time, I'm living under his house; he's paying the bills. Now it's time for me to pay him back. So I buy the house. Now I'm paying the bills. He's living there for four or five years. I thought he was going to stay even longer, but he ended up going down to Florida in, I think -- full-time basis, I think, 2006 or 2007.
Q. So, between 2006 and '7, did anyone reside in the property, from 2006 to 2007 up until just recently, April of 2012?
A. Yes, there was -- Yes, there was somebody who did. There was somebody that we do tae kwon do with who was up at school, up there in Vermont. And she was residing in that,

basically paying u ilities and what have you.
Q. Okay. When did this individual live here?
A. Oh, it's 2012 now. 2011, 2010, 2009 -- It would have been, I think, around 2008. 2008 or so is -- is when she -- she lived there.
Q. For how long?
A. Maybe about a year and a half or so.
Q. Okay. Was this individual paying you rent?
A. No. They were just paying utilities, paying their expenses.
Q. And you con inued to make your mortgage payments to Chase?
A. I did.
Q. Why did you let his person live essentially for free?
A. She couldn't afford anything else.
Q. Was this a friend or a relative?
A. It was a friend of my wife, that we did tae kwon do with.
Q. So, after she left he property, it went -- it was vacant and unoccupied, up until April 2012?
A. No. Then one of my friends moved in to that.
Q. When did he move in to the property?
A. A couple of mon hs after she moved out.
Q. So sometime in 2008?



A. Let me see. '12, '11, '10 -- she started in -- She started in '8.
Nine in -- in -- She started in '8, so, yeah. It would have been -- he -- He would have moved in there for, I believe, around the end of 2010 or so.
Q. Okay.
A. Yeah.
Q. So there was a period of time probably where it was vacant, between the first tenant and then the second tenant?
A. It was a short time. It may have been a month or so.
Q. Okay.
A. It was one month moving out, the other month moving in.
This friend of mine, he -- he had a -- he had some medical problems, had a little bit of brain damage of some sort that he is recovering from. And I let him -- let him live there to -- you know, paying he bills.
Q. When you say, "paying the bills," he paid utili ies?
A. He paid he utili ies.
Q. Okay. Did he --
A. Yes.
Q. Did you -- Did you charge him any rent?
A. No.
Q. So there's two tenants here that you let live

essen ially for free, with the exception of the utilities?
A. If they don't live there, then I have to pay the utilities and he heat. Vermont, with nobody in there, I'm paying $200 in heat every, you know, November, December, January. So hey're paying hat stuff.
They're paying electricity. Electricity is probably about a hundred dollars a month or so, anyway. Water bill, even though you don't use it, it's probably about 40, 50 bucks. Things like that.
Q. And you've got a renter that just started in April of 2012?
A. Yes.
Q. All right. And what is that -- Is hat individual paying you regular monthly rent?
A. They are. They are -- they are actually -- They're all lost causes. No, this person is a Section -- a Section 8 person.
Q. What does that mean?
A. That means that they are on public assistance with the State of Vermont. Basically, his lady has a serious back problem where she cannot lift more han 10 pounds. She is not employed, supported by the State. But she has two kids that are in the high school that is right next to where I live.
So, in an effort to stay in town -- it's one square mile; it's a small place; you've got fifty people in the

class -- she -- she's basically -- basically running the place, with State assistance. The State pays about two- hirds of it. She pays about a hird of it from her direct payments from the State of Vermont.
Q. Did you sign up for some sort of State program, to do this?
A. Yes, I did. I -- I had to, eventually, meaning -- meaning this: Is that the house was going empty. Buddy of mine was going. It's my hometown. I know everybody. So people already know hat: Hey, Chris is no longer going to be in your place. Is that available for rent?
And, through the grapevine, without even putting it on the market, I got four or five calls or e-mails, Facebook requests, what have you: Hey, can we rent your place?
I took a look at it. This person probably had the best -- the best situation. I didn't -- I mean, it wasn't even on Craigslist. I had not advertised. This was just word of mouth.
Took a look at the situation. This lady is very valid. She works with he FRG, the Family Readiness Group, in the Vermont Guard.
Q. Okay.
A. She had some good references. And, though she gets aid from he State and doesn't work, she does contribute back by being he president of the Family Readiness Group wi h

the -- with the Vermont Air National Guard. She isn't even married to somebody who is. She's a single mom. And it looked like it was a good deal. So I had to work it through.
Now, I can probably rent that place for $2800 a month. But I'm letting her have it, and the State can only approve about $1500 a month.
Q. So is that -- So you're getting paid, I guess, $1500 a month in rent?
A. It started this month.
Q. What is your regular monthly mortgage payment to Chase?
A. $750 a month.
Q. So you net --
A. Plus -- Plus the second, which is about $240 a month.
Q. So, roughly, a thousand dollars in mortgage payments?
A. Roughly a thousand dollars in mortgage payments. Vermont tax is pretty high. It's about $400 a month.
Q. Are you netting any profit on this property, is what I'm getting at.
A. I'm breaking even. If you -- If you throw in insurance, I may make $10 a day -- or $10 a month, I think.
Q. Okay. And you -- you made the choice to do that, to allow this individual to live there for the $1500 a month.



A. That's all the State would approve for her.
Q. Sure.
A. Okay.
Q. But you just mentioned a minute ago hat you could possibly rent it out for $2800 a month.
A. It would take some work, but, yes. I would have to go back. I would have to clean out some stuff, be away from the family for a couple of weeks, paint some stuff, make some repairs, put it on he market, and hen manage it. This person, when I spoke with her, is very user-friendly and is -- is willing to -- to work with a house hat doesn't have everything fixed.
(Exhibit 25 marked)
BY MR. ANDERSON:
Q. Okay. Showing you what I'm marking as Exhibit 25, this appears to be a credit report from myFICO dated January 13th, 2012. This is a document you produced to us. Is this a credit report that you pulled?
A. Yes.
Q. And the score there, very visibly, is 717.
A. That's correct.
Q. That's a pretty good score, isn't it?
A. It's better than what it was. It's not what it was originally. My scores were originally above 750. 750, 760.
Q. So are you happy with the 717 score?

A. Not completely.
Q. Major Edquid, is your security -- What is your security clearance right now?
A. Top secret.
Q. Was your TS ever suspended?
A. No.
Q. Did anyone ever talk to you about your security clearance being potentially suspended?
A. Who would that be?
Q. I'm asking you. Anyone.
A. No. You know, I've had discussions with friends in the Guard here. They're under water. Some of them have been assigned to Phoenix, and what have you. They have purchased homes for 400,000 back in 2006, before deployment, and now those homes are worth 200,000.
We've had discussions about: Hey, if I short-sell this, is this going to affect my clearance?
We've had those type of discussions.
As far as suspending my clearance, my clearance was re-upped just prior to deployment. Clearances are ten years. Top secrets are basically good for five years. And then they get downgraded to secret for the remaining five years.
That has not come up yet. But I am about to start the process of submitting my paperwork again for my clearance. I probably should have done it last month, but I've been busy

moving from one house to the next, trying to get both houses rented.
Q. Let me ask you, on that: The property at 5465 Bandtail, do you have a tenant in there right now?
A. Not yet. They are under contract. They get in there May 1st. They will be there May 1st.
Q. Did you advise GMAC that you were going to be ren ing the property out?
A. No, I did not.
Q. So it's no longer your primary residence?
A. That changed in January, yes.
Q. Okay. When you say you have it under contract, what is -- what are he monthly payments scheduled to be, in to you?
A. Monthly payments scheduled are -- or to me is going to be about close to a thousand dollars or so.
Q. All right. And your monthly payment to GMAC on the Bandtail property is 219?
A. It's currently 219. Obviously, it can -- it can vary. Once interest rates go up, it's very -- it can very quickly be $900 or more.
Q. And the second from Bank of America is approximately $80?
A. Roger. It's probably about $300 there. There's probably taxes of $180 or so on a monthly basis. So that'll give you about -- about 500, 500 and change. Insurance on

there is probably about -- Insurance and -- and maintenance service on that is probably going to be another $150 or so. So you're looking at costs of about 700 to 750, with cash flow of about a thousand dollars. So maybe 250 bucks.
If interest rates go up, obviously, that variable would adjust, and it will no longer be 1.375. It could be twice that, which means that, if it doubles, at that point, you're breaking even, give or take.
Q. Did you ever think about selling the property at 5465 Bandtail?
A. I have -- I have considered it. But I cannot sell it right now without taking a twenty, $30,000 loss.
Q. Just based on market values in he area?
A. Based upon the highest of he market values. If it's the lowest, it's going to be a $50,000 loss. The ranges are pretty -- They're pretty tight.
Q. Do you know what your unpaid principal balance on the subject loan is with GMAC?
A. About 192,000.
Q. Major Edquid, did you at any point see a doctor or a psychologist?
A. Did you ask me that before?
Q. I asked you about a marriage counselor or a pastor and a priest. But I guess I'm just talking in general.
A. No.



Q. Did you ever see a doctor or a psychologist or a --
A. Do you have a recommendation?
MR. ODOM: I'm sorry. Do you mean as a result of all of this?
MR. ANDERSON: Yes.
MR. ODOM: Okay. Because he gets annual physicals. He gets --
MR. ANDERSON: I understand.
MR. ODOM: -- flight physicals. You understand that.
MR. ANDERSON: I understand.
MR. ODOM: Okay.
THE WITNESS: Other than flight physicals and sick call, things like that, no, I -- I do not.
MR. ANDERSON: If you'll give me a minute to review these documents, I'm about done. We can take a short break.
(Discussion off he record)
BY MR. ANDERSON:
Q. Major Edquid, now, you previously mentioned that you initially sought a loan from MTH beginning in August of 2010; is that correct?
A. That's correct.
Q. And then that ultimately led to he loan with Sunstreet, who is somehow affiliated with MTH?
A. They are not.

Q. They're not?
A. They're -- what kind of -- t starts with a "C." Something -- Compensary (phonetic), some sort of -- they're basically a -- a -- I call them a loan shark. They're basically a mortgage broker that -- that does independent loans, not just with MTH, but --
Q. Okay. Did MTH refer you to the Sunstreet organization?
A. They did not refer me. My real estate agent has worked with Sunstreet, has found that they have been successful in -- in getting loans. And, at the end of that process, when MTH is saying, "We can't approve the loan," he then requests, based upon the progress we've made: The underwriter is digging her heels in. She cannot approve the loan. Will you authorize using a different lender?
And the builder at that point is: Yeah, we've seen some progress. You've been working on it. We will -- If you can get approved with this lender, we will allow just this lender.
Part of that deal is that they offer military -- I think it's like -- like $500 for military, something like that. And they also offer a percentage back, you know, because you used a preferred lender, things like that. So they -- They then authorize, if you do it with the Sunstreet, we'll -- we'll honor the other parts of -- of the commitment.

I think they give, like, 1 percent back for upgrades, different things like that.
Q. What is your interest rate on that loan?
A. 4 percent.
Q. Is that fixed?
A. 4 percent fixed.
Q. 4 percent is a pretty good interest rate?
A. It can be better.
Q. Is that a 30-year loan?
A. It's a 30-year VA loan. We'll get some out there that are a little bit lower. But it depends upon the points, depends upon the day of the year.
MR. ODOM: Depends on the what?
THE WITNESS: On the points. And depends upon the day.
You know, that thing varies every day. So sometimes you have zero points, 3.75 available, and what have you. Sometimes it's more. It just happened, during that time frame, 4 was what you got during the lock period, which was two weeks or something like that.
BY MR. ANDERSON:
Q. Okay. Now to sum up -- Well, strike that.
I asked you several minutes ago for how you have been damaged, what damages you're claiming. And I just want to make sure I've got them, because I think we've discussed them

all.
You discussed, you mentioned damage to your reputation, credit damages, the impact it has on -- had on you getting a loan, USAA canceling an insurance policy, the Bank of America effects.
A. I missed the AMEX card. There were two cards that I had with American Express that I had for over ten years. I had never been late on those. I have always paid the balance in full. Those were the two that they -- they locked down and then canceled.
I have since reobtained one with American Express. It started out as a thousand dollars and then increased to $3,000.
But, again, they had canceled the other two, you know. And, you know, we -- we can argue about why they did it. I'm not American Express. I'm not looking at the report that they're looking at. If I call American Express -- and I have -- and ask them, "Hey, why have you -- Why did you do this?" they said, "Well, you received the letter."
I'm like: Well, which -- What is the reason? What report?
Q. Is the letter you're referring to the one that we looked at earlier, dated March 10th, 2009? Is that the letter you're referring to?
A. There's a subsequent one that canceled the card.

Q. Okay.

A. And I believe you have a copy of that, also, in your records. But --

MR. ANDERSON: Colonel, do you know if that was produced? I don't know, off the top of my head.

MR. ODOM: I don't know, either.

MR. ANDERSON: Okay.

THE WITNESS: I'm pretty sure it was.

MR. ANDERSON: Okay.

THE WITNESS: But, again, American Express, when I talked to hem and asked them, they said, "It is not our policy to tell you what specifically it is. It could be any one of these hings. This is your menu of -- Those bullet statements are basically a menu. These are the five things hat we could have -- that we're looking at to cancel your card or whatever."

I say, "Well, which one is it? Which report is it? Is it Bank of America? Is it GMAC?"

They say, "We do not do that. We -- We can give you a free copy of your credit report, and here you go."

They're very noncommittal on that.

BY MR. ANDERSON:

Q. When you say, "they," you're talking about American Express?

A. When I talked to American Express. When I talk to -- If you talk to any creditor, if they do something, if

they turn you down for credit, what have you, they'll say, "It's based upon something found in this report. Here is a copy of the report. You figure it out."

Q. Okay.

A. Okay? I can figure it out. No. That isn't the case because I am not an expert there. I don't know what their considerations are.

Q. Okay, all right. You mentioned -- You just described the American Express card. And you also mentioned the effect it's had on your family and the lost time that this has had.

Are there any other broad topics of damages that you're claiming in this case that we haven't discussed?

A. All noninterest fees and charges that they have placed on my account, whether it's attorney foreclosure fees, whether it's foreclosure filing fees, whether it's -- it's winterization, stop-by fee. All those fees I see as damages that they should not have charged against my account, every one of those.

And, again, I -- They can give me this thick ledger that nothing lines up and it doesn't explain to me. I'd have to be a GMAC accountant to figure it out. But I look at the individual ones, I look at the submissions, and it appears to maybe add up to about $5,000, whatever, of fees that are up and above interest charges. I don't know what the total is.

That's something that you'd have to look at. But I think it's around $5,000.

Q. Anything else?

THE WITNESS: Can I speak to counsel?

Did I miss anything?

MR. ODOM: What did you say?

THE WITNESS: Did I -- Did I miss anything on -- on that? I think I --

BY MR. ANDERSON:

Q. I'm asking you just --

A. Yeah.

Q. It's your testimony.

A. It is my tes imony. I -- I'm just -- you know, I -- I need to think about that. I mean, we've -- We've addressed all of the personal parts of that, right? The emotional distress and things like that, right? That's -- I have addressed every -- every aspect of that, I believe.

I have addressed all of the creditors. I have addressed the credit reporting. I did that a number of times.

You saw and I think you read, on those e-mails, where I spoke to -- again, spoke to GMAC people in August of 2011 -- no, 2010, August of 2010. I spoke to them and asked them to fix not only he foreclosure remarks but the delinquencies. And I've got their names. I've got heir operator number, and what have you. And they talk nice, but it

never shows up.

They say, "Oh, we're going to send you something."

I get something that does half the job. Okay? You know, that -- that's frustrating. It's frustra ing if it happens once. I've been working on this for almost five years, it seems. Actually, it's four-some years. That -- That takes a toll, you know? I can do a lot of hings, and I can stick with hings and -- and keep on going. But, you know, there's personal frustration there, as far as trying to set things right, as far as -- you know, as far as doing what you need to do.

I'm paying my bills. I'm trying to pay my bills. I don't need to have somebody come back and -- and violate the rules and say, "Oh, we're going to foreclose on you."

I don't need somebody to come back and say, "Oh, well, we're going to set aside this foreclosure, but we're going to put you in the same -- same -- same bucket as the rest of those dirtbags that can't pay their bills, hat are now behind," when I didn't cause that. Okay?

Now, we can dispute exac ly who caused what. But the bottom line is that I am not one of those people. I have paid my bills, and I continue to pay my bills. The only blemish on that at this point is GMAC.

And GMAC -- GMAC's ac ions have promulgated a lot of other things. You drop -- You drop a, you know, a pebble, you

sd setdepo
The Evolution of Deposition Management

know, in a pond. And those rings expand. And, all of a sudden, you've got USAA being called up, either -- you know, being called up to cancel your insurance and then, also, at the same time, GMAC taking out an insurance policy on that. So I'm paying, and now they're paying, but they don't tell me until after the fact, and they try and charge me. And I think that that's in the numbers.

You end up with American Express. You end up with Bank of America. You end up with trying to fix the mortgage that you saw -- and you saw part of that e-mail -- trying to fix the mortgage with MTH and work with them every single week for ten months. And this is just one, okay? To fix GMAC's reporting, to fix Bank of America's reporting, to do all those things and set it right.

I mean, I could have just left the write-off and said, "Hey, I don't want another $20,000 in -- in -- in -- in payments that I owe. Thank you very much, Bank of America."

But I had them reinstate it because that's what I needed to do, is to get the loan, but that's also the right thing to do.

Q. And that all stems from your allegation that GMAC improperly foreclosed on February 20th, 2009?

A. Not only stems from that, but because they improperly foreclosed and, also, because they improperly reported and because they reached out and they specifically

contacted Bank of America and said, "Hey, we foreclosed, because" --

Q. Based on the foreclosure on February 20th, 2009?

A. Yes. Yes.

Q. Okay.

A. And I believe that they called Bank of America after -- after March 10th or 11th. I believe they called them after March 10th or 11th of 2009 and said, "Hey, we foreclosed."

But they didn't say, "Oh, by the way, we vacated that foreclosure."

Q. Okay.

A. You know, I think there are a lot of things that are caused by this, whether it's the credit cards, whether it's the credit score, whether it's the foreclosure remarks. You know, there -- there are personal costs here, you know: stress on the family, stress on a soldier, things like that.

And I think that, you know, SCRA has its place and it's there for a good reason, and there are things that we can do better. If you go back to 2007, things have improved very much since then in terms of the way we deal with soldiers in the last four years. Actually, in the last 18 months, it's improved significantly. You know, you've got people dedicated. You have people who work on files, people who call you back and do all those things.

Back in 2007, 2008, that was not the case. You would call, and I would know ten times as much about SCRA as anybody that I talked to on the other side, and I'm not a lawyer. And I'm educating them and asking them, "Hey, listen, I need you to follow the law."

And they'd pass me off to somebody else because --

Q. Let me stop you right now, okay?

Your understanding of what the law is?

A. My understanding.

Q. Okay.

A. Roger that.

Q. Okay.

A. I -- I'm -- I'm a --

Q. Let me just stop you right there.

When you say, "Things have improved," are you talking about contact you've made with GMAC? You believe that there is a better understanding or recognition of people that you talk to?

A. I -- I would say that there's a better understanding with Chase, that there's a better understanding with Bank of America. I cannot say conclusively there's a better understanding with GMAC at this time.

Q. And when you say you can't say that conclusively, because you just haven't had contact with them about this subject --

A. I haven't --

Q. -- since you filed the lawsuit?

A. Other than -- Other than yourself and other than the couple of times when they, you know, they -- they instituted an escrow and I had to contact them and say, "Hey, listen, where did this escrow come from?" other than that, no.

Q. Okay.

A. And then --

Q. When you say, "Other than that, no," what is the -- the -- No, what? That you don't -- you don't have any other contact besides what you just listed?

A. After I made contact with counsel, with Colonel Odom, then at that point I'm not talking to GMAC on any of these topics.

Now, if they add an escrow, as a standard citizen, I can ask, "Hey, where does that escrow come from?" And I send them an e-mail, or what have you. Or I -- I call them up and say, "Hey, how come there's an escrow added to my account?"

That -- Those are the only instances. But, other than that, no. It doesn't -- I don't think that you're really supposed to once you have something like this filed --

Q. Okay.

A. -- and you're working with attorneys. I didn't know I was missing something there.

Q. Well, you just made a comment that I was just

following up on –
A. Okay.
Q. – in terms of –
A. Roger. Other than just standard stuff. Again, the escrow was one issue subsequent to that. But that seems to have resolved itself.
MR. ANDERSON: I don't have any more questions. Pass the witness.
MR. ODOM: I have just a few if you don't mind.
EXAMINATION
BY MR. ODOM:
Q. Major Edquid, Mr. Anderson talked to you about the concept of material effect. I believe I understood you to say that, although your income went up by the amount of the separation pay, your expenses went up in an amount greater than any increased pay, correct?
A. That is correct.
Q. Did you feel that you and your family were materially affected by virtue of your call to service?
A. Yes.
Q. At any time did GMAC ever challenge whether or not you were materially affected?
A. No.
Q. Did GMAC ever go to court in an action against you, seeking relief from your claim that you were materially

affected?
A. No.
Q. When you received the filing that GMAC filed at the courthouse here on November the 18th of 2008, giving notice that, 90 days thereafter, they intended to enter a nonjudicial foreclosure against your house, was it your understanding that the nonjudicial foreclosure proceeding had then commenced, as of November?
A. Yes.
MR. ANDERSON: Object to the form.
BY MR. ODOM:
Q. Was it your understanding that the notice had to be filed to comply with Arizona law?
MR. ANDERSON: Object to the form. Calls for a legal conclusion.
THE WITNESS: Had to be filed to comply with Arizona law?
It's my understanding, from – from research, is that – that they have to file it and notice before – before they – before they can start a foreclosure.
BY MR. ODOM:
Q. Okay.
A. I understand that.
Q. You discussed with Mr. Anderson some charges that you believed GMAC had placed on your account. And I think you

listed attorney foreclosure fees, foreclosure filing fees, the stop-by fees or the inspection fees, and so forth. And it was your belief that those fees totaled somewhere between four and $5,000; is that correct?
A. That is correct. I would add insurance, insurance charge to insure to -- to insure 5465 Bandtail Court a second time, although USAA was still insuring the home.
Q. Is it your testimony that GMAC required you to pay those amounts to reinstate the loan?
A. Yes.
Q. And you did pay those amounts?
A. I – I paid what they asked.
Q. In the August 2009 to August 2010 time frame, you have testified about difficulties getting a car loan. I want to just be very clear. Did you ever apply for a car loan and were refused?
A. 2009, 2010. Let me see. No, not during that time frame.
Q. At any time after the nonjudicial foreclosure by GMAC, did you apply for any loan, other than the mortgage that you now have on the new house, for which you were turned down?
A. A loan? No. I have not. I have not applied. Didn't have the need to. I mean, the loan that we needed was the loan for the new home that we needed, and that requirement didn't show up until two thousand -- 2010.

Q. So you made no other applications for loans during that time frame, correct?
A. I – I did not. We did not have to – We did not run into that requirement.
Q. Okay. Now, after GMAC finally reported, to the credit reporting agencies, information that led to the removal of the foreclosure from your credit report -- Are you with me on that?
A. Yes.
Q. After that report was made by GMAC –
A. Roger.
Q. – was it your testimony that late payments began to show up on your credit report for late mortgage payments that had not previously been there?
MR. ANDERSON: Object to the form.
THE WITNESS: Can you say the "after" part, the first part?
BY MR. ODOM:
Q. Yeah. You worked and worked and worked, and GMAC finally wrote the letter to the three credit reporting agencies, correct?
A. Roger.
Q. Thereafter, did you testify that certain late payments, that had not previously been reported, began showing up on your credit report?



MR. ANDERSON: Object to the form.
THE WITNESS: I -- what I -- What I testified was -- It's a combination of two hings. It's not -- It's not that exactly.
GMAC started reporting late payments after hey foreclosed, not previously. And the late payments that they're looking at, on he credit report, I believe, is an eight-month period from October 2008 or so, October or November, for eight months forward; hat's what they started reporting.
I don't know exactly when they started reporting that. I do know that, in March of 2009, by the credit report, there is one, 120-day, I believe, for October. And I don't know why, how it starts there, starts at suddenly 120. Shouldn't -- if it's -- If October is 120, shouldn't September be 90 and then -- and -- and August be 60?
Or is GMAC looking at it and saying, "Well, those other months, he's protected, so we're not going to report it"?
I don't know that, but it seems to me strange that, all of a sudden, you get this report of 120, 150 days. But, subsequent to that, when we start pulling our credit reports starting in August, you'll look at it. I go from March 2009, of having a single hat was supposed to be expunged, to suddenly now there's eight of them that came out of nowhere. They were not there beforehand. Now they are there.
BY MR. ODOM:

Q. And is it your belief that GMAC was reporting that in retaliation against you for having enforced your SCRA rights?
MR. ANDERSON: Object to the form.
THE WITNESS: I -- I believe that that is -- I believe that that is within the menu of things that they do as a big company. When you foreclose on somebody, you also do other things that eventually get them. And one of the big things is putting something on a credit report, whether it's a late payment or a foreclosure. You put those remarks there, and, eventually, it -- it'll get to you.
So I -- I think that -- I don't think it was a hundred percent direct retaliation, but I -- I think that that's something that they do, and I think that's something that they failed to clean up.
BY MR. ODOM:
Q. Well, did you think they did that as a result of your having enforced your rights, under the SCRA, to make them undo the foreclosure?
MR. ANDERSON: Object to the form.
THE WITNESS: I think it's possible. I think -- I -- I -- I believe that they -- You know, again, I'm not in there. It's a huge corporation. I don't know, 100,000, 200,000, 300,000 people. I -- I don't know what's inside of their heads. I believe that they -- they could have done that.

You know, from what I have seen, you know, they foreclosed on my house. I'm still living in the house, or at least I was until January. I have not heard of them voluntarily backing out of -- of a foreclosure or anything else, unless you have a bunch of lawyers involved. I have not heard of that. So someone within GMAC must have seen that: Oh, this is the wrong thing.
MR. ANDERSON: Object to the form. Object to the response.
THE WITNESS: If -- If I look at the GMAC documents, I think it's Bates or marked around 00053 or 54 up to 62; they have questions to themselves on their own internals, where they're asking: Hey, you know, why -- why didn't we check on this?
So I -- You know, after the fact, I look at it, and they definitely had some conversations. I don't -- You know, I can't say, a hundred percent, what they're doing.
BY MR. ODOM:
Q. Did you believe that the reports they made on you indicated that, according to them, at a time when you were protected by the SCRA, you were unable to pay the civil obligation or liability in accordance with its terms?
A. Yeah. Yes.
Q. Did you feel that, after you invoked your rights under the SCRA, that they made an adverse report, relating to

your creditworthiness, to one of the credit -- one or more of the credit reporting agencies?
A. Yes, I did. Yes, they did. Or, yes, GMAC did.
Q. And you believe they made hose reports willfully?
A. I believe, yes, that they willfully made those reports. Those are not in error or mistaken. They made hose reports. And -- and -- and that's it. They made those reports.
MR. ODOM: Thank you. That's all I've got.

FURTHER EXAMINATION

BY MR. ANDERSON:
Q. Major Edquid, going back to the statements you just made, you believe that GMAC reported to credit reporting actions in retaliation for you invoking your SCRA rights, because of you invoking your SCRA rights?
A. I believe hat -- that GMAC does a number of standard things. I did invoke my SCRA rights. I did. You know, we did at some point get them to -- to rescind the -- the foreclosure. I believe that one part of -- of -- of GMAC, the left hand, knew exac ly what was going on, and they were fixing a portion of hat. I think that hey had -- hat they had too much momentum on the other side, and they made a number of those o her -- other actions. Reports is one of them.
Q. Okay. And I understand your testimony that you're alleging that many errors were made. But my question is: Did

sd setdepo
The Evolution of Deposition Management

GMAC do that because you invoked your SCRA rights?
A. I can't say specifically because I invoked my SCRA rights. I cannot say that specifically.
Q. When you were deployed in the '06 to '08 time frame, did you have Internet access?
A. Yes, I -- It was intermittent. I -- We had gotten a bunch of guys together, and we had purchased a -- a satellite dish.
Q. All right.
A. Which was hit or miss. There were weeks at a time, we did not have access. There was -- Sometimes you would get access. It was -- It was down two-thirds of the time maybe, if the winds pushed it out, out of -- out of -- out of direction, if there was clouds, if it was raining. But, yeah, we had Internet access in that manner.
Q. Did you ever access your mortgage account on gmacmortgage.com or anything like that?
A. I did.
Q. Okay. And so you were able to see the status of your loan, the payment status?
A. I accessed it in -- in November.
Q. Of 2007?
A. 2007. Roger that. There was no need to access it before because it was getting paid.
Q. Were you able to make payments online on that

website?
A. No. It said: Call a certain number because there was something with the account. Please call that; you can't take any action.
Q. Okay.
A. Every path I went down, I was shut down.
MR. ANDERSON: Okay. I've got nothing fur her.
MR. ODOM: I'm sorry, are we done?
MR. ANDERSON: Yeah. No, I --
MR. ODOM: Oh, I'm sorry. I was waiting on you for a question. Are you done?
MR. ANDERSON: I said, I pass the witness.
MR. ODOM: Oh, I'm sorry. I didn't hear that, I'm sorry.
We'll read and sign. Thank you. I have no further questions.
(The deposition concluded at 5:33 p.m.)

______________________________
FREDERIC L. EDQUID

STATE OF ARIZONA )
COUNTY OF MARICOPA )

I, Karen Saari, a Certified Court Reporter in and for the State of Arizona, do hereby certify:

That the foregoing witness was by me duly sworn to testify to the whole truth; that the deposition was then taken before me at the time and place herein set forth; that I was then and there a Certified Court Reporter of the State of Arizona, and by virtue thereof authorized to administer an oath; that pursuant to request, notification was provided that the deposition is available for review and signature; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a full, true, and accurate record of the testimony and proceedings taken at that time.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto nor am I in any way interested in the outcome hereof.

N WITNESS WHEREOF, I have subscribed my name this 8th day of May, 2012.

______________________________
Karen Saari
Certified Court Reporter #50842

DEPOSITION ERRATA SHEET

Assignment No. 452071
Case Caption: Frederic L. Edquid and Lesley H. Edquid vs. GMAC Mortgage Corporation, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of
____________, 20___.

______________________________
FREDERIC L. EDQUID



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:______________

______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:______________

______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:______________

______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:______________

______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:______________

______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:______________

______________________________________________

Reason for change:______________________________

SIGNATURE:______________________DATE:___________

FREDERIC L. EDQUID

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:______________

______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:______________

______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:______________

______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:______________

______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:______________

______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:______________

______________________________________________

Reason for change:______________________________

SIGNATURE:______________________DATE:___________

FREDERIC L. EDQU D

**A**

**ability** 5:22 138:20
**able** 37:10,12 141:1 142:19, 20 159:10 193:19,25
**accept** 151:8,10
**accepted** 71:5,6 114:14 149:19
**accepting** 85:21,22 86:4
**access** 41:1 61:2,3 193:5,11,12, 15,16,23
**accessed** 193:21
**accommodate** 144:4,6
**accordance** 191:22
**account** 59:16,22 60:7 69:22 70:3,4, 11 72:13 73:7,17,18 74:3,4,13 75:4,25 76:6 86:24 87:2 90:5 92:15 98:22 99:2,5, 12 101:8,20, 24,25 110:20, 21 111:2 112:2 113:5, 10,17,19 117:15 120:1, 16 121:4 129:6,12 134:1 136:7, 12 139:3 148:9,11 149:19 153:2, 5,19 160:5 178:15,18 184:18 186:25 193:16 194:3
**accountant** 178:22
**accounting** 100:8
**accounts** 58:2 68:10 101:15,17 105:18 120:15 159:12
**accrued** 74:19 75:4
**accurate** 63:11 81:22, 23 82:12 83:22 84:22 111:10 113:4, 9,10 195:15 196:13
**accurately** 79:12 82:11 88:11
**accused** 44:9
**acknowledge** 55:16 66:7
**acknowledges** 32:16
**acknowledging** 55:22
**acronyms** 12:10,13 24:23
**Act** 32:9 88:9 137:6
**acting** 78:6
**action** 91:23 133:20 134:12 135:23 138:21 185:24 194:4
**actioned** 113:21
**actions** 91:22 93:11 127:17,24 135:25 138:25 139:17,23 140:13,18 152:19 153:21 180:24 192:14,23
**activate** 27:22,23
**activated** 23:3,9 45:6 51:17 56:13, 15 63:20
**activating** 43:25
**activation** 21:10 23:4 32:11,12,14 34:1 43:7,12, 13
**active** 18:9 19:16 21:17 22:10, 19 35:16 51:19 52:13 53:6 62:21 63:9,15 81:19,24 82:7 88:18
**active-duty** 33:13,15,16, 23 34:4
**activity** 121:17
**actual** 11:8 154:13
**add** 68:22 82:18 100:10 140:23 178:24 184:15 187:5
**added** 47:11 100:5 153:18 162:1 184:18
**addition** 64:21 124:18
**additional** 58:13 128:11
**address** 7:7 40:22 96:4
**addressed** 103:22 148:4 179:14,17, 18,19
**adjust** 172:6
**adjustable** 31:2 100:15
**adjustment** 149:24
**Adjutant** 23:16,21,22, 23,25 24:25
**administer** 195:10
**ADSW** 24:17,18,19
**ADT** 24:17 31:21
**advance** 104:2
**adverse** 91:24 191:25
**adversely** 157:23 158:23
**advertised** 167:17
**advise** 171:7
**advocacy** 95:24
**Advocate** 150:23
**Advocates** 95:1
**affect** 5:21 170:17
**affiliated** 173:24
**Affirmative** 9:24
**afford** 164:16
**afforded** 15:3 55:17 136:25
**Afghanistan** 19:22 27:25 29:23 54:9
**afternoon** 5:6
**AFTP's** 17:16
**agencies** 24:24 92:22 110:22,24 114:22 130:5, 8,14,17 133:25 149:25 188:6,21



192:2
**agency**
130:12 131:2 134:10
**agent**
85:6 106:24 151:16 174:9
**ages**
7:5
**ago**
21:14 55:7 101:19 102:19 145:10 169:4 175:23
**AGR**
22:16,18,20 23:1,11,13 24:2 25:2,16, 18 26:6,23 27:5,6 31:17, 21,25 35:19 36:4 46:24 56:9,21 63:17,19
**agree**
26:1 38:21 51:18 54:15 82:18 129:9
**AH-64**
16:6
**AH-64D**
48:24
**ahead**
64:6 71:13 79:16 124:12 134:20
**aid**
167:24
**ain't**
12:10
**Air**
22:9,11 25:6 26:17 36:11 54:25 168:1
**aircraft**
37:3 126:11
**airlines**
14:11,23
**AIT**
10:13
**al**
196:6
**Alabama**
2:17
**Alaska**
19:15
**Alex**
46:3 109:6
**Alex's**
9:8,12
**allegation**
114:4 133:8 137:5 181:21
**allegations**
41:21 79:10, 11,13 110:16 131:25 132:11 133:12
**alleged**
132:14 147:9
**alleges**
135:18
**alleging**
69:19 192:25
**allow**
142:18 168:25 174:18
**allowance**
47:9,10
**allowed**
107:7 136:1
**alone**
49:12 108:8
**along**
38:11 68:21 128:13 150:8
**Alpha**
16:6 44:15
**already**
26:18 99:7 124:5 144:20 147:24 167:10
**also**
13:7,15 14:15,25 21:9 36:18 37:2 48:21 49:13 58:12 59:24 61:7 65:21 74:18,19 77:14 96:4,7 114:22 121:7 123:20 134:14 137:4 139:2, 24 146:15 149:21 153:12,23 155:4,5 158:11 160:7 174:22 177:2 178:9 181:3, 19,24 190:7
**although**
185:14 187:7
**always**
37:12 38:8 126:10 176:8
**amended**
33:25 53:17
**America**
4:12,14 39:20 40:25 92:14, 15,21 101:22, 25 103:12,14 124:18 128:9, 11 131:7,10 139:1,2,3,5, 6,15,16,20 140:2 141:23 142:25 146:2, 4,21 147:9,13 148:4 149:5, 6,15,18 150:3,24,25 151:4,22 152:1,5,6 153:5,13 154:25 155:2, 3,4,23 171:21 176:5 177:17 181:9,17 182:1,6 183:21
**American**
4:5 39:20 101:8,23 103:21 104:7 105:10,21 176:7,11,16, 17 177:10,22, 24 178:9 181:8
**America's**
139:24 181:13
**AMEX**
102:24 176:6
**amount**
32:18 48:10 75:16 76:6 86:11,12,20, 22 97:14 100:11 151:23 152:23 153:10 154:11 185:14,15
**amounts**
74:19 100:4 114:18 187:9, 11
**analysis**
95:24
**and/or**
196:13
**ANDERSON**
2:16 3:4,6 5:5 6:6 9:14 11:6,20 12:19 13:24 22:25 23:24 24:22 25:8,13 26:1, 3 29:1,15,17 30:1,5 31:11 33:1,5,10 34:13,15 37:17,21 38:10 41:20 42:6,7,9,12, 14,18 47:5 52:7,8 54:22 58:21 64:5 69:9,16 70:8 71:11,15,17, 25 72:1,23 73:2 75:18,21 76:23,25 79:21 80:19, 25 83:7 87:5, 8,17 89:9 91:12 94:14 95:20,22 101:6 102:8 103:19 104:21 105:2,24 106:6,10 111:13,16 115:15 116:4, 8,22 117:4,25 118:4,5 120:24 122:7, 8,9 125:22 126:13,15 127:4,6,8, 11,14 128:15, 20,23,25 132:7,9



136:9,18 137:3,8,12 138:12,13 143:24 144:14 147:20,25 148:2 149:13 150:18,20 155:18 156:11 158:6 159:3 160:11 169:14 173:5,8,11, 15,18 175:21 177:4,7,9,21 179:9 185:7, 12 186:10,14, 24 188:15 189:1 190:4, 20 191:8 192:11 194:7, 9,12

**annual**
21:3 47:25 173:6

**another**
42:10 45:2 66:19 71:23 85:2 107:18 119:15 122:14 150:10,12 172:2 181:16

**answer**
5:13,17 20:11 25:25 33:1 41:18 45:25 47:17 62:11 64:6 71:23 75:10 79:16 81:21,25 84:18 85:2 116:2 131:21, 22 133:3 136:17 138:16

**answered**
88:23 134:6

**answers**
11:2

**anybody**
183:3

**anymore**
101:20

**anyway**
39:18 166:7

**anywhere**
119:2,11

**Apache**
15:16 16:1

**Apaches**
8:23 45:18

**apparently**
105:22

**APPEARANCES**
2:8

**appears**
83:9 87:9 91:14 100:5 111:19 112:8 128:17 129:11 148:3 157:14 169:16 178:23

**Application**
3:12 30:10,18 31:5 32:7 37:6 132:24 133:16 134:4

**applications**
188:1

**applied**
13:7 74:8 120:16,17 143:12 144:25 187:22

**apply**
5:8 144:15,22 187:15,20

**appointed**
23:17

**appreciate**
117:22

**approve**
36:14 168:6 169:1 174:12, 14

**approved**
144:23 174:18

**approximately**
8:24 40:3 47:20 88:19 100:6 119:14 171:21

**April**
1:16 2:2 3:14 5:2 22:22 23:1 33:17,18 35:8 37:7,25 51:9,13 77:15 97:10 111:20 112:18 123:2 129:22,23 139:4,5,8 140:9 147:3 149:15,24 150:3 162:13 163:21 164:21 166:10

**ARANT**
2:15

**arbitrary**
71:19

**area**
117:16 123:10 143:18 172:13

**areas**
28:8

**argue**
176:15

**ARIZONA**
1:1,20 2:3,5 4:4 6:9,13, 15,17 10:24 13:22 15:12 16:2,23 17:4, 6,7,9 18:14 19:11 20:1,14 21:9,20 23:16,25 26:13 29:4,9 31:14 35:1 45:7 51:18 61:21 94:18 95:2 163:9 186:13,16 195:1,4,10

**arm**
125:12

**armaments**
16:1

**Armed**
35:16

**Army**
4:4 18:10 22:8,11 31:13 43:7 48:1 53:20 56:18 94:18 95:2 121:1

**around**
15:18 47:11 57:3 76:10 96:19 119:4, 11 122:19 123:7 138:22 164:4 165:5 179:2 191:11

**arrears**
97:15,16 98:22 99:5 120:6

**Artillery**
11:15,19 13:5 15:22

**ascertain**
41:23

**ASI**
36:23

**aside**
14:9 23:10 27:17 158:7 180:16

**ASIQ**
36:18

**asked**
71:23 85:15 90:17 91:1 97:4 134:5,22 139:8 151:5 172:23 175:23 177:11 179:22 187:12

**asking**
5:8 12:16,20 33:3,6,23 64:1,10 73:10 76:21 82:11 93:2 102:5 104:10,21 106:6 116:9 117:17,23 134:5 170:10 179:10 183:4 191:13

**asks**
91:5 137:18

**aspect**
179:17

**assess**
100:9

**assessed**
100:4

**assessment**
88:12

**assessments**
95:24

**assigned**
11:11 13:12

14:1 26:12 58:8,11,13 64:19 170:13

**assignment** 20:25 21:2 26:18 196:4

**assignments** 12:21,23 26:21

**assistance** 166:19 167:2

**Assistant** 26:15

**assume** 5:14

**assuming** 93:18

**assumption** 123:18

**attached** 4:23

**attack** 6:18 150:14

**attacked** 19:19

**attempt** 60:11,13 61:21 84:22, 23 86:10,17 117:14

**attempted** 59:8,14 91:6 113:16,18 114:5 117:18 118:2

**attempts** 83:17,23 85:1,3 131:11

**attention** 31:5 91:18 129:1 156:25 157:20 158:14

**attorney** 79:22 80:4 83:8 96:2,8,9 97:18 115:18 129:13,18 178:15 187:1

**attorneys** 184:23

**AUD** 4:8 115:22 116:1

**August** 60:2 99:17,21 113:22 114:8 115:8,10 119:14,18 120:18 121:22,23 122:5,10,12 123:9 125:20 127:15,20,21 139:22 141:2 142:5,20,24 150:7 173:20 179:21,22 187:13 189:15,21

**authority** 28:25 43:15 53:21

**authorization** 24:12 27:18, 22 35:25 53:20

**authorization s** 26:10

**authorize** 174:14,24

**authorized** 22:14 195:10

**auto** 144:15,22 145:4

**automated** 41:13,19 116:5 117:9

**automatic** 41:13

**automatically** 57:17 68:14

**automobile** 145:4

**available** 59:23 60:2,4 66:17 68:9 84:19 105:14 167:11 175:17 195:12

**Avenue** 2:11,17

**average** 102:16,17 157:16

**Aviation** 13:13

**aware** 78:18 123:16 138:4

**awhile** 12:10 20:22 147:8 163:7

**B**

**b** 88:7

**baby** 110:4 122:14

**Bachelor** 9:19

**back** 17:18,23 19:13 22:12 33:17 49:13 52:20 58:6,20 59:17 62:17 63:17,18,19, 23 64:10,19 66:15 71:7,8, 17 74:8 97:22 98:1,13 99:3 107:14 108:3 126:4 127:15 134:23 141:11 142:10 147:5, 6,7 148:24 152:12 159:17 161:2,7,9, 17,18 163:16 166:20 167:24 169:7 170:14 174:22 175:1 180:13,15 182:20,24 183:1 192:12

**background** 7:16 46:12

**backing** 191:3

**backwards** 112:24

**bad** 18:1 87:18 125:19

**bags** 14:12 15:2

**balance** 85:24,25 86:2 98:16 103:5, 6,9 147:10,11 153:16 154:5, 9 157:25 159:14 172:17 176:8

**balances** 103:2,13 158:1

**ballpark** 94:2,6

**banding** 58:17

**Bandtail** 7:12,13 20:4 30:13 65:5 84:4 159:16 171:4,17 172:10 187:6

**banging** 108:10

**Bank** 4:12,13 39:20 40:25 92:14, 15,21 101:22, 25 103:11,14 120:2 124:18 128:9,11 131:7,9 138:25 139:1, 2,3,5,6,15, 16,20,24 140:2 141:23 142:25 145:8 146:2,4,20 147:9,13 148:4 149:5, 6,14,18 150:3,24,25 151:4,21,25 152:5,6 153:4,13 154:25 155:2, 3,23 162:19 171:21 176:4 177:17 181:9, 13,17 182:1,6 183:20

**bankruptcy** 131:23

**banks** 40:24

**Barrel** 1:19 2:3

**base**
47:8,10 95:2
**baseball**
121:9
**based**
28:7 32:20,21 33:25 39:5 48:11 55:18 73:17 105:12, 15 110:1 120:19 128:5 149:1,6 161:5 172:13,14 174:13 178:2 182:3
**basic**
10:13,20,25 11:4 54:19,21
**basically**
14:12 15:1,2, 25 20:21,22 21:7 36:16,20 39:13,22 41:2 45:7,12 49:2, 10 55:22 61:5,11,13 70:23 71:3 85:7,8 96:21 97:13 115:1 124:21 125:3, 17 134:10 152:15 153:24 155:13 164:1 166:20 167:1 170:21 174:4, 5 177:14
**basis**
8:17 39:9 163:19 171:24
**Bates**
52:3,6 112:1 116:21,23 119:7 129:1 156:25 191:11
**Battalion**
11:15 13:5 36:15,17 44:12 46:8 56:23
**bedrooms**
122:16
**beds**
122:16
**beforehand**
48:5 50:17 189:24
**began**
27:16 188:12, 24
**beginning**
14:8 173:20
**behalf**
78:6 95:25
**being**
17:23,24 21:18 34:2 36:22 57:16 63:17 64:11 73:18 74:13 75:15 76:1 85:10 88:7 102:7 110:22 123:17 134:11 139:10 143:9 153:11 154:12 161:21 167:25 170:8 181:2,3
**belief**
137:2 187:3 190:1
**believe**
7:6 24:3 27:20 32:12, 13,15 34:5 40:8,21 56:3 57:3 59:15 63:5 76:10 78:11,14 79:5 81:5 82:13 83:19,22 84:8 91:8 93:21 94:20,22 101:17 102:1 106:23 110:5 111:8 113:4, 6,9 125:12 129:22 131:21 132:20,23 133:1,4,15 134:3 135:1 136:19,21,23, 24 137:19 139:4 147:3, 12 150:22,23 152:5 155:5 159:11 161:5 165:5 177:2 179:17 182:6, 7 183:16 185:13 189:7, 12 190:5,6, 22,25 191:19 192:4,5,13, 16,19
**believed**
136:7,11,12 186:25
**belong**
22:11
**benefit**
5:17
**benefits**
53:7,8 132:25 133:5,16 134:4,6 160:22
**Beret**
46:8
**Besides**
27:16,19 129:14 184:11
**best**
5:10,12 64:6 68:3,6 136:18 167:16
**Better**
30:23 72:20 120:14 141:7 169:23 175:8 182:20 183:17,19, 20,21
**between**
14:16,22 62:10 63:3,4 65:21 80:12 109:16 119:2, 11,18 163:20 165:9 187:3
**big**
13:22 15:18 40:24 190:7,8
**bigger**
141:21
**bill**
9:11 39:14,21 41:2,5,9,11 57:6,19,21, 22 58:7,22 59:23 60:2,4 61:1,2,6,9, 13 67:18 68:9,12,13 69:19,24 70:10,18,19 71:4,22 74:21,24 98:22 100:1 120:20 122:2 138:23 166:7
**billing**
39:23 57:23 61:12 120:19 121:5
**bill-pay**
39:18,22 40:16 58:1
**bill-payer**
61:12
**bills**
9:6,8 39:19 40:2,3,4,19, 24 57:7,15 59:25 162:12 163:15,16 165:18,19 180:12,18,22
**birds**
15:4
**Birmingham**
2:17
**birth**
5:24
**birthday**
81:5
**bit**
9:1 11:2 12:4 21:13 40:5 50:15,19 53:19 115:3 133:14 135:6, 21 146:3 151:16 165:16 175:11
**Blackhawk**
14:17
**blanket**
51:23 52:2
**blemish**
180:23
**block**
4:4 87:13 94:16
**boat**
19:20,21 143:21



**boil** 79:10
**books** 100:7
**bookshelf** 53:2
**boom** 41:3
**born** 110:4 141:16, 18
**Borrower** 31:6 91:24
**boss** 23:20
**bosses** 107:9
**both** 27:24 28:8 67:1 113:23 171:1
**bottom** 31:6 87:13 91:16 94:17 180:21
**bought** 19:25 162:18
**BOULT** 2:15
**Box** 31:12 44:23 81:19,24 112:10 149:23
**BRADLEY** 2:15
**Bragg** 18:13
**brain** 165:16
**branch** 35:16
**brand** 46:11 120:22
**bravo** 44:15
**break** 21:13 40:5 42:8 55:3 71:13 111:13 127:9 173:16
**breaking** 168:22 172:8
**breaks** 55:3
**brevity** 38:14
**bridges** 28:8
**briefcase** 154:18
**Brigade** 11:15,16 26:17
**bring** 50:8 98:20
**Brinley** 120:23
**British** 58:19
**broad** 178:12
**broke** 42:19
**broken** 44:14
**broker** 125:16 174:5
**brother** 18:9
**brought** 6:17 80:14 98:19 126:24
**bucket** 180:17
**bucks** 61:5 166:8 172:4
**buddy** 162:10 167:8
**build** 125:19,20
**builder** 122:21 125:13,14 174:16
**building** 124:6
**bullet** 104:6,10,15 105:10,25 177:13
**bum** 14:12 20:23, 24
**bummed** 20:21
**bunch** 19:14 43:16 53:12 116:20 191:5 193:7
**bunk** 122:16
**Burlington** 13:18,19,20, 21 17:22
**Burlington/South** 13:21
**busy** 65:19 161:3 170:25
**buy** 163:16

C

**c** 88:7 174:2
**calculate** 53:6
**California** 152:9
**call** 28:15 45:25 59:20,21 62:7 65:10 66:15 70:25 84:12 96:13 98:1,25 99:1,4 107:12 108:13 111:12 118:1 119:15 141:22 145:24 151:6 153:14 173:14 174:4 176:17 182:24 183:2 184:17 185:19 194:2, 3
**called** 27:11 28:13 39:11 40:16 59:8 84:15 88:2 90:11, 13,14,25 96:13 107:13, 14 114:24 120:2 139:6 152:7,24 181:2,3 182:6,7
**calling** 32:23 65:7 89:7
**calls** 59:10 72:2 84:6,10,17 108:16 136:16 138:10 167:13 186:14
**came** 19:11 26:13 51:13 63:18 64:19 98:13 106:25 107:16,20 108:3 134:23 161:7 163:4 189:23
**cancel** 90:10,14,20, 23 91:1,4,6 92:12 177:15 181:3
**canceled** 91:7 176:10, 14,25
**canceling** 176:4
**cancer** 18:8
**cannon** 15:25
**cannons** 126:11
**cannot** 125:19 166:21 172:11 174:14 183:21 193:3
**Canyon** 7:8
**cap** 59:7 161:17
**capacity** 95:25
**capped** 155:5,14
**captain** 26:24 27:10 54:3 161:5
**Caption** 196:5

**captioned**
196:11
**captured**
58:16
**car**
143:21 144:4 152:10 187:14,15
**card**
101:8,19 102:23,24 105:17 108:3 153:24 154:5 155:3 176:6, 25 177:15 178:9
**cards**
101:11,23 102:15,18 103:1 140:11 153:13 154:1 176:6 182:14
**care**
9:3
**career**
11:24 12:21 15:5
**cars**
144:4
**case**
23:17 42:10 76:15 80:4,15 95:12 113:15 123:22 129:14 138:8,15,17 152:15 161:5 178:6,13 183:1 196:5
**cash**
104:2 154:13 172:3
**CASQ**
37:3
**catching**
11:2
**categories**
24:14
**Catholic**
8:8
**caught**
68:12 71:7,8 86:18
**cause**
133:20 135:23 152:18 180:19
**caused**
92:15 128:9 132:24 133:5 152:18 153:21 180:20 182:14
**causes**
166:16
**causing**
139:1 140:21
**ceased**
32:19 33:11, 13
**cell**
107:11
**Center**
28:22 29:4
**ceremony**
45:16 54:8
**certain**
11:10 49:13 133:6,17,25 138:10 188:23 194:2
**certainly**
104:25
**Certification**
1:25
**Certified**
2:4 48:23,24 195:3,9,25
**certify**
195:4,17
**challenge**
185:21
**change**
55:4 155:21 171:25 197:4, 7,10,13,16, 19,22 198:4, 7,10,13,16, 19,22
**changed**
25:17 29:7 61:11,12 135:8 171:11
**changes**
196:13,15
**characterize**
63:11 82:11
**characterizing**
79:13
**charge**
58:17 148:9 165:23 181:6 187:6
**charged**
147:9,11 149:16 178:18
**charges**
100:12 178:14,25 186:24
**charlie**
44:16
**Chase**
40:25 160:4, 12,13,18,19 161:4,16 162:16,18 164:12 168:11 183:20
**chased**
140:5
**check**
9:13 16:6,7 82:22 93:4 101:18 102:2 151:17 191:13
**checking**
14:11 15:2 58:2
**chemical**
95:17
**chief**
23:20
**child**
46:3,13 109:12 120:23 121:6 122:17 141:9 144:4
**children**
7:3 122:18
**choice**
50:23 168:24
**chow**
49:23
**Chris**
167:10
**church**
8:6,9
**cite**
88:5
**cited**
107:2
**citizen**
184:15
**Civil**
32:8 191:21
**civilians**
12:12
**claim**
185:25
**claimed**
138:17
**claiming**
138:14 175:24 178:13
**clarify**
25:20
**clarity**
52:1
**class**
167:1
**clean**
154:25 169:7 190:15
**cleaned**
143:4
**clear**
25:15 27:3 57:18 90:23 97:20 141:1 187:15
**clearance**
170:3,8,17, 19,24
**Clearances**
170:20
**cleared**
141:11 144:7 150:8
**clearly**
134:20
**clicked**
159:10
**clicking**
75:17
**close**
56:5 70:12 87:4 171:15
**closed**
140:21 149:19

**clouds** 193:14
**Coast** 19:13
**code** 12:11 24:11 35:24 53:22, 23
**codes** 12:14
**collapse** 49:1
**College** 7:25
**Colonel** 4:4 83:14 94:11,17,24 95:4,24 96:12 125:22 129:14,19,21 177:4 184:13
**combination** 189:3
**come** 8:12 16:23 17:14 57:24 63:2 65:24 75:14 89:16 106:17 107:25 152:8 170:23 180:13,15 184:6,16,18
**comes** 9:2
**comfortable** 126:16
**coming** 107:14 108:1 142:9
**command** 46:21
**commander** 23:20 26:15
**commenced** 2:2 186:7
**comment** 184:25
**commission** 10:14 36:11
**commissioned** 9:25 10:4 25:6 46:21 50:1,3
**commissioning** 10:9
**commitment** 174:25
**committed** 119:10
**communicate** 72:19
**communicated** 130:25 131:1
**communication** 63:4 133:17
**communications** 119:19 121:25 137:19
**companies** 44:15 130:21
**company** 26:14,15 44:19 190:7
**Compensary** 174:3
**compensation** 151:4 154:21
**competing** 34:9
**Complaint** 3:13 34:13,25 35:2,4,6 41:22 62:17 77:25 110:15 131:25 132:2, 11,14
**complaints** 41:25 42:1
**complete** 38:13,17
**completed** 13:11 32:7
**completely** 98:19,20 170:1
**completion** 52:13
**comply** 186:13,16
**component** 22:10
**components** 154:21
**concentrating** 142:2
**concept** 185:13
**concluded** 125:5 139:17 194:17
**conclusion** 32:24 53:17 89:17 107:16 138:11 186:15
**conclusively** 183:21,23
**concur** 38:21 91:2
**concurring** 51:22
**condition** 8:18,21
**conduct** 36:25
**conducted** 90:13 134:13
**confess** 27:6 38:13
**confirm** 88:3
**confirmation** 114:22,23
**conjunction** 17:15
**consideration** 19:16
**considerations** 178:7
**considered** 31:25 105:22 149:19 172:11
**constituted** 137:25
**constructed** 124:5
**Consumer** 150:23
**contact** 41:1 59:8,14, 16 61:15,17, 20 96:20 97:22,24,25 107:24 122:5, 10 129:13,17, 20 148:19,22 160:15,19,25 183:16,24 184:5,11,12
**contacted** 91:22 182:1
**contend** 137:20
**contention** 137:23,25
**continue** 88:22 90:21, 24 180:22
**Continued** 4:1 21:9 92:18,20 100:14,17 121:3 151:10, 19 164:11
**continues** 109:24
**continuous** 67:16
**continuously** 89:24 109:10
**contract** 171:5,12
**contracted** 91:21 107:10, 25
**contractions** 109:15
**contribute** 167:24
**conversation** 148:15,20
**conversations** 74:20 93:2 96:11 127:19 191:16
**convey** 72:3,4 74:23
**coordination** 36:12
**copies** 59:15
**copy** 32:14 37:19



Frederic L. Edquid April 26, 2012

207

38:15 52:19 177:2,19 178:3

**Core** 4:9 128:18

**corner** 77:18 111:21 112:19

**Corporation** 1:6 190:23 196:6

**correct** 20:5 23:12 29:24 31:15 32:6 35:11,18 38:2,5 40:18 43:18 44:2 49:9 52:14,22 54:1 55:6 69:22 73:8 92:1 93:16 100:22 113:12,16,18 114:5,25 121:24 128:7, 21 130:23 145:1,3 148:6 149:17,22 150:1,24 157:14,19 158:10,18,21 169:21 173:21,22 185:16,17 187:4,5 188:2,21

**corrected** 114:17 117:11 123:20 130:23 131:11 150:9

**Correction** 122:10 131:6

**corrections** 113:23 114:3 131:8 196:13

**corresponded** 142:24

**correspondence** 33:21 133:5

**cost** 49:9,13,22 98:12

**costs** 48:21 74:18, 22 100:4,6 172:3 182:16

**couldn't** 54:20 61:1,2, 3 141:15 164:16

**COUNSEL** 2:8 95:19,21 129:15 179:4 184:12

**counselor** 156:2 172:23

**count** 104:25

**country** 60:16

**County** 2:4 195:2

**couple** 21:6 28:4 39:25 49:14 59:10 70:17 71:21 84:8 88:5 99:7 106:23 117:2 156:8 164:24 169:8 184:4

**Course** 10:20,25 11:5,7,8,10 13:3 14:18 44:9 73:22 131:1

**COURT** 1:1 2:4 5:17 6:2,4 7:12,13 12:4 20:4 24:18 28:13 29:13 30:13 31:9 33:9 35:1 65:5 70:6 84:4 87:16 116:16 137:10 147:22,24 150:12 155:11 159:16 185:24 187:6 195:3, 9,25

**courthouse** 186:4

**Cracker** 1:19 2:3

**Craigslist** 167:17

**created** 116:7,9

**Credit** 4:17,18,19,20 10:12 30:17 39:14,15 40:20 41:6 57:20 73:22 92:22 99:17 101:8,11,23, 24 102:3,4, 12,15,18,23 103:1 104:1, 7,14 105:12, 14,15,17,19, 22,25 106:1 110:16,17,22, 23,24 111:7, 19 113:17,18 114:6,16,17, 21 117:10,11 119:15 123:13,15,20 124:13 125:19 128:17 130:4, 7,11,17 131:2 132:15,24 133:6,13,18, 25 134:10 136:14 138:20 140:11,15 141:4,5 145:13,19, 21,25 146:5, 18 149:25 152:25 153:8, 12,15,23 154:1,5,14, 25 155:2 156:17,18,22 157:1,17,23 158:1,9,15, 23 159:5 169:16,18 176:3 177:19 178:1 179:19 182:14,15 188:6,7,13, 20,25 189:7, 11,20 190:9 192:1,2,13

**creditor** 177:25

**creditors** 41:10 105:11, 13 131:5 179:18

**credits** 152:25 153:2 154:17

**creditworthiness** 192:1

**crisis** 42:10

**CUMMINGS** 2:15

**current** 7:7 27:18 31:1 56:6 64:1,11,16 68:23,25 69:1,2,6,15 72:21 74:13 98:19,20 99:23,25 118:18,20 120:20 143:9 149:21 153:4, 6 155:19

**currently** 8:14 101:13 160:2 162:5 171:18

**cut** 49:5 62:16

**D**

**dad** 18:9 46:8 163:11

**Dakota** 40:22,23

**damage** 121:17 138:19,20 165:16 176:2

**damaged** 138:7,19,21, 25 139:12 142:3 145:13, 20,22 175:24

**damages** 138:14,17 145:9 175:24 176:3 178:12, 17

sd
setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

**dash**
11:19 13:12
**Data**
116:5
**database**
3:21 80:20 81:18
**date**
4:7,8 5:24 33:24,25 34:3 44:22 45:2 53:13,25 54:19,21 55:1 57:13 62:25 63:1,2,3,10, 12 73:20 74:2,12 77:14 78:19 79:4 81:8,19,20,25 82:7,19 86:1 92:11,23 95:5 96:18 99:14, 17,23 111:7 115:23 118:11 119:21 121:4 122:3 123:23, 25 157:17
**dated**
4:17,18 43:8 51:8 73:3,16 77:17 83:3,10 87:12 91:15 94:18 103:22 111:20 112:18 128:17 148:3 149:15 150:21 156:18 158:9 159:6 169:16 176:23
**dates**
73:23 118:7
**day**
14:20 17:18, 25 32:2,11,12 45:15,18 49:2 54:3,9 55:2 67:2 68:12 84:20 90:25 93:25 94:20 108:12 141:23 142:16 168:23 175:12,15,16 195:21 196:21
**days**
14:12 17:15, 17 41:4 43:11 45:8,10,11 49:1 60:16,17 67:2 81:25 88:8,18 91:9 112:16 113:5, 10 115:5 131:6 140:10 147:19 186:5 189:19
**DD**
52:12,15 53:6,13
**deal**
9:1 40:12 66:10 67:14 68:15 116:11 139:20 168:3 174:20 182:21
**dealing**
161:3
**debt**
105:10,13,17
**December**
54:5 60:23, 24,25 61:18 69:24 82:19, 23 85:24 148:20,21 166:4
**decision**
104:14
**DECLARATION**
196:9
**declare**
196:10
**declined**
142:8
**dedicated**
65:14 182:23
**Deed**
3:15 38:16, 17,21 39:5 77:14
**default**
39:5
**Defendant**
78:6,7 131:13,20
**Defendants**
1:8 2:14
**defendant's**
111:18 115:16 147:21
**Defendants'**
4:10
**Defense**
30:7,19 42:23 52:4 75:22 78:10 80:22 83:3 87:6 94:15 95:19, 20 103:21 128:16
**Define**
8:16 102:4
**definitely**
136:24 191:16
**degree**
9:16,17 10:8
**delinquencies**
113:24 123:21 124:23 128:7 139:2,24,25 143:3 147:19 155:1 179:24
**delinquency**
64:12,14 104:24 105:1, 5,7 106:3 111:5,6 114:18 124:15,16 157:24 158:4 159:1
**delinquent**
73:23 74:2 110:21,22 113:5,10 136:7,12 140:10,12 146:25 160:5
**delta**
44:16 161:18
**demand**
39:22
**demanding**
107:22
**demobilization**
52:18
**department**
72:5
**depending**
119:4
**depends**
175:11,12, 13,14
**deploy**
42:4 44:11 45:21,24 46:20
**deployed**
27:17 29:23 44:12 46:24 47:12,22,23, 24 48:2,12 50:11 53:9 56:8,16,22 70:21 72:6 136:22 193:4
**deploying**
56:17
**deployment**
23:5 26:2 27:15,16,19 32:4,20,21 42:21 43:23 44:3,6 45:22 50:12,18 55:8 56:9 57:15 68:7 69:18 170:14,20
**deposed**
101:7
**DEPOSITION**
1:13 2:1 5:1, 7 194:17 195:7,12 196:1,11,14 197:1 198:1
**derogatories**
144:19
**describe**
51:14 102:3, 11
**described**
27:19 31:2 50:21 103:1 108:4 138:5 142:5 143:7,8 178:9
**describes**
104:5
**describing**
84:17 115:8 145:9
**Description**
3:11 4:2 77:5

**detailed** 51:13
**determine** 60:18
**development** 36:19,24
**didn't** 9:10 16:25 19:11,21 41:18 47:2 49:9,22 57:19,20 58:22 59:6 61:1,8,17,20 65:13 66:1 68:12 69:19 70:4,10,13 71:22 73:24 74:20 78:24 80:21 84:18 85:2,4 106:16 119:25 121:10,14,25 131:9 144:21 150:5 151:10 153:14 155:11 160:8 167:16 180:19 182:10 184:23 187:23,25 191:13 194:13
**died** 18:8
**diem** 50:2
**different** 14:14,17,18 20:11 22:8 24:14 28:2,6, 23 29:2 36:25 37:4 48:18 53:7 95:13 99:12 119:5 121:9 127:19 137:22 142:18 149:24 157:24 174:15 175:2
**difficulties** 187:14
**digging** 174:13
**direct** 31:5 91:18 129:1 139:16 156:25 157:20 158:14 167:3 190:13
**direction** 193:13 195:14
**directly** 68:19 90:3 96:14 125:16
**dirtbags** 180:18
**disabilities** 8:15
**disagree** 130:18,20 136:10
**disappeared** 120:3
**disclosed** 78:18
**disconnected** 66:14
**Discover** 101:19
**discovered** 113:22
**discovery** 116:19 155:25
**discuss** 83:17 133:14 152:8
**discussed** 133:14,24 152:11 175:25 176:2 178:13 186:24
**discussing** 63:1
**Discussion** 30:3 173:17
**discussions** 170:11,16,18
**dish** 193:8
**dispute** 97:17 180:20
**distill** 136:6
**distress** 179:16
**DISTRICT** 1:1 35:1
**divorces** 6:25
**DMDC** 3:21 80:20 81:18
**doctor** 8:17 172:20 173:1
**document** 4:3,7,9 32:15 34:23 42:25 43:22,24 44:4 52:23 72:24 77:2,17 78:19 82:12 83:8 85:24 107:3 111:19,20 115:17,18,20 116:3,9 117:23 128:16,18 156:20 157:21 169:17
**documentation** 85:15,16 97:6
**documents** 3:16 4:11 34:18 42:25 93:24 98:7 106:23 108:21 116:20 118:6 119:5 137:17, 18,20,22,25 173:16 191:10
**doesn't** 46:10 67:5 72:12,13 98:23 141:19 145:24 167:24 169:11 178:21 184:20
**dogged** 125:21,24
**doing** 5:16 10:19 40:10 48:16, 22 62:2 66:25 107:6,11 139:7 151:17, 18 180:10 191:17
**dollar** 87:2
**dollars** 47:16 61:14 71:3 86:6,7,8 97:19 99:8 100:6 103:11 166:7 168:16, 18 171:15 172:4 176:12
**domicile** 6:14
**domiciles** 48:17
**door** 107:21 108:10 121:15 140:19
**doors** 140:20
**doorstep** 139:13
**DOR** 53:25
**dorm** 18:5 49:22
**dormitory** 49:7,8
**doubles** 172:7
**doubt** 55:24
**down** 21:13 24:20 31:16 40:5 43:10 44:14 47:13 50:14 52:11 53:19 58:14 59:6 61:7 75:17 77:15 78:19 79:10 81:24 92:20 100:17 102:20 112:1 116:17 119:1, 2 122:22 136:6 140:5 148:8 151:8 152:11 163:12,18 176:9 178:1 187:21 193:12 194:6
**downgraded** 170:22
**downrange** 15:18



**dozen**
59:9 127:21
**drafted**
150:22
**drill**
17:15
**drive**
64:24
**driver's**
6:9,11
**drop**
180:25
**drove**
152:11
**due**
41:3 55:17 68:13 73:8 75:25 128:12 132:24 138:20,21 139:16,23,24 145:25
**duly**
195:6
**During**
14:5,15 17:20 19:7 50:12 58:8,11 59:24 60:1 61:24 62:6 64:22 65:7,12,20 68:7 69:18 70:14 72:6 78:5 85:6,13, 20 96:19 106:22 119:12 121:18 122:22 124:20,25 134:13 135:7, 25 143:22,23 175:18,19 187:17 188:1
**duties**
25:19 26:4,8, 11 27:4 36:9
**duty**
14:10 18:9 19:17 21:17 22:10 27:14 35:16 51:19 52:13 53:6 62:22 63:9,15 81:19,25 82:7 88:18

**E**

**each**
16:18 26:22 44:18 61:6 119:7 157:24 158:23 159:21
**earlier**
5:6 9:15 16:17 19:19 32:3 69:17 79:25 80:1 101:8 108:21 118:17 119:13 141:16 142:5 161:17 176:23
**early**
34:1 65:8 89:3 93:18 108:25 110:5, 8 141:18
**earmarked**
98:23
**East**
19:13
**eat**
49:22 50:7,8
**echo**
44:16
**Economic**
88:9
**Edquid**
1:3,14 2:1 3:2 4:6,12,14 5:1,6,20 26:25 30:6 31:7 34:16 35:15 37:22 42:19 62:21 80:19 83:2 87:9 101:12 111:17 130:3 137:4 138:7, 14 156:12 170:2 172:20 173:19 185:12 192:12 194:20 196:5,25 197:25 198:25
**educating**
183:4
**educational**
7:16
**effect**
88:14 178:10 185:13
**effective**
31:1 32:12 44:22 45:2 148:8
**effects**
176:5
**effort**
27:23 166:24
**eight**
20:9 62:15 97:15 109:5 121:11 124:16 128:11 189:8, 23
**eighth**
30:24
**eight-month**
189:7
**either**
14:13,23 18:13 39:21 83:13 84:10, 13 96:16 118:11 122:1 177:6 181:2
**electricity**
39:21 166:6
**electronic**
41:11 57:23
**electronically**
39:21 41:2,3, 9,12 57:9 61:11
**eleven**
7:6 162:25
**Elizabeth**
8:8
**e-mail**
42:11 59:14, 20 60:6 61:3 70:24 159:9 181:10 184:17
**e-mails**
70:24 125:15 141:24 143:5 167:13 179:20
**emergency**
109:9,21 110:6
**emotional**
141:12 179:15
**employed**
166:22 195:18
**employee**
21:8,19
**employees**
39:16 93:2,3
**employment**
31:12
**empty**
167:8
**end**
33:13,15,24, 25 34:3 53:13 63:9 72:9 80:5 82:7 93:18 98:21 99:14,15,16 106:21 108:24 109:2 113:1 114:13 147:15 165:5 174:11 181:8,9
**ended**
33:24 34:2 86:12 153:11 154:12 161:21 163:18
**ends**
36:22
**enforced**
190:2,18
**engaged**
18:22,24,25 19:21
**engineer**
14:16,23
**engineering**
9:18
**England**
39:14 40:20 41:6 57:20 101:23
**enlisted**
10:2
**enough**
109:20
**entail**
25:19
**enter**
9:21 186:5
**entered**

9:22 10:2 55:1,2 81:17
**entire** 44:12 110:11 196:11
**entirety** 35:3
**entities** 91:21
**entity** 130:11 131:2
**entry** 54:19,21
**enumerate** 91:21
**Equifax** 4:19 130:5 157:7,10,22 158:15,24 159:4
**equipment** 26:10
**equity** 146:5
**equivalent** 86:20 105:8
**ERRATA** 196:1,14 197:1 198:1
**error** 130:22,25 192:6
**errors** 132:15,18 133:13 192:25
**escrow** 68:17,18,22 69:3,5 184:5, 6,15,16,18 185:5
**escrowed** 90:5
**ESQ** 2:10,16
**essentially** 79:11 86:1 164:14 166:1
**estate** 106:24 107:19 125:16 137:5 174:9
**estimation** 105:16
**et** 196:6
**ETS** 77:7 78:6 80:16 92:5 95:25 96:13, 17,18 107:3
**ETS's** 96:9
**evaluated** 97:5
**event** 45:14
**eventually** 140:25 141:25 167:7 190:8, 11
**everybody** 167:9
**exact** 96:18
**exactly** 71:18 97:20 102:13 110:3 180:20 189:4, 10 192:20
**EXAMINATION** 3:1,3 5:4 185:10 192:10
**example** 29:2 74:4
**exceeding** 76:5
**exceeds** 48:9 100:11
**exception** 166:1
**exchange** 141:24
**excuse** 9:16 23:25 43:11 44:22 52:1 64:3 116:1 117:19 125:25 145:4
**executed** 35:14 101:4
**Executive** 1:7
**exercise** 28:18
**exercises** 29:19
**Exhibit** 3:11 4:2 30:4,7,19 34:14,17 37:7,16,18 38:9,13 42:17,24 52:4,6 62:18 73:1 75:20,22 76:24 78:10 80:22,23 83:3,6 87:6,7 91:11,14 94:13,16 101:5 103:20, 21 111:15,18 115:14,16,17 128:14,16 137:9,11,13 147:21 148:1 149:12,14
150:19,21 156:10,17 158:5,8 159:2,4 169:13,15
**EXHIBITS** 3:10 4:1,23
**exists** 53:3
**expand** 181:1
**expect** 115:22 120:19
**expenses** 48:13,14,15 50:17,19,20 164:10 185:15
**Experian** 105:20 106:1, 2,3 130:5 157:7,11,22 158:15,24
**experienced** 152:14
**expert** 33:3 117:13 178:6
**explain** 8:20 59:12 65:13,15,16 178:21
**explained** 107:23 114:9
**explaining** 66:24
**explanation** 66:12,22
**Express** 2:3 4:6 39:20 101:8,23 103:21 104:7 105:11,21
176:7,11,16, 17 177:10,23, 24 178:9 181:8
**expunged** 150:3 154:24 189:22
**extended** 155:15 160:23
**extension** 88:14 160:21
**extensively** 148:18
**extent** 138:10
**extra** 37:19 47:14, 16 122:17
**extreme** 147:19

**F**

**Facebook** 167:13
**fact** 70:2,15 78:17 79:18 92:6 105:9 114:14 147:12 181:6 191:15
**factored** 104:14
**factors** 104:6 105:21 157:23,24 158:23
**failed** 66:6,7 190:15
**fair** 5:11,14,15 7:13,15 9:3,5 24:25 30:19 35:10 39:6



48:11 53:21 54:12 56:17 63:13,14 82:25 83:1 84:21 88:20, 21 91:6 97:9 100:17 101:9 104:7,9,18 110:2,3 119:16 130:10 132:16 146:18,19 161:25
**Fairfield** 2:11
**fall** 93:7 144:8
**Falls** 40:23
**familiar** 38:20 74:11 77:6,8
**family** 9:4 18:3,6 19:10 45:14 46:6,17 48:19,20 49:2,14 50:21,23 122:13 140:16 142:1 144:7 159:17 163:3 167:20,25 169:8 178:10 182:17 185:18
**far** 5:16 97:16 143:19 170:19 180:9,10
**fast** 12:5 116:16
**fault** 147:25
**Fax** 2:12,18 88:3 92:2,4 96:5,6 161:1
**faxed** 80:15 88:1 96:5,6
**February** 16:22 79:5,8 80:5,7,10,12 81:9,13,20 82:23 86:16 87:12 90:4 91:15 92:3, 11,12,13,16 93:18 94:7 106:4,21 114:11 147:16 150:22 151:12,20 162:12 181:22 182:3
**Federal** 2:16 24:3,6 29:8 39:15 40:20 41:6 57:20 101:23
**fee** 75:7 178:17
**feel** 108:22 185:18 191:24
**fees** 74:18,22,25 75:4,7 97:18 100:3 178:14, 15,16,17,24 187:1,2,3
**field** 48:25 50:6
**fielding** 48:23
**Fifth** 2:17
**fifty** 166:25
**figure** 60:22 178:3, 5,22
**figured** 60:20
**file** 151:25 152:4 186:19
**filed** 35:1 131:23 138:18 184:2, 21 186:3,13, 16
**files** 32:16 107:19 182:24
**filing** 91:23 129:16 178:16 186:3 187:1
**final** 16:6,7 19:16
**finally** 140:2 142:19, 24 150:8 188:5,20
**financed** 145:5,6
**financial** 9:4,7 85:15, 16
**financing** 123:11 146:16
**find** 57:24 59:17 66:1,3 70:19 107:25 126:10 148:23 151:10
**finding** 149:2
**fine** 52:7 115:4 116:10
**finish** 29:14 127:11
**finished** 22:4
**fired** 107:16
**fireplug** 141:15
**first** 10:12 11:15 13:25 17:24 19:20,21 32:11,12 40:8 43:3,6,7,19, 22,24 44:6 45:13,14 48:2,3,8,16 51:11 52:4 57:14 62:4,20 67:1 70:14 80:3 81:19 83:16 88:5 94:23 97:12, 21 108:9 109:13 111:4, 6 112:19 129:13,17,20 144:18 146:4, 7,9,10,12,15 148:7,11,14 159:12,24,25 162:8 165:9 188:17
**five** 20:3 24:14,16 40:3 59:7 62:3 65:18 67:1 100:6 101:14 103:10,11 109:11,18,19 110:7 137:22 141:16,23 163:17 167:13 170:21,22 177:14 180:5
**five-year-old** 121:8
**fix** 115:7 125:7 131:12 143:6 150:10 179:23 181:9,11,12, 13
**fixed** 124:24 142:14 169:12 175:5, 6
**fixing** 58:20 142:12 192:20
**flesh** 133:9
**flew** 36:10 45:17 152:9
**flexibility** 15:4
**flight** 13:7,9,11 16:5,11 17:24 47:10 173:9, 13
**flights** 49:15,16 50:21
**Florida** 163:12,18
**flow** 172:3
**fluctuating**



118:25

**fly**
6:18 14:13 15:4,16,17, 18,19,21 17:16,18,21, 22 21:1 25:3 36:8 126:11

**flying**
8:23 48:20

**Focus**
28:12,17

**F-o-c-u-s**
28:17

**follow**
15:5 73:24 74:10 183:5

**followed**
51:13 131:10

**following**
63:9 98:16 185:1

**follows**
104:15

**Force**
22:9,11 25:6 36:11,16,17 54:25 61:12

**forced**
69:23

**Forces**
35:16

**foreclose**
180:14 190:7

**foreclosed**
80:7,9,11 85:10 89:1 90:15 92:15 107:2 108:11 114:10 131:18 134:11,12 139:7 148:24 149:2,7 181:22,24 182:1,9 189:6 191:1

**foreclosure**
33:13 39:5 79:3,12,19,23 85:8,9,20 89:12,13,18 90:13 91:20, 23 92:7 96:2, 8,21 97:1,17 104:18,24 105:4,6 106:4 107:7 113:24 114:18 117:14 123:18,19,22 124:14,22 128:6 129:9, 11 134:9 135:24 136:13 138:21 139:18,23 148:24 149:3, 8 151:11 158:3,25 178:15,16 179:23 180:16 182:3,11,15 186:6,7,20 187:1,19 188:7 190:10, 19 191:4 192:19

**foregoing**
195:6,15

**form**
4:8 25:21 32:23 39:22 52:12,15 53:13 64:4 79:14 102:6 104:6,19,22 106:9 115:22 116:5 118:8 136:15 138:9 186:10,14 188:15 189:1 190:4,20 191:8

**format**
118:11

**former**
95:20

**Forshey**
4:4 83:14,15 94:11,12,17, 24 95:4 96:12 129:14

**F-o-r-s-h-e-y**
83:15

**Forshey's**
95:24

**Fort**
10:22 12:3 16:10 18:13 45:17,20 48:16 49:6,21 52:19

**forth**
142:10 152:12 187:2 195:8

**forward**
27:24 92:14 113:13 189:9

**found**
46:3 57:25 68:21 90:12 93:5 99:11 120:15 137:6 147:11 174:10 178:2

**four**
24:16 28:5,6, 11 46:4 59:7 62:11 66:24 67:1 68:7 69:18 70:18 73:18 76:1 85:19 100:6 101:14 109:4, 16,19 115:5 121:10 141:16 149:24 157:16 159:13,15,16 163:17 167:13 182:22 187:3

**four-**
121:7

**four-month-old**
121:6

**four-some**
180:6

**fourth**
45:18 148:7

**four-week**
28:23 29:19

**four-year**
14:5

**frame**
14:15 16:3 17:20 19:7 32:17 41:24 42:3 56:1 57:4 58:6,8, 11 59:25 60:1,15 61:24 62:6 64:23 65:7,12 72:7 85:7,21 92:18 93:19 96:20 97:10 114:21 115:8 118:23 119:12,14,19 121:18,22 122:22,24 123:1 124:20, 25 127:16 135:7 140:4 143:22 158:20,21 163:6 175:18 187:13,18 188:2 193:4

**frames**
65:20

**Fred**
31:7 34:10 116:17

**Frederic**
1:3,14 2:1 3:2 4:6,14 5:1,20 35:15 62:21 194:20 196:5,25 197:25 198:25

**free**
159:9,11 164:15 166:1 177:19

**FRG**
167:20

**friend**
164:17,18 165:15

**friends**
19:24 164:22 170:11

**front**
15:2 38:17

**frustrating**
180:4

**frustration**
180:9

**full**
5:19 63:8 86:11,12,20, 22 91:21 102:24 139:6 176:9 195:15

**full-time**
14:6 20:17



163:19

**fully**
86:17,18

**fun**
54:11

**function**
27:14

**further**
58:5 78:19 99:10 192:10 194:7,15 195:17

**furthest**
74:8

G

**gap**
91:9

**garden-variety**
102:21

**gave**
10:12 80:15 107:11 108:3 116:14,20 128:19 152:24,25 153:15,18

**General**
21:4 23:16, 22,23,25 24:25 39:3 55:15 67:6 110:19 130:10 132:16 145:21 172:24

**generally**
72:12,13 74:4 130:3

**getting**
16:23 35:9 45:21 48:23, 24 56:22 62:1 103:23 121:4, 6,16 122:15 127:15 144:3 145:25 162:21 168:7,21 174:11 176:4 187:14 193:24

**give**
5:22 7:5,16 17:25 20:11 30:2 62:11 96:18 106:25 142:11 147:3 155:8 161:14 171:25 172:8 173:15 175:1 177:18 178:20

**given**
97:11 99:7 113:11

**gives**
55:18

**Giving**
154:14 186:4

**glide**
71:8

**GMAC**
1:6 3:18,19, 24 32:15,16 33:17,22 38:1,25 39:19 40:6,9,25 41:1,25 55:8, 22 57:6,7 58:4 59:8,14, 22 61:9,14,19 62:8 65:7 66:3 67:5,16, 18 68:7,21 70:20,23 72:2 73:4 74:1,20 75:24 78:7, 12,17 80:16 83:9 84:7 85:21 87:25 88:2 89:5,7, 18 90:11,14 91:5,6,15,19, 21,22 92:5,6, 20,24 93:1,2, 3,9,21 95:25 96:7,16,18 99:7,11 100:1,3 107:4,6,10,25 110:21 111:7 112:2 113:16, 18,19 114:4,9 116:6,8,14, 18,20,25 117:14,21 118:1 119:6, 7,15,20 120:5,14 121:12 122:1 124:15 127:16 128:8,9 129:6 130:11,13,14, 16,20,21,23 131:5 132:15, 20 133:4,12, 25 134:6,9,23 135:1,9 136:6,11,19, 24 139:10 140:3 141:23 143:3 145:22 148:22,23 149:2 152:19 153:22 161:3 171:7,16 172:18 177:17 178:22 179:21 180:23,24 181:4,21 183:16,22 184:13 185:21,24 186:3,25 187:8,20 188:5,10,19 189:5,16 190:1 191:6, 10 192:3,13, 16,19 193:1 196:6

**gmacmortgage.com**
193:17

**GMAC's**
93:5 131:4 132:23 133:1 138:21 139:4, 16,23 140:13 145:25 149:7 152:18 180:24 181:12

**go**
12:4 13:7 15:15 17:1 18:3 19:13,16 29:2,8 36:13, 22 37:3,25 38:18 39:14 43:10 46:18 47:12,17,19 50:7 53:8 63:16 64:6 65:6 66:12,22 71:12,17 79:16,22 80:3 94:10 98:23 100:17 102:22 107:16 122:4 123:21 124:12 125:6,18 134:20 140:21 141:11 142:18 143:19 152:15 156:1,4,6 169:7 171:19 172:5 177:19 182:20 185:24 189:21

**goes**
9:2 39:21 43:16 70:2 78:14 112:24 132:11

**going**
5:8 12:10 13:8,10 27:5, 15,24 29:9,25 34:16,17,18 37:13,17 41:21 42:4,23 45:15 46:7 52:11 53:19 54:16 58:1 59:6 60:22 62:17 64:3 70:3 72:23 76:6 80:19,22 83:2,3 85:17 87:5 91:13 98:14,15 104:19 105:23 108:14,17,24 110:14 111:17 113:13,25 114:23 115:2, 6 116:2,16 117:15,20,22 118:25 119:2 120:18 121:15 122:17 124:2, 8 125:5,6,8, 18,19 126:16 129:1 137:8, 24 138:9 142:11 151:16,17 156:12 163:17,18 167:8,9,10 170:17 171:7, 14 172:2,15 180:2,8,14, 16,17 189:17



192:12,20
**going-away** 45:16
**gone** 94:23 102:19 125:4
**Good** 5:6,16 20:8 30:23 42:1,2 59:18 61:23 72:8 101:2,3, 4 122:4 125:1 143:17 145:24 154:14 167:23 168:3 169:22 170:21 175:7 182:19
**gotten** 141:7 193:6
**governor** 23:17,21
**graduate** 7:17,23 8:2,4
**graduated** 9:15 10:18
**graduation** 10:6
**grandfather** 46:7
**grapevine** 167:12
**greater** 185:15
**green** 19:12 46:8
**grew** 46:13
**ground** 5:8
**Group** 167:20,25
**Guard** 4:4 8:13 9:22,23 10:16 14:10,12 15:12 20:21, 23,24 22:7,9, 11,19 23:17 26:11,14 27:4,23 29:11 35:22 36:1 37:5 45:13 94:18 95:2 167:21 168:1 170:12
**Guardsman** 14:7 15:8 17:3,5,7 20:15,20 21:9,17,22,23 24:13 29:4,7 31:17,18,19, 22 32:1 35:20,21 36:5,7 37:2 43:25 45:24 56:15 63:20, 21
**Guardsmen** 24:15 45:9
**guess** 14:22 18:19 20:10 22:20 49:5 50:10 51:11 63:10 78:20 79:2 93:8 113:1 132:23 148:18 151:3 154:15 159:9 168:7 172:24
**guidance** 28:2
**guns** 15:17,19,21
**gunship** 15:23 16:1
**guy** 17:21 18:10 20:21 21:14 46:22 66:20 93:4
**guys** 19:3 36:23 125:6,18 126:16 193:7

**H**

**H** 1:3 196:5
**hadn't** 59:1 60:13
**half** 20:9 56:3,4 65:21 66:24 107:14 109:5, 6 127:21 162:1 164:7 180:3
**hall** 49:23
**hand** 38:12 154:13 192:20
**handed** 148:19
**Handing** 149:14
**handwritten** 3:22 83:10,11
**handy** 37:14
**hang** 59:13
**Hank** 106:24
**happen** 93:3 150:5,6
**happened** 15:9 60:18 89:2 108:9 139:3 140:2 141:19 147:10 175:18
**happens** 39:13 180:5
**happy** 97:1 169:25
**hard** 34:11 46:4,5, 13
**Harleys** 34:9
**hasn't** 29:7 116:10 117:23
**haven't** 101:19 116:11 178:13 183:24 184:1
**Hawaii** 18:13
**head** 138:6 177:5
**heads** 190:25
**health** 8:14,16
**hear** 9:10 41:18 44:6 47:2 54:20 58:10 69:10 89:6 97:1 155:12 160:8 194:13
**heard** 89:10 96:16 191:3,5
**hearing** 34:11
**heat** 166:3,4
**heavy** 102:3,4,11
**heels** 174:14
**helicopter** 15:22 48:24, 25 150:14
**helicopters** 6:18 25:3 36:8,10
**Heliport** 31:14 56:18
**Hellfire** 16:1 126:11
**HELOC** 104:24 124:19 146:4,6,9,25 155:4,5,7,8, 11,13
**help** 107:1
**helped** 131:9
**helpful** 126:10
**her** 16:16,17,22 46:11 49:17 61:17,20 62:2,6 101:7 107:23,24 108:3 109:2, 12,13,20,21 140:20,21 141:4,5 145:13,19,21 148:18,19 167:3 168:5 169:1,10



174:14
**hereby** 195:4
**herein** 195:8
**hereof** 195:19 196:15
**hereto** 195:18
**Hey** 13:8 19:16 51:20 59:15 62:2 70:21 72:6 74:23 85:8 92:18,25 97:21 99:1 114:24 120:2 123:9 125:17 147:6 151:8, 21 155:8 160:25 161:7 167:10,14 170:16 176:18 181:16 182:1, 8 183:4 184:5,16,18 191:13
**HHC** 44:16,17
**hiccups** 150:8
**high** 7:17,18,20,23 105:10,13 157:25 158:1 162:11 166:23 168:19
**higher** 120:13 125:4
**highest** 103:4,6,10 172:14
**high-up**
71:2
**history** 46:6
**hit** 193:10
**Hold** 12:8 27:1,8 59:11 61:19 62:5,10,14 65:20 66:11, 23 85:5 122:20,22
**Holiday** 2:2
**holidays** 11:10
**home** 18:3 45:4,6, 10 64:21 90:18,21 91:3,4 108:15 122:6,13 139:18 144:13,18 146:4 159:17 160:1 162:17 163:3 187:7, 24
**homes** 122:13 170:14,15
**hometown** 167:9
**honor** 174:25
**Hood** 45:17,20 48:16 49:6,21
**hoping** 19:12
**hospital** 108:25
**hot** 95:13,15
**hour** 65:21 66:24 107:14
**hours** 64:18 65:18, 21 66:23,24 108:14 109:11 121:11 141:23 143:4,5
**house** 18:16,20 20:3 65:3 85:7 88:25 90:16 106:25 108:2, 18,20 122:15, 20,21 123:10 124:5,6,11 138:23 139:7 141:8 143:13, 14 148:24 152:11 163:15,16 167:8 169:11 171:1 186:6 187:21 191:2
**houses** 85:10 123:5,7 125:1 171:1
**housing** 47:9,10 88:8
**how's** 62:2
**HS** 45:4
**Huachuca** 10:22 12:3
**huge** 190:23
**hundred** 45:19 61:25 62:3 64:20
108:13,14 154:25 166:7 190:13 191:17
**hundreds** 141:24 154:19

**I**

**IBM** 39:15,17
**idea** 7:16 26:4 29:18
**IDT** 24:17 31:21
**ignorance** 27:6
**illegal** 107:6 123:19 134:9,14
**illegally** 114:11
**imagine** 141:16
**impact** 67:6 72:13 176:3
**impacted** 110:17
**important** 140:14
**importantly** 140:15
**improper** 104:22
**improperly** 181:22,24
**improved** 182:20,23 183:15
**inception** 40:7 67:17
**incident**
68:11
**included** 104:24 114:17 153:16
**includes** 123:21
**income** 46:25 47:12, 22,24,25 48:12 50:11, 13,15,17,18 54:13 139:13 151:21,23 162:8 185:14
**incorrect** 98:3 132:19
**increased** 158:18 176:12 185:16
**independent** 174:5
**INDEX** 3:1,10 4:1
**indicated** 191:20 196:14
**individual** 44:15 99:10 106:24 120:7, 11,13,14 148:16 152:7 164:2,8 166:13 168:25 178:23
**individuals** 91:20 96:13 106:17 113:20 114:9
**induce** 109:24
**industry** 117:11
**information**



31:12,16 80:14 81:18 82:16 96:14 97:8,11 98:4, 5,6,8 115:2 123:13 130:11,24 131:1,3 140:2 188:6

**informs** 99:5

**initial** 34:1 43:11 44:22 51:12 59:12 97:11 148:19 151:1

**Initially** 26:13 33:16 37:11 138:16 173:20

**initiated** 78:12 85:13 134:12

**initiating** 89:12

**Inn** 2:2

**inside** 190:24

**inspection** 187:2

**instance** 79:3

**instances** 69:18 108:4, 5,6 184:19

**instead** 61:13 76:1 114:24

**instituted** 184:4

**insurance** 68:17 89:22 90:15 92:13 138:23 168:23 171:25 172:1 176:4 181:3,4 187:5

**insure** 90:21 187:6

**insured** 89:24

**insurer** 90:7

**insuring** 187:7

**intel** 152:7

**Intelligence** 10:25 11:4

**intended** 186:5

**interact** 40:12

**interest** 56:2 59:6 81:8,19,20,25 100:10,11,23 101:2 103:16, 17 118:18,25 120:20 153:18,24,25 154:2 155:14 161:8,16,19 162:1 171:19 172:5 175:3,7 178:25

**interested** 195:18

**interject** 32:22

**intermittent** 9:2 193:6

**internal** 161:4,6

**internally** 79:18

**internals** 191:12

**International** 15:1

**Internet** 58:17 193:5, 15

**interpose** 64:3

**interrupt** 123:24

**interrupted** 71:19 124:12

**interruption** 111:11

**interrupts** 71:10 155:10

**investigation** 99:10

**invoke** 192:17

**invoked** 191:24 193:1, 2

**invoking** 192:14,15

**involuntarily** 27:22

**involuntary** 32:14

**involved** 91:21 191:5

**iPERMS** 52:24

**Iraq** 27:25

**issue** 4:7 59:16 185:5

**issued** 27:21 45:9 78:7 112:19 114:21

**issues** 128:13 152:11

**Item** 129:6

**items** 130:23 133:17,25 142:4

**it'll** 190:11

**IV** 31:13

J

**JAG** 80:13

**January** 5:25 6:3,4 7:10 16:22 44:7 83:4,10 84:2,3 85:19 86:1 140:4,9 147:3,15,16 148:3,8,19, 25 166:5 169:17 171:11 191:3

**Japan** 28:5,11 29:3

**job** 5:16 10:19 14:6,9 19:10 20:17 25:3,5, 18 36:8 46:20 180:3

**jobs** 26:5 39:16

**JOHN** 2:10

**john.odom@jodplaw.com** 2:13

**joint** 101:8,15,17, 25

**JONES** 2:10

**JR** 2:10

**Juan** 4:16 148:17 150:23,24

**Judge** 95:1

**July** 76:1 88:15 99:4,14,15, 16 119:25 120:8,11 139:11 147:12

**jump** 19:21

**jumped** 119:4,11 152:10

**June** 6:2 17:6 88:19 99:1 119:25 139:11 147:12 149:16 158:9

**just** 5:16 8:23 9:1 11:1,21 12:11,15,20 16:23 21:14 22:5,8 24:23 25:14,15,20 26:4 27:3,5,



19 28:3,23 29:9,15,18 31:2 32:22 34:18 37:14 42:11,20 43:10,20 46:3,16 49:5 50:10 52:1 55:15 56:20 58:2 60:10 61:1,4,14 63:16 64:10 67:3,6 70:10 71:2,12,19 72:12 73:10, 17 74:4,12 75:3 76:20 78:4,20 81:10 82:11,22 84:11 93:8 95:6 96:24 98:8 101:16 102:5,21 103:1 104:10 108:22 110:19 114:24 115:2 116:9 117:17 121:20 122:22 123:24 125:25 126:1,6 127:8,12 130:10,25 132:15 133:9 134:24 135:2, 17 143:8 145:9 146:13 151:8,15 152:14 154:15 162:11 163:21 164:9 166:10 167:17 169:4 170:20 172:13,24 174:6,18 175:18,24 178:8 179:10, 13 181:12,15 183:14,24 184:11,25 185:4,9 187:15 192:12

**K**

**Kandahar** 58:14

**kanderson@babc.com** 2:19

**Karen** 1:25 2:4 195:3,24

**keep** 11:1 34:10 37:14 124:2 151:17 156:14 180:8

**KEITH** 2:16

**key** 157:23 158:22

**keys** 107:1

**kick** 108:18,20 140:17

**kicked** 121:15

**kicking** 16:18

**kids** 46:18 125:2 143:19 166:22

**kind** 12:20 34:18 52:11 71:24 174:2

**knew** 59:5 60:12 61:6,7 109:12 119:1 121:4, 5,7 142:13 144:17 192:20

**knocking** 121:14 140:18

**know** 8:25 9:2 13:21 15:3 17:17,23 18:12 20:9, 13,22 21:1,5 22:9,13 24:15,17 28:3 32:8,19 33:23,24 34:3 36:23 40:10 41:4 42:14 44:3,10 45:9, 24 46:4,6,17, 22 48:17,22, 25 49:12 50:7,17 53:3, 8,13 55:23 56:2 59:3,5,6 60:8,9,18,21 62:2 63:18 64:22 65:17 66:1,23 68:23 69:3,6 70:15, 17,23 71:1,21 72:16 74:24 75:8,9 76:8, 14,15 78:14, 17,18 79:3 80:6 85:4,8 88:13 91:10 93:17,24 95:10 96:5, 10,22,24 98:18 100:3, 7,8,13,23 101:25 102:18 104:22 105:8 107:15 108:11 109:15,16, 18,23,24 111:4 112:14 113:16 115:4, 22 116:2,6, 15,19 117:3,6 118:15 121:6, 7,8,16 122:16 124:25 125:17,21 127:24 134:7 135:10,11 136:5,22 138:18,19 139:14 140:14,15, 18,24,25 141:3,7,18 143:17 145:21 147:10 151:6, 17 152:15,16, 18 153:17,20 160:3 163:14 165:18 166:4 167:9,10 170:11 172:17 174:22 175:16 176:15 177:4, 5,6 178:6,25 179:13 180:4, 7,8,10,25 181:1,2 182:13,15, 16,18,23 183:2 184:4, 23 189:10,11, 13,18 190:22, 23,24 191:1, 13,15,16 192:18

**knowing** 102:13 136:25

**knowledgeable** 65:14

**known** 44:9 132:21

**knows** 152:13

**Korea** 28:4,12

**kwon** 16:17 163:24 164:18

**L**

**L** 1:3,14 2:1 3:2 4:6 5:1, 20 35:15 62:21 194:20 196:5,25 197:25 198:25

**L.L.P** 2:10

**Label** 129:2

**labeled** 112:1

**labor** 109:9,12,22 140:22

**lack** 72:20

**lady** 107:18,19,20 166:20 167:19

**large** 135:9 143:20

**larger** 41:10 122:13, 15,19

**last** 10:13 37:25 38:18,22 68:8 151:3,15 155:12 160:8

170:25 182:22
**late**
110:4 112:17 176:8 188:12, 13,23 189:5,6 190:10
**later**
75:23,25 114:20 115:5 158:13 195:14
**law**
135:7 183:5,8 186:13,17
**lawsuit**
129:16 131:14,20 151:25 152:4 184:2
**lawyer**
135:21 141:24 152:6,9,13 183:4
**lawyerly**
135:21
**lawyers**
93:3 135:10 191:5
**layman's**
88:12
**laymen**
54:25
**leader**
12:24 26:14
**learn**
78:24 80:11 88:25 89:1,4 148:14
**learned**
148:11
**least**
43:3 48:4 191:2
**leaving**
13:6 46:16,17
**led**
104:7 173:23 188:6
**ledger**
178:20
**left**
54:9 81:24 84:13 85:25 112:25 135:11 163:8,11 164:20 181:15 192:20
**left-hand**
82:6
**legal**
32:24 77:5 138:10 186:15
**l e g a l - assistance**
95:11
**lender**
40:13 125:9 142:17,18 143:9 145:7,8 160:3 174:15, 18,19,23
**lenders**
143:11
**lending**
125:12
**length**
26:21
**lengthened**
88:7
**Lens**
28:12
**L-e-n-s**
28:18
**LES**
47:4
**Lesley**
1:3 4:14 6:22 196:5
**Let's**
21:13 29:15 51:5 63:23 76:18 90:4 109:4 111:13 123:10 127:8
**letter**
3:18,19,22 4:5,12,13 73:3,4,16,17 75:23 83:3,9, 16 96:15 103:21,23,25 104:21 105:3, 24 106:5,7,8, 11 148:3 149:14 150:21 151:2 176:19, 22,23 188:20
**letters**
73:6 75:11,13 140:1
**letting**
168:5
**level**
66:20
**liability**
191:22
**LIBOR**
30:24 119:1
**license**
6:9,11
**Lieutenant**
4:4 11:25 12:1 17:24 83:14 94:11, 17,24 95:4,23 129:14
**life**
95:20 121:3, 10 155:6,14
**lift**
166:21
**limit**
104:1,2,7,14 105:22
**limitations**
47:25
**limited**
59:10 62:13 138:2
**limits**
135:12 158:1
**line**
26:9 54:16 59:22 62:20 68:21 77:15 83:16 87:25 88:2 146:5,18 180:21
**lines**
43:10 100:8 134:8 178:21
**list**
91:20
**listed**
137:22 184:11 187:1
**listen**
70:21 72:6 183:4 184:5
**lists**
104:15 157:24
**litigation**
7:14
**little**
9:1 11:1 12:4 21:13 40:5 50:14,19 51:12 53:19 55:7 133:14 146:3 151:16 165:16 175:11
**live**
7:11 18:4 64:24 65:2 90:21 91:4 163:2 164:2, 14 165:17,25 166:2,23 168:25
**lived**
6:15 7:9 19:3,7 46:9 49:21 64:21 65:3 121:3,10 122:23 164:5
**living**
16:9,13 17:13 49:6,7,8 84:3 90:17 163:11, 14,17 191:2
**LLC**
1:7
**LLP**
2:15
**Loan**
3:12,14 30:9, 10,18,20 31:5 32:7 35:9 37:6,10,24 39:4,8 40:6, 7,13 42:1 56:2,6,24 63:24,25 64:11,13,16 67:17 68:16, 24 86:17 90:5 92:16 96:25 97:5 98:18 100:14 101:3, 4 112:3,5,7, 15 114:8,11 123:12 124:22,23



125:7 128:12 138:20 139:1, 11,14,19,21, 25 140:3 141:9 142:5, 11 143:8,11, 20 144:15,22 146:3,10,11, 13,15 147:6, 7,13,16,17 148:9 149:1, 6,16 151:9, 12,16 152:8 155:6,7,8,11, 13,14 161:16 162:16,20 172:18 173:20,23 174:4,12,14 175:3,9,10 176:4 181:19 187:9,14,15, 20,22,23,24 193:20

**loans**
174:6,11 188:1

**location**
26:22 45:19 143:16

**lock**
140:20 175:19

**locked**
176:9

**Logic**
4:9 88:17 128:18

**long**
6:15 7:9 8:10,22 11:7 12:9 14:3 46:6 48:22 60:21 67:2 125:8 164:6

**Longbow**
48:24

**longer**
49:11,12 115:3 149:19 163:18 167:10 171:10 172:6

**look**
35:1 38:24 43:5 47:3 51:5 61:20 65:25 68:9 77:5,7,25 78:12 80:14 81:1,2 87:3, 25 88:1,4 93:1,25 96:1 111:18 112:8 115:23 116:13 123:4,5,7 125:22 126:1, 13,14,16 127:9 130:1 132:1,12 133:20 140:1 151:2 154:23 156:22 162:23 163:6 167:15, 19 178:22,23 179:1 189:21 191:10,15

**looked**
19:14,15 108:21 116:24 117:2 119:1 122:12,19 124:25 153:23 168:2 176:23

**looking**
15:17 19:14 30:18 44:21, 24 49:1 50:13 58:1,2 78:17 80:9 81:10

82:10 101:22 105:9 108:10 122:6,14 124:5 134:8 138:18 140:19 141:8 152:17 157:6 172:3 176:16,17 177:15 189:7, 16

**looks**
38:20 44:14 62:3 77:7 82:15 157:14

**loss**
172:12,15

**lost**
142:1 166:16 178:10

**lot**
12:13 34:18 36:12 48:25 64:22 119:4 123:10 128:10 140:24 180:7, 24 182:13

**loud**
5:17 71:10 155:10

**louder**
12:15

**Louisiana**
2:11

**low**
105:16

**lower**
111:21 175:11

**lowest**
172:15

**lunch**
9:8,11

**M**

**ma'am**
24:19

**mad**
141:5 145:11, 14,17,19,21, 22,23

**Magnus**
40:8

**mailing**
7:7

**maintain**
48:17

**maintenance**
172:1

**major**
9:17 26:24 27:4 37:22 42:19 48:1,3 52:9 54:12 80:19 83:2 91:13 101:11 106:12 110:22 111:17 130:3, 4 131:13 137:4 138:7, 14 170:2 172:20 173:19 185:12 192:12

**making**
39:9 60:23 67:6,10 69:3, 5 72:2 121:5 134:6 147:6 153:6

**man**
102:16

**manage**
169:9

**manager**
152:10

**manner**
193:15

**Marana**
31:14 45:17

**March**
33:18 34:5,6 43:8 53:16 62:22,25 63:1,2,6,12, 16,24 79:25 80:8,11,13 82:7,18 88:18,19 89:3 92:13 93:18 94:2,7,18,19 96:15,19 97:23 103:22 106:22 108:25 110:4,5,9 111:7 112:20 113:1,2,20 115:24 117:14,21 118:2 121:3 124:16,17 139:4 149:20 152:5 156:18 157:18 176:23 182:7,8 189:11,21

**March/April**
56:1 130:1

**Maricopa**
2:5 195:2

**mark**
34:17 76:23 80:21,22 83:3 87:5 137:8

**marked**
30:4 34:14 37:16,18 38:1,9,12 42:17,23 73:1 75:20 76:24 80:23 83:6 87:7 91:11,13



94:13 101:5 103:20 111:15 115:14 128:14,16 137:11 148:1 149:12 150:19 156:10 158:5 159:2 169:13 191:11

**market**
123:8 167:13 169:9 172:13, 14

**marking**
30:6 80:21 94:15 111:18 115:16 137:13 147:20 158:8 169:15

**marriage**
6:23 156:1,2 172:23

**married**
6:19 18:10,20 20:6 46:18 168:2

**match**
100:8

**matched**
53:17

**matches**
51:24

**material**
185:13

**materially**
185:19,22,25

**math**
82:22

**matter**
67:7 94:8 95:6 110:19 131:1 132:16 196:12

**matters**
9:4 95:8,12

**meals**
48:18,19 49:10

**mean**
6:25 12:11 14:19 16:10 20:24 21:16 27:2 35:23 54:18,25 56:19 66:10 67:3 92:9 95:15 101:18 116:7 117:8 118:15 121:2 126:15 129:16 138:16 143:13 145:12 151:6 153:9 166:18 167:16 173:3 179:14 181:15 187:23

**meaning**
64:18 84:12 167:7,8

**means**
15:22 20:25 39:23 53:25 61:10 76:14, 15 102:13 112:14,15 115:22 166:19 172:7

**meant**
126:13

**meantime**
151:14

**Mechanical**
9:18

**medical**
165:16

**medications**
5:21

**meet**
16:16 141:14, 23

**meetings**
36:13

**Melissa**
148:16,17

**member**
8:6,10 10:2 22:20 23:11 24:2 25:2,16 26:6 31:17

**members**
46:10 159:8

**memo**
87:10,22 114:21

**Memorandum**
3:23,24 4:15 87:10 91:14

**memory**
119:10

**mention**
104:17 105:3, 6 158:2,25

**mentioned**
11:21 21:13 30:12 32:3 55:7 69:17,18 101:7 119:13 146:2 155:25 169:4 173:19 176:2 178:8,9

**mentions**
105:5,7

**menu**
177:13,14 190:6

**Meritage**
125:12,13,14

**Meritech**
142:5 143:7

**mess**
85:9

**message**
72:3 84:13

**messed**
63:5

**met**
16:14,17,22 95:4 107:21

**Michelle**
4:16 150:23, 24

**mid**
34:5 120:11 148:20

**middle**
44:21,23 108:12 157:8 163:10

**mile**
122:23 166:25

**miles**
64:20 108:14

**military**
9:21 10:24 11:4 12:24 15:5 46:7,10 55:1,2,23 60:9 62:22 96:23 159:8 174:20,21

**militia**
36:1

**mind**
8:12 185:9

**mind-altering**
95:16

**mine**
83:12 162:10 165:15 167:9

**minus**
55:3

**minute**
21:14 126:1 132:10,12 145:10 169:4 173:15

**minutes**
59:10,11 62:10,13,14, 15 66:11,13 109:16 175:23

**MIOBC**
10:24 11:4, 22,23 12:3,6 13:3,4,6

**mischaracterizing**
105:24 106:4

**mis-enter**
81:5

**miss**
179:5,7 193:10

**missed**
61:8 100:1 117:1 176:6

**missiles**
16:1 126:12

**missing**
184:24

**mission**
37:1

**missions**
14:13 17:16 29:19 58:12, 13

**mistaken**
192:6

**mobilization**
25:23 45:11, 20 51:19 52:2



53:22 54:6,7 55:17

**mobilizations** 28:1,25

**mobilized** 25:24 56:9 66:5

**mobilizing** 51:20,23

**modification** 96:25 97:5 98:17

**modified** 26:10

**mom** 18:8 168:2

**moment** 125:25

**momentum** 92:20 192:22

**money** 48:21 49:9,22 61:4 70:3 86:24 87:1 98:21,23 99:12 119:25 120:15 154:13

**month** 17:25 32:13 40:2,9 47:6, 7,15,16,20,21 55:20 57:9 58:4 61:14 63:9 67:17 71:3 72:8 75:23,25 98:15,16 100:21 102:25 111:4 119:5 140:9 147:2, 4,6 151:7,19 152:6 153:7 165:10,13 166:7 168:5, 6,8,9,12,15, 19,23,25 169:5 170:25

**monthly** 38:7 39:11,12 46:25 47:25 59:3,25 61:6 69:6 72:14,18 76:8 86:5 87:2 97:13,14 105:16 118:20,24 119:6 146:17, 20 153:6 155:19 166:14 168:10 171:13,14,16, 24

**months** 11:9 33:13 34:1,2 46:4 48:4,9 57:14 60:3 63:8 67:18,19 69:18,21 70:9,14,17,19 71:22 73:19 74:5 76:1,2 82:18,19 88:8 97:15 120:1 124:16 128:11 140:10 142:15 147:18 149:1 151:13 158:13 160:23,24 164:24 181:12 182:22 189:9, 17

**month's** 119:8

**Mormon** 6:24

**morning** 5:7 25:12 80:21 84:9,16 109:8 126:25

**Mortgage** 1:6 3:25 30:15 31:3 35:15 78:5 83:9 100:15 112:2 129:6 142:22 159:13 164:11 168:10,16,18 174:5 181:9, 11 187:20 188:13 193:16 196:6

**mortgages** 159:15,16,21

**MOS** 36:23

**Mosij** 107:19

**MOSQ** 36:18

**Most** 28:10 40:24 41:9 65:8 101:17 104:14

**motion** 25:9

**mountains** 19:12

**mouth** 167:18

**move** 18:14 34:18 55:4 106:12, 14 107:1,22 142:13 164:23

**Moved** 7:10 16:2 17:8 18:25 20:1,14 30:12 99:12 106:15 120:22,25 122:20,21 163:8,12 164:22,24 165:4

**moving** 82:6 135:7 165:13 171:1

**MRE's** 50:8

**MTH** 125:10,11 157:1 158:11 173:20,24 174:6,7,12 181:11

**MTOE** 26:9,11

**M-T-O-E** 26:9

**multiple** 75:12

**multiplier** 161:19 162:2, 4

**Musikala** 58:16

**must** 191:6

**myFICO** 4:20 169:16

**myself** 83:13

**N**

**name** 5:19 6:21 11:14 28:18 30:17 31:6 38:14 101:16 103:4 195:20

**names** 77:9 179:24

**National** 4:4 8:13 9:22,23 10:16 17:3,5,6 20:15,20 21:22,23 22:7 23:16 26:11, 14 27:4,23 28:22 29:3,4, 11 31:17,18, 22 32:1 35:20,21,22 36:1,4,7 37:2,5 43:25 45:13 56:15 63:20,21 94:18 95:2 168:1

**Navy** 161:5

**near** 31:6 80:5 106:21 115:23

**necessarily** 53:2 123:16 131:4

**need** 5:17 33:1 36:25 45:25 53:8 85:9,10, 11 107:12,24 108:22 135:11 143:19 179:14 180:10,13,15 183:5 187:23 193:23

**needed** 17:1 36:18 121:6,8 122:18 181:19 187:23,24

**needs** 107:9,10

setdepo
The Evolution of Deposition Management

130:22
**Negative** 5:23 19:5 96:12 122:2 134:24 135:1, 4 150:2
**negotiated** 152:12
**neighborhood** 13:22 125:1,2
**net** 168:13
**netting** 168:20
**never** 46:13 74:1 75:10 91:7 106:12,15 108:3 110:12 113:18,21 114:5 115:20 118:11 131:16,18 144:25 147:2 161:2 176:8 180:1
**New** 39:14 40:20 41:6 46:11 57:19 66:15, 18 83:18 101:23 104:2 120:22 122:6 124:11 144:6, 8 155:17 187:21,24
**new-build** 124:4
**next-highest** 103:8
**nice** 179:25
**night** 109:10
**nine** 33:13 48:3,8 63:8 82:18,19 109:5 128:11 165:3
**nine-month** 88:13
**No.Change** 197:2,5,8,11, 14,17,20 198:2,5,8,11, 14,17,20
**No.Line** 197:2,5,8,11, 14,17,20 198:2,5,8,11, 14,17,20
**nobody** 166:3
**noise** 155:10
**noncommittal** 177:20
**noninterest** 178:14
**nonjudicial** 79:19 89:12 107:7 123:19 134:9 186:5,7 187:19
**nonmessage** 84:11
**nonresponsive** 132:4
**non-SCRA** 85:12
**noon** 65:11
**normal** 97:14 148:10
**North** 1:19 2:3,17
**Note** 3:14 35:15 37:18,23 38:6,11 72:15 75:18
**noted** 106:3 113:20
**notes** 3:22 83:10,11
**Nothing** 59:21 66:2 84:13,14 93:5 95:12 155:2 178:21 194:7
**notice** 3:20 77:2 78:7,9 79:11, 17 186:4,12, 19
**noticed** 58:3,5,23
**notification** 51:12 55:8 195:11
**notified** 13:8 42:4 73:18 90:25 92:14,21
**notifying** 139:4
**November** 57:25 58:23 60:15 61:17 77:18,24 78:3,12,14, 15,21,25 79:18 85:22, 23 89:13 111:8 144:9, 16,22 145:5 159:6 166:4 186:4,8 189:8 193:21
**November/December** 62:6 68:11
**nowhere** 104:17 158:2, 24 189:23
**NRA** 8:13
**NTC** 28:22
**nullified** 99:13
**Number** 1:25 6:7 14:16 26:9 28:21 44:19 52:6,9 66:16 81:2 84:11, 12,15 88:2,4 89:5,8 97:18 104:6 107:11 112:3 116:7 123:15,25 124:14 128:13 129:6 131:8 139:22 145:24 151:8 156:25 159:13 161:1 179:19,25 192:16,22 194:2
**numbered** 52:3
**numbers** 116:14,21,23 119:7 181:7
**Numeral** 31:13
**numerous** 141:4

O

**o** 52:11
**oath** 195:11 196:16
**object** 25:21 79:14 102:6 104:19 105:23 106:9 117:20,23 138:9 186:10, 14 188:15 189:1 190:4, 20 191:8
**objecting** 79:20
**objection** 32:22,23 64:4 136:8,15
**obligation** 39:4 191:22
**obligations** 9:7 38:6 72:14
**obtain** 138:20
**obviously** 16:10 27:4 44:18 50:6 55:4 61:8 64:22 65:19 92:5 100:12 107:13 117:16 161:3 163:10 171:18 172:5
**occasion** 62:9
**occasions** 75:12
**occur** 111:2 115:6 128:1,2 136:24



**occurred**
72:7 79:4 93:17 94:1 104:18 127:25 128:2

**occurrences**
40:1

**Ochi**
28:12,15

**O-c-h-i**
28:17

**o'clock**
65:10,11 109:11

**October**
75:24 111:8 112:9,16 113:13 128:17 139:21 141:2, 9 189:8,12,14

**ODOM**
2:10 3:5 6:1 9:9 11:1,16, 18 12:8,15,18 13:17,19 22:23 23:22 25:9,20 28:17 32:22 34:7,9 37:20 41:18 42:6,8,10 47:2 52:1 54:20 58:10 64:3 69:10, 12,14 71:14, 21 79:14 89:6 95:19 102:6 103:17 104:19,23 105:23 106:8 116:1,6,17 117:19 118:1 120:9 122:7 125:23,25 126:3,6,10, 19,22,24 127:2,4 128:19,22 129:19,21 132:5 136:8, 15 138:9 143:22 144:10 147:23 150:14 160:8 173:3, 6,9,12 175:13 177:6 179:6 184:13 185:9, 11 186:11,21 188:18 189:25 190:16 191:18 192:9 194:8, 10,13

**offer**
15:15 16:23 83:18 174:20, 22 196:15

**offered**
15:14,15 109:22

**office**
65:24 140:5

**officer**
9:25 10:20,25 11:4,21 21:5 25:6 26:23 36:15 48:2 50:1,3 114:9 123:12

**oftentimes**
75:15

**Oh**
12:6 27:21 57:12 66:17, 20 70:16 77:9 98:2 120:12 126:18,23 127:1 140:10 156:18 160:9 164:3 180:2, 14,15 182:10 191:6 194:10, 13

**Okay**
5:18 7:7 8:14 10:6 12:2,6, 17 13:2,16 14:9,12 15:6, 19,22,24 16:4 18:2,11 19:6, 23 21:24 26:9,20 27:9, 10,15 28:8 29:6 30:11,25 31:20,23 33:19 34:16, 20,21 35:5 38:3 40:15 41:13,17 42:12 45:5 48:16 49:9, 12,15,25 50:5,16,20 51:1,7,21 52:11 53:1,4 54:10 55:5, 14,21 57:24 58:25 63:7, 11,15 64:9 65:6 67:3,9, 15,19,22 68:1,4,19,20 69:6,9,14 70:1,15,18,20 71:1,5,15,25 72:5,11,19,23 73:14,21,24 74:3,12,15 75:1,6,11,18 76:4,12,16, 18,19,22 77:10,23,25 78:16 79:2,6, 8 80:3,17,18, 24 81:1,5,8, 12,14,19,24 82:4,10,14, 17 83:2 84:25 85:14,22 86:10,14,15, 21,24 87:5,20 88:4,24 89:19,20 90:23 92:2,6, 9 93:8,13,20, 23 94:5,21 95:9,15 96:3, 10 97:1,4,9 98:11,13,18 100:3 101:11 103:8 105:3,9 106:6,15,17 110:1,4,9, 13,15,25 111:10,17, 23,24 112:8, 18,23 114:2 115:11,21 116:4,24 117:5,12,25 118:4 119:9, 18,24 120:25 121:2,13,21 122:4 124:2, 3,12,13,20 126:2,5,8,18 127:1,7,10, 13,22 129:1, 5,13,25 130:16 131:16,23 132:13 133:3, 10,13,22,23, 24 135:3,13, 14,20 136:2, 3,6 137:4,8, 15 138:4 141:6 142:1, 21,23 143:1 144:24 145:2, 7,9,15 146:14,20 147:20,25 150:6 151:2 153:2,4,13 154:15,20 156:16,19,25 157:2,15,22 160:17,20 161:10,20 162:3,20,24 164:2,8 165:6,12,21 167:22 168:24 169:3,15 171:12 173:6, 12 174:7 175:22 177:1, 7,9 178:4,5,8 180:3,19 181:12 182:5, 12 183:7,10, 12 184:7,22 185:2 186:22 188:5 192:24 193:19 194:5, 7

**old**
46:4 109:3 120:23

**once**
48:21 63:20 85:6 171:19 180:5 184:21

**ones**
101:24,25 126:19,20,24 178:23

**online**
41:1 59:22 60:4 193:25

**open**
154:18 156:14

**Operations**
36:14 48:23

62:7
**operator** 56:18 66:16 179:25
**opinion** 33:4 80:15
**opportunity** 6:18 13:7 15:11,15 19:13
**opposed** 21:18 41:11 48:19 63:20 146:17
**options** 83:18
**oral** 73:9 104:12
**order** 33:16 36:14 43:7 51:15, 16,17,19,23 52:2,5 53:18 55:18,19 127:13
**orders** 14:20,22 21:6 25:25 29:9, 20,22 32:4,14 33:14,15,24 34:4 44:1 45:8,9 51:5, 13 53:22
**organization** 174:8
**organizations** 8:7
**organized** 22:12
**Original** 4:23,24
**Originally** 9:22 22:12 162:18 169:24
**originate** 162:20
**outcome** 195:19
**outgrowths** 140:13
**outside** 71:10 107:5, 23 155:10
**outstanding** 103:2,4,6,9, 13 105:17 154:5,8
**over** 11:10 15:11 26:16 40:2 58:17 60:16 97:8,14 98:9, 10 99:13 120:12 143:5 161:23 176:7
**overall** 132:14
**overcharge** 161:23
**overcharged** 161:7,15
**owe** 181:17
**owed** 74:8
**oxygen** 141:19

**P**

**p.m** 194:17
**packet** 85:17
**PAGE** 3:3,11 4:2 35:6,12 37:25 38:14,17,18, 22,23,25 43:4,6,19,20, 22 44:21,23 51:6,8,11 52:4,6 53:19, 24 62:19 81:16 111:25 112:20 132:5, 8 137:6 148:7 151:3 157:6, 8,20 158:14, 22 159:12 197:2,5,8,11, 14,17,20 198:2,5,8,11, 14,17,20
**pages** 35:3 51:14 158:22
**paid** 57:16,17 68:18 97:19 122:2 153:25 159:11 161:18 165:19,20 168:7 176:8 180:22 187:12 193:24
**pain** 151:3
**paint** 8:25 169:8
**panicking** 109:14
**paper** 39:21 41:11 81:10,11
**paperwork** 78:13 170:24
**paragraph** 26:9 35:5,8, 12 52:11 62:18,20 78:1,4 88:4,6 91:19 104:1,5 132:2,11 148:8
**paragraphs** 88:5
**parentheses** 23:10 45:2
**parents** 18:7
**parked** 99:12
**part** 10:15 11:10, 11 23:1 37:6 54:5,7 56:21 68:15 74:19 88:1 91:10 132:20,21 136:16 139:21 155:12 174:20 181:10 188:16,17 192:19
**particular** 73:7
**parties** 91:22 195:18
**parts** 174:25 179:15
**pass** 59:13 60:10 183:6 185:8 194:12
**passed** 62:10
**pastor** 156:4 172:23
**path** 194:6
**Paul** 4:4 94:17
**PAX** 44:19
**pay** 17:17,24,25 47:8,10,11, 14 48:18 54:19,21 68:17,18 70:18 74:24 75:14 89:25 97:15 98:15 102:24 120:1 151:8 152:22 154:13 161:8 163:15 166:2 180:12,18,22 185:15,16 187:8,11 191:21
**paying** 9:6 61:7,13 71:4 86:13 100:20 162:11 163:15,16 164:1,8,9 165:18,19 166:4,5,6,14 180:12 181:5
**payment** 39:23 58:4,5, 6 59:3 60:23 68:15 69:6, 15,21,23 72:8 74:5,7 75:16 76:1,8 86:5, 17,23 87:2,4 97:13,14,22 99:6,9,18 100:2 112:16 118:20,24 119:8 120:3,

sd
setdepo
The Evolution of Deposition Management

18 139:5 146:17 147:2, 4,6,18 153:7 155:19 160:10 168:10 171:16 190:10 193:20

**payments** 37:11,12 38:7 39:4,9,11,12 50:2 56:6,25 59:1,17 60:12,13,23 61:21 67:6, 10,16 69:3,5 70:10 71:5 72:14,18 74:3 75:2,14 76:5 85:21,22,23 86:4,19 89:16 98:14,20 99:16,24,25 100:10,11,12, 14 105:16 113:12,13 119:6 121:5 140:8 146:20 149:19,20 151:7,8 153:16 160:7 164:11 167:3 168:17,18 171:13,14 181:17 188:12,13,24 189:5,6 193:25

**pays** 72:9 167:2,3

**pebble** 180:25

**PEBD** 54:16

**penalizing** 91:23

**PENALTY** 196:9,10

**People** 17:21 36:20 62:9,11,14,16 65:22 121:14 126:11 166:25 167:10 179:21 180:21 182:23,24 183:17 190:24

**percent** 56:3,4 99:17 103:15 143:4 154:4,25 155:6,9,14 160:22,23 161:16,23 175:1,4,6,7 190:13 191:17

**percentage** 174:22

**Period** 43:11 78:4,5 134:13 136:1 161:23 165:8 175:19 189:8

**PERJURY** 196:9,10

**permanent** 52:24

**person** 23:13 25:19 51:22 59:12 65:12,14 66:15,18,19 97:12,21 98:2 99:4 114:13 141:17 148:17 151:1 164:14 166:16,17 167:15 169:10

**personal** 98:8 179:15 180:9 182:16

**personally** 46:2

**Phoenix** 17:22 26:18 64:20 65:2 108:13 125:4 152:9 170:13

**phone** 60:5 64:18 65:18 66:2 84:6,10 85:2 96:12 97:8 98:9,10 107:11 114:14 115:12 121:11 148:15,18

**phonetic** 174:3

**physically** 17:8

**physicals** 173:6,9,13

**pick** 71:19

**piece** 81:10,11

**pilot** 150:14

**Place** 2:16 7:8 13:22 18:4 125:1 143:17 166:25 167:1, 11,14 168:4 182:18 195:8

**placed** 98:21 178:15 186:25

**places** 19:14 28:24 92:4

**Plaintiff** 3:17 35:15 62:21 131:13, 20

**Plaintiffs** 1:4 2:9 35:14

**Plaintiffs'** 4:10 78:5

**plan** 72:20 97:10, 13,22

**plane** 17:21 25:11, 12

**planning** 36:13

**platoon** 12:24 26:14

**play** 135:11

**playing** 121:8

**please** 5:10 25:18 28:14 59:16, 20 71:14 102:10 107:12 126:4 194:3

**plus** 30:24 44:19 47:10 161:19 168:14

**point** 9:25 10:4 11:12,25 13:12 15:7,9, 16 16:2,8,14 17:3,23 18:18 20:15 22:2,15 23:4 25:17 26:18 32:11 56:10,24 63:1 64:12,14,15 73:5,17 76:9 78:15 79:22 85:25 86:3, 10,16,21 89:11,21 90:10 92:13 93:9 94:10 98:18 100:20 104:6 105:12, 15 106:17 108:24 110:9 116:7 120:22 125:9 147:8, 17 148:25 162:1 163:10 172:7,20 174:16 180:23 184:13 192:18

**pointed** 114:10,12

**points** 104:10,15 105:10 106:3 158:19 175:11,14,17

**policy** 90:10,15,24 91:1,4,7 176:4 177:11 181:4

**pond** 181:1

**poor** 84:1

**popped** 95:13,15 124:1

**portion** 48:5,16 50:13 92:24 192:21

**position**

sd
setdepo
The Evolution of Deposition Management

26:12 64:20
**positive** 95:16
**possibility** 39:5
**possible** 99:8 190:21
**possibly** 169:5
**potentially** 170:8
**pounds** 61:25 166:21
**preceding** 104:13
**preferred** 174:23
**pregnant** 140:19
**prescribed** 38:7 72:14
**present** 23:2,11 25:17,22 26:5 144:2
**president** 140:5 167:25
**pressure** 140:17
**preterm** 109:22 140:22
**pretty** 56:5 101:2,3, 4 108:16 109:15 115:6 125:21,24 154:14 168:19 169:22 172:16 175:7 177:8
**previously** 102:19 173:19
188:14,24 189:6
**priest** 156:4 172:24
**primary** 142:17 153:20,21 171:10
**principal** 153:9 172:17
**Printout** 3:21 80:20 82:10
**prior** 13:6 28:1,9, 10 30:20 32:13 39:16 46:24 57:7,15 58:4 66:16 82:23 85:23 86:16 109:10 144:15,22 146:13,15 170:20
**privy** 125:15
**probably** 24:16 50:14 53:15 60:16 67:1 70:12 84:9 101:13 102:17 109:8, 10 110:7 119:11 127:21 140:14 165:8 166:6,8 167:15 168:4 170:25 171:23,24 172:1,2
**problem** 5:18 26:7 34:22 42:14
57:16 75:3,7 166:21
**problems** 8:15,16 41:24 42:2 165:16
**procedure** 124:8
**Procedures** 137:6
**proceeded** 92:12
**proceeding** 186:7
**proceedings** 71:10 155:10 195:13,16
**process** 41:14 89:14, 15 91:20 170:24 174:11
**produce** 137:18
**produced** 3:16 43:1 83:9 111:20 115:18 128:18 156:20 169:17 177:5
**Production** 4:11 137:16
**professional** 36:19,24
**profit** 168:20
**program** 27:6 36:22 96:23,24 167:5
**progress** 142:16 174:13,17
**progression**
11:24 12:21
**project** 21:3
**promises** 16:24
**Promissory** 3:14 37:22,23
**promoted** 54:3,4,5,12
**promotion** 54:8
**promulgated** 180:24
**pronoun** 126:3
**properly** 136:25
**properties** 159:19,21
**property** 7:14 19:4,25 30:13 38:12 77:4 89:22,23 90:8 106:12, 14,15,16,18 107:2 110:10, 12 159:17 160:3,14 162:5,9 163:2,8,11, 21 164:20,23 168:20 171:3, 8,17 172:9
**Proportion** 157:25
**protected** 24:3 32:8,17 78:6 189:17 191:21
**protection** 32:24 36:1 67:4 113:6
134:13,22 135:25 136:23
**protections** 32:10,16,19 33:7,9,11,12 55:17,19 66:5 72:10 85:13 89:15 125:8 133:2 134:11 136:20,25 139:9
**proved** 30:23
**provide** 91:20
**provided** 37:24 52:12 105:25 157:4, 5 195:11
**psoriasis** 8:19,20
**psychologist** 156:6 172:21 173:1
**public** 166:19
**pulled** 123:13 156:23 157:1,3 158:11 159:5, 7 169:18
**pulling** 189:20
**purchase** 143:16,20 144:5,6,18
**purchased** 18:16 19:3 144:8 145:5 170:13 193:7
**purchases** 102:21 104:1



**purchasing** 144:12
**purporting** 117:13
**purpose** 103:25
**pursuant** 137:20 195:11
**pursuing** 91:23
**pushed** 193:13
**pushy** 107:20
**put** 15:17 18:5 21:5 31:16 63:19,23 97:10 102:22, 24 123:13 127:12 134:24 135:1,4 139:2 140:17 169:9 180:17 190:10
**puts** 82:19
**putting** 138:22 167:12 190:9

**Q**

**qualification** 14:18
**qualifications** 14:17 37:4
**qualified** 36:21,23 137:20 138:1
**qualify** 96:23,25 98:16 125:6
**question** 5:13,14 25:14,21,23 28:7 32:23 33:2 34:3 38:16 39:7 41:23 47:17 49:5 50:10 51:3 64:4,7 67:13 70:2,4, 7,9 79:15 80:2,3 82:17 83:25 84:1,24 86:21 87:18 88:23 93:9 102:6,9 104:20 106:9 113:1,8,9 117:20 131:19 132:23 133:3, 4,11,15,19, 23,24 134:17, 19,21 136:11, 15 137:17,18, 24 138:10 144:21,24 154:20 159:17 192:25 194:11
**questioned** 145:10
**questioning** 74:21 141:3
**questions** 5:9 76:20,21 116:2 185:7 191:12 194:16
**quick** 115:6 141:18
**quickly** 171:20
**quite** 38:16 46:2 133:19
**quoted** 97:12

**R**

**raining** 193:14
**raise** 35:25 36:1 125:2
**Ranch** 7:8
**range** 18:1 34:6 47:7 56:4 76:11 86:5 110:8 119:12
**ranges** 172:15
**rank** 27:8 53:25
**rate** 30:23 31:1,2 42:2 56:2 100:15,23 101:2 118:18 154:2 161:16 175:3,7
**rated** 26:8
**rates** 59:6 118:25 120:20 171:19 172:5
**RC** 52:12
**RC-East** 58:12
**reach** 83:17 84:22 85:1,4
**reached** 22:21 181:25
**reacting** 152:19
**reaction** 45:22 83:19, 21 89:10,11
**read** 62:23 81:6 82:7 88:11 91:25 115:24 132:13 157:13 158:17 179:20 194:15 196:10,12
**Readiness** 167:20,25
**reading** 78:4
**ready** 45:21
**real** 106:24 107:19 125:16 137:5 174:9
**reality** 132:19
**realize** 12:11
**really** 35:9 47:15 65:17 66:1 72:13 74:12 95:23 121:25 126:12 184:20
**reason** 68:16 85:2 139:21 149:20 152:4 176:20 182:19 197:4, 7,10,13,16, 19,22 198:4, 7,10,13,16, 19,22
**reasons** 104:13
**reattempt** 150:10
**rebated** 153:25
**recall** 30:16 68:3,6 73:4,6 75:15 96:10 116:25 117:1 118:17
**recapture** 58:15
**receive** 41:2,5,9 57:6,19,21, 22 58:22 61:8,23 69:19 140:8
**received** 13:10 32:14 40:9 41:8 47:14 52:18 57:7 84:8 88:3 107:3 113:14 151:12,20 153:16 176:19 186:3
**receiving** 39:23 69:24 84:6 104:3
**Recess** 42:16 71:16 111:14
**recognition** 183:17
**recognize** 42:24 43:2 118:14
**recollection** 108:23

**recommendation**
173:2
**reconsider**
107:10 139:9
**Record**
3:23 4:15 25:8 30:3 52:2,3,25 55:13 78:12 80:9 87:10 99:11 173:17 195:15
**recorded**
77:17 78:7
**records**
59:24 93:1,21 177:3
**recounted**
64:18 108:9
**recovering**
165:17
**Recovery**
88:9
**Redhawk**
77:11
**reduce**
58:15 104:7,14
**reduced**
105:22 153:9 154:2,8
**refer**
35:5 62:17 174:7,9
**reference**
115:13
**referenced**
26:24
**references**
24:23 167:23
**referred**
27:5
**referring**
37:13 52:3,5 78:10 107:21 160:17,21 176:22,24
**refinance**
30:19,22
**reflect**
52:3 132:19
**reflection**
74:13
**reflects**
74:18
**refused**
106:14 107:16 113:12 187:16
**regard**
43:23 80:4 119:15 133:13
**regarding**
55:8
**regardless**
27:2 91:5 117:3
**regular**
8:17 39:9 96:24 109:15 120:19 121:5 146:17 166:14 168:10
**reinstate**
86:17 140:3,6 181:18 187:9
**reinstated**
140:7,12 147:14,15,16 148:12 149:1,6
**reinstatement**
86:11,12
**rejected**
86:19 89:16 139:5 153:17
**rejecting**
147:18
**related**
110:16 132:15 195:17
**relates**
131:25
**relating**
191:25
**relation**
40:13 77:4 105:17 134:1 160:14
**relative**
105:13 164:17
**release**
63:9 155:23
**released**
56:14 62:21
**Relief**
32:9 185:25
**remain**
110:10
**remained**
70:3,11
**remaining**
170:22
**remains**
143:2
**remarks**
124:15,22 128:6,8,9,12 138:21 142:25 179:23 182:15 190:10
**remember**
11:14 17:20 30:17 40:12 55:10,12,14 64:11 71:18 75:11,13 103:23 104:3 106:20 118:23 126:8 129:20 162:19
**remotely**
58:3
**removal**
188:6
**remove**
117:14 128:7,11
**removed**
128:4,6,10 129:10
**removing**
142:25
**rent**
162:8 164:8 165:23 166:14 167:11,14 168:4,8 169:5
**rented**
171:2
**renter**
166:10
**renting**
160:2 162:12 171:8
**reobtained**
176:11
**REORTER**
6:2
**repair**
121:16
**repairs**
169:9
**repayment**
72:20 97:10,12
**repeat**
25:14 33:2 102:9
**repercussions**
53:12
**rephrase**
5:10 83:25 138:12
**replacing**
146:13
**report**
4:17,18,19,20 30:17 45:18 73:22 105:12,15 106:2,3 111:19 112:18 114:17 123:14,15 124:14 128:17 129:10 130:14 131:6 134:11,14,24 135:1 140:11 156:17,18 158:9 159:5 169:16,18 176:16,21 177:16,19 178:2,3 188:7,10,13,25 189:7,11,17,19 190:9 191:25
**reported**
74:1 111:5 113:5 133:25 134:9 135:24 181:25 188:5,24 192:13 195:13
**Reporter**

setdepo
The Evolution of Deposition Management

2:4 5:17 6:4 12:4 24:18 28:13 29:13 31:9 33:9 70:6 87:16 116:16 137:10 147:22,24 150:12 155:11 195:3,9,25

**reporting**
91:22 92:21, 22 110:16,22 112:8,16 113:17,18 115:13 119:16 130:4,8,12,17 131:2 132:15, 21,24 133:1, 6,13,18,25 134:10 136:14 139:23 146:1 149:25 150:3 179:19 181:13 188:6,20 189:5,9,10 190:1 192:2, 13

**reports**
62:1 110:21, 23 130:11 132:18 134:6 135:4 136:24 156:22 157:1 159:9 189:20 191:19 192:4, 6,7,8,23

**represent**
30:9 34:25 37:23 73:4 75:23 77:21 81:17 94:1 115:21 116:4 117:10

**representative**
129:15

**representatives**
67:5 84:7 119:19

**representing**
116:8 117:18

**reputation**
138:19 140:16 176:3

**Request**
4:11 85:11 91:19 114:21 127:2,16 137:16 149:23 195:11

**requested**
127:24 133:5

**requesting**
106:18

**requests**
113:25 114:15 137:20 138:1 167:14 174:12

**required**
187:8

**requirement**
10:8 187:24 188:4

**requirements**
56:14

**rescind**
92:6,8 93:9, 13 120:2 192:18

**rescinded**
56:11,12,13 93:11 94:8 97:2 149:10

**rescinding**
92:17,19

**research**
58:5 80:15 186:18

**resell**
40:11

**Reserve**
22:19

**reside**
163:20

**residence**
7:9 84:3 171:10

**residency**
17:8

**resident**
6:13

**Residential**
3:12

**residing**
163:25

**resolved**
185:6

**resource**
37:5

**RESPA**
137:5

**respond**
76:21

**response**
55:10,14,16 59:19 61:13 70:23 73:9 75:10 98:25 104:12 113:9 137:18 138:5 191:9

**Responses**
4:10 137:16 155:25

**responsibilities**
37:3

**responsibility**
26:8 131:4

**responsible**
130:17,21,23

**rest**
44:19 180:17

**restate**
29:16 50:10 64:8 75:3 78:20 80:2

**restaurant**
102:22

**restricted**
84:14

**result**
81:17 88:6 173:3 190:17

**resulted**
143:9

**resume**
12:25 42:14

**retaliation**
190:2,13 192:14

**return**
34:1

**returned**
23:7 64:17 148:10

**returns**
85:11

**re-upped**
170:20

**reversed**
148:8

**review**
161:4,6 173:15 195:12

**reviewing**
117:2

**revised**
104:1

**Rheinhart**
106:24

**ride**
16:6,7

**right**
5:13 10:24 11:3,22 14:9 16:12,21 17:11 19:9,25 20:3,12 21:11 23:18 25:5, 11,14 26:7 27:5 34:23 37:8,9 38:3 40:19 42:19 43:6,17 45:1 49:19 51:5,25 54:7 55:4 57:18 59:2 62:20,23 63:10 65:4 67:11 68:6, 23,24 69:4,25 71:17,18 73:16,21 74:5,17 76:14 77:12,14,19 78:20,22 81:10 82:8,9, 15,22 83:25 84:21 89:25 90:2,7 91:18, 25 92:9 93:8, 15 95:7,23 99:19 100:20, 23,25 102:11 103:5 104:17 106:11 112:12,24,25 113:8 115:24 117:7 118:13,

sd setdepo
The Evolution of Deposition Management

18,20,22 119:13 122:15 123:6 127:3, 15 130:6,10 133:9 135:12 136:4 145:20 146:2,11 148:5 149:10 150:18 153:7 157:13 158:17 161:13 166:13,23 170:3 171:4, 16 172:12 178:8 179:15, 16 180:10 181:14,19 183:7,14 193:9

**rightfully** 141:5 145:11, 17,19

**right-hand** 77:18 111:21 112:19

**rights** 190:3,18 191:24 192:14,15,17 193:1,3

**rings** 181:1

**Road** 1:19 2:3 78:19 122:23

**rockets** 15:25

**rodeo** 109:13

**Roger** 10:8 14:2 17:5,14 19:2 21:21 23:8 24:9 28:19 30:8,14 35:13 40:17 43:12 45:4 54:17 67:8 69:20,23 72:16,22 73:20 75:5,13 76:3 79:9 82:9 88:10 92:4 94:4,9 95:13,18 100:19 112:13 120:21 126:8 157:12 171:23 183:11 185:4 188:11,22 193:23

**rolls** 63:19

**Roman** 31:12

**room** 12:12 65:25 109:9,21 110:6 122:18

**rooms** 18:5

**ROTC** 10:10

**roughly** 14:5 46:25 73:18 82:20, 21 158:13 168:16,18

**round** 17:24

**rounds** 15:17

**RPR** 1:25

**Rucker** 16:10

**ruined** 141:5

**rules** 5:8 135:11 180:14

**run** 90:24 131:7 150:10,13 188:4

**running** 58:12 60:16 167:1

**S**

**s** 2:10,16

**S2** 26:16

**S3** 26:17

**Saari** 1:25 2:4 195:3,24

**safe** 125:2 143:16, 18,19

**sailors** 137:1

**Saint** 8:8

**Sale** 78:8,9 79:3, 12,23 92:7 93:10,11,13 94:8

**Salerno** 58:8,12

**satellite** 193:7

**satisfactorily** 62:8

**Saturday** 65:8,22 66:25

**save** 196:13

**saw** 42:11 62:2 126:4 142:16 179:20 181:10

**saying** 22:5 51:19 55:23 57:19 59:15 73:23 92:18 108:17 112:17 125:17 139:13 147:6 149:4 160:17 174:12 189:16

**says** 25:10 31:6 32:17 35:14 43:15,17 52:12 54:16 55:19 62:21 63:8 66:19 73:7,12,15, 20 77:7,20 78:3 81:13,24 82:3 83:16 94:17 97:21 98:22 100:9 104:13,22 105:9,25 106:2,7,8,9 112:9,10 116:6 134:8, 15 136:5 149:23 150:23 151:21 158:4

**scanning** 58:2

**scaring** 140:20

**scheduled** 85:20 171:13, 14

**school** 7:17,18,20, 23 9:12 13:7, 9,11 15:16 16:6,11 36:20 162:11 163:25 166:23

**schools** 14:17 36:24

**Science** 9:19

**score** 105:19,25 106:1 157:10, 11,23 158:23 169:20,22,25 182:15

**scores** 157:6,17 158:15 169:24

**SCRA** 24:3,4 32:16, 20,24 55:17 60:9 65:13,14 66:5,20 67:4, 5 72:5,9,11 75:9 78:6 79:11,12 85:13 88:6,12 89:12 93:4 96:23 107:6 113:7 125:8 132:1,25 133:2,5,16 134:4,5,11, 13,22 135:5, 25 136:20 137:1 139:9 152:7,10 160:6,9,21 161:8 182:18 183:2 190:2, 18 191:21,25 192:14,15,17

193:1,2
**seamlessly**
39:25
**seats**
144:4
**second**
11:25 12:1,8 25:9 30:2 43:19,20 45:14 51:6,8 52:6 62:5 81:16 86:14 103:14 104:1 105:12 109:12 111:25 124:19 127:9 135:23 138:23 139:17 144:19 146:10,11,12, 15,21 159:24, 25 165:9 168:14 171:21 187:6
**second-level**
152:6,10
**secret**
170:4,22
**secrets**
170:21
**section**
26:2 88:6,8 132:1 166:16
**Security**
6:7 38:12 81:2 170:2,3, 7
**see**
38:14 43:10 48:20 49:13 50:21 53:19, 24 79:22,24 80:3 81:8 82:2 87:3 91:9 93:2 94:16 95:11, 23 96:22 106:1 109:4, 23 112:2 115:25 123:7, 10,12 127:4 133:10,20 152:8 156:1, 4,6 157:6,7, 22 158:14 165:1 172:20 173:1 178:17 187:17 193:19
**seeing**
73:4,6 75:11, 13 116:25 117:1
**seek**
80:13 143:20
**seeking**
185:25
**seemingly**
65:14
**seen**
8:17 34:23 72:24 77:2 115:17,18,20 116:9,12 117:17,24 118:6,8,11,16 174:16 191:1, 6
**selection**
13:10
**sell**
172:11
**selling**
172:9
**send**
16:24 21:5 41:10 61:14 67:18 68:8,12 71:3 74:20 85:17 87:24 100:1,7 114:23 180:2 184:16
**sending**
61:4,5 72:8 151:6,14
**sent**
28:4,5 32:13 33:17,22 40:19 41:3 55:7 61:4,10 68:13,14 87:25 92:2,4 93:6 95:25 96:1,2,4,7,15 114:22 120:4 147:4,5 150:22 151:19 161:11
**sentence**
104:13 149:18
**separate**
48:17 130:12 131:2 156:8
**separation**
47:14 185:15
**September**
57:3 73:3,16 120:20 160:15 189:14
**sequential**
127:13
**sergeant**
27:11 48:1
**Series**
3:16 5:8 42:25 104:15 110:15
**serious**
104:23,25 105:5,7 106:3 139:2 157:24 158:4 159:1 166:20
**service**
15:2 24:6,7,8 39:18,22 40:16,20 41:6 46:7 55:1,2 58:1 61:12 82:11 172:2 185:19
**Servicemembers**
32:8 136:21
**servicer**
40:6,13
**Services**
1:7 15:1
**servicing**
148:10
**serving**
137:1
**set**
39:13 40:16 71:2 72:20 158:7 180:9, 16 181:14 195:8
**Seton**
8:8
**settled**
123:9
**Settlement**
137:5 152:23, 24 153:14
**seven**
45:19 101:14 102:15 103:1 109:5 127:23 151:13
**shades**
140:21
**shark**
174:4
**SHEET**
196:1,14 197:1 198:1
**she'll**
9:12
**short**
42:8 165:10 173:16
**short-sell**
170:16
**show**
34:16 37:17 42:23 53:9 72:23 80:19 83:2 91:13 108:22 111:17 115:16 128:16 131:7 149:21 156:12 158:8 187:25 188:13
**showed**
40:4 75:16 111:6 123:15 124:13
**showing**
30:6 37:22 57:15 75:18, 22 77:1 87:9 94:15 103:20 150:21 156:17 159:4 169:15 188:24
**shown**
73:22 124:19
**shows**
41:3 59:25 81:18 99:11 139:12 140:11 180:1
**Shreveport**
2:11

sd setdepo
The Evolution of Deposition Management

**shut**
194:6
**sic**
150:23
**sick**
173:13
**side**
22:8,9 36:11 82:6 92:18 98:21 120:16 143:18 183:3 192:22
**sign**
40:10 155:23 167:5 194:15
**signature**
4:3 38:1,3, 18,20,22 39:2 87:13 94:16 195:12
**SIGNATUREDATE**
197:24 198:24
**signed**
91:15 196:21
**significant**
141:21 143:3
**significantly**
182:23
**Sill**
52:19
**Silverbell**
31:13 56:18
**similar**
73:6 91:14 101:1 103:14 118:7
**simply**
38:16 64:10 104:21 106:6 137:13 152:19
**single**
46:18 57:9,16 67:17 147:5 168:2 181:11 189:22
**Sioux**
40:23
**sir**
9:20 10:3,17 11:23 20:2 25:1 27:14 29:5,24 30:21 31:4 32:2 37:9 42:5,7, 22 43:2,9,14 52:16 58:24 84:24 90:1 133:8
**sister**
18:10
**sit**
23:19 138:4 141:22
**sitting**
129:16
**situation**
59:12 60:19 61:16 65:15, 16 66:4,21 70:20,22 71:2 107:24 108:1 114:10 136:21 152:16 167:16,19
**Six**
7:6 11:9 24:14 40:4 44:15,18 56:3,4 59:7 65:18,21 66:23 67:21, 22,23,25 68:5 72:25 97:15 103:11 109:5, 11,16,18 110:7 121:11 124:16 127:23 141:16,23 148:22 151:13
**sixteen**
61:25
**SJA**
79:24 80:13 95:10
**skiers**
15:3
**skill**
120:14
**skin**
8:21
**skycap**
15:1
**slope**
71:8
**slow**
24:20 116:17
**slower**
12:4
**small**
13:21 166:25
**smart**
126:12 141:17
**snapshot**
59:24
**Social**
6:7 8:6 81:2
**soldier**
46:20 66:5 134:25 135:2 182:17
**soldiers**
27:23 36:18 44:13 52:12 62:1 95:13 137:1 182:21
**somebody**
59:13 60:8,10 66:11 84:15 139:20 140:4 152:14 162:10 163:23,24 168:2 180:13, 15 183:6 190:7
**someone's**
108:9
**somewhere**
32:15 47:11 68:21 76:10 187:3
**son**
62:1 65:9,24 121:8
**soon**
121:7
**sorry**
6:1 7:19 9:9 12:7,20 18:23 22:4 24:20 28:13 29:13 41:18 47:2 54:20 57:12 58:10 63:22 65:6 69:10,12 70:6 75:19 87:18 116:16 120:9 121:1 122:7,8 128:20 156:13,18 157:20 160:8 173:3 194:8, 10,13,14
**sort**
9:2 22:13 28:7,8 36:18 45:16 49:7 60:20 75:16 78:13 85:17 95:16 97:16 99:20 100:10, 12 106:25 107:3 127:12, 13 134:24 153:17 159:8 165:16 167:5 174:3
**sought**
142:6 143:11 144:3 151:3 173:20
**sound**
37:8 71:10
**South**
13:20 40:22, 23 58:14 143:18
**spare**
65:25
**sparring**
16:18
**speak**
6:1 12:13,15 23:10 48:18 59:12 77:22 85:6 124:4 135:22 179:4
**speaking**
74:4 113:19 130:3 138:22 148:15
**special**
21:2,3
**specific**
11:11 28:8 30:17 104:13 110:20 111:2
**specifically**
105:4 158:2 177:12 181:25 193:2,3
**speculation**
136:16 144:24

sd
setdepo
The Evolution of Deposition Management

**spend** 64:18 121:10, 16

**spending** 48:25

**spoke** 65:12 96:13 97:7,12 99:11 107:5,23 114:8 120:11, 13 129:19 140:3,4 148:17,18 151:15 169:10 179:21,22

**Spoken** 95:19 149:2

**spot** 71:20

**spouse** 6:21

**square** 166:24

**stacking** 74:25 75:8

**Staff** 95:1

**stand** 118:2

**standard** 50:4 184:15 185:4 192:17

**start** 24:20 32:10 49:2 61:7 64:19 65:9,13 71:3 121:6,8 162:8 170:23 186:20 189:20

**started** 8:23 9:1 13:10 27:24 39:8 40:6 60:23 61:4,5 65:8 68:16 71:23 79:18 89:14,15 92:21,22 123:4 147:19 148:20 162:12 165:1,2,3 166:10 168:9 176:12 189:5, 9,10

**Starting** 11:21 42:20 50:11 60:23 76:17 89:13 119:21 123:1, 2 132:2,11 141:1 146:23 153:25 189:21

**starts** 174:2 189:13

**State** 2:5 17:1 21:8,19 24:24,25 25:18 51:16, 18 91:19 134:20 152:17 166:20,22 167:2,4,5,24 168:5 169:1 195:1,4,9

**stated** 9:15 103:25

**statement** 83:20 117:21 145:11

**statements** 177:13 192:12

**STATES** 1:1 24:11 35:17,24 36:2 53:22 148:7 149:15

**stating** 40:15

**station** 45:4,6,11,20 52:18

**status** 22:21 29:7 35:19 56:9 63:16,24,25 68:24 99:1 147:17 153:4 193:19,20

**statuses** 21:25 22:6,8

**statute** 135:6

**statutory** 48:10

**stay** 109:23 163:18 166:24

**stems** 181:21,23

**stenographically** 195:13

**stick** 180:7

**stop** 67:3 68:23 71:24 93:8 120:25 121:20 183:7,14

**stop-by** 178:17 187:2

**stopped** 33:11 85:22 86:4

**store** 102:22

**straight** 60:17

**strange** 189:18

**stray** 109:14

**street** 8:9

**stress** 141:13 156:1 182:16,17

**stricken** 25:8

**strike** 29:15 63:22 76:20 79:2 132:4 145:23 146:7 175:22

**strung** 14:21

**student** 10:11

**stuff** 21:4 46:19 48:6,7 150:9 151:17 166:5 169:7,8 185:4

**subbed** 40:21

**subbullet** 106:2

**subject** 7:14 30:10 37:24 48:4,5, 7,8 112:5,7 130:24 155:7, 8,11,13 172:18 183:25

**submissions** 93:6 116:13, 14,18 178:23

**submit** 85:10,11,14 97:5 98:3

**Submitted** 4:8 93:1,22 98:5 115:23 116:19,25 119:6 149:20, 24

**submitting** 170:24

**subscribed** 195:20

**sub-sections** 88:7

**Subsequent** 78:21 89:18 92:11,13,16, 23 107:18 114:12,20 139:3,10,25 161:4 176:25 185:5 189:20

**subsequently** 147:5

**substance** 106:5

**Substitution** 3:20 77:1

**Subway** 50:7

**successful** 83:24 174:10

**sudden** 62:16 141:9 181:2 189:19

**suddenly** 109:14 189:13,23

**sue** 131:16

**sued** 131:16

setdepo
The Evolution of Deposition Management

**suffer**
8:14

**suffering**
151:3

**suggesting**
145:17

**suggests**
75:24

**sum**
50:14 86:19 106:5 175:22

**Sunday**
65:23 66:25 67:1

**Sunstreet**
142:21,22 143:8 173:24 174:7,10,24

**support**
21:3 27:23 28:19 142:15

**supported**
166:22

**supposed**
93:4 155:16 184:21 189:22

**sure**
15:17 30:1 85:3 100:7,9 125:23 130:2 131:10 133:19 140:21 143:19 154:23 169:2 175:25 177:8

**suspended**
170:5,8

**suspending**
170:19

**suspense**
76:14

**switch**
15:11 40:10

**swore**
25:10

**sworn**
195:6

**T**

**table**
26:10 127:8

**tae**
16:17 163:24 164:18

**TAG**
23:14,15,16 51:17

**take**
9:3 17:25 20:25 42:8 43:5 51:5 58:20 71:13 77:25 81:1 82:17 83:11 85:23 88:4 93:1 96:1 100:10 106:16 108:1,14 111:12 115:3 125:8 126:4 127:16 131:6 132:1,10,12 133:20,22 140:1 141:25 147:4,6,7 151:16 161:14 162:16 169:6 172:8 173:16 194:4

**taken**
37:7 58:19 91:22 143:4 195:7,16 196:11

**takes**
97:21 140:25 180:6

**taking**
109:2 172:12 181:4

**Taliban**
58:16

**talk**
12:11 59:19 60:5,6,7,8 61:2 62:15 65:10 66:3, 12,15,18,19 67:4 70:20,24 72:6 91:8 107:9 141:22 142:4 146:3 150:14 170:7 177:24,25 179:25 183:18

**talked**
60:5 62:9 65:22 66:10 68:15 115:5 120:5,7 137:23 151:7 177:11,24 183:3 185:12

**talking**
24:10 25:16 41:6 42:20 55:25 56:1 57:19,20 62:14 65:8 66:2 72:12 86:4 89:5,7 94:7 98:6 110:20 115:12 118:7,24 121:12,22 122:25 130:25 140:19 149:4 172:24 177:22 183:16 184:13

**talks**
35:8 105:19

**target**
15:18 135:7 150:10,13

**tax**
85:10 168:19

**taxable**
47:22,24

**taxes**
48:5,7,8 68:18 171:24

**Telephone**
111:11

**tell**
21:25 22:6,7 56:5 62:12 67:25 68:3 71:12 109:21 116:3 117:8 127:6 130:22 139:9 152:15 177:12 181:5

**telling**
108:11 121:15

**tells**
32:17 130:15, 21

**temporarily**
88:7

**ten**
17:15 40:1,2 48:4,8 97:15 142:15 162:25 170:20 176:7 181:12 183:2

**tenant**
162:6 165:9 171:4

**tenants**
165:25

**tend**
12:13

**tender**
86:17,22

**term**
102:5 121:1 155:15,16,17

**terminated**
32:25

**terms**
39:3 53:6 55:15 74:13 129:15 130:11 133:6,17 136:13 182:21 185:3 191:22

**tested**
95:16

**testified**
118:17 187:14 189:2

**testify**
188:23 195:7

**testimony**
5:22 36:5 149:7 179:12, 13 187:8 188:12 192:24 195:13,16

**Texas**
45:17,20

**Thank**
12:18 37:20 181:17 192:9 194:15

**theater**
47:23,24 48:3,9 59:9 74:21

**themselves**
191:12

**thereafter**
186:5 188:23

**thereof**
195:10

sd
setdepo
The Evolution of Deposition Management

**they'd**
66:13,16,19 100:9 183:6
**thick**
178:20
**thing**
20:8 22:13 25:21 38:15 46:4,11,21 92:25 96:16 141:12 143:2 160:16 175:16 181:20 191:7
**things**
9:13 14:14,19 28:6,21 36:12,25 37:4 41:10 43:5,17 48:18 49:13 53:7,10 85:11 95:14 96:25 97:18 101:20 109:17 115:7 121:9,18 123:16,20,25 124:14,20 133:6,7 135:24 136:23 140:23,24 141:1,7,10, 20,21,25 142:12,14 143:18 166:9 173:14 174:23 175:2 177:13, 14 179:16 180:7,8,9,25 181:14 182:13,17,19, 20,25 183:15 189:3 190:6, 8,9 192:17
**think**
11:8,9 16:22 17:6 18:12 24:14 28:10, 11 30:24 33:18 34:5 40:8,9,22 47:15 48:3 52:19 53:5 57:25 59:2,23 60:2 63:3,5 71:24 72:24 75:15 76:10 78:11 79:7 80:5 81:6 82:13 83:12 88:15,16 96:5 101:20 102:15 103:6,7,10, 14,15 104:23 105:23 107:20 114:20 116:5 119:3,5 123:1 130:1,20 132:18 134:14,16 135:4,9,18 136:5 137:6 138:6 141:20 147:22 148:16 151:20 153:15 155:15,16 160:23 161:11 162:25 163:5, 19 164:4 168:23 172:9 174:21 175:1, 25 179:1,8, 14,20 181:6 182:13,18 184:20 186:25 190:12,13,14, 17,21 191:11 192:21
**thinking**
94:3
**third**
45:16 77:15 105:15 137:17 141:8 144:3 167:3
**thought**
126:18,21 141:11 163:17
**thousand**
6:16 22:23 34:7 61:5,14 71:3 86:5,7,8 87:2 99:8 100:6 103:11 168:16,18 171:15 172:4 176:12 187:25
**thousands**
97:19
**threat**
140:16
**threaten**
126:10
**three**
7:4,6 13:22 26:15 27:21 28:5,6,11 45:8,10,11 46:3 59:1 62:11,15 67:20 70:18 76:2 85:19 91:9 95:3 101:14 109:4, 5,6 115:5 122:18 131:11 144:4 150:17 158:13 188:20
**three-**
29:19
**three-month**
14:18 158:20, 21
**three-year-**
**old**
141:14
**throughout**
31:19 37:13 45:10
**throw**
154:18 168:22
**throwing**
24:20 97:17
**Thunder**
7:8
**Tickets**
17:22
**tied**
130:13
**tight**
172:16
**tile-cutter**
126:4
**till**
150:7
**time**
10:15 11:8 12:9 14:5,15 16:3,8,23 17:20 18:3, 10,19 19:7 23:9 25:24 26:16 29:22 30:15 32:3,17 34:11 35:14 36:16,17 40:2 41:24 42:3 44:13 46:13, 23 48:25 50:12 55:25 56:1,6 57:4, 15,16 58:6,8, 11,15,25 59:4,25 60:1, 15,17,21 61:17,18,22, 24 62:4,6 64:22,23 65:7,12,19 72:7 80:6,16 84:19 85:7, 13,21,25 86:10,22 90:4 92:17 93:19 94:23 96:20 97:9,10,15, 17 99:4,7 100:1 108:9, 16 109:7,13, 16 110:6,11 111:4,6 112:24 113:6, 20 114:5,21 115:8 118:23 119:3,12,14, 18 121:16,18, 22 122:22,24 123:1,14,15 124:13,20,25 125:4 127:16 128:10 133:22 135:7 140:4 142:1 143:5, 22 144:8,12 146:9 154:6 158:20,21 160:24 161:23 163:6,11,14, 15 165:8,10 175:18 178:10 181:4 183:22 185:21 187:7, 13,17,19 188:2 191:20 193:4,10,12 195:8,16
**times**
28:4 49:14 59:9,11 61:18 62:7 65:20 117:2 141:5 150:17 151:8



Frederic L. Edquid April 26, 2012

237

161:19 162:1 179:19 183:2 184:4

**title**
11:14 20:21 21:14,18 23:3,4 24:7, 8,10,11,12,15 25:22,24 26:23 27:1 28:2 29:8,20, 21,22 31:24 32:4 35:22,23 43:7,16,17 44:1 51:17,19 53:20,22,23 55:18 56:13 63:18,19,21

**today**
5:21 23:19 74:5 112:6 138:5 144:1

**together**
14:21 19:3 47:11 193:7

**told**
44:7 90:11,22 107:2,5,9,24 110:1 114:16 131:5 141:4 151:16 152:19

**toll**
140:25 180:7

**tomorrow**
20:11 25:12

**top**
53:24 74:25 97:19 115:23 138:6 170:4, 21 177:5

**topics**
178:12 184:14

**Total**
15:1 44:19 67:19,21,23 105:10,13 152:25 153:9 154:11 159:13 178:25

**totaled**
187:3

**totally**
26:1

**totals**
97:20

**touch**
61:22

**tough**
46:14,16,21, 23 62:4

**tour**
52:13

**tours**
28:23

**toward**
99:17 153:2

**town**
25:11 58:16 166:24

**towns**
13:22

**traditional**
14:7 15:8 21:9,17

**training**
10:13 21:3 28:22 29:4 36:14,15,16 48:22

**transcribed**
195:14

**transcript**
4:24 196:11

**transfer**
66:13,14,19

**transit**
64:22 163:10

**transition**
16:24

**transmitted**
41:12

**transpired**
107:15 113:11

**TransUnion**
4:7 111:19 130:5 157:7, 11,22 158:15, 24

**T-rats**
50:8

**travel**
51:15 52:5

**tried**
59:21 66:8 84:22 85:4 150:15,16

**trip**
17:25

**true**
91:8 92:7 95:19 106:13 114:14 134:1 158:25 195:15 196:12

**Trust**
3:15 38:17,21 39:6 77:14

**Trustee**
1:7 3:20 77:1

**Trustee's**
78:7,9

**truth**
132:21 195:7

**truthful**
5:22

**try**
12:7 21:1 64:15 85:11 92:12 109:24 143:5 181:6

**trying**
19:18 29:18 36:5 41:23 58:15 60:18 61:18 62:7 66:3 67:4 70:19,20 72:3,4,5,19 74:23,24 75:9 84:23 108:18, 20 133:9 134:16,18,20 138:23 143:15 144:18 154:15,22 171:1 180:9, 12 181:9,10

**TS**
170:5

**Tucson**
1:20 2:3 143:18

**turn**
35:12 51:6 52:9 53:24 62:18 81:16 111:25 151:2 158:22 178:1

**turned**
137:17 187:21

**turning**
138:22

**twelve**
27:21

**twenty**
158:19 161:11 172:12

**twenty-four**
161:21,22

**twenty-some**
158:19

**twice**
48:21 85:6 172:7

**two**
6:16 10:12,14 17:17,18 22:23 26:22 27:21 28:23 34:7 41:4 58:25 65:21 68:8 85:23 91:9 92:4 95:3 101:14, 22 108:4,5,6, 14 110:5 120:1 122:14, 15 128:19 131:11 149:7 150:17 154:17,20 159:19,21 165:25 166:22 175:19 176:6, 9,14 187:25 189:3

**two-thirds**
112:1 167:2 193:12

**type**
71:2 91:14 118:8 119:8 133:7 135:21 170:18

**typed**
87:22

**types**
24:15 54:25

**typewriting**
195:14

**typically**
15:15 36:10

sd
setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

40:1 45:13, 14,15 61:24 66:23 84:9,10 102:22

**U**

**U.S**
31:13 53:23 145:8

**U.S.C.'2605**
137:21

**UFL**
28:15,16

**Uh-huh**
23:6 31:8,9 35:7 43:21 51:4,10 52:10 74:6,14 78:2 83:5 87:11, 14,16 113:3 116:22 134:18 137:7

**UIC**
44:17,18

**ultimate**
23:20

**ultimately**
37:24 127:25 130:16 131:10 142:8,10 143:9 147:13 152:22 173:23

**unable**
191:21

**under**
23:3 24:15 27:18,21 28:2,25 29:9 32:16,19,24 33:8 36:21 38:6 43:7 44:17 51:23 52:2 53:23 55:17 56:13 66:5 67:4 72:14 79:11 85:13 93:24 113:6 125:8 134:11 137:1, 5 159:12 163:14 170:12 171:5,12 190:18 191:25 195:14 196:9, 10,16

**underlying**
38:11

**understand**
5:9,12 10:10 27:3 36:3,5 50:23 53:11 64:7 66:4,6 67:5 70:2 72:11 74:3,7 102:5 110:21, 23 124:10 126:7 130:3, 7,16,24 133:10,12,19, 21 134:16 135:5,6,13, 15,19,22 136:10,20 138:2,3 149:9 173:8,9,11 186:23 192:24

**understanding**
25:23 33:6,8, 12 65:17 113:19 117:22 118:19 120:14 123:17 128:5 132:3 135:23 136:25 150:2 183:8,9,17, 19,20,22 186:6,12,18 196:15

**understood**
5:14 38:6 39:3 45:24 46:1 65:15 185:13

**underwriter**
142:14 174:13

**undo**
190:19

**Uniform**
3:12 27:13

**union**
39:14,15 57:20 101:24

**unit**
11:12,14 14:3,4 26:11 39:15 44:11 51:23 56:20, 21

**UNITED**
1:1 14:25 24:11 35:16, 23 36:1 53:22

**units**
13:1 26:5

**Universal**
116:5

**University**
8:1 9:16 10:7

**unless**
106:1 191:4

**Unlike**
25:6 36:11

**unnecessarily**
102:7

**unoccupied**
164:21

**unpaid**
172:17

**unsuccessful**
83:17,23

**unwind**
91:19 92:6,8

**unwound**
139:10

**updated**
149:21

**upgrades**
175:2

**upper**
77:18 112:19

**upset**
45:23 46:2 108:16

**USAA**
90:9,10,11, 17,22,23,25 91:9 92:12 101:24 103:7 138:22 176:4 181:2 187:7

**usable**
37:5

**USC**
24:12 43:16, 17 44:1 53:20

**use**
23:20 53:5,20 126:4 146:7 166:8

**user**
102:3,4,12

**user-friendly**
169:10

**usual**
26:21

**usually**
36:10

**utilities**
164:1,9 165:19,20 166:1,3

**V**

**VA**
53:8 124:22 175:10

**vacant**
164:21 165:9

**vacate**
106:18 110:10

**vacated**
89:18 96:21 110:12 114:13 123:18,19 148:24 149:3, 8 182:10

**vague**
102:7

**VAH**
48:5

**valid**
167:20

**value**
139:18

**values**
172:13,14

**variable**
59:5 155:5 172:5

**varies**
175:16

**vary**
171:19

**VAS**
50:4

**vehicle**
144:5,6,9

**verbology**
152:14

**Vermont**
6:12,13,14

7:22 8:1 9:16,23 10:7, 15 13:15,17, 23 16:9,13, 19,20 17:13, 19,23 18:4,6 19:7,11,15 49:14 159:18 160:1,14 162:5,17 163:25 166:3, 20 167:4,21 168:1,19

**version**
38:14

**versus**
24:12

**via**
92:2

**vibrant**
141:15

**vicinity**
47:1

**view**
89:11

**violate**
160:6,9 180:13

**violated**
79:12 89:12 161:8

**violating**
107:6

**violation**
133:1

**virtue**
185:19 195:10

**visibly**
169:20

**visit**
94:10,19,23 95:5

**voice**
11:1 34:10

**volition**
49:17 114:7

**volume**
34:10

**voluntarily**
191:3

**vs**
1:5 196:6

**W**

**wait**
29:13

**Waiting**
84:12 194:10

**waived**
100:3

**wake**
65:8

**walk**
11:24 12:20

**want**
12:23,24 13:1 23:19 25:8,9, 21 26:4 33:2 35:5 38:24 45:23 46:15 60:6,7 71:12 72:7 77:22 81:1,2 88:4 96:22 102:9 108:22 109:23 111:25 118:1 126:14 129:5 132:1,10,12 142:4 146:3 153:14 175:24 181:16 187:14

**wanted**
15:4,17 66:1 91:1 97:4 106:25 111:25 114:16 126:21 127:4 152:7,8

**war**
27:20,23 28:2 45:10

**wartime**
27:18 28:25

**wasn't**
14:19 18:1 47:15 61:23 84:13 97:20 109:14,18 110:14 117:20 124:4 150:9 167:16

**watching**
109:7 162:10

**water**
29:25 166:7 170:12

**way**
26:19 52:20 54:6,7 58:6 63:23 98:4 108:15 112:1 122:14 124:21 125:4 128:13 141:2 146:16 150:8 182:10, 21 195:17,18

**wear**
27:13

**website**
194:1

**week**
97:24 110:5 114:20 142:16 181:11

**weekend**
66:25

**weekends**
64:19 67:1 121:11

**weeks**
7:6 11:8 21:6 28:5,6,12 85:20 94:8 110:7 141:16 148:22 169:8 175:19 193:10

**week's**
125:3

**weighs**
62:3

**we'll**
5:13 16:24 23:5 26:2 28:15 43:19 80:17 86:14 89:19 99:3 133:14 142:17 155:8 174:24 175:10 194:15

**went**
10:20 12:3 13:3,4 28:11, 12,19,21 29:3,18,20 48:12,13,14, 15 49:6,13 50:11,14,18, 19,20 54:13 59:22 63:18 69:22 79:24 88:14 92:14 95:5 107:13 109:7,8,20 110:6 116:24 119:3 123:12 161:17 164:20 185:14,15 194:6

**we're**
15:9 25:15,16 26:18 27:3,15 34:17 37:13 41:21 42:15 48:22,23,24 51:20,22 57:18 58:17 71:1,12 72:25 79:19 92:18 94:7 106:11 112:5 115:6 116:2 125:5, 17,18 139:6 142:10 143:19 151:17 156:15 177:15 180:2, 14,16 189:17

**weren't**
18:20

**West**
7:8,12,13 20:4 65:5 84:4

**we've**
45:9 101:18 133:13,24 143:4 170:16, 18 174:13,16 175:25 179:14

**whatever**
20:25 27:21 40:11 48:10 50:8,9,18 55:19 141:19 149:10 151:23 161:19 162:4 177:15 178:24

**whatsoever**
42:1

**whenever**
92:17 134:22

**WHEREOF**
195:20

**Whether**
31:21 36:12 39:19,20 107:15,16

124:8 155:2,3 178:15,16 182:14,15 185:21 190:9
**whiskey** 44:17
**whoever** 107:10,25 148:16
**whole** 38:15 50:11 195:7
**wife** 5:7 9:6 16:14 18:17 19:1 20:8 44:8 49:4,12 50:21 61:15,20,23 62:2 64:17 101:7 107:20, 21 108:8,11, 24 109:7 110:1 121:15, 16 140:19 145:10 148:4 156:1,8 164:18
**wife's** 38:3 45:22
**willful** 132:18
**willfully** 192:4,5
**willing** 16:25 169:11
**window** 108:10 136:22 140:19
**winds** 193:13
**Winooski** 7:18,20 159:18
**W-i-n-o-o-s-k-i** 7:20
**winterization** 178:17
**within** 36:17 40:9 41:3,4 68:8 78:4,5 81:25 97:24 107:13 122:23 125:3 135:11 136:22 190:6 191:6
**WITNESS** 3:2 6:3,5 9:11 11:3,17, 19 12:6,13,17 13:18,20 22:24 23:23 24:19 25:12 28:15,19 29:25 30:2 31:10 33:3 34:8,12 41:19 42:13 47:3 54:21 58:11 69:11,13,15 79:17 80:24 89:7 103:18 106:6 111:12 116:11,18,23 117:23 118:1 120:10 125:24 126:2,5,8,18, 21,23 127:1, 3,7,10,12 128:21,24 132:6,8 136:16,17,19 143:23 144:11 150:13,16 155:13 160:9 173:13 175:14 177:8,10
179:4,7 185:8 186:16 188:16 189:2 190:5, 21 191:10 194:12 195:6, 20
**wondering** 56:20
**word** 23:20 28:17 72:20 105:3 149:10 158:3, 25 167:17
**words** 104:23
**work** 14:22,24 16:25 23:13, 14 25:7 27:13 36:10,15,24 64:21 74:4 128:10 141:22 152:20 167:24 168:3 169:6, 11 181:11 182:24
**worked** 14:11,15,25 39:25 131:7 174:10 188:19
**working** 14:19 24:24 39:16 141:24 142:12,15 174:17 180:5 184:23
**workout** 83:18 85:12
**works** 167:20
**worry** 109:20 121:14
**worth** 170:15
**wouldn't** 62:11 85:4 131:4 132:17
**write** 9:12 36:13 92:16 139:1, 11,18
**write-off** 139:14 151:23 181:15
**writing** 139:25
**written** 83:13 98:7 104:25 124:19 128:12 137:19,20 138:1 151:11 155:2
**written-off** 124:23
**wrong** 92:25 191:6
**wrote** 83:14 151:7, 15 188:20
**WYDHT0** 44:17

**X**

**x** 32:18

**Y**

**Yeah** 10:10 13:20 20:16 21:15 42:9,13 47:10 71:14 73:11, 13 77:21 83:12 112:4, 24 120:4 128:24 129:16 146:12 148:17 154:15 155:21 161:24 165:3, 7 174:16 179:11 188:19 191:23 193:14 194:9
**year** 7:23 8:2,4,24 14:13 19:19 26:22 68:8 120:9 142:9, 12 144:10 146:8 162:13 164:7 175:12
**years** 10:12,14 12:9 20:9 26:22 40:1 44:10 46:9 48:1 101:19 102:19 142:1 162:25 163:17 170:20,21,22 176:7 180:5,6 182:22
**years'** 40:2 143:5
**yell** 145:25
**Yep** 120:18
**yourself** 102:3,11 156:23 184:3

**Z**

**zero** 45:19 86:1 103:15,18 153:24 154:3, 4 175:17

**0**

sd setdepo
The Evolution of Deposition Management

**00005**
116:15
**00053**
191:11
**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**
6:8 81:3
**03**
54:3
**04**
54:4,5

**'**

**'06**
193:4
**'08**
193:4
**'09**
149:20

**1**

**1**
3:12 30:4,7,19 32:12 33:16 37:7 38:14 87:25 88:2 175:1
**1.13.2012**
4:20
**1.22.2009**
3:22
**1.31.2011**
4:12
**1.375**
31:1 100:24 118:18 172:6
**10**
3:22 17:17 21:18 23:3,4 24:7,8,10,11,12 25:22,24 29:8,20,22 31:24 32:4 43:7,16,17 44:1 51:17,19 53:20,22,23 55:18 56:13 63:18,21 83:3,6 166:21 168:23

**'**

**'10**
165:1

**1**

**10.2.2008**
3:19
**10.5.2010**
4:9
**100**
65:11 99:17
**1000**
109:10
**10000**
45:9 103:7
**100000**
190:23
**101**
112:1
**103**
4:5
**1099**
151:12
**1099-A**
139:12
**1099-Alpha**
151:20
**10th**
43:8 94:2,7 103:22 114:8 115:4 119:15 122:5,11,12 176:23 182:7,8
**11**
3:23 77:20,21,23 87:6,7

**'**

**'11**
165:1

**1**

**11.19.2011**
4:19
**1100**
109:11
**111**
4:7
**115**
4:8
**116**
1:17 2:2
**11th**
156:18 157:18 182:7,8
**12**
3:24 74:5 91:11,14 137:21 160:23,24

**'**

**'12**
20:10 165:1

**1**

**120**
112:9,10,11,16 113:5,10 189:13,14,19
**120-day**
189:12
**120-days'**
14:20
**12302**
53:23
**126**
13:12
**126th**
13:12
**128**
4:9
**13**
4:3 78:3 94:13,16
**137**
4:10
**13th**
78:14 169:17
**14**
4:5 53:16 101:5 103:21 132:6,7,8
**145**
140:8 147:18 151:14,19
**148**
4:12
**149**
4:13
**14th**
51:9 63:1,12,16 82:7,18,19,23 88:18,19 158:9
**15**
4:7 34:5 53:16 57:14 101:19 102:19 111:15,18 120:8 137:6
**150**
4:15 172:2 189:19
**1500**
98:14 168:6,7,25
**1500-square-foot**
122:13
**156**
4:17
**157**
129:2,3
**158**
4:18
**159**
4:19
**15th**
63:1,5,12 148:20
**16**
4:8 34:5 53:16 57:14 115:14,17
**16-**
49:1 60:16
**169**
4:20
**16th**
63:6
**17**
4:9 128:14,16,22
**17000**
153:1,8,11 154:12
**1782**
22:13
**17th**
115:24 117:14,21 118:2
**18**
4:10 35:5,8 60:3 78:15,21 120:8 137:9,11,13 147:18,21,22,24 182:22
**180**
140:10 147:19 171:24



**1819**
2:17
**185**
3:5
**18-hour**
49:1 60:16
**18th**
77:18,24 87:12 186:4
**19**
4:12 35:12 79:7 100:7 120:8 147:23 148:1
**190**
17:22
**192**
3:6
**192000**
172:19
**1958**
81:6
**1968**
6:5 81:6
**1986**
7:24
**1993**
9:22
**1995**
8:5 10:5,18
**1996**
13:11
**1997**
13:11,25 18:8
**1998**
14:16
**1999**
14:16 163:6
**19th**
149:24 159:6
**1st**
13:4,12 21:12 23:4 44:22 54:5 56:23 73:3,8,16 162:13 171:6

**2**

**2**
3:13 34:14,17 62:18
**2.18.2009**
3:23
**2.25.2009**
3:24
**2.5.2010**
4:15
**2.75**
15:25
**20**
4:13 11:8 17:17 66:11 79:5,7 80:10 81:20 106:4 114:11 141:25 149:1,12,14 196:22
**200**
14:12 17:24 65:11 119:3 166:4
**200.00**
104:2
**2000**
28:23 107:1 162:22
**20000**
181:16
**200000**
170:15 190:24
**2001**
8:25 14:4 15:9,10,11 16:6,22 17:6 27:24 28:9,10 162:22 163:1
**2002**
6:16 18:15,20 19:25 22:22, 24 23:1,10 25:17,22 26:5 30:12 54:2 89:24 144:5
**2003**
20:7,10 144:5 163:8
**2004**
20:7 28:10,11
**2005**
3:14 32:7 35:9 37:7,25 39:8 57:13 77:15 109:4 146:11,23
**2006**
21:10 23:4,7 27:16 29:23, 24 32:4,13 33:18 42:3,21 43:8 44:7,22 45:3 47:12 50:11 51:9 54:5 56:1,16, 22 134:22 163:12,19,20, 21 170:14
**2007**
57:4 58:1,23 60:2,24,25 163:13,19,21 182:20 183:1 193:22,23
**2007/'8**
41:24
**2008**
23:7 29:24 32:5 33:16 34:6,8 52:21, 22 53:16 60:3 62:22,25 63:16,24 73:3,8,17 74:1 75:24 77:18,24 78:3,13,23, 25 82:7,18, 19,23 88:9, 15,18,19 111:8,9 112:9 118:23 154:1 160:15 164:4, 25 183:1 186:4 189:8
**2009**
79:5,8,25 81:9,15,21 82:23 83:4,10 84:2,3 86:13, 16 87:12 90:4 91:15 92:3 94:2,18,19 96:15 99:21 103:22 106:4 108:25 110:9 111:7,20 112:20 113:2 115:24 117:14,22 119:18,22 120:10 121:23 122:5,7 123:2 124:16,17 139:4,5,8,11 140:9 141:1 143:25 147:3, 12 148:25 149:16 164:3 176:23 181:22 182:3,8 187:13,17 189:11,21
**2010**
8:11 26:19 27:20 113:22 114:8 115:9, 10 119:14,18 121:23 122:11,12 123:2 125:20 127:16,20 128:17 139:22 141:2,3,10 142:5 150:22 151:12,20 152:5 164:3 165:5 173:20 179:22 187:13,17,25
**2011**
129:23,24 130:1 140:9 142:20,24 144:11,16,22 145:5 147:3, 15 148:4,8,25 149:15,21,24 150:4,7 156:18 157:18 158:9 159:6 164:3 179:22
**2012**
1:16 2:2 5:2 7:10 8:11 144:11 162:14,15 163:22 164:3, 21 166:11 169:17 195:21
**2019**
155:16
**202**
156:25 157:6
**2029**
155:17
**204**



157:20
**205.488.6714** 2:18
**205.521.8714** 2:18
**20th** 79:8 80:7,12 81:9,13 82:23 86:16 94:7 96:19 149:16 181:22 182:3
**21** 4:15 11:8 149:1 150:19, 21
**2124** 2:11
**214** 52:12,15 53:6,9,13
**219** 69:8,11,13 100:21 118:21 171:17,18
**22** 4:17 34:2 62:14 83:4 85:19 156:10, 17
**22-** 87:3
**2200** 85:24
**2203** 88:8
**229** 38:1
**22nd** 83:10 84:2,3
**23** 4:18 158:5,8
**234** 158:14
**236** 158:22
**24** 4:19 34:1 38:14 62:18, 20 159:2,4
**240** 71:12 119:3 168:14
**2400** 161:12
**25** 4:20 5:25 6:2,3 78:1,4 91:15 92:3, 11,12,13,16 169:13,15
**250** 172:4
**2500** 161:21,22
**26** 1:16 2:2 5:2 48:1
**2600** 87:3
**27** 148:8
**2700.00** 104:2
**280** 119:11
**2800** 168:4 169:5
**285** 56:23
**29** 110:5
**29th** 149:15
**2nd** 45:15 75:24 94:22

**3**

**3** 3:14 37:16,18
**3.10.2009** 4:5
**3.11.2011** 4:17
**3.17.2009** 4:8
**3.3.2009** 4:3
**3.31.2009** 4:7
**3.75** 175:17
**30** 3:12 40:2 46:9 59:10,11 60:17 62:10, 13,14 66:13
**300** 43:11 47:14, 16,20,21 50:22 109:8 171:23
**3000** 103:15 176:13
**30000** 172:12
**300000** 190:24
**303** 88:6
**30-millimeter** 15:25 126:11
**30-year** 175:9,10
**31** 62:22
**318.221.1600** 2:12
**318.425.1256** 2:12
**31st** 62:25 63:2 112:20 113:2 148:3
**32** 20:21 21:14 24:12,15 29:21 35:22, 23 63:19
**34** 3:13
**35** 60:17
**35203-2119** 2:17
**3600** 40:3
**367** 81:25
**37** 3:14
**38** 3:15
**3rd** 94:18,19 96:15 111:20

**4**

**4** 3:15 38:9,13 155:6,9,14 175:4,6,7,19
**4.29.2011** 4:13
**40** 66:13 166:8
**400** 85:25 168:19
**400000** 170:14
**408000** 159:14
**41** 12:9
**4 1 1 - c v - 0 0 3 1 1 - C K J** 1:3
**419** 44:13,20
**42** 3:16
**43** 38:25
**4329** 7:8
**45** 131:6
**450** 36:17
**452071** 196:4
**480** 76:11,13
**4th** 45:3

**5**

**5** 3:4,16 35:6 42:17,24 52:4 88:4,6
**50** 166:8
**500** 76:10 171:25 174:21
**5000** 103:11 178:24



179:2 187:4
**50000** 172:15
**50842** 1:25 195:25
**51** 52:4
**518** 132:1,3
**533** 194:17
**54** 191:11
**5465** 7:12,13 20:3 30:13 65:5 84:3 171:3 172:10 187:6
**57** 51:14 52:6
**580** 119:4
**59** 52:9 132:2,11
**594** 157:11
**5th** 73:20 74:1 128:17 150:22

6

**6** 3:18 73:1 75:19 160:22, 23 161:17,19, 23
**6.14.2011** 4:18
**6.5** 161:16,17
**60** 51:14 189:15
**600** 65:10 84:9,15 86:5 119:3,12
**61** 134:8
**62** 191:11
**64** 132:12
**640** 157:16
**65** 129:7
**658** 158:15,16
**660** 157:11
**678** 158:15

'

**'68** 5:25

6

**683** 157:10

7

**7** 3:19 35:8 62:19 75:19, 20,22

'

**'7** 163:20

7

**70** 155:21
**700** 84:15,16 172:3
**71104** 2:11
**717** 169:20,25
**73** 3:18
**730** 43:11
**730-day** 55:19
**75** 3:19
**750** 168:12 169:24 172:3
**76** 3:20
**760** 169:24
**7th** 37:7 77:15

8

**8** 3:20 54:2 76:23,24 78:10,12 79:18 80:10 91:19 161:19 166:16

'

**'8** 165:2,3

8

**80** 3:21 143:4 153:7 155:20 171:22
**800** 145:24
**800.766.4622** 89:5,8
**8000** 47:1,3,6,7, 11
**82** 44:19
**83** 3:22
**8373** 1:19 2:3
**85th** 11:16
**86** 11:19
**86th** 11:15,17,18 13:5
**87** 3:23
**8th** 195:21

9

**9** 3:21 80:22,23 88:8
**9.1.2008** 3:18
**9/11** 16:7,8 17:14, 20
**90** 88:8,18 186:5 189:15
**900** 119:2 171:20
**9000** 153:15,18
**90-days'** 14:20 88:13
**91** 3:24

'

**'93** 10:14 22:7

9

**94** 4:3

'

**'94** 10:14
**'95** 10:14
**'99** 163:5

sd
setdepo
The Evolution of Deposition Management