# Exhibit 3

**Wallace Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------- | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------------- | ) | |

**DECLARATION OF DAVID WALLACE IN SUPPORT OF THE RESCAP BORROWER CLAIMS TRUST'S OBJECTION TO CLAIM NOS. 4757, 4758, 4762, AND 4764, FILED BY PATRICIA MCNERNEY AND SUSAN GRAY**

I, David A. Wallace, declare as follows:

1.      I am a partner with Carpenter Lipps & Leland LLP, 280 Plaza, Suite 1300, 280 North High Street, Columbus, Ohio 43215.

2.      I currently represent defendant and debtor Homecomings Financial LLC ("Homecomings") in litigation between the Debtors and Patricia McNerney ("McNerney") before the United States District Court for the Northern District of Ohio.  I have represented various financial institutions and mortgage servicing companies in consumer finance and commercial litigation matters in state and federal courts for over 15 years.

3.      I submit this declaration (the "Declaration") in support of the *ResCap Borrower Claims Trust's Objection To Claim Nos. 4757, 4758, 4762, and 4764, Filed By Patricia McNerney and Susan Gray* (the "Objection").[1]

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' litigation with McNerney based on my participation as counsel for the Debtor and if I were called upon to testify, I could and would testify competently to the facts set forth in the Objection on that basis.

---

[1]      Defined terms used but not defined herein shall have the meanings ascribed to such terms in the Objection.

5.      McNerney obtained a loan on December 27, 2002 (the "<u>Loan</u>") that refinanced a prior loan (the "<u>Household Loan</u>") that McNerney and her then husband had with Household Realty Corporation.  <u>See</u> Trial Transcript, attached hereto as <u>Exhibit A</u>, at 64. McNerney and her husband had divorced and McNerney was required to refinance the Household Loan as part of her obligations under the divorce decree.  <u>See</u> Trial Transcript at 227-28.

6.      McNerney retained a local mortgage broker, Ohio Mortgage Company, Inc. d/b/a OMC Lending ("<u>OMC</u>") to work on her behalf to obtain the Loan.  <u>See</u> Trial Transcript, at 196-97.  OMC assisted in the preparation of McNerney's loan application (the "<u>Application</u>") and submitted the Application to Homecomings.  Prior to signing the loan documents, Homecomings and McNerney had no contact with each other, and McNerney was not aware that Homecomings had any involvement with the Loan prior to the costing.  <u>See</u> Trial Transcript, at 203, 275.  McNerney's broker, in her deposition, testified that OMC was dealing with hundreds of lenders at the time it originated the Loan.  <u>See</u> Deposition of Nancy George, at 17, attached hereto as <u>Exhibit B</u>.

7.      In her deposition and at trial, McNerney stated that she had a high school degree and at the time the Loan was originated, worked as a librarian.  <u>See</u> Trial Transcript, at189; McNerney Deposition, at 6, attached hereto as <u>Exhibit C</u>.  In her deposition and at trial, McNerney said that she understood that she was signing a note borrowing $108,000 and agreeing to pay it back, that her monthly payment was $1,232.48, that if she did not pay she would be default, and that the lender could require her to pay the full amount if she was in default.  Trial Transcript, at 204-05; McNerney Deposition, at 22-24. She also testified in her deposition that she understood that the mortgage she signed was a security instrument and allowed the lender to

2

foreclose if she did not make her payments.  Id. at 28-29.  She also stated that because of her divorce she needed to refinance the mortgage on her house and that she also wished to lower her payments and escrow her taxes.  Trial Transcript, at 182-86.  She also testified that she knew that she received the notice of the right to cancel, which indicated that she had three days from the origination to cancel the transaction if she wished to.  Id., at 193.

8.      In November 2003, Mortgage Electronic Registrations Systems, Inc. ("MERS") filed a foreclosure action (the "First Foreclosure Action") in the Cuyahoga Court of Common Pleas (the "State Court") against McNerney because McNerney's account was in default.  See First Foreclosure Action Complaint, attached hereto as Exhibit D.  McNerney filed an answer on June 16, 2004 asserting affirmative defenses and counterclaims against MERS/Homecomings.  See State Court Docket, attached hereto as Exhibit E.  On November 6, 2006, McNerney filed an amended answer and counterclaims (the "Amended State Court Counterclaims").[2]  See Amended State Court Counterclaims, attached hereto as Exhibit F.  At this time, McNerney also filed a third-party complaint asserting causes of action against Ohio Mortgage Company, Inc. d/b/a OMC Lending ("OMC") and GMAC Mortgage LLC ("GMACM").

9.      On January 31, 2008 GMACM was substituted as plaintiff for MERS.  See State Court Docket.  On November 4, 2008, Homecomings was substituted as plaintiff for GMACM.  See id.

10.     The State Court held a bench trial in December 2008.  The trial came after several years of discovery and motion practice.

---

[2] The Amended State Court Counterclaims included counts against the Debtors for: (1) violation of the Truth in Lending Act; (2) Violation of RESPA; (3) Improvident Lending; (4) Breach of Fiduciary Duty; (5) Negligence and Gross Negligence; (6) Negligent and Intentional Misrepresentation; (7) Unconscionability; (8) Civil Conspiracy; (9) Violation of the OMBA; and (10) Failure to Engage in Loss Mitigation.

ny-1204292

11.     Before the State Court issued its decision in the First Foreclosure Action, the Eighth District Court of Appeals in Ohio issued its decision in <u>Wells Fargo Bank N.A. v. Jordan</u>, No. 91675, 2009 WL 625560 (Ohio Ct. App. Mar 12, 2009). In <u>Jordan</u>, the court held that to establish standing to sue in a state court foreclosure case, the plaintiff had to demonstrate that, at the time the case was filed, it was both entitled to enforce the Note and was the mortgagee or assignee of the mortgage.  As a result, the State Court ordered Homecomings to provide evidence that the initial plaintiff, MERS, was entitled to enforce the note at the time the First Foreclosure Action was filed.  When Homecomings did not make this showing, the State Court dismissed the First Foreclosure Action without prejudice (the "<u>State Court Decision</u>") on September 14, 2009.  <u>See</u> State Court Decision, attached hereto as <u>Exhibit G</u>.

12.     McNerney filed an appeal of the State Court Decision, and on December 17, 2009, the Eighth District Court of Appeals dismissed the appeal (the "<u>Appellate Court Decision</u>").  <u>See</u> State Court Docket.  McNerney attempted an appeal to the Ohio Supreme Court, but the Court declined jurisdiction to hear a further appeal of the Appellate Court Decision.  <u>See</u> State Court Docket.

13.     Homecomings refiled the foreclosure action (the "<u>Second Foreclosure Action</u>") in the United States District Court for the Northern District of Ohio (the "<u>District Court</u>"), case no. 09-CV-2383, on October 14, 2009.  <u>See</u> District Court Docket, attached hereto as <u>Exhibit H</u>.  McNerney filed a motion to dismiss the Second Foreclosure Action on January 18, 2010 for lack of standing to sue, which the District Court denied on September 24, 2010. <u>See</u> District Court Docket.

14.     On January 23, 2011, McNerney filed an answer and counterclaims
asserting the same claims that she asserted in the State Court Action as well as new claims
for violation of the Ohio Consumer Sales Practices Act, and invasion of privacy, and a new
basis for the previously asserted civil conspiracy claim (the "District Court
Counterclaims").  See District Court Docket; District Court Counterclaims, attached hereto
as Exhibit I.

15.     On September 28, 2011, Homecomings filed a motion for judgment on
the pleadings and a motion for summary judgment ("Judgment on the Pleadings Motion"
and "Summary Judgment Motion," respectively) addressing all of the claims in the District
Court Counterclaims. See District Court Docket.   McNerney responded with memoranda in
opposition (the "Judgment on the Pleadings Opposition" and the "Summary Judgment
Opposition," respectively).  See District Court Docket; see also Judgment on the Pleadings
Opposition and Summary Judgment Opposition, attached hereto as Exhibit J and Exhibit K,
respectively.  Homecomings then filed reply memoranda. See District Court Docket.

16.     On August 7, 2012 Homecomings filed a Notice of Bankruptcy in the
District Court, and as a result the District Court did not issue a ruling on either of the
motions, instead issuing an order staying the case because of the Chapter 11 Cases on
August 8, 2012.  See District Court Docket.

17.     During the Second Foreclosure Action, in November 2010,
Homecomings, through counsel, discovered that the City of Lakewood had condemned the
house located on the Property.  See Inspection Report, attached hereto as Exhibit L.  Upon
further research, the Debtors learned that McNerney had not lived in the Property for some
time and had allowed the inside of the house to deteriorate, making it uninhabitable.  See

5

Property Preservation Report and City of Lakewood Correction Notices, attached hereto as Exhibit M and Exhibit N, respectively.  As a result, the collateral securing the Loan was essentially destroyed. See id.

18.    After learning of the condition of the Property, Homecomings, again through counsel, was contacted by a local civic group, Lakewood Alive, which was interested in facilitating the restoration of the Property, which was located in an historic and architecturally significant area of Lakewood, Ohio. Lakewood Alive requested that Homecomings release its lien on the Property to allow the house and the Property to be donated to Cuyahoga County Land Bank Reutilization Corporation (the "Local Land Bank") to allow for restoration and rehabilitation and to avoid demolition.  In December 2010, Homecomings' counsel contacted Gray to discuss a possible lien release that would resolve the case, but Gray did not respond.  See December 1, 2010 Letter, attached hereto as Exhibit O.  Homecomings then filed an emergency motion for a settlement conference because the demolition of the house appeared imminent, and there had been no indication McNerney would agree to deed the Property to the Local Land Bank.  See District Court Docket.  The settlement conference conducted by the District Court was unsuccessful.

19.    Homecomings, through counsel, later learned that McNerney had agreed to deed the property to the Local Land Bank at the request of Lakewood Alive and the deed was executed on April 19, 2011 and recorded on May 11, 2011. See Transfer Deed, attached hereto as Exhibit P.  After McNerney deeded the Property Homecomings executed a Certificate of Release to release its lien on July 22, 2011, so the donation, restoration and rehabilitation of the Property could occur.  See Lien Release, attached hereto as Exhibit Q; Deed.  The Certificate of Release was recorded on July 22, 2011.

ny-1204292

20.      The Loan was later identified as being eligible for extinguishment under the terms of a nationwide settlement entered into by GMACM.  As a result, Homecomings offered to extinguish the debt owed by McNerney, McNerney accepted, and Homecomings moved to dismiss the Second Foreclosure Action.  The District Court granted the motion to dismiss on August 7, 2013.  See Aug. 7, 2013 District Court Order, attached hereto as Exhibit R. As a result, only the District Court Counterclaims remained pending for decision by the District Court.

I declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on October 23, 2015, at Columbus, Ohio.

/s/ David A. Wallace
David A. Wallace

## Exhibit A

**This document contains confidential information.
Copies have been provided to Chambers and to the Claimants.**

## Exhibit B

Page 1

The State of Ohio          )
Cuyahoga County            )
            IN THE COURT OF COMMON PLEAS

MORTGAGE ELECTRONIC         )
REGISTRATION SYSTEMS, INC.  )

            Plaintiff,      ) Case No.  CV-03-514406

                vs.         )

PATRICIA JOANNE MCNERNEY,   ) Judge: Nancy A. Fuerst
et al.
            Defendants.      )


            Deposition of NANCY GEORGE, a witness

taken before ROBERT CORNS, Notary Public within and for

the State of Ohio in this cause on MONDAY, the 21st day

of AUGUST, 2006 at 21330  CENTER RIDGE ROAD, SUITE  11,

Cuyahoga County, Ohio at 10:52 a.m.  Pursuant to notice

sent to  counsel, this deposition was  tape recorded by

Legal Electronic Recording, Inc.


            - - - - - - - - - - - - - - - - -
            LEGAL ELECTRONIC RECORDING, INC.
                  5230 ST. CLAIR AVENUE
                  Cleveland, Ohio  44103
            (216) 881-8000  Fax 881-DEPO (3376)


Job #06H8268A

Page 2

APPEARANCES


ZOE K. CARLISLE, ESQ.
800 SUPERIOR AVENUE
SUITE 1400
Cleveland, Ohio
For the Plaintiff


SUSAN M. GRAY, ESQ.
21330 CENTER RIDGE ROAD
SUITE 11
Rocky River, Ohio
For the Defendant


ALSO PRESENT:


JAMES MACDONALD


-

Page 3

1              P-R-O-C-E-E-D-I-N-G-S

2              Nancy George, of lawful age, a witness

3              herein having been first duly sworn as

4              hereinafter certified, deposes and says

5              as follows:

6     DEPOSITION OF NANCY GEORGE

7  BY MS. GRAY:

8  Q    Thank you, Ms. George.  Could you identify

9  yourself, please?

10 A    Nancy George, G-E-O-R-G-E.

11 Q    And is your -- your work address is?

12 A    4311 Ridge Road, Brooklyn, Ohio  44144.

13 Q    What was the Zip?  44 --

14 A    144.

15 Q    All right.  Is that the address for Ohio Mortgage

16 Company, Inc.?

17 A    Ohio Mortgage Company, Inc. is no longer in

18 existence.

19 Q    All right.  I'm going to get into that -- those

20 details with you in a little bit.  I was only really --

21 the thrust of my question is do you conduct a business

22 there?

23 A    Yes.

24 Q    At that address?  And what is the name of the

25 business that you conduct there?

Page 4

1    A    OMC Lending --

2    Q    All right.

3    A    -- Inc.

4    Q    All right.  And now, when you were here earlier

5    you told me that you've been in depositions before.

6    A    Yes, I have.

7    Q    So I'll just briefly review deposition procedure.

8    You understand, of course, that all that's happening

9    today is I'm getting information?

10   A    Yes.

11   Q    I'm just asking you for your knowledge of certain

12   documents and a certain transaction which we'll go

13   into.  Nothing about this is designed to make you

14   uncomfortable.  I know we had a contentious start, but

15   I don't have anything against you.  Nothing -- you

16   know, I'm really not trying to make you uncomfortable.

17   I really just want to get information.

18        If something happens that you don't understand, a

19   question -- a question isn't clear, I've mumbled, don't

20   feel that you have to answer unless you clearly

21   understand the question.

22   A    Okay.

23   Q    Now, I understand that you are not represented

24   today by counsel.

25   A    I was not given enough notice to have counsel

Page 5

1    present.

2    Q    All right.  And you understand that I -- that I

3    offered you the opportunity to reschedule so you could

4    get counsel but you said that you wanted to get it done

5    today; is that correct?

6    A    I told you I was going to Europe and I would not

7    be available until after September 15th.

8    Q    All right.  And did you also say you just want to

9    get it done today?

10   A    I prefer to get it over with today.  Yes.

11   Q    Okay.  The transaction I want to ask you about

12   involves a loan that -- that Ohio Mortgage Company,

13   Inc. was involved in.  So let me start by asking you

14   this.  What -- what is Ohio Mortgage Company, Inc.?

15   A    It was a mortgage company.

16   Q    And what was your affiliation with that mortgage

17   company?

18   A    I was the owner.

19   Q    It was a mortgage company?  And you were the owner

20   from when to when?

21   A    1994 to 2002.

22   Q    Were you the sole owner?

23   A    Yes.

24   Q    Okay.  And it was incorporated?

25   A    Yes.

Page 6

1    Q    And what happened in 2002 that it ceased to exist?

2    A    We chose -- the State had a question about my

3    continuing education, so rather than argue the point we

4    closed that corporation and the licensing with the

5    State.

6    Q    So you closed the corporation and you --

7    A    Returned the license.

8    Q    And what kind of license was that?

9    A    Mortgage broker license.

10    Q    Okay.  And that was your mortgage broker license.

11        Now, who had the mortgage broker license, you or

12    the corporation?

13    A    The corporation.

14    Q    So it was in the name of Ohio Mortgage Company,

15    Inc.?

16    A    Yes.  Maybe not.  It could have been Nancy George

17    doing business as.  I think it was a DBA on the

18    licensing but a corporate actually managed it.

19    Q    And the license was issued by what department in

20    the State of Ohio?

21    A    Department of Commerce.

22    Q    And that was a dispute over a certain amount of

23    continuing education?

24    A    Yes.

25    Q    All right.  And it was resolved by closing the

Page 7

1    corporation?

2    A    Yes.

3    Q    And surrendering the license?

4    A    Yes.

5    Q    And then -- now, when you say we, who do you mean

6    by we?

7    A    It's just a phrase.  It's I.

8    Q    Okay.  And -- and what is OMC Lending Company?

9    A    A mortgage broker company.

10    Q    All right.  And what is your affiliation with OMC

11    Lending Company?

12    A    I'm president.  Sole owner.  I own a hundred

13    percent of the stock.

14    Q    All right.  And when did that company open up?

15    A    2002.

16    Q    What month in 2002?

17    A    I don't remember.

18    Q    Approximately?

19    A    I don't know.

20    Q    Was it like Christmastime?  Was it New Year's?

21    A    I don't remember.

22    Q    Do you have any documents that would help you out

23    with that?

24    A    You can probably pull it up on the web site for

25    the State of Ohio yourself.

Page 8

1    Q    All right.  I could do some research but for right

2    now I'm asking you questions and I'd like your most

3    informed answer.

4    A    I probably do.

5    Q    Okay.  And but you're -- at this point you're not

6    even able to tell me what season of the year it was?

7    A    No.

8    Q    How close in time to the closing of Ohio Mortgage

9    Company, Inc.?

10    A    Probably around the same time.

11    Q    Okay.  Did -- was a broker license necessary in

12    order to open up OMC Lending -- operate OMC Lending

13    Company?

14    A    If I wanted to close loans, yes.

15    Q    Okay.  Do you close loans?

16    A    Yes.

17    Q    All right.  Did you get a broker's license?  And

18    by you, did OMC Lending or did you?

19    A    OMC Lending did.

20    Q    All right.  Did OMC Lending have to take a test?

21    What's involved in getting a broker's license?

22    A    The operations manager took a test.

23    Q    All right.  And who is the operations manager?

24    A    Laura George.

25    Q    Is she related to you?

Page 9

1    A    She's my niece.

2    Q    And who was it that took the test and got the

3    license with OMC Mortgage Company, Inc.?  Was it -- was

4    it also --

5    A    OMC is licensed by the State of Ohio.  It does not

6    need -- it is not required to take a li -- a test.

7    Q    I'm trying to --

8    A    You need to have an oper --

9    Q    I'm trying to --

10    A    I'm explaining it to you.

11    Q    Go ahead.  Sure.

12    A    If you'd just let me talk.

13         You are required to have an operations manager in

14    the State of Ohio.

15    Q    Mm-hmm.

16    A    The operations manager is Laura George.

17    Q    Okay.

18    A    That's all that's required.

19    Q    Okay.  So the operations manager has to be a

20    broker?  Has to have a broker's license?  I mean I

21    really am trying --

22    A    The operations manager has to have an operations

23    manager's license.

24    Q    Okay.

25    A    And each loan officer has to be licensed through

Page 10

1    the State of Ohio as well.  And they all fall under the

2    corporation which is running the company.

3    Q    All right.  And the operations manager has to have

4    an operations manager license.  And what -- what is

5    involved in getting an operations manager license?

6    A    Passing a test with the State of Ohio.

7    Q    And what's -- what's --

8    A    And a background check.  I have no idea.

9    Q    Okay.  Is it the same test that each loan officer

10   has to take --

11   A    No.

12   Q    -- or a different test?

13        All right.  So -- and who -- and who is

14   responsible -- who gets the continuing education, the

15   operations manager?

16   A    Yes.

17   Q    The brokers or both?

18   A    Both.

19   Q    Both.

20   A    Not the brokers.  The operations managers and the

21   loan officers attend continuing education on an annual

22   basis.

23   Q    All right.  Okay.  So there's the operations

24   manager, the loan officer.  And who is the broker, the

25   corporation?

Page 11

1    A    Yes.

2    Q    Okay.  And in order to operate -- I'm just

3    summarizing, but I want to know that my summary is

4    accurate.  In order for a corporation to operate as a

5    broker, it has to have an operations manager who's

6    passed certain tests with the State?

7    A    Yes.

8    Q    And then each loan officer also has to pass

9    certain tests with the State?

10   A    Yes.

11   Q    And then the operations manager and the loan

12   officers --

13   A    And none of those laws were probably in effect

14   when that loan was done.

15   Q    All right.  The operations manager and the loan

16   officer each have to get continuing education, right?

17   A    Yes.

18   Q    All right.  All right.  Now, I learned a little

19   bit about OMC Lending Company.  OMC Lending is

20   incorporated?

21   A    Yes.

22   Q    All right.  And OMC Lending has the broker's

23   license?

24   A    Currently, yes.

25   Q    All right.  And Ohio Mortgage Company, Inc. held

Page 12

1    the broker's license?

2    A    Held a separate license for itself.  Yes.

3    Q    Right.  Okay.  All right.  All right.  What is the

4    relationship between Ohio -- what was the relationship

5    between Ohio Mortgage Company, Inc. and Brooklyn Title?

6    A    There is no relationship.  They did business

7    together.

8    Q    All right.  No relationship?  Just did business

9    together?  Who owned Brooklyn Title?

10    A    My husband, Ray George.

11    Q    All right.  And where was Brooklyn Title located?

12    A    4355 Ridge Road.

13    Q    All right.  And that's in Brooklyn?

14    A    Yes.

15    Q    All right.  I think that we're going to have a

16    separate deposition of Mr. Ray George, but do you know

17    when -- when Brooklyn Title began operations?

18    A    2005 -- or 1995 or '96, I believe.  Maybe '97.  I

19    don't know exactly when.

20    Q    All right.  And it operated continuously since

21    then?

22    A    It's closed.

23    Q    When did it close?

24    A    February of this year, I believe.

25    Q    February 2006?

Page 13

1    A    Yes.

2    Q    Do you know why it closed?

3    A    No.

4    Q    Did Mr. George open another title company?

5    A    No.

6    Q    All right.  When -- I want to just get kind of

7    like an overview.  I'm going to ask you about the

8    specific transaction in a short while, but I would like

9    to get an overview of how things work together between,

10   say, a lender, a broker and the title company, how

11   all -- all of these -- what -- what is the interface in

12   a -- in a loan transaction, generally speaking, without

13   getting into, necessarily, the details of this case?

14   How -- and what I'm going to do is I'm going to ask you

15   about how Ohio Mortgage Company, Inc. operated because

16   it is my understanding that Ohio Mortgage Company, Inc.

17   was the broker for the transaction that occurred on

18   December 27th, 2002.  And that actually is why it's

19   sort of important to know when Ohio Mortgage Company

20   stopped operating and when OMC Lending started

21   operating because, of course, 2002 is the date of this

22   loan.

23   A    Well, if you look at the settlement statement,

24   it'll tell you what the company was that closed it.

25   Q    All right.  Well, maybe we'll just glance at that

Page 14

1    for a minute.

2    A    It was OMC Lending, Inc. that closed it.

3    Q    All right.  So, in that case, I'm going to change

4    my question a little bit and I'm going to ask these

5    questions from a perspective of OMC Lending, Inc.

6         On December 27th, 2002, were you the president and

7    sole shareholder of OMC Lending, Inc.?

8    A    Yes.

9    Q    Okay.  And how many employees did you have?

10   A    Probably twenty-five (25) to thirty (30).

11   Q    All right.  And how many of those were loan

12   officers?

13   A    Probably twenty (20) to twenty-five (25).

14   Q    All right.  And then what were the -- what were

15   the other positions?  Who --

16   A    A receptionist, processors, bookkeeper.

17   Q    All right.  And anybody else?

18   A    No.

19   Q    All right.  And the processors, how do they differ

20   from the loan officers?

21   A    They process the loans.  They don't actually

22   discuss anything with the clients.  They simply gather

23   information, do submissions.

24   Q    And from whom do they gather the information?

25   A    The loan officer or the client.

1    Q    And then who -- when they process the information,

2    who do they give the information to?

3    A    The -- whoever's -- whoever will fund the loan,

4    ultimately.  The actual lender in the file.

5    Q    So, typically, the loan officer works with the

6    client and the processor works with the lender?  Is

7    that how it's broken down, typically?

8    A    In our office, yes.

9    Q    Okay.

10   A    It's not typical for the industry.

11   Q    No, no, no.  I'm just -- I'm just asking about

12   typical for your --

13   A    Mm-hmm.

14   Q    -- for your office.

15        So, basically, the loan officer talks to the

16   processor.  The processor talks to the lender?

17   A    Yes.

18   Q    Is that how it -- kind of how it goes?

19        Does a -- does a processor have to have any

20   special training or licensing?

21   A    No.

22   Q    All right.  At the time that -- that this loan

23   took place, who were the processors involved?  Who were

24   the processors?

25   A    I honestly wouldn't know.

Page 16

1    Q    All right.  Do you have any way of remembering if

2    I give you a couple of seconds?  I can remember who

3    worked for me for a long time.  Do you have any idea

4    who worked for you, who they might have been or could

5    you tell by looking at that document?

6    A    I would have to go to payroll records to look.  I

7    wouldn't -- I couldn't even begin to tell you.

8    Q    All right.  How about loan officers?  Who were the

9    loan officers at the time?

10    A    Again, in this industry, we change loan officers

11    frequently so I would never know who was working for me

12    at the time.

13    Q    If you looked at the -- at your loan file, would

14    you be able to tell me who were the processors?

15    A    You can see who signed the application.  That

16    would probably tell you who the loan officer is.

17    Q    All right.  So what I'll do is I'll defer that

18    question until we get to the file, to the documents.

19         All right.  And then how -- in the case of OMC

20    Lending in around the time we're talking about, 12-27-

21    02, how would a client know to come to OMC Lending for

22    a loan?

23    A    Either by advertising in the Yellow Pages,

24    mailers, newspaper, radio, TV.

25    Q    Okay.  And the -- and then how -- how do -- how

1    does OMC Lending, how did OMC Lending, at that time,

2    12-27-02, how do you form like relationships with

3    lenders?  How do you -- how do you decide which lender

4    to go to?  How do you find out what products lenders

5    have?  What -- what is the way that you communicate

6    with lenders?

7    A    They have sales reps that come in.

8    Q    Okay.  So they come in and do they meet with you

9    or the loan officers?  Who do they --

10   A    Usually the loan officers, processors, myself.

11   Q    And when they come in, typically, how -- how

12   many -- how many lender -- lender sales reps were you

13   dealing with around the time this McNerney loan was

14   made?  How -- is there a vast array of lenders who

15   would --

16   A    Sure.

17   Q    Okay.  And about how many?

18   A    There's hundreds of them.

19   Q    Hundreds of lenders and the reps come in and --

20   A    Either the reps come in or they send mailers, e-

21   mails, faxes.

22   Q    All right.  When -- when you -- when you opened

23   up, did you kind of send -- send a flyer or send a

24   letter to banks or lenders letting them know you were

25   there ready to serve as a mortgage company or did they

Page 18

1    find you --

2    A    No.

3    Q    -- or --

4    A    They usually find you.

5    Q    Okay.  And when they find you do they -- do they

6    call you up.  Do they make an appointment?

7    A    They usually just come in.

8    Q    Come in.  And when they come in, what do they show

9    you?  What is it -- what do they -- what is it about

10   themselves that they kind of bring to your attention?

11   A    Whatever products they have available.

12   Q    All right.  And by a product, that would be, for

13   example, the ability to make loans, the ability to make

14   home mortgage loans?  I mean when they -- what are the

15   fac -- what are the features of any one particular

16   product?  What, for example, would they all have in

17   common?  What things would you look for as you were

18   comparing products, for example?

19   A    Based on whatever their guidelines are.

20   Q    And what -- and what are the factors --

21   A    Late pays in mortgage.  Credit scores.

22   Collections.  If the, you know, collections are

23   required to be paid.  Maximum loan-to-values.  Maximum

24   debt ratios.  I mean our clients are not bank material

25   so you're always looking for something outside of

Page 19

1    the -- the normal, day-to-day realm.

2    Q    Mm-hmm.  So, basically, what they do, in other

3    words, I think what -- if I can summarize what you're

4    telling me or characterized it.  You're telling me that

5    when a rep comes in, they're saying, you know, these

6    are the standards that we need before we can make a

7    loan to somebody who may come to you looking for

8    financing or looking for a loan, so they would need to

9    have a certain credit score.  They would need to have

10   collections paid or not have any collections.  They

11   might need a, you know, whatever the loan-to-value

12   ratio is, whatever the debt-to-income ratio is.

13   A    Right.

14   Q    Those kinds of questions.

15        So -- so -- but then -- but then as they're

16   explaining these products to you, what do they have

17   that would, say, make you choose this rep over this rep

18   or this product over that product?  What --

19   A    Their ability to close loans.

20   Q    And -- and what are the factors in their ability

21   to close a loan?

22   A    Ratios of submissions to closings.  You might

23   submit ten loans to a company and they might not close

24   any of them even though it follows their guidelines.

25   Q    So is that something that you just, after a while

Page 20

1    you get with experience?

2    A    Sure.

3    Q    Okay.  And as -- as the lender -- or as the loan

4    sales reps, lender sales reps come in or call and they

5    explain their products, do they leave you with any

6    written materials to refer to later?

7    A    Sometimes.  I prefer that they not.

8    Q    Why is that?

9    A    I don't need it.

10    Q    All right.  How many -- how many lenders were you

11    dealing with in December 2002?

12    A    Who knows.

13    Q    Well, as between you and me, you're in a better

14    position to know, so what's your best answer?

15    A    I'm approved with over a hundred different lenders

16    now, so --

17    Q    Is that how it was in 2002?

18    A    I would imagine.  Probably.

19    Q    All right.  When you opened up OMC Lending Company

20    in 2002 --

21    A    It's not -- yeah, go ahead.

22    Q    What were you going to say?

23    A    Nothing.  Go ahead.

24    Q    Did I say it right, OMC Lending --

25    A    Yeah.

1    Q    -- Company?

2    A    It's Inc.  OMC Lending, Inc.

3    Q    Oh, it's not company?

4    A    No.

5    Q    It's OMC Lending, Inc.?

6         Did you -- did you pretty much keep the same

7    lender sales reps?  Did the operations pretty much flow

8    continuously without much of a break?

9    A    No.  We stopped for about a month.

10   Q    Okay.  All right.  So were there fewer of them at

11   that time or had you pretty much gotten your operations

12   up to speed?

13   A    Fewer what?

14   Q    Fewer lender sales reps, fewer clients?

15   A    Fewer lenders because we had to get reapproved

16   with a lot of -- you know, we had to apply for approval

17   as a new company with other companies.

18   Q    Okay.  And what did that application process

19   consist of?

20   A    Usually a broker application and a contract.

21   Q    Okay.  So there was a broker application and a

22   contract?

23   A    Mm-hmm.

24   Q    So would you have to do a broker application and a

25   contract with each lender?  Is that how it worked?

Page 22

1    A    Yes.

2    Q    So if -- if you are dealing with a hundred

3    lenders, you would have a hundred contracts?

4    A    Yes.

5    Q    Are they standard contracts?  Do they vary much

6    from contract to contract to contract?

7    A    Quite frankly, I don't read them so I don't know.

8    Q    Okay.  Do you save them?

9    A    Probably a majority of them.

10   Q    Okay.  All right.  And can you -- I think you've

11   already answered my question, but let me try.  Do you

12   know approximately or generally speaking what the terms

13   are of these contracts with -- with the lenders?

14   A    I don't read them.

15   Q    Do you decide which lender you're going to have

16   contracts with or who makes that decision in the

17   office?

18   A    Usually a process does because they decide with

19   the loan officer that they want to send a file

20   somewhere, so they make that decision.

21   Q    So the processor decides where to send the file;

22   is that what you said?

23   A    No, the loan officer does.

24   Q    And what -- what else does the loan officer

25   decide?

Page 23

1    A    That's it.

2    Q    So the loan officer will decide -- when you say

3    where to send the file, the loan officer will decide

4    who the loan application should be submitted to?

5    A    Right.

6    Q    What lender the loan application should be

7    submitted to?

8    A    Mm-hmm.

9    Q    But then who decides which lenders to enter into

10   contracts with?

11   A    If we have a file that the loan officer would like

12   to send to a company and we're not approved with them,

13   then I'll get the application and have it filled out

14   and we send it in and get approval.

15   Q    I see.  And -- but it's not a separate application

16   for each loan, I wouldn't think.  I mean once you --

17   once you submit an application and you have a contract,

18   is it just for that loan or is it for --

19   A    No.

20   Q    -- any loan you want to submit after that?

21   A    It's for any loan we want to submit.

22   Q    Okay.  And how would you describe the -- the

23   duties of a loan officer?

24   A    They talk to the customer and they take the

25   application.  They try to quote them a rate and a

Page 24

1    payment based on the knowledge that they have.  They

2    fill out the application, submit it to the processor.

3    Q     All right.  And then what?

4    A     That's what the loan officer does.

5    Q     Okay.  And then the processor takes it from there?

6    A     The processor will correct any information in the

7    file.

8    Q     And by correcting information, what -- could you

9    give some examples as to the type of thing you mean?

10   A     Like if the income isn't correct based on how the

11   loan officer calculated it.  They'll do the submission

12   sheet for the investor that it's going to and fax it

13   over.  Or now we do them on line, on line approvals.

14   Q     Okay.  And what does the submission sheet consist

15   of?

16   A     Client's name, address, property address, income,

17   terms of the loan, your name and co -- you know, your

18   name, phone number, fax number.

19   Q     Now, when you say terms of loan, what determines

20   the terms of the loan?  By the terms you mean the

21   interest rate, the time over which it will be paid,

22   things like that.  When -- so the processor, at that

23   time, faxed to the investor the terms of the loan?  Is

24   that --

25   A     What we would like to see for our clients.

1    Q    What you would like to see.  Okay.  Okay.  That's

2    what I wanted to -- you know.  Okay.  What the client's

3    looking for and what you're hoping to get?

4    A    Right.

5    Q    Okay.  And -- and by the investor, do you mean the

6    lender or do you mean --

7    A    Yeah.

8    Q    -- somebody else?

9    A    Lender.

10    Q    Okay.  Alrighty.  And -- all right.

11        And then after -- after the processor -- so the

12    processor will submit a submission sheet to the

13    investor.  What -- what does the investor send back?

14    A    An approval subject to conditions.

15    Q    All right.  And what does that document look like?

16    A    It's usually and eight and a half by fourteen (14)

17    sheet of paper with the client's name.  It's pretty

18    much everything back that you want plus whatever

19    conditions they need.

20    Q    Okay.  And that'll come from the investor?

21    A    Mm-hmm.

22    Q    All right.  And after -- after you get that back,

23    that goes to the processor; is that right?

24    A    Yes.

25    Q    All right.  And then what does the processor do

Page 26

1    with it?

2    A    She will do all the conditions that she can do

3    without contacting the client.  For instance, any

4    verifications of employment or deposits or anything

5    like that will be handled by the processors and any

6    documentations required from the customer, either the

7    loan officer or the processor will call.

8    Q    Okay.  And the loan officer tries to get from the

9    customer.

10    And then after -- after that is all pulled

11    together, what happens?

12    A    We submit all of our conditions, get the final

13    loan approval, request documents, closing documents.

14    Q    Okay.  When you say you submit all your

15    conditions, does that mean you -- you fax back or send

16    back to the investor all of the documentation that the

17    investor wanted?

18    A    Right.

19    Q    All right.  That would be documents, verification,

20    clarification --

21    A    Whatever they're asking for.  Yes.

22    Q    Okay.  Okay.  You got a -- you got a little ahead

23    of me there.

24    So you -- so you submit all the conditions and

25    then what happens?

1    A    They finalize it.  Give us final loan approval,

2    the clear to close.  We request closing documents.

3    Q    Okay.  So the investor, back to the processor,

4    sends final loan approval and says it's clear to close?

5    A    Mm-hmm.

6    Q    And then who requests the closing documents?

7    A    Usually the processors.

8    Q    And how does the processor request closing

9    documents?  Who is that request made to?

10    A    The lender.  They fill out forms that they have,

11    standard forms that they have.

12    Q    All right.  Okay.  Standard closing documents.

13    All right.

14         And then on -- and so the lender or the investor

15    will provide those standard closing documents back to

16    the processor; is that right?

17    A    No, they go to the title company.

18    Q    Okay.  Okay.  All right.

19         Now, at what point does the title company become

20    involved in the loan process?

21    A    Once they get the documents for closing.

22    Q    Okay.

23    A    Well, actually, a little bit before that because

24    they do the title search and that's required by the

25    investor prior to loan approval.

Page 28

1    Q    Okay.  Did you say a title search?

2    A    Yes.

3    Q    Okay.  All right.  And how is the title company

4    selected?

5    A    Either the client selects it or we select it.

6    Q    All right.  And so you simply inform the lender

7    what title company you're working with?

8    A    Mm-hmm.

9    Q    Okay.  So --

10   A    Well, they approve them, also.  They have -- back

11   then they had title companies that were not approved

12   with them, so you could only use certain title

13   companies.

14   Q    So, for example, a lender might say I only want to

15   use ABC Title Company and so that's the title company

16   you would use?

17   A    They'll say only seven different title companies

18   or fifty (50) different title companies are approved

19   with us.  Pick off of this list.

20   Q    Okay.  Do you know at the point that you're

21   getting the title search done what lender you're going

22   to be using?

23   A    Usually, yes.

24   Q    All right.  And that's because you kind of know

25   the lender products and you kind of know which lender

1    this person is going to fit with; is that right?

2    A    Because we get an approval back and we know we can

3    close the loan and then we'll order the title.

4    Q    Okay.  I got you.

5    A    That would be one of the conditions required.

6    Q    I got you.  Okay.

7        So the -- so I guess -- I'm just trying to get the

8    timing, the title company first becomes involved after

9    you know you can close the loan?

10    A    Yes.

11    Q    Okay.  All right.  And then -- so the loan -- the

12    loan approval is in.  You get the title search and the

13    closing documents go to the title company?

14    A    Yes.

15    Q    All right.  And then the title company officially

16    closes the loan?

17    A    Yes.

18    Q    Okay.  What happens after -- do you -- are you

19    familiar with that closing process?

20    A    Yes.

21    Q    Okay.  Could you tell me about -- tell me what

22    happens then when the title company closes the loan?

23    What is that process?

24    A    They receive the closing package from the

25    investor, the lender.  Following their escrow

Page 30

1    instructions they prepare a settlement statement.

2    Q    And the escrow instructions come from the lender?

3    A    Yes.  If there's any deeds required to be prepared

4    and they've done title, they would prepare a deed as

5    well and they send it with a preliminary HUD to the

6    investor.  The investor approves it and sends them the

7    rest of the closing package.  They schedule an

8    appointment with the borrower, sign the package and

9    send it back to the investor.  File -- they file it

10   with the County, the mortgage.

11   Q    So they sign the package.  Send back to inves --

12   A    File it, disburse it and then send it back to the

13   investor.

14   Q    All right.  The preliminary HUD-1, who prepares

15   that?

16   A    The title company.

17   Q    Okay.  And the preliminary HUD-1 will basically

18   contain things like what property taxes are due,

19   what --

20   A    Yeah.

21   Q    -- what payoff -- what the payoff is?

22   A    Interim interest that's due.  The payoffs.

23   Q    Okay.

24   A    The escrow account, title company fees, lender

25   fees, mortgage company fees.

1    Q    And then the investor approves that.  And when --

2    is that what you said?

3    A    Yes.

4    Q    And then -- so after the investor approves the

5    preliminary HUD-1 and sends the rest of the closing

6    package, what is in the rest of the closing package?

7    What documents?

8    A    The note, the mortgage, TIL, good faith.

9    Q    And by the TIL you mean the Truth in Lending --

10   A    Payment letter.  Yes.

11   Q    Truth in Lending Disclosure Statement?

12   A    Mm-hmm.

13   Q    And what else?  Okay.  I have --

14   A    Good faith.

15   Q    That's good faith Estimate of closing costs?

16   A    Mm-hmm.

17   Q    And what's the payment letter?

18   A    What the borrower's going to make the payment of

19   how much and when it's due.

20   Q    Okay.

21   A    Who it goes to.

22   Q    All right.

23   A    ECOA disclo -- there's all kinds -- there's --

24   there's seventy (70) pages in it so --

25   Q    I understand.  All right.

Page 32

1          So after the -- after all of these things then --

2     A    There's also a rescission.

3     Q    Okay.

4     A    Notice of right to cancel.  Those are probably the

5     most important documents in there.

6     Q    Okay.  So the lender will send those to the title

7     company and then the title company will schedule an

8     appointment -- an appointment with the borrower and

9     then what happens?

10    A    The borrower comes in and signs the package.

11    Q    Mm-hmm.

12    A    There's a three-day rescission.  We wait the three

13    days, then we file the mortgage and the note or, I'm

14    sorry, file the mortgage and any riders.

15    Q    Mm-hmm.

16    A    Then you fax that over to the investor, usually,

17    and they give you the okay to fund.  And then the title

18    company disburses the funds, ships the package back to

19    the investor, scans the package, files it and off we

20    go.

21    Q    All right.  And when you say scan the package and

22    file it, you send the original back to the investor?

23    Is that what --

24    A    Yes.

25    Q    Okay.  And so what do you scan?  You scan it

Page 33

1    before you send it?

2    A    Yes.

3    Q    Okay.  And so -- and by you, I guess at this point

4    I'm talking about the title company.  These are all

5    things the title company does.  And I know you're not

6    the title company --

7    A    Mm-hmm.

8    Q    -- but --

9    A    Right.

10    Q    -- you're just telling me what the title company

11    does.

12        So the title company will send the original title

13    company package back to the original lender but before

14    that will have a copy and will scan that copy and then

15    file it; is that right?

16    A    Yes.

17    Q    Okay.

18    A    They have a scanned copy of it.

19    Q    Sure.  Okay.  So -- so actually, if I went to a

20    title company and wanted an original -- if I went to

21    the title company, Brooklyn Title, which I realize no

22    longer exists, I wouldn't get an original loan file?  I

23    would --

24    A    No.

25    Q    I would have to go to the investor to get that?

Page 34

1    A    Yes.

2    Q    Okay.  Okay.  All right.

3        And when you were referring to the preliminary

4    HUD-1 to the investor, you indicated that the title

5    company prepared it and it had things like lender fees,

6    the mortgage company fees, title company fees.  How --

7    taking them one by one, how -- how is each of these

8    amounts determined?

9    A    When I explained to you that we get final loan

10    approval at the mortgage company, we're issued a clear

11    to close and then the investor has standard closing

12    cost sheets that we fill in and prepare with our fees.

13    And to that they add their fees and send over the

14    closing instructions.

15    Q    All right.  And the standard closing cost sheets,

16    what -- what do they have on them?

17    A    Credit report fee, appraisal fee, mortgage broker

18    fee, processing fee, underwriting fee, tax service

19    fees, flood cert.  Everything in the top section of

20    your HUD-1.

21    Q    Mm-hmm.  All right.  And so, the clear to close

22    will have -- one of the documents in that will be the

23    standard closing cost sheets?

24    A    Yes.

25    Q    All right.  And do they vary from loan to loan?

1    A    The standard forms?  No.

2    Q    Okay.  Do the numbers on the standard forms vary

3    from loan to loan?

4    A    Whose numbers?

5    Q    The numbers on the --

6    A    But whose numbers?  The mortgage company's?

7    Q    Well, I was actually referring --

8    A    Or the investor's?

9    Q    Well, let's take it -- if you could start with the

10   investor.

11   A    Do their fees vary?

12   Q    Yeah.

13   A    Usually they have standard underwriting and

14   processing fees.  So usually, no, they don't vary.

15   They may make an exception, you know, cut one of their

16   fees to accommodate a customer, but --

17   Q    Mm-hmm.

18   A    -- for the most part it's a standard fee.

19   Q    Okay.  So the investor has standard underwriting

20   and processing fees.  Do they have standard credit

21   reporting fee, application fee?  Is that part of the

22   lender's fees?

23   A    Pretty much.  Mm-hmm.

24   Q    Processing fee?  Is that one of the investor's?

25   A    That's the broker's fees.

Page 36

1    Q    Okay.  So that's the broker.  The tax service fee,

2    whose fee is that?

3    A    Usually the investor.

4    Q    Okay.  And the flood certification fee, whose fee

5    is that?

6    A    Lender.  It's not actually a fee.  It's a third-

7    party origination, so --

8    Q    Actually, I'm going to --

9    A    It would be like First American --

10    Q    Yeah.  I'm actually going to --

11    A    -- Flood.

12    Q    -- ask you about that.  But -- because I know

13    you're making a good point there.

14         The -- okay.  So the investor's standard

15    underwriting and processing fees include the following:

16    the  credit report?

17    A    No.  That's not included.

18    Q    Oh.

19    A    Their underwriting and their processing fee is

20    separate.  Then they have --

21    Q    Oh.

22    A    -- other fees like credit report, flood cert, tax

23    service.  Those are all third-party origination fees.

24    Q    Okay.

25    A    And you have to have a bill for those; blah, blah,

1    blah.

2    Q    Okay.  All right.

3    A    Or there's a disclosure in the package that says

4    that they pay them and may receive a benefit from it.

5    Q    All right.  So I'm glad you clarified that because

6    I thought these -- I was reading them differently.

7         So the investor will have its standard

8    underwriting fees, and how are these broken down?  Will

9    the -- will the --

10   A    It's just an underwriting fee.

11   Q    So it'll just say underwriting and --

12   A    Mm-hmm.

13   Q    -- give a number?  Okay.  And then processing and

14   give a number?

15   A    Right.

16   Q    And -- and what does underwriting consist of in

17   this context?

18   A    What do you mean?

19   Q    What do they -- what -- what's your understanding

20   of what an underwriting fee is?

21   A    That's the fee that they charge to underwrite the

22   loan.

23   Q    All right.  And processing, what is the processing

24   fee?

25   A    It's usually a fee that the broker charges to

Page 38

1    process the loan.

2    Q    Oh, see, I'm trying to separate out.  I should be

3    clear about my question.  At this point I'm trying to

4    separate out which are investor fees and which are

5    title company fees.

6    A    They're usually specific on the HUD to who the

7    money goes to.

8    Q    All right.  So maybe we'll save that for when we

9    look at the documents.

10    But when you talk about standard closing cost

11    sheets, I'm just trying to figure out which are the

12    standard closing costs?

13    A    It's usually -- again, if there's a flood cert it

14    goes to like First American Flood.  And it's a twenty

15    dollar ($20) fee.  And that's always standard on the

16    fee sheet.  Not necessarily going to that lender, but

17    it's a standard fee that's in every closing.  So we

18    have a flood cert.  We have a tax service fee.  We have

19    an underwriting fee.

20    Q    Mm-hmm.

21    A    Those are standard fees that are in most every

22    loan.

23    Q    All right.  And -- and the lender basically sends

24    you a sheet with these items on it?

25    A    Yes.

Page 39

1    Q    And who fills in the numbers?

2    A    The same reoccurring fees are always filled in.

3    They don't change.  They're the same reoccurring fees

4    for every file.

5    Q    So the sheet that --

6    A    The flood cert is twenty dollars ($20) whether if

7    it's for you or me.  It's a twenty dollar ($20) fee,

8    period.

9    Q    All right.  So when the lender sends these

10   standard closing cost sheets, the numbers are also

11   filled in?

12   A    I believe so.  Yes.  Because you do a number a box

13   check for that or it's already checked for you and

14   there may not be a dollar amount there but there may be

15   an X that you need it and they'll order it.

16   Q    Who will order it?

17   A    The lender --

18   Q    The lender --

19   A    -- will order it.

20   Q    -- will order it?

21   A    Whatever's required.

22   Q    All right.  All right.

23        So if I'm -- if I'm following you, I -- I think

24   what -- what you're telling me is that -- is that the

25   lender's fees stay pretty standard.

Page 40

1    A    Mm-hmm.

2    Q    Okay.  And the lender determines those fees?

3    A    Mm-hmm.  Yes.

4    Q    All right.  All right.

5         And then the next fee you mentioned was the -- the

6    mortgage company fee.  How are those fees determined?

7    A    Well, we have a standard processing fee of nine

8    ninety-five (995).  Well, actually I think back then it

9    was fourteen ninety-five (1,495).  I'm not sure what it

10   was but we, at any given time, will have a standard

11   fee.

12   Q    And just -- and it's called a processing fee?

13   A    Yes.

14   Q    Okay.  And then what other -- what other mortgage

15   company fees are there?

16   A    And then, of course, the loan officer determines

17   his broker fee, what he's going to charge the customer.

18   Q    And -- and so the loan officer fills that in?

19   A    He and the processor will complete a fee sheet.

20   Q    And how, ultimately, do the loan officer and the

21   processor decide like what -- what to put on that fee

22   sheet?

23   A    Well, it's generally based on the amount of work

24   that a file requires.

25   Q    All right.  So do they have a certain set of

Page 41

1    standards they look at or how do they ultimately come

2    up with a number?

3    A    It's just based on how much time and energy you're

4    going to put into a file.  You know that going into it.

5    Q    All right.  And at what point is this -- is this

6    fee sheet completed?

7    A    After the clear to close.

8    Q    And where does that go, the fee sheet?

9    A    To the lender.

10   Q    And -- and would there be -- and that goes to the

11   lender at what time?  Is that part of the total package

12   that's sent at the end or is it --

13   A    No.  Prior to the docs.

14   Q    Okay.

15   A    Once you have loan approval, then they give you

16   the clear to close.  You complete the fee sheet.  You

17   send it in and they send the preliminary documents to

18   the title company.  Sign off on the good faith.  Give

19   you the package.

20   Q    So those documents are going to be already on the

21   documents that go to the title company.  Those --

22   A    Yes.

23   Q    -- numbers are going to be on the documents.

24        All right.  All right.  So there's a standard

25   processing fee, the loan officer fee.  What -- what

Page 42

1    other fees would be mortgage company fees?

2    A    That's it.

3    Q    Those two things?  All right.

4         And then is there any other compensation paid to

5    the mortgage company other than the standard processing

6    fee and the loan officer fee?

7    A    There may be yield spread.

8    Q    Okay.  And -- and does that vary from loan to

9    loan?

10   A    Yes.

11   Q    And how -- what is that based on?

12   A    The interest rate.

13   Q    Okay.  And when you say it's based on the interest

14   rate, what do you mean by that?

15   A    Whatever rate they close the loan at that pays

16   your premium or not.

17   Q    All right.  So -- so, for example, do you get some

18   like information from the lender about the yield spread

19   premium that tells you when you'll get it, when you

20   won't get it?

21   A    When they give us the approval.  Tells you what

22   the base rate is.

23   Q    All right.  And -- and when you say when they --

24   when they give you the approval, is that the same as

25   the clear to close or is that before the clear to

Page 43

1    close?

2    A    Before the clear to close.

3    Q    All right.  So it'll say -- well, so, say if it

4    says the base rate is eight percent and the loan is

5    made at eight percent, is there a yield spread premium

6    paid to the mortgage company?

7    A    No.

8    Q    But if it closes at nine percent is there a yield

9    spread premium?

10    A    There would be.  Sure.

11    Q    Okay.

12    A    If the base rate was eight, yes.

13    Q    Okay.  And then who ultimately decides what

14    interest rate goes on the -- on the promissory note?

15    A    Pretty much it's based on the file.  I mean if the

16    customer's not going to have any money to close, of

17    course the only way to get paid is to increase the

18    interest rate and take yield spread, so it's -- it's

19    significant to each file how that's determined.

20    Q    And then in what circumstance -- when you say --

21    when you say if the borrower has no mon -- you said if

22    the borrower has no money to close?  In other words --

23    A    For instance, if you're doing a refinance and the

24    house appraises for a hundred thousand and they're

25    approved at eighty (80) percent loan-to-value, which is

Page 44

1    eighty thousand (80,000) and their mortgage payoff is

2    seventy-nine five, which is pretty frequent --

3    Q    Mm-hmm.

4    A    -- you have no money for yourself to get paid --

5    Q    Mm-hmm.

6    A    -- and nobody goes to work for free.

7    Q    No, absolutely.

8    A    So you're going to increase the interest rate to

9    cover your fee.

10   Q    Mm-hmm.  Okay.

11   A    Because --

12   Q    Okay.

13   A    -- otherwise, nine times out of ten, the customer

14   doesn't have any money to bring to close.

15   Q    Mm-hmm.

16   A    So --

17   Q    Okay.  I understand.  I understand.  Okay.  I

18   followed that.

19        Okay.  So there is -- just going back to -- going

20   back to the list, there are the lender's fees, the

21   mortgage company fees, and those three fees are

22   basically the standard processing fee, the loan officer

23   fee and possibly the yield spread premium.  Does that

24   cover it?

25   A    It's not called the loan officer fee.  It's called

1    the mortgage broker fee.

2    Q    Okay.  Okay.  But the loan officer decides the

3    broker fee?

4    A    Right.

5    Q    Okay.  I got it.  Okay.

6         And then the yield spread premium?

7    A    Yes.

8    Q    Okay.  And so that's it for the mortgage company,

9    those three?

10   A    Pretty much.  I mean those are pretty much

11   standard.  I don't know if there would be anything in

12   addition to, but --

13   Q    Okay.  And then next we get to the title company

14   fees.  What -- what would be the title company fees?

15   A    They have a closing cost fee, title search fee,

16   commitment fee, EPA and comprehensive endorsement fees.

17   It's a filing fee.  Title insurance fee.

18   Q    All right.  And --

19   A    Deed --

20   Q    Go ahead.

21   A    Deed profit if there's a deed.

22   Q    Anything else?

23   A    I mean there may be a survey involved.  There may

24   be a pest inspection, and again, some of those are

25   third-party fees.

Page 46

1    Q    Mm-hmm.

2    A    Some of them go to the title company so --

3    Q    All right.  Now, the closing fee -- I don't want

4    to belabor this.  Closing is when people sit down and

5    sign the documents?

6    A    Yes.

7    Q    And is that typically -- how is that amount -- how

8    is the amount of that fee determined?

9    A    It's pretty standard for the industry.

10    Q    Okay.  Title search?

11    A    Standard for the industry.

12    Q    Okay.  And commitment?

13    A    Standard for the industry.

14    Q    Now, I mean, I can conceptualize closing and I can

15    conceptualize title search.  I -- I'm not sure what

16    commitment, what consists of a commitment.

17    A    You usually do a update.  In between the time that

18    you've done the title search and the time you do an

19    update of the records to make sure there's no other

20    liens or judgments that would be filed in between, so

21    that's your commitment fee, to send the examiner back

22    in to do that again.

23    Q    All right.  And that would be done before the

24    closing?

25    A    Prior to filing.

Page 47

1    Q    Oh, prior to filing.

2    A    Yes.

3    Q    All right.  Okay.  So the closing has already

4    occurred, but then --

5    A    Yes.

6    Q    -- you do the double-check?

7    A    Yes.

8    Q    All right.  This is sort of an aside, but what

9    would happen if there had been a change?  Would the

10   loan --

11   A    It wouldn't file.

12   Q    It wouldn't.

13        Now, if I'm reading what I wrote here, and it

14   looks like EPA and comprehensive endorsement?  Is that

15   it?

16   A    Yes.

17   Q    What is that?

18   A    Those are standard required by the insurance

19   agency division.

20   Q    What do they consist of though?  I mean --

21   A    I have no idea.

22   Q    Okay.  I mean I see them often.  I just -- when

23   you say they're required, who does them?  What --

24   what --

25   A    It's an endorsement that's attached to the title

Page 48

1    insurance.  You know, I'm sure it insures for any EPA

2    or comprehensive claims against the policies.

3    Q    Does somebody pay money to somebody else to get

4    this EPA and comprehensive endorsement?

5    A    Yeah.

6    Q    Who pays money to whom?

7    A    The title companies pay the underwriters for that.

8    Q    And who are the underwriters?

9    A    The big insurance underwriters like Stewart, First

10   American.

11   Q    Is that -- is that different from the underwriting

12   fee charged by the lender?

13   A    Yes.  They're insurance underwriters.

14   Q    Okay.  And so the lender's underwriting is

15   different?

16   A    Yes.

17   Q    All right.  And these -- these fees that are paid

18   to the underwriters like, as you said, for example,

19   like Stewart?

20   A    Mm-hmm.

21   Q    And then who would be some of the others?

22   A    First American.  United General, I believe, is

23   another one.

24   Q    All right.  What do they insure against?  What is

25   the loss that they insure against?

Page 49

1    A    For?

2    Q    Talking about this EPA and comprehensive

3    endorsement.

4    A    I have no idea.

5    Q    Who -- who is the beneficiary on the policy?

6    A    The borrower.

7    Q    Have you -- have you ever seen one of these

8    policies?

9    A    I've seen them.  I've never read it.

10   Q    Does the borrower get a copy of it?

11   A    Sure.

12   Q    Would that be part of the standard file?

13   A    Yes.

14   Q    Okay.

15   A    That's actually given to them in their title --

16   their final policy.

17   Q    All right.

18   A    It would be attached in their final policy.

19   Q    All right.  And so it's charged at closing.  It's

20   listed as a title company fee but it's actually an

21   insurance policy that benefits the borrower.  Is

22   that -- have I got that right?

23   A    Yes.

24   Q    Okay.  All right.  And I -- and I know what a

25   filing fee is.  I won't worry about that.  That is when

Page 50

1    you file the deed or you file the mortgage?

2    A    You pay the County that money.  Yes.

3    Q    Pay the County.  Okay.

4        And you can figure out in advance what that is

5    because it's just by the number of pages?

6    A    Yes.

7    Q    Okay.  All right.  So there's the closing, the

8    title search, the commitment, the EPA and comprehensive

9    endorsement, filing to the County.  And then what comes

10   next?

11   A    I don't remember what I said.

12   Q    I can't -- I can't read what I wrote.  Title

13   insurance?

14   A    Yeah.

15   Q    Okay.  And what does -- who -- how is that fee

16   determined?

17   A    The State dictates that, State Insurance.

18   Division of Insurance dictates that amount.

19   Q    And who is that paid to?

20   A    It is paid to the title company and then the title

21   company, in turn, pays the underwriter.

22   Q    Is that the same underwriter who is paid for the

23   EPA and comprehensive endorsement?

24   A    Yes.

25   Q    All right.  And the deed preparation?

Page 51

1    A    That's usually paid to an attorney.  Fee paid to

2    the attorney.

3    Q    All right.  And the survey?

4    A    Paid to an outside surveyor.  Same with the pest

5    inspection.

6    Q    All right.

7    A    There might be like -- there's also a hold sig

8    fee, it's called.

9    Q    What is that?

10   A    That's what they -- they have to continually

11   update the records to get the release of liens for the

12   previous mortgages, so that money covers that fee, and

13   also to file that when it comes through.

14   Q    I understand.  That's like that follow-up work

15   that has to be done --

16   A    Right.

17   Q    -- before everything can finally be --

18   A    Right.  And there's also usually a FedEx fee or a

19   delivery fee in there, too, which is part of the APR.

20   Q    And the FedEx fee and the delivery fee, is that

21   basically kind of an anticipatory charge figuring --

22   A    Right, because you have to ship back the original

23   package.  You have to send out the release of liens to

24   the investors that are on title currently.  Sometimes

25   you ship packages to your customers, copy packages,

Page 52

1    things like that.

2    Q    All right.  Are there any other fees that go in

3    the title company column?

4    A    I think I pretty much covered them.

5    Q    All right.  Is there any other compensation

6    received by the title company other than these fees

7    which are listed here?

8    A    Not that I'm aware of.  No.

9    Q    Okay.  Would the fees that the title company sees

10   vary according to the size of the loan?

11   A    The title insurance varies because it's based on

12   the loan amount.

13   Q    But --

14   A    And your filing fee will vary, also.

15   Q    According to the loan amount?

16   A    According to the pages, number of pages filing.

17   Q    Yeah, according to the pages.  Yeah.  All right.

18        And how -- how does the title company or title

19   insurance vary with the size of the loan?

20   A    Because it's based on so much per thousand.

21   Q    And what -- and who does that title insurance fee

22   go to?

23   A    It goes to the title company who, in turn, pay the

24   underwriter.  You asked me that.

25   Q    Well, I was a little unclear.  I thought that's

Page 53

1    what you had told me.

2        Okay.  Goes to the title insurance company who

3    pays the underwriter.  Does one hundred (100) percent

4    of it go to the underwriter?

5    A    I have no idea what their fees are, how it's

6    broken down.

7    Q    Okay.  So -- so -- so when I asked you did the

8    title company fee vary according to the size of the

9    loan and you -- and you told me yes, so the amount that

10   goes to -- not necessarily one hundred (100) percent

11   goes to the underwriter.  Some of it stays with the

12   title company; is that right?

13   A    It's probably based on like when you buy

14   homeowners insurance, the agent makes his percentage

15   and whatever he pays the underwriter is -- is their

16   fee.  I mean I'm sure there's money made somewhere.

17   They wouldn't do it if they were working for free.

18   Q    Mm-hmm.  Who -- who would know how that's broken

19   down?

20   A    You could probably call like Stewart Title or

21   First American and ask them what they pay their agents.

22   Q    Okay.  Presumably the title company records would

23   show that as well, right?

24   A    No.  Why would the title company records show

25   that?

Page 54

1    Q    The title company records -- does the title

2    company have a way of noting how much it earns on a

3    particular loan that it closes?

4    A    I don't know.  I don't know how they do their

5    accounting, but I wouldn't think it's -- I don't know.

6    Q    So if -- if I'm following you, from your

7    perspective, the title company would be, for example,

8    an agent of Stewart or First American or United?

9    A    Right.

10   Q    Okay.  So -- so kind of getting back to -- to our

11   events.  The preliminary HUD-1 to the investor will

12   then -- then have all of these fees that we've just

13   spent a little bit of time, the title company prepares

14   that preliminary HUD-1?

15   A    Yes.  Yes.

16   Q    Okay.  All right.  All right.

17        Okay.  Getting to the situation, the loan that we

18   are here on today, the lender -- would you say the

19   lender funds the loan?  Is that how you say it?

20   A    Yes.

21   Q    The lender who funded the loan in this case was

22   Homecomings.  Do you know who the Homecomings rep was

23   at that time?

24   A    It was probably Doug Boyle.  I think he's worked

25   for them for a couple years.

Page 55

1    Q    All right.  And does he live locally?

2    A    Yes.

3    Q    Okay.  Do you know where he lives?

4    A    No.

5    Q    But he has a local phone -- I mean when you call

6    him, you call him at a local phone number?

7    A    Yeah.  It's a 440 number.

8    Q    Okay.  All right.  Okay.

9         Do you have -- you probably don't have that in

10   your Palm Pilot with you today?

11   A    Mm-hmm.

12   Q    Okay.  Do you have -- do you have knowledge of how

13   lender -- lender reps are compensated when -- when a

14   loan is closed?

15   A    No.

16   Q    Okay.  All right.  So -- but Doug Boyle is the

17   first -- is Doug Boyle the specific person that the

18   processor would deal with when the processor is

19   forwarding the loan for consideration?

20   A    She may talk to him but not necessarily deal with

21   him.  I mean usually we'll fax it into their main

22   office.

23   Q    Okay.

24   A    Or overnight it to the main office.

25   Q    So his -- so Doug Boyle's connection with you

Page 56

1    is -- is to keep you updated on the products?  What is

2    his --

3    A    Yeah.  And if we have a situation, we can contact

4    him and say, hey, we need help.

5    Q    If something -- you'll ask him to help you if

6    you're having trouble getting the loan processed?

7    A    Right.

8    Q    All right.  And -- all right.

9         I'm going to -- well, let me ask you this.  You

10   have al -- you have already told me that there -- that

11   OMC Lending would have a contract with Homecomings; is

12   that right?

13   A    Yes.

14   Q    And whose signatures would be on those contracts?

15   Yours and --

16   A    Somebody from Homecomings --

17   Q    -- would it be Doug Boyle or somebody in the main

18   office?

19   A    I don't think it would be Doug Boyle, but somebody

20   in the main office.

21   Q    All right.  And are there any contracts between

22   OMC Lending and Brooklyn Title?

23   A    What type of contract?  For what?

24   Q    Well, any at all.  It's a pretty open-ended

25   question.  Are there any contracts between OMC Lending

Page 57

1    and Brooklyn Title?

2    A    No.

3    Q    Do -- are there -- are there contracts typically

4    between a mortgage company and a title company?

5    A    No.

6    Q    All right.  Are there any fees exchanged between

7    the mortgage company and the title company?

8    A    Well, back at -- I don't know when the laws

9    changed, but you can have -- there is some type of

10   program where you can be involved with title companies

11   and receive a benefit from referring business.

12   Q    All right.  And so there -- was there a program

13   like that in December 2002 between Brooklyn Title and

14   OMC Lending?

15   A    No.

16   Q    Was -- when was the last time there was an

17   agreement like that?

18   A    We don't have an agreement like that.  Never did.

19   Q    Never did?

20   A    Mm-mm.

21   Q    All right.  Okay.  Did you have it with any other

22   title company or --

23   A    No.  All right.

24        I'm going to ask you to look at this folder.  I

25   have a copy here with me.

Page 58

1                              BY MS. CARLISLE:  Are you marking those

2                              as an exhibit?

3                              BY MS. GRAY:  I'm going to mark them

4                              document by document, but this is the

5                              stack of documents we're going to be

6                              looking at for now.

7                              BY THE WITNESS:  Is there something

8                              particular you want me to look at?  I

9                              mean it's a standard package.

10                             BY MS. GRAY:  That's all right.

11                             BY THE WITNESS:  Okay.

12    BY MS. GRAY:

13    Q    All right.  Let me have them back a minute.

14    A    I think I took them out of order.

15    Q    Huh?

16    A    A little bit out of order.

17    Q    I know and I'm a fanatic with keeping them in

18    order so that's what I was going to do is fix it.

19         You know what?  It's okay.  The order that you put

20    these in, is that an order that makes more sense to

21    you?  Is that why you did it that way?

22    A    I was just looking for certain documents --

23    Q    Okay.

24    A    -- to see what was going on with the loan.

25    Q    Okay.

Page 59

1    A    Which I guess really doesn't make sense to me, so

2    I don't --

3    Q    Okay.  That's all right.  We're just going to take

4    it --

5         When you say it doesn't make sense to you, what

6    specifically were you referring to?

7    A    You asked me a questions you want.

8    Q    I just did.

9    A    I don't know.

10   Q    What -- what strikes you as odd about the loan?

11   A    Nothing.  Go ahead.  Just ask me whatever you

12   want.

13   Q    No.  You're under oath.

14   A    I'm going to tell you I don't know.

15   Q    You're under oath and you've got to tell me the

16   truth.

17   A    I don't know.

18   Q    You looked at it.  You said it doesn't make sense.

19   I'm asking you what about it doesn't make sense?

20   A    I don't know why she refinanced.

21   Q    Becau -- and when you say you don't --

22   A    There's a page missing in that application that

23   you have.

24   Q    All right.

25        When you say you don't know why she refinanced,

Page 60

1    what do you mean?

2    A    I don't understand if there was more to the file

3    or not.  Was it a refinance of the land contract?  Did

4    she own the property prior to?  So forth.  I need my

5    file to look -- to tell you what's with that.

6    Q    All right.  So you said there was a page missing

7    in this loan application?

8    A    Yes.

9    Q    Is that the only thing about it that didn't make

10   sense to you?

11   A    Yes.

12   Q    All right.  All right.

13       Do you -- do you have any memory of Patricia

14   McNerney?

15   A    No.

16   Q    All right.  So you don't -- is it -- is it

17   accurate to say you have no personal knowledge of this

18   loan?

19   A    No.

20   Q    All right.

21   A    I don't.

22   Q    Do you -- and I'm just going to explore that a

23   little bit.

24       Do you have -- do you -- do you have any specific

25   memory of her coming to your office?

Page 61

1    A    No.

2    Q    What she looks like?

3    A    No.

4    Q    Did you have any personal conversations with her?

5    A    If you show me her driver's license I might

6    remember her, but from paperwork, no.

7    Q    Okay.  All right.  And is any -- is anything about

8    this paperwork that I just handed you which --

9                BY MS. GRAY:  I guess for clarity on the

10               record we should identify this set of

11               documents.  But what I'm going to do is

12               I'm going to just identify them as

13               documents numbered 1 through 76.

14               BY THE WITNESS:  It's borrower's copy.

15               BY MS. GRAY:  Borrower's --

16               BY THE WITNESS:  Is probably the best

17               way to --

18               BY MS. GRAY:  Borrower's copy of the

19               closing documents?

20               Then if we label -- then if we label the

21               documents individually, they'll have to

22               be 1-1, 1-2, is that right, if we

23               labeled the whole -- how would we do

24               that for ease of reference if we're

25               labeling the whole file itself?

Page 62

1          BY THE COURT REPORTER:  This is one

2          file.

3          BY MS. GRAY:  One file.

4          BY THE COURT REPORTER:  And you want

5          each page of this file to do --

6          BY MS. GRAY:  Well, actually, each page

7          has been numbered for -- for our

8          reference so that we know, you know, the

9          order that we got them in and the order

10         that we keep them in.  But now for

11         purposes of the record, if I just want

12         to -- want to refer to this as a set of

13         documents, should I refer to it as

14         Exhibit 1 but then later on when I want

15         to identify each individual document,

16         how would I do that?

17         BY THE COURT REPORTER:  You can say this

18         is Exhibit 1 -- each one also has a

19         different page number?  Is that it?

20         BY MS. GRAY:  That's true.

21         BY THE COURT REPORTER:  You can just say

22         this Exhibit 1.  Would you turn to page

23         43, Exhibit 1.  I mean to label each and

24         every page.

25         BY MS. GRAY:  Mm-hmm.

Page 63

1              BY THE COURT REPORTER:  I usually don't,

2              you know, do that as far as --

3              BY MS. GRAY:  Yeah, I know what you're

4              saying.

5              BY THE WITNESS:  Can we go off the

6              record and can I use the restroom

7              BY MS. GRAY:  Yeah, go ahead.

8         (Off the record.)

9              BY MS. GRAY:  All right, thanks.  I

10             think what we'll do is we'll label this

11             Brooklyn Title Agency, Inc., borrower's

12             copy of the closing documents, as

13             Exhibit 1.  And it's a document

14             consisting of seventy-seven (77) pages.

15             All right.

16    BY MS. GRAY:

17    Q    So before we took our break we were just figuring

18    out what to call this.  You suggested we call it, Ms.

19    George, that we call this set of documents the

20    borrower's copy of the closing file?

21    A    Yes.

22    Q    And for purposes of identification we've labeled

23    the entire document as Defendant's Exhibit 1.  And when

24    you -- when you looked at it you said it didn't make

25    sense and I asked you what about it doesn't make sense.

Page 64

1   And if I understand you right, you said --

2   A    There's a page missing to the application.

3   Q    There's a page missing in the application and you

4   don't know why she made the loan, why she got the loan?

5   Are they basically -- is it because the page is missing

6   that you don't --

7   A    Right.

8   Q    -- know why --

9   A    Mm-hmm.

10   Q    All right.  And so -- and then you indicated that

11   you thought that the file that you had would have that

12   missing page; is that right?

13   A    Yes.

14   Q    Okay.  I'm going to hand you two sets of

15   documents, one at a time.  One I'm going to call -- we

16   might have to relabel these -- Exhibit 2, and the other

17   I'm going to call Exhibit 3.  And I'm putting these

18   numbers on the outside of the folders for 1, 2 and 3.

19        All right.  I'm going to hand you this folder I

20   just called Exhibit 2 and ask you if you can tell me

21   what that is?

22   A    This would be the mortgage company's file.

23   Q    All right.  And is that the file that you provided

24   to me in response to a subpoena issued earlier in this

25   case?

1    A    Yes.

2    Q    Okay.  And --

3                    BY MS. CARLISLE:  Excuse me.  When was

4                    this file produced?

5                    BY MS. GRAY:  I'm not exactly sure.  It

6                    came -- it came after the date on the

7                    subpoena but --

8                    BY MS. CARLISLE:  Her subpoena?

9                    BY MS. GRAY:  Yeah.  But I'm not sure

10                   exactly when.

11                   BY MS. CARLISLE:  Why weren't we

12                   notified that documents were produced

13                   and/or the opportunity to get a copy?

14                   BY MS. GRAY:  You're welcome to have a

15                   copy.  I just, you know --

16                   BY MS. CARLISLE:  I know.  And I

17                   informed you if you got a response to

18                   the subpoena that I wanted a copy of

19                   anything you received and this is the

20                   first time I've seen it.

21                   BY MS. GRAY:  Okay.

22                   BY THE WITNESS:  Go ahead.  I'm

23                   listening.

24   BY MS. GRAY:

25   Q    I'm just -- I need -- I just -- I want you to take

Page 66

1    the time to look at it.

2    A    Go ahead.

3    Q    Okay.  So this is what you provided to me; is that

4    right?

5    A    Mm-hmm.

6    Q    And as far as you know, it's a complete copy?

7    A    As far as I know.  Yes.

8    Q    Now, when I -- I don't think this is part of the

9    record, but when you were here earlier I asked you if

10   you had the original file and you told me all you had

11   was a scanned copy of the original file; is that right?

12   A    Yes.

13   Q    So you weren't able to -- what do you have to

14   compare this with so that you can state for certainty

15   that this is a complete copy of what you provided to

16   me, that this Exhibit 2 is a complete copy of what you

17   provided to me?

18   A    A copy on a disk.

19   Q    Okay.  Do you have any reason to doubt that it's a

20   complete copy of what you provided to me?

21   A    No.

22   Q    Okay.  And then -- and then handing you --

23   A    Provided you didn't take anything out of it.

24   Q    No, I didn't.

25   A    Okay, then.

1    Q    And then I'm going to hand you what has been

2    identified on the outside of the folder as Exhibit 3.

3    Could you tell me what that is?

4    A    Title company file.

5    Q    All right.  Did you provide that in response to

6    this or did your husband provide that?

7    A    Actually, the receptionist provided both of them

8    to you.

9    Q    Okay.  And by the receptionist, who is that?

10    A    Kate.

11    Q    All right.  Does she spell that with a K or a C?

12    A    K-A-T-E.

13    Q    All right.  And does she work for OMC Lending,

14    Inc.?

15    A    She -- yes.

16                   BY MS. CARLISLE:  Do you have a copy of

17                   Exhibit 3 for me?

18                   BY MS. GRAY:  Yeah, I do.  There you go.

19                   BY MS. CARLISLE:  Again, this was

20                   produced in response to the subpoena

21                   when you originally served it?

22                   BY MS. GRAY:  Well, no, not when I --

23                   BY THE WITNESS:  It came in the same

24                   package.

25                   BY MS. GRAY:  Yeah, but they did come in

Page 68

1                        the same package.

2                        BY THE WITNESS:  That's the one from

3                        OMC.

4                        BY MS. GRAY:  And those are your copies.

5    BY MS. GRAY:

6    Q    Okay.  So -- and she works for OMC Lending and so

7    she provided the title company file and the mortgage

8    company file; is that right?

9    A    Yes.

10   Q    All right.  And what's Kate's last name?

11   A    Seitz, S-E-I-T-Z.

12   Q    Okay.  All right.

13        And one of the things I was -- would the -- would

14   the application be in Exhibit 2 which was the mortgage

15   company file or Exhibit 3 which is the title company

16   file?

17   A    Should be in both files.

18   Q    All right.  You're looking now at the folder

19   labeled Exhibit 3.  Do you -- are you coming across the

20   item that is missing?

21   A    Yes.  It was in the other file.

22   Q    It was in the folder labeled Exhibit 2?

23   A    Mm-hmm.

24   Q    And --

25   A    Yes.

1    Q     -- would it be something called a Uniform

2    Residential Loan Application?

3    A     Yes.

4    Q     All right.

5                     BY MS. CARLISLE:  It's about ten pages

6                     in or so.

7                     BY MS. GRAY:  About ten pages in.  All

8                     right.  I think I see it.  Okay.

9                     What I'd like to do is label that

10                    Uniform Residential Loan Application.

11                    Some of these -- stop me if I'm making

12                    things too hard.  Exhibit 4.  We can --

13                    I think we can start labeling the

14                    documents by exhibit number.  Is that

15                    okay?  Yeah.  The reason I don't like

16                    letters is you end up doubling and

17                    tripling and -- all right.

18   BY MS. GRAY:

19   Q     And this Uniform Residential Loan Application

20   consists of four pages; am I right?

21   A     It could be more if the borrower has more debt,

22   but typically it's four pages.

23   Q     All right.  And in the -- and in the document

24   which is contained in the title company file -- I'm

25   sorry, the mortgage company file which has been labeled

Page 70

1    as a whole, Exhibit 2, does that consist of four pages,

2    the Uniform Residential Loan Application?

3    A    Your file there?  The one you're looking at or the

4    one I'm looking at?

5    Q    They're both the same.

6    A    This is the title company -

7    Q    Oh, I'm sorry.  I thought you -- I thought you

8    were looking at --

9    A    No, I'm looking at the title company now.

10   Q    Look at -- look at my -- I'll take that if you

11   don't mind.

12   A    That's all right.  I want to flip through both of

13   them.  Go ahead.

14        Is there -- is there four pages in here?  Is that

15   what you're asking me?

16   Q    Yeah.  I'm asking you to identify this document as

17   the Uniform Residential Loan Application.

18   A    One, two, three, four.  Yes, there's four.

19   Q    All right.  And is this -- this one that you're

20   looking at, is that -- is that an accurate copy of what

21   you have sent me?

22   A    Yes.

23   Q    All right.  And as you look at this, does that

24   answer your question about why the loan was made or

25   does it make --

Page 71

1    A    Makes more sense.  Yes.

2    Q    What -- what is it about it that --

3    A    Just the debts that she was paying off are now on

4    here.

5    Q    Okay.  So what -- what was contained in the -- and

6    her copy of the file didn't have a complete loan

7    application; is that right?

8    A    Right.  Mm-hmm.

9    Q    And it didn't have the debts paid off?

10    A    Right.

11    Q    All right.  In the copy that I am looking at, I

12    don't see anything signed by the borrower.  Do you see

13    anything si -- do you see her signature on the Uniform

14    Residential Loan Application?  I'm just referring now

15    to the Uniform Residential Loan Application.

16    A    Well, this would have been the final application

17    that would have been signed at closing.

18    Q    All right.  So does that mean the title company

19    file would have a signed application?

20    A    Yes, probably.

21    Q    All right.

22                    BY MS. GRAY:  May I have the title

23                    company file, please?

24    BY MS. GRAY:

25    Q    I'm going to hand you Exhibit 3.

Page 72

1    A    There is one in here.

2    Q    Alrighty.  About where is it?

3    A    Look, there's the end.

4    Q    Okay.

5    A    Let me just find it for you.  It will probably be

6  a lot easier.

7    Q    That's okay.

8    A    Why don't you just give it to me.

9    Q    I got it.  I got it.

10    A    No, you're too far forward.

11    Q    Am I too far forward?  Relax.

12    A    Jesus Christ, we're going to be here all day.  You

13  don't know what it looks like.  Why don't you -- there

14  it is.

15    Q    I know what a Uniform --

16    A    Right there.  Right there.

17    Q    I know.  I see it.  Thank you very much.

18        Would you refer to your copy, please?  Okay.

19        So -- so the application is essen -- is

20  essentially signed at closing?  Is that standard

21  procedure?

22    A    Yes.

23    Q    Okay.  And Sharon Davis, whose name appears on

24  page 3, would that be a title company employee?

25    A    That was the loan officer.

1    Q    All right.  So -- and the loan officer would be --

2    are loan officers employees of OMC Lending Company?

3    A    Yes.

4    Q    Okay.  And is Sharon Davis still employed --

5    A    No.

6    Q    All right.  -- with OMC Lending Company, Inc.?

7    A    No.

8    Q    Do you know where she's employed now?

9    A    She is employed for another mortgage company and I

10   do not know the name.

11   Q    All right.

12   A    But she still has her license with the State of

13   Ohio.

14   Q    All right.  And how -- how was -- how are loan

15   officers compensated by OMC Lending?

16   A    They're W-2 employees.

17   Q    And is that -- and when you say they're W-2

18   employees, would you -- does that mean they have a set

19   hourly rate, a set salary, set monthly income, annual

20   income?  What -- what do you mean?

21   A    Up until recently they receive a percentage of

22   their commission -- of the fees that are charged on a

23   file.

24   Q    And was that the case on -- in December 27th,

25   2002?

Page 74

1    A    I don't know when the law changed so I don't

2    remember.

3    Q    All right.  Is it -- when you say up until

4    recently, is it fair to say --

5    A    At some point in time the Department of Labor --

6    Q    -- more recently than four years ago?

7    A    -- changed the law where they were required --

8    we're required to pay them minimum wage.

9    Q    Mm-hmm.  All right.  When -- and is it your

10    understanding that that was within the last four years,

11    within the last two years?

12    A    I don't know that.

13    Q    All right.

14    A    I don't handle payroll.

15    Q    Okay.  When -- when you talk about them receiving

16    a percentage of commission and fees, but you say

17    they're W-2 employees, what -- what does that mean,

18    that somebody determines what the commission is and

19    then withholds taxes from it?

20    A    Right.

21    Q    All right.  And -- and the current situation is

22    they have to receive minimum wage and then in addition

23    do they get a percentage of the commission and fees?

24    A    Yes.

25    Q    Okay.  Now, when you say a percentage of the

Page 75

1    commission and the fees, I'd like to break that down a

2    little bit.  When we were talking earlier about the

3    mortgage company fees --

4    A    Mm-hmm.

5    Q    -- you indicated that the mortgage company fees

6    were the standard processing fee, the broker fee and

7    possibly a yield spread premium depending on the file?

8    A    Right.

9    Q    What -- what would be the broker's commission or

10   percentage of a commission on the standard processing

11   fee?

12   A    They don't receive anything from that.  That goes

13   directly to the company.

14   Q    Okay.  That would be zero then?

15   A    Right.

16   Q    And then what about the percentage on the -- on

17   the broker fee?

18   A    The percentage on the broker fee.  It depends on

19   the loan officer and their compensation.  It could be

20   anywhere from ten to fifty (50) percent.

21   Q    And what determines whether it's ten or fifty

22   (50)?

23   A    Their base salary, if they have one, and where the

24   loan came from.  Whether it was a referral or it was an

25   ad call.

Page 76

1    Q    Do you have -- do you have a compensation

2    structure with your employees?

3    A    Yes, we do.

4    Q    Is that a written document?

5    A    Yes.

6    Q    And does it vary from employee to employee?

7    A    Yes.

8    Q    Do you recall what the compensation structure was

9    with Sharon Davis?

10    A    She received fifty (50) percent commission.

11    Q    All right.  Was that on -- on all loans that she

12    was loan officer for?

13    A    Yes.

14    Q    Okay.  And what was her -- what -- what was that

15    based on?

16    A    The mortgage broker fee.

17    Q    Mm-hmm.

18    A    And the yield spread.

19    Q    All right.  And then did OMC Lending, Inc. get the

20    other fifty (50) percent?

21    A    Yes.

22    Q    Why would -- why would Sharon, for example,

23    receive fifty (50) and somebody else only ten?  What

24    would that difference be based on?

25    A    A person that received ten may have been getting a

Page 77

1    salary of two or three or four hundred dollars ($400) a

2    week, so --

3    Q    Okay.

4    A    -- they would get a smaller commission.

5    Q    All right.  All right.  Now, if a -- am I correct

6    that going back then to the loan application --

7                    BY MS. CARLISLE:  I'm sorry.  Are we

8                    going to mark the one that was signed,

9                    the separate exhibit?  The one we marked

10                   as Exhibit 4 was the unsigned in the

11                   other file.

12                   BY MS. GRAY:  That's a good point.  Why

13                   don't we just -- actually I didn't mark

14                   it.  I didn't put a four on any of them

15                   yet.  Why don't we mark as Exhibit 4 the

16                   signed copy of the loan application

17                   which is in the title company file which

18                   is -- the entire folder is identified as

19                   Exhibit 3.  All right.

20   BY MS. GRAY:

21   Q    When you indicated a little bit earlier that --

22   that Kate made these copies, do I infer correctly that

23   OMC Lending, Inc. has -- has the file, the Brooklyn

24   Title files as well as the OMC Lending files?

25   A    She went and got them from the building --

Page 78

1    Q    What building?

2    A    -- that they were in.

3    Q    Oh, okay.   What building are they in?

4    A    The 4355.   I gave you that address.

5    Q    And -- okay.   So is that just a storage area now?

6    A    Yes.

7    Q    On 4355 Ridge Road?

8    A    Yes.

9    Q    Are any other businesses conducted there now?

10   A    No.

11   Q    So it's just storage?

12   A    Yes.

13   Q    Looking -- looking through the -- this other

14   document that we labeled as Exhibit 1, is there

15   anything else that you would expect to see in that file

16   besides the missing loan application that was not

17   there?

18   A    Are we referring back to Brooklyn Title's copy?

19   Q    Yeah.   I'm referring to the first set of documents

20   that I handed you.

21   A    You can't tell me that.   You have to tell me

22   which --

23   Q    Which has been --

24   A    -- set you're talking about.

25   Q    Which has been labeled Exhibit 1.

Page 79

1    A    Which ones?

2    Q    Remember when you -- you looked at this file and

3    I'm handing it back to you now.

4    A    So you're talking about the borrower's copy?

5    Q    The borrower's copy.

6    A    Okay.

7    Q    Was there anything else that -- that you would

8    expect to find in there that wasn't there?

9    A    No.

10   Q    Okay.  So it's just the missing loan application?

11   A    Yes.

12   Q    Okay.  All right.  And that's the only thing that

13   seems strange about the file to you?

14   A    Mm-hmm.

15   Q    All right.  All right.

16        Then what I'm going to do -- when I ask you

17   questions about Brooklyn Title file, will you be able

18   to tell me if they're accurate copies of the -- of the

19   title company file or should I wait until I talk to Mr.

20   George?  He indicated that you were the one who had

21   more specific knowledge.

22   A    I can probably answer it better than he can.

23   Q    Okay.  So what I'm going to do is I'm -- I'm going

24   to start with the title company file and then I'm going

25   to ask you to look at the package labeled Exhibit 3.

Page 80

1    And I'm going -- I'm going to ask you how -- how it is

2    that you have a copy of the accuracy of the title

3    company file?   I mean just the basis of your knowledge.

4    Is it --

5    A    It was a copy of what came out of the filing

6    drawer or the disk.   Whichever.

7    Q    All right.  All right.  Well, then, starting with

8    the document on top, and this is a folder labeled

9    Exhibit 3, so I'm going to start with the document on

10   top which is Brooklyn Title Company, Inc.  It's a

11   document dated May 19.  Could you tell me what this is?

12   A    Final title policy that was sent to the customer.

13   Q    All right.  I'm going to call this Defendant's

14   Exhibit 5.  It's a document signed by Sue Weiss.  Is

15   she somebody who worked for Brooklyn Title Agency,

16   Inc.?

17   A    She was the title officer.  Yes.

18   Q    Okay.  And you call this a final title policy?

19   A    Yes.

20   Q    And the final title policy is -- is this one of

21   these documents that's like an insurance policy?

22   A    Yes.

23   Q    All right.  And the premium goes to whom?

24   A    The title company.

25   Q    Is the title company -- all right.  The fee goes

1    to the title company.  Is that -- is that part of like

2    one of the closing charges listed like on the HUD-1 or

3    the preliminary HUD-1?

4    A    Yes.

5    Q    And when the fee goes to the title company, is it

6    then forwarded to the insurance company?

7    A    Yes.

8    Q    Okay.  But -- but some commission remains with the

9    title company?

10   A    Yes.

11   Q    But you don't know how much that commission is?

12   A    No.

13   Q    What the percentage is?  Okay.

14        And -- and again, the beneficiary on this

15   policy -- this policy runs to the benefit of the

16   borrower; is that right?

17   A    Yes.

18   Q    And kind of a vernacular way to say it would be it

19   sort of insures clear title?

20   A    Yes.

21   Q    Okay.  All right.  And -- and the -- and so I'm

22   trying to figure out how many pages this is?  It's a

23   pretty big -- is it -- is it --

24   A    What, the title insurance premium?

25   Q    Yeah, the --

Page 82

1    A    Or the policy?

2    Q    -- policy.  Yeah.  It appears -- one, two --

3    A    It's the first six pages.

4    Q    All right.  That's what I was -- one, two, three,

5    four, five, six.  So Exhibit 5 consists of six pages;

6    is that right?

7    A    Yes.

8    Q    All right.  Alrighty.

9         And then Exhibit 6, what I'm going to call Exhibit

10   6, is a document titled mortgage?

11   A    It's actually the recorded mortgage.

12   Q    The recorded mortgage.  And that consists of it

13   looks like sixteen (16) pages.  Do you agree with that?

14   A    Yeah.

15   Q    Okay.  And this number, this handwritten number

16   down at the bottom, 3145547, on the bottom of the first

17   page, do you know what that is?

18   A    It probably coincides with an exam ordered or the

19   County ordered in for something prior to filing.

20   Q    Okay.  So you think that's a notation the County

21   made?  All right.

22        Who would have written in there on the first page

23   under Ms. McNerney's name, a/k/a Patricia Joanne

24   Kellicker?  Do you know who would have written that in?

25   A    Probably the title company.

Page 83

1    Q    All right.  Who would have pre -- who prepared

2    this mortgage?

3    A    Homecomings.

4    Q    Homecomings prepared the mortgage?

5    A    No, actually I shouldn't say that.  Either them or

6    a company that prepares documents.

7    Q    Who -- well --

8    A    There's companies that prepare documents.

9    Q    Okay.

10                   BY THE WITNESS:  You're going to have to

11                   excuse me.  I'm going to have to take

12                   this all.

13                   BY MS. GRAY:  I don't mind.

14   BY MS. GRAY:

15   Q    Alrighty.  If it weren't Homecomings, who --

16                   BY MS. CARLISLE:  I'm going to object to

17                   this.  She can't answer questions based

18                   on another party's actions or what

19                   they've taken.  She can talk -- she can

20                   speak to what the broker or title

21                   company would know about the mortgage

22                   but --

23                   BY MS. GRAY:  Okay.  You can object but

24                   you can't make a speaking objection and

25                   your objection will be noted but she

Page 84

1            still needs to answer.

2    BY MS. GRAY:

3    Q    So who -- who -- you say it would either be

4    Homecomings or a company that prepares documents.  Who

5    would have requested the document?  Would you have gone

6    to a company that prepares documents?

7    A    No.

8    Q    So -- so how would -- how would you have gotten

9    this document?  Is this --

10   A    From Homecomings.

11   Q    So Homecomings would have sent you this document?

12   A    Yes.

13   Q    Okay.  So however Homecomings got it done, it came

14   to you from Homecomings?

15   A    Yes.

16   Q    Okay.  And -- so -- so other than the handwritten

17   part filled in here, it would have -- it would have

18   been as it came to you from Homecomings?

19   A    Yes.

20   Q    All right.  And if -- do you want to compare it

21   with the one in the -- in your file to make sure

22   it's --

23   A    There wouldn't be one in my file.

24   Q    You wouldn't have a copy of the mortgage --

25   A    No.

Page 85

1    Q    -- in your file?  Okay.

2                  BY MS. CARLISLE:  Are you marking that

3                  mortgage as Exhibit 6?

4                  BY MS. GRAY:  Yeah.

5    BY MS. GRAY:

6    Q    Okay.  All right.  So this -- this is -- this you

7    would have -- this -- OMC Lending, Inc. would then,

8    after receiving it from Homecomings, would send it over

9    to the title company or --

10   A    We're looking at the title company file.

11   Q    Right.

12   A    This went directly to the title company.

13   Q    From Homecomings?

14   A    From Homecomings.

15   Q    Okay.  All right.

16        Do you know, looking at the signatures on page 16,

17   can you identify Teresa Aldanci?

18   A    She was a notary.

19   Q    And was she employed by the title company?

20   A    Yes.

21   Q    All right.  Do you know what her position was?

22   A    No, I don't.

23   Q    All right.  Can you read the name underneath that?

24   It looks like B-E-A-T-A and then possibly T-R-Z-A-S-I-

25   C-A?  Do you know who that is?  Do you recognize the

Page 86

1    name?

2    A    Oh, that's Beata.  She also worked for the title

3    company.

4    Q    Okay.

5    A    Escrow clerk.

6    Q    She was an escrow clerk?

7    A    Yes.

8    Q    All right.  Was it T-R-Z-A-S-I-C-A?

9    A    I have no idea how she spells her name.

10   Q    All right.  Alrighty.

11        Okay.  So the mortgage contained in the file

12   that's been identified as Exhibit 3, that mortgage is

13   Exhibit 6 and it consists of sixteen (16) pages.

14                  BY THE WITNESS:  I have to take this

15                  again.  I'm sorry.

16   (Phone call.)

17   BY MS. GRAY:

18   Q    Alrighty.  The next document after the mortgage in

19   Exhibit 3?

20   A    It's a release of lien from Household.

21   Q    All right.  And --

22                  BY MS. CARLISLE:  Objection.  Are you

23                  going to walk her through every single

24                  document?

25                  BY MS. GRAY:  I am.  I'm going to

Page 87

1                    identify every --

2                    BY MS. CARLISLE:  She already said that

3                    the whole file is a complete and

4                    accurate copy of the file.

5                    BY MS. GRAY:  I'm sorry.  I'm going

6                    to -- I'm going to explore these

7                    documents, okay?

8                    BY MS. CARLISLE:  How long do you expect

9                    to be here today?

10                   BY MS. GRAY:  It's not going to go too

11                   fast.  I mean it's not going to go too

12                   slow if we just zip through them.  Let's

13                   just -- let's just zip through them.

14   BY MS. GRAY:

15   Q    This is a satisfaction of the mortgage and --

16                   BY MS. CARLISLE:  Objection, relevance.

17                   BY THE WITNESS:  I don't plan on being

18                   here all day.

19   BY MS. GRAY:

20   Q    -- and the document underneath that -- okay.  The

21   title company just mailed this satisfaction to the

22   County; is that right?  To clear the title?

23   A    Yes.

24   Q    And that's part of that work that they got --

25   A    Yes.

Page 88

1    Q    -- there at the end.  What is that called?

2    A    That's a release of lien.

3    Q    It's a release of lien.  Okay.  And we'll just

4    call that Exhibit 7.

5         And is the document underneath that just a fax

6    cover sheet showing it being faxed to the title

7    company?

8    A    Yes.

9    Q    All right.  So we'll call that Exhibit 7

10   consisting of two pages, the release and the -- is that

11   right?

12   A    Yes.

13   Q    All right.  The release and the fax cover sheet.

14        All right.  And then the next one is also from

15   Household to the escrow clerk, Beata.  It's dated 1-7-

16   03.  Could you tell me what that is?

17   A    It's a fax cover sheet from Household.  It's

18   pretty self-explanatory.

19   Q    Showing items paid off on 5-17?

20   A    Showing what?

21   Q    I'm -- see, I don't think we're looking at the

22   same document.  I'm looking at the document dated 1-7-

23   03.

24   A    I'm looking at the same document.  What are you

25   asking me?  I don't know what items were paid off on 5-

Page 89

1    17.  That has nothing to do with this file so I have no

2    idea what that is.

3    Q    Well --

4    A    Maybe your client can clarify it.

5    Q    Could you -- could you look at that file because

6    I'm going to -- I'm going to ask you some questions

7    about that page.  I do see my client's name on that,

8    Ms. McNerney.

9    A    Mm-hmm.

10   Q    All right.  And -- all right.  And there -- there

11   are some -- some -- something indicated that something

12   was recorded on 5-15-09 (sic).  What -- was this

13   referring to the lien -- simply the lien that was paid

14   off?  If it is, you just need to tell me.

15   A    I have no idea what it's referring to.  I don't

16   know what occurred in 1996.  I'm sure your client could

17   probably tell you what information she authorized us to

18   fax to them.

19   Q    Now, the next document I see says Truth in Lending

20   Disclosures, page 2 of 2.  Does that make sense?  Where

21   is page 1 of 2?

22   A    Obviously, that's the document that we forwarded

23   to whoever she wanted us to from their '96 file.

24   Q    Do you know, I don't mean to belabor the point,

25   Ms. George.  I'd -- I'd like to like get you out

Page 90

1    because I know you have things to do and I'd like to

2    get Ms. Carlisle out and the rest of us, but -- but the

3    only reason I wanted you here today is that I -- I want

4    an explanation of what was in your file, like what was

5    the significance of the documents.  Like I could see

6    the documents.

7    A    I understand, but they're self-explanatory.

8    You're asking me to educate you and your practice and

9    that's not my job.

10   Q    Yes.  Yes.

11   A    It's not my job.

12   Q    They are self-explanatory --

13   A    Read the file and self -- you know, and get

14   yourself education.

15   Q    It's -- it's self -- that's exactly what --

16   A    I mean you're bringing me in here to educate you

17   and waste my time --

18   Q    I'm bring you here --

19   A    -- from my business --

20   Q    -- to tell me --

21   A    -- and I'm losing money to help you file your

22   claim.

23   Q    Thank you very much.

24   A    I mean this is ridiculous.

25   Q    What I want --

Page 91

1    A    You haven't even reviewed this file.

2    Q    -- from you is -- you don't know what I've done.

3    A    Okay.

4    Q    And I don't have to justify myself to you.

5    A    Okay.  But I don't have to sit here --

6    Q    And quit --

7    A    -- and give you all of my knowledge.

8    Q    Quit --

9    A    I will answer whatever specific questions you

10    have --

11    Q    I'm sorry.  You can't just --

12    A    -- but you're asking me to go page by page and

13    explain to you --

14    Q    I am asking you.

15    A    -- what a page is.

16    Q    And you know what?  We're going to get out of here

17    way quicker if you just answer my questions.

18    A    Well, pretty soon I'm going to get up and walk out

19    because I have a business to run --

20    Q    All right.

21    A    -- and I don't have time to sit here unless you're

22    going to pay me --

23    Q    Okay.  So how about --

24    A    -- a good couple hundred dollars an hour to sit

25    here.

Page 92

1    Q    -- answering my questions.  What is this document?

2    What happens when you get this document?

3    A    Okay, listen.  If you were to ask your client --

4    Q    This says Beata is sending --

5    A    -- your client requested that we forward this

6    document to somebody.  So why don't you ask your client

7    for explanation.

8    Q    This looks like a document from Household --

9    A    And your client asked us to forward it to

10   somebody --

11   Q    -- to the title company.

12   A    -- and that's what we did.  That's exactly what we

13   did.  We got something from Household for your client

14   and forwarded it to somebody.  So ask your client what

15   it is and you'll get an explanation.

16   Q    It looks like --

17   A    It looks like the Truth --

18   Q    -- to Beata from --

19   A    -- in Lending from their 1996 application and

20   mortgage that they closed through Conti Mortgage.  I

21   mean I'm sorry you're not educated in the mortgage

22   business, but that's not my job to do.  Now, if you

23   have a specific question about something, ask me.

24   Q    I'm sorry.  You -- you cannot limit what I'm

25   asking you but you can get out a lot quicker if you

1    just answer my questions --

2    A    I'm not going to get out any quicker because if

3    you want to go page by page --

4    Q    Well --

5    A    -- there's over a hundred pages here --

6    Q    And you know --

7    A    -- and two more files to go through.

8    Q    There are a hundred pages but some of these

9    documents are multi-page.  So I'm -- I'm just trying --

10    in the entire loan process --

11    A    Listen, I have a lot of things to do in my life.

12    Q    -- what would --

13    A    I don't have time to sit here, okay?

14    Q    What would be the -- so this is --

15    A    Unless you're going to compensate me to teach

16    you --

17    Q    Does this have --

18    A    -- ask me specific questions, okay?

19    Q    Does this have any significance --

20    A    You're frustrating me.

21    Q    -- in the loan process?

22    A    Not to the best of my knowledge.

23    Q    Okay.

24    A    No, it doesn't.

25    Q    That's all I need to know.  Okay.

Page 94

1          So -- so we'll just label this -- we won't even

2     bother labeling this document.

3          And then what -- and this agent filing

4     notification, attention Teresa, Kasparnet, LLC, this is

5     from Brooklyn Title Agency, Inc.  What -- what is this

6     document?

7                    BY MS. CARLISLE:  Objection, relevance.

8                    BY THE WITNESS:  Again, if you just read

9                    it, you'll understand it.

10    BY MS. GRAY:

11    Q     Okay.  I'm asking you to tell me.  What is the

12    significance of this document?

13    A     It shows that the mortgage was filed.

14    Q     All right.  So all -- all Exhibit 8 does is show

15    the mortgage was filed?

16    A     Yes.

17    Q     And who is Kasparnet, LLC?

18    A     The company that filed it.

19    Q     All right.  So does the title company give it to

20    Kasparnet and Kasparnet files it and sends it back

21    to --

22    A     Yes.

23                    BY MS. CARLISLE:  Objection, relevance.

24    BY MS. GRAY:

25    Q     And sends it back to the title company?

Page 95

1    A    Yes.

2    Q    Okay.  And is that -- and then this next document,

3    auditor's tax list, what significance does this have in

4    the loan process?  And that'll be Exhibit 8.

5    A    Apparently your client was delinquent on property

6    taxes, seventy-two hundred dollars ($7,200), so that

7    bill had to be paid at the time of filing.

8    Q    All right.  So this is -- the auditor's tax record

9    would have been -- well, let me ask you, I want to know

10   the significance of this in the loan process.  Does

11   this -- it this ultimately a number that would appear

12   on the HUD-1 or on the good faith estimate as something

13   that had to be paid at closing?

14   A    Yes.

15   Q    Is that the significance of this document?

16   A    Yes.

17   Q    Okay.  That's -- that's all I needed to know.

18        And then the next page, is that part of Exhibit 9

19   or is it --

20   A    Yes.

21   Q    -- something different?

22   A    It's the form that goes down to file the mortgage.

23   Q    All right.  So it's not part of the County

24   Auditor's Treasurer's payoff.  It just goes when you

25   file a mortgage you --

Page 96

1    A    Yes.

2    Q    Okay.  So -- so that would be Exhibit 10 and

3    that's just what went down when the mortgage --

4              BY MS. GRAY:  I'm going to need a bunch

5              of these document -- these exhibit

6              numbers, these labels.

7    BY MS. GRAY:

8    Q    All right.  And then the document after that, is

9    that just another copy of Exhibit 6?  Is there anything

10   different about it?

11   A    It's the non-filed copy of the mortgage.

12   Q    All right.  That answers my question.  All right.

13        It's -- the one thing that I -- that I want to ask

14   you about is this non-filed copy of the mortgage, maybe

15   I'm just misremembering this.  It's 15 of 15.  But I

16   thought the file copy was 16.

17             BY MS. CARLISLE:  Objection, relevance.

18   BY MS. GRAY:

19   Q    So let me just ask you --

20   A    There's a legal description included which is not

21   a numbered page.

22   Q    Got you.  Okay.  That answers my question.

23   A    This is so stupid.

24   Q    And then -- then the Stewart Title Guaranty

25   Company commitment, what is -- what --

1    A      Exactly what it says.  It's a title commitment.

2    Q      All right.  And that's Exhibit No. 11.

3           And turn to this --

4                    BY MS. CARLISLE:  What purpose are you

5                    marking this as an exhibit for?  Are you

6                    going to ask her specific questions

7                    about the actual content of the document

8                    or are you just going to keep marking as

9                    exhibits every single document you talk

10                   about?

11   BY MS. GRAY:

12   Q      In terms of the contents, the role this has in

13   the -- in the loan process, is this again the -- to

14   show the -- to show the borrower's getting clear title?

15   Is that the only purpose?

16   A      This --

17   Q      Or does it insure something --

18   A      This shows what needs to be paid off.

19   Q      Okay.  So this is -- this is the commitment and

20   the commitment shows what needs to be paid off?

21          Does the Stewart Title Company --

22   A      I, quite frankly, am going to tell you it is 1:10.

23   I am leaving here at two o'clock whether we're done or

24   not, and I will claim this is a hardship to my business

25   because I cannot be away for this amount of time.

Page 98

1    Q    The --

2    A    So I suggest you ask me pertinent questions.

3    Q    The Stewart Title Guaranty Company commitment

4    shows what needs to be paid off.  Where dose it show

5    what needs to be paid off?

6    A    This is ridiculous.

7    Q    Oh, okay.  Part --

8    A    This is absolutely ridiculous.

9    Q    Part B, defects, liens, encumbrances --

10    A    I would suggest that you review this and then we

11    meet again, okay, because I am not going to sit here

12    and go through this page by page.  I absolutely refuse.

13    Q    Who prepares this document, the title company?

14    A    Do you understand what I'm saying to you?  I

15    absolutely refuse --

16    Q    And I'm --

17    A    -- to continue down this path.

18    Q    And I'm going to ask you what's in this file.

19    A    Okay.  You have until two o'clock.  I'm warning

20    you an hour ahead of time.

21    Q    Who prepared this document?

22    A    I am walking out of here at two o'clock.

23    Q    You're not answering my question though.

24    A    I don't care.  I'm telling you that right now.  Do

25    you understand --

Page 99

1    Q    Who --

2    A    -- the statement that I said?

3    Q    I'm asking a question, Ms. George, and you are

4    here pursuant --

5    A    Okay.  Do you understand that at two o'clock I am

6    leaving?

7    Q    -- to a subpoena and I'm sure you want to do the

8    best you can --

9    A    Yeah.

10   Q    -- to clearly answer my questions.

11   A    Up until two o'clock.

12   Q    So I'm asking you again --

13   A    Who prepares this?  The title company prepares

14   this.

15   Q    The title company prepares this.

16        Now, my under -- how does Stewart Title relate to

17   Brooklyn Title?

18   A    Stewart Title is the underwriter.

19   Q    Okay.  So the title company pre -- Brooklyn Title

20   prepared this document; is that right?

21   A    Yes, they did.

22   Q    They sent it to --

23   A    Nobody.

24   Q    It just goes in the file?

25   A    Yes.

Page 100

1    Q    Okay.   Why is it called Stewart Title Company

2    commitment?

3                    BY MS. CARLISLE:   Objection, relevance.

4                    BY THE WITNESS:   Stewart Title is the

5                    underwriter.   They are the underwriting

6                    insurance company for Brooklyn Title.

7    BY MS. GRAY:

8    Q    Okay.

9    A    How many times do we have to go through this?

10   Q    I appreciate --

11   A    This is now --

12   Q    -- your telling me that.

13   A    -- the third time that I've explained this --

14   Q    Okay.

15   A    -- to you.

16   Q    Well, you know what?   Okay.

17        And -- but Brooklyn Title prepares it.   So who --

18   who sets the standards for what has to be paid off,

19   Brooklyn Title or Stewart Title?

20                   BY MS. CARLISLE:   Objection, relevance.

21                   BY THE WITNESS:   Who sets the standard?

22   BY MS. GRAY:

23   Q    In other words, this --

24   A    It's common knowledge what needs to be paid off.

25   Whatever appears on title has to be paid off.

1    Q    All right.  So -- but Brooklyn Title prepared

2    then this Schedule B, Part 1, Part 2?  Brooklyn Title

3    prepared all of this?

4    A    Yes.

5    Q    Okay.  But they prepared it on a Stewart Title

6    Guaranty Company commitment sheet; is that right?

7    A    Yes.

8    Q    Okay.  And that's because Stewart Title is the

9    underwriter; is that right?

10   A    Yes.

11   Q    And -- and as the underwriter, what does Stewart

12   Title do?  Does it guaranty the loan?  Does it

13   guaranty -- who --

14                BY MS. CARLISLE:  Objection, relevance.

15   BY MS. GRAY:

16   Q    What's the relationship of Stewart Title to

17   Brooklyn Title?

18   A    They are the underwriter.

19   Q    And --

20   A    How much clearer can I make it to you?

21   Q    And when you say they're the underwriter, do they

22   guaranty that it's a good loan?  Do they guaranty clear

23   title?  What do they --

24   A    They guaranty that Brooklyn Title is going to

25   issue a clear title.  Yes.

Page 102

1    Q    Okay.  So Stewart Title issues a guaranty to Ms.

2    McNerney?

3    A    Yes.  Through Brooklyn Title.

4    Q    All right.  Okay.

5    A    Man, I feel sorry for your client.

6    Q    So -- and then this list of items that has to be

7    paid off or things that have to be done, this is a list

8    that Brooklyn Title put together based on --

9    A    The title exam.

10    Q    -- the title exam?

11        All right.  And then it would be the

12    responsibility of Brooklyn Title to see that each of

13    these things was done by the date of closing; is that

14    correct?

15    A    Yes.

16    Q    Or prior to the date of closing?

17    A    The date of closing.

18    Q    All right.  And -- and this consists of one, two,

19    three pages, this being Exhibit 11; is that right?

20    A    I guess.

21    Q    Is that what your copy showed?

22    A    Yes.

23    Q    Okay.  All right.  And the mortgage payoff

24    request, I don't -- okay.  That would be a request made

25    to Household Realty?

Page 103

1    A     Yes.

2    Q     And it verified the amount of the mortgage.  All

3    right.  And that's something that Brooklyn Title sent

4    to Household and Household, at some point, said yeah,

5    that's the right amount or no, that's not the right

6    amount?

7                    BY MS. CARLISLE:  Objection.

8    BY MS. GRAY:

9    Q     Is that correct?

10   A     I have no idea.

11   Q     All right.  It does ask -- it does ask Household

12   to verify the payoff on the mortgage; is that correct?

13   A     Yes, it does.

14   Q     All right.  All right.  And that's Exhibit 12.

15         All right.  The next document --

16                    BY MS. GRAY:  I need some more labels

17                    here.

18                    BY MS. CARLISLE:  You should only mark

19                    them as exhibits when you're asking her

20                    specific questions on the document.

21                    This is ridiculous.

22                    BY MS. GRAY:  The last one was 12.

23   BY MS. GRAY:

24   Q     All right.  Let me -- let me ask you this.  I'm --

25                    BY MS. GRAY:  Thank you.

Page 104

1    BY MS. GRAY:

2    Q    The next document in there is called Stewart Title

3    Company commitment.  Is this anything other than a copy

4    of -- of the one we -- we called commitment earlier

5    or --

6    A    That's probably all it is is a copy.

7    Q    It's a copy.  So that's Schedule A.  Schedule B.

8    Okay.  And it's just a commitment.

9         Now -- now, let me ask you about this -- after

10   that copy I see something dated 12-20-02 called

11   commitment for McNerney and it's a handwritten

12   document.

13   A    I have no idea what you're referring to.

14   Q    All right.

15                   BY MS. CARLISLE:  Are you talking about

16                   the fax cover sheet?

17                   BY MS. GRAY:  I'm talking about the --

18                   the fax cover sheet and then the

19                   document that follows it.  The fax cover

20                   sheet is dated 2-20-02.  And then the

21                   page underneath looks like Kasparnet,

22                   LLC, provided for Brooklyn, attention

23                   Wendy.

24                   BY THE WITNESS:  So what do you want to

25                   know about it?

Page 105

1    BY MS. GRAY:

2    Q    I want to know who would have prepared it and what

3    significance it has in the loan process?

4                    BY MS. CARLISLE:  Objection.

5                    BY THE WITNESS:  Kasparnet would have

6                    prepared it and it's part of the title

7                    search.

8    BY MS. GRAY:

9    Q    All right.  And -- all right.

10   A    And that's what, pretty much, most of the rest of

11   it is until you get to -- so you could stop asking me

12   these silly questions.

13   Q    Well --

14   A    This is all part of the title search.

15   Q    This whole document, the whole rest of the

16   document is part of the title search?

17        The --

18   A    This is the last page of the title search right

19   here and I don't know how many pages it consists of --

20   Q    I see --

21   A    -- because I'm not counting them.

22   Q    All right.  I see a handwritten thing is in the

23   page following -- following the fax.  Not immediately

24   following that fax cover sheet.

25   A    That's from the title examiner.  They fill out

Page 106

1    that form and it shows who's on title and the different

2    parts to it.

3    Q    All right.  And -- and would that include the copy

4    of the deed?  I see a copy --

5    A    Yes, that was the previous deed, previous

6    mortgage.  Everything that was pertinent.

7    Q    All right.  And -- and was this done as of 12-20-

8    02?

9    A    That's the date on it.  Yes.

10   Q    Because that's the date on the -- does title

11   search include the copy of the divorce?

12   A    Yes.

13   Q    Restraining orders and does it include the copy of

14   the docket?

15   A    Yes.

16   Q    All right.  And --

17   A    Keep going.  Yes, that's included.

18   Q    Okay.  I'm seeing -- okay, yeah, that's a part of

19   it.

20   A    Keep going.

21   Q    And then --

22   A    Keep going.

23   Q    This looks like the application --

24   A    Before that.  Before that.

25   Q    Before that.  Okay.  All right.

Page 107

1    A    There you go.  That's the last page.

2    Q    Kasparnet Associates, same day filing.  And then

3    there's a handwritten thing, payoff received, North

4    Olmsted Household.  Is that part of it?

5    A    No.

6    Q    All right.  So we're talking about from the fax

7    cover dated 12-20-02 to the document Kasparnet &

8    Associates, that whole thing is simply the title

9    search?

10   A    Mm-hmm.

11   Q    Okay.  So I'm going to clip all that together.

12   And who would have -- Brooklyn Title would have done --

13   did the title search; is that right in this case?

14   A    Yes.

15   Q    Okay.  And is it based on the title search then

16   that Brooklyn Title decides ultimately how much has to

17   be paid for the loan to close?

18   A    Yes.

19   Q    All right.  And is it -- is it Brooklyn Title that

20   decides how much has to be paid for the loan to close?

21   A    It's Brooklyn Title and Homecomings.

22   Q    Okay.  So --

23   A    And the mortgage broker.  All three of them decide

24   what needs to be included for the loan to close.

25                    BY MS. GRAY:  Okay.  I'm going to label

Page 108

1                        this title search Exhibit 13.

2      BY MS. GRAY:

3      Q    So it's Brooklyn Title, the loan officer and

4      Homecomings?

5      A    Yes.

6      Q    So how do they communicate?  Do they communicate

7      in writing?

8      A    Yes.

9      Q    And do those communications have like an official

10     form?

11     A    It's your loan closing documents.

12     Q    Okay.

13     A    There's escrow instructions.

14     Q    All right.  All right.  In this file that we're

15     looking at which has been labeled broadly Exhibit 3,

16     would you show me the loan -- identify the loan closing

17     documents?

18     A    They would begin right here.

19     Q    Okay.  Urgent?  The top line says urgent?

20     A    Yes.

21     Q    And it's going to be after -- obviously after the

22     ones we looked at already.

23          You don't have to answer if you don't want to

24     waste your time, but I've always wondered why do title

25     companies use such long paper?

Page 109

1    A    It's required by the County.

2    Q    Is that right?

3    A    Yes.

4    Q    Okay.  Who -- I'm looking at a document which I

5    will label Defendant's Exhibit 14, and the top part is

6    urgent, if items circled below are not received,

7    approved -- all right.  Who prepared this particular

8    document?  Was this prepared by Homecomings?

9    A    Yes.

10   Q    Okay.  And --

11   A    You're right around it.  Go down one more, I

12   think.  A little bit further.

13   Q    All right.  So Homecomings prepared this document

14   which consists of how many pages?

15   A    Six.

16   Q    All right.  And was this then faxed to Brooklyn

17   Title?

18   A    It appears to be.  Yes.

19   Q    And it's called the lender's closing instructions.

20   Somewhere on here I saw -- oh, okay.  The loss payee

21   mortgage clause is through GMAC Mortgage Corporation,

22   its successors and assigns?

23   A    Yes.

24   Q    How does that relate to Homecomings?

25                    BY MS. CARLISLE:  Objection.

Page 110

 1                   BY THE WITNESS:  Probably their

 2                   servicer.

 3     BY MS. GRAY:

 4     Q     Probably their servicer?  All right.

 5           And I'm going to -- I'm going to ask you some

 6     questions about No. 14, but I want to ask you first --

 7     I want to ask you about another document that I -- that

 8     I saw in here and that is a copy of a certified funds.

 9     Did you -- do you know what I'm referring to?

10     A     It's in the other package.

11     Q     I think I saw it in here.  I mean I know it's in

12     hers but I think I saw it in here, too.

13           At what -- at what point, Ms. George, prior to

14     closing do the title company, the loan officer and

15     Homecomings, at what point do they figure out how much

16     has to be paid to close the loan?

17     A     Right after the escrow instructions come over.

18     Q     All right.  And in terms of the time line, the

19     escrow instructions come -- come in that part in the

20     process which you identified as clear to close?

21     A     Yes.

22     Q     Okay.  So actually you get the clear to close

23     letter with the escrow instructions.  That's when you

24     figure out how much money you need to close?

25     A     Yes.

1    Q    All right.  Now, at what point was it determined

2    in this loan that Ms. McNerney was going to have to

3    provide another eight thousand dollars ($8,000)?

4                        BY MS. GRAY:  I have a copy of the check

5                        here which I'll call Exhibit 15.  Did

6                        you find it in your set of -- I'll help

7                        you find it if you want.

8                        BY MS. CARLISLE:  I saw it already.

9                        BY MS. GRAY:  All right.  All right.

10                       I'm calling that Exhibit 15.

11                       BY MS. CARLISLE:  You should try and

12                       number these documents so that we don't

13                       have to root through everything before

14                       the deposition.

15   BY MS. GRAY:

16   Q    Do you want me to help you find it?

17   A    I already -- it's right here.  I'm looking at it.

18   It's right there.  It's the same one.

19   Q    All right.  At what point would it have been

20   determined that she needed to bring an extra eight

21   thousand dollars ($8,000) to close the transaction?

22   Can you tell that from looking at the loan documents?

23   A    Not from the loan documents.  No.  I'd have to

24   look at the settlement statement.

25   Q    Well, can you tell by looking at the settlement

Page 112

1    statement?

2    A    Yes.

3    Q    All right.  And do you have a copy of the

4    settlement statement in -- in -- in the title company

5    file which you're referring to?

6    A    There's three or four of them in here so --

7    Q    And -- well, let's find all three or four of them.

8         Okay.  I see -- all right.  I'm not -- I'm not

9    seeing a complete one yet.  Okay.  I did see a good

10   faith estimate but I'm not --

11                   BY MS. CARLISLE:  Since Mrs. George

12                   needs to leave at two o'clock, am I

13                   going to be allowed to start asking my

14                   questions at any time?

15                   BY MS. GRAY:  When mine are done.

16   BY MS. GRAY:

17   Q    Ms. George, part of what I wanted to ask you about

18   are the fact that there are several different

19   settlement statements in Ms. McNerney's copy of the

20   closing file and I think there are several in the copy

21   that you provided as well.  I'm looking on -- on one

22   which I will call Defendant's Exhibit 16.  And it's --

23   it's dated 12-27-02.  Do you have that copy?  If you

24   like, I will find it in your stack because I want to

25   make sure we're talking about the same one.

1    A    You're going to have to give me a minute because

2    I'm looking.  If you're going to ask me to answer

3    questions, I have to find my answers first --

4    Q    Okay.

5    A    -- before I'm going to do this with you.

6    Q    If you hand me your stack, I'll find the

7    precise --

8    A    I don't want you to find what you want to find.  I

9    want to find what I need to find to answer the

10   questions that I have.

11                   BY MS. CARLISLE:  What file are you

12                   looking at?

13                   BY MS. GRAY:  I'm -- I haven't changed

14                   the folder.  I'm still in the main

15                   folder labeled Exhibit 3.

16                   BY THE WITNESS:  Apparently, the reason

17                   why she brought this extra money in is

18                   she owed her ex-husband money which is

19                   part of the divorce decree.

20   BY MS. GRAY:

21   Q    And you base that on what?

22   A    Look at your divorce decree in the title exam.

23   There's a copy of the divorce decree.  Do you remember

24   asking me about that?

25   Q    I sure do.

Page 114

1    A    Okay.  That's where it states in there that she

2    owes him money.

3    Q    All right.  Okay.  Did you find the settlement

4    statement?

5    A    Which one are you asking me to look at?

6    Q    I'm -- I'm asking you to look at the title of --

7    the copy of the settlement statement.  I'm going to ask

8    you to hand me that stack so that I can make sure that

9    we're looking at --

10   A    Just tell me which page it's after.  Look at the

11   page before that and tell me which one it's after.

12   It's after the first page payment letter?

13   Q    Mm-hmm.

14   A    Okay.

15   Q    I do want to look at it and make sure it's the

16   same -- the same document.

17        Ms. George, let me have the whole file so I can

18   keep things in order.  I'm sorry.  I'm a stickler for

19   that.

20   A    It's in order.  If you hand it right back to me it

21   will be right back in order.

22   Q    I know.  But I'm asking you to hand it to me,

23   okay?

24                  BY MS. CARLISLE:  It's the witness' copy

25                  of it.

1              BY MS. GRAY:  Thank you.  I'm sorry.

2              I'm just fussy about keeping things in

3              order.

4    BY MS. GRAY:

5    Q    All right.  So this document that I'm -- that I'm

6    labeling 16, and I'm just -- I wand to make sure that

7    we're talking about the same document.  All right.  And

8    I'll hand it back to you here.  Here's your copy and

9    here -- and here's the closing statement, HUD-1

10   statement.  It's dated 12-27-02; is that accurate?

11   A    Yes, it is.

12   Q    And it's signed by Ms. McNerney?

13   A    Yes.

14   Q    And the person whose signature appears opposite

15   the date, who is that?  Teresa --

16   A    Dempsey.  Your notary.

17   Q    And she's the notary who's employed by Brooklyn

18   Title; is that right?

19   A    Yes.  Mm-hmm.

20   Q    And I'm looking at line 303 of that document.

21   Would you look at line 303 as well?

22   A    Yes.  I'm looking at it.

23   Q    What does it say for cash from --

24   A    It says zero.

25   Q    Zero.

Page 116

1    A    But if you look at line 1303 it shows the mortgage

2    payoff as ninety thousand (90,000) and the actual

3    payoff was ninety-eight thousand (98,000), so that's

4    where your difference is.

5    Q    Now, the mortgage payoff --

6    A    To Household.

7    Q    Okay.  The mortgage -- so at what point did -- did

8    the title company become aware that the mortgage payoff

9    to Household was ninety-eight thousand (98,000) rather

10   than ninety thousand (90,000)?

11   A    Probably at some point when you asked me about

12   that fax cover sheet from Household, that probably had

13   all --

14   Q    Well, that --

15   A    -- the explanation.

16   Q    -- would be a good thing to go back to and look at

17   then because that possibly would provide the answer.

18   That's on 12 -- that document that you've identified is

19   Defendant's Exhibit 13; is that right or was that a

20   different one?

21   A    I believe it was.

22   Q    This one.  Actually we didn't give this an exhibit

23   number at the time.

24   A    Also stated in here somewhere that seventy-two

25   (72) hours was the time that they had to give for

1    notice for Household to give a payout.  One of these

2    fax cover sheets.

3    Q    All right.  We'll find it.

4                   BY MS. GRAY:  Which way, James?  This

5                   way or is it this way?

6                   BY THE WITNESS:  And here's your payoff;

7                   ninety-eight thousand (98,000) --

8                   ninety-eight thousand three hundred and

9                   forty-nine dollars and ninety-four cents

10                   ($98,349.94).

11    BY MS. GRAY:

12    Q    And where are we going to find that in our -- in

13    our stack?

14    A    Right after the disbursement of funds.  There's

15    checks from Brooklyn Title that show all the funds that

16    were disbursed.

17    Q    Do we show -- do we have a statement from

18    Household showing what the payoff is?

19    A    That's what I just read you.

20    Q    Okay.  And I just want to find out where it is in

21    the -- in this set of documents.  And is this going to

22    be after the title commitment?

23    A    It was after the disbursement of checks.  So yes,

24    it's after the commitment, after the title search.

25    Q    Okay.  We've got the title search.

Page 118

1                        BY MS. CARLISLE:  Right after a series

2                        of checks.

3     BY MS. GRAY:

4     Q     All right.

5     A     And that wouldn't affect the APR because it's the

6     payoff on the mortgage and the customer brought the

7     cash to the table so --

8     Q     All right.  I'm seeing the check to Household.

9     A     Keep going.  There's the payoff right behind it.

10                       BY MS. GRAY:  All right.  So we'll label

11                       that Household Finance Corporation

12                       letter dated 12-27-02 as Defendant's

13                       Exhibit 17.

14    BY MS. GRAY:

15    Q     And is that a -- that's a one-page document,

16    right?  And it shows -- it shows a payoff of ninety-

17    eight three four nine nine four; is that correct?

18    A     Yes.

19    Q     And --

20    A     And all along she told us the payoff was around

21    ninety-two (92), ninety (90) to ninety-two thousand

22    (92,000).

23    Q     All along she --

24    A     Because that's all we've accounted for.

25    Q     -- told you that?

Page 119

1   A    That's all we've accounted for.

2   Q    Do you -- do you recall her telling you that?

3   A    It's in the mortgage, copy of the mortgage one.

4   If you look on the --

5   Q    Show me where -- where it is.

6   A    -- application, it shows ninety-two thousand

7   (92,000) was the payoff on the mortgage.

8   Q    All right.  And did you get -- did the title

9   company or did the broker request a payoff from

10  Household at any time prior to December 27, 2002?

11  A    What's the date on the payoff?  December 27th.

12  That's when we would have gotten it.

13  Q    All right.  Did you request a payoff at any time

14  prior to that?

15  A    No, we wouldn't.

16  Q    All right.  So this December 27, 2002, is the date

17  that you first got the payoff?

18  A    Yes.

19  Q    All right.  And so at that time you learned the

20  amount?

21  A    Yes.

22  Q    And is it at that time that Ms. McNerney would

23  have been informed of --

24  A    Yes.

25  Q    -- what the payoff was?

Page 120

1        All right.  Now, immediately following that, do

2    you see another final settlement statement?

3    A    Yes.

4    Q    All right.  We'll call that Exhibit 18.  And that

5    consists of how many pages?  Two pages?

6    A    Yeah.

7    Q    All right.  Who would have prepared this

8    settlement statement?

9    A    Either Beata or Wendy.  Usually the escrow clerks

10   prepare them first.

11   Q    All right.  So they would have been prepared right

12   at the title company?

13   A    Yes.

14   Q    This settlement statement and -- and the

15   settlement statement that we looked at earlier that

16   showed -- that showed no cash from borrower?  That also

17   would have been prepared there at the title company?

18   A    Yes.

19   Q    Would it be prepared -- all right.

20        And do you notice Exhibit 18 also bears the date

21   12-27-02?

22   A    Mm-hmm.  Settlement dates don't change.

23   Q    Okay.  Even though the documents --

24   A    Documents change but settlement dates don't.

25   Q    All right.

Page 121

1    A    Unless there isn't a Truth-in-Lending issued.

2    Q    All right.  Was there a Truth-in-Lending

3    Disclosure Statement issued?

4    A    Not for a payoff change.  No.

5    Q    All right.

6    A    That's not included in the Truth-in-Lending.

7    Q    And -- and is it -- do I understand correctly that

8    this loan couldn't close until -- until the eight

9    thousand (8,000) was provided?

10   A    Yes.

11   Q    Okay.  And so it couldn't -- it couldn't close

12   until all the money was brought in including the eight

13   thousand (8,000)?

14   A    Right.

15   Q    Okay.  Is it customary to not request the payoff

16   until -- until the actual date of closing?  You

17   don't -- you don't look ahead and say --

18   A    With Household, yes.

19   Q    And -- and why is that?

20   A    Because they would solicit the customer and

21   refinance them.

22   Q    Okay.  All right.  But weren't we -- weren't we

23   earlier, Ms. George, looking at a document where you

24   asked them to confirm a particular payoff amount?

25   Wasn't that -- wasn't that one of the documents --

Page 122

1    A    It was a request for a payoff and it said it was

2    seventy-two (72) hours.

3    Q    Right.

4    A    There's a fax cover sheet in here.

5    Q    Yeah.  I saw that, too.  We called it Exhibit 12.

6    And it's dated -- okay.  December 26th.  That's when

7    you would have asked Household for it.

8         So up until that time you -- you had no basis for

9    the mortgage amount other than something she would have

10   orally told you?

11   A    It would be on the credit report.

12   Q    Or it would be on the credit report?

13   A    It was on the credit report.

14   Q    Now, a couple minutes ago, and I -- and I know

15   that we're going through a lot of documents so I'm

16   not -- I'm not trying to do anything other than just

17   clarify some information.  At one point you were saying

18   the eight thousand (8,000) difference was a matter of a

19   payoff of Household but then at another point you were

20   saying it had to do with something was an obligation to

21   her husband?

22   A    Well, there's something in the divorce decree that

23   she owed him money so I don't know if that was part of

24   the payoff to Household.

25   Q    Can you think of any way that would be?

Page 123

1  A    If they advanced money.  I'm sorry?

2  Q    Is it -- okay.

3       So basically you're saying it could be because the

4  payoff to Household was more than you thought or it

5  could be because she owed her husband eight thousand

6  dollars ($8,000)?

7  A    Could be either/or.

8              BY MS. CARLISLE:  Objection.

9  BY MS. GRAY:

10 Q    Um --

11 A    She obviously owes Household more than what we

12 thought --

13 Q    All right.

14 A    -- and then she owes her ex-husband.

15 Q    Is there any --

16 A    I don't know if she paid him outside of closing or

17 how she settled that.

18 Q    Is there anything in the HUD-1, either Exhibit 16

19 or Exhibit 18, that would show any money going to her

20 husband?

21 A    No.

22 Q    All right.  There's nothing in the HUD-1 that

23 would show that?

24 A    No.

25 Q    All right.  Are there anything in the closing

Page 124

1    instructions?

2    A    No.

3    Q    All right.

4    A    Well, I don't know.  I didn't read them, so --

5    Q    Oh, yeah.  Well, check -- if you look at them now

6    would you see anything that would show that, anything

7    going to her husband?

8    A    No, it does not refer to the ex-husband.

9    Q    All right.

10   A    So she, quite frankly, could have advanced it and

11   that could be what this other piece of paper is from

12   Household.  She could have taken an advance when they

13   got divorced off of the Household loan.

14   Q    All right.  What other piece of paper from

15   Household are you referring to?

16   A    When you asked me about the APR from the husband

17   in '97.  I don't know when their divorce was but that

18   could be part of it.

19   Q    Would you be able to tell from reviewing the file

20   in Exhibit 2 or Exhibit 3 who would have called Ms.

21   McNerney to tell her that she needed to bring in

22   another eight thousand dollars ($8,000)?

23                    BY MS. CARLISLE:  Objection.

24                    BY THE WITNESS:  No.  I probably

25                    wouldn't be able to tell.  Typically,

Page 125

1            notes like that aren't made.

2    BY MS. GRAY:

3    Q    Would you take a look and see?  You looked at it

4    pretty carefully, I realize, and I don't want to

5    belabor the point.  But would there have been a fax

6    from someone to someone else raising the issue?  Would

7    that have been a matter of concern?

8    A    I mean without going through page by page, I can't

9    answer that question accurately.

10   Q    All right.  So as far as you know --

11   A    And I'm not going to do that.

12   Q    -- you don't know who would have called her?

13   A    I don't know how she would have been notified.

14   No.

15   Q    All right.

16        What I'm looking for, Ms. George, and maybe you

17   can find it more quickly than I can, is a copy of that

18   payoff from Household.

19   A    It's in the back behind the checks.

20   Q    That's what I thought but I'm not finding it now.

21   A    Title company disbursement checks.  It's right

22   behind that.  There's a title exam.  Remember where the

23   title exam was?

24   Q    Yeah, that was -- was it near that?

25   A    There you go.  Keep going.

Page 126

1    Q    All right.

2    A    A couple more pages.

3    Q    All right.  Okay.  Exhibit 17 is what we're

4    looking at.  Did that arrive -- did that arrive by fax?

5    A    Yes.

6    Q    All right.

7    A    It's across the top.

8    Q    There at the top.  And so it arrived December 30;

9    is that right?

10    A    Yes.

11    Q    Would you look at your copy and see if that's

12    right?

13    A    I know it is because I looked at it already.  It's

14    December 30th.  Yes.

15    Q    All right.  17:51 apparently was the time.  Would

16    that be -- all right.  Is that the timing right, 17:51?

17    A    That would be like 5:51.

18    Q    All right.  Okay.

19        There are a couple of documents that you referred

20    to and I wanted to see if you would identify them for

21    me in this file.  I don't think it will be in this

22    file.  The first item I'm interested in is the

23    application and the contract that -- that OMC Lending

24    Com -- Lending, Inc. has with Homecomings.

25    A    Mm-hmm.

Page 127

1    Q    That's not included in this file, is it?

2    A    No.

3    Q    Okay.  How about the submission sheet from the

4    processor to the investor?  Is that in this file or in

5    the broker file?

6    A    It's in the broker file.

7    Q    All right.  And the broker file we've labeled as

8    Exhibit 2.  Could you identify that document for me?

9    A    Actually, it was done on line because there's an

10   on line rate lock so it was probably submitted on line

11   and we probably would not have printed that out.  I

12   take that back.  Here it is.

13   Q    All right.  Is that about like six pages in or

14   twelve (12) pages in?

15   A    It's in the broker package.  In the broker.

16   Q    About how many pages in is that?  I got it.  Is it

17   electronic lock confirmation?

18   A    No.  No, no, no, no.

19                 BY MS. GRAY:  All right.  We'll call

20                 that Exhibit 19.

21                 BY THE WITNESS:  They're starting to all

22                 look alike.  There we go.  It's actually

23                 a Fannie Mae loan so that's right after

24                 the Fannie Mae information in here.

25   BY MS. GRAY:

Page 128

1    Q    All right.  I would like you just to examine a

2    few -- a few items on here.

3                    BY MS. CARLISLE:  Exhibit 19?  I'm

4                    sorry.

5                    BY MS. GRAY:  That's right.

6    BY MS. GRAY:

7    Q    Now, you -- this is something that went from the

8    processor at OMC Lending, Inc. to the investor.  And so

9    in this case the investor was Homecomings Financial; is

10   that right?

11   A    Yes.

12   Q    And the processor would be --

13   A    That was either Aurora or Dee.

14   Q    All right.  And -- and it's requesting -- I can

15   see a hundred and eight thousand (108,000).  And it

16   says the appraised value of the house is a hundred and

17   twenty; is that right?

18   A    Yes.

19   Q    And the appraisal would be done at what point?

20   A    After we have loan approval.

21   Q    Okay.  So the submission is prior to loan approval

22   though, right?

23   A    Yes.

24   Q    Okay.  So is that just an estimate or --

25   A    Yes.

Page 129

1    Q    Okay.  And about the middle of the page where it

2    shows interest rate, eight point two five (8.25).

3    A    Mm-hmm.

4    Q    This is what you indicated what the -- what you're

5    requesting, right?

6    A    Yes.

7    Q    What you're requesting.  And for property -- okay.

8    And then down at the bottom where it says broker fees

9    you show points, twenty-six twenty, balance due,

10   twenty-six twenty.  Is that just a flat amount or is it

11   a percentage?  How did the -- how was this number,

12   twenty-six twenty, come up with?  What does it mean?

13                  BY MS. CARLISLE:  Objection.

14                  BY THE WITNESS:  It's probably a

15                  percentage.

16                  BY MS. GRAY:  All right.

17   BY MS. GRAY:

18   Q    So is it -- is it simply a communication on the

19   loan submission form indicating that there's going to

20   be an appraisal fee of two seventy-five (275) and that

21   the broker fee is going to be twenty-six twenty?

22   A    Yes.

23   Q    Now, why is it called points if it's a flat

24   amount?

25                  BY MS. CARLISLE:  Objection.

Page 130

1                    BY THE WITNESS:  I don't know.

2    BY MS. GRAY:

3    Q    Would points ordinarily be like related to the

4    amount of interest?

5    A    No.

6    Q    The interest rate?

7    A    No.

8    Q    When you buy down points don't you lower the

9    interest rate?

10   A    You can if you want to lower the interest rate.

11   Yes.

12   Q    Right.  So that's what I'm asking.  Doesn't the

13   concept of points usually refer to interest rate?

14   A    No.

15   Q    Or changes in interest rate?

16   A    It could be interest rates or it could be cost for

17   the loan.

18   Q    All right.  So, in any event, the loan officer

19   anticipated getting twenty (20) -- twenty-six twenty

20   from the loan?

21   A    Yes.

22   Q    Six forty-five (645) processing fee and a two

23   fifty (250) administrative fee?

24   A    Yes.

25   Q    And the administrative fee would be paid also to

1   the -- to the broker?

2   A    Yes.

3   Q    And the broker meaning OMC?

4   A    Yes.

5   Q    Okay.  And so this presum -- is this -- is this

6   document dated and I'm just missing it?

7   A    No.

8   Q    Is it dated?  Just not dated at all?

9   A    No.

10  Q    All right.  And what would have been the lender's

11  response?  What -- what document would the lender's

12  response appear on?

13              BY MS. CARLISLE:  Objection.

14              BY THE WITNESS:  Well, there's a Fannie

15              Mae approval right behind it, so it was

16              approved when it was submitted based on

17              those conditions in the following pages

18              that could be -- those conditions can be

19              met, which apparently they were.

20  BY MS. GRAY:

21  Q    Okay.  Well, your response -- well, probably very,

22  you know, indicating a higher level of understanding of

23  this process than mine, just needs a little

24  clarification.

25       When you say there was an approval right behind

Page 132

1    it, are you suggesting that this was the lender's

2    response to the loan submission form or are you

3    suggesting that this was information you had --

4    A    It was run on line through Fannie Mae and there

5    was an approval received.

6    Q    Okay.  And so all these terms were -- were

7    already -- so, in other words, Fannie Mae already --

8    Fannie Mae agreed to guaranty all these terms; is that

9    right?

10   A    Yes.

11   Q    Okay.  So when you sent the submission report to

12   Homecomings Financial, you also --

13   A    We received this in reply.

14   Q    What did you receive?

15   A    The top two sheets in reply.  No, go back to the

16   front of the file.  Go back to the front of the file.

17   Q    All right.

18   A    There's your approval from Homecomings.

19   Q    All right.  So Exhibit 19 is a submission form.

20   The underwriting findings report is something that --

21   A    Goes with it.

22   Q    -- went with the submission form?

23   A    Yes.

24   Q    Okay.  And that is a document that you -- that

25   Ohio Mortgage, OMC Lending Corp. filled out on line; is

Page 133

1    that right?

2    A    It's -- yeah, basically, for the sake --

3    Q    You fill it out on line and --

4    A    -- of no knowledge.  Yes.

5    Q    -- and got the -- and got the guaranty?

6    A    Yes.

7    Q    All right.  And then -- and then Exhibit 20 is the

8    response the lender would have -- would have given to

9    the submission and that is the loan underwriting

10   transmittal; is that right?

11   A    Yes.

12   Q    And that was apparently faxed on December 16,

13   2002?

14   A    The approval, yes.

15   Q    Okay.  So 20 is the approval.

16        And the following conditions were conditions of

17   Homecomings; is that right?

18   A    Yes.

19   Q    All right.  And then it would be up to the title

20   company to see those conditions were met; is that

21   right?

22   A    No.

23   Q    That would be the --

24   A    Mortgage company.

25   Q    -- mortgage company would do that and then --

Page 134

1    before having anything forwarded to the title company?

2    A    Yes.

3    Q    When the mortgage company sent forward something

4    to the title company, is it the complete file, the

5    complete mortgage company file?

6    A    No.

7    Q    What specifically do you send to the title

8    company?

9    A    Usually the final typed loan application, the

10   homeowners insurance and any payoffs if we have it.

11   Q    So you wouldn't, for example, submit the loan

12   approval?

13   A    No.

14   Q    That wouldn't be part of the package.  All right.

15        Now, when you took about -- okay.  I'm going down

16   this list of documents that you referred to earlier.

17   One of them was a copy of a fee sheet from the loan

18   officer and the processor. Which file would that be in?

19   A    It's in this file.

20   Q    It's in the broker file?

21   A    Document order form.

22   Q    It's called a document order form?

23   A    Let's go back a little further.  It looks like

24   this.  Go back further from where we were just now.

25   Q    All right.  And is it closer to the front or

1    closer to the back?

2    A    It's actually right in front of the submission

3    form or five pages in front of the submission form.

4    Q    Okay.  Okay.  Is it before Capital One or after

5    Capital One?

6    A    It's after Capital One.

7    Q    All right.

8    A    Says document order form at the top.  Keep going.

9    No, it's before Capital One.  I'm sorry.

10   Q    Yeah, that's what I thought.  All right.  We'll

11   get it.  All right.

12        So I would like you to just take a few minutes to

13   explain this document to me.  Who -- who would have

14   made these entries?  By the way, just for clarity,

15   we'll call it Exhibit 21.

16   A    Laura George would have made the entries.

17   Q    All right.  And starting with the fees, the loan

18   origination fee that the broker -- that three percent,

19   that refers to three percent of the amount borrowed?

20   A    Yes.

21   Q    And by the amount borrowed, that would -- that

22   would mean the entire amount of money advanced by the

23   lender?

24   A    Yes.

25   Q    All right.  And that's -- and then the discount to

Page 136

1    the broker, what is that?

2    A    It's another fee.

3    Q    And the thirty-two forty, is that -- which is the

4    origination and the three percent, does that come from

5    the loan proceeds?

6    A    Yes.

7    Q    And that goes to OMC Lending?

8    A    Yes.

9    Q    All right.  And then the discount broker, one

10   percent, ten eighty, does that come from the loan

11   proceeds?

12   A    Yes.

13   Q    And that goes to the broker?

14   A    Yes.

15   Q    All right.  And I see appraisal fee of three fifty

16   (350).

17   A    Goes to the appraiser.

18   Q    And that goes directly to the appraiser?

19   A    Mm-hmm.

20   Q    Now, I noticed on document -- Defendant's Exhibit

21   19 which is the loan submission form?

22   A    Mm-hmm.

23   Q    It showed appraisal, two seventy-five (275).

24   A    It's actually two seventy-five (275).

25   Q    All right.  But then I'm -- but then I'm looking

1    on Exhibit 21.  It shows appraisal fee, three fifty

2    (350).

3    A    Probably would have sent the bill over to the

4    title company and they probably would have corrected it

5    to be two seventy-five (275).

6    Q    All right.  Who -- who was the appraiser in this

7    case?  Do you have any record of that?

8    A    Don Williams.  And that appraisal was paid outside

9    of closing so it's not part of the APR either, so it

10   wouldn't have mattered if it was two seventy-five (275)

11   or three twenty-five (325).

12   Q    Okay.  Don Williams?

13   A    Yes.

14   Q    All right.  And when you say paid outside closing,

15   are you saying that she advanced cash for it?

16   A    Yes.

17   Q    And so it wasn't paid from the proceeds --

18   A    No.

19   Q    -- that were distributed at closing?

20   A    No.

21   Q    All right.  And the processing fee of six forty-

22   five (645), that again is to OMC Lending, Inc.?

23   A    Yes.

24   Q    Okay.  And then what's other administration?

25   A    It's an administration fee to OMC Lending.

Page 138

1    Q    Okay.  When you -- when you determine these fees,

2    do they vary from loan to loan?  Are they --

3    A    No.

4    Q    -- flat amounts?

5    A    They're flat amounts.

6    Q    All right.  And so they don't vary according to

7    the size of the loan or --

8    A    No.

9    Q    All right.

10                 BY THE WITNESS:  So if you want to

11                 reschedule I'll be back after the 15th,

12                 but I'm done as of today.  I have too

13                 much to do and cannot stay any longer.

14                 BY MS. GRAY:  Well, what we might want

15                 to do -- I'll tell you, Ms. George, I --

16                 I know because when you're planning

17                 traveling you do -- and you're running a

18                 business and you do have -- are short of

19                 time.  The problem that we have is that

20                 the Magistrate has given us a deadline

21                 to conclude this.  What we could try to

22                 do is --

23                 BY MS. CARLISLE:  We can extend that

24                 deadline due to the circumstances.

25                 BY MS. GRAY:  We can -- we can call the

1          Magistrate and ask the Magistrate to

2          give you approval to leave, which I will

3          be happy to do.  Do you want to do that?

4          Do you want to try to make a call to the

5          Magistrate?

6          BY MS. CARLISLE:  This is your

7          deposition so --

8          BY MS. GRAY:  Okay.

9          BY MS. CARLISLE:  I don't think she

10         needs approval to leave.

11         BY THE WITNESS:  Yeah.  I don't need

12         approval to leave.  You're not holding

13         me hostage here.  I am leaving here and

14         I have done my fair time since ten

15         o'clock this morning and I'm not staying

16         any longer, so --

17         BY MS. GRAY:  The problem, Ms. George,

18         is that -- is that we aren't done and --

19         BY THE WITNESS:  That's not my fault.

20         You should have been more educated on

21         this file prior to bringing me in.

22         BY MS. GRAY:  Now, I appreciate --

23         BY THE WITNESS:  You want to make a

24         call, you're welcome to make a call.

25         BY MS. GRAY:  I appreciate your

Page 140

1                    feedback --

2          BY THE WITNESS:  But I'm done and I'm

3          leaving, so --

4          BY MS. GRAY:  -- but --

5          BY THE WITNESS:  Do you want to

6          reschedule?

7          BY MS. GRAY:  Yeah.  I think we -- I

8          think so.

9          BY THE WITNESS:  Okay.

10         BY MS. GRAY:  But --

11         BY THE WITNESS:  When do you want to

12         reschedule for?

13         BY MS. GRAY:  -- again, we're going to

14         need the Court's approval because --

15         because the 25th is past the deadline.

16         BY THE WITNESS:  Go ahead and make your

17         call then.  You don't need to keep

18         talking to me.  Go ahead and make your

19         call.

20         BY MS. GRAY:  But --

21         BY THE WITNESS:  So if you want to do

22         that, go ahead.

23         BY MS. GRAY:  Okay.

24         BY THE WITNESS:  I don't think you have

25         objection from counsel here to extend

1         the dates.  I'm sure the Magistrate is

2         not in any hurry.

3         BY MS. GRAY:  Well, be careful speaking

4         for Ms. Carlisle.

5         BY MS. CARLISLE:  I'm sorry, but this

6         was your burden to try to get these

7         depositions much, much earlier.  Your

8         problem is your latency with discovery,

9         not anyone else's.

10    (Ms. Gray making a telephone call to the

11 Magistrate)

12        BY MS. GRAY:  Yes, please.  This is

13        Susan Gray calling for Magistrate

14        Jackson.  I'm here with Zoe Carlisle and

15        we are working on the McNerney case and

16        we've been in a deposition today with --

17        with Ms. George.  And we aren't able to

18        finish because she has -- she has travel

19        plans and she won't be back until after

20        the deadline for concluding this

21        discovery.  And so I wanted to just get

22        the Magistrate's approval to finish up

23        the deposition after she gets back even

24        though it's -- all right.  Well, he

25        asked us to -- he said he wanted to

Page 142

1          follow this proceeding pretty closely.

2          He asked us to keep him in touch on it

3          and we are in the middle of a deposition

4          and the deponent is basically, you know,

5          walking out, and I'm just trying to

6          accommodate her.  Well, I understand

7          that, but I would -- but it is customary

8          to confer when there are deposition

9          issues.  Let me ask you this.  I don't

10         have my -- I can get my calen -- okay,

11         thank you.  Bye-bye.

12         I can get my -- let me get my calendar.

13         BY MS. CARLISLE:  You can also submit

14         any questions to her as a way to depose

15         her continuation.

16         BY MS. GRAY:  Okay.  You're back on the

17         13th?

18         BY THE WITNESS:  15th.

19         BY MS. GRAY:  September 15 which is a

20         Friday.  Are you back on that date or

21         available on that date?

22         BY THE WITNESS:  Back on that date.

23         BY MS. GRAY:  Okay.  So we wouldn't

24         think of that as available.

25         BY THE WITNESS:  The 18th would be the

1        soonest.

2        BY MS. GRAY:  All right.  Well, I don't

3        know if we're going to have the

4        Magistrate's permission.  I don't mind

5        tentatively rescheduling it for the

6        18th.  I have to tell you, Ms. George, I

7        don't --

8        BY THE WITNESS:  I can't do it on the

9        18th.  I'm not coming in until the late

10       afternoon because I have a business to

11       run.

12       BY MS. GRAY:  Well, we can -- we'll do

13       everything we can to accommodate that

14       and make you feel comfortable.  I just

15       have to make it clear on the record that

16       it's not with my consent that you're

17       going.  Just so the Magistrate knows

18       that I didn't say, you know, okay, come

19       and go whenever you please.  I mean, as

20       far as I'm concerned, we have a subpoena

21       and it's my job to, you know, let you

22       know clearly that I -- that I would like

23       to finish today and that --

24       BY THE WITNESS:  And I told you prior to

25       this deposition that I could not do it

Page 144

1            today.  You had your law clerk or

2            somebody call me back and threaten me

3            that you were going to throw me in jail.

4            BY MS. GRAY:  Well --

5            BY THE WITNESS:  So here I am, okay?

6            BY MS. GRAY:  Okay.

7            BY THE WITNESS:  And I already told

8            you --

9            BY MS. GRAY:  But you are here but

10           you're not staying.

11           BY THE WITNESS:  -- I could not do this.

12           BY MS. GRAY:  Okay.  But you're --

13           BY THE WITNESS:  Okay.  You are not

14           cooperating with me and I am not going

15           to go through this, okay?  You can say

16           whatever you want for the record and you

17           can tell the Magistrate whatever lie you

18           want to tell them.  I told you prior to

19           coming here today I could not come

20           today.

21           BY MS. GRAY:  Okay.

22           BY THE WITNESS:  You have put me under a

23           burden to come here, okay?

24           BY MS. GRAY:  Right.  Absolutely.

25           BY THE WITNESS:  It is my duty and my

1          responsibility to take care of my family

2          and my business and earn my income.  It

3          is not my duty and responsibility to be

4          here unless I am able to be here.  I

5          told you I could not be here.  You

6          insisted and threatened me by arresting

7          me, okay?

8          BY MS. GRAY:  All right.

9          BY THE WITNESS:  By saying that you were

10         going to arrest me.

11         BY MS. GRAY:  Okay.  But it's only two.

12         The day is not over.

13         BY THE WITNESS:  You are not -- no, it

14         is over for me.  I am here --

15         BY MS. GRAY:  And I'm just making clear

16         that it's not with my -- it's just not

17         with my permission that you're going,

18         okay?

19         BY THE WITNESS:  Excuse me because I

20         need to get away from this crazy lady.

21         BY MS. GRAY:  All right.

22         BY THE WITNESS:  Jesus.

23         BY MS. GRAY:  All right.  Thank you very

24         much for coming.

25         BY THE WITNESS:  I would hope that at

Page 146

1              some point in your career you would be a

2              little more attentive to your client.

3              BY MS. GRAY:  Well, the Magistrate's in

4              a hearing so I don't know what we can

5              accomplish other than just, you know,

6              letting him know and finding out if he's

7              just going to let me finish up with her

8              after the deadline.

9              BY MS. CARLISLE:  That's fine.  If you

10             want me on the call you can conference

11             me in, but I need to get back to the

12             office.

13             BY MS. GRAY:  Okay.  Thanks for coming.

14             BY MS. CARLISLE:  I'll see you tomorrow

15             afternoon.

16             BY MS. GRAY:  All right.  Bye-bye.  I

17             guess we're off the record.

18             BY THE COURT REPORTER:  Well, do you

19             want to make a final statement before

20             you go off the record now or --

21             BY MS. GRAY:  Other than everybody's

22             gone, no, I think that's fine.  Do you,

23             James?  I think we're done.  Okay.

24             Thanks.  We're off the record.

25        (Deposition Adjourned.)

LEGAL ELECTRONIC RECORDING, INC.
5230 St. Clair Avenue
Cleveland, Ohio  44113-1310
(216) 881-8000   Fax No. 881-DEPO (3376)

Date:    September 12, 2006

To:    NANCY GEORGE
       OMC LENDING, INC.
       4311 RIDGE ROAD
       BROOKLYN OH  44144

In re:

       Case #        CV-03-514406
       Plaintiff     MERS
       Defendant     Patricia McNerney, et al.
       Job No.       06H8268A
       Witness       Nancy George

This is to inform you that the deposition(s) of the abovenamed has been transcribed this date.  Please be aware that it is available for review and for signature of the witness.  If you fail to read and sign within the period prescribed by law, you may be deemed to have waived your right to do so.  If a review is desired, please call our office to schedule an appointment.

Should you desire to purchase a copy of this transcript, please let us know.

Sincerely
LEGAL ELECTRONIC RECORDING, INC.

Marc Eppler, President

cc:  Zoe Carlisle, Esq.
     Susan Gray, Esq.

Page 147

1        I have read the foregoing page(s) 1 through 146

2   and note the following corrections:

3

4   PAGE          LINE                    CORRECTION

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   _____

22   NANCY GEORGE                              DATE

23

24

25   06H8268A

Page 148

1                        CERTIFICATE

2

3    The State of Ohio    )    ss

4    County of Cuyahoga    )

5

6

7        I, MARC EPPLER, a Notary Public within and for the

8    State of Ohio, duly commissioned and qualified, do

9    hereby certify that the abovenamed NANCY GEORGE, was

10   first duly sworn to testify the truth; that the

11   testimony then given by her was tape recorded and

12   reduced to writing; that the foregoing is a true and

13   correct transcript of the testimony given by the

14   witness as aforesaid; that I am not a relative or

15   counsel of either party or otherwise interested in the

16   event of this action.

17       IN WITNESS WHEREOF, I have hereunto set my hand and

18   seal of office in Cleveland, Ohio this 12th day of

19   SEPTEMBER, A.D., 2006.

20

21       _____
                        MARC EPPLER
22                Notary Public - State of Ohio
             my commission expires 9-14-2008

23

24

25

Legal Electronic Recording, Inc. 216-881-8000

**A**

ABC 28:15
ability 18:13,13 19:19
    19:20
able 8:6 16:14 66:13
    79:17 124:19,25
    141:17 145:4
abovenamed 148:9
absolutely 44:7 98:8,12
    98:15 144:24
accommodate 35:16
    142:6 143:13
accomplish 146:5
account 30:24
accounted 118:24
    119:1
accounting 54:5
accuracy 80:2
accurate 11:4 60:17
    70:20 79:18 87:4
    115:10
accurately 125:9
action 148:16
actions 83:18
actual 15:4 97:7 116:2
    121:16
ad 75:25
add 34:13
addition 45:12 74:22
address 3:11,15,24
    24:16,16 78:4
Adjourned 146:25
administration 137:24
    137:25
administrative 130:23
    130:25
advance 50:4 124:12
advanced 123:1 124:10
    135:22 137:15
advertising 16:23
affect 118:5
affiliation 5:16 7:10
aforesaid 148:14
afternoon 143:10
    146:15
age 3:2
agency 47:19 63:11
    80:15 94:5
agent 53:14 54:8 94:3
agents 53:21
ago 74:6 122:14
agree 82:13
agreed 132:8
agreement 57:17,18
ahead 9:11 20:21,23
    26:22 45:20 59:11
    63:7 65:22 66:2
    70:13 98:20 121:17

140:16,18,22
al 1:7 56:10
Aldanci 85:17
alike 127:22
allowed 112:13
Alrighty 25:10 72:2
    82:8 83:15 86:10,18
American 36:9 38:14
    48:10,22 53:21 54:8
amount 6:22 39:14
    40:23 46:7,8 50:18
    52:12,15 53:9 97:25
    103:2,5,6 119:20
    121:24 122:9 129:10
    129:24 130:4 135:19
    135:21,22
amounts 34:8 138:4,5
and/or 65:13
annual 10:21 73:19
answer 4:20 8:3 20:14
    70:24 79:22 83:17
    84:1 91:9,17 93:1
    99:10 108:23 113:2,9
    116:17 125:9
answered 22:11
answering 92:1 98:23
answers 96:12,22
    113:3
anticipated 130:19
anticipatory 51:21
anybody 14:17
apparently 95:5 113:16
    126:15 131:19
    133:12
appear 95:11 131:12
APPEARANCES 2:1
appears 72:23 82:2
    100:25 109:18
    115:14
application 16:15
    21:18,20,21,24 23:4
    23:6,13,15,17,25
    24:2 35:21 59:22
    60:7 64:2,3 68:14
    69:2,10,19 70:2,17
    71:7,14,15,16,19
    72:19 77:6,16 78:16
    79:10 92:19 106:23
    119:6 126:23 134:9
apply 21:16
appointment 18:6 30:8
    32:8,8
appraisal 34:17 128:19
    129:20 136:15,23
    137:1,8
appraised 128:16
appraiser 136:17,18
    137:6

appraises 43:24
appreciate 100:10
    139:22,25
approval 21:16 23:14
    25:14 26:13 27:1,4
    27:25 29:2,12 34:10
    41:15 42:21,24
    128:20,21 131:15,25
    132:5,18 133:14,15
    134:12 139:2,10,12
    140:14 141:22
approvals 24:13
approve 28:10
approved 20:15 23:12
    28:11,18 43:25 109:7
    131:16
approves 30:6 31:1,4
approximately 7:18
    22:12
APR 51:19 118:5
    124:16 137:9
area 78:5
argue 6:3
array 17:14
arrest 145:10
arresting 145:6
arrive 126:4,4
arrived 126:8
aside 47:8
asked 52:24 53:7 59:7
    63:25 66:9 92:9
    116:11 121:24 122:7
    124:16 141:25 142:2
asking 4:11 5:13 8:2
    15:11 26:21 59:19
    70:15,16 88:25 90:8
    91:12,14 92:25 94:11
    99:3,12 103:19
    105:11 112:13
    113:24 114:5,6,22
    130:12
assigns 109:22
Associates 107:2,8
attached 47:25 49:18
attend 10:21
attention 18:10 94:4
    104:22
attentive 146:2
attorney 51:1,2
auditor's 95:3,8,24
AUGUST 1:14
Aurora 128:13
authorized 89:17
available 5:7 18:11
    142:21,24
AVENUE 1:21 2:3
aware 52:8 116:8
A.D 148:19

a.m 1:15
a/k/a 82:23

**B**

B 98:9 101:2 104:7
back 25:13,18,22 26:15
    26:16 27:3,15 28:10
    29:2 30:9,11,12
    32:18,22 33:13 40:8
    44:19,20 46:21 51:22
    54:10 57:8 58:13
    77:6 78:18 79:3
    94:20,25 114:20,21
    115:8 116:16 125:19
    127:12 132:15,16
    134:23,24 135:1
    138:11 141:19,23
    142:16,20,22 144:2
    146:11
background 10:8
balance 129:9
bank 18:24
banks 17:24
base 42:22 43:4,12
    75:23 113:21
based 18:19 24:1,10
    40:23 41:3 42:11,13
    43:15 52:11,20 53:13
    76:15,24 83:17 102:8
    107:15 131:16
basically 15:15 19:2
    30:17 38:23 44:22
    51:21 64:5 123:3
    133:2 142:4
basis 10:22 80:3 122:8
bears 120:20
Beata 86:2 88:15 92:4
    92:18 120:9
Becau 59:21
began 12:17
belabor 46:4 89:24
    125:5
believe 12:18,24 39:12
    48:22 116:21
beneficiary 49:5 81:14
benefit 37:4 57:11
    81:15
benefits 49:21
best 20:14 61:16 93:22
    99:8
better 20:13 79:22
big 48:9 81:23
bill 36:25 95:7 137:3
bit 3:20 11:19 14:4
    27:23 54:13 58:16
    60:23 75:2 77:21
    109:12
blah 36:25,25 37:1

bookkeeper 14:16
borrowed 135:19,21
borrower 30:8 32:8,10
    43:21,22 49:6,10,21
    69:21 71:12 81:16
    120:16
borrower's 31:18
    61:14,15,18 63:11,20
    79:4,5 97:14
bother 94:2
bottom 82:16,16 129:8
box 39:12
Boyle 54:24 55:16,17
    56:17,19
Boyle's 55:25
break 21:8 63:17 75:1
briefly 4:7
bring 18:10 44:14
    90:18 111:20 124:21
bringing 90:16 139:21
broadly 108:15
broken 15:7 37:8 53:6
    53:18
broker 6:9,10,11 7:9
    8:11 9:20 10:24 11:5
    13:10,17 21:20,21,24
    34:17 36:1 37:25
    40:17 45:1,3 75:6,17
    75:18 76:16 83:20
    107:23 119:9 127:5,6
    127:7,15,15 129:8,21
    131:1,3 134:20
    135:18 136:1,9,13
brokers 10:17,20
broker's 8:17,21 9:20
    11:22 12:1 35:25
    75:9
Brooklyn 3:12 12:5,9
    12:11,13,17 33:21
    56:22 57:1,13 63:11
    77:23 78:18 79:17
    80:10,15 94:5 99:17
    99:19 100:6,17,19
    101:1,2,17,24 102:3
    102:8,12 103:3
    104:22 107:12,16,19
    107:21 108:3 109:16
    115:17 117:15
brought 113:17 118:6
    121:12
building 77:25 78:1,3
bunch 96:4
burden 141:6 144:23
business 3:21,25 6:17
    12:6,8 57:11 90:19
    91:19 92:22 97:24
    138:18 143:10 145:2
businesses 78:9

buy 53:13 130:8
Bye-bye 142:11 146:16
B-E-A-T-A 85:24

**C**

C 67:11
calculated 24:11
calen 142:10
calendar 142:12
call 18:6 20:4 26:7
  53:20 55:5,6 63:18
  63:18,19 64:15,17
  75:25 80:13,18 82:9
  86:16 88:4,9 111:5
  112:22 120:4 127:19
  135:15 138:25 139:4
  139:24,24 140:17,19
  141:10 144:2 146:10
called 40:12 44:25,25
  51:8 64:20 69:1 88:1
  100:1 104:2,4,10
  109:19 122:5 124:20
  125:12 129:23
  134:22
calling 111:10 141:13
cancel 32:4
Capital 134:4,5,6,9
care 98:24 145:1
career 146:1
careful 141:3
carefully 125:4
Carlisle 2:3 58:1 65:3,8
  65:11,16 67:16,19
  69:5 77:7 83:16 85:2
  86:22 87:2,8,16 90:2
  94:7,23 96:17 97:4
  100:3,20 101:14
  103:7,18 104:15
  105:4 109:25 111:8
  111:11 112:11
  113:11 114:24 118:1
  123:8 124:23 128:3
  129:13,25 131:13
  138:23 139:6,9 141:4
  141:5,14 142:13
  146:9,14
case 1:4 13:13 14:3
  16:19 54:21 64:25
  73:24 107:13 128:9
  137:7 141:15
cash 115:23 118:7
  120:16 137:15
cause 1:13
ceased 6:1
CENTER 1:14 2:7
cents 117:9
cert 34:19 36:22 38:13
  38:18 39:6

certain 4:11,12 6:22
  11:6,9 19:9 28:12
  40:25 58:22
certainty 66:14
CERTIFICATE 148:1
certification 36:4
certified 3:4 110:8
certify 148:9
change 14:3 16:10 39:3
  47:9 120:22,24 121:4
changed 57:9 74:1,7
  113:13
changes 130:15
characterized 19:4
charge 37:21 40:17
  51:21
charged 48:12 49:19
  73:22
charges 37:25 81:2
check 10:8 39:13 111:4
  118:8 124:5
checked 39:13
checks 117:15,23 118:2
  125:19,21
choose 19:17
chose 6:2
Christ 72:12
Christmastime 7:20
circled 109:6
circumstance 43:20
circumstances 138:24
claim 90:22 97:24
claims 48:2
CLAIR 1:21
clarification 26:20
  131:24
clarified 37:5
clarify 89:4 122:17
clarity 61:9 135:14
clause 109:21
clear 4:19 27:2,4 34:10
  34:21 38:3 41:7,16
  42:25,25 43:2 81:19
  87:22 97:14 101:22
  101:25 110:20,22
  143:15 145:15
clearer 101:20
clearly 4:20 99:10
  143:22
clerk 86:5,6 88:15
  144:1
clerks 120:9
Cleveland 1:22 2:4
  148:18
client 14:25 15:6 16:21
  26:3 28:5 89:4,16
  92:3,5,6,9,13,14 95:5
  102:5 146:2

clients 14:22 18:24
  21:14 24:25
client's 24:16 25:2,17
  89:7
clip 107:11
close 8:8,14,15 12:23
  19:19,21,23 27:2,4
  29:3,9 34:11,21 41:7
  41:16 42:15,25 43:1
  43:2,16,22 44:14
  107:17,20,24 110:16
  110:20,22,24 111:21
  121:8,11
closed 6:4,6 12:22 13:2
  13:24 14:2 55:14
  92:20
closely 142:1
closer 134:25 135:1
closes 29:16,22 43:8
  54:3
closing 6:25 8:8 26:13
  27:2,6,8,12,15,21
  29:13,19,24 30:7
  31:5,6,15 34:11,14
  34:15,23 38:10,12,17
  39:10 45:15 46:3,4
  46:14,24 47:3 49:19
  50:7 61:19 63:12,20
  71:17 72:20 81:2
  95:13 102:13,16,17
  108:11,16 109:19
  110:14 112:20 115:9
  121:16 123:16,25
  137:9,14,19
closings 19:22
coincides 82:18
collections 18:22,22
  19:10,10
column 52:3
Com 126:24
come 16:21 17:7,8,11
  17:19,20 18:7,8,8
  19:7 20:4 25:20 30:2
  41:1 67:25 110:17,19
  110:19 129:12 136:4
  136:10 143:18
  144:19,23
comes 19:5 32:10 50:9
  51:13
comfortable 143:14
coming 60:25 68:19
  143:9 144:19 145:24
  146:13
Commerce 6:21
commission 73:22
  74:16,18,23 75:1,9
  75:10 76:10 77:4
  81:8,11 148:22

commissioned 148:8
commitment 45:16
  46:12,16,16,21 50:8
  96:25 97:1,19,20
  98:3 100:2 101:6
  104:3,4,8,11 117:22
  117:24
common 1:2 18:17
  100:24
communicate 17:5
  108:6,6
communication 129:18
communications 108:9
companies 21:17 28:11
  28:13,17,18 48:7
  57:10 83:8 108:25
company 3:16,17 5:12
  5:14,15,17,19 6:14
  7:8,9,11,14 8:9,13
  9:3 10:2 11:19,25
  12:5 13:4,10,15,16
  13:19,24 17:25 19:23
  20:19 21:1,3,17
  23:12 27:17,19 28:3
  28:7,15,15 29:8,13
  29:15,22 30:16,24,25
  32:7,7,18 33:4,5,6,10
  33:12,13,20,21 34:5
  34:6,6,10 38:5 40:6
  40:15 41:18,21 42:1
  42:5 43:6 44:21 45:8
  45:13,14 46:2 49:20
  50:20,21 52:3,6,9,18
  52:23 53:2,8,12,22
  53:24 54:1,2,7,13
  57:4,4,7,7,22 67:4
  68:7,8,15,15 69:24
  69:25 70:6,9 71:18
  71:23 72:24 73:2,6,9
  75:3,5,13 77:17
  79:19,24 80:3,10,24
  80:25 81:1,5,6,9
  82:25 83:6,21 84:4,6
  85:9,10,12,19 86:3
  87:21 88:7 92:11
  94:18,19,25 96:25
  97:21 98:3,13 99:13
  99:15,19 100:1,6
  101:6 104:3 110:14
  112:4 116:8 119:9
  120:12,17 125:21
  133:20,24,25 134:1,3
  134:4,5,8 137:4
company's 35:6 64:22
compare 66:14 84:20
comparing 18:18
compensate 93:15
compensated 55:13

73:15
compensation 42:4
  52:5 75:19 76:1,8
complete 40:19 41:16
  66:6,15,16,20 71:6
  87:3 112:9 134:4,5
completed 41:6
comprehensive 45:16
  47:14 48:2,4 49:2
  50:8,23
concept 130:13
conceptualize 46:14,15
concern 125:7
concerned 143:20
conclude 138:21
concluding 141:20
conditions 25:14,19
  26:2,12,15,24 29:5
  131:17,18 133:16,16
  133:20
conduct 3:21,25
conducted 78:9
confer 142:8
conference 146:10
confirm 121:24
confirmation 127:17
connection 55:25
consent 143:16
consideration 55:19
consist 21:19 24:14
  37:16 47:20 70:1
consisting 63:14 88:10
consists 46:16 69:20
  82:5,12 86:13 102:18
  105:19 109:14 120:5
contact 56:3
contacting 26:3
contain 30:18
contained 69:24 71:5
  86:11
content 97:7
contentious 4:14
contents 97:12
context 37:17
Conti 92:20
continually 51:10
continuation 142:15
continue 98:17
continuing 6:3,23
  10:14,21 11:16
continuously 12:20
  21:8
contract 21:20,22,25
  22:6,6,6 23:17 56:11
  56:23 60:3 126:23
contracts 22:3,5,13,16
  23:10 56:14,21,25
  57:3

conversations 61:4
cooperating 144:14
copies 68:4 77:22 79:18
copy 33:14,14,18 49:10
  51:25 57:25 61:14,18
  63:12,20 65:13,15,18
  66:6,11,15,16,18,20
  67:16 70:20 71:6,11
  72:18 77:16 78:18
  79:4,5 80:2,5 84:24
  87:4 96:9,11,14,16
  102:21 104:3,6,7,10
  106:3,4,11,13 110:8
  111:4 112:3,19,20,23
  113:23 114:7,24
  115:8 119:3 125:17
  126:11 134:17
CORNS 1:12
Corp 132:25
corporate 6:18
corporation 6:4,6,12
  6:13 7:1 10:2,25 11:4
  109:21 118:11
correct 5:5 24:6,10
  77:5 102:14 103:9,12
  118:17 148:13
corrected 137:4
correcting 24:8
CORRECTION 147:4
corrections 147:2
correctly 77:22 121:7
cost 34:12,15,23 38:10
  39:10 45:15 130:16
costs 31:15 38:12
counsel 1:16 4:24,25
  5:4 140:25 148:15
counting 105:21
County 1:1,15 30:10
  50:2,3,9 82:19,20
  87:22 95:23 109:1
  148:4
couple 16:2 54:25
  91:24 122:14 126:2
  126:19
course 4:8 13:21 40:16
  43:17
COURT 1:2 62:1,4,17
  62:21 63:1 146:18
Court's 140:14
cover 44:9,24 88:6,13
  88:17 104:16,18,19
  105:24 107:7 116:12
  117:2 122:4
covered 52:4
covers 51:12
crazy 145:20
credit 18:21 19:9 34:17
  35:20 36:16,22

122:11,12,13
current 74:21
currently 11:24 51:24
customary 121:15
  142:7
customer 23:24 26:6,9
  35:16 40:17 44:13
  80:12 118:6 121:20
customers 51:25
customer's 43:16
cut 35:15
Cuyahoga 1:1,15 148:4
CV-03-514406 1:4
C-A 85:25

## D

date 13:21 65:6 102:13
  102:16,17 106:9,10
  115:15 119:11,16
  120:20 121:16
  142:20,21,22 147:22
dated 80:11 88:15,22
  104:10,20 107:7
  112:23 115:10
  118:12 122:6 131:6,8
  131:8
dates 120:22,24 141:1
Davis 72:23 73:4 76:9
day 1:13 72:12 87:18
  107:2 145:12 148:18
days 32:13
day-to-day 19:1
DBA 6:17
deadline 138:20,24
  140:15 141:20 146:8
deal 55:18,20
dealing 17:13 20:11
  22:2
debt 18:24 69:21
debts 71:3,9
debt-to-income 19:12
December 13:18 14:6
  20:11 57:13 73:24
  119:10,11,16 122:6
  126:8,14 133:12
decide 17:3 22:15,18
  22:25 23:2,3 40:21
  107:23
decides 22:21 23:9
  43:13 45:2 107:16,20
decision 22:16,20
decree 113:19,22,23
  122:22
Dee 128:13
deed 30:4 45:19,21,21
  50:1,25 106:4,5
deeds 30:3
defects 98:9

Defendant 2:9
Defendants 1:7
Defendant's 63:23
  80:13 109:5 112:22
  116:19 118:12
  136:20
defer 16:17
delinquent 95:5
delivery 51:19,20
Dempsey 115:16
department 6:19,21
  74:5
depending 75:7
depends 75:18
deponent 142:4
depose 142:14
deposes 3:4
deposition 1:11,16 3:6
  4:7 12:16 111:14
  139:7 141:16,23
  142:3,8 143:25
  146:25
depositions 4:5 141:7
deposits 26:4
describe 23:22
description 96:20
designed 4:13
details 3:20 13:13
determine 138:1
determined 34:8 40:6
  43:19 46:8 50:16
  111:1,20
determines 24:19 40:2
  40:16 74:18 75:21
dictates 50:17,18
differ 14:19
difference 76:24 116:4
  122:18
different 10:12 20:15
  28:17,18 48:11,15
  62:19 95:21 96:10
  106:1 112:18 116:20
differently 37:6
directly 75:13 85:12
  136:18
disburse 30:12
disbursed 117:16
disbursement 117:14
  117:23 125:21
disburses 32:18
disclo 31:23
disclosure 31:11 37:3
  121:3
Disclosures 89:20
discount 135:25 136:9
discovery 141:8,21
discuss 14:22
disk 66:13 80:6

dispute 6:22
distributed 137:19
division 47:19 50:18
divorce 106:11 113:19
  113:22,23 122:22
  124:17
divorced 124:13
docket 106:14
docs 41:13
document 16:5 25:15
  58:4,4 62:15 63:13
  63:23 69:23 70:16
  76:4 78:14 80:8,9,11
  80:14 82:10 84:5,9
  84:11 86:18,24 87:20
  88:5,22,22,24 89:19
  89:22 92:1,2,6,8 94:2
  94:6,12 95:2,15 96:5
  96:8 97:7,9 98:13,21
  99:20 103:15,20
  104:2,12,19 105:15
  105:16 107:7 109:4,8
  109:13 110:7 114:16
  115:5,7,20 116:18
  118:15 121:23 127:8
  131:6,11 132:24
  134:21,22 135:8,13
  136:20
documentation 26:16
documentations 26:6
documents 4:12 7:22
  16:18 26:13,13,19
  27:2,6,9,12,15,21
  29:13 31:7 32:5
  34:22 38:9 41:17,20
  41:21,23 46:5 58:5
  58:22 61:11,13,19,21
  62:13 63:13,14 64:15
  65:12 69:14 78:19
  80:21 83:6,8 84:4,6
  87:7 90:5,6 93:9
  108:11,17 111:11,22
  111:23 117:21
  120:23,24 121:25
  122:15 126:19
  134:16
doing 6:17 43:23
dollar 38:15 39:7,14
dollars 39:6 77:1 91:24
  95:6 111:3,21 117:9
  123:6 124:22
Don 137:8,12
dose 98:4
double-check 47:6
doubling 69:16
doubt 66:19
Doug 54:24 55:16,17
  55:25 56:17,19

drawer 80:6
driver's 61:5
due 30:18,22 31:19
  129:7 138:24
duly 3:3 148:8,10
duties 23:23
duty 144:25 145:3

## E

e 17:20
earlier 4:4 64:24 66:9
  75:2 77:21 104:4
  120:15 121:23
  134:16 141:7
earn 145:2
earns 54:2
ease 61:24
easier 72:6
ECOA 31:23
educate 90:8,16
educated 92:21 139:20
education 6:3,23 10:14
  10:21 11:16 90:14
effect 11:13
eight 25:16 43:4,5,12
  111:3,20 118:17
  121:8,12 122:18
  123:5 124:22 128:15
  129:2
eighty 43:25 44:1
  136:10
either 16:23 17:20 26:6
  28:5 83:5 84:3 120:9
  123:18 128:13 137:9
  148:15
either/or 123:7
electronic 1:3,17,21
  127:17
else's 141:9
employed 73:4,8,9
  85:19 115:17
employee 72:24 76:6,6
employees 14:9 73:2,16
  73:18 74:17 76:2
employment 26:4
encumbrances 98:9
endorsement 45:16
  47:14,25 48:4 49:3
  50:9,23
energy 41:3
enter 23:9
entire 63:23 77:18
  93:10 135:22
entries 135:14,16
EPA 45:16 47:14 48:1
  48:4 49:2 50:8,23
EPPLER 148:7,21
escrow 29:25 30:2,24

86:5,6 88:15 108:13
110:17,19,23 120:9
ESQ 2:3,7
essen 72:19
essentially 72:20
estimate 31:15 95:12
112:10 128:24
et 1:7
Europe 5:6
event 130:18 148:16
events 54:11
everybody's 146:21
exactly 12:19 65:5,10
90:15 92:12 97:1
exam 82:18 102:9,10
113:22 125:22,23
examine 128:1
examiner 46:21 105:25
example 18:13,16,18
28:14 42:17 48:18
54:7 76:22 134:11
examples 24:9
exception 35:15
exchanged 57:6
excuse 65:3 83:11
145:19
exhibit 58:2 62:14,18
62:22,23 63:13,23
64:16,17,20 66:16
67:2,17 68:14,15,19
68:22 69:12,14 70:1
71:25 77:9,10,15,19
78:14,25 79:25 80:9
80:14 82:5,9,9 85:3
86:12,13,19 88:4,9
94:14 95:4,18 96:2,5
96:9 97:2,5 102:19
103:14 108:1,15
109:5 111:5,10
112:22 113:15
116:19,22 118:13
120:4,20 122:5
123:18,19 124:20,20
126:3 127:8,20 128:3
132:19 133:7 135:15
136:20 137:1
exhibits 97:9 103:19
exist 6:1
existence 3:18
exists 33:22
expect 78:15 79:8 87:8
experience 20:1
expires 148:22
explain 20:5 91:13
135:13
explained 34:9 100:13
explaining 9:10 19:16
explanation 90:4 92:7

92:15 116:15
explore 60:22 87:6
extend 138:23 140:25
extra 111:20 113:17
ex-husband 113:18
123:14 124:8

**F**

fac 18:15
fact 112:18
factors 18:20 19:20
fair 74:4 139:14
faith 31:8,14,15 41:18
95:12 112:10
fall 10:1
familiar 29:19
family 145:1
fanatic 58:17
Fannie 127:23,24
131:14 132:4,7,8
far 63:2 66:6,7 72:10
72:11 125:10 143:20
fast 87:11
fault 139:19
fax 1:22 24:12,18 26:15
32:16 55:21 88:5,13
88:17 89:18 104:16
104:18,19 105:23,24
107:6 116:12 117:2
122:4 125:5 126:4
faxed 24:23 88:6
109:16 133:12
faxes 17:21
features 18:15
February 12:24,25
FedEx 51:18,20
fee 34:17,17,18,18,18
35:18,21,21,24 36:1
36:2,4,4,6,19 37:10
37:20,21,24,25 38:15
38:16,17,18,19 39:7
40:5,6,7,11,12,17,19
40:21 41:6,8,16,25
41:25 42:6,6 44:9,22
44:23,25 45:1,3,15
45:15,16,17,17 46:3
46:8,21 48:12 49:20
49:25 50:15 51:1,8
51:12,18,19,20,20
52:14,21 53:8,16
75:6,6,11,17,18
76:16 80:25 81:5
129:20,21 130:22,23
130:25 134:17
135:18 136:2,15
137:1,21,25
feedback 140:1
feel 4:20 102:5 143:14

fees 30:24,25,25 34:5,6
34:6,12,13,19 35:11
35:14,16,20,22,25
36:15,22,23 37:8
38:4,5,21 39:2,3,25
40:2,6,15 42:1,1
44:20,21,21 45:14,14
45:16,25 48:17 52:2
52:6,9 53:5 54:12
57:6 73:22 74:16,23
75:1,3,5 129:8
135:17 138:1
fewer 21:10,13,14,14
21:15
fifty 28:18 75:20,21
76:10,20,23 130:23
136:15 137:1
figure 38:11 50:4 81:22
110:15,24
figuring 51:21 63:17
file 15:4 16:13,18 22:19
22:21 23:3,11 24:7
30:9,9,12 32:13,14
32:22 33:15,22 39:4
40:24 41:4 43:15,19
47:11 49:12 50:1,1
51:13 60:2,5 61:25
62:2,3,5 63:20 64:11
64:22,23 65:4 66:10
66:11 67:4 68:7,8,15
68:16,21 69:24,25
70:3 71:6,19,23
73:23 75:7 77:11,17
77:23 78:15 79:2,13
79:17,19,24 80:3
84:21,23 85:1,10
86:11 87:3,4 89:1,5
89:23 90:4,13,21
91:1 95:22,25 96:16
98:18 99:24 108:14
112:5,20 113:11
114:17 124:19
126:21,22 127:1,4,5
127:6,7 132:16,16
134:4,5,18,19,20
136:13 147:2
filed 46:20 94:13,15,18
files 32:19 68:17 77:24
77:24 93:7 94:20
filing 45:17 46:25 47:1
49:25 50:9 52:14,16
80:5 82:19 94:3 95:7
107:2
fill 24:2 27:10 34:12
105:25 133:3
filled 23:13 39:2,11
84:17 133:25
fills 39:1 40:18

final 26:12 27:1,4 34:9
49:16,18 71:16 80:12
80:18,20 120:2 134:9
146:19
finalize 27:1
finally 51:17
Finance 118:11
Financial 128:9 132:12
financing 19:8
find 17:4 18:1,4,5 72:5
79:8 111:6,7,16
112:7,24 113:3,6,8,8
113:9,9 114:3 117:3
117:12,20 125:17
finding 125:20 146:6
findings 132:20
fine 146:9,22
finish 141:18,22 143:23
146:7
first 3:3 29:8 36:9
38:14 48:9,22 53:21
54:8 55:17 65:20
78:19 82:3,16,22
110:6 113:3 114:12
119:17 120:10
126:22 148:10
fit 29:1
five 44:2 82:5 129:2
135:3 137:22
fix 58:18
flat 129:10,23 138:4,5
flip 70:12
flood 34:19 36:4,11,22
38:13,14,18 39:6
flow 21:7
flyer 17:23
folder 57:24 64:19 67:2
68:18,22 77:18 80:8
113:14,15
folders 64:18
follow 142:1
followed 44:18
following 29:25 36:15
39:23 54:6 105:23,23
105:24 120:1 131:17
133:16 147:2
follows 3:5 19:24
104:19
follow-up 51:14
foregoing 147:1 148:12
form 17:2 95:22 106:1
108:10 129:19 132:2
132:19,22 134:21,22
135:3,3,8 136:21
forms 27:10,11 35:1,2
forth 60:4
forty 136:3 137:21
forty-five 130:22

forty-nine 117:9
forward 72:10,11 92:5
92:9 134:3
forwarded 81:6 89:22
92:14 134:1
forwarding 55:19
four 69:20,22 70:1,14
70:18,18 74:6,10
77:1,14 82:5 112:6,7
118:17,17
fourteen 25:16 40:9
frankly 22:7 97:22
124:10
free 44:6 53:17
frequent 44:2
frequently 16:11
Friday 142:20
front 132:16,16 134:25
135:2,3
frustrating 93:20
Fuerst 1:6
fund 15:3 32:17
funded 54:21
funds 32:18 54:19
110:8 117:14,15
further 109:12 134:23
134:24
fussy 115:2

**G**

gather 14:22,24
General 48:22
generally 13:12 22:12
40:23
George 1:11 3:2,6,8,10
6:16 8:24 9:16 12:10
12:16 13:4 63:19
79:20 89:25 99:3
110:13 112:11,17
114:17 121:23
125:16 135:16
138:15 139:17
141:17 143:6 147:22
148:9
getting 4:9 8:21 10:5
13:13 28:21 54:10,17
56:6 76:25 97:14
130:19
give 15:2 16:2 24:9
27:1 32:17 37:13,14
41:15,18 42:21,24
72:8 91:7 94:19
113:1 116:22,25
117:1 139:2
given 4:25 40:10 49:15
133:8 138:20 148:11
148:13
glad 37:5

glance 13:25
GMAC 109:21
go 4:12 9:11 16:6 17:4
  20:21,23 27:17 29:13
  32:20 33:25 41:8,21
  45:20 46:2 52:2,22
  53:4 59:11 63:5,7
  65:22 66:2 67:18
  70:13 87:10,11 91:12
  93:3,7 98:12 100:9
  107:1 109:11 116:16
  125:25 127:22
  132:15,16 134:23,24
  140:16,18,22 143:19
  144:15 146:20
goes 15:18 25:23 31:21
  38:7,14 41:10 43:14
  44:6 52:23 53:2,10
  53:11 75:12 80:23,25
  81:5 95:22,24 99:24
  132:21 136:7,13,17
  136:18
going 3:19 5:6 12:15
  13:7,14,14 14:3,4
  20:22 22:15 24:12
  28:21 29:1 31:18
  36:8,10 38:16 40:17
  41:4,4,20,23 43:16
  44:8,19,19 56:9
  57:24 58:3,5,18,24
  59:3,14 60:22 61:11
  61:12 64:14,15,17,19
  67:1 71:25 72:12
  77:6,8 79:16,23,23
  79:24 80:1,1,9,13
  82:9 83:10,11,16
  86:23,25 87:5,6,10
  87:11 89:6,6 91:16
  91:18,22 93:2,15
  96:4 97:6,8,22 98:11
  98:18 101:24 106:17
  106:20,22 107:11,25
  108:21 110:5,5 111:2
  112:13 113:1,2,5
  114:7 117:12,21
  118:9 122:15 123:19
  124:7 125:8,11,25
  129:19,21 134:15
  135:8 140:13 143:3
  143:17 144:3,14
  145:10,17 146:7
good 31:8,14,15 36:13
  41:18 77:12 91:24
  95:12 101:22 112:9
  116:16
gotten 21:11 84:8
  119:12
Gray 2:7 3:7 58:3,10

58:12 61:9,15,18
  62:3,6,20,25 63:3,7,9
  63:16 65:5,9,14,21
  65:24 67:18,22,25
  68:4,5 69:7,18 71:22
  71:24 77:12,20 83:13
  83:14,23 84:2 85:4,5
  86:17,25 87:5,10,14
  87:19 94:10,24 96:4
  96:7,18 97:11 100:7
  100:22 101:15 103:8
  103:16,22,23,25
  104:1,17 105:1,8
  107:25 108:2 110:3
  111:4,9,15 112:15,16
  113:13,20 115:1,4
  117:4,11 118:3,10,14
  123:9 125:2 127:19
  127:25 128:5,6
  129:16,17 130:2
  131:20 138:14,25
  139:8,17,22,25 140:4
  140:7,10,13,20,23
  141:3,10,12,13
  142:16,19,23 143:2
  143:12 144:4,6,9,12
  144:21,24 145:8,11
  145:15,21,23 146:3
  146:13,16,21
guaranty 96:24 98:3
  101:6,12,13,22,22,24
  102:1 132:8 133:5
guess 29:7 33:3 59:1
  61:9 102:20 146:17
guidelines 18:19 19:24
G-E-O-R-G-E 3:10

H
half 25:16
hand 64:14,19 67:1
  71:25 113:6 114:8,20
  114:22 115:8 148:17
handed 61:8 78:20
handing 66:22 79:3
handle 74:14
handled 26:5
handwritten 82:15
  84:16 104:11 105:22
  107:3
happen 47:9
happened 6:1
happening 4:8
happens 4:18 26:11,25
  29:18,22 32:9 92:2
happy 139:3
hard 69:12
hardship 97:24
hearing 146:4

held 11:25 12:2
help 7:22 56:4,5 90:21
  111:6,16
hereinafter 3:4
hereunto 148:17
hey 56:4
higher 131:22
hold 51:7
holding 139:12
home 18:14
Homecomings 54:22
  54:22 56:11,16 83:3
  83:4,15 84:4,10,11
  84:13,14,18 85:8,13
  85:14 107:21 108:4
  109:8,13,24 110:15
  126:24 128:9 132:12
  132:18 133:17
homeowners 53:14
  134:10
honestly 15:25
hope 145:25
hoping 25:3
hostage 139:13
hour 91:24 98:20
hourly 73:19
hours 116:25 122:2
house 43:24 128:16
Household 86:20 88:15
  88:17 92:8,13 102:25
  103:4,4,11 107:4
  116:6,9,12 117:1,18
  118:8,11 119:10
  121:18 122:7,19,24
  123:4,11 124:12,13
  124:15 125:18
HUD 30:5 38:6
HUD-1 30:14,17 31:5
  34:4,20 54:11,14
  81:2,3 95:12 115:9
  123:18,22
Huh 58:15
hundred 7:12 20:15
  22:2,3 43:24 53:3,10
  77:1 91:24 93:5,8
  95:6 117:8 128:15,16
hundreds 17:18,19
hurry 141:2
husband 12:10 67:6
  122:21 123:5,20
  124:7,16

I
idea 10:8 16:3 47:21
  49:4 53:5 86:9 89:2
  89:15 103:10 104:13
identification 63:22
identified 67:2 77:18

86:12 110:20 116:18
identify 3:8 61:10,12
  62:15 70:16 85:17
  87:1 108:16 126:20
  127:8
imagine 20:18
immediately 105:23
  120:1
important 13:19 32:5
include 36:15 106:3,11
  106:13
included 36:17 96:20
  106:17 107:24 121:6
  127:1
including 121:12
income 24:10,16 73:19
  73:20 145:2
incorporated 5:24
  11:20
increase 43:17 44:8
indicated 34:4 64:10
  75:5 77:21 79:20
  89:11 129:4
indicating 129:19
  131:22
individual 62:15
individually 61:21
industry 15:10 16:10
  46:9,11,13
infer 77:22
inform 28:6
information 4:9,17
  14:23,24 15:1,2 24:6
  24:8 42:18 89:17
  122:17 127:24 132:3
informed 8:3 65:17
  119:23
insisted 145:6
inspection 45:24 51:5
instance 26:3 43:23
instructions 30:1,2
  34:14 108:13 109:19
  110:17,19,23 124:1
insurance 45:17 47:18
  48:1,9,13 49:21
  50:13,17,18 52:11,19
  52:21 53:2,14 80:21
  81:6,24 100:6 134:10
insure 48:24,25 97:17
insures 48:1 81:19
interest 24:21 30:22
  42:12,13 43:14,18
  44:8 129:2 130:4,6,9
  130:10,13,15,16
interested 126:22
  148:15
interface 13:11
Interim 30:22

inves 30:11
investor 24:12,23 25:5
  25:13,13,20 26:16,17
  27:3,14,25 29:25
  30:6,6,9,13 31:1,4
  32:16,19,22 33:25
  34:4,11 35:10,19
  36:3 37:7 38:4 54:11
  127:4 128:8,9
investors 51:24
investor's 35:8,24
  36:1
involved 5:13 8:21 10:5
  15:23 27:20 29:8
  45:23 57:10
involves 5:12
issue 101:25 125:6
issued 6:19 34:10 64:24
  121:1,3
issues 102:1 142:9
item 68:20 126:22
items 38:24 88:19,25
  102:6 109:6 128:2
it'll 13:24 37:11 43:3

J
Jackson 141:14
jail 144:3
James 2:13 117:4
  146:23
Jesus 72:12 145:22
Joanne 1:6 82:23
job 1:24 90:9,11 92:22
  143:21
Judge 1:6
judgments 46:20
justify 91:4

K
K 2:3 67:11
Kasparnet 94:4,17,20
  94:20 104:21 105:5
  107:2,7
Kate 67:10 77:22
Kate's 68:10
keep 21:6 56:1 62:10
  97:8 106:17,20,22
  114:18 118:9 125:25
  135:8 140:17 142:2
keeping 58:17 115:2
Kellicker 82:24
kind 6:8 13:6 15:18
  17:23 18:10 28:24,25
  51:21 54:10 81:18
kinds 19:14 31:23
know 4:14,16 7:19 11:3
  12:16,19 13:2,19
  15:25 16:11,21 17:24

18:22 19:5,11 20:14
21:16 22:7,12 24:17
25:2 28:20,24,25
29:2,9 33:5 35:15
36:12 41:4 45:11
48:1 49:24 53:18
54:4,4,5,22 55:3 57:8
58:17,19 59:9,14,17
59:20,25 62:8,8 63:2
63:3 64:4,8 65:15,16
66:6,7 72:13,15,17
73:8,10 74:1,12
81:11 82:17,24 83:21
85:16,21,25 88:25
89:16,24 90:1,13
91:2,16 93:6,25 95:9
95:17 100:16 104:25
105:2,19 110:9,11
114:22 122:14,23
123:16 124:4,17
125:10,12,13 126:13
130:1 131:22 138:16
142:4 143:3,18,21,22
146:4,5,6
knowledge 4:11 24:1
55:12 60:17 79:21
80:3 91:7 93:22
100:24 133:4
knows 20:12 143:17
K-A-T-E 67:12

L

label 61:20,20 62:23
63:10 69:9 94:1
107:25 109:5 118:10
labeled 61:23 63:22
68:19,22 69:25 78:14
78:25 79:25 80:8
108:15 113:15 127:7
labeling 61:25 69:13
94:2 115:6
labels 96:6 103:16
Labor 74:5
lady 145:20
land 60:3
late 18:21 143:9
latency 141:8
Laura 8:24 9:16
135:16
law 74:1,7 144:1
lawful 3:2
laws 11:13 57:8
learned 11:18 119:19
leave 20:5 112:12
139:2,10,12
leaving 97:23 99:6
139:13 140:3
legal 1:17,21 96:20

lender 13:10 15:4,6,16
17:3,12,12 20:3,4
21:7,14,25 22:15
23:6 25:6,9 27:10,14
28:6,14,21,25,25
29:25 30:2,24 32:6
33:13 34:5 36:6
38:16,23 39:9,17,18
40:2 41:9,11 42:18
48:12 54:18,19,21
55:13,13 133:8
135:23
lenders 17:3,4,6,14,19
17:24 20:10,15 21:15
22:3,13 23:9
lender's 35:22 39:25
44:20 48:14 109:19
131:10,11 132:1
Lending 4:1 7:8,11
8:12,12,18,19,20
11:19,19,22 13:20
14:2,5,7 16:20,21
17:1,1 20:19,24 21:2
21:5 31:9,11 56:11
56:22,25 57:14 67:13
68:6 73:2,6,15 76:19
77:23,24 85:7 89:19
92:19 126:23,24
128:8 132:25 136:7
137:22,25
letter 17:24 31:10,17
110:23 114:12
118:12
letters 69:16
letting 17:24 146:6
let's 35:9 87:12,13
112:7 134:23
level 131:22
li 9:6
license 6:7,8,9,10,11,19
7:3 8:11,17,21 9:3,20
9:23 10:4,5 11:23
12:1,2 61:5 73:12
licensed 9:5,25
licensing 6:4,18 15:20
lie 144:17
lien 86:20 88:2,3 89:13
89:13
liens 46:20 51:11,23
98:9
life 93:11
limit 92:24
line 24:13,13 108:19
110:18 115:20,21
116:1 127:9,10,10
132:4,25 133:3 147:4
list 28:19 44:20 95:3
102:6,7 134:16

listed 49:20 52:7 81:2
listen 92:3 93:11
listening 65:23
little 3:20 11:18 14:4
26:22 27:23 52:25
54:13 58:16 60:23
75:2 77:21 109:12
131:23 134:23 146:2
live 55:1
lives 55:3
LLC 94:4,17 104:22
loan 5:12 9:25 10:9,21
10:24 11:8,11,14,15
13:12,22 14:11,20,25
15:3,5,15,22 16:8,9
16:10,13,16,22 17:9
17:10,13 19:7,8,21
20:3 22:19,23,24
23:2,3,4,6,11,16,18
23:20,21,23 24:4,11
24:17,19,20,23 26:7
26:8,13 27:1,4,20,25
29:3,9,11,12,16,22
33:22 34:9,25,25
35:3,3 37:22 38:1,22
40:16,18,20 41:15,25
42:6,8,9,15 43:4
44:22,25 45:2 47:10
52:10,12,15,19 53:9
54:3,17,19,21 55:14
55:19 56:6 58:24
59:10 60:7,18 64:4,4
69:2,10,19 70:2,17
70:24 71:6,14,15
72:25 73:1,2,9,11
75:19,24 76:12 77:6
77:16 78:16 79:10
93:10,21 95:4,10
97:13 101:12,22
105:3 107:17,20,24
108:3,11,16,16
110:14,16 111:2,22
111:23 121:8 124:13
127:23 128:20,21
129:19 130:17,18,20
132:2 133:9 134:9,11
134:17 135:17 136:5
136:10,21 138:2,2,7
loans 8:14,15 14:21
18:13,14 19:19,23
76:11
loan-to-value 19:11
43:25
loan-to-values 18:23
local 55:5,6
locally 55:1
located 12:11
lock 127:10,17

long 16:3 87:8 108:25
longer 3:17 33:22
138:13 139:16
look 13:23 16:6 18:17
25:15 38:9 41:1
57:24 58:9 60:5 66:1
70:10,10,23 72:3
79:25 89:5 111:24
113:22 114:5,6,10,15
115:21 116:1,16
119:4 121:17 124:5
125:3 126:11 127:22
looked 16:13 59:18
63:24 79:2 108:22
120:15 125:3 126:13
looking 16:5 18:25
19:7,8 25:3 58:6,22
68:18 70:3,4,8,9,20
71:11 78:13,13 85:10
85:16 88:21,22,24
108:15 109:4 111:17
111:22,25 112:21
113:2,12 114:9
115:20,22 121:23
125:16 126:4 136:25
looks 47:14 61:2 72:13
82:13 85:24 92:8,16
92:17 104:21 106:23
134:23
losing 90:21
loss 48:25 109:20
lot 21:16 72:6 92:25
93:11 122:15
lower 130:8,10

M

M 2:7
MACDONALD 2:13
Mae 127:23,24 131:15
132:4,7,8
Magistrate 138:20
139:1,1,5 141:1,11
141:13 143:17
144:17
Magistrate's 141:22
143:4 146:3
mailed 87:21
mailers 16:24 17:20
mails 17:21
main 55:21,24 56:17,20
113:14
majority 22:9
making 36:13 69:11
141:10 145:15
Man 102:5
managed 6:18
manager 8:22,23 9:13
9:16,19,22 10:3,4,5

10:15,24 11:5,11,15
managers 10:20
manager's 9:23
MARC 148:7,21
mark 58:3 77:8,13,15
103:18
marked 77:9
marking 58:1 85:2 97:5
97:8
material 18:24
materials 20:6
matter 122:18 125:7
mattered 137:10
Maximum 18:23,23
McNerney 1:6 17:13
60:14 89:8 102:2
104:11 111:2 115:12
119:22 124:21
141:15
McNerney's 82:23
112:19
mean 7:5 9:20 18:14,24
23:16 24:9,20 25:5,6
26:15 31:9 37:18
42:14 43:15 45:10,23
46:14 47:20,22 53:16
55:5,21 58:9 60:1
62:23 71:18 73:18,20
74:17 80:3 87:11
89:24 90:16,24 92:21
110:11 125:8 129:12
135:22 143:19
meaning 131:3
meet 17:8 98:11
memory 60:13,25
mentioned 40:5
met 131:19 133:20
middle 129:1 142:3
mind 70:11 83:13
143:4
mine 112:15 131:23
minimum 74:8,22
minute 14:1 58:13
113:1
minutes 122:14 135:12
misremembering 96:15
missing 59:22 60:6
64:2,3,5,12 68:20
78:16 79:10 131:6
Mm-hmm 9:15 15:13
19:2 21:23 23:8
25:21 27:5 28:8
31:12,16 32:11,15
33:7 34:21 35:17,23
37:12 38:20 40:1,3
44:3,5,10,15 46:1
48:20 53:18 55:11
62:25 64:9 66:5

68:23 71:8 74:9 75:4
76:17 79:14 89:9
107:10 114:13
115:19 120:22
126:25 129:3 136:19
136:22
**Mm-mm** 57:20
**mon** 43:21
**MONDAY** 1:13
**money** 38:7 43:16,22
44:4,14 48:3,6 50:2
51:12 53:16 90:21
110:24 113:17,18
114:2 121:12 122:23
123:1,19 135:22
**month** 7:16 21:9
**monthly** 73:19
**morning** 139:15
**mortgage** 1:3 3:15,17
5:12,14,15,16,19 6:9
6:10,11,14 7:9 8:8
9:3 11:25 12:5 13:15
13:16,19 17:25 18:14
18:21 30:10,25 31:8
32:13,14 34:6,10,17
35:6 40:6,14 42:1,5
43:6 44:2,21 45:1,8
50:1 57:4,7 64:22
68:7,14 69:25 73:9
75:3,5 76:16 82:10
82:11,12 83:2,4,21
84:24 85:3 86:11,12
86:18 87:15 92:20,20
92:21 94:13,15 95:22
95:25 96:3,11,14
102:23 103:2,12
106:6 107:23 109:21
109:21 116:1,5,7,8
118:6 119:3,3,7
122:9 132:25 133:24
133:25 134:3,5
**mortgages** 51:12
**multi-page** 93:9
**mumbled** 4:19

___
**N**
**name** 3:24 6:14 24:16
24:17,18 25:17 68:10
72:23 73:10 82:23
85:23 86:1,9 89:7
**Nancy** 1:6,11 3:2,6,10
6:16 147:22 148:9
**near** 125:24
**necessarily** 13:13 38:16
53:10 55:20
**necessary** 8:11
**need** 9:6,8 19:6,8,9,11
20:9 25:19 39:15

56:4 60:4 65:25
89:14 93:25 96:4
103:16 110:24 113:9
139:11 140:14,17
145:20 146:11
**needed** 95:17 111:20
124:21
**needs** 84:1 97:18,20
98:4,5 100:24 107:24
112:12 131:23
139:10
**never** 16:11 49:9 57:18
57:19
**new** 7:20 21:17
**newspaper** 16:24
**niece** 9:1
**nine** 40:7 43:8 44:13
118:17,17
**ninety** 116:2,10 118:16
118:21
**ninety-eight** 116:3,9
117:7,8
**ninety-five** 40:8,9
**ninety-four** 117:9
**ninety-two** 118:21,21
119:6
**non-filed** 96:11,14
**normal** 19:1
**North** 107:3
**notary** 1:12 85:18
115:16,17 148:7,22
**notation** 82:20
**note** 31:8 32:13 43:14
147:2
**noted** 83:25
**notes** 125:1
**notice** 1:15 4:25 32:4
117:1 120:20
**noticed** 136:20
**notification** 94:4
**notified** 65:12 125:13
**noting** 54:2
**number** 24:18,18 37:13
37:14 39:12 41:2
50:5 52:16 55:6,7
62:9 69:14 82:15,15
95:11 111:12 116:23
129:11
**numbered** 61:13 62:7
96:21
**numbers** 35:2,4,5,6
39:1,10 41:23 64:18
96:6

___
**O**
**oath** 59:13,15
**object** 83:16,23
**objection** 83:24,25

86:22 87:16 94:7,23
96:17 100:3,20
101:14 103:7 105:4
109:25 123:8 124:23
129:13,25 131:13
140:25
**obligation** 122:20
**obviously** 89:22 108:21
123:11
**occurred** 13:17 47:4
89:16
**odd** 59:10
**offered** 5:3
**office** 15:8,14 22:17
55:22,24 56:18,20
60:25 146:12 148:18
**officer** 9:25 10:9,24
11:8,16 14:25 15:5
15:15 16:16 22:19,23
22:24 23:2,3,11,23
24:4,11 26:7,8 40:16
40:18,20 41:25 42:6
44:22,25 45:2 72:25
73:1 75:19 76:12
80:17 108:3 110:14
130:18 134:18
**officers** 10:21 11:12
14:12,20 16:8,9,10
17:9,10 73:2,15
**official** 108:9
**officially** 29:15
**oh** 21:3 36:18,21 38:2
47:1 70:7 78:3 86:2
98:7 109:20 124:5
**Ohio** 1:1,13,15,22 2:4,8
3:12,15,17 5:12,14
6:14,20 7:25 8:8 9:5
9:14 10:1,6 11:25
12:4,5 13:15,16,19
73:13 132:25 148:3,8
148:18,22
**okay** 4:22 5:11,24 6:10
7:8 8:5,11,15 9:17,19
9:24 10:9,23 11:2
12:3 14:9 15:9 16:25
17:8,17 18:5 20:3
21:10,18,21 22:8,10
23:22 24:5,14 25:1,1
25:2,5,10,20 26:8,14
26:22,22 27:3,12,18
27:18,22 28:1,3,9,20
29:4,6,11,18,21
30:17,23 31:13,20
32:3,6,17,25 33:3,17
33:19 34:2,2 35:2,19
36:1,4,14,24 37:2,13
40:2,14 41:14 42:8
42:13 43:11,13 44:10

44:12,17,17,19 45:2
45:2,5,5,8,13 46:10
46:12 47:3,22 48:14
49:14,24 50:3,7,15
52:9 53:2,7,22 54:10
54:16,17 55:3,8,8,12
55:16,23 57:21 58:11
58:19,23,25 59:3
61:7 64:14 65:2,21
66:3,19,22,25 67:9
68:6,12 69:8,15 71:5
72:4,7,18,23 73:4
74:15,25 75:14 76:14
77:3 78:3,5 79:6,10
79:12,23 80:18 81:8
81:13,21 82:15,20
83:9,23 84:13,16
85:1,6,15 86:4,11
87:7,20 88:3 91:3,5
91:23 92:3 93:13,18
93:23,25 94:11 95:2
95:17 96:2,22 97:19
98:7,11,19 99:5,19
100:1,8,14,16 101:5
101:8 102:1,4,23,24
104:8 106:18,18,25
107:11,15,22,25
108:12,19 109:4,10
109:20 110:22 112:8
112:9 113:4 114:1,3
114:14,23 116:7
117:20,25 120:23
121:11,15,22 122:6
123:2 126:3,18 127:3
128:21,24 129:1,7
131:5,21 132:6,11,24
133:15 134:15 135:4
135:4 137:12,24
138:1 139:8 140:9,23
142:10,16,23 143:18
144:5,6,12,13,15,21
144:23 145:7,11,18
146:13,23
**Olmsted** 107:4
**OMC** 4:1 7:8,10 8:12
8:12,18,19,20 9:3,5
11:19,19,22 13:20
14:2,5,7 16:19,21
17:1,1 20:19,24 21:2
21:5 56:11,22,25
57:14 67:13 68:3,6
73:2,6,15 76:19
77:23,24 85:7 126:23
128:8 131:3 132:25
136:7 137:22,25
**once** 23:16,17 27:21
41:15
**ones** 79:1 108:22

**one-page** 118:15
**open** 7:14 8:12 13:4
**opened** 17:22 20:19
**open-ended** 56:24
**oper** 9:8
**operate** 8:12 11:2,4
**operated** 12:20 13:15
**operating** 13:20,21
**operations** 8:22,23
9:13,16,19,22,22
10:3,4,5,15,20,23
11:5,11,15 12:17
21:7,11
**opportunity** 5:3 65:13
**opposite** 115:14
**orally** 122:10
**order** 8:12 11:2,4 29:3
39:15,16,19,20 58:14
58:16,18,19,20 62:9
62:9 114:18,20,21
115:3 134:21,22
135:8
**ordered** 82:18,19
**orders** 106:13
**ordinarily** 130:3
**original** 32:22 33:12,13
33:20,22 51:22 66:10
66:11
**originally** 67:21
**origination** 36:7,23
135:12 136:4
**outside** 18:25 51:4
64:18 67:2 123:16
137:8,14
**overnight** 55:24
**overview** 13:7,9
**owed** 113:18 122:23
123:5
**owes** 114:2 123:11,14
**owned** 12:9
**owner** 5:18,19,22 7:12
**o'clock** 97:23 98:19,22
99:5,11 112:12
139:15

___
**P**
**package** 29:24 30:7,8
30:11 31:6,6 32:10
32:18,19,21 33:13
37:3 41:11,19 51:23
58:9 67:24 68:1
79:25 110:10 127:15
134:14
**packages** 51:25,25
**page** 59:22 60:6 62:5,6
62:19,22,24 64:2,3,5
64:12 72:24 82:17,22
85:16 89:7,20,21

91:12,12,15 93:3,3
95:18 96:21 98:12,12
104:21 105:18,23
107:1 114:10,11,12
125:8,8 129:1 147:4
**pages** 16:23 31:24 50:5
52:16,16,17 63:14
69:5,7,20,22 70:1,14
81:22 82:3,5,13
86:13 88:10 93:5,8
102:19 105:19
109:14 120:5,5 126:2
127:13,14,16 131:17
135:3
**page(s)** 147:1
**paid** 18:23 19:10 24:21
42:4 43:6,17 44:4
48:17 50:19,20,22
51:1,1,4 71:9 88:19
88:25 89:13 95:7,13
97:18,20 98:4,5
100:18,24,25 102:7
107:17,20 110:16
123:16 130:25 137:8
137:14,17 106:2
**Palm** 55:10
**paper** 25:17 108:25
124:11,14
**paperwork** 61:6,8
**part** 35:18,21 41:11
49:12 51:19 66:8
81:1 84:17 87:24
95:18,23 98:7,9
101:2,2 105:6,14,16
106:18 107:4 109:5
110:19 112:17
113:19 122:23
124:18 134:14 137:9
**particular** 18:15 54:3
58:8 109:7 121:24
**parts** 106:2
**party** 36:7 148:15
**party's** 83:18
**pass** 11:8
**passed** 11:6
**Passing** 10:6
**path** 98:17
**Patricia** 1:6 60:13
82:23
**pay** 37:4 48:3,7 50:2,3
52:23 53:21 74:8
91:22
**payee** 109:20
**paying** 71:3
**payment** 24:1 31:10,17
31:18 114:12
**payoff** 30:21,21 44:1
95:24 102:23 103:12

107:3 116:2,3,5,8
117:6,18 118:6,9,16
118:20 119:7,9,11,13
119:17,25 121:4,15
121:24 122:1,19,24
123:4 125:18
**payoffs** 30:22 134:10
**payout** 117:1
**payroll** 16:6 74:14
**pays** 18:21 42:15 48:6
50:21 53:3,15
**people** 46:4
**percent** 7:13 43:4,5,8
43:25 53:3,10 75:20
76:10,20 135:18,19
136:4,10
**percentage** 53:14 73:21
74:16,23,25 75:10,16
75:18 81:13 129:11
129:15
**period** 39:8
**permission** 143:4
145:17
**person** 29:1 55:17
76:25 115:14
**personal** 60:17 61:4
**perspective** 14:5 54:7
**pertinent** 98:2 106:6
**pest** 45:24 51:4
**phone** 24:18 55:5,6
86:16
**phrase** 7:7
**Pick** 28:19
**piece** 124:11,14
**Pilot** 55:10
**place** 15:23
**Plaintiff** 1:4 2:5
**plan** 87:17
**planning** 138:16
**plans** 141:19
**PLEAS** 1:2
**please** 3:9 71:23 72:18
141:12 143:19
**plus** 25:18
**point** 6:3 8:5 27:19
28:20 33:3 36:13
38:3 41:5 74:5 77:12
89:24 103:4 110:13
110:15 111:1,19
116:7,11 122:17,19
125:5 128:19 129:2
146:1
**points** 129:9,23 130:3,8
130:13
**policies** 48:2 49:8
**policy** 49:5,16,18,21
80:12,18,20,21 81:15
81:15 82:1,2

**position** 20:14 85:21
**positions** 14:15
**possibly** 44:23 75:7
85:24 116:17
**practice** 90:8
**pre** 83:1 99:19
**precise** 113:7
**prefer** 5:10 20:7
**preliminary** 30:5,14,17
31:5 34:3 41:17
54:11,14 81:3
**premium** 42:16,19 43:5
43:9 44:23 45:6 75:7
80:23 81:24
**preparation** 50:25
**prepare** 30:1,4 34:12
83:8 120:10
**prepared** 30:3 34:5
83:1,4 98:21 99:20
101:1,3,5 105:2,6
109:7,8,13 120:7,11
120:17,19
**prepares** 30:14 54:13
83:6 84:4,6 98:13
99:13,13,15 100:17
**present** 2:11 5:1
**president** 7:12 14:6
**presum** 131:5
**Presumably** 53:22
**pretty** 21:6,7,11 25:17
35:23 39:25 43:15
44:2 45:10,10 46:9
52:4 56:24 81:23
88:18 91:18 105:10
125:4 142:1
**previous** 51:12 106:5,5
**printed** 127:11
**prior** 27:25 41:13
46:25 47:1 60:4
82:19 102:16 110:13
119:10,14 128:21
139:21 143:24
144:18
**probably** 7:24 8:4,10
11:13 14:10,13 16:16
20:18 22:9 32:4
53:13,20 54:24 55:9
61:16 71:20 72:5
79:22 82:18,25 89:17
104:6 110:1,4 116:11
116:12 124:24
127:10,11 129:14
131:21 137:3,4
**problem** 138:19 139:17
141:8
**procedure** 4:7 72:21
**proceeding** 142:1
**proceeds** 136:5,11

137:17
**process** 14:21 15:1
21:18 22:18 27:20
29:19,23 38:1 93:10
93:21 95:4,10 97:13
105:3 110:20 131:23
**processed** 56:6
**processing** 34:18 35:14
35:20,24 36:15,19
37:13,23,23 40:7,12
41:25 42:5 44:22
75:6,10 130:22
137:21
**processor** 15:6,16,16
15:19 22:21 24:2,5,6
24:22 25:11,12,23,25
26:7 27:3,8,16 40:19
40:21 55:18,18 127:4
128:8,12 134:18
**processors** 14:16,19
15:23,24 16:14 17:10
26:5 27:7
**produced** 65:4,12
67:20
**product** 18:12,16 19:18
19:18
**products** 17:4 18:11,18
19:16 20:5 28:25
56:1
**profit** 45:21
**program** 57:10,12
**promissory** 43:14
**property** 24:16 30:18
60:4 95:5 129:7
**provide** 27:15 67:5,6
111:3 116:17
**provided** 64:23 66:3,15
66:17,20,23 67:7
68:7 104:22 112:21
121:9
**Public** 1:12 148:7,22
**pull** 7:24
**pulled** 26:10
**purpose** 97:4,15
**purposes** 62:11 63:22
**pursuant** 1:15 99:4
**put** 40:21 41:4 58:19
77:14 102:8 144:22
**putting** 64:17
**P-R-O-C-E-E-D-I-N...**
3:1

**Q**

**qualified** 148:8
**question** 3:21 4:19,19
4:21 6:2 14:4 16:18
22:11 38:3 56:25
70:24 92:23 96:12,22

98:23 99:3 125:9
**questions** 8:2 14:5
19:14 59:7 79:17
83:17 89:6 91:9,17
92:1 93:1,18 97:6
98:2 99:10 103:20
105:12 110:6 112:14
113:3,10 142:14
**quicker** 91:17 92:25
93:2
**quickly** 125:17
**quit** 91:6,8
**quite** 22:7 97:22
124:10
**quote** 23:25

**R**

**radio** 16:24
**raising** 125:6
**rate** 23:25 24:21 42:12
42:14,15,22 43:4,12
43:14,18 44:8 73:19
127:10 129:2 130:6,9
130:10,13,15
**rates** 130:16
**ratio** 19:12,12
**ratios** 18:24 19:22
**Ray** 12:10,16
**read** 22:7,14 49:9
50:12 85:23 90:13
94:8 117:19 124:4
147:1
**reading** 37:6 47:13
**ready** 17:25
**realize** 33:21 125:4
**really** 3:20 4:16,17
9:21 59:1
**realm** 19:1
**Realty** 102:25
**reapproved** 21:15
**reason** 66:19 69:15
90:3 113:16
**recall** 76:8 119:2
**receive** 29:24 37:4
57:11 73:21 74:22
75:12 76:23 132:14
**received** 52:6 65:19
76:10,25 107:3 109:6
132:5,13
**receiving** 74:15 85:8
**receptionist** 14:16 67:7
67:9
**recognize** 85:25
**record** 61:10 62:11
63:6,8 66:9 95:8
137:7 143:15 144:16
146:17,20,24
**recorded** 1:16 82:11,12

89:12 148:11
**Recording** 1:17,21
**records** 16:6 46:19
   51:11 53:22,24 54:1
**reduced** 148:12
**refer** 20:6 62:12,13
   72:18 124:8 130:13
**reference** 61:24 62:8
**referral** 75:24
**referred** 126:19 134:16
**referring** 34:3 35:7
   57:11 59:6 71:14
   78:18,19 89:13,15
   104:13 110:9 112:5
   124:15
**refers** 135:19
**refinance** 43:23 60:3
   121:21
**refinanced** 59:20,25
**refuse** 98:12,15
**REGISTRATION** 1:3
**relabel** 64:16
**relate** 99:16 109:24
**related** 8:25 130:3
**relationship** 12:4,4,6,8
   101:16
**relationships** 17:2
**relative** 148:14
**Relax** 72:11
**release** 51:11,23 86:20
   88:2,3,10,13
**relevance** 87:16 94:7
   94:23 96:17 100:3,20
   101:14
**remains** 81:8
**remember** 7:17,21 16:2
   50:11 61:6 74:2 79:2
   113:23 125:22
**remembering** 16:1
**reoccurring** 39:2,3
**rep** 19:5,17,17 54:22
**reply** 132:13,15
**report** 34:17 36:16,22
   122:11,12,13 132:11
   132:20
**REPORTER** 62:1,4,17
   62:21 63:1 146:18
**reporting** 35:21
**represented** 4:23
**reps** 17:7,12,19,20 20:4
   20:4 21:7,14 55:13
**request** 26:13 27:2,8,9
   102:24,24 119:9,13
   121:15 122:1
**requested** 84:5 92:5
**requesting** 128:14
   129:5,7
**requests** 27:6

**required** 9:6,13,18
   18:23 26:6 27:24
   29:5 30:3 39:21
   47:18,23 74:7,8
   109:1
**requires** 40:24
**reschedule** 5:3 138:11
   140:6,12
**rescheduling** 143:5
**rescission** 32:2,12
**research** 8:1
**Residential** 69:2,10,19
   70:2,17 71:14,15
**resolved** 6:25
**response** 64:24 65:17
   67:5,20 131:11,12,21
   132:2 133:8
**responsibility** 102:12
   145:1,3
**responsible** 10:14
**rest** 30:7 31:5,6 90:2
   105:10,15
**Restraining** 106:13
**restroom** 63:6
**Returned** 6:7
**review** 4:7 98:10
**reviewed** 91:1
**reviewing** 124:19
**riders** 32:14
**Ridge** 1:14 2:7 3:12
   12:12 78:7
**ridiculous** 90:24 98:6,8
   103:21
**right** 3:15,19 4:2,4 5:2
   5:8 6:25 7:10,14 8:1
   8:1,17,20,23 10:3,13
   10:23 11:15,16,18,18
   11:22,25 12:3,3,3,8
   12:11,13,15,20 13:6
   13:25 14:3,11,14,17
   14:19 15:22 16:1,8
   16:17,19 17:22 18:12
   19:13 20:10,19,24
   21:10 22:10 23:5
   24:3 25:4,10,15,22
   25:23,25 26:18,19
   27:12,13,16,18 28:3
   28:6,24 29:1,11,15
   30:14 31:22,25 32:4
   32:21 33:9,15 34:2
   34:15,21,25 37:2,5
   37:15,23 38:8,23
   39:9,22,22 40:4,4,25
   41:5,24,24 42:3,17
   42:23 43:3 45:4,18
   46:3,23 47:3,8 48:17
   48:24 49:17,19,22,24
   50:7,25 51:3,6,16,18

51:22 52:2,5,17
   53:12,23 54:9,16,16
   55:1,8,16 56:7,8,8,12
   56:21 57:6,12,21,23
   58:10,13 59:3,24
   60:6,12,12,16,20
   61:7,22 63:9,15 64:1
   64:7,10,12,19,23
   66:4,11 67:5,11,13
   68:8,10,12,18 69:4,8
   69:17,20,23 70:12,13
   70:23 71:7,8,10,11
   71:18,21 72:16,18
   73:1,6,11,14 74:3,9
   74:13,20,21 75:8,15
   76:11,19 77:5,5,19
   79:12,15,15 80:7,7
   80:13,23,25 81:16,21
   82:4,6,8,21 83:1
   84:20 85:6,11,15,21
   85:23 86:8,10,21
   87:22 88:9,11,13,14
   89:10,10 91:20 94:14
   94:19 95:8,23 96:8
   96:12,12 97:2 98:24
   99:20 101:1,6,9
   102:4,11,18,19,23
   103:3,5,5,11,14,14
   103:15,24 104:14
   105:9,9,18,22 106:3
   106:7,16,25 107:6,13
   107:19 108:14,14,18
   109:2,7,11,13,16
   110:4,17,18 111:1,9
   111:9,17,18,19 112:3
   112:8 114:3,20,21
   115:5,7,18 116:19
   117:3,14 118:1,4,8,9
   118:10,16 119:8,13
   119:16,19 120:1,4,7
   120:11,11,19,25
   121:2,5,14,22 122:3
   123:13,22,25 124:3,9
   124:14 125:10,15,21
   126:1,3,6,9,12,15,16
   126:16,18 127:7,13
   127:19,23 128:1,5,10
   128:14,17,22 129:5
   129:16 130:12,18
   131:10,15,25 132:9
   132:17,19 133:1,7,10
   133:17,19,21 134:14
   134:25 135:2,7,10,11
   135:17,25 136:9,15
   136:25 137:6,14,21
   138:6,9 141:24 143:2
   144:24 145:8,21,23
   146:16

**River** 2:8
**Road** 1:14 2:7 3:12
   12:12 78:7
**ROBERT** 1:12
**Rocky** 2:8
**role** 97:12
**root** 111:13
**run** 91:19 132:4 143:11
**running** 10:2 138:17
**runs** 81:15

**S**

**sake** 133:2
**salary** 73:19 75:23 77:1
**sales** 17:7,12 20:4,4
   21:7,14
**satisfaction** 87:15,21
**save** 22:8 38:8
**saw** 109:20 110:8,11,12
   111:8 122:5
**saying** 5:9 63:4 98:14
   122:17,20 123:3
   137:15 145:9
**says** 3:4 27:4 37:3 43:4
   89:19 92:4 97:1
   108:19 115:24
   128:16 129:8 135:8
**scan** 32:21,25,25 33:14
**scanned** 33:18 66:11
**scans** 32:19
**schedule** 30:7 32:7
   101:2 104:7,7
**score** 19:9
**scores** 18:21
**seal** 148:18
**search** 27:24 28:1,21
   29:12 45:15 46:10,15
   46:18 50:8 105:7,14
   105:16,18 106:11
   107:9,13,15 108:1
   117:24,25
**season** 8:6
**seconds** 16:2
**section** 34:19
**see** 16:15 23:15 24:25
   25:1 38:2 47:22
   58:24 69:8 71:12,12
   71:13 72:17 78:15
   88:21 89:7,19 90:5
   102:12 104:10
   105:20,22 106:4
   112:8,9 120:2 124:6
   125:3 126:11,20
   128:15 133:20
   136:15 146:14
**seeing** 106:18 112:9
   118:8
**seen** 49:7,9 65:20

**sees** 52:9
**Seitz** 68:11
**select** 28:5
**selected** 28:4
**selects** 28:5
**self** 90:13,15
**self-explanatory** 88:18
   90:7,12
**send** 17:20,23,23,23
   22:19,21 23:3,12,14
   25:13 26:15 30:5,9
   30:11,12 32:6,22
   33:1,12 34:13 41:17
   41:17 46:21 51:23
   85:8 134:7
**sending** 92:4
**sends** 27:4 30:6 31:5
   38:23 39:9 94:20,25
**sense** 58:20 59:1,5,18
   59:19 60:10 63:25,25
   71:1 89:20
**sent** 1:16 41:12 70:21
   80:12 84:11 99:22
   103:3 132:11 134:3
   137:3
**separate** 12:2,16 23:15
   36:20 38:2,4 77:9
**September** 5:7 142:19
   148:19
**series** 118:1
**serve** 17:25
**served** 67:21
**service** 34:18 36:1,23
   38:18
**servicer** 110:2,4
**set** 40:25 61:10 62:12
   63:19 73:18,19,19
   78:19,24 111:6
   117:21 148:17
**sets** 64:14 100:18,21
**settled** 123:17
**settlement** 13:23 30:1
   111:24,25 112:4,19
   114:3,7 120:2,8,14
   120:15,22,24
**seven** 28:17
**seventy** 31:24
**seventy-five** 129:20
   136:23,24 137:5,10
**seventy-nine** 44:2
**seventy-seven** 63:14
**seventy-two** 95:6
   116:24 122:2
**shareholder** 14:7
**Sharon** 72:23 73:4 76:9
   76:22
**sheet** 24:12,14 25:12,17
   38:16,24 39:5 40:19

40:22 41:6,8,16 88:6
88:13,17 101:6
104:16,18,20 105:24
116:12 122:4 127:3
134:17
sheets 34:12,15,23
38:11 39:10 117:2
132:15
ship 51:22,25
ships 32:18
short 13:8 138:18
show 18:8 53:23,24
61:5 94:14 97:14,14
98:4 108:16 117:15
117:17 119:5 123:19
123:23 124:6 129:9
showed 102:21 120:16
120:16 136:23
showing 88:6,19,20
117:18
shows 94:13 97:18,20
98:4 106:1 116:1
118:16,16 119:6
129:2 137:1
si 71:13
sic 89:12
sig 51:7
sign 30:8,11 41:18 46:5
signature 71:13 115:14
signatures 56:14 85:16
signed 16:15 71:12,17
71:19 72:20 77:8,16
80:14 115:12
significance 90:5 93:19
94:12 95:3,10,15
105:3
significant 43:19
signs 32:10
silly 105:12
simply 14:22 28:6
89:13 107:8 129:18
single 86:23 97:9
sit 46:4 91:5,21,24
93:13 98:11
site 7:24
situation 54:17 56:3
74:21
six 82:3,5,5 109:15
127:13 130:22
137:21
sixteen 82:13 86:13
size 52:10,19 53:8
138:7
slow 87:12
smaller 77:4
sole 5:22 7:12 14:7
solicit 121:20
somebody 19:7 25:8

48:3,3 56:16,17,19
74:18 76:23 80:15
92:6,10,14 144:2
soon 91:18
soonest 143:1
sorry 32:14 69:25 70:7
77:7 86:15 87:5
91:11 92:21,24 102:5
114:18 115:1 123:1
128:4 135:9 141:5
sort 13:8 47:8 81:19
speak 83:20
speaking 13:12 22:12
83:24 141:3
special 15:20
specific 13:8 38:6
55:17 60:24 79:21
91:9 92:23 93:18
97:6 103:20
specifically 59:6 134:7
speed 21:12
spell 67:11
spells 86:9
spent 54:13
spread 42:7,18 43:5,9
43:18 44:23 45:6
75:7 76:18
ss 148:3
ST 1:21
stack 58:5 112:24
113:6 114:8 117:13
standard 22:5 27:11,12
27:15 34:11,15,23
35:1,2,13,18,19,20
36:14 37:7 38:10,12
38:15,17,21 39:10,25
40:7,10 41:24 42:5
44:22 45:11 46:9,11
46:13 47:18 49:12
58:9 72:20 75:6,10
100:21
standards 19:6 41:1
100:18
start 4:14 5:13 35:9
69:13 79:24 80:9
112:13
started 13:20
starting 80:7 127:21
135:17
state 1:1,13 6:2,5,20
7:25 9:5,14 10:1,6
11:6,9 50:17,17
66:14 73:12 148:3,8
148:22
stated 116:24
statement 13:23 30:1
31:11 99:2 111:24
112:1,4 114:4,7

115:9,10 117:17
120:2,8,14,15 121:3
146:19
statements 112:19
states 114:1
stay 39:25 138:13
staying 139:15 144:10
stays 53:11
Stewart 48:9,19 53:20
54:8 96:24 97:21
98:3 99:16,18 100:1
100:4,19 101:5,8,11
101:16 102:1 104:2
stickler 114:18
stock 7:13
stop 69:11 105:11
stopped 13:20 21:9
storage 78:5,11
strange 79:13
strikes 59:10
structure 76:2,8
stupid 96:23
subject 25:14
submission 24:11,14
25:12 127:3 128:21
129:19 132:2,11,19
132:22 133:9 135:2,3
136:21
submissions 14:23
19:22
submit 19:23 23:17,20
23:21 24:2 25:12
26:12,14,24 134:11
142:13
submitted 23:4,7
127:10 131:16
subpoena 64:24 65:7,8
65:18 67:20 99:7
143:20
successors 109:22
Sue 80:14
suggest 98:2,10
suggested 63:18
suggesting 132:1,3
SUITE 1:14 2:4,8
summarize 19:3
summarizing 11:3
summary 11:3
SUPERIOR 2:3
sure 9:11 17:16 20:2
33:19 40:9 43:10
46:15,19 48:1 49:11
53:16 65:5,9 84:21
89:16 99:7 112:25
113:25 114:8,15
115:6 141:1
surrendering 7:3
survey 45:23 51:3

surveyor 51:4
Susan 2:7 141:13
sworn 3:3 148:10
SYSTEMS 1:3
S-E-I-T-Z 68:11

_____

T

table 118:7
take 8:20 9:6 10:10
23:24 35:9 43:18
59:3 65:25 66:23
70:10 83:11 86:14
125:3 127:12 135:12
145:1
taken 1:12 83:19
124:12
takes 24:5
talk 9:12 23:24 38:10
55:20 74:15 79:19
83:19 97:9
talking 16:20 33:4 49:2
75:2 78:24 79:4
104:15,17 107:6
112:25 115:7 140:18
talks 15:15,16
tape 1:16 148:11
tax 34:18 36:1,22 38:18
95:3,8
taxes 30:18 74:19 95:6
teach 93:15
telephone 141:10
tell 8:6 13:24 16:5,7,14
16:16 29:21,21 59:14
59:15 60:5 64:20
67:3 78:21,21 79:18
80:11 88:16 89:14,17
90:20 94:11 97:22
111:22,25 114:10,11
124:19,21,25 138:15
143:6 144:17,18
telling 19:4,4 33:10
39:24 98:24 100:12
119:2
tells 42:19,21
ten 19:23 44:13 69:5,7
75:20,21 76:23,25
136:10 139:14
tentatively 143:5
Teresa 85:17 94:4
115:15
terms 22:12 24:17,19
24:20,20,23 97:12
110:18 132:6,8
test 8:20,22 9:2,6 10:6
10:9,12
testify 148:10
testimony 148:11,13
tests 11:6,9

thank 3:8 72:17 90:23
103:25 115:1 142:11
145:23
thanks 63:9 146:13,24
thing 24:9 60:9 79:12
96:13 105:22 107:3,8
116:16
things 3:9 18:17 24:22
30:18 32:1 33:5 34:5
42:3 52:1 68:13
69:12 90:1 93:11
102:7,13 114:18
115:2
think 6:17 12:15 19:3
22:10 23:16 39:23
40:8 52:4 54:5,24
56:19 58:14 63:10
66:8 69:8,13 82:20
88:21 109:12 110:11
110:12 112:20
122:25 126:21 139:9
140:7,8,24 142:24
146:22,23
third 36:6 100:13
third-party 36:23
45:25
thirty 14:10
thirty-two 136:3
thought 37:6 52:25
64:11 70:7,7 96:16
123:4,12 125:20
135:10
thousand 43:24 44:1
52:20 111:3,21 116:2
116:3,9,10 117:7,8
118:21 119:6 121:9
121:13 122:18 123:5
124:22 128:15
threaten 144:2
threatened 145:6
three 32:12 44:21 45:9
70:18 77:1 82:4
102:19 107:23 112:6
112:7 117:8 118:17
135:18,19 136:4,15
137:1,11
three-day 32:12
throw 144:3
thrust 3:21
time 8:8,10 15:22 16:3
16:9,12,20 17:1,13
21:11 24:21,23 40:10
41:3,11 46:17,18
54:13,23 57:16 64:15
65:20 66:1 74:5
90:17 91:21 93:13
95:7 97:25 98:20
100:13 108:24

110:18 112:14
116:23,25 119:10,13
119:19,22 122:8
126:15 138:19
139:14
times 44:13 100:9
timing 29:8 126:16
title 12:5,9,11,17 13:4
13:10 27:17,19,24
28:1,3,7,11,12,15,15
28:17,18,21 29:3,8
29:12,13,15,22 30:4
30:16,24 32:6,7,17
33:4,5,6,10,12,12,20
33:21,21 34:4,6 38:5
41:18,21 45:13,14,15
45:17 46:2,10,15,18
47:25 48:7 49:15,20
50:8,12,20,20 51:24
52:3,6,9,11,18,18,21
52:23 53:2,8,12,20
53:22,24 54:1,1,7,13
56:22 57:1,4,7,10,13
57:22 63:11 67:4
68:7,15 69:24 70:6,9
71:18,22 72:24 77:17
77:24 79:17,19,24
80:2,10,12,15,17,18
80:20,24,25 81:1,5,9
81:19,24 82:25 83:20
85:9,10,12,19 86:2
87:21,22 88:6 92:11
94:5,19,25 96:24
97:1,14,21 98:3,13
99:13,15,16,17,18,19
99:19 100:1,4,6,17
100:19,19,25 101:1,2
101:5,8,12,16,17,23
101:24,25 102:1,3,8
102:9,10,12 103:3
104:2 105:6,14,16,18
105:25 106:1,10
107:8,12,13,15,16,19
107:21 108:1,3,24
109:17 110:14 112:4
113:22 114:6 115:18
116:8 117:15,22,24
117:25 119:8 120:12
120:17 125:21,22,23
133:19 134:1,4,7
137:4
titled 82:10
Title's 78:18
today 4:9,24 5:5,9,10
54:18 55:10 87:9
90:3 138:12 141:16
143:23 144:1,19,20
told 4:5 5:6 53:1,9

56:10 66:10 118:20
118:25 122:10
143:24 144:7,18
145:5
tomorrow 146:14
top 34:19 80:8,10
108:19 109:5 126:7,8
132:15 135:8
total 41:11
touch 142:2
training 15:20
transaction 4:12 5:11
13:8,12,17 111:21
transcript 148:13
transmittal 133:10
travel 141:18
traveling 138:17
Treasurer's 95:24
tries 26:8
tripling 69:17
trouble 56:6
true 62:20 148:12
truth 31:9,11 59:16
89:19 92:17 148:10
Truth-in-Lending
121:1,2,6
try 22:11 23:25 111:11
138:21 139:4 141:6
trying 4:16 9:7,9,21
29:7 38:2,3,11 81:22
93:9 122:16 142:5
turn 50:21 52:23 62:22
97:3
TV 16:24
twelve 127:14
twenty 14:13 38:14
39:6,7 128:17 129:9
129:10,12,21 130:19
130:19
twenty-five 14:10,13
137:11
twenty-six 129:9,10,12
129:21 130:19
two 42:3 64:14 70:18
74:11 77:1 82:2,4
88:10 93:7 97:23
98:19,22 99:5,11
102:18 112:12 120:5
129:2,20 130:22
132:15 136:23,24
137:5,10 145:11
type 24:9 56:23 57:9
typed 134:9
typical 15:10,12
typically 15:5,7 17:11
46:7 57:3 69:22
124:25
T-R-Z-A-S-I 85:24

T-R-Z-A-S-I-C-A 86:8
_____
U
ultimately 15:4 40:20
41:1 43:13 95:11
107:16
Um 123:10
unclear 52:25
uncomfortable 4:14,16
underneath 85:23
87:20 88:5 104:21
understand 4:8,18,21
4:23 5:2 31:25 44:17
44:17 51:14 60:2
64:1 90:7 94:9 98:14
98:25 99:5 121:7
142:6
understanding 13:16
37:19 74:10 131:22
underwrite 37:21
underwriter 50:21,22
52:24 53:3,4,11,15
99:18 100:5 101:9,11
101:18,21
underwriters 48:7,8,9
48:13,18
underwriting 34:18
35:13,19 36:15,19
37:8,10,11,16,20
38:19 48:11,14 100:5
132:20 133:9
Uniform 69:1,10,19
70:2,17 71:13,15
72:15
United 48:22 54:8
unsigned 77:10
update 46:17,19 51:11
updated 56:1
urgent 108:19,19 109:6
use 28:12,15,16 63:6
108:25
usually 17:10 18:4,7
21:20 22:18 25:16
27:7 28:23 32:16
35:13,14 36:3 37:25
38:6,13 46:17 51:1
51:18 55:21 63:1
120:9 130:13 134:9
_____
V
value 128:16
varies 52:11
vary 22:5 34:25 35:2
35:11,14 42:8 52:10
52:14,19 53:8 76:6
138:2,6
vast 17:14
verification 26:19

verifications 26:4
verified 103:2
verify 103:12
vernacular 81:18
vs 1:5
_____
W
wage 74:8,22
wait 32:12 79:19
walk 86:23 91:18
walking 98:22 142:5
wand 115:6
want 4:17 5:8,11 11:3
13:6 22:19 23:20,21
25:18 28:14 46:3
58:8 59:7,12 62:4,11
62:12,14 65:25 70:12
84:20 90:3,25 93:3
95:9 96:13 99:7
104:24 105:2 108:23
110:6,7 111:7,16
112:24 113:8,8,9
114:15 117:20 125:4
130:10 138:10,14
139:3,4,23 140:5,11
140:21 144:16,18
146:10,19
wanted 5:4 8:14 25:2
26:17 33:20 65:18
89:23 90:3 112:17
126:20 141:21,25
warning 98:19
wasn't 79:8 121:25,25
137:17
waste 90:17 108:24
way 16:1 17:5 43:17
54:2 58:21 61:17
81:18 91:17 117:4,5
117:5 122:25 135:14
142:14
web 7:24
week 77:2
Weiss 80:14
welcome 65:14 139:24
Wendy 104:23 120:9
went 33:19,20 77:25
85:12 96:3 128:7
132:22
weren't 65:11 66:13
83:15 121:22,22
we'll 4:12 13:25 29:3
38:8 55:21 63:10,10
88:3,9 94:1 117:3
118:10 120:4 127:19
135:10,15 143:12
we're 12:15 16:20
23:12 34:10 58:5
59:3 61:24 72:12

74:8 85:10 88:21
91:16 97:23 107:6
108:14 112:25 114:9
115:7 122:15 126:3
140:13 143:3 146:17
146:23,24
we've 54:12 63:22
117:25 118:24 119:1
127:7 141:16
Whatever's 39:21
WHEREOF 148:17
Whichever 80:6
whoever's 15:3
Williams 137:8,12
withholds 74:19
witness 1:11 3:2 58:7
58:11 61:14,16 63:5
65:22 67:23 68:2
83:10 86:14 87:17
94:8 100:4,21 104:24
105:5 110:1 113:16
114:24 117:6 124:24
127:21 129:14 130:1
131:14 138:10
139:11,19,23 140:2,5
140:9,11,16,21,24
142:18,22,25 143:8
143:24 144:5,7,11,13
144:22,25 145:9,13
145:19,22,25 148:14
148:17
wondered 108:24
words 19:3 43:22
100:23 132:7
work 3:11 13:9 40:23
44:6 51:14 67:13
87:24
worked 16:3,4 21:25
54:24 80:15 86:2
working 16:11 28:7
53:17 141:15
works 15:5,6 68:6
worry 49:25
wouldn't 15:25 16:7
23:16 33:22 47:11,12
53:17 54:5 84:23,24
118:5 119:15 124:25
134:11,14 137:10
142:23
writing 108:7 148:12
written 20:6 76:4 82:22
82:24
wrote 47:13 50:12
W-2 73:16,17 74:17
_____
X
X 39:15

**Y**

yeah 20:21,25 25:7
  30:20 35:12 36:10
  48:5 50:14 52:17,17
  55:7 56:3 63:3,7 65:9
  67:18,25 69:15 70:16
  78:19 81:25 82:2,14
  85:4 99:9 103:4
  106:18 120:6 122:5
  124:5 125:24 133:2
  135:10 139:11 140:7
year 8:6 12:24
years 54:25 74:6,10,11
Year's 7:20
Yellow 16:23
yield 42:7,18 43:5,8,18
  44:23 45:6 75:7
  76:18

**Z**

zero 75:14 115:24,25
zip 3:13 87:12,13
Zoe 2:3 141:14

**$**

$20 38:15 39:6,7
$400 77:1
$7,200 95:6
$8,000 111:3,21 123:6
  124:22
$98,349.94 117:10

**#**

#06H8268A 1:24

**0**

02 16:21 106:8
03 88:16,23
06H8268A 147:25

**1**

1 61:13 62:14,18,22,23
  63:13,23 64:18 78:14
  78:25 89:21 101:2
  147:1
1,495 40:9
1-1 61:22
1-2 61:22
1-7 88:15,22
1:10 97:22
10 96:2
10:52 1:15
100 53:3,10
108,000 128:15
11 1:14 2:8 97:2 102:19
12 103:14,22 116:18
  122:5 127:14
12th 148:18

12-20 106:7
12-20-02 104:10 107:7
12-27 16:20
12-27-02 17:2 112:23
  115:10 118:12
  120:21
13 108:1 116:19
13th 142:17
1303 116:1
14 25:16 109:5 110:6
1400 2:4
144 3:14
146 147:1
15 96:15,15 111:5,10
  142:19
15th 5:7 138:11 142:18
16 82:13 85:16 86:13
  96:16 112:22 115:6
  123:18 133:12
17 89:1 118:13 126:3
17:51 126:15,16
18 120:4,20 123:19
18th 142:25 143:6,9
19 80:11 127:20 128:3
  132:19 136:21
1994 5:21
1995 12:18
1996 89:16 92:19

**2**

2 64:16,18,20 66:16
  68:14,22 70:1 89:20
  89:20,21 101:2
  124:20 127:8
2-20-02 104:20
20 14:13 130:19 133:7
  133:15
2002 5:21 6:1 7:15,16
  13:18,21 14:6 20:11
  20:17,20 57:13 73:25
  119:10,16 133:13
2005 12:18
2006 1:14 12:25 148:19
21 135:15 137:1
21st 1:13
21330 1:14 2:7
216 1:22
25 14:10,13
25th 140:15
250 130:23
26th 122:6
27 119:10,16
27th 13:18 14:6 73:24
  119:11
275 129:20 136:23,24
  137:5,10

**3**

3 64:17,18 67:2,17
  68:15,19 71:25 72:24
  77:19 79:25 80:9
  86:12,19 108:15
  113:15 124:20
30 14:10 126:8
30th 126:14
303 115:20,21
3145547 82:16
325 137:11
3376 1:22
350 136:16 137:2

**4**

4 69:12 77:10,15
43 62:23
4311 3:12
4355 12:12 78:4,7
44 3:13
440 55:7
44103 1:22
44144 3:12

**5**

5 80:14 82:5 88:25
5-15-09 89:12
5-17 88:19
5:51 126:17
50 28:18 75:20,22
  76:10,20,23
5230 1:21

**6**

6 82:9,10 85:3 86:13
  96:9
645 130:22 137:22

**7**

7 88:4,9
70 31:24
72 116:25 122:2
76 61:13
77 63:14

**8**

8 94:14 95:4
8,000 121:9,13 122:18
8.25 129:2
80 43:25
80,000 44:1
800 2:3
881-DEPO 1:22
881-8000 1:22

**9**

9 95:18
9-14-2008 148:22
90 118:21

90,000 116:2,10
92 118:21
92,000 118:22 119:7
96 12:18 89:23
97 12:18 124:17
98,000 116:3,9 117:7
995 40:8

**Exhibit C**

# In The Matter Of:

*Mortgage Elect. Reg. Sys., Inc.   v.*
*Patricia JoAnne McNerney, et al.*

---

*Patricia J. McNerney*
*August 22, 2006*

---

*Corsillo & Grandillo*
*Court Reporters*
*700 City Club Building*
*850 Euclid Avenue*
*Cleveland, OH  USA  44114*
*(216) 523-1700     FAX: (216) 523-1997*

*Original File DEPOOF~1.TXT, 112 Pages*
*Min-U-Script® File ID: 3408066738*

**Word Index included with this Min-U-Script®**

Mortgage Elect. Reg. Sys., Inc. v.
Patricia J. McNerney
Patricia J. McNerney
1:11-cv-02020-McNerney Doc. #280-3    Filed 10/23/15    Entered 10/23/15 16:32:18    Exhibit 3
August 22, 2006
part 1   Pg 175 of 300

Page 1

[1] The State of Ohio,                            )

[2] County of Cuyahoga.                      )

[3]    IN THE COURT OF COMMON PLEAS

[4] MORTGAGE ELECTRIC,                  )

   INC.,                                              )

[5]

        Plaintiff,                                 )

[6]

     -v-                                    ) Case Number

[7]                                            ) CV03514406

   PATRICIA JOANNE                     )

[8] MCNERNEY, ET AL.,                   )

[9]       Defendants. )

[10]  DEPOSITION OF PATRICIA JOANNE MCNERNEY

        Tuesday, August 22, 2006

[11]

   Deposition of PATRICIA JOANNE MCNERNEY, one

[12]

   of the Defendants, called by the Plaintiff

[13]

   for examination under the Ohio Rules of Civil

[14]

   Procedure, taken before me, Amanda Goldberg,

[15]

   Notary Public in and for the State of Ohio,

[16]

   pursuant to notice and agreement of counsel,

[17]

   at the offices of Calfee, Halter & Griswold,

[18]

   LLP, 1400 McDonald Investment Center, 800

[19]

   Superior Avenue, Cleveland, Ohio 44114,

[20]

   commencing at 1:00 p.m., the day and date

[21]

   above set forth.

[22]

        CORSILLO & GRANDILLO

[23]        COURT REPORTERS

      700 City Club Building

[24]    Cleveland, Ohio 44114

        216-523-1700

[25]

Page 2

[1] APPEARANCES:

[2]    On Behalf of the Plaintiff:

[3]      Zoe Carlisle, Esquire

         Laura C. McBride, Esquire

[4]      Calfee, Halter & Griswold, LLP

         1400 McDonald Investment Center

[5]      800 Superior Avenue

         Cleveland, Ohio 44114

[6]

      On Behalf of the Defendants:

[7]

         Susan M. Gray, Esquire

[8]      Executive Club Building

         21330 Center Ridge #11

[9]      Rocky River, Ohio 44116

[10]     James E. MacDonald, Esquire

         12 Southwest Avenue

[11]     Tallmadge, Ohio 44278

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 3

[1]                INDEX

[2]

[3] EXAMINATION:                    PAGE:

[4] BY MS. CARLISLE                    4

[5]

[6] EXHIBITS:                        PAGE:

[7] Exhibit 1           20

[8] Exhibit 2           26

[9] Exhibit 3           38

[10] Exhibit 4          42

[11] Exhibit 5          46

[12] Exhibit 6          48

[13] Exhibit 7          50

[14] Exhibit 8          52

[15] Exhibit 9          55

[16] Exhibit 10         60

[17] Exhibit 11         64

[18] Exhibit 12         66

[19] Exhibit 13         80

[20] Exhibit 14         87

[21] Exhibit 15         96

[22] Exhibit 16         98

[23] Exhibit 17         100

[24]

[25]

Patricia J. McNerney
August 22, 2006
12-12020-mg    Doc 9280-3    Filed 10/23/15    Entered 10/26/15... Exhibit 3 et al.
part 1    Pg 176 of 300

Mortgage Elect. Reg. Sys., Inc.    v.

Page 4

[1] **PATRICIA JOANNE MCNERNEY**
[2] one of the Defendants, called by the
[3] Plaintiff for examination under the
[4] Ohio Rules of Civil Procedure, after
[5] having been first duly sworn, as
[6] hereinafter certified, was examined and
[7] testified as follows:
[8]
[9] **EXAMINATION**
[10]
[11] **BY MS. CARLISLE:**
[12] **Q:** Hi, Ms. McNerney. I'm here to take
[13] your deposition today. I'm just going to
[14] ask you some questions. If there are any
[15] questions that I ask that you don't
[16] understand, please just tell me that you
[17] don't understand and I will try to
[18] rephrase.
[19]     And if you aren't sure about an
[20] answer and you don't know, you can just
[21] tell me that. I don't really want you to
[22] guess or speculate about things. Just
[23] tell me your personal knowledge on the
[24] questions that I ask you.
[25]     If you need to take a break, just

Page 5

[1] let me know, for water, lady's room,
[2] whatever.
[3] **A:** All right.
[4] **Q:** If you can please state your full
[5] name and address for the record, please?
[6] **A:** I'm Patricia Joanne McNerney. 1241
[7] Thoreau Road, Lakewood, Ohio 44057.
[8] **Q:** Are you on any medication that
[9] would affect your ability to testify?
[10] **A:** No.
[11] **Q:** Have you ever had your deposition
[12] taken before?
[13] **A:** No.
[14] **Q:** This is the first time?
[15] **A:** Yes.
[16] **Q:** What did you do today to prepare
[17] for your deposition or in advance of the
[18] deposition?
[19] **A:** I took my son to school and got
[20] ready to come down here.
[21] **Q:** So you didn't review any documents
[22] beforehand?
[23] **A:** No.
[24] **Q:** I just would like to learn a little
[25] bit about your background.

Page 6

[1] **Q:** Where did you graduate from high
[2] school?
[3] **A:** St. Joseph Academy.
[4] **Q:** Did you grow up in Cleveland?
[5] **A:** Lakewood.
[6] **Q:** Did you attend college?
[7] **A:** No.
[8] **Q:** Any other kinds of specialized
[9] training or degree?
[10] **A:** No.
[11] **Q:** Where are you employed now?
[12] **A:** Lakewood Library.
[13] **Q:** What do you do there?
[14] **A:** Assistant supervisor in the
[15] customer service department.
[16] **Q:** What are your daily activities like
[17] in that capacity?
[18] **A:** I go in and work usually 9:00 to
[19] 6:00, Monday through Wednesday. And my
[20] night work is on Thursday evening and
[21] that's when I'm usually in charge. I
[22] work on Friday's.
[23]     I take care of customers, or
[24] patrons as we refer to them. I check in
[25] and check out, order books, ordering

Page 7

[1] DVD's, that sort of thing.
[2] **Q:** How long have you worked at the
[3] library?
[4] **A:** It was six or seven years on the
[5] 11th.
[6] **Q:** Did you work prior to that?
[7] **A:** Before I had kids, yes.
[8] **Q:** What did you do at that point?
[9] **A:** I was an executive secretary for
[10] Coopers & Lybrand.
[11] **Q:** Have you ever been married?
[12] **A:** Yes.
[13] **Q:** Just once?
[14] **A:** Yes.
[15] **Q:** For how long?
[16] **A:** Twenty years.
[17] **Q:** You are not currently married, are
[18] you?
[19] **A:** No.
[20] **Q:** Is there anyone that you are
[21] involved with that is living with you at
[22] the house at 1241 Thoreau Road?
[23] **A:** No.
[24] **Q:** Have you ever been involved in a
[25] lawsuit prior to this litigation?

Mortgage Elect. Reg. Sys., Inc.  v.
Patricia J. McNerney

Patricia J. McNerney

10-11202-NGrnne-2280-3    Filed 10/23/15    Entered 10/23/15 16:32:18    Exhibit August 22, 2006
part 1    Pg 177 of 300

Page 8

[1]  **A:** Other than my divorce, no.

[2]  **Q:** So no previous foreclosures?

[3]  **A:** Nope.

[4]  **Q:** What was the first home that you
[5] purchased?

[6]  **A:** This has been the only home that we
[7] purchased.

[8]  **Q:** When did you buy the house?

[9]  **A:** My ex and I bought it off of his
[10] great uncle in July of '81.

[11]  **Q:** Was that after you two were
[12] married?

[13]  **A:** We were married August 1st.

[14]  **Q:** Was the — I'm sorry. The house we
[15] are referring to right now is the house
[16] at 1241 Thoreau Road, correct?

[17]  **A:** Uh-huh.

[18]  **Q:** When you and your former husband
[19] purchased the house was the title in both
[20] of your names at that point?

[21]  **A:** Yes.

[22]  **Q:** So you bought the house from your
[23] ex-husband's great uncle?

[24]  **A:** Yes.

[25]  **Q:** Did you finance the purchase of

Page 9

[1] that house from him?

[2]  **A:** We did a quit claim deed and we had
[3] to pay his estate — or actually, my ex's
[4] aunt.

[5]  **Q:** Did you ever take any financing out
[6] on the house at that point?

[7]  **A:** No.

[8]  **Q:** When did you enter into the
[9] mortgage with Household Finance
[10] Corporation? Do you know approximately,
[11] if you are not sure exactly?

[12]  **A:** I'm not really sure, no.

[13]  **Q:** You did enter into a mortgage with
[14] Household?

[15]  **A:** When we were married, yes.

[16]  **Q:** Do you remember generally the terms
[17] of that mortgage?

[18]  **A:** Off the top of my head, no.

[19]  **Q:** But the mortgage was entered into
[20] to secure your interest in the house at
[21] 1241 Thoreau Road?

[22]  **A:** Yes.

[3]  **Q:** Were both your name and your
[24] ex-husband's name on the mortgage?

[25]  **A:** Yes.

Page 10

[1]  **Q:** Do you remember approximately how
[2] much your monthly payments were for that
[3] first mortgage?

[4]  **A:** I'm guessing it was about a
[5] thousand.

[6]  **Q:** A month?

[7]  **A:** Uh-huh.

[8]  **Q:** Do you know generally what went
[9] into that monthly mortgage payment? What
[10] costs were included?

[11]  **A:** I know that we had to keep paying
[12] on our property taxes, if that's what
[13] you're after.

[14]  **Q:** But you understood that there was a
[15] note for the loan and then a mortgage
[16] that secured it?

[17]  **A:** Yes.

[18]  **Q:** Did you or your ex-husband make
[19] every monthly payment on that first
[20] mortgage?

[21]  **A:** We did until he left.

[22]  **Q:** Then did you take over the
[23] responsibility of paying that mortgage?

[24]  **A:** It was included in my — whatever
[25] he would give me monthly. His allotment

Page 11

[1] would take care of the mortgage.

[2]  **Q:** Alimony payments?

[3]  **A:** It wasn't at the time.

[4]  **Q:** But you were receiving money from
[5] him to help out with the cost of the
[6] house?

[7]  **A:** Right.

[8]  **Q:** Taking care of your children, I
[9] presume?

[10]  **A:** Uh-huh.

[11]  **Q:** I'm sorry. I meant to ask, how
[12] many children do you have?

[13]  **A:** I have three. Katie is twenty-
[14] two. Mike is twenty-one. And Jeffrey is
[15] fifteen.

[16]  **Q:** The youngest is still living with
[17] you?

[18]  **A:** Yes.

[19]  **Q:** How about the older two?

[20]  **A:** The older one just graduated from
[21] college, so, yes, she is still living
[22] with me.

[23]  **Q:** Congratulations.

[24]  **A:** My son is also still living with
[25] me. I don't know how much longer, but

Patricia J. McNerney      Mortgage Elect. Reg. Sys., Inc.   v.
August 22, 2006    12-12020-mg    Doc 9280-3    Filed 10/23/15    Entered 10/23/15 16:32:14   Exhibit 3, et al.
part 1    Pg 178 of 300

Page 12

[1] he's still living with me.

[2] **Q:** As part of your divorce settlement,
[3] I assume that you and your ex-husband had
[4] to discuss how the house would be taken
[5] care of, correct?

[6] **A:** He gave me the house. There wasn't
[7] much discussion.

[8] **Q:** So after your divorce was
[9] finalized, you kept the house at 1241
[10] Thoreau?

[11] **A:** Yes.

[12] **Q:** Was that the point when you decided
[13] to seek refinancing of your first
[14] mortgage?

[15] **A:** Yes.

[16] **Q:** Do you know about approximately
[17] when that was? What the date, you know,
[18] the year?

[19] **A:** November — no. It was October
[20] of — I'm getting confused. I'm thinking
[21] November of 2001.

[22] **Q:** Generally, what were you hoping for
[23] in refinancing your mortgage?

[24] **A:** Lower monthly payments and
[25] something that would include my property

Page 13

[1] taxes.

[2] **MR. MACDONALD:** If I
[3] could take a minute. Was that
[4] also pursuant to the divorce
[5] decree?

[6] **A:** Yes. It was pursuant to the
[7] divorce. I had to get his name off any
[8] financial liability.

[9] **Q:** So you were required by your —

[10] **A:** The divorce decree, yes.

[11] **Q:** So his name — your ex-husband's
[12] name is no longer on the title of the
[13] house or on any of these documents?

[14] **A:** No.

[15] **Q:** Part of your refinancing was to
[16] include property taxes in the monthly
[17] payment, so you knew that would be on top
[18] of any mortgage payment that you would
[19] have to make?

[20] **A:** Yes.

[21] **Q:** Do you remember how many banks,
[22] mortgage companies you talked to about
[23] refinancing?

[24] **A:** I talked to one bank and then I
[25] called OMC Lending.

Page 14

[1] **Q:** Do you remember which bank that
[2] was?

[3] **A:** First Federal of Lakewood.

[4] **Q:** What did they tell you?

[5] **A:** They told me that they could
[6] probably help me out, but I would have to
[7] do some letter writing because of my ex's
[8] credit rating and starting out on my own.

[9] **Q:** That you would have to write
[10] letters to lenders or the credit agency?

[11] **A:** To the board of whoever approved
[12] mortgages.

[13] **Q:** Why did you decide not to do that?

[14] **A:** Because I went into it going to
[15] other people, and OMC Lending told me
[16] that I should have it refinanced by
[17] Thanksgiving of that year.

[18] **Q:** So you felt that the process would
[19] go faster if you went that route instead
[20] of refinancing through the First Federal
[21] Lakewood Bank?

[22] **A:** Yes.

[23] **Q:** That is the only bank that you
[24] spoke to?

[25] **A:** Yes.

Page 15

[1] **Q:** Did you speak to any other mortgage
[2] brokers other than OMC Lending?

[3] **A:** No.

[4] **Q:** When you went to OMC Lending it was
[5] the fall of 2002? Is that about the
[6] right timing approximately?

[7] **A:** It is 2002?

[8] I'm not really sure anymore.

[9] **MS. GRAY:** I thought you
[10] said 2001?

[11] How about if she looks at
[12] her papers and refreshes her
[13] memory?

[14] **MR. CARLISLE:** Sure. She
[15] can refresh her recollection.

[16] **A:** I'm thinking it's 2002, yes. So I
[17] called them in October of 2002 and they
[18] told me I should be refinanced and ready
[19] to go by Thanksgiving.

[20] **Q:** Do you remember who you spoke to at
[21] that time?

[22] **A:** I believe her name was Sharon
[23] Davis.

[24] **Q:** She was the loan officer that you
[25] worked with at OMC Lending?

12-12020-mg Doc 9280-3 Filed 10/23/15 Entered 10/23/15 16:32:18 Exhibit
part 1 Pg 179 of 300

Page 16

[1] **A:** Correct.

[2] **Q:** How many times did you speak to
[3] Ms. Davis?

[4] **A:** I don't know.

[5] **Q:** Do you know if it was more than
[6] three, five times?

[7] **A:** Yes.

[8] **Q:** So quite a few times?

[9] **A:** Yes.

[10] **Q:** What was the substance of these
[11] conversations?

[12] **A:** I had to bring out some paperwork.
[13] I had to schedule an appraisal. And the
[14] appraisal didn't go through or something,
[15] and we had to schedule another appraisal.

[16] **Q:** So she obtained financial
[17] information about you?

[18] **A:** Oh, yes.

[19] **Q:** Did she ask you about your first —
[20] the mortgage that existed on your house
[21] at the time?

[22] **A:** I don't recall. I mean, I gave her
[23] all my paperwork.

[24] **Q:** Do you remember generally what kind
[25] of paperwork? Was it your mortgage

Page 17

[1] promissory note included in that
[2] paperwork?

[3] **A:** Yes.

[4] **Q:** And any credit card debt?

[5] **A:** Yes.

[6] **Q:** So you gave documentation on all
[7] your relevant financial information?

[8] **A:** Whatever she asked me for.

[9] **Q:** Were there any issues raised at
[10] that point with OMC Lending about your
[11] ex-husband's bad credit or any of the
[12] issues that the bank raised with you?

[13] **A:** No.

[14] **Q:** Did they ask you about the divorce
[15] settlement?

[16] **A:** Yes.

[17] **Q:** So, OMC Lending knew that you had
[18] to get your ex-husband's name off the
[19] title?

[20] **A:** Yes.

[21] **Q:** That was one of the reasons why you
[22] were refinancing?

[3] **A:** Yes.

[24] **Q:** Any other information that you can
[25] remember that you and Ms. Davis or anyone

Page 18

[1] else at OMC Lending talked about when you
[2] were initially seeking the refinance?

[3] **A:** She did ask for a copy of my
[4] divorce decree, so I did show her that.
[5] She asked for alimony payments, child
[6] support payments.

[7] **Q:** Did you ask Ms. Davis any questions
[8] along the way about the process or —

[9] **A:** I did. The normal questions.

[10] **Q:** Like what?

[11] **A:** Well, basically, what my payment
[12] was going to be and how long it was going
[13] to take.

[14] **Q:** What did she represent to you about
[15] your payment?

[16] **A:** About 850, which was along the same
[17] lines as First Federal so —

[18] **Q:** Did that 850 estimate include
[19] property taxes or any property insurance
[20] cost or would that just be pure —

[21] **A:** She told me that's how much it
[22] would be a month.

[23] **Q:** Total?

[24] **A:** Yes.

[25] **Q:** Do you remember how much money was

Page 19

[1] left on your first mortgage when you
[2] refinanced?

[3] **A:** No, I don't.

[4] **Q:** You understood that the new loan
[5] that you received would payoff whatever
[6] you had — or whatever debt still existed
[7] on that first mortgage?

[8] **A:** Yes.

[9] **Q:** And you are not sure?

[10] **A:** I would say that I'm not really
[11] sure, no.

[12] **Q:** This is also something that you
[13] told OMC Lending in those initial
[14] conversations, how much you owed the
[15] previous mortgage?

[16] **A:** Yes.

[17] **Q:** Did you speak with anyone at
[18] Brooklyn Title at that point in time or
[19] was your contact soley with OMC Lending?

[20] **A:** Solely with OMC Lending.

[21] **Q:** At what point did you learn who
[22] your actual lender would be who was
[23] actually going to disburse the funds for
[24] your loan?

[25] **A:** I think it was — I believe it was

Patricia J. McNerney    Mortgage Elect. Reg. Sys., Inc.   v.

August 22, 2006   12-12020-mg   Doc 9280-3   Filed 10/23/15   Entered 10/23/15 16:33:18   McNerney, et al.

part 1   Pg 180 of 300

**Page 20**

[1] when I went in there.

[2]    **Q:** So pretty much right away they told
[3] you it was going to be Homecomings?

[4]    **A:** I was under the assumption it was
[5] GMAC.

[6]    **Q:** Right. Excuse me. GMAC is now the
[7] servicer of the loan.

[8]     Initially, the entity that the
[9] money was coming from was Homecomings
[10] Financial Network, did you know that?

[11]    **A:** I'm not —

[12]    **Q:** We're going to go through the
[13] promissory note and mortgage, but they're
[14] listed on there.

[15]     So the person — the entity that
[16] you thought you were dealing with was
[17] GMAC at that time?

[18]    **A:** Yes.

[19]

[20]     (Plaintiff's Exhibit 1 marked for
[21] identification.)

[22]

[23]    **Q:** Could you please identify what has
[24] been marked as Plaintiff's Exhibit 1?

[25]    **A:** It looks like a note.

**Page 21**

[1]    **Q:** Is this the promissory note that
[2] you signed for the loan of one $108,000?

[3]    **MR. MACDONALD:** Can you
[4] clarify that this is a copy of
[5] the note, not the original?

[6]    **Q:** Plaintiff's Exhibit 1 is a copy of
[7] the promissory note. It's not the
[8] original promissory note that was
[9] signed.

[10]    **A:** It looks like it.

[11]    **Q:** Is that your signature on page
[12] three?

[13]    **A:** Yes.

[14]    **Q:** Are those your initials at the
[15] bottom of page one and page two, PJM?

[16]    **A:** Yes.

[17]    **Q:** Now, given your previous mortgage,
[18] this is not the first promissory note you
[19] ever signed, correct?

[20]    **A:** Correct.

[21]    **Q:** When did you sign this promissory
[22] note?

[23]    **A:** When I went out there with my
[24] money.

[25]    **Q:** So you signed it at the closing of

**Page 22**

[1] this loan?

[2]    **A:** I believe so, yes.

[3]    **Q:** Could you tell me generally what
[4] you understand this document to mean,
[5] just in a general sense?

[6]    **A:** That I borrowed $108,000 to payoff
[7] my mortgage, which had my ex-husband on
[8] it and agreed to pay it.

[9]    **Q:** So you recognize that by virtue of
[10] that document you promised to pay back
[11] $108,000 that was loaned to you?

[12]    **A:** Uh-huh.

[13]    **Q:** If you could make sure you
[14] verbalize your responses?

[15]    **A:** Oh, yes.

[16]    **Q:** Do you recognize that the lender
[17] has identified the note? If you read in
[18] the first sentence, "Borrower has
[19] promised to pay. In return for what I
[20] have received, I promise to pay —", so
[21] the lender is Homecomings Financial
[22] Network?

[23]    **A:** Yes.

[24]    **Q:** In paragraph two the interest rate
[25] is listed. Is that the same interest

**Page 23**

[1] rate that you understood from OMC Lending
[2] that you would have on this refinancing?

[3]    **A:** Yes.

[4]    **Q:** Eight percent.

[5] Could you please read paragraph six
[6] entitled "Borrowers Failing To Pay As
[7] Required"?

[8]    **A:** Okay.

[9]    **Q:** Do you understand that paragraph?

[10]    **A:** Yes.

[11]    **Q:** In 6A, the note indicates that you
[12] would assess late fees if you do not make
[13] your monthly payments timely; is that
[14] correct?

[15]    **A:** Correct.

[16]    **Q:** Did you understand this at the time
[17] you signed the note?

[18]    **A:** Yes.

[19]    **Q:** In 6B, the note indicates that if
[20] you do not make your full monthly
[21] payment, you would be considered in
[22] default; is that correct?

[23]    **A:** Yes.

[24]    **Q:** Did you understand that at the time
[25] you signed the note?

Mortgage Elect. Reg. Sys., Inc. v.
Patricia J. McNerney

Patricia J. McNerney

13-ap-1120 McNerney Doc 230-3    Filed 10/23/15    Entered 10/23/15 16:32:18    Exhibit August 22, 2006
part 1    Pg 181 of 300

Page 24

[1] **A:** Yes.

[2] **Q:** In 6C, the note indicates that
[3] after you have been notified of your
[4] default, the note holder may require you
[5] to pay the full amount, which has not yet
[6] been paid and all the interest; is that
[7] correct?

[8] **A:** Yes.

[9] **Q:** Did you understand that when you
[10] signed that note?

[11] **A:** I'm sure I read it.

[12] **Q:** In 6E, the note also indicates that
[13] the lender, Homecomings, would have the
[14] right to seek its costs and expenses in
[15] enforcing its right under the note,
[16] including reasonable attorney's fees; is
[17] that correct?

[18] **A:** Yes.

[19] **Q:** Did you understand that when you
[20] signed the note?

[21] **A:** Yes.

[22] **Q:** You were the only borrower on this
[23] note?

[24] **A:** Yes.

[25] **Q:** Did you intend to be the sole

Page 25

[1] borrower?

[2] **A:** Yes.

[3] **Q:** There is another signature on the
[4] signature page of the note, Karen
[5] Shefert. Was that person present when
[6] you signed the note do you remember?

[7] **A:** There was one person present.

[8] **Q:** Do you know —

[9] **A:** And I only did this at the title
[10] bureau.

[11] **Q:** That was a person that worked for
[12] Brooklyn Title Agency?

[13] **A:** Yes.

[14] **Q:** After you signed this note and the
[15] loan closed, do you remember when you
[16] made your first mortgage payment?

[17] **A:** I believe it was in January.

[18] **Q:** January of 2003?

[19] **A:** Yes.

[20] **Q:** When did you stop making the
[21] required monthly payments?

[22] **A:** Well my mother got sick, so May.

[3] **Q:** May of 2003?

[24] **A:** Yes.

[25] **Q:** What was wrong with your mother?

Page 26

[1] **A:** She was dying.

[2] **Q:** So you had to — was she in the
[3] hospital?

[4] **A:** I was her power of attorney.

[5] **Q:** I'm sorry to hear that.

[6]

[7]     (Plaintiff's Exhibit 2 marked for
[8] identification.)

[9]

[10]     **Q:** Handing you what has been marked as
[11] Plaintiff's Exhibit 2.

[12]     Could you identify that document
[13] for me?

[14] **A:** It's the mortgage.

[15] **Q:** This is the mortgage you signed in
[16] conjunction with the promissory note we
[17] just looked at for the same loan?

[18] **A:** Just looking for my signature.

[19] **Q:** Sure. Take your time.

[20] **A:** Yes.

[21] **Q:** That is your signature on page
[22] fourteen, fifteen and sixteen at the
[23] bottom?

[24] **A:** Yep.

[25] **Q:** Could you identify the names of the

Page 27

[1] witnesses on the same page?

[2] **A:** Theresa Dempsey and Betta; is that
[3] what her name is?

[4] **Q:** I know it's kind of a strange
[5] name. Yesterday, Ms. George said it was
[6] pronounced "Betta"

[7]     These people were with you when you
[8] signed the mortgage?

[9] **A:** I would have to say only the second
[10] one. I don't recall the first one being
[11] there.

[12] **Q:** Again, at the bottom of each page
[13] there's a person PJM, those are your
[14] initials?

[15] **A:** Yes.

[16] **Q:** Again, this is not the first
[17] mortgage you have ever signed, correct?

[18] **A:** Nope.

[19] **Q:** Did you sign this document the same
[20] time you signed the note at the closing?

[21] **A:** I would believe so.

[22] **Q:** Well, do you have anything that —
[23] is there anything in your memory that
[24] would indicate that you didn't sign these
[25] documents at the same time?

Patricia J. McNerney     Mortgage Elect. Reg. Sys., Inc. v.
August 22, 2006 12-12020-mg   Doc 9280-3   Filed 10/23/15   Entered 10/23/15 16:32:18  Exhibit, et al.
part 1   Pg 182 of 300

Page 28

[1] **A:** I was only out there once, so I
[2] would assume I signed them all at one
[3] time.
[4] **Q:** Again, could you tell me what you
[5] understand the significance of this
[6] document to be?
[7] **A:** The significance of it?
[8] **Q:** Do you understand why you sign a
[9] mortgage? What interest does it protect
[10] or secure? Do you understand?
[11] **A:** Yes, I do.
[12] Do you want me to explain it?
[13] **Q:** Please.
[14] **A:** I was refinancing my home and I
[15] needed to refinance as part of my divorce
[16] decree. So I took out a loan to have
[17] that happen.
[18] **Q:** Do you understand that mortgage is
[19] a security instrument that basically
[20] works in conjunction with your promissory
[21] note, which is your promise to pay back
[22] the loan?
[23] **A:** Yes.
[24] **Q:** And that the mortgage gives the
[25] lender a right to foreclose on your house

Page 29

[1] if you do not pay your monthly payments
[2] pursuant to your note?
[3] **A:** Yes.
[4] **Q:** The mortgage covered the entire
[5] property at 1241 Thoreau Road, correct?
[6] **A:** Correct.
[7] **Q:** That was your intention?
[8] **A:** Yes.
[9] **Q:** And you are listed as borrower for
[10] this loan?
[11] **A:** Yes.
[12] **Q:** And, if you look at definition C on
[13] the first page, MERS is listed as the —
[14] it's a long description if you read it.
[15] It says that MERS is the nominee of
[16] Homecomings and the nominee of the
[17] security instrument.
[18] **A:** Okay.
[19] **Q:** Is that what you understood when
[20] you signed the mortgage?
[21] **A:** No.
[22] **Q:** Could you tell me what you
[23] understood?
[24] **A:** That I was signing a mortgage
[25] probably with Homecomings Financial. I

Page 30

[1] didn't even notice MERS.
[2] **Q:** But this is the document, this is a
[3] true and accurate copy of what you signed
[4] at the date of closing, correct?
[5] **A:** Yes.
[6] **Q:** If you flip the page to paragraph
[7] E. It states the amount of the note being
[8] $108,000, correct?
[9] **A:** Yes.
[10] **Q:** That would reflect what was stated
[11] in the promissory note?
[12] **A:** Correct.
[13] **Q:** On page three, could you please
[14] read the second paragraph that begins
[15] with "The security instrument", and,
[16] again, you can let me know when you are
[17] finished reading.
[18] Do you see what I'm referring to?
[19] **A:** Yes. Okay.
[20] **Q:** Do you understand what this means?
[21] **A:** No.
[22] This down here?
[23] **Q:** No. I'm sorry. Up here. Under
[24] "Transfer of rights of the property.
[25] This is security instrument that secures

Page 31

[1] the lender."
[2] Could you basically tell me what
[3] you understand from that paragraph?
[4] **A:** That I was supposed to repay the
[5] loan.
[6] **Q:** What would happen if you did not
[7] repay the loan?
[8] **A:** That I would be in default.
[9] **Q:** And by signing the mortgage, by
[10] both initialing at the bottom of the page
[11] and signing at the end, you understood
[12] you were granting an interest in the
[13] property to secure the payment on the
[14] note, correct?
[15] **MS. GRAY:** Objection.
[16] Asked and answered.
[17] **A:** I'm sorry. What was the question?
[18] **Q:** You understood by signing at the
[19] bottom of this page and at the end of
[20] mortgage, you were securing the interest
[21] in the lender to secure your repayment on
[22] the note?
[23] **A:** Yes.
[24] **MR. MACDONALD:** My copy
[25] doesn't have a legal description

Mortgage Elect. Reg. Sys., Inc.  v.
Patricia J. McNerney

Patricia J. McNerney
August 22, 2006

18-A1-20-20-McNerney-Doc-02B0-3    Filed 10/23/15   Entered 10/23/15 16:32:18    Exhibit
part 1   Pg 183 of 300

**Page 32**

[1] attached to it.

[2]   Did the original?

[3]   **MR. CARLISLE:** Actually,

[4] in our complaint, we are seeking

[5] a reformation of the —

[6]   **MS. GRAY:** I show on page

[7] four.

[8]   **MR. MACDONALD:** Thanks.

[9] Sorry. I thought it would be

[10] attached.

[11]   **Q:** Actually, if you could turn,

[12] because that's what we are going to look

[13] at next.

[14]   Exhibit A, is that the correct

[15] address of your residence?

[16]   **A:** Am I missing it?

[17]   **MS. GRAY:** No, you are

[18] looking at it.

[19]   **A:** Yes.

[20]   **Q:** Turn to the next page.

[21] Again, if you could please read the

[22] first sentence of paragraph one and tell

[23] me when you are finished, please?

[24]   **A:** Okay.

[25]   **Q:** So, again, this paragraph is

**Page 33**

[1] further evidence of your promise to repay

[2] the note?

[3]   **MS. GRAY:** Objection.

[4] The document speaks for itself.

[5] I think you are trying to get a

[6] legal conclusion from the

[7] witness. It says what it says.

[8]   **MR. CARLISLE:** Thank you

[9] for the objection, but no

[10] speaking objections. Thank you.

[11]   **A:** I'm sorry, what am I supposed to

[12] answer now? Do I understand this

[13] paragraph?

[14]   **Q:** Yes.

[15]   Did you understand it at the time

[16] you signed the mortgage?

[17]   **A:** Yes.

[18]   **Q:** If you turn to the next page and if

[19] you would look down at paragraph four.

[20] Please read the first two sentences after

[21] paragraph four.

[22]   **A:** Okay.

[3]   **Q:** Could you tell me generally what

[24] paragraph four is about?

[25]   **A:** No.

**Page 34**

[1]   **Q:** Is it about paying the property

[2] taxes, assessment charges, fines,

[3] imposition attributable to the property?

[4]   **MS. GRAY:** Again, same

[5] objection.

[6]   **A:** I don't see property taxes on

[7] there.

[8]   **Q:** Did you understand that as part of

[9] your monthly mortgage payment you would

[10] be required to pay an amount that would

[11] go towards property taxes?

[12]   **A:** I was told it would be in my

[13] payment.

[14]   **Q:** That that was going to be part of

[15] your monthly payment?

[16]   **A:** Right.

[17]   **Q:** And that your obligation to pay

[18] that is part of the mortgage?

[19]   **A:** Yes.

[20]   **Q:** Did you understand the same thing

[21] for property insurance?

[22]   **A:** No.

[23]   **Q:** You did not believe that you were

[24] obligated to pay property insurance?

[25]   **MS. GRAY:** Objection.

**Page 35**

[1] Leading.

[2]   **MR. CARLISLE:** I'm

[3] allowed to lead, it's cross-

[4] examination.

[5]   **A:** I did not know about property —

[6] that I had to pay property insurance,

[7] like Allstate or something like that?

[8]   **Q:** Whatever your understanding was.

[9]   **A:** Yes, I was to keep up the property

[10] insurance, yes.

[11]   **Q:** And you had property insurance at

[12] the time?

[13]   **A:** Yes, I did.

[14]   **Q:** Have you kept up the property

[15] insurance?

[16]   **A:** No.

[17]   **Q:** Did you understand that under the

[18] mortgage, if you did not continue to pay

[19] for property insurance the lender would?

[20]   **A:** But they have been paying for it,

[21] right?

[22]   **MS. GRAY:** You just need

[23] to say if you do understand it or

[24] if you didn't.

[25]   **A:** Yes, I did understand that.

Patricia J. McNerney     Mortgage Elect. Reg. Sys., Inc.   v.

August 22, 2006   12-12020-mg    Doc 9280-3    Filed 10/23/15    Entered 10/23/15 16:13:21   Exhibit 3 et al.

part 1    Pg 184 of 300

**Page 36**

[1]   **Q:** So whether the payment is coming
[2] from you or the payment is coming from
[3] the lender, someone had to pay for
[4] property insurance?
[5]   **A:** Yes.
[6]   **Q:** If you look at paragraph number
[7] five on the next page. That paragraph is
[8] talking about property insurance and the
[9] obligations we just discussed?
[10]   **MS. GRAY:** Same
[11] objection. The document speaks
[12] for itself.
[13]   **A:** Paragraph five you said?
[14]   **Q:** Yes, on page six.
[15]   **A:** Okay.
[16]   **Q:** Do you agree that the paragraph
[17] requires that someone pay for property
[18] insurance whether that be you or the
[19] lender?
[20]   **MR. MACDONALD:** Oject.
[21]   **MS. MCBRIDE:** If we have
[22] objections coming from only one
[23] of us, it might be easier for
[24] Zoe and for the record.
[25]   **MS. GRAY:** Well, again,

**Page 37**

[1] she can only testify to her
[2] understanding. How you
[3] characterize it is how you
[4] characterize, so the document
[5] speaks for itself. It is an
[6] ongoing objection.
[7]   **A:** What is the question?
[8]   **Q:** Basically, I was just asking
[9] whether paragraph five is the paragraph
[10] in the mortgage which speaks to property
[11] insurance?
[12]   **A:** Yes.
[13]   **Q:** If you could turn to page ten of
[14] the mortgage. Please read the first
[15] sentence under paragraph fourteen, which
[16] begins with "loan charges".
[17]   **A:** Okay.
[18]   **Q:** Do you understand what this
[19] paragraph fourteen is referencing?
[20]   **A:** No.
[21]   **Q:** Would you like more time to review
[22] it?
[23]   **A:** Okay.
[24]   **Q:** Could you tell me what you believe
[25] that sentence is in relation to?

**Page 38**

[1]   **A:** That if I'm in default, I could
[2] have more charges put against me
[3] financially.
[4]   **Q:** Including cost of attorney's fees,
[5] property inspection and evaluation fees?
[6]   **A:** Yes.
[7]
[8]    (Plaintiff's Exhibit 3 marked for
[9] identification.)
[10]
[11]   **Q:** This is another document that you
[12] received at the closing of your loan,
[13] correct?
[14]   **A:** Yes.
[15]   **Q:** It is entitled, "Notice Concerning
[16] Private Mortgage Insurance."
[17]    Do you know what private mortgage
[18] insurance is?
[19]   **MS. GRAY:** Have you seen
[20] this before?
[21]   **MR. CARLISLE:** It was
[22] produced to you.
[23]   **MS. GRAY:** I'm just
[24] asking if she has seen this
[25] before. I'm not trying to

**Page 39**

[1] interfere.
[2]   **Q:** That is your signature at the
[3] bottom of the page; correct?
[4]   **A:** Yes.
[5]   **MS. GRAY:** Do you see
[6] that?
[7]   **MR. CARLISLE:** What is
[8] the issue?
[9]   **MS. GRAY:** Was it
[10] produced to her at closing.
[11]   **MR. CARLISLE:** She
[12] responded, so we can go on.
[13]   **Q:** Are you disputing the fact that you
[14] received this at closing?
[15]   **MS. GRAY:** Well, I mean,
[16] if you did, you did and if you
[17] didn't, you didn't. I would say
[18] look and see.
[19]   **MS. CARLISLE:** Could we
[20] state for the record what
[21] Ms. McNerney is looking at? What
[22] file have you brought with you?
[23]   **A:** This is the closing paper that
[24] Brooklyn Title gave me.
[25]   **Q:** It is the copy you kept from

Mortgage Elect. Reg. Sys., Inc. v.
Patricia J. McNerney

Patricia J. McNerney
August 22, 2006

13-10029-hcm Doc#280-3   Filed 10/23/15   Entered 10/23/15 16:32:18   Exhibit part 1   Pg 185 of 300

[1] documents that were given to you at
[2] closing, correct?
[3]   **A:** Yes.
[4]   **Q:** So it's your copy of the documents
[5] that were given to you at closing?
[6]   **A:** Yes.
[7]   **Q:** It's not necessarily every document
[8] you got at closing, is it?
[9]   **MS. GRAY:** Is it every
[10] document you got at closing?
[11]   **A:** Yes.
[12]   **MS. GRAY:** So see if that
[13] document is in there.
[14]   **MR. CARLISLE:** She didn't
[15] dispute the fact she received
[16] this document at closing.
[17]   **A:** There it is.
[18]   **Q:** So did you receive it at closing?
[19]   **A:** Yes.
[20]   **Q:** That is your signature at the
[21] bottom of the page?
[22]   **A:** Yes.
[23]   **Q:** Did you understand that the type of
[24] loan you received required you to obtain
[25] and pay for private mortgage insurance?

[1]   **A:** Not until I got there.
[2]   **Q:** But you received this at closing?
[3]   **A:** Yes, after I brought the $8,000
[4] then, they told me then that my payment
[5] was not going to 791 or 850, it would be
[6] whatever that is.
[7]   **Q:** Could you please close the file?
[8] I'm sorry, but you don't need to be
[9] reviewing anything. If you need to use
[10] that to refresh your recollection that's
[11] fine, but —
[12]   **A:** No.
[13]   **Q:** When you were presented with this,
[14] did you ask what private mortgage
[15] insurance was? What was explained to
[16] you?
[17]   **A:** They even called the mortgage
[18] company for me.
[19]   **Q:** What information did you get about
[20] it?
[21]   **A:** That I needed to have it.
[22]   **Q:** So what did you ask?
[1]   **A:** Well, I had to do it because I had
[24] my check and everything else. I didn't
[25] find out about it until I showed up there

[1] to sign the papers and I had the $8,000
[2] check for them.
[3]   **Q:** You decided to go forward with the
[4] loan at that point?
[5]   **A:** Well, I guess I had to.
[6]   **MS. GRAY:** Just "yes" or
[7] "no" is fine.
[8]   **A:** Yes.
[9]
[10]   (Plaintiff's Exhibit 4 marked for
[11] identification.)
[12]
[13]   **Q:** Are you checking to see if you have
[14] a copy in your file?
[15]   **A:** Yes, I am.
[16]   **Q:** Do you have a reason to dispute
[17] that this document is not an accurate
[18] copy?
[19]   **A:** No, it's right there.
[20]   **Q:** So you received this document at
[21] closing as well?
[22]   **A:** Yes.
[23]   **Q:** Could you tell me generally what
[24] this document lays out? First of all,
[25] what is the document's title, please?

[1]   **A:** First Payment Notice. It lays out
[2] how much my monthly payment was going to
[3] be.
[4]   **Q:** Could you please state what the
[5] total monthly payment was going to be?
[6]   **A:** $1,232.48
[7]   **Q:** And that includes a break down of
[8] principle interest, property tax
[9] insurance and the mortgage insurance,
[10] correct?
[11]   **A:** Yes.
[12]   **Q:** You received this document at
[13] closing in conjunction with the mortgage
[14] and promissory note, the other documents
[15] we have looked at thus far?
[16]   **A:** Yes.
[17]   **Q:** You understood that your monthly
[18] payment was going to be $1,232.48?
[19]   **A:** Yes.
[20]   **Q:** Did you object at that time?
[21]   **A:** Yes.
[22]   **Q:** What did you say?
[23]   **A:** That I was — I thought they were
[24] all going to be $850.
[25]   **Q:** What was the response?

Patricia J. McNerney        Mortgage Elect. Reg. Sys., Inc.   v.

August 22, 2004   12-12020-mg    Doc 9280-3    Filed 10/23/15    Entered 10/23/15 16:32:01   McNerney, et al.

part 1   Pg 186 of 300

Page 44

[1]   **A:** They called the — the title agency
[2] called the mortgage company and talked to
[3] Sharon.
[4]   **Q:** What was the substance of that
[5] conversation?
[6]   **A:** Sharon was a little surprised that
[7] it was that high. It was on speaker
[8] phone.
[9]   **Q:** Could you tell me, was there any
[10] resolution at the end of that
[11] conversation?
[12]   **A:** Resolution?
[13]   **Q:** Was there any discussion about the
[14] monthly payment being any different from
[15] what it is expressed as here in the first
[16] payment notice?
[17]   **A:** I don't recall.
[18]   **Q:** Did anyone tell you that they were
[19] going to change the monthly payment?
[20]   **A:** No.
[21]   **Q:** You understood when you were done
[22] with that conversation that this was
[23] going to be your monthly payment.
[24]   **A:** Yes.
[25]   **Q:** And you signed the notice with that

Page 45

[1] knowledge?
[2]   **A:** Yes.
[3]   **Q:** Now, we spoke earlier a little bit
[4] about when the last time was you made a
[5] monthly payment pursuant to the
[6] mortgage.
[7]   And I understand that you had to
[8] take care of your mother, but we need to
[9] talk about the last time you paid your
[10] mortgage.
[11]   Do you remember exactly when? If I
[12] told you your last payment was June of
[13] 2003, would you believe that that was
[14] correct?
[15]   **A:** Yes.
[16]   **Q:** Have you been living at the house
[17] at 1241 Thoreau Road the entire time?
[18]   **A:** Yes.
[19]   **Q:** You have lived there since June
[20] 2003?
[21]   **A:** Yes.
[22]   **Q:** The amount that you would have been
[23] paying towards your mortgage in that
[24] time, have you been saving it in any way?
[25]   **A:** No.

Page 46

[1]   **Q:** Have you been making any payments
[2] of any kind to GMAC pursuant to your
[3] mortgage?
[4]   **A:** No.
[5]   **Q:** Or Homecomings?
[6]   **A:** No.
[7]   **Q:** You understand that because of this
[8] nonpayment you are considered in default
[9] of your obligation under the promissory
[10] note of the mortgage?
[11]   **A:** Yes.
[12]   **MS. CARLISLE:** I'm going
[13] to mark Plaintiff's Exhibit 5.
[14]
[15]   (Plaintiff's Exhibit 5 marked for
[16] identification.)
[17]
[18]   **MS. CARLISLE:** Do you
[19] want to take a break? Is this a
[20] good time for a break?
[21]   **MS. GRAY:** Sure.
[22] (Discussion held off the record.)
[23]
[24]   **Q:** Handing you what had been marked as
[25] Plaintiff's Exhibit 5. This is a letter

Page 47

[1] that was sent to you from Homecomings
[2] Financial, correct?
[3]   **A:** I don't know if it was sent to me.
[4]   **Q:** Is that your name at the top of the
[5] letter?
[6]   **A:** I'm sorry?
[7]   **Q:** Did you receive the letter in some
[8] way at closing or in the mail?
[9]   **A:** Yes.
[10]   **Q:** Basically, this letter was sent to
[11] you, so you would know that the servicing
[12] of your loan was transferred to GMAC
[13] Mortgage Corporation; is that correct?
[14]   **A:** Yes.
[15]   **Q:** So you understood that your
[16] mortgage payments would have to be sent
[17] to GMAC?
[18]   **A:** Yes.
[19]   **Q:** The payment that you did send in
[20] from January 2003 through June 2003, were
[21] sent to GMAC?
[22]   **A:** Yes.
[23]   **Q:** Did this letter confuse you in any
[24] way or did you understand the assignment
[25] that was happening?

Mortgage Elect. Reg. Sys., Inc. v.
Patricia J. McNerney

Patricia J. McNerney

13-12020-mg Doc 9280-3 Filed 10/23/15 Entered 10/23/15 16:32:18 Exhibit
part 1 Pg 187 of 300

August 22, 2006

Page 48

[1] **A:** I understood I had to send it to
[2] GMAC.
[3] **Q:** We were talking about the mortgage
[4] earlier and we discussed the obligation
[5] under the mortgage. And that if you were
[6] in default, GMAC or Homecomings had to
[7] let you know and give you notice of that
[8] default.
[9]     Do you recall that?
[10] **A:** We discussed that, is that what you
[11] said?
[12] **Q:** I'm sorry, that was too long of a
[13] question.
[14]     Did you understand that pursuant to
[15] the mortgage you would receive notice of
[16] that default?
[17] **A:** Yes.
[18]
[19]     (Plaintiff's Exhibit 6 marked for
[20] identification.)
[21]
[22] **Q:** Handing you what has been marked as
[23] Plaintiff's Exhibit 6. I apologize for
[24] the fact that the copy is sideways.
[25] Unfortunately, this is the way the

Page 49

[1] computer generated it at GMAC.
[2]     This is a letter that was sent to
[3] you April 11, 2003, indicating that your
[4] account was due for March 1, 2003.
[5]     Do you recall receiving this
[6] letter?
[7] **A:** No.
[8] **Q:** Did you not receive a copy of this
[9] letter in the mail?
[10] **A:** I don't recall receiving this copy.
[11] **Q:** Do you remember if your payment in
[12] March of 2003 was late in any way?
[13] **A:** I do remember making a payment of
[14] that amount.
[15] **Q:** In March of 2003?
[16] **A:** I don't know when.
[17] **Q:** So you dispute the fact that you
[18] received this letter?
[19] **A:** I'm sorry?
[20] **Q:** Do you dispute whether you received
[21] this letter or not?
[22] **A:** I don't recall receiving this
[23] letter.
[24] **Q:** But is it possible that you
[25] received it?

Page 50

[1] **A:** I don't recall receiving this
[2] letter.
[3] **Q:** If you got notice that your payment
[4] was late or that you were in default,
[5] what did you do in response?
[6] **A:** I'm sorry, where were we?
[7] **Q:** Basically, I was asking whether
[8] after you received this letter of a late
[9] payment or default, what steps would you
[10] take to remedy that?
[11] **A:** I do recall talking to someone and
[12] making this payment?
[13] **Q:** So you did call in regards to a
[14] late payment some time in March of 2003
[15] or in the spring of 2003?
[16] **A:** Sometime, yes.
[17] **Q:** But you remedied that nonpayment?
[18] **A:** Yes.
[19]
[20]     (Plaintiff's Exhibit 7 marked for
[21] identification.)
[22]
[23] **Q:** Handing you what has been marked as
[24] Plaintiff's Exhibit 7.
[25]     Could you identify that document

Page 51

[1] please for the court?
[2] **A:** It is a letter dated July 14, 2003.
[3] **Q:** Who is it addressed to?
[4] **A:** Patricia McNerney.
[5] **Q:** Who is the letter from?
[6] **A:** Collection department mortgage loan
[7] services.
[8] **Q:** Do you recall receiving this
[9] letter?
[10] **A:** I do not recall receiving it.
[11] **Q:** Do you dispute that it was sent to
[12] you?
[13] **A:** I don't.
[14] **Q:** Do you have any reason to believe
[15] that it wasn't sent to you?
[16] **A:** I don't know.
[17] **Q:** This letter indicates that your
[18] account was due for June 1, 2003, meaning
[19] that you hadn't made your June payment.
[20]     Do you recall that?
[21] **A:** I don't know. At the time there
[22] was so much going on in my personal
[23] life. I don't recall.
[24] **Q:** It is possible that you received
[25] this letter and you just don't recollect

Patricia J. McNerney            Mortgage Elect. Reg. Sys., Inc.    v.

August 22, 2006    12-12020-mg     Doc 9280-3     Filed 10/23/15     Entered 10/23/15 16:32:14 McNerney, et al.

part 1    Pg 188 of 300

Page 52

[1] that?

[2] **A:** I don't know.

[3] **Q:** You don't dispute the fact that

[4] you — that your June payment may have

[5] been late at least or in default?

[6] **MS. GRAY:** Objection.

[7] Asked and answered. Go ahead and

[8] answer.

[9] **A:** I don't know. I mean, I was making

[10] payments.

[11] **Q:** We discussed earlier the fact that

[12] your last payment was June 1, 2003,

[13] correct?

[14] **A:** Correct.

[15]

[16] (Plaintiff's Exhibit 8 marked for

[17] identification.)

[18]

[19] **Q:** Handing you what has been marked as

[20] Plaintiff's Exhibit 8.

[21] Could you please identify that

[22] document for me?

[23] **A:** It is a letter dated August 12th

[24] from the collection department.

[25] **Q:** Again, this is a notice of a late

Page 53

[1] payment that was sent to you?

[2] **MS. GRAY:** Objection.

[3] Compound.

[4] **A:** It is addressed to me.

[5] **Q:** Do you recall receiving it?

[6] **A:** I do not recall receiving this.

[7] **Q:** Do you dispute that when you did

[8] not make your mortgage payment, GMAC gave

[9] you adequate written notice of your

[10] default and payment?

[11] **A:** I don't recall receiving this.

[12] **Q:** Were you provided with notice that

[13] you were not making your mortgage

[14] payment? Any kind of notice, regardless

[15] of Exhibit 8?

[16] **A:** I'm trying to remember. I don't

[17] recall.

[18] **Q:** You knew you weren't making your

[19] mortgage payments at that time in July

[20] 2003?

[21] **A:** I knew I was behind.

[22] **Q:** You don't recall at this time

[23] whether you received a letter dated

[24] August 12, 2003, which notified you of

[25] this default?

Page 54

[1] **A:** I don't recall receiving this

[2] letter.

[3] **Q:** Did you communicate with anyone at

[4] GMAC in July of August 2003 about your

[5] nonpayment?

[6] **A:** I don't recall talking to anyone

[7] from Homecomings.

[8] **Q:** How about anyone at GMAC?

[9] **A:** I do remember making payment

[10] arrangements with someone there, but I

[11] can't remember the day.

[12] **Q:** Do you remember approximately when

[13] it was? Was it July or August or

[14] September of 2003?

[15] **A:** It was in the summer. I don't

[16] really know.

[17] **Q:** What kind of payment arrangements

[18] did you discuss with GMAC?

[19] **A:** I think I was making a payment of

[20] $2,400.

[21] **Q:** Did you make that payment?

[22] **A:** Obviously not.

[23] No. I made the payment. I'm

[24] thinking —

[25] **Q:** You're thinking of the earlier

Page 55

[1] March and April?

[2] **A:** That was the last time I talked to

[3] anyone.

[4] **Q:** You did not talk to — now that you

[5] are remembering better, you don't recall

[6] having a specific conversation in the

[7] summer of 2003 with personnel at GMAC?

[8] **A:** No.

[9] **Q:** Do you dispute that this letter was

[10] sent to you?

[11] **A:** I don't recall receiving this

[12] letter.

[13]

[14] (Plaintiff's Exhibit 9 marked for

[15] identification.)

[16]

[17] **Q:** Handing you what has been marked as

[18] Plaintiff's Exhibit 9.

[19] Could you please identify that?

[20] **A:** It's a letter dated August 28th.

[21] **Q:** Who is it addressed to?

[22] **A:** Patricia McNerney.

[23] **Q:** Again, this is a letter in regards

[24] to your default under the mortgage,

[25] correct?

Mortgage Elect. Reg. Sys., Inc. v.
Patricia J. McNerney

10-11202-mg  Doc 9280-3    Filed 10/23/15    Entered 10/23/15 16:32:18    Exhibit G
part 1    Pg 189 of 300

August 22, 2006

Page 56

[1] **A:** Correct.

[2] **Q:** Do you recall receiving this
[3] letter?

[4] **A:** No.

[5] **Q:** What all was going on in the summer
[6] of 2003 that you don't recall whether you
[7] received these letters or not? You can
[8] just give me a general understanding of
[9] what was going on in your life.

[10] **A:** My mother was ill. My son was
[11] graduating from high school. I had two
[12] kids going off to college. That's about
[13] it.

[14] **Q:** So is it possible that you received
[15] these letters, but with so much going on
[16] you just don't recall receiving them?

[17] **A:** I don't know.

[18] **Q:** Do you have any reason to dispute
[19] that you received them?

[20] **A:** I don't recall receiving them.

[21] **Q:** Do you feel that you were not given
[22] adequate notice of default on your
[23] mortgage?

[24] **A:** I don't recall receiving these, so
[25] I guess I don't feel I was given

Page 57

[1] adequate —

[2] **MS. GRAY:** Object, only
[3] that it calls for a legal
[4] conclusion.

[5] **MS. CARLISLE:** I don't
[6] agree. I'm asking whether she
[7] recollects receiving a letter.

[8] **MS. GRAY:** That's okay.
[9] I'm just objecting.

[10] **MS. CARLISLE:** But if she
[11] is going to raise issue of
[12] whether she received notice of
[13] default from GMAC, then that is
[14] something that I will pursue.

[15] **MS. GRAY:** I don't think
[16] she did.

[17] **MS. CARLISLE:** She just
[18] did by her answer.

[19] **MS. GRAY:** But that's
[20] something that calls for a legal
[21] conclusion. It was just a
[22] response to your question, which
[3] was really asking for a legal
[24] conclusion. That's what I'm
[25] saying. I do not intend to get

Page 58

[1] in an argument with you.

[2] **Q:** In this present lawsuit, do you
[3] intend to argue that you were not
[4] notified of your default under the
[5] mortgage?

[6] **MS. GRAY:** Object.
[7] That's a legal conclusion.

[8] **A:** I don't know.

[9] **Q:** Is it your contention that GMAC did
[10] not provide notice to you of your
[11] default?

[12] **A:** What do I say?

[13] **MS. GRAY:** If you don't
[14] understand the question —

[15] **A:** I don't understand what you are
[16] asking me.

[17] **Q:** You are telling me you don't
[18] recollect receiving any of these default
[19] letters?

[20] **A:** I don't recall. I remember getting
[21] the first one.

[22] **Q:** You remember getting the first one,
[23] but —

[24] **A:** I mean, I remember talking to
[25] someone to make that payment.

Page 59

[1] **Q:** You don't recall receiving the ones
[2] sent in July or August of 2003?

[3] **A:** I do not recall getting them, no.

[4] **Q:** Do you remember getting any kind of
[5] notice from GMAC that you were in default
[6] of your mortgage?

[7] **A:** I remember someone showing up at
[8] the door.

[9] **Q:** Who showed up at the door?

[10] **A:** Someone that GMAC sent out there to
[11] make sure that we were still living there
[12] and we didn't leave.

[13] **Q:** What did you say to that person?

[14] **A:** I told them I would call them.

[15] **Q:** Who was the person that came to the
[16] door? You didn't ask a name or capacity?

[17] **A:** They left a message that I had to
[18] call.

[19] **Q:** When was this? When did this
[20] occur?

[21] **A:** In the summer.

[22] **Q:** So in the summer of 2003?

[23] **A:** Yes.

[24] **Q:** Someone came to your house to make
[25] sure you were still a resident?

Patricia J. McNerney          Mortgage Elect. Reg. Sys., Inc.   v.

August 22, 2006    12-12020-mg    Doc 9280-3    Filed 10/23/15    Entered 10/26/15 16:32:01    McNerney, et al.    Exhibit part 1    Pg 190 of 300

Page 60

[1] A: Yes.

[2] Q: Did he say that he was coming

[3] because you were in default of your

[4] mortgage payment?

[5] A: He said that he was coming there to

[6] make sure we were still there.

[7] Q: Do you think that person came to

[8] your house after you didn't respond to

[9] the default letters and GMAC was

[10] attempting to —

[11] MS. GRAY: Object.

[12] Speculation.

[13] A: I don't know.

[14] Q: You knew you weren't making the

[15] mortgage payments in the summer of 2003?

[16] A: Yes.

[17] Q: And that GMAC was going to inform

[18] you of your default because they wanted

[19] you to pay?

[20] MS. GRAY: Objection

[21] speculation.

[22] A: I don't know.

[23]

[24] (Plaintiff's Exhibit 10 marked for

[25] identification.)

Page 61

[1]

[2] Q: I'm handing you what has been

[3] marked as Plaintiff's Exhibit 10.

[4] Could you please identify that for

[5] the record, please?

[6] A: It's a letter dated February 16,

[7] 2004 addressed to Patricia McNerney

[8] Q: What is the substance of the

[9] letter?

[10] A: I was turned down for a

[11] modification of the loan.

[12] Q: When did you seek a modification of

[13] your loan?

[14] A: When I was notified I was in

[15] default.

[16] Q: So you were notified of your

[17] default?

[18] A: No. When I got the papers from the

[19] county. The letter.

[20] Q: When the lawsuit was filed?

[21] A: Yes.

[22] Q: So you sought modification of the

[23] loan after our complaint was filled in

[24] this action?

[25] A: Yes.

Page 62

[1] Q: Who did you call at that time to

[2] talk about modification?

[3] A: I was telephoned.

[4] Q: You were telephoned?

[5] A: By — what is that?

[6] The primary insurance. Whatever I

[7] was paying that money for.

[8] Q: Private mortgage insurance?

[9] A: Yep.

[10] Q: Someone at GMAC called you?

[11] A: It was General Electric.

[12] Q: General Electric?

[13] A: Whatever the PMI was.

[14] Q: I believe that might be in

[15] reference to who the property insurance

[16] is through, I belive.

[17] A: No. It's the PMI.

[18] Q: General Electric called and do you

[19] know about what time that was

[20] approximately?

[21] A: It was like right within the week

[22] of getting the legal notices.

[23] Q: So on or around November 10, 2003?

[24] A: Yes.

[25] Q: What did they say when they phoned

Page 63

[1] you?

[2] A: They sent me a packet and I filled

[3] it out. And I sent it back next day

[4] air. And then I heard in February.

[5] Q: What information did the packet ask

[6] for?

[7] A: My financial records. How much I

[8] made. How much I got in alimony and

[9] child support.

[10] Q: So you were approached by General

[11] Electric to seek a loan modification?

[12] A: They were my PI. They told me that

[13] that is what I paid all the big bucks

[14] for.

[15] Q: So you sent that application to

[16] them?

[17] A: To them.

[18] Q: In the winter of 2003?

[19] A: Yes.

[20] Q: And when you got this response from

[21] GMAC, did you attempt to call GMAC or

[22] discuss this any further?

[23] A: No.

[24] Q: And in February of 2004 when you

[25] received this response rejecting your

Mortgage Elect. Reg. Sys., Inc. v.
Patricia J. McNerney

Patricia J. McNerney
August 22, 2006

13-12020-mg Doc 2180-3   Filed 10/23/15   Entered 10/23/15 16:32:18   Exhibit 3
part 1   Pg 191 of 300

Page 64

[1] request for modification, you were still
[2] not making your mortgage payments?
[3]   **A:** No.
[4]   **Q:** And you took no further measures to
[5] modify your loan or do anything else?
[6]   **A:** No. I contacted Susan.
[7]
[8]    (Plaintiff's Exhibit 11 marked for
[9] identification.)
[10]
[11]   **Q:** Handing you what has been marked as
[12] Plaintiff's Exhibit 11.
[13]    Could you please identify that
[14] document for me?
[15]   **A:** It is from The Court of Common
[16] Pleas.
[17]   **Q:** Do you recognize this document? It
[18] is a copy of the complaint that was filed
[19] November 10, 2003 seeking foreclosure; is
[20] that correct?
[21]   **A:** Correct.
[22]   **Q:** And you received a copy of this
[23] complaint right around the time of
[24] filing?
[25]   **A:** Yes. I had to go to the post

Page 65

[1] office to get it.
[2]   **Q:** What did you do after you received
[3] this complaint and you knew the
[4] foreclosure was being sought on your
[5] house?
[6]   **A:** That's when the PMI contacted me
[7] and I filled out all the paperwork and
[8] sent it back to them.
[9]   **Q:** Did you feel that was going to
[10] resolve your problems in making your
[11] payments?
[12]   **A:** They led me to believe that they
[13] would try for a modification and I had
[14] some time.
[15]   **Q:** Time for?
[16]   **A:** To let this go through.
[17]   **Q:** "They", being General Electric?
[18]   **A:** The PMI, yes.
[19]   **Q:** If you look at the end of paragraph
[20] one, it states that at the time of the
[21] filing of this lawsuit you owed
[22] $107,632.79, plus interest at the rate of
[3] eight percent at the time of filing.
[24]    Do you dispute that that's what you
[25] owed on your loan at the time?

Page 66

[1]   **A:** No.
[2]
[3]    (Plaintiff's Exhibit 12 marked for
[4] identification.)
[5]
[6]   **Q:** Handing you what has been marked as
[7] Plaintiff's Exhibit 12.
[8]    Could you please identify this
[9] document?
[10]   **A:** It's my court papers.
[11]   **Q:** It's the answering counter claim
[12] your counsel filed on your behalf in
[13] response to the complaint that we just
[14] marked as Plaintiff's Exhibit 12; is that
[15] correct?
[16]   **A:** Correct.
[17]   **Q:** Did you prepare this document?
[18]   **A:** No.
[19]   **Q:** Your attorney prepared it, correct?
[20]   **A:** Yes.
[21]   **Q:** In these in your answer and counter
[22] claim there are a lot of allegations
[23] about the closing that occurred on this
[24] loan. In particular, one of the claims
[25] you make is that in late December 2002,

Page 67

[1] you were called from Brooklyn Title
[2] Agency.
[3]    Could you please describe that
[4] call; approximately when it happened, who
[5] you talked to?
[6]   **A:** I was at work.
[7]   **Q:** You were at the library?
[8]   **A:** Yes. And I was at the front desk
[9] working and I was told I had a phone
[10] call. And all I know is that the woman
[11] had a foreign voice and told me that I
[12] needed $8,000 and some cents in order to
[13] make the loan go through.
[14]   **Q:** Did she identify herself as an
[15] employee of Brooklyn Title?
[16]   **A:** She was the receptionist.
[17]   **Q:** The receptionist at Brooklyn Title?
[18]   **A:** Yes.
[19]   **Q:** What had happened before this? Had
[20] you gone to close the loan at this time
[21] or this was all still when the loan was
[22] at process?
[23]   **A:** It was still in process.
[24]   **Q:** You had not seen any documents at
[25] this point?

Patricia J. McNerney

Mortgage Elect. Reg. Sys., Inc. v.

August 22, 2004   12-12020-mg      Doc 9280-3      Filed 10/23/15      Entered 10/23/15 16:32:18      Exhibit v.

Declaration McNerney, et al.

part 1 · Pg 192 of 300

Page 68

[1]   **A:** No.

[2]   **Q:** Do you remember approximately when
[3] the phone call came in?

[4]   **A:** I would say no I don't recall
[5] remember the day if that's what you are
[6] asking.

[7]   **Q:** Do you remember if it was prior to
[8] December 27, 2002?

[9]   **A:** I don't remember know I can't
[10] remember the time frame because that was
[11] right around the holidays.

[12]   **Q:** It was late in the month.

[13]   **A:** Yes.

[14]   **Q:** Late December 2002?

[15]   **A:** Yes.

[16]   **Q:** The loan was set to close on
[17] December 27, 2002; is that correct?

[18]   **A:** I believe so.

[19]   **Q:** And so you don't remember whether
[20] you got that phone call before or after
[21] the date that it was set to close?

[22]   **A:** I had not gone out to Brooklyn
[23] Title yet, so it had to be before I went
[24] out there.

[25]   **Q:** When you got this call, were you

Page 69

[1] surprised by the fact that —

[2]   **A:** Yes.

[3]   **Q:** The receptionist at Brooklyn Title
[4] told you that you were going to have to
[5] pay roughly 8,150 to close the loan?

[6]   **A:** Yes.

[7]   **Q:** What was your understanding of your
[8] closing costs before that time? How much
[9] did you think you were going to have to
[10] pay to close your loan before that phone
[11] call?

[12]   **A:** I really don't know.
[13] Of the way I interpreted it?

[14]   **Q:** Right.

[15]   **A:** Of GMAC — or OMC, was that
[16] everything was just going to be included
[17] in the closing cost.

[18]   **Q:** So you were not going to have to
[19] pay any amounts at the closing?

[20]   **A:** Yes.

[21]   **Q:** That's why this was surprising
[22] news?

[23]   **A:** Yes.

[24]   **Q:** Once you received this news, did
[25] you decide to not go through with the

Page 70

[1] loan and may be take some more time?

[2]   **A:** Oh, I made some phone calls.

[3]   **Q:** Who did you call?

[4]   **A:** OMC.

[5]   **Q:** What did OMC tell you?

[6]   **A:** They knew there was a problem and I
[7] should take the money out of my IRA.

[8]   **Q:** They knew there was a problem?

[9]   **A:** I mean, I told them I got the phone
[10] call. They were aware of it and she said
[11] I should probably take the money out of
[12] my IRA.

[13]   **Q:** Did you tell them that you didn't
[14] want to go through with the loan?

[15]   **A:** I told them I had to think about
[16] it.

[17]   **Q:** Did you get any explanation from
[18] them on why you had to pay this extra
[19] amount?

[20]   **A:** Something with the title.

[21]   **Q:** They didn't provide any other
[22] information?

[23]   **A:** No.

[24]   **Q:** The title of your house or title
[25] insurance?

Page 71

[1]   **A:** Title of the house, I believe.

[2]   **Q:** Did they explain why the change was
[3] occurring from your former understanding
[4] that you wouldn't have to pay anything in
[5] closing costs to paying $8,150?

[6]   **A:** They told me they are having
[7] trouble closing it and that in order to
[8] is secure the title they would have to
[9] have $8,150 or $8,000.

[10]   **Q:** Do you know what they meant by
[11] having trouble closing it?

[12]   **A:** Something with the prior loan.

[13]   **Q:** So you said you talked to OMC
[14] Lending, did you talk to anyone else
[15] after you got the phone call?

[16]   **A:** I called my brother.

[17]   **Q:** And who is your brother?

[18]   **A:** John Kellicker, K-e-l-l-i-c-k-e-r.

[19]   **Q:** What does John do for a living?

[20]   **A:** He's a CPA.

[21]   **Q:** What did you talk to him about?

[22]   **A:** I asked him if I should do it and
[23] we talked a little bit and he told me how
[24] much in penalty fees I would have to pay
[25] in my IRA if I did it.

Mortgage Elect. Reg. Sys., Inc. v.
Patricia J. McNerney

Patricia J. McNerney

1:11-cv-02280-3   Filed 10/23/15   Entered 10/23/15 16:32:18   Exhibit 0
part 1   Pg 193 of 300

August 22, 2006

Page 72

[1] **Q:** In terms of taking the money out?

[2] **A:** Yeah, early out of the IRA.

[3] **Q:** So how did you — what did he say
[4] to you about the closing cost? Did he
[5] tell you to not go through with it or —

[6] **A:** No, he didn't. He just told me
[7] what I — he just told me how it would be
[8] if I did something like that.

[9] **Q:** Did you ever think that — did you
[10] ever think of the possibility of
[11] canceling the loan transaction and going
[12] through a different broker or lender?

[13] **A:** The thought never occurred to me,
[14] no.

[15] **Q:** So you decided to get that extra
[16] amount, even though you felt that — felt
[17] surprised by the fact that you have to do
[18] that? You still took the measures
[19] necessary to get that money and bring it
[20] to closing?

[21] **A:** What?

[22] **Q:** Basically, I'm just trying to
[23] understand that despite the fact that you
[24] felt surprised by the phone call and the
[25] requirement, you were going to have to

Page 73

[1] bring extra money to closing, you decided
[2] to go through with that anyway?

[3] **A:** Yes.

[4] **Q:** Was there anyone else you talked to
[5] besides OMC Lending and your brother?

[6] **A:** There was one woman at work I
[7] talked to about it, but —

[8] **Q:** Just in general?

[9] **A:** Just in general. She happened to
[10] take the phone call.

[11] **Q:** And sorry to back up on you, but
[12] you spoke to — who did you speak to at
[13] OMC Lending?

[14] **A:** Sharon.

[15] **Q:** She confirmed that you were going
[16] to have to bring this amount to closing
[17] in order for the loan to go through?

[18] **A:** She was the one that told me to
[19] take it from my IRA.

[20] **Q:** Did you contact anyone at
[21] Homecomings or GMAC, or were you not in
[22] contact with them at that point?

[3] **A:** Nope.

[24] **Q:** So after you decided to go through
[25] with the loan and get the money out of

Page 74

[1] your IRA, what happened next?

[2] **A:** I went out and gave them the check
[3] and signed the papers.

[4] **Q:** Do you remember what day that was?

[5] **A:** It was the date the check was
[6] signed. The 2nd of January.

[7] **Q:** Now, I know I already started to
[8] ask you about this, but the day that the
[9] loan was said to close was December 27,
[10] 2002; is that correct?

[11] **A:** I'm not really —

[12] **Q:** Is there a problem?

[13] **A:** Go ahead.

[14] **MR. MACDONALD:** Did she
[15] say the second of January?

[16] **MS. GRAY:** I think you
[17] just misread the check.

[18] **A:** Is it wrong?

[19] **MS. GRAY:** You might want
[20] to look at the date.

[21] **A:** It's the 3rd.

[22] **Q:** January 3rd?

[23] **A:** It is dated and stamped that, too.

[24] **Q:** So the call about the extra closing
[25] cost came sometime before January 3,

Page 75

[1] 2003?

[2] **A:** Correct.

[3] **Q:** And is that the same date that you
[4] went to Brooklyn Title to sign all the
[5] closing documents?

[6] **A:** No.

[7] **Q:** When did you go to Brooklyn Title?

[8] **A:** When I had this check, January 3rd.

[9] **Q:** Right. I'm sorry.
[10] Isn't that what I just asked you?

[11] **A:** Is that when I went?

[12] **Q:** That's when you went to Brooklyn
[13] Title to sign all the documents?

[14] **A:** Right. Yes.

[15] **Q:** Can you explain to me why the date
[16] on the document is December 27, 2002?
[17] Were you told to put that date on there?

[18] **MS. GRAY:** Object. There
[19] is no evidence she put any date
[20] on that.

[21] **Q:** Do you dispute you wrote the date
[22] next to your signature on the promissory
[23] note?

[24] **A:** I don't recall.

[25] **Q:** You can look back on Exhibit 1 and

Mortgage Elect. Reg. Sys., Inc. v.
12-12020-mg   Doc 9280-3   Filed 10/23/15   Entered 10/23/15 16:13:2nd McNerney, et al.
part 1   Pg 194 of 300

Page 76

[1] Exhibit 2.

[2]   MR. MACDONALD: There is

[3] no date written on Exhibit 1.

[4]   Is it typed at the top?

[5]   A: Yeah, I noticed that. There is no

[6] date written in Exhibit 1.

[7]   Q: On Exhibit 3, starting with the

[8] note, it says December 27, 2002 on the

[9] top, correct? I know you didn't write it

[10] yourself, but that's what it says?

[11]   A: Yes, that's what it says.

[12]   Q: And then the mortgage, Exhibit 2,

[13] also dates the security instrument on

[14] December 27, 2002?

[15]   A: I'm sorry. What am I looking for?

[16]   MS. GRAY: Objection.

[17] The document speaks for itself.

[18]   Q: Exhibit 2.

[19]   A: Oh, okay. Right there.

[20]   Q: Did you dispute this date at the

[21] time you signed the promissory note or

[22] the mortgage?

[23]   MS. GRAY: Object. No

[24] foundation.

[25]   A: I don't recall.

Page 77

[1]   Q: But you did not go to Brooklyn

[2] Title on December 27, 2002?

[3]   A: No.

[4]   Q: You only went on January 3, 2003?

[5]   A: Yes.

[6]   Q: That is when you signed the

[7] promissory note, Exhibit 1 and the

[8] mortgage, Exhibit 2?

[9]   A: Yes.

[10]   Q: Could you look at Exhibit 3,

[11] please?

[12]   A: Okay.

[13]   Q: Did you write that date next to

[14] your name?

[15]   A: I don't recall. It is my name. I

[16] don't recall doing that.

[17]   Q: Do you believe that someone wrote

[18] that in after you signed your name?

[19]   MS. GRAY: Object,

[20] speculation.

[21]   A: I don't know.

[22]   Q: Do you have any reason to believe

[23] that anyone would put a date after your

[24] name?

[25]   MS. GRAY: Objection.

Page 78

[1]   A: I don't know.

[2]   Q: So you didn't ask anyone at

[3] Brooklyn Title why things were dated

[4] December 27, 2002?

[5]   MS. GRAY: Object.

[6]   A: No, I didn't.

[7]   Q: Did it strike you as odd that you

[8] were in on January 3rd and documents were

[9] marked December 27th?

[10]   MS. GRAY: Object, there

[11] is no foundation.

[12]   A: I don't know.

[13]   Q: Who gave you the documents when you

[14] went for closing?

[15]   A: It was — it wasn't the

[16] receptionist. It was another lady.

[17]   Q: So you were at Brooklyn Title

[18] Agency?

[19]   A: Yes.

[20]   Q: And you don't recall her name?

[21]   A: No, I don't.

[22]   Q: It was just one other — it was

[23] just this one woman in the room with you?

[24]   A: Yes.

[25]   Q: Did she answer questions for you

Page 79

[1] when you had questions about the

[2] documents that you were signing?

[3]   A: She was — yes.

[4]   Q: What kind of questions did you ask

[5] her?

[6]   A: I really don't recall what I would

[7] have asked. I mean, that is three years

[8] ago. I don't recall.

[9]   Q: But you understand that when you

[10] signed these documents that —

[11]   MS. GRAY: Object,

[12] argumentative.

[13]   MS. CARLISLE: I'm sorry?

[14]   MS. GRAY: Objection.

[15] Argumentative.

[16]   MS. CARLISLE: You are

[17] interjecting in the middle of a

[18] question, first of all. And it

[19] wasn't argumentative.

[20]   Q: But when you signed these documents

[21] you were acknowledging that you reviewed

[22] these documents at the time you signed

[23] them?

[24]   MS. GRAY: Object, no

[25] foundation.

**Min-U-Script®**   Corsillo & Grandillo Court Reporters

Mortgage Elect. Reg. Sys., Inc. v.
Patricia J. McNerney

Patricia J. McNerney

Case 1:10-cv-02280-3 Filed 10/23/15 Entered 10/23/15 16:32:18 Exhibit 3
part 1 Pg 195 of 300

August 22, 2006

Page 80

[1] **A:** Yes.

[2] **Q:** So at the time you were signing

[3] them, if you had questions about the

[4] documents you would have asked them,

[5] correct?

[6] **MS. GRAY:** Object, no

[7] foundation.

[8] **A:** Yes.

[9] **Q:** You don't recall now whether you

[10] had such questions?

[11] **A:** I did have a question about the

[12] PMI.

[13] **Q:** Who did you voice that question to?

[14] **A:** The woman sitting there, who in

[15] turn called Sharon on speaker phone.

[16] **Q:** And you received an answer to your

[17] question about that?

[18] **A:** It was just really high.

[19] **Q:** And you decided to go through with

[20] the loan?

[21] **MS. GRAY:** Objection.

[22] Asked and answered.

[23] **A:** Yes.

[24]

[25] (Plaintiff's Exhibit 13 marked for

Page 81

[1] identification.)

[2]

[3] **Q:** Handing you what has been marked as

[4] Plaintiff's Exhibit 13.

[5] Could you please identify this

[6] document for me?

[7] **A:** Notice of rights to cancel.

[8] **Q:** Is this a document you received at

[9] closing?

[10] **MS. GRAY:** Do you want to

[11] check your file and see?

[12] **MS. CARLISLE:** She should

[13] really only need to check the

[14] file if she disputes the

[15] authenticity of this copy.

[16] **MS. GRAY:** She's checking

[17] to get an answer to your

[18] question.

[19] **A:** Here it is. Okay. What's the

[20] question, again?

[21] **Q:** Did you receive this document at

[22] closing?

[3] **A:** Yes.

[24] **Q:** Sorry, I just lost my train of

[25] thought.

Page 82

[1] Could you please read the second

[2] sentence of the first paragraph starting

[3] with "You have a legal right", and let me

[4] know when you are finished reading?

[5] **A:** I'm sorry. Where am I to read?

[6] **Q:** Sure.

[7] First paragraph, second sentence.

[8] It starts with "You have a legal right."

[9] **A:** Okay.

[10] **Q:** Do you understand what this

[11] document is informing you about?

[12] **A:** Yes.

[13] **Q:** Could you give me your general

[14] understanding?

[15] **A:** It's telling me I have a legal

[16] right to cancel within 3 business days.

[17] **Q:** And basically — I'm sorry.

[18] You reviewed this document when it

[19] was given to you at closing?

[20] **A:** Yes.

[21] **Q:** So you understood that you had 3

[22] days from receiving this document to

[23] cancel the transaction if you wished?

[24] **A:** Yes.

[25] **Q:** Did you sign the note of the right

Page 83

[1] to cancel on December 27, 2002 or January

[2] 3, 2003?

[3] **A:** I'm not sure. I mean, I only went

[4] out there once.

[5] **Q:** So that is your signature at the

[6] bottom of the page; correct.

[7] **A:** Yes.

[8] **Q:** Do you know whether you wrote that

[9] date that is next to it?

[10] **A:** I don't recall doing it.

[11] **Q:** Is that your handwriting?

[12] **A:** That's my handwriting, my

[13] signature, yes.

[14] **Q:** Your signature is your

[15] handwriting.

[16] What about the date?

[17] **A:** It could be.

[18] **Q:** Did you contact anyone to exercise

[19] your right to cancel on or before

[20] December 30, 2003? Did you call to

[21] cancel three days after your closing date

[22] as signed on the note of December 27,

[23] 2002?

[24] **A:** No.

[25] **MS. GRAY:** Object to the

Patricia J. McNerney
Mortgage Elect. Reg. Sys., Inc. v.
August 22, 2006 12-12020-mg    Doc 9280-3    Filed 10/23/15    Entered 10/23/15 10:48:19 McNerney et al.
part 1    Pg 196 of 300

Page 84

[1] characterization that December
[2] 27th is the closing date.
[3]    **Q:** How about on or about January 6,
[4] 2003?
[5]    **A:** No.
[6]    **Q:** So you knew you had a legal right
[7] to cancel, but you chose not to exercise
[8] it; is that correct?
[9]    **A:** Yes.
[10]    **Q:** You are claiming in your
[11] counterclaims that you have a right to
[12] rescind — a continuing right to rescind
[13] with the transaction that you have.
[14]    I would like you to explain to me
[15] why you think the right to rescind
[16] continues.
[17]    **MS. GRAY:** Object, that
[18] is a legal argument in regards
[19] that she would have no
[20] knowledge.
[21]    **MS. CARLISLE:** It is
[22] stated in her counterclaim that
[23] she is rescinding the mortgage
[24] and I'm allowed to ask her why
[25] she has the right to rescind that

Page 85

[1] mortgage.
[2]    **MS. GRAY:** And I'm
[3] allowed to restate my objection.
[4]    **MS. CARLISLE:** I'm still
[5] entitled to an answer.
[6]    **MS. GRAY:** Absolutely,
[7] to the extent that you know the
[8] legal basis. If you don't know
[9] the legal basis, you don't know
[10] the legal basis.
[11]    **Q:** So you are not sure why you are
[12] alleging that you have the right to
[13] rescind in your counterclaim?
[14]    **MS. GRAY:** Object, asked
[15] and answered.
[16]    **A:** No.
[17]    **Q:** You also claim in your answer and
[18] counterclaims that you didn't receive two
[19] notices of the right to cancel.
[20]    Are you sure you didn't receive two
[21] copies of the right to cancel? And you
[22] are welcome to review your file if need
[23] to do that in order to answer the
[24] question.
[25]    **A:** What? This file?

Page 86

[1]    Oh, no, I don't have anything like
[2] that in here.
[3]    **Q:** You don't have one copy of the
[4] notice of the right to cancel?
[5]    **A:** Oh, I thought you were talking —
[6] Yes, I do have the right to cancel.
[7]    **MS. GRAY:** The question
[8] is, do you have two of these?
[9]    **A:** I don't know if I have two of
[10] these. I don't think so. I don't see
[11] another one in here.
[12]    **Q:** The copy that you did receive, that
[13] copy disclosed your right to cancel the
[14] transaction; correct?
[15]    **A:** Correct.
[16]    **Q:** And you understood that it was —
[17] that you had this right to cancel based
[18] on the copy that you received?
[19]    **A:** Yes.
[20]    **Q:** Did you lack of having a second
[21] copy change your understanding of the
[22] right to cancel?
[23]    **MS. GRAY:** Object.
[24]    **A:** I don't really know.
[25]    **Q:** If you had exercised your right to

Page 87

[1] cancel, what do you think that would mean
[2] in terms of the loan?
[3]    **MS. GRAY:** Object, calls
[4] for a legal conclusion.
[5]    **A:** I'm not really sure.
[6]    **Q:** Do you believe that your obligation
[7] to pay the mortgage would be gone?
[8]    **MS. GRAY:** Object.
[9]    **A:** I don't —
[10]    **Q:** But you wouldn't have to make any
[11] more mortgage payments if you canceled
[12] the transaction?
[13]    **A:** I don't really know.
[14]
[15]    (Plaintiff's Exhibit 14 marked for
[16] identification.)
[17]
[18]    **Q:** I'm handing you what has been
[19] marked as Plaintiff's Exhibit 14.
[20]    Could you please identify the
[21] documents once you have a reviewed them?
[22]    **A:** Truth In Lending Disclosure
[23] Statement.
[24]    **Q:** Could you also identify the second
[25] page?

Mortgage Elect. Reg. Sys., Inc. v.
Patricia J. McNerney

Patricia J. McNerney
Patricia J. McNerney Doc. 280-3    Filed 10/23/15    Entered 10/23/15 16:32:18    Exhibit August 22, 2006
part 1   Pg 197 of 300

Page 88

[1] **A:** Federal Truth and Lending
[2] Disclosure Statement.
[3] **Q:** You claim in your counterclaims —
[4] I'm sorry.
[5] Do you need a minute?
[6] **A:** No. Go ahead and ask.
[7] **Q:** You claim that plaintiff has
[8] violated The Truth In Lending Act.
[9] What violations of The Truth In
[10] Lending Act have been committed by
[11] Plaintiff?
[12] **MS. GRAY:** Object, calls
[13] for a legal conclusion.
[14] **A:** I'm not really sure.
[15] **Q:** You allege that certain material
[16] disclosures were not made to you. Which
[17] disclosures were not made to you?
[18] **MS. GRAY:** Object, calls
[19] for a legal conclusion.
[20] **A:** I don't really know.
[21] **Q:** You could look at Exhibit 14.
[22] **MS. GRAY:** Object, asked
[23] and answered.
[24] **A:** Okay.
[25] **Q:** Do you see the various columns of

Page 89

[1] information, annual percentage rate,
[2] finance charge, amount financed, total
[3] payments?
[4] **A:** Yes.
[5] **Q:** The information under these
[6] columns, please point out what is
[7] incorrect about these amounts or how you
[8] feel they are inaccurate?
[9] **MS. GRAY:** Object, legal
[10] conclusion.
[11] **A:** I'm not really sure, but I thought
[12] it was supposed to be eight percent.
[13] **Q:** Is that one of the things that you
[14] feel is inaccurate?
[15] **A:** I don't know.
[16] **Q:** If we could look at the first Truth
[17] In Lending form, it's labeled Plaintiff's
[18] 136?
[19] **A:** What are will we looking for?
[20] **Q:** Just the first page of Exhibit 14.
[21] Again, this is a document you
[22] received at closing?
[3] **A:** I was just looking for it. I don't
[24] recall. Okay.
[25] What are you asking?

Page 90

[1] **Q:** Is that a document you received at
[2] closing?
[3] **A:** Yes.
[4] **MS. GRAY:** I would just
[5] like the record to indicate that
[6] they are very similar except your
[7] Exhibit 14 has a fax number at
[8] the top, which may or may not be
[9] on here. It doesn't appear to be
[10] on here, so I don't think it is
[11] the exact same document, but a
[12] lot of the numbers are the same.
[13] Do you want to compare
[14] them?
[15] **MS. CARLISLE:** My
[16] question doesn't have anything to
[17] do with the copy that she has in
[18] her file. It's the same document
[19] regardless of how it was sent to
[20] my client.
[21] **MS. GRAY:** That's fine.
[22] Sure. It just has different
[23] information, so it isn't exactly
[24] the same.
[25] **MS. CARLISLE:** It has a

Page 91

[1] fax line at the top, is that the
[2] only difference you see?
[3] **MS. GRAY:** That's the
[4] only one I see.
[5] **MS. CARLISLE:** There is
[6] no differences in any of the
[7] other subtenant information?
[8] **MS. GRAY:** I'm not seeing
[9] any are you at the moment?
[10] **THE WITNESS:** No, I don't
[11] see any.
[12] **Q:** Is it your signature at the bottom
[13] of the page?
[14] **A:** Yes.
[15] **Q:** I'm sorry.
[16] Could make sure we are referencing
[17] to the exhibit and not the copy in your
[18] file? Now that you reviewed it, you
[19] don't need to keep that open anymore, do
[20] you?
[21] **A:** No.
[22] **Q:** You confirm that you received this
[23] at closing?
[24] **A:** Yes.
[25] **Q:** At the top of the first page of

Patricia J. McNerney,                    Mortgage Elect. Reg. Sys., Inc.   v.
August 22, 2006    12-12020-mg    Doc 9280-3    Filed 10/23/15    Entered 10/26/15 16:32:04  Exhibit, et al.
                                    part 1    Pg 198 of 300

Page 92

[1] Exhibit 14, the title is "Truth In
[2] Lending Disclosure Statement" underneath
[3] it says, "This is neither a contract or a
[4] commitment to lend."
[5]     Could you please tell me who this
[6] document was prepared by?
[7]   **A:** OMC Lending.
[8]   **Q:** And the date that it was prepared?
[9]   **A:** 11-19-2002.
[10]   **Q:** Are you aware that this is a Truth
[11] In Lending document prepared by the
[12] mortgage broker?
[13]   **MS. GRAY:** The document
[14] speaks for itself. I don't think
[15] there is any foundation. I
[16] object, there is no foundation
[17] that she has any independent
[18] knowledge other than what the
[19] document itself says. If you are
[20] asking to read the document —
[21]   **MS. CARLISLE:** I just
[22] asked her if she was aware.
[23]   **MS. GRAY:** Again, if you
[24] are asking her if she is aware of
[25] what the document says, then she

Page 93

[1] can tell you if she is aware. If
[2] you are asking her if she has any
[3] independent knowledge, then there
[4] is no foundation.
[5]   **MS. CARLISLE:** Well,
[6] again, you are engaging in
[7] speaking objections, which is not
[8] allowed. But unless you are
[9] going to instruct her not to
[10] answer my question then she has
[11] to answer my question.
[12]     I have asked her if she
[13] is aware that this first form is
[14] an internal Truth In Lending
[15] document prepared by the broker.
[16] That is my only question.
[17]   **MS. GRAY:** And, again, I
[18] repeat my objection. There is no
[19] foundation.
[20]   **MS. CARLISLE:** That's
[21] fine. You are not allowed to
[22] engage in speaking objections, so
[23] she can now answer the question.
[24]   **A:** What am I answering again?
[25]   **Q:** Are you aware that this is an

Page 94

[1] internal Truth In Lending document
[2] prepared by the broker of OMC Lending?
[3]   **MS. GRAY:** Do you have
[4] any knowledge, apart from what
[5] you are reading in the document?
[6]   **A:** No, I don't.
[7]   **MS. CARLISLE:** That's not
[8] the question I asked, so don't
[9] recharacterize my question. This
[10] is not your deposition.
[11]   **MS. GRAY:** I respect
[12] that.
[13]   **MS. CARLISLE:** Then stop
[14] instructing your client not to
[15] answer. This is her deposition,
[16] not yours.
[17]   **MS. GRAY:** She can only
[18] speak to what she is aware of,
[19] and I'm instructing her to speak
[20] of what she is actually aware of.
[21]   **MS. CARLISLE:** But then
[22] you asked her a different
[23] question than what I asked.
[24]   **MS. GRAY:** Then ask her
[25] your question again.

Page 95

[1]   **Q:** Are you aware that this first page
[2] is an internal Truth In Lending document
[3] prepared by the broker, OMC Lending?
[4]   **A:** I am now by reading it just now.
[5]   **Q:** Thank you.
[6] If you could turn now to the second
[7] page, and what is the second page
[8] entitled?
[9]   **A:** Federal Truth In Lending Disclosure
[10] Statement.
[11]   **Q:** Could you please tell me what the
[12] date is on that document?
[13]   **A:** 12-27-2002.
[14]   **Q:** You received this document at
[15] closing as well?
[16]   **A:** Yes.
[17]   **Q:** That is your signature at the
[18] bottom of the page?
[19]   **A:** Yes.
[20]   **Q:** So this is the document that you
[21] were given in closing to disclose certain
[22] information to you under The Truth In
[23] Lending Act; is that correct?
[24]   **MS. GRAY:** Object to
[25] characterization.

Mortgage Elect. Reg. Sys., Inc.  v.
Patricia J. McNerney
Case 18-1020-McGern Doc 230-3    Filed 10/23/15    Entered 10/23/15 16:32:18    Exhibit
part 1   Pg 199 of 300

Patricia J. McNerney
August 22, 2006

Page 96

[1]    **A:** All I know is I got this in my
[2] closing. I'm not really sure.
[3]    **MS. CARLISLE:** How is
[4] everyone doing?
[5]    **MS. GRAY:** Just fine.
[6]    **MS. CARLISLE:** Keep
[7] going?
[8]    **MS. GRAY:** Absolutely.
[9]
[10]    (Plaintiff's Exhibit 15 marked for
[11] identification.)
[12]
[13]    **Q:** Handing you what has been marked as
[14] Plaintiff's Exhibit 15.
[15]    Can you please identify that
[16] document for me?
[17]    **A:** U.S. Department of Housing and
[18] Urban Development Final Settlement
[19] Statement.
[20]    **Q:** If you could turn to page two? Is
[21] that your signature that is actually
[22] there twice on the document?
[23]    **A:** Yes.
[24]    **Q:** This is a document that you
[25] received at closing?

Page 97

[1]    **MS. GRAY:** Do you want to
[2] check and see?
[3]    **A:** It's not this one.
[4]    **Q:** Does it look like one of the ones
[5] you got at closing?
[6]    **A:** Yes.
[7]    **Q:** So you did receive this document at
[8] closing?
[9]    **A:** Yes.
[10]    **Q:** In your counterclaims you allege
[11] that plaintiff has violated RESPA and
[12] these violations relate to the settlement
[13] statements you relate to closing.
[14]    Could you tell me how plaintiff has
[15] violated RESPA?
[16]    **MS. GRAY:** Object, calls
[17] for a legal conclusion.
[18]    **A:** I don't know.
[19]    **Q:** Look at Plaintiff's Exhibit 15 if
[20] you could, please? Look at row 303,
[21] named "Cash From Borrower."
[22]    I apologize for the small font. If
[3] you have trouble reading maybe you can
[24] refer to your file.
[25]    **A:** I see it.

Page 98

[1]    **Q:** How much does the settlement
[2] statement say you are going to have to
[3] pay?
[4]    **A:** Zero.
[5]    **Q:** Now, please look at row 1303, which
[6] is on the second page. I know this is
[7] not the easiest to read, but 1303 is
[8] called "Estimated Payoff First
[9] Mortgage."
[10]    Could you please the amount that
[11] was listed in that settlement statement
[12] to payoff that first mortgage?
[13]    **A:** I believe it says, $90,571.76, is
[14] that right?
[15]    **Q:** Yes. Thank you. I know it is very
[16] small writing.
[17]
[18] (Plaintiff's Exhibit 16 marked for
[19] identification.)
[20]
[21]    **Q:** Handing you what has been marked as
[22] Plaintiff's Exhibit 16.
[23]    Could you please identify that
[24] document for me?
[25]    **A:** Household Finance Corporation.

Page 99

[1]    **Q:** Again, this is that is the company
[2] that held the preexisting mortgage on
[3] your house before you refinanced; is that
[4] correct?
[5]    **A:** Correct.
[6]    **Q:** And could you please read the total
[7] amount due to payoff your first
[8] mortgage? It's about a quarter down the
[9] page.
[10]    **A:** It that 80 or 98,349.94.
[11]    **Q:** So that's different than the amount
[12] that was first in the first settlement;
[13] is that correct?
[14]    **MS. GRAY:** Object to
[15] foundation for the document.
[16]    **A:** I'm sorry.
[17] Were you asking me something?
[18]    **Q:** I said, that's a different amount
[19] that is listed as the payoff in the first
[20] settlement under 1301 that we just looked
[21] at?
[22]    **A:** Yes.
[23]    **Q:** Do you have any reason to believe
[24] this is not an accurate payoff quote from
[25] household finance corporation?

Patricia J. McNerney                    Mortgage Elect. Reg. Sys., Inc.  v.

August 22, 2006  12-12020-mg   Doc 9280-3   Filed 10/23/15   Entered 10/26/15 16:18:24  McNerney, et al.
                                        part 1   Pg 200 of 300

Page 100

[1] **MS. GRAY:** Objection.
[2] speculation.
[3] **A:** I don't know.
[4] **Q:** Do you have any reason to believe
[5] that it's not?
[6] **A:** I don't think so.
[7] **Q:** It was sent to Brooklyn Title
[8] Agency; is that correct?
[9] **MS. GRAY:** Object, no
[10] foundation.
[11] **A:** I don't know.
[12] **Q:** That's who is in the "Attention To"
[13] line?
[14] **A:** Right. Brooklyn Title.
[15]
[16] (Plaintiff's Exhibit 17 marked for
[17] identification.)
[18]
[19] **Q:** Handing you what has been marked as
[20] Plaintiff's Exhibit 17.
[21]    Would you please identify that for
[22] me?
[23] **A:** U.S. Department of Housing and
[24] Urban Development Final Settlement
[25] Statement.

Page 101

[1] **Q:** So you received this document at
[2] closing as well?
[3] **A:** Yes.
[4] **Q:** This is the second settlement
[5] statement, different from the one we were
[6] looking at in Exhibit 15; is that
[7] correct?
[8] **A:** It is different.
[9] **Q:** Now, could you please tell me on
[10] Exhibit 17 what the amount is listed
[11] under row 1303, Cash from Borrower.
[12] **MS. GRAY:** Objection.
[13] **A:** $8,150.18.
[14] **Q:** Could you please turn the page and
[15] tell me what is listed under row 1403,
[16] Payment of First Mortgage.
[17] **MS. GRAY:** Object,
[18] document speaks for itself.
[19] **A:** Good Lord.
[20] **Q:** I know, I apologize for the copy.
[21] **A:** Is it 98?
[22] **MS. GRAY:** If you can
[23] read it.
[24] **A:** I can't read it.
[25] **Q:** You can refer to the file that you

Page 102

[1] brought with you if you would like to do
[2] that?
[3] **A:** Okay. It's 98,349.94.
[4] **Q:** This was the same amount that was
[5] listed in Exhibit 16 as payoff for your
[6] first mortgage?
[7] **MS. GRAY:** Object,
[8] document speaks for itself.
[9] **A:** Yes.
[10] **Q:** You stated earlier that when you
[11] called about the 8,150 you were going to
[12] have produce at closing, they had said
[13] something to you about paying off the
[14] prior mortgage or the first mortgage —
[15] **MS. GRAY:** Object, her
[16] prior testimony is what it is, so
[17] I just object to the
[18] characterization.
[19] **MS. CARLISLE:** If you
[20] engage in speaking objections, we
[21] are going to call the magistrate.
[22] **MS. GRAY:** I object to
[23] the characterization.
[24] **MS. CARLISLE:** That's
[25] fine. All you have to say is

Page 103

[1] objection.
[2] **MS. GRAY:** No, I think I
[3] have to say object to the
[4] characterization.
[5] **Q:** Was it your testimony earlier that
[6] someone had told you that there was some
[7] problem with the first mortgage and that
[8] was one of the reason why you were going
[9] to have to pay this extra amount?
[10] **A:** Yes.
[11] **Q:** By the second settlement sheet,
[12] that indicates that there was an extra
[13] amount that wasn't indicated in the first
[14] settlement sheet —
[15] **MS. GRAY:** Object,
[16] documents speak for them
[17] themselves.
[18] **A:** Yes.
[19] **Q:** The actual cost of paying off the
[20] first mortgage was 98,349.94 —
[21] **MS. GRAY:** Objection.
[22] **MS. CARLISLE:** If you
[23] don't let me finish the question,
[24] so the record is clear —
[25] **MS. GRAY:** Sorry. Sorry.

Page 104

[1] All right.

[2] **MS. CARLISLE:** You are

[3] doing it on purpose.

[4] **MS. GRAY:** No, I'm not,

[5] Zoe. I'm sorry. I jumped ahead.

[6] Go ahead and please ask and then

[7] I'll do my objection.

[8] **Q:** Did second settlement statement

[9] state that to payoff the first mortgage

[10] it would require a cost of $98,349.94, as

[11] opposed to the first settlement

[12] statement, which is a cost of $90,571.76;

[13] is that correct?

[14] **MS. GRAY:** Objection.

[15] The document speaks for itself.

[16] **A:** Yes.

[17] **Q:** That is roughly approaching the

[18] extra 8,000 that you had to produce at

[19] closing; is that correct?

[20] **A:** Roughly, yes.

[21] **Q:** Does this provide an indication of

[22] why you had pay those funds to close the

[23] loan?

[24] **MS. GRAY:** Object,

[25] speculation.

Page 105

[1] **A:** I guess.

[2] **Q:** You knew that the first mortgage

[3] had to be paid off in order for the loan

[4] to go though.

[5] **A:** Yes, I knew that.

[6] **Q:** The other amounts that were listed

[7] — you can just compare Exhibit 15 with

[8] Exhibit 17. There are amounts listed

[9] paying off debt to Capital One and then a

[10] debt to payoff back taxes that were due

[11] to Cuyahoga Treasurer?

[12] **A:** Yes.

[13] **Q:** If you want to take a minute to

[14] compare.

[15] Those amounts are the same for the

[16] first and second settlement statement; is

[17] that correct?

[18] **MS. GRAY:** Objection.

[19] **A:** I can't really tell.

[20] **Q:** Again, you are welcome to refer to

[21] your files in order to — so you don't

[22] have to read these copies.

[3] **A:** Yes.

[24] **Q:** Yes, they are the same amounts for

[25] both sheets?

Page 106

[1] **A:** Yes.

[2] **Q:** Do you dispute any of those

[3] amounts?

[4] **MS. GRAY:** Object as to

[5] foundation.

[6] **A:** I'm pretty sure the charges were

[7] correct.

[8] **Q:** You knew that these debts to

[9] Capital One and the back taxes were to be

[10] paid out of the —

[11] **A:** Right. I had to take care of that,

[12] yes.

[13] **Q:** At any point during the closing and

[14] signing of these various documents that

[15] we have reviewed, did you ever indicate

[16] that you did not want to proceed with the

[17] loan?

[18] **MS. GRAY:** Object.

[19] **A:** I don't believe I did.

[20] **Q:** Did you voice any objections to the

[21] documents that you were signing?

[22] **A:** Other than it being a different

[23] amount, no.

[24] **Q:** Let me go back to Exhibit 12, your

[25] answering counterclaim. If you would

Page 107

[1] please turn to paragraph 37 of your

[2] answering counterclaim.

[3] **A:** Okay.

[4] **Q:** Do you want to take a minute to

[5] read it?

[6] **A:** Okay. Paragraph 37?

[7] **Q:** Yes.

[8] **A:** Okay.

[9] **Q:** You referenced an actual cost of

[10] credit. What is that?

[11] **A:** I have no idea.

[12] **MS. GRAY:** Object, legal

[13] conclusion?

[14] **Q:** You don't know the amounts that go

[15] into this actual cost of credit?

[16] **A:** Nope.

[17] **Q:** On what basis are you asserting

[18] that the Home Owner's Equity Protection

[19] Act applies to this loan?

[20] **MS. GRAY:** Object, legal

[21] conclusion.

[22] **A:** I don't know.

[23] **Q:** Could you tell me the material

[24] disclosures that were not given to you

[25] pursuant to the Home Owner's Equity

Patricia J. McNerney
August 22, 2006    12-12020-mg    Doc 9280-3    Filed 10/23/15    Entered 10/23/15 16:52:41    Exhibit et al.

Mortgage Elect. Reg. Sys., Inc.   v.
McNerney et al.

part 1    Pg 202 of 300

Page 108

[1] Protection Act?

[2]     **MS. GRAY:** Object, legal

[3] conclusion.

[4]     **A:** I don't know.

[5]     **MS. CARLISLE:** Why don't we

[6] take a quick break? I just have a

[7] few more questions —

[8]     **MS. GRAY:** I don't need to

[9] take a break. We can go through

[10] them.

[11]     **MS. CARLISLE:** Well, I would

[12] like to take a break, so we'll take a

[13] ten minute break.

[14]     (Back on the record.)

[15]     **Q:** Ms. McNerney, I appreciate your

[16] patience this afternoon. I just have a few

[17] more questions and then you'll be free to

[18] go.

[19]     I just want to clarify that you only

[20] went once to Brooklyn Title Agency to sign

[21] the documents and close your loan?

[22]     **A:** As far as I remember, yes.

[23]     **Q:** There was just one date you went and

[24] gave them the check for the 8,150 and signed

[25] all the documents that we have reviewed

Page 109

[1] today?

[2]     **A:** As far as I remember, yes.

[3]     **Q:** As best as you can remember, that date

[4] was January 3, 2003?

[5]     **A:** I had the check with me, whether or not

[6] it was the 3rd, I don't know.

[7]     **Q:** Are there any answers to questions that

[8] I have asked today that you wish to change or

[9] expand on before we end this deposition?

[10]     **MS. GRAY:** Object.

[11]     **A:** No.

[12]     **Q:** Is there any further information that

[13] you have remembered over the course of the

[14] afternoon to any of the questions that I have

[15] asked that you would like to provide at this

[16] time?

[17]     **MS. GRAY:** Object.

[18]     **A:** I don't really think so.

[19]     **Q:** And is there anything that you would

[20] like to add so we understand your perspective

[21] or viewpoint of this transaction more

[22] clearly?

[23]     **A:** No.

[24]     **MS. CARLISLE:** I want to

[25] thank you for coming in today and

Page 110

[1] answering my questions. We are done.

[2]     **MS. GRAY:** We do not waive

[3] signature.

[4]

[5]     (Deposition concluded.)

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 111

[1] The State of Ohio,            )

                        ) SS: CERTIFICATE

[2] County of Cuyahoga.        )

[3]     I, Amanda Goldberg, a Notary Public

[4] within and for the State of Ohio, duly

[5] commissioned and qualified, do hereby certify

[6] that the within-named PATRICIA JOANNE

[7] MCNERNEY as by me first duly sworn to testify

[8] the truth, the whole truth and nothing but

[9] the truth in the cause aforesaid; that the

[10] testimony then given by her was by me reduced

[11] to stenotypy in the presence of said witness,

[12] afterwards transcribed upon a computer, and

[13] that the foregoing is a true and correct

[14] transcript of the testimony so given by her

[15] as aforesaid.

[16]     I do further certify that his

[17] deposition was taken at the time and place in

[18] the foregoing caption specified and was

[19] completed without adjournment.

[20]     I do further certify that I am not a

[21] relative, counsel or attorney of either party

[22] or otherwise interested in the event of this

[23] action, nor am I, nor is the court reporting

[24] firm with which I am affiliated, under a

[25] contract as defined in Rule 28(D).

9939

# NOTE

DECEMBER 27TH, 2002       BROOKLYN       OHIO
[Date]       [City]       [State]

1241 THOREAU ROAD, LAKEWOOD, OH 44107

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 108,000.00       (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is    HOMECOMINGS FINANCIAL NETWORK, INC.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    8.0000    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the FIRST day of each month beginning on FEBRUARY 1ST, 2003 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JANUARY 1ST, 2033 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 27725 STANSBURY BLVD, SUITE 375, FARMINGTON HILLS,
MI 48334       or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $       792.47 .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

VMP-5N (0207)       Form 3200 1/01

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 3       Initials *pm*       MFCD6054 - (11/02) //       993-9


PLAINTIFF'S EXHIBIT
8-22-a 04

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15          calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.00          % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

PLAINTIFFS 0004

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Patricia Joanne McNerney_ (Seal)
PATRICIA JOANNE MCNERNEY          -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

WITHOUT RECOURSE
PAY TO THE ORDER OF
GMAC MORTGAGE CORPORATION

_Karen Schiefert_
KAREN SCHIEFERT
ASSISTANT SECRETARY
HOMECOMINGS FINANCIAL NETWORK INC.
A DELAWARE CORPORATION          Page 3 of 3

*[Sign Original Only]*

VMP-5N (0207)
MFCD6054 - (11/02) /          .993-9

Form 3200 1/01

PLAINTIFFS 0005

Return To:

HOMECOMINGS FINANCIAL NETWORK, INC
ONE MERIDIAN CROSSING, STE 100
MINNEAPOLIS, MN 55423
Loan Number: ███████993-9

CUYAHOGA COUNTY RECORDER
PATRICK J. OMALLEY
MORT 01/06/2003 11:04:42 AM
**200301060120**

────────[Space Above This Line For Recording Data]────────

# MORTGAGE

MIN ████████████9391

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    DECEMBER 27TH, 2002
together with all Riders to this document.
(B) "Borrower" is
PATRICIA JOANNE MCNERNEY, A SINGLE WOMAN

*AKA PATRICIA JOANNE KELLICKER*

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS                 Form 3036 1/01
MFOH7770 (9/02) /          993-9
ⓂⓅ-6A(OH) (0201)
Page 1 of 15                    Initials: *PJM*
VMP MORTGAGE FORMS - (800)521-7291



PLAINTIFF'S
EXHIBIT
2
8-22-06
PENGAD 800-631-6989

3145547



(D) "Lender" is  HOMECOMINGS FINANCIAL NETWORK, INC.

Lender is a  CORPORATION
organized and existing under the laws of  DELAWARE
Lender's address is  27725 STANSBURY BLVD, SUITE 375
FARMINGTON HILLS, MI 48334
(E) "Note" means the promissory note signed by Borrower and dated DECEMBER 27TH, 2002
The Note states that Borrower owes Lender  ONE HUNDRED EIGHT THOUSAND AND NO/100

Dollars

(U.S. $  108,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than JANUARY 1ST, 2033            .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider   ☐ Condominium Rider                ☐ Second Home Rider
☐ Balloon Rider           ☐ Planned Unit Development Rider   ☐ 1-4 Family Rider
☐ VA Rider                ☐ Biweekly Payment Rider           ☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

MFOH7770 (9/02) /      .993-9
-6A(OH) (0201)                              Page 2 of 15            Initials _____      Form 3036  1/01

PLAINTIFFS 0030

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the COUNTY                                    of CUYAHOGA                                    :
            [Type of Recording Jurisdiction]                        [Name of Recording Jurisdiction]
Legal description attached hereto and made a part hereof

Parcel ID Number:  312-28-084                          which currently has the address of
1241 THOREAU ROAD                                                                  [Street]
LAKEWOOD                                        [City], Ohio          44107      [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

MFOH7770 (9/02) /      1993-9
-6A(OH) (0201)                            Page 3 of 15              Initials: pm              Form 3036   1/01

PLAINTIFFS 0031

File No:201546

## EXHIBIT A - LEGAL DESCRIPTION

Situated in the City of Lakewood, County of Cuyahoga and State of Ohio:

And known as being Sublot No. 35 in the J.A. Zangerle Subdivision of part of original Rockport Township Section No. 21, as shown by the recorded plat in Volume 34 of Maps, Page 7 of the Cuyahoga County Records, and being 50 feet front on the easterly side of Thoreau Road and extending back of equal width 140 18/100 feet deep, as appears by said plat, be the same more or less, but subject to all legal highways.

1241 Thoreau Road, Lakewood, OH 44107

CUYAHOGA COUNTY RECORDER
200301050120   PAGE 4 of 16

PLAINTIFFS 0032

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

MFOH7770 (9/02) /          993-9
-6A(OH) (0201)                                    Page 4 of 15          Initials PPM          Form 3036   1/01

PLAINTIFFS 0033

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

CUYAHOGA COUNTY RECORDER
200301060120   PAGE 7 of 16

PLAINTIFFS 0035

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

MFOH7770 (9/02) /     993-9

-6A(OH) (0201)                      Page 7 of 15                Initials: AM         Form 3036  1/01

PLAINTIFFS 0036

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

CUYAHOGA COUNTY RECORDER
200301060120   PAGE 8 of 18

PLAINTIFFS 0037

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

CUYAHOGA COUNTY RECORDER
200301060120   PAGE 10 of 18

PLAINTIFFS 0038

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

CUYAHOGA COUNTY RECORDER
200301060120   PAGE 11 of 18

PLAINTIFFS 0039

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

CUYAHOGA COUNTY RECORDER
200301060120    PAGE 12 of 18

PLAINTIFFS 0040

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

CUYAHOGA COUNTY RECORDER
200301060120   PAGE 13 of 16          PLAINTIFFS 0041

NON UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Certain Other Advances.** In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office, _____ County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 24 to acknowledge, affirm and comply with the provision of Section 5301.233 of the Revised Code of Ohio.

CUYAHOGA COUNTY RECORDER
200301060120   PAGE 14 of 18

PLAINTIFFS 0042

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____ (Seal)
Theresa K. Dempsey

_Patricia Joanne McTurley_ (Seal)
PATRICIA JOANNE MCNERNEY   -Borrower

_Beata Trzaska_
BEATA TRZASKA

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

MFOH7770 (9/02) /          993-9
-6A(OH) (0201)                              Page 14 of 15                      Form 3036   1/01

PLAINTIFFS 0043

STATE OF OHIO,                                                County ss: Cuyahoga

This instrument was acknowledged before me this 27TH DECEMBER of 2002                    by

PATRICIA JOANNE MCNERNEY, A SINGLE WOMAN

My Commission Expires: 9-11-07



Notary Public

THERESA L.
DEMPSEY
NOTARY PUBLIC
STATE OF OHIO
Recorded in
Cuyahoga Cty.
My Comm. Exp. 9/11/07

This instrument was prepared by
HomeComings Financial Network
27725 Stansbury Blvd, Suite 375
Farmington Hills, MI 48334

MFOH7770 (9/02) /    1993-9

-6A(OH) (0201)

Page 15 of 15                    Initials: _____

Form 3036  1/01

PLAINTIFFS 0044

DEC. 26. 2002 4:29PM    HOMECOMINGS

## Notice Concerning Private Mortgage Insurance - Initial Disclosure - Fixed Rate Mortgages

Borrower Name(s):
PATRICIA JOANNE MCINERNEY

Lender:
HOMECOMINGS FINANCIAL NETWORK, INC.
27725 STANSBURY BLVD, SUITE 375
FARMINGTON HILLS, MI 48334

Loan Number:    1993-9
Property Address:
1241 THOREAU ROAD
LAKEWOOD, OH 44107

Date: 12/27/2002

You are obtaining a mortgage loan that requires private mortgage insurance ("PMI"). PMI protects lenders and others against financial loss when borrowers default. Charges for the insurance are added to your loan payments.

Under certain circumstances, federal law gives you the right to cancel PMI or requires that PMI automatically terminate. This disclosure describes when cancellation and termination may occur. Please note that PMI is *not* the same as property/casualty insurance - such as homeowner's or flood insurance - which protects you against damage to the property. Cancellation or termination of PMI does *not* affect any obligation you may have to maintain other types of insurance.

In this disclosure, "loan" means the mortgage loan you are obtaining; "you" means the original borrower (or his or her successors or assigns); and "property" means the property securing the mortgage loan.

### Initial Amortization Schedule
An amortization schedule showing the principal and interest due on your loan, along with the balance remaining after each scheduled payment, is attached for your reference.

### Borrower Requested Cancellation of PMI
You have the right to request that PMI be canceled on or after the following dates:

1. The date the principal balance of your loan is first *scheduled* to reach 80% of the original value of the property. This date is    05/01/2012    . For balloon loans with a fixed interest rate and no conditional right to refinance, if applicable, this date may not be reached before the loan matures.

2. The date the principal balance *actually* reaches 80% of the original value of the property.

"Original value" means the lesser of the contract sales price of the property or the *appraised* value of the property at the time the loan was closed. If this loan refinances an existing loan secured by the property, "original value" means the appraised value relied on by the lender to approve this loan.

PMI will only be canceled if all the following conditions are satisfied:

1. you submit a written request for cancellation;
2. you have a good payment history;
3. you are current on the payments required by your loan; and
4. we receive, if requested and at your expense, evidence satisfactory to the holder of your loan that the value of the property has not declined below its original value, and certification that there are no subordinate liens on the property.

A "good payment history" means no payments 60 or more days past due within two years and no payments 30 or more days past due within one year of the later of (a) the cancellation date, or (b) the date you submit a request for cancellation.

### Automatic Termination of PMI
If you are current on your loan payments, PMI will automatically terminate on the date the principal balance of your loan is first *scheduled* to reach 78% of the original value of the property. This date is    08/01/2013    . For balloon loans with a fixed interest rate and no conditional right to refinance, if applicable, this date may not be reached before the loan matures. If you are *not* current on your loan payments as of that date, PMI will automatically terminate on the first day of the month immediately following the date you thereafter become current on your payments.

### Exceptions to Cancellation and Automatic Termination
The cancellation and automatic termination requirements described above do not apply to certain loans that may present a higher risk of default. Your loan, however, does not fall into this category. Accordingly, the cancellation and automatic termination provisions described above apply to your loan.

I/We have received a copy of this disclosure and initial amortization schedule.

Patricia Joanne McInerney    12.2702
Borrower PATRICIA J/JOANNE MCINERNEY    Date    Borrower    Date

Borrower    Date    Borrower    Date

Borrower    Date    Borrower    Date

Borrower    Date    Borrower    Date

-375 (0107)    Form C-1    7/01
VMP MORTGAGE FORMS - (800)521-7291
© 1998, 2001 America's Community Bankers®,
Mortgage Bankers Association of America
FIXEDPMI-11/01




PLAINTIFF'S
EXHIBIT
3
PENGAD 800-631-6989
8-22-06

# FIRST PAYMENT NOTICE

__DECEMBER 27, 2002__
**Date**

__993-9__
**Loan Number**

Dear Borrower:

We wish to take this opportunity to welcome you as a customer of   HomeComings Financial Network,
**Inc.**                                and to provide you with the following information regarding
your loan.

In accordance with the terms of the Note and Mortgage, your first monthly payment is due and payable on or before
**FEBRUARY 1, 2003**                  . All succeeding payments are due and payable on the first day of the month.

Your initial monthly payment will be as follows:

| | |
|---|---|
| Monthly Principal and Interest: | $     792.47 |
| Monthly Property Tax Deposit: | $     230.81 |
| Monthly Hazard Insurance Deposit: | $      31.00 |
| Monthly Annual Assessment Amount: | $ |
| Monthly Flood Insurance Deposit: | $ |
| Monthly Mortgage Insurance Deposit: | $     178.20 |
| | $ |
| | $ |
| | $ |
| **Total Initial Monthly Payment:** | $    1232.48 |

You will be provided with monthly payment coupons for your convenience. However, if your initial payment coupon
has not arrived by the time you need to make your payment, please detach and mail the coupon below along with your
check to the address indicated. Our mailing address for all correspondence is:

GMAC Mortgage Corporation
P.O. Box 780
Waterloo, IA  50704-0780
800-766-4622

**Please include your loan number on all correspondence.**

Please provide us with the following information in order for us to assure timely receipt of your monthly mortgage billing
statements and to correspond with you on any other matters of importance. Please sign below and return to the mailing
address provided above.

*Mailing Address/P.O. Box _____
                          (* Indicate mailing address __after__ loan settlement)

City, State & Zip Code  _____

Present Telephone Number (include area code)_____

If I/We the Borrower(s) desire the mailing address to be different than the address of the Property indicated on the Deed
of Trust, Borrower(s) must provide the correct mailing address. I/We certify the above mailing information to be true
and correct and further agree to notify the holder of service of the note immediately of any change of address by certified
mail, return receipt requested, to the above referenced address. No other knowledge, whether actual or constructive by
the holder of the Note or any of its agents or employees, will be sufficient to put the holder of the Note on notice of any
change of Borrower(s) mailing address and/or telephone number.

_Patricia Joanne McNerney_
PATRICIA JOANNE MCNERNEY          (-Borrower          ·Borrower

_____          _____
                          ·Borrower          ·Borrower
...............................................................................................................................

### FIRST PAYMENT COUPON

**NAME:** PATRICIA JOANNE MCNERNEY          **LOAN NUMBER:** ·993-9
**AMOUNT:** $1,232.48          **DATE DUE:** FEBRUARY 1, 2003

A late charge will be assessed if payment is received at this designated location after the 15th calendar day following
the due date indicated above.

**Send payment to:**          **Using overnight mail service, send payment to:**
**GMAC Mortgage Corporation**          **GMAC Mortgage Corporation**  ·
**P.O. Box 780**          **3451 Hammond Ave**
**Waterloo, IA  50704-0780**          **Waterloo, IA  50702**

*First Payment Notice*          MFC09677 - 02/02
                          1993-9


PLAINTIFF'S EXHIBIT 4

# Homecomings Financial

*A GMAC Company*

01/02/2003

PATRICIA JOANNE MCNERNEY

1241 THOREAU ROAD
LAKEWOOD, OH 44107

HFN #        993-9

Dear PATRICIA JOANNE MCNERNEY

This is to advise you that your mortgage loan has been purchased by HomeComings Financial Network, Inc.
from HOMECOMINGS FINANCIAL NETWORK, INC.   and the servicing of your loan has recently been transferred
to GMAC Mortgage Corporation effective 01/01/2003 . Please be assured that this is a normal business
transaction and will not affect any other term or condition of the mortgage documents, other than terms
directly related to the servicing of the loan. We would like to take this opportunity to welcome you as
a customer of HomeComings Financial Network, Inc. and GMAC Mortgage Corporation and to assure you
that we are committed to providing the highest level of service.

Effective  01/01/2003 , payments should be made payable to GMAC Mortgage Corporation and sent
directly to:

        GMAC Mortgage Corporation
        ATTN:  Payment Processing
        P.O. Box 780
        Waterloo, IA  50704

The amount of your monthly payment is $ 1,232.48 . You will receive a monthly account statement from
GMAC Mortgage Corporation under separate cover which will include a payment coupon and return envelope
to be used in forwarding your payment to GMAC Mortgage Corp.

Any written inquiries should be addressed to GMAC Mortgage Corporation and sent directly to:

        GMAC Mortgage Corporation
        ATTN:  Customer Service Department
        P.O. Box 780
        Waterloo, IA  50704
        (800) 766-GMAC (4622)

As of 01/01/2003 , HOMECOMINGS FINANCIAL NETWORK, can no longer accept payments on your account.
However, if you have any questions BEFORE the transfer, you may contact their Loan Servicing Depart-
ment at  248-539-9880  . If this is a toll call, collect calls will be accepted.

You will receive a Year-End statement summarizing your loan for your income tax return for the partial
year your loan is with GMAC Mortgage Corp. You should also receive a Year-End statement from your
previous servicer.

HomeComings Financial Network, Inc. and GMAC Mortgage Corporation look forward to a pleasant
association with you.

Sincerely,

HOMECOMINGS FINANCIAL NETWORK, INC.
A member of the GM Family

PLAINTIFF'S
EXHIBIT
5
8-22-06
PENGAD 800-631-6989

NFCD004 (1:02)

PATRICIA JOANNE MCNERNEY
Page 2
01/02/2003

You should also be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605):

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (U.S.C. 2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 business days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request.

Not later than 60 business days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60 business day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

A business day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that section. You should seek legal advice if you believe your rights have been violated.

Future inquiries regarding the servicing of your loan should be directed to GMAC Mortgage. Their correspondence address and toll-free telephone number are as follows:

GMAC Mortgage Corporation
Attention: Customer Service Department
P.O. Box 780
Waterloo, IA 50704

Toll Free Telephone Number 1-800-766-4622

Customer Service Hours
Monday - Thursday 7:00 a.m. - 9:00 P.M. (C.S.T.)
Friday 7:00 a.m. - 6:30 P.M. (C.S.T.)
Saturday 9:00 a.m. - 1:00 P.M. (C.S.T.)

Sincerely,

HOMECOMINGS FINANCIAL NETWORK, INC.

PLAINTIFFS 0089

MFCLX044 (8/02)

April 11, 2003


PATRICIA MCNERNEY
1241 THOREAU ROAD
LAKEWOOD, OH 44107


RE:    ACCOUNT NUMBER          9939
       PROPERTY ADDRESS    1241 THOREAU ROAD
                           LAKEWOOD, OH 44107

DEAR PATRICIA MCNERNEY:

Our records indicate the above referenced mortgage loan is in default.

Your account is due for March 1, 2003 and succeeding payments.  This is a
demand for payment of the total amount due and owing as of the date of this
letter, which is as follows:

| | |
|---|---|
| Payments........................................ | $2,464.96 |
| Late Charges.................................... | $39.62 |
| Fees, Costs, and other amounts accrued to date.... | $0.00 |
| Suspense........................................ | $0.00 |
| Total Amount Due................................ | $2,504.58 |

You may cure the default by paying the total amount due, indicated above,
within thirty (30) days from the date of this letter.  You are also
responsible for paying any additional payments, fees, and charges that
become due during this thirty-day period.  Payment must be made in
certified funds or cashier's check.  If funds tendered are not honored for
any reason, the default will not be cured.  Our acceptance of any funds
less than the Total Amount Due shall not constitute a waiver of our rights
and/or remedies under the loan documents or applicable law.

You are hereby notified your credit rating may be adversely affected if you
fail to fulfill the terms of your credit obligations.  You are also
notified we may visit the above-referenced property from time to time to
determine its condition and occupancy status, the costs of which you will
be responsible for.

Unless we receive full payment of all past due amounts, we will accelerate
the maturity of the loan, declare the obligation due and payable without
further demand, and begin foreclosure proceedings.  This could result in
the loss of your property.  You have the right to assert or defend the non-
existence of a default and you may have other rights under state law.

                                        DMS5-BRCH(GN)
                                        (continued on back)

April 11, 2003
Account Number      9939
Page Two

Once in foreclosure, you have the right to reinstate your account up to
five days prior to the foreclosure sale of the property if: 1.) you pay the
Total Amount Due plus any fees, costs, and other amounts accrued through
the reinstatement date, and 2.) you take any other action reasonably
required by us to assure the security for the property as well as your
obligations under the loan documents continue in full force and effect.

HUD-approved counseling is available on FHA Guaranteed loans by calling
1-800-569-4287.  If you would like to discuss any matter contained in this
notice, we encourage you to contact our Loan Counselors immediately at
1-800-850-4622.

Collection Department
Mortgage Loan Servicing

Notice - This is an attempt to collect a debt and any information obtained
will be used for that purpose.  If your debt has been discharged in
bankruptcy, our rights are being exercised against the collateral for
the above-referenced loan, not as a personal liability.

                                          DMS5-BRCH(GN)

PLAINTIFFS 0471

July 14, 2003


PATRICIA MCNERNEY
1241 THOREAU ROAD
LAKEWOOD, OH 44107



RE:  ACCOUNT NUMBER        .9939
     PROPERTY ADDRESS  1241 THOREAU ROAD
                       LAKEWOOD, OH 44107

DEAR PATRICIA MCNERNEY:

Our records indicate the above referenced mortgage loan is in default.

Your account is due for June 1, 2003 and succeeding payments.  This is a
demand for payment of the total amount due and owing as of the date of this
letter, which is as follows:

| | |
|---|---|
| Payments......................................... | $2,464.96 |
| Late Charges..................................... | $39.62 |
| Fees, Costs, and other amounts accrued to date.... | $15.00 |
| Suspense......................................... | $0.00 |
| Total Amount Due................................. | $2,519.58 |

You may cure the default by paying the total amount due, indicated above,
within thirty (30) days from the date of this letter.  You are also
responsible for paying any additional payments, fees, and charges that
become due during this thirty-day period.  Payment must be made in
certified funds or cashier's check.  If funds tendered are not honored for
any reason, the default will not be cured.  Our acceptance of any funds
less than the Total Amount Due shall not constitute a waiver of our rights
and/or remedies under the loan documents or applicable law.

You are hereby notified your credit rating may be adversely affected if you
fail to fulfill the terms of your credit obligations.  You are also
notified we may visit the above-referenced property from time to time to
determine its condition and occupancy status, the costs of which you will
be responsible for.

Unless we receive full payment of all past due amounts, we will accelerate
the maturity of the loan, declare the obligation due and payable without
further demand, and begin foreclosure proceedings.  This could result in
the loss of your property.  You have the right to assert or defend the non-
existence of a default and you may have other rights under state law.

                                        DMS5-BRCH(GN)
                                        (continued on back)



July 14, 2003
Account Number      9939
Page Two

Once in foreclosure, you have the right to reinstate your account up to
five days prior to the foreclosure sale of the property if: 1.) you pay the
Total Amount Due plus any fees, costs, and other amounts accrued through
the reinstatement date, and 2.) you take any other action reasonably
required by us to assure the security for the property as well as your
obligations under the loan documents continue in full force and effect.

HUD-approved counseling is available on FHA Guaranteed loans by calling
1-800-569-4287.  If you would like to discuss any matter contained in this
notice, we encourage you to contact our Loan Counselors immediately at
1-800-850-4622.

Collection Department
Mortgage Loan Servicing

Notice - This is an attempt to collect a debt and any information obtained
will be used for that purpose.  If your debt has been discharged in
bankruptcy, our rights are being exercised against the collateral for
the above-referenced loan, not as a personal liability.

                                                    DMS5-BRCH(GN)

PLAINTIFFS 0468

August 12, 2003


PATRICIA MCNERNEY
1241 THOREAU ROAD
LAKEWOOD, OH 44107


RE:    ACCOUNT NUMBER        9939
       PROPERTY ADDRESS    1241 THOREAU ROAD
                           LAKEWOOD, OH 44107

DEAR PATRICIA MCNERNEY:

Our records indicate the above referenced mortgage loan is in default.

Your account is due for July 1, 2003 and succeeding payments.  This is a
demand for payment of the total amount due and owing as of the date of this
letter, which is as follows:

| | |
|---|---|
| Payments......................................... | $2,464.96 |
| Late Charges..................................... | $0.00 |
| Fees, Costs, and other amounts accrued to date.... | $0.00 |
| Suspense......................................... | $8.28 |
| Total Amount Due................................. | $2,456.68 |

You may cure the default by paying the total amount due, indicated above,
within thirty (30) days from the date of this letter.  You are also
responsible for paying any additional payments, fees, and charges that
become due during this thirty-day period.  Payment must be made in
certified funds or cashier's check.  If funds tendered are not honored for
any reason, the default will not be cured.  Our acceptance of any funds
less than the Total Amount Due shall not constitute a waiver of our rights
and/or remedies under the loan documents or applicable law.

You are hereby notified your credit rating may be adversely affected if you
fail to fulfill the terms of your credit obligations.  You are also
notified we may visit the above-referenced property from time to time to
determine its condition and occupancy status, the costs of which you will
be responsible for.

Unless we receive full payment of all past due amounts, we will accelerate
the maturity of the loan, declare the obligation due and payable without
further demand, and begin foreclosure proceedings.  This could result in
the loss of your property.  You have the right to assert or defend the non-
existence of a default and you may have other rights under state law.

                                        DMS5-BRCH(GN)
                                        (continued on back)



August 12, 2003
Account Number    .9939
Page Two

Once in foreclosure, you have the right to reinstate your account up to
five days prior to the foreclosure sale of the property if: 1.) you pay the
Total Amount Due plus any fees, costs, and other amounts accrued through
the reinstatement date, and 2.) you take any other action reasonably
required by us to assure the security for the property as well as your
obligations under the loan documents continue in full force and effect.

HUD-approved counseling is available on FHA Guaranteed loans by calling
1-800-569-4287.  If you would like to discuss any matter contained in this
notice, we encourage you to contact our Loan Counselors immediately at
1-800-850-4622.

Collection Department
Mortgage Loan Servicing

Notice - This is an attempt to collect a debt and any information obtained
will be used for that purpose.  If your debt has been discharged in
bankruptcy, our rights are being exercised against the collateral for
the above-referenced loan, not as a personal liability.

                                              DMS5-BRCH(GN)

PLAINTIFFS 0463

August 20, 2003


PATRICIA MCNERNEY
1241 THOREAU ROAD
LAKEWOOD, OH 44107


RE:   ACCOUNT NUMBER        9939
      PROPERTY ADDRESS    1241 THOREAU ROAD
                          LAKEWOOD, OH 44107

DEAR PATRICIA MCNERNEY:

Your account is in default under the terms of the mortgage.  The
mortgage payments of $1,232.48 for the months of July 1, 2003, through
August 1, 2003, are past due.  If you have already mailed these
payments, please accept our thanks.

Due to the unresolved delinquency on your account, you may be
experiencing temporary or permanent financial problems that led to the
default.  Your account could soon be referred to foreclosure if the
default is not resolved.  We would like to discuss possible loss
mitigation options, which may be available to you to resolve the
delinquency and avoid foreclosure.  A brief description of these
options follows.

If you have experienced a temporary loss of income or increase in
expenses and now have sufficient income to make increased payments, we
may be able to work out a REPAYMENT PLAN.

LOAN MODIFICATION: A loan modification capitalizes delinquent payments
into the unpaid principal balance.  This may be completed if you are
unable to make temporary increased monthly payments, yet can still
affort your mortgage payments

SHORT SALE: The investor may accept less than a full payoff when the
value of your property has declined.  You must list the property at
fair market value and forward any offers, along with estimated closing
costs, to our company.  The acceptance of the offer is subject to
investor approval.  You may be required to contribute to reduce the
total loss.

DEED IN LIEU OF FORECLOSURE: A deed in lieu voluntarily gives back the
Deed to the lender to satisfy the debt and avoid foreclosure.  You
must have tried to sell the property for 90 days at fair market value.

The collection activity will not stop and the monthly mortgage
payments are still due while we evaluate your financial situation.
Not all options may be available to you and we cannot guarantee you
will qualify for any of the loss mitigation options.

In order to be considered for any of these loss mitigation options,
you may be required to provide us with financial information.  Please
contact us at 1-800-850-4622 to discuss any of these loss mitigation
options.  For your information, you may contact a HUD Counseling Agent
at 1-800-569-4287.  Toll free TDD number for the HUD Counseling Agency
is 1-800-877-8339.

Notice - This is an attempt to collect a debt and any information
obtained will be used for that purpose.  If your debt has been
discharged in bankruptcy, our rights are being exercised against the
collateral for the above-referenced loan, not as a personal liability.

Collection Department
Mortgage Loan Servicing                              DMS5-OPTION



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT

02/16/04

PATRICIA MCNERNEY

1241 THOREAU ROAD

LAKEWOOD        OH 44107

RE:    Account Number          9939
       Property Address        1241 THOREAU ROAD

                       LAKEWOOD          OH 44107

Dear    PATRICIA MCNERNEY

The financial information submitted by you for consideration of a Loan Modification has been
reviewed.  GMAC Mortgage Corporation is unable to approve your request for the following
reason(s):

Insufficient Income to support Modification

Notice - This is an attempt to collect a debt and any information obtained will be used for that
purpose.  If your debt has been discharged in bankruptcy, our rights are being exercised against the
collateral for the above-referenced loan, not as a personal liability.

If you have any questions regarding the above decision, please contact our office at
1-800-449-8582, extension .

Loss Mitigation Department
Loan Servicing

5:90


PLAINTIFF'S
EXHIBIT
10
8-22-06

F13920

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

**FILED**

Mortgage Electronic Registration )
Systems, Inc., acting solely as a )    **CASE NO.**    NOV 1 0 2003
nominee for Homecomings Financial )
Network, Inc. )    **JUDGE**    GERALD E. FUERST
c/o GMAC Mortgage Corporation )                    CLERK OF COURTS
500 Enterprise Road, Suite 150 )                    CUYAHOGA COUNTY, OHIO
Horsham, PA  19044 )
)
PLAINTIFF )    **COMPLAINT FOR MONEY,**
)    **FORECLOURE, REFORMATION**
-vs- )    **AND OTHER EQUITABLE**
)    **RELIEF**
)
Patricia Joanne McNerney aka )
Patricia Joanne Kellicker )
1241 Throeau Road )
Lakewood, OH 44107 )    Judge: NANCY A FUERST
)
-and- )    ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖  CV 03 514406
)
John Doe, Unknown Spouse, if any, )
of Patricia Joanne McNerney aka )
Patricia Joanne Kellicker )
1241 Throeau Road )
Lakewood, OH 44107 )
)
DEFENDANTS )

## FIRST COUNT

1.  Plaintiff says that it is the owner and holder of a

certain promissory note, a copy of which is hereto attached,

marked EXHIBIT A and made a part hereof; that by reason of

default in payment of the said note and mortgage securing same,

it has declared said debt due; that there is due and unpaid

PLAINTIFF'S
EXHIBIT
1

thereon the sum of $107,632.79 plus interest at the rate of 8%
per annum from June 1, 2003.

## SECOND COUNT

2.    Plaintiff incorporates herein by reference all of the
allegations contained in its first count, and further says that
it is the owner and holder of a certain mortgage deed securing
the payment of said promissory note, a copy of which mortgage
attached hereto, marked as EXHIBIT B and made a part hereof;
that said mortgage is a valid and first lien upon the premises
described therein, being Permanent Parcel Number 312-28-084.

3.    Plaintiff says that the conditions in said mortgage
have been broken by reason of default in payment, and the same
has become absolute.

4.    Plaintiff says that pursuant to the covenants and
conditions of said mortgage deed it may, from time to time
during the pendency of this action, advance sums to pay real
estate taxes, hazard insurance premiums and property protection
and maintenance.

5.    Plaintiff says that the Defendants, Patricia Joanne
McNerney aka Patricia Joanne Kellicker, and John Doe, Unknown
Spouse, if any, of Patricia Joanne McNerney aka Patricia Joanne
Kellicker, have or claim to have an interest in the premises.

## THIRD COUNT

6.    Plaintiff incorporates herein by reference all of the

allegations contained in its first and second counts, and further says that the real property described herein is commonly known as 1241 Thoreau Road, Lakewood, OH 44107 with the full legal description as follows:

SITUATED IN THE CITY OF LAKEWOOD, COUNTY OF CUYAHOGA AND STATE OF OHIO:

AND KNOWN AS BEING SUBLOT NO. 35 IN THE J.A. ZANGERLE SUBDIVISION OF PART OF ORIGINAL ROCKPORT TOWNSHIP SECTION NO. 21, AS SHOWN BY THE RECORDED PLAT IN VOLUME 34 OF MAPS, PAGE 7 OF THE CUYAHOGA COUNTY RECORDS, AND BEING 50 FEET FRONT ON THE EASTERLY SIDE OF THOREAU ROAD AND EXTENDING BACK OF EQUAL WIDTH 140-18/100 FEET DEEP, AS APPEARS BY SAID PLAT BE THE SAME MORE OR LESS, BUT SUBJECT TO ALL LEGAL HIGHWAYS.

**ALSO PART OF THOREAU AVENUE VACATED AS SHOWN BY VOL. 204, PAGE 22 OF OHIO COURT MAPS RECORDS.**

7.    Plaintiff further says that through mutual mistake, the legal description contained in the mortgage deed does not conform to the legal description as set forth above; that the intention of the parties at the time of the execution of the mortgage deed was to transfer to the plaintiff all interest that the defendants had in and to the aforesaid described real property, but that, through a scrivener's error, the legal description was not entirely and properly placed in the mortgage deed.

W H E R E F O R E, Plaintiff demands judgment against the Defendant, Patricia Joanne McNerney aka Patricia Joanne Kellicker, in the sum of $107,632.79 plus interest at the rate of 8% per annum from June 1, 2003, unless said Defendant has

been or is discharged in bankruptcy proceedings during the
pendency of this action; that the Defendants named herein be
required to answer and set up any claim that they may have in
said premises or be forever barred; that the mortgage deed
attached hereto as EXHIBIT B be reformed to provide for the
proper legal description as contained in this pleading; that the
Plaintiff be found to have a first lien on said premises for
this amount so owing together with its advances made pursuant to
the terms of the mortgage for real estate taxes, hazard
insurance premiums and property protection and maintenance; that
said premises be ordered, appraised, advertised and sold
according to law, and that from the proceeds the Plaintiff be
paid the amount found due it, and for such other and further
relief as equity entitles it to receive.

THE LAW OFFICES OF
JOHN D. CLUNK CO. LPA

JOHN D. CLUNK # 0005376
TED A. HUMBERT # 0022307
TIMOTHY R. BILLICK #0010390
ROBERT R. HOOSE #0074544
LISA M. MICHAELS #0066918
MICHAEL L. WIERY #0068898
Attorneys for Plaintiff
5601 Hudson Drive, Suite 400
Hudson, Ohio 44236
(330) 342-8203

## NOTICE UNDER THE FAIR DEBT COLLECTION PRACTICES ACT

If your name appears as a Defendant in this Complaint, the following notice applies to you.

1. The purpose of the attached documents is to collect a debt. Any information you provide to John D. Clunk, Attorney at Law, will be used for that purpose.

2. The amount of the debt is stated in paragraph one of this Complaint.

3. The Plaintiff as named in this Complaint is the creditor to whom the the debt is owed.

4. The debt described in this Complaint and evidenced by the copy of the note attached hereto will be assumed to be valid by John D. Clunk Attorney at Law, unless, within thirty days after the receipt of this notice, you dispute, in writing, the validity of the debt or some portion thereof.

5. If you notify John D. Clunk, Attorney at Law, in writing within thirty days of the receipt of this notice that the debt or any portion thereof is disputed, John D. Clunk, Attorney at Law, will obtain a verification of the debt and a copy of the verification will be mailed to you by John D. Clunk, Attorney at Law.

6. If the creditor named as Plaintiff in this Complaint is not the original creditor, and if you make written request to John D. Clunk, Attorney at Law, within thirty days from the receipt of this notice, the name and address of the original creditor will be mailed to you by John D. Clunk, Attorney at Law.

7. Written requests should be addressed to:
   THE LAW OFFICES OF JOHN D. CLUNK CO., LPA, ATTORNEYS AT LAW
   5601 Hudson Drive, Suite 400, Hudson, Ohio 44236

This is an attempt to collect a debt and any information obtained will be used for that purpose.



EX...BIT _____A_____

# NOTE

DECEMBER 27TH, 2002                    BROOKLYN                    OHIO
[Date]                                 [City]                      [State]

1241 THOREAU ROAD, LAKEWOOD, OH 44107

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 108,000.00        (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is    HOMECOMINGS FINANCIAL NETWORK, INC.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of     8.0000    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B)
of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the   FIRST   day of each month beginning on   FEBRUARY 1ST, 2003   . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest
before Principal. If, on   JANUARY 1ST, 2033      , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."

I will make my monthly payments at   27725 STANSBURY BLVD, SUITE 375, FARMINGTON HILLS,
MI 48334                                    or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $        792.47   .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my
monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-5N (0207)                    Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                    Initials: _pm_              MFCD6054 - (11/02)        993-9





## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     5.00           % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

Form 3200 1/01
Initials: _____

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Patricia Joanne McNerney_ (Seal)
PATRICIA JOANNE MCNERNEY            -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

WITHOUT RECOURSE
PAY TO THE ORDER OF
  GMAC MORTGAGE CORPORATION                    *[Sign Original Only]*

_Karen Schiefert_
KAREN SCHIEFERT
ASSISTANT SECRETARY
HOMECOMINGS FINANCIAL NETWORK INC.
A DELAWARE CORPORATION      Page 3 of 3

VMP-5N (0207)                                   Form 3200 1/01
MFC06064 - (11/02)/   993-9

Return To:
HOMECOMINGS FINANCIAL NETWORK, INC
ONE MERIDIAN CROSSING, STE 100
MINNEAPOLIS, MN 55423
Loan Number: 041-571993-9

CUYAHOGA COUNTY RECORDER
PATRICK J. OMALLEY
MORT 01/06/2003 11:04:42 AM
200301060120

EXHIBIT ___B___

————————————[Space Above This Line For Recording Data]————————————

# MORTGAGE

MIN ████████9391

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated   DECEMBER 27TH, 2002
together with all Riders to this document.
**(B) "Borrower" is**
PATRICIA JOANNE MCNERNEY, A SINGLE WOMAN

*AKA PATRICIA JOANNE KELLICKER*

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS                Form 3036  1/01
MFOH7770 (9/02) /          '993-9
VMP-6A(OH) (0201)
Page 1 of 15            Initials: *PJM*
VMP MORTGAGE FORMS - (800)521-7291

3145547



(D) "Lender" is  HOMECOMINGS FINANCIAL NETWORK, INC.

Lender is a  CORPORATION
organized and existing under the laws of  DELAWARE
Lender's address is  27725 STANSBURY BLVD, SUITE 375
FARMINGTON HILLS, MI 48334
(E) "Note" means the promissory note signed by Borrower and dated DECEMBER 27TH,  2002
The Note states that Borrower owes Lender  ONE HUNDRED EIGHT THOUSAND AND NO/100

Dollars

(U.S. $  108,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than JANUARY 1ST,  2033
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider  ☐ Condominium Rider         ☐ Second Home Rider
☐ Balloon Rider          ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider               ☐ Biweekly Payment Rider    ☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

MFOH7770 (9/02) /        993-9
⓿-6A(OH) (0201)                    Page 2 of 15        Initials _AMM_        Form 3036  1/01

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the
COUNTY                          of CUYAHOGA                          :
   [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
Legal description attached hereto and made a part hereof

Parcel ID Number:  312-28-084                     which currently has the address of
1241 THOREAU ROAD                                              ,                    [Street]
LAKEWOOD                                        [City], Ohio          44107    [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

MFOH7770 (9/02) /        .993-9
-6A(OH) (0201)                            Page 3 of 15            Form 3036  1/01

Initials: DM

File No:201546

## EXHIBIT A - LEGAL DESCRIPTION

Situated in the City of Lakewood, County of Cuyahoga and State of Ohio:

And known as being Sublot No. 35 in the J.A. Zangerle Subdivision of part of original Rockport Township Section No. 21, as shown by the recorded plat in Volume 34 of Maps, Page 7 of the Cuyahoga County Records, and being 50 feet front on the easterly side of Thoreau Road and extending back of equal width 140 18/100 feet deep, as appears by said plat, be the same more or less, but subject to all legal highways.

1241 Thoreau Road, Lakewood, OH 44107

CUYAHOGA COUNTY RECORDER
200301050120    PAGE 4 of 16

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

CUYAHOGA COUNTY RECORDER
200301080120    PAGE 6 of 16

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

CUYAHOGA COUNTY RECORDER
200301060120    PAGE 6 of 16

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

MFOH7770 (9/02) /          '993-9
(VMP)-6A(OH) (0201)                              Page 6 of 15          Initials [PPM]          Form 3036  1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

MFOH7770 (9/02) /     '993-9

Ⓜ️-6A(OH) (0201)     Page 7 of 15     Initials _AM_     Form 3036   1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

CUYAHOGA COUNTY RECORDER
200301060120  PAGE 10 of 16

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

CUYAHOGA COUNTY RECORDER
200301060120   PAGE 11 of 18

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

MFOH7770 (9/02) /        .993-9

6A(OH) (0201)                                    Page 11 of 15                    Initials: _PPM_                Form 3036   1/01

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

CUYAHOGA COUNTY RECORDER
200307060120 PAGE 13 of 16

NON UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Certain Other Advances.** In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office,
County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 24 to acknowledge, affirm and comply with the provision of Section 5301.233 of the Revised Code of Ohio.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_Theresa L. Dempsey_

_Patricia Joanne McNerney_ (Seal)
PATRICIA JOANNE MCNERNEY          -Borrower

_Beata Truska_
BEATA TRZASKA

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

**STATE OF OHIO,**

County ss: *Cuyahoga*

This instrument was acknowledged before me this *27TH DECEMBER* of 2002    by

PATRICIA JOANNE MCNERNEY, A SINGLE WOMAN

My Commission Expires: *9-11-07*

_____
Notary Public



THERESA L.
DEMPSEY
NOTARY PUBLIC
STATE OF OHIO
Recorded in
Cuyahoga Cty.
My Comm. Exp. 9/11/07

This instrument was prepared by
HomeComings Financial Network
27725 Stansbury Blvd, Suite 375
Farmington Hills, MI 48334

MFOH7770 (9/02) /        1993-9
VMP-6A(OH) (0201)                    Page 15 of 15

Initials: _____

Form 3036   1/01

COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| Mortgage Elect. Reg. Sys. Inc. | ) | Case No. CV03514406 |
| | ) | |
| | ) | Judge Nancy A. Fuerst |
| Plaintiff | ) | |
| vs. | ) | |
| | ) | _Answer and Counterclaim_ |
| Patricia Joanne McNerney, et al | ) | |
| | ) | |
| Defendants | ) | |

Ms. McNerney respectfully responds as follows to the complaint:

*Answer*

1.    Denies paragraphs one, two and three, of the complaint.

2.    Denies paragraph four for lack of knowledge

3.    Admits paragraphs five

4.    Denies paragraph six

4.    Denies paragraph seven for lack of knowledge

*General Denial*

5.    Denies generally each and every paragraph not heretofore admitted or

denied

*Affirmative Defenses*

6.    The complaint is barred by the doctrines of laches and unclean hands

7.    The contract is void for failure of consideration


PLAINTIFF'S
EXHIBIT
12

8.    The contract is void for fraud and other illegality

9.    The contract is unenforceable due to rescission by Ms. McNerney

### Counterclaims

#### Preliminary Statement

10.  This Counterclaim is filed under the Truth in Lending Act, 15 U.S.C. Sec.

1601 (TILA) and the Real Estate Settlement Procedures Act (RESPA) to

enforce Ms. McNerney's right to rescind a consumer credit transaction

involving the taking of a security interest in Ms. McNerney's home, and to

recover statutory damages, reasonable attorney's fees and costs by reason of

violations of the Truth in Lending Act and Regulation Z, 12 C.F.R. 226

(Regulation Z) and also violation of the Real Estate Settlement Procedures

Act.

### The Parties

11. The Plaintiff on the Counterclaim, Ms. Martha McNerney, is a natural person

residing at 1241 Thoreau Road, Lakewood, Ohio 44107.

12. The Defendant on the Counterclaim, on information and belief, is the

"Nominee" (as set forth in the Mortgage) of Homecomings Financial

Network, Inc., a corporation engaged in the business of Consumer Lending

with an address as set forth on the HUD 1 statement of 27725 Stansbury Blvd,

Suite # 375, Farmington Hills, MI 48334.

13. At all times relevant, the Homecomings Financial Network, Inc., in the

ordinary course of its business, regularly extended or offered to extend

consumer credit for which a finance charge is or may be imposed or by written agreement which is payable in more than four installments.

## *Factual Allegations*

14. On or about January 3, 2003, Ms. McNerney entered into a consumer credit transaction with Homecomings Financial Network, Inc., (as set forth in the HUD 1 statement, although the mortgage names Mortgage Eletronic Registration Systems, Inc. as the nominee for Homecomings Financial Network, Inc.,) for a loan in the amount of $108,000.00, in which Homecomings Financial Network, Inc. extended consumer credit which was subject to a finance charge and which was payable to the Mortgage Elecronic Registration Systems, Inc, as nominee of Homecomings Financial Network, Inc.

15. As part of this consumer credit transaction, the Mortgage Elecronic Registration Systems, Inc retained a security interest in Ms. McNerney's Principal Residence, which is the subject of this foreclosure proceeding.

16. Attached as Exhibit 1 is a Truth in Lending disclosure statement (inaccurate in its disclosures) issued in connection with the transaction.

17. Attached as Exhibit 11 is another Truth in Lending disclosure statement (also inaccurate in its disclosures) issued in connection with the transaction

18. Attached as Exhibits 2 and 3 are two conflicting RESPA settlement statement issued in connection with the transaction, each identified as "final".

19. The loan at issue was arranged by Homecomings Financial Network, Inc., Ms.
McNerney's request when she needed funds to refinance the mortgage on her
home in connection with her divorce.

20. At the time of the transaction in issue, the property at issue was subject to a
mortgage in favor of Household Realty Corporation to secure a prior loan.

21. The first mortgage in favor of Household Realty Corporation was satisfied in
the transaction at issue.

22. The prior loan with Household had been at a high interest rate (13%) with a
monthly payment of $985.00 that did not include an escrow payment toward
property tax liability.

23. The broker informed Ms. McNerney that she was approved for a loan at 8%
with a monthly payment in the amount of $850.00 that did include an escrow
for property taxes.

24. The loan was scheduled to close on 12/27/02.

25. On information and belief, the loan was closed by Brooklyn Title Agency, Inc.

26. In late December, 2002, an agent from Brooklyn Title Agency called Ms.
McNerney and informed her that the closing would not occur unless she paid
an additional $8,000.00; she advised Ms. McNerney to withdraw the funds
from her Individual Retirement Account

27. Since Ms. McNerney needed the relief afforded by the lower monthly

payment, she withdrew funds and appeared for the rescheduled closing on
January 3, 2003.

28. At the closing, Ms. McNerney delivered a First Federal of Lakewood certified
check no 1-314628 in the amount of $8,150.00 payable to Brooklyn Title.
(Exhibit 4)

29. The funds were disbursed on the same day—(1-3-03)(Exhibits 5-9)

30. On the date of closing, (1/3/03), Ms. McNerney received one notice of right to
cancel stating a deadline of December 31, 2002.  (Ex. 10)

*First Cause of Action*

31. This consumer credit transaction was subject to Ms. McNerney's right of
rescission as described in 15 U.S.C. Sec. 1635 and Regulation Z Sec. 226.15
and 226.23.

32. In the course of this consumer credit transaction, Homecomings Financial
Network, Inc , whose nominee is Mortgage Elecronic Registration Systems,
Inc violated 15 U.S.C. Sec. 1635(a) and Regulation Z by failing to deliver to
Ms. McNerney two copies of the notice of the right to rescind which

   a. Identified the transactions.

   b. Clearly and conspicuously disclosed the security interest in Ms.
   McNerney's principal dwelling.

   c. Clearly and conspicuously disclosed Ms. McNerney's right to rescind

the transactions.

    d.  Clearly and conspicuously disclosed how to exercise the right to rescind the transaction, with a form for that purpose, designating the address of Mortgage Elecronic Registration Systems, Inc's place of business.

    e.  Clearly and conspicuously disclosed the effects of rescission.

    f.  Clearly and conspicuously disclosed the date the rescission periods expired. (Exhibit 5)

33. In the course of this consumer credit transaction, Homecomings Financial Network, Inc., whose nominee is Mortgage Elecronic Registration Systems, Inc failed to deliver all "material" disclosures, required by TILA and Regulation Z, including the following:

    a.  It failed to properly and accurately disclose the "amount financed," in violation of Regulation Z Sec. 226.1(b) and 15 U.S.C. Sec. 1638(a)(2)(A)

    b.  It failed to clearly and accurately disclose the "finance charge" in violation of Regulation Z Sections 226.4 and 226.18(d) and 15 U.S.C. Sec. 1638(a)(3).

    c.  It failed to clearly and accurately disclose the "annual percentage rate" in violation of Regulation Z Sec. 226.18(e) and 15 U.S.C. Sec. 1638(a)(4)

    d.  It failed to properly disclose the number, amounts, and timing of payments scheduled to repay the obligation, in violation of Regulation

Z Sec. 226.18(g) and 15 U.S.C. Sec. 1638(a)(6).

e.  It failed to clearly and accurately disclose the "total of payments" in
violation of Sec. 226.18(h) and 15 U.S.C. Sec. 1638(a)(5).

34. Ms. McNerney has a continuing right to rescind the transaction until the third
business day after receiving both the notice described in paragraph 18 and all
material disclosures described in paragraph 19, pursuant to 15 U.S.C. Sec.
1635(a) and Regulation Z Sec. 226.23(a)(3).

35. By this Counterclaim, Ms. McNerney rescinds the transactions.

36. As a result of Homecomings Financial Network, Inc. whose nominee is
Mortgage Elecronic Registration Systems, Inc's failure to comply with the
Truth in Lending Act, Ms. McNerney is entitled to Rescission of the
transaction; termination of any security interest in their property created under
the transaction; return of any money or property given by her to anyone,
including Homecomings Financial Network, Inc., whose nominee is Mortgage
Elecronic Registration Systems, Inc., in connection with the transactions;
twice the finance charge in connection with the transaction, but not less than
$200.00 nor more than $2000.00; the right to retain proceeds; actual damages
in an amount to be determined at trial; and reasonable attorney fees.

37. When the actual cost of credit is  placed in the finance charge, the APR is
raised dramatically to cause this transaction to be covered by the Home
Owners Equity Protection Act, causing plaintiff to be liable for the absence of

additional material disclosures set forth in that act, and additional damages set forth in that act.

*Second Cause of Action--RESPA*

38. This transaction is subject to the provisions of the Real Estate Settlement Procedures Act

39. With respect to this transaction, Homecomings Financial Network, Inc., whose nominee is Mortgage Electronic Registration Systems, Inc failed to comply with RESPA provisions which require that a settlement statement be issued and that a good faith estimate of closing costs be issued prior to the closing of the transaction—the Settlement statement was not issued prior to the transaction; the settlement statement fails to itemize settlement charges, and the excessive amount of the settlement charges disclose a kickback to the broker, OMC Lending, Inc.(Exhibits 2 and 3)

40. As a result of failure by Homecomings Financial Network, Inc to issue the settlement statements and the good faith estimates of closing costs, Ms. McNerney is entitled to damages and rescission as set forth in RESPA

*Prayer for Relief*

WHEREFORE, Ms. McNerney respectfully requests that this Court:

41. Order that the transaction has been rescinded

42. Order the Plaintiff to take all action necessary to terminate any security interest in Ms. McNerney's property and that the Court declare any such security interests void;

43. Order the return to Ms. McNerney of any money or property given by her to anyone in connection with the transaction;

44. Award Ms. McNerney twice the finance charges in connection with the transaction,

45. Award damages for each violation, but not less than $200.00 for each and not more than $2,000.00 for each as provided in 15 U.S.C. Sec 1640(a);

46. Order that the right to retain proceeds vest in Ms. McNerney;

47. Award actual damages in the amount established at trial;

48. Award Ms. McNerney costs and reasonable attorney fees as provided in 15 U.S.C. Sec. 1640(a), RICO, and any other relevant statutory provision for fees;

49. Award punitive damages and compensatory damages

50. Award treble damages

51. Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Susan M. Gray (0062356)
Attorney for Ms. McNerney
Executive Club Building
21330 Center Ridge # 11
Rocky River, OH  44116
(440) 331-3949
(440) 331-8160 fax

Exhibits to Answer and Counterclaim
Ex 1-TILA
Ex 2-RESPA
Ex3-Respa with different numbers
Ex 4—Copy of check—certified first federal of Lakewood
EX 5-9—copies of checks issued by title company
Ex. 10—Copy of notice of right to cancel
Ex.11—Other TILA

# TRUTH-IN-LENDING DISCLOSURE STATEMENT

(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

| | |
|---|---|
| Applicant: Patricia McNerney | Prepared By: OMC Lending, Inc.<br>4311 Ridge Rd<br>Brooklyn, OH 44144<br>216-739-9000 |
| Property Address: 1241 Thoreau Road<br>Lakewood, OH 44107 | |
| Application No: SD021106 | Date Prepared: 11/19/2002 |

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS |
|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you | The amount of credit provided to you or on your behalf | The amount you will have paid after making all payments as scheduled |
| 10.894 % | $ 246,137.22 | $ 102,145.00 | $ 348,282.22 |

**REQUIRED DEPOSIT:** The annual percentage rate does not take into account your required deposit

**PAYMENTS:** Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning: | | | Monthly Beginning: | | | Monthly Beginning: |
| 359 | 967.47 | | | | | | | |
| 1 | 960.49 | | | | | | | |

☐ **DEMAND FEATURE:** This obligation has a demand feature.

☐ **VARIABLE RATE FEATURE:** This loan contains a variable rate feature. A variable rate disclosure has been provided earlier.

**CREDIT LIFE/CREDIT DISABILITY:** Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost.

| Type | Premium | Signature |
|---|---|---|
| Credit Life | | I want credit life insurance. Signature: |
| Credit Disability | | I want credit disability insurance. Signature: |
| Credit Life and Disability | | I want credit life and disability insurance. Signature: |

**INSURANCE:** The following insurance is required to obtain credit:

☐ Credit life insurance  ☐ Credit disability  ☐ Property insurance  ☐ Flood insurance

You may obtain the insurance from anyone you want that is acceptable to creditor

☐ If you purchase  ☑ property  ☐ flood insurance from creditor you will pay $ _____ for a one year term.

**SECURITY:** You are giving a security interest in:

☐ The goods or property being purchased  ☐ Real property you already own.

**FILING FEES:** $ 72.00

**LATE CHARGE:** If a payment is more than _____ days late, you will be charged _____ % of the payment

**PREPAYMENT:** If you pay off early, you

☐ may  ☑ will not  have to pay a penalty.

☐ may  ☑ will not  be entitled to a refund of part of the finance charge.

**ASSUMPTION:** Someone buying your property

☐ may  ☐ may, subject to conditions  ☐ may not  assume the remainder of your loan on the original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties

☐ * means an estimate  ☐ all dates and numerical disclosures except the late payment disclosures are estimates.

* * NOTE: The Payments shown above include reserve deposits for Mortgage Insurance (if applicable), but exclude Property Taxes and Insurance.

THE UNDERSIGNED ACKNOWLEDGES RECEIVING A COMPLETED COPY OF THIS DISCLOSURE.

| | | |
|---|---|---|
| _Patricia McNerney_ | 12-27-02 | |
| Patricia McNerney (Applicant) (Date) | | (Applicant) (Date) |
| | | |
| (Applicant) (Date) | | (Applicant) (Date) |
| | | |
| (Lender) (Date) | | |

Calyx Form - til.hp (02/95)

EXHIBIT
1

OMB No. 2502-0265

| A. U.S. Department of Housing and Urban Development | B. Type of Loan | | |
|---|---|---|---|
| | 1. [ ] FHA | 2. ( ] FMHA | 3. [ ] Conv. Unins. |
| | 4. [ ] VA | 5. [X] Conv. Ins | |
| | 6. File Number | 7. Loan Number | |
| | 201546 | 1993-9 | |
| FINAL | 8. Mortgage Ins. Case No. | | |

### Settlement Statement

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked ("POC") were paid outside the closing; they are shown here for information purposes and are not included in the totals.

D. Name of Borrower: Patricia Joanne Kellicker, NKA Patricia Joanne McNerney, 1241 Thoreau Road, Lakewood, OH 44107

E. Name of Seller:

F. Name of Lender: Homecomings Financial Network, Inc., 27725 Stansbury Blvd, Suite # 375, Farmington Hills, MI 48334

G. Property Location: Known as being sublot no. 35

1241 Thoreau Road, Lakewood, OH 44107

H. Settlement Agent: Brooklyn Title Agency, Inc. (216) 739-9100        TIN: 

Place of Settlement: 4355 Ridge Road, Brooklyn, OH 44144

I. Settlement Date: 12/27/02        Proration Date:    1/2/03

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross amount due from borrower: | | 400. Gross amount due to seller: | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 108,023.67 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance: | | Adjustments for items paid by seller in advance: | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. Gross amount due from borrower: | 108,023.67 | 420. Gross amount due to seller: | 0.00 |
| 200. Amounts paid by or in behalf of the borrower: | | 500. Reduction in amount due to seller: | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 108,000.00 | 502. Settlement charges to seller (line 1400) | 0.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. 1 day of interest credit | 23.67 | 509. | |
| Adjustments for items unpaid by seller: | | Adjustments for items unpaid by seller: | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total paid by/for borrower: | 108,023.67 | 520. Total reduction in amount due seller: | 0.00 |
| 300. Cash at settlement from/to borrower: | | 600. Cash at settlement to/from seller: | |
| 301. Gross amount due from borrower (line 120) | 108,023.67 | 601. Gross amount due to seller (line 420) | 0.00 |
| 302. Less amount paid by/for borrower (line 230) | 108,023.67 | 602. Less total reduction in amount due seller (line 520) | 0.00 |
| 303. CASH ()FROM ()TO BORROWER | 0.00 | 603. CASH ()FROM ()TO SELLER | 0.00 |

SUBSTITUTE FORM 1099 SELLER STATEMENT - The information contained in Blocks E, G, H and I and on line 401 (or if line 401 is asterisked, lines 403 and 404) 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER INSTRUCTION - If your real estate was your principal residence, file form 2119 (Sale or Exchange of Principal Residence, for any gain, with your income tax return, for other transactions, complete the applicable parts of form 4797, Form 8252 and/or Schedule D (Form 1040)

You are required by law to provide Brooklyn Title Agency, Inc. (216) 739-9100 with your correct taxpayer identification number.
If you do not provide Brooklyn Title Agency, Inc. (216) 739-9100 with your correct taxpayer identification number, you may be subject to civil or criminal penalties.

EXHIBIT
2
Page 1 of 2

| | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| 700. | Total Sales/Broker's commission | | | |
| | Division of commission (line 700) as follows: | | | |
| 701. | $ | | | |
| 702. | $ | | | |
| 703. | Commission paid at settlement | | | |
| 704. | | | | |
| 800. | Items payable in connection with loan | | | |
| 801. | Loan origination fee to OMC Lending, Inc. | | 2,904.00 | |
| 802. | Loan discount to OMC Lending, Inc. ( 1%) | | 1,080.00 | |
| 803. | Appraisal fee | | | |
| 804. | Credit report | | | |
| 805. | Lender's inspection fee | | | |
| 806. | Mortgage insurance application fee | | | |
| 807. | Assumption fee | | | |
| 808. | Underwriting Fee to Homecomings Financial Network, Inc. | | 225.00 | |
| 809. | Tax Service Fee to Homecomings Financial Network, Inc. | | 95.00 | |
| 810. | Closing Fee to Homecomings Financial Network, Inc. | | 150.00 | |
| 811. | Flood Certification to Homecomings Financial Network, Inc. | | 10.50 | |
| 812. | Administration Fee to OMC Lending, Inc. | | 250.00 | |
| 813. | Processing Fee to OMC Lending, Inc. | | 645.00 | |
| 814. | Broker Fee from MF to OMC Lending, Inc. POCL 2430.00 | | | |
| 900. | Items required by lender to be paid in advance | | | |
| 901. | Interest from | | | |
| 902. | Mortgage insurance premium for | | | |
| 903. | Hazard insurance premium for | | | |
| 904. | | | | |
| 905. | | | | |
| 1000. | Reserves deposited with lender | | | |
| 1001. | Hazard insurance 2 mo @ $31.0000 per mo. | | 62.00 | |
| 1002. | Mortgage insurance | | | |
| 1003. | City property taxes | | | |
| 1004. | County property taxes 2 mo @ $230.8100 per mo. | | 461.62 | |
| 1005. | Annual assessments (maint.) | | | |
| 1006. | | | | |
| 1007. | | | | |
| 1008. | | | | |
| 1009. | Aggregate Adjustment | | | |
| 1100. | Title charges | | | |
| 1101. | Settlement or closing fee to Brooklyn Title Agency, Inc. | | 325.00 | |
| 1102. | Abstract or title search | | | |
| 1103. | Title examination to Brooklyn Title Agency, Inc. | | 325.00 | |
| 1104. | Title insurance binder to Brooklyn Title Agency, Inc. | | 50.00 | |
| 1105. | Document preparation | | | |
| 1106. | Notary fees | | | |
| 1107. | Attorney's fees to Natalie Grosso | | | |
| | includes above items no. | | | |
| 1108. | Title insurance to Brooklyn Title Agency, Inc. | | 370.00 | |
| | includes above items no. | | | |
| 1109. | Lender's coverage $108,000.00 $370.00 | | | |
| 1110. | Owner's coverage | | | |
| 1111. | EPA Endorsement to Brooklyn Title Agency, Inc. | | 75.00 | |
| 1112. | Comprehensive Endorsement to Brooklyn Title Agency, Inc. | | 150.00 | |
| 1113. | Aira Courier Fee to Brooklyn Title Agency, Inc. | | 45.00 | |
| 1114. | Exam Update to Brooklyn Title Agency, Inc. | | 35.00 | |
| 1115. | Endorsement Filing Fee to Brooklyn Title Agency, Inc. | | 25.00 | |
| 1116. | Transfer Fee | | | |
| 1117. | HUD Signature to Brooklyn Title Agency, Inc. | | 28.00 | |
| 1118. | Special Tax Search | | | |
| 1200. | Government recording and transfer charges | | | |
| 1201. | Recording fees Mortgage $70.00 | | 70.00 | |
| 1202. | City/county tax/stamps | | | |
| 1203. | State tax/stamps | | | |
| 1204. | | | | |
| 1205. | | | | |
| 1206. | | | | |
| 1300. | Additional settlement charges | | | |
| 1301. | Survey Aird & Associates | | | |
| 1302. | Pest inspection | | | |
| 1303. | Government Payoff for Mtg to Household Realty Corporation | | 90,571.79 | |
| 1304. | Payoff to Capital One | | 1,000.00 | |
| 1305. | Payoff to Capital One | | 1,207.20 | |
| 1306. | Payoff to Capital One | | 503.59 | |
| 1307. | Payoff to Capital One | | 1,136.64 | |
| 1308. | Payoff to Capital One | | 585.18 | |
| 1309. | 1/4 Taxes Jan-Jun 2002 to Cuyahoga County Treasurer | | 5,847.19 | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | | 108,023.87 | |

Patricia Jeanne McKinley
(signatures)

Warning: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

EXHIBIT 2
Page 2 of 2

OMB No. 2502-0265

| A. U.S. Department of Housing and Urban Development | B. Type of Loan | | |
|---|---|---|---|
| | 1 [ ] FHA | 2. [ ] FMHA | 3 [ ] Conv. Unins. |
| | 4 [ ] VA | 5 [X] Conv. Ins. | |
| FINAL | 6. File Number | | 7. Loan Number |
| | 201546 | | 1993-9 |
| Settlement Statement | 8. Mortgage Ins. Case No. | | |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked ("POC") were paid outside the closing; they are shown here for information purposes and are not included in the totals.

**D. Name of Borrower:** Patricia Joanne Kellicker, NKA Patricia Joanne McNerney, 1241 Thoreau Road, Lakewood, OH 44107

**E. Name of Seller:**

**F. Name of Lender:** Homecomings Financial Network, Inc., 27725 Stansbury Blvd, Suite # 375, Farmington Hills, MI 48334

**G. Property Location:** Known as being sublot no. 15

1241 Thoreau Road, Lakewood, OH 44107

**H. Settlement Agent:** Brooklyn Title Agency, Inc. (216) 739-9100    TIN:
**Place of Settlement:** 4355 Ridge Road, Brooklyn, OH 44144

**I. Settlement Date:** 12/27/02    Proration Date: 1/2/03

| | J. Summary of Borrower's Transaction | | | K. Summary of Seller's Transaction | |
|---|---|---|---|---|---|
| 100. | Gross amount due from borrower: | | 400. | Gross amount due to seller: | |
| 101. | Contract sales price | | 401. | Contract sales price | |
| 102. | Personal property | | 402. | Personal property | |
| 103. | Settlement charges to borrower (line 1400) | 116,173.85 | 403. | | |
| 104. | | | 404. | | |
| 105. | | | 405. | | |
| | Adjustments for items paid by seller in advance: | | | Adjustments for items paid by seller in advance: | |
| 106. | City/town taxes | | 406. | City/town taxes | |
| 107. | County taxes | | 407. | County taxes | |
| 108. | Assessments | | 408. | Assessments | |
| 109. | | | 409. | | |
| 110. | | | 410. | | |
| 111. | | | 411. | | |
| 112. | | | 412. | | |
| 120. | Gross amount due from borrower: | 116,173.85 | 420. | Gross amount due to seller: | 0.00 |
| 200. | Amounts paid by or in behalf of the borrower: | | 500. | Reductions in amount due to seller: | |
| 201. | Deposit or earnest money | | 501. | Excess deposit (see instructions) | |
| 202. | Principal amount of new loan(s) | 108,000.00 | 502. | Settlement charges to seller (line 1400) | 0.00 |
| 203. | Existing loan(s) taken subject to | | 503. | Existing loan(s) taken subject to | |
| 204. | | | 504. | Payoff of first mortgage loan | |
| 205. | | | 505. | Payoff of second mortgage loan | |
| 206. | | | 506. | | |
| 207. | | | 507. | | |
| 208. | | | 508. | | |
| 209. | 1 day of interest credit | 23.67 | 509. | | |
| | Adjustments for items unpaid by seller: | | | Adjustments for items unpaid by seller: | |
| 210. | City/town taxes | | 510. | City/town taxes | |
| 211. | County taxes | | 511. | County taxes | |
| 212. | Assessments | | 512. | Assessments | |
| 213. | | | 513. | | |
| 214. | | | 514. | | |
| 215. | | | 515. | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |
| 219. | | | 519. | | |
| 220. | Total paid by/for borrower: | 108,023.67 | 520. | Total reduction in amount due seller: | 0.00 |
| 300. | Cash at settlement from/to borrower: | | 600. | Cash at settlement to/from seller: | |
| 301. | Gross amount due from borrower (line 120) | 116,173.85 | 601. | Gross amount due to seller (line 420) | 0.00 |
| 302. | Less amount paid by/for borrower (line 220) | 108,023.67 | 602. | Less total reduction in amount due seller (line 520) | 0.00 |
| 303. | CASH [X] FROM ( ) TO BORROWER | 8,150.18 | 603. | CASH ( ) FROM ( ) TO SELLER | 0.00 |

SUBSTITUTE FORM 1099 SELLER STATEMENT - The information contained in Blocks E, G, H and I and on line 401 (or if line 401 is asterisked, lines 403, and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER INSTRUCTION - If this real estate was your principle residence, file form 2119 Sale or Exchange of Principal Residence for any gain, with your income tax return for other transactions complete the applicable parts of form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide Brooklyn Title Agency, Inc. (216) 739-9100 with your correct taxpayer identification number.

If you do not provide Brooklyn Title Agency, Inc. (216) 739-9100 with your correct taxpayer identification number you may be subject to civil or criminal penalties.

EXHIBIT
3
Page 1 of 2

| L. Settlement Charges | | | File Number: 201564... | |
|---|---|---|---|---|
| | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
| 700. | Total sales/broker commission | | | |
| | Division of commission (line 700) as follows: | | | |
| 701. | | | | |
| 702. | | | | |
| 703. | Commission paid at settlement | | | |
| 704. | | | | |
| 800. | Items payable in connection with loan | | | |
| 801. | Loan origination fee | to  OMC Lending, Inc | | |
| 802. | Loan discount | to  OMC Lending, Inc     ( .   %) | | |
| 803. | Appraisal fee | | | |
| 804. | Credit report | | | |
| 805. | Lender's inspection fee | | | |
| 806. | Mortgage insurance application fee | | | |
| 807. | Assumption fee | | | |
| 808. | Underwriting Fee | to  Homecomings Financial Network, Inc | | |
| 809. | Tax Service Fee | to  Homecomings Financial Network, Inc | | |
| 810. | Closing Fee | to  Homecomings Financial Network, Inc | | |
| 811. | Flood Certification | to  Homecomings Financial Network, Inc | | |
| 812. | Administration Fee | to  OMC Lending, Inc | | |
| 813. | Processing Fee | to  OMC Lending, Inc | | |
| 814. | Broker Fee from HF | to  OMC Lending, Inc                 POOL 3420.00 | | |
| 900. | Items required by lender to be paid in advance | | | |
| 901. | Interest from | | | |
| 902. | Mortgage insurance premium for | | | |
| 903. | Hazard insurance premium for | 1 yrs         to  All State | | |
| 904. | | | | |
| 905. | | | | |
| 1000. | Reserves deposited with lender | | | |
| 1001. | Hazard insurance | 2 mo @ $31.0000 per mo | | |
| 1002. | Mortgage insurance | | | |
| 1003. | City property taxes | | | |
| 1004. | County property taxes | 2 mo @ $230.8100 per mo | | |
| 1005. | Annual assessments (maint.) | | | |
| 1006. | | | | |
| 1007. | | | | |
| 1008. | | | | |
| 1009. | Aggregate Adjustment | | | |
| 1100. | Title charges: | | | |
| 1101. | Settlement or closing fee | to  Brooklyn Title Agency, Inc | | |
| 1102. | Abstract or title search | | | |
| 1103. | Title examination | to  Brooklyn Title Agency, Inc | | |
| 1104. | Title insurance binder | to  Brooklyn Title Agency, Inc | | |
| 1105. | Document preparation | | | |
| 1106. | Notary fees | | | |
| 1107. | Attorney's fees | to  Natalie Grubb | | |
| | includes above items no. | | | |
| 1108. | Title insurance | to  Brooklyn Title Agency, Inc | | |
| | includes above item no. | | | |
| 1109. | Lender's coverage | $108,000.00          $370.00 | | |
| 1110. | Owner's coverage | | | |
| 1111. | 8.1A Endorsement | to  Brooklyn Title Agency, Inc | | |
| 1112. | Comprehensive Endorsement Im | to  Brooklyn Title Agency, Inc | | |
| 1113. | Wire Courier Fee | to  Brooklyn Title Agency, Inc | | |
| 1114. | Exam Update | to  Brooklyn Title Agency, Inc | | |
| 1115. | Conditional Filing Fee | to  Brooklyn Title Agency, Inc | | |
| 1116. | Transfer Fee | | | |
| 1117. | Legal Signature | to  Brooklyn Title Agency, Inc | | |
| 1118. | Special Tax Search | | | |
| 1200. | Government recording and transfer charges | | | |
| 1201. | Recording fees | Mortgage $70.00 | | |
| 1202. | City/county tax/stamps | | | |
| 1203. | State tax/stamps | | | |
| 1204. | | | | |
| 1205. | | | | |
| 1206. | | | | |
| 1300. | Additional settlement charges | | | |
| 1301. | Survey  Hoff & Associates | | | |
| 1302. | Pest inspection | | | |
| 1303. | Payoff to Amp | to  Wonderland Realty Corporation | | |
| 1304. | Payoff | to  Capital One | | |
| 1305. | Payoff | to  Capital One | | |
| 1306. | Payoff | to  Capital One | | |
| 1307. | Payoff | to  Capital One | | |
| 1308. | Payoff | to  Capital One | | |
| 1309. | 2001 Taxes and RM 2002 | to  Cuyahoga County Treasurer | | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | | | |

CERTIFICATION: I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

_____
Patricia Joanne McHenry AKA Patricia Joanne McHenry

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Brooklyn Title Agency, Inc                                              Date

SELLER'S and/or PURCHASER'S STATEMENT: Sellers and Purchaser's signature hereto acknowledges his/their approval of tax prorations and signifies their understanding that prorations were based on taxes for the preceding year or estimates for the current year, and in the event of any change for the current year's tax assessment, any readjustment to be made between Seller and Purchaser. However, in case of any default or delinquent taxes and fees connected to Title Company by the Client...

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

EXHIBIT
3
Page 2 of 2

Booking No. 5119

THIS DOCUMENT HAS AN ARTIFICIAL WATERMARK PRINTED ON THE BACK. THE FRONT OF THE DOCUMENT HAS A MICRO-PRINT SIGNATURE LINE. ABSENCE OF THESE FEATURES WILL INDICATE A COPY



VOID OVER $8,150.18                                     No. 1-314628

01-03-2003

PAY TO THE ORDER OF ___ ****BROOKLYN TITLE****

DRAWER: FIRST FEDERAL LAKEWOOD          THE SUM OF ⊕8,150 dols 4 8cts

PATRICIA J MCNERNEY                                                     OFFICIAL CHECK

CUSTOMER'S SIGNATURE OR NAME

ADDRESS

Issued By: Travelers Express Company, Inc.
P.O. Box 9476, Minneapolis, MN 55480
Drawee: Huntington National Bank, Columbus, OH



560 7‖•

EXHIBIT

4



Escrow Account
4355 Ridge Road
Brooklyn, OH 44144
(216) 671-6999

538 Broad Street
Elyria, Ohio 44035
6-271/410

1-3157

1/3/03

Pay Five Hundred Eighty Six and 18/100 Dollars

$ *******586.18

To the order of Capital One and McNerney and Patricia McNerney

Void after 90 days

SS#

File : 201546

5590

Brooklyn Title Agency, Inc.
Escrow Account

FirstMerit Bank, N.A.
538 Broad Street

1-3157

1/3/03

To the order of Capital One and McNerney and Patricia McNerney

$ *******586.18

File : 201546
Buyer : Patricia Joanne Kellicker, NKA Patricia Joanne McNerney
Seller :
Property Address   1241 Thoreau Road Lakewood, OH 44107
    (1308) Payoff - $586.18

EXHIBIT 5



Brooklyn OH 44144
(216) 671-6999

Elyria, Ohio 44035
6-271/410

1/3/03

**Pay One Thousand Two Hundred Seven and 20/100 Dollars**                 $ *****1,207.20

To the order of Capital One and McNerney and Patricia McNerney

Void after 90 days

55

& File : 201546

5590"

---

Brooklyn Title Agency, Inc.
Escrow Account

**FirstMerit Bank, N.A.**          1-3155
538 Broad Street
                                   1/3/03
                                   $ *****1,207.20

To the order of Capital One and McNerney and Patricia McNerney

---

File : 201546
Buyer : Patricia Joanne Kellicker, NKA Patricia Joanne McNerney
Seller :
Property Address : 1241 Thoreau Road Lakewood, OH 44107
    (1305) Payoff - $1,207.20

EXHIBIT 6



Escrow Account
4355 Ridge Road
Brooklyn OH 44144
(216) 671-6999

FirstMerit Bank, N.A.
538 Broad Street
Elyria, Ohio 44035
6-271/410

1-3154

1/3/03

Pay One Thousand and 00/100 Dollars                    $ *****1,000.00

To the order of Capital One and McNerney and Patricia McNerney

Void after 90 days

SS#

File : 201546

5 5 9 0

Brooklyn Title Agency, Inc.
Escrow Account

FirstMerit Bank, N.A.
538 Broad Street

1-3154

1/3/03

$ *****1,000.00

To the order of Capital One and McNerney and Patricia McNerney

File : 201546
Buyer : Patricia Joanne Kellicker, NKA Patricia Joanne McNerney
Seller :
Property Address : 1241 Thoreau Road Lakewood, OH 44107
    (1304) Payoff - $1,000.00

EXHIBIT
7

EXHIBIT 8



Escrow Account
4355 Ridge Road
Brooklyn, OH 44144
(216) 671 6999

538 Broad Street
Elyria, Ohio 44051
8-271/410

1/3/03

Pay Six Hundred Three and 59/100 Dollars

$ *******603.59

To the order of Capital One and McNerney and Patricia McNerney

Void after 90 days

SS #

File : 201546

⑈5590⑈

Brooklyn Title Agency, Inc.
Escrow Account

FirstMerit Bank, N.A.
538 Broad Street

1-3153
1/3/03

To the order of Capital One and McNerney and Patricia McNerney

$ *******603.59

File : 201546
Buyer : Patricia Joanne Kellicker. NKA Patricia Joanne McNerney
Seller :
Property Address : 1241 Thoreau Road Lakewood, OH 44107
    (1306) Payoff - $603.59

Brooklyn Title Agency, Inc.
Escrow Account
4355 Ridge Road
Brooklyn OH 44144
(216) 671-6999

FirstMerit Bank, N.A.
538 Broad Street
Elyria, Ohio 44035
8-271/410

1-3156

1/3/03

**Pay One Thousand One Hundred Thirty Six and 64/100 Dollars**

$ *****1,136.64

To the order of Capital One and McNerney and Patricia McNerney

Void after 90 days

35 H

File : 201546

5590

---

**Brooklyn Title Agency, Inc.**
Escrow Account

**FirstMerit Bank, N.A.**
538 Broad Street

1-3156

1/3/03

$ *****1,136.64

To the order of Capital One and McNerney and Patricia McNerney

File : 201546
Buyer : Patricia Joanne Kellicker, NKA Patricia Joanne McNerney
Seller :
Property Address : 1241 Thoreau Road Lakewood, OH 44107
    (1307) Payoff - $1,136.64

## NOTICE OF RIGHT TO CANCEL

| | | |
|---|---|---|
| LENDER: | HOMECOMINGS FINANCIAL NETWORK, INC.<br>27725 Stansbury Blvd, Suite 375<br>Farmington Hills, MI 48334 | DATE: 12/27/2002<br>LOAN NO.: 993-9<br>TYPE: FNMA;30YR |

BORROWERS:     PATRICIA JOANNE MCNERNEY

ADDRESS:     1241 THOREAU ROAD
CITY/STATE/ZIP:     LAKEWOOD, OH 44107
PROPERTY:

　　　　You are entering into a transaction that will result in a mortgage on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

　　　　(1)　　The date of the transaction, which is　DECEMBER 27TH, 2002　　　; or
　　　　(2)　　The date you received your Truth in Lending disclosures; or
　　　　(3)　　The date you received this notice of your right to cancel.

　　　　If you cancel the transaction, the mortgage is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage on your home has been cancelled, and we must return to you any money or property you have given us or to anyone else in connection with this transaction.
　　　　You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

### HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing at:

　　　　HOMECOMINGS FINANCIAL NETWORK, INC.
　　　　27725 Stansbury Blvd, Suite 375
　　　　Farmington Hills, MI 48334
　　　　FAX: 248 426-7165

　　　　You may use any written statement that is signed and dated by you and states your intention to cancel and/or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

　　　　If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of  DECEMBER 31ST, 2002　　　　　(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

### I WISH TO CANCEL

_____　　　_____
SIGNATURE　　　　　　　　　　　　　　　　　DATE

---

The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

| | | |
|---|---|---|
| *Patricia Joanne McNerney*   12-27-02 | | _____ |
| PATRICIA JOANNE MCNERNEY      Date | | Date |
| _____ | | _____ |
| Date | | Date |
| _____ | | _____ |
| Date | | Date |
| _____ | | _____ |
| Date | | Date |
| _____ | | _____ |
| Date | | Date |

EXHIBIT

10

FEDERAL TRUTH IN LENDING DISCLOSURE STATEMENT
Pg 282 of 300

| Borrower: | Creditor: |
|---|---|
| PATRICIA JOANNE MCNERNEY<br>1241 THOREAU ROAD<br>LAKEWOOD, OH 44107 | HOMECOMINGS FINANCIAL NETWORK, INC.<br>27725 STANSBURY BLVD, SUITE 375<br>FARMINGTON HILLS, MI 48334 |

Loan Number:    993-9                    Date:    12/27/2002

| ANNUAL PERCENTAGE RATE<br><br>The cost of your credit as a yearly rate | FINANCE CHARGE<br><br>The dollar amount the credit will cost you. | Amount Financed<br><br>The amount of credit provided to you or on your behalf. | Total of payments<br><br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 10.1493% | $204,168.04 | $102,624.18 | $306,792.22 |

Your payment schedule will be:

| No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin | No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin | No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin |
|---|---|---|---|---|---|---|---|---|
| 120 | 970.67 | 02/01/2003 | | | | | | |
| 7 | 810.47 | 02/01/2013 | | | | | | |
| 232 | 792.47 | 09/01/2013 | | | | | | |
| 1 | 785.49 | 01/01/2033 | | | | | | |

INSURANCE: The following insurance is required to obtain credit:    * Property
   You may obtain the insurance from anyone that is acceptable to creditor.

SECURITY: You are giving a security interest in real property you already own.
   Property Address: 1241 THOREAU ROAD, LAKEWOOD, OH 44107

LATE CHARGE: If a payment is more than 15 days late, you will be charged 5 % of the
   overdue payment of principal and interest.

PREPAYMENT: If you pay off your loan early,    * You will not have to pay a penalty.
   * You will not be entitled to a refund of part of the finance charge.

ASSUMPTION: Someone buying your property cannot assume the remainder of your loan on the
   original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before
the scheduled date, and prepayment refunds and penalties.

_Patricia Joanne McNerney_        _12-27-02_
PATRICIA JOANNE MCNERNEY                DATE

EXHIBIT
11

Certificate of Service

On this _____14th_____ day of _____June___, 2004, a copy of the foregoing
document was served upon the following at the address shown below by regular U.S.
Mail.

Ted A. Humbert
5601 Hudson Drive; Suite 400
Hudson, OH 44236

                                        Susan M. Gray
                                        Attorney for Ms. McNerney

**NOTICE OF RIGHT TO CANCEL**

| | | | |
|---|---|---|---|
| **LENDER:** | HOMECOMINGS FINANCIAL NETWORK, INC. | **DATE:** | 12/27/2002 |
| | 27725 Stansbury Blvd, Suite 375 | **LOAN NO.:** | 993-9 |
| | Farmington Hills, MI 48334 | **TYPE:** | FNMA:30YR |

**BORROWERS:**    PATRICIA JOANNE MCNERNEY

**ADDRESS:**    1241 THOREAU ROAD
**CITY/STATE/ZIP:**    LAKEWOOD, OH 44107
**PROPERTY:**

You are entering into a transaction that will result in a mortgage on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

       (1)    The date of the transaction, which is  DECEMBER 27TH, 2002    ; or
       (2)    The date you received your Truth in Lending disclosures; or
       (3)    The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage on your home has been cancelled, and we must return to you any money or property you have given us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home-or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing at:

    HOMECOMINGS FINANCIAL NETWORK, INC.
    27725 Stansbury Blvd, Suite 375
    Farmington Hills, MI 48334
    FAX: 248 426-7165

You may use any written statement that is signed and dated by you and states your intention to cancel and/or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of  DECEMBER 31ST, 2002    (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

_____    _____
**SIGNATURE**                     **DATE**

---

The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

| | | |
|---|---|---|
| *Patricia Joanne McNerney*  12-27-02 | | |
| PATRICIA JOANNE MCNERNEY    Date | | Date |
| _____ | _____ | _____ |
| Date | Date | Date |
| _____ | _____ | _____ |
| Date | Date | Date |
| _____ | _____ | _____ |
| Date | Date | Date |
| _____ | _____ | _____ |
| Date | Date | Date |

                                       993-9



PLAINTIFF'S EXHIBIT
13

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

| | | |
|---|---|---|
| Applicant: Patricia McNerney | Prepared By: | OMC Lending, Inc.<br>4311 Ridge Rd<br>Brooklyn , OH 44144<br>216-739-9000 |
| Property Address: 1241 Thoreau Road<br>Lakewood, OH 44107 | | |
| Application No: SD021106 | Date Prepared: 11/19/2002 | |

| ANNUAL PERCENTAGE RATE<br><br>The cost of your credit as a yearly rate | FINANCE CHARGE<br><br>The dollar amount the credit will cost you | AMOUNT FINANCED<br><br>The amount of credit provided to you or on your behalf | TOTAL OF PAYMENTS<br><br>The amount you will have paid after making all payments as scheduled |
|---|---|---|---|
| 10.894 % | $ 246,137.22 | $ 102,145.00 | $ 348,282.22 |

☐ **REQUIRED DEPOSIT:** The annual percentage rate does not take into account your required deposit

**PAYMENTS:** Your payment schedule will be:

| Number of Payments | Amount of Payments | Monthly Beginning: | Number of Payments | Amount of Payments | Monthly Beginning: | Number of Payments | Amount of Payments | Monthly Beginning: |
|---|---|---|---|---|---|---|---|---|
| 359 | 967.47 | | | | | | | |
| 1 | 960.49 | | | | | | | |

☐ **DEMAND FEATURE:** This obligation has a demand feature.
☐ **VARIABLE RATE FEATURE:** This loan contains a variable rate feature. A variable rate disclosure has been provided earlier.

**CREDIT LIFE/CREDIT DISABILITY:** Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost.

| Type | Premium | Signature | |
|---|---|---|---|
| Credit Life | | I want credit life insurance. | Signature: |
| Credit Disability | | I want credit disability insurance. | Signature: |
| Credit Life and Disability | | I want credit life and disability insurance. | Signature: |

**INSURANCE:** The following insurance is required to obtain credit:
☐ Credit life insurance ☐ Credit disability ☐ Property insurance ☐ Flood insurance
You may obtain the insurance from anyone you want that is acceptable to creditor
☐ If you purchase ☑ property ☐ flood insurance from creditor you will pay $      for a one year term.
**SECURITY:** You are giving a security interest in:
☐ The goods or property being purchased ☐ Real property you already own.
**FILING FEES:** $   72.00
**LATE CHARGE:** If a payment is more than    days late, you will be charged    % of the payment
**PREPAYMENT:** If you pay off early, you
☐ may ☑ will not have to pay a penalty.
☐ may ☑ will not be entitled to a refund of part of the finance charge.
**ASSUMPTION:** Someone buying your property
☐ may ☐ may, subject to conditions ☐ may not assume the remainder of your loan on the original terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.
☐ * means an estimate ☐ all dates and numerical disclosures except the late payment disclosures are estimates.
* * NOTE: The Payments shown above include reserve deposits for Mortgage Insurance (if applicable), but exclude Property Taxes and Insurance.

THE UNDERSIGNED ACKNOWLEDGES RECEIVING A COMPLETED COPY OF THIS DISCLOSURE.

| *Patricia McNerney* | 12-27-02 | | |
|---|---|---|---|
| Patricia McNerney | (Applicant) (Date) | | (Applicant) (Date) |
| | (Applicant) (Date) | | (Applicant) (Date) |
| | (Lender) (Date) | | |

Calyx Form - tl3.frm (02/95)


PLAINTIFF'S EXHIBIT 14

### FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

| Borrower: | Creditor: |
|---|---|
| PATRICIA JOANNE MCNERNEY<br>1241 THOREAU ROAD<br>LAKEWOOD, OH 44107 | HOMECOMINGS FINANCIAL NETWORK, INC.<br>27725 STANSBURY BLVD, SUITE 375<br>FARMINGTON HILLS, MI 48334 |

Loan Number:      993-9         Date: 12/27/2002

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of payments |
|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 10.1493% | $204,168.04 | $102,624.18 | $306,792.22 |

Your payment schedule will be:

| No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin | No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin | No. of Pmts. | Amount of Pmts. | Monthly Pmts. Begin |
|---|---|---|---|---|---|---|---|---|
| 120 | 970.67 | 02/01/2003 | | | | | | |
| 7 | 810.47 | 02/01/2013 | | | | | | |
| 232 | 792.47 | 09/01/2013 | | | | | | |
| 1 | 785.49 | 01/01/2033 | | | | | | |

INSURANCE: The following insurance is required to obtain credit:  * Property
You may obtain the insurance from anyone that is acceptable to creditor.

SECURITY: You are giving a security interest in real property you already own.
Property Address: 1241 THOREAU ROAD, LAKEWOOD, OH 44107

LATE CHARGE: If a payment is more than 15 days late, you will be charged 5 % of the
overdue payment of principal and interest.

PREPAYMENT: If you pay off your loan early,    * You will not have to pay a penalty.
* You will not be entitled to a refund of part of the finance charge.

ASSUMPTION: Someone buying your property cannot assume the remainder of your loan on the
original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before
the scheduled date, and prepayment refunds and penalties.

_Patricia Joanne McNerney_        _12-27-02_
PATRICIA JOANNE MCNERNEY                DATE

PLAINTIFFS 0134

12/27/02 11:20 AM                                                                    OMB No. 2502-0265

| A. U.S. Department c. . .sing and Urban Development | B. Type of Loan |
|---|---|
| **FINAL** | 1. [ ] FHA     2. [ ] FMHA     3. [ ] Conv. Unins |
| | 4. [ ] VA     5. [X] Conv. Ins. |
| **Settlement Statement** | 6. File Number     7. Loan Number |
| | 201546                              993-9 |
| | 8. Mortgage Ins. Case No. |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked ("POC") were paid outside the closing; they are shown here for information purposes and are not included in the totals.

**D. Name of Borrower:** Patricia Joanne Kellicker, NKA Patricia Joanne McNerney, 1241 Thoreau Road, Lakewood, OH 44107

**E. Name of Seller:**

**F. Name of Lender:** Homecomings Financial Network, Inc., 27725 Stansbury Blvd, Suite # 375, Farmington Hills, MI 48334

**G. Property Location:** Known as being sublot no. 35

1241 Thoreau Road, Lakewood, OH 44107

**H. Settlement Agent:** Brooklyn Title Agency, Inc. (216) 739-9100          TIN:

**Place of Settlement:** 4355 Ridge Road, Brooklyn, OH 44144

**I. Settlement Date:** 12/27/02          Proration Date:     1/2/03

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100.  Gross amount due from borrower:** | | **400.  Gross amount due to seller:** | |
| 101.   Contract sales price | | 401.   Contract sales price | |
| 102.   Personal property | | 402.   Personal property | |
| 103.   Settlement charges to borrower (line 1400) | 108,023.67 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance:** | | **Adjustments for items paid by seller in advance:** | |
| 106.   City/town taxes | | 406.   City/town taxes | |
| 107.   County taxes | | 407.   County taxes | |
| 108.   Assessments | | 408.   Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120.   Gross amount due from borrower:** | 108,023.67 | **420.   Gross amount due to seller:** | 0.00 |
| **200.   Amounts paid by or in behalf of the borrower:** | | **500.   Reduction in amount due to seller:** | |
| 201.   Deposit or earnest money | | 501.   Excess deposit (see instructions) | |
| 202.   Principal amount of new loan(s) | 108,000.00 | 502.   Settlement charges to seller (line 1400) | 0.00 |
| 203.   Existing loan(s) taken subject to | | 503.   Existing loan(s) taken subject to | |
| 204. | | 504.   Payoff of first mortgage loan | |
| 205. | | 505.   Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209.   1 day of interest credit | 23.67 | 509. | |
| **Adjustments for items unpaid by seller:** | | **Adjustments for items unpaid by seller:** | |
| 210.   City/town taxes | | 510.   City/town taxes | |
| 211.   County taxes | | 511.   County taxes | |
| 212.   Assessments | | 512.   Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220.   Total paid by/for borrower:** | 108,023.67 | **520.   Total reduction in amount due seller:** | 0.00 |
| **300.   Cash at settlement from/to borrower:** | | **600.   Cash at settlement to/from seller:** | |
| 301.   Gross amount due from borrower (line 120) | 108,023.67 | 601.   Gross amount due to seller (line 420) | 0.00 |
| 302.   Less amount paid by/for borrower (line 220) | 108,023.67 | 602.   Less total reduction in amount due seller(line 520) | 0.00 |
| **303.   CASH ()FROM ()TO BORROWER** | 0.00 | **603.   CASH ()FROM ()TO SELLER** | 0.00 |

SUBSTITUTE FORM 1099 SELLER STATEMENT - The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported

SELLER INSTRUCTION - If this real estate was your principle residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide Brooklyn Title Agency, Inc. (216) 739-9100 with your correct taxpayer identification number.

If you do not provide Brooklyn Title Agency, Inc. (216) 739-9100 with your correct taxpayer identification number, you may be subject to civil or criminal penalties.

PLAINTIFF'S
EXHIBIT
15

PENGAD 800-631-6989

8-22-06



| L. Settlement Charges | 12/27/02 11:26 AM | File Number 201646 | |
|---|---|---|---|
| | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
| 700. | Total sales/broker comm. | | |
| | Division of commission (line 700) as follows: | | |
| 701. | $ | | |
| 702. | $ | | |
| 703. | Commission paid at settlement | | |
| 704. | | | |
| 800. | Items payable in connection with loan | | |
| 801. | Loan origination fee | to OMC Lending, Inc | 2,604.00 | |
| 802. | Loan discount | to OMC Lending, Inc ( 1%) | 1,080.00 | |
| 803. | Appraisal fee | | | |
| 804. | Credit report | | | |
| 805. | Lender's inspection fee | | | |
| 806. | Mortgage insurance application fee | | | |
| 807. | Assumption fee | | | |
| 808. | Underwriting Fee | to Homecomings Financial Network, Inc | 225.00 | |
| 809. | Tax Service Fee | to Homecomings Financial Network, Inc | 85.00 | |
| 810. | Closing Fee | to Homecomings Financial Network, Inc | 150.00 | |
| 811. | Flood Certification | to Homecomings Financial Network, Inc | 10.50 | |
| 812. | Administration Fee | to OMC Lending, Inc | 250.00 | |
| 813. | Processing Fee | to OMC Lending, Inc | 645.00 | |
| 814. | Broker Fee from HF | to OMC Lending, Inc    POCL 2470.00 | | |
| 900. | Items required by lender to be paid in advance | | | |
| 901. | Interest from | | | |
| 902. | Mortgage insurance premium for | | | |
| 903. | Hazard Insurance premium for | | | |
| 904. | | | | |
| 905. | | | | |
| 1000. | Reserves deposited with lender | | | |
| 1001. | Hazard insurance | 2 mo @ $31.0000 per mo | 62.00 | |
| 1002. | Mortgage Insurance | | | |
| 1003. | City property taxes | | | |
| 1004. | County property taxes | 2 mo @ $230.8100 per mo. | 461.60 | |
| 1005. | Annual assessments (maint ) | | | |
| 1006. | | | | |
| 1007. | | | | |
| 1008. | | | | |
| 1009. | Aggregate Adjustment | | | |
| 1100. | Title charges | | | |
| 1101. | Settlement or closing fee | to Brooklyn Title Agency, Inc | 325.00 | |
| 1102. | Abstract or title search | | | |
| 1103. | Title examination | to Brooklyn Title Agency, Inc | 325.00 | |
| 1104. | Title insurance binder | to Brooklyn Title Agency, Inc | 50.00 | |
| 1105. | Document preparation | | | |
| 1106. | Notary fees | | | |
| 1107. | Attorney's fees to Nanine Gruhn | | | |
| | includes above items no | | | |
| 1108. | Title insurance | to Brooklyn Title Agency, Inc | 370.00 | |
| | includes above items no | | | |
| 1109. | Lender's coverage | $105,000.00    $370.00 | | |
| 1110. | Owner's coverage | | | |
| 1111. | EPA Endorsement | to Brooklyn Title Agency, Inc | 15.00 | |
| 1112. | Comprehensive Endorsement | to Brooklyn Title Agency, Inc | 150.00 | |
| 1113. | Wire Convert Fee | to Brooklyn Title Agency, Inc | 45.00 | |
| 1114. | Exam Update | to Brooklyn Title Agency, Inc | 35.00 | |
| 1115. | Courthouse Filing Fee | to Brooklyn Title Agency, Inc. | 29.00 | |
| 1116. | Transfer Fee | | | |
| 1117. | Hold Signature | to Brooklyn Title Agency, Inc | 28.00 | |
| 1118. | Special Tax Search | | | |
| 1200. | Government recording and transfer charges | | | |
| 1201. | Recording fees | Mortgage $70.00 | 70.00 | |
| 1202. | City/county tax/stamps: | | | |
| 1203. | State tax/stamps: | | | |
| 1204. | | | | |
| 1205. | | | | |
| 1206. | | | | |
| 1300. | Additional settlement charges | | | |
| 1301. | Survey Holt & Associates | | | |
| 1302. | Pest inspection | | | |
| 1303. | Exhausted Payoff 1st Mtg | to Household Realty Corporation | 90,571.76 | |
| 1304. | Payoff | to Capital One | 1,000.00 | |
| 1305. | Payoff | to Capital One | 1,207.20 | |
| 1306. | Payoff | to Capital One | 603.59 | |
| 1307. | Payoff | to Capital One | 1,158.64 | |
| 1308. | Payoff | to Capital One | 586.18 | |
| 1309. | 2001 Taxes and Fri 2002 | to Cuyahoga County Treasurer | 5,847.18 | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | 109,023.02 | |

DISTRIBUTION: I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

Patricia Joanne Kellicker    [signature] Patricia Joanne McKenney
Patricia Joanne Kellicker, NKA Patricia Joanne McKenney

[signature] Patricia Joanne McKenney

Settlement, to my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

[signature]    [signature] 12-27-02
Brooklyn Title Agency, Inc    Date

SELLER'S AND/OR PURCHASER'S STATEMENT Sellers and Purchaser's acknowledge the matters set forth below, and agree that the same is accurate.

Patricia Joanne Kellicker    [signature] Patricia Joanne McKenney
Patricia Joanne Kellicker, NKA Patricia Joanne McKenney

[signature] Patricia Joanne McKenney

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010

DEC 30 2002 17:51 FR HOUSEHOLD 656200    440 777 6435 TO 1216739408J    P.01/01

# HOUSEHOLD FINANCE CORPORATION

| | |
|---|---|
| Date: | 12/27/2002 |
| From: | Payoff Department |
| Attn: | BROOKLYN TITLE AGENCY, INC |
| | 4355 RIDGE RD |
| | BROOKLYN, OH 44144 |
| Ref: | JEFFREY MCNERNEY-NLLT and PATRICIA MCNERNEY |
| Acct: | 16460 |

The amount to payoff the above-referenced account in full, is as follows:

| | |
|---|---|
| Payoff Balance (Principal + Interest): | $97,412.85 |
| PrePayment Penalty: | $923.29 |
| Reconveyance/Releasing Fee: | $14.00 |
| Other Fees: | $0.00 |
| Total Amount Due: | $98,349.94 * |
| Good Until: | 01/10/2003 |
| Per Diem: | $31.57 |

The above payoff quote is subject to a final audit. The payoff quote does not waive our rights to receive any funds, which are due and owing on this account as a result of any subsequent adjustments, which may include but are not limited to recent advances, returned items and additional fees. Additionally, we will not release any security interest until the account is paid in full.

Please reference our account number and issue a check for: $98,349.94 to Household Finance for the payoff. Please forward the payoff to the address indicated below.

For Regular Mail:
Household Finance/Household Bank
Attn: Payoff Department
P.O. Box 4153
Carol Stream, IL 60197-4141

For Overnight Mail:
Household Finance/Household Bank
Attn: Payoff Department
1301 E. Tower Road
Schaumburg, IL 60173

If the credit line is to be cancelled, please sign below and include this letter with your payment. We will forward the necessary documents to the Trustee/County Recorder's office to release our lien within thirty days after the account is paid in full.

Please cancel my credit line. Unless signed authorization to cancel the credit line is received, the line will remain open and we will not release the lien.

Signature: _____ Date: _____

Signature: _____ Date: _____

* Note: If your loan contains one or more credit insurance products for which refunds are entitled, the net payoff amount includes all related refunds due.


PLAINTIFF'S
EXHIBIT

12/30/02 5:10 PM

OMB No. 2502-0265

| A. U.S. Department of Housing and Urban Development | B. Type of Loan | | |
|---|---|---|---|
| **FINAL** | 1. [ ] FHA | 2. [ ] FMHA | 3. [ ] Conv. Unins. |
| | 4. [ ] VA | 5. [X] Conv. Ins. | |
| **Settlement Statement** | 6. File Number<br>201648 | 7. Loan Number<br>993-9 | |
| | 8. Mortgage Ins. Case No. | | |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked ("POC") were paid outside the closing; they are shown here for information purposes and are not included in the totals.

**D. Name of Borrower:** Patricia Joanne Kellicker, NKA Patricia Joanne McNerney, 1241 Thoreau Road, Lakewood, OH 44107

**E. Name of Seller:**

**F. Name of Lender:** Homecomings Financial Network, Inc., 27725 Stansbury Blvd, Suite # 375, Farmington Hills, MI 48334

**G. Property Location:** Known as being sublot no. 35

1241 Thoreau Road, Lakewood, OH 44107

**H. Settlement Agent:** Brooklyn Title Agency, Inc. (216) 739-9100    TIN:
**Place of Settlement:** 4355 Ridge Road, Brooklyn, OH 44144

**I. Settlement Date:** 12/27/02    Proration Date: 1/2/03

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100.** Gross amount due from borrower: | | **400.** Gross amount due to seller: | |
| **101.** Contract sales price | | **401.** Contract sales price | |
| **102.** Personal property | | **402.** Personal property | |
| **103.** Settlement charges to borrower (line 1400) | 116,173.85 | **403.** | |
| **104.** | | **404.** | |
| **105.** | | **405.** | |
| Adjustments for items paid by seller in advance: | | Adjustments for items paid by seller in advance: | |
| **106.** City/town taxes | | **406.** City/town taxes | |
| **107.** County taxes | | **407.** County taxes | |
| **108.** Assessments | | **408.** Assessments | |
| **109.** | | **409.** | |
| **110.** | | **410.** | |
| **111.** | | **411.** | |
| **112.** | | **412.** | |
| **120.** Gross amount due from borrower: | 116,173.85 | **420.** Gross amount due to seller: | 0.00 |
| **200.** Amounts paid by or in behalf of the borrower: | | **500.** Reduction in amount due to seller: | |
| **201.** Deposit or earnest money | | **501.** Excess deposit (see instructions) | |
| **202.** Principal amount of new loan | 108,000.00 | **502.** Settlement charges to seller (line 1400) | 0.00 |
| **203.** Existing loan(s) taken subject to | | **503.** Existing loan(s) taken subject to | |
| **204.** | | **504.** Payoff of first mortgage loan | |
| **205.** | | **505.** Payoff of second mortgage loan | |
| **206.** | | **506.** | |
| **207.** | | **507.** | |
| **208.** | | **508.** | |
| **209.** 1 day of interest credit | 23.67 | **509.** | |
| Adjustments for items unpaid by seller: | | Adjustments for items unpaid by seller: | |
| **210.** City/town taxes | | **510.** City/town taxes | |
| **211.** County taxes | | **511.** County taxes | |
| **212.** Assessments | | **512.** Assessments | |
| **213.** | | **513.** | |
| **214.** | | **514.** | |
| **215.** | | **515.** | |
| **216.** | | **516.** | |
| **217.** | | **517.** | |
| **218.** | | **518.** | |
| **219.** | | **519.** | |
| **220.** Total paid by/for borrower: | 108,023.67 | **520.** Total reduction in amount due seller: | 0.00 |
| **300.** Cash at settlement from/to borrower: | | **600.** Cash at settlement to/from seller: | |
| **301.** Gross amount due from borrower (line 120) | 116,173.85 | **601.** Gross amount due to seller (line 420) | 0.00 |
| **302.** Less amount paid by/for borrower (line 220) | 108,023.67 | **602.** Less total reduction in amount due seller (line 520) | 0.00 |
| **303.** CASH [X]FROM ( )TO BORROWER | 8,150.18 | **603.** CASH ( )FROM ( )TO SELLER | 0.00 |

SUBSTITUTE FORM 1099 SELLER STATEMENT - The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.
SELLER INSTRUCTION - If this real estate was your principle residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of form 4797, Form 6252 and/or Schedule D (Form 1040).
You are required by law to provide Brooklyn Title Agency, Inc. (216) 739-9100 with your correct taxpayer identification number.
If you do not provide Brooklyn Title Agency, Inc. (216) 739-9100 with your correct taxpayer identification number, you may be subject to civil or criminal penalties.



PLAINTIFF'S
EXHIBIT
PENGAD 800-631-6989

| L. Settlement Charge | 12-30-02 $10PM | File Number: 20148 | |
|---|---|---|---|
| | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
| 700. Total sales/broker commiss. | | | |
| Division of commission (line 700) as follows: | | | |
| 701. $ | | | |
| 702. $ | | | |
| 703. Commission paid at settlement | | | |
| 704. | | | |
| 800. Items payable in connection with loan | | | |
| 801. Loan origination fee | to OMC Lending, Inc. | 2,604.60 | |
| 802. Loan discount | to OMC Lending, Inc. (1%) | 1,040.00 | |
| 803. Appraisal fee | | | |
| 804. Credit report | | | |
| 805. Lender's inspection fee | | | |
| 806. Mortgage insurance application fee | | | |
| 807. Assumption fee | | | |
| 808. Underwriting Fee | to Homecomings Financial Network, Inc. | 295.00 | |
| 809. Tax Service Fee | to Homecomings Financial Network, Inc | 85.00 | |
| 810. Closing Fee | to Homecomings Financial Network, Inc | 150.00 | |
| 811. Flood Certification | to Homecomings Financial Network, Inc. | 10.50 | |
| 812. Administration Fee | to OMC Lending, Inc | 250.00 | |
| 813. Processing Fee | to OMC Lending, Inc. | 645.00 | |
| 814. Broker Fee from HF | to OMC Lending, Inc.    POCL 2430.00 | | |
| 900. Items required by lender to be paid in advance | | | |
| 901. Interest from | | | |
| 902. Mortgage insurance premium for | | | |
| 903. Hazard insurance premium for | 1 yrs    to All State | 372.00 | |
| 904. | | | |
| 905. | | | |
| 1000. Reserves deposited with lender | | | |
| 1001. Hazard insurance | 2 mo @ $31.0000 per mo | 62.00 | |
| 1002. Mortgage insurance | | | |
| 1003. City property taxes | | | |
| 1004. County property taxes | 2 mo @ $230.8100 per mo | 461.62 | |
| 1005. Annual assessments (maint.) | | | |
| 1006. | | | |
| 1007. | | | |
| 1008. | | | |
| 1009. Aggregate Adjustment | | | |
| 1100. Title charges | | | |
| 1101. Settlement or closing fee | to Brooklyn Title Agency, Inc. | 325.00 | |
| 1102. Abstract or title search | | | |
| 1103. Title examination | to Brooklyn Title Agency, Inc. | 325.00 | |
| 1104. Title insurance binder | to Brooklyn Title Agency, Inc | 50.00 | |
| 1105. Document preparation | | | |
| 1106. Notary fees | | | |
| 1107. Attorney's fees to Natalie Grubb | | | |
| Includes above items no.: | | | |
| 1108. Title insurance | to Brooklyn Title Agency, Inc | 370.00 | |
| Includes above items no.. | | | |
| 1109. Lender's coverage | $108,000.00    $370.00 | | |
| 1110. Owner's coverage | | | |
| 1111. EPA Endorsement | to Brooklyn Title Agency, Inc. | 75.00 | |
| 1112. Comprehensive Endorsement | to Brooklyn Title Agency, Inc. | 150.00 | |
| 1113. Wire Courier Fee | to Brooklyn Title Agency, Inc. | 45.00 | |
| 1114. E-uro Update | to Brooklyn Title Agency, Inc. | 35.00 | |
| 1115. Condmonat Filing Fee | to Brooklyn Title Agency, Inc. | 25.00 | |
| 1116. Transfer Fee | | | |
| 1117. Hold Signature | to Brooklyn Title Agency, Inc. | 25.00 | |
| 1118. Special Tax Search | | | |
| 1200. Government recording and transfer charges | | | |
| 1201. Recording fees. | Mortgage $70.00 | 70.00 | |
| 1202. City/county tax/stamps. | | | |
| 1203. State tax/stamps. | | | |
| 1204. | | | |
| 1205. | | | |
| 1206. | | | |
| 1300. Additional settlement charges | | | |
| 1301. Survey Hall & Associates | | | |
| 1302. Pest inspection | | | |
| 1303. Payoff 1st Mtg | to Household Realty Corporation | 98,340.94 | |
| 1304. Payoff | to Capital One | 1,600.03 | |
| 1305. Payoff | to Capital One | 1,207.23 | |
| 1306. Payoff | to Capital One | 500.49 | |
| 1307. Payoff | to Capital One | 1,139.64 | |
| 1308. Payoff | to Capital One | 599.18 | |
| 1308. 2001 Taxes and FH 2002 | to Cuyahoga County Treasurer | 6,847.18 | |
| 1400. Total settlement charges (entered on lines 103, section J and 502, section K) | | 115,173.85 | |

CERTIFICATION: I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

*Patricia Joanne Kellicker, HKA Patricia Joanne McNerney*

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Brooklyn Title Agency, Inc.    Date

SELLER'S AND/OR PURCHASER'S STATEMENT: Seller's and Purchaser's signature hereon acknowledges his/their approval of tax prorations and signifies their understanding that proration were based on taxes for the preceding year, or estimates for the current year, and in the event of any change for the current year, all necessary adjustments must be made between Seller and Purchaser; likewise any default in payment taxes will be reimbursed to Title Company by the Seller.

Title Company, as Company as Escrow Agent, is and has been authorized to disperse all funds it receives in this transaction to any financial institution whether affiliated or not. Such financial institution may provide Title Company complete accounting and audit services directly or through a separate entity which, if affiliated with Title Company, may charge the financial institution reasonable and proper compensation therefore and retain any profits therefrom. Any escrow fees paid by any party involved in the transaction shall only be for check writing and input to the computers, but not for the credit accounting and audit services. Title Company shall not be liable for any interest or other charges on the escrow money and shall be under no duty to invest or reinvest funds held by it at any time. Seller and Purchaser hereby acknowledge and consent to the deposit of the escrow money in financial institutions with which Title Company has or may have other banking relationships and further consent to the retention by Title Company and/or its affiliates of any net benefit (including advantageous interest rates on loans) Title Company and/or its affiliates may achieve from such financial institution by reason of the establishment of held escrow accounts.

Purchasers/Borrowers    Sellers

Patricia Joanne Kellicker, HKA Patricia Joanne McNerney

WARNING: It is a crime to knowingly make a false statement to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**Exhibit D**

F13920

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

**FILED**

Mortgage Electronic Registration )
Systems, Inc., acting solely as a )    CASE NO.    NOV 1 0 2003
nominee for Homecomings Financial )
Network, Inc. )    JUDGE    **GERALD E. FUERST**
c/o GMAC Mortgage Corporation )    CLERK OF COURTS
500 Enterprise Road, Suite 150 )    CUYAHOGA COUNTY, OHIO
Horsham, PA  19044 )
)
PLAINTIFF )    **COMPLAINT FOR MONEY,**
)    **FORECLOURE, REFORMATION**
-vs- )    **AND OTHER EQUITABLE**
)    **RELIEF**
)
Patricia Joanne McNerney aka )
Patricia Joanne Kellicker )
1241 Throeau Road )
Lakewood, OH 44107 )    Judge: NANCY A FUERST
)
-and- )    ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖    CV 03 514406
)
John Doe, Unknown Spouse, if any, )
of Patricia Joanne McNerney aka )
Patricia Joanne Kellicker )
1241 Throeau Road )
Lakewood, OH 44107 )
)
DEFENDANTS )

## FIRST COUNT

1.    Plaintiff says that it is the owner and holder of a

certain promissory note, a copy of which is hereto attached,

marked EXHIBIT A and made a part hereof; that by reason of

default in payment of the said note and mortgage securing same,

it has declared said debt due; that there is due and unpaid

**PLAINTIFF'S EXHIBIT**

1

thereon the sum of $107,632.79 plus interest at the rate of 8%
per annum from June 1, 2003.

## SECOND COUNT

2.   Plaintiff incorporates herein by reference all of the
allegations contained in its first count, and further says that
it is the owner and holder of a certain mortgage deed securing
the payment of said promissory note, a copy of which mortgage
attached hereto, marked as EXHIBIT B and made a part hereof;
that said mortgage is a valid and first lien upon the premises
described therein, being Permanent Parcel Number 312-28-084.

3.   Plaintiff says that the conditions in said mortgage
have been broken by reason of default in payment, and the same
has become absolute.

4.   Plaintiff says that pursuant to the covenants and
conditions of said mortgage deed it may, from time to time
during the pendency of this action, advance sums to pay real
estate taxes, hazard insurance premiums and property protection
and maintenance.

5.   Plaintiff says that the Defendants, Patricia Joanne
McNerney aka Patricia Joanne Kellicker, and John Doe, Unknown
Spouse, if any, of Patricia Joanne McNerney aka Patricia Joanne
Kellicker, have or claim to have an interest in the premises.

## THIRD COUNT

6.   Plaintiff incorporates herein by reference all of the

allegations contained in its first and second counts, and further says that the real property described herein is commonly known as 1241 Thoreau Road, Lakewood, OH  44107 with the full legal description as follows:

SITUATED IN THE CITY OF LAKEWOOD, COUNTY OF CUYAHOGA AND STATE OF OHIO:

AND KNOWN AS BEING SUBLOT NO. 35 IN THE J.A. ZANGERLE SUBDIVISION OF PART OF ORIGINAL ROCKPORT TOWNSHIP SECTION NO. 21, AS SHOWN BY THE RECORDED PLAT IN VOLUME 34 OF MAPS, PAGE 7 OF THE CUYAHOGA COUNTY RECORDS, AND BEING 50 FEET FRONT ON THE EASTERLY SIDE OF THOREAU ROAD AND EXTENDING BACK OF EQUAL WIDTH 140-18/100 FEET DEEP, AS APPEARS BY SAID PLAT BE THE SAME MORE OR LESS, BUT SUBJECT TO ALL LEGAL HIGHWAYS.

**ALSO PART OF THOREAU AVENUE VACATED AS SHOWN BY VOL. 204, PAGE 22 OF OHIO COURT MAPS RECORDS.**

7.    Plaintiff further says that through mutual mistake, the legal description contained in the mortgage deed does not conform to the legal description as set forth above; that the intention of the parties at the time of the execution of the mortgage deed was to transfer to the plaintiff all interest that the defendants had in and to the aforesaid described real property, but that, through a scrivener's error, the legal description was not entirely and properly placed in the mortgage deed.

W H E R E F O R E, Plaintiff demands judgment against the Defendant, Patricia Joanne McNerney aka Patricia Joanne Kellicker, in the sum of $107,632.79 plus interest at the rate of 8% per annum from June 1, 2003, unless said Defendant has

been or is discharged in bankruptcy proceedings during the
pendency of this action; that the Defendants named herein be
required to answer and set up any claim that they may have in
said premises or be forever barred; that the mortgage deed
attached hereto as EXHIBIT B be reformed to provide for the
proper legal description as contained in this pleading; that the
Plaintiff be found to have a first lien on said premises for
this amount so owing together with its advances made pursuant to
the terms of the mortgage for real estate taxes, hazard
insurance premiums and property protection and maintenance; that
said premises be ordered, appraised, advertised and sold
according to law, and that from the proceeds the Plaintiff be
paid the amount found due it, and for such other and further
relief as equity entitles it to receive.

THE LAW OFFICES OF
JOHN D. CLUNK CO. LPA


JOHN D. CLUNK # 0005376
TED A. HUMBERT # 0022307
TIMOTHY R. BILLICK #0010390
ROBERT R. HOOSE #0074544
LISA M. MICHAELS #0066918
MICHAEL L. WIERY #0068898
Attorneys for Plaintiff
5601 Hudson Drive, Suite 400
Hudson, Ohio 44236
(330) 342-8203

## NOTICE UNDER THE FAIR DEBT COLLECTION PRACTICES ACT

If your name appears as a Defendant in this Complaint, the following notice applies to you.

1.  The purpose of the attached documents is to collect a debt. Any information you provide to John D. Clunk, Attorney at Law, will be used for that purpose.

2.  The amount of the debt is stated in paragraph one of this Complaint.

3.  The Plaintiff as named in this Complaint is the creditor to whom the the debt is owed.

4.  The debt described in this Complaint and evidenced by the copy of the note attached hereto will be assumed to be valid by John D. Clunk Attorney at Law, unless, within thirty days after the receipt of this notice, you dispute, in writing, the validity of the debt or some portion thereof.

5.  If you notify John D. Clunk, Attorney at Law, in writing within thirty days of the receipt of this notice that the debt or any portion thereof is disputed, John D. Clunk, Attorney at Law, will obtain a verification of the debt and a copy of the verification will be mailed to you by John D. Clunk, Attorney at Law.

6.  If the creditor named as Plaintiff in this Complaint is not the original creditor, and if you make written request to John D. Clunk, Attorney at Law, within thirty days from the receipt of this notice, the name and address of the original creditor will be mailed to you by John D. Clunk, Attorney at Law.

7.  Written requests should be addressed to:
    THE LAW OFFICES OF JOHN D. CLUNK CO., LPA, ATTORNEYS AT LAW
    5601 Hudson Drive, Suite 400, Hudson, Ohio 44236

This is an attempt to collect a debt and any information obtained will be used for that purpose.



EXHIBIT ____A____

# NOTE

DECEMBER 27TH, 2002                    BROOKLYN                                    OHIO
    [Date]                                        [City]                                        [State]

1241 THOREAU ROAD, LAKEWOOD, OH 44107

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 108,000.00        (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is    HOMECOMINGS FINANCIAL NETWORK, INC.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of    8.0000    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B)
of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the  FIRST   day of each month beginning on   FEBRUARY 1ST, 2003  . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest
before Principal. If, on JANUARY 1ST, 2033      , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."

I will make my monthly payments at   27725 STANSBURY BLVD, SUITE 375, FARMINGTON HILLS,
MI 48334                                              or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $        792.47  .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my
monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

VMP-5N (0207)                    Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3        Initials: _____        MFCD6054 - (11/02)        993-9



## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15          calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.00          % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Patricia Joanne McNerney_ (Seal)
PATRICIA JOANNE MCNERNEY     -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

WITHOUT RECOURSE
PAY TO THE ORDER OF
GMAC MORTGAGE CORPORATION

*[Sign Original Only]*

_Karen Schiefert_
KAREN SCHIEFERT
ASSISTANT SECRETARY
HOMECOMINGS FINANCIAL NETWORK INC.
A DELAWARE CORPORATION    Page 3 of 3

-5N (0207)
MFCD6064 - (11/02) /    993-9

Form 3200 1/01

Return To:

HOMECOMINGS FINANCIAL NETWORK, INC
ONE MERIDIAN CROSSING, STE 100
MINNEAPOLIS, MN 55423
**Loan Number:** 041-571993-9

CUYAHOGA COUNTY RECORDER
PATRICK J. OMALLEY
MORT 01/06/2003 11:04:42 AM
**200301060120**

⸗ **EXHIBIT ___B___**

———————————————[Space Above This Line For Recording Data]———————————————

# MORTGAGE

MIN ██████████9391

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated   DECEMBER 27TH, 2002
together with all Riders to this document.
**(B) "Borrower" is**
PATRICIA JOANNE MCNERNEY, A SINGLE WOMAN

*AKA PATRICIA JOANNE KELLICKER*

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3036  1/01
MFOH7770 (9/02) /          '993-9
Ⓥ -6A(OH) (0201)
Page 1 of 15          Initials _____
VMP MORTGAGE FORMS - (800)521-7291



