**<u>Exhibit L</u>**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

ANTHONY D. MCDONALD and                    Case No.  8:09-bk-25594-MGW
MARY B. MCDONALD,

      Debtors.
_____/

ANTHONY D. MCDONALD and
MARY B. MCDONALD,

      Plaintiffs,

vs.                                        Adv. Pro. No. 8:10-ap-00292-MGW

GMAC MORTGAGE, LLC, and
LAW OFFICE OF DAVID J. STERN, P.A.,

      Defendants.
_____/

## SECOND AMENDED COMPLAINT FOR DAMAGES

      Plaintiffs, ANTHONY D. MCDONALD and MARY B. MCDONALD (collectively "McDonalds"), by their undersigned co-counsel, hereby file this Second Amended Complaint against Creditor, GMAC Mortgage, LLC ("GMAC") and against the Law Office of David J. Stern, P.A., ("DJS") and in support thereof state the following:

## JURISDICTION AND VENUE

      1.      At all times material herein Plaintiffs owned real estate located at 906 Woodleaf Way, Tampa, FL 33613.

      2.      At all times material herein Plaintiffs resided in the above-described real estate which constituted their homestead.

3.     On or about the 29th day of June, 2005, Anthony D. McDonald executed and delivered a promissory note to Premier Mortgage Funding, Inc. Said note was secured by a mortgage on Plaintiffs' real estate. A copy of the note and mortgage are attached hereto as Exhibits A and B respectively and made part hereof.

4.     Defendant, GMAC, claims to own the note and mortgage at the present time.

5.     Defendant, DJS, is a law office whose principal place of business is located in Plantation, Florida and is engaged in volume mortgage foreclosures in the State of Florida.

## GENERAL ALLEGATIONS

6.     Approximately June of 2009, Mr. McDonald became unemployed.

7.     Consequent to Mr. McDonald's unemployment he was unable to maintain his mortgage payments.

8.     Mr. McDonald's home was incredibly important to him and the preservation of the home for his family was Mr. McDonald's paramount concern. The gravity of this importance drove Mr. McDonald to desperately seek every possible opportunity to maintain his mortgage.

9.     Throughout the months of July, August, September and early October 2009, Mr. McDonald frequently contacted GMAC to request modification of the McDonalds' payment terms to allow him to maintain his mortgage while managing his financial challenges at the time. Mr. McDonald repeatedly attempted to contact GMAC personnel who possessed the authority to modify his mortgage payments. Despite numerous and frequent attempts and requests for contact, Mr. McDonald was never allowed to speak to personnel who could authorize or even discuss modification of his mortgage payments. Mr. McDonald desperately sought assistance at a GMAC branch location in hopes that he would be more successful speaking to someone in

person. Mr. McDonald was turned away and advised to call the same telephone number he had
called countless times without successfully reaching personnel who could help him.

10.     GMAC never communicated with Mr. McDonald about the possibility of
modifying the McDonalds' payment terms.

11.     By October 2009, Mr. McDonald regained employment and saved sufficient
funds to pay the deficiency of the McDonalds' mortgage.

12.     On or about October 21, 2009, Mr. McDonald contacted GMAC to pay the
deficiency of the McDonalds' mortgage. Mr. McDonald was notified by GMAC personnel that
the McDonalds' mortgage was referred to The Law Office of David J. Stern for collection and
Mr. McDonald must communicate directly with DJS.

13.     The fact that the McDonalds' mortgage was referred to DJS for collection and
possible foreclosure sent Mr. McDonald into a severe panic. Mr. McDonald immediately called
DJS at which time he was told by DJS personnel that he must communicate with DJS in writing.
Mr. McDonald quickly wrote and faxed a note to DJS, dated October 21, 2009 and attached
hereto as Exhibit C and made part hereof.

14.     Throughout the day of October 21, 2009, Mr. McDonald remained in a panic
about the possibility his home may become subject to foreclosure. As he anxiously waited for
DJS to respond to his faxed note but never received a response. Mr. McDonald called Mrs.
McDonald several times every hour in hopes DJS had somehow contacted Mrs. McDonald
instead. Mr. McDonald remained in this panicked state as he repeatedly attempted to contact DJS
by telephone. Mr. McDonald was repeatedly told by DJS personnel that he would be contacted
by someone from DJS. Mr. McDonald was not contacted for over a week.

15.     In late October, Mr. McDonald received a "Reinstatement Letter" from DJS, dated October 27, 2009 and attached hereto as Exhibit D and made part hereof.

16.     The "Reinstatement Letter" from DJS contained blatantly fraudulent charges and deceptive information.

17.     Within the Reinstatement Letter DJS demanded a "Reinstatement Amount" of $9,299.58, as the "amounts needed to reinstate the" loan and declared in bold-typed capital letters that the Reinstatement Amount was "good through **NOVEMBER 8, 2009**."

18.     The Reinstatement Amount contained fraudulent charges for services that were never performed, yet DJS demanded payment of these fraudulent charges to reinstate the loan. Amongst the fraudulent charges were (a) "Clerk's Filing Fee - $1,100.00," (b) "Clerk Recording Fee - $30.00," (c) "Service of Process - $800.00," and (d) "Attorney's Fees - $1,170.00."

19.     The Reinstatement Letter's explanation of the itemized charges and confirms that said charges were for services not performed and the attempt to extort said amounts from the McDonalds was clear fraud.

20.     The "Clerk's filing fee" was identified in the Reinstatement Letter as "the amount paid by the Firm to the Clerk of the Circuit Court in order to file a foreclosure complaint and initiate a foreclosure action." However, no such complaint was filed at the time the Reinstatement Letter was generated. A print out of the Hillsborough County Circuit Court docket related to foreclosure of the McDonalds' home is attached hereto as Exhibit E and made part hereof. The case docket reflects that no action was taken to foreclose on the McDonalds' home until November. Yet, the Reinstatement Letter was dated October 27, 2009 and the demand of payment for these unincurred costs to reinstate the loan was clear fraud.

21.    The "Service of process" was identified in the Reinstatement Letter as "the amount for costs incurred by the Firm to pay process servers to legally serve the complaint and summons on a person." However, again the docket reflected in Exhibit E demonstrates a summons was not issued until November 17, 2009. Yet, the Reinstatement Letter was dated October 27, 2009 and the demand of payment for these unincurred costs to reinstate the loan was clear fraud.

22.    The "Attorney's Fees" was identified in the Reinstatement Letter as a charge for "attorney's fees earned by the Firm as of the Reinstatement Amount good through date." However, the docket reflected in Exhibit E demonstrates that a complaint would not be filed for another two weeks. Consequently, the fees assessed for attorney work not yet performed was an attempt to collect on fraudulent charges for unincurred costs.

23.    The "Clerk Recording Fee" was identified in the Reinstatement Letter as "the amount paid by the Firm to the Clerk of the Circuit Court to record documents related to the foreclosure action." Again, the docket reflected in Exhibit E demonstrates no such action was taken until November. The Reinstatement Letter was dated October 27, 2009 and the demand of payment for this unincurred cost to reinstate the loan was clear fraud.

24.    The Reinstatement Letter also stated in capital letters: "WE WILL NOT DELAY THE FORECLOSURE ACTION."

25.    The Reinstatement Letter further warned that the Reinstatement Amount could be greater and that DJS must be contacted to confirm the Reinstatement Amount. The Reinstatement Letter never indicated or implied in any way that the Reinstatement Amount may be less upon confirmation.

26.     The McDonalds possessed sufficient funds to pay the deficiency but could not pay the exorbitant fraudulent charges attached by DJS for reinstatement.

27.     Upon reading the Reinstatement Amount Mr. McDonald was stricken with severe panic and immediately called DJS for clarification of the Reinstatement Amount. Mr. McDonald was terrified his home may be foreclosed. When Mr. McDonald contacted DJS he was mistreated by dismissive and rudely uncooperative personnel. When Mr. McDonald asked for clarification or explanation of the Reinstatement Amount he was simply directed to, "read the letter, it's all in the letter." When Mr. McDonald urged DJS personnel to assist him with explanation of the Reinstatement Amount his call was immediately and unilaterally terminated by DJS. Mr. McDonald repeatedly called DJS for explanation of the Reinstatement Amount and every call was unilaterally terminated by DJS personnel.

28.     Mr. McDonald's calls and pleas for explanation were intentionally frustrated by DJS personnel and Mr. McDonald's investigation of DJS's fraud was systematically obstructed by uniform DJS procedures.

29.     This system of obstruction was clearly designed to further DJS's monetary gain by frustrating reinstatement efforts which would terminate DJS's representation of GMAC before billing for further foreclosure work.

30.     This pattern of overt obstruction continued when the McDonalds obtained the assistance of an accountant, Lucy Young, CPA. Ms. Young repeatedly attempted to contact DJS on behalf of the McDonalds to assist with the reinstatement by clarifying which costs within the Reinstatement Amount were actually incurred and legitimately due. Ms. Young's attempts to contact DJS and receive explanation were met with the same obstruction and dismissive attitude experienced by Mr. McDonald. On one such occasion Ms. Young asked to speak to a supervisor

to which the DJS personnel responded, "You want to speak to a supervisor? Here you go . . .", at which time the call was suddenly and unilaterally terminated by DJS.

31.    The obstructionism and fraud of DJS deprived the McDonalds of an honest reinstatement of their mortgage and the November 8 "good through" date was drawing near. Terrified by the prospect of an even greater Reinstatement Amount and driven by the desperation to save their home, the McDonalds were forced to consider bankruptcy.

32.    The thought of bankruptcy was anathema to Mr. McDonald and the prospect of such threatened the psychological and physical stability that hinged on Mr. McDonald's pride. Mr. McDonald's role as a reliable provider was a core quality of his character. Indeed, Mr. McDonald prized his self-reliance and this defined his personality. Consequently, Mr. McDonald experienced tremendous mental anguish over the possibilities of foreclosure and bankruptcy. When Ms. Young recommended bankruptcy Mr. McDonald was appalled. Mr. McDonald exclaimed that it was unfair that he was prevented from reinstating the mortgage without a good reason. Mr. McDonald expressed his feelings of helplessness and frustration that even though he had worked hard to save enough money to reinstate the mortgage he was now prevented from doing so by the obstructionism of DJS.

33.    Due to the high cost of the fraudulent Reinstatement Amount and DJS's additional efforts to frustrate the McDonalds' reinstatement, the McDonalds were forced to reluctantly seek bankruptcy.

34.    The McDonalds' bankruptcy counsel, Malka Isaak, continued efforts to communicate with DJS in an attempt to reinstate the mortgage and obtain clarification of the Reinstatement Amount. Ms. Isaak contacted DJS by telephone at which time she was referred to Jenna Cobb of the Bankruptcy Department at DJS. Ms. Isaak faxed a letter to DJS advising she

was counsel to the McDonalds and requested reinstatement at the deficiency amount of

$5,765.09. Said letter is attached hereto as Exhibit F and made part hereof. Ms. Isaak continued

in her attempts to contact Ms. Cobb at DJS to resolve the discrepancy between the mortgage

deficiency amount and the Reinstatement Amount that demanded payment for uncurred costs.

35.     Ms. Isaak finally received a call from Ms. Cobb at DJS. Ms. Isaak inquired of Ms.

Cobb as to the uncurred costs included as additional expenses in the Reinstatement Amount.

36.     Ms. Cobb notified Ms. Isaak that she could not discuss the matter without written

authorization from the McDonalds. Despite DJS's receipt of notice from Ms. Isaak of her legal

representation of the McDonalds, DJS continued to obstruct Ms. Isaak's reinstatement efforts on

behalf of the McDonalds.

37.     Due to the fraud and obstruction perpetrated by DJS the McDonalds were left

with no other choice to save their home and ultimately filed chapter 13 bankruptcy.

38.     As a consequence of the bankruptcy Mr. McDonald suffered extreme depression.

The act of filing and being in bankruptcy destroyed Mr. McDonald's self-image and stripped him

of the characteristics of pride and self-reliance that defined his entire life.

39.     From the time Mr. McDonald was forced to file bankruptcy he experienced

extreme and debilitating shame. He began to withdraw from his family and friends. Mr.

McDonald no longer participated in the activities he enjoyed before the bankruptcy. Upon filing

bankruptcy he abruptly ceased to enjoy his life.

40.     Prior to the bankruptcy Mr. McDonald enjoyed daily activities with his fourteen –

year-old and nine-year-old daughters. Mr. McDonald attended school concerts and open houses,

played softball and rode bicycles with his daughters and enjoyed football games with his friends

and family. Subsequent to filing bankruptcy Mr. McDonald immediately ceased participation in
the above activities.

41.    Mr. McDonald's shame induced depression caused him to suffer from lack of
sleep and anxiety.

42.    Mr. McDonald started abusing alcohol, a habit he did not suffer from before DJS
drove him into bankruptcy.

43.    Mr. McDonald's depression manifested in a substantial weight-loss of over thirty-
five pounds.

44.    Mr. McDonald often expressed his shame to his wife by asking her: "do you still
love me even though I can't provide for you? Are you disappointed with me?" He also believed
the world looked at him as a failure and that his daughters saw him as a disappointment. Mr.
McDonald often lamented to Mrs. McDonald that he believed his daughters no longer respected
or loved him because he failed to provide for them.

45.    On August 21, 2010, Mr. McDonald came home from work and laid on his sofa to
watch television while his daughters hosted their friends for a sleepover. At approximately 7:30
A.M., August 22, 2010, Mr. McDonald was discovered deceased by Mrs. McDonald. The 48-
year-old Mr. McDonald passed way during the night from a heart attack brought on by mental
distress.

46.    As a result of DJS's attempts to collect on fraudulent charges and the systematic
frustration of reinstatement efforts, Mr. McDonald was forced to file bankruptcy, the consequent
depression Mr. McDonald suffered proved fatal.

47.    DJS, on behalf of and agent for GMAC, intentional included fraudulent charges in
the Reinstatement Amount they demanded of Mr. McDonald. DJS intentionally obstructed

efforts to reinstate the mortgage at a legitimate rate. This behavior was the direct and proximate
cause of Mr. McDonald's severe emotional distress and eventual death.

48.     This method of fraud and obstruction is a system implemented by DJS to extort
greater fees either for services not performed or to perpetuate its rendering of services by
preventing early resolution. The uniformity of this practice is demonstrative of an intentional
scheme to defraud or abuse every homeowner with the misfortune of being subjected to DJS's
collection practices.

## CAUSES OF ACTION

## COUNT I. – CLAIMS AGAINST DEFENDANT DJS AND GMAC UNDER THE
## FDCPA

49.     Plaintiffs reallege and incorporate paragraphs 1 through 48.

50.     Defendant DJS is subject to the Fair Debt Collection Practices Act (FDCPA) as a
"debt collector" defined within 15 U.S.C. 1692(a)(6). Indeed, Defendant DJS admits application
of FDCPA prohibitions as indicated by requisite FDCPA notices within DJS's Reinstatement
Letter to the McDonalds.

51.     Defendant DJS violated FDCPA, 15 U.S.C. 1692(e)(2) which prohibits the
intentional mischaracterization of the character, amount, and legal status of the debt.

52.     DJS's Reinstatement Letter required Plaintiffs pay a debt that included charges
that were not incurred or legitimately due. This misrepresentation was intentional and clearly
mischaracterized the character, amount, and legal status of the debt. The Reinstatement Letter
required payment of mischaracterized debt in the form of (a) "Attorney's Fees", (b) "Clerk Filing
Fees", (c) "Clerk Recording Fees", and (d) "Service of Process" none of which were incurred by
the debt collector and none of which were legitimately due or owing.

53.    The requirement that this debt be paid to reinstate the mortgage was confirmed by DJS upon multiple attempts to clarify the debt at which time DJS personnel referred the McDonalds and their representatives to the amount state in the Reinstatement Letter.

54.    Defendant DJS violated FDCPA, 15 U.S.C. 1692(e)(10) which prohibits the use of false representation and deceptive means in collecting a debt. Again, DJS's Reinstatement Letter deceptively and falsely represented that certain amounts were due and owing.

55.    Defendant DJS violated the FDCPA, 15 U.S.C. 1692(d) which generally prohibits conduct the natural consequence of which is to harass, oppress or abuse any person in connection with the collection of a debt. The deceptive representation amounts due and owing in the Reinstatement Letter abused the Plaintiffs by attempting to collect on expenses which were not incurred.

56.    Defendant DJS violated the FDCPA, 15 U.S.C. 1692(f) which generally prohibits the use of unfair or unconscionable means to collect or attempt to collect a debt. The deceptive representation that certain amounts were due and owing was an unfair and unconscionable means of attempting to collect from the McDonalds.

57.    The above violations were clearly intentional and Defendants are liable to Plaintiffs for damages.

58.    WHEREFORE, Plaintiffs respectfully request the court enter judgment against Defendants, DJS and GMAC and award Plaintiffs all statutory damages, actual damages, consequential damages, attorneys fees, costs and grant such further relief as the Court deems just and proper.

## COUNT II. – CLAIMS AGAINST DEFENDANTS GMAC & DJS UNDER THE

## FCCPA

59.     Plaintiffs reallege and incorporate paragraphs 1 through 48.

60.     DJS violated Florida Statutes § 559.72(7) by willfully engaging in conduct which

can reasonably be expected to abuse or harass the McDonalds.

61.     DJS's fraudulent misrepresentation of the Reinstatement Amount to include

charges not due and owing is a communication that can reasonably be expected to be abusive.

62.     GMAC is vicariously liable as a consequence of DJS acting as agent on behalf of

GMAC. GMAC hired DJS to represent GMAC in this matter and thereby acknowledged that

DJS would act as agent on behalf of GMAC. DJS accepted this role and thereby undertook to

represent GMAC as GMAC's agent. GMAC ultimately controlled the actions of DJS as the

agent of GMAC by merit of GMAC's ability to terminate DJS's agency. However, GMAC

consented to DJS behavior as agent on GMAC's behalf.

63.     WHEREFORE, Plaintiffs respectfully request the court enter judgment against

Defendants, DJS and GMAC and award Plaintiffs all statutory damages, actual damages,

consequential damages, attorneys fees, costs and grant such further relief as the Court deems just

and proper.


## COUNT III. – CLAIMS AGAINST GMAC & DJS UNDER FLORIDA

## DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

64.     Plaintiffs reallege and incorporate paragraphs 1 through 48.

65.     Defendants have violated Florida Statutes § 501.204(1) by engaging in
unconscionable acts and practices as well as unfair and deceptive acts and practices in the
conduct of trade and commerce.

66.     Defendants GMAC and DJS were engaged in the commercial enterprises of
lending money and collecting debt. These commercial activities fall within the scope of the
Florida Deceptive and Unfair Trade Practices Act as commerce which benefits from the
protections afforded by prohibitions on deception and other unfair practices to create a fair
marketplace for consumers and competitors within the same industry.

67.     DJS individually and as agent of GMAC engaged in practices that deceived the
McDonalds by attempting to collect charges that were not due and owing. This act was both
deceptive and unfair. Because this behavior was committed within the trade industries of the
Defendants' respective commercial enterprises it violates Florida Statutes § 501.204(1).

68.     Defendants' above referenced unfair and deceptive practice caused Plaintiffs to
suffer actual damages.

69.     WHEREFORE, Plaintiffs respectfully request the court enter judgment against
Defendants, DJS and GMAC and award Plaintiffs all statutory damages, actual damages,
consequential damages, attorneys fees, costs and grant such further relief as the Court deems just
and proper.


## COUNT IV. – CLAIMS AGAINST GMAC AND DJS FOR FRAUDULENT MISREPRESENTATION

70.     Plaintiffs reallege and incorporate paragraphs 1 through 48.

71.     Defendant, DJS, is liable for committing fraudulent misrepresentations.

12-12020 a-mg-Doc-03t635-mEDY-d-by/1045-FReB06/b5/11-54.7:40:58-451 Lathrop
Case 8:10-ap-2103-mEDY Doc 43 FRed 11/10/15 Page 14 of 45
Decl. - Exhibit L  Pg 15 of 46

72.    DJS fraudulently misrepresented the amount due and owing for inclusion in the Reinstatement Amount, which was a material fact central to the calculation of the Reinstatement Amount.

73.    DJS knew the representation of incurred costs was false at the time DJS made the representation because the date of the letter long preceded any action taken to incur the costs fraudulently represented within the Reinstatement Amount.

74.    DJS intended Plaintiffs to act reliance upon DJS's fraudulent misrepresentation. Indeed, the very purpose of the Reinstatement Letter was clearly to induce the Plaintiffs to act in reliance upon the information fraudulently misrepresented within it. DJS either intended Plaintiffs to pay the fraudulent charges or to be frustrated from reinstatement to force Plaintiffs into foreclosure and allow DJS to collect additional fees from the foreclosure action.

75.    Plaintiffs did in fact act in reliance upon the fraudulent misrepresentations of DJS and filed bankruptcy. The Plaintiffs suffered from acting in reliance upon DJS's fraudulent misrepresentation due to bankruptcy fees, attorney's fees, damage to credit and other financial damages. Furthermore, Mr. McDonald suffered severe emotional distress as a consequence of acting in reliance upon the fraudulent misrepresentations of DJS.

76.    GMAC is vicariously liable as a consequence of DJS acting as agent on behalf of GMAC. GMAC hired DJS to represent GMAC in this matter and thereby acknowledged that DJS would act as agent on behalf of GMAC. DJS accepted this role and thereby undertook to represent GMAC as GMAC's agent. GMAC ultimately controlled the actions of DJS as the agent of GMAC by merit of GMAC's ability to terminate DJS's agency. However, GMAC consented to DJS behavior as agent on GMAC's behalf.

77.     WHEREFORE, Plaintiffs respectfully request the court enter judgment against

Defendants, DJS and GMAC and award Plaintiffs all statutory damages, actual damages,

consequential damages, attorneys fees, costs and grant such further relief as the Court deems just

and proper.

## COUNT V. – CLAIMS AGAINST DJS AND GMAC FOR INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

78.     Plaintiffs reallege and incorporate paragraphs 1 through 48.

79.     Defendant, DJS intentionally represented fraudulent amounts in the Reinstatement

Letter and demanded a Reinstatement Amount beyond the McDonalds' ability to pay. This

intentional fraudulence was supplemented by DJS's systematic obstruction of the McDonalds'

attempts to discern the legitimate Reinstatement Amount. This conduct by DJS was deliberate

and reckless in nature. The intentional recklessness of DJS is such that malice is properly

imputed to the Defendant as a matter of law.  Furthermore, DJS either knew or should have

known the likely result of this intentional behavior would be the suffering of emotional distress

by the McDonalds.

80.     DJS's conduct was outrageous and utterly intolerable in civilized community.

DJS intentional represented a fraudulent Reinstatement Amount that was at least $3000.00 or

approximately 60% more than the apparent legitimate amount to reinstate the mortgage. DJS

attempted to fraudulently extort these exorbitant charges from the Plaintiffs while they

desperately sought to preserve the home they shared with their two young daughters. Then, DJS

prevented Plaintiffs from discerning the legitimate amount of reinstatement with systematic

obstruction by their personnel. DJS's deceptive conduct in pursuit of monetary gain at the

expense of a family attempting to remain in their home is clearly outrageous, beyond all bounds

of decency and utterly intolerable in civilized community.

81.     DJS's intentional conduct of fraud and obstruction was the cause of Mr.

McDonalds' emotional distress. If DJS had not fraudulent represented the amount required for

reinstatement or persisted in obstructing the McDonalds' efforts to determine a legitimate

reinstatement amount then Mr. McDonald would not have suffered his emotional distress. DJS's

fraudulence led to Mr. McDonald's crushing resignation to bankruptcy and consequent severe

depression.

82.     The emotional distress Mr. McDonald suffered as a consequence of DJS's

intentional conduct was severe. Mr. McDonald's emotional distress was so severe that it

destroyed his social and family life, caused severe weight-loss, alcohol abuse and ultimately

resulted in his untimely death.

83.     Because DJS's conduct was intentional, outrageous, the cause of Mr. McDonald's

emotional distress and Mr. McDonald's emotional distress was severe, DJS, is liable to Plaintiffs

for damages.

84.     GMAC is vicariously liable as a consequence of DJS acting as agent on behalf of

GMAC. GMAC hired DJS to represent GMAC in this matter and thereby acknowledged that

DJS would act as agent on behalf of GMAC. DJS accepted this role and thereby undertook to

represent GMAC as GMAC's agent. GMAC ultimately controlled the actions of DJS as the

agent of GMAC by merit of GMAC's ability to terminate DJS's agency. However, GMAC

consented to DJS behavior as agent on GMAC's behalf.

85.     WHEREFORE, Plaintiffs respectfully request the court enter judgment against

Defendants, DJS and GMAC and award Plaintiffs all statutory damages, actual damages,

consequential damages, attorneys fees, costs and grant such further relief as the Court deems just and proper.

## <u>COUNT VI. – CLAIMS FOR WRONGFUL DEATH AGAINST DJS AND GMAC</u>

86.  Plaintiffs reallege incorporate paragraphs 1 through 48.

87.  This claim is brought pursuant to the Florida Wrongful Death Act.

88.  As direct and proximate result of the outrageous wrongful acts of DJS, Mr. McDonald suffered extreme emotional distress which was a cause of his death.

89.  As a result of the death of Mr. McDonald, his estate and his statutory survivors have suffered the following:

   a.  ESTATE of ANTHONY D. McDONALD – Accrued burial and funeral expenses and loss of net accumulations as defined by Florida Statutes § 768.21;

   b.  MARY B. McDONALD – mental pain and suffering, the loss of decedents companionship and protection, loss of decedent's support and services, all both past and future as defined by Florida Statutes § 768.21;

   c.  FIRST MINOR DAUGHTER – mental pain and suffering, the loss of decedents companionship and protection, loss of decedent's support and services, all both past and future as defined by Florida Statutes § 768.21; and

   d.  SECOND MINOR DAUGHTER - mental pain and suffering, the loss of decedents companionship and protection, loss of decedent's support and services, all both past and future as defined by Florida Statutes § 768.21.

90.    GMAC is vicariously liable as a consequence of DJS acting as agent on behalf of

GMAC. GMAC hired DJS to represent GMAC in this matter and thereby acknowledged that

DJS would act as agent on behalf of GMAC. DJS accepted this role and thereby undertook to

represent GMAC as GMAC's agent. GMAC ultimately controlled the actions of DJS as the

agent of GMAC by merit of GMAC's ability to terminate DJS's agency. However, GMAC

consented to DJS behavior as agent on GMAC's behalf.

91.    WHEREFORE, Plaintiffs respectfully request the court enter judgment against

Defendants, DJS and GMAC and award Plaintiffs all above mentioned damages, attorneys fees,

costs and grant such further relief as the Court deems just and proper.

Dated: January 5, 2011.

Respectfully submitted,

/s/ *Richard J. McIntyre*_
RICHARD J. McINTYRE
Florida Bar No. 0962708
Rich@mcintyrefirm.com
JOHN R. HIGHTOWER, JR.
Florida Bar No. 0077478
Hightower@mcintyrefirm.com
McIntyre, Panzarella, Thanasides,
Eleff & Hoffman, P.L.
6943 East Fowler Avenue
Tampa, FL 33617
T: 813-899-6059
F: 813-899-6069
*Co-Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing Amended Complaint for Damages has been furnished via the Court's CM/ECF system to all registered users and U.S. Mail to: the United States Trustee, 501 East Polk St., Ste.1200, Tampa, Florida 33602 and Lara Roeske Fernandez, Esquire, Trenam, Kemker, et al., Post Office Box 1102, Tampa, FL 33601-1102; Wanda D. Murray, Esquire, Law Offices of David J. Stern, P.A., 900 South Pine Island Road, Suite 400, Plantation, FL 33324; Malka Isaak, Esquire, Law Office of Malka Isaak, 6014 U.S. Highway 19, Suite 305, New Port Richey, FL 34652; Ziona Kopelovich, Esquire, Debt Relief Law Offices of Tampa Bay, 6014 U.S. Highway 19, Suite 305, New Port Richey, FL 34652, on this 15th day of October 2010.

 

                                         */s/ Richard J. McIntyre* _____
                                                  Attorney

# NOTE

MIN: ███████████ 0148

ORIGINAL

June 29, 2005

TAMPA
[City]

FLORIDA
[State]

906 WOODLEAF WAY
TAMPA, FLORIDA 33613-1025
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 135,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is PREMIER MORTGAGE FUNDING, INC. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.500%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on August 1, 2005. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on July 1, 2035, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 3001 EXECUTIVE DRIVE, SUITE 330, CLEARWATER, FLORIDA 33376 or at a different place if required by the Note Holder.

FLORIDA FIXED RATE NOTE - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3210   1/01
(Page 1 of 4 Pages)



04+FRNOTENW

INITIALS: _____

Loan No:                                                                                     Data ID: 724

(B) Amount of Monthly Payments
My monthly payment will be in the amount of U.S. $ 766.52.

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charge for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

FLORIDA FIXED RATE NOTE - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3210  1/01
(Page 2 of 4 Pages)



04 : FRNOTENW

INITIALS: _____  _____

Loan No:                                                                                               Data ID: 724

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 11. DOCUMENTARY TAX

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

**FLORIDA FIXED RATE NOTE** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3210   1/01
(Page 3 of 4 Pages)

I 03-i 04 I FRNOTENW

INITIALS: _____

Loan No:

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.



ANTHONY D. MCDONALD - Borrower

*[Sign Original Only]*

**FLORIDA FIXED RATE NOTE** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3210   1/01
(Page 4 of 4 Pages)

04 I 04 1 FRNOTENW

Loan No.

Borrower:   Anthony D. McDonald

**ORIGINAL**

## ALLONGE TO NOTE

For purposes of further endorsement of the following described Note, the allonge is affixed and becomes a permanent part of the Note.

Note Date:     June 29, 2005

Amount:        $135,000.00

Borrower:      Anthony D. McDonald

Property Address:   906 Woodleaf Way, Tampa FL 33613

### PAY TO THE ORDER OF

WITHOUT RECOURSE

Premier Mortgage Funding, Inc.

By: Holly O'Neal
    Vice President

INSTR # 2005305906
O BK 15235 PG 0802
Pgs 0802 - 813; (12pgs)
RECORDED 07/13/2005 08:11:39 AM
CLERK OF COURT
HILLSBOROUGH COUNTY
DOC TAX PD(F.S.201.08) 472.50
INT. TAX PD(F.S.199) 270.00
DEPUTY CLERK P Beckhas

Return to: MORTGAGE RESOURCE NETWORK
ATTENTION: JOB ID #2251
14800 LANDMARK BLVD. #400 *Return TO*
DALLAS, TX 75254

MASTERPIECE TITLE
15302 Casey Road
Tampa, FL 33624

Prepared under the supervision of:
Michael L. Riddle
Middleberg, Riddle & Gianna
717 N. Harwood, Suite 2400
Dallas, TX 75201

Folio:

_____ [Space Above This Line For Recording Data] _____

Loan No:                                                          Data ID: 724
Borrower: ANTHONY D. MCDONALD

## MORTGAGE                    MIN: ▓▓▓▓▓▓▓148

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document
are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated June 29, 2005, together with all Riders
to this document.

(B) "Borrower" is ANTHONY D. MCDONALD AND MARY B. MCDONALD , HUSBAND AND
WIFE   . Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that
is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has
an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is PREMIER MORTGAGE FUNDING, INC. Lender is A CORPORATION organized
and existing under the laws of the State of FLORIDA. Lender's address is 3001 EXECUTIVE DRIVE,
SUITE 330      CLEARWATER, FL 33376.

(E) "Note" means the promissory note signed by Borrower and dated June 29, 2005. The Note states
that Borrower owes Lender ONE HUNDRED THIRTY-FIVE THOUSAND and NO/100-----Dollars
(U.S. $ 135,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments
and to pay the debt in full not later than July 1, 2035.

(F) "Property" means the property that is described below under the heading "Transfer of Rights in
the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
                    Form 3010    1/01    (Page 1 of 11 Pages)

‡01‡11‡FLCNV‡PT

Loan No:                                                                Data ID: 724

(R) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider                 ☐ Second Home Rider
☐ Balloon Rider            ☐ Planned Unit Development Rider
☐ 1-4 Family Rider         ☐ Biweekly Payment Rider
☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the County of HILLSBOROUGH:

Lot 3, Block 2, WOODBRIAR VILLAGE, UNIT 4, according to that certain plat as recorded in Plat Book 50, Page 72, of the Public Records of Hillsborough County, Florida.

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
                                    Form 3010    1/01    (Page 2 of 11 Pages)



-02+11+FLCNVAOT

Loan No:                                                                 Data ID:  724

which currently has the address of 906 WOODLEAF WAY,
                                                    [Street]
TAMPA, FLORIDA                                      33613-1025    ("Property Address"):
[City]                                              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.  **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then, to reduce the principal balance of the Note.
If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
                                              Form 3010    1/01    (Page 3 of 11 Pages)

-03-11-FLCNVAQT

Loan No:                                                                Data ID: 724

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due
under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts
due for: (a) taxes and assessments and other items which can attain priority over this Security
Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the
Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and
(d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the
payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items
are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may
require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and
such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender
all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow
Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.
Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any
time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly,
when and where payable, the amounts due for any Escrow Items for which payment of Funds has been
waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment
within such time period as Lender may require. Borrower's obligation to make such payments and to
provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this
Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is
obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due
for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower
shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the
waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and,
upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then
required under this Section 3.
    Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender
to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount
a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of
current data and reasonable estimates of expenditures of future Escrow Items or otherwise in
accordance with Applicable Law.
    The Funds shall be held in an institution whose deposits are insured by a federal agency,
instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured)
or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later
than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the
Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays
Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless
an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender
shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender
can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower,
without charge, an annual accounting of the Funds as required by RESPA.
    If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to
Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in
escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower
shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in
no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under
RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the
amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12
monthly payments.
    Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly
refund to Borrower any Funds held by Lender.
4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions
attributable to the Property which can attain priority over this Security Instrument, leasehold payments
or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if
any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided
in Section 3.
    Borrower shall promptly discharge any lien which has priority over this Security Instrument unless
Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner
acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien
in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's
opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only
until such proceedings are concluded; or (c) secures from the holder of the lien an agreement
satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any
part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender
may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is
given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this
Section 4.
    Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or
reporting service used by Lender in connection with this Loan.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

                                 Form 3010    1/01    (Page 4 of 11 Pages)

04+11+FLCNVADT

Loan No:                                                                Data ID: 724

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3010    1/01    (Page 5 of 11 Pages)

05-11+FLCNVADT

Loan No:                                                                 Data ID:  724

7.  **Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  **Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  **Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3010    1/01    (Page 6 of 11 Pages)



+06+11+FLCNVADT

Loan No:                                                                      Data ID: 724

   Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses
it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage
Insurance.

   Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and
may enter into agreements with other parties that share or modify their risk, or reduce losses. These
agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other
party (or parties) to these agreements. These agreements may require the mortgage insurer to make
payments using any source of funds that the mortgage insurer may have available (which may include
funds obtained from Mortgage Insurance premiums).

   As a result of these agreements, Lender, any purchaser of the Note, another insurer, any
reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly)
amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage
Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such
agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share
of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

   (a) Any such agreements will not affect the amounts that Borrower has agreed to pay for
Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount
Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

   (b) Any such agreements will not affect the rights Borrower has - if any - with respect to the
Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may
include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage
Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any
Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

   11.  Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby
assigned to and shall be paid to Lender.

   If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair
of the Property, if the restoration or repair is economically feasible and Lender's security is not
lessened.  During such repair and restoration period, Lender shall have the right to hold such
Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the
work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken
promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of
progress payments as the work is completed.  Unless an agreement is made in writing or Applicable
Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay
Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not
economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be
applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if
any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in
Section 2.

   In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous
Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due,
with the excess, if any, paid to Borrower.

   In the event of a partial taking, destruction, or loss in value of the Property in which the fair
market value of the Property immediately before the partial taking, destruction, or loss in value is equal
to or greater than the amount of the sums secured by this Security Instrument immediately before the
partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the
sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds
multiplied by the following fraction: (a) the total amount of the sums secured immediately before the
partial taking, destruction, or loss in value divided by (b) the fair market value of the Property
immediately before the partial taking, destruction, or loss in value.  Any balance shall be paid to
Borrower.

   In the event of a partial taking, destruction, or loss in value of the Property in which the fair
market value of the Property immediately before the partial taking, destruction, or loss in value is less
than the amount of the sums secured immediately before the partial taking, destruction, or loss in
value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be
applied to the sums secured by this Security Instrument whether or not the sums are then due.

   If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the
Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages,
Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is
authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the
Property or to the sums secured by this Security Instrument, whether or not then due.  "Opposing
Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom
Borrower has a right of action in regard to Miscellaneous Proceeds.

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
                                  Form 3010    1/01    (Page 7 of 11 Pages)

07+11+FLCNVAOT

Loan No:                                                                 Data ID: 724

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3010    1/01    (Page 8 of 11 Pages)



+08+11+FLCNVADT

Loan No:                                                                 Data ID:  724

16.  Governing Law; Severability; Rules of Construction.  This Security Instrument shall be
governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and
obligations contained in this Security Instrument are subject to any requirements and limitations of
Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract
or it might be silent, but such silence shall not be construed as a prohibition against agreement by
contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts
with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the
Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include
corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and
include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation
to take any action.

17.  Borrower's Copy.  Borrower shall be given one copy of the Note and of this Security
Instrument.

18.  Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18,
"Interest in the Property" means any legal or beneficial interest in the Property, including, but not
limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales
contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date
to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if
Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without
Lender's prior written consent, Lender may require immediate payment in full of all sums secured by
this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is
prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice
shall provide a period of not less than 30 days from the date the notice is given in accordance with
Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower
fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies
permitted by this Security Instrument without further notice or demand on Borrower.

19.  Borrower's Right to Reinstate After Acceleration.  If Borrower meets certain conditions,
Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time
prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale
contained in this Security Instrument; (b) such other period as Applicable Law might specify for the
termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security
Instrument.  Those conditions are that Borrower: (a) pays Lender all sums which then would be due
under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default
of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security
Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation
fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights
under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure
that Lender's interest in the Property and rights under this Security Instrument, and Borrower's
obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may
require that Borrower pay such reinstatement sums and expenses in one or more of the following forms,
as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or
cashier's check, provided any such check is drawn upon an institution whose deposits are insured by
a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by
Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no
acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration
under Section 18.

20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.  The Note or a partial interest
in the Note (together with this Security Instrument) can be sold one or more times without prior notice
to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects
Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan
servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might
be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of
the Loan Servicer, Borrower will be given written notice of the change which will state the name and
address of the new Loan Servicer, the address to which payments should be made and any other
information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold
and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the
mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred
to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided
by the Note purchaser.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3010    1/01    (Page 9 of 11 Pages)



- U + FLGNVADT

Loan No:                                                                                    Data ID: 724

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.  Hazardous Substances.  As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows.

22.  Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23.  Release.  Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument.  Borrower shall pay any recordation costs.  Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24.  Attorneys' Fees.  As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25.  Jury Trial Waiver.  The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3010    1/01    (Page 10 of 11 Pages)

D1111-FLCNVADT

Loan No:                                                Data ID:  724

    BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in
this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

.........................................                .........................................
        Witness - Printed Name                              Witness - Printed Name


*Mary B McDonald* (Seal)                          *Anthony D M Donald* (Seal)
MARY B. MCDONALD —Borrower                     ANTHONY D. MCDONALD —Borrower


_____ [Space Below This Line For Acknowledgment] _____

State of FLORIDA                          §
County of  **Hillsborough**               §

The foregoing instrument was acknowledged before me this _____ day of _____  **JUN 2 9 2005**
20 ____, by
ANTHONY D. MCDONALD AND MARY B. MCDONALD
who [strike the following that does not apply] are personally known to me/has produced
~~Drivers License~~  as identification.

                                    _____
                                           Notary Public

                                    *Leslie Kessler*
                                    (Name of person taking acknowledgment Typed,
                                    Printed or Stamped)

My commission expires:_____

LESLIE KESSLER
MY COMMISSION # DD 413608
EXPIRES: April 6, 2009
Bonded Thru Notary Public Underwriters

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
                          Form 3010   1/01   (Page 11 of 11 Pages)

+11+FLCNVADT

Exhibit "A"


Lot 3, Block 2, WOODBRIAR VILLAGE, UNIT 4, according to that certain plat as recorded in
Plat Book 50, Page 72, of the Public Records of Hillsborough County, Florida.

Anthony D McDonald

906 Woodleaf Way

Tampa FL 33613

(813) 960-4423

GMAC #██████ 4256

Work # (813) 681-8479

I have been Referred To you from GMac

I Tried to Pay My Mortgage in full but I

was declined.

Reason of deliquency Loss of employment

I Now have a new Job and Can pay in full.

Please Call Me at Work Today 10/21/09

I'll be here until 9:00 P.M.

Thank you

© FranklinCovey All Rights Reserved • franklincovey.com • Original-Monarch

The Law Offices Of
David J. Stern P.A.
900 South Pine Island Road Suite 400
Plantation, FL 33324-3920
Phone: (954) 233-8000
Fax: (954) 233-8333

October 27, 2009

RE:  ████9256  Many
     Mortgagor: ANTHONY MCDONALD
     Property Address: 906 WOODLEAF WAY, TAMPA, FL 33613
     Our File No.: 09-97290 (GMAC) (FNM)

To:   Anthony Mcdonald
      906 Woodleaf Way
      Tampa, FL  33613

    We represent GMAC MORTGAGE, LLC (the "Lender") concerning the collection of the
above referenced loan, and we are sending this letter pursuant to your request for reinstatement
figures good through **NOVEMBER 8, 2009**.  As of the date of this letter, you owe $5,765.09 in
monthly mortgage payments, late fees, and other charges as reflected below in the column
entitled "Amounts Currently Due". Because additional interest, additional late charges, and other
charges may vary from day to day, the amount due on the day you pay may be greater.  You will
also be liable for additional costs and attorneys fees incurred in the foreclosure action.  Listed
below is an itemization of the amounts needed to reinstate the above-referenced loan(s), which
are good through **NOVEMBER 8, 2009** (the "Reinstatement Amount").  Please review the
enclosed **Explanation of Charges** included with this letter for an explanation of each of the
itemized amounts.

    Upon our acceptance of the **Reinstatement Amount** below, if a foreclosure action has
been filed with a court, we will advise the court accordingly.

    How to Make Payment: Funds must be sent to the Law Offices of David J. Stern, P.A. by
certified check or money order drawn on a United States bank, and made payable to "Law
Offices of David J. Stern, P.A. Trust Account".  Trust account and escrow account checks will
not be accepted under any circumstances.  Acceptance of funds is subject to final approval by the
Lender.

| Description of Charges | Amounts Currently Due | Amounts Due As Of November 8, 2009 |
|---|---|---|
| *** Monthly Mortgage Payment(s) due from | $4,457.96 | $5,572.45 |
| Accumulated Late Charges | $344.88 | $344.88 |
| ** Escrow Deficit | | |

   

Loan
Page 2

Reinstatement Statement
October 27, 2009

| Description of Charges | Amounts Currently Due | Amounts Due As Of November 8, 2009 |
|---|---|---|
| Suspense Balance | | |
| Non-Sufficient Funds | | |
| *Property Inspections | $282.25 | $282.25 |
| *Property Preservation | | |
| *Broker's Price Opinion/Appraisal | | |
| *Loan Modification Fees | | |
| Title Search | | |
| Title Exam | | |
| *Title Update | | |
| Pre-suit Occupancy Investigation* | | |
| Mediation Charge* | | |
| Clerk Filing Fee | | $1,100.00 |
| *Clerk Recording Fee | $30.00 | $30.00 |
| *Certified Copies Fee | | |
| *Post-Judgment Clerk Filing Fee | | |
| *Service of Process | | $800.00 |
| *Publication Costs | | |
| *Overnight Document Delivery Costs | | |
| *Guardian Ad Litem Fees | | |
| *Attorneys' Fees | $650.00 | $1,170.00 |
| *Bankrutpcy Fees Paid To Other Counsel | | |
| | **Current Amount Due:** $5,765.09 | **Reinstatement Amount:** $9,299.58 |

***These figures do not include any escrow shortage that may have accrued. Upon application of the reinstatement amount, the loan will be re-analyzed and the monthly payment will be adjusted accordingly.

** These amounts may contain estimates and are subject to change depending upon advances made by the Lender.

* These amounts depend upon the services performed to litigate the foreclosure case and costs incurred during the case. Therefore, these are estimated amounts and are subject to increase depending upon various factors involved in the foreclosure case (see Explanation of Charges below). You must contact this office prior to sending the Reinstatement Amount for an updated list of the itemized amounts.

Case 8:09-ap-00292-MGW Doc 43-4 Filed 11/01/11 Page 3 of 5

The Reinstatement Amount may change under certain circumstances (see below). If you have any questions about the amounts listed above, please refer to the **Explanation of Charges** enclosed with this letter. Should you need further explanation, please contact our office.

Changes in the Reinstatement Amount: The Lender reserves the right to demand amounts in addition to the charges stated above before or after the release of its security interest in the property if there was an error or omission in the above charges that was made in good faith, whether mathematical, clerical, typographical or otherwise. The Reinstatement Amount is also subject to change to reflect services that may be performed on or after the date of this letter.

Notice Regarding Bankruptcy Action: If an action has been filed with a bankruptcy court, the charges stated above are subject to change. Accordingly, the Reinstatement Amount will change if you file for relief under the Bankruptcy Code. Additionally, if this loan is currently subject to a bankruptcy court action, the Reinstatement Amount will change if additional attorneys' fees and costs are incurred by the Lender concerning the loan.

WE WILL NOT DELAY THE FORECLOSURE ACTION: Please note that we will not delay or dismiss the foreclosure action while we are waiting to receive reinstatement charges.

**PLEASE NOTE - YOU MUST CONTACT THIS OFFICE BEFORE TENDERING ANY FUNDS TO VERIFY THE TOTAL AMOUNT DUE.**

If you have any questions, please do not hesitate to contact our office.

Stacey Operator# 10054, Legal Assistant # 1775
Law Offices of David J. Stern, P.A.
Attorneys for the Lender
(954) 233-8000

**NOTICE REQUIRED BY THE FAIR DEBT COLLECTION PRACTICES ACT, 15 U.S.C. § 1601, AS AMENDED**

(1) THE AMOUNT OF THE DEBT TO REINSTATE THE LOAN IS SET FORTH IN THIS LETTER AND IS OWED TO THE LENDER;
(2) THE DEBTOR MAY DISPUTE THE VALIDITY OF THE DEBT, OR ANY PORTION THEREOF, WITHIN 30 DAYS AFTER RECEIPT OF THIS LETTER. IF THE DEBTOR FAILS TO DISPUTE THE DEBT WITHIN 30 DAYS AFTER RECEIPT OF THIS LETTER, THE DEBT WILL BE ASSUMED TO BE VALID BY THE LAW OFFICES OF DAVID J. STERN, P.A. (THE "FIRM");
(3) IF THE DEBTOR NOTIFIES THE FIRM IN WRITING WITHIN 30 DAYS AFTER RECEIPT OF THIS LETTER THAT THE DEBT, OR ANY PORTION OF THE DEBT, IS DISPUTED, THE FIRM WILL OBTAIN VERIFICATION OF THE DEBT OR A COPY OF A JUDGMENT AGAINST THE DEBTOR AND A COPY OF SUCH VERIFICATION OR JUDGMENT WILL BE MAILED TO THE DEBTOR BY THE FIRM; AND
(4) UPON THE DEBTOR'S WRITTEN REQUEST WITHIN 30 DAYS AFTER RECEIPT OF THIS LETTER, THE FIRM WILL PROVIDE THE DEBTOR WITH THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR IF DIFFERENT FROM THE CURRENT LENDER;
(5) WRITTEN REQUESTS PURSUANT TO THIS NOTICE SHOULD BE ADDRESSED TO:
FAIR DEBT COLLECTION CLERK, LAW OFFICES OF DAVID J. STERN, P.A.
900 SOUTH PINE ISLAND ROAD, SUITE 400
PLANTATION, FL 33324

THE FIRM IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. THE INSTRUCTIONS IN THIS LETTER PERTAIN TO YOUR DEALINGS WITH THE FIRM AS A DEBT COLLECTOR. IT DOES NOT AFFECT YOUR DEALINGS WITH THE COURT, AND IN PARTICULAR, IT DOES NOT CHANGE THE TIME AT WHICH YOU MUST ANSWER THE COMPLAINT. THE SUMMONS IS A COMMAND FROM THE COURT, NOT FROM THE FIRM, AND YOU MUST FOLLOW THE INSTRUCTIONS ON THE SUMMONS, EVEN IF YOU DISPUTE THE VALIDITY OR AMOUNT OF THE DEBT. THE INSTRUCTIONS IN THIS LETTER ALSO DO NOT AFFECT THE FIRM'S RELATIONSHIP WITH

THE COURT AND THE FIRM MAY FILE PAPERS IN THE LAWSUIT ACCORDING TO THE COURT'S RULES AND THE JUDGE'S INSTRUCTIONS.

## EXPLANATION OF CHARGES

**Monthly Mortgage Payments**: These are the amounts for unpaid monthly mortgage payments based on information provided to us by the Lender.

**Accumulated Late Charges**: This is the amount that has accumulated and will continue to accumulate because payment was not timely received by the Lender, based on the information provided to us by the Lender.

**\*\* Escrow Deficit**: This is the amount the Lender has advanced for payment of property taxes, assessments, insurance or other items. This amount does not include any shortage of amounts collected by a borrower and held in an escrow account by the Lender for payment of taxes, assessments, insurance or other items that may be due in the future.

**Non-Sufficient Funds**: This is the amount of bank charges incurred by the Lender because, prior to acceleration of the loan(s) by the Lender, the Lender received payment for the loan(s) by check or draft for which there was not sufficient funds on deposit at the time the Lender drew upon the check or draft.

**Property Inspections**: This is the amount incurred by the Lender to have the property periodically inspected once the loan is delinquent. The inspection typically consists of a visual exterior review of the property. The review determines whether the property is occupied and adequately maintained. Expenses for preservation of the property may occur if the property is reported vacant, for securing the property or to perform regular maintenance to protect the Lender's interest in the property.

**Property Preservation**: This is the amount incurred by the Lender to prevent the property from deteriorating or decreasing in value due to its condition.

**Broker's Price Opinion/Appraisal**: This is the amount for an appraisal. Once a property is referred for a foreclosure, the Lender may order a Broker's Price Opinion or Appraisal to ascertain the market value of the property.

**Loan Modification Fees**: Fee which may be charged by the Plaintiff for processing a modification of the loan terms.

**Title Search**: This is the amount for performing a title search of the property. A title search is an investigation of the public records on file in the county where the property is located, which is performed to identify all persons who may have in interest in the property. Immediately upon receipt of a foreclosure referral from the Lender, the Firm orders a title search on the property.

**Title Examination**: Once a Title Search is complete, a title examiner reviews the information gathered from the Title Search to identify all persons who may have an interest in the property.

**Title Update**: During the foreclosure process the Lender may have the title search and exam updated.

**Pre-suit Occupancy Investigation**: An occupancy investigation performed for the purpose of compliance with complaint filing requirements under applicable Administrative Order.

**Mediation Charge**: Mandatory mediation cost pursuant to Administrative Order.

**Disclosure of Related Entity**: The Title Search, Title Examination, and Title Update services described above may have been performed by Professional Title & Abstract Company. The sole owner of the Law Firm is also the owner of Professional Title & Abstract Company. The Lender and the Law Firm have agreed to the amounts charged by Professional Title & Abstract Company for its services and that they will be paid by the Firm and reimbursed to the Firm by the Lender. The Lender and the Firm have also agreed that the Firm should collect these amounts as costs related to the foreclosure as permitted under your mortgage and note with the Lender.

**Clerk Filing Fee**: This is the amount paid by the Firm to the Clerk of the Circuit Court in order to file the foreclosure complaint and initiate the foreclosure action.

**Clerk Recording Fee**: This is the amount paid by the Firm to the Clerk of the Circuit Court to record documents related to the foreclosure action.

**Certified Copies Fee**: This is the amount paid by the Firm to obtain documents related to the foreclosure action.

**Post-Judgment Clerk Filing Fee**: This is the amount paid by the Firm to the Clerk of the Court in order to reopen a case after a final judgment has been entered to file papers with the Court.

**Service of Process**: This is the amount for costs incurred by the Firm to pay process servers to legally serve the complaint and summons on a person. These amounts include a process server's charges to actually serve the complaint, as well as unsuccessful attempts to serve the complaint, upon known and unknown persons who may have an interest in the property. These amounts also include a process server's charges to locate any defendant who cannot be served the complaint and summons at the address on the summons.

The Firm uses Service of Process and attempted Service of Process to identify persons who may have an interest in the property and who may not be identified by the Title Search and Title Examination. Other than the Title Search and Title Examination, the Firm does not typically investigate whether other persons have an interest in the property. Therefore, the Firm hires process servers to serve parties with an interest in the property and an "unknown spouse" and "unknown tenants" with a summons and complaint, and the Service of Process amount above includes charges for service and attempted service of those persons, whether or not they actually exist. If such a person is served with a copy of the complaint, that person is identified by name on future filings in the foreclosure action, and is served all subsequent filings in the foreclosure action.

"Unknown spouses" and "unknown tenants", if they exist, may have an interest in the property which is not revealed by the Title Search and Title Examination. Summonses were or will be issued for service on "unknown spouses and tenants", and the charge for service or attempted service of process on the unknown parties is $45 per summons, which is included in the total amount for Service of Process listed above. The amount shown above for service of

process in the Reinstatement Amount also includes an estimate of additional charges not yet incurred for service of process that may be incurred in the future course of the foreclosure.

If a process server cannot locate a defendant to serve the complaint and summons at the address listed on the summons, Florida law requires a plaintiff to diligently attempt to locate the defendant before the plaintiff can serve the defendant by advertising/publishing legal notice of the foreclosure case. The Firm pays process servers to locate defendants by performing a "skip trace" report. If a "skip trace" report is required, the amount charged by a process server will be included as part of Service of Process costs. In addition, if service by mail is required, an additional charge will be due and included as part of Service of Process costs.

**Publication Costs**: This is the amount paid by the Firm to a local newspaper to advertise/publish notice of a case when a defendant cannot be located by a process server to personally serve the complaint and summons. This amount may also include the amount paid by the Firm to a local newspaper to advertise notice of a scheduled foreclosure sale.

**Overnight Document Delivery Costs**: This is the amount the Firm has incurred to deliver court documents, correspondence, and other documents to courts, clients, borrowers or others by overnight delivery.

**Guardian Ad Litem Fees**: If a defendant cannot be located by a process server to serve the summons and complaint, the Court may appoint an attorney to represent the defendant during the foreclosure case. These fees are the amount a Court awards to the attorney appointed by the Court.

**Attorneys' Fees**: This is the estimated amount for attorneys' fees earned and to be earned by the Firm as of the Reinstatement Amount good through date. The final amount of the Lender's attorneys' fees is calculated based upon the status of the foreclosure action at the time the Reinstatement Amount is accepted by the Firm. Please note that if additional services are performed by the Firm in the foreclosure action or in a bankruptcy action, the amount for attorneys' fees may increase.

**Bankruptcy Fees Paid to Other Counsel**: Attorneys fees that may have been paid to counsel other than the Law Offices of David J. Stern, P.A.

## DEBT RELIEF LAW OFFICES OF TAMPA BAY, LLC
### Ziona Kopelovich, Esq.
#### Board Certified in Consumer Bankruptcy

## <u>URGENT – NEEDS IMMEDIATE ATTENTION</u>

## <u>ATTN:  DAVID J. STERN, ESQ</u>

## <u>ATTN:  JENNA COBB – BANKRUPTCY DEPT.</u>

## <u>FAX:  954-233-8333 AND 954-233-8554</u>

## <u>Re:  ANTHONY McDONALD</u>

## <u>YOUR FILE NO:  09-97290 (GMAC)(FNM)</u>

Please be advised that I represent Anthony McDonald.  On October 27, 2009, you sent to my client reinstatement information.  According to the Reinstatement Statement, the amount necessary to reinstate the mortgage note prior to November 8, 2009 is $5765.09.  My client ant his wife had talked with an employee of the office of David J. Stern, Esq., and were told that the amount represented in the Reinstatement Statement is no longer applicable and even though November 9, 2009, had not arrived, they amount they needed to pay the loan was $9299.58 to reinstate the mortgage note.

I do not know whether the information given to my client over the phone overrides the information in the Reinstatement Statement.

My clients are ready, able and willing to overnight to the office of David J. Stern, Esq., a cashier's check of $5765.09 in which case the bank check will be received in your office prior to November 8, 2009.

## <u>Please advise me no later than tomorrow, Friday, November 6, 2009, at 2:00 p.m. whether the mortgage can be reinstated for the amount of $5765.09.</u>

I did leave a message on your answering machine.  My cell phone number is 813-382-6112 and an immediate return telephone call will be appreciated.

Sincerely,

Malka Isaak, Esq.

6014 U.S. HIGHWAY 19, STE. 305, NEW PORT RICHEY, FL  34652     TELEPHONE: 727-967-4847, FACSIMILE:  727-846-7687

<u>Probate, Guardianship. Mental Health Court Progress Dockets</u>

# Docket

**Name:** MCDONALD, ANTHONY D    **Person Id:** @6751206    **Party:** D001    **Party Status:** Opened

**UCN:** 292009CA028766D001TA    **Case Number:** 09-CA-028766    **Case Created:** 11/17/2009    **Division:** F    **Case Status:** Opened

**Case Type Description:** MORTGAGE FORECLOSURE    **Court Type:** CIRCUIT CIVIL

| Filing Date | Party | Description | Text |
|---|---|---|---|
| 12/04/2009 | P001 | SUMMONS RETURNED UNSERVED ON | JANE DOE |
| 12/04/2009 | P001 | SUMMONS RETURNED UNSERVED ON | JOHN DOE |
| 12/04/2009 | D003 | SUMMONS RETURNED UNSERVED ON | WOODBRIAR HOA INC |
| 12/04/2009 | D001 | SUMMONS RETURNED UNSERVED ON | MCDONALD, ANTHONY D. |
| 12/04/2009 | D002 | SUMMONS RETURNED UNSERVED ON | MCDONALD, MARY B. |
| 11/17/2009 | P001 | RECEIPT | 17-NOV-2009,$956.00, User Id = STAFORDM, Receipt No = 1701700 |
| 11/17/2009 | **General** | SUMMONS ISSUED | X5 |
| 11/09/2009 | P001 | CIVIL COVER SHEET | |
| 11/09/2009 | P001 | LIS PENDENS | |
| 11/09/2009 | P001 | MF/RE CLAIMS 50,001-249,999 | |
| 11/09/2009 | P001 | VALUE OF MF / RE CLAIM | |