12-12020-mg    Doc 9318-1    Filed 11/13/15    Entered 11/13/15 13:54:32    Exhibit 1 -
Supplemental Lathrop Declaration    Pg 1 of 10

**Exhibit 1**

**Supplemental Declaration**

ny-1210893

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DECLARATION OF SARA LATHROP IN SUPPORT OF THE RESCAP BORROWER CLAIMS TRUST'S OMNIBUS REPLY IN SUPPORT OF ITS EIGHTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS ((I) NO LIABILITY BORROWER CLAIMS AND (II) REDUCE AND ALLOW BORROWER CLAIMS) AS TO CLAIM NOS. 1687, 1689, AND 4121**

I, Sara Lathrop, hereby declare as follows:

1.  I serve as Senior Claims Analyst for the ResCap Borrower Claims Trust (the "Borrower Trust"), established pursuant to the terms of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6030] confirmed in the above-captioned Chapter 11 Cases. During the Chapter 11 Cases, I served as Regulatory Compliance Manager and Loss Mitigation Manager in the loan servicing department of Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases (collectively, the "Debtors"). I began my association with ResCap in June 2006 working as an associate in the Default Division of the loan servicing operation of GMAC Mortgage, LLC ("GMACM"). In 2008, I became a Default Quality Control Specialist, a position that I held until I became a Supervisor in the Default Division in 2009. In 2011, I became a Supervisor in the Loss Mitigation Division of GMACM's loan servicing operation, and in February 2012, I became a Manager in that division. In this role, I oversaw

1

GMACM associates in their efforts to provide borrowers with loss mitigation options and assisted in the development of GMACM's loss mitigation policies. In January of 2013, I became the Regulatory Compliance Manager for ResCap. I became Senior Claims Analyst for ResCap in July 2013 and continued in this role when the ResCap Liquidating Trust (the "Liquidating Trust") was established in December 2013. In my current position as Senior Claims Analyst to the Borrower Trust, among my other duties, I continue to assist the Borrower Trust in connection with the claims reconciliation process.[1] I am authorized to submit this declaration (the "Declaration") in support of the *ResCap Borrower Claims Trust's Omnibus Reply in Support of Its Eighty-Ninth Omnibus Objection to Claims ((I) No Liability Borrower Claims and (II) Reduce and Allow Borrower Claims)* (the "Reply").[2]

    2.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations, information learned from my review of relevant documents and information I have received through my discussions with other former members of the Debtors' management or other former employees of the Debtors, the Liquidating Trust, and the Borrower Trust's professionals and consultants. If I were called upon to testify, I could and would testify competently to the facts set forth in the Objection on that basis.

    3.  In my capacity as Senior Claims Analyst, I am intimately familiar with the claims reconciliation process in these Chapter 11 Cases with regard to Borrower Claims. Except as otherwise indicated, all statements in this Declaration are based upon my familiarity with the Debtors' Books and Records kept in the course of their regularly conducted business activities

---

[1] The ResCap Liquidating Trust and the ResCap Borrower Claims Trust are parties to an Access and Cooperation Agreement, dated as December 17, 2013, which, among other things, provides the Borrower Trust with access to the books and records held by the Liquidating Trust and Liquidating Trust's personnel to assist the Borrower Trust in performing its obligations.
[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Reply.

(the "Books and Records") as well as the Debtors' schedules of assets and liabilities and statements of financial affairs filed in these Chapter 11 Cases (collectively, the "Schedules"), my review and reconciliation of claims, and/or my review of relevant documents. I or my designee at my direction have reviewed and analyzed the proof of claim form and supporting documentation filed by the Claimants. Since the Plan went effective and the Borrower Trust was established, I, along with members of the Liquidating Trust's management or employees of the Liquidating Trust have consulted with the Borrower Trust to continue the claims reconciliation process, analyze claims, and determine the appropriate treatment of the same. In connection with such review and analysis, where applicable, I or Liquidating Trust personnel, together with professional advisors, have reviewed (i) information supplied or verified by former personnel in departments within the Debtors' various business units, (ii) the Books and Records, (iii) the Schedules, (iv) other filed proofs of claim, and/or (vi) the official claims register maintained in the Debtors' Chapter 11 Cases.

4. In connection with the claims reconciliation process, the Borrower Trust identified certain claims filed by Borrowers that are not liabilities of the Debtors (together, the "No Liability Borrower Claims").

5. The Debtors sent Request Letters to certain Borrowers, including all of the Respondents, requesting additional documentation in support of the No Liability Borrower Claims.[3] The Request Letters state that the claimant must respond within 30 days with an explanation that states the legal and factual reasons why the claimant believes he is owed money or is entitled to other relief from the Debtors, and the claimant must provide copies of any and all documentation that the claimant believes supports the basis for his claim. The Request Letters further state that if the claimant does not provide the requested explanation and supporting

---

[3] A Request Letter was sent to Mr. Harris and Mr. Carroll on May 20, 2013.

3

ny-1211638

documentation within 30 days, the Debtors may file a formal objection to the claimant's claim, seeking to have the claim disallowed and permanently expunged.

6. The Debtors received responses to the Request Letters from the Respondents[4] (the "Diligence Responses"), copies of which are attached hereto as Exhibit A. The Diligence Responses either (i) stated a claim in the amount that was less than the amount originally asserted in the proofs of claim or (ii) fail to allege bases for claims against the Debtors' estates. Further, as stated in the Objection, with regard to the Carroll Claim, the Books and Records do not show any liability due and owing to Mr. Carroll.

**Harris Claim**

7. On or around October 26, 2012, Mr. Harris filed two proofs of claim against Debtor GMAC Mortgage, LLC ("GMACM"), designated as Claim No. 1687 ("Claim 1687") and Claim No. 1689 ("Claim 1689" and collectively with Claim 1687, the "Harris Claims"), asserting secured claims for $45,999.45 and $108,609.46, respectively. See Exhibit B attached hereto.

8. According to the Debtors' books and records, non-Debtor Aegis Mortgage Corporation d/b/a UC Lending ("UC Lending") originated a loan in the amount of $51,000.00 to Mr. Harris on March 29, 2002 (the "Westwego Loan"), secured by a mortgage on property located at 905 Patton Lane, Westwego, LA 70094 (the "Westwego Property"). See Westwego Note, attached hereto as Exhibit C, and Westwego Mortgage, attached hereto as Exhibit D. Debtor Residential Funding Company ("RFC") purchased the Westwego loan from UC Lending and transferred its interest on or about June 1, 2002 when the loan was securitized and JP Morgan Chase Bank, NA was appointed as trustee. Claim 1687 relates to the Westwego Loan.

---

[4] The Debtors received a Diligence Response from Mr. Harris related to the Harris Claims (defined below) on June 24, 2013 (the "1687 Diligence Response" and the "1689 Diligence Response") and from Mr. Carroll on June 5, 2013.

4

Non-Debtor Home Loan Center, Inc., d/b/a LendingTree Loans ("Lending Tree") originated a loan in the amount of $116,250.00 to Mr. Harris on March 22, 2006 (the "Marrero Loan"), secured by a mortgage on property located at 6220 3rd Ave., Marrero, LA 70072 (the "Marrero Property"). See Marrero Note, attached hereto as Exhibit E, and Marrero Deed of Trust, attached hereto as Exhibit F. RFC purchased the Marrero loan from Lending Tree and transferred its interest on or about April 1, 2006 when the loan was securitized and Deutsche Bank Trust Company Americas was appointed as trustee. Claim 1689 relates to the Marrero Loan.[5]

         9.     Debtor Homecomings Financial, LLC ("Homecomings") serviced the Westwego Loan from May 31, 2002 and the Marrero Loan from March 22, 2006 until servicing of both loans was transferred to GMACM on July 1, 2009. See Exhibit B to the Proposed Order. GMACM serviced both loans until servicing was transferred to Ocwen on February 16, 2013. See Exhibit B to the Proposed Order. The last payment made by Mr. Harris on the Westwego Loan prior to transferring servicing to Ocwen was in the amount of $688.95 on December 14, 2012. See Westwego Servicing Notes, attached hereto as Exhibit G, at 3 of 136. The last payment made by Mr. Harris on the Marrero Loan prior to it being transferred to Ocwen was in the amount of $1,083.90 on January 11, 2013. See Marrero Servicing Notes, attached hereto as Exhibit H, at 3 of 93.

         10.    On January 7, 2011, the Debtors referred the Westwego loan to foreclosure because the account was owing for the October 2010 payment. See Westwego Servicing Notes at 98 of 136. The foreclosure was closed on April 15, 2011 because Mr. Harris brought the account current. See id at 47 of 136.

---

[5] Exhibit B to the Proposed Order, attached as Exhibit 1 to the Objection ("Exhibit B to the Proposed Order"), incorrectly listed Claim 1687 as related to the Marrero Loan and 1689 as relating to the Westwego Loan.

11.     On April 8, 2011, the Debtors referred the Marrero Loan to foreclosure because it was owing for the January 2011 payment. See Marrero Servicing Notes at 58 of 93. The foreclosure was closed on May 20, 2011 because Mr. Harris brought the account current. See id at 41 of 93.

**Carroll Claim**

12.     On or around November 9, 2012, Mr. Carroll filed a proof of claim against Debtor Residential Capital, LLC, designated as Claim No. 4121 (the "Carroll Claim"), asserting a general secured claim in in an amount of $80,000. See Exhibit I attached hereto.

13.     According to the Debtors' books and records, non-Debtor Mortgage Outlet, Inc. ("Mortgage Outlet") originated a loan to Mr. Carroll on April 22, 2003 (the "Carroll Loan"), secured by a mortgage (the "Carroll Mortgage") on 2285 Cedar Point Rd., Mobile, AL 36605 (the "Carroll Property"), which was recorded on April 30, 2003. See Carroll Note, attached hereto as Exhibit J, and Carroll Mortgage, attached hereto as Exhibit K.

14.     Homecomings serviced the loan from July 1, 2003 until servicing was transferred to GMACM on or around July 1, 2009. GMACM serviced the Carroll Loan until the foreclosure sale on April 1, 2010.

15.     The Carroll Loan became delinquent when Mr. Carroll failed to make the July 1, 2009 payment.[6] See Carroll Servicing Notes, attached hereto as Exhibit L. On August 3, 2009, GMACM sent a breach letter to Mr. Carroll informing him of the delinquency, as well as an Options to Avoid Foreclosure Letter on August 11, 2009. See August 2009 Breach Letter and Options to Avoid Foreclosure Letter, attached hereto as Exhibit M and Exhibit N, respectively.

---

[6] The Debtors' Books and Records indicate that a payment was received from Mr. Carroll on July 10, 2009 in the amount of $651.00; however, this payment satisfied the June 1, 2009 payment, leaving the account owing for the July 1, 2009 payment. The Debtors also received a payment from Mr. Carroll on August 7, 2009 in the amount of $601.00; however, this payment was not enough to satisfy the July 1, 2009 payment in full, and therefore the account remained owing for the July 1, 2009 payment. See Servicing Notes at 3 of 56.

16. On September 25, 2009, the Carroll Loan was referred to foreclosure because it was owing for the July 1, 2009 payment. See Servicing Notes at 43 of 56. On October 9, 2009, GMACM sent a Notice of Acceleration to Mr. Carroll (the "First Notice of Acceleration"). See First Notice of Acceleration, attached hereto as Exhibit O.

17. On October 13, 2009, the Claimant spoke with a representative of GMACM over the phone and indicated that he would like a loan modification. See Servicing Notes at 38 of 56. As a result, Mr. Carroll was approved for a repayment plan that same day (the "First Repayment Plan") and the foreclosure process was closed on October 27, 2009. See First Repayment Plan, attached hereto as Exhibit P. The First Repayment Plan required Mr. Carroll to make monthly payments of $721.00. See id.

18. Mr. Carroll made the first two payments required under the First Repayment Plan on October 23 and November 3, 2009. See Servicing Notes at 3 of 56. He did not make the December 2009 payment required under the First Repayment Plan.[7] See id. As a result, GMACM sent Mr. Carroll a breach letter on December 29, 2009 and the First Repayment Plan was cancelled on January 4, 2010. See December 2009 Breach Letter, attached hereto as Exhibit Q and the First Repayment Plan Cancellation Letter, attached hereto as Exhibit R.

19. On January 5, 2010, Mr. Carroll talked with a representative of GMACM via phone, during which GMACM advised him that another repayment plan would be set up on the account (the "Second Repayment Plan"). See Servicing Notes at 33 of 56. The Second Repayment Plan required a payment of $721.00 to be made on January 5, 2010 and February 5, 2010. See id. The Second Repayment Plan specifically stated that "If at any time you fail to

---

[7] The Servicing Notes reflect that a payment in the amount of $701.00 was received from Mr. Carroll on December 16, 2009 but was returned the next day because it was not enough for a full payment as required under the First Repayment Plan. See Servicing Notes at 2-3 of 56. Mr. Carroll attaches a Western Union receipt showing that the returned payment was received by him on January 5, 2010. See Carroll Response at 19 of 46.

7

ny-1211638

comply with any of the above described conditions and requirements, file bankruptcy, or remit a check with non-sufficient funds, this agreement will be considered null and void." See Second Repayment Agreement, attached hereto as Exhibit S.

20. Mr. Carroll did not make the payment due on January 5, 2010, and as a result the Second Repayment Plan was cancelled on January 29, 2010. See Second Repayment Plan Cancellation Letter, attached hereto as Exhibit T.

21. On February 4, 2010, GMACM referred the Carroll Loan to foreclosure, as it was owing for the September 1, 2009 payment. See Servicing Notes at 32 of 56. On February 25, 2010, GMACM mailed a Notice of Acceleration to Mr. Carroll (the "Second Notice of Acceleration"), informing Mr. Carroll that the foreclosure sale was scheduled for April 2, 2010. See Second Notice of Acceleration, attached hereto as Exhibit U. The foreclosure sale was also publicized in the *Mobile-Register Press* on March 1, March 8, and March 15, 2010. See Proof of Publication, attached hereto as Exhibit V. Additionally, on March 25, 2010, GMACM's foreclosure attorney Colleen McCullough mailed a letter to Mr. Carroll again informing him of the foreclosure sale and the amount necessary to reinstate the account. See Reinstatement Letter, attached hereto as Exhibit W.

22. On April 2, 2010, a foreclosure sale of the Carroll Property took place, at which time the Carroll Property was sold to a third party in the amount of $24,000. See Servicing Notes at 18 of 56.

23. The Borrower Trust reviewed the bank statements provided in his diligence response and confirmed that all of the payments demonstrated in these records were properly applied to Mr. Carroll's account.

24. A chart summarizing the reconciliation of the payments from July 1, 2009 (the date of the first delinquency) through the date of the foreclosure is attached hereto as <u>Exhibit X</u>.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 13, 2015

        /s/ Sara Lathrop
        Sara Lathrop
        Senior Claims Analyst for the ResCap
        Borrower Claims Trust