# EXHIBIT A

EFiled: Aug 05 2015 10:58AM EDT
Transaction ID 57656084
Case No. N11C-12-207 MMJ

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
# IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| GMAC RESIDENTIAL HOLDING COMPANY, LLC and RESIDENTIAL CAPITAL, LLC, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. N11C-12-207-MMJ [CCLD] ) ) |
| BROOKFIELD RPS LLC and ROYAL LEPAGE RELOCATION SERVICES LTD., now known as Brookfield Global Relocation Services Ltd., | ) ) ) ) ) ) ) |
| Defendants. | ) |

## [PROPOSED] ORDER REGARDING PLAINTIFFS' MOTION TO EXTEND TIME

Upon consideration of Plaintiffs GMAC Residential Holding Company, LLC and Residential Capital, LLC's (collectively, "Plaintiffs") Motion to Extend Time ("Motion") and the parties' submission in connection with the Motion;

IT IS HEREBY ORDERED this *2nd* day of *August*, 2015 that Plaintiffs' Motion is GRANTED. *This case shall remain on the Dormat Docket/Bankruptcy.*

_____
Honorable Mary M. Johnston

2015 AUG -3 PM 3: 33

FILED PROTHONOTARY

# EXHIBIT B

**EXECUTION COPY**

PURCHASE AND SALE AGREEMENT

BY AND AMONG

GMAC RESIDENTIAL HOLDING COMPANY, LLC,

RESIDENTIAL CAPITAL, LLC,

BROOKFIELD RPS LLC,

AND

ROYAL LEPAGE RELOCATION SERVICES LTD.

DATED AS OF SEPTEMBER 22, 2008

# TABLE OF CONTENTS

**Page**

ARTICLE 1          DEFINITIONS ........................................................................2

    1.1    Defined Terms ........................................................................2
    1.2    Other Interpretive Provisions...............................................10

ARTICLE 2          PURCHASE AND SALE OF OWNERSHIP INTERESTS AND
SUPPORT ASSETS ..........................................................................................11

    2.1    Ownership Interests and Support Assets; GHS Indebtedness Option ..................11
    2.2    Purchase Price........................................................................12
    2.3    Receivables Pay-Out..............................................................12
    2.4    Payment of the Purchase Price ...............................................13
    2.5    Post-Closing Adjustments ......................................................15
    2.6    Excluded Assets.....................................................................17

ARTICLE 3          CLOSING ..............................................................................17

    3.1    Time and Place of Closing......................................................17
    3.2    Deliveries by Seller Parties....................................................17
    3.3    Deliveries by Buyer................................................................19

ARTICLE 4      GENERAL REPRESENTATIONS AND WARRANTIES OF SELLER
    PARTIES      19

    4.1    Organization of Seller Parties and the Company Entities .....................19
    4.2    Capitalization.........................................................................20
    4.3    Authorization..........................................................................21
    4.4    Financial Statements; Books and Records...............................22
    4.5    Real Property; Leaseholds .....................................................23
    4.6    Title to Assets........................................................................24
    4.7    Insurance................................................................................24
    4.8    Contracts and Commitments ..................................................24
    4.9    Absence of Undisclosed Liabilities .......................................26
    4.10   No Conflict or Violation.........................................................26
    4.11   Governmental Approvals........................................................26
    4.12   Litigation; Orders..................................................................27
    4.13   Compliance with Laws; Permits.............................................27
    4.14   Intellectual Property and Technology.....................................28
    4.15   Taxes  30
    4.16   Employees; Employee Benefit Plans.......................................31
    4.17   Employee and Labor Matters .................................................33
    4.18   No Brokers..............................................................................34
    4.19   Absence of Certain Changes or Events ..................................34
    4.20   Environmental Matters ..........................................................35

4.21   International Trade ...................................................................................... 36
4.22   Client Trust Funds ...................................................................................... 36
4.23   Privacy and Data Security .......................................................................... 36
4.24   Affiliate Transactions .................................................................................. 36
4.25   Disclaimer .................................................................................................... 37
4.26   Representations and Warranties of Seller Regarding Business Units ...... 37

ARTICLE 5      REPRESENTATIONS AND WARRANTIES OF BUYER .............. 41

5.1   Organization of Buyer ................................................................................. 41
5.2   Authorization ................................................................................................ 41
5.3   No Conflict or Violation .............................................................................. 41
5.4   Governmental Approvals .............................................................................. 41
5.5   Financial Ability ........................................................................................... 42
5.6   No Brokers .................................................................................................... 42
5.7   Acquisition of Ownership Interests ............................................................. 42
5.8   Disclaimer .................................................................................................... 42

ARTICLE 6      COVENANTS OF THE SELLER PARTIES ................................. 42

6.1   Maintenance of Business ............................................................................. 42
6.2   Certain Prohibited Transactions ................................................................. 43
6.3   Access and Consultation .............................................................................. 43
6.4   No Solicitation ............................................................................................. 45
6.5   Third-Party Consents .................................................................................. 45
6.6   Resignation of Directors .............................................................................. 46
6.7   Employees ..................................................................................................... 46

ARTICLE 7      COVENANTS OF BUYER ............................................................ 47

7.1   Third-Party Consents .................................................................................. 47
7.2   Employees ..................................................................................................... 47

ARTICLE 8      OTHER COVENANTS .................................................................. 48

8.1   Confidentiality .............................................................................................. 48
8.2   Efforts; Consents; Regulatory and Other Authorizations ......................... 48
8.3   Notification of Certain Matters ................................................................... 48
8.4   Restrictive Covenants ................................................................................... 49
8.5   GM Relocation Agreements ......................................................................... 49
8.6   Certain Franchisees ...................................................................................... 51
8.7   REO Referrals ............................................................................................... 52
8.8   Excluded Relocation Receivables ............................................................... 53
8.9   GM Amendments .......................................................................................... 53
8.10  Financing ....................................................................................................... 53
8.11  Canadian Franchise Litigation ................................................................... 53

ARTICLE 9      CONDITIONS TO THE SELLER PARTIES' OBLIGATIONS ...... 53

9.1     Representations, Warranties and Covenants .................................................. 53
9.2     Consents .................................................................................................. 54
9.3     No Governmental Orders .......................................................................... 54
9.4     No Governmental Litigation ..................................................................... 54
9.5     Deliveries ................................................................................................. 54
9.6     Certificates .............................................................................................. 54

ARTICLE 10         CONDITIONS TO BUYER'S OBLIGATIONS ..................................... 54

10.1    Representations, Warranties and Covenants ............................................. 55
10.2    Consents .................................................................................................. 55
10.3    No Governmental Orders .......................................................................... 55
10.4    No Governmental Litigation ..................................................................... 55
10.5    Minimum Cash Requirement ..................................................................... 55
10.6    Financing ................................................................................................ 55
10.7    GHS Indebtedness ................................................................................... 55
10.8    Deliveries ................................................................................................. 56
10.9    Certificates .............................................................................................. 56

ARTICLE 11         TAX MATTERS ..................................................................................... 56

11.1    Tax Periods .............................................................................................. 56
11.2    Tax Returns ............................................................................................. 56
11.3    Tax Indemnification Apportionment .......................................................... 56
11.4    Cooperation; Records .............................................................................. 57
11.5    Tax Proceedings ...................................................................................... 57
11.6    Refunds; Amendments ............................................................................. 57

ARTICLE 12         INDEMNIFICATION ............................................................................ 58

12.1    Survival of Representations and Warranties and Covenants ...................... 58
12.2    Indemnification by the Seller Parties ......................................................... 58
12.3    Indemnification by Buyer .......................................................................... 58
12.4    Method of Asserting Claims ...................................................................... 59
12.5    Other Indemnification Provisions .............................................................. 60
12.6    Limitations on Indemnification .................................................................. 60
12.7    Mitigation ................................................................................................ 60
12.8    Subrogation ............................................................................................. 61
12.9    Treatment of Indemnity Payments ............................................................ 61

ARTICLE 13         MISCELLANEOUS ............................................................................... 61

13.1    Termination .............................................................................................. 61
13.2    Effect of Termination ............................................................................... 61
13.3    Assignment .............................................................................................. 62
13.4    Notices .................................................................................................... 62
13.5    Choice of Law; Jurisdiction and Forum; Waiver of Jury Trial .................. 63
13.6    Entire Agreement; Amendments and Waivers ........................................... 64

13.7    Counterparts; Facsimile .................................................................. 64
13.8    Invalidity .................................................................................... 65
13.9    Headings ..................................................................................... 65
13.10   Expenses ..................................................................................... 65
13.11   Further Assurances ........................................................................ 65
13.12   Publicity; Disclosure ..................................................................... 65
13.13   Effect of Due Diligence and Investigation ........................................... 65
13.14   Construction of Agreement .............................................................. 65
13.15   Guaranty ..................................................................................... 65

## LIST OF EXHIBITS

**Exhibits**

A                  Net Working Capital Example

14732498RV-19

# INDEX OF DEFINED TERMS

| | |
|---|---|
| 2005 Balance Sheets | 22 |
| 2005 Financial Statements | 22 |
| 2006 Balance Sheets | 22 |
| 2006 Financial Statements | 22 |
| 2007 Balance Sheets | 22 |
| 2007 Financial Statements | 22 |
| 35% Receivables Withholding | 22 |
| Accounting Firm | 14 |
| Accounts Receivable | 16 |
| Additional Documents | 2 |
| Affiliate | 2 |
| Agency Agreement | 3 |
| Agreement | 40 |
| Base Amount | 3 |
| Base Receivables Pay-Out | 12 |
| Basket Amount | 12 |
| Breach | 60 |
| Business | 3 |
| Business Day | 1 |
| Business Unit | 3 |
| Buyer | 3 |
| Buyer 401(k) Plan | 1 |
| Buyer Indemnified Parties | 47 |
| Buyer Losses | 58 |
| Buyer Obligations | 58 |
| Cap Amount | 65 |
| Claim | 60 |
| Client Trust Funds | 59 |
| Closing | 3 |
| Closing Date | 17 |
| Closing Net Working Capital Statement | 17 |
| COBRA | 16, 17 |
| Company | 48 |
| Company Defined Benefit Plan | 1 |
| Company Employee Benefit Plan | 33 |
| Company Entity | 3 |
| Company Information Technology | 3 |
| Company Intellectual Property | 28 |
| Company Owned Information Technology | 28 |
| Company Owned Intellectual Property | 28 |
| Company Qualified Plan | 28 |
| Company Subsidiary | 3 |
| Completion Date | 1 |
| Confidentiality Agreement | 14 |
| Consent | 4 |
| | 4 |

| Contemplated Transactions | 4 |
| Contracts | 4 |
| Control | 4 |
| Controlled Affiliate | 3 |
| CORE Companies | 4 |
| CORE Sales Associates | 4 |
| Deferred Receivables Pay-Out | 40 |
| Disclosure Schedules | 12 |
| Employee Benefit Plan | 4 |
| Employee Leasing Company | 4 |
| Employee Leasing Period | 46 |
| EMRE | 46 |
| Encumbrances | 1 |
| Environmental Laws | 4 |
| ERISA | 4 |
| ERISA Affiliate | 4 |
| Excluded Assets | 4 |
| Excluded Indebtedness | 5 |
| Excluded Receivables Administration and Servicing Agreement | 18 |
| Excluded Relocation Receivables | 5 |
| Face Amount | 5 |
| Final Excluded Receivables Schedule | 5 |
| Final Receivables Schedule | 53 |
| Financial Statements | 13 |
| Fort Dearborn Title | 22 |
| Franchise Agreements | 2 |
| Franchise Financing Agreements | 38 |
| Franchise Laws | 38 |
| Franchise Operating Loans | 39 |
| Franchise System | 38 |
| Franchisee | 38 |
| GAAP | 38 |
| General Business Practices | 5 |
| General Survival Period | 5 |
| GHS Indebtedness | 58 |
| GHS Indebtedness Newco | 5 |
| GHS Indebtedness Option | 2 |
| GHS Metro NY | 2 |
| GHS Mortgage | 2 |
| GHS Relocation UK | 1 |
| GM Amendments | 1 |
| GM Relocation Agreements | 18 |
| GMAC Network | 5 |
| GMAC Real Estate | 5 |
| GMAC Relocation | 1 |
| GMAC Relocation Services | 1 |
| | 1 |

| | |
|---|---|
| Governmental Authority | |
| Hazardous Materials | 6 |
| Home Services Companies | 6 |
| HR Trust Liability | 6 |
| Indebtedness | 6 |
| Indemnified Party | 6 |
| Indemnifying Party | 59 |
| Information Technology | 59 |
| Installment Period | 6 |
| Intellectual Property | 6 |
| Interim Balance Sheets | 6 |
| Interim Financial Statements | 22 |
| K&S Insurance | 22 |
| Knowledge of Seller | 1 |
| Koenig & Strey | 7 |
| Law | 1 |
| Leased Employees | 7 |
| License Agreement | 46 |
| Licensor | 7 |
| Litigation | 7 |
| LLC Interests | 7 |
| Losses | 7 |
| Marks | 7 |
| Material Adverse Effect | 7 |
| Material Contract | 8 |
| Net Cash Balance | 25 |
| Net Working Capital | 8 |
| Net Working Capital Adjustment Amount | 8 |
| Newco Consideration | 16 |
| Noncompetition and Nonsolicitation Agreement | 12 |
| Offering Circulars | 8 |
| Order | 39 |
| Organizational Documents | 8 |
| Ownership Interests | 8 |
| Pacific Union | 1 |
| Permits | 2 |
| Permitted Encumbrances | 9 |
| Person | 9 |
| Pre-Closing Period | 9 |
| Pre-Closing Proceeding | 56 |
| Preliminary Excluded Receivables Schedule | 57 |
| Preliminary Net Cash Balance | 53 |
| Preliminary Receivables Amount | 9 |
| Preliminary Receivables Schedule | 13 |
| Protected Information | 12 |
| Protected Period | 50 |
| | 52 |

| | |
|---|---|
| Purchase Price | |
| Purchased Receivables | 12 |
| Receivable Interest | 9 |
| Receivables Pay-Out | 14 |
| Referral IL | 12 |
| Referral NY/NJ | 2 |
| Referral PUREG | 2 |
| Relocation Companies | 2 |
| Relocation Company | 9 |
| Relocation Properties | 9 |
| Representative | 23 |
| Required Net Working Capital | 9 |
| ResCap | 9 |
| Scheduled Intellectual Property | 1 |
| Second Tier Subsidiaries | 9 |
| Securities Laws | 20 |
| Seller | 9 |
| Seller 401(k) Plan | 1 |
| Seller Indemnified Parties | 47 |
| Seller Losses | 59 |
| Seller Parties | 59 |
| Sensitive Information | 1 |
| Shares | 45 |
| Special Franchisee | 10 |
| Straddle Period | 52 |
| Subsidiary | 10 |
| Support Assets | 10 |
| Tax Liability Issue | 10 |
| Tax or Taxes | 57 |
| Tax Return | 10 |
| Termination Expenses | 10 |
| Total Receivables Withholding | 15 |
| Transferred Employees | 14 |
| Transition Agreement | 10 |
| Treasury Regulations | 10 |
| Underwriter | 10 |
| | 40 |

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement, dated as of September 22, 2008, is by and among GMAC Residential Holding Company, LLC, a Delaware limited liability company ("Seller"), Residential Capital, LLC, a Delaware limited liability company ("ResCap" and collectively with Seller, the "Seller Parties"), Brookfield RPS LLC, a Delaware limited liability company ("Buyer"), and Royal LePage Relocation Services Ltd., an Ontario corporation, solely for the purposes of the guaranty set forth in Section 13.15 of this Agreement.

## RECITALS

I.     Seller is engaged, directly or indirectly through its subsidiary entities, in the global relocation, real estate brokerage, both owned and franchised, and home purchase services and captive mortgage businesses (collectively, the "Business").

II.     Seller owns all of the issued and outstanding membership interests or shares, as the case may be (the "Ownership Interests"), of the following directly owned entities (each, a "Company" and collectively, the "Companies") through which it conducts the Business:

A.     GHS Global Relocation U.K. Limited, a United Kingdom limited company ("GHS Relocation UK"), which owns all of the issued and outstanding shares of GMAC Global Relocation Services Limited, a United Kingdom limited company ("GMAC Relocation Services"); and

B.     GMAC Home Services, LLC, a Delaware limited liability company, which owns all of the issued and outstanding membership interests, capital stock or shares, as the case may be, of the following operating companies (each such operating company, together with GMAC Relocation Services, a "Company Subsidiary"):

(i)     GMAC Global Relocation Services, LLC, a Delaware limited liability company ("GMAC Relocation");

(ii)     GHS Mortgage, LLC, a Delaware limited liability company ("GHS Mortgage");

(iii)     GMAC Real Estate, LLC, a Delaware limited liability company ("GMAC Real Estate");

(iv)     Eastern Massachusetts Real Estate, LLC, a Delaware limited liability company ("EMRE");

(v)     Koenig & Strey Insurance Agency, LLC, a Delaware limited liability company ("K&S Insurance");

(vi)     Koenig & Strey, LLC, a Delaware limited liability company ("Koenig & Strey");

1472324\NY-19

(vii)  Fort Dearborn Land Title Company, LLC, a Delaware limited liability company ("Fort Dearborn Title");

(viii)  Referral Network of IL, LLC, a Delaware limited liability company ("Referral IL");

(ix)  Pacific Union Real Estate Group, Ltd., a California corporation ("Pacific Union");

(x)  GHS Metro NY, LLC, a Delaware limited liability company ("GHS Metro NY");

(xi)  Referral Network of NY/NJ, LLC, a Delaware limited liability company ("Referral NY/NJ"); and

(xii)  Referral Network of PUREG, Inc., a Delaware corporation ("Referral PUREG").

III.    Buyer desires to purchase and acquire from Seller, and Seller desires to sell, transfer and convey to Buyer, or cause the sale, transfer and conveyance of to Buyer, the Ownership Interests and the Support Assets, subject to the terms and conditions of this Agreement.

IV.    Buyer (or its designee) desires to obtain an option ("GHS Indebtedness Option").exercisable prior to the Closing, to purchase and acquire from ResCap or its Affiliates, at the Closing, and ResCap desires to grant Buyer (or its designee) an option pursuant to which it will sell, transfer and convey, or cause to be sold transferred and conveyed, to Buyer (or its designee), all of the outstanding capital stock of a newly formed Delaware corporation ("GHS Indebtedness Newco") to which will have been transferred all of the GHS Indebtedness, all subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Defined Terms.  As used herein, the terms below shall have the following meanings:

"Accounts Receivable" shall mean all outstanding accounts receivable and other receivables, billed and unbilled, and all negotiable instruments or other instruments and chattel paper, as are payable to a Person, in connection with the conduct of its business.

"Additional Documents" shall mean the Transition Agreement, the License Agreement, the Excluded Receivables Administration and Servicing Agreement, the Noncompetition and Nonsolicitation Agreement, the Assignment of Excluded Relocation Receivables and such

additional agreements, instruments and documents executed or delivered by any party in connection with this Agreement.

"Affiliate" means a Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with the Person specified. For purposes of this definition and the definition of Controlled Affiliate, the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to (i) vote 50% or more of the voting securities or interests of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agreement" means this Purchase and Sale Agreement, together with all schedules and exhibits hereto (including the Disclosure Schedules) referenced herein, as it may be amended from time to time.

"Breach" means (i) any breach, inaccuracy, failure to perform, failure to comply, failure to notify, default, or violation or (ii) any other act, omission, event, occurrence or condition the existence of which would (A) permit any Person to accelerate any monetary obligation or terminate or cancel or enforce any right or obligation, or (B) require the payment of a monetary penalty.

"Business Day" means any day except a Saturday or Sunday or other day on which commercial banks in New York, New York are required or authorized by law or executive order to close.

"Business Unit" means each of (i) the Relocation Companies, (ii) GMAC Real Estate, (iii) the CORE Companies and (iv) the Home Services Companies.

"Client Trust Funds" means all monies held by the Company Entities in a fiduciary, trust, custodial or other safekeeping capacity for the benefit of Persons not Affiliated with Seller.

"Code the Internal Revenue Code of 1986, as it may be amended from time to time.

"Company Employee Benefit Plan" means any material Employee Benefit Plan (i) that is maintained or sponsored by Seller or any Company Entity to which Seller or any Company Entity contributes or is required to contribute, or (ii) that is maintained or sponsored by an ERISA Affiliate of Seller or any Company Entity or to which an ERISA Affiliate of Seller or any Company Entity contributes or is required to contribute, in each case, for the benefit of any active, retired or former employee, director, manager or consultant of any Company Entity, provided that the term "Company Employee Benefit Plan" shall not include any Employee Benefit Plan that is maintained under applicable law by a governmental body.

"Company Entity" means any Company, Company Subsidiary or Second Tier Subsidiary.

"Company Qualified Plan" means any Company Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code.

14732249\WV-19

"Confidentiality Agreement" means that Confidentiality Agreement between ResCap and Brookfield Real Estate Services Limited dated as of January 15, 2008.

"Consent" means any consent, authorization, approval, exemption, waiver or similar action.

"Contemplated Transactions" means the transactions contemplated by this Agreement and the Additional Documents.

"Contract" means any agreement, obligation, contract, commitment or undertaking that is legally binding upon a Person.

"Controlled Affiliate" shall mean, with respect to any Person, an Affiliate of such Person which is controlled by such Person.

"CORE Company" means each of EMRE, Koenig & Strey, Pacific Union, GHS Metro NY, Referral IL, Referral NY/NJ and Referral PUREG and their respective Subsidiaries, referred to collectively as the "CORE Companies."

"Disclosure Schedules" means the schedules attached hereto and delivered by the parties hereto as of the date hereof.

"Employee Benefit Plan" means any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA; (ii) any plan, program or agreement providing for or granting (A) stock options or options to purchase limited liability company interests, (B) rights to purchase stock or limited liability company interests, (C) rights to acquire restricted stock or limited liability company interests, (D) equity based compensation, (E) deferred compensation, (F) bonuses, (G) incentive compensation, (H) fringe benefits, (I) sick leave, vacation or paid or unpaid leave, (J) profit sharing, (K) pension or retirement benefits, (L) medical, life, disability or accident coverage, (M) salary continuation, (N) retention benefits, (O) supplemental retirement benefits, (P) severance, termination pay or change of control benefits, and (Q) unemployment benefits (whether or not insured); or (iii) employment agreement (but only to the extent of any provision thereof that provides benefits described in clause (ii)); provided, however, "Employee Benefit Plan" shall not include any government required programs.

"Encumbrances" means any lien, charge, adverse right, claim, mortgage, security interest or encumbrance in favor of any Person.

"Environmental Laws" means all Laws concerning pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release or cleanup of any Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" with respect to any Person, means any trade or business, whether or not incorporated, that is a member of the same controlled group of corporations as such Person, within the meaning of Section 414(b) of the Code, that is under common control with such

Person, within the meaning of Section 414(c) of the Code, that is a member of the same affiliated service group as such Person, within the meaning of Section 414(m) of the Code, or that is otherwise required to be aggregated with such Person pursuant to Section 414(o) of the Code.

"Excluded Assets" means the Marks, the GMAC Network, the Excluded Relocation Receivables, the Employee Benefit Plans (except as otherwise provided in Section 6.7(b) and Section 7.2(b)) and the other specified assets or operating rights, as set forth on Schedule 2.6.

"Excluded Receivables Administration and Servicing Agreement" shall mean that Excluded Receivables Administration and Servicing Agreement between Buyer and ResCap in form and substance as mutually agreed between the parties thereto.

"Excluded Relocation Receivables" means that portion of the Relocation Receivables owing by General Motors Corporation, GMAC, LLC or any of their respective Affiliates.

"Face Amount" means the aggregate principal amount of the Purchased Receivables as of the Closing Date.

"GAAP" means generally accepted accounting principles as in effect in the United States from time to time.

"General Business Practices" shall mean the business policies, customs and practices of the Company Entities, including customer acquisition, advertising, licensing, investment, cash management, cash distribution, marketing, pricing, credit, the collection of Accounts Receivables, the payment of payables, purchasing, personnel, sales, returns, refunds, budgeting, confidentiality and trade secret protection, research and development and product acquisition policies.

"GHS Indebtedness" means all Indebtedness and other intercompany payables of any of the Company Entities which are treated as disregarded entities for United States federal income tax purposes owing to ResCap or its Affiliates (other than the Company Entities) net of all Indebtedness and other intercompany payables of any of ResCap or its Affiliates (other than the Company Entities) owing to any of such Company Entities, all as outstanding as of the Closing.

"GM Relocation Agreements" means the agreements by and among any of the Relocation Companies, on the one hand, and General Motors Corporation, GMAC, LLC, or any of their respective Affiliates, on the other hand, as set forth in Schedule 8.5.

"GMAC Network" means the communication infrastructure, both voice and data, that is owned, managed and used by ResCap and its direct and indirect Subsidiaries for their businesses. The GMAC Network provides and maintains connectivity between the offices of ResCap and its direct and indirect Subsidiaries and includes, but is not limited to one or more network backbones, optical communication links, wire-based communication links, wireless communication links, the communication circuits that connect to each datacenter of ResCap and its direct and indirect Subsidiaries, and any equipment that resides within any such datacenter, and all of the software and hardware associated with the foregoing. The GMAC Network is listed as an Excluded Asset.

"Governmental Authority" means any: (i) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (ii) federal, state, local, regional, municipal, foreign or other government; or (iii) governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, ministry, fund, foundation, center, bureau, agency, organization, unit, body and any court or other tribunal).

"Hazardous Materials" means all hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos or polychlorinated biphenyls.

"Home Services Company" means each of GHS Mortgage, K&S Insurance and Fort Dearborn Title and their respective Subsidiaries, referred to collectively as the "Home Services Companies."

"HR Trust Liability" means the reimbursement of eligible claims incurred by sales agents in the Franchise System and their covered family members relating to the cessation of operations of HR Trust, LLC, aka IBO Managed Services, a managed services provider providing group health insurance benefits to independent contractor agents, which ceased all operations in the United States as of April 11, 2008.

"Indebtedness" means, of any Person at any date, without duplication, (i) all indebtedness (including interest payments or prepayments required prior to satisfaction) of such Person for borrowed money or for deferred purchase price of property or services (other than current liabilities for trade payables incurred and payable in the ordinary course of business consistent with past practice), or (ii) any other indebtedness of such Person which is evidenced by a note, mortgage, bond, debenture or similar instrument.

"Information Technology" means (i) computer software, including application software, compilers and tool kits in object (or executable) code and/or (human readable) source code, and related documentation; (ii) proprietary computer programming languages and related documentation and materials; (iii) data feeds and databases; (iv) voice and data circuits, including, by way of example but not of limitation, hubs and routers; (v) telecommunications systems and services; and (vi) computer hardware and operating systems; provided, however, that "Information Technology" shall in no event include the GMAC Network.

"Installment Period" shall mean (i) the number of days remaining in the calendar quarter in which the Closing Date occurs and (ii) thereafter, each quarterly period commencing on the day immediately following the end of the immediately preceding Installment Period, if not a full calendar quarter, ending on the second anniversary of the Closing Date.

"Intellectual Property" means (i) patents and patent applications, including reissuances, continuations, continuations-in-part, extensions and reexaminations of such patents and patent applications; (ii) registered and unregistered trademarks, service marks, trade dress, logos, trade names and corporate names, or other identifying marks, indicators or labels, together with the goodwill associated with them and applications for, and renewals of, each of them; (iii) registered and unregistered copyrights and applications for, and renewals of, copyrights;

(iv) mask works and all registrations and applications for registration thereof; (v) trade secrets, confidential information, and proprietary data and information (including compilations of data (whether or not copyrighted or copyrightable), ideas, formulae, processes, know-how, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, improvements, proposals, technical data, financial and accounting data, business and marketing plans, and customer and supplier lists and related information); (vi) inventions (whether patentable or unpatentable, and whether or not reduced to practice), improvements to inventions, utility models, statutory invention registrations and (vii) Internet domain names; *provided,* *however,* that "Intellectual Property" shall not include Information Technology.

"Knowledge of Seller" means the actual knowledge of the senior executives of the Business Units as to matters within their respective areas of responsibility after (i) reasonable inquiry and (ii) a review of the text of the representations and warranties contained herein.

"Law" means any federal, state, local, municipal, foreign or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"License Agreement" means that certain License Agreement, by and between Buyer and Licensor, dated as of and in a form to be mutually agreed to by the Closing Date.

"Licensor" means General Motors Corporation.

"Litigation" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Authority or any arbitrator or arbitration panel.

"LLC Interests" means for any Company Entity that is a limited liability company, all of the issued and outstanding limited liability company interests of such Company Entity.

"Losses" means, in respect of any obligation to indemnify any Person pursuant to the terms of this Agreement, any and all actual losses, damages (other than special, consequential, exemplary, punitive or similar damages, except to the extent awarded to a third party pursuant to any Claim asserted against an Indemnified Party), indemnities, liabilities, obligations, judgments, settlements, awards, deficiencies, offsets, fines and penalties and any reasonable out-of-pocket costs, expenses and attorneys' fees relating to the foregoing.

"Marks" means the registered and unregistered trademarks, registered and unregistered service marks, trade dress, logos, designs, colors, slogans, Internet domain names, other commercial symbols and related registrations and applications for registration and all common law rights relating thereto together with the goodwill associated with all of the foregoing, used to identify the products and services offered by the Business Units that use or employ the characters "GMAC" or any derivation or combination thereof.

"Material Adverse Effect" means (i) any change, event or effect that is, or reasonably would be expected to be, individually or together with all other related or relevant changes, events or effects, materially adverse to the business, assets, results of operations or condition (financial or otherwise) of the Company Entities, taken as a whole, excluding any change, event or effect proximately caused by any of the following: (A) adverse changes in the economy or the financial markets in general or in economic, business or financial conditions, including interest rate conditions, affecting the industry or markets in which the Company Entities operate, but only to the extent that such events, changes circumstances or states of facts do not have a materially disproportionate effect on the Company Entities or their Business, relative to other companies operating similar businesses; (B) any military action or act of terrorism or any worsening thereof, other than as actually directed at a Company Entity or which have a materially disproportionate effect on the Company Entities or the Business relative to other companies operating similar businesses; (D) changes in regulatory or political conditions generally; (E) changes in accounting requirements or principles or any change in applicable Law; or (F), except for the purposes of **Section 10.1**, this Agreement or the Contemplated Transactions or any announcement thereof; or (ii) a material impairment of any Seller Party's or the Company Entities' ability to perform any of their material obligations under this Agreement or to consummate the Contemplated Transactions in accordance with the terms of this Agreement.

"Net Cash Balance" means (x) aggregate cash assets of the Company Entities as of the Closing Date minus (y) the sum of (i) all outstanding checks and wire transfers by the Company Entities as of the Closing Date, plus (ii) all cash advanced to the Company Entities by clients for prepayment of future services or funding which as of the Closing Date have yet to be provided or performed.

"Net Working Capital" means (i) the book value of all assets of the Company Entities on a consolidated basis as of Closing with anticipated maturities that do not exceed 12 months, excluding all cash, the Excluded Assets and the Purchased Receivables, net of allowances for maturity, including tax and other proper accruals and all Indebtedness, but excluding any Excluded Indebtedness and excluding the GHS Indebtedness, in each case that would be reflected in accordance with GAAP on a consolidated balance sheet of the Company Entities as of the close of business on the Closing Date. The calculation of Net Working Capital shall be prepared in accordance with the example calculation of Net Working Capital and the related principles, assumptions and applications set forth in **Exhibit A.**

"Noncompetition and Nonsolicitation Agreement" means that certain Noncompetition and Nonsolicitation Agreement, by and between Buyer and GMAC, LLC, dated as of the Closing Date and in a form substantially similar to the provisions set forth in **Section 8.4(b)** and **Section 8.4(d).**

"Order" means any award, decision, injunction, judgment, order, ruling or verdict entered, issued, made or rendered by any court, administrative agency or other Governmental Authority or by any arbitrator.

"Organizational Documents" means (i) in respect of any corporation, its articles or certificate of incorporation and bylaws, (ii) in respect of any limited liability company, its

articles or certificate of formation or organization and limited liability company or operating agreement, and (iii) in respect of any other entity, its comparable charter and governing agreements, instruments and documents.

"**Permits**" means all licenses, permits, franchises, Orders, Consents, registrations, authorizations, qualifications, certificates and filings with and under all Governmental Authorities or pursuant to any Law.

"**Permitted Encumbrances**" " means: (i) liens for Taxes, assessments and governmental charges or levies not yet due and payable, or (to the extent adequately reserved for) contested in good faith by appropriate action, (ii) pledges or deposits to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations, (iii) minor survey exceptions, reciprocal easement agreements and other customary Encumbrances on title to real property, (iv) mechanics', carriers', workers', repairers' purchase money security interests and other similar liens, (v) as to any lease, any Encumbrance affecting the interest of the lessor thereof, (vi) statutory landlords' liens and liens granted to landlords under any leases, and (vii) liens arising under conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business.

"**Person**" means an individual, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, a limited liability entity, a Governmental Authority or any other entity.

"**Preliminary Net Cash Balance**" means the Net Cash Balance, as estimated in good faith as of the Closing and reflected on a detailed schedule delivered by Seller to Buyer at the Closing.

"**Purchased Receivables**" means the Relocation Receivables other than the Excluded Relocation Receivables.

"**Relocation Company**" means each of GMAC Relocation and GHS Relocation UK and their respective Subsidiaries, referred to collectively as the "**Relocation Companies**."

"**Relocation Receivables**" means Accounts Receivables of the Relocation Companies.

"**Representative**" means, with respect to a particular Person, any director, officer, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"**Required Net Working Capital**" means negative $4,500,000, as reflected in the Net Working Capital example set forth in **Exhibit A.**

"**Scheduled Intellectual Property**" means Intellectual Property that is listed in clauses (i), (ii), (iii), (iv) or (vii) of the definition of Intellectual Property.

"**Securities Laws**" means the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

147224/RV-19

"<u>Shares</u>" means for any Company Entity (i) that is a corporation, all the issued and outstanding shares of capital stock of such entity and (ii) that is a limited company, all of the issued and outstanding shares of such entity.

"<u>Straddle Period</u>" means a taxable period that begins on or before and ends after the Closing Date.

"<u>Subsidiary</u>" means, with respect to any Person, any corporation, limited liability company, partnership or other organization, whether incorporated or unincorporated, of which such Person or any other subsidiary of such Person beneficially owns a majority of the total combined voting or equity interests.

"<u>Support Assets</u>" means those certain assets used by the Transferred Employees in conducting the Business as set forth on <u>Schedule 2.1(b)</u>.

"<u>Tax</u>" or "<u>Taxes</u>" means any net income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, franchise, capital, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, custom duty, transfer, documentary or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax.

"<u>Tax Return</u>" means any return, report, declaration, form, claim for refund, or information return or statement required or permitted to be filed with any Governmental Authority relating to Taxes, including estimated tax returns, income tax returns, information returns, withholding returns, employment tax returns, and any schedule or attachment thereto or any amendment thereto.

"<u>Transferred Employees</u>" means those employees of Seller or its Affiliates (other than a Company Entity) that are dedicated to the operation of the Business as set forth on <u>Schedule 2.1(c)</u> and whose employment will be transferred to the Employee Leasing Company at or prior to the Closing Date.

"<u>Transition Agreement</u>" means that certain Transition Agreement by and between Buyer and Seller, in form and substance as mutually agreed by the parties thereto.

"<u>Treasury Regulations</u>" means the United States Tax regulations, including temporary regulations, promulgated under the Code, as the same may be amended hereafter from time to time (including corresponding provisions of succeeding United States Tax regulations).

## 1.2    <u>Other Interpretive Provisions</u>.

(a)    The words "hereof," "herein," "hereto," "hereunder" and other words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement unless specifically indicated as applying to a particular provision.

1473249RV-19

(b)    Terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa.

(c)    The terms "dollars" and "$" shall mean United States dollars.

(d)    The word "including" shall mean including without limitation and the words "include" and "includes" shall have corresponding meanings. The words "or" and "any" are not exclusive.

(e)    A reference to a Law includes any amendment thereto, and any modification or re-enactment thereof, any legislative provision substituted therefor and any rules, regulations and statutory instruments issued thereunder or pursuant thereto.

(f)    When a reference is made in this Agreement to Sections, such reference shall be to a Section of this Agreement unless otherwise indicated.

(g)    In the event that the final day of any time period provided herein based on calendar days does not fall on a Business Day, such time period shall be extended such that the final day of such period shall fall on the next Business Day.

## ARTICLE 2
## PURCHASE AND SALE OF OWNERSHIP INTERESTS AND SUPPORT ASSETS

### 2.1    Ownership Interests and Support Assets; GHS Indebtedness Option.

(a)    Upon the terms and subject to the conditions contained herein, Seller will sell, transfer and convey to Buyer, or cause the sale transfer and conveyance to Buyer, and Buyer will purchase and acquire from Seller or its Affiliates at the Closing, (a) the Ownership Interests, free and clear of all Encumbrances other than the restrictions on transfer pursuant to the Securities Laws and applicable state securities laws and (b) the Support Assets free and clear of all Encumbrances, other than Permitted Encumbrances.

(b)    In the event that prior to the Closing Buyer delivers to ResCap written notice that it irrevocably elects to exercise the GHS Indebtedness Option which shall be effective only in connection with the consummation of all of the Contemplated Transactions, then:

(1)    ResCap shall form, or cause to be formed, on or prior to the Closing Date, GHS Indebtedness Newco as a Delaware corporation, wholly owned by ResCap, with the certificate of incorporation, by-laws and other organizational documents with respect thereto to be in form and substance approved in writing by Buyer, and shall have directors and officers appointed who are approved in writing by Buyer;

(2)    GHS Indebtedness Newco shall have no assets or liabilities of any kind whatsoever, shall not conduct any business whatsoever, other than the receipt of a capital contribution from ResCap and/or its Affiliates of the GHS Indebtedness, and shall not grant any rights, options, warrants, subscriptions or other obligations to issue any of its capital stock, other than the capital stock actually issued to ResCap in consideration for the contribution of GHS Indebtedness;

(3)    ResCap shall contribute, or cause to be contributed, to GHS Indebtedness Newco all of the GHS Indebtedness at the Closing, free and clear of all Encumbrances, and solely in consideration for the issuance of capital stock in Newco; and

(4)    upon the terms and subject to the conditions contained herein, ResCap will sell, transfer and convey to Buyer (or its designee), or cause the sale transfer and conveyance to Buyer (or its designee), and Buyer (or its designee) will purchase and acquire from ResCap, at the Closing, all of the outstanding capital stock of GHS Indebtedness Newco, free and clear of all Encumbrances other than the restrictions on transfer pursuant to the Securities Laws and applicable state securities laws, in consideration for the payment by Buyer (or its designee) of an amount (the "Newco Consideration) equal to (x) One Dollar ($1) plus (y) the cost actually incurred by ResCap or its Affiliates in connection with the formation and organization of GHS Indebtedness Newco (which in no event shall exceed $5,000).

**2.2    Purchase Price.** The purchase price for the Ownership Interests and the Support Assets shall equal Fifteen Million Dollars ($15,000,000) (the "Base Amount) plus the Receivables Pay-Out (as calculated in accordance with Section 2.3, plus any amounts due under Section 2.4(d)(3) for Purchased Receivables that have not been either collected by Buyer or written off by Buyer as uncollectible (collectively, the "Purchase Price")." Buyer and Seller agree that the Purchase Price and the liabilities of the Company Entities other than the GHS Indebtedness (plus other relevant items) will be allocated among the assets of the Company Entities and Ownership Interests and the Support Assets for all Tax purposes in a manner consistent with the fair market values thereof set forth on **Schedule 2.2.** Buyer and Seller will file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with **Schedule 2.2** and shall not take any position inconsistent with the allocation for Tax purposes, except as and to the extent required by applicable Law. The purchase price for the capital stock of GHS Indebtedness Newco, if the GHS Indebtedness Option is exercised, will be the Newco Consideration.

**2.3    Receivables Pay-Out.**

(a)    The Purchase Price shall include an amount equal to (x) 69.75% of the principal amount of the Purchased Receivables as of the Closing Date as reflected on the Final Receivables Schedule (as hereinafter defined) (the "Base Receivables Pay-Out") and (y) 23.25% of the principal amount of the Purchased Receivables multiplied by a fraction, the numerator of which is the aggregate principal amount of the Purchased Receivables outstanding on the Closing Date which are actually collected within twenty-four (24) months of the Closing Date and the denominator of which is equal to the aggregate principal amount of the Purchased Receivables outstanding on the Closing Date (the "Deferred Receivables Pay-Out" and collectively with the Base Receivables Pay-Out and the Receivable Interest, the "Receivables Pay-Out").

(b)    Not less than five (5) nor more than ten (10) days prior to the Closing Date, Seller shall deliver to the Buyer a schedule of all Purchased Receivables as of the last day of the month prior to the month in which such schedule is being delivered (the "Preliminary Receivables Schedule"), listing (i) the account debtor, (ii) the amount of such Purchased Receivables and (iii) an aging schedule with respect to such Purchased Receivables. The

-12-

aggregate dollar amount of the Purchased Receivables reflected in the Preliminary Receivables Schedule is referred to as the "Preliminary Receivables Amount."

(c)    Within thirty (30) days after the Closing Date, Buyer shall cause to be delivered to Seller a schedule, prepared on the same basis as the Preliminary Receivables Schedule, of all Purchased Receivables as of the Closing Date (the "Final Receivables Schedule"), listing (i) the account debtor, (ii) the amount of such Purchased Receivables and (iii) an aging schedule with respect to such Purchased Receivables. Such schedule shall be subject to review and audit by Seller (at Seller's sole cost and expense) and Buyer shall make available to Seller all work papers, documents and personnel necessary for such review and audit. The Final Receivables Schedule shall be deemed to be final and definitive unless Seller shall have delivered written notice specifically detailing any disagreement with the Final Receivables Schedule not more than thirty (30) days after delivery of the Final Receivables Schedule, with any dispute which the parties are not able to resolve within ten (10) days by mutual agreement to be resolved by the Accounting Firm, which resolution shall be final and determinative. If the Preliminary Receivables Amount is less than the aggregate dollar amount of the Relocation Receivables set forth in the Final Receivables Schedule, then Buyer shall pay to Seller 69.75% of the amount of such deficiency within ten (10) days after the Final Receivables Schedule becomes final. If the Preliminary Receivables Amount is more than the aggregate dollar amount set forth in the Final Receivables Schedule, then Seller shall pay to Buyer 69.75% of the amount of such excess within ten (10) days after the Final Receivables Schedule becomes final.

2.4    **Payment of the Purchase Price.**

(a)    Five Million Dollars ($5,000,000) of the Base Amount plus an amount equal to 69.75% of the Preliminary Receivables Amount plus an amount equal to the Preliminary Net Cash Balance, to the extent positive, and minus the Preliminary Net Cash Balance, to the extent negative shall be paid by Buyer to Seller on the Closing Date by wire transfer of immediately available funds to an account or accounts to be designated by Seller in writing at least two (2) Business Days prior to the Closing Date. If the GHS Indebtedness Option is exercised, the Newco Consideration will be paid by Buyer (or its designee) to ResCap (or its designee) on the Closing Date in consideration for all of the outstanding capital stock in GHS Indebtedness Newco.

(b)    Subject to Section 2.4(d), the remaining Ten Million Dollars ($10,000,000) of the Base Amount shall be paid by Buyer to Seller on the 18-month anniversary of the Closing Date by wire transfer of immediately available funds to an account or accounts to be designated by Seller in writing at least two (2) Business Days prior thereto.

(c)    The Deferred Receivables Pay-Out shall be paid by Buyer to Seller in installments, within fifteen (15) days after the end of each Installment Period until the final Installment Period, except as provided below, by wire transfer of immediately available funds to an account or accounts to be designated by Seller in writing not later than five (5) days after the end of the applicable Installment Period. Buyer shall, and shall cause the Relocation Companies to, use the same procedures, methods, standards of care and policies for collecting and processing the Relocation Receivables after Closing as the Buyer or its Affiliates use in the ordinary course of their own Relocation Business. The amount of each installment shall be equal

to (x) 23.25% of the Purchased Receivables multiplied by a fraction, the numerator of which is the aggregate principal amount of the Purchased Receivables outstanding on the Closing Date which were actually collected during such Installment Period and the denominator of which is equal to the aggregate principal amount of the Purchased Receivables outstanding on the Closing Date; provided, that (i) thirty-five percent (35%) of each installment payable prior to the Completion Date shall be withheld by Buyer (the "35% Receivables Withholding"); provided, further, that in the event that as of the first anniversary of the Closing Date the aggregate amount of the 35% Receivables Withholding is less than Eighteen Million Dollars ($18,000,000), then the full amount of all installments payable thereafter, but prior to the Completion Date, shall be withheld by the Buyer until the sum of (x) the 35% Receivables Withholding and (y) the aggregate amount withheld from installments pursuant to this proviso (collectively, with the 35% Receivables Withholding, the "Total Receivables Withholding") equals Eighteen Million Dollars ($18,000,000); provided, further, that in no event shall the 35% Receivables Withholding or the Total Receivables Withholding exceed Eighteen Million Dollars ($18,000,000). The Total Receivables Withholding shall be retained by Buyer and paid to Seller not later than five (5) Business Days after the completion, in all material respects, of all of the material services provided by the Seller Parties under the Transition Agreement in accordance with its terms (the "Completion Date"), subject to the rights of setoff or recoupment set forth in Section 2.4(d)(2). Each installment shall also include interest for the period from the later of the Closing Date and the date on which the immediately preceding installment was paid until the date of payment of such installment ("Receivable Interest"). Receivable Interest will accrue at a per annum rate equal to the average prime rate as quoted in the Wall Street Journal for each Business Day during the Installment Period minus 2.75%, on an amount equal to the difference of (x) 23.25% of the principal amount of Purchased Receivables as of the Closing Date minus (y) the cumulative amount of all payments previously made pursuant to the first sentence of this Section 2.4(c) (including any such amounts actually and validly set-off or recouped in accordance with Section 2.4(d)(2)). Prior to or simultaneously with the payment of any installment, Buyer shall deliver to Seller a schedule of the Purchased Receivables which were collected by Buyer and/or the Company Entities during such Installment Period. Such schedule shall be subject to review and audit by Seller in the same manner (and subject to the same procedures regarding notice and resolution of disputes) as contemplated in Section 2.3(c). For the purposes hereof, any amounts collected with respect to Purchased Receivables shall be applied in accordance with the terms and conditions of the agreements with the account debtor relating to such Purchased Receivables, or, absent any express agreement as to priority, first to interest, fees, penalties and costs of collection with respect thereof to the extent allowed by the applicable agreement, and then to the principal amount of such Purchased Receivable. Notwithstanding anything herein, Buyer may elect to terminate any further obligations pursuant to this Section 2.4(c) by paying to Seller, by wire transfer, an amount equal to 23.25% of the Purchased Receivables minus all payments made prior thereto pursuant to this Section 2.4(c). For the purposes of this Section 2.4(c) the amount of the Purchased Receivables shall be the amount of Purchased Receivables reflected in the Final Receivables Schedule (subject to resolution of any disputes regarding the Final Receivables Schedule by mutual agreement or by the Accounting Firm).

      (d)    Notwithstanding anything herein to the contrary:

      (1)    any amounts to be paid pursuant to Section 2.4(b) are subject to setoff and/or recoupment in connection with (A) any claim for reimbursement for Termination

Expenses pursuant to **Section 2.5(a)(iii)**, (B) any claim for any Net Working Capital Adjustment Amount pursuant to **Section 2.5(b)** or for amounts payable to Buyer pursuant to **Section 2.5(c)**, (C) any claim for any amounts due pursuant to **Section 8.5** or **Section 8.6**, (D) any claim for indemnification pursuant to **Section 11.3** or **Section 12.2** and (E) any indemnification obligations for a Fundamental Breakdown pursuant to and as defined in the Transition Agreement;

(2)    the Total Receivables Withholding may be offset in connection with (i) any claim for any amounts due pursuant to **Section 8.5** or **Section 8.6** and (ii) any indemnification obligations for a Fundamental Breakdown pursuant to and as defined in the Transition Agreement; and

(3)    at the twenty-four (24) month anniversary of the Closing Date, Buyer shall pay to Seller an amount equal to five and one quarter percent (5.25%) of the Face Amount of the Purchased Receivables that as of such date have not been either collected by Buyer or written off by Buyer as uncollectible. Within fifteen (15) days after the end of such twenty-four (24) month period, Buyer shall deliver to Seller a schedule of such performing Purchased Receivables. Such schedule shall be subject to review and audit by Seller in the same manner (and subject to the same procedures regarding notice and resolution of disputes) as contemplated in **Section 2.3(e)**. Buyer shall pay to Seller any such amount within fifteen (15) days of when such schedule becomes final.

In addition, in the event that any claim for payment which is subject to set-off and/or recoupment pursuant to this **Section 2.4(d)** has been asserted in writing in accordance with the terms hereof, and is pending resolution on the date a payment pursuant to **Section 2.4(b)** or of 35% Receivables Withholding, as the case may be, is due and owing, Buyer may withhold from such payment an amount equal to the asserted amount of such pending claim, and shall not be obligated to pay such amount to Seller unless and until such pending claim has been satisfied, subject to any offset pursuant to this **Section 2.4(d)**.

2.5    **Post-Closing Adjustments.**

(a)    **Termination Expenses.** The Seller Parties shall jointly and severally be responsible (i) for the aggregate severance payments made by the Employee Leasing Company to any Leased Employee terminated from employment during the Employee Leasing Period, (ii) for the aggregate severance payments made by the Employee Leasing Company, pursuant to any obligation that exists as of the date hereof, to any Leased Employee who does not accept employment with such Company Entity or Buyer at or prior to the end of the Employee Leasing Period and (iii) to reimburse the Buyer for the aggregate severance payments by the Buyer, the Company Entities or any of its Affiliates (including any claims, settlements or judgments for wrongful termination not resulting from any illegal conduct by Buyer, the Company Entities (following the Closing Date) or any of its Affiliates) for any Leased Employee or other employee of the Company Entities who accepts Buyer's offer of employment and becomes an employee of Buyer, the Company Entities or any Affiliates thereof, but has such employment terminated within ninety (90) days of the Closing (collectively, the "Termination Expenses"); provided, that in no event shall the Seller Parties' responsibility for Termination Expenses exceed One Million Two Hundred Fifty Thousand Dollars ($1,250,000). Other than as provided in clause (iii) of the

preceding sentence, Buyer shall be responsible for severance payments, if any, payable to any Leased Employee who accepts Buyer's offer of employment and who actually becomes an employee of Buyer, the Company Entities or any Affiliates thereof. Not later than thirty (30) days after the expiration of the Employee Leasing Period, Seller shall provide to Buyer a schedule of the aggregate amount of Termination Expenses paid by the Employee Leasing Company pursuant to subparagraphs (i) and (ii) herein, the persons who received such severance payments and the amount of Termination Expenses paid with respect to each of them. Such schedule shall be subject to review and audit by the Buyer in the same manner (and subject to the same procedures regarding notice and resolution of disputes) contemplated by Section 2.3(e). Not later than one hundred twenty (120) days after the Closing or as soon thereafter as practicable, Buyer shall provide to Seller a schedule of the aggregate amount of Termination Expenses paid by the Buyer, the Company Entities or any of their Affiliates pursuant to clause (iii) of the first sentence of this Section, the persons who received such severance payments and the amount of Termination Expenses paid with respect to each of them. Such schedule shall be subject to review and audit by the Seller in the same manner (and subject to the same procedures regarding notice and resolution of disputes) contemplated by Section 2.3(e). Buyer shall be responsible for and shall indemnify the Seller Parties for the amount, if any, of Termination Expenses paid by Seller Parties in excess of One Million Two Hundred Fifty Thousand Dollars ($1,250,000), as set forth in the Transition Agreement.

(b)    Post-Closing Net Working Capital Adjustment. Within ninety (90) days after the Closing Date, Buyer shall cause to be delivered to Seller a calculation of the Net Working Capital of the Company Entities on a consolidated basis as of the Closing Date (the "Closing Net Working Capital Statement"), together with all work papers and relevant materials. The calculation of Net Working Capital as set forth in the Closing Net Working Capital Statement shall be prepared in accordance with the example calculation of Net Working Capital and the related principles, assumptions and applications set forth in Exhibit A. The Closing Net Working Capital Statement delivered by Buyer shall be conclusive and shall be deemed binding upon the parties unless within ten (10) business days of the delivery thereof, Seller delivers, in good faith, a written notice to Buyer specifying ways in which the Closing Net Working Capital Statement was not prepared in the manner required by this Section 2.5(b), in which case, any such matters in dispute shall be resolved by the accounting firm of KPMG (the "Accounting Firm"). The parties shall provide all information and work papers to the Accounting Firm as the Accounting Firm shall reasonably request as necessary to resolve any such disputed matters. The fees and expenses of the Accounting Firm in preparing the Closing Net Working Capital Statement shall be paid by the Seller Parties. The Closing Net Working Capital Statement, as resolved by the Accounting Firm, shall be final and binding on the parties. Within thirty (30) days after the Closing Net Working Capital Statement becomes final, the Seller Parties shall pay to Buyer the amount, if any, by which the Net Working Capital of the Company Entities shown on the Closing Net Working Capital Statement is less than the Required Net Working Capital (the "Net Working Capital Adjustment Amount"); provided, that if the Seller Parties fail to make such payment, Buyer may offset such amount as set forth in Section 2.4(d). Buyer shall pay to Seller the amount, if any, by which the Net Working Capital of the Company Entities shown on the Closing Net Working Capital Statement is greater than the Required Net Working Capital within ten (10) days after delivery of the Closing Net Working Capital Statement. For example (and solely as illustrations), if the Net Working Capital as reflected on the Closing Net Working Capital Statement is negative Seven Million Dollars ($7,000,000), then the Seller Parties shall be

-16-

required to pay to the Buyer the difference between negative Seven Million Dollars ($7,000,000) and the Required Net Working Capital (i.e., $2,500,000) and if the Net Working Capital as reflected on the Closing Net Working Capital Statement is zero ($0), then Buyer will be required to pay to Seller the difference between $0 and the Required Net Working Capital (i.e., $4,500,000).

(c)    Cash Adjustment.  Within thirty (30) days after the Closing Date, Buyer shall cause to be delivered to Seller a calculation of the Net Cash Balance on a consolidated basis as of the Closing Date (the "Closing Net Cash Statement"), together with all work papers and relevant materials.  Such schedule shall be subject to review and audit by the Seller in the same manner (and subject to the same procedures regarding notice and resolution of disputes) contemplated by Section 2.3(c).  Within thirty (30) days after the Closing Net Cash Statement becomes final, the Seller Parties shall pay to Buyer the amount, if any, by which the Net Cash Balance shown on the Closing Net Cash Statement is less than the Preliminary Net Cash Balance; provided, that if the Seller Parties fail to make such payment, Buyer may offset such amount as set forth in Section 2.4(d).  Buyer shall pay to Seller the amount, if any, by which the Net Cash Balance shown on the Closing Net Cash Statement is greater than the Preliminary Net Cash Balance within ten (10) days after the Closing Net Cash Statement becomes final.

2.6    Excluded Assets.  Notwithstanding the transfer of the Ownership Interests and the Support Assets to Buyer and, to the extent the GHS Indebtedness Option is exercised, the transfer of the GHS Indebtedness to GHS Indebtedness Newco and the transfer of all of the outstanding capital stock in GHS Indebtedness Newco to Buyer (or its designee), in all cases at the Closing upon the terms and subject to the conditions contained herein, Seller will not sell, transfer or convey, and Buyer will not purchase or acquire, the Excluded Assets, and Seller or its Affiliates will remain the owner of the Excluded Assets after the Closing.

## ARTICLE 3
## CLOSING

3.1    Time and Place of Closing.  Subject to the receipt of the deliveries specified in Sections 3.2 and 3.3 below, the closing of the Contemplated Transactions (the "Closing") shall take place at the offices of K&L Gates LLP, 599 Lexington Avenue, New York, New York, and shall be held within five (5) Business Days after the conditions precedent to the parties' obligations hereunder are satisfied or waived and otherwise on such date (the "Closing Date") and at such time as the parties may agree.

3.2    Deliveries by Seller Parties.  At the Closing, Seller Parties shall deliver, or cause to be delivered, the following to Buyer:

(a)    Certificates representing the Ownership Interests, or other satisfactory evidence of ownership of the Ownership Interests, together with appropriate instruments of transfer;

(b)    The certificate(s) contemplated by Article 10 hereof;

(c)    The License Agreement, duly executed by Licensor;

(d)    The Transition Agreement, duly executed by Seller Parties;

(e)    The Noncompetition and Nonsolicitation Agreement, duly executed by GMAC, LLC;

(f)    The Excluded Receivables Administration and Servicing Agreement duly executed by ResCap;

(g)    An Assignment of Excluded Relocation Receivables duly executed by ResCap and the Relocation Companies, in form and substance as mutually agreed between the parties thereto and Buyer;

(h)    Amendments to the GM Relocation Agreements, executed by the parties thereto, in form and substance reasonably acceptable to the Buyer, to the effect that the Relocation Companies have no obligations (whether by Contract or otherwise) to extend credit or otherwise make payment for the purchase of Relocation Properties from employees of General Motors Corporation, GMAC or any of their respective Affiliates, other than from funds actually received by the Relocation Companies paid by or on behalf of General Motors Corporation, GMAC or their respective Affiliates ("GM Amendments");

(i)    Release from GMAC, LLC of the liens set forth in **Schedule 3.2(i)** relating to the $3.5 billion secured credit facility issued by GMAC, LLC, in form and substance reasonably acceptable to Buyer;

(j)    The duly executed resignations specified in **Section 6.6**;

(k)    Evidence reasonably satisfactory to Buyer of the release or satisfaction of all Indebtedness of the Company Entities to (i) Seller or its Affiliates (other than the GHS Indebtedness but only to the extent that (A) the GHS Indebtedness Option is exercised, (B) the GHS Indebtedness is assigned to GHS Indebtedness Newco and (C) all of the outstanding capital stock in GHS Indebtedness Newco is transferred to Buyer or its designee pursuant hereto), and (ii) those Persons listed on **Schedule 3.2(k)** (collectively, the "Excluded Indebtedness");

(l)    Release of the liens set forth in **Schedule 3.2(l)**;

(m)    If the GHS Indebtedness Option has been exercised:

(1)    All documents, instruments and writings required to transfer the GHS Indebtedness to GHS Indebtedness Newco;

(2)    The Certificate of Incorporation, by-laws and other organizational documents with respect to GHS Indebtedness Newco; and

(3)    Certificates representing all of the outstanding capital stock of GHS Indebtedness Newco, or other satisfactory evidence of ownership of the ownership interests, together with appropriate instruments of transfer;

(n)    A schedule that contains the Preliminary Net Cash Balance;

(o)   All documents, instruments and writings required to transfer the Support Assets to Buyer; and

(p)   All other documents, instruments and writings required to be delivered by Seller at or prior to the Closing Date pursuant to Seller's obligations as set forth in this Agreement.

3.3   **Deliveries by Buyer**. At the Closing, Buyer shall deliver the following to Seller:

(a)   The portion of the Purchase Price payable pursuant to **Section 2.4(a)** by wire transfer in immediately available funds to an account designated in writing by Seller no later than two (2) Business Days before the Closing Date;

(b)   The certificate(s) contemplated by **Article 9** hereof;

(c)   The License Agreement, duly executed by Buyer;

(d)   The Transition Agreement, duly executed by Buyer;

(e)   The Noncompetition and Nonsolicitation Agreement, duly executed by Buyer;

(f)   The Excluded Receivables Administration and Servicing Agreement;

(g)   All documents, instruments and writings required to assume any liabilities associated with the Support Assets; and

(h)   All other documents, instruments and writings required to be delivered by Buyer at or prior to the Closing Date pursuant to Buyer's obligations as set forth in this Agreement.

### ARTICLE 4
### GENERAL REPRESENTATIONS AND WARRANTIES OF SELLER PARTIES

Seller Parties, jointly and severally, hereby make the following representations and warranties to Buyer:

4.1   **Organization of Seller Parties and the Company Entities**.

(a)   Each of the Seller Parties is a limited liability company duly formed and validly existing as a limited liability company in good standing under the laws of its jurisdiction of organization. Each Seller Party has full limited liability company power and authority to conduct its business and to own, lease and operate its properties and assets. Each Seller Party is duly qualified or otherwise authorized in all material respects as a foreign entity to conduct its business and is in good standing in each jurisdiction where such authorization or qualification is required for the conduct of its business or the ownership of its assets, except where the failure to be so qualified would not have a Material Adverse Effect. True and complete copies of the

1472246RLV-19

Organizational Documents of each Seller Party as in effect on the date hereof have been previously made available to Buyer.

(b)     Each Company Entity that is a (i) limited liability company is duly formed and validly existing as a limited liability company in good standing under the laws of its jurisdiction of formation or (ii) corporation or limited company is duly incorporated and validly existing as a corporation in good standing under the laws of its jurisdiction of incorporation. Each Company Entity has full limited liability company or corporate power, as the case may be, and authority to conduct its business and to own, lease and operate its properties and assets. Each Company Entity is duly qualified or otherwise authorized in all material respects as a foreign entity to conduct its business and is in good standing in each jurisdiction where such authorization or qualification is required for the conduct of its business or the ownership of its assets, except where the failure to be so qualified would not have a Material Adverse Effect. True and complete copies of the Organizational Documents of each Company Entity, in each case as in effect on the date hereof, have been previously made available to Buyer.

4.2    **Capitalization.**

(a)     The instruments listed on **Schedule 4.2(a)** represent all of the outstanding LLC Interests or Shares, as the case may be, of each of the Companies and Company Subsidiaries. All of the outstanding LLC Interests or Shares, as the case may be, of each Company and each Company Subsidiary have been duly authorized and validly issued, are fully paid and nonassessable and were not issued in violation of any preemptive or similar rights created by statute, their respective Organizational Documents or any Contract, and have been issued in material compliance with Securities Laws and applicable state and foreign securities or "blue sky" Laws. There are no Contracts relating to the issuance, sale or transfer of any LLC Interests or Shares, as the case may be, or other securities of the Companies or Company Subsidiaries, other than as contemplated herein. Other than as contemplated herein, no Person holds or is entitled to obtain any LLC Interests or Shares, as the case may be, or other option, warrant or other right to purchase or obtain LLC Interests or Shares, as the case may be, of any of the Companies or Company Subsidiaries. There are (i) no outstanding or authorized stock appreciation, phantom stock, profit participation or other similar rights with respect to the LLC Interests or Shares of the Companies or any Company Subsidiary and (ii) no voting trusts, stockholder agreements, proxies or other Contracts in effect with respect to the governance of the Companies or any Company Subsidiary or the voting or transfer of any LLC Interests or Shares in the Companies or any Company Subsidiary. Seller is the sole record and beneficial owner of the Ownership Interests, free and clear of all Encumbrances, other than pursuant to the Securities Laws and applicable state securities laws.

(b)     **Schedule 4.2(b)** sets forth a true and accurate list of all direct or indirect Subsidiaries of each Company Subsidiary (collectively, the "Second Tier Subsidiaries") and their outstanding equity securities. All of the outstanding equity securities of each Second Tier Subsidiary have been duly authorized and validly issued, are fully paid and nonassessable and were not issued in violation of any preemptive or similar rights created by statute, their respective Organizational Documents or any Contract, and have been issued in material compliance with the Securities Laws and applicable state and foreign securities or "blue sky" Laws. There are no Contracts relating to the issuance, sale or transfer of any equity securities or

-20-

other securities of the Second Tier Subsidiaries, other than as contemplated herein. Other than as contemplated herein, no Person holds or is entitled to obtain any equity security or other option, warrant or other right to purchase or obtain equity securities of any of the Second Tier Subsidiaries. There are (i) no outstanding or authorized stock appreciation, phantom stock, profit participation or other similar rights with respect to the LLC Interests or Shares of any Second Tier Subsidiary and (iii) no voting trusts, stockholder agreements, proxies or other Contracts in effect with respect to the governance of any Second Tier Subsidiary or the voting or transfer of any LLC Interests or Shares in any Second Tier Subsidiary. The Company Subsidiaries are the sole record and beneficial owners of all of the outstanding equity securities of the Second Tier Subsidiaries free and clear of all Encumbrances, other than pursuant to the Securities Laws and applicable state securities laws.

(c)    Except as set forth on **Schedule 4.2(c)**, the Company Entities do not own, or have any Contract to acquire, any equity securities or other securities of any Person or any direct or indirect equity or ownership interest in any other business.

(d)    In the event that the GHS Indebtedness Option is exercised, at the Closing Date:

(1)    all of the outstanding capital stock of GHS Indebtedness Newco will be duly authorized, validly issued, fully paid and nonassessable;

(2)    there will be no Contracts relating to the issuance, sale or transfer of any equity securities or other securities of GHS Indebtedness Newco, other than as contemplated herein;

(3)    other than as contemplated herein, no Person will hold or be entitled to obtain any equity security or other option, warrant or other right to purchase or obtain equity securities of GHS Indebtedness Newco;

(4)    there will be (i) no outstanding or authorized stock appreciation, phantom stock, profit participation or other similar rights with respect to the capital stock of GHS Indebtedness Newco and (iii) no voting trusts, stockholder agreements, proxies or other Contracts in effect with respect to the governance of GHS Indebtedness Newco; and

(5)    ResCap will be the sole record and beneficial owner of all of the outstanding equity securities of GHS Indebtedness Newco free and clear of all Encumbrances, other than pursuant to the Securities Laws and applicable state securities laws.

**4.3    Authorization**. Each of the Seller Parties has full limited liability company power and authority to execute and deliver this Agreement and the Additional Documents to which it is a party and to consummate the Contemplated Transactions. The execution, delivery and performance of this Agreement and the Additional Documents to which it is a party by each of the Seller Parties have been duly authorized by all necessary limited liability company action. This Agreement has been, and each of the Additional Documents will be, duly executed and delivered by each of the Seller Parties which are parties thereto and, assuming the due execution of this Agreement by Buyer, is, or upon execution and delivery will be, a valid and binding obligation of such Seller Party, enforceable against such Seller Party in accordance with its

terms, except as such enforcement may be limited by bankruptcy, insolvency, receivership, conservatorship, reorganization, moratorium, fraudulent conveyance or other similar laws now or hereafter in effect relating to or affecting the rights and remedies of creditors generally, and general principles of equity (whether considered in a proceeding at law or in equity).

4.4    <u>**Financial Statements; Books and Records**</u>.

(a)    Seller has delivered to Buyer for each Business Unit: (i) internally prepared unaudited balance sheets as of December 31, 2007 (the "<u>2007 Balance Sheets</u>") and the related statements of income for the fiscal year then ended (together with the 2007 Balance Sheets, the "<u>2007 Financial Statements</u>"), (ii) internally prepared unaudited balance sheets as of December 31, 2006 (the "<u>2006 Balance Sheets</u>") and the related statements of income for the fiscal year then ended (together with the 2006 Balance Sheets, the "<u>2006 Financial Statements</u>"), (iii) internally prepared unaudited balance sheets as of December 31, 2005 (the "<u>2005 Balance Sheets</u>") and the related statements of income for the fiscal year then ended (together with the 2005 Balance Sheets, the "<u>2005 Financial Statements</u>") and (iv) internally prepared unaudited balance sheets as of June 30, 2008 (the "<u>Interim Balance Sheets</u>") and the related statements of income for the six months then ended (together with the Interim Balance Sheets, the "<u>Interim Financial Statements</u>"; and, collectively with the 2007 Financial Statements, the 2006 Financial Statements and the 2005 Financial Statements, the "<u>Financial Statements</u>"). The Financial Statements fairly present, in all material respects, the financial condition and the results of operations of the Company Entities as at the respective dates thereof and for the periods covered thereby, all in accordance with GAAP and in accordance with the same accounting principles consistently applied by the Companies except (x) that the Financial Statements do not contain all of the footnote disclosures required by GAAP, (y) that the Interim Financial Statements are subject to normal year-end adjustments, and (z) for such adjustments and exceptions reflected on the Financial Statements or as set forth on <u>Schedule 4.4(a)</u>.

(b)    The books of account and minute books of the Company Entities, which have been made available to Buyer, are complete in all material respects. Notwithstanding the foregoing, the documents and communications between and among Seller, the Company Entities and each of their Affiliates and the Representatives of any of them concerning the Contemplated Transactions have been excluded from the minute books of the Company Entities and shall not be in the possession of the Company Entities as of the Closing Date.

(c)    Each Company Entity maintains internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, including policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of each Company Entity, (ii) are designed to provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of each Company Entity are being made only in accordance with authorizations of the managers or board of directors of the Company Entity, as applicable and (iii) are designed to provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of each Company Entity that could have a material effect on the Financial Statements (it being understood that the Seller Parties are not

making any representation or warranty that the Company Entities comply, or have complied with, Section 404 of the Sarbanes-Oxley Act of 2002, as amended, and any Law enacted or promulgated pursuant or relating thereto).

(d)    All Accounts Receivable of the Company Entities (i) represent valid obligations arising from sales or transactions actually made or services actually performed in the ordinary course of business consistent with past practice, (ii) are properly reflected on the books and records of the Company Entities in accordance with GAAP and (iii) are not currently the subject of any counterclaim, or a claim for a chargeback, deduction, credit, set-off or other offset, other than as reflected by the reserve for bad debts recorded on the Interim Balance Sheet in accordance with GAAP. To the Knowledge of the Sellers, all Purchased Receivables and any other Accounts Receivable to be included on the Closing Net Working Capital Statement are collectible in the ordinary course of business, consistent with past practice, except for any reserves for bad debts reflected in the Closing Net Working Capital Statement. No Person has any Encumbrance other than a Permitted Encumbrance on any Accounts Receivable of a Company Entity or any part thereof, and there is no agreement for deduction, free goods or services, discount or other deferred price or quantity adjustment made by the Company Entities with respect to any Account Receivable that is not reflected in the Interim Balance Sheet or reserves made since the date of the Interim Balance Sheet in the ordinary course of business.

4.5    **Real Property; Leaseholds.**

(a)    Except as set forth in **Schedule 4.5(a)** and except for those properties owned by the Relocation Companies acquired in the conduct of their business for the account of a client as a result of relocating client employees (the "**Relocation Properties**"), no Company Entity owns any real property.

(b)    **Schedule 4.5(b)**, which is grouped in subdivisions for each of the Business Units, sets forth a true and accurate list of all real property leaseholds held directly or indirectly by any Company Entity. Except as otherwise described in **Schedule 4.5(b)** with respect to each such parcel of leased real property: (i) the leases constitute all of the leases, subleases and agreements under which any of the Company Entities holds any interest in any leased real estate used in connection with the Business; (ii) the Seller Parties have made available to Buyer and its counsel true and complete copies of all of the leases; (iii) each lease is in full force and effect in all material respects, has not been repudiated by any Company Entity, or to the Knowledge of Seller, any other party thereto and is a legal, valid, binding and enforceable obligation of the applicable Company Entity and, to the Knowledge of Seller, each of the other parties thereto except as such enforcement may be limited by bankruptcy, insolvency, receivership, conservatorship, reorganization, moratorium, fraudulent conveyance or other similar laws now or hereafter in effect relating to or affecting the rights and remedies of creditors generally, and general principles of equity (whether considered in a proceeding at law or in equity); (iv) neither the applicable Company Entity nor, to the Knowledge of Seller, any other party to any such lease is in any material respect in breach or default thereof, and no event has occurred which, with notice or the lapse of time, or both, would constitute such a breach or default or permit termination, modification or acceleration thereof or thereunder; (v) no such lease has been modified in any material respect, except to the extent disclosed in documents made available to Buyer; (vi) no Company Entity has assigned, transferred, conveyed,

mortgaged, deeded in trust or encumbered any interest in any leasehold or subleasehold, other than for Permitted Encumbrances; (vii) other than the leases identified in **Schedule 4.5(b)**, there are no material leases, subleases, licenses, concessions or other agreements, written or oral, by which any of the Company Entities has granted to any Person the right of use or occupancy of any portion of such properties; and (viii) no Person (other than the Company Entities) is in possession of such properties.

4.6    **Title to Assets**.    Except as set forth in **Schedule 4.6(a)**, the Company Entities have good (and, in the case of real property, insurable) title to all of the assets and properties which they purport to own (including all tangible assets reflected on the Interim Financial Statements as being owned by them (except for assets sold or otherwise disposed of since the date of the Interim Financial Statements either (x) in the ordinary course of business consistent with past practice or (y) which both (a) individually and in the aggregate were not material to the continued operations of any Business Unit and (b) did not have a fair market value in excess of One Hundred Thousand Dollars ($100,000), individually, or Five Hundred Thousand Dollars ($500,000), in the aggregate)) free and clear of any Encumbrances except for Permitted Encumbrances. All material items of machinery, equipment and other tangible personal property and assets of the Company Entities are in good condition and repair, except for ordinary wear and tear. Except as set forth in **Schedule 4.6(a)**, the Excluded Assets and the Support Assets, the Company Entities own or validly lease or license all tangible and intangible assets necessary for the conduct of their respective businesses as currently conducted in the ordinary course of business. At the Closing, good title to the Support Assets will be transferred to Buyer and the Support Assets will be free and clear of all Encumbrances, except for Permitted Encumbrances. If the GHS Indebtedness Option is exercised, at the Closing, good title to the GHS Indebtedness will be transferred to GHS Indebtedness Newco and the GHS Indebtedness will be free and clear of all Encumbrances, except for Permitted Encumbrances.

4.7    **Insurance**.    Schedule 4.7, which is grouped in subdivisions for each of the Business Units, sets forth a true and accurate list of all material insurance policies maintained by any Company Entity that cover losses and risks relating to the Business. No Company Entity or Seller Party has received any written notice of cancellation or non-renewal of any such insurance policies. None of such insurance policies will continue for the benefit of Buyer after the Closing.

4.8    **Contracts and Commitments**.

(a)    **Schedule 4.8(a)**, which is grouped in subdivisions for each of the Business Units, sets forth a true and accurate list of the following, to the extent not duplicative of the information contained in **Schedules 4.14(a)** and **(b)** relating to Intellectual Property and Information Technology, **Schedule 4.16(a)** relating to employment agreements and **Schedule 4.26(b)(2)** relating to Franchise Agreements:

(1)    all Contracts to which a Company Entity is a party, or by which any of the assets and properties of a Company Entity is bound, which either (A) involve an obligation of a Company Entity to make payments or purchase any goods or services in any year in excess of One Hundred Thousand Dollars ($100,000) or (B) involve performance of services or delivery of goods or services or payments to a Company Entity in any year in excess of One

-24-

Hundred Thousand Dollars ($100,000) and are not terminable on notice of sixty (60) days or less without the payment of a termination fee or penalty;

(2)    all equipment leases to which a Company Entity is a party, or by which any of the assets and properties of a Company Entity is bound, which involve a lease or installment payment in any year in excess of Twenty-Five Thousand Dollars ($25,000) and are not terminable on notice of sixty (60) days or less without the payment of a termination fee or penalty;

(3)    all Contracts relating to joint ventures or similar arrangements involving any of the Company Entities;

(4)    all Contracts with any Person that generated consolidated net revenues for the Company Entities during the fiscal year ended December 31, 2007 in excess of One Hundred Thousand Dollars ($100,000);

(5)    all Contracts with any Person for which the total commitments thereunder exceed One Hundred Thousand Dollars ($100,000), or pursuant to which the Company Entities incurred expenses for the fiscal year ended December 31, 2007 in excess of One Hundred Thousand Dollars ($100,000);

(6)    all Contracts that result in any Person holding a power of attorney that relate to any of the Company Entities or its Business (other than powers of attorney granted in the ordinary course of business to (i) legal counsel engaged in providing legal services and (ii) employees of a Company Entity to act on behalf of such Company Entity with respect to Taxes); and

(7)    all collective bargaining or other related labor agreements to which a Company Entity is a party;

(8)    all agreements evidencing Indebtedness of any Company Entity;

(9)    all agreements that purport to limit the ability of any Company Entity to compete in any business or territory; and

(10)    any other Contract to which a Company Entity is a party which was not entered into in the ordinary course of business and which is not otherwise set forth on **Schedule 4.8(a)** but is material to the Business.

(each, including the Contracts disclosed on **Schedules 4.14(a)** and **(b)** relating to Intellectual Property and Information Technology, **Schedule 4.16(a)** relating to employment agreements and **Schedule 4.26(b)(2)** relating to Franchise Agreements, a "**Material Contract**").

(b)    True and complete copies of all the Material Contracts listed on any of **Schedules 4.8(a)**, **4.14(a)**, **4.14(b)**, **4.16(a)** or **4.26(b)(2)** together with all amendments and supplements thereto and all waivers of any of the terms thereof, have been made available to Buyer.

1472249RV-19

(c)   Each Material Contract is in full force and effect, constitutes the entire agreement with respect to the parties thereto regarding the subject matter thereof and represents a legally valid, binding and enforceable obligation of the applicable Company Entity, and to the Knowledge of Seller, the other parties thereto except as such enforcement may be limited by bankruptcy, insolvency, receivership, conservatorship, reorganization, moratorium, fraudulent conveyance or other similar laws now or hereafter in effect relating to or affecting the rights and remedies of creditors generally, and general principles of equity (whether considered in a proceeding at law or in equity). Each Company Entity, and to the Knowledge of Seller, the other parties thereto, have performed in all material respects all of their respective obligations under each Material Contract in accordance with the terms thereof. None of the Seller Parties nor the Company Entities have received any written notice of default in connection with the performance of any obligation, agreement or condition contained in any Material Contract and, to the Knowledge of Seller, no other party to any Material Contract is in default thereunder.

**4.9**   **Absence of Undisclosed Liabilities.**   Except as set forth in **Schedule 4.9**, no Company Entity has any material liability, except (a) as disclosed, reflected or reserved against in the Financial Statements, (b) for liabilities incurred since the date of the Interim Balance Sheet either (i) in the ordinary course of business consistent with past practice or (ii) which do not exceed One Hundred Thousand Dollars ($100,000), individually or, Five Hundred Thousand Dollars ($500,000) in the aggregate and were incurred prior to the date hereof or (c) incurred in connection with this Agreement or the Contemplated Transactions. The Company Entities do not have any Indebtedness, and have not guaranteed any Indebtedness, except as set forth in **Schedule 4.9**.

**4.10**   **No Conflict or Violation.**   Except as set forth in **Schedule 4.10**, neither the execution and delivery of this Agreement nor the consummation of the Contemplated Transactions will in any material respect:

(a)   interfere with the ability of Seller to consummate the Contemplated Transactions;

(b)   result in the creation or imposition of any Encumbrance on the Ownership Interests, other than pursuant to the Securities Laws and applicable state securities laws;

(c)   give any Governmental Authority the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under any Order to which any Company Entity, or any of the assets owned or used by any of them, may be subject;

(d)   result in the creation or imposition of any material Encumbrance, other than Permitted Encumbrances, on any of the property or assets of any Company Entity;

(e)   result in any violation of the provisions of the Organizational Documents of Seller or any Company Entity;

(f)   result in any violation by Seller or any Company Entity of any Law or any Permit; or

(g)    conflict with or result in any Breach, in any material respect, which would constitute a default (or which would give rise to any right of Consent, acceleration or termination or the loss of any benefit) under any term or provision of any Material Contract which Breach could reasonably be expected to be material to the operation, or results of operation, of the business of any Business Unit or the financial condition of any Business Unit.

**4.11    Governmental Approvals.**    Except as set forth in **Schedule 4.11**, which is grouped in subdivisions for each of the Business Units, no Consent of, or declaration, notice, filing or registration with, any Governmental Authority is required to be made or obtained by Seller or any Company Entity on or prior to the Closing Date in connection with the execution, delivery and performance of this Agreement and the consummation of the Contemplated Transactions.

**4.12    Litigation; Orders.**

(a)    **Schedule 4.12(a)** sets forth all pending Litigation: (i) that has been commenced by or against any of the Company Entities and which could reasonably be expected to result in a settlement or award of damages in excess of Fifty Thousand Dollars ($50,000); (ii) that could reasonably be expected to have a Material Adverse Effect; or (iii) that challenges, or that could reasonably be expected to have the effect of preventing, delaying or making illegal any of the Contemplated Transactions.    Except as set forth in **Schedule 4.12(a)**, to the Knowledge of Seller, no such Litigation has been threatened against any Company Entity or, with respect to clause (iii) hereof, any Seller Party.

(b)    Except as set forth in **Schedule 4.12(b)**, (i) there is no material Order to which any Company Entity, or any of the assets owned or used by any of them, is subject, (ii) no officer or director of any Company Entity is subject to any Order that prohibits such officer or director from engaging in or continuing any conduct, activity or practice relating to the Business and (iii) none of the Seller Parties nor any Company Entity has received, at any time since January 1, 2005, any notice or other communication from any Governmental Authority or any other Person regarding any actual, alleged, possible or potential material violation of, or material failure to comply with, any term or requirement of any Law or Order to which any of the Company Entities, or any of the assets owned or used by them, is or has been subject and which could reasonably be expected be material to the operation, or results of operations, of the business of any Business Unit or the financial condition of any Business Unit.

**4.13    Compliance with Laws; Permits.**

(a)    Except as set forth in **Schedule 4.13(a)**, which is grouped in subdivisions for each of the Business Units:

(1)    Each Company Entity is in compliance with all Laws applicable to it or to the conduct or operation of its business or use of any of its assets, except for any such failure that would not reasonably be expected to have a Material Adverse Effect;

(2)    No event has occurred or circumstance exists that (with or without notice or lapse of time) constitutes or could reasonably be expected to result in a violation by any

14722498v.v-19

Company Entity of, or a failure on the part of any of them  to comply with, any Law, except for any such failure that would not reasonably be expected to have a Material Adverse Effect; and .

(3)    Neither Seller nor any Company Entity has received since January 1, 2005 any written notice or other communication from any other Governmental Authority or any other Person regarding any actual, alleged, possible or potential violation of, or failure to comply with, any Law, except for any such failure that would not reasonably be expected to have a Material Adverse Effect.

Notwithstanding the foregoing, no representation or warranty is made in this Section 4.13(a) with respect to franchise matters, which are covered exclusively in **Section 4.26(b)**.

(b)    **Schedule 4.13(b)** contains a list, which is grouped in subdivisions for each of the Business Units, of each Permit that is required by the Company Entities to lawfully conduct and operate the Business in the manner presently conducted, except for those the absence of which are not material to the ongoing conduct of such Business Units' business. Except as set forth in **Schedule 4.13(b)**, each of the Company Entities is in compliance with all of the terms and requirements of each Permit identified or required to be identified in **Schedule 4.13(b)**, no Company Entity nor any Seller Party has received any notices that any Company Entity is in violation of any of the terms or conditions of any such Permit and each such Permit is in full force and effect except where such notice or the failure to be in compliance or in full force and effect would not be material to the ongoing conduct of the business of any Business Unit.

### 4.14    Intellectual Property and Technology.

(a)

(1)    All of the material Intellectual Property that any Company Entity owns (the "Company Owned Intellectual Property"), licenses or otherwise has acquired the right to use as of the date of this Agreement (collectively, the "Company Intellectual Property") that constitutes Scheduled Intellectual Property is set forth on **Schedule 4.14(a)(1)**, which is grouped in subdivisions for each of the Business Units. **Schedule 4.14(a)(1)** specifies, as applicable, (A) the nature of such Scheduled Intellectual Property, (B) whether such Scheduled Intellectual Property is owned or legally and validly licensed, (C) if provided under a license, the name of the licensor, and (D) whether such Scheduled Intellectual Property is registered or has an application for registration filed with any Governmental Authority and, if so, the applicable application or registration number(s).

(2)    All of the material Information Technology that any Company Entity owns (the "Company Owned Information Technology"), licenses or otherwise has acquired the right to use as of the date of this Agreement (collectively, the "Company Information Technology") is set forth on **Schedule 4.14(a)(2)**, which is grouped in subdivisions for each of the Business Units. **Schedule 4.14(a)(2)** specifies, as applicable, (A) whether such Company Information Technology is provided under a service contract or is owned or legally and validly licensed, (B) the date and parties to the contract, and (C) for contracts resulting in annual aggregate expenditures per contract in excess of One Hundred Thousand Dollars

-28-

($100,000), (i) the scope of purchase (e.g., number of licenses if it is a software license), (ii) the ongoing costs under such agreements, and (iii) expiration dates for all such licenses and contracts. For those contracts resulting in annual aggregate expenditures per contract equal to or less than One Hundred Thousand Dollars ($100,000), the definition of "Company Information Technology" specifically excludes commercial "off-the-shelf" or "shrink-wrap" software that is licensed to any Company Entity as an end user on a non-exclusive basis.

(b)    Except as set forth on **Schedule 4.14(b)**:

(1)    Each Company Entity has taken all commercially reasonable measures to keep in full force and effect all Company Owned Intellectual Property and Company Owned Information Technology registrations, renewals, and applications for registration that constitute Company Owned Intellectual Property or Company Owned Information Technology. All registrations and applications for registration of all material Company Owned Intellectual Property with a Governmental Authority currently comply in all material respects with the formal legal requirements for such registrations and applications (as applicable).

(2)    The Company Owned Intellectual Property and the Company Owned Information Technology are owned by the Company Entities, free and clear of any Encumbrance, except for Permitted Encumbrances. The Company Entities have legally and validly licensed or otherwise acquired from a third party the Company Intellectual Property that is not Company Owned Intellectual Property and the Company Information Technology that is not Company Owned Information Technology.

(3)    (A) All material licenses, material service Contracts, and other material Contracts that constitute Company Information Technology or Company Intellectual Property are in full force and effect, (B) none of the Company Entities, and to the Knowledge of the Seller, no other parties thereto are in default with respect to any material obligation under any such licenses and (C) none of the Company Entities, any licensors nor any other contracting parties have exercised termination rights with respect to such licenses, service Contracts or other Contracts.

(4)    As of the date of this Agreement, there is no Litigation pending or, to the Knowledge of Seller, threatened, that involves a claim against any Company Entity that any Company Owned Intellectual Property or Company Owned Information Technology infringes, misappropriates or violates a third party's rights in or to Intellectual Property or Information Technology or challenging the ownership, use, protectability, registerability, validity, or enforceability of the Company Owned Intellectual Property or Company Owned Information Technology. To the Knowledge of Seller, there is no Litigation pending or threatened as of the date of this Agreement that involves a claim against any customers or clients of any Company Entity with respect to the Company Owned Intellectual Property or Company Owned Information Technology or any such customer's use thereof.

(5)    To the Knowledge of Seller, no third party is infringing, violating, diluting, misusing, or misappropriating any Company Intellectual Property or Company Information Technology. No Seller Party nor any Company Entity has made any claim against

any third party based upon any such infringement, violation, dilution, misuse, or misappropriation.

(6)    To the Knowledge of Seller, the processes employed, the services provided, the businesses conducted and the products used or dealt in by the Company Entities and the Company Owned Intellectual Property and/or Company Owned Information Technology have not infringed, violated, diluted, misused or misappropriated any Intellectual Property or Information Technology rights of a third party. No Seller Party nor any Company Entity has received any written complaint, demand, notice, material charge or claim against any Company Entity based upon any such infringement, violation, dilution, misuse, or misappropriation.

(7)    No Seller Party has received written notice that any Company Owned Intellectual Property or Company Owned Information Technology is currently the subject of any re-examination, opposition, cancellation or invalidation proceeding before any Governmental Authority.

(8)    Other than "off-the-shelf" or "shrink-wrap" software that is licensed to any Company Entity as an end user on a non-exclusive basis, (i) the Company Intellectual Property, (ii) the Company Information Technology, and (iii) the Intellectual Property licensed pursuant to the License Agreement include all of the material Intellectual Property and material Information Technology, currently used in the ordinary day-to-day conduct of the Business, and, to the Knowledge of the Seller, there are no other items of Intellectual Property or Information Technology that are material to such ordinary day-to-day conduct of the Business. To the Knowledge of Seller, the Company Entities have a legal and valid license to use all software development tools, library functions, compilers and other third-party software that are material to the Business, and to all "off-the-shelf" or "shrink-wrap" software that is used by any Company Entity as an end user on a non-exclusive basis. To the Knowledge of the Seller, all material software used in the Business (other than any "off-the-shelf" or "shrink-wrap" software licensed to a Company Entity on a non-exclusive basis) is free of all viruses, worms, Trojan horses, bugs, errors, or problems that could reasonably be expected to materially disrupt its operation or have a material adverse impact on the Business.

**4.15    Taxes.**

(a)    Seller Parties have timely filed or caused to be filed all Tax Returns that are or were required to be filed by or with respect to the Company Entities to the extent required to be filed on or prior to the Closing Date. Seller Parties have paid or caused to be paid all Taxes reflected on such Tax Returns, and such Tax Returns are correct in all material respects and have been completed in all material respects in accordance with all applicable Tax Laws.

(b)    **Schedule 4.15(b)** contains a complete and accurate list of all audits of all Tax Returns filed by or with respect to the Company Entities from December 31, 2002 through the Closing Date, including a reasonably detailed description of the nature and outcome of each audit. All deficiencies proposed as a result of any audits have been paid, reserved against, settled, or, as described in **Schedule 4.15(b)**, are being contested in good faith by appropriate proceedings. Except as described in **Schedule 4.15(b)**, neither Seller nor any of the Company Entities has given or been requested to give waivers or extensions (or is or would be subject to a

14752498\V-19

waiver or extension given by any other Person) of any statute of limitations relating to the payment of Taxes of the Company Entities or for which any of them may be liable.

(c)    To the Knowledge of Seller, there exists no proposed Tax assessment against the Company Entities except as disclosed in the 2007 Balance Sheets or in **Schedule 4.15(c)**. All Taxes that any Seller Party or the Company Entities are or were required by Law to withhold or collect by or on behalf of any of them in connection with the conduct of the Business by the Company Entities or the Seller Parties have been duly withheld or collected and, to the extent required, have been paid to the proper Governmental Authority or other Person.

(d)    There is no Tax sharing or allocation agreement that will require any payment by any of the Company Entities after the date of this Agreement.

(e)    There are no liens for Taxes (other than for current Taxes not yet due and payable) existing upon the Company Entities or any of the LLC Interests or Shares.

(f)    No Company Entity has assumed an obligation to make a payment that is not deductible under Section 280G of the Code or any similar provision of state, local or foreign law.

(g)    **Schedule 4.15(g)** sets forth the classification of each of the Company Entities for U.S. federal Tax purposes.

(h)    Neither the entering into this Agreement or the Additional Documents nor the performance by any party of any of its respective obligations under this Agreement or the Additional Documents will obligate Buyer to withhold any amounts from the Purchase Price pursuant to the Foreign Investment in Real Property Tax Act.

4.16  **Employees; Employee Benefit Plans.**

(a)    **Schedule 4.16(a)**, which is grouped in subdivisions for each of the Business Units, sets forth a true and accurate list of each employment, service, severance, change of control, non-compete and consulting agreement between any employee, director, consultant or independent contractor and any Company Entity that involves the payment of base salary in any calendar year in excess of One Hundred Thousand Dollars ($100,000).

(b)    **Schedule 4.16(b)**, which is grouped in subdivisions for each of the Business Units, sets forth a true and accurate list, to the extent not duplicative of the information contained in **Schedule 4.16(a)**, of all Company Employee Benefit Plans and identifies, with respect to each such Company Employee Benefit Plan, either any Seller Party, a Company Entity or the applicable ERISA Affiliate of Seller or a Company Entity that sponsors or maintains such Company Employee Benefit Plan or that contributes or is required to contribute to such Company Employee Benefit Plan or that entered into such Company Employee Benefit Plan. Except as set forth on **Schedule 4.16(b)**, neither Seller, any Company Entity, nor any ERISA Affiliate of Seller or any Company Entity has announced or otherwise made a commitment to implement any arrangement that, if implemented, would be a Company Employee Benefit Plan.

(c)    With respect to each Company Employee Benefit Plan, Seller has made available or caused to be made available to Buyer, to the extent applicable, a true and complete copy of such Company Employee Benefit Plan, any amendments thereto (or if such Company Employee Benefit Plan is not written, a description thereof), any related trust or other funding vehicle agreements, the most recent report or summary required under ERISA and the most recent determination letter received from the Internal Revenue Service with respect to each Company Qualified Plan.

(d)    Each Company Employee Benefit Plan complies in form in all material respects with and has been maintained and operated in all material respects in accordance with, the requirements of all applicable laws, including ERISA and the Code, and each Company Employee Benefit Plan has been maintained and operated in all material respects in accordance with its terms. All reports and descriptions (including Form 5500 Annual Reports, summary annual reports and the summary plan descriptions) with respect to all Company Employee Benefit Plans have been properly filed with the appropriate government agency, as required by law, and distributed as required by law to employees and/or their beneficiaries. The Company Entities and the Seller Parties have complied in all material respects with the requirements of Section 4980B of the Code in connection with each of the Company Employee Benefit Plans to which it is applicable.

(e)    **Schedule 4.16(e)**, which is grouped in subdivisions for each of the Business Units, separately identifies each Company Qualified Plan. Except as set forth on **Schedule 4.16(e)**, each Company Qualified Plan and each trust established in connection with each Company Qualified Plan is the subject of a favorable determination letter or a favorable opinion letter, as applicable, issued by the Internal Revenue Service.

(f)    Neither Seller, any Company Entity, nor any ERISA Affiliate of Seller or any Company Entity has contributed to or has ever had an obligation to contribute to a multiemployer pension plan (as defined in Section 3(37) of ERISA) for the benefit of any active, retired or former employee, director or manager of Seller or any Company Entity. No Company Entity has, or as a result of the consummation of the Contemplated Transactions will have, any liability, including actual or potential withdrawal liability with respect to any such multiemployer pension plan.

(g)    No Company Employee Benefit Plan is a multiple employer welfare arrangement within the meaning of Section 3(41) of ERISA, and no Company Entity nor any Seller Party has ever contributed to any such multiple employer welfare arrangement in connection with the Business or the Company Entities.

(h)    Except as provided on **Schedule 4.16(h)**, the consummation of the Contemplated Transactions is not a precondition to (i) any current or former employee, officer or consultant of any Company or any ERISA Affiliate of Seller or any Company Entity becoming entitled to severance pay, unemployment compensation or any other similar payment or (ii) the material acceleration of the time of payment or vesting, or the material increase in the amount, of compensation or other benefits due any such employee, officer or consultant.

-32-

(i)      Except as provided on **Schedule 4.16(i)**, no Company Employee Benefit Plan provides medical, surgical, hospitalization, death or similar benefits (whether or not insured) for employees or former employees of a Company Entity for periods extending beyond their retirement or other termination of service, other than (i) coverage mandated by applicable law, (ii) death benefits under any "pension plan," (iii) benefits the full cost of which is borne by the current or former employee (or his or her beneficiary) or (iv) deferred compensation benefits accrued as liabilities on the books of any Company Entity.

(j)      There are no pending, or to the Knowledge of Seller, threatened material claims by or on behalf of any Company Employee Benefit Plan, by any employee or beneficiary covered under any such Company Employee Benefit Plan, or otherwise involving any such Company Employee Benefit Plan (other than routine claims for benefits).

(k)      **Schedule 4.16(k)** sets forth each Company Employee Benefit Plan that is subject to Title IV or Section 302 of ERISA (each, a "**Company Defined Benefit Plan**"). Except as set forth on **Schedule 4.16(k)**, the present fair market value of each Company Defined Benefit Plan equals or exceeds the present value of vested and nonvested accrued benefits under such Company Defined Benefit Plan, based on the actuarial assumptions and methodology used for funding purposes as set forth in such Company Defined Benefit Plan's most recent actuarial report. No reportable event under Section 4043 of ERISA has occurred with respect to any Company Defined Benefit Plan. No event has occurred and no condition has existed that could constitute grounds under Section 4042 of ERISA for termination of or appointment of a trustee to administer any Company Defined Benefit Plan. No accumulated funding deficiency (as defined in Section 402 of ERISA or Section 412 of the Code) exists nor has any funding waiver from the Internal Revenue Service been received or requested with respect to any Company Defined Benefit Plan. No excise or other tax is due or owing because of any failure to comply with the minimum funding standards of the Code or ERISA with respect to any Company Defined Benefit Plan. Seller has made available or caused to be made available to Buyer a true and complete copy of the most recent actuarial and financial statements prepared with respect to each Company Defined Benefit Plan.

(l)      The Company Entities do not operate, sponsor or maintain any "nonqualified deferred compensation plans" subject to Section 409A of the Code.

### 4.17    Employee and Labor Matters.

(a)      No Company Entity is a party to or is bound by any collective bargaining agreement, Contract or other agreement or understanding with a labor union or labor organization, nor is any Company Entity the subject of a proceeding asserting that it has committed an unfair labor practice (within the meaning of the National Labor Relations Act) or seeking to compel it to bargain with any labor organization as to wages or conditions of employment, nor is there any strike or other material labor dispute or disputes involving any Company Entity pending, or to the Knowledge of Seller, threatened. To the Knowledge of Seller, there is no activity involving any employees of any Company Entity seeking to certify a collective bargaining unit or engaging in other organizational activity. Since January 1, 2005, none of the Company Entities or Seller Parties has experienced any union organization attempts

(including any request for representation), labor disputes or general work stoppage or slowdowns due to labor disagreements.

(b)    No employee of any of the Company Entities whose annual base compensation is greater than One Hundred Thousand Dollars ($100,000) has given·written notice to any Company Entity or Seller Party of any plans to terminate his or her employment with the Company Entity with which he or she is employed. The Company Entities have complied in all material respects with all applicable laws relating to the employment of labor, including provisions thereof relating to wages, hours, equal opportunity, collective bargaining and the payment of social security and other taxes, the Worker Adjustment and Retraining Notification Act and the Immigration Reform and Control Act of 1986. There are no administrative proceedings or court complaints pending or, to the Knowledge of Seller, threatened against any of the Company Entities before the U.S. Equal Employment Opportunity Commission or any state or federal court or agency concerning alleged employment discrimination or any other matters relating to the employment of labor.

**4.18    No Brokers.** Except as set forth in **Schedule 4.18,** neither Seller nor any Company Entity has employed, or is subject to any valid claim of, any broker, finder, consultant or other intermediary in connection with the Contemplated Transactions.

**4.19    Absence of Certain Changes or Events.** Except as set forth in the Interim Financial Statements or **in Schedule 4.19,** since June 30, 2008, no Material Adverse Effect has occurred. Except as contemplated by this Agreement or permitted under **Section 6.2,** since the date of the Interim Balance Sheets, the Company Entities have carried on their business in all material respects in the ordinary course consistent with past practice, and have not:

(a)    other than in the ordinary course of business consistent with past practice, sold, assigned, licensed or transferred any of their material assets (including to any Seller Party or any stockholder, member, employee or Affiliate of any Company Entity or Seller Party), except for dispositions of obsolete or worn-out assets in the ordinary course of business consistent with past practice, or mortgaged, pledged or subjected them to any Encumbrance, except for Permitted Encumbrances;

(b)    other than in the ordinary course of business consistent with past practice, sold, assigned, transferred, abandoned or permitted to lapse any material Permit or any of the Company Owned Intellectual Property or Company Owned Information Technology or other material intangible assets, or disclosed any material proprietary confidential information to any Person (except for disclosure pursuant to a non-disclosure or confidentiality agreement restricting the use and further disclosure thereof) or granted any license or sublicense of any rights under or with respect to any Company Intellectual Property or Company Information Technology;

(c)    made or granted any bonus or any wage or salary increase to any employee, officer or director, or made any other material change in employment terms for any employee, officer or director, other than bonuses and increases in the ordinary course of business consistent with past practice, or deferred any salary or compensation owed any employee, officer or director (excluding compensation which is deferred in the ordinary course of business

consistent with past practice), or made any material change in any contract with any independent contractor utilized by any Company Entity;

(d)    made or granted any increase in, or amended or terminated, any existing Company Employee Benefit Plan;

(e)    materially altered or modified, or failed to comply, in any material respect, with, its General Business Practices;

(f)    made any capital expenditures or commitments therefor such that the aggregate outstanding amount of unpaid obligations and commitments with respect thereto shall exceed One Hundred Thousand Dollars ($100,000) on the Closing Date;

(g)    made any loans or advances to (other than expense advances made in the ordinary course of business consistent with past practice) the respective officers, directors or employees of the Company Entities or any Seller Parties;

(h)    suffered any damage, destruction or casualty loss, whether or not covered by insurance which has been, or reasonably could be expected to be, material to the operation, or results of operation, of the business of any Business Unit or the financial condition of any Business Unit;

(i)    waived or cancelled any material right or debt owed to it outside of the ordinary course of business consistent with past practice;

(j)    received notification that any of its material customers, franchisees (direct or indirect, including subfranchisees) or suppliers will stop or decrease, or otherwise alter, their business relationship with the Company Entities in a manner that reasonably could be expected to be material to the operation, or results of operation, of the business of any Business Unit or the financial condition of any Business Unit;

(k)    suffered any material destruction of its books and records;

(l)    made any capital investment in, any loan to, or any acquisition of the securities or assets of any other Person or taken any steps to incorporate a subsidiary;

(m)    amended or authorized the amendment of their Organizational Documents;

(n)    incurred any Indebtedness not discharged at closing or any other material liability outside of the ordinary course of business consistent with past practice not discharged at Closing; or

(o)    declared or made any distribution or dividend, other than distributions or dividends to another Company Entity.

4.20    **Environmental Matters.**

(a)    Except as set forth in **Schedule 4.20(a)**, to the Knowledge of Seller, no Hazardous Materials have been disposed of or discharged into the environment on or from the premises of any Company Entity, which is currently, or since January 1, 2005, has been, required by applicable Environmental Law to be remediated by or at the expense of any Entity. Seller has delivered or otherwise made available for inspection to Buyer true and complete copies and results of any reports, studies, analyses, tests or monitoring initiated by any Company Entity pertaining to Hazardous Materials in, on, beneath or adjacent to any real property that is owned or leased by any Company Entity.

(b)    Except as set forth in **Schedule 4.20(b)**, to the Knowledge of Seller, no Company Entity has treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled or released any substance, in a manner that has given rise to liabilities of any Company Entity pursuant to any Environmental Law, including any liability for response costs, corrective action costs, personal injury, property damage, natural resources damage or attorney fees, or any investigative, corrective or remedial obligations.

**4.21    International Trade.** Since January 1, 2005, to the Knowledge of Seller, no Company Entity has violated any provisions of the Export Administration Regulations administered by the U.S. Department of Commerce, the International Traffic in Arms Regulations administered by the U.S. Department of State, and the various regulations administered by the Office of Foreign Assets Control of the U.S. Treasury Department. To the Knowledge of Seller, since that date, the Company Entities have not engaged in any commercial activities in or related to the following countries: (a) Cuba; (b) Iran; (c) Libya; (d) North Korea; (e) Sudan; (f) Syria; (g) Burma (Myanamar); (h) Sierra Leone; or (i) Liberia, including facilitating trade or financial transactions with entities located in such countries, providing services to entities located in such countries, selling or delivering products to such countries, or entering into any contract or other obligation to provide services or products to such countries or to purchase goods or services from such countries, except in accordance with such foregoing laws and regulations. Seller or its Affiliates have engaged in the activities set forth in **Schedule 4.21**, which were in accordance with such foregoing laws and regulations.

**4.22    Client Trust Funds.** All Client Trust Funds have been held by the Company Entities in compliance with all applicable requirements under Law or applicable Contracts governing the holding, disbursement and payment of such funds. To the Knowledge of Seller, since January 1, 2005, there has been no improper commingling of the Client Trust Funds and no shortages exist in such funds.

**4.23    Privacy and Data Security.**

(a)    The Seller has provided true and correct copies of all privacy policies adopted by the Company Entities in connection with their operations. To the Knowledge of Seller, each of the Company Entities has (i) complied in all material respects with all applicable Laws related to the protection, privacy and security of sensitive personal information, including the Gramm-Leach-Bliley Act, the European Union Data Protection Directive and any similar federal, state or foreign Law, (ii) not violated, in any material respects, its applicable privacy policies and (iii) taken commercially reasonable steps to protect and maintain the confidential

nature of the personal information provided to any of the Company Entities by Persons in accordance with its applicable privacy policies.

(b)    The Company Entities have each taken commercially reasonable measures to protect the privacy, secrecy and confidentiality of all third party data (including any personally identifiable data) which have been entrusted to them. To the Knowledge of Seller, no Company Entity has experienced a material breach of data security or any other material unauthorized access to any third party data entrusted to any of the Company Entities.

**4.24    Affiliate Transactions.**  To the Knowledge of Seller, and except as disclosed on **Schedule 3.2(i)**, **Schedule 4.16**, or **Schedule 4.24**, no Seller Party, nor any Affiliate, director, officer or key employee of any of the Company Entities or Seller Parties is a party to any Contract or transaction with any of the Company Entities affecting the Business of any of the Company Entities, or has any interest in any property, whether real, personal or mixed, or tangible or intangible, used in or necessary to the Business of the Company Entities.

**4.25    Disclaimer.**  Except as and to the extent set forth in this Agreement or any Additional Document, the Seller Parties make no representation or warranty whatsoever to Buyer, and Seller Parties hereby disclaim all liability and responsibility for any representation, warranty, statement or information not included in this Agreement or any Additional Document that was made, communicated or furnished (orally or in writing) to Buyer or its Representatives (including any opinion, information, projection or advice that may have been provided to Buyer or its Representatives by Seller or any Company Entity or any of their Representatives).

**4.26    Representations and Warranties of Seller Regarding Business Units.**  The representations and warranties set forth in this Section 4.26 shall apply exclusively to the Business Units, as specified below:

(a)    The Relocation Companies.

(1)    Relocation Properties. Except as set forth in **Schedule 4.26(a)(1)**, the costs associated with the purchase and sale of Relocation Properties, together with all gains or losses realized in connection therewith, are all undertaken for the account of clients of the Relocation Companies, such that the Relocation Companies do not bear economic risk associated with such transactions other than the risk of collecting the associated accounts receivable.

(2)    Real Estate Brokerage License. GMAC Relocation and its Subsidiaries, as the case may be, hold valid and existing real estate brokerage licenses in such states in the United States (which permit it to collect commissions and referral fees as necessary in furtherance of its business operations) and GHS Relocation UK and its Subsidiary, as the case may be, hold all material Permits in such foreign jurisdictions, in all cases, which are required or necessary for the conduct of their businesses as currently conducted in the ordinary course of business consistent with past practice.

(b)    GMAC Real Estate.

14732498\v-19

(1)    <u>Certain Definitions</u>.  For purposes of this **Section 4.26(b)**, the following definitions shall apply:

(A)    "<u>Franchise Financing Agreements</u>" means any note or guaranty or any loan, security or pledge agreement between GMAC Real Estate and a Franchisee granted for transitioning into or renewing with the Franchise System.

(B)    "<u>Franchise Operating Loans</u>" means any note or guaranty or any loan, security or pledge agreement between GMAC Real Estate and a Franchisee granted to meet operational needs.

(C)    "<u>Franchise System</u>" means GMAC Real Estate's system for the franchising of real estate brokerage entities.

(2)    <u>Franchise Matters</u>.

(A)    **Schedule 4.26(b)(2)(A)** accurately identifies all franchise agreements to which GMAC Real Estate is a party (collectively, the "<u>Franchise Agreements</u>"), by name of franchisee ("<u>Franchisee</u>"), date of agreement, expiration date, business location(s), and exclusive territory or development area, if any.  No other agreements exist between GMAC Real Estate and other party granting the right, or any option or right of first refusal, to conduct a real estate brokerage business under the name "GMAC Real Estate" or any other Marks owned or used by GMAC Real Estate.  Except as set forth in **Schedule 4.26(b)(2)(A)**, the consummation of the Contemplated Transactions will not require the Consent of any Franchisee.  Seller has made available to Buyer a true and complete copy of each Franchise Agreement (as amended to date) listed on **Schedule 4.26(b)(2)(A)**.

(B)    **Schedule 4.26(b)(2)(B)** accurately identifies all Franchise Financing Agreements to which GMAC Real Estate is a party, by name of Franchisee, date of agreement and business location(s).  Seller has made available to Buyer a correct and complete copy of each Franchise Financing Agreement listed on **Schedule 4.26(b)(2)(B)**.

(C)    **Schedule 4.26(b)(2)(C)** accurately identifies all Franchise Operating Loans to which GMAC Real Estate is a party, by name of Franchisee, date of agreement and business location(s).  Seller has made available to Buyer a true and complete copy of each Franchise Operating Loan listed on **Schedule 4.26(b)(2)(C)**.

(D)    Except as set forth in **Schedule 4.26(b)(2)(D)**, each Franchisee is current (consistent with ordinary course of business practices for such Franchisee) in its financial obligations to GMAC Real Estate, including payments due under any Franchise Agreement, Franchise Financing Agreement or Franchise Operating Loan.

(E)    Except as set forth on **Schedule 4.26(b)(2)(E)**, as of the date of this Agreement, neither GMAC Real Estate, nor to the Knowledge of Seller, any Franchisee, is in material Breach under any Franchise Agreement, Franchise Financing Agreement or Franchise Operating Loan which Breaches are, individually or in the aggregate, material to GMAC Real Estate (or to the Knowledge of Seller with or without notice or lapse of time or both, would be in material Breach of or material default under any such agreement).

I47722498V-19

Except as set forth in <u>Schedule 4.26(b)(2)(E)</u>, there is, as of the date of this Agreement, no dispute between GMAC Real Estate and any Franchisee that is material to GMAC Real Estate.

(F)    GMAC Real Estate is not a party to any agreement which prohibits GMAC Real Estate from operating any real estate brokerage businesses or selling franchises to do so in any geographic area or location, except as expressly set forth in the Franchise Agreements.

(G)    <u>Schedule 4.26(b)(2)(G)</u> accurately sets forth each state or other jurisdiction in which GMAC Real Estate is currently registered or with which GMAC Real Estate has filed an application for registration or an exemption from registration, to sell franchises, the effective date and expiration date of each such registration relating to the current registration or exemption period, whether relating to renewal or amendment applications. Except as set forth in <u>Schedule 4.26(b)(2)(G)</u>, there currently exist no escrow or impound conditions or requirements imposed upon GMAC Real Estate's sale of franchises in any jurisdiction.

(H)    Except as set forth in <u>Schedule 4.26(b)(2)(H)</u>, to the Knowledge of Seller, GMAC Real Estate has conducted its business in compliance with all applicable laws, rules and regulations of the Federal Trade Commission and of any state or other jurisdiction relating to the relationship between GMAC Real Estate and franchisees, or the offer, sale, assignment, renewal, termination or rights of succession, of franchises, business opportunities or seller-assisted marketing plans (collectively, "<u>Franchise Laws</u>"), except where the failure to so comply would not reasonably be expected to have a material adverse impact on the business, operations or condition of GMAC Real Estate. Since January 1, 2007, GMAC Real Estate has not received written or, to the Knowledge of Seller, oral notice from any Governmental Authority or third party alleging a material violation of the Franchise Laws.

(I)    <u>Schedule 4.26(b)(2)(I)</u> identifies by jurisdiction, both domestic and foreign, and effective date all currently effective offering circulars used by GMAC Real Estate relating to the sale of franchises (the "<u>Offering Circulars</u>"), true and complete copies of which have been made available to Buyer. As of their respective dates, the Offering Circulars complied in all respects with the Franchise Laws to the extent applicable, except for such noncompliance as would not reasonably be expected to have a material adverse impact on the business, operations or condition of GMAC Real Estate.

(J)    GMAC Real Estate has at all times complied fully with all agreements governing its Marketing Fund and has administered the Marketing Fund in compliance with all applicable Laws, except for such noncompliance as would not reasonably be expected to have a material adverse impact on the business, operations or condition of GMAC Real Estate. The only covenants or agreements governing the Marketing Fund are contained in the Franchise Agreements. The Marketing Fund and all monies paid thereto have been used and expended in all material respects in accordance with the terms, conditions and restrictions of the Franchise Agreements and in accordance with disclosures in each disclosure document delivered to any Franchisee or any Governmental Authority.

(K)    GMAC Real Estate has not engaged, and does not engage, any Person to act as a franchise broker in connection with any transaction evidenced by a

Franchise Agreement. No Person other than GMAC Real Estate, its Affiliates or Subsidiaries and their respective employees has been involved in the identification, recruitment, lead generation and solicitation of prospective franchisees, the negotiation of Franchise Agreements or the offer or sale of franchises generally.

(c)    The CORE Companies.

(1)    **Listings.** **Schedule 4.26(c)(1)** sets forth, as of the date contained therein, an itemization that is true and accurate in all material respects based on the books and records of the CORE Companies of the open real estate listings pursuant to a written listing agreement between any CORE Company and owners of real property.

(2)    **Sales Associates.** **Schedule 4.26(c)(2)** sets forth as of the date contained therein, a list that is true and accurate in all material respects of the sales associates affiliated with the CORE Companies (the "**CORE Sales Associates**"), and with respect to each such CORE Sales Associate the following information: (A) the name of such CORE Sales Associate, (B) the office in which such CORE Sales Associate is located or otherwise affiliated, and (C) such CORE Sales Associate's total sales commissions earned in calendar year 2007.

(d)    The Home Services Companies.

(1)    Fort Dearborn Title.

(A)    Fort Dearborn Title serves as title agent for those title insurance underwriters set forth in **Schedule 4.26(d)(1)(A)** (each an "**Underwriter**" and collectively, the "**Underwriters**") pursuant to the agency agreements listed therein (each an "**Agency Agreement**" and, collectively, the "**Agency Agreements**"). True and complete copies of all Agency Agreements have been previously made available to Buyer. Except as set forth in **Schedule 4.26(d)(1)(A)**, no Agency Agreement contains any provision requiring Fort Dearborn Title to use an Underwriter's services exclusively or guarantees any minimum amount of business to an Underwriter. Except as set forth in **Schedule 4.26(d)(1)(A)**, each Agency Agreement is terminable by Fort Dearborn Title at any time without cause, cost, penalty or the consent of the Underwriter (subject to any notice period required by such Agency Agreement).

(B)    **Schedule 4.26(d)(1)(B)** sets forth a description of all claims made and asserted since January 1, 2007 against or on any policy of insurance issued by Fort Dearborn Title (whether or not such claim was made or asserted directly to or against Fort Dearborn Title) and the amount paid or expected to be paid with respect thereto.

(C)    Fort Dearborn Title is an agent in good standing of each applicable Underwriter, is not in default with respect to payment of any premiums, fees, dues and other sums due to such Underwriter, and is not in Breach of any material provisions of the applicable Agency Agreement, except for such defaults or Breaches as would not reasonably be expected to have a material adverse effect on business, operations or condition of Fort Dearborn Title.

(2)    Loan Commitments, Loan Servicing and Loan Portfolio. The Home Services Companies have no loan commitments or other commitments to fund the

purchase of real property, except as have been made by Union Trust Mortgage Services, Inc. and GHS Mortgage, LLC dba Windsor Mortgage. None of the Home Services Companies holds any home mortgage loan or interest therein in portfolio or as an investment or has any obligation, duty or responsibility to service any such loan except for the activities of Union Trust Mortgage Services, Inc. and GHS Mortgage, LLC dba Windsor Mortgage.

      (3)   Home Warranty, Inspection and Insurance Services.  The Home Services Companies do not directly issue Contracts or provide services for home warranty, home inspection or homeowners insurance, but provide such products and services exclusively on a third-party Contract basis.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby makes the following representations and warranties to Seller:

**5.1**    **Organization of Buyer**.  Buyer is duly organized and validly existing as limited liability company and in good standing under the laws of the State of Delaware and has full limited liability company power and authority to conduct its business and to own, lease and operate its properties and assets.  True and complete copies of Buyer's Organizational Documents in effect on the date hereof have been previously made available to Seller.

**5.2**    **Authorization**.  Buyer has full limited liability power and authority to execute and deliver this Agreement and to consummate the Contemplated Transactions.  The execution, delivery and performance of this Agreement by Buyer have been duly authorized by all necessary limited liability company action.  This Agreement has been duly executed and delivered by Buyer and, assuming the due execution of this Agreement by Seller, is a valid and binding obligation of Buyer, enforceable against it in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, receivership, conservatorship, reorganization, moratorium, fraudulent conveyance or other similar laws now or hereafter in effect relating to or affecting the rights and remedies of creditors generally, and general principles of equity (whether considered in a proceeding at law or in equity) and the discretion of the court before which any proceeding therefor may be brought.

**5.3**    **No Conflict or Violation**.  Except as set forth in **Schedule 5.3**, neither the execution and delivery of this Agreement nor the consummation of the Contemplated Transactions will in any material respect:

      (a)   interfere with the ability of Buyer to consummate the Contemplated Transactions;

      (b)   give any Governmental Authority the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under any Order to which Buyer, or any of the assets owned or used by Buyer, may be subject;

      (c)   result in the creation or imposition of any material Encumbrance, other than Permitted Encumbrances, on any of the property or assets of Buyer;

(d)    result in any violation of the provisions of the Organizational Documents of Buyer; or

(e)    result in any violation by Buyer of any Law or any Permit that is material to the operation of its business; or

(f)    conflict with or result in any breach which would constitute a default (or which would give rise to any right of Consent, acceleration or termination or the loss of any benefit) under any term or provision of any material Contract to which Buyer is a party.

**5.4    Governmental Approvals.**  Except as set forth in **Schedule 5.4**, no Consent of, or declaration, filing or registration with, any Governmental Authority is required to be made or obtained by Buyer on or prior to the Closing Date in connection with the execution, delivery and performance of this Agreement and the consummation of the Contemplated Transactions.

**5.5    Financial Ability.**  Buyer has sufficient funds available to it to consummate the Contemplated Transactions, including payment of the Purchase Price.

**5.6    No Brokers.**  Buyer has not employed, and is not subject to the valid claim of, any broker, finder, consultant or other intermediary in connection with the Contemplated Transactions.

**5.7    Acquisition of Ownership Interests.**  Buyer has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its purchase of the Ownership Interests.  Buyer is acquiring the Ownership Interests for investment and not with a view toward or for sale in connection with any distribution thereof, or with any present intention of distributing or selling the Ownership Interests.  Buyer agrees that the Ownership Interests may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under Securities Laws, except pursuant to an exemption from registration under such Securities Laws, and without compliance with state securities laws, in each case, to the extent applicable.  Buyer and its Representatives have been permitted access to the books and records, facilities, equipment, Tax Returns, Contracts, insurance policies (or summaries thereof) and other properties and assets of the Company Entities that it and its Representatives have desired or requested to see or review, and Buyer and its Representatives have had an opportunity to meet with the officers and employees of Seller and the Company Entities to discuss the business and financial condition of the Company Entities.

**5.8    Disclaimer.**  Except as and to the extent set forth in this Agreement or any Additional Document, Buyer makes no representation or warranty whatsoever to Seller, and Buyer hereby disclaims all liability and responsibility for any representation, warranty, statement or information not included in this Agreement or any Additional Document that was made, communicated or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been provided to Seller or its Representatives by Buyer or its Representatives).

**ARTICLE 6**
**COVENANTS OF THE SELLER PARTIES**

The Seller Parties covenant as follows for the period from the date hereof to the Closing Date (or to the end of the Employee Leasing Period or such other date as is applicable to **Section 6.7**):

**6.1**    **Maintenance of Business**.  Seller shall cause the Company Entities to, in each case in all material respects, (a) carry on their business in the ordinary course consistent with past practice, subject to any events occurring as a result of this Agreement or the Contemplated Transactions, except as contemplated or required by this Agreement and the Additional Documents, or as otherwise agreed in writing by the parties hereto and (b) use commercially reasonable efforts to maintain and preserve intact their current business organization, employees and advantageous business relationships.

**6.2**    **Certain Prohibited Transactions**.  Except as specifically permitted or contemplated by this Agreement, Seller shall not, and shall cause the Company Entities not to, without the prior written approval of Buyer, which shall not be unreasonably withheld:

(a)    change in any material respect any accounting methods used by the Company Entities except as required by GAAP;

(b)    change the Companies' or Company Subsidiaries' authorized or issued Shares or LLC Interests, as applicable; grant any option, warrant or right to purchase Shares or LLC Interests, as applicable; issue any security or instrument convertible into or exchangeable for such Shares or LLC Interests, as applicable, or take any of the foregoing actions with respect to equity securities of any Second Tier Subsidiary;

(c)    engage in or offer to make any acquisition, by means of a merger or otherwise, of any business, assets (excluding any assets acquired in the ordinary course of business consistent with past practice not in connection with the acquisition of a business), or securities, or any sale, lease or other disposition of assets (excluding any assets sold, leased or otherwise disposed of in the ordinary course of business consistent with past practice not in connection with the disposition of a business) or securities involving the payment or receipt of consideration of One Hundred Thousand Dollars ($100,000) or more individually and Two Hundred Fifty Thousand Dollars ($250,000) or more in the aggregate;

(d)    except in the ordinary course of business consistent with past practice and except in connection with actions expressly permitted pursuant to this **Section 6.2**, enter into a contract that would be a Material Contract (if it existed as of the date of this Agreement) or amend or terminate any Material Contract or grant any release or relinquishment of any material rights under any Material Contract;

(e)    assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations (other than de minimis obligations) of any other Person except a Company Entity or that will be released or extinguished prior to Closing;

(f)    incur any Indebtedness not discharged at Closing or any other material liability outside of the ordinary course of business consistent with past practice;

(g)     mortgage, pledge or otherwise similarly encumber any of its material assets (tangible or intangible), or create, assume or suffer to exist any material Encumbrances (other than Permitted Encumbrances) thereupon, other than any such Encumbrance that will be released or extinguished prior to Closing;

(h)     make any loans, advances or capital contributions to, or investments in, any Person, other than a Company Entity, except in the ordinary course of business consistent with past practice and not exceeding One Hundred Thousand Dollars ($100,000) individually or Five Hundred Thousand Dollars ($500,000) in the aggregate;

(i)     enter into, forgive, renew or amend in any respect any loans to employees, officers or directors;

(j)     (1) enter into any new, or amend, terminate or renew any existing, employment, severance, consulting or salary continuation agreements with or for the benefit of any officers, directors or employees (other than with respect to new hire employees who are not officers or directors and whose annual base salary does not exceed One Hundred Thousand Dollars ($100,000) or grant any increases in the compensation, perquisites or benefits to officers, directors or employees (other than normal increases in annual salary in the ordinary course of business consistent with past practice); (2) accelerate the vesting or payment of the compensation payable or the benefits provided or to become payable or provided to any of its current or former directors, officers or employees (other than any such acceleration required by the terms of the Company Employee Benefit Plans applicable to such individuals as in effect on the date of this Agreement), or otherwise pay any amounts not due such individual; or (3) take any action with respect to salary, compensation, benefits or other terms and conditions of employment that would reasonably be expected to result in the holder of a change in control or similar agreement identified in **Schedule 4.16(a)** having "good reason" to terminate employment and collect severance payments and benefits pursuant to such agreement;

(k)     (i) make or agree to make any capital expenditure or expenditures, or enter into any agreements or arrangements providing for capital expenditures, in each case other than those set forth in **Schedule 6.2(k)** or (ii) enter into any new line of business outside of its existing Business;

(l)     renew or enter into any non-compete, exclusivity, non-solicitation or similar agreement that would restrict or limit, in any material respect, the operations of any of the Company Entities after the Closing Date (other than any such agreement with any Franchisee renewed or entered into in the ordinary course of business consistent with past practice);

(m)     compromise, settle or agree to settle any Litigation, or consent to the same, other than compromises, settlements or agreements) in the ordinary course of business consistent with past practice that involve only the payment of monetary damages not in excess of One Hundred Thousand Dollars ($100,000) individually or Five Hundred Thousand Dollars ($500,000) in the aggregate or consistent with the reserves reflected in the 2007 Balance Sheets, in any case without the imposition of material equitable relief on, or the admission of wrongdoing by, any Company Entity; provided that notwithstanding the foregoing no compromise, settlement or agreement with respect to the dispute identified in item (b) of

-44-

Schedule 4.26(b)(2)(E) shall be agreed to without the prior written consent of Buyer (not to be unreasonably withheld);

        (n)     amend the Organizational Documents of any of the Company Entities;

        (o)     materially change or modify any General Business Practices;

        (p)     take any action intended to, or which otherwise will, cause any of the representations and warranties set forth in **Article 4** to be not true and correct in all material respects as of the Closing Date (or such other date as specified therein);

        (q)     enter into any transaction with a Franchisee other than in the ordinary course of business consistent with past practice (other than sourcing mortgage business with any Franchisee) or (except with the consent of the Buyer, which shall not be unreasonably denied) grant any material waiver or consent pursuant to any Franchise Agreement, Franchise Financing Agreement or Franchise Operating Loan; or

        (r)     authorize, commit or agree to take any of the foregoing actions.

      **6.3**    **Access and Consultation.**  Seller shall allow Buyer during regular business hours and following receipt of reasonable prior written notice, through Buyer's Representatives (a) (i) to make such reasonable investigation of the business, properties, books and records of the Company Entities, (ii) to conduct such reasonable examination of the condition of the Company Entities, and (iii) to engage in discussions with the officers and employees of the Company Entities in the case of each of clauses (i), (ii) and (iii) as is reasonably necessary or advisable for purposes of the Contemplated Transactions or integration of the Business into Buyer's operations following the Closing; and (b) and with the participation of Representatives of GMAC Home Services, LLC, to engage in discussions with customers of the Relocation Companies as is reasonably requested for purposes of completing the Contemplated Transactions; provided, however, that neither Seller nor any Company Entity shall be obligated to provide Buyer with any information relating to trade secrets, or which is commercially sensitive, or which would violate any Law or term of any Contract, or if the provision thereof would adversely affect the ability to assert attorney-client, attorney work product or other similar privilege (collectively, "Sensitive Information"). Seller shall provide Buyer with regular progress reports, and consult with Buyer regarding the progress and strategy to be pursued, with respect to the dispute identified in item (b) of **Schedule 4.26(b)(2)(E).** Any disclosure whatsoever during any investigation by Buyer shall not constitute an enlargement or a diminution of the representations or warranties of Seller beyond those specifically set forth in this Agreement. All information and access given Buyer and its Representatives shall be subject to the terms and conditions of the Confidentiality Agreement.

      **6.4**    **No Solicitation.**  The Seller Parties agree that none of the Seller Parties, the Company Entities or their respective Affiliates, nor any of their respective Representatives, during the period commencing with the execution and delivery hereof and terminating upon the earlier to occur of the Closing Date or the termination of this Agreement pursuant to and in accordance with **Section 13.1,** shall (i) submit, knowingly solicit, initiate, knowingly encourage or discuss any proposal or offer from any Person or enter into any agreement or accept any offer

relating to any (a) reorganization, liquidation, dissolution or recapitalization of any of the Company Entities, their Business or any portion thereof, (b) engage in a merger or consolidation involving any of the Company Entities or Seller, (c) purchase or sell of any LLC Interests or Shares of the Company Entities or Seller or substantially all of the assets of the Company Entities or (d) engage in similar transactions or business combinations involving a change in ownership of the Company Entities or their respective Businesses (the foregoing items (a) through (d) collectively referred to herein as a "Business Sale"), or (ii) furnish any information with respect to, assist or participate in or facilitate in any other manner any effort or attempt by any Person to do or seek to do any of the foregoing. The Seller Parties represent and warrant that (i) none of them nor any of the Company Entities is a party to or bound by any agreement with respect to a Business Sale other than this Agreement and (ii) the Seller Parties and the Company Entities have terminated all discussions with third parties regarding any of the foregoing and shall notify Buyer immediately if any Person makes any proposal, offer, inquiry or contact with respect to any of the foregoing. Without limiting the foregoing, it is agreed that any violation of the restrictions set forth in this **Section 6.4** by any Affiliate of any Seller Party or Company Entity, or any of their respective Representatives, shall be a Breach of this **Section 6.4** by the Seller Parties. The Seller Parties acknowledge and agree, that in the event of a Breach of this **Section 6.4**, if there has been no Breach of this Agreement by Buyer that would allow the Seller Parties to terminate under **Section 13.1(b)** and Buyer terminates this Agreement under **Section 13.1(b)** due to a Breach of **Section 6.4**, then upon the written demand of Buyer, and in addition to any other remedies which may be available to Buyer in equity or at law, the Seller Parties and the Company Entities will be jointly and severally liable to reimburse Buyer and its Affiliates, for all reasonable out-of-pocket costs and expenses incurred in connection with the investigation, negotiation, structuring, documentation and contemplated consummation of the Contemplated Transactions, whether incurred before or after the entry into this Agreement.

6.5   **Third-Party Consents**.   Seller shall, and shall cause the Company Entities to (a) use commercially reasonable efforts in attempting to secure any Consents from third parties identified in **Schedule 4.10** and (b) cooperate with Buyer in obtaining any Consents from third parties identified in **Schedule 5.3**.

6.6   **Resignation of Directors**.   Seller shall use commercially reasonable efforts to obtain and deliver to Buyer on or before the Closing the resignation of the managers and directors of each Company Entity, as applicable, and such officers of each Company Entity, and in the event that the GHS Indebtedness Option is exercised, GHS Indebtedness Newco as specified in writing by Buyer not less than ten (10) days prior to the Closing.

6.7   **Employees**.

(a)   Prior to the Closing Date, the employment of all U.S. employees of the Company Entities and the Transferred Employees (the "Leased Employees") will be transferred to one of the Seller Parties or their Affiliates (the "Employee Leasing Company"). The Seller Parties shall lease the Leased Employees to the Buyer in accordance with the terms of the Transition Agreement. While the employee leasing arrangement remains in effect (the "Employee Leasing Period"), the Seller Parties shall cause each Leased Employee to be eligible to participate in the Company Employee Benefit Plans on the same terms and conditions applicable to similarly situated peer employees of the Seller Parties and their Affiliates. Upon

-46-

the expiration of the Employee Leasing Period, the Seller Parties shall cause the Employee Leasing Company to terminate the employment of all Leased Employees and allow Buyer and/or its Affiliates to offer employment to any or all of the Leased Employees.

(b)    The Seller Parties shall cause the GMAC LLC Retirement Savings Plan ("Seller 401(k) Plan") to allow each Leased Employee who becomes an employee of Buyer or an ERISA Affiliate of Buyer to elect to have such Leased Employee's outstanding participant loans under the Seller's 401(k) Plan transferred in a direct rollover to the trustee of the trust maintained under an existing or newly-established qualified defined contribution plan established or maintained by Buyer or one of its ERISA Affiliates ("Buyer 401(k) Plan"); provided that such direct rollover election is made within fifteen (15) days following the expiration of the Employee Leasing Period and the Leased Employee elects to transfer his entire account balance to the Buyer 401(k) Plan.

(c)    The Seller Parties shall provide each Leased Employee with full vesting of any award or benefit under any Company Benefit Plan where such vesting was otherwise conditioned upon the future performance of services with the Seller Parties or their Affiliates, including under any Company Qualified Plan and under any related non-qualified plan. The Seller Parties shall pay in full, on or prior to the expiration of the Employee Leasing Period, all compensation and benefits with respect to any such Leased Employee who accepts employment with the Buyer or any of its ERISA Affiliates which were deferred at any time prior to the expiration of the Employee Leasing Period by any Company Entity or Seller Party or any such Leased Employee, to the extent provided under the terms of the respective Company Benefit Plan under which such compensation or benefits were deferred.

(d)    This Section 6.7 shall be binding upon and inure solely to the benefit of each of the parties to this Agreement, and nothing in this Section 6.7, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Section 6.7.

## ARTICLE 7
## COVENANTS OF BUYER

7.1    **Third-Party Consents**. Buyer shall (a) use commercially reasonable efforts in attempting to secure any Consents from third parties identified in **Schedule 5.3** and (b) cooperate with Seller and the Company Entities in obtaining any Consents from third parties identified in **Schedule 4.10**.

7.2    **Employees**.

(a)    Upon the expiration of the Employee Leasing Period, the Buyer or its Affiliates may make offers of employment to all of the Leased Employees. Such offers, if any, may be made not later than five (5) Business Days prior to the expiration of the Employee Leasing Period.

(b)    As soon as practical after the expiration of the Employee Leasing Period, the Buyer shall cause the trustee of the trust maintained under the Buyer 401(k) Plan to accept direct rollovers that include the outstanding participant loans under the Seller 401(k) Plan of any

1473249\V.19                                      -47-

Leased Employee who becomes an employee of Buyer or any of its ERISA Affiliates at the expiration of the Employee Leasing Period; provided that such direct rollover election is made within fifteen (15) days following the expiration of the Employee Leasing Period and the Leased Employee elects to transfer his entire account balance to the Buyer 401(k) Plan.

(c)    Effective upon the expiration of the Employee Leasing Period, Buyer shall assume the responsibility for providing continuation of group health care coverage required to be provided under Sections 601 through 607 of ERISA and 4980B of the Code ("COBRA") with respect to each Leased Employee and each dependent of any Leased Employee who has a qualifying event (as defined in Section 603 of ERISA and Section 4980B(f)(3) of the Code) after the Closing Date.

(d)    This Section 7.2 shall be binding upon and inure solely to the benefit of each of the parties to this Agreement, and nothing in this Section 7.2, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Section 7.2.

## ARTICLE 8
## OTHER COVENANTS

**8.1    Confidentiality.**  The parties to this Agreement hereby agree to be bound by and comply with the terms of the Confidentiality Agreement, which shall continue in full force and effect until the Closing Date, such that the information obtained by any party to this Agreement, or its officers, employees, agents or representatives, during any investigation conducted pursuant to this Agreement, or in connection with the negotiation and execution of this Agreement or the consummation of the Contemplated Transactions, or otherwise, shall be governed by the terms of the Confidentiality Agreement.

**8.2    Efforts; Consents; Regulatory and Other Authorizations.**

(a)    Each party to this Agreement shall use its commercially reasonable efforts to (i) take, or cause to be taken, all appropriate action, and do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to promptly consummate and make effective the Contemplated Transactions; (ii) obtain all authorizations, Consents, Orders and approvals of, and give all notices to and make all filings with, all Governmental Authorities and other third parties that may be or become necessary for the performance of its obligations under this Agreement and the consummation of the Contemplated Transactions, including those Consents set forth in the Disclosure Schedules; (iii) fulfill all conditions to such party's obligations under this Agreement and the Additional Documents as promptly as practicable. Each party to this Agreement shall cooperate fully with the other parties to this Agreement in promptly seeking to obtain all such authorizations, Consents, Orders and approvals, giving such notices, and making such filings. Notwithstanding the foregoing or anything to the contrary set forth in this Agreement, in connection with obtaining such Consents from third parties, no party to this Agreement shall be required to make payments (other than filing, license or similar fees required pursuant to Law), commence Litigation or agree to material modifications of the terms and conditions of any agreements with third parties. The parties to this Agreement shall not take

-48-

any action that is reasonably likely to have the effect of unreasonably delaying, impairing or impeding the receipt of any required authorizations, Consents, Orders or approvals.

(b)     Notwithstanding anything in this Agreement to the contrary, neither Buyer nor any of its Affiliates shall be under any obligation to make proposals, execute or carry out agreements or submit to Orders providing for the sale or other disposition or holding separate (through the establishment of a trust or otherwise) of any assets or categories of assets of Buyer, any of its Affiliates, or any of the Company Entities or any of their Affiliates, or seeking to impose any material limitation on the ability of Buyer or any of its Affiliates to conduct their business or own such assets or to acquire, hold or exercise full rights of ownership of any of the Company Entities.

8.3     **Notification of Certain Matters**.  Seller shall give prompt notice to Buyer, and Buyer shall give prompt notice to Seller, of the occurrence or non-occurrence of any event, that is likely to result in the failure of a condition set forth in **Articles 9 or 10**; provided, however, that the delivery of any notice pursuant to this **Section 8.3** shall not limit or otherwise affect the remedies available hereunder to any of the parties receiving such notice.

8.4     **Restrictive Covenants**.    In consideration of the consummation of the Contemplated Transactions and the payment of consideration to Seller set forth herein, the Seller Parties covenant with Buyer as follows:

(a)     Restrictions.  The Seller Parties acknowledge that Buyer will pay valuable consideration pursuant to the Contemplated Transactions, and a key asset of the Company Entities are their customer and supplier lists, distribution records, know-how, goodwill and other proprietary business information and trade secrets.  The use by any of the Seller Parties or their Subsidiaries or Controlled Affiliates of these relationships and such confidential information in a business or activity which competes with the Company Entities would provide the competing business with an unfair advantage over the Company Entities, and accordingly, unfairly devalue the investment being made by Buyer pursuant to the Contemplated Transactions and otherwise in the Company Entities and their Business.  Accordingly, Buyer wishes to restrict the use of such information by the Seller Parties and their Subsidiaries and their respective ability to compete with Company Entities as set forth in this **Section 8.4**.  Each of the Seller Parties, on behalf of itself and its Subsidiaries, agrees to comply with the terms of this **Section 8.4**, all of which are reasonable and necessary to protect the confidential business information and trade secrets being acquired by Buyer and to prevent any unfair advantage from being conferred upon a directly competing business of a Buyer, as set forth below.

(b)     Non-competition.  For a period of three (3) years from the Closing Date, none of the Seller Parties nor any of their Subsidiaries shall, either alone or as a stockholder, partner, member, associate, consultant, owner, agent, creditor or co-venturer of any other Person, or in any other capacity, engage in the Business; provided, however, that nothing herein shall prohibit any of the Seller Parties or their respective Subsidiaries from (i) being an owner of not more than five percent (5%) of the outstanding stock of any class of a corporation which is publicly traded, so long as none of such Seller Party or its Subsidiaries or Controlled Affiliates actively participates in the business of such corporation; (ii) engaging in the business of originating, acquiring, servicing, selling or securitizing residential mortgages or (iii), subject to

-49-

**Section 8.7**, operating, handling or managing real estate owned and other properties owned from time to time, including engaging real estate brokers to sell such properties.

(c)    <u>Non-Interference with Business Relations</u>.  For a period of three (3) years after the Closing Date, none of the Seller Parties nor any of their Subsidiaries or Controlled Affiliates shall solicit, induce or attempt to solicit or induce any customer, supplier, licensee or other business relation of the Company Entity to cease doing business with such Company Entity, or in any way interfere with any such business relation, subject in each case to the proviso set forth in **Section 8.4(b)**.

(d)    <u>Solicitation of Employees</u>.  For a period of three (3) years after the Closing Date except as expressly contemplated by **Section 6.7**, none of the Seller Parties nor any of their Subsidiaries shall, directly or indirectly, either alone or as a stockholder, partner, member, consultant, adviser, owner, associate, agent, creditor, or co-venturer of any other Person, or in any other capacity, solicit, hire, attempt to solicit or hire, or participate in any attempt to solicit or hire any Person who was a Leased Employee or independent consultant of any Company Entity as of the Closing Date or was an employee or independent consultant of any Company Entity at any time within the six month period prior thereto other than pursuant to a general advertisement not specifically targeted at, or designed to solicit, any current or former employee or consultant of the Company, subject in each case to the proviso set forth in Section 8.4(b).

(e)    <u>Referral of Business</u>.  For a period of eighteen months after the Closing Date, each of the Seller Parties will refer, and will cause their Subsidiaries and Controlled Affiliates, to refer all customer and franchisee inquiries related to the Business to the Buyer by informing such inquiring parties that the Business has been transferred to Buyer and that Buyer may be contacted at a number, address or e-mail address provided by Buyer.

(f)    <u>Confidential Information</u>.  Each of the Seller Parties recognizes that Buyer's business interests require the protection and confidential treatment of all information not generally known within the relevant trade group or by the public, including all documents, writings, memoranda, business plans, illustrations, designs, plans, processes, programs, inventions, computer software, reports, sources of supply, customer lists, supplier lists, trade secrets and all other valuable or unique information and techniques acquired, developed or used by the Seller Parties or the Company Entities in connection with the Business (hereinafter collectively termed "<u>Protected Information</u>").  Each of the Seller Parties expressly acknowledges and agrees that, following the Closing, Protected Information constitutes trade secrets and confidential and proprietary business information of Buyer and the Company Entities.  Protected Information shall not include information which is or becomes part of the public domain through no Breach of this Agreement by any of the Seller Parties.  Protected Information shall include the terms, conditions and existence of this Agreement and the Additional Documents and the transactions contemplated hereby and thereby except to the extent that disclosure of such terms and conditions is required to be made by applicable Securities Laws.  Each of the Seller Parties agrees (and shall cause its Subsidiaries and Controlled Subsidiaries), following the Closing, to keep secret and to treat confidentially and not to use, divulge, disclose or otherwise disseminate to any other Person nor use in any manner for purposes or benefit of any Person other than Buyer and the Company Entities any Protected Information, and not to use or aid others in using any

-50-

such Protected Information in competition with Buyer or any Company Entity except to the extent that disclosure is required by Law (it being understood that Protected Information may be used by the Seller Parties and their Affiliates and Controlled Subsidiaries to defend any Litigation, claim or dispute relating to activities of the Business prior to Closing); provided, however, that each of the Seller Parties, as applicable, shall provide Buyer with notice as far in advance of any required disclosure as is practicable in order for Buyer to obtain an order or other assurance that any information required to be disclosed will be treated as Protected Information and each of the Seller Parties shall use all commercially reasonable efforts to cooperate with Buyer in connection therewith and in furtherance thereof. This obligation of non-disclosure of Protected Information shall continue with respect to each item of Protected Information for so long as such information remains Protected Information.

(g)    Scope. If, at the time of enforcement of this Section 8.4, a court shall hold that the duration, scope or area restrictions stated herein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area.

(h)    Remedies. Each of the Seller Parties agrees that if it shall commit or threaten to commit a breach of any of the covenants and agreements contained in this Section 8.4 or any other provision in this Agreement, then Buyer shall have the right to seek all appropriate injunctive and other equitable remedies therefor against such breaching party, in addition to any other rights and remedies that may be available at law, it being acknowledged and agreed that any such breach would cause irreparable injury to Buyer and that money damages would not provide an adequate remedy therefor.

8.5    GM Relocation Agreements. ResCap agrees that for each of (a) the twelve-month period ending on the first anniversary of the Closing Date and (b) the six month period ending on the eighteen month anniversary of the Closing Date, if (i) General Motors Corporation, GMAC, LLC, or any of their respective Affiliates exercise their right to terminate for convenience any GM Relocation Agreement in accordance with its terms or (ii) General Motors Corporation, GMAC, LLC or any of their respective Affiliates perform in-house or obtain from a third-party provider other than the Relocation Companies or other Affiliates of Buyer a substantial portion of the services that would otherwise be provided by the Relocation Companies under the GM Relocation Agreements, then, if such event occurs within such twelve-month period, ResCap shall pay Buyer the difference between the actual aggregate revenue earned by the Relocation Companies under the GM Relocation Agreements during such twelve-month period and Seven Million Dollars ($7,000,000) and, if such event occurs during such six-month period, then ResCap shall pay Buyer the difference between the actual aggregate revenue earned by the Relocation Companies under the GM Relocation Agreements during such six-month period and Three Million Dollars ($3,000,000); provided, however, that in no event shall the aggregate liability of ResCap hereunder exceed Seven Million Dollars ($7,000,000). Within thirty (30) days after such twelve-month period and such six-month period, Buyer shall deliver to ResCap an accounting of the aggregate revenue earned by the Relocation Companies under the GM Relocation Agreements during such period. Such accounting shall be subject to review and audit by ResCap in the same manner as contemplated (and be subject to the same procedures regarding notice and resolution of disputes) in Section 2.3(e). ResCap shall pay Buyer any such difference properly set forth in such accounting in accordance with this Section 8.5 within thirty

(30) days after delivery of such accounting or promptly after the resolution of any disputed amount; provided, that if ResCap fails to make such payment, Buyer may offset such payment against any payments due from Buyer to any Seller Party pursuant to Section 2.4(c) or the servicing section of the Transition Agreement.

**8.6    Certain Franchisees.**

(a)    ResCap agrees that if, during the six-month period after the Closing Date (the "Protected Period"), any of the Franchisees listed in **Schedule 8.6(a)** (each, a "Special Franchisee") gives Buyer written notice of an intention to terminate its respective Franchise Agreement and:

(1)    (A) the Franchise Agreement with a Special Franchisee is actually terminated during the Protected Period, and (B) the aggregate revenue earned by Buyer for fees or royalties paid by the Special Franchisees attributable to the Protected Period is less than Seven Hundred Fifty Thousand Dollars ($750,000), then ResCap shall pay Buyer the difference between the actual aggregate revenue earned by Buyer for fees or royalties paid by the Special Franchisees attributable to the Protected Period and Seven Hundred Fifty Thousand Dollars ($750,000). If a Special Franchisee actually terminates during the Protected Period, then within thirty (30) days after the end of the Protected Period, Buyer shall deliver to ResCap an accounting of the aggregate revenue earned by Buyer for the fees or royalties paid by the Special Franchisees attributable to the Protected Period. Such accounting shall be subject to review and audit by ResCap in the same manner contemplated (and be subject to the same procedures regarding notice and resolution of disputes) in **Section 2.3(e)**. ResCap shall pay Buyer any such difference properly set forth in such accounting in accordance with this **Section 8.6(a)(1)** within thirty (30) days after delivery of such accounting or promptly after the resolution of any disputed amount; provided, that if ResCap fails to make such payment, Buyer may offset or recoup such payment against any payments due from Buyer to any Seller Party pursuant to **Section 2.4(b)**, **Section 2.4(c)** or the servicing section of the Transition Agreement; or

(2)    (A) Buyer enters into good faith negotiations with a Special Franchisee to continue its Franchise Agreement, Buyer is not otherwise in material default under such Franchise Agreement and such agreement is not actually terminated within the Protected Period and (B) Buyer incurs extraordinary expenses during such period in its efforts to continue such Franchise Agreement, then ResCap shall reimburse Buyer for such extraordinary expenses, up to a maximum of Seven Hundred Fifty Thousand Dollars ($750,000). Within thirty (30) days after the Protected Period, Buyer shall deliver to ResCap an accounting of the aggregate amount of such extraordinary expenses spent during the Protected Period. Such accounting shall be subject to review and audit by ResCap in the same manner contemplated (and be subject to the same procedures regarding notice and resolution of disputes) in **Section 2.3(e)**. ResCap shall pay Buyer for any such extraordinary expenses properly set forth in such accounting in accordance with this **Section 8.6(a)(2)** within thirty (30) days after delivery of such accounting or promptly after the resolution of any disputed amount; provided, that if ResCap fails to make such payment, Buyer may offset or recoup such payment against any payments due from Buyer to any Seller Party pursuant to **Section 2.4(b)**, **Section 2.4(c)** or the servicing section of the Transition Agreement.

(b)   For the avoidance of doubt, in no event shall the aggregate amount paid by ResCap to Buyer under this **Section 8.6** exceed Seven Hundred Fifty Thousand Dollars ($750,000).

**8.7   REO Referrals.**  For a period of three (3) years from the Closing Date, ResCap agrees to use commercially reasonable efforts to continue the referral process in effect as of the date hereof with GMAC Home Services, LLC for the referral of real estate asset management work to Franchisees; *provided, however,* that such Franchisees continue to provide during such three-year period the same capability and effectiveness in the resolution of residential real estate problem assets as was provided during the period immediately prior to the Closing;  and provided, that nothing herein shall obligate ResCap to continue in any line of business or continue a relationship with any specific customer or Franchisee.

**8.8   Excluded Relocation Receivables.**  At Closing, Seller shall deliver to Buyer a schedule of all Excluded Relocation Receivables as of the last day of the month prior to the month in which such schedule is being delivered (the "Preliminary Excluded Receivables Schedule"), listing (a) the account debtor, (b) the amount of each such Excluded Relocation Receivable and (c) an aging schedule with respect to such Excluded Relocation Receivable. Within thirty (30) days after the Closing Date, Buyer shall cause to be delivered to Seller a schedule of all Excluded Relocation Receivables as of the Closing Date (the "Final Excluded Receivables Schedule"), listing the same type of information as that required on the Preliminary Excluded Receivables Schedule.  Such Final Excluded Receivables Schedule shall be subject to review and audit by Seller in the same manner contemplated (and be subject to the same procedures regarding notice and resolution of disputes) in **Section 2.3(c)**.

**8.9   GM Amendments.**  Seller shall use its commercially reasonable efforts to obtain the GM Amendments.

**8.10   Financing.**  Buyer shall use its commercially reasonable efforts to obtain at least $200,000,000 of debt financing on terms and conditions reasonably satisfactory to Buyer.

**8.11   Canadian Franchise Litigation.**  Following the Closing, Buyer shall cause the appropriate Company Entities to continue to diligently and in good faith defend the Litigation identified as item (b) on **Schedule 4.26(b)(2)(E)**, and not settle such Litigation without the consent of Seller which shall not be unreasonably withheld and which shall only be required with respect to any matter for which Seller has an indemnification obligation under **Section 12.2(e)**. Buyer provide Seller with regular progress reports and consult with Seller regarding progress and strategy of such Litigation.

## ARTICLE 9
## CONDITIONS TO THE  SELLER PARTIES' OBLIGATIONS

The obligations of Seller to consummate the Contemplated Transactions on the Closing Date are subject, in the discretion of Seller, to the satisfaction or waiver in writing, on or prior to the Closing Date, of each of the following conditions:

**9.1   Representations, Warranties and Covenants.**  All representations and warranties of Buyer contained in this Agreement shall be true and correct as of the date of this

Agreement and as of the Closing Date as though made on and as of the Closing Date (or on the date when made in the case of any representation and warranty which specifically relates to an earlier date), except as otherwise consented to in writing by Seller and except for the failure or failures of such representations and warranties to be so true and correct that (after excluding any effect of materiality qualifications as set forth in any such representation or warranty), in the aggregate, has not resulted in, or would not reasonably be expected to result in, a material adverse effect on Buyer's ability to consummate the Contemplated Transactions, and Buyer shall have performed in all material respects all agreements and covenants as required hereby to be performed by it prior to or at the Closing Date. There shall be delivered to Seller a certificate (signed by the President of Buyer, or by an individual with similar authority) to the foregoing effect.

**9.2    Consents.** All Consents and Permits from Governmental Authorities or third parties necessary to permit Seller to consummate the Contemplated Transactions shall have been obtained, except for such Consents and Permits the absence of which would not prohibit the consummation of such transactions or render such consummation illegal.

**9.3    No Governmental Orders.** Neither of the parties hereto shall be subject to any Order of a Governmental Authority which enjoins or prohibits or makes illegal the consummation of this Agreement or the Contemplated Transactions or which conditions the consummation of this Agreement or the Contemplated Transactions in such a manner as would reasonably be expected to have a Material Adverse Effect following the consummation of the Contemplated Transactions.

**9.4    No Governmental Litigation.** There shall not be any pending or threatened Litigation in which a Governmental Authority is, or is threatened to become, a party and no party hereto shall have received any written or other communication from any Governmental Authority in which such Governmental Authority indicates the possibility of commencing any Litigation or taking any other action (a) challenging or seeking to restrain or prohibit the consummation of the Contemplated Transactions; (b) relating to the Contemplated Transactions and seeking to obtain from Seller or its Affiliates any damages or other relief that may be material to Seller; or (c) seeking to compel Seller or any of its Affiliates to dispose of or hold separate any material assets as a result of the Contemplated Transactions.

**9.5    Deliveries.** All payments, escrow, deposits, documents or instruments required to be delivered by Buyer at or prior to the Closing Date shall have been delivered to Seller.

**9.6    Certificates.** Buyer will furnish Seller with such certificates of its officers, directors and others to evidence compliance with the conditions set forth in this **Article 9** as may be reasonably requested by Seller.

**ARTICLE 10**
**CONDITIONS TO BUYER'S OBLIGATIONS**

The obligations of Buyer to consummate the Contemplated Transactions on the Closing Date are subject, in the discretion of Buyer, to the satisfaction or waiver, on or prior to the Closing Date, of each of the following conditions:

**10.1    Representations, Warranties and Covenants.**    All representations and warranties of the Seller Parties contained in this Agreement shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (or on the date when made in the case of any representation and warranty which specifically relates to an earlier date), except as consented to in writing by Buyer and except for the failure or failures of such representations and warranties to be so true and correct (after excluding any effect of materiality qualifications set forth in any such representation or warranty) that, in the aggregate, has not resulted in a Material Adverse Effect, and the Seller Parties shall have performed in all material respects all agreements and covenants required hereby to be performed by the Seller Parties prior to or at the Closing Date.    There shall be delivered to Buyer a certificate (signed by the President of Seller, or by an individual with similar authority) to the foregoing effect.

**10.2    Consents.**    All Consents and Permits from Governmental Authorities or third parties either (x) set forth on Schedule 10.2 or (y) otherwise necessary to permit Buyer to consummate the Contemplated Transactions shall have been obtained, except for such Consents and Permits pursuant to clause (y) the absence of which would not prohibit the consummation of such transactions, render such consummation illegal or otherwise cause a Material Adverse Effect.

**10.3    No Governmental Orders.**    Neither of the parties hereto shall be subject to any Order of a Governmental Authority which enjoins or prohibits or makes illegal the consummation of this Agreement or the Contemplated Transactions or which conditions the consummation of this Agreement or the Contemplated Transactions in such a manner as would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect or a material adverse effect on the financial condition, business or results of operations of Buyer following the consummation of the Contemplated Transactions.

**10.4    No Governmental Litigation.**    There shall not be any pending or threatened Litigation in which a Governmental Authority is, or is threatened to become, a party and no party hereto shall have received any written or other communication from any Governmental Authority in which such Governmental Authority indicates the possibility of commencing any Litigation or taking any other action (a) challenging or seeking to restrain or prohibit the consummation of the Contemplated Transactions; (b) relating to the Contemplated Transactions and seeking to obtain from Buyer or its Affiliates any damages or other relief that may be material to Buyer; or (c) seeking to compel Buyer or any of its Affiliates to dispose of or hold separate any material assets as a result of the Contemplated Transactions.

**10.5    Minimum Cash Requirement.**    GHS Relocation UK, GMAC Global Relocation Services PTE LTD and GMAC Global Relocation Services Consulting (Shanghai) Company Limited shall have cash assets in an aggregate amount of not less than Three Million Five Hundred Thousand Dollars ($3,500,000) nor more than Five Million Dollars ($5,000,000).

**10.6    Financing.**    Buyer shall have available for draw on or immediately prior to the Closing at least $200,000,000 of debt financing on terms and conditions reasonably satisfactory to Buyer.

**10.7    GHS Indebtedness.** The aggregate amount of the GHS Indebtedness shall not be less than Five Hundred Million Dollars ($500,000,000). There shall be delivered to Buyer a certificate (signed by the President of ResCap, or by an individual with similar authority) to the foregoing effect..

**10.8    Deliveries.** All payments, escrow, deposits, documents or instruments required to be delivered by Seller at or prior to the Closing Date shall have been delivered to Buyer.

**10.9    Certificates.** Seller shall furnish Buyer with such certificates of its officers, managers and others to evidence compliance with the conditions set forth in this Article 10 as may be reasonably requested by Buyer.

<h1 style="text-align:center">ARTICLE 11<br>TAX MATTERS</h1>

**11.1    Tax Periods.** The parties shall, to the extent permitted by applicable Law, cause each Tax period of the Company Entities that begins on or before the Closing Date to end as of the end of the day on the Closing Date.

**11.2    Tax Returns.**

(a)    Seller shall cause to be prepared and timely filed all Tax Returns of the Company Entities for Tax periods that end on or before the Closing Date (a "Pre-Closing Period") that are due (taking into account extensions) after the Closing Date. All such Pre-Closing Period Tax Returns shall be prepared on a basis consistent with the past practices of the Company Entities, as the case may be, unless otherwise required by Law (as reasonably determined by Seller).

(b)    Buyer shall cause to be prepared and filed all Tax Returns relating to Straddle Periods. All such Tax Returns shall be prepared on a basis consistent with the past practices of the Companies, unless otherwise required by Law. Buyer shall provide Seller with copies of such Tax Returns that relate to the Straddle Period at least fifteen (15) days before filing for Seller's review and comment. Seller shall have ten (10) days to comment on each such Tax Return to the extent related to any Straddle Periods. If Seller delivers written comments to Buyer within the applicable ten-day period, Buyer shall consider such written comments in good faith, and Buyer and Seller shall negotiate in good faith in order to resolve any material disputes with respect to such Tax Return.

**11.3    Tax Indemnification Apportionment.** Seller Parties shall be responsible, jointly and severally, for payment of Taxes that relate to the Company Entities for all Pre-Closing Periods and that portion of a Straddle Period that ends on, and includes, the Closing Date. Buyer shall be responsible for payment of Taxes that relate to the Company Entities for that portion of a Straddle Period that begins after the Closing Date and otherwise for all Taxes that relate to the Business after Closing. For purposes of determining the amount for which each party is responsible, with respect to a Straddle Period, the following rules of apportionment shall apply: (a) real and personal property Taxes for the taxable period that includes the Closing Date shall be

prorated between Buyer and Seller Parties, with such Taxes being borne by Seller Parties based on the ratio of the number of days in the relevant period prior to and including the Closing Date to the total number of days in the actual taxable period with respect to which such Taxes are assessed, and being borne by Buyer based on the ratio of the number of days in the relevant period after the Closing Date to the total number of days in the actual taxable period with respect to which such Taxes are assessed, irrespective of when such Taxes are due, become a lien or are assessed; (b) sales and use Tax shall be deemed to accrue as property is purchased, sold, used, or transferred; and (c) all other Taxes shall accrue in accordance with GAAP; except for income Tax or Tax measured by receipts, which shall accrue by way of a closing of the books, as though the relevant taxable period had ended on the Closing Date. In addition, Seller Parties shall not be responsible for Taxes arising on the Closing Date attributable to any actions or events, not in the ordinary course of business, that take place (or are deemed to take place) after the Closing on the Closing Date (including any deemed sale of assets resulting from an election under Section 338 of the Code or any similar provision of state, local or foreign Law).

**11.4    Cooperation; Records.**

(a)    Buyer and Seller shall reasonably cooperate with each other in a timely manner in the preparation and filing of any Tax Returns and the conduct of any Tax audit or other Tax proceeding. Each party shall execute and deliver such powers of attorney and make available such other documents as are reasonably necessary to carry out the intent of this Article 11.

(b)    Buyer shall retain copies of all reports, returns or records relating to Pre-Closing Periods and Straddle Periods (including supporting schedules and data) until such time as Buyer is no longer entitled to any indemnification for Taxes pursuant to Section 12.2.

**11.5    Tax Proceedings.**  Buyer shall promptly notify Seller of any notice of Tax audit or deficiency relating to a Pre-Closing Period or Straddle Period of any of the Company Entities for which Buyer may be entitled to indemnification under Section 12.2 (a "Tax Liability Issue"). Seller shall have the right to control the conduct of any audit or proceeding relating to a Tax Liability Issue (a "Pre-Closing Proceeding") and shall provide Buyer with copies of all written communications relating to such proceeding. In addition, Buyer shall have the right to participate in any Pre-Closing Proceeding and have its counsel present at any meetings relating thereto.

**11.6    Refunds; Amendments.**

(a)    Any Tax refunds that are received by Buyer or the Company Entities relating to Pre-Closing Periods or the portion of any Straddle Period ending on, and including, the Closing Date, and any amounts credited against Taxes to which Buyer or the Company Entities become entitled, that relate to such periods shall be paid over to Seller. Buyer shall pay over to Seller any such refund or the amount of any such credit within ten (10) days after (i) the receipt of any such refund or (ii) the application of such credit against a Tax, as applicable.

(b)    No amended Tax Return of any Company Entity with respect to any Pre-Closing or Straddle Period shall be filed unless required by Law, and Buyer hereby agrees with

respect to each acquired Company Entity to elect to waive the carryback period for losses as set forth in Section 172(b)(3) of the Code.

## ARTICLE 12
## INDEMNIFICATION

**12.1**   **Survival of Representations and Warranties and Covenants.**   All of the representations and warranties of the Seller Parties contained in Article 4 (other than **Sections 4.1, 4.2, 4.3, 4.15, 4.16** and **4.18**), and all of the representations and warranties of Buyer contained in Article 5 (other than **Sections 5.1, 5.2** and **5.6**), shall survive the Closing hereunder and continue in full force and effect for a period of eighteen (18) months thereafter (the "General Survival Period") and, except as otherwise provided in this **Section 12.1**, no Person may seek indemnification under this **Article 12** with respect to a breach of a representation or warranty after the expiration of the General Survival Period.  The representations and warranties of the Seller Parties contained in **Sections 4.1, 4.2, 4.3, 4.15, 4.16** and **4.18** hereof and of the Buyer contained in **Sections 5.1, 5.2** and **5.6** shall survive the Closing and continue in full force and effect until the expiration of the applicable statutes of limitations (after giving effect to any extensions or waivers) plus 60 days and, except as otherwise provided in this **Section 12.1**, no Person may seek indemnification under this **Article 12** with respect to a Breach of a representation or warranty contained in any such Sections after the expiration of such period. The foregoing limitations shall not apply with respect to those specific pending claims for indemnification for which the requisite written notice was given by either party to the other party on or prior to the end of the General Survival Period or the applicable period with respect to a claim involving any of the Sections specified in the second sentence of this **Section 12.1**, for which the requisite written notice shall effectively toll such time limitations until such specific claims are resolved.  The parties' respective covenants and agreements to be performed at or after the Closing Date contained in this Agreement shall survive indefinitely unless otherwise set forth herein; provided, however, that any such survival shall not be deemed, directly or indirectly, to affect the General Survival Period or other survival period specifically applicable to claims with respect to representations and warranties.

**12.2**   **Indemnification by the Seller Parties.**   Subject to the limitations of **Sections 12.1, 12.5** and **12.6**, the Seller Parties, jointly and severally, agree to indemnify Buyer and its officers, directors, employees and stockholders (collectively, the "Buyer Indemnified Parties") and hold them harmless against any Losses, which any of the Buyer Indemnified Parties actually suffer or incur that are caused by or are a result of or related to (a) any Breach of any of the representations and warranties of the Seller Parties contained in this Agreement, (b) any Breach of, or failure to perform, any agreement of the Seller Parties contained in this Agreement, (c) any Excluded Asset, including any Company Benefit Plan which is an Excluded Asset, or any Excluded Indebtedness, (d) the HR Trust Liability or (e) subject to compliance with the first sentence of **Section 8.11**, the termination of that certain Area Development Agreement dated as of October 26, 1991 by and among Meredith Corporation  and Laurum Marketing, Inc., as amended and the other matters related to the dispute identified as item (b) on **Schedule 4.26(b)(2)(E)** (collectively, "Buyer Losses").

**12.3**   **Indemnification by Buyer.**   Subject to the limitations of **Sections 12.1, 12.5** and **12.6**, Buyer agrees to indemnify the Seller Parties and their Affiliates, and their respective

officers, directors, employees and stockholders (collectively, the "Seller Indemnified Parties") and hold them harmless against any Losses which any of the Seller Indemnified Parties actually suffer or incur that are caused by or are a result of or related to (a) any Breach of any of the representations and warranties of Buyer contained in this Agreement, (b) any Breach of, or failure to perform, any agreement of Buyer contained in this Agreement, (c) claims brought by any Franchisee arising or relating to, in whole or in part, the operation of the Franchise System after Closing (other than any matters identified in Section 12.2(e) or claims for Breach resulting from the consummation of the Contemplated Transactions)or (d) the Support Assets or the Transferred Employees incurred after the Closing Date (collectively, "Seller Losses").

**12.4    Method of Asserting Claims.**

(a)    As used herein, an "Indemnified Party" shall refer to a Buyer Indemnified Party or Seller Indemnified Party, as the case may be, and the "Indemnifying Party" shall refer to the party or parties hereto obligated to indemnify such Indemnified Party.

(b)    In the event that any of the Indemnified Parties is made a defendant in or party to any action or proceeding, judicial or administrative, instituted by any third party which may result in Losses (any such third party action or proceeding being referred to as a "Claim"), the Indemnified Party shall give the Indemnifying Party prompt notice thereof. The failure to give such notice shall not affect any Indemnified Party's ability to seek reimbursement unless such failure has adversely affected the Indemnifying Party's ability to successfully defend a Claim. The Indemnifying Party shall be entitled to contest and assume the defense of such Claim. Notice of the intention to so contest and defend shall be given by the Indemnifying Party to the Indemnified Party within thirty (30) business days after the Indemnified Party's notice of such Claim. The Indemnified Party shall be entitled at any time, at its own cost and expense (which expense shall not constitute a Loss), to participate in such contest and defense and to be represented by attorneys of its own choosing, which attorneys shall be reasonably acceptable to the Indemnifying Party; provided, that, if in the reasonable opinion of counsel for the Indemnified Party, there is a conflict or potential conflict of interest between the Indemnified Party and such Indemnifying Party in such contest, if the Claim involves a governmental investigation or inquiry of Buyer, the Claim seeks material remedies other than the payment of monetary damages or there is a material risk that the aggregate amount of monetary damages will exceed any limitation on damages payable by such Indemnifying Party, the Indemnified Party shall be entitled to be represented by attorneys of its own choosing, with the reasonable fees and expenses of one law firm for the Indemnified Parties being at the Indemnifying Party's cost and expense. If the Indemnified Party elects to participate in such defense, the Indemnified Party will cooperate with the Indemnifying Party in the conduct of such defense. Neither the Indemnified Party nor the Indemnifying Party may concede, settle or compromise any Claim without the consent of the other party, which consent will not be unreasonably withheld; provided, however, that in the case of any Claim, if the Indemnifying Party requests the Indemnified Party to accept a proposed financial settlement or financial compromise as the primary aspect of any such settlement with respect to any Claim (assuming that no part of the settlement or compromise involves a material change in Buyer's or one of its Affiliate's methods of doing business or otherwise materially restricts any of their respective future conduct) and the Indemnified Party withholds its consent thereto, the obligation of the Indemnifying Party to such Indemnified Party under this Article 12 with respect to such Claim shall not thereafter exceed

the aggregate amount that the Indemnifying Party would have paid hereunder in connection with such settlement or compromise (including reimbursable expenses to the date thereof).

(c)    In the event any Indemnified Party should have a claim against any Indemnifying Party that does not involve a Claim, the Indemnified Party shall deliver a notice of such claim to the Indemnifying Party, setting forth in reasonable detail the identity, nature and estimated amount of Losses related to such claim or claims, with reasonable promptness and in any event prior to the expiration of the Indemnifying Party's indemnification obligation hereunder. If the Indemnifying Party notifies the Indemnified Party that the Indemnifying Party disputes the claim described in such notice, the Indemnifying Party and the Indemnified Party will proceed in good faith to negotiate a resolution of such dispute for a period of at least thirty (30) days.

**12.5    Other Indemnification Provisions.**  The foregoing indemnification provisions shall be the sole and exclusive remedies of each party and their respective Affiliates and their respective officers, directors, employees, stockholders, agents and Representatives for any breach of any representation or warranty by the other party contained in this Agreement.

**12.6    Limitations on Indemnification.**

(a)    In addition to the other limitations contained in this Agreement, the indemnification obligations of the Seller Parties under this **Article 12** are subject to the following terms and conditions:  (i) the Seller Parties shall be liable to the Buyer Indemnified Parties under **Section 12.2(a)** (other than a Breach of **Sections 4.1, 4.2, 4.3, 4.15, 4.16 or 4.18**) only if the aggregate amount of all Buyer Losses under **Section 12.2(a)** exceeds One Million Dollars ($1,000,000) (the "Basket Amount"), in which case the Seller Parties shall be obligated to indemnify the Buyer Indemnified Parties for the aggregate amount of all such Buyer Losses under **Section 12.2(a)** including the Basket Amount; (ii) in no event shall Seller have any liability for indemnification under **Section 12.2(a)** in an aggregate amount in excess of Ten Million Dollars ($10,000,000) (the "Cap Amount"); (iii) the amount of any indemnification to be paid under this **Article 12** shall be computed after giving effect to any insurance proceeds received by the Buyer Indemnified Parties; and (v) the Seller Parties shall have no liability for indemnification hereunder (x) with respect to any claim for indemnification for any liability to the extent the relevant liability was expressly reflected in the Interim Balance Sheets, but only up to the amount reflected therein, or (y) for any Buyer Loss arising from a change in any federal, foreign, state or local Law after the Closing Date having a retroactive effect.

(b)    In addition to the other limitations contained in this Agreement, Buyer's indemnification obligations under this **Article 12** are subject to the following terms and conditions: (i) Buyer shall be liable to the Seller Indemnified Parties under **Section 12.3(a)** only if the aggregate amount of all Seller Losses under **Section 12.3(a)** exceeds the Basket Amount in which case Buyer shall be obligated to indemnify the Seller Indemnified Parties under **Section 12.3(a)** for all such Seller Losses including the Basket Amount; (iii) in no event shall Buyer have any liability for indemnification under **Section 12.3(a)** in an aggregate amount in excess of the Cap Amount; and (iv) the amount of any indemnification to be paid under this **Article 12** shall be computed after giving effect to any insurance proceeds actually received by the Seller Indemnified Parties.

-60-

**12.7    Mitigation.**  Notwithstanding anything contained herein to the contrary, each party shall use commercially reasonable efforts to mitigate all Losses in respect of which it may be entitled to indemnification hereunder consistent with applicable law; provided, that all reasonable costs and expenses of such mitigation shall be deemed to be Losses of such party.

**12.8    Subrogation.**  After any indemnification payment is made to any Indemnified Party pursuant to this **Article 12**, the Indemnifying Party shall, to the extent of such payment, be subrogated to all rights (if any) of the Indemnified Party against any third party in connection with the Losses to which such payment relates.  Without limiting the generality of the preceding sentence, any Indemnified Party receiving an indemnification payment pursuant to the preceding sentence shall execute, upon the written request of the Indemnifying Party, any instrument reasonably necessary to evidence such subrogation rights.

**12.9    Treatment of Indemnity Payments.**  It is the intent of the parties that amounts paid under this **Article 12** and any Tax indemnification payments under **Article 11** shall represent an adjustment to the Purchase Price and the parties will report such payments consistent with such intent.

**ARTICLE 13**
**MISCELLANEOUS**

**13.1    Termination.**  This Agreement may be terminated:

(a)    At any time on or prior to the Closing Date, by the mutual consent in writing of the parties hereto;

(b)    At any time on or prior to the Closing Date, by Buyer in writing, if any Seller Party has, or by Seller in writing, if Buyer has, Breached (i) any covenant or agreement contained herein or (ii) any representation or warranty contained herein, and in either case such breach would constitute a failure to satisfy the condition contained in **Section 9.1** or **Section 10.1**, as applicable, and in either case if such breach has not been cured by the earlier of 30 days after the date on which written notice of such breach is given to the party committing such breach or the Closing Date;

(c)    At any time, by either party hereto in writing, if (i) any Governmental Authority which must grant a Permit or Consent contemplated by **Section 9.2** or **10.2** has denied such Permit or Consent and such denial has become final and nonappealable or (ii) any Governmental Authority shall have issued a final nonappealable Order enjoining or otherwise prohibiting the consummation of the Contemplated Transactions; or

(d)    By either party hereto in writing, if the Closing Date has not occurred by the close of business on November 17, 2008, unless the failure of the Closing Date to occur by such date shall be due to the failure of the party seeking to terminate this Agreement to perform or observe the covenants and agreements of such party set forth herein.

**13.2    Effect of Termination.**  In the event this Agreement is terminated pursuant to **Section 13.1** hereof, this Agreement shall become void and have no effect, except that (a) the provisions relating to expenses and publicity set forth in **Sections 13.10** and **13.12**, respectively,

and this **Section 13.2** shall survive any such termination and (b) a termination pursuant to **Section 13.1(b)(i)** or **Section 13.1(d)** shall not relieve the breaching party from liability for an uncured breach of any covenant or agreement giving rise to such termination or existing and uncured as of the date of such termination. In the event that this Agreement is terminated (a) by Buyer pursuant to **Section 13.1(b)** due to Seller's Breach of **Section 8.9** and (i) Seller does not then have a right to terminate this Agreement pursuant to **Sections 13.1(b)** or **13.1(c)** and (ii) Buyer is not then subject to any Order or Litigation of a Governmental Authority that would restrain, prohibit or make illegal the consummation of the Contemplated Transactions or (b) by either party pursuant to **Section 13.1(d)** and (i) Seller does not then have a right to terminate this Agreement pursuant to **Sections 13.1(b)** or **13.1(c)**, (ii) Seller has failed to obtain the GM Amendments and (iii) all of the other conditions to Buyer's obligations to consummate the Contemplated Transactions set forth in **Article 10** have otherwise been satisfied or waived, then in case of either such event (in addition to any other remedies or rights which Buyer may have on account of any uncured Breach by Seller which is not relieved pursuant to the preceding sentence), Seller Parties shall be jointly and severally liable, upon written demand of the Buyer to reimburse Buyer and its Affiliates for all reasonable out-of-pocket costs and expenses incurred in connection with the investigation, negotiation, structuring, documentation and contemplated consummation of the Contemplated Transactions, whether incurred before or after entry into this Agreement, up to a maximum of One Million Dollars ($1,000,000).

13.3    **Assignment.**  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by either party without the prior written consent of the other; provided, however, that notwithstanding the foregoing, Buyer shall have the unrestricted right to (i) assign this Agreement and all or any part of its rights hereunder and to delegate all or any part of its obligations hereunder to any Affiliate of Buyer, but in such event Buyer shall remain fully liable for the performance of all of such obligations in the manner prescribed in this Agreement and (ii) assign the benefits pursuant to **Section 8.4** to the Company Entities, to the extent that the obligations relate to any Protected Information or the Business of such Company Entity.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, and no other Person shall have any right, benefit or obligation hereunder, other than Buyer Indemnified Parties and Seller Indemnified Parties pursuant to **Article 12** hereof and the Company Entities pursuant to **Section 8.4**.  Any purported assignment of this Agreement, or any rights or obligations hereunder, in violation of this **Section 13.3** shall be null and void.

13.4    **Notices.**  Unless otherwise provided herein, any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered in person or by courier or by facsimile transmission (such facsimile notice to be effective on the date such receipt is acknowledged), as follows:

If to Buyer:   Brookfield RPS, LLC
        c/o Brookfield Residential Property Services
        39 Wynford Drive
        Toronto, Ontario  M3C 3K5
        Canada
        Attention:  Senior Vice President, Corporate Development
        Fax:  (416) 446-0050

With copies to:  Brookfield Asset Management
        Brookfield Place, Suite 300
        181 Bay Street
        Toronto, ON M5J 2T3
        Canada
        Attention:  Vice President, Legal Affairs
        Fax. (416) 365-9642

        and

        Sonnenschein Nath & Rosenthal LLP
        7800 Sears Tower
        Chicago, Illinois  60606
        Attention:  John Baer, Esq. and Michael Rosenthal, Esq.
        Fax:  (312) 876-7934

If to Seller:   GMAC ResCap
        One Meridian Crossing
        Minneapolis, MN  55423
        Attention:  General Counsel
        Fax: (952) 352-0586

With copies to:  K&L Gates LLP
        1601 K Street, NW
        Washington, DC 20006
        Attention: Thomas F. Cooney, Esq.
        Fax:  (202) 778-9100

or to such other place and with such other copies as either party may designate as to itself by written notice to the other.

**13.5 Choice of Law; Jurisdiction and Forum; Waiver of Jury Trial.**

   (a)  This Agreement shall be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of Delaware, without regard to the conflict of law principles thereof.

   (b)  Any action or proceeding brought in connection with this Agreement shall be brought in the federal or state courts located in Wilmington, Delaware which courts shall have

14732497RV-19

exclusive jurisdiction. Each party hereby waives, to the fullest extent possible under applicable law, any objection that it may have to the venue of any action or proceeding with respect to this Agreement in such courts, or that such action or proceeding brought in such courts was brought in an inconvenient court and agrees not to plead or claim the same. The parties further agree, to the extent permitted by law, that final and unappealable judgment against any of them in any action or proceeding contemplated above shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment, a certified copy of which shall be conclusive evidence of the fact and amount of such judgment. Each party hereby waives, to the fullest extent possible under applicable law, any objection that it may have to the venue of any action or proceeding with respect to this Agreement in such courts, or that such action or proceeding brought in such courts was brought in an inconvenient court and agrees not to plead or claim the same. The parties further agree, to the extent permitted by law, that final and unappealable judgment against any of them in any action or proceeding contemplated above shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment, a certified copy of which shall be conclusive evidence of the fact and amount of such judgment. Each party hereby authorizes and accepts service of process sufficient for personal jurisdiction in any action or proceeding against it as contemplated by this **Section 13.5** by certified mail, return receipt requested, postage prepaid, or by courier to its address for the giving of notices as set forth in this Agreement, or in any other manner set forth in **Section 13.4** of this Agreement for the giving of notice, it being agreed that service in such manner shall constitute valid service upon such party in connection with any such action or proceeding; provided, further, that nothing in this **Section 13.5(b)** shall affect the right of any party hereto to serve legal process in any other manner permitted by applicable law.

(c)    EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS. EACH PARTY CERTIFIES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS SET FORTH ABOVE IN THIS SECTION 13.5.

13.6    **Entire Agreement; Amendments and Waivers.** This Agreement, together with all schedules and exhibits hereto (including the Disclosure Schedules), constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties; provided, however, this **Section 13.6** shall not terminate the Confidentiality Agreement which shall survive the execution and delivery of this Agreement. No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by all parties. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

13.7    **Counterparts; Facsimile.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A facsimile signature by any party on a counterpart of this Agreement shall be binding and effective for all purposes. Such party shall subsequently deliver

to the other party an original, executed copy of this Agreement; provided, however, that a failure of such party to deliver an original, executed copy shall not invalidate its facsimile signature.

**13.8    Invalidity.**  In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

**13.9    Headings.**  The headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

**13.10    Expenses.**  Except as otherwise provided herein, Seller Parties and Buyer will each be liable for its own costs and expenses incurred in connection with the negotiation, preparation, execution or performance of this Agreement, whether or not the Closing shall have occurred.

**13.11    Further Assurances.**  On and after the Closing Date, Seller Parties and Buyer will take all appropriate action and execute all documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the provisions hereof.

**13.12    Publicity; Disclosure.**  No party shall issue any press release, make any public announcement relating to the existence, subject matter or terms of this Agreement, or otherwise disclose the existence, subject matter or terms of this Agreement without the prior written approval of the other party; provided, however, that any party may make any such disclosure that it believes in good faith is required by applicable Law (in which case the disclosing party will use commercially reasonable efforts to advise the other party prior to making the disclosure); provided, further, that nothing contained herein shall prohibit any party, following notification to the other party, from making any disclosure which its counsel deems necessary.

**13.13    Effect of Due Diligence and Investigation.**  No investigation by or on behalf of Buyer or its Affiliates into the business, operations, prospects, assets or condition (financial or otherwise) of the Company Entities and their respective Businesses, whether before or after the execution of this Agreement, shall diminish in any way the effect of any representations or warranties made by the Seller Parties in this Agreement or shall relieve the Seller Parties of any of their respective obligations under this Agreement.

**13.14    Construction of Agreement.**  Seller Parties and Buyer acknowledge that each party and each party's counsel have reviewed and revised this Agreement and that normal rules of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of this Agreement or any amendments or schedules hereto.

**13.15    Guaranty.**  Royal LePage Relocation Services Ltd. hereby unconditionally and irrevocably guaranties to the Seller Parties the full and timely payment of the portion of the Base Amount to be paid pursuant to Section 2.4(b), Section 2.4(d)(3) and the Total Receivables Withholding pursuant to, in accordance with, and subject to the terms and conditions of this Agreement (collectively, the "Buyer Obligations"). This guaranty is an absolute, present, continuing, unlimited and unconditional guaranty and undertaking of payment, of all the Buyer

Obligations, and, without limitation, is in no way conditioned or contingent upon any effort or attempt by any Seller Party first to seek performance or payment from Buyer. Notwithstanding the foregoing, this guaranty is subject to all right of recoupment, set off and other remedies, defenses and conditions for the benefit of the Buyer hereunder with respect to the Buyer Obligations.

[SIGNATURE PAGE TO FOLLOW ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or have caused this Agreement to be duly executed on their behalf by their respective officers thereunto duly authorized, as of the day and year first above written.

BROOKFIELD RPS LLC

By:
Name:    BARRY S. BLATTMAN
Title:    PRESIDENT

GMAC RESIDENTIAL HOLDING COMPANY, LLC

By:
Name:
Title:

SOLELY FOR THE PURPOSES OF SECTION 13.15:

ROYAL LEPAGE RELOCATION SERVICES LTD, as guarantor

By:
Name:
Title:

RESIDENTIAL CAPITAL, LLC,

By:
Name:
Title:

[PURCHASE AND SALE AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or have caused this Agreement to be duly executed on their behalf by their respective officers thereunto duly authorized, as of the day and year first above written.

BROOKFIELD RPS LLC

By: _____
Name:
Title:

GMAC RESIDENTIAL HOLDING COMPANY, LLC

By: _____
Name:
Title:

SOLELY FOR THE PURPOSES OF SECTION 13.15:

RESIDENTIAL CAPITAL, LLC,

By: _____
Name:
Title:

ROYAL LEPAGE RELOCATION SERVICES LTD, as guarantor

By: _____
Name:  G. BAXUN,
Title:  PRESIDENT & CEO

[PURCHASE AND SALE AGREEMENT SIGNATURE PAGE]

14732498\V-13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or have caused this Agreement to be duly executed on their behalf by their respective officers thereunto duly authorized, as of the day and year first above written.

BROOKFIELD RPS LLC

By: _____
Name:
Title:

SOLELY FOR THE PURPOSES OF SECTION 13.15:

ROYAL LEPAGE RELOCATION SERVICES LTD, as guarantor

By: _____
Name:
Title:

GMAC RESIDENTIAL HOLDING COMPANY, LLC,

By: _____
Name: _Anthony Renzi_
Title: _President_

RESIDENTIAL CAPITAL, LLC,

By: _____
Name:
Title:

[PURCHASE AND SALE AGREEMENT SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or have caused this Agreement to be duly executed on their behalf by their respective officers thereunto duly authorized, as of the day and year first above written.

BROOKFIELD RPS LLC

By: _____
Name:
Title:

SOLELY FOR THE PURPOSES OF SECTION 13.15:

ROYAL LEPAGE RELOCATION SERVICES LTD, as guarantor

By: _____
Name:
Title:

GMAC RESIDENTIAL HOLDING COMPANY, LLC

By: _____
Name:
Title:

RESIDENTIAL CAPITAL, LLC,

By: _____
Name:
Title:

[PURCHASE AND SALE AGREEMENT SIGNATURE PAGE]

14734498V-13

# EXHIBIT C

<u>Schedule 4.26(b)(2)(E)</u>
<u>Franchisee Breaches</u>

(a) See Attachment 4.26(b)(2)(E).

(b) There is a dispute between GRE and Laurum Marketing ("Laurum", including its subsidiaries), the Canadian Area Developer and master franchisee, as to whether Laurum met its requirement to open a designated number of offices within a certain time period.  If the required number of offices were opened, Laurum would have the right to renew the ADA and master franchise agreements for an additional 10-year period, effective in 2011; if not, it would not.  There is no provision in the present agreements which would permit GRE to compel Laurum to terminate its use of the GMAC marks.  Both sides have retained counsel and the matter is pending.  Laurum filed, on or about 9/17/08, a Petition in Canada seeking a declaration that it  is entitled to renew the Master Franchise agreement through 2021.  GRE intends to contest the matter.

(c) The master franchise agreement with the master franchisee for Portugal was recently amended to permit GRE to direct the master franchisee to discontinue using the GMAC brand and to begin using another brand.

Project Greenhouse 26

4 26(b)(2)(E) List of Franchisee Breaches(UPD) 82108.xls

|  | A | B | C | E | F | G | H |
|---|---|---|---|---|---|---|---|
| 1 | (4.26(b)(2)(E) List of Franchisee breaches | | | | | | |
| 2 | Notice Of Default-Monetary | | | | | | |
| 3 | Company | State | Account Number | Date Sent | Right to Cure Expires | Cured - Not Cured | Status Update |
| 4 | Castles & Cottages | FL | 001693000 | 8/5/2008 | 9/5/2008 | | Restructure in process, working to find company to acquire entity |
| 5 | Western Realty Company, Inc. | KY | 000287200 | 7/30/2008 | 9/2/2008 | | Restructure in process |
| 6 | Better Choice | SC | 001597000 | 7/24/2008 | 8/25/2008 | | Restructure in process |
| 7 | Blue Realty | NJ | 001605800 | 7/11/2008 | 8/11/2008 | | Had been working on a renewal/restructure, though S-P is not responsive at this time |
| 8 | Valley Realty & Auction Co. | TN | 001665200 | 6/11/2008 | 7/11/2008 | | Restructure in process |
| 9 | Frontier | CO | 000195500 | 7/3/2008 | 8/4/2008 | | Franchisee disputing claims in default notice, working on restructure |
| 10 | Bob Scott | WY | 001697200 | 7/3/2008 | 8/4/2008 | | Restructure in process |
| 11 | Equity Realty | OR | 001475100 | 6/16/2008 | 7/16/2008 | | Restructure in process |
| 12 | Appleseed Realty | NY | 001709400 | 6/2/2008 | 7/2/2008 | | Restructure in process |
| 13 | Five Star | TX | 001700200 | 6/2/2008 | 7/2/2008 | | Restructure in process |
| 14 | GMAC Real Estate ServiceMax | NY | 001702600 | 5/28/2008 | 6/30/2008 | | Restructure in process |
| 15 | Buyers & Sellers Realty | OH | 001328400 | 4/30/2008 | 5/30/2008 | | Restructure in process |
| 16 | Carolina Sun GMAC Real Estate | SC | 001699400 | 4/17/2008 | 5/19/2008 | | Restructure in process |
| 17 | Coleman & Sons GMAC Real Estate | MA | 001694300 | 4/16/2008 | 5/16/2008 | | Restructure in process |
| 18 | Atrio Properties, LLC | NH | 001695700 | 4/16/2008 | 5/16/2008 | | Restructure in process |
| 19 | Hatmaker | TX | 001698100 | 4/9/2008 | 5/9/2008 | | Restructure in process |
| 20 | Select Real Estate, Inc. | FL | 000455700 | 3/11/2008 | 4/11/2008 | | Restructure in process |

4 28(b)(2)(E) List of Franchisee Breaches(UPD) 82108.xls

| | A | B | C | E | F | G | H |
|---|---|---|---|---|---|---|---|
| 1 | (4.2X)(b)(2)(E) List of franchise breaches | | | | | | |
| 2 | Notice Of Default: Monetary | | | | | | |
| 3 | Company | State | Account Number | Date Sent | Right to - Cure Expires | Cured - Not Cured | Status Update |
| 21 | DeRoso & Associates | MI | 001521300 | 3/10/2008 | 4/10/2008 | | Restructure in process |
| 22 | Steve Hodge Company, Inc. | AL | 001162400 | 3/10/2008 | 4/10/2008 | | Restructure in process |
| 23 | Butler Mohr | OH | 001628800 | 3/10/2008 | 4/10/2008 | | Restructure in process |
| 24 | Dave Thompson | IL | 000133900 | 3/10/2008 | 4/10/2008 | | Restructure in process |
| 26 | Entrepreneur Realty | NV | 001700400 | 2/13/2008 | 3/12/2008 | Cured | |
| 27 | Wheeler | CO | 000067200 | 2/8/2008 | 3/7/2008 | Cured | |
| 29 | Bob Scott | WY | 001697200 | 2/7/2008 | 3/6/2008 | | |
| 30 | Country Ranch | AZ | 001701000 | 2/7/2008 | 3/6/2008 | | Restructure in process |
| 31 | Select Properties | IL | 001583100 | 2/4/2008 | 3/3/2008 | | Restructure in process |
| 35 | International Properties | NY | 001700700 | 1/30/2008 | 2/29/2008 | | Restructure in process |
| 37 | Tierra Ridge Real Estate, Inc. | AZ | 001532900 | 1/29/2008 | 2/28/2008 | | Restructure in process |
| 38 | Broker Network, Inc. | TN | 001695600 | 1/28/2008 | 2/27/2008 | | Restructure in process |
| 41 | Park Place Realty | CA | 000796400 | 1/25/2008 | 2/25/2008 | | Restructure in process |
| 42 | Town & Country | NC | 000425700 | 1/23/2008 | 2/25/2008 | | Restructure in process |
| 43 | Ramagli | PA | 001689600 | 1/22/2008 | 2/21/2008 | | Restructure in process |
| 44 | The Pillsbury Group | TX | 001683200 | 1/22/2008 | 2/21/2008 | | Restructure in process |

9/22/2008 12:33 PM

Page 2 of 3

4 28(b)(2)(E) List of Franchise Breaches(UFD) 82108.xls

|  | A | B | C | E | F | G | H |
|---|---|---|---|---|---|---|---|
| 1 | (4.28)(b)(2)(E) List of franchise breaches | | | | | | |
| 2 | Notice Of Default: Monetary | | | | | | |
| 3 | Company | State | Account Number | Date Sent | Right to Cure Expires | Cured - Not Cured | Status Update |
| 48 | Charleston Properties | SC | 001699300 | 1/22/2008 | 2/21/2008 | Cured | |
| 48 | Integrity | FL | 001694400 | 1/15/2008 | 2/15/2008 | | Restructure in process |
| 50 | Global | VA | 001706200 | 1/15/2008 | 2/14/2008 | Cured | |
| 51 | Dilbeck Premier Realtors | CA | 001699000 | 1/15/2008 | 2/14/2008 | | S-P moving to dissolve company due to ownership dispute |
| 52 | Mirabal | TX | 001700000 | 1/15/2008 | 2/14/2008 | | Restructure and ownership change in process |
| 55 | Paul Law Realty, Inc. | CA | 000565700 | 12/19/2007 | 1/21/2008 | | Restructure in process |
| 57 | St. George GMAC Real Estate | UT | 001683500 | 12/19/2007 | 1/21/2008 | | Restructure in process |
| 58 | TIRI Corporation GMAC Real Estate | PR | 001058200 | 12/1/2007 | 1/17/2008 | | Restructure in process |
| 69 | Sonoran GMAC Real Estate | AZ | 001706600 | 12/18/2007 | 1/18/2008 | | Restructure in process |
| 62 | Strategic GMAC | FL | 001705400 | 10/29/2007 | 11/29/2007 | Cured | |
| 63 | Preferred Properties | SC | 001702200 | 10/23/2007 | 11/23/2007 | Cured | |
| 70 | Cornerstone | IL | 001703400 | 10/10/2007 | 11/12/2007 | | Restructure in process |
| 71 | Fox Realty Group | MD | 001376600 | 10/8/2007 | 11/8/2007 | | Restructure in process, working to find company to acquire entity |
| 73 | First Realty Associates | MI | 000013800 | 10/4/2007 | 11/5/2007 | | Restructure in process |

# EXHIBIT D

## GMAC ResCap

March 24, 2010

<u>Via Email</u>
Brookfield Residential Property Services
39 Wynford Drive, Don Mills
Ontario, M3C 3K5
Canada
Attention: Mr. Graham Badun

Re: <u>Net Working Capital Reconciliation and Payment of Receivables Withholding</u>

Dear Mr. Badun:

This letter agreement is in follow-up to our conference call held on March 11, 2010. Capitalized terms used in the letter but not defined have the meanings given to them in the Purchase and Sale Agreement dated as of September 22, 2008, by and among GMAC Residential Holding Company, LLC, Residential Capital, LLC, Brookfield RPS LLC and Royal LePage Relocation Services Ltd (the "PSA").

Buyer and Royal LePage Relocation Services Ltd, as guarantor of the Buyer Obligations pursuant to Section 13.15 of the PSA (the "Buyer Parties"), hereby acknowledge and agree that the Completion Date occurred on or about September 30, 2009 and that there are no setoff or recoupment amounts arising under Section 2.4(d)(2) of the PSA. Therefore, the Buyer Parties hereby agree to remit to the Seller Parties an amount equal to $19,074,858 as payment in full for the Total Receivables Withholding and unpaid Receivable Interest through April 9, 2010. The Buyer Parties and Seller acknowledge and agree that Seller has previously received all amounts due in respect of the monies that Buyer has collected from the Reserve for File Adjustments, with the exception of $69,649.34 that will be paid as part of the quarterly installment due on April 15, 2010.

The Seller Parties hereby agree to remit to Buyer (by means of netting against the amounts referenced in the previous paragraph), in full and final settlement of the Net Working Capital Adjustment Amount, the sum of $3,885,484. The Seller Parties acknowledge that Buyer has reserved its right to claim setoff against any remaining amounts due to the Seller Parties under the PSA in respect of disputed estimated future legal claims, should there be a provision of the PSA applicable to such claims other than provisions in respect of Net Working Capital. The Seller Parties also acknowledge that such disputed estimated claims do not relate to the existing Laurum litigation matter.

The calculations, as discussed in the March 11 conference call and in subsequent communications, reflecting the details as to how the parties arrived at the above final amounts are set forth on Exhibit A to this letter and are incorporated by reference in full herein. The Seller Parties and the Buyer Parties hereby agree that the net amount of $15,189,375 is due and payable to the Seller Parties. The Seller Parties hereby acknowledge receipt of $10,159,707 of such amount on Wednesday, March 24, 2010, and the Buyer Parties hereby agree to remit the balance of $5,029,668 by no later than 3:00

pm eastern time on Friday, April 9, 2010. If such payment is made earlier, the amount due will reduce by $793.00 per day

We look forward to speaking with you again in a couple of months to finalize the remaining purchase price payments under the PSA.

Sincerely yours,

Tammy Hamzehpour
General Counsel

**AGREED:**

GMAC RESIDENTIAL HOLDING COMPANY, LLC

By: _____
Title: _____ CFO

RESIDENTIAL CAPITAL, LLC

By: _____
Title: _____ CFO

BROOKFIELD RPS LLC

By: _____ C. BROUN.
Title: CEO _____

ROYAL LEPAGE RELOCATION SERVICES LTD.

By: _____ C. BROUN
Title: CEO. _____

GMAC ResCap
Working Capital Reconciliation and Return of Withholdings
Letter Dated March 15, 2010   Exhibit A

| | | | | | |
|---|---|---|---|---|---|
| 1 | Due to ResCap for Receivables Hold Back | | | | |
| 2 | GM/ GMAC Excluded Receivables | | $  4,500,000 | | |
| 3 | Relocation Receivables Deferred Pay Out | | 14,405,793 | | |
| 4 | Interest | | 169,066 | | |
| 5 | Total hold back due to ResCap | | $  19,074,858 | $ | 19,074,858 |
| | | | | | |
| 6 | Amount Due as proposed by Brookfield (letter dated December 2, 2009) | | | | |
| | | | | | |
| 7 | Working Capital | | $  3,747,985 | | |
| | | | | | |
| 8 | Special franchisees | | 688,536 | | |
| 9 | Circuit City adjustment to 93% | | 207,123 | | |
| | | | | $  4,643,644 | |
| 10 | Differences Agreed To: | | | | |
| 11 | Adjust Relo AR credits to $323,095 | (50,193) | | | |
| 12 | Remove disputed legal reserves | (400,000) | | | |
| 13 | Total adjustments agreed to | | $  (450,193) | | |
| 14 | Working capital agreed to | | $  4,193,451 | | |
| | | | | | |
| 15 | Disputed items we agreed to split | | | | |
| 16 | Other receivables | 213,000 | | | |
| 17 | Circuit City | 207,123 | | | |
| 18 | Adjustment for WIP credits | 195,812 | | | |
| 19 | Total Other Differences | 615,935 | | | |
| 20 | Agree to split these items | | $  (307,967) | | |
| | | | | | |
| 21 | Adjusted Amount ResCap Owes to Brookfield For Working Capital | | $  3,885,484 | $ | (3,885,484) |
| | | | | | |
| 22 | Net amount due to ResCap | | | $ | 15,189,375 |

Summary of Payments for the Hold Back Balance From Above
Payments from Brookfield to ResCap as follows:

| | | | | |
|---|---|---|---|---|
| 23 | Cash Payment received on March 24, 2010 | | $ | 10,159,707 |
| 24 | Cash Payment on April 9, 2010 | | | 5,029,668 |
| 25 | Working Capital Credit Applied on April 9, 2010 | | | 3,885,484 |
| | | | | |
| 26 | Total Payments or credit offsets from Brookfield to ResCap | | $ | 19,074,858 |

Please utilize the following instructions for GMAC Residential Holding, LLC

| | |
|---|---|
| Beneficiary: | GMAC Residential Holding LLC |
| Beneficiary Bank: | Bank of America |
| Beneficiary Bank Address: | San Francisco, CA |
| ABA Number: | 026-009-593 |
| Account Number: | 1235617150 |

GMAC ResCap
Worbis Capital Reconciliation and Return of Withholdings
Loan Direct Iowa 16, 2010  Exhibit A



GMAC ResCap Hold Basis Summary - Accrued Interest - GMAC/AAC Holdback

Month 2010 interest is based on a March 23, 2010 settlement data

GMAC ResCap
Working Capital Reconciliation and Return of Withholdings
Letter Dated March 15, 2010  Exhibit A

| Days | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 31 | 28 | 31 | 30 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GMAC ResCap Hold Back Summary - Accrued Interest - Rate AR HoldBack | | | | | | | | | | | | | | | | | Total |
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | |
| Prime Rate | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 0.00% |
| Spread to Prime | | | 1.33% | | | | | | | | | | -3.75% | -2.75% | -2.75% | 0.00% | 0.00% |
| Interest Rate | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 3.25% | 0.50% | 0.50% | 0.50% | 3.25% | 3.25% |

The interest (or prior periods) has been included in the quarterly receivables payout.

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Accrued Interest | | | | | | | | | | | | | 6,111.53 | 5,927.86 | 4,547.45 | 3,418.09 | 27,842.10 |
| | | | | | | | | | | | | | 6,111.53 | 5,927.86 | 4,547.45 | 3,418.09 | 27,842.10 |

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Outstanding Balance | | | | | | | | | | | | | | | | | |
| Beginning Balance | $ - | $ 6,360,898 | $ 6,360,898 | $ 6,360,898 | $ 10,574,949 | $ 10,574,949 | $ 10,574,949 | $ 10,574,949 | $ 12,913,060 | $ 12,913,060 | $ 12,913,060 | $ 14,405,793 | $ 14,405,793 | $ 14,411,910 | $ 14,417,438 | 4,365,310 $ | |
| Additional Hold Back | 6,360,898 | | | 4,214,051 | | | | 2,338,111 | | 1,492,733 | | | | | | | 14,405,793 |
| Accrued Interest | | | | | | | | | | | | | 6,118 | 5,528 | 4,542 | 3,416 | 22,042 |
| Less: | | | | | | | | | | | | | | | | | |
| Payment received on March 24, 2010 | | | | | | | | | | | | | | | (10,159,787) | | (10,159,787) |
| Payment to be received on April 6, 2010 | | | | | | | | | | | | | | | | (363,244) | (363,244) |
| Working Capital Credit Applied | | | | | | | | | | | | | | | | (3,056,666) | (3,056,666) |
| Ending Balance | $ 6,360,898 | $ 6,360,898 | $ 6,360,898 | $ 10,574,949 | $ 10,574,949 | $ 10,574,949 | $ 10,574,949 | $ 12,913,060 | $ 12,913,060 | $ 12,913,060 | $ 14,405,793 | $ 14,405,793 | $ 14,411,910 | $ 14,417,438 | $ 4,282,273 | $ 4,265,310 | $ - |
| Average Balance | $ 3,180,449 | $ 6,360,898 | $ 6,360,898 | $ 8,467,923 | $ 10,574,949 | $ 10,574,949 | $ 11,744,005 | $ 12,913,060 | $ 12,913,060 | $ 13,659,426 | $ 14,405,793 | $ 14,405,793 | $ 14,408,851 | $ 14,414,674 | $ 9,339,855 | $ 4,283,791 | 2,132,655 |

# EXHIBIT E

<u>Schedule 4.12(a)</u>

<u>Litigation</u>[1]

**FRANCHISE**

| Case Name And Docket/Matter No. | Date Asserted | Summary And Status | Exposure |
|---|---|---|---|
| Realty Works, LLC, et al. v. GMAC Real Estate, LLC<br>Superior Court, Judicial District of Hartford, CT<br>Case No. HHD-CV-08-5016422S | 12/13/07 | Litigation<br>Former franchisee filed suit alleging fraud and statutory violations. Former franchisee is seeking refund of all fees paid, attorney's fees, punitive damages, and "money damages to be proven at trial." The Court granted GRE's motion to dismiss the Connecticut litigation. The matter is now in arbitration before the AAA in IL, where GRE is seeking $206K in fees and future damages. | *$10K Estim'd Adverse Settlement/Liability*<br><br>$30K<br>Estim'd Attorneys' fees |
| GMAC Real Estate, LLC v. Joseph Carl Real Estate, LLC<br>AAA, Chicago, Illinois<br>Case No. 51-115Y-01329-07 | 9/24/07 | Litigation<br>GRE initiated arbitration against former franchisee, seeking $732K in fees and future damages. One principal has filed bankruptcy and another principal is functionally insolvent. Third principal is contesting GRE's claim. GRE has offered to accept $50K in settlement.   Discovery has been extended to November 2008. | *$10K Estim'd Adverse Settlement/Liability*<br><br>$35K<br>Estim'd Attorneys' fees |
| Patricia Cerrigone v. GMAC Home Services (nominally, Franchise)<br><br>NJ Division on Civil Rights<br>Case No. EP24AB-53634<br><br>EEOC<br>Case No. 17E200800181 | 12/21/07 | Regulatory<br>Plaintiff filed a charge of age discrimination with the NJ Division on Civil Rights and with the EEOC, alleging that she was terminated on the basis of age. GHS contends she was terminated for performance issues and improper expense reimbursement submissions.  GHS submitted its | *$10K Estim'd Adverse Settlement/Liability*<br><br>$0<br>Estim'd Attorneys' fees |

[1] All estimates have been prepared in good faith in the ordinary course of business.

| | | Answer in the NJDCR matter and NJDCR is engaged in fact-finding. | |
|---|---|---|---|
| **FTC Complaint**<br>**Marsden GMAC Real Estate** | 8/06 | Regulatory<br>Former franchisee filed a letter with the FTC listing complaints against GRE as to disclosures, etc. (GRE previously filed litigation against the franchisee for losses from monetary defaults). Subsequently, the letter was withdrawn and GRE filed a response. No further action has been taken in this regulatory aspect of the matter. | *$10K*<br>*Estim'd Adverse*<br>*Settlement/Liability*<br><br>$0<br>Estim'd Attorneys' fees |

### RELOCATION

| Case Name<br>And<br>Docket/Matter No. | Date<br>Asserted | Summary<br>And<br>Status | Exposure |
|---|---|---|---|
| **Lewis v. GMAC GRS**<br>District Court of Jefferson County, TX<br>No. E-0175306 | 2/1/06 | Litigation<br>Plaintiff home buyers filed suit in connection with their purchase from GMAC GRS of a transferee home (approx $250K), alleging that GMAC GRS was aware of, and failed to disclose, nearby drilling activity. Plaintiffs have not quantified their damages and have failed to retain an expert. Trial scheduled for October 2008. | *$15K*<br>*Estim'd Adverse*<br>*Settlement/Liability*<br><br>$30K<br>Estim'd Attorneys' fees |
| **Green v. GMAC GRS**<br><br>Harrisburg, Pennsylvania<br><br>Demand Letter | 9/5/08 | Claim<br>Home buyer claims failure to disclose basement flooding issues. Alleging $8K in repairs and $125K in unspecified damages.<br><br>Employee/Transferee did not disclose basement flooding issues in disclosure form provided to buyer, but apparently disclosed basement flooding issues in an earlier disclosure form that was not provided to buyer. | $15K<br>Attorney Fees<br><br>$40K<br>Settlement/Liability |

| | | We are investigating facts prior to making tender to Eli Lilly | |
|---|---|---|---|

## GHS MORTGAGE

| Case Name And Docket/Matter No. | Date Asserted | Summary And Status | Exposure |
|---|---|---|---|
| Sandra Hayward v. GMAC Mortgage, LLC, fka GMAC Mortgage Corporation, GMAC Global Relocation Services, LLC, and Karl Thuge<br><br>US District Court, Eastern District of Michigan, Northern Div. Case No. 07-10622-BC | 8/1/06 | Litigation<br>Plaintiff alleges age and weight discrimination, retaliation and defamation, by a supervisor at GHS Mortgage. She was transferred to GRS and subsequently terminated for performance issues. | *$15K*<br>*Estim'd Adverse*<br>*Settlement/Liability*<br><br>$65K<br>Estim'd Attorneys' fees |
| GHS Mortgage, LLC, d/b/a Windsor Mortgage v. James Pullen<br><br>Circuit Court of Cook County, Illinois,<br>First District<br>Case No. 07-M1-143760 | 5/1/07 | Litigation and potential Regulatory<br><br>GHS Mortgage filed suit against former loan officer seeking to recover $20K in draws. LO has filed a whistleblower counterclaim. | *$10K*<br>*Estim'd Adverse*<br>*Settlement/Liability*<br><br>$25K<br>Estim'd Attorneys' fees |

## CORE – PAC UNION

| Case Name And Docket/Matter No. | Date Asserted | Summary And Status | Exposure |
|---|---|---|---|
| Bellach v. Sagarchi-Nefei | 6/30/06 | Litigation<br>Alleged non-disclosure of slope defect. Buyers allege PU failed to request old engineering reports from seller. PU maintains that buyers were advised by PU agents to go to the City and look for the report. Buyers admit they went to the City, but claim report was not there. | *$10K*<br>*Estim'd Adverse*<br>*Settlement/Liability*<br><br>$20K<br>Estim'd Attorneys' fees<br>*Note: E&O deductible will be met by payment of next $20K atty's fees.* |

44

| | | | |
|---|---|---|---|
| | | PU has confirmed report was on file with City. Buyers are also facing criminal exposure in connection with bankruptcy and tax proceedings. | |
| **Young v. Danku** | 3/23/07 | Claim<br>Alleged non-disclosure of extensive preexisting problems with property.<br><br>Although a claim was made against PU by way of an attorney demand letter, we have **not** been named in the subsequent lawsuit, which is directed solely against a contractor and home inspector.<br><br>The statute of limitations on the last remaining cause of action against PU expires as of December 2008. | *$25K*<br>*Estim'd Adverse*<br>*Settlement/Liability*<br><br>$15K<br>Estim'd Attorneys' fees |

### CORE - EMRE

| Case Name And Docket/Matter No. | Date Asserted | Summary And Status | Exposure |
|---|---|---|---|
| **Helmka v. EMRE** | 4/23/08 | Litigation<br>Buyer alleges misrepresentation regarding condition of septic system. Mediation scheduled for Sept. 8, 2008 | *$25K*<br>*Estim'd Adverse*<br>*Settlement/Liability*<br><br>$18K<br>Estim'd Attorneys' fees |
| **Herlicka** | 10/12/07 | Regulatory<br>New Hampshire Real Estate Commission alleges agent misconduct in connection with | *$10K*<br>*Estim'd Adverse*<br>*Settlement/Liability* |

| | | | |
|---|---|---|---|
| | | mortgage deadline. EMRE replied by letter denying all allegations. No further action taken to date. | $5K Estim'd Attorneys' fees |
| Frary | 7/2/08 | Regulatory New Hampshire Real Estate Commission alleges conflict of interest and breach of fiduciary duty by agent. EMRE is investigating. | *$10K Estim'd Adverse Settlement/Liability* $5K Estim'd Attorneys' fees |
| EPA Lead Investigation | 6/28/08 | Regulatory EPA alleges lead paint disclosure violations by agents in Holyoke, MA office, by having wrong party sign the disclosures first. EMRE is contesting factual accuracy. | *$10K Estim'd Adverse Settlement/Liability* $10K Estim'd Attorneys' fees |

## CORE – K&S

| Case Name And Docket/Matter No. | Date Asserted | Summary And Status | Exposure (Atty Fees and Liability) |
|---|---|---|---|
| **Trump International Hotel and Tower** NKJ, LLC v. 401 North Wabash Venture, LLC Circuit Court, Cook County Case No. 08 CH 02902 | 7/1/08 | Claim Demand by Trump Organization that K&S (which serves as listing agent for Trump Tower in Chicago) provide indemnity and costs of defense in connection with lawsuit filed by unit owners against Trump. K&S is not a defendant in the lawsuit. Trump claims that some of the owners also relied on a written chart prepared by K&S that purported to show the owners their estimated return on investment and that this will ultimately be alleged. | *$75K Estim'd Adverse Settlement/Liability* $10K Estim'd Attorneys' fees |
| *Caleel v. K&S* | 9/3/08 | Claim K&S agent representing the owner of luxury condo listed for $3.9 million received an offer of $3.1 million, but advised the owner that the offer was $1.3 million, which owner rejected. Owner is now | $10K Attorney Fees $200K Settlement/Liability |

|  |  |  | listing with a new real estate company, and condo has not sold. Market value appears to have dropped below $3 million.<br><br>Owner has demanded $200K settlement, based on 1 year of additional carrying costs. |  |

### CORE – GHS Metro

| Case Name And Docket/Matter No. | Date Asserted | Summary And Status | Exposure |
|---|---|---|---|
| NJ Real Estate Commission | 5/25/04 | Regulatory . Administrative investigation of two agents (including Gloria Nilson) for alleged improper dual agency conduct in connection with sale of home.<br><br>Tentative settlement reached with NJ REC (total payment of $55K - $45K to be paid by agent (no reimb by GHS Metro) and $10K by mgr (which GHS Metro will reimburse); Settlement Order being negotiated. | *$10K* *Estim'd Adverse Settlement/Liability*<br><br>$10K Estim'd Attorneys' fees |

**Schedule 4.12(b)**

**Orders**

**and**

**Schedule 4.13(a)**

**Laws**

**FRANCHISE**

| Case Name And Docket/Matter No. | Date Asserted | Summary And Status | Exposure |
|---|---|---|---|
| Patricia Cerrigone, etc. | | See Schedule 4.12(a) | |
| FTC Complaint Marsden-GMAC Real Estate | | See Schedule 4.12(a) | |

**GHS MORTGAGE**

| Case Name And Docket/Matter No. | Date Asserted | Summary And Status | Exposure |
|---|---|---|---|
| GHS Mortgage, LLC, d/b/a Windsor Mortgage v. James Pullen | | See Schedule 4.12(a) | |

**CORE - EMRE**

| Case Name And Docket/Matter No. | Date Asserted | Summary And Status | Exposure |
|---|---|---|---|
| Herlicka | | See Schedule 4.12(a) | |
| Frary | | See Schedule 4.12(a) | |
| EPA Lead Investigation | | See Schedule 4.12(a) | |

**CORE – GHS Metro**

| Case Name And Docket/Matter No. | Date Asserted | Summary And Status | Exposure |
|---|---|---|---|
| NJ Real Estate Commission | | See Schedule 4.12(a) | |

**The Home Services Companies - Koenig & Strey Insurance Agency, LLC**

Koenig & Strey Insurance Agency, LLC, is operating as an insurance agent in FL, while its application for a license to do so is pending, but not yet issued.

Except as set forth above and, within the Knowledge of Seller: None

(b) A petition was filed, on or about 9/17/08, by Laurum Marketing, Inc. against GRE, in the Superior Court of Justice (Ontario), File No. CV-08-7731, in which Laurum is seeking, among

- 48 -

other things, a summary proceeding to obtain a declaration that Laurum is entitled to renew the Master Franchise Agreement through 2021. We estimate that GRE will incur approximately $50,000.00 in attorneys' fees and costs in connection with the defense of this matter. We cannot estimate the amount of money damages (if any) to which GRE might be exposed; in addition, at this stage, the legal proceeding seeks declaratory relief only.

By way of further background, Laurum is the Canadian Area Developer and master franchisee, and the issue in dispute is whether Laurum met its requirement to open a designated number of offices within a certain time period. If the required number of offices were opened, Laurum would have the right to renew the ADA and master franchise agreements for an additional 10-year period, effective in 2011; if not, it would not. There is no provision in the present agreements which would permit GRE to compel Laurum to terminate its use of the GMAC marks. Both sides have retained counsel and the matter is pending.

(c) The master franchise agreement with the master franchisee for Portugal was recently amended to permit GRE to direct the master franchisee to discontinue using the GMAC brand and to begin using another brand.

- 49 -