**Hearing date: December 16, 2015 at 10:00 a.m. (Prevailing Eastern Time)**
**Response Deadline: December 9, 2015 at 4:00 p.m. (Prevailing Eastern Time)**

Susan Marie Gray
Attorney at Law
22255 Center Ridge Road; Suite 210
Rocky River, OH  44116
Telephone:  (440) 331-3949
Facsimile: (440) 331-8160
smgray@smgraylaw.com

Counsel for Patricia J. McNerney
Also on Behalf of Susan M. Gray, *Pro Se*

### IN THE UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 12-12020 |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, *et al.,* | ) | JUDGE MARTIN GLENN |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |

**RESPONSE OF PATRICIA MCNERNEY AND SUSAN GRAY IN OPPOSITION TO RESCAP BORROWER CLAIMS TRUST'S OBJECTION TO CLAIM NOS. 4757, 4758, 4762, AND 4764, FILED BY PATRICIA MCNERNEY AND SUSAN GRAY**

i

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ........................................................................1

II. JURISDICTION, VENUE, AND STATUTORY PREDICATE....................................1

    A. The "First-Filed" Doctrine and Abstention Both Favor Litigation In the Court Whose Jurisdiction Was First Invoked ....................................................1

    B. Venue for the Non-Bankruptcy Issues Should Be the Ohio District Court ........4

    C. Statutory Predicate .......................................................................4

III.  BACKGROUND AND STATEMENT OF FACTS ....................................................6

    A. The Predatory Loan to Ms. McNerney .............................................6

    B. The Legal History Between the Parties ...........................................10

        1.   The First Complaint Filed by MERS (for Homecomings/GMAC) ..............10

        2.   Ms. McNerney's Appeal to the Eighth District Court of Appeals................12

        3.   *Ms. McNerney's Appeal to the Ohio Supreme Court* ..................................12

        4.   Homecomings' Second Lawsuit in the Northern District of Ohio ..............13

IV.  RESPONSE IN OPPOSITION TO TRUST'S OBJECTION: THE TRUST IS NOT ENTITLED TO THE RELIEF SOUGHT ..........................................................15

    A.   Preliminary Matters Applicable to All Causes of Action................................15

        1.   An Agency Relationship Existed Between OMC (the Broker) and Homecomings, such that Homecomings, as principal, is liable for acts of its agent, OMC............................................................................................16

        2.   Relation back and tolling principles apply to Ms. McNerney's Counterclaims............................................................................................18

        3.   The statutes of limitations on Ms. McNerney's Federal causes of action were tolled and the Trust's Arguments Are Subject to Judicial Estoppel .............20

        4.   Several of the Trust's Arguments Were Rejected By the State Trial Court............................................................................................23

    B.  There Are Genuine Issues of Material Fact that Warrant A Trial on the Issue of Whether Homecomings Is Liable for OMC Lending's Breach of Fiduciary Duty Under An Agency Theory ..........................................................23

C.   There Are Genuine Issues of Material Fact that Warrant A Trial on the Issue of Whether Homecomings Is Liable for OMC Lending's Negligence/Improvident Lending Under An Agency Theory ...................................................................26

D.   Ms. McNerney's Fraud on the Court Claim May Be Cognizable .....................29

E.   The Ohio Consumer Sales Practice Act Claim Is Cognizable Against Homecomings .................................................................................................30

F.   Ms. McNerney's Claims under TILA Are Meritorious ...................................32

G.   Ms. McNerney's Claims Under RESPA Have Merit .........................................33

H.   Homecomings, as the principal, is liable for its agent's violations of the Ohio Mortgage Broker Act ........................................................................................34

I.   Loss Mitigation Is Moot .................................................................................34

J.   As the principal, Homecomings is liable for its agent's fraud, intentional misrepresentation and negligent misrepresentation ...........................................35

K.   The Civil Conspiracy In This Action Is Evident From the Facts that Occurred in the State Court Action .........................................................................................37

L.   The Loan Transaction At Issue In This Matter Was Both Procedurally and Substantively Unconscionable ..........................................................................38

M.   Ms. McNerney's Claim For Breach of Privacy Has Merit ...............................40

N.   Gray's Claim for Attorney's Fees Is Valid under TILA, RESPA, CSPA and OMBA .....................................................................................................41

NOTICE.............................................................................................................41

CONCLUSION....................................................................................................42


TABLE OF AUTHORITIES

<u>Cases</u>

*ABN AMRO Mortg. Group, Inc. v. Amold,* 2005-Ohio-925 ...................................31

*Abrams v. Worthington*, 169 App.3d 94, 2006-Ohio-5516 N.E.2d 920 (10th Dist.)..............26

*Abroms v. Synergy Building Systems,* 2011-Ohio-2180 .......................................35

*Allegaheny Health, Edu. and Research Foundation,* 312 B.R. 776 (Bankr. W.D.Pa. 2005) ..............................................................................5

*All Star Land Title Agency, Inc. v. Surewin Invest., Inc.*, 2006-Ohio-5729 (Ohio App. 8th Dist. 2006.....................................................................................................24

*Armstrong v. Harp Realty Co.*, 73 Ohio App. 3d 292 (Ohio 8th Dist. App. 1991) ..............18

*Blankenship v. CFMOTO Powersports, Inc.,* 2011-Ohio-948, ¶ 11, 2009 CVH 1340 (Ohio Misc. Ohio C.P. Clermont 2011).................................................................31

*Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655 (6th Cir. 2005) .................17

*Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424 (1965) ........................................... 20-21,22

*Burr v. Stark Cty. Bd. of Commrs.,* 23 Ohio St.3d 69, 73 (1986) ........................ 36

*Camp St. Marys Assn. of W. Ohio Conference of the United Methodist Church, Inc. v. Otterbein Homes*, 176 Ohio.App.3d 54 (Ohio App. 3d 2008) ........................................24

*Chalfie and Teller v. Monumental Life Ins. Co.*, 293 N.E.2d 329, 332, 33 Ohio Misc. 173 (Ohio Com.Pl. 1973) ........................................................................................16

*Chamberlin Grp. v. Lear Corp. (In re Lear)*, 09-14326 (Bankr. S.D.N.Y. 2009) .................2, 3

*Chicago Title Ins. Co. v. Huntington Nat'l. Bank,* 1999-Ohio-62. ........................................35

*Comer v. Risko*, 106 Ohio St.3d 185, 2005- Ohio-4559 (Ohio 2005) ...................................18

*Coulson v. Coulson*, 448 N.E.2d, 809, 811, 5 Ohio St.3d 12 (Ohio 1983)............................29

*Crown Property Development, Inc. v. Omega Oil Co.,* 113 Ohio App.3d 647 (Ohio App. 12th Dist. 1996) .........................................................................................................35-35

*Demajanjuk v. Petrovsky,* 10 F.3d 338 (6th Cir. 1993) .........................................................29

*Discover Bank v. Owens*, 129 Ohio Misc.2d 71, 2004-Ohio-7333......................................28

*Ed Schory & Sons v. Francis*, 75 Ohio St. 3d 433 (Ohio 1996) ............................................24

*Equicredit Corp. of Am. v. Jackson*, 2004-Ohio-6376, ¶ 46 (Ohio App. 7th Dist.)...............31

*Feinberg v. Bank of N.Y. (In re Feinberg)*, 442 B.R. 215 (Bankr. S.D.N.Y. 2010) ..............5

*Fuller and Associates v. Heil Windermere Moving and Storage Co.*, 2005-Ohio-2599 (Ohio App. 5th Dist. 2005) .................................................................................................37

*Glus v. Brooklyn Eastern Terminal*, 359 U.S. 231 (1959)...............................................21-22

*Graessle v. Nationwide Credit, Inc.,* No. 06-cv-00483, 2007 U.S. Dist. LEXIS 24870, (S.D. Ohio Mar. 21, 2007)...................................................28

*Gosden v. Louis*, 116 Ohio App.3d 195, 219 (Ohio App. 9th Dist. 1996) ...........................37

*Grigsby v. O.K. Travel*, 118 Ohio App.3d 671 (Ohio App. 1st Dist. 1997) ........................16

*Guth v. Allied Home Mortg. Capital Corp.*, 2008-Ohio-3386................................................30

, *Haefka v. W.W. Extended Care*, 2001-Ohio-1796 (Ohio App. 9th Dist. 2001)..................41

*Harris. V. U.S.*, 422 F.3d 322 (6th Cir. 2005) ....................................................18

*Haddon View Invest. Co. Coopers & Lybrand*, 70 Ohio St.2d 154 (Ohio 1982) .................36

*Housh v. Peth,* 165 Ohio St. 35 (Ohio 1956) ......................................................40

*Hummel v. Hummel,* 133 Ohio St. 520, 528 (Ohio 1938).......................................33

*Insurance Co. v. Wilkinson*, 13 Wall. 222 (1861)................................................22

*In re Fedders North America, Inc.,* No. 08-50549 (Bankr. D.C.D. 2009)............................28

*In re Robinson*, 55 B.R. 839 (Bankr. S.D. Ind. 1985).........................................2

*Jeffers v. Olexo*, 43 Ohio St. 3d 140 (1989)....................................................28

*Kellen Co. v. Calphalon Co*., 54 F. Supp.2d 218, 221 (S.D.N.Y. 1999) ...........................3

*King v. Ca.,* 784 F.2d 910, 914 (9th Cir. 1986) ..................................................22

*LaBarbera v. Batsch*, 5 Ohio App.2d 151 (Ohio App. 8th Dist. 1966) ................................19

*LaBarbera v. Batsch*, 10 Ohio St.2d 106 (Ohio 1967) ..........................................19

*Manley v. Personacare of Ohio*, 2007-Ohio-343..................................................38

*Merrit v. Countrywide Financial Corp*., 759 F.3d 1023 (9th Cir. 2014)..............................22

*Mills v. Best Western Springdale*, 2009-Ohio-2901 (Ohio Ct. App. 2009)..........................28

*Mid-state Horticultural Co. v. Pennsylvania R. Co.*, 320 U.S. 356 (1943)..........................22

*Morgan v. Graham*, 228 F.2d 625 (10th Cir. 1956) ...............................................29

*Mullinax v. Radian Guar., Inc*. 199 F.Supp.2d 311 (M.D.N.C. 2002) ...............................34

*Mussivand v. David,* 45 Ohio St.3d 314, 544 N.E.2d 265 (1989) .................................26

*Nat'l City Capital Corp. v. AAAA at Your Serv., Inc.*, 114 Ohio St.3d 82, 2007-Ohio-2942, 868 N.E.2d 663 (Ohio 2007)..................................................................21

*Nat'l RM Ins. Co. v. Gross*, 142 Ohio St.2d 132, 50 N.E.2d 258 (1943) .............................18

*Packard v. Provident Nat'l Bk,* 994 F.2d 1039, 1049 (3d Cir. 1993) ....................................28

*Pickle v. Swinehart,* 170 Ohio St. 441 (Ohio 1960) ..............................................................37

*Plating Resources, Inc. V. UTI Corp.*, 47 F.Supp.2d 899 (N.D. Ohio 1999) ........................2

*Pratt v. Payne,* 794 N.E.2d 723 (Ohio Ct. App. 2008)..............................................................

*Reliance Ins. Co. v. Six Star, Inc.*, 155 F.Supp.2d 49 (S.D.N.Y. 2001)................................2

*Rudisell v. Fifth Third Bank*, 622 F.2d 243(6th Cir. 1980)....................................................33

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 (3rd Cir. 1996)........23

*Semmes Motors v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970)) ......................................2

*Schaller v. Nat'l Alliance Ins. Co.,* 496 F. Supp. 2d 890 (N.D. Ohio 2007)....................30-31

*Sustin v. Fee,* 69 Ohio St.2d 143 (Ohio 1982) ......................................................................41

*Swayne v. Beebles Invests. Inc*, 176 Ohio App.3d 293 (Ohio App. 2008) ......................25,26

*Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1153 (D.C. Cir. 1984)..........................................38

*UBS Real Estate Securities, Inc. v. Teague*, 191 Ohio App.3d 189, 2010-Ohio-5634.........34

*U.S. v. Stauffer Chem. Co.*, 464 U.S. 165, 170 (1984) ..........................................................23

*Vitrified Prods. V. On Application to Certify Crooks,* 20 Ohio L. Abs. 627 (1935) .............38

*Warfel v. Chase Bank USA, N.A.*, No. 2:11-cv-699 (S.D. Ohio 2012) ..................................2

*Wells Fargo Home Mortg., Inc. v. Neal,* 398 Md. 705,727 (Md. 2007)................................35

*Wells Fargo v. Wick*, 2013-Ohio-5422 ..................................................................................25

*Westchester Mort. Co. v. Grand Rapids and Ionia R.R. Co.,*
213 N.Y.S. 593, 599 (N.Y. 1926) ...........................................................................................38

*Williams v. Aetna Finance Company,* 83 Ohio St. 3d 464 (Ohio 1998)................................37

*Zide Sport Shop of Ohio, Inc., v. Ed Tobergate Assoc., Inc.*,
16 Fed.Appx. 433 (6th Cir. 2001)............................................................................................2

*Zuber v. Ohio Ins. Dept.,* 34 Ohio App.3d 42, 45 (1986)......................................................36

<u>Statutes</u>

Ohio Revised Code 1302.15 ...................................................................................................38

Ohio Revised Code 1322.01, 062, 07, 11 ...............................................................................24

Ohio Revised Code 1345.01, 02, 03 ..................................................................................30-31

Ohio Revised Code 2305.19 ...................................................................................................19

Ohio Revised Code 5725.14 ...................................................................................................31

20 CFR § 30.35 ......................................................................................................................35

11 U.SC. §101 .........................................................................................................................4

11 U.SC. § 501 .........................................................................................................................4

11 U.S.C. § 502.......................................................................................................................4-5

12 U.S.C. § 2614 ....................................................................................................................20

15 U.S.C. §§ 1631, 1632 and 1635 ........................................................................................32

15 U.S.C. § 1640 ....................................................................................................................20

28 U.S.C. § 1334......................................................................................................................2

Other Authorities

11 Wright & Miller, Fed. Practice and Pro. (1973) 253, Sec. 2870

18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and
Procedure § 4477 (1981).......................................................................................................23

*Black's Law Dict.,* 7th ed. p. 1528 .......................................................................................27

Fed.R.Bankr.P. 3001................................................................................................................4

Fed.R.Bankr.P. 3003................................................................................................................5

Fed.R.Bankr.P. 3007................................................................................................................5

Fed.R.Bankr.P. 7008................................................................................................................5

Fed.R.Bankr.P. 9014................................................................................................................5

Fed.R.Civ.P. 8........................................................................................................................35

Rule 9 of the Ohio Supreme Court Rules and Practice........................................................28,

**TO THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

## I.  PRELIMINARY STATEMENT

Patricia McNerney and Susan Gray (Claimants) hereby respond in opposition to the objection to claim filed by ResCap Borrower Claims Trust (Trust).  The Trust objects to the claims on the sole basis that the claims do not state a basis for liability against the Debtors. *Objection*, p. 1.  Interestingly enough, the remainder of the Objection then discusses the basis of the claims.  Further, the claims properly state the basis for liability as being the unliquidated causes of action currently pending in the United States District Court for the Norther District of Ohio – the forum whose jurisdiction was first invoked.  Rather than have that Court decide the merits of the causes of action, the Trust seeks a determination on the merits from this Court.  In essence, the Trust has filed an objection to the above claims arguing that the lawsuit that has been pending in Ohio for over three years and has been briefed on several of the issues, should now be litigated in New York with no need to transfer the suit and no need to lift the automatic stay.

As is more fully discussed below and in the accompanying Motion for Modified Relief from Stay, this Court should abstain from such a determination and allow the Northern District of Ohio, the Court whose jurisdiction was first invoked, to decide the merits of the claims under the "first-filed" doctrine and/or in the interests of justice and judicial economy.

Assuming the Court does not choose to abstain, the Trust's objection should be overruled, as the claims of Ms. McNerney and Ms. Gray have merit.

## II. JURISDICTION, VENUE, AND STATUTORY PREDICATE

1

A. *The "First-Filed" Doctrine and Abstention Both Favor Litigation In the Court Whose Jurisdiction Was First Invoked.*

As the Trust clearly outlines in its Objection, the underlying causes of action that form the basis of the Claims have been pending in the United States District Court for the Northern District of Ohio since 2011 (Ohio District Court).  In its Objection, the Trust does not merely seek a determination on the treatment of the claims.  Rather, it seeks a determination on the *merits* of the causes of action that form the basis of the unliquidated claims.

It is well-established:

> [W]hen actions involving nearly identical parties and issues have been filed in two different district courts, the court in which the first suit was filed should generally proceed to judgment. *Zide Sport Shop of Ohio, Inc., v. Ed Tobergate Assoc., Inc.*, 16 Fed.Appx. 433, 437 (6th Cir. 2001). The rule serves to prevent duplicative litigation and promote judicial efficiency. *Graessle v. Nationwide Credit, Inc.*, No. 06-cv-00483, 2007 U.S. Dist LEXIS 24870, at *8 (S.D. Ohio Mar. 21, 2007); *Plating Resources, Inc. V. UTI Corp.*, 47 F.Supp.2d 899, 903 (N.D. Ohio 1999).

*See Warfel v. Chase Bank USA, N.A.*, No. 2:11-cv-699 (S.D. Ohio 2012).  *See also*, *Chamberlin Grp. v. Lear Corp. (In re Lear)*, 09-14326 (Bankr. S.D.N.Y. 2009) (dismissing litigation in a Chapter 11 because identical suit had been pending in an Illinois District Court for over four years under the first-filed doctrine and discretionary abstention pursuant to 28 U.S.C. § 1334(c)(1)).  The doctrine is not intended to be applied mechanically, but it creates a strong presumption in favor of the forum of the first-filed suit.  *Reliance Ins. Co. v. Six Star, Inc.*, 155 F.Supp.2d 49, 54 (S.D.N.Y. 2001).  "The party seeking to avoid application of the first-filed doctrine has the burden of showing that exceptional circumstances exist or that principles of convenience dictate proceeding with the second action."  *In re Lear*, 09-14326 (citing *Semmes Motors v. Ford Motor Co.*, 429 F.2d 1197, 1202 (2d Cir. 1970)).

As the Court in *In re Lear* noted, Courts generally consider the following factors when weighing the convenience of competing forums:

> (1) the convenience of witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiffs choice of forum; (9) trial efficiency and the interests of justice based on the totality of the circumstances.

*In re Lear*, 09-14326 (quoting *Kellen Co. v. Calphalon Co.*, 54 F. Supp.2d 218, 221 (S.D.N.Y. 1999)).

As noted above, the Ohio District Court matter has been pending since 2010, with Ms. McNerney's claims pending since 2011. *See* Docket, attached hereto as Exhibit ("Exh.") B. Also attached hereto are two documents Homecomings filed in the Ohio Northern District: (1) a motion for judgment on the pleadings (Exh. C); and (2) a motion for summary judgment. (Exh. D). The arguments made in those documents are almost identical to those made in the Trust's objection. Moreover, on July 17, 2013, the Homecomings filed a motion in that Court seeking to dismiss its remaining breach of contract cause of action. In doing so, Homecomings made clear to the Ohio District Court that Ms. McNerney's claims would remain pending. (Exh. E). On August 7, 2013, the Ohio District Court granted the motion and stated it would maintain jurisdiction over Ms. McNerney's federal and state law claims. (Exh. F).

Based upon the foregoing, it is clear the merits of the causes of action that form the basis of the Claims were first pending in the Ohio District Court, with the same parties, and based upon the same issues. Under the first filed doctrine, there is a strong presumption that the merits should be decided by the Ohio District Court. The burden is upon the Trust to show exceptional circumstances exist or that principles of convenience dictate proceeding with the second action.

3

*In re Lear,* No. 09-14326. (Exh. A).    However, application of the factors espoused in *Kellen*

shows litigation in the Ohio District Court is more convenient.  The majority of the witnesses are

in Ohio and the location of evidence is in Ohio.  Moreover, Ohio would be more convenient for

Ms. McNerney, as she resides in Ohio.  *See* McNerney Declaration. Exhibit 1.  Traveling to and

lodging in New York would cause a great financial burden to Ms. McNerney and her witnesses.

*Id.*    Further, there are no exceptional circumstances to have the merits of the causes of action

decided in this Court, as numerous other issues are being handing in various courts (e.g., the

NACBA motion for relief cases).  In addition, there are no issues of delaying plan confirmation,

as the Plan was confirmed on December 11, 2013. (*See* Docket).  All these factors weigh heavily

in the Ohio District Court being the more convenient forum. Once the merits of the causes of

action can be determined, and a sum certain is revealed, the matter can then proceed in this Court

through the claims process.

      B.    *Venue For the Non-Bankruptcy Matters Should Be In the Ohio Northern District*

While venue in this Court and District may be proper for pure bankruptcy matters, as

discussed above, the merits of the underlying causes of action that form the proofs of claim

should be decided in the Ohio District Court.

      C.    *Statutory Predicate*

The bankruptcy code allow creditors to file claims for unliquidated causes of action

whether or not they have been reduced to judgment.  11 U.SC. §§101(5), 501.  If a written proof

of claim is filed with supporting information, the filing thereof is prima facie evidence of the

claim's validity and amount.  Fed.R.Bankr.P. 3001(f).

Objections to a proof of claim are governed by Rule 3007 and Section 502 of the

Bankruptcy Code.  Once an objection is made, after notice and a hearing, the Court shall

4

determine the amount of the claim and allow the claim except to the extent it is not enforceable against the debtor and property of the debtor.  11 U.S.C. § 502(b).  Further, "[t]here shall be estimated for purpose of allowance under this section any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c).

In an ordinary claims-objection scenario, the creditor files a claim, the debtor files and objection, and the Court makes a determination of whether the claim is supported by the evidence.  In fact, the Trust stated, "the burden of persuasion once an objection refutes an essential allegation of the claim is on the holder of a proof of claim to establish a valid claim against a debtor by a preponderance of the evidence. Objection to Claim, at p. 5 (citing *Feinberg v. Bank of N.Y. (In re Feinberg)*, 442 B.R. 215, 220-22 (Bankr. S.D.N.Y. 2010)).

It is odd for the Trust to say Ms. McNerney and Ms. Gray must come forward with evidence to support their claims when the gravamen of the Trust's arguments centers on pure issues of law.  In fact, the whole objection alleges each cause of action "fails as a matter of law." This begs the question of what the proper standard is for this type of objection to claim.[1]  One easy way to get around this issue is to have the merits of the causes of action decided in the Ohio District Court prior to entertaining the claims issues.  Further, the relief sought by the Trust, a dismissal of substantive causes of action through an objection to claim, certainly raises the

---

[1] If an objection to claim is not joined with a demand for other relief, it constitutes a contested matter that is governed by Fed.R.Bankr.P. 9014. *See* Fed.R.Bankr.P. 3007, 11 U.S.C.A. (West 2004), advisory committee's note. The instant objection to claim by the Trust constitutes a contested matter.  If the Court does not permit the matters to be decided in the Ohio District Court, certainly the matters would be better disposed of via summary judgment after discovery. *See In re Allegaheny Health, Edu. and Research Foundation,* 312 B.R. 776, n.1 (Bankr. W.D.Pa. 2005) (contested matters may be disposed of via summary judgment).  A large part of the Trust's objection is based upon assertion of the applicable statute of limitations, which is an affirmative defense.  Fed.R.Civ.P. 8(c), made applicable to bankruptcy proceedings through Fed.R.Bankr.P. 7008.

question whether the proper vehicle would have been an adversary action.  *See*  Fed.R.Bankr.P.

3003.

In any event, Ms. McNerney and Ms. Gray filed proofs of claim with supporting information.

Their claims are therefore prima facie valid.   The Trust has not come forward with any

contradictory evidence to overcome the prima facie validity of the claims.  If anything, the Trust

has created genuine issues of material fact that would be better resolved at trial.  Those issues are

discussed in turn.

### III.  BACKGROUND AND STATEMENT OF FACTS

A.    The Predatory Loan To Ms. McNerney

Ms. McNerney had just been divorced.  *See* McNerney Declaration at ¶ __5_.  Pursuant

to the Divorce Court's order, Ms. McNerney was award the home located at 1241 Thoreau Road

(Property).  *Id.*  at ¶ 5, 6. In addition, she was ordered to have the Property placed in her name

only.  *Id.*  at ¶ 5, 6. To accomplish this task, Ms. McNerney contacted Nancy George at OMC

Lending, Inc., the broker of the loan (Broker).  *Id.*  at ¶ 7. Ms. McNerney told the Broker what

she wanted to accomplish – to get her husband's name off the deed and lower her monthly

payment – a payment she was no longer financially able to make.  *Id.*  at ¶ 8.  However, the

Property had a mortgage on it at an interest rate of thirteen percent (13%) with a monthly

payment of $985.00, which did not include escrow of insurance ($30.00 per month) or property

taxes ($230.81 per month).  *Id.*  at ¶ 9. Together, her monthly property expenditures were

approximately $1,245.81.

The Broker informed Ms. McNerney that she could refinance the loan to accomplish her

goal of removing her husband's name from the deed, and at the same time, have a lower monthly

payment.  *Id.*  at ¶ 11.  Ms. McNerney then provided the Broker (for the Homecomings

underwriting analysis) accurate evidence of her monthly earned income, her meager financial holdings (including an IRA) and a complete copy of her divorce decree disclosing monthly child support terms (and the end date thereof). *Id*. at ¶ 9.

The Broker and/or Homecomings entered false information into the FNMA Desktop Underwriter (Homecomings' underwriting system) for the underwriting analysis. *See* Transcript of trial at Cuyahoga County Court of Common Pleas, Exhibit A to Debtor's objection to claims, at transcript pages 86-112.

Homecomings reviewed the correct information from Ms. McNerney, noted the false information in the Desktop underwriter, and failed to correct the information submitted to FNMA via the Desktop underwriter. *Id.* Thus, Homecomings at all times thereafter and before closing knew that Ms. McNerney did not qualify for the loan and did not have income or assets to make the payments. *See id.*

After the application process, the Broker informed Ms. McNerney that she was approved for a loan at eight percent (8%) with a monthly payment of $850.00 that included escrow for property taxes. ***McNerney Declaration, Para 12;*** Trial Transcript, pp. 204, 209. On its face and according to the Broker's statements, this certainly sounded like a great deal for Ms. McNerney as she started life anew after her divorce. McNerney Declaration at ¶ 13. However, what looked too good to be true, was too good to be true. Unbeknownst to Ms. McNerney, the Broker was fraudulently/negligently entering information into Homecomings' underwriting software so she would appear to qualify for a loan that she did not. Moreover, Homecomings was aware of this fraud/negligence and did nothing to correct it. Trial Transcript, Exh _86-112.

7

The loan transaction was originally scheduled to close on December 27, 2002 with Brooklyn Title Agency, Inc. (BTA). [2] In Later December 2002, an employee of BTA called Ms. McNerney and informed her that the closing would not occur until she paid an additional $8,150.00 in closing costs. *McNerney Aff.* at ¶ 15. This change in circumstances surprised Ms. McNerney and she questioned the accuracy of the information. *Id.* at ¶ 16.

Ms. McNerney then called the Broker (OMC) to confirm the accuracy of the information she just learned, and to her consternation, verified it was true. *Id.* at ¶ 16. The Broker suggested Ms. McNerney liquidate her meager IRA with all the tax consequences thereof. *Id.* at ¶ 17. Since Ms. McNerney needed the relief afforded by the promised lower monthly payment, and in anticipation of the benefit of the lower payment, she withdrew funds from her IRA on January 3, 2003, and went to Brooklyn Title to close the loan on some date on or after January 3, 2003. *Id.* at ¶ 18.

On or about January 3, 2003, Ms. McNerney entered into the loan (a consumer credit transaction) with Homecomings Financial Network, Inc. (Homecomings) (as stated in the HUD 1 statement and promissory note; however, the mortgage names Mortgage Electronic Registration Systems, Inc. (MERS) as the mortgagee, as nominee for Homecomings). *See* McNerney Declaration at ¶ _19__ and HUD 1 statement attached thereto as Exh. _A__.

The loan was in the amount of $108,000.00 in which Homecomings, as lender, extended consumer credit subject to a finance change and payable to Homecomings at its mailing address in Michigan. *See* McNerney Declaration at ¶ _20, 21__ and Mortgage attached thereto as Exh. _B__.

---

[2] BTA was owned by Raymond George, the then husband of Nancy George, who owned OMC Lending, Inc.

As part of the consumer credit transaction, MERS, "acting solely as nominee for Lender and Lender's successors and assigns" was given a security interest in Ms. McNerney's principal residence, which security interest was the subject of the foreclosure proceeding. *See id.* MERS had no actual beneficial interest in the note of the mortgage, hence the use of the word "nominee." *Id.* MERS only interest in this lawsuit stemmed from its agreement with Homecomings or GMAC to register mortgages and pursue and defend lawsuits with respect to mortgages registered on its system.

At the closing on or after January 3, 2003, Ms. McNerney delivered a First Federal of Lakewood certified check no 1-314628 in the amount of $8,150.00 payable to Brooklyn Title with the same date thereon. *Id.* at ¶ 19, and copy of check attached thereto as Exh. C. When she arrived for the closing, Ms. McNerney learned, for the first time, that Homecomings required as a condition of the loan private mortgage insurance (PMI) in the amount of $178.20 per month. *Id.* at ¶ 22; Exhibit D. As a result of the imposition of private mortgage insurance, the amount of the payment on the new loan, now increased to $1,232.48/month, was essentially indistinguishable from the amount of the payment on the loan refinanced.

Homecomings also chose the provider of private mortgage insurance and did not give Ms. McNerney a choice to select her own insurer or to shop around for any lower costs. *Id.* at ¶ 23. Neither Homecomings nor OMC Lending informed Ms. McNerney of the imposition of PMI prior to the actual closing. *McNerney Declaration* at ¶ 22. It is clear that the imposition of PMI was a material change to Ms. McNerney's detriment.

The loan closed and the funds were disbursed on the same day. On the date of closing, on or after January 3, 2003, Ms. McNerney received only <u>one</u> notice of right to cancel stating

that December 31, 2002 was the deadline to exercise her right to cancel. *McNerney Declaration.* at ¶24, 25; Exhibit H.

Ms. McNerney received two different Truth in Lending disclosure statement that contained inaccurate and false disclosures, both issued on or after January 3, 2003, at the time of the closing of the loan transaction. *McNerney Declaration* at Para. 26, and Exhs. E and F attached thereto. She also received two conflicting "final" RESPA settlement statements issued on January 3, 2003, in connection with the closing of the loan transaction. *Id*. at Para. 27, and Exhs. I and J attached thereto.

Ms. McNerney was unable to pay the loan and rapidly became delinquent. Although she vigorously pursued loss mitigation, Homecomings failed to participate in loss mitigation, simply telling her she did not qualify. *Id*. at ¶ 28.

Homecomings, through a sham entity, MERS, filed the first foreclosure action in the Cuyahoga County Court of Common Pleas on November 12, 2003, a merely 10 months after closing. Throughout the foreclosure proceeding, and even after its dismissal by the court, agents of Homecomings came to the home of Ms. McNerney and publically humiliated her and her children. The agents came by in cars to take pictures, and at times, the agents got out of the car and came onto the property and called out to the family and heckled them while the family was visiting together on their front balcony. The agents would call out in loud voices that the family should stand up and wave and smile for the cameras. *Id. Para. 29, 30.*

Ms. McNerney and her children suffered humiliation, embarrassment, anxiety and emotional distress as a result of the conduct of Homecomings' agents. Ms. McNerney and her children became ill and could not live under such conditions. As a result, Ms. McNerney and her children moved to another location. *Id. Para 44.*

Because Ms McNerney, on her limited means, could not maintain the home while living elsewhere, the home deteriorated and was condemned.

B.    <u>The Legal History Between the Parties</u>

*1.  The First Complaint Filed by MERS (for Homecomings/GMAC).*

MERS had an agreement with Homecomings and/or GMAC whereby it agreed to provide assistance to Homecomings and/or GMAC in pursuing or defending lawsuits with respect to mortgages registered on the MERS system, and the mortgage at issue in particular.

On November 10, 2003, MERS filed a foreclosure lawsuit against Ms. McNerney in the Cuyahoga County Court of Common Pleas. *See* Docket attached as Exhibit E to Objection to Claims. The matter proceeded through discovery and motions for summary judgment.  *Id.* MERS' motion for summary judgment was denied on February 20, 2007 via Magistrate's Decision.  MERS' objections to the Magistrate's Decision were overruled on December 10, 2007. *Id.* Homecomings/GMAC was then substituted as the Plaintiff on November 4, 2008.  *Id.* The matter proceeded to bench trial on November 13, 2008. *Id.*  During trial, representatives from Homecomings testified that Homecomings continuously owned and held the note since the inception of the loan. CITE.

After trial, the Eighth District Court of Appeals decided the case of *Wells Fargo v. Jordan*, 2009-Ohio-1092 (finding the plaintiff lacked standing to bring foreclosure against the defendant when the complaint was filed).  The trial court then ordered MERS "to provide the Court with a brief demonstrating that it owned the subject promissory note as of the date of the filing of its complaint." *Id* Trial Court Docket.

The Plaintiff never held the note and it was not the owner of the mortgage.  As such, it could not come forward and present evidence of standing to the Cuyahoga County Court of

Common Pleas prior to case commencement. The case was then dismissed without prejudice, along with Ms. McNerney's Counterclaims, over her objection.

Thus, for six years Homecomings, through a plethora of fraudulent paperwork, imposed upon the court and the parties, perpetrated a fraud upon the court and the parties, caused Ms. McNerney to incur substantial liability for costs and attorney's fees to defend the false statements in the fraudulent paperwork, and caused Ms. McNerney and her children severe emotional distress as a result of the protracted litigation.

*2. Ms. McNerney's Appeal to the Eighth District Court of Appeals*

Ms. McNerney then timely appealed the dismissal of her Counterclaims to the Eighth District Court of Appeals on October 13, 2009. She argued that dismissal of her counterclaims based on federal law where the statute of limitations had run during the case, which had an independent basis for jurisdiction, while stated without prejudice, operated as a dismissal with prejudice because the state savings statute could not be used to refile those claims. Homecomings/GMAC vehemently opposed Ms. McNerney's appeal arguing, in effect, the dismissal without prejudice was not a final, appealable order and the savings statute argument was not relevant.

The Eighth District dismissed the appeal. McNerney's motion for reconsideration was overruled on December 11, 2009. *See Certified Orders*, attached hereto as Exh. __K__.

*3. Ms. McNerney's Appeal to the Ohio Supreme Court*

On January 22, 2010, McNerney timely appealed to the Ohio Supreme Court on a discretionary appeal.

Homecomings again opposed the discretionary appeal, and in effect, argued McNerney's savings statute argument was without merit. The Ohio Supreme Court issued its final order not

accepting the discretionary appeal on April 14, 2010.  *See Case Announcements*, 2010-Ohio-1557, at p. 11 (Ohio 2010).

### 4.  *Homecomings' Second Lawsuit in the Northern District of Ohio*

On October 14, 2009, the day after the appeal was dismissed by the Eighth District Court of Appeals and during the appeal time to the Ohio Supreme Court, Homecomings filed a complaint for foreclosure against Ms. McNerney.  *See* Ohio Dist. Ct. Docket attached as Exhibit H to Objection to Claims

After an unsuccessful motion to dismiss and after granted leave, Ms. McNerney filed an Answer with Affirmative Defenses and Counterclaims against Homecomings as follows:  (1) Violations of the Truth in Lending Act (TILA), including rescission and claims for damages (Counts 1-3); Violations of the Real Estate Settlement Procedures Act (RESPA) (Count 4); Improvident Lending (Count 5); Breach of Fiduciary Duty (Counts 6 and 14); Negligence and Gross Negligence (Count 7); Negligent and Intentional Misrepresentation (Count 8); Unconscionability (Count 9);  Civil Conspiracy (Counts 10, 15, and 16); Violations of the Mortgage Loan Broker Act – Ohio Revised Code 1322.01, et seq. (Count 11); Failure to Engage in Loss Mitigation (Count 12); Fraud and Intentional Misrepresentation (Count 13); and Violations of the Ohio Consumer Sales Practices Act, Ohio Revised Code 1345.01, et seq. (Counts 14 and 17).  Ms. McNerney sought damages, rescission, and attorney's fees.  She also demanded a trial by jury on those issues that were so triable.

Ms. McNerney alleged, in addition to the above facts, at all times, she was a natural person who, at the time of the transaction, and resided at 1241 Thoreau Road, Lakewood, Ohio 44107 until she moved, as noted above.    McNerney Declaration. at ¶ 5.  At all times, Homecomings was a corporation engaged in the business of Consumer Lending with an address

as set forth on the HUD 1 statement of 27725 Stansbury Blvd, Suite # 375, Farmington Hills, MI 48334 (for Homecomings). *Id*. at ¶ 27, and Exh. I and J

At all times relevant, Homecomings, in the ordinary course of its business, regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or by written agreement which is payable in more than four installments, with the credit extended or offered primarily for personal, family, or household purposes.

OMC, at all times relevant, was a corporation located and doing business at 4311 Ridge Road, Brooklyn, OH 44144. As more fully discussed below, Homecomings is liable as principal or in the context of a civil conspiracy for the acts and/or omissions of OMC. OMC was the broker for the transaction which is the subject of the Ohio District Court proceedings. OMC had a broker agreement with Homecomings. Trial Transcript pp. 86 ff.

In furtherance of the agreement, Homecomings, on a regular basis, provided OMC Lending with rate sheets which showed the interest rates for which various loans could be made, and the enhanced broker fee, in the form of a yield spread premium, which OMC Lending could earn if it sold a loan for an interest rate in excess of the available rate for which a borrower qualified. *Id* The rate sheet disclosed the bonus OMC Lending would receive for closing the loan at the rate provided to Ms. McNerney in the transaction at issue. *Id.* OMC Lending never advised Ms. McNerney that she could qualify for a lower rate than the one provided. *Declaration of Patricia McNerney Para. 32.* OMC Lending did not disclose to Ms. McNerney that it would receive a bonus or fee for providing her with an interest rate higher than the one for which she could qualify. *Id.*

OMC Lending knew that Household, which had a mortgage on Ms. McNerney's home at the time of the refinance, would make a competitive offer for a refinance if it knew that Ms.

14

McNerney was seeking a refinance. OMC Lending deliberately refrained from seeking payoff information from Household until the very last minute prior to the scheduled closing in order to foreclose an opportunity for Ms. McNerney to consider a competitive offer from Household.  As a result of OMC Lending's deliberate decision to delay contact with Household in order to foreclose Ms. McNerney's opportunity to consider a competitive offer from Household.  Ms. McNerney was foreclosed from having an opportunity to consider a competitive offer from Household.

As a further result of OMC's deliberate decision to delay contact with Household, Ms. McNerney was not timely informed that the payoff to Household was higher than anticipated. OMC received a fee from Homecomings to sell the loan package to Ms. McNerney.

On September 28, 2011, Homecomings filed a motion for judgment on the pleadings with respect to some of Ms. McNerney's claims and a motion for summary judgment with respect to the remainder of the claims.  Ms. McNerney timely responded in opposition.

The arguments made by the parties in those documents are substantially similar to those made by the Trust.  In fact, the Trust anticipated arguments against its positions via those documents.

It is these causes of action and the relief sought that support the claims that are at issue herein and the objection thereto.

## IV.  RESPONSE IN OPPOSITION TO TRUST'S OBJECTION: THE TRUST IS NOT ENTITLED TO THE RELIEF SOUGHT

### A.  *Preliminary Matters Applicable to All Causes of Action*

Before we respond and object to the Trust's specific arguments, there are some preliminary arguments that relate to many of the causes of action and the Trust's arguments.

First, Homecomings (and now the Trust) and OMC Lending had an agency relationship at the time the loan was made to Ms. McNerney.  Acts of an agent are attributable to its principal.  Second, the date Ms. McNerney actually filed her Counterclaims in the Ohio District Court is irrelevant.  Rather, the date to be used is the date Homecomings filed its Complaint in that court under relation back. Further, her state law claims were timely under Ohio Savings statute.  Third, not only were the applicable statutes of limitation for Ms. McNerney's federal causes of action tolled, the Trust's arguments that the savings statute does not "save" her federal claims should be disregarded on the theory of judicial estoppel. Fourth, the legal bases of Ms. McNerney's claims have already survived the scrutiny of the arguments set forth in the Objection to Claim.  For example, MERS' motion for summary judgment on these claims was denied and the matter proceeded to trial in the Cuyahoga County Court of Common Pleas. Certainly, principles of collateral estoppel should apply.

1. An Agency Relationship Existed Between OMC (the Broker) and Homecomings, such that Homecomings, as principal, is liable for acts of its agent, OMC.

"A principal and agency relationship exists when one party exercises the right of control over the actions of another, and those actions are directed toward the attainment of an objective which the former seeks. But the manner in which the parties designate the relationship is not controlling, and if an act done by one person on behalf of another is in its essential nature one of agency, the one is the agent of such other notwithstanding he is not so called." *Grigsby v. O.K. Travel*, 118 Ohio App.3d 671, 675 (Ohio App. 1st Dist. 1997) (internal citations and quotations omitted and emphasis added).

Under Ohio law, mortgage brokers have been found to be agents of lenders.  *Chalfie and Teller v. Monumental Life Ins. Co.*, 293 N.E.2d 329, 332, 33 Ohio Misc. 173, 177 (Ohio Com.Pl. 1973).  The Sixth Circuit Court of Appeals stated, "[a]n agency relationship may arise pursuant

to several theories. First, actual agency occurs where a consensual relationship exists between the agent and principal. Agency relationships may also arise from apparent agency or agency by estoppel. The principal's ratification of the unauthorized acts of another may also establish an agency relationship. *Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655, 661 (6th Cir. 2005) (citations omitted). Any conflicting evidence as to the existence of an agency relationship is sufficient to overcome a motion for summary judgment (or in this case, an objection to claim on purely legal grounds). *See id.* at 661.

In this matter, an agreement existed between Homecomings and OMC Lending to create a limited express agency. *See* Plaintiff's Memorandum in Support of Summary Judgement filed in the Ohio District Court, fn 3, attached as Exh. ____. The agreement attempted to limit the agency relationship to OMC acting as Homecomings' agent for the sole and limited purpose of delivering notices of action taken as required by the Equal Credit Opportunity Action and Regulation B. *Id.* However, the Trust does not provide evidence that either it or OMC Lending informed Ms. McNerney that their agency relationship was limited to the extent stated in their agreement. Rather, Homecomings allowed OMC Lending to gather information on its behalf, enter underwriting data on its behalf into the FNMA desktop underwriting software (Exh. ____ p. 94, lines 12-25) and present documents to Ms. McNerney with Homecomings' name stated thereon. These actions by Homecomings created an implied or apparent agency relationship. The parties' attempts to limit the agency relationship through a document was not controlling. *Grigsby,* 118 Ohio App.3d at 675. Further, not only did OMC Lending purposely input into Homecomings' desktop underwriter incorrect and fraudulent information in order to make it appear as though Ms. McNerney would qualify for the loan at issue in this matter, but Homecomings was aware of the incorrect and fraudulent information and did not change it. (Exh.

_____ p. 102, lines 8-14; p. 103 lines 10-25; p. 104, lines 1-21; p. 101 lines 13-25; p. 102 lines 1-15.)  This is pure and simple ratification.  As such, based upon Homecomings' ratification of OMC Lending's unauthorized and fraudulent acts, an agency relationship existed.

Thus, whether express, apparent, or via ratification, an agency relationship existed between Homecomings and OMC Lending.  Because an agency relationship existed between Homecomings and OMC, Homecomings is liable for the unlawful acts of OMC Lending in furtherance of the consummation of the loan in this matter. *See, e.g., Comer v. Risko*, 106 Ohio St.3d 185, 2005- Ohio-4559, ¶ 20 (Ohio 2005) ("[t]he liability for the tortious conduct flows through the agent by virtue of the agency relationship to the principal").

2. *Relation back and tolling principles apply to Ms. McNerney's Counterclaims.*

Under Ohio law, "a counterclaim asserted by the defendant against the plaintiff, which relates to the same transaction or occurrence asserted in the original claim, relates back to the original commencement of the action." *Armstrong v. Harp Realty Co.*, 73 Ohio App. 3d 292, 294 (Ohio 8th Dist. App. 1991).  In other words, the filing of action by a plaintiff tolls the statute of limitations for counterclaims while that action is pending.  *See Nat'l RM Ins. Co. v. Gross*, 142 Ohio St.2d 132, 50 N.E.2d 258 (1943), paragraph two of the syllabus.  The statute continues to be tolled until all appeals are final.  *See Harris. V. U.S.*, 422 F.3d 322, 332 (6th Cir. 2005) (collecting cases that hold the statute of limitations is tolled until final judgment on appeal or during time which an appeal can be taken).

Here, MERS filed its original complaint in the Cuyahoga County Court of Common pleas on November 10, 2003.   Ms. McNerney asserted every claim in that action as she did in Ohio District Court with the exception of the privacy claim.   Under Ohio law, Ms. McNerney's counterclaims related back to the date of the complaint. Therefore, they were filed on that date –

November 10, 2003.   The closing occurred in January 2003 and the Complaint was filed in

November 2003 – a mere 10 months.   There is no doubt whatsoever that her claims were timely

when the complaint was filed in the state court.   Further, under Ohio law, the statute of

limitations was tolled during the pendency of the case through the date the court of appeals

issues it final order, which in this case, the Ohio Supreme Court issued its order on April 14,

2010.   Yet, Homecomings had already commenced its action prior to the Ohio Supreme Court

decision on October 14, 2009.   Consequently, the applicable statutes of limitations were tolled

through the filing of the complaint in the Ohio District Court. Thus, the statutes of limitations

have never run on any of Ms. McNerney's state causes of action.

On the other hand, even assuming the statutes were not tolled, the Ohio savings statute,

Ohio Rev. Code 2305.19, allowed Ms. McNerney to file her state law claims within one year

after the Ohio Supreme Court entered its order.   That section states:

> In any action that is commenced or attempted to be commenced, if in due time a
> judgment for the plaintiff is reversed or if the plaintiff fails otherwise than upon
> the merits, the plaintiff or, if the plaintiff dies and the cause of action survives, the
> plaintiff's representative may commence a new action within one year after the
> date of the reversal of the judgment or the plaintiff's failure otherwise than upon
> the merits or within the period of the original applicable statute of limitations,
> whichever occurs later. This division applies to any claim asserted in any pleading
> by a defendant.

Ohio Rev. Code § 2305.19(A).

When applying the savings statute, the date of affirmance on appeal is the date the

savings statute begins to run, not the date the trial court dismisses the action.   *LaBarbera v.*

*Batsch*, 5 Ohio App.2d 151, 159-160 (Ohio App. 8th Dist. 1966) (rev'd on other grounds by

*LaBarbera v. Batsch*, 10 Ohio St.2d 106 (Ohio 1967)).   Again, the Ohio Supreme Court's order

postdated the filing of the Ohio District Court.  Thus, under the savings statute analysis, Ms.
McNerney's state law claims were also timely.[3]

### 3.   *The statutes of limitations on Ms. McNerney's Federal causes of action were tolled and the Trust's Arguments Are Subject to Judicial Estoppel*

With respect to her federal claims under TILA and RESPA, Ms. McNerney asserts that
the applicable statutes of limitations were also tolled during the pendency of the state suit.
Generally, TILA maintains a one year statute of limitations that begins to run from the date of
the transaction that is the subject of the complaint. 15 U.S.C. § 1640(e).  RESPA likewise
maintains a one year statute of limitations.  12 U.S.C. § 2614.

In this matter, the closing occurred January 3, 2003.  The first foreclosure complaint was
filed on November 12, 2003.  Under the relation back doctrine, Ms. McNerney's counterclaims
were filed on November 12, 2003, under the one year statute of limitations for either TILA or
RESPA.  The statute of limitations was then tolled during the pendency of the state court action.

In *Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424 (1965), the Supreme Court reversed the
trial court's dismissal based on statute of limitations grounds holding:

> [W]hen a plaintiff begins a timely FELA action in a state court having
> jurisdiction, and serves the defendant with process and plaintiff's case is
> dismissed for improper venue, the FELA limitation is tolled during the pendency
> of the state suit. We believe that the interests of uniformity embodied in the Act
> are best served by holding that this rule, tolling the statute, applies in all States
> regardless of whether or not a State has a saving's statute.

*Id*. at 434-35.

The instant case, while based on a different federal law and being dismissed for other
reasons, is analogous to *Burnett.*  Read another way: when a party brings a timely TILA or
RESPA action in state court having jurisdiction, and serves the opposing party with process and

---

[3] The Trust does not allege Ms. McNerney's privacy claim, which has a four year statute of
limitations, *Salupo v. Fox, Inc.*, 2004-Ohio-149, ¶ 12, has run.

the case is dismissed, the TILA and RESPA limitation is tolled during the pendency of the state suit.

Here, there is no doubt Ms. McNerney's TILA and RESPA claims were timely when they were filed in the state court action and the case as dismissed due to MERS', GMAC/Homecomings' inability to show who was the proper plaintiff. While the trial court called it a dismissal "without prejudice," it operated as a dismissal with prejudice because the statute of limitations had run on Ms. McNerney's TILA and RESPA claims and they could not be filed again. *See Wells Fargo v. Wick*, 2013 – Ohio -5422, ¶ 6, (citing *Nat'l City Capital Corp. v. AAAA at Your Serv., Inc.*, 114 Ohio St.3d 82, 82, 2007-Ohio-2942, ¶ 1, 868 N.E.2d 663, 665 (Ohio 2007).[4]   Thus, the statute of limitations tolled during the pendency of the state court action, which includes all appeals.  *See Burnett*, 380 U.S. at 434-35.

As noted above, the second foreclosure action was filed in the Ohio District Court prior to the date the Ohio Supreme Court declined jurisdiction.  Under *Burnett*, the applicable statute of limitations for the TILA and RESPA claims was tolled when the foreclosure complaint was filed in 2009.  Moreover, Ms. McNerney's counterclaims related back to that date and were filed within the tolling period.

With respect to her federal claims under TILA and RESPA, Ms. McNerney also asserts that the applicable statutes of limitations were also equitably tolled.

In *Glus v. Brooklyn Eastern Terminal*, 359 U.S. 231 (1959), Glus claimed Brooklyn was estopped to plead the three year statute of limitations because Brooklyn had induced the delay by representing to him that he had seven years in which to sue. Id. at 232-33. The Court noted the following:

---

[4] That was the crux of Ms. McNerney's unsuccessful appeals.

> To decide the case we need look no further than the maxim that no man may take advantage of his own wrong. Deeply rooted in our jurisprudence this principle has been applied in many diverse classes of cases by both law and equity courts and has frequently been employed to bar inequitable reliance on statutes of limitations.

*Id.* The Court went on to quote Justice Miller in *Insurance Co. v. Wilkinson*, 13 Wall. 222, 233:

> The principle is that, where one party has, by his representations or his conduct, induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not, in a court of justice, be permitted to avail himself of that advantage. And, although the cases to which this principle is to be applied are not as well defined as could be wished, the general doctrine is well understood, and is applied by courts of law as well as equity where the technical advantage thus obtained is set up and relied on to defeat the ends of justice or establish a dishonest claim.

Id. at 233.  Later, in *Burnett v. New York Central R.R. Co.*, 380 U.S. 424, (1965) the Court noted that "[t]he basic question to be answered in determining whether, under a given set of facts, a statute of limitations is to be tolled is one "of legislative intent whether the right shall be enforceable . . . after the prescribed time." Id. at 426 (*quoting Mid-state Horticultural Co. v. Pennsylvania R. Co.*, 320 U.S. 356, 360 (1943)). "[T]he basic inquiry is whether congressional purpose is effectuated by tolling the statute of limitations in given circumstances." Id. at 427.

Both TILA and RESPA are remedial acts and should be construed broadly.  Moreover, other courts have found the statute of limitations in each act is not jurisdictional and each is subject to equitable tolling.  *See King v. Ca.,* 784 F.2d 910, 914-15 (9th Cir. 1986) (finding TILA statute of limitations is subject to equitable tolling) and *Merrit v. Countrywide Financial Corp.*, 759 F.3d 1023, 1040 (9th Cir. 2014) (finding RESPA is subject to equitable tolling).

The principles espoused in *Burnett* and *Wilkinson* apply here.  MERS (GMAC/Homecomings' agent/privy) filed a complaint without any proof that it the right to do so.  Ms. McNerney filed TILA and RESPA claims before the applicable statutes of limitations expired. The trial court then dismissed the entire action based upon MERS' (and later

22

GMAC/Homecomings) actions.  They then fought Ms. McNerney's appeals tooth and nail even though they now assert that she was correct in her arguments to the Courts that the Ohio savings statute could not revive her federal claims and the trial court's dismissal "without prejudice" was not a final appealable order (thus, with prejudice).  Not only should equitable tolling apply to this behavior, Homecomings and the Trust should be judicially estopped from making competing arguments made in prior court proceedings.[5]

    4.   *Several of the Trust's Arguments Were Rejected By the State Trial Court*

On June 29, 2006, MERS filed a motion for summary judgment advancing many of the arguments the Trust now asserts as purely legal matters.  *See* MERS' Motion for Summary Judgment, attached to Gray Aff. at. Exh. ____.    For example, it argued: (1) Ms. McNerney received legally sufficient notices under TILA, *id*. at pp. 11-15; (2) there is no private cause of action under RESPA and the statute of limitations has run, *id*. at 16-18.

The Ohio trial court denied the motion for summary judgment finding there were genuine issues of material fact to be litigated.  As such, the matter proceeded to trial.  The facts have not changed.  As such, summary disposition of Ms. McNerney's causes of action through the claims procedure would not only be inequitable, but would also be barred by issue preclusion.[6]

    B.   There Are Genuine Issues of Material Fact that Warrant A Trial on the Issue of Whether Homecomings Is Liable for OMC Lending's Breach of Fiduciary Duty Under An Agency Theory.

---

[5] "The basic principle ... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4477 (1981), p. 782.  This principle applies to the same parties or its privy.  *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co*., 81 F.3d 355 (3rd Cir. 1996).

[6] Issue preclusion applies to issues of law and issues of fact if those issues were conclusively determined in the prior action.  *U.S. v. Stauffer Chem. Co*., 464 U.S. 165, 170-71 (1984).

While a lender does not ordinarily owe a fiduciary duty to a borrower, an exception applies when the lender and the broker have an agency relationship. As noted above, Homecomings, as principal, is liable for the acts and omissions of its agent, OMC Lending. Further, Homecomings could be viewed as a broker for Fannie Mae because the loan was originally slated to go to Fannie Mae. Trial Trans. at _____.

A breach of fiduciary duty is established by: (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom. *Camp St. Marys Assn. of W. Ohio Conference of the United Methodist Church, Inc. v. Otterbein Homes*, 176 Ohio.App.3d 54, 68 (Ohio App. 3d 2008). A claim of breach of fiduciary duty is essentially a claim for negligence with a higher standard of care. *All Star Land Title Agency, Inc. v. Surewin Invest., Inc.*, 2006-Ohio-5729, at ¶36 (Ohio App. 8th Dist. 2006). Thus, it is a tort.

Some factors to consider include: (1) whether the transaction was a commercial transaction; (2) whether each party protected its own interests; (3) whether the creditor was not acting solely in its own interest; (4) whether either party had a reasonable expectation that the creditor would act solely or primarily on behalf of the debtor; and (5) whether the borrowers were sophisticated enough to understand the risks associated with the transaction. *See Ed Schory & Sons v. Francis*, 75 Ohio St. 3d 433, 442-443 (Ohio 1996).

Applying these factors, the following scenario is discerned: This was not a commercial transaction; Ms. McNerney did not protect her own interest (Exh. III attached to the Trial Trans.); OMC Lending was acting in the interest of itself and Homecomings (Trial Trans., p. 138); Ms. McNerney had a reasonable expectation that OMC Lending would act primarily on her behalf (*Id.*, pp .198-204; p. 229 lines 11-23); and Ms. McNerney was not sophisticated enough to

24

understand the risks associated with the transaction.  These conclusions are supported by the fact

that Ms. McNerney did not know until the scheduled closing date on December 27, 2002 (but the

closing did not occur until January 3, 2003), that she would be required deplete her IRA account

in order to complete the loan process or that OMC Lending was not acting on her behalf because

OMC Lending, contrary to mandatory provisions of the Ohio Mortgage Broker Act, did not

supply to her the notices that it was not working for her. Deposition of Nancy George, p. 121;

Trial Trans. pp. 199-200; p. 81 lines 6-11).

      Ms. McNerney reposed confidence in the broker and thought the broker was acting in her

best interest to obtain for her the best possible loan opportunity. In defiance of the requirements

of the Mortgage Loan Broker Act, the broker fostered that confidence by refusing to provide the

disclosures that would have alerted Ms. McNerney that the broker was not working in her

interest. (Trial Trans. p. 81).   The broker, as the agent of the Homecomings (or in a civil

conspiracy therewith), or Homecomings as the Broker for Fannie Mae, worked to maximize its

own profit at the expense of the safety and stability of Ms. McNerney and her children. The

Broker(s) misrepresented the terms of the transaction up until the final moment of closing; and

withheld vital information that Ms. McNerney needed to evaluate her loan options.  In essence,

OMC switched hats and became an arm of the lender.  In these situations, the Broker(s) engaged

in deceptive and unfair practices in such a manner Ms. McNerney would never had been able to

pay off her loan and she eventually lose her house.  *See Swayne v. Beebles Invests. Inc*, 176 Ohio

App.3d 293, 306 (Ohio App. 2008).   Consequently, through its agency relationship with OMC

Lending, Homecomings is liable for the tortious conduct of its agent. Further, Homecomings was

the Broker for Fannie Mae. Either way Homecomings owed a duty to Ms. McNerney and

breached that duty.  Summary disposition of her causes of action through the claims process should be denied, as a genuine issue of material fact remains to be litigated.

C. There Are Genuine Issues of Material Fact that Warrant A Trial on the Issue of Whether Homecomings Is Liable for OMC Lending's Negligence/Improvident Lending Under An Agency Theory.

While a lender does not ordinarily owe a duty to a borrower, an exception applies when the lender and the broker have an agency relationship (or in a civil conspiracy).  As noted above, Homecomings, as principal, is liable for the acts and omissions of its agent, OMC Lending.

In order to establish negligence, the pleader must show:  duty, breach, causation, and damages.  *Abrams v. Worthington*, 169 App.3d 94, 2006-Ohio-5516, 861 N.E.2d 920 (10th Dist.).  The existence of a duty in a negligence case is a question of law for a court to determine and there is no formula for ascertaining whether such a duty arises. *Mussivand v. David,* 45 Ohio St.3d 314, 318, 544 N.E.2d 265 (1989).

Mortgage brokers owe a special duty to borrowers, as noted above. OMC Lending breached that duty as noted above when it worked to maximize its own profit at the expense of the safety and stability of Ms. McNerney and her children. The Broker misrepresented the terms of the transaction up until the final moment of closing; and withheld vital information that Ms. McNerney needed to evaluate her loan options.  Again, the Broker switched its hats and became an arm of the lender.  In these situations, the Broker engaged in deceptive and unfair practices in such a manner Ms. McNerney would never had been able to pay off her loan and she eventually lose her house.  *See Swayne*, 176 Ohio App.3d at 306.  Consequently, through its agency relationship with OMC Lending, Homecomings is liable for the tortious conduct of its agent.  Thus, Homecomings owed a duty to Ms. McNerney and summary disposition of her causes of

action through the claims process should be denied, as a genuine issue of material fact remains to be litigated.

Homecomings was not just the lender in this matter, but also took on the role of underwriter. In this role, Homecomings received accurate information from Ms. McNerney. It then had a duty to enter the correct and accurate information provided to it into the FNMA Desktop Underwriter program in order to get approval for the loan. However, because the true information would have resulted in a "no sale" Homecomings through its Broker entered the incorrect information. Although Homecomings, in its review prior to closing noted the incorrect information, made hand-written notations of the correct information, it never made the actual changes into the underwriting desktop program. Had it made the changes, the underwriting program would have noted that Ms. McNerney did not qualify for the loan and Homecomings would not have been able to complete the transaction with FNMA. In other words, it cheated to sell a "dud" to FNMA, which would have been a fraud upon FNMA, but also negligently injured Ms. McNerney. *Counterclaims, ¶¶*69-74. By not entering the correct information, Homecoming breached its duty to Ms. McNerney as the underwriter.

This breach is akin to the breach that occurred in *Walters v. First Nat. Bank of Newark*, 69 Ohio St.2d 677 (Ohio 1982). In that case, the lender's agent failed to structure a loan to include credit life insurance or to provide the borrower with the requisite data. *Id.* at 679. The Court went on to say that even if negligence had not been alleged, the lender was still liable for misrepresentation. *Id.* at 680. In either respect, the lender was liable for its misdeeds. While this matter does not center on credit life, the lender took on the role as underwriter. Underwriting is defined as "the act of assuming a risk by insuring it . . . ." *Black's Law Dict.,* 7th ed. p. 1528. By performing the underwriting process, the lender had a duty to enter the correct information into

27

the desktop underwriter to ensure that Ms. McNerney would qualify for the loan. Its failure to enter the correct information is a clear breach of this duty. *Counterclaims, ¶¶*69-74. The breach of this duty resulted in Ms. McNerney being subjected to a loan she could not afford, along with additional onerous terms and costs, specifically excessive fees, the loss of her Individual Retirement Account, excessive interest rates and private mortgage insurance, which made default even more likely. She further has been injured in the overcharges, excessive fees, and a loan for which she could not qualify under responsible underwriting standards, illness and emotional distress arising from fear of losing her home. *Counterclaims*, ¶¶ 181-187. Ms. McNerney has stated a duty, breach, injury and causation. *Mills v. Best Western Springdale*, 2009-Ohio-2901, at ¶ 13 (Ohio Ct. App. 2009) (citing *Jeffers v. Olexo*, 43 Ohio St. 3d 140, 142 (1989)).

A handful of courts have given borrowers remedies with respect to improvident lending. *See In re Robinson*, 55 B.R. 839 (Bankr. S.D. Ind. 1985) (discharging a debt and holding banks cannot "follow imprudent lending practices  . . . and then seek recourse and rescue from the courts to preserve and protect [them] from a risk [they] freely assumed in order to gain greater profits . . ."). *See also*, *Discover Bank v. Owens*, 129 Ohio Misc.2d 71, 2004-Ohio-7333 (granting judgment to borrower based upon lender's unscrupulous lending practices).

Because no Ohio state court has recognized a cause of action for improvident lending, Federal courts are obliged either to consider whether the Ohio Supreme Court would recognize such a cause of action and on what terms. *See In re Fedders North America, Inc.,* No. 08-50549 (Bankr. D.C.D. 2009) (citing *Packard v. Provident Nat'l Bk,* 994 F.2d 1039, 1049 (3d Cir.

1993)), or certify the question to the Ohio Supreme Court pursuant to Rule 9 of the Rules and Practices of the Supreme Court of Ohio.[7]

Ms. McNerney respectfully requests that summary disposition of this cause of action not be performed through the claims procedure until the question is answered by the Ohio Supreme Court.

D. *Ms. McNerney's Fraud on the Court Claim May Be Cognizable.*

Ms. McNerney also asserted a cause of action in the Ohio District Court for Fraud on the Court. This cause of action is premised on the idea that "[n]o court system can function without safeguards against actions that interfere with its administration of justice. *Demajanjuk v. Petrovsky,* 10 F.3d 338 (6th Cir. 1993). Courts have developed a concept of fraud on the court which provides for relief from such conduct. *Id.* Under Ohio law, "[a]ny fraud connected with the presentation of a case to a court is a fraud upon the court, in a broad sense." *Coulson v. Coulson*, 448 N.E.2d, 809, 811, 5 Ohio St.3d 12, 15 (Ohio 1983) (quoting 11 Wright & Miller, Fed. Practice and Pro. (1973) 253, Sec. 2870)).

The Trust argues witness immunity operates as a complete bar to Ms. McNerney's fraud on the court cause of action. However, there are exceptions to the witness immunity rule. For example, one Ohio court has contemplated an exception to witness immunity where there exists a larger scheme to defraud. *Pratt v. Payne,* 794 N.E.2d 723, 728-729 (Ohio Ct. App. 2008) (citing to *Morgan v. Graham*, 228 F.2d 625 (10th Cir. 1956)).

In this matter, Ms. McNerney has alleged sufficient facts to meet this exception. From its inception through the court filings, the loan transaction was a scheme to defraud Ms. McNerney: The paperwork, the input into the underwriting program, and the false documents to institute the

---

[7] Proposed certified questions could be: "Does Ohio recognize a cause of action for improvident lending against a lender and/or its agent? If so, what are the elements of such a cause of action?"

first Ohio trial court action – all filed in an attempt to secure a loan that was destined to fail.  All

these actions show a larger scheme to defraud both Ms. McNerney and the Courts.  Summary

disposition on these claims is not warranted.  Further, it is clear Ohio Courts do contemplate an

exception to witness immunity.  If this Court is not convinced, there is sufficient reason to certify

the question to the Ohio Supreme Court pursuant to Rule 9 of the Rules and Practices of the

Supreme Court of Ohio.[8]

### E.    *The Ohio Consumer Sales Practice Act Claim Is Cognizable Against Homecomings.*

Several courts in Ohio have found mortgage brokers are subject to the Ohio Consumer

Sales Practice Act (CSPA).  *See Guth v. Allied Home Mortg. Capital Corp*., 2008-Ohio-3386, ¶¶

48-49 (collecting cases on each side of the issue, but ultimately deciding mortgage brokers are

subject to the CSPA).  Further, as discussed above, the statute of limitations never ran on her

CSPA claims.  They are therefore timely. Further, as principal, Homecomings is liable for OMC

Lending's violations of the CSPA.

In *Schaller v. Nat'l Alliance Ins. Co.,* 496 F. Supp. 2d 890 (N.D. Ohio 2007), the Court
noted:

> The Ohio Consumer Sales Practices Act ("OCSPA") prohibits a person engaged
> in the business of effecting or soliciting consumer transactions from committing
> an unfair or deceptive act or practice in connection with those consumer
> transactions. Ohio Rev. Code Ann. §§ 1345.01(C), 1345.02(A). The term
> "consumer transaction" includes, among other things, sales, leases, assignments or
> services to individuals for purposes that are primarily personal, family, or
> household. Ohio Rev. Code Ann. § 1345.01(A). The term does not, however,
> include transactions between persons defined in § 5725.01. Ohio Rev. Code Ann.
> § 1345.01(A).

*ld.* at 901.  Likewise, R.C. 1345.03(A) prohibits any "supplier" from "commit[ing] an

unconscionable act or practice in connection with a consumer transaction.  Such an

---

[8] The certified question could be:  "Does Ohio follow the exception to the witness immunity
doctrine where there exists a larger scheme to defraud?"

unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

A "supplier' is "a…person engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer." R.C. 1345.01(C). Further, a "consumer transaction" is "a sale,…a service, …, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." R.C. 1345.01(A).

While it is true the CSPA "exclude[s] from its coverage all transactions between financial institutions, including banks, and their customers," *see* R.C. 1345.01(A) and R.C. 5725.01; *ABN AMRO Mortg. Group, Inc. v. Amold,* 2005-Ohio-925, ¶ 29, there is an exception: civil conspiracy and by analogy, agency. *See, e.g., Schaller v. Nat'l Alliance Ins. Co.* 496 F. Supp. 2d 890, 903 (S.D. Ohio 2007) (inferring if the plaintiff could maintain a claim for any of the underlying unlawful acts, e.g., CSPA, against either defendant, the claim for conspiracy could be maintained). Further, the violation of the CSPA is akin to a tort. *See, e.g., Blankenship v. CFMOTO Powersports, Inc.,* 2011-Ohio-948, ¶ 11, 2009 CVH 1340 (Ohio Misc. Ohio C.P. Clermont 2011) (discussing CSPA is akin to a tort). As such, Homecoming is liable for its agent's violations of the CSPA.

Under Ohio law, mortgage broker services fit the definition of a supplier and a consumer transaction. *Equicredit Corp. of Am. v. Jackson*, 2004-Ohio-6376, ¶ 46 (Ohio App. 7th Dist.). Further, R.C. 1345.03(B)(4) makes it a violation of the Act if "the supplier knew at the time the consumer transaction was entered into that there was no reasonable probability of payment of the obligation in full by the consumer."

OMC Lending intentionally entered the wrong information into the FNMA Desktop Underwriter software to ensure Ms. McNerney would qualify for a loan she could not afford. (Trial Trans. pp. 82-94 and p. 114). This is evident because Ms. McNerney could not even make the first payment. (Trial Trans. p. 98) What is more, when Ms. McNerney went to the lender in this matter to attempt a workout, shortly after default, the lender responded that she did not qualify because of insufficient income. See Exh. III to Trial Trans. Further, OMC Lending unquestionably violated the CSPA by failing to provide the disclosures mandated by the Mortgage Loan Broker Act, by affirmatively misrepresenting the terms of the loan, by obtaining an kickback from Homecomings for making the loan, and by affirmative concealing from Ms. McNerney information she needed to understand her choices. Consequently, as OMC Lending has violated the CSPA, then Homecomings, as the principal can be held liable for its agent's violations thereof. Accordingly, the Trust's objection should be overruled with respect to cause of action. Lastly, as her claims are cognizable, so too, is her claim for statutory attorney's fees for violations of the CSPA.

F. *Ms. McNerney's Claims under TILA Are Meritorious.*

As noted above, the applicable statute of limitations never ran on the TILA claims and/or are subject to equitable tolling. Therefore, discussion of the substantive issues is necessary.

Ms. McNerney is entitled to statutory damages based on the plaintiff's violations of the law of truth in lending in that it failed to provide clear and conspicuous material disclosures she needed to evaluate the terms of the loan, and failed to provide clear and conspicuous notice of her right to rescind. 15 U.S.C. §§ 1631, 1632 and 1635. Ms. McNerney is entitled to a second award of statutory damages based on the plaintiff's failure to respond as required under 15 U.S.C. Sec. l635(b) when she rescinded the transaction.

In this matter, Ms. McNerney received two conflicting and inconsistent settlement statements (Trial Trans. p. 245, lines 13-45; p. 246, lines 1-23; Ex. F attached thereto), as well as conflicting and inconsistent truth in lending disclosure statements. (Trial Trans. pp. 242-255; Ex. F). Also among those documents was a single notice of right to cancel informing her that her notice of right to cancel expired four days before closing on 12/31/2008 (Trial Trans, pp. 242-255; p. 249, lines 17- 21; Ex. F).[9] Lastly, the notice of right to cancel, the 39th page in a stack of pages that required signature or initials, was so confusing that even as of the date of trial, Ms. McNerney, asked directly to state the deadline to cancel, chose a date that was wrong. (Trial trans. p. 249).  These are clear violations of TILA.  Homecomings arguments to the contrary are unavailing.

With respect to tender, in *Rudisell v. Fifth Third Bank*, 622 F.2d 243 (6th Cir. 1980), the Court noted:

> **The statute clearly does not require the debtor to tender first.** It contemplates the creditor tendering first. But upon the creditor fulfilling its obligations under the statute, the debtor then must tender. Since rescission is an equitable remedy, the court may condition the return of monies to the debtor upon the return of property to the creditor.

Id. at 254 (citations omitted, emphasis added).

Here, no monies were ever returned to Ms. McNerney.  Homecomings continues to violate TILA and continues to be unjustly enriched.[10]  As her claims under TILA, including statutory attorney's fees, have merit, summary disposition under the claims procedure is not warranted.

---

[9] The Lathrop Declaration even admits that Ms. McNerney was supplied with only one ("a") notice of right to cancel. *Lathrop Declaration*, at ¶ 9.

[10] Unjust enrichment occurs when one retains money or benefits that, in justice and equity, belong to another. *Hummel v. Hummel,* 133 Ohio St. 520, 528 (Ohio 1938).

G. *Ms. McNerney's Claims Under RESPA Have Merit.*

Ms. McNerney alleges multiple violations of RESPA: failure to provide timely and accurate good faith estimates of closing costs prior to the closing and an excessive fee give to the broker as a kick back.  These claims were brought within the applicable statute of limitations because the statute was tolled during the state case and/or based upon equitable tolling principles discussed above.  Courts have found them to be viable theories.  *See, e.g., Mullinax v. Radian Guar., Inc*. 199 F.Supp.2d 311 (M.D.N.C. 2002).

H. *Homecomings, as the principal, is liable for its agent's violations of the Ohio Mortgage Broker Act.*

The Mortgage Broker Act, RC. § 1322.01, *et seq*., requires brokers, to deliver to the borrower a mortgage loan origination disclosure statement that describes the method by which the fee to be paid by the buyer to the broker will be calculated, RC. § 1322.062(A)(1)(f), and a statement that the lender may pay compensation to the broker. R.C. § 1322.062(A)(1)(g). In addition, R.C. § 1322.07(B) prohibits, a broker from "[m]ak[ing] false or misleading statements of a material fact, omissions of statements required by state law, or false promises regarding a material fact, through advertising or other means, or engage in a continued course of misrepresentations." Violations of the act can result in damages. RC. § 1322.11. As violation of the CSPA is akin to a tort, so is a violation of the Mortgage Broker Act.

The Act requires specific disclosures designed to put Ms. McNerney on notice that the broker was not her agent and to alert Ms. McNerney that the broker was be compensated by the lender and thus was the agent of the lender. Ms. McNerney is entitled to statutory and actual damages as set forth in that act. As OMC Lending failed to make these disclosures, (Trial Trans. p. 81) it violated the Act. As the principal, Homecomings is liable for its agent's violations of the Act.  The Trust's objection with respect to this argument should likewise be overruled.

I.    _Loss Mitigation Is Moot._

The Trust cites to *UBS Real Estate Securities, Inc. v. Teague*, 191 Ohio App.3d 189, 2010-Ohio-5634, ¶ 11, for the proposition that "loss mitigation is always at [the] pleasure of lender." However, that statement was merely the Court of Appeals quoting the Common Pleas Court in a denial of a motion for relief from judgment. Further, the Court of Appeals did not comment on this particular statement or whether it is in fact a proper statement of law. Nonetheless, if a lender chooses not to engage in loss mitigation, it does so at its own peril. For example, 20 CFR 30.35 states, "[t]he Mortgagee Review Board may initiate a civil money penalty action against any mortgagee or lender who knowingly and materially . . . fails to engage in loss mitigation as provided in § 203.605 of this title. 20 CFR 30.35(a)(14).

Moreover, while there may be no private cause of action under this section for monetary relief, courts have recognized the use of this section as a defense to a foreclosure. *See, e.g., Wells Fargo Home Mortg., Inc. v. Neal,* 398 Md. 705,727 (Md. 2007) (finding HUD violations may be used to defend a foreclosure action in the form of injunctive relief). This defense was mistakenly designated as a counterclaim. *See* Fed. R. Civ. P. (8)(c)(2). In addition, loss mitigation, in its essence, is mitigation of damages. Well-settled law in Ohio requires that "an injured party has a duty to mitigate and may not recover for damages that reasonably could have been avoided. *Abroms v. Synergy Building Systems,* 2011-Ohio-2180 *citing Chicago Title Ins. Co. v. Huntington Nat'l. Bank,* 1999-Ohio-62. However, the matter is now moot because the Plaintiff states that it is no longer seeking to foreclose or damages. Consequently, this cause of action should be dismissed as moot.

J.    _As the principal, Homecomings is liable for its agent's fraud, intentional misrepresentation and negligent misrepresentation._

35

A cause of action for negligent misrepresentation is defined by the following scenario:

"One who, in the course of his business, profession, or employment, or any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, [and is therefore] subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

*Crown Property Development, Inc. v. Omega Oil Co.,* 113 Ohio App.3d 647, 656 (Ohio App. 12th Dist. 1996), quoting *Haddon View Invest. Co. Coopers & Lybrand*, 70 Ohio St.2d 154 (Ohio 1982). As such, the essential elements for negligent misrepresentation are false information and justifiable reliance. Zuber v. Ohio Ins. Dept., 34 Ohio App.3d 42, 45 (1986). Reliance is justified if the representation does not appear unreasonable on its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the representation. *Lepara v. Fuson*, 83 Ohio App.3d 17, 26 (1992).

A claim for fraudulent misrepresentation requires: (1) a representation, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *See Burr v. Stark Cty. Bd. of Commrs.,* 23 Ohio St.3d 69, 73 (1986). Again, Homecoming is liable for its agent's unlawful actions that it ratified.

OMC Lending negligently and/or intentionally misrepresented the availability of a loan with a payment in the amount of $850.00 including escrow for taxes and interest; (Trial Trans. pp 204 and 209) it concealed the imposition of private mortgage insurance until the last minute;

36

(Nancy George Depo., p. 121; Trial Trans. pp. 199-200); it concealed that the lender on the refinanced loan would offer a better deal for her (Trial Trans. p. 199; Ex. 9. p. 121; Ex. 7 p. 44, 45, and 115-116; it concealed that she did not qualify for the loan product offered to her. (Trial Trans., pp 102-104). In addition, the broker and lender were grossly negligent in using false information to qualify Ms. McNerney for a loan based on false information with a payment requirement that that could only result in foreclosure on the real and clearly known facts. Ms. McNerney relied upon all this information believing that she was getting the best loan for her, that she could afford it, and it would fulfill all the purposes for refinancing the loan in the first place.

Under an agency theory, Homecomings is liable for the acts of OMC Lending.  As such, these claims are cognizable and summary disposition under the claims procedure would be in error.

K. *The Civil Conspiracy In This Action Is Evident From the Facts that Occurred in the State Court Action.*

Civil conspiracy is a malicious combination of two or more persons acting to injure another in person or property, in a way not competent for one person acting alone, which results in actual damages. *Williams v. Aetna Finance Company,* 83 Ohio St. 3d 464, 475 (Ohio 1998). To state a claim for civil conspiracy, there must be an underlying unlawful act. *Id.* (citing *Gosden v. Louis*, 116 Ohio App.3d 195, 219 (Ohio App. 9th Dist. 1996). In this case, torts of breach of fiduciary duty, negligence, fraud, violations of the Consumer Sales Practices Act and violations of the Mortgage Brokers Act, satisfy as wrongful acts. The malice required in a civil conspiracy is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Pickle v. Swinehart,* 170 Ohio St. 441, 443 (Ohio 1960). "[M]alice may be inferred from or imputed to a common design by two or more

persons to cause harm to another and need not be proven separately or expressly." *Fuller and Associates v. Heil Windermere Moving and Storage Co.*, 2005-Ohio-2599 (Ohio App. 5th Dist. 2005). Proof of a malicious combination to injure another does not require a showing of an express agreement, but

only a common understanding or design, even if tacit, to commit an unlawful act. *Id.*

Both the broker and Homecomings needed Fannie Mae to fund the loan so the broker could get its fee/kickback from Homecomings. Homecomings needed the broker to steer borrowers to it so that it could generate loan products for sale on the secondary market. CITE

Homecomings and the broker acted in concert. Both independently reviewed all verification of income and assets, and both independently reviewed the information in the FNMA desktop underwriter. Both knew that they had entered false information in the desktop underwriter in order to obtain FNMA approval for the loan. At the close of day, the broker received a large fee amounting to over $6,000.00 and Homecomings had a product for sale on the secondary market. The "dupes" were meant to be FMNA and Ms. McNerney. FNMA would get a non-performing loan, and its only recovery would be through a claim on the private mortgage insurer (also an intended dupe) and foreclosure on the home. Ms. McNerney would lose her home.

L.   *The Loan Transaction At Issue In This Matter Was Both Procedurally and Substantively Unconscionable.*

"There are two prongs that must be met for a successful claim of Unconscionability, Substantive Unconscionability and procedural Unconscionability." *Manley v. Personacare of Ohio*, 2007-Ohio-343, ¶14. The Court in Manley continued:

A substantive unconscionability analysis considers whether the actual terms of the contract are commercially reasonable. Procedural unconscionability involves those factors bearing on the relative bargaining position of the contracting parties,

including their age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, and whether alterations in the printed terms were possible.

Id. (Citations and quotation marks omitted).

The note is void and unenforceable because the loan itself is unconscionable. *See American Vitrified Prods. V. On Application to Certify Crooks*, 20 Ohio L. Abs. 627 (1935) (discussing a contract that is unconscionable is void). *See also*, *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1153 (D.C. Cir. 1984) (discussing provisions of a contract which are unconscionable are void); *Westchester Mort. Co. v. Grand Rapids and Ionia R.R. Co.*, 213 N.Y.S. 593, 599 (N.Y. 1926) (court held agreement unconscionable and void); R.C. § 1302.15 (goods) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract").

Only by falsifying the facts could Homecomings obtain approval from FNMA for the loan. Even with the facts as falsely stated, the loan was viewed as a high risk loan, as it was only approved under the expanded approval process, and required the imposition of private mortgage insurance. (Trial Trans. pp. 95 and 114). But as established at trial, the facts had to be falsified in two respects in order to achieve the approval under even the expanded approval level III provisions. The projected income over the next three years was overstated by *$400 a month,* and the funds in Ms. McNerney's IRA were described as directly available, which is not true of funds in an IRA. Ms. McNerney barely met expanded approval on false facts, and did not meet the requirements at all on her true facts. Homecomings' underwriter reviewed and approved the underwriting with all accurate documents in hand. Homecomings knew the information was false and made the loan in spite of that, hoping to be rid of the loan before the inevitable default. The default and foreclosure that followed was the inevitable outcome of this unsustainable loan. The

fact that the loan is unsustainable is confirmed by Homecomings itself, when it refused to accept

a loan modification on the grounds that there was insufficient income to support a modification.

Exhit III to Trial Trans. his loan left Ms. McNerney far worse off than she would have been had

no loan been made. Her IRA, her only asset, was reduced by $8,150.00. Her payment was

essentially the same. She lost the opportunity for the offer of better terms from the lender she

had. Also, she lost the opportunity for better terms from her personal bank, which opportunity

she only refrained from pursuing because of assurances that Homecomings could provide the

same terms for less trouble and in less time.

Because the transaction was unconscionable, it would be inequitable for Homecomings to

retain any of Ms. McNerney's funds.

### M. *Ms. McNerney's Claim For Breach of Privacy Has Merit.*

In 1956, the Ohio Supreme Court recognized that there are three distinct and actionable invasion

of privacy claims: "(1) the unwarranted appropriation or exploitation of one's personality; (2) the

publicizing of one's private affairs with which the public has no legitimate concern; (3) or the

wrongful intrusion into one's private activities in such a manner as to outrage or cause mental

suffering, shame or humiliation to a person of ordinary sensibilities." *Housh v. Peth,* 165 Ohio

St. 35, paragraph two of the syllabus (Ohio 1956) (enumeration and emphasis added). Thus, to

state a cause of action for the second type of invasion of privacy, Ms. McNerney must prove that

Plaintiff (1) made public (2) her private affairs (3) with which the public has no legitimate

concern. To state a cause of action for the third type of invasion of privacy, Ms McNerney must

show: (1) wrongful intrusion into her private affairs; (2) in an outrageous manner; (3) that results

in mental suffering, shame or humiliation. *Id.* In *Housh*, the Court found the defendant, a debt

collector, intruded upon Ms. Housh's privacy by going beyond reasonable collection efforts in a pattern to harass and humiliate Ms. Housh. *Id*. at 41.

In this matter, Ms. McNerney has alleged a cause of action under the second and third theories of invasion of privacy – that Plaintiffs agents publicized her affairs with loud and highly public taunts within the hearing of her neighbors, and that there has been an intrusion into her private activities in such a manner as to outrage or cause mental suffering, shame or humiliation. Paragraphs 104-109 and 318-321 of her Counterclaims clearly set forth factual allegations, that if believed, would state a plausible claim for invasion of privacy. Agents from Homecomings came to Ms. McNerney's home to harass her, yell at her and her family and caused them humiliation within the hearing of their neighbors and they subsequently became ill. As a result, they moved out of their home so they would not have to endure any further harassment or humiliation from Homecomings' agents. The actions of Homecomings' agents, engaging in a pattern to harass and humiliate Ms. McNerney and her family, are similar to those actions the Court found to result in an invasion of privacy in *Housh*. Consequently, Ms. McNerney has stated a plausible cause of action for invasion of privacy.

The Trust argues that Ms. McNerney was required to show "dissemination and/or publication of information about a [her]" in order to state a claim for invasion of privacy. However, that element relates to "the publicizing of one's private affairs with which the public has no legitimate concern" and not the intrusion of one's seclusion. *See, e.g., Sustin v. Fee,* 69 Ohio St.2d 143 (Ohio 1982) (discussing invasion of one's seclusion with no discussion of dissemination being an element). *See also, Haefka v. W.W. Extended Care*, 2001-Ohio-1796 (Ohio App. 9th Dist. 2001) (same). In addition, at paragraph 318, Ms. McNerney specifically alleges that Homecomings "sent people to her home to harass and intimidate her and her family

41

*in the presence and hearing of neighbors....*" Thus, the element of publication is met in any

event. As a result, the Trust's objection with respect to this cause of action should be overruled.

### N.   *Gray's Claim for Attorney's Fees Is Valid under TILA, RESPA, CSPA and OMBA.*

Having shown the TILA, RESPA, CPSA, and OMBA claims are valid, so too are the

statutory attorney's fees under those acts.

## NOTICE

Claimants have provided notice of this Response in Opposition to Objection in

accordance with the Case Management Procedures Order, approved by this Court on May 23,

2012 [Docket No. 141] and the Procedures Order.

## CONCLUSION

WHEREFORE, Ms. McNerney and Ms. Gray respectfully request that this Court

overruled the Trust's objections and either allow the Ohio District Court resolve the underlying

merits or allow the parties to go forward with discovery and briefs, as the Trust's objection

creates a contested matter.   In the alternative, Ms. McNerney has presented viable, cognizable

claims and the claims should be allowed.   Ms. McNerney and Ms. Gray reserve the right to prove

the amount of their claims by a hearing or trial in this matter.

Dated: November 16, 2015
       Cleveland, Ohio

                                        /s/ Susan M. Gray
                                        **SUSAN M. GRAY** (0062356)
                                        22255 Center Ridge Road, Ste 210
                                        Rocky River, OH 44116
                                        Tel. (440) 331-3949
                                        Fax. (440) 331-8160
                                        Email: smgray@smgraylaw.com