**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | **FOR PUBLICATION** |
| In re: | ) | |
| | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |
| | ) | (Jointly Administered) |

### MEMORANDUM OPINION AND ORDER DENYING THE MOTION OF THE RESCAP LIQUIDATING TRUST FOR AN ORDER ENFORCING PLAN INJUNCTION AND CONFIRMATION ORDER

*A P P E A R A N C E S:*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Attorneys for the ResCap Liquidating Trust*
805 South Figueroa Street, 10th Floor
Los Angeles, California 90017
By:    Matthew R. Scheck, Esq.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Attorneys for the ResCap Liquidating Trust*
51 Madison Avenue
New York, New York 10010
By:    Isaac Nesser, Esq.

CARPENTER LIPPS & LELAND LLP
*Special Litigation Counsel for the Debtors*
280 N. High Street, Suite 1300
Columbus, Ohio 43215
By:    Jeffery A. Lipps, Esq.

ALSTON & BIRD LLP
*Attorneys for Wells Fargo Bank*
90 Park Avenue
New York, New York 10016
By:    John P. Doherty, Esq.

ANASTASI JELLUM, P.A.
*Attorneys for Honor Bank, f/k/a The Honor Bank*
14985 60th Street North
Stillwater, Minnesota 55082
By:    T. Chris Stewart, Esq.

COZEN O'CONNER
*Attorneys for Sierra Pacific Mortgage Company, Inc.*
277 Park Avenue
New York, New York 10172
By:    Frederick E. Schmidt, Esq.

JENKINS KAYAN LLP
*Attorneys for Sierra Pacific Mortgage Company, Inc.*
444 S. Flower Street, Suite 1530
Los Angles, California 90071
By:    Jonathan M. Jenkins, Esq.

SKADDEN, ARPS, SLATE, MEAGHER & GLOOM LLP & AFFILIATES
*Attorneys for UBS Real Estate Securities, Inc.*
4 Times Square
New York, New York 10036
By:    Alexander C. Drylewski, Esq.

WILLIAMS & CONNOLLY LLP
*Attorneys for Decision One Mortgage Company, LLC*
725 12th Street, N.W.
Washington, D.C. 20005
By:    David S. Blatt, Esq.
       Matthew V. Johnson, Esq.

WROBEL SCHATZ & FOX LLP
*Attorneys for PHH Mortgage*
1040 Avenue of the Americas
New York, New York 10001
By:    Daniel F. Markham, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the *Motion of the ResCap Liquidating Trust for an Order Enforcing Plan Injunction and Confirmation Order* (the "Motion," ECF Doc. # 8947) filed by the ResCap Liquidating Trust (the "Trust"), as successor to Residential Funding Company, LLC ("RFC"). The Trust seeks to enforce the injunction provisions of the second amended joint chapter 11 plan (the "Plan," ECF Doc. # 6030) and the order confirming the Plan (the "Confirmation Order," ECF Doc. # 6065) to enjoin Decision One Mortgage Company, LLC

("Decision One"), PHH Mortgage Corp. ("PHH"), Honor Bank f/k/a The Honor State Bank

("Honor Bank"), and Sierra Pacific Mortgage Company, Inc. ("Sierra Pacific," and together with

Decision One, PHH, and Honor Bank, the "Counterclaimants" or "Objectors") from continuing

to assert counterclaims against RFC and the Trust (the "Counterclaims") related to the Trust

Litigation (defined below).  Additionally, the Trust seeks to enforce Article IX.I of the Plan,

which states that "[a]ny person injured by willful violation of this injunction shall be entitled to

recover actual damages, including costs and attorneys' fees and, in appropriate circumstances,

may recover punitive damages from the willful violator."  (Mot. at 2.)  The Motion is supported

by the declaration of Matthew R. Scheck (the "Scheck Declaration," ECF Doc. # 8948).

Opposing the Motion are the objections of Decision One (the "Decision One Objection,"

ECF Doc. # 9079), PHH (the "PHH Objection," ECF Doc. # 9082), Honor Bank (the "Honor

Bank Objection," ECF Doc. # 9080), and Sierra Pacific (the "Sierra Pacific Objection," ECF

Doc. # 9086, and together with the Decision One Objection, the PHH Objection and the Honor

Bank Objection, the "Objections").[1]  The Trust filed a reply (the "Reply," ECF Doc. # 9213).

The Court held a hearing on October 8, 2015 and took the matter under submission.  As

explained below, the Motion is **DENIED**.

It is important to recognize what this Opinion does and does not involve.  The only

question here is whether the Plan and Confirmation Order bar the Counterclaimants from

continuing to prosecute the Counterclaims—based on the Court's ruling, they may continue to do

---

[1]    The Decision One Objection is supported by the declaration of N. Mahmood Ahmad (the "Ahmad Declaration," ECF Doc. # 9079), the PHH Objection is supported by the declaration of Tessa K. Somers (the "Somers Declaration," ECF Doc. # 9083), and the Honor Bank Objection is supported by the declaration of T. Chris Stewart (the "Stewart Declaration," ECF Doc. # 9081).

so.  But whether the Counterclaimants have stated any viable claims for relief is a matter for the

district court in Minnesota to decide, where the litigation is pending.[2]

## I.    BACKGROUND

### A.    RFC's Prepetition Contracts with the Objectors

Well before RFC filed for bankruptcy protection, RFC purchased mortgage loans from

each of the Counterclaimants pursuant to prepetition contracts (the "Contracts").  (Mot. at 2.)

RFC purchased mortgage loans from Decision One under at least three correspondent

client agreements, dated January 8, 1999, March 10, 1999 and June 12, 2000 (including

amendments and addenda, the "Decision One Contracts").  (*Id.* at 3.)  The Decision One

Contracts were most recently amended on March 11, 2004.  (*Id.*)  The Decision One Contracts

provide that the prevailing party in any legal action or other proceeding brought for enforcement

---

[2]    As discussed below, the Counterclaimants are on strong ground with respect to claims based on prevailing party attorneys' fee clauses.  Of course, the Trust too can seek to recover its attorneys' fees if it prevails on contract claims arising from contracts containing such clauses.  If the Trust filed a post-confirmation lawsuit in violation of a covenant not to sue contained in a settlement agreement (alleged by Sierra Pacific), such a counterclaim may be cognizable.  Counterclaims based on allegations that the Trust breached a contractual sole remedy clause are much more problematic.  The defendants may (or may not) prevail on their sole remedy arguments on a motion to dismiss, for summary judgment or after trial.  But under New York law, at least, the weight of authority recognizes that a damages remedy may be available for a plaintiff alleging breach of representations and warranties if specific performance through repurchase of defective loans is not possible or available—hence, a suit for damages does not breach a sole remedy contract provision.  *See, e.g., In re ResCap Liquidating Tr. Mortg. Purchase Litig.*, 524 B.R. 563, 585–86 (Bankr. S.D.N.Y. 2015) (denying motion to dismiss damages claim based on sole remedy provision); *see also Ace Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 554 (S.D.N.Y. 2014) (concluding that money damages are permitted where repurchase is or may be impossible).  One district judge in Minnesota, predicting what he believes the New York Court of Appeals would find, concluded in two opinions that monetary damages are not available when specific performance is not possible.  *See MASTR Asset Backed Sec. Tr. 2006-HE3 v. WMC Mortg. LLC*, 983 F. Supp. 2d 1104, 1112 (D. Minn. 2013) (Tunheim, J.); *MASTR Asset Backed Sec. Tr. 2006-HE3 v. WMC Mortg. LLC*, 843 F. Supp. 2d 996, 1001 (D. Minn. 2012) (Tunheim, J.).  The New York district judge in *Ace Sec. Corp.* expressly declined to follow the Minnesota district judge's decision concerning New York law.  5 F. Supp. 3d at 554 (stating that "the Court will decline to follow [the Minnesota decision] in light of persuasive in-Circuit precedent permitting money damages where repurchase is or may be impossible"); *see also Deutsche Bank Nat'l Trust Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 97 F. Supp. 3d 548, 557 (S.D.N.Y. 2015) (concluding that "many courts have awarded money damages, notwithstanding sole remedy provisions, equivalent to what the defendant would pay were performance possible in situations in which properties have been foreclosed or specific aspects of the prescribed remedy mechanism are no longer feasible") (internal quotation marks and citations omitted); *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12cv7096, 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015) (stating that "courts applying New York law have repeatedly held that money damages may be awarded in lieu of repurchase even where equitable relief is described as the 'sole remedy'") (collecting cases).  It is unclear what states' laws apply to the contracts involved in the Counterclaims.

or breach of the contracts is entitled to reasonable attorneys' fees and other costs incurred. (Decision One Obj. at 3.)

RFC purchased mortgage loans from Honor Bank under at least two client contracts dated November 16, 2001 and April 29, 2002 (the "Honor Bank Contracts").  (Mot. at 3.) Additionally, the loans sold to RFC under the Honor Bank Contracts were subject to other agreements between Honor and RFC, including, for example, client guides (the "Honor Bank Client Guides").  (Honor Bank Obj. at 2.)

RFC purchased mortgage loans from PHH and its predecessor under at least two contracts (the "PHH Contracts")—a client contract between RFC and PHH's predecessor, dated May 13, 1998 (the "PHH Client Contract"), and a mortgage loan flow purchase, sale and servicing agreement between RFC and PHH, dated September 1, 2006 (the "PHH Flow Agreement").  (Mot. at 3.)

RFC purchased mortgage loans from Sierra Pacific under at least three contracts—a seller/servicer contract dated March 31, 1997, a client contract dated March 8, 2001, and another client contract dated March 13, 2002 (including amendments and addenda, the "Sierra Pacific Contracts").  (Id.)  RFC and Sierra Pacific amended the Sierra Pacific Contracts on April 17, 2002.  (Id.)  RFC and Sierra Pacific entered into two settlement agreements relating to certain loans that Sierra Pacific sold to RFC, one dated December 19, 2007 and one dated March 10, 2008 (the "Sierra Pacific Settlement Agreements").  (Id. at 3–4.)  Each of the Sierra Pacific Settlement Agreements has a prevailing party attorneys' fees provision.  (Sierra Pacific Obj. Ex. 2, 5; Hr'g Tr. at 11.)

As discussed below, RFC or the Trust filed lawsuits against Decision One, Honor Bank, PHH and Sierra Pacific in state or federal court in Minnesota for breach of contract and

contractual indemnification, alleging that the defendants breached representations and warranties concerning the mortgages defendants sold to RFC. The lawsuits against these four defendants are among more than 75 lawsuits now pending in the U.S. District Court in Minneapolis. Several additional similar cases are pending in state court in Minneapolis. Six similar cases are pending in this Court. Decision One, Honor Bank, PHH, and Sierra Pacific filed counterclaims against the Trust, which the Trust now seeks to enjoin.

## B.     The Debtors' Disclosure Statement and Chapter 11 Plan

The Debtors, including RFC, filed petitions for relief under chapter 11 of the Bankruptcy Code on May 14, 2012 (the "Petition Date"). On December 6, 2013, the Debtors filed the Plan. During the pendency of the chapter 11 cases, the Counterclaimants did not file proofs of claims related to the Counterclaims.[3] (Mot. at 5–6.) None of the Counterclaimants objected to the confirmation of the Plan and this Court entered the Confirmation Order on December 11, 2013. The Plan's effective date occurred on December 17, 2013 (the "Effective Date"). (*Id.* at 7.) The Plan incorporates the Bankruptcy Code's definition of "claim" in its discharge and injunction sections. (Plan 1.A.53.)

### 1.     *Plan and Confirmation Order Discharge*

The Plan provides for a discharge of claims arising prior to the Effective Date:

> The rights afforded herein and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Liquidating Trust, or any of their respective assets or properties arising prior to the Effective Date.

(Plan Art.IX.K.)

---

[3]     Sierra Pacific filed a proof of claim unrelated to its counterclaim. (*Id.* at 6.)

The Confirmation Order also provides for a discharge of claims arising prior to

the Effective Date (together with the Plan's discharge, the "Discharge"):

> [E]ach holder . . . of a Claim against or Equity Interest in a Debtor
> shall be deemed to have forever waived, released and discharged
> the Debtors, to the fullest extent permitted by section 1141 of the
> Bankruptcy Code, of and from any and all Claims, Equity
> Interests, rights and liabilities that arose prior to the Effective Date
> . . . .

(Conf. Order ¶ 42.)

2.      *Plan and Confirmation Order Injunctions*

The Plan and Confirmation Order also contain injunction provisions (together, the

"Injunction," and with the Discharge, the "Discharge and Injunction"):

> Except as otherwise provided in the Confirmation Order or herein
> and in accordance with Article IX.E hereof, all Entities . . . who
> have held, hold or may hold Claims, Equity Interests, Causes of
> Action or liabilities that constitute Released Claims, are
> permanently enjoined and precluded, from and after the effective
> date of the Plan, from: (a) commencing or continuing in any
> manner or action or other proceeding of any kind against any
> Released Party whether directly, derivatively or otherwise, on
> account of or in connection with or with respect to any Released
> Claims . . . (b) enforcing, attaching, collecting or recovering by any
> manner or means any judgment, award, decree or order against any
> Released Party on account of or in connection with or with respect
> to any Released Claims . . . and (e) commencing or continuing in
> any manner or action or other proceeding of any kind against any
> Released Party on account of or in connection with or with respect
> to any Released Claims . . . .[4]

(Plan Art. IX.I.)

> Except as otherwise expressly specified in the Plan, after the
> Effective Date, any holder of such Claim or Equity Interest shall be
> precluded from asserting against the Debtors, the Liquidating
> Trust, or any of their respective assets or properties, any other or
> further Claim based on any document, instrument, act, omission,
> transaction, or other activity of any kind or nature that occurred
> before the entry of the Confirmation Order.

---

[4]      The term "Released Claims" is defined to include "liabilities that . . . have been discharged . . . pursuant to
the Plan." (Plan Art. I.A.242.) The term "Released Party" includes the Trust. (Plan Art. I.A.243.)

(Plan Art.IX.K.)

> [A]ll such holders shall be forever precluded and enjoined,
> pursuant to section 524 of the Bankruptcy Code, from prosecuting
> or asserting any discharged Claim against or terminated Equity
> Interest in the Debtors.

(Conf. Order ¶ 42.)

### 3.    Disclosure Statement

The disclosure statement described, in broad terms, that the Debtors or the Trust reserved

rights to pursue causes of action not expressly waived (the "Disclosure Statement" or "DS," ECF

Doc. # 4157):

> Unless any Causes of Action against an Entity are expressly
> waived, relinquished, exculpated, released, compromised or settled
> in the Plan (including pursuant to the Plan Support Agreement), or
> by a Final Order, in accordance with section 1123(b) of the
> Bankruptcy Code, . . . the Liquidating Trust with respect to other
> causes of Action, shall retain and may enforce all rights to
> commence and pursue, as appropriate, any and all Causes of
> Action of the Debtors or the Debtors' Estates, . . . .

(DS at 111.)

### 4.    Plan Supplement Reservation of Rights

In the plan supplement filed on October 11, 2013 (the "Plan Supplement," ECF Doc. #

5342 Ex. 13), the Debtors more clearly preserved and reserved causes of action.  The Plan

Supplement contains a section subtitled "Preservation of Causes of Action," in which the

Debtors broadly preserved causes of action for the Trust:

> Unless any Causes of Action against an Entity are expressly
> waived, relinquished, exculpated, released, compromised, or
> settled in the Plan (including pursuant to the Plan Support
> Agreement), or by a Final Order, in accordance with section
> 1123(b) of the Bankruptcy Code, the Borrower Claims Trust with
> respect to Borrower-Related Causes of Action, and the Liquidating
> Trust with respect to all other Causes of Action, shall retain and
> may enforce all rights to commence and pursue, as appropriate,
> any and all Causes of Action of the Debtors or the Debtors'
> Estates, whether arising before or after the Petition Date, including

8

> any Causes of Action specifically enumerated in the Plan
> Supplement, and the Liquidating Trust's and Borrower Claims
> Trust's respective rights to commence, prosecute, or settle such
> Causes of Action shall be preserved notwithstanding the
> occurrence of the Effective Date. The Liquidating Trust and the
> Borrower Claims Trust may pursue their respective Causes of
> Action, as appropriate, in accordance with the best interests of
> the respective Trust.

(*Id.* at 1.) The Plan Supplement contains a section titled "Claims Related to Contracts and

Leases" in which the Debtors expressly reserved all contract and leases based causes of action

for the Trust:

> Unless otherwise released by the Plan, the Debtors expressly
> reserve all Causes of Action based in whole or in part upon
> any and all contracts and leases to which any Debtor is a party
> or pursuant to which any Debtor has any rights whatsoever,
> regardless of whether such contract or lease is specifically
> identified herein. The claims and Causes of Action reserved
> include, among others, Causes of Action against mortgage
> servicing companies, borrowers, realtors, loan originators,
> insurance companies, correspondent lenders, suppliers of goods
> and services, vendors, financial institutions or any other parties
> . . . .

(*Id.* at 2.) Further, the Plan Supplement contains a section titled "Potential Claims Relating to

RMBS Recoveries" in which the Debtors disclose that they are in the process of reviewing

recovery opportunities of loans places into residential mortgage backed securities:

> The Estates are in the process of reviewing loans placed into
> Residential Mortgage Backed Securities for recovery
> opportunities. Some of those loans were sold to the Estates via
> correspondent relationships. Those relationships are governed by
> contractual agreements that contain representations and
> warranties for loans sold to the Estates, whereby certain
> correspondents may have potentially breached the contractual
> agreements. The Estates are investigating, and expressly reserve
> all Causes of Action against or related to any entity or person
> that sold or transferred any loan, mortgage, security, note or
> certificate to any Debtor, their affiliates, subsidiaries, officers,
> directors and employees, including, for the avoidance of doubt,
> entities that had a correspondent relationship with the Debtor.

(*Id.* at 3.)  Finally, the Plan Supplement, in unnumbered pages in a table format, identifies certain contract-based recovery efforts.  (*Id.* Ex. 13.)  Under the heading, "Potential Matters, Generally," the Plan Supplement discloses that "[t]he Estates are pursuing recovery of a defective loan(s) under the reps and warrants of an executed Purchase/Sale agreement" with respect to Decision One and PHH.  (*Id.*)  Honor Bank and Sierra Pacific are not specifically mentioned in the table. (*See id.*)

### C.    The Minnesota Actions and the Objectors' Counterclaims

Between December 14, 2013 and May 13, 2014, RFC or the Trust commenced actions against each of the Counterclaimants for breach of contract and contractual indemnification under the Prepetition Contracts (the "Trust Litigation"):

- RFC commenced a suit against Sierra Pacific in Minnesota district court on December 14, 2013.
- RFC commenced a suit against Decision One in Minnesota state court on December 17, 2013.  The action was later removed to Minnesota district court.
- The Trust commenced adversary proceedings in this Court against Honor Bank and PHH on May 13, 2014.  The district court withdrew the reference of these two actions and transferred them to the Minnesota district court because the contracts contained Minnesota forum selection clauses.

(Mot. at 9.)  Subsequently, the Counterclaimants filed their Counterclaims seeking, among other things, attorneys' fees incurred in connection with responding to the Trust Litigation:

- Sierra Pacific filed a counterclaim (the "Sierra Pacific Counterclaim") on August 16, 2014, alleging that RFC and the Trust breached covenants not to sue contained in the Sierra Pacific Contracts and the Sierra Pacific Settlement Agreements.  Sierra Pacific's counterclaim alleges that as a result of RFC and the Trusts' alleged breaches, "Sierra has been damaged in multiple ways, including but not limited to incurring attorneys' fees, paying for (and lose the use of) employee and management time and other company resources responding to and establishing the breaches, and in other ways."
- Decision One filed a counterclaim (the "Decision One Counterclaim") against RFC on June 25, 2015 alleging (1) Decision One "is entitled to recover its reasonable attorneys' fees and other costs incurred in this action" under a "prevailing party" clause in the Decision One Contracts; and (2) Decision One is entitled to damages, including attorneys' fees and costs in defending RFC's claims, because RFC purportedly breached

10

the Decision One Contracts by failing to give Decision One notice and an opportunity to cure defaults before RFC filed its lawsuit against Decision One.

- PHH filed a counterclaim (the "PHH Counterclaim") on June 26, 2015, alleging that RFC and the Trust: (1) breached the forum selection clause of the PHH Client Contract; (2) were required to notify PHH of breaches of the PHH Flow Agreement, and did not; (3) were required to give PHH an opportunity to cure breaches of the PHH Flow Agreement, and did not; and (4) breached the implied covenant of good faith and fair dealing in both contracts in the three foregoing ways. As damages for the alleged breaches, PHH seeks to recover its attorneys' fees associated with transferring the action to the District of Minnesota, and its attorneys' fees and "company resources" associated with "responding to and establishing" the alleged breaches of the PHH Flow Agreement.

- On July 16, 2015, Honor Bank filed a counterclaim (the "Honor Bank Counterclaim") alleging that RFC and the Trust: (1) breached the forum selection clauses of the Honor Bank Contracts; (2) were required to notify Honor Bank of breaches of the Honor Bank Contracts, and did not; (3) were required to give Honor Bank an opportunity to make a substitution for, or repurchase, any allegedly defective mortgage loans, and did not; and (4) breached the implied covenant of good faith and fair dealing in both contracts in the three foregoing ways. As damages for these alleged breaches, Honor Bank seeks to recover its attorneys' fees associated with transferring the action to the District of Minnesota, and its attorneys' fees and "bank resources" associated with "responding to and establishing" the alleged breaches.

(*Id.*)

## II.    PARTIES' AGUMENTS

### A.    Trust's Argument

The Trust's main argument is that because the Counterclaims assert contractual claims that arise from prepetition contracts, the claims are prepetition claims that are subject to the Discharge and Injunction. (Mot. at 13.) The Trust notes that it is not seeking to enjoin the Objectors' ability to assert affirmative defenses against RFC or the Trust. (*Id.* at 2.) The Trust maintains that the Bankruptcy Code's broad definition of "claim" includes contingent and unmatured claims, and that the Counterclaimants contractual claims constitute contingent prepetition claims that arose as of the date that the contracts were executed. (*Id.* at 13–14.) In support of this position, the Trust relies on a number of cases in which postpetition breaches of prepetition contracts gave rise to prepetition claims. *See, e.g.*, *Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575, 582 (S.D.N.Y. 2001) (stating that "the clear weight of case law in this

Circuit . . . recognizes that contract-based bankruptcy claims arise at the time the contract is executed"); *In re Riodizio, Inc.*, 204 B.R. 417, 424 n.6 (Bankr. S.D.N.Y. 1997) (stating that "[t]he postpetition breach of a prepetition contract gives rise only to a prepetition claim"); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 687, 696 n.12 (Bankr. S.D.N.Y. 1992) (stating that "[w]here the debtors' obligations stem from contractual liability, even a post-petition breach will be treated as a prepetition liability where the contract was executed prepetition").  Additionally, the Trust argues that because the contracts with the Counterclaimants were executed prepetition, it is irrelevant if RFC breached the contracts postpetition—as the Counterclaimants allege—because the Counterclaimants' claims arose when the contracts were executed (prepetition), making them prepetition claims, capable of being discharged in the Plan.  Further, the Trust argues that since the Counterclaimants did not object to the Plan, they should be barred from collaterally attacking the discharge and injunction provisions of the Plan and Confirmation Order.  (*Id.* at 18.)

The Trust cites Article IX.I of the Plan which provides that "[a]ny person injured by willful violation of this injunction shall be entitled to recover actual damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages from the willful violator."  (*Id.* at 12, 18.)  The Trust maintains that the Counterclaimants intentionally filed their Counterclaims against RFC and the Trust, thereby willfully violating the injunction.  (*Id.* at 18–19.)  The Trust also maintains that the Counterclaimants acted in bad faith by proceeding despite receiving notice of, among other things, the bar date and the Plan confirmation hearing.  (*Id.*)  Accordingly, the Trust contends that the Court should award appropriate monetary relief, including attorneys' fees and costs associated with bringing the Motion.  (*Id.*)

### B.    Objectors' Arguments

#### 1.    Decision One's Argument

Decision One contends that the Trust is breaching the very same Decision One Contracts that form the basis of the Trust's suit against Decision One by initiating the post-discharge lawsuit without fulfilling the appropriate conditions precedent. (Decision One Obj. at 3.) Decision One maintains that each of the Decision One Contracts contains a unique contractual addendum that prohibits the Trust from suing Decision One unless the Trust first complied with certain conditions precedent before filing suit. (*Id.*) Each addendum states that: "GMAC/RFC *shall not* exercise any other rights and remedies against or with respect to [Decision One] or any affected Loan *unless and until* [Decision One] *has first been afforded* the opportunity to cure or repurchase [any] affected Loan, as provided in Section 8.A.1 above." (*Id.* (emphasis added).) Thus, Decision One maintains, under the Decision One Contracts that it seeks to enforce, the Trust was required to give Decision One "the opportunity to cure or repurchase" any loan before exercising any right or remedy with respect to that loan. (*Id.*) Accordingly, in its counterclaim, Decision One alleges that the Trust effected a post-discharge breach of the Decision One Contracts by filing suit and seeking to exercise rights and remedies against Decision One and its loans without first giving Decision One the contractually-required opportunity to cure or repurchase the loans. (*Id.*)

Additionally, Decision One argues that under the terms of the Decision One Contracts, it is entitled to recover reasonable attorneys' fees and costs incurred in the action if it is the prevailing party. (*Id.* at 4.) Decision One further maintains that it is entitled to such fees and costs regardless of whether the request is a counterclaim or a defense under the contracts. (*Id.*)

### 2.    *PHH's Argument*

Consistent with the other Counterclaimants' positions, PHH argues that by prosecuting its action, the Trust is breaching the very contracts that form the basis of the Trust's suit against PHH. PHH's counterclaims arose post-confirmation. (PHH Obj. at 1.) The PHH Client Contract or the PHH Flow Agreement governs each PHH loan at issue. (*Id.*) PHH also argues that the PHH Flow Agreement requires the Trust to provide PHH with written notice and an opportunity to cure alleged defects in the case of an "Event of Default." (*Id.* at 4.) Accordingly, for the loans governed by the PHH Flow Agreement, PHH alleges that the Trust breached its contract by bringing suit without providing PHH notice and the opportunity to cure any alleged defects. (*Id.*) The PHH Client Contract contains a forum-selection clause that limits the proper venue to courts in Hennepin County, Minnesota and waives any argument of an inconvenient forum. (*Id.* at 3–4.) Despite the forum selection clause, the Trust filed its lawsuit in this New York bankruptcy court. District Judge John G. Koeltl withdrew the reference and transferred venue to the District of Minnesota. (*Id.* at 4.) Accordingly, PHH alleges that the Trust breached its contractual obligations by bringing suit against PHH in this Court instead of the contractually mandated venue of Minnesota. (*Id.* at 1.) PHH argues that the Trust's breaches of the PHH Client Contract and the PHH Flow Agreement occurred after the confirmation date and after the Effective Date. (*Id.*)

### 3.    *Honor Bank's Argument*

Honor Bank joins in the objections of Decision One and PHH in contending that the Trust is seeking to enforce obligations under contracts that it breached post-confirmation and that the Motion should be denied because the Counterclaims did not arise prior to confirmation. (Honor Bank Obj. at 8.) Honor Bank alleges that the Trust, by bringing suit without satisfying

the required conditions precedent, breached the terms of the Honor Bank Contracts.  (*Id.* at 1.)

Specifically, Honor Bank alleges that the Trust breached the Honor Bank Contracts by failing to

initiate its suit in Minnesota.  (*Id.*)  Additionally, Honor Bank maintains that the Honor Bank

Client Guides required the Trust to provide Honor Bank with notice of a repurchase demand

which would be followed by one of three events: (a) Honor Bank could agree to repurchase a

loan file on terms mutually acceptable to Honor Bank and the Trust, (b) Honor Bank could offer

to provide a substitute loan in place of the repurchase loan, or (c) Honor Bank could file an

appeal requesting reconsideration of the repurchase demand in the first instance.  (*Id.*)

Accordingly, Honor Bank alleges that Trust breached the Honor Bank Client Guides by initiating

suit prior to any of the forgoing occurring.  (*Id.*)

Honor Bank contends that it had no "claim" that would have entitled it to file a proof of

claim at the time the bankruptcy was filed.  (*Id.* at 6.)  Honor Bank further maintains that its

claim arose postpetition, not until May 13, 2014, when the Trust filed suit against it.  (*Id.*)

### 4.    *Sierra Pacific's Argument*

Consistent with the other Objections, Sierra Pacific contends that the Trust's own

actions—bringing suit against Sierra Pacific in violation of the broad releases and covenants not

to sue previously granted to Sierra Pacific by the Trust's predecessor-in-interest RFC—brought

about Sierra Pacific's counterclaims and, as such, the counterclaims are post-effective date

claims.  (Sierra Pacific Obj. at 1.)  Specifically, Sierra Pacific argues that the Trust's suit violated

the releases and covenants not to sue in the three prior settlement agreements between the

parties—all of which reference the contract on which [RFC] based its suit.  (*Id.* at 3.)  Sierra

Pacific cites as an example one settlement agreement, effective December 19, 2007, which

released a number of specific loans as well as loans involving "a borrower who has made the

first twelve consecutive payments due GMAC-RFC within the month mandates by the contract."
(*Id.*)  Under that agreement, the parties agreed not to "bring any claim, demand, liability or cause
of action that is the subject of this Agreement."  (*Id.*)  Also included was a prevailing party
attorneys' fee provision.  (*Id.*)

Sierra Pacific also raises the argument that the Debtors and the Trust did not receive a
discharge by the Plan and Confirmation Order.  (*Id.* at 10.)  Specifically, because the Plan was a
liquidation Plan, RFC (and the Trust, as the successor-in-interest) was not discharged by the Plan
and Confirmation Order.  (*Id.* at 10–11.)  Accordingly, even if the Sierra Pacific counterclaims
were deemed prepetition contingent claims—as the Trust contends they are—they were not
discharged by the Plan and the Confirmation Order.  (*Id.* at 11–12.)

### C.    Trust's Reply

In its reply, the Trust reiterates its position that the Counterclaims are prepetition claims
that were discharged by the bar date order and the Discharge and Injunction.  (Reply at 3.)  The
Trust contends that it cannot be disputed that the bar date order, the Plan and the Confirmation
Order are binding on the Counterclaimants and expressly bar any claims arising prior to the
Effective Date.  (*Id.*)  The Trust maintains that the contractual Counterclaims arise out of
prepetition contacts, the Counterclaims are "claims" as defined in section 101(5) of the
Bankruptcy Code, and thus fall under the bar date order, the Plan and Confirmation Order which
all adopt the Code's definition.  (*Id.* at 3–4.)

The Trust counters Sierra Pacific's argument that RFC did not receive a discharge under
the Plan and Confirmation Order because the Plan was a liquidation plan and the Confirmation
Order provided RFC with a limited discharge to the extent allowable under section 1141 of the
Bankruptcy Code.  (*Id.* at 11–12.)  In response to this argument, the Trust contends that even if
the Court were to determine that RFC did not receive a discharge under the Confirmation Order

and section 1141 of the Bankruptcy Code, the Counterclaims would still be barred by the

independent provisions of the bar date order, the Plan and Confirmation Order, which all barred

unfiled claims arising before the Effective Date.  (*Id.* at 12.)  Additionally, the Trust contends

that the Plan is *res judicata* as to the discharge of liabilities.  (*Id.* 12–13.)  The Trust reiterates its

position that it is not seeking to enjoin the Counterclaimants from asserting affirmative defenses

of setoff and recoupment, but it is seeking to preclude affirmative recoveries by the

Counterclaimants on account of the Counterclaims.  (*Id.* at 15.)

### III.   DISCUSSION

#### A.   Claims Under the Code and Discharge in Bankruptcy

Section 101(5) of the Code defines a "claim" as a "right to payment, whether or not such

right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured,

disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. §101(5) (emphasis

added).[5]  A claim is a contingent claim when in order for the debtor to become liable a specified

outcome must occur.  *See, e.g.*, *In re XO Communc'n's, Inc.*, 301 B.R. 782, 795 n.7 (Bankr.

S.D.N.Y. 2003) (citing *In re Pennypacker*, 115 B.R. 504, 507 (Bankr. E.D. Pa. 1990) (noting that

a "contingent claim" is defined as "[t]he debt is one which the debtor will be called upon to pay

only upon the occurrence or happening of an extrinsic event which will trigger the liability of the

debtor to the alleged creditor and if such triggering event or occurrence was one reasonably

contemplated by the debtor and creditor at the time the event giving rise to the claim occurred"),

*aff'd*, No. 04 Civ. 01489, 2004 WL 2414815 (S.D.N.Y. June 14, 2004)).  "Congress

unquestionably expected this definition to have wide scope"; indeed, the Supreme Court has

"noted Congress' intent to invest the term 'claim' with the 'broadest possible' scope so that 'all

legal obligations of the debtor . . . will be able to be dealt with in a bankruptcy case.'"  *LTV Steel*

---

[5]      The Plan incorporates the Bankruptcy Code's definition of a "claim."  (Plan 1.A.53.)

*Co. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 496–97 (2d Cir. 1995) (citations omitted).

The Second Circuit has made clear that "the existence of a valid bankruptcy claim depends on

(1) whether the claimant possessed a right to payment, and (2) whether that right arose before the

filing of the petition." *Id.* As to this second element, "[a] claim will be deemed pre-petition

when it arises out of a relationship recognized in, for example, the law of contracts or torts." *Id.*

at 497.

> In terms of the effect of a discharge imposed by a confirmed chapter 11 plan,

> > the basic rule is that claims arising after confirmation from a
> > contractual relationship are not barred by a confirmation order. It
> > is only where the liability asserted in a claim is based upon a
> > breach of contract that occurred before confirmation that the claim
> > must be filed in the bankruptcy. Potential claims for liabilities for
> > breach of obligations which might occur after confirmation cannot
> > be filed before confirmation even if they could be anticipated.

*Texaco Inc. v. Bd. of Comm'rs for the LaFourche Basin Levee Dist. (In re Texaco Inc.)*, 254 B.R.

536, 559–60 (Bankr. S.D.N.Y. 2000). "[N]o court has ever held that future claims for possible

future breaches of contract constitute 'claims' under Section 101(5) that must be filed pre-

confirmation." *Id.* at 559. Confirmation of a plan of reorganization discharges a debtor of its

pre-confirmation liabilities. *Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525, 533 (9th Cir.

1998) (citing *Sure-Snap Corp. v. Vermont (In re Sure-Snap)*, 983 F.2d 1015, 1019 (11th Cir.

1983)).

The bar date order entered in this case provided that "[c]laims based on acts or omissions

of the Debtors that occurred before the Petition Date must be filed on or before the applicable

Bar Date, even if such claims are not now fixed, liquidated or certain or did not mature or

become fixed, liquidated or certain before the Petition Date." (Bar Date Notice, ECF Doc. #

1412, Ex. G § 1.) Here, the Claimants contend that the Counterclaims arise from RFC's or the

Trust's acts after plan confirmation in filing the lawsuits against the Claimants. While such lawsuits may have been possible or even likely before confirmation, it is the act of filing and prosecuting the lawsuits that allegedly gives rise to the Counterclaims. With respect to prevailing party attorneys' fees, the Claimants argue, there is no basis to discharge the Trust from such potential liability. With respect to prevailing party attorneys' fees, the Claimants have substantial support for their position.

In *Sure-Snap*, the Eleventh Circuit held that the confirmation of a debtor's chapter 11 plan did not terminate the debtor's contractual liability under a prepetition contract's attorneys' fee provision where the fees were incurred from a post-confirmation appeal initiated by the debtor. The chapter 11 debtor filed an action in the bankruptcy court seeking a declaration that its indebtedness under a mortgage and security agreement was void under Vermont law. 983 F.2d at 1017. The bankruptcy upheld the enforceability of the agreement and shortly thereafter confirmed the debtor's chapter 11 plan in which the debtor's obligations under the agreement— which provided for the attorneys' fees incurred by the lender in certain instances—were discharged in consideration of the debtor's conveyance of certain mortgaged real property to the secured creditor. *Id.* The court noted that confirmation of the debtor's chapter 11 plan discharged its pre-confirmation liabilities under the prepetition agreement but that the attorneys' fees that the creditor sought were incurred as a result of a voluntary post-confirmation appeal initiated by the debtor. *Id.* at 1018. Accordingly, by choosing to appeal the validity of the agreement after confirmation, the debtor did so at the risk of incurring associated post-confirmation costs. *Id.* ("[B]ankruptcy was intended to protect the debtor from the continuing costs of pre-bankruptcy acts but not to insulate the debtor from the costs of post-bankruptcy acts." *In re Hadden*, 57. B.R. 187, 190 (Bankr. W.D. Wis. 1986)).

19

*Sure-Snap* is not the only circuit court decision permitting recovery of post-confirmation attorneys' fees under a prevailing party attorneys' fees clause in a prepetition contract. In *Siegel*, 143 F.3d at 534, the Ninth Circuit held that an attorneys' fee provision from a prepetition contract was not discharged through bankruptcy when the debtor chose to "return to the fray and use the contract as a weapon." The debtor and his partner initiated a pre-discharge action against the mortgagee alleging violations of the lender's duties under the deeds of trust. *Id.* at 528–29. The action eventually resulted in post-discharge grant of summary judgment in favor of the secured lender and an award of attorneys' fees incurred in pursuing its rights under the deeds of trust, pursuant to a provision therein.[6] *Id.* In affirming the award of attorneys' fees, the court noted that the debtor's discharge in bankruptcy did not extinguish the contractual attorneys' fee provision and that, although the provision may have fallen dormant, it was reviviscible. *Id.* at 531. While the debtor had been freed from the "untoward effects" of its prepetition contracts, it "chose to return to the fray and to use the contract as a weapon" by pursuing its breach of contract action against the secured lender. *Id.* at 533. Accordingly, it was "perfectly just, and within the purposes of bankruptcy, to allow the same weapon to be used against him [the discharged debtor]," and to allow the secured creditor to wield the attorneys' fee provision against the discharged debtor. *Id.*

In *Boeing North American, Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018, 1027 (9th Cir. 2005), the Ninth Circuit followed its reasoning in *Siegel* and held that claims for attorneys' fees and costs incurred postpetition are not discharged where, postpetition, the debtor voluntarily returns to the fray. The *Ybarra* court held that whether attorneys' fees and costs incurred through the continued prosecution of litigation initiated prepetition may be discharged depends

---

[6]    For the purposes of the action, the parties did not dispute that the debtor's acts which gave rise to the secured creditor's award of attorneys' fees occurred post-discharge. *Id.* at 532.

on whether the debtor has taken the affirmative postpetition action to litigate a prepetition claim

and has "thereby risked the liability to these litigation expenses." *Id*. at 1026. The court also

concluded that administrative priority cases did not control the determination whether a claim is

prepetition or postpetition in the discharge context. *Id.* The court reasoned that the inquiries

determining administrative expense priority and discharge differ—the discharge inquiry involves

the existence of personal liability while administrative expense priority concerns the distribution

of assets from a limited pool. *Id.* Even if a cause of action arose prepetition, "the discharge

shield cannot be used as a sword that enables a debtor to undertake risk-free litigation at others'

expense." *Id.* (citing *Siegel*, 143 F.3d at 533–34). Accordingly, the court reasoned that personal

liability for fees incurred through the voluntary pursuit of litigation initiated postpetition was

more consistent with the purpose of discharge. *Id.*

> ### B. The Counterclaims are Post-Discharge Claims that are not Barred by the Discharge and Injunction

The crux of the dispute between the Trust and the Objectors is whether the Counterclaims

are prepetition claims, and, thus, subject to the Discharge and Injunction. Here, where the

Counterclaims arise from voluntary post-discharge actions of the Trust (as successor-in-interest

to RFC), the Counterclaims arise from the same contracts that form the basis of the Trust's

lawsuits.[7] Whether the Counterclaimants were on notice that RFC or the Trust may (or were

likely) to sue for breach of representations and warranties and indemnification is of no particular

moment where the alleged contract breaches by RFC or the Trust arise solely from post-

confirmation acts. While claims arising from any pre-conformation acts or omissions by RFC

are discharged under the Plan and Confirmation Order, no such claims are asserted here as part

of the Counterclaims. As the court stated in *Texaco*, 254 B.R. at 559, "no court has ever held

---

[7]    With the exception of the Trust and RFC's action against Sierra Pacific.

that future claims for possible future breaches of contract constitute 'claims' under Section

101(5) that must be filed pre-confirmation."  While the statement in *Texaco* related to executory

contracts that were assumed by the debtor, and we deal here with contracts that were rejected

upon confirmation, the stated principle applies equally here.

Further, the Trust's position that the Counterclaims were discharged because the

Counterclaimants failed to file protective proofs of claims is untenable.  The rule that the Trust is

advocating would mean that any party to any contact with a debtor must—when no claim has

been asserted, or even likely—nonetheless file a protective proof of claim and require a court to

go through a claim objection process.  In such instances, a court would be inundated with

protective proofs of claims, draining juridical resources.

Where a post-discharge debtor, after it is freed from liability under its prepetition

contracts, chooses to "return to the fray and use the contract as a weapon," it is just and within

the purposes of bankruptcy to allow the same weapon to be used against the debtor.  *Siegel*, 143

F.3d at 533.  Viewed another way, "a discharge does not cancel the obligation; the obligation

still exists.  A discharge merely disables the creditor from enforcing its claim."  *Wagner v.

United States*, 573 F.2d 447, 453 (7th Cir. 1978) (citation omitted).  In this vein, even assuming

that RFC—and the Trust by extension—may have received a discharge under its prepetition

contracts, RFC and the Trust's action in bringing suit against the Counterclaimants, served to

revive the damages provisions of the contracts at issue.  *See Siegel*, 143 F.3d at 531 (noting that

the debtor's bankruptcy discharge did not extinguish a contractual attorneys' fees provision and

that [t]he provision itself may have fallen dormant, but it was reviviscible"); *Sure-Snap*, 983 F.2d

at 1018 (noting that confirmation of the debtor's chapter 11 plan did not terminate a prepetition

agreement but rather prevented the creditor from enforcing the terms of the agreement against the debtor to collect its pre-confirmation debt).

Principles of equity also support the Court's conclusion.  In the case of Decision One, Honor Bank and PHH, the Trust is seeking to thwart suits on the same contracts that form the basis of its suits.  (*See* Decision One Obj. at 1; Honor Bank Obj. at 1–2; PHH Obj. at 1.)  As such, principles of equity weigh against allowing the Trust to enforce the continuing contractual obligations of the Counterclaimants, without regard to the RFC's (and the Trust's as RFC's successor-in-interest) obligations under the same contracts.  *Cf. E. Air Lines, Inc. v. Inc. Co. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 999–1000 (2d Cir. 1996) (stating that "[b]ased on equitable principles, once a party accepts the proceeds and benefits of a contract, that party is estopped from renouncing the burdens that the contract places upon him") (internal quotation marks and citations omitted).

The Counterclaims are not prepetition claims subject to the Discharge and Injunction because they result from the voluntary post-confirmation actions of RFC and the Trust.  *See Texaco*, 254 B.R. at 559 (stating that "the basic rule is that claims arising after confirmation from a contractual relationship are not barred by a confirmation order").  By choosing to initiate the Trust Litigation, RFC and the Trust did so with the risk of liability under the Counterclaims.  "[B]ankruptcy was intended to protect the debtor from the continuing costs of pre-bankruptcy acts but not to insulate the debtor from the costs of post-bankruptcy acts."  *Sure-Snap*, 983 F.2d at 1018 (quoting *In re Haden*, 57 B.R. 187, 190 (Bankr. W.D. Wis. 1986)) (internal quotation marks omitted).

This conclusion is consistent with the "fresh start" purpose of discharge in bankruptcy.  Here, the successor-in-interest to a debtor facing potential liability as a result of its *voluntary*

post-confirmation actions is entirely consistent with the fresh start goal of bankruptcy. Indeed, "the discharge shield cannot be used as a sword that enables a debtor to undertake risk-free litigation at others' expense." *Ybarra*, 424 F.3d at 1026 (citing *Siegel*, 143 F.3d at 533–34). Additionally, between principles governing administrative priority and discharge, "[p]ersonal liability for fees incurred through the voluntary pursuit of litigation initiated post-petition is more consistent with the purpose of discharge [than administrative priority case law]." *Id.*

### C.   Administrative Priority Case Law is Inapplicable

The Trust also argues that the administrative expense priority scheme under the Bankruptcy Code also requires barring the Counterclaims. The purpose of administrative expense priority is to facilitate the operation of the debtor-in-possession to rehabilitate the business for the benefit of the estate's creditors. *See, e.g.*, *Trs. of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986). Section 507 of the Bankruptcy Code defines expenses and claims against a bankrupt estate that are entitled to priority in a bankruptcy proceeding. A claim is entitled to administrative priority only if, among other things, it arises out of a transaction between a creditor and the bankrupt's trustee or debtor-in-possession (*i.e.*, a postpetition transaction). *See id.* (citations omitted). When determining whether a contract-based claim is entitled to administrative expense priority, courts have looked to when the contract was entered into. *See, e.g.*, *Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575, 582 (S.D.N.Y. 2001) (stating that "the clear weight of case law in this Circuit . . . recognizes that contract-based bankruptcy claims arise at the time the contract is executed"); *In re Riodizio, Inc.*, 204 B.R. 417, 424 n.6 (Bankr. S.D.N.Y. 1997) (stating that "[t]he postpetition breach of a prepetition contract gives rise only to a prepetition claim") (citations omitted); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 687, 696 n.12 (Bankr. S.D.N.Y. 1992) (stating that "[w]here the debtors' obligations stem from contractual liability, even a post-petition breach will be treated as a prepetition

liability where the contract was executed prepetition") (internal quotation marks and citations

omitted). "The central question in determining whether a claim is granted administrative expense

priority is whether the third party should be paid at the expense of the debtor's existing

unsecured creditors." *Ybarra*, 424 F.3d at 1026 (citing *Total Minatome Corp. v. Jack/Wade

Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 389 (5th Cir. 2001)).

The Trust's reliance on administrative priority case law is misplaced. Cases concluding

that the moment parties execute a contract, each has a cognizable claim under the Bankruptcy

Code for a contingent right to payment based upon the other party breaching the contract—and,

its corollary, that postpetition breaches of prepetition contracts give rise to prepetition claims—

are inapposite where claims arise from voluntary *post-confirmation* conduct of a post-discharge

debtor. *See, e.g.*, *Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575 (S.D.N.Y. 2001); *In*

*re Riodizio, Inc.*, 204 B.R. 417 (Bankr. S.D.N.Y. 1997); *In re Drexel Burnham Lambert Grp., Inc.*,

138 B.R. 687 (Bankr. S.D.N.Y. 1992). While such cases control the determination of

administrative priority status (which turns on, among other things, prepetition versus postpetition

claim status), such cases are of less utility when deciding the instant matter, which involves

discharge. One of the animating principles of administrative priority cases—encouraging

dealings with a bankrupt while balancing the uniform treatment of all creditors—is absent when

an alleged post-discharge breach (entirely within the debtor's successor's control) gives rise to

claims arising from prepetition contracts. *See, e.g.*, *Pension Benefit Guar. Corp. v. LTV Corp.*

*(In re Chateaugay Corp.),* 87 B.R. 779, 796 (S.D.N.Y.1988) (stating that "[c]onsistent with the

goals of uniform treatment for creditors and a fresh start for debtors, courts have determined

when a claim arises for Code purposes by focusing upon 'the time when the acts giving rise to

the alleged liability were performed,' since only reference to prepetition acts of the debtor will

result in treating liabilities flowing from such acts in an equitable fashion") (citations omitted),

*aff'd,* 875 F.2d 1008 (2d Cir.1989), *rev'd on other grounds,* 496 U.S. 633 (1990).

## IV.    <u>CONCLUSION</u>

For the forgoing reasons, the Motion is **DENIED**.

**IT IS SO ORDERED.**

Dated:    November 23, 2015
      New York, New York

*Martin Glenn*
_____

MARTIN GLENN
United States Bankruptcy Judge
