# Exhibit 1

**Supplemental Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DECLARATION OF SARA LATHROP IN SUPPORT OF THE RESCAP BORROWER CLAIMS TRUST'S OMNIBUS REPLY IN SUPPORT OF ITS NINETIETH OMNIBUS OBJECTION TO CLAIMS ((I) NO LIABILITY BORROWER CLAIMS, (II) REDUCE AND ALLOW BORROWER CLAIM, AND (III) ALLOWED IN FULL BORROWER CLAIM) AS TO CLAIM NOS. 2526 AND 6270**

I, Sara Lathrop, hereby declare as follows:

1. I serve as Senior Claims Analyst for the ResCap Borrower Claims Trust (the "Borrower Trust"), established pursuant to the terms of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6030] confirmed in the above-captioned Chapter 11 Cases. During the Chapter 11 Cases, I served as Regulatory Compliance Manager and Loss Mitigation Manager in the loan servicing department of Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases (collectively, the "Debtors"). I began my association with ResCap in June 2006 working as an associate in the Default Division of the loan servicing operation of GMAC Mortgage, LLC ("GMACM"). In 2008, I became a Default Quality Control Specialist, a position that I held until I became a Supervisor in the Default Division in 2009. In 2011, I became a Supervisor in the Loss Mitigation Division of GMACM's loan servicing operation, and in February 2012, I became a Manager in that division. In this role, I oversaw

1

ny-1214806

GMACM associates in their efforts to provide borrowers with loss mitigation options and assisted in the development of GMACM's loss mitigation policies.  In January of 2013, I became the Regulatory Compliance Manager for ResCap.  I became Senior Claims Analyst for ResCap in July 2013 and continued in this role when the ResCap Liquidating Trust (the "Liquidating Trust") was established in December 2013.  In my current position as Senior Claims Analyst to the Borrower Trust, among my other duties, I continue to assist the Borrower Trust in connection with the claims reconciliation process.[1]  I am authorized to submit this declaration (the "Declaration") in support of the *ResCap Borrower Claims Trust's Omnibus Reply in Support of Its Ninetieth Omnibus Objection To Claims ((I) No Liability Borrower Claims, (II) Reduce And Allow Borrower Claim, And (III) Allowed In Full Borrower Claim) As To Claim Nos. 2526 And 6270* (the "Reply").[2]

    2.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations, information learned from my review of relevant documents and information I have received through my discussions with other former members of the Debtors' management or other former employees of the Debtors, the Liquidating Trust, and the Borrower Trust's professionals and consultants.  If I were called upon to testify, I could and would testify competently to the facts set forth in the Objection on that basis.

    3.  In my capacity as Senior Claims Analyst, I am intimately familiar with the claims reconciliation process in these Chapter 11 Cases with regard to Borrower Claims.  Except as otherwise indicated, all statements in this Declaration are based upon my familiarity with the

---

[1] The ResCap Liquidating Trust and the ResCap Borrower Claims Trust are parties to an Access and Cooperation Agreement, dated as December 17, 2013, which, among other things, provides the Borrower Trust with access to the books and records held by the Liquidating Trust and Liquidating Trust's personnel to assist the Borrower Trust in performing its obligations.
[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Reply.

2

ny-1214806

Debtors' Books and Records kept in the course of their regularly conducted business activities (the "Books and Records") as well as the Debtors' schedules of assets and liabilities and statements of financial affairs filed in these Chapter 11 Cases (collectively, the "Schedules"), my review and reconciliation of claims, and/or my review of relevant documents. I or my designee at my direction have reviewed and analyzed the proof of claim form and supporting documentation filed by the Claimants. Since the Plan went effective and the Borrower Trust was established, I, along with members of the Liquidating Trust's management or employees of the Liquidating Trust have consulted with the Borrower Trust to continue the claims reconciliation process, analyze claims, and determine the appropriate treatment of the same. In connection with such review and analysis, where applicable, I or Liquidating Trust personnel, together with professional advisors, have reviewed (i) information supplied or verified by former personnel in departments within the Debtors' various business units, (ii) the Books and Records, (iii) the Schedules, (iv) other filed proofs of claim, and/or (vi) the official claims register maintained in the Debtors' Chapter 11 Cases.

4. In connection with the claims reconciliation process, the Borrower Trust identified certain claims filed by Borrowers that are not liabilities of the Debtors (together, the "No Liability Borrower Claims").

5. The Debtors sent Request Letters to certain Borrowers, including all of the Respondents, requesting additional documentation in support of the No Liability Borrower Claims.[3] The Request Letters state that the claimant must respond within 30 days with an explanation that states the legal and factual reasons why the claimant believes he is owed money or is entitled to other relief from the Debtors, and the claimant must provide copies of any and all documentation that the claimant believes supports the basis for his claim. The Request Letters

---

[3] A Request Letter was sent to Ms. Tammaro on May 24, 2013 and the Coopers on June 21, 2013.

3

ny-1214806

further state that if the claimant does not provide the requested explanation and supporting documentation within 30 days, the Debtors may file a formal objection to the claimant's claim, seeking to have the claim disallowed and permanently expunged.

6.      The Debtors received responses to the Request Letters from the Respondents[4] (the "Diligence Responses"), copies of which are attached hereto as Exhibit A. The Diligence Responses fail to allege bases for claims against the Debtors' estates and the Books and Records do not show any liability due and owing to the Respondents.

**Tammaro Claim**

7.      On or around November 6, 2012, Ms. Tammaro filed a proof of claim against Debtor Residential Capital, LLC ("ResCap"), designated as Claim No. 2526 (the "Tammaro Claim"), asserting a general unsecured claim in the amount of "$30,000 plus $45,000" and a secured claim in an unliquidated amount. See Exhibit B attached hereto.

8.      According to the Debtors' books and records, GMACM originated a loan in the amount of $100,000 to Ms. Tammaro on October 29, 1999 (the "Tammaro Loan"), secured by a mortgage on property located at 24 Pleasant Street, Everett, MA 02149 (the "Tammaro Property"). See Tammaro Note, attached hereto as Exhibit C, and Tammaro Mortgage, attached hereto as Exhibit D. GMACM transferred its interest in the Tammaro Loan to Fannie Mae.

9.      On May 10, 2009, Ms. Tammaro submitted an application for a loan modification. See Servicing Notes at 37-38, attached hereto as Exhibit E. GMACM approved Ms. Tammaro for a trial HAMP loan modification (the "Trial Plan") on May 13, 2009 with payments due June through August 2009. See id. at 36. The Trial Plan was completed and

---

[4] The Debtors received a Diligence Response from Ms. Tammaro related to the Tammaro Claim (defined below) on June 17, 2013 and from the Coopers on July 22, 2013.

4

ny-1214806

GMACM approved Ms. Tammaro for a permanent HAMP loan modification (the "Loan Modification") on September 15, 2009. See id. at 30. GMACM mailed the documents to Ms. Tammaro on September 17, 2009 to be executed. See Servicing Notes at id.

10. Prior to the execution of the Loan Modification, the principal balance of the Tammaro Loan was $67,231.91. See Servicing Notes at 4. Pursuant to section 3.B of the Loan Modification, a total of $18,473.34 was added to the principal balance, which represented $5,446.45 in unpaid interest, $9,434.87 in unpaid escrow, $1,279.32 in default fees, and $2,312.70 in attorney's fees. See Servicing Notes at 36 of 94. Thus, the new total amount owed on the Tammaro Loan after the Loan Modification was $85,705.25 (the "New Principal Balance").[5]

11. Section 3.C of the Loan Modification agreement stated that "$29,563.02 of the New Principal Balance shall be deferred…and I will not pay interest or make monthly payments on this amount." See Loan Modification, attached hereto as Exhibit F. Section 3.F states "I agree to pay in full the Deferred Principal Balance and any other amounts still owing under the Loan Documents at the earliest of: (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the Maturity Date." See id. Thus, while the New Principal Balance was $85,705.25, she did not need to make monthly payments or accrue any interest on $29,563.02 of that amount (the "Deferred Principal Balance"), and therefore her monthly payment schedule was determined based on the principal amount of $56,592.02.[6]

---

[5] The Loan Modification Agreement improperly lists $56,592.02 as the new principal balance, however, this is actually the amount that she was making payments on after the Deferred Principal Balance (defined below) was deducted from the New Principal Balance.

[6] This amount is $449.79 more than the difference between $85,705.25 and $29,563.02. The Borrower Trust cannot explain the reason for this difference. However, the schedule of payments listed on the Loan Modification agreement, which Ms. Tammaro agreed to, is based on an interest bearing principal balance of $56,592.02.

5

ny-1214806

12. On October 28, 2009, because GMACM had not yet received the executed Loan Modification Documents, GMACM mailed a breach letter to Ms. Tammaro because the Tammaro Loan was owing for the October 2008 through October 2009 payments (the "Breach Letter"). See Tammaro Breach Letter, attached hereto as Exhibit G. The Tammaro Loan was not referred to foreclosure at this time. See Servicing Notes at 24-35 of 94.

13. After GMACM mailed the Breach Letter, it received the executed Loan Modification Documents from Ms. Tammaro, and her account was brought current. See Servicing Notes at 4, 24 of 94.

14. Ms. Tammaro remained current on the Tammaro Loan for the remainder of the period it was serviced by GMACM. See Servicing Notes at 1-4 of 94. HAMP Program Guidelines state "To provide an additional incentive for borrowers to keep their modified loan current, borrowers whose monthly mortgage payment…is reduced through the HAMP by six percent or more and who make timely monthly payments will earn an annual 'pay for performance' principal balance reduction equal to the lesser of: (i) $1,000, or (ii) one-half of the reduction in the borrower's annualized monthly payment for each month a timely payment is made." See HAMP Guidelines, attached hereto as Exhibit H, at 24. Pursuant to this provision, GMACM applied a $1,000 incentive payment annually to Ms. Tammaro's unpaid principal balance. These incentive payments were applied on August 2, 2010, July 28, 2011, and July 31, 2012. See Servicing Notes.

**Cooper Claim**

15. On or around November 9, 2012, the Coopers filed a proof of claim against ResCap, designated as Claim No. 6270 (the "Cooper Claim"), asserting a secured claim in an amount of $50,000. See Exhibit I attached hereto.

16. According to the Debtors' books and records, GMACM originated a home equity line of credit to the Coopers on August 25, 2003 (the "Cooper HELOC"), secured by a mortgage (the "Cooper Mortgage") on 175 South Street, Concord, NH 03301 (the "Cooper Property"), which was recorded on September 2, 2003. See Cooper Note, attached hereto as Exhibit J, and Cooper Mortgage, attached hereto as Exhibit K.

17. GMACM serviced the Cooper HELOC from September 9, 2003 until servicing was transferred to Ocwen on or around February 16, 2013.

18. On May 27, 2005, the Coopers made a payment to GMACM of $45,508.82 on account of the Cooper HELOC, reducing the principal balance of the Cooper HELOC to zero. See Servicing Notes, attached hereto as Exhibit L, at 4. There is nothing in the Debtors' books and records to indicate that this payment was accompanied by a letter from the Coopers closing the account. See id.

19. On September 13, 2005, the Coopers spoke with GMACM via phone, at which time the Coopers stated that they intended to draw funds soon. During this conversation, the Coopers did not state that the Cooper HELOC should have been closed. See Servicing Notes at 8.

20. The Coopers subsequently withdrew $10,000 from the Cooper HELOC on October 3, 2005. See Servicing Notes at 4. Subsequent to that amount being drawn, the Coopers made monthly payments on the account. See id.

21. The Coopers withdrew additional amounts on the Cooper HELOC on March 9, 2005 ($10,000), November 8, 2006 ($1,000), January 23, 2007 ($5,000), August 14, 2007 ($6,000), November 1, 2007 ($5,000), November 29, 2007 ($4,000), December 17, 2007 ($6,000) and February 29, 2008 ($2,500). See Servicing Notes at 3-4.

ny-1214806

22. As of February 29, 2008, the unpaid principal balance on the Cooper HELOC was $49,049.55. See id. at 3. The Coopers made monthly payments on this amount until servicing of the Cooper HELOC was transferred to Ocwen. See id.

23. On October 4, 2012, the Coopers requested a full account history. See Cooper Servicing Notes at 6. This was the first time the Coopers had made such a request. See id. On October 22, 2012, GMACM mailed a payment history to the Coopers, and on October 30, 2012, GMACM mailed the Cooper HELOC and Cooper Mortgage, as well as the Coopers' loan application, HUD-I, and another payment history for the account. See id at 6-7.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 11, 2015

/s/ Sara Lathrop
Sara Lathrop
Senior Claims Analyst for the ResCap
Borrower Claims Trust