**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | JOINT PRETRIAL ORDER |

-------------------------------------------------------------

### JOINT PRETRIAL ORDER AS IT PERTAINS TO PROOF OF CLAIMS
### 2291, 2294, 2295, AND 2357

The parties having conferred among themselves and with the Court pursuant to Fed. R. Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial Order herein. Given that discovery is still continuing in this case, the parties would request an opportunity to amend this Joint Pretrial Order at an appropriate time, after discovery has completed.

## I.    NATURE OF THE CASE

This case concerns claims for an alleged wrongful foreclosure surrounding the sale of certain real property located at 5540 Twin Creeks Road in Reno, Nevada ("Property"). Borrowers Pamela Longoni ("Longoni"),[1] and Jean Gagnon ("Gagnon") (collectively with Lacey Longoni, the "Claimants") originally brought suit against GMAC Mortgage, LLC ("GMACM"), Executive Trustee Services LLC ("ETS"), Residential Funding Company, LLC ("RFC"), and Residential Asset Mortgage Products, Inc. ("RAMPI") in Nevada on ten claims: (i) violation of certain Nevada foreclosure laws; (ii) violation of certain Nevada statutes, specifically, N.R.S. § 205.372; (iii) fraud and misrepresentation; (iv) negligence and negligent misrepresentation; (v) breach of contract; (vi) tortious breach of the implied covenant of good faith and fair dealing; (vii) breach of covenant of quiet title; (viii) intentional infliction of emotional distress; (ix) promissory estoppel; and (x) concert of actions against all defendants. All of the original counts stem from Claimants' assertions that GMACM approved Longoni for a permanent loan modification, assured her that her foreclosure was on hold, and then improperly sold the Property. This case was subsequently removed to the United States District Court for the District of Nevada (Reno Division – Case No. 3:10-CV-00297) (the "Nevada Litigation").

On December 14, 2010, the United States District Court for the District of Nevada dismissed Longoni's claims for breach of covenant of quiet title and tortious breach of the implied covenant of good faith and fair dealing. On May 17, 2012, GMACM,

---

[1] Lacey Longoni, a minor at the time the Nevada Litigation was initiated, appears through her mother Pamela Longoni and is a listed plaintiff in the Third Amended Complaint.

ETS, RFC, and RAMPI filed a Notice of Bankruptcy and Automatic Stay. Consistent with that, the Nevada Litigation was stayed in reference to the above defendants on June 26, 2012 and administratively closed on September 24, 2013 as to the remaining parties.

Longoni, Gagnon, and Lacey Longoni (through her mother) then filed Proof of Claims 2291, 2292, 2293, 2294, 2295, 2296, 2297, and 2357 in this Court on July 18, 2013. Each attached the Third Amended Complaint from the Nevada Litigation. Surviving at this time are only Proof of Claim #s 2291, 2294, 2295, and 2357. Each seeks damages in the amount of $600,000—two on Gagnon's behalf, two on Longoni's behalf (including Lacey Longoni).

Longoni and Gagnon originally executed a promissory note and deed of trust on the Property at issue on September 29, 2005 in favor of Equifirst Corporation. The ResCap Borrower Claims Trust ("Trust") contends that Homecomings Financial LLC, and later GMACM, acted as the sub-servicer on the loan beginning in 2005 and continuing until 2013.

Due to Gagnon/Longoni's failure to make the required payments, GMACM declared the loan in default for the December 2008 payment and sent a notice of default to Gagnon/Longoni on January 2, 2009. Longoni failed to cure the default, and ETS formally recorded a Notice of Breach and Default with the Washoe County Recorder on February 26, 2009. The Trust contends that a corresponding affidavit from ETS indicates that this Notice was sent to Longoni at the Property address on March 4, 2009.

GMACM received Longoni's request for a loan modification review on or about March 5, 2009. On March 10, 2009, GMACM offered Longoni a three month trial plan ("Repayment Agreement") requiring three monthly payments of $2,270 each, with a balloon payment of $19,421.76 at the end of this three-month period. According to this proposed plan, these payments were required to be made on March 30, 2009, April 30, 2009, and May 30, 2009, with the balloon payment due June 30, 2009. This proposed plan was sent to Longoni and Gagnon but was never signed nor agreed to by them. Longoni and Gagnon could not afford the $2,270 monthly payment amount proposed in the Repayment Agreement and Longoni alleges that she requested and received oral approval for a three-month trial loan modification plan with a reduced monthly payment of $1,600. No signed agreement memorializing these terms was ever located or produced during discovery.

Longoni made three payments of $1,600 in April, May and June. GMACM refused to take Longoni's $1,600 payment on July 3, 2009, as it was less than the full amount of the June 30, 2009 balloon payment listed in the originally proposed Repayment Agreement.

Throughout this time period, Longoni was communicating, via email, with a loan modification specialist named Jonathan "Nate" Stephenson. Documents produced

during discovery document their correspondence regarding the loan modification and foreclosure sale.

The foreclosure sale occurred on August 14, 2009 and the Property sold for $172,500.00 to third party National Real Estate Services. The Trust alleges that at the time of the foreclosure sale, the amount of the unpaid debt owed by Gagnon/Longoni was $467,815.00.

On August 24, 2009, Longoni called in to check on the status of her loan modification, and was told that the Property had been sold on August 14, 2009. The Trust alleges that she then began communicating with a GMACM representative named Farrah Tolbert, and forwarding certain email communications between herself and Stephenson to "Ms. Newton."

Bradley Arant Boult Cummings, LLP initially attempted to re-purchase the Property. Those discussions were ultimately unsuccessful and the Nevada Litigation ensued.

In conjunction with actual damages arising out of the alleged wrongful sale of the Property and alleged fraudulent representations of GMACM and ETS, Longoni also alleges that she has suffered severe emotional distress. Discovery indicates that Longoni did not seek medical treatment for her emotional distress but she testified during her deposition that she suffered extreme weight loss, anxiety and stress. In addition, Longoni alleges that the entire foreclosure process was traumatic for Lacey Longoni.

## II.   BASIS FOR JURISDICTION, WHETHER THE CASE IS CORE OR NON-CORE, AND WHETHER THE BANKRUPTCY JUDGE MAY ENTER FINAL ORDERS OR JUDGMENT

This Court has core jurisdiction to hear and decide this matter under 28 U.S.C. sections 1334(a), 1334(b), 157(a), 157(b)(1), 157(b)(2)(B), 157(c)(2) (if needed), by consent of the parties and the Amended Standing Order of Reference in Case No. 12 MISC 00032 (filed February 1, 2012, Dkt. No. 1).  See also *Erisken v. Residential Capital, LLC*, No. 14 – CV – 7205 (S.D.N.Y. Dec. 18, 2014) (holding that the presence of a claim for emotional distress damages does not convert a matter into one governed by 28 U.S.C. section 157(b)(5)).  The Borrower Trust submits that this a core matter with respect to which the bankruptcy court may enter final orders.

## III.   STIPULATED FACTS

1. Pamela Longoni and Jean Gagnon originally executed a promissory note and deed of trust (together, the "Loan") on certain real property located at 5540 Twin Creeks Drive, Reno, Nevada ("Property"), on September 29 2005 in favor of Equifirst Corporation.

2. The loan number for Gagnon and Longoni's Loan was XXXXXX3498.

3. Longoni/Gagnon defaulted on the Loan on July 5, 2006, however that default was subsequently cured.

4. Longoni/Gagnon defaulted on the Loan on April 1, 2007, however that default was subsequently cured.

5. Longoni/Gagnon defaulted on the Loan in November 2007, however, that default was subsequently cured via a loan modification.

6. Longoni/Gagnon executed an original Adjustable Rate Loan Modification Agreement on November 2, 2007.

7. Longoni/Gagnon failed to make the loan payment required on the modified Loan in December 2008.

8. GMACM declared Gagnon/Longoni's Loan in default and a notice of default was mailed to Longoni/Gagnon on January 2, 2009.

9. Longoni/Gagnon failed to cure the claimed default.

10. ETS formally recorded a Notice of Breach and Default with the Washoe County Recorder on February 26, 2009.

11. On March 3, 2009, Longoni faxed a loan modification application package to GMACM, providing both Gagnon and her information. The document listed Gagnon as the "Homeowner" and Longoni as the "Additional Homeowner." The fax contained an attachment detailing Longoni and Gagnon's financial hardship as well as certain bank account information.

12. The account history for the Loan indicates that GMACM received Longoni's request for a loan modification review on or about March 5, 2009.

13. By way of letter dated March 10, 2009, GMACM offered Longoni/Gagnon a three month Foreclosure Repayment Agreement ("Repayment Agreement") requiring three monthly payments of $2,270 each, with a balloon payment of $19,421.76 at the end of the three-month period. These payments were required to be made on March 30, 2009, April 30, 2009, and May 30, 2009, with the balloon payment due on June 30, 2009.

14. Longoni/Gagnon could not afford the $2,270 monthly payment amount proposed in the Repayment Agreement. Longoni requested and received oral approval for the three-month trial plan with a reduced monthly payment of $1,600.

4

15. There is no signed written agreement recording the terms of the reduced monthly payment of $1,600, however, the terms of this agreement are referenced in GMACM's account history on March 19, 2009.

16. Longoni/Gagnon did not execute the original Repayment Agreement offered by GMACM on March 10, 2009.

17. The proposed Repayment Agreement stated that "Lender has instituted forclosure proceedings against the property securing the Mortgage indebtedness, which proceedings will continue until the default(s) herein is/are brought current under the terms of the Mortgage, or otherwise cured as provided for in this Agreement. Nothwithstanding the foregoing, Lender "agrees to suspend but not terminate foreclosure activity on the default account, provided we receive the executed Agreement and we receive the initial installment in the amount of $2270 no later than [sic]."

18. GMACM's account history indicates that on March 27, 2009, Longoni advised GMACM that she would need additional time to make the first payment due March 30, 2009, and the due date was extended to April 3, 2009.

19. On April 2, 2009, Longoni and Stephenson corresponded via email.  At 1:01 pm, Longoni sent Stephenson an email stating that she made the $1,600 payment.  She further asked when the next payment was due.

20. At 11:09am, in response, Stephenson advised Longoni that her next payment would be due on April 30, 2009 for $1,600.  Stephenson further advised that all he was waiting for was approval from the Vice President of the Bank in order to make the change permanent.  Stephenson stated, "I should know the outcome in the next month(ish)."

21. At 1:16pm, Longoni stated in an email to Stephenson: "Oh?? I thought this was a "for sure" thing. There's a chance it will not go through."

22. In response, Stephenson advised, "Your trail [sic] modification is approved, but since I am trying to write off $176K from your loan, I need to get approval from our Vice President.  There is a chance that she may come back and say no." Stephenson further stated "I have done the analysis already and it seems to be a win win situation, so I am fairly  confident that it will get approved for a permanent modification."

23. On April 20, 2009, Longoni emailed Stephenson to follow up on their April 2, 2009 correspondence. Longoni advised she would make another $1600 payment on Thursday, the 30th.  Longoni stated she had not received any documentation regarding the loan modification and that she was "absolutely certain" that a payment amount greater than $1,600 would result in her having to "mail you the

keys." She further stated "I know you told me not to worry, but I'm just weird that way! Do you still feel confident that this will go through?"

24. On April 21, 2009 at 2:36 PM, Stephenson responded to Longoni, stating that he is still awaiting approval from our VP, that things are a little backed up here due to the current state of the housing market. He told her he would let her know as soon as he heard anything.

25. On April 21, 2009 at 4:39 PM, Longoni responded to Stephenson's above-referenced email and advised that she will wait to hear back regarding her loan modification and to "tell that VP not to let me lose my house!"

26. On April 21, 2009 at 4:51 PM, Stephenson responded to Longoni's above-referenced email and stated: "I'll let her know."

27. On April 28, 2009 at 12:22 PM Longoni emailed Stephenson stating that she was looking at her mortgage information online and it indicated that her last payment of $1,600 was received in addition to the $7.50 processing fee. Longoni further states that fees were charged in the amount of $2,316.30 on April 7th and inquired if she is responsible to pay said fees. Longoni said she would make another $1,600 payment on Thursday, April 30th.

28. On April 28, 2009 at 1:14 PM Stephenson replied to Longoni's above-referenced email. Stephenson advised that the fees were for the escrow shortage and that had already added that back into the loan. He further stated that he was looking at the notes on her loan and that "it looks as if one manager looked at it and agreed that it was a win win situation, but because it is $186K that we are trying to write off, it has to go a little higher."

29. On April 28, 2009 at 1:15 PM Longoni responded to Stephenson's above-referenced email. Longoni inquired as to what has to go higher and the balance of her loan.

30. On April 28, 2009 at 1:20 PM Stephenson responded to Longoni's above-referenced email. Stephenson advised that the debt forgiveness had to be sent to higher management due to the amount. Stephenson further stated that "If we get this MOD approved your balance will drop to $269,677.03 at 3% for five years."

31. On April 28, 2009 at 1:31 PM Longoni responded to Stephenson's above-referenced email inquiring whether or not the interest rate and principal will go back up on the balance remaining if the $186,000.00 is written off.

32. On April 28, 2009 at 2:18 PM Stephenson responded to Longoni's above-referenced email explaining, "The $186K includes $15K in interest. So the actual principal that is being written off is around $169K. After 5 yrs your rate will

increase by no more than 1% per year.  The highest that it can go is 13.875%.  The principle will be gone forever."  He further stated "Don't worry about being a pest, that's what I'm here for!!!  Let me know if you can think of anything else."

33. On May 1, 2009 at 9:44 AM Longoni emailed Stephenson and advised that she tried to make her payment online and over the phone and her payment was declined.  She also stated that it had worked on the prior month's payment.

34. On May 1, 2009 at 10:30 AM Stephenson emailed Longoni in response to her above-referenced email and advised that someone had placed a "Certified Funds Flag" flag on her account required her to send certified payments but that he had removed it.

35. On May 1, 2009 at 4:40 PM Longoni responded to Stephenson's above-referenced email confirming she been able to make the payment.

36. On May 5, 2009 at 3:58 PM Longoni sent an email to Stephenson stating she received a call from Homecomings stating that her payment had not been received and inquired if Stephenson would check on the status of her payment.

37. On May 5, 2009 at 4:10 PM Stephenson responded to Longoni's email confirming receipt of payment on May 4, 2009.  Further, Stephenson stated that the VP had not had a chance to look at Longoni's pending modification. He further stated that "It doesn't look like our VP has had a chance to look at this yet. (We are swamped!!!!!!!!!!).  The notes that I saw are good though (indicating that it makes sense to do the Modification).  We still have 2 months before I would have to set up a plan.  So everything is still on hold.  Hope all is well.  Let me know if you have any other questions."

38. On May 26, 2009 at 12: 36 PM Longoni sent Stephenson an email stating, "I will be making my third payment of $1,600 on Friday.  However, I still have not received any paperwork re: the modification.  Do you have any update for me? And do I still continue the $1600 next month?  I hope so.  I would never be able to afford more." Longoni also informed Stephenson that she had a friend with a situation similar to hers and she asked if she could refer him to her.

39. On May 26, 2009 at 1:43 PM, Stephenson replied to the above-referenced email. Stephenson states he does not have an update but advises Longoni to make the $1,600 payment.  Stephenson states that Claimant will receive paperwork with the new terms once the decision has been made.  Stephenson instructs he will be moving to another team next week and therefore he would not be able to help her friend.

40. On May 27, 2009 at 10:31 PM Longoni sent Stephenson an email stating she was comfortable corresponding with him regarding her loan, and inquired who she

should contact since Stephenson will be moving to another team. Longoni expressed concern that her modification would not be approved and she'd lose her home.

41. On May 27 2009 at 10:37 AM Stephenson replied to Longoni's above-referenced email and instructed that he did not know who her loan would be assigned to but he will supply her with contact information as soon as he finds out.

42. On June 2, 2009, Longoni emailed Stephenson indicating that she had been trying since yesterday to make another payment and it wouldn't let her. She further stated that she had just broken her arm but that she was driving to Western Union to make the payment. She asked if there was a way she could pay it asap."

43. GMACM's account history reflects receipt of $1,600.

44. On June 29, 2009 at 5:15 PM Longoni sent Stephenson an email stating, "I can't seem to get a hold of anyone who knows anything about the modification you were working on. Homecomings sent me information indicating that my payment was as it was before, and the balance was the same."

45. On June 30, 2009 at 7:08 AM Stephenson replied to Longoni's above-referenced email stating, "I e-mailed my old dept yesterday and they responded that the file has been sent for final management approval. The person handling the file is Landon Huck. I hope that this helps you. Good luck."

46. On June 30, 2009 at 11:00 AM Longoni responded to the above-referenced email asking, "Do you have any contact information for Landon?"

47. On June 30, 2009 at 9:12 AM Stephenson replied to the above-referenced email, "I am sorry I am not able to give you the contact info. I did, however, rcv an e-mail stating that the Mod has been approved yesterday, but that is all that I know. You may want to call in and see if you can get some more details."

48. On June 30, 2009 at 11:39 AM, Longoni emailed Stephenson asking "So 'approved' means $1600 a month and the principal reduction? Mr. Stephenson responded saying "That is the way that I had it set up, however, I am not sure if that was how it was approved or not.

49. Longoni did not pay any June balloon payment of $19,421.76.

50. GMACM refused to take Longoni's $1,600 payment on July 3, 2009.

51. On July 9, 2009 at 8:31 AM Longoni sent an email to Stephenson wherein she indicated that she had "been trying to make the $1600 payment for SIX days, and to no avail. I finally reached financial services this morning and was told by some

8

guy named Henry that our modification was NOT APPROVEED and we owe $19,000 some odd dollars or they will sell our house!!  He would not accept the $1600 payment and said that was only set up for three months.  Nate, you assured me that this was approved and everything would be okay.  Please help., I can't get anyone at GMAC/Homecomings to understand our situation.  Now what do we do?  I can't lose my house.  If I do, my ex will take my kids away from me.  Please e-mail or call me."

52.  On July 9, 2009 at 9:10 AM Stephenson emailed Longoni and stated: It looks like they are trying to put you onto an Obama Modification. Your Foreclosure is on Hold. GMAC does not want to take your house. When we last talked I said that, from the information that I could gather from my old dept, this was waiting to be approved by management. I am not sure what happened with that, but when I had originally set you up it was a traditional GMAC Mod. We are now trying to put everyone into the Obama plan. Per the notes that I saw Landon Huck gave you a call on 7/02. There is an Obama pckg that you can download from www.gmacmortgage.com
Go to Resource Center
Then go to Homeowner Help
Download the Financial Analysis PDF.
You can fax it to 866 709 4744
There will be a check list for the items that we need. I am sure that we have most of it, but please try to send it all to be sure. I want you to know that we will try to do everything we can before we proceed with a foreclosure. Unfortunately I can't do anything with this file myself because I am no longer with this group. I hope this helps you a little bit. Sorry for all the confusion."

53.  On July 9, 2009 at 9:26 AM Stephenson emailed Longoni stating he will put email Landon and have him give Claimant Longoni a call. Stephenson explained the Obama Modification to Longoni, stating that GMAC starting "doing them in mid May."

54.  On July 9, 2009 at 11:21 AM Longoni emailed Stephenson informing that she has not received a call from Landon Huck and inquired as to his contact information. Longoni asks about an Obama Modification.

55.  On July 15, 2009, GMACM removed the foreclosure hold on the Property.

56.  On July 16, 2009 GMACM sent a letter to Longoni advising that "The repayment plan we previously established to your request has been canceled for one of the more of the following reasons:  'The payment was not received by the payment due date as specified in the signed repayment agreement." The letter goes on to state that default proceedings would resume.

57. On July 23, 2009, ETS filed the Notice of Trustee's Sale in Washoe County, and posted a copy at the Reno Courthouse, City Hall, and Public Library on July 24, 2009. The Notice was also published in the *Sparks Tribune* from July 24, 2009 through August 7, 2009.

58. On July 30, 2009, GMACM sent Longoni a financial package, urging her to submit it along with a "signed letter explaining cause of default, two most recent paycheck stubs and copy of most recent federal tax return." That letter contained a note at the bottom which read "30 days to sale."

59. On August 3, 2009 at 10:55 AM, Longoni emailed Stephenson and stated: "I hate to bother you, but I have no alternative. I am absolutely unable to get any assistance from GMAC at all and now I am getting notices in my mail from some place called ETS saying my house is being sold at auction on the 18th. Why is this happening? I thought everything was going smoothly. I have NEVER received anything from GMAC. Please Nate, please help."

60. On August 3, 2009 at 11:00 AM Stephenson emailed Landon Huck stating: "Hey man, can you help this woman? Thanks, Nate."

61. On August 3, 2009 at 2:22 PM Landon Huck responded saying "If she will send in the WKOUT that we sent her she will get the help she needs. This is not in my split. Sorry bro."

62. On August 3, 2009 at 2:24 PM Stephenson emailed Huck saying: "Thanks man. Can you forward this on to whomever's split it falls into? Thanks, Nate."

63. On August 3, 2009 at 2:31 PM Huck emailed Stephenson saying "You keep corresponding with her, just tell her to fill out the WKOUT and send it in. It will get assigned then."

64. On August 3, 2009 at 12:36 PM Stephenson emailed Longoni stating: "Apparently, we need you to send in the workout package that you can download from our website. Once we get that then they can work on it. The instructions are below. Hope that this helps. Also please include your acct number on everything that you send."

65. On August 3, 2009 at 2:43 PM Longoni emailed Stephenson asking if her loan is in foreclosure.

66. On August 3, 2009, at 12:45 PM, Stephenson responded to the above email and stated that he was no longer able to see the account.

67. On August 3, 2009, at 3:01 PM, Stephenson emailed Brian Fulgence forwarding Longoni's email and asking if Fulgence could assist her with the workout.

68. On August 14, 2009, a foreclosure sale was held and the Property sold for $172,500.00 to a third party, National Real Estate Services.

69. At the time of the foreclosure sale, the amount of the unpaid debt owed by Longoni was $467,815.00.

70. On August 24, 2009 Longoni  emailed Stephenson stating when she called GMAC to find out the status of her modification, as she sent in her workout package a week ago, she found out her house was sold on August 14, 2009. Specifically, the email stated: "Your past emails to me indicate that the foreclosure process was on hold, and nothing would happen as I was attempting to be put in the Obama Modification program.   Now I am losing my house. Can you explain this to me? How could this happen and why?  I have SEVERAL emails from you stating that the modification had been approved for five years, and the interest and principal had been reduced.  What happened to that?   And why did you tell me something that was not true?  I have small children at my home—and we are being forced out of our house. I won't stop with GMAC until I get my house back.  I have turned this matter over to counsel.  Any explanation?"

71. "

72. On August 25, 2009 at 11:30 AM Longoni emailed Stephenson asking him to respond to the above-referenced email.

73. On August 25, 2009 at 11:48 AM Stephenson email Wills stating:  "Ben,this is a loan that I started working on when I first got hired in March. At the time, I didn't know that we were not allowed to email customers.  I had sent numerous emails to the FRC team and apparently nobody was able to work her Modification.  I had put her FC on hold in July (I think) but as this is not on our report I didn't follow up on it.  Now her house has been sold and she has referred the matter to counsel. Obviously I will not be corresponding with her again, but I wanted to make you aware of the situation."

74. On August 26, 2009 at 9:45 AM Ben Wills emailed Gill stating:  "Hopefully you can help me out with this.  Basically the long and skinny is that Nate told this lady the foreclosure was on hold when it is not and it went to 3rd party sale.  He now knows not to email borrowers/3rd parties and will definitely be held responsible for his actions, but would this fall under the mod teams cost center as far as the rescind process is concerned?  I am willing to do the leg work on it if I need to but I just need to figure out where this would fall.  Thanks in advance for your help.."

75. On August 26, 2009 at 4:48 PM Longoni emailed Stephenson asking why Stephenson isn't responding to her emails.

76. On September 10, 2009, Longoni communicated with Brett Nelson, a representative from National Real Estate Services, via email. Nelson told Longoni that he would provide her with a $1,500 check in exchange for her move out on Saturday, September 12.

## IV.    PARTIES' CONTENTIONS

The pleadings are deemed amended to embrace the following, and only the Following contentions of the parties:

### A. *Plaintiff's Contentions*

1. The plaintiffs' contend as follows: Pamela Longoni and her former husband first purchased the real property located at 5540 Twin Creeks Drive, Reno, Nevada on or about April 1, 1996. She was married and had just given birth to her second daughter, Lacey Ann Longoni. In 2002, she divorced but remained in the home. In 2003, she began a relationship with Jean Gagnon and in 2005 they sought to refinance the mortgage. As part of that refinance, they pulled out approximately $65,000.00 in equity in the home, the vast majority of which was used to renovate and improve the property.

2. In the latter part of 2008, they realized because of a change in their circumstances which required Mr. Gagnon to relocate from Reno to Las Vegas that they would not be able to meet the residential loan requirements. Ms. Longoni contacted Homecomings Financial whom she believed was the owner of her loan hoping to obtain a modification to their loan. She was told that to be considered for any loan modification, that they had to be in default. Therefore, they did not make their December 2008, payment.

3. In conformity with what she had been told, on January 10, 2009, Ms. Longoni and Mr. Gagnon submitted a formal request for a loan modification. They were contacted in early March 2009, by a representative by the name of Jonathan "Nate" Stephenson. Mr. Stephenson first suggested a Repayment Plant pursuant which included three increased monthly payments of $2,270.00 to be followed by a balloon payment of more than $19,000.00. Ms. Longoni informed Mr. Stephenson that they would never be able to make that payment and therefore Mr. Stephenson then instructed her that they would try and place her into a permanent loan modification. At that time they discussed the payments which the borrowers believed they could make and it was agreed that the monthly payment would be $1,600.00. This was described as a trial payment plan. Ms. Longoni was never told that there was any time limit on this trial plan.

4. The plan was set to commence on March 30, 2009, and because of matters which were beyond her control, they were not able to make the payments in strict accordance with the plan. However, on each occasions, they made the payments within the period permitted by GMACM. During the next three months, Ms. Longoni continued to have contact with Mr. Stephenson who repeatedly assured her that he had submitted their request for a permanent modification to their existing loan and that it appeared that their request would be approved. During this process, Mr. Stephenson described the terms of the new loan and the amount of the principal of the loan that was being written down by the lender. He informed her that because of the amount of principal that was being written off, their request had to be approved by higher management.

5. Toward the end of May, Mr. Stephenson was transferred to a different team. Ms. Longoni made numerous attempts to make contact with the person who had assumed responsibility for their modification request and had no success. So she turned to Mr. Stephenson who continued to respond to her providing her with details of the status of their request. On June 30, 2009, Mr. Stephenson sent Ms. Longoni and email stating that he received an email stating that their request for a loan modification had been approved. Although he was not aware of the specifics of the approval, he informed her that it was the way he had it set up.

6. When the time came to make the fourth payment, GMACM would not accept their payment. After several days of trying, on July 9, 2009, she finally made contact with an individual who identified himself as "Henry." It is believed that this individual is actually Henry Casas. During their call, Mr. Casas informed Ms. Longoni that their trial payment plan was only set up for 3 months, that their request for a permanent loan modification had not been approved, and that if they did not pay approximately $19,000.00 their home would be sold. Despite saying this, Henry informed her that they should submit a workout under the new "Obama Modification Plan." He told her that they had 60 days within which to complete this process. He assured her that the foreclosure process was on hold.

7. Later that same day, Ms. Longoni emailed Mr. Stephenson who informed her that, in fact, GMACM was trying to put them into an Obama Modification. He specifically informed her that the "Your Foreclosure is on Hold. GMAC does not want to take your home." On July 30, 2009, GMACM sent the plaintiffs a letter with the forms for the Obama Modification Plan. That letter contained a note at the bottom which stated "30 days to Sale." That package was received by Ms. Longoni on August 4, 2009. They returned the package to GMACM on August 10, 2009.

8. GMACM never responded to their Obama Plan request and instead sold their home at a foreclosure sale on August 14, 2009. To date, neither GMACM nor Executive Trustee Services has ever been able to provide an explanation for the following questions:

1) Was the plaintiff's request for a permanent loan modification really approved as Mr. Stephenson indicated on July 9, 2009;

2) Why GMACM and ETS sold the plaintiffs' home on August 14, 2009, after they specifically informed them that it was on hold and that they had 60 days within which to apply under the Obama Plan; and,

3) Did anyone at GMACM actually make the decision to reinstate the foreclosure?

9. It is Mr. Stephenson's belief that GMACM's automated system likely started the foreclosure process once they defaulted upon the loan and that a new time schedule was initiated based upon the Repayment Plan which he first suggested. However, when the Repayment Plan was abandoned in lieu of a permanent Loan Modification, no one changed the automated system which reinstituted the foreclosure process. It is entirely possible that the foreclosure occurred without anyone at GMACM ever knowing it was occurring. Apparently, we will never know exactly what occurred.

10. The net result is the same. The plaintiffs' home was sold in direct contradiction to the promises and representations which were made to the plaintiffs by GMACM representatives. The plaintiffs contend this was either fraud, or at the very minimum, constituted promises which were enforceable under the doctrine of promissory estoppel. Because GMACM failed to perform in accordance with their promises, the plaintiffs lost their home.

B. *Defendant's Contentions*

1. Claimants Longoni/Gagnon were performing on a modified loan when they defaulted in December 2008.

2.  In March 2009, GMACM sent Longoni a Foreclosure Repayment Agreement that required three payments of $2,270, with a balloon payment of $19,421.76. Notes from the Loan history indicate that Claimant Longoni called in and said she could not afford the $2,270 payment. A payment of $1,600 for three months was proposed; however, no signed agreement or writing memorializing these terms was ever developed. There is no notation regarding the balloon payment.

3. Longoni was not able to make the three $1,600 payments on time, but GMACM accepted them nonetheless.

4. During this time, Longoni was communicating with Nate Stephenson about the status of her pending permanent loan modification. On June 30, 2009, Stephenson emailed Longoni and stated that he saw an email that her permanent loan modification had been approved; however, he was unable to tell her the terms surrounding the alleged approval and urged to call in to get the details. In

addition, the notes from the Loan history contain no mention of a loan modification approval, in any form.

5.  On July 9, 2009, a full month before the foreclosure sale, Longoni called in to GMACM. Henry at GMACM expressly told Claimant Longoni that her loan modification was not approved and that she owed $19,421.76 or her Property would be sold. Notes on the Loan history indicate that he urged her to submit a workout package, and went on to explain that the turnaround time for a workout package is 60 days, with nothing guaranteed. Longoni then emailed Stephenson, and Stephenson urged Longoni to submit a workout package. At this point, Longoni is fully aware that her modification was not approved, and that she needed to complete additional documentation in order to be considered for a potential loan workout. Accordingly, any reliance that Longoni placed on Stephenson's June 30 statement that her modification had been approved is not justifiable after this date.

6.  Due to the fact that there was no permanent modification in place and she failed to make the June balloon payment, the foreclosure hold on the Property was lifted on July 15, 2009.

7.  On July 16, 2009, GMACM mailed to Claimant Longoni, at the Property address, a letter notifying her that the repayment plan had been cancelled. Specifically, that letter goes on to note that "[a]t this time, the default proceedings will resume."

8.  GMACM attempted to contact Claimant Longoni on July 13, 2009; notes from the Loan history indicate that GMACM left a call back number and advised that they needed a completed workout package from her.

9.  On July 29, 2009, GMACM sent Claimant Longoni a letter stating that they needed additional information from her to consider her for possible workout options. While the footer on the document, with no other context, states "30 days to sale," there are no promises or guarantees in the body of the letter regarding the potential sale of the Property.

10. The records reflect that GMACM attempted to contact Claimant Longoni on July 30; July 31; August 4; August 5; August 6; and August 7; Longoni never responded to those contact attempts.

11. On August 3, 2009, Claimant Longoni emailed Stephenson and referenced receipt of the Notice of Trustee's Sale from ETS, which expressly stated that the Property would be sold on August 14. In response, Stephenson told her that GMACM was trying to review her for a HAMP modification and that she needed to send in her workout package. Claimant Longoni then asked Stephenson if her Loan was in foreclosure, to which Stephenson responded that he was unable to see her account. At that point, Longoni was well aware that her Property was moving

towards a foreclosure sale, and any reliance she puts on the July 9, 2009 statement from Stephenson that the foreclosure was on hold is not justified.

12. Claimants have never been able to provide any proof that Longoni submitted a workout package in August 2009, and the notes on the Loan history do not indicate receipt of any package.

13. The Property was sold on August 14, 2009 for $172,500. At the time of sale, Claimants Longoni/Gagnon owed $467,815.00-- resulting in a net loss of $293,315.00 to GMACM.

14. On August 24, 2009, in an attempt to try and persuade GMACM to purchase back her Property, Claimant Longoni appears to have altered an email and sent it to Farrah Tolbert. This apparently altered email made it appear that Stephenson, on August 3, 2009, told her that the foreclosure was on hold.

15. In reliance upon the apparently altered email from Claimant Longoni, GMACM attempted to rescind the foreclosure sale and clean up Claimant Longoni's credit. While GMACM ultimately decided not to rescind the foreclosure sale, the foreclosure was removed from Longoni's credit.

16. Claimant Longoni never sought medical treatment for her alleged emotional damages, and did not have to take any time off of work to deal with same. In addition, deposition testimony indicated that any lingering anxiety or emotional damages that she claims to date are more likely to be a proximate result of a motorcycle accident that she was in in February 2015.

17. The Trust further contends that Claimant Gagnon is not entitled to recover damages in this suit. He has never participated in this suit, and has made no move to prosecute this action.

18. The Trust further contends that Claimant Lacey Longoni is not a proper party plaintiff. She is not a party to the Note and Mortgage. In addition, while the Nevada Litigation was instituted when Lacey Longoni was a minor, she is now past the age of majority and has made no move to join this action on her accord.

19. Finally, the Trust contends that ETS is not a proper party defendant. Claimants point to no actions or omissions on the part of ETS to support their claims for fraud, negligent misrepresentation, promissory estoppel and IIED. All of the alleged representations and omissions are actions by GMACM, not ETS. Accordingly, ETS is not a proper defendant.

### V.    ISSUES TO BE TRIED

*Fraud Claim[2]*

1. Whether GMACM committed fraud through its communications with Claimant Longoni regarding the modification and the foreclosure:
   a. Whether the representations concerning the modification and the foreclosure constituted false statements.
   b. On the fraud claim, whether GMACM knew that these representations concerning the modification and foreclosure were false.
   c. Whether GMACM intended for Claimant Longoni to rely on these representations.
   d. Whether Claimant Longoni justifiably relied on the representations.
2. Whether Claimant Gagnon is entitled to assert claims for fraud/negligent misrepresentation.
3. The extent of any actual damages, if any, actually or proximately caused by GMACM's alleged fraudulent representations.

*Negligent Misrepresentation Claim*

4. Whether GMACM committed negligent misrepresentation through its communications with Claimant Longoni regarding the modification and the foreclosure:
   a. Whether GMACM supplied false information regarding the modification and the foreclosure.
   b. Whether Claimant Longoni justifiably relied on GMACM's conduct.
   c. Whether GMACM failed to exercise reasonable care in delivering the alleged misrepresentations to Claimant Longoni.
5. Whether Claimant Gagnon is entitled to assert a claim for negligent misrepresentation.
6. The extent of any actual damages, if any, actually and or proximately caused by GMACM's alleged negligent misrepresentations.

*IIED Claim*
*(Debtors' Contention)*
7. Whether Claimants can prove that the GMACM conduct complained of was extreme and outrageous to support the claim for intentional infliction of emotional distress.

---

[2] Under Rule 9(b), Claimants are required to plead their claims for fraud and misrepresentation with particularity. At this point, the Trust is still unsure what representations Claimants are using as their basis for their fraud/misrepresentation claims. The Trust assumes, for purposes of this Pre Trial Order, that the fraudulent representations/omissions of which Claimants complain are: (i) the June 30, 2009 statement that the loan modification had been approved and (ii) the July 9, 2009 statement that the foreclosure was on hold.

8. Whether Claimants can prove that GMACM's alleged conduct was done with the intention of, or reckless disregard for, causing emotional distress.
9. Whether Claimant Longoni suffered emotional distress.
10. Whether Claimant Longoni's alleged emotional distress was actually or proximately caused by GMACM's conduct.
11. Whether Claimant Lacey Longoni suffered emotional distress.
12. Whether Claimant Lacey Longoni's alleged emotional distress was actually or proximately caused by GMACM's conduct.
13. Whether Claimant Gagnon suffered emotional distress.
14. Whether Claimant Gagnon's alleged emotional distress was actually or proximately caused by GMACM's conduct.

*(Plaintiffs' Contention)*
15. Did the plaintiffs prove that GMACM requested the plaintiffs to apply for a different loan modification and assure them that the foreclosure was on hold during that process?
16. Did the plaintiffs prove they suffered severe emotional distress?

*Promissory Estoppel Claim*

17. Whether GMACM made a promise that it knew, or reasonably should have expected, would cause the Claimants to act or forebear from acting.
18. Whether Claimants relied to their detriment upon a promise from GMACM.
19. Whether the Claimants suffered damage as a result of the reliance upon a promise from GMACM?
20. The extent of any actual damages, if any, actually or proximately caused by GMACM's conduct.

*Exemplary Damages*

21. Did the defendants engage in despicable conduct in conscious disregard of the rights of the Claimants. "Conscious disregard" means the knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences. *See* Nev. Rev. Stat. § 42.001-.002.
22. What sum of money would appropriately punish the defendant or deter future culpable conduct?

*Standing Issues*

23. Whether Claimant Gagnon can recover damages given his lack of participation in the conduct and litigation?
24. Whether Claimant Lacey Longoni is a proper party plaintiff?

*Miscellaneous Issues*

25. Whether ETS is a proper party defendant?

## VI.    CLAIMANT'S EXHIBITS

Claimants' Exhibit List is appended to this document as Appendix A**.**


## VII.    DEFENDANT'S EXHIBITS

a. Complete copy of Promissory Note, dated September 29. 2005 (GMAC-01-129-0138)

b. May 21, 2007 Notice of Default (GMAC-01-0267-0268)

c. October 5, 2007 Notice of Default (GMAC-01-0277-0278)

d. Executed Adjustable Rate Loan Modification Agreement dated November 2, 2007 (GMAC-01-0139-0142)

e. January 2, 2009 Notice of Default (GMAC-01-0271-0272)

f. January 9, 2009 Notice of Default (GMAC-01-0275-0276)

g. First Financial Package submitted by Claimant on March 3, 2009 (GMAC-01-0178-01089)

h. Affidavit of Mailing – Executive Trustee Services, dated on March 4, 2009 (GMAC-01-0291)

i. March 19, 2009 Email from Jonathan Stephenson to Logan Gill (RFC-03-000003)

j. April 2, 2009, 4:22 PM email from Longoni to Jonathan Stephenson (RFC-03-000042)

k. April 28, 2009, 1:31 PM email from Longoni to Jonathan Stephenson (RFC-03-000059)

l. May 26, 2009, 1:43 PM email from Jonathan Stephenson to Longoni (RFC-03-000075)

m. Trustees Deed Upon Sale, dated August 26, 2009 (GMAC-01-0145 through GMAC-01-0147)

n. August 3, 2009 email chain between Longoni and Jonathan Stephenson (RFC-03-109-111)

o. August 3, 2009 email from Nate Stephenson's Outlook inbox folder (RFC-03-103-105)

p. August 24, 2009 email chain from Longoni to Farrah Tolbert (RFC-03-152-154)

q. Objection of the Rescap Borrower Claims Trust to Proofs of Claim Filed by Pamela D. Longoni and Jean Gagnon (Claim Nos. 2291, 2294, 2295 and 2357) filed with this Court on April 24, 2015, including all exhibits included therein.

r. Reply Brief in Further Support of the Objection of the Rescap Borrower Claims Trust to Proofs of Claim Filed by Pamela D. Longoni and Jean Gagnon (Claim Nos. 2291, 2294, 2295 and 2357) filed with this Court on June 4, 2015

s. Deposition of Pamela Longoni taken on November 10, 2011

t. Deposition of Pamela Longoni taken on November 9, 2015

u. Affidavit of Mailing of Notice of Trustee Sale dated July 22, 2009 (ETS-01-94-95)

v. Notice of Trustee's Sale and Mailing Receipts (ETS-01-53-56)

w. Any and all exhibits needed for rebuttal and/or impeachment

x. All documents listed by Claimants in this Pre Trial Order not objected to.

No exhibit not listed by plaintiff or defendant may be used at trial except (a) for cross-examination purposes or (b) if good cause for its exclusion from the pretrial order is shown. Each side shall list all exhibits it intends to offer on its case in chief. The list shall include a description of each exhibit. All exhibits shall be pre-marked with each exhibit bearing a unique number or letter (numbers for plaintiff and letters for defendant), with the prefix PX for plaintiff's exhibits and DX for defendant's exhibits. Two copies of each exhibit shall be delivered to chambers with the proposed pretrial conference order.

## VIII.    STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

The parties are mailing their exhibits to Chambers via separate cover.

The parties are working in collaboration to develop a streamlined summary of the various email communications that are stipulated to. Ideally, this would be one document that lists the emails, and their various contents, in chronological order and can be used at trial rather than the various separate email communications. The parties are working on this document and will provide same in a supplement, no later than January 13, 2016.

Claimants object to the following exhibits:
- The plaintiff objects to Defendant's Exhibit P as it lacks authentication.
- The plaintiff objects to Defendants' Exhibit Q as it is hearsay as well as any exhibit attached thereto that is not otherwise listed in the plaintiff's exhibits
- The plaintiff objects to Defendants' Exhibit R as hearsay as well as any exhibit attached thereto that is not otherwise listed in the plaintiff's exhibits.


The Trust objects to the following exhibits:
- To the extent that Plaintiffs' proposed exhibits 31 and 32 (Settlement Agreements) are being used to establish liability, the Trust contends that under FRE 408, the proposed settlement agreements are not admissible for that purpose.
- The Trust objects to the use of Plaintiffs' proposed exhibits 41 and 42 (the 2012 and 2015 affidavit and declaration of Nate Stephenson). To the extent that any testimony from Stephenson will be used, he must be present at trial so that the Trust can cross examine him. Stephenson was not an employee at GMACM at the time his statements were made, and the statements contained in the 2012 affidavit and 2015 declaration constitute inadmissible hearsay.
- The Trust is not sure what Plaintiffs' proposed exhibit 43—entitled "Assignment from Gagnon to Longoni" is. The Trust has never seen this document, as it was never produced during discovery, and the Trust does not know what it contains. If this document goes to damages and Longoni and Gagnon's ability to recover same, Claimants were required to produce it to the Trust consistent with Rule 26(a)(1)(A).
- The Trust takes the position that the August 24, 2009 email forward from Longoni to Tolbert (Def. Proposed Exhibit P "DP"), in which Stephenson allegedly says "Don't

worry, the foreclosure is on hold" is not admissible for purposes of determining liability if, in fact, it was altered by Longoni.

## IX.    PLAINTIFF'S WITNESS LIST

Pamela Longoni
Lacey Longoni
Jean Gagnon
Nate Stephenson (via deposition testimony)
Paul Williams (via deposition testimony)
Katie Brewer (via deposition testimony)
Juan Aguirre (via deposition testimony)
Myron Ravelo (via deposition testimony)
Brett Nelson (via deposition testimony)

Claimants will designate line/page numbers in a supplement document, to be provided at close of discovery, on or around January 13, 2016.

## X.    DEFENDANT'S WITNESS LIST

Sara Lathrop

## XI.    RELIEF SOUGHT

The plaintiff shall set forth the precise relief sought, including each element of damages.

The plaintiffs seek a monetary damage award of $100,000.00 which is the difference between the current market value of their real property and the amount of the indebtedness plaintiffs would have if GMACM had performed in accordance with the loan modification plan that they informed the plaintiff had been approved. The plaintiffs further seek an award of $300,000.00 in compensatory damages (general damages) for Pamela Longoni, $300,000.00 for Lacey Longoni and $50,000.00 for Jean Gagnon for the distress and suffering they endured as a result of the loss of their home. The plaintiffs seek an exemplary damage award in the amount of 3 times the compensatory damage award if that award is more than $100,000.00 or $300,000.00 if that award is less than $100,000.00 per Nevada Revised Statute § 42.005.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

Dated:  December 14, 2015

/s/ Thomas P. Beko
[Signature of Plaintiff's counsel]


/s/ Avery A. Simmons
[Signature of Defendant's counsel]



**IT IS SO ORDERED.**

Dated:  December 17, 2015.
      New York, New York


**/s/Martin Glenn**
MARTIN GLENN
United States Bankruptcy Judge