**<u>Exhibit A</u>**

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KENNETH REAVES,            )
                          )
    Plaintiff,            )
                          ) CIVIL ACTION FILE
    vs.                   )
                          ) NO. 1:11-CV-4138-RLV
GMAC MORTGAGE, LLC and    )
U.S. BANK NATIONAL        )
ASSOCIATION,              )
                          )
    Defendant.            )

———————————————————

DEPOSITION OF CARITA BOWERS
APRIL 27, 2012
11:00 A.M.

———————————————————

## Page 2

1     APPEARANCES OF COUNSEL
2         On behalf of the Plaintiff:
3             David P. Rachel, Esq.
4         On behalf of Defendants:
5             Teah N. Glenn, Esq.
6         Also present:
7             Joe Edlin (via telephone)
8             Kenneth Reaves
9
10                  * * *
11        MR. RACHEL:  This is deposition of Carita
12    Bowers.  Is that the correct pronunciation?
13        THE WITNESS:  Yes.
14        MR. RACHEL:  In the case of Kenneth Reaves
15    versus GMAC Mortgage and Bank National -- US
16    Bank National Association.
17        This deposition will be taken pursuant to
18    the Civil Practice Act and will be used for all
19    applicable purposes.
20        Are we going to waive signature?
21        MS. GLENN:  Let's do it.
22        MR. RACHEL:  The parties have consented
23    she is going to sign the document at the end of
24    the deposition.
25        MS. GLENN:  No, I'm sorry.  She's going to
      read and sign.

## Page 3

1         MR. RACHEL:  She is going to read and sign
2     at the end of the deposition.
3         What about objections?
4         MS. GLENN:  That's what I thought you were
5     asking me earlier.  Let's not waive objections.
6     Let's put them on the record.
7         MR. RACHEL:  We are going to put
8     objections on the record.  At this time she
9     will be sworn in.
10                CARITA BOWERS,
11    having been first duly sworn, was deposed and testified as
12    follows:
13                EXAMINATION
14    BY MR. RACHEL:
15        Q    Okay.  Could you please state your name
16    for the record?
17        A    Carita Bowers.
18        Q    And could you state your address for the
19    record?
20        A    527 Lantern Wood Drive, Scottdale, Georgia
21    30079.
22        Q    Okay.  And I would just like to -- when I
23    start a deposition, I like to do a quick
24    housekeeping.
25            When we do the deposition, of course, I'm

## Page 4

1     going to ask the questions.  Once I finish with the
2     questions, then you will then answer the questions.
3         During the time I ask the questions, if
4     you would please refrain from answering any
5     questions, and when you're answering the questions,
6     then I will do the same and refrain.  That way we
7     both are not talking at the same time.
8         A    Yes.
9         Q    And Ms. Bowers, could you tell me where do
10    you work?
11        A    GMAC Mortgage.
12        Q    And how long have you been there?
13        A    Five years.
14        Q    And what is your job title there?
15        A    Community Relations Specialist.
16        Q    And what exactly do you do as a Community
17    Relations Specialist?
18        A    I meet with customers one-on-one to
19    discuss loss mitigation options.  I work with
20    nonprofit organizations to tell them about the GMAC
21    brand, to do some community revitalization and
22    neighborhood stabilization.
23        Q    Now, where is your office located?
24        A    At 2 Ravinia Drive, Suite 500, Atlanta,
25    Georgia 30356.

Page 5

1    Q    Is that the office you work out of at all
2    times?
3    A    Yes.
4    Q    Do you travel to any other states with
5    GMAC?
6    A    Yes.
7    Q    Approximately how many states do you
8    travel to?
9    A    All of them except maybe Hawaii.
10    Q    Okay.  And you have the same
11    responsibilities when you travel to those states?
12    A    Yes.
13    Q    And when you travel to those states, how
14    do you keep in contact with your office?
15    A    Can you tell me what you mean by "my
16    office"?
17    Q    Yes.  Do you use a cell phone?  Do you use
18    E-mail?  How do you communicate with the office?
19    A    Are you referring to my main office,
20    GMAC's main office?
21    Q    Your main office on Ravinia Drive or any
22    of your customers that need to reach you, how would
23    they reach you?
24    A    Telephone.
25    Q    Is that a cell phone or -- I'm assuming a

Page 6

1    cell phone?
2    A    When I am traveling it is a cell phone.
3    Q    And who actually supplies that?  Is that a
4    cell phone that GMAC supplies?
5    A    Yes.
6    Q    Does GMAC have all the phone records of
7    that phone?
8    A    Yes.
9    Q    Are you privy to any of those phone
10    records, such as call logs?
11    A    What do you mean by "call logs"?
12    Q    With the cell phone, when you call
13    someone, when the bill comes out, it shows you whom
14    you called, the date you called, the time you called
15    and the amount of time that you were on that phone
16    call.
17         Do you have privy to any of that
18    information?
19    A    No.
20    Q    So GMAC has all those records, okay.
21         MS. GLENN:  Can we get an answer to that
22    on record?
23         MR. RACHEL:  Sure.
24         THE WITNESS:  I don't know.
25    BY MR. RACHEL:

Page 7

1    Q    Now, do you travel a lot?
2    Q    What do you mean "a lot"?
3    Q    Approximately how many times do you travel
4    from your office, whether it be a flight or whether
5    it be a drive or a train or bus or any other kind of
6    medium, to any other office other than the one on
7    Ravinia Drive per month?  How often would you say
8    that happens?
9    A    It differs.  I cannot --
10    Q    On average?
11    A    Several times a year.
12    Q    Would you say approximately maybe two or
13    three times a month?
14    A    At times.
15    Q    At times.  What is the most amount of
16    times you've traveled in one month approximately?
17    A    Five times.
18    Q    And what's the least amount you've
19    traveled?
20    A    None.
21    Q    Does the traveling keep you away from your
22    family?
23    A    At times.
24    Q    How do you feel about that?
25         MS. GLENN:  I'd object just as to

Page 8

1    relevance.
2         But you may answer.
3         THE WITNESS:  I don't feel bad about it.
4    BY MR. RACHEL:
5    Q    If you could not travel, would you take
6    that?
7    A    No.
8    Q    Now, have you ever given a deposition
9    before?
10    A    Yes.
11    Q    Approximately how many times?
12    A    Three or four.
13    Q    Now, at those depositions, were you made
14    aware of the penalties of perjury?
15    A    Yes.
16    Q    What were those depositions concerning?
17    A    Insurance and a notary.
18    Q    Have you ever had to give a deposition for
19    GMAC before?
20    A    No.
21    Q    Have you ever had to be a witness for GMAC
22    before?
23    A    Yes.
24    Q    And what was the reason you were a
25    witness?  What was the type of case?

Page 9

1     A   It was a mediation.
2     Q   Mediation for what type of case?  Was it
3  wrongful foreclosure?  A accident?
4     A   I don't remember.
5     Q   Approximately when was that?
6     A   I don't remember.
7     Q   Was it within the last -- how long have
8  you been working at GMAC, five years?
9     A   Five years.
10     Q   Was it within the last five years?
11     A   Yes.
12     Q   Have you ever spoken to Mr. Reaves before?
13     A   Yes.
14     Q   Approximately how many conversations have
15  you had with him?
16     A   I don't remember.
17     Q   Okay.  Were those all phone conversations
18  or have you communicated with him via E-mail or
19  facsimile?
20     A   Phone conversations.
21     Q   So you have never communicated with him
22  via E-mail or facsimile?
23     A   I don't remember.
24     Q   Are you aware that in Georgia a person can
25  legally tape a phone conversation without the other

Page 10

1  party knowing?
2         MS. GLENN:  Object just as to the
3     legality.  You're asking her for a legal
4     conclusion or to propound on the law.
5         But you may answer to the extent you know.
6         THE WITNESS:  No.
7  BY MR. RACHEL:
8     Q   Did you ever ask Mr. Reaves if he was
9  taping any of your phone conversations?
10     A   Yes.
11     Q   Why did you ask him that?
12     A   Because I wanted to know if he was taping
13  them.
14     Q   Have you ever asked any other client of
15  GMAC or mortgage holder if they were taping a
16  conversation?
17     A   Yes.
18     Q   And approximately how many times have you
19  asked that question or how many people have you
20  asked that question to?
21     A   I don't know.
22     Q   Is it standard course of business for you
23  to ask someone if they're taping your conversations?
24     A   What do you mean "standard course of
25  business"?

Page 11

1     Q   Is that a protocol that GMAC -- under
2  GMAC's employee manual -- you are an employee of
3  GMAC; am I correct?
4     A   Yes.
5     Q   Did you receive an employee manual when
6  you were hired?
7     A   Yes.
8     Q   Did you review that employee manual?
9     A   Yes.
10     Q   Did the employee manual stipulate that you
11  should ask clients if they were taping your
12  conversations?
13     A   No.
14     Q   So this is something that you do on your
15  own?
16     A   Yes.
17     Q   Now, do you ask someone if they're taping
18  your conversations because of what you're going to
19  say?
20     A   No.
21     Q   How many times did you ask Mr. Reaves if
22  he was taping your conversation?
23     A   I don't know.
24     Q   Did you ever tell Mr. Reaves that you did
25  not want to lose your job?

Page 12

1     A   I don't remember.
2     Q   Do you think it's possible, given the
3  circumstances of his foreclosure, that you could
4  have asked him that?
5         MS. GLENN:  Objection to the extent you're
6     asking the witness to speculate.
7         But you may answer, if you know.
8         THE WITNESS:  I don't really -- I don't
9     understand the question.
10  BY MR. RACHEL:
11     Q   Okay.  Given the circumstances of why
12  you're here today -- are you aware of why you're
13  here today?
14     A   Yes.
15     Q   Why would you say you're here today?
16     A   Mr. Reaves' property went to foreclosure
17  sale and he was told that the sale was going to be
18  postponed.
19     Q   Okay.  Who told him the sale was going to
20  be postponed?
21     A   I did.
22     Q   Okay.  Now why did you tell him the sale
23  was going to be postponed?
24     A   The notes in our system indicated that the
25  sale was going to be postponed.

Page 13

1    Q    You are a supervisor, you said; is that
2  correct?
3    A    No.
4    Q    What is your position again?
5    A    Community Relations Specialist.
6    Q    Is that above a supervisor or what would
7  that be?
8    A    No.
9    Q    Are there supervisors above you?
10    A    Yes.
11    Q    Who was your direct supervisor at the time
12  Mr. Reaves' property went to foreclosure?
13    A    Catherine Coto.
14    Q    Did Ms. Coto ever review Mr. Reaves' file?
15    A    I don't know.
16    Q    Would it have been proper procedure after
17  the foreclosure, if there may have been an issue,
18  for her to review the file?
19    A    I don't know.
20    Q    Did you review the file after it
21  foreclosed?
22    A    Yes.
23    Q    Did you ask anyone else to review the
24  file?
25    A    Yes.

Page 14

1    Q    Who did you ask to review the file?
2    A    I escalated the file through our
3  escalation process.
4    Q    And ultimately was supposed to review
5  that file?
6    A    Once I escalated, I don't know who it
7  directly goes to.
8    Q    Okay.  So let me back up then.  What is
9  the escalation process at GMAC?
10    A    The escalation process for me is to send a
11  synopsis to an E-mail box that is handled by an
12  escalations person.
13        It's then sent off to various
14  departments who can make decisions on files.
15    Q    So essentially it is possible that, given
16  the escalation process -- now you said it goes to an
17  E-mail box?
18    A    Yes.
19    Q    What is that E-mail box address?
20    A    Hopeescalations.
21    Q    @gmac.com?
22    A    I don't know that for sure.
23    Q    Now, approximately how many files have you
24  had to escalate in your five years with GMAC?
25    A    I don't know.

Page 15

1    Q    But -- let me make sure I'm understanding.
2  You have an escalation process with GMAC, and I'm
3  assuming is this a written process?
4    A    Yes.
5    Q    So you have written instructions from
6  GMAC?
7    A    Yes.
8    Q    Would you be able to produce those written
9  instructions?
10    A    Yes.
11    Q    Now, in those instructions essentially,
12  then, it says for you, if I'm understanding you, to
13  send any files that may have had a problem with the
14  foreclosure and may have been foreclosed improperly
15  or wrongfully foreclosed, to an E-mail address and
16  that someone will review it?
17    A    Not necessarily.  The E-mail box is for
18  any file that I want to have looked at.
19    Q    Okay.  And I may have asked this, but let
20  me make sure.  Approximately how many files have you
21  ever asked to be reviewed?
22    A    I don't know.
23    Q    Would you say it was more than ten?
24    A    Yes.
25    Q    So it goes to this E-mail box,

Page 16

1  hopeescalations -- we do know that's part of it --
2  and then someone reviews it.
3        When they review it, do they communicate
4  with you and ask you any questions concerning why
5  you had it escalated?
6    A    Yes.
7    Q    Okay.  who actually communicated with you
8  on this file, Mr. Reaves' file?
9    A    You're asking me who exactly communicated
10  with me on this file?
11    Q    Yes.
12    A    Catherine Coto and Mark Folweiler.
13    Q    I guess my next question -- I'm confused
14  because I asked previously did Catherine Coto review
15  the file and you told me you're not sure.
16        But now you're telling me that Catherine
17  Coto actually spoke to you about the file.  So how
18  could she -- my question is:  How could she speak to
19  you about the file if she didn't review the file?
20    A    When you asked that question, I was
21  thinking did you mean was she the person who
22  reviewed the file when I sent it to the
23  hopeescalations E-mail box.
24        I do not know if she reviewed it at
25  that time.  Ultimately she did respond to me about

Page 17

1    the file.
2        Q   Okay.  And you said it was Catherine Coto
3    and what was the other gentlemen's name?
4        A   Mark Folweiler.
5        Q   F-U-L-W-I?
6        A   F-O-L-W-E-I-L-E-R.
7        Q   What did Catherine Coto tell you about the
8    file?  Actually, let me back up.  What did you tell
9    Catherine about the file, why you escalated?  Why
10   did you tell her or Mark, either one, why you
11   escalated the file?
12       MS. GLENN:  Objection as to foundation.
13   BY MR. RACHEL:
14       Q   I'll rephrase.  When you spoke to
15   Catherine or Mark, when they originally contacted
16   you, what did you tell them about escalating the
17   file?  What was your reason?
18       A   I had told Mr. Reaves that the foreclosure
19   sale was going to be postponed.
20       Q   Okay.
21       A   The property went to foreclosure sale.
22       Q   Okay.
23       A   So my question was:  Are we going to
24   rescind the foreclosure sale and to review him for a
25   modification.

Page 18

1        Q   Now, do you believe that this file was
2    wrongfully foreclosed, Mr. Reaves was wrongfully
3    foreclosed on, based on the actions and the
4    happenings prior to the foreclosure?
5        MS. GLENN:  Objection as to relevance,
6    speculation, asking for a legal conclusion.
7    BY MR. RACHEL:
8        Q   In your role as a Community Relations
9    Specialist, would you say that this file should not
10   have been foreclosed on?
11       MS. GLENN:  Objection as to relevance.
12   Speculation.  Calling for a legal conclusion.
13       You may answer.
14       THE WITNESS:  Yes.
15   BY MR. RACHEL:
16       Q   Did you, at any time, tell Mr. Reaves that
17   you believe he was wrongfully foreclosed upon?
18       A   I don't remember.
19       Q   Did you, at any time, tell Mr. Reaves that
20   he should obtain an attorney?
21       A   No.
22       Q   Do you believe that Mr. Reaves, based on
23   the situation, should have obtained an attorney?
24       MS. GLENN:  Objection as to relevance.
25       Improper layperson, calling for a legal

Page 19

1    conclusion.
2        THE WITNESS:  I don't know.
3    BY MR. RACHEL:
4        Q   Do you have a mortgage on your home?
5        A   No.
6        Q   If you had a mortgage on your home and the
7    same scenario happened, do you believe that it would
8    be grounds for a wrongful foreclosure?
9        MS. GLENN:  Objection as to relevance.
10   Improper layperson, calling for a legal
11   conclusion.
12       THE WITNESS:  I could not speculate.
13   BY MR. RACHEL:
14       Q   What does GMAC's system say now as to why
15   Mr. Reaves' property was foreclosed upon?
16       MS. GLENN:  Objection as to foundation.
17       THE WITNESS:  The system said that we did
18   not have sufficient time to review him for a
19   modification.
20   BY MR. RACHEL:
21       Q   Okay.  In your opinion, did you have
22   sufficient time?
23       MS. GLENN:  Objection as to improper lay
24   opinion.
25       THE WITNESS:  Yes.

Page 20

1    BY MR. RACHEL:
2        Q   When you sent the file up to escalation,
3    what did Catherine Coto tell you concerning a
4    rescinding of the foreclosure?
5        A   That we would not rescind the foreclosure
6    sale.
7        Q   And what was her reasoning?
8        A   She did not give me a reason.
9        Q   You've escalated files before, you said.
10   Is it normal GMAC procedure or is it normal for you
11   not to get a reason as to why it wasn't going to be
12   rescinded?
13       A   Sometimes.
14       Q   Has Catherine Coto ever not given you a
15   reason as to why something was not rescinded?
16       A   Yes.
17       Q   Now, according to the written
18   documentation that you have concerning escalation,
19   that we're going to ask to be produced, does it
20   state to you what is supposed to happen once it's
21   escalated?
22       Because apparently you're -- once it's
23   escalated, you're still going to be the point of
24   contact with whomever the client is, in this case
25   Mr. Reaves; am I correct?

Page 21

1    A    Yes.
2    Q    Okay.  So does the writing state what you
3  are supposed to do in a case where Catherine Coto or
4  whomever is reviewing it will not give you a reason
5  what you are supposed to do with the client?
6        MS. GLENN:  Objection.  The documents
7     aren't in front of her, but to the extent they
8     were they would speak for themselves.
9        But you can answer to the extent you know
10     or recall.
11        THE WITNESS:  I don't quite understand the
12     question.
13  BY MR. RACHEL:
14    Q    The question being if you are still
15  communicating, the person that has to communicate
16  with Mr. Reaves, and you have explained to
17  Mr. Reaves that the file has been escalated -- did
18  you explain to Mr. Reaves the file had been
19  escalated?  Let me ask that first.
20    A    Yes.
21    Q    So you are going to be still the point of
22  contact for Mr. Reaves.  Did Mr. Reaves, at any
23  time, have any contact information for Catherine
24  Coto or Mark Folweiler?
25    A    I don't think so.

Page 22

1    Q    Is it normal course, pursuant to the
2  escalation, for you to give out any information
3  concerning the person who is escalating, who is
4  working on the file, to the mortgage holder?
5    A    No.
6    Q    So, then you would be the point of contact
7  for Mr. Reaves at all times?
8    A    Yes.
9    Q    In the previous situations where Ms. Coto
10  would not give you any kind of reason, what did you
11  tell the homeowner?
12    A    I would give the homeowner the information
13  that the system showed regarding the denial.
14    Q    Okay.  And in this situation what does the
15  system say about a denial?
16    A    That we had insufficient time to review
17  his documentation for a modification review.
18    Q    Okay.  What did Mark Folweiler tell you
19  about Mr. Reaves' file?
20    A    That the sale would not be rescinded.
21    Q    And what was his reasoning?
22        MS. GLENN:  Objection as to foundation.
23        THE WITNESS:  That we did not have enough
24     time to review the file.
25  BY MR. RACHEL:

Page 23

1    Q    Did, at any time, Mark Folweiler and
2  Catherine Coto discuss the file together?
3    A    I don't know.
4    Q    Did, at any time, Mark Folweiler and
5  Catherine Coto discuss the file together with you?
6    A    Only to say that we would not rescind the
7  file.
8    Q    And what is Catherine Coto's position?
9    A    Eastern District Supervisor for the hope
10  team.
11    Q    And what about Mark Folweiler?
12    A    I don't know his exact title, but he is
13  the manager above Catherine.
14    Q    So when you had any of the other files
15  escalated, was Catherine usually the person that
16  worked on those files?
17    A    What do you mean by "worked on" the files?
18    Q    When it was escalated, was she usually the
19  person that reviewed it and communicated with you
20  about it?
21    A    No.
22    Q    Who was that person?
23    A    The person who manages the hopeescalations
24  inbox.
25    Q    And who is that?

Page 24

1    A    At this time it is Rashan Austin.
2    Q    Who was it at the time Mr. Reaves was
3  foreclosed upon?
4    A    I believe it was Rashan, but I am not
5  100 percent sure about that.
6    Q    Okay.  So in the other situations where
7  you have escalated it, you have typically spoke to
8  Rashan?
9    A    Sometimes.
10    Q    In any other escalations, have you ever
11  spoke to Catherine Coto?
12    A    Yes.
13    Q    In any other escalations have you ever
14  spoke to Mark Folweiler?
15    A    Yes.
16    Q    Have you ever spoken to anyone else when a
17  file was escalated?
18    A    Not normally, no, but I cannot say never.
19    Q    Okay.  Is Mark Folweiler the highest
20  positioned person at GMAC that you have ever spoke
21  to when a file had been escalated?
22    A    I don't know.
23    Q    Is it common practice for Mark Folweiler
24  to get involved when you escalate a file?
25    A    Sometimes.

Page 25

1    Q   Have any of those files ever been
2   rescinded?
3    A   I have seen files be rescinded.
4    Q   Has any of the files that you've escalated
5   ever been rescinded?
6        MS. GLENN:  To be clear, by "files" do you
7   mean foreclosure sales?
8        MR. RACHEL:  Foreclosure sales.
9   BY MR. RACHEL:
10   Q   Have they ever been rescinded?
11   A   I'm sorry.  Can you ask the question
12  again?
13   Q   Sure.  In any of the files that you've
14  ever escalated in your five years at GMAC, have any
15  of those files, if they were foreclosed upon, ever
16  been rescinded?
17   A   Yes, I'm pretty sure some of them have.
18   Q   You're pretty sure some have.  Would you
19  estimate approximately how many?  15, 20?
20   A   I don't know.
21   Q   Would you say it was at least ten?
22   A   No, I do not think it was ten.
23   Q   Would you say it was at least five?
24   A   I cannot say.
25   Q   Would you believe it was less than five?

Page 26

1    A   I just -- I cannot answer that question.
2    Q   Now, let's talk about a little bit why
3   Mr. Reaves originally contacted you.  Do you
4   remember Mr. Reaves originally contacting you?
5    A   No, I do not have -- remember him
6   originally contacting me.
7    Q   Did you ever speak to Mr. Reaves about a
8   reinstatement of his loan?
9    A   Yes.
10   Q   Did Mr. Reaves have a question concerning
11  that reinstatement?
12       MS. GLENN:  Can you clarify what you mean
13  by "reinstatement"?
14       MR. RACHEL:  Reinstatement, when he was in
15  foreclosure, he received a reinstatement letter
16  from GMAC saying he could pay X amount of
17  dollars and pay his loan and come out of
18  foreclosure.
19  BY MR. RACHEL:
20   Q   So did he have any questions concerning
21  that reinstatement amount?
22   A   Yes.
23   Q   What was his question?
24   A   To the best of my knowledge, his question
25  surrounded some fees.

Page 27

1    Q   Do you believe those were called
2   miscellaneous fees -- miscellaneous corporate
3   advances?
4    A   Corporate advances.
5    Q   How many reinstatement documents or
6   reinstatement -- I guess you can say reinstatement
7   documents have you seen pertaining to the homeowner
8   having an amount broken down for them to reinstate?
9        How many would you say you've seen in your
10  five years at GMAC?
11   A   I could not count.
12   Q   Okay.  What does miscellaneous corporate
13  advances mean?
14   A   Corporate advances could mean charges for
15  VPO, foreclosure expenses, fees that were paid out
16  for certain things.
17   Q   Such as?
18   A   Inspections.
19   Q   What type of inspections?
20   A   Property inspections.  It may include late
21  charges.  That's the only thing I can think of right
22  now.
23   Q   Okay.  Now is it standard protocol for
24  GMAC to have a inspection during a foreclosure
25  process?

Page 28

1    A   Yes.
2    Q   What are they inspecting?
3    A   To make sure that the property is
4   occupied.
5    Q   Okay.  So they basically go out and check
6   and see if the property is occupied?
7    A   Yes.
8    Q   Okay.  Is it proper protocol for them to
9   order a VPO?
10   A   Not always.
11   Q   Okay.  You said -- now in Mr. Reaves'
12  case, his reinstatement amount was about -- the
13  total reinstatement amount was 7,895.33.
14       Of that, the corporate advance fee was
15  actually approximately half of the reinstatement
16  fee, which means, according to what you have said,
17  that a VPO, or actually VPO may not have even been
18  ordered, a inspection of someone driving out to
19  verify someone was there and assuming late charges
20  would have amounted to essentially the same amount
21  that was owed on a mortgage.
22       Is that theoretically possible?
23       MS. GLENN:  Objection.  Just to be clear,
24  Ms. Bowers is a fact witness.  She's not a
25  30(b)(6) witness for GMAC, sir.

Page 29

1    Her testimony as to policy would be
2 guessing or speculating. Her testimony also
3 cannot bind the company.
4    To the extent that you know or understand
5 the question, you may answer.
6    But if we could -- to the extent we could
7 keep it within what would be her personal
8 knowledge of her job description.
9    MR. RACHEL: Okay.
10    MS. GLENN: That would be preferrable.
11    THE WITNESS: I am not able to say what
12 all corporate advances could be. It is not
13 my -- that's not my job role.
14 BY MR. RACHEL:
15    Q    Okay. Have you ever seen -- you've seen
16 many of them, where the corporate advance is
17 basically the same amount, being 50 percent or more
18 than the actual amount that's owed in arrearage,
19 that's actually owed to reinstate?
20    A    Yes.
21    Q    Okay. Did Mr. Reaves question and ask
22 what those fees were?
23    A    Yes.
24    Q    And were you able to find out a breakdown
25 of those fees for him?

Page 30

1    A    I believe I reviewed the reinstatement
2 quote itself and we discussed that, and I think I
3 did look at some of the fees.
4    Q    Were you able to get a breakdown from GMAC
5 of the corporate advances?
6    A    I don't remember.
7    Q    Okay. Did you explain to Mr. Reaves that
8 he could apply for a modification if he did not want
9 to reinstate?
10    A    Yes, I believe so.
11    Q    And at that time you explained to him
12 about a modification, did he attempt to apply for a
13 modification?
14    A    Yes, he did.
15    Q    Okay. Now, why did you tell him to apply
16 for a modification?
17    A    A modification is one of the tools that a
18 customer can use to avoid foreclosure.
19    Q    Did you explain the required documents to
20 Mr. Reaves that would be needed for a modification?
21    A    I believe I did.
22    Q    Have you ever spoke to any other person
23 concerning modifications, obtaining a modification?
24    A    Yes, I've spoken to customers.
25    Q    In your speaking with other customers,

Page 31

1 would you say that you normally explain all of the
2 items that would be needed for the modification?
3    A    Yes.
4    Q    So would you say, in this case, it is
5 highly likely that you did explain all the documents
6 required to Mr. Reaves for the modification?
7    MS. GLENN: Objection. Speculation.
8    THE WITNESS: It is likely.
9 BY MR. RACHEL:
10    Q    At the time he attempted to do the
11 modification, was his home in foreclosure?
12    A    Yes, I believe it was.
13    Q    Did you explain this to Mr. Reaves?
14    A    Yes.
15    Q    Did you provide a timeline for Mr. Reaves
16 to provide you with the paperwork for the
17 modification?
18    A    I do not remember.
19    Q    Did Mr. Reaves supply all the paperwork in
20 a timely manner to GMAC?
21    A    To the best of my knowledge, he did.
22    Q    Now, let me go back. You stated earlier
23 that you believed that the foreclosure should not
24 have been done because he provided all the documents
25 in a timely manner.

Page 32

1    So I just want to refresh your memory. So
2 let me reask the question. Did Mr. Reaves, to your
3 knowledge, provide all of the documents that you
4 requested of him for the modification in a timely
5 manner?
6    MS. GLENN: Objection.
7 Mischaracterization of prior testimony.
8 Relevance. Improper lay opinion.
9    You may answer.
10    Can we go off the record really quick.
11    (Whereupon, a brief recess was taken.)
12 BY MR. RACHEL:
13    Q    Now, Mr. Reaves' reinstatement, was he
14 adamant about trying to reinstate this property?
15    A    No.
16    Q    Did he want to apply for a modification?
17    A    I cannot answer that.
18    Q    After you suggested the modification to
19 him as a -- other than reinstatement, because the
20 figure -- the miscellaneous corporate advance
21 couldn't be explained to him and he didn't want to
22 pay what couldn't be explained, was he apprehensive
23 about a modification at that time?
24    MS. GLENN: Objection to the extent it
25 calls for her to speculate as to Mr. Reaves'

Page 33

1    sentiments or feelings.
2        But you can answer to the extent that you
3    can.
4        THE WITNESS: I cannot answer that.
5    BY MR. RACHEL:
6        Q    Did Mr. Reaves, at any time, tell you that
7    he really wasn't interested in a modification?
8        A    I do not remember.
9        Q    Did Mr. Reaves call you approximately
10   eight times concerning the reinstatement amount?
11       A    I do not remember.
12       Q    If we were able to supply you with taped
13   conversations concerning reinstatement on eight
14   different occasions, would that be able to assist
15   you with your memory?
16       A    Yes.
17       Q    Now back to the modification, you said he
18   did meet the timeline as far as getting all the
19   documents to GMAC?
20       A    Yes, I thought he did.
21       Q    Who was the person working on Mr. Reaves'
22   file?
23       A    I do not know.
24       Q    Was it assigned to one work-out
25   specialist?

Page 34

1        A    I do believe the files are assigned to one
2    work-out specialist.
3        Q    Have you ever spoken to that work-out
4    specialist?
5        A    No.
6        Q    So the only people you have spoken to --
7    let me ask it this way: Who -- give me the names of
8    the people you have spoken to concerning Mr. Reaves'
9    file that work at GMAC.  You've given me Catherine
10   Coto and Mark Folweiler.
11       Is there anyone else?
12       A    Those are the only two that I actually
13   spoke to.
14       Q    Okay.  Now, why did you tell Mr. Reaves
15   that the foreclosure should be rescinded or would be
16   rescinded?
17       MS. GLENN:  Objection.
18   Mischaracterization of testimony.
19       THE WITNESS:  I do not remember telling
20   Mr. Reaves that the foreclosure sale would be
21   rescinded.
22   BY MR. RACHEL:
23       Q    Okay.  I believe you testified to that
24   earlier.  However, do you have the power to have a
25   foreclosure rescinded?

Page 35

1        A    No.
2        Q    Now, I'm going to remind you that you are
3    under oath.  Did you any time tell Mr. Reaves that
4    you had the power to have the foreclosure rescinded
5    or have the problem fixed?
6        A    No.
7        Q    Are you personally aware of any other
8    foreclosures that has happened at GMAC being the
9    same circumstances as Mr. Reaves?
10       MS. GLENN:  Objection.  Relevance.
11       But you may answer.
12       THE WITNESS:  Not that I can recall off --
13   right this second.
14   BY MR. RACHEL:
15       Q    The files that you had escalated, you said
16   you had at least ten or more than ten.  What reason
17   would you escalate a file?  If it had been
18   foreclosed on, what reason would you escalate it?
19       A    If a file had been foreclosed on, why
20   would I escalate it?  On a foreclosed file, a
21   customer concern, a customer complaint, receiving
22   paperwork.
23       Q    What do you mean "receiving paperwork"?
24       A    Maybe legal documents for a property that
25   had been foreclosed on.

Page 36

1        Q    Legal documents.  Elaborate on legal
2    documents -- from whom?
3        A    From the customer.
4        Q    From the customer or a customer's
5    attorney, I'm assuming?
6        A    Yes.
7        Q    Okay.  So a customer's concern is a reason
8    to escalate the file?
9        A    Sometimes.
10       Q    Could you give me a situation as when a
11   customer concern would prompt you to escalate a
12   file?
13       A    If a customer is adamant, he or she feels
14   that the foreclosure was wrong or unjust, I may
15   escalate it.
16       Q    Do you escalate it if you don't have a
17   concern?
18       A    Yes.
19       Q    So if I review the paperwork from GMAC
20   concerning escalations, would it tell me that you
21   are to escalate a file based on a customer's concern
22   even though you believe it has no basis for the
23   escalation?
24       MS. GLENN:  Objection.  The document is
25   not here.  To the extent we're -- it speaks for

Page 37

1    itself.
2        You may answer.
3        THE WITNESS: It depends.
4    BY MR. RACHEL:
5        Q    Okay. Let's go back. What kind of
6    training did you get when you arrived at GMAC?
7        A    I don't understand your question.
8        Q    You've been at GMAC five years, correct?
9        A    Yes.
10       Q    Where did you work prior to GMAC?
11       A    Portastevo & Associates.
12       Q    Which is?
13       A    A law firm.
14       Q    A law firm. Now, when you arrived at GMAC
15   as a Community Relations Specialist, what kind of
16   training has GMAC supplied you with?
17       A    Some of the training I got was how to use
18   the system.
19       Q    Okay.
20       A    Documentation.
21       Q    Okay. Documentation, what do you mean?
22       A    For the financial work-up packet that
23   customers submit.
24       Q    How to ascertain what is on the documents?
25       A    Yes.

Page 38

1        Q    Okay.
2        A    Some other things regarding policy and
3    procedure.
4        Q    Such as?
5        A    Documentation, general things,
6    documentation, documentation, how to handle
7    documentation, customer documentation, hours of
8    operation, travel and entertainment policy, things
9    like that.
10       Q    Okay. Now you mentioned a policy and
11   procedure. What kind of training have you had on
12   policy and procedure at GMAC?
13       A    Standard training.
14       Q    And when was this training?
15       A    We have training periodically.
16       Q    Okay. And when -- how periodically? When
17   was the last time you had training?
18       A    I had some online training last week.
19       Q    Which was in reference to?
20       A    Fraud and awareness, documentation
21   awareness.
22       Q    Okay. I want to specifically point your
23   attention to the policy and procedure for escalating
24   a file.
25       Have you had training on that?

Page 39

1        A    Yes.
2        Q    When was that training?
3        A    The last training on that was several
4    months ago.
5        Q    Okay. And who actually did the training?
6        A    Rashan Austin.
7        Q    And now, if I'm not mistaken, Rashan
8    Austin is the person that manages the hope inbox?
9        A    Yes.
10       Q    Okay. And is he a manager or is he just
11   someone who handles the inbox?
12       MS. GLENN: Objection. Compound.
13   BY MR. RACHEL:
14       Q    What is his title?
15       A    Her title is --
16       Q    Her title. I'm sorry.
17       A    I don't know what her title is. It's a
18   lady. She -- she manages the hope escalation inbox.
19       Q    Okay. How long was this training?
20       A    Are you referring to the training for the
21   escalation process?
22       Q    Yes.
23       A    An hour or so.
24       Q    Okay. Did you have any paperwork to
25   review in this training?

Page 40

1        A    Yes.
2        Q    Okay. Now with Mr. Austin training you,
3    did he tell you who to escalate or why you should
4    escalate or just how to escalate? What was this
5    training on?
6        A    There are some examples of files that
7    should be escalated or that can be escalated.
8        Q    So is the escalation process, is that a
9    process that is more or less kind of subjective?
10       A    Sometimes.
11       Q    Okay. So in this process, if some of it
12   is subjective, then if customers call in with
13   concern, that is a process also you're supposed to
14   escalate it?
15       What was your training on, if a customer
16   calls in with concern adamant that they were
17   wrongfully foreclosed on, yet you know they were not
18   wrongfully foreclosed on, looking at the paperwork,
19   what is the policy concerning that?
20       MS. GLENN: Objection. Compound.
21       THE WITNESS: I am allowed in situations
22   to make a judgment call as to whether or not
23   I'm going to escalate something.
24   BY MR. RACHEL:
25       Q    So if you have a customer calling in with

Page 41

1    just a concern or a complaint and you know it should
2    not be escalated, do you escalate that?
3        A   Sometimes.
4        Q   And why would you escalate that?
5        A   Sometimes a customer needs to get
6    something in writing, and with the escalation
7    process, typically a letter of explanation is sent
8    out to the customer.
9        Q   Was a letter of escalation sent to
10   Mr. Reaves?
11       A   I do not know.
12       Q   Okay. I'm to ascertain this process,
13   then. You stated that a customer just needs to have
14   something in writing. Who sends the writing out to
15   the customer?
16       A   That would come from our main office.
17       Q   That comes from the main office. Is that
18   a part of the escalation -- the main office is not a
19   part of the escalation process, so why would they
20   send out a letter?
21       A   The main office can be a part of the
22   escalation process.
23       Q   Okay. I'm a little confused, then,
24   because I'm beginning to wonder about this training
25   that you had, because you're kind of -- seems like

Page 42

1    you're kind of making it up as we go or adding on to
2    it as we go.
3        Because originally you told me the
4    escalation process was you escalating the file to
5    the inbox of which is hopeescalating somewhere.
6        We don't know whether it's at GMAC or
7    Freddie Mac or Fannie Mae. We don't have any idea
8    where it's going.
9        But we do know a Rashan Austin supposedly
10   is getting this. Now does Rashan Austin, to your
11   knowledge, work at GMAC? Is Rashan Austin an
12   employee of GMAC?
13       MS. GLENN: Objection. Counsel is
14   testifying. If we could keep it in
15   question-and-answer format.
16       MR. RACHEL: Okay. I will do that for
17   you, Counselor.
18   BY MR. RACHEL:
19       Q   To your knowledge, is Rashan Austin an
20   employee of GMAC?
21       A   Yes, she is.
22       Q   How long has she been an employee?
23       A   Longer than I have.
24       Q   Okay. Then I'm confused. Earlier you
25   stated --

Page 43

1        MS. GLENN: She would like a break.
2    He's getting ready to ask a question.
3        Once you finish that question may we take
4    a break?
5        MR. RACHEL: Sure.
6    BY MR. RACHEL:
7        Q   Earlier you stated and testified, when I
8    asked who manages the hope inbox, your exact words
9    were "at this time Rashan Alan -- Austin". I'm
10   sorry.
11       Which would mean that at some previous
12   time someone else would have been managing that.
13       But you stated that you've been there five
14   years and Rashan Austin has been there longer than
15   you. So I'm concerned and would like to know why
16   you would state at that time -- "at this time"?
17       MS. GLENN: Objection. Counsel is
18   testifying. If counselor would like to testify
19   we can get counselor sworn in.
20       Other than that, I would ask if you keep
21   it in question-answer format and no more
22   compound questions.
23       We are overloading Ms Bowers with
24   information. We just want to give her one
25   question at a time.

Page 44

1        MR. RACHEL: Okay. I will.
2    BY MR. RACHEL:
3        Q   Why would you make the comment "at this
4    time" when you were speaking about Rashan Austin if
5    she had been there longer than you?
6        A   Rashan Austin used to do another job.
7        Q   Okay. Rashan Austin used to do another
8    job, but in your five years she has been the manager
9    of hope inbox?
10       A   No.
11       MR. RACHEL: Okay. Now we're going to
12   take a break in a minute, but Ms. Glenn, you
13   just have to bear with me because I've gotten
14   two different conflicting things here.
15       MS. GLENN: You can finish your line of
16   questioning.
17   BY MR. RACHEL:
18       Q   You said Rashan Austin had been doing that
19   job longer than you had been at GMAC. Now you're
20   stating that Rashan Austin has not being doing that
21   longer than you've been at GMAC.
22       Which one is it?
23       A   I stated Rashan Austin has been at GMAC
24   longer than I have and that she is now managing the
25   hope escalation box, that she previously did another

Page 45

1  job.
2      Q   Since the time you were at GMAC, who has
3  been the manager of the hope inbox?  Give me all the
4  people.
5      A   I cannot say for sure, but Rashan Austin
6  was one of them and I do believe that the district
7  managers also managed it at one time or another.
8      Q   Approximately how long has Rashan Austin
9  been doing this?
10     A   Maybe -- around six or seven months maybe.
11 I do not think more than a year.
12     Q   Okay.  So about six months.  So who was
13 Rashan Austin's job prior to that?
14     A   Community Relations Specialist.
15     Q   Okay.  So make sure I'm understanding.
16 GMAC is promoting someone from Community Relations
17 Specialist to manage the hope inbox.  Do you know
18 how to manage the hope inbox?
19     A   I don't understand your question.
20     Q   Would you, right now, know how to manage
21 the hope inbox?
22     A   I cannot answer that.
23     Q   Okay.  But you did state that Rashan
24 Austin was the person who gave you the training on
25 escalation processing?

Page 46

1      A   Yes.
2      Q   Has anyone else given you training on
3  escalation processing?
4      A   We do receive updates from time to time
5  about the hope escalation process changing.
6      Q   I don't want to know about updates.  I'm
7  saying training.
8      A   Rashan has been the one to give the
9  training.
10     Q   And Rashan has trained you how many times?
11     A   I don't know.
12     Q   You stated earlier once about six months
13 ago?
14     A   I stated that was the last training that I
15 received.
16     Q   Last training you received.  Did she train
17 you prior to that six months?
18     A   We did have previous training on the
19 escalations and it was not her who trained at the
20 time before.  I do not remember who it was.
21     Q   So you've had more than one training on
22 the hope escalation process?
23     A   Yes.
24     MS. GLENN:  Dave, are you all done with
25 this line of questioning?

Page 47

1      MR. RACHEL:  Not really.
2      MS. GLENN:  Can she take a break or is
3  this an endurance test?
4      MR. RACHEL:  It's not an endurance test.
5  I just want to make sure because the story is
6  changing a little bit.
7      I just want to make sure that I get all
8  the story in, if that makes sense.
9  BY MR. RACHEL:
10     Q   So let me just see if I'm understanding
11 you.  Rashan Austin moved from community relations
12 approximately six months to a year ago from
13 community relations to manager of hope inbox.
14     In the previous six months she has trained
15 you one time and prior to that you have had another
16 training on the escalation process.
17     Am I correct?
18     A   I'm not able to follow your questions.
19 I'm sorry.
20     Q   I'll do them one at a time.  Rashan
21 Austin, six months to a year ago, moved positions to
22 manage the hope inbox; is that correct?
23     A   I believe that's correct.
24     Q   Within the last six months, has Rashan
25 Austin provided training to you concerning

Page 48

1  escalation process?
2      A   We have had a training.
3      Q   Approximately how many people were at that
4  training?
5      A   Twenty or more people.
6      Q   Approximately how many community relations
7  specialists are there at GMAC, to your knowledge?
8  Approximation.
9      A   Eighteen.
10     Q   Are they all based in your office?
11     A   No.
12     Q   Where is Rashan Austin based?
13     A   In Memphis, Tennessee.
14     Q   So when you had this training, did you go
15 to Memphis, Tennessee?
16     A   No.
17     Q   Well, how did Rashan Austin train you?
18     A   It was conference call training.
19     Q   Conference call training.  How does that
20 work?
21     MS. GLENN:  David, she's going to take a
22 break.
23     Go take a break.
24     MR. RACHEL:  Okay.
25     MS. GLENN:  We can go off the record.

Page 49

1          (Whereupon, a brief recess was taken.)
2    BY MR. RACHEL:
3      Q   I was just -- now I think we left off with
4    Rashan Austin.  You said she used to be a Community
5    Relations Specialist.
6          And Rashan Austin was a community
7    relations specialist prior to you becoming -- coming
8    to GMAC, becoming an employee; are you aware?
9      A   I believe she was.
10     Q   Okay.  Now one side question.  You stated
11   that Mr. Reaves did want to do a reinstatement and
12   then couldn't get that miscellaneous corporate
13   fee -- I think that's what it's called -- couldn't
14   get that information on that.
15         Did you ever get that defined for him,
16   what those fees were really supposed to be or what
17   they were supposed to be, a breakdown?
18     A   No, I did not.
19     Q   Now, in obtaining that breakdown, whom all
20   did you attempt to give you the breakdown?  Did you
21   speak to anyone else at GMAC to assist with that?
22     A   I don't remember.
23     Q   Would it have been, I guess, standard
24   procedure if you have a customer that is adamant
25   about reinstatement and getting an explanation of

Page 50

1    the fee so they can reinstate, would it be proper
2    procedure to escalate that?
3      A   No, not necessarily.
4      Q   So your escalation process, we know it is
5    for people who have been foreclosed on.  Apparently
6    we are understanding now that it is not for people
7    who want to reinstate.
8          So other than people who have been
9    foreclosed on, what is the escalation process for?
10   What else can be escalated, other than someone who
11   has been foreclosed on?
12     A   The escalation process is for customer
13   concerns.
14     Q   No, no.  I'm saying what -- if it's for
15   customer concerns, then I'm confused.  Mr. Reaves
16   was concerned about getting reinstatement but it
17   wasn't escalated.
18         So why was that not escalated?
19     A   Because I provided Mr. Reaves with an
20   explanation as to what the charges appeared to be.
21     Q   Right.  But Mr. Reaves wanted a breakdown,
22   and you just stated earlier that you never could
23   give him the breakdown.
24         So why was it not escalated so he could
25   obtain the breakdown?

Page 51

1      A   Mr. Reaves had the breakdown of what the
2    charges were on the reinstatement letter.
3      Q   Okay, now I'm really confused.
4          MS. GLENN:  Okay.  Think about that
5    question for just a second.
6          Go off the record.
7          I'm just going to call in -- I just got an
8    E-mail that he's available now.
9          (Whereupon, a discussion ensued off the record.)
10   BY MR. RACHEL:
11     Q   Now, on Mr. Reaves' letter it just says
12   miscellaneous corp advances.  It has absolutely no
13   breakdown.
14         And you stated earlier that you never was
15   able to get him the breakdown.  So why was that not
16   escalated?
17     A   I did discuss with Mr. Reaves what the
18   miscellaneous charges were related to.  If he was
19   looking for another answer about those charges, I
20   was not able give it to him.
21     Q   Then why was that not escalated so he
22   could get a written breakdown of what those fees
23   were?
24     A   I just did not escalate that.
25     Q   Is that proper procedure not to escalate

Page 52

1    that customer concern?
2          MS. GLENN:  Again, she's not a 30(b)(6)
3    witness, so to the extent that --
4          MR. RACHEL:  But she is aware of -- she
5    testified earlier that she has had training on
6    the policies and procedures, and as a Community
7    Relations Specialist she should know what
8    policies and procedures, and she testified
9    earlier that her job, she escalates customer
10   concerns and complaints.
11         Mr. Reaves had a concern, definitely, and
12   he was complaining about not wanting to pay
13   what he didn't know -- if he didn't know what
14   that was.
15         So if she is following the policy and
16   procedures manual and she is in that position,
17   she should well be able to answer that
18   question.
19         MS. GLENN:  Very convincing closing
20   argument.  I will adjust my objection to those
21   documents speak for themselves.
22         But to the extent you are aware, you may
23   answer.
24         THE WITNESS:  I did not escalate that.
25   That was not Mr. Reaves' main concern at the

Page 53

1    time that he brought his issue to me.
2    BY MR. RACHEL:
3        Q    What was his concern?
4        A    Saving his home, applying for the
5    modification, which is what he did.
6        Q    But you stated earlier you told him about
7    the modification -- because he didn't know anything
8    about it, told him that he could apply for a
9    modification.
10        So if his -- if he wanted to save his
11    home, I'm confused as to why he would call you seven
12    to eight times wanting to get a breakdown of this
13    fee so he could reinstate but it wasn't escalated.
14        MS. GLENN:  Where is the question?
15    BY MR. RACHEL:
16        Q    The question is:  Why was it not escalated
17    if he called you seven to eight times about what
18    this fee was so he can reinstate?
19        But you stated that he wanted a
20    modification, but you testified earlier that you
21    told me he didn't know what that was.
22        So I still want to know why was this --
23    was this just a decision you made not to escalate?
24        A    Mr. Reaves called me and we discussed a
25    modification.  Discussing what corporate advances

Page 54

1    are, I can look in the system to see what those
2    charges were.  We would have discussed that.
3        Other than that, there is -- there's
4    not anything else I would have done.  I was there to
5    assist him with trying to get the modification.
6        But I certainly would have addressed
7    the issue about the corporate advances.  I did not
8    escalate that.
9        Q    Okay.  So you're saying when -- I'm trying
10    to understand the policies and procedures at GMAC
11    then.
12        If a customer calls in and he wants to
13    reinstate his loan, that's all he wants to do, and
14    he wants to know what the corporate advances are,
15    which are not itemized out on his statement that
16    he's getting for the reinstatement amount, what is
17    the procedure at GMAC to provide the customer with
18    that information so they can reinstate?
19        A    The customer could have contacted our
20    customer care department to ask for that.
21        Q    Did you ever tell him to contact the
22    customer care department to ascertain that
23    information?
24        A    He had already done so.
25        Q    Okay.  Did they provide it to him?

Page 55

1        A    I do not know.
2        Q    If he is calling you requesting it, do you
3    believe that they had provided it to him?
4        MS. GLENN:  Objection as to speculation.
5    Improper lay testimony.
6        THE WITNESS:  I cannot answer that.
7    BY MR. RACHEL:
8        Q    Okay.  You testified earlier that you were
9    unable to provide it to him.  So if you were unable
10    to provide it to him and he's called you after he
11    called them, what is GMAC's policy on explaining
12    what a miscellaneous corporate advance is?
13        A    I cannot answer that.
14        Q    Okay.  So you are a Community Relations
15    Specialist and your job is to do what?  What is your
16    actual job description?
17        A    To meet with customers, to help them
18    obtain a modification, to explain to them the
19    modification procedures, documentation, to submit
20    their file for a review by the loss mitigation
21    department, to work with non profits for
22    neighborhood stabilization and neighborhood
23    revitalization.
24        Q    Okay.  So are you aware of anybody at GMAC
25    that is supposed or is able to give a breakdown to a

Page 56

1    customer, since that is not your position, a
2    customer of miscellaneous corporate advances?
3        A    I cannot answer that.
4        Q    Okay.  In your training with GMAC, you're
5    stating that you have absolutely nothing to do with
6    reinstatement.
7        The only thing you have to do with is
8    modifications?
9        A    I'm stating that my job with GMAC is to
10    meet with customers and discuss the modification
11    options, to explain to them about the documentation
12    that is needed and to assist them, to work with non
13    profits for neighborhood stabilization and
14    neighborhood revitalization.
15        Q    Do you assist customers with short sales?
16        A    I will take a short sale financial packet
17    and send it over to the short sale department.
18        Q    Do you assist customers with deed in lieu
19    of foreclosure?
20        A    I will take a deed in lieu request and
21    send it over to the deed in lieu department.
22        Q    So you assist customers in making sure the
23    paperwork is done and then you send it to the
24    underwriter?
25        A    Yes.

Page 57

1    Q   Okay.  So, in the instance of
2  reinstatement, if you get that, you don't have a
3  policy for that at all in your job description?
4    A   If a customer calls me inquiring about a
5  reinstatement, I refer them to the foreclosure
6  attorney's office to get a reinstatement letter.
7        The foreclosure attorney prepares the
8  reinstatement letter and sends it to the customer.
9  If the customer has a question, they can call me and
10 I can try to provide an answer.
11   Q   Okay.  Now in this instance you stated
12 that you only sent Mr. Reaves back to the customer
13 service department.
14       Why did you not send Mr. Reaves to
15 whomever the foreclosure attorney was?
16   A   I did not send Mr. Reaves to the customer
17 care department.
18   Q   You testified earlier that you told him
19 that he should get that figure from the customer
20 care department.  That was your testimony.
21   A   I said that if a customer had a concern
22 about miscellaneous fees, I would refer them to the
23 customer care department for additional information.
24   Q   Where did you refer Mr. Reaves to when he
25 had the information?

Page 58

1    A   I do not remember if I told Mr. Reaves to
2  contact the customer care department.
3    Q   What did you tell him to do?
4    A   I discussed the fees with Mr. Reaves.  I
5  did give him some detail about what I saw in the
6  mortgage service system about what some of the fees
7  were.
8    Q   Okay.
9    A   I think he was not in agreement with them.
10   Q   And that was basically the end of what you
11 could do?
12   A   For the miscellaneous fees.
13   Q   Why did you not refer him to the
14 attorney's office, if that is your policy, as you've
15 stated earlier?
16   A   I would refer a customer to the attorney's
17 office to get a reinstatement letter.  He had the
18 reinstatement letter, so I would not refer him back
19 to the attorney's office.
20   Q   So if a customer calls and they're routed
21 to you, there is no policy at GMAC to tell you if
22 the foreclosing attorney's letter doesn't have any
23 kind of breakdown.
24       You said that you did not refer him back
25 over to customer relations or customer service,

Page 59

1  whichever one it was.
2        So there is no policy at GMAC, in your
3  capacity, to assist a customer with getting a
4  breakdown of the fees; am I correct?
5    A   I cannot answer that.
6    Q   I'm confused as to why you can't answer
7  that.  If there is a policy, please enlighten me on
8  what it is.
9    A   I have explained what the policy is.
10 Mr. Reaves asked about the miscellaneous fees.  We
11 did discuss that.
12       I did look in the mortgage service
13 system and explain to him, based upon what I could
14 see, what the fees were.
15       I can only assume that he was not
16 satisfied with that.  We went into the modification
17 portion of it.  I did not escalate the issue about
18 the corporate advances.
19   Q   Have you ever escalated an issue about
20 corporate advances?
21   A   Not that I can remember at this time.
22   Q   Okay.  You stated originally that you have
23 read the policy and procedures manual concerning
24 your job description?
25   A   Yes.

Page 60

1    Q   From GMAC, you have read that through?
2    A   Yes, I have read the manual.
3    Q   Okay.  In that manual does it state any
4  procedure concerning reinstatement figures?
5    A   I do not believe that it does.
6    Q   So there is no policy for your position
7  stating what to do if a customer wants to reinstate
8  but does not know or wants to know a breakdown of
9  what miscellaneous corporate advances are; am I
10 correct?
11   A   I don't understand your question.
12   Q   My question is, according to your policies
13 and procedures handbook, you just stated -- you just
14 testified that according to your policies and
15 procedures handbook it says nothing about
16 reinstatement.
17       If it says nothing about reinstatement and
18 that is -- in your job description, then you have no
19 policy, as far as Community Relations Specialist,
20 concerning what to do if a customer calls in with
21 any reinstatement questions; am I correct?
22   A   No.
23   Q   I'm incorrect?
24   A   According to the hope escalations manual,
25 it does not have any information in it related to a

Page 61

1  reinstatement.
2         As far as the policy and procedure
3  for GMAC regarding a customer in corporate advances,
4  I cannot speak to that right now.
5     Q   I'm not asking you to speak for GMAC.  I
6  am saying in the -- both the manual for hope
7  escalation and in your manual that was given to you
8  when you received your job for a Community Relations
9  Specialist, neither manual mentions the how to or
10 anything about a reinstatement?
11        MS. GLENN:  Can I go off the record.
12        MR. RACHEL:  Sure.
13        (Whereupon, a discussion ensued off the record.)
14 BY MR. RACHEL:
15    Q   Okay, with the foreclosing on a property
16 when you have received the documents, has it ever
17 happened before at GMAC, to your knowledge?
18    A   Can you be more clear about your question?
19    Q   Sure.  In the instance of Mr. Reaves, all
20 the documents were received in a timely manner.  You
21 have testified to that a couple times, okay.
22        Has it ever been any other case, to your
23 knowledge, where you have received all the documents
24 but for some reason it got foreclosed on
25 inadvertently or otherwise?

Page 62

1     A   I want to be sure about your question.
2  Are you asking me in the case where a customer has
3  sent all of the documentation has a property still
4  gone to foreclosure?
5     Q   Yes.  Such as the case of Mr. Reaves.  All
6  the stuff is there and should have been reviewed.
7  It's there in a timely manner.
8         But for some reason the ball dropped or
9  whatever happened and it was foreclosed on?
10    A   Yes.
11    Q   Approximately how many, to your knowledge?
12    A   I could not answer that.
13    Q   Do you believe that's a pattern at GMAC?
14        MS. GLENN:  Objection.  Improper lay
15 testimony.  Relevance.  Speculation.
16 BY MR. RACHEL:
17    Q   In your position as Community Relations
18 Specialist, have you seen that to be a pattern at
19 GMAC?
20        MS. GLENN:  Objection.  Vague.  What do
21 you mean by pattern?
22 BY MR. RACHEL:
23    Q   A pattern, as in you'll get some this
24 month, some next month, some the month after that,
25 some the month after that with the same thing, all

Page 63

1  the documents were there but they're foreclosed?
2     A   No.
3     Q   In your estimation, approximately -- your
4  five years, how many has it been?
5     A   I could not answer that.
6     Q   More than ten?
7     A   I could not answer that.
8     Q   How many have you escalated?
9     A   I could not answer that.
10        MS. GLENN:  What are we speaking about
11 here when you say all the documents are there?
12        Because you can have someone submit
13 documents and they're not approved for a
14 modification.
15        So I guess be more specific about exactly
16 what you're asking Ms. Bowers.
17        MR. RACHEL:  In the interest of my client,
18 the documents were there.  She testified that
19 it was wrongfully foreclosed, think she said it
20 shouldn't have been foreclosed on.
21        MS. GLENN:  David, she didn't say that.
22        MR. RACHEL:  I specifically asked her that
23 question.  I believe that she said yes.  I
24 believe that she said that.
25        And she testified that he should not have

Page 64

1  been foreclosed on.  We'll go with that.
2  Because the documents were there and they
3  should have been reviewed and he should not
4  have been foreclosed on.
5         MS. GLENN:  Objection.  That's your
6  characterization of her testimony.  Be more
7  specific about your line of questioning now.
8         MR. RACHEL:  My question is:  How many
9  have been same situation that she has seen or
10 escalated in the past?
11        MS. GLENN:  Let's answer that.
12        THE WITNESS:  I'm not able to answer that.
13        MS. GLENN:  She's not able to answer that.
14 BY MR. RACHEL:
15    Q   Have you ever seen any that was in the
16 system -- I believe you testified that he was
17 actually in the system, said postponed but for some
18 reason it got foreclosed.
19        Have you ever seen any other ones in the
20 system that said postponed that were foreclosed on?
21    A   Yes.
22    Q   Approximately how many?
23    A   I could not answer that.
24    Q   More than ten?
25    A   I could not answer that.

Page 65

1    Q   Approximately how many files have you
2  escalated in the last year due to a foreclosure?
3    A   When you say "in the last year"", do you
4  mean --
5    Q   The year of 2011?
6    A   None.  Oh, 2011.  I could not give an
7  approximate number.  I can say not five.
8    Q   More than five?  Less than five?
9    A   Maybe.
10   MR. RACHEL:  I'll have to subpoena the
11  ones that she did because we don't have any.
12 BY MR. RACHEL:
13   Q   Okay.  After Mr. Reaves' foreclosure, did
14 you have any conversations with him?
15   A   Yes.
16   Q   Approximately how many times?
17   A   I don't know the exact number, but I
18 believe it was more than once.
19   Q   More than once, okay.  Did you ever tell
20 Mr. Reaves that you were frustrated with some of the
21 things GMAC was doing?
22   A   I do not remember.
23   Q   Have you ever told anyone you were
24 frustrated with the things GMAC was doing?
25   MS. GLENN:  Objection as to relevance.

Page 66

1    THE WITNESS:  I may have.
2  BY MR. RACHEL:
3    Q   What would that frustration stem from?
4    MS. GLENN:  Objection as to relevance.
5    THE WITNESS:  The amount of work.  The
6  nature of the job.
7    Q   Have you ever been frustrated when GMAC
8  foreclosed and they should not have?
9    MS. GLENN:  Objection as to relevance.
10  Calls for a legal conclusion to the extent that
11  you're asking her to guess as to what -- it's a
12  legal conclusion to the extent you're asking
13  her to guess as to what constitutes a wrongful
14  foreclosure, when GMAC should or should not
15  have foreclosed.
16   MR. RACHEL:  In her opinion.  She said in
17  this case it should not have foreclosed.
18   MS. GLENN:  To that extent we would object
19  that it's an improper lay opinion.
20   But you can answer to the extent you
21  understand the question.
22   THE WITNESS:  Repeat the question for me.
23 BY MR. RACHEL:
24   Q   Has GMAC ever foreclosed on a property

Page 67

1  that, in your opinion or you believe or you
2  escalated or anything to that effect, should not
3  have been foreclosed on and, in that, it made you a
4  little frustrated?
5    MS. GLENN:  Same objection.
6    THE WITNESS:  Was that the question?
7    MR. RACHEL:  Yes.
8    MS. GLENN:  It's the new question.  The
9  same objection.
10   THE WITNESS:  I still don't understand.
11 BY MR. RACHEL:
12   Q   When GMAC foreclosed on a property --
13 forecloses on a property, in your opinion you either
14 escalate it because you believe -- like in Mr.
15 Reaves' case, you believe that it should not have
16 been foreclosed on or you escalated it because of
17 customer concern, customer complaint or some legal
18 papers.
19   Have you ever been frustrated because of
20 that?
21   MS. GLENN:  Same objection.
22   THE WITNESS:  I'm just frustrated with the
23  number of foreclosures, period, that we have.
24 BY MR. RACHEL:
25   Q   Were you frustrated in the events with Mr.

Page 68

1  Reaves' case?
2    MS. GLENN:  Objection as to relevance.
3    THE WITNESS:  Mr. Reaves' case was -- I
4  would consider it to have been a frustrating
5  case.
6  BY MR. RACHEL:
7    Q   Why do you believe it was frustrating?
8    MS. GLENN:  Objection as to relevance.
9  Improper lay opinion.
10   THE WITNESS:  It was foreclosed on.
11 BY MR. RACHEL:
12   Q   It was frustrating because it was
13 foreclosed on?
14   MS. GLENN:  Asked and answered.
15 BY MR. RACHEL:
16   Q   Do you mean it should not have been
17 foreclosed on?  Are you saying that it should not
18 have been foreclosed on?
19   A   No, I am not saying that.  I am saying
20 that his case was frustrating.
21   Q   Why was it frustrating to you?
22   MS. GLENN:  Asked and answered.
23   MR. RACHEL:  Actually, Counsel, she did
24  say because it was foreclosed on, but I don't
25  understand what she means.

Page 69

1    BY MR. RACHEL:
2        Q    Could you elaborate on that?
3        A    It's frustrating any time that I am not
4    able to get a customer a solution.  It's frustrating
5    to me.
6        Q    Was it frustrating because you told him it
7    was not going to be foreclosed on and then, of
8    course, they did it anyway?
9            MS. GLENN:  Objection.
10           David, it's argumentative.
11   BY MR. RACHEL:
12       Q    Was it frustrating to you or did it
13   frustrate you because you had explained that -- and
14   had him under the assumption that it was not going
15   to be foreclosed on and you believed it was not
16   going to be foreclosed on.
17           Am I correct?  Did you believe it was not
18   going to be foreclosed on?
19       A    I believed it was not going to be
20   foreclosed on.
21       Q    Was that frustrating?
22       A    Yes.
23       Q    See.  It's simple.
24           MS. GLENN:  Moving right along.
25   BY MR. RACHEL:

Page 70

1        Q    Let's see.  Did you speak to Mr. Reaves
2    while you was at the airport?
3        A    It's possible.
4        Q    In that conversation, did you advise him
5    to seek counsel?
6        A    I don't remember.
7        Q    In that conversation, did you advise him
8    that that foreclosure situation would be handled?
9    You were going to escalate it and make sure it was
10   handled or have it handled?
11       A    I don't remember.
12       Q    Did you escalate it after that
13   conversation?
14       A    I don't remember.
15       Q    Now, you testified earlier that the people
16   that you spoke to concerning Mr. Reaves' property is
17   Mark Folweiler, Catherine Coto and I believe, maybe,
18   Rashan Austin for a moment; is that correct?
19       A    Yes.
20       Q    Those were the only people you spoke to on
21   this file, correct?
22       A    To my knowledge, yes.
23       Q    Are you familiar with a Kitty Harris?
24       A    Yes.
25       Q    Who is Kitty Harris?

Page 71

1        A    Kitty Harris was a manager in the loss
2    mitigation department, I believe in Dallas.
3        Q    Now, you said "was".  What does that mean?
4    Is she no longer there?
5        A    I do not believe that she is with GMAC any
6    longer.
7        Q    And why would you come to that conclusion?
8        A    I was told that.  I was told she was no
9    longer with GMAC.
10       Q    And who told you that?
11       A    I don't remember.
12       Q    When did they tell you that?
13       A    When I got the notice for Mr. Reaves'
14   request for a deposition.
15       Q    Who supplied you with the notice?
16       A    Counsel.
17       Q    Would it have been counsel that told you
18   she wasn't there?
19           MS. GLENN:  Objection.
20           David, why are you asking what I would
21   have told her?
22           MR. RACHEL:  I'm trying to ascertain as to
23   how she would know Kitty Harris was not there.
24   I withdraw that question.
25   BY MR. RACHEL:

Page 72

1        Q    So you found out during the time that you
2    got your deposition?  You did not know, prior to
3    getting the notice of deposition, that Kitty Harris
4    was no longer with GMAC?
5        A    No.
6            MS. GLENN:  Okay.  Let's move on from
7    there.
8    BY MR. RACHEL:
9        Q    Did you speak to Kitty Harris about Mr.
10   Reaves' foreclosure?
11       A    I don't remember.
12       Q    Did you have a three-way conversation with
13   Mr. Reaves and Ms. Harris concerning his foreclosure
14   and rescinding?
15       A    Not that I remember.
16       Q    Okay.  How do you know Kitty -- did Kitty
17   Harris do anything on Mr. Reaves' case?
18       A    I assume she did, because there were some
19   notes with her name on it.
20       Q    What did the notes say?
21       A    I'm not able to say what they said.  I
22   don't know.
23       Q    Did they say that it was denied or -- was
24   it a lot of notes?  One note?  Two notes?
25       A    I don't know how many.

Page 73

1    Q    And when were the notes?  Were the notes
2  prior to the foreclosure or after the foreclosure?
3    A    I don't know.
4    Q    She is in the loss mitigation department.
5  Was she the person assigned to Mr. Reaves'
6  modification?
7    A    I don't know.
8    Q    You spoke to Mr. Reaves several times
9  concerning his modification, correct?
10    A    Yes.
11    Q    And during those conversations, you don't
12  know who the underwriter was working on the loan?
13    A    No.  That's not something I would know.
14    Q    So how would you be able to tell him the
15  status?
16    A    I would read the notes in the system.
17    Q    Wouldn't the notes tell you who it was?
18  You said Kitty Harris had her name on there.
19    A    I said there was a note with her name on
20  there.  But no, all notes do not have a name written
21  on them.
22    Q    Okay.  You are the contact person for the
23  person getting the modification at GMAC, correct?
24    A    Yes.
25    Q    If there is an issue where, say, the

Page 74

1  customer calls you and says I was called and told
2  that I needed to forward in another 45016, then who
3  does he forward that to?
4    A    A customer could forward that to me.
5    Q    Who would you forward it to?
6    A    I would forward it over to the loss
7  mitigation department.
8    Q    Okay.  So you -- in your description, you
9  are not able to at GMAC to ascertain or talk to the
10  underwriter working on the modification?
11    A    I can talk to anyone at GMAC.  Normally I
12  do not.
13    Q    So in this case, you did not talk to the
14  underwriter at all concerning Mr. Reaves'
15  modification?
16    A    I don't know who was underwriting Mr.
17  Reaves' modification.
18    Q    Did you talk to anyone in the loss
19  mitigation department, then, concerning Mr. Reaves'
20  modification?
21    A    I don't remember.
22    MR. RACHEL:  Can we take a five-minute
23  break, talk to my client, please?
24    MS. GLENN:  If I can come.
25    MR. RACHEL:  You're welcome to come.

Page 75

1    (Whereupon, a brief recess was taken.)
2  BY MR. RACHEL:
3    Q    Now, Ms. Bowers, just a couple of
4  questions about the reinstatement.  Just to make
5  sure I'm clear on that.
6    When he spoke to you about the
7  reinstatement, he was just adamant about knowing
8  what those fees were, not that he was not going to
9  pay them.
10    He wanted to know what they were; am I
11  correct?
12    A    I got that feeling.
13    Q    Okay.  So it wasn't that he -- you didn't
14  get the feeling he was not going to pay it.  He's
15  just the guy that wants to know what he's paying?
16    A    I did not have a feeling either way.  He
17  did appear more concerned with knowing exactly what
18  they were.
19    Q    Now, did, at any time, he tell you he had
20  the money in his bank but he just wanted to know
21  what they were?
22    A    I do not remember that.
23    Q    All right.  Now the reinstatement fees, if
24  you do a modification at GMAC, is it true that the
25  reinstatement fees would then be put back into the

Page 76

1  loan and you pay them over your monthly payment?
2    MS. GLENN:  Objection to the extent you're
3  asking her to speak to general policies and
4  procedures at GMAC.  She's not a 30(b)(6)
5  witness.
6    MR. RACHEL:  But she would know the
7  policies as she handles modifications or she
8  should.
9    MS. GLENN:  I don't think she's testified
10  that he handles modifications or that she
11  reviews borrowers for modifications.
12    But, again, to the extent that she knows
13  she can answer.  But I'll put that objection on
14  the record that she very well may not know.
15    THE WITNESS:  Can you ask that question
16  again?
17  BY MR. RACHEL:
18    Q    Yes.  If I'm a person with GMAC and I'm in
19  foreclosure and I got a reinstatement of $500 and I
20  do a modification.  Then they take that
21  reinstatement fee, the 500, and put it back in the
22  loan and I can just pay it over time?
23    A    Yes, that's essentially how it could work.
24    Q    Did you explain that process to
25  Mr. Reaves?

Page 77

1      A   I may have.
2      Q   Did you believe if he was adamant, seems
3  like he would have paid it.  But if, for some
4  reason, he was not going to pay it, would that have
5  been a better route, for him to do a modification?
6      MS. GLENN:  Objection as to improper lay
7  testimony.
8      But to the extent that you can answer.
9      THE WITNESS:  I could not say what would
10     have been better for Mr. Reaves, the
11     modification or the reinstatement.
12  BY MR. RACHEL:
13     Q   Okay.  What department at GMAC helps
14  clients or helps to advise clients on their options
15  as to short sale, deed in lieu, modification, or
16  what have you, half of whatever it may be?
17     A   The loss mitigation department could
18  advise them.  Customer care department could advise
19  them.  I could give them some advice.  A number of
20  departments could give them some advice.
21     Q   Okay.  So then you would be able to advise
22  as to the things he would be able to do to save his
23  home?
24     A   I would be able to advise him of some
25  possible options.

Page 78

1      Q   And what options would you be able to
2  discuss with him?
3      A   The modification, the reinstatement, a
4  deed in lieu, a short sale, and any other program
5  that I would have been aware of.
6      Q   Now, what programs did you discuss with
7  Mr. Reaves, other than the modification?
8      A   I don't remember.
9      Q   Okay.  Now you testified earlier that the
10  reinstatement technically is not a part of your job
11  description or in your manual -- either in your
12  manual for your job description or in the manual for
13  the escalation process.
14      So technically the reinstatement would not
15  be one.  So really the only option you spoke to him
16  is modification.
17     MS. GLENN:  Lacks a question.
18  BY MR. RACHEL:
19     Q   Is the only option you spoke to him about
20  modification?
21     A   No, I think we discussed a reinstatement.
22     Q   Okay.  So the options that you spoke to
23  him about was -- okay.  He contacted you concerning
24  the reinstatement, correct?
25     A   I don't remember what he contacted me, if

Page 79

1  it was about the reinstatement or he wanted
2  information about a modification.  I don't remember.
3      Q   Now, you testified earlier that you
4  mentioned modification to him.  So if you mentioned
5  modification to him, I mean, is it possible -- if
6  you mentioned it to him and he didn't know about it,
7  how is it possible that he would call you about a
8  modification?
9      A   Me mentioning a modification is a standard
10  procedure.  I would mention a modification to any
11  customer that contacted me.
12     Q   Correct.  That's a part of your job
13  description?
14     A   Yes.
15     Q   So if he called you about a reinstatement
16  and you mentioned modification, then the only option
17  you technically gave him was modification, because
18  he was already aware of the reinstatement; am I
19  correct?
20     A   No.
21     Q   What other options did you give him?
22     A   I do not remember what other options we
23  discussed, but there would have been more than just
24  one option that could have possibly been available.
25     Q   Did you discuss short sale?

Page 80

1      A   I don't remember.
2      Q   If you discussed a short sale with a
3  client, what is the procedure?  What do you tell
4  them?
5      A   Typically what I would say is I would
6  explain the paperwork that would need to be
7  completed.
8      Q   And what's that paperwork?
9      A   It's called a short sale financial
10  package.  I would send it to them and explain the
11  documents that they need.
12     Q   Explain about three documents in there?
13     A   Proof of income, a listing agreement and
14  the actual financial packet, the actual short sale
15  financial packet.
16     Q   And what else would they need?
17     A   I cannot say offhand.  I would have to
18  look at it.
19     Q   What is HAFA?
20     A   HAFA is the home affordable refinance
21  program, home affordable short sale program.  It's
22  the home affordable short sale program, HAFA.
23     Q   If you were to explain that to a customer,
24  how do you explain?  If I call you and say what is
25  HAFA, what are the steps that you need to get HAFA?

Page 81

1    A   If a customer called and asked me that, I
2  would look it up and I would read off what the
3  requirements are, and I would also, more than
4  likely, refer them to another Website to get some
5  more information for themselves.
6    Q   Okay.  What about a deed in lieu.  What
7  would be the steps for a deed in lieu?
8    A   For a deed in lieu -- and this is off the
9  top of my head.  I would also read what would be
10 required -- a written request in a financial packet
11 with proof of income.
12   Q   Okay.  So generally, if a person calls in,
13 then, if you don't know the answer you have it on
14 your system, the whole guidelines of what is
15 required?
16   A   I am able to look that up -- information
17 up.
18   Q   So you stated that you did discuss a short
19 sale with Mr. Reaves?
20     MS. GLENN:  She stated she did not recall.
21     MR. RACHEL:  She did not recall, okay.
22 BY MR. RACHEL:
23   Q   Do you recall discussing a deed in lieu of
24 foreclosure?
25   A   I do not remember.

Page 82

1    Q   Do you recall discussing the HAFA program?
2    A   I do not remember.
3    Q   How do you know that Mr. Reaves' property
4  was foreclosed upon?
5      MS. GLENN:  Objection.  Restate the
6  question.
7  BY MR. RACHEL:
8    Q   How do you know Mr. Reaves' property was
9  foreclosed upon?
10     MS. GLENN:  Objection to the extent it
11 calls for her to speculate or to proffer on
12 legal conclusions.
13     MR. RACHEL:  She stated that he's properly
14 foreclosed on.  She talked to him after the
15 foreclosure.
16     How did she know it was foreclosed upon?
17     MS. GLENN:  Do you mean proper foreclosure
18 under Georgia law?
19     MR. RACHEL:  No.  I'm asking her to tell
20 me how she found out Mr. Reaves' property was
21 foreclosed upon.  I don't want to know -- just
22 how did she find out, just like how she found
23 out Ms. Kitty Harris was no longer there.
24     I'm not asking for any legal things.  Just
25 can she tell me how she found out.

Page 83

1      MS. GLENN:  Okay.  Just objecting to the
2  phrase improperly foreclosed on.
3  BY MR. RACHEL:
4    Q   I'm not going to say that, but go ahead.
5    A   I read the notes in the system and it
6  stated that the foreclosure had proceeded.
7    Q   When did you read the notes?
8    A   I do not recall the exact date.
9    Q   Why would you need the notes?  What would
10 urge you to read the notes if you believed, as you
11 stated earlier, and you told Mr. Reaves the property
12 was not going to be foreclosed upon, why would you
13 go back and read notes?
14   A   Any file that I submit over to the loss
15 mitigation team for review, I follow that file.
16   Q   Okay.  His foreclosure was set for
17 September the 9th, but it was supposedly postponed
18 to October the 6th; am I correct?
19   A   Yes.
20   Q   Okay.  So if it's postponed and it says in
21 the system postponed to October 6th, correct?
22   A   Are you asking me?
23   Q   Yes, I'm asking you.
24   A   I'm sorry.  Repeat the question.
25   Q   The October the 6th date was -- it had

Page 84

1  said that in the system that it was postponed to
2  October the 6th, correct?
3    A   Yes.
4    Q   So if it has in the system postponed to
5  October 6th, what reason would you have on
6  September the 9th, 10th, 11th, 12th, 13th,
7  14th to review and see if it had been foreclosed?
8  Did you not trust your system?
9    A   No.  It is just what I would normally do.
10   Q   How many files do you handle on a monthly
11 basis?
12   A   I could not say for sure.
13   Q   Is it 100 or more?
14   A   Possibly, yes.
15   Q   So you handle 100 or more files on a
16 monthly basis and you testified that you travel,
17 also, and you testified that you do have some online
18 training or something.
19     So if you have -- how many customers do
20 you have calling you on a daily basis,
21 approximately?
22   A   Approximately, on a daily basis, I
23 probably get between --
24   Q   Say 50, 30, 100?
25   A   Maybe 20 to 30 calls.

Page 85

1    Q    So we'll say 25 calls.  Approximately how
2    long do you have to talk to a client?  What's the
3    approximate length of time that you speak to a
4    client on those 25 calls, average time?
5    A    There is no average time.  It depends on
6    the customer.
7    Q    What is the shortest average time that you
8    would talk to a customer?
9    A    I could not answer that.
10    Q    When customers contact you, they are
11    contacting you concerning the modification?
12        MS. GLENN:  Is that a question?
13        MR. RACHEL:  Yes.
14    BY MR. RACHEL:
15    Q    Are they contacting you concerning a
16    modification?
17    A    Sometimes.
18    Q    What other reasons are they contacting
19    you?
20    A    About reinstatements, about short sales,
21    about purchasing properties, about grass not being
22    cut.
23    Q    Okay.  If they're calling you about
24    purchasing properties, grass -- we'll take out grass
25    not being cut.

Page 86

1        Purchasing properties, short sales,
2    modifications, or reinstatements, is it possible for
3    those conversations to be five minutes?
4    A    Sometimes.
5    Q    So if I'm calling you concerning a
6    modification, you can explain modification to me in
7    five minutes for me to understand as a customer?
8    A    No, that's not what I'm saying.
9    Q    Trying to understand what you're saying.
10    A    Okay, I'm not understanding the question.
11    Are you asking me --
12    Q    I'm trying to obtain or ascertain the
13    average length of time you have on those 25 phone
14    calls.
15        The only way to obtain that is to find out
16    what you get calls for.  You said you get calls for
17    cutting the grass, which we'll say that's a three
18    minute conversation.  I'll give you three minutes.
19        But the other calls, understanding a
20    modification -- I'm calling you about a
21    modification.  I need to understand what that means
22    and what I need to do.
23        You said they call about short sales.  You
24    said they call about deed in lieu.  And you said
25    they call about -- the other thing was the short

Page 87

1    sale.
2        So if they're calling you about those four
3    things, and you testified earlier that the short
4    sales, the HAFAs, which is a part of short sales,
5    the federal plan, the deed in lieu and the
6    reinstatement, sometimes you need to look those up
7    and explain to them what the system says and
8    sometimes you explain it to them and then send them
9    to a Website for further information.
10        So if you do that and those are the calls
11    you're getting in, other than the grass cutting
12    call, is it possible for you to talk to them and
13    explain that to them in ten minutes?
14    A    It could be possible.
15    Q    So you've been able to explain to someone
16    in ten minutes the whole process of HAFA?
17    A    Maybe -- I'm not able to answer that.  I'm
18    not able to answer that.
19    Q    So, then, if you're taking these 25 phone
20    calls and they're taking whatever amount of time and
21    you have 100 files at least a month, how do you have
22    time to go back and check each individual file to
23    find out if it was foreclosed upon?
24        MS. GLENN:  David, it misstates the
25    evidence.  She didn't say that every active

Page 88

1    file that she had results in borrowers calling
2    her and she also stated that she's not able to
3    give you an average amount of time.
4        That assumes that she's just reading off
5    and there are no questions from the borrower.
6    That assumes either she's dealing with the
7    average Ph.D. candidate or the high school
8    dropout.
9        Like the question is too vague.  You can
10    narrow it down or like -- she can't answer that
11    as asked.
12    BY MR. RACHEL:
13    Q    I can ask you this way:  You have a lot of
14    phone calls every day, correct?
15    A    Normally, yes.
16    Q    And you have, on a monthly basis, 100 at
17    least -- you said, in your words, 100 files per
18    month; correct?
19    A    I can have up to 100 active files.
20    Q    Okay.  Now are you restating?  Earlier you
21    said at least 100.  Now you're saying up to 100.
22    Which one is it?  Can we do an average of 100?
23    A    That's fine.
24    Q    Average of 100, which means that there's
25    30 days -- 31 days in September, October, November

Page 89

1 and -- April, June and November, roughly, anyways,
2 and the rest of them have 31 days.
3     But you only work Monday through Friday;
4 am I correct?
5     A   No, you're not.
6     Q   Okay.  What days do you work?
7     A   I can work seven days a week at times.
8     Q   What is your -- generally, for the year
9 2011, approximately how many hours did you work per
10 week?
11     A   I could not say.  It varies.
12     Q   Varies.  So would you say typically -- a
13 week is 40 hours, so say an average of maybe 50?
14     A   I could not say.
15     Q   Well, if that being the case, even if it's
16 50 or 60, you believe that you would have time to
17 answer those numerous phone calls, as you said, and
18 explain whatever due processes are and go back and
19 check each individual file, as you stated earlier?
20     MS. GLENN:  Objection to the extent it
21 calls for speculation.
22     But you can try to answer.
23 BY MR. RACHEL:
24     Q   I'm just stating what you told me earlier.
25     A   No, that's not what I said.  I am able to

Page 90

1 go back and check files that I think need to be
2 checked or files that are pending foreclosure sales
3 very soon.
4     Q   Okay.  But now your testimony to me, when
5 I asked you why did you review Mr. Reaves' file, you
6 stated "I check all my files".
7     That was -- and we can go back and have
8 her read it, if you like, but you stated "I check
9 all my files".
10     So if you check all your files, I'm merely
11 trying to ascertain as to how you would possibly
12 have enough time to check all those files and answer
13 all those phone calls and do escalations.
14     Do you believe that is theoretically
15 possible?
16     MS. GLENN:  Objection, David, to the
17 extent you're calling on her to guess or
18 speculate.
19 BY MR. RACHEL:
20     Q   In your job description -- is that
21 possible in your job description?
22     MS. GLENN:  Objection.  Anything is
23 possible.  She's a very good multitasker,
24 David.
25 BY MR. RACHEL:

Page 91

1     Q   Okay.  Let me ask it this way:  Do you go
2 back and check all of your files, as you stated
3 earlier, or is it possible that you just check the
4 ones that are foreclosure?
5     A   I do check all of my files.  Do I check
6 every file every day, no.  Do I prioritize my files
7 and they get checked according to how I prioritize
8 them, yes.
9     Q   So you would be able to supply us -- well,
10 let me ask you this:  How do you prioritize your
11 files?  What is your system?
12     A   Files that are pending foreclosure sale
13 dates within 30 days are at the top of the list.
14     Q   Okay.  Okay.  Then what?
15     A   Files that do not have pending foreclosure
16 sales come after that.
17     Q   Okay.  Then what?
18     A   I try to return all phone calls within two
19 business days, if possible.
20     Q   Okay.
21     A   Files that have been escalated, I do
22 follow-up every day or every other day for a status.
23     Q   Okay.  That's it?
24     A   Yes.
25     Q   Okay.  I guess that would help my

Page 92

1 question.  The ones that is escalated, that is at
2 the bottom of the list.
3     So is it just that once it's escalated you
4 believe they're going to take care of whatever needs
5 to be taken care of?
6     A   When I stated to you about the escalated
7 files, I did not give that in terms of one, two,
8 three, four priority.
9     I was just telling you that that is
10 one of the things that I prioritize.
11     Q   Okay.  But I'm looking for you to give me
12 one, two, three, four.  Now you've given me sale
13 within 30 days, no sale date, returning phone calls
14 within two days and the escalation of files.
15     So how do you prioritize that?  Number one
16 would be?
17     A   Files that have been escalated --
18     Q   Escalated, okay.
19     A   -- would be checked regularly for status.
20     Q   That would be first.  All right.
21     A   Files that have pending foreclosure sale
22 dates would be number two.
23     Q   Dates within 30 days, okay.  All right.
24 And you have phone calls and no sale date.
25     A   Phone calls are a priority, so they do

Page 93

```
 1   need to be returned.  I try to return them within
 2   two business days.
 3           And files with no foreclosure sale
 4   date, I handle those accordingly.
 5       Q   Now, your voicemail, does your voicemail
 6   say you're going to try to return phone calls within
 7   48 hours or is it just a general voicemail?
 8       A   I do have a voicemail.  I do have a
 9   voicemail message that I do change.  I am not sure
10   if at this time it says I will return calls within
11   48 hours.
12       Q   Does it typically say that?
13       A   It has said that.
14       Q   Okay.  Now you said that the ones that are
15   escalated are first, makes sense, and then the ones
16   with the pending 30-day sale date within 30 days.
17   Now, if we look at Mr. Reaves' file, you would have
18   had to check it prior to the 30 days, because he
19   wasn't set until October, but the original one was
20   September.
21           So you just wanted to make sure?
22       A   I don't understand your question.
23       Q   His file would not have fallen within that
24   30-day window.  So technically it would have been
25   down all the way at the bottom or next to the
```

Page 94

```
 1   bottom.
 2           It had a sale date but it was not within
 3   the 30 days.  So it technically would have been, I
 4   guess in between two and three -- between the phone
 5   calls.
 6           But yet you checked it.  So did you just
 7   have a gut feeling or --
 8       A   Mr. Reaves' file was an escalated file.
 9       Q   When was it escalated?
10       A   I escalate his file when he originally
11   sent it to me.
12       Q   So his file was escalated prior to the
13   foreclosure?
14       A   Yes.
15       Q   Okay.  I'm a little confused, because
16   that's not what you told me earlier.
17           MS. GLENN:  That's not what you asked her
18   earlier, David.
19   BY MR. RACHEL:
20       Q   When did you escalate his file?
21       A   I escalated Mr. Reaves' file when he sent
22   me his documentation.
23       Q   And who did you escalate it to?
24       A   The hope escalations.
25       Q   Hope escalations?
```

Page 95

```
 1       A   Inbox.
 2       Q   And then you spoke to Catherine Coto and
 3   Mark Folweiler.  Was that before or after the
 4   foreclosure?
 5       A   After.
 6       Q   So files that are escalated to hope
 7   escalation -- and I'm just trying to understand --
 8   are escalated because you escalate -- escalated
 9   Mr. Reaves' file because you received other
10   documents?
11       A   No.
12       Q   Why did you escalate?
13       A   Mr. Reaves' file was escalated because,
14   when I got his documents, he was right at the
15   required timeline, per my understanding.  I wanted
16   to be sure that his file was reviewed.
17       Q   Okay.  What did you escalate after the
18   foreclosure?
19       A   I wanted to know if we were going to
20   rescind the sale.
21       Q   Okay.  What kind of escalation is that?
22   Does that go through Rashan Austin?
23       A   Yes.
24       Q   And is that -- what kind of escalation is
25   that?  What is that called?
```

Page 96

```
 1       A   We just refer to it as an escalation, an
 2   escalated file.
 3       Q   So the file was already escalated through
 4   Rashan Austin prior to the foreclosure, but then the
 5   file was re-escalated to Rashan Austin again; am I
 6   correct?
 7       A   Yes.
 8       Q   Is that typically how the escalation
 9   process works?  You can escalate a file two and
10   three or however many times?
11       A   If it's necessary.
12       Q   Do you believe it was necessary in this
13   case?
14       A   I believe I needed to have an
15   understanding about the file.
16       Q   Okay.  But do you believe it was necessary
17   to escalate it?
18           MS. GLENN:  Asked and answered.
19           MR. RACHEL:  She didn't answer that.  She
20   said -- I believe she wanted to obtain.  That's
21   a yes or no.  I want a yes or no.
22   BY MR. RACHEL:
23       Q   Do you believe that it was necessary to
24   escalate the file?
25       A   Yes.
```

Page 97

1    Q   Now, I think I didn't get my answer
2  earlier because we went off into wrongful
3  foreclosures or I think you said the property was
4  rightfully foreclosed.
5         You stated that you knew the property was
6  foreclosed upon from the notes?
7    A   Yes.
8    Q   Did Mr. Reaves call you concerning the
9  foreclosure?
10   A   Yes.
11   Q   Did he indicate to you that his insurance
12 company contacted him and told him his insurance was
13 dropped?
14   A   I don't remember.
15   Q   Did you ever talk to the law firm
16 concerning his foreclosure?
17   A   I do not believe I did.  I don't remember.
18   Q   Now, I just want to clarify before we
19 start pulling records.  Did you say you don't know
20 if you had a conversation with Kitty Harris or you
21 didn't have a conversation with Kitty Harris?
22   A   I don't remember.
23   Q   You don't remember.
24   A   I'm sorry.
25   Q   So you don't remember whether you had a

Page 98

1  conversation with Kitty Harris.  Did you, at any
2  time, tell Mr. Reaves that he may have a problem
3  with his foreclosure?
4    A   I don't remember using those words.
5    Q   Did you ever have any apprehension of
6  speaking frank with Mr. Reaves?
7         MS. GLENN:  Objection as to relevance.
8  BY MR. RACHEL:
9    Q   You can answer the question.
10   A   No, no.
11   Q   Did you ever believe your conversations
12 with Mr. Reaves would cause you to lose your job?
13   A   No.
14   Q   Did Mr. Reaves -- when he contacted you
15 concerning the foreclosure after the foreclosure,
16 what was that conversation concerning or what was
17 the outcome of that conversation?
18   A   I told him that it had gone to foreclosure
19 sale.  I told him about -- I think the timeline,
20 that it was the timeline had not been met.
21         Those -- that's what I remember.  I
22 do not remember the entire conversation.
23   Q   Now, is that what the system said, the
24 timeline hasn't been met?
25   A   Yes.

Page 99

1    Q   But you stated earlier that the timeline
2  had been met?
3    A   I thought the timeline had been met.
4    Q   I was just clarifying.
5         MS. GLENN:  How much longer have you got?
6         MR. RACHEL:  I may be done.  One moment.
7         MS. GLENN:  Do you want to take a break
8  and look over your notes?
9         MR. RACHEL:  Yes, we can do that.
10        (Whereupon, a brief recess was taken.)
11 BY MR. RACHEL:
12   Q   I just want to clarify.  You actually
13 found out about the foreclosure through the system
14 and not by Mr. Reaves contacting you?
15   A   I am not sure if he called first or if I
16 had already saw it.  I could not say.
17   Q   Okay.  Because you remember -- did he ever
18 call you at the airport?
19   A   I just don't really remember talking to
20 him, but more than likely I did speak to him.
21   Q   Okay.  Because it was his understanding
22 that that's when he told you, that you was at the
23 airport.  That's why I asked, okay.
24         So -- and if you was at the airport, would
25 you have access to be able to check the system?

Page 100

1    A   I would have looked something like that up
2  immediately.
3    Q   Okay.  What I'm saying, though, if you're
4  at the airport, is it probable that you wasn't
5  looking at the system prior to him calling if you're
6  at the airport?
7    A   Maybe.
8    Q   So it's possible that he did actually call
9  you and tell you and then you immediately jumped on
10 it?
11   A   It is possible.
12   Q   Okay.  Now you did say you advised him
13 that the foreclosure was postponed until October the
14 6th?
15   A   Yes, I did.
16   Q   Now -- so do you believe that him
17 believing that it didn't foreclose, he didn't try to
18 do any other options, whether deed in lieu or
19 foreclosure or a short sale?
20         Have you had a customer, once you've told
21 them that their property has been postponed, to
22 continually call you or call you and ask you about
23 some other option if they're working on a
24 modification?
25   A   Sometimes.

Page 101

1    Q    And what would they call about?
2    A    Sometimes customers want to talk about
3  some other options, since they have a little more
4  time.
5    Q    Did Mr. Reaves call you to discuss any
6  other options?
7    A    I don't remember.
8    Q    Do you believe, since he was adamant about
9  the reinstatement, that he may have just reinstated
10  it to keep it from being foreclosed if he had known
11  it was foreclosed on?
12        MS. GLENN:  Objection. Speculation.
13        THE WITNESS:  I cannot speculate.
14  BY MR. RACHEL:
15    Q    In telling Mr. Reaves that on October the
16  6th, it would be his new foreclosure date, are you
17  aware that you could have caused him not to take any
18  other actions to stop that foreclosure, whether it
19  be a bankruptcy or whatever else?
20        MS. GLENN:  Objection as to speculation.
21        THE WITNESS:  Repeat the question, please.
22  BY MR. RACHEL:
23    Q    Are you aware that, being a representative
24  of GMAC, when you advised him that the foreclosure
25  was postponed, he was not afforded any other

Page 102

1  ramifications or legal rights, such as to file a
2  bankruptcy or something else to stop the
3  foreclosure?
4        MS. GLENN:  Objection as to speculation.
5        Improper lay testimony.
6        THE WITNESS:  Yes.
7  BY MR. RACHEL:
8    Q    But you really believed the foreclosure
9  was stopped?
10        MS. GLENN:  Asked and answered.
11        MR. RACHEL:  Well, I want to make sure
12    that we know she wasn't just trying to tell him
13    something.
14  BY MR. RACHEL:
15    Q    Did you believe that, in your dealings
16  with Mr. Reaves, that he would try to get to the
17  bottom of it, since he was so adamant about that
18  money -- whatever the thing was called, the
19  miscellaneous fee?
20        MS. GLENN:  Objection. Vague.
21        David, what do you mean by "get to the
22    bottom of it"?
23  BY MR. RACHEL:
24    Q    After the foreclosure, did you believe he
25  was going to keep calling until he could find out

Page 103

1  what was going on?
2        Was he that type of person that would call
3  you over and over and over to make sure everything
4  was right?
5    A    Can you clarify that a little bit more?
6    Q    Was he a detail person that was trying to
7  make sure everything was right and he was taken care
8  of?
9        MS. GLENN:  Objection to the extent you're
10    asking her to speculate as to Mr. Reaves'
11    propensities.
12  BY MR. RACHEL:
13    Q    In your conversation with Mr. Reaves, was
14  he detailed enough to tell you what your last
15  conversations were and what was going on?
16    A    Mr. Reaves seemed detailed.
17        MS. GLENN:  David, her answers are simple.
18    Your questions are not.  You can just ask her
19    did he appear detailed.
20  BY MR. RACHEL:
21    Q    Did he appear as the type of person that
22  would go through all this if this happened?
23    A    I can't speculate.
24    Q    So in your opinion -- let me make sure I
25  clarify this, as a -- let me get your title.

Page 104

1        MS. GLENN:  You can tell him your title.
2        THE WITNESS:  I am a Community Relations
3    Specialist.
4  BY MR. RACHEL:
5    Q    There you go, Community Relations
6  Specialist.  Did Mr. Reaves ever indicate to you
7  that he did have the funds available for the
8  reinstatement?
9    A    I do not remember Mr. Reaves telling me he
10  had the funds for reinstatement.
11    Q    So in your opinion, as a Community
12  Relations Specialist, did Mr. Reaves do everything
13  you told him to do in forwarding documents and
14  adhere to your guidelines?
15    A    Mr. Reaves did forward -- he did return
16  the documents back to me.
17    Q    Okay.  So he did everything, basically,
18  that he was supposed to do?
19    A    To my knowledge, yes.
20        MR. RACHEL:  I'm done.
21        MS. GLENN:  Just a few redirect questions.
22        EXAMINATION
23  BY MS. GLENN:
24    Q    Ms. Bowers, are there any circumstances
25  where you're required to escalate a file?

1    A    No, there are no circumstances where I'm
2  required to escalate a file.
3    Q    So you were always permitted to use your
4  own discretion as to whether a file should or should
5  not be escalated?
6    A    Yes.  For the most part, yes.
7    Q    You testified that there are multiple
8  reasons that a file could be escalated?
9    A    Yes, there are multiple reasons a file
10  could be escalated.
11    Q    For instance, if a borrower required some
12  form of written documentation?
13    A    Yes, I could escalate a file if a borrower
14  was requesting written documentation.
15    Q    So because a file is escalated, that
16  doesn't necessarily mean that you perceived
17  something wrong with the file?
18    A    No, it does not.
19    Q    Okay.  Nothing further.
20          (Deposition Concluded)
21

_____

22          KENNETH REAVES
23  Sworn to and subscribed before me,
   this the _____ day of _____, 2002.
24

_____

25          Notary Public

1          My commission expires:
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          C E R T I F I C A T E
2          - - - - - - - - - - -
3  STATE OF GEORGIA:
4  FULTON COUNTY:
5          I hereby certify that the foregoing
6  transcript was  taken down as stated in the caption,
7  and the questions and answers thereto were reduced
8  to typewriting under my direction; that the
9  foregoing pages 1 through 105 represent a true and
10  correct transcript of the evidence given upon said
11  hearing, and I further certify that I am not a
12  relative or employee or attorney or counsel of any
13  of the parties, nor am I a relative or employee of
14  such attorney or counsel, nor am I financially
15  interested in the action.
16          This the 4th day of May, 2012.
17

_____

18          KELLY A. EMERY, CCR-B-941
19
20
21
22
23
24
25